**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUSIANA**
_____

|  |  |
|---|---|
| | ) |
| IN RE: OIL SPILL BY THE OIL RIG DEEPWATER | ) |
| HORIZON IN THE GULF OF MEXICO, ON | ) MDL No. 2179 |
| APRIL 20, 2010 | ) |
| | ) Section: J |
| IN RE THE COMPLAINT AND PETITION OF | ) |
| TRITON ASSET LEASING GmbH, ET AL., IN A | ) Judge: Barbier |
| CAUSE OF EXONERATION FROM OR | ) |
| LIMITATION OF LIABILITY | ) Magistrate: Wilkinson |
| | ) |
| This Document Relates To: | ) |
| 2:10-CV-02771; 10-8888; 10-9999; 13-1971; 14-1525 | ) |
| _____ | ) |

## DECLARATION OF C. CATHY NORMAN

My name is Cathy Norman Penland. I certify that I am fully competent to make this

declaration, and under penalty of perjury, that the following statements are true and correct.

1. I reside at 4823 Perrier Street, New Orleans, Louisiana, 70115. I have a B.A. degree from

   Tulane University and received a law degree from Tulane University in 1982. I am a member

   of the Louisiana Bar. My license number is #01507.

2. My work history and background are primarily as a petroleum landman and attorney,

   working with contract negotiations and project administration.

3. From 1992 until my resignation in October of 2013, I worked as the Secretary-

   Treasurer/Land Manager ("Manager") of the Edward Wisner Donation ("Donation" or

   "Wisner").

4. In May of 2010, I provided newly elected Mayor Mitchell Landrieu with a document entitled

   "Transition Information for Mayor Mitchell J. Landrieu, as Trustee for the Edward Wisner

   Donation." This document contained information concerning the Donation, including a

1

listing of the percentage interest held by each beneficiary (p.4), as well as a description of the roles and responsibilities of the Secretary Treasurer/ Land Manager, the EWDAC, and the Trustee. The document also contained attachments, including the underlying documents that governed the Wisner, such as the original Act of Donation, the Compromise, the New Orleans City Council Ordinances, and the 2003 By-Laws. I attach a copy of the "Transition Information" document as Exhibit 1. The information contained therein is true and correct and the documents compiled therein are true and authentic copies, to the best of my knowledge. The information referenced in §§5-11 of this Declaration is found in Exhibit 1.

5. In 1914, businessman and philanthropist Edward Wisner created a 100 year complex trust for the benefit of the City of New Orleans, Charity Hospital, Tulane University, and the Salvation Army. Mr. Wisner donated large tracts of land and waterbottoms in Jefferson, St. John, and Lafourche Parishes to the trust.

6. On September 17, 1929, the above listed beneficiaries and the three heirs of Edward Wisner entered into a Compromise Agreement that settled a lawsuit challenging the Donation. The 1929 Compromise gave the Wisner Family and their assigns a 40% interest in the Donation and made them co-equal beneficiaries.

7. Pursuant to the Act of Donation and 1929 Compromise Agreement, the New Orleans City Council created the Edward Wisner Donation Advisory Committee ("EWDAC") on March 12, 1931, by passage of Ordinance 12,883. Under the terms of the Ordinance, the EWDAC is composed of five representatives, with one representative appointed by each beneficiary (or group of beneficiaries in the case of the Wisner Family) named above.

8. The 1931 Ordinance empowered the EWDAC to meet, to appoint a Secretary, and to adopt rules and regulations. Subject to City Council oversight, the EWDAC was given the "powers,

duties, and functions of… the supervision, direction and administration of all of the lands."
… and directed "in the first instance" to handle matters relating to the trust by majority vote.

9.  On April 29, 2003, the EWDAC and Trustee adopted the By-Laws currently in force, which were finalized after years of work by the Committee, Mayors Mark Morial and Ray Nagin, and long-time outside counsel, Simon, Peragine, Smith and Redfearn (Simon, Peragine"). These Bylaws, based on the original By-Laws written in Moon Landrieu's administration, provided broad authority to the EWDAC as the primary administrative and operational body of the Donation, whose functions include "the preparation and negotiation of… contracts" and the "contracting of attorneys… to assist in the exploitation, development and preservation of the Donation Properties." By-Laws, Art.1, §5. Among other powers, the By-Laws provided me, in my capacity as Manager, the responsibility of "the negotiation and proper execution of any and all contracts to protect and/or use the Donation Properties…" By-Laws, Adden., §2.

10. For two decades, through four mayoral administrations, I and my small staff managed the Donation and worked at the direction and under the supervision of the Edward Wisner Donation Advisory Committee ("EWDAC"), the governing body of the Donation. And when called upon, the Mayor of New Orleans - as the Donation's trustee and titular head - performed whatever ministerial duties he was asked to do by majority vote of the EWDAC. The EWDAC included the Mayor's appointed representative who acted as the EWDAC's Chairperson.

11. The majority of the revenues we generated funded various philanthropic causes in and around the City of New Orleans. For example, some of the recent recipients have been New Orleans' Mayoral Fellow Program, the NO Police & Justice Foundation's Cops for Kids

program, and the Gun Buy Back Committee.Over my 20 year tenure as Secretary-Treasurer, I was responsible for daily operation of the Donation, oversight of the property, negotiation and execution of agreements pertaining to the property, the collection of all revenue produced by the property, the payment of all invoices and bills related to the management of the property, and the distribution of funds on a monthly basis to the beneficiaries of the trust.

12. I reported to the EWDAC nearly every month regarding the work and activity that involved the Property and performed such duties "as the Committee may from time to time direct."

13. As Secretary-Treasurer, I assisted, with the Committee's consent, in the hiring of outside contractors needed for specific projects and ongoing tasks for Wisner. Over a 20 year period, I engaged lawyers, accountants, auditors, oil and gas auditors, geologists, scientists, engineering firms, and onsite managers on behalf of the Donation and most often at the direction of the EWDAC.

14. Over the course of my 20-year career with the Donation, I gained considerable experience in environmental matters. From 1995 to 1999, I managed the remediation of a Chevron oil and gas facility in the Donation's Fourchon property that had caused extensive contamination. The remediation of this contamination, and restoration of the property, included a massive injection well and over $100M in expenses. Before the BP oil spill, I also oversaw the replacement of a BP pipeline, the installation of the Shell Mars Pipeline, and a lawsuit against Schlumberger for wetland damage done by their seismic teams.

15. In order to establish consistent land management practices, I developed an Access Agreement format used to monitor all activity on Donation property. The Access Agreement was utilized for all companies and individuals operating on Wisner property to insure that guidelines to protect the property from damage were followed. I, as Secretary-Treasurer,

executed these Access Agreements, including the one with BP that was reviewed and improved by Waltzer and Wiygul ("W&W") in this case. The BP Access Agreement ultimately became the subject of extensive litigation with BP, in which I participated as a witness.

16. In April and May of 2010, when BP's oil was first moving around the Gulf, my office consisted of myself, an assistant who worked 35 hours a week, and a part time onsite manager who looked over the property. I felt we were woefully understaffed to handle the environmental disaster looming before us. I had some knowledge of oil spill emergency response due to participation in LOOP spill drills and helping my late husband, Dr. Shea Penland, with his business as an oil spill consultant. I knew that a baseline of the property had to be established before the oil hit and clean up began, and I had knowledge of the Unified Command's role and how the SCAT process worked.

17. When the oil first landed on Fourchon Beach, I attempted to get an Access Agreement executed between Wisner and BP, knowing that an adjacent landowner (Conoco Phillips) had a similar agreement in place.

18. At that time, the law firm of Simon Peragine represented Wisner as outside counsel. I turned to environmental lawyers Andy Wilson and Susan Clade at Simon Peragine for help, anticipating that the Wisner property located in Fourchon would receive an onslaught of oil. Simon Peragine called me and told me that they, like so many firms, had been conflicted out of representing clients against BP due to a minor representation of BP years before. Simon Peragine suggested that I contact Joel Waltzer or Robert Wiygul for representation.

19. Michael Peneguy, the Committee representative for the Wisner family, and I met with Joel Waltzer to discuss the situation in June of 2010. I was impressed with Joel's environmental

experience and deep knowledge of the facts of the spill, the law regarding the spill and contaminated property, and with emergency response doctrine. After discussing the matter with Mr. Peneguy, we invited Mr. Waltzer to make a presentation to the EWDAC.

20. At that time, oil was already landing on shore. The Unified Command had launched a massive response with hundreds of workers and heavy equipment moving around our property. Wisner did not have a protective agreement with BP, nor did BP's GCCF pay our interim claim, so the Donation's costs were piling up. I knew that evidence of damage caused by the spill was being lost or destroyed every day. And we were not receiving any help from our own counsel (who was conflicted) or from the Donation Trustee. As I repeatedly told the EWDAC, the Donation was in a state of emergency without adequate representation.

21. On July 1, 2010, at an EWDAC Special Meeting, Robert Wiygul and Joel Waltzer presented their thoughts and experience and discussed their engagement directly with the EWDAC representatives. They also presented a proposed contract. Ashley Gardere, the City's representative, was present at this meeting.  The Committee voted 4-0 to engage W&W to represent the Donation in the BP matter, subject to the City of New Orleans waiving certain conflicts and negotiation of an acceptable engagement contract. The City declined to vote on this matter.

22. Specific contract negotiations with W&W commenced. The EWDAC had stated its preference to lower the contingent rate applied to the ultimate recovery in the meeting. W&W offered to lower its rates and tier them based on recovery, if the Donation would pay for the experts needed in the litigation. Mr. Peneguy and I determined that was a good deal for the Donation. After putting in these changes, and others, we finalized the contract.

23. At the Wisner Committee meeting held July 27, 2010, the City representative Ashley Gardere stated that the City Attorney did not have a problem waiving any potential conflict. Ms. Gardere further stated that as she understood it at least as it related to this relationship, the City was comfortable. Dawn Segura from the City Attorney's office was also present at the meeting. I subsequently received an email from City Attorney, Nannette Jollivette Brown waiving any conflicts.

24. W&W immediately began to work as a team on the Wisner's case. I worked primarily with Joel Waltzer on modifying the Access Agreement to reflect the legal circumstances of the spill and to effectuate W&W's strategy of putting BP's OPA interim claim and response reimbursement obligations in a contract. Joel was able to convince BP to sign the Access Agreement in early August 2010.

25. Robert Wiygul and Joel engaged Dr. John Pardue, an expert in oil fate, transport, degradation, and remediation, and Dr. Jeffress Williams, an expert in coastal geomorphology (change), and Northwest Economics, to assist in calculating damages. We met with these individuals on many instances throughout the time W&W represented Wisner. All of these experts were ultimately used as experts in the litigation surrounding the Access Agreement.

26. I worked with Joel and Robert to engage Unified Command, with the goal of participating as in the cleanup, which we felt was necessary to ensure that Wisner land was protected and to collect evidence. We met with the top National Incident Commander, who committed to involve us. After a year of doing so, we were provided with a written commendation for our work as a partner in the spill response. See, Exhibit 2.

27. The three of us worked with my Administrative Assistant, Ms. Amanda Phillips, to present OPA interim claims to BP under the Access Agreement. In fact, Joel Waltzer was able to get

BP to pay the unpaid claim I presented to BP before W&W was hired as a pre-condition to my signing the Access Agreement on behalf of the Donation.

28. I worked extensively with Robert Wiygul, Joel Waltzer, and Forrest Travirca, our Wisner investigator who lived in a trailer on Fourchon Beach after the spill, to learn specifically what evidence we should collect, to protect the property during the response, and interact with the Unified Command.

29. In late August 2010, after much discussion and negotiation between the Committee and W&W, the Contingency Fee Agreement with W&W was finalized and forwarded to the Mayor's office for execution, along with several other critical contracts (leases) that had been executed by all of the other beneficiaries. This included the Marina Lease with Port Fourchon, involving additional rental money for Wisner.

30. At the Wisner meeting held on August 31, 2010, Ashleigh Gardere stated that the Mayor needed to fully understand the contracts the EWDAC had approved and forwarded for his signature, including the W&W contract, but that it would happen that week.

31. I was finally able to meet with Mayor Mitch Landrieu for the first time regarding Donation business on September 25, 2010. I explained that the EWDAC was concerned about his lack of interest in the Donation's work and lack of action on the contracts we forwarded to him for signature. He reacted poorly to my criticism. As to W&W's contract, the Mayor raised concerns about entering into any contingency fee agreement, but posited no alternative. City Attorney Nannette Jollivette Brown, who attended, specifically indicated to the Mayor that she had waived any conflicts. I told him that the Wisner was functioning in a state of emergency in regards to the oil spill, that the EWDAC and I were empowered to sign the

agreement, and that I must bring the matter to the EWDAC should he fail to sign. The Mayor questioned Wisner's right to office space in City Hall and terminated the meeting.

32. On September 28, 2010, I reported to the EWDAC about my meeting with the Mayor. After discussion, the EWDAC passed a resolution that approved the W&W Contingency Fee Agreement and directed me to execute same.  See, Exhibit 3.

33. After the September 28th meeting, the Mayor's representative on the EWDAC, Ms. Ashleigh Gardere, asked the EWDAC to draft an agenda with a list of the issues that needed to be discussed with the Mayor. The EWDAC submitted this list on October 6, 2010, in anticipation of a Special Meeting to address the issues. The City never responded or followed up on the proposed agenda. Additionally, critical contracts which had been executed by the other beneficiaries for several months remained in the Mayor's office unexecuted.

34. For a four-month period, from October 15, 2010 until late February 2011, the City's representative did not attend Wisner meetings and did not respond to my emails or phone calls. During this interval, our office continually checked in to attempt to find out the status of the outstanding agreements and implored the City to attend Wisner committee meetings as we faced insurmountable issues in light of the BP spill. The unexecuted contracts lingered in the Mayor's office until late February, resulting in the withholding of rental money by Port Fourchon.

35. During this critical period of repeated oiling and cleanup, through the Access Agreement, the Wisner office and W&W billed BP for the ongoing costs incurred including aerial photography, equipment, on sight management costs, science, extended hours for Wisner employees and attorney's fees and costs. Without BP's reimbursement of the extensive costs that were being incurred during this time of crisis, as required by the Access Agreement, the

monthly distributions to the beneficiaries of the trust would have been extremely low. Wisner office's annual operating costs had increased from approximately $350,000 to close to $1M per year as a result of the spill and cleanup activities.

36. In February 2011, Richard Cortizas, the Mayor's Executive Counsel, was designated as the City's representative on the EWDAC. He participated in the meeting process as Chairman of the EWDAC and in matters involving the Donation case. As I recall, Mr. Cortizas voted in favor of W&W's filing of suit against BP, approved W&W's proposed actions involving response and clean up, and the invoices prepared by Amanda and W&W for reimbursement of costs under OPA and the Access Agreement, the payment of W&W's invoices for their time related to the response, and in August of 2011, W&W's proposed global settlement offer to BP. At no time do I recall Mr. Cortizas objecting to either W&W's representation or the job they were doing. At the time, I thought the issue with the Mayor had passed.

37. I learned later that I was wrong. The City put out an RFP for legal representation of the City's economic loss claims against BP sometime around mid-2011. In December 2011, the Mayor hired a consortium of law firms that called themselves "the Joint Venture team" ("JV team") to represent the City of New Orleans in its economic claims against BP. The JV Team consisted of Steve Herman, Jim Roy, Calvin and Caroline Fayard, Fred Herman, and Walter Leger.

38. Around the time Mayor Landrieu hired the JV team to pursue the City's claims, he appointed Mr. Michael Sherman as his new representative on the EWDAC, to replace Mr. Cortizas. Mr. Sherman became very active in his work with the Committee and all of its members. He held ex-parte meetings with members of the Committee, and ultimately a meeting with the Committee without my knowledge, in what I believe to be a violation of the Bylaws.

39. On February 17, 2012, with the Committee's approval, including that of Michael Sherman, W&W filed a Motion for Partial Summary Judgment on behalf of the Donation, based on BP's breach of the Access Agreement contract. This breach involved over $700,000 in reimbursement costs under the agreement as well as BP's failure to turn over all of the reports and information collected during the cleanup. Again, there were no objections to W&W's legal representation of Wisner in this matter.

40. For months, W&W had reported to the Donation that a global settlement with BP was imminent. In April 2012, on short notice, Mr. Sherman called a meeting with the Mayor, W&W and the JV team, purportedly to share information and maps concerning the evaluation of claims presented in a settlement. I was out of town when I learned about the meeting and could not attend. Later that evening, I received a memorandum from our counsel that the meeting was really about who should act as the Wisner Donation's counsel, W&W or the JV Team. Thereafter, Mr. Sherman began to refer to W&W as a boutique environmental firm in Wisner meetings.

41. Mr. Sherman also began disseminating W&W's briefings with the EWDAC to the JV team. On more than one occasion, at a time when the JV team stated that it did not represent the Wisner, JV attorneys shared privileged information given in executive session by W&W to the EWDAC with BP's legal counsel - without W&W or the EWDAC's knowledge or consent.

42. On May 15, 2012, an order from Magistrate Judge Joseph Wilkinson indicated that a telephone status conference would be held to discuss resolution of the issues surrounding the Partial Motion for Summary Judgment. Only Counsel for the Wisner Donation and BP were to participate. See Exhibit 4. On May 16, 2012, JV attorney Steve Herman wrote to Judge

Wilkinson and requested permission to attend the telephone conference as retained outside counsel to the City of New Orleans, a Wisner Donation Beneficiary, whose Mayor serves as the Donation's Trustee. See Exhibit 5. This permission was granted.

43. As a result of this request, BP lawyer Greg Johnson contacted Robert Wiygul and raised questions about who the actual client was and who properly represented the EWDAC. See emails Exhibit 6. I remember being very concerned that our legal counsel was being undermined and that the Wisner's internal governance issues were being exposed to BP, to the detriment of the EWDAC. I was also concerned because the authority to act could also be used by BP as a defense in regards to the Access Agreement, which I knew BP wanted out of, much to the Wisner's detriment.

44. In response to these events, on June 3, 2012, four of the five Committee members sent a letter to Steve Herman, asking him to clarify his legal role as it related to the EWDAC and inviting him to attend a meeting with the Committee. Exhibit 7. Mr. Herman replied to the letter and but did not respond to the meeting invitation, nor attend the meeting. Exhibit 8.

45. At the meeting held on June 7, 2012, the EWDAC entered into Executive Session to discuss W&W's plan to file a claim in the proposed Global Settlement. WWG wanted to file the claim well before the opt out deadline, to see what might be offered as compared to damages that could be claimed in an independent suit. The EWDAC approved.

46. The next day, JV attorney Steve Herman wrote an email to Claims Administrator Patrick Juneau, with copies to BP lawyers Mark Holstein and Chris Esbrook, informing them of the EWDAC's plan. Mr. Herman advised them to make sure the Release was ironclad and the formalities met, presumably to make sure that the Wisner claim went away. Exhibit 9. I was very concerned, for obvious reasons, and believed that the JV group was intentionally

interfering with the Wisner case without the EWDAC's approval and to Wisner's detriment. These revelations led to a very contentious June meeting of the EWDAC, where representatives openly expressed concern about the JV attorneys' motivations.

47. The day before the June 27, 2012 Special Meeting of the EWDAC, I received an email from Michael Sherman, stating that the LSUHSC had appointed a new representative to the Committee. Exhibit 10. LSU's letter making this change was dated June 21, 2012, but Mr. Sherman failed to notify the EWDAC until the day before the Special Meeting. I called Dr. Townsend, who facilitated the appointment, and she told me that she had been asked by the Mayor's office to make this change to the Committee.

48. At the meeting of the Committee the next day, Mr. Sherman invited the City's JV team to the Committee meeting in hopes of swaying the EWDAC to hire the City's JV team. Mr. Sherman presented the EWDAC with a resolution for approval outlining the terms and conditions of his proposal. Exhibit 11. The EWDAC voted down the measure and requested that Joel Waltzer and I meet with members of the JV team to try to work out a co-counsel agreement. Mr. Sherman emphasized that any contract with the JV team would be identical, if not better, than the terms that Wisner had with W&W.

49. On Sunday June 15, 2012, I attended a meeting at the offices of Herman, Herman and Katz and met with Joel Waltzer, Carolyn Fayard, and Soren Gisleson for the purpose of reaching a co-counsel agreement. An email outlining the JV team's proposed terms and conditions, including the splitting of fees, is attached as Exhibit 12. Soren and Caroline proposed that W&W would continue their work on the case, and that the JV team would negotiate a settlement of the case. Soren and Caroline Fayard wanted Mr. Waltzer to propose a division of the fee. Mr. Waltzer would not agree to a co-counsel relationship without the JV's

13

assurance that he or his partner would participate in all facets of the case, including the settlement discussions, and that any proposed settlement would be presented to the EWDAC for approval. Mr. Giselson and Ms. Fayard refused to give such assurances; Mr. Waltzer refused to propose a division of the fee.

50. At that meeting, I informed Ms. Fayard and Mr. Gisleson that the Mayor could act only with the advice and consent of the Committee, and my opinion that any settlement of the case could not be decided by the Trustee alone. Ms. Fayard inquired about the number of committee members and the number of votes needed to prevail. "So all we need are three votes?" She asked and then she stated, "Live by the by laws, die by the bylaws." Attached are my notes from the meeting Exhibit 13.

51. At prior EWDAC meetings, Mr. Sherman insinuated that in spite of the fact that W&W had done a tremendous job, the JV team would better represent the Committee. At the EWDAC's July 2012 meeting, W&W were fired by a majority (3-2) vote.

52. According to Michael Sherman the new contract with the JV team was to be "largely duplicative of the previous document entered into with Waltzer and Wiygul." There were no further protestations about a contingency fee contract as I heard from the Trustee in the fall of 2010. At no point in time had there been a separate RFP for the hiring of the Joint Venture team to represent the Donation, only for their representation of the City in its economic loss claims for loss of taxes and the like. The Wisner's case was totally different and independent from the City's claims. Subsequently, the JV signed a contract with the EWDAC with no RFP.

53. Had the EWDAC not directed me to execute the W&W agreement in September of 2010, I have no doubt that Wisner would have been unrepresented throughout the entire period the

response was at its heaviest on Donation property. By the time the City hired the JV team to represent their economic claim, W&W had been working diligently for Wisner for over a year and a half, in my legal opinion doing an excellent job, and providing me with invaluable assistance during a crisis situation.

54. I was in contact with W&W on nearly a daily basis for nearly two years. W&W often visited the cleanup site and met with Unified Command many times, as well as with BP's counsel. I know that W&W assembled a capable team including Wisner personnel at our home office and onsite, as well as experts. I participated as a team member in their plan to involve the Donation in response, to collect evidence for use at a later damages trial, and to meet the legal criteria for reimbursement from BP. Through our collective efforts, the Donation was reimbursed millions of dollars.

55. W&W coordinated our science and the collection of evidence with the lawyers who brought natural resource claims for Louisiana and Lafourche. Through careful monitoring of the property, we developed evidence that we could later use to prove BP substantially understated the extent of oiling in their SCAT line assessments.

56. We met with multiple agencies, including coastal restoration personnel, to assess and document what was happening on our land. And throughout their representation, W&W submitted comprehensive reports to the EWDAC and followed through with legal action (filing suit) to protect the Donation and ensure full restoration of the property. I don't know of any other landowner affected by this spill that accomplished what Robert, Joel and I did.

57. After the JV team took over, I had little communication from them and so I do not have a sense of the strategy or the work they did before I left the Donation at the end of January 2013.

58. The Access Agreement specified that these costs were to be reimbursed by BP. Any fees collected from BP were to be offset against the ultimate contingent fee. From our personal interactions nearly every day, I know that W&W was very diligent in filing these claims and fighting for reimbursement when they represented Wisner. I am not certain if the JV team fully utilized the terms of this agreement to save Wisner legal costs and expert fees.

59. I regret that by October 31, 2012, my dealings with the Mayor and Mr. Michael Sherman became sufficiently adversarial that I announced effective January 31, 2013 I would resign as Secretary-Treasurer. I was disheartened when I was later supplied with what appears to be an email between Mr. Calvin Fayard and Michael Sherman on the day I announced my resignation.  It just seemed like the interests of the Donation - which after twenty years I really cared about – were getting lost in the conflict. Exhibit 14.

60. I participated in the Access Agreement litigation on behalf of the Donation throughout 2015-16 without compensation. W&W was also involved as counsel for the Wisner family. In that proceeding, I worked closely with JV attorney Soren Giselson and Joel Waltzer of W&W, in my preparing for deposition and for trial, prior to the Wisner settlement with BP.

61. I also have recently done some hourly work for W&W in regards to subsistence claims. From this experience, I am reinforced in my belief that Robert and Joel know how to organize large amounts information, are experienced environmental lawyers who think out of the box, and were more than capable of handling the Donation's case.

62. This declaration has taken me several days to put together. I have not been compensated for this time.


Date: November 17, 2016                          /s/ C. Cathy Norman Penland

# TRANSITION INFORMATION for
# Mayor Mitchell J. Landrieu,
# as Trustee for
# the EDWARD WISNER DONATION



*St. John the Baptist Parish*
*April 19, 2002*
*Photo Courtesy of Amanda Phillips*



*Hilcorp Gas Well, Jefferson Parish*
*May 21, 2009*
*Photo Courtesy of Amanda Phillips*



*Fourchon Beach, Post-Hurricane Ida*
*December 16, 2009*
*Photo Courtesy of Cathy Norman*

May 20, 2010
C. Cathy Norman
Secretary Treasurer

Exhibit 1 to Declaration of C. Cathy Norman

# TABLE OF CONTENTS

Introduction to the Edward Wisner Donation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

History of the Edward Wisner Donation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Roles and Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Grant Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Wisner Property Information and History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Environmental and Legislative Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Extension of the Donation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**EXHIBITS**

Exhibit A—Original Act of Donation dated August 4, 1914 . . . . . . . . . . . . . . . . . . . . . . . . . 14

Exhibit B—Act of Compromise dated September 17, 1929 . . . . . . . . . . . . . . . . . . . . . . . . . 19

Exhibit C—Ordinance No. 12883 creating the Edward Wisner Donation

        Advisory Committee adopted March 12, 1931 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Exhibit D—*Yes, they have no bananas* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Exhibit E—By-Laws of the Edward Wisner Donation Advisory Committee . . . . . . . . . . . . . 30

Exhibit F—Committee Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Exhibit G—Committee Meeting Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Exhibit H—*Abbreviated Vitae* for C. Cathy Norman and Resume

        for L. Amanda Phillips . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Exhibit I— Wisner Grant Application Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Exhibit J—Wisner Grants Awarded in 2009 and Year-to-Date 2010 . . . . . . . . . . . . . . . . . 56

Exhibit K—Draft Extension of the Donation Document . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

**FIGURES**

Figure 1—Revenues by Category 1999—2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Figure 2—Edward Wisner Donation Management Chart . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Figure 3—Map of Wisner Donation Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Figures 4 and 5—Aerial Views of Marsh Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Figures 6—8—Marsh Project and Cypress Planting Area . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Figure 9— Fourchon Beach. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Figures 10—13—Fourchon, Forrest Travirca, and St. John the Baptist Parish. . . . . . . . . . . 63

## Additional Attachments

2008 Audit of the Donation

Employment Agreements for C. Cathy Norman and L. Amanda Phillips

# INTRODUCTION TO THE EDWARD WISNER DONATION

There are three entities referred to as "Wisner"; the Edward Wisner Donation, the Edward Wisner Donation Advisory Committee and the Edward Wisner Trust Fund.

*The Edward Wisner Donation* (the Donation) manages the land holdings of the original 1914 Donation and distributes revenues to the beneficiaries. It is a Complex Trust. It is managed by the Secretary Treasurer/Land Manager and her staff. The Secretary Treasurer and her staff are employed by and report to the Edward Wisner Donation Advisory Committee. The Mayor of the City of New Orleans is Trustee of the Donation. He acts with the advice and consent of the *Edward Wisner Donation Advisory Committee.*

The Donation functions independently of the City as a small business with separate bank accounts, bylaws, employment contracts and internet access. The City provides office space, phone service and two garage parking spots.

*The Edward Wisner Donation Advisory Committee* (the Committee) is comprised of one representative and one alternate from each of the five beneficiary groups. Each member has a single vote. The Mayor appoints a representative to the Committee who also acts as Chair of the Committee. The Committee meets monthly. The Committee oversees the management of the Donation properties and the Donation office.

*The Edward Wisner Trust Fund* is the City's account for their beneficial interest (34.8%) proceeds from the Donation. This account is managed by the City's Finance Department. The Finance Department provides the Donation with a monthly copy of the Wisner Land Trust Proceeds Statement.

The Mayor, with the advice and consent of the Committee, awards Wisner grants funded from the City's beneficial interest for educational, beautification, recreational and Human Services purposes within the city. Grants are issued to 501 (c) 3's located in and benefiting Orleans Parish. The City's representative on the Committee manages the application process. The Donation office is not involved with the grant process.

# HISTORY OF THE EDWARD WISNER DONATION

The Donation was created by an Act of Donation in 1914 (see Exhibit A). The Act of Donation gave approximately 53,500 acres of land and waterbottoms in Jefferson, St. John the Baptist and Lafourche Parishes, Louisiana, from the estate of Edward Wisner to the City of New Orleans, as Trustee, for a 100-year charitable trust.

*BENEFICIARIES*
The original beneficiaries of the trust were the City of New Orleans as beneficiary for several charitable purposes, Charity Hospital of New Orleans (Charity), Tulane University (Tulane), and the Salvation Army. Specific portions of the land or the income from the land were also designated for the establishment and maintenance of specific struc-

3

tures for certain other organizations operating within the City of New Orleans.

After Edward Wisner's death in 1915, his widow and two daughters filed a lawsuit which claimed that the Act of Donation of 1914 violated several articles of the Civil Code of Louisiana and failed to comply with Act 124 of 1882. The lawsuit resulted in an Agreement of Compromise and Satisfaction of 1929 (see Exhibit B). It granted Mrs. Mary J. Wisner (wife of Edward Wisner) and her two daughters, jointly, an undivided 40% interest in the Donation. Their attorneys' legal fees are a percentage of their share.

| Party | Interest |
|-------|----------|
| City of New Orleans | 34.8% |
| Tulane University | 12.0% |
| Charity Hospital | 12.0% |
| The Salvation Army | 1.2% |
| Wisner Heirs | 40.0% |

As a result of their compromise the beneficial interests are divided, as shown to the left.

The City of New Orleans was named as the beneficiary of the several municipal, charitable and educational purposes mentioned in the Original Act of Donation. Each beneficiary was given a seat on the Edward Wisner Donation Advisory Committee, which was to be formed for the more cost-effective and efficient operation and management of the Donation (see Exhibit C). The Mayor of the City of New Orleans remains the Trustee of the Donation, and acts upon the advice and consent of the majority of the representatives of the Edward Wisner Donation Advisory Committee.

### REVENUES

| 2009 Revenues by Category as a Percentage of Total Revenues | |
|---|---|
| Royalties: | 19.6% |
| Industrial Leases: | 74.2% |
| Miscellaneous Leases: | 6.1% |

Primary revenue sources of the Donation property are: Royalties from Oil, Gas and Mineral leases, Industrial Rentals , and Miscellaneous Leases. For the majority of the Trust's life royalties were the primary revenue source.  Over the past 10 years, revenues have shifted from royalties to industrial leases.  The Greater Lafourche Port Commission's exponential growth has led the change (see Exhibit D).



**Revenue by Category 1999-2009**

Figure 1

4

EDWARD WISNER DONATION MANAGEMENT

BENEFICIARIES & SHARE OF THE DONATION HELD BY EACH BENEFICIARY
Each beneficiary appoints one representative and one alternate representative to serve on the committee

**Figure 2**

## ROLES AND RESPONSIBILITIES

*THE MAYOR AS TRUSTEE*

The Mayor, as the City's Representative and Chairman of the Committee:

- ⚘  acts as Trustee of the Donation, with the advice and consent of the Committee (see Exhibit E for the By-Laws).

- ⚘  attends the meetings or appoints someone to act on his behalf.

- ⚘  has signatory authority on the Committee's bank accounts, along with the Secretary Treasurer (only one signature is required).

- ⚘  controls the grant process for the Edward Wisner Trust Fund.

*THE COMMITTEE*

The Committee (see Exhibit F) :

- ⚘  is composed of a representative from each of the 5 major beneficiary groups (see Figure 2).

- ⚘  meets on the last Tuesday of each month except for one month in the summer and in December (see Exhibit G).

- ⚘  oversees the cost-effective and efficient management of the Donation.

- ⚘  directs the actions of the Secretary Treasurer.

Committee meetings:

- ⚘  are held in the offices of Simon, Peragine, Smith and Redfearn L.L.P., The Energy Centre, 1100 Poydras Street, 30th floor.

- ⚘  are also attended by an appointed representative from the City Attorney's Office and several individual beneficiaries of the Donation.

*THE SECRETARY TREASURER OF THE COMMITTEE*

Ms. C. Cathy Norman has held this position since 1992 (see Exhibit H for her Abbreviated Vitae). Ms. L. Amanda Phillips has been Ms. Norman's Executive Assistant since 2001 (see Exhibit H for her Resume).

The Secretary Treasurer is a full-time employee of and an Officer of the Committee.

6

She is responsible for:

- ✂ Accounting
- ✂ Property Management

- ✂ Overseeing employees, contracted employees, legal counsel and auditors.

- ✂ Recordkeeping

- ✂ The Secretary Treasurer's office is located in City Hall, Room 8E06.
  Phone number :      504/658.4060
  Fax number:         504/658.4065
  Email:         wisnerdonation@aol.com

- ✂ Mailing Address:   P.O. Box 52204, New Orleans, LA 70152-2204

## GRANT PROCESS

The City's beneficial interest income funds grants awarded by the Mayor, with the advice and consent of the Committee, to 501 (c) 3's operating within Orleans Parish.  The organizations generally provide educational, beautification, recreational or Human Services purposes. The Mayor's representative to the Committee handles the grant process.

- ✂ An application form created by the Marc Morial Administration and updated by the Nagin Administration (see Exhibit I) is used.

- ✂ The Mayor's office reviews grant applications and makes recommendations for funding.

- ✂ The Mayor's representative presents the Mayor's selections to the Committee for approval.

- ✂ The Mayor's representative informs the applicants of their award.

- ✂ The City's Finance department issues the award.

- ✂ The grant recipient reports to the Mayor's representative regarding the grant's use.

- ✂ The Mayor's representative issues an Annual Report of Grants to the Mayor and the Committee.

7

A list of grants awarded in 2009 and to date in 2010 is in Exhibit J.

## WISNER PROPERTIES

The Donation covers approximately 37,000 acres in 3 parishes: Jefferson, Lafourche and St. John the Baptist. The Donation's size has been reduced since the original Donation through erosion and a few lawsuits.

- The largest tract is in Lower Lafourche Parish (Tenth Ward) and covers approximately 35,000 acres from Leeville to the Gulf of Mexico.

- The Louisiana Offshore Oil Port (LOOP) enters from the Gulf of Mexico onto Wisner lands.

- The LOOP Fourchon gathering facility is also located on Wisner property. Approximately 1.3 million barrels of oil per day flow through this facility from the offshore docking facility. This accounts for about 15% of the US's imported oil.

- The Mars Pipeline also enters the Gulf of Mexico from Wisner lands.

- Chevron Pipeline Company has a major gathering facility that covers 75 acres close to the Gulf of Mexico.

- Wisner leases over 2,000 acres of land to the Greater Lafourche Port Commission. Port Fourchon has become the focal point of intermodal transfer for support of over 75% of today's deepwater projects on line.

- The property in Jefferson Parish is within the boundaries of the Jean Lafitte National Park and Preserve.

The greatest threats to the Donation's property are coastal erosion and expropriation.

Coastal erosion

- Has been exacerbated by the hurricanes in 2005, 2008, and 2009.

- The BP Oil Spill could catastrophically accelerate erosion in the marsh.

- Creates tangled legal issues with property boundaries, trespass, ownership claims and mineral rights.

Expropriation Threats

- Land that erodes into State navigable waterways becomes State property.

8



## WISNER DONATION PROPERTIES

1. Bay Chevreuil Property
   St. John the Baptist Parish
   1,500 Acres

2. Bayou Segnette Property
   Jefferson Parish
   1,800 Acres

3. Fourchon/Leeville Property
   Lafourche Parish
   35,000 Acres



**Figure 3**



ଔ      The South Lafourche Beachfront Development District

ଔ      The Louisiana Wildlife Federation's State Seashore Concept

ଔ      Wildlife and Fisheries issuance of erroneous oyster leases on private waterbottoms.

## ENVIRONMENTAL AND LEGISLATIVE ISSUES

Ms. Norman has relied on the City's Environmental Office and Intergovernmental Relations Office for support with environmental and legislative issues. There are issues of critical importance to the State of Louisiana and the City of New Orleans in managing 35,000+ acres of wetlands.



**Figure 4—*Aerial view of Broken Marsh Public Boat Launch Pre-construction—Spring 2003***



**Figure 5—*Filled Marsh Area, Public Boat Launch Post-construction—February 27, 2004***

The Wisner property covers 11 miles of beach at Fourchon, Lafourche Parish, that experiences approximately 47 feet of coastline retreat annually. One hundred feet were lost in the 2005 storms alone. The average loss elsewhere in the US is ± 2 feet annually.

Restoration and protection of the coastline and interior marshes provides a protective barrier for interior property, including the City of New Orleans. Barrier Islands and shorelines, coastal marshes, swamps, and wetlands provide seafood production, storm protection, habitat for fish and wildlife, recreational opportunities and improve water quality.

Balancing the growth of industry (the Greater Lafourche Port Commission, oil production) and creation of revenue for the Donation, with protection and enhancement of existing wetland areas is challenging, but achievable with proper planning and support.

*PAST RESTORATION PROJECTS*

**Lafourche Parish Wisner Restoration Project**

10



**Figure 6—Aerial View**
**Marsh platform — October 22, 2005**
*Photo courtesy of Dr. Shea Penland*



**Figure 7—Marsh platform — March 4, 2006**
*Photo courtesy of Brian Kendrick*



**Figure 8—Areas in Blue and Red to be Planted with Cypress Trees**
*Image Courtesy of Jefferson Parish*

Ms. Norman used Wisner funds and a Community-based Restoration Project grant from the National Oceanic and Atmospheric Administration (NOAA) to create the Lafourche Parish Wisner Restoration Project. It encompassed over 2,000 acres. Fifty acres of new marsh were created and vegetated in lower Lafourche Parish. Hydrology was restored to a formerly impounded area. Sand fencing was erected along the beach. Black mangroves were planted along the bayside of Bay Champagne, behind the sand fencing.

This project earned Ms. Norman in 2004 the Coalition to Restore Coastal Louisiana's Coastal Stewardship Award and NOAA's Environmental Hero Award.

**Other Projects**

Wisner has supported experimental restoration projects on its Lafourche property by various universities and local organizations.  Some of the projects have been dune creation using *bagasse* (sugar cane) buried under sand, additional sand fencing, and vegetative plantings.  Various studies have been performed on the property to aid in future coastal restoration projects.

In Jefferson Parish cypress trees were planted along the Main Canal by Jefferson Parish and the Coalition to Restore Coastal Louisiana. The trees' roots will help retain the soil and stymie erosion along the banks (see photo to left).

Ms. Norman formed a consortium, the **Fourchon Region Restoration Initiative (FRRI)** in 2004 to expedite coastal restoration projects in Fourchon. The consortium funded research to help insure scientific certainty for the Barataria Basin Barrier Shoreline Project.

*FUTURE RESTORATION PROJECTS*

### Barataria Basin Barrier Shoreline Project (BBB)
BBB is one of the largest critical projects in the State. It is in review in DC as there are questions regarding its sustainability.

- Covers the area from Belle Pass east to Elmer's Island, including 9 miles of Wisner beach.

- Includes beach nourishment, dune creation, marsh creation, and plantings.

- Funded by the Water Resources Development Act of 2007, for $300 million.

### Caminada Headland Restoration Project (CHRP)
If coordinated with the BBB, it could provide the necessary State dollar match.

- Separates out the beach component from the BBB.

- Would utilize $75 million in Coastal Impact Assistance Program (CIAP) funds.

- Would speed up the critical beach restoration along Wisner's 9 miles of beach.

### BP Deepwater Horizon Oil Spill
The Donation's property is at direct risk from this spill. Not only are the beaches endangered, but so are the marshes. Despite filling the 5 breaches along the beachfront, oil entered the marsh on Thursday, May 18, 2010.

It is very difficult to clean oil from the marshes. Once marsh vegetation is oiled, it dies. Erosion will accelerate.

Current activities to fill the breaches are damaging the beach and marsh area. Heavy trucks and other equipment are being used without regard to the dunes and wildlife.

## EXTENSION OF THE DONATION

The Edward Wisner Donation was established in 1914 as a 100-year trust. Over the past 5 years the Committee and the Wisner family have worked tirelessly to address the issue of extending the Donation in perpetuity. Exhibit K is a Draft extension document.

# EXHIBITS



**Figure 9—Fourchon Beach—Post Hurricanes Gustav and Ike**

**September 23, 2008**

*Photo Courtesy of Amanda Phillips*

# Exhibit A

UNITED STATES OF AMERICA

STATE OF LOUISIANA

PARISH OF ORLEANS

CITY OF NEW ORLEANS

BE IT KNOWN,  That on this fourth day of the month of August, in the year, one thousand, nine hundred and fourteen;

Before me,  ROBERT LEGIER,  a Notary Public, duly commissioned and qualified in and for the Parish of Orleans, State of Louisiana, aforesaid, therein residing, and in the presence of the witnesses hereinafter named and undersigned,

Personally Came and Appeared:

MR. EDWARD WISNER,  of the full age of majority and a resident of this City.

And the said appearer declared that he does, by these presents, donate, assign, set over, transfer, abandon and deliver, irrevocably and forever, with all legal warranties and with full subrogation and substitution in and to all his rights and actions of warranty, against all preceding owners and other warrantors,

Unto the CITY OF NEW ORLEANS, herein represented by the HONORABLE MARTIN BEHRMAN, Mayor, herein acting under and by virtue of the power and authority in him vested by the terms and provisions of Ordinance No. 8369, New Council Series, adopted by the Council of the City of New Orleans, on February 5, 1912, a copy of which Ordinance is hereto annexed and made part hereof.  The said Martin Behrman, Mayor, being here present and accepting for the said City of New Orleans, its legal representatives and assigns, on the hereinafter set forth terms and conditions, and acknowledging due delivery and possession of all and singular the following described property, to-wit:

JEFFERSON PARISH, LOUISIANA.

That portion of Section Twenty Two, East of Bayou Segnette, Southeast quarter of Section Seventy Two, all Section Seventy Three, East of Bayou Segnette, except Northeast quarter. all Section Seventy Six east of Bayou Segnette, except East half of Southeast quarter, East half of Southeast quarter and that portion of the West half of Section Eighty, east of Bayou Segnette, all Section Eighty Three, Township Fourteen South Range Twenty Three East. 1,840 Acres, approx

ST. JOHN THE BAPTISTE PARISH, LOUISIANA.

South Half of Southwest quarter and Northwest quarter of Southwest quarter of Section Twenty Nine, Township Twelve South Range Nineteen East.

Section Fifteen, Northwest quarter of Southwest quarter, South half of southwest quarter, Southwest quarter of southeast quarter and lot Two of Section Twenty Seven; Lots Two, Three, Four, Five and Six of Section Twenty Eight; Southeast quarter of Northeast quarter of Section Twenty Nine; lot One of Section Thirty One; Lots One, Two, Three, Four and Six and east half of Northwest quarter of Section Thirty-Two, Township Thirteen South Range Eighteen east.

Southeast quarter of Northwest quarter, north half of Northeast quarter and that portion of the north half of south half of Section Two, North of Bayou Chevril that portion of the northwest quarter of northeast quarter of Section Four, north of Bayou Chevriel, Township Fourteen, South Range Eighteen East.

LAFOURCHE PARISH, LOUISIANA.

All Section One, those portions of Section Two and Three and East half

14

-2-

of Section Four, lying south of Bayou Chevriel, northwest quarter of Northeast quarter South half of Northeast quarter and lot One of Section Ten; lots One and Two, south half of northwest quarter; northwest quarter of Southwest quarter and north half of northeast quarter of Section Eleven, Township Fourteen South, Range Eighteen East.

That part of Section Thirteen, lying south of Commercial Canal, Southeast quarter and that part of northeast quarter of Southwest quarter lying south of Commercial Canal, Section Fourteen, East half of southeast quarter of Section Twenty Three, southeast quarter of southeast quarter, west half of Southeast quarter and southwest quarter of Section Twenty Four, all Section Twenty Five, northeast quarter of northeast quarter, South half of Northeast quarter and southeast quarter of Section Twenty six, southeast quarter of southwest quarter, south half of southeast quarter, north half of northeast quarter and northwest quarter of northwest quarter of Section Thirty five, north half of north half and south half of south half of Section Thirty six, Township Twenty One, South Range Twenty two east.

Those portions of Sections Eight, Nine, Ten and Eleven, lying south of Commercial Canal, Sections Fourteen, Fifteen and Seventeen, that portion of Section Eighteen lying south of Commercial Canal, all Sections Nineteen, Twenty, Twenty One, Twenty Two, Twenty Three, Twenty Five, Twenty Six, Twenty Seven, Twenty Eight, Twenty Nine, Thirty, Thirty one, Thirty two, Thirty three, Thirty Four, Thirty Five and Thirty six, Township Twenty one South Range Twenty three east.

All Sections One to Fifteen, inclusive, all section Seventeen, all Section Twenty, except Southwest quarter of Southwest quarter, Sections Twenty One, Twenty Two and Twenty Three, Sections Twenty Six and Twenty Seven, North half of north half and southwest quarter of Section Twenty Eight, south half of northwest quarter and southwest quarter of Section Twenty Nine, northwest quarter and south half of Section Thirty Two, Section Thirty Three, south half of north half and south half of Section Thirty Four, all Section Thirty five, except northwest quarter of northwest quarter. Section Thirty Six, Township Twenty two South, Range Twenty Three East.

Sections One and Two, northwest quarter of northeast quarter and east half of east half of Section Three, northeast quarter of northeast quarter of Section Ten, Sections Eleven and Twelve, all Section Thirteen, except south half of southwest quarter; north half of southeast quarter, east half of northwest quarter and northeast quarter of Section Fourteen, lot Three of Section Twenty Two, those portions of Sections Twenty Three, Twenty Seven and Thirty four, south of west fork of Bayou Lafourche, lots Two, Three and Six, west half of southwest quarter, southeast quarter of southwest quarter, east half of northeast quarter of Section Twenty Four, all section Twenty five, except lot One, Sections Twenty six and thirty five, township twenty three south, range twenty two east.

Sections One to Twelve, inclusive, all Section Nineteen except southwest quarter of southwest quarter, Sections Twenty and Twenty One, northeast quarter of north-west quarter and northeast quarter of Section Thirty, Sections Seventeen and Eighteen, Township Twenty three south, Range Twenty three east.

The foregoing descriptions containing in the aggregate fifty thousand (50,000) acres of land, more or less, according to Government Survey.

To have and to hold the above described property unto the City of New Orleans, with full warranty of title and with full substitution and subrogation to any and all rights of the donor.

This donation is made to the City of New Orleans for the benefit and use, either through the revenue or ultimate sale of the property, hereinabove described, and hereby conveyed, of the following beneficiaries, to-wit:

Ten Thousand (10,000) acres, or one fifth (1/5) thereof, for the establishment of a Convalescent Home for patients of the Charity Hospital and other hospital purposes.

Ten Thousand (10,000) acres or one fifth (1/5) thereof for the purpose of establishing an agricultural department for the City Schools and other school purposes.

Ten Thousand (10,000) acres or one fifth (1/5) thereof for the embellishment of the City of New Orleans, making the City beautiful.

Ten Thousand (10,000) acres or one fifth (1/5) thereof for the benefit and use of the Tulane University of New Orleans, Louisiana.

Five Thousand (5,000) acres or one tenth (1/10) thereof for the creation

15

-3-

and maintenance of a Civic Center and Free Platform in New Orleans.

One Thousand (1,000) acres or one fiftieth (1/50) thereof for the establishment of a home for superannuated teachers of the City of New Orleans.

One Thousand (1,000) acres or one fiftieth (1/50) thereof for the establishment of a Country Home for Newsboys, and such other benefits as may accrue to the newsboys of New Orleans.

One thousand (1,000) acres or one fiftieth (1/50) thereof for the establishment and maintenance of country home for the super-annuated policemen and firemen of New Orleans.

One thousand (1,000) acres or one fiftieth (1/50) thereof for the Salvation Army or other societies of similar aims and purposes for such a period of time as the City may elect.

One thousand (1,000) acres or one fiftieth (1/50) thereof for the establishment of a City Poor Farm, whereon can be located, the mendicants of the City of New Orleans.

The Mayor of the City of New Orleans, or his successors in office, as Chief Executive, under whatever name said successor may be designated, is hereby appointed, authorized and empowered to act as representative of Commissioner to administer the trust herein created.

The trusteeship herein provided for shall exist for the term and period of one hundred years from the date hereof, and this donation is made upon the condition that the said City of New Orleans shall, in no way, alienate any part or portion of the lands herein conveyed until one hundred years from the date hereof, except as hereinafter provided for.

After the expiration of the said one hundred years, the said City of New Orleans shall be free to dispose of any or all of the said lands in such manner as the City Government may direct; but employing the proceeds thereof for the purposes above set forth only.

Each of the above beneficiaries, including the City of New Orleans, for the herein provided charitable bequests pertaining to it, shall be permitted to segregate its portion of said donated lands for its uses, and the trustee hereinabove provided for shall make conveyances to it subject to the terms of this donation and such beneficiaries shall retain the ownership of said lands during the unexpired term of said one hundred years.

In case any of the beneficiaries herein named decline to accept this donation, or shall pass out of existence before receiving its share or portion, then such portion or share enuring to the benefit of such beneficiary or beneficiaries shall be used by the trustee for and are hereby dedicated to the embellishment of the City of New Orleans.

Any or all of the lands herein donated may be included within reclamation drainage districts and taxed for the cost of reclamation and maintenance of same as though owned by an individual, provided that a lease providing for a minimum rental of a sum sufficient to pay the tax levied on account of such reclamation and maintenance for a period of ten years be made, with some solvent individual or corporation with satisfactory assurance to the trustee hereunder.

No beneficiary hereunder shall be permitted to select more than its pro-rata share of the lands in Jefferson Parish near the City of New Orleans, first selecting shall have choice of location.

Whenever, from time to time, funds shall accumulate under this trust, the trustee shall use the same for any one or more of the purposes herein designated in the proportions indicated in the discretion of the said trustee. Any and all accumulated funds shall draw interest at a minimum rate obtained by the City of New Orleans on its other funds or same may be invested in the bonds or other evidences of indebtedness of the City of New Orleans or of the State of Louisiana.

The donor herein reserves the right to make such modifications and changes during his lifetime as may be agreed to by the City of New Orleans, but always for some charitable or public purpose, but this shall not apply to any beneficiary that has received its portion and the donor shall not have the power to abolish or alter any institution which shall have been established or created hereunder.

16

It is also provided that, at any time after the death of the donor herein, if it should be considered of sufficient moment in behalf of the public interest, the chief executive of the City of New Orleans, the chief executive of the State of Louisiana and the Chief Justice of the Supreme Court may, acting unanimously direct the Trustee to sell any or all of the lands not selected by the beneficiaries or having reverted to the City of New Orleans by reason of said beneficiaries passing out of existence, turning the proceeds of such sale into the City Treasury.

The acceptance of this donation by the Mayor of the City of New Orleans and the City of New Orleans, imposes no financial obligation or responsibility upon the said City of New Orleans, but whatever commissions, costs, expense or expenditures may become necessary or arise out of or by reason of the administration or execution of these presents shall be paid out of, or in case of any advance, reimbursed out of the revenues or funds accruing or arising thereunder.

And the said Martin Behrman, Mayor, aforesaid, hereby declared that he hereby accepts the said donation and trust for and on behalf of the said City of New Orleans.

The parties hereto waive the production of all certificates required by law, fully exonerating the Notary, undersigned, from all responsibility in the premises.

And the said donor here declared that all the taxes on the above described and herein donated property are paid up to 1913, inclusive, and the said Behrman being satisfied with the said declaration hereby waives the production of evidence in support thereof, hereby exonerating the Notary, undersigned, from all responsibility in the premises.

Thus done and passed in quadruplicate at my office in the City of New Orleans on the day, month and year, herein first above written, in the presence of Theodore A. Beck and Miss Odile Musson, both of this City, competent witnesses, who have hereunto signed their names with the said appearers and me, Notary, after due reading of the whole.

(Original Signed)

Edward Wisner

Odile Musson
T. A. Beck

Martin Behrman, Mayor

Robert Legier, Not. Pub.

Approved, N.O., La. August 3, 1914.
            (Signed) I. D. Moore, City Attorney          "No.118963
                                                          Civil District Court
A true copy from the original act.                       Parish of Orleans
            /s/ Robert Legier, Not. Pub.                  Filed Jan. 12/17 "

Recorded in the Parish of St. John the Baptist in Conveyance Book 5 N.S., folio 233 etc.
Recorded in the Parish of Lafourche, in Willand Donation Book "B", folio 295.
Recorded in the Parish of Jefferson in Conveyance Book 34, fo. 341, and in Donation Book 3, fo. 138.

---

The said premises as to which this instrument does apply, are described as follows:

49,248 acres, more or less, situated in the Parish of Lafourche, recorded in said Parish, in Will and Donation Book "B", Folio 295.

2,412 acres, more or less, situated in the Parish of St.John the Baptist, recorded in said Parish in Conveyance Book 5 N.S., Folio 233, etc.

1,840 acres, more or less, situated in the Parish of Jefferson, recorded in said Parish in Conveyance Book 34, Folio 341, and in Donation Book 3, Folio 138.



thorizing the Mayor of the City of New Orleans to accept said donation is required, therefore

Be it Ordained by the Council of the City of New Orleans, That the Mayor of the City of New Orleans be and he is hereby authorized to accept by notarial act the said donation from the said Edward Wisner, as stated in the preamble of this ordinance, and for the purposes stated therein, under such terms, conditions and stipulations as to the said Mayor may deem wise, proper and prudent, and the said Wisner will consent and agree to, provided, however, that no financial obligation or responsibility on the part of the City of New Orleans be assumed under the terms of said act of donation, or as a result of the trust imposed on the city.

Adopted by the Council of the City of New Orleans, February 8th, 1911.

GEORGE FERRIER, JR.,
Clerk of Council.

Approved February 8th, 1911.
MARTIN BEHRMAN,
Mayor.

A true copy.
JOHN P. COLEMAN,
Secretary to the Mayor.

Mayoralty of New Orleans,
City Hall, Feb. 8th, 1911.
Calendar No. 10,763.

NO. 4383 NEW COUNCIL SERIES — Whereas, it appears by the message of His Honor, the Mayor of the City of New Orleans and the communication from Mr. Edward Wisner thereto annexed, that the latter proposes to donate to the City of New Orleans 50,000 acres of unreclaimed, but reclaimable, alluvial lands, situated within the New Orleans delta, of the Mississippi River, to be held by the city and the revenues of designated tracts to be devoted to the following purposes, to-wit:

10,000 Acres for the use of Tulane University, for such purposes as shall be designated in the act of donation.

10,000 Acres for the establishment of a City Convalescent Home for patients of the Charity Hospital and other hospital purposes.

10,000 Acres for the purpose of establishing an Agricultural Department for the City Schools and other school purposes.

10,000 Acres for embellishing the City of New Orleans—making the "City Beautiful."

5,000 Acres to be used for the maintenance of a Civic Center and Free Platform.

1,000 Acres for the establishment of a Parisian Home for superannuated teachers of the Public Schools of the City.

1,000 Acres for the establishment of a Country Home for Newsboys and such other benefits as may accrue to the newsboys of New Orleans.

1,000 Acres for a country home to be established by the City of New Orleans for the superannuated Policemen and Firemen of the city.

1,000 Acres for the use and employment of the Salvation Army for such a period of time as the city may elect.

1,000 Acres for the establishment of a City Poor Farm, where can be located the mendicants of the city.

And, Whereas, Councilmanic action au-

CLERK'S OFFICE, COMMISSION COUNCIL, NEW ORLEANS

City Hall, _June 17_ 19 _46_

I hereby certify the above to be a true and correct copy of Ordinance No. _8369_ New Commission Council Series, as Officially promulgated and on file in Ordinance Book in this office.

_H. J. Mearer_
CLERK OF COMMISSION COUNCIL

Ord. Authorizing
Mayor to accept
Donation

# Exhibit B

UNITED STATES OF AMERICA,

STATE OF LOUISIANA,

PARISH OF ORLEANS,

CITY OF NEW ORLEANS.

\* \* \* \* \* \* \* \* \* \* \*

BE IT KNOWN, That on this 17th day of the month of September, in the year of our Lord, 1929,

BEFORE ME, ROBERT LEGIER, a Notary Public, duly commissioned and qualified in and for the Parish of Orleans, State of Louisiana, therein residing, and in the presence of the witnesses hereinafter named and undersigned;

PERSONALLY CAME AND APPEARED:

(1st)  HON. T. SEMMES WALMSLEY, Act. Mayor of the City of New Orleans, herein appearing and acting in behalf of the City of New Orleans by virtue of the power and authority in him vested by the terms and provisions of Ordinance No. 11,243, Commission Council Series, adopted by the Commission Council of the City of New Orleans on the 23rd day of April 1929, a copy of which Ordinance is hereto annexed and made part hereof.

(2nd)  ESMOND PHELPS, of full age of majority and a resident of this City, herein appearing and acting in behalf of The Administrators of the Tulane Educational Fund, a body corporate under the laws of the State of Louisiana, under and by virtue of a resolution of said corporation adopted on the _____ day of _____ 1929, a certified copy of which is hereto annexed and made part hereof.

(3rd)  T. J. DORGEY, of full age of majority and a resident of this City, herein appearing and acting in behalf of the Board of Administrators of the Charity Hospital of New Orleans, a public board, under and by virtue of the power and authority in him vested by the terms and provisions of a resolution adopted by said Board on the 15th day of July, 1929, a certified copy of which is hereto annexed and made part hereof.

(4th)  J. A. FINN, of full age of majority and a resident of this City, in his capacity as Division Commander of and acting in behalf of The

-2-

Salvation Army, Inc., a corporation created by and existing under the laws of the State of Georgia but qualified in the State of Louisiana, under and by virtue of the power and authority in him vested by the terms and provisions of a resolution adopted by the Board of Directors of said corporation on the 29th day of March, 1929, a certified copy of which is hereto annexed and made part hereof;

(5th) MRS. MARY J. WISNER, MISS ELIZABETH WISNER, and MRS. HARRIET ROWENA WISNER, wife of HARRY J. PENEGUY, all of full age of majority and residents of the City of New Orleans, appearing herein in their respective capacities as as widow in community and executrix and sole and only heirs at law and legatees of the late Edward Wisner, deceased.

THEREUPON, said appearers declared:

That they have entered into, freely and voluntarily, the following Agreement of Compromise and Satisfaction, to-wit:

WHEREAS, by act before Robert Legier, Notary Public, dated the 4th day of August, 1914, Edward Wisner, then a resident of this City, made and executed a donation inter vivos in favor of the City of New Orleans in trust, of certain lands situated in the Parishes of Jefferson, St. John the Baptist and Lafourche, which act of donation was duly accepted in behalf of the City of New Orleans, Trustee, by Martin Behrman, then Martin Behrman, then Mayor of said City, a certified copy of which act of donation is here referred to, and made part hereof for greater certainty of description of its terms, provisions and conditions:

WHEREAS, Mrs. Mary J. Wisner, Miss Elizabeth Wisner and Mrs. Harriet Rowena Wisner, wife of Harry J. Peneguy, as widow in community and sole and only heirs at law, and as legatees of said Edward Wisner, on the_____day of_____ _____, 1928, after the death of said Edward Wisner, instituted a suit in the Civil District Court for the Parish of Orleans, to annul and set aside and have declared void said act of donation, and to have declared their interest in said property covered by said act of donation, a certified copy of their petition in the premises being hereto annexed and made part hereof;

WHEREAS, the other parties hereto have contested, and do contest said suit on the ground that said donation in all respects was a valid and legal act of said Edward Wisner and binding on his widow in community, heirs and assigns;

WHEREAS, all of the parties hereto, in view of the uncertainty of the outcome of said suit, are desirous of effecting a compromise of said litigation and a settlement by agreement of the rights of the parties in the premises;

NOW, THEREFORE, in consideration of the mutual promises, agreements,

20

-3-

and covenants on the part of each of the parties herein contained, each promise, covenant and agreement on the part of the one being the consideration for each promise, covenant and agreement on the part of the others and each of the others; and in further consideration of the mutual concessions made by the one to the other in the settlement, compromise and adjustment of said suit and the termination of said litigation, the parties hereto have agreed as follows:

1. Mrs. Mary J. Wisner, as widow in community and as legatee under the will of the late Edward Wisner and as executrix of his will, and said Miss Elizabeth Wisner and said Mrs. Harriet Rowena Wisner, wife of Harry J. Peneguy, as the forced and only heirs at law and as legatees under the will of said Edward Wisner, for themselves, their heirs, successors and assigns, do hereby in all respects ratify, confirm, approve, acquiesce in and accept, and acknowledge the validity of the act of donation made by said Edward Wisner to the City of New Orleans, aforesaid, a certified copy of which is, as aforesaid, annexed to and made part of this act and do hereby relinquish, release and forego forever, in favor of all other parties in interest, any right, claim, demand, action, cause or right of action which they have asserted in said suit, or which they may, in any respect or for any cause, be hereafter entitled to assert, respecting the validity of said donation, or respecting the rights of any party or beneficiary mentioned therein, except only insofar as the rights of said Mrs. Mary J. Wisner, Miss Elizabeth Wisner and Mrs. Harriet Rowena Wisner, wife of Harry J. Peneguy are recognized, established and confirmed by this Agreement of Compromise; that upon the execution of this agreement all parties hereto will petition for the confirmation thereof by the Judge of Division " " of the Civil District Court for the Parish of Orleans, in the cause entitled "Mrs. Mary J. Wisner, et al, vs. City of New Orleans, et al", No._____of the docket of said court, and said Court shall thereupon enter its judgment adjudicating the rights of the parties hereto in accordance with this Compromise Agreement and such judgment shall be final and binding, and each and all parties hereto hereby acquiesce therein and relinquish all right of review or appeal therefrom.

2nd. The other parties to this agreement, for themselves, their successors and assigns, do hereby irrevocably recognize, acknowledge and declare that said Mrs. Mary J. Wisner, Miss Elizabeth Wisner and Mrs. Harriet Rowena Wisner, wife of Harry J. Peneguy, are, and each of them is recognized as beneficiaries

-4-

under said act of donation of Edward Wisner to the City of New Orleans, annexed hereto, to the extent in the aggregate for the three of Forty Per Cent. (40%) of the rights, interests, revenues and profits hereafter derived from said trust estate and of the proceeds of the trust estate when and if sold under the provisions established by said act of donation, and as entitled to the same relative rights that all other beneficiaries thereunder may have by virtue of said act of donation, with the same force and effect as if they had originally been named and declared beneficiaries under said act of donation by Edward Wisner, donor, to the extent and interest herein agreed upon.

3rd. That in order to readjust, clarify and definitely fix the interests of the respective beneficiaries in and under said trust, it is hereby declared and agreed that their respective interests in said trust estate are and shall be forever as follows, to-wit:

> The City of New Orleans, as beneficiary for the uses and purposes of the several municipal, charitable and educational purposes mentioned in said Act of Donation, thirty-four and eightytenths per cent.     34-8/10%

> The Administrators of the Tulane Educational Fund, twelve per cent.     12%

> The Board of Administrators of the Charity Hospital of New Orleans, twelve per cent.     12%

> The Salvation Army of America, One and two-tenths per cent.     1-2/10%

> Mrs. Mary J. Wisner, Miss Elizabeth Wisner and Mrs. Harriet Rowena Wisner, wife of Harry J. Peneguy jointly, forty per cent., subject to such division between themselves or to such trusts as they may establish and in satisfactory form notify to the City of New Orleans, Trustee     40%

4. That in order to clear up an ambiguity in said act of donation in respect of the provision granting to the beneficiaries the right to segregate their respective proportions of said donated lands, and believing it conducive to the better administration of said trust, the parties hereto, recognized beneficiaries under said act of donation, for themselves, their heirs, successors and assigns, hereby release, abandon and forego the right of segregation conferred upon them by the terms of said act of donation, and agree that said donated property shall be held in indivision and administered by the Trustee during

-5-

the trust period as a whole, and otherwise until sold in accordance with the provisions of said act of donation.

5. That believing it will conduce to a more orderly, economical and practical operation and management of said trust estate than an Advisory Committee to the Trustee should be appointed, it is agreed that the City of New Orleans will cause the Commission Council, by ordinance, to create an Advisory Commission to be known as the "EDWARD WISNER DONATION ADVISORY COMMISSION," composed of five (5) members, one, and the Chairman, to be the Mayor of the City of New Orleans, one to be selected by the Administrators of the Tulane Educational Fund, one to be selected by the Board of Administrators of the Charity Hospital of New Orleans, one by the Salvation Army of America, and one jointly by Mrs. Mary J. Wisner, Miss Elizabeth Wisner and Mrs. Harriet Rowena Wisner, wife of Harry J. Peneguy, or jointly by their heirs, administrators, executors or assigns, The right of appointment herein given may be exercised by the heirs, trustee, successors, or assigns of said parties; that the Mayor of the City of New Orleans, with the approval of the Commission Council ( or its successor body), may act as such Trustee upon the advice and with the consent of the majority of said Commissioners, and such action, so authorized, shall be binding on all parties hereto.

THUS DONE AND PASSED in my office in said City of New Orleans, on the day, month and year first hereinabove written, in the presence of the two undersigned competent witnesses, who have signed hereto with the said appearers and me, Notary, after due reading of the whole.

(ORIGINAL SIGNED)

WITNESSES:

L. Moret

Edith Bowden

CITY OF NEW ORLEANS

BY    T. S. Walmsley
            Acting Mayor

ADMINISTRATORS OF THE TULANE EDUCA-
TIONAL FUND,

BY    Edmond Phelps
            President

Approved as to Form,

Bertrand I. Cahn
City Attorney

BOARD OF ADMINISTRATORS OF THE CHARITY
HOSPITAL OF NEW ORLEANS

By    T. J. Dorcey
         Member of Board

23

-6-

THE SALVATION ARMY OF AMERICA, INC.

BY    J. Arthur Fynn

Mary J. Wisner

Clarisa Elizabeth Wisner
BY   Mary J. Wisner

Harriet Rowena Wisner Peneguy

Robert Legier
Notary Public

A TRUE COPY.

Acting for Robert Legier, Notary Public, absent on leave.

## Exhibit C



City of New Orleans
City Hall, March 13, 1931
Calendar No. 11243
No. 12883 COMMISSION COUNCIL

AN ORDINANCE creating an Advisory Committee to be known as the "Edward Wisner Donation Advisory Committee" and defining the powers and duties of said Advisory Committee.

Whereas, as set forth in Ordinance No. 11243 Commission Council Series, Edward Wisner, now deceased, by notarial act before Robert Legier on August 4th, 1914, made a donation inter vivos of approximately 50,000 acres of land situated partly in the Parish of St. John the Baptist and partly in the parish of Lafourche, all as will appear by reference to the aforesaid Act of Donation, unto the City of New Orleans, the Administrators of Tulane Educational Fund, the Board of Administrators of the Charity Hospital and the Salvation Army of America; and

Whereas, as set forth in said Ordinance No. 11243, Commission Council Series, after the death of the said Edward Wisner, a compromise agreement between the said donees and the heirs of the said Wisner was entered into; and

Whereas, by the terms of the said donation, the Mayor of the City of New Orleans was empowered to act as a representative or commissioner of all of the donees and to administer the trust created in said Act of Donation, as the Trustee for all the said donees; and

Whereas, one of the provisions of the compromise agreement between the said donees and the heirs of the late Edward Wisner was that the City of New Orleans should adopt an ordinance appointing an advisory committee to act with the Mayor in an advisory capacity in the administration of the aforesaid trust;

Therefore—
Section I. Be it ordained by the Commission Council of the City of New Orleans, That an Advisory Committee to be known as the "Edward Wisner Donation Advisory Committee" be and the same is hereby constituted and created. The said Advisory Committee shall be composed of five members. One of said members shall be the Mayor of the City of New Orleans, or some one designated by him to act in his place. The Mayor or his designation shall be the chairman of the said committee. The other members of the committee are to be chosen and appointed as follows. One by the Administrators of the Tulane Educational Fund, one by the Board of Administrators of the Charity Hospital, one by the Salvation Army of America, and one jointly by the heirs, legatees or assigns of the late Edward Wisner, or a majority in interest thereof. Said committee, immediately after its appointment shall meet for the purpose of organization and shall be authorized to appoint a Secretary and to adopt such rules and regulations as it may deem advisable and which are not in conflict with this ordinance or with the terms of Ordinance No. 11243, Commission Council Series. The persons appointed by the beneficiaries aforesaid shall serve until their respective successors have been appointed and notified in writing to the Mayor. Any vacancy occurring in an appointed member representing any beneficiary shall be filled by the beneficiary having the original right of appointment.

Section II. Be it further ordained, etc. That subject to the control and direction of the Commission Council, the powers, duties and functions of said committee shall be the supervision, direction and administration of all of the lands, funds and avails constituting and comprising the Wisner donation, to the avails or fruits thereof, and to consult with and advise the Mayor of the City of New Orleans in his capacity as Trustee upon all matters pertaining to said trust and the Mayor of the City of New Orleans when acting upon the advice of said committee, or a majority thereof, shall be deemed to be acting for and in behalf of all the parties at interest. To that end, all matters relating to said trust shall in the first instance be referred to and handled by said committee. The action of a majority of said committee shall be deemed to be the action of the committee.

Section III. Be it further ordained, etc. That the committee shall at least once a year deliver to the Mayor of the City of New Orleans for transmission to the Commission Council a report of their actions in the premises.

Section IV. Be it further ordained, etc. that any and all expenses, necessary or proper, incurred by the committee shall be paid on the advice of the committee and the approval of the Mayor out of any funds belonging to said trust estate.

Adopted by the Commission Council of the City of New Orleans, March 12, 1931

W. P. BRAND,
Asst. Clerk of Commission Council.
Approved March 13, 1931.
T. S. WALMSLEY,
Mayor.

A True Copy:
D. E. KNOWLES,
Secretary to the Mayor.

ORDINANCE NO. 12,883 C.C.S., creating the Edward Wisner Donation Advisory Committee, adopted March 12, 1931.

## Exhibit D

PORT FOURCHON SUPPLEMENT

# Yes, they have no bananas

*But, 50-year-old Port Fourchon is certainly not complaining*

**Jim Redden**

Determined to corner the lucrative banana trade, Louisiana Gov. Jimmie Davis on July 7, 1960, put his signature to Act 222 that created the Greater Lafourche Port Commission, and with it, Port Fourchon.

Over the next 50 years, the banana bonanza never materialized as most boat captains opted to unload their fruity cargo farther east in Biloxi, Mississippi. Nevertheless, you'd be hard-pressed to find anyone in Port Fourchon bemoaning the monopoly lost, for the consolation prize has eclipsed by several magnitudes any banana revenue. It also propelled what once was an isolated backwater, popular only with weekend anglers and duck hunters, into what is unquestionably one of the nation's most indispensable pieces of waterfront.

According to the latest federal estimates, upwards of one-fourth of the US domestic oil supply and nearly 90% of its offshore gas production flow through what is known as "The Gulf's Energy Connection" just over 100 mi (161 km) south of New Orleans. With the deepwater Gulf of Mexico as its backyard, Port Fourchon is the nucleus for nearly all of the flourishing drilling and production business in the outer fringes of the continental shelf. What's more, Port Fourchon also serves as the base for the Louisiana Offshore Oil Port (LOOP) that offloads from some of the world's largest tankers as much as 1.2 MMb/d, or 10-15% of all US oil imports.

"They could've added pineapples and several other fruits and wouldn't have come close to making up what they have

gotten in oil and gas," 40-year port veteran Pat Pitre, vice president of family-owned supply boat company L & M Botruc Inc., says of the commission's original ambition.

Indeed, a study commissioned by the Louisiana Department of Economic Development and released in late 2008 disclosed just how vital this once insignificant port is to US energy security. The report concluded that any disruption of Port Fourchon operations would keep 18% of the nation's energy supplies out of the marketplace. That ominous assessment was driven home in August and September of 2008 when hurricanes Gustav and Ike slammed into southern Louisiana, temporarily shutting off production coming out of the port and keeping an estimated $7 billion in oil and gas from reaching consumers.

### Still bullish on deepwater

The core of Port Fourchon remains the deepwater, which unlike other geographic drilling theaters, shows no indications of falling on hard times within the foreseeable



A tanker off-loads imported crude at the Louisiana Offshore Oil Port (LOOP).

future. Some estimates say that by the end of this year, the deepwater could account for nearly 80% of GoM oil production. The US Minerals Management Service (MMS) said that as of Jan. 25, 43 new projects in 1,030 ft to 8,850 ft (314 to 2,697 m) of water were undergoing either drilling or workover operations. It followed a similar report issued in early 2009, which showed 33 deepwater wells being drilled, along with another 59 "pending." Factoring in the 135 deepwater fields already developed at the time, the 2009 report documented nearly 230 deep and ultra deepwater projects in need of products and services, not including the projects under way this year.

"Our saving grace is the deepwater," says



Louisiana Gov. Jimmy Davis signs Act 222 on July 7, 1960, to create the Greater Lafourche Port Commission and, in turn, Port Fourchon. Looking on, from left, are State Rep. Woolen Falgout, State Sen. A.O. Rappelet, and State Rep. Dudley Bernard.

### Once dead shelf showing signs of life

While deepwater is the primary focus in Port Fourchon, others say the shallow waters of the Gulf of Mexico shelf also are poised for a resurgence in drilling activity.

"We're finding that some companies are planning to go back and look again at some of the older wells that were drilled there. With the technology we have today, they can drill those wells even with current (gas) prices," says Greater Lafourche Port Commission Executive Director Chett Chiasson.

Many believe Fourchon would



Stacked jackup drilling rigs may return to work if prospects improve for the shelf.

enjoy full employment if not for the rigs, boats, and workers idled by the free fall in deep shallow-water shelf drilling. That once dormant drilling arena may be in line for a rebound, thanks to a major discovery in January by Louisiana's own McMoRan Exploration Co. of New Orleans. Drilled to a depth of more than 28,000 ft (8,534 m) in 20-ft (6-m) of water some 20 mi (32 km) off the Louisiana coast, McMoRan's Davy Jones discovery is believed to hold from to 2 to 6 tcf of gas, making it one of the largest shelf discoveries in decades. Chiasson and others believe it could breathe new life into the once drilling dead zone.

"The deepwater is going well and continues to be very strong, but now we're seeing a lot of the shelf operators starting to pick up activity," says Daniel LaFont, Fourchon marketing manager for Edison Chouest Offshore.

PORT FOURCHON SUPPLEMENT

Karl Boffanie, manager of long-time port tenant John W. Stone Oil Distributor Inc. "If anyone doubts the value of the deepwater all they have to do is look at the price of oil after Katrina and these other hurricanes when the port was shut down for a while."

Despite the healthy outlook for the deepwater, Port Fourchon has not been entirely immune to the economic downturn that brought with it a sharp decline in drilling and production elsewhere in the country. The shelf earlier became a virtual dead zone for drillers, and even some companies involved directly with servicing and supplying the more prosperous deepwater market have been proceeding a bit more cautiously of late, says Chett Chiasson, who this year became only the second executive director in the history of the Greater Lafourche Port Commission. He replaced Ted Falgout, who after 31 years at the helm retired at the end of last year as the first executive director of the now 50-year-old port commission.

"We're having to deal with the economic downturn like everyone else," he says. "Companies are still coming in, but not at the same pace as before. But, we've recently seen interest pick up. Companies are drilling and they tell us that between 2011 and 2012 they'll be back to where they were."

## Port tenants optimistic, expanding

L & M Botruc's Pitre agrees, saying that since the first of the year, signs have been




The 1971 (left) and current port commission boards and new Executive Director Chett Chiasson.



encouraging. "We've seen an upturn over the last two to three weeks and that's a good sign. Normally, January's slow even in a good year."

Pitre and others say that while they have not experienced any major upturn, they have not seen any signs of decline either.

"Business is steady," says Rene Melancon, Port Fourchon yard manager for mooring company Delmar Systems Inc. "We haven't seen any downfall at all and, in fact, we're seeing steady improvement."

"Business hasn't been wide open, but it's been steady and really started picking up in December," says Al Graham, director of Marine Operations for the Central Division of USLL, which specializes in waste management.

"Somebody's drilling," adds Tyrus Smith, business development manager

for Halo LLC, which provides wire rope, chains, slings, and related industrial equipment for the offshore. "Between Jan. 1 and Jan. 20, we've manufactured and sold 700 pipe slings." The same for Danos & Curole, which provides supplemental labor and related services for area operators and service companies. Nicole Williams says business in 2009 increased appreciably for the 63-year-old family-owned company,

---

## Port, ROR work to save the coastline

A spate of shoreline-eating hurricanes in recent years and the sweeping expansion under way at Port Fourchon have combined to invigorate fears that the Gulf of Mexico is close to swallowing the southern Louisiana coast.

No one argues the scientific evidence that warns Louisiana is losing its coastal marshland at an alarming rate. The non-profit Restore or Retreat (ROR) advocacy group that counts among its members a number of operators and service companies, says the state is losing 25 to 30 sq mi (40 to 48 sq km) of wetlands every year, or more simply, marshland the size of an American football field every 30 minutes.

ROR and the Greater Lafourche Port Commission have joined to reverse that trend.

"Restore or Retreat and the port work together, directly and indirectly, on many coastal projects. For years, the Greater Lafourche Port Commission has consistently supported Restore or Retreat financially through a significant annual membership donation," says ROR Executive Director Simone Theriot Maloz. "We are working together on a number of initiatives today."

Her counterpart at the port commission, Executive Director Chett Chiasson, says commissioners have long recognized the environmental threat to expanded development and have taken steps to combat it. Every time the port literally creates



The non-profit Restore or Retreat and the Greater Lafourche Port Commission are working on initiatives to keep the Port Fourchon shoreline intact and open.

land from the seabed for development, it gives birth to a similar amount of wetlands, he says.

"For example, for the 700 acres we are developing for the Northern Expansion, we also will create 700 acres of new marshland," Chiasson says, referring to the port-sponsored Maritime Forest Ridge project.

"Port Fourchon has been an industry leader when it comes to balancing their growth and the environment. The port has been consistent in beneficially using dredge material for decades, and a prime example of this is the Maritime Forest Ridge project," Maloz says. "This 6,000-linear ft (1829-m) ridge restoration project originated from the need of the port to expand to accommodate increased federal outer continental shelf energy activity. Going above and beyond the required mitigation, the project is envisioned to be 12,000 ft (3,658 m) upon completion and will provide a world-class birding habitat, increased hurricane protection, and serve as an educational and eco-tourism platform."

She adds ROR and the port also are involved in a number of marshland-saving projects, including, among others, one devoted to re-introducing freshwater into Bayou Lafourche and another aimed at diverting encroaching salt water from the GoM. Also underway is the $243-million US Corps of Engineers Caminada Headlands Project, a shoreline restoration initiative that is part of the Louisiana Coastal Area Study (LCA).



An anchor handling vessel undergoes work at the recently opened Edison Chouest covered dock in Port Fourchon.

pointing specifically to a multi-year contract the company received recently to provide contract operations and maintenance personnel for all of BP's deepwater activities.

"We've seen amazing growth the past year," she says. "The deepwater remains strong and now it looks like drilling on the deep shelf may take off."

In response, and following the lead of its landlord, many port tenants, likewise, are expanding their operations. Bollinger Shipyards, for example, recently unveiled the first public dry dock in Port Fourchon; Cal Dive International has completed development of its Fourchon Marine Base; Offshore Cleaning Systems became the latest company to establish a port presence; and Hornbeck Offshore introduced the world's largest multi-purpose vessel, says Chiasson.

Mammoth Edison Chouest Offshore, which like the port is celebrating its 50th anniversary this year, also had a busy 2009 with the opening of its covered anchor handling dock. By far the port's largest leaseholder, Edison Chouest operates 165 supply vessels worldwide and services 41 rigs out of Port Fourchon, says Daniel LaFont, marketing manager. The company operates the C-Port I and C-Port II covered facilities and last summer opened its three-slip covered dock. The facility, which has lifting capacity for 9,950 tons, comprises two wet and one dry dock. "We can handle any size (anchor handling) boat in the Gulf," he says.

M-I SWACO, already the port's dominant supplier of drilling and completion fluids, intends to increase completion fluids capacity this year by 10,000 to 20,000 bbl at its HOS Port location, says the company's Port Fourchon Facilities Manager Ron Domangue. In addition, he says the company plans to introduce its automated boat and tank cleaning technology this year at its C-Port II location, one of five it operates within Port Fourchon.

## Remarkable growth

It took nearly 20 years after its creation before the port went all out in major infrastructure enhancements that included roads and channel improvements. Since then, and despite the cyclical ups and downs of the E&P industry, the growth of Port Fourchon over the past 50 years has been nothing short of remarkable and, with its overseers seemingly locked onto a continual mode of expansion, it shows no sign of slowing anytime soon. The 700-acre Northern Expansion, in what at one time was a playground for duck hunters, is well under way, and when completed over the next decade or so, will more than double the port's developed acreage.

More than 125 service and operating companies, from multi-national conglomerates to private, home-grown enterprises, call Port Fourchon home and many, led by Edison Chouest, hold multiple leases. The soon-to-be completed Phase 1 of the Northern Expan-

sion will provide operating space for more than 20 new companies, says Chiasson.

As for the first phase of the Northern Expansion, Chiasson says 3,000 ft (914 m) of bulkhead for Slip B was completed recently with an additional 1,000 ft (305 m) now under construction. With the completion of Slip B in 2011 and the newly completed Slip A, he says Phase 1 of the expansion will be complete.

A short time ago the commission received the necessary permits to begin dredging for the 2,000-ft-long by 700-ft-wide (610 x 213 m) Slip C, which essentially kicks off the second phase of the expansion. Pointing out that work began on slips A and B in 2000, Chiasson says the entire Northern Expansion project will take 10 to 15 years to complete.

While all that is in full swing, the new director says port officials continue to explore innovative ways to serve the tenants already there.

"We're constantly planning to do anything we can to further enhance our capabilities. For instance, we recognize that vessels are becoming larger so we're looking at deeper drafts to allow the industry to continue to expand here," he says.

## Inauspicious beginning

All this is a far cry from the Port Fourchon of 1979 when Boffanie began working in what was basically an undeveloped swamp. Boffanie, who says he practically grew up around the port, recalls when the main artery was nothing more than a dirt road canopied by towering cattails, and the only business enterprise was fishing. "At that time, there was one dock and the only two (oil) companies here were Martin Fuel Distributors and Baroid Drilling Fluids," he says.

The same for Wayne St. Pierre, Fourchon facility manager for



Schematic of future Port Fourchon expansion.

InterMoor Inc. "When I started here in the late '70s all we had basically was a gravel road and this whole area was used mainly for duck hunting. A few small banana boats would come in occasionally and there were the fishing companies, but that was about it," he says from what is now the central location for InterMoor's worldwide operations and home of the largest lift crane on the Gulf Coast, a behemoth capable of lifting 800 tons (726 metric tons).

The times they most definitely have been a-changing and many of those changes, ironically, came when the oilfield was mired in turmoil. In the early 1980s, the industry took a severe and prolonged nosedive with the price of a barrel of crude dropping to low single digits. With jobs harder to come by, service and supply companies considered every possible avenue to cut costs. More times than not, that avenue reached a dead end at Port Fourchon.

"Many of the service and supply companies had numerous, small facilities located all along coastal Louisiana so they could be close to the projects they were working on. They had to downsize and centralize their operations into one or two logistically advantageous locations. For many of them, Port Fourchon was chosen for their consolidated shore base," Chiasson says.

"While oil and gas suffered through a depression in the '80s, Fourchon actually experienced tremendous growth, as more and more support services companies set up their shore base operations here to take advantage of our strategic proximity to the current and future activities in the GoM.

"The port received a major boost in 1995 when the US Congress passed the Deepwater Royalty Relief Act that improved the economics of drilling in more than 1,000 ft (305 m) of water.

"Significant technological advancements were made to coincide with the timing of the passage of this act. Therefore, all the conditions were favorable for the rebirth of the drilling industry in the GoM. Fortunately for Fourchon the service companies realized there was no better place economically, environmentally, or geographically to conduct their operations than Port Fourchon.

"The passage of the deepwater royalty act created rapid expansion at the port. At that time, we had a 2000 to 2030 strategic plan that soon went out the window and we had to revise it upward."

In addition to the ongoing 700-acre Northern Expansion, since 1996 the available 500 acres created in the three-phased E-Slip development all were leased quickly and fully developed. "We really ramped up between 1997 and 1998 and by 2000, a third of the E-Slip had already been leased," Chiasson says.

## Taking hurricane evacuations to a new level

Port newcomer Offshore Cleaning Systems takes a unique approach to evacuating for a hurricane: Just pack up the whole kit and caboodle and move it out of harm's way.

Michael Breaux, corporate asset manager for the tank and vessel cleaning company, says within a matter of hours its entire Port Fourchon location can be cleared, leaving nothing behind, but a concrete slab. Owing to the company's uniquely designed 8- x 12-ft (2.4- x 4-m) modular office and warehouse, when a hurricane approaches the building can be disconnected simply by flipping corner bottom and top levers. Once the structure is detached from his support, a crane lifts it onto a trailer and hauls to a safe location until the all-clear is given to return.



With its modular design, the Port Fourchon headquarters of Offshore Cleaning Systems can be removed completely in the face of a hurricane.

"Once the roads are cleared and we are given approval to return, we can be up and running in 24 hours," he says, adding the site also is equipped with generators to keep it in operation if electricity is down.

Based in Abbeville, Louisiana, the 12-year-old company established a base in Port Fourchon last November.

Then came Hurricane Katrina in late summer 2005. As operators and service companies surveyed the wreckage the storm left in its wake, many once more turned their sights to Port Fourchon. "Many of these companies still had facilities in Cameron, Venice, and elsewhere along the coast and most of those were either destroyed or under water. Like everyone here, we had a mess to clean up, but sustained no major structural damage, so we were able to get back up and running fairly quickly. Several of those companies decided it would be more prudent to operate out of here."

"If you service the offshore oil and gas industry, this is the only place to be," says Offshore Cleaning Systems Corporate Asset Manager Michael Breaux, echoing what seems to be a universal sentiment among Port Fourchon tenants.

"Fourchon has really changed and the growth over the past 10 years has just been remarkable," adds Todd Hornbeck, chairman, president, and CEO of Hornbeck Offshore. "It offers the best value proposition for those of us operating in the GoM."

### Airport also growing

The expansion has not been restricted to the port. The South Lafourche Leonard Miller Jr. Airport in neighboring Galliano, which came under the umbrella of the port commission in 2001, likewise is engrossed in expansion. Named Louisiana's 2006 Airport of the Year by the US Federal Aviation Administration (FAA), the airport early last year extended its main runway from 3,800 ft to 6,500 ft (1,158 to 1,981 m) to accommodate mid-size corporate jets. Airport manager Jason Duet says construction of a parallel jet taxi way is complete as is installation of sophisticated localized landing systems that rely on radio signals. He says the port commission also continues to look at developing an industrial park at its undeveloped 1,200-acre parcel that surrounds the airport.

This year, VIH Cougar opened its new hangar, which will serve as the base for its GoM air services operations, while Edison Chouest, which already operates one hangar, is looking at build another, Duet says.

"Traffic has increased steadily," Duet says. "In fact, between January 2009 and January 2010, we've seen a 19% increase in traffic and that even with us being closed two months for construction. We also have several tenants who've expressed interest in building at the airport."

If Davis and the other pioneers who laid the foundation for Port Fourchon could see what their once modest port had become 50 years after its founding, they undoubtedly would feel is if they had been transported into some parallel universe. And, considering where the port is headed and where it is headed, anyone who still believes the administrators should have held steadfast to their original aspiration, would be looked upon here as being a bit, well, bananas.

The continuous advancements in deepwater oil and gas technology, coupled with the reserve projections for the GoM, indicate the activity currently ongoing at Port Fourchon will be sustained for the next 40 years, at least. ●

**Exhibit E**

# BYLAWS

# OF THE

# EDWARD WISNER DONATION

# ADVISORY COMMITTEE

**April 29, 2003**

# BYLAWS

## OF

### EDWARD WISNER DONATION ADVISORY COMMITTEE

---

## TABLE OF CONTENTS

**ARTICLE**                                                                    **PAGE**

I.   NAME AND FUNCTION ...................................................................... 1

    SECTION 1: Origination of the Committee ........................................ 1

    SECTION 2: Establishment of the Committee ................................... 1

    SECTION 3: Assets managed by the Committee ............................... 1

    SECTION 4: Purpose of the Committee ............................................ 1

    SECTION 5: Functions of the Committee .......................................... 2

II.  OFFICES ............................................................................................... 2

    SECTION 1: Principal Business Office ............................................. 2

    SECTION 2: Alternate Office ........................................................... 3

III. BENEFICIARIES AND COMMITTEE MEMBERS ............................. 3

    SECTION 1: Beneficiaries of the Donation ..................................... 3

    SECTION 2: Representation on the Committee ................................. 3

    SECTION 3: Trustee of the Donation ............................................... 3

IV. OFFICERS AND DUTIES ..................................................................... 4

    SECTION 1: Designation & Election of Officers ............................. 4

    SECTION 2: Duties of Chair ............................................................ 4

    SECTION 3: Duties of Vice-Chair ................................................... 4

    SECTION 4: Duties of Secretary-Treasurer/Land Manager ............. 4

    SECTION 5: Term of Office ............................................................ 4

    SECTION 6: Absence of an Officer ................................................. 4

    SECTION 7: Employment Agreement for an Officer ....................... 5

    SECTION 8: Replacement of an Employed Officer .......................... 5

    SECTION 9: Removal of an Employed Officer ................................ 5

V.  MEETINGS .......................................................................................... 5

# BYLAWS

## OF

### EDWARD WISNER DONATION ADVISORY COMMITTEE

**ARTICLE**                                                                          **PAGE**

SECTION 1: Regular Meetings ........................................................5

SECTION 2: Special Meetings ........................................................5

SECTION 3: Quorum ........................................................6

SECTION 4: Voting ........................................................6

SECTION 5: Location of Meetings ........................................................6

SECTION 6: Rules of Conducting meetings ........................................................6

SECTION 7: Executive Session ........................................................6

SECTION 8: Proxies and Mail Ballots........................................................6

VI. SUBCOMMITTEES ........................................................7

SECTION 1: Composition of Subcommittees ........................................................7

SECTION 2: Subcommittee Quorum ........................................................7

SECTION 3: Subcommittee Reports and Records ........................................................7

SECTION 4: Subcommittee Findings and Recommendations........................................................8

VII. OPERATING FUNDS........................................................8

SECTION 1: Use of Donation Funds........................................................8

SECTION 2: Depositing and Accounting for Funds........................................................8

VIII. FISCAL YEAR ........................................................9

IX. ANNUAL AUDIT, ANNUAL REPORT AND ANNUAL BUDGET ........................................................9

SECTION 1: Annual Audit........................................................9

SECTION 2: Annual Report and Annual Budget ........................................................9

SECTION 3: Review and Distribution ........................................................9

X. INDEMNIFICATION ........................................................10

XI. ADMENDMENTS........................................................10

XII. ADOPTION OF BYLAWS........................................................11

ADDENDUM: JOB DESCRIPTION FOR SECRETARY-TREASURER/LAND MANAGER........................................................12

**BYLAWS**

**OF**

**EDWARD WISNER DONATION ADVISORY COMMITTEE**

### ARTICLE I.

### NAME AND FUNCTION

SECTION 1.  The name, composition and purpose of the Edward Wisner Donation Advisory Committee (the "Committee") originated with an Agreement of Compromise and Satisfaction, which was made and executed on the 17th day of September, 1929 (the "Compromise Agreement") by all parties involved in the Edward Wisner Act of Donation dated August 4, 1914 (the "Act of Donation") and was made the judgment of the Civil District Court for the Parish of Orleans, State of Louisiana, Division "E", presiding in the case of Mrs. Mary J. Wisner, Et Al. Vs. City of New Orleans, Et Al., No. 178,463, Docket 5, on the 1st day of April, 1930.

SECTION 2.  The Committee was established by action of the Commission Council of the City of New Orleans, through Ordinance No. 12,883, Commission Council Series, dated March 12, 1931, which was pursuant to, and in accordance with, the terms and conditions of the Compromise Agreement.

SECTION 3.  The lands, fruits and avails subject to the management of the Committee are: (a) the properties in Jefferson, St. John the Baptist and Lafourche Parishes, Louisiana which were included in the Act of Donation, the title of which is held in the name of the City of New Orleans (the "Donation Properties"), in trust on behalf and for the beneficiaries of the Act of Donation with, and including, the beneficial interest changes which were effected by the Compromise Agreement; and (b) the gross income generated through contracts and other agreements for the exploitation and development of the Donation Properties, including the surface, subsurface, waterways, and mineral resources (the "Donation").  Gross income, in this respect, is defined as any income received by the Donation before operating expenses and distributions to the beneficiaries.

SECTION 4.  The Committee was created for the orderly, economical and practical operation and management of the Donation.  The Committee is the primary administrative and operational body of the Donation and is responsible for the supervision,

1

## BYLAWS
## OF
## EDWARD WISNER DONATION ADVISORY COMMITTEE

direction, administration and development of the Donation Properties and all of the lands, fruits and avails derived therefrom.

SECTION 5. The Committee's functions include: (a) the election or appointment of Officers, including the employment of a Secretary-Treasurer/Land Manager; (b) the selection, or appointment, of subcommittees, as needed, for establishing and recommending policies and procedures and addressing other specific issues associated with the business of the Donation; (c) the supervision and coordination of all business activities on, or connected with, the Donation Properties; (d) the preparation and negotiation of lease agreements, contracts and other documents and agreements for the exploitation, development and preservation of the Donation Properties, including the surface, subsurface, waterways and mineral resources; (e) the contracting of attorneys, consultant engineers, geologists, surveyors, appraisers, auditors and other professionals, as needed, to assist in the exploitation, development and preservation of the Donation Properties or in the evaluation of lease and mineral income therefrom; (f) the providing of advice and consent to the Mayor of the City of New Orleans (the "Trustee") in respect to funding of projects with moneys received from the Donation by the City of New Orleans as beneficiary for the uses and purposes of municipal, charitable and educational purposes within the city; and (g) the engagement in other activities which may, from time to time, be determined as desirable and/or necessary by the beneficiaries of the Donation and are permitted within the intent of the Donation and by the laws of the State of Louisiana governing such donations.

## ARTICLE II.
### OFFICES

SECTION 1. The principal business address of the Donation and Committee is Room 8E06, City Hall, Civic Center, 1300 Perdido Street, New Orleans, Louisiana 70112 (the "Committee Office").

2

34

## BYLAWS

### OF

### EDWARD WISNER DONATION ADVISORY COMMITTEE

SECTION 2.  The Committee may also have an office at such other place within the vicinity of the Parish of Orleans, State of Louisiana, as the Committee may, from time to time, designate.

### ARTICLE III.

### BENEFICIARIES AND COMMITTEE MEMBERS

SECTION 1.  The beneficiaries of the Donation are:

|  | % INTEREST |
|---|---|
| The City of New Orleans, the uses and purposes of the several municipal, charitable and educational purposes mentioned in the Act of Donation | 34.8 |
| The Administrators of The Tulane Educational Fund | 12.0 |
| The Board of Administrators of The Medical Center of Louisiana at New Orleans | 12.0 |
| The Salvation Army, Inc. | 1.2 |
| The Heirs of Edward Wisner | 40.0 |
| Total | 100.0 |

SECTION 2.  Pursuant to the Compromise Agreement, the Committee is composed of five individuals (the "Members"). Each beneficiary has the right to designate one individual as a Member and another individual as an Alternate Member to represent its beneficial interest on the Committee. The designation of each Member and each Alternate Member shall be confirmed, in writing, by the beneficiary to the Committee and the Trustee.

SECTION 3.  The Mayor of the City of New Orleans, with approval from the City Council, acts as Trustee upon the advice and pursuant to the consent of the majority of the Committee.

3

35

BYLAWS

OF

EDWARD WISNER DONATION ADVISORY COMMITTEE

## ARTICLE IV.

### OFFICERS AND DUTIES

SECTION 1.  The Officers of the Committee are: (a) the Mayor of the City of New Orleans (or his designated alternate) as Chair; (b) a Vice-Chair, to be elected by the Committee; and (c) a Secretary-Treasurer/Land Manager, to be employed by the Committee.

SECTION 2.  The Chair shall preside at all meetings of the Committee and shall have the general and legal powers and duties of supervision and management as set forth herein.

SECTION 3.  The Vice-Chair, who must be a Member, shall be elected by the Committee; shall preside at meetings in the absence of the Chair; and shall be responsible for informing the Chair of all business and activities conducted in his absence.

SECTION 4.  The Secretary-Treasurer/Land Manager shall be responsible for the administrative, financial and general management of the Donation under the direction of, and reporting to, the Committee; shall perform the duties and functions as set forth in the job description attached to and made a part of these bylaws; shall make all operational decisions for the discharge of the responsibilities, duties and functions as outlined in said job description; and shall perform other duties as the Committee may, from time to time, direct.  The Committee shall set policies to guide the Secretary-Treasurer/Land Manager in the performance of the duties as outlined in the job description.  Compensation for the services of the Secretary-Treasurer/Land Manager shall be provided from the Donation gross income, as a Committee operating expense, and said compensation shall be reviewed by the Committee annually at such meeting as the Committee deems proper.

SECTION 5.  All Officers shall hold office until their successors are chosen, or appointed, and said successors accept the appointment.

SECTION 6.  In the case of the absence of an Officer, the Chair may delegate, during the absence, the powers and duties of said Officer to any Member, subject to Committee approval.

4

BYLAWS

OF

EDWARD WISNER DONATION ADVISORY COMMITTEE

SECTION 7. Any Officer employed by the Committee shall have a separate employment agreement to specify the terms, conditions and provisions of said employment; provided, however, that said terms, conditions and provisions are in agreement with, or subordinate to, the terms, conditions and provisions as herein stated.

SECTION 8. Should an Officer retire, resign, be removed, or be unable to continue serving as such for any reason, the Committee shall appoint or employ a successor.

SECTION 9. Any Officer appointed or employed by the Committee may be removed by the Committee, provided, however, that such removal is for cause.

## ARTICLE V.

### MEETINGS

SECTION 1. The Committee shall meet at least six times a year in regular meetings to be scheduled at least once in every other month during the calendar year (the "Regular Meetings"). A tentative schedule for said Regular Meetings shall be set for the next calendar year during the last Regular Meeting of each calendar year. All business to be conducted in Regular Meetings shall be set by an agenda, which shall be assembled by the Secretary-Treasurer/Land Manager and delivered in writing and by U. S. mail or hand delivered, to each Member with the notice of the meeting at least three (3) working days prior to the dates of such meetings. Meeting notices shall state the place, date and hour of each meeting.

SECTION 2. Special meetings may be held: (a) at the call of the Chair, or (b) by written request to the Chair from at least two Members (the "Special Meetings"). Special Meetings may be held at such time and place as shall be stated in the notice of the meeting. The Secretary-Treasurer/Land Manager shall deliver in writing by U. S. mail, or hand delivery, notice of the Special Meeting to each Member at least three (3) working days prior to the date of said Special Meeting. Business transacted in a Special Meeting shall be limited to the purpose stated in the notice for such Special Meeting. The Committee shall have at least one Special Meeting each calendar year, preferably prior to the first Regular Meeting for the calendar year,

5

BYLAWS

OF

EDWARD WISNER DONATION ADVISORY COMMITTEE

with the purposes of said Special Meeting being the review of, and actions in respect to: (a) the Annual Report from the Secretary-Treasurer/Land Manager for the previous calendar year; (b) the proposed Annual Budget for the upcoming calendar year; (c) internal operations and organizational staffing requirements; and (d) employee performance and compensation.

SECTION 3. The physical presence of any three (3) Members, or respective Alternate Members, constitutes a quorum of the Committee.

SECTION 4. All business conducted by the Committee shall be by the affirmative vote of a majority of the Members, or respective Alternate Members, present at a duly convened meeting, and such vote shall constitute the action of the whole Committee.

SECTION 5. Meetings of the Committee shall be held in a conference room of the Committee Offices or at other locations as selected by the Chair or Secretary-Treasurer/Land Manager and accepted by the Committee. Arrangements for meeting places and times shall be arranged by the Secretary-Treasurer/Land Manager.

SECTION 6. Meetings of the Committee shall be conducted in accordance with Robert's Rules of Order.

SECTION 7: The Committee may elect to enter executive session for discussing sensitive internal, litigation and negotiating issues. A majority Committee vote shall be required to enter and exit said executive session and, should minutes be recorded for said executive session, the minutes shall be approved in a subsequent executive session and shall remain private to the Committee and all attorneys, professionals and beneficiaries permitted to participate in said executive session. Voting shall not occur within an executive session.

SECTION 8. Ballots via facsimile (fax), electronic mail (e-mail), or telephone from the Secretary-Treasurer/Land Manager shall be an acceptable form of voting by the Members on an emergency basis for negotiating terms of lease agreements, addressing litigation matters and/or other issues associated with managing the

6

BYLAWS

OF

EDWARD WISNER DONATION ADVISORY COMMITTEE

Donation Properties, provided, however, that should one Member, or an Alternate Member, respond to such a ballot to the effect that a Special Meeting should be called for discussing the specific issue addressed by said ballot, the Secretary-Treasurer/Land Manager shall, prior to acting in accordance with the results of said ballot, contact the other Members, via fax, e-mail or telephone, to advise of the request for a Special Meeting and determine from the replies from the other Members as to whether a Special Meeting should be called in accordance with Article V, Section 2.  Ballots via U.S. mail, fax, e-mail or telephone shall not be permitted for amending internal operating procedures or organizational changes of the Committee.

## ARTICLE VI.
## SUBCOMMITTEES

SECTION 1.  Subcommittees shall be composed of two or more Members as elected by the Committee or appointed by the Chair; shall be limited to the activities required to accomplish the specific function, or functions, assigned to them by the Committee; and shall stand discharged upon the accomplishment of said function, or functions, without further notice, or requirement for further notice, of such discharge. Appointments made to such subcommittees by the Chair, other than in a meeting of the Committee, shall be verified, in writing with notice to all Members delivered by U. S. mail, and shall be subject to approval by the Committee.

SECTION 2.  The presence in person of a majority of the Members of a subcommittee shall constitute a quorum of the subcommittee, provided, however, that a subcommittee composed of two Members shall not conduct business or vote without both subcommittee Members being present. All business conducted by a subcommittee shall be by a majority vote of the Members present, at a duly convened meeting, and such vote shall constitute the action of the whole subcommittee.

SECTION 3.  The chair of each subcommittee shall prepare, or cause to be prepared, a record of each meeting of said subcommittee and promptly file a copy of such record with

7

39

BYLAWS

OF

EDWARD WISNER DONATION ADVISORY COMMITTEE

the Chair and Secretary-Treasurer/Land Manager.   The chair of each subcommittee shall also prepare, or cause to be prepared, a written report of the activities and recommendations of said subcommittee and present, or cause to be presented, said report to the Committee during a Regular Meeting or a Special Meeting called for that purpose.

SECTION 4.   All findings or actions recommended by a subcommittee shall be subject to, and shall become the findings or actions of the Committee upon, the ratification and/or approval of said findings or actions by the Committee at a Regular Meeting or a Special Meeting duly convened for that purpose.

## ARTICLE VII.

### OPERATING FUNDS

SECTION 1.   The Committee shall draw operating funds from the Donation gross income prior to distributions to the beneficiaries.  Said operating funds shall be used to cover all Committee operating expenses, to include: (a) the contracting of attorneys, auditors, surveyors, appraisers, consultant engineers, geologists and other professionals, as needed, to assist in the exploitation, development and preservation of the Donation Properties or the evaluation of lease and mineral income therefrom; (b) the compensation and benefits required for the employment of a Secretary-Treasurer/Land Manager; and (c) normal operating expenses, such as payroll taxes, automobile and travel expenses, office supplies, employment of clerical support staff, subscriptions, postage, telephone and miscellaneous expenses.  The amount retained in the Donation account for Committee operating funds shall be based on historical and anticipated monthly operating expenses with an allowance for minimum balance requirements.  Unusual operating fund balances shall require the approval of the Committee.

SECTION 2.   The Secretary-Treasurer/Land Manager shall be responsible for establishing and maintaining a checking account for the Edward Wisner Donation in a local bank that is insured and protected by FDIC insurance.  The operating fund for the

8

BYLAWS

OF

EDWARD WISNER DONATION ADVISORY COMMITTEE

Committee shall be included as part of the checking account for the Donation. All checks, drafts or notes drawn on said checking account shall be executed, and accounted for, by the Secretary-Treasurer/Land Manager, or other Officer and/or person as the Committee may, from time to time, designate.

### ARTICLE VIII.

### FISCAL YEAR

The fiscal year for the Donation and Committee shall be the calendar year.

### ARTICLE IX.

### ANNUAL AUDIT, ANNUAL REPORT AND ANNUAL BUDGET

SECTION 1.  The Committee shall employ a certified public accountant firm who shall prepare a certified audit of the accounts of the Donation for each calendar year. Said audit shall include reviews of the Donation income, Committee expenses, beneficiary distributions and all benefits provided in connection with the employment of a Secretary-Treasurer/Land Manager. The Committee shall review said audit and the Secretary-Treasurer/Land Manager shall correct all exceptions noted.

SECTION 2.  The Secretary-Treasurer/Land Manager shall prepare an annual report of Committee activities and leasing activities on the Donation Properties (the "Annual Report"), to include unusual Committee expenses incurred and summaries of the major areas of Donation Property income, and submit said Annual Report to the Committee for review prior to its first meeting of the upcoming calendar year. The Secretary-Treasurer/Land Manager shall also prepare an annual budget for each successive calendar year (the "Annual Budget"). Said Annual Budget shall include projections by source of anticipated Donation income and Committee operating expenses for the calendar year. Said Annual Budget shall be submitted to the Committee prior to its first meeting of the upcoming calendar year.

SECTION 3.  Upon approval of the Annual Report and Annual Budget by the Committee, the records shall be available for distribution to beneficiaries upon individual requests through their respective Member.

9

41

BYLAWS

OF

EDWARD WISNER DONATION ADVISORY COMMITTEE

## ARTICLE X.
### INDEMNIFICATION

The Donation and the Committee shall indemnify and hold each Member, Alternate Member and Officer harmless from and against any and all claims or liabilities to which he (or she) may become subject by reason of his (or her) service, alleged acts and/or omissions as such Member, Alternate Member or Officer of the Committee, whether or not he (or she) continues to be such Member, Alternate Member or Officer at the time when any such claim or liability is asserted, and shall reimburse such Member, Alternate Member or Officer for all reasonable expenses in connection with defending any and all such claims or liabilities, including any amounts paid or agreed to be paid in connection with reasonable settlements made, before final adjudication, with the majority approval of the Committee, whether or not he (or she) continues to be such Member, Alternate Member or Officer at the time such expenses are incurred; provided, however, that no Member, Alternate Member or Officer shall be indemnified or held harmless against any claim or liability arising out of his (or her) own gross negligence or willful misconduct.  This right of indemnification shall not be exclusive of other rights to which any Member, Alternate Member or Officer may be entitled to as a matter of law.

## ARTICLE XI.
### AMENDMENTS

These bylaws, including the job description attached to and made a part hereof, may be amended by the Committee at any Regular or Special Meeting called for that purpose and any such amendment shall become effective at the time of adoption of said amendment, provided, however, that: (a) a copy of any such proposed amendment shall be mailed or hand delivered to each Member and Alternate Member at least ten (10) working days prior to said meeting, and (b) no change in Officers shall be made within sixty (60) days preceding the day on which said amendment is proposed for adoption.

10

42

## BYLAWS

### OF

### EDWARD WISNER DONATION ADVISORY COMMITTEE

---

All amendments shall be affixed to and become a part of these bylaws upon adoption. The Secretary-Treasurer/Land Manager shall be responsible for providing each Member, Alternate Member and Officer copies of these bylaws and all amendments as they are adopted.

### ARTICLE XII.

### ADOPTION OF BYLAWS

These bylaws replace and supersede the bylaws that were adopted by a majority vote of the Members of the Committee on the 9th day of July 1974.

Adopted by a majority vote of the Members of the Edward Wisner Donation Advisory Committee and made effective on the 29th day of _April_____, 2003.


_____
Mayor C. Ray Nagin
Trustee


_____
C. Cathy Norman
Secretary-Treasurer/Land Manager


11

43

BYLAWS

OF

EDWARD WISNER DONATION ADVISORY COMMITTEE

### ADDENDUM TO BYLAWS

### SECRETARY-TREASURER/LAND MANAGER JOB DESCRIPTION

1. **SCOPE:** This position embraces the administrative, financial and general management of the Donation under the direction of, and reporting to, the Committee. The Committee will set policies to guide the Secretary-Treasurer/Land Manager in the performance of his (or her) duties. The Secretary-Treasurer/Land Manager is to make all operational decisions for the discharge of the responsibilities and duties as outlined herein.

2. **RESPONSIBILITIES:** The Donation derives its income from movable and immovable property. The Secretary-Treasurer/Land Manager is responsible for:

   a. The proper leasing of the Donation Properties; all contracts relating to the Donation Properties; all mineral exploration, drilling, or mining thereof and rights or leases thereto; all wetlands and properties therein and contracts and/or leases related thereto; all buildings and/or real property which may be a part thereof; all business and financial records relating to the business and finances of the Donation; and establishing plats and working maps on all properties.

   b. The negotiation and proper execution, or cause to be executed, of any and all contracts to protect and/or use the Donation Properties; the recording of such documents; and the administration of those contracts in behalf of the Donation.

   c. The timely collection of all fees due the Donation from any and all sources, with authority to employ legal assistance as authorized by the Committee to aid in such collection as may be required, with diligence to recommend the filing of legal action if necessary.

   d. To (i) prepare proper records and maintain same in computerized form, for the financial accounting of income and disbursements; (ii) provide the external audit/accounting firm of record with all accounting information on a timely basis; (iii) comply with any request for additional required information from the external audit/accounting firm, and (iv) maintain files of all records submitted by the external

12

**BYLAWS**

**OF**

**EDWARD WISNER DONATION ADVISORY COMMITTEE**

---

audit/accounting firm for the Donation's interests. All appropriate accounting records shall be maintained as determined by the Committee based upon the recommendations of the Donation's independent auditor.

e. To design and formulate a development plan which will include land development, business development and methodology to attempt to raise and improve the income and cash flow to the Donation and its interests.

f. To act publicly in the interests to the Donation as appropriate in banking, financial, and legal relations and with the Legislature, the Department of Natural Resources, the Department of Wildlife and Fisheries, the public, the media and others as they may appear.

g. To maintain contacts with legislators and be current in legislative knowledge through appropriate and legitimate sources, and to be alert and in a position to react positively or negatively to proposed legislation which could impact the Donation and its interests.

h. To maintain a library and to subscribe to newspapers, or other publications to provide accurate and current information to discharge all duties accurately with supported knowledge. To attend seminars to stay abreast with new technologies, legal and environmental affairs, tax consequences, and legislative matters, as may be appropriate to protect the interests of the Donation.

i. To take an active part in organizations whose interests coincide with those of the Donation and to either join in collective action, if appropriate, or take separate action from the organization in matters affecting the Donation as may be in its best interest.

j. To prepare the agenda for all meetings; to audio tape all meetings and preserve such tapes in file until the minutes for said meetings are approved by the Committee; to prepare minutes of all meetings and distribute copies of those minutes to all appropriate parties and interests; and to provide a written and oral report to the Committee at each of its meetings. This report should be inclusive of income and disbursements, and should include copies of monthly financial statements for the prior

13

BYLAWS

OF

EDWARD WISNER DONATION ADVISORY COMMITTEE

---

month.  The report should also include discourse of projects in progress, projects completed, operational plans and developmental activities.  All business requiring Committee approval, decision or action is to be placed on the agenda and shown as such.  Copies of the agenda should be provided to all Members in advance allowing sufficient time for evaluation.

k.  To develop short and long-term goals for the improved operation and income which would include, but is not limited to, savings and increased income on property and safe investments of temporarily idle funds.

l.  To effectively and properly manage and direct the efforts of clerical support staff and independent contractors as may be needed and approved by the Committee, in the efficient operation of the business office(s) of the Donation and on the Donation Properties; to employ staff and independent contractors as may be approved by the Committee; and to train all personnel supervised.

3.  **DUTIES:**   To perform all tasks related to the accomplishment of the above outlined responsibilities in an efficient, accurate, professional and cost effective manner.

Adopted and made effective on the _19th_ day of _April_ , 2003 by the Edward Wisner Donation Advisory Committee at its regularly scheduled meeting held on the same date.


Mayor C. Ray Nagin
Trustee

C. Cathy Norman
Secretary-Treasurer/Land Manager

14

46

# Exhibit F

## COMMITTEE MEMBERS

*Alternates*

For:  Tulane University:
**Dr. Sandra Robinson**
1300 Perdido Street, Room 8E18
New Orleans, LA 70112
Srobinson@cityofno.com
504/658.2512 Office in City Hall
504/658.2520 Fax in City Hall
504/899.5437 Office
504/899.8668 Fax

**Mr. Michael Peneguy**
1541 Maplewood Drive
Slidell, LA 70458
Peneguy@bellsouth.net
985/649.1191 Home
985/649.2911 Fax

**Mr. William Peneguy**
P. O. Box 381
Gulfport, MS 39502
WACPA@bellsouth.net

**Dr. Everett Williams**
Charity Trust Funds
1730 Constantinople Street
New Orleans, LA 70115
EWill57774@aol.com
504/269-2590 Home
504/717-8832 Cell

**Mayor Mitchell J. Landrieu**
c/o To be Named
1300 Perdido Street
Room 2E04, City Hall

**Ms. Dawn Segura**
City Attorney
1300 Perdido Street
5th Floor, City Hall
Dsegura@cityofno.com
504/658.9839

**Captain Ethan Frizzell**
Salvation Army
Post Office Box 13808
New Orleans, LA 70185-3808
Ethan_Frizzell@uss.salvationarmy.org
504/202-6154 Office
504/891-1444Fax
504/208.8294 Cell

**Ed Buddy**
Ed_Buddy@uss.salvationarmy.org

47

## Exhibit G

# PROPOSED 2010 MEETING SCHEDULE

# EDWARD WISNER DONATION

# ADVISORY COMMITTEE

| | | |
|---|---|---|
| TUESDAY, JANUARY 26 | 12:00 NOON | REGULAR MEETING |
| TUESDAY, FEBRUARY 23 | 12:00 NOON | REGULAR MEETING |
| TUESDAY, MARCH 30 | 12:00 NOON | ANNUAL REVIEW |
| | 1:30 PM | REGULAR MEETING |
| TUESDAY, APRIL 27 | 12:00 NOON | REGULAR MEETING |
| TUESDAY, MAY 25 | 12:00 NOON | REGULAR MEETING |
| JUNE | NO MEETING | |
| TUESDAY, JULY 27 | 12:00 NOON | REGULAR MEETING |
| TUESDAY, AUGUST 30 | 12:00 NOON | REGULAR MEETING |
| TUESDAY, SEPTEMBER 28 | 12:00 NOON | REGULAR MEETING |
| TUESDAY, OCTOBER 26 | 12:00 NOON | REGULAR MEETING |
| TUESDAY, NOVEMBER 30 | 12:00 NOON | REGULAR MEETING |
| DECEMBER | NO MEETING | |

**NOTE:** ALL MEETINGS ARE HELD IN THE OFFICES OF SIMON, PERAGINE, SMITH AND REDFEARN, L.L.P. UNTIL FURTHER NOTICE.

48

# Exhibit H

### ABBREVIATED VITAE

**C. Cathy Norman**
Secretary Treasurer/ Land Manager
Edward Wisner Donation
1300 Perdido Room 8E06
New Orleans, Louisiana 70112
(504) 658-4060
wisnerdonation@aol.com

## EDUCATION

Tulane University; B.A. 1978 – Bachelor of Arts (English)
Tulane University Law School; J.D. 1982
Admitted to Louisiana Bar 1982

## PROFESSIONAL HISTORY

EQUTABLE PETROLEUM, INC., New Orleans Louisiana 1982 – 1985
Attorney/Landman

CNG PRODUCING COMPANY, New Orleans Louisiana and Denver, Colorado
1985 – 1992
Attorney Landman I, Landman III, Senior Landman

EDWARD WISNER DONATION, New Orleans, Louisiana 1992 – Present
Secretary Treasurer/Land Manager

## PROFESSIONAL EXPERIENCE

C. Cathy Norman is an Attorney/Landman with extensive oil and gas, wetlands and environmental experience including contract negotiations, land acquisition and management and the administration of associated operations and activities. Since 1992, Ms. Norman has overseen a 35,000 acres quasi public land trust including all of the administrative, financial and management duties. This position involves the negotiation of contracts and leases, resolution of environmental issues, legislative lobbying on related issues, land use development, business planning and the collection and distribution to beneficiaries of over $4 million annually.

In 2003 Ms. Norman was the project manager of the NOAA Community Based Lafourche Parish Wisner Restoration Project. This restoration project is the largest Community based project ever constructed. For her efforts Ms. Norman received NOAA's 2004 Environmental Hero Award and the Coalition to Restore Coastal Louisiana's Coastal Stewardship Award.

**L. Amanda Phillips**

**543 Octavia Street, New Orleans, LA 70115**          504/899.7908, email: lapno@aol.com

| | |
|---|---|
| **Education** | |
| *1994 – 1996* | Master of Business Administration, **Loyola University**, College of Business Administration, New Orleans, LA |
| *1988 – 1990* | Bachelor of Arts, German, cum laude **Tulane University**, Newcomb College, New Orleans, LA |
| *1987 – 1988* | **American College of Switzerland**, Leysin, Switzerland |

**Experience**

*2001 – Present*  **Executive Assistant**                                **Edward Wisner Donation**, New Orleans, LA
Oversee miscellaneous and industrial leases for compliance and revenue collection. Maintain accounting records, generate monthly reports and assist in compiling the annual budget and the annual report. Manage office operations.  Train and supervise file clerk. Transitioning to digital recordkeeping and filing. Set up database for miscellaneous leases. Created Procedure Manual. Evacuated records and established remote office post-Katrina.

*2000 – 2002*  **Census Taker**                    **US Bureau of the Census, Department of Commerce**, New Orleans, LA

*1999*  **Marketing Manager**                                **Aunt Sally's Pralines**, New Orleans, LA
Positioned Aunt Sally's as a premium brand outside the local market to build brand equity. Managed shipping, wholesale, and mail order departments. Produced 1999 catalog. Created and launched Internet sales site. Wrote and published quarterly corporate newsletter. Developed and implemented procedures for new and expanding departments.

*1997 – 1998*  **District Manager, Midwest (IL, IN, MN, MO)**                    **Tie Rack/Knot Shop**
Ten stores. $3 million annual sales. Recruited, trained and developed store managers. Integrated new acquisition, 8 Knot Shop stores, into Tie Rack. Created a single Tie Rack and Knot Shop district. Planned and organized 2 new Tie Rack stores in Chicago. Closed 2 Knot Shops and cleared all obsolete inventory in US. Guided buyers, set sales goals for district and operated within district budget.

*1992 – 1997*  **Store Manager**                                **Tie Rack**, New Orleans, LA
Increased year to year sales 11%. Developed training procedures for US stores. Selected local vendors and goods for other stores. Guided stock selection and merchandising. Trained managers for 3 other stores. Managed store repairs, negotiated claims, and reopened following damage by runaway ship. Evaluated airport store opportunity for CEO. Vice President (1996) Riverwalk's Merchant Association. Full-time graduate student from 9/94 to 8/96.

*1991 – 1992*  **Store Manager**                                **Hologram Haven**, New Orleans, LA
Exceptional sale per square foot ($783 vs. $505 mall average in 1991). Developed ordering system, price list, and product information guide. Trained manager for another store.

*1987*  **Department Manager**                                **John Wanamaker**, Wilmington, DE
Organized and executed the most efficient inventory in store history. Identified and sold $3 million worth of obsolete inventory. Supervised 17 employees.

**Honors, Activites**
Sigma Alpha Nu (Jesuit academic honorary for top 2% with community service). Delta Phi Alpha (German Honorary), appointed to ACS President's Commission for Development for 1988-89, AIESEC International Association of Business Students, German Club, Volunteer Buddy for 2 terminal AIDS patients with NO/AIDS Task Force (10-92-8/94)

**International**
Read and speak fluent German, read and converse in French, and read and speak some Spanish. Lived three years in Germany and one in Switzerland.

50

# Exhibit I

## EDWARD WISNER DONATION
## ADVISORY COMMITTEE
## GRANT APPLICATION*  ** ***

### GENERAL INSTRUCTIONS

1.  Please type and single space all proposals.
2.  Please answer all of the applicable questions in the order listed.
    If question is not applicable, put N/A.
3.  Please use the headings, subheadings, and numbers provided.
4.  Please submit only one original.
5.  Please do not bind your application.

Note:  Incomplete applications will not be processed.

### *ELIGIBILITY*

*Eligibility:  To qualify for Wisner Grants, entities must be non-profits, or public entities whose purposes fit generally into the following categories: Education, Beautification, Recreation, or Human Services.  Capital Projects are preferred, and will be granted on a project by project basis.  Operational funds will be considered but will normally be granted only for one year.  If compelling and applicable need is established, operations could be funded for multiple years, with diminishing grant amounts.*

Send completed application form to the following address:

Edward Wisner Donation Advisory Committee
1300 Perdido Street, Suite 2E04
New Orleans,  Louisiana  70112

*Application revised 1/25/04      ** Revised to require email address 3/24/05      *** New Vendor info added 7/1/06

# PROPOSAL FORMAT (rev. 1/25/04)

## SECTION I: PROPOSAL SUMMARY FORM

Please complete the attached grant proposal summary. Do not bind your information.

## SECTION II: NARRATIVE

Please complete the following narrative section of the application. The narrative must be three pages or less and typed.

A.   Background Information

Description of the work of your organization, addressing each of the following topics:

1.   A brief description of the history of the organization and its mission.
2.   The primary issue(s) that the organization seeks to address.
3.   Current programs and accomplishments. Please emphasize the achievements of the past year.
4.   The population that your agency reaches, including geographic location, socioeconomic status, race, ethnicity, gender, age, and physical or mental abilities.
5.   Overview of organization⁁s structure including board, staff and volunteer involvement.
6.   Your organization⁁s relationship with other organizations that provide similar services or programs.

B.   Funding Request

Describe the program for which you seek funding.

1.   If applying for general operating support, briefly describe how this grant would be used. If your request is for a specific project/program, please describe in detail:

Π   A statement of its primary purpose and the issue that you are seeking to address.
Π   The population that you plan to reach; how they will be involved and how they will benefit from the project/program.
Π   Strategies that you will use to implement your project/program.
Π   The names and qualifications of the individuals who will direct the project/program, if known.
Π   Anticipated length of the project/program and time line.
Π   How the project/program contributes to your organization⁁s overall mission. How will it benefit the community?
Π   Any collaboration/interaction with other groups.

C.    Evaluation

Please explain how you will measure the effectiveness of your activities.

1.    Describe your criteria for a successful program.
2.    What are the results you expect to have achieved by the end of the funding period?
3.    What are your plans for future funding?
4.    Explain how evaluation results will be used and/or disseminated and if applicable, how the project/program can be replicated.

## SECTION III:  ATTACHMENTS

A.    Financial Information/Overall

1.    Organization's current and prior year operating budget, including expenses and revenue; list sources of revenue received and those pending, including in-kind.  If possible, indicate what percentage of donations are provided directly or indirectly by your board.
2.    Most recent annual financial statement (audited, if available: if not, enclose most recent IRS, form 990).

B.    Financial Information/Program-Project

1.    A budget for the project/program.
2.    List key staff positions separately and include the percentage of time spent of the project.
3.    List the names and amounts requested of other foundations, corporations, and other funding sources to which this proposal has been submitted.
4.    Indicate the specific uses of the requested grant.
5.    List in-kind support.

C.    Other Supporting Materials

1.    A list of your board of directors and their principal affiliations.  Please include criteria for board selection.
2.    One paragraph resumes of key organizational staff including key project/program staff.
3.    A copy of the current IRS determination letter indicating 501(c)(3) and 509(a) tax exempt status or that of your fiscal agent.
4.    Your most recent annual report, if available.
5.    Agency affiliation with federated funds or public agencies.

## APPLICATION FOR WISNER FUNDING
## SECTION I: PROPOSAL SUMMARY FORM (rev. 1/25/04)

| Name of Applicant | Please print or type responses. Use additional pages when necessary and attach to this document.<br>Date of Submittal: | |
|---|---|---|
| Federal I.D.# | Proposal Attached : ☐ Yes ☐ No | |
| Address (city, state, zip) | Name, Title, phone & email of contact person | |
| Title of proposed project and one paragraph description: | | |
| Area(s) affected by project (e.g. councilmanic district, neighborhood, census tracts, etc.) | **Estimated Funding - All sources** | |
| | Source | Amount |
| | Edward Wisner Trust | $ |
| | | $ |
| | Total Project/Program Budget | $ |
| | **Total Organizational Annual Budget** | $ |

| Project Start Date | Project End Date | Type of Applicant<br>____ Non Profit<br>____ Public Entity<br>Describe briefly________________ |
|---|---|---|

***To the best of my knowledge and belief, all data in this application is true and correct, the document has been duly authorized by the governing body of the applicant and the applicant will comply with the attached assurances if the assistance is awarded.***

| Name of Authorized Representative | Title | Phone & Email |
|---|---|---|
| Signature of Authorized Representative | Date Signed | |

January 2006

Dear City of New Orleans Vendor:

The City of New Orleans Department of Finance Purchasing Bureau's procurement system, BuySpeed Online, operates on a windows-based platform with access using Internet Explorer. The system provides enhanced vendor services in order to view and update your company's vendor file, allows vendors to receive and respond to online bids, receive purchase orders, receive downloads, bid solicitations and the ability to contact the Purchasing Bureau.

## Online Vendor Registration Procedure:

1. Log onto the City of New Orleans website at: www.cityofno.com.
2. At the left of the screen, select City Purchasing Portal.
3. Select Click here to begin using the new City of New Orleans online purchasing portal.
*You are now at the City of New Orleans BuySpeed Online site.*
4. Click on 'Disclaimer' and read the disclaimer carefully then select 'Close Window'.
5. Click on the word 'Register'.
6. Enter your Tax Identification Number and Official Company Name and click on the 'Submit' button.
*You are now in the vendor registration site.*
7. Complete the 'Company Information' and 'Administrative User Information'.
8. All items marked with an asterisk * are required to be completed before continuing registration.
9. Upon completion of this page, select either: a) 'Add Another Address' if your company has more than one address or location, b) 'Continue Registration' if page complete, c) 'Reset' which resets to prior information saved, or d) 'Cancel' to cancel the transaction.
10. Upon 'Continue Registration' select a choice for Terms, Categories and Certifications. If you chose to continue registration, then click 'Continue Registration' again.
11. At the next screen select a 'Region' that applies to your company then click 'Continue Registration' if the page is complete and you chose to continue the registration process.
12. If you choose continue registration the next screen 'Commodity & Service Codes' allows you to choose the materials, supplies, equipment and services your company provides. Please select as many codes as describes the materials, supplies, equipment and services your company provides. Select the codes and descriptions under 'NIGP Code Browse' then select either 'Save and Add More' to add additional commodities, 'Save and Continue Registration' to save the commodities selected or 'Exit and Continue Registration' to exit without saving the currently selected commodities

If you have any problems accessing this system, logging on the system or if you do not have access to the Internet, please contact the Purchasing Department at (504) 658-1550, or email purchasing@cityofno.com. Assistance is available Monday through Friday, 9:00 a.m. to 4:00 p.m. CST.

Sincerely,

*Andrée Cohen*

Ms. Andrée Cohen
Purchasing Administrator

# Exhibit J

## Wisner Grants Awarded in 2009

| 2009 | Multi-Year | Organization | Amount |
|---|---|---|---|
| January | | Anthony Bean Community Theater | $25,000.00 |
| January | | The Greater N.O. Gun Buy Back Committee | 25,000.00 |
| January | | Mayoral Fellows Program | 180,300.00 |
| January | | New Orleans African American Museum | 100,000.00 |
| January | | Ruach, Inc. | 25,000.00 |
| March | | Efforts of Grace | 50,000.00 |
| March | | N. O. Police & Justice Foundation | 20,000.00 |
| April | | African American Male & Female Institute "Juneteenth Freedom Celebration" | 15,000.00 |
| April | | Bridge House | 50,000.00 |
| April | | Committee for a Better N.O./Metropolitan Area Committee | 25,000.00 |
| April | | Dillard University – Project SEEC | 30,000.00 |
| April | | Mayoral Fellows Program | 72,000.00 |
| April | | New Orleans Jazz Orchestra | 50,000.00 |
| May | | New Orleans Opera Association | 50,000.00 |
| June | | Friends of Danneel Park | 25,000.00 |
| June | | Lionman Foundation, Inc. | 25,000.00 |
| June | | Louisiana Philharmonic Orchestra | 150,000.00 |
| June | | New Orleans Museum of Art | 40,000.00 |
| June | | T.U. "For the Children Literacy Program" | 25,000.00 |
| June | | New Orleans Jazz Orchestra [Fiscal Agent for purchase of statues in Armstrong Park] | 1,210,000.00 |
| July | | N. O. Council for Community & Justice | 20,000.00 |
| July | | New Orleans Musicians' Assistance Foundation | 100,000.00 |
| July | 5 of 5 | Ogden Museum of Southern Art (5th of 5) | 100,000.00 |
| July | | Sweet Home New Orleans | 50,000.00 |
| July | | WRBH Radio for the Blind & Print Handicapped | 25,000.00 |
| September | 1 of 3 | Greater New Orleans Youth Orchestra (1st of 3) | 100,000.00 |
| September | | Louisiana Children's Museum | 500,000.00 |
| September | | Parkway Partners Program | 50,000.00 |
| October | | New Orleans Opera Association | 100,000.00 |
| October | | Roots of Music, Inc. | 20,000.00 |
| November | | Foundation for Science & Mathematics Education, Inc. | 30,000.00 |
| November | | Israelite Baptist Church | 20,000.00 |
| November | | Junior Achievement of Greater New Orleans | 100,000.00 |
| November | | Lionman Foundation, Inc. | 25,000.00 |
| November | | New Orleans Jazz Orchestra | 50,000.00 |
| November | | St. Thomas Community Health Center | 100,000.00 |
| December | | MLK, Jr. Federal Holiday Planning Commission | 22,000.00 |
| | | **2009 Subtotal Grants Awarded** | **$3,604,300.00** |
| | | **2009 Income from Edward Wisner Donation** | **$976,767.27** |

56

## Wisner Grants Awarded in 2010

## As of April 30, 2010

| 2010 | Multi-Year | Organization | Amount |
|---|---|---|---|
| January | | Human Relations Commission "Leading a Diverse City in the 21st Century" | $7,000.00 |
| January | | Mayoral Fellows Program | 226,00.00 |
| February | 1 of 3 | Louisiana Philharmonic Orchestra | 200,000.00 |
| February | 1 of 3 | New Orleans Jazz Orchestra | 200,000.00 |
| February | | N. O. Police & Justice Foundation "COPS for Kids" | 25,000.00 |
| March | 1 of 3 | New Orleans Opera Association | 150,000.00 |
| March | | Operation Clean Sweep | 20,000.00 |
| March | | Parkway Partners | 50,000.00 |
| April | | African American Male & Female Institute "Juneteenth Freedom Celebration" [Faith in Action is their Fiscal Agent] | 15,000.00 |
| April | | Gun Buy Back Committee [NORECC is their Fiscal Agent] | 25,000.00 |
| April | | New Orleans African American Museum | 150,000.00 |
| April | | New Orleans Jazz Orchestra (Armstrong Park sculpture garden & unveiling party) | 25,000.00 |
| **2010 Subtotal Grants Awarded during Nagin Administration** | | | **$1,093,00.00** |
| **2010 Income from Edward Wisner Donation during N.A.** | | | **$209,105.87** |
| ***2010 Estimated Income from Edward Wisner Donation for Entire Year*** | | | **$870,970.00** |

**Total Grants Awarded during Nagin Administration**    $10,493,100.00
**Total Income from Edward Wisner Donation during Nagin Administration**    8,975,689.82
**Difference between Awards and Income**    ($1,517,410.18)

**Fund Balance on April 30, 2002**    $3,798,464.91
**Fund Balance on April 30, 2010**    $3,418,438.84

**Change in Fund Balance**    ($380,026.07)

57

# Exhibit K

STATE OF LOUISIANA                                   Document Date: October 2, 2008

PARISH OF ORLEANS

CITY OF NEW ORLEANS

**AMENDMENT AND EXTENSION**
**of the**
**EDWARD WISNER DONATION**

THIS AGREEMENT is entered into effective as of the _____ day of _____,
2007, by and amongst:

1 -   THE CITY OF NEW ORLEANS, as Trustee of the Edward Wisner Donation
      (hereinafter the "Donation"), herein represented by C. Ray Nagin, Mayor, duly
      authorized by resolution of the Edward Wisner Donation Advisory Committee
      (hereinafter the "Advisory Committee") and the City Council of New Orleans;

2 -   LSU PUBLIC HOSPITAL, FORMERLY KNOWN AS MEDICAL CENTER OF
      LOUISIANA AT NEW ORLEANS, as successor-in-interest of The
      Administrators of the Charity Hospital of New Orleans;

3 -   THE SALVATION ARMY, INC.;

4 -   THE BOARD OF ADMINISTRATORS OF THE TULANE UNIVERSITY
      EDUCATIONAL FUND and

5 -   the HEIRS OF EDWARD WISNER, herein represented by WENDELL H.
      COOK, JR.; CHRISTOPHER T. COOK; TIMOTHY M. COOK; ANDREW J.
      COOK; JOHN P. COOK, individually, and as Trustee of the Jane Peneguy Cook
      Family Trusts A, B, C and E; KATHY M. TEMPLE; EDWARD W. PENEGUY,
      JR.; MICHAEL J. PENEGUY; ROBERT O. PENEGUY; WILLIAM A.
      PENEGUY; ANN P. BLOUNT; JANE P. CASEY; JAMES N. PENEGUY;
      RICHARD A. PENEGUY, JR.; ELIZABETH P. GREEN; SUCCESSION OF
      DAVID CHARLES PENEGUY; MARK E. PENEGUY; and CHRISTOPHER T.
      PENEGUY

(hereinafter, collectively, "Beneficiaries")

**WITNESSETH:**

WHEREAS, by act before Robert Legier, Notary Public, dated the 4th day of August,
1914, Edward Wisner, then a resident of New Orleans, made and executed a donation *inter vivos*
(the "Act of Donation") in favor of the City of New Orleans in trust for one hundred years from
the date thereof, of certain lands situated in the Parishes of Jefferson, St. John the Baptist and

58

Lafourche, State of Louisiana, which Act of Donation was duly accepted on behalf of the City of New Orleans, Trustee, by Martin Behrman, then Mayor of said City, as recorded in Conveyance Book 34, fo. 341 and Donation Book 3 fo. 138 in the Parish of Jefferson, in Conveyance Book 5 N.S., folio 233 in the Parish of St. John the Baptist, in Willand Donation Book "B", folio 295 in the Parish of Lafourche and as No. 118963 in the Civil District Court of the Parish of Orleans and registered in the Notarial Acts of Robert Legier maintained in the Notarial Archives in Orleans Parish; and,

WHEREAS, by act before Robert Legier, Notary Public, dated the 17th day of September, 1929, the Honorable T. Semmes Walmsley, Acting Mayor of the City of New Orleans, acting on behalf of the City of New Orleans, made and executed an Agreement of Compromise and Satisfaction wherein Mrs. Mary J. Wisner, widow of Edward Wisner, and Miss Elizabeth Wisner and Mrs. Harriet Rowena Peneguy, heirs of Edward Wisner, were each recognized as beneficiaries of the Act of Donation made by Edward Wisner on the 4th day of August, 1914; and,

WHEREAS, the Agreement of Compromise and Satisfaction was subsequently presented to the Civil District Court for the Parish of Orleans, State of Louisiana, Division "E", presiding in the case of Mrs. Mary J. Wisner, et al. vs. City of New Orleans, et al. No. 178,463, Docket 5, and whereas said agreement was made the Judgment of the court in said case on April 1, 1930 (the "Judgment of April 1, 1930"), ; and,

WHEREAS, pursuant to the Judgment of April 1, 1930, the Commission Council of the City of New Orleans on the 12th day of March, 1931, enacted Ordinance No. 12,883, Commission Council Series, establishing the **Advisory Committee**; and,

WHEREAS, desiring to preserve and enhance the Donation properties with all of the resulting benefits that will accrue therefrom, the Beneficiaries wish to provide for a continuation of the Donation beyond the stated date of termination in the aforesaid Donation documents; and,

WHEREAS, in view of the passage of time and changing community, charitable and public requirements which have rendered some of the original purposes of said Donation to be of no current benefit to the community, it is deemed necessary to make certain changes with respect to the purposes of said Donation, for the benefit of the community, as to be more fully set out hereinafter; and,

59

WHEREAS, in view of certain ambiguities existing in various documents relating to the operation of the Donation, the Beneficiaries desire to execute this Agreement, in order to assure the Donation's smooth, efficient, and flexible operation in future years.

NOW, THEREFORE, in consideration of the mutual agreements, the Beneficiaries agree as follows:

1.      The Donation shall be extended and amended as set forth below.

2.      The Donation shall not terminate in August 2014 as provided in the Act of Donation, but shall, instead, be extended in perpetuity as heretofore and being comprised and composed of (l) the lands, assets, funds, fruits and avails of the existing Donation; (2) the Beneficiaries of the existing Donation; and (3) the terms and provisions of the existing Donation documents, except as specifically clarified, modified or changed in this Agreement.

3.      Should conditions change such that it becomes necessary or beneficial to terminate the Donation, such termination shall become effective upon proper notification of, and consideration by, all beneficial interests, a unanimous vote of the Advisory Committee and approval of the Trustee; and, upon such termination, all remaining lands, assets, funds, fruits and avails of the Donation, or receipts from the sale of such lands, assets, funds, fruits and avails of the Donation, shall be distributed to the Beneficiaries in accordance with the beneficial interests, as follows:

| Beneficial Interest | Interest |
|---|---|
| The City of New Orleans (representing the municipal civic, charitable and educational purposes of the Donation) | 34.8% |
| The Board of Administrators of The Tulane Educational Fund and its successors-in-interest domiciled, or for services provided, within the City of New Orleans | 12.0% |
| The Board of Administrators of the Charity Hospital of New Orleans and its successors-in-interest domiciled, or for services provided, within the City of New Orleans | 12.0% |
| The Salvation Army, Inc. and its successors-in-interest domiciled, or for services provided, within the City of New Orleans | 1.2% |
| The Heirs of Edward Wisner | 40.0% |
| Total | 100.0% |

4.      The proportionate share of funds that are distributed from the Donation to the City of New Orleans, as the beneficiary for the civic, charitable and educational purposes within the City of New Orleans, shall henceforth be used for non-political, civic and charitable non- profit projects that are designed to serve one or more of the following purposes: (l) education, (2) beautification, (3) recreation, and (4) human services. The Mayor of the City of New Orleans, as

Page 3 of 12

Trustee of the Donation, with the advice and consent of the Advisory Committee as to whether or not said projects are in compliance with the purposes and objectives of the Donation, shall determine the particular non-political, civic and charitable non-profit projects to be supported and the amounts to be committed thereto.

     5.     The Mayor of the City of New Orleans, with approval from the City Council, shall continue to act as Trustee of the Donation upon the advice and with the consent of the Advisory Committee.

     6.     The Mayor of the City of New Orleans (or his designated alternate) shall continue to act as the chairperson for the Advisory Committee and each of the other beneficial interests shall continue to have the right and obligation to designate one individual as a member of the Advisory Committee and another individual as an alternate member to represent its beneficial interest on the Advisory Committee. The designation of each member and each alternate member shall be confirmed, in writing, by the appropriate beneficial interest to the Advisory Committee and the Trustee. Any vacancy occurring in an appointed member representing any beneficial interest shall be filled by the beneficial interest having the original right of appointment.

     7.     The duties and functions of the Advisory Committee shall include: (a) the adoption and amendment of bylaws for its operation; (b) the election or appointment of Officers, including the employment of a Secretary-Treasurer/Land Manager; (c) the selection, or appointment, of subcommittees, as needed, for establishing and recommending policies and procedures and addressing other specific issues associated with the business of the Donation; (d) the supervision and coordination of all business activities on, or connected with, the Donation lands; (e) the providing of advice and consent to the Mayor of the City of New Orleans (the Trustee) in respect to the funding of projects with monies received from the Donation by the City of New Orleans as beneficiary for civic, charitable and educational purposes within the City of New Orleans; and (f) consulting with and advising the Mayor of the City of New Orleans in his capacity as Trustee on all matters pertaining to the Donation. All matters relating to the Donation shall in the first instance be referred to and handled by the Advisory Committee; the action of a majority of the Advisory Committee in a meeting with a proper quorum present to be deemed to be the action of the Advisory Committee; and, when acting upon the advice and with the consent of the Advisory Committee, the Mayor of the City of New Orleans, as Trustee, shall be deemed to be acting for and on behalf of all of the Beneficiaries.

<div align="center">Page 4 of 12</div>

8.      Any and all expenses, necessary or proper, incurred by the Advisory Committee shall continue to be paid on the approval of the Committee out of any funds belonging to the Donation.

9.      In the event of a conflict between the provisions and terms of this Agreement and the provisions and terms of the Judgment of April 1, 1930, the provisions and terms of this Agreement shall control and prevail, and, where there is no conflict between the provisions and terms of this Agreement and the provisions and terms of the Judgment of April 1, 1930, the provisions and terms of the Judgment of April 1, 1930 shall remain in full force and effect and shall be incorporated herein as if they were stated and agreed upon within this Agreement.

10.     This Agreement shall be recorded in the records of Orleans, Jefferson, St. John the Baptist and Lafourche Parishes, State of Louisiana, as part of, and as an amendment to, the Act of Donation of August 4, 1914 and the Judgment of April 1, 1930.

11.     This Agreement may be executed in any number of counterparts and, when so executed, each counterpart shall have the same effect as if all parties had executed the same document. The Secretary-Treasurer/Land Manager of the Advisory Committee may compile the signature and acknowledgment pages of such counterparts into a single composite document.

THUS DONE AND EXECUTED, EFFECTIVE ON THE DATE FIRST SET OUT ABOVE.

**WITNESSES:**                                    CITY OF NEW ORLEANS, TRUSTEE

_____          By: _____
*PRINT NAME:* _____                   Mitchell J. Landrieu


_____
*PRINT NAME:* _____



                                                  LSU PUBLIC HOSPITAL, FORMERLY
                                                  KNOWN AS MEDICAL CENTER OF
                                                  LOUISIANA   AT   NEW   ORLEANS

_____
*PRINT NAME:* _____          By: _____

_____
*PRINT NAME:* _____


Page 5 of 12



**Figure 10—Fourchon, Louisiana—October 2008**
*Photo Courtesy of Amanda Phillips*





**Figures 11 and 12—Floaton Marsh (top), Cypress Forest (bottom) St. John the Baptist Parish—April 19, 2002**
*Photos Courtesy of Amanda Phillips*



**Figure 13 - Forrest Travirca with a Gator**
*2005*
*Photo Courtesy of Forrest Travirca*



**EDWARD WISNER DONATION**

**1300 Perdido Street, Room 8E06**

**New Orleans, LA 70112**

**504/658.4060 office 504/658.4065 fax**

**wisnerdonation@aol.com**

C. Cathy Norman—*Secretary Treasurer/Land Manager*

L. Amanda Phillips—*Executive Assistant*

# 2009 ANNUAL REPORT



*Fourchon Beach—December 16, 2009*
*November 8 – 10, 2009 Hurricane Ida*
*Photo Courtesy of C. Cathy Norman*

# Edward Wisner Donation Advisory Committee

## C. Cathy Norman
## Secretary Treasurer



**Gulf Coast Incident Management Team**
1250 Poydras Street, 14th Floor
New Orleans, LA  70113

January 20, 2011

Joel Waltzer
Waltzer & Wiygul Law Firm
3715 Westbank Expressway, Suite 13
Harvey, LA 70058

Dear Mr. Waltzer:

Subject:  Operational Science Advisory Team (OSAT-2) and Wisner Donation

The Wisner Donation has been a valued partner to the UAC/GC-IMT throughout this response.  We greatly appreciate the expertise and efforts provided by your organization in oil recovery operations and scientific inquiry.  Your role has exemplified the public-private partnership outlined in the National Response Framework and the National Oil and Hazardous Substances Pollution Contingency Plan.

The OSAT-1 report identified the persistent re-oiling problems presented by submerged oil mats.  The OSAT-2 team was chartered to address the fate and effects of this submerged oil.  In contrast to OSAT-1, OSAT-2 had a very short timeframe which limited collection of new data, but focused on the analysis of available data.  OSAT is finalizing the OSAT-2 report, and will be concluded within weeks.  However, once the OSAT project is complete, the GC-IMT Environmental Unit, including the Shoreline Cleanup Assessment Techniques (SCAT) group, will continue to advise the GCIMT Incident Commands on environmental matters of this response.

We welcome your generous offer to present your findings to the GC-IMT.  Environmental data, such as yours, is extremely useful to our ongoing response planning efforts.  Please contact LCDR Brian Moore (504-335-0911, Brian.E.Moore@uscg.mil) or LCDR Kenneth Boda (504-335-0860, Kenneth.J.Boda@uscg.mil) to arrange the meeting.

Sincerely,

CAPT Lincoln Stroh
USCG Federal on Scene Coordinator

Exhibit 2 to Declaration of C. Cathy Norman



**Gulf Coast Incident Management Team**
1250 Poydras Street, 14th Floor
New Orleans, LA 70113

June 3, 2011

Mr. Robert Wiygul
Waltzer & Wiygul Law Firm
3715 Westbank Expressway Suite 13
Harvey, LA 70058

Dear Mr. Wiygul:

This letter responds to your email of June 2, 2011 in which you expressed interest in attending upcoming Endpoints/STR4 discussions regarding transitional planning. Your input in this matter is appreciated. Throughout this GC IMT Endpoint process, your client, Wisner Donation, has continued to facilitate a valuable response effort with regard to its affected properties. I echo the sentiment of previous FOSCs who valued the relationship sought by your client. It truly exemplifies the public-private partnerships envisioned in the National Contingency Plan.

As I am sure you may appreciate, I have been arduously tasked with maintaining an effective and efficient response. This duty naturally entails a focused use of resources to achieve the balance of interests of all of those affected by this spill.

In planning the attendance for the above referenced transitional meeting, I sought to use the basic National Contingency Plan (NCP) framework of Federal, State, and Responsible Party functions/participants as my basis for participants. This response has thus far affected a vast amount of the Gulf of Mexico shoreline, much of which affected private entities in similar positions as your client. Bypassing the NCP processes and permitting attendance of all private entities impacted by this event would open the floodgate for inefficiency—it would simply be an inequitable use of my discretion for me to single out one valued private entity for participation. I trust you will understand my reasoning behind the difficult decision of not forwarding an invite to your client.

In the meantime, trust that you concerns are being considered. Please continue to use the office of your State On-Scene Coordinator (SOSC) as the means to advocate your client's interests. I will continue to address the inquiries of your client, as well as those of other affected private entities, via my direct communication with the SOSC.

Again, I appreciate the cooperation the multitude of private entities, including Wisner Donation, have provided throughout this response. I am certain that these efforts will continue to work towards the betterment of this region.

Sincerely,

CAPT Julia Hein, USCG
Federal On-Scene Coordinator

# EDWARD WISNER DONATION ADVISORY COMMITTEE

## RESOLUTION

**WHEREAS,** the **EDWARD WISNER DONATION ADVISORY COMMITTEE** (the "**COMMITTEE**") and its interests have been impacted by the Deep Water Horizon Spill and the **COMMITTEE** desires to engage outside counsel for the purposes of representing and assisting the **COMMITTEE** in its response to the spill, including the restoration of Wisner property damaged by the spill, and of filing suit on the **COMMITTEE**'s behalf against BP, if necessary;

**WHEREAS,** the **COMMITTEE** has interviewed and discussed the potential engagement of the firm of Waltzer and Wiygul for the purpose of representing the **COMMITTEE**;

**WHEREAS,** at an Emergency Committee Meeting held on July 1, 2010 at which a quorum of the Committee members was present and acting throughout on motion duly made, seconded and carried, with one Committee member abstaining from the vote, the **COMMITTEE** decided by majority vote to retain Waltzer and Wiygul to represent the **COMMITTEE** and its interests in the BP oil spill cleanup; and

**WHEREAS,** at the regular monthly meeting of the **COMMITTEE** held on September 28, 2010, at which a quorum of the **COMMITTEE** members was present and acting throughout on motion, duly made, seconded and carried by majority vote, the following Resolution was adopted;

**NOW, THEREFORE,** the **COMMITTEE** desires to take the following action:

1) To proceed with engaging Waltzer and Wiygul to represent the **COMMITTEE** in the BP matter; and

2) To authorize the Secretary/Treasurer of the **COMMITTEE** to sign a Retainer Agreement with Waltzer and Wiygul on behalf of the **COMMITTEE**.

### CERTIFICATE

I, the undersigned Secretary Treasurer/Land Manager of the **EDWARD WISNER DONATION ADVISORY COMMITTEE**, hereby certify that the above is a true, full, complete and correct copy of the Resolution adopted, on motion duly made and seconded, at a meeting of the **EDWARD WISNER DONATION ADVISORY COMMITTEE** held on September 28, 2010 at which at least a quorum of the Committee Members was present and that the Resolution is duly entered into the minutes of said meeting, and is now in full force and effect and has not been amended, changed, modified, rescinded, or repealed in any way.

**WITNESS MY SIGNATURE,** this 28th day of September, 2010.

_C. Cathy Norman_
**SECRETARY TREASURER/LAND MANAGER**

Exhibit 3 to Declaration of C. Cathy Norman

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE OIL SPILL BY THE OIL RIG                         CIVIL ACTION
"DEEPWATER HORIZON" IN THE
GULF OF MEXICO ON APRIL 20, 2010                       MDL 2179

Member Case: In re: Triton Asset Leasing;             SECTION "J" (1)
              Civil Action No. 10-2771 (Wisner Donation
              Motion for Partial Summary Judgment)

**ORDER**

A status conference by telephone is hereby set in this matter on **May 29, 2012 at
3:00 p.m.** before Magistrate Judge Joseph C. Wilkinson, Jr.  Counsel for the Wisner
Donation and BP only must participate in the conference by contacting my office at 504-
589-7630 at the designated time, prepared to discuss (1) the status of their discussions
concerning resolution of the issues raised in the motion for partial summary judgment,
including attorneys' fees, and (2) whether the motion may now be dismissed without
prejudice to being renoticed for submission at a later date, if necessary, in light of those
discussions.

New Orleans, Louisiana, this _____15th_____ day of May, 2012.

JOSEPH C. WILKINSON, JR
UNITED STATES MAGISTRATE JUDGE

**CLERK TO NOTIFY:**
**HON. CARL J. BARBIER**

Exhibit 4 to Declaration of C. Cathy Norman

**PLAINTIFFS' LIAISON COUNSEL**
**IN RE: DEEPWATER HORIZON**
**MDL No. 2179**

**JAMES PARKERSON ROY**                    **STEPHEN J. HERMAN**
**Domengeaux Wright Roy & Edwards LLC**    **Herman, Herman Katz & Cotlar LLP**
**556 Jefferson St. Suite 500**            **820 O'Keefe Avenue**
**Lafayette, LA. 70501**                   **New Orleans, LA 70113**
**E-Mail: jimr@wrightroy.com**             **E-Mail: sherman@hhkc.com**
**Telephone: (337) 233-3033**              **Telephone: (504) 581-4892**
**Fax No. (337) 233-2796**                 **Fax No. (504) 561-6024**

May 16, 2012

The Honorable Joseph C. Wilkinson, Jr.
United States Magistrate Judge
500 Poydras Street, Room B409
New Orleans, Louisiana 70130

Dear Judge Wilkinson:

As Plaintiffs' Co-Liaison Counsel, and as retained outside counsel to the City of New Orleans, a Wisner Donation beneficiary whose mayor serves as the Donation's trustee, we would respectfully request permission to attend the Court's Telephone Status Conference on May 29, 2012 [Doc 6521] (enclosed).

We appreciate the Court's consideration in this matter.

Respectfully submitted,

STEPHEN J. HERMAN
JAMES PARKERSON ROY
*Plaintiffs Liaison Counsel*
*(and Counsel to the City of New Orleans)*

Enclosures
cc: Don K. Haycraft, Esq.
    Joel Waltzer, Esq.

Exhibit 5 to Declaration of C. Cathy Norman

**Joel Waltzer**

| | |
|---|---|
| **From:** | Greg L. Johnson <gljohnson@liskow.com> |
| **Sent:** | Friday, June 08, 2012 5:23 PM |
| **To:** | Robert Wiygul; 'sherman@hhklawfirm.com' |
| **Cc:** | Joel Waltzer; 'Block, Nathan'; Shannon S Holtzman; 'Esbrook, Christopher J.' |
| **Subject:** | RE: Proposed consent judgment |

Dear Robert,

BP's response to the issues raised below is as follows:

**Consent Judgment vs. Settlement Agreement (your nos. 1, 6, 7, and 8) :**  As we discussed, the issue of a consent judgment versus a settlement agreement is an important one to BP.  We have been willing to compromise on certain issues that are not even raised in your motion, but we are not willing to agree to entering an adverse judgment against BP on those issues.  If Wisner cannot agree to handle these matters in a settlement agreement, BP would rather have Judge Wilkinson rule on the motion for partial summary judgment.  In that case, only the documents issue is before the court.  As for the attorneys' fees, Wisner must comply with Local Rule 54.2 to prove them up before Judge Wilkinson will enter an order with regard to attorneys' fees.  If we can do this in a Settlement Agreement, Wisner can dismiss its motion without prejudice and re-urge it if necessary if your concern is the continuing supervision of the Court.

**Wisner Proper Party and Representation Issues (your no. 2 below):**  Also as we discussed, BP's concern is that it is dealing with the proper party and counsel.  Since the Wisner Donation is a different sort of entity, BP needs some additional information and assurances that it is not at risk for dealing with the wrong party or counsel.

**Sufficiency of Documents Produced to Date (your no. 3):**  BP is willing to limit Wisner's representation as to the sufficiency of the documents BP has provided to Wisner's current knowledge as of a certain date, but BP would like an acknowledgment that Wisner does not have further objections based on the documents it has received and what it knows as of now.  If you would like to make some kind of exception with regard to a particular issue or category, please suggest language.

**Reimbursement (your no. 4):**  BP changed "invoices" to "claims" simply to better track the title of the documents Wisner has submitted (*e.g.*, "Claim 21").  BP's only concern here is that we can identify the universe of claims/invoices that are included.  The May 31 date is related to that same consideration.  If Wisner has more claims in the pipeline, then please send them and we can include them in the process with the neutral.  But, a line must be drawn at some point to demarcate what will be considered by the neutral and what will not.  With regard to the OPA response costs language, BP is concerned about dealing with Wisner on matters that may be covered by the settlement.  Since the contract issue is clearly outside the settlement, BP submits that it is cleaner to include only the contract language in this agreement, even if concepts like *Keytronic* ultimately inform the neutral's decision about what is reimbursable.

**Hold Back (your no. 9):**  If Wisner believes that the holdback does not apply to this matter, then please have the PSC enter a stipulation setting forth an exemption.  Absent an exemption, BP will pay 94% of the attorneys fees to Wisner and 6% to the hold back escrow.

Best regards,

Greg

**Greg L. Johnson**
**Liskow & Lewis**
504/556-4115 office

1

Exhibit 6 to Declaration of C. Cathy Norman

504/810-4115 cell
gljohnson@liskow.com

---

**From:** Robert Wiygul [mailto:Robert@waltzerlaw.com]
**Sent:** Friday, June 08, 2012 11:35 AM
**To:** Greg L. Johnson; 'sherman@hhklawfirm.com'
**Cc:** Joel Waltzer; 'Block, Nathan'; Shannon S Holtzman; 'Esbrook, Christopher J.'
**Subject:** RE: Proposed consent judgment

Dear Greg:

The following is the Wisner Donation's response to BP's counterproposal on memorializing the settlement of the Access Agreement issues.

1.      The appropriate form for the agreement is a consent judgment.  The Donation does not agree to a separate settlement agreement and order of dismissal.  All parties contemplate that the court will retain jurisdiction to enforce the agreement.

2.       Paragraph 1 – Assuming we get the other issues resolved, we're confident the parties can work out acceptable language and signing parties which will keep BP comfortable that the agreement will stick.

3.      Paragraph 3(b) was not negotiated or agreed to, and it is not necessary.  The Donation doesn't know everything that you have in terms of documents – indeed, I don't think everyone at BP knows everything it has – so we can't agree that all of your obligations to date have been discharged.

4.      Paragraph 4(a)  - Is there a reason that you changed "invoices" to "claims?"  I note that you removed "reimbursable response costs under OPA;" it seems to make sense to cover all these bases at once.  After all, your liability is limited to what was invoiced anyway, and if you are correct on your theories about reimbursability under OPA you will not owe anything extra on that basis anyway.  With respect to the May 31 cutoff, we have a couple more claims on the way, assuming we get those to you it would make sense to go ahead and submit everything to the neutral at once.

5.       There seem to be two paragraph 4's – on the second one, we can provide you timesheets with the privileged parts removed.

6.      Paragraphs 8 and 9 will not be necessary since it is a consent judgment.

7.      The first sentence of Paragraph 10 is not necessary, since it will be a consent judgment.  We agree that this judgment can't be used for purposes other than what it says, and could include the language in the second sentence.   This is a partial settlement which affects only the issues stated, and is not admissible with respect to any other issue under the Access Agreement or otherwise.  It would be a good idea to include language to that effect as well.

8.       Paragraphs 11 – 13 are unnecessary with a consent judgment, as noted above we can make sure everybody is comfortable that the consent judgment can be relied on.

9.      With respect to the holdback, the Donation does not believe it should be applicable with respect to this claim.  The order clarifying the hold-back provision entered on May 3 was based on the idea that common benefit fees to date would be paid in addition to sums paid under the settlement agreement.   To the extent that common benefit work did benefit this motion, it is the same work that was undertaken to underpin the settlement agreement and the same logic would apply.

`I am available today and Monday to discuss these issues.`

ROBERT B. WIYGUL  |  PARTNER  |  **Waltzer‑Wiygul**  |  1011 IBERVILLE DRIVE, OCEAN SPRINGS, MS 39564  |  Phone : 228.872.1125  |  Fax : 228.872.1128  |  Cell :  228.990.1228  |  E: robert@waltzerlaw.com

---

**From:** Greg L. Johnson [mailto:gljohnson@liskow.com]
**Sent:** Friday, June 01, 2012 11:15 AM
**To:** Robert Wiygul; 'sherman@hhklawfirm.com'
**Cc:** Joel Waltzer; 'Block, Nathan'; Shannon S Holtzman; 'Esbrook, Christopher J.'
**Subject:** RE: Proposed consent judgment

Robert and Steve,

Please find the attached Settlement Agreement and Proposed Order that BP has drafted in response to Robert's earlier document.  We would like to point out a few items for your review of the documents:

First, in light of the recent developments regarding the representation of the City and Mayor (as Trustee) of the Wisner Donation, BP would like you to confirm whether the Wisner Donation is the proper party/juridical entity to bring suit against BP or whether the City of New Orleans or the Mayor as Trustee may be the proper party.  Wisner's Answer in Limitation is styled as being on behalf of the "Edward Wisner Donation," but I am told that lawsuits in the past have been brought by the Mayor as Trustee.  To that end, unless and until we reach a final resolution of that issue, BP would like counsel for both the City and Wisner to sign off on the attached documents and both parties to sign any final agreement.

Secondly, BP requests some substantiation of the $31,543 number for attorneys fees related to the motion.

Finally, BP would like to raise the issue of the application of the holdback order in the MDL to this proceeding.  Please advise as to whether and how you propose the order would apply to the Wisner matter generally and specifically to this agreement.

Best regards,

Greg


**Greg L. Johnson**
**Liskow & Lewis**
504/556-4115 office
504/810-4115 cell
gljohnson@liskow.com

---

**From:** Robert Wiygul [mailto:Robert@waltzerlaw.com]
**Sent:** Thursday, May 24, 2012 10:53 AM
**To:** Greg L. Johnson; Joel Waltzer
**Subject:** Proposed consent judgment

Greg, here is a draft of a proposed consent judgment for your review.  Please give me a call with any questions.

ROBERT B. WIYGUL  |  PARTNER  |  **Waltzer‑Wiygul**  |  1011 IBERVILLE DRIVE, OCEAN SPRINGS, MS 39564  |  Phone : 228.872.1125  |  Fax : 228.872.1128  |  Cell :  228.990.1228  |  E: robert@waltzerlaw.com

**EDWARD WISNER DONATION ADVISORY COMMITTEE**

C. CATHY NORMAN
SECRETARY TREASURER
LAND MANAGER

935 GRAVIER STREET
SUITE 825
NEW ORLEANS, LA 70112
(504) 210-1152
FAX (504) 210-1156
WISNERDONATION@AOL.COM

MAILING ADDRESS
P. O. BOX 52204
NEW ORLEANS, LA 70152-2204

Wisner

REPRESENTING

CHARITY HOSPITAL / MEDICAL CENTER
OF LOUISIANA
CITY OF NEW ORLEANS
THE SALVATION ARMY
TULANE UNIVERSITY
THE WISNER FAMILY

June 3, 2012

Mr. Stephen J. Herman
Herman, Herman, Katz and Cotlar, LLP
820 O'Keefe Avenue
New Orleans, La. 70113
Sherman@hhkc.com      by hand and electronically

Dear Mr. Herman:

This letter is on behalf of the undersigned members of the Edward Wisner Donation Advisory Committee.

The Advisory Committee has reviewed the recent correspondence sent to you and Mr. Robert Wiygul by BP attorney Greg Johnson. Mr. Johnson states that "in light of the recent developments regarding the representation of the City and Mayor (as Trustee) of the Wisner Donation, BP would like you to confirm whether the Wisner Donation is the proper party/juridical entity to bring suit against BP or whether the City of New Orleans or the Mayor as Trustee may be the proper party." BP advises that it wishes for you to "sign off" on decisions directly relating to the Donation.

A majority of the Edward Wisner Donation Advisory Committee, representing the beneficiaries of the Donation have called for a special meeting regarding these developments for Thursday, June 7 at 10:30 am at the offices of Simon, Peregine, Smith and Redfearn. The Advisory Committee instructs you to attend this meeting, to address the following subjects:

1) What you believe to be the nature of your relationship with the Wisner Donation.

2) State what authority you believe you have to act for the Donation with respect to the Deepwater Horizon oil spill.

3) Please provide the Advisory Committee with copies of any written or electronic communications regarding the Wisner Donation's claims at least 24 hours prior to the meeting.

Exhibit 7 to Declaration of C. Cathy Norman

Page Two
Stephen Herman
June 3, 2012

4) If you purport to represent the interests of Wisner Donation we direct you to provide the Committee with a copy of your entire file regarding the Wisner Donation's claim.

5) Provide the Committee with a copy of any instructions received from the Trustee, his designee and/or Agent regarding the Wisner Donation's claim in this matter.

The Donation's Advisory Committee has not authorized you to take any action on behalf of the Donation at this time, and we assume that you have not done so and instruct you not to do so.

Thank you for your consideration of this request.

Sincerely,

*C. Cathy Norman*

C. Cathy Norman
Secretary Treasurer/Land Manager

Cc: Mayor Mitchell J. Landrieu

MEDICAL CENTER OF LOUISIANA AT NEW ORLEANS

By:_____

THE SALVATION ARMY

By:_____

THE ADMINSITRATORS OF THE TULANE EDUCATIONAL FUND

By: _____

WISNER FAMILY HEIRS

By: _____



820 O'Keefe Avenue
New Orleans, Louisiana
70113-1116

p: (504) 581-4892
f: (504) 581-6024
e: info@hhklawfirm.com

hhklawfirm.com

Harry Herman (1914-1987)
Russ M. Herman*
Maury A. Herman*
Steven J. Lane
Leonard A. Davis*
James C. Klick[1]
Stephen J. Herman
Brian D. Katz
Soren E. Gisleson
Joseph E. Cain

Jennifer J. Greene[2]
John S. Creevy
Jeremy S. Epstein[1]
Aaron Z. Ahlquist[5]
Craig M. Robinson
Carl A. Woods
Adam H. Weintraub[4]
Mikalia M. Kott[5]

Of Counsel:
Herbert A. Cade
Morton H. Katz*
Joseph A. Kott, MD, JD

This Firm and Its Partners Are Also
Partners in Herman Gerel, LLP

* A Professional Law Corporation
[1] Also Admitted in Texas
[2] Also Admitted in Arkansas
[3] Also Admitted in Tennessee
[4] Also Admitted in New Jersey & Pennsylvania
[5] Also Admitted in Colorado

June 5, 2012

**_via_ E-Mail and by U.S. Mail**
C. Cathy Norman
Secretary Treasurer/Land Manager
Edward Wisner Donation Advisory Committee
P. O. Box 52204
New Orleans, Louisiana 70152-2204

　　　　Re: In re: Deepwater Horizon
　　　　　　MDL No. 2179

Dear Ms. Norman,

　　　　I have received and appreciate your correspondence of June 4, 2012.

　　　　As Plaintiffs' Co-Liaison Counsel, I have been authorized and directed by the Court to manage, conduct and coordinate common litigation activities for all plaintiffs, as defined in Pre-Trial Order No. 8 (enclosed).

　　　　With respect to the City of New Orleans in particular, we have been retained to represent the interests of the City in litigation against BP and the other parties responsible for the Macondo / _Deepwater Horizon_ tragedy.

　　　　While I understand that the City is a beneficiary of the Wisner Donation, and that the Mayor of the City serves as the Donation's Trustee, we have not been asked to become involved in the operation or management of the Wisner Donation.

Exhibit 8 to Declaration of C. Cathy Norman

I believe that you should address these issues directly with the Mayor's Office and/or the City Attorney's Office.

Sincerely,

Steve Herman

Enclosures

cc:     Hon. Mitchell J. Landrieu
        Richard F. Cortizas, Esq.
        Michael G. Sherman, Esq.
        Sharonda R. Williams, Esq.
        Calvin C. Fayard, Jr., Esq.
        Walter J. Leger, Jr., Esq.
        Fred L. Herman, Esq.
        James Parkerson Roy, Esq.

**Robert Wiygul**

| | |
|---|---|
| **From:** | Steve Herman <SHERMAN@hhklawfirm.com> |
| **Sent:** | Friday, June 08, 2012 1:56 PM |
| **To:** | Patrick Juneau; lgreer@browngreer.com |
| **Cc:** | Jim Roy; 'Calvin Fayard'; Holstein, Mark E; 'Esbrook, Christopher J.'; Robert Wiygul |
| **Subject:** | BP Oil - Wisner Donation |

Dear Pat & Lynn,

On behalf of the City of New Orleans, Jim and Calvin and I are working collaboratively with Waltzer & Wiygul with respect to the claims of the Wisner Donation, of which the City is a beneficiary and for which the Mayor serves as trustee.

I believe that the Donation will be submitting a claim to the Settlement Program.

Assuming that a claim is submitted, and is deemed eligible for payment, I just wanted to put this potential claim on your radar, so that the Program will be able to make sure that the I's are dotted and the Ts are crossed in terms of the Release.

Thanks and best wishes, - Steve

Stephen J. Herman, Esq.
Herman Herman & Katz LLP
Office (direct): (504) 680-0554
E-Mail: sherman@hhklawfirm.com

```
CONFIDENTIAL ATTORNEY WORK PRODUCT
This e-mail message contains confidential, privileged information intended
solely for the addressee.  Please do not read, copy, or disseminate it unless
you are the addressee.  If you have received it in error, please call us
(collect) immediately at (504) 581-4892 and ask to speak with the message
sender.  Also, we would appreciate your forwarding the message back to us and
deleting it from your system.  Thank you.
```

Exhibit 9 to Declaration of C. Cathy Norman

1

**From:** Michael G. Sherman <mgsherman@nola.gov>
**To:** Michael G. Sherman <mgsherman@nola.gov>
**Subject:** New Member of Donation Advisory Committee
**Date:** Tue, Jun 26, 2012 4:11 pm
**Attachments:** 6_21_12_Gardner-Williams Appointment.pdf (40K)

Colleagues:

I am pleased to welcome Dr. Ron Gardner, Vice-Chancellor of LSU Health Sciences Center to the Wisner Donation Advisory Committee as the designee of the interim LSU Public Hospital. Attached is a letter of appointment from Dr. Townsend of LSU. I look forward to working with Dr. Gardner.

I am also pleased that the letter of appointment names a familiar face in Dr. Everett Williams as the alternate representing the interim LSU Public Hospital. I look forward to continuing to work with Dr. Williams and benefitting from his experience serving on the Donation Advisory Committee.

I'll see everyone tomorrow at noon. As a reminder, the meeting is in the Energy Center at the office of Simon, Peragine, Smith and Redfearn: 1100 Poydras St., 30th Floor.

--Mike
Chair, Wisner Donation Advisory Committee

Michael G. Sherman
Executive Counsel
Mayor Mitch Landrieu, City of New Orleans
504.658.4941 (office)
504.621.1824 (cell)
mgsherman@nola.gov

Exhibit 10 to Declaration of C. Cathy Norman



June 21, 2012

Mayor Mitchell J. Landrieu
Trustee, Edward Wisner Donation
1300 Perdido Street, Suite 2E04
New Orleans, LA 70112

Edward Wisner Donation Advisory Committee Members
c/o Cathy Norman, Secretary-Treasurer / Land Manager
Edward Wisner Donation Advisory Committee
935 Gravier Street, Suite 825
New Orleans, LA 70112

*Re: Appointment of Dr. Ron Gardner to Donation Advisory Committee*

Dear Mayor Landrieu and Members of the Donation Advisory Committee:

By the authority vested in me as the acting Chief Executive Officer of the Interim LSU Public Hospital, formerly known as Medical Center of Louisiana at New Orleans, I hereby select:

- Dr. Ron Gardner as the designee of the Interim LSU Public Hospital to serve on the Edward Wisner Donation Advisory Committee; and

- Dr. Everett Williams as the alternate to serve on the Edward Wisner Donation Advisory Committee.

Dr. Gardner can be reached at:

LSU Health Sciences Center
433 Bolivar Street
New Orleans, LA 70112
504.568.4810 · rgardner@lsuhsc.edu.

Sincerely,

Roxane A. Townsend, M.D.
Interim Chief Executive Officer
Interim LSU Public Hospital, formerly known as Medical Center of Louisiana at New Orleans

Resolution #1

(1) The Edward Wisner Donation Advisory Committee (hereinafter "Donation Advisory Committee") authorizes the joint venture of the law firms Herman, Herman, Katz & Cotlar, LLP; Leger & Shaw; Fayard & Honeycutt; the Law Offices of Fred L. Herman; and Domengeaux Wright Roy & Edwards (hereinafter joint venture) to represent the Edward Wisner Donation in all matters arising from the BP/Deepwater Horizon Oil Spill.

(2) The City of New Orleans procured the joint venture through the public procurement process established by MJL 10-05.

(3) The Donation Advisory Committee authorizes the Mayor to execute an agreement to hire joint venture as counsel in the above referenced matter.

(4) The Donation Advisory Committee re-authorizes the Mayor to execute an agreement to hire the firm of Waltzer & Wiygul as counsel in the above-referenced matter.

(5) Such agreement or agreements referenced in paragraphs 4 and 5 above shall be upon the same payment terms as the Donation Advisory Committee previously authorized. (i.e. The collective cost for all legal fees shall not exceed what the Donation Advisory Committee previously authorized).

Exhibit 11 to Declaration of C. Cathy Norman

**From:** Cathy <wisnerdonation@aol.com>
**To:** Peneguy <Peneguy@bellsouth.net>; peneguy <peneguy@cox.net>
**Subject:** Fwd: BP-OIL, Wisner Trust
**Date:** Fri, Jul 20, 2012 3:27 pm
**Attachments:** Meeting notes City's legal team.docx (22K), Meeting notes City's legal team 2.docx (20K)

---

Mike and Mark:

This is the email that Joel received from the City's attorneys last week prior to our meeting. I have also attached my meeting notes that need to be rewritten prior to sending out to the entire committee. I am sending you both versions.

Cathy
C. Cathy Norman
Secretary Treasurer/Land Manager
**Edward Wisner Donation**
935 Gravier Street, Suite 825
New Orleans, LA 70112
phone: 504/210.1152
fax: 504/210.1156

Mailing Address:
P. O. Box 52204
New Orleans, LA 70152-2204

*** Please note our new physical address, phone and fax numbers!   ***

-----Original Message-----
From: Joel Waltzer <Joel@waltzerlaw.com>
To: wisnerdonation <wisnerdonation@aol.com>
Sent: Mon, Jul 16, 2012 5:03 pm
Subject: FW: BP-OIL, Wisner Trust

---

**From:** Soren Gisleson [mailto:SGISLESON@hhklawfirm.com]
**Sent:** Saturday, July 14, 2012 7:57 PM
**To:** Joel Waltzer; Robert Wiygul
**Cc:** Steve Herman; 'James Roy'; Calvin Fayard; 'Caroline Fayard'
**Subject:** BP-OIL, Wisner Trust

CONFIDENTIAL
ATTORNEY WORK PRODUCT

Joel,

We would suggest that you take the lead on issues related to the access agreement and restoration. We would assist you with the claim preparation, and work with you, the Mayor, and the Advisory Committee regarding overall settlement strategy, whether thru the existing Settlement Program or otherwise. While your insights and the recommendations of the Advisory Committee would be important, the ultimate decision-making authority should rest with the Mayor, as Trustee.

We will need a complete copy of your file to assist us in performing our due diligence in developing a better understanding of the nature and value of the claim. (Also, any previous settlement offers would need to be formally withdrawn in writing.)

Exhibit 12 to Declaration of C. Cathy Norman

As for a division of fees, we suggest one of the two following approaches:

   You retain your hourly fee agreement, while the contingency portion of the fee would be divided based on relative contributions to the Donation's total recovery at the end of the day. We are confident that we would be able to come to an agreement on this amicably. But, out of an abundance of caution, there would be some type of binding arbitration mechanism to resolve a dispute, if necessary.

   With respect to the total recoveries by the Donation from this point forward, we would get paid on the City's Beneficiary share under the terms of our agreement with the City, while you get paid on the remaining Beneficiary shares based on your agreement.

Of course, if you have some alternate formulation, we are willing to discuss it.

I look forward to seeing you on Sunday.

Thanks,

Soren

Soren E. Gisleson, Esq.
Partner
Herman, Herman & Katz
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Direct Dial: 504-680-0569/Office: 504-581-4892/Fax: 504-561-6024

*This e-mail message contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect) immediately at (504) 581-4892 and ask to speak with the message sender. Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you.*

**CONFIDENTIAL ATTORNEY WORK PRODUCT**

P Please consider the environment before printing this e-mail

CONFIDENTIAL ATTORNEY WORK PRODUCT
This e-mail message contains confidential, privileged information intended
solely for the addressee. Please do not read, copy, or disseminate it unless
you are the addressee. If you have received it in error, please call us
(collect) immediately at (504) 581-4892 and ask to speak with the message
sender. Also, we would appreciate your forwarding the message back to us and
deleting it from your system. Thank you.

Attendees: Soren Gisleson, Caroline Fayard, Joel Waltzer and Cathy Norman

A meeting was held on Sunday July 15, 2012 at 4:00 pm in the offices of Herman, Herman and Katz to further discuss the possible addition of the City's joint venture outside counsel in the BP matter ("City's legal team") as co counsel with Wisner's current attorneys, Waltzer and Wiygul. The meeting was called to discuss fee issues between the two law firms after it was raised at the last Wisner Special Meeting held on June 27, 2012, that there had been no communication between the two legal groups. This meeting was preceded by an email (attached) in which the Mayor's legal group suggested a breakdown of duties, responsibilities and division of fees.

It became clear that once again the discussion would hinge on internal governance issues, particularly when the email from the City's legal team states in reference to settlement strategies; "While your insights and the recommendations of the Advisory Committee would be important, the ultimate decision making authority should rest with the Mayor, as Trustee". Our discussion pressed forward as the City's legal team urged Joel Waltzer to agree to a division of fees as a step forward so that there would be movement that could be presented to their client and the joint representation could move forward. Mr. Waltzer insisted that it was putting the cart before the horse and that the Committee needed to approve the co-counsel arrangement first.

At the meeting held on June 27, 2012, the Committee approved a resolution requesting that Ms. Norman get an ethics opinion from the Bar Association concerning the dual representation by the City's legal team of the City of New Orleans in their claim against BP as well as the City as Trustee and as a beneficiary of the Edward Wisner Donation in their claim against BP. Mr. Waltzer referred to this ethics opinion in his email dated July 2, 2012 in which a written waiver of conflicts was requested from the City's legal team. The Waltzer email recommended the safeguards which he reiterated in the meeting:

1) Safeguards must be in place with Waltzer and Wiygul participating in every facet of the case, specifically during negotiations.
2) Any settlement needs to be unanimously approved by the Committee.

The City's legal team indicated that they alone would be involved in the settlement negotiations with BP. I pointed out that this was unacceptable and that Waltzer and Wiygul would have to be included in all settlement discussions. The City's legal team continued to push for a discussion of the division of fees. Mr. Waltzer continued to state that the money was not the issue, the proper representation of his client, the Edward Wisner Donation, was the issue of importance.

When the internal governance issues were discussed, Caroline Fayard referred to the Wisner Bylaws and Soren Gisleson stated that under the bylaws they only needed three votes to fire Waltzer and Wiygul and replace them.

I informed the group that over the past 20 years I have educated the Donation on the need for restoration and that dollars held back for restoration from previous Federal lawsuits were used to restore the property. Restoration is necessary in order to protect the corpus of the Donation.

Exhibit 13 to Declaration of C. Cathy Norman

Settlement should include an amount of money that will be used to restore an denhance the property.

It was apparent that there would not be a resolution of the division of fees. Joel Waltzer again discussed the need for every beneficiary to sign off on any settlement to alleviate the ethics issues and suggested that their group take that back to the Mayor. Also, that all negotiations must be done in the presence of both attorney groups. Again the issue of the Mayor "giving up his authority" was raised. They asked the question as to why would there need to be unanimous approval of a settlement? The Mayor only needs three votes for a majority vote of the Committee.

I indicated that the Mayor, as Trustee, has a responsibility of prudence and if the settlement was a good one, it should be approved by all of the beneficiaries.

In my opinion, the board must remain vigilant in their decision making to insure they consider what is best for the Donation as a whole and what will best give a maximum return to their organization, not only from the BP litigation, but for years to come from the Wisner Donation.

The meeting ended at 5:30 pm.

creatures. It's not the kind of document that will startle you or make you piss your pants....it's the kind that will turn your stomach and make you upchuck.

Thanks to a public records request filed by an AZ reader and commenter, I've been going through a chain of former City Attorney Michael Sherman's emails regarding matters on Wisner. Sherman served as the appointee for Mayor Landrieu to the Advisory Committee.

From the get-go, Sherman's primary target was former Wisner Trust Advisory

Followers

| | |
|---|---|
| **From:** | Calvin Fayard |
| **To:** | Michael G. Sherman |
| **Subject:** | RE: Wisner – BP Matter |
| **Date:** | Wednesday, October 31, 2012 4:35:29 PM |

Amen brother.

**From:** Michael G. Sherman [mailto:mgsherman@nola.gov]
**Sent:** Wednesday, October 31, 2012 3:28 PM
**To:** Calvin Fayard
**Subject:** RE: Wisner – BP Matter

I speak the truth, counselor. I speak the truth.

**From:** Calvin Fayard [mailto:Calvin@fayardlaw.com]
**Sent:** Wednesday, October 31, 2012 3:28 PM
**To:** Michael G. Sherman
**Subject:** RE: Wisner – BP Matter

Mike I was hoping today would be a good day. But being Halloween, you are not trying to pull a fast one on me, are you?
Thanks,
Calvin

**From:** Michael G. Sherman [mailto:mgsherman@nola.gov]
**Sent:** Wednesday, October 31, 2012 3:20 PM
**To:** Steve Herman; fherman@fredhermanlaw.com; Soren Gisleson; Calvin Fayard; Caroline Fayard; WALTER LEGER; Jim Roy; Bob Wright
**Cc:** Sharonda R. Williams; Matthew J. Lindsay; Richard F. Cortizas; Matthew J. Averill
**Subject:** Wisner – BP Matter

Attorney-client communication
Privileged and confidential

Just an FYI – Cathy Norman resigned yesterday as Secretary-Treasurer of the Wisner Donation Advisory Committee. Pursuant to her contract, she gave the required 90 days notice. I suspect that she will be on vacation for most of that time and may leave sooner than the 90 days.

--Mike

Michael G. Sherman
Executive Counsel
Mayor Mitch Landrieu, City of New Orleans
504.658.4941 (office)
504.621.1824 (cell)

Exhibit 14 to Declaration of C. Cathy Norman