# AFFIDAVIT

**STATE OF LOUISIANA**

**PARISH OF ST. TAMMANY**

      BEFORE ME, notary public in and for the Parish of St. Tammany, State of Louisiana, this __3rd__ day of December, 2012, came and appeared:

### MICHAEL J. PENEGUY

who after being duly sworn, did depose, and state as follows:

1. I am a person of the age of majority and a resident of St. Tammany Parish, State of Louisiana. I give this affidavit based upon my personal knowledge, and information that I have obtained in my capacity as a member of the Edward Wisner Donation Advisory Committee (sometimes hereafter "Committee").

2. The Edward Wisner Donation (hereafter "Donation") is a charitable trust, first established by an Act of Donation of Edward Wisner in 1914. I attach hereto a detailed discussion of the creation, history, governance, and holdings of the Donation.

3. The current beneficiaries of the Donation are as follows:

    | BENEFICIARY | INTEREST |
    | --- | --- |
    | City of New Orleans | 34.8% |
    | Tulane University Educational Fund | 12.0% |
    | Charity Hospital | 12.0% |
    | The Salvation Army | 1.2% |
    | The Wisner Heirs | 40.0% |
    | Total | 100.0% |

4. The City of New Orleans, Charity Hospital of New Orleans, Tulane University, The Salvation Army, and the individual heirs of the Wisner Family are each entitled to designate one member of the Edward Wisner Donation Advisory Committee.

5. The current members of the Committee are Michael G. Sherman, sitting as the alternate of the Mayor, for the City of New Orleans, Ron E. Gardner for the Interim LSU Public Hospital, successor to Charity Hospital, Anthony P. Lorino for the Board of Administrators of the Tulane Educational Fund, Ed Buddy for The Salvation Army, Inc., and Michael J. Peneguy, your affiant, for the Wisner Heirs.

6. Mr. Sherman, executive counsel to Mayor Landrieu, has served as the City's representative on the committee since November 2011. Prior to Mr. Sherman's involvement with the Donation, former New Orleans City Attorney Nannette Jolivette-Brown had represented the City at the February 2011 committee meeting, and current City Attorney Richard Cortizas had represented the City at the March, April, May, June, July & September 2011 Committee meetings.

7. The Donation currently owns approximately 35,000 acres of property, with the majority of the property being wetlands in Lafourche Parish and smaller tracts in St. John the Baptist and Jefferson Parishes. It is estimated that nine miles of Donation beach property, extending from Bayou Lafourche to Bayou Thunder (the Lafourche-Jefferson Parish boundary), and an unknown amount of Donation wetlands behind the beach, were affected by the BP oil spill. The beach continues to be impacted by the BP oil spill, with severe instances of oiling being noticed during and following Hurricane Isaac. The Donation is believed to have one of the largest private claims for damages in the entire BP litigation.

8. Ms. Cathy Norman has served as the Secretary-Treasurer/Land Manager of the Edward Wisner Donation Advisory Committee since January 1992 and has been heavily involved in the all aspects of the Donation's BP oil spill related issues and claims since the spill occurred.

9. On July 1, 2010 the Edward Wisner Donation Advisory Committee voted to hire attorneys Joel Waltzer & Robert Wiygul for representation in the BP oil spill matters. Waltzer and Wiygul requested a waiver of a potential conflict from the City of New Orleans as a result of another case handled by the firm wherein the City is defendant, which litigation is entirely unrelated to BP. Nannette Jolivette-Brown, the then City Attorney for the City of New Orleans, granted a waiver of the potential conflict by a July 7, 2010 e-mail message to Ms. Norman and the attorney-client agreement was approved by the Committee by August 2010.

10. However, after providing the attorney-client agreement to the Mayor's office, Ms. Norman was advised that the Mayor would not sign the agreement because the City had not waived the potential conflict with the Waltzer & Wiygul attorneys arising out of the suit unrelated to the BP case, referred to in Paragraph 9, above.

11. In fact. City Attorney Nannette Jolivette-Brown had agreed on behalf of the City to waive any conflict caused by the involvement of Waltzer & Wiygul in unrelated claim.

12. Additionally, it was reported that the Mayor would not agree to the Donation entering into a contract calling for the payment of a contingency fee. However, it should be noted that the Mayor subsequently signed two contracts which provided for contingency fees in the BP oil spill matter.

13. Another purported reason for the Mayor's refusal to approve the Waltzer & Wiygul contract was that the Donation had failed to follow the procedures required by the City Charter, which supposedly required a public bid hiring process. This claim was obviously a sham, as it is clear that the Donation is not a public entity. Moreover, if it were true that the Donation was a public body and required to hire attorneys through a public bid process, this process was not followed in the process of the Donation retaining new counsel.

14. The Edward Wisner Donation Advisory Committee, upon advice from its regular legal counsel, Simon, Peragine, Smith & Redfearn, LLP, voted to approve the signing of the attorney-client agreement by Ms. Norman in a September 28, 2010 regular Committee meeting. The agreement was then executed by Ms. Norman on October 4, 2010.

15. No objection was voiced by anyone from the city administration on the work and progress of the representation by Waltzer & Wiygul until June 27, 2012 when Mr. Michael Sherman proposed that Waltzer & Wiygul agree to share their legal fees with a group of attorneys who were representing the City in its BP claim.

16. Waltzer and Wiygul are experienced environmental attorneys and by all indications the firm was doing an excellent job in their prosecution of BP claims. Based upon the reports of Ms. Norman, and their attendance at Committee meetings and reports to the Committee, it was clear that the firm had done a tremendous amount of work in its investigation of the Donation's claims and the damage to the property. Furthermore, Waltzer & Wiygul were able to negotiate an access agreement with BP whereby the Donation has received substantial interim compensation from BP, approximately $1.3 million, to date.

17. There was never any assertion made that Waltzer and Wiygul had not effectively represented the Donation or that these attorneys had not properly prosecuted the Donation's claims. Rather, the only apparent objection to these attorneys was that they had not been selected by Mayor Landrieu.

18. Nevertheless, on July 31, 2012, it was proposed by Mr. Sherman that the Donation should terminate its relationship with Waltzer & Wiygul and replace them with a group of new attorneys which included Stephen J. Herman, Soren E. Giselson, James Parkerson Roy, Bob Wright, Calvin C. Fayard, Jr., Carolyn Fayard, Fred Herman, and Walter J. Leger, Jr. (hereinafter referred to as the Joint Venture attorneys)

19. Based upon the fact that a change of attorneys was being proposed without any apparent reason, and given that the new attorneys proposed by the City's representative on the Committee also represented the City in its BP claim, I and other beneficiaries became concerned. After looking at the City's dual interests in the matter it appeared to us that there might be a conflict of interest for the same group of attorneys to represent both the City of New Orleans and the Wisner Donation.

20. As noted above, the City of New Orleans owns a 34.8% beneficial interest in the Wisner Donation. Because the City of New Orleans has its own BP claim there have been concerns among the Wisner beneficiaries that the City of New Orleans might try to "horse trade" with the Wisner Donation's claim in order to obtain a benefit for the City. For instance, it is feared that an agreement might be negotiated whereby the Donation's very large property damage claim might be settled for something less than is truly deserved, in exchange for the City receiving a larger payment for its separate claim.

21. On June 28, 2012 Ms. Norman, sought an opinion from the Louisiana State Bar Association Ethics Advisory Service regarding the proposed retainer of the City's attorneys by the Donation, and whether this arrangement constituted a prohibited conflict of interest.

22. On June 29, 2012 Ms. Norman received an email from Mr. Eric Barefield, Ethics Counsel with the Louisiana State Bar Association. Mr. Barefield stated that in his opinion the facts presented to him indicated the existence of a concurrent conflict of interest. He recommended that there be a full explanation to all involved of the potential for problems with the situation. Furthermore, he noted that the problem could be averted and any conflict could be avoided by simply having the Donation not use the same attorneys as the City.

23. Due to the tremendous amount of time and effort that Waltzer & Wiygul had invested in the case, and because of their intimate familiarity with the Donation's claims, there was considerable discussion of a proposal whereby Waltzer & Wiygul would remain involved in the representation, particularly with regard to issues related to the access agreement and restoration of the property. Under such a scenario the attorneys would split any fees generated.

24. The discussions regarding any continued involvement by Waltzer & Wiygul broke down over the issue of whether Waltzer & Wiygul would be involved in settlement negotiations with BP, with the City's legal team taking the position that they (the City's legal team), alone, would be involved in the settlement negotiations with BP. Ms. Norman took the position that this would not be acceptable, and Mr. Wiygul prepared an extensive memorandum regarding his position on this issue, which essentially concluded that ethical responsibilities would not permit the Waltzer & Wiygul firm to participate in the representation under such a draconian restriction.

25. Ms. Norman continued to raise concerns about the risk that BP would attempt to lump together the City's and the Donation's claims, resulting in potential inequities and conflicts. These concerns were repeatedly raised with the City's representative on the committee, Mr. Sherman. However, Mr. Sherman turned a deaf ear to all concerns about the conflict and instigated the firing of Waltzer & Wiygul.

26. Thereafter, at the Committee's meeting of July 31, 2012 a single motion was offered by Mr. Sherman, the City's representative, whereby Waltzer & Wiygul were discharged and the Joint Venture attorneys were hired. The motion passed by a 3-2 vote of the

Committee with the representatives of the Interim LSU Public Hospital and the Tulane Educational Fund joining Mr. Sherman in voting in favor of this resolution.

27. I and other Wisner beneficiaries continued to raise objections regarding the perceived conflict of interest which was posed by the same group of attorneys representing both the City and the Donation. Our concerns were heightened by the Joint Venture attorneys' refusal to communicate and cooperate with me and with Ms. Norman, who had heretofore spearheaded all aspects of the Donation's prosecution of its BP claim.

28. Despite having enrolled in the case and taking possession of the file, the Joint Venture attorneys still had not entered into a formal contract with the Donation. Eventually it was learned that the proposal of a formal contract with the Joint Venture attorneys would be presented to the Advisory Committee at its regular monthly meeting scheduled for September 25, 2012.

29. At 1:49 PM on September 24, 2012, one day prior to the regular monthly meeting of the Donation, Mr. Sherman presented me and other members of the Committee and the family with a proposed attorney contract with the Joint Venture attorneys.

30. The proposed attorney client contract contained several provisions that alarmed and concerned me and other beneficiaries, particularly terms regarding a potential conflict of interest and a contingency fee arrangement for payment of the attorneys' fees.

31. Paragraph 11 of that contract addressed the conflict of interest created by the joint representation of the City and the Donation by the Joint Venture attorneys and provides:

> *"The Donation acknowledges that Attorneys represent the City of New Orleans in its BP Oil claims. The Donation Advisory committee to the Trustee considered this potential conflict and had the opportunity to consult with outside counsel, and the Donation Advisory Committee took a vote that it has waived any potential conflict this may create. Accordingly, Trustee hereby waives any conflict of interest due to Attorneys representation to the City of New Orleans in its BP oil claims."*

32. Contrary to what was stated in the contract, there was in fact no opportunity for members of the Committee or the beneficiaries to consult with outside counsel regarding the potential conflict, since we had not received the contract until late the day prior to its consideration.

33. Furthermore, it was not clear how we could have had a meaningful consultation about this potential conflict of interest, as neither the attorneys, nor the representatives of the City, have provided us with any information regarding the nature, extent, or cause of this conflict.

34. Despite the lack of information regarding the nature of the conflict referred to in paragraph 11 of the contract, a resolution to enter into a contract with the Joint Venture

attorneys was taken up by the Advisory Committee at the September 25 meeting. One of the Joint Venture attorneys, Mr. Soren Giselson, appeared at the meeting and made a proposal for the Donation to enter into the contract.

35. During the course of the meeting I and other beneficiaries of the Donation asked Mr. Giselson about the nature of the potential conflict, and the provision which stated that there had been an opportunity for consultation with outside counsel. We advised Mr. Giselson that in order to have a meaningful consultation and an effective waiver we would need additional information regarding the nature of the conflict. However, neither Mr. Giselson, nor Mr. Sherman provided us with any additional facts or information regarding the conflict referred to in the contract.

36. The attorney contract provides for recovery of a fee on a contingency basis., paragraph 4(b) of the contract says that one methodology would provide

> *For Attorneys' services associated with obtaining interim or partial payments of oil spill damages other than response/removal costs (such as lost income or rent), Donation agrees to pay Attorneys ten percent of the amount received from BP or Transocean, whether on a monthly, bi-annual or other basis.*

Paragraph 4(c) of the contract provides that:

> *For services rendered in connection with physical damage and restoration costs, as well as final economic loss damages, the Donation will pay Attorneys a contingency fee based on the gross present value of benefits received by the Donation.*
>
> *For benefits received up to $10,000,000, the contingency fee would be 10% if the matter is resolved without suit; $10,000,000 - $50,000,000, the fee would be 6% if resolved without suit; and if greater than $50,000,000, the fee would be 3% if the matter is resolved without suit.*

37. Mr. Sherman of the City touted the fairness of this contingency fee contract in his email of September 24, 2012 stating:

> *The contingency fee is the LESSER of what the Donation had previously negotiated with Waltzer and Wiygul and the City's existing contract with the publicly procured joint venture of attorneys. Stated in other words, when it comes time to pay the attorneys, we calculate the attorney fee under the agreement the donation drafted w/ Waltzer and Wiygul, then calculate it under the attorneys' agreement for the city's claims. Whichever is less, the Donation pays.*

38. At the Advisory Committee meeting on September 25, 2012, I and other beneficiaries pointed out that circumstances regarding the BP claims and litigation had substantially

changed since the Donation entered into the initial contingency fee contract with Waltzer & Wiygul (October 4, 2010).

39. As Mr. Giselson himself noted during the September 25, 2012 Committee meeting, the question of BP's liability was no longer an issue. Mr. Giselson conceded that there was 'no possibility' that the Donation would be found to not have a claim. Rather, as a result of developments which had occurred in the BP litigation during the preceding 22 months, it was recognized that all legitimate claimants, such as the Donation, would be receiving financial compensation. The sole remaining issue was how much that compensation would be.

40. Thus, I and others noted that there was really no contingency involved since there was no risk of a non-recovery.

41. In Mr. Sherman's email of September 24, 2012 he made another statement that was apparently intended to demonstrate the fairness of the proposed contract with the joint venture attorneys:

> *We do not pay ANY attorney fees out of our bank account. They are putting in their time and effort and will only be paid when BP pays us or when the case settles (or we win at trial). Stated in other words, we can stop using our money to pay attorneys and can make larger distributions to beneficiaries or investments in the property, as appropriate.*

42. Again, I and other beneficiaries pointed out the fallacy of Mr. Sherman's contention. The Donation has no need to give up a significant portion of its expected recovery as a contingency fee, as the Donation has substantial regular income, in excess of $5.4 million dollars during 2011, which sum has already been exceeded as of the end of October, 2012. Thus, the Donation could easily afford to pay its attorneys on an hourly basis rather than paying a substantial contingency fee, particularly in light of the fact that there was really no continuing "contingency" from a liability standpoint.

43. I and others raised this concern with Mr. Sherman and Mr. Giselson during the September 25th meeting, noting that, in order to properly consider the fairness and reasonableness of the contingency fee contract, it would be necessary for the Joint Venture attorneys to provide us with some additional information. In particular, we asked to be briefed regarding the amount of the expected recovery and the number of hours and attorneys' fees that could reasonably be expected to be expended in the pursuit of that recovery.

44. Mr. Giselson stated that information regarding the expected recovery would be provided at the next meeting of the Committee, which was scheduled for October 30, 2012.

45. We asserted that without this information we could not make a properly informed decision regarding the reasonableness of the proposed contingency fee contract. Nevertheless, despite counsel's concession that there was no risk of non recovery, and despite the refusal to provide information regarding the expected amount of recovery and

possibility of entering into a contract for services on an hourly basis, the Committee went forward with the consideration of the proposed contract at the September 25th meeting.

46. The contract with the Joint Venture attorneys was approved by at vote of 3 to 2, with the City's representative, Mr. Sherman, making the motion and voting to approve the contract. The representatives of Tulane and the Interim LSU Public Hospital also voted in favor of the contract, while I and the representative of the Salvation Army voted against the contract.

*MICHAEL J. PENEGUY*

**SWORN TO AND SUBSCRIBED
BEFORE ME**, this _3rd_ day of December, 2012, at in Slidell, Louisiana.

Print Name: _Victoria P. CenTanni_
**NOTARY PUBLIC**
**La. Bar No.:** _65660_
**(My commission expires at death)**