**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE | * | |
| GULF OF MEXICO ON APRIL 20, 2010 | * | SECTION "J" |
| | * | |
| THIS DOCUMENTS RELATES ONLY TO: | * | JUDGE CARL J. BARBIER |
| Civil Action Nos. 10-2771; 10-8888; | * | MAGISTRATE JUDGE |
| 10-9999; 13-1971; and 14-1525 | * | JOSEPH C. WILKINSON, JR. |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

<u>DECLARATION OF DYLAN T. LEACH</u>

My name is Dylan T. Leach. I am an associate at the law firm of Smith & Fawer, L.L.C. I have personal knowledge regarding the documents that were produced by the Edward Wisner Donation Advisory Committee in response to the public records request dated October 17, 2016, attached hereto as Exhibit "A."

I also requested the same public records from the City of New Orleans on October 17, 2016.  On October 20, 2016, I received the written response from Anita B. Curran, Deputy City Attorney, attached hereto as Exhibit "B."

Subsequently, L. Amanda Phillips, Secretary Treasurer and Land Manager of the Wisner Donation Advisory Committee, produced the following public records:

1.  Engagement letter from Bourgeois Bennett, L.L.C. for the year ended December 31, 2006, attached hereto as Exhibit "C;"

2.  Engagement letter from Bourgeois Bennett, L.L.C. for the year ended December 31, 2007, attached hereto as Exhibit "D;"

3.  Engagement letter from Bourgeois Bennett, L.L.C. for the year ended December 31, 2008, attached hereto as Exhibit "E;"

4.  Engagement letter from Bourgeois Bennett, L.L.C. for the year ended December 31, 2009, attached hereto as Exhibit "F;"

5.  Engagement letter from Bourgeois Bennett, L.L.C. for the year ended December 31, 2011, attached hereto as Exhibit "G;"

6. Engagement letter from Bourgeois Bennett, L.L.C. for the year ended December 31, 2012, attached hereto as Exhibit "H;'"

7. Email from City Attorney Nannette V. Jolivette-Brown to Cathy Norman, dated July 7, 2010, attached hereto as Exhibit "I;"

8. Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, January 26, 2010, attached hereto as Exhibit "J;"

9. Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, February 23, 2010, attached hereto as Exhibit "K;"

10. Minutes of the Annual Review Meeting of the Edward Wisner Donation Advisory Committee, March 30, 2010, attached hereto as Exhibit "L;"

11. Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, March 30, 2010, attached hereto as Exhibit "M;"

12. Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, April 27, 2010, attached hereto as Exhibit "N;"

13. Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, May 25, 2010, attached hereto as Exhibit "O;"

14. Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, June 15, 2010, attached hereto as Exhibit "P;"

15. Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, July 1, 2010, attached hereto as Exhibit "Q;"

16. Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, July 27, 2010, attached hereto as Exhibit "R;"

17. Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, August 24, 2010, attached hereto as Exhibit "S;"

18. Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, August 31, 2010, attached hereto as Exhibit "T;"

19. Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, September 28, 2010, attached hereto as Exhibit "U;"

20. Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, October 26, 2010, attached hereto as Exhibit "V;"

21. Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, November 30, 2010, attached hereto as Exhibit "W;"

22.     Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, January 25, 2011, attached hereto as Exhibit "X;"

23.     Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, February 22, 2011, attached hereto as Exhibit "Y;";

24.     Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, March 29, 2011, attached hereto as Exhibit "Z;"

25.     Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, April 26, 2011, attached hereto as Exhibit "AA;"

26.     Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, May 31, 2011, attached hereto as Exhibit "BB;"

27.     Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, June 28, 2011, attached hereto as Exhibit "CC;"

28.     Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, July 26, 2011, attached hereto as Exhibit "DD;"

29.     Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, September 27, 2011, attached hereto as Exhibit "EE;"

30.     Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, October 25, 2011, attached hereto as Exhibit "FF;"

31.     Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, November 29, 2011, attached hereto as Exhibit "GG;"

32.     Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, January 31, 2012, attached hereto as Exhibit "HH;"

33.     Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, February 28, 2012, attached hereto as Exhibit "II;"

34.     Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, March 20, 2012, attached hereto as Exhibit "JJ;"

35.     Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, March 27, 2012, attached hereto as Exhibit "KK;"

36.     Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, April 24, 2012, attached hereto as Exhibit "LL;"

37.     Transcript of the Meeting of the Edward Wisner Donation Advisory Committee, May 29, 2012, attached hereto as Exhibit "MM;"

38.	Transcript of the Meeting of the Edward Wisner Donation Advisory Committee, June 7, 2012, attached hereto as Exhibit "NN;"

39.	Minutes of the Meeting of the Edward Wisner Donation Advisory Committee, June 19, 2012, attached hereto as Exhibit "OO;"

40.	Transcript of the Meeting of the Edward Wisner Donation Advisory Committee, June 27, 2012, attached hereto as Exhibit "PP;" and

41.	Transcript of the Meeting of the Edward Wisner Donation Advisory Committee, July 31, 2012, attached hereto as Exhibit "QQ."

I declare under penalty of perjury that the foregoing is true and correct. Dated this 18th day of November, 2016.

_/s/ Dylan T. Leach_____
Dylan T. Leach (No. 35879)



# SMITH & FAWER LLC
### ATTORNEYS AT LAW

201 St. Charles Avenue, Suite 3702 • New Orleans, Louisiana 70170
Telephone: (504) 525-2200 • Facsimile: (504) 525-2205

**VIA CERTIFIED MAIL**          October 17, 2016

Edward Wisner Donation Advisory Committee
ATTN: Records Custodian
935 Gravier Street, Suite 825
New Orleans, Louisiana 70112

  Re: *Public Records Request*

Dear Sir or Madam:

  Pursuant to the Public Records Act of Louisiana, R.S. 44:1, *et seq.*, I request the following public records be made available for inspection and/or copying:

1. A copy of any and all contracts, agreements, addendums, and/or amendments thereto and any and all purported contracts, agreements, addendums, and/or amendments thereto for legal services relating to and/or involving the Deepwater Horizon Oil Spill, clean-up of the Deepwater Horizon Oil Spill, or remediation of Louisiana's coasts, marshes, bayous, and/or any other waterway from the effects of the Deepwater Horizon Oil Spill, for the period April 19, 2010 through the present between, involving, signed on behalf of, and/or obligating The Edward Wisner Donation, and/or its Trustee the Mayor of New Orleans, and/or the Edward Wisner Donation Advisory Committee and one or more attorneys and/or law firms, including, but not limited to:

  a. Herman Herman & Katz, LLC;

  b. Leger & Shaw;

  c. Domengeaux Wright Roy & Edwards, LLC;

  d. Fayard & Honeycutt;

  e. The Law Offices of Fred Herman;

  f. Waltzer & Wiygul; and/or

  g. Waltzer Wiygul & Garside.

2. A copy of any and all meeting minutes of the Edward Wisner Donation Advisory Committee for any and all meetings held between January 1, 2007 and the present.



EXHIBIT
*A*

Edward Wisner Donation Advisory Committee
October 17, 2016
Page - 2 -

3.  A copy of any and all transcripts and/or recordings of any and all meetings of the Edward Wisner Donation Advisory Committee held between January 1, 2007 and the present.

4.  A copy of any and all notices of any and all meetings of the Edward Wisner Donation Advisory Committee held between January 1, 2007 and the present.

5.  A copy of any and all correspondence regarding any contracts, agreements, addendums, and/or amendments thereto and/or any purported contracts, agreements, addendums, and/or amendments thereto for legal services relating to and/or involving the Deepwater Horizon Oil Spill, clean-up of the Deepwater Horizon Oil Spill, or remediation of Louisiana's coasts, marshes, bayous, and/or any other waterway from the effects of the Deepwater Horizon Oil Spill, for the period April 19, 2010 through the present between, involving, signed on behalf of, and/or obligating The Edward Wisner Donation, and/or its Trustee the Mayor of New Orleans, and/or the Edward Wisner Donation Advisory Committee and one or more attorneys and/or law firms, including, but not limited to:

    a.  Herman Herman & Katz, LLC;

    b.  Leger & Shaw;

    c.  Domengeaux Wright Roy & Edwards, LLC;

    d.  Fayard & Honeycutt;

    e.  The Law Offices of Fred Herman;

    f.  Waltzer & Wiygul; and/or

    g.  Waltzer Wiygul & Garside.

6.  A copy of any and all Requests for Proposals and all criteria, amendments, and/or addenda thereto, requesting legal services on behalf of The Edward Wisner Donation, and/or its Trustee the Mayor of New Orleans, and/or the Edward Wisner Donation Advisory Committee relating to the Deepwater Horizon Oil Spill, clean-up of the Deepwater Horizon Oil Spill, or remediation of Louisiana's coasts, marshes bayous, and/or any other waterway from the effects of the Deepwater Horizon Oil Spill, as well as any related submissions, ratings of submissions, panels, panel meeting notes, rankings, scores, and award letters for the period April 19, 2010 through the present, including but not limited to Solicitation Nos. 2310-01439 and 2340-01030.

7.  A copy of any and all documents which established, amended, modified, and/or terminated the Edward Wisner Donation, including but not limited to the donation, the Consent Judgment entered in or about the year 1929, the Bylaws of the Edward Wisner Donation Committee adopted July 9, 1974 and any addendums or amendments thereto, and the Bylaws of the Edward Wisner Donation Committee effective April 29, 2003 and any addendums or amendments thereto.

Edward Wisner Donation Advisory Committee
October 17, 2016
Page - 3 -

8.  A copy of any and all documents relating to contracts, agreements, addendums, and amendments thereto for legal services relating to the Deepwater Horizon Oil Spill, clean-up of the Deepwater Horizon Oil Spill, or remediation of Louisiana's coasts, marshes, bayous, and/or any other waterway from the effects of the Deepwater Horizon Oil Spill, including but not limited to, letters, emails, text messages, notes, meeting minutes, calendar items, reports, resolutions, and memoranda for the period April 19, 2010 through the present.

9.  A copy of any and all conflict waivers, memoranda correspondence, and opinions related to or otherwise involving any contracts, agreements, addendums, and/or amendments thereto or any purported contracts, agreements, addendums, and/or amendments thereto for legal services relating to, involving, the Deepwater Horizon Oil Spill, clean-up of the Deepwater Horizon Oil Spill, or remediation of Louisiana's coasts, marshes, bayous, and/or any other waterway from the effects of the Deepwater Horizon Oil Spill, for the period April 19, 2010 through the present between, involving, signed on behalf of, and/or obligating The Edward Wisner Donation, and/or its Trustee the Mayor of New Orleans, and/or the Edward Wisner Donation Advisory Committee and one or more attorneys and/or law firms, including, but not limited to:

    a.  Herman Herman & Katz, LLC;

    b.  Leger & Shaw;

    c.  Domengeaux Wright Roy & Edwards, LLC;

    d.  Fayard & Honeycutt;

    e.  The Law Offices of Fred Herman;

    f.  Waltzer & Wiygul; and/or

    g.  Waltzer, Wiygul & Garside.

10. A copy of any and all contracts, agreements, addendums, and/or amendments thereto signed by C. Cathy Norman in her capacity as Secretary-Treasurer/Land Manager of the Edward Wisner Donation Advisory Committee, purporting to involve, be signed on behalf of, and/or obligate The Edward Wisner Donation and/or the Edward Wisner Donation Advisory Committee

Under the provisions of R.S. 44:32, if you raise a question as to whether the record requested is a public record, you are required to notify me in writing of your determination and the reasons, including the legal basis therefore, within three (3) days of the receipt of the request, exclusive of Saturdays, Sundays, and legal public holidays.

Edward Wisner Donation Advisory Committee
October 17, 2016
Page - 4 -

Under the provisions of R.S. 44:33, if the public record is not immediately available, you are required to certify this in writing promptly, and in your certificate fix a day and hour within three (3) days, exclusive of Saturdays, Sundays, and legal public holidays, for the exercise of the right granted in the Public Records Act.

Under R.S. 44:4.1(C), if you are withholding any requested records under a claim of privilege or a claim that the record constitutes or reflects the mental impressions, conclusions, opinions or legal theories of any attorney or an expert, obtained or prepared in anticipation of litigation or in preparation for trial:

1.  If your position is based upon a claim of privilege, then:

    a.  State the entire basis for your claim of privilege, including all underlying facts;

    b.  Identify all persons having knowledge concerning the facts, information, communications, or documents which you claim to be privileged; and

    c.  Identify all persons having knowledge of the facts upon which you based your claim of privilege.

2.  If your position is based upon a claim that any information or document is "work product" or "prepared in anticipation of litigation," then:

    a.  State the complete basis for your claim that the information or document constitutes or reflects the mental impressions, conclusions, opinions, or legal theories of nay attorney or other person obtained or prepared in anticipation of litigation or in preparation for trial;

    b.  Identify all persons having knowledge or copies of any information or documents which you claim to be or reflect mental impressions, conclusions, opinions, or legal theories for any attorney or the person to whose mental impressions, conclusions, opinions, or legal theories you refer; and

    c.  Identify all persons having knowledge of the facts upon which you base your claims that the information or document is not a public record.

Under R.S. 44:34, "If any public record applied for by any authorized person is not in the custody or control of the person to whom the application is made, such person shall promptly certify this in writing to the applicant, and shall in the certificate state in detail to the best of his knowledge and belief, the reason for the absence of the record from his custody or control, its location, what person then has custody of the record and the manner and method in which, and the exact time at which it was taken from his custody or control. He shall include in the certificate ample and detailed answers to inquiries of the applicant which may facilitate the exercise of the right granted by this Chapter."

Edward Wisner Donation Advisory Committee
October 17, 2016
- Page - 5 -

If you are invoking R.S. 44:34 to deny this request, please answer the following questions in detail:

1. Is a copy of the requested public record usually located in your office?
2. Why is your copy of the requested public record absent from your office?
3. Where is your copy of the requested public record?
4. Who has received your copy of the requested public record?
5. How and from whom did the present custodian gain control of your copy of the requested public record?
6. What was the exact time your copy of the requested public record was taken from your custody and control?
7. When will your copy of the requested public record be returned to your office?
8. Is there any other public official who has a copy of the requested public record?
9. State the name or names of anyone who has A copy of the requested public record?
10. State the location(s) where the requested public record can be viewed.
11. State the hours and dates when the requested public record can be viewed.

Please inform me of the volume of records requested so I can decide whether to have them copied or to inspect. I also prefer to receive records in electronic form, if possible.

Thank you for your cooperation and assistance.

If you have any questions or concerns regarding the above, please call me.

Sincerely,

Dylan T. Leach

DTL/sw

**[External Message Added] City of New Orleans records request 16-1772**

**New Orleans City Attorney's Office** <support@nextrequest.com>                    Thu, Oct 20, 2016 at 10:06 AM
Reply-To: nola_16-1772-requester-notes@inbound.nextrequest.com
To: Dylan Leach <dleach@smithfawer.com>

-- Write ABOVE THIS LINE to post a reply --

 NextRequest

### City of New Orleans Public Records Requests

A message was sent to you regarding record request #16-1772:

> Mr. Leach: The City of New Orleans is not the custodian of the Wisner
> Donation records you requested. Nevertheless, you may wish to contact
> Amanda Phillips with the Wisner Donation Advisory Committee which
> may have responsive records.  Ms. Phillips can be reached at
> wisnerdonation@aol.com. Sincerely,Anita B. CurranDeputy City
> AttorneyLaw Department1300 Perdido St., Ste. 5E03New Orleans, LA
> 70112

**View Request #16-1772.**

*Too many emails? Change your email settings here*
*Like NextRequest? Recommend us to another government!*



EXHIBIT
**B**



**Bourgeois Bennett**

July 9, 2007

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
P.O. Box 52204
New Orleans, LA 70152-2204

Dear Mrs. Norman:

We are pleased to confirm our understanding of the services we are to provide for Edward Wisner Donation Trust for the year ended December 31, 2006.

We will audit the statement of assets, liabilities, and fund balance – cash basis of the Edward Wisner Donation Trust as of December 31, 2006, and the related statement of revenues, expenses, and changes in fund balance – cash basis for the year then ended.

The objective of our audit is the expression of an opinion about whether your financial statements are fairly presented, in all material respects, in conformity with the cash basis of accounting. Our audit will be conducted in accordance with U. S. generally accepted auditing standards and will include tests of your accounting records and other procedures we consider necessary to enable us to express such an opinion. If our opinion is other than unqualified, we will discuss the reasons with you in advance. If, for any reason, we are unable to complete the audit or are unable to form or have not formed an opinion, we may decline to express an opinion or to issue a report as a result of this engagement.

Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, and direct confirmation of receivables and certain other assets and liabilities by correspondence with selected funding sources, creditors, and financial institutions. We will also request written representations from your attorneys as part of the engagement, and they may bill you for responding to this inquiry. At the conclusion of our audit, we will require certain written representations from you about the financial statements and related matters.

1340 West Tunnel Blvd., Suite 430
P.O. Box 2168
Houma, LA 70361-2168
Phone (985) 868-0139
Fax (985) 879-1949

Certified Public
Accountants I Consultants
A Limited Liability Company

P.O. Box 60600
New Orleans, LA 70160-0600
Heritage Plaza, 17th Floor
Phone (504) 831-4949
Fax (504) 833-9093



EXHIBIT

C

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
July 9, 2007
Page 2

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audit will involve judgment about the number of transactions to be examined and the areas to be tested. We will plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the entity or to acts by management or employees acting on behalf of the entity.

Because an audit is designed to provide reasonable, but not absolute, assurance and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements may exist and not be detected by us. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform you of any material errors that come to our attention, and we will inform you of any fraudulent financial reporting or misappropriation of assets that comes to our attention. We will also inform you of any violations of laws or governmental regulations that come to our attention, unless clearly inconsequential. Our responsibility as auditors is limited to the period covered by our audit and does not extend to any later periods for which we are not engaged as auditors.

Our audit will include obtaining an understanding of internal control sufficient to plan the audit and to determine the nature, timing, and extent of audit procedures to be performed. An audit is not designed to provide assurance on internal control or to identify deficiencies in internal control. However, during the audit, we will communicate them to you and those charged with governance internal control related matters that are required to be communicated under professional standards.

You are responsible for establishing and maintaining internal controls, including monitoring ongoing activities; for the selection and application of accounting principles; and for the fair presentation in the financial statements of assets, liabilities, and fund balance and the revenues, expenses and changes in fund balance in conformity with the cash basis of accounting. You are also responsible for management decisions and functions; for designating a management-level individual with suitable skill, knowledge, or experience to oversee the tax services and any other nonattest services we provide; and for evaluating the adequacy and results of those services and accepting responsibility for them.

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
July 9, 2007
Page 3

You are responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. Your responsibilities include adjusting the financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

You are responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us about all known or suspected fraud affecting the Trust involving (1) management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the financial statements. Your responsibilities include informing us of your knowledge of any allegations of fraud or suspected fraud affecting the Trust received in communications from employees, former employees, grantors, regulators, or others. In addition, you are responsible for identifying and ensuring the Trust complies with applicable laws and regulations and for taking timely and appropriate steps to remedy any fraud, illegal acts, or violations of contracts or grant agreements that we may report.

We understand that your employees will prepare all cash, accounts receivable, and other confirmations we request and will locate any documents selected by us for testing. We will furnish you a list of schedules and analyses which we expect your staff to prepare prior to the start of the engagement. The fees quoted herein are for our audit of the Trust's financial statements. Those fees do not cover the cost of additional services not contemplated by this engagement letter, such as correction or completion of requested schedules and analyses, reconciling accounts, balancing subsidiary ledgers, etc., all of which are the responsibility of your staff.

We expect to begin our audit on approximately July 17, 2007 and issue our report no later than September 15, 2007.

We estimate that our fees for these services will not exceed $5,400. The fee estimate is based on anticipated cooperation from your personnel and the assumption that unexpected circumstances will not be encountered during the audit. If significant problems are encountered which require additional time on our part, we will discuss the

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
July 9, 2007
Page 4

problems with you and gain your approval to provide additional services prior to incurring any time. We will do our best to keep you informed of the progress of the additional procedures as the work progresses. We will provide you with an itemization of the time incurred and the resulting fees when our invoice is rendered.

If you should request any consulting or other services not described in this letter, in the absence of any other written communication from us documenting such additional services, our services will continue to be governed by the terms of this engagement letter. Such services will be billed based on established hourly rates in effect at the time the services are provided.

During the course of our engagement, we will request information and explanations from management regarding the Trust's operations, internal controls, future plans, specific transactions, and accounting systems and procedures. At the conclusion of our engagement, we will require, as a precondition to the issuance of our report, that management provide certain representations in a written representation letter. The procedures we will perform in our engagement and the conclusions we reach as a basis for our report will be heavily influenced by the written and oral representations that we receive from management. In view of the foregoing, the Trust agrees to release our firm and its personnel from any liability and costs relating to our services under this letter resulting from false or misleading representations made to us by any member of the Trust's management.

In addition, the Trust further agrees to indemnify and hold us harmless for any liability and all reasonable costs, including legal fees that we may incur as a result of the services performed under this engagement in the event there are false or misleading representations made to us by any member of the Trust's management.

You agree that our maximum liability to you for any reason related to the services provided in the performance of this engagement will be limited to an amount equal to two times our fees, except to the extent determined to result from our gross negligence or willful misconduct.

Our audit engagement ends on delivery of our audit report. Any follow-up services that might be requested will be a separate, new engagement.

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
July 9, 2007
Page 5

At Bourgeois Bennett, it is our goal to provide clients with services that add value. As you can appreciate, our most valuable asset is our staff. Our Firm invests a great deal of time and effort to train our staff, as well as substantial financial resources to attract and retain top professionals. Accordingly, neither Edward Wisner Donation Trust nor any of its affiliates will attempt to employ any of our staff on either a part-time or full-time basis without our prior written consent. In the event that a member of our staff is hired by Edward Wisner Donation Trust or any of its affiliates, then Edward Wisner Donation Trust agrees to pay Bourgeois Bennett, L.L.C. a fee of 30% of the annual compensation offered to our employee. This fee is due upon commencement of his or her employment.

We appreciate the opportunity to be of service to you and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign the enclosed copy and return it to us.

Very truly yours,

For the Firm

RESPONSE:

This letter correctly sets forth the understanding of Edward Wisner Donation Trust.

_C. Cathy Norman_
Officer signature

_Secretary Treasurer / Land Manager_
Title

_July 18, 2007_
Date

Z:\data\94182\2006\Word\engagement letter.doc



**Bourgeois Bennett**

July 24, 2008

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
P.O. Box 52204
New Orleans, LA 70152-2204

Dear Mrs. Norman:

We are pleased to confirm our understanding of the services we are to provide for Edward Wisner Donation Trust for the year ended December 31, 2007.

We will audit the statement of assets, liabilities, and fund balance – cash basis of the Edward Wisner Donation Trust as of December 31, 2007, and the related statement of revenues, expenses, and changes in fund balance – cash basis for the year then ended.

The objective of our audit is the expression of an opinion about whether your financial statements are fairly presented, in all material respects, in conformity with the cash basis of accounting. Our audit will be conducted in accordance with U. S. generally accepted auditing standards and will include tests of your accounting records and other procedures we consider necessary to enable us to express such an opinion. If our opinion is other than unqualified, we will discuss the reasons with you in advance. If, for any reason, we are unable to complete the audit or are unable to form or have not formed an opinion, we may decline to express an opinion or to issue a report as a result of this engagement.

Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, and direct confirmation of receivables and certain other assets and liabilities by correspondence with selected funding sources, creditors, and financial institutions. We will also request written representations from your attorneys as part of the engagement, and they may bill you for responding to this inquiry. At the conclusion of our audit, we will require certain written representations from you about the financial statements and related matters.

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audit will involve judgment about the number of transactions to be examined and the areas to be tested. We will plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the entity or to acts by management or employees acting on behalf of the entity.

1340 West Tunnel Blvd., Suite 430
P.O. Box 2168
Houma, LA 70361-2168
Phone (985) 868-0139
Fax (985) 879-1949

**Certified Public
Accountants l Consultants**
A Limited Liability Company

P.O. Box 60600
New Orleans, LA 70160-0600
Heritage Plaza, 17th Floor
Phone (504) 831-4949
Fax (504) 833-9093



**EXHIBIT
D**
tabbies

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
July 24, 2008
Page 2

Because an audit is designed to provide reasonable, but not absolute, assurance and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements may exist and not be detected by us. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform you of any material errors that come to our attention, and we will inform you of any fraudulent financial reporting or misappropriation of assets that comes to our attention. We will also inform you of any violations of laws or governmental regulations that come to our attention, unless clearly inconsequential. Our responsibility as auditors is limited to the period covered by our audit and does not extend to any later periods for which we are not engaged as auditors.

Our audit will include obtaining an understanding of the Trust and its environment, including internal control, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing, and extent of further audit procedures. An audit is not designed to provide assurance on internal control or to identify deficiencies in internal control. However, during the audit, we will communicate them to you and those charged with governance internal control related matters that are required to be communicated under professional standards.

You are responsible for establishing and maintaining internal controls, including monitoring ongoing activities; for the selection and application of accounting principles; and for the fair presentation in the financial statements of assets, liabilities, and fund balance and the revenues, expenses and changes in fund balance in conformity with the cash basis of accounting. You are also responsible for management decisions and functions; for designating a management-level individual with suitable skill, knowledge, or experience to oversee the tax services and any other nonattest services we provide; and for evaluating the adequacy and results of those services and accepting responsibility for them.

You are responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. Your responsibilities include adjusting the financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
July 24, 2008
Page 3

You are responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us about all known or suspected fraud affecting the Trust involving (1) management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the financial statements. Your responsibilities include informing us of your knowledge of any allegations of fraud or suspected fraud affecting the Trust received in communications from employees, former employees, grantors, regulators, or others. In addition, you are responsible for identifying and ensuring the Trust complies with applicable laws and regulations and for taking timely and appropriate steps to remedy any fraud, illegal acts, or violations of contracts or grant agreements that we may report.

We understand that your employees will prepare all cash, accounts receivable, and other confirmations we request and will locate any documents selected by us for testing. We will furnish you a list of schedules and analyses which we expect your staff to prepare prior to the start of the engagement. The fees quoted herein are for our audit of the Trust's financial statements. Those fees do not cover the cost of additional services not contemplated by this engagement letter, such as correction or completion of requested schedules and analyses, reconciling accounts, balancing subsidiary ledgers, etc., all of which are the responsibility of your staff.

We estimate that our fees for these services will not exceed $7,400. The fee estimate is based on anticipated cooperation from your personnel and the assumption that unexpected circumstances will not be encountered during the audit. If significant problems are encountered which require additional time on our part, we will discuss the problems with you and gain your approval to provide additional services prior to incurring any time. We will do our best to keep you informed of the progress of the additional procedures as the work progresses. We will provide you with an itemization of the time incurred and the resulting fees when our invoice is rendered.

If you should request any consulting or other services not described in this letter, in the absence of any other written communication from us documenting such additional services, our services will continue to be governed by the terms of this engagement letter. Such services will be billed based on established hourly rates in effect at the time the services are provided.

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
July 24, 2008
Page 4

During the course of our engagement, we will request information and explanations from management regarding the Trust's operations, internal controls, future plans, specific transactions, and accounting systems and procedures. At the conclusion of our engagement, we will require, as a precondition to the issuance of our report, that management provide certain representations in a written representation letter. The procedures we will perform in our engagement and the conclusions we reach as a basis for our report will be heavily influenced by the written and oral representations that we receive from management. In view of the foregoing, the Trust agrees to release our firm and its personnel from any liability and costs relating to our services under this letter resulting from false or misleading representations made to us by any member of the Trust's management.

In addition, the Trust further agrees to indemnify and hold us harmless for any liability and all reasonable costs, including legal fees that we may incur as a result of the services performed under this engagement in the event there are false or misleading representations made to us by any member of the Trust's management.

You agree that our maximum liability to you for any reason related to the services provided in the performance of this engagement will be limited to an amount equal to two times our fees, except to the extent determined to result from our gross negligence or willful misconduct.

Our audit engagement ends on delivery of our audit report. Any follow-up services that might be requested will be a separate, new engagement.

At Bourgeois Bennett, it is our goal to provide clients with services that add value. As you can appreciate, our most valuable asset is our staff. Our Firm invests a great deal of time and effort to train our staff, as well as substantial financial resources to attract and retain top professionals. Accordingly, neither Edward Wisner Donation Trust nor any of its affiliates will attempt to employ any of our staff on either a part-time or full-time basis without our prior written consent. In the event that a member of our staff is hired by Edward Wisner Donation Trust or any of its affiliates, then Edward Wisner Donation Trust agrees to pay Bourgeois Bennett, L.L.C. a fee of 30% of the annual compensation offered to our employee. This fee is due upon commencement of his or her employment.

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
July 24, 2008
Page 5

We appreciate the opportunity to be of service to you and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign the enclosed copy and return it to us.

Very truly yours,

For the Firm.

RESPONSE:

This letter correctly sets forth the understanding of Edward Wisner Donation Trust.

_____
Officer signature

_____
Title

_____
Date

Engagement\94182.0\2007\Audit\001



**Bourgeois Bennett**

May 7, 2009

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
P.O. Box 52204
New Orleans, LA  70152-2204

Dear Mrs. Norman:

We are pleased to confirm our understanding of the services we are to provide for Edward Wisner Donation Trust for the year ended December 31, 2008.

We will audit the statement of assets, liabilities, and fund balance – cash basis of the Edward Wisner Donation Trust as of December 31, 2008, and the related statement of revenues, expenses, and changes in fund balance – cash basis for the year then ended.

The objective of our audit is the expression of an opinion about whether your financial statements are fairly presented, in all material respects, in conformity with the cash basis of accounting. Our audit will be conducted in accordance with generally accepted auditing standards established by the Auditing Standards Board (United States) and will include tests of your accounting records and other procedures we consider necessary to enable us to express such an opinion. If our opinion is other than unqualified, we will discuss the reasons with you in advance. If, for any reason, we are unable to complete the audit or are unable to form or have not formed an opinion, we may decline to express an opinion or to issue a report as a result of this engagement.

Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, and direct confirmation of certain other assets and liabilities by correspondence with selected funding sources, creditors, and financial institutions. We will also request written representations from your attorneys as part of the engagement, and they may bill you for responding to this inquiry. At the conclusion of our audit, we will require certain written representations from you about the financial statements and related matters.

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audit will involve judgment about the number of transactions to be examined and the areas to be tested. We will plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the entity or to acts by management or employees acting on behalf of the entity.

1340 West Tunnel Blvd., Suite 226
P.O. Box 2168
Houma, LA 70361-2168
Phone (985) 868-0139
Fax (985) 879-1949

Certified Public
Accountants | Consultants
A Limited Liability Company

P.O. Box 60600
New Orleans, LA 70160-0600
Heritage Plaza, 17th Floor
Phone (504) 831-4949
Fax (504) 833-9093

**EXHIBIT**

tabbies®

**E**

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
May 7, 2009
Page 2

Because an audit is designed to provide reasonable, but not absolute, assurance and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements may exist and not be detected by us. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform you of any material errors that come to our attention, and we will inform you of any fraudulent financial reporting or misappropriation of assets that comes to our attention. We will also inform you of any violations of laws or governmental regulations that come to our attention, unless clearly inconsequential. Our responsibility as auditors is limited to the period covered by our audit and does not extend to any later periods for which we are not engaged as auditors.

Our audit will include obtaining an understanding of the Trust and its environment, including internal control, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing, and extent of further audit procedures. An audit is not designed to provide assurance on internal control or to identify deficiencies in internal control. However, during the audit, we will communicate them to you and those charged with governance internal control related matters that are required to be communicated under professional standards.

You are responsible for making all management decisions and performing all management functions; for designating an individual with suitable skill, knowledge, or experience to oversee the tax services and any other nonattest services we provide; and for evaluating the adequacy and results of those services and accepting responsibility for them.

You are responsible for establishing and maintaining internal controls, including monitoring ongoing activities; for the selection and application of accounting principles; and for the fair presentation in the financial statements of assets, liabilities, and fund balance and the revenues, expenses and changes in fund balance in conformity with the cash basis of accounting. You are also responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. Your responsibilities include adjusting the financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
May 7, 2009
Page 3

You are responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us about all known or suspected fraud affecting the Trust involving (1) management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the financial statements. Your responsibilities include informing us of your knowledge of any allegations of fraud or suspected fraud affecting the Trust received in communications from employees, former employees, funding sources, regulators, or others. In addition, you are responsible for identifying and ensuring the Trust complies with applicable laws and regulations.

We understand that your employees will prepare all cash and other confirmations we request and will locate any documents selected by us for testing. We will furnish you a list of schedules and analyses which we expect your staff to prepare prior to the start of the engagement. The fees quoted herein are for our audit of the Trust's financial statements. Those fees do not cover the cost of additional services not contemplated by this engagement letter, such as correction or completion of requested schedules and analyses, reconciling accounts, balancing subsidiary ledgers, etc., all of which are the responsibility of your staff.

Eric Smith is the engagement partner and is responsible for supervising the engagement and signing the report. We expect to begin our audit on approximately May 18, 2009.

We estimate that our fees for these services will not exceed $7,400. The fee estimate is based on anticipated cooperation from your personnel and the assumption that unexpected circumstances will not be encountered during the audit. If significant problems are encountered which require additional time on our part, we will discuss the problems with you and gain your approval to provide additional services prior to incurring any time. We will do our best to keep you informed of the progress of the additional procedures as the work progresses. We will provide you with an itemization of the time incurred and the resulting fees when our invoice is rendered.

If you should request any consulting or other services not described in this letter, in the absence of any other written communication from us documenting such additional services, our services will continue to be governed by the terms of this engagement letter. Such services will be billed based on established hourly rates in effect at the time the services are provided.

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
May 7, 2009
Page 4

During the course of our engagement, we will request information and explanations from management regarding the Trust's operations, internal controls, future plans, specific transactions, and accounting systems and procedures. At the conclusion of our engagement, we will require, as a precondition to the issuance of our report, that management provide certain representations in a written representation letter. The procedures we will perform in our engagement and the conclusions we reach as a basis for our report will be heavily influenced by the written and oral representations that we receive from management. In view of the foregoing, the Trust agrees to release our firm and its personnel from any liability and costs relating to our services under this letter resulting from false or misleading representations made to us by any member of the Trust's management.

In addition, the Trust further agrees to indemnify and hold us harmless for any liability and all reasonable costs, including legal fees that we may incur as a result of the services performed under this engagement in the event there are false or misleading representations made to us by any member of the Trust's management.

You agree that our maximum liability to you for any reason related to the services provided in the performance of this engagement will be limited to an amount equal to two times our fees, except to the extent determined to result from our gross negligence or willful misconduct.

Our audit engagement ends on delivery of our audit report. Any follow-up services that might be requested will be a separate, new engagement.

At Bourgeois Bennett, it is our goal to provide clients with services that add value. As you can appreciate, our most valuable asset is our staff. Our Firm invests a great deal of time and effort to train our staff, as well as substantial financial resources to attract and retain top professionals. Accordingly, neither Edward Wisner Donation Trust nor any of its affiliates will attempt to employ any of our staff on either a part-time or full-time basis without our prior written consent. In the event that a member of our staff is hired by Edward Wisner Donation Trust or any of its affiliates, then Edward Wisner Donation Trust agrees to pay Bourgeois Bennett, L.L.C. a fee of 30% of the annual compensation offered to our employee. This fee is due upon commencement of his or her employment.

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
May 7, 2009
Page 5


We appreciate the opportunity to be of service to you and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign the enclosed copy and return it to us.

Very truly yours,

*E A Smith*

For the Firm.

RESPONSE:

This letter correctly sets forth the understanding of Edward Wisner Donation Trust.

_C. Cathy Norman_
Officer signature

_Secretary Treasurer / Land Manager_
Title

_May 26, 2009_
Date

Engagement\94182.0\2008\Audit\001



**Bourgeois Bennett**

January 20, 2010

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
P.O. Box 52204
New Orleans, LA  70152-2204

Dear Mrs. Norman:

   We are pleased to confirm our understanding of the services we are to provide for Edward Wisner Donation Trust for the year ended December 31, 2009.

   We will audit the statement of assets, liabilities, and fund balance – cash basis of the Edward Wisner Donation Trust as of December 31, 2009, and the related statement of revenues, expenses, and changes in fund balance – cash basis for the year then ended.

   We will also prepare the Trust's Income Tax return Form 1041 for the year ended December 31, 2009.

   The objective of our audit is the expression of an opinion about whether your financial statements are fairly presented, in all material respects, in conformity with the cash basis of accounting. Our audit will be conducted in accordance with auditing standards generally accepted in the United Stated of America and will include tests of your accounting records and other procedures we consider necessary to enable us to express such an opinion. If our opinion is other than unqualified, we will discuss the reasons with you in advance. If, for any reason, we are unable to complete the audit or are unable to form or have not formed an opinion, we may decline to express an opinion or to issue a report as a result of this engagement.

   Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, and direct confirmation of certain other assets and liabilities by correspondence with selected customers, creditors, and financial institutions.  We will also request written representations from your attorneys as part of the engagement, and they may bill you for responding to this inquiry. At the conclusion of our audit, we will require certain written representations from you about the financial statements and related matters.

1340 West Tunnel Blvd., Suite 226
P.O. Box 2168
Houma, LA 70361-2168
Phone (985) 868-0139
Fax (985) 879-1949

**Certified Public**
**Accountants | Consultants**
A Limited Liability Company

P.O. Box 60600
New Orleans, LA 70160-0600
Heritage Plaza, 17th Floor
Phone (504) 831-4949
Fax (504) 833-9093



EXHIBIT
F

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
January 20, 2010
Page 2

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audit will involve judgment about the number of transactions to be examined and the areas to be tested. We will plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the entity or to acts by management or employees acting on behalf of the entity.

Because an audit is designed to provide reasonable, but not absolute, assurance and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements may exist and not be detected by us. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform you of any material errors that come to our attention, and we will inform you of any fraudulent financial reporting or misappropriation of assets that comes to our attention. We will also inform you of any violations of laws or governmental regulations that come to our attention, unless clearly inconsequential. Our responsibility as auditors is limited to the period covered by our audit and does not extend to any later periods for which we are not engaged as auditors.

Our audit will include obtaining an understanding of the Trust and its environment, including internal control, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing, and extent of further audit procedures. An audit is not designed to provide assurance on internal control or to identify deficiencies in internal control. However, during the audit, we will communicate them to you and those charged with governance internal control related matters that are required to be communicated under professional standards.

You are responsible for making all management decisions and performing all management functions; for designating an individual with suitable skill, knowledge, or experience to oversee the tax services and any other nonattest services we provide; and for evaluating the adequacy and results of those services and accepting responsibility for them.

You are responsible for establishing and maintaining internal controls, including monitoring ongoing activities; for the selection and application of accounting principles; and for the fair presentation in the financial statements of assets, liabilities, and fund balance and the revenues, expenses and changes in fund balance in conformity with the cash basis of accounting. You are also responsible for making all financial records and related information available to us and for the accuracy and completeness of that information. Your responsibilities include

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
January 20, 2010
Page 3

adjusting the financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the latest period presented are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

You are responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us about all known or suspected fraud affecting the Trust involving (1) management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the financial statements. Your responsibilities include informing us of your knowledge of any allegations of fraud or suspected fraud affecting the Trust received in communications from employees, former employees, funding sources, regulators, or others. In addition, you are responsible for identifying and ensuring the Trust complies with applicable laws and regulations and for taking the appropriate steps to remedy any fraud, illegal acts, or violations of contracts or grant agreements that we may report.

We understand that your employees will prepare all cash and other confirmations we request and will locate any documents selected by us for testing. We will furnish you a list of schedules and analyses which we expect your staff to prepare prior to the start of the engagement. The fees quoted herein are for our audit of the Trust's financial statements. Those fees do not cover the cost of additional services not contemplated by this engagement letter, such as correction or completion of requested schedules and analyses, reconciling accounts, balancing subsidiary ledgers, etc., all of which are the responsibility of your staff.

Eric Smith is the engagement partner and is responsible for supervising the engagement and signing the report. We expect to begin our audit on approximately March 1, 2010.

We estimate that our fees for these services will not exceed $7,600 for the audit and $3,600 for the tax return. The fee estimate is based on anticipated cooperation from your personnel and the assumption that unexpected circumstances will not be encountered during the audit or return preparation. If significant problems are encountered which require additional time on our part, we will discuss the problems with you and gain your approval to provide additional services prior to incurring any time. We will do our best to keep you informed of the progress of the additional procedures as the work progresses. We will provide you with an itemization of the time incurred and the resulting fees when our invoice is rendered.

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
January 20, 2010
Page 4

If you should request any consulting or other services not described in this letter, in the absence of any other written communication from us documenting such additional services, our services will continue to be governed by the terms of this engagement letter. Such services will be billed based on established hourly rates in effect at the time the services are provided.

During the course of our engagement, we will request information and explanations from management regarding the Trust's operations, internal controls, future plans, specific transactions, and accounting systems and procedures. At the conclusion of our engagement, we will require, as a precondition to the issuance of our report, that management provide certain representations in a written representation letter. The procedures we will perform in our engagement and the conclusions we reach as a basis for our report will be heavily influenced by the written and oral representations that we receive from management. In view of the foregoing, the Trust agrees to release our firm and its personnel from any liability and costs relating to our services under this letter resulting from false or misleading representations made to us by any member of the Trust's management.

In addition, the Trust further agrees to indemnify and hold us harmless for any liability and all reasonable costs, including legal fees that we may incur as a result of the services performed under this engagement in the event there are false or misleading representations made to us by any member of the Trust's management.

You agree that our maximum liability to you for any reason related to the services provided in the performance of this engagement will be limited to an amount equal to two times our fees, except to the extent determined to result from our gross negligence or willful misconduct.

Our audit engagement ends on delivery of our audit report. Any follow-up services that might be requested will be a separate, new engagement.

At Bourgeois Bennett, it is our goal to provide clients with services that add value. As you can appreciate, our most valuable asset is our staff. Our Firm invests a great deal of time and effort to train our staff, as well as substantial financial resources to attract and retain top professionals. Accordingly, neither Edward Wisner Donation Trust nor any of its affiliates will attempt to employ any of our staff on either a part-time or full-time basis without our prior written consent. In the event that a member of our staff is hired by Edward Wisner Donation Trust or any of its affiliates, then Edward Wisner Donation Trust agrees to pay Bourgeois Bennett, L.L.C. a fee of 30% of the annual compensation offered to our employee. This fee is due upon commencement of his or her employment.

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation
Advisory Committee
January 20, 2010
Page 5


We appreciate the opportunity to be of service to you and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign the enclosed copy and return it to us.

Very truly yours,

*E A Smith*

For the Firm.

RESPONSE:

This letter correctly sets forth the understanding of Edward Wisner Donation Trust.

_C. Cathy Norman_
Officer signature

_Secretary Treasurer / Land Manager_
Title

_Jan. 26, 2010_
Date

Engagement\94182.0\2009\Audit\001



**Bourgeois Bennett**
CERTIFIED PUBLIC ACCOUNTANTS | CONSULTANTS
A LIMITED LIABILITY COMPANY

January 11, 2012

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation Advisory Committee
P.O. Box 52204
New Orleans, LA 70152-2204

Dear Mrs. Norman:

We appreciate the opportunity of working with you and advising you regarding your income tax. To minimize the possibility of any misunderstanding between us, this letter confirms our understanding as to the nature and extent of the tax services we will provide. Please sign it and return it to us.

We will prepare your Federal fiduciary income tax return for the fiscal year ended December 31, 2011 and related income tax returns for any appropriate states from information which you will furnish to us. We will prepare your return for the purpose of enabling you to file these returns with the IRS and the appropriate state agencies. Our services are not designed for any other purpose, including, but not limited to, your providing copies of these returns to third parties for any reason.

Unless covered by another engagement letter for the same period, we will not audit or otherwise verify the data you submit, although we may need to ask you for clarification of some of the information. You represent that the information you are supplying is accurate and complete to the best of your knowledge and that you have supporting documentation for rent and royalty 1099's as well as beneficiary distribution support.

It is your responsibility to provide us with all the information required for the preparation of complete and accurate returns. You should retain all the documents, canceled checks and other data that form the basis of income and deductions. These may be necessary to prove the accuracy and completeness of the returns to a taxing authority. Our policy is to destroy tax returns and our workpapers developed while preparing your returns after seven years, after which our files will no longer be available.

You have the final responsibility for the income tax returns and, therefore, you should review them carefully before you sign them or approve them for electronic filing.

During the preparation of your return, we may be required to e-mail certain information to you or third parties in order to gather data required for the preparation of your return. E-mail is a fast and convenient means of communication. However, it uses the internet, which is not a secure means of communication. By signing this letter, you agree to allow us to use e-mail to communicate with you or other parties when necessary for us to complete your return unless you instruct us otherwise in writing. Under IRS regulations, we may need to get your specific written permission before contacting third parties to request information.

EXHIBIT
tabbies
**G**

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation Advisory Committee
January 11, 2012
Page 2

Our work in connection with the preparation of your fiduciary income tax returns does not include any procedures designed to discover fraud, defalcations or other irregularities, should any exist. We will render any accounting and bookkeeping assistance that we find necessary for preparation of the returns.

We will use professional judgment in resolving questions where the tax law is unclear, or where there may be conflicts between the taxing authorities' interpretations of the law and other supportable positions. Unless otherwise instructed by you, we will resolve such questions in your favor whenever possible. In the event you ask us to take a position that in our professional judgment will not meet the applicable laws and standards as promulgated, we reserve the right to stop work and shall not be liable to you for any damages that occur as a result of ceasing to render services.

It may become necessary to file for an extension of time to file your income tax returns if you have not yet provided all or a part of your income tax information or there are unresolved issues or other delays in processing. The last few weeks leading up to April 15th are extremely busy ones for us. If you have not provided us your tax information or major parts of your information are still missing by March 15th, we may be unable to complete your return by April 15th. If you do not provide the information by April 1st, your tax return will be placed on extension for completion after April 15th.

The law provides various penalties that may be imposed when taxpayers understate their tax liability. If you would like information on the amount or circumstances of these penalties, please contact us.

The IRS or a state agency may select your return for examination. You should understand that you have certain rights of appeal for any adjustments that these agencies may propose. If your return is examined, we will be available upon request to represent you and will render additional invoices for the time and expenses incurred. If you decide to represent yourself or have other representation, we will be happy to provide whatever information or assistance you require.

We will prepare your return based on the law as it exists at this time. These laws may be changed in the future. In addition, Congress has the ability to change laws retroactively. We have no control over such events and are not obligated to inform you of any such changes that may affect your return or the positions taken thereon.

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation Advisory Committee
January 11, 2012
Page 3

We estimate that our fees for these services will not exceed $3,900 for the tax return. The fee estimate is based on anticipated cooperation from your personnel and the assumption that unexpected circumstances will not be encountered during the return preparation. If significant additional time is necessary, we will keep you informed of any problems we encounter and our fees will be adjusted accordingly. Our invoices for these fees will be rendered each month as work progresses and are payable on presentation.

The engagement does not include any services not specifically stated in this letter. However, we would be pleased to consult with you regarding other income tax matters such as proposed or completed transactions, income tax projections, and other planning if you so request.

You agree to indemnify and hold us harmless for any liability and all reasonable costs, including legal fees that we may incur as a result of the services performed under this engagement in the event there are false or misleading representations made to us by you.

You further agree that our maximum liability to you for any reason related to the services provided in the performance of this engagement will be limited to an amount equal to two times our fees, except to the extent determined to result from our gross negligence or willful misconduct.

If you have any questions or would like to alter this arrangement in any manner, please contact the director in charge of your work or Ted Stacey in New Orleans or Ed Bouterie in Houma.

We appreciate the opportunity to be of service to you and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree to the terms of this letter, please sign this letter below and return it to us in the envelope provided. The second copy is for your files.

Very truly yours,

For the Firm.

Mrs. C. Cathy Norman
Secretary/Treasurer/Land Manager
Edward Wisner Donation Advisory Committee
January 11, 2012
Page 4

RESPONSE:

This letter correctly sets forth the understanding of the Edward Wisner Donation Trust.

_C. Cathy Norman_
Officer signature

_Secretary Treasurer_
Title

_January 31, 2012_
Date

Engagement\94182.0\2011\Audit\001\Current Tax Engagement Letter



**Bourgeois Bennett**
CERTIFIED PUBLIC ACCOUNTANTS · CONSULTANTS
A LIMITED LIABILITY COMPANY

January 23, 2013

Edward Wisner Donation Trust
935 Gravier Street, Suite 825
New Orleans, LA 70112

We are providing the enclosed engagement letter that sets forth our understanding of the services
we will provide to you. If this letter fairly sets forth your understanding, please sign it and return
it to us. A copy for your records is also provided. We will not be able to prepare your return
until you have done so. If you have any questions, please call your BB professional or Ted
Stacey in our New Orleans office.

We are pleased to have you as a client and look forward to a long and mutually satisfying
relationship.

Sincerely,

*Bourgeois Bennett, L.L.C.*

EXHIBIT
**H**

**Bourgeois Bennett**
CERTIFIED PUBLIC ACCOUNTANTS | CONSULTANTS
A LIMITED LIABILITY COMPANY

January 23, 2013

COPY FOR TAXPAYER'S FILE
BOURGEOIS BENNETT, L.L.C.
CERTIFIED PUBLIC ACCOUNTANTS
Heritage Plaza Building
NEW ORLEANS

Edward Wisner Donation Trust
935 Gravier Street, Suite 825
New Orleans, LA 70112

We appreciate the opportunity of working with you and advising you regarding your income tax. To minimize the possibility of any misunderstanding between us, this letter confirms our understanding as to the nature and extent of the tax services we will provide. Please sign it and return it to us.

We will prepare your Federal and State fiduciary income tax returns for the fiscal year ended December 31, 2012 from information which you will furnish to us. We will prepare your returns for the purpose of enabling you to file these returns with the IRS and the appropriate state agencies. Our services are not designed for any other purpose, including, but not limited to, your providing copies of these returns to third parties for any reason.

Unless covered by another engagement letter for the same period, we will not audit or otherwise verify the data you submit, although we may need to ask you for clarification of some of the information. You represent that the information you are supplying is accurate and complete to the best of your knowledge and that you have supporting documentation for automobile expenses, travel and entertainment expenses, charitable contributions, business gifts and other expenses required by law.

It is your responsibility to provide us with all the information required for the preparation of complete and accurate returns. You should retain all the documents, canceled checks and other data that form the basis of income and deductions. These may be necessary to prove the accuracy and completeness of the returns to a taxing authority. We agree to retain copies of your returns and supporting information for 5 years, after which time they may be no longer available.

You have the final responsibility for the income tax returns and, therefore, you should review them carefully before you sign them or approve them for electronic filing.

During the preparation of your returns, we may be required to e-mail certain information to you or third parties in order to gather data required for the preparation of your return. E-mail is a fast and convenient means of communication. However, it uses the internet, which is not a secure means of communication. Under IRS regulations, we may need to get your specific written permission before contacting third parties to request information. By signing this letter, you agree to allow us to use e-mail to communicate with you or other parties when necessary for us to complete your return unless you instruct us otherwise in writing.

Our work in connection with the preparation of your fiduciary income tax returns does not include any procedures designed to discover fraud, defalcations or other irregularities, should any exist.

We will use professional judgment in resolving questions where the tax law is unclear, or where there may be conflicts between the taxing authorities' interpretations of the law and other supportable positions. Unless otherwise instructed by you, we will resolve such questions in your favor whenever possible. In the event you ask us to take a position that in our professional judgment will not meet the applicable laws and standards as promulgated, we reserve the right to stop work and shall not be liable to you for any damages that occur as a result of ceasing to render services.

It may become necessary to file for an extension of time to file your income tax returns if you have not yet provided all or a part of your income tax information or there are unresolved issues or other delays in processing. The last few weeks leading up to April 15th are extremely busy ones for us. *If you have not provided us your tax information or major parts of your information are still missing by March 15th, we may be unable to complete your return by April 15th. If you do not provide the information by April 1st, your tax return will be placed on extension for completion after April 15th.*

The law provides various penalties that may be imposed when taxpayers understate their tax liability. If you would like information on the amount or circumstances of these penalties, please contact us.

The IRS or a state agency may select your return for examination. You should understand that you have certain rights of appeal for any adjustments that these agencies may propose. If your return is examined, we will be available upon request to represent you and will render additional invoices for the time and expenses incurred. If you decide to represent yourself or have other representation, we will provide whatever information or assistance you or your representative require.

We will prepare your return based on the law as it exists at this time. These laws may be changed in the future. In addition, Congress has the ability to change laws retroactively. We have no control over such events and are not obligated to inform you of any such changes that may affect your return or the positions taken thereon.

Fees for our services will be at our standard rates plus computer charges and out-of-pocket expenses. Payment for service is due when rendered and interim billings may be submitted as work progresses and expenses are incurred.

The engagement does not include any services not specifically stated in this letter. However, we would be pleased to consult with you regarding other income tax matters such as proposed or completed transactions, income tax projections, estate planning, gift taxes, and pension planning if you so request.

You agree to indemnify and hold us harmless for any liability and all reasonable costs, including legal fees that we may incur as a result of the services performed under this engagement in the event there are false or misleading representations made to us by you.

You further agree that our maximum liability to you for any reason related to the services provided in the performance of this engagement will be limited to an amount equal to two times our fees, except to the extent determined to result from our gross negligence or willful misconduct.

94182.0

If you have any questions or would like to alter this arrangement in any manner, please contact the director in charge of your work or Ted Stacey in New Orleans.

We appreciate the opportunity to be of service to you and believe this letter accurately summarizes the significant terms of our engagement.   If you agree to the terms of this letter, please sign this letter below and return it to us in the envelope provided.   The second copy is for your files.

Very truly yours,

*Bourgeois Bennett, L.L.C.*

This letter correctly sets forth the understanding of the Edward Wisner Donation Trust.

_____
Taxpayer

29 January 2013
_____
Date

94182.0

**From:** Nannette V. Jolivette-Brown <njbrown@cityofno.com>
   **To:** Edward W. Donation <wisnerdonation@aol.com>
**Subject:** Re: Outside Counsel for the Edward Wisner Donation
   **Date:** Wed, Jul 7, 2010 8:53 pm

---

I will waive any conflicts. I would like to get together to strategize. I am putting out an RFP next week. I think we should try to coordinate our efforts if we can.
Nannette

---

**From:** WISNERDONATION@aol.com <WISNERDONATION@aol.com>
**To:** Nannette V. Jolivette-Brown; Ashleigh G. Gardere
**Sent:** Wed Jul 07 16:57:53 2010
**Subject:** Outside Counsel for the Edward Wisner Donation

Nanette:

Just wanted to touch base with you again about the Wisner Emergency meeting held last Thursday at which the Committee approved hiring Joel Waltzer to represent Wisner for the BP spill. At this point we desperately need to get experts out onto the property to start collecting baseline information. Oil continues to heavily impact the property especially in light of the recent weather events. I am hesitant to hire a science expert without first engaging outside counsel.

Please let me know as soon possible if the conflicts with the City of New Orleans have been resolved and Wisner can proceed with engaging Mr. Waltzer.

Thanks you,


C. Cathy Norman

Secretary Treasurer/Landman
1300 Perdido, Room 8E06
New Orleans, La 70112
(504) 658-4060
Fax (504) 658 4065
wisnerdonation@aol.com



## MINUTES OF THE MEETING OF THE
## EDWARD WISNER DONATION ADVISORY COMMITTEE
### TUESDAY, January 26, 2010

**Present:**

Julie Schwam Harris, Chair, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
Ed Buddy, The Salvation Army
Dr. Sandra Robinson, Tulane University
Dr Everett Williams, Charity Hospital


Staff:
C. Cathy Norman, Secretary Treasurer/Land Manager
Dawn Segura, City Attorney's Office
Amanda Phillips, Executive Assistant Wisner

Guest:
Mark Peneguy

Meeting called to order at 12:10 pm.

**OLD BUSINESS**

**OLD BUSINESS ITEM 1.**         **Approval of Minutes from the Meeting**
                                 **held on November 24, 2009**

The minutes from the meeting held on November 24, 2009 was approved on a motion by Dr. Everett Williams, second by Michael Peneguy. Motion passed.

## NEW BUSINESS

**NEW BUSINESS ITEM 1.**         **City of New Orleans December and**
                                 **January Grants Requests**

There was a single grant request in December that was approved via electronic voting. The request was for the Martin Luther King, Jr. Activities and was for $22,000.

Additionally there were two (2) grant requests recommended by the City of New Orleans for the Committee's approval:

| | |
|---|---|
| Human Relations Commission | $ 7,000 |
| Mayoral Fellows Program | $226,000 |

A discussion ensued. The Committee approved the grants on a motion by Dr. Sandra Robinson, second by Dr. Everett Williams. Motion passed.

**NEW BUSINESS ITEM 2.**         **Secretary Treasurer's report**

Invoices:

1



| | | |
|---|---|---|
| 2 | La One Coalition | $2000.00 |
| 3 | Insurance Underwriters (Dishonesty Policy) | $ 550.00 |
| 4 | FET (pipe for signs) | $ 370.00 |
| 5 | FET  Dec. | $4460.00 |
| 6 | Expense Account (CCN) (Dec) | $ 326.00 |
| 7 | Expense Account (CCN) (Jan) | $ 65.69 |
| 8 | Expense Account (LAP)  (Dec) | $  4.31 |
| 9 | Expense Account (LAP) (Jan) | $141.77 |

11    There was other information for the Committee. The IRS mileage rate
12  has changed and it is now $.50 per mile.

14  The LA One Coalition is still working and trying to move towards
15  completion of the elevated Highway. They have requested another
16  contribution of $2000 for this year (2010). Wisner has supported this effort
17  in the past.

19  Michael Peneguy did some very diligent research investigating why the
20  Surface Rental increases from Chevron have been off. The discrepancies
21  were the result of use of a different rate chart (CPI) to determine the annual
22  increase. The Committee discussed this issue and agreed that a letter
23  pointing out the mistake should be written to Chevron, requesting that the
24  overpayment be deducted from next year's rental. Similar mistakes were
25  made on the NORM injection annual check, which increased by a large
26  percentage this past year.

28  On a motion by Michael Peneguy and a second by Dr. Sandra Robinson, the
29  Committee recommended that a letter be sent to Chevron pointing out these
30  discrepancies and requesting that the adjustment be made in the next
31  payment.

33  Ms. Norman also gave the Committee several articles of importance
34  including one about the Audubon Society considering drilling for
35  hydrocarbons in certain refuges to support the cost of coastal restoration.
36  There was also an article about Port Fourchon's ongoing expansion plans
37  that will greatly benefit the Committees revenue.

39  Plains has submitted plans for the building of their boat launch along
40  Highway 3090.

42    Additionally there was a letter hand delivered from the office of
43  Simon Peragine notifying the Committee of an increase in their fees. This is
44  after 15 years of performing legal work for the Committee.

46    The Committee discussed the letter and agreed to the increase. There
47  was a motion to approve the increase by Michael Peneguy. Seconded by Dr.
48  Sandra Robinson. Motion passed.

50    The Committee approved the Secretary Treasurer's report on a motion
51  by Michael Peneguy. There was a second by Dr. Sandra Robinson. Motion
52  passed.

1   **NEW BUSINESS ITEM 3.**    **Dune Energy Proposed Amendment of**
2                          **Hydrocarbon Lease**
3
4        The Counsel for Dune has been involved in a trial and has not been
5   able to meet. Ms. Norman did give the committee a copy of a map from the
6   State Website advertising for Oil and Gas Leasing that indicates an area that
7   is covered by the freeze statute. This is the first time that she has seen a
8   reference to the freeze statute in the acreage that the State has up for bids.
9
10       Ms. Norman then took some time to explain how the Freeze statute
11   works in referenced to producing property and erosion of private property.
12
13       There is also the issue of Manti lease and how that lease should be
14   handled. Ms. Norman will write a letter to Manti and ask them where they
15   stand on their lease of the tract in the Leeville area. Wisner accepted their
16   offer to lease last fall.
17
18       A subsequent discussion ensued concerning certain insurance
19   provisions that Mark Peneguy thinks should be included in any future leases.
20   Specifically the OEE (Owner's Extra Expense or blow out prevention
21   insurance) provision is not part of general liability insurance. It was
22   recommended that Ms. Norman get an opinion from Simon Peragine as to
23   whether OEE is part of the General Liability insurance or not and if not
24   should we require it?  Do we have sufficient insurance? Are we covered for
25   blow outs and pipeline ruptures? What is the best provision to use in our
26   agreement.
27
28       There was a motion by Michael Peneguy to request an opinion from
29   Simon Peragine on this issue. Seconded by Dr. Sandra Robinson. Motion
30   passed.
31
32   **NEW BUSINESS ITEM 4.**    **Fourchon Beach: Caillouet Permit;**
33                          **Removal of Pilings; 2010 Beach Proposal;**
34                          **South Lafourche Beachfront**
35                          **Development District**
36
37       Item 4 and 5 will be combined for the purpose of discussion. After the
38   last Wisner meeting Ms. Norman attended the CPRA meeting in early
39   December. The State Seashore concept was on their agenda. The presented
40   their idea of a State Seashore and they encouraged the CPRA to include (and
41   revise) their concept in the planning for the Caminada Headland Project. Ms.
42   Norman addressed the CPRA Committee and indicated that the Seashore
43   concept is at odds with the project and the timeline that is currently in place.
44   Ms. Norman picked up a magazine from the Louisiana Wildlife Federation
45   and it contains language encouraging people to object to the project if it does
46   not embrace the State Seashore concept.  Ms. Norman thinks this is very ill
47   timed and dangerous to the restoration project. This is merely a "concept"
48   and could delay this project. The CORPS and the State both do not consider
49   vehicular traffic on the newly restored beach appropriate. The State Seashore
50   group considers this a flaw in the plan and they are going to protest.
51
52       At the CPRA meeting Garrett Graves stated that every year that
53   Louisiana delays coastal restoration projects it cost the State $2 billion. They

1  have hired Jim Wilkins at the Sea Grant program at LSU to draft legislation
2  for the State Seashore concept. It will take some lobbying effort to oppose
3  this bill.
4
5      The SLBDD requested at our last meeting that Wisner give them
6  access to the beach every weekend this summer. Ms. Norman recommends
7  we not respond to this request at this time. She also does not recommend
8  giving them access to the beach this summer. Just as they want to retrain
9  people to use the beach, we need to retrain as well since the beach will only
10 be accessible by on foot after the project is built.
11
12     This has become a very political issue. Ms Norman gave the
13 Committee a copy of a statute that prohibits driving or hauling on levees to
14 prevent damage. Ms. Norman recommends that legislation be drafted that
15 prohibits driving or hauling, as well as airboats, ATV's etc. from use on
16 recently restored areas.  She recommended not using the words beach or
17 sand.
18
19     Ms. Norman is currently trying to arrange a meeting with Norbert
20 Chabert, the new Senator for the Lower Lafourche area. Also she has a long
21 list of organizations that she needs to meet with about this issue.
22
23     Ms. Norman then suggested that the committee consider hiring Cheryl
24 Teamer to assist the committee on this issue. It was recommended that Ms.
25 Norman contact Ms. Teamer and get an idea of what her rates are and if she
26 would assist us on this issue.
27
28     The South Lafourche Beachfront Development District has hired a
29 public relations and planning firm to assist them and Randy Langtot is very
30 politically connected.
31
32     Ms. Norman was told by the CORPS that if they have to go back and
33 do a study assessing the economic impacts of recreation, it could put the
34 entire project over budget and could kill the authorization especially if the
35 have to redesign the project.
36
37     If the State Seashore concept passes it could also complicate
38 landowner negotiations and it will give them standing to object and have
39 their input considered.
40
41     The Caillouet Land Company has filed a permit for a pier on the
42 beach as well.
43
44     Ms. Norman requested comments from the Committee about the letter
45 she planned to give to members of CPRA. There were several small changes
46 suggested and with those changes, the letter was approved on a motion by
47 Michael Peneguy, second by Dr. Sandra Robinson. Motion passed.
48
49     The Committee agreed with the recommendation that Ms. Norman
50 contact Cheryl Teamer. Motion by Michael Peneguy to contact Cheryl
51 Teamer, second by Dr. Everett Williams. Motion passed.
52

4

**NEW BUSINESS ITEM 5.    Caminada State Seashore Concept/CPRA Meeting**

See above agenda item.

**NEW BUSINESS ITEM 6.    Oyster Leases and State Land Office Update**

Ms. Norman met with the State Land Office and they are claiming the narrow strip of beach in front of Bay Champagne. The State claims that this is accreted property in front of the Bay that was previously water. Ms. Norman plans to write a letter challenging the State's claim of this property.

Of the 16 outstanding oyster leases in conflict 11 of them are not considered State owned property. There was someone from the Attorney General's office that attended the meeting and he was curious as to why the leases were not released. Since that time nothing has happened.

**NEW BUSINESS ITEM 7.    Entergy and Chevron proposed mitigation settlement**

There were past damages from activity by both Entergy and Chevron for projects conducted on Wisner property. Both companies have agreed to give money to Wisner for the beach project in addition to paying into the State mitigation fund which is required. Ms. Norman received a release from Entergy that she wants to rewrite. She is waiting on a release form from Chevron. The Mayor will sign the settlement letter. The settlement money will be used to support a project on the beach.

**NEW BUSINESS ITEM 8.    Bayou Segnette environmental projects**

There will be a project involving the planting of 2800 cypress trees along the banks of Bayou Segnette on Wisner property.

**NEW BUSINESS ITEM 9.    Greater Lafourche Port Commission status of various projects**

Ms. Norman updated the Committee on the status of the Amendment Agreement. Charity Hospital's agreement is still out standing. Dr. Williams will follow up on this issue.

**NEW BUSINESS ITEM 10.    Campsite update and various issues**

Ms. Norman updated the Committee on the campsites. Revenues are down but we continue to collect funds. The office had collected $90,000 in Jefferson and $71,000 in 2010 in Lafourche. There have been late fees and transfer fees as well. We just evicted 3 campsite owners in Jefferson Parish. The signs need to be completed in Jefferson.

**NEW BUSINESS ITEM 11.    Office Issues – paperless banking and 4 day work week**

Whitney is going paperless and of course there is no way to verify the endorsement without getting a copy of the check from the bank. They retain the checks for 7 years. Ms. Phillips and Ms. Norman are going to talk to Jim Burton at Simon Peragine about this issue to insure that we are adequately covered. We may need to retain records for 10 years so we need investigate this matter. There is a possibility of getting e statements and we can download the checks digitally and keep a full copy. This would preclude a paper statement and we would need to backup digitally and take it with us if necessary. We also want to consult with Mr. Burton to get an opinion on what papers are critical to keep. Motion to consult with Jim Burton by Michael Peneguy and a second by Dr. Everett Williams. Motion passed.

There was then a discussion about the new 4 day work week. Amanda is an hourly employee and there is a question about how to handle sick days and holidays.

Julie Schwam Harris said we should just work out the hours as we see fit.

**NEW BUSINESS ITEM 12.    Bourgeois Bennett Engagement 2009 tax return and 2009 Financial Audit**

Wisner had not received a bill for last year's audit. It has now been received. The Committee now needs to consider this years audit and taxes. BB plans to begin the audit much earlier this year. They have prepared an engagement letter for approval. $7600 for the audit $3600 for the taxes are the estimated fees. There was a motion to approve the bid and sign the engagement letter by Dr. Sandra Robinson. Seconded by Dr. Everett Williams. Motion passed. There was a discussion about bidding out the project for next year to determine if we are getting a competitive price for the work.

**NEW BUSINESS ITEM 13.    Entergy Repairs on Wisner Property**

Entergy needs access to do repairs on the line to Golden Meadow and has requested access for some time in May. They will be contacting the office to discuss the route of entry.

**NEW BUSINESS ITEM 14.    Next Meeting – Tuesday January 26, 2010 12:00 noon**

Motion was made to adjourn at 1:45 by Michael Peneguy, second by Dr. Everett Williams. **Motion passed.**

RESPECTFULLY SUBMITTED BY:

*C. Cathy Norman*

C. Cathy Norman, Secretary Treasurer

6

1   AMENDED AND APPROVED AT ___2 . 23 / ___ MEETING.
2                                                DATE

7

**MINUTES OF THE MEETING OF THE**
**EDWARD WISNER DONATION ADVISORY COMMITTEE**
**TUESDAY, February 23, 2010**

**Present:**

Julie Schwam Harris, Chair, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
Ed Buddy, The Salvation Army
Cap. Ethan Frizzell, The Salvation Army
Dr. Sandra Robinson, Tulane University
Dr Everett Williams, Charity Hospital

Staff:
C. Cathy Norman, Secretary Treasurer/Land Manager
Dawn Segura, City Attorney's Office
Amanda Phillips, Executive Assistant Wisner

Guest:
Mark Peneguy

Meeting called to order at 12:20 pm.

**OLD BUSINESS**

**OLD BUSINESS ITEM 1.**      **Approval of Minutes from the Meeting**
                             **held on January 26, 2010**

There were some minor changes to the minutes. With those changes
the minutes from the meeting held on January 26, 2010 were approved on a
motion by Michael Peneguy, second by Dr.Everett Williams. Motion passed.

**NEW BUSINESS**

**NEW BUSINESS ITEM 1.**      **City of New Orleans February Grant**
                             **Requests**

There were several grant requests from the Mayor's office that
reflected multi year funding. The organizations will have to come back to
the City each year for the additional funding. This will recommend future
funding for these organizations. The recommended grants were as follows:

| | |
|---|---|
| Louisiana Philharmonic Orchestra | $200,000 per year for 3 years |
| New Orleans Jazz Orchestra | $200,000 per year for 3 years |
| N.O Police and Justice Foundation | $25,000 |

A discussion ensued. The question arose as to how much
money was spent in 2009 and how much is left in the Wisner Trust Fund.
Ms. Norman estimated that over $3 million was spent in 2009. There should
be close to $4 million left in the City's Wisner Trust Fund Account. The
multi year commitments will require that these organizations come back to
the city for subsequent annual funds. With this requirement  that the

1


EXHIBIT
K

1. organizations come back to the City for subsequent approval, the Committee
2. approved the grants on a motion by Dr. Sandra Robinson, second by
3. Michael Peneguy. Motion passed.
4.
5. **NEW BUSINESS ITEM 2.     Secretary Treasurer's report**
6.
7. Invoices:
8.
9. LWCC                                                  $326.00
10. Insurance Underwriters (Dishonesty Policy)            $ 550.00
11. Expense Account (CCN) (Feb)                           $ 73.00
12. Expense Account (LAP) (Feb)                           $ 30.73
13. Simon Peragine General                                $770.23
14. Simon Peragine General                                $100.00
15. Simon Peragine Wildlife and Fisheries                 $2700.00
16.
17. Other items include a joint public notice on the back filling of the canal in
18. the Barataria Public Preserve. This will involve knocking some of the spoil
19. and trash trees along the bank into the canal to fill in some of the banks. The
20. entire area has been declared an MPA (Marine Protected Area). Some of the
21. camp owners have expressed concern that their access or right to fish will be
22. limited by this but our conversations with NOAA indicate that this is not
23. true.
24.
25. There is a request for a donation to the Coalition to Restore Coastal
26. Louisiana. Ms Norman recommended that Wisner give them a $200 to $300
27. donation.
28.
29. There is also a report from the LA 1 coalition about the project
30. moving forward without the Federal Tiger Grant. They are seeking other
31. funding opportunities.
32.
33. There is an article about Port Fourchon beginning the storm protection
34. repairs on the beach. "Its Beach!". The Port is still trying to settle with
35. FEMA on the damage to the boudin bags. They have settled and fixed the
36. damage to the offshore breakwaters.
37.
38. Ms. Norman met with Dr. Williams and several Charity Hospital/LSU
39. individuals to discuss Wisner money and what they hope to do to get the
40. money back to being used for indigent health care in New Orleans. The new
41. name for Charity Hospital for legal purposes is "The Interim LSU Public
42. Hospital formerly known as the Medical Center of Louisiana at New
43. Orleans". Ms Norman corrected the last agreement for the Mitigation
44. Servitude and redelivered it to Dr. Townsend for signature. This will
45. hopefully prevent delays in the signing of documents in the future.
46.
47. Ms. Norman stated that the meeting was very productive and that
48. there is a hope that the Charity Hospital Trust Fund money will be moved to
49. the Medical Center of Louisiana Foundation so that it can be used for
50. indigent health care in the city. Ms. Norman also discussed with the people
51. at LSU the extension of the Donation.
52.

2

1     Dr. Williams chairs the Medical Center of Louisiana Foundation and
2    their funds are currently being used to fund various clinics around town as
3    well as equipment for the hospital.
4
5     There were also several tracts nominated near Couba Island in the
6    State's April Mineral Lease Sale.
7
8     The Committee approved the Secretary Treasurer's report on a motion
9    by Dr. Everett Williams. There was a second by Michael Peneguy. Motion
10   passed.
11
12   There was a separate motion to approve a donation to the Coalition for
13   $300.00 Motion by Michael Peneguy. Second by Dr. Sandra Robinson
14   Motion passed.
15

16   **NEW BUSINESS ITEM 3.**    **Dune Energy Proposed Amendment of**
17                                  **Hydrocarbon Lease**
18

19     Ms. Norman indicated first that the questions that were previously
20   raised about the types of insurance that should be required in Wisner's
21   Hydrocarbon Lease has not been addressed. The current lease situation with
22   Manti and Dune utilizes the existing lease form, but these insurance issues
23   can be addressed prior to the next Hydrocarbon Lease negotiation. Dune did
24   indicate in the meeting that they did have the
25

26     The meeting with Dune was fruitful however Dune did not like much
27   of the Amendment language because it did not apply to many of the
28   circumstances and facts for the current situation. For example, use of the
29   words "primary term" in the amendment is inappropriate because the lease is
30   long past the primary term. They also thought the restatement did cause
31   some confusion as it related to the old lease. They did commit to 27.5%
32   royalty and $350 per acre, but it may not be in the form of a delay rental
33   perhaps in the form of a Pugh Clause or a delayed drilling rental. Dune also
34   does not want any unnecessary parties signing the lease such as Chevron or
35   Enervest.
36

37     Dune is poised and ready to embark on an aggressive exploration
38   program. They want to look at this as a drilling/development partnership
39   with Wisner. They want ongoing development in spite of the fact that in the
40   last amendment of lease in the 1982 Wisner acknowledged that the property
41   was fully developed. They want to have a continuing drilling obligation and
42   commitment and treat Wisner like a partner.
43

44     Dune will be restructuring the agreement and get back to Wisner prior
45   to the next meeting. They have a well ready to drill (CNO #38) and Manti
46   has a well ready to go also. Ms. Norman found out that the Manti request
47   for a lease is for buffer acreage. She recommended that Wisner settle things
48   with Dune and then address the lease with Manti. It can be back dated if
49   necessary.
50

51   **NEW BUSINESS ITEM 4.**    **Fourchon Beach Update**
52

3

1   Ms. Norman attended the CPRA meeting and distributed her letter about the
2   State Seashore concept. She also spoke with Sea Grant at LSU about the
3   proposed legislations. Sea Grant raised the issue of who would own the
4   newly restored property beyond where the current shoreline lies. Ms.
5   Norman reiterated that it was premature to dedicate lands for future projects
6   when it is not yet determined as to who will own it. Ms. Norman want to get
7   LOOP involved.
8
9        Ms Norman met with Cheryl Teamer and they discussed partners and
10  who should be brought in to the discussion to work on this issue. For the
11  upcoming legislature, the deadline for pre filing is March 22nd and after that
12  it is only 5 bills per person.
13
14       Her standard fee for 24 hours a day for 24 hours a day is $5000 per
15  month. The additional bonus is that Ms. Teamer is working with Mayor elect
16  Landrieu on the transition team and has already spoken to him about the
17  Donation, coastal restoration and the need to address the extension of the
18  Donation.
19
20       Ms. Norman recommended that we get Ms. Teamer involved ASAP.
21  Ms. Norman recommended that the Committee consider utilizing some of
22  the money from Chevron or Entergy mitigation payments to pay for these
23  services.
24
25       Ms. Norman also wants to get approval from FRRI to support the
26  geotube project.
27
28  There was a motion by Dr. Everett Williams that we proceed in hiring
29  Cheryl Teamer and utilize the Energy mitigation money to pay for her
30  services. Second by Michael Peneguy. Motion passed.
31
32       Ms. Norman also raised the issue of the need for legislation to protect
33  new land that is created with coastal restoration monies.
34
35       At the last SLBDD meeting there were long term plans presented that
36  involve driving to the east towards Bay Champagne. Additionally they
37  mentioned a land swap with the Caillouet's in the Pass Fourchon vicinity,
38  which includes areas of conflicted title that cannot be alienated until the
39  ownership is clarified.
40
41       There is a schedule for the Caminada Headlands Restoration Project
42  and they should begin moving dirt in 2011. Ms. Norman was contacted by
43  Joe Picciola, a subcontractor for Taylor Engineering out of Florida the
44  design firm for the project. They will begin some survey and testing on the
45  beach and marsh this summer.
46
47  **NEW BUSINESS ITEM 5.     Oyster Lease Conflict Issue Update**
48
49
50  # REDACTED - POTENTIAL LITIGATION

4

**NEW BUSINESS ITEM 6.**      **LUMCON Facility Lafourche Parish**

Due to cut backs the LUMCON facility in Fourchon has been temporarily closed. Ms. Norman has contacted them and requested a spot outside the gate for Forrest Travirca to place his trailer and keep an eye on the place for security and potential liability issues.

LUMCON is a sublessee of Nicholls State. If neither of them keep it going Wisner gets the property back with the improvements as consideration.

We should hear back soon about having a location for Forrest on the site.

**NEW BUSINESS ITEM 7.**      **Entergy and Chevron proposed mitigation settlement**

This was discussed earlier. Ms. Norman is negotiating with Chevron on their settlement language.

**NEW BUSINESS ITEM 8.**      **Bayou Segnette planting Project**

There will be a project involving the planting of 3000 cypress trees along the banks of Bayou Segnette on Wisner property. Cap. Frizzell indicated that the Salvation Army's canteen could provide the lunch for volunteer's. Ms. Norman will follow up on this.

**NEW BUSINESS ITEM 9.**      **Campsite update and various issues**

There are 9 camps in Lafourche and 19 in Jefferson that have not renewed. Evicted 3 camps in Jefferson Parish. The other two we may be able to sell.

**NEW BUSINESS ITEM 10. Next Meeting Tuesday March 30, 2010**

Annual meeting will be held at Noon and the monthly meeting will be at 1:30.

Motion was made to adjourn at 1:40 by Dr. Everett Williams, second by Michael Peneguy. **Motion passed.**

RESPECTFULLY SUBMITTED BY:


_____

C. Cathy Norman, Secretary Treasurer


AMENDED AND APPROVED AT _____ MEETING.
                                    DATE

**MINUTES OF THE ANNUAL REVIEW MEETING OF THE**
**EDWARD WISNER DONATION ADVISORY COMMITTEE**
**TUESDAY, March 30, 2010**

**Present:**

Julie Schwam Harris, Chair, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
Ed Buddy, The Salvation Army
Dr. Everett Williams, Charity Hospital
Dr. Sandra Robinson, Tulane University

Staff:
C. Cathy Norman, Secretary Treasurer/Land Manager
Amanda Phillips, Executive Assistant Wisner

Meeting called to order at 12:17 pm.

Ms Norman reviewed the Annual report with the Committee.

1) Revenue and Disbursements

There is a change in the format of the Annual Report that Ms Norman pointed out in that the graphs and restatement of income and expenses goes back only 5 years as opposed to 10. Income from the Port has stabilized the revenue somewhat as the dependence on oil and gas royalty has decreased from nearly 90% in the early 1990's to less than 30% in recent years. The Port income is close to $2 million per year and less likely to be disrupted. It constitutes 62% of our income. Additionally, in the 1990's income of $3 million annually was impressive. In 2009 the income was slightly higher than $3 million but down substantially from the previous years.

Ms. Norman explained that there is still an increase to be expected from Port revenues as they continue to expand. Also ongoing recovery is taking place that should impact oil and gas revenues. Chevron attended a meeting in 2009 and indicated that their repairs from Gustov and Ike should be completed by the end of the first quarter of 2010. There is also an ongoing drilling plan in the works.

Dune's income was also down especially since April 2009 when Wisner placed them in default and negotiations on the lease began.

Just like the rest of the State, Wisner is hit economically with each year that storms hit our coastline.

Expenses for the year were up from 14.38% from $319,000 to $365000 this year. This was the result of increased attorneys fees and $16,000 spent on signs. There was an 11.52% ratio of expenses to income. Non profits usually operate at an 11 to 13 % overhead ratio.


EXHIBIT

1      Money max account has $60,000 in it and as discussed earlier we
2  hope to use this money to contribute to the geotube project on the beach,
3  provided it is approved by all of the FRRI partners.
4
5  2. New Projects and Changes in 2009
6
7  Jefferson Parish
8
9    • Helis released their Hydrocarbon Lease
10    • Camp survey completed and the renumbering has begun
11    • May meeting held at Bayou Segnette
12    • Several environmental projects in the area including the cypress tree
13      planting and the spoil bank degrading project.
14    • There is also a project to remove derelict structures in the area.
15      Wisner will try to piggy back on this project to get trash removed
16      from our property.
17
18  St. John the Baptist Parish
19
20     Nothing to report
21
22  Lafourche Parish (separate section on the beach)
23
24    • The new bridge over Bayou Lafourche is open, the old bridge is gone
25      and they continue to work towards completion of the elevated
26      highway to Fourchon
27    • Hurricane Ida produced a lot of beach erosion
28    • Wildlife Management Area finally cancelled after 60 years
29    • GLPC requested an Amendment to the Mitigation Servitude for the
30      Northern expansion. This Amendment was finalized
31    • Chouest completed their third facility at Port Fourchon
32    • LLOG terminated their Pipeline Use Agreement from Wisner
33    • Wisner challenged the Dune Energy Oil Gas and Mineral lease
34      Agreement. This is ongoing
35    • Caillouet Land Corporation received approval for a scaled down
36      version of their subdivision proposal south of the LUMCON facility.
37      There are severe zoning and insurance issues so it will probably never
38      be built. They also filed a permit that is pending to build a pier on the
39      beach.
40
41  City of New Orleans Wisner Trust Fund
42
43     The City received $976,767.28 from the Donation in 2009. Grants
44  amounting to $3,604,300 were approved by the Committee and given out
45  by the City. Estimated income for 2010 for the City is $870,970.
46
47  Fourchon Beach
48
49     There are some pictures of the beach showing the destruction that has
50  occurred even from minor storm activity last year.
51

2

1　The new geotube project to replace the old "boidin" bags will involve
2　sand filed textile bags as opposed to concrete filled bags. These may
3　qualify as a match for federal money. Most hard structures do not but
4　because they are filled with sand they are being considered.

6　There are now 2 projects for the beach area on the books. The Caminada
7　Headland Restoration Project (CHRP) will be funded with CIAP funds
8　and involve sand disposition on the beach that is dredged up from ship
9　shoal. The larger project named the Barataria Basin Beachfront
10　Restoration Project (Triple B Project) is the larger Federal project funded
11　through the WERTA bill that will involve both the beach and the marsh
12　behind it. It is a $350 million project.

14　Beach Access continues to be a hot issue and it will be interesting to see
15　how the geotubes will affect beach access. They have a 15 foot
16　"footprint" and are 5 feet tall.

18　During 2009 the South Lafourche Beachfront Development District
19　continued to grow and began a partnership with the Louisiana Wildlife
20　Federation. They have big plans to take over and develop Fourchon
21　Beach and call it the Caminada Headlands State Seashore. The concept is
22　dangerous and without proper planning. It is also contrary to the
23　restoration projects "environmental" plans which do not have a
24　recreational component.

26　Ms. Norman then discussed utilizing Cheryl Teamer's skills to help to
27　promote the restoration project on the beach. Taking this approach, as
28　opposed to fighting over beach access will be more proactive and raise
29　important issues concerning the need for restoration rather than
30　concentrating on the vehicular access issue.

32　Elmer's Island reopened in 2009 and there are several issues about the
33　"taking" of the seashore and the access road that Ms. Norman considers
34　illegal. Ms. Norman also publically criticized the lack of monitoring and
35　rules and trash at Elmer's Island and within a month new rules for the
36　area were released by the Department of Wildlife and Fisheries.

38　There are title issues on the property in Jefferson and St. John that need
39　to be addressed. Additionally there are title issues in Lafourche, including
40　the oyster leases and shoreline issues concerning abandoned Pass
41　Fourchon and Bay Champagne.

43　The Charity Hospital beneficial interest has been renamed and will now
44　be called "Interim Public Hospital formerly known as the Medical Center
45　of Louisiana at New Orleans".

47　The Oil, Gas and Mineral Audit for 2006 through 2008 has been initiated.

49　The Wisner office relocated in City Hall in 2009 and is now on the eighth
50　floor in Room 8E06.

52　Ms. Norman and Ms. Phillips participated in the ARC GIS software
53　training in 2009.

3

1  There has not been any progress on the extension of the Donation;
2  however Ms. Norman hopes to raise this issue early on with the new
3  administration.
4
5  Oil and gas prices averaged around $50 per barrel down from the high
6  prices in 2008.
7
8  Oyster lease issue has not been resolved but there are only 16 conflicted
9  leases remaining.
10
11  Hunting and Trapping
12
13      Camp rentals remained at the 2008 rate of $650. New leases were sent
14  out to the Lafourche Parish camp owners. Forty camps in Lafourche Parish
15  have been relinquished since Hurricane Katrina.
16
17      Rental income for the camps alone was $162,915. Higher than 2008
18  but this is not fixed due to the end of the year fluctuation.
19
20      There were 85 months in late fees collected. There were 26 camps
21  transferred during the year.
22
23      Jefferson Parish had 4 evictions. The Jefferson Parish survey has
24  never been completed by Morris Hebert. They have not billed for the entire
25  amount. About half of the camps in Jefferson have been renumbered and re
26  measured. Derelict camps are being photographed and may be removed if
27  not repaired.
28
29  Hunting leases were renewed and the rental increased in 2009.
30
31  The gator season was really poor. One of trappers turned in their tags for the
32  year and there was not any alligator egg collection in 2009.
33
34  Budget review for 2009
35
36  The total budget for 2009 was $406113.48. The final operating budget came
37  in $40,000 under at $365367.01. There some items not paid for in 2009
38  including the oil gas and mineral audit which is $22,000 and the 2008
39  financial audit was paid in 20101.
40
41  Revenue breakdowns and projected income
42
43  Since 2005 Wisner has more than doubled their income from the Port.
44  Chevron royalty is down substantially due to the impacts of the storm.
45
46  Estimated monthly income
47
48      Ms. Norman was very conservative in the income estimates for 2010.
49  Chevron and Dune estimates were low. The final estimate is just at $3
50  million.
51

4

1   Proposed budget is over $400,000. Professional fees are higher due to the
2   hiring of a lobbyist and anticipated attorneys' fees. There will also be double
3   audit fees in 2010 as well as the Oil Gas and Mineral audit costs.
4
5   Goals and Projections
6
7        Ms. Norman reviewed the goals for 2010. Included were the extension
8   of the Donation, the Dune negotiations, land surveys, audit of Port
9   payments, promote the restoration of the Caminada Headland area, finalize
10  oyster lease issues and settle boundary issues.
11
12  Ms. Norman and Ms. Phillips exited the meeting and the Committee
13  convened for the performance review.
14
15  The meeting reconvened and the Committee informed Ms. Norman and Ms.
16  Phillips that they would receive a 2% increase in their compensation
17  retroactive to January 1, 2010. This was approved on a motion by Michael
18  Peneguy, seconded by Everett Williams.
19
20        Ms. Norman also advised the Committee that the June meeting would
21  not be held and there would be a meeting held in August.
22
23        Motion was made to adjourn at 1:32 by Dr. Everett Williams, second
24  by Michael Peneguy. **Motion passed.**
25
26  RESPECTFULLY SUBMITTED BY:
27
28
29  _Cathy Norman_
30  C. Cathy Norman, Secretary Treasurer
31
32
33  AMENDED AND APPROVED AT 4-27-10       MEETING.
34                                DATE

5

## MINUTES OF THE MEETING OF THE
## EDWARD WISNER DONATION ADVISORY COMMITTEE
## TUESDAY, March 30, 2010

**Present:**

Julie Schwam Harris, Chair, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
Ed Buddy, The Salvation Army
Dr. Sandra Robinson, Tulane University
Dr Everett Williams, Charity Hospital


Staff:
C. Cathy Norman, Secretary Treasurer/Land Manager
Dawn Segura, City Attorney's Office
Amanda Phillips, Executive Assistant Wisner

Guest:
Mark Peneguy
Cheryl Teamer, Consultant

Meeting called to order at 1:40 pm.

**OLD BUSINESS**

**OLD BUSINESS ITEM 1.**         **Approval of Minutes from the Meeting**
                                 **held on February 23, 2010**

There were some minor changes to the minutes. With those changes
the minutes from the meeting held on February 23, 2010 were approved on a
motion by Michael Peneguy, second by Dr.Everett Williams. Motion passed.

## NEW BUSINESS

With the approval of the minutes the Committee agreed to alter the
agenda to address Item 4.and Item 5. to accommodate Ms. Teamer who was
a guest at the meeting.

**NEW BUSINESS ITEM 4.**         **Fourchon Beach Update Cheryl Teamer**

**and**

**NEW BUSINESS ITEM 10.**        **Legislative Update**


Ms. Norman began the discussion by relaying the information that she
had been informed that the State Seashore bill would not be filed. Ms.
Teamer indicated that we still needed to keep an eye on what is filed because
stranger things have happened and the issue could come up later in the
session as a late bill or an amendment to another bill.

1



1   Additionally, Ms Norman is relying on Ms. Teamer to assist her in pushing
2   forward with costal restoration issues, in particular the projects proposed on
3   Wisner property. There was a meeting with State Senator Norby Chabert and
4   there is an upcoming meeting with Wes Kungel from Senator Mary
5   Landrieu's office. Ms. Norman will also be meeting with Taylor
6   Engineering about the upcoming access for studies on the beach for the
7   Triple B project. Ms. Norman also wants to meeting with DNR and CORPS
8   about the project. The word Ms. Norman ahs from the CORPS is that the
9   Triple B project is stalled in Washington because it is perceived to lack
10  sustainability. Because there is not ongoing maintenance so there is a
11  sustainability problem but the flip side of that is what happens if it is not
12  built? There are potential devastating consequences both locally regionally
13  and nationally if this project is not built. Not to mention a loss of land that
14  will impact Wisner's revenue stream.
15
16  Ms. Norman wants to emphasize the Homeland Security issue to call
17  attention to the matter.
18
19  Ms. Teamer addressed the Committee. Ms. Teamer recounted her visit to the
20  lower Lafourche Parish area. Ms. Teamer indicated that the Mayor elect will
21  make coastal erosion issues a priority. He has already met with the other
22  Parish Presidents to discuss the issues. Because New Orleans has the ability
23  to attract national attention, the new Mayor hopes to step up and push the
24  Federal Leaders so that the federal dollars will flow.
25
26  On the State level, there are over 2000 bills before the legislature, including
27  a lot of expropriation bills. Ms. Teamer will be monitoring those and feeding
28  the info back to Ms. Norman. Ms. Norman had mentioned attempting to
29  amend a bill dealing with oyster leases. House Bill 876 deals with the
30  removal the requirement for payment of a survey fee for oyster leases. Ms.
31  Norman wants to amend the bill to require public notice prior to the issuance
32  of a lease and to state the necessary qualifications of a private surveyor.
33
34  There are other bills that need to be addressed as well.
35
36  Ms. Teamer is also helping to educate the congressional delegation on some
37  of the coastal erosion issues. They know about the issues but they need a
38  broader viewpoint.
39
40  Ms Norman indicated that her initial response to the beach access issue was
41  to prohibit access this summer. Ms. Teamer after attending the meetings
42  indicated that Wisner should allow access this year to keep them at bay. Last
43  year there was vehicular access for 5 weeks during the summer. This
44  summer they are interested in access every weekend.
45
46  Taylor indicated that they could work around the public access issue.
47
48  Ms. Norman has amended the Temporary Access Agreement to include
49  language that requires the SLBDD to acknowledge that Wisner does not
50  believe that vehicular access is appropriate after restoration and that if use is
51  granted it cannot be considered "Historical Use".
52

1    This agreement can be cancelled at any time, particularly if a bill for
2    the State Seashore is filed this year.
3
4    Ms. Teamer pointed out that the day she was on the beach, the parking
5    lot to the beach was closed and a man removed the chain and drove onto the
6    area, in spite of a sign indicating the beach was closed. He told Ms. Norman
7    that he had permission from the Port commission to be there.
8
9    Ms. Teamer then discussed a proposed constitutional amendment concerning
10   takings. There are several expropriation bills floating around this year that
11   need to be watched.
12
13   Ms. Norman then raised the issue of Ms. Teamer's contract which was
14   originally approved for 3 months and is outlined as 4 months since the
15   legislature does not end until June 21st.
16
17   The Committee approved the 4 month contract on a motion by Michael
18   Peneguy second by Dr. Sandra Robinson. Motion passed.
19
20   Ms. Norman gave the Committee a copy of the "draft" proposed swap
21   between the Caillouet Land Corp. and the Parish. The problems are that the
22   land t be swapped from Pass Fourchon, does not have clear ownership.
23   Additionally the Caillouet swap proposal includes a potential new road to
24   the west, with the old road to the Chevron facility being moved and
25   relinquished. Since the original road was given specifically for use by
26   Chevron, yet they have not been included in the discussions at all.
27
28   Ms. Norman again raised the issue of Homeland Security that must be
29   tapped in order to raise awareness of the coastal erosion issues. Also there
30   needs to be an emphasis on the "working coast" concept.
31
32   There is also a proposed bill to give tax credits to landowners who restore
33   their own property.
34
35   The new Temporary Right of Access Agreement covering 22 weekends was
36   reviewed by the Committee and approved on a motion by Michael Peneguy.
37   Second by Dr. Sandra Robinson. Motion passed.
38
39   **NEW BUSINESS ITEM 1.      City of New Orleans March Grant**
40   **                          Requests**
41
42   **The City of** New Orleans recommended the following grants for funding:
43
44   Parkway Partners                    $50,000
45   New Orleans Opera                   $150,000
46   Operation Clean Sweep               $20,000
47
48   The Committee approved the grants on a motion by Dr. Everett Williams,
49   second by Dr. Sandra Robinson. Motion passed.
50
51   **NEW BUSINESS ITEM 2.      Secretary Treasurer's report**
52
53

1    Invoices:
2
3    Expense Account (CCN) (March)          $425.00
4    Expense Account (LAP) (March)          $112.03
5    Simon Peragine Dune                    $11,607.20
6    Simon Peragine General              $1117.84
7    FETI (March)                        $4791.89
8
9       The quote to update our GIS capabilities was $416.00.
10
11   LWCC returned funds to Wisner after charging more money this year. This
12   is a reoccurring trend.
13
14       The cypress planting took place and it was a great project. Very
15   informative and people were very enthusiastic. It is a good way to get people
16   involved.
17
18   Coastal use permit application about the Golden Meadow to Leeville
19   transmission line. Ms. Norman hopes that Entergy will work with Wisner
20   again on this issue.
21
22   There was information about the Homeland Security issue in reference to the
23   Port and Wisner needs to use this to protect the entire area.
24
25   There was a request to correct and amend a Port sublease that has requested
26   a 10 year extension. Ms. Norman will check the original lease to verify the
27   dates and will report back to the committee on this issue.
28
29   The Committee approved the Secretary Treasurer's report on a motion by
30   Dr. Everett Williams. There was a second by Michael Peneguy. Motion
31   passed.
32
33   **NEW BUSINESS ITEM 3.**    **Dune Energy Proposed Amendment of**
34                               **Hydrocarbon Lease**
35
36
37   **REDACTED - ATTORNEY CLIENT**
**COMMUNICATIONS**

44
45

51
52

4

**NEW BUSINESS ITEM 5.     Oyster Lease Conflict Issue Update**

There is no report on this Item.

**NEW BUSINESS ITEM 6.     Pending Access Agreements St. John and
                           Lafourche Parishes**

There was a request for access on the old Koch/Belle Rose pipeline to do some work on this line. This piece of property is probably not owned by Wisner.

There is also a permit application to remove the Tennessee Gas Pipeline that runs through Fourchon Island.

**NEW BUSINESS ITEM 7.     LUMCON  Update**

Lumcon has allowed Forrest Travirca to locate his trailer on the LUMCON lease.

**NEW BUSINESS ITEM 8.     Bayou Segnette debris removal project**

Ms. Norman has been working with David Muth on this issue.

**NEW BUSINESS ITEM 9.     Access for surveys for Barataria Barrier
                           Shoreline Project**

Taylor Engineering will be meeting with Ms. Norman on Monday to discuss access on the beach to do the survey work this summer. They are willing to work with Wisner and the SLBDD on the public access issue.

**NEW BUSINESS ITEM 11.   Next Meeting Tuesday April 27, 2010**

Motion was made to adjourn at 2:45 by Dr. Everett Williams, second by Michael Peneguy. **Motion passed.**

RESPECTFULLY SUBMITTED BY:

_____

C. Cathy Norman, Secretary Treasurer

AMENDED AND APPROVED AT _____ MEETING.
                          DATE

5

# MINUTES OF THE MEETING OF THE
# EDWARD WISNER DONATION ADVISORY
# COMMITTEE
# TUESDAY, APRIL 27, 2010

**Present:**
Julie Schwam Harris, Chair, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
Dr. Sandra Robinson, Representative, Tulane University

<u>Staff:</u>
C. Cathy Norman, Secretary Treasurer/Land Manager
Dawn Segura, City Attorney's Office
L. Amanda Phillips, Executive Assistant Wisner

<u>Guests:</u>
Mark Peneguy

Meeting called to order at 12:20 pm.

## OLD BUSINESS

**OLD BUSINESS ITEM 1.**　　**Approval of the Minutes from the March 30, 2010, Annual Review and the March 30, 2010, Regular Meeting**

There was one correction on the Annual Review minutes, Page 4, Line 39, the year at the end of the sentence should be "2010" not "20101." The Regular Meeting Minutes had some minor changes. Michael Peneguy moved to approve the Minutes as corrected. The motion was seconded by Dr. Sandra Robinson. **Motion passed.**

## NEW BUSINESS

**NEW BUSINESS ITEM 1.**　　**City of New Orleans Grant Requests**

There were four grant requests, all were repeat requests.

| | |
|---|---|
| *Juneteenth Celebration* | *$15,000* |
| *Gun Buy Back Program of New Orleans* | *$25,000* |
| *New Orleans African American Museum* | *$150,000* |
| *New Orleans Jazz Orchestra (NOJO)* | *$25,000* |
| **TOTAL** | **$215,000** |

Michael Peneguy had a question about the grant request for the New Orleans Jazz Orchestra. Ms. Harris explained they were handling the unveiling event for the Sculpture Garden. Part of the funding is for base of Elizabeth Catlett's sculpture ($3,000~$7,000). It was heavier than anticipated and needs a larger base. The other part is for the event. The Mayor rounded the amount up so there was not an additional invoice for which NOJO was unable to pay.

The grants were approved on a motion by Dr. Sandra Robinson, seconded by Michael Peneguy. **Motion passed.**

**NEW BUSINESS ITEM 2.**　　**Secretary Treasurer's Report**

Ms. Norman reviewed the additional paperwork handed out as all the items on her report were on the agenda.

1



**EXHIBIT**
**N**

1    Tennessee Gas Pipeline's further permit plans for work they are doing on
2  Fourchon Island to remove an old pipeline and related infrastructure on Wisner
3  property.
4
5    An article and a permit from Coastal Environments for bioengineered shore-like
6  oyster reef units which are being placed on the north side of Grand Isle at Fifi's Island.
7  This looks like an interesting idea to watch. We have property just north of this. This
8  looks like an excellent idea of something that could be dropped along the Caminada Bay,
9  which might protect Wisner's property inexpensively.  It is the exact same habitat in our
10  area as in Grand Isle.
11
12    An article on the oil expansion and boom for the State and President Obama's
13  commitment to the oil business. Mobile has stated they want to be the next Port
14  Fourchon. Port Fourchon is prospering. Chett Chaisson indicated on tv that the Port has
15  a large area it could develop, Fourchon Island.
16
17    Invitations to the Sculpture Garden unveiling and to a State of the Coast meeting
18  in Baton Rouge were included.
19
20    Invoices presented for approval were:
21
22    Amanda Phillips' Expense Report            $5.25
23    Cathy Norman's Expense Report              265.00
24    FETI Investigations                       4,685.00
25
26    The Secretary Treasurer's Report with additional expense accounts and FETI's
27  invoice was approved on a motion by Michael Peneguy which was seconded by Dr.
28  Sandra Robinson. **Motion passed.**
29
30  **NEW BUSINESS ITEM 3:        Dune Energy Proposed Amendment of**
31  **                            Hydrocarbon Lease**
32
33    Ms. Norman said there was not much to report on this matter. Dune's attorney
34  wants Ms. Norman to rework their clean copy. Ms. Norman wants to Committee to see
35  all of the changes from the original agreement before she turns it over to Dune. It is
36  about half completed. Guy Smith is working on the other half. It has been difficult to
37  arrange another meeting with Dune.
38
39    Ms. Norman suggested that Mark Peneguy, Michael Peneguy, she, and Guy Smith
40  meet again to discuss the agreement. Ms. Harris suggested that permanent sub-
41  Committee be formed to work on this matter. Mark Peneguy requested that despite not
42  being a Committee member, he be on the sub-Committee. Ms. Norman replied that he
43  could be an attendee. Michael Peneguy recommended that the other Committee
44  members be invited to attend these meetings, so that the new City representatives would
45  be included. Ms. Norman indicated she always invites all of the Committee members.
46
47  **NEW BUSINESS ITEM 4.        FOURCHON BEACH UPDATE, SLBDD**
48
49    Ms. Norman included a lot of the emails between Wisner, Chevron and the
50  SLBDD in the packet. Chevron clearly stated they would not accept the Access
51  Agreement from Taylor Engineering with Taylor's changes to the insurance language.
52  This language included that they would not hold us harmless if there was any negligence
53  on the part of the Grantor's (Wisner and Chevron). In some instances that might be
54  reasonable. But when there are pipelines buried in the sand, this puts an undue burden
55  on Wisner and Chevron to make sure that the pipelines are safe before the public is
56  invited to drive on them. The Port disagrees.
57
58    Ms. Norman doesn't believe the Port's insurance company has been told there are
59  pipelines on the property. Ms. Norman specifically asked the Port if their insurance
60  company is aware of the pipelines. Mr. Autin's email response doesn't specifically
61  address this. Ms. Norman read from Mr. Autin's email, *"During the countless hours that*
62  *our office has spent dealing with the issue of beach office, I am confident we've taken*
63  *every possible measure to protect the interests of both Wisner and Chevron. Our*

2

1  *underwriters are well aware of the pipelines in the vicinity of Fourchon Beach."*
2  Michael Peneguy suggested that Ms. Norman keep that email.
3
4      To access Chevron's facility one must have a TWIC pass. It is not a public access
5  area. When Ms. Norman raised that issue, Mr. Autin countered that the Port maintains
6  numerous facilities that are accessible to the public. Ms. Norman recounted her
7  statements at the recent Port Commission language and that the same language used in
8  the Beach Access agreement was used with Taylor Engineering. This was a contentious
9  matter for the Port Commissioners. The Port's insurance company required changes to
10  the agreement's language neither Wisner nor Chevron was willing to accept. Some
11  Commissioners didn't believe the Port should be paying the insurance.
12
13      Enthyion, a company working on repairs to the break waters at Belle Pass, had
14  someone run amuck with a marsh buggy nowhere near where the work had been done.
15  Ms. Norman took pictures and will send a letter to them. Heavy equipment was brought
16  in by boat to the place at which it was needed for work. Ms. Harris suggested that we
17  demand they repair the damage. Ms. Norman noted that it was a Corps' project and that
18  she would copy the Corps on the letter.
19
20      Rickey Cheramie, on the Board of the SLBDD, is on the property all the time. He
21  accesses the property through Chevron's gate. Ms. Norman wants to ensure that access
22  to the beach is only with prior notification to Chevron and only for a given purpose
23  related to activity on the beach. Mr. Cheramie knows people at the Port who let him
24  enter. The Port has a key to the gate.
25
26      Ms. Norman is writing a letter to Chevron concerning several issues. She is going
27  to suggest that Chevron fence off their entire lease area, down to the edge of the dunes.
28  Ms. Harris suggested it go to the water. Ms. Norman stated Chevron could if they
29  wanted to protect their pipelines. A discussion concerning the liabilities if fencing were
30  to go to the water ensued. Dr. Robinson suggested a camera be installed to monitor
31  activities.
32
33      Ms. Norman cited a case in which several youths "hung out" at an oil and gas
34  facility drinking beer and smoking cigarettes. There was an explosion, three boys were
35  killed and one badly injured. The company was found negligent because there was a
36  pattern of use which the company had failed to prevent.
37
38      Loulan Pitre, Al Danos, Cullen Curole and Ms. Norman had met a week prior to
39  the SLBDD monthly meeting. They presented Ms. Norman with their plan to develop to
40  the west. The plans were unveiled at the monthly meeting. The plans involve roads on
41  the beach, buried utilities, roads going into the marsh with places for RVs, and a
42  boardwalk out to the jetties. At the meeting they discussed the plan and ways for
43  Lafourche Parish to make money from the vendors who will be out there. There was no
44  answer for what Wisner would get from this.
45
46      Chett Chaisson, the new Executive Director of the Port, was at the meeting. He
47  commented that the Port has plans to lease parts of the area from Wisner to develop.
48  Ms. Norman confirmed. The Port is interested in the abandoned Phillips Canal. The Port
49  would build a road along the northern portion of the island. The SLBDD thought they
50  could get the Port to pay to build the road along the beach for them. Ms. Norman
51  mentioned that if there is development by the Port, then there will be Homeland
52  Security concerns.
53
54      Elmer's Island is going to reopen. There are new rules in place.
55
56      Ms. Norman and Jay Caillouet have met to discuss the Caillouet Land
57  Corporation's proposed land swap. Mr. Caillouet provided a map to Ms. Norman from
58  State Land showing the State claims a roll over area in front of both Bay Champagne and
59  Bay Marchand. These are not state owned properties. Ms. Norman will set up a meeting
60  with State Land to discuss. She believes that the State is claiming this because at one
61  time these areas were water. Michael Peneguy said there is a settlement that shows in
62  front of Bay Champagne it is Wisner's. Ms. Norman said if it is created by an evulsive
63  event (a storm) that Wisner can claim it, as she believes occurred.

3

Mark Peneguy asked if the Bay was fully within Wisner property originally. Ms. Norman affirmed that it was. Mark Peneguy then asked if it was owned by the State at that time. Ms. Norman stated she did not know, and that it should be determined if the State redeemed the property in the early 1900's as a State owned water bottom under Act 60 of 1912. Which was the issue with Bay Champagne.

The Caillouets are trying to build a pier and to do this land swap. Ms. Norman told them she would challenge the land swap, because one cannot swap that which one does not own. The original road which they want to swap, the servitude was given to Chevron and Chevron has never been contacted.

Wisner is going to have to maintain no driving on the beach, put some heavy restrictions on the Chevron gate access and possibly ask Chevron to fence in their entire facility.

**NEW BUSINESS ITEM 5.     LUMCON UPDATE**

Forrest Travirca has his little trailer outside LUMCON's gate. He and Ms. Norman slipped through the gate to LUMCON and inspected the site. LUMCON is doing nothing with the property. At the end of the lease area, the pier disappeared in the storms and the wooden bulkhead is being undermined.

Ms. Norman discussed the possibility of getting some of the dirt Wisner has a call on from the Port with Chett Chaisson. The Port is willing to help with this. LUMCON has said they are waiting on FEMA funds to fix this. This is the perfect opportunity for Wisner to get it fixed and send LUMCON the bill. This is another item that can be used against LUMCON if they continue to neglect the facility which can be used to retake the facility.

Ms. Rabelais at LUMCON and Nicholls (who subleases to LUMCON) are interesting in keep the facility but do not have any money. Ms. Norman suggests contacting the Audubon Society or the Nature Conservancy to see if they were interested in leasing. They could work with the universities to continue research activities there.

If LUMCON does not maintain the lease, Wisner can seize the property. They shut down their plumbing system, say they are running the air conditioning and until Forrest moved on site they never cut the grass. The entire downstairs was wiped out in Gustav and has never been repaired. A letter has been sent demanding repairs be made. Ms. Rabelais replied there was no money with which to make repairs until the FEMA claim is paid.

Ms. Norman suggested that LUMCON be contacted and told that Wisner is concerned about the erosion of the land, and that we are making the emergency repairs. Ms. Norman will try to coordinate repairs with the Port. Wisner might have to pay for the materials. If in a year from now, Wisner learns LUMCON is not reopening and is not doing any repairs, then Wisner steps in and demands return of the premises. Michael Peneguy suggests that further discussions to ensure that the Port can do this be had. Michael Peneguy moved to approve Ms. Norman's plan. Dr. Robinson seconded the motion. **Motion passed.**

Mark Peneguy added that Wisner should inform LUMCON they will be billed for all repairs. Even if they are unable to pay, that might make them more attentive to the property. Ms. Norman reminded the Committee of the education cuts being made and that LUMCON was using its funds for the larger facility in Cocodrie. Michael Peneguy suggested that LUMCON be given the opportunity to pay when it could.

**NEW BUSINESS ITEM 6.     TRANSITION NEW ADMINISTRATION**

Ms. Norman included information she put together for the transition team on Coastal Restoration and Flood Protection Transition Team. She was on the Coastal Restoration Transition Team. It made her think a lot what Wisner needs to do.

4

**NEW BUSINESS ITEM 7.      UPDATE GREATER LAFOURCHE PORT COMMISSION**

They are having a 50th anniversary open house that weekend the Committee members were welcome to attend.

Ms. Harris inquired as to whether the boat graveyard was taken care of. Ms. Norman replied that it was as taken care of as it would ever be.

*Yes, We Have No Bananas* is included. It is an interesting history of the Port and its expansion plans. Of note is the map of Fourchon Island which shows the Port's future expansion plans. The Port has colored in the two leases on the island which are granted by Wisner. Michael Peneguy stated that when one pulls up the Port's website it lists our leases on their website.

There is a meeting tomorrow regarding Ike/Gustav Disaster recovery which Ms. Norman cannot attend. It is mainly proposed fisheries infrastructure projects. Ms. Norman thought that Wisner could ask for money to clean up some waterway obstructions that are on private property but do interfere with fisheries. There might be another NOAA grant for that purpose as well.

Ms. Norman noted that there is a minimal amount of information on the L-506 lease the Port is proposing. Michael Peneguy commented that the lease was between the Port, LL&E and Wisner. The Port now owns LL&E's property. A new lease is needed. Ms. Norman was not happy with $114 and $72 per acre rental either. Wisner has 50% ownership. The lease says we can devise new terms at this time. Ms. Norman suggests that a new lease be written for 2012. Mark Peneguy raised the concern as to whether the Port could partition the property as they are a co-owner.

**NEW BUSINESS ITEM 8.      ACCESS SURVEYS FOR BARATARIA BARRIER SHORELINE PROJECT**

Wisner has signed agreements. The first day they were going out there, Forrest called. They had not notified Forrest they were going out there, despite it being spelled out in the agreement. Ms. Norman is sending an email this afternoon reminding them to notify Forrest.

The next two items tie into the Legislative Update as well.

Taylor Engineering met with Ms. Norman regarding access for both the Barataria Barrier Shoreline Project and the Caminada Headland Restoration Project. Several items of note were gleaned from the meeting. First, one of the project delays is MMS, who oversees the issuance of sand mining leases, has announced they will only do one sand mining lease per year due to lack of human and financial resources. This year's lease was issued for Cameron Project. Wisner's projects have to wait until next year to negotiate a sand mining lease.

Ms. Harris asked if Ms. Norman informed Wes Kungal of this. She added that the Senator needs to write a letter about this. Ms. Norman affirmed she had. Ms. Harris recommended that Ms. Norman determine if MMS has put this in writing. If so, a copy needs to be sent to the Senator.

For this initial CIAP phase of the project, due to start in 2013, Taylor has a budget of $70 million. The cost for the sand and the sand movement is about $35 per cubic yard. They will have 2 million cubic yards of sand to put on the beach. They will start at Belle Pass and work their way east as far as they can do. That is all they will do until the Federal project kicks in. They are still hoping to use this portion as a match.

Michael Peneguy asked when the Federal project will begin. Ms. Norman responded that the BBB project is stalled in Washington, DC, because they believe it lacks sustainability. But what are the alternatives?

Ms. Harris asked who is answering officially the challenge that it is not sustainable. Ms. Norman said she and Ms. Teamer were going to try to ascertain that. Ms. Harris noted that Senator Landrieu is the coastal restoration champion. Ms. Teamer is trying to set up a meeting with Senator Landrieu, Ms. Norman and Ms. Teamer.

When Ms. Norman met with Wes Kungal of Senator Landrieu's office, she showed him a map of the area. He asked which property Wisner owned. Ms. Norman informed him that Wisner owned it all, to his astonishment, including the property under the Port. He said he had been meeting with the SLBDD members about the beach and believed the Port owned the beach. Ms. Norman told him Wisner also owns the property on which LOOP is located.

Ms. Teamer stated that it would be very embarrassing for Mary to be down there cutting a ribbon with Ted Falgout, meanwhile her brother is the Trustee of all this property and he isn't very happy about what they are doing.

**NEW BUSINESS ITEM 9.       LEGISLATIVE UPDATE**

Ms. Norman passed out a list of background on what is happening in the legislature. She and Ms. Teamer are going to attend the Committee on Natural Resources tomorrow morning. Ms. Harris suggested they stay in touch with the City's lobbyists.

Mark Peneguy asked if anything was known about the attempt to redo the Kelo bill, Senate Bill 154. Michael Peneguy replied that it had been assigned to Judiciary A Committee and hasn't gone anywhere yet.

Ms. Norman stated that there are also concerns about Senate Bill 3224 Obstruction of a Highway of Commerce. She read the proposed changes. The Louisiana Landowner's Association wants to amend the bill to read "The highway of commerce shall include only those waterways that are navigable in law and fact and whose beds are owned by the State of Louisiana." Ms. Teamer discussed this with them. This is what has concerned Ms. Norman about pipeline canals.

**NEW BUSINESS ITEM 10.       NEXT MEETING – TUESDAY, MAY 25, 2010**
                                              **12:00 NOON**

Meeting adjourned at 1:30 pm on a motion by Michael Peneguy, seconded by Dr. Robinson. **Motion passed.**

RESPECTFULLY SUBMITTED BY:


C. Cathy Norman, Secretary Treasurer


AMENDED AND APPROVED AT _May 25, 2010_ MEETING
                                          *DATE*

6

# MINUTES OF THE MEETING OF THE
# EDWARD WISNER DONATION ADVISORY
# COMMITTEE
# TUESDAY, MAY 25, 2010

**Present:**

Brooke Smith, Chair, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
William Peneguy, Alternate, Wisner Family Heirs
Dr. Sandra Robinson, Representative, Tulane University
Dr. Everett Williams, Representative, Charity Hospital
Edward Buddy, Alternate, The Salvation Army

<u>Staff:</u>

C. Cathy Norman, Secretary Treasurer/Land Manager
Dawn Segura, City Attorney's Office
L. Amanda Phillips, Executive Assistant Wisner

<u>Guests:</u>

Mark Peneguy

Meeting called to order at 12:20 pm. Dr. Everett Williams moved to allow Michael Peneguy chair the meeting. Seconded by Ed Buddy. **Motion passed.**

## OLD BUSINESS

**OLD BUSINESS ITEM 1.**   **APPROVAL OF THE MINUTES FROM THE APRIL 27, 2010, REGULAR MEETING**

The minutes were not ready for the meeting. Ms. Norman indicated she may email completed minutes for approval.

## NEW BUSINESS

**NEW BUSINESS ITEM 1.**   **CITY OF NEW ORLEANS NEW ADMINISTRATION, WELCOME, INTRODUCTIONS AND APPROVAL TO CHANGE AUTHORIZED SIGNATORY FOR BANK ACCOUNTS**

Dr. Williams moved to change the authorized signatories on the bank accounts to the new Mayor and to remove former Mayor Nagin from the accounts. Seconded by Ed Buddy. **Motion passed.**

**NEW BUSINESS ITEM 2.**   **CITY OF NEW ORLEANS MAY GRANT REQUESTS**

There were no grants for approval.

**NEW BUSINESS ITEM 3:**   **SECRETARY TREASURER'S REPORT**

Ms. Norman emailed a Secretary Treasurer's report last night. It all deals with the spill, as do most of the invoices.

| | | |
|---|---|---:|
| Amanda Phillips' Expense Account | - | $60.05 |
| FET Investigations | - | 4,038.60 |
| Bourgeois Bennett | - | 3,800.00 |
| | **TOTAL** | $7,898.65 |



EXHIBIT

O

1     Ms. Phillips updated the Committee on the camp leases. She believes the oil spill
2    will affect future rentals on all campsites. To date no camp owners have called. The
3    Jefferson Parish renumbering project was put on hold after the spill. Forrest has been
4    occupied overseeing the spill activities.
5
6     Ms. Phillips also updated the Committee on the Hunting and Trapping Leases.
7    Mr. Carmadelle's lease expires July 31, 2010. Last year his lease was increased by 2%
8    from $9,969 to $10,168. Another 2% increase would bring his rental to $10,272. The
9    club had the best hunting year last year that they have ever had.
10
11    Dr. Pilié's rental is fixed for three years. Rusty Cavalier has not contacted us
12   regarding his alligator egg collection lease.
13
14    The oyster lessees will be able to claim damages if oiled. But they cannot sue
15   anyone who damages the reefs while trying to clean up the oil.
16
17    Ms. Gordon worked for three weeks in May. She is returning for June, but only
18   for the month. A replacement for Ms. Gordon is needed.
19
20    Bourgeois Bennett is almost finished with last year's audit.
21
22    Dr. Williams moved to approve the Secretary Treasurer's report with additional
23   invoices. Seconded by Ed Buddy. **Motion passed.**
24
25   **NEW BUSINESS ITEM 4.**     **BP HORIZON DEEPWATER SPILL EVENT –**
26                              **IMPACT ON WISNER PROPERTY**
27
28    Ms. Norman reviewed the spill history, what was done and what she thought
29   should be done. The GLPC has communicated closely with Wisner. Lafourche Parish has
30   not.
31
32
33 REDACTED - POTENTIAL LITIGATION

36
37
38
39

46
47

51
52

56
57
58
59



Dr. Williams made a motion to pay the three invoices for Forrest Travirca: $7126.47, $7273.87, $881.72. Dr. Robinson seconded the motion. **Motion passed.**

Brooke Smith moved to approve sending out the public records request letters. Dr. Williams seconded. **Motion passed.**

**NEW BUSINESS ITEM 5.**          **DUNE ENERGY PROPOSED AMENDMENT OF HYDROCARBON LEASE**

There was very little to report. Ms. Norman and John Pearce have spoken. Ms. Norman will inform Mark Peneguy and Micheal Peneguy when she is able to set up a meeting.

**NEW BUSINESS ITEM 6.**          **FOURCHON BEACH UPDATE, SLBDD**

3

1    Ms. Norman attended the most recent SLBDD meeting. They are still making
2    plans. One of the Board Members didn't believe the oil spill would affect the Board's
3    plans. Jim Caillouet of Caillouet Land Corporation also attended this meeting. He was
4    surprised by the Port's expansion plans for Fourchon Island.
5
6        One of the Port Commissioners in the audience mentioned that the current
7    bridge may be dismantled and another bridge built to the northern side of Fourchon
8    Island. This was another shock for Mr. Caillouet.
9
10       Mr. Caillouet and Ms. Norman met separately after the SLBDD meeting. They
11   discussed the now cancelled land swap, the Port's expansion plans and rumors that CLC
12   was charging Taylor Engineering to be on the property for the CHRP. The Caillouets
13   have put up for sale about 47 acres of land adjacent to the Port. There is no price listed
14   with this property. It has been said since, that the fee CLC was charging was rescinded.
15
16       There was a public meeting for the CLC's plans to build a pier on the beach. The
17   public only had objections.
18
19   **NEW BUSINESS ITEM 7.        LUMCON UPDATE**
20
21       LUMCON is still sitting vacant. Ms. Norman is working on getting a price to fill
22   the bulkhead. She will then send a letter demanding reimbursement for repairs. If it is
23   left vacant for six months, then Wisner should retake the property.
24
25   **NEW BUSINESS ITEM 8.        CAMINADA HEADLANDS PROJECT**
26   **                            SURVEYS**
27
28       At this time the project is on hold. Ms. Norman met with Charlotte Randolph.
29   Ms. Randolph reported that when the Governor and Billy Nunngesser were working on
30   the plan to build barriers along shorelines, they identified Ship Shoal as a sediment
31   source for the berms. They also discussed the possibility of including the CHRP. There
32   are a number of regulatory and environmental issues surrounding the sand berm
33   project.
34
35       Fourchon Beach is the perfect site, because we are in the final stages of approval.
36   Ryan Hearn, the State Project Manager with DNR, and Ms. Norman will meet tomorrow
37   at the beach to discuss this. The surveying is on hold because of the spill. The largest
38   issue facing coastal restoration in Louisiana is: Does one want to put pristine sand on
39   beaches that will be continuously oiled for the next 5 years? The Federal government
40   will not spend money on areas that will be oiled repeatedly.
41
42       Ms. Randolph is pushing for Fourchon beach to be nourished. It will cost $75
43   million. Mr. Nunngesser and the Governor's plan would cost $350 million. This project
44   has almost all of the planning done.
45
46       If this project is done with private funds, Wisner as a landowner can file a coastal
47   restoration plan for our property. Any newly created property will belong to Wisner
48   because public money is not being used. This would provide enormous protection from
49   storms and from the back marsh being oiled.
50
51       Davie Breaux mentioned that Highway 1 and the Port would be in jeopardy if our
52   marsh eroded away. MMS has being holding up this project because they do not believe
53   it is sustainable and they have already issued their one sand mining permit for this year.
54
55   **NEW BUSINESS ITEM 9.        LEGISLATIVE UPDATE**
56
57       Ms. Teamer sent an update. Ms. Norman has been most concerned with bills
58   related to lifting the moratorium of issuing oyster leases. The Final Report of the oyster
59   commission was distributed. Of 18 issues, 8 were left unanswered. The strong oyster
60   fisherman lobby pushed their bills through. New leases will be posted on the website
61   and one will have 60 days in which to object. This is better than previously. Ms. Norman
62   questions if this is still not due process and proper notification of landowners.
63

4

HB 1090 was amended. It substitutes CPRA for the Department of Natural Resources. *213 – Riding or Hauling on Levees Prohibited* was amended to include *or any coastal restoration or protection projects*. If it passes, it will be illegal to drive on any coastal restoration or protection projects. Ms. Teamer involved Cynthia Duet, Walter Leger and Garret Graves in this.

**NEW BUSINESS ITEM 10.**       **NEXT MEETING – TUESDAY, JULY 27, 2010**
                                **12:00 NOON**

Meeting adjourned at 1:35 pm on a motion by Dr. Williams, seconded by Ed Buddy. **Motion passed.**

RESPECTFULLY SUBMITTED BY:

C. Cathy Norman, Secretary Treasurer

AMENDED AND APPROVED AT _____July 27, 2010_____ MEETING
                        *DATE*

# MINUTES OF THE SPECIAL MEETING OF THE
# EDWARD WISNER DONATION ADVISORY
# COMMITTEE
# TUESDAY, JUNE 15, 2010

**Present:**
Ashleigh Gardere, Chair, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
Dr. Everett Williams, Representative, Charity Hospital
Captain Ethan Frizzell, Representative, The Salvation Army
Edward Buddy, Alternate, The Salvation Army

Staff:
C. Cathy Norman, Secretary Treasurer/Land Manager
Dawn Segura, City Attorney's Office
L. Amanda Phillips, Executive Assistant Wisner

Guests:
Mark Peneguy
Forrest Travirca, FET Investigations
Timothy Travirca, FET Investigations
James Burton, Simon Peragine Smith and Redfearn, LLP
Nanette Jolivette Brown, City Attorney

Meeting called to order at 12:13 pm. Dr. Williams motioned for Michael Peneguy to chair the meeting so that Ashleigh Gardere could learn our meeting process. Captain Frizzell seconded the motion. **Motion passed.**

## NEW BUSINESS

NEW BUSINESS ITEM 1.        BP HORIZON OIL SPILL

*BP Pending Claim and Claims Process*
Ms. Norman updated the Committee on the status of the claims with BP. Current outstanding claims are $64,295.85. There is another close to $10,000 in claims which have yet to be filed. Ms. Phillips related her conversation with a BP claims' representative.

The initial $45,000 claim is under review. The claim representative had not submitted the second claim. The claims representative stated that sometimes a claimant is fronted money, while the questions/documentation issues are being answered. He is waiting to see what further documentation might be required for some of the reoccurring expenses that are in both claims. Those issues could be addressed before submitting the second claim and avoid delays in reimbursement.

Wisner is in the Large Loss Unit with other large businesses. BP hired claims adjusters to administer the process.

It is anticipated that Wisner's costs will only increase as FETI is needed more on the beach for oversight. Simon Peragine suggested that Wisner have more oversight and documentation of activities. As the Natural Resource Damages Assessment (NRDA) progresses there will be more people on the beach and more people requesting access.

It has also been recommended that Wisner has a wetlands expert.

Jim Burton, Andy Wilson, Susan Clade, and Ms. Norman met with Nanette Jolivette-Brown on Monday, June 14, 2010, to discuss the City's program for claims against BP and how Wisner could tap into that fund to cover some of Wisner's future expenses.

1

EXHIBIT
**P**

1    Ms. Jolivette-Brown explained the revolving fund the Parish has with BP. The
2  City was initially given $500,000. Other parishes were given different amounts. The
3  City has a draft agreement they are negotiating with BP for $1 million. As the City
4  submits expenses that approach $1 million, the fund is replenished. Parishes do not
5  have to go through the same claims process as Wisner.
6
7    Due to the City's interesting relationship with the Wisner Donation, the City felt
8  it was appropriate for the Wisner costs to be funneled through the City's account. That
9  would provide immediate reimbursement. The money is held with the City.
10
11    The City's larger picture is that as they put their plan together for overall
12  response costs, what needs to be done in preparation for hurricane season, training
13  people, maybe 24-hour security, these are extreme expenses BP should pay. Since they
14  have established this process, why not include Wisner.
15
16    The draft agreement between the City and BP was circulated. Ms. Jolivette-
17  Brown invited the attorneys and anyone else to suggest language for the agreement. BP
18  has been amenable to requests by the City. Although Ms. Jolivette-Brown cannot
19  imagine any additional language that would protect the City, its interests, or anyone who
20  is related to the City and its interests that could be inserted.
21
22    Ms. Norman commented that she could not see a downside; it was almost too
23  good to be true. Ms. Jolivette-Brown said the agreement clearly states that it does not
24  prevent Wisner or the City from filing a claim against BP through their claims process or
25  a lawsuit. Ms. Jolivette-Brown commented that BP was causing a lot of damage, getting
26  a lot of pressure and the City did not believe that this was nearly enough to compensate
27  from any damage. This revolving fund is really just to help the entities get through and
28  to protect the interests that are at stake. Ms. Jolivette-Brown reiterated that it is almost
29  too good to be true.
30
31    Ms. Norman noted that the only portion of Lafourche Parish affected is the
32  Wisner property. Lafourche Parish was given $1 million and has not offered to share it
33  with Wisner at all, but rather spent it on new equipment for the Parish.
34
35    Ms. Jolivette-Brown said that the City has asked Ms. Norman to be directly
36  involved in the entire process so that the costs Wisner incurs will be reimbursed. Ms.
37  Norman noted that there is equipment, such as a 4-wheeler, which is needed to patrol
38  the beach properly. Ms. Jolivette-Brown replied that Wisner should not have to go
39  without the equipment it needs or front the cost. She did concede there might be some
40  initial push-back from BP. The money is sitting there.
41
42    Michael Peneguy asked if the claims would now be handled through this process
43  rather than the claims process. Ms. Jolivette-Brown answered it did not have to be. She
44  indicated that Wisner could pursue the claims process as well as go through the City.
45  She said the City's process was far less onerous for reimbursement, informal. Wisner
46  could wait to decide if it wanted to participate with the City.
47
48    Ms. Jolivette-Brown replied to Mark Peneguy that at the moment there is only
49  $500,000 in the account and BP has yet to sign the agreement circulated. He also asked
50  if BP was going to submit to Civil District Court for jurisdiction. Ms. Jolivette-Brown
51  said they haven't pushed back or said they wanted to negotiate on this point. The City is
52  waiting for a signed agreement to be returned. She averred that the Mayor really wanted
53  $1 million for initial funding as a political statement about the damages. BP has assured
54  the City that as the $500,000 was drawn down, it would be replenished.
55
56    Ms. Norman stated that her point of contact on this will be Lt. Colonel Jerry
57  Sneed and Ms. Jolivette-Brown.
58
59    Ms. Jolivette-Brown added that the City has not forgone as a separate City entity
60  filing a lawsuit at some point if there is some claim or item that isn't really considered a
61  response cost.
62

1    Michael Peneguy asked if the money was set aside in a certain City account. Ms.
2    Jolivette-Brown responded that the City was waiting for the money. Initially the City
3    was not incurring response costs. The City thought if the money was there to get and
4    Wisner was incurring the costs, they had an obligation to contact Wisner and offer it to
5    Ms. Norman. The City has other programs going on, but since there isn't a cap and this
6    is an easier way than the claims process, the City believed they had an obligation to offer
7    it to Wisner.
8
9    Ms. Norman's preliminary budget for the next year is about $900,000 in
10   additional expenses. Ms. Jolivette-Brown remarked that this is an unprecedented
11   natural disaster and no one should be expected to front costs.
12
13   Mr. Burton noted that this is something that is only available to parishes. It is the
14   unique nature of Wisner that allows Wisner to take advantage of it. Simon Peragine has
15   reviewed the document and is comfortable with it.
16
17   Captain Frizzell moved that Wisner use the City as the lead intermediary for
18   reimbursement of funds expensed because of the spill, recognizing that it is a donation
19   to the City and the City would be the entity to for pre-imbursement. Dr. Williams
20   seconded the motion. **Motion passed.**
21
22   Ms. Jolivette-Brown explained that Ms. Norman will give Lt. Col. Sneed a budget
23   for the next year. That will be submitted to BP and be the starting point for the revolving
24   BP fund. Captain Frizzell said that going forward that the Standard Operating
25   Procedures need to be changed while dealing with the spill. Past expense budgets have
26   been $300,000 per year and this spill will quadruple the annual expense budget.
27   Expanded authority will need to be given as well so that Ms. Norman can proceed as
28   needed.
29
30   Captain Frizzell respectfully asked from the City how long of an approval process
31   will it take, in case there is a hiccup. He believes it should be formal.
32
33   Ms. Jolivette-Brown was confused by Captain Frizzell's question. Captain Frizzell
34   asked what the time limit is, who does the budget go to, how long does it take to be
35   approved? Ms. Jolivette-Brown answered that it would go to Lt. Col. Sneed, the Deputy
36   Mayor of Public Safety; and it would be immediate. She is not sure of when BP will sign
37   the agreement. But when they do, the money will be wire transferred into Wisner's
38   account. Ms. Jolivette-Brown stated that the City wants to empower Ms. Norman in this
39   process.
40
41   Captain Frizzell wants a formal document that states that if Ms. Norman gets a
42   budget into Lt. Col. Sneed it will be paid within 30 days. Ms. Jolivette-Brown replied
43   that Wisner should be ahead of needing the money. Ms. Norman stated she will be
44   meeting with Lt. Col. Sneed later this week and they will work out a protocol.
45
46   Ms. Jolivette-Brown left the meeting.
47
48   ***Update on Spill by C. Cathy Norman and Forrest Travirca***
49   Ms. Norman stated since the spill occurred the office has been overwhelmed with
50   work. There is no sign of the work load abating. Lafourche Parish was given $1 million
51   by BP.
52
53   Discussion ensued regarding the impact response expenses were having on
54   Wisner's cash flow. While there is no loss of revenue at this time to Wisner, the
55   increased expenses will result in a loss of revenue disbursed to the Beneficiaries. A
56   concern raised was that operations would be inhibited by a slow reimbursement by BP.
57
58   Ms. Norman said Ms. Jolivette-Brown had told Ms. Norman to submit to the City
59   what Wisner had already filed as a claim against BP. If the City can pay Wisner quicker,
60   then Wisner can cancel the claim. Capt. Frizzell shared that the Salvation Army moves
61   the cash into a disaster area before anything else, so that there is not a delay in paying
62   necessary expenses.
63

1    Forrest Travirca distributed copies of his report. He relayed his observations of
2  the spill, the response and its challenges. The National Guard lost one of their large
3  backhoes on the beach. It took 3 battlefield tank recovery vehicles and two large
4  caterpillars to remove the backhoe. An ATV sank as well.
5
6    The Coast Guard has been diligent and responsive to all concerns raised by
7  Wisner. Wisner has a good line of communication with the Incident Command
8  Structure in Fourchon.
9
10    There are several structures which have been placed on the property in the
11  response. The question is who will remove these structures and fix the collateral
12  damage? EOC in Houma is granting permission to people to access the beach without
13  communicating with Wisner.
14
15    ***Protocol for Operations on Wisner Property***
16    Ms. Norman gave a copy of our access agreement to a scientist with Polaris, who
17  took it back to BP. The BP attorney indicated they had an access agreement with
18  ConocoPhillips for co-owned property. Ms. Norman explained the process used by the
19  EOC to allow access to the spill area. Wisner does not have any firm controls in place
20  right now. Wisner needs to know who is out there, when, what kind of access they are
21  using, what type of vehicles and equipment they are using. Wisner needs a copy of all
22  reports generated regarding our property.
23
24    A copy of Wisner's protocol was distributed at last Thursday's meeting in
25  Fourchon, but it is unknown how widely it was distributed by the meeting attendees.
26  Another question is how and where to set up a credentialing system. Ms. Norman was
27  banned from the EOC by the Parish. Therefore, Wisner would not be able to use the
28  EOC for credentialing.
29
30    When Lt. Col. Sneed traveled with Ms. Norman to Fourchon, he was initially
31  barred entry to the EOC. After some discussion, Lt. Col. Sneed was allowed to enter the
32  EOC, but Ms. Norman was not. The Parish's position is that if Ms. Norman is allowed
33  access to the EOC, then all the other landowners would have to be given access. James
34  Richard from the Louisiana Department of Homeland Security disagrees with this
35  position.
36
37    Capt. Frizzell suggested that Wisner charge per person for access to cover our
38  costs for the credentialing and additional insurance costs. Then charge BP for the costs
39  of credentialing. Ms. Norman explained that some of the access is granted for
40  Emergency operations. She did not believe that we could charge for emergency access.
41
42    Mark Peneguy added that he believed Wisner would take on a huge liability if
43  Wisner were to charge for access. He believed that hiring someone to be stationed in the
44  area to control access and charging BP for that person was the preferred method.
45
46    A conversation ensued regarding whether insurance should be purchased or if the
47  access agreements and hold harmless agreements would be sufficient.
48
49    Access to the beach is controlled by both a sheriff's officer parked before the
50  bridge and a BP security guard at the beach. Wisner will attempt to get those
51  checkpoints to stop people and ask if they have the proper credentials. Mr. Travirca will
52  meet tomorrow with the spill response team and will discuss this.
53
54    ***Hiring of Environmental Expert***
55    Capt. Frizzell recommended that Wisner contract with someone to work with the
56  researchers. They would become the hub of all things research who could funnel the
57  information to Ms. Norman in a timely manner. Ms. Norman presented a resume for a
58  potential researcher for the property. His qualifications and availability were discussed.
59
60    ***Approval of Invoices; FET and Aerodata***
61    Dr. Williams moved to pay the current spill related invoices of $45,815.79. Capt.
62  Frizzell seconded. **Motion passed.**
63

4

1      Aerodata's invoice has not been submitted yet. Capt. Frizzell motioned that
2 Aerodata's invoice be paid should it arrive while Ms. Norman was on vacation. Dr.
3 Williams seconded. **Motion passed.**
4
5      ***Campsite Subleasing Request***
6      A camp owner in Jefferson Parish reported to Ms. Phillips that someone was
7 riding in a boat along Bayou Segnette asking camp owners if they would like to sublease
8 their camps to spill workers. It is a 10 minute boat ride from Bayou Segnette to the spill
9 site and rentals are scarce in Lafourche Parish. Wisner's campsite lease does not permit
10 subleasing.
11
12      ConocoPhillips was not allowing subleases. Their lease language is the same as
13 Wisner's. Ms. Norman recommended that subleasing not be allowed. Capt. Frizzell
14 suggested that a reduction in rentals be given next lease year in consideration for the
15 spill. Ms. Norman said this would be considered later this year.
16
17      Capt. Frizzell moved that a letter be sent to the camp owners informing them that
18 subleasing was prohibited. Dr. Williams seconded. **Motion passed.**
19
20      ***Hiring Environmental Expert***
21      Ms. Norman is concerned that BP's aggressive hiring of experts might leave
22 Wisner without an expert. She presented the resume and credentials of William Wilder,
23 Ph. D, who was recommended by Andy Wilson at Simon Peragine.  He charges
24 $200/hour. Ms. Norman noted that our future counsel may wish to engage someone
25 else. Simon Peragine is unable to represent Wisner against BP.
26
27      Capt. Frizzell moved that Wisner spend $5,000 three times to select the right
28 environmental expert and then 100 hours per month. Dr. Williams seconded. **Motion**
29 **passed.**
30
31      ***Litigation***
32      Jim Burton explained that in the past Simon Peragine has done unrelated work
33 and is doing unrelated work for BP. The ethical rule when there is ongoing work is that
34 if the work is completely unrelated, as Simon Peragine believes it is, then one can
35 proceed if both parties, fully informed, give their consent. Simon Peragine approached
36 BP. BP said they would not consent, as they have across the board with other firms in
37 town.
38
39      Simon Peragine cannot prepare or prosecute a claim against BP. They can advise
40 on how to preserve and protect the property. Mr. Burton recommended that another
41 attorney be engaged to handle the expert and prepare any future litigation. While some
42 suits have been filed already, it is possible Wisner will not know the full extent of
43 damages for some time and it would be premature to file now. Ms. Jolivette-Brown
44 indicated in yesterday's meeting that the City was under some pressure to get out in
45 front of this issue, but was weighing it against having a suit thrown out on procedural
46 grounds. This is important because the City is on both sides of the trust as trustee and as
47 beneficiary.
48
49      Ms. Norman commented that we do not need to rush to file suit, but as we engage
50 someone to represent us, they may have a team of people they would like to handle
51 matters instead of who we select. Mr. Burton suggested Joel Waltzer and Robert Wiygul.
52 They are interested in the case. However, they represent a litigant in a suit against the
53 City, on a totally unrelated matter. Mr. Burton thought the Committee should authorize
54 Ms. Norman to consult with the firm to determine interest, if they would be a good fit
55 and if potential conflict which has been identified by all parties could be waived. Ms.
56 Jolivette-Brown brought up the conflict in yesterday's meeting before Mr. Burton could.
57
58      Ms. Gardere asked that Ms. Norman discuss the potential environmental expert
59 with Waltzer and Wiygul so that Wisner doesn't engage someone with whom they don't
60 usually work. Ms. Norman said she would call Mr. Waltzer before her vacation to
61 discuss this.
62

1         Capt. Frizzell requested that Ms. Norman get a letter from counsel regarding
2 future unknown costs and costs of attorneys for Ms. Norman's budget.
3         ***BP Access Letter***
4         Ms. Norman presented a letter to BP. She based it on ConocoPhillips' access
5 agreement with BP. She made some changes and back dated it to May 7, 2010, and
6 included a clause requiring BP to share any and all data and information collected on
7 the spill and the cleanup within 30 days. It contains hold harmless language, and is
8 limited to the Natural Resource Damages Assessment. It also banned airboat usage. She
9 may tweak it further to include requiring individuals to sign a form before accessing the
10 property and obtain a pass.
11
12         Mark Peneguy stated he felt comfortable with Ms. Norman's recommendations,
13 as she has been handling access agreements for years and knows what Wisner should
14 require.
15
16         Ms. Norman asked that any comments be emailed to her before tomorrow. She
17 desired to mail it tomorrow. Capt. Frizzell requested that Ms. Norman insert that the
18 agreement can be updated at the discretion of Wisner. With that insertion, Capt. Frizzell
19 moved that the agreement be approved. Dr. Williams seconded. **Motion passed.**
20
21         ***Request for Information Letters***
22         As a result of the letters Ms. Norman sent requesting information on whether
23 permits had been granted and to whom they were granted for the structures on the
24 beach, Ms. Norman received Lafourche Parish's permit. It was dated June 4, 2010. All
25 the work was done before that. The landowner's list states that they have made every
26 reasonable effort to determine the identity and current address and the applicant has
27 made an effort to contact them. No landowner's list is attached. It seems it was filed at
28 the last minute after they realized all this work was done without a permit, without any
29 permission and without any funding from BP.
30
31         ***Request to Erect Sand Fencing Along the Beach***
32         Both Lafourche Parish and the Port have requested permission to erect sand
33 fencing along the beach in some of the low lying areas that don't have Hesco Baskets and
34 some washover areas on Fourchon Island. At the meeting last Thursday Ms. Norman
35 learned no other structures would be placed on the beach. Wisner has the opportunity to
36 get $150,000 worth of free sand fencing.
37
38         Michael Peneguy asked if it would be done now with all the people on the beach.
39 Mr. Travirca stated it would. It would be east of LOOP and would be accessed from
40 Elmer's Island.
41
42         Allyse Ferrara with Nicholls State is doing this in conjunction with Mitch's
43 Landscaping. He was critical in the marsh planting on the Lafourche Parish Wisner
44 Restoration Project. Michael Peneguy reiterated his concern that the fencing would be
45 destroyed by all the people currently working on the beach.
46
47         Ms. Norman was going to send a letter stating that in an effort to raise elevation
48 in certain washover areas to protect the property from oil spills Wisner approves this
49 project. Since BP is paying for it, no one else can make a claim for it. Dr. Williams
50 moved that Ms. Norman send such letter. Capt. Frizzell seconded. **Motion passed.**
51
52         ***Impact of Oil Moratorium on Port and Rentals***
53         All 33 deepwater rigs that have been shut down are serviced out of Fourchon. It is
54 a strong possibility that companies will pull out of the Port. Ms. Norman met with Chett
55 Chaisson, Executive Director of the Port, to discuss the spill and the moratorium. He
56 sent a letter stating the Port may have to grant some concessions over the next 4-5
57 months to keep the Port's tenants. Ms. Norman asked that he send a letter as to who the
58 tenants might be and what the concessions are. Whatever concessions the Port grants
59 will reduce Wisner's revenue.
60
61         Ms. Norman included some articles and a resolution from the Port. A group of
62 Port Commissioners are going to DC to lobby Congress to lift the moratorium. It does

6

1 not appear hopeful. Ms. Norman will reply to the Port with a letter providing Wisner's
2 support.
3
4     Capt. Frizzell offered the Salvation Army's mobile feeding unit to go feed the
5 people of Lafourche Parish. He proposed that they get a Wisner grant and do it in the
6 name of Wisner, to show Wisner's support to the Parish. The Salvation Army would be
7 happy to share some compassion in the name of Wisner if at all possible.
8
9     Capt. Frizzell motioned to approve Ms. Norman sending a letter to the Port in
10 response to the Port's letter. Dr. Williams seconded. **Motion passed.**
11
12
13 **NEW BUSINESS ITEM 2.      GLPC MARINA LEASE; NEW AGREEMENT**
14
15     Ms. Norman has received Michael Peneguy's comments. She requested any
16 further comments. Mark Peneguy noted Paragraphs 17 and 22 were redundant. He
17 believed they could be combined into one as they deal with warranty of title (Paragraph
18 17) and with other warranties (Paragraph 22). He added that the agreement should be
19 referred to by one name throughout. He offered to email his comments to Ms. Phillips.
20
21     Mark Peneguy stated that he agrees with Michael Peneguy's comment regarding
22 Paragraph 27, that one cannot direct the clerk of court to cancel anything. He suggested
23 that we should instead state that this lease supersedes and replaces the previous leases.
24 In Paragraph 30 he recommended that we insert a physical address for notices to be
25 sent via Federal Express or UPS.
26
27
28 **NEW BUSINESS ITEM 3.      JEFFERSON PARISH SURVEY, AGREEMENT,**
29 **INVOICE AND FINAL PRODUCT**
30
31     The survey started in 2003. Wisner just got maps back which omit two small
32 pieces of property despite Ms. Norman having given Morris P. Hebert complete
33 property descriptions and other maps. The accompanying invoice exceeds the original
34 estimate. Ms. Norman doesn't want to tell them we are not paying the invoice, but is
35 going to wait until the final maps are delivered. Then she will pull out the original
36 estimate and refuse payment in excess of the original estimate.
37
38
39 **NEW BUSINESS ITEM 4.      LUMCON**
40
41     The entire perimeter of the camp has been undermined. It is very dangerous. The
42 bulkhead needs to be replaced. Fill needs to be brought in. Ms. Norman took pictures of
43 the situation. It is almost crisis proportions. LUMCON was closed in January due to
44 budget constraints. Wisner granted Forrest a lease outside of the fence. Since the spill
45 LUMCON has leased out space to EPA. Nicholls State gave Ms. Norman the name of a
46 contact person to see if in fact a claim has been filed with FEMA.
47
48     Ms. Norman will get an estimate from the Port to fix the property. Then she will
49 send LUMCON a demand letter to either fix the property or Wisner will fix it and
50 rescind the lease. Despite the gratuitous lease, LUMCON is still required to maintain the
51 property.
52
53
54 **NEW BUSINESS ITEM 5.      CHERYL TEAMER**
55
56     Cheryl Teamer's legislative update was distributed and discussed. The legislative
57 session was not as big an ordeal as expected.
58
59     The South Lafourche Beachfront Development District continues to meet despite
60 the spill. Ms. Norman is attending their meetings.
61
62     Capt. Frizzell requested by email a Standard Operating Procedures for the Spill
63 time period so that the office and Ms. Norman have the necessary authority to operate

more efficiently.  He suggested perhaps a per diem during this time to help reduce
paperwork. In his past two years on the Committee he has seen very reasonable
expenses and would endorse a per diem during this time. Ms. Norman stated that she
and Ms. Phillips will review the current standard operating procedures and assess if any
changes need to be made.


**NEW BUSINESS ITEM 6.**          Next Meeting – Tuesday, July 27, 2010,
                                  12:00 noon


        Meeting adjourned at 2:34 pm on a motion by Captain Frizzell, seconded by Dr.
Williams. **Motion passed.**


RESPECTFULLY SUBMITTED BY:




C. Cathy Norman, Secretary Treasurer


AMENDED AND APPROVED AT _____ MEETING
                              DATE

8

## MINUTES OF THE EMERGENCY MEETING OF THE
## EDWARD WISNER DONATION ADVISORY
## COMMITTEE
## THURSDAY, JULY 1, 2010

**Present:**
Ashleigh Gardere, Representative, City of New Orleans
Dr. Sandra Robinson, Representative, Tulane University
Mike Peneguy, Representative Wisner Heirs
Dr. Everett Williams, Representative Medical Center of La. at New Orleans
Edward Buddy, Alternate, The Salvation Army
William Peneguy, Alternate, Wisner Heirs

**Staff:**
C. Cathy Norman, Secretary Treasurer/Land Manager
Amanda Phillips, Executive Assistant
Dawn Segura, Asst. City Attorney

**Guest:**
Mark Peneguy

Motion for Michael Peneguy to chair the meeting for Ashley Gardere at her request.
Motion by Everett Williams, second by Dr. Sandra Robinson. Motion passed.

Meeting called to order at 2:30 pm.

New Business Item 1.   Update BP Deepwater Horizon Oil Spill

# REDACTED - ATTORNEY CLIENT
# COMMUNICATIONS - POTENTIAL
# LITIGATION





1
2
3
4

7
8        Joel Waltzer then arrived at the meeting to address the Committee.
9
10   **New Business Item 2.   Engagement of outside Counsel Discussion**
11
12        **REDACTED - ATTORNEY CLIENT COMMUNICATIONS**

16
17

22
23

28
29

37
38

44
45

51



39  Ms. Norman asked the Committee if they would like to make a motion to engage
40  the Waltzer firm subject to a discussion with the City Attorney's office concerning the
41  conflict.

43  There was a motion by Dr. Everett Williams. He stated that the particulars could
44  be worked out with the Waltzer firm. Seconded by Dr. Sandra Robinson and also by
45  Michael Peneguy.

47  Ashleigh Gardere requested clarification on several points. In particular she
48  requested that the motion include contact with the City Attorney's office to resolve the
49  conflict issue. Dawn Segura of the City Attorney's office was asked to comment and she
50  too stated that the City Attorney's office should be contacted to obtain a waiver of the
51  potential conflict.

53  Once the conflict issue is resolved the Committee will proceed with an
54  engagement letter.

1    The scope of the representation will include the spill response, filing of suit
2  should that move forward and the restoration of the property.

3

4    After the discussion with the City Attorney and resolution of the conflict issue
5  engagement letter will be presented by the Waltzer firm to the Committee.

6

7

9

10   Mr. Waltzer departed the meeting.

11

12  **The vote on the motion was reviewed and approved by a vote of four with**
13  **one abstaining.**

14

15  **New Business Item 3.     Greater Lafourche Port Commission – Drilling**
16  **                                      Moratorium impacts. Proposal to reduce rentals**

17

18    Ms. Norman informed the committee that there was an update on the proposed
19  concessions by the port in response to the moratorium. The Port proposed that for the
20  next six months or until the moratorium is lifted, whichever comes first. The new
21  proposal is fairly severe and includes a waiver of the escalation of annual rentals as well
22  as a 30% reduction of rentals for the term of the moratorium. The original proposal was
23  a 20% reduction. Ms. Norman stated that this is a huge concession that will have an
24  impact on the Committee's monthly revenue to the tune of about $35,871 per month.

25

26    Ms. Norman recommends that the Committee give the Port tenants some relief.
27  There may be possible reimbursement from BP for this shortfall. Long term this relief
28  will provide tenants relief so that they do not pull out altogether. Ms. Norman suggested
29  that the Committee not sign a letter agreement as this may threaten possible
30  reimbursement. It was recommended that Ms. Norman discuss this with Simon,
31  Peragine. If the Committee just accepts this reduction, then we can claim the impact. If
32  the Port is reimbursed, they have an obligation under the lease to pay Wisner its share.

33

34    Ms. Norman stated that she thought there had to be a level of cooperation to
35  support the ongoing business at the Port.

36

37    Mike Peneguy indicated that the increase from 20% to 30% was difficult for the
38  Committee to agree to. He also stated that an agreement was not something that we
39  should sign. Also if there is any recovery of lost income, we should share in that.

40

41    The Committee discussed how to handle this and not put it in writing, but accept
42  the checks, acknowledge that they are not in accordance with the agreements  and then
43  do nothing.

44

45    Ms. Norman then stated that the Committee should not set a precedent of
46  accepting less money. This is not a Force Majeur situation. Ms. Norman also suggested
47  that we be provided an accounting of what should have been paid. The figure of 30%
48  needs to be questioned. This is not what Wisner was originally provided in terms of
49  concessions. This agreement was made without our input. We can either accept or sue.
50  Wisner gets a percentage of the revenue collected.

51

52    Ms. Norman has looked at their lease and this issue is not addressed, meaning
53  that the Port can arbitrarily reduce the rentals. The old leases say rentals in the new
54  leases it is all revenues collected. The Caillouett Land Company called to see how Wisner
55  will handle this. Conoco Phillips has agreed to this.

There was a motion to agree to an informal 20% reduction, after speaking to Simon, Peragine. Motion by Dr. Sandra Robinson. Second by Dr. Everett Williams. **Motion passed.**

**New Business Item 4.    Other issues**

Ms. Norman pointed out the escalation of expenses due to the spill.  Also she raised the issue of overtime which can be paid by BP. To date none of this overtime has been paid to Ms. Norman and Ms. Phillips. It can be claimed but has to be paid first. In reality you cannot be reimbursed for something that has not been paid out. In fact all time that is spent on BP should be paid by BP. Ms. Norman gets no overtime since she is salaried although Amanda is paid time and a half. BP should be reimbursing Wisner for all work hours that are spent on the spill.

The Committee then discussed the City's negotiations with BP about the preburtsement claim. They are still in negotiations according to the information received from the City Attorney's office. Wisner's claim is still pending.

There was a discussion about the $2 Billion Feinberg fund. There was a discussion about whether that process will be faster. Current claim with BP seems stuck. If there is no relief within 90 days, Wisner can file suit.

Eventually, BP should pay for all time spent by Wisner employees on the BP spill. This actually will reduce Wisner's payroll.

Payment of overtime was approved on a motion by Dr Everett Williams, second by Ed Buddy. **Motion passed.**

Additionally, there is a need for an ATV for Forrest to traverse the beach. The ATV can be bought by and insured by FET. He will have to buy this and bill Wisner for the vehicle as an oil spill expense. The proposed cost is $14,445.07.

The payment of the invoice for the ATV was approved on a motion by Ed Buddy, second by Dr. Everett Williams. Forrest will be responsible for the maintenance and insurance. **Motion passed.**

The meeting was adjourned at 5 pm on a motion by Dr. Everett Williams, second by Ed Buddy. **Motion passed.**

RESPECTFULLY SUBMITTED BY:

C. Cathy Norman, Secretary Treasurer

AMENDED AND APPROVED AT ___10 / 26 / 10___ MEETING

*DATE*

# MINUTES OF THE MEETING OF THE
# EDWARD WISNER DONATION ADVISORY
# COMMITTEE
## TUESDAY, JULY 27, 2010

**Present:**
Ashleigh Gardere, Chair, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
William Peneguy, Alternate, Wisner Family Heirs
Dr. Sandra Robinson, Representative, Tulane University
Stacey Gerhold-Marvin, Alternate, Charity Hospital
Edward Buddy, Alternate, The Salvation Army

<u>Staff:</u>
C. Cathy Norman, Secretary Treasurer/Land Manager
Dawn Segura, City Attorney's Office
L. Amanda Phillips, Executive Assistant Wisner

<u>Guests:</u>
Mark Peneguy
Scott Elston, Rogers and Elston
Robert Wiygul, Waltzer and Wiygul

Meeting called to order at 12:12 pm. Ashleigh Gardere thanked Michael Peneguy for chairing the past two meetings so that she could learn our meeting process.

## OLD BUSINESS

**OLD BUSINESS ITEM 1.**  **APPROVAL OF THE MINUTES FROM THE APRIL 27, 2010, AND MAY 25, 2010 REGULAR MEETINGS**

Mark Peneguy asked that the April 27, 2010 Minutes be clarified on page 2, line 43 regarding his "request" to be on the Subcommittee. He thought that he was asking if it was appropriate for him to be on the Subcommittee when he was not a member of the Committee.

Michael Peneguy stated that the bill referred to on page 6 as HB 3225 does not exist. Michael Peneguy moved that with Mark's correction and the correct bill number, that the April 27 and May 25 minutes be approved. Ed Buddy seconded. **Motion passed.**

## NEW BUSINESS

**NEW BUSINESS ITEM 1.**  **CITY OF NEW ORLEANS JULY GRANT REQUESTS**

There were no grants for approval at this time. Ms. Norman asked how the Wisner office was to handle grant application requests. Ms. Gardere stated they were to be forwarded to her. She was answering all inquiries as she received them.

Ms. Norman suggested that with the Committee's approval the agenda be altered to allow Scott Elston and then Robert Wiygul to make their presentations first. Michael Peneguy moved that New Business Item 3 be next, followed by New Business Item 4. Ed Buddy seconded. **Motion passed.**

1


EXHIBIT
R
tabbies®

1  NEW BUSINESS ITEM 3.         SCOTT ELSTON – OIL, GAS, AND MINERAL
2                               AUDIT 2006-2008
3
4        Scott Elston passed out pictures of damages done to some of the offshore oil and
5  gas platforms from Hurricane Katrina and the OGM Audit 2006-2008 Report. Mr.
6  Elston did not see any production problems in this report.
7
8        Ms. Norman asked the Committee when we should start the next audit. Mr.
9  Elston asked that he be called in mid-2011 to begin the next audit 2009-2011.
10
11       Michael Peneguy moved that the Audit be accepted. Ed Buddy seconded. **Motion**
12 **passed.**
13
14
15  NEW BUSINESS ITEM 4.         BP HORIZON DEEPWATER SPILL EVENT
16
17        Engagement Letter Outside Counsel –

# REDACTED - ATTORNEY CLIENT
# COMMUNICATIONS, POTENTIAL
21
22     # LITIGATION

32
33

39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61

2





1

5
6

9
10

18
19
20
21

26
27   c
28
29   **Claims Status –**
30
31
32   **Activity on the beach –**

35
36

40   **Impact on campsite and other leases –**
41

48   **Proposal to temporarily increase bank account float to cover**
49   **additional costs – T**

56   Michael Peneguy moved that the float be increased by $34,500. Ed Buddy
57   seconded the motion. **Motion passed.**
58
59   Michael Peneguy made a motion to respond to a written request by the camp
60   owner for rental refund with a written no. Dr. Robinson seconded. **Motion passed.**
61
62   **Moratorium –**

4



17    Michael Peneguy moved that the letter be approved and sent. Ed Buddy seconded
18  the motion. **Motion passed.**

20  **NEW BUSINESS ITEM 2.    SECRETARY TREASURER'S REPORT**

22    The only items in the Secretary Treasurer's Report not included in the agenda
23  were the expense accounts and FETI's invoices.

|  |  |
| --- | --- |
| Amanda Phillips' Expense Account | $44.33 |
| Cathy Norman's Expense Account | 528.10 |
| FETI invoice for BP | 9,185.30 |
| FETI invoice | 3,725.00 |

30    Michael Peneguy moved that the Secretary Treasurer's Report be accepted with
31  the additional invoices and Ms. Phillips' camp report. Ed Buddy seconded the motion.
32  **Motion passed.**

34  **NEW BUSINESS ITEM 5.    MEETING WITH CONOCOPHILLIPS**

36    Last week Ms. Norman and Ms. Phillips visited with ConocoPhillips at their
37  offices in Houma. Kermit Coulon is no longer there. Phil Precht is the new fee land
38  manager. BP and ConocoPhillips signed an access agreement on co-owned property that
39  Ms. Norman did not like.
40    Mr. Precht stated that ConocoPhillips is going to be more involved in coastal
41  restoration issues. He indicated that he would include Wisner in any meetings regarding
42  this. He also asked that Wisner and ConocoPhillips meet quarterly. The next meeting
43  will be in October.

45  **NEW BUSINESS ITEM 6.    FOURCHON BEACH UPDATE, SLBDD**

47    The South Lafourche Beachfront Development District continues to meet and
48  devise its plans. Forest Travirca attended the last meeting on Ms. Norman's behalf.
49  SLBDD wants to pursue BP for $2 million to support it. SLBDD is also discussing zoning
50  issues on Wisner property.
51    Once litigation against BP begins, the beach will be considered a crime scene and
52  the public will be barred.

54  **NEW BUSINESS ITEM 7.    LUMCON UPDATE**

56    Ms. Norman engaged two contractors to look at the LUMCON camp. If another
57  storm comes, the property will be further damaged.
58    EPA is on the property in a trailer, in some type of sublease agreement. LUMCON
59  has rehired Wilton Delaune, the caretaker.
60    The rock covered road leading to the camp has some potholes which the EPA has
61  asked to fill in with rocks.

1   Michael Peneguy inquired as to whether the EPA has an actual sublease.
2   LUMCON says they are not. He asked Ms. Norman to find out the lease terms and send
3   Wisner the money.

**NEW BUSINESS ITEM 8.        CAMINADA HEADLANDS PROJECT
                                SURVEYS**

9   Nothing much to report on this issue. They are acting as if proceeding. Core
10  samples are being taken, which can be used in litigation to show what is going on. It is
11  beneficial to Wisner to have ongoing restoration work occurring during the spill. Wisner
12  can show the direct correlation between the spill and any delays and the data collected.

**NEW BUSINESS ITEM 9.        FINAL LEGISLATIVE UPDATE**

16  Cheryl Teamer submitted the final legislative report. The session lost a little
17  punch because of the spill and the State's economic state. Nothing could be funded. All
18  the oyster related issues passed.
19  Michael Peneguy noted there was a correction on the first page, Senate Bill 1324
20  actually passed and signed by Governor Jindal. It is Act 853. On the third page, House
21  Bill 876 should be House Bill 875.

**NEW BUSINESS ITEM 10.       RENEWAL OF HUNTING LEASE JEFFERSON
                                PARISH**

26  Jefferson Parish has not been affected by the oil spill. Last year's lease was
27  increased 2% from $9,969.48 to $10,168.87. In light of the economic climate and last
28  year's rental increase, it was suggested by Ms. Phillips that the lease be increased by 2%
29  again this year to $10,372.25.
30  Michael Peneguy asked if Mr. Camardelle is still interested in the lease. Ms.
31  Phillips affirmed that he was. Michael Peneguy moved that the lease be renewed and the
32  rental be increased by 2%. Ed Buddy seconded. **Motion passed.**

**NEW BUSINESS ITEM 11.       NEXT MEETING – TUESDAY, JULY 31, 2010
                                12:00 NOON**

37  Ms. Norman requested that a separate subcommittee meeting be held before the
38  next meeting to discuss the office staff and schedules. Ms. Norman is spending most of
39  her time on the spill and not her other duties. Ms. Norman and Ms. Phillips will map out
40  the tasks and needs of the office before the meeting and make a recommendation.
41  Ms. Gardere stated that Tuesdays or Wednesdays were better for her. Ms.
42  Norman suggested that the Committee members only meet on Tuesday, August 24, at 12
43  noon in the Wisner offices. The meeting will cover work schedules, staffing and
44  responsibilities in the office.
45  Michael Peneguy moved that a meeting be set for Tuesday, August 24, 2010, to
46  discuss staffing. Ed Buddy seconded. **Motion passed.**

49  Meeting adjourned at 2:15 pm on a motion by Michael Peneguy, seconded by Ed
50  Buddy. **Motion passed.**

RESPECTFULLY SUBMITTED BY:

C. Cathy Norman, Secretary Treasurer

AMENDED AND APPROVED AT ___10 / 26 / 10___ _____ MEETING
                                *DATE*

6

1   **MINUTES OF THE SPECIAL MEETING OF THE**
2   **EDWARD WISNER DONATION ADVISORY**
3   **COMMITTEE**
4   **TUESDAY, AUGUST 24, 2010**
5
6   **Present:**
7   Ashleigh Gardere, Chair, City of New Orleans
8   Michael Peneguy, Representative, Wisner Family Heirs
9   Dr. Sandra Robinson, Representative, Tulane University
10  Dr. Everett Williams, Representative, Charity Hospital
11  Captain Ethan Frizzell, Representative, The Salvation Army
12  Ed Buddy, Alternate, The Salvation Army
13
14  Staff:
15  C. Cathy Norman, Secretary Treasurer/Land Manager
16  Dawn Segura, City Attorney's Office
17  L. Amanda Phillips, Executive Assistant Wisner
18
19
20          Meeting called to order at 12:10 noon.
21
22
23  **NEW BUSINESS**
24
25  **REDACTED - POTENTIAL**
    **LITIGATION**



30
31

37
38

42
43

46
47

50
51
52
53
54

1

EXHIBIT
S



1

5
6

9
10

14
15
16   **NEW BUSINESS ITEM 3.**      **INCREASED DUTIES OF CURRENT STAFF**
17
18         Captain Frizzell noted that in respect to Ms. Norman's pay, the idea of exempt
19   employees is that there is the unusual week of overage in time; not an ongoing overage.
20   He stated that the Salvation Army would renegotiate jobs in this type of situation.
21
22
23   **NEW BUSINESS ITEM 1.**      **STATUS OF BP CLAIM**
24
25   **REDACTED - POTENTIAL**
**LITIGATION**

29
30

36
37
38
39
40

44
45
46

51
52
53
54
55

63



1

4
5

9
10

17
18
19
20
21

26
27
28   **NEW BUSINESS ITEM 4.**      **STRATEGIES AND PROTOCOLS FOR SPILL**
29                               **OVER SIGHT, CLEAN UP, RESTORATION**
30
31
**32   REDACTED - POTENTIAL LITIGATION,**
**ATTORNEY CLIENT COMMUNICATIONS**
3

38
39

42
43

48

56
57

62
63

3

1 **NEW BUSINESS ITEM 2.    ADDITIONAL STAFFING NEEDS FOR THE**
2                                                   **OFFICE**
3
4        Ms. Norman distributed Ann Burnside's resume. Help is needed in the office. Ms.
5  Burnside is Ms. Phillips' cousin. Ms. Burnside worked for Ms. Norman at CNG
6  Producing 18 year ago. Ms. Burnside was most recently the head of the lease records
7  department at CNG's successor, Eni Petroleum.
8
9        Ms. Gardere and Captain Frizzell asked that Ms. Norman advertize the position.
10 Mr. Peneguy asked if the position would be a contract position.
11
12       Ms. Norman's recommendation is that the position be a part-time, 28 – 30 hour
13 per week employee. Mr. Peneguy wondered if Wisner would have another employee
14 once the BP situation is resolved. Ms. Norman replied we might.
15
16       Dr. Robinson suggested that the hire be provisional. Ms. Norman said it could be
17 a contract position. Captain Frizzell suggested using 90-day contracts.
18
19       Ms. Norman also requested hiring an attorney to work on an hourly rate on some
20 of the other issues Ms. Norman does not have time to address (oyster leases, Dune,
21 property issues, lobbying, South Lafourche Beachfront Development District). Simon
22 Peragine charges $200/hour.
23
24       After discussion of whether or not to hire an attorney, Ms. Norman gave the
25 alternative of hiring a landman on a day rate.
26
27       Mr. Peneguy asked what tasks Ms. Norman wanted Ms. Burnside, or a person in
28 that position, to do. Ms. Phillips and Ms. Norman reviewed the outstanding tasks. Ms.
29 Phillips stated she had worked 19 hours of overtime in the past two-week payroll period
30 and needed help to accomplish all she has to do.
31
32       Ms. Gardere asked if there were deadlines for the legal issues. Ms. Norman said
33 there were not, but there are spill related issues intertwined with ongoing legal issues
34 that arise.
35
36       Mr. Peneguy asked if there were temporary legal services which could be utilized
37 instead of hiring an attorney. He wondered if the 2014 end date to the Donation could
38 inhibit Wisner's ability to employ the best person for the job.
39
40       Captain Frizzell offered assistance with project management and developing
41 timelines. He noted that Wisner was in disaster mode and one can only stay in that and
42 healthy for so long.
43
44       Ms. Norman said she believed a person could be hired on a 1-year contract. Ed
45 Buddy echoed Mr. Penguy's concern and added that the temporary nature of the spill
46 was another factor that should also be disclosed up front. Ms. Gardere added she did not
47 believe it would be a problem, 4 years isn't that short-term.
48
49       Ms. Gardere questioned if the clerical or legal position was being considered. Mr.
50 Peneguy wondered if one person could be hired to do both jobs. Ms. Gardere replied she
51 thought the skill sets for the two jobs were different, but didn't disagree with Mr.
52 Peneguy's point.
53
54       A discussion of possible sources of temporary employees and pending tasks for
55 temporary legal assistance ensued. The merits of hiring someone as a provisional
56 employee were discussed. Mr. Peneguy stated he believed Ms. Burnside was well
57 qualified for the Lease Records position.
58
59
60 **NEW BUSINESS ITEM 3.        INCREASED DUTIES OF CURRENT STAFF**
61
62       Ms. Norman stated that a lot of her salary and Ms. Phillips' wages and overtime
63 would be billed to BP. She didn't see the Lease Records position being funded by BP.

4

1    Wisner's payroll would be substantially reduced given the amount of Ms. Norman's and
2    Ms. Phillips' time that would be reimbursed by BP.

**NEW BUSINESS ITEM 2.    ADDITIONAL STAFFING NEEDS FOR THE OFFICE**

Ms. Gardere suggested that the contract of whoever was hired be written to state that the position might not be retained after the BP spill was resolved. She said that if Ms. Burnside was going to ultimately be hired, then she was unsure if it matters if Wisner advertised the position. She asked that Wisner think more carefully about hiring people going forward.

Mr. Buddy stated he believed should Wisner run an ad, someone more qualified may surface. Ms. Norman agreed that it was a good idea to run an ad. Mr. Buddy suggested running an ad in a Thursday or Sunday paper. Ms. Phillips said Wisner could open a google mail email account to use for blind responses.

Ms. Norman stated the ad would request an oil and gas background, lease records experience, and excellent organizational skills. Dr. Robinson recommended that Wisner give no longer than one week for replies and then to make a decision.

Dr. Robinson asked how much Ms. Norman anticipated an attorney would cost. Mr. Peneguy replied around $200 to $300 per hour.

**NEW BUSINESS ITEM 6.    OUTSIDE COUNSEL**

Ms. Norman interjected that Waltzer and Wiygul were working for Wisner, giving her support without a signed contract. Ms. Gardere replied that she was prepared to make a report, but that was all she could do. Ms. Norman inquired as to when the Mayor might sign the contract.

Ms. Gardere said the Committee had asked several questions. One being what is the City's process for signing documents. It will not be as it was previously, where a document came into the Mayor's office and it was signed. Any contract or agreement that has to be signed by the Mayor will go to the City Attorney's office first. She will review it for form and legality and all that. Ms. Norman asked if that included documents already approved by the Committee. Ms. Gardere replied yes.

Ms. Norman suggested that the Committee alter its process. The documents should go to the City Attorney's office for review before being approved by the Committee. Ms. Gardere thought that was a great idea. She then stated that after documents are reviewed by the City Attorney, they are given to the General Counsel, Richard Cortizas. He will review the documents for policy or whatever. Mr. Cortizas will then take the documents to the Mayor for signature. Ms. Gardere was frustrated because the two leases were signed. She stated that she just needed to send them up.

Ms. Norman asked if the two were the hunting lease and the Marina lease. Ms. Gardere affirmed those were the two.

In regards to the Walzter and Wiygul piece, Ms. Gardere reminded the Committee of the history. Ms. Norman said she had received an email from Nanette Jolivette-Brown waiving conflict on the open lawsuit. Ms. Gardere said Ms. Jolivette-Brown had reviewed the Engagement Agreement, asked lots of questions and said that it was fine.

The City's next question was how does Wisner make agreements with people. Do things have to go to public bid? Even though these are private funds, with the exception of the City's check, how does the City manage this and view it? Ms. Jolivette-Brown and the team, per Ms. Gardere's report, worked through it and said for the purposes of Waltzer and Wiygul and to move it forward; that was fine. Move forward.

5

1    Now the City is stuck with the contingency fee set-up in the contract. It is not
2  something the City does, nor does the City feel comfortable doing it. As far as Ms.
3  Jolivette-Brown was concerned, everything was fine until she saw the contract. It was
4  not what she expected it to be. Ms. Jolivette-Brown has reviewed it and given it to Mr.
5  Cortizas to present to the Mayor and have a conversation. It is not something that can
6  just be signed. The Mayor needs to be asked if he is comfortable moving forward.
7
8    Ms. Gardere was given the commitment that within the next week, hopefully this
9  week that will occur. Ms. Gardere was not willing to commit to a date because it is the
10 Katrina anniversary and the Mayor has many other commitments.
11
12    Mr. Peneguy said the family had also been concerned about the contingency
13 agreement. Waltzer and Wiygul did make changes that made it more palatable to the
14 family. Ms. Gardere stated that in full disclosure, we have a Mayor who is much more
15 attentive and the climate is different. The City wants to be cautious about the things the
16 Mayor signs. She believes this circumstance has been thoroughly vetted, but it is the
17 price of the process.
18
19    Mr. Peneguy requested that the Committee meet with the Mayor and review
20 Wisner. Ms. Gardere replied she knew that at the beginning of this administration an
21 offer was made to the Committee to bring the full weight of the administration and
22 leadership to support Wisner; especially in light of the oil spill, and anything that the
23 City could do. Ms. Gardere believed that the Fund had not responded to that offer. In
24 light of that, Ms. Gardere was willing to test it again.
25
26    Ms. Norman asked Ms. Gardere to repeat herself. Ms. Gardere replied that her
27 understanding was that post-oil spill the City and its leadership offered to support
28 Wisner however it needed: whether it was the relationships with Lafourche or across the
29 board that they might be able to support, especially if they were being difficult with
30 Wisner. She did not know that the Committee ever took the City up on its offer.
31
32    Ms. Norman told Ms. Gardere that she had met with Judy Reese-Morse, Nanette
33 Jolivette-Brown, Andy Kopplin and Jerry Sneed before Ms. Gardere had been hired.
34 They had offered Ms. Norman everything. Any bit of support she could possible need.
35 They said they would invite Ms. Norman to the City's meetings on emergency response
36 and the oil spill. She never heard from them. The only thing heard from Mr. Sneed was
37 his request to Forrest Travirca. He asked Mr. Travirca to go investigate on behalf of the
38 Mayor, on Mr. Travirca's own nickel. Ms. Gardere responded she would bring that back
39 to the City.
40
41    Ms. Gardere inquired if Wisner had made any requests for assistance after that
42 meeting. Ms. Norman replied that Ms. Jolivette-Brown had offered to seek funds for
43 Wisner from BP, but nothing came of that. Wisner continues to pursue reimbursement
44 on its own, so the City's help is no longer needed. Getting Waltzer and Wiygul on board
45 will give Ms. Norman the support she needs with the spill. They are already intervening
46 with the access agreements. They are concerned because they originally met with
47 Wisner in June and still do not have a signed contract.
48
49    Ms. Gardere stated that the things she could share were in her time, the
50 partnerships the City has forged with people have not been just in words. She suggested
51 that the ball got dropped because there was not a clear person representing the City on
52 the Committee. She believes that it is an offer worth exploring.
53
54    Ms. Norman said there were political issues relating to Lafourche Parish which
55 will be enumerated in the meeting next week. She suggested that the Mayor's close
56 relationship with Charlotte Randolph could help. Lafourche Parish is asking BP for $1
57 million for Wisner property and has ideas on how use the funds to develop Wisner's
58 property without Wisner's permission.
59
60    Ms. Gardere replied that in the next month she and Judy Reese-Morse could sit
61 down with Ms. Norman to discuss this.
62

6

1   Ms. Gardere reiterated she wanted to explain the City's process and manage
2   expectations. Ms. Norman noted that in the future Dawn Segura should take all
3   documents the Mayor will sign back to the City Attorney for comment. Ms. Norman
4   asked for comments at the last meeting on the Engagement Agreement. Ms. Norman
5   said the Committee needs the City Attorney's comments before it votes to approve, so it
6   will not slow the Committee's process.
7
8   Mr. Peneguy informed Ms. Gardere that if an agreement has to be sent back
9   through the family for signature, it will be difficult. Ms. Norman explained that usually if
10  it is a 1-year agreement or less, she signs it. If the agreement goes beyond a year or has a
11  magnitude such as the Engagement Agreement, the Mayor signs it. If it is anticipated
12  that the agreement will go beyond 2014, all the beneficiaries sign it.
13
14  Ms. Gardere asked to clarify Waltzer and Wiygul's status. Ms. Norman stated that
15  they are working on an hourly basis right now and Wisner will have to pay for their
16  efforts. The contingency only kicks in when certain things happen, such as a lawsuit.
17
18  Mr. Peneguy said an issue he wants to discuss with the Mayor is the Extension of
19  the Donation. Ms. Gardere said she would take that back to the Mayor.
20
21
22  **NEW BUSINESS ITEM 5.        APPROVAL OF ADDITIONAL OFFICE**
23  **EQUIPMENT TO SUPPORT STAFF**
24
25  Ms. Norman asked for approval to purchase a camera that records GPS data on
26  the photo and an all-in-one laser printer. The camera is necessary for the fieldwork and
27  would be Wisner's equipment. The printer would be for the new hire to use. Ms.
28  Norman stated the camera would be a BP related cost.
29
30  Mr. Buddy made a motion to approve the purchase of the camera and printer.
31  Mr. Peneguy seconded. **Motion passed.**
32
33
34  **NEW BUSINESS ITEM 1.        STATUS OF BP CLAIM**
35
36  Ms. Gardere asked how the claim proceeds would be disbursed. Ms. Norman
37  stated that all the money would be distributed. Ms. Norman reviewed what the estimate
38  for experts was. Waltzer and Wiygul has asked Ms. Norman to meet with the potential
39  experts before Waltzer and Wiygul hires them.
40
41  Mr. Peneguy asked if the paid claim showed a breakout for the payment. Ms.
42  Phillips responded that it did not. She also noted that for the items not paid by the
43  adjuster, BP is reimbursing Wisner. Mr. Peneguy commented that if BP pays us the
44  additional expenses, the only legal claim Wisner will have is for damages to the
45  property.
46
47  Ms. Norman reported she had read that a landowner had filed a suit for overall
48  damages, including punitive damages. Mr. Peneguy mentioned the Federal judge has
49  announced he will consolidate the cases. Ms. Norman believes Wisner is too large and
50  too unique to be consolidated. The Caillouets are charging by the square foot for BP to
51  use a road to access the beach.
52
53  Mr. Peneguy inquired about the Feinburg process. Ms. Phillips explained the new
54  process. She had problems submitting online. The website said Ms. Phillips entered the
55  wrong name and instructed her to call.
56
57  Ms. Gardere stated that the City is Wisner's advocate. She reiterated that Mr.
58  Cortizas had the signed leases. She would make sure the leases were brought to the
59  office. Ms. Norman repeated her request for the City Attorney to get involved in the
60  review process when the documents are presented to the Committee for comment.
61

1       Ms. Norman suggested that a sheet be made to attach to the documents
2   indicating Ms. Jolivette-Brown had reviewed the document; Mr. Cortizas had reviewed
3   the document, so the Mayor would know he could sign.
4
5
6   **NEW BUISNESS ITEM 7.**        **NEXT MEETING – TUESDAY, AUGUST 31,**
7   **2010 12:00 NOON**
8
9       Meeting adjourned at 1:49 pm on a motion by Ed Buddy, seconded by Michael
10  Peneguy. **Motion passed.**
11
12
13  RESPECTFULLY SUBMITTED BY:
14
15
16
17
18  _C. Cathy Norman_
19  C. Cathy Norman, Secretary Treasurer
20
21
22  AMENDED AND APPROVED AT _July 30, 2010_ MEETING
23                              DATE

8

# MINUTES OF THE MEETING OF THE
# EDWARD WISNER DONATION ADVISORY COMMITTEE
# TUESDAY, August 31, 2010

**\*\*\* Please note that there was a recording failure and there is not a record of this meeting. Please advise of any excluded information. \*\*\***

**Present:**

Ashleigh Gardere, Chair, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
W. A. Peneguy, Alternate, Wisner Family Heirs
Dr. Everett Williams, Representative, Medical Center of Louisiana, NO
Dr. Sandra Robinson, Representative, Tulane University
Captain Ethan Frizzell, Representative, The Salvation Army
Ed Buddy, Alternate, Representative, The Salvation Army

Staff:
C. Cathy Norman, Secretary Treasurer/Land Manager
Dawn Segura, City Attorney's Office
Amanda Phillips, Executive Assistant, Wisner

Guest:
Susan Clade, Simon, Peragine, Smith and Redfearn
Mark Peneguy

Meeting called to order at 12:15 pm.


## OLD BUSINESS

**OLD BUSINESS ITEM 1.**      **Approval of Minutes from the Regular Meeting Held on July 27, 2010**

The July minutes were not finalized at the time of the meeting.


## NEW BUSINESS

**NEW BUSINESS ITEM 1.**      **City of New Orleans May Grant Requests**

There were no grant requests proposed by the Mayor for funding.


**NEW BUSINESS ITEM 2.**      **Secretary Treasurer's Report**

Includes invoices:

| | |
|---|---|
| Cathy Norman, Exp. Act. | $ 788.25 |
| L. Amanda Phillips, Exp. Act. | $ 121.37 |

1



| | | |
|---|---|---|
| 1 | FET | $3409.76 |
| 2 | FET (BP) | $8810.79 |
| 3 | | $9259.30 |
| 4 | | $8599.50 |
| 5 | | $8963.48 |
| 6 | | $9460.71 |
| 7 | Simon Peragine (Dune) | $ 800.00 |
| 8 | Simon Peragine (General) | $1100.31 |

9
10          There were several articles presented to the Committee about
11   the oil spill including one on oil eating microbes and skimmers for the
12   beach. There was also information about the Cenac case, which is back in
13   the Attorney General's office. It concerns the ownership of and public use of
14   a private canal.
15
16          Amanda Phillips gave a report on the campsite leases and surface
17   leases. The Bankston group has relinquished their site on Highway One due
18   to erosion. Their other fishing leases were reduced in cost to account for the
19   3 months it was unusable due to the oil spill.
20
21          The office float was increased by $34,350 as approved at the Special
22   meeting. These funds will be added back for distribution once the oil spill
23   related expenses are reduced.
24
25          The Wisner Wildlife Management area is still being promoted by the
26   Department of Wildlife and Fisheries as an active preserve open to the
27   public. The Committee recommended sending emails and/or letters to the
28   websites requesting the Wisner WMA be removed from the sites within 30
29   days. If no action is taken have Simon Peragine send a demand letter.
30
31          The report included a letter to Stone Energy demanding payment of
32   their rental due July 12, 2011. With late fees the amount now due is $19,722.
33
34          There was also information about the annual rental due for the
35   Chevron Surface Lease. Chevron had been using an incorrect CPI index to
36   fix the annual increases over the past three years. This resulted in an over
37   payment that needs to be corrected. There was no escalation in 2009 and
38   there is a small (1.05%) increase for 2010. Hopefully all of these errors will
39   be corrected by Chevron in the upcoming payment.
40
41          Most of the topics discussed in the Secretary Treasurer's report will
42   also be covered in the agenda.
43
44          The Secretary Treasurer's Report including invoices and the campsite
45   report was approved on a motion by Michael Peneguy and a second by
46   Everett Williams. **Motion approved.**
47
48
49   **NEW BUSINESS ITEM 3.        BP Horizon Deepwater Spill Event**
50
51          Wisner received the first check from the Greater Lafourche Port
52   Commission reflecting a reduction in income due to the drilling/permit

2

1    moratorium. Ms. Phillips will contact James Rome with the Port about a
2    claim for losses as a result of the moratorium.
3        Ms. Norman reported that the cleanup effort continues with more
4    buried oil being found on the beach and heavy oil mats discovered in the
5    near shore areas during low tides. Ms Norman constantly receives calls
6    from "snake oil salesmen," who claim to have solutions for oiled property
7    and techniques that need to be tested and marketed. There have been
8    several meetings with the Unified Command that have included Wisner.
9
10        The BP Access Agreement was finally signed. The agreement requires
11    that BP account for every person on the beach, keep Wisner informed and
12    provide Wisner with all science and information that they collect during
13    the spill response and clean up.
14
15        After much run around, a partial claim check was paid by BP
16    ($139,208.08) the week before the 90 day window that Wisner has to file
17    suit if the claim is not paid. The payment gave little information about
18    what was paid and Ms. Norman met with BP at the Unified Command
19    Center in Houma to discuss the balance due. They agreed to pay the
20    additional amount but to date the check has not been received. They also
21    referred Wisner to the new GCCF process for future claims. Ms. Phillips
22    and Ms. Norman have already registered with GCCF, however the process
23    was less than easy. There were problems with the spelling of Wisner's
24    name which generated a new claim number.
25
26        Lafourche Parish has hired outside counsel to represent them as
27    needed for the spill.
28
29        Wisner will continue to be represented by Simon Peragine to work on
30    ordinary legal issues other than BP. The engagement of outside counsel by
31    Wisner for the spill is critical. To date the engagement agreement has not
32    been executed by Mayor Landrieu. There is a need for experts and
33    assistance with the current response. Delays could have long term effects
34    on the lawsuit and future claims.
35
36        The City Attorney waived the conflict that Waltzer and Wiygul had
37    with the City of New Orleans in an email dated July 7, 2010. Concerns
38    about the contingency fee have been reviewed by the Committee. Ashleigh
39    Gardere indicated that Wisner "waived" the public bid process and that the
40    Mayor needed to fully understand the engagement contract before signing
41    it, but that it would happen that week.
42
43
44    **NEW BUSINESS ITEM 4.   Wisner Beach Update – SLBDD**
45
46        Ms. Norman shared with the Committee a letter from the Louisiana
47    Wildlife Federation to Governor Jindal, referencing the proposed State
48    Seashore concept. There is no mention of the private ownership of the
49    property involved.
50
51        Ms. Norman attended the SLBDD meeting and there was a
52    presentation by Cheryl Brodnax of NOAA about the West Belle Pass
53    restoration project (a CWPPRA project). The current issues with that

1   project are insuring that the beach is clean enough to build the project and
2   whether the source sediments are free of contamination. The sediments are
3   coming from a shoal 15 miles west of the project in Timbalier Bay.
4
5       At the meeting the Commission members also mentioned the hard
6   structures on the beach and the Hesco Baskets. They were interested in
7   whether all of these structures would remain in place after the spill.
8
9
10  **NEW BUSINESS ITEM 5.   LUMCON Update**
11
12      Ms. Norman continues to investigate the reopening of the LUMCON
13  facility. She received word that EPA had a verbal agreement to sublease
14  the facility for a few months during the spill response. Amanda Phillips has
15  requested a copy of the invoice from EPA. This subleasing would be a
16  clear violation of the existing lease with Wisner. EPA has requested that
17  the road to the facility be repaired. The property itself continues to
18  deteriorate as a result of the recent storms and need to be repaired as soon
19  as possible.
20
21
22  **NEW BUSINESS ITEM 6.     Caminada Headlands Project and West**
23  **                          Belle Pass Restoration Project**
24
25      The West Belle Pass project was covered in Item 4. The Caminada
26  Headlands project appears to be stalled. Ryan Hearn is the State Project
27  Manager. Taylor Engineering is the firm designing the project. Ms. Norman
28  discussed that Taylor Engineering has collected a great deal of data on the
29  project over the years. There was a discussion about trying to get copies of
30  all the data on the project.
31
32      A motion was made by Captain Frizzell to make a significant effort
33  to get as much information as possible from Taylor Engineering related to
34  the project. There was a second by Dr Williams. **Motion passed.**
35
36
37  **NEW BUSINESS ITEM 7.     Website Development for Wisner**
38
39      The Committee had a discussion about obtaining domain names and
40  working towards the development of a website for Wisner. Ashleigh Gardere
41  cautioned that it might increase the possibility of public scrutiny. A
42  discussion ensued concerning Wisner's "brand identity." Captain Frizzell
43  indicated that Godaddy.com would be a good place to begin. The proposal
44  concerned securing the following web site addresses for three (3) years:
45  wisnerdonation.org, .net, .info, and .com. The idea of a web site was
46  discussed however, due to time constraints, the Committee discouraged that
47  idea for the time being.
48
49      There was a motion by Michael Peneguy to proceed to purchase the
50  domain names and park them. Second by Dr. Sandra Robinson. **Motion**
51  **passed.**
52
53

1 **NEW BUSINESS ITEM 8.    Staffing Issues Update**
2
3     The position for a lease records administrator was advertised as
4 requested. There were approximately 35 resumes received with no
5 candidates having the all of the skills set, knowledge, and abilities as Ms.
6 Ann Burnside. The Committee discussed offering Mrs. Burnside a part time
7 position for 90 days on a contract basis. The Committee then discussed
8 hiring a second individual at a high skill level for 30 days or so. This would
9 be to relieve some of the pressure on Ms. Norman and Ms. Phillips who are
10 putting in overtime as a result of the BP spill. While Ms. Phillips is paid
11 overtime as an hourly employee, Ms. Norman is not.
12
13     Captain Frizzell, with The Salvation Army, indicated that during a
14 crisis situation, their employee contracts are sometime renegotiated for their
15 exempt employees. Ms. Norman and Ms. Phillips were asked to leave the
16 meeting while the Committee discussed the BP situation and the current
17 staffing issues.
18
19     When the full meeting resumed, the Committee indicated that the
20 crisis situation in the office had come across loud and clear and that the
21 current situation was unusual and required some changes to the staffing of
22 the office and the current compensation. The proposal was outlined by Susan
23 Clade from Simon, Peragine. Ms. Burnside would be hired as indicated. Ms.
24 Norman and Ms. Phillips would continue to track their time spent on BP
25 matters. They would each be paid double their current hourly rate for BP
26 time effective immediately and retroactive to the last claim paid. All BP time
27 would continue to be submitted to BP for reimbursement.
28
29     When Ms. Clade finished summarizing the Committee's findings,
30 there was a motion by Dr. Sandra Robinson to hire Ann Burnside, part time
31 for 90 days at $35 per hour; to double Ms. Norman and Ms. Phillips'
32 compensation for BP Spill related hours which will be included in the BP
33 claim; to make the BP spill increased rate retroactive to the July 25, 2010.
34 There was a second to the motion by Michael Peneguy. **Motion passed.**
35
36
37 **NEW BUSINESS ITEM 9.    Proposed Field Trip to Spill Area for**
38                                          **Committee Members**
39
40     Ms. Norman indicated that she would like the Committee Members to
41 tour the spill area to increase their awareness of the impact that the spill has
42 had on the property. She stated that she could only take two members at a
43 time and that it might be on short notice. She would send out emails with
44 potential dates.
45
46
47 **NEW BUSINESS ITEM 10.    Next Meeting – Tuesday, September 28,**
48                                         **2010, 12:30 PM**
49
50     Motion was made to adjourn at 2:30 by Michael Peneguy, second by
51 Sandra Robinson. **Motion passed.**
52
53

1   RESPECTFULLY SUBMITTED BY:
2
3
4
5
6
7   C. Cathy Norman, Secretary Treasurer
8
9
10  AMENDED AND APPROVED AT $\underline{4 \cdot 26 - 2011}$ MEETING.
11                        DATE

6

# MINUTES OF THE MEETING OF THE
# EDWARD WISNER DONATION ADVISORY
# COMMITTEE
# TUESDAY, SEPTEMBER 28, 2010

**Present:**
Ashleigh Gardere, Chair, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
William Peneguy, Alternate, Wisner Family Heirs
Dr. Sandra Robinson, Representative, Tulane University
Stacey Gerhold-Marvin, Alternate, Charity Hospital
Captain Ethan Frizzell, Representative, The Salvation Army

<u>Staff:</u>
C. Cathy Norman, Secretary Treasurer/Land Manager
Dawn Segura, City Attorney's Office
L. Amanda Phillips, Executive Assistant Wisner
Judy Reese Morse, Mayor's Office
Nanette Jolivette-Brown, City Attorney

<u>Guests:</u>
Mark Peneguy
Susan Clade, Simon Peragine
Joel Waltzer, Waltzer and Wiygul

Meeting called to order at 12:26 pm. Judy Morse announced that she, Ms. Jolivette-Brown and Ms. Gardere had a 12:45pm meeting and would not be able to stay. Ashleigh Gardere asked Michael Peneguy to chair the meeting. She then asked Ms. Morse to give a report on the previous day's meeting between Ms. Morse, Ms. Jolivette-Brown, Mayor Landrieu, Mr. Cortizas, Ms. Gardere, an unidentified male and Ms. Norman.

Ms. Morse related her version of events. She suggested that an agenda be set that all parties agree upon and a meeting set to discuss the agenda.

Ms. Morse, Ms. Jolivette-Brown and Ms. Gardere departed the meeting.

Dr. Sandra Robinson moved that Michael Peneguy would chair the meeting in Ms. Gardere's absence. Captain Frizzell seconded. **Motion passed.**

## OLD BUSINESS

**OLD BUSINESS ITEM 1.**          **APPROVAL OF THE MINUTES FROM THE
                                   JULY 27, 2010 REGULAR MEETING, AND
                                   JULY 1, 2010 EMERGENCY MEETING**

Michael Peneguy suggested that since these minutes were given out today, that the Committee postpones approving them until the next meeting. This would give the Committee time to review the minutes. Dr. Robinson moved to postpone approval of the minutes of the July 27 Regular Meeting and the July 1 Emergency Meeting until the October meeting. Captain Frizzell seconded. **Motion passed.**

## NEW BUSINESS

**NEW BUSINESS ITEM 1.**          **CITY OF NEW ORLEANS JULY GRANT
                                   REQUESTS**

1



1   As there was no City of New Orleans representative at the meeting, it was
2   assumed there were no grants to be approved.
3
4
5   **NEW BUSINESS ITEM 2.        SECRETARY TREASURER'S REPORT**
6
7   The BP Oil Spill expenses were summarized. Ms. Norman reported that the Gulf
8   Coast Claims Facility (GCCF) rejected Wisner's claim on the basis that it was a
9   governmental claim. Ms. Norman spoke with the governmental claims office. The lady
10  there stated Wisner was not a government entity, this she knew because she knew the
11  Wisner claim. She told Ms. Norman to contact the GCCF via email (this is their process).
12  Ms. Norman did. She has not heard from them.
13
14  Ms. Clade returned from escorting out the City's group. Ms. Clade reported that
15  the City said their intent was to meet with Cathy first as a courtesy and then to request a
16  meeting with the entire Committee. They meant it to identify the issues to discuss; then
17  a meeting with the Mayor and the whole Committee.
18
19  Ms. Norman shared her version of yesterday's meeting. In the meeting, Richard
20  Cortizas supported Mayor Landrieu's assertion that public funds were involved in
21  Wisner with the free office space and two free parking spaces Wisner has at City Hall.
22
23  Discussion ensued regarding whether the offices should remain in City Hall. Ms.
24  Norman suggested the Committee be given a letter by the City inviting Wisner to stay in
25  City Hall and stating that the public funds aspect of it would never be used against
26  Wisner. Dr. Robinson stated that since the question has come up that Wisner should
27  move. Captain Frizzell suggested that Wisner state to the Mayor that we understand the
28  importance of public transparency and that it is and has been important to Wisner as
29  well.
30
31  A discussion arose as to the documents that remain in the Mayor's office without
32  signature. Ms. Norman mentioned that the City does not answer emails. It was debated
33  as to whether the minutes should reflect the individual representatives' actual votes. It
34  was decided as that a majority vote carries, the entire Committee is committed and the
35  entity the individual represents is committed regardless of the individual's vote that
36  individual votes would not be recorded.
37
38  Ms. Norman's expense account was not available for the meeting. Invoices were
39  high because of BP. There is a claim pending for $111,000. FET is being paid partial
40  payments until BP pays Wisner. FET's outstanding balance was included so that if
41  Wisner is paid before the next meeting, the balance can be paid to FET.
42
43  Entergy has requested access to do some work on the line in Lafourche Parish.
44  The map they sent shows the now defunct Wisner Wildlife Management Area. Ms.
45  Norman will have to meet with them to ensure they know they have to work with Wisner
46  and not the State in this area. The work is scheduled to begin in November. This will be
47  more work that someone will need to oversee. We have recent low level photography
48  already, so they may pay for post-project low level photography. If so, we will be able to
49  document any damages and possibly get mitigation for damages.
50
51  Chevron is doing some work. Caillouet Land Corporation has asked to extend its
52  permit to build its marina. Bob Marshall had a great article on the front page of the
53  Sunday paper which featured Forrest Travirca.
54
55  Ms. Norman will email out her expense report amount. Captain Frizzell moved to
56  approve the invoices upon receipt of Ms. Norman's emailed expense report. Stacey
57  Gerhold-Marvin seconded. **Motion passed.**
58
59
60  **NEW BUSINESS ITEM 3.        BP HORIZON DEEPWATER SPILL EVENT**
61  ***Current Response and Condition of the Property*** – Since the last
62  meeting Ms. Norman was on the property for the night operations. There were 265

2

1  people working on the beach at night. Close to 400 people were working during the day.
2  There was an incredible amount of oil on the beach after particularly bad weather.
3
4      While Ms. Norman was on the beach with Joel Walzter and Robert Wiygul, she
5  encountered Farley Burge, one of BP's attorneys. She believes he is now well educated
6  on the huge extent of our land, our response to the spill and our engagement.
7
8      ***Engagement Letter Outside Counsel*** – Ms. Norman brought another copy
9  of the Engagement Letter and of a Resolution from the meeting authorizing the
10  engagement of Walzter and Wiygul. Ms. Norman wanted to verify the Committee's
11  position on hiring Walzter and Wiygul. They have already been approved and are doing
12  excellent work.
13

# REDACTED - ATTORNEY CLIENT COMMUNICATIONS



3

1     Ms. Gerhold-Marvin moved to resolve for Ms. Norman to sign the Engagement
2  letter. Dr. Robinson seconded. **Motion passed.** There was no objection by Captain
3  Frizzell.
4
5     Captain Frizzell moved that as a Committee they recognize the need to work with
6  the City in order to resolve this BP Incident MC 252 crisis at hand, in order to
7  communicate in a way that is mutually beneficial to all five beneficiaries listed and gets
8  back in regular process and working order. Recognizing the need to work with the City
9  in the earliest manner to resolve this crisis situation and how to process crisis
10 movements in the overall process of the Donation itself. Dr. Robinson seconded.
11 **Motion passed.** Captain Frizzell asked that it remain an agenda item until resolved.
12
13    Captain Frizzell motioned to go into Executive Session. Ms. Gerhold-Marvin
14 seconded. **Motion passed.**
15
16    Upon exiting Executive Session, Captain Frizzell asked the record to reflect his
17 motion that Committee acknowledge the position of Wisner on the side of having a
18 culture and personality of historically supporting research and allowing research on the
19 property and that this carry forward in this time of the BP Spill. And that is reflected in
20 the past by all the research we have allowed on the property as well as LUMCON being
21 situated on the property gratuitously.
22
23
24 **NEW BUSINESS ITEM 4.       WISNER BEACH UPDATE SLBDD**
25
26    This property is now under the Federal microscope as a result of the spill and the
27 Endangered Species Act. They will never get Federal money for this project. Ms.
28 Norman continues to attend the meetings.
29
30
31 **NEW BUSINESS ITEM 5.       LUMCON UPDATE**
32
33    Ms. Norman and Ms. Phillips saw the aerial photography for the BP Spill. It
34 showed the damage around the LUMCON camp. Wisner will be able to attach a
35 photograph of the damage to a letter to LUMCON. Ms. Norman requested three bids. To
36 date no one has responded. The priority is to repair the property.
37
38
39 **NEW BUSINESS ITEM 6.       GREATER LAFOURCHE PORT COMMISSION**
40 **                            ECONOMIC DEVELOPMENT GRANT**
41
42    The Port receives a lot of money to build roads and Port priority funds to develop
43 the Port. This was a grant for road improvements in Port Fourchon. It is an interior road
44 that will contact our property, create access for development and increase Wisner's
45 revenue. They have gotten these grants in the past. Because it is on co-owned property
46 Wisner is being asked to co-sign.
47
48    Ms. Norman sent an email to all Committee members. She heard from three
49 members who authorized Ms. Norman to complete and sign the form. There was a lot of
50 pressure to move quickly on this.
51
52    Wisner has received information regarding the reduced rentals during the
53 moratorium period. Ms. Phillips discussed whether the Port was going to file a claim
54 with the Baton Rouge Foundation rig worker fund. The Port was undecided as to how to
55 proceed. Bryce Autin, volunteered that the Port would share any revenues received.
56
57
58 **NEW BUSINESS ITEM 7.       CHEVRON TANK FARM AND SUB-SURFACE**
59 **                            LEASE RENTALS**
60
61    Ms. Norman contacted Thomas August when the annual check had not arrived.
62 Mr. Thomas responded that they had audited their payments and found the same
63 mistake we had. They calculated the same amount of overpayment. The check received

4

1   for this year was $250,112.99, which included an overpayment of $14,085.06 for the
2   past three years.
3
4        The NORM lease was due September 1st. It is in the mail. They are unable to
5   calculate the amount due until mid-September when the August CPI is released. The
6   lease gives them until October 15 to pay.
7
8
9   **NEW BUSINESS ITEM 8.        STAFFING ISSUES UPDATE**
10
11       Ann Burnside began on September 20. She is working on the document retention
12  plan, organizing files, scanning documents in, helping with any litigation needs and
13  anything else needed in the office.
14
15
16  **NEW BUSINESS ITEM 9.        FEMA INQUIRY INTO LAFOURCHE CAMPS**
17
18       Ms. Phillips met with two FEMA employees. Most of our property in Fourchon is
19  in a Coastal Barrier Resource Area (CBRA). In 1990 FEMA hand drew lines around
20  communities which were in repetitive loss areas. The areas outside the lines are not
21  given any Federal funding whatsoever in an attempt to reduce repetitive losses. FEMA is
22  reassessing the CBRA areas. With newer technologies, they are now able to better
23  delineate those areas.
24
25       As a result, they are auditing their old maps. Mr. Dutton and his associate met
26  with Ms. Phillips to determine if camps which show on the aerial photography outside of
27  the CBRA boundaries should be inside the boundaries. They are going to share any
28  maps created with Wisner in appreciation for the information we shared with them.
29
30       Ms. Phillips showed them the SLBDD's Strategic Plan. She asked if the Port
31  would be able to build the roads in this development. They stated that the Port would
32  lose its Federal grants if it used any funds to develop the beach, a CBRA area. Private
33  funds could be used and it could be privately self-insured, but there could be no federal
34  funds or insurance. Mr. Dutton's associate was going to walk a copy of the plan to
35  FEMA's environmental arm. The Endangered Species Act would be Wisner's greatest
36  weapon against the development threat.
37
38       They suggested that the Louisiana Land Trust could be a potential money source.
39  Ms. Norman noted that she had heard at the last SLBDD meeting Randy Lanctot was
40  looking at using offshore royalty funds. These would be federal funds as well.
41
42
43  **NEW BUSINESS ITEM 10.       STATE LANDS OFFER TO SELL TRACT**
44                                **ADJACENT TO WISNER LANDS**
45
46       The State Land Office contacted Ms. Norman and offered this tract to Wisner.
47  She did not discuss the mineral rights with them, but believes the minerals were
48  retained by the previous owner. This tract was set up as a mitigation site. The
49  Department of Wildlife and Fisheries was relinquishing it. Ms. Norman didn't believe
50  this was the appropriate time to discuss Wisner purchasing it.
51
52
53  **NEW BUSINESS ITEM 11.       SELECT DATES FOR COMMITTEE MEMBERS**
54                                **TO VISIT SPILL AREA**
55
56       Ms. Norman will email the Committee members each time she goes to Fourchon
57  to give them the opportunity to see the spill site. There are fewer people working on the
58  property now. She would prefer to take two people at a time. It is more comfortable in
59  the ATV with four people. It may be during the weekend as well.
60
61
62  **NEW BUISNESS ITEM 12.       NEXT MEETING – TUESDAY, OCTOBER 26,**
63                                **2010 12:00 NOON**

5

Meeting adjourned at 3:00 pm on a motion by Stacey Gerhold-Marvin, seconded by Dr. Sandra Robinson. **Motion passed.**

RESPECTFULLY SUBMITTED BY:


C. Cathy Norman, Secretary Treasurer


AMENDED AND APPROVED AT  4·26·2014  _____ MEETING
                         *DATE*

6

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY
COMMITTEE
TUESDAY, OCTOBER 26, 2010

**Present:**
Michael Peneguy, Representative, Wisner Family Heirs
William Peneguy, Alternate, Wisner Family Heirs
Dr. Sandra Robinson, Representative, Tulane University
Dr. Everett Williams, Representative, Charity Hospital
Stacey Gerhold-Marvin, Alternate, Charity Hospital
Captain Ethan Frizzell, Representative, The Salvation Army
Ed Buddy, Alternate, The Salvation Army

Staff:
C. Cathy Norman, Secretary Treasurer/Land Manager
Dawn Segura, City Attorney's Office
L. Amanda Phillips, Executive Assistant, Wisner
Ann Burnside, Lease Records Administrator, Wisner

Guests:
Mark Peneguy
Joel Waltzer, Waltzer and Wiygul

Meeting called to order at 12:20 pm.

Ed Buddy moved that Michael Peneguy would chair the meeting in Ms. Ashleigh Gardere's absence. Dr. Everett Williams seconded. **Motion passed.**

**NEW BUSINESS ITEM 3.        BP HORIZON DEEPWATER SPILL EVENT**

Dr. Williams moved that Agenda Item 3. BP Horizon Deepwater Spill Update moves to the top of the agenda and that the Committee enter into Executive Session to discuss this agenda item. Capt. Ethan Frizzell seconded. **Motion passed.**

Capt. Frizzell moved that the Committee exit Executive Session. Dr. Robinson seconded. **Motion passed.**

Capt. Frizzell moved that the Committee increase the float to $100,000 when the next BP reimbursement is made and then revisit the need for the increased float in 3 months. Dr. Robinson seconded. **Motion passed.**

**OLD BUSINESS**

**OLD BUSINESS ITEM 1.        APPROVAL OF THE MINUTES FROM THE
                              JUNE 15, 2010 SPECIAL MEETING, AUGUST
                              31, 2010 REGULAR MEETING AND
                              SEPTEMBER 28, 2010 REGULAR MEETING**

The August 31, 2010 Regular Meeting Minutes were not ready in time for the meeting. There was an issue with the recorder for the August meeting and Ms. Norman is piecing the minutes together.

Ms. Norman informed the Committee that in the process of doing the audit for 2009, it was discovered that the April 28, 2009 Regular Meeting Minutes had not been done. These were in the packet. The July 27, 2010 Regular Meeting Minutes and the July 15, 2010 Emergency Meeting Minutes had been distributed at the last meeting. The

1



1    Committee was asked to make comments on these. The June 15, 2010 Special Meeting
2    Minutes and September 28, 2010 Regular Meeting Minutes were also in the packet.
3
4        Dr. Williams moved to approve the minutes of the June 15, 2010 Special Meeting,
5    the July 1, 2010 Emergency Meeting and the July 27, 2010 Regular. Captain Frizzell
6    seconded. **Motion passed.**
7
8
9    **OLD BUSINESS ITEM 2.        APPROVAL OF THE JULY EMERGENCY**
10    **MEETING AND THE JULY REGULAR**
11    **MEETING MINUTES THAT WERE HANDED**
12    **OUT AT THE SEPTEMBER MEETING**
13
14        Michael Peneguy suggested that the minutes for the April 28, 2009
15    Regular Meeting and the September 28, 2010 Regular Meeting be postponed. Ms.
16    Norman asked the Committee to email any comments on the April 28, 2009 Regular
17    Meeting minutes to Ms. Norman. If no one responded by next week, then the minutes
18    were approved. The auditor needs the minutes to complete the audit.
19
20
21    **NEW BUSINESS**
22
23    **NEW BUSINESS ITEM 1.        CITY OF NEW ORLEANS OCTOBER GRANT**
24    **REQUESTS**
25
26        As there was no City of New Orleans representative at the meeting, it was
27    assumed there were no grants to be approved.
28
29
30    **NEW BUSINESS ITEM 2.        SECRETARY TREASURER'S REPORT**
31
32        BP matters were covered in the Executive Session.
33
34        Invoices:
35        Amanda Phillips, Expense Account            $65.39
36        C. Cathy Norman, Expense Account            288.75
37        Simon Peragine (General Matters)            4,725.59
38        Simon Peragine (General Matters)            8,048.15
39        Simon Peragine (General Matters)            950.00
40
41
42        Ms. Norman included a letter from the Louisiana Wildlife Federation (LWF)
43    which was attached to a fundraising letter from the Coalition to Restore Coastal
44    Louisiana (CRCL). The LWF letter touts the State Seashore Concept. Ms. Norman will
45    send CRCL a letter elucidating the contradictory goals of the LWF and the CRCL.
46
47        Ms. Norman included a variety of articles including ones on the moratorium
48    being lifted, the National Guard troops going home after building the berm on Wisner's
49    property, and the offshore revenue sharing allocations. The State of Louisiana and the
50    coastal parishes only received $222,725 from offshore energy production in 2009. In
51    2010 only $56,000 will be shared. That is an average of $3,000 per coastal parish.
52    Inland states get up to 90% of revenue from production on federal lands.
53
54        Forrest Travirca did work on behalf of the City in Plaquemines Parish and sent
55    Ms. Norman an invoice for it ($1,157). It was also forwarded to Jerry Sneed. Mr. Sneed
56    told Mr. Travirca to bill it to BP with Wisner's other bills. Ms. Norman refused to claim
57    something on Wisner's claim that was not done for Wisner. Mr. Sneed is not responding
58    to Mr. Travirca's emails regarding this invoice. Michael Peneguy asked Ms. Norman to
59    send the City a letter asking them to pay Mr. Travirca.
60
61        Mark Peneguy noted that the Secretary Treasurer's Report should be dated
62    October and not August. The meeting with Unified Command's date should be
63    September and not October.

2

1    Dr. Robinson moved to approve payment of the invoices and expense accounts
2 and the Secretary Treasurer's Report. Dr. Williams seconded. **Motion passed.**
3
4
5 **NEW BUSINESS ITEM 4.        WISNER BEACH UPDATE SLBDD**
6
7    Ms. Norman discovered at the latest SLBDD meeting that members of the
8 SLBDD have been going on the beach. Ms. Norman sent an email advising them that
9 there needs to be some sort of access agreement or a notification process so that they
10 can be escorted onto the property during this time. She reminded the SLBDD that they
11 had not come to terms for an access agreement this past summer.
12
13    Apparently Charlotte Randolph had arranged a beach visit with State Trustees,
14 BP, the Department of the Interior, Cullen Curole (who designed their plan), and Loulan
15 Pitre to discuss Parish Claims for the SLBDD last Thursday. Ms. Norman demanded
16 that she and either Mr. Waltzer or Mr. Wiygul are included in the meeting. Loulan
17 Pitre's father died so the meeting has to be rescheduled.
18
19    Cam Morvant, Lafourche Parish DA, is representing the Louisiana Department of
20 Wildlife and Fisheries for the State's claim for birds and wildlife. Lafourche Parish
21 retained Walter Leger to represent the Parish's claims. Lafourche got $1 million to
22 reimburse them for the police officers and equipment they had to buy. There was a
23 $2,500 deductible on the $245,000 front-end loader Lafourche lost on the beach, which
24 will be paid with the BP money.
25
26    Capt. Frizzell asked if Wisner could ask Lafourche Parish to share their plan for
27 their claim with Wisner in as far as it relates to Wisner property in exchange for entering
28 the property, as is required of others. The SLBDD's plan adds potential value to our
29 property in our BP claim. It makes Wisner Beach more comparable to Florida's
30 property.
31
32    Mark Peneguy expressed his concern that if SLBDD gets the money for this plan
33 that the SLBDD will try to expropriate this property.
34
35
36 **NEW BUSINESS ITEM 5.        LUMCON UPDATE**
37
38    Ms. Norman received one quote out of three requested. It was for $238,500. She
39 will ascertain the status of LUMCON's FEMA claim. There is a tremendous amount of
40 land loss. LUMCON asserts they have never received any FEMA money to fix it. Ms.
41 Norman awaits two more quotes.
42
43    After getting the quotes, Ms. Norman will send a demand letter insisting
44 LUMCON either makes the repairs or Wisner will and then take the property back.
45
46    LUMCON reopened after the spill and is operational.
47
48    Michael Peneguy requested that Wisner require that 2x12's be attached to the top
49 of the bulkhead and it be treated with Thompson's water seal. If Ms. Norman is having
50 trouble getting more quotes, the contractor he used for his bulkhead is willing to give a
51 quote.
52
53
54 **NEW BUSINESS ITEM 6.        RENEWALS: CAMPSITE AND OYSTER**
55 **                                                LEASES**
56
57    Ms. Phillips asked that in light of current economic conditions the rentals remain
58 stable in Jefferson and St. John the Baptist Parishes at $650/year. She spoke with the
59 Park Service. They are not raising their rates this coming year. At a past meeting Capt.
60 Frizzell suggested that Wisner give some consideration to the camp owners in Lafourche
61 Parish. While the camp owners can get to their camps, they cannot enjoy them fully. Ms.
62 Phillips proposed a $50/year reduction on wholly owned property and $25/year on co-
63 owned property.

3

All the oyster leases were in Area 13. This area was closed for 155 days due to the spill (42.47% of the year). It is proposed that a reduction of 42.47% be given to this year's rental as the leases are pre-paid. The lessees will be informed this is a one-time reduction and the lost revenue will be submitted to BP for reimbursement.

Capt. Frizzell believes this is the responsible thing for Wisner to do. Dr. Robinson asked if any of the camp owners or oyster lessees had been reimbursed by BP. Mark Peneguy said he knew that there would be those who will double dip, but he thought we should do this.

Dr. Robinson moved to keep the Jefferson and St. John the Baptist Parishes campsite rentals at $650/year (50' x 100' lot); to reduce the Lafourche Parish campsite rentals on wholly owned property by $50/year and on co-owned property by $25/year; and to charge $2.60/acre for the oyster leases. Capt. Frizzell seconded. **Motion passed.**

Capt. Frizzell recommended that this motion be recorded on our one sheet summaries for future reference to show the Board's compassion.

**NEW BUSINESS ITEM 7.      PROPOSED AGENDA FOR MEETING WITH MAYOR LANDRIEU AND STAFF**

Ms. Norman has yet to receive a response to the October 14, 2010, memo to Ashleigh Gardere. Ms. Norman sent an email yesterday to Ms. Gardere asking who would be attending for the City. There was no response.

Mark Peneguy noted that Dawn Segura was not present as a representative for the City but in her capacity as a City Attorney.

Capt. Frizzell requested that Ms. Gardere be sent a letter respectfully asking if today was a conflict of schedule or a choice to not be here so that the Committee can know and move forward accordingly.

A copy of the letter sent by Simon Peragine was distributed. It asks the City to move forward and points out over the past ten years the City has received close to $12 million and operating expenses have averaged 8.5%.

Michael Peneguy mentioned that the GLPC Marina Lease has not been returned. Ms. Norman replied that there are some other pending agreements that will need to be signed. Which is the reason she added "The need for an expeditious document review and signing by the City" to the proposed agenda.

**NEW BUSINESS ITEM 8.      OFFICE SPACE OPTION FOR THE DONATION**

Ms. Norman compiled information on the commercial real estate business for the Committee's edification. Most brokers represent the landlord in commercial real estate and collect the full 6% broker's fee. There are tenant representatives who will negotiate the best deal for the tenant. The building then evenly splits the 6% fee.

Three potential sites were presented to the Committee as examples. Ms. Norman asked Mr. Cortizas via email for the value of the current office space. As of the meeting he had not responded with a value. Internet, phone, electricity, parking, insurance, and possibly water are additional costs to be considered.

Dr. Robinson suggested that some of the agencies represented on the Committee might have office space available for rent. She offered to inquire as to whether there was any space with Tulane. Ms. Gerhold-Marvin also offered to speak with Charity to see what was available. She mentioned the Hutchinson building.

Capt. Frizzell recommended the Committee consider its vision/mission for the property in looking at office space. He stated that if Wisner had space; researchers and

4

1  students could possibly utilize Wisner's space for research and for projects. He
2  suggested considering the value of that. He urged broadening the question from today's
3  needs to encompass future needs. He encouraged Wisner to view its identity as not
4  energy lands, but as environmental, community interests that has benefits from energy.
5
6      Mark Peneguy suggested purchasing an office instead of renting.
7
8      Ms. Norman noted that renting office space will increase overhead from about
9  8.5% to about 10%, or about $32,000/year.
10
11     Dr. Robinson stated she liked Capt. Frizzell's idea of expanding Wisner's ability.
12 She thought it would be nice for a group to come in and learn about what Wisner does.
13
14     Dr. Williams mentioned that the Blood Center just bought the ACORN building
15 on Canal Street. He thought there might be some space available, but it would not be
16 immediate.
17
18     A discussion ensued as to how much space Wisner should look for and if a
19 conference room should be included. Capt. Frizzell remarked that Wisner could build
20 something new on two formerly blighted lots, which would make a positive statement
21 engaging the larger community. The office could be in any number of neighborhoods in
22 the City. The Committee would have a valuable asset at the end of three years. The
23 houses that the Salvation Army builds are turned around in 90-days, and cost '
24 $100,000.
25
26     Dr. Robinson left the meeting. Ms. Norman stated she would continue to explore
27 ideas. Capt. Frizzell asked for three scenarios for consideration for the next meeting.
28
29
30 **NEW BUSINESS ITEM 9.        SELECT DATES FOR THE COMMITTEE**
31 **                            MEMBERS TO VISIT THE SPILL AREA**
32
33     Ms. Norman invited whoever was available and interested in going to Fourchon
34 to let her know when they were available. Capt. Frizzell stated January might be a good
35 time for him. Ms. Norman asked Ms. Gerhold-Marvin to email her when she was
36 available.
37
38     There will be a meeting on November 18, 2010, with Ms. Norman, Forrest
39 Travirca, the attorneys, and all the experts. They will spend 2 days in Fourchon.
40
41
42 **NEW BUSINESS ITEM 10.       PORT LEASE INTERNAL AUDIT AND**
43 **                            DATABASE**
44
45     Ann Burnside was introduced to the Committee. Ms. Phillips briefed the
46 Committee on Ms. Burnside's work to date. The retention plan was initiated. Ms.
47 Burnside is awaiting a draft plan from Mr. Burton at Simon Peragine. The royalty files
48 have been organized and statements scanned with paper copies shredded. Ms. Burnside
49 is currently creating a database of the Port's leases. She will then audit the Port's
50 payments and compliance with its lease terms.
51
52     Ms. Burnside has already uncovered some issues.
53
54
55 **NEW BUSINESS ITEM 11.       GLPC SUBORDINATION AGREEMENT FOR**
56 **                            HANCOCK BANK FOR HALO WIRE ROPE LLC**
57
58     A Subordination, Non-Disturbance and Attornment Agreement was sent to
59 Wisner for loans Hancock Bank is going to make to Halo LLC and Halo Wire Rope LLC,
60 who is in turn a sub-lessee of Inter-Moor Inc., who is a sub-tenant of the Port. Wisner
61 has never signed an agreement like this. The attorney for Hancock Bank stated that
62 Hancock Bank just wants to make sure that if someone along the chain defaults on the
63 lease, that the bank or someone in the chain will be able to cure it.

5

Mark Peneguy and Michael Peneguy pointed out they would like to change Paragraph 3. Ms. Norman noted that the recitals would also have to be changed. She asked Ms. Clade to review the document. Everyone, including the Mayor, will have to sign.

Mark Peneguy asked why Wisner was signing this agreement, as Wisner is not in a position to notify Hancock Bank if there is a default. He believes that the Port only should sign this. Michael Peneguy asked Ms. Clade to advise the Committee as to whether Wisner should sign. She agreed to review the document and respond to the Committee.

Michael Peneguy asked if there was any other business to be discussed. Mark Peneguy inquired about the Dune matter and any risk of it not being completed. Ms. Norman said she would contact Dune to push this matter forward.

**NEW BUSINESS ITEM 12.       NEXT MEETING – TUESDAY, NOVEMBER 30, 2010 12:00 NOON**

Meeting adjourned at 2:28 pm on a motion by Capt. Frizzell, seconded by Dr. Williams. **Motion passed.**

RESPECTFULLY SUBMITTED BY:


C. Cathy Norman, Secretary Treasurer

AMENDED AND APPROVED AT ___4 – 26 – 11_____ MEETING
                                                    *DATE*

6

## MINUTES OF THE MEETING OF THE
## EDWARD WISNER DONATION ADVISORY
## COMMITTEE
## TUESDAY, NOVEMBER 30, 2010

**Present:**
Michael Peneguy, Representative, Wisner Family Heirs
William Peneguy, Alternate, Wisner Family Heirs
Dr. Sandra Robinson, Representative, Tulane University
Stacy Gerhold-Marvin, Alternate, Charity Hospital
Ed Buddy, Alternate, The Salvation Army

<u>Staff:</u>
C. Cathy Norman, Secretary Treasurer/Land Manager
Dawn Segura, City Attorney's Office
L. Amanda Phillips, Executive Assistant Wisner

<u>Guests:</u>
Mark Peneguy
Susan Clade, Simon Peragine
Guy Smith, Simon Peragine

Meeting called to order at 12:19 pm.

Dr. Sandra Robinson moved that Michael Peneguy chair the meeting in Ms. Gardere's absence. Ed Buddy seconded. **Motion passed.**

The Agenda was then adjusted so that Ms. Susan Clade and Mr. Guy Smith could present their items first.

## NEW BUSINESS

**NEW BUSINESS ITEM 8.**       **MEETING WITH MAYOR LANDRIEU AND STAFF**

On Tuesday, November 23, 2010, Jim Burton and Susan Clade from Simon Peragine met with City Attorney Nanette Jolivette-Brown, Executive Counsel Richard Cortizas, Dawn Segura and another lady who also works in the City Attorney's office. They discussed what the City needed to be comfortable with Wisner, so that the Mayor would sign the Marina Lease Amendment, the Halo Subordination Agreement and soon the Dune Hydrocarbon Lease Amendment.

It appeared that the difference between leases (which affect the property and all beneficiaries must sign) and agreements which the Board by vote authorizes Ms. Norman to execute was not clear. There was also a misunderstanding as to how the grant process works.

Ms. Clade stated that Ms. Jolivette-Brown and Mr. Cortizas want to protect the transparency and accountability of the Mayor's Office. The Mayor will not sign any document until he is completely comfortable with the document. In an effort to make the Mayor more comfortable, Ms. Clade drafted and had hand delivered yesterday a letter explaining the three outstanding documents.

No specific commitments were made at the meeting. It was agreed Wisner and the Mayor would communicate through the attorneys for the time being.

Tomorrow either Ms. Clade or Mr. Burton would contact Mr. Cortizas to see if there were any further questions.

1



1    Ms. Norman noted that this was the meeting at which funding for the MLK
2  Celebration and Mayoral Fellows is traditionally presented for approval. She asked Ms.
3  Segura to relay to this to the City. Ms. Clade said she would speak with the City
4  regarding these grants.
5
6    Michael Peneguy inquired if the City indicated why they have not set a meeting
7  with the Committee. Ms. Clade said they did not. Ms. Norman said that she had sent in
8  October, per the City's request an agenda, dates that the Committee members were
9  available to meet, and names of Committee members. There has been no response.
10
11
12  **NEW BUSINESS ITEM 5.**          **DUNE ENERGY APPROVAL OF ASSIGNMENT**
13                                    **OF 60% INTEREST TO MANTI ENERGY,**
14                                    **DUNE LEASE AMENDMENT**
15
16  **REDACTED - ATTORNEY CLIENT**
    **COMMUNICATIONS, POTENTIAL**
    **LITIGATION**




27
28




32
33




39
40




46
47    Ed Buddy moved that a letter be sent stating that assignment will more than
48  likely be approved upon finalization of a mutually agreeable amendment between Dune
49  and Wisner to the 1945 Texaco lease. Motion seconded by Stacy Gerhold-Marvin.
50  **Motion passed.**
51
52
53  **OLD BUSINESS**
54
55  **OLD BUSINESS ITEM 1.**          **APPROVAL OF THE MINUTES FROM THE**
56                                    **JUNE 15, 2010 SPECIAL MEETING, AUGUST**
57                                    **31, 2010 REGULAR MEETING AND THE**
58                                    **OCTOBER 26, 2010 REGULAR MEETING**
59
60    Ms. Norman reminded the Committee that the June 15, 2010 Special Meeting
61  Minutes had been distributed at the last meeting. She asked for the Committee to send
62  her corrections before this meeting. Michael Penenguy and Mark Peneguy both sent

2

1   corrections to Ms. Phillips. Neither the August nor October Regular Meeting Minutes
2   were ready in time for this meeting.
3
4       Ms. Norman asked that corrections to the minutes be sent to Ms. Phillips.
5
6       The minutes for June 15, 2010 Special Meeting, and the September 28, 2010
7   Regular Meeting were handed out at the last meeting. The minutes for the August 24,
8   2010 Special Meeting and the July Special Meetings were distributed today.
9
10
11   **NEW BUSINESS**
12
13   **NEW BUSINESS ITEM 1.**     **CITY OF NEW ORLEANS NOVEMBER GRANT**
14                               **REQUESTS**
15
16       As there was no City of New Orleans representative at the meeting, it was
17   assumed there were no grants to be approved.
18
19
20   **NEW BUSINESS ITEM 2.**     **SECRETARY TREASURER'S REPORT**
21
22       Expense Account – Ms. Phillips       $89.43
23       Expense Account – Ms. Norman       399.17
24       Waltzer & Wiygul – partial payment   8,280.00 – BP expense
25       FET Investigations – partial payment   11,344.00 – BP expense
26       FET Investigations – partial payment   10,084.00 – BP expense
27       FET Investigations                  3,975.36 – non-BP related
28
29       Everything on the Secretary Treasurer's Report is on the meeting agenda. Ms.
30   Phillips reviewed the actual expenses versus the budgeted expenses and the impact of
31   the BP Oil Spill, especially on payroll expenses. To date Wisner has received about
32   $216,087.22 from BP in reimbursement of expenses. Revenues already exceed the
33   estimated income for the year, without including November and December revenues.
34
35       The Moratorium related concessions with the Port will end. The February 2011
36   check will be back to pre-spill levels. Chevron has started drilling some new near-shore
37   wells and their payments have bounced back to pre-storm levels.
38
39       Ms. Phillips reminded the Committee that in the October meeting it was moved
40   that the float be increased to $100,000 once BP paid. She asked if the $57,617.34
41   payment just received should be held to increase the float or disbursed. Michael
42   Peneguy stated he thought that would be best to hold the payment. William Peneguy
43   added that if a larger amount was needed this could be revisited once the next payment
44   is received.
45
46       William Peneguy asked that Ms. Phillips contact the CPA about the tax
47   implications of the increased float.
48
49       Ms. Phillips informed the Committee that she would change the disbursements in
50   2011 to capture the interest income and banking service charge expense each month.
51   This will prevent erosion of the float.
52
53       The camp renewal letters, and the oyster leases and their renewal letters went out
54   last week.
55
56       Ms. Gerhold-Marvin requested that the agenda be adjusted so that any business
57   which required a vote will be addressed before she had to leave.
58
59       Mr. Buddy moved to approve the Secretary Treasurer's Report and was seconded
60   by Ms. Gerhold-Marvin. **Motion passed.**
61
62
63

1   **NEW BUSINESS ITEM 3.**      **BP HORIZON DEEPWATER SPILL EVENT**
2
3       Mr. Buddy moved that the Committee go into Executive Session to discuss the BP
4   Horizon Deepwater Spill Event. Dr. Robinson seconded. **Motion passed.**
5
6       Mr. Buddy moved that the Committee exit Executive Session to discuss the
7   remainder of the agenda. Dr. Robinson seconded. **Motion passed.**
8
9
10   **NEW BUSINESS ITEM 6.**      **UPDATE GLPC SUBORDINATION**
11                                  **AGREEMENT FOR HANCOCK BANK FOR**
12                                    **HALO WIRE ROPE LLC, MARINA LEASE**
13                                    **UPDATE**
14
15       Mr. Buddy left the meeting.
16
17       After the October meeting, Ms. Clade wrote an opinion letter on the Halo Wire
18   Rope LLC Subordination, Non-Disturbance and Attornment Agreement which Hancock
19   Bank is requesting Wisner sign. She only took issue with Paragraph 3 of the Agreement
20   because it says the bank can step into the Port's shoes should Halo default. This is per
21   Ms. Clade a pretty standard agreement. Wisner will probably start to see more
22   agreements of this type at the Port.
23
24       Dr. Robinson moved to approve the agreement. Ms. Gerhold-Marvin seconded.
25   **Motion passed.**
26
27
28   **NEW BUSINESS ITEM 4.**      **WISNER BEACH UPDATE SLBDD**
29
30       According to the minutes of the last SLBDD meeting they still believe that the
31   beach will be open this summer and that BP will pay for their strategic plan. BP has a
32   community outreach director who will be attending all future SLBDD meetings. Ms.
33   Norman will be at the next meeting.
34
35       At Ms. Norman and Chett Chaisson's last meeting she asked how long the GLPC
36   will enforce the bridge to the beach's closure. Mr. Chaisson said the bridge will be
37   manned as long as clean-up activity is ongoing (about next April or May). Ms. Norman
38   does not believe Wisner wants the public on the beach if Wisner is involved in a lawsuit
39   with BP.
40
41       Randy Lanctot is featured in two articles regarding his State Seashore concept
42   and his desire for BP to pay for projects to restore natural resources (including the State
43   Seashore). He wants to reopen Fourchon Beach to the public and make it a part of the
44   State Seashore. The State Seashore will rear its head in the Legislature next spring. BP is
45   aware that Wisner is a private entity and that Wisner owns the beach.
46
47       Ms. Norman spoke with Ryan Hearn project manager for the Caminada
48   Headlands project. He was interested to learn about our archeological sites. The money
49   has been allocated to do the restoration project. The previous engineering firm was fired
50   due to a conflict. The new engineering firm is CEC from Florida. They are moving
51   forward with the sand mining lease, trying to get the Ship Shoal sand.
52
53       Ms. Norman reiterated to Mr. Hearn her desire to use the river sand in Mobile.
54   She asked if Wisner could get BP to purchase the sand, would the sand be utilized for
55   the project. Mr. Hearn said they would certainly look at it. If BP pays for a million cubic
56   yards of sand for Wisner, Wisner can file a restoration plan and co-ordinate it with the
57   State's plan. Then Wisner will be an active matching funds participant in the project and
58   will own the property instead of giving a servitude.
59
60       Ms. Norman asked the Committee if the money in the FRRI account (belongs
61   equally to Shell, GLPC, Chevron, LOOP and Wisner) can be used for Wisner's geo-tube
62   project if the rest of the participants would be willing. First, she will ask if the Port can
63   set it aside for the geo-tube project. If so, then she will approach the other participants.

1     Dr. Robinson moved that Ms. Norman determine if GLPC can set aside and use
2 the FRRI money for the geo-tube project and then approach the other participants for
3 their approval to use the money in this way. Ms. Gerhold-Marvin seconded the motion.
4 **Motion passed.**
5
6
7 NEW BUSINESS ITEM 7.     2009 AUDIT UPDATE
8
9     The audit is complete and awaiting final review at Bourgeois Bennett. If it is
10 received before the next meeting, Ms. Norman will mail it to the Committee members so
11 it can be discussed at the January meeting.
12
13     There will be a LWCC audit in January. When the spill hit, Wisner requested that
14 Mr. Travirca get worker's compensation policy for FET Investigations. He is no longer
15 carried on our policy. This will make a big difference in the policy premium for next
16 year.
17
18
19 NEW BUSINESS ITEM 9.     **WISNER OFFICE PLANS AND ONGOING**
20                                   **STAFFING NEEDS**
21
22     The office will remain in the City Hall location for the time being. The idea of
23 moving will be readdressed in January.
24
25     Ms. Burnside's 90-day contract ends in December. Ms. Norman suggested that
26 the contract be extended until the Annual Meeting in March. Ms. Phillips briefed the
27 Committee on Ms. Burnside's activities. Ms. Burnside has created a database for the
28 GLPC and has input all information except for payments. She is currently entering the
29 payment information for the past 10 years. She has 2 years of data input. This initiates
30 Wisner's internal audit of the GLPC's payments and lays the groundwork for auditing
31 the GLPC's files onsite.
32
33     Ms Gerhold-Marvin moved to extend Ms. Burnside's contract until March 29,
34 2010. Dr. Robinson seconded the motion. **Motion passed.**
35
36
37 NEW BUSINESS ITEM 10.     **MEETING WITH AND PROPOSAL FROM**
38                                   **GLOBAL GREEN**
39
40     Ms. Norman has met with Beth Gallant from Global Green a couple of times. Ms.
41 Gallant came to Ms. Norman to learn more about Louisiana's wetlands. She has started
42 a group called Louisiana Wetland Action Program. Its purpose is to educate and work
43 with private property owners on ways they can manage, protect and restore their lands.
44 The Louisiana Landowners' Association was disinterested in her proposal.
45
46     She would like to do an example project on Wisner's property, which would cost
47 Wisner nothing. She has also been mining Ms. Norman's management techniques for a
48 good management template that other landowners can use. Her group has $3 million to
49 use for restoration, mainly planting.
50
51     Ms. Norman is taking her to the Lafourche property to look at some potential
52 planting sites. This could be beneficial to Wisner's position in future litigation.
53
54
55 NEW BUSINESS ITEM 11.     2011 PROPOSED MEETING SCHEDULE
56
57     This was distributed at the beginning of the meeting.
58
59 NEW BUISNESS ITEM 12.     **NEXT MEETING – TUESDAY, JANUARY 25,**
60                                   **2011 12:00 NOON**
61
62     Meeting adjourned at 2:12 pm on a motion by Ms. Gerhold-Marvin, seconded by
63 Dr. Robinson. **Motion passed.**

RESPECTFULLY SUBMITTED BY:

C. Cathy Norman

C. Cathy Norman, Secretary/Treasurer

AMENDED AND APPROVED AT ___4-26-2011___ MEETING

DATE

# MINUTES OF THE MEETING OF THE
# EDWARD WISNER DONATION ADVISORY
# COMMITTEE
# TUESDAY, JANUARY 25, 2011

**Present:**
Michael Peneguy, Representative, Wisner Family Heirs
William Peneguy, Alternate, Wisner Family Heirs
Dr. Sandra Robinson, Representative, Tulane University
Dr. Everett Williams, Representative, Charity Hospital
Stacey Gerhold-Marvin, Alternate, Charity Hospital
Ed Buddy, Alternate, The Salvation Army

Staff:
C. Cathy Norman, Secretary Treasurer/Land Manager
Dawn Segura, City Attorney's Office
L. Amanda Phillips, Executive Assistant, Wisner

Guests:
Mark Peneguy
Joel Waltzer, Waltzer and Wiygul
Eric Smith, Bourgeois Bennett, LLC
James Burton, Simon Peragine Smith and Redfearn

Meeting called to order at 12:16 pm.

Dr. Sandra Robinson moved that Michael Peneguy chair the meeting in Ms. Ashleigh Gardere's absence. Dr. Everett Williams seconded. **Motion passed.**


## OLD BUSINESS

**OLD BUSINESS ITEM 1.**     APPROVAL OF THE MINUTES OF THE
                             AUGUST 31, 2010 REGULAR MEETING, THE
                             OCTOBER 26, 2010 REGULAR MEETING AND
                             THE NOVEMBER 30, 2010 REGULAR
                             MEETING

There were no minutes to approve. Michael Peneguy asked that the minutes from the November Meeting be checked to see if there had been a motion to approve the September minutes presented in October.


## NEW BUSINESS

**NEW BUSINESS ITEM 1.**     **2009 FINANCIAL AUDIT**

Eric Smith of Bourgeois Bennett, LLC presented the Financial Report as of December 31, 2009, and two letters to the Committee for the 2009 Audit. Three new accounting pronouncements were adopted despite being cash basis accounting. Financial accounting standards were codified with GAAP (Generally Accepted Accounting Procedures) pronouncements. Anything referred to as FASB in the past will now be referred to as FASB ASC.

Wisner is now required to provide a subsequent events statement for events that have transpired after the balance sheet date but before the financial statements are issued. The BP Horizon Deepwater Spill Event is one such event.

1

**EXHIBIT**

tabbies®

X

The third pronouncement has no effect on Wisner except a statement that "2007 and later years do remain open by taxing authorities" is required to be stated in the notes.

Both letters were required to be submitted to the governance board (the Committee) by the auditor.

Mr. Smith left the meeting.

Dr. Everrett Williams moved to accept the 2009 Audit Report. Dr. Sandra Robinson seconded. **Motion passed.**

The engagement letter for Bourgeois Bennett to prepare the taxes for 2010 and the 2010 Audit was presented to the Committee for approval. Tax preparation will not exceed $3,600 and the audit will not exceed $7,600. A discussion ensued as to when to bid out the audit and the tax preparation. Michael Peneguy suggested that letters requesting bids be sent out in July.

Dr. Robinson moved to approve the engagement letter. Dr. Williams seconded. **Motion passed.**

**NEW BUSINESS ITEM 2.       BP HORIZON DEEPWATER SPILL EVENT**

Dr. Williams moved that the Committee enter Executive Session to discuss the BP Oil Spill. Dr. Robinson seconded. **Motion passed.**

Dr. Robinson moved that the Committee exit Executive Session. Dr. Williams seconded. **Motion passed.**

**NEW BUSINESS ITEM 3.       CITY OF NEW ORLEANS JANUARY GRANT
                             REQUESTS**

As there was no City of New Orleans representative at the meeting, it was assumed there were no grants to be approved.

**NEW BUSINESS ITEM 4.       SECRETARY TREASURER'S REPORT**

Invoices:

| | |
|---|---|
| Amanda Phillips, Expense Account (Dec) | $2.80 |
| C. Cathy Norman, Expense Account (Dec) | 575.23 |
| Amanda Phillips, Expense Account (Jan) | 18.76 |
| C. Cathy Norman, Expense Account (Jan) | 340.51 |
| Bourgeois Bennett, Audit (paid ½, owe ½) | 3,800.00 |
| LWCC (post-audit increase due to payroll) | 3,887.00 |
| Simon Peragine (City) | 2,841.00 |
| Simon Peragine (Dune) | 3,860.00 |
| Waltzer & Wiygul (BP) | 34,896.87 |
| | 415.31 |
| FETI | 4,098.84 |
| | 3,921.53 |
| FETI (BP) | 11,050.00 |
| | 8,609.00 |
| | 8,500.00 |
| | 9,910.00 |

LWCC's premium increased last year due to higher payroll for the office and higher costs for FET Investigations, who Wisner was required to carry on its policy. In August, Mr. Travirca obtained a LWCC policy for FET Investigations. This will decrease the amount owed by Wisner in 2011. The portion attributable to BP will be billed to BP.

2

1     Chevron changed its accounting method. They farmed out to Energy Partners,
2  who will pay their own portion of the Bay Marchand field royalties. In December,
3  Chevron estimated what Energy Partner's portion would be and paid it. January's check
4  will be adjusted to reflect actual royalties. Wisner will now get a paper check from
5  Chevron for Energy Partner's portion and an EFT for Chevron's portion. Michael
6  Peneguy discovered an error on the statement.
7
8     Miscellaneous items mentioned were:
9       • The GLPC approved their budget for 2011: $79.3 million.
10     • Another cypress tree planting is occurring in Jean Lafitte National Park,
11      but not on Wisner property.
12     • New mileage allowance by the IRS for 2011 is $0.51/mile.
13     • Ms. Burnside submitted a report on the Port lease issues that have arisen
14      in her internal audit.
15     • Final actual income for 2010 was $4,208,661.34. Expenses were
16      $952,190.55.
17     • BP has paid $350,000. An additional $500,000 in claims is outstanding.
18
19     Ms. Phillips reported on oyster and campsite leases, the document retention plan,
20  and Ms. Burnside's progress with the database.
21
22     Dr. Williams moved to approve payment of the invoices and expense accounts
23  and the Secretary Treasurer's Report. Dr. Robinson seconded. **Motion passed.**
24
25
26  **NEW BUSINESS ITEM 5.**     **DUNE ENERGY - UPDATE**
27
28     Dune has still not responded to the proposal sent in early December. Ms. Norman
29  and Mr. Guy Smith are meeting after this meeting. They will investigate if the sale of the
30  property went through.
31
32
33  **NEW BUSINESS ITEM 6.**     **GLPC – FRRI, GEOTUBES, AND**
34                             **MORATORIUM**
35
36     Ms. Norman and Chett Chaisson will meet on Thursday to review the Geotube
37  project. He has agreed that the project would be a good use of the FRRI money. Ms.
38  Norman still needs to get approval from the other FRRI members. She will also send
39  them each a copy of the SLBDD's Strategic Plan.
40
41     The Port is waiting on two agreements, which are on the Mayor's desk. A copy of
42  a letter sent directly to Mayor Landrieu by Chett Chaisson was included in the packet. It
43  states that the higher rental paid in good faith since August for the terms in the yet-to-be
44  executed Marina lease will be rescinded retroactively if the executed document is not
45  returned to the Port by January 31, 2011. Simon Peragine also forwarded a copy of this
46  agreement to Richard Cortizas.
47
48     The Halo Attornment agreement is also sitting on the Mayor's desk.
49
50
51  **NEW BUSINESS ITEM 7.**     **WISNER BEACH UPDATE SLBDD**
52
53     The SLBDD hired someone to appraise property on the beach in furtherance of
54  expropriation. Both Al Danos and the Caillouet Land Corporation (CLC) stated that it is
55  CLC property SLBDD wants to expropriate.
56
57     Ms. Norman took two Lafourche Parish Councilmen to the beach. Rodney Doucet
58  was one of the Councilmen. He reported to the SLBDD that the beach was a mess and
59  there was no way it would be open this summer. Ms. Norman then invited the SLBDD
60  members to tour the beach with her. They need to be educated.
61

3

1     There are now designated bird-nesting areas that are federally protected. There
2  are federally protected archeological dig areas. They will make development prohibitive,
3  but not restoration.
4
5     Mr. Danos informed Ms. Norman that they did not care about restoration, but
6  wanted BP's money to build the SLBDD's project. The restoration project is going
7  forward. New engineers have been hired. It is hoped public meetings will be held in
8  April or May of this year regarding the restoration project.
9
10    Native Elders came to the beach to repatriate bones from the arch site. This raises
11  the restoration project's profile. The project will protect this burial site.
12
13    Ms. Norman met with Gerald Ford, BP's Community Liaison, at the Lafourche
14  Parish Council Meeting. He was unaware that the beach was privately owned. He is the
15  key to the tourism money.
16
17    Mark Peneguy suggested that the charter for the SLBDD be revoked. He was
18  unsure who would sponsor the bill.
19
20
21  **NEW BUSINESS ITEM 8.**     **CHEVRON MITIGATION SETTLEMENT**
22                        **AGREEMENT – STATUS**
23
24    This agreement is also outstanding. Executed copies have been returned by all
25  parties except John Cook, Tulane University and the Mayor.
26
27
28  **NEW BUSINESS ITEM 9.**     **UPDATE ON STATUS OF COMMUNICATION**
29                        **WITH CITY OF NEW ORLEANS – PENDING**
30                        **AGREEMENTS**
31
32    James Burton and Susan Clade (from Simon Peragine) have been communicating
33  with the City as requested by the City. Any documents which require a signature are
34  delivered to them, and they deliver them to the City.
35
36    Prior to the meeting today, Ms. Norman emailed Ashleigh Gardere, copying
37  Brooke Smith and Judy Reese-Morse, informing her of today's meeting. A voice message
38  was also left on Ms. Gardere's voicemail. There was no response from anyone. It appears
39  they do not desire to participate in the Committee or the meetings.
40
41    Mr. Burton reported he and Ms. Clade were communicating with Richard
42  Cortizas after having met with City Attorney Nanette Jolivette-Brown and Mr. Cortizas.
43  Mr. Burton and Ms. Clade have explained that there are agreements pending, like the
44  Marina lease. They also explained the Port would not pay the higher rentals after
45  January 31st if an executed agreement was not returned by then.
46
47    Last Thursday Mr. Cortizas returned Mr. Burton's phone calls and emails. He
48  stated he had the documents and awaited comments from the City Attorney. Once he
49  got Ms. Jolivette-Brown's comments, he would call again.
50
51    The delineation has always been that the Committee has the authority to offer
52  advice and consent to the Mayor's on his duties as *ex officio* Trustee and to initiate the
53  actions that the Committee takes. Documents that have an impact on the real estate
54  require the Trustee's signature. There are three such documents backed up, and are
55  affecting the ongoing business operations of the Committee and the Donation.
56
57    Mr. Burton suggested that the Committee plan accordingly if there is no
58  response. Ms. Norman relayed her conversation with Capt. Frizzell. He suggested that a
59  letter be written to the City and signed by the Committee members. It would state that
60  together, the Committee believes the best thing to do, is to go forward, and the
61  Committee hopes that they will have ongoing cooperation in continuing its good work.
62

1    A discussion ensued regarding the nexus of the problem. Michael Peneguy said
2  he wanted to include a request for the Mayor to meet with the Committee because he
3  believes that would straighten out things. Ms. Norman reminded him that in October
4  the City asked for an agenda and suggested meeting dates. She provided those to them
5  and never heard back.
6
7    Capt. Frizzell urged exhausting all cooperative options before taking legal action;
8  yet to keep in mind that the Committee would be naïve to think this relationship will be
9  healed at a point in time when the City's support is crucial.
10
11    Ms. Phillips reported that Oliver Weiss was sent into the office by Andy Kopplin
12  to determine if Wisner was moving out of its office space. He said the City was not
13  asking Wisner to leave.
14
15    Mr. Burton described the various relief measures defined in the trust code. He
16  also explained the various laws and enabling documents defining the Donation. Dr.
17  Robinson asked if Mr. Burton and Ms. Clade had been able to ascertain what the Mayor
18  wants and what he fears. Mr. Burton replied that they believed there is an across the
19  board review of all entities in which the City is involved.
20
21    Michael Peneguy stated that the press has called him.  Ms. Norman related that
22  there have been at least 30 phone calls from organizations wanting grants. No one from
23  the City has returned their calls and they are searching for information. Those
24  organizations have been expressing their frustrations to the press.
25
26    Mr. Burton reminded the Committee that Simon Peragine represents the
27  Committee and each of the beneficiaries, which includes the City. If action is taken
28  against the Mayor, it will be on behalf of all the beneficiaries, including the City. The
29  Mayor acts not through the City, but through the Donation as an *ex officio* of the
30  Donation.
31
32    Michael Peneguy asked if Forrest Travirca was ever paid for going to
33  Plaquemines Parish at the Mayor's behest. Ms. Norman replied that to her knowledge,
34  he had not been paid.
35
36    Dr. Williams moved to authorize Simon Peragine to complete their research into
37  what the next step in the process should be, should it become necessary. Dr. Robinson
38  seconded. **Motion passed.**
39
40    Dr. Robinson suggested that the Committee try to anticipate what the media and
41  political arguments are going to be in favor of the Mayor's position. She could not think
42  of anything he could use, especially since the grants are the Mayor's decisions. Michael
43  Peneguy reiterated that the media had already called him, and believed that the media
44  may call the other Committee members.
45
46    Ms. Norman told the Committee that she had been called earlier in this
47  administration by Marcy Planner requesting copies of documents submitted by the
48  Committee to the Mayor in past annual reports. Ms. Planner said she had been
49  contacted by the City to investigate various Boards and Commissions. A discussion
50  unfolded as to whether to hire a spokesperson and who.
51
52    Dr. Robinson suggested that all the phone calls the Wisner office has received
53  regarding grants because the City has not responded to the potential applicants be noted
54  in the letter. Ms. Norman said she and Mr. Burton would compose the letter and
55  circulate it to the Committee for signature and delivery within the next two days.
56
57
58  **NEW BUSINESS ITEM 10.      MITIGATION BANKING PROPOSAL –**
59  **RESTORATION SYSTEMS, LLC**
60
61    As Dr. Robinson had to leave, Ms. Norman stated she would send an email to the
62  Committee explaining the Mitigation Banking Proposal by Restoration Systems (a North
63  Carolina company). This group is interested in the Bayou Segnette property. The Corps

1    of Engineers needs large areas of credits for its work here.  The credits will be worth
2    between $80,000 and $100,000 per acre. There will be stringent restrictions on the
3    property for 20 years (the life of the servitude), but Wisner could have areas to the north
4    in exploration. They want a 90-day option. If they don't like the property or don't see
5    mitigation opportunities, or Wisner doesn't like the agreement, the agreement is over.
6
7         Restoration Systems needs a large area of property committed quickly. Ms.
8    Norman recommended that the Committee further investigate this opportunity. It has
9    the potential to be $12 million dollars over 5 years. It could add value to the property.
10   Jean Lafitte has a new funding source it could use to expropriate the Bayou Segnette
11   property. But mitigation banking will tie up the property in a servitude for 20 years.
12
13        Ms. Norman requested approval to have Simon Peragine review the matters and
14   send an offer letter. Mark Peneguy replied that a group he works with independently
15   was also approached by this company. His fellow investors were also impressed.
16
17        Ms. Norman stated Wisner should get some guaranteed payments even if it
18   doesn't succeed. They do pay $20/acre upfront ($20,000). Mark Peneguy said he
19   believes part of Restoration Systems' strategy is to force the Corps to use their
20   mitigation bank. He was told the payout was either 5 or 15 years. The bulk of the money
21   would come in the first five years.
22
23        Michael Peneguy asked that the Committtee look at the area in consideration.
24
25        A documentary filmmaker (Radical Media) requested filming on Monday out on
26   the property to see the oil spill impact. Ms. Norman will obtain the necessary access
27   agreements and releases.
28
29        Dr. Williams moved to approve Ms. Norman granting a standard access
30   agreement to Radical Media. Seconded by Ed Buddy.
31
32
33   **NEW BUSINESS ITEM 11.        LWCC AUDIT AND RESULTS**
34
35        This was discussed in the Secretary Treasurer's report.
36
37
38   **NEW BUSINESS ITEM 12.        LUMCON UPDATE**
39
40        Ms. Norman received a second quote to repair the bulkhead at LUMCON. It was
41   similar to the first, $235,000. Ms. Norman will send it, the other quote, and an aerial
42   photograph showing the land lost with a letter to LUMCON demanding they either
43   repair or remove the camp.
44
45        Three weeks ago Ms. Norman and James Richard from the State Department of
46   Homeland Security, were on the beach. They were approached by two people who were
47   from FEMA and investigating the boudin bags. Ms. Norman discussed the LUMCON
48   FEMA claim non-payment. The gentlemen promised to look into it for Ms. Norman if
49   she provided them with the claim numbers. Ms. Norman will put a demand on
50   LUMCON to repair this bulkhead prior to hurricane season. Mark Peneguy echoed Ms.
51   Norman's concerns.
52
53        In the same estimate, Mr. Travirca has a quote to put pilings along the beach
54   (from shore to the marsh, approximately 1100' long, placed 4' apart and at least 6' both
55   above and below ground) to block Elmer's Island from Wisner's property. It is about
56   $60,000. But it may be something to consider as access becomes an issue this summer.
57
58
59   **NEW BUSINESS ITEM 13.        NEXT MEETING – TUESDAY, FEBRUARY 22,**
60                                  **2011 12:00 NOON**
61
62        Meeting adjourned at 2:37 pm on a motion by Dr. Williams, seconded by Ed
63   Buddy. **Motion passed.**

RESPECTFULLY SUBMITTED BY:


C. Cathy Norman, Secretary Treasurer


AMENDED AND APPROVED AT __31  May  2011_____ MEETING
                           *DATE*

7

# MINUTES OF THE MEETING OF THE
# EDWARD WISNER DONATION ADVISORY
# COMMITTEE
# TUESDAY, FEBRUARY 22, 2010

**Present:**

Nannette Jolivette-Brown, Appointed Chair, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
W. A. Peneguy, Alternate, Wisner Family Heirs
Dr. Everett Williams, Representative, Charity Hospital
Dr. Sandra Robinson, Representative, Tulane University
Ed Buddy, Alternate, The Salvation Army

Staff:
C. Cathy Norman, Secretary Treasurer/Land Manager
Dawn Segura, City Attorney's Office
Amanda Phillips, Executive Assistant, Wisner
Richard Cortizas, Executive Counsel, City of New Orleans

Guest:
Mark Peneguy
Joel Waltzer, Waltzer and Wiygul
Susan Clade, Simon, Peragine, Smith and Redfearn
Guy Smith, Simon, Peragine, Smith and Redfearn

**Prelude:**

There was a long and heated discussion about who was representing the City and would be chairing the meeting. This included a discussion concerning the letter recently sent by the City Attorney to Simon, Peragine concerning the City's perception of the Mayor's rights and duties as Trustee of the Edward Wisner Donation. The letter alleges that the Mayor has complete fiduciary control of the Donation and that he revokes any designation of duties and powers that may have been previously granted to the Committee and the Secretary Treasurer.

There were many references to a meeting held the previous Friday, which excluded Ms. Norman and was therefore not under the Bylaws a formal meeting. At that meeting Ms. Jolivette-Brown claimed that she informed members of the Committee that she would be attending this meeting and acting as Chair. Committee members remembered her stating that she would attend as she had in the past. Nothing was given to any of the Committee members in writing that stated that she would Chair the meeting. Additionally, Ms. Norman and the Wisner office was not informed of any of the information that transpired neither at the meeting, nor of Ms. Jolivette-Brown's intent to attend and chair today's meeting.

Michael Peneguy raised the issue of the Bylaws specifically indicating that the Chair or representative must be appointed in writing. He also referred to the letter received the previous week from Ms. Jolivette-Brown to Simon, Peragine in which the Mayor specifically indicated that the Bylaws

1

EXHIBIT
**Y**

1   are illegal because they were not approved by the Trustee and in which the
2   Mayor revoked all fiduciary duty previously assigned to the Committee. Ms.
3   Jolivette-Brown countered with a comment that chairing the meeting is
4   purely ministerial. Ms. Jolivette-Brown stated that a lot of practices have
5   developed on the Committee and the Mayor wants to get back to the basics;
6   and determine what ministerial duties he may or may not want to delegate
7   and what is the appropriate interaction between the Mayor as Trustee and the
8   Committee. Ms. Jolivette-Brown then stated that even the decision as to who
9   should chair the meeting was convoluted. Mark Peneguy replied that it
10  would not be if the decision had been made in a timely manner and the
11  office and Committee were informed in writing as is outlined in the bylaws.
12  He also alleged that Ms. Jolivette-Brown has represented herself as Chair
13  several ways, as the City Attorney, as the Mayor's representative and as
14  having the Mayor's power of attorney. Ms. Jolivette-Brown indicated that
15  the Committee requested a meeting with the Mayor which was held and
16  many of these subjects addressed. It was pointed out that the meeting was
17  held without the full Committee in that it did not include the Secretary
18  Treasurer.
19
20          Ms. Norman suggested that the Committee vote as to who should
21  chair and move on with the Agenda. Richard Cortizas, felt that was not
22  necessary in that the Mayor had already designated Ms. Jolivette-Brown. He
23  also stated that the Mayor does not have to delegate in writing who his
24  representative and Chair are. Ms. Clade countered with the fact that the
25  appointed officer is Ashleigh Gardere, and in her absence Brooke Smith.
26  That all information from the Committee was directed by Judy Reese Morris
27  to be sent to them as the Mayor's representative. Further, Section 6 of the
28  Bylaws states that in the absence of a Committee Member someone else can
29  be appointed to represent the member subject to Committee approval.
30
31          Mr. Cortizas and Ms. Jolivette-Brown allege that the representative on
32  the Committee is the Mayor and in his absence he can appoint whomever he
33  wants to represent the Committee and Chair the meetings.
34
35          Ms. Jolivette-Brown lodged her objection and did not wave any of the
36  assertions that had been presented to the Committee. She further stated that
37  if the Committee chose to proceed any decisions made by the Committee
38  would be considered null and void. Ms. Jolivette-Brown further asserted
39  reserving all the rights and privileges of the Mayor. Ms. Norman stated that
40  all of these problems would not exist if there had been open and transparent
41  communication between the Mayor's office and the Committee. She further
42  stated that until the meeting held the previous week, there had been complete
43  and total silence and refusal to cooperate on the part of the City. No
44  communication whatsoever, refusal to sign documents, no response to
45  emails or phone calls. Ms. Jolivette-Brown then asserted that Ms. Norman
46  met with the Mayor and told him to stay out of it. Ms. Norman then
47  defended herself by stating that the meeting was a set up and there were six
48  members of the Mayor's staff and the Mayor present while she attended
49  alone.
50
51          Ms. Jolivette-Brown stated that she would get the Mayor to send
52  something over appointing her as the representative and Chair of the
53  meeting.

2

1    Michael Peneguy also reserved the rights of the Committee to make
2    decisions and vote in accordance with the Bylaws. He also requested that
3    Ms. Jolivette-Brown consider any motion put before the committee in the
4    meeting that is included on the Agenda. Ms. Jolivette-Brown stated she
5    could not agree to that and that the Committee should just wait for the letter
6    from the Mayor.
7

8    Michael Peneguy then formally objected to Ms. Jolivette-Brown
9    chairing the Committee and stated that he needed to protect the family and
10    stay consistent with the Articles and legal background that created the
11    Committee. No other Committee members would second Mr. Peneguy's
12    objection.
13

14    The Mayor's position was that having the appointment in writing was
15    not necessary, but the Committee decided to wait until the letter arrived. Dr.
16    Robinson suggested that someone else begin the meeting and we tackle the
17    noncontroversial items. A comment was made by Mark Peneguy that
18    everything was controversial at this point.
19

20    Michael Peneguy suggested again that the Committee meet alone with
21    the Mayor and try to work things out. Said meeting should include Ms.
22    Norman. If not he suggested that there would be an ugly fight and the
23    beneficiaries will suffer.  If the Mayor continues to not sign agreements the
24    entire Donation will shut down and things will grind to a halt. He stated that
25    he had never seen anyone in a responsible position attack things as this has
26    been attacked. Years of cooperation have been destroyed by the current
27    situation.
28

29    Mark Peneguy stated that this was a gift to the City by his great-
30    grandfather and he was personally offended. Ms. Jolivette-Brown stated that
31    she appreciated their point of view, however on behalf of the Mayor; he is
32    very resolved in his conviction to understand what his responsibilities are in
33    regards to Wisner. Michael Peneguy's biggest objection is that the Mayor
34    will not talk to the Committee to discuss how they could get along, how they
35    operate and how he can work with the Committee. Ms. Jolivette-Brown will
36    communicate the request to the Mayor to meet with the Committee as a
37    group or individually. Michael Peneguy state "NO" that the Mayor has to
38    meet with the Committee as a group including the Secretary Treasurer and
39    does not need 5 or 10 people from his administration in the room.
40

41    Ms. Jolivette-Brown reiterated the need to get an opinion from a trust
42    lawyer to be used as a final determination in this matter. Mr. Peneguy stated
43    that there are so many opinions out there that none of them can be counted
44    on without going to court. The City Ordinance addresses everything and
45    there do not need to be any other opinions from the City Attorney.
46

47    Ms. Jolivette-Brown then stated that as the City Attorney and as a
48    representative of the Mayor, she was not intimidated and she would continue
49    to ask questions and do research until they got some answers.
50

51    By letter dated February 22, 2011, Mayor Mitchell Landrieu
52    designated the City Attorney, Nanette J. Brown, to serve as his

1    representative and as Chairman of the meeting of the Wisner Committee on
2    Tuesday, February 22, 2011.
3
4       Meeting called to order at 1:05 pm.
5

## OLD BUSINESS

7

**OLD BUSINESS ITEM 1.**    **Approval of Minutes**

9
10       There were no minutes finalized for review and approval at the time
11    of the meeting.
12

## NEW BUSINESS

14

**NEW BUSINESS ITEM 1.**    **Secretary Treasurer's Report**

16
17       Includes invoices:
18

| | |
|---|---|
| Waltzer and Wiygul | $8484.11 |
| FETI (BP) | $7906.76 |
| FETI | $3518.11 |
| Simon Peragine (City) | $7,572.84 |
| C. Norman Exp. Act. | $ 307.09 |
| L. Amanda Phillips Exp. Act. | $ 20.07 |
| FET signs for property | $ 500.00 |
| FET (BP) | $15,156.76 |

27
28       Wisner received a rebate from LWCC in the amount of $1,673.00. A
29    rental was also received for a surface lease from Energy Partners in the
30    amount of $2,325.96.
31
32       There were several articles presented to the committee about the oil
33    spill. Most of the topics discussed in the Secretary Treasurer's report will
34    also be covered in the agenda including the BP Spill in Executive Session.
35
36       Camp leases were covered by Ms. Phillips. Collections are going well.
37    The response is better in Jefferson than in Lafourche.
38
39       Ms. Phillips also reported that the in house audit of the Greater
40    Lafourche Port Commission has resulted in an under payment of $43,000
41    that will be addressed with the Port. BP claims status will be covered in
42    executive.
43
44       Ms. Jolivette-Brown then requested information about an invoice for
45    work done in Plaquemines Parish for the Mayor. Ms. Norman indicated that
46    this was work requested by Jerry Sneed on behalf of the Mayor and that it
47    did not involve any Wisner property and needed to be paid by the City of
48    New Orleans. Ms. Norman will forward the email request from Mr. Sneed to
49    Ms. Jolivette-Brown. It was suggested that Wisner could pay for this invoice
50    however it cannot be paid because the project has nothing to do with the
51    Trust property.
52

4

1       Ms. Jolivette-Brown stated that it should be part of the City's BP
2  claim, not Wisner's. Ms. Norman will send the email to Ms. Jolivette-
3  Brown. The question is who should pay the invoice.
4
5       Michael Peneguy made a motion to approve the Secretary Treasurer's
6  Report including invoices. There was a second by Everett Williams.  Ms.
7  Jolivette-Brown opposed the motion. **Motion approved.**
8
9       Ms. Norman asked the reason for the opposition and Ms. Jolivette-
10  Brown stated that she had not had an opportunity to review these invoices
11  and still does not understand how decisions were made. Also that Ms.
12  Normans' role is ministerial and it would not be prudent to approve payment
13  at this time.
14
15       Ms. Jolivette-Brown then mentioned that the Mayor was visited by
16  Charlotte Randolph concerning the cleaning of the beaches. It was indicated
17  that that issue would be handled in item 4.
18
19
20  **NEW BUSINESS ITEM 2.**    **City of New Orleans February Grant**
21                                    **Requests**
22
23       There were no grant requests proposed by the Mayor for funding.
24
25
26  **NEW BUSINESS ITEM 3.**    **City of New Orleans – Meeting with the**
27                                      **Mayor and Letter to Simon Peragine**
28
29       Ms. Jolivette-Brown commented that much of this topic had been
30  discussed prior to the calling to order of the meeting. Further she set forth a
31  motion to agree to hire an outside trust attorney to render an opinion on the
32  duties and powers of the Mayor as Trustee of the Edward Wisner Donation.
33  As a result of the previous week's meeting with the Mayor there was a
34  request that the Committee agree to work together in getting an opinion as to
35  the role of the Mayor as Trustee and finalize things for once and all and
36  bring all of these issues to a close. Michael Peneguy objected to that motion.
37  Ms. Robinson asked who would pay for the opinion, and what is the
38  selection process for who would render this opinion. Ms. Jolivette-Brown
39  mentioned the old opinion by Max Nathan.  Michael Peneguy indicated that
40  Mr. Nathan has represented the family and there may be a conflict. Also
41  several opinions were already given by Max Nathan 20 years ago. Mr.
42  Peneguy further stated that another opinion would not solve the issues.
43  There had been numerous opinions over the years and to date, there had
44  been no problems with the current processes, procedures and protocol. Mr.
45  Peneguy would need to refer this matter to the family.  Also, Mr. Peneguy
46  requested that Simon Peragine render the opinion. Ms. Jolivette-Brown
47  wanted to hire someone without a prior allegiance to the Committee.
48
49       The City Attorney stated that she already had an outside legal opinion
50  on the matter from the law firm of King, Krebs, however she refused to
51  share that opinion in case we end up in court.
52

1    Max Nathan has also volunteered to mediate this matter. The City
2  does not want a new opinion to be the Mayor's opinion but one of everyone
3  involved. The Committee cannot agree ahead of time to accept a legal
4  opinion. It will need to be settled in court.
5
6    Ms. Norman indicated that she was not included in the meeting the
7  previous Friday, and she posed the question of what does the Mayor want at
8  this point in time. She is confused as to what his goals are in reference to
9  Wisner. She knows that he wants to fire her but she does not understand
10  what his goals are. She further stated that Wisner has been a hugely
11  successful operation without a blemish to its name.  The Mayor has decided
12  for whatever reason that he wants to change everything. If the Mayor could
13  meticulously point out what his problems with Wisner are we might get
14  somewhere. Ms. Jolivette-Brown indicated that it was "an inaccurate
15  characterization as to what the Mayor wants control over". He wants to fully
16  understand Wisner and what he is doing is acting as a Fiduciary and is not
17  accepting someone else's word or actions in reference to Wisner. He wants a
18  very clear understanding of what his responsibilities are as the
19  Trustee/Chairman of the Committee. There is an ordinance to consider, there
20  are Settlement Documents to consider and there is a history and evolution
21  that has occurred. Custom practices and procedures that the Mayor wants to
22  understand so that he can fully understand and execute his fiduciary duties.
23  Ms. Norman replied that the customs, practices and procedures have worked
24  because the Committee is aware that there is an election every 4 years and
25  someone new may be coming in to take over. That was part of the goal in
26  setting the Donation and its Bylaws up the way they are.
27
28    Ms. Norman's next question was because the letter from the City
29  Attorney indicated that the Mayor claims complete fiduciary duty, can she
30  sign checks to pay invoices approved by the Committee and continue to sign
31  checks making the monthly distributions to the 52 beneficiaries?
32
33    Ms. Norman stated that she did not want to do anything that would be
34  contrary to the demands made in the letter.
35
36    Ms. Jolivette-Brown replied that the Mayor has the duty to consider
37  his role and obligations. She commented that Ms. Norman had been in this
38  position for a long time and that she thinks things work but the Mayor wants
39  to be sure that the assets and investments of the trust are being maximized.
40  Ms. Jolivette-Brown stated that those are the responsibilities of the Trustee
41  and cannot be delegated. The Mayor would like to get a legal opinion to
42  determine how decisions should be made in the future. Mark Peneguy stated
43  that the Committee has been acting in this manner for many years.
44
45    Ms. Jolivette-Brown reiterated that the Mayor wants to know,
46  understand, and completely embrace what his role is as Trustee. Secondly,
47  every 4 years there is an election for Mayor. The Mayor, as an individual
48  and in his capacity as Mayor is the Trustee and Chairman of this Committee
49  and the Committee has to be able to accept that.
50
51    Ms. Norman interjected that the business of the committee would
52  grind to a halt if every new Mayor got to change things around. She then
53  repeated her question about the signing the checks?

6

1       Mr. Peneguy proposed a motion authorizing Ms. Norman to sign the
2   checks and continue to operate as she has in managing the affairs of the
3   Donation.
4
5       Ms. Jolivette-Brown stated that she did not want to stop the operations
6   of the Trust but that the Mayor would reserve all of his rights as the
7   fiduciary. He will persist in requesting that the Committee join in a
8   clarification of the roles.
9
10      Mike Peneguy suggested that the Mayor needs to address the specific
11  issues which he has with the Committee, not get a new legal opinion. Is
12  there any way to define the roles? Dr. Robinson stated that it is defined in
13  the Bylaws. Mr. Peneguy also stated that it is in the Bylaws. Ms. Jolivette-
14  Brown stated that the City can and has gotten a legal opinion again but
15  wants the Committee to participate so that a new opinion will be accepted by
16  all. Ms. Jolivette-Brown stated that she was not opposed to going to court to
17  get the issues settled.
18
19      Ms. Jolivette-Brown stated that there were three Peneguy members in
20  attendance and she has allowed everyone to speak.
21
22      Ms. Robinson asked about the City's opinion and asked that the
23  Committee be able to bring their information to the table and also offer other
24  experts. She indicated that it would be good to integrate the City's
25  information. Ms. Jolivette-Brown stated there needs to be a procedure as to
26  how to select a Trust attorney.
27
28      Dr. Robinson suggested that the committee could agree that the old
29  governing documents on procedures be used until such time that the issue is
30  settled how things operate. One of the responsibilities of the representatives
31  requires that there is stability in getting the funds to the beneficiaries.
32
33      The City Attorney stated that the Mayor will not concede as to what
34  his rights, powers, and duties are. To the extent that the Mayor must sign and
35  agree he is reluctant unless he fully understands what is going on. If
36  anything goes wrong he is responsible.
37
38      Michael Peneguy requested that the City Attorney ask that the Mayor
39  put into writing the issues he has and then the Committee will try to address
40  those issues. There is no clarity as to what he wants.
41
42      The City Attorney indicated she could not be specific. She then stated
43  that if it was the conclusion of this entire committee that we go to court then
44  it would be a waste of time. Ms. Jolivette-Brown will ask the Mayor if he
45  has any reservations in sharing any legal opinions that have been rendered.
46  The Mayor wants an objective opinion. There was no guidance given to the
47  outside counsel. She has reservations about sharing the legal opinion if there
48  is going to be litigation.
49
50      The City asked for an explanation of the trust original documents,
51  settlement, lawsuit and the Bylaws in the letter to Simon Peragine the
52  previous week, including a statement that the current Bylaws were illegal
53  and not approved by the Trustee

1  There was a question about Dr. Robinson's motion as to whether the
2 Donation continues to operate as they currently do?
3
4  Ms. Jolivette-Brown offered an amendment to that motion that
5 considering the Mayor's concerns that he will not waive his rights in any
6 matter before the Committee.
7
8  Ms. Norman then stated that this put her in a dangerous position and
9 that perhaps the Mayor should sign all 52 of the beneficiaries check.
10
11  Ms. Norman felt that this was a threat.
12
13  Michael Peneguy seconded the motion of Dr. Robinson as it was
14 presented. Ms. Jolivette-Brown's amendment was seconded by Dr. Williams.
15 Motion for amendment failed on a vote of two to two. The original motion
16 by Dr. Robinson was restated in that the office needs to continue as it has
17 functioned in the past. Second by Michael Peneguy. **Motion Passed.**
18
19  There was a motion by Michael Peneguy to enter into Executive
20 Session to discuss the New Business Item 4, BP Horizon Deepwater Spill
21 Event with outside counsel. There was a second by Everett Williams.
22 **Motion passed.**
23
24  Upon resumption of the Regular meeting there was a motion by
25 Michael Peneguy to approve the proposal to fly additional photography on
26 the property, covering the property along the beach at a cost of $17,050.00.
27 There was a second by Ed Buddy. **Motion passed.** One vote opposed. There
28 was also a motion approving the request for Joel Waltzer to file an
29 intervention in the administrative process to preserve Wisner's legal rights in
30 the BP Spill. There was a motion by Michael Peneguy, second by Dr.
31 Everett Williams. **Motion passed. Ms. Jolivette-Brown abstained.**
32
33
34 **NEW BUSINESS ITEM 5.  Wisner Office Plans**
35
36  Ms. Norman explained that the current administration had questioned
37 whether Wisner was utilizing public funds in accepting free office space and
38 parking spaces in City Hall. Ms. Norman explained that the office was at one
39 time in Charity Hospital, and was then moved many years ago to City Hall.
40 Prior to Katrina the meetings were held in Charity Hospital.  There are
41 concerns among the Committee that once this issue is raised it needs to be
42 addressed. Ms. Jolivette-Brown indicated that the issue was raised in that
43 one meeting and that was not intended to force a move on Wisner's part.
44
45  Mr. Peneguy expressed his thought that the office would be better in a
46 separate location away from any particular beneficiary. The City Attorney
47 indicated that there was not a problem with the office remaining in City Hall
48 and there was no intention for Wisner to move. Ms. Jolivette-Brown also
49 indicated that it might not be a good thing to rehash that issue at this time.
50 William Peneguy was in support of a move and felt that the lease proposal
51 was a great deal. Michael Peneguy also supported moving the office. Ms.
52 Norman remarked that the cost does impact the bottom line, but that she felt

1   this issue should be put aside as attempts were being made to iron out other
2   issues.
3
4
5   **NEW BUSINESS ITEM 6.      Dune Lease Amendment**
6
7         Ms. Norman updated the Committee about the negotiations on the
8   Dune Lease. This is an attempt to amend the old 1945 Oil and Gas Lease
9   that is out of date and poorly written. The attempts to avoid litigation and at
10  the same time sweeten the pot for Wisner by demanding development of the
11  1700 acres involved. The royalty will be increased from 16.6% to 27.5%.
12  Ms. Norman, Mr. Smith and Michael Peneguy met previously and just
13  received the restatement of the lease. Ms. Norman recommended a motion to
14  hold a special meeting next Tuesday to discuss this lease and try to finalize.
15  It was recommended that the meeting be held on March 1, 2011. Then the
16  final document will be presented to the Committee for final approval.
17
18        There is an unsubstantiated claim that all of the property has turned to
19  water and is now owned by the State of Louisiana. However, as long as the
20  lease remains in place the ownership cannot change.  There was a motion by
21  Michael Peneguy to hold the meeting on March 1, 2011, at 12 noon. Second
22  by Dr. Everett Williams. **Motion passed.**
23
24
25  **NEW BUSINESS ITEM 7.      SLBDD – Wisner Beach Update.**
26                              **Expropriation Plans and Phase One**
27                              **Development of the Beach Plan**
28
29        Ms. Jolivette- Brown had raised the issue earlier in the meeting of
30  Lafourche Parish President Charlotte Randolph's meeting with Mayor Mitch
31  Landrieu and their discussion about beach clean up on Fourchon Beach. Ms.
32  Norman updated and discussed the ongoing dispute between the parish, the
33  public and the private landowners about Fourchon Beach. Most of the
34  problems are centered around the issue of driving on the beach. Problems
35  over the years that relate to the public's use of the beach include drowning,
36  trespass, trash, fires, theft, stuck vehicles and damage to dunes and
37  vegetation. There is no control or policing on this beach due to its remote
38  location. The Caillouet Land Company who owns a small piece of the beach
39  at the end of the road that accesses the property has made numerous attempts
40  to prohibit access of vehicles. After Hurricane Katrina the bridge accessing
41  the beach was destabilized and no one could access the beach. This caused a
42  public outcry resulting in legislation being passed creating the South
43  Lafourche Beachfront Development District. Their sole purpose is to
44  develop the property and create roads for access.
45
46        Currently their purpose appears to be contrary with the Wisner
47  Committee's desire to push forward coastal restoration of this property.
48  Currently there is a $340 million project on the books that has been pending
49  since 1998. It is the Barataria Basin Barrier Island restoration project (Triple
50  B). This property loses 46 feet of shoreline a year. Since the spill, so many
51  people have arbitrarily made decisions about this property without even
52  consulting the landowner. Some of the actions fell under emergency
53  protocols however; Wisner could have at least been informed of what was

1    going on, instead, Ms. Norman was banned from the emergency control
2    center.
3
4        The SLBDD has maintained throughout that the beach is clean and
5    ready for recreation. Ms. Norman stated that she offered to take them on a
6    field trip and only 2 of the Lafourche Parish councilmen showed up. The
7    SLBDD is currently threatening expropriation and has funds for the first
8    time due to the BP Oil Spill. They have also joined forces with the Louisiana
9    Wildlife Federation to try to turn the entire Caminada Headland Area
10   including Wisner property into a State Seashore. Ms. Norman reiterated that
11   Ms. Randolph is not a friend to Wisner or this property. That prior to the BP
12   Spill Ms. Randolph has never done anything to assist in efforts to clean up or
13   protect this property. Also there are unprotected pipelines under this beach
14   that are at risk due to cars and fires. This group has a lot of leverage and a lot
15   of clout.
16
17        Last year's legislature was poised to approve a bill creating the State
18   Seashore, however, Wisner openly opposed this at CPRA meetings and
19   hired Cheryl Teamer to fight the idea and the bill was never filed. Wisner
20   wants to be a strong participant in the restoration of this property. Ms.
21   Norman indicated that if settlement money from BP for damage to the
22   property could be used to supplement the restoration project, then Wisner
23   will have a better chance at negotiating for ownership of the newly created
24   land out to the 1935 shoreline. Ms. Norman embraces the philosophy that
25   development of the area is actually contrary to the State's public policy
26   supporting restoration of a piece of property critical to the state of Louisiana.
27
28        Wisner has never denied access to the public on foot although there
29   was a law suit filed by someone who was injured while walking on the
30   beach. Currently there is a push to access the beach this summer in spite of
31   the oil spill cleanup and the contamination. Ms. Norman then discussed the
32   pending coastal restoration projects that could enhance Wisner's property all
33   of which have been delayed by the BP oil spill.
34
35
36   **NEW BUSINESS ITEM 8.**      **Greater Lafourche Port Commission**
37
38        The Marina and Halo Agreements are stalled and waiting on
39   execution by the City. Ms. Norman met with Chett Chaisson, the Executive
40   Director of the Port and discussed the Geotube project as well as the loss of
41   income due to the moratorium and how it would be handled. Ms. Norman
42   indicated that Ms. Ann Burnside has been performing an internal audit of the
43   Port and to date there is $43,000 in question.
44
45        The delay in execution of the Marina Lease, which doubles Wisner's
46   percentage of the rental, resulted in a reduction of income to the Donation.
47   The Port, in good faith, has been paying the higher rental that the new
48   agreement provides since August of 2010. The deadline for the signing of
49   the lease was January 31, 2011, at which time the overpayment was
50   deducted and the continuing payment went back to the old rental. The Halo
51   Subordination Agreement for the bank is also important for future
52   development in the Port. The Committee requested that these Agreements be
53   executed as soon as possible.

**NEW BUSINESS ITEM 9.**     **Mitigation Banking Proposal –**
                             **Restoration Systems, LLC**

There was no update on the proposal by Restoration Systems, Inc. to create a mitigation bank on Wisner property. Ms. Norman has not received a draft agreement from them and has been too busy to address this issue. It also appears that this group is in a great hurry to get something done.

**NEW BUSINESS ITEM 10.**     **Chevron Mitigation Agreement**

Wisner is waiting on the City of New Orleans for execution. Ms. Norman explained this Agreement to the City Attorney and requested that the execution process be streamlined.

**NEW BUSINESS ITEM 12.**     **Next Meeting – Tuesday, March 29, 2011,**
                             **12:30 PM**

Motion was made to adjourn at 3:25 by Michael Peneguy, second by Sandra Robinson. **Motion passed.**

RESPECTFULLY SUBMITTED BY:

_____

C. Cathy Norman, Secretary Treasurer

AMENDED AND APPROVED AT _____ MEETING.
                                    DATE

# MINUTES OF THE MEETING OF THE
# EDWARD WISNER DONATION ADVISORY
# COMMITTEE
# TUESDAY, MARCH 29, 2011

**Present:**
Richard Cortizas, Chairman, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
Dr. Sandra Robinson, Representative, Tulane University
Dr. Everett Williams, Representative, Charity Hospital
Stacey Gerhold-Marvin, Alternate, Charity Hospital
Ed Buddy, Alternate, The Salvation Army

Staff:
C. Cathy Norman, Secretary Treasurer/Land Manager
Dawn Segura, City Attorney's Office
L. Amanda Phillips, Executive Assistant, Wisner

Guests:
Mark Peneguy
Steven Green
Joel Waltzer, Waltzer and Wiygul
Guy Smith, Simon Peragine Smith and Redfearn

Meeting called to order at 12:20 pm.

Richard Cortizas presented the Committee with a letter from Mayor Landrieu authorizing him to serve as Chairman for the meeting and to vote on behalf of the City for this meeting. Michael Peneguy asked when Ms. Ashleigh Gardere would return from maternity leave. Mr. Cortizas replied in May. He was unsure if Ms. Gardere would continue to be the representative.

## OLD BUSINESS

**OLD BUSINESS ITEM 1.**     **APPROVAL OF THE MINUTES OF THE AUGUST 31, 2010 REGULAR MEETING, THE OCTOBER 26, 2010 REGULAR MEETING, THE NOVEMBER 30, 2010 REGULAR MEETING, THE JANUARY 25, 2011 REGULAR MEETING, AND THE FEBRUARY 22, 2011 REGULAR MEETING**

Only November's minutes were presented. Mr. Cortizas asked if the Committee could hold off on approving the minutes until all the minutes were submitted so that the Committee could read them all and approve them all at the same time. After discussion, Richard Cortizas moved that the minutes of August 2010, October 2010, November 2010, January 2011, and February 2011 be approved at the next regularly scheduled meeting. Dr. Everett Williams seconded. **Motion passed.**

## NEW BUSINESS

**NEW BUSINESS ITEM 1.**     **SECRETARY TREASURER'S REPORT**

Invoices:
Simon Peragine (City/Donation)      $10,537.64
FETI (BP)                           8,065.76 ($5,340 outstanding)
                                    7,996.76 ($5,220 outstanding)
                                    8,216.76 ($5,520 outstanding)

1

EXHIBIT
Z

| | FETI  (Regular) | 3,929.90 |
| | Waltzer & Wiygul (BP) | 24,446.49 (includes experts) |
| | | ($15,211.75 outstanding) |
| | Amanda Phillips, Expense Account | 20.68 |
| | C. Cathy Norman, Expense Account | 190.49 |
| | ESRI (GIS) | 416.00 |
| | John Pardue, Ph.D., PE | 9,024.29 |
| | John Pardue, Ph.D., PE | 7,556.40 |
| | Simon Peragine (City) | 14,927.72 |
| | Simon Peragine (Dune) | 6,300.00 |
| | Simon Peragine (City) | 10,537.64 |

The two invoices from John Pardue had been left off of a previous Waltzer & Wiygul invoice.

Ms. Norman informed the Committee she had checked the pre-filed legislative bills. So far there is nothing regarding the South Lafourche Beachfront Development District. April 15 is deadline to pre-file bills. The session will be from April 25 to June 23, 2011. Mark Peneguy asked if Wisner would consider hiring Cheryl Teamer again to handle Wisner's lobbying efforts. Ms. Norman replied that will be considered later in the meeting.

Chevron contacted Wisner to remove of a 168' pipeline that is interfering with the Tennessee Gas pipeline's removal and activities along Fourchon Island. This will require an intrusive access agreement as it does exceed their 40' right-of-way. Chevron is also removing some pipelines offshore, off of the Bay Champagne area. Wisner was notified because it is an adjacent landowner.

LOOP wants to build 6-600,000 barrel tanks for additional storage. Ms. Norman does not believe these will be on Wisner property as the storm damage risk is so high.

Ms. Norman included a revised meeting schedule. The Annual Review is now on Tuesday, May 31, 2011, at 10:30 am.

Ms. Phillips updated the Committee on camp leases, Ms. Burnside's progress on the Port database and internal audit, and computer issues. The financial auditors will be in the office next week. A majority of requested materials have already been emailed to the auditors in preparation for the site visit.

# REDACTED - POTENTIAL LITIGATION



# REDACTED - POTENTIAL LITIGATION

Ms. Phillips requested a budget as well as recommendations for time tracking software. Mark Peneguy suggested that a "cloud" based software not be used. He uses PC Law. A $600 budget was suggested.

Michael Peneguy moved to approve payment of the monthly invoices and expense accounts, payment of outstanding balances on Claims 8, 9 and 10, a $600 budget for time-tracking software, and the Secretary Treasurer's Report. Dr. Everett Williams seconded. **Motion passed.**

**NEW BUSINESS ITEM 2.**       **CITY OF NEW ORLEANS MARCH GRANT REQUESTS**

Mr. Cortizas was not aware of any grant requests. Ms. Norman informed Mr. Cortizas that the Wisner office was getting a large number of calls since the Wisner Grant Proposal was announced in the *Times-Picayune*. Ms. Phillips found the application on the City's website, but many callers wanted to speak with a person. Mr. Cortizas believes Ms. Brooke Smith may be the contact person. He said he would confirm this information.

Michael Peneguy asked who the Selection Committee was. Mr. Cortizas replied that the City put together a set of guidelines for grant proposals. There is an argument that the City's money is public money once it is received. Therefore the City is going to evaluate those proposals rather than come back to the Committee. He did not believe that the City would come to the Committee for approval as it has in the past. Michael Peneguy explained that the Committee reviewed the requests to insure the grants complied with the Donation's intent. Mr. Cortizas suggested that there be an offline conversation to discuss this issue.

Mark Peneguy stated he believes the Mayor cannot select what he wishes to fund and fund them without Committee approval.

Mr. Cortizas said the City is going to use an open process because the City does not want this to become politicized. There will be more eyes on the selection. Mark Peneguy reiterated that the Committee is the arbiter of what is an appropriate use of Wisner funds. Mr. Cortizas was unsure as to who would be on the Selection Committee. He was not fully briefed on this and unable to fully discuss at this moment.

Ms. Norman mentioned the confusion in the names used in the instructions.

Mark Peneguy suggested that the City not make any grants until this is discussed and a resolution is agreed upon.

Mr. Cortizas noted Mark Peneguy's suggestion. Mr. Cortizas stated there needed to be an independent legal opinion, for which the City is willing to pay. He asked to table the debate as to the City's authority to give out grants without Committee approval until such legal opinion has been obtained.

**NEW BUSINESS ITEM 3.**       **FINAL REVIEW OF THE AMENDMENT TO THE 1945 TEXAS COMPANRY LEASE AGREEMENT WITH DUNE ENERGY**

Ms. Norman sent a synopsis of the amendment to the Committee via email. During the time this agreement has been negotiated the price of oil has gone from $80 per barrel to $120 per barrel.

3

1 **REDACTED - ATTORNEY CLIENT COMMUNICATIONS**



7
8
9

13
14

19
20
21

23
24
25
26
27    Michael Peneguy moved to approve the Amendment with minor typographical
28 changes. Dr. Sandra Robinson seconded. **Motion passed.**
29
30
31 **NEW BUSINESS ITEM 4.        WISNER OFFICE SPACE OPTIONS**
32
33    A lease option and proposal from the Exchange Center was presented to the
34 Committee. The proposed rental is $1259 per month. Mr. Cortizas questioned why
35 Wisner was looking at office space. Ms. Norman replied that in her meeting with the
36 Mayor, Mr. Cortizas and others, Mr. Cortizas suggested that Wisner accepted public
37 funds through its gratuitous office space and two parking spots in the City Hall garage.
38
39    Michael Peneguy stated that it was better to separate the offices from City Hall.
40 Historically Wisner's offices had been housed in City Hall and in Charity Hospital
41 because revenues had not been sufficient to support office rental. Now revenues are.
42
43    Mr. Cortizas appreciated the opportunity to clarify his comments. Any time one
44 accepts public property there has to be a public purpose and a public benefit. This is
45 constitutionally required. His comments were not to suggest that Wisner was misusing
46 public property or public assets, but rather Wisner should be careful because it is public
47 space. He also said it was not the intent of the City to ask Wisner to leave. If that is what
48 was understood, that was a mistake.
49
50    Dr. Robinson asked if there were any other entities like Wisner in City Hall. Mr.
51 Cortizas mentioned the Notary and food vendors, who all lease space. He said no one
52 has claimed Wisner is in City Hall illegally.
53
54    Dr. Robinson stated she believes that since so many entities have come under fire
55 in the past months this is very serious. No one on the Committee receives compensation
56 for attending the meetings, not even having their parking reimbursed. Wisner is
57 different from those entities. She is bothered by the possibility of a perception of
58 impropriety. She is extraordinarily careful to insure there is no hint of impropriety with
59 her dealings.
60
61    Mr. Cortizas reviewed the context in which the comment arose. He did not
62 believe anyone could legally make the argument that Wisner was receiving a public
63 benefit without the City receiving a commiserate or greater public good.

4

1   Michael Peneguy asked if there was an objection to the Committee moving out of
2   City Hall. Mr. Cortizas said there was not, but he did not want it to be said the City
3   evicted Wisner or that Wisner received a public benefit greater than the public good
4   received back to the public. Michael Peneguy replied that he always believed that it was
5   better to have a physical separation of the offices from the City.
6
7   Dr. Robinson said while she was comfortable with what Mr. Cortizas explained,
8   she is uncomfortable with the fact that this issue has been raised. And she believes that
9   the misbehavior of other Committees could potentially taint Wisner and the
10   organizations whose representatives sit on the Committee.
11
12   Ms. Norman noted that Wisner will be able to use Conference room space in the
13   Exchange Center and that Chevron left a lot of furniture which Wisner will be able to use
14   instead of purchasing new furniture.
15
16   Mark Peneguy added that his main concern is that Ms. Norman and Ms. Phillips
17   be comfortable where they work.
18
19   Mr. Cortizas stated he would abstain from voting as he represents the City.
20
21   Ms. Norman reviewed the proposal and associated costs. Mr. Cortizas suggested
22   that the matter be tabled for 30 days so that it could be more carefully reviewed. Michael
23   Peneguy asked if this would be a problem with the lease. Ms. Norman replied that she
24   did not think this would adversely affect Wisner.
25
26   Mr. Cortizas moved that the discussion of office space be tabled for 30 days. Dr.
27   Williams seconded. **Motion passed.**
28
29   Mr. Cortizas asked that all the proposals be emailed to the Committee to be
30   reviewed all at the same time.
31
32
33   **NEW BUSINESS ITEM 5.       EXTENSION OF ANN BURNSIDE'S**
34   **                                              CONTRACT**
35
36   Ms. Phillips asked that Ms. Burnside's contract be renewed for 2 90-day periods
37   while she completed multiple tasks. A review of projects and their status was presented.
38   Dr. Robinson moved that the 2 90-day contract extensions be approved. Michael
39   Peneguy seconded. **Motion passed.**
40
41
42   **NEW BUSINESS ITEM 6.       ONGOING ISSUES REGARDING THE**
43   **                                              OPERATIONS AND ADMINISTRATION OF**
44   **                                              THE DONATION**
45
46   Some of this was covered in the New Business Item 2. Ms. Norman said she
47   understood Mr. Cortizas had some agreements for her. Mr. Cortizas reviewed the
48   agreements that had been presented to the Mayor. The Mayor has signed the Marina
49   lease and the Halo Subordination agreement. Mr. Cortizas needed more information
50   regarding the Chevron Mitigation release agreement which Ms. Norman provided to
51   him in the meeting.
52
53
54   **NEW BUSINESS ITEM 7.       REQUEST BY MIKE PERLSTEIN OF WWL-TV**
55   **                                              4-INVESTIGATES TO ATTEND COMMITTEE**
56   **                                              MEETINGS**
57
58   Mike Perlstein continues to contact the office asking to attend the meetings. Mr.
59   Cortizas advised that if the meetings are opened to Mr. Perlstein, the meetings will have
60   to be open to all press. Mark Peneguy averred he believes that the Committee is not a
61   public body. Mr. Cortizas stated that the Mayor's position is the more open the better.
62
63

5

1    Dr. Robinson commented that she believes there are too many sensitive issues
2    discussed to allow press in the meetings. She said he is welcome to see any grant
3    applications and information, but not agendas, minutes or to attend meetings.
4
5    Michael Peneguy moved that the Edward Wisner Donation Advisory Committee
6    is not a public entity and its meetings are not open. If there are issues with which the
7    press can be helpful, the Committee may consider inviting them. Dr. Williams seconded.
8    There were 4 votes in favor of and 1 opposed to the motion. **Motion passed.**
9

10

11   **NEW BUSINESS ITEM 8.**    **BP HORIZON DEEPWATER SPILL EVENT**
12
13    Michael Peneguy moved to enter Executive Session. Dr. Williams seconded.
14   **Motion passed.**
15
16    Dr. Robinson moved to exit Executive Session. Dr. Williams seconded. **Motion**
17   **passed.**
18
19    Dr. Robinson moved that Wisner file suit against BP by April 20, 2011, which is
20   the one year anniversary, the one year prescriptive period, in Federal Court and to also
21   intervene in the LDEQ Administrative Agency Action. Seconded by Dr. Williams.
22   **Motion passed.**
23

24

25   **NEW BUSINESS ITEM 17.**    **WISNER 2010 FINANCIALS, 2011 PROPOSED**
26                    **BUDGET, AND PENDING BUSINESS OF THE**
27                     **DONATION**
28
29    Captain Frizzell asked for the 2010 final Financials and a proposed 2011 Budget
30   to be presented since the Annual Review has been delayed to May. Ms. Norman
31   presented the 2010 Financials. Expenses were extremely high due to the BP spill. If BP
32   expenses were excluded there would be a 9% overhead. Of the $952,000 in expenses,
33   Wisner recouped $216,000 in claims. This brings the total expenses to $736,103, which
34   is a 17.4% overhead. Any BP related expenses not recouped in the claims process will be
35   included in the law suit for recovery.
36
37    Ms. Phillips explained the differences in the BP Claims schedule totals versus the
38   2010 Total Expenses spreadsheet. Payroll, payroll expenses and the GeauxPass toll
39   expenses are not captured as oil spill expenses when recorded in QuickBooks.
40
41    For 2011 income is projected to be $4,033,862 without including potential BP
42   claims revenue. Expenses are projected to be $536,529 without including BP expenses.
43   Included are leasing office space, IT services, and moving costs. That is a 13.3%
44   operating overhead. If BP related claims revenue is considered, income is projected to
45   be $4,789,000. If BP related expenses are included, expenses are projected to be
46   $1,237,000. That results in a 25.8% operating overhead.
47
48    Ms. Norman noted there were some agreements in the works which may result in
49   a higher income for 2011 than estimated. She also distributed a list of current projects
50   and activities in which the office is engaged.
51

52

53   **NEW BUSINESS ITEM 9.**    **NEW OIL INTRUSION OF FOURCHON**
54                   **BEACH**
55
56    This was covered in the Executive Session.
57

58

59   **NEW BUSINESS ITEM 10.**    **WISNER BEACH UPDATE SLBDD**
60
61    Ms. Norman attended the March SLBDD meeting. They continue to push to
62   access the beach and do not believe that there is still oil on the beach. Ms. Norman has
63   offered to take the SLBDD members on a tour of the beach. No one has taken her up on

1   this. Two Lafourche Parish Councilmen have. SLBDD asked for an access agreement so
2   they could tour the beach independently of Wisner. Their plans for expropriating
3   Caillouet Land Corporation property move forward, as well as gathering estimates for
4   the cost of Phase 1's creation. An engineer and an appraiser have been hired for the
5   expropriation.
6
7       Wisner did a FOIA request. It was discovered that Rickey Cheramie, new
8   Chairman of SLBDD, has been taking people on the beach without our permission. Joe
9   Picciola has also been on the property without permission, which he knows is incorrect
10  as he has worked with an access agreement on our property before. Ms. Norman sent
11  both letters telling them they needed access agreements. Loulan Pitre responded that at
12  the meeting SLBDD asked for an access agreement. Ms. Norman replied that she had
13  requested this to be in writing. She took Mr. Pitre's letter to be a written request and
14  sent him both the intrusive and non-intrusive access agreements to him.
15
16      Mr. Cortizas asked if they were performing a governmental function. Ms. Norman
17  explained that the nexus of this problem is their desire to drive on the beach.
18
19      Lafourche Parish has received $2.1 million for tourism in Lafourche Parish from
20  BP. It is anticipated this will be used to expropriate Caillouet's property, build some
21  roads on the property and start Phase 1 of the SLBDD's Strategic Plan.
22
23      As a result of the spill, the Federal government has identified endangered bird
24  nesting habitat that no one will ever be able to drive on the beach. The archeological
25  sites discovered will also prohibit vehicles on the beach. Once a lawsuit is filed, Wisner
26  has every right to keep people off of the beach while clean-up is ongoing. FEMA also has
27  regulations that prohibited development with Federal funds.
28
29      Ms. Norman believes there is not a genuine cause for expropriation. There is a
30  real threat that SLBDD will put a parking lot and/or pier on Caillouet property. After
31  one storm it will all be gone, it seems a waste of public funds.
32
33      Ms. Norman asked for the Committee's approval to discuss with the Nature
34  Conservancy the possibility of a temporary servitude in some of the high value nesting
35  areas on the beach. A servitude with them would protect the property from
36  expropriation and the threats from Elmer's Island.
37
38      The Port's Geo-tube project is moving forward. It is clear from the FOIA requests
39  that the Port is siding with the SLBDD. This is not to their advantage, as Caillouet Land
40  gave them a servitude with the *caveat* that the Port could never expropriate their
41  property. Ms. Phillips noted that the SLBDD wants the Port to help build roads on the
42  beach. This use of Port funds would violate the Priority Port fund rules and could lead to
43  the Port losing Priority Port money.
44
45
46  **NEW BUSINESS ITEM 11.    UPDATE GLPC**
47
48      Mr. Cortizas reported that the Port's Marina lease and the Halo Subordination
49  request have been signed by the Mayor and returned to Ms. Norman.
50
51      The status of the in-house Port audit was covered earlier.
52
53      The Port's Moratorium claim had been submitted to GCCF. The Port believed it
54  was still pending. At the end of February the Port discovered that the rejection letter had
55  gone to the wrong address. Ms. Norman will coordinate with Mr. Waltzer to add our
56  losses to Wisner's lawsuit against BP. The Port's concessions were supposed to end in
57  December 2010, but have been continued through the end of June 2011.
58
59      The E-slip lease's primary term will expire next year. Bryce Autin from the Port
60  has sent a letter invoking their right to extend their lease. The lease has 6 5-year renewal
61  terms.
62
63

7

**NEW BUSINESS ITEM 12.      GLOBAL GEOPHYSICAL REQUEST TO
                                                 SHOOT SEISMIC IN FOURCHON AREA**

Ms. Norman distributed a draft seismic agreement of the most recent seismic agreement. She has surveyed the going rate for seismic shoots. She was told it was about $100 per acre. It appears Global Geophysical wants to shoot 5,000 to 6,000 acres. This will increase the duties of FET, but the FET rates will be paid by Global Geophysical.

Mark Peneguy pointed out Paragraph 13, Liquidated Damages needed to be looked at carefully.

**NEW BUSINESS ITEM 13.      REQUEST TO ELIMINATE COYOTES ON
                                                 FOURCHON ISLAND**

Forrest Travirca is requesting permission to shoot them. They have overtaken the island, are eating the wildlife and have become very bold. They have to be shot only at night, with a .22 rifle, and they have to be buried onsite because of disease. Mr. Travirca will be shooting them. Coyotes are considered a nuisance quadruped. They were approaching the night ops people while searching for food. Night ops have ended.

Michael Peneguy moved to give Forrest Travirca authority to shoot coyotes on Fourchon Island. Dr. Williams seconded. **Motion passed.**

**NEW BUSINESS ITEM 14.      MORRIS HEBERT – JEFFERSON PARSIH
                                                 SURVEY**

An agreement was signed for a survey of Jefferson Parish in 2003. Morris Hebert finally finished the survey. They have sent Wisner several invoices which were $1,500 over the original agreed upon price, $31,200. This is for an invoice they misplaced but Wisner found. As soon as Morris Hebert sends maps with aerial photography of all sections on one map.

Michael Peneguy moved to reauthorize Ms. Norman to pay the Morris Hebert invoice. Dr. Williams seconded. **Motion passed.**

**NEW BUSINESS ITEM 15.      ENTERGY HURRICANE CINDY MITIGATION
                                                 RELEASE**

This agreement is similar to the Chevron Mitigation agreement. It was sent to the prior Administration for signature, but never executed. Ms. Norman drew up a new agreement and sent it Entergy. Entergy had forgotten about this agreement.

Entergy had to do emergency repairs on Wisner property in 2005 after Hurricane Cindy. They damaged the property. The Department of Natural Resources assessed the damages at $15,000. Because of the good relationship with Wisner, Entergy not only paid to the State (as required by law), but also to Wisner. It had been earmarked for the Geo-tube project.

Since both Chevron and Entergy have given Wisner matching mitigation funds, Ms. Norman will now require this in all future agreements. Then Wisner can use it on restoration projects on Wisner property. Ms. Norman explained Wisner's past use of mitigation funds to create the Lafourche Parish Wisner Restoration Project.

**NEW BUSINESS ITEM 16.      PLAINS BOAT LAUNCH SITE AGREEMENT**

Plains has this exact lease in place for production facilities on Wisner property. Plains keeps a boat so they can run the pipelines every few days. They were kicked out of Charlie Hardison's marina. Wisner has a lot along the highway that is vacant, the old

8

Marshland site. It is an eyesore and an attractive nuisance. Plains has asked if they can rent this and build a boat launch.

Ms. Norman proposed that Wisner lease to Plains for $3000, and they have to put up and to maintain a gate. There will still be room for another tenant. This is a similar lease to the one Plains signed in 2007 on Fourchon Island.

Michael Peneguy asked how the sewerage lot-size requirements would affect this lease area. Ms. Phillips replied that the requirement is a 12,000 square foot lot in order to have sewerage. Ms. Norman does not believe Plains will need water or sewerage on the lot, but will inform Plains of the requirement.

It would be a 1-year lease with 9 1-year renewals with a 5% escalation. Mr. Cortizas asked if Wisner wanted to be in a long lease with Plains. Ms. Norman responded that Plains is a good company with a long history with Wisner. She feels comfortable having a long lease with them.

Michael Peneguy moved to approve the lease with Plains. Dr. Williams seconded. **Motion passed.**

**NEW BUSINESS ITEM 18.    NEXT MEETING – TUESDAY, APRIL 26, 2011**
**12:00 NOON**

Meeting adjourned at 3:04 pm on a motion by Michael Peneguy, seconded by Dr. Williams. **Motion passed.**

RESPECTFULLY SUBMITTED BY:

_____
C. Cathy Norman, Secretary Treasurer

AMENDED AND APPROVED AT _____ MEETING
*DATE*

# MINUTES OF THE MEETING OF THE
# EDWARD WISNER DONATION ADVISORY
# COMMITTEE
# TUESDAY, APRIL 26, 2011

**Present:**
Richard Cortizas, Chairman, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
William Peneguy, Alternate, Wisner Family Heirs
Dr. Sandra Robinson, Representative, Tulane University
Dr. Everett Williams, Representative, Charity Hospital
Ed Buddy, Alternate, The Salvation Army

Staff:
C. Cathy Norman, Secretary Treasurer/Land Manager
Dawn Segura, City Attorney's Office
L. Amanda Phillips, Executive Assistant, Wisner

Guests:
Mark Peneguy
Joel Waltzer, Waltzer and Wiygul
Jim Burton, Simon, Peragine, Smith and Redfearn
Guy Smith, Simon, Peragine, Smith and Redfearn

Meeting called to order at 12:15 pm.

Richard Cortizas presented the Committee with a letter from Mayor Landrieu authorizing him to serve as Chairman for the meeting and to vote on behalf of the City for this meeting

## OLD BUSINESS

**OLD BUSINESS ITEM 1.**     **APPROVAL OF THE MINUTES OF THE AUGUST 31, 2010 REGULAR MEETING, THE SEPTEMBER 28, 2010 REGULAR MEETING, THE OCTOBER 26, 2010 REGULAR MEETING, THE NOVEMBER 30, 2010 REGULAR MEETING, THE JANUARY 25, 2011 REGULAR MEETING, AND THE FEBRUARY 22, 2011 REGULAR MEETING**

Michael Peneguy motioned to approve the August 31, 2010 Regular Meeting Minutes, the September 28, 2010 Regular Meeting Minutes, the October 26, 2010 Regular Meeting Minutes, and the November 30, 2010 Regular Meeting Minutes. Dr. Everett Williams seconded. **Motion passed.**

## NEW BUSINESS

**NEW BUSINESS ITEM 1.**     **SECRETARY TREASURER'S REPORT**

Invoices:

| | |
|---|---|
| Simon Peragine (City/Donation) | $4,514.79 |
| FETI (BP) | 8,913.00 ($7,425.21 outstanding) |
| | 7,513.00 ($7,420.76 outstanding) |
| | 1,300.00 |
| | 1,512.48 |
| Amanda Phillips, Expense Account | 9.78 |
| C. Cathy Norman, Expense Account | 288.03 |

1



EXHIBIT
*AA*

Other items that are not included on the agenda include various articles involving issues affecting the property. The first was an article about the potential of a spill at LOOP. Another was about Louie the dolphin. Louie was the dolphin that Ms. Norman and Mr. Travirca rescued in September on the beach. Louie is the only surviving marine mammal rescued during the spill.

Ms. Norman spoke at length with Chett Chaisson, the Executive Director of the Port various issues. Prior to the spill there were 33 working deepwater permits, 30 of which were home based and marshaled out of Port Fourchon. Currently, there are 11 new permits 10 of which are handled by Port Fourchon. The rental concessions will be lifted by June 2011. To date the Port has not lost any tenants. The Port's claim for loss of revenuewas denied but they hope to file suit through OPA 90 for relief. Ms. Norman also talked about the hard structures on the beach and the Port wants them to remain in place. BP has not yet cleaned the boudin bags on the beach so the Geotube project has been delayed.

There was a letter from Chevron concerning the Oil Gas and Mineral audit. Ms. Norman will be re-contacting them by mail to get answers on some of the questions that were raised by the audit concerning flare and other costs that were very inconsistent from year to year.

There was a request for a donation from the Golden Meadow Tarpon rodeo which is held at the Public Boat launch. Past donations ranged from $500 in 2007 to $200 in 2009. The rodeo was cancelled last year due to the spill. Ms. Norman has concerns about trespass on the property and the fact that many fences are down as a result of the spill. This may not be the year to support the rodeo. Ms. Norman wants more clarification prior to supporting the rodeo. There is a June 6th deadline for donations. Ms. Norman would like to wait until the May meeting to make a recommendation. There was also a report from the Harbor Police that camp owners on adjacent property are trespassing onto Wisner property at night with airboats for bow fishing.

Ms. Norman has also gotten a lot of calls about marsh clean up techniques for various groups that want to use Wisner property for a test site for their techniques. The group out of Berkley wants a 100' by 100' site where they would spray the marsh and then use a suction boat to suck up the oil. Most of these projects are an attempt to develop a technique that will be required in the future and will be big business. The question is raised as to how Wisner will share in any profits.

Michael Peneguy moved to approve payment of the monthly invoices and expense accounts, and the Secretary Treasurer's Report. Dr. Robinson seconded. **Motion passed.**

**NEW BUSINESS ITEM 2.**     **CITY OF NEW ORLEANS MARCH GRANT REQUESTS**

There were not grant requests from the City of New Orleans for approval.

**NEW BUSINESS ITEM 3.**     **DUNE ENERGY FINAL LEASE RESTATEMENT AND AMENDMENT WITH ATTACHED MEMORANDUM**

# REDACTED - ATTORNEY CLIENT COMMUNICATIONS

2



21  Michael Peneguy moved to approve the Amendment with minor typographical
22  changes and removal of the language stating that the old lease is of no further affect.  Dr.
23  Sandra Robinson seconded. **Motion passed.**

**NEW BUSINESS ITEM 4.      WISNER OFFICE SPACE OPTIONS**

28  Ms. Norman has presented a proposed lease and terms for a new office for the
29  Wisner Donation. The City and Committee have expressed an interest in complete
30  transparency by establishing an independent office. Mr. Cortizas indicated that the
31  City had no issue with the Wisner office remaining in City Hall. He also indicated that he
32  would abstain from voting on this issue. Ms. Norman provided comparables for the
33  space to the Committee.

35  Michael Peneguy made a motion to approve the proposed lease and the move of
36  the office space into the Exchange Centre. Mr. Peneguy also asked if the Mayor would be
37  willing to execute the lease for the office space. Mr. Cortizas indicated that he did not
38  understand why the Committee would want to pay rent, but that if it is a fair lease he
39  indicated that the Mayor would sign it with the Committee's approval.  The costs
40  presented includes phones, insurance, parking, furniture and some moving costs. There
41  was a motion to approve the move with additional motion that Ms. Norman be
42  authorized to execute the lease if the Mayor cannot or prefers not to. The motion was
43  made by Michael Peneguy.  Dr. Robinson seconded. **Motion passed. Richard**
44  **Cortizas abstained.**

46  At 1:20 pm there was a motion to enter Executive Session to discuss New
47  Business Item 5, the BP Oil Spill, by Michael Peneguy. Second by Dr. Everett Williams.
48  **Motion passed.**

50  There was a motion to exit Executive Session at 1:47 pm by Michael Peneguy.
51  Second by Dr. Sandra Robinson. **Motion passed.**

**NEW BUSINESS ITEM 6.      WISNER BEACH UPDATE**

55  Ms. Norman attended the monthly meeting of the SLBDD and once again the
56  Commission asked to be allowed on the beach and indicated that they had heard that the
57  beach was not that bad in terms of contamination. Specifically they mentioned the term
58  "NFT" and indicated that there was no further treatment needed. Ms. Norman also met
59  with the Coast Guard and USF&W and both agree that the public should not be out
60  there. Ms. Norman also gave the Committee copies of letters she sent to companies that
61  are working for the SLBDD in furtherance of their appraisal of the property and
62  proposed development plan. Ms. Norman warned them that they are not allowed on
63  Wisner property without an Access Agreement.

3

Ms. Norman was contacted by CEC, a company out of Naples, Florida that is the new engineering consultant for the Caminada Headlands project. They referred to this as a strictly environmental project. The plan is to use hopper dredges to bring the sand in from Ship Shoal to nourish the beach. They will meet with Wisner within the next month to discuss all of these issues. There was also a discussion about the hard structures on the beach and whether they need to be removed or not.

**NEW BUSINESS ITEM 7.          PENDING CONTRACTS AND STATUS**

There is one outstanding document needing execution by the Mayor, specifically, the Chevron Mitigation Agreement. The balance of the agreements are pending with outside company approval including Plains, Chevron Access for pipeline removal and Entergy Mitigation.

Ms. Norman also turned over several agreements for execution by the Mayor including Alligator Trapping lease in Jefferson and St. John the Baptist Parishes and Alligator Egg collection leases in St. John and Jefferson Parishes. There is also a Trapping lease in St. John for nutria. These leases were handed over to Mr. Cortizas for the Mayor's execution.

**NEW BUSINESS ITEM 8.          NEXT MEETING – TUESDAY, MAY 31, 2011**
                                           **ANNUAL REVIEW 10:30 AM**
                                           **REGULAR MEETING 12:00 NOON**

Meeting adjourned at 2:07 pm on a motion by Michael Peneguy, seconded by Dr. Williams. **Motion passed.**

RESPECTFULLY SUBMITTED BY:

C. Cathy Norman, Secretary Treasurer

AMENDED AND APPROVED AT  31 May 2011          MEETING
                                            *DATE*

4

# MINUTES OF THE MEETING OF THE
# EDWARD WISNER DONATION ADVISORY
# COMMITTEE
# TUESDAY, MAY 31, 2011

**Present:**
Richard Cortizas, Chairman, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
Dr. Sandra Robinson, Representative, Tulane University
Dr. Everett Williams, Representative, Charity Hospital
Ed Buddy, Alternate, The Salvation Army

Staff:
C. Cathy Norman, Secretary Treasurer/Land Manager
Dawn Segura, City Attorney's Office
L. Amanda Phillips, Executive Assistant, Wisner

Guests:
Mark Peneguy
Joel Waltzer, Waltzer and Wiygul
Guy Smith, Simon, Peragine, Smith and Redfearn
Stephen Green

Meeting called to order at 12:43 pm.

## OLD BUSINESS

**OLD BUSINESS ITEM 1.**     **APPROVAL OF THE MINUTES OF THE
JANUARY 25, 2011 REGULAR MEETING, THE
FEBRUARY 22, 2011 REGULAR MEETING,
THE MARCH 29, 2011 REGULAR MEETING,
AND THE APRIL 26, 2011 REGULAR
MEETING**

Michael Peneguy found one change in the March 29th minutes on line 22 Page 8 where the word authority should be inserted. Richard Cortizas also had a change on page5 Line 59 where the word "cautioned" should be changed to "advised".

With those changes Michael Peneguy made a motion to approve all of the minutes from January through April. There was a second by Everett Williams. **Motion passed.**

## NEW BUSINESS

**NEW BUSINESS ITEM 1.**     **SECRETARY TREASURER'S REPORT**

In addition to the listed invoices there were the following expense accounts:

C. Cathy Norman          $538.76
L. Amanda Phillips        $ 33.42

Other items that are not included on the agenda include:

LOOP wants to do a survey on the beach to replace markers where the pipeline comes onto shore. This is on hold due to bird nesting. This project is on hold.

Coalition to Restore Coastal Louisiana wants to do a black mangrove planting. Ms. Norman has suggested the area where the Wisner Restoration project was built. Ms. Norman will meet with their representatives in Fourchon to look at the area.

1



EXHIBIT
*BB*
tabbies

1 The Tarpon Rodeo has requested support from Wisner. Due to the BP spill, it was
2 recommended that Wisner not participate and that the sponsors be reminded to stay off
3 of Wisner's property. Ms Norman recommended that a letter be written advising Chris
4 Moran, the head of the rodeo, that we will not be a contributor this year and that the
5 public needs to stay off of Wisner's property.
6
7 Ann Burnside has been working on the oyster lease issue. She has organized the files
8 and they are ready for Ms. Norman to proceed when she has time.
9
10 The GLPC has responded to Ms. Burnside's in house audit of the Port's lease payments.
11 The Port disagrees with some of our computations for payment and these issues will
12 need to be addressed in detail. Some of the other items that were revealed have already
13 been paid.
14
15  Dr. Everett Williams moved to approve payment of the monthly invoices and
16 expense accounts and the Secretary Treasurer's Report. Dr. Sandra Robinson seconded.
17 Motion passed.
18
19
20 NEW BUSINESS ITEM 2.  CITY OF NEW ORLEANS MARCH GRANT
21   REQUESTS
22
23  There were no grant requests from the City of New Orleans for approval.
24
25
26 NEW BUSINESS ITEM 3. 2010 ANNUAL AUDIT BOURGEOIS BENNETT
27
28 This item was tabled and will be addressed at the next meeting. Ms. Norman did
29 distribute the audit to the Committee for review.
30
31 NEW BUSINESS ITEM 4.  DUNE ENERGY FINAL LEASE
32   RESTATEMENT AND AMENDMENT.
33   REQUEST BY HUNT TO ASSIGN THEIR
34   INTEREST IN THE DEEP RIOGHTS IN THE
35   LEEVILLE AREA TO MANTI

36
37 # REDACTED - ATTORNEY CLIENT
  # COMMUNICATIONS
39
40
41

    42

44

46

50
51
52

54
55
56

60
61
62

1
2

9
0

12
13
14

17
18
19
20
21
22
23
24   On advice of counsel Michael Peneguy moved to approve the execution and
25   swapping of documents with Dune and Manti, simultaneously executing the approval of
26   the assignments to Manti and then having Dune and Manti execute the Amendment to
27   lease. Dr. Sandra Robinson seconded. Motion passed.
28
29
30   NEW BUSINESS ITEM 5.      WISNER OFFICE SPACE UPDATE
31
32   The lease was signed and returned to building.  Insurance $1260/year this does
33   not include the three million in excess that will be another $1000. Moving costs will be
34   approx. $2000 and the phone purchase will be $2643. Total monthly cost will be around
35   $2100 per month.  Ms. Norman recommended that the committee consider raising the
36   campsite rentals by $100 per month to cover our additional office costs. Ms Norman
37   stated that this can be considered later in the year. At $650 per year Wisner's leases are
38   some of the cheapest leases in the State.
39
40   This will be discussed later in the year when camp renewals are reviewed.
41
42   At 1:33 pm there was a motion to enter Executive Session to discuss New
43   Business Item 5, the BP Oil Spill, by Michael Peneguy. Second by Dr. Sandra Robinson.
44   Motion passed.
45
46   There was a motion to exit Executive Session at 2:15 pm by Everett Williams.
47   Second by Dr. Michael Peneguy. Motion passed.
48
49   NEW BUSINESS ITEM 7.      WISNER BEACH UPDATE
50
51   Ms. Norman attended the monthly meeting of the South Lafourche Beach Front
52   Development District. Ms. Norman also reported a lot of movement with the Caminada
53   Headlands Restoration Project. She is meeting with the new engineering firm. There is
54   also another potential source of sand in the Corps of Engineers branch in Mobile
55   Alabama. Mark Peneguy inquired as to how far out into the Gulf the project would
56   extend. Ms. Norman indicated that there were several templates with different dune
57   heights and the amount of land created depends on which template is used. The beach
58   changes so much that the project will no doubt change again prior to building the
59   project. They will only be able to nourish a portion of the beach with the $70 million
60   that they have from CIAP. Ideally Wisner would like to dovetail onto of this project with
61   additional sand paid for by BP.
62

3

1      The Department of Wildlife and Fisheries has reopened Elmer's Island. As a
2  result there are vehicles riding on the dunes and entering Wisner property from the east.
3  The solution is to get pilings installed to prevent access.
4
5  **NEW BUSINESS ITEM 8.**      **PENDING CONTRACTS AND STATUS**
6
7      Richard Cortizas indicated that he has the executed Chevron mitigation
8  agreement and that he would get it back to the Wisner office.
9
10  **NEW BUSINESS ITEM 9.**      **GLOBAL INDUSTRIES SEISMIC REQUEST**
11                          **BAY MARCHAND AREA**
12
13      The last seismic agreement paid $50 per acre. That was for the Leeville shoot.
14  Global has indicated that they have been delayed due to the birds and BOMER. When
15  we last shot seismic there was serious damage due to a drought and hurricane season.
16  Both of these conditions exist now so we would prefer to wait. Ms. Norman requested
17  that the Committee look at the old Agreement and send her any comments. The shoot
18  covers around 10,000 acres. Chevron will also need to approve, but Ms. Norman
19  assumes that they are involved in the shoot.
20
21  **NEW BUSINESS ITEM 10.**      **CAMPSITE UPDATE**
22
23  There have been some trespassers in airboats and there was also a helicopter that
24  landed on the property without permission. We also suspect that the helicopter's
25  occupant is running a commercial fishing operation. There is a request for a fishing
26  rodeo for Bayou Segnette. They want to raise money for CRCL and to buy new fire
27  pumps for the area. This is a bunch of camp owners who want to get together to do this.
28  It was suggested that they have insurance in place prior to the event.
29
30  **NEW BUSINESS ITEM 11.**      **COALITION TO RESTORE COASTAL**
31                          **LOUISIANA REQUEST FOR MANGROVE**
32                          **PLANTING SITE**
33  Previously discussed
34
35  **NEW BUSINESS ITEM 12.**      **CHEVRON OIL COMPANY**
36
37  Wisner received proposed changes in two Unit agreements. Wisner must give a letter of
38  no objection. Michael Peneguy suggested that it was all in pooled area II and that
39  approval should be granted. Motion to approve by Michael Peneguy. Second by Everett
40  Williams. Motion passed.
41
42  **NEW BUSINESS ITEM 13.**      **LOOP WORK ON BEACH REPLACING**
43                          **PIPELINE MARKERS**
44  Previously discussed
45
46  **NEW BUSINESS ITEM 14. LEGISLATIVE UPDATE**
47
48  Rep. Cortez authored Bill 563 which relates to Act 312 giving more power to the oil
49  companies to decide on how much clean up to do. This bill was defeated.
50
51
52  **NEW BUSINESS ITEM 15.**      **ANNUAL REVIEW SUB COMMITTEE RECAP**
53
54  Richard Cortizas commended Ms. Norman and Ms. Phillips for a job well done,
55  especially under the current extenuating circumstances. Both Amanda Phillips and
56  Cathy Norman were given 3% raises retroactive to January 1, 2011.
57
58  The Executive Committee also agreed to a new employment agreement for Ms. Norman
59  effective January 1, 2012 with the renewal clauses for January 1, 2013 thru December 31,
60  2013 and January 1, 2014 through August 4, 2014. Said Agreement will have the same
61  terms and conditions of the January 1, 2007 Agreement as amended by the Committee
62  on February 17, 2009.
63

Motion to approve by Michael Peneguy, second by Ed Buddy. Motion passed.

**NEW BUSINESS ITEM 16.**      **NEXT MEETING – TUESDAY, JUNE 28, 2011**
                                 **12:00 NOON**

    Meeting adjourned at 3:07 pm on a motion by Michael Peneguy, seconded by Dr. Williams. **Motion passed.**

RESPECTFULLY SUBMITTED BY:

C. Cathy Norman, Secretary Treasurer

AMENDED AND APPROVED AT _Apl. 27, 2011_ _____ MEETING
                                 *DATE*

5

# MINUTES OF THE MEETING OF THE
# EDWARD WISNER DONATION ADVISORY
# COMMITTEE
# TUESDAY, JUNE 28, 2011

**Present:**
Richard Cortizas, Chairman, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
William Peneguy, Alternate, Wisner Family Heirs
Major William A. Owens, Representative, The Salvation Army
Ed Buddy, Alternate, The Salvation Army
Dr. Sandra Robinson, Representative, Tulane University
Dr. Everett Williams, Representative, Charity Hospital
Stacy Gerhold-Marvin, Alternate Charity Hospital

Staff:
C. Cathy Norman, Secretary-Treasurer/Land Manager
L. Amanda Phillips, Executive Assistant, Wisner

Guests:
Mark Peneguy
Kelly Mc Ghee, Bourgeois Bennett
Stephen Green
James Burton, Simon Peragine Smith and Redferan


The meeting was called to order at 12:15 pm.

## OLD BUSINESS

**OLD BUSINESS ITEM 1.**      **APPROVAL OF THE MINUTES OF THE MAY 31, 2011 ANNUAL MEETING AND THE MAY 31, 2011 REGULAR MEETING**

There were no Minutes for approval at this time.


**OLD BUSINESS ITEM 2.**      **APPROVAL OF THE 2010 ANNUAL REPORT**

Ms. Norman distributed the updated budget, which reflected changes in the IRS mileage allowance and the pay raises approved in the last meeting. A resolution to extend Ms. Norman's contract through the end of 2014 was presented to the Committee for ratification. The Annual Report was amended as suggested in the previous meeting by Captain Frizzell.

Michael Peneguy moved to approve the updated 2011 budget. Dr. Sandra Robinson seconded. **Motion passed.**

It was agreed to come back to the Annual Report for approval when the amended Annual Report was presented.

Mr. Cortizas recognized Major William Owens, the new Representative for the Salvation Army.

EXHIBIT
CC
tabbies

## NEW BUSINESS

**NEW BUSINESS ITEM 1.**　　　**SECRETARY TREASURER'S REPORT**

Invoices:

| | | |
|---|---|---|
| FET (non-BP) | $3,587.25 | |
| FET (non-BP) | 1,295.00 | |
| FET (BP) | 6,347.00 | ($6,087.78 outstanding) |
| FET (BP) | 6,214.00 | ($6,160.76 outstanding) |
| FET (BP) | 5,214.00 | ($5,185.82 outstanding) |
| FET (BP) | 5,240.00 | ($5,567.41 outstanding) |
| FET (BP) | 1,000.00 | |
| AeroData (BP) Aerial Photography | 17,400.00 | |
| Waltzer & Wiygul (BP) | 4,015.00 | |
| Waltzer & Wiygul (BP) | 28,555.71 | ($7,624.50 outstanding) |
| Simon Peragine (Dune) | 2,041.60 | |
| (Dune) | 4,111.20 | |
| Simon Peragine (City) | 2,337.84 | |
| Eagan Insurance (New Office - liability) | 1,260.00 | |
| C. Cathy Norman Expense Account | 111.40 | |
| L. Amanda Phillips Expense Account | 9.52 | |
| LA 1 Coalition Dues | 2,000.00 | |

Most of the items on the Secretary Treasurer Report will be addressed in the Agenda. A copy of the Highway LA 1 map was included, because it still shows the Wisner Wildlife Management Area.

Ms. Norman included a nomination of some property in the Bayou Segnette area for the August State Lease sale. She will send a letter stating that at least everything in Jefferson Parish which is a man-made corridor; including the Bayou Segnette Waterway, Wisner maintains the minerals underneath it. Most of the waterways within the outline for the sale are man-made. There are also two tracts surrounding it which are not owned by Wisner also up for the lease sale. It shows additional interest in this area for oil and gas development. Helis leased in this area, but was unable to get a permit because they tried to drill on Federal Park property.

The Port is interested in opening negotiations for Fourchon Island. It is about 3500 acres which currently houses the Chevron facility, the MARS pipeline, Stone Energy, Plains and Energy Partners. Chevron also holds subsurface rights in this area. The Port's budget is $79.3 million.

An article from the Louisiana State Bar Journal about the Unrecorded Exercise of Option to Extend Lease was included. It states that a third party is bound by an unrecorded exercise of an option to renew the lease if a lease containing the option is recorded. Wisner has many leases with options included.

The Chevron unit is going forward and they are calling for a public hearing.

Michael Peneguy moved to have Wisner contribute to the LA 1 Coalition for $2000. Dr. Everett Williams seconded. **Motion passed.**

Michael Peneguy moved to approve the Secretary Treasurer's Report and to pay the Expense Accounts. Dr. Sandra Robinson seconded. **Motion passed.**

| | |
|---|---|
| 1 | **NEW BUSINESS ITEM 2.**      **CITY OF NEW ORLEANS GRANT REQUESTS** |
| 2 | **UPDATE ON CITY'S GRANT PROCESS** |
| 3 | |

4    There are no grant requests to be presented. Unfortunately Ashleigh Gardere,
5  who is Advisor to the Mayor on Development and Strategy had a schedule conflict and
6  could not attend today's meeting. The City had a Wisner Grant Information Session
7  which Ms. Norman and Ms. Phillips attended. The meeting was to inform the public as
8  to how to apply for a Wisner grant.

9

10    Mr. Cortizas stated that he and Ms. Norman had discussed having a separate
11  meeting for the Committee to discuss specifics without taking up a lot of time in the
12  Regular Meeting. It is important to the City that they are careful in how they handle the
13  money from the Trust; because once it is received it is Public Funds. That was the intent
14  behind the informational seminar.

15

# REDACTED - POTENTIAL LITIGATION





NEW BUSINESS ITEM 3.     2010 ANNUAL AUDIT – BOURGEOIS BENNETT

1    Kelly McGhee presented Bourgeois Bennett's audit of Wisner's 2010 financial
2  statements. Wisner reports on a cash basis and not a GAAP basis. There are no new
3  accounting policies or footnotes.
4    Michael Peneguy moved to approve the 2010 Annual Audit. Dr. Sandra Robinson
5  seconded. **Motion passed.**
6
7
8  **NEW BUSINESS ITEM 4.        DUNE ENERGY – FINAL LEASE**
9  **                                               AMENDMENT AND RESTATEMENT –**
10 **                                               STATUS OF SIGNATURES**
11
12    Ms. Norman reported the only outstanding agreements were James Peneguy and
13 The Salvation Army. Major Owens said Major Larry Broom is the new legal secretary on
14 behalf of The Salvation Army. Copies of the two assignment approvals were in the
15 packet. Dune is anxious to drill a new well.
16
17
18 **NEW BUSINESS ITEM 5.        WISNER OFFICE MOVE UPDATE**
19
20    The office is moving a week from today. The copier is moving on Friday. The
21 insurance was $3,802 and $3,600 was budgeted. Eagan had a difficult time binding the
22 policy without any underlying coverage. The salesman is insisting on having Wisner look
23 at some other coverages. Ms. Norman requested permission to shop the policy around.
24 It was necessary to have insurance in place to move in, but it could be less expensive
25 with another firm. Ms. Norman did not hear from the other companies she called
26 before.
27
28    Michael Peneguy moved to approve the additional $202 expenditure on the
29 insurance. Dr. Sandra Robinson seconded. **Motion passed.**
30
31
32    Ms. Norman asked Joel Waltzer to arrive at 1:30pm, so the agenda was changed
33 to accommodate him.
34
35
36 **NEW BUSINESS ITEM 7.        WISNER BEACH UPDATE**
37
38    The South Lafourche Beachfront Development District sent a letter requesting
39 access to the property. It and Ms. Norman's response were in the packet. It is an
40 inappropriate time. Mr. Cheramie misunderstands the meaning of "NFT – No Further
41 Treatment," it does not mean there is no oil. It is a spill term. He asks for even
42 pedestrian access. There are still clean-up crews, debris and oil on the property. Elmer's
43 Island did open. It has no enforcement, bathroom facilities or lifeguards. People are
44 accessing Wisner's private property from Elmer's Island.
45
46    The Port and BP helped Forrest Travirca reinforce the boundary line. Wisner will
47 have to continue to post the property. Ms. Norman will be there one day this weekend
48 since it will be July 4, to see what is going on at Elmer's.
49
50    The Corps sent a letter regarding the Barataria Basin Barrier Shoreline
51 Restoration (BBB) project and whether Wisner would sell its property. They are in the
52 planning process and trying to determine their fiscal liability with the project. Ms.
53 Norman informed them in writing that it was not for sale, but Wisner would like to enter
54 into a servitude with them and that Wisner completely supports the project.
55

1    There is a $1 billion early restoration agreement, of which Louisiana will receive
2    $100 million from BP. The State is asking for projects to be submitted. The Caminada
3    Headlands Restoration Project (CHRP) is high on the list. Wisner cannot submit the
4    CHRP for project because Lafourche Parish submitted it to CIAP. Ms. Norman did send
5    a letter in support for the CHRP project because it is planned and ready to go. The $100
6    million can increase the footprint and size as opposed to creating a new project. It is her
7    understanding that CHRP is receiving a lot of attention.
8
9    Michael Peneguy moved to send the SLBBD a letter that access to the beach be
10    prohibited this summer due to ongoing clean-up concerns. Dr. Sandra Robinson
11    seconded. **Motion passed.**
12
13
14    **NEW BUSINESS ITEM 8.        PENDING CONTRACTS AND STATUS**
15
16    Michael Peneguy asked if Ms. Norman had heard from Plains. She had not, or
17    from Chevron. Chevron had informed Ms. Norman that they would be working on the
18    property on a pipeline. She sent them the same Access Agreement they signed 2 years
19    ago. After initially making changes, they agreed to sign it was originally. So far it has
20    not been returned.
21
22    Since the Access is only for 2 or 3 months, Ms. Norman will send it only to the
23    Mayor for signature instead of the entire Committee and family. This will expedite its
24    execution. Most of the work they will do, will be in the existing servitude.
25
26
27    **NEW BUSINESS ITEM 9.        GLOBAL INDUSTRIES SEISMIC REQUEST –**
28    **                           BAY MARCHAND AREA**
29
30    A draft agreement was distributed. Gentlemen from Global Services (GS) visited
31    with Ms. Norman. They have not decided whether or not they will do it this year. The
32    last time Wisner did a seismic agreement it was paid a flat amount. GS has countered
33    that as this is a less intrusive method of gathering seismic data they will only pay $15 per
34    acre. Ms. Norman refused this offer.
35
36    She suggested the Committee look at a flat fee instead of a per acre fee. They are
37    having problems getting permits because of the bird nesting on the beach. If approval is
38    needed quickly, it will be asked for electronically. She asked for comments to be made
39    via email. Mark Peneguy said he would send comments and corrections.
40
41    Michael Peneguy asked if only the Mayor's signature was necessary. Jim Burton
42    stated that it depends on the length of the agreement and in this situation, it would be
43    ok.
44
45
46    **NEW BUSINESS ITEM 10.       CAMPSITE UPDATE**
47
48    Ms. Norman wrote to Mr. Bankston regarding repairs to his gate. He responded
49    that he is doing some repairs to the gates along Bayou Moreau. He will be speaking with
50    Forrest.
51
52    The Fishing Rodeo in Bayou Segnette was canceled.
53
54    Houston Saucier contacted the office requesting a Minnow lease. He sells bait. He
55    is currently leasing 4100 acres from ConocoPhillips further north. He pays $1,025 per

1   year and it is a 5 year lease. He sent a map outlining the area in which he is interested.
2   Some of this area is co-owned with ConocoPhillips. He says he has insurance and is fine
3   with Wisner's insurance requirements. Ms. Norman said Wisner would need to check
4   him out before issuing a lease.
5
6       Leon Borne has approached Wisner for a hunting lease in St. John the Baptist
7   Parish. Ms. Norman has called Dr. Pilié to see if he knows Mr. Borne. Michael Peneguy
8   does not want to put the lease in the grandson's name. Ms. Norman noted that $3.50
9   per acre is much lower than what is being received on the Jefferson Parish deer hunting
10   lease.
11
12
13   **NEW BUSINESS ITEM 11.**     **COALITION TO RESTORE COASTAL**
14                                        **LOUISIANA – REQUEST FOR MANGROVE**
15                                        **PLANTING SITE IN LAFOURCHE PARISH**
16
17       Ms. Norman is meeting with CRCL tomorrow. She will suggest that they plant the
18   2500 mangroves on the mitigation area Wisner created adjacent to the canal. It will be a
19   community based planting. Participants would have to sign waivers. They would be
20   ferried across the canal. CRCL would manage the entire project. The Port would also
21   assist in the event.
22
23
24   **NEW BUSINESS ITEM 12.**     **LOOP WORK ON THE BEACH – REPLACING**
25                                        **SIGNS MARKING PIPELINE**
26
27       LOOP is awaiting permission from the bird people. Their response was when they
28   were ready, they'd be ready.
29
30
31   **NEW BUSINESS ITEM 13.**     **FRRI PROPOSED MEETING**
32
33       Ms. Norman spoke at length with Cindy Leblanc at LOOP. Ms. Norman would be
34   participating in LOOP's Spill Drill. Cindy is going to work with Ms. Norman to set up a
35   FRRI meeting. In addition to the FRRI members, people involved with the BBB and
36   CHRP project, someone from the Corps and someone from CPRA will be invited to
37   educate the members about the projects. At that time the FRRI members can decide
38   how to spend the remaining money in the account.
39
40
41   **OLD BUSINESS ITEM 2.**     **APPROVAL OF THE 2010 ANNUAL REPORT**
42
43       Ms. Phillips updated the Committee on the changes in the 2010 Annual Report
44   distributed from the one presented at the May Meeting. The Report itself incorporated
45   changes suggested by Capt. Frizzell: a section on the history of the Donation, a section
46   on past restoration projects and anticipated restoration projects on the property. The
47   budget was changed to reflect raises given in the May Annual Review, a change in the
48   IRS mileage allowance and some typographical corrections.
49
50       Michael Peneguy moved to approve the 2010 Annual Report. Dr. Everett
51   Williams seconded. **Motion passed.**
52
53
54
55

**NEW BUSINESS ITEM 6.**       **BP HORIZON DEEPWATER SPILL UPDATE**

Dr. Everett Williams moved that the Committee enter Executive Session at 1:45 pm. Dr. Sandra Robinson seconded. **Motion passed.**

Exited Executive Session at 2:20 pm on a motion by Michael Peneguy, seconded by Dr. Everett Williams. **Motion passed.**

**NEW BUSINESS ITEM 14.**       **NEXT MEETING – TUESDAY, JULY 26, 2011,**
                                **REGULAR MEETING 12:00 NOON**

Meeting adjourned at 2:20 pm on a motion by Dr. Everett Williams, seconded by Michael Peneguy. **Motion passed.**

RESPECTFULLY SUBMITTED BY:


C. Cathy Norman, Secretary Treasurer

AMENDED AND APPROVED AT _October 25, 2011_ MEETING
                        DATE

# MINUTES OF THE MEETING OF THE
# EDWARD WISNER DONATION ADVISORY
# COMMITTEE
## TUESDAY, JULY 26, 2011

**Present:**

Richard Cortizas, Chairman, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
William Peneguy, Alternate, Wisner Family Heirs
Ed Buddy, Alternate, The Salvation Army
Dr. Everett Williams, Representative, Charity Hospital
Stacy Gerhold-Marvin, Alternate Charity Hospital

Staff:

C. Cathy Norman, Secretary-Treasurer/Land Manager
L. Amanda Phillips, Executive Assistant, Wisner

Guests:

Mark Peneguy
Erin Monju, City of New Orleans

The meeting was called to order at 12:28 pm.

## OLD BUSINESS

**OLD BUSINESS ITEM 1.        APPROVAL OF THE MINUTES OF THE MAY 31, 2011 ANNUAL MEETING AND THE MAY 31, 2011 REGULAR MEETING AND THE JUNE 28, 2011 REGULAR MEETING**

There were no Minutes for approval at this time.

## NEW BUSINESS

**NEW BUSINESS ITEM 1.        SECRETARY TREASURER'S REPORT**

Invoices:

| | |
|---|---|
| FET (BP) | $5,420.00 ($5,430.93 outstanding) |
| FET (BP) | 1,911.97 |
| FET (BP) | 1,072.80 |
| C. Cathy Norman Expense Account | 707.11 |
| L. Amanda Phillips Expense Account | 140.75 |

A documentary, ***Black Tide***, done by Animal Planet on the effects of the BP Oil Spill was filmed on Wisner property. Ms. Norman and Forrest Travirca were interviewed for the documentary. It will air on Thursday, July 28, 2011, on Channel 69 at 8 pm.

Dune returned the executed leases. A letter of objection was sent to the State Mineral Board regarding a tract in the State Lease Sale. A series of Public Meetings are being held regarding the Barataria Basin Barrier (BBB) Shoreline Restoration Project. The next is Thursday, July 28, 2011; at the South Lafourche High School at 6 pm. Ms.

EXHIBIT
DD

1  Norman and Ms. Phillips will attend. The deadline for written comments is Monday,
2  August 8, 2011.
3
4  There was an AP article about the archaeological site on Wisner Beach and an ad
5  for the sale of 2189 acres in the Lake Catherine area for $10 million included in the
6  report. Ms. Norman attended the LOOP Spill Drill. She proposed the Committee devise
7  a written protocol for a spill. She discussed with LOOP's legal department their need to
8  mark their pipeline and how it can be done in light of the current situation on the beach.
9
10  Drue Banta from the Governor's Office of Coastal Protection and Restoration
11  (OCPR) invited Ms. Norman to attend the Louisiana Landowner's Association (LLA)
12  meeting where Ms. Banta spoke. Wisner is not a member. LLA charges $0.12 per acre of
13  land for membership dues. They recognize we do participate and work with them on
14  issues of importance. Ms. Norman believes the Committee should consider joining in
15  the future.
16
17  Michael Peneguy moved to accept the Secretary-Treasurer's Report and to pay
18  the additional invoices. Dr. Everett Williams seconded. **Motion passed.**
19
20
21  **NEW BUSINESS ITEM 2.       CITY OF NEW ORLEANS GRANT REQUESTS**
22  **SPECIAL MEETING DISCUSSION**
23
24  Mark Peneguy requested that the City meet with the Committee prior to the
25  public grant selection meeting to discuss the process. Mr. Cortizas assured he would call
26  a meeting prior to the public meeting. He had not had time to set up a meeting yet. It is
27  the City's desire that a legal opinion of the Mayor's authority would be made before the
28  meeting.
29
30  Ms. Phillips informed the Committee that the Grant Selections, according to the
31  schedule disseminated by the City at a public meeting regarding the process, stated that
32  the proposal review would take place between August 15 and 31, 2011. Thirty to forty-
33  five days from the meeting the grants would be awarded to the recipients.
34
35  Mr. Cortizas committed to scheduling a meeting either before the end of August
36  or August 15.
37
38
39  **NEW BUSINESS ITEM 3.       WISNER OFFICE MOVE UPDATE**
40
41  Ms. Norman updated the Committee on the successful move. The moving
42  expenses were itemized in the Secretary-Treasurer's Report. Most of the furniture used
43  in the previous office belonged to the City and was left behind. Kingfish Development
44  has been very generous in giving Wisner about $5,000 of office furniture. Ms. Norman
45  is bringing in an office chair from home for her desk.
46
47  An additional cabinet is needed. Kingfish Development asked that Wisner pay
48  $100 for that cabinet. Six additional chairs are needed for the offices, as well as a new
49  shredder, a utility cart, and the cabinet. Ms. Phillips requested a budget of $1,300 for
50  the purchases.
51
52  Ms. Phillips also presented a contract for a copier upgrade with Ikon. The current
53  lease ends in November 2011. The monthly service fee will be reduced and color copy
54  prices will be slightly lower. This should save Wisner about $27 per month. If Ms.

Phillips were to find another supplier, it would cost Wisner $2,298.12 as of August 14, to buy out the rest of the contract plus the $1800 buy-out required when the lease ends.

If Wisner remains with Ikon, there is no buy out payment, it is built into the monthly fee. The contract can also be structured to end on August 14, 2014, so if Wisner does not continue past that date, there will be no penalty for early termination of the contract. A discussion ensued regarding the benefits of Ikon. Mark Peneguy asked that the hard drive be retained.

Michael Peneguy moved to renew the contract through August 14, 2014, with the new machine. Dr. Everett Williams seconded. **Motion passed.**

The building will not allow Wisner to pay separately for the gym membership ($10/person/month). It will be billed with the office rent. Ms. Norman asked for guidance on how to handle the payments for Ms. Phillips and herself. Mr. Cortizas asked if there would be a wellness credit available through the individuals' insurance plan.

Change of address cards will be mailed.

Dr. Everett Williams moved that the $1300 budget for chairs, the cabinet, a utility cart and a shredder be approved. Michael Peneguy seconded. **Motion passed.**

Michael Peneguy moved that the Committee pay the monthly gym memberships for Ms. Norman and Ms. Phillips. Dr. Everett Williams seconded. **Motion passed.**

**NEW BUSINESS ITEM 4.        BP HORIZON DEEPWATER SPILL UPDATE**

Michael Peneguy moved that the Committee enter Executive Session. Dr. Everett Williams seconded. **Motion passed.**

Michael Peneguy moved that the Committee exit Executive Session. Dr. Everett Williams seconded. **Motion passed.**

Michael Peneguy moved that Ms. Norman take the lowest offer and to spend as much as $45,000 on beach profile work. Dr. Williams seconded. The vote was postponed until the Committee exited Executive Session. **Motion passed.**

**NEW BUSINESS ITEM 5.        WISNER BEACH UPDATE**

A copy of a letter from Rickey Cheramie, Chairman of the SLBDD, was included in the packet. Much of his information regarding the beach after restoration is erroneous. He paints Wisner as a difficult landowner. Ms. Norman reported on the SLBDD's meeting last Wednesday night. The public meeting is Thursday night at South Lafourche High School. Mr. Cheramie is on the radio enflaming the public and requesting they attend the meeting to demand driving on the beach.

The largest problem with the project is the Highway 3090 servitude that ends on the beach. Ms. Norman has urged the State to extinguish that Right-of-Way. Brad Davis is arranging a meeting with Ms. Norman and the State's Real Estate group.

A copy of the Parish's attempt to expropriate the Caillouet's property was included in the packet. The Caillouets still have not given Picciola a Right-of-Access to do the beach profiles on their property.

1   A copy of the Concurrent Resolution to create a State Seashore was included. It
2   passed. There is also a copy of the quote from Joe Picciola of what the SLBDD wants to
3   build on the beach. There are some open houses for the CPRA in August to discuss the
4   Master Plan for 2012. The closest meeting is in Belle Chase.
5
6   Last Tuesday Chett Chaisson called. BP was paying for the Port police to man a
7   guard house and to control access on Highway 3090 during the clean-up operations.
8   The Port placed a chain at the parking area stating "Beach Closed. No Pedestrian Access.
9   No Vehicular Access." The Parish and Charlotte Randolph demanded that the Port
10  remove the chain from across the Parish Right-of-Way. There are mixed messages as to
11  whether the beach is open or not.
12
13  Access to the beach was one of the topics at the SLBDD meeting. Ms. Norman
14  explained it is unsafe and still contaminated. The SLBDD thinks they only need trash
15  cans, lifeguards, portolets and patrols if there is vehicular access.
16
17
18  **NEW BUSINESS ITEM 6.       GLOBAL INDUSTRIES SEISMIC REQUEST –**
19  **                           BAY MARCHAND AREA**
20
21  Ms. Norman incorporated some changes into the agreement and sent it to Global
22  Industries. She has not heard from them yet. There is no report. Mark Peneguy inquired
23  as to the actual name. Michael Peneguy replied Global Geophysical Services, Inc.
24
25  Mr. Cortizas asked what rate Wisner was requesting. Global Geophysical offered
26  $10 per acre. Wisner refused and they have not given another offer. Ten years ago,
27  Wisner was paid $38 per acre. Global Geophysical contends that the rates 10 years ago
28  were due to the impacts to the property. Ms. Norman countered that it is the
29  information for which Wisner is charging, because they have to pay for the impacts
30  regardless of how the information is obtained.
31
32
33  **NEW BUSINESS ITEM 7.       CAMPSITE UPDATE**
34
35  Stephen Green, Mark Penguy's nephew, emailed and asked for the right to kayak
36  fish on the property. Ms. Norman responded that the property is under lease. She
37  believes the best thing to do is to contact Mr. Bankston. Ms. Norman will email both
38  Brent and Kevin Bankston Stephen's information and copy Stephen on the email and
39  allow them to work this out.
40
41  Dr. Pilié has the duck hunting lease near Kraemer. Ms. Norman asked him to
42  look up the gentlemen who are interested in a hunting lease adjacent to him. He does
43  not know the gentlemen.
44
45  Ms. Norman has not had time to address the minnow lease. ConocoPhillips
46  informed Ms. Phillips they got about $8000 a year for a minnow lease on wholly owned
47  ConocoPhillips property.
48
49  Dr. Pilié's lease renews on August 1 for $2,947. It ends next year.
50
51  Brad Carmadelle's deer hunting lease is a one-year lease that renews on
52  September 1. He has been a tenant since 2007. At each renewal, his lease has been
53  increased by 2%. He is an excellent tenant. Ms. Phillips recommended that his lease be
54  renewed again this year at a 2% increase. Ms. Norman reminded the Committee that he
55  was awarded the lease after putting it out for bid. She suggested that the Committee

1  change his lease to a 2 or 3-year lease and write in escalation terms for each year to
2  reduce the number of times this is brought before the Committee.
3
4      Michael Peneguy moved that Brad Carmadelle's lease be extended for 3 years
5  with a 2% per annum escalation. Ed Buddy seconded. **Motion passed.**
6
7      The final oyster lease renewed in July. Mr. Parker was thrilled to get the
8  discounted rate. There are two campsites in Jefferson and two in Lafourche that were
9  sent eviction notices. One of the campsites in Lafourche is on co-owned property. It was
10  determined that they had relinquished the lease with us and paid ConocoPhillips. The
11  camp owners have been informed they cannot pay one owner and not the other.
12
13      Stone Energy's surface lease renewal was due July 12 for $19,448. Last year Stone
14  Energy was very late paying their lease. For every 10 days the rent is late, Stone Energy
15  owes $300. Ms. Phillips attempted to prevent a late payment this year by calling in
16  advance. To date there has been no response or payment. Ms. Norman knows the CFO
17  and will send him a copy of a letter demanding payment.
18
19      Michael Peneguy asked how many oyster leases Wisner has. Ms. Norman
20  reported that many close to shore have sanded out, and many will be covered up with
21  this project. There are 8 or 9 private leases and 12 unresolved leases. Ms. Burnside has
22  organized all the information so that it is ready for Wisner to move on, when it is ready.
23  Ms. Norman will discuss these oyster leases in August when she meets with the State
24  Real Estate Department. The restoration project may kill many of the oyster leases.
25
26
27  **NEW BUSINESS ITEM 8.**　　　**GREATER LAFOURCHE PORT COMMISSION**
28  　　　　　　　　　　　　　　　　**EXPANSION ONTO FOURCHON ISLAND**
29
30      Fourchon Island is the last piece of property in the area that is not leased by the
31  Port. Ms. Norman met with Chett Chaisson to discuss various issues regarding the Port
32  yesterday. He had been in DC with the Gulf Economic Survival Team which lobbies
33  primarily for oil and gas activities affected by the spill. MMS is being replaced with
34  BOEMRE which will have an Environmental branch and a Regulatory branch. This
35  means there will be more than one sand mining lease per year issued.
36
37      The Port is expanding. Their costs for expansion have decreased. There is great
38  pre-development interest in the new slip (the C Slip) in the Northern Expansion. The
39  Port would like to lease Fourchon Island. It is in total about 3000 acres. They would
40  dredge Pass Fourchon to 35 feet deep and to dredge the abandoned Phillips Canal for
41  deep draft cargo. They do not want to be near the beach.
42
43      A portion of the island is included in the BBB project for marsh restoration;
44  Stone Energy, Chevron, Plains, Energy Partners have facilities on the island; and there is
45  a sub-surface lease for injection. This would be a massive undertaking for the Port
46  environmentally; there will be an extraordinary amount of mitigation required.
47
48      For the Northern Expansion the Port paid us $35 per acre to maintain the
49  property until they were able to develop it. Mr. Chaisson would like to revisit that lease
50  for the island and have this done by November, so he can put a line item in his budget
51  for next year. Ms. Norman noted that the life of the Donation would be an issue in
52  negotiating this lease.
53

1     Michael Peneguy suggested that in addition to a special meeting with the City to
2  discuss the Wisner Funds issue, that a special meeting to discuss the extension of the
3  Donation be set up as well.
4
5     A discussion regarding the potential change in land valuation in the face of
6  expropriation that could happen if Wisner were to lease part of the Island to the Port for
7  a nominal fee was had.
8
9
10  **NEW BUSINESS ITEM 9.**     **CHEVRON SURFACE LEASE RENEWAL**
11
12     Michael Peneguy ran calculations on the payment due by Chevron. In previous
13  years Chevron made some mistakes, so last year a lower amount was paid to correct the
14  overpayments. It should be $274,925.88. When Ms. Norman started Wisner received
15  $2,500 a year for this lease.
16
17     Ms. Gerhold-Marvin reported that the money that has accumulated in Charity
18  Trust Fund will be used to purchase medical equipment. There is now some discussion
19  of moving the Wisner money from the Trust Fund to the Foundation. She asked the
20  Committee for a letter supporting the move of the money to the Foundation. Ms.
21  Norman suggested that the Committee receive a letter outlining the ownership history
22  for the Trust Fund.
23
24     The Foundation issues grants to clinics and medical programs in Orleans Parish.
25  It was discussed as to whether Wisner's Donation would need to be amended to allow
26  this. The Foundation is more in line with the intent of Mr. Wisner's gift – indigent
27  health care. Mark Peneguy asked where the equipment would be going, because the
28  money has to remain in Orleans Parish. He also noted that this is not LSU's money, it is
29  Charity's, and therefore it should remain in Orleans Parish.
30
31     Ms. Norman pointed out that these are the kind of issues that have arisen in past
32  discussions of extending the Donation. This is the opportunity to revamp the Donation
33  to adjust to recent and future changes unanticipated at the time Mr. Wisner made his
34  Donation.
35
36     Ms. Gerhold-Marvin was asked to send the Committee a letter requesting the
37  Committee's support to move the money to the Foundation. She was asked to include a
38  history, where the money has gone for the past 5 years and what the vision of the future
39  use would be.
40
41  **NEW BUSINESS ITEM 10.**     **NEXT MEETING – TUESDAY, SEPTEMBER**
42                      **27, 2011, REGULAR MEETING 12:00 NOON**
43
44     Meeting adjourned at 2:42 pm on a motion by Michael Peneguy, seconded by Dr.
45  Everett Williams.
46
47  RESPECTFULLY SUBMITTED BY:
48
49
50
51
52
53  C. Cathy Norman, Secretary Treasurer
54
55  AMENDED AND APPROVED AT _October 25, 2011_ MEETING
56                                     *DATE*

# MINUTES OF THE MEETING OF THE
# EDWARD WISNER DONATION ADVISORY
# COMMITTEE
# TUESDAY, SEPTEMBER 27, 2011

**Present:**
Richard Cortizas, Chairman, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
Dr. Sandra Robinson, Representative, Tulane University
Dr. Everett Williams, Representative, Charity Hospital
Ed Buddy, Alternate, The Salvation Army
William A. Peneguy, Alternate Wisner Family Heirs
Stacy Gerhold-Marvin, Alternate, Charity Hospital

**Staff:**
C. Cathy Norman, Secretary Treasurer/Land Manager
Amanda Phillips, Executive Assistant, Wisner

**Guests:**
Mark Peneguy
Joel Waltzer, Waltzer and Wiygul
Jim Burton, Simon, Peragine, Smith and Redfearn
Stephen Green

Meeting called to order at 12:10 pm.

## OLD BUSINESS

**OLD BUSINESS ITEM 1.**          **APPROVAL OF THE MINUTES OF THE MAY**
                                 **31, 2011 ANNUAL MEETING, THE MAY 31,**
                                 **2011 REGULAR MEETING, THE JUNE 28,**
                                 **2011 REGULAR MEETING, AND THE JULY 26,**
                                 **2011 REGULAR MEETING**

The only minutes presented were the May minutes from the regular meeting. Ms
Norman requested that the minutes from the May meeting be reviewed and comments
be emailed to Ms. Norman.

## NEW BUSINESS

**NEW BUSINESS ITEM 1.**          **SECRETARY TREASURER'S REPORT**

The invoices included payment of old outstanding balances to FET amounting to
$34,248.43. There were also invoices from FET for August and September as well as an
invoice from Waltzer and Wiygul for July.

In addition to the listed invoices there were the following expense accounts:

C. Cathy Norman – Aug/Sept Expenses               $810.10

Ms. Norman outlined recent events in the Secretary Treasurer's report. A lot of it deals
with trying to insert Wisner back into the clean up process. Then due to Tropical Storm
Lee, the activity level has increased back to the level it was a year ago. The media, the
Department of Justice and all levels of government have been in contact over the past
several weeks.

Finally after our last meeting we met with BP, and although the General Counsel did not
show up, we met again with the same attorneys who reiterated that they would not pay

1


EXHIBIT
EE

1   certain parts of our claim. They also indicated that they wanted a letter outlining our
2   demand for settlement.
3
4   In spite of the somewhat nonproductive nature of the meeting, they did get our letter
5   outlining our demand for settlement and they have until Friday September 30th to
6   respond. About a week later we did receive a check for of $274,935.47. Still excluded are
7   legal fees, expert fees and any activity that I had that involved experts or attorneys.
8
9   The old UTV was repaired for $3000.00. New aerial photography is critical because of
10  the storm, including new erosion and new breaches. The cost is estimate $10,900.
11
12  The Port payment was the first since the moratorium concessions were lifted and it was
13  $197,000. The September revenues will be very high as a result of the Chevron Surface
14  Lease payment and the increase in Chevron royalty.
15
16  Forrest Travirca continues to document the spill daily and he has been involved with the
17  media.
18
19  Approval of the Secretary Treasurer's report should include approval to pay the regular
20  invoices, the outstanding balances owed to FET and Waltzer and Wiygul that are
21  covered by the claim that was paid, the UTV repair, the aerial photography, and the
22  beach profiles which were approved at the last meeting
23
24  There was a motion by Michael Peneguy to approve payment of the invoices and
25  expense accounts and the Secretary Treasurer's Report. Dr. Sandra Robinson seconded.
26  **Motion passed.**
27
28
29  **NEW BUSINESS ITEM 2.      CITY OF NEW ORLEANS SEPTEMBER GRANT**
30  **                                              REQUESTS**
31
32  There was a long discussion about the City's grant requests. Richard Cortizas referenced
33  the request for a meeting with the Mayor to discuss the Mayor's beneficial portion of the
34  Wisner funds. This meeting has not taken place due to major issues over the past month
35  including the marsh fire and the Tropical Storm. Mr. Cortizas stated that the Mayor was
36  committed to managing the City's income from its beneficial interest through the newly
37  created grant process, which has greater alignment with public law and the City's
38  priorities.  The funds will be used for items that reflect the donations original intent. The
39  Mayor wants to demonstrate innovative use of the funds. Mr. Cortizas acknowledged
40  that there would be philosophical differences but he wanted to proceed with explaining
41  the process.
42
43  There are 2 processes that will be used. The first is to distribute discretionary one-time
44  grants to local non-profits through an unsolicited grant application process. This will be
45  an annual pool of approximately $500,000 with the average grants being $10 –
46  $50,000. The applications will be reviewed between February 15 – 28 and August 15 -31
47  annually with awards announced on April 1st and October 1st respectively. The decision
48  will be made by the appointed Wisner Selection Committee. The Selection Committee
49  consists of Senior Level officials appointed by the Mayor. Specifically, the Committee
50  consists of Judy Reese Morris, Ashleigh Gardere, Scott Hutchinson, James Carter, Vic
51  Richards and Brooke Smith.
52
53  The second use of the City's Wisner funds will be for strategic investments aligned with
54  the City's priorities and goals along with the Donation's original intent. These include
55  public safety, children and families, economic development, sustainable communities,
56  open and effective government and innovation. The City wants to take an innovative
57  approach to government and maximize public access to the funds and to demonstrate a
58  performance driven approach to government and capitalize on diversity inclusiveness.
59  These funds will be leveraged for multi-agency and multi-sector projects, and matching
60  funds from outside sources such as the cease fire program that was recently introduced.
61
62  The fall proposal grant applications have been reviewed and the grant awards will be
63  made on October 1st.

2

Ms. Norman raised the issue that her office continues to receive many phone calls and emails about the City's grant process and often complaints about a lack of response from the City as to questions. Will the grant applicants be notified if they do not receive a grant? Mr. Cortizas said he would push for this to be done and they will be encouraged to apply again. Amanda Phillips asked who we should direct the inquiries to? Mr. Cortizas indicated that Ashley Gardere is the proper point of contact. Ms. Norman also indicated that the City of New Orleans needs to appoint a formal alternate for the Edward Wisner Donation Advisory Committee and clarify as to whether Ms. Gardere is still on the Committee. Mr. Cortizas then indicated that he is the representative on the Committee and acknowledged that the City needed to name an alternate, especially when Mr. Cortizas takes over his new duties in the City Attorney's office.

Michael Peneguy indicated that the family was concerned that the Committee is not involved in the process as the City Charter directs it to be. He acknowledged that the Mayor's selection committee is a good idea but that after the selections are made, the Committee should have final approval once the City has made their decision as to what they want to fund.

Dr. Robinson pointed out that the Committee has never gotten involved with the City's grant selection process, but gives their final advice and consent on their selections.

The Committee only saw the final selections not the process by which selections were made.

Mark Peneguy did question as to whether the proposed strategic investments are in line with the original donor intent. Mr. Cortizas indicated that the Committee deems that the strategic investments do meet the terms of the Wisner Donation. When asked what Committee Mr. Cortizas replied "the Selection Committee". Michael Peneguy stated that the Selection Committee is appointed by the Mayor and has no control or relationship with the Edward Wisner Donation Advisory Committee that is established in the City Charter.

Mr. Cortizas disagreed but stated that the strategic grants would be implemented. He further stated that once the funds are in a City account they become public funds. Michael Peneguy stated that the funds are held in a separate account (Wisner Land Trust Account) and are not public funds but subject to restrictions. Mr. Cortizas countered that once the funds accrue to the City they become public funds. Stacy Gerhard Marvin asked how this affected donor intent. Mr. Cortizas stated that the intent is still there and is still met but the funds themselves become public funds. The example used was that of property taxes. A homeowner pays their property taxes with the intent of not having a lien placed on his house. Once the funds are received by the city they become public funds and once the funds become public they can use the money any way they want. However, the Selection Committee does have to consider the original intent of the Donation.

Richard Cortizas indicated that the City did not intend to ignore donor intent. Michael Peneguy once again requested that a meeting be set up with the Mayor to discuss this further.

There are other beneficiaries that do not have specific uses for their interest defined. Ms. Norman pointed out that there is a restriction in that the money must be used in Orleans Parish and that the City is the only government entity and that is why there is a system of check and balances requiring the Wisner Committee approval. Ms. Norman asked the question that why philosophically does the Mayor want to exclude the Edward Wisner Donation Advisory Committee from the process when they have been actively involved in the past? Mr. Cortizas indicated that he did not want the Committee excluded only to make sure that there was complete transparency in the decision as to how the money was spent. Ms. Norman indicated that the Committee gives the process transparency by taking it out of total city control and having independent oversight. Dr. Robinson pointed out that proposed changes made now may outlive this administration and fall into the wrong hands. Mr. Cortizas pointed out that this is a closed door Committee and is therefore not transparent.

3

Ms. Norman pointed out that for the past 19 years all of the grants proposed by the City were reviewed by this Committee. The Committee asked tough questions and in some cases required more information and requested that matching funds be found for grants. It was always run very well and it is something that this Committee is proud of. Mr. Cortizas believes that the process is now set up is an open public process. Michael Peneguy reiterated that the Wisner Committee does not want to be involved in the grant making decision process, only to be consulted and give their advice and consent on the final decision to insure it is within the intent of the donation as stipulated in the City Charter and in Wisner historical documents.

Dr. Robinson stated that she liked the new selection process that the Administration has established. She did point out that after selections are made they have always come back to the Wisner Committee for final approval. She pointed out that it is not for this administration to make changes for future administrations. This Administration excels at being open but what about future administrations. Mr. Cortizas then pointed out again that there may just be philosophical differences. He again stated that the selection process for public funds should lie with the City. It was again pointed out that the Wisner Committee only wants to review the final selection for grants to insure that it meets with donor intent.

Jim Burton then discussed his firm's review of the history of the Donation over a year ago. It is strictly a legal question. The original ordinance and the original Donation clearly set out as to how the City's money is spent and overseen. And it does require that the final oversight of grants is with the advice and consent of the Committee.

Mr. Cortizas then referred to another opinion by King, Krebs that gives a different legal opinion. Once again the Committee asked for a copy of this opinion.

Mr. Cortizas stated that he thought that this entire issue can be solved. Dr. Williams indicated that he cannot recollect the Committee turning down a grant request by a previous Mayor.

Mr. Cortizas stated that he thinks it is a public dollar, public statute and transparency issue. This Administration has zero tolerance for either a perception or actual misuse of public monies.

Ms. Norman pointed out that there has been a complete breakdown of communication from the Mayor's office and this Committee in regards to this matter. This indicates a lack of respect. Ms. Norman does not want this to go forward and grants be given out without this issue being addressed beforehand. Mark Peneguy indicated that until today this Committee had no idea who was on the Mayor's Selection Committee, when it was indicated that the entire process would be transparent and open. No one was informed about the open Selection Committee meeting. Mr. Cortizas stated that this meeting is a closed door meeting as well. Mark Peneguy pointed out that this is not a public Committee but that the City is.

Michael Peneguy suggested that we have a meeting with the Mayor to discuss the extension of the Donation. Ms. Norman mentioned that she received a call from the Corps of Engineers about the Donation and any effect that the 2014 date may have on the funding and building of the $220 million Triple B project. Ms. Norman stated that she would put together a synopsis of issues that will be affected by the 100 year anniversary of the Donation and the dangers of not extending the Donation.

Again a meeting with the Mayor was requested, possibly in November. All of the beneficiaries have agreed that the Donation needs to be extended. The question is whether the City wants to extend the Donation.

Mr. Cortizas raised the issue of a "Trustee" vis a vis a Committee that may alter how the Donation goes forward. It was also suggested that the grants approval issue be resolved before we have the other meeting with the Mayor about the extension of the Donation. Ms. Norman then indicated that she had received a call from Mary Landrieu's office in response to an article in the paper about oil on Fourchon Beach. Specifically, the

4

1  questions from the Senator's office had nothing to do with the oil spill but narrowly
2  focused on 100 year term of the Donation and the 2014 date. Ms. Norman found this
3  very interesting and asked why they were so interested in that issue. She was told that
4  the Senator just wanted more information.
5
6  Michael Peneguy moved that there be a meeting with the Mayor in November to discuss
7  the extension of the Donation. Dr. Sandra Robinson seconded. **Motion carried.**
8
9  Michael Peneguy also requested that we receive an update on the Wisner Land Proceeds
10 Trust Fund Account. We received these regularly in the past, but we have not gotten one
11 in a while. Ms. Norman will request this accounting and let Mr. Cortizas know if there is
12 a problem.
13
14 Mark Peneguy asked if the grants will go forward on October 1st even if the Committee
15 has not given their approval. Mr. Cortizas indicated that the grant announcements
16 would be made on the first of October and the funds would be disbursed shortly
17 thereafter. Michael Peneguy made a motion that the Mayor be notified that it is the
18 Committee's understanding that the selection requires their final approval. Richard
19 Cortizas indicated that he would take that information back to the Mayor. Michael
20 Peneguy suggested that a letter be written by Simon Peregine. At least to go on record
21 that we have not looked at the grants. There was not a second. The discussion
22 continued.
23
24 Stacy Gerhold-Marvin indicated that what is ethical and part of donor intent is the
25 review of the Mayor's final grant selections by the Wisner Committee. It is a review and
26 a Committee involvement issue.
27
28 Ms. Norman pointed out that this is an important and prolific bequeath that is a
29 win/win for everyone. She further stated that credit should be given to the Donation and
30 that it maintains an upside instead of being tainted by this disruption. There is a great
31 value in this property and this needs to remain positive. The work of this Committee is
32 very important in the financial success of the management and protection of this
33 property.
34
35 Mr. Cortizas stated that he would go back to the Selection Committee and did not
36 recommend that the committee go forward with the proposed motion by Mr. Peneguy. It
37 was recommended that a vote be held on the motion.
38
39 Dr. Robinson then discussed her views of the operations of the Committee and the
40 importance of its role as an Advisory Committee looking out for the citizens of New
41 Orleans. The Committee has reviewed grant proposals and generally approved them, but
42 there were instances where the Committee objected to the entire use of grant funds to
43 pay for salaries and those grants were turned down. The idea being not to create non
44 profits but to create uses for the citizens of the City. Sometimes a match was also
45 required. People should work for this money; it needs to do the most good. She added
46 that this is an ongoing situation that may be risky later on if this change is made. Why
47 change it if it is not broken.
48
49 The only thing the Committee would like is the final last approval of grants that are
50 given out.
51
52 It is a technical problem according to Mr. Cortizas. Dr. Williams remembers similar
53 issues that he has had with grants and non-profits.
54
55 Jim Burton stated that there were vast areas of agreement among the Committee as to
56 the appropriate, ethical and environmentally sensitive management of the property. The
57 last point for the advice and consent of the Committee is the sticking point.  There are
58 big areas of agreement but how do we address the narrow area of concern. Is a letter the
59 appropriate way to convey this? There are potential legal consequences as well as
60 creating ongoing discontent. Dr. Robinson recommended that something be in writing
61 so that the Committee knows exactly why these decisions are being made. It was an
62 understanding that this is the way it is done and these are the guidelines.
63

1   Mr. Cortizas stated that it is not Wisner it is the money that accrues to the City from
2   Wisner and unlike in the past there will be more than a handful of grant recipients. Ms.
3   Norman corrected Mr. Cortizas and indicated that there were over 194 unique grant
4   recipients over the past 10 years.
5
6   Michael Peneguy's motion was to notify the Mayor that we have not reviewed or given
7   any consent to the Mayor for the grants going out this Friday.
8
9   We are going on record that it is the Committee's view that under the original organic
10  documents that govern this Committee that their final approval is required prior to the
11  issuance of any grants by the City of Wisner funds.
12
13  Mr. Cortizas will carry the message back to Mayor. The Committee does not necessarily
14  disagree with the Mayor's position on awarding grants to these entities, however, the
15  Mayor is acting without the final approval of this Committee.
16
17  After further discussion it was agreed that the message needs to be in writing from
18  Simon Peregine. Motion by Michael Peneguy to have this message from the Committee
19  conveyed to the Mayor in writing. There was a second Dr. Everett Williams. **Motion**
20  **passed.** Richard Cortizas abstained.
21
22  Ms. Norman recommended that because Joel Waltzer was present that Item 4. be
23  addressed next in Executive session.
24
25  There was a motion to enter into Executive session at 1:51 pm by Michael Peneguy.
26  Second by Sandra Robinson. **Motion passed.**
27
28  There was a motion at 2:42 pm to exit the Executive Session by Everett Williams,
29  Second by Ed Buddy. **Motion passed.**
30
31
32  **NEW BUSINESS ITEM 3.         GLOBAL SEISMIC PROPOSAL FOURCHON**
33                                **AREA**
34
35  The Committee reviewed certain changes that Global recommended for the Agreement.
36  Most of these changes were rejected or modified. In particular the term of the
37  Agreement was changed back to a one year term and the *force majeure* clause was
38  rewritten.
39
40  The Committee then discussed the price per acre that should be charged for the seismic
41  shoot. Ms. Norman reminded the Committee that the entire shoot area is under lease to
42  Chevron and has been since the 1950's. It is an area of great success to Chevron that
43  accounts for a large portion of Wisner's revenue. Ms. Norman also stated that she
44  recently discussed the shoot with Harold Harper of Chevron.
45
46  After some discussion, it was decided that the Committee should maintain its position of
47  $50 per acre. There is a dispute as to the amount of acreage involved so the total amount
48  that will be considered will be between $453,400 and $400,000.
49
50  There was a motion by the Committee to go forward with the negotiations within these
51  guidelines by Dr. Everett Williams. Seconded by Ed Buddy. **Motion passed.**
52
53
54  **NEW BUSINESS ITEM 5.      WISNER BEACH UPDATE**
55
56  Ms. Norman once again attended the South Lafourche Beachfront Development District
57  Meeting. They continue to push for reopening "access" to the beach, meaning vehicular
58  traffic. There is also new information as the Caminada Headlands project moves
59  forward. Ms. Norman distributed the initial Servitude request that was received from
60  the State. She indicated that it needed to be closely scrutinized with both Susan Clade of
61  Simon Peregine and Joel Waltzer so that all future scenarios on the property can be
62  considered.
63

The beach profiles, which were approved at the last meeting, have been completed for $29,841. This information will be shared with the State in furtherance of the project, but in fact the profiles were done to ascertain the effects of the clean up on the beach by BP.

The USACOE is also moving forward with their project and have requested historical documents from Wisner pertaining to the land. Locally they are convinced that servitude is appropriate for this project, however the higher ups in Washington have to be convinced. Generally property is expropriated for a project this size.

The Greater Lafourche Port Commission has also resurrected their geotube project and they are doing new additional work involving core samples in the project footprint for contamination.

**NEW BUSINESS ITEM 6.        MANTI/DUNE UPDATE CNO#1 WELL**

Ms. Norman updated the Committee with news that the CNO #1 Well has been drilled to total depth and they are waiting on a completion rig. This is very good news in light of the extensive negotiations that occurred to amend the lease. Wisner's royalty was increased from 16.66% to 27.5%. A new well in the Leeville area means important new revenue that diversifies Wisner's income stream.

**NEW BUSINESS ITEM 7.        OFFICE DOCUMENT RETENTION POLICY**

Jim Burton has been working with the office on the document retention policy which was finalized and is ready for the Committee review and approval. Currently, the office is moving forward with trying to get all of the important documents scanned and organized, particularly the old historical ones. The issue of which documents can be destroyed and under what timeframes was outlined. After some discussion, the document retention policy was **approved** on a motion by Michael Peneguy, second by Dr Sandra Robinson.

**NEW BUSINESS ITEM 8.        ANN BURNSIDE CONTRACT EXTENTION**

Ann Burnside's contract ends on September 30, 2011. Ms. Norman and Ms. Phillips outlined the ongoing tasks that Ms. Burnside is working on and recommended that her contract be extended for one year. There was a motion by Michael Peneguy, Seconded by Dr Sandra Robinson to extend the contract for one year. **Motion passed.** The only other additional change is that Ms. Burnside has worked for Wisner long enough that she is now qualified to participate in the 401k program.

**NEW BUSINESS ITEM 9.        CHEVRON USA**

Chevron has requested access onto Wisner's property for a pipeline survey. This will take place just west of their facility on Fourchon Island. Ms. Norman is currently negotiating the Access Agreement.

Additionally there was a response to Ms. Norman's questions concerning the Oil Gas and Mineral audit, which explained some of the additional charges and costs associated with the royalty production.

**NEW BUSINESS ITEM 10.        COALITION TO RESTORE COASTAL
                               LOUISIANA REQUEST FOR MANGROVE
                               PLANTING SITE**

The planting took place on September 24, 2011 and was a complete success.

**NEW BUSINESS ITEM 11.        JEFFERSON PARISH BOUNDARY ISSUES
                               WITH MARRERO LANDS**

Ms. Norman is trying to find the time to meet with Buckner Barkley of Marrero Lands to discuss a boundary issue on the Jefferson property.

1   **NEW BUSINESS ITEM 12.   NEXT MEETING – TUESDAY, NOVEMBER 29,**
2   **2011 12:00 NOON**
3
4      Meeting adjourned at 3:11 pm on a motion by Dr. Everett Williams, seconded by
5   Ed Buddy.  **Motion passed.**
6
7
8   RESPECTFULLY SUBMITTED BY:
9
10
11
12
13
14   C. Cathy Norman, Secretary Treasurer
15
16
17   AMENDED AND APPROVED AT _____ MEETING
18                              *DATE*

8

# MINUTES OF THE MEETING OF THE EDWARD WISNER DONATION ADVISORY COMMITTEE
## TUESDAY, OCTOBER 25, 2011

**Present:**
Michael Peneguy, Representative, Wisner Family Heirs
William Peneguy, Alternate, Wisner Family Heirs
Ed Buddy, Alternate, The Salvation Army
Dr. Everett Williams, Representative, Charity Hospital
Stacy Gerhold-Marvin, Alternate Charity Hospital
Dr. Sandra Robinson, Representative, Tulane University

Staff:
C. Cathy Norman, Secretary-Treasurer/Land Manager
L. Amanda Phillips, Executive Assistant, Wisner

Guests:
Mark Peneguy, Wisner Family
Stephen Green, Wisner Family
Jim Burton, Simon Peragine

The meeting was called to order at 12:15 pm. Dr. Sandra Robinson motioned for Michael Peneguy to chair the meeting in Richard Cortizas' absence. Dr. Everett Williams seconded. **Motion passed.**

## OLD BUSINESS

**OLD BUSINESS ITEM 1.**   **APPROVAL OF THE MINUTES OF THE MAY 31, 2011 ANNUAL MEETING, THE JUNE 28, 2011 REGULAR MEETING, THE JULY 26, 2011 REGULAR MEETING, AND THE SEPTEMBER 27, 2011 REGULAR MEETING**

Michael Peneguy pointed out corrections in the September Regular Meeting Minutes:

Page 2, Line 63 "October" not "September"
Page 4, Line 17 a space between "he" and "again"
Page 4, Line 23 should be "the"

Mark Peneguy also noted corrections:

September Regular Minutes:   Page 2, Line 36 "City's"
Page 2, Line 54 "Donation's"
Pages 3, Line 29–32 believes it should be Michael Peneguy, not Mark Peneguy when the sentence begins "Mr. Peneguy," it should be Michael and should be clarified. The paragraph begins citing Mark Peneguy.

Ms. Norman stated she would review the tape and clarify it.



1   June Regular Minutes:              Page 2, Line 32 "tracts"
2                                      Page 2, Line 49 "Michael Peneguy moved to
3                                      have the Donation contribute" not "Michael
4                                      Peneguy moved to contribute"
5
6       Ms. Norman interjected that on Page 2, Line 30 "Cortizas" is spelled incorrectly.
7
8       Mark Peneguy continued with one correction to the July Regular Minutes: Page
9   5, Line 33 "affected" and not "effected."
10
11      Dr. Everett Williams motioned to approve the Minutes with the changes.
12  Seconded by Dr. Sandra Robinson. **Motion passed.**
13
14
15  **NEW BUSINESS**
16
17  **NEW BUSINESS ITEM 1.          SECRETARY TREASURER'S REPORT**
18
19      Invoices:
20      FET (BP)                          $17,840.00 ($14,027.03 outstanding)
21      FET (BP)                           2,600.00   paid in full
22      FET (non-BP)                       3,936.98
23      EMC, Inc. (beach profiles)        29,841.12
24      C. Cathy Norman Expense Account      208.12
25      L. Amanda Phillips Expense Account    22.49
26      Waltzer & Wiygul                  42,932.26 (expert fees)
27      Waltzer & Wiygul                   1,508.75
28      Waltzer & Wiygul                   4,187.50 ($3,041.25 outstanding)
29      Simon Peragine (Donation)          3,350.00
30
31      At the end of the third quarter $4,311,996.05 in revenues has been collected.
32  Another claim is being prepared for BP. The office is in the process of answering BP's
33  questions for the Claims 11-15.
34
35      Updated budgets and income statements were included in the packets. Mileage
36  increased to $0.555 per mile on July 1, 2011. Most items in the Secretary Treasurer's
37  Report will be covered in the Meeting's Agenda. Ms. Norman directed the Committee's
38  attention to Simone Maloz's comments at the SLBDD Meeting regarding the need to
39  change laws in light of the impending Caminada Headlands Restoration Project. Mark
40  Peneguy asked if the Committee would consider having a lobbyist next session for that
41  purpose.
42
43      Dr. Sandra Robinson moved to accept the Secretary-Treasurer's Report and to
44  pay the additional invoices. Dr. Everett Williams seconded. **Motion passed.**
45
46
47  **NEW BUSINESS ITEM 2.          CITY OF NEW ORLEANS SPECIAL MEETING**
48                                  **REQUEST**
49
50      The unaudited Land Proceeds Statements from May 2011 to September 2011, as
51  well as the audited December 2010 Land Proceeds Statements were received and
52  distributed to the Committee. Jim Burton sent a letter to the City after the last meeting.
53  There has been no response to date. Ms. Norman is working on a white paper on the
54  Extension of the Donation. She will meet with Ms. Phillips and Mr. Burton to work on
55  this. Once completed, she will send it to the Committee.

Mark Peneguy relayed his recent *ad hoc* conversation with Mr. Cortizas. Ms. Norman expressed a hope in getting responses to the Committee's questions. Michael Peneguy suggested that the current version Extension of the Donation and the version with his comments be sent with the white paper. A discussion of what will be lost if the Donation is not extended and what obligations and revenues would persist ensued.

Ms. Phillips discussed the changes between the December 2010 audited Land Trust Proceeds Statements and the December 2010 unaudited Land Trust Proceeds Statement. A voucher payable for $150,000 appears on the audited statements, but there is no disbursement analysis showing to whom the $150,000 was disbursed. William Peneguy suggested the error could be carried over from December 2009 and that those statements be reviewed.

The June Land Trust Proceeds Statements show an additional $150,000 in the vendor payments without being reflected on the Disbursement Analysis. In the August Land Trust Proceeds Statements show a voucher payable for $102.35. This is noted in the Disbursement Analysis as "Wisner Grant." Mark Peneguy commented that no approval had been given for expenditures. Ms. Norman noted that previously no money had been spent on operating costs from this account.

The September Land Trust Proceeds Statements show $250,102.35 has been paid to vendors. The Disbursement Analysis only lists expenditures to the Greater New Orleans Youth Orchestra for $100,000 and to "Wisner Grant" for $102.35.

As Mr. Cortizas was not present to answer the questions, Ms. Phillips will email Ashleigh Gardere the questions.

Discussion returned to the white paper. Mark Peneguy stated that in speaking with Mr. Cortizas, Mr. Cortizas mentioned that the Mayor received a letter from someone Ms. Norman refused to allow access to the beach. The Mayor allegedly responded.

Mr. Burton commented that a Trust is governed by the documents which set it up. In this case those would be the Act of Donation, Act of Compromise, the Ordinances, and the City Charter. All previous opinions support this. While one can call it a Trust, it is a unique entity. This Committee has the right to advise and to consent, and to initiate actions. In addition, there is 97 years of operating history to back-up this.

Michael Peneguy stated that another request for a copy of the King Krebs opinion be made. Ms. Gerhold-Marvin asked why a copy had not been received previously. Mark Peneguy stated that Ms. Jolivette-Brown had refused to share it as it could be used in potential litigation. Michael Peneguy noted that Mr. Cortizas had said in the last meeting he would send the Committee a copy of the opinion.

Ed Buddy asked if extra resources would be deployed in writing the white paper. Ms. Phillips suggested hiring an economist resulting in a discussion. Ms. Norman said she would investigate hiring an economist and finalize what the white paper's focus would be.

There were no grants for approval.

1   **NEW BUSINESS ITEM 3.**      **GLOBAL SEISMIC PROPOSAL – FOURCHON**
2                               **ISLAND AREA, FINALIZE AGREEMENT**
3
4      Ms. Norman returned the draft agreement to Global and asked for $450,000.
5   Global did not counter. ConocoPhillips is getting $30 per acre: $20 for the surface and
6   $10 for the subsurface. Yesterday Harold Harper from Chevron called Ms. Norman. He
7   informed Ms. Norman that he had been contacted by Global and that Chevron is
8   underwriting this shoot. They are committed to the Shelf and don't want to rely on
9   Deepwater. They want to start the shoot in mid-November. Chevron asked Wisner to
10   accept $300,000 for the shoot.
11
12      Through the end of September Wisner has made $2,017,504.80 from Chevron,
13   ongoing drilling will impact that. Nine thousand acres at $35 per acre would be a little
14   over $300,000. Wisner got $35 per acre from Schlumberger the last time we shot in this
15   area. Wisner was going to give Global a pass on the aerial photography, but it was more
16   expensive than anticipated because it had to go to the highway. Chevron is akin to a
17   partner in many of Wisner's ventures. The shoot will not be as damaging as the
18   Schlumberger shoot was. Ultimately Wisner will benefit from the new seismic in
19   Chevron's hands.
20
21      Dr. Everett Williams motioned to accept the $300,000 offer from Global and to
22   ask them to pay for the aerial photography. Dr. Sandra Robinson seconded. **Motion**
23   **passed.**
24
25
26   **NEW BUSINESS ITEM 4.**      **BP HORIZON DEEPWATER SPILL UPDATE**
27
28   # REDACTED - POTENTIAL LITIGATION

35
36

46
47

52
53      T
5

1
2      REDACTED
7
8          There will be a round-table discussion as an informational briefing either in New
9   Orleans or Washington, DC. Joel Waltzer and Robert Wiygul are working with this and
10  requested that Ms. Norman attend. She will speak about the contamination issue. The
11  Coast Guard Commander will be there.
12

13  # REDACTED - POTENTIAL LITIGATION

20
21         Ms. Norman requested permission to travel to Washington, DC, should the
22  round-table be held there. She would also try to meet with Senator David Vitter while
23  there, and possibly Senator Mary Landrieu as well. Ms. Norman has participated in the
24  last two round-tables. Dr. Sandra Robinson moved to approve funds for Ms. Norman to
25  travel to Washington, DC, for the round-table discussion. Dr. Everett Williams
26  seconded. **Motion passed.**
27
28
29  **NEW BUSINESS ITEM 5.        WISNER BEACH UPDATE**
30
31         Ms. Norman attended the SLBDD meeting last week. The Caillouet property
32  appraised at $275,000. Charlotte Randolph reported it would cost the Parish $32,000 a
33  year for insurance to utilize the beach. The clean-up, the Caminada Headland project,
34  the Caillouet's new land swap deal, and access to the beach summer 2012 was discussed.
35  The DA is involved in the new deal with the Caillouets. The Caillouets can have a jury
36  trial on the valuation of the property. Several members of the public stood up to speak
37  on their perception of what the public right to newly created land was. Loulan Pitre did
38  not comment on the legality of driving on dunes and newly created coastal restorations.
39
40         Ms. Clade, Mr. Waltzer, and Ms. Norman drafted a Temporary Easement to the
41  State for the Caminada project. Ms. Norman will insert the Wisner access language. In
42  Amendment B Ms. Norman changed it to read "Grantor and Grantee agree that no
43  vehicular traffic will be allowed on the beach except for emergency response, our lessees
44  or servitude holders, for repair . . ." instead of "No one can drive on the beach in
45  accordance with Louisiana law." The State is anxious to move on this.
46
47         The State asked Ms. Norman to send the Committees comments to them for their
48  review. Afterwards, the State would like to meet with Ms. Norman and Ms. Clade to
49  discuss the agreement. At the next meeting Ms. Norman will probably have a finalized
50  agreement for the Committee's approval.
51
52         The land description needs to be checked. A non-exclusive right was granted. The
53  State is subordinate to any other easements, servitudes, or right-of-ways granted. In
54  Paragraph II, Ms. Norman will need to add Access Agreement language. In Paragraph V

1   "the State acknowledges that Louisiana Revised Statute . . . provides that no rights
2   whatsoever shall be created to the Public." Ms. Norman changed that we "agree to this."
3
4       A discussion needs to be had as to who gets title to the created lands, especially if
5   Wisner is financially involved in this project. The agreement dances around this issue
6   but does not define it. Ms. Norman added oil spill removal activities to the exercises
7   of rights granted, those activities will be ongoing.
8
9       Ms. Norman inserted that any transfers must get Wisner's approval which will
10  not be unreasonably withheld. It will not begin until 60 days prior. She deleted
11  "anything herein contained to the contrary notwithstanding." Mark Peneguy asked to
12  whom would they assign and why would they? Ms. Norman replied she would inquire.
13  Ms. Norman gave the State in writing that Wisner would not approve assignment to
14  Wildlife and Fisheries.
15
16
17  **NEW BUSINESS ITEM 6.        MANTI/DUNE UPDATE CNO #1 WELL**
18
19      It looks like there is a nice gas well in the Leeville area. Michael Peneguy noted
20  that Manti tested it for 2.5 million cubic feet per day. The current price is $3.50~4.00
21  per mcf.
22
23
24  **NEW BUSINESS ITEM 7.        CHEVRON USA – ACCESS FOR PIPELINE**
25                             **INSPECTION**
26
27      Chevron has signed an Access Agreement that the Mayor will need to sign. They
28  want to start in the next day. They are going out in an airboat to flag a pipeline. There
29  was some conflict initially over signing the agreement.
30
31      Chevron is sponsoring a study on pipeline sustainability. Ms. Norman will
32  compile our historical pipeline documents to share with Chevron for the study. There
33  are a lot of soil engineers involved, so it is unknown where exactly they will concentrate
34  the study. This will be worth Wisner's time. They want to look at old reports and
35  photography. They have already been on the property. It was suggested they concentrate
36  on the LOOP pipeline.
37
38      Mark Peneguy asked if Ms. Norman is having any problems getting the Mayor's
39  signature on documents. He suggested that perhaps the Committee should give Ms.
40  Norman authority to sign the agreements in the Mayor's stead, especially the short-term
41  documents. Ms. Norman reported that Mr. Cortizas has been very good in getting
42  agreements signed and returned to her.
43
44
45  **NEW BUSINESS ITEM 8.        HUNTING LEASE REQUEST IN ST. JOHN**
46                             **THE BAPTIST PARISH**
47
48      Both Mr. Borne and our trapper, Mr. Loupe, have requested a lease in St. John
49  adjacent to Dr. Pilié's lease. Mr. Loupe wants to meet with Ms. Norman in mid-
50  November to discuss a lease. They are looking at dove hunting. He believes he can work
51  well with Dr. Pilié so there will be no overlap. Mr. Loupe has been trapping on the
52  property since before Ms. Norman managed the property. Dr. Pilié and Mr. Loupe hunt
53  together.
54

1      Mr. Borne lives in Kraemer. He is trying to obtain the lease for his grandson.
2    They have property adjacent to Wisner's.
3
4
5    **NEW BUSINESS ITEM 9.**      **NEXT MEETING – TUESDAY, NOVEMBER 29,**
6                                **2011, REGULAR MEETING 12:00 NOON**
7
8      Meeting adjourned at 1:50 pm on a motion by Dr. Everett Williams, seconded by
9    Ed Buddy.
10
11   RESPECTFULLY SUBMITTED BY:
12
13
14
15
16
17   C. Cathy Norman, Secretary Treasurer
18
19   AMENDED AND APPROVED AT _____ MEETING
20                                 *DATE*

**MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY
COMMITTEE
TUESDAY, NOVEMBER 29, 2011**

**Present:**
Michael Sherman, Chairman, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
Dr. Sandra Robinson, Representative, Tulane University
Dr. Everett Williams, Representative, Charity Hospital
Ed Buddy, Alternate, The Salvation Army

<u>Staff:</u>
C. Cathy Norman, Secretary Treasurer/Land Manager
Amanda Phillips, Executive Assistant, Wisner
Ann Burnside

<u>Guests:</u>
Joe Guillory, CPRA
Brad Miller, CPRA
Mark Peneguy
Robert Wiygul, Waltzer and Wiygul
Joel Waltzer, Waltzer and Wiygul
Jim Burton, Simon, Peragine, Smith and Redfearn
Stephen Green

Meeting called to order at 12:10 pm.

This was the first meeting for Michael Sherman, representing the City of New Orleans on behalf of Mayor Landrieu. Mr. Sherman was introduced to the Committee and the guests for the meeting prior to calling the meeting to order at 12:10pm and assuming the role of Chair. Ms. Norman invited Mr. Sherman to visit the property when he was available.

**NEW BUSINESS**

**NEW BUSINESS ITEM 1.          WISNER BEACH UPDATE**

The first order of business was a presentation by Brad Miller and Joe Guillory from CPRA about the proposed Caminada Headlands Project. The project has been on the books for many years but the funding is now in place to proceed. The project funding will come from CIAP funds (Coastal Impact Assistance Program) and from State surplus funding. The State surplus funding is tenuous and give the project some urgency as the project needs to be built soon or the money will be lost.

There is also another larger Federal project on the books, the Barataria Basin Barrier Shoreline (Triple BS) project that is not currently funded and not in the immediate future. The Caminada project will nourish only a portion of the beach and there are studies being done to determine where the proper location of the project should be to result in the most benefit. There are templates with a shorter project (in miles) that has a higher dune creation or a longer project with a lower elevation. Currently they are completing the archeological review of the area and permitting will begin in the spring of 2012. Construction will take about a year and will begin in late 2012 if the project remains on schedule.

Ms. Norman pointed out that State law prohibits the Public from claiming right of use of the property as a result of public monies expended for the project. The State does claim some of the land in front of Bay Champagne. Ms Norman also raised the potential of increasing the size of the project if Wisner receives some restoration funding from BP.

1

**EXHIBIT
66**

1  Mr. Miller indicated that adjusting the template for the footprint would not be difficult if
2  the project was to be expanded.
3  Permitting for the project will take 6 months. CPRA hopes to begin construction in late
4  2012. Construction will take one year.
5
6  The sand source is offshore from Ship Shoal (27 miles away). Hopper dredges will
7  transport the sand and it will be pumped onshore. Bids have not been received for the
8  work. Pipelines in the area are a problem. There are three potential spots for the dredges
9  to operate; Belle Pass, Pass Fourchon and an off shore pump out/re-handling area. All
10 options are being kept open so that a good price for the project can be obtained and the
11 largest benefit possible will result.
12
13 There are archeological issues that are currently being addressed. Permits will need to
14 be obtained from all state and federal agencies. Also the land rights must be settled prior
15 to commencing construction.
16
17 It is hoped that eventually this project, as built, will act as the State's 35% cost share for
18 the larger Triple BS project that is currently still in planning stages with the USACOE
19 and is not yet funded. Currently there is $70 million for this project. The CORPS
20 feasibility study for the larger project may take quite some time.
21
22 The sand in these systems moves, so the State is currently modeling to determine the
23 best location to introduce sand into the system.
24
25 Forty million of the $70 million are CIAP funds which must be used by 2013. The rest of
26 the funding is State surplus which can be pulled at any time. This is a top priority project
27 and there is pressure to get it done ASAP.
28
29 There was a question about contaminates and both the borrow area and the re-handling
30 areas have been tested.  The only negative of the project is the removal of one time
31 sediment from the ship shoal area. Most of the wildlife will be displaced temporarily but
32 will recover according to studies that have been done.
33
34 The hopeful shelf life of the project is 20 years. The largest anticipated footprint out into
35 the Gulf of Mexico is 400 feet.
36
37 There was also mention of the GLPC's geotube project which is in the foot print of this
38 project. This will help in that less volume of sand will be needed in those areas. This
39 project does not have any maintenance and is a one shot deal. The sand will be
40 introduced into this system and it will be studied to see how long it will last.  If there are
41 a lot of storms, there will be a lot of roll back into the back areas. The higher the dunes,
42 the less roll back there will be. Mr. Guillory and Mr. Miller remained at the meeting for
43 the next presentation by Mr. Forrest Travirca.
44
45 Ms. Norman then briefly discussed the SLBDD and mentioned that Lafourche Parish
46 has passed a resolution concerning the future public use of the beach. The Port has
47 backed off of this idea, however, the Parish is moving forward with support of
48 expropriation of the Caillouet Land Company property.
49
50 There are two issues that are being raised. The first is taxes, in which Wisner is accused
51 of not paying property taxes and the idea that a public beach would create tax/tourism
52 revenue. In fact the top tax revenue sources in the Parish are Hornbeck, Chouest and
53 Chevron, all of whom create jobs and revenue as a result of Port Fourchon, which is on
54 Wisner property.
55
56 The second issue is the State's claim of property at Pass Fourchon and in front of Bay
57 Champagne, both of which Wisner disputes. The SLBDD claims there is a public right of
58 access to and use of this property.
59
60 Finally, there is the issue of the use of public monies to restore his area. However State
61 law prohibits the public from claiming a right to use and must defend Wisner if this
62 becomes an issue. There is also a lot of chatter about the 2014 date and who will own or

1   Dr. Robinson entered the meeting.
2
3
4   **NEW BUSINESS ITEM 2.**      **BP HORIZON DEEPWATER SPILL**
5   **UPDATE**
6
7   # REDACTED - POTENTIAL LITIGATION



10
11
12

21
22

28
29

36
37

41
42

44
45
46
47
48
49

51
52

59
60



20  There was a motion to enter into executive session at 1:50 pm by Michael Sherman,
21  seconded by Dr. Everett Williams. Motion passed.

23   Robert Wiygul then addressed the Committee and updated them on the litigation with
24  BP

**OLD BUSINESS ITEM 1.        APPROVAL OF THE MINUTES OF THE
                             OCTOBER 25, 2011 REGULAR MEETING**

The minutes from the meeting held on October 25, 2011 were approved on a motion by
Dr. Everett Williams, seconded by Michael Peneguy. Motion passed.

**<u>NEW BUSINESS</u>**

**NEW BUSINESS ITEM 3.        SECRETARY TREASURER'S REPORT**

In addition to the regular invoices, Ms. Norman's expense account

There was a motion by Michael Peneguy to approve payment of the invoices and
expense accounts and the Secretary Treasurer's Report. Dr. Sandra Robinson seconded.
**Motion passed.**

**NEW BUSINESS ITEM 4.        CITY OF NEW ORLEANS**

**NEW BUSINESS ITEM 5.        GLOBAL SEISMIC PROPOSAL FOURCHON
                             AREA**

**NEW BUSINESS ITEM 6.        MANTI/DUNE UPDATE CNO#1 WELL**

**NEW BUSINESS ITEM 7.        CHEVRON U.S.A.**

4

1
2 The seismic shoot has been delayed as a result of some underwater hazards. The shoot
3 will begin from the west as opposed to the east. There will be a pause in the shoot in
4 March due to the dolphin calving season. We have not received a signed copy from
5 Global and Ms. Norman has asked that it be returned as soon as possible and payment
6 be made prior to the end of the year.
7
8 The Committee has already approved the agreement
9
10 **NEW BUSINESS ITEM 6.     MANTI/DUNE UPDATE CNO#1 WELL**
11
12 Wisner currently awaiting the first royalty check from the newly drilled well, which has
13 been completed. The well cost was $7 million. The royalty for this well under the newly
14 negotiated agreement changed from 16.66% to 27.5%. This should have a positive
15 impact on monthly revenues.
16
17 **NEW BUSINESS ITEM 7.     CHEVRON U.S.A.**
18
19 There is an Access Agreement pending from Fenstermaker for a pipeline survey for
20 Chevron. This agreement has been executed by Fenstermaker and they hope to get
21 started soon. Ms. Norman has given the agreement to Michael Sherman for the Mayor's
22 signature.
23
24 Chevron has underwritten a program at LSU called the Coastal Sustainability
25 Partnership. Ms. Norman has met with the principle several times and the group will be
26 teaching a multi disciplinary class in the spring entitled "Disturbed Systems".
27 Chevron requested that Wisner work with them. After meeting with them the group will
28 be studying the old Cheramie impoundment/failed marsh management area. They will
29 have a formal field trip to the area in the spring and Ms. Norman will address their class
30 in Baton Rouge.
31
32 In matters pertaining to BM2 6000 RASU, this unit was a reservoir unit that has one
33 well and covers two leases. The unit needs to be reestablished every 90 days in the
34 absence of production. Chevron chose instead to cancel this unit and reestablish it as a
35 new drilling and spacing unit (BM6000 RASUA). It is strictly administrative.
36
37 Motion to approve the new unit and the dissolving the old unit by Michael Peneguy,
38 second by Ed Buddy. Motion passed.
39
40 **NEW BUSINESS ITEM 8.     CAMPSITE RENEWALS**
41
42 There was a discussion about raising the rentals on the campsite leases. Currently they
43 are $650 for a 50 x 100 foot lot. It was recommended that it be raised by $50 per year.
44 On the co-owned property it was recommended that the increase also be in line with the
45 new square foot rental on the other camps.
46
47 Motion to increase the rental rates on the camps by Michael Peneguy, second by Dr.
48 Everett Williams. Motion passed.
49
50 **NEW BUSINESS ITEM 9.     OYSTER LEASE RENEWALS**
51
52 Conoco Phillips is charging $5 per acre for their private oyster leases. Wisner has been
53 charging $4 per acre. There are only a few leases and some are on co owned property.
54 It was recommended that Wisner raise the rent to $5 per acre. Motion to raise the
55 oyster lease rental to $5 per acre by Michael Peneguy, second by Dr. Everett Williams.
56 Motion passed.
57
58 **NEW BUSINESS ITEM 10.     OIL, GAS AND MINERAL AUDIT 2009 - 2011**
59
60 The bid from Elston and Rogers for the Oil, Gas and Mineral Audit for the years 2009 –
61 2011 is $25,000. This is the same firm that has been performing this highly specialized
62 audit for Wisner for over 12 years. The proposal was approved on a motion by Michael
63 Peneguy, seconded by Ed Buddy. Motion passed.

**NEW BUSINESS ITEM 11.**     **FINANCIAL AUDIT 2011 DISCUSSION**

There was a discussion about getting quotes for the 2011 audit. It will be too late to engage someone to also do the 2011 tax return which needs to be done early so that the K-1's can be sent out. Ms. Norman will send out bid requests to all of the firms that were contacted for the last bid process. Michael Sherman requested that Cathy or Amanda contact him for a list from the city of firms that perform audits for non-profits so that they can be given an opportunity to bid as well.

It was proposed that the Committee enter into a three year contract with the selected firm.

**NEW BUSINESS ITEM 12.**     **PROOSED MEETING SCHEDULE 2012**

The proposed meeting schedule for 2012 was approved on a motion by Michael Peneguy, seconded by Dr. Everett Williams. **Motion passed.**

**NEW BUSINESS ITEM 13.**     **NEXT MEETING – TUESDAY, JANUARY 31, 2012  12:00 NOON**

Meeting adjourned at 3:10 pm on a motion by Michael Peneguy, second by Dr. Everett Williams. **Motion passed.**


RESPECTFULLY SUBMITTED BY:




C. Cathy Norman, Secretary Treasurer

AMENDED AND APPROVED AT ___3-27-2012___ MEETING
                              *DATE*

6

# MINUTES OF THE MEETING OF THE
# EDWARD WISNER DONATION ADVISORY
# COMMITTEE
# TUESDAY, JANUARY 31, 2012

**Present:**
Michael Sherman, Chairman, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
Tony Lorino, Representative, Tulane University
Dr. Everett Williams, Representative, Charity Hospital
Ed Buddy, Alternate, The Salvation Army
William Peneguy, Alternate Wisner Family Heirs
Stacy Gerhold-Marvin, Alternate, Charity Hospital

Staff:
C. Cathy Norman, Secretary Treasurer/Land Manager
Amanda Phillips, Executive Assistant, Wisner

Guests:
Bryce Autin, Greater Lafourche Port Commission
Chett Chaisson, Greater Lafourche Port Commission
Mark Peneguy
Robert Wiygul, Waltzer and Wiygul

Meeting called to order at 12:10 pm. The meeting began with a round table of introductions.

**OLD BUSINESS ITEM 1.**          **APPROVAL OF THE MINUTES OF THE**
                                                  **NOVEMBER 29, 2011 REGULAR MEETING**

The minutes were not available for approval at the time of the meeting.

## NEW BUSINESS

**NEW BUSINESS ITEM 1.**          **GREATER LAFOURCHE PORT COMMISSION**
                                                  **PRESENTATION**

Chett Chaisson and Bryce Autin addressed the Committee about issues pertaining to the Port. Among the items that were discussed included the Port's expansion and many current projects on the under construction or in design.

Mr. Chaisson indicated that he appreciated the relationship that the Port had with Wisner and that the Wisner property has been a key to the Port's success.

The first item discussed was that the deep water oil and gas industry BSEE (Bureau of Safety and Environmental Enforcement)and  BOEM  (Bureau of Energy Management) is reporting 36 drilling rigs working in the OCS. There were 42 rigs prior to the spill so things are definitely coming back. The expectation is that there will be 10 more deep water rigs in the Gulf in 2012. That results in a push for the Port to complete their expansion plans. Slip B is complete, and only 700 linear feet is not leased. Slip C will begin next. Chouest has taken over the development of one of the larger areas and doing the construction themselves. During the year of decreased rentals, 30% concession and the port lost 3 million. The Port has applied for reimbursement from BP and it was denied. There were no tenants lost. The Port is now in the process of filing an OPA claim for the lost funds. The Port is also hoping to get at least some funds directed for coastal restoration if BP will not directly pay the claim.

Future plans and development there are only 2 non waterfront development sites on 3090 for lease. Material will be brought in to develop more of the land adjacent to the Highway. The Northern expansion Agreement was signed in 1999 and it is getting

1

EXHIBIT

HH

tobbies'

1   developed very rapidly. There is not another Port servicing the deep water oil industry
2   that has 6000 linear feet of bulk head. Port Fourchon has 60,000 linear feet and 1800
3   acres of development The commodities offered at Port Fourchon are not offered
4   elsewhere, as well as the proximity to the deep water drilling. The Port's market share is
5   90 to 95% of the offshore industry in the Gulf of Mexico.
6
7   The Port is interested in the Fourchon Island Area for future expansion. The industry is
8   building vessels to the depth limitations of Port Fourchon. The Port is looking at
9   potentially utilizing Fourchon Island for the deeper draft vessel docking and repair.
10  The Port wants to stay ahead of the expansion and not lose the business.
11
12  The Port is interested in the western 2/3rds of the Island and would like to move
13  forward with negotiations. Also the planning for permitting and Corps approval for
14  development and deeper drafts will all take time. The first item is to get access and
15  get a lease in place.
16
17  Ms Norman pointed out that the subsurface rights are tied up with Chevron so that
18  would not be available on Fourchon Island.
19
20  Access for the Geotube project borings was then discussed. The old boudin bag project
21  was built in the 1980's. Hurricane's Katrina and Gustov resulted in damage, but first by
22  Hurricane Isadore and Lili. These repairs were in place then Katrina hit. The project was
23  ready to go then Gustov hits. After that the geotube project was developed, like on
24  Grand Isle. The project is still in final design when the oil spill hit. First they need Access
25  Agreement for core samples of the area. 200 samples ten feet deep in the 5300 foot area.
26  The borings should give some of this information as to whether the project can proceed.
27  Geotubes will be immediately behind the old boudin bags that will not be removed.
28  There will be a ten foot dune. Parish access will be up to the geotube. Mr. Chaisson
29  stated that the parish right of way is still there as a foot print in the water.
30
31  Chevron has not been approached to fund the project, but Shell will to some extent.
32  This is not a repair but a new improved project. There will only be borings done behind
33  the bags.
34
35  Ms. Norman then discussed a LNG fueling station for the larger vessels that will be
36  using LNG for fuel. The project would be located on the western bank of Bayou
37  Lafourche on property owned by the State.
38
39  **NEW BUSINESS ITEM 2.        SECRETARY TREASURER'S REPORT**
40
41  In addition to the regular invoices, Ms. Norman's expense account was $183.56.
42
43  $783.44 expense account for January .
44
45  There was a report on royalty payments that Michael Peneguy compiled that indicated
46  that there was production from one well that was reported to the state that Wisner has
47  not yet been paid on.  Hopefully this will show up in the next month's payment.
48
49  Our total revenues for 2011 amounted to $5,434,914.21. Expenses inclusive of BP
50  expenses were $1,864,459.30. Without the BP expenses, normal operating expenses
51  were $508,901.44. This amounts to a 10.7% operating overhead, without the
52  extraordinary BP expenses. Michael Sherman wanted to take some time in an extra
53  meeting to review and go over the budget.
54
55  The audit letter emails did go out and a review of the bids will be discussed at the next
56  meeting.
57
58  Tulane University has appointed a new representative to the Committee, Mr. Tony
59  Lorina. Ms. Lisabeth A. Turner has been appointed as the alternate. Tulane has contact
60  the office to notify Wisner that the organization will be honored and admitted to the
61  Paul Tulane Society as a donor of more than $1million. Ms. Norman researched the gifts
62  to Tulane over the past 20 years and it exceeds $7million. The event will take place on
63  March 15th, with an awards ceremony at 3pm and a dinner at 6:30 that evening.

2

1    There is also a letter about the LA 1 highway. Ms. Norman attended the ground
2    breaking.
3
4    There was a motion by Michael Peneguy to approve payment of the invoices and
5    expense accounts and the Secretary Treasurer's Report.  Dr. Everett Williams seconded.
6
7    **Motion passed.**
8
9    **NEW BUSINESS ITEM 3.        CITY OF NEW ORLEANS**
10
11   Mike Sherman indicated that he understood that although it has been public, there has
12   never been a formal presentation to the Committee on the City's grant process. Mr.
13   Sherman stated that he would initiate with an email, an explanation and move forward
14   from there. He informed the Committee that on February 2, 2012 at 10:30 am in the old
15   Amoco Building at 1340 Poydras, on the 9th floor, a public review of the process will take
16   place.
17
18   In reference to the request to meet with the Mayor, the update on the grants and the
19   discussion to address the extension of the Donation. Mr. Sherman indicated that these
20   items should be addressed at the next Wisner meeting.
21
22   There was then a discussion about having a special meeting to discuss the Wisner Trust
23   fund issues with a second meeting in March to discuss the extension of the Donation.
24   Michael Peneguy suggested that a meeting with the Mayor where the Committee clearly
25   knows how the Mayor wants to use the grant money should be addressed first, with a
26   second meeting to address the extension of the Donation at another time.
27
28   Mark Peneguy then stated that he wanted to get a system in place that respects the
29   Committee, the family and the initial wishes of Mr. Wisner in his bequeath.
30
31   Mr. Sherman then stated that the City Attorney has delivered an opinion that differed
32   from past practices. Michael Peneguy stated that the Committee had not yet seen that
33   opinion. These are the things that need to be discussed. Then the extension of the
34   Donation can be discussed.
35
36   Mr. Sherman then indicated that this could be the first item at the next meeting so that
37   enough time would be allocated to it and the meeting could be wrapped up at 1:30.
38   Mr. Sherman then suggested that at the next meeting the Committee plan to meet from
39   12 until 3 and that he would probably bring a colleague with him to participate in the
40   discussion.
41
42   He also stated that he would in the next week give the Committee detailed list on how
43   the City allocated the funds last year.
44
45   Mr. Sherman suggested that the February meeting could be moved up date wise and this
46   idea was rejected. Ms. Norman then suggested a longer meeting in February and to
47   address the City issue at that time. Michael Peneguy then indicated that he would like
48   the Mayor to participate as well. Mr. Peneguy stated that he thought there were some
49   misunderstanding with the Mayor about what the Committee does and how they
50   operate.
51
52   Mr. Sherman acknowledged the request and stated that he appreciated the spirit in
53   which it was presented.
54
55   Mr. Peneguy suggested that at the March meeting if there is not a special meeting we
56   need to address the Donation extension soon to allow continuity in business practices.
57
58   Ms. Norman then suggested that Robert Wiygul address the Committee next and that
59   Item 5 on the agenda be discussed. Michael Peneguy made a motion to go into executive
60   session. Second by Dr. Everett Williams. Motion passed.
61
62   The Committee resumed the Regular Meeting at 1:35.
63

3

1    **NEW BUSINESS ITEM 4.**    **WISNER BEACH UPDATE**
2
3    Ms. Norman indicated that there was a non intrusive access agreement from the State to
4    do Archeological  work for the Caminada Project.
5
6    Ms Norman has met with the State and there is now a clearer template for the project.
7    There will be a higher dune with a smaller foot print are. This plan should provide the
8    best long term results for the property.
9
10    A company called GBA wants to do a subsidence project tied to the restoration to study
11    subsidence rates. The project will involve using heavy equipment to take borings both
12    before and after the nourishment. There will also be permanent markers placed on the
13    property. Ms. Norman put together an Access Agreement and she wanted the
14    Committee's comments on the Agreement. This has to be looked carefully because heavy
15    equipment will be used and we need to parse out the footprint and document it to keep
16    it separate from BP. Ms. Norman will be looking at sites where the  work will be done
17
18     In the meantime the SLBDD is trying to convince the Parish to purchase the Caillouet
19    Land Company property. Ms. Norman met with the State land Office.  Ms. Norman
20    indicated that Wisner wanted to include language prohibiting cars in the servitude for
21    the Caminada Project. The State replied that that they felt that language would be
22    contrary to public policy. There are still concerns about the State's claim of the property
23    in front of Bay Champagne. State law indicates that the Public use of the seashore is
24    limited to landing a boat on the seashore. Ms. Norman recommended that the claim in
25    front of Bay Champagne needs to be challenged. Additionally Ms. Norman referred to
26    the claim of the property in front of Pass Fourchon, where a hard structure closed off the
27    area and it was filled . Ms. Norman has concerns that the same thing may occur in the
28    areas where hard structures were placed on the beach for the oil spill. Those areas are
29    now land. Is the State going to claim them? In some cases the sheet piling is now totally
30    covered.
31
32     Ms. Norman also pointed out that even if the Caillouet property is purchased to get to
33    Bay Champagne there is a gap of ½ of a mile over Wisner property to get there. Ms.
34    Norman has Forrest Travirca doing a study of the high tides in the winter months which
35    determines the dividing line between the State's ownership and private ownership.
36
37     This is a very political situation. That needs to be researched and Wisner needs to hold
38    the line. It was then indicated that the Port is on the side of the Parish and we need to
39    delay cooperation with the Port as to Fourchon Island until we clarify their position.
40
41     Ms. Norman needs  approval from the Committee to engage Susan Clade to assist in
42    writing a response letter to the State about Wisner's position on ownership issues and
43    the servitude for the project. There was a motion by  Ed Buddy, second by Stacy
44    Gerhold-Marvin. Motion passed.
45
46    **NEW BUSINESS ITEM 6.**    **GLOBAL SEISMIC SERVITUDE FOURCHON**
47
48    Ms Norman indicated that a check for the Agreement and the aerial photography should
49    be received in the next two weeks.
50
51    **NEW BUSINESS ITEM 7.**    **MANTI/DUNE CNO#1 WELL**
52
53    Ms. Norman stated that to date no royalty has been received for the CNO #1 well.  There
54    has also been an inquiry indicating interest in leasing more property in the area.
55
56    **NEW BUSINESS ITEM 8**    **CHEVRON U.S.A.**
57
58    Ms. Norman has been working with LSU at the Coastal Sustainability Studio. She will
59    be teaching a class at LSU this spring.
60
61    There was a call about an assignment from Chevron to Energy XXI, LLC. But there has
62    been no further information on this proposed assignment.
63

4

1   There was a question about whether this was an assignment of a pipeline or a portion of
2   the Surface Lease. There are some questions about rental allocation, and liability that
3   may result from the approval of the assignment. Ms. Norman will look at this issue
4   further and collect more information and get back to the Committee at the next
5   meeting.
6
7   Mr. Sherman departed the meeting and  Ed Buddy moved that Mr. Peneguy assume the
8   Chair. Second by Stacy Gerhold- Marvin Motion passed.
9
10   **NEW BUSINESS ITEM 9.        CAMPSITE AND OYSTER LEASE RENEWALS**
11
12   The renewal letters for 75 camps with the higher rates went out. To date $81,363 has
13   been collected in Jefferson Parish. $46,246 has been collected in Lafourche Parish.
14   Eight ( 8) oyster leases were sent out and $542 has been collected on those.
15   There was a request for hunting lease in the old Wildlife and Fisheries area. Ms. Norman
16   thinks that a formal process entertaining offers should take place when there is time.
17   This request should be rejected and an advertising campaign should take place.
18
19   **NEW BUSINESS ITEM 10.        FINANCIAL AUDIT 2011 BID LETTERS**
20
21   The bid letters for the audit will be presented at the next meeting. Bourgeois Bennett has
22   submitted their bid for $7900 for the audit and $3900 for the taxes.
23
24   **NEW BUSINESS ITEM 11.        BOURGEOIS BENNETT 2011 TAXES –**
25                                            **LETTER OF ENGAGEMENT**
26
27   The Committee was requested to give approval for Ms Norman to sign the engagement
28   letter from Bourgeois Bennett to begin the 2011 tax return at a cost f $3900. Motion by
29   Ed Buddy, second by Stacy Gerhold –Marvin. Motion passed.
30
31   **NEW BUSINESS ITEM 12.        NEXT MEETING – TUESDAY, FEBRUARY 28,**
32                                            **2012  12:00 NOON**
33
34        Meeting adjourned at 2:15 pm on a motion by Ed Buddy, second by Stacy
35   Gerhold-Marvin.  **Motion passed.**
36
37
38   RESPECTFULLY SUBMITTED BY:
39
40
41
42
43
44   C. Cathy Norman, Secretary Treasurer
45
46
47   AMENDED AND APPROVED AT  3 - 27 - 2012               MEETING
48                                          *DATE*

5

# MINUTES OF THE MEETING OF THE
# EDWARD WISNER DONATION ADVISORY
# COMMITTEE
# TUESDAY, FEBRUARY 28, 2012

### Redacted version

**Present:**
Mike Sherman, Chair, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
W. A. Peneguy, Alternate, Wisner Family Heirs
Dr. Everett Williams, Representative, Charity Hospital
Stacy Gerhold-Marvin, Alternate, Charity Hospital
Tony Lorino, Representative, Tulane University
Lizbeth Turner, Alternate, Tulane University
Ed Buddy, Alternate, The Salvation Army

Staff:
C. Cathy Norman, Secretary Treasurer/Land Manager
Amanda Phillips, Executive Assistant, Wisner

Guest:
Mark Peneguy
Stephen Green
Matthew Averill, City of New Orleans
Robert Wiygul, Waltzer & Wiygul
Joel Waltzer, Waltzer and Wiygul
Dr. John Pardue, LSU
Susan Clade, Simon, Peragine, Smith and Redfearn

Meeting called to order at 12:03 pm. The Agenda was rearranged to allow Dr.
John Pardue to present first.

## NEW BUSINESS

**NEW BUSINESS ITEM 1.**     **BP Horizon Deepwater Spill Update (Joel
                              Waltzer, Robert Wiygul, and John
                              Pardue will attend)**

Dr. John Pardue briefed the Committee on the work his team has done. He also
outlined what is being done and what needs to be done in response. The oil that came
ashore was a stable emulsion that does not readily break down. There has only been one
other spill, off the coast of England in the early 1960s, with this type of oil. Dr. Pardue's
group has been documenting the presence of oil (sand mixed with oil emulsion) on the
beach. Last week 8,000 pounds of small surface oil residue balls were removed in one
day. Oil snare continues to be found. The oil is not breaking down as had been reported.

Michael Peneguy moved that the Meeting enter Executive Session at 12:52pm.
Dr. Everett Williams seconded. **Motion passed.**

Michael Peneguy moved that the Meeting exit Executive Session at 1:56 pm. Dr.
Everett Williams seconded. **Motion passed.**

1



1      Michael Peneguy moved to fund the two studies Dr. Pardue proposed. Dr. Everett
2    Williams and Ed Buddy seconded. **Motion passed.**

3    **OLD BUSINESS**

4

5    **OLD BUSINESS ITEM 1.**    **Approval of the Minutes of the November**
6                                             **29, 2011 and the January 31, 2012**
7                                           **Regular Meetings**

8

9      Mike Sherman asked that the Minutes be deferred until the March Meeting for
10   approval.

11

12

13   **NEW BUSINESS, continued**

14

15   **NEW BUSINESS ITEM 2.**    **Secretary Treasurer's Report**

16

17      Invoices:
18      Cathy Norman Expense Report -                     $357.76
19      Amanda Phillips Expense Report -               8.83
20      FET Investigations Inv. #680 (BP) -   Paid $5,890   Balance due $5,111.23
21      FET Investigations Inv. #681 (BP) -   Paid $5,180   Balance due $5,511.78
22      FET Investigations Inv. #682 (BP) -   Paid $1,000   Balance due $0

23

24      There were some articles regarding BP in the packet and an article reporting
25   Charlotte Randolph was under investigation for ethics issues. She leased her camp to BP
26   during the clean-up.

27

28      BP partially reimbursed Wisner for Claims 16-20 (July-November 2011)
29   $236,608.97. Ms. Phillips reviewed three payment options for the outstanding balances
30   owed to FET Investigations and Waltzer & Wiygul. Discussion of the alternatives
31   ensued. Michael Peneguy stated that all the outstanding balances from July 2011 to
32   present should be paid in full.

33

34      NOAA has proposed a CWPPRA restoration project on part of Wisner property.
35   Ms. Norman has not communicated to them, that Wisner has no objection. She is certain
36   if it occurs, Wisner and NOAA will be able to work it out.

37

38      Forrest Travirca submitted a report on the degradation of the LUMCON camp.
39   Ms. Norman will send Nancy Rabelais at LUMCON in Cocodrie a letter, attaching this
40   report, demanding it be repaired and returned to us, or returned to us along with the
41   FEMA funds. LUMCON has maintained they are awaiting FEMA money to repair the
42   camp. It will be an agenda item for the Annual Report so opportunities for its reuse can
43   be discussed.

44

45      Michael Peneguy moved that all outstanding balances be paid in full. Dr. Everett
46   Williams seconded. **Motion passed.**

47

48      The approval of the 2012 budget was deferred to the next meeting.

49

50      Michael Peneguy moved that the Secretary-Treasurer's Report be approved and
51   that additional invoices and expense accounts be paid. Ed Buddy seconded. **Motion**
52   **passed.**

53

54

55   **NEW BUSINESS ITEM 3.**    **City of New Orleans**

56

57      Matthew Averill handed out packets of information regarding the City's Grant
58   Process. Mike Sherman reviewed the 2011 Strategic Grants, and the 2012 Program status.

1   He opened the floor for discussion of the Extension of the Trust and for whether the
2   discretionary grants should come before the Committee for approval.
3
4        In 2011 $885,000 in discretionary grants were awarded. A description of each of
5   the grants was attached to the cover sheet. Mr. Sherman detailed the Mayor's efforts to
6   make this an open and transparent process. There have been press releases informing the
7   public of the informational sessions for the grants. Those meetings have been standing
8   room only.
9
10       Stacy Gerhold-Marvin asked if for the next funding cycle the Committee would
11  get to see the grants before they were awarded. Mr. Sherman deferred his answer until
12  later in the meeting.
13
14       Mark Peneguy asserted his objections because the City did not come to the
15  Committee first, as it is supposed to do under the terms of Donation and all of the
16  governing documents. Mr. Sherman responded that this would be discussed later in the
17  meeting. Mark Peneguy stated that his objections were to the 2011 grants, which were
18  currently being discussed. He added that he took offense to the use of the word
19  "discretionary." The grants are not discretionary. The Mayor is governed by documents
20  which run the Committee. Mr. Sherman reviewed the 2012 Grant Process and distributed
21  a package given to the meeting attendees.
22
23       Mark Peneguy asked where it was detailed on the 2011 list the money given to the
24  Chicago Crime Initiative. Mr. Sherman explained that was not on the list as it was a
25  strategic grant and not a discretionary grant. In response to a question by Ms. Gerhold-
26  Marvin a discussion regarding the strategic grants followed.
27
28       A group of City officials screen the grants and makes their recommendations to
29  the Mayor. The Grants Selection Committee is composed entirely of City officials:
30  Deputy Mayor, Chief of Staff – Judy Reese Morse, Director of Social Innovation –
31  Brooke Smith, Ashleigh Gardere, Director of the New Orleans Recreation Development
32  Commission – Vic Richards, Health Commissioner – Dr. Karen DeSalvo, Criminal
33  Justice Commissioner – James Carter, Head of New Orleans Redevelopment Authority –
34  Jeff Hebert, Mayor's Cultural Economy Liaison – Scott Hutchinson. Ms. Gerhold-Marvin
35  asked that Mr. Sherman email the Committee the names of Selection Committee. He said
36  he would.
37
38       The Mayor has committed $500,000 to the Cease Fire Program. It is an education
39  program to reduce homicides, the City's number one problem in the Mayor's opinion.
40  Mr. Sherman will email Committee members a link to a PBS documentary on Cease Fire.
41  It was recommended to the City by the Department of Justice. Mr. Sherman also offered
42  to have Jeanetta Walker come speak to Committee. This investment was met with another
43  $500,000 in private funds. The program will target St. Roch and Central City areas.
44
45       The City Attorney, Richard Cortizas and the previous City Attorney Nanette
46  Jolivette-Brown have both reviewed the documents. None of the other entities are
47  required to come to the Committee for approval. They do not believe the City is required
48  to come back to the Committee for approval. The Mayor does not mean any disrespect to
49  the Committee. Mr.
50
51       A discussion regarding why the other beneficiaries do not have to come to the
52  Committee for approval to spend their money followed. It was asked of the City, why if
53  all other Mayors, regardless of legal opinions, came back to the Committee to get
54  approval for grants, does Mayor Landrieu not? Mr. Sherman responded the Mayor is
55  committed to following whatever the law is. He got the City Attorney's opinion on the
56  law.
57
58       Ms. Mr. Buddy stated that he still had not heard the answer to Ms. Gerhold-
59  Marvin's question as to why the Mayor won't just honor the family and the Committee
60  and run the grants by them. He does not understand, especially when almost everything in
61  the past was approved, that this is such a big issue. He believes that they could get over

3

1    this impasse with just a little cooperation and communication. Michael Peneguy added
2    that he cannot understand the answer the Mayor gives as to why he won't be open.
3
4         Mr. Sherman responded that everything is open and transparent. What is being
5    asked for is the chance to review prior to being public, which is different. Mr. Sherman
6    asked that the Committee be careful with their words.
7
8         Ms. Phillips raised the question of whether the City Charter stated that money in a
9    trust fund could not be spent without approval of the governing board of that trust fund.
10   Susan Clade replied that it is. She presented Mr. Sherman with a letter from September
11   11, 1972, on the City Attorney's letterhead to Mayor "Moon" Landrieu. This letter was
12   signed off by Blake Arata, the then City Attorney. The issue was whether or not Wisner
13   Fund money could be used by the City to set up a Capital Loan Account. The City
14   Attorney signed off on it saying that neither the Act of Donation nor the Act of
15   Compromise prohibited it, but that the Home Rule Charter of the City of New Orleans
16   does.
17              *"Trust proceed funds are to be used to make disbursements there*
18              *from only in accordance with resolutions or other appropriate*
19              *authorization furnished by officers, departments or boards having*
20              *power so to authorize."* The opinion then says *"most significantly in*
21              *this case the appropriate board would be the Edward Wisner Donation*
22              *Advisory Committee. This Committee has the authority to authorize the Director*
23              *of Finance to set up a capital loan account to be used to underwrite capital*
24              *construction accounts."*
25
26         Mr. Sherman thanked Ms. Clade for bringing him a document. This is what he has
27   asked for. Ms. Norman noted that the City Charter has not changed since 1972. The
28   money is held in the Wisner Donation Land Trust Proceeds Fund. No money can be
29   removed from that type of account without the permission of the governing Board or
30   Commission. Michael Peneguy asked if the office had received an accounting of the
31   Trust Proceeds Fund.
32
33         Mr. Sherman asked what this was. Ms. Norman explained that Wisner used to get
34   a monthly accounting of the money in the Fund. After Katrina the receipt of which was
35   sporadic. The office has not received a copy since September 2011.
36
37         Michael Peneguy asked Mr. Sherman if he would come back to the Committee
38   with answers to questions raised in the meeting. Mr. Sherman replied that he would be
39   happy to sit down with anyone and the City Attorney Mr. Cortizas to discuss any legal
40   issues. Michael Peneguy reiterated that he wanted Mr. Sherman to come back to the
41   Committee with the answer as to whether they would be able to review the grants.
42
43         Mr. Sherman moved on to the final discussion item, which time has limited.
44   Michael Peneguy moved to have a Special Meeting in March to discuss the Extension of
45   the Donation. He presented a letter for anyone else to sign. Mr. Sherman said as Chair he
46   would be happy to call a Special Meeting, eliminating the need for a written request.
47
48         Mr. Sherman acknowledged Michael Peneguy and the family's desire to extend
49   the Donation. He stated that the Mayor does not have an opinion on that, at all. The first
50   step the Mayor and the City would like is to conduct an evaluation of what the assets
51   might be worth. So that the Committee could have full information on whether or not it is
52   in the best interests of the beneficiaries to sell the assets and each beneficiary to take his
53   share or if it is in the best interests of the beneficiaries to continue the trust and any
54   changes that may be necessary. Depending on the value of the assets that can be sold, the
55   beneficiaries may or may not want to continue the trust. The Mayor's perspective is that
56   he wants to see an evaluation that the Committee can commission.
57
58         Ms. Gerhold-Marvin said she agrees with that, but that the Committee is running
59   out of time. Michael Peneguy pointed out the difficulties with doing that. The land is in
60   jeopardy of expropriation. Mr. Sherman suggested that if the Committee agrees with an
61   evaluation, that Ms. Norman be authorized to put out a request to get proposals for an
62   evaluation for a Special Meeting in a couple of weeks. A discussion regarding an

4

1    evaluation evolved. Ms. Norman noted that there were several sensitive matters which
2    could be upset by news of this leaking.
3
4
5        Ms. Norman asked if a Special Meeting could be set by email to discuss the
6    Extension of the Donation.
7
8
9    NEW BUSINESS ITEM 4.     Wisner Beach Update
10
11        Forrest Travirca submitted a proposed ticket to issue to violators on the beach.
12    Ms. Norman will have Ms. Clade review it.
13
14        Ms. Norman included both Michael Peneguy and Mark Peneguy's comments on
15    the Intrusive Access Agreement and asked the Committee to send her their comments.
16    She would like to get it finalized and sent to the Mayor for signature within the next
17    day. If it is ok, she would like to have the Committee approve the Agreement via email.
18
19
20
21
22
23
24
25
26
27



28
29    NEW BUSINESS ITEM S.     Financial Audit Bids -Discussion and
30                                      Selection of Firm
31
32        Bids were received. Emails will be sent to the bidders to let them know the
33    Committee did not have time to review the bids at the meeting. This gives the Committee
34    a chance to review the bids and the Minutes.
35
36        Tony Lorino asked why it was put out for bid. Ms. Norman noted that continuity
37    may be a good thing given the BP Oil Spill. Ms. Kelly McGhee sent Wisner an email
38    about the impacts of the Spill on our tax return. A lengthy conversation was also had with
39    someone from their trust department regarding the impact a settlement would have. These
40    should be considered. Ms. Norman will invite Bourgeois Bennett to discuss these matters
41    with the Committee at the next meeting.
42
43        Bourgeois Bennett has done a great job. Wisner has the option of asking another
44    partner to review the audit. It was suggested at the last meeting that a 3-year contract be
45    signed. Mr. Lorino noted that is prohibited in public companies. Michael Peneguy
46    remarked that the last time it was put out to bid, the bids reconfirmed that Bourgeois
47    Bennett's fees were reasonable.
48
49
50    NEW BUSINESS ITEM 6.     Update on 2012 Legislative Session
51
52        Ms. Norman pointed out a strange bill regarding the State donating property to the
53    Greater Lafourche Port Commission. The State Land Department mentioned in a meeting
54    with Ms. Nonnan they were trying to determine a value on the property on the western
55    side of Bayou Lafourche for a Liquid Natural Gas fueling station. Ms. Norman emailed
56    Chet! Chaisson at GLPC for more specifics on this. He responded that he would get back
57    to her.
58
59        Mark Peneguy asked Ms. Norman if Wisner should hire a lobbyist, such as Cheryl
60    Teamer, to watch the bills for Wisner. Michael Peneguy said that first Ms. Norman

1  should see if Ms. Teamer were available. Mr. Sherman asked how much Ms. Teamer was
2  paid the last time. Ms. Norman replied $5,000 per month. Mr. Sherman asked that it be
3  approved in case she was needed. Michael Peneguy said he would approve it subject to
4  whether she was needed.
5
6
7  **NEW BUSINESS ITEM 7.**        **Next Meeting – Tuesday, March 27, 2012,**
8                                  **Special Annual Meeting 10:30 AM**
9                                  **Regular Meeting 12:00 noon**
10
11        Motion was made to adjourn at 3:05 pm by Dr. Everett Williams,
12  second by Michael Peneguy. **Motion passed.**
13
14
15  RESPECTFULLY SUBMITTED BY:
16
17
18
19
20  _____
21  C. Cathy Norman, Secretary Treasurer
22
23
24  AMENDED AND APPROVED AT _____ MEETING.
25                                  DATE

6

## MINUTES OF THE SPECIAL MEETING OF THE
## EDWARD WISNER DONATION ADVISORY
## COMMITTEE
## TUESDAY, MARCH 20, 2012

**Present:**
Michael Sherman, Chairman, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
Tony Lorino, Representative, Tulane University
Dr. Everett Williams, Representative, Charity Hospital
Ed Buddy, Alternate, The Salvation Army
W. A. Peneguy, Alternate Representative, Wisner Family Heirs
Stacy Gerhold-Marvin, Alternate Representative, Charity Hospital
Lizbeth A. Turner, Alternate Representative Tulane University
Dr. Roxanne Townsend, LSU/Charity Hospital

Staff:
C. Cathy Norman, Secretary Treasurer/Land Manager
Amanda Phillips, Executive Assistant, Wisner

Guests:
Matt Averill, City of New Orleans
Mark Peneguy, Wisner Family Heirs
Stephen Green, Wisner Family Heirs
Jim Burton, Simon, Peragine, Smith and Redfearn

Meeting called to order at 1:00 pm. The purpose of the Special meeting was to discuss the Extension of the Donation.

The participants introduced themselves as there were several new participants in attendance for the purposes of this meeting.

Michael Sherman turned the meeting over to Cathy Norman who had prepared information about the topic for the Committee. Then Mr. Sherman thought it appropriate to go around the table and get input from each committee member.

1



EXHIBIT
tabbies®
55



2









Meeting adjourned at 2:24 pm on a motion by Tony Lorino, second by Dr. Everett Williams. **Motion passed.**

RESPECTFULLY SUBMITTED BY:

_____

C. Cathy Norman, Secretary Treasurer

AMENDED AND APPROVED AT _____ MEETING
                                                              *DATE*

## MINUTES OF THE REGULAR MEETING OF THE
## EDWARD WISNER DONATION ADVISORY
## COMMITTEE
## TUESDAY, MARCH 27, 2012

**Present:**
Michael Sherman, Chairman, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
William Peneguy, Alternate, Wisner Family Heirs
Tony Lorino, Representative, Tulane University
Lizbeth Turner, Alternate, Tulane University
Dr. Everett Williams, Representative, Charity Hospital
Stacy Gerhold-Marvin, Alternate, Charity Hospital
Ed Buddy, Alternate, The Salvation Army

<u>Staff:</u>
C. Cathy Norman, Secretary Treasurer/Land Manager
L. Amanda Phillips, Executive Assistant

<u>Guests:</u>
Mark Peneguy
Stephen Green

The meeting was called to order at 12:00 noon.

## OLD BUSINESS

**OLD BUSINESS ITEM 1.**          **APPROVAL OF THE MINUTUES OF THE NOVEMBER 29, 2011 AND THE JANUARY 31, 2012 REGULAR MEETINGS (DISTRIBUTED AT THE FEBRUARY MEETING) AND FEBRUARY 28, 2012 MEETING**

Mr. Michael Peneguy motioned that the November 29, 2011 and the January 31, 2012 Minutes for both the Regular and Executive Sessions be approved. Dr. Williams seconded, adding with the corrections. **Motion passed.**

## NEW BUSINESS

**NEW BUSINESS ITEM 1.**          **SECRETARY TREASURER'S REPORT**

Invoices were presented for approval and payment. A couple of articles were included, as well as information about the LSU field trip Ms. Norman took, and the class that was in Fourchon.

Highway LA 1 Coalition asked for $2000 for our annual membership dues. Also in receipt are Restore or Retreat's membership dues. The Arts Council, whose conference room the Committee uses, requested that Wisner join in order to have free use of the conference room. A discussion as to whether to make a donation or to join the Arts Council ensued. Mr. Michael Peneguy suggested Wisner give between $500 and $600.

Mr. Michael Peneguy moved to make a $500 rental payment for the conference room to the Arts Council. Dr. Williams seconded. **Motion passed.**

1

\*\*\* REDACTED VERSION \*\*\*



**EXHIBIT**

**KK**

1  Mr. Michael Peneguy moved that the LA 1 Coalition be paid $2000 and Restore or
2  Retreat be paid what they were the previous year. Dr. Williams seconded. **Motion**
3  **passed.**
4
5  Ms. Norman briefed the Committee on activities on the property. Ms. Norman
6  requested permission to sign the Access Agreements when there is a short fuse and a
7  short-term agreement. Mr. Michael Peneguy moved that Ms. Norman be given
8  permission to sign the short-term standardized form Access Agreements which need to
9  be executed immediately. Mr. Sherman asked that Ms. Norman propose a set of criteria
10 under which Ms. Norman would sign Access Agreements. He then gave reasons it was
11 beneficial for the Mayor to sign the Agreements.
12
13 Ms. Norman explained the process by which she negotiates the agreements. She shared
14 the history of Wisner's use of the agreements and the protocols in place for the
15 agreements. This has set Wisner apart from every other landowner in the BP Oil spill.
16 Our Access Agreement with BP is holding them contractually to a high liability than
17 *OPA 90* does.
18
19 Mr. Michael Peneguy moved that the Secretary Treasurer's Report be accepted with the
20 additional Expense Accounts. Dr. Williams seconded.  Mr. Sherman asked Ms. Norman
21 to review the invoices which are being paid. Ms. Norman did. **Motion passed.**
22
23 **NEW BUSINESS ITEM 2.**          **CITY OF NEW ORLEANS – FOLLOW-**
24                                   **UP ON SPECIAL MEETING TO**
25                                   **DISCUSS THE EXTENSION OF THE**
26                                   **DONATION, SPRING 2012 WISNER**
27                                   **GRANTS**
28
29 **Follow-up on Special Meeting to Discuss the Extension of the Donation**
30
31 Ms. Norman briefed the Committee on the results of her appraiser research. She spoke
32 with Albert Bienvenue, who represents the Caillouet Land Corporation (CLC). CLC is
33 getting appraisals on their coastal property. He reported that property in the Port,
34 excluding the bulkheads, excluding the buildings is appraising at $1.50 - $2.50 a square
35 foot.
36
37 Mr. Michael Peneguy distributed a letter to be recorded in the minutes (see attached). A
38 discussion ensued as to who should pay for an evaluation.
39
40 Mr. Michael Peneguy made a motion for a Special Meeting in April specifically to go
41 over the Agreement to extend the Donation and to discuss it. Dr. Williams seconded the
42 motion. Michael Sherman asked for a discussion of the motion. **Motion passed.**
43
44 **Spring 2012 Wisner Grants** – Mr. Sherman appealed for the third and last time that
45 if anyone had anything else to share with the City on why they fell legally or for any
46 other reason that process needs to come through the Committee, he would appreciate
47 that by the end of the week. He had promised that the City would do a review, taking
48 into account everything anyone gave him. He promised an open review. He would
49 return with Mr. Richard Cortizas and share everything. A discussion ensued.
50
51
52 **NEW BUSINESS ITEM 3.**          **BP HORIZON DEEPWATER SPILL**
53                                   **UPDATE**
54
55 Mr. Michael Peneguy made a motion to enter Executive Session at 1:05 pm. Mr. Lorino
56 seconded. **Motion passed.**
57
58 Mr. Michael Peneguy made a motion to exit Executive Session at 1:32 pm. Dr. Williams
59 seconded. **Motion passed.**
60

*** REDACTED VERSION ***

1 Mr. Michael Peneguy moved that the Committee allow the Greater Lafourche Port
2 Commission drill holes 10' deep in front of the structures, that were put out on the
3 beach during the oil spill for prevention, up to $7000, to drill the holes and do the
4 analysis on the samples to determine if there are hydrocarbons on the property and
5 what the level of contamination is. Mr. Lorino seconded. **Motion passed.**
6
7
8 **NEW BUSINESS ITEM 4.          WISNER BEACH UPDATE**
9
10 Susan Clade and Ms. Norman sent a letter to the State asserting Wisner's claim to the
11 area in front of Bay Champagne, with supporting scientific evidence, due to avulsion in
12 this area. The State doesn't agree, but has agreed to mark this area on its map as an area
13 in conflict. Wisner can continue to claim this area for the purposes of BP and for the
14 purpose of including it in the land rights servitude with the State.
15
16 Mr. Forrest Travirca created a form he wants to issue to people he finds on the beach
17 illegally. He has no authority to issue tickets. He wants to inform people of the laws they
18 may be violating by being on the beach illegally. Susan Clade reviewed it and thought it
19 was good.
20
21 Mr. Michael Peneguy moved to approve the form and its use. Dr. Williams seconded.
22 **Motion passed.**
23
24 Ms. Norman presented an Intrusive Access Agreement for GBA.
25
26 Mr. Michael Peneguy moved to approve the Access Agreement. Dr. Williams seconded.
27 **Motion passed.**
28
29 BTNEP submitted a proposal to have an ATV go out and look at birds. Ms. Norman will
30 convert this proposal to an Access Agreement.
31
32 Mr. Michael Peneguy moved that the Non-Intrusive Access Agreement be approved. Dr.
33 Williams seconded. **Motion passed.**
34
35 Ms. Norman reviewed her efforts and her progress in restricting vehicular traffic on
36 Wisner Beach.
37
38 Mr. Michael Peneguy moved to approve the agreement via email after everyone has 24
39 hours to review it. Dr. Williams seconded. **Motion passed.**
40
41
42 **NEW BUSINESS ITEM 5.          FINANCIAL AUDIT BIDS –**
43 **                              DISCUSSION AND SELECTION OF A**
44 **                              FIRM**
45
46 There was a discussion on the merits of the bids. Mr. Micheal Peneguy moved that
47 Wisner continue with Bourgeois Bennett with a 3-year contract. Mr. Lorino seconded on
48 the condition the motion be amended to a 1-year contract. The Committee and Mr.
49 Michael Peneguy accepted the amendment. **Motion passed.**
50
51
52 **NEW BUSINESS ITEM 6.          UPDATE 2012 LEGISLATIVE SESSION**
53
54 Ms. Norman updated the Committee on several bills filed for proposed oil and gas
55 legacy suits on both sides of the issue, HB 143 – the transfer of State water bottoms to
56 the GLPC, HB 916, and HB476 Trusts for Mixes, Private and Charitable Purposes.
57
58 Mr. Sherman mentioned the RESTORE bill pending before the US House of
59 Representatives.
60
61

**NEW BUSINESS ITEM 7.**          **ANNUAL REVIEW AND**
                                  **EVAULATION**

This was deferred to May.

**NEW BUSINESS ITEM 8.**          **NEXT MEETING APRIL 24, 2012**
                                  **REGULAR MEETING 12:00 NOON**

There was a motion to the meeting at 2:19 pm by Mr. Michael Peneguy, second by Dr. Williams. **Motion passed.**

RESPECTFULLY SUBMITTED BY:


_____
C. Cathy Norman, Secretary Treasurer


AMENDED AND APPROVED AT _____ MEETING
                                    *DATE*

\*\*\* REDACTED VERSION \*\*\*

# MINUTES OF THE ANNUAL REVIEW MEETING OF THE
# EDWARD WISNER DONATION ADVISORY
# COMMITTEE
## TUESDAY, APRIL 24, 2012

**Present:**
Michael Sherman, Chairman, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
William Peneguy, Alternate, Wisner Family Heirs
Tony Lorino, Representative, Tulane University
Lizbeth Turner, Alternate, Tulane University
Dr. Everett Williams, Representative, Charity Hospital
Stacy Gerhold-Marvin, Alternate, Charity Hospital
Ed Buddy, Alternate, The Salvation Army

<u>Staff:</u>
C. Cathy Norman, Secretary Treasurer/Land Manager
L. Amanda Phillips, Executive Assistant

The meeting was called to order at 10:46 Am.

There was discussion as to whether the Annual Review Meeting was to be held in Executive Session or not. Michael Peneguy explained this meeting was not held in Executive Session if only the Committee Members were present. Michael Sherman inquired if the difference was whether the minutes were public or not. Mr. Michael Peneguy stated that the minutes were not public anyway. Mr. Sherman said fair enough.

Mr. Sherman took a few minutes to discuss the previous two special meetings and to state that the important issues were not getting any easier: the BP claim continues to escalate, the Extension of the Donation as the Committee pursues that process and comes closer to a decision on how we handle that and the Port's request to enter into a major new lease. From his perspective he felt like a line had been crossed from being professional and respectful of each other. He was going to do everything on his part as the Committee moves forward to have everyone treat one another with respect and professionally. Passion is great, but he asked everyone to refrain from *Ad hominem* attacks. He felt like he was being attacked last week, there were curse words used and unprofessional conduct.

Ms. Stacey Gerhold-Marvin commented that the Wisner Committee feels attacked by the City of New Orleans. Mr. Sherman interjected, that was ok, and that he would give her an opportunity to speak. He wanted everyone to have an opportunity to speak as well. He wanted to share his feelings. He requested that everyone not have a repeat of last week. That the Committee treats each other professional, with respect and that there would be disagreements sometimes. He asked that they agree to disagree respectfully. He then opened the floor to anyone else who wished to comment beginning with Ms. Gerhold-Marvin.

Ms. Gerhold-Marvin said she had just made her comment. Mr. Michael Peneguy stated he did not see anything other than respect at the last meeting and he saw nothing wrong with the last meeting. Ms. Gerhold-Marvin concurred.

Mr. Sherman interjected that whenever someone has the floor that the Committee gives them the respect to speak and that the Committee not interrupt that person. He asked Mr. Michael Peneguy if he had any further comments. Mr. Peneguy did not. Mr. Sherman opened the floor to others. There were no other comments.

Mr. Sherman asked if anyone felt it was important to move into Executive Session. Upon no request, the meeting proceeded.

1



EXHIBIT
LL
tabbies

1 Ms. Cathy Norman explained that the way the Annual Review Meeting is usually held.
2 The 2012 Budget was approved at the March Meeting but if there is any change in
3 payroll, then the budget will be amended.
4
5 Mr. Sherman yielded the floor to Ms. Norman to review the report. The beginning of the
6 report includes a history of the Donation and of restoration projects done on the
7 property upon the suggestion last year by Major Frizzell. Ms. Norman discussed New
8 Projects addressed during 2011. The Geotube project with the Greater Lafourche Port
9 Commission is moving forward. Borings behind the *boudin* bags were completed just
10 over two months ago, but Ms. Norman still has not gotten a report as to if oil is present
11 or not. The Geotubes will be installed prior to the Caminada project. Sand for the
12 Caminada project will go on top. The Geotube project only covers the footprint of the old
13 *boudin* bag project, built in 1988. Shell has given $500,000 towards this project.
14
15 The Servitude for the Caminada Headlands Project has been signed. This project is in
16 limbo right now because of the hard structure argument with BP and the Parish. BP is
17 trying to push the liability for the hard structure placement on the Parish. Ms. Gerhold-
18 Marvin inquired if this had to be settled within the next week. Ms. Norman affirmed
19 that it did.
20
21 Ms. Norman briefed the Committee on the Revenues and Expenses for 2011. Mr.
22 Sherman asked from whence the Money Market funds came. Ms. Norman explained the
23 Fourchon Region Restoration Initiative which was formed in 2004 by Wisner. $150,000
24 was collected. Some was used to fund studies to decrease scientific uncertainty for the
25 coastal restoration project that is going to be built. This information was turned over to
26 the State and no one knows where this information is post-Katrina.
27
28 This money has been sitting in the account for 5 to 6 years. Wisner has to have the
29 approval of its partners before it disposes of this money.
30
31 Mr. Michael Peneguy noted that this was started after the success of Wisner's NOAA
32 Community-based Restoration Project. Mr. Sherman queried what the limitations were
33 on spending this money. Ms. Norman replied that she believed Wisner had to go back to
34 its partners for approval before spending it.
35
36 Mr. Sherman inquired how much it would be to remove the hard structures. Ms.
37 Norman estimated that it would be between $5 and $10 million. Mr. Michael Peneguy
38 commented that was going to be a difficult project. There is a concern when the
39 structures are removed there will be a lot of oil to clean up. The largest structure to the
40 east is 200,000 cubic yards of material.
41
42 Ms. Norman explained how potentially the area would have to be cleaned. Joel Waltzer,
43 Robert Wiygul and she have discussed that Wisner may potentially have to undertake
44 removing the structures.
45
46 Ms. Norman reviewed the New Projects and Changes. Mr. Sherman asked until what
47 date did the contractual relationship between LUMCON and Wisner provides LUMCON
48 with access? Ms. Norman replied 2025. Mr. Sherman and Ms. Norman discussed
49 Wisner's efforts to get LUMCON to comply with their obligations and LUMCON's
50 history.
51
52 Mr. Michael Peneguy and Ms. Norman discussed Wisner's right to terminate the lease.
53
54 Ms. Norman briefed the Committee on the oyster lease history. She noted that as more
55 land turns to water, this issue will become more problematic.
56
57 Ms. Norman went over the City's Trust Fund account. Ms. Phillips presented the Office
58 Issues. It was noted that the office move date on page 13 should be "2011" and not
59 "2012."
60
61 Mr. Sherman disagreed with the statement that no progress was made on the Extension
62 of the Donation. He believed that while most of the discussions had taken place in 2012,
63 there had been progress made in terms of discussing this in meetings. He wondered if

2

1   the Committee was concerned about the appearance of that statement to outsiders if
2   they should get a copy of the Annual Report. He was not sure that the line "n[N]o
3   progress was made extending the Donation" helped the Committee. He said he was fine
4   with it either way. It was not a concern he had raised, but that others had.
5
6   Ms. Norman suggested that it read "c[C]ontinue to explore the idea of extending the
7   Donation." Mr. Michael Peneguy said he did not think it made any difference. He also
8   commented that the report does not go public unless the City releases it.
9
10   Mr. Sherman replied that he did not know of any Public Records law that allowed him to
11   shield it, should there be a public records request that came into the City of New
12   Orleans. Ms. Norman promised to make that change. Mr. Sherman said he was fine with
13   leaving it the way it was. Ms. Norman noted that another change had to be made
14   anyway.
15
16   Ms. Norman covered the price of oil, the BP Deepwater Horizon Spill and Wisner Beach
17   Issues. She reported that the *vibrio* virus is being found in high concentrations in tar
18   balls. This is another reason to keep people off the beaches at this time.
19
20   In meetings last week with BP, the Parish and the State, BP has alleged that one reason
21   the hard structures have not been removed is that the Parish told the State the Parish
22   did not want the structures removed. The Parish wants to keep the beach solid so people
23   can drive on it. This raises a lot of questions about Wisner's relationship with each of
24   these entities and who will be pulled into any liability for damage to Wisner property
25   from these structures. And who is at fault if these structures are not removed and the
26   $72 million restoration project is lost.
27
28   Ms.Gerhold-Marvin asked if this was the only thing holding up the project. Ms. Norman
29   responded that BP sent an Amendment to the Access Agreement but BP will be held free
30   of liability, won't pay for any damage to the property, and won't pay for ongoing clean-
31   up and monitoring. Wisner will not sign that. What happens with these structures is the
32   largest amount of damage Wisner will have. Also included in the Amendment is that BP
33   refuses to release any financial information between them and the Parish. Joel Waltzer,
34   Robert Wiygul and Ms. Norman have worked out a response. Wisner is in a delicate
35   situation between BP, the Parish and the State.
36
37   Ms. Phillips went through the Campsite, Hunting and Trapping Leases. She explained
38   how the campsite leases work for the new Committee members. Mr. Michael Peneguy
39   posed the question of how many campsites that had been relinquished, still had
40   structures on the lots that needed to be removed. Ms. Phillips answered that most were
41   empty lots because everything had washed away. Ms. Norman discussed the need to
42   remove derelict camps and grants available through NOAA. Ms. Phillips noted camp
43   owners' requests to have a garbage barge.
44
45   Mr. Sherman asked if the lots or the camps were being numbered. Ms. Phillips replied
46   that the numbers were being placed on the structures. He inquired what happened if an
47   empty lot was leased. Ms. Phillips stated that an empty lot would not be leased because
48   there is a moratorium on new leases. In Lafourche Parish the area is classified by FEMA
49   as a COBRA area, which strongly discourages development of the area. Additionally
50   requirement by the Department of Health and Hospitals for the lot size eligible for
51   sewerage is not 12,000 square feet. Mr. Sherman posed the question – what if one was
52   leasing a lot without a camp on it, that was washed away, is that lot being numbered?
53   Ms. Phillips said it would have a number but until a structure is built on that lot, no
54   number would be posted.
55
56   Ms. Norman commented that both Jefferson and Lafourche Parishes have requested
57   numbers be posted in case of emergency.
58
59   Ms. Norman reviewed the 2011 Approved Budget, which the Donation came in under.
60   Mr. Sherman observed that on page 21, the third note on the Approved Budget 2011
61   read "i[I]ncludes Legal, Surveillance, Tax Preparation, and a Lobbyist. $70,988.40 was
62   spent in legal fees, of that 65.15% ($42,250.36) was due to City related issues." He asked
63   Ms. Norman to share with him, as to what the City related issues cost was. Ms. Norman

3

1  responded that was due to having Simon Peragine attending meetings over the same
2  type of issues that were currently being discussed. Mr. Sherman noted those were
3  internal governance issues and inquired if it was fair to characterize those as City related
4  issues or internal governance issues.
5
6  Mr. Michael Peneguy and Ms. Stacy Gerhold-Marvin both replied it was City related.
7  Ms. Gerhold-Marvin stated that the City is the only party opposing the documents. Mr.
8  Michael Peneguy said the Committee is not inter-government related at all. Mr.
9  Sherman maintained that he would prefer that line read "was due to governance issues,
10  or administration issues." Mr. Michael Peneguy interjected that he would leave it the
11  same. Ms. Gerhold-Marvin concurred.
12
13  Mr. Sherman reiterated his opening comments regarding interruptions. He reaffirmed
14  his preference that the note read it was due to administration or governance issues or
15  exploring legal issues. He did not believe it even needed to be included. He didn't see
16  that the Committee line itemed anything else in that respect, so it stood out to him. He
17  preferred that not be in there. He yielded the floor to other Committee members'
18  thoughts.
19
20  Mr. Peneguy asserted that he disagreed totally. Ms. Gerhold-Marvin stated that it was
21  $46,000 that would not have been spent had the City not been constantly challenging
22  the governing documents of the Committee. Mr. Sherman replied that was fair enough
23  and that the Committee was going to have to spend some more money. Mr. Michael
24  Peneguy proposed that if the City was willing to pay all the legal fees, the line be
25  eliminated altogether.
26
27  Mr. Sherman reposted that these were governance issues related to the trust. The City,
28  by the Donation itself, the expenses come out of the Trust. That is a part of the Donation
29  itself that Mr. Wisner made in 1914. He stated he stood firm that the Committee not line
30  item anything in that way. There are other unresolved internal governance issues that
31  would be talked about that day. These issues may be resolved in some peoples' minds,
32  but are still out there because there is not an agreement between all five of the
33  beneficiaries and the Trustee.
34
35  Ms. Norman suggested that she would call Mr. Sherman for them to discuss the wording
36  if that was ok with the Committee. Mr. Michael Peneguy disagreed with that. Ms.
37  Gerhold-Marvin asked what the correct way would be, because she personally agreed
38  with the way it was written. Mr. Michael Peneguy concurred. Mr. Sherman replied that
39  if it was important to notate them, to describe them as what they were: internal
40  governance issues, legal issues related to the Trust Documents.
41
42  Ms. Norman proposed it be "legal challenges related to the Trust Documents." Mr.
43  Michael Peneguy agreed to that, as did Ms. Gerhold-Marvin. Mr. Sherman said that was
44  fine and he liked it. He appreciated everyone working together on that.
45
46  Ms. Norman covered the BP Reimbursements and Expenses for 2011. Tony Lorino
47  asked how such a close budget was derived. Ms. Norman and Ms. Phillips described
48  their process and noted that budget was presented in May of 2011.
49
50  Ms. Norman then discussed the Primary Revenue Breakdown for 2011, the Estimated
51  Income for 2012 and the Approved Budget for 2012. She noted that the Dune/Manti
52  revenue is probably underestimated given the checks received this year as a result of the
53  new well. If another well is drilled, it could probably be even higher. Mr. Michael
54  Peneguy apprised the Committee of the Dune/Manti activity.
55
56  The Approved Budget for 2012 could change if there is a change in the approved salaries
57  and benefits for the staff.
58
59  The 2012 Goals and Projections were examined. Mr. Sherman asked if anyone had any
60  thoughts or concerns about the goals. Mr. Lorino inquired as to what the in-house audit
61  of the Greater Lafourche Port Commission was. He wondered if it was an annual project.
62  Ms. Norman expounded on the complexity of an audit, how the leases with the Port
63  work, and Ms. Burnside's role in the in-house audit.

4

Mr. Sherman commented on the goals. He thought they were very important because the goals give the Committee a baseline for what they are striving to achieve. He wanted to point out that for number 2, the Mayor's position is that number 3 is a condition precedent to making the determination on number 2. He stated that the Committee had all agreed to move forward on two tracks. That way the Committee is not waiting until the end of what may be a several month process to value the Donation. So for the City's side, the word "finalize" would be better if it were "resolve the Extension of the Donation." He understood that at least one of the beneficiaries has made it very clear that he does not want to sell any assets, under any circumstances. From the City's side, they have not made a determination about what is in the best interest. But they look forward to doing that. They look forward to resolving the Extension. That is a great goal. But resolve would be the word that is most accurate as we work on this two track process.

Ms. Beth Turner remarked she saw a change on page 8. She believed it should read "2011"and not "2010" under the heading "Revenues. "

Mr. Michael Peneguy asked if there was anything related to Ms. Burnside that the Committee needed to discuss. He observed that her contract was through September. Ms. Norman replied that it would be important if Wisner would pay for her parking.

Dr. Williams asked why she had not been hired full-time since there was such a need. Mr. Michael Peneguy and Ms. Norman both responded that that was something to be reviewed in September. Mr. Michael Peneguy added that the Committee may be looking at hiring her full-time in September.

Ms. Norman and Ms. Phillips stepped out for the Committee to review their performance. After the discussion a three minute break was taken.

Mr. Sherman stated Ms. Norman and Ms. Phillips' performance review discussion would be concluded at the beginning of next month's meeting. He asked that documents be circulated to all Committee members. He further desired to insure that the Committee was following all appropriate labour laws, in particular the Fair Labour Standards Act. Mr. James Burton from Simon Peragine was asked to review all employment practices to make sure the Committee was following all the laws appropriately. Then the Committee will be ready to make a decision next week.

Mr. Sherman offered a motion that rather than going through an abstract exercise every year, that the Committee and staff work together to create a criteria to analyse the team every year. With the goals in mind that the staff knows up front, and the staff can give input in to what those goals are, individually and for the organization. That way the Committee has a structured way, so when the Committee goes into the room and closes the doors, the Committee knows the criteria they are looking at.

Mr. Sherman moved that a three person Committee, which he would chair, with Dr. Williams and Mr. Michael Peneguy would be on, would work together to create a set of criteria for future employment evaluations that would not be retrospective, that would not be used for this year. Dr. Williams seconded. **Motion passed.**

Mr. Sherman said the next motion would be brought up in the next meeting. He thanked Ms. Norman, Ms. Phillips and Ms. Burnside for the work they had done this past year. It had been a year full of activities for the Wisner Donation. Many big milestones coming up this year and next year, the Committee looks forward to continuing the discussion next month. It should take just a few minutes.

Ms. Norman added that Simon Peragine has handled all of the Committee's employment practices and put in place the Employee Handbook and the Substance Abuse Policy. She asked if that was what Mr. Sherman was looking for.

Mr. Sherman responded that they could talk in more detail about it. The documents they all wanted to see were the Employment Agreements. There were several new members and even though copies were distributed to their predecessors, they wanted a

5

1  copy distributed to everyone. Mr. Sherman said they wanted everything from how the
2  Committee pays salaried employees versus hourly employees, how the Committee treats
3  sick and annual leave. Just generally making sure all applicable employment laws, in
4  particular the Fair Labour Standards Act was pointed out.
5
6  Mr. Michael Peneguy added he would include the Employee Handbook, the Substance
7  Abuse Policy.
8
9  Mr. Burton asked for clarification as to what form Mr. Sherman wanted back. Mr.
10  Sherman said he thought a report back that yes, the Committee was in compliance with
11  all applicable labour laws or Simon Peragine recommends that the Committee take
12  these three items. Specifically Mr. Sherman requested that Simon Peragine focus on
13  classifying the employees as salaried versus hourly to make sure the Committee is
14  following the appropriate practices for each classification of employee. Mr. Sherman
15  reiterated his request to Ms. Norman to circulate the Employment Agreements to
16  everyone.
17
18  Ms. Norman commented that Ms. Burnside does not have an Employment Agreement.
19  She is working under a letter agreement. Ms. Phillips added that the Sick and Annual
20  leave policies are in the contracts as well as in the Employee Handbook.
21
22  There was a motion to exit Executive Session and adjourn the meeting at 12:56 pm by
23  Dr. Williams, second by Mr. Michael Peneguy. **Motion passed.**
24
25  RESPECTFULLY SUBMITTED BY:
26
27
28
29
30  _____
31  C. Cathy Norman, Secretary Treasurer
32
33
34  AMENDED AND APPROVED AT _____ MEETING
35                                                    *DATE*
36

6

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012

1   **PRESENT:**
2   Michael G. Sherman, Chair, Representative, CITY OF NEW ORLEANS
3   Michael Peneguy, Representative, WISNER HEIRS
4   William A. Peneguy, Alternate, WISNER HEIRS
5   Anthony Lorino, Representative, TULANE UNIVERSITY
6   Lizbeth Turner, Alternate, TULANE UNIVERSITY
7   Ed Buddy, Alternate, THE SALVATION ARMY
8   Dr. Everett Williams, Representative, LSU HEALTH SCIENCES CENTER
9   Stacy Gerhold-Marvin, Alternate, LSU HEALTH SCIENCES CENTER
10
11  <u>STAFF:</u>
12  C. Cathy Norman, Secretary-Treasurer/Land Manager
13  L. Amanda Phillips, Executive Assistant
14
15  <u>GUESTS:</u>
16  Mark Peneguy
17  Stephen J. Green
18
19  Mr. Sherman called the meeting to order at 12:57 PM and apologized to those who had to wait
20  outside until the Annual Review meeting was concluded.
21
22  **OLD BUSINESS**
23
24  **OLD BUSINESS ITEM NO. 1**          **Approval of the Minutes of the February 28,**
25                                       **2012 and March 27, 2012 Meetings.**
26
27  Mr. Sherman advised that the first item of the agenda is the approval of the minutes and that we
28  have two months of minutes.  He then stated that he would prefer to defer that until the next
29  meeting.
30
31  Mr. Michael Peneguy moved that all of the minutes be approved with one or two minor
32  corrections.
33
34  Mr. Sherman then stated that he had a few minor corrections and in the interest of time he would
35  like to push it off for one month because he didn't want to waste everyone's time going through
36  them at this time.
37
38  Mr. Michael Peneguy asked for the corrections that Mr. Sherman wanted and stated that Mr.
39  Sherman said that they were minor.  After not receiving a response, Mr. Peneguy stated "OK,
40  we'll push them off until the next meeting, but I think it is rather ridiculous that we can't do it
41  now."
42
43  Mr. Sherman took that as a motion and stated that we have a motion to postpone the approval of
44  the minutes until the next meeting and asked for a second.  Mr. Michael Peneguy then stated that
45  he did not move for the approval of the minutes to be pushed to the next meeting, but Mr.
46  Sherman can.  Mr. Sherman then said he would move for it with the explanation that he wanted
47  to review the tape recording and asked for a second to his motion.  Dr. Williams seconded the
48  motion and it passed with a vote of 4 to 1 and an objection from Mr. Michael Peneguy.
49
50  **NEW BUSINESS**
51
52  **NEW BUSINESS ITEM NO. 1**          **Secretary-Treasurer's Report.**
53
54  Mr. Sherman advised that the next item on the agenda is the Secretary-Treasurer's report.
55
56  Invoices were:
57
58          FET             $3,973.89
59          FET             $7,100.00 (outstanding balance $5,861.09)
60          FET             $5,100.00 (outstanding balance $5,047.76)
61          FET             $2,600.00

**MINUTES OF THE MEETING OF THE**
**EDWARD WISNER DONATION ADVISORY COMMITTEE**
**TUESDAY, APRIL 24, 2012**

1    Waltzer & Wiygul    $5,586.06
2
3    Ms. Cathy Norman stated that she included the invoices and, basically, everything in the
4    Secretary-Treasurer's report will be covered in the agenda. She then stated that there were a few
5    other items included in the handouts, which were as follows:
6
7        1.  An April 16, 2012 letter and invoice for the yearly maintenance of the ESRI desktop
8            software for $416.00, which starts on July 1, 2012 and runs through June 30, 2013. The
9            invoice is in addition to those included in the Secretary-Treasurer's report.
10
11       2.  An April 12, 2012 e-mail from Mike Peneguy about the Donation's royalty area of Bay
12           Marchand Field with some information on new production; and
13
14       3.  A division order that came from Manti, which is the first division order that has been
15           received in 20 years. Ms. Norman advised that she did not know what the policy is in
16           regards to signing division orders.
17
18           Some discussion ensued about whether or not to sign the division order with the result
19           being Ms. Norman suggesting that she discuss the division order with Manti and bringing
20           the information from that discussion back to the committee at the next committee
21           meeting.
22
23       4.  Ms. Norman then stated the next item that was included in the handouts was a letter from
24           the Arts Council thanking us for the donation last month and it allows us to continue to
25           use their conference room for the committee meetings.
26
27       5.  Ms. Phillip's revised March expense account of $10.29 and her expense account for April
28           of $35.96.
29
30       6.  Ms. Norman's expense account from March 27th to April 24th of $195.49.
31
32       7.  A letter from LWCC with a dividend check for $802.00.
33
34       8.  Some articles on Port Fourchon.
35
36   Ms. Cathy Norman advised that that was it for the Secretary-Treasurer's report and reiterated
37   that she would talk to Manti about the division order and get back with the Committee.
38
39   Mr. Michael Peneguy moved to approve the Secretary-Treasurer's Report with the additional
40   invoice and expense accounts. Dr. Everett Williams seconded the motion and it passed without
41   objection.
42
43   **NEW BUSINESS ITEM NO. 2**          **City of New Orleans.**
44
45   Mr. Sherman stated that the next item of the agenda is the City of New Orleans and referred to an
46   April 12, 2012 e-mail message from Marissa E. Shapiro in the meeting packet while stating that
47   the e-mail message was sent to the members of all boards that interact with the City as a courtesy
48   notice of the requirements to file financial disclosures with the State Board of Ethics. He
49   advised further that it is up to the individual to decide for himself if he should file and that he
50   was going to file after consulting with the City Attorney. He further advised that he has to file a
51   more stringent disclosure, but will be filing under Tier 2.1 because of his involvement with the
52   Edward Wisner Donation Advisory Committee. He then reiterated that the e-mail is sent as a
53   courtesy and, if someone does not wish to receive the notice, they can have their name deleted
54   from the list of recipients.
55
56   Mr. Michael Peneguy advised that he had already requested to have his name removed from the
57   list of recipients.
58
59   **A. Report of the Special Meeting held April 19, 2012**
60

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012

1    Mr. Sherman referred to the Special Meeting held on April 19th and advised that a request was
2    made to the City, first to affirm and acknowledge that Waltzer & Wiygul was the properly
3    procured attorney firm and second, in the alternate, to affirm that the City will not contest that
4    Waltzer & Wiygul is the appropriately affirmed attorney firm representing the Donation
5    Advisory Committee.  He then stated that he appreciated Amanda sending several documents
6    that he had requested and explained that he reviewed this matter with the City Attorney.  He then
7    stated that the issue was raised, not by the City, and that there was no special meeting called at
8    the request of the City, but at the request of Mr. Peneguy and he attended.  He went on to explain
9    that the Mayor's obligation is clearly outlined in the documents and trust code and he will always
10   do what is in the best interest of the Donation and that is one of the many obligations that he has
11   and we cannot provide any attestations on our internal governance issues, particularly as it
12   relates to the BP case.  In the alternative, he proposed that it might be a thoughtful solution to
13   have the City's attorneys meet with Waltzer & Wiygul.  He then stated that he spoke with Joel
14   Waltzer and Joel confirmed that he would meet with any member of the commission at any time
15   or with the attorneys at any time.  Mr. Sherman then stated that he thought, certainly, that would
16   an advisable meeting to take place and that he understood from Mr. Peneguy's e-mail message
17   that he disagreed and that he further understood that Stacy disagrees as well.  He then advised
18   that the Mayor has taken no action of any kind according to Joel Waltzer that would impair his
19   ability to pursue the Wisner claim.
20
21   Ms. Norman asked why would the City's attorneys and Waltzer & Wiygul need to meet and
22   what are they going to resolve?  Mr. Sherman's answer was to discuss the claim, which
23   prompted Ms, Norman and Ms. Stacy Gerhold-Marvin to ask "Why", followed by Ms. Norman
24   asking that, if you are not acknowledging Waltzer & Wiygul, what are you hoping for them and
25   the City's attorneys to resolve together, especially since we don't acknowledge whoever the City
26   has hired and don't even know who they are?  Ms. Norman went on to say that the Mayor has no
27   consent to hire someone to represent us, does this mean that we're unrepresented at this time?
28
29   Mr. Sherman responded that no one has acknowledged or indicated to the Wisner Donation
30   Advisory Committee that the City's attorneys have been retained to represent the Donation.  Ms.
31   Stacy Gerhold-Marvin and Ms. Norman then asked, if that is the case, then why did they bring
32   up that question?
33
34   Mr. Sherman's response was that the Mayor is the trustee and the Donation was made to the City
35   and the land is titled in the City's name and they were retained by the City through a requested
36   proposal to represent the City, so they asked the question at that meeting as to who is pursuing
37   Wisner's claim.
38
39   Ms. Norman then asked, if the Mayor won't acknowledge that Waltzer & Wiygul are
40   representing the Donation, why would he want them to meet with us because I don't understand
41   what –
42
43   Mr. Sherman interrupted to say that he would encourage Tulane's attorneys or Charity's
44   attorneys or the Salvation Army's attorneys or the Peneguy's attorneys –
45
46   Ms. Norman stated that that was not her question, but Mr. Sherman asked her to let him finish
47   and then he would turn the floor back to her.  He then continued by saying that he would advise
48   any attorneys to visit with Waltzer & Wiygul along with the Advisory Committee members to
49   insure that they're comfortable with the way the claim is proceeding and the City's attorneys
50   have made a request to meet with Waltzer & Wiygul.
51
52   Ms. Norman said "OK, but they already made one request and said they were bringing maps, so
53   what is the purpose of this meeting and could we be present."
54
55   Mr. Sherman answered by stating that he was not planning on being present, but he didn't see a
56   problem with others being present and calling a meeting.
57
58   Ms. Norman stated that when she looks at the two contracts that we have – and of course, the
59   Mayor insisted that he would not do a contingency fee and that is why he didn't like the contract
60   with Waltzer & Wiygul.  And when I compare the contracts, side by side, we are much better off
61   financially represented by Waltzer & Wiygul because their contingency fee is substantially lower

**MINUTES OF THE MEETING OF THE**
**EDWARD WISNER DONATION ADVISORY COMMITTEE**
**TUESDAY, APRIL 24, 2012**

1    than that of the attorneys engaged by the City of New Orleans. That's No. 1. No. 2, there are
2    several members of the City's attorneys who have, in my opinion, a conflict in that they were
3    also on the Plaintiff's Steering Committee. The Plaintiff's Steering Committee's goal was to try
4    and find a global settlement for the many plaintiffs, thousands, hundred of thousands of the
5    plaintiffs in this case that would help BP to settle claims out of court and help move the hundred
6    of thousands of claims along so that it wouldn't be tied up in court for ever and ever. As a result
7    of that, the Plaintiff's Steering Committee will be reported by the Court 6% of whatever -
8    whoever settles in the global settlement. If, as the City seems to be contending, the Wisner
9    Donation is public and not private, we will not qualify for that global settlement and it seems
10   kind of odd that we have these attorneys now representing the City and apparently the City wants
11   to represent us, who would be involved in making a decision as to whether we're public or
12   private. I find that somewhat hard to get my head about and my arms around. In the meantime
13   we have this Plaintiff's Steering Committee Group that is almost identical to the attorneys
14   representing the City as a public entity and the City's claim is not that good. The City is not
15   expected to recover very much money because they have to prove loss of income and loss of
16   revenue and we've had some pretty good years since the spill and the loss of tax revenue and
17   other things, it's not going to a very big claim. So, we have Wisner's claim, which does look
18   like a good claim and Joel Waltzer shared a lot of the information, and I listened to some minutes
19   last night in which Joel Waltzer shared information with these same attorneys that are on the
20   Plaintiff's Steering Committee, telling them how good the Donation claim was. Now, suddenly,
21   we have some of these attorneys questioning Waltzer & Wiygul in a meeting whether Waltzer &
22   Wiygul have the right to represent us and I have some really grave concerns. On top of all of
23   that, currently today, I've already received several phone calls from Charlotte Randoff and a
24   multitude of e-mails about the hard structure issues and about Lafourche Parish and one of the
25   attorneys who represents the City of New Orleans in the BP matter also represents Lafourche
26   Parish, which is a really glaring conflict of interest.
27       Ms. Normand continued by stating that, if you put the two contracts side by side, and I
28   have them here. The Waltzer & Wiygul contract is based on a contingency that goes up in
29   accordance with the money that we're looking at and what we're looking in respect to how long
30   we are in trial. The City's is based on dates and the dates in the City's contract as of July 2010,
31   its 13.5% contingency fee. So, I don't know why that is, but it's a typo in here and the date is
32   supposed to be July 2012. If we were to settle this for, say $40 MM after July 1st of this year,
33   they would get 13.5%. Waltzer & Wiygul would get 6%. So why should we even think about
34   attorneys represent this organization whose fee is going to be double, plus these are people who
35   we don't know - they haven't done a bit of work for us – we don't know who they are. I don't
36   really understand – the only goal that I can see in this is that these attorneys have been promised
37   something that they haven't gotten and I don't know what that is, but for whatever reason, they
38   are coming after us because they want the money that will result from this lawsuit that our
39   attorneys who have been representing this committee in a fantastic manner deserve to get and I
40   am very, very, concerned about this matter. I am very, very, concerned that it is not in the best
41   interest of this committee and I think this committee needs to proceed as we have with the full
42   belief that we are doing things in a lawful manner, that we are doing things in a just manner and
43   we need to just proceed with this and go forward and, if the City has a problem with, then they
44   can take action.
45
46   Mr. Sherman responded by, first thanking Ms. Norman for sharing ten-minutes of remarks on the
47   City that she was alleging of trying to replace Waltzer & Wiygul with the attorneys that the City
48   procured and stated "Let me make it very clear, and Joel Waltzer made it very clear, that the City
49   has done nothing at any point to injure or, in any way, impair the claim of the Wisner Donation.
50   Joel said that last week. Further more, Joel agreed that he would meet with any of us, or talk to
51   any of us, at any time and that he would meet with the attorneys for any of us at any time. The
52   City, through a public process, procured a team of attorneys. The one thing I agree with you on
53   is the Wisner claim and the City's claim are very different types of claims. I disagree with you
54   that City doesn't have a good claim and I'm not going to talk to you about the City's strategy, it
55   is a very different claim. And, as Joel offered, and I hope everyone will take him up on that, if
56   you've got a question, I think you have an obligation to ask that question to make sure you have
57   all of the information. The City would like to follow-up by having its attorneys that it procured
58   in this matter to also meet with Waltzer & Wiygul later this week."
59       He continued by saying "I want to say a couple of words as well. Your summary of the
60   Waltzer & Wiygul contingency fee arrangement is just not accurate – it is multi-tiered that
61   changes at different price points, so it's not as simple as one percentage. That's the first thing."

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012

1 Mr. Michael Peneguy stated that it doesn't change with the price, it changes with what happens
2 with the litigation.
3
4 Mr. Mark Peneguy stated that was what Cathy said –
5
6 Ms. Norman stated that is exactly what I said.
7
8 Mr. Sherman stated "The second thing is -"
9
10 Mr. William Peneguy said "You whipped out the first thing, so let's start with the first thing –
11 No. 1 this time. - You said the second thing, the first thing is not an issue." When Mr. Sherman
12 said he wasn't sure what, Mr. William Peneguy said "Ok, go on, go on."
13
14 Mr. Sherman stated that the second thing was – the Mayor is the sole Trustee of the Donation
15 and he needs to be given full and complete information to make sure he can fulfill his
16 obligations. In furtherance of that duty, I bring information back to him every single day, our
17 City Attorney does, and he's asking the City Attorney, the City Attorney is asking as
18 representing the City to meet with – in this case it's the City Attorney who made the request.
19 The Mayor has asked us to make sure we're studying and following everything closely – the City
20 Attorney has asked for these two groups to meet and we welcome everyone here – we welcome
21 everyone to attend the meeting – it would be wonderful if everyone. In fact, the reason that we
22 want this meeting to happen is because we believe that the Mayor of the City on New Orleans is
23 an integral component to this settlement – an integral component to this settlement.
24     He continued on by stating that the very first time that the Mayor met you, Cathy, in City
25 Hall, when your office was located there, he offered the full and complete weight of the Mayor's
26 office, both to fulfill his obligation as the Trustee of the Donation and to further its interest. At
27 the time you were having interference in Lafourche Parish, the Mayor said I will take you down
28 to Lafourche Parish and use the weight of my office and the relationships if that is what is
29 needed to interact with Charlotte Randoff. He stated further that BP is going to request a
30 meeting with the Mayor at some point, we understand, to discuss a multitude of issues. He
31 continued by stating that this is an opportunity for us. If you understand that the Mayor is one of
32 our biggest assets as the Trustee, I think that we would all be on the same page and moving
33 together. I don't know why we having internal governance fights on a simple meeting taking
34 place.
35
36 Mr. Michael Peneguy answered that he does and went on to explain that, No. 1 - if the Mayor
37 had all of that to say, he has not told the committee. I don't know what occurred in that meeting,
38 other than what Cathy has reported and what the City reported and that was two different stories.
39 And the one that I believe is the one that Cathy presented because I know Cathy. I don't know a
40 doggone person in that City Hall and I don't believe them. So, if the Mayor wanted to cooperate
41 with the committee, he's had a year and a half to do it, or two years or what is it? Mark Peneguy
42 then said "almost two years." Mr. Michael Peneguy continued to state almost two years and he
43 has not, so I don't –
44
45 Mr. Sherman interrupted by stating that he would respond and he appreciated Mr. Peneguy
46 bringing it up and, addressing Mr. Peneguy, he continued with, first of all, you know me, my
47 name is Mike Sherman –
48
49 Mr. Michael Peneguy responded with "No, I don't know you."
50
51 Mr. Sherman continued by stating that you know Ashleigh Gardere, you know Richard Cortizas
52 and that he didn't appreciate the attack on - and asked that we stay away from saying that you
53 don't believe me, I don't appreciate that –
54
55 Ms. Norman then stated that, if the Mayor, in her opinion, were a Trustee who cared about the
56 interests of this committee and if he knew what was going on with the BP spill and had so much
57 great information, why didn't he sign and engage outside counsel until September 2011. If he
58 considers our counsel not valid, why did he wait, what were we supposed to be doing for 18
59 months during the largest oil spill in the history of the United States when there was oil all over
60 our property? He never came to us, he never offered his help. He didn't hire attorneys for the
61 City until December of 2011, 18 months after the advent of oil and the explosion. I don't

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012

1  understand that, I don't understand how that's good government, I don't understand how that's
2  good business and I don't understand how that's in the best interest of this committee and these
3  beneficiaries.
4
5  Mr. Michael Peneguy then moved for the committee to advise Waltzer & Wiygul that all
6  meetings with any committee member or the committee be held in a properly called committee
7  meeting with a full quorum present and those meetings to occur in this room or in Simon
8  Peragine's conference room.  Dr. Everett Williams seconded the motion.
9
10  Mr. Sherman advised that it is time for discussion and stated that he thought that was a terrible
11  motion that will deny timely information to the entire committee and deny each of the
12  beneficiaries to have adequate information for themselves and for their attorneys.  He then
13  addressed Ms. Norman and stated that she was speaking about the City's claim and advised her
14  that she can not compare the Donation's claim to the City's claim because they are legally very
15  different claims in terms of the legal basis for the claims and the type of law that applies.  He
16  continued by stating that they are inherently very different claims.
17
18  Ms. Stacy Gerhold-Marvin attempted to ask a question by starting with "So, if they are" –
19
20  Mr. Sherman cut her off and continued with stating that, what was told to him last week by
21  several folks in this room, was that it would injure the claim if you have two competing sets of
22  lawyers fighting over who represents Wisner.  He then stated that he saw several folks nodding,
23  he saw Cathy nodding and he saw Mr. Peneguy (Mark Peneguy) nodding.  He continued by
24  stating that the Mayor has not, the City Attorney has not, taken any affirmative action that would
25  result in two sets of attorneys fighting over who represents the Wisner Donation and several
26  people here just acknowledged that that would be bad for the Donation.  The Mayor has not done
27  this – your counsel was retained and affirmed and the City has done nothing wrong to harm this
28  claim.  You are making a request for the City to do something affirmative, it is a request that we
29  can not fulfill.
30
31  Ms. Norman asked "to affirm that they represent us?"
32
33  Mr. Sherman responded with to make an affirmative set "yes" and the City has offered several
34  solutions dating back to last year.
35
36  Mr. William Peneguy attempted to ask a question, but Mr. Sherman continued with stating one
37  of the solutions was to solve the internal governance and to solve some of the very key issues of
38  public versus private of procurement of the Mayor's role and the Donation's Advisory
39  Committee's role.
40
41  Ms. Norman stated that he picked a hell of time to do it and that's the truth.
42
43  Mr. Sherman continued that he wants the record to reflect that he was interrupted by Mr.
44  Peneguy (William Peneguy), Ms. Norman and Ms. Marvin-Gerhold.
45
46  Ms. Stacy Gerhold-Marvin stated that Mr. Sherman will have his chance to interrupt too.
47
48  Mr. Michael Peneguy stated that he made the motion and he called for the question.
49
50  Mr. Sherman then stated that the City has done nothing at any point and, in fact has affirmed a
51  course of action as not one that the City has pursued.  And we are here today because the issue
52  was raised by Mr. Peneguy.
53
54  Ms. Stacy Gerhold-Marvin stated that we didn't affirm that, and asked Ms. Norman "what did he
55  just say, are you taking notes?"  Then she stated that he said that we affirmed something that the
56  City is not doing, what –
57
58  Mr. Mark Peneguy replied that Waltzer & Wiygul have affirmed that the City hasn't done
59  anything to interfere with the BP claim that Wisner has.
60
61  Mr. Sherman stated that they affirmed that at the last meeting.

**MINUTES OF THE MEETING OF THE**
**EDWARD WISNER DONATION ADVISORY COMMITTEE**
**TUESDAY, APRIL 24, 2012**

1  Ms. Norman then stated that "So we should just proceed and let them continue representing us
2  and move forward.
3
4  Mr. Mark Peneguy stated to Cathy that he agreed – but was interrupted by Mr. Michael Peneguy
5  who advised that he had a motion on the table.
6
7  Mr. Mark Peneguy then stated that he believed that the motion should be voted on and then he
8  had one thing to say on the issue.
9
10  Mr. Sherman stated he thinks that denying access is just going to further acerbate this problem
11  without bring resolutions to internal governance.   It has been suggested that the internal
12  governance should be concluded separate and apart from this oil spill.   Waltzer & Wiygul
13  suggested that last week and some members of the committee have suggested that we do need to
14  resolve the internal governance, but this in not the best time to do that in that we should reserve
15  those evasive issue for a future time.
16
17  Mr. Michael Peneguy stated that the motion that he made does not prevent anybody from asking
18  the attorneys a question.   He continued by stating that all he is saying is that this committee
19  needs to be present and it needs to be in a formal meeting.   He further explained that, in other
20  words, what he is saying is the same thing that has been transpiring since the committee hired the
21  attorneys – the attorneys have been coming to the meetings and the committee members have
22  had discussions with them with everybody knowing what was going on at the same time.   And
23  that is what he thinks needs to happen, with no separate meetings because then things get out of
24  the realm of everybody understanding what's going on.
25      He then referred to the meeting that Mr. Sherman had in City Hall to illustrate his point
26  by saying that the committee received two different interpretations as to what transpired in the
27  meeting with one being a written report and the other not.   He then pointed out that the written
28  report was the one he believed and that the questions that were raised in the last meeting were
29  related to the questions that were written down.
30      He then stated that everyone in this room is entitled to the same information at the same
31  time and not two different versions of the information.
32
33  Mr. Sherman then attempted to interrupt by saying "but Mr. Peneguy"
34
35  Mr. Michael Peneguy continued to state, while referring to Mr. Sherman, that, and that is why
36  you should have the attorneys talk to the committee, period.   And, if you have some outside
37  people who want to the attorneys, there is no reason that they can't attend the meeting with the
38  understanding that, if necessary, we may have to go into executive session where they may have
39  to be excluded, just like some of the beneficiaries that I represent are being excluded -.
40
41  Mr. Sherman then stated that the Mayor has a legal duties and obligations that –
42
43  Mr. Michael Peneguy interrupted to say "yes, the first legal obligation he has is to come here."
44
45  Mr. Sherman then asked Mr. Peneguy to please not interrupt him and went on to state that the
46  Mayor has duties and obligations as the Trustee and nothing this committee can do can impair
47  him from exercising his legal duties and obligations to operate in the best interest of the
48  Donation and that is exactly what he will do is to operate in the best interest of the Donation and
49  fulfill all of his legal duties under all applicable laws and trust codes and fiduciary obligations.
50  He reiterated that the Mayor will continue to do that.   He went on to state that this motion
51  purports to interfere with his ability to get all of the information in un-feted capacity to fulfill his
52  legal duty and Mr. Sherman doesn't think it is a germane motion and thinks it further  the
53  problem with internal governance without resolving anything and tries to put up an artificial wall
54  that really makes a conversation of internal governance much more salient and maybe needs to
55  be addressed much quicker because any attempt to block the Mayor from having access to
56  information in a timely fashion as he needs to fulfill his duties as Trustee will not be well
57  received.
58      He then stated that he also wanted to point out one thing that is very interesting – there is
59  a difference between the committee providing advice and consent to the Mayor and the Mayor
60  taking no action and the committee providing advice and consent and the Mayor saying "No".
61  He further stated that he did not want anyone to forget that, in this instance, the committee

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012

1    approved a contract with Waltzer and Wiygul and sent it to the Trustee. They provided the
2    Mayor with their advice and consent and the Mayor said "No." He reiterated that the Mayor said
3    "No" and then stated that the committee then proceeded to get a legal opinion from Ms. Clade at
4    a meeting, a meeting after the City representative had left, and approved a motion to have the
5    Secretary-Treasurer/Land Manager sign the document, rather than have the Trustee sign, as had
6    always been done, -
7
8    Ms. Norman at this point said "No."
9
10   Mr. Sherman continued by stating having the Secretary-Treasurer/Land Manager sign the
11   document and that the document also purports a waiver of a conflict by someone that is not the
12   client that possess the conflict, which is the City. He further stated that there are a lot of serious
13   issues here and they have been raised by Mr. Peneguy and this motion will further acerbate the
14   conflict. He then recognized Mr. Burton to speak next, followed by Mr. Buddy.
15
16   Mr. Jim Burton stated that when the motion was made and maybe I am a little confused. There
17   were two things that I was trying to interject on. One is that I disagree with the last
18   characterization of the way Waltzer & Wiygul came to be hired, at least with regard to the legal
19   authority of doing it. But the issue is that they were engaged to represent this committee much
20   like our firm represents the committee and the committee consists of five members, the City of
21   New Orleans, Tulane, LSU Charity, the Peneguy family and the Salvation Army. And it's a
22   different entity than any one of those five individually. He then stated that he didn't understand
23   the motion in the sense that he thought it might, as worded, lend some layer of uncertainty or
24   ambiguity in terms of his firm having communications with the five members individually
25   gathering information and it seemed to him that the Waltzer & Wiygul firm, to do their work,
26   they have to have communications with other lawyers involved in the litigation, including some
27   of these lawyers as necessary for them to function and he didn't see the necessity or where it
28   would really clarify. He also stated that he was interested in hearing more because Mr. Sherman
29   got a couple of times to the point when he was saying a couple of times to the point that he was
30   saying that the City has taken no affirmative action to disrupt the representation of the claim of
31   the Wisner Donation and the counsel who has been representing it, Waltzer & Wiygul. He then
32   asked Mr. Sherman if he was saying that that lack of – you mentioned that that was a solution
33   that was suggested by Mr. Waltzer, I believe, in the emergency meeting, and are you suggesting
34   that that stance would continue on the part of the City, to allow this claim to move forward?
35
36   Mr. Sherman answered by stating that that was the request to the City and the response is that
37   Mayor will continue to fulfill his role as the Trustee and take actions in the best interest of the
38   Donation and all of its beneficiaries.
39
40   Ms. Norman then asked "With their advice and consent? With their advice and consent?"
41
42   Mr. Sherman responded by stating that you are asking a different question than Mr. Burton asked
43   and I was responding to Mr. Burton's question.
44
45   Ms. Norman then stated "Alright, then I'm asking you, will the Mayor do this with the advice
46   and consent of this committee?"
47
48   Mr. Sherman responded by stating that the Mayor will fulfill his role as Trustee.
49
50   Ms. Norman then said "OK, so the answer is no."
51
52   Mr. Sherman responded by stating that he did not say that and he requested that no one put
53   words in his mouth. He went on to state that the Mayor has a legal duty and that duty can be
54   legally defined and that is exactly what he will do, to fulfill his legal duty to act in the best
55   interest of the Trust. He further stated that he, Mr. Sherman, can make no artificial commitments
56   on anything.
57
58   Ms. Norman then asked "So you can't say that he will act with the advice and consent of this
59   committee."
60
61   Mr. Sherman responded by stating that the Mayor will fulfill his legal duty.

**MINUTES OF THE MEETING OF THE**
**EDWARD WISNER DONATION ADVISORY COMMITTEE**
**TUESDAY, APRIL 24, 2012**

1    Ms. Norman then stated that his legal duty under the trust law, and asked Ms. Turner to correct
2    her if she is wrong, is that he handle all other properties that he may oversee separately and this
3    property be dealt with separately and under trust law it has to be dealt with completely separately
4    from other property – am I correct?
5
6    Ms. Turner responded by stating that Ms. Norman put her on the spot and suggested that she ask
7    counsel.
8
9    Mr. Jim Burton responded that it has to be dealt with separately as provided by law.  He
10   continued by stating that it is a separate interest of the City from the City's general funds or other
11   assets and that the law pretty well speaks for itself in that regard.
12
13   Mr. Sherman then stated that he did not disagree that the law speaks for itself and recognized Mr.
14   Mark Peneguy.
15
16   Mr. Mark Peneguy stated that he had just a very brief comment and it revolves around the
17   Waltzer & Wiygul Firm meeting with anyone representing the City for a BP claim separate from
18   the Wisner BP claim.  He went on to state that, as a client of Waltzer & Wiygul through this
19   committee, he doesn't want Waltzer & Wiygul giving any information that may be considered
20   confidential to the Wisner claim to anybody's attorney that is not part of this committee and that
21   will include every single City of New Orleans claim that it may have where BP is concerned that
22   is not the Wisner Donation because this is a separate entity and is not the City of New Orleans.
23          He continued by stating that he does not want Waltzer & Wiygul meeting with the City's
24   BP counsel for any purpose and, if it is done, then he agrees with his cousin – it should be done
25   in a committee meeting, here in the executive session, and I don't think they should be giving
26   any of the Donation's information to other attorneys.
27
28   Mr. Sherman then recognized Mr. Ed Buddy, who asked Mr. Sherman to explain to him one
29   more time, how the motion made by Mr. Michael Peneguy block the Mayor.
30
31   Mr. Sherman responded by stating that the Mayor has obligations, rights and responsibilities
32   unique from those of us on the Donation Advisory Committee to fulfill his role as Trustee and
33   this motion seeks to block the Mayor, the Trustee of the Edward Wisner Donation, from having
34   unfettered access to speak with a particular law firm who the Donation Advisory Committee
35   retained to represent on the BP matter.
36
37   Mr. Ed Buddy then asked, but didn't Mr. Peneguy say that anybody can be present as long as this
38   committee sanctions that meeting and the committee members are there, right?
39
40   Mr. Sherman responded by stating to have a meeting, you have to have notice and there is a
41   whole process to have notice of the meetings and it prevents the Mayor to make a timely phone
42   call and to receive information – it is a barrier to get information.
43
44   Ms. Norman stated that Mr. Sherman was supposed to provide the Mayor with information as a
45   member of the committee.
46
47   Mr. Sherman responded with "Of course I do."
48
49   Ms. Stacy Gerhold-Marvin then asked if she could read the ordinance and then read the part of
50   the ordinance, as follows "To that end, all matters relating to said trust shall in first instance be
51   referred to and handled by said committee.  The action of a majority of said committee shall be
52   deemed to be the action of the committee."  She then stated that, first of all, it doesn't say the
53   majority, including the Mayor.  She continued by stating that this is the very last part of that
54   ordinance and it is very interesting to her and she thinks it speaks to everything that is going on
55   here.  She then continued to read from the ordinance, the part that states "Be it further ordained,
56   etc., That the committee shall at least once a year deliver to the Mayor of the City of New
57   Orleans for transmission to the Commission Council a report of their actions in the premises."
58          She then stated that, basically, the business of the committee can go on without the
59   Mayor even being here and that once a year, only once a year, is this committee required to give
60   the Mayor a report.
61

**MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012**

1   Mr. Sherman responded by saying the Commission Council and then stated that the Mayor has
2   an obligation 24-7 of serving as the Trustee and now, under what you just said, the Mayor has to
3   act upon the advice and consent, that would be the assumption that you just read.
4
5   Ms. Stacy Gerhold-Marvin stated that it is in the ordinance.
6
7   Mr. Sherman continued by stating that the different opinions are that one is that can the Mayor
8   just act in the best interest of and number two is that can he only act upon the advice and
9   consent. He then stated that that issue doesn't even arise here because the issue here is that the
10  committee advised and consented that the Mayor can do something and the Mayor said I don't
11  want to do that and, before the Mayor could propose something else that could be done, the
12  committee went ahead and changed the signature line from Mayor Mitchell J. Landrieu, Trustee,
13  to Secretary-Treasurer/Land Manager and proceeded to retain counsel and pursue –
14
15  Ms. Stacy Gerhold-Marvin interrupted and stated that there was no participation by the Mayor at
16  that point and at this point it is –
17
18  Ms. Norman interrupted to say that he (the Mayor) wouldn't even attend the committee
19  meetings.
20
21  Ms. Stacy Gerhold-Marvin continued by stating that it was consented and thank God the
22  committee did – thank God that the majority came together because during the past two years we
23  have had people out there monitoring that beach, collecting information and all of this because of
24  Waltzer & Wiygul and because of the majority of this committee's decision to hire that law firm
25  even without the Mayor or the Mayor's opinion because he wasn't participating in anything with
26  Wisner. She continued by stating that now we have a strong claim against BP and she wondered
27  out loud why the City would do this - first of all, when the Land Manager was on vacation was
28  when the City decided to have their meeting with the City Attorney and Waltzer & Wiygul and
29  the question gets raised. She then asked why would the City or the attorneys even ask that
30  question and who had the authority to negotiate with BP?
31
32  Mr. Sherman responded by stating that they did not. He then stated that the question pursuit to
33  Waltzer & Wiygul was raised by the attorneys and that the first question that any attorney has to
34  ask, and Mr. Burton could confirm this, is who is my client and who am I representing. He
35  continued by stating that that is the first question every attorney has to ask –
36
37  Ms. Stacy Gerhold-Marvin interrupted to ask why would the attorneys even have that question in
38  mind.
39
40  Ms. Norman pointed out that most of the City's attorneys are part of the Plaintiff's Steering
41  Committee and had been dealing with Waltzer & Wiygul and knew that Waltzer & Wiygul were
42  representing the Donation.
43
44  Mr. Sherman then stated that he was not going to guess why the question was raised.
45
46  Ms. Norman & Ms. Stacy Gerhold-Marvin, both responded that it is because they want the
47  money, with Ms. Norman adding that they have given money to the Mayor and he's made a
48  promise and now he's trying to pull through - .
49
50  Mr. Sherman then stated that he wants the record to reflect that an *ad hominem* attack was
51  launched against the Mayor by Ms. Norman and asked Ms. Phillips to make sure that is recorded
52  in the minutes.
53
54  Ms. Norman and Ms. Stacy Gerhold-Marvin then asked "What?"
55
56  Mr. Sherman responded that you stated that the attorneys gave money to the Mayor and that he's
57  hiring them and that he would like the record to show that *ad hominem* attack on the Mayor by
58  the Secretary-Treasurer/Land Manager.
59
60  Ms. Norman then stated that she read the donations and that it is public information.
61

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012

1   Mr. Michael Peneguy started to state that he asked for the question, but Mr. Sherman interrupted
2   and started to state that he also wanted to, and then advised that he would go to Mr. Peneguy
3   next.
4
5   Mr. Sherman continued by stating that the City has taken no action to assert that any other
6   attorneys represent the Donation Advisory Committee at this time and that is not something that
7   has happened and Waltzer & Wiygul has confirmed that. He then stated that it is Ms. Norman
8   who has seemed to suggest that Waltzer & Wiygul is attempting to be replaced. He then stated
9   that it is not a suggestion from the City attorneys.
10
11  Mr. Michael Peneguy stated that it also you trying to call meetings that shouldn't be called.
12
13  Ms. Norman then stated that it was told to us that this issue was raised by the attorneys at the
14  meeting, apparently in reply to Mr. Sherman's assertion that it was raised by Mr. Michael
15  Peneguy.
16
17  Mr. Michael Peneguy stated that he moves that we settle this by voting on his motion and go on
18  to the rest of the business and, as far as he is concerned, that we ignore the e-mails we received
19  from Mr. Sherman.
20
21  Mr. Sherman stated that he would make a concluding comment and then poll everyone else
22  before calling the question. He then stated that we do have serious issues of internal governance
23  and he would ask everyone this – our most important obligation on this committee is to insure
24  that this land is protected and yields the most amount of money for all of the beneficiaries. He
25  continued by stating that it is his hope that we can get past these internal governance issues and
26  get back to our core mission and that is exactly where the Mayor is each and every day –
27  thinking about the best interest of the Donation and all of the beneficiaries because we all benefit
28  when the assets are managed well. He continued be stating that we all benefit when the BP
29  claim is resolved well and we all benefit when the Donation generates the most money.
30      He then stated that he believes that this motion further ex the issue of internal governance
31  and that the City has offered a couple of ideas to get through the internal governance, be it all
32  choosing an attorney to answer questions and respecting that or be it trying to get to the same
33  page else where and the City has continually offered to resolve these issues through amicable
34  discussions. He continued by stating that this motion takes a big step back and tries to further
35  exacerbate issues of internal governance at a time when this committee can not afford to
36  exacerbate the internal governance issues and this is the time we need to focus on the BP claim,
37  on the new lease for the Greater Lafourche Port Commission, on the valuations so that we can
38  make a determination – those are big issues right now, not a motion to exclude folks from being
39  able to talk to Waltzer & Wiygul.
40
41  Ms. Stacy Gerhold-Marvin asked if there was a motion to exclude and Mr. Michael Peneguy
42  answered that there wasn't.
43
44  Ms. Stacy Gerhold-Marvin then stated that there was no motion to deny or exclude.
45
46  Mr. Sherman responded by stating that he thinks this motion creates a barrier and I ask us to
47  refocus on the substance of making this Donation is well manageable and I encourage everyone
48  to be able to meet with Waltzer & Wiygul to fully understand the issues so that we come here
49  and are prepared to resolve issues at our meetings.
50
51  Ms. Norman stated that she had one more thing to say and explained that, since last week, Mr.
52  Sherman had asked for a multitude of documents from the committee office which were
53  provided to him and that she asked for one thing at the last meeting, which was a copy of the
54  RFP that was posted and a copy of every bid for the RFP that came in, the dates on it and all of
55  the people that were on the committee that hired the City's attorneys. She then stated that she
56  would like that information.
57
58  Mr. Sherman responded by, first asking Ms. Norman to come to City Hall and then stating that it
59  is online.
60

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012

1 Ms. Norman then stated that she has gone online and got a copy of the agreement, but could not
2 find the other information and asked Mr. Sherman to please e-mail the information to her.
3 Mr. Sherman responded by stating that everything is online and he would show Ms. Norman –
4
5 Ms. Norman and Mr. Michael Peneguy, both, said "No, send it."
6
7 Mr. Sherman then asked if there was any further discussion and recognized Mr. Ed Buddy.
8
9 Mr. Buddy stated that he had just one point of clarification and asked Mr. Sherman if he was
10 saying that the fact that the City has not taken steps against at this time as to Waltzer & Wiygul
11 that that position will still be in place in the future?
12
13 Mr. Sherman started to respond by stating that the City is always going to do what's in the best
14 interest –
15
16 Mr. Buddy interrupted and asked, if the City has not thus far taken steps against our decision,
17 will that same position be in place in the future?
18
19 Mr. Sherman responded by stating that he wanted to give the best answer that he can but he
20 needed to stay in the confines of the law as it relates to the Mayor's obligations. He then stated
21 that he thought the answer to the question is that the City has determined that at this point its
22 actions have been in the best interest of, from the City's side, of making sure that we focus on
23 the substance of the issue, so the City's actions as can be represented to you is that the Mayor
24 believes that the City has acted in the best interest, so we have acted this way very intentionally
25 because it's in the best interest of the Donation and that is what you can always expect from the
26 City of New Orleans and the Mayor of New Orleans. He further stated that you're asking me to
27 ratify something that – and then cited the following example to illustrate his point:
28       "If the committee said to the Mayor, settle this for a million dollars, he would say
29 absolutely not, the claim is worth way more than that and it is not in the best interest of the
30 Donation to settle this for a million dollars."
31       He then went on to state that he shared the hypothetical because he believed that that is
32 the question that the Mayor must ask at every single juncture and with every single decision –
33 what's in the best interest, so long as what continues to happen is in the best interest of the
34 Donation, the city will continue to support what is in the best interest of the Donation. He
35 continued by saying that that is as close as he could get to give an open-ended confirmation and
36 that he knows that folks are asking for an open-ended confirmation. He then stated that you
37 approved the Waltzer & Wiygul contract and we can not do that – we refuse to do anything that
38 says that Waltzer & Wiygul is not the appropriate counsel, we can not give you those
39 affirmations because we're guided by the law that requires the obligations upon the Mayor.
40
41 Mr. Ed Buddy stated that he appreciates that position and he understands that position, but we
42 may have two different ways to get there – so what I am saying is that I am not trying to take
43 away your options and I wouldn't take it off the table just like I wouldn't take it off the table for
44 the Donation, but, by the same token, can we move this down the line and to the point where the
45 Mayor feels it is a bad deal or whatever the case may be and, at that point, if the Mayor sees it as
46 a real bad deal or a derogatory deal, then you still have the option to do like you're doing now,
47 but the – the point where Stacy is, why make this an issue right now, when we're at a critical
48 juncture? If you have blessed this process and blessed the lawyer now or counsel now and they
49 continue down the line to get the best deal for everyone, why wouldn't everyone – why wouldn't
50 you leave it in place and at that point, you could say "no."
51
52 Mr. Sherman responded by stating that Mr. Buddy asked the key question and that he wanted to
53 directly respond to that key question -- why make it an issue now. He then continued by stating
54 that the City is absolutely not making it an issue now and that the last action that the Mayor took
55 on this was when he was presented with something that was based on the advice and consent of
56 the committee and he said no. The commission then retained counsel and the City has not made
57 it an issue. The only reason that we are discussing this is because Mr. Peneguy called for a
58 meeting last week to discuss a meeting between Waltzer & Wiygul and the City's retained
59 counsel, but I want to assure you that the City has not made this an issue. If this motion passes
60 today and we're blocked out of access, except for committee meetings or something else, we're
61 going to have to re-evaluate the situation, but I do want to assure you that the City has not made

**MINUTES OF THE MEETING OF THE**
**EDWARD WISNER DONATION ADVISORY COMMITTEE**
**TUESDAY, APRIL 24, 2012**

1   it an issue – we are having this discussion solely and completely because Waltzer & Wiygul
2   made a report and a request came to the City and that is a request that we have been unable to
3   honor. He further stated that he would say for the third and fourth time that we have not made
4   this an issue.
5
6   Ms. Stacy Gerhold-Marvin then asked if she could ask a question, to which Mr. Sherman
7   responded "sure." Ms. Stacy Gerhold-Marvin then asked if the Mayor believes that he has the
8   powers of Trustee that he thinks he does, why can't he affirm this – what is keeping you'll from
9   affirming? She continued by asking if the Mayor thinks he's got all the power of the committee,
10  why does he not have the power to affirm attorneys that were hired to handle a claim for the
11  Donation?
12
13  Mr. Sherman responded by stating that was a great question, a great question. He then stated
14  he's going to do it very quickly because the answers lead to a whole bunch of other questions
15  that don't need to be discuss today, but the answer is this – there are serious unresolved internal
16  governance issues about the Mayor's role as Trustee and the Donation Advisory Committee's
17  role and these are not new issues to this Mayor and the folks sitting on the Advisory Committee.
18  He continued by stating there is an open issue as to whether we are a public entity or a private
19  entity, whether procurement laws apply or don't apply, there are issues relative to what it means
20  to give advice and consent and what the Mayor's reaction is to receiving that.
21
22  Ms. Stacy Gerhold-Marvin responded by saying Ok, but –
23
24  Mr. Sherman interrupted and stated that there is an issue relative to a conflict of interest between
25  the attorneys and the Mayor –
26
27  Ms. Stacy Gerhold-Marvin responded by saying that you said that the City was going to act in
28  the best interest of the Donation, no matter what –
29
30  Mr. Sherman stated always, that's a legal obligation.
31
32  Ms. Stacy Gerhold-Marvin responded by repeating Mr. Sherman's last statement and then stated
33  so, we got these attorneys, they've been hired, you applauded and blessed their work – just a few
34  months ago we had John Pardue in here and I could see you face and you were just like man this
35  is really good, but now, all of a sudden two months later, who's got authority to represent us.
36  She then asked how is not affirming this law firm that you have blessed and applauded for a
37  whole year now – how is that in the best interest of this Donation?
38
39  Mr. Sherman responded by saying sure and that's another great question and the answer is what
40  the City's tried to do dating back a year now and which he brought up as recently as last week is
41  get these internal governance issues behind us – we offered a solution – we offered a way of
42  doing it. He continued by stating that the problem is we have laws to follow at the City that we
43  do not have a choice of whether or not to follow – the advice of the City Attorney and the advice
44  through my research. We are not in a position to affirm something that may not have been done
45  according to the City policies, processes, procedures, charter, public bid laws, city code -
46
47  Ms. Stacy Gerhold-Marvin interrupted and stated that the only law of the City of New Orleans
48  that pertains to this committee is this ordinance of 1931 that you'll knew and the Mayor's office
49  does not want to follow. Do you not want to follow this ordinance – I mean it –
50
51  Ms. Norman then asked if we are following City laws or are we following trust laws, and Ms.
52  Stacy Gerhold-Marvin added that we can follow the trust laws too.
53
54  Mr. Sherman responded by stating that these are great questions that need to be resolved and
55  continued by asking is it a donation or is it a trust, is it public or is it private.
56
57  Ms. Norman then stated that the trust laws indicate that it would be in the best interest of the
58  Mayor to bless us and let us carry on.
59
60  Mr. Sherman responded by stating that these are great questions that need to be resolved and
61  answered – is it a donation or is it a trust, is it public or is it private, is it -

**MINUTES OF THE MEETING OF THE**
**EDWARD WISNER DONATION ADVISORY COMMITTEE**
**TUESDAY, APRIL 24, 2012**

1    Ms. Stacy Gerhold-Marvin then asked what do you mean by is it a donation or a trust, to which
2    Mr. Sherman responded that you can ask Ms. Norman – she believes it is not a trust, but a
3    donation.  He then continued by stating that there are several documents by Max Nathan and
4    others that call it a trust and there is a City Attorney opinion from 1972 that Ms. Clay presented
5    to him that says it qualifies as a non-expendable trust - that was the City Attorney opinion that
6    Ms. Clade presented to him, so these are issues that we would like to resolve.  When we have
7    certainty on that, and that is a very good process.
8
9    Mr. Michael Peneguy then moved to handle the motion now.
10
11   Mr. Lorino then asked if he could just have one comment.  Mr. Michael Peneguy stated that he
12   would let him.  Mr. Lorino then addressed Ms. Norman and asked where we are in the process
13   and stated that he heard a lot of concerns in the last meeting about we needed to continue to
14   move forward, there was May 1st day that he believed that was mentioned as being -
15
16   Ms. Norman replied that yes, we're in the thick of things and beyond.  She stated that a copy of
17   Exhibit 12-A, which is the formula for the global settlement from BP, was enclosed in the packet
18   today, as well as correspondence that happened in the last couple of days.  She then stated that it
19   looks like she is going to be meeting on the 4th at 10:30 AM with attorneys and Judge Wilkinson
20   mainly about the hard structures.  She continued by stating that a joint status report was
21   generated about the hard structures and there was a need to act rapidly on that.
22        She then advised that BP was supposed to respond today as to whether they were going to
23   remove the hard structures.  However, as of yesterday and today, BP sent a whole amendment to
24   the access agreement, which was determined to be totally unacceptable.  She explained that she
25   and Waltzer & Wiygul confected a new one and sent it back to BP this morning.  She also stated
26   that, just since this morning, the Parish President called her and the Parish is integrally involved
27   in the removal of the hard structures because, if we don't go after BP for the removal of the hard
28   structures, we will be suing the Parish for the damage the hard structures have done to the
29   property.
30        She then explained what is happening now is that BP, in their efforts to avoid liability if
31   we loose this $72 M project, is attempting to put it back in our court by saying they will do it if
32   we amend the access agreement.  She then stated that what they want us to do is exclude the
33   paragraphs in which we hold them harmless.
34        She then stated that it is an ongoing mess as far as where it stands right now and, as far as
35   the total overall settlement, she and Waltzer & Wiygul are fighting very hard for this removal
36   issue right now and she doesn't know what is going to happen in the next two hours on this,
37   much less the next day.
38
39   Mr. Lorino then stated that he understood that, if we didn't get something, or a commitment, to
40   the State by May 1st, then the state was going to withdraw or re-program the money for
41   elsewhere –
42
43   Ms. Norman replied that that was right and that is what she is talking about – the CIAP funds
44   would be re-programmed to be spent elsewhere we are trying to work that out.  She stated that
45   the last conversation she had with Robert Wiygul this morning was that Greg Johnson, the
46   attorney for BP from Liskow & Lewis, who is representing BP and put together this amendment
47   to the access agreement, which was responded to this morning, has said that we need to go
48   further up the line with BP with this.  She also explained that, in the meantime, they also sent
49   something to the Parish.  She went on to quote a section of the information received from BP this
50   morning wherein BP entered a statement to the effect that this consultation shall not include
51   disclosures regarding funding and related details by and between BP and Lafourche Parish and
52   then asked the question "What does that mean?"  She then stated that we are very concerned
53   about that entry if it means that BP is giving Lafourche Parish money to assume the liability.
54   She then said that BP wants to delete a whole paragraph about waving their rights.  She then
55   stated that the only thing that BP put into the agreement that she and Waltzer & Wiygul would
56   agree to was to allow them to bring in large equipment to remove the structures without our
57   previous approval and that she & Waltzer & Wiygul can not agree with everything else they have
58   ask for.
59        She then explained that the current plan is to meet with the Magistrate Judge and discuss
60   the issue in an attempt to get him to put pressure on BP to get this issue settled.

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012

1   Mr. Lorino stated that he doesn't know any of the attorneys that represent the City in the BP
2   claim and asked Mr. Sherman if there is a potential conflict of interest.
3
4   Mr. Sherman responded that, not only is there not a potential conflict of interest, it is a great
5   benefit to this committee to be able to get the resources of that group. He then stated that he
6   would give one example - that he would suspect that, if there is not a communication from
7   Waltzer & Wiygul that is transmitted to the PSC, we would have no option to be included in the
8   proposed private class action settlement or excluded. He continued by stating that we have
9   choices, we can evaluate our claim under the proposed private class settlement and take that
10  settlement, in which case we can be compensated in like the next 60 to 90 days, or we can chose
11  to opt-out and pursue our action separately. He continued by stating that, because our action is
12  so unique, it may be in our interest to pursue it separately or it may be in our interest to pursue it
13  - all of these firms are part of the Plaintiff's Steering Committee and Stephen Herman of Herman
14  & Herman is the liaison counsel, Calvin Fayard on the PSC. He then stated that they have clients
15  that will pursue the proposed class action settlement and they have clients that will pursue the
16  claims separately, so it is a great benefit to us to have those folks.
17          He continued on to state that they are the ones dealing directly with the head of BP North
18  America and general counsel for BP North America and Kirkland Ellis, who is head counsel for
19  BP North America in this case, so, in terms of having access and an opportunity to negotiate
20  amongst a sea of a hundred thousand plus claims, or whatever the actual number is, is a
21  tremendous benefit. He then stated that that is one of the most important reasons why the Mayor
22  feels that this issue needs to be handled in the appropriate fashion because the weight of the
23  Mayor's office in terms of interacting with the executives at BP, if that is in our interest, in terms
24  of having the attorneys who have led this entire class action settlement. He continued by stating
25  that it is absolutely in our interest and we can always opt-out, but having Herman, Herman and
26  all of those folks not defining the class in the way they did, we would have no choice but to
27  pursue this as a private settlement, so we are in a better position today than we were three weeks
28  ago and –
29
30  Ms. Norman interrupted to state that Joel Waltzer is the one who guided them in developing this
31  strategy.
32
33  Mr. Sherman then continued by stating that, separately and apart, this is why this conversation is
34  partially a silly conversation – Joel's been reporting to us that he has, for a year plus, working
35  with the Plaintiff's Steering Committee and all these folks and he's making that run in and out of
36  the room and he's meeting with most of these folks that this motion seeks to ban Waltzer &
37  Wiygul from meeting with them outside the presence of all of us at an organized meeting and
38  that the Plaintiff's Steering Committee is ground zero for all of these –
39
40  Mr. Mark Peneguy interrupted and stated that is not what his motion proposes and you are re-
41  wording his motion and Mr. Michael Peneguy said "Right."
42
43  Ms. Norman then stated that Tony asked if there is a conflict and there is a conflict with Walter
44  Leger – there is absolutely a conflict of interest in that he represents Lafourche Parish –
45
46  Mr. Sherman interrupted and stated that there is a conflict between Waltzer & Wiygul and the
47  City – they are suing the City –
48
49  Ms. Norman, Ms. Stacy Gerhold-Marvin, Mr. Mark Peneguy and Mr. Michael Peneguy all
50  interrupted by saying "No."
51
52  Mr. Sherman attempted to continue by stating that there is a conflict with Waltzer & Wiygul, to
53  which Ms. Norman and Mr. Michael Peneguy all saying "No – no there isn't", followed by Ms.
54  Stacy Gerhold-Marvin stating that it was waived.
55
56  Mr. Sherman then asked if anyone had something that stated that the City signed a waiver. He
57  then stated that Walter Leger represents Lafourche so there could be a potential conflict,
58  absolutely, if they were ever to represent the Donation. He continued by stating that we've never
59  discussed that and that Ms. Norman is the only one that said that the City is trying to supplant
60  Waltzer & Wiygul with this group and that is absolutely not – we would like to make sure that

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012

1   the Donation get the best settlement possible, that the City gets the best settlement possible and
2   that a simple meeting take place.
3
4   Ms. Stacy Gerhold-Marvin stated that Ms. Norman didn't say that, that came from Waltzer &
5   Wiygul as their impression from that meeting and it is in that memo that you also got and read.
6   She continued by stating that that was their impression and the reason that we had the meeting
7   last week was to address the questions that were brought up by the City attorneys because, for
8   some reason, they thought for some reason that they might be able to speak for Wisner. She
9   continued by stating that nobody is trying to block you or deny access and she thinks the general
10  feeling of this committee now is that we just don't feel like we can trust the Mayor's office to
11  work for the beneficial interest of all of the beneficiaries and especially with this BP claim, so
12  that is why Mr. Peneguy is calling for a quorum to be present in any meetings especially with the
13  attorneys who are representing the City in the City's claim.
14
15  Mr. Sherman responded by stating that Waltzer & Wiygul have been meeting with them for
16  months and over a year –
17
18  Mr. Michael Peneguy interrupted to state that is alright and that is completely different, with Ms.
19  Stacy Gerhold-Marvin then stating that your question changed it all.
20
21  Mr. Michael Peneguy then explained what he is saying is that, if you want to call a meeting
22  between your firm and us –
23
24  Mr. Sherman interrupted by saying "Not us – just those two attorneys – the two sets of
25  attorneys."
26
27  Mr. Michael Peneguy then asked "Is there any reason why it can't be handled in a committee
28  meeting – just like we have all of the discussions in the meetings and as it should be?" He then
29  continued by stating that everyone of these committee members represent a beneficiary that
30  should know what is going on at any time that we have something that happens and that is the
31  problem with meeting separately and that is that we don't know what is going on in that meeting
32  – all we can rely on is the reports that we get out of that meeting and the report that we got out of
33  the meeting didn't come from Mr. Sherman – it came from our attorneys and they're the ones
34  that expressed a concern about the questions that were asked. He continued by stating that Mr.
35  Sherman is entitled to attend the meeting, the Mayor is entitled to attend these meetings and
36  there is no problem with anybody else attending these meetings as long as they are called right
37  and –
38
39  Mr. Sherman interrupted by stating that he will remake a point that he made an hour and a half
40  ago – its fine for other folks want to attend, that is fine. He stated that he believed he said that an
41  hour and a half ago and continued by stating that if other folks want to go, that is fine, but he was
42  not planning on attending, but if everyone is, he will attend. He then stated that was absolutely
43  fine and continued by explaining that what happened with that meeting was that he and Joel
44  Waltzer talked briefly afterward and agreed that a report should go back to the committee and he
45  asked Joel if he would do that in a memo and he gave me the choice to report, so that memo
46  came upon agreement between him and Joel before it was sent –
47
48  Mr. Michael Peneguy attempted to interrupt, but Mr. Sherman continued by stating that there are
49  lots of meetings that take place involving Wisner and what happens is that a report comes back
50  to the committee. He continued to state that we don't need to meet as a board, as the Donation
51  Advisory Board, at every single meeting – we physically couldn't do it – everyone has full-time
52  responsibilities outside of this, but a meeting takes place and a report comes back. He continued
53  by stating that, if anyone wants to attend any particular meeting, he is sure Cathy will allow you
54  to attend one and, in this context, if you want to be at that meeting, it would be wonderful for
55  you to be at that meeting –
56
57  Mr. Michael Peneguy interrupted to state that we weren't invited and it wasn't even announced
58  to us.
59
60  Mr. Sherman continued by stating that he believed that he sent an e-mail to the entire committee,
61  to which Mr. Michael Peneguy responded "No."

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012

1   Ms. Stacy Gerhold-Marvin then asked "About the City's attorney with Waltzer & Wiygul?" and
2   then stated that she had not even heard about it until the memo was received.
3
4   Ms. Norman stated that he must be talking about the previous one.
5
6   Mr. Michael Peneguy attempted to say something and was interrupted by Mr. Sherman, who
7   stated that, at the last full committee meeting, Joel Waltzer stated that he was happy to meet with
8   anyone or their attorneys at any time and we took him up on that opportunity. He continued by
9   stating that he didn't know if anyone else did, but they are certainly welcome to do that.
10
11  Mr. William Peneguy stated that Joel Waltzer said that after your meeting to which Mr. Sherman
12  stated "Both, before and after – he said that multiple times."
13
14  Ms. Stacy Gerhold-Marvin stated that she didn't believe the issue is that the attorneys met,
15  although none of us see the point in that - or what could have come out of that for the Donation.
16  She then stated that the problem is that the authority of the committee was questioned, the
17  authority of Waltzer & Wiygul was questioned, which ultimately questions the authority of the
18  committee and brings up internal governance issues.
19
20  Mr. Sherman responded by saying that's right and Ms. Stacy Gerhold-Marvin continued by
21  stating that that was brought on by the City of New Orleans, to which Mr. Sherman responded
22  that that issue was raised a year and a half ago.
23
24  Ms. Stacy Gerhold-Marvin then stated that Mr. Sherman just brought it back to life in that
25  meeting with the attorneys and then asked why would the attorneys even ask that.
26
27  Mr. Sherman responded by stating it was not the City's attorneys, but it was the attorneys that
28  were hired to represent the City of New Orleans and they asked the question as to who their
29  client is to get some clarification of whether - .
30
31  Ms. Stacy Gerhold-Marvin interrupted and said "Ok" and then Sherman continued by stating that
32  he was also present at that meeting, but this issue is a year and a half old issue - the internal
33  governance issue relative to this contract and that this is not a new issue.
34
35  Ms. Stacy Gerhold-Marvin stated that, actually, it is a new issue because this is the first time that
36  the authority of Waltzer & Wiygul has been questioned. Mr. Sherman attempted to interrupt, but
37  Ms. Stacy Gerhold-Marvin continued by stating at such a critical point in these negotiations with
38  everything that is going on and this is what we're sitting here talking about instead of talking
39  about what are we going to do about these hard structures and this restoration project and this is
40  what the City of New Orleans has brought on –
41
42  Mr. Michael Peneguy interjected that we are wasting time, and Ms. Stacy Gerhold-Marvin
43  continued stating that we are wasting time and the documents say that the majority of the
44  committee is deemed the action of the committee and that the majority of the committee
45  members voted for this law firm and they are doing an excellent job for us. She then stated that
46  the City has approved their invoices and applauded their efforts until two weeks ago, so she says
47  that we move on too - that this is going round and round and round.
48
49  Mr. Sherman responded by stating that he can testify to this internal governance issue and
50  anyone who has access to these attorneys –
51
52  Mr. Michael Peneguy interrupted and stated that he would like a vote on his motion and Mr.
53  Sherman continued by stating and the substance of the meeting to take place and he already said
54  an hour and a half ago that he would love for more folks to go –
55
56  Mr. Michael Peneguy then stated that he doesn't care about the meetings that Mr. Sherman has in
57  City Hall and that he is not going to attend a meeting in City Hall for the rest of his life, period,
58  and asked to go on with the motion   .
59
60  Ms. Norman then asked Mr. Michael Peneguy to read the motion and Mr. Michael Peneguy read
61  the motion out loud again, with the motion being that the committee instruct Waltzer & Wiygul

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012

1   that any meeting with any member of the committee and the committee be held by a properly
2   called committee meeting with a full quorum present and the meeting to take place in the Arts
3   Council conference room or the conference room in Simon Peragine's office.
4
5   Mr. Lorino was out of the room when Mr. Michael Peneguy started reading the motion and Mr.
6   Sherman asked Ms. Phillips to repeat Mr. Peneguy's motion for Mr. Lorino. Ms. Phillips
7   repeated the motion by stating that he wanted to notify Waltzer & Wiygul that all meetings with
8   a member of the committee would be in a properly called meeting with a full quorum present in
9   the Arts Council conference room or Simon Peragine's office.
10
11  Mr. Sherman stated that there is motion on the table and asked if there was a second. Dr.
12  Williams had already seconded it and repeated his second to the motion. Mr. Lorino asked that
13  the motion be read again because he thought he heard something different stated than what was
14  stated the first time it was stated.
15
16  Mr. Mark Peneguy explained that it was the same motion with the only difference being that Mr.
17  Michael Peneguy added that the words the Arts Council conference room and everything is the
18  same and the purpose of the motion is for barring Walter & Wiygul to only meet with committee
19  members in a meeting of the committee called for that purpose or a regular committee meeting,
20  but a quorum has to be present – the goal of course is to keep the City from having these private
21  meetings and questioning the authority of the committee's counsel.
22
23  Mr. Sherman then asked for a clarification as to whether that barred phone contact with the
24  attorneys so committee members can have unfettered phone contact with the attorneys?
25
26  Mr. Mark Peneguy answered no and Mr. Michael Peneguy stated that he didn't see any problem
27  with the attorneys answering questions for a member of the committee, but to get into a meeting
28  – in other words, if you have a question, you can call –
29
30  Mr. Mark Peneguy then stated to Mr. Michael Peneguy that it should be a conference call
31  because you can't allow that to happen because you can't trust the City to do the right thing.
32
33  Mr. Michael Peneguy responded that he guessed the only thing that he could do is include all
34  communications –
35
36  Mr. Lorino then advised that he still didn't understand the motion and asked Ms. Phillips to read
37  it again. Ms. Phillips then read it again as follows: "We would notify Walter & Wiygul that all
38  meetings with a member of the committee would be in a properly called meeting with a full
39  quorum present in either the Arts Council conference room, here, or in Simon Peragine's offices.
40
41  Mr. Lorino then stated that, unless he's missing something, he does not see how that stops
42  anybody from meeting with anybody and it seems to him that all this says is, if they are going to
43  meet with any of the committee members, it has to be with the group.
44
45  Ms. Stacy Gerhold-Marvin said "Yes', followed by Mr. Mark Peneguy and Mr. Michael
46  Peneguy stating that that is all it says.
47
48  Mr. Sherman then stated that it excludes the Trustee, to which Mr. Michael Peneguy responded
49  that it does not, followed by Ms. Stacy Gerhold-Marvin asking "What?"
50
51  Mr. Sherman stated that he is not a committee member, to which Ms. Norman responded that he
52  is the chairman of the committee, which was followed by Ms. Stacy Gerhold-Marvin stating that
53  Mr. Sherman is his designee and Mr. Mark Peneguy stating that Mr. Sherman is his alternate.
54
55  Mr. Sherman then stated that it violates the trust code because it places –
56
57  Ms. Norman, Mr. Mark Peneguy and Ms. Stacy Gerhold-Marvin all responded together, saying
58  "No it doesn't." Ms. Stacy Gerhold-Marvin then stated that the Trustee is the chairman of the
59  committee and he can attend the meetings at anytime.
60

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012

1  Mr. Lorino then stated that we have a trust lawyer sitting at the table here and asked Mr. Jim
2  Burton if there is anything wrong with this motion in respect to the trust law.
3
4  Mr. Jim Burton stated, first of all to clarify, he would not characterize himself as a trust lawyer.
5  He then stated that the motion, as discussed, clarified and re-read, his concern about it before
6  was that he knew that there were ongoing discussions between counsels and he believes that
7  counsel would probably very much want to continue and reporting with individual committee
8  members. He then stated that, in regard to it being in the context of a meeting, he thinks that the
9  concerns that he had before are largely allayed and he doesn't see where it changes much the
10  way it –
11
12  Mr. Sherman interrupted and stated something about unfettered phone access, followed by, it
13  was just that a meeting was to –
14
15  Mr. Jim Burton stated as it stood right now that –
16
17  Mr. Sherman said "Ok."
18
19  Mr. Mark Peneguy asked Mr. Michael Peneguy to amend his motion to make sure any
20  communication with any committee member is included because, unfortunately, he believes that
21  any loophole the City can find it will find and we've seen that. Ms. Stacy Gerhold-Marvin then
22  indicated that she agreed.
23
24  Mr. Michael Peneguy stated that he would have ask to see if he could get a second on that – to
25  amend it to include all communications.
26
27  Mr. Lorino then stated that, as he understands it, what the City wants is to have a meeting with
28  Waltzer & Wiygul with the City's attorneys and Mr. Sherman agreed. Mr. Lorino then asked
29  Mr. Sherman if there was a reason that the committee members couldn't be in attendance.
30
31  Mr. Sherman responded by stating that he would love for that to happen and that he said that an
32  hour and a half ago and it would be great. He then stated that he thinks that, the more forks that
33  participate, that would be great and he believes that that is a wonderful idea.
34
35  Mr. Mark Peneguy stated that, except that the first time they did this, they had that without
36  anyone knowing and that is when the attorneys that they hired for their claim questioned whether
37  they should not be representing Wisner and that is what this is resulting in – Waltzer & Wiygul is
38  concerned that the City is doing its best to undermine their work so that they can take over the
39  Wisner claim, which will benefit the City tremendously because the City's claim isn't as good as
40  the Wisner claim and that is what they're trying to do is play the Wisner claim against the City's
41  claim so they can raise theirs – it doesn't matter what happens with the Wisner claim – they want
42  to raise their claim by getting the attorneys to represent the Wisner claim so they can play them
43  off against one another.
44
45  Ms. Lizbeth Turner stated that the question that she has is what is Waltzer & Wiygul advising us
46  in this situation – are they advising us not to meet?
47
48  Mr. Sherman responded that Waltzer & Wiygul and he wanted to be cautious in paraphrasing,
49  but they said two things – one is that they don't want to get involved in internal governance
50  issues - they want to work on protecting the value of the Donation's claim, which is exactly what
51  they should be doing, and second is that they have said that they will meet with anyone, any
52  committee member or their attorneys at anytime whatsoever and we, in fact, have even discussed
53  on the phone with Joel that could be no action taken at any committee meeting, any meeting that
54  we want to take place, that anything that is discussed, if anyone wanted to discuss something
55  with the Donation claim, it would come back to this committee to discuss and the City would
56  obviously already have been briefed. He then addressed Dr. Williams and stated we would love for
57  everyone to be at that meeting. He then stated that he will make this motion –
58
59  Mr. Michael Peneguy interrupted and said it would be out of order –
60

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012

1    Mr. Sherman responded that it would not necessarily be out of order and he could easily make
2    this motion that to the extent that we would love to invite these folks to the meeting – the more
3    involvement, the more folks are briefed, the more folks would be a great thing.
4
5    Mr. Mark Peneguy stated that he is concerned that when they did this without the committee,
6    Waltzer & Wiygul said "Are we allowed to continue" because, apparently, they were telling
7    Waltzer & Wiygul that you all have no authority – maybe not directly, but that is how they took
8    it and that was what the special meeting was about last week, as to whether they had the
9    authority, and I think continuing to meet with the City like this without the committee being
10   present will continue to undermine Waltzer & Wiygul's authority. He then stated that he
11   understands that they have said that they will meet with anybody – they are required to do that
12   under their contract, but the committee is the one that controls what they can and can not do. He
13   then stated that he thinks, to protect Waltzer & Wiygul and to be sure that these stories that we
14   get from the City are actually the truth, the committee needs to have somebody meeting with
15   these people because we already know the difference is black and white in what the City
16   perceives is happening and what the City is actually doing. He then corrected the last part by
17   stating, not what the City perceives – what the City actually tells us what it happening and what
18   is actually happening.
19
20   Mr. Lorino then asked if we are saying that we don't want the entire committee to be in
21   attendance at a meeting of Waltzer & Wiygul and the City's attorneys?
22
23   Mr. Mark Peneguy & Ms. Stacy Gerhold-Marvin both responded by saying with a quorum of the
24   committee. Mr. Mark Peneguy then stated that a quorum of the committee should be present and
25   that he thinks it is should be to protect the committee and protect the Wisner Donation. He then
26   stated that any loophole you give the City to do something – you've got to close that loophole,
27   including the telephone conferences and all these other things they might choose to do.
28
29   Mr. Sherman responded by stating, lets be clear what is happening here –
30
31   Mr. Lorino interrupted to state that he is really not clear.
32
33   Mr. Sherman then continued by stating that there is a meeting proposed and that is how we got
34   into this discussion. He then stated that he would love for everyone to be there, but that is a side
35   issue. He continued by stating that any meeting that we have, Walter might want to be there, but
36   a couple of things, a couple of differences, one is Mr. Mark Peneguy is trying to – his suggestion
37   is that the motion be that no communications ever take place outside one of these meetings -
38
39   Ms. Stacy Gerhold-Marvin and Mr. Mark Peneguy interrupted to say "With Waltzer & Wiygul."
40
41   Mr. Sherman then stated "With Waltzer & Wiygul" and continued by stating that he is trying to
42   ban contact between the Trustee and Waltzer & Wiygul -
43
44   Mr. Mark Peneguy interrupted and stated that the Trustee is a committee member and as a
45   committee member, he has a right to meet with them – all he has to do is attend –
46
47   Mr. Sherman then stated that Mr. Michael Peneguy wants to ban any in-person meeting taking
48   place without a duly called meeting of the entire committee.
49
50   Mr. Michael Peneguy started to interrupt, but Ms. Norman asked to let her just point something
51   out and explained that Mr. Sherman called her yesterday and said, and these are the words that I
52   remember, he said that the City is unable to resolve the internal governance issue and that he
53   talked to Joel Waltzer and we're going to have another meeting with Joel Waltzer and his law
54   partner, he wants him there, and she asked if he had talked to the committee about this and he
55   said he had not yet -
56
57   Mr. Sherman interrupted to state that he –
58
59   Ms. Norman continued by stating that was what she said and he said no, but he was getting ready
60   to send out an e-mail, which he did. She continued by saying that is exactly what he said to her
61   and she said to him that she thought that the committee needs to be informed and that she did not

1 think that he should be holding these meeting without talking to the committee before he talked
2 to Waltzer & Wiygul.
3
4 Mr. Sherman responded that he did not recount the conversation, but from the City's position, we
5 need to have access to be able to call Waltzer & Wiygul and anyone at anytime -
6
7 Messrs. William and Michael Peneguy, both, interrupted and asked "Why?"
8
9 Mr. Sherman did not answer, but continued on to state that as for meetings he wants folks to
10 come to participate and he loved to send out the e-mail and have folks to come join us – that's an
11 easy thing – that's a wonderful easy thing, but to have them here in this room or to have it at
12 Simon Peragine's office or to have to go through some notice process and have to wait for a
13 quorum – anything that bars the City from picking up the phone and calling Waltzer & Wiygul
14 injures the claim, is the first thing as far as he's have ever seen, that injures the claim and
15 elevates the discussion of internal governance rather what we tried to do at the start of the
16 meeting, which was to focus on the BP claim and resolve internal governance in due course.
17
18 Mr. Mark Peneguy then stated that what Mr. Sherman is saying is that he wants to meet as
19 Trustee and that's the difference – he doesn't consider the Trustee to be a committee member –
20 he considers the Mayor (showing one position by extending a hand above his head) to be here
21 and all of the rest of you to be down here (showing his other hand in a lower position) and
22 whatever the Mayor wants is what we do and what we want, tough luck –
23
24 Mr. Michael Peneguy interrupted to state that we have to wait for these meetings and asked why
25 shouldn't the Mayor have to wait for these meetings?
26
27 Mr. Mark Peneguy responded that the Mayor believes he is all powerful and that is the difference
28 here – we do not believe that – he does believe that.
29
30 Several people then tried to talk at the same time and Ms. Stacy Gerhold-Marvin broke in to state
31 that he is the Trustee and one of the representatives, one of the five that sits on the committee
32 and if the Mayor can't do it because he's too busy with City stuff, then it is his designee, but he
33 is a committee member and there is not the committee and then the Trustee – there is the Trustee
34 who is the chairman and who is a committee member – one of the five. She then stated that we
35 are not talking about six people here.
36
37 Mr. Sherman then stated that he would urge and caution not to escalate our issues of internal
38 governance and that he thinks that is an unwise thing –
39
40 Mr. Michael Peneguy stated that he asked for the question several times and that he is asking for
41 the question again – we have a motion and seconded.
42
43 Mr. Lorino stated, if that question is called, he was going to abstain. He then asked that, to move
44 this thing along and avoid whether or not we try to resolve the internal governance issue, why
45 couldn't we just have this committee call a meeting and invite the two law firms?
46
47 Mr. Michael Peneguy attempted to answer, but several people interrupted at the same time, with
48 Mr. Lorino finally stating that he was trying to listen to Mr. Mark Peneguy and did not hear what
49 Ms. Norman was saying.
50
51 Ms. Norman then stated that it is not up to these two law firms to decide who represents the
52 Donation.
53
54 Mr. Sherman interrupted to state that that is not the issue at all and Mr. Mark Peneguy stated that
55 the issue is whether the City can go behind the committee's back as the so-called Trustee and all
56 powerful oz and call these meetings and instruct our attorneys to deal with their claim attorney
57 for completely different purposes.
58
59 Mr. Lorino then asked, if we just called a meeting and – when he was interrupted with several
60 people, all talking at once.
61

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012

1   Mr. Michael Peneguy stated that his motion does not prevent that and that his motion is simply to
2   have –
3
4   Mr. Sherman interrupted to state that if the motion was for that, he would support that absolutely
5   because it calls a meeting in time for all of us to get together, but this motion restricts contact and
6   communications –
7
8   Mr. Michael Peneguy interrupted and stated "No it doesn't."  He then explained that it does not
9   restrict communications with anything except that it occur in the form of a committee meeting
10  and that is all it does.
11
12  Mr. Lorino stated that you need to amend your motion then.
13
14  Mr. Michael Peneguy stated that he did not know how to amend it, but basically all he's saying,
15  if everyone will be quiet, is that all meetings with our attorneys be in a meeting with a full
16  quorum present in this room or in a conference room in Simon Peragine's office.
17
18  Mr. Mark Peneguy stated that you have to restrict the communications, to which Mr. Michael
19  Peneguy stated that the communications part he didn't believe would be legal and Mr. Jim
20  Burton said "Yes, I think you would have trouble with that."
21
22  Mr. Mark Peneguy stated that you're going to end up with conference calls between the City and
23  Waltzer & Wiygul, to which Mr. Michael Peneguy responded that he thought that Waltzer &
24  Wiygul are smart enough to realize that, if they get into conference calls with that, it is time to
25  hang up.
26
27  Ms. Norman stated that we have several other issues to discuss and two members of the
28  committee will have to leave, so she would like to move the meeting along.
29
30  Mr. Michael Peneguy then stated that he would like to have a vote on the motion.
31
32  Mr. Sherman stated that just to be clear on the motion that he would like to have it restated and
33  asked Ms. Phillips to state it again.  Ms. Amanda then stated the motion as being that we will
34  notify Waltzer & Wiygul that all meetings with a member of the committee will be in a properly
35  called meeting with a full quorum present in the Arts Council conference room or in the offices
36  of Simon Peragine.
37
38  Mr. Sherman asked if Mr. Lorino wanted to make a substitute motion and Mr. Lorino responded
39  that he would make another motion after this motion is voted on.
40
41  Mr. Sherman then asked those in favor of the motion to signify by raising your hand and Mr.
42  Michael asked for those to say aye.  Mr. Sherman then asked for those opposed and then stated
43  that the City opposes.  The vote was therefore 4 to 1 in favor of the motion and Mr. Sherman
44  stated that he would advise the Mayor of the advice and consent of the committee.
45
46  Mr. Lorino then moved that this committee call a meeting for the purpose of inviting Waltzer &
47  Wiygul and the City's attorneys for the purpose of discussing the BP claim and he would suggest
48  that that meeting occur as soon as possible.
49
50  Mr. Mark Peneguy asked Mr. Lorino which attorneys he was talking about, was it the private
51  attorneys that they hired to resolve BP matters or the City attorneys.
52
53  Mr. Lorino then asked Mr. Sherman which ones are the ones that want to meet.
54
55  Mr. Sherman answered that it is the attorneys that the City hired for the BP claim and then
56  mentioned some of the attorneys' names.
57
58  Mr. Mark Peneguy then stated that Waltzer & Wiygul are meeting with them in a separate
59  capacity and what he is trying to do is get the Wisner interest involved in that and that is why he
60  –
61

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012

1  Mr. Sherman interrupted asked Mr. Mark Peneguy to please don't try to assign motivations that
2  he doesn't know are true.
3
4  Mr. Mark Peneguy responded by saying that then there is no reason to contact the committee and
5  say we'd like to have a meeting with Waltzer & Wiygul if it had nothing to do with the
6  committee and he thinks it is pretty obvious.
7
8  Mr. Sherman responded that Waltzer & Wiygul had substantial trouble in getting response
9  during various times throughout the year on litigation and response to their claims and now
10 they're using a magistrate to help to get them moving  - they weren't even getting phone calls
11 returned for quite awhile and these attorneys are right in the class action and have daily contact.
12 He continued by stating that it is obvious that we are not being well served to the fullest extent –
13
14 Ms. Phillips stated that the reason for the magistrate is because they filed a motion for partial
15 summary judgment – that is why we're with the mag –
16
17 Mr. Sherman attempted to state that is because they couldn't resolve –
18
19 Ms. Norman interrupted and stated that that is absolutely not true and you weren't here.  She
20 then explained that the reason that we did that is because we were addressing issues, not from the
21 oil spill, but from the access agreement which is a contractual claim and we did not want to
22 present that to Barbier because we felt it would be inappropriate and tossed to the side, so we
23 filed a motion for partial summary judgment for the access agreement –
24
25 Mr. Sherman interrupted and stated that it was because, privately, we couldn't get a favorable
26 response from BP – we couldn't even get responses back from BP according to Waltzer &
27 Wiygul.
28
29 Ms. Stacy Gerhold-Marvin asked "What is so surprising about that?
30
31 Mr. Sherman responded that it is not a surprise, but we have attorneys that are in daily contact
32 with them and –
33
34 Ms. Norman responded, right, and they are part of the PSC, which is working to resolve issues
35 and receiving 6% of everything that is settled over a billion dollars –
36
37 Mr. Sherman responded that we have an option to be in or out and –
38
39 Ms. Norman responded right and these attorneys are being compensated for everything they do
40 to tie everything up, which means it benefits BP and the BP plaintiffs, right, because BP won't
41 have to go to trial the plaintiffs will get the money sooner as opposed to later and that is what the
42 Plaintiff's Steering Committee does, which is like seeing a movie while sitting on a fence.
43
44 Mr. Sherman stated that all right, let's move on to the next –
45
46 Ms. Amanda interrupted and stated that we have Mr. Lorino's motion on the table and she just
47 wanted to make sure that she had it correctly and stated that Mr. Lorino, you wanted to call a
48 meeting to invite Waltzer & Wiygul and the City's attorneys for the purpose of discussing the BP
49 claim as soon as possible, is that correct?
50
51 Mr. Lorino stated that that was correct, but he thinks that he needs to withdraw it because it
52 doesn't seem that it is going to go anywhere.
53
54 Mr. Sherman then stated that, based upon the last motion, you might just suggest a special
55 meeting to discuss internal governance.
56
57 Mr. Michael Peneguy stated that he didn't think that we want to discuss that issue and Ms. Stacy
58 Gerhold-Marvin stated that no body's going to change their position, so what is the point?
59
60 Mr. Sherman responded by stating that Mr. Burton suggested a few potential ways to resolve it at
61 the last meeting and we might want to discuss it.

**MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012**

1    Mr. Michael Peneguy stated that there is an easy way - you'll can just honor the –
2
3    Ms. Stacy Gerhold-Marvin interrupted and stated that you can just honor the ordinance and the
4    law.
5
6    Mr. Sherman responded that we are following every law tot the tee, but let's move to the next
7    item and stated that it was the Spring 2012 Wisner grant updates.
8
9    **NEW BUSINESS ITEM NO. 2            City of New Orleans.**
10
11       **B. Spring 2012 Wisner Grants**
12
13    Mr. Sherman stated that he will distribute, prior to issuing the grants, a list –
14
15    Mr. Michael Peneguy interrupted and asked where is the statement from the City funds, the
16    statement that we've asked for three times, but Mr. Sherman stating that this is additional
17    information about the grants.
18       He started handing out a packet and stated that this is a summary of the grants, of what
19    each project is, and, if anyone has a particular interest, he could get a little more information on
20    that.
21
22    Mr. Mark Peneguy stated that he wanted to know when it is going to be presented to the
23    committee for approval.
24
25    Mr. Sherman responded by saying that we addressed that issue in total previously and Ms.
26    Norman asked that we move on.
27
28    Mr. Sherman read from the agenda – update on evaluation of the Wisner Property.
29
30    Mr. Michael Peneguy stated that before we get to that, Mr. Sherman promised three times that he
31    would provide the statements from the Wisner Land Trust Account and we haven't received
32    them and he requested that they be e-mailed within next week.
33
34       **C. Update on Valuation of the Wisner Property**
35
36    Ms. Norman stated that she included in today's packet the qualifications for Mike Truax and she
37    had spoken to him at length and asked him to send us his proposal, which she has not received.
38    She stated that she did receive his CB and qualifications and he would do the Port Fourchon
39    portion of the valuation. She continued by saying that she reminded him about his proposal, but
40    that will have to be at the next meeting. She then stated that she also included an estimate from
41    Rogers & Elston to do a geology-reservoir engineering study of the Bay Marchand Field for
42    $18,500. She continued by stating that she didn't know how we can hire anyone because we
43    don't know if we need to go to an RP or not and, even though we were able to hire Bourgeois
44    Bennett, she is now confused on all of our hiring practices. She then stated that Rogers and
45    Elston does do work for us now and they would be the ideal persons to do this work for us and
46    Truax has done work on the port property for us in the past when we were having problems with
47    the port and they were threatening expropriation and that is why she suggested these people. She
48    continued by stating that she is open to any other suggestions of people that the committee may
49    want her to contact about this, but those are her suggestions.
50       She completed the report by saying that, if we could go about it under the normal route,
51    she would make these suggestions, the committee would meet with these people and, if
52    everything seemed above board, then we would hire them, but now, she doesn't know what to do
53    and, so, moving forward.
54
55    Mr. Michael Peneguy stated that we could table it and then said he would make that motion –
56    let's table it.
57
58    Ed Buddy stated that he would second it.
59
60    Mr. Mark Peneguy asked Mr. Michael Peneguy what he was making a motion to table.
61

**MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012**

1  Mr. Michael Peneguy responded to hire these people and Ms. Stacy Gerhold-Marvin added the
2  property valuation.
3
4  Ms. Norman stated that she believes that she is now being posed with and questioned, so she
5  now doesn't know how to proceed in her job any further.
6
7  Mr. Mark Peneguy stated that he would say that you continue to do what you've been doing
8  because you are contracted by the committee to do your job and don't worry about what the City
9  thinks.
10
11  Ms. Stacy Gerhold-Marvin and Mr. Michael Peneguy agreed.
12
13  Mr. Sherman ignored the motion and stated that the next item is the BP Deepwater Horizon and
14  Ms. Norman stated that we need some people to leave the room.
15
16  Mr. Sherman asked for a pause for a moment and then stated that we need to re-prioritize
17  because we may loose a quorum and -
18
19  Ms. Stacy Gerhold-Marvin stated that you are not because she is about to call the kids'. school
20  and asked Dr. Williams if he was leaving. Dr. Williams advised that he wasn't and Ms. Stacy
21  Gerhold-Marvin said that she doesn't believe she will leave either, but she would just call the
22  kids' school.
23
24  Ms. Norman advised that there were only one or two items that need a vote and Mr. Sherman
25  stated that let's do this and asked that we move the BP Deepwater Horizon discussion to the end
26  of the agenda and move everything else up so we can finish everything off and then go into
27  executive session and allow everyone else to go home. He then stated that his motion would be
28  to skip to number 4 on the agenda.
29
30  Ms. Norman said Ok and Mr. Sherman asked if there were any objections, with none being
31  presented.
32
33  **NEW BUSINESS ITEM NO. 4          Wisner Beach Update.**
34
35        **A. Caminada Headlands Project – Proposed Project Expansion.**
36        **B. Bay Champagne Ownership Issue.**
37        **C. Status of Servitude for the Caminada Headlands Project.**
38        **D. Subsidence Project Update.**
39        **E. Access Agreement for Bird Study.**
40
41  Ms. Norman stated that she is going to discuss the hard structures on the beach with the BP
42  issues because it is integrally involved. She then referred to a news article and stated that, as far
43  as the South Lafourche Beachfront Development District, Falgout becomes the adviser and it
44  says here very clearly in this article from the Lafourche Gazette that the beach is conducive to
45  vehicular traffic, it would be a shame to loose that right. She continued by stating that, once
46  again, we are back in the saddle fighting that issue.
47        She then reported that there was nothing on the Bay Champagne ownership issue and the
48  state said that they were going to respond to the letter that Susan Clade and she put together
49  contending that the area in front of Bay Campagne belongs to Wisner.
50        She reported that, in respect to the Caminada Headlands project, there was a meeting on
51  the beach last week by the state, CPRA representatives and the project manager and they have
52  been funded by BP to expand the project study, not the project itself, for engineering design
53  beyond the original scope and they are calling it the Caminada expansion or extension. She
54  continued by stating that the project design is being funded by BP is NRDA money and then, if it
55  and the original project was fully funded, our entire shoreline would be covered and restored.
56  She then stated that, right now, everything is up in the air.
57        She reported that the status of servitude for the Caminada Headlands Project is that the
58  Salvation Army's executed servitude agreement is the only one that has not been returned and
59  asked Ed Buddy if he could encourage Georgia to execute and return it because she would love
60  to have that back and be able to send it to the state by the 30th so they can go forward and say
61  that all of the land rights are in place.

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012

1    Ms. Norman reported that the coring for the subsidence project was done and it was done
2    prior to the Caminada project and that it will be done again once the project is built.
3    She then stated that there is also a second request for a bird study that she received from a
4    group called Conservatism for Coastal Bird Conservation that she received. She explained that
5    this person did a great report that will help us in the future with the vehicular access issue, but
6    she had heard from people that she's a bit militant about bird activity and, as a result of that she
7    had some concerns. Ms. Norman then advised that she wrote her an e-mail telling her about the
8    restoration project, but that she has some concerns that she is going to want to be involved in
9    everything and that she is not from Louisiana. Ms. Norman then stated that she believes that we
10   can give her access but she wanted to recommend that we limit it to the nesting session this
11   summer and then just tell her after that that we're done, or, if she wants to continue to do work
12   for us, just work closely with her and we can put together a standard access agreement. She then
13   explained that she will be just standing and walking and looking at the nests and doing things
14   like that. She then stated that she is one person that she is worried about because, if something is
15   raised about the nesting period, it could delay the permit and it could mean a loss of funding.
16   To sum it up, Ms. Norman stated that we give her access, but limit it to until September
17   because that is when they'll start construction and that is probably when we wouldn't want her
18   around.
19
20   Mr. Michael Peneguy stated that he so moves.
21
22   Mr. Sherman asked Mr. Peneguy if that was a motion and Mr. Peneguy replied "Yes." Mr.
23   Sherman then asked if there is a second and Mr. Buddy replied "Yes." Mr. Sherman
24   acknowledged the second from Mr. Buddy and called for the vote with the result being a
25   unanimous positive vote.
26
27   **NEW BUSINESS ITEM NO. 5**          **Update of the 2012 Legislative Session.**
28
29   Ms. Norman reported that she didn't have much on the legislative session and that she has been
30   reading articles and is continuing to read articles about the debate over the oil & gas legacy suits
31   and it appears that they are pushing it back toward the end of the session because it is such a
32   tenuous issue, but that is about all she has to report on that.
33
34   Mr. Michael Peneguy stated that one or two of the proposals have made it out of the committees,
35   but they haven't gone too far beyond that.
36
37   Mr. Sherman stated that the next up is the alligator egg collection.
38
39   **NEW BUSINESS ITEM NO. 6**          **Alligator Egg Collection Lease Renewal – St.**
40                                        **John and Jefferson Parishes.**
41
42   Ms. Norman reported that Rusty Caviler collects eggs on both, our St. John the Baptist and
43   Jefferson Parish properties and he sat out last year and asked Ms. Phillips is that right, with Ms.
44   Phillips stating that he sat out two years before and he collected in 2011 and he would like to
45   collect this year.
46
47   Ms. Norman agreed and explained what he does is they fly in a helicopter and go down to spot
48   the nests and then they go in and take the eggs and the eggs are hatched in captivity under
49   Wildlife & Fisheries rules and regulations and 17% of the alligators are released once they are 4
50   feet long. She then stated that she had a friend that went on the release and it was pretty exciting.
51   She then stated that unfortunately they tag them and then the ones that are released are eaten by
52   the bigger ones out in the marsh, but basically the eggs are taken as a business to alligator farms
53   where they are hatched, raised and feed nurture meat and then they are killed off for their meat
54   and their skins.
55   She then stated that we get 50% of the sales price for the fertile eggs, but we don't know
56   what that price is ahead of time because it fluctuates, but this is a request and she brought in last
57   year's lease and just wanted to request a renewed lease.
58   Mr. Michael Peneguy stated that he thought about all you need to do is to change the dates on the
59   lease and Ms. Norman replied "Pretty much."
60

MINUTES OF THE MEETING OF THE
EDWARD WISNER DONATION ADVISORY COMMITTEE
TUESDAY, APRIL 24, 2012

1    Mr. Michael Peneguy then moved that we approve the agreement as written, but with the change
2    of dates.
3
4    Mr. Buddy seconded the motion and Mr. Sherman asked all in favor, which was shortly followed
5    by him stating that without opposition, the motion carries.
6
7    **NEW BUSINESS ITEM NO. 7**          **Update on Global Geophysical Project.**
8
9    Ms. Norman stated that they are supposed to begin the project on May 1st and, right now, they're
10    doing assessments of the activities on the beach.  She then explained that a lot of equipment will
11    be walked in and it should be fairly non-intrusive, but she did not know how long it will take, but
12    assumed that it will take about 6 weeks.
13       She then advised that Forrest will be out there when they have to go out into the marsh
14    and he'll be walking them out there.  She explained that they will be putting poles in the ground
15    and hanging receivers on them, whereas in the old days they had to lay out lines, which was very
16    intrusive because all of the geophones were connected.  She then explained that now they have
17    wireless receivers, which makes it really great and that they will not be doing any dynamiting on
18    our property because all of the sounding is going to done offshore in big boats.
19       She then stated that we have already received our $300,000.00 for the project and Forrest
20    will be paid by them in the time that he is under our agreement and the time that he is out there.
21    She concluded by stating that the project will be done and she just wanted to give an update on it.
22
23    **NEW BUSINESS ITEM NO. 8**          **2011 Annual Review and Evaluation.**
24
25    Mr. Sherman stated the next agenda item, the 2011 annual review and evaluation, will be the first
26    agenda item for next meeting.
27
28    Mr. Michael Peneguy stated no, not actually because the annual review was already complete
29    and he guessed that the only thing that will have to be handle is the result of our motions for
30    handling the last part of the agenda item -- the part for us to handle things.
31
32    Mr. Sherman then stated Ok, there is no action item here and Mr. Michael Peneguy agreed.
33
34    Mr. Sherman then stated that at this time he would entertain a motion for executive session to
35    discuss the BP Deepwater Horizon oil spill update, to which Mr. Lorino stated so moved.  Mr.
36    Sherman asked if there was a second and none was immediately offered.
37
38    Ms. Norman asked Mr. Buddy if he had to leave and then explained that she thought we could
39    get through with it in five minutes.  Mr. Buddy then elected to second the motion and Mr.
40    Sherman advised hearing no opposition, we will go into executive session.
41
42    Upon exiting the executive session the following motion was made by Mr. Buddy, seconded by
43    Mr. Lorino and passed without objection:
44
45       That the committee accept the agreement associated with the partial summary judgment
46       of the access agreement wherein it is agreed that $150,000 will immediately be paid to
47       the Donation upon submission of the matter to the neutral party with the neutral party
48       then making a determination as to which claims are related to response and should be
49       paid to the Donation and which claims are related to litigation and will not be paid and
50       BP will then pay 75% of the invoiced amount related to response with the balance of
51       25% being addressed in the final settlement with BP.
52
53    The meeting was then adjourned at 3:18 PM.
54
55    RESPECTFULLY SUBMITTED BY:
56
57
58    _____
59    L. Amanda Phillips, Interim Secretary-Treasurer/Land Manager
60
61
62    AMENDED AND APPROVED AT _____ MEETING
63                            *DATE*

Transcript of the Testimony of
# Transcition from Audio Tape of Regular Session

## Date taken: May 29, 2012

## Edward Wisner Donation Advisory Committee

All **electronic deposition & exhibit files**
are available at **www.psrdocs.com.**
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.

**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   http://www.psrdocs.com**

*Approved at the October 29, 2013 Regular Meeting*

*L. Amanda Phillips*
*Interim Secretary Treasurer*

ORIGINAL

EXHIBIT
MM

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 1

EDWARD WISNER DONATION

ADVISORY COMMITTEE

TRANSCRIPTION FROM AUDIO TAPE of
the Edward Wisner Donation Advisory
Committee Meeting, held in the offices of
the Arts Council, 8th Floor Conference Room,
935 Gravier Street, New Orleans, Louisiana
70112, on Tuesday, the 29th day of May,
2012.

PRESENT:

      Michael G. Sherman, Chair
      CITY OF NEW ORLEANS

      Michael Peneguy, Representative
      WISNER FAMILY HEIRS

      Lizbeth Turner, Alternate
      Anthony Lorino, Alternate
      TULANE UNIVERSITY

      Ed Buddy, Alternate
      THE SALVATION ARMY

      Stacy Gerhold-Marvin
      Dr. Everett J. Williams, Jr.
      MEDICAL CENTER OF LOUISIANA
      LSU HEALTH SCIENCES CENTER

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 2

```
 1   STAFF:

 2        C. CATHY NORMAN
          Secretary-Treasurer/Land Manager
 3
          L. AMANDA PHILLIPS
 4        Executive Assistant, Wisner

 5

 6   GUESTS:

 7
          MARK E. PENEGUY, ESQ.
 8
          MATTHEW AVERILL
 9        City of New Orleans

10        JAMES A. BURTON, ESQ.
          Simon, Peragine, Smith & Redfearn, LLP
11

12   TRANSCRIBED BY:

13        LINDA G. GRIFFIN, RPR
          Certified Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 3

```
1                    AGENDA INDEX
2                                          PAGE
   OLD BUSINESS
3  1.  Approval of Minutes
       2/28/12; 4/19/12 Special Mtg.
4      4/24/12 Annual Review ..........   39
   2.  2011 Performance Review
5      and 2012 goals ................   40
6  NEW BUSINESS
   1.  Secretary-Treasurer's Report ....  43
7  2.  City of New Orleans
       Wisner Grants..................   50
8      Update on valuation of
       Wisner Property ...............   53
9  3.  BP Deepwater Horizon Update
       a.  Waltzer & Wiygul ...........   57
10     b.  First Amendment to
           Access Agreement ...........   59
11     c.  Proposed Tilling
           on Wisner property ..........  58
12     d.  Ongoing SCAT and
           Clean-up Operations ........   59
13     e.  Wisner Expert Team
           Meeting; June 2012 ..........  59
14 4.  Wisner Beach Update
       a.  Caminada Headlands Project ..  59
15     b.  Geotube Project
           Update (Terracon)...........   60
16     c.  Review of Current
           Access Agreements ..........   62
17     d.  SLBDD .....................   63
   5.  Update on 2012 Legislative
18     Session .......................   67
   6.  Bankston Fishing Lease
19     Renewal and Noel Pilie
       Duck Camp Lease Renewal ........   76
20 7.  Update Global Geophysical Proj..   61
   8.  LUMCON Camp Damage/Update ......   90
21 9.  Chevron Consent to Sublease
       to Energy XXI Pipeline;
22     Chevron Meeting to Review All
       Land Rights/Bay Marchand Field.   100
23 10. Manti Division Order and
       Request to Assign Interest in
24     CNO#1 Well....................   106
   11. Next Meeting; June 26, 2012 ....  123
25
```

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 4

```
 1                  M O T I O N S
                                        PAGE
 2    MOTION by Michael Peneguy
        to continue to prepare minutes
 3       the same as we are at the
         present time
 4    SECONDED by Ed Buddy
 5    MOTION FAILED (2:2) ...............  28

 6    _____

      MOTION by Michael Sherman
 7      to approve preparation of minutes
        in conformity with Robert's Rules,
 8      free of additional information
        and/or commentary on what was said,
 9      but to stick to what happens at mtgs.
      SECONDED by Anthony Lorino
10    OPPOSED BY ED BUDDY
      OPPOSED BY MICHAEL PENEGUY
11
      MOTION FAILED (2:2) ................  29
12    _____

13    MOTION by Michael Sherman
        to provide the minutes with basic
14      information in them, and anyone that
        wants a transcript is entitled to
15      have one, and it shall be prepared
        at the request of someone
16    NO SECOND
17    MOTION WAS LOST ...................  33

18    _____

      MOTION by Michael Sherman
19      for preparation of minutes with
        actions taken; everyone is
20      entitled to an audio CD, should
        they request it
21    SECONDED by Dr. Everett Williams
22    MOTION PASSED (3:2) ...............  37

23    _____

      MOTION by Michael Peneguy
24      to enter brief Executive Session
      SECONDED by Ed Buddy
25
```

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 5

```
 1    MOTION by Michael Peneguy
       to approve Secretary-Treasurer's
 2      Report, with additional expenses
      SECONDED by Dr. Everett Williams
 3
      MOTION PASSED (Unanimous) .......   49
 4
 5    MOTION by Michael Peneguy
       to renew Bankston Fishing leases
 6    on same general terms, 5 years;
       per acreage charge to be equal
 7    on both leases; split the difference
       between $1.77 and $2.49
 8    SECONDED by Ed Buddy
 9    MOTION PASSED (Unanimous) ........   88

10
      MOTION by Michael Peneguy
11     to approve assignment
        with the changes, with
12      everybody signing;(Chevron/Energy XXI)
       Make change from TX to LA
13    SECONDED by Dr. Everett Williams
14    MOTION PASSED (Unanimous) .......   106

15
      MOTION by Michael Peneguy
16     to approve/authorize signing
       Manti Division Order/W9
17    NO SECOND
18    MOTION WAS LOST .................   108

19
      MOTION by Michael Peneguy
20     to enter Executive Session
      SECONDED by Dr. Everett Williams
21
      MOTION PASSED(Unanimous) .......... 123
22
23    MOTION by Ed Buddy
       to adjourn
24    SECONDED by Michael Peneguy
25    MOTION PASSED ................... 124
```

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 6

```
 1              P R O C E E D I N G S
 2         MR. SHERMAN:  Today is Tuesday, May 29.
 3    Our first item on the agenda is old
 4    business.
 5              Let me thank everyone for giving
 6    me an extra month on the February 28th
 7    minutes.  There were several things I
 8    disagreed with,  that I indicated I think
 9    were taken out of context or didn't
10    accurately reflect what happened at the
11    meeting, and I think I found a much better
12    solution, and I want to share that with
13    everyone, because -- Amanda, are you the one
14    that drafts the minutes, generally?
15         MS. PHILLIPS:  Both.
16         MS. NORMAN:  We both do.  It depends on
17    how busy we are.
18         MR. SHERMAN:  Well, there's clearly an
19    intent in the minutes, the way I perceive
20    it, to document what was said at the
21    meeting.  So when you look at the different
22    line items, "Mr. Sherman said," "Mr. Peneguy
23    said," "Mr. Peneguy asked," "Mr. Buddy
24    stated," "Mr. Averill interjected" -- and
25    we're required, under our bylaws, to conduct
```

1    our meeting in accordance with Robert's

2    Rules.  And I pulled a copy of our bylaws

3    and pulled a copy of Robert's Rules, and I

4    think, if folks would agree with me, this

5    might solve some of the issues I have.

6            But Robert's Rules states, "Not

7    only is it not necessary to summarize

8    matters discussed at a meeting, in the

9    minutes of that meeting, it is improper to

10   do so.  Minutes are a record of what was

11   done at a meeting, not a record of what was

12   said."  "Minutes are a record of what was

13   done in a meeting, not a record of what was

14   said."

15           So I would offer two separate

16   things, and I would look forward to

17   everyone's input.  I feel, upon reviewing

18   all three of those meetings, you don't get

19   the full context for how comments were made.

20   There are certain excerpts, there are

21   quotations, there's different things pulled

22   out, and I don't think that's an accurate

23   reflection of the discourse, so I would one

24   of two things.

25           First of all, I think we need to

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 8

1    do minutes in accordance with Robert's Rules

2    of Order, which we're required to do, by the

3    bylaws.  If there is, on this committee, a

4    feeling that we want to do transcripts of

5    every single committee hearing, I'm okay

6    with that, but I want everything on the

7    record.  Let's do everything or nothing.

8    Let's just not pick out whatever excerpts

9    happen to make it into the minutes.

10            So with that, I would be happy to

11   either do a transcript of everything, like a

12   court proceeding or a deposition, or just

13   minutes, or both of those.

14            I can tell you, from my

15   perspective, I don't see a need for a

16   transcript.  I think a transcript probably

17   makes people more guarded and inhibits our

18   ability to have a good, free discussion, to

19   build upon each other's ideas, to brainstorm

20   or do what's in the best interest of the

21   donation.  I think people would be more

22   guarded and that would inhibit the flow of

23   meetings.

24            But, again, if folks want a

25   transcript, let's do it.  But I'm not

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 9

 1    comfortable with minutes that are

 2    semi-quotations and don't follow our rules,

 3    so --

 4         MS. PHILLIPS:  May I ask a question?

 5         MR. SHERMAN:  Yeah, please.

 6         MS. PHILLIPS:  Because in the last

 7    meeting, there were several points where you

 8    said you wanted, on the record, things that

 9    were said.

10         MR. SHERMAN:  That's right.

11         MS. PHILLIPS:  Do you want that

12    continued or not?

13         MR. SHERMAN:  So if we agree to just do

14    regular minutes, the way Robert's Rules

15    require, we don't need any of that stuff on

16    the record, unimportant.

17              But since the minutes have been

18    taking the form of quotes that were

19    excerpted and things were put in the

20    minutes, well, then, I do want those things.

21    But I think we've got to do a transcript of

22    everything or do nothing at all.

23         MS. NORMAN:  And may I say that, you

24    know, the minutes have gotten much more

25    intense, because there have been a lot of

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 10

1    intense issues dealt with over the past two

2    years.  And, boy, I would much prefer to

3    just say, "This was the order of the

4    business, we discussed X, Y, Z; motion

5    passed," done, and that is really, you

6    know -- for us, that would be much easier.

7              But I will point out that we do

8    record the minutes and we do retain a disk

9    with all the information in the file for

10   that meeting, and I think we're required to

11   keep that recorded transcript for two years,

12   so -- and we'll continue to do that, so that

13   if there is a question that's raised in the

14   future, we can go back to it.

15        MR. SHERMAN:  Perfect.

16        MR. MICHAEL PENEGUY:  And one question

17   along that line basically.  There's some

18   things that are really discussed in detail,

19   and sometimes we need that detail, in the

20   future, to refer back to what went on, and

21   the only option is to go with the tapes, and

22   I have a question as to whether it is a good

23   idea to change what we're doing now versus

24   relying strictly on tapes for the

25   discussions.

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 11

1          I mean, I'm not sure that Robert's

2     Rules of Order don't provide what we've

3     provided.  Because I do the minutes for an

4     organization in pretty much the same -- I

5     handle it the same way because of Robert's

6     Rules of Order.

7          MR. SHERMAN:  To the extent that it's

8     helpful, I will pass out just the excerpts

9     just so you can see what I'm saying.  And

10    these are just excerpts taken directly from

11    Robert's Rules of Order, and it's the

12    current edition, the 11th Edition, and it

13    says, "Not only is it not necessary to

14    summarize the matters discussed in the

15    meeting, in the minutes of that meeting, it

16    is improper to do so.  Minutes are a record

17    of what was done at the meeting, not a

18    record of what was said."

19          So, again, I would suggest, if you

20    feel that we want that transcript, I would

21    be in support of that.  If we're not going

22    to do a transcript, then I'm not comfortable

23    with the quotations or excerpts.  Any other

24    thoughts?

25          MR. BUDDY:  Well, quite frankly, from

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 12

1    my standpoint, I don't think there ever has

2    been an issue, in the last five or six years

3    that I've been in the meetings, with the way

4    the minutes are taken, No. 1.  And, No. 2,

5    the fact that, at the next meeting, you

6    always can come back in and change or amend

7    if something was not right, or wrong.

8              The other issue I would have, too,

9    is the fact that I like the additional

10   information.  While Robert's Rules is just

11   general -- I mean, are very specific,

12   sometimes it leaves out some of what was

13   said, some ideas, objections.  So I'm

14   inclined to think, if I had to vote, I would

15   say I would leave it like it is.

16        MR. SHERMAN:  Any more thoughts?

17        MS. GERHOLD-MARVIN:  I agree with Ed

18   Buddy.

19        MR. LORINO:  Well, my view is, I think

20   it should be "either or," as well.  I find

21   that something that is near a recording is

22   not quite right.  I mean, either it should

23   be the total transcript or not.  And if it's

24   not the transcript, then I do believe you

25   just need summarized minutes with what was

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 13

1     approved.  I find the combination's lacking,

2     because it doesn't have everything.  It

3     either needs to have everything or do the

4     summarized version.

5          MR. BUDDY:  And really, we do have

6     everything, because if there's an objection

7     or something we feel can't be resolved, you

8     always can go to the tapes.  I think,

9     just -- you could look at the minutes we

10    take, as a highlight, or a recap, or just a

11    general synopsis.  I don't think it's

12    supposed to be all inclusive.  But it gives

13    you a quick overview, other than the fact

14    that you've got to go back to the tapes.

15             I don't see why it's got to be

16    "either or" since we have the actual

17    transcript -- or the tapes, that if there's

18    a question, we always -- that will be

19    concrete.

20         MR. MICHAEL PENEGUY:  Basically, I get

21    a lot of questions from the family when I

22    send out the minutes to one person, and then

23    the rest of them get it in the packets, but

24    they tend to want the emphasis and what's in

25    here, and then they'll ask me questions

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 14

1   about what -- you know, what this meant, and
2   so on and so forth.  But they tend to
3   believe that, you know, basically they get
4   the information they need now, versus a
5   summary, which, you know, would generate a
6   lot more questions.
7        MR. SHERMAN:  Well, if you think they
8   need more information, let's do a
9   transcript.
10       MS. NORMAN:  Well, I have to say that,
11  you know, I'm not a court reporter, and
12  neither is Amanda, and doing a transcript
13  makes things a little complicated for us, --
14       MR. SHERMAN:  Sure.
15       MS. NORMAN:  -- because you talk about
16  time-consuming.  I mean, we -- we are not
17  writing these out verbatim, but we're trying
18  to --
19       MR. MICHAEL PENEGUY:  Get most of it.
20       MS. NORMAN:  -- get most of it.  And as
21  it is, because there have been so many
22  questions raised later about the manner in
23  which we're conducting business, and there
24  are a lot of very sticky issues, we've been
25  trying to be as accurate as we can.  But we

Page 15

```
 1   are not court reporters, especially not me.
 2   Amanda's more so than I am, but I am not a
 3   court reporter.  My typing skills are
 4   adequate.
 5        MR. LORINO:  Well, couldn't you do
 6   summarized minutes and then have the tape
 7   sent out for transcription services?
 8        MS. PHILLIPS:  We could do that.
 9        MR. LORINO:  And then you could make
10   that available to whoever needs it.
11        MS. NORMAN:  I don't know what that
12   would cost.
13        MR. MICHAEL PENEGUY:  I don't either.
14        MS. NORMAN:  But how are they going to
15   identify who's who, on the transcript?
16        MR. MICHAEL PENEGUY:  Right.  We don't
17   say our --
18        MS. NORMAN:  We don't identify
19   ourselves necessarily all the time.
20        MS. PHILLIPS:  Right.
21        MR. MICHAEL PENEGUY:  I don't say, "I'm
22   Mike Peneguy; this is what my comment is."
23        MR. SHERMAN:  I will be happy, as
24   chair, to make sure I identify who's
25   speaking at every moment, just like you do
```

Page 16

1   in a deposition.  It would be several

2   hundred dollars.

3        MR. MARK PENEGUY:  It's really sad we

4   have to go to this where we have to worry

5   about what's happening.  And I tell you, the

6   only time we've ever had to do that is with

7   the City.  We don't have that problem with

8   the other members.  It's the City that

9   nobody seems to trust, and I think -- well,

10  I don't trust, I'll tell you that, flat out.

11  I don't trust the City.  And so I think that

12  every time the City speaks, we have to have

13  it on the record -- we have to have it on

14  the record, because we know the City changes

15  its story from one week to the next.

16       MS. NORMAN:  I mean, honestly, I think

17  it would be cheaper to just take the disks

18  and make recordings of the disks and send

19  them out to people.  That would be cheaper

20  than having them transcribed.

21       MS. PHILLIPS:  Yeah.

22       MS. NORMAN:  Anyone who wants to listen

23  to it and wants a copy of the recording can

24  get a copy of the recording.

25       MR. MICHAEL PENEGUY:  Yeah.  The only

1    problem with that is, basically, you send a

2    package out to some of the family members

3    and you'd have to include all of them.

4         MS. NORMAN:  Well, we'd send out

5    minutes, too, and if anyone requested more

6    information, we could send out a copy of the

7    CD.  I mean, CDs are a dime a dozen and

8    anyone who wanted to verify what was on that

9    recording could ask for it.  I mean --

10        MR. MARK PENEGUY:  It's okay with me.

11   I don't care.

12        MS. NORMAN:  You know, that's a --

13   that's a simple solution to that.  And in

14   particular, commuters, it would make

15   wonderful commuting information to listen

16   to.

17        MR. MICHAEL PENEGUY:  As long as you're

18   driving on a safe highway.

19        MR. SHERMAN:  Well, I'm offering a

20   peace branch to folks who want more detail

21   by agreeing to do transcriptions every

22   month.  Happy to do that.  Also, for folks

23   who feel like just a proper set of minutes,

24   more expedited, according to Robert's Rules,

25   would suffice, plus a copy of the audio

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 18

 1    transcript, also happy to do that.

 2            But, again, I want to assert that,

 3    right now, the three minutes we have before

 4    us, I do not feel fairly reflect the entire

 5    meeting.  They've got a lot of excerpts that

 6    I believe were taken out of context.  It's

 7    not fair really to --

 8        MR. MICHAEL PENEGUY:  Can you point out

 9    one that's taken out of context?

10        MR. SHERMAN:  Many of them are taken

11    out of context and --

12        MR. MICHAEL PENEGUY:  Well, that's -- I

13    disagree with that basically, because I've

14    read through all of them and I couldn't find

15    anything that was really out of context.

16        MR. SHERMAN:  And we can agree to

17    disagree.  And if we have the transcript,

18    then everyone could draw their own

19    assumptions from the transcript.

20        MS. GERHOLD-MARVIN:  Well, where are

21    all these changes?  I mean, has he presented

22    these changes to you?

23        MS. NORMAN:  I haven't -- no, no.  And

24    actually, Mike, you did, at the last

25    meeting, indicate that you wanted to listen

1    to the February minutes, and now I'm happy

2    to put them on a disk and give them to you,

3    if you have three extra hours, which I'm

4    sure you don't have.

5        MR. SHERMAN:  I appreciate that, but

6    when I discovered the real source of the

7    problem, the source of my concern is not the

8    February minutes, per se.  It is the

9    every-month occurrence of minutes that are

10   composed of excerpts, "he said," "she said,"

11   "he asked," "he interjected."  It's excerpts

12   of a full meeting and it's not in compliance

13   with the Robert's Rules of Order, which we

14   adopted, and doesn't fairly and completely

15   reflect the entire meeting.

16           And what one person thinks is

17   important, someone else doesn't think is

18   important, and we should all be given the

19   opportunity of having everything available

20   to us if we want to draw our own

21   conclusions, or we should all have the

22   option just to work off of summarized

23   minutes.

24       MR. MICHAEL PENEGUY:  I thought that

25   was the purpose of approving the minutes,

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 20

1    basically, going over them before the

2    meetings and picking out anything that you

3    find wrong and --

4        MS. GERHOLD-MARVIN:  And changing it,

5    yeah.

6        MR. MICHAEL PENEGUY:  And changing it.

7        MR. SHERMAN:  And then we would spend

8    the first hour or two hours of every

9    meeting --

10       MR. MICHAEL PENEGUY:  No.

11       MR. SHERMAN:  -- not worrying about

12   what we're here to do, which is to make sure

13   this land is properly administered,

14   generating the maximum value for all the

15   beneficiaries, we'd start going back and

16   forth with a discussion, much more intense

17   than this one, about which line to add or

18   not to add.

19       MR. MICHAEL PENEGUY:  I don't think

20   that's the case.

21       MS. GERHOLD-MARVIN:  Well, we've never

22   really had that problem until --

23       MR. MICHAEL PENEGUY:  No.  Until now.

24       MS. GERHOLD-MARVIN:  Yeah.  Among many

25   other problems, but --

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 21

1       MR. SHERMAN:   And I'm raising it to the

2   group, and I would appreciate everyone's

3   consideration.  And for those who want more

4   information, I'm agreeing to give you

5   everything, a transcript.  The City will

6   support doing a transcript every month.  And

7   for those who are satisfied with just a more

8   expedited form of what happened at the

9   meeting, the City is happy to support that,

10  as well.

11      MR. BUDDY:   But don't we have that

12  anyway?

13      MR. MICHAEL PENEGUY:  Yes, we have that

14  now.

15      MR. SHERMAN:   I think that's absolutely

16  right, Mr. Buddy.  If we were to adopt the

17  method I'm suggesting, we would be able to

18  take these minutes, condense them to a much

19  more concise format that's easier to find

20  out what actions happened at every meeting.

21  We would have that document.  I think we --

22  what I'm recommending --

23      MR. BUDDY:   But you know -- but my

24  point is, that will just give you the

25  results.  That won't give you --

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 22

1        MR. MICHAEL PENEGUY:  Right.

2        MR. BUDDY:  -- what was said, what was

3    thought, what -- a different position.  It

4    doesn't give you the -- I guess, the --

5        MS. GERHOLD-MARVIN:  Details.

6        MR. BUDDY:  Yeah, the detail, or some

7    of the essence of the matters, the elements

8    of what went on in the meeting.  If I wanted

9    a more detailed, all inclusive, then I would

10   call Cathy and ask for transcripts.  So all

11   I'm saying is, I'm not seeing where, what

12   you're proposing, is actually needed,

13   because I think we already have it.

14       MR. SHERMAN:  If it would be -- it's

15   just a -- it's a huge exercise of time and I

16   don't think it's a productive use of time to

17   go through the entire transcript of one

18   month's meeting, compare it to the minutes,

19   and start pointing out when I said something

20   and then someone responded, and their

21   response wasn't included, or when a comment

22   was made that wasn't included in the minutes

23   that should be included in the minutes.  It

24   just -- it's not a full, complete recitation

25   of what everyone said.  There are some

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 23

1    things in there, some things not in there.

2    If we want everything that's said, let's get

3    everything that's said.  Let's put it in a

4    transcript.

5         MS. PHILLIPS:  Yeah, I just -- I'm not

6    arguing one way or the other.  I think that,

7    when the auditors come in, that the minutes

8    we've done in the past, they fully

9    appreciate, because they're able to see what

10   is going on and how -- because one of the

11   things that they check, in our financial

12   audit, is they look at our minutes and they

13   look to make sure that expenses that are

14   paid have been approved by the committee and

15   different things, and they have appreciated

16   the level of detail that's been in the

17   minutes, and that's just my --

18        MR. SHERMAN:  But that's great.  That's

19   the perfect point you just made.  Because

20   the proper minutes, according to Robert's

21   Rules, would have all the information, in

22   detail, that an auditor would want to see,

23   that a motion was put forward, approving of

24   a specific set of things; the committee took

25   action, what the vote was, and the auditor

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 24

1     would look and say, "the committee

2     considered, on this date."

3              Now, what's unimportant to the

4     auditor is, "I like this," "I don't like

5     this." "This is what the committee

6     proposed; this is what was done," and that's

7     what the auditor would need.

8              And these are very unique minutes.

9     I have -- we have 162 boards and

10    commissions, and I've looked through a whole

11    bunch of different minutes, and I've never

12    seen anything with quite this amount of

13    detail on the discussions.

14         MS. GERHOLD-MARVIN:  You haven't seen

15    mine.

16         MR. MICHAEL PENEGUY:  And you haven't

17    seen mine.

18         MS. GERHOLD-MARVIN:  You haven't seen

19    my minutes.  Same thing.  That's why it

20    takes me all day to do them.

21         MR. MICHAEL PENEGUY:  Yeah.

22         MR. MARK PENEGUY:  And this committee,

23    while it operates -- while it has approved

24    Robert's Rules, this is the way it's

25    operated for at least since the 1980s, when

Page 25

```
 1    I started coming, and it works this way for

 2    the members.  Now, perhaps, some members

 3    don't want it, but I think it seems to work.

 4    I know it works for the Wisner family.

 5        MR. SHERMAN:  What's the problem with

 6    getting a transcript every month?  That way,

 7    for folks who want the additional

 8    information, they get it.

 9        MR. MICHAEL PENEGUY:  I think, you

10    know, basically, if we're going to --

11        MS. NORMAN:  I don't know what the cost

12    is going to be.

13        MR. MICHAEL PENEGUY:  Yeah.  And I

14    would not turn it over to the City to carry

15    it out.

16        MS. NORMAN:  We'd have to hire an

17    independent person --

18        MR. MICHAEL PENEGUY:  Right.

19        MS. NORMAN:  -- to do the transcript or

20    bring someone in to sit in the meetings

21    and --

22        MR. MARK PENEGUY:  We just -- where

23    he's headed, we're headed to litigation, is

24    what I think he's trying to get at, so I

25    think that maybe what we need is to bring in
```

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 26

1   a stenographer to -- or a person who takes

2   depositions, and to do all this work.  I

3   think that's where we're headed.

4        MR. MICHAEL PENEGUY:  But we have the

5   tapes that do the same thing, so I don't

6   see --

7        MS. NORMAN:  That's why we record the

8   meetings, yeah.

9        MR. MICHAEL PENEGUY:  I think that

10  we --

11       MR. MARK PENEGUY:  Except for

12  identification purposes.

13       MR. MICHAEL PENEGUY:  Right.

14       MR. MARK PENEGUY:  And if we're going

15  to stop and identify everybody who's

16  speaking, these meetings will take five, six

17  hours.

18       MS. NORMAN:  Not necessarily.  I

19  disagree with that.  It would actually

20  make -- if people were to identify

21  themselves, or if Mike, as chair, would

22  identify people before they speak, it might

23  be helpful, as well.  So just even for us

24  doing the minutes, any way we do them.  I

25  don't think that would take that long.

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 27

1           MR. SHERMAN:   Yeah.   And I would also

2    maybe just try to find a compromise that

3    works for everyone here and --

4           MR. MICHAEL PENEGUY:   Well, my

5    motion --

6           MR. SHERMAN:   -- the first thing that I

7    think is important is that we have a proper

8    set of minutes that just simply discuss

9    actions, with no superfluous information,

10   and conforming with Robert's Rules of Order,

11   and that will be the first thing.

12          And then if I could bifurcate it,

13   if there's something else folks want, if

14   they want a separate document, that is, like

15   commentary to each of the agenda items

16   that's prepared by Amanda or Cathy, and

17   that's something they're requesting of

18   Amanda or Cathy, which is some commentary of

19   some sort, let's discuss what the commentary

20   that's necessary is, and let's just devise

21   some ground rules.   Is it everything anyone

22   says?   Is it every question asked?   Is it

23   every comment?   There's just too much

24   discretion here and it just fails to provide

25   an accurate survey of the entire meeting.

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 28

1      MR. MICHAEL PENEGUY:  Well, my motion

2    would be to continue as we are.  But I do

3    have a few small corrections to the minutes

4    that we have in front of us.

5      MR. SHERMAN:  We have a motion.

6      MR. BUDDY:  I second it.

7      MR. SHERMAN:  There's a second, so it's

8    time for discussion.  I would -- I would

9    oppose that motion.  I don't think that

10   keeps us in conformity with Robert's Rules.

11   I think it does not offer us an opportunity

12   to have a complete transcript or to have a

13   set of minutes that's free from excerpting

14   and paraphrasing, and I would ask my fellow

15   committee members to oppose that motion.

16     MR. MICHAEL PENEGUY:  The motion hasn't

17   been seconded yet.

18     MR. MARK PENEGUY:  Mr. Buddy did.

19     MS. GERHOLD-MARVIN:  Mr. Buddy did.

20     MR. MICHAEL PENEGUY:  Do you want to

21   take a vote?

22     MR. SHERMAN:  Is there any more

23   discussion?  All right.  We have a motion on

24   the table.  I've offered my logic opposing

25   it.  Who is in favor of the motion?

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 29

```
 1          MR. MICHAEL PENEGUY:  Aye.

 2          MR. BUDDY:  Aye.

 3          MR. SHERMAN:  Who's opposed?  Nay.

 4          MR. LORINO:  Nay.

 5          MR. SHERMAN:  Any abstentions?

 6               (Vote taken).

 7          MR. SHERMAN:  Okay.  The motion fails,

 8      2:2.

 9               I would make a motion, to start

10      off, that we approve a version of the

11      minutes, in conformity with Robert's Rules,

12      that is free of additional information or

13      commentary on what was said, but simply

14      sticks to what happened at the meetings.

15      That would be my motion.  Is there a second?

16          MR. LORINO:  I'll second it.

17          MR. SHERMAN:  The motion is seconded.

18      Is there any discussion?  I would ask for

19      folks to support this motion.  I think, at

20      the very beginning, this motion brings us

21      into conformity with our own bylaws, and I

22      would offer, as an olive branch, a peace

23      branch, to anyone who wants more

24      information, that we would support them,

25      support them in getting a transcript, or we
```

Page 30

1   can continue the discussion today, but my

2   motion is to start with what's in our

3   bylaws, what's in Robert's Rules already,

4   and that we reformat the minutes like that.

5   So any other discussion?  All in favor,

6   raise your hands.

7        MR. MICHAEL PENEGUY:  Looks like we've

8   got a stalemate.

9        MR. SHERMAN:  All of those opposed?

10       MR. MICHAEL PENEGUY:  Opposed.

11       MR. BUDDY:  Two.

12       MR. SHERMAN:  And abstentions?

13            (Vote taken).

14       MR. SHERMAN:  Okay, 2:2.  The motion

15   fails.

16       MS. PHILLIPS:  So what do I do?

17       MR. MARK PENEGUY:  It stays as is, it

18   seems.

19       MR. SHERMAN:  I guess, now we move on

20   to considering the approval of the minutes

21   for the February meeting.

22       MS. PHILLIPS:  Well, what do I do about

23   this meeting?

24       MR. SHERMAN:  I don't know.  I don't

25   know.  I would think that you have to

Page 31

1    default to what's required in the bylaws and

2    in Robert's Rules, because that is the

3    existing rules, as it's been pointed out.  I

4    suspect I have a couple of colleagues here

5    who would expect you to continue doing

6    something that I would say is not in the

7    bylaws or Robert's Rules, so -- perhaps you

8    should consult with Mr. Burton.

9        MR. BURTON:  I think you are in a

10   sandwich.

11       MR. SHERMAN:  Counsel, do you have

12   anything to add to our discussion about --

13       MR. BURTON:  The only thing I would

14   add, we have two motions and they've both

15   failed, so there has been no change in

16   the -- there has been no motion that has

17   passed to change the procedure.  Now, that

18   doesn't answer the question of whether the

19   procedures have been properly followed, in

20   the past.

21           I have certainly been familiar, in

22   the past, with some boards that did, in

23   fact -- I don't think it's a tremendous

24   expense -- bring in a court reporter, who is

25   certified, not answerable to any party in

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 32

1   here, but just to what was said, and provide

2   a transcript, and it would probably cost in

3   the range of several hundred dollars a

4   meeting, depending on how long the meeting

5   was and how many pages were involved, but

6   I -- there's been no motion that would

7   change any of the proper lawful procedures

8   of the committee, going forward.  Both

9   motions failed, so we're exactly where we

10   were when we started that.

11        MR. SHERMAN:  So, I guess, as chair, my

12   request to you would be -- and do you have a

13   copy of that -- to look at our existing

14   bylaws and to look at Robert's Rules of

15   Order, which we've adopted and are required

16   to follow, and perhaps provide us your own

17   interpretation that you can provide by next

18   month, to Cathy and Amanda, that would tell

19   us the form of minutes.

20            It's my assertion that there is a

21   right and a wrong form, as required by the

22   bylaws.  Dr. Williams, if you want to be the

23   voice of reason or offer any compromises,

24   we'd certainly look forward to your wisdom,

25   but I don't want to --

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 33

1        DR. WILLIAMS:  It just seems to me that

2   we're all dealing with something that's

3   senseless.  I certainly would be in favor

4   of -- I wouldn't mind if we followed the

5   rule and only used the information, leave

6   all the extraneous stuff out altogether, and

7   if someone would want more information,

8   we've got the transcript, let them request

9   the transcript.

10       MS. NORMAN:  Well, or a copy of the --

11  a CD of the meeting.

12       DR. WILLIAMS:  Yeah, that seems to

13  be --

14       MS. NORMAN:  Which is a lot less

15  expensive than a transcript.

16       MR. SHERMAN:  I would absolutely

17  support that, so that folks can get whatever

18  information they needed.  I will take the

19  middle ground that you suggest and form that

20  into a motion, which is, we provide the

21  minutes with basic information in them and

22  anyone that wants a transcript is entitled

23  to have one, and it shall be prepared, at

24  the request of someone.

25       MR. BUDDY:  So what's your

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 34

1    interpretation of "basic information"?

2         MR. MICHAEL PENEGUY:   That's where you

3    get into a problem.

4         MR. SHERMAN:   The actions taken.

5         MR. MICHAEL PENEGUY:   That's where you

6    get into a problem.

7         MR. LORINO:   With just the actions?

8         MR. SHERMAN:   Just the actions.

9         MR. BUDDY:   Basic information.

10        MR. MICHAEL PENEGUY:   Well, the only

11   problem with that is you get into

12   interpretations with all that, because you

13   have to explain -- for instance, if somebody

14   objects, if they give a reason for an

15   objection, they've got to have that, if

16   they --

17        MR. MARK PENEGUY:   I think you're going

18   to need to have a court reporter in here,

19   because we can't ask Cathy and Amanda to

20   create --

21        MR. MICHAEL PENEGUY:   Right.

22        MR. MARK PENEGUY:   -- a detailed

23   transcript of these meetings.   That just

24   doesn't make sense.   You might as well just

25   call the court reporter in and get them

Page 35

1  started and have them here every meeting.

2  That's the only way we're going to get this

3  done.

4      MR. SHERMAN:  I think that's what

5  Dr. Williams' suggestion is, that everyone's

6  entitled to that information, should they

7  want one, and they can certainly have that

8  request.

9      MR. MARK PENEGUY:  Well, I don't think

10  there's a problem with people being entitled

11  to it.  I think the problem is the amount of

12  work --

13      MR. MICHAEL PENEGUY:  Work.

14      MR. MARK PENEGUY:  -- that you're

15  asking Cathy and Amanda to do if somebody

16  requests a transcript.

17      MR. MICHAEL PENEGUY:  And then on top

18  of that --

19      MR. MARK PENEGUY:  And if you're going

20  to get a transcript, then I think you might

21  as well just start with the court reporter

22  at these meetings, every meeting, taking

23  down everything that's said by everybody

24  and -- because that's where we're headed.

25      MR. MICHAEL PENEGUY:  Yeah.

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 36

1        MR. MARK PENEGUY:  These have worked.

2        MR. MICHAEL PENEGUY:  And that gets

3    expensive.

4        MR. MARK PENEGUY:  If this doesn't work

5    for the City, I don't know what to say.  I

6    would suggest that you make the motion to

7    alter these so that it does work for the

8    City.  Or, perhaps, maybe have Cathy and

9    Amanda make these up and then do a separate

10   set of minutes that makes the City happy,

11   and is part of the record.

12       MR. SHERMAN:  Dr. Williams, I want to

13   make sure I properly -- I thought you

14   offered a good middle ground.  I want to

15   make sure I properly recite that.  Would you

16   help me make sure I said that right, which

17   is --

18       DR. WILLIAMS:  Just like I said,

19   just -- do just the minutes, where actions

20   are taken, that's it.  Anybody else who

21   wants anything else, let them get a

22   transcript.  Let them get a CD.

23       MS. NORMAN:  A CD.

24       MS. PHILLIPS:  A CD, and not

25   transcribed.

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 37

1        MR. SHERMAN:  So I would put that into

2    a motion, a set of minutes, with actions

3    taken.  Then everyone is entitled to a CD,

4    should they request it, with the audio on

5    it.  I'll make that as a motion.

6        DR. WILLIAMS:  Second.

7        MR. SHERMAN:  We have a motion and a

8    second.  All those in favor?  Aye, three

9    votes.  All those opposed?  Two votes.  So

10   the motion carries.  All right.  So --

11       MR. MICHAEL PENEGUY:  Can we handle

12   these minutes the way they are right now,

13   rather than try to go back and change all

14   these minutes to go like you want?  Because

15   that's more work for Cathy and Amanda right

16   now if you just throw these minutes out.

17       MR. SHERMAN:  I would -- I appreciate

18   that thought, but let me suggest this.  I

19   think all of the actions taken are actually

20   in these minutes, so I think the exercise

21   that we'd be asking Cathy and Amanda to do

22   is actually not a herculean task, because

23   it's simply excerpting from the --

24       MS. NORMAN:  Deleting.

25       MR. SHERMAN:  -- actions in here and

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 38

1   taking the commentary out.  So I'd prefer

2   that we move on to new business and we come

3   back to the minutes next month.

4        MR. MICHAEL PENEGUY:  We'll be doing

5   that every month.

6        MS. PHILLIPS:  So you're asking that we

7   rewrite the minutes that are before you all?

8        DR. WILLIAMS:  No.  You're talking

9   about going forward, right?  You're not

10  talking about going back --

11       MS. NORMAN:  No.

12       DR. WILLIAMS:  -- and redoing all these

13  minutes?

14       MS. NORMAN:  Well, --

15       MR. MICHAEL PENEGUY:  Well, that's my

16  question.

17       MS. NORMAN:  Well, no, no, no.

18       MR. SHERMAN:  Cathy, how much work is

19  it just to excerpt these?

20       MS. NORMAN:  No, I -- listen, he wants

21  us to go back in and -- just go in and

22  delete the stuff that seems extraneous, in

23  these minutes, and that is not that big a

24  deal, to go and do that, and we will have

25  both forms of these for those who want it.

Professional Shorthand Reporters, Inc.                1-800-536-5255
Offices in New Orleans and Baton Rouge                www.psrdocs.com

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 39

1   You've already gotten them.  We'll produce a

2   new form, in accordance with what was voted

3   on by the committee today, and anyone who

4   ever wants a CD, call me; we have them.  We

5   can burn a CD and put it in the mail to you

6   and you can listen to every word.

7        MR. MICHAEL PENEGUY:  Okay.

8        MR. SHERMAN:  Thank you.

9        MR. MICHAEL PENEGUY:  On the April 24th

10  minutes, I'd like to point out one thing.

11       MS. NORMAN:  Okay.

12       MR. MICHAEL PENEGUY:  The last page,

13  Line 22, where there's a motion to exit the

14  Executive Session.

15       MS. NORMAN:  Uh-huh.

16       MR. MICHAEL PENEGUY:  There was no

17  Executive Session -- no vote for an

18  Executive Session.  We mentioned it in the

19  front part, but we didn't have to have a

20  second.

21       MS. NORMAN:  Oh, okay.  That's right,

22  it was an Executive Session, right, okay.

23       MR. MICHAEL PENEGUY:  So I guess we're

24  finished with the minutes.

25       MS. NORMAN:  Well, no, we weren't.  All

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 40

1    right.  What about any of the other minutes?

2    Are there any other comments that --

3    substantive comments that need to be

4    changed?

5        MR. MICHAEL PENEGUY:  All I saw was

6    that little bitty place there.

7        MS. NORMAN:  Okay.  So we'll redo these

8    and get the rest of them to you prior to the

9    next meeting.

10       MR. SHERMAN:  All right.  2011

11   performance review and 2012 goals.  This is

12   a continuation from last month.  And I don't

13   see "Executive Session" on here.  Is it

14   inappropriate to go into a brief Executive

15   Session?  Yeah, okay.  I'd make a motion

16   that we go into a brief Executive Session,

17   just to regroup.

18       MR. MICHAEL PENEGUY:  Can the chairman

19   make the motions?  Because I'll be glad to

20   make that motion.

21       MR. SHERMAN:  Please, go ahead.

22       MR. MICHAEL PENEGUY:  I move that we go

23   into Executive Session.

24       MR. SHERMAN:  Motion.

25       MR. BUDDY:  Second.

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 41

1        MS. NORMAN:   Does that mean you want us

2    to stay or leave?

3        MR. SHERMAN:   I think, just for a brief

4    minute, probably leave, like you did last

5    month.

6        MS. NORMAN:   Okay.

7        MR. SHERMAN:   We have a motion and a

8    second.   All in favor?

9            (Vote taken).

10       MR. SHERMAN:   Hearing no opposition,

11   we'll go into a brief Executive Session.   So

12   the motion passes.

13           (Executive Session took place).

14       MR. SHERMAN:   We have a separate issue

15   we can talk about offline that Mr. Burton is

16   going to look into --

17       MS. NORMAN:   Okay.

18       MR. SHERMAN:   -- that's regular --

19   regarding how we classify those BP claims.

20       MS. NORMAN:   Okay.

21       MR. MICHAEL PENEGUY:   And he may need

22   the committee minutes.   I think it was

23   September of 2010 --

24       MS. NORMAN:   Okay.

25       MR. MICHAEL PENEGUY:   -- where we made

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 42

1    the resolution --

2         MS. NORMAN:  Okay.

3         MR. MICHAEL PENEGUY:  -- about the BP

4    stuff.

5         MR. SHERMAN:  And then on June 7th,

6    from 2:00 to 4:00, we're going to have our

7    first Employee Validation Committee meeting

8    to start setting goals for 2012.

9         MS. NORMAN:  Okay.

10        MR. MICHAEL PENEGUY:  That will be

11   subcommittees, right?

12        MS. NORMAN:  Subcommittees.

13        MS. PHILLIPS:  Do you all need us to

14   make an appointment for the room?

15        MR. SHERMAN:  Yeah.  We'll follow up on

16   that.

17        MS. PHILLIPS:  Okay.

18        MR. SHERMAN:  Okay.

19   Secretary-Treasurer's Report.

20        MS. NORMAN:  All right.  Let's get

21   re-engaged here.  Hold on.

22        MR. SHERMAN:  Let me ask, what time --

23   is everyone comfortable till 3:00 p.m.

24   today?

25        MS. NORMAN:  Yeah.  And I think we can

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 43

1    get through everything.  There's not a huge

2    amount of stuff that we need to cover, but

3    there are just a lot of issues and

4    information that I need to impart, because

5    there's been a lot going on.

6        MR. SHERMAN:  Have you been accused of

7    being an optimist ever?  Sometimes it's

8    difficult.

9        MS. NORMAN:  Oh, that's right, we

10   haven't gone to that yet.  Okay.  Two

11   expense accounts, $117.70 for me and $22.25

12   for Amanda.

13           Going through the

14   Secretary-Treasurer's Report, there's a few

15   articles to read.  There were some tracts

16   nominated in Lafourche Parish, and I put --

17   I attached a map.  Most of these are

18   along -- near the town of Leeville and

19   they -- if you look at the northwest corner

20   of our property, and they're getting very

21   close to us, some of the tracts nominated,

22   and I just wanted the committee to be aware

23   that -- I don't know whether this ties into

24   the City of New Orleans' well, which is up

25   in that area, but they are nominating

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 44

1    property in that area, and we need to watch,

2    after this sale comes up, to see if anyone

3    bids on them.

4        MR. MICHAEL PENEGUY:  Here's a map

5    showing exactly where the --

6        MS. NORMAN:  The tracts are?  Okay.

7        MR. MICHAEL PENEGUY:  The two closest

8    ones there, I've marked in red.

9        MS. NORMAN:  Okay.  Thank you for that,

10   Mike.

11       MR. MICHAEL PENEGUY:  That way, if you

12   want to look at it.

13       MS. NORMAN:  There is a huge meeting

14   here on Monday, June 25th, called The State

15   of the Coast.  I have signed up to attend.

16   Our meeting is that Tuesday, and it all

17   worked out pretty well, in that there

18   weren't very many sessions that were real

19   important for me to attend on that time,

20   so -- it should be interesting.  They're

21   going to be discussing a lot of the coastal

22   issues relating to south Louisiana, and it

23   should be a very interesting program.

24            Tied in with that, Jeff Williams,

25   who is our coastal geomorphologist, who's

1    working with us on our BP claim, is coming

2    in to attend that conference, and we are

3    going to tie that in to several days of

4    meetings later in that week, with John

5    Pardue and Jeff Williams, and Waltzer and

6    Wiygul, to evaluate all the materials we've

7    gotten from BP, in our Partial Motion for

8    Summary Judgment, so we can kind of look at

9    it and have a team meeting to determine how

10   the proposed global settlement affects

11   Wisner.

12       MR. MICHAEL PENEGUY:   Looking at that

13   information, as the attorneys mentioned, are

14   we going to -- it's going to take several

15   days to look at all this stuff.

16       MS. NORMAN:   Well, -- oh, no.   All the

17   information we've gotten, one of the first

18   of things that we're going to be doing is

19   forwarding it up to Aero-Data, who has all

20   our aerial photography, and try and

21   incorporate at least -- what we want are

22   some really, really good working maps, --

23       MR. MICHAEL PENEGUY:   Yeah.

24       MS. NORMAN:   -- showing areas that --

25   where intensive digging was done, looking at

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 46

1    the aerial photography, over two years, to

2    see if those areas were more adversely

3    affected, looking at the areas where we've

4    found contamination, putting it all on some

5    really good maps, and kind of going through

6    the data between now and then so that we can

7    have a good working meeting.  I think Robert

8    Wiygul said we're basically going to lock

9    Jeff Williams in a room for two days and

10   have him go to work, so -- but that's going

11   to be --

12        MR. MICHAEL PENEGUY:  He's going to

13   feed him lunch?

14        MS. NORMAN:  Yeah.  That's going to be

15   coming up.  We had a request from the Golden

16   Meadow Fourchon International Tarpon Rodeo.

17   We have sponsored Chris Moran in the tarpon

18   rodeo in the past.  I'm not real happy with

19   Chris Moran, who runs this, and now runs the

20   big marina, in Fourchon.

21        We've had several people

22   trespassing on the property, in airboats and

23   on other boats, particularly night fishing

24   in airboats, with bows and arrows, and all

25   of them say, "Well, Chris Moran said I could

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 47

1    do this out here."

2            And so at this point in time, I do

3    not recommend that we support this rodeo

4    just because I think that we don't want to

5    give him the idea that we allow all these

6    people -- because they take out -- they go

7    out of the Fourchon Marina, and I just don't

8    want them to think that we are going to

9    allow them to be out fishing and galavanting

10   around on Wisner property without our

11   permission.

12           We also, in looking at this, and

13   in talking to not only Mr. Green, who is

14   Mark's nephew, but to some other people that

15   I met recently, a guy from Chevron, they

16   have these big other fishing tournaments in

17   which they use --

18       MS. PHILLIPS:  Kayaks.

19       MS. NORMAN:  -- kayaks and canoes, and

20   a lot -- and just like the big Bayou

21   Segnette Bass Fishing Tournament, they have

22   absolutely no regard for private property --

23       MR. MICHAEL PENEGUY:  Yeah.

24       MS. NORMAN:  -- when they go out on

25   these, in fishing rodeos.  So it's something

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 48

1    that we -- we either need to be contacted by

2    these rodeos, sign an agreement and be held

3    harmless, or they shouldn't be fishing on

4    our property.

5        MR. MICHAEL PENEGUY:  Yeah.

6        MS. NORMAN:  So anyway, I put that in

7    there.  If someone thinks we should support

8    it, that's up to the committee.  I do not

9    recommend that we do.

10            Last is Chouest Port Services.

11   This involves a -- you know, just ongoing

12   expansion of Chouest, down in Port Fourchon,

13   and I just -- I get copies of the permits

14   that are issued, and I got a copy of this

15   one.

16            And I did have an opportunity, at

17   a social event, to meet Laney Chouest, and I

18   had a conversation with him.  I met him

19   through a mutual friend.  And it was a

20   pretty interesting conversation.  First

21   thing he asked me about was the extension of

22   the donation, oddly enough.

23       MR. MICHAEL PENEGUY:  Yeah, that's --

24       MS. NORMAN:  So the word is out there

25   and --

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 49

1      MR. MICHAEL PENEGUY:  That's everybody

2  is going to be asking that one for the next

3  year or so.

4      MS. NORMAN:  So anyway -- and that

5  pretty much is the end of my

6  Secretary-Treasurer's Report.

7      MR. MICHAEL PENEGUY:  Okay.  I move

8  that we approve the Secretary-Treasurer's

9  Report, with the additional expense

10  accounts.

11      DR. WILLIAMS:  Second.

12      MR. SHERMAN:  Motion is seconded.  Any

13  discussion?  All in favor?  Any opposed?

14          (Vote taken; Motion passed).

15      MS. GERHOLD-MARVIN:  I'm sorry, Cathy,

16  did you need some kind of a motion on this

17  tarpon rodeo?

18      MS. NORMAN:  Well, I mean, if someone

19  wants to make a motion on the tarpon rodeo,

20  you can, to support it.

21      MS. GERHOLD-MARVIN:  Oh, okay.

22  Otherwise --

23      MS. NORMAN:  We did not support it last

24  year, I don't believe.

25      MR. MICHAEL PENEGUY:  No.

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 50

1    MS. PHILLIPS:  No, but we ended up in

2    the book, because I think we supported it in

3    2010, and they canceled the rodeo, so they

4    ended up running something in the 2011,

5    given that we had given money in 2010.

6    MR. MICHAEL PENEGUY:  Yeah.  Last year,

7    I think, we had -- the BP stopped a lot of

8    what was going on and they didn't want

9    everybody out there.

10    MS. PHILLIPS:  Right, right.

11    MS. GERHOLD-MARVIN:  Oh, okay.

12    MR. SHERMAN:  All right.  Next up is

13    City of New Orleans report.  I'm pleased to

14    share with you information on additional

15    City grants that were issued.  I'll refer

16    everyone to one of my colleagues in the

17    mayor's office, who has all the information

18    on any grant, should anyone in the public be

19    interested, obviously, including any

20    Donation Advisory Committee member.

21        But, as you know, the City's

22    position, this committee is the advisory

23    committee to manage the plan, not any

24    beneficiary's use of their individual

25    beneficiary proceeds.  So I will share this,

Page 51

1   but I don't know if there's any discussion.

2   I think you'll agree, they're just

3   absolutely first-class organizations in our

4   City.

5        MR. MARK PENEGUY:  We can't tell,

6   because you never give us the background of

7   what these organizations are or what they're

8   doing with the money.  All you give us is a

9   list.

10       MR. MICHAEL PENEGUY:  Along that line,

11   have you gotten a copy of the statements

12   from the Wisner trust fund?

13       MR. SHERMAN:  So, again, I want to keep

14   this meeting focused on our core mission,

15   which is managing the assets of the land, so

16   one of my colleagues, Brooke Smith, manages

17   the City's use of its proceeds, as a

18   beneficiary, one of the five beneficiaries.

19   So the way we're going to move forward, from

20   the City's side, everything's open and

21   transparent.  We'll get everyone anything

22   they want.  You're welcome to come meet,

23   come make specific requests.

24           Brooke has that document, that

25   she's going to interact with anyone that

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 52

1   wants to see it, so anyone that's interested

2   in how the City spends any money whatsoever,

3   if you can't find it online, ask for it, and

4   we'll be happy to share it with you,

5   including any details you'd like, but I'm --

6   for this purpose, my role, as the mayor's

7   designee and chair of this committee, is to

8   do exactly what the settlement agreement

9   says, which is to manage this asset

10  properly, and that's what I'm going to

11  remain focused on here.  So with that

12  said, --

13      MR. MICHAEL PENEGUY:  Would you have

14  any objections to the Secretary-Treasurer

15  requesting statements from last October to

16  current date?

17      MS. NORMAN:  I think we have them all.

18  Don't we?  I mean, --

19      MR. MICHAEL PENEGUY:  No, we haven't

20  gotten them.

21      MS. PHILLIPS:  No, we haven't gotten --

22      MS. NORMAN:  Well, we've gotten these

23  two lists.

24      MR. MICHAEL PENEGUY:  No, what I'm

25  talking about --

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 53

1      MS. PHILLIPS:  No, he means the land

2   trust, the proceeds account.

3      MR. MARK PENEGUY:  No, no.  He's

4   talking about the proceeds trust account.

5      MS. NORMAN:  Oh, the proceeds account,

6   okay.

7      MS. PHILLIPS:  Yeah.

8      MR. SHERMAN:  You know, exactly, from

9   working with the City, what's most helpful

10  to anyone who wants to -- so why don't you

11  you -- we'll arrange a meeting for you and

12  Brooke, and anything that you want to report

13  back, that will be fine, but I don't want to

14  get distracted with how the City uses its

15  money, as a beneficiary, in this meeting.

16     MR. MICHAEL PENEGUY:  Well, I just want

17  to request that we get those statements,

18  because I think it's a function of the

19  committee to review those statements and

20  make sure everything's in line.

21     MR. SHERMAN:  Okay.  Next up is update

22  on valuation of the Wisner property.

23     MS. NORMAN:  And I don't have much to

24  report.  I have not heard back from Mike

25  Truax, and I have sent him -- and I don't

Page 54

1    know whether I need to start investigating,

2    looking for someone else to do that portion

3    of the work.  Of course, we did get the work

4    from Elston and Rogers, of $18,500, to do

5    the evaluation of the oil and gas portion,

6    and I have -- this is the second meeting

7    that I've informed Mr. Truax -- he sent me

8    his CV, which I gave out at the last

9    meeting, along with the list of cases that

10   he's worked on, legal cases, and, you know,

11   basically, I've asked him to just kind of

12   give us an idea of what he would recommend,

13   in our situation, the scope of work that he

14   would recommend, because he knows better

15   than I, and I have not heard back from him.

16            So there is another commercial

17   broker, industrial broker, that has been

18   calling me, over the years, always

19   constantly wanting to meet with me, but I

20   have no idea of how good his work is.  If

21   anyone else has a suggestion on someone else

22   that they can recommend to do this

23   evaluation, I would, you know, welcome that.

24            We have to have someone with a

25   strong industrial background, who has worked

Page 55

 1    in litigation, on expropriation of wetland

 2    areas, industrial areas, pipelines, that

 3    kind of work, and Mike kind of fits the

 4    bill, you know, completely, but --

 5          MR. MARK PENEGUY:  I have a friend who

 6    buys a lot of industrial property.  I'll ask

 7    him if he has somebody he can recommend to

 8    us.

 9          MS. NORMAN:  Okay.  I appreciate that.

10          MR. SHERMAN:  All right.  I'll just

11    add, I appreciate us making progress.

12    That's just the one piece of information the

13    mayor's trustee needs before we can be in a

14    position to ever make an ultimate

15    determination, in his view, on succession

16    versus disposition, so --

17          MR. MICHAEL PENEGUY:  And then the

18    other thing is basically we agreed to go on

19    a two-track basis to review the agreement

20    and everything and get ready for the

21    extension of the donation, but that got

22    sidetracked a little bit, and I'd like to

23    bring it forward.

24          MR. SHERMAN:  Well, Cathy, you

25    certainly have the authorization of the

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 56

 1    committee.  I know we are waiting on Roxanne

 2    Townsend's -- is it Roxanne or Kathleen

 3    Townsend?

 4         MS. NORMAN:  Roxanne.

 5         MS. PHILLIPS:  Roxanne.

 6         MS. GERHOLD-MARVIN:  What are we

 7    waiting on Dr. Townsend for?

 8         MR. SHERMAN:  I think Dr. Townsend's

 9    schedule, from what I understand, was the

10    toughest to coordinate.

11         MS. NORMAN:  For our next -- a meeting?

12         MS. GERHOLD-MARVIN:  For what?

13         MS. NORMAN:  A meeting about the

14    extension of the donation?

15         MS. GERHOLD-MARVIN:  Because I haven't

16    sent her over anything new.

17         MS. NORMAN:  No, we haven't -- I don't

18    think we've even discussed having another

19    meeting, have we, or --

20         MS. GERHOLD-MARVIN:  No.

21         MR. MICHAEL PENEGUY:  No, not recently.

22    But I know Tulane had some questions that

23    were basically on the agreement, the draft

24    agreement we have now, and I think we need

25    to start pressing toward that end, because

Page 57

1   this is 2012, and we've got, what, a year

2   and a half to go, not even a year and a half

3   to go, on the existing donation.

4       MS. GERHOLD-MARVIN:  We might not need

5   to have Dr. Townsend's coordination or

6   whatever, to be present at the meeting,

7   because we've already spoken with her.  We

8   know how LSU feels about it, and so I'll

9   just ask her if she feels like she wants to

10  be in on any of the meetings, but it might

11  not even be an issue.

12      MR. MICHAEL PENEGUY:  Okay.

13      MR. SHERMAN:  BP Horizon Deepwater

14  Spill Update.

15      MS. NORMAN:  I don't know -- yeah, I

16  guess we might want to go into Executive

17  Session to discuss a few of these things.

18      MR. BURTON:  Do you all need me for

19  anything further or --

20      MR. MICHAEL PENEGUY:  No.

21      MS. NORMAN:  No, I think that's --

22      MR. MARK PENEGUY:  Is there anything

23  else on the agenda for Mr. Burton?

24      MS. NORMAN:  No.

25      MR. MICHAEL PENEGUY:  Okay.  Thank you.

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 58

1        MS. NORMAN:   Thank you, Jim.

2        MR. SHERMAN:   Let's do this.   Why don't

3   we do this.   I think this doesn't change

4   your voting either.   Why don't we switch to

5   No. 5.

6        MS. NORMAN:   Okay.

7        MR. SHERMAN:   I'm sorry, No. 4, so we

8   can get everything done.

9        MS. NORMAN:   Okay.

10        MR. SHERMAN:   That way everyone doesn't

11   have to stay for Executive Session.

12        MR. MARK PENEGUY:   I'm not leaving

13   while the Executive Session's on anyway, so

14   it doesn't matter to me when you do it.   If

15   you all want to do it now, you might as

16   well.   I'll step out.   I still don't think I

17   should be required to, being a beneficiary

18   and an attorney for the Wisner family, but

19   if you all have me stepping out, I will, if

20   you're going into Executive Session, but --

21        MR. SHERMAN:   Well, shall we switch to

22   No. 4, Wisner Beach Update?

23        MR. MARK PENEGUY:   All right.

24        MS. NORMAN:   Okay.   Just to head

25   through what is going on, in terms of this,

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 59

1    the Caminada Headlands project extension was

2    approved and signed.  The meeting that they

3    originally planned to have about two weeks

4    ago, at the last minute, was canceled.  BP

5    said they had not yet assigned a project

6    manager to discuss the hard structure

7    removal, but we now have a meeting on

8    schedule for next Monday.

9            So I will be attending that

10   meeting next Monday, and they have a project

11   manager -- they have hired someone

12   completely separate to manage this project,

13   and then he's going to have two counterparts

14   below him, one who will deal with removal of

15   the hard structure, one who will deal with

16   clean-up, so -- but the meeting is going to

17   be in Baton Rouge.  It will be with CPRA, it

18   will be with the Governor's office, the

19   parishes, the state, everything, so I plan

20   to be there.

21            And the -- let's see, what else.

22   This is all stuff dealing with the BP stuff.

23   I'm sorry, Mike.  I'm out of order now.  And

24   I did include a copy of the agenda for that

25   meeting next Monday, June 4th.

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 60

```
 1              There was an article in the Daily
 2    Comet about the lingering oil limiting the
 3    restoration.  I also included the site
 4    investigation report from Terracon.  This is
 5    the group that did the hole borings below --
 6    I mean, in front of the boudin bags, before
 7    they put this GeoTube project in, and it's
 8    interesting that their findings -- they did
 9    find oil, but the findings that they have
10    found is it's within the limits of a beach
11    that is not an amenity beach.
12              And that's just interesting, once
13    again, because we have the Parish of
14    Lafourche constantly stating that they want
15    this to be a public beach and they want
16    public access and they want people to be
17    able to use it, and yet the clean-up
18    standard that is being used by BP, and the
19    clean-up standard that is being used by the
20    Port of Fourchon, before they do this
21    GeoTube project, is not an amenity beach.
22    So that, in and of itself, creates a bit of
23    a problem.
24              Access agreements.  I kind of
25    wanted to just go through which access
```

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 61

1    agreements are current, on the beach.  We

2    have the Conservian access agreement for

3    four months.  That is a bird research access

4    agreement.  The same with BTNEP.  That's a

5    five-month access agreement, on the beach.

6    These have all been executed.

7            Global Geophysical is doing the

8    geophysical work on the beach.  That work

9    has begun, and hopefully will continue to

10   proceed.  It seems to be going very well.

11   Forrest seems to have a very good

12   relationship with them.  It's very different

13   from the way they used to do seismic.

14           The last time we had seismic shot

15   on this property, we ended up in a lawsuit

16   due to damage.  They no longer dig holes and

17   put dynamite down holes.  They use sounding

18   from offshore and they use -- they just put

19   a pole in the ground and hang a receiver on

20   it.  And I actually included a copy of what

21   these receivers look like, yeah.

22           We had two one-day access

23   agreements, very short access agreements,

24   with C & C Technology and SJB that have

25   been -- they've come and gone.

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 62

1        We have a new request for an

2   access agreement from a company called

3   Energy XXI.  They want to come in and check

4   out a pipeline, but I did not -- they called

5   me last week and I told them they had to

6   wait until we did give a -- get the approval

7   to sublease from Chevron, which had not

8   been -- I hadn't even received the paperwork

9   until about two weeks ago.

10       There's an anticipated servitude

11  to the port for the GeoTube project, and I

12  attended the South Lafourche Beach Front

13  Development District Meeting.  Basically,

14  Loulan Pitre, who is the attorney for them,

15  told a very unhappy group that it was

16  doubtful that anyone could get on the beach

17  until after this project is built.  At that

18  time people on the committee said, "Well,

19  then will we be able to drive on this

20  property after that?"  He said, "We will

21  have to apply for a permit for access."

22       And if you read the law, the law

23  says, basically, that you can apply for a

24  permit for limited access.  Well, limited

25  access doesn't mean public access, at least

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 63

1    in my eyes, and that's an argument we're
2    going to use, as we move forward.
3         MR. SHERMAN:  What's the citation of
4    the law?  Do you have that handy?
5         MS. NORMAN:  I don't have it handy, no.
6    But it was -- it was -- I should have given
7    it out before.  The original law prohibits
8    riding or hauling on levees.  And then when
9    CPRA joined the Levee District and CPRA kind
10   of -- OCPRA joined together, they amended
11   that law to include riding and hauling on
12   levees or coastal restoration projects,
13   which is actually language that Cheryl
14   Teamer helped me get inserted into that
15   bill, and so we can just only hope that, in
16   two years -- but he basically said, don't
17   even think about getting out there until
18   2014, so the -- that's the good news.
19            The bad news is that, already
20   today, Forrest has texted us and there are
21   people trying to do everything on our beach.
22   We -- he texted me while I was outside and
23   said that someone from Grand Isle had a big
24   rake and was raking up and down our beach,
25   with a rake.

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 64

1         MS. PHILLIPS:  He made two passes.

2         MS. NORMAN:  Yeah.

3         MR. MICHAEL PENEGUY:  With a vehicle or

4    just --

5         MS. PHILLIPS:  Yeah.

6         MS. NORMAN:  Yeah, and they see the

7    signs that say "Wisner; No Trespassing," and

8    they just assume it doesn't apply to them.

9         MS. PHILLIPS:  He said it was -- he

10   thought it was to the north.

11        MS. NORMAN:  So even though we have

12   established a pattern and we have put up

13   signs and done everything we can do, it's

14   very, very important that we have someone

15   down there to enforce it, because there is

16   no other enforcement.

17        MR. MARK PENEGUY:  Well, a lot of

18   people don't think that the beach itself is

19   private, and I know that Forrest has

20   determined that.

21        MS. PHILLIPS:  Yeah, but the signs go

22   from the water --

23        MR. MARK PENEGUY:  Oh, I know.

24        MS. NORMAN:  Well, and let me remind

25   all of you, and I know that this is

Page 65

1    something that you don't want to think about

2    too much, but, you know, over at UNO, they

3    had two drownings in that beach behind the

4    CERM building.

5         MR. MICHAEL PENEGUY:  Yeah.

6         MS. NORMAN:  And three or -- no, before

7    Hurricane Katrina, they had a drowning, and

8    they sued UNO over that drowning.

9         MR. MICHAEL PENEGUY:  Yeah.

10        MS. NORMAN:  Even though the area has

11   gates, the area has signs, "No Swimming."

12   And this is what we have on our beach, and

13   for those that don't know, probably in the

14   last ten years, we've had at least eight or

15   nine drownings on our beach.

16        MR. MICHAEL PENEGUY:  Yeah.

17        MS. NORMAN:  We had -- when was it?

18        MR. MARK PENEGUY:  Lucky we didn't get

19   sued.

20        MS. PHILLIPS:  A little boy, a couple

21   of years ago, before the spill.

22        MS. NORMAN:  Yeah.  So, you know, this

23   is -- these are all liability issues that

24   you have to -- and we do not get any support

25   from local authorities on this.  You know,

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 66

1    we do not.  So we have to handle it

2    ourselves.  I think that that covers

3    everything on the Wisner Beach Update, so --

4         MR. MICHAEL PENEGUY:  Okay.

5         MS. NORMAN:  Oh, no, one more.  I'm

6    sorry, pardon me.  Pardon me.  I have a

7    meeting on Thursday.  A group from EPA is

8    coming down and they're trying to find sites

9    for additional CWPPRA projects and -- those

10   are federally-funded coastal restoration

11   projects, and Archie Chiasson, from the

12   Office of Coastal Zone Management for the

13   Lafourche Parish, called and asked for

14   access, and I said, "Better yet, let me go

15   with you, because I do have some really good

16   ideas," and he's only been around for a

17   couple years, and he was, "Great."  He said

18   he'd be glad to have me along, so I can

19   point out a couple areas where I think some

20   CWPPRA projects could be put into the loop.

21        Now, once you nominate them, it

22   takes probably about two years before they

23   rise to the top and go through the process

24   and get approved, and it probably takes

25   another four years before they get built,

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 67

1    but at least they're looking at our property

2    for these federally-funded projects.

3        MR. SHERMAN:  Any questions on the

4    Wisner Beach Update?  We will now go to the

5    2012 Legislative Session.  Cathy.

6        MS. NORMAN:  We don't have a lot on

7    that, except that all the bills keep, you

8    know, getting reintroduced and changed to

9    different numbers and, you know, one --

10   1175 -- let me see.  What have they turned

11   into?  1175 is now 1121.  And 760 is -- I

12   have another number on that one.

13       MR. MARK PENEGUY:  I think it was 731.

14   That's the one you handed out today?

15       MS. NORMAN:  Right, right.  And this is

16   the one that -- you know, these are going to

17   move forward.  I don't know what's going to

18   happen.  I don't know who's going to win, in

19   the battle of the wills, over who's going

20   to --

21       MR. MARK PENEGUY:  Well, this is the

22   Act 312 --

23       MS. NORMAN:  Right.

24       MR. MARK PENEGUY:  -- Legislation, and

25   The Times-Picayune, for whatever it's worth,

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 68

 1   reported that the landowners and the oil

 2   companies came to an agreement, and that's

 3   what I'm assuming this is, their agreement.

 4        MS. NORMAN:  Well, --

 5        MR. MICHAEL PENEGUY:  It will probably

 6   be modified before it goes through, though.

 7        MS. NORMAN:  Yeah.

 8        MR. MARK PENEGUY:  They only have the

 9   rest of this week, so -- they've got to

10   adjourn at the end of the week, or the

11   Saturday or something, so they don't have

12   much more time, but --

13        MR. MICHAEL PENEGUY:  Let me see.

14   Which one are you talking about, the --

15        MR. MARK PENEGUY:  That's 760, the one

16   that was handed out today, Michael.

17        MR. MICHAEL PENEGUY:  760?

18        MR. MARK PENEGUY:  Yeah, the short

19   paper.

20        MS. NORMAN:  I think that basically

21   what they've changed is that someone can, up

22   front, say, "Yes, we had operations there;

23   this is an area where we are the most

24   probable party to have contaminated it and

25   we will take responsibility," and then they

Page 69

1    put it in the hands of the Department of

2    Natural Resources to determine what level of

3    clean-up needs to be done to try and avoid

4    the process.

5           And, you know, once again, it's a

6    double-edged sword.  You have landowners

7    suing, right and left, who are being granted

8    large sums of money, but they aren't

9    cleaning up the property.  That's one end of

10   the spectrum.

11          At the other end, you have

12   companies who aren't paying and aren't

13   following through, and you get dragged into

14   court.  And then when they turn it over to

15   the state -- at least, in my experience,

16   when we had seismic damage on our

17   property -- and the Department of Wildlife

18   and Fisheries oversees seismic permits --

19   and when we had seismic damage, back in the

20   late nineties, the permit was violated

21   several times.

22          And I went up and I looked through

23   their records, and they, in their records,

24   said "permit violated," "permit violated."

25   They did nothing.  We had to sue

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 70

1    Schlumberger in order to bring to light the

2    damage that was done.  Of course, we used

3    their records to prove that we were correct,

4    but then it gets to, okay, how do we fix

5    what's damaged?  Because when you're dealing

6    with damage in a wetland the size of this

7    table right where the recorder is, you do

8    more damage getting in to fix it.

9             So, you know, how do you -- how do

10   you evaluate that?  And it just gets back to

11   mitigation, and they're trying to fight this

12   out, and I don't -- I don't know how it's

13   going to go.  I think that it has to be a

14   hybrid of the rights of a public individual

15   to protect their property and -- but their

16   needs to be some teeth in any decisions made

17   to make sure that the land is fixed, because

18   in Louisiana, we can't afford to lose it.

19        MR. MARK PENEGUY:  And I think that's

20   what this is planning to do.  It does not --

21   as I understand it, it does not limit the

22   right of the landowner to go ahead and sue

23   for other damages that it has, which is part

24   of Act 312 already.  And that actually, if

25   you all have read the -- well, I know you

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 71

1    haven't read the cases yet, but the ones in

2    the Louisiana Bar Journal that referred to

3    the Vermilion Parish School Board, --

4         MS. NORMAN:  Right.

5         MR. MARK PENEGUY:  -- that's one of the

6    issues is whether or not they can sue for

7    the additional damage, or for damage over

8    and above what 312 would require the

9    Department of Natural Resources to deal

10   with.

11           And as far as I understand it,

12   right now this new legislation does not

13   change the right of us, as a private party,

14   to go ahead and still sue the tortfeasor --

15        MR. MICHAEL PENEGUY:  Yeah, as long as

16   you --

17        MR. MARK PENEGUY:  -- and to get some

18   damages that way.

19        MS. NORMAN:  Well, --

20        MR. MARK PENEGUY:  But it does still --

21   it does go through the process with the

22   state.

23        MS. NORMAN:  Mark, it was my

24   understanding that basically, under 312, the

25   landowner would come up with a plan to fix

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 72

1   the property and then the Department of

2   Natural Resources would, and then a judge

3   would decide which was a better plan.

4        MR. MARK PENEGUY:  That's -- I'm not

5   saying that that still won't happen, or

6   something similar to that.  I'm just saying,

7   that's one part of 312.

8        MS. NORMAN:  Yeah.

9        MR. MARK PENEGUY:  And the other part

10  is, your private claim against the --

11       MS. NORMAN:  Right.

12       MR. MARK PENEGUY:  -- party who did

13  this damage, which is over and above, which

14  really is money damages as opposed to

15  repairing the property.

16       MS. NORMAN:  Right.

17       MR. MARK PENEGUY:  The property's got

18  to be repaired, is the way I understand

19  this.

20       MS. NORMAN:  Well, and most of -- most

21  of the suits of this kind can be, with

22  proper contractual negotiation, moving

23  forward, avoided altogether.

24       MR. MARK PENEGUY:  Right.

25       MS. NORMAN:  It's just when you're

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 73

1    dealing with very old leases, as we are, in

2    some cases, and we've actually had this

3    exact situation on our property back in the

4    nineties.

5         MR. MICHAEL PENEGUY:  Yeah.

6         MS. NORMAN:  And it all got done.

7         MR. MARK PENEGUY:  Oh, did it?

8         MS. NORMAN:  Yeah, so --

9         MR. MICHAEL PENEGUY:  Chevron.

10        MS. NORMAN:  But it's a very

11   interesting issue.  There's nothing really

12   at this point, at this late point in time,

13   that we can do to influence what's going on.

14   At one point in time, we considered joining

15   the Louisiana Landowners Association.  And

16   although we worked with them on issues such

17   as this in the past, the Landowners

18   Association charges --

19        MR. MICHAEL PENEGUY:  Yeah, a pretty

20   penny.

21        MS. NORMAN:  Yeah, they charge per

22   acre, for your fee to join.  And when you

23   have 35,000 acres, it would probably be, I

24   think, nine or $10,000 a year, for us to be

25   a member, and that's pretty -- that's pretty

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 74

1    dear, so -- and we asked them to waive that

2    and let us just join as a -- and they were

3    not very receptive to that.

4        MR. MICHAEL PENEGUY:  They want their

5    money.

6        MS. NORMAN:  Yeah.

7        MR. MARK PENEGUY:  And if I may go on

8    to another, Cathy, I don't know if you were

9    going to address the trust, and I know, Beth

10   addressed what the trust code change was

11   about.

12       MS. TURNER:  Yeah, but there's been a

13   change.

14       MR. MARK PENEGUY:  That's what I was

15   going to say.

16       MS. TURNER:  The law is -- the two

17   people went up to talk to them.  I think

18   there was supposed to be some further

19   modification, so I'll check with the

20   committee chair to see, because I'm not

21   happy to see that the change is still in it.

22       MR. MARK PENEGUY:  I'm not surprised.

23   Well, Senator Alario was asked what this is

24   about.  He says, "I don't know."

25       MS. NORMAN:  And did he author the

Page 75

1    bill?

2         MR. MARK PENEGUY:   No, I don't know if

3    he authored it.

4         MR. MICHAEL PENEGUY:   No, Abramson.

5         MR. MARK PENEGUY:   Abramson authored

6    it.

7         MR. MICHAEL PENEGUY:   Abramson authored

8    the bill.

9         MR. MARK PENEGUY:   But he was

10   supporting it and trying to get his

11   colleagues to vote in favor of it, but he

12   didn't know what it was about, what it

13   meant.   CB Forgotston was reporting on that,

14   in his blog.   It just was funny to read it.

15   And I remember hearing it on the news, so --

16        MS. TURNER:   No, they were supposed to

17   go back to the original language, but then

18   they were going to try to just limit it to

19   gratuitous transfers to the charity, but we

20   want it to be broader than that, but it

21   might not happen this session.

22        MR. MICHAEL PENEGUY:   Yeah.   Right now,

23   it's pending House concurrence, so -- I

24   don't know whether it will make it out of

25   the House, or even to the Senate, by the

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 76

1    time --

2        MS. TURNER:  Yeah.

3        MR. SHERMAN:  Any other issues on the

4    2012 legislative session?  Okay.  We are now

5    on No. 6.  Bankston Fishing Lease Renewal.

6        MS. NORMAN:  We have actually had --

7    for those that don't know, Mr. Bankston --

8    we have two leases that are currently up for

9    renewal.  One is a fishing lease.  And

10   originally there were two fishing leases out

11   there, kind of what we call the northern

12   impoundment and the southern impoundment.

13   Mr. Bankston originally had the northern

14   impoundment.  We had the southern leased to

15   another gentleman, and we weren't really

16   happy with him, as a lessee, so once we got

17   rid of him, we leased the whole area to

18   Bankston.

19       The way Bankston works this is --

20   Kevin and Brent Bankston are from Baton

21   Rouge.  Their father developed an area down

22   in Fourchon, called Pointe Fourchon.  It's a

23   very high end -- they have camps there that

24   are 500, 600, $700,000, and we leased to

25   them, and they have a certain number of

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 77

1    people who put a sticker on their boat, and

2    if they belong to this, the Fourchon Fishing

3    Club or whatever they call it, they --

4    Forrest, if he sees them out there, knows

5    that they're allowed to be out there, and

6    other people are not.

7             In exchange, they are supposed to

8    secure the property, and I don't know how

9    secure it is right now.  I think that one

10   gate is in really good shape, but there's

11   another one that needs some work.  They've

12   been tenants for a long time.  They are

13   people that I find are very trustworthy.

14            This is not anything that ever

15   went out to bid.  We were approached by

16   Bankston.  And this area -- part of our

17   initial strategy on this area was, we

18   were -- we had some old lessees, from the

19   eighties, who were out there who were truly

20   criminals and outlaws, and after we evicted

21   them, in court, they continued to occupy the

22   property.

23            MR. SHERMAN:  Is this the Cheramies

24   or --

25            MS. NORMAN:  Yes.  They continued to

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 78

1    occupy the property.  We had to have them

2    evicted, as tenants.  I mean, it's a story

3    that makes up a John Grisham novel.  It

4    involves the FBI, it involves $60 million in

5    fines in the U.S. Attorneys' Office.  It

6    involves illegal fishing and drug dealing

7    and everything else.

8              But, that all being said, once

9    those people were off the property -- one of

10   the ways we instigated getting them off the

11   property was find someone who was

12   trustworthy and giving a lease to them, so

13   that they could occupy -- they could -- this

14   was before Forrest -- so that they could

15   occupy, they could put up fences, and say,

16   "We have the lease here; we are legally

17   here," and then they -- and actually

18   Mr. Bankston, he went to -- he's no longer

19   alive, but he went to court with us and

20   showed pictures of Mr. Cheramie standing on

21   the land with one finger extended to the

22   camera, to the judge, among our things.

23       MR. MARK PENEGUY:  Was that the one in

24   jail?

25       MS. NORMAN:  Oh, yeah, he put him in

Page 79

1    jail.  He went to jail for six months for

2    contempt of court.

3         MS. GERHOLD-MARVIN:  You said Cheramie

4    is the last name?

5         MR. MICHAEL PENEGUY:  Yeah.

6         MS. NORMAN:  Yeah.

7         MR. MARK PENEGUY:  That's -- Rickey is

8    the President of the South Lafourche

9    Beachfront Development District.

10        MS. NORMAN:  Yeah.  Now, they're still

11   around.

12        MR. MARK PENEGUY:  That's his brother.

13        MS. NORMAN:  In any case, we have

14   maintained -- then we had another group come

15   in and they put a big barge down there, and

16   they had the southern part of this fishing

17   area, and they seemed to be constantly

18   cutting corners on things and doing side

19   deals with people that we found out about.

20   We tried to get rid of them when an option

21   came up, by like tripling their rent, but

22   they paid it, so --

23        MS. PHILLIPS:  But then they paid late.

24        MS. NORMAN:  Yeah, and then ultimately,

25   Katrina came, and their big houseboat they

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 80

```
 1   had parked on our property ended up in the
 2   middle of the highway and had to be cut up
 3   in pieces and removed so people could have
 4   access.
 5            And so we offered the second
 6   lease, the southern lease, to the Bankstons,
 7   as well.  And, you know, they're not out
 8   there every day, but they do have a lease.
 9            And it's a very, very difficult
10   thing with open property like that, to,
11   No. 1, find someone you trust who's not
12   going to start commercially fishing it, not
13   going to start making a lot of money by
14   having guided tours out there, that they're
15   going to be out there, have someone who's a
16   bit of a caretaker to oversee it, and also
17   put up fences and maintain it, and have the
18   insurance and everything else, and it -- you
19   know, if we could -- if we could do this to
20   some of our other areas on our property, we
21   could, but a lot of times, it's not as
22   geographically easy as this is, because this
23   area has only just one or two openings to
24   it, so that we can make sure that we keep it
25   private.  And it is all private waterbottoms
```

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 81

1    in there.

2            And we went through all of that

3    with the judge, trust me.  He said, if you

4    want to go in there, you can take a

5    helicopter and have them drop you off and

6    you can stand in the water and fish, but

7    other than that, you cannot take a boat in

8    there.

9            So my recommendation would be to

10   continue to lease to the Bankstons, and I

11   would do it in two separate leases, just

12   because, if they chose to get rid of one of

13   them, then it would be very easy to

14   delineate the two areas, because there is an

15   old levee system between the two.  As for --

16       MR. MICHAEL PENEGUY:  That's what I was

17   going to ask you.  What about just combining

18   them?

19       MS. NORMAN:  No, I think it's better to

20   do two.  The big issues are, are we getting

21   enough money, and what do we do about the

22   date.  We originally have given them a

23   five-year lease.  Do we want to give a

24   five-year lease at this point, with the

25   unknown 2014 date looming over us.  And, you

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 82

1    know, if -- this lease actually ends at the

2    end of this month, so we need to make some

3    sort of decision on that.

4        MR. MICHAEL PENEGUY:  Well, that's --

5        MS. NORMAN:  Amanda's done a complete

6    breakdown on costs.

7        MR. SHERMAN:  Show me that real quick.

8        MS. NORMAN:  Yeah.  And then the other

9    lease, just so we can discuss, because we're

10   going to have some of the same issues.

11   Dr. Pilie predates me.  He's been out with

12   his little duck camp, and this is on a piece

13   of property that's in St. John the Baptist

14   and Lafourche Parish, right near the

15   southwest corner of Lake Des Allemands, and

16   all he has out there is a gate, a waterway,

17   a duck camp, and then he has some fishing

18   areas around it where he fishes ducks.

19       MR. MARK PENEGUY:  I think that may

20   have come in today's package.

21       MS. PHILLIPS:  Yeah, it may have been.

22       MS. NORMAN:  Yeah, here.  Just pass it

23   down.  So he's out there -- he's out there,

24   doing his thing, too, and we -- that's

25   another lease.  We have a little more time

Page 83

1    on this one, because it doesn't end until

2    August, so we might want to just wait and

3    defer this until June so we can have some

4    more time to think about it, but we really

5    do need to address the fishing leases now.

6         MR. MICHAEL PENEGUY:  The only question

7    I have is, can we work it out 0to be the

8    same charge per acre?  Because the northern

9    section was at $2.49 per acre right now

10   and -- or was last year, and the south area

11   was $1.77 per acre.

12             So I'd make a motion to renew the

13   leases on the same general terms, for the

14   five years, and just work out the per

15   acreage charge to be equal on both of them.

16   You could split the difference between the

17   1.77 and 2.49, but that way, at least it

18   would be the same for both of them.  I'll

19   give you the figures that I have.

20        MS. PHILLIPS:  Well, it's -- the

21   northern one, it's on property co-owned with

22   ConocoPhillips.

23        MR. MICHAEL PENEGUY:  Oh, that's why.

24        MS. PHILLIPS:  712-1/2 acres are

25   co-owned, --

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 84

1      MR. MICHAEL PENEGUY:  That's why.

2   That's why.

3      MS. PHILLIPS:  -- so it would be -- if

4   we're going to make them the same, it would

5   be better to bring up the rent on the

6   southern lease, to make them the same, than

7   splitting the difference and lowering the

8   northern.

9      MS. NORMAN:  And, also, we're supposed

10  to have a two percent escalation, as of this

11  year, --

12     MR. MICHAEL PENEGUY:  Right.

13     MS. NORMAN:  -- in accordance to the

14  old lease, so we should go up two percent.

15     MR. MICHAEL PENEGUY:  Yeah.  That's

16  what I was going to say.  The same terms,

17  two percent per year.

18     MR. SHERMAN:  Let me ask you this.

19  Between now and, let's say, six months from

20  now -- I'm just using six months as an

21  arbitrary number for how long it might take

22  us to do our valuation and come to a

23  thoughtful analysis or conclusion -- how

24  many more leases will come up before us --

25     MR. MICHAEL PENEGUY:  We've got one

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 85

1    that --

2        MR. SHERMAN:   -- that if they were --

3    not year-to-year rates, so forget the

4    hunting and camping, because those are

5    year-to-year.   How many long-term leases are

6    coming up in the next six months?

7        MS. NORMAN:   Energy Partners.

8        MR. MICHAEL PENEGUY:   Yeah.

9        MS. NORMAN:   Which we need to

10   renegotiate.   We're going to, of course, be

11   negotiating the new port lease --

12       MR. MICHAEL PENEGUY:   Right.

13       MS. NORMAN:   -- for Port Fourchon, for

14   the Fourchon Island, the Bankston lease, the

15   Pilie lease.   The alligator trapper, they're

16   year-to-year.

17       MS. PHILLIPS:   They're year-to-year.

18       MS. NORMAN:   And the same with the camp

19   leases.   But the camp leases are

20   year-to-year, but then it's a --

21       MR. MICHAEL PENEGUY:   Optional.

22       MR. MARK PENEGUY:   It's over five

23   years.

24       MS. PHILLIPS:   -- it's a one-year lease

25   with five one-year renewal terms.

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 86

1        MS. NORMAN:  And when are those up, at

2   the end of --

3        MS. PHILLIPS:  The ones in Jefferson

4   Parish are up in 2013, and the ones in

5   Lafourche are up in 2014.

6        MS. NORMAN:  So -- and those are

7   year-to-year.  I'm trying to think if there

8   are any others.  We did a lot of them last

9   year.

10       MS. PHILLIPS:  Yeah.

11       MS. NORMAN:  I think -- not a whole

12   lot.

13       MR. SHERMAN:  I don't see a problem

14   with extending them now.

15       MR. MICHAEL PENEGUY:  I think, starting

16   out, increase the rates two percent and keep

17   the same conditions, two percent per year,

18   with the option of -- a five-year option on

19   each one.  And if we can, even out the --

20       MS. NORMAN:  The rental?

21       MR. MICHAEL PENEGUY:  -- the rental,

22   between the two, as far as on a per-acre

23   basis.

24       MS. PHILLIPS:  So you want to take the

25   2.49 and go up two --

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 87

1        MS. NORMAN:  So increase it by two

2   percent.

3        MS. PHILLIPS:  That would be 2.54.

4        MS. NORMAN:  So 2.54 per acre, each.

5   And these leases were --

6        MR. MICHAEL PENEGUY:  I don't know

7   whether Bankston's brothers are like

8   Mr. Bankston was, but he was very helpful in

9   getting out to the property and all of that.

10  When we'd go down there, he'd provide us

11  fishing trips and everything.

12       MS. NORMAN:  Yeah.  He took us out,

13  when the committee went down, and I know

14  that if we went down there, they would allow

15  us -- I did hold a meeting at Mr. Bankston's

16  camp, and I know that they would take us out

17  again, if we needed an extra boat, or

18  something along those linings.  He would be

19  very helpful, as well as, you know, a lot of

20  our camp lessees say, "Please have your

21  meeting here."  They love showing people

22  around, so --

23       MR. MARK PENEGUY:  So, Michael, you

24  made a motion to increase it by -- increase

25  the higher number by two percent.  Then make

Page 88

 1   the lower one the same price --

 2         MR. MICHAEL PENEGUY:  Right.

 3         MR. MARK PENEGUY:  -- and extend it for

 4   five years?

 5         MR. MICHAEL PENEGUY:  Yes.

 6         MR. SHERMAN:  Could someone restate

 7   that one more time?

 8         MS. PHILLIPS:  His motion was to renew

 9   the leases on the same terms with each lease

10   being at 2.54, $2.54 per acre, but the same

11   terms and conditions as previously.

12         MR. MICHAEL PENEGUY:  Which would be a

13   two percent raise each.

14         MS. PHILLIPS:  Yeah, two percent on

15   those.

16         MR. SHERMAN:  A two percent escalation.

17         MS. PHILLIPS:  Escalation.

18         MR. MICHAEL PENEGUY:  Right.

19         MR. MARK PENEGUY:  You need a second on

20   that?

21         MR. MICHAEL PENEGUY:  Yes, I do.

22         MR. SHERMAN:  We have a motion.  Do we

23   have a second?

24         MR. BUDDY:  Second.

25         MR. SHERMAN:  Second.  Any questions or

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 89

1    discussion on this?

2         MS. NORMAN:  Shall I make a suggestion

3    that we wait and discuss -- at the next

4    meeting, we can discuss Dr. Pilie's?  I did

5    put a phone call into him to find out -- I

6    sent an email to both of the Bankston

7    bothers, saying "What do you want?"  And

8    they said, "We want to renew, if possible,"

9    and just the same as -- keep going.  But I

10   have not heard back from Dr. Pilie.  I

11   called his office and I have not heard back

12   from him, so --

13        MR. SHERMAN:  Okay.

14        MR. MARK PENEGUY:  Maybe he doesn't

15   want to renew.

16        MR. MICHAEL PENEGUY:  We better make

17   sure he will.

18        MS. NORMAN:  I'm sure he will.

19        MR. SHERMAN:  We have a motion and a

20   second on the table for the Bankston fishing

21   lease.  All in favor?  Any opposed?  Hearing

22   none, it's approved.

23            And does anybody have any problem

24   with Cathy's recommendation that we wait

25   until next month on the second lease?

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 90

1          MR. MICHAEL PENEGUY: No.

2          MR. SHERMAN: Okay. On Global

3     Geophysical, No. 7.

4          MS. NORMAN: I pretty much already did

5     that.

6          MR. SHERMAN: Covered that, yeah.

7          MS. NORMAN: There's a picture here,

8     Forrest's potential hazards suggested and

9     what he's given out to the people there.

10    Forrest continues to do a really great job

11    for us in taking care of whatever we need

12    down there.

13          Global is paying for his time.

14    This is part of our agreement that we had

15    with Global, when we gave them an access

16    agreement, just as BP reimburses us for

17    Forrest's time, in our claims, but in the

18    case of Global, he will actually be billing

19    them directly, so --

20          MR. MICHAEL PENEGUY: Good.

21          MR. SHERMAN: Okay. LUMCON?

22          MS. NORMAN: I have been going back and

23    forth with Nancy Rabalais. I did today --

24    one of the things that Forrest had done, in

25    his frustration, was file a FOIA request to

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 91

1    FEMA about exactly what was being paid for

2    by FEMA, in the damage to the LUMCON camp.

3         MR. MICHAEL PENEGUY:  Good.

4         MR. SHERMAN:  Have a picture?

5         MS. NORMAN:  I know.  And I sent her

6    another email, I think, Friday, saying, you

7    know, "We need to discuss this again at the

8    meeting," and I just today got another email

9    from her.  She wants to plan a trip down

10   there.  Her email was from FEMA, and with a

11   list of questions about how they were

12   maintaining this thing and -- but, you know,

13   what concerns me is storm season, and so I'm

14   just continuing -- we have -- she and I have

15   traded no less than six or seven emails this

16   past month, and if you would like, I can

17   read -- I'll just go ahead and send out the

18   email that I got today, that I checked

19   earlier today, that she got from FEMA.

20            Basically they said, you know, did

21   you have a maintenance -- a process in place

22   for the bulkhead, when was the last time it

23   was inspected, and all these things that,

24   you know, have nothing to do with nothing.

25   But that's what happens when you're dealing

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 92

1    with FEMA.

2         MR. MICHAEL PENEGUY:  Yeah, I think

3    they built that bulkhead and left it and

4    didn't do any maintenance on it at all.

5         MS. NORMAN:  No, no.  So -- and it

6    was --

7         MR. MICHAEL PENEGUY:  And it's

8    probably -- they built it back in the

9    seventies or sixties.

10        MS. NORMAN:  Yeah.  So I don't -- you

11   know, I think that --

12        MR. MICHAEL PENEGUY:  Mine finally gave

13   loose after 30 years, so I think theirs is

14   going.

15        MS. NORMAN:  The thing that people need

16   to remember here is that, you know, if we

17   say "fix it or we're going to fix it," it's

18   going to cost us at least $240,000 to fix,

19   so -- and at which time, we could easily

20   find someone else to take over -- cancel the

21   lease, someone to take over the lease, and

22   get our money back.

23             However -- and it's a very big

24   "however" -- the LUMCONcamp is a -- it's a

25   great asset for us in many ways, in

Page 93

1    particular, a public relations asset.

2    People go down there.  They have groups come

3    from all over the country to study the

4    environment.  It's used by all the local

5    universities.  You know, it's something that

6    we can point to and say, "This is something

7    else that Wisner gives back to, in

8    particular, to Lafourche Parish," but also

9    to the various universities and school

10   children and education in the City.

11            And, you know, we've already

12   canceled one lease with the state, with the

13   Department of Wildlife and Fisheries, and I

14   just -- it's a big responsibility, if we

15   were to cancel this lease and want to try

16   and take it over.  We could probably lease

17   it the next day, like that, to the port.

18            And it's very possible that if

19   they can't afford to fix it, we could go to

20   the port, and others, and get people to

21   donate money to fix it.  But the point --

22   the problem right now is that they are doing

23   absolutely nothing.  It's like a poor

24   stepchild to them.  They have a $22 million

25   facility in Chauvin, Louisiana, and that's

Page 94

1    where all their money's going.

2            So I don't know how hard to push,

3    in this situation.  I would hate to rock the

4    boat too much, but, I mean, we could -- we

5    could probably go to the port, and to

6    Chevron, and I mean, you talk about a great

7    public relations thing for Chevron to do, to

8    give some money to repair this so that --

9    and they probably have some of the

10   equipment -- so that -- and they could say,

11   "We repaired the LUMCON camp, and this is a

12   great contribution we made to them."  There

13   are other, you know, other things we can do.

14   I don't know how much Tulane uses this.

15        MR. MICHAEL PENEGUY:  Yeah.  LUMCON

16   could probably tackle Chevron and get some

17   money out of them for that.

18        MS. NORMAN:  Exactly.  And, you know,

19   this is -- you know, and so maybe we need to

20   take more of a -- instead of a threatening

21   approach, more of a proactive approach, to

22   try and get them to come up with a plan.

23   And if they get the money later, they can do

24   more improvements, but right now, what

25   we're -- you know, the camp needs

Page 95

1    improvements.

2         MR. MICHAEL PENEGUY:  Uh-huh.

3         MS. NORMAN:  But the camp is livable.

4    But the real problem is that the land is

5    eroding away.

6         MR. MARK PENEGUY:  You know, that's got

7    to be repaired, because we've -- liability

8    alone, I know we have indemnifications, but

9    you know we'll be sued if somebody gets hurt

10   there.

11        MS. NORMAN:  Well, you know, one of the

12   laws that -- one of the laws, the statutes

13   that's mentioned in all of these leases, is

14   93221, that the lessor is not liable for

15   injury from a defect unless they knew, or

16   should have known, and received notice.

17             So we do know that there's a

18   problem, and I know that there are going to

19   be teenage and school-age kids out there

20   this summer, and there are holes as big as

21   one of these squares in the middle of the

22   grass that people can fall in, and so there

23   is a liability out there.

24        MR. MARK PENEGUY:  Well, just the loss

25   of land, as well.

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 96

1       MS. NORMAN:  Well, the loss of land

2    is tragic.

3       MR. MARK PENEGUY:  Sooner or later, the

4    camp's going to end up in the water.

5       MS. NORMAN:  Exactly.  It could end

6    up -- with one storm, it could end up in the

7    water.

8       MR. MARK PENEGUY:  That's right.

9       MR. MICHAEL PENEGUY:  Yeah.

10      MS. NORMAN:  So what do -- I don't

11   know.  I think that we need to put pressure

12   on them, but I think we need to find some

13   creative solutions.

14      MR. MICHAEL PENEGUY:  Yeah, I would

15   suggest, you know, basically suggesting to

16   them, if they can't get the money from FEMA,

17   if they can go ahead and get some money from

18   the port and the port can -- and Chevron and

19   Shell, and some other people that are down

20   there, to repair it.

21      MS. NORMAN:  Okay.

22      MR. MICHAEL PENEGUY:  Because I think

23   all of them would be willing to put money

24   towards fixing it.  The port --

25      MS. NORMAN:  Yeah, LOOP.

Page 97

1      MR. MICHAEL PENEGUY:  The port would

2   probably even put equipment out there for

3   repairing it because they have the

4   equipment.  They're building the bulkheads

5   out there now.

6      MS. NORMAN:  Okay.  That gives me --

7   yeah, that gives me some ideas, okay.

8      MR. MARK PENEGUY:  I also think that --

9      MR. MICHAEL PENEGUY:  The other thing

10  is, maybe if we tell them, we're coming down

11  there this fall for a meeting, and we'd like

12  to have a catfish fry down there at their

13  camp, maybe they'll get off the ball.

14     MS. NORMAN:  Well, --

15     MR. MARK PENEGUY:  Well, I think we

16  have to set a date certain by which it must

17  be repaired or we have to do whatever we

18  have to do to recover that money.

19     MS. NORMAN:  Well, --

20     MR. MARK PENEGUY:  Because I think,

21  ultimately, the liability is going to be too

22  great for us to just sit back and do

23  nothing.

24     MS. NORMAN:  Either that or we have to

25  tell them to close it and not rent it out

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 98

1   until it's repaired.

2        MR. MARK PENEGUY:  Well, it's still got

3   to be repaired, and so I think that has to

4   be done by --

5        MS. NORMAN:  Because it's an attractive

6   nuisance, yeah.

7        MR. MARK PENEGUY:  -- whatever date we

8   want to set, and I think -- I think you need

9   to do that.

10       MS. NORMAN:  Okay.

11       MR. MARK PENEGUY:  I don't care how

12  upset they become.

13       MS. NORMAN:  Well, I'm -- she has

14  suggested, in her text I got today, that I

15  meet one of her colleagues down there, to

16  look at it, and I'm sure that that will

17  occur before the next meeting, and I'll ask

18  that it does, and we'll maybe try and come

19  up with some creative solutions.

20           I mean, who -- you know, you think

21  about it.  I mean, there's a wetland camp in

22  the Rigolets, that UNO has, that is a

23  fabulous camp and it's actually named after

24  my late husband.  Yeah, it's unbelievable.

25  You drive over and there's a big -- and it

Page 99

1    is a fantastic -- and I don't know where

2    they got the funding for it, but it is a

3    fantastic camp.

4              And, you know, it seems like this

5    would be, with all the oil and gas down

6    there, and as well as things are coming

7    back, it would be a great opportunity for us

8    to say, "Look, let's try and put something

9    together and get this thing fixed up, for

10   coastal research." So anyway --

11       MR. MICHAEL PENEGUY: Okay. You know,

12   I'd try to push them to give us a date that

13   they can live with and --

14       MR. SHERMAN: Does that give you a good

15   idea?

16       MS. NORMAN: It does give me a good

17   idea.

18       MR. SHERMAN: If we make a motion with

19   it? Yeah.

20       MS. NORMAN: Yeah. No, I'll just --

21   I'll come back and talk to you all about it

22   after I've met with them and maybe thrown

23   that idea around with some of the people at

24   Chevron.

25       MR. SHERMAN: And at the end of the

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 100

1   day, they need to either just step up or get

2   out.  That's the problem.

3        MS. NORMAN:  I know, I know, and I

4   agree with you, but it's --

5        MR. SHERMAN:  It's sad to see them step

6   out, if that's their will.

7        MS. NORMAN:  It is.  And like I said,

8   we'd come out smelling like a rose, because

9   the port would come in or someone would come

10  in and want this camp.

11       MR. SHERMAN:  Okay.

12       MR. MICHAEL PENEGUY:  And we'd make

13  more money that way.

14       MS. NORMAN:  Yeah.  We don't make any

15  money on this.

16       MR. MICHAEL PENEGUY:  Right.

17       MS. NORMAN:  So --

18       MR. SHERMAN:  So next is the Chevron

19  sublease.  This is a request from Chevron to

20  sublease its property.  There's a provision

21  requiring our approval.

22       MS. NORMAN:  As well as everyone's

23  signatures.

24       MR. SHERMAN:  It doesn't seem to let

25  Chevron off the hook at all.  It just seems

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 101

1    to improve the sublease.

2         MS. NORMAN:  It seems pretty -- it

3    seems pretty well written.  Chevron will

4    continue to be responsible for the rental.

5    They will be recouping part of that from

6    Energy XXI.  It's an interconnecting

7    facility.  It's -- I think the amount of

8    property involved is like about half an

9    acre, or less, in a long strip underneath

10   this pipeline that ties into their facility.

11   I don't believe that it's a huge area, so --

12        MR. MICHAEL PENEGUY:  And Chevron still

13   will have control over that area.

14        MS. NORMAN:  Yes.  And if you read the

15   document, it basically says they -- you

16   know, they allow them access to do what

17   needs to be done.

18             And this is the group from Energy

19   XXI that contacted me and said, "We want to

20   go out and check the area," and I said, "Can

21   you just get -- let me get this approved

22   before you do so."  So they are waiting to

23   hear from me.  And once we get this

24   approved, I mean, and we can get them to

25   sign it and get it back to me while we're

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 102

 1   getting signatures, we should be okay.

 2        MR. SHERMAN:  Are we signing this in

 3   duplicate or singly?

 4        MS. NORMAN:  Well, it -- I mean,

 5   because the original --

 6        MR. SHERMAN:  This form, yeah.

 7        MS. NORMAN:  -- the original agreement

 8   with Chevron was signed by everyone, the

 9   surface lease, they -- and this doesn't have

10   everyone on it -- it will need to be signed

11   by all of the beneficiaries.

12        MS. GERHOLD-MARVIN:  Is this what I'm

13   going to take to Dr. Townsend?

14        MS. NORMAN:  No.  I'm going to need to

15   add -- because they don't have everyone on

16   there.

17        MR. SHERMAN:  I'll say this.  To the

18   extent time's not an issue and everyone

19   wants to sign, which has been the custom and

20   practice, I've been advised, there's no

21   problem with it, but to expedite the

22   process, it seems a simple resolution by the

23   committee, attesting that all beneficiaries

24   were present in a duly-noticed meeting,

25   approved, and then the trustee's signature

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 103

1    should cover it.

2            But to the extent they want

3    everyone's signature on line, that's a

4    custom and practice that folks want, we have

5    no objection to it, but it seems like a lot

6    of work.  And, particularly, I know,

7    Mr. Buddy, every time we ask you to do it,

8    you have to send it off to Georgia and --

9    you know, I've got no objection if folks

10   want to sign, to get each individual

11   beneficiary's signature, that's fine, but at

12   the same time, a resolution providing the

13   advice of the committee and the trustee's

14   signature should be all that we get.

15       MR. MICHAEL PENEGUY:  The Wisner family

16   wants to sign.

17       MR. SHERMAN:  The family wants to sign?

18       MR. MARK PENEGUY:  Not "wants to."  The

19   family is required to, by law.  You have bad

20   advice, in my opinion.  And Cathy, I have --

21       MR. SHERMAN:  We have different advice,

22   Mr. Peneguy, different advice.

23       MR. MARK PENEGUY:  Bad advice.

24       MR. SHERMAN:  We have different advice.

25       MR. MARK PENEGUY:  You have a lot of

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 104

  1   bad advice.  Section 13 --

  2        MR. SHERMAN:  We have different advice,

  3   Mr. Peneguy.

  4        MR. MARK PENEGUY:  Section 13 --

  5        MS. PHILLIPS:  Not all the

  6   beneficiaries signed, because the contingent

  7   beneficiaries do not sign on this.  There

  8   are over 50 of them, so --

  9        MR. MICHAEL PENEGUY:  Right, but

 10   they're --

 11        MS. PHILLIPS:  So this is just not the

 12   full complement, so --

 13        MS. NORMAN:  Oh, where they can assign,

 14   we need to get --

 15        MR. MARK PENEGUY:  Yes, Section 13 has

 16   a -- they are allowed to assign with only

 17   Chevron's consent.

 18        MS. NORMAN:  We need to get that

 19   changed, okay.

 20        MR. MARK PENEGUY:  Section 16 and 17 do

 21   not indemnify Wisner and the beneficiaries,

 22   and I think that ought to be changed.

 23        MS. NORMAN:  Okay.

 24        MR. MARK PENEGUY:  Now, Chevron

 25   continues to defend us, but --

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 105

1        MS. NORMAN:   You want to be added in?

2        MR. MARK PENEGUY:   No, I'm sorry, 16

3    requires that.   17 says that it's

4    interpreted according to the laws of Texas.

5        MS. NORMAN:   And we want it Louisiana.

6        MR. MARK PENEGUY:   And I think it

7    should be Louisiana, because that's where we

8    are and that's where our property is.

9        MR. MICHAEL PENEGUY:   And that's where

10   Chevron is.

11       MS. NORMAN:   Yeah.   Wait a minute.

12   Where is that, in 17?

13       MR. MARK PENEGUY:   17.

14       MS. NORMAN:   Okay.   Oh, yeah, okay.

15       MR. MARK PENEGUY:   Those were the

16   comments I had on the --

17       MS. NORMAN:   Okay.   I'm sure that can

18   go along with all of this.   I'll call --

19   okay.

20       MR. MICHAEL PENEGUY:   I move that we

21   approve the assignment with those changes --

22       MS. NORMAN:   Okay.

23       MR. MICHAEL PENEGUY:   -- and with

24   everybody signing.

25       DR. WILLIAMS:   I'll second.

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 106

1      MR. SHERMAN:  We have a motion and a

2   second.  Any discussion?  All in favor?

3          (Vote taken).

4      MR. SHERMAN:  Hear no objections, the

5   motion passes.  Shall we entertain a motion

6   to go into Executive Session to discuss --

7      MR. MICHAEL PENEGUY:  Well, we've got

8   one more.

9      MS. PHILLIPS:  No, one more, huh?

10     MS. NORMAN:  One more.  We've got

11  Manti.

12     MR. MICHAEL PENEGUY:  Yeah, Manti

13  report.

14     MR. MARK PENEGUY:  On the new agenda in

15  today's packet?

16     MS. PHILLIPS:  Yeah.

17     MS. NORMAN:  I blacked out, on the

18  Division Order -- the Division Order is the

19  first order of business, the portion of the

20  Division Order that I thought -- everything

21  else is pretty vanilla, other than this

22  paragraph, and so my thought was that we

23  could initial the paragraph and then just

24  sign it.

25     MR. MARK PENEGUY:  And I still object

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 107

1    to it, because there's no need to sign a

2    Division Order, in Louisiana.  You should --

3    you must return the W9, but no need to sign

4    the Division Order.  If there's no need to,

5    by law, there's no reason to do it.

6         MR. MICHAEL PENEGUY:  Well, that

7    basically, you know -- my way of thinking

8    is, there's nothing wrong with it, as long

9    as you scratch out what you don't want in

10   it.  And in actuality, it can't change, even

11   if it says it can change the agreement.  It

12   can't, by Louisiana law, so --

13        MR. MARK PENEGUY:  Right.  The Division

14   Order cannot change the terms of the lease.

15        MR. MICHAEL PENEGUY:  Right.

16        MR. MARK PENEGUY:  Or any other

17   agreement that the lessor has with the

18   lessee.

19        MS. PHILLIPS:  Right.

20        MR. MARK PENEGUY:  But there's still no

21   reason to sign it if the law does not

22   require it be signed.

23        MR. MICHAEL PENEGUY:  Yeah, but the

24   other thing is you have to fill out a W9, so

25   just as --

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 108

1        MR. MARK PENEGUY:  The W9 is separate

2    from this, though.

3        MR. MICHAEL PENEGUY:  Yeah, but --

4        MS. NORMAN:  Well, you really don't,

5    because it says that they just need our

6    taxpayer ID number, and they already have

7    that.

8        MR. MICHAEL PENEGUY:  Right.

9        MR. MARK PENEGUY:  Well, that's the W9.

10       MR. MICHAEL PENEGUY:  Yeah, that's the

11   replacement of the W9.  I move that we

12   approve it, based on your scratch-out and

13   initialing of the thing, and signing it and

14   sending it back to them.

15       MS. NORMAN:  All right.  And shall this

16   be forwarded to the mayor's trustee to sign?

17       MR. MICHAEL PENEGUY:  I'll leave that

18   up to --

19       MR. SHERMAN:  Yeah, I would think

20   that's appropriate.

21       MS. NORMAN:  Okay.

22       MR. MICHAEL PENEGUY:  Do you think you

23   have any problems with the agreement -- I

24   mean, the --

25       MS. NORMAN:  Division Order?

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 109

1      MR. MICHAEL PENEGUY:  The Division

2   Order?

3      MS. NORMAN:  And he would --

4      MR. MARK PENEGUY:  Yeah, I think if

5   you're going to sign it, Cathy ought to just

6   sign it, as the manager.

7      MR. MICHAEL PENEGUY:  That's my

8   thought, but I'll leave that argument to

9   y'all.

10      MR. SHERMAN:  I'll tell you in a moment

11   if we could.

12      MR. MICHAEL PENEGUY:  There's another

13   point --

14      MR. SHERMAN:  We'll have them sign

15   first and then present it to the mayor.

16      MS. NORMAN:  Okay.  Well, they don't

17   sign.  They don't sign a Division Order.

18      MR. MICHAEL PENEGUY:  Yeah.

19      MS. NORMAN:  This is the Division

20   Order.

21      MR. SHERMAN:  Well, there's a

22   signature, it's signed, yeah.

23      MS. NORMAN:  No, no, no.  Look at

24   what's up in your lap.  That's what we're

25   talking about first, the Division Order.

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 110

1      MR. MICHAEL PENEGUY:  Yeah, the only

2   thing the Division Order tells them is

3   that's your interest and --

4      MR. MARK PENEGUY:  What you're doing

5   with the Division Order is acknowledging

6   that your interest is what is stated there.

7      MR. MICHAEL PENEGUY:  Right.

8      MR. MARK PENEGUY:  If your interest is

9   greater, you are saying that that's all you

10   need to pay me, regardless of what the

11   actual interest is.  It's another reason not

12   to sign a Division Order.  I understand that

13   the Wisner Donation knows what its interest

14   is --

15      MR. MICHAEL PENEGUY:  Right.

16      MR. MARK PENEGUY:  -- but there's still

17   no reason to sign something that limits you.

18   Who knows if something didn't come and we

19   found out that we actually owned twice as

20   much?

21      MR. MICHAEL PENEGUY:  Well, in that

22   case --

23      MR. MARK PENEGUY:  We are done once you

24   sign a Division Order.

25      MR. MICHAEL PENEGUY:  No.  No, we

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 111

1    aren't.

2         MR. MARK PENEGUY:  Oh, yes.  That's the

3    law.  Look at the law.

4         MR. MICHAEL PENEGUY:  I've done that

5    over in Mississippi and Alabama.

6         MR. MARK PENEGUY:  Mississippi is not

7    Louisiana.  Neither is Alabama.

8         MR. MICHAEL PENEGUY:  Well, it's the

9    same thing.

10        MR. MARK PENEGUY:  Neither is Texas.

11        MR. MICHAEL PENEGUY:  It's the same

12   thing.  Essentially, a Division Order is for

13   this payment.

14        MR. MARK PENEGUY:  Right.

15        MR. MICHAEL PENEGUY:  If you find out

16   you have a larger interest --

17        MR. MARK PENEGUY:  Not in Louisiana.

18        MR. MICHAEL PENEGUY:  You will get

19   another Division Order.

20        MR. MARK PENEGUY:  You are signing that

21   this --

22        MR. MICHAEL PENEGUY:  No.

23        MR. MARK PENEGUY:  You are certifying

24   that this is your only interest, that this

25   is --

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 112

1    MR. MICHAEL PENEGUY: Right now, yes,
2    but if --
3    MR. MARK PENEGUY: One, you don't sign
4    a Division Order, in Louisiana.
5    MR. MICHAEL PENEGUY: But if you'll
6    find more interest, then that will be
7    another Division Order. That's the same in
8    every state.
9    MS. NORMAN: And this has nothing to do
10   with the lease.
11   MR. MICHAEL PENEGUY: Right.
12   MS. NORMAN: It has just to do with the
13   well.
14   MR. MICHAEL PENEGUY: Right.
15   MR. MARK PENEGUY: Bad idea.
16   MS. PHILLIPS: Well, have we --
17   MR. SHERMAN: The motion is to approve
18   or authorize signature of it. The next
19   thing I would do, I'm going to have the City
20   attorney also opine just on this particular
21   issue that you raised so we can get one more
22   set of legal ears. I'd love to hear your
23   argument so we can have it at the next
24   meeting.
25   MR. MARK PENEGUY: I'm reading what the

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 113

1    law says and --

2        MR. SHERMAN:  Our staff, and anyone

3    else that wants, and then we can find out if

4    the mayor wants to sign, authorize you to

5    sign --

6        MS. NORMAN:  Okay.

7        MR. SHERMAN:  -- or return it back to

8    the committee.

9        MS. NORMAN:  Okay.  All right.

10       MR. SHERMAN:  If anyone has further

11   thoughts, let's set -- there's no time

12   sensitivity over the next week here, I don't

13   see.

14       MS. NORMAN:  No, but we need to pretty

15   quickly or they won't -- they'll stop --

16       MR. MARK PENEGUY:  All we need to do is

17   send a letter saying, "That is the interest

18   I know we own at this time, and here is your

19   W9."  That's all you need to do.  You don't

20   need to sign the Division Order.

21       MR. MICHAEL PENEGUY:  The other --

22   you've got another portion of this.

23       MR. MARK PENEGUY:  I respectfully --

24   I'd refuse, respectfully.  That's my view.

25       MR. SHERMAN:  We'll do some further

Page 114

1    legal work on that.

2         MS. NORMAN:  Okay.  Next is another

3    request to us.

4         MR. SHERMAN:  We didn't vote on that

5    yet.

6         MS. NORMAN:  Okay.

7         MR. SHERMAN:  Cathy, do you think we

8    need to take action within the next 30 days?

9         MS. NORMAN:  Let me contact them and --

10        MR. MICHAEL PENEGUY:  Yeah, I think

11   with the partial assignment --

12        MS. NORMAN:  With the assignment, we

13   do.  Not with the Division Order.

14        MR. MICHAEL PENEGUY:  Well, the same

15   thing is tied to it, because essentially if

16   we start approving assignments before we

17   approve, you know, something that says what

18   our interest is, basically we --

19        MS. NORMAN:  All right.  Well, then

20   I -- you know, I can -- I can move forward

21   and look beyond this.  There were some

22   questions that Mike raised about appropriate

23   payments for Manti.  Basically all they are

24   asking for request to assign is 15 percent

25   interest in the first well they drilled,

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 115

1    under our new amended agreement.  And

2    probably they want to sell 15 percent of the

3    well so they can help pay for the next well

4    they want to drill.

5        MR. MICHAEL PENEGUY:  Yeah.

6        MS. NORMAN:  Which is how they do it in

7    this business.

8        MR. MICHAEL PENEGUY:  Yeah, except that

9    they may not be going to drill the next

10   well.  We haven't seen anything yet.

11       MS. NORMAN:  And that's what -- yeah,

12   that's what -- we may want to ask some

13   questions.  So if -- I mean, if the

14   committee would prefer to defer this, I can

15   go forward and ask some more questions about

16   this, with Manti, and wrap it up in one

17   letter, shoot them a letter, get some

18   responses, and then we can just finalize

19   this at the next meeting.

20       MR. SHERMAN:  I certainly want to do

21   some more research.

22       MS. NORMAN:  Got you.

23       MR. SHERMAN:  I'm comfortable either

24   authorizing it, and then subject to the

25   further research, or in the alternative, if

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 116

1    we can offer something less and they accept

2    it, --

3         MS. NORMAN:   Okay.

4         MR. SHERMAN:   -- then that solves our

5    problem before next month.

6         MS. NORMAN:   But we still need to

7    approve the request to assign.

8         MR. SHERMAN:   Yeah.

9         MR. MICHAEL PENEGUY:   But we can't do

10   that until we find out --

11        MS. NORMAN:   Okay.

12        MR. MICHAEL PENEGUY:   Yeah.

13        MR. MARK PENEGUY:   Cathy, the partial

14   assignment there for Manti, does that not

15   require Chevron's signature, as well?

16        MS. NORMAN:   No.

17        MR. MICHAEL PENEGUY:   No.   No.

18   Chevron --

19        MR. MARK PENEGUY:   Okay.   Well,

20   Chevron's still bound to maintain our

21   property as a result of the agreement, to

22   allow them to assign the Texaco lease?

23        MS. PHILLIPS:   This is -- no, this is

24   the stuff with the old Entergy -- not

25   Entergy --

Page 117

```
 1          MS. NORMAN:  Well, this is --
 2          MR. MARK PENEGUY:  This is --
 3          MS. PHILLIPS:  The June Gold King --
 4          MS. NORMAN:  It's Leeville.
 5          MR. MARK PENEGUY:  This Manti thing?
 6          MS. NORMAN:  Yes.  It's Leeville.
 7          MS. PHILLIPS:  Yeah, it's Leeville.
 8          MR. MARK PENEGUY:  It's not the Texas
 9  company lease?
10          MS. NORMAN:  That has been amended.
11          MR. MICHAEL PENEGUY:  It's amended.
12          MR. MARK PENEGUY:  Right, but Chevron's
13  still bound by it.  Chevron's still a party
14  to that, is it not?
15          MS. NORMAN:  No.
16          MR. MICHAEL PENEGUY:  No, Texaco or
17  Chevron are --
18          MR. MARK PENEGUY:  So we released
19  Chevron from any liability that it had?
20          MS. NORMAN:  No, they are -- they
21  are -- Texaco, which -- signed something
22  that they would continue to have liability.
23  But they didn't sign our amendment.  Why
24  would they need to sign the assignment of
25  the amendment?
```

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 118

1    MR. MARK PENEGUY:  Well, that was a

2    choice that our counsel told us that it

3    would need to do; is that correct?

4    MS. NORMAN:  Yes.

5    MR. MARK PENEGUY:  Okay.  And the

6    concerns I have there, of course, are

7    indemnification, all the same things that I

8    always have, for us.  Because what they're

9    doing is they're assuming if I -- I only got

10   this, what, today and so I did a quick read

11   of it, and it appears to me that they're

12   assigning an interest, 15 percent interest,

13   to this company.

14   MS. NORMAN:  Probably a working

15   interest, yes.

16   MR. MARK PENEGUY:  Are they assuming

17   all our -- is Manti retaining all liability?

18   MS. NORMAN:  As far as I know, I think

19   they are.

20   MR. MARK PENEGUY:  That's one of the

21   concerns I have.  And, of course, we don't

22   want them assigning this to somebody else

23   without our approval.

24   MR. MICHAEL PENEGUY:  Yeah.  Well, the

25   first thing that I thought about is

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 119

1   basically --

2       MS. NORMAN:  They have a joint

3   operating agreement.

4       MR. MARK PENEGUY:  Right, I understand

5   that.  I don't know what that joint

6   operating agreement says.

7       MR. MICHAEL PENEGUY:  No, that doesn't.

8   The primary thing is, to me, you know, along

9   with that liability and all, is Manti going

10  to be paying all the royalties throughout

11  the life of this agreement.  Because if they

12  start splitting it up, well then you've got

13  15 percent or 7 percent from one group, two

14  percent from another group --

15      MR. MARK PENEGUY:  Well, they're not --

16  yeah.

17      MR. MICHAEL PENEGUY:  And we don't want

18  that.

19      MR. MARK PENEGUY:  They're not

20  subleasing this, they're assigning this.

21      MR. MICHAEL PENEGUY:  Yeah, they're

22  assigning it, which, again, it's about

23  working interest.

24      MR. MARK PENEGUY:  And it doesn't

25  acknowledge that they --

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 120

1      MS. NORMAN:  Yeah, they're assigning

2   it.

3      MR. MARK PENEGUY:  -- have an

4   obligation to come to us to further assign

5   it, if one of these other companies wants to

6   assign it.  And so, you know, it's -- all

7   those things need to be looked at, so --

8      MR. MICHAEL PENEGUY:  Along with us not

9   getting paid right from Manti right now.

10     MR. MARK PENEGUY:  Well, that -- I

11  agree with that one.

12     MS. NORMAN:  You have quite a few

13  issues, I know.

14     MR. SHERMAN:  Cathy, this sounds like

15  we have some issues to go through.

16     MS. NORMAN:  Yeah.  This did not -- as

17  you see, it arrived at my office and I did

18  not even look at it until last week.  That's

19  why it didn't make the packet, so I -- there

20  are a lot of issues with this.  But they

21  specifically, if you look at the exhibits,

22  they reference our agreement, as amended, in

23  the back.

24     MR. MICHAEL PENEGUY:  Right.

25     MR. MARK PENEGUY:  That doesn't matter.

Page 121

1   I'd like to be sure that any assignment they

2   have recognizes that they have to come to us

3   for approval of any further assignments.

4        MS. NORMAN:  Okay.

5        MR. MARK PENEGUY:  That's what we had

6   before.  Every assignment we ever approved

7   required that.  That's why -- that's how

8   Manti got this lease, to begin with.  They

9   got it through Gold King and all that,

10  didn't they?

11       MR. MICHAEL PENEGUY:  Yes.

12       MS. NORMAN:  Yes.

13       MR. MARK PENEGUY:  Didn't they buy it

14  from them and we approved those assignments?

15       MS. NORMAN:  Right, exactly.

16       MR. MARK PENEGUY:  And that's what I

17  want to be sure, that Blue Moon and all

18  these others do not assign this to somebody

19  without our approval.

20       MR. MICHAEL PENEGUY:  Okay.

21       MR. MARK PENEGUY:  Even though I

22  recognize that what they're getting is a

23  piece of a lease that requires them to do

24  that.

25       MS. NORMAN:  All right.

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 122

1      MR. MARK PENEGUY:  I want them to

2    acknowledge that.

3      MS. NORMAN:  I mean, should I go ahead

4    and ask them for a copy of their joint

5    operating agreement?

6      MR. MICHAEL PENEGUY:  That may be a

7    good idea.

8      MS. NORMAN:  I think that that's what

9    I -- that's all you really have to do

10   because that spells out everything, the JOA.

11     MR. MICHAEL PENEGUY:  Yeah, but I

12   would, you know, make --

13     MS. NORMAN:  But, you know, this is the

14   way the oil business goes now.  You don't --

15   you don't -- people, particularly smaller

16   companies don't -- you don't deal with one

17   company drilling a well.  They sell off

18   pieces of it --

19     MR. MARK PENEGUY:  I understand that.

20     MS. NORMAN:  -- to have enough money to

21   drill the next well, develop the field.

22     MR. MARK PENEGUY:  We're protecting

23   ourselves.

24     MS. NORMAN:  Right.

25     MR. MICHAEL PENEGUY:  And the other

Transcription from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 123

1    thing, that we may want to reurge some of

2    that agreement to cover us, but the joint

3    operating agreement would be the first step

4    to get -- or to get the joint operating

5    agreement would be the first step.

6        MS. NORMAN:  Okay.  All right.  Well,

7    we will look into this further.  I have not

8    had time to even think about it before this

9    meeting today, and I read it as briefly as

10   you did, so --

11       MR. SHERMAN:  All right.  Anything

12   further on that issue?  All right.  Bringing

13   us home, is there a motion for Executive

14   Session for the BP Horizon Deepwater Spill

15   Update?

16       MR. MICHAEL PENEGUY:  I'll move that we

17   go into Executive Session for the special --

18   the sensitive lease.

19       MR. SHERMAN:  We have a motion.  Is

20   there a second?

21       DR. WILLIAMS:  Second.

22       MR. SHERMAN:  Motion and a second.  All

23   in favor?  Any opposed?

24           (Vote taken).

25       MR. SHERMAN:  All right.  The motion

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 124

1    carries.

2              (Executive Session took place).

3         MR. SHERMAN:  Is there a motion to

4    adjourn?

5         MR. BUDDY:  So moved.

6         MR. SHERMAN:  We have a motion.  Is

7    there a second?

8         MR. MICHAEL PENEGUY:  I'm sorry, what?

9         MR. SHERMAN:  Is there a second to

10   adjourn?

11        MS. NORMAN:  That that --

12        MR. MICHAEL PENEGUY:  Oh, yeah.  Oh,

13   yeah.

14        MR. SHERMAN:  All in favor of

15   adjournment.

16             (Vote taken).

17        MR. SHERMAN:  All right.  Hearing no

18   opposition, we are adjourned.

19             (Meeting concluded).

20                  *       *       *

21

22

23

24

25

Transciption from Audio Tape of Regular Session
Edward Wisner Donation Advisory Committee

Page 125

```
 1                 REPORTER'S CERTIFICATE

 2

 3

 4         I, LINDA G. GRIFFIN, RPR, Certified

 5    Court Reporter, in and for the State of

 6    Louisiana, do hereby certify that this was

 7    prepared and transcribed by or under my

 8    personal direction and supervision, and is a

 9    true and correct transcript, to the best of

10    my ability and understanding; that I am not

11    related to counsel or to the parties herein,

12    nor am I otherwise interested in the outcome

13    of this matter.

14

15

16

17

18

19

20

21

22               LINDA G. GRIFFIN, RPR
                 Certified Court Reporter
23

24

25
```

OFFICIAL SEAL
LINDA G. GRIFFIN
Certified Court Reporter
in and for the State of Louisiana
Certificate Number  80892
Certificate expires 12-31-13

Transcript of the Testimony of
# Transcription from Audio Tape of Special Meeting

### Date taken: June 7, 2012

### Edward Wisner Donation Advisory Committee

All **electronic deposition & exhibit files**
are available at **www.psrdocs.com.**
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password.**

# Professional Shorthand Reporters, Inc.
**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   http://www.psrdocs.com**

*Amended and Approved at the October 29, 2013 Regular Meeting*

ORIGINAL

*Interim Secretary Treasurer*

EXHIBIT
NN

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 1

EDWARD WISNER DONATION

ADVISORY COMMITTEE


SPECIAL MEETING


TRANSCRIPTION FROM AUDIO TAPE of
the Edward Wisner Donation Advisory
Committee Meeting, held in the offices of
the Arts Council, 8th Floor Conference Room,
935 Gravier Street, New Orleans, Louisiana
70112, on Thursday, the 7th day of June,
2012.

PRESENT:

     Michael G. Sherman, Chair
     CITY OF NEW ORLEANS

     Michael Peneguy, Representative
     WISNER FAMILY HEIRS

     William A. Peneguy, Representative
     WISNER FAMILY HEIRS

     E. W. Peneguy
     WISNER FAMILY HEIRS

     Lizbeth Turner, Alternate
     Anthony Lorino, Alternate
     TULANE UNIVERSITY

     Ed Buddy, Alternate
     THE SALVATION ARMY

     Dr. Everett J. Williams, Jr.
     Stacy Gerhold-Marvin
     CHARITY

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 2

1    STAFF:

2         C. CATHY NORMAN
          Secretary-Treasurer/Land Manager
3
          L. AMANDA PHILLIPS
4         Executive Assistant, Wisner

5

6    GUESTS:

7
          MARK E. PENEGUY, ESQ.
8         Wisner Family

9         JOEL WALTZER, ESQ.
          Waltzer & Wiygul
10
          ROBERT WIYGUL, ESQ.
11        Waltzer & Wiygul

12        JAMES BURTON, ESQ.
          Simon Peragine
13
          SUSAN CLADE, ESQ.
14        Simon Peragine

15

16   TRANSCRIBED BY:

17        LINDA G. GRIFFIN, RPR
          Certified Court Reporter
18

19

20

21

22

23

24

25

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 3

```
 1                    AGENDA INDEX
 2                                       PAGE
 3    1) Presentation by Steve Herman
           Letter Sent; Signed by
 4            3 beneficiaries .............     6
 5    2) BP Deepwater Horizon Oil Spill
           Access Agreement ............   100
 6
      3) BP Deepwater Horizon Oil Spill
 7         Authority of Counsel ........    10
 8    4) BP Deepwater Horizon Oil Spill
           Opt-in/Opt-out options;
 9           Submitted Claim .............    41
10                      ***
11                  M O T I O N S
12    MOTION BY MICHAEL PENEGUY
           to rearrange agenda; Move
13         "Authority of Counsel" up
      SECONDED BY ED BUDDY
14    MOTION PASSED ....................    10

15    MOTION BY MICHAEL PENEGUY
           to compel mayor to acknowledge
16         W&W is representing Donation
      MOTION WAS LOST ..................    62
17
      MOTION BY MICHAEL PENEGUY
18         to reschedule regular meeting
           for June 19, 2012
19    SECONDED BY DR. EVERETT WILLIAMS
      MOTION PASSED ....................    71
20
      MOTION BY MICHAEL PENEGUY
21         for Cathy to draft letter to
           Cortizas; what authority does
22         W&W have; to be answered within
           two days; upon advice of Wiygul
23    SECONDED BY ED BUDDY
      MICHAEL SHERMAN (ABSTAIN)
24    MOTION PASSED ....................    87

25
```

Professional Shorthand Reporters, Inc.                    1-800-536-5255
Offices in New Orleans and Baton Rouge                    www.psrdocs.com

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 4

```
 1   MOTION BY MICHAEL PENEGUY
         Response from mayor in writing
 2       regarding W&W authority in BP matters;
         City Attorney in BP matters
 3   MOTION WAS LOST ...................  88

 4   MOTION BY MICHAEL PENEGUY
         to enter Executive Session
 5   SECONDED BY DR. EVERETT WILLIAMS
     MOTION PASSED ....................  105
 6
     MOTION BY MICHAEL PENEGUY
 7       to exit Executive Session
     SECONDED BY ED BUDDY
 8   MOTION PASSED ..........(Exec Sess)  49

 9   MOTION BY MICHAEL PENEGUY
         to follow advice of W&W to
10       submit claim to
         Deepwater Horizon Claims Center
11   SECONDED BY ED BUDDY
     MICHAEL SHERMAN (ABSTAIN)
12   MOTION PASSED ...................  106

13   MOTION BY DR. EVERETT WILLIAMS
         to adjourn
14   SECONDED BY MICHAEL PENEGUY
     MOTION PASSED ...................  108
15

16

17

18

19

20

21

22

23

24

25
```

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 5

```
 1              *SPECIAL MEETING*

 2        MR. SHERMAN:  Perhaps we can just run

 3   around the room quickly, for your benefit,

 4   and have everyone say who they are.  I'm

 5   Mike Sherman, the Mayor's Executive Counsel,

 6   for the City.  Mr. Lorino?

 7        MR. LORINO:  Tony Lorino, Tulane

 8   University.

 9        DR. WILLIAMS:  Everett Williams,

10   Charity Hospital.

11        MS. TURNER:  Beth Turner, Tulane.

12        MS. PHILLIPS:  Amanda Phillips, Wisner

13   office.

14        MS. NORMAN:  Cathy.

15        MS. MARVIN:  Stacy Marvin, Charity.

16        MR. WIYGUL:  Robert Wiygul, with

17   Waltzer & Wiygul.

18        MR. WALTZER:  And Joel Waltzer, Waltzer

19   & Wiygul.

20        MR. BUDDY:  Ed Buddy, Salvation Army.

21        MR. MARK PENEGUY:  Mark Peneguy, your

22   cousin.

23             (Inaudible comment).

24        MR. SHERMAN:  Well, welcome.

25        MR. WILLIAM PENEGUY:  Next time we'll
```

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 6

1    bring James.

2        MS. NORMAN:  No, please.

3        MR. EDWARD PENEGUY:  Don't worry,

4    Amanda, I've got him by the big ones.

5        MS. PHILLIPS:  Thank you.

6        MR. SHERMAN:  Well, we have a special

7    meeting today with a four number agenda.

8    Mr. Peneguy, let me -- a busy four number

9    agenda.  Let me turn to you, as the one who

10   made the motion for the meeting.  Do you

11   want to share any thoughts?

12       MR. MICHAEL PENEGUY:  Not right now.

13   Essentially, I think we've got an agenda.

14       MR. SHERMAN:  All right.  Well, the

15   first was a presentation by Steve Herman of

16   Herman, Herman, Katz & Cotlar, and a letter

17   was sent, signed by, I think, three of the

18   beneficiaries.  I hope everyone had an

19   opportunity to read the letter back from

20   Mr. Herman that Cathy circulated yesterday.

21   Cathy, is there anything you want to add on

22   that?

23       MS. NORMAN:  Well, I don't think he

24   answered our questions, but we didn't ask

25   him if he -- whether we wanted him involved

Page 7

1   in the workings of the committee, and he

2   answered that he was not involved in the

3   operation or management of the committee.

4   We asked him if he was representing himself

5   to be representing the committee or the

6   Donation in any way, in this lawsuit, or had

7   taken any action that would affect the

8   City's claim with BP, and we really didn't

9   get an answer to the question, but that

10  being said, we just need to move off that

11  subject at this point.  He chose not to come

12  and talk to us, and that was his

13  prerogative.

14      MR. SHERMAN:  Fair enough, okay.

15  Moving on to No. 2, matters involving the

16  Deepwater Horizon Oil Spill, including but

17  not limited to a proposed settlement

18  agreement of some outstanding access

19  agreement issues.

20          So the next three really are all

21  on the oil spill, and it looks like the way

22  we have our agenda structured, (2) is

23  primarily the access agreement, (3) is the

24  issue of counsel, and (4) is, for better or

25  worse, the opt-out/opt-in duly submitted

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 8

1    claim.  I think that's probably a fair

2    summary of the three agenda items.

3          MS. NORMAN:  Right.  And we did want

4    Jim and Susan to come in --

5          MR. MICHAEL PENEGUY:  Right.

6          MS. NORMAN:  -- with the authority of

7    counsel, because we're not going to be

8    specifically discussing the claim, but more

9    discussing the authority of outside counsel

10   engaged, so we would want to call them in.

11   We can either address that one first and

12   call them in, and then go to the other two,

13   or we can go into Executive Session and

14   discuss the matters involving BP.

15         MR. MARK PENEGUY:  Cathy, I think you

16   all ought to deal with No. 3 first, because

17   there's been a question of whether the City

18   has got its own attorneys trying to

19   represent Wisner and I think we need to

20   resolve that.

21         MS. NORMAN:  Well, --

22         MR. MARK PENEGUY:  There's no point in

23   resolving the other two if the City is

24   taking a different position.

25         MS. NORMAN:  Well, shall we go get Jim

Page 9

1    and Susan?

2         MR. SHERMAN:  Well, --

3         MR. MARK PENEGUY:  Until that's

4    resolved, there's no point in discussing the

5    other items.

6         MR. SHERMAN:  I don't know that we're

7    going to make much progress on (3) today.

8    And (2) and (4) are rather time-sensitive.

9         MS. NORMAN:  We will make progress on

10   (3) today.

11        MR. SHERMAN:  So why don't we just

12   stick with the agenda, as structured.  So

13   the first --

14        MR. MARK PENEGUY:  So you're going to

15   go into Executive Session, come out of

16   Executive Session, go back into Executive

17   Session?

18        MS. NORMAN:  If we need to, that's what

19   we'll do.

20        MR. MARK PENEGUY:  I would suggest you

21   all rearrange the agenda and somebody ought

22   to make a motion to do that.  Just my

23   thought.

24        MR. MICHAEL PENEGUY:  I would make that

25   motion.

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 10

1       MR. SHERMAN:  Well, as chair, let me

2   just hear -- do folks want to rearrange the

3   agenda and do Authority of Counsel first?

4   If that makes folks happier, I'm happy to do

5   that first.  So, as chair, I'm happy to

6   rearrange -- let's go to No. 3, matters

7   involving the authority of counsel.

8       MS. NORMAN:  Okay.  Is there a motion?

9       MR. MICHAEL PENEGUY:  I'll move that

10  we --

11      MR. BUDDY:  Second.

12      MR. SHERMAN:  It's been moved and

13  seconded.  All in favor?  Any opposition?

14  Hearing none, we'll go to No. 3, Authority

15  of Counsel.

16      MS. NORMAN:  Okay.

17      MR. SHERMAN:  Cathy, do you want to

18  lead us off?

19      MS. NORMAN:  Well, I'd like Jim and

20  Susan to get in here, because we have done

21  some research and we're trying to figure out

22  how to address this issue.  Of course, the

23  whole idea of getting another opinion, which

24  would be nonbinding, has been tossed around,

25  and I believe that Tulane and the City

Page 11

1   believe that that would be a good idea, to

2   get another opinion, but we have come up --

3   Jim has done some trust law research and has

4   come up with another solution that we feel

5   may be interesting, and I'd really prefer

6   him to go into it --

7          MR. SHERMAN:  Sure.

8          MS. NORMAN:  -- rather than trying to

9   explain it myself.  So they'll be right

10  here.

11              While we're waiting, were you able

12  to ever get a copy of that public request

13  for documents that I asked you to?

14         MR. SHERMAN:  You know, I've never --

15  that's the first I've ever even heard of

16  that.  That's like a year-and-a-half

17  document.

18         MS. NORMAN:  No, no.  I'm talking about

19  when you, at the meeting, at the last

20  regular meeting, you indicated that BP had

21  made a public request for documents, and I

22  emailed you and asked for a copy of that,

23  and I have not gotten it.

24         MR. SHERMAN:  Yeah, I called you.  Mark

25  Holstein made the request.

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 12

1        MS. NORMAN:   Who?

2        MR. SHERMAN:   Mark Holstein.

3        MS. NORMAN:   With?

4        MR. SHERMAN:   And that's exactly the

5   two documents I suggested.   It's the trust,

6   the Inter Vivos Donation --

7        MS. NORMAN:   Who is Mark Holstein?

8        MR. SHERMAN:   He's from BP, counsel.

9        MS. NORMAN:   Can you give me the

10  written request?

11       MR. SHERMAN:   Yeah.

12       MS. NORMAN:   Okay.   Will you just send

13  it to me, please?

14       MR. WIYGUL:   Cathy, Mark is -- I've

15  forgotten exactly what his title is, but

16  from early on, he's been one of the BP

17  managing attorneys for this whole situation.

18       MS. NORMAN:   Okay.

19       MR. MARK PENEGUY:   He's employed by BP

20  or --

21       MR. WIYGUL:   Yeah, he's inhouse with

22  BP.

23       MR. WALTZER:   It would probably be a

24  good idea if we got copies of stuff like

25  that.

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 13

```
 1        MS. NORMAN:  Well, that's what I
 2   would -- I would like a copy of that.  And
 3   they were supplied with a copy of the --
 4        MR. SHERMAN:  The Donation.  The same
 5   as last month.  It's the -- I confirmed, the
 6   1914 Inter Vivos Donation and the Settlement
 7   Agreement from 1929.
 8        MS. NORMAN:  Okay.  And this other
 9   request that you said that -- we just have
10   never gotten it.
11        MR. SHERMAN:  No, I never heard of that
12   until you sent it to me in an email.
13        MS. NORMAN:  Well, there's a letter
14   from the City back.
15        MR. SHERMAN:  Yeah.  That's the
16   standard public request letter that everyone
17   gets.
18        MS. NORMAN:  Okay.
19             (James Burton, Esq., and Susan
20   Clade, Esq., have joined the meeting).
21        MR. SHERMAN:  Our secretary-treasurer,
22   or land manager, has asked you to come in
23   and thought you might have some thoughts
24   which could facilitate the discussion on the
25   authority of counsel.
```

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 13

1    MS. NORMAN: Well, that's what I
2  would -- I would like a copy of that. And
3  they were supplied with a copy of the --
4    MR. SHERMAN: The Donation. The same
5  as last month. It's the -- I confirmed, the
6  1914 Inter Vivas Donation and the Settlement
7  Agreement from 1929.
8    MS. NORMAN: Okay. And this other
9  request that you said that -- we just have
10 never gotten it.
11   MR. SHERMAN: No, I never heard of that
12 until you sent it to me in an email.
13   MS. NORMAN: Well, there's a letter
14 from the City back.
15   MR. SHERMAN: Yeah. That's the
16 standard public request letter that everyone
17 gets.
18   MS. NORMAN: Okay.
19     (James Burton, Esq., and Susan
20 Clade, Esq., have joined the meeting).
21   MR. SHERMAN: Our secretary-treasurer,
22 or land manager, has asked you to come in
23 and thought you might have some thoughts
24 which could facilitate the discussion on the
25 authority of counsel.

Page 14

1    MR. WIYGUL: Is this in Executive
2  Session yet?
3    MS. NORMAN: No.
4    MR. MICHAEL PENEGUY: No.
5    MR. WILLIAM PENEGUY: You can't leave.
6    MR. MARK PENEGUY: Well, you can, but
7  we'd rather you not.

Page 15

Page 16

Pages 13 to 16

Professional Shorthand Reporters, Inc.          1-800-536-5255
Offices in New Orleans and Baton Rouge          www.psrdocs.com

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee



Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee



Pages 21 to 24

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page  25

Page  27

Page  26

Page  28

Pages  25  to  28

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 31

1
2
3
4
5
6
7
8
9

11
12
13
14
16
17
18
19
20
21
22
23

25

Page 30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 32

10
11
12
13
14
15

17
18
19
20
21
22
23
24
25

Pages 29 to 32

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee



Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 37

1

5
6

12

14

16

22
23

Page 39 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 38

2

4

6

9

11

14

16

19
20
21

23
24

Page 40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Pages 37 to 40

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 41

Page 43

1
2
3
4
5
6
7
B
9
10
11
12
13
14
15
16
17
18                                        18
19
20
21
22
23
24
25

Page 42

Page 44

2                                          1
                                           2
4                                          3
                                           4
                                           5
                                           6
                                           7
                                           B
                                           9
                                           10
                                           11
                                           12
13                                         13
                                           14
                                           15
                                           16
                                           17
                                           18
                                           19
                                           20
                                           21
                                           22
23                                         23
24                                         24
                                           25

Professional Shorthand Reporters, nc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 45

Page 47

Page 46

Page 48

Pages 45 to 48

Professional Shorthand Reporters,hc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee



Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Pages 49 to 52

Professional Shorthand Reporters, nc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 53

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 55

13
14
15

18
19
20
21
22
23

Page 54

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 56

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Pages 53 to 56

Professional Shorthand Reporters, nc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee



Pages  57  to  60

Professional Shorthand Reporters,  nc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 61

Page 63

Page 62

Page 64

Pages 61 to 64

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 65

Page 67

Page 66

Page 68

Pages 65 to 68

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 69

```
 3
 5
 7
 9
10
11
12

15
16
17

19

21
22    MR. SHERMAN: Excellent. So do we have
23    a motion to hold a special meeting on the
24    19th?
25    MR. MICHAEL PENEGUY: No. I'll move --
```

Page 71

```
 1    MR. BURTON: Yeah.
 2    DR. WILLIAMS: Second.
 3    MR. SHERMAN: Okay. We have a motion
 4    and a second. Any discussion? All right.
 5    I will just add, my discussion is I am
 6    optimistic, and I will come with that
 7    intent, that we all will see if we can get
 8    on the same page, and I'm very hopeful, with
 9    the excellent work of Mr. Burton, that we
10    can do that. So with that said --
11    MR. MICHAEL PENEGUY: I would say, just
12    don't say anything, just come prepared to
13    approve it.
14    MR. SHERMAN: And I appreciate your
15    humor, but --
16    MR. WILLIAM PENEGUY: That is humorous.
17    MS. NORMAN: I think Mr. Wiygul has
18    some comment.
19    MR. WIYGUL: Yeah. I have a question I
20    want to ask Mike. This has to be directed
21    to you --
22    MR. SHERMAN: Please, go ahead.
23    MR. WIYGUL: -- as to, you know, the
24    special meeting. We have last, our contract
25    was ratified by the rest of the advisory
```

Page 70

```
 1    MS. NORMAN: No, it would be a
 2    rescheduled.
 3    MR. SHERMAN: A regular meeting,
 4    rescheduled regular meeting.
 5    MS. NORMAN: Right.
 6    MR. MICHAEL PENEGUY: I move that we
 7    reschedule the regular meeting on May 19th,
 8    at 11:00 to 3:00, and ask counsel to --
 9    MR. WIYGUL: I think you said "May."
10    MS. PHILLIPS: Yeah. You want June.
11    MR. WILLIAM PENEGUY: June.
12    MR. MICHAEL PENEGUY: Oh, I said "May."
13    Yeah, I did say "May," didn't I? May.
14    MR. WILLIAM PENEGUY: It's June 19th.
15    It's June 19th when the meeting is.
16    MR. MARK PENEGUY: June, yeah.
17    MR. MICHAEL PENEGUY: Oh, June 19th,
18    okay. I'm sorry. I'd still be in May.
19    MR. WILLIAM PENEGUY: 11:00 o'clock.
20    MR. SHERMAN: We have a motion for a
21    meeting, moving the regular meeting to
22    June 19th, from 11:00 to 3:00.
23    MR. MICHAEL PENEGUY: And at the
24    request, counsel can draw up the proposal
25    -- that he stated --
```

Page 72

```
 1    committee, not by the City.
 2    MR. SHERMAN: Yeah.
 3    MR. WIYGUL: And so what I would like
 4    to understand clearly is just what the
 5    City's position is on what our authority is
 6    to represent and act with the Donation, in
 7    this litigation, and what Steve and Jim and
 8    the rest of the City's outside attorneys,
 9    what their authority is with the Donation,
10    and how you expect us to move forward while
11    doing that --
12    MR. SHERMAN: Sure. No, that's a great
13    and fair question. That's a great and fair
14    question.
15    MR. WIYGUL: What's the correct
16    position, in any case?
17    MR. SHERMAN: Sure. And I would ask
18    you to come meet with me today -- it could
19    be today, it could be tomorrow, it could be
20    on the phone, if you don't have the time --
21    MR. MARK PENEGUY: He's not going to
22    tell you, Mr. Wiygul.
23    MR. SHERMAN: -- and sit with the City
24    attorney and myself, and I'd be happy to go
25    through all the points so that you are --
```

Pages 69 to 72

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 70

1        MS. NORMAN:  No, it would be a

2    rescheduled.

3        MR. SHERMAN:  A regular meeting,

4    rescheduled regular meeting.

5        MS. NORMAN:  Right.

6        MR. MICHAEL PENEGUY:  I move that we

7    reschedule the regular meeting on May 19th,

8    at 11:00 to 3:00, and ask counsel to --

9        MR. WIYGUL:  I think you said "May."

10       MS. PHILLIPS:  Yeah.  You want June.

11       MR. WILLIAM PENEGUY:  June.

12       MR. MICHAEL PENEGUY:  Oh, I said "May."

13   Yeah, I did say "May," didn't I?  May.

14       MR. WILLIAM PENEGUY:  It's June 19th.

15   It's June 19th when the meeting is.

16       MR. MARK PENEGUY:  June, yeah.

17       MR. MICHAEL PENEGUY:  Oh, June 19th,

18   okay.  I'm sorry.  I'd still be in May.

19       MR. WILLIAM PENEGUY:  11:00 o'clock.

20       MR. SHERMAN:  We have a motion for a

21   meeting, moving the regular meeting to

22   June 19th, from 11:00 to 3:00.

23       MR. MICHAEL PENEGUY:  And at the

24   request, counsel can draw up the proposal

25   that he stated.

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 71

```
 1        MR. BURTON:  Yeah.

 2        DR. WILLIAMS:  Second.

 3        MR. SHERMAN:  Okay.  We have a motion

 4   and a second.  Any discussion?  All right.

 5   I will just add, my discussion is I am

 6   optimistic, and I will come with that

 7   intent, that we all will see if we can get

 8   on the same page, and I'm very hopeful, with

 9   the excellent work of Mr. Burton, that we

10   can do that.  So with that said --

11        MR. MICHAEL PENEGUY:  I would say, just

12   don't say anything, just come prepared to

13   approve it.

14        MR. SHERMAN:  And I appreciate your

15   humor, but --

16        MR. WILLIAM PENEGUY:  That is humorous.

17        MS. NORMAN:  I think Mr. Wiygul has

18   some comment.

19        MR. WIYGUL:  Yeah.  I have a question I

20   want to ask Mike.  This has to be directed

21   to you --

22        MR. SHERMAN:  Please, go ahead.

23        MR. WIYGUL:  -- as to, you know, the

24   special meeting.  We have last, our contract

25   was ratified by the rest of the advisory
```

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 72

1  committee, not by the City.

2      MR. SHERMAN:  Yeah.

3      MR. WIYGUL:  And so what I would like

4  to understand clearly is just what the

5  City's position is on what our authority is

6  to represent and act with the Donation, in

7  this litigation, and what Steve and Jim and

8  the rest of the City's outside attorneys,

9  what their authority is with the Donation,

10 and how you expect us to move forward while

11 doing that --

12     MR. SHERMAN:  Sure.  No, that's a great

13 and fair question.  That's a great and fair

14 question.

15     MR. WIYGUL:  What's the correct

16 position, in any case?

17     MR. SHERMAN:  Sure.  And I would ask

18 you to come meet with me today -- it could

19 be today, it could be tomorrow, it could be

20 on the phone, if you don't have the time --

21     MR. MARK PENEGUY:  He's not going to

22 tell you, Mr. Wiygul.

23     MR. SHERMAN:  -- and sit with the City

24 attorney and myself, and I'd be happy to go

25 through all the points so that you are

Page 73

1    crystal clear.

2        MS. NORMAN:  I think we'd all like to

3    hear this right now.

4        MR. MARK PENEGUY:  No, we all need to

5    hear this.

6        MR. EDWARD PENEGUY:  We need to hear

7    this, in front of the committee right here.

8        MS. NORMAN:  Yes.  We need to hear it

9    right now.

10        MR. SHERMAN:  The City has gone through

11    a public procurement process to represent

12    its interest and has selected a team of

13    lawyers to represent the City of New Orleans

14    and I've provided to Cathy --

15        MR. WILLIAM PENEGUY:  That was not the

16    question.

17        MR. SHERMAN:  -- or you could download

18    it off online.  All of our contracts are

19    online.  I'd love to show you the scope of

20    work that -- have you seen that contract?

21        MR. WIYGUL:  Yeah.

22        MR. SHERMAN:  Okay.

23        MS. NORMAN:  It was executed in

24    December of 2011.

25        MR. SHERMAN:  That defines the scope of

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 74

1    work there --

2        MR. MICHAEL PENEGUY:  The bids are --

3    the bids only --

4        MR. SHERMAN:  -- relative to Waltzer &

5    Wiygul.

6        MR. WIYGUL:  Hang on, guys.  I'm

7    listening, Mike.

8        MR. SHERMAN:  The City of New

9    Orleans -- the mayor was presented with your

10   retainer agreement.  He chose not to sign

11   that, so the City has not approved the

12   hiring of your firm to represent the

13   Donation, according to that action by the

14   mayor.

15       MR. WIYGUL:  Right.  Let me -- I want

16   to make sure that we get the answer to the

17   question on the table, which is, what

18   authority do we have to move forward and to

19   take the actions that we've been taking and

20   propose to continue to take for the Wisner

21   Donation?  So that's -- that's -- I'm not

22   sure we're quite getting to the --

23       MR. SHERMAN:  Yeah, and --

24       MR. WIYGUL:  I'm just telling you,

25   Mike.

Page 75

1          MR. SHERMAN:   No.

2          MR. WIYGUL:   I need to know this, --

3          MR. SHERMAN:   Please, and I'm glad

4     you're asking the question directly.

5          MR. WIYGUL:   -- what your position is.

6          MR. SHERMAN:   It's a fair question for

7     you to ask, and I want to give you the full

8     and complete answer, and the right person to

9     do that is the City attorney, not myself.

10         MR. WIYGUL:   I think --

11         MS. NORMAN:   The City attorney approved

12    the filing of the lawsuit by Waltzer &

13    Wiygul.

14         MR. WIYGUL:   Well, hang on.   I think

15    it's fair, Cathy, if -- you know, this is --

16    you know, Mike is giving his answer here.

17    We ought to let him give his answers.   So

18    Richard has a more full answer to this?   Can

19    you tell me what the answer is?   I mean,

20    even in brief, what authority do we have, in

21    the City's view?

22         MR. SHERMAN:   I don't --

23         MR. WIYGUL:   If any.

24         MR. SHERMAN:   I don't know how he would

25    phrase it and I don't want to, on such an

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 76

1    important issue, do an injustice by saying

2    any one word wrong, particularly considering

3    this thing is going to potentially head

4    towards litigation, based upon the

5    discussion today, so I -- in anticipation of

6    potential litigation, I do not want to give

7    an answer, while correct, that is phrased

8    improperly, so I am not going to answer that

9    question at this table, in my own words.  I

10   want it to be answered definitively for you

11   in the City's words.

12        MS. NORMAN:  So shall I, on behalf of

13   the committee, write a letter to Richard

14   Cortizas, asking him that question, and

15   email it to him this afternoon?

16        MR. SHERMAN:  That would be fine.  I'm

17   going to do the same thing, but if it would

18   be helpful for you to write that letter, I

19   think that's absolutely fine.

20        MS. NORMAN:  Okay.

21        MR. SHERMAN:  Absolutely fine and fair.

22        MS. NORMAN:  With the committee's

23   approval, I will do that.

24        MR. MICHAEL PENEGUY:  I'll move that

25   you do that and ask for the answer within

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 77

1    two days.

2        MR. MARK PENEGUY:  Cathy, I'd ask you

3    to include, with the advice of Robert and

4    Joel, so that their actual questions can be

5    answered, not when we get a response, the

6    attorney --

7        MR. WIYGUL:  The second question, Mike,

8    was what authority is the -- are Steve and

9    the rest of the team of outside lawyers, in

10   the City's view, representing the Donation

11   with respect to the Deepwater Horizon

12   matter?

13       MR. SHERMAN:  Their representation is

14   of the City of New Orleans.

15       MR. WIYGUL:  And the City in what

16   capacity?

17       MR. SHERMAN:  In all capacities.  It's

18   not specifically defined, in the scope of

19   work.

20       MR. WIYGUL:  And that's, to help me

21   understand, the City, as trustee of the

22   Edward Wisner Donation, correct?

23       MR. SHERMAN:  Again, in anticipation of

24   litigation, I don't want to say something

25   which is correct, but phrase it improperly,

Page 78

1    so I think that's another great one for our

2    secretary to -- and land manager to send to

3    our City attorney to have him answer, in a

4    way that you can rely upon.

5         MS. NORMAN:  Can I ask a question?  And

6    that is, we've -- we've had Waltzer & Wiygul

7    under retainer for almost two years.  The

8    City has continually approved invoices,

9    approved the filing of a lawsuit by their

10   firm, approved it, without --

11        MR. MICHAEL PENEGUY:  Right.

12        MS. NORMAN:  -- without any objection

13   whatsoever, and now they're going to say

14   they don't have the authority to do this?  I

15   don't understand how you can go through a

16   timeline where there is acquiescence,

17   acquiescence, acquiescence -- oh, no, we

18   didn't ever approve anything.  It's pretty

19   confusing.

20        MR. MICHAEL PENEGUY:  I think that's --

21        MR. EDWARD PENEGUY:  It doesn't make

22   any sense.

23        MS. NORMAN:  Well, it -- it

24   basically -- it basically -- it jeopardizes

25   our claim and it is really, I think, --

Page 79

1           MR. WIYGUL:  You understand where

2     I'm -- Cathy, I want you to understand where

3     I'm coming from.  This is -- like I'll be

4     candid with all of y'all.  I think anybody,

5     trying to help and trying to represent an

6     entity like the Donation would want an

7     answer to this question and they would want

8     an answer to this question, where nobody's

9     being coy and nobody's mincing words and

10    nobody is being strategic in the way they

11    approach this, and frankly, I think it

12    should have been done quite some time ago.

13          You know, we are at a point, I

14    think, where this question needs to be

15    answered, it needs to be answered openly and

16    fully.  Positions need to be aired

17    completely and we've got to have the answer

18    to them.

19          MR. LEGER:  Our name's on federal

20    pleadings, as it stands now.

21          MR. WIYGUL:  We need permission of the

22    City attorney.  If the position of the City

23    is now that we do not have authority or that

24    that authority is limited in some fashion, I

25    think it would be appropriate for anybody,

Page 80

1    especially someone acting in the capacity of

2    the trustee, to make it full and clear what

3    their position is and how that needs to be

4    resolved.

5        MS. NORMAN:  The trustee is basically

6    making the --

7        MR. WIYGUL:  Are you with me about

8    that?

9        MR. SHERMAN:  Sir?

10       MR. WIYGUL:  Do you agree with me about

11   that?

12       MR. SHERMAN:  Yeah, I just -- restate

13   the last part you just said, because you and

14   Cathy talked at the same time.

15       MR. WIYGUL:  I think it's going to be

16   important, given that we are on pleadings in

17   Federal Court, we've been acting for the

18   Donation, we've been negotiating for the

19   Donation, undertaking these things, two

20   years, with the acquiescence or ratification

21   of everyone on this committee, and if the

22   position is now that we do not have

23   authority, or the actions that we're taking

24   are ultra vires, are inappropriate and

25   cannot take these actions, I think that any

Page 81

1    rational person, and certainly someone

2    acting in the position of the trustee, would

3    go ahead and make the position clear and

4    explain what the thinking is legally about

5    our authority, what the bounds of that

6    authority are and what's proposed to be done

7    about it.

8         MR. SHERMAN:  Yeah.

9         MR. WIYGUL:  So I hope everyone would

10   agree with me about that.

11        MR. SHERMAN:  That is a fair request.

12   That's a fair statement.  And in addition

13   to, unfortunately, sounding like a broken

14   record and saying that the mayor chose, as

15   trustee, not to retain your firm by signing

16   as the trustee, to sign the retainer

17   agreement, I will get you something more,

18   which is, subsequent to him making that

19   decision, what does he view the actions you

20   have taken as, and I will -- that is the

21   question -- we have a point certain where we

22   know the trustee's position, and I think I

23   appropriately repeated that the City cannot

24   and has not affirmed what this committee's

25   asked it to, that Waltzer & Wiygul has been

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 82

1    properly retained and ratified and approved

2    by the trustee, but I will secure for you

3    any -- a better answer to the specific

4    questions you've asked.

5        MR. WIYGUL:  Right.  Mike, you know, do

6    not be concerned about hurting feelings or

7    putting things in a way that goes around

8    anything.  I just think it's appropriate

9    to -- it's not just appropriate.  Let me

10   say, it's necessary to lay this out and

11   explain exactly what the thinking is, so

12   that at that point, what -- you know, as far

13   as we know, we have been properly authorized

14   and are doing what we're supposed to be

15   doing.  And the City has very kindly said,

16   on a number of occasions, it thinks the work

17   that we have done is very good.  We

18   appreciate that.  But, look, we, you know,

19   really should not be in a position where we

20   have to go on without just being clear about

21   it.  When your position is clear, I'm sure

22   the committee and others will take whatever

23   action they deem appropriate, and I'm not,

24   you know, advising them about that.

25       MR. SHERMAN:  And the other issue just

 1    that I want to raise, because I don't want

 2    to let that conversation go by, is the

 3    conflict issue.  That the City attorney sent

 4    an email to Cathy about something she would

 5    do in the future, after having a meeting,

 6    and I don't know of any signed document by

 7    the City attorney or the mayor, waiving that

 8    conflict of interest.  And there's active

 9    litigation against the City on a different

10    matter.  Now, there is an email from the

11    City attorney that she wanted to have a

12    meeting to discuss --

13         MS. NORMAN:  No, she just said she

14    waived the conflict.

15         MR. SHERMAN:  She did not say that.

16    She said "I will waive."

17         MS. PHILLIPS:  And that came after her

18    meeting with them.

19         MR. MARK PENEGUY:  That's correct.

20         MS. PHILLIPS:  That email came after

21    her meeting with them.

22         MR. WIYGUL:  Yeah, and let's state it

23    this way.  I want --

24         MS. NORMAN:  And when I sat in the

25    mayor's office --

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 84

1       MR. WIYGUL:  You're going to have to --

2       MR. SHERMAN:  I wanted to raise the

3    issue.

4       MS. NORMAN:  I sat in the mayor's

5    office, and when I said, "Nannette waived

6    the conflict," she shook her head up and

7    down, and I will swear on a Bible that that

8    occurred.  I also will tell you --

9       MR. SHERMAN:  But people using

10   professional conduct, don't talk about

11   nodding or waving.  There's a conflict

12   there.

13      MR. MARK PENEGUY:  That's right.

14      MR. SHERMAN:  And there's a bigger

15   issue --

16      MS. NORMAN:  Well, there's also a

17   conflict with the attorneys that you have

18   hired, a terrible conflict.

19      MR. WIYGUL:  Well, Mike --

20      MR. SHERMAN:  I don't --

21      MS. NORMAN:  Yes, there is, Mike.

22      MR. WIYGUL:  Let me --

23      MR. SHERMAN:  There's absolutely no

24   conflict with the City hiring its own

25   attorneys.

Professional Shorthand Reporters, Inc.                    1-800-536-5255
Offices in New Orleans and Baton Rouge                   www.psrdocs.com

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 85

1        MS. NORMAN:  No, no, that they -- with

2    Walt Leger.

3        MR. WIYGUL:  I'm going to ask you all,

4    please, let -- Mike, on that issue, the

5    City's going to need to take what action it

6    feels that it needs to take.  You know --

7    you know, if you need -- whatever you need

8    to do on that is what you ought to do.

9        MR. MICHAEL PENEGUY:  That's as clear

10   as you can go as far as that waiver, right

11   there (indicating).

12       MR. MARK PENEGUY:  No, that's --

13   they've re-read that because they don't like

14   the result of it.

15       MR. MICHAEL PENEGUY:  Right.  They read

16   it, but they ignore it.

17       MR. MARK PENEGUY:  Well, they just

18   considered it was --

19       MS. MARVIN:  Yeah, just like they

20   ignored our votes.

21       MR. WILLIAM PENEGUY:  You've got a

22   motion on the table?

23       MS. NORMAN:  What?

24       MR. WILLIAM PENEGUY:  You've got a

25   motion on the table?

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 86

1          MS. PHILLIPS:  Yeah, Mike had --

2          MR. WILLIAM PENEGUY:  You've got a

3     motion on the table to write that letter,

4     right?

5          MS. NORMAN:  Yeah.  Well, I've got a

6     motion to write the letter, but I don't have

7     a second.

8          MR. BUDDY:  Second.

9          MR. MICHAEL PENEGUY:  Write the letter

10    to include and --

11         MS. NORMAN:  All these issues.

12         MR. MICHAEL PENEGUY:  Yeah.  Robert may

13    need to help you phrase that, but I would

14    put all that in a letter to Richard

15    Cortizas, with a request to have an answer

16    back to us in two days.  They ought to --

17    they've been thinking about it for a year

18    and a half now.  It's time to give the

19    answer.

20         MR. MARK PENEGUY:  And Ed buddy

21    seconded it.

22         MR. SHERMAN:  Okay.

23         DR. WILLIAMS:  Second.

24         MR. MICHAEL PENEGUY:  Oh, we've got two

25    seconds.

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 87

1        MR. SHERMAN:  Motion by Mr. Peneguy

2    give, seconded by Mr. Buddy.  Any

3    discussion?  I think they're all fair

4    questions.  All those in favor, "Aye."  All

5    right.  I'll abstain, as always.

6        MR. MICHAEL PENEGUY:  And that's not an

7    objection.

8        MR. WILLIAM PENEGUY:  Now, you also

9    stated that you were going to get something

10   from the mayor's position, directly from the

11   mayor, that's going to come back to this

12   table, right?

13       MR. SHERMAN:  Yeah.

14       MR. WILLIAM PENEGUY:  Okay.  It's going

15   to be a letter or some form, formal form?

16       MR. SHERMAN:  I'm not sure what form it

17   will be, but I'll bring it.

18       MR. WILLIAM PENEGUY:  It will be in a

19   formal format?

20       MR. SHERMAN:  I don't know.

21       MR. MICHAEL PENEGUY:  I want it in

22   writing.

23       MR. WILLIAM PENEGUY:  I would like it

24   in writing.

25       MR. EDWARD PENEGUY:  We're going to

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 88

 1   need it in writing.

 2        MS. NORMAN:  Yeah, we need something in

 3   writing.

 4        MR. WILLIAM PENEGUY:  Make a motion.

 5        MR. MICHAEL PENEGUY:  I'll move that we

 6   get it in writing.

 7        MR. MARK PENEGUY:  Get what in writing?

 8   Make it specific.

 9        MR. MICHAEL PENEGUY:  The response from

10   the mayor as far as what his position is.

11        MS. MARVIN:  That's right.

12        MR. WALTZER:  So other than annullity

13   and us being unethical, is there anything

14   else we need to know?

15        MR. MICHAEL PENEGUY:  I agree with that

16   comment.

17        MR. WALTZER:  Any other good news you

18   care to forward our way?

19        MR. MARK PENEGUY:  Joel, I'll tell you

20   what I think.

21        MR. SHERMAN:  I don't think that motion

22   is productive, but this is a serious --

23        MR. WILLIAM PENEGUY:  I think it's a

24   very productive motion.

25        MS. PHILLIPS:  So you want a response

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 89

1    from the mayor, in writing, with regard

2    to --

3        MR. WILLIAM PENEGUY:  Well, he told us

4    he was going to get one.

5        MR. MICHAEL PENEGUY:  Right.

6        MS. MARVIN:  From Cortizas, huh?  Is it

7    Cortizas?

8        MR. WILLIAM PENEGUY:  But we'd like it

9    in writing.

10       MR. SHERMAN:  The first motion was to

11   our City attorney.

12       MS. PHILLIPS:  Right.

13       MR. MICHAEL PENEGUY:  Right.  He may

14   direct -- he said he would bring it, the

15   information in.  I'm asking for it in

16   writing.

17       MS. PHILLIPS:  And that's about the

18   mayor's authority -- the mayor's --

19       MR. WILLIAM PENEGUY:  Position.

20       MS. PHILLIPS:  -- position as to the

21   authority of --

22       MR. WILLIAM PENEGUY:  Directly from the

23   mayor.

24       MS. PHILLIPS:  -- Waltzer & Wiygul and

25   the City's attorneys, okay.

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 90

1       MR. MICHAEL PENEGUY:  Right.

2       MS. PHILLIPS:  Okay.

3       MR. WIYGUL:  And the answer to our

4    question.

5       MR. MICHAEL PENEGUY:  That way we have

6    the City attorney and the mayor on present.

7       MR. SHERMAN:  I think that is wholly

8    unnecessary.

9       MR. MICHAEL PENEGUY:  But I think that

10   is very necessary.

11      MR. SHERMAN:  And every time that we've

12   asked the question for the mayor, I've come

13   back.  When it was on the extension of the

14   Donation, I came back and shared with you

15   the mayor's position directly, which is,

16   he's made no decision whatsoever.  He wants

17   to be able to value the asset before giving

18   you his opinion, and we're now traveling

19   down that path, so --

20      MS. PHILLIPS:  Is there a second?

21      MR. MICHAEL PENEGUY:  No.  I'll put

22   that in the way of a motion, I guess.  I'll

23   ask for a second.

24      MR. BUDDY:  Could you repeat the

25   motion?

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 91

1        MS. PHILLIPS:  All right.  This is how

2    I understand the motion.  To get a written

3    response from the mayor regarding his

4    position in answer to Waltzer & Wiygul's

5    questions as to their authority to act in

6    the BP matter and the City's attorneys to

7    act in the BP matter.  Is that --

8        MR. BUDDY:  Is that the mayor's --

9        MR. MARK PENEGUY:  That's just going to

10   be a waste of time.  The City attorney is

11   just going to copy it and it's going to

12   say --

13       MR. WALTZER:  Well, I think Robert

14   articulated it, so maybe we can listen to

15   it.  He articulated it fairly precisely.

16       MS. PHILLIPS:  Okay.

17       MR. SHERMAN:  That was the first

18   motion.  That was for the letter to Richard

19   Cortizas.

20       MR. MICHAEL PENEGUY:  Right.

21       MR. WILLIAM PENEGUY:  This is the

22   second.

23       MS. PHILLIPS:  That letter to -- this

24   is something from the mayor, yeah.

25       MR. MARK PENEGUY:  This is why I think

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 92

1  it's --

2      MR. MICHAEL PENEGUY: Now, this is a

3  second motion. Mike Sherman basically told

4  us he'd come back with an answer from the

5  mayor, how he interprets his position in

6  respect to BP.

7      MR. SHERMAN: A motion's not necessary.

8  I got it and I will do that.

9      MR. WILLIAM PENEGUY: Okay.

10      MR. MICHAEL PENEGUY: I'm saying we

11  want a motion.

12      MS. MARVIN: He won't follow an

13  ordinance. You all think he's going to

14  follow a motion from this committee, the

15  mayor? I don't think so.

16      MR. MICHAEL PENEGUY: Yeah, I doubt

17  that he will, but I want it in writing, and

18  that's why the motion is there, to get that

19  response.

20      MR. LORINO: I don't understand what

21  you're asking for. How is that -- first of

22  all, that doesn't have any bearing on

23  anything. How is it different than what

24  we're asking Cathy to draft, to write -- to

25  get from the City's attorney?

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 93

1          MR. MARK PENEGUY:  It's not.  It's not.

2          MR. LORINO:  I mean, the mayor's only

3     going to follow a --

4          MR. WILLIAM PENEGUY:  It's not.  It's

5     nothing different.  The only difference is

6     it's coming from the mayor.  We have never

7     heard from the mayor at this table.  I would

8     love to see something with his signature on

9     it, addressed to us.

10         MR. MARK PENEGUY:  Yeah, good luck.

11         MR. MICHAEL PENEGUY:  And, you know, a

12    difference, you know, if it's written by the

13    City attorney, fine, let the mayor sign it.

14         MR. WILLIAM PENEGUY:  Who cares.

15         MR. MICHAEL PENEGUY:  That's basically

16    what it --

17         MR. WILLIAM PENEGUY:  That's who's

18    going to write it anyway.

19         MR. MICHAEL PENEGUY:  Right.  So I

20    guess basically the only thing that we want

21    to say is that --

22         MR. EDWARD PENEGUY:  The City of New

23    Orleans is going to be making the decision.

24         MS. MARVIN:  Their position is they

25    will not be held responsible in everything.

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 94

1        MR. WIYGUL:  We are not here to

2    complicate this.  We simply want to find out

3    what the position is so we can order our

4    contract and --

5        MR. WILLIAM PENEGUY:  Just withdraw the

6    motion.

7        MR. MICHAEL PENEGUY:  I'll withdraw the

8    second motion.

9        MR. WIYGUL:  Whether Mike signs it or

10   Richard Cortizas signs it, or the mayor

11   signs it, or whoever signs it, I'm not -- I

12   don't know that it's of particular concern.

13       MR. MICHAEL PENEGUY:  I'll recant one,

14   the first motion -- I mean, the second

15   motion.

16       MR. MARK PENEGUY:  Right.

17       MS. NORMAN:  I personally think that,

18   you know, the proper administration of

19   this trust, this Donation, is being held

20   hostage --

21       MR. MICHAEL PENEGUY:  Right.

22       MS. NORMAN:  -- by this situation.

23       MR. MARK PENEGUY:  I think it's a

24   breach of fiduciary duty.

25       MS. NORMAN:  And I think that -- I

1    think that we aren't able to do anything.

2    And the biggest claim and the most important

3    claim we've ever had before us is being

4    jeopardized and we can't -- you know, we can

5    not get an answer as to why, and the why --

6    all it takes is one person to say, "You're

7    right, this is what's best for the Donation;

8    let's go forward."  But he doesn't

9    apparently care what's best for the

10   Donation.

11        MR. SHERMAN:  Cathy, please don't say

12   offensive things like that.

13        MS. NORMAN:  I truly believe that.

14        MR. MARK PENEGUY:  That's offensive.

15   That's --

16        MS. MARVIN:  That's not -- that's -- I

17   mean, that's her opinion.

18        MS. NORMAN:  That's my opinion, that

19   the beneficiary right now --

20        MS. MARVIN:  We're all entitled to

21   that.

22        MS. NORMAN:  -- is not considering what

23   is best for the beneficiaries, including the

24   beneficial group that he represents, the

25   City of New Orleans.

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 96

1         MS. MARVIN:  I concur.

2         MS. NORMAN:  He is jeopardizing our

3    claim against BP.

4         MR. MARK PENEGUY:  And as a resident of

5    the City of New Orleans, I agree that he's

6    violating -- he's harming the City of New

7    Orleans.

8         MS. MARVIN:  Yes, I agree.

9         MR. SHERMAN:  Listen, I -- this is

10   absolutely uncalled for.  This is not

11   productive and this is not the agenda --

12        MR. MARK PENEGUY:  It's not a person's

13   fault.  It's an opinion.

14        MR. SHERMAN:  -- item that we're on.

15        MS. MARVIN:  Not productive?

16        MR. SHERMAN:  This is not productive.

17   We've heard the same arguments repeatedly.

18   I am trying to bring us together and these

19   offensive comments --

20        MS. MARVIN:  No, you're not.  No,

21   you're not.

22        MR. SHERMAN:  These offensive comments

23   don't help.

24        MS. MARVIN:  You want to bring us all

25   together?

Page 97

```
 1        MR. SHERMAN:  And they're
 2   counter-productive.
 3        MS. MARVIN:  Then stop trying to take
 4   over the authority of the committee.  Stop
 5   trying to go against an ordinance of the
 6   City of New Orleans.
 7        MR. SHERMAN:  A trustee can't advocate
 8   his authority.
 9        MS. MARVIN:  It's very simple.
10        MR. SHERMAN:  He's giving you his
11   opinion.
12        MS. MARVIN:  It's a very, very
13   simple --
14        MR. SHERMAN:  All right.  Moving on.
15        MS. MARVIN:  -- solution to the
16   problem.
17        MR. SHERMAN:  All right.  Moving on.
18   Moving on to No. 2 and 4.  Are those that we
19   want to address today or --
20        MR. MARK PENEGUY:  Well, are they
21   brief?
22        MR. SHERMAN:  -- do you want to do
23   those --
24        MR. MICHAEL PENEGUY:  Well, I think we
25   need to.
```

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 97

1      MR. SHERMAN: And they're
2   counter-productive.
3      MS. MARVIN: Then stop trying to take
4   over the authority of the committee. Stop
5   trying to go against an ordinance of the
6   City of New Orleans.
7      MR. SHERMAN: A trustee can't advocate
8   his authority.
9      MS. MARVIN: It's very simple.
10     MR. SHERMAN: He's giving you his
11  opinion.
12     MS. MARVIN: It's a very, very
13  simple --
14     MR. SHERMAN: All right. Moving on.
15     MS. MARVIN: -- solution to the
16  problem.
17     MR. SHERMAN: All right. Moving on.

19  want to address today or --
20     MR. MARK PENEGUY: Well, are they
21  brief?
22     MR. SHERMAN: -- do you want to do
23  those --
24
25  need to.

Page 98

1      MR. WILLIAM PENEGUY: I think we have
2   to.
3      MR. MICHAEL PENEGUY: And I don't think
4   there's any reason to have an Executive
5   Session, because basically it's out in the
6   open because of the City, so let's go on
7   without the Executive Session. It's out in
8   the clear now basically. BP knows exactly
9   what --
10     MR. SHERMAN: On No. 2 --
11     MR. MARK PENEGUY: Yeah, so you all
12  decide that, because you all are the proper
13  parties.
14

18

20
21
22

24

Page 99

Page 100

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee



Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 105

4 MR. SHERMAN: Well, hang on. We need
5 to give an opportunity for other people. I
6 want to give an opportunity for anyone to
7 offer a motion for Executive Session.
8 MR. MARK PENEGUY: I don't have a
9 problem with you all going into executive
10 Session and I think you might want to do
11 that to keep certain discussions private. I
12 don't think anyone in this room needs to
13 vacate the room because of it, because we
14 know that our representatives -- our manager
15 and her assistant are all going to be privy
16 to this information anyway. My cousin,
17 Edward, and I are both beneficiaries, which
18 makes us clients in this matter, and
19 everybody else is a board member.
20 MR. MICHAEL PENEGUY: I'll make the
21 motion if you'll allow the family members to
22 stay in.
23 MR. MARK PENEGUY: I'm not leaving.
24 They'll have to take me out by their
25 prayers.

Page 106

1 MR. SHERMAN: Perhaps if Mr. Burton
2 files a suit, we should include whether or
3 not beneficiaries can be in Executive
4 Sessions, as a sub.
5 MR. MARK PENEGUY: I am an attorney, as
6 well, representing the family.
7 MR. MICHAEL PENEGUY: Wait. I'm not
8 including that in my motion, for that.
9 MR. SHERMAN: Then there's no
10 difference. Is there a second?
11 DR. WILLIAMS: Second.
12 MR. SHERMAN: Motion and second.
13 Executive Session, but let the two
14 beneficiaries stay.
15 MR. MICHAEL PENEGUY: Okay.
16 MR. SHERMAN: All in favor, "Aye." All
17 right. No objections. All right. We're in
18 Executive Session.
19 (Executive Session took place).
20 MR. MICHAEL PENEGUY: Okay. I'll  make
21 a motion that we follow the attorneys'
22 advice and submit a claim for a settlement.
23 MR. BUDDY: Second.
24 MR. SHERMAN: Motion by Mr. Peneguy.
25 MR. WALTZER: Wait. Can I just make a

Page 107

1 comment? Unless you intend to submit it
2 personally, I'd like you to authorize me to
3 submit it.
4 MR. MICHAEL PENEGUY: All right.
5 MR. WALTZER: Because you can, if you
6 would like. We'll give you the forms.
7 MR. MICHAEL PENEGUY: I am in trouble
8 with a couple of agencies right down here.
9 MR. SHERMAN: Motion by Mr. Peneguy.
10 Seconded by Mr. Buddy.
11 MR. MICHAEL PENEGUY: Two points, wait
12 a minute.
13 MR. WILLIAM PENEGUY: Filing two
14 claims, right?
15 MR. MARK PENEGUY: No, whatever claims
16 they --
17 MR. WALTZER: Filing a claim with the
18 facility, the Deepwater Horizon Claims
19 Center.
20 MR. MICHAEL PENEGUY: Okay. Let me
21 restate that and make sure everybody
22 understands. I move that the
23 duly-authorized attorneys of Waltzer &
24 Wiygul to submit a claim for settlement --
25 MR. MARK PENEGUY: For the BP claims.

Page 108

1 MR. MICHAEL PENEGUY: -- for the BP
2 claims.
3 MR. MARK PENEGUY: With the settlement
4 claims facility.
5 MR. WALTZER: There you go. Yeah, it's
6 called the Deepwater Horizon Claims Center.
7 MR. MARK PENEGUY: Deepwater Horizon,
8 thank you.
9 MR. MICHAEL PENEGUY: Okay.
10 MR. SHERMAN: Second by Mr. Buddy. Any
11 discussion? And, again, I am going to
12 abstain from this vote, as chair, and I will
13 bring back any advice to the mayor. All in
14 favor, "Aye." Hearing no opposition, the
15 motion carries. Do we have a motion to
16 adjourn?
17 DR. WILLIAMS: So moved.
18 MR. MICHAEL PENEGUY: Second.
19 MR. SHERMAN: Moved by Dr. Williams.
20 Seconded by Mr. Peneguy. All in favor,
21 "Aye." Hearing no objections, we will
22 reconvene in two weeks.
23 *   *   *

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 107

1   comment?  Unless you intend to submit it
2   personally, I'd like you to authorize me to
3   submit it.
4        MR. MICHAEL PENEGUY:  All right.
5        MR. WALTZER:  Because you can, if you
6   would like.  We'll give you the forms.
7        MR. MICHAEL PENEGUY:  I am in trouble
8   with a couple of agencies right down here.
9        MR. SHERMAN:  Motion by Mr. Peneguy.
10  Seconded by Mr. Buddy.
11       MR. MICHAEL PENEGUY:  Two points, wait
12  a minute.
13       MR. WILLIAM PENEGUY:  Filing two
14  claims, right?
15       MR. MARK PENEGUY:  No, whatever claims
16  they --
17       MR. WALTZER:  Filing a claim with the
18  facility, the Deepwater Horizon Claims
19  Center.
20       MR. MICHAEL PENEGUY:  Okay.  Let me
21  restate that and make sure everybody
22  understands.  I move that the
23  duly-authorized attorneys of Waltzer &
24  Wiygul to submit a claim for settlement --
25       MR. MARK PENEGUY:  For the BP claims.

Transcription from Audio Tape of Special Meeting
Edward Wisner Donation Advisory Committee

Page 108

1       MR. MICHAEL PENEGUY:  -- for the BP

2    claims.

3       MR. MARK PENEGUY:  With the settlement

4    claims facility.

5       MR. WALTZER:  There you go.  Yeah, it's

6    called the Deepwater Horizon Claims Center.

7       MR. MARK PENEGUY:  Deepwater Horizon,

8    thank you.

9       MR. MICHAEL PENEGUY:  Okay.

10      MR. SHERMAN:  Second by Mr. Buddy.  Any

11   discussion?  And, again, I am going to

12   abstain from this vote, as chair, and I will

13   bring back any advice to the mayor.  All in

14   favor, "Aye."  Hearing no opposition, the

15   motion carries.  Do we have a motion to

16   adjourn?

17      DR. WILLIAMS:  So moved.

18      MR. MICHAEL PENEGUY:  Second.

19      MR. SHERMAN:  Moved by Dr. Williams.

20   Seconded by Mr. Peneguy.  All in favor,

21   "Aye."  Hearing no objections, we will

22   reconvene in two weeks.

23              *      *      *

24

25

Page 109

1                    REPORTER'S CERTIFICATE

2

3

4

5          I, LINDA G. GRIFFIN, RPR, Certified

6    Court Reporter, in and for the State of

7    Louisiana, as the officer before whom this

8    audio tape was transcribed, do hereby

9    certify that this was transcribed by me, was

10   prepared and transcribed by or under my

11   personal direction and supervision, and is a

12   true and correct transcript, to the best of

13   my ability and understanding; that I am not

14   related to counsel or to the parties herein,

15   nor am I otherwise interested in the outcome

16   of this matter.

17

18

19

20

21   LINDA G. GRIFFIN, RPR

22   Certified Court Reporter

23

24

25

# MINUTES OF THE MEETING OF THE
# EDWARD WISNER DONATION ADVISORY
# COMMITTEE
# TUESDAY, JUNE 19, 2012

**Present:**
Mike Sherman, Chair, City of New Orleans
Michael Peneguy, Representative, Wisner Family Heirs
W. A. Peneguy, Alternate, Wisner Family Heirs
Dr. Everett Williams, Representative, Charity Hospital
Stacy Gerhold-Marvin, Alternate, Charity Hospital
Tony Lorino, Representative, Tulane University
Lizbeth Turner, Alternate, Tulane University
Ed Buddy, Alternate, The Salvation Army

Staff:
C. Cathy Norman, Secretary Treasurer/Land Manager
Amanda Phillips, Executive Assistant, Wisner

Guest:
Mark Peneguy
Edward Peneguy
Matthew Averill, City of New Orleans
Matt Lindsay, City Attorney's Office
Brooke Bacuetes, City of New Orleans
Jim Burton, Simon, Peragine, Smith and Redfearn

Meeting called to order at 12 noon.

## OLD BUSINESS

**OLD BUSINESS ITEM 1 – Approval of the Revised Minutes of the February 28, 2012 Monthly Meeting, April 19, 2012 Special Meeting (Waltzer & Wiygul), and April 24, 2013 Annual Review**

Michael Sherman – It is our monthly meeting. We are here a week early. I will introduce Matt Lindsay from our City Attorney's Office and Brooke Bacuetes who is joining us as a law clerk for the summer. So, uh, uh, with those introductions said, uh let's start with Old Business. I know that . . .

Cathy Norman – I have not . . .

Michael Sherman – yeah, the revised minutes didn't make it. . .

Cathy Norman – No.

MS - . . . so let's push that over to the next, the next month.

Michael Peneguy – No. No. I move that we approve the minutes with the changes that I handed out, all the minutes.

1



EXHIBIT

00

1   Michael Sherman – Right. We, we passed a motion to this effect last month
2   sir.
3
4   Michael Peneguy – No, we didn't pass a motion to any affect last month.
5
6   Michael Sherman – We did pass a motion last month to revise the minutes,
7   that they switched to a, a summary form. And I believe staff is working on
8   that, isn't that right Cathy?
9
10  Cathy Norman – Correct.
11
12  Michael Sherman – And we will have those for next month?
13
14  Michael Peneguy – I don't think . . .
15
16  Cathy Norman – We hope. Yeah.
17
18  Michael Peneguy – I don't think that is necessary.
19
20  Michael Sherman – I understand that. We had a motion last month . . .
21
22  Michael Peneguy – We didn't have a motion. . .
23
24  Michael Sherman – It passed. It was a rather long discussion. I would rather
25  keep the meeting moving along. Staff is hard at work fulfilling the intent of
26  the motion. Let's move on to, to New Business.
27
28  Michael Peneguy – By Robert's Rules of Order, you read the thing wrong. It
29  is inappropriate to summarize the minutes. This thing answers that question
30  (passes out hand out).
31
32  Michael Sherman – Team, uh . . .
33
34  Michael Peneguy – And I think that was not a motion that passed to
35  summarize the minutes.
36
37  Michael Sherman – There was. It was offered by Dr. Williams.
38
39  Michael Peneguy – No, it was . . .
40
41  Michael Sherman – It was seconded . . .
42
43  Michael Peneguy - . . . it was seconded by Dr. Williams, but you made the
44  motion and it failed.
45
46  Michael Sherman – I made a motion and it failed.
47
48  Michael Peneguy – And then . . .
49
50  Michael Sherman – And Dr. Williams later made a motion and it passed.
51
52  Michael Peneguy – No, it didn't.
53

1    Michael Sherman – Cathy, could you clarify for us?
2
3    Cathy Norman – I, I don't have my minutes in front of me but that was my
4    understanding, that . . .
5
6    Michael Sherman – That's right.
7
8    Cathy Norman - . . . there was a motion.
9
10    Michael Sherman – Yes. Yes.
11
12    Cathy Norman – But I don't have my minutes in front of me.
13
14    Michael Sherman – Mr. Peneguy, let's, let's, let's do this then, uh . . .
15
16    Michael Peneguy – The last thing, the last thing you were asking for was a
17    legal opinion from, uh, Jim Burton . . .
18
19    Michael Sherman – Nah.
20
21    Michael Peneguy – . . . ah . . .
22
23    Michael Sherman – Mr. Peneguy, I'll ask Cathy to have maybe Amanda or
24    someone else pull what they've got from the last meeting. That would help
25    us move along more productively. We had three motions at the last meeting,
26    and . . .
27
28    Michael Peneguy – All of them failed.
29
30    Michael Sherman - . . .that is not correct. There is a successful motion by Dr.
31    Williams that he offered. Which was to have our minutes in conformity with
32    Robert's Rules of Order. Cathy and Amanda have been working hard the
33    past month, I know that. Since we moved the meeting a week early, they
34    didn't have time to finish it.
35
36    Michael Peneguy – Well, they . . .
37
38    Michael Sherman – Mr. Peneguy, please do not interrupt me. Cathy hasn't,
39    hasn't staff been working to create the . . .
40
41    Cathy Norman – We ha, I have, I have started kind of abbreviating, or I
42    don't know what you call it . . .
43
44    Michael Sherman – Actions, not comments.
45
46    Cathy Norman – . . .yeah, yeah, . . .
47
48    Michael Peneguy – (unintelligible)
49
50    Cathy Norman – . . . to just try and pass them down. And I was, what I was
51    going to do was to send out a copy of each on, one of them as an example
52    and make sure it was what was wanted.
53

1　Amanda Phillips – There were three motions. The first two failed. The third
2　one, um, was, Mike, you proposed Robert's Rules of Order minutes, and Mr.
3　Lorino seconded them. And I believe, that one, that one passed. And we
4　were to redo the previous minutes and remove the Executive Session.
5
6　Michael Sherman – Excellent. So I think that issue is settled. So if there is
7　nothing further at this time, we will go to New Business.
8
9　Michael Peneguy – I handed some out on the minutes just now, I prefer that
10　everybody read them for the next meeting. Then we can pass the minutes at
11　the next meeting.
12
13　Michael Sherman – We will certainly oblige. Team we are going to move on
14　to the Secretary Treasurer's Report. And uh, I am going to have to take a
15　point of personal privilege, and uh, team, I am trying my hardest as our chair
16　to get us to work closer. To get us to get aligned. When we get to the City's
17　report, I think I have a couple of things that will bring us closer today on, the
18　biggest matter we have before us, which is the BP litigation. Um, I think it
19　will be a fantastic idea for us to, uh, for some new members of the
20　Committee and those who haven't been there in a while, to take a tour of the
21　property. That could be an opportunity for us to bond and talk and hopefully,
22　um, facilitate working together better. Mr. Peneguy I understand your
23　frustration. Um, but I know that for us to do our job, we've got to be able to
24　work well together. We've got to not spend forty-five minutes each meeting
25　talking about internal governance matters like minutes. So I am going to ask
26　everybody to indulge me, to work with me, uh, as much as possible to let us
27　get along and focus on issues. We will have disagreements. We can have
28　passionate disagreements, but I do want everyone to redouble their efforts
29　and make sure we all treat each other with respect. Knowing the tensions
30　we've had at past meetings, so I hope my comments are helpful. Let's move
31　on to New Business. Cathy, the Secretary Treasurer's report please.
32
33

34　**NEW BUSINESS**
35
36　**NEW BUSINESS ITEM 1.**　　　**Secretary Treasurer's Report**
37
38　Invoices:
39　FET　　　　　　　　　$6,210 (outstanding balance of $5,668.68)
40　FET　　　　　　　　　$6,100 (outstanding balance of $5,162.03)
41　Waltzer & Wiygul　　　$16,277.75 (experts costs only)
42　Waltzer & Wiygul　　　$6,314.50 (RW January hours)
43　Simon Peragine　　　　$7,350 (City internal governance issues)
44
45　Cathy Norman – Um, in the report I go over various things, um, invoices,
46　and various things that are going on, most of which will be covered in the,
47　uh, body of the meeting. Ah, there were there two expense accounts. Mine
48　was $384.41, Amanda's $12.91. . .
49
50　Unknown person – unintelligible comment
51
52　Cathy Norman - . . .ninety-one cents. Amanda has a report on the uh, camp,
53　camp leases. Uh, there is a Right-of-Access in here for Tulane. Tulane is

4

1  going to be working in tandem with John Pardue, on the research, the BP
2  research. But because they will actually be constructing walkways out on the
3  marsh, I wanted to do a separate Access Agreement to protect Wisner. It is
4  our standard Right-of-Access. It is intrusive. Because it is related to BP and
5  a lot of the scientific studies we do waive a lot of things certain things like
6  Forrest's time. Forrest is out there any way. So, and, and, Forrest's time will
7  be billed to BP. All the hold harmless language and the insurance language
8  is the same. Um, I spoke to Tulane this morning and they didn't have any
9  changes to it, so I think it is going to proceed and we are going to get it back
10  signed. And I can give it to the Mayor for his signature. These are also some
11  agreements that have been approved for you to take in for signature.
12
13  Michael Sherman – Fantastic.
14
15  Cathy Norman – Um. . .
16
17  Mark Peneguy – Cathy, if I can, on the Intrusive Access Agreement, I, I
18  have just one change. Everywhere else you say "Grantee shall" and then, uh,
19  second to last paragraph on page 2 you say "Grantee may." That should be
20  changed to "shall."
21
22  Cathy Norman – Well, I've already sent it to them, but in the future I can do
23  that. I, this, this agreement has come around a million times and I have never
24  gotten that comment before.
25
26  Mark Peneguy – Well that is because I didn't notice it before. . .
27
28  Cathy Norman – Ok, where, what paragraph is that?
29
30  Mark Peneguy – Second to last paragraph on page 2. Grantee may. . .
31
32  Cathy Norman – Shall.
33
34  Mark Peneguy – . . . Grantee shall.
35
36  Cathy Norman – Ok, I will make that change and make sure that doesn't
37  happen again. Uh, Manti, I, I did send a letter quoting Louisiana law that we
38  don't need to sign a, a division order and sent them a copy of the W-9. We
39  had some difficulties with Stone Energy. They had a late fee of $1200 in
40  2010 and then $900 last year on their rental. So when they adjusted it with a
41  5% increase, uh, things got kind of messed up. They overpaid us. We went
42  back and forth, Amanda did, with them. We figured out how much the
43  overpayment was and they did want us to pay that money back. So that will
44  be reflected. I think it was $1200.
45
46  Amanda Phillips – $1232.
47
48  Cathy Norman - $1232. So, just for your information, they overpaid us and,
49  and that was it. And then I guess the only other thing on, uh, is Amanda's
50  uh, report on the camp leases, office matters, BP claim payment and hunting
51  and trapping and fishing leases.
52

1    Amanda Phillips – Well, for the camp leases we've got three people that I
2    have sent eviction notices to. I have not heard from them yet. Two people
3    I've got the return receipt card back from, so I know they've got the letter.
4    The third one, he has moved and he's never given me a forwarding address,
5    so who knows where he is. But um, we can file eviction on them in July if
6    we don't hear from the other two folks. Two of the camps were in Lafourche
7    Parish. They were probably destroyed during the storm. And there is
8    probably nothing out there, but we just need to go through the steps with
9    that. In Jefferson Parish we actually have someone who is interested in it and
10   would buy it from us.
11
12   Um, we have collected over $96,000 in 2012 rentals for Jefferson Parish,
13   and we have collected $300 in back rentals for 2011. And we have collect
14   $520 for 2013 rentals. In Lafourche Parish we've collected just over
15   $48,000. Um, we have one camp in Lafourche that was relinquished. We
16   have a second one that is pending. I am waiting on a letter from the owner to
17   tell me they don't want it. He and I have gone back and forth. He will call
18   me and I am like you need to write me a letter to put in your file. I can't put
19   your phone call in a file. Um, and then there a cou, there are a few payment
20   plans that are outstanding. And they got notices that you know,
21   (unintelligible) and the amount.
22
23   And in the office, our copier is leased through Ikon Office Solutions. In
24   2008 they were bought by Ricoh. And Ricoh's financing arm that we pay
25   our lease rental to, they just changed their name to GE Capital c/o Ricoh
26   USA. I just wanted to let you all to be aware of that.
27
28   At the end of last year there was a $423.07 balance that was remaining in my
29   FSA plan. When you have balance remaining you have two options. You
30   can either apply that balance to your administrative costs, and if we were a
31   larger organization with more people, that would probably be the way to go.
32   But since it is just Cathy and I, it is very simple to uniformly split it and split
33   it between the two of us 50/50. And which is what our accountants
34   recommended we do with that.
35
36   Cathy Norman – So how much am I getting of your money?
37
38   Amanda Phillips – Two, almost $212.
39
40   Michael Peneguy – Um.
41
42   Cathy Norman – Which means I give it back to her. So. You write me a
43   check and I write you a check.
44
45   Amanda Phillips – I'll pay your tax. Because we get taxed on that when it
46   gets returned to us. Ah, um, the, skipping over the BP stuff for a moment,
47   the Bankston leases. Um, he is, he agreed to the increases, he signed them
48   and we are sending them today. . .
49
50   Cathy Norman – Right.
51   Amanda Phillips – . . . for the Mayor's signature. Mr. Loupe has also
52   executed and returned his alligator hunting and nutria trapping leases. His
53   nutria trapping last year, he, our share of his take was only $361.25. He pays

1  us a yearly fee of $400 as a base for both his alligator and his trapping
2  leases. On his trapping lease he gives us whatever, his take, if our 25% of his
3  take is large than $400, we get that difference. It was not so we just get the,
4  the $400. And for the alligator we get 35% of whatever his take is over
5  $400. And Mr. Fabre, who also has alligator hunting leases, has ah, returned
6  that. And that one I believe is in the Mayor's office for signature.
7
8  Cathy Norman – is, do you have any? Do you have any?
9
10  Michael Sherman – We have everything executed. The Mayor did.
11
12  Cathy Norman – Ok.
13
14  Amanda Phillips – Ok.
15
16  Cathy Norman – Where is that?
17
18  Michael Sherman – I've got to look for that one.
19
20  Cathy Norman – Ok.
21
22  Amanda Phillips – Ok, because it is not there he said.
23
24  Cathy Norman – Um, well, I don't believe so. Let's see. Let me see what's
25  in here. This is the Bankston. There are two different Bankston leases. And
26  this is Loupe. And that's it.
27
28  Amanda Phillips – And then do you want me to go over the BP claims
29  payment information or do you want to wait?
30
31  Cathy Norman – Um . . .
32
33  Michael Peneguy – Well, first of all. . .
34
35  Cathy Norman – . . . well.
36
37  Michael Peneguy – . . . do you need. Where would that ah . . .
38
39  Cathy Norman – I'll find, it is either on my desk or has it already been
40  signed and returned to him?
41
42  Amanda Phillips – Not to him. He may not have sent it back though.
43
44  Cathy Norman – I don't think he sent it back. I don't think he has sent it
45  back yet.
46
47  Amanda Phillips – I'll talk to him and see.
48
49  Cathy Norman – Because I don't think I received it back signed. And I don't
50  give them to Mike for execution until they are signed.
51  Michael Sherman – Until they are signed.
52
53  Cathy Norman – Yeah, so.

1
2   Amanda Phillips – So, the um, do you want me to go over the BP claims?
3
4   Cathy Norman – Sure go ahead and go over the BP claims.
5
6   Amanda Phillips – So yesterday I opened the mail and I got a letter, surprise,
7   for $131,299.60 from BP for Claims 21-23. Which was the months of
8   December, January and February. Um, yesterday evening Greg Johnson sent
9   an email back letting us know what they paid, and what they questioned, and
10   what they refused. And attached on the. . .
11
12   Michael Sherman – Where is that?
13
14   Amanda Phillips – . . . the long sheet, attached to the back of my report is a
15   breakdown for each month. And what they are still not reimbursing legal
16   fees, expert fees, um, additional payroll at the increased rates, any additional
17   payroll for meetings with lawyers, and my work preparing the invoice that
18   we send them to get the money from them. And then uh, any expenses for
19   meetings with lawyers. They have finally realized what the mileage rate is
20   and are paying that.
21
22   Michael Peneguy – They didn't go back and pay back pay on that.
23
24   Cathy Norman – So any time, any time I meet or talk to Robert and Joel they
25   won't pay that time at all. And this is, uh, probably about 50% of, of my
26   time. And then some of your time talking to their office about claims.
27
28   Amanda Phillips – The bulk of my time is taking care of emails and
29   invoices, and preparing this information; going over what they have paid and
30   what they haven't paid.
31
32   Cathy Norman – But the largest, the largest chunk of what they haven't paid
33   is over the past, um, six months, as the Committee is aware, we approved
34   spending quite a bit of money on expert fees, ah, for John Pardue and that is
35   the bulk of what they did not pay: at least in January and February. Now in
36   December there wasn't much. And then attorney fees.
37
38   Amanda Phillips – Right. So in February when we last got a payment from
39   them we agreed to pay all of our current outstanding balances for Waltzer &
40   Wiygul and FET. So the claims we just got paid for, those outstanding
41   balances are paid. We have two options. We can um, just take all that $131 .
42   . .
43
44   Cathy Norman – $131,000.
45
46   Amanda Phillips – . . . and just distribute that. Or we could pay what we
47   currently have outstanding for Waltzer & Wiygul and for FET. Which would
48   be $106,236.59, and that would leave us $25,063.01 to distribute to the
49   beneficiaries.
50
51   Michael Peneguy – I would move that we uh, we pay all the invoices that are
52   outstanding.
53

1   Michael Peneguy – I need a second.
2
3   Cathy Norman – Where is that on here?
4
5   Michael Peneugy – That's on the second . . .
6
7   Amanda Phillips – Page 2, back side of the first page.
8
9   Michael Peneguy – Uh.
10
11  Amanda Phillips – My thriftiness to save money on copies.
12
13  Michael Peneguy – The second, the second . . .
14
15  Cathy Norman – Oh here it is.
16
17  Mark Peneguy – I do the same thing.
18
19  Michael Peneguy – . . . the second page has the outstanding balances.
20
21  Cathy Norman – I see FET.
22
23  Amanda Phillips – Turn it, back side of the front page.
24
25  Cathy Norman – Oh. No? Oh.
26
27  Michael Peneguy – It is Waltzer & Wiygul.
28
29  Cathy Norman – Oh, ok. I got it. I got it. Ok. So uh.
30
31  Amanda Phillips – The other two I didn't just because I didn't think you
32  would want to turn it over.
33
34  Michael Peneguy – $7,130.50.
35
36  Amanda Phillips – I also broke out for Forrest. I did subtotals for each of his
37  outstanding claims. So you could say, you know we haven't, Claim 27 is
38  current for what we could incurred during June. We could take that $15,498
39  and add that back in and that would give you $40,000 to distribute, of this.
40
41  Mark Peneguy – I say pay it all.
42
43  Michael Peneguy – I would prefer it to pay it all, but I need a second to that
44  motion.
45
46  Dr. Williams – I second it. I am (unintelligible).
47
48  Michael Sherman – Ok, we have a motion and a second and I will ask for
49  just a minute or two to read through the documents that were provided.
50
51  Amanda Phillips – Um huh.
52
53  Michael Sherman – Amanda, the current claim is 27?

9

1
2    Amanda Phillips – It will be 27.
3
4    Michael Sherman – It will be 27.
5
6    Amanda Phillips – Yes.
7
8    Michael Sherman – So 26 was submitted when?
9
10   Amanda Phillips – It was submitted on the, either the 14 or 15 of June.
11
12   Michael Sherman – Ok. And then the . . .
13
14   Amanda Phillips – By me to Waltzer & Wiygul.. . .
15
16   Michael Sherman – Got it,
17
18   Amanda Phillips – And then there is. . .
19
20   Michael Sherman – Amanda just a minute. The master unreimbursed amount
21   for 1-23 is?
22
23   Amanda Phillips – The total that they have, that uh. . .
24
25   Cathy Norman – They have not paid us?
26
27   Amanda Phillips – Yeah, Cathy do you have that email from them? I don't
28   have that. . .
29
30   Cathy Norman – I just . . .
31
32   Amanda Phillips – . . . email from Liskow & Lewis.
33
34   Michael Sherman – This right here.
35
36   Cathy Norman – Yeah. That's not the total. You mean over all through the
37   claims?
38
39   Amanda Phillips – No, no, no. He asked for 21 -23.
40
41   Michael Sherman – One through twenty-three. No, no, 1-23.
42
43   Cathy Norman – No, he wants 1-23. . .
44
45   Amanda Phillips – Oh, ok. Everything 1-6 has been completely paid and
46   there is no outstanding balance from BP at all.
47
48   Michael Sherman – Ok.
49
50   Amanda Phillips – That we are square on. Um, I will have to go pull . . .
51   Michael Sherman – Fair enough.
52
53   Amanda Phillips – . . . the claims for you for 7 -23.

1
2   Michael Peneguy – I think, I think, this is what. I don't know whether there
3   have been any changes in what you had? But that's . . .
4
5   Cathy Norman – Well we . . .
6
7   Amanda Phillips – There would be, there would be additional to that. So um.
8
9   Cathy Norman – And, and that of course is the subject of what we are trying
10  to get resolved with this partial motion for summary judgment.
11
12  Amanda Phillips – Cathy, what is the amount on the email from Greg that
13  wasn't paid?
14
15  Michael Peneguy – And that was $746,000.
16
17  Cathy Norman – What, what, I gave mine to Mike, so I don't have it.
18
19  Michael Sherman - $102,000.
20
21  Cathy Norman - $102,000 that was not paid.
22
23  Amanda Phillips – So we are looking at $849,000, $850,000.
24
25  Michael Sherman – Ok, alright so we have a motion and a second. Does
26  anyone need any more time to read or have any questions? Alright, we have
27  a motion and a second. Is, all in favor please say aye.
28
29  Michael Peneguy, Dr. Everett Williams, Ed Buddy, Tony Lorino – Aye.
30
31  Michael Sherman – Any opposed? Motion carries. Amanda anything further
32  on your report?
33
34  Amanda Phillips – That was it.
35
36  Michael Sherman – Cathy, anything further on your report?
37
38  Cathy Norman – Nope, except I do need approval of the rest of the invoices
39  that are listed on my uh . . .
40
41  Michael Peneguy – I move that we approve the Secretary Treasurer's Report
42  with the additional invoices.
43
44  Michael Sherman – Ok, we have a motion to approve the Secretary
45  Treasurer's Report. Is there a second?
46
47  Dr. Everett Williams – Second.
48
49  Michael Sherman – We have a motion and a second. Any discussion?
50  Hearing none, all those in favor of say aye please.
51  Michael Peneguy, Dr. Everett Williams, Ed Buddy, Tony Lorino – Aye.
52

1  Michael Sherman – Alright, hearing no opposition, the motion carries.
2  Alright next up is City of New Orleans Report
3
4
5  **NEW BUSINESS ITEM 2.    City of New Orleans Report**
6
7  Michael Sherman – And uh, I am going to try my best here. I think I have a
8  couple of solutions that get us, get us to a compromise. Now listen, let me
9  say at the outset, uh, that I cannot make everyone happy. There is nothing
10 that will satisfy everyone in terms of their desires and wishes. And satisfy
11 everyone in terms of their passionate beliefs on how we operate, um. But I
12 have done my best in the past month, um to get as close as possible as we
13 can. I think I have a couple of ideas that will get us there. And if you will
14 indulge me. My first question, I contacted Simon Peragine to make sure I
15 heard what Mr. Burton was telling us correctly. Um, as you know, one of the
16 concerns that the City has expressed, um, is the nature of this entity, the, in
17 terms of what Public Records Act, Public Meetings Act, are we, what Public
18 Procurement policies apply. And Mr. Burton I am going to kind of
19 paraphrase it in my way but then turn it over to you. What I understood you
20 telling me was that there was a custom and practice for many years that we
21 operate privately. That we do not follow the Open Public Meetings Act, the
22 Public Records Act, or the Public Procurement policies. And that it is the
23 opinion of your firm that those things are not required. Is that a fair
24 assessment?
25
26 Jim Burton – That is a fair statement. It goes that, in fact The Advisory
27 Committee was created as a settlement of a lawsuit involving a private
28 charitable trust, involving first a Compromise Agreement between these
29 parties in 1929, a Judgment in 1930. The Compromise and Judgment
30 obligated the City to attempt to pass an ordinance embodying that, which
31 was Ordinance 12:883 in 1931. I think consistently from that point on, with
32 one or two little glitches, and an opinion here and there dealing with, in my
33 opinion, unrelated issues, this has been treated as a private charitable trust.
34 And it is subject to governance by this Advisory Committee. That's the way
35 it has always been. And I think that is appropriate, as you know, I studied
36 the applicable law and certainly when you add 80 years of custom and usage
37 to that, of the way this has done business. I think that is a correct statement
38 what you said.
39
40 Michael Sherman – Here is the progress I can report from the City's side.
41 Um. Thank you for your interpretation. Um. That unfortunately does not put
42 the issue to bed permanently for the City. Um. But, I think following some
43 guidance that you, that you offered, some wisdom you offered. Um.
44 Combining it with some thoughts that Joel and Robert said, and I'll be
45 paraphrasing this, this is not the time, with the BP claim in front of us, to
46 fight internal governance issues. This is not the time to fight these issues.
47 Um, I feel comfortable that when you reduce what you just said to writing,
48 with the custom and practice of the past half century, with uh, an opinion by
49 counsel, we can kick this can down the road. And what I would ask, not for
50 this meeting, but as we begin our dual track discussions of both valuing the
51 assets and negotiating what the extension would like if we are to extend the
52 Donation indefinitely or for some period of time. Let's address that in those
53 discussions. And let's do two things: figure out what the stated law is right

1   now and what we want it to be. Um, and I think without the, the pressure of
2   BP over our heads, we can put that internal governance issue to bed, for
3   now. We can act upon advice of counsel. Um, that you will reduce to
4   writing, um, and that will give the comfort of not having to deal with this
5   public/private issue, this procurement issue right now at all. So, I think that
6   is one step to getting us closer to a solution, by taking some issues off the
7   table; at least for the next six months or a year. Um. But I do want to let you
8   know that we want to discuss those issues openly and honestly, um, when
9   we go through our, our, um, discussion of the extension issues. Which I
10  know we are going to need to start pretty quickly because there's a whole lot
11  of elements to the extension. So I think that gets us across one of the hurdles,
12  um, in a rather agreeable way to most. Um. So I can get us closer there.
13
14  Now the second thing is, uh, you know, I will report back on, on the Waltzer
15  & Wiygul issue, uh. The, the Donation Advisory Committee's asked,
16  Waltzer & Wiygul has asked for the Mayor to ratify them, to choose them,
17  um, I, I can't get us. I can't us totally there today. But, uh, I can get us a
18  compromise that I think that puts the Donation Advisory Committee, the
19  Donation, and all the beneficiaries in the single best possible position period.
20  And I hope that everyone will, will indulge me for two minutes while I, I
21  share this proposed solution. Because I really think it works.
22
23  Um, some of the concerns with Waltzer & Wiygul were that they didn't
24  have the capacity, as a small boutique environmental firm to pursue this
25  claim. They've done a good job. We've had to finance them along the way
26  to do it. Unlike most every other claim in the BP matter where the attorneys
27  do it on, on a contingency fee. This is a very innovative arrangement, since
28  we have the money to give them hourly fees to keep them going along. But
29  then we recoup it as the Donation, um, when the thing settles because that
30  comes out of their contingency fee. Uh. What both Robert and Joel also
31  suggested, both at this meeting and again to us, if it reaches a point in this
32  matter, that, um, there is not a settlement and this has to move forward
33  towards trial, towards litigation, towards a, a more intense period. Which we
34  are really entering in over the next few months, and hopefully not the next
35  several years. But it very well could be if we end up in litigation. They
36  would have to bring in additional counsel, additional attorneys, to repre, to
37  work with them, alongside them.
38
39  I would like to combine all those issues now on behalf of the City. And
40  propose a solution that I think gets us there. The City went through a public
41  procurement process. It was open for everyone, who wanted to apply. Um,
42  we had many heated, uh, uh, it was, it was a, a very, a sought after proposal
43  represent the City of New Orleans. The result was a joint venture of firms
44  was selected through a public process, after a public meeting, after a public
45  submissions. Um, and we procured that firm to represent the City. Not the
46  Wisner Donation, but the City. It is a broad scope that involves any and all
47  claims that the City has. Um, that is the team the Mayor has confidence in,
48  that the City Attorney has confidence in. The team includes the Plaintiff's
49  Liaison Counsel, many members of the Plaintiff's Steering Committee. The
50  team includes some of the finest attorneys, and that work with Simon
51  Peragine in fact on many cases. It is beyond reproach one of the top groups
52  of law firms ever combined in this region. Of nationally recognized, but
53  local attorneys who pursue these very large litigation, class action . . .

1
2   Stacy Gerhold-Marvin – But what are you proposing then?
3
4   Michael Sherman – I am, I am going to get there in just a second. I'll get
5   there more quickly Stacy.
6
7   Stacy Gerhold-Marvin – I mean. Ok.
8
9   Michael Sherman – So what I am proposing is . . .
10
11  William Peneguy – (unintelligible)
12
13  Michael Sherman – . . . and I reduced it . . .
14
15  Mark Peneguy – He's selling it.
16
17  William Peneguy – Yeah, he's selling.
18
19  Cathy Norman – Ssssh, ya'll.
20
21  Michael Sherman – I'd appreciate just letting me propose my solution. If it
22  works great. If not well, we will confront it then.
23
24  Stacy Gerhold-Marvin – We are waiting for it.
25
26  Michael Sherman – Right now the Donation is paying, we will call it "x"
27  right? We have a contingency fee agreement, that's variable, right? As the
28  more money gets settled, we pay less of a percentage. So the higher the
29  value of the settlement, the lower the percentage that we pay. So we are
30  paying "x" to Waltzer & Wiygul. What I am proposing is the Donation pays
31  not a single penny more. We pay "x." But rather than just having Waltzer &
32  Wiygul, we combine this great joint venture from the City and Waltzer &
33  Wiygul. That solves our issues of having litigators, having trial counsel,
34  having all the power of the Plaintiff's Steering Counsel, the Plaintiff's
35  Liaison Counsel and having the benefit of all the work that Waltzer &
36  Wiygul has done, all the research they've done. We combine the two teams.
37  So we are paying "x" right now, and all we are getting is Waltzer & Wiygul.
38  I'm suggesting we still pay "x," not a penny more. And we get this entire
39  team plus Waltzer & Wiygul. And I think that settles the issue. Let me say
40  this as well. . .
41
42  I think the single most damaging decision we can make at this critical time
43  in the Donation's history, is to start litigating issues against each other. Um,
44  Mr. Burton thank you for, for doing what the Committee asked. Coming up
45  with a petition, which is what you were asked to do. I, the City disagrees,
46  you know, with several of the assertions and that it is the best way to solve.
47  And I know other folks agree, disagree with parts of it as well. It was a
48  challenging task, you could not have made everyone happy. Um, if you feel
49  comfortable opining I would welcome that. But let me just say, if that gets
50  filed the City, and all the beneficiaries I expect to respond, and we end up in
51  a protracted litigation. Not about one minor issue, but lots of issues, and I
52  think that is not the right move for two reasons. One is, we are so close to
53  the extension date, right? And we can negotiate all these tough, big issues in

14

1   the extension. We could put to bed the public procurement, the public versus
2   private. We could all those big issues to bed in a non-time sensitive
3   extension of the Donation over the next six months. But for today, we avoid
4   litigation amongst ourselves. We unify and without paying a single penny
5   more we get the finest collection of attorneys. One that was publicly
6   procured by the City. And one that the Donation Advisory Committee has
7   expressed. So, I, uh, commend that to you for your consideration. I look
8   forward to the discussion. And I would strongly urge us to, to vote in favor
9   of that. I think that today that solves the issue, puts internal governance
10  behind us and lets us get on the same page immediately.
11
12  Stacy Gerhold-Marvin – (unintelligible)
13
14  Dr. Everett Williams – Thank you. Our attorneys are amenable to that, to
15  that recommendation.
16
17  Michael Sherman – So I don't want to speak for them, I can't do that. But let
18  me suggest, uh, what, the line which they have said repeatedly. Which is we
19  will meet with anyone and work with anyone. Um, they believe in the claim,
20  they want to work for the claim. Um, uh, so implicitly I took that to mean
21  they would be amenable to it. I really did. But they not say that, I can't, I
22  can't speak for them.
23
24  Cathy Norman – I think, I think that they were a little shocked when, uh,
25  Steve Herman sits in on these, uh, these uh, conferences with the Magistrate
26  and then there are emails back and forth. And we sit in this, in Executive
27  Session here discussing matters about BP and about potential, uh, filing of
28  potential settlement and the next day not only is he collaborating already. In
29  his email he uses the word "collaborating," without the approval of this
30  Committee. But he is sharing that information not just with the people on the
31  Settlement Committee, but those emails went to in-house counsel at BP.
32  Which to me is a huge breach of confidence. It is an ethics breach, it is
33  everything that I, I just was astonished that Steve Herman would do this.
34  And I, I, don't, personally I am flabbergasted.
35
36  Michael Sherman – Well, Cathy, let me respond to you. First of all, I do not
37  want to talk about the past right now. I don't think . . .
38
39  Dr. Everett Williams – (unintelligible)
40
41  Cathy Norman – No, well this deals with the past!
42
43  Stacy Gerhold-Marvin – Oh, no! Oh, no, no!
44
45  William Peneguy – You don't get to come here . . .
46
47  Stacy Gerhold-Marvin – Oh, no, no! Uh, uh.
48
49  Michael Sherman – Let, let me say what happened there.
50
51  Michael Peneguy – Cathy, we . . .
52  Cathy Norman – Wait, let, I want to him to explain what happened there,
53  because I would really like to hear this.

15

1
2   Michael Sherman – I, I talked to Steve Herman after I saw your email. BP is
3   aware of the internal governance conflict. It's, it's not surprising that they
4   know, right? And in that effort. . .
5
6   Cathy Norman – Yes, no, it is surprising!
7
8   Stacy Gerhold-Marvin – They shouldn't know!
9
10  Michael Sherman – . . . he was trying to downplay . . .
11
12  Mark Peneguy – Yeah, they shouldn't know.
13
14  Michael Sherman – We have not been secretive about . . .
15
16  Stacy Gerhold-Marvin – That is not the issue.
17
18  Michael Sherman – . . . the internal governance. That is not a secretive
19  matter that there is an internal governance dispute and there has been in the
20  City for twenty years. He was trying to downplay the incidence and . . .
21
22  Mark Peneguy – There has been one for twenty years!
23
24  Cathy Norman – By saying he is collaborating and that we are possibly
25  filing for settlement.
26
27  Michael Sherman – Team. Team. Team. We are all one team.
28
29  Cathy Norman – Let me, let me finish. Ok . . .
30
31  Michael Sherman – We are all one team. Cathy has the floor.
32
33  Cathy Norman – Let me, I do have the floor. . .
34
35  Michael Sherman – We are one team. And Cathy has the floor.
36
37  Cathy Norman – Let me finish. First of all, you told me there was a public
38  records request. We have never seen it. You told me the name of the man
39  who made the public records request and that was the person that Steve
40  Herman, uh, sent the, a copy of the email of what we in Executive Session
41  decided to do in terms of filing for, through, going through the claims
42  process. Then, within one day he is already in our business without our
43  permission. I am astonished! Personally, I am astonished! . . .
44
45  Michael Sherman – I, I can't help that.
46
47  Cathy Norman – . . . And well, you know, I think there, I think there are Bar
48  Association breaches there!
49
50  Stacy Gerhold-Marvin – They couldn't get information that was part of
51  Executive Session (unintelligible).
52

1   Cathy Norman – And I am, I am dead serious. And why we would we, after
2   that, after him arbitrarily saying that he is collaborating with our attorneys
3   and interfering with our business, why would we trust them. That is number
4   one. And number two Walt Leger is in direct conflict. We have a direct
5   conflict with Walt Leger. Because he represents Lafourche Parish who we
6   may be in litigation with over the removal of these hard structures. Ok? That
7   is a direct conflict for us. Alright, that's number two. The third is that I
8   looked at the RFP and I got a letter from someone in the City Attorney's
9   Office who said there were, uh, five firms that responded. And then I looked
10  online and it says that there, there was only one bid.
11
12  Michael Peneguy – Yeah.
13
14  Michael Sherman – Well, we have. . .
15
16  Cathy Norman – Well, I've got it right here.
17
18  Michael Sherman – We have all the RFP responses.
19
20  Cathy Norman – Well, online it says there was one bid.
21
22  Edward Peneguy – (unintelligible)
23
24  Cathy Norman – Herman, Herman, Katz and Cotlar.
25
26  Michael Sherman – There are five RFP responses. I've got the sheet I can
27  give you today.
28
29  Cathy Norman – Then, then you need to clean up what is online. Because
30  online it says there was one.
31
32  Edward Peneguy – I think also, Cathy what you need, is you need the
33  written response from everybody that had a decision making respon, that,
34  uh, input into this decision of who the attorneys are. Their, they elected or
35  decided to go with. They need to have them sign off with the reasons that
36  they went with them.
37
38  Cathy Norman – Well, I mean, this, it says right here. Um, this is what was
39  online. It says, uh . . .
40
41  Edward Peneguy – Secondly, I don't think you can (unintelligible).
42
43  Cathy Norman – Total number of submitted quotes – one.
44
45  Michael Sherman – Where are you seeing this?
46
47  Cathy Norman – Right here, at the top of that page.
48
49  Michael Sherman – Alright, show me where you are looking at.
50
51  Cathy Norman – Right there.
52

17

1    Michael Sherman – That is for this firm, there's been five responses. I've got
2    them right there. I'll give them to you.
3
4    Cathy Norman – Well . . .
5
6    Michael Sherman – I'll give them to you right now.
7
8    Cathy Norman – . . . but the point is, you know, I just. I, I think that at this
9    point and time, uh, we are getting something crammed down our throats.
10
11   Michael Peneguy – Yes.
12
13   Stacy Gerhold- Marvin – Yeah.
14
15   Cathy Norman – And, and that is my feeling. And you know, this has been
16   going on since the day the Mayor walked down the hall and I ran into him
17   right after the spill. And Nanette Jolivette said what are, who are we going to
18   hire to represent the City in this matter. I said, we? And that is what I said to
19   her. And it started then and it hasn't stopped since then. So obviously there
20   was already someone in mind. I, I just, I don't, you know, Herman, Herman,
21   they have been . . .
22
23   Michael Sherman – Please, Please do not make assertions. Please do not
24   make assertions.
25
26   Cathy Norman – Ok, they have only been on board since December 29,
27   2011. Our guys have been working day and night since 2010. There was no,
28   if it, I mean, they've done, to me they have done a great job. At such point in
29   time that we need to engage someone else, we can engage someone else and
30   we can discuss it then. That shouldn't be discussed right now. We need
31   ratification of their work for, working for us and representing us right now.
32   Solely. And there has to be a cease and desist order sent to Herman, Herman,
33   Katz and Cotlar to tell them to butt out of our business.
34
35   Michael Peneguy – And I would want that today . . .
36
37   Stacy Gerhold-Marvin – Yes.
38
39   Michael Sherman – I, I am gonna, will recognize the next person now. . .
40
41   Edward Peneguy – Hey, hey, hey.
42
43   Michael Sherman – . . . we are going to keep going around and we are going
44   to show everyone respect. I, I am going to ask everyone to remain calm.
45   Share your, your thoughts. Who would like the floor next?
46
47   Michael Peneguy – I would say basically what Cathy. . .
48
49   Michael Sherman – Mr. Peneguy has the floor.
50
51   Michael Peneguy – . . . What Cathy has said is true. I haven't heard anything
52   from Waltzer & Wiygul that says that they would not be willing to share the
53   records and things. And until then I am firmly behind them representing us

18

1   without any interference from the City. And I, I personally think we to, to
2   approve, uh, the petition that Jim Burton has drawn up and get, get that into
3   court. Because this issue is not going to be settled the way your suggesting at
4   all. We can't afford it because basically those attorneys will want a fee from
5   the Donation. And if that's the case, we have not approved it and I won't
6   approve it. . .
7
8   Michael Sherman – Ok. Well, let, let me suggest, (unintelligible) thank you
9   for your comments.
10
11  Michael Peneguy – . . . I haven't finished! I haven't finished, I haven't
12  turned over the floor . . .
13
14  Michael Sherman – Ok, well, I will let you finish. Relax, I want you to
15  finish. Talk until we are done.
16
17  Michael Peneguy - . . . and basically that is the only way we will get this
18  thing resolved. Because, uh, it has been going on for well over a year and a
19  half. I don't see any end to it with what you just said. Because you said
20  basically you want either a compromise from us or you will take something
21  back to the Mayor and get an answer. We've gone through that process
22  several times. And we're not gone, I don't think, a, a compromise from this
23  Committee should occur at all. Now I am finished and I pass it to . . .
24
25  Michael Sherman – Your brother? Please, Mr. Peneguy.
26
27  Edward Peneguy – Yes, I'd say one thing is, the City has shown bad faith.
28  Continuously. Since day one, since the Mayor came in. He definitely has an
29  agenda which is contrary to the best wishes of the beneficiaries from what
30  I've been able to read. And I read everything that goes on. And I have 15
31  years' experience on this Committee. And I, I served on this Committee
32  when his father was Mayor. And I can tell you all I see is bad faith. You've
33  come to the table with a compromise. I don't see it being a compromise on
34  the City's part at all. Secondly, we have lead counsel now, and as far as I am
35  concerned they should be making the decision who they want to partnership
36  with. Not the City. I have a real problem with hiring lawyers on a public bid
37  basis. . .
38
39  Michael Sherman – Ok.
40
41  Edward Peneguy – . . . I think you get what you pay for.
42
43  William Peneguy – My turn?
44
45  Michael Sherman – Please.
46
47  William Peneguy – Thank you. I would like to see Simon Peragine write a
48  letter cease and desist with this attorneys, the, the Herman group, as of
49  today, or suffer the consequences. Because they are not our attorneys. They
50  have never been hired by this group. We don't even know them. They have
51  never even introduced themselves.
52
53  Stacy Gerhold-Marvin – They've never even. . .

19

1   Cathy Norman – We asked them to come to a meeting and they refused.
2
3   William Peneguy – Yeah. They refused.
4
5   Mark Peneguy – And the next day they reported on. . .
6
7   Cathy Norman – And the next day they are collaborating.
8
9   Edward Peneguy – It's because they are serving a higher authority.
10
11   Michael Sherman – Anything further?
12
13   Mark Peneguy – For you or for?
14
15   Michael Sherman – Anyone else?
16
17   Mark Peneguy – Amanda, you, you have anything to say?
18
19   Michael Sherman – The floor is open.
20
21   Amanda Phillips – My name is Bennett and I'm not in it.
22
23   Mark Peneguy – Well, I, uh, personally. The only way I think we should not,
24   uh, go ahead start this process in court, as Simon Peragine has proposed, is if
25   the Mayor is going to, today, right now in this meeting, ratify the Waltzer &
26   Wiygul contract. If not, then there is no reason to continue discussing that
27   issue. Secondly, I don't trust the Mayor of New Orleans. I don't trust you
28   because I think you are the source that went to Herman and Herman and told
29   them what went on in this Executive Session. If you are not, it came from
30   you to somebody else because nobody else was in here for the City. And
31   there would be, nobody else here would have contact with Herman and
32   Herman. And uh, honestly I don't trust Herman and Herman. I see nothing,
33   no good that can come of that for the Wisner Donation.
34
35   Ed Buddy – Done? I think one positive thing was the fact that, uh, you
36   offered to kick the can down the road for a little while to help us get through
37   BP. I think that was originally proposed early on. That piece was positive. I,
38   uh, don't remember Waltzer & Wiygul ever saying, it, I may be wrong, I
39   don't, at some point in time they may have to, uh, uh, seek outside counsel if
40   it goes to litigation. I think Cathy, uh, uh, offered somewhat of a solution
41   too, that at the point that we do feel we need outside counsel, perhaps that
42   group that you proposed could make a presentation. Or uh, we can further
43   examine it, but for right now, I, I don't, I uh, think I would need more
44   information as to what Watlzer & Wiygul has to say.
45
46   Michael Sherman – Ok. Stacy?
47
48   Stacy Gerhold-Marvin – Um, ratify Waltzer & Wiygul. Um, petition the
49   court. And cease and desist.
50
51   Michael Sherman – Ok. Counselor anything from you?
52

1   Cathy Norman – I did have one more thing to say and that is, you know, the
2   other issue about this firm that bothers me a little bit. And I don't know
3   them. And I don't, I know they, I am sure they are very good attorneys. Is
4   that the Mayor as Trustee has an obligation under trust law to keep his
5   business and personal affairs separate from those of the Trust. And having
6   the same attorneys represent both, to me, is a, is really overt conflict because
7   we don't know what, whether they're going to be, how, whether they are
8   going to be dealing. Even though they may not intend to, BP may perceive
9   there is give and take between the two claims even though they are supposed
10  to be separate. Do you, do you understand what I am saying? That BP may
11  say, oh well, you know, are you going to help us with this a little bit and
12  we'll work a little bit on that. And that is why Trust law requires that a
13  Trustee keep private and business matters separate from other things, and
14  um, that's why the City really has an obligation under Trust law to keep this
15  entity separate. The property is held in trust by the City of New Orleans and
16  they should be represented by separate counsel by the City. And that is just
17  one idea that I have.
18
19  Michael Sherman – Do you have anything Dr. Williams?
20
21  Dr. Everett Williams – You know, I was hoping there was some level of
22  compromise that we can come to Mike.
23
24  Michael Sherman – Yeah.
25
26  Dr. Everett Williams – But, uh, I would certainly like to know what Waltzer
27  & Wiygul feel about, how they feel about some kind of cooperation. But I . .
28  .
29
30  Michael Sherman – I like that idea. Um. . .
31
32  Mark Peneguy – Cathy may have that information.
33
34  Michael Sherman – . . . let me, uh, let me. . .
35
36  Cathy Norman – I don't. I don't really. I haven't discussed it with them.
37
38  Michael Sherman – I will reserve my comments to the end, but I like that
39  idea.
40
41  Michael Peneguy – I, I would think they would have discussed it with you if
42  they . . .
43
44  Michael Sherman – Dr. Williams, I really like that idea.
45
46  Dr. Williams – Yeah.
47
48  Stacy Gerhold-Marvin – Well, is it their decision though? Is it Waltzer &
49  Wiygul's?
50
51  Michael Peneguy – No, no.
52

1    Stacy Gerhold-Marvin – No, it has to come here first, and then, then we
2    would search.
3
4    Michael Peneguy – That's why I say, that's why I say . . .
5
6    Edward Peneguy – If you were on this case, and you were lead counsel, how
7    would you feel about them coming in with some other counsel?
8
9    Jim Burton – Well, for the one thing. The reason I didn't have a comment
10   was that I am not a member of the Committee, and not a voting member and
11   this is a policy decision. But if I did have one, it would have been a
12   clarification. For, do you envision, and maybe this is what Dr. Williams is
13   getting to, and maybe the idea you would like to follow up. Uh, your
14   question, if I were on this case, if I were on this case I would want a little
15   clearer understanding now of what the roles of everybody is, and who is lead
16   counsel going forward. Um, for the interim. . .
17
18   Michael Sherman – Thank you.
19
20   Jim Burton – So that's uh, I think that is, one area of fuzziness that I would
21   like to have addressed. Certainly . . .
22
23   Cathy Norman – Well.
24
25   Jim Burton – . . . if I was on the case. But as just counsel to the Committee
26   not on that case, that still is . . .
27
28   Cathy Norman – Well, we have entered into a contract with them, and, and
29   so at what point in time are we going to be having contingency fees upon
30   contingency fees if we hire someone else?
31
32   Michael Sherman – No.
33
34   Michael Peneguy – Well, that's what . . .
35
36   Cathy Norman – How do you resolve that?
37
38   Michael Peneguy – Yeah.
39
40   Michael Sherman – I'll offer that motion.
41
42   Cathy Norman – Ok.
43
44   Michael Sherman – I think Dr. Williams just gave us a solution. Um,
45   implicitly.
46
47   Mark Peneguy – Are you through?
48
49   Michael Sherman – Anything further?
50
51   Dr. Williams – No, that is all.
52
53   Tony Lorino – So are you going to explain how the fee structure will work?

1
2  Michael Sherman – Yeah, so here is what I suggest. Dr. Williams, I typed
3  this up ahead of time. And I, I think this will work. So, so let me just
4  observe. I want to put aside all the attacks against the Mayor, me or the City.
5  I want to talk about the issue at hand. I think Mr. Peneguy and I have two
6  diametrically opposed views. And I think, and I would encourage everyone
7  to think about what is in the best interests of your beneficiary, right? We
8  have two choices. Litigate. Each other. Right? So spend the next several
9  months litigating each other and not fighting BP. Having issues in terms of
10  questions of counsel as this proceeding moves before a Civil District Court
11  Judge. So, we can litigate each other, or we can compromise and unify and
12  fight BP. So here is what I suggest. There is a legal fee, um, I will read it to
13  you everyone. I, I know we all know it, but it just is sometimes is helpful
14  sometimes to see it. Um, it is in the retainer that the Committee previously
15  approved. Up to ten million dollars, you know, it's up to ten percent for
16  Waltzer & Wiygul without suit, eighteen percent if the case is set for trial,
17  twenty-five percent if it goes to trial, then between ten and fifty million it
18  goes to six, twelve, right? So we have a contingency fee agreement. For the
19  exact same fee agreement, I am suggesting that rather than having just one
20  firm, Waltzer & Wiygul, everyone works and splits up the contingency fee.
21  Attorneys do this all the time. I would not think that we need to as this group
22  get in the way of how the attorneys split this thing up. What I would suggest
23  today is that we authorize, authorize the Mayor to sign an agreement with
24  Herman, Herman, Katz and Cotlar, that firm, that joint venture, and Waltzer
25  & Wiygul, collectively. And those attorneys would meet this week amongst
26  themselves, and work it out. Now, Dr. Williams, to your point, if Waltzer &
27  Wiygul and the joint venture cannot work it out, as Chair I will call an
28  emergency meeting for next week. We can call one today for one a week
29  from today, and have it on the books. And we can all visit next week and go
30  through it again. So let's authorize it to move forward at the same exact fee.
31  How the attorneys split it up is on them. . .
32
33  Cathy Norman – We have never even met them, Michael.
34
35  Stacy Gerhold-Marvin, William Peneguy – No. No.
36
37  Cathy Norman – We have never met these guys.
38
39  Michael Sherman – . . . Please, let, I have the floor now.
40
41  Cathy Norman – Alright.
42
43  William Peneguy – They don't even have the courtesy to come and visit us.
44
45  Stacy Gerhold-Marvin – No.
46
47  Cathy Norman – I invited them to our meeting.
48
49  Mark Peneguy – They are representing us.
50
51  Michael Sherman – We, we authorize the compromise for the teams to get
52  together, at the exact same fee structure. It costs us no more. So for your

23

1   beneficiaries, for the same exact contingency fee, before you were just
2   getting Waltzer & Wiygul, now you are getting the whole team . . .
3   Stacy Gerhold-Marvin – But why do we need them? Why do we need them?
4
5   William Peneguy – Ah,
6
7   Michael Sherman – . . . It is not our job, it is not our job to determine how
8   the attorneys split up the fee.
9
10  Stacy Gerhold-Marvin – Well, what is the Mayor's reasoning?
11
12  Mark Peneguy – It is what the Mayor wants.
13
14  Michael Peneguy – I've got a question.
15
16  Michael Sherman – If they can come to an agreement, great. If not, we will
17  meet again here in a week and figure it out then.
18
19  Stacy Gerhold-Marvin – Mike, I have a question. Why do we need them?
20
21  Michael Peneguy – A contract is a contract. We already signed a contract.
22
23  Stacy Gerhold-Marvin – Why? What is the Mayor's reason for pushing this
24  on this Committee? Why?
25
26  Michael Sherman – The City went through a public procurement process.
27
28  Stacy Gerhold-Marvin – It doesn't. No, no, no. No, no, no. Wisner. I don't
29  care about the City. Wisner . . .
30
31  Michael Sherman – Stacy. Team. I need, I need. . .
32
33  Stacy Gerhold-Marvin – Wisner. Keep it to Wisner.
34
35  Michael Peneguy – You need . . .
36
37  Michael Sherman – I am going to request. I am going to request that
38  everyone calm down. . .
39
40  Stacy Gerhold-Marvin – I am calm.
41
42  Michael Sherman –  . . . and not be hostile.
43
44  Stacy Gerhold-Marvin – Answer the question within the framework of
45  Wisner, not the City. Why does Wisner need Herman and Herman if we
46  already have Walzter & Wiygul? Why?
47
48  Michael Sherman – First of all . . .
49
50  Stacy Gerhold-Marvin – Give us a reason for that if you want us to authorize
51  it.
52

24

1  Michael Sherman – First of all Stacy, I am not going to respond when
2  someone is pointing their finger and yelling at me.
3
4  William Peneguy – Ah, come on!
5
6  Mark Peneguy – (laughter)
7
8  Michael Sherman – I am not going to respond when someone attacks me like
9  that. . .
10
11  Stacy Gerhold-Marvin – Attacking you?
12
13  Michael Peneguy – I would like to offer . . .
14
15  Michael Sherman – That is hostile. What I . . .
16
17  Stacy Gerhold-Marvin – He doesn't have the answer for anything!
18
19  Michael Sherman – . . . will say is what I started off with. . .
20
21  Michael Peneguy – I would like to. . .
22
23  Michael Sherman - . . . we have got two solutions. I am going to offer a
24  motion.
25
26  Michael Peneguy – Ah.
27
28  Michael Sherman – I am going to offer a motion. I am offering a motion.
29
30  Michael Peneguy – You offer a motion and I am going to follow up with
31  two. An amendment. An amendment.
32
33  Michael Sherman – I am going to offer a motion that the Donation Advisory
34  Committee authorize the joint venture of Herman, Herman, Katz, Cotlar,
35  Leger Shaw, Fayard Honeycutt, the law offices of Fred Herman, and
36  Domengeaux Roy Wright Edwards . . .
37
38  Mark Peneguy – (unintelligible) He still wants them involved.
39
40  Michael Sherman – . . . along with. . .
41
42  Stacy Gerhold-Marvin – Here comes the fix.
43
44  Michael Sherman – . . . Waltzer & Wiygul. . .
45
46  Cathy Norman – We have never even met them. None of them.
47
48  Michael Sherman – . . . at the exact same fee structure. . .
49
50  Mark Peneguy – (unintelligible) we are going to undercut (unintelligible)
51
52  Michael Sherman – . . . that the Donation Advisory Committee previously
53  authorized . . . if the attorneys can come to. Cathy.

25

1   Cathy Norman – Ok.

2

3   Stacy Gerhold-Marvin – Yeah, we are going to undercut our attorneys.
4   (Unintelligible) for us.

5

6   Michael Sherman – If the attorneys can come to an agreement, the issue is
7   solved. If Waltzer & Wiygul objects and they cannot, we will meet back
8   here in a week.

9

10  Mark Peneguy – We have a contract with Waltzer & Wiygul.

11

12  Stacy Gerhold-Marvin – Waltzer & Wiygul . . .

13

14  Mark Peneguy – Their contract.

15

16  Michael Peneguy – Am.

17

18  Mark Peneguy – (unintelligible)

19

20  Michael Sherman – I have a motion, is there a second.

21

22  Tony Lorino – I'll second it.

23

24  Michael Sherman – Ok, a motion and a second . . .

25

26  Michael Peneguy – I'd like to amend that motion. . .

27

28  Michael Sherman – It's . . .

29

30  Michael Peneguy – . . . that we file this petition, ah, with the Civil District
31  Court.

32

33  Michael Sherman – I do not accept that as a friendly amendment, but I will
34  certainly offer you the floor after we do this motion.

35

36  Edward Peneguy – Nah, he can amend it.

37

38  Michael Sherman- A friendly amendment, uh, I am not accepting the
39  amendment. I am the author of the motion. Um, it is time for discussion. Mr.
40  Buddy.

41

42  Ed Buddy – I would just, just like to know. I mean, as we did with Waltzer
43  & Wiygul, they made presentations to the Committee. We did, did, uh, an
44  interview process. Uh . . .

45

46  Cathy Norman – Multiple.

47

48  Ed Buddy – . . . multiple times. Ah, there is so much that we don't know
49  about this firm you, you suggested. Plus the fact that Cathy has raised, uh, to
50  me, a serious question about conflict of interest just to start off with. So, I
51  mean, to me its poor timing right now to even. We don't even know if we
52  are going to need additional counsel. But, but because we've got a serious
53  conflict of interest, interest thing to begin with, how do you resolve that.

1   Why does that have to be done today? Why can't we do like, I think the
2   family suggested that, at that point, giving us more time to investigate, what,
3   Waltzer & Wiygul who they think they can work best with. If they need
4   someone. Why do we have to do that today?
5
6   Michael Sherman – So, I think the time is today because there has been a
7   petition offered which would start an internal litigation process which would
8   derail our progress on the BP claim. So this is an offer of compromise . . .
9
10  Mark Peneguy – The petition does not have anything to do with that process.
11
12  Michael Sherman – . . . please do not interrupt me sir. Please do not interrupt
13  me. I am going to answer why the timing is today. Because the City's
14  procured counsel, it has confidence in. That's among the best firms in the
15  country and they are all local. That we think is the perfect route to work.
16  That is who the City procured. The Donation Advisory Committee has one
17  group. For the exact same fee . . .
18
19  Ed Buddy – I understand that.
20
21  Michael Sherman – . . . rather than just getting one, you get all of them. So, I
22  am suggesting that we see if it works, right? We authorize it, we authorize
23  the Mayor to execute that contract with Walzter & Wiygul and this joint
24  venture can come together. If they cannot, we will be back here in a week.
25  But we will not have started a petition, uh, amongst ourselves before a court.
26  What Dr. Williams suggested, and that's why I incorporated that in my
27  motion, it was brilliant. This motion authorizes the Mayor to sign both
28  the two groups together. If Waltzer & Wiygul and this joint venture come to
29  an agreement, at the exact same terms, then the situation has solved itself. If
30  Waltzer & Wiygul says no, we will be back here next week for an
31  emergency meeting to discuss the issue.
32
33  Cathy Norman – Now, now Mike, let me ask you . . .
34
35  William Peneguy – What (unintelligible)
36
37  Cathy Norman – . . . let me ask you this. Why would he be willing? I
38  thought, he, he there was no public procurement . . .
39
40  Edward Peneguy – Yeah.
41
42  Cathy Norman – . . . of Waltzer & Wiygul. He doesn't like them because
43  there is a conflict with the City. He didn't like contingency fees. And now he
44  is willing to do it only if they join his attorneys?
45
46  Stacy Gerhold-Marvin – Oh, my (unintelligible).
47
48  Mark Peneguy – (unintelligible)
49
50  Michael Sherman – Actually, I have brought a compromise to this group.
51  Listen, I want to focus on the big issue here.
52
53  Cathy Norman – That is the big issue.

1
2    Stacy Gerhold-Marvin – That is the issue.
3
4    Michael Sherman – We've got two paths. We've got two paths. We litigate
5    amongst ourselves.
6
7    Cathy Norman – It's not amongst ourselves, I hate to say it.
8
9    Michael Sherman – We join forces. We join forces and litigate against BP
10   with one of the finest legal teams put together. I have a motion. I have a
11   second. Um, I would like us all to take a vote. Because if this passes I think
12   we have a solution. And to your point Dr. Williams, if they can come to an
13   agreement, it is solved. If they can't come to an agreement, we are back
14   here. Nothing, nothing moves forward. So I think if we authorize this, that
15   one point that if Waltzer & Wiygul will agree, we get a chance before we
16   start fighting amongst ourselves. So. . .
17
18   William Peneguy – (unintelligible) Simon Peragine . . .
19
20   Cathy Norman – (unintelligible)
21
22   William Peneguy – . . . let me ask you, uh, if we delay this thing with this
23   kind of stuff, what type. First of all what type of litigation would this cause.
24
25   Michael Sherman – That's not true. That's not true. Please stop. That is not
26   true.
27
28   Cathy Norman – Yes, it is true.
29
30   William Peneguy – If we file this, what kind of litigation do you anticipate?
31
32   Cathy Norman – (unintelligible)
33
34   Jim Burton – It would be, uh, well it is a different statue, the petition that we
35   drafted . . .
36
37   William Peneguy – Right.
38
39   Jim Burton – . . . it would be like a declaratory action. It is an action, a
40   specific action where you go into court and you ask for . . .
41
42   Multiple voices – (unintelligible)
43
44   William Peneguy – Will there be litigation caused by that?
45
46   Jim Burton – Well, this is litigation.
47
48   William Peneguy – I realize that, will we have additional litigation because
49   of this?
50
51   Jim Burton – I couldn't control what the individual beneficiaries would do.
52   They might assert claims, but this wouldn't be (unintelligible). . .
53

1  Cathy Norman – Oh, it is all it has been since the beginning. It has been a
2  struggle for two years.
3  Jim Burton – Nobody can (unintelligible).
4
5  Michael Sherman – Alright. Team. We have a motion. Because, listen if we
6  do this, we give it a week to see if Waltzer & Wiygul and this group come
7  together.
8
9  Cathy Norman – But we don't want this group.
10
11  Michael Sherman – But we, the Committee is going to do that in a second in
12  a vote.
13
14  Michael Peneguy – I'd like to offer. I'd like to offer.
15
16  Michael Sherman – I am going to call for a vote right now.
17
18  Cathy Norman – Ok.
19
20  Michael Sherman – We have a motion and a second. If Waltzer & Wiygul
21  and the group can come together, we've a solution that moves forward. I
22  started by saying not everyone was going to be happy. I started by saying
23  that. Everyone has got to give a little bit. Everyone has got to give a little bit,
24  and . . .
25
26  William Peneguy – (laugh)
27
28  Cathy Norman – A little bit?
29
30  Stacy Gerhold-Marvin – What is the City giving? Tell us!
31
32  Edward Peneguy – What is the City giving?
33
34  Stacy Gerhold-Marvin – What is the City giving?
35
36  Mark Peneguy – Tell us!
37
38  Michael Sherman – Please don't yell. What we get is a unified group and we
39  focus on this. So we have a motion. . .
40
41  William Peneguy – We should have brought James.
42
43  Michael Sherman – . . . and a second. I am going to ask all those in favor, to
44  please, uh, say aye.
45
46  Michael Sherman, Tony Lorino – Aye.
47
48  Michael Sherman – All those opposed, say nay.
49
50  Michael Peneguy, Ed Buddy – Nay.
51
52  Michael Sherman – We have one abstention. We need, we need to take a
53  vote on this today.

29

1
2  Michael Peneguy – Ah, ah. I have, I have a . . .
3
4  Michael Sherman – Dr. Williams, (unintelligible).
5
6  Edward Peneguy – It just failed!
7
8  Michael Peneguy – Yeah, it just failed and I, I'll make a motion that we go
9  ahead with the petition, uh, in Civil District Court. . .
10
11 Michael Sherman – We have a motion to file a petition.
12
13 Michael Peneguy – . . . and, and a letter going from Simon Peragine to your
14 attorneys saying cease and desist. Can you uh, write that letter? Are, are
15 you?
16
17 Mark Peneguy – Is that appropriate for you to do Jim?
18
19 Michael Peneguy – Is it appropriate?
20
21 Jim Burton – I think that would be participation in the BP case . . .
22
23 Mark Peneguy – Well then direct Waltzer & Wiygul. . .
24
25 Jim Burton – . . . and we are recused from that.
26
27 Mark Peneguy – . . . in a separate motion.
28
29 Michael Peneguy – Yeah, uh, I would make a second motion after this one,
30 this motion to go forward with the petition.
31
32 Michael Sherman – We have a motion. Hearing no second.
33
34 Michael Peneguy – You haven't had, you haven't asked for a second yet.
35
36 Michael Sherman – Is there a second?
37
38 (pause)
39
40 Michael Sherman – Hearing no second. I'll offer one more motion which is
41 we, we give this a week of the two firms getting together, and we reconvene
42 in one week.
43
44 Edward Peneguy – No. No. No.
45
46 Michael Peneguy – That was your last motion.
47
48 Michael Sherman – We give Waltzer & Wiygul the opportunity to, to, to,
49
50 Michael Peneguy – That's, that is the same motion you just made, that
51 failed.
52

1    Michael Sherman – No, no its not. My last motion was to authorize the
2    action. This motion is to wait one week. Have Waltzer & Wiygul present
3    and have the firm present, the joint venture present.
4
5    Edward Peneguy – You know what the effect of this is? You are putting
6    your thumb down on our attorneys.
7
8    Cathy Norman, Michael Peneguy – Right.
9
10   Cathy Norman- Yes, it is.
11
12   Edward Peneguy – That is exactly what the effect is.
13
14   Cathy Norman – It is you forcing your attorneys down our throat.
15
16   Edward Peneguy – It's calling in political (unintelligible) in the City of New
17   Orleans.
18
19   Michael Sherman – (unintelligible) Please.
20
21   Liz Turner – Can you ask Waltzer & Wiygul what do they think is in the
22   best interest of the Donation in this litigation, the BP litigation. Is it in the
23   best interest to go forward with the joint venture? Or go forward with the
24   petition for instructions?  And hear what they say . . .
25
26   Cathy Norman – Well, I, I can tell you what Waltzer & Wiygul told me
27   today. And I'll read it to you. Ok. And this is when I told them that we were
28   going to be discussing things. What they would like, is, they would like, uh,
29   the letter that Jim was going to write about. That you originally proposed. . .
30
31   Liz Turner – Um huh.
32
33   Cathy Norman – . . . stating that we are a private entity. That the Committee
34   has the authority to hire. And then get, that uh, that we have the authority to
35   hire without a public procurement process. And then a place for the Trustee
36   to sign on the bottom stating that we have hired Waltzer & Wigyul and that
37   they duly represent this Committee. That's what they told me they wanted
38   today. And have the Mayor put his John Hancock on that at the bottom.
39   That is what we want, that is what they told me they want.
40
41   Mark Peneguy – Cathy, and if they (unintelligible). . .
42
43   Michael Sherman – I have a motion. I have a motion which I have offered
44   which is in line with what Dr. Williams said. Let's reconvene in one week.
45   We will bring both firms. . .
46
47   Michael Peneguy – No.
48
49   Michael Sherman – . . . both teams here.
50
51   Edward Peneguy -
52

31

1    Stacy Gerhold-Marvin – Wait, wait, that wasn't, that wasn't approved was
2    it?
3
4    Michael Sherman – No.
5
6    Stacy Gerhold-Marvin – No, it wasn't approved.
7
8    Michael Sherman – No, I am offering the motion to bring the firms here for
9    next week. To schedule a meeting for next week. To bring the firms here. In
10   line with what you said, to ask Waltzer & Wiygul to tell us what it is they
11   need. And, uh, that way we kick the can down the road just one week. Just
12   one week.
13
14   Dr. Williams – Yeah.
15
16   Michael Sherman – And next week we dissolve, we resolve the issue. And
17   then next week we either file the petition or, or we, or we bring on joint
18   counsel. So I will offer that as a motion. Is there a second.
19
20   Tony Lorino – I'll second.
21
22   Michael Sherman – We have a motion and a second. All those in favor, aye.
23
24   Michael Peneguy – I've got a comment about that. We have a contract with,
25   um, Wiygul and Waltzer. . .
26
27   Mark Peneguy – Waltzer & Wiygul.
28
29   Michael Peneguy – . . . if we decide in a meeting to, to change that contract,
30   we are putting ourselves in line for a legal law suit from them. And I would
31   not want to do that without word from them as to what they could accept and
32   what they won't.
33
34   Michael Sherman – Which is why we have a week.
35
36   Dr. Williams – That's, that's what bothered me too Mike.
37
38   Cathy Norman – Suppose, let me ask you this Michael.
39
40   Michael Sherman – We have a motion and a second. To have a meeting next
41   week to have both firms present next week to see if it works . . .
42
43   Edward Peneguy – Let me, let me say something here.
44
45   Michael Sherman – . . . we have a motion. . .
46
47   Mark Peneguy – No, you can't (unintelligible).
48
49   Michael Sherman – Go ahead.
50
51   Edward Peneguy – Look, I am a Wisner. I have been involved in this thing
52   for what, 50-60 years. And I can tell you something, that, what he's
53   proposing is not in the benefit of the beneficiaries at all. We've got the

1  largest interest at this table. And if come necessary I will have my attorneys
2  call on you. Ok? Because your Mayor, as far as I am concerned is in
3  violation of his duties as Trustee. Ok?
4
5  Michael Sherman – And, and let me invite anyone or their attorneys to come
6  visit with us in our City Attorney's. . .
7
8  Edward Peneguy – Oh, no! Listen to me! He isn't going to be visiting with
9  you!
10
11 Michael Sherman – He can visit with us.
12
13 Edward Peneguy – No, he isn't going to be visiting with you! Ok? This, this
14 Committee needs to finally, this gives you the best chance here to get it
15 straight with the Mayor. You've got an issue here that is very concrete. You
16 have eighty years of experience on how this Trust has been run. And I
17 realize there are some political interests on this table.
18
19 Michael Sherman – No (unintelligible).
20
21 Edward Peneguy – Ok? Oh, yeah. And I think it is time that this Committee
22 stood up for their beneficial interest. Ok? Which does not include going
23 along with the Mayor, because he does not have your interest in mind. He
24 really doesn't.
25
26 Stacy Gerhold-Marvin – No, uh, uh.
27
28 Michael Sherman – So first of all, I, I just need to say that the Mayor has
29 absolutely has every beneficiary's best interest in mind. We all be good. . .
30
31 Mark Peneguy – (laugh)
32
33 Edward Peneguy – No, he doesn't.
34
35 Stacy Gerhold-Marvin – Don't lie!
36
37 Michael Sherman – . . . we'd all be good. And let me just say, what's clear is
38 that the Peneguys want to fight a lawsuit amongst ourselves. . .
39
40 Stacy Gerhold-Marvin – No lying at the table.
41
42 Multiple voices – (unintelligible)
43
44 Michael Sherman – I'm trying to bring us to compromise. We have a motion
45 and a second. . .
46
47 Stacy Gerhold-Marvin – Lying at the table.
48
49 Michael Sherman – . . . for next week to have a meeting with all the firms
50 present, so we can get input from Waltzer & Wiygul.
51
52 Cathy Norman – Can I ask a question?
53

33

1   Michael Sherman – Let's offer the question.
2
3   Cathy Norman – I have a question.
4
5   Stacy Gerhold-Marvin – Dr. Williams. . .
6
7   Michael Sherman – Cathy and then we will vote.
8
9   Cathy Norman – A question is, suppose we put them together and we say ok,
10  uh, there is no joint venture. We continue on this path. At such time that we
11  may need help, then it would be Waltzer & Wiygul's decision whether to
12  hire them or not.
13
14  Michael Sherman – We can talk about that next week when everyone is
15  here.
16
17  Mark Peneguy – It's Waltzer & Wiygul's decision to do that now.
18
19  William Peneguy – We still have a conflict with the group.
20
21  Cathy Norman – Yeah, we do.
22
23  Multiple voices – (unintelligible)
24
25  Michael Sherman – We do, but we can talk about it next week.
26
27  Cathy Norman – I do.
28
29  Michael Sherman – That's why this is a good vote.
30
31  Cathy Norman – You, you need to look at trust law. You really need to look
32  at trust law.
33
34  Michael Sherman – We have a motion and a second for a meeting next week
35  so that way we can discuss all these issues. With the attorneys present. Uh.
36  We have a motion and a second. All those in favor say aye.
37
38  Tony Lorino, Dr. Williams, Ed Buddy, Michael Sherman – Aye.
39
40  Michael Sherman – So that's four votes. All those against say nay.
41
42  Michael Peneguy – Nay!
43
44  Michael Sherman – It carries, four to one. So we will meet next week. We
45  will have all the groups present. We will discuss the issues and then at that
46  time we will decide whether we get them together or we file a petition.
47
48  Cathy Norman – Next week is a very, very bad week.
49
50  Stacy Gerhold-Marvin – It is a bad week for the Foundation, too.
51
52  Michael Peneguy – Yeah.
53

34

1    Cathy Norman – It is going to be very difficult. I've got all my experts
2    coming in from around the country to work on BP. We are going to be down
3    at Fourchon and about. And so it's going to be. And it is not a meeting
4    without me here.
5
6    Michael Peneguy – Yeah, it's an invalid motion. We're not going to have all
7    the Committee.
8
9    Stacy Gerhold-Marvin – (unintelligible) petition.
10
11    Michael Sherman – Cathy, next up is the . . .
12
13    William Peneguy – Petition, please.
14
15    Michael Sherman – . . . BP Horizon Deepwater Spill Update.
16
17    William Peneguy – No, we've never resolved the petition issue.
18
19    Michael Sherman – The motion was that we would discuss that next week.
20
21    William Peneguy – No. No, it wasn't.
22
23    Michael Peneguy – No. No.
24
25    Michael Peneguy – No, it wasn't.
26
27    Stacy Gerhold-Marvin – No, it wasn't.
28
29    Mark Peneguy – Have you listened to your own motion?
30
31    William Peneguy – Jesus.
32
33    Michael Peneguy – I move that we, we, uh, we . . .
34
35    Stacy Gerhold-Marvin – No lying at the table. . .
36
37    Mark Peneguy – No lying at the table.
38
39    Stacy Gerhold-Marvin – . . . except the City of New Orleans. That is it.
40
41    Michael Peneguy – . . . proceed with the motion. I move that we proceed
42    with the motion.
43
44    Cathy Norman – Ssssh.
45
46    Michael Sherman – You had a motion. I am sorry, you had a motion that
47    failed. There is no second to file the petition . . .
48
49    Michael Peneguy – You had a motion that failed. . .
50
51    Michael Sherman – . . . we chose to meet next week. . .
52
53    Michael Peneguy – . . . you had a motion that failed too. . .

1
2   Michael Sherman – . . . Ok.
3
4   Michael Peneguy – . . . So I am going to make my motion again. . .
5
6   Michael Sherman – So please make your motion again.
7
8   Michael Peneguy – . . . Ah, I move that we, ah, file the petition as soon as
9   possible.
10
11  Michael Sherman – Ok, we have a motion to file the petition as soon as
12  possible.
13
14  Michael Peneguy – And that would be a two way deal. We can wait until
15  next week, and then the petition can be filed at the same time.
16
17  Edward Peneguy –I don't understand that.
18
19  Ed Buddy – Wait, I don't understand that.
20
21  Michael Peneguy – Basically he can have his . . .
22
23  Stacy Gerhold-Marvin – (unintelligible) the petition.
24
25  Ed Buddy – (unintelligible) and file the petition.
26
27  Michael Peneguy – No, I am saying that file the petition now and we can
28  have a meeting next week and discuss all this. I know the results of that
29  meeting. But, essentially we . . .
30
31  Mark Peneguy – Actually you don't.
32
33  Michael Peneguy –  . . . can have a meeting next week and discuss it all . . .
34
35  Michael Sherman – Mr. Peneguy, I need to say something. . .
36
37  Edward Peneguy – Not with what he's brought to the table today, you don't.
38
39  Michael Sherman – . . . One thing that, one thing that impresses me about
40  every beneficiary's designee on this Committee is the passion, the
41  commitment and dedication, and, everyone brings. And let me tell you, I
42  trust that, that the designees, this Committee. Mr. Peneguy, I want you to
43  know this. I trust everyone on this Committee to listen to the attorneys and
44  make a decision about what is in the best interest of their beneficiary. Not
45  assuming anything. I think it was a great compromise. That we are going to
46  have a good meeting next week. And at the end of that meeting, we are
47  either going to decide on counsel, or we are going to file a petition or we are
48  going to do something else. But I think anything else further, just chooses
49  between the sides of fighting amongst ourselves and coming together. With
50  that in mind, we have a motion. I am waiting to hear, is there a second? Ok. .
51  .
52
53  Michael Peneguy – Wait, wait . . .

Michael Sherman – . . . hearing no second . . .

Michael Peneguy – . . . wait, I presume you are talking about my motion? Or are you talking about your motion again?

Michael Sherman – Your motion.

Michael Peneguy – Ok.

Michael Sherman – Ok. We have no second.

Mark Peneguy – (unintelligible) motion.

Michael Sherman – Ok, Mr. Peneguy, we are going to move onto the BP Deepwater Spill Update in a moment. Ok, Cathy, next agenda item.

Cathy Norman – Uh.

Michael Peneguy – I've got another motion along that line. (*Tape ends.*)

**NEW BUSINESS ITEM 3.      BP Horizon Deepwater Spill Update**

(*At 1:02 PM the tape was stopped to switch to the Executive Session, without recording who made the motion, who seconded the motion to enter Executive Session, or the vote that was passed to enter Executive Session.*)

Michael Sherman – Motion to come out of Executive Session.

Mark Peneguy – Michael.

William Peneguy – It is (unintelligible) it's all over the city.

Michael Sherman – Second?

Mark Peneguy – Michael, you can't discuss anything about BP because (unintelligible).

Michael Sherman – Second? All those in favor say aye?

(*The second is not audible.*)

Michael Sherman, Michael Peneguy, Dr. Williams, Ed Buddy, Tony Lorino – Aye.

Michael Sherman – Hearing none, we are out of Executive Session. Let's proceed. Go ahead.

Cathy Norman – Even if we aren't in Executive Session, what we are discussing is confidential, so please keep it within this Committee.

William Peneguy – Ok.

1   Cathy Norman – Ok? Ah, several things have happened since our last
2   meeting. Uh first, I had sent several letters to the Coast Guard concerning
3   tilling issues, and other clean-up issues, ah, and removal of the hard
4   structures. Finally did, did get a, uh, a letter back from the Coast Guard in
5   response to my letters. They as usual don't say much, but. Uh they, they
6   talked about ongoing cleanup after bird nesting is over, and the removal of
7   the hard structures, and. We still have a lot of, uh, concerns about the fact
8   that there are now a lot of, uh, board roads out on the beach that last year
9   when hurricanes came through, they took them back into the marsh. Ah, but
10  they, they are saying they can't remove the board roads because of the bird
11  nesting, and um, the, so there are a lot of, um, issues out there ongoing. I did
12  have, uh, Mike Taylor with BP come over and give me this variance request
13  for beach tilling, sifting. . .
14
15  (Knock on the door)
16
17  Matt Averill – Sorry.
18
19  Mark Peneguy – Come on back in, we are not in Executive Session.
20
21  Michael Sherman – We are out of Executive Session.
22
23  Michael Peneguy – Yep.
24
25  Matt Averill – Already?
26
27  William Peneguy – (unintelligible)
28
29  Mark Peneguy – Confidential
30
31  William Peneguy – It's confidential.
32
33  Michael Peneguy – So, I suggest you leave anyway.
34
35  Cathy Norman – Um. . .
36
37  Mark Peneguy – Actually I think you are right.
38
39  Cathy Norman – . . . anyways, the variance. . .
40
41  Mark Peneguy – (unintelligible)
42
43  Cathy Norman – . . . the variance request, sssh, I am trying to give my report
44  Mark.
45
46  William Peneguy – Ok, go please.
47
48  Cathy Norman – The variance request is um, for, they picked out one area, if
49  you look at this map on our beach, that still has a lot of oiling. It is a 200
50  foot by 1300 foot area. He says that, this is their report, that if they have two
51  teams of 30 people it will take them 590 days for them to finish the cleanup
52  on just this area. And this is why they want to do the tilling. And then they

1    gives us a whole report on how, if they do the tilling they are going to go
2    down, I think 18 inches. They are going to use this beach tech machine.
3
4    Dr. Everett Williams – What's this? Cathy, what is this?
5
6    Cathy Norman – This is what BP wants. . .
7
8    Dr. Everett Williams – This is what BP wants. Ok. Good.
9
10   Cathy Norman – . . . to do to finish cleaning up. They want to put up a silk
11   fence so if anything blows, the stuff won't be caught in the water afterwards.
12   And you know, basically, my reaction was, you know, the only way we'd let
13   you do a test site even, is if you did com-, very, you know spent so much
14   money to determine how, do a total beach profile on that area before or
15   afterwards. And you'd have to continue to do them in the future so we will
16   know what kind of damage it is. Uh, you know Robert and Joel are basically
17   like, no, you are not doing beach tilling on our beach. So, I don't know, you
18   know, this is what they asked for. But we are certainly are not going to, at
19   this point, we are not interested in doing it. They are doing it, or beginning
20   to do it on, um, Elmer's Island. I did notice that Elmer's was closed for a
21   period. Most of the oil we are looking at in these areas is a lot deeper than,
22   wher-, how deep they are going in to go with this tilling, ah, equipment. You
23   can see this is basically land farming. They are breaking it up into little
24   pieces. It is something we already said no to, over a year ago. And I pointed
25   that letter, that out to the Coast Guard in my letter. Ah, the next issue is . . .
26
27   Edward Peneguy – Can I ask before you go on, can I ask you about the, the
28   uh, wooden roads?
29
30   Cathy Norman – The board roads.
31
32   Edward Peneguy = Yes. Are those made out of treated timber?
33
34   Cathy Norman – Ah, they are typical oil field board roads, that you . . .
35
36   Edward Peneguy – So, they are going to have chemicals in them, treated,
37   they've been treated and that stuff is sooner or later going to go into your,
38   your environment.
39
40   Cathy Norman – Well, I don't know. That is a very good question Ed. I
41   didn't, I will bring that up. But they are chained together, big wooden roads
42   that they put out, like you would put out in oilfield.
43
44   Edward Peneguy – They can break those up and pull them out. I mean if
45   they take a chain saw to them.
46
47   Cathy Norman – Well, last year forty of them ended up back in our marsh.
48   And they had to use heavy equipment to go and retrieve them. But right
49   now, we are just cautioning them that they put extra board road in over the
50   past year and with hurricane season approaching, there is another risk of
51   them breaking free like they did last year. And then it damaging our marsh,
52   because I mean they weigh about 4000 pounds apiece.
53

1    Edward Peneguy – How close are they to the campsites?

2

3    William Peneguy – No, they are not even near. Not even near.

4

5    Amanda Phillips – Close.

6

7    Cathy Norman – Oh, well. Wait a minute. Wait a minute.

8

9    William Peneguy – When they float I guess they can hit. Yeah.

10

11   Cathy Norman – They picked them up all the way on Highway 1.

12

13   Edward Peneguy – Oh my god!

14

15   William Peneguy – Jeez.

16

17   Cathy Norman – So, so don't, don't think, yeah, uh.

18

19   Edward Peneguy – So you could end up with some liability. . .

20

21   Cathy Norman – Absolutely.

22

23   Edward Peneguy – . . . if that stuff gets loose.

24

25   Cathy Norman – Well, we won't but they certainly will. Um, then um, the
26   last issue to discuss is the settlement agreement, which is very important for
27   us to try and um, move forward on. Um, obviously we, I tried to break this
28   down as simply as I could. We filed a motion for summary judgment. The
29   motion for summary judgment strictly dealt with the information. As we, as
30   there were meetings that I was not privy to and was not included to, I was
31   privy to them, but I was not included to the meetings, uh. The whole idea of
32   this outstanding reimbursement fees came up. Those reimbursement fees,
33   uh, ah, we worked out a kind of separate agreement aside from the
34   settlement agreement. The settlement agreement will be covered when, when
35   the case is dismissed, when the motion for summary judgment is dismissed.
36   There will be a court order, uh, covering the uh, settlement agreement as far
37   as the document, ah, ah, exchange goes. But the other will be kind of a
38   separate agreement, settlement agreement, outside the purview of the court,
39   so they wanted to include Kokkonen language in the order of the court.
40   Which is, ah, ah, an inclusiveness where it can be court enforced if there are
41   any problems. Nothing has really changed. They keep trying to change this.
42   Every time we've gone back and forth on these settlement agreements, they
43   keep trying to make it into an amendment of the access agreement. One of
44   the things outright that Greg Johnson said is, when can we end this access
45   agreement? And, and you know my response to Joel and Robert was, you
46   know, you've got to remove the hard structures. You are still cleaning up oil.
47   You still need access to our beach. You need the access agreement. You are
48   stuck with it. And, and we are not really interested in amending it at any
49   point in time. We have to keep it in place to protect ourselves. So, um, I
50   guess what, what Joel and Robert hope that we could do, and one of the
51   things, uh, that uh, I included in here. Ah, for whatever reason, that I don't
52   know it, it certainly wasn't put in by Waltzer & Wiygul, it, uh, all the thing
53   said "the Mayor, Mitchell J. Landrieu, acting on behalf of the City of New

1    Orleans and as Trustee." That needs to be taken out because the City of New
2    Orleans is the Trustee. And so that language needs to be changed, he is
3    acting as the Trustee with the advice and consent of the Committee, and that
4    is included in this settlement agreement. We need to number one, as we go
5    forward, uh, we basically have said that we are satisfied with on the
6    information exchange. We are satisfied with what they have given us. They
7    wanted us to say they don't owe us anything else. Well, we can't do that . . .
8
9    Michael Peneguy – No.
10
11   Cathy Norman – . . . because there is ongoing cleanup and there's ongoing
12   things going on. Ah, then, ah, on the money part, we've already discussed,
13   $150,000 of the $850,000 that are, or thereabouts, that is owed us, we will
14   get $150,000 up front. Then a neutral will be hired, jointly, ah, approved by
15   both Wisner, and, uh, uh, Waltzer & Wiygul and BP. Then the neutral will
16   decide which, what can be paid under the access agreement and what can't.
17   And then whatever is left will be rolled over and we will reserve our rights
18   in whatever future litigation there is. So, um, in the meantime it was great
19   that, uh, they are still honoring our access agreement and sent us a check, as
20   this thing is, is ongoing. So, what, uh, was requested of Waltzer & Wiygul
21   was that I go ahead and get the Committee to approve this settlement in
22   terms. We had hoped that they would get back to us today, before we met
23   today, but, um, you know, we don't want to be holding it up. The Judge
24   wants this to go away. The Magistrate wants this to go away. And then, we
25   would want to know that if, if the Committee approves this, and I draft a
26   resolution of the Committee, that the Mayor will sign it.
27
28   Michael Sherman – Ok.
29
30   Michael Peneguy – I'll move that we, uh, go forward with the settlement
31   agreement. Uh, I think that the only changes you had mentioned in here and,
32   uh, uh, there may be a slight modification from this point on right?
33
34   Cathy Norman – Right.
35
36   Michael Peneguy – I move that we approve it as, as you stated here, and, and
37   leave it up to Wiygul and uh, Waltzer & Wigyul to finalize the thing.
38
39   Michael Sherman – Motion. Is there a second?
40
41   Dr. Everett Williams – Second.
42
43   Michael Sherman – Second, I see Mr. Buddy down there. All in favor?
44
45   Dr. Everett Williams – Aye.
46
47   Michael Peneguy – Aye.
48
49   Michael Sherman – Hearing no objections, the motion carries.
50
51   Cathy Norman – Ok, so I will, I will do a resolution. And as for, if, if this
52   thing is confected, we will attach the resolution to the back of the agreement.

1   They have requested that we do so. And we will present this to the Mayor
2   for his signature. Do you see any problem with the Mayor executing this?
3
4   Michael Sherman – Um, I will call you as soon as I get it.
5
6   Cathy Norman – Ok.
7
8   Cathy Norman – Ok. . .
9
10  Michael Sherman – Wisner Beach Update, Caminada Headlands.
11
12
13  **NEW BUSINESS ITEM 4.     Wisner Beach Update**
14
15  Cathy Norman – Ok, a couple of things happening. There is a great report
16  from um, from, ah, Forrest that you really need to read. He, um, is talking
17  about a $14,000 fence that he wants to put on the property. And that is fine,
18  but we need to make sure we don't need some type of permit if we are going
19  to put the posts in there, before we go out and start jamming posts in the
20  beach and get caught in some type of permit violation. So I am going to have
21  him look into that and re-present this to the Committee at a later point in
22  time.
23
24  William Peneguy – What is the purpose of the fence?
25
26  Cathy Norman – To keep people out.
27
28  William Peneguy – Oh.
29
30  Edward Peneguy – Cathy, Cathy. Many years ago we put a fence up. Ok, a
31  10-foot fence.
32
33  Michael Peneguy – Yeah.
34
35  Edward Peneguy – The stole the wire the first day. They stole the poles the
36  next day.
37
38  Cathy Norman – I know. They stole all the beach fencing. I know, but. . .
39
40  Dr. Everett Williams – Ain't that something?
41
42  Cathy Norman – Um, another thing that has come up and, um, next week,
43  uh, and this relates to BP too.  Next week is a conference on Monday,
44  Tuesday, and Wednesday, called the uh, the Coast of, uh, the Condition of
45  the Coast. And it is a big, uh, national conference, that I am going to go.
46  They have a couple of seminars on BP and on other issues, so I will be
47  attending parts of that. But, um, Jeff Williams, who is our coastal
48  geomorphologist, will be in town. Um, a lot of other people will be in town.
49  It is going to be an interesting time. But, we have chosen, because we are,
50  are looking at, uh, analyzing over 10,000 documents that we have gotten
51  from BP, and trying to put them together. Trying to get some maps made,
52  trying to get all the information put on maps that we can utilize. And
53  possibly utilize in, in attempting a settlement with BP, or whatever we

42

1  decide to do. Uh, Jeff Williams will be in town and he, we're, we're, we
2  plan in addition to the coastal conference, and to taking two or three days
3  and locking ourselves in a room and discussing everything. We are going to
4  have Forrest there. We are going to have Jeff there, uh, John Pardue, and all
5  the people who have been working on this, and putting, putting our team
6  together. Jeff has also, off and on over the past year, particularly on one
7  issue, ah, he has answered a few questions of mine relating to the, ah beach
8  in general. And ah, as a result of that he sent me an email wondering if, and
9  he has done it more or less as a favor, but, I, I, I need to know, that if I do
10  need him on specific issues, it uh, you know, uh, whether we could, could
11  hire him to do certain, ah, issues relating to the beach. And let me just give
12  you . . . And there's nothing right now, but let me just give you an idea. Am,
13  I gave out emails.
14
15  We have huge abandoned trees all over our beach. There, they've
16  uncovered, this used to be a chenier. They are huge. You remember seeing
17  all the big trees on the beach. The Caminada Headlands people contacted
18  me, they, they want to go out and they want to clean up all of the man-made,
19  uh, stuff off the beach. And then they want to take all of the big trees and
20  move them back, behind the dune. And Jeff, is not an engineer, but he says
21  this, it is stupid, either put them under the dune or just leave them in place
22  and cover them up. The problem is that the coastal engineers designing this
23  project are used to designing projects in Florida. They are used to designing
24  projects on amenity beaches. And, they are very adamant about wanting to
25  do this. And Jeff, who I just asked about it, is very adamant against it. So I
26  am hoping next week, uh, at the conference, I can get Jeff to dialogue with
27  these, because I am sure these people will be at this conference as well. And
28  talk a little bit about what they, why each of them have this opinion. I mean
29  my opinion is leave them on the beach. There are probably, if you dig down
30  there are probably 10 more trees buried under the beach, underneath it. And
31  it seems crazy that some of these beaches, I mean some of these trees are
32  longer than this room and higher than this table and stuck in the sand. Why
33  would you spend the money to go out and remove them?
34
35  Michael Peneguy – Well . . .
36
37  Cathy Norman – . . . It just doesn't make sense.
38
39  Michael Peneguy – . . . if you are going to spend that type of money, why
40  not haul them to a lumber mill where you can get them cut up and used for
41  something?
42
43  Cathy Norman – Well, but, no, I mean . . .
44
45  Michael Peneguy – (unintelligible)
46
47  Cathy Norman – . . . they, they, they want to, if they want to leave them on
48  the beach and put them behind the project . . .
49
50  Michael Peneguy – Yeah, but . . .
51
52  Cathy Norman – . . . Jeff said either leave them in place or put them
53  underneath the dune, to give the dune more structure.

43

1
2   William Peneguy – Because if you go over those dunes, you are just tearing
3   them up.
4
5   Michael Peneguy – Right.
6
7   Cathy Norman – So, I don't, don't, I don't know what's, I don't know what
8   is going to happen. But this is just an example of, of, of, sort of what is
9   going on with this.
10
11  Edward Peneguy – Cathy, if you bury those trees, you are going to have
12  subsidence sooner or later.
13
14  Mark Peneguy – Yeah. . .
15
16  Michael Peneguy – You will, but, uh . . .
17
18  Mark Peneguy – When the trees rot.
19
20  Cathy Norman – They are already buried.
21
22  Edward Peneguy – Yeah, but eventually they are going to rot and you are
23  going to have subsidence.
24
25  Mark Peneguy – . . . eventually they are going to rot.
26
27  Michael Peneguy – Yeah, but they are not, you are going to have
28  subsidence, but not that bad of subsidence.
29
30  Edward Peneguy – Ok, yeah. Well I don't know how many of them. . .
31
32  Cathy Norman – Most of them are, are cypress.
33
34  Edward Peneguy – Well, they'll last forever. . .
35
36  Cathy Norman – Or oak. So.
37
38  Michael Peneguy – Well that's why I suggested that they haul them away . .
39  .
40
41  Cathy Norman – Um.
42
43  Michael Peneguy – . . . or something. Because I know the Cajuns are out
44  there dragging those logs out of . . .
45
46  Cathy Norman – Right.
47
48  Michael Peneguy – . . . the bayous and all. . .
49
50  Cathy Norman – Oh yeah.
51
52  Michael Peneguy – . . . and using them.
53

1   Cathy Norman – Oh, someone has already asked if they could come get
2   them.
3
4   Michael Peneguy – Right.
5
6   Cathy Norman – Um, aside from that, obviously something went very right
7   for me this month because they cancelled the South Lafourche Beachfront
8   Development District meeting. And I did not have to drive to Galliano and
9   listen to them talk about driving on the beach. I did receive this letter from
10  Jerome Zeringue about what, what the permitting process will be for future,
11  ah, driving on the beach. And I did respond to his letter. I don't know
12  whether you had a chance to read my response, but you know, when he talks
13  about, uh, that OCPR will carefully consider the potential impacts of driving
14  hauling. And that they have to make sure it won't, it will protect the integrity
15  of the project and they use some of the other language. "That it, ah, that it
16  won't expose the project to wear, tear and abuse." He really failed to, to
17  include the exact language, which means, "allow them to make provisions
18  for limited riding, driving or hauling." Limited by its very nature, means,
19  does not mean public access. They are, limited is not public access. So that
20  is what I wanted to point out to them. I know this is going to be a battle. I'm,
21  I am thankful that probably won't be one that we have to fight for about two
22  years. So.
23
24  Michael Peneguy – They, they basically will give a permit but it is private
25  property, so they have to get the access from us, the Committee.
26
27  Cathy Norman – Yeah, they, they are going to have to get the access from
28  us.
29
30  Michael Sherman – Duck camp lease.
31
32
33  **NEW BUSINESS ITEM 5.   Noël Pilié Duck Camp Lease Renewal**
34
35  Cathy Norman – Ahm, I have not heard from Dr. Pilié. For those who, who,
36  don't know, he, ah, has a camp, ah, in Saint John the Baptist Parish. Pretty
37  much on his own. And I have called and left messages. I think I am just
38  going to send him a letter. Um, I don't know whether ya'll remember. But he
39  had the camp with his cousin and his cousin was tragically killed, out on the
40  property in a boating accident. And so I don't know whether, I don't know
41  what is going on with him. I have left messages at, at his dental clinic. And
42  so I am going to go ahead and send him a letter. We do have some time. I
43  think it is, it is August 1st or September 1st? Do you know?
44
45  Amanda Phillips – August 1st.
46
47  Cathy Norman –August 1st, so we have some time on that.
48
49  Michael Peneguy – Yeah, August 1st.
50
51  Michael Sherman – Ok. Global Geophysical.
52
53

1   **NEW BUSINESS ITEM 6.**    **Update Global Geophysical Project**
2
3   Cathy Norman – Um, just they are working out on the property. Just wanted
4   to update you they had some boat problems, but they continue to work on
5   the property. Probably will, will be continuing to shoot the seismic through
6   September.
7
8   Michael Sherman – Very good. How long do they have under the access
9   agreement?
10
11   Cathy Norman – I think we gave them to the end of the year.
12
13   Michael Sherman – So they are fine.
14
15   Cathy Norman – Yeah.
16
17   Michael Sherman – Alright, LUMCON.
18
19
20   **NEW BUSINESS ITEM 7.**    **LUMCON Camp Meeting and Update**
21
22   Cathy Norman – I met with LUMCON, and um, I included a LUMCON bill.
23   There is a controversy in the House. The property is a mess. There, the guy I
24   met with, all he cares, you know. I want to point out that as a result of the
25   holes and everything on the property I included a, a statute that says that if
26   we know about the, the possible dangers we can be held liable.
27
28   Michael Peneguy – Right.
29
30   Cathy Norman – They have gone out as a result of our meeting and, and put
31   um, construction fencing around the holes and, and worked out certain areas.
32   They gave me a very long, involved song and dance, that I do believe, um,
33   about FEMA and what has happened with their FEMA claim. It was started
34   with Katrina. They had to start a new one after Gustav and Ike. And, and
35   you probably know a lot about this, but it is, it is in FEMA hell. And ah, and
36   ah, one of the things, the quotes we got to replace the bulkhead was about
37   $235,000 with fill behind it. The quote he showed me was, uh, over a
38   million dollars, but that is because it includes mitigation. They actually have
39   a mitigation, so it's, it's one that will prevent damage from future storms,
40   and, and they'll have to quit the duplicative process of filing a clam after
41   every storm.
42
43   I don't know what is going to happen. But, I, I, I think that, ah, we are going
44   to have to put a deadline on this. I mean, I know they are trying. It is such a
45   hard decision. LUMCON is a really great thing for the State. It is great to
46   have them out on the property. We now have Forrest's trailer located on the
47   road. We have a very old lease that needs to be redone, and, but I don't want
48   to redo the lease because I am not sure in another three or four months, if
49   they haven't taken some action. We've got, we've got to write a letter saying
50   we are aware of this, and give them a timeline in which to repair it or close
51   down.
52
53   Edward Peneguy – Do they have insurance?

46

1
2   Cathy Norman – Ah, the State of Louisiana.
3
4   Edward Peneguy – Well, I think you're going, you may have to, you may
5   want to talk to attorneys, but I would think on liability's sake you almost
6   have to put up something . . .
7
8   Mark Peneguy – I think we already. . .
9
10  Edward Peneguy = . . . physically to keep people out.
11
12  Mark Peneguy – . . . are at risk. They know we know. . .
13
14  Michael Peneguy – It is fenced off.
15
16  Edward Peneguy – It is fenced off?
17
18  Mark Peneguy – . . . and we need to shut the place down until it is fixed.
19
20  Edward Peneguy – Because from what she said it sounded like, just like
21  construction ribbon.
22
23  Cathy Norman – No, no. No, no, they have the facility fenced off, but when
24  people are staying at the facilities, there are holes that people could fall in
25  and get hurt.
26
27  Edward Peneguy – I think you have to tell them that they can't let people
28  stay there until they fix it.
29
30  Mark Peneguy – I don't think anyone should be on the property until it is
31  repaired.
32
33  Cathy Norman – Ok. Well, I'll leave that up to . . .
34
35  Michael Peneguy – I'll move that. . .
36
37  (Unintelligible)
38
39  Cathy Norman – I don't know, I think they do. I think they do. But
40
41  Michael Peneguy – I would, I would. . .
42
43  Edward Peneguy – Hell is going to freeze over before (unintelligible).
44
45  Cathy Norman – I know they have people who are, right now have contracts
46  to stay there this summer, including kids.
47
48  Edward Peneguy – Oh boy!
49
50  Mark Peneguy – We are at risk.
51
52  Edward Peneguy – You do not want that to happen.
53

47

1   Michael Peneguy – I move that we notify them of that, that nobody should
2   be on the property until the repairs are done. And, and also give them uh, uh,
3   six months to get it done at the maximum.
4
5   Mark Peneguy – Except that, that they have people who are going to be
6   coming on there in the next six months.
7
8   Cathy Norman – Well, they are going to have to cancel them.
9
10  Mark Peneguy – Ok.
11
12  Michael Peneguy – Well, well that's why I am saying the motion includes
13  not allowing, uh, people to stay at the camp.
14
15  Mark Peneguy – They will get it fixed very quickly once you do that,
16  probably.
17
18  Cathy Norman – Well, I think we need to do that.
19
20  Edward Peneguy – I think you need to let the attorney write the letter, so that
21  you are also, ensure sure your liability there, because you guarantee your
22  deep pockets if any trial attorney gets ahold of that. He is coming after you.
23  He'll go after the State, but that is secondary.
24
25  Cathy Norman – Alright. Six months, give them six months. . .
26
27  Michael Sherman – Mr. Buddy, second?
28
29  Cathy Norman – . . . and get Simon Peragine to write the letter?
30
31  Michael Sherman – Motion. Second by Mr. Buddy. To write the letter. All
32  those in favor?
33
34  Dr. Everett Williams, Ed Buddy, Michael Peneguy, Tony Lorino – Aye.
35
36  Michael Sherman – Hearing no opposition it carries. Alright, last item, the
37  Chevron meeting.
38
39
40  **NEW BUSINESS ITEM 8.      Chevron Meeting to Review All Land**
41                              **Rights in Bay Marchand Field**
42
43  Michael Peneguy – Yeah, I've got one, uh, thing I'd . . .
44
45  Edward Peneguy – Chevron meeting?
46
47  Cathy Norman – Well, I've had several Chevron meetings. This is uh, you
48  had something about Chevron?
49
50  Michael Peneguy – No, I have a motion to make . . .
51
52  Cathy Norman – Ok.
53

1    Michael Peneguy – . . . to set a special meeting, a Committee, I mean a
2    special Committee meeting.
3
4    Cathy Norman – This was a letter I sent Chevron about subordinating the
5    Caminada Headlands project. They can either sign this or I pointed them in
6    the right direction to, uh, discuss it with, uh, with the uh, with the State. I
7    also, did I not include that letter in my packet?
8
9    Mark Peneguy – Is it in today's?
10
11   Michael Peneguy – I don't think so?
12
13   Cathy Norman – Ok.
14
15   Mark Peneguy –I don't know I didn't get (unintelligible).
16
17   Cathy Norman – I also sent out, I sent a letter about the sublease out by
18   email to everyone. I don't know whether you got it, but about Chevron's
19   request for a sublease. And I sent it to Peggy Campiere. And I got an email
20   back yesterday saying that she's, uh, she submitted the attached draft to the
21   legal department for review. And it might, they might have to amend the
22   sublease in order to have it. I included everything that ya'll asked for in
23   terms of uh, us being held harmless, and the other things you included in
24   there. They couldn't sublease without permission of Chevron or Wisner, so,
25   I don't know what is going to happen on that. But there was, at there was
26   some correspondence on that.
27
28   Last, but not least, Chevron has um, has come to me to discuss ownership.
29   And I sent a map out to you. Um, ownership in front of the Bay Marchand
30   area. And we, the ownership all, we went through everything. And the
31   ownership all ties into a compromise agreement that Ed is probably very
32   familiar with, ah, from what is it, 19?
33
34   Edward Peneguy – 1977.
35
36   Cathy Norman – 1977. And so, right now. And this is all really. . .
37
38   Edward Peneguy –I'd like to make one point. If you read the resolution
39   ratifying that agreement, you will find out that the Committee has the force .
40   . .
41
42   Michael Peneguy – Ah, the ninth, ah, ah . . .
43
44   Stacy Gerhold-Marvin – Where is that?
45
46   Michael Peneguy – . . . the tenth and the eleventh page.
47
48   William Peneguy – The last few pages I guess.
49
50   Edward Peneguy – No, no.
51
52   Michael Peneguy – The tenth and eleventh page.
53

49

1    Stacy Gerhold-Marvin – Well, we already know that but it is nice to have in
2    written form again.
3
4    Edward Peneguy - Yes. That and the court approved it.
5
6    Stacy Gerhold-Marvin – Ah, really!
7
8    Mark Peneguy – Yeah.
9
10   Stacy Gerhold-Marvin – Not an attorney opinion this time.
11
12   Edward Peneguy – Obviously, Michael has not seen it.
13
14   Cathy Norman – Anyway, the whole point is that Chevron is shooting this
15   new seismic and they are trying to clarify their ownership issues in the area.
16   And um, basically what we have here, um, we've got a couple of things
17   going on. This, this agreement, compromise froze the, the shoreline at 1977.
18   And so everything offshore and everything that was Bay Marchand, covered
19   at high tide, at that point in time, um, was released to the State. Well then, in
20   the meantime the shoreline . . .
21
22   Mark Peneguy – (unintelligible)
23
24   Edward Peneguy – No, it was low tide, isn't it?
25
26   Cathy Norman – No, it is high tide, it says in here.
27
28   William Peneguy – I thought it was low tide.
29
30   Cathy Norman – Meanwhile, the whole shoreline has rolled back, and the
31   same, um, premise that I used on Bay Champagne of avulsion as opposed to
32   accretion, which is imperceptible, really applies to Bay Marchand. And even
33   if the State owns it, if there is rollovers, we own, we own what fills in,
34   during sudden, sudden events. Quick events. But basically what our
35   shoreline looks like now, if you look at this, they are going to claim what is
36   part of Bay Marchand in here. They are going to claim everything offshore,
37   to here. We basically, our freeze statute, freezes our ownership at 1977. So
38   there is going to be a space in between there that we own. And then, and
39   they are trying to figure out what they need to lease from the State. . .
40
41   Michael Peneguy – (unintelligible)
42
43   Cathy Nroman – . . . Um, I, I will, I will claim, I, I will write, I will have
44   another letter written by Susan Clade claiming that the bed of Bay Marchand
45   as a result of evulsion. The same way, and I did find out on the State website
46   that, they never responded to my letter. And on the State website they now
47   show that as a conflicted area in front of Bay Champagne.
48
49   Michael Peneguy – Boy, that's great.
50
51   Cathy Norman – So, never heard back from them. But the other issue is, is
52   as we've signed this servitude with the State to build the shoreline out. They
53   say 400 feet, but then I heard100 feet, whatever it is going to be, and fill in

50

1   the water, the State will claim that. And, and unless we have, well even with
2   the freeze statute, but the minerals they might claim. But we don't have to
3   worry about that because . . .
4
5   Michael Peneguy – The minerals were settled there.
6
7   Cathy Norman – Right, but they're settled at the, at the 1977 shoreline.
8
9   Michael Peneguy – But even out, out beyond that we have an interest in
10  those minerals.
11
12  Cathy Norman – Not off of Bay Champagne.
13
14  Michael Peneguy – Yes, we do.
15
16  Cathy Norman – Not according to this.
17
18  Michael Peneguy – Well . . .
19
20  Cathy Norman – This compromise agreement releases everything in all of
21  these sections off of Bay Marchand.
22
23  Michael Peneguy – I think we. . .
24
25  Edward Peneguy – Roger Doyle handled that.
26
27  Cathy Norman – Yeah, see, you see. We own over here, but not here. All of
28  these over here.
29
30  Michael Peneguy – Ok. Yeah, ok.
31
32  Edward Peneguy – Yeah.
33
34  Cathy Norman - But, but, I have to say that even if this, this, this, uh,
35  property is built out, they are never going get out to the 1977 shoreline. So
36  we don't really have an issue there.
37
38  William Peneguy – Why do they want this property? What are they doing?
39
40  Mark Peneguy – Driving on it.
41
42  Cathy Norman – They just, they are just trying to figure out who owns what.
43  I mean, I always thought that it was a pretty simple title history, but after
44  sitting down with them, it is pretty complicated.
45
46  Edward Peneguy – Yeah, yeah.
47
48  Cathy Norman – So they are just walking through the exercise. I met with
49  the landmen, and we just went through the exercise.
50
51  William Peneguy – They've got pipeline running through it.
52

1     Cathy Norman – Right, but I just wanted to make you aware of what, what is
2     going on. Um, I am going to go ahead and get, if, with the Committee's
3     approval, I'm going to get Susan to write another letter about Bay
4     Marchand. Because I did, I used the same, if you look I used the same book .
5     . .
6
7     Michael Peneguy – Um, huh.
8
9     Cathy Norman – . . . that shows this coastal. That was done for the USGS,
10    and the Louisiana Geological Survey, by my late husband I might add. But
11    it, it basically, um, shows this as a washover fan area, just like Bay
12    Champagne. The same exact geological, um, washover fans, washover, uh,
13    terraces, so it, anything that happens, happens during a sudden event and is
14    not accretion. So, I would like to get a letter written to them about Bay
15    Marchand.
16
17    Michael Peneguy – I'll, I'll move that we write that letter.
18
19    Michael Sherman – Moved by Mr. Peneguy.
20
21    Dr. Everett Williams – Second.
22
23    Michael Sherman – Second by Dr. Williams. All, any discussion? All those
24    is favor say aye.
25
26    Dr.Williams, Michael Peneguy, Tony Lorino, Ed Buddy – Aye.
27
28    Michael Sherman – Hearing no objection, the motion carries.
29
30    Amanda Phillips – Cathy, you have one item that was left out of your
31    Secretary Treasurer's Report. Ann. Ann's parking.
32
33    Cathy Norman – Oh, yes, thank you. Um, when we, when we were going
34    through, um . . .
35
36    Michael Sherman – You want to pay for Ann's parking?
37
38    Cathy Norman – Yeah.
39
40    Michael Sherman – How much?
41
42    Cathy Norman - $100 a month?
43
44    Amanda Phillips – Um, hm.
45
46    Michael Sherman – Motion?
47
48    Michael Peneguy – I'm sorry, what, what was that now?
49
50    Cathy Norman – Well, uh, when, when we did the reviews, uh, we did not . .
51    .
52
53    Amanda Phillips – We brought it up . . .

1
2   Cathy Norman – . . . we brought it up and . . .
3
4   Amanda Phillips – . . . but it was deferred.
5
6   Cathy Norman – . . . it was deferred. To pay for her parking. She has gone
7   ahead and gotten a contract because parking is so difficult in this building
8   now with all the people here, so.
9
10  Michael Peneguy – I move that, that we fund her parking.
11
12  Michael Sherman – Moved and seconded by Mr. Buddy. All those is favor.
13
14  Dr. Williams, Tony Lorino, Ed Buddy, Michael Peneguy – Aye.
15
16  Cathy Norman – Ok.
17
18  Michael Sherman – Hearing no objections the motion carries.
19
20  Cathy Norman – Ok.
21
22  Michael Peneguy – Uh, I, that, I've got a motion dealing with a, uh, special
23  meeting. Ah, I would like to move that we temporarily relieve Cathy of the,
24  uh, the requirement to give three days' notice, uh, written notice, of the, uh,
25  special meeting and revise that temporarily for 48 hours. That way, uh, if
26  you have problems with meetings, and that, special meetings arranged,
27  that'll help you out.
28
29  Michael Sherman – Sure.
30
31  Mark Peneguy – From 72 to 48 hours?
32
33  Cathy Noman – Yeah, usually it takes 3 business days. And, and because we
34  are trying to get a special meeting arranged, we know what it will be about,
35  um. I have a couple of questions, um. Am I to contact Waltzer & Wiygul
36  and ask them their opinion about joining forces with this other firm?
37
38  Michael Sherman – Sure, and ask them to come next week.
39
40  Cathy Norman – Ok, and then ask them to come next week and then . . .
41
42  Michael Sherman – I'll coordinate getting the City's attorneys.
43
44  Cathy Norman – And then, and then, ah, who, is the special meeting already
45  called by the Committee and seconded so, we just need to find out a time?
46
47  Michael Sherman – Date. That is right.
48
49  Cathy Norman – Can everyone please, um, email me your schedules, so we
50  can try and coordinate when, what would be a good time next week?
51
52  Stacy Gerhold-Marvin – All we have is Monday and Wednesday next week.
53

53

1   Cathy Norman – That's it?
2
3   Stacy Gerhold-Marvin – Unless you have something personal. Dr. Williams
4   on Monday or Wednesday? But we have a meeting Tuesday.
5
6   Dr. Everett Williams – Our meeting is what Thursday? Our board meeting is
7   Thursday, right?
8
9   Stacy Gerhold-Marvin – And then we have the convestment committee
10  meeting on Tuesday.
11
12  Dr. Williams – On Tuesday.
13
14  Stacy Gerhold-Marvin – Um, hm. Of course that is just an hour.
15
16  Cathy Norman – Either of those days work for me; Monday or Wednesday.
17
18  Ed Buddy – We're open either of those days.
19
20  Cathy Norman – Ok.
21
22  Michael Sherman – Monday or Wednesday.
23
24  Michael Peneguy – Monday or Wednesday.
25
26  Cathy Norman – Monday or Wednesday? How about Tulane?
27
28  Michael Peneguy- Bee? Uh?
29
30  Liz Turner – Um. . .
31
32  William Peneguy – I don't know. I don't have my calendar, I don't think I
33  got my calendar with me.
34
35  Liz Turner – After 11 on Wednesday.
36
37  Stacy Gerhold-Marvin – Our meeting is on Thursday.
38
39  Dr. Williams – So Wednesday.
40
41  Cathy Norman – After 11 Wednesday.
42
43  Stacy Gerhold-Marvin – What about Monday?
44
45  Liz Turner – Next Wednesday is . . .
46
47  Cathy Norman – The 25th, I think. No . . .
48
49  Liz Turner – The 27th.
50
51  Cathy Norman – The 27th.
52
53  Liz Turner – I could do it after 11.

1   Cathy Norman – How about you?
2
3   Michael Sherman – I can move some stuff around, but Wednesday
4   afternoon?
5
6   Cathy Norman – What time?
7
8   Michael Sherman – Uh . . .
9
10  Amanda Phillips – You want to do noon?
11
12  Cathy Norman – You want to do noon again?
13
14  Michael Sherman – Um.
15
16  Michael Peneguy – I think that is the easiest thing.
17
18  Michael Sherman – Yeah, I could do noon.
19
20  Cathy Norman – Ok. How about you, uh, Mr. Lorino?
21
22  Tony Lorino – Noon.
23
24  Cathy Norman – Noon? Noon on Wednesday. Any opposition? I am going
25  to play Chair, Chairwoman.
26
27  Michael Sherman – Got it.
28
29  Cathy Norman – Coordinator.
30
31  Stacy Gerhold-Marvin – How long is this meeting supposed to be?
32
33  Michael Sherman – A couple of hours.
34
35  Michael Peneguy – Based on what we heard here today, it is going to be all
36  afternoon.
37
38  Mark Peneguy – I have a question (*tape ends*).
39
40
41  Michael Peneguy made a motion to have Simon Peragine give the City of
42  New Orleans a deadline to provide information that was requested in a
43  Freedom of Information Act request in February 2011. Ed Buddy seconded.
44  Michael Sherman voted against the motion. **Motion failed.**
45
46  Michael Peneguy then asked to have Simon Peragine send a letter stating the
47  urgency of the February 2011 request.
48
49
50  **NEW BUSINESS ITEM 9.**     **Next Meeting – Tuesday, July 31, 2012,**
51                               **12:00 noon**
52
53

1   **Meeting adjourned at 1:45 PM**
2
3
4   RESPECTFULLY SUBMITTED BY:
5
6
7
8
9   _____
10   L. Amanda Phillips, Interim Secretary Treasurer
11
12
13   AMENDED AND APPROVED AT _____ MEETING.
14                              DATE

Transcript of the Testimony of
# Special Meeting (Final Transcription)

### Date taken: June 27, 2012

### Edward Wisner Donation Advisory Committee

All **electronic deposition & exhibit files**
are available at **www.psrdocs.com**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# ORIGINAL

# Professional Shorthand Reporters, Inc.

**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   http://www.psrdocs.com**

Amended and Approved at the October 29, 2013
meeting.

*[signature]*
Interim Secretary Treasurer



EXHIBIT
PP

Page 1

EDWARD WISNER DONATION
ADVISORY COMMITTEE

SPECIAL MEETING

FINAL TRANSCRIPTION FROM AUDIO
TAPE of the Edward Wisner Donation Advisory
Committee Meeting, held in the offices of
the Arts Council, 8th Floor Conference Room,
935 Gravier Street, New Orleans, Louisiana
70112, on Wednesday, the 27th day of June,
2012.

PRESENT:

    Michael G. Sherman, Chair
    CITY OF NEW ORLEANS

    Michael Peneguy, Representative
    WISNER FAMILY HEIRS

    William A. Peneguy, Representative
    WISNER FAMILY HEIRS

    Lizbeth Turner, Alternate
    Anthony Lorino, Alternate
    TULANE UNIVERSITY

    Ed Buddy, Alternate
    THE SALVATION ARMY

    Dr. Everett J. Williams, Jr.
    CHARITY

STAFF:

    C. CATHY NORMAN
    Secretary-Treasurer/Land Manager

    L. AMANDA PHILLIPS
    Executive Assistant, Wisner

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 2

 1   GUESTS:

 2        MARK E. PENEGUY, ESQ.
          Wisner Family
 3
          STEPHEN GREEN
 4        Wisner Family

 5        MATTHEW AVERILL
          City of New Orleans
 6
          JAMES A. BURTON, ESQ.
 7        Simon, Peragine, Smith & Redfearn, LLP

 8        JOEL WALTZER, ESQ.
          Waltzer & Wiygul
 9
          ROBERT WIYGUL, ESQ.
10        Waltzer & Wiygul

11        CAROLINE FAYARD, ESQ.
          Fayard & Honeycutt
12
          CALVIN FAYARD, ESQ.
13        Fayard & Honeycutt

14        FRED HERMAN, ESQ.

15        BOB F. WRIGHT, ESQ.

16        SOREN GISLESON, ESQ.
          Herman, Herman & Katz
17
          WALTER J. LEGER, JR., ESQ.
18        Leger & Shaw

19        BROOKE BACUETES
          City of New Orleans
20
          MATTHEW LINDSAY, ESQ.
21        City Attorney's Office

22   TRANSCRIBED BY:

23        LINDA G. GRIFFIN, RPR
          Certified Court Reporter
24

25

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 3

1                    AGENDA INDEX

2                                        PAGE

3    1)  Discussion of proposed
         compromise offered by the
4        City of New Orleans for the
         Donation to engage the City's
5        legal team as co-counsel in the
         BP Deepwater Horizon Matter.
6        Waltzer and Wiygul as well as
         members of the City's legal
7        team will be present for the
         discussion ................. 13
8
     2)  Review of the petition of the
9        Court under 2233 of the Trust
         Code for determination of
10       Trust authority and
         administration .............. 218
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 4

```
 1               M O T I O N S
                                          PAGE
 2   MOTION BY MICHAEL SHERMAN
         that the Donation Advisory Committee
 3   authorize the joint venture of Herman,
     Herman, Katz; Leger and Shaw; Fayard
 4   and Honeycutt, and the Law Offices of
     Fred Herman, and Domengeaux, Wright,
 5   Roy and Edwards, the joint venture, to
     represent the Donation in all matters
 6   arising from the BP Deepwater Horizon
     Oil Spill.  The City procured the joint
 7   venture through a public procurement.
     The Donation Advisory Committee
 8   authorized the mayor to execute an
     agreement to hire the joint venture as
 9   counsel in the above-referenced matter.
     The Donation Advisory Committee
10   re-authorizes the mayor to execute an
     agreement to hire the firm of Waltzer &
11   Wiygul, as counsel in the above-
     referenced matter, and that the agreement
12   could be one, or it could be two, shall
     be upon the same payment terms as the
13   Donation Advisory Committee previously
         authorized...........................   84
14
     SECONDED BY DR. RON GARDNER
15   ____
16   AMENDMENT TO MOTION BY DR. RON GARDNER
         that this motion is contingent upon
17   the joint venture and Waltzer & Wiygul
     reaching an acceptable agreement,
18   within two weeks, with the same
         terms .............................   215
19   AMENDMENT SECONDED BY MICHAEL SHERMAN
20   MOTION PASSED (3:2)  ...............   219

21   _____
     MOTION BY DR. RON GARDNER
22     to adjourn........................   219
     SECONDED BY ANTHONY LORINO
23
     MOTION PASSED (3:2)................   219
24   ____
25
```

Page 5

```
 1              *SPECIAL MEETING*

 2       MR. SHERMAN:  We have a formal agenda

 3  and we'll call it to order at 12:07.  We

 4  have representatives from all the

 5  beneficiaries present.  I'm honored to

 6  welcome our newest member, the Vice

 7  Chancellor of LSU Health Sciences, Dr. Ron

 8  Gardner.

 9       DR. GARDNER:  Ron Gardner.

10       MR. SHERMAN:  Doctor, welcome to our

11  meeting.  This is -- just before you got

12  here, I shared a few remarks.  We are

13  fortunate and blessed to have a senior

14  leader of LSU with us and also be able to

15  keep our good friend, Dr. Williams, as your

16  alternate.  So I know the two of you will --

17  I see you all know each other well.

18            All right.  Well, I want to start

19  the meeting off by going around the room,

20  primarily for our visitors' benefit.

21  Dr. Gardner, I had asked everyone to do this

22  a few times when I took over, as chair, just

23  a few months ago.  We'll go around the room

24  and state who our affiliation is with.  My

25  name is Mike Sherman.  I'm the Mayor's
```

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 6

1    Executive Counsel and the Mayor's Designee.

2    I also serve as chair of the Donation

3    Advisory Committee.

4         MS. TURNER:  I'm Beth Turner, with

5    Tulane University, alternate.

6         MR. BURTON:  Jim Burton, with Simon

7    Peragine.  We're counsel, outside counsel,

8    to the Advisory Committee.

9         MR. LORINO:  I'm Tony Lorino.  I'm with

10   Tulane University.

11        MS. PHILLIPS:  Amanda Phillips, with

12   Wisner.

13        MS. NORMAN:  I'm Cathy Norman.  I'm the

14   Secretary-Treasurer of Wisner.  I need to

15   get together with you and give you some

16   documents to get you up to speed --

17        DR. GARDNER:  Thank you.

18        MS. NORMAN:  -- spend some time with

19   you, minutes, old historical documents --

20        DR. GARDNER:  Thank you.

21        MS. NORMAN:  -- whenever you're ready.

22        DR. GARDNER:  Okay.

23        MR. MICHAEL PENEGUY:  I'm Mike Peneguy.

24   I represent the Wisner family.

25        DR. WILLIAMS:  Everett Williams,

Page 7

```
 1    representing Charity Hospital.
 2         MR. BUDDY:  Ed Buddy, representing
 3    Salvation Army.
 4         MR. WALTZER:  My name is Joel Waltzer,
 5    and my partner and I, Robert, we're with
 6    Waltzer & Wiygul.  We represent the Wisner
 7    Donation, for BP.
 8         MR. WIYGUL:  Like Joel said.
 9         MR. GREEN:  Stephen Green, Wisner
10    family.
11         MR. MARK PENEGUY:  I'm Mark Peneguy.
12    I'm also the Wisner family.
13         MR. WILLIAM PENEGUY:  I'm Bill Peneguy.
14    I'm the alternate for the Wisner family.
15         DR. GARDNER:  I'm Ron Gardner.  My
16    title, Vice Chancellor at the LSU Health
17    Sciences Center.  And let me say, I'm
18    pleased and honored to be invited to be a
19    part of this, with the Wisner family, the
20    mayor, and the cohorts from Tulane.  I'm
21    finishing Tulane School of Public Health and
22    Tropical Medicine, so I'm currently related
23    with Tulane.
24              I've had the -- I'm a big fan of
25    Dr. Williams there.  His leadership is
```

Page 8

1 legendary around this town, and so when

2 Dr. Townsend, Roxanne, asked if I would be a

3 part of this, with him, I told her I had no

4 problems with doing that at all, being --

5 carrying your bags or being a substitute is

6 fine with me. And I was told a long time

7 ago, a substitute's only a poor excuse for

8 the real thing, so I'm not light-headed

9 about what I may be able to contribute, but

10 I -- anybody that gets to know me for any

11 short period of time will know that I will

12 do windows, weather reports, whatever needs

13 to be done, to be able to make things go

14 successfully, and certainly to the

15 satisfaction of the Wisner family and all of

16 my friends -- new friends here.

17     MR. SHERMAN: Welcome to the Advisory

18 Committee. Matt?

19     MR. LINDSAY: My name's Matthew

20 Lindsay. I work at the City attorney's

21 Office.

22     MR. SHERMAN: Okay. There's two other

23 folks I'll jump to first, from the City.

24 Brooke Bacuetes, who is with us as a law

25 clerk, in the mayor's office, and Matt

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 9

1    Averill, who is with us from the mayor's

2    office, and then we'll go to our special

3    guests.

4        MR. LEGER:  I'm Walter Leger.  I'm an

5    attorney representing the City of New

6    Orleans, in connection with BP.

7        MR. GISLESON:  Soren Gisleson.  I'm a

8    partner with Herman, Herman & Katz.  I also

9    represent the City of New Orleans in their

10   BP claims.

11       MR. WRIGHT:  My name is Bob Wright.

12   I'm also representing the City of New

13   Orleans.

14       MR. FRED HERMAN:  I'm Fred Herman with

15   the Law Offices of Fred Herman, and I also

16   represent BP -- the City of New Orleans.

17       MR. CALVIN FAYARD:  I'm Calvin Fayard.

18   I'm here with my associate, Caroline Fayard.

19   I'm a member of the team of attorneys that

20   have been retained by the City of New

21   Orleans to represent all of its interests

22   and claims arising out of the Deepwater

23   Horizon spill, and it's my pleasure to be

24   here, and I appreciate being invited to

25   attend this meeting.

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 10

```
 1      MR. SHERMAN:  Thank you.  And, again,
 2   welcome, Dr. Gardner.
 3      DR. GARDNER:  Ron, please.
 4      MR. SHERMAN:  Ron, okay.
 5      DR. GARDNER:  I'm glad the City has a
 6   little representation here.
 7      MR. SHERMAN:  What was that?
 8      DR. GARDNER:  I said, I'm glad the City
 9   has a little representation here.
10      MR. SHERMAN:  Okay.  Just a little,
11   right?  Well, listen, I apologize for your
12   first meeting being such a critical time in
13   the Donation's history.  There's a couple
14   things we'll all be working on over the next
15   several months, couple of years.
16             Not on the agenda today is the
17   issue of the August 2014 date when the
18   hundred-year period of the Donation reaches
19   us, and we'll be working on two tracks, to
20   value the assets, and also work on what an
21   extension would look like.  So we'll look
22   forward to working with you on that.  That's
23   probably one of the most significant events
24   in the history of the Donation.
25             The other issue we're here today
```

Page 11

 1   on, this is a special meeting, is the issue
 2   of our BP Deepwater Horizon claim, and to
 3   put it as briefly as possible, we have
 4   internal governance issues.  We have several
 5   unresolved internal governance issues, and
 6   we're going to have to resolve those, as a
 7   team, and we can either resolve them right
 8   now, through litigation, at this critical
 9   time during the BP case, and start filing
10   lawsuits against each other, and that's
11   Item 2 on the agenda today, is whether we
12   sue each other, about internal governance
13   issues, or whether we can resolve this in a
14   more amicable fashion, and the City has
15   brought forth a proposal.
16           So by way of history, the Donation
17   Advisory Committee has secured counsel,
18   Waltzer & Wiygul.  It was presented to the
19   mayor for signature, as all of our
20   critical -- most of our critical documents
21   are.  The mayor chose not to sign it and not
22   to retain Waltzer & Wiygul.
23           In contravention of the mayor's
24   trustee's demand, the Donation Advisory
25   Committee authorized hiring Waltzer &

Page 12

 1  Wiygul.  It has been at issue for almost a

 2  couple of years now, and it has come to a

 3  critical head, of late.  The City separately

 4  went through a public procurement process.

 5  It was a competitive process, and the team

 6  you see here is who the City publicly

 7  selected.

 8          And I can tell you, the City's

 9  preference is the team the City hired

10  through a public procurement process.

11          Members of the Donation Advisory

12  Committee, and I won't speak for the

13  Peneguys -- they're here, and I'm certain,

14  will speak for themselves -- want Waltzer &

15  Wiygul.

16          So we have two issues.  We can

17  either litigate -- and in the back of our

18  packets today is a petition drafted by Simon

19  Peragine to start a lawsuit, and we can

20  start filing actions against each other

21  about what authority the mayor has, as

22  trustee, what the settlement agreement says,

23  what the City code says, what the Donation

24  says, and that will probably take us many,

25  many months at this critical time.  Or as

Page 13

```
 1    the City has suggested, and this will be my

 2    intro to the proposal, listen, let's work

 3    together on this.  Let's put the internal

 4    governance issues as part of the discussion

 5    on the extension of the Donation.  Let's

 6    have those discussions over the next six or

 7    nine months, without BP holding the gun to

 8    our head here, or -- and let's choose both.

 9            So the Donation Advisory Committee

10    has authorized a certain fee agreement

11    with -- to be paid to lawyers.  Right now

12    there's a retainer between the Advisory

13    Committee and Waltzer & Wiygul.

14            The City is saying, let's keep

15    that same agreement.  Let's take Waltzer &

16    Wiygul, let's take the City's attorneys.

17    They get -- they figure out how they make

18    that work, but we authorize both the City's

19    publicly-procured counsel and the preference

20    of the Donation Advisory Committee members,

21    as expressed from a couple of years ago,

22    let's get all the attorneys working

23    together, on the same page, and we think,

24    from the City's side, very passionately,

25    that would put the Edward Wisner Donation in
```

Page 14

1   the best possible position to maximize the

2   value of the Donation for every single

3   beneficiary.  Because when the Donation does

4   well, all of us do well.

5            These two folks sitting down

6   there, and this team over here, is the best

7   ones to do it.  So I promised to bring the

8   City's legal team here.  This is not a

9   discussion of internal governance of

10  authority.  This is a request that other

11  Donation Advisory Committee members made.

12           Dr. Williams, we appreciate your

13  wisdom and leadership in getting us through

14  last week's meeting, to this meeting, and

15  I'll turn it over to our team to introduce

16  themselves.  It's among the finest group of

17  attorneys, I think -- for those of you that

18  know them, or those of you that will meet

19  them for the first time today -- in the

20  country.  They'll introduce themselves,

21  we'll hear from Waltzer & Wiygul, and we can

22  then entertain the City's motion.

23      MS. NORMAN:  I would really suggest

24  that there be sort of a question and answer

25  period.

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 15

```
 1          MR. MICHAEL PENEGUY:  Right.
 2          MS. NORMAN:  Because I know that, I,
 3     myself have quite a few questions, and I
 4     believe that Waltzer & Wiygul also have
 5     quite a few questions.
 6          MR. SHERMAN:  Absolutely fair.  They're
 7     going to introduce themselves.  If there's a
 8     question -- I will say, just to -- as chair,
 9     to keep the discussion moving forward, this
10     is not the time to discuss internal
11     governance.  If we do that, it's either
12     going to be over the next six months or it's
13     going to be through litigation.  This is to
14     see if the City's compromise, which is the
15     first agenda item, works.  If it does,
16     great.  If it doesn't, we'll move forward
17     from there, but --
18          MS. NORMAN:  I believe, though --
19          MR. SHERMAN:  I think question and
20     answers are totally appropriate.
21          MS. NORMAN:  Right, right, right.  I
22     just, in furtherance -- and, you know, I've
23     worked for the committee for 20 years, but
24     it took us four months of interviews and
25     discussions with Waltzer & Wiygul to make a
```

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 16

 1    decision to engage them to work for us and

 2    we've never met these people before.

 3        MR. MICHAEL PENEGUY:  Right.

 4        MS. NORMAN:  And we need some answers

 5    and questions in order to know whether it is

 6    a good fit for us, and that is what we want

 7    to do.

 8        MR. SHERMAN:  They're here.

 9        MS. NORMAN:  Okay.

10        MR. SHERMAN:  And, listen, if this

11    works -- the City has gone through a public

12    procurement process.  We have selected this

13    team.  The Donation Advisory Committee has

14    Waltzer & Wiygul.

15            The reason this compromise works

16    is because everyone can feel comfortable

17    with this fantastic group of attorneys on

18    one team, representing the Donation.  So I

19    think, to the extent this compromise works,

20    you have Waltzer & Wiygul, you have the

21    City's team.

22            So without further ado, I think

23    I'll turn it over to Mr. Fayard, if that

24    will be appropriate, to introduce the team

25    and --

Page 17

1          MR. CALVIN FAYARD:  Sure.

2          MR. SHERMAN:  And then it will be fair

3     game for folks to ask questions.

4          MR. CALVIN FAYARD:  As I said, I'm

5     Calvin Fayard.  I will limit my personal

6     history with respect to the Deepwater

7     Horizon, my discussion about that, and if

8     you want to ask me any other questions about

9     my professional reputation, that's fine.

10              I have been involved in the

11     litigation from the beginning.  Early on, I

12     shepherded the -- or I shepherded it through

13     the MDL process, the selection process, when

14     New Orleans was selected as the venue for

15     this litigation, which, I think, was inured

16     to the benefit of everybody in this room,

17     and it's continuing to inure to the benefit

18     of our City, i.e., the placement of the

19     claims center in our City that's probably

20     resulting in somewhere between four to 6,000

21     jobs in the City and the surrounding areas,

22     just from that standpoint alone.

23              Also, I think it has brought the

24     focus on the claims, not only for the City

25     of New Orleans and the Wisner Trust, but

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 18

1    other, more significant claims and other

2    significant claims -- not that there are any

3    other more significant -- that happened

4    along our Gulf Coast.

5              So as a result of my involvement,

6    I was selected by the judge, the Court, to

7    serve on the MDL committee, which I

8    accepted.  As a result of that, I was

9    selected by the committee to be one of the

10   lead negotiators with respect to the present

11   settlement that's pending before us today.

12             In that role, I served as a

13   head-to-head negotiator with some of the

14   executives of BP, and have established at

15   least a communication relationship with them

16   directly that cuts through a lot of the

17   layers of lawyers that they have put up to

18   defend their company.

19             So along with that experience,

20   along with my previous experience with

21   respect to mass disaster claims,

22   environmental lawsuits throughout not only

23   the State of Louisiana, but the nation, I

24   feel that I am capable of representing the

25   City's interest, and I was selected to

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

```
 1    represent the City's interest in this
 2    particular incident.
 3              During that process, there was a
 4    team that was formed.  Mr. Herman or
 5    Mr. Gisleson can give you more details about
 6    how that process worked.  But there were a
 7    number of people in competition for that, a
 8    number of firms in competition for it, and
 9    it took, I think, over a year, maybe a year
10    and a half, in that selection process, and
11    there were interviews, credentials checked,
12    Certificates of Insurance required, public
13    notice given, and appearances before not
14    only the mayor, but representatives of the
15    City Council.
16              I will like to just give you one
17    message.  Our goal is to do what is in the
18    best interest of the City of New Orleans.
19    That includes whatever interest it may have
20    with respect to claims arising through the
21    Wisner Trust.  And we see the opportunity
22    here to combine forces and do even a better
23    job, and with the ultimate goal, to achieve
24    the total -- the highest total possible
25    compensation for the damages sustained, and
```

Page 20

1    continuing to be sustained, as we

2    understand, on a daily basis.  I think,

3    Mr. Herman.

4         MR. FRED HERMAN:  My name's Fred

5    Herman.  I've spent the first 12 years of my

6    practice of law with Herman, Herman & Katz.

7    I became a partner there, and I then,

8    thereafter, established my own firm, the Law

9    Offices of Fred Herman.  I practice

10   generally in commercial law and commercial

11   litigation, personal injury litigation.  I

12   do mediation, arbitration, and I have a

13   governmental relations practice.

14         I got into the BP case as a

15   consultant, in my role for the different

16   attorneys for the Parish of Orleans.  The

17   claim for the Parish of Orleans, District

18   Attorney, has to do with a lot of

19   beneficiaries' injuries and whether or not

20   the state penalties that apply to those

21   injuries would be compensable and

22   collectable by the DAs.  And I joined with

23   several other law firms, advising the

24   district attorneys of our lower or

25   southwest/southeastern parishes, of what

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 21

1    their potential claims were.  I helped

2    organize their approach to the BP claim.

3              I do not represent the Orleans

4    Parish District Attorney's Office in the BP

5    claim.  I am the District Attorney's adviser

6    in the BP claim.  I serve, in fact, as the

7    District Attorney's adviser in all civil

8    litigation.

9              I am not here to fight with

10   anybody over a fee and I'm not here to argue

11   with anybody about what the governance

12   issues you may have internally or externally

13   may be.  My appreciation, in fact, is that

14   that whole issue is -- we're insulated from

15   that issue, as a team; that the City has

16   other counsel advising it with respect to

17   how it will proceed, if it needs to proceed

18   on that issue.

19             So with respect to the governance

20   issue, if I could be so presumptive, I'm not

21   really here to answer your questions.  While

22   I feel fully capable in doing so, given the

23   opportunity, that's not my role.  I'll echo

24   what Calvin said.

25             With respect to BP, I've served --

Page 22

 1    and I'm not in any official capacity in BP,

 2    except my representation of the City of New

 3    Orleans, with this wonderful array of folks

 4    here.  You don't know us, obviously.  I

 5    don't know many of you all.  I've met

 6    Dr. Williams and I know some of the

 7    members -- or at least one of the Peneguy

 8    family, the fellow that used to write.  I

 9    don't know if he's here today.

10         MR. MICHAEL PENEGUY:  No.

11         MR. MARK PENEGUY:  He's not part of the

12    family.

13         MR. FRED HERMAN:  He's not part of the

14    family?

15         MR. MARK PENEGUY:  He's not a Wisner.

16         MR. FRED HERMAN:  He is not a Wisner,

17    okay.  In any event -- well, are there

18    Peneguys here?

19         MR. MICHAEL PENEGUY:  Yeah.

20         MR. FRED HERMAN:  Okay.  My

21    misimpression.  My apologies to you, sir.

22    But in any event, with respect to the

23    remainder of you, I don't know you, and

24    frankly, it -- I'm hired by a lot of people

25    that don't know me a lot of times, and if I

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 23

1  wasn't, I wouldn't get any work.

2          But the fact of the matter is is

3  that, in my 37 years of practice, we've

4  experienced a great deal, including all

5  kinds of government negotiations, whether it

6  be for Tom Benson's acquisition of the

7  Saints, to the negotiation of the lease on

8  the Superdome, to working for the Board of

9  Assessor's, rendering tax opinions,

10  et cetera, et cetera.

11          I've been employed to do those

12  things, not because of some political

13  involvement, which may concern you, but

14  because of my competency.  And frankly, I

15  don't sell my abilities in terms of

16  political relationships.  Those change.

17          And we've been hired

18  successively -- my firm has been hired --

19  I'll let Mr. Gisleson talk about my

20  brother's firm in a minute.  But we've been

21  hired by successive administrations, and not

22  because we were necessarily supporters or

23  opponents.  We were hired to render a

24  service.  We rendered that service.  We do

25  it capably and we think we can provide you

Page 24

```
 1    and your legal' team with added value,

 2    particularly with respect to interacting

 3    directly with BP, directly with the Court,

 4    and directly with whomever our clients are,

 5    to meld our abilities to bring home to the

 6    trust, as well as the City, the greatest

 7    recovery possible.

 8            Now, clearly, if you get into a

 9    dispute, you're going to have to decide how

10    you go.  Mr. Wright?  And I'll answer all

11    your questions.  I've got to leave at a

12    quarter to 1:00.

13        MR. SHERMAN:  Just him.  The rest of

14    you, there's no problem.

15        MR. WRIGHT:  Thank you.  I'm not going

16    to take much of your time.  My name is Bob

17    Wright.  I've been practicing law now for 57

18    years in practically every aspect of law

19    that I can think of, much of the trial law,

20    both in New Orleans and around the state.  I

21    was asked by these folks to join with them

22    in this process.  I'm happy to do so.  I

23    know your present counsel; I admire them

24    very much, and would be pleased to work with

25    them, as well.  Thank you.
```

Page 25

```
 1          MR. GISLESON:  My name is Soren
 2   Gisleson.  I'm a partner with Herman, Herman
 3   & Katz.  As you all may already know, there
 4   are basically two lead counsel appointed in
 5   the entirety of the BP litigation.  That
 6   would be Jim Roy, one of Bob Wright's
 7   partners, and my partner, Steve Herman.
 8   These two partners are in charge of
 9   basically the entirety of the complexities
10   in the MDL.
11          Of the hundreds of lawsuits that
12   have been filed across the Gulf Coast, these
13   two gentlemen are primarily responsible for
14   the administration of those lawsuits, the
15   oversight of those lawsuits.  When it comes
16   to legal theories, which legal theories to
17   further, those two lawyers are primarily
18   responsible for those legal theories,
19   defending, representing, deposing certain
20   witnesses, general legal strategy.
21          When we took in excess of 300
22   depositions last year, those two lawyers
23   were in charge of marshaling the hundreds of
24   plaintiff lawyers responsible for taking
25   those depositions.
```

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 26

1           When it came time to do the

2    settlement, perform the settlement, they

3    were the two primary decision-makers, along

4    with Calvin Johnson -- or Calvin Fayard,

5    sorry, and another gentleman, responsible

6    for constructing that litigation.

7           I don't know how far back you want

8    me to go in terms of the types of cases that

9    we do.  If there's a major complex class

10   action that finds its way to Louisiana, you

11   can rest assured, my firm's involved.  We've

12   got well over 20 lawyers in our firm who do

13   complex litigation.  We've got a support

14   staff in excess of 50, 60 people.  This is

15   what we do.  These are the kinds of cases

16   that we handle.  We've got a large staff.

17   We understand important, complex issues.

18           If anybody has any individual

19   questions, specific questions, about the

20   kind of law firm we are, or what we do, I'd

21   be happy to answer them.  Thank you.

22       MR. LEGER:  To give you a brief

23   background, my name is Walter Leger, Jr.

24   I've been an attorney for quite a while

25   myself.  I'm a graduate -- an undergraduate

Page 27

1    degree from LSU and a law degree from

2    Tulane, and at Tulane, I chaired the

3    maritime -- I was the managing editor of the

4    Maritime Law Journal.

5           I started practicing law at the

6    Phelps Dunbar firm, which was then the

7    largest maritime law firm in the country.  I

8    set out thereafter to form my own firm, and

9    our firm, and its successors, has been

10   involved in probably most of the major

11   maritime disasters since we've been

12   practicing law, for 35 years.

13          In recent -- we've also been

14   involved actually with several of these

15   firms in some of the biggest class actions

16   in the country.  We've also worked with

17   Mr. Burton's firm here, in the context of

18   the largest civil jury trial in the State of

19   Louisiana, the Scott tobacco litigation.

20          We represented, as special

21   counsel, the Attorney General for the State

22   of Louisiana, and eventually the State of

23   California, in connection with the

24   nationwide tobacco litigation, and we were

25   primarily front-line litigators.

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 28

```
 1            In the context of BP, we've been
 2    involved -- our firm has been involved from
 3    the very beginning, as well.  We represent a
 4    number of local governments.  We represent a
 5    number of private entities and private
 6    governments, and we've been in all -- and
 7    retained by all, as a matter of public
 8    process.
 9            I've been fortunate enough to have
10    been requested by the co-lead counsel,
11    Mr. Roy and Mr. Herman, to be special
12    counsel to the litigation team, and I'm one
13    of eight members of the trial team, and
14    we -- in fact, this case, will be tried, as
15    far as we're concerned, and trial has been
16    reset for January of 2014.  We are ready to
17    go to trial in February and we're ready to
18    go to trial right now.
19            Many of the -- I understand there
20    is an issue as to whether or not -- whether
21    or not the trust will be in or out of the
22    settlement.  The point is, a lot of the
23    local governments themselves have not been
24    included in the settlement, the state
25    governments have not been included in
```

Page 29

1    settlement, and the United States of America

2    is not included in the settlement, with

3    respect to its civil penalties attempts,

4    under the Clean Water Act.

5              So we have extensive experience in

6    this type of litigation.  It's really an

7    honor to appear before you and it was an

8    honor to be retained by the City of New

9    Orleans, and also the other local

10   governments that we are fortunate to have

11   been retained by, and the other private

12   citizens, and I -- we could tell you more,

13   but I suspect you will have some questions

14   and I want to give you plenty of time for

15   questions.  Thank you.

16      MR. SHERMAN:  Thank you.  Well, I hope

17   from -- just from the introductions,

18   everyone can see that the City, when it put

19   out its procurement, selected a firm with

20   more experience than any combination of

21   firms ever, in complex, environmental,

22   multi-district litigation and class action

23   cases, and is fully prepared to settle,

24   negotiate, try, whatever is in the best

25   interest of the donation.

Page 30

1          So with that, I'll ask for folks

2    to -- if you have any questions.

3         MR. WIYGUL:  I tell you what, Mike.

4    Could I just spend five minutes on our

5    background with this --

6         MR. SHERMAN:  That would be great.

7         MR. WIYGUL:  -- for the benefit of

8    Dr. Gardner and if there are other folks

9    here who may not be as familiar with it.

10        MR. SHERMAN:  Please, that would be

11   great.

12        MR. WIYGUL:  Joel Waltzer and myself

13   have been practicing together for about ten

14   years.  Collectively, we're both 25-year

15   lawyers.  What I've done for about the last

16   22 of those 25 years is largely

17   environmental law.  I've served out my

18   career here at Gordan, Arata, McCollam &

19   Duplantis, in New Orleans, and actually have

20   been a member of the Louisiana bar for many

21   years, although I live in Ocean Springs,

22   Mississippi now.

23          Joel's a New Orleans native.  I

24   came from Millsaps College and the

25   University of Mississippi Law School.  Joel

```
 1    came from Boston University and Harvard Law
 2    School.  We met because Joel was over at
 3    Tulane Environmental Law Clinic.  He's one
 4    of the earliest supervising attorneys.  We
 5    both had an interest in environmental law
 6    for many years.
 7              I did my time as a fellow at the
 8    University of Colorado Law School, writing
 9    and studying the environmental law that
10    applies to the Outer Continental Shelf, and
11    in particular, have spent many years working
12    for the Sierra Club Legal Defense Fund.
13              What our specialty has been is
14    cases that you might call at the
15    intersection of administrative and trial
16    practice, citizen suits, under the Clean
17    Water Act, air pollution, land pollution,
18    impacted communities, things of that nature.
19    We try cases to judges.  We try cases to
20    juries, as well.  That's what we do
21    basically.
22              Now, we were first engaged by the
23    Wisner Donation in the summer of 2010, and
24    for those of you who weren't on that
25    property at that time, it's sort of hard to
```

Page 32

1    imagine what it was like now.

2           All right.  The Wisner Donation

3    has that 9-mile stretch of beach down in

4    Fourchon, Louisiana, which is one of the

5    last headlands protecting the interior marsh

6    and the City of New Orleans from the Gulf of

7    Mexico.

8           It was one of the first places

9    that heavy oil came in, in May of 2010, and

10   from that point forward, through the fall of

11   2010, there were anywhere from 500 to 1200

12   people out on that beach with equipment,

13   front-end loaders, bulldozers, tents,

14   porta-potties, four-wheelers, bobcats.  I

15   mean, you name it.  It was like an

16   industrial center out there.

17        MS. NORMAN:  It was like a war zone.

18        MR. WIYGUL:  It was -- you know,

19   honestly, most of us here went through

20   Hurricane Katrina, and when I think back on

21   this, it's like the aftermath of Hurricane

22   Katrina.  It's a time that's a little bit

23   difficult to recreate for yourself right

24   now.

25           But Joel and I were engaged by the

Page 33

```
 1    Wisner Donation to try to figure out what to
 2    do with this mess that was going on down
 3    there.  We did two things.  The first thing
 4    we do, because we try cases, is we start
 5    figuring out, looking down the road of what
 6    we are going to need to prove our case.
 7              Now, what happened to the
 8    Donation's property down there.  And, look,
 9    I know all of these folks, either
10    individually or by reputation, and I think
11    they would agree with me that that's one of
12    the first things that you do, as a trial
13    attorney, is collect all the information you
14    can.
15              Now, some of it's ephemeral.  Some
16    of it goes away if you don't get out there
17    and collect it.  But you know that probably
18    95 percent of it, 98 percent, you're going
19    to throw away.  You know, it's like they say
20    about elections, right?  90 percent of the
21    money is wasted, but you don't know which
22    90 percent it is.  And that's what we
23    started doing.
24              Now, the other thing we did, the
25    Donation has had a long history of requiring
```

Page 34

1     anyone using its property to have a

2     contractual access agreement, which governs

3     the relationship.  It includes the insurance

4     provisions, it includes provisions about the

5     location, if someone's going to come on the

6     property, things of that nature.

7           We took that agreement and

8     modified it to fit the exigencies of the BP

9     spill that were going on at that time, and

10    BP signed it, and among the provisions in

11    that agreement were information-sharing, so

12    everything about the property, reimbursement

13    of the Donation for its costs associated

14    with the response, and probably most

15    critically, a contractual restoration

16    obligation for the property itself.  And

17    that has governed, with varying degrees of

18    compliance with BP, it's fair to say, it's

19    governed their relationship ever since that

20    point.

21          So what we've been doing for the

22    last two years is trying to take the --

23    there are three or four dimensions that you

24    really have to look at to deal with the

25    impact of an event like this on a piece of

1    property, all right.

2           There's the basic element of

3    contamination.  What area got oil on it?

4    What is that oil?  How is it behaving, in

5    that particular place?  All right.  How

6    broad is the scope of the contamination?  Is

7    it changing over time, and this -- the

8    Wisner Donation property and the beach down

9    there are regressing headlands.

10          It's a headland that's moving at

11   40 to 60 feet a year, to the north, so it's

12   an extremely dynamic place, and

13   understanding what's happening there, in

14   2011, is not the same as understanding what

15   happened there in 2010.  So it's a different

16   place, and remarkably enough, in a different

17   place, in 2011.

18          You're looking at that and then

19   you're also looking at the intention of the

20   response effort itself and the physical

21   impact that it's going to have on that

22   property, because this is -- again, it's a

23   fragile place, in the first place, and when

24   you have the thousand people and the heavy

25   equipment and the four-wheelers, you have

Page 36

1    removal of sediment going on, you

2    actually -- it's astounding really, looking

3    back on it -- you have the creation of major

4    earthworks on this beach, damming some of

5    the major bayous that drain the marshes and

6    the drains the net percent of the Gulf of

7    Mexico.

8              You've got all of these things

9    happening out there and you have to look at

10   the impacts of the response effort, which,

11   in main respects, are probably going to be

12   as or more significant than what's happened

13   as a result of the oil contamination.

14             You're also looking at

15   contamination that's in several different

16   places, and behaving differently as a

17   consequence of that.  There's the beach,

18   which is moving.  There's the marsh behind

19   it, where there's oil, and it's just sitting

20   out there right now actually.

21             So one of the things that we did

22   was engage experts to start evaluating those

23   different dimensions of impasse to the

24   property right away.  Dr. John Pardue is the

25   head of the environmental engineering

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 37

 1    program up at LSU.  He's been out on the

 2    beach since September of 2010, doing our own

 3    work, so we don't have to rely on BP to tell

 4    us where the oil is and was, how it's been

 5    moving around, and equally important, what's

 6    been happening to it, how has it been

 7    degrading.

 8          And, Dr. Gardner, I'll just tell

 9    you that the work that Dr. Pardue has done

10    shows us that, particularly, when it's marsh

11    environments and beach environments, it's

12    not degrading very quickly.  In fact, it's

13    degrading much more slowly than what the

14    early thought was about that process, so --

15          DR. GARDNER:  Can you attach --

16          MR. WIYGUL:  To make a long story

17    short -- I'm sorry?

18          DR. GARDNER:  I was just going to ask,

19    did they attach a time frame to that, in the

20    sense of whether it's a glacial move or

21    quicker than that?

22          MR. WIYGUL:  Well, it's not in

23    geological time, but it's in long-term human

24    time, so you're talking about 20 years.

25          DR. GARDNER:  Okay.

Page 38

```
 1        MR. WIYGUL:  It's that kind of a time
 2    frame.
 3        DR. GARDNER:  Yeah.
 4        MR. WIYGUL:  That's -- you know, you
 5    ought to discuss the science of time.  It's
 6    fascinating stuff.  I mean, people back away
 7    from me at cocktail parties when I start to
 8    talk about that stuff, because I sound a
 9    little too interested in it, but -- but it's
10    a very -- it's a fascinating thing.
11            But anyway, that -- bringing this
12    forward, what the Donation staff and we've
13    been doing since that time is collecting
14    information about the property, as it
15    changes, over time.
16            There's also been a major coastal
17    restoration project that is proposed for at
18    least part of the Donation property, and
19    possibly much more of it, and obviously,
20    that project has interacted with the spill
21    response effort.  That has had to be managed
22    and dealt with, as well.
23            So that's kind of our background
24    on this whole thing.  It has been
25    information-gathering and hopefully getting
```

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 39

1    us to the point where, today, the Donation

2    is in a good position to evaluate what its

3    options are.  Joel?  You might want to --

4        MR. WALTZER:  Yeah.  I want to add

5    another layer on top of what Robert has

6    presented and share a little more of our

7    experiences with you, particularly in an

8    emergency environmental-wise, distracted by

9    an emergency disaster, which, you know,

10   worked in the post-Katrina era, on land fill

11   issues, on solid waste issues, on

12   contamination issues, and that experience

13   has really helped us when it comes to

14   representing the Wisner Donation here,

15   because the emergency law sits on top of

16   regular ordinary law and creates a very

17   complex, a very complex environment that

18   needs to be watched and regulated, and

19   frankly, that our interventions are

20   necessary in order to mitigate the actual

21   land loss of the headlands that ultimately

22   protect the revenue sources for this

23   Donation, including the Port of Fourchon,

24   where 25 percent of our nation's energy

25   flows across Wisner Donation property.

Page 40

1          As a result of that and as a

2     result of our environmental experience, we

3     were able to -- well, one, we crafted our

4     contract with the Wisner Donation in such a

5     way as to pass much of the -- as much of the

6     attorneys' fees as possible, ultimately, to

7     BP.  And because of our knowledge of the

8     Clean Water Act, we are able -- we're

9     shifting our expert costs, under the Oil

10    Pollution Act, to BP, and these are all

11    claims that are going in.  We've received

12    over a million dollars already of

13    reimbursement, and we're in line right now,

14    through a settlement we've negotiated with

15    BP, for them to pay 75 percent of our expert

16    costs and our legal fees that are associated

17    with the response.

18          The reason we're able to do this

19    is we understand the environmental law, we

20    understand the national contingency plan,

21    which is the blueprint that our country has,

22    in terms of emergency disasters, and we've

23    been doing things to make sure that the

24    expenditures of the Wisner Donation are

25    consistent with that blueprint.

Page 41

1          The consistency with that

2     blueprint is the key to getting BP

3     responsible, under the Oil Pollution Act, to

4     reimburse us.  So we're in a very unique

5     position, vis à vis BP and the kind of

6     claims that we can position, because we have

7     channeled as much of our resource and

8     energy, in compliance, and we've been

9     updating the unified command, and we've been

10    creating a record of consistency with the

11    national contingency plan.  That's been our

12    strategy, to try and shift all of these

13    costs onto BP.

14          You know, that said, we have --

15    again, this is a multi-dimensional approach

16    that we've had to take, and we have taken.

17    You know, part of that is the evaluation of

18    our claim, and as Robert's mentioned,

19    through the litigation.

20          You know, basically there are

21    several tracts that we are following and we

22    are analyzing, at present.  One of that is,

23    of course, to proceed on our own.  That's

24    always been -- you know, my father, who's

25    been practicing long before I was, taught me

Page 42

```
 1   that to settle the case, you've got to be
 2   ready to try it.  You get ready to try it.
 3   And if you, for sure, want to try a case,
 4   you prepare it to settle.  So all along,
 5   we've been preparing the case to try.
 6            Some of the science is slower to
 7   develop.  This is -- this is -- we're still
 8   very close to the actual advent of the oil
 9   spill.  So, but we're looking now at the one
10   track, always, which has been to develop our
11   own case, to prepare for trial, and we're
12   completely confident we can do that.
13            And then, several months ago, or
14   actually backing up to about December, we
15   became involved with Calvin and others, from
16   the team, from the City's team, but really
17   from the Plaintiff Steering Committee, in
18   helping and assisting, giving our
19   environmental expertise, you know, in terms
20   of how these claims are shaped and what are
21   the elements of damages, to try and get --
22   assist with a quote/unquote global
23   resolution, which is what was announced in
24   March, and then again in April and May, that
25   was filed in Court.  So that would be the
```

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 43

1    second track.

2            And then the third track would be

3    a private negotiation with BP.  And we have

4    already walked down that road a bit and made

5    an offer, at some point sometime ago, that

6    included a very significant amount of money,

7    some of which would be cash, and another

8    component would be a large restorative

9    measure, a large amount of money for the

10   Wisner Donation to contribute to the

11   restoration effort that's under way on the

12   beach, through the government.

13           And knowing that BP will be

14   funding some of the natural resource damages

15   that are going to be going to fund

16   particular projects to protect the coast,

17   one of which will surely be at Caminada Bay.

18   This is something, at the Caminada

19   Headlands, this is something that Cathy and

20   your staff have been working on for decades.

21           So the reason we are so interested

22   in funneling and channeling as much of --

23   some of the restoration -- some of the

24   settlement dollars, frankly, is to preserve

25   the title of the Wisner Donation, which

Page 44

1    would otherwise be lost, through legal

2    means.

3            So we have these three different

4    tracks that we're analyzing.  We have been

5    working with all of the lawyers that are

6    sitting behind you.  We have a good

7    relationship with them certainly.

8            We do believe that -- we believe

9    that the position and the status of the

10   litigation, there being counsel for the

11   class, and that the City of New Orleans has

12   a unique set of claims, separate and apart

13   from the Wisner Donation, that it is

14   advisable for the Donation and the City of

15   New Orleans to maintain -- to work together,

16   surely -- but to maintain separate

17   identities, and to make sure that the

18   interests of the Wisner Donation are

19   advocated.  We had a discussion with

20   Mr. Herman, --

21        MR. WIYGUL:  Steve Herman, not Fred

22   Herman.

23        MR. WALTZER:  -- Steve Herman, and I

24   think -- I think -- they agree.  I mean,

25   from what understand, the City of New

Page 45

```
 1   Orleans' team -- the City of New Orleans,
 2   through the Oil Pollution Act, is given a
 3   set of claims that are different from
 4   private individuals.  They have claims for
 5   lost revenue, for increased cost of
 6   services, and these are all -- these are
 7   very substantial claims.
 8          If you look at the economic
 9   damages that have been incurred by the City
10   of New Orleans -- in the region, in the City
11   of New Orleans' political boundary, and you
12   look at the settlement agreement, in
13   general, what it's providing, it will be
14   hundreds of millions of dollars -- or
15   billions probably, ultimately, that are paid
16   to businesses within the boundaries of the
17   City of New Orleans, if you consider the
18   City of New Orleans has a sales and use tax.
19          So certainly there's a large
20   percentage of 7 percent or 5 -- I'm sorry, I
21   don't know the exact --
22      MR. SHERMAN:  Five percent.
23      MR. WALTZER:  -- 5 percent that, at
24   least theoretically, of that amount, would
25   otherwise have gone to the City of New
```

Page 46

1    Orleans.  So it's an extremely sizable

2    amount of money that the City of New Orleans

3    has that's completely independent, has a

4    completely different set of evidence, and

5    it's completely independent of the claims of

6    the Donation, which include the Donation's

7    claims.

8             The Donation, as a private entity,

9    or as a landowner, would have claims for

10   loss of income, for property contamination,

11   and because of the access agreement that

12   we've negotiated, we have a very unique, in

13   fact, the only contractual claim for

14   restoration with any landowner, that we're

15   aware of, in the state -- I mean, throughout

16   the Gulf Coast.

17            That is extremely valuable and

18   it's extremely significant for the Donation.

19   It's called a Corbello right.  Corbello is

20   the name of a Louisiana Supreme Court case

21   file.  You might have worked on it, I don't

22   know; you're smiling at me.  And what it

23   does is it contractualizes the obligation,

24   because often a party like BP will argue

25   that you can't spend more money than the

1    value of the property.  And they try and tie

2    your damages to the value of the property,

3    and then they're going to try and argue that

4    undeveloped wetlands is not as valuable as

5    developments, as the Florida Coast,

6    et cetera.

7            Corbello allows a contractual

8    agreement to override that principle, to the

9    extent it applies, to begin with.  And BP

10   has essentially hitched their horse to the

11   Corbello access agreement, and they're going

12   to owe us a whole lot of money for the

13   actual physical repair of the property.

14           So, I guess, what I'm trying to

15   point out is there's a set of claims that

16   the City owns that are completely distinct

17   from the set of claims, as the City, as the

18   political entity, from the set of claims

19   that are owned by the Wisner Donation.

20           We have had a discussion with

21   Mr. Herman yesterday.  The suggestion is

22   that we jointly -- apparently BP wishes

23   this, too, that we jointly approach BP to

24   talk to BP about the set of claims both for

25   the City -- not us, for the City -- that's

Page 48

1    the City's team -- and then also on behalf

2    of the Wisner Donation, that we sort of

3    bundle them.

4           Because we're going to be talking

5    about a bundled set of claims, we think it's

6    very important that we do maintain -- even

7    though we work together, we're completely

8    together on that, but that we maintain that

9    we are the representatives of the Wisner

10   Donation, and they represent the City's

11   interest, as beneficiary, and the City is --

12   the mayor is the pro forma trustee of the

13   Donation and -- you know, but it still is

14   important to have both seats filled so that

15   we're --

16         MR. SHERMAN:  What word did you say

17   before "trustee"?  I just didn't hear you.

18         MR. WALTZER:  Pro forma?  Pro forma.

19   I'm trying to look for the right word.

20         MR. SHERMAN:  Okay.

21         MR. WALTZER:  I'm not good at Latin.

22         MR. SHERMAN:  No problem.  All right.

23   Joel and Robert --

24         MR. WALTZER:  My degree's in Latin and

25   I can't read it.

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 49

```
 1        MR. SHERMAN:  Dr. Gardner, did I see
 2   you had a --
 3        DR. GARDNER:  No.  No.
 4        MR. WALTZER:  So, as I appreciate it,
 5   you know, on the table is how we work
 6   together, and I think you can --
 7        MR. WIYGUL:  On at least that third
 8   track, which is the private negotiation with
 9   BP and with that.
10        MR. WALTZER:  And we have a whole lot
11   of information to share.  We have developed
12   an incredible amount of information on
13   the -- so that's on the one track, which
14   would be the City teaming with us in
15   negotiating the entire bundle, I guess, of
16   claims.  And we would -- you know, we're
17   amenable to that, of course.  We want to get
18   as many different --
19        MR. WIYGUL:  We want to do whatever is
20   best for these claims.
21        MR. WALTZER:  For the Donation.
22        MR. WIYGUL:  And, you know, there are
23   undeniable talents on this team, which we
24   would love to get in position as to --
25        MR. WALTZER:  Right.
```

Page 50

```
 1         MS. NORMAN:  So what you're --
 2         MR. WALTZER:  And at the same time,
 3    though, we want to be able to -- we are
 4    analyzing --
 5         MR. WIYGUL:  For the Donation.
 6         MR. WALTZER:  -- for the Donation, yes.
 7    On behalf of the Donation, we're analyzing
 8    what the global settlement that's been filed
 9    will mean to the Donation.  And I've got a
10    handout, if you would like.  But it
11    includes -- the handout -- I don't know if I
12    have this many.  But for the --
13         MR. MARK PENEGUY:  Does that handout
14    include privileged information?
15         MR. WALTZER:  Yes, it would.
16         MR. MARK PENEGUY:  I would prefer it
17    not be shared with anyone but the committee.
18         MR. WALTZER:  Okay.  Well, that's -- we
19    have done some analysis, preliminary
20    analysis of the settlement agreement that
21    was negotiated by Calvin and the team, and
22    we have some work to do if you want to
23    maximize, at least, a potential offer from
24    that agreement.  You know, as it stands now,
25    we anticipate about -- oh, I don't know, do
```

Page 51

1    we need to --

2         MR. WIYGUL:  Do you all have any

3    questions?

4         MR. CALVIN FAYARD:  Let me say

5    something.

6         MS. NORMAN:  I have a lot of questions.

7         MR. SHERMAN:  Yeah.  I'll recognize

8    Mr. Fayard.  Is that okay?

9         MR. CALVIN FAYARD:  If I could just

10   comment on this.  You know, I don't want

11   anybody to have the impression that this is

12   two teams of lawyers not speaking or in

13   competition with each other.  We've been

14   talking to your lawyers for two years.  I

15   personally engage, on a very constant, and

16   Caroline did on a regular, if not daily, but

17   weekly basis, trying to exchange

18   information, within the confines of

19   confidentiality agreements on both sides.

20             As a result of that, we learned a

21   lot about the Wisner situation, and my

22   professional view, it doesn't fit the

23   settlement and the settlement doesn't fit

24   it.  It can be tweaked, working together, I

25   think, to maximize a return, so that you can

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 52

1    look at that and see what you could get a

2    check for, and more, but it would take some

3    very hard work to do that, and cooperation.

4         But we know that -- and we have,

5    we think, an arrangement to where you can go

6    either way.  Are you in?  Are you out?  You

7    can sit down at a table, get direct access,

8    and try to resolve this if you want to.

9    That will be up to your lawyers to decide,

10   however that works out, because you've got a

11   very complex case here.

12        It involves a lot more than the

13   normal uninhabited, unproductive, you know,

14   mile strip of wetlands along the Gulf,

15   whether it was oiled or not.

16        The settlement provides unique

17   compensation in that it pays property that

18   was never oiled, and never will be, and

19   that's good for a lot of people.  But you do

20   have a special situation here.  We

21   acknowledge that.  We've worked with your

22   lawyers to try to get into that, and Manuel

23   found out that BP is well aware of that.

24        Now, what does that translate

25   into, with all the knowledge of the Clean

Page 53

1    Water Act and OPA and everything else that

2    everybody brings to the table, in dollars

3    and cents?  I don't think anybody can tell

4    you, with all these lawyers in this room

5    today, because I agree there's a lot more

6    work to be done, and you have to be prepared

7    to try your case, because BP is, I think, a

8    responsible corporate citizen, but they're

9    not really worried about your trust and your

10   Donation.  They're worried about resolving

11   this case and moving on to the next well.

12   And if it fits within their box or budget of

13   money, they'll do it.  If it does not, we

14   may have to be standing up and trying this

15   case.

16            But I think what we're saying is

17   that, collectively -- and I think the work

18   you have done and the work we can do

19   together, I think we can maximize your

20   return, and I don't think it would cost you

21   any more in fees or anything else, if that's

22   an issue here, but we have cooperated.

23        MR. SHERMAN:  I'll turn to the

24   committee.  I also want to say a couple of

25   things.  First of all, I appreciate counsel

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 54

1    on both sides deferring to us on the

2    internal governance issues and staying out

3    of that.  I appreciate that.  I think that

4    is a productive thing.

5              Second, I appreciate the spirit of

6    cooperation that I saw from both sides.

7    Right now, I tell you, my motion, I feel

8    actually a little better after hearing both

9    sides, because I think that would be one

10   heck of an outstanding team to maximize the

11   Donation, at zero additional cost to the

12   Donation.  You get the --

13        MS. NORMAN:  I'm a little confused

14   about what --

15        MR. MICHAEL PENEGUY:  What -- yeah.

16        MS. NORMAN:  -- type of relationship

17   you're talking about.

18        MR. SHERMAN:  Sure.

19        MS. NORMAN:  And I still have a list of

20   eight questions.

21        MR. SHERMAN:  But third -- well, we're

22   going to -- but third -- we're going to --

23   I'm going to acknowledge everyone.  We've

24   got plenty of time.

25              And the third thing I want to say,

Page 55

```
 1    though -- and Joel, I want to just -- I

 2    don't want to oversimplify.  I want us to

 3    hit this issue dead on.  My motion -- we

 4    will be keeping the City and the Wisner

 5    Donation claims legally separate.  They are

 6    separate claims, right?  We got to this

 7    point over the Donation, who's representing

 8    the Donation.  That's why we're here today.

 9            If the mayor and the Donation

10    Advisory Committee were on the same page two

11    years ago, we wouldn't be here.  It would be

12    the City's team, or it would be Waltzer &

13    Wiygul, or it would be some combination.

14    There could have been a joint procurement on

15    Wisner.

16            We are here today because the

17    Donation Advisory Committee procured

18    counsel, Waltzer & Wiygul.  The City did not

19    accept that counsel, for several reasons.  I

20    don't know that it's important to rehash

21    today, because I'm trying to keep us moving

22    forward.  The City separately procured,

23    through a public process, counsel.  My

24    motion is to take Waltzer & Wiygul and the

25    City's joint venture counsel, put them
```

Page 56

```
 1    together to represent the Donation, and that

 2    is my motion.  I think that gets us the best

 3    of both worlds.  But my motion is nothing

 4    different than that.  So I want us to be

 5    able to hit those issues head on and for

 6    everyone to be able to ask their questions.

 7         MS. NORMAN:  I'll start.  You just said

 8    that they would be kept legally separate.

 9    But now you're saying they're going to be

10    together.  Which is it?

11         MR. SHERMAN:  I don't understand your

12    question.

13         MS. NORMAN:  You said that the

14    Donation's claim and the City's claim were

15    going to be legally separate and now you

16    said they're going to be together.  Which is

17    it?

18         MR. SHERMAN:  I think both counsel said

19    that there's benefits by working together,

20    but they are two separate entities.

21         MS. NORMAN:  Working together or by --

22         MR. FRED HERMAN:  Might I help you out

23    there?

24         MS. NORMAN:  Sure.  Go ahead, please,

25    by all means.
```

Page 57

```
 1          MR. FRED HERMAN:  Because your question
 2     presumes, in some way, that they can't be
 3     distinct.  They are distinct.  Your counsel,
 4     very able counsel, people that I know, by
 5     reputation, have very clearly articulated
 6     how they will proceed on your behalf.  What
 7     you're trying to do is project an image to
 8     BP that you walk together into the room and
 9     that the power of both teams are going to
10     lift all boats.  That's how you do it, as a
11     practical matter.
12          MS. NORMAN:  And --
13          MR. FRED HERMAN:  If you -- go ahead.
14          MS. NORMAN:  And will there be any type
15     of understanding -- I mean, I'll get to all
16     my questions.
17          MR. FRED HERMAN:  Yeah, yeah.
18          MS. NORMAN:  There will be an
19     understanding where you can't represent, as
20     has already been done, in emails, that you
21     are working for the Wisner Donation, because
22     Steve Herman has already represented that
23     he --
24          MR. SHERMAN:  Is that all?
25          MS. NORMAN:  No, it's not all.
```

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 58

1        MR. SHERMAN:  But we're all going to

2    take a deep breath and treat each other with

3    respect.

4        MR. FRED HERMAN:  I can't -- I can't

5    speak for Steve Herman.  I'm sorry, I can't.

6        MS. NORMAN:  Well, I've got an email in

7    which he sent --

8        MR. FRED HERMAN:  That's quite all

9    right.

10       MS. NORMAN:  -- concurrently --

11       MR. FRED HERMAN:  Let me clear it up

12   for you.

13       MR. MICHAEL PENEGUY:  Well, he's got a

14   partner here.  Can you answer that question?

15       MR. GISLESON:  If it's an authority

16   issue?

17       MS. NORMAN:  No, it was an email after

18   we met, in Executive Session, in a

19   confidential Executive Session --

20       MR. FRED HERMAN:  I saw --

21       MS. NORMAN:  -- with our attorneys --

22       MR. FRED HERMAN:  No.

23       MS. NORMAN:  -- to proceed on

24   something.

25       MR. FRED HERMAN:  I know the issue.

Page 59

```
 1        MS. NORMAN:  Wait a minute.  I can't
 2   even get a word in here.
 3        MR. FRED HERMAN:  No, no, you asked the
 4   question and I'm going to try to answer it
 5   for you.
 6        MR. MICHAEL PENEGUY:  Well, I think --
 7        MR. SHERMAN:  Hang on, I'm chair.  I'm
 8   chair.  I'm going to recognize Cathy to ask
 9   her question and then I'm going to recognize
10   someone to respond.
11        MS. NORMAN:  I have ten questions,
12   okay.
13        MR. SHERMAN:  Ask your question then.
14        MR. MICHAEL PENEGUY:  The person that
15   probably should respond is not --
16        MR. SHERMAN:  Cathy has the floor.
17        MR. FRED HERMAN:  Ma'am?
18        MS. NORMAN:  Yes.
19        MR. FRED HERMAN:  Could I take them one
20   at a time?
21        MS. NORMAN:  I understand the whole
22   "let's get together and have power in
23   numbers in going before BP," but I feel like
24   the Donation needs assurances that there is
25   not going to be any representation of
```

Page 60

1   Wisner's rights or any negotiation on behalf

2   of Wisner unless our counsel is present.

3        MR. SHERMAN:  Right.

4        MS. NORMAN:  No. 1.

5        MR. SHERMAN:  Wait, hang on.

6        MS. NORMAN:  No. 2.

7        MR. SHERMAN:  Hang on.

8        MR. FRED HERMAN:  Is that a question or

9   a demand?

10       MS. NORMAN:  That's not a question.

11       MR. FRED HERMAN:  Okay.

12       MS. NORMAN:  That is -- that is the way

13  I would -- that is my recommendation to this

14  Donation, that I have worked for for 20

15  years, and I know the ins and outs of it.

16       MR. SHERMAN:  Okay, team, team, we're

17  all -- listen, Cathy, I'm going to

18  acknowledge you, for the floor.  I'm going

19  to ask everyone, everyone, to always treat

20  each other with respect and take a deep

21  breath.  These are important issues.  I

22  understand the passion folks bring, but I

23  want everyone to treat each other

24  respectfully.

25       MS. NORMAN:  Okay.

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 61

```
 1        MR. SHERMAN:  Cathy, you have the
 2   floor --
 3        MS. NORMAN:  Okay.
 4        MR. SHERMAN:  -- to ask your questions.
 5        MS. NORMAN:  Okay.  How many different
 6   legal firms comprise your consortium?
 7        MR. FRED HERMAN:  You've just met them.
 8        MS. NORMAN:  How many are there, eight,
 9   six?
10        MR. FRED HERMAN:  One, two, three,
11   four.  I think it's five.
12        MS. NORMAN:  Okay, five.
13        MR. WALTZER:  Five.
14        MS. NORMAN:  How many are on the PSC?
15        MR. FRED HERMAN:  One, two.
16        MR. WALTZER:  Three.
17        MR. FRED HERMAN:  Three.
18        MS. NORMAN:  Three, okay.  Mr. Leger,
19   you represent Lafourche Parish?
20        MR. LEGER:  That's correct.
21        MS. NORMAN:  We have an extreme
22   conflict of interest with Lafourche Parish.
23   We are constantly in -- working against
24   Lafourche Parish in possible -- No. 1, there
25   are hard structures on our beach that need
```

Page 62

 1   to be removed that we almost have -- we may

 2   indeed have to include them in litigation.

 3   No. 2, Lafourche Parish is expropriating

 4   property adjacent to ours and that we are in

 5   constant disagreement with them about rights

 6   to access our property and our beach, so we

 7   have an extreme problem with that.

 8       MR. LEGER:  Well, may I answer your

 9   question?

10       MS. NORMAN:  Uh-huh.

11       MR. LEGER:  First of all, I

12   represent -- I've been retained by Lafourche

13   Parish, Terrebonne Parish and St. Tammany

14   Parish, the City of New Orleans, St. Bernard

15   Parish and probably about 50 other local

16   governments --

17       MS. NORMAN:  We only have a problem

18   with one of them.

19       MR. LEGER:  -- for the express purpose

20   of basically what we're talking about here.

21       MS. NORMAN:  The Wildlife and

22   Fisheries.

23       MR. LEGER:  Creating, you know, unity

24   and strength, approaching together, in the

25   rising tide, lifting all boats.  I'm

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 63

1    retained by Lafourche for a very limited

2    purpose and that is to pursue damages

3    against BP.  I don't represent them for any

4    other purpose.  I'm not aware of what you

5    contend is an extreme conflict of interest.

6           I did speak with the District

7    Attorney last week because I understood you

8    had raised it.  The District Attorney, I

9    think, finds it incredulous that I would

10   have a conflict, and Lafourche would be

11   willing to waive such a conflict, and I'm

12   not aware of what your issues are, because

13   I'm not involved in that.

14        MS. NORMAN:  Well, --

15        MR. LEGER:  But in any event, our claim

16   with respect to my representation thus far,

17   it has been very aggressive.  And by the

18   way, every public entity that retained me

19   did it openly and publicly and asked us to

20   represent them on it.

21           And, I'm sorry, we could have

22   given you an explanation of our view of the

23   law and the environmental law, too, and the

24   approaches, et cetera, strategically, but we

25   didn't, and I agree with Joel and Rob that,

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 64

1    you know, we have a lot in common.

2         MR. FRED HERMAN:  There's nowhere a

3    legal conflict issue, because we knew it was

4    an issue, but given the narrow --

5         MR. LEGER:  Well, we don't think

6    there's a conflict.

7         MR. FRED HERMAN:  Well, let's explain

8    why.  The reason there is no conflict with

9    this group, and with Mr. Leger, is the very

10   narrow scope of the representation of this

11   group.

12        MS. NORMAN:  What about -- but the

13   conflict --

14        MR. LEGER:  But we can get an ethics

15   opinion.

16        MS. NORMAN:  Okay.

17        MR. FRED HERMAN:  No more -- and let me

18   give you an example.

19        MR. LEGER:  I would like an opinion.

20        MS. NORMAN:  I want an ethics opinion,

21   as well.

22        MR. LEGER:  Since you've raised it, I

23   want an opinion now.

24        MR. FRED HERMAN:  Okay.  Well, what

25   I'm -- that's not a difficult thing, though.

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 65

```
 1        MR. SHERMAN:  Okay.  Cathy's got the
 2   floor.  Cathy's got the floor for the next
 3   question.
 4        MS. NORMAN:  I've still got more
 5   questions.  My next question is, what about
 6   ethics and concurrent representation of a
 7   mayor who has an obligation to keep his
 8   personal and government property separate
 9   from the property of the trust and
10   concurrently representing both the Donation
11   and this?
12        MR. FRED HERMAN:  Could you specify for
13   me where you see that to be a conflict for
14   us?
15        MR. MARK PENEGUY:  Title 9, Section
16   2082.
17        MR. FRED HERMAN:  No, no, that's the
18   law.
19        MR. LEGER:  No, no, no, that's --
20        MR. FRED HERMAN:  I'm asking where
21   the -- we've looked at the law.
22        MR. LEGER:  I don't think that -- I
23   don't think that -- I'd like to look at it
24   and investigate it and research it myself,
25   too, and we can get ethics to handle it, but
```

Page 66

1    I don't think that presents an ethical

2    conflict of interest.

3         MR. FRED HERMAN:  No, not all.

4         MR. LEGER:  Because the claims against

5    BP are advanced, separately and apart.  The

6    claims that -- and as Joel pointed out, the

7    advantage of putting all the claims together

8    or putting all local governments together is

9    one recognized by the Federal Courts and

10   Congress, when they created the whole

11   concept of multi-district litigation and

12   implementation of a steering committee, the

13   unity that's created.

14        MR. FRED HERMAN:  If I might, what I

15   would say to you, Ms. Norman, and to you,

16   sir, with your back to me, I don't know how

17   you know what the --

18        MR. MARK PENEGUY:  My name is Mark

19   Peneguy.

20        MR. FRED HERMAN:  Okay.

21        MR. MARK PENEGUY:  I'm a member of the

22   Wisner family.

23        MR. FRED HERMAN:  Yes, sir.

24        MR. MARK PENEGUY:  I choose to face

25   this way, not as an insult to you.

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 67

1        MR. FRED HERMAN: No, no, no. I didn't

2    suggest that.

3        MR. MARK PENEGUY: This is where my

4    table is.

5        MR. FRED HERMAN: Yes, sir.

6        MR. MARK PENEGUY: Okay. I'm

7    listening.

8        MR. FRED HERMAN: Okay. And what I'm

9    trying to do is suggest to you, in as plain

10   language as I can, that your able counsel

11   are there purely and simply to represent

12   your property interests. That does not

13   conflict with the city's property interest,

14   period, end of sentence.

15           Now, if you want to get a legal

16   opinion, independent of that, you should do

17   that, but I'm not going to sit here, I don't

18   think, and convince you that your counsel

19   and us could work together without that

20   legal impediment. That is not a legal

21   impediment, period.

22       MR. SHERMAN: All right. Let's go to

23   the next question, please.

24       MS. NORMAN: Mr. Fayard, when you were

25   initially engaged by the City of New

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 68

1    Orleans, you all said it took a very long

2    time to put this group together.  We've had

3    this counsel engaged since 2010.  I know

4    your contract was signed on December 29th of

5    2011.  Obviously, there were a long set of

6    negotiations, during which time we were

7    never contacted, we were never informed that

8    there was an RFP, we were never included in

9    the process.  Did the City ever represent to

10   any of you that you would be representing

11   the Wisner interest?

12       MR. CALVIN FAYARD:  We were charged

13   with representing all interests for the City

14   of New Orleans, whatever that would be.

15       MS. NORMAN:  So did they specifically

16   mention the Wisner interest?

17       MR. CALVIN FAYARD:  Whatever that

18   includes.

19       MS. NORMAN:  So no one's going to

20   answer my question.

21       MR. CALVIN FAYARD:  I would defer to

22   Soren on that.

23       MR. SHERMAN:  Yeah, actually I can take

24   that one, because I've looked at the RFP.

25   It was intentionally broad to cover all

Page 69

```
 1    interests known, and even things that may

 2    emerge, so it was intentionally a broad RFP

 3    related to the BP Deepwater Horizon.

 4         MR. FRED HERMAN:  Ms. Norman, are you

 5    suggesting that the City either

 6    misrepresented, in the RFP, or --

 7         MR. SHERMAN:  Mr. Herman, we'll let her

 8    ask the --

 9         MS. NORMAN:  I have no idea.  They

10    don't communicate with us.

11         MR. FRED HERMAN:  I'll let her ask the

12    question.  Please.  I'm sorry, please.  I'm

13    sorry.

14         MS. NORMAN:  They don't communicate

15    with us.  The trustee does not communicate

16    with this committee.

17         MR. SHERMAN:  All right.

18         MS. NORMAN:  And it hasn't for two

19    years.

20         MR. SHERMAN:  All right.  I'm going to

21    take objection here, in the meeting, but

22    Ms. Norman, go ahead.  You have my cell

23    phone, my email, and we do communicate, but

24    go ahead, Ms. Norman.

25         MS. NORMAN:  Well, if you communicate,
```

Page 70

1    then how come we heard about his appointment

2    last night and the letter went out last

3    Thursday?

4         MR. SHERMAN:  We received the letter, I

5    believe, yesterday or the day before.

6         MS. NORMAN:  Yeah.  Well, you knew

7    about it before then.  Is it possible for

8    this large a group of attorneys to keep the

9    claims of Wisner separate from the claims of

10   the City, you know?  I mean --

11        MR. FRED HERMAN:  Ask them.  Ask your

12   lawyers.

13        MS. NORMAN:  Is it?  What do you think?

14        MR. WIYGUL:  I've got to tell you.  I

15   mean, my recommendation, I think this is for

16   the safety of the City, for the safety of

17   these lawyers over here; that the City's

18   claims will be represented by separate

19   counsel from the Donation's claims, and that

20   the Donation's claims will not be

21   represented --

22        MS. NORMAN:  Then why are we here?

23        MR. WIYGUL:  -- by the same lawyers.

24        MR. SHERMAN:  Right.

25        MR. WIYGUL:  Now, that does not mean

Page 71

1     that we cannot work together with this

2     group, exactly as has been proposed.

3          MR. LEGER:  Ma'am, the real question

4     is, do the lawyers, your lawyers and us, do

5     we represent other clients than this one,

6     and can we keep their claims separate from

7     each other, and we do.  We have other

8     employers.  Professional lawyers do that

9     every day, and we do that.

10          MS. NORMAN:  I'm a lawyer, as well,

11     so --

12          MR. LEGER:  Well, then you know that.

13          MS. NORMAN:  Yes, I do know that.

14          MR. LEGER:  And you shouldn't have

15     asked the question.

16          MR. MICHAEL PENEGUY:  All right.  I

17     think what Robert's saying is that --

18          MR. SHERMAN:  Mr. Peneguy, I think

19     Cathy has the floor.  Did you have any more

20     questions?

21          MS. NORMAN:  Yeah, I had one more

22     question.  I have one more question.

23          MR. SHERMAN:  Mr. Peneguy, we'll

24     acknowledge you next.  Ms. Norman.

25          MS. NORMAN:  And that is, you've got

Page 72

 1    three members in this team who are part of

 2    the PSC.  And aren't there limitations on

 3    whether you can encourage people to opt in

 4    or out of the global settlement?  The people

 5    who are a part of that, aren't they

 6    encouraged to get people to accept the

 7    settlement?  Are there any prohibitions that

 8    could limit us in terms of that?  And I'm

 9    asking this question --

10        MR. FRED HERMAN:  No.

11        MR. LEGER:  No, absolutely not.

12        MS. NORMAN:  Okay.  And government

13    entities do not qualify for the settlement,

14    right?

15        MR. LEGER:  Correct.

16        MS. NORMAN:  Why?  Because they're

17    public?  Is it anything public?

18        MR. LEGER:  They were excluded -- they

19    were exclude as a member.

20        MS. NORMAN:  And is it a public -- is

21    it because they're a public entity?

22        MR. FRED HERMAN:  It's a matter of

23    negotiation --

24        MR. LEGER:  Right.

25        MR. FRED HERMAN:  -- and it's not been

Page 73

```
 1    negotiated as part of the present
 2    settlement.
 3         MS. NORMAN:  Okay.
 4         MR. FRED HERMAN:  It is not a
 5    preclusion, in the sense that there's a
 6    legal impediment.  It is a -- it has not
 7    been negotiated.
 8         MS. NORMAN:  Negotiated, okay.  But --
 9         MR. LEGER:  And, Cathy, just a moment.
10    Most of the governments did not want to be
11    included, so --
12         MS. NORMAN:  Right.  But is it other
13    public entities or just governments?
14         MR. LEGER:  Government, the United
15    States of America and all of the states are
16    not included.  Every local government and
17    political subdivisions who are not in the --
18         MS. NORMAN:  Okay.  So --
19         MR. MICHAEL PENEGUY:  So it's
20    essentially all public?
21         MS. NORMAN:  So it's only for private
22    entities that can be part of this global
23    settlement, correct?
24         MR. GISLESON:  Certain entities which
25    are defined in the settlement as being
```

Page 74

1    included, because I think the question,

2    where you're headed, is whether --

3        MS. NORMAN:  So it's not a

4    public/private thing?

5        MR. FRED HERMAN:  No, ma'am.

6        MR. GISLESON:  It's not really --

7        MR. LEGER:  No.  There are many private

8    entities that are included, as well.

9        MS. NORMAN:  Okay.

10       MR. GISLESON:  I think the question, I

11   think, where you're headed, is whether or

12   not the trust is a public or private entity,

13   such that it could even be included in the

14   settlement, in the first place.

15       MS. NORMAN:  Right.

16       MR. GISLESON:  And the answer is, it's

17   probably a little bit undefined and there

18   are arguments on both sides.

19       MR. FRED HERMAN:  But a hybrid.

20       MR. GISLESON:  But hopefully, depending

21   upon whatever counsel you enjoy or employ,

22   would be able to have that discussion --

23       MS. NORMAN:  We already have counsel

24   employed.

25       MR. GISLESON:  Would have a discussion,

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 75

1    at the very highest level of BP counsel, to

2    discuss what is in everyone's best interest.

3        MR. FRED HERMAN:  Ms. Norman, thank

4    you.  I've got to leave now.

5        MR. SHERMAN:  Yeah, and I appreciate

6    you -- and we did call you out on short

7    notice.  All right.  Mr. Peneguy, the floor

8    is yours for questions.

9        MR. MICHAEL PENEGUY:  I just -- I'm

10   trying to figure out what we're trying to

11   decide here, because, as Robert told us, is

12   that Steve Herman agreed with him that

13   everything should be separate, handled

14   separate, and what Robert's pointing out is,

15   the point being, to keep all attorneys out

16   of harm's way for all this litigation, it is

17   best to let them handle the Donation, with

18   cooperation from y'all, as has been going

19   on, without any changes and any commitment

20   from this Donation that says we need to hire

21   y'all for that purpose, because he's been

22   cooperating with everybody along those lines

23   already.  So I don't see where this motion

24   really needs to be considered.

25       MR. SHERMAN:  All right.  I appreciate

Page 76

1   your perspective.  I hear that you do

2   disagree, but thank you for sharing.

3        MR. MICHAEL PENEGUY:  And I think there

4   is a problem in the fact that if a committee

5   comes back and does what the City is asking

6   for, the City is essentially saying that,

7   "We don't agree with a vote from this

8   committee unless it goes along with what we

9   want," and that does not do any good for the

10  beneficiaries of the Donation, because

11  basically this committee is the -- as far as

12  this committee is concerned, they're here to

13  represent the beneficiaries, and essentially

14  if they all change their minds because the

15  mayor doesn't agree with the committee, then

16  essentially the committee is saying, "Well,

17  the mayor's running this operation," and

18  that's not the purpose of this committee.

19       MS. NORMAN:  It's not the way it was

20  set up.

21       MR. MICHAEL PENEGUY:  Yeah.  The

22  purpose of the committee is to represent the

23  beneficiaries, give Charity Hospital, well,

24  LSU Interim, Tulane University, the Wisner

25  heirs and Salvation Army each have a vote,

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 77

1    and if their vote is overridden by the

2    mayor, then essentially they're not

3    protecting their interest, and that's my

4    concern here.  And none of these lawyers or

5    attorneys can answer the question there as

6    to what this committee should be doing.

7         MR. SHERMAN:  Are you finished?

8         MR. MICHAEL PENEGUY:  Yeah.

9         MR. SHERMAN:  I want to thank you for

10   your perspective.  I want to suggest two

11   things.  First of all, the purpose of this

12   motion is to delay -- to delay settling and

13   resolving these issues of internal

14   governance.

15        MR. MICHAEL PENEGUY:  I think it's

16   to --

17        MR. SHERMAN:  Please.  I gave you the

18   respect of speaking.  I'm now going to

19   speak.  Is to delay solving the internal

20   governance issues at this critical time in

21   the Donation's history, and doing it in a

22   more thoughtful, prolonged way.  I

23   respectfully disagree with your

24   interpretation.

25             But let me say this.  It is an

Page 78

 1   absolute show of respect to this committee,

 2   by the mayor and the City, that we are

 3   coming here, trying to resolve this issue

 4   with a compromise.  If the mayor just wanted

 5   to appoint counsel, if he -- under his

 6   authority as trustee --

 7        MS. NORMAN:  He can't do it.

 8        MR. SHERMAN:  If he just wanted to do

 9   that, we'd be in court right now.

10        MS. NORMAN:  He can't do it.

11        MR. MICHAEL PENEGUY:  Well, if he --

12        MR. SHERMAN:  We would appoint counsel,

13   you'd appoint counsel.  We may still end up

14   in court.  We could end up in court.  I

15   don't think anyone thinks it's in the best

16   interest for us to be internally fighting

17   each other with litigation.

18             I have come here with respect to

19   the committee to propose a compromise that

20   does two great things, takes Waltzer &

21   Wiygul, who the Peneguy family -- and,

22   Ms. Norman, I hear you, I've heard you at

23   every meeting, I know that's who you want --

24   we hear you, the mayor hears you, we do, and

25   this counsel --

Page 79

1          MS. NORMAN:  The committee wants --

2          MR. SHERMAN:  -- that the City has

3    publicly procured, through a very, very

4    competitive public process, put both of them

5    together on the same team to represent the

6    Donation, at no additional cost to the

7    Donation or any of the beneficiaries, we get

8    the benefit of two phenomenal teams.

9              I come in the spirit of compromise

10    and to allow us to delay resolving these

11    internal governance issues, so I appreciate

12    your perspective, Mr. Peneguy.  I thank you

13    for sharing.  I want you to know, from my

14    heart, I hear you.  I understand that --

15          MS. NORMAN:  What type of agreement

16    will there be?

17          MR. SHERMAN:  -- we disagree.

18          MS. NORMAN:  What type of agreement?

19          MR. SHERMAN:  I'm bringing a motion to

20    try to resolve this.  Any other thoughts?

21    Dr. Williams.

22          DR. WILLIAMS:  Mike, let me see if I

23    understand this.

24          MS. NORMAN:  I don't understand it.

25          DR. WILLIAMS:  I'm trying to define, in

Page 80

1    my own mind, what's going to be the

2    separation of the City attorneys and our

3    attorneys, No. 1.  Second, there is --

4    there's certainly some strength, I think, in

5    all firms working together.  Is the mayor

6    willing, given that, be willing to join

7    together to approve our -- he's never

8    approved our attorneys.

9         MR. SHERMAN:  Absolutely.  This motion

10   is for the mayor to approve Waltzer & Wiygul

11   and the City's counsel at the same exact

12   terms and conditions that the Donation

13   Advisory Committee -- so it's no additional

14   cost to the Donation.  So what you just

15   said, absolutely.  If this plan works, we

16   approve the City's counsel, we approve

17   Waltzer & Wiygul, we get on the same page.

18        MS. NORMAN:  And the contract --

19        MR. SHERMAN:  Excuse me.  Dr. Williams

20   has the floor.

21        MS. NORMAN:  Okay.

22        DR. WILLIAMS:  My next question, I

23   guess, is to our attorneys.  Would that be

24   amenable to you guys?  Joel, Bob?

25        MR. WALTZER:  We have been, when we

Page 81

1    discussed it with Mr. Herman -- maybe this

2    is an alternative to what Mr. Sherman is

3    suggesting, but Mr. Herman and everybody

4    here, I think, has represented that they

5    represent the interests of the City.  The

6    City is a beneficiary.  We represent the

7    interests of the Wisner Donation.  As long

8    as we keep that line separate, we certainly

9    can work together.

10           I think that keeping the line

11   separate frankly avoids problems.  I mean,

12   it avoids conflating the claims and -- but

13   as I appreciate it, we understand each other

14   and there's never -- is that incorrect, Bob?

15       MR. WIYGUL:  And I think that, what I

16   understand Mike to have proposed, and I will

17   certainly look to my colleagues over here to

18   make sure I am understanding this correctly,

19   that Mike is proposing that the Wisner

20   Donation will hire the City's team to be its

21   attorneys.

22       MS. NORMAN:  Is that correct?

23       MR. WIYGUL:  And will directly

24   represent the Wisner Donation.  It will

25   represent the City, in its claims, will

Page 82

```
 1    represent the Wisner Donation, in its
 2    claims.
 3            MR. SHERMAN:  That --
 4            MR. WIYGUL:  And let me say further, --
 5            MR. SHERMAN:  Yeah, I'm aware.
 6            MR. WIYGUL:  -- we are on the same
 7    team, and if we need to walk in lock-step
 8    into a negotiation with Bob Wright, who I
 9    met when I was 25 years old, working for
10    Jean Davis in Lafayette, and Bob Wright
11    says, "Look, we have something that works
12    here," we need to walk in lock-step and
13    we're here to do that, I'm going to do it.
14            But I am going to tell you that
15    my -- I think that the Wisner Donation, as
16    an entity, has separate claims, and that the
17    trustee has separate claims, as well, and
18    frankly, if a member, if Ed Buddy here had a
19    separate claim, he would be in the same
20    position, because I think each member of the
21    advisory committee, as I appreciate it,
22    subject to being corrected, each member of
23    the advisory committee has obligations to
24    the entire entity and to the beneficiaries.
25            I think that you're on dangerous
```

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 83

1    ground if you cross that line, and I think

2    that it's not necessary to cross that line

3    for us to achieve the goal, Mike, that you

4    want to achieve, --

5        MR. WALTZER:  Right.

6        MR. WIYGUL:  -- which is walking in

7    there as one entity and seeing if there's a

8    solution that's going to optimize the

9    Donation's claims and optimize the City's

10   claims.  I'm going to commit to you right

11   now, we have never had any problem with

12   that.

13            That is the right thing to do and

14   that's the path that is best for everyone.

15   We've got the ability to do that right now,

16   and frankly, I think that's the path that

17   protects everybody.

18       MR. SHERMAN:  I appreciate your

19   perspective.

20       MS. NORMAN:  I just -- I don't

21   understand what your perspective is as

22   opposed to what he just enumerated.

23       MR. SHERMAN:  Sure.  If it will be

24   helpful to further the discussion, I'll

25   state my motion.  And just to make sure I

Page 84

```
 1   get it right, I did jot down a few notes in
 2   my computer before I left just to get it
 3   right.
 4            So my motion is that the Donation
 5   Advisory Committee authorize the joint
 6   venture of Herman, Herman, Katz; Leger and
 7   Shaw; Fayard and Honeycutt, and the Law
 8   Offices of Fred Herman, and Domengeaux,
 9   Wright, Roy and Edwards, the joint venture,
10   to represent the Donation in all matters
11   arising from the BP Deepwater Horizon Oil
12   Spill.
13            The City established -- procured
14   the joint venture through a public
15   procurement.  The Donation Advisory
16   Committee authorized the mayor to execute an
17   agreement to hire the joint venture as
18   counsel in the above-referenced matter.  The
19   Donation Advisory Committee re-authorizes
20   the mayor to execute an agreement to hire
21   the firm of Waltzer & Wiygul, as counsel in
22   the above referenced matter, and that the
23   agreement could be one, or it could be two,
24   shall be upon the same payment terms as the
25   Donation Advisory Committee previously
```

Page 85

 1    authorized.  That's my motion.

 2        MR. MICHAEL PENEGUY:  That is not the

 3    same as what you are saying.

 4        MR. SHERMAN:  It is not.

 5        MS. NORMAN:  No.

 6        MR. SHERMAN:  Let's be clear.  There's

 7    a distinction.  He's saying, just ratify

 8    Waltzer & Wiygul, and we promise to work

 9    with the City.

10        MS. NORMAN:  And this is what

11    Mr. Herman said, that, you know, there's

12    power in numbers and we can go in together

13    and we can go to BP; you can represent the

14    City; they can represent us, and together we

15    can get a great solution for everyone, and

16    that sounds like a brilliant idea.

17        MR. SHERMAN:  I appreciate that.

18    That's not my motion.  And I'm hearing that

19    that was not what Mr. Herman suggested

20    either, but --

21        MS. NORMAN:  But that's what he

22    suggested we could do.

23        MR. SHERMAN:  He's not here today,

24    so --

25        MR. MICHAEL PENEGUY:  He got his point

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 86

 1  in here, so --

 2       MR. WRIGHT:  Cathy, you can amend that.

 3       MS. NORMAN:  I can't amend anything.

 4       MR. WALTZER:  I would have a practical

 5  question then.  How are we all going to get

 6  paid?

 7       MR. SHERMAN:  So let me explain.  Let

 8  me be exact and explain.  This committee

 9  would authorize the mayor to sign that

10  retainer agreement, or agreements, so it

11  could be one, it could be two.  Y'all two go

12  in a conference room here, go in a

13  conference room at your office, or your

14  office.  I don't care.  The City doesn't

15  care how you all divide this up.  Y'all will

16  probably say we've been working on it for

17  two years and we have this and that, and

18  they'll even tell you about what value they

19  can bring, and you all will come to some

20  sort of an agreement, that will be how you

21  decide to split up the attorneys' fees.

22            There are millions of dollars in

23  attorneys' fees here.  I don't see why we

24  don't put the Donation in the best possible

25  position to maximize the value.  There's

Page 87

 1   plenty of money on attorneys' fees to go

 2   around, under the previously authorized

 3   payment terms, millions.  Millions and

 4   millions of dollars.

 5       MR. MICHAEL PENEGUY:  So what basically

 6   you're saying is the only way the mayor will

 7   sign anything is essentially if he gets his

 8   way now?

 9       MR. SHERMAN:  Is what?

10       MR. MICHAEL PENEGUY:  Is if he gets his

11   way and the committee --

12       MR. SHERMAN:  Absolutely not.  I've

13   brought previous proposals.

14       MR. MICHAEL PENEGUY:  Because --

15       MR. SHERMAN:  I've brought previous

16   proposals to go through --

17       MR. MICHAEL PENEGUY:  Well, that's what

18   I'm hearing.

19       MR. SHERMAN:  -- of procurement and

20   other things.  They've been turned down by

21   this committee.  This is a compromise.  This

22   is not what the City has been urging for two

23   years.

24       MR. MICHAEL PENEGUY:  No, the City has

25   not --

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 88

1        MR. SHERMAN:  All right.  Team, listen,

2    we've reached a point -- I want to give

3    anyone an opportunity to make any comments

4    and then we'll bring it to a vote.

5        MR. MICHAEL PENEGUY:  Well, just a

6    minute.  I have a -- I was trying to voice

7    some debate.

8        MR. SHERMAN:  Please.

9        MR. MICHAEL PENEGUY:  I don't believe

10   the committee can really just satisfy the

11   mayor in any way, except the way the mayor

12   wants it, and -- or wants us to, and that is

13   totally against all committee operations,

14   period, and that's my concern, is

15   essentially if the committee does that, then

16   what they're telling the beneficiaries is

17   the mayor is going to run this operation,

18   period.

19        And that's my concern, is this

20   committee has a purpose, and that purpose

21   should be to represent each beneficiary that

22   they're representing, and voice that

23   opinion, and that should ride through, all

24   the way through the trustee taking any

25   proper action, because basically that's

Page 89

1     already been done two years ago, when we

2     took a vote.  It was four and one

3     abstention.  The City abstained from voting,

4     which is only right, because they're the

5     chair and they shouldn't vote, unless they

6     have a real strong opinion, and they didn't

7     have a real strong opinion back then.

8            That's my concern is basically

9     you're riding over the beneficiaries'

10    interest in the Donation.

11        MR. SHERMAN:  All right.  Well, I think

12    we've reached a point where -- Mr. Buddy,

13    I'll recognize you.

14        MR. BUDDY:  I understand the City's

15    position.  I also understand the City's

16    procurement laws, and I really see that the

17    City has hired a tremendous amount of

18    talent, based upon their needs, and I also

19    hear, from your counsel, or who you have

20    hired, that it's kind of two different

21    issues, you know.

22            You're almost like apples and

23    oranges, how it's got to be litigated, and I

24    hear from our own attorneys the same thing,

25    that while they're working in conjunction,

Page 90

 1    and it's good to show a unison, by walking

 2    in, it truly is separate.

 3             I also appreciate, Mike, the fact

 4    that, if the mayor truly wants to kick the

 5    can down the road and we want to somewhat

 6    come to the governorship issue at a later

 7    date, this is not the time to do it, when

 8    we're in litigation.

 9             So I go back to what Cathy said.

10    If they are working together, and there's

11    two separate issues here, no one here wants

12    litigation.  We want a successful outcome

13    for the City and the Wisner family and

14    everyone, so why -- why are we opposed to

15    what Cathy says?

16        MR. SHERMAN:  No, I appreciate the

17    question.  And I'll go back to two years

18    ago.  The mayor said "no" for several

19    reasons.  One, their firm is suing the City,

20    still today, as we speak.

21        MR. BUDDY:  Wait, what for?

22        MR. SHERMAN:  Waltzer & Wiygul are

23    suing the City today.  They've been suing

24    the City for how many years?

25        MR. WIYGUL:  To be clear, why there

Page 91

 1    isn't any conflict there, there was a

 2    written waiver at that time.

 3        MR. SHERMAN:  I understand.  We agree

 4    to disagree on whether or not there had been

 5    a conflict waiver.  We agree to disagree.

 6    There's a statement by the City Attorney

 7    that she will do something after we have a

 8    meeting about an RFP.

 9        MR. MICHAEL PENEGUY:  No, no.

10        MS. PHILLIPS:  That was done after

11    their meeting.

12        MR. MICHAEL PENEGUY:  That -- you can't

13    argue with a written waiver, and that's what

14    that one blatantly is.

15        MS. NORMAN:  And you know what?

16        MR. SHERMAN:  Hang on.  I have the

17    floor.  Second -- that's the first thing.

18    Second, the mayor was uncomfortable at the

19    time with the arrangement.  Third, we are

20    one of the only -- one of the only claims

21    that I think I've ever heard of, in this BP

22    case, where we're actually paying our

23    attorneys and all of our experts with our

24    money, which we're getting reimbursed, and

25    we've been over a million dollars

Page 92

1    reimbursed, and we'll get to deduct that

2    from the overall attorneys' fees, but we're

3    paying you all on an hourly basis.  Everyone

4    is doing contingency.  The attorneys are

5    taking risks.

6              There's very few cases that I know

7    of -- this is a very atypical arrangement.

8    You are a small boutique firm.  I appreciate

9    all your summaries today.  The mayor feels

10   that the best -- and the City attorney --

11   that the best, for the Wisner Donation, the

12   best possible position, we take this group

13   and we take that group, and we put them

14   together so everyone has someone that

15   they're comfortable with on one team, and

16   the motion is to authorize the mayor to sign

17   the agreements, which the mayors have always

18   done.

19        MR. MARK PENEGUY:  What's the motion?

20        MR. SHERMAN:  It is the motion.  I made

21   the motion.  I'm happy to repeat it so

22   everyone's crystal clear on what it is.

23        MS. NORMAN:  A joint venture agreement.

24        MR. MARK PENEGUY:  It's a joint venture

25   motion.  It's not the motion to authorize

Page 93

 1    the Waltzer & Wiygul firm to represent the

 2    Wisner Donation, which they've been doing

 3    already for two years.

 4        MR. SHERMAN:  So you're factually

 5    wrong, so let me restate my motion.  I want

 6    everyone to be crystal clear.  But that is

 7    not correct, okay.  That's not correct.  Let

 8    me restate the motion so everyone is crystal

 9    clear on what the motion is.

10            The Edward Wisner Donation

11    Advisory Committee authorizes the joint

12    venture of Herman, Herman, Katz; Leger and

13    Shaw, Fayard and Honeycutt, Law Offices of

14    Fred Herman, and Domengeaux, Wright, Roy and

15    Edwards, to represent the Donation in all

16    matters arising from the BP Deepwater

17    Horizon oil spill.  The City of New Orleans

18    procured the joint venture through a public

19    procurement process established by MJL 10-05

20    Executive Order.  The Donation Advisory

21    Committee authorizes the mayor to execute an

22    agreement to hire the joint venture, as

23    counsel, in the above referenced matter.

24    The Donation Advisory Committee

25    re-authorizes the mayor to execute an

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 94

1    agreement to hire the firm of Waltzer &
2    Wiygul, as counsel, in the above-referenced
3    matter.  Such agreement or agreements
4    referenced above shall be upon the same
5    payment terms as the Donation Advisory
6    Committee previously authorized.  That is,
7    the collective costs for all legal fees
8    shall not exceed what the Donation Advisory
9    Committee previously authorized.
10            So that is my motion, and I think
11   we've reached a point here where it's time
12   for a vote.
13       MR. MARK PENEGUY:  No, it's not.  You
14   haven't even finished going around the
15   table.  You haven't even let Mr. Lorino
16   speak.
17       MR. SHERMAN:  Mr. Peneguy, I'm going to
18   ask you to calm down, sir.  I don't
19   appreciate your tone.  This is a very
20   important issue.  We'll take our time to
21   discuss it.
22       MR. MICHAEL PENEGUY:  All right.
23   Basically --
24       MR. SHERMAN:  And let me also add, if
25   we don't resolve No. 1, No. 2 is that we

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 95

1    start filing litigation against ourselves.

2         MS. NORMAN:  It's not against

3    ourselves.

4         MR. SHERMAN:  It sure is.

5         MS. NORMAN:  No, it is not against

6    ourselves.

7         MR. SHERMAN:  Is there anyone else that

8    would like to offer a comment?

9         MR. MARK PENEGUY:  Yes.

10        MR. WALTZER:  I have a question, which

11   is, is the City undertaking negotiations

12   with BP.

13        MR. SHERMAN:  Is the City

14   undertaking --

15        MR. WALTZER:  On its claims.

16        MR. SHERMAN:  On its claims.

17        MR. WALTZER:  Yeah.

18        MR. SHERMAN:  I don't feel comfortable

19   answering that without the City Attorney's

20   permission, so I don't want to answer that

21   right now.

22        MS. NORMAN:  Wait.

23        MR. SHERMAN:  I would turn to counsel

24   for the City, and the City attorney.  Is

25   that an appropriate question to answer now,

Page 96

1    or no?

2         MR. LINDSAY:  I'm not even exactly sure

3    what they're asking.

4         MR. SHERMAN:  Calvin.

5         MR. WALTZER:  I just was asking if the

6    City is in negotiations on its own.

7         MR. SHERMAN:  Mr. Fayard?

8         MR. CALVIN FAYARD:  I'll say no.

9         MR. SHERMAN:  Fair enough.

10        MS. NORMAN:  If the City is going to

11   be -- if we're going to be jointly in this,

12   shouldn't we be privy to the City's

13   negotiation, if they're going to be privy to

14   Wisner's?

15        MR. CALVIN FAYARD:  You would be.  You

16   would be.

17        MS. NORMAN:  Okay.

18        MR. SHERMAN:  That's right.

19        MR. CALVIN FAYARD:  You would be.

20        MS. NORMAN:  Okay.  Well, you're

21   already privy to ours apparently.

22        MR. MICHAEL PENEGUY:  The motion that

23   you made, Mike -- the motion that you

24   made --

25        MS. NORMAN:  We wouldn't be.  If

Page 97

```
 1    there's a joint venture, we would know what
 2    you were doing --
 3         MR. SHERMAN:  If we're working
 4    together, we're working together.
 5         MS. NORMAN:  You would know what we
 6    were negotiating, but we would never be
 7    privy to what you were negotiating, on
 8    behalf of the City.
 9         MR. SHERMAN:  We can address that.
10         MR. CALVIN FAYARD:  That's my
11    interpretation of --
12         MS. NORMAN:  What's that?  What's that?
13         MR. CALVIN FAYARD:  (Inaudible).
14         MS. NORMAN:  How do we know then that
15    you aren't negotiating -- knowing what we're
16    negotiating, you aren't using our claim,
17    Wisner's claim, to get a better deal for the
18    City of New Orleans?
19         MR. LEGER:  Because that would be
20    unethical.
21         MR. SHERMAN:  That's unethical for them
22    to do that.
23         MR. LEGER:  You know that.
24         MR. SHERMAN:  All right.
25         MS. NORMAN:  There are a lot of
```

Page 98

1    unethical things going on.

2         MR. SHERMAN:  Let me ask for a show of

3    hands.  Who would like to speak at the

4    table?

5         MR. MICHAEL PENEGUY:  I would.

6         MR. SHERMAN:  Okay.  Mr. Peneguy, then

7    Mr. Peneguy.  Okay.  We'll go to this

8    Mr. Peneguy first.

9         MR. MARK PENEGUY:  Which one, me?

10        MR. SHERMAN:  You raised your hand

11   first.

12        MR. MARK PENEGUY:  If I understand this

13   correctly, the City of New Orleans is

14   attempting to force the Wisner Donation, by

15   their motion about the publicly procured

16   legal counsel, to cram them into a contract

17   with Waltzer & Wiygul that Waltzer & Wiygul

18   may or may not want to be involved in.

19   They've made it clear that they have no

20   desire to have this joint representation,

21   because they think, if I'm stating it

22   correctly, that you all believe you all can

23   do the job for Wisner better separately from

24   them.

25        MS. NORMAN:  I think it's in the best

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 99

1    interest.

2         MR. MARK PENEGUY:  That's all.

3         MR. WIYGUL:  The point that I want to

4    make clear here is that the Wisner Donation,

5    as an entity, has its claims, it has

6    management, and whatever form and whatever

7    rights that management has, right, each of

8    them may have separate claims of their own

9    that the Wisner Donation needs separate

10   representation on, on those other claims.

11        MR. MARK PENEGUY:  Right.

12        MR. WIYGUL:  That is my opinion about

13   this, and I'm willing to do anything that is

14   necessary to help maximize the Donation's

15   claim, including carrying Calvin Fayard's

16   briefcase, if that is what is required or

17   anything else.

18        MR. MARK PENEGUY:  So you don't --

19        MR. WIYGUL:  But I just think that

20   separate representation --

21        MR. MARK PENEGUY:  Right.

22        MR. WIYGUL:  -- is the safest for the

23   City, for these attorneys, for the Donation.

24        MR. MARK PENEGUY:  And you have been

25   working with the Wisner Donation for two

Page 100

1    years, is that correct, --

2         MR. WALTZER:  Yeah.

3         MR. MARK PENEGUY:  -- under a contract

4    that was negotiated between you all and the

5    Wisner Donation; is that correct?

6         MR. WIYGUL:  Yes.

7         MR. MARK PENEGUY:  And if Mr. Sherman's

8    proposal is approved, as I understand it,

9    he's expecting you to change your contract

10   and include them and allow the other

11   attorneys -- and I don't mean "them"

12   pejoratively, by the way -- the other

13   attorneys to become a part of yours and

14   share the fee that's been arranged with the

15   Wisner Donation and Waltzer & Wiygul, is

16   that correct?

17        MR. WIYGUL:  I think so.

18        MR. MARK PENEGUY:  And would you

19   also -- I believe that that -- I personally

20   think that perhaps could be a breach of the

21   contract by the Wisner Donation, subjecting

22   the Wisner Donation to litigation, but

23   that's whether you all would choose to look

24   at it that way is your own business.

25             But I'm curious to know, from an

Page 101

1    earlier discussion about this settlement

2    agreement that the plaintiffs' counsel and

3    BP put together, and showed that the Wisner

4    Donation is not oiled -- has not been oiled,

5    and how they can now tell us that they can

6    represent us well, when they, with BP,

7    agreed that the Wisner Donation property

8    isn't oiled and we have evidence to the

9    contrary from the time oil hit the beach on

10   Wisner property.  And how that can be

11   working together, when we have people who

12   say we're not oiled and people who know we

13   are oiled, how that can work together.  And

14   finally, and I know, maybe I'm just making

15   speeches here --

16        MS. NORMAN:  The maps show us unoiled,

17   in the global settlement.

18        MR. MARK PENEGUY:  In here, the mayor

19   has no --

20        MS. CAROLINE FAYARD:  How does that --

21        MR. MARK PENEGUY:  In here, the mayor

22   has no -- I have the floor and I would

23   appreciate it if you do not interrupt me.

24        MS. CAROLINE FAYARD:  I can answer your

25   question.  It's very simple, okay.

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 102

1        MR. SHERMAN:  Carol, we'll recognize

2    you next.  I want to go to Mr. -- let

3    Mr. Peneguy have the floor.

4        MR. MARK PENEGUY:  The mayor has not

5    been offering a compromise.  The mayor has

6    been choosing to try to force its attorneys

7    into a deal where perhaps we have a good

8    deal on attorneys' fees and whatever

9    recovery they're going to get, good for

10   them, or perhaps we don't, but that's really

11   what we're trying to do is -- work has been

12   done for two years and now we're going to

13   say, "Well, okay, let's share the spoils of

14   that work," when we've been very happy with

15   environmental lawyers who do environmental

16   work on an environmental claim, and I just

17   can't see how -- how this -- I have the

18   phrase written down -- how, what you all are

19   proposing, benefits all of the beneficiaries

20   and why the mayor believes that he's not

21   subject to Title 9, Section 2082 of the

22   trust code.

23            That trust that says, in

24   Paragraph A, "A trustee shall administer the

25   trust solely in the interest of the

Page 103

1    beneficiaries."

2              And, Ms. Fayard, do you want to

3    tell us an answer to that?

4         MR. SHERMAN:  Yeah.  I'm going to

5    acknowledge you.  I do want to respond when

6    the City is concerned.

7         MS. CAROLINE FAYARD:  Yeah, I'll wait.

8         MR. SHERMAN:  I need to make two things

9    clear.  This is a Donation Advisory

10   Committee duly-noticed meeting.  I am

11   sitting here, as the chair and the City

12   representative, with a proposal.  It's a

13   proposal I have offered for your

14   consideration, and hopefully for your

15   approval, to stop the path that some in this

16   room have urged, which is filing a petition.

17             In fact, in your packets, you have

18   a draft petition that Mr. Burton prepared, a

19   very challenging task, because the interest

20   to the beneficiaries were not aligned, to

21   start litigation, which could take months

22   and months, or years, and then rather than

23   just sitting at a table, resolving internal

24   governance, over the next few months, we'd

25   be doing it in court.

Page 104

```
 1            So the mayor has done nothing

 2    except tell me, the chair of this committee,

 3    to come here, working with the City

 4    Attorney's Office, to attempt to resolve

 5    this situation.

 6            So I am here with absolute respect

 7    for the entire committee and its role, which

 8    we'll obviously debate over the next few

 9    months, along with the role of the trustee,

10    specifically with the proposal for

11    compromise.

12            Mr. Peneguy, the mayor has not

13    done anything.  We are here at the Donation

14    Advisory Committee making a proposal.  And

15    Ms. Fayard?

16        MS. CAROLINE FAYARD:  Sure.  Just to

17    address --

18        MR. MARK PENEGUY:  I need to re-ask it.

19        MR. SHERMAN:  Please.  That's

20    appropriate.

21        MS. CAROLINE FAYARD:  Let me just --

22    it's just a technical point to your question

23    about the maps, and I'm sure -- when you're

24    going through this process -- Caroline

25    Fayard, and I work for Calvin.  I was
```

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 105

1    intently involved with mapping and the
2    problems with the mapping software, the
3    problems with actually mapping all of the
4    Gulf Coast, but particularly Louisiana
5    wetlands.  We haven't really done global
6    mapping of our coast since the Tobin Parcels
7    really came around, and Joel and I
8    particularly have had discussions about
9    this.
10            When you have questions about what
11   may or may not be shown on the map as oiled
12   or not oiled, as a part of the settlement
13   agreement, it could just be a technical
14   issue, because if some of these parcels do
15   not show up, either through the settlement
16   facility mapping technology or the actual
17   agreement itself, because perhaps they were
18   styled as being owned by a governmental
19   entity.
20            If their assessment notice said it
21   was owned by the State of Louisiana, that's
22   not going to show up on that map.  It's not
23   going to show up in the printed agreement,
24   it's not going to show up on the
25   calculations you can see online, because

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 106

1    quite simply, the mapping experts are not

2    engaged to put on the map color-shaded

3    parcels that may be disputed as to whether

4    they're covered on the agreement.

5              We've already had the discussion

6    about governmental entities and

7    quasi-governmental entities and whether the

8    trust and its lands fall under that.

9              So please do not take -- let me

10   just -- there's another one little point.

11   Please do not take these maps as gospel as

12   to the extent of the oil.  There's also a

13   provision in the settlement agreement that

14   landowners who feel that their property has

15   been oiled and has not been so documented,

16   have a challenge, and have a way to prove

17   so, under the terms of the agreement, which

18   I'm sure your lawyers will talk to you

19   about.

20        MR. SHERMAN:  I'll acknowledge --

21   Mr. Peneguy has a rebuttal, and then

22   Mr. Peneguy, you're our last speaker.

23        MR. MARK PENEGUY:  Well, the main

24   rebuttal is that the mayor has not been

25   interested in working with us.  If he had,

Page 107

```
 1    he would have been talking to us a long time
 2    ago.  What you keep proposing and keep --
 3    when you don't get your answer, you propose
 4    it again the next month, and in this case,
 5    the next meeting, the special meeting called
 6    for it, is something that the committee has
 7    expressed, on numerous occasions, no
 8    interest in doing, and that is, changing
 9    their legal counsel.
10         MR. SHERMAN:  Thank you.
11         MR. MARK PENEGUY:  And so I am -- I'm
12    really tired of having to re-argue these
13    points.  Now, to Ms. Fayard's point, I
14    appreciate it, I understand what you're
15    saying, but as I understand it -- and I am
16    not Messrs. Waltzer and Wiygul, and I
17    haven't read the settlement agreement -- as
18    I understand it, the settlement agreement
19    includes a mathematic formula that you plug
20    in numbers and you get out a certain number
21    back, towards settlement, and if you were
22    oiled, you get one set of calculations.  If
23    you're not oiled, you get something else.
24              What I am hearing you telling me
25    is that we can -- we can go ahead and make a
```

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 108

1    settlement proposal, based on what the

2    current map shows, and if we disagree that,

3    in fact, and say our property was oiled, we

4    then have to go through another step and

5    prove it was, when all along, we all know it

6    was, including BP, and --

7        MS. CAROLINE FAYARD:  Well, I'll -- I

8    don't want to get too much further into

9    that, but I think you have to prove it

10   regardless, whether you go through the

11   settlement or you didn't, but the basis of

12   the settlement agreement, and both Joel and

13   Robert know, is based on the government's

14   guideline.  It's just the, I would say,

15   threshold.

16       Now, I can't speak to the -- you

17   know, the view of the land and the soluence,

18   I would never propose to speak to that.

19   What I can tell you is that that's how we

20   get into the wetlands compensation zone now,

21   which is the border of Texas to the border

22   of Mississippi, in the State of Louisiana,

23   with the exception of Grand Isle, which is

24   under its own zone.

25       MR. SHERMAN:  Mr. Peneguy, then

Page 109

1    Dr. Gardner.

2        MR. MICHAEL PENEGUY:  I just have -- if

3    you picked up our property as state

4    property, I suspect you probably went to the

5    state website or DNR website, where, since

6    LSU, or basically Charity Hospital at one

7    time, had the interest, they covered

8    everything green, showing it as state

9    interest property, and that's probably what

10   the problem is, that you went to that

11   website and picked up that color.

12       MS. CAROLINE FAYARD:  Yes, sir, I could

13   definitely see where that could have

14   occurred.

15       MR. MICHAEL PENEGUY:  And if that --

16       MS. CAROLINE FAYARD:  You know, we're

17   dealing with imperfect databases and we have

18   to try and deal with about 70,000 individual

19   parcels just in the coastal zones that were

20   oiled.

21       MR. MICHAEL PENEGUY:  So rather than us

22   trying to --

23       MS. CAROLINE FAYARD:  That by no means

24   means that this is correct ownership

25   information, --

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 110

1          MR. MICHAEL PENEGUY:  Yeah.

2          MS. CAROLINE FAYARD:  -- based on a

3    map, or the database that has been publicly

4    available through the established website.

5          MR. MICHAEL PENEGUY:  Okay.  In that

6    case, we shouldn't have to prove anything,

7    because we have documentation that shows

8    it's not state-owned property; it's state

9    interest property.

10         MS. CAROLINE FAYARD:  Yes, sir, I

11   agree, and I'm not trying to say that you

12   have to prove it, in that circumstance.

13         MR. WALTZER:  And I just want to add

14   that, thankfully, we've been working with

15   the Unified Command in submitting evidence,

16   and really, in a unique way, working with

17   them and have gotten commendations from them

18   in giving them evidence, because the -- it's

19   the only way, under the agreement, the only

20   way that, in having an independent academic

21   person to change it.

22              You can't have your own expert

23   change it.  It's not someone hired by you,

24   but -- we know that there are several big

25   issues with how they view your property, one

Page 111

```
 1    of which is the parcel information and how
 2    they -- you know, and it's the difference
 3    between $11, and at a minimum, --
 4         MR. MICHAEL PENEGUY:  Right.
 5         MR. WALTZER:  -- $26 a linear foot from
 6    where it's oiled.  And we have a lot of work
 7    to do to put in the correct parcel
 8    information.  And Carolyn is right.  I mean,
 9    I'm sure it's a process, and they did the
10    best they could.
11            The other thing, though, is that
12    the SCAT line itself, the government SCAT
13    line really is a BP SCAT line, and the BP
14    SCAT line, by their own evidence that
15    they've produced to us because of our access
16    agreement, and only because of our access
17    agreement, is patently and obviously
18    incorrect.
19         MR. MICHAEL PENEGUY:  Yeah, definitely.
20         MR. WALTZER:  And that is -- I don't
21    know, you know, we're going to -- we're
22    going to run into problems, I think,
23    ultimately, in terms of timing, because
24    there is an opt out date, under the
25    settlement agreement, for all of these
```

Page 112

1    reasons, and we may have to file an

2    objection, which may -- you know, I just --

3    we, again, just reiterate, we believe that

4    the Wisner Donation needs independent

5    counsel from people at the City.

6         MR. SHERMAN:  Dr. Gardner has the floor

7    next.

8         DR. GARDNER:  Well, I -- obviously, I'm

9    the least informed about all of this, and I

10   make no pretense about that.  I have

11   appreciated the Wisner Fund, over the years,

12   because of my various stints in City

13   government, going back to Moon Landrieu and

14   then Dutch Morial, and so I -- I have always

15   held, in high regard, Mr. Wisner and all of

16   his descendents for feeling and caring that

17   way about the City of New Orleans, and

18   certainly our respected institutions and

19   entities.

20             It sounds like there's an awful

21   lot of unreadiness about a number of issues

22   or facts, and clarification of those facts.

23   And, Mike, help me out here.  It sounds like

24   there is -- if this motion, or one like it,

25   moved forward, if, and that's a big "if,"

Page 113

1    that from what I'm hearing from the

2    attorneys, Walter and everybody, that there

3    are ways that you all have and could

4    continue to work in concert for the greater

5    good of what we're trying to accomplish here

6    with the Wisner Donation.  Am I incorrect in

7    that assumption?

8         MR. SHERMAN:  Right.

9         DR. GARDNER:  But as with anything

10   legal -- and this is the mother of all legal

11   things, I think, for us down here.  And as

12   the mayor often says, the devil will be in

13   the details of how that relationship would

14   work -- how the interest of the Wisner

15   Donation, which we are responsible for,

16   remains whole in this process, and while the

17   many interests have to be attended to, but

18   still maintain the wholeness of the Donation

19   and what we're trying to do with that.

20        Obviously, there's still some

21   unreadiness or questions or lack of clarity

22   as to what's oiled and unoiled, land, that

23   will have to be, I guess, eventually

24   ferreted out.

25        My question is, must we, Mike, at

Page 114

 1  this moment advance this motion, as is

 2  currently confected, or would it be -- and

 3  I'm purely asking, not suggesting -- would

 4  it be of use to have the principals, by way

 5  of the lawyers who would be responsible for

 6  moving forward for us, possibly clarify or

 7  bring back for us, if this was done, how it

 8  would work and how the respective interests

 9  would be held whole, the Wisner Donation,

10  the City, and those things.

11          Because I think there's a fair

12  amount of uncertainty, certainly in my mind,

13  of how it would work -- as the mayor would

14  say, the devil is in the details -- and how

15  they would make that work --

16          MR. SHERMAN:  Yeah.

17          DR. GARDNER:  -- and make us feel

18  comfortable that they could make that work

19  that way.  And so my question is, is it

20  plausible, reasonable, Dr. Williams, to

21  allow ourselves at least a moment -- no harm

22  and foul in trying, I would think; but, I

23  mean, you all have been battling with this

24  stuff and working on it for decades -- but

25  no harm or foul, in the interest of getting

Page 115

1    it right, to allow for some maybe additional

2    communications between the attorneys.  And

3    you all correct me if I'm wrong.  That while

4    generally being aware of all of this, and

5    while working, so to speak, on some things,

6    together on some things, I'm not aware that

7    you all have actually, with a concerted

8    mind, said, "Let's sit down and see, if we

9    did this for the Donation, how this would

10   work."  Am I unfair in saying that?

11        MR. WIYGUL:  Certainly, we have been.

12   Given the clarity, though, of what the City

13   was proposing, until Mike read that out

14   today, it was that --

15        MS. NORMAN:  It's very different from

16   what we heard yesterday.

17        MR. WIYGUL:  -- we thought we had had a

18   discussion, but I -- you know, we had an

19   initial discussion, so --

20        MR. SHERMAN:  Dr. Gardner?

21        DR. GARDNER:  Yes.

22        MR. SHERMAN:  Let me say this.

23        DR. GARDNER:  And I'm just asking.

24        MR. SHERMAN:  No, this is a -- I think

25   you hit the million-dollar question.  And

Page 116

1    let me say, I completely and totally agree

2    with everything you just said, and I

3    structured the motion very intentionally

4    this way, because if we would have had a

5    resolution, we would have been here by

6    today.

7            What this motion does is

8    authorizes the mayor to sign that agreement

9    or agreements, which will happen subsequent

10   to this meeting if the Donation Advisory

11   Committee says, "You know what?  Waltzer &

12   Wiygul, you've now been given the direction

13   of the Donation Advisory Committee; the

14   mayor's been given the authorization.  Sit

15   down with this group.  Any legal opinions

16   that are necessary, any ethics opinions, any

17   outstanding issues, y'all work it out in the

18   next few days and hopefully everything works

19   out perfectly."

20           And what the mayor's presented

21   with is a contract upon the same terms with

22   the entire group, and he signs it.  If they

23   don't come to that agreement, we're going to

24   be back here discussing it again.  But I

25   think the motion -- and, again, why I

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 117

1    structured it this way, we are saying, as

2    the Donation Advisory Committee, we

3    understand, respectfully, Mr. Peneguy and

4    Ms. Norman, that you all want Waltzer &

5    Wiygul. We understand Joel and Robert,

6    Mr. Waltzer, we understand you all don't

7    want to split this up and want to keep going

8    forward.

9        MR. WIYGUL: Mike, that's wrong. Don't

10   characterize --

11       MR. SHERMAN: Okay.

12       MR. WIYGUL: -- what we said that way.

13       MR. SHERMAN: Okay. Okay.

14       MR. WIYGUL: Sir, --

15       MR. SHERMAN: Well, I thought that's

16   what I heard.

17       MR. WIYGUL: Sir, you need to be

18   careful about what you say.

19       MR. SHERMAN: Okay. That's what I

20   heard today.

21       MR. WIYGUL: Now, --

22       MR. SHERMAN: That you think we should

23   be moving forward with independent counsel.

24       MR. WALTZER: That's a different

25   statement.

Page 118

1      MR. SHERMAN:  Okay, okay.  But let me

2   finish my thought.

3      MR. WIYGUL:  That's a misstatement.

4      MS. NORMAN:  And then I have something

5   to add.

6      MR. SHERMAN:  Yeah.  I'll finish with

7   that.  I'll turn it over to you next.  But I

8   hear that.  And what the City's proposal

9   is -- listen, we went through a public

10  procurement process.  We have a team of

11  attorneys ready and capable to step in today

12  and do this.

13          The compromise is to get the City

14  attorneys, the City's attorneys, and these

15  folks together, and again, for all of us at

16  this table, we're getting the powerhouse of

17  this group and that group at no additional

18  cost.

19      MS. NORMAN:  That's your opinion.

20      MR. SHERMAN:  There's millions of

21  dollars to go around, in attorneys' fees.

22  This is a big claim.  That would be more

23  than enough for everyone to split up.  And I

24  would hope, in the next few days, or week,

25  if this motion passed, the mayor would be

Page 119

1    able to execute an agreement upon the same

2    terms and conditions, with the whole group,

3    and they will have split it up.

4         MR. WIYGUL:  May I suggest this?  I

5    think that, you know, with respect to the --

6         MR. SHERMAN:  If not, we're going to

7    end up in litigation, I see.

8         MR. WIYGUL:  Mike, I think you're --

9    you know, first, standing on formalities

10   here, I think, you know, it's -- you could

11   amend.  If someone makes a motion to accept

12   this proposal, one could amend it to order

13   us to work cooperatively and hand in glove

14   with all.

15            You know, if Caroline Fayard calls

16   and says, "Get over here," we will get over

17   there, and that way, I think, you're going

18   to get the best of both worlds, because

19   you're going to get the independent

20   representation that a trust with individual

21   claims needs and you're going to get the

22   same cooperation, the lock-step approach to

23   BP that you get -- you know, again, if

24   there's a resolution that maximizes the

25   Donation's claims, we're going to be there,

Page 120

 1    working on that.

 2              So I think, you know, you can get

 3    to the point that you need to get to without

 4    getting into the issues about, you know, the

 5    trustee's attorney representing the

 6    beneficiaries of the trust, when the trustee

 7    has its own claims that it's trading on, and

 8    it's not going to be disclosed, at least, as

 9    I understand what was said.  It's not going

10    to be disclosing to the beneficiaries -- or

11    to the Donation or the trust itself.

12              You know, the same position that

13    if Ed buddy had a claim, and he had a

14    lawyer, and he said, "I want the lawyer to

15    represent the Donation and represent me in

16    my individual claim."  I think, Ed, you

17    would be in that same dangerous position.

18         MR. MICHAEL PENEGUY:  Right.

19         MR. WIYGUL:  So what I'm saying to you,

20    I think that you can have a proposal in a

21    motion that's going to accomplish the same

22    thing for you practically without putting

23    you in that situation.

24         MR. SHERMAN:  Yeah.  And I do need to

25    say just one thing, though.  There's a big

Page 121

```
 1    difference, so -- Mr. Wisner donated this
 2    property to the City of New Orleans.  The
 3    mayor has made --
 4         MR. MICHAEL PENEGUY:  No.  Correct
 5    that.
 6         MR. MARK PENEGUY:  No.
 7         MR. SHERMAN:  He did.  It was donated
 8    to the City of New Orleans --
 9         MR. MICHAEL PENEGUY:  He divvied --
10         MR. SHERMAN:  -- for listed
11    beneficiaries and he -- for all public uses,
12    and he made the mayor the administrator of
13    the trust, so this property is in the
14    records -- you know, it doesn't -- we don't
15    pay property tax, you know.  City of New
16    Orleans, Edward Wisner --
17         MR. MICHAEL PENEGUY:  I don't --
18         MS. NORMAN:  It's held in trust by the
19    City of New Orleans, in trust.
20              (Inaudible comments; numerous
21    people speaking at the same time).
22         MS. NORMAN:  May I say something?
23         MR. SHERMAN:  Sure.
24         MS. NORMAN:  Because I have something I
25    feel is quite important.  I've been doing
```

Page 122

1    quite a bit of reading on the ethics of this

2    and, you know, I've written it down.  In the

3    trustee's obligation to keep trust property

4    separate from its individual and/or business

5    dealings, can the trustee engage the same

6    attorney concurrently for its personal and

7    business interests, in a suit, and utilize

8    the same attorney to represent the trust in

9    an action against the same defendant, and if

10   allowed, whose written -- and in Louisiana,

11   you need written permission -- whose

12   permission do they need.  Are they going to

13   need each and every one of our --

14       MR. MICHAEL PENEGUY:  Every one of the

15   beneficiaries.

16       MS. NORMAN:  -- committee members or

17   each and every one of our beneficiaries?  We

18   have 54 beneficiaries.  But they need

19   written consent to do that.  How -- I mean,

20   these are the ethical questions that I have.

21   And perhaps you all know more about this

22   than I do, but I know that there is an

23   obligation to keep trust property separate

24   from all other business dealings and hold it

25   in the highest regard.

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 123

1        MR. MICHAEL PENEGUY:  And it would have

2    to be a waiver from every beneficiary in the

3    future.

4        MS. NORMAN:  I believe it would.

5        MR. MICHAEL PENEGUY:  Future

6    beneficiaries.

7        MS. NORMAN:  I believe it would,

8    written permission, and it's written

9    consent, in Louisiana.

10        MR. SHERMAN:  Well, listen, look --

11        MR. MICHAEL PENEGUY:  Because any

12    beneficiary has a chance to challenge

13    anything this committee or the trustee does.

14        MS. NORMAN:  And we have 54

15    beneficiaries.

16        MR. SHERMAN:  Team, I want everyone to

17    have an opportunity to share their thoughts,

18    but I don't want to belabor it, so

19    Mr. Lorino, we look forward to your --

20        MR. LORINO:  Well, I have a question.

21    I think it's -- maybe it's similar to what

22    Dr. Gardner said, but as I listened to your

23    motion, and listening here again, what I

24    hear it saying is that we're going to

25    authorize the joint venture to represent the

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 124

1    Donation.

2         MR. SHERMAN:  That's right.

3         MR. LORINO:  Well, what -- what I'm not

4    seeing is how does the joint venture -- does

5    it have another joint venture, where the

6    joint venture becomes the joint venture with

7    the Waltzer & Wiygul firm?  It doesn't -- we

8    already have this firm appointed, so is this

9    in addition to this firm?  How is it going

10   to work is, I guess, what I'm asking.

11        MR. SHERMAN:  Yeah.  So the mayor's

12   never executed any document to retain this

13   firm, and has stated that --

14        MS. NORMAN:  Under our bylaws, we have

15   the --

16        MR. SHERMAN:  Cathy, please don't

17   interrupt me.

18        MS. NORMAN:  -- we have the power to

19   hire counsel.

20        MR. SHERMAN:  Cathy, please don't

21   interrupt me.  I'm asking you, please, to

22   not interrupt me.  I'm asking everyone not

23   to interrupt each other.  And that the mayor

24   would be authorized to sign a retainer

25   agreement.  The question was asked earlier,

Page 125

```
 1    would the mayor sign something with Waltzer

 2    & Wiygul and with these firms.  Yes, he

 3    would.  This is the compromise.  That's why

 4    it's a compromise, because he would be

 5    authorizing both firms, both groups.

 6         MR. LORINO:  I guess that's what I was

 7    asking you.  And maybe what we need is for

 8    you to, maybe again, if you could make us a

 9    copy of it, if we're going to vote on this

10    today, because that's the piece I'm missing.

11    I don't see where this resolution brings the

12    two together.  What I see of this

13    resolution, is just appointing the joint

14    venture.

15         MR. SHERMAN:  So it appoints both.

16         MR. LORINO:  Oh, it does?

17         MR. SHERMAN:  Yes.

18         MR. LORINO:  Okay.  Well, maybe I

19    missed that.

20         MR. SHERMAN:  Yeah, the Donation

21    Advisory Committee reauthorizes the mayor to

22    execute an agreement to hire the firm of

23    Waltzer & Wiygul, as counsel --

24         MR. LORINO:  Okay.

25         MR. SHERMAN:  -- in the
```

Page 126

```
 1    above-referenced matter.
 2         MR. LORINO:  Okay.
 3         MR. SHERMAN:  So, yeah, that's in
 4    there.
 5         MR. LORINO:  Okay.  I missed that.
 6         MR. WILLIAM PENEGUY:  Well, can you
 7    read the whole thing again?
 8         MR. SHERMAN:  Yeah, I'd be happy to.
 9         MR. WILLIAM PENEGUY:  The whole thing.
10         MR. SHERMAN:  The Edward Wisner
11    Donation Advisory Committee authorizes the
12    joint venture of the law firms, Herman,
13    Herman, Katz; Leger and Shaw; Fayard and
14    Honeycutt; Law Offices of Fred Herman, and
15    Domengeaux, Wright, Roy and Edwards,
16    hereinafter, the "joint venture," to
17    represent the Donation in all matters
18    arising from the BP Deepwater Horizon Oil
19    Spill.  The City of New Orleans procured the
20    joint venture through the public procurement
21    process, established by MJL 10-05.  The
22    Donation Advisory Committee authorizes the
23    mayor to execute an agreement to hire joint
24    venture as counsel in the above-referenced
25    matter.  The Donation Advisory Committee
```

Page 127

1    reauthorizes the mayor to execute an

2    agreement to hire the firm of Waltzer &

3    Wiygul, as counsel, in the above-referenced

4    matter.  Such agreement or agreements

5    referenced above shall be upon the same

6    payment terms as the Donation Advisory

7    Committee previously authorized, that is,

8    the collective cost for all legal fees shall

9    not exceed what the Donation Advisory

10   Committee previously authorized.

11       MR. WILLIAM PENEGUY:  Now, you've got

12   two motions in there, two different items.

13       MR. MICHAEL PENEGUY:  Yeah.  Right.

14       MR. WILLIAM PENEGUY:  The joint venture

15   is one and the rehiring W & W down here is

16   the second.  Now, you're authorizing the

17   mayor to do both, but it's not required of

18   the mayor to do both.  Right?

19       MR. SHERMAN:  That's not the intention.

20   I mean, you're reading into it.

21       MR. WILLIAM PENEGUY:  Yes, it is.  Yes,

22   it is.

23       MS. NORMAN:  Then it needs to be

24   rewritten.

25       MR. SHERMAN:  I'm going to ask you

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 128

 1    never --

 2          MR. WILLIAM PENEGUY:  Wait.

 3          MR. SHERMAN:  I'm asking you never to

 4    do that to me.  That's disrespectful.  I'm

 5    telling you, that's not the intention.

 6          MR. MICHAEL PENEGUY:  Basically --

 7          MR. WILLIAM PENEGUY:  You're telling us

 8    it's not the intention.  Can you write it to

 9    where it's not?

10          MR. SHERMAN:  You can express your

11    concern.  I'd be happy to --

12          MR. MICHAEL PENEGUY:  And basically the

13    mayor hadn't gone along with the vote of the

14    committee in the first place --

15          MR. WILLIAM PENEGUY:  Ever.

16          MR. MICHAEL PENEGUY:  -- so that

17    doesn't obligate him to come along with a

18    vote of the committee.

19          MS. NORMAN:  That's right.

20          MR. WILLIAM PENEGUY:  That's right.

21          MS. NORMAN:  He doesn't recognize our

22    vote on anything.

23          MR. SHERMAN:  That's not correct and

24    that's 99 percent of the time wrong.

25    99 percent of the time, all the

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 129

```
 1    beneficiaries and the mayor are in lock-
 2    step.  There's only two issues where --
 3         MR. MICHAEL PENEGUY:  I hear -- I hear
 4    one.
 5         MR. SHERMAN:  -- I've never seen this
 6    body have a disagreement on, so --
 7         MS. NORMAN:  Michael, we've asked the
 8    mayor to come and meet with us for over two
 9    years and he has never showed his face here,
10    never.  We've asked him repeatedly, and he
11    has a duty, as a trustee --
12         MR. SHERMAN:  Cathy, you --
13         MS. NORMAN:  -- to communicate with
14    this group.
15         MR. SHERMAN:  Cathy, you have called
16    the mayor corrupt at a public meeting.
17         MS. NORMAN:  I didn't --
18         MR. MICHAEL PENEGUY:  No, she didn't.
19         MS. NORMAN:  I didn't call him corrupt.
20         MR. SHERMAN:  You have absolutely
21    said that.  You have said terrible -- made
22    ad hominem attacks.
23         MR. MICHAEL PENEGUY:  No, she hasn't.
24         MR. SHERMAN:  I'm asking everyone to
25    treat each other respectfully.
```

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 130

1        MS. NORMAN:  And you're bringing

2    that -- that's -- wait a minute.  Wait a

3    minute.  I did not make a -- I just said he

4    refuses to meet with us.

5        MR. SHERMAN:  That's not all.  You said

6    a lot more at previous meetings.

7        MR. MICHAEL PENEGUY:  Mike, Mike, --

8        MS. NORMAN:  How is that a disrespect?

9    Don't bring up the past, Michael.

10       MR. SHERMAN:  I'm trying to move

11   forward.

12       MR. MICHAEL PENEGUY:  Mike, Mike --

13       MR. SHERMAN:  I'm trying to move

14   forward.

15       MS. NORMAN:  You are trying to move

16   forward?  You brought up the past.

17       MR. MICHAEL PENEGUY:  Mike, Mike --

18       MR. SHERMAN:  The City has made a

19   motion.

20       MR. MICHAEL PENEGUY:  Mike, I am the

21   one that asked the mayor, over six months of

22   meetings, to come and visit with us, so --

23       MS. NORMAN:  He won't even do it.

24       MR. MICHAEL PENEGUY:  So Cathy is not

25   saying anything against the mayor.  All

Page 131

```
 1    she's doing is stating the facts.
 2         MR. SHERMAN:  I'm talking about trying
 3    to get us on the same page.  You're talking
 4    about who had or didn't have a meeting.
 5         MR. MICHAEL PENEGUY:  No, what --
 6         MR. SHERMAN:  Go ahead, Amanda, please.
 7         MR. MICHAEL PENEGUY:  No, you're not
 8    doing what you're supposed to be doing.
 9         MS. PHILLIPS:  I have two questions.
10         MR. SHERMAN:  I disagree.
11         MS. PHILLIPS:  The first one is I'm
12    confused about the public meeting.  We
13    haven't had any public meetings, have we?
14         MR. MARK PENEGUY:  No.
15         MR. MICHAEL PENEGUY:  No.
16         MR. SHERMAN:  I'm not sure what you're
17    talking about.
18         MR. MICHAEL PENEGUY:  No, we haven't.
19         MS. PHILLIPS:  Well, when you -- the
20    statement you just made about that.
21         MS. NORMAN:  You made that -- at a
22    public meeting?
23         MR. SHERMAN:  These meetings right
24    here.
25         MS. PHILLIPS:  Okay.
```

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 132

1        MS. NORMAN:  Is this a public meeting

2    or a private meeting?

3        MR. MICHAEL PENEGUY:  This is not a

4    public meeting.

5        MR. SHERMAN:  We're not talking about

6    issues of internal governance.  You

7    absolutely -- stop, stop.

8        MS. NORMAN:  All right.  Well, you just

9    said it was a public meeting.

10        MR. SHERMAN:  Stop, everyone, stop.  I

11    have the floor now.  I will give it back to

12    you.  I have started this off today, saying

13    we have heated --

14        MS. NORMAN:  Let's call the press.

15        MR. SHERMAN:  -- internal governance

16    issues.  One of those is the nature of this

17    entity.  The City Council created us.  I've

18    told this group previously, I have concerns

19    about whether we have to follow open

20    meetings laws, public procurement policy,

21    public records laws, et cetera.  We need to

22    resolve those, and we're going to resolve

23    those.  Rather than getting into litigation

24    today, which is the second agenda item, I

25    have offered -- I have offered, on behalf of

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 133

1    the City, to approach those in a more

2    thoughtful way.

3            Counsel has given us an opinion,

4    last week, about his interpretation of the

5    public versus private and the public

6    procurement laws, which enables us to even

7    have this discussion, it was a letter, and

8    we're trying to move those issues to a more

9    thoughtful debate and discussion, more

10   thoughtful debate and discussion, and today

11   I'm not talking about public meetings.  I'm

12   not talking about public meetings today.

13       MS. PHILLIPS:  Okay.  That's not my

14   sole issue, though.

15       MR. SHERMAN:  Today we're talking about

16   Agenda Item No. 1, is do we continue to head

17   on the path or file litigation against each

18   other, public meetings, open records, public

19   procurement, et cetera.  It's Item 2, on our

20   agenda, is to file litigation, or do we

21   pursue this compromise.

22           And there's a few things that

23   probably -- if the motion passes, a few

24   things that will need to happen.  The first

25   thing is Waltzer & Wiygul and this team

Page 134

 1    would get together and they'd work out an

 2    agreement for presentation to the mayor.

 3        MS. PHILLIPS:  May I ask my second

 4    question?

 5        MR. SHERMAN:  We'll go around the

 6    table.  Dr. Williams.  We'll go around the

 7    table.

 8        DR. WILLIAMS:  I just want to go back

 9    to our partnership, once again.

10        MR. SHERMAN:  Yeah.

11        DR. WILLIAMS:  There was a question

12    that was raised that concerns me.  If I

13    understand the -- I don't know the

14    gentleman's name right there.

15        MR. SHERMAN:  Soren Gisleson.

16        DR. WILLIAMS:  The question was raised

17    about who has advantage of information, and

18    I heard someone say that the City's

19    attorneys would have all access to our

20    information, from these guys, but we have no

21    access to your information.  I mean, why is

22    that?

23        MR. SHERMAN:  So they already do, by

24    the way.  The City attorneys already have

25    access to the Wisner Donation things.

Page 135

```
 1        MR. MICHAEL PENEGUY:  Wait.  And he
 2   asked a question of this man and then you --
 3        MR. SHERMAN:  But they already do, sir.
 4        MR. MICHAEL PENEGUY:  Wait.  You're not
 5   the one that --
 6        MR. SHERMAN:  Because the property was
 7   donated to the City, the mayor, as trustee,
 8   is entitled to every bit of information --
 9        MR. MICHAEL PENEGUY:  Mr. Chairman.
10        MR. SHERMAN:  -- as trustee.
11        MR. MICHAEL PENEGUY:  Mr. Chairman.
12        MR. SHERMAN:  So the City Attorney's
13   Office is the mayor's legal attorneys, under
14   the Home Rule Charter, so the City
15   Attorney's Office already has access to
16   absolutely everything.  They're the
17   repository for all of our City files, on
18   Wisner, so, in essence, they already do.
19        MS. PHILLIPS:  That wasn't his
20   question.  His question was asking about the
21   joint venture representing the City.
22        DR. GARDNER:  Dr. Williams, what I'm
23   hearing, and you obviously speak well for
24   yourself, but what I'm hearing inherent in
25   that, Mike, is that there's not a question
```

Page 136

```
 1    about the City's access, but is there a
 2    prohibition to have the reverse, where it is
 3    the same equal access and awareness for the
 4    Donation.
 5         MR. WRIGHT:  If I can address your
 6    concerns.
 7         MR. SHERMAN:  Sure.  Thank you, Bob.
 8         MR. WRIGHT:  This is not unusual at
 9    all.  The issue is, attorneys have a -- the
10    client has a privilege that he asserts,
11    privilege of confidentiality, and the
12    attorney is not allowed to produce
13    confidential information unless allowed to,
14    to other people.  So when they -- when an
15    attorney represents multiple partners, his
16    obligation is to keep confidential from
17    other parties the information that, you
18    know, with respect to that party.
19              If an attorney represents the
20    trust and he represents private parties, he
21    can't let the other parties he represents
22    know the information he has about the trust.
23              Likewise, with respect to private
24    parties, shrimpers, seafood processors,
25    other landowners, he can't let you know what
```

Page 137

1  he knows about them with respect to an

2  independent claim by the City, and is

3  independent.  It's the same thing.  It's not

4  any different than any other case.

5      MS. NORMAN:  Well, I know.  Then how

6  come BP is getting our --

7      MR. LEGER:  It doesn't produce a

8  conflict of interest.

9      MS. NORMAN:  -- information from the

10 Herman -- from Stephen Herman?  This is my

11 point.  Stephen Herman conveyed our

12 confidential information a month ago --

13     MR. WRIGHT:  I'm not aware of that.

14     MS. NORMAN:  -- to BP.  I have the

15 email.

16     MR. WRIGHT:  I'm not aware of that.

17     MS. NORMAN:  When we -- in Executive

18 Session --

19     MR. WRIGHT:  That's a different issue.

20     MS. NORMAN:  -- we decide that we want

21 to file suit -- I mean, file with the global

22 settlement.  The very next day, an email is

23 copied to Robert Wiygul, saying that the

24 Wisner -- from Steve Herman, with copies to

25 two members, in-house counsels for BP,

Page 138

1    Holstein and Chris Esbrook, saying that this

2    is what was our plan.

3        MR. SHERMAN:  No.

4        MS. NORMAN:  And how that information

5    got obviously through the City of New

6    Orleans to Steve Herman and was disseminated

7    to the defendants' counsel, in this matter,

8    is beyond me.

9        MR. SHERMAN:  This is very simple.

10       MS. NORMAN:  It's not simple.

11       MR. SHERMAN:  This is very simple.

12       MS. NORMAN:  It's a breach of trust.

13       MR. CALVIN FAYARD:  Yeah, I understand.

14       MR. WRIGHT:  That answers both of your

15   questions, but doesn't attempt to address

16   what Ms. Norman's raising and I can

17   understand her concern there.  I don't

18   understand what transpired there.  But it is

19   not unusual, just like a doctor who has all

20   his patients, --

21       MR. CALVIN FAYARD:  Yeah, 10 patients.

22       MR. WRIGHT:  -- you don't share, you

23   know, multiple aspects.  But -- and then the

24   real issue is, as Ms. Norman raised before,

25   how do you know we're not going to use

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 139

1     information we have here to gain -- well,

2     because we have a license that is heavily

3     regulated, much more than a lot of other

4     professions, and that would be highly

5     unethical to use private information.

6         MS. NORMAN:  And that's why you would

7     need permission from everyone on this

8     committee to concurrently represent.  You

9     would need express written permission from

10    everyone.

11        MR. WRIGHT:  I'm not so sure that

12    that's correct, as a matter of law.  Maybe

13    it may be, but you don't need permission in

14    all these things.

15        MR. WIYGUL:  There's ethics and there's

16    trust law, right?

17        MR. MICHAEL PENEGUY:  Right.

18        MS. NORMAN:  Yes.

19        MR. WIYGUL:  Is that right, Jim?

20        MR. BURTON:  Yeah, yeah.  Right.

21        MR. WIYGUL:  There's ethics and then

22    there's trust law.  I mean, I think that we

23    have two separate issues.

24        MR. WRIGHT:  But that might be true,

25    and no offense, you know, to your other --

Page 140

1    to your counsel.  That may be true with

2    respect to other clients they have, also, if

3    you take that position, that you need to get

4    a better fit for them around even other

5    clients.  And that's why I don't think

6    that's totally accurate.  But if you would

7    suggest so, I think we can --

8         MS. NORMAN:  There are other clients,

9    like the trustee of this trust.

10        MR. WRIGHT:  I'm sure of that.  There a

11   lot of distinctions.

12        MR. SHERMAN:  We're going to recognize

13   you.  We're going to recognize Mr. Burton.

14        MR. BURTON:  Mike, you -- part of what

15   we did, when you stated the City's position

16   as to the public aspects of this entity --

17        MR. SHERMAN:  Sure.

18        MR. BURTON:  -- and you had asked us

19   for an opinion, in our role as counsel to

20   the Advisory Committee, and we've functioned

21   in that role for years, and we get -- I

22   showed you an opinion last week, which

23   actually I didn't email, which I will give

24   you copies of that opinion.

25        MR. SHERMAN:  Okay.

Page 141

1        MR. BURTON:  It's a very short opinion.

2    But it has always been our view that this is

3    a private entity, and that the supervision,

4    direction and administration of the trust is

5    by the Advisory Committee, which was part of

6    the Compromise Agreement of 1929, the

7    Judgment of 1930, and then Ordinance 12883

8    from 1931, and then you have the bylaws, and

9    that a further inquiry was passed on to me

10   informally, but taken on itself, just as to

11   the duties of the trustee, and the second

12   one, which I wouldn't even really call an

13   opinion, just builds on the first one that I

14   showed you a little bit ago as to why it's

15   our view that this is -- you know, this

16   entity, which is a hybrid sui generis entity

17   with five beneficiaries, two of whom are

18   governmental entities, two of whom are

19   private, 501(c)(3) type entities, have a

20   whole bunch of beneficiaries.  One group is

21   completely private, the Wisner heirs.

22        But even within that group, you

23   have Associated Catholic Charities and

24   St. Joseph's Church, which have been taken,

25   by assignment or inheritance, from some of

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 142

1    the private beneficiaries.  So I -- that has

2    been our view.

3              Also, the only other clarifying

4    point I'd like to make is, when you talked

5    about us drafting a petition, that was when

6    we -- when looking at the possibility of

7    trying to have an application for

8    instructions to the trustee -- which, you

9    know, it may not be a moot point, or

10   depending on how -- who knows what the

11   future holds -- but we drafted what we

12   drafted at the request of this committee,

13   you know, by resolution of this committee,

14   and that was one of the drafts that was

15   circulated.  It wasn't drawn up for any

16   other purpose other than that.

17             But let me go ahead, and I will

18   pass out to the committee, as a whole, and

19   then to the five beneficiaries, these two

20   opinions for you to read.

21        MR. SHERMAN:  Very good.  Are there any

22   other comments?

23        MR. MARK PENEGUY:  Yes.  I would

24   appreciate it if you would only state

25   something; you don't misrepresent it, as you

Page 143

1    did with the Donation.  The Donation was

2    made in 1914, to the City of New Orleans, as

3    trustee, for the benefit of these charities,

4    that include the ones that are sitting here

5    today, but it was amended by the lawsuit

6    that came in 1928, the Compromise Agreement

7    in 1929, the Judgment in 1930, and the

8    Ordinance of 1931, and that took away any

9    right for the mayor to act unilaterally or

10   only on his opinion --

11       MR. SHERMAN:  Completely disagree, but

12   that's okay.

13       MR. MARK PENEGUY:  But what annoys me

14   is that you continue to misrepresent facts.

15   You've done it with Waltzer & Wiygul.

16   You've done it with me, you've done it with

17   Cathy, you've done it with everybody.  I

18   don't want to hear it any more.  Stop

19   misrepresenting it.  Be honest with us.

20       MR. SHERMAN:  Sir, I'm the chair of the

21   committee.

22       MR. MARK PENEGUY:  I know you're the

23   chair.

24       MR. SHERMAN:  I can't -- I can't help

25   the fact that I'm the chair.  You're going

Page 144

 1    to have to -- you're going to have to listen
 2    to me, as the chair.
 3         MR. MARK PENEGUY:  Then don't
 4    misrepresent.  That's all I'm --
 5         MR. SHERMAN:  I'm going to state the
 6    truth every time.
 7         MR. MARK PENEGUY:  If you know better,
 8    don't misrepresent it.
 9         MR. SHERMAN:  Please, stop, stop.  I'm
10    not -- I don't appreciate attacks against
11    me.
12         MR. MARK PENEGUY:  I know you don't.
13         MR. SHERMAN:  I really don't appreciate
14    attacks against me.
15         MR. MARK PENEGUY:  We know.  You call
16    and tell on people.  Go on.
17         MR. SHERMAN:  I really don't appreciate
18    attacks against me.
19         MR. MARK PENEGUY:  We know.  We know.
20         MR. SHERMAN:  I want to keep this
21    discussion professional, I want to keep it
22    forward looking and I want to keep it with
23    the intent of resolving our issues.  We all
24    know we can file litigation, and there's
25    lots of issues we could file on.

Page 145

 1          MR. MARK PENEGUY:  And that's the other
 2     one you are misrepresenting.  This
 3     litigation on the rights of the
 4     beneficiaries to proceed is not --
 5          MR. SHERMAN:  We can file litigation on
 6     lots of issues.
 7          MR. MARK PENEGUY:  -- fighting against
 8     one another.
 9          MR. SHERMAN:  The motion I --
10          MR. MARK PENEGUY:  It is adjoining --
11          MR. SHERMAN:  You can't even show me
12     the respect of listening to me speak.  You
13     can't even show me the respect of listening.
14          MR. MARK PENEGUY:  This is a nightmare.
15          MR. SHERMAN:  I am requesting you show
16     me the respect, and I will give you that
17     same respect, as I have the whole meeting,
18     of listening to you speak when you have the
19     floor.  Thank you.
20                We all know we could litigate this
21     thing.  That's No. 2 on our agenda.  What
22     I'm proposing is a motion that would give
23     the mayor authorization, and I would try to
24     get these two great groups together and
25     hopefully resolve this issue and put the

Page 146

1   Wisner Donation Advisory Committee and the

2   Donation in the best possible position,

3   period, at no additional cost.

4        MR. WALTZER:   May I address the

5   question?

6        MR. SHERMAN:   Please, Joel.

7        MR. WALTZER:   We're dancing around

8   here.

9        MR. MICHAEL PENEGUY:   Right.

10       MR. WALTZER:   And as a practical

11  matter, we've offered and will certainly do

12  and always will do -- we are zealous

13  advocates and we will do whatever is in the

14  best interest of the Donation at all times.

15            We have worked together already

16  with the group of lawyers that you guys

17  have -- that the City has chosen to hire as

18  a team.   It's what is the formality you

19  change, is the real question, you know,

20  because, again, we're all agreeing, we can

21  work together.   We could leave here with no

22  change and work together to accomplish the

23  best -- the best result for the Donation.

24            The difference is that whoever has

25  hired this lawyer has the authority to bind

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 147

```
 1    this client, and that would mean that the
 2    group of New Orleans lawyers would have the
 3    authority to bind the Wisner Donation to a
 4    settlement agreement, if that's what it
 5    chose to do.  We could be left out of that
 6    process entirely.  There would be no legal
 7    impediment to doing so, and that's not --
 8    we're not going to be left out of the
 9    negotiations with BP.
10        MR. WIYGUL:  Well, I think you laid it
11    out good, is that the City obviously has its
12    multiple other claims that it's going to be
13    negotiating, which we would not be aware of.
14    We would not be aware of those negotiations.
15    So, I think, in that situation, it would be
16    very difficult for us to carry out the job
17    that we're required to do for the Donation
18    and the beneficiaries.
19            And, Mike, I don't think there's
20    any reason to be coy about it.  As I
21    understand it, what you're saying is the
22    City would agree that the Advisory Committee
23    can have us as attorneys for the Donation,
24    if the Advisory Committee agrees that the
25    trustee's attorneys will also represent the
```

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 148

 1    Donation.  So in the end is, as I put it, I

 2    like these firms' lawyers, right.  Then as I

 3    understand it, is that the trustee's

 4    attorneys be brought in to represent the

 5    beneficiaries and the Donation.

 6         MR. MICHAEL PENEGUY:  And I would --

 7         MR. WIYGUL:  Do I understand that

 8    correctly?  So I think we shouldn't be coy

 9    about it.

10         MR. MICHAEL PENEGUY:  I would think

11    these attorneys deserve the --

12         MR. SHERMAN:  Yeah.  So I appreciate

13    the directness that you've approached this

14    with.  I think, at least I'm trying to be as

15    direct as humanly possible by re-reading

16    that motion several times.  The City has

17    gone through a public procurement and has

18    selected someone, okay.

19              The Donation Advisory Committee

20    procured Waltzer & Wiygul, and when that

21    retainer agreement was submitted to the

22    trustee, he said, "No."  We have an impasse.

23              What I'm proposing, through this

24    motion, is a way for everyone at this table

25    to feel well represented by counsel, to get

1    the mayor, as trustee, and the Donation

2    Advisory Committee, the majority of it --

3    we've not going to get unanimity, I can see,

4    from the opinions, on the exact same page.

5           If the Donation Advisory Committee

6    and the mayor are on the same page, issue

7    done; we know who represents the Donation;

8    BP knows who represents the Donation and we

9    can move forward. If not, the path we're

10   going down is litigation on a whole bunch of

11   issues, the role of the trustee, the role of

12   the Donation Advisory Committee, the 1929

13   Settlement, the City Ordinance, you know,

14   legal opinions, role of the

15   Secretary-Treasurer. We're going to be

16   going down all those issues and that will be

17   months of litigation. It will be months of

18   litigation. It could be years of

19   litigation.

20          We need to confront those issues.

21   The choice before the committee today, the

22   choice before the committee today is a

23   simple one, I think. A, in the midst of

24   this critical time in the Donation's

25   history, the BP claim, we go down the legal

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 150

1    path and we start filing litigation.   Or, B,

2    at no single additional cost to the

3    Donation, we get Waltzer & Wiygul and the

4    joint venture publicly procured by the City,

5    on the same team, and that's an all-star

6    team, so -- Amanda, you've had your hand

7    raised, and we'll go to Mr. Peneguy, then

8    Cathy.

9        MR. WILLIAM PENEGUY:   Okay.   Who would

10   be the lead counsel in your motion?

11       MR. SHERMAN:   Who would be the lead

12   counsel?

13       MR. WILLIAM PENEGUY:   Yeah.   Who would

14   be the lead counsel in your motion?

15       MR. SHERMAN:   My motion did not state a

16   lead counsel.

17       MR. WILLIAM PENEGUY:   No, but who are

18   you -- who would you want to be your lead

19   counsel?

20       MR. SHERMAN:   I mean, I would present

21   that issue to the trustee.

22       MR. WILLIAM PENEGUY:   There you go.

23       MR. SHERMAN:   My motion didn't include

24   that.

25       MR. MICHAEL PENEGUY:   Right.

Page 151

```
 1        MR. WILLIAM PENEGUY:  It's his

 2   decision.

 3        MS. PHILLIPS:  All right.  So the

 4   options -- so what you just said the options

 5   are, the committee votes to approve your

 6   motion and have the joint venture, or we're

 7   going -- if they vote to -- against your

 8   motion, what, we're going to litigation?

 9        MR. SHERMAN:  No, no, that's --

10        MS. PHILLIPS:  Okay.  So what is --

11        MR. SHERMAN:  So let me --

12        MS. PHILLIPS:  What's --

13        MR. SHERMAN:  Amanda, I appreciate your

14   asking that question.  That's a good one.

15   And, Dr. Gardner, for your benefit, we have,

16   meeting after meeting, for many months tried

17   to resolve this.  I do want to note, for

18   your benefit, sir, the very, very first

19   suggestion the mayor had was, "Listen, the

20   Donation Advisory thinks they have some

21   authority.  I think I have some authority.

22   My City attorneys tell me I have some

23   authority.  Why don't we collectively agree

24   upon a law firm that" --

25        MR. MICHAEL PENEGUY:  No, that's not --
```

Page 152

1       MR. SHERMAN:  That -- please, I'm

2   asking for the respect to finish this.

3       MR. MICHAEL PENEGUY:  Well, I'm just

4   trying to --

5       MS. NORMAN:  That was never presented

6   to us.

7       MR. SHERMAN:  -- to get an opinion.  A

8   firm that we all agree upon.  And let's all

9   agree that whatever that opinion says about

10  authority, we'll follow, at least to resolve

11  this matter.  So that was turned down.  We

12  couldn't agree upon, the five beneficiaries,

13  a law firm.  Secondly, offered potentially a

14  quick new procurement, where we open it up

15  and select collectively.  That was turned

16  down.

17          So I'm trying to brainstorm.  All

18  I've heard from the folks who are advocating

19  for Waltzer & Wiygul, as the sole counsel,

20  without any additional counsel, is, "Mayor,

21  sign Waltzer & Wiygul."  That's all I've

22  heard.  This is my third brainstorm, my

23  third one, trying to get a resolution.  I

24  wish in an extra few days or a week, we

25  could think of something else.  I would love

Page 153

1    that.  I think this motion gets us on the

2    path to clear authority to the mayor and the

3    Donation Advisory Committee being on the

4    same page.

5          And, Amanda, to answer your

6    question, Item 2 on our agenda is filing

7    litigation.  We'll talk about that in a few

8    minutes after we handle my motion.  So

9    there's a potential that we could authorize

10   filing litigation today.  Members of --

11   Mr. Peneguy suggested that the Peneguy

12   family might sue without --

13        MR. MICHAEL PENEGUY:  No.

14        MR. SHERMAN:  -- the Donation Advisory

15   Committee's --

16        MR. MICHAEL PENEGUY:  No, I didn't

17   suggest any such thing.  I haven't suggested

18   anything.

19        MR. SHERMAN:  Okay.  When you took -- I

20   apologize.  When you told me, "We're going

21   to sue," I thought that meant you were going

22   to sue.

23        MR. MICHAEL PENEGUY:  I didn't ask

24   that.

25        MR. SHERMAN:  I apologize if I

Page 154

1  misunderstood what you communicated to me.

2      MR. MICHAEL PENEGUY:  I did not say --

3  I never said we were going to sue, period.

4      MR. SHERMAN:  And, again, I apologize.

5  If, by saying that, you were saying

6  something in anger or slang or --

7      MR. MICHAEL PENEGUY:  No, I was not

8  saying that.

9      MR. SHERMAN:  -- out of context, I took

10  that to mean you were going to sue and I'd

11  report that back to the City.

12      MR. MICHAEL PENEGUY:  I never made that

13  statement, period.  Period.

14      MS. NORMAN:  May I say --

15      MR. SHERMAN:  I appreciate it.  So,

16  Amanda, to answer your question.

17      MS. PHILLIPS:  Yeah, because I'm having

18  a blonde moment.

19      MR. SHERMAN:  No, no.  I appreciate the

20  question.

21      MS. NORMAN:  Well, I really have

22  something important that I want to say, as

23  well.

24      MR. SHERMAN:  But I have brainstormed

25  an idea to get us on the same page.  I think

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 155

1    it works.  I think it makes no one fully

2    satisfied, but I think it works to get

3    everyone on the same page.

4         MR. MICHAEL PENEGUY:  I would like --

5         MR. SHERMAN:  I fully admit, Amanda --

6    I want to say this.  I'll fully admit it.

7         MS. NORMAN:  I would like to say

8    something.

9         MR. SHERMAN:  My motion does not make

10   the Peneguy family happy, it's not going to

11   make Cathy happy; I fully admit that.  I

12   also admit my motion doesn't get the City to

13   where we thought we should have been,

14   through a public procurement process.  My

15   motion doesn't make anyone completely

16   happy.  It's a compromise of sorts within

17   the confines of the law, as outlined by

18   counsel --

19        MS. NORMAN:  The law?

20        MR. WILLIAM PENEGUY:  It doesn't make a

21   fair deal.

22        MR. SHERMAN:  -- of what we can do, and

23   if it doesn't happen and there have been no

24   other ideas that I think work, litigation's

25   the only other thing which I think could

Page 156

 1    move it forward.

 2         MS. NORMAN:  Okay.  Right, whatever.

 3         MR. SHERMAN:  So it's not one or the

 4    other.  I just don't see any other

 5    solutions.

 6         MS. NORMAN:  Mike, Mike, let me --

 7         MR. SHERMAN:  Cathy, we're going to

 8    acknowledge you.

 9         MS. NORMAN:  I do have quite a bit to

10    say.

11         MR. SHERMAN:  Please.

12         MS. NORMAN:  No. 1, Mr. Sherman has

13    been involved with Wisner for six months,

14    okay.  He is a self-proclaimed expert at

15    this point apparently on how we're supposed

16    to be run, what we're supposed to be doing.

17         MR. SHERMAN:  Please, Cathy, I would

18    ask you to not make attacks on me, please.

19         MS. NORMAN:  I am -- I have been

20    working for this committee and have been an

21    officer of this committee for 20 years.  In

22    front of me, I'm reading the bylaws of this

23    committee, which is one of the governing

24    documents of this committee, along with the

25    initial trust documents and the legal

Page 157

```
 1    documents that resulted from litigation in
 2    the twenties, as well as the City Charter.
 3              Bylaws.  The committee's functions
 4    include -- and it goes through election,
 5    appointment of officers, blah, blah, blah,
 6    blah, blah, blah.
 7              E, the contracting of attorneys,
 8    consulting engineers, geologists, surveyors,
 9    appraisers, auditors and other
10    professionals, as assisted, to assist in the
11    exploitation, development and preservation
12    of the Donation properties, or in the
13    evaluation of lease and mineral income
14    therefrom, so -- the providing of advice and
15    consent of the mayor of the City of New
16    Orleans.  So these are our bylaws.  They
17    were signed by the trustee.  These bylaws,
18    we took two years creating, with this firm,
19    and they were signed by the trustee.
20         MR. MICHAEL PENEGUY:  And it basically
21    says that we're also responsible for the
22    other --
23         MS. NORMAN:  And may I say, we have
24    sued in Federal Court before.  We procured
25    our own attorneys.  We settled -- we've been
```

Page 158

1    in court numerous times over the past 20

2    years, and we have never, ever been faced

3    with this situation, ever, ever, until this

4    administration came in.  I am on my fourth

5    mayor.  I was hired in the Bartholomew

6    administration and I'm probably, other than

7    Mr. Peneguy, the only -- Messrs. Peneguy --

8    the only person in this room, and

9    Mr. Burton, who's been here for 15 years, ·

10   who has knowledge on how this committee

11   operates, for the benefit of all of the

12   beneficiaries, including the citizens of the

13   City of New Orleans who receive grants from

14   the money created by this property.

15          And that's what I have to say,

16   that this is -- what is happening now is so

17   far off the radar on the way we have

18   operated during the 20 years of my tenure,

19   and probably 30 or 40 years before that,

20   that it is unbelievable.

21       MR. MARK PENEGUY:  We've only had one

22   problem like this during the Bartholomew

23   administration, only one.

24       MR. MICHAEL PENEGUY:  There was one

25   with Dutch Morial.

Page 159

1        MR. MARK PENEGUY:  Dutch Morial.

2        MR. WALTZER:  I just want to be very,

3    very, very crystal clear.  There's already

4    been communications between your proposed

5    counsel and BP, outside of our presence, and

6    without our consent, and we are not going to

7    do that.  We're not going to be your lawyers

8    if that's what it's going to be.

9        MR. MICHAEL PENEGUY:  I would -- I

10   would say we need to --

11       MR. WALTZER:  I mean, you can choose

12   this --

13       MR. MICHAEL PENEGUY:  -- vote on this

14   motion --

15       MR. SHERMAN:  Okay.

16       MR. MICHAEL PENEGUY:  -- and go onto

17   the next item.

18       MR. SHERMAN:  I appreciate it.  So I

19   will -- Dr. Gardner.

20       DR. GARDNER:  Before calling the

21   question, it says, discussion of proposed

22   compromise.  Is anyone against the

23   possibility of a compromise of some sort, no

24   matter what form that might take?

25       MR. MICHAEL PENEGUY:  Yes.

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 160

1        DR. GARDNER:   Out of hand?

2        MR. MICHAEL PENEGUY:   Yes, because

3    basically he's -- what's happened here is

4    essentially we have an attorney for us

5    that's been working for a long time, and

6    here comes another attorney firm.   I don't

7    know whether y'all see the same point that

8    Robert brought out, that there is a big

9    conflict here, but essentially to come to a

10   compromise at this point essentially tells

11   Robert and Joel -- especially, you know,

12   when you're talking about sharing their

13   contingency -- it tells Robert and Joel that

14   this committee is going to change their

15   contract --

16       MR. MARK PENEGUY:   There's a breach of

17   contract.

18       MR. MICHAEL PENEGUY:   -- and there's a

19   breach of contract, and that's my concern on

20   any of this is essentially keeping this

21   committee from breaking promises and

22   breaking contracts.   Because once you break

23   the contract, all hell starts breaking loose

24   with all the leases and everything else we

25   have.

Page 161

1        DR. GARDNER:  They could sue us.

2        MR. MICHAEL PENEGUY:  Right.

3        MS. NORMAN:  I have another compromise.

4   Another compromise is that every month I

5   collect the revenue from the Edward Wisner

6   Donation.  It comes to our offices.  If this

7   case were settled, the check would be made

8   out, would go into our bank account, which

9   is separate from the City; there are no

10  public funds involved in our office

11  whatsoever.  We take our operating

12  expenses --

13       MR. SHERMAN:  I disagree, by the way.

14       MS. NORMAN:  What -- what public funds

15  are there?

16       MR. SHERMAN:  We're not going to have

17  internal governance discussions today.

18       MS. NORMAN:  There are -- we have no

19  public money that comes into our office.

20       MR. MICHAEL PENEGUY:  Right.

21       MS. NORMAN:  We are a trust.  The money

22  comes in.  We take our operating expenses

23  off the top and then the money is

24  distributed on a monthly basis to the

25  beneficiaries, including the City of New

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 162

1   Orleans, who, last month, I wrote a check

2   for $125,000 for. And Charity Hospital,

3   Salvation Army, Tulane University.

4           Perhaps the compromise should be

5   that after we give the City their share of

6   the money, they can pay their attorneys, out

7   of their share. How about that? They can

8   engage them. They can work with them and

9   then we'll pay the City their share of the

10  money, their 34.8 percent, and then they can

11  pay them, out of their share of the money,

12  instead of us paying them out of everyone --

13  every other beneficiary's pocket.

14      MR. MARK PENEGUY: It still doesn't

15  solve the problem that Waltzer & Wiygul,

16  should have them as part of this compromise.

17      MS. NORMAN: That's correct.

18      MR. MARK PENEGUY: And the breaches of

19  confidentiality, we already know took place.

20      MS. NORMAN: Right. I agree.

21      MR. MARK PENEGUY: This is a bad deal

22  all the way around.

23      MR. SHERMAN: I would say this, and I

24  want to thank Mr. Peneguy for your honesty.

25  That was a tough thing to say. I want to

Page 163

1  thank you for it.  I think you made it

2  clear, there is no compromise, in your mind.

3      MR. MICHAEL PENEGUY:  Yeah.

4      MR. SHERMAN:  Okay.

5      MR. MICHAEL PENEGUY:  No compromise on

6  this issue.

7      MR. SHERMAN:  Got it.  Thank you for

8  saying that.  I think that's important, and

9  I would say this.  This is not the City's

10  desired outcome.  This is a compromise.

11  This is a compromise.  This puts us in the

12  best possible position on this very

13  important claim to the City, to LSU, to

14  Tulane, to the Salvation Army and to the

15  family.  And all this does is give the

16  authorization to the mayor.  And if there

17  was a hope for compromise, I would say,

18  "Let's try to compromise."  Let's continue

19  the discussion, Mr. Peneguy, let's stay here

20  all night until we find the compromise.

21          But you have made it very clear,

22  there is no compromise, in your mind, which

23  is why I think we need to move forward with

24  this today.  If it works, great.  If it

25  doesn't, we can be back here next week and

Page 164

1    continue the discussion for other

2    alternatives.  Dr. Gardner, can I yield to

3    you, sir?

4         DR. GARDNER:  Yeah.  And I'm glad you

5    said that last thing there of -- because

6    I'm -- in terms of energy on these issues,

7    I'm probably fresher than you all because

8    you've been struggling with it for a long

9    time, even though I don't feel like I'm

10   fresh, energy-wise.

11        I was hoping to -- and am hoping

12   to lend my shoulder and efforts to the

13   wheel, in a concerted effort, for the good

14   of the Donation, and therefore, the City.  I

15   am, to the extent that I am fit, was fully

16   geared up to unleash all my energies towards

17   BP and anybody else that might have an issue

18   with what we're trying to do.

19        MR. SHERMAN:  Yeah.

20        DR. GARDNER:  It bothers me that, in

21   getting out of the blocks, it appears that

22   there's -- that we are, in the sense, sort

23   of gnawing, or appear to be -- I'm just

24   being candid here --

25        MR. SHERMAN:  Yeah.

Page 165

1    DR. GARDNER:  -- on our own limbs, so

2    to speak, and that can't be good for the

3    Donation, for the mayor, and for LSU,

4    Tulane.  It just can't be.

5         And I'm hoping, Mike, that --

6    since one way or the other, whether we take

7    a vote or not, that we're back in a week or

8    two.  And I'm committed that, if folk want

9    to meet at 2:00 o'clock in the morning under

10   an oak tree in Audubon Park, I'll be there.

11   Just give me a little lead time and I'll be

12   there.

13        And I would expect that the

14   mayor's view of success, too, must include

15   that we arrive at something that accrues to

16   his challenge, as trustee for this, as well

17   as mayor of the City of New Orleans, and so,

18   you know, I'm -- I'm ready to come back

19   again and again and again, even though I

20   know this has been vetted repeatedly.  Some

21   things just -- just take more time.  I'm --

22   I am -- I'm hoping we can maybe -- if no

23   one, if no more than selfishly for me, --

24   MR. SHERMAN:  Yeah.

25   DR. GARDNER:  -- take a breath on this.

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 166

1    Dr. Williams, you know, you -- I see why you

2    were so quick to say, "Yeah, Ron, go ahead."

3         MR. MICHAEL PENEGUY:  You had a dirty

4    trick coming.

5         DR. GARDNER:  Yeah.

6         MR. SHERMAN:  Could I ask -- could I

7    ask this?

8         DR. GARDNER:  Yeah.

9         MR. SHERMAN:  Let's set a meeting to

10   come back in a week, if that would help.

11   What I would ask is -- I mean, I will put

12   whatever necessary amendments onto my

13   motion.  I'd like to give this a chance.

14   I'd like to give Waltzer & Wiygul the chance

15   to sit with these folks.  I'd like to give

16   that a chance.  And if they can come to an

17   agreement, I think the issue's solved.  If

18   they can't, we'll be back here in a week to

19   discuss.

20        DR. GARDNER:  I would love that.  And

21   how people budget or husband that time with

22   the lawyers, the Donation, us, as a

23   committee, I think we ought to use those --

24   budget those moments in a week's time that's

25   very quick, to --

Page 167

```
 1        MR. SHERMAN:  And let me say this.
 2        MR. MICHAEL PENEGUY:  Along those
 3   lines, --
 4        MR. SHERMAN:  I would add onto my
 5   motion, in the interest to bring everyone
 6   together, that the firms would have to come
 7   to an agreement amongst themselves.
 8        MR. MICHAEL PENEGUY:  No.
 9        MR. SHERMAN:  I think that satisfies
10   Mr. Lorino.
11        MR. MICHAEL PENEGUY:  No, that's not
12   the way to do things.
13        MR. SHERMAN:  Hang on, sir.  Just give
14   it a try.
15        MR. MICHAEL PENEGUY:  That's not the
16   way to do things, if they don't come to
17   agreement.
18        MR. SHERMAN:  If the firms -- we'll set
19   a meeting back for one or two weeks or
20   whenever we need to.  I would propose my
21   motion with an addition to it, that if the
22   firms are unable to come to an agreement
23   amongst themselves, we would be back here.
24             So if this works, that means
25   Waltzer & Wiygul has been satisfied that
```

Page 168

```
 1   this agreement satisfies them, we get the

 2   benefit of both groups.  If it doesn't,

 3   we're back here in a week or two anyway and

 4   we'll figure out an alternate strategy,

 5   but --

 6       MR. WIYGUL:  Well, Mike, what I would

 7   recommend that you do is instruct us to talk

 8   to our colleagues.  If that's what you want,

 9   I think that's going to be your most

10   productive path.

11       MR. MARK PENEGUY:  That's different

12   than what he wants.

13       MR. WIYGUL:  I understand that.

14       MR. SHERMAN:  It is.

15       MR. WIYGUL:  It's going to get it done.

16       MR. SHERMAN:  We keep pushing this off

17   and I want to start bringing some resolution

18   to this.

19       MR. MICHAEL PENEGUY:  Well, Mike --

20       MR. SHERMAN:  This motion -- I'll tell

21   you about the amendment to the motion.

22       MR. MICHAEL PENEGUY:  Well, Mike, if

23   you're going to put --

24       MR. SHERMAN:  This -- I'm going to give

25   you the floor next.  I'm going to give you
```

Page 169

```
 1    the floor next.  You get the full floor.  If
 2    this motion works, the mayor and the
 3    Donation Advisory Committee, for the first
 4    time, on this issue, are on the same page.
 5         MR. MICHAEL PENEGUY:  Well, that --
 6         MR. SHERMAN:  If it doesn't, we're back
 7    here in a week or two anyway.
 8         DR. GARDNER:  And that's what I want
 9    to --
10         MR. MICHAEL PENEGUY:  I would say --
11         DR. GARDNER:  I'm sorry, Mr. Peneguy.
12         MR. MICHAEL PENEGUY:  Okay.  I would
13    say, if you want to have another meeting,
14    the proper way to have another meeting is
15    what Robert said, let them talk to your
16    counsel, and then call another meeting, but
17    don't put it in the way of a motion, because
18    basically what you're trying to get in that
19    motion is not what we can really vote on,
20    because we can't commit them to do anything
21    other than talk.
22         MR. SHERMAN:  I think a motion is
23    necessary.  I really -- Dr. Gardner, you
24    wanted to say something?  I do really think
25    a motion's necessary.
```

Page 170

1        DR. GARDNER:  Yeah.  Yeah.  I don't

2    mind moving that the two firms get together

3    and talk and then we know what we're about

4    here.  Not that you can have them decide and

5    want to talk to one another.  That you

6    specifically get together and talk and come

7    back in a week or two, when we sit down,

8    with, you know, the product of those talks.

9    Or lack thereof of a product.

10       MR. MARK PENEGUY:  And what happens --

11       DR. GARDNER:  And I think that's going

12   to -- I'm sorry?  Yes, sir.

13       MR. MARK PENEGUY:  What happens if

14   there's a lack thereof?  I'm sorry to

15   interrupt you.  But if they feel, as they

16   have made clear here today, that they should

17   be the sole Wisner Donation counsel, that

18   they will happily work with the other

19   counsel to jointly benefit the Wisner

20   Donation, but they -- I don't want to speak

21   for them.  I don't think they ever suggested

22   here that they want to insert these

23   attorneys, or any other attorneys, into

24   their contract, which is what the mayor is

25   asking us to do, is to breach their

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 171

1    contract, insert some other lawyers in, and

2    give a piece of their contract to other

3    lawyers, whether these ladies and gentlemen

4    or other people.

5            So if they come back and they say,

6    "We couldn't come to an agreement, but we'll

7    still work with them, toward the benefit of

8    the Donation," what purpose is this going to

9    serve?  I mean, they've made it clear where

10   they believe their best representation to

11   this Donation lies.

12       MR. MICHAEL PENEGUY:  And they've

13   also --

14       DR. WILLIAMS:  Then if they do that, we

15   could breach their contract.  They could sue

16   us.

17       MR. MARK PENEGUY:  Well, we will breach

18   their contract if we force them to take

19   other attorneys in.  That is a breach of

20   their contract and they have the right to

21   sue us.  And whether they do it or not is

22   their decision.  They know this.  It's not

23   like I'm saying something that they don't

24   already know.

25       MR. MICHAEL PENEGUY:  And I think,

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 172

1    basically, I believe that there are --

2        MS. NORMAN:  And, Dr. Gardner, just so

3    you know, at the time the spill occurred,

4    Jim Burton and Simon Peragine have been

5    representing this committee since 1995, on

6    all matters, and in other litigation, but at

7    the time the spill occurred, their firm did

8    have a conflict of interest, and that was

9    the only reason we went outside to look for

10   additional counsel, because there was a

11   conflict of interest on the part of Simon

12   Peragine.  Otherwise, they would be

13   representing us in the BP matter, because

14   they've always represented us in all our

15   legal matters.

16       MR. MICHAEL PENEGUY:  Right.

17       MR. MARK PENEGUY:  And the only reason

18   this continues to come up is because the

19   mayor hasn't gotten what he wants yet and so

20   we keep pushing it off.  We've addressed

21   this for months now, actually weeks.  It was

22   all settled when the contract was signed by

23   Cathy, with authority of the committee,

24   under our bylaws.  This has been settled for

25   two years.  It's just that the mayor has

Page 173

```
 1    kept trying to put somebody else into the

 2    contract.

 3         MS. NORMAN:  And the City attorney, at

 4    the time we decided to file suit against BP

 5    and file our petition, the City attorney,

 6    Richard Cortizas, voted to go ahead and go

 7    forward and file that petition.

 8         MR. MARK PENEGUY:  So that was 8-7.

 9         MS. NORMAN:  And I have that on tape.

10         MR. SHERMAN:  Please don't point at me.

11    I don't appreciate that.  Dr. Gardner, I

12    hate to see it coming down to you.  Last

13    week, I'm sure you know, there was a 2:2

14    vote on this very same motion.  Dr. Williams

15    abstained with the hope of getting everyone

16    here today.

17              I would simply say this.  I would

18    simply say this.  If we leave here today

19    without anything except for asking everyone

20    to talk, I don't think we've advanced the

21    discussion much and I think that anyone can

22    file suit at any time in here.  We have a

23    petition that folks could use.

24              I would like to add that caveat

25    onto my motion, that if the firms don't
```

Page 174

 1    agree, we're back here.  That way it gives

 2    comfort.  I think we give this a chance.

 3    This -- this gets -- this is the only

 4    potential that I can see right now that gets

 5    us on the same page.  If it doesn't work, I

 6    hope we all continue brainstorming, if this

 7    idea doesn't work, about what we want to do

 8    next week, or in two weeks.

 9              But I would ask this.  I'm going

10    to amend my motion, to add on, "and should

11    the two firms not agree on an arrangement,

12    between the two of them, we will come back

13    to the committee for further discussions."

14              And I say that, Dr. Gardner,

15    because if we leave today without a motion,

16    I think we are perilously close -- and this

17    was all precipitated, by the way -- we had a

18    meeting in the law department and Waltzer &

19    Wiygul sent a memo to the committee where

20    this issue was brought back up again a few

21    months ago.  We have tried unsuccessfully.

22    This is my third idea, Dr. Gardner.  I'm

23    trying everything I can.  I would hope that

24    we could give this -- give this a chance,

25    give peace a chance here.  If it doesn't

Page 175

1    work, we're back next week.

2         MR. WALTZER:  Except that we really

3    don't have an alternative.

4         MR. MICHAEL PENEGUY:  Right.

5         MR. WALTZER:  Because the only

6    alternative that's acceptable to you is for

7    us to give up our ability to be present at

8    negotiations, to guide the Wisner Donation's

9    claim.  I mean, since this is not really

10   giving a --

11        MR. SHERMAN:  Soren, could you make

12   sure, give him the comfort that we worked --

13   that he would be --

14        MR. WALTZER:  I'm sorry?  We've already

15   worked out -- and we thought we had that

16   relationship, where we would agree to work

17   together, and we would -- and they would

18   call themselves the lawyer, properly, the

19   lawyers for the City of New Orleans, and we

20   are hired by the Wisner Donation, and we'd

21   go together and work together and I'd

22   support them however they want.  They'd

23   support us however we want.  We agreed.  We

24   already agreed.  But that's -- the problem

25   is that's not what you're talking about.

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 176

1    What you're talking about is having them as

2    co-counsel.

3        MR. SHERMAN:  Co-counsel, that's

4    exactly -- that's my motion.

5        MR. WALTZER:  Which -- which we believe

6    poses a problem --

7        MS. NORMAN:  Is a conflict of interest.

8        MR. WALTZER:  -- under the -- under the

9    trust code and under -- and it poses a

10   problem -- let's be very specific.

11       MR. SHERMAN:  And if you can't resolve

12   that in the next week, you'll be back here.

13       MR. GISLESON:  For us, it poses a

14   problem for us, because we want to make

15   sure -- we've got your back.  We want to

16   make sure that we're there to get your back.

17   But if someone else has the authority, then

18   that's not going to do it.

19       MR. WRIGHT:  Is that an insurmountable

20   problem?

21       MR. MICHAEL PENEGUY:  Yes, it will be.

22       MR. MARK PENEGUY:  Wait, wait, wait.

23   They ought to be quiet, please.

24       MR. SHERMAN:  Please treat all of our

25   guests with respect.  Please, let's treat

Page 177

```
 1   everyone with respect in this room.  Okay.
 2   Mr. Wiygul and then Mr. Peneguy.
 3        MR. WIYGUL:  The way I understand your
 4   motion, as it's now proposed, it hires
 5   additional counsel --
 6        MR. SHERMAN:  It does.
 7        MR. WIYGUL:  -- for the Donation and
 8   then tells us to go off --
 9        MR. WILLIAM PENEGUY:  And go talk to
10   them.
11        MR. WIYGUL:  -- and negotiate.  I don't
12   understand that.
13        MR. SHERMAN:  It authorizes the mayor
14   to enter into the agreement.
15        MR. WILLIAM PENEGUY:  That's right.
16        MR. WIYGUL:  Right.  So you authorize
17   me to hire the --
18        MS. NORMAN:  On behalf of the Donation.
19        MR. WIYGUL:  For the Donation.  Yeah,
20   yeah, I understand.  I'm not saying anything
21   bad about these lawyers or their ethics or
22   anything else, but I'm just telling you, in
23   terms of me exercising my independent
24   judgment, if I have an entity that I'm
25   working with that, remember -- what does the
```

Page 178

```
 1   City have, 34 percent?
 2        MS. NORMAN:   34.8.
 3        MR. WIYGUL:   34.8 percent.   The
 4   Donation -- you know, dollars for the
 5   Donation, for the City, are 34.8 percent.
 6   Dollars for the City's main claims are
 7   hundreds of dollars, and I want to be there
 8   when those things are being discussed and --
 9        MR. SHERMAN:   That's reasonable.
10        MR. WIYGUL:   It's major, I've got to be
11   able to represent the Donation.
12        MR. SHERMAN:   That's appropriate and I
13   think that's what we have in mind --
14        MR. WIYGUL:   No.
15        MR. SHERMAN:   -- is that we authorize
16   this today --
17        MS. NORMAN:   No, that's not what you --
18        MR. SHERMAN:   We authorize this today
19   and we give it a chance.   All right.   I
20   think we're reaching a point where this
21   discussion -- Mr. Buddy, please.
22        MR. BUDDY:   The way to keep -- you
23   know, you may be close.   He said that's not
24   really what your motion says.   So maybe we
25   can have a conversation on how to amend your
```

Page 179

 1    motion that both sides could be comfortable

 2    with.  Right now I don't see us -- I mean,

 3    nothing would be served by us coming next

 4    week, because there's no new data, nothing

 5    to go over again.  We've got a position,

 6    y'all have got a position or whatever the

 7    case would be.  So I think someone has said

 8    that's not what your motion said.

 9         MR. MARK PENEGUY:  That's right.

10         MR. BUDDY:  So let's amend your motion

11    where everybody's comfortable.

12         MR. WILLIAM PENEGUY:  Nobody's seconded

13    the motion yet, so it's not even on the

14    table.

15         MR. MARK PENEGUY:  And even if they

16    did, it's not going to satisfy them unless

17    they are able to shove their attorneys into

18    this contract.  That's the only thing that

19    the City is going to -- is waiting for.

20         MR. SHERMAN:  I think we're reaching

21    the point where it's probably time to see

22    where everyone is on the motion.

23         MR. MARK PENEGUY:  No.

24         MR. MICHAEL PENEGUY:  I think it's

25    probably a time for a bathroom break.

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 180

1       MS. PHILLIPS:  Mike, can we get a copy

2   of the motion to pass around?

3       MR. SHERMAN:  Well, let's take a

4   five-minute break.  Let's use the restroom

5   and then we can reconvene.

6              (Break).

7       MR. SHERMAN:  All right, team, we've

8   got everyone back in the room.  All right.

9   Well, I appreciate the discussion that we've

10  had.  I've passed a copy of the motion out,

11  and it is proper procedure, after a motion

12  and second, we would enter into a final

13  discussion.

14      MR. MARK PENEGUY:  Has it been

15  seconded?

16      MR. SHERMAN:  I'm offering the motion

17  now.

18      MR. MARK PENEGUY:  May I -- and I'm

19  sorry to interrupt you, but I would like to

20  have people who are not part of the Wisner

21  Donation to leave the room except for the

22  attorneys here.

23      MR. SHERMAN:  We can take action.  We

24  can take action.

25      MR. MARK PENEGUY:  I just don't see a

Page 181

1    reason for them being here when Wisner

2    business is being conducted.

3         MR. SHERMAN:  I mean, we have folks

4    who --

5         MR. MARK PENEGUY:  I'm not talking

6    about people you brought over from the City.

7    I'm talking about the gentlemen that came

8    with your crew.

9         MR. SHERMAN:  Listen, we can take

10   action.  We're not in Executive Session, so

11   I'm going to offer the motion.  If there's a

12   second, we'll move onto discussion.  Is

13   there a second?

14        MR. LORINO:  Second.

15        MR. SHERMAN:  We have a motion,

16   seconded by Mr. Lorino.  It's time for

17   discussion.

18        MR. BUDDY:  Who seconded it?

19        MR. SHERMAN:  Mr. Lorino.  All right.

20   I would simply, very briefly, say I have

21   tried my hardest, as chair, to bring us

22   together to find a path forward, and I would

23   just commend to you that this is a potential

24   path forward.  I know everyone is not

25   excited about this.  Everyone has to give a

Page 182

1    little bit.  But I think this --

2         MR. WILLIAM PENEGUY:  Except for the

3    mayor.

4         MR. SHERMAN:  What?

5         MR. WILLIAM PENEGUY:  With the

6    exception of the mayor's position.  He's

7    excited about this motion.

8         MR. SHERMAN:  That's not true at all.

9    So I would commend this to everyone as a

10   path forward.

11        MS. NORMAN:  May I suggest that all

12   ethical considerations and issues that may

13   be raised by this motion be thoroughly

14   investigated prior to anything happening?

15        DR. GARDNER:  That was exactly what I

16   was thinking, Ms. Norman.  I'm not a lawyer,

17   but I admit, there seems to be a lot of

18   other things around this, orbiting this

19   thing we're doing, and -- that are legal,

20   ethical, maybe moral, that ought to -- you

21   know, we ought to allow ourselves the

22   benefit of deeper review on some of those

23   things.

24        MS. NORMAN:  Before anything is

25   approved.

Page 183

1           DR. GARDNER:  Knowing or unknowing.

2           MS. NORMAN:  Yes.

3           MR. MARK PENEGUY:  What can be approved

4     and what's the motion about?

5           MS. NORMAN:  I don't know.

6           DR. GARDNER:  Was the motion seconded?

7           MR. SHERMAN:  The motion was made and

8     seconded.

9           DR. GARDNER:  I'm -- and I was candid

10    with Mike, uncomfortable with the motion as

11    it currently is confected.  Mr. Peneguy --

12          MR. MICHAEL PENEGUY:  Mark.

13          MS. NORMAN:  Mark.

14          MR. MARK PENEGUY:  I'm sorry.

15          DR. GARDNER:  Yeah.  I was saying, and

16    I was candid with Mike that I was

17    uncomfortable with the motion, as it's

18    confected, but I do believe, as my wife

19    says, being the sucker for punishment that I

20    am, that we must continue to try to -- try

21    to move, to keep moving forward.  And I took

22    note of Robert and Joel and their comments

23    about, "if at all possible," even when it

24    can't maybe be seen at this table right now,

25    of how to make something work with the

Page 184

1    attorneys that you all have already been

2    working together with.  I'd like -- a waste

3    of time that it might be -- to get two more

4    weeks.

5         MR. MARK PENEGUY:  I have no say on

6    this.

7         DR. GARDNER:  Yeah.  No, no.

8         MR. MARK PENEGUY:  I understand where

9    you're going.

10        DR. GARDNER:  I'd like it and I'm

11   saying that from a selfish person who just

12   walked in the door, two more weeks.  One, to

13   allow -- with the caveat, to allow the

14   attorneys to again talk specifically about

15   what could or could not be done with the

16   right of refusal, that either group says

17   they think it can work, we don't see it that

18   way, then end of story, and we're back where

19   we were, or where you all have been, and

20   we're now where -- like it or not -- I find

21   itself.

22             I'm hoping that that's not wholly

23   unpalatable for you, two weeks, to give the

24   unbridled authority for the attorneys to

25   just talk, knock this thing out, have

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 185

```
 1    drinks, whatever that's legal and moral and
 2    what your wives and spouses will allow for,
 3    and come back and say, "Look, we've put our
 4    best minds to it, our best pencils to it,
 5    and we just don't think, relative to the
 6    needs and protections that the Donation
 7    needs, or that the City needs, or that the
 8    trustee needs to carry this thing out, it
 9    just ain't going to happen," and then, okay,
10    now -- now we're certainly at a point where
11    it's clear that whatever we've tried to do
12    before just ain't going to make it.  And
13    whether that means litigation or whatever,
14    so be it.  Hopefully not.  But my caveat
15    then, Mike, would be that we allow two
16    weeks.
17         MR. SHERMAN:  Okay.
18         DR. GARDNER:  That the motion allows
19    for two weeks for unbridled review,
20    discussion by the attorneys, and that they
21    come back and tell us that, you know,
22    "Whatever you all were drinking, stop
23    drinking it because it ain't going to work,"
24    and that, you know, we've just got to look
25    for some other alternatives.  I could --
```

Page 186

1   hopefully, that we, nor the mayor, will

2   bounce off the walls with that.  We're big

3   boys and girls.  We ought to be able to --

4   I'm hoping that we can make something

5   happen.

6        MR. SHERMAN:  Okay.

7        DR. GARDNER:  If not, at least extreme

8   clarity.

9        MR. SHERMAN:  Dr. Gardner --

10       DR. GARDNER:  Yes.

11       MR. SHERMAN:  As a new member of the

12   committee, I think you're certainly entitled

13   to some additional time that helps bring

14   this -- brings this to resolution.  I think

15   that your motion was to -- it was an

16   amendment, is this correct?

17       DR. GARDNER:  Yes.

18       MR. SHERMAN:  That we would come back

19   in two weeks, if they're unable to reach an

20   agreement, or to report back what their

21   agreement is.  And I would accept that as a

22   friendly amendment, if we could figure out

23   how to put that.  If you would restate it

24   for me, I'll add it as a No. 6.

25       DR. GARDNER:  Okay.

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 187

1       MR. SHERMAN:  Is it that --

2       DR. WILLIAMS:  Add it?

3       MR. MARK PENEGUY:  Add it?

4       MS. NORMAN:  Add it?

5       MR. MARK PENEGUY:  Or just replace it

6    with a new motion.

7       MR. SHERMAN:  No, I heard it as an

8    amendment, but Dr. Gardner, you offered it.

9       MS. PHILLIPS:  I think he offered it,

10   moving with it one way or another, whether

11   it was an amendment or a motion.

12      MR. MICHAEL PENEGUY:  I don't think you

13   can amend this to put that framework in

14   there.

15      MR. SHERMAN:  I think --

16      MR. WILLIAM PENEGUY:  We could.

17      MR. SHERMAN:  I think we can.

18      MR. WILLIAM PENEGUY:  We could take 3

19   and 4 out, and 1.  Take 1, 3 and 4 out.

20      MR. MARK PENEGUY:  And 2.

21      MR. WILLIAM PENEGUY:  I've already

22   taken 2, I'm sorry.

23      MR. MARK PENEGUY:  Okay.

24      MR. WILLIAM PENEGUY:  That's a waste of

25   time.

Page 188

1          MR. MARK PENEGUY:  That's right.

2          MR. SHERMAN:  May I rephrase it?

3          DR. GARDNER:  Go ahead.

4          MR. SHERMAN:  We add, as No. 6, that

5     should the attorneys be unable to reach an

6     agreement, we'll be back in two weeks.

7          MS. NORMAN:  And this motion will be --

8          MR. WILLIAM PENEGUY:  It won't make any

9     difference, giving them two weeks more to --

10         MS. NORMAN:  -- null and void.

11         MR. MARK PENEGUY:  Yeah, that's not

12    going to work, because the motion's already

13    passed.

14         MS. NORMAN:  Yeah, the resolution will

15    be null and void.  That's --

16         MR. SHERMAN:  Does that work?

17         MR. MARK PENEGUY:  That's a wonderful

18    move.

19         MR. SHERMAN:  Yeah, please, restate it,

20    yeah.

21         DR. GARDNER:  No.  Mike, what -- I

22    mean, all of this hinges upon, as I

23    understand it, a joint venture between these

24    firms.  If that doesn't happen, to me,

25    nothing else is able to happen, so I'm

Page 189

```
 1    putting as the lead caveat that if the

 2    attorneys come back and say that can't

 3    happen, then everything else is a wash and

 4    we're back to the drawing board.

 5         MR. MARK PENEGUY:  But, you see, that's

 6    the problem.

 7         MR. WILLIAM PENEGUY:  That's not the

 8    case.

 9         MR. SHERMAN:  I accept that.

10         MR. WILLIAM PENEGUY:  That's not going

11    to be fixed.

12         MR. MARK PENEGUY:  If you add that to

13    this motion, it's not the case.  You have

14    agreed to force them into it, whether you

15    like it or not, because that's what this

16    motion does, so you have to have a

17    completely separate motion.  I don't think

18    that's --

19         MR. MICHAEL PENEGUY:  Yeah.

20         MR. LORINO:  I think that's called a

21    substitute motion.

22         MR. MARK PENEGUY:  A substitute motion.

23    But more importantly, I don't understand

24    what you think is actually going to happen,

25    if they come back and say, "We couldn't come
```

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 190

1    to an agreement." I think, what I hear you

2    say, and correct me if I'm wrong, that we're

3    just going to throw it back and we're going

4    to be right back here doing the same thing

5    for another year.

6        DR. GARDNER: I thought I heard that

7    there was some possibilities of working

8    together on these issues, provided certain

9    things were retained as whole, the

10   relationship, your responsibilities to the

11   Donation and those kind of things, without

12   any particulars to that, but that's what I

13   thought I heard. Did I mishear that?

14       MR. WIYGUL: That's correct, doctor,

15   and I think what Mr. Peneguy here was saying

16   that the motion on the resolution, in the

17   motion, pertains to, as it's currently

18   stated, says that the Donation Advisory

19   Committee authorizes the joint venture

20   colleagues here, the City's attorneys to

21   represent the Edward Wisner Donation in all

22   matters arising from the BP Deepwater

23   Horizon Oil Spill.

24            So when this motion passes, then

25   my colleagues here will be representing the

Page 191

```
 1    Donation, for whatever period -- I mean,

 2    permanently, I suppose.  Then, two and three

 3    are -- let's see.  Two is sort of

 4    informatory.  Three, you authorize the mayor

 5    to execute an agreement, hire the joint

 6    venture, as counsel.  So if you pass the

 7    motion, as stated, you're hiring the joint

 8    venture; four, the Donation Advisory

 9    Committee reauthorizes the mayor to execute

10    an agreement to hire the firm of Waltzer &

11    Wiygul, as counsel in the above-referenced

12    matter, which is -- not to be too technical,

13    Mike, but it's not actually hiring us.  The

14    language is different from what's in

15    Paragraph 1, and authorizes the mayor to

16    execute an agreement, which has dealt -- I

17    mean --

18         MS. NORMAN:  We already have an

19    agreement.

20         MR. WIYGUL:  I don't know that, you

21    know -- but I think --

22         DR. GARDNER:  I guess what -- I guess

23    what I'm saying, in a nutshell, is that the

24    motion, how it's confected, only advances,

25    as a motion, or it dies.  If you all come
```

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 192

1   back and say, for whichever side, and that

2   they agree, one consent, one side would say,

3   "We think it's perfect and we can work with

4   it," and then one disagreement kills it.

5   That, "Yes, this can work; here's how we

6   think it can work," and then that still has

7   to be approved, and, yes, that's how we want

8   to go forward.

9       MR. MARK PENEGUY:  But I just want to

10  make something -- I think -- I think there

11  may be a miscommunication between the two of

12  you all.  And don't misunderstand this.

13  When you said you heard them say they think

14  they can work with this other team, they did

15  say that, but they said that they should be

16  solely responsible for the Wisner Donation

17  claim.  The City's attorneys --

18      DR. GARDNER:  Well, I hear you,

19  Mr. Peneguy.

20      MR. MARK PENEGUY:  Okay.  That's not

21  what this motion does.

22      DR. GARDNER:  What I'm trying to say

23  is, without hanging on every word that was

24  in that meeting, or document.

25      MR. MARK PENEGUY:  Okay.  I just wanted

Professional Shorthand Reporters, Inc.                1-800-536-5255
Offices in New Orleans and Baton Rouge                www.psrdocs.com

Page 193

```
 1    to be sure.

 2         MR. WIYGUL:  You're correct.

 3         MR. MARK PENEGUY:  Okay.

 4         MR. WIYGUL:  I mean, we talked about

 5    structures, the technical aspects, whatever.

 6         DR. GARDNER:  And that's why I said

 7    earlier, Mr. Peneguy, that --

 8         MR. MARK PENEGUY:  Right.  "Mark" is

 9    fine.

10         DR. GARDNER:  Mark.  Ron.  That, count

11    it up to -- charge it to a new guy that's

12    just dumb about this -- I'm asking you to

13    waste two more weeks, is all I'm asking.

14         MR. MARK PENEGUY:  But not with this

15    motion.  It's got to be a substitute motion,

16    because this motion authorizes actions if it

17    can't take place.

18         DR. GARDNER:  My amendment indicates

19    that none of this is valid unless there's

20    something that comes from them that

21    ultimately has to be approved.

22         MR. MARK PENEGUY:  So you're giving --

23    essentially giving them or the other

24    attorneys veto power?

25         DR. GARDNER:  In effect, yes.
```

Page 194

```
 1        MR. MARK PENEGUY:  And that's fine.
 2        DR. GARDNER:  And if they agree -- that
 3   doesn't mean that we would agree -- then we
 4   would have to, again, come back and --
 5        MR. MARK PENEGUY:  And assuming the --
 6        MS. NORMAN:  And vote.
 7        MR. MARK PENEGUY:  -- motion can be
 8   amended correctly -- and I won't speak on
 9   that because I don't know that power -- but
10   assuming it can and we do come back to the
11   situation that they've already told us they
12   would prefer to have, not necessarily what
13   they would do if they were ordered to speak
14   with these other attorneys -- I have no idea
15   what they'll come back with -- and let's
16   assume they come back the same way, that,
17   "No, we don't think it's a good idea for the
18   Wisner Donation and we think that we ought
19   to be the sole counsel for the Wisner
20   Donation claim" --
21        DR. GARDNER:  Then we've delayed two
22   weeks of --
23        MR. MARK PENEGUY:  Right.
24        DR. GARDNER:  -- shouting at each other
25   and knuckling and fighting.
```

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 195

1        MR. MARK PENEGUY:  Right.  And then
2    what happens?  I mean, the mayor's not
3    happy.
4        DR. GARDNER:  If we delay two weeks,
5    then we come back to fighting it.
6        MR. MARK PENEGUY:  And so we'll just
7    keep fighting, trying to force a --
8            (Inaudible).
9        DR. GARDNER:  Well, I don't look
10   forward to fighting it, but -- I wish I were
11   clairvoyant.  If so, I'd -- no offense, I
12   probably wouldn't be on this board.  I'd
13   just take that Powerball money and I'd just
14   want to be somewhere else --
15       MR. MARK PENEGUY:  People might be
16   looking for you, too, to give that money to
17   them.
18       DR. GARDNER:  -- and probably make
19   contributions towards the Wisner Donation
20   myself.  But after that ability, all I'm
21   saying is -- and I think it's pretty clear
22   what I'm saying, that, you know, we lose two
23   weeks, we lose two weeks, but we're not
24   bound -- the lawyers are not bound by
25   anything.  If they come back in complete

Page 196

 1    concert and agreement, we are not

 2    necessarily bound by that.

 3         MR. MICHAEL PENEGUY:  Well, I think

 4    you're going to have to have a substitute

 5    motion.

 6         MR. WILLIAM PENEGUY:  It's going to

 7    take a substitute motion because --

 8         MR. SHERMAN:  Dr. Gardner.

 9         MR. MICHAEL PENEGUY:  You know, you'd

10    have to -- I think you'd have to make a

11    substitute motion.

12         MR. SHERMAN:  Dr. Gardner.

13         DR. GARDNER:  This part of it.

14         MR. SHERMAN:  I would accept, as a

15    friendly amendment, I just jotted it down,

16    this motion is contingent upon the joint

17    venture and Waltzer & Wiygul reaching an

18    agreement.

19         MR. MICHAEL PENEGUY:  Well, I think an

20    appropriate way to be doing this --

21         MS. NORMAN:  With subsequent approval

22    by the committee --

23         MR. MICHAEL PENEGUY:  I would -- I

24    would make a clean motion to --

25         MS. NORMAN:  -- of that agreement.

Page 197

 1        MR. MICHAEL PENEGUY:  -- to do what you

 2    said, would be the proper way to handle

 3    this, rather than try to put all this in

 4    this motion, because this motion commits to

 5    something right away.  If they -- even if

 6    they come back and say, "Well, we can't go

 7    along with it," the first part of it commits

 8    the committee.

 9        MR. BUDDY:  Is there a possibility that

10    we would rescind this, and letting the

11    doctor make a motion?

12        MR. SHERMAN:  Well, what I think I

13    heard -- and I don't know that the doctor

14    and I agree with everything that he said,

15    but I think the part that he said that I can

16    certainly agree with is that the motion's

17    contingent upon the joint venture and

18    Waltzer & Wiygul reaching an agreement.  I

19    will accept that as a friendly amendment,

20    and if the --

21        DR. GARDNER:  I have tried -- and that

22    could very well be the way to go, but I was

23    trying to get at a statement, Ms. Norman,

24    Ms. Amanda, that would, in effect, make it

25    irrelevant.  We could have "hickory, dickory

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 198

1   and dock" on here if they don't come back

2   with something that's acceptable.

3       MS. PHILLIPS:   Then why do we need to

4   amend that motion?

5       MS. NORMAN:   We should have a

6   substitute motion, --

7       MS. PHILLIPS:   Why don't we have a

8   substitute motion?

9       MS. NORMAN:   -- under Robert's Rules.

10      MS. PHILLIPS:   And then present that

11  motion at the next meeting for --

12      DR. GARDNER:   Well, because that was

13  the motion on the floor.

14      MR. SHERMAN:   We have a motion on the

15  floor and a second.   Doctor, if you would

16  offer this, I would accept that this motion

17  is contingent upon the joint venture and

18  Waltzer & Wiygul reaching an agreement.   If

19  they're not, we'll be back here in two

20  weeks.   I would absolutely accept that.

21      MS. TURNER:   Michael, can I suggest --

22      MR. SHERMAN:   Please.

23      MS. TURNER:   Another possible approach

24  is you keep this resolution here, but the

25  amendment is that we ask Waltzer & Wiygul to

Page 199

1    review the resolution and work with counsel

2    to flesh out the details and -- or present

3    alternatives, so nothing's contingent on --

4    I mean, you're getting them to review it.

5    You keep the language here.  We're not

6    adopting any of this.  But from what I hear

7    you're saying, you're just asking the

8    attorneys to look at it a little more

9    closely to see if it can work or some

10   arrangement can work.

11       MR. SHERMAN:  I don't necessarily see

12   the need for baby steps here, but I am happy

13   to -- I'm happy to make folks comfortable,

14   if we can.

15            Listen, the motion is what it is.

16   It's to take the City's joint venture and

17   Waltzer & Wiygul, if they can agree among

18   themselves, let's move forward.  That's what

19   this motion does, same terms and conditions.

20   I'm happy to make it fully contingent, happy

21   to make it fully contingent, upon them

22   reaching an agreement.

23            Amanda, the words I used is "this

24   motion is contingent upon the joint venture

25   and Waltzer & Wiygul reaching an agreement."

Page 200

1      MS. NORMAN:  And the committee

2   subsequently approving the terms of that

3   agreement, because whatever agreement they

4   reach is going to have to come back.

5      MR. SHERMAN:  I'm suggesting it

6   doesn't -- I'm suggesting the agreement

7   doesn't change.  We just bring on additional

8   counsel.

9      MR. MARK PENEGUY:  You're suggesting

10   breaching the contract then.

11      MS. NORMAN:  That's a breach of their

12   contract.

13      MR. SHERMAN:  No.  If they have an

14   agreement, there would be a new agreement.

15      DR. GARDNER:  The only problem for some

16   folk, Michael, would be, they would not know

17   the terms of that agreement or the details.

18      MR. SHERMAN:  I'm suggesting they're

19   the same, same terms as they've currently

20   approved.  The only thing that would change

21   is rather than having Waltzer & Wiygul, we

22   would also have this group.

23      MR. MARK PENEGUY:  We're back to where

24   we started --

25      MS. NORMAN:  Yeah.

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

1      MR. MARK PENEGUY:  -- with what you're

2   suggesting.

3      MR. SHERMAN:  We are absolutely not,

4   because I'm agreeing that if they can't come

5   to an agreement, we're back here without

6   this motion moving forward.

7      MR. MARK PENEGUY:  Well, then why don't

8   we rewrite the motion so it specifically

9   says that instead of all this -- all this

10  "contingent on," all this other.

11     MR. SHERMAN:  I'm trying to get us

12  across the goal line, and if the two firms

13  reach an agreement, we're across the goal

14  line.

15     MR. WILLIAM PENEGUY:  You are, not all

16  of us.

17     MR. MICHAEL PENEGUY:  Yeah, and I

18  think --

19     MS. PHILLIPS:  What was the word before

20  "an agreement"?

21     MR. SHERMAN:  "Reaching."

22     MS. PHILLIPS:  "Reaching," okay.  I

23  mean, do we have two weeks?

24     MR. MICHAEL PENEGUY:  Yeah, I guess

25  that's a good question.

Page 202

1     MS. PHILLIPS:  I mean, is there -- is

2     that going to hurt our case with BP if we

3     wait, our claim, if we wait two weeks?

4          MS. NORMAN:  It's getting there.

5          MR. MARK PENEGUY:  I think it should be

6     voted against, in any event, and I've said

7     that clearly, and if any of the other

8     members need to hear that, I'll say it.  The

9     whole motion ought to be defeated, and

10    another motion ought to be made where we

11    take -- we stop all discussion of this and

12    move forward.  We don't need any further

13    legal advice.  We've got it.

14         MR. SHERMAN:  All right.  So the

15    motion -- I have added to the motion that

16    this motion is contingent upon the joint

17    venture and Waltzer & Wiygul reaching an

18    agreement.  I'll ask for a last call for any

19    last thoughts.  We have a motion.  It's been

20    properly seconded.  All those in favor,

21    please raise your hands.

22         MR. MICHAEL PENEGUY:  No.  I disagree.

23         MS. PHILLIPS:  Does the addition need

24    to be seconded?

25         MR. SHERMAN:  Well, it -- was that a --

Page 203

```
 1    did I say what you said closely enough to

 2    make it a friendly amendment, that I

 3    accepted?

 4         DR. GARDNER:  Repeat what you said.

 5         MR. SHERMAN:  This motion is contingent

 6    upon the joint venture and Waltzer & Wiygul

 7    reaching an agreement.

 8         DR. GARDNER:  Right, reaching an

 9    acceptable agreement.

10         MR. SHERMAN:  Acceptable agreement.

11         MR. MICHAEL PENEGUY:  Well, you've got

12    to -- you have a problem.  You only -- for

13    these certain terms.

14              (Inaudible).

15         MR. SHERMAN:  All right.  I'm going to

16    repeat that.

17         MR. MICHAEL PENEGUY:  You have to add

18    in there the time.

19         MR. MARK PENEGUY:  The Donation has to

20    accept it, as well.

21         MS. NORMAN:  Yes.  And then it has to

22    be approved by the Donation.

23         MR. MICHAEL PENEGUY:  Right.

24         MR. SHERMAN:  Dr. Gardner, I want to

25    repeat that for everyone here.  This motion
```

Page 204

```
 1   is contingent upon the joint venture and
 2   Waltzer & Wiygul reaching an acceptable
 3   agreement within two weeks.
 4        DR. GARDNER:  Two weeks, I think, is
 5   sufficient.
 6        MR. SHERMAN:  I can leave the time out.
 7   I'm fine leaving the time out.
 8        DR. GARDNER:  Yeah, I'm just trying to
 9   put a shot clock, but I'm not a lawyer.
10        MR. WALTZER:  Two weeks is plenty of
11   time.  One week is enough time.
12        MR. SHERMAN:  I will accept that as a
13   friendly amendment.  Let me restate it for
14   all to hear one more time.  This motion is
15   contingent upon the joint venture and
16   Waltzer & Wiygul reaching an acceptable
17   agreement within two weeks.
18        MR. MARK PENEGUY:  And acceptable to
19   whom?
20        MR. MICHAEL PENEGUY:  Yeah, that's the
21   problem.
22        MR. MARK PENEGUY:  Acceptable to the --
23        MR. SHERMAN:  To the attorneys.
24        MR. MARK PENEGUY:  And then to the
25   committee?  Or are you taking the committee
```

Page 205

1    out of it at that point?  Because the

2    committee may say they don't think it's a

3    good thing and that's -- you all have hired

4    attorneys already and you're asking them

5    right now to change their contract.

6         MR. SHERMAN:  I would be happy to add,

7    upon the same terms, to make it clear that

8    it's the exact same terms.

9         MR. MARK PENEGUY:  There you go.

10        MR. SHERMAN:  Dr. Gardner, is that the

11   iteration for this?

12        DR. GARDNER:  I don't have a problem

13   with it coming back to the committee.  Quite

14   frankly, if you guys have already decided,

15   one way or the other, in your minds, that

16   you're, "Okay, we'll placate this guy," but

17   if it's dead, then it's dead anyway.

18        DR. WILLIAMS:  I think you're right

19   about that.

20        DR. GARDNER:  Sir?

21        DR. WILLIAMS:  I think you're right,

22   it's already dead.

23        MS. NORMAN:  Yeah.

24        MR. MARK PENEGUY:  It's better off to

25   stop being discussed at this point.

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 206

1        MR. SHERMAN:   Okay.   Dr. Gardner, is

2   there a form that can make this -- I want to

3   make sure I understand what you're

4   suggesting.

5        DR. GARDNER:   Yeah.   I don't see the

6   harm and foul in saying, by way of

7   acceptable, that it then comes back to us

8   for ratification, or not.

9        MS. NORMAN:   And which -- yeah.

10       DR. GARDNER:   Because if it's

11  something -- if they come back with

12  something that's palatable to both sides,

13  then what's the harm?   And if not, then

14  that's the end of that anyway.

15       MR. MICHAEL PENEGUY:   Yeah.   The only

16  problem with that is that somebody's got to

17  approve that contract, and it should go to a

18  committee for any changes and finalization.

19  In other words, basically if they want to --

20  if they agree to changing their contract,

21  that contract has to be reviewed and

22  everything by us before it goes to the

23  mayor.

24       MS. NORMAN:   For signature, exactly.

25       MR. MICHAEL PENEGUY:   Yeah.

Page 207

1      MS. NORMAN:  He asked for the advice

2  and consent of this committee.

3      DR. GARDNER:  Well, I would expect

4  that.

5      MR. SHERMAN:  What I would suggest,

6  it's upon the same terms and conditions.

7      MR. WALTZER:  So we're amending our

8  contract to add on counsel, to the trust?

9      MR. SHERMAN:  That would be the same

10  terms and conditions.

11      MR. MARK PENEGUY:  That's what I'm

12  saying, breaching your contract, doing that.

13      DR. GARDNER:  No, no.

14      MR. MARK PENEGUY:  I call it that.

15      MR. WALTZER:  Well, why don't we just

16  put "verge" and we'll get together with them

17  in the next couple days.

18      MR. MARK PENEGUY:  No motion; just

19  defer it and talk.

20      MR. WIYGUL:  Believe me, we have been

21  instructed.  Folks, we are going to talk and

22  try to come up with a structure, and I do

23  not believe you need the motion to do that.

24      MR. MICHAEL PENEGUY:  Yeah.

25      DR. GARDNER:  Thank you.

Page 208

1        MR. WIYGUL:  But we're not going to say

2    two weeks.

3        MR. MICHAEL PENEGUY:  I'll therefore

4    ask that the motion would just go away --

5        MR. WIYGUL:  We appreciate the

6    difficulties here, but you --

7        MR. MICHAEL PENEGUY:  -- and let them

8    handle it for two weeks.

9        DR. WILLIAMS:  Let's just withdraw it.

10       MR. MARK PENEGUY:  Withdraw the motion.

11       MR. MICHAEL PENEGUY:  I mean, I would

12   think --

13       MR. SHERMAN:  You've been asking me to

14   withdraw the motion for three hours.  I have

15   no doubt about that.

16       MR. MARK PENEGUY:  There's no need for

17   it.

18       MR. SHERMAN:  But I appreciate that.

19       MR. MARK PENEGUY:  Is there?

20       MR. SHERMAN:  If you'd like to suggest

21   that we just do Waltzer & Wiygul, you may do

22   that, as well.

23       MR. MARK PENEGUY:  Mike, why don't you

24   propose that they withdraw the motion?

25       MR. MICHAEL PENEGUY:  I -- I --

Page 209

```
 1          MR. SHERMAN:  We have a motion and a

 2     second --

 3          MR. MICHAEL PENEGUY:  I would

 4     suggest --

 5          MR. SHERMAN:  -- properly on the table.

 6          MR. MICHAEL PENEGUY:  I'd suggest that

 7     we do without the motion, period.  Just meet

 8     them back here in two weeks.

 9          MR. SHERMAN:  I appreciate that.

10          MR. MICHAEL PENEGUY:  And then discuss

11     it.

12          MR. SHERMAN:  But there's a motion,

13     there's a second.

14          DR. GARDNER:  Now, what's the harm in

15     doing that by motion?

16          MR. MICHAEL PENEGUY:  Huh?

17          DR. GARDNER:  If it doesn't matter to

18     you about that?

19          MR. MICHAEL PENEGUY:  The problem with

20     the motion is the way it's framed.

21          MR. MARK PENEGUY:  It's written so

22     poorly.

23          MR. MICHAEL PENEGUY:  And based upon --

24     it's as if you want to have a --

25          MR. MARK PENEGUY:  And we'll be
```

Page 210

1  litigating that motion.

2      MR. MICHAEL PENEGUY:  Right.  You can

3  basically have a motion that just says,

4  "Let's meet back here in two weeks; let

5  Robert and Joel talk to the other people,"

6  or you can just say, "We're going to meet

7  back here in two weeks" and just instruct

8  them.

9      MR. MARK PENEGUY:  We've already said

10  that --

11      MR. SHERMAN:  Respectfully, that's what

12  we did last week.

13      MR. MICHAEL PENEGUY:  Yeah.

14      MR. SHERMAN:  That's what we did last

15  week and we're here again.

16      DR. GARDNER:  And the reason I offered

17  that, only in the sense of -- I think the

18  difference is that you all have all

19  indicated that you've been talking.

20      MR. WALTZER:  I thought we had an

21  agreement.  Really, I thought that.

22      MR. MARK PENEGUY:  You do have an

23  agreement.

24      MR. WALTZER:  I thought we had an

25  agreement with them, that they would

Page 211

1    represent the City of New Orleans, we would

2    represent the Wisner Donation, and we would

3    work together to do whatever, to go to BP

4    privately, and try and resolve both of our

5    claims together.

6         MS. NORMAN:   That's what they were told

7    yesterday.

8         MR. WALTZER:   Then we would act in

9    concert, that we would do all the things,

10   but that we would have the clear

11   delineation, with Waltzer & Wiygul having

12   the authority and responsibility for the

13   independent claim in the Wisner Donation.

14        DR. GARDNER:   Is that documented

15   somewhere?

16        MR. WALTZER:   I mean, that's the

17   conversation I had with him.

18        DR. GARDNER:   And I'm not talking

19   about -- and I'm not questioning -- I'm not

20   challenging you.   I'm just saying --

21        MR. WALTZER:   I don't think Mr. Sherman

22   wanted that.

23        MS. NORMAN:   That was the conversation

24   he had yesterday with Steve Herman.

25        MR. MICHAEL PENEGUY:   And I think

Page 212

 1    that --

 2        MR. SHERMAN:  You have very different

 3    interpretations, apparently.

 4        MR. MICHAEL PENEGUY:  Well, I --

 5        MR. MARK PENEGUY:  Were you there?

 6        MR. MICHAEL PENEGUY:  Oh, --

 7        MR. MARK PENEGUY:  Were you at that

 8    meeting?

 9        MR. MICHAEL PENEGUY:  I ~~went~~ would -- I ~~was~~ would say

10    ~~there~~.

11        MR. SHERMAN:  Yes, he did.

12        MR. MARK PENEGUY:  Oh, well.

13        MR. MICHAEL PENEGUY:  You asked a good

14    question.

15        MR. SHERMAN:  And what you're saying

16    does not comport with my understanding of

17    that conversation.

18        MR. MICHAEL PENEGUY:  I'm going to

19    suggest that you ask for them to take --

20    both of them, to give written permission, I

21    mean, a written statement to that effect,

22    and that should go to the mayor.

23        MS. NORMAN:  Let's move on to Agenda

24    Item No. 2.

25        MR. MICHAEL PENEGUY:  And their

1    attorney, Steve Herman, said that, and they

2    said that.   Then all they've got to do is

3    write a letter and forward this to the

4    mayor.

5         MR. SHERMAN:   Team, let --

6         DR. GARDNER:   Yeah, I just felt that

7    specifically charging folk, them with that,

8    that means in two weeks, they'll actually

9    come back with something, or nothing.

10        MR. MARK PENEGUY:   A substitute motion.

11        DR. GARDNER:   And if they come back

12   with something, then we would have -- they

13   would put that before us for us to say that

14   it was --

15        MR. SHERMAN:   Dr. Gardner, I would

16   happily -- in the interest of bringing this

17   to a resolution, I would happily add, as a

18   friendly amendment, should you be offering,

19   "This motion is contingent upon the joint

20   venture and Waltzer & Wiygul reaching an

21   agreement."

22        MS. NORMAN:   Acceptable agreement.

23        MR. SHERMAN:   "Acceptable agreement to

24   the committee within two weeks."

25        DR. GARDNER:   Yes, I can support

Page 214

1    advancing that kind of motion.

2        MR. SHERMAN:  That would give us one

3    more chance.  So we have a motion, a second.

4    We have a friendly amendment offer, I accept

5    it, and Amanda has suggested we need a

6    second on it, and I will second his.

7        MR. MICHAEL PENEGUY:  Whoa, whoa.  Wait

8    a minute.  You can't make the motion and

9    second it, too.

10       MR. SHERMAN:  No, I didn't.

11   Mr. Lorino, he's making a friendly

12   amendment, and I have accepted it, so let me

13   read one more time so we're all crystal

14   clear.

15       DR. GARDNER:  Originally, I did say

16   that, that if it worked at all.

17       MR. MARK PENEGUY:  No, no.  What I'm

18   talking about is different than what you're

19   saying.

20       DR. GARDNER:  Okay.

21       MR. MARK PENEGUY:  I agree that what

22   you said is that the motion, this whole

23   motion, if passed, would go out of existence

24   if there's no agreement.  I understood that.

25   I'm saying that why don't you amend -- have

Page 215

1    your amendment include that, if there is no

2    agreement, that this issue is settled and

3    the mayor go away and leave us alone and let

4    us do the business that we've been doing for

5    two years.

6        DR. GARDNER:  I'm not clear as to that.

7        MR. SHERMAN:  All right.  I'm going to

8    restate --

9        MR. WILLIAM PENEGUY:  We're serious.

10   We're serious.  Quit laughing about it.

11       MR. SHERMAN:  This motion is contingent

12   upon the joint venture and Waltzer & Wiygul

13   reaching an acceptable agreement to the

14   Donation Advisory Committee within two

15   weeks.

16       MS. NORMAN:  I put "Coming back to the

17   committee for full ratification."

18       MR. WALTZER:  And you understand you're

19   phrasing it, an agreement in two weeks.

20       MS. NORMAN:  That's what you said

21   before.

22       MR. WALTZER:  And at this point, it's

23   like what --

24       MR. SHERMAN:  I do.

25       MR. MARK PENEGUY:  Yeah, and that's

Page 216

```
 1   okay.
 2        MR. SHERMAN:  I actually was pushing
 3   for this to be approved today, but I'm
 4   accepting an amendment.  Okay.  We have a
 5   motion and a second.
 6        MS. PHILLIPS:  What, y'all can't do any
 7   work for two weeks?
 8        MR. WALTZER:  Are we nuts?
 9        MR. SHERMAN:  We have an amendment.
10        MS. PHILLIPS:  I don't think so.  I
11   just wanted to be clear on that.
12        MR. MICHAEL PENEGUY:  I think we better
13   listen to the attorneys.
14        MR. SHERMAN:  I heard him.
15        MR. MICHAEL PENEGUY:  He's saying -- he
16   said --
17        MR. WALTZER:  They have no reason to
18   work for you.
19        MS. NORMAN:  Right.
20        MR. MICHAEL PENEGUY:  He said -- yeah.
21   Basically -- that basically that's --
22        MR. SHERMAN:  For two years, they've
23   been working without the mayor's consent.  I
24   don't see what would change in the next two
25   weeks.
```

Page 217

1     MR. WILLIAM PENEGUY:  Unbelievable.

2     MR. LORINO:  We need to ratify it.

3     MS. NORMAN:  And then we need a

4  ratification that they can continue to work.

5     MR. SHERMAN:  We have a motion.  It's

6  been properly seconded.  We have a friendly

7  amendment that I've repeated, for the

8  record.

9     MR. WALTZER:  Can you please make it

10  not two weeks?  Because I don't want to wait

11  two weeks to start working again.

12     DR. GARDNER:  Well, just saying, 4th of

13  July?  But that's up to you all.  I mean, I

14  just don't --

15     MR. WALTZER:  Yeah, give us two days.

16  Really, just don't prolong this pain any

17  longer.

18     MR. MICHAEL PENEGUY:  And what I would

19  suggest is that you all have Steve Herman

20  write down what he is agreeable to and

21  report back to the group.

22     MR. SHERMAN:  You guys can report back

23  here if you're not having success.  All

24  right.  We have a motion and a second.  We

25  have a friendly amendment that's been

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 218

```
 1    accepted.  All those in favor, please say
 2    "Aye."  Aye.
 3         MR. LORINO:  Aye.
 4         DR. GARDNER:  Aye.
 5         MR. SHERMAN:  All those opposed, "Nay."
 6         MR. MICHAEL PENEGUY:  Nay.
 7         MR. BUDDY:  Nay.
 8         MR. SHERMAN:  The motion carries, three
 9    to two.
10              The next agenda item is the
11    petition.  Considering the first motion,
12    that the first agenda item passed, I would
13    ask for a motion to adjourn at this time.
14         DR. GARDNER:  Motion.
15         MR. SHERMAN:  Is there a second on the
16    motion to adjourn?
17         MR. LORINO:  Second.
18         MR. SHERMAN:  Motion and a second --
19         MR. MICHAEL PENEGUY:  Well, wait, wait.
20         MS. NORMAN:  Wait, wait.  There's
21    another agenda item to be reviewed.
22         MR. MICHAEL PENEGUY:  And I'll make a
23    motion that we review it.
24         MR. MARK PENEGUY:  And I'd ask that all
25    people who have no reason to be here now,
```

Page 219

```
 1    leave.
 2         MR. SHERMAN:  Thank you so kindly.
 3         MR. MARK PENEGUY:  These attorneys have
 4    no reason to be here for this discussion.
 5         MR. SHERMAN:  Thank you so kindly,
 6    Mr. Peneguy.  So we have -- we have a motion
 7    to adjourn.
 8         MR. LEGER:  If I may interrupt you,
 9    I've been thrown out of better meetings than
10    this before, but I will respectfully leave.
11         MR. MARK PENEGUY:  Well, ask this
12    gentleman to join you.
13         MR. LEGER:  But by the way, we are
14    lawyers for the City.
15         MR. MARK PENEGUY:  I don't care who you
16    are.
17         MR. LEGER:  That's why we're here, sir.
18    Obviously, sir, you do not.
19         MR. MARK PENEGUY:  You're a lawyer for
20    the City, for BP.
21         MR. LEGER:  Obviously, sir --
22         MR. MARK PENEGUY:  You're not for the
23    Donation.
24         MR. LEGER:  I know, sir.  And I'm
25    sorry.  I was offering to leave the meeting,
```

Page 220

1    at your request.

2        MR. MARK PENEGUY:  I understand that,

3    and I thank you.  Please go.  I don't need

4    excuses.

5        MR. LEGER:  But by the way, thank you.

6    We intend to work in good faith to try to

7    help resolve this for the benefit of the

8    return.

9        MR. SHERMAN:  Okay.

10       MS. NORMAN:  And I believe that.

11       MR. LEGER:  And I'm sorry for your

12   weakness, sir.

13       MR. MARK PENEGUY:  I'm sorry for yours.

14   Thank you.

15       MR. LEGER:  Thank you, sir.

16       MR. SHERMAN:  All right.  We have a

17   motion to adjourn and second.  If you want

18   to discuss the second item, --

19       MR. MARK PENEGUY:  Please leave.

20       MR. SHERMAN:  -- you should vote

21   against this.

22       MR. MARK PENEGUY:  Please leave.

23       MS. NORMAN:  Wait.  Who should vote

24   against this?

25       MR. MARK PENEGUY:  Ask this gentleman

Page 221

1    to please accompany you.

2         MR. SHERMAN:  Stop, stop.

3         MR. MARK PENEGUY:  He has no reason to

4    be here.

5         MR. LEGER:  I have another meeting to

6    go to, --

7         MR. MARK PENEGUY:  That's fine.

8         MR. LEGER:  -- that's why I'm going.

9         MR. MARK PENEGUY:  Oh, that's why

10   you're going.

11        MR. LEGER:  Yes.

12        MS. NORMAN:  Wait a minute.  Mark,

13   Mark, Mark, just a minute.  We have a second

14   agenda item that we need to discuss.

15        MR. MARK PENEGUY:  Right.  I don't want

16   to discuss it with this attorney in here.

17        MR. SHERMAN:  And we have a motion to

18   adjourn on the table, which has been

19   seconded, and I'm saying to the committee,

20   as part of the discussion now, if you would

21   like to discuss --

22        MS. NORMAN:  I consider you a hostile

23   chair.

24        MR. SHERMAN:  -- the agenda item, --

25        MR. MICHAEL PENEGUY:  Wait, who --

Page 222

1      MR. SHERMAN:  -- please vote against

2  the motion to adjourn.

3      MR. MARK PENEGUY:  Wait, who seconded

4  it and --

5      MR. MICHAEL PENEGUY:  Who seconded the

6  motion?

7      MS. PHILLIPS:  Mr. Lorino.

8      MR. MARK PENEGUY:  Thank you, Amanda.

9      MR. MICHAEL PENEGUY:  Okay.

10     MR. SHERMAN:  We have a motion and a

11  second.  If you would like to continue to

12  discuss the second item, which is filing a

13  petition, which I believe is moot because of

14  the first motion.

15     MR. MICHAEL PENEGUY:  No.

16     MR. SHERMAN:  You should vote against

17  the motion to adjourn and we'll do that.  If

18  you -- if you want to defer this item, then

19  you should vote for the motion to adjourn.

20  All those in favor of adjourning, please say

21  "Aye."  Aye.

22     DR. GARDNER:  Aye.

23     MR. LORINO:  Aye.

24     MR. SHERMAN:  All those opposed?

25     MR. MICHAEL PENEGUY:  Nay.

Page 223

1          MR. BUDDY:  Nay.

2          MR. SHERMAN:  Okay.  We are adjourned.

3                    *        *        *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Special Meeting (Final Transcription)
Edward Wisner Donation Advisory Committee

Page 224

1

2                    REPORTER'S CERTIFICATE

3

4

5          I, LINDA G. GRIFFIN, RPR, Certified

6    Court Reporter, in and for the State of

7    Louisiana, as the officer before whom this

8    was transcribed, do hereby certify that this

9    was transcribed by or under my personal

10   direction and supervision, and is a true and

11   correct transcript, to the best of my

12   ability and understanding; that I am not

13   related to counsel or to the parties herein,

14   nor am I otherwise interested in the outcome

15   of this matter.

16

17

18                              OFFICIAL SEAL
                                LINDA G. GRIFFIN
19                              Certified Court Reporter
                                in and for the State of Louisiana
                                Certificate Number   80002
20                              Certificate expires 12-31-13

21

22

23   _____
     LINDA G. GRIFFIN, RPR
24   Certified Court Reporter

25

# Transcript of the Testimony of
# **Regular Meeting**

## **Date taken: July 31, 2013**

## **Edward Wisner Donation Advisory Committee**

All **electronic deposition & exhibit files**
are available at **www.psrdocs.com.**
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password.**

# **Professional Shorthand Reporters, Inc.**

**Phone:   504-529-5255**
**Fax:   504-529-5257**
**Email:   reporters@psrdocs.com**
**Internet:   http://www.psrdocs.com**



**EXHIBIT**
**QQ**

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 1

EDWARD WISNER DONATION
ADVISORY COMMITTEE


REGULAR MEETING


TRANSCRIPTION FROM AUDIO TAPE of
the Edward Wisner Donation Advisory
Committee Meeting, held in the offices of
the Arts Council, 8th Floor Conference Room,
935 Gravier Street, New Orleans, Louisiana
70112, on Tuesday, the 31st day of July,
2012.

PRESENT:
    Michael G. Sherman, Chair
    CITY OF NEW ORLEANS

    Michael Peneguy, Representative
    WISNER FAMILY HEIRS
    William A. Peneguy, Representative
    WISNER FAMILY HEIRS

    Lizbeth Turner, Alternate
    Anthony Lorino, Alternate
    TULANE UNIVERSITY

    Ed Buddy, Alternate
    THE SALVATION ARMY
    Dr. Ron Gardner
    LSUHSC

STAFF:

    C. CATHY NORMAN
    Secretary-Treasurer/Land Manager
    L. AMANDA PHILLIPS

Page 2

1   GUESTS:
2       MARK E. PENEGUY, ESQ.
        Wisner Family
3
        STEPHEN GREEN
4       Wisner Family
5       JAMES N. PENEGUY
        Wisner Family
6
        MATT AVERILL
7       City of New Orleans
8       BROOKE BACUETES
        City of New Orleans
9
        JAMES A. BURTON, ESQ.
10      Simon, Peragine, Smith & Redfearn, LLP
11      JOEL WALTZER, ESQ.
        Waltzer & Wiygul
12
        ROBERT WIYGUL, ESQ.
13      Waltzer & Wiygul
14      SOREN GISLESON, ESQ.
        Herman, Herman & Katz
15
        BARBARA GOODSON
16      Board of Regents
17      UMA SUBRAMANIAN
        Board of Regents
18
19   TRANSCRIBED BY:
20      LINDA G. GRIFFIN, RPR
        Certified Court Reporter
21
22
23
24
25

Page 3

1                AGENDA INDEX
2                        PAGE
    OLD BUSINESS
3   1) Approval of Minutes from
       March 27, 2012 Monthly Meeting
4   and Executive Session, April 19,
    2012 Special Meeting
5   (Waltzer & Wiygul), April 24, 2012
    Regular Meeting and Executive
6   Session and April 24, 2012
    Annual Review ...................... 43
7
    NEW BUSINESS
8   1) Secretary-Treasurer's Report ...... 49
    2) City of New Orleans
9      Wisner Land Trust Proceeds Acct. 75
    3) BP Horizon Deepwater Spill Update
10     Waltzer & Wiygul Representation
       CNO Ethics Review; Tilling;
11     Global Settlement; Hard
       Structure Removal ............... 80
12  4) Wisner Beach Update
       Caminada Headlands Project;
13     SLBDD; AG Response to Ownership
       of Bay Champagne Area.......... 160
14  5) Noel Pilie Duck Camp Lease
       Renewal...................... N/A
15  6) Global Geophysical Project ...... N/A
    7) LUMCON; LSU reps attending....... 5
16  8) Chevron; Land Rights-Bay Marchand.N/A
    9) Chevron; Letter Agreement
17     Approval of Right to Assign
       Portion of Surface Lease ...... N/A
18  10)Chevron Subordination of
       Caminada Project Servitude..... N/A
19  11)Greater Lafourche Port Commission
       Servitude for Geotube Project.. N/A
20
21
22
23
24
25

Page 4

1          M O T I O N S
2                        PAGE
    MOTION BY MICHAEL PENEGUY
3   to approve Secretary-Treasurer's
    Report ...................... 75
4   SECONDED BY DR. RON GARDNER
    MOTION PASSED
5
    MOTION BY MICHAEL SHERMAN
6   to retain the City's publicly
    procured Joint Venture to
7   represent the Donation,
    moving forward, and terminate
8   the relationship with
    Waltzer & Wiygul................... 87
9
    SECONDED BY ANTHONY LORINO
10  DISCUSSION ENSUED
    (no vote taken)
11
    MOTION BY MICHAEL SHERMAN
12  to retain the City's publicly
    procured Joint Venture to
13  represent the Donation in
    the BP Deepwater Horizon
14  matter; terminate
    Waltzer & Wiygul.
15  SECONDED BY DR. GARDNER

16  VOTES FOR:       | VOTES AGAINST:

17  DR. RON GARDNER  | MICHAEL PENEGUY
    ANTHONY LORINO   | ED BUDDY
18  MICHAEL SHERMAN  |
19  MOTION PASSED (3:2) .............. 159

20
    NO MOTION TO ADJOURN .............. 160
21  (End of Meeting)

22
23
24
25

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 5

1          *REGULAR MEETING*
2      MR. SHERMAN: Ms. Norman asked me, am I
3  the Mayor's representative. The Mayor wrote
4  a letter, again, just verifying. "The
5  purpose of this memo is to confirm that
6  Michael Sherman, my Executive Counsel, is
7  and continues to be my designee to the
8  Donation Advisory Committee and has my right
9  to vote and chair all meetings of the
10 Donation Advisory Committee."
11     MS. NORMAN: The reason I asked is
12 because in our bylaws, it's required to have
13 it -- we are required to have it in writing,
14 so that was why I needed it.
15     MR. SHERMAN: All right. If there's no
16 objection to moving the LUMCON presentation
17 first -- please, welcome.
18     MS. GOODSON: As stated a few moments
19 ago, I'm Barbara Goodson. I'm with the
20 Board of Regents, and Uma. We have recently
21 become aware of some of the issues, I think,
22 that you all have been discussing about the
23 LUMCON property.
24     LUMCON is under the Board of
25 Regents, and Uma can explain more about the

Page 6

1  structural organization later, but we're
2  here really to just share our concern; we
3  understand your issues with the property
4  damage that was done by Katrina, and to
5  assure you that we're working on getting
6  them repaired.
7      We have recently had some contact
8  with facility planning and control and
9  they've had some movement with FEMA, so
10 we're aggressively pursuing getting the
11 bulkhead and the repairs done, so, I mean,
12 that's really why we're here to tell you
13 that we've heard your concerns. We are here
14 to try to make sure that you know that we
15 are actively engaged in getting them
16 repaired.
17     MS. NORMAN: And, well -- and for those
18 that don't know, what Jim Burton and I
19 initiated was that -- we really -- because
20 we're aware of the damage and because we
21 feel it presents a very dangerous
22 situation -- and I showed you the
23 photographs -- we, as landowners, could be
24 held liable very easily if someone were
25 injured on the property, and we requested

Page 7

1  that the property be closed and not used
2  until such time that the damage is repaired.
3  I know people are staying there and there's
4  no one there from LUMCON. Someone shows up
5  maybe once a week, does the laundry and cuts
6  the yard, but other than that, there is no
7  supervision. There are people staying
8  there, people in and out. And I still
9  continue to have concerns that the facility
10 should be just closed up until such time
11 that it's in proper shape to be able to be
12 used by the public.
13     MS. GOODSON: Well -- do you want to
14 address that? Yeah. What we're doing,
15 Cathy -- I mean, since you have contacted us
16 and since we've had several conversations
17 with you, we are -- and I don't know how
18 many of you have ever had to deal with a
19 FEMA issue, from the storms, but the initial
20 phase in trying to get FEMA to share in
21 doing any type of replacement or
22 construction work is to get a project
23 worksheet.
24     The project worksheet that FEMA
25 had presented to LUMCON only allowed $30,000

Page 8

1  to fix the bulkhead. Facility planning,
2  which is the arm of the division of
3  administration which oversees all
4  construction on state facilities, estimated
5  that the cost would be close to a million
6  dollars, so you had a big gap there that has
7  existed until the last couple of weeks.
8      And so we are beginning to see
9  significant changes from FEMA, and they have
10 now revised their estimate, which is closer
11 to facility planning than their original
12 estimate. So we think that we're getting
13 very close, and once we have an agreement on
14 what the dollar amount will be, facility
15 planning will begin the repairs. I mean,
16 that's basically how it will work.
17     MS. NORMAN: And that's wonderful.
18 That's wonderful news. I also contacted the
19 Greater Lafourche Port Commission, and Chet
20 Chiasson went and took a look. There are
21 rocks being removed from our beach that they
22 don't -- they're going to be storing their
23 big old boulders that were on the beach --
24 they're going to be removed, and they can be
25 placed and possibly used in the project. I

Pages 5 to 8

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 9

1   mean, I was just contacting them, saying, is
2   there anything you can do for just -- to
3   help out a little.
4       MS. GOODSON:  Right.
5       MS. NORMAN:  I'm thinking, perhaps, at
6   least re-grading the road, which wouldn't be
7   included in your FEMA claim.  Because the
8   road is a mess.  You can barely get down
9   it --
10      MS. GOODSON:  Right.
11      MS. NORMAN:  -- in a storm because the
12  water's about that deep.  So, you know, I've
13  been continuing to try and make this a joint
14  issue, particularly since, when you go down
15  to Port Fourchon, you have the Chouests, you
16  have Danos & Curole -- Danos is on your
17  Board of Supervisors.
18      MS. GOODSON:  Well, he's on LSU's
19  board.
20      MS. NORMAN:  Okay, LSU's Board of
21  Supervisors.  But there are a lot of
22  LSU-related people who, no doubt, we could
23  get --
24      MS. GOODSON:  Would help.
25      MS. NORMAN:  -- to contribute to

Page 10

1   upgrade this facility to be what it should
2   be for the area.  And so I'm going to
3   continue in that effort, with your
4   permission, because I think that the port
5   can be a linchpin in trying to help get
6   together some people to get this thing back
7   on its feet.
8       MS. GOODSON:  Well, and -- I mean, the
9   main -- I guess the main issue that we have
10  is that a lot of the contact originally was
11  with Nancy Rabalais and would much prefer
12  that Nancy use her talent and her skills and
13  background to continue to do research, and
14  let us be the people that you work with to
15  try to make all these improvements and get
16  the --
17      MS. NORMAN:  Okay.
18      MS. GOODSON:  -- work completed.  I
19  mean, that's really kind of why we're here
20  is we want to assist you --
21      MS. NORMAN:  Right.
22      MS. GOODSON:  -- and keep Nancy doing
23  research.
24      MS. NORMAN:  Well -- and there's no
25  doubt that this facility is a huge asset

Page 11

1   down there, and I know everyone feels that
2   way.  I know the oil companies that are down
3   there, Chevron, Shell, and others -- I know
4   that the port, like I said, and LOOP and
5   others, would all support an effort, if we
6   could get one going, to help improve this
7   area.
8       But in the meantime, it still
9   doesn't take away the liability that is
10  hanging out there, for us and for you, with
11  the current condition of the property, and
12  I'm telling you, it is very dangerous.
13      MS. SUBRAMANIAN:  We -- we do
14  understand.  We have been brought into the
15  situation only about three weeks ago.  Until
16  then, Nancy Rabalais was handling this and
17  we have been in touch with her.
18      MS. NORMAN:  Right.
19      MS. SUBRAMANIAN:  And we appreciate you
20  asking us to come give you a status update
21  on this.  We are fully familiar with this
22  situation now and we are working with the
23  division of administration and GCEF and FEMA
24  to expedite the process, as Barbara
25  mentioned.

Page 12

1       We understand your concern;
2   however, I don't think immediate closure of
3   the facility is something that LUMCON is
4   ready to do at this time.
5       MS. GOODSON:  Well, we can't do that.
6   There is another advisory committee
7   comprised of other individuals from other
8   campuses, so --
9       MS. SUBRAMANIAN:  It's an executive
10  board that is in charge of the immediate
11  operations of LUMCON, under the supervision
12  of Nancy Rabalais.  So we'd be glad to
13  communicate to them, and we have
14  actually done that.
15      In the meantime, we think LUMCON
16  is -- especially at this time, without
17  assistance, they are doing everything
18  possible to move this process, move the
19  repair process to where it can be done
20  timely and done to everybody's satisfaction,
21  so we would hope that you would let the
22  process continue and let us assist LUMCON in
23  getting all of this, all the repairs done,
24  and not demand immediate closure.  But if
25  that is your choice, we'd be glad to go back

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 13

1  and communicate that to the executive board
2  and to Nancy Rabalais.
3      Also, one thing that they
4  mentioned to us was they made a request that
5  any visit to the facility, from this
6  committee, that they be notified of such
7  visits by the visitor, and that's -- I would
8  like to communicate that request to you,
9  again, restate the request to you.
10     MR. LORINO:  You don't have adequate
11  insurance to cover it and is there any state
12  facility helping out?
13     MS. GOODSON:  Well, any state facility
14  is covered by risk management, which is the
15  self-insured --
16     MR. JAMES PENEGUY:  It's broke.
17     MS. GOODSON:  No, it -- I mean, it's
18  self-insured, but, I mean, it's -- I
19  wouldn't say it's broke, but it is part of
20  the division, and it has called on state
21  resources.
22     MR. JAMES PENEGUY:  That's what I'm
23  saying, do you have any insurance.
24     MR. SHERMAN:  What's the path forward
25  that you'd recommend or that you're

Page 14

1  requesting?
2      MS. GOODSON:  Well, I mean --
3      MR. SHERMAN:  Help us understand the
4  path forward.
5      MS. GOODSON:  We only had -- we've only
6  been involved about three weeks, and since
7  then, we've already made significant
8  progress with FEMA.
9      MR. SHERMAN:  Great.
10     MS. GOODSON:  And so, you know, what
11  we'd like to do is try to get an estimate.
12  We don't mind reporting back, coming back
13  down here to meet --
14     MR. MICHAEL PENEGUY:  Oh, good.
15     MS. GOODSON:  -- another day trip, you
16  know, to --
17     MR. SHERMAN:  So what I hear you saying
18  is you want the facility, you want to stay
19  there, you have an interest in there, and
20  you want to repair it with the FEMA funds
21  you get.  You just don't have them.  And
22  that's --
23     MS. GOODSON:  Well --
24     MR. SHERMAN:  Will the FEMA funds be
25  repurposed or will they be used to repair

Page 15

1  the facility?
2      MS. GOODSON:  It's to re --
3      MS. SUBRAMANIAN:  It's for the specific
4  purpose.  And like Barbara said, we have
5  made huge headway with FEMA of the
6  settlement.  They are closer to our estimate
7  than the initial $30,000 that they've
8  estimated the damages at.  So we are hopeful
9  that this is going to be an immediate
10  project as soon as the planning assessment
11  is done and the plans are made available.
12     MS. GOODSON:  And the difference in the
13  estimate is primarily that facility planning
14  is coming back, recommending more of a
15  steel-type structure/bulkhead rather than a
16  replacement of the type of structure, right.
17     MS. NORMAN:  It's a mitigation bulkhead
18  that will withstand future storms --
19     MS. GOODSON:  Right.
20     MS. NORMAN:  -- as opposed to just a
21  replacement.
22     MS. GOODSON:  Right.  And that's the
23  big difference -- that was the gap in the --
24  in the repairs, but FEMA's coming closer to
25  it now, so -- the only thing that they -- my

Page 16

1  appreciation is the engineers and
2  architects, you know, basically will have to
3  agree on how much of that type of structure
4  material will be used in order to agree on
5  the estimate, so --
6      MS. SUBRAMANIAN:  And this is not
7  unusual for the New Orleans area.  Courts
8  here are familiar with so many facilities
9  not yet being repaired because of delays
10  with FEMA, so --
11     MR. SHERMAN:  Dr. Gardner.
12     DR. GARDNER:  Ms. Goodson,
13  Ms. Subramanian --
14     MS. SUBRAMANIAN:  Yes.
15     DR. GARDNER:  Ron Gardner, LSU Health
16  Sciences Center --
17     MS. SUBRAMANIAN:  Yes, sir.
18     DR. GARDNER:  -- and new member to the
19  Wisner Fund Board.  And forgive me if I'm
20  going over old territory.  Just count it up
21  to being new and somewhat slow.
22     As best I'm able to understand --
23  and I certainly pick up on all the FEMA
24  issues -- and that's another galaxy in a
25  land far, far away, I understand -- what I

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 17

1    think -- and, again, if this has already
2    been covered and already been done, then I
3    just need to do more homework because I
4    don't have it.  But I think that it would
5    behoove LUMCON and all those that are
6    attached to it to reduce to some -- at least
7    a bullet document, what the issues are, the
8    challenges are, hopefully attach maybe some
9    timelines, even though we know they may just
10   be out there somewhat.
11        Because obviously the Wisner Fund
12   has indicated concerns it has and challenges
13   it has that it's got to satisfy and -- so
14   you certainly want to respond to those as
15   best you can.
16        I tend to work better when I've
17   got a sort of good picture of the
18   boundaries, and then I can sort of zero in.
19   I understand that the general feeling is
20   that something needs to be done with LUMCON,
21   that, in addition to you all, there's some
22   other pieces out there that you -- which
23   ought to be delineated as to where they are,
24   who they are, that sort of thing, for my
25   purposes, and I think maybe for everybody

Page 18

1    else, but certainly for mine.
2        MS. GOODSON:  The organizational
3    structure.
4        DR. GARDNER:  And actual responses in
5    writing, given some of the concerns that
6    have been brought up in the past regarding
7    this that's been evidenced, that are
8    concerns that rest on this end, and respond
9    to those as best you can.  Am I asking for
10   something that's out of reach here?
11       MS. SUBRAMANIAN:  No.
12       MS. GOODSON:  No, no.
13       DR. GARDNER:  Okay.  And has that --
14   was that something done already?  Am I
15   just --
16       MS. SUBRAMANIAN:  No, it's not been
17   done, because the executive board has not
18   met since the time we have been brought into
19   this, so we have made a request to
20   Dr. Savoie, with ULL.
21       MS. GOODSON:  And Dr. Holbert, with
22   Nicholls.
23       MS. SUBRAMANIAN:  With Nicholls.
24       DR. GARDNER:  I suggest, without
25   necessarily suggesting that you all preempt

Page 19

1    anybody or whatever, but since you all, if
2    I'm hearing correctly, on point on this,
3    including Ms. Rabalais, that you all at
4    least draft that up.  I'm not aware that you
5    need the board to tell you that it's okay to
6    draft up what these particulars are, because
7    you do need to report back to them, the
8    concerns from the Wisner side of this thing,
9    as well as what challenges you all have in
10   addressing those things.  Is that correct?
11       MS. SUBRAMANIAN:  That's a good
12   suggestion and that's something that we have
13   been moving toward.  We have gathered pretty
14   much all the facts from you, the documents,
15   and we have some information from LUMCON as
16   to their concerns, and we have the FEMA
17   development, so as soon as this process is
18   finalized, we'd be glad to report back to
19   you in a written form with a brief
20   response --
21       DR. GARDNER:  Yeah, yeah.
22       MS. SUBRAMANIAN:  -- as to where we are
23   and where we --
24       DR. GARDNER:  I, for one -- and
25   nobody's died and left me boss -- so, as I

Page 20

1    said, the last meeting was my first meeting,
2    so I yield to the wisdom at the table, but I
3    would strongly suggest that you all do that,
4    and do that as thoroughly and expeditiously
5    as possible.
6        As I sense here, with Wisner,
7    you're among friends.  You're allies here.
8    We just need to get help, to help you all,
9    if we can.  But, to me, for me to help, I've
10   got to understand stuff better and where all
11   the tentacles are and whether that goes back
12   up to the Governor.  But we ought to at
13   least see.  And we may not be able to do
14   anything about it, but we need to at least
15   see that.  Mr. Chairman, am I off base here?
16       MR. SHERMAN:  I think you're exactly on
17   point.
18       DR. GARDNER:  Okay.  All right then.
19       MS. SUBRAMANIAN:  That's a great
20   suggestion.  We'd be glad to do that.  I
21   just want to make sure that I understand
22   what you said.  You said "all the other
23   concerns."  I didn't know what that meant.
24       DR. GARDNER:  Well, I know, from the
25   minutes, that this is not a new issue.

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 21

1    Ms. Norman just sort of did a litany of some
2    things, but I'm sure that was probably the
3    tip of the iceberg, I'm assuming.  I'm just
4    saying whatever those things are that have
5    been brought up in the past that are still
6    outstanding, at least in terms of what to be
7    done about those, who else is involved in
8    doing something about it, that's been
9    expressed to you all and Ms. Rabalais maybe,
10   I don't know, but I'm trying to be global
11   about it in the sense that whatever those
12   things are -- I don't claim to know what
13   they are -- I just suspect that it's --
14   other than what's been said this morning,
15   there's some things still out there.
16          But I want to know about that.
17   What are those things?  Who are these
18   people?  What are the -- so at least we can
19   start to try to problem-solve.  But you
20   can't fix a problem you don't think you
21   have.  You need that, at least.
22          MS. NORMAN:  Well, once again, the
23   liability issue is out there.  Someone could
24   be hurt today, and as much as you can say
25   you're self-insured, they're going to sue us

Page 22

1    and it's going to directly impact every
2    single beneficiary at this table if we get
3    sued and if someone is injured on the
4    property.  It's happened before.
5          And we -- we need to have -- I
6    mean, there are a couple things that bother
7    me.  No. 1, we're the landowner.  We're
8    being told that we can't go on the property,
9    and this is a gratuitous lease.  That seems
10   a little bit strong that we have to notify
11   you to go on our own property that we lease
12   to you, for free.  I don't understand that
13   at all.  And I can understand you saying we
14   can't enter your facility, but for us to go
15   and check on our land, that -- I find that a
16   little bit aggressive on the part of LSU and
17   on the part of Nancy Rabalais, in
18   particular.
19          DR. GARDNER:  Yeah, I don't mind that,
20   as a courtesy, but it does seem rather
21   strong that it's an obligation to have to do
22   it.
23          MS. NORMAN:  Well -- and the second
24   thing is that, you know, this is a very old
25   lease, and one of the things you can put on

Page 23

1    your list is that we need to redo this
2    lease.  This lease is -- doesn't protect
3    anyone.  It's -- the language in it, it's
4    not well written.  We need to get a new --
5    start working on a new mutually agreeable
6    lease, as we move forward.
7          There is also -- when the facility
8    was proposed to be closed, in January 2010,
9    because of budget cuts, the facility was
10   closed.  It was shuttered and closed for, I
11   think, about three months, and it was --
12   when the oil spill hit, we asked that we
13   could have our on-site surveillance person
14   down there, and put a trailer down there, so
15   that he could keep an eye on the facility,
16   because people are on that property
17   constantly.  The gate gets left open.  You
18   have to understand that it's a road and
19   people are constantly trespassing who aren't
20   staying there and --
21          MS. GOODSON:  And you're actually very
22   correct in that we don't know.
23          MS. NORMAN:  Well, I'm telling you
24   this.  And so with Forrest there, he at
25   least tells people to turn around now, if

Page 24

1    he's there.  But Forrest came and has his
2    trailer on the property, outside the gate of
3    the facility, and, you know, when I talked
4    to your facilities manager, he's concerned
5    about liability of having Forrest there.
6          So it's kind of a two-way street
7    of us trying to get this worked out, where
8    we redo the lease, carve out the piece that
9    he's on, which is outside of the facility,
10   and move forward.  But those are a couple of
11   things that we need to discuss.
12          MS. SUBRAMANIAN:  May I briefly add
13   something to that?
14          MS. NORMAN:  Uh-huh.
15          MS. SUBRAMANIAN:  I want to make sure
16   that we all understand the scope of work we
17   are assisting LUMCON with.  We are here to
18   help LUMCON and, you know, coordinate with
19   you and the other entities involved, FEMA,
20   of course, the division of administration.
21   We have also reached out to the AG's office
22   in case we need them.
23          So we are here to coordinate a
24   repair of the bulkhead.  If you have
25   concerns about the terms of the lease, the

Pages 21 to 24

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 25

1  lease expires in 2022, on its own terms, so
2  if you think you need to renegotiate the
3  lease, I would think that the City needs to
4  renegotiate the lease with Nicholls, and
5  Nicholls needs to renegotiate the sublease
6  with LUMCON, but as --
7      MS. NORMAN:  Why do we have to do
8  another sublease?
9      MS. GOODSON:  Well, let me tell you.  I
10 think that's how it flows.  I mean --
11     MS. SUBRAMANIAN:  The sublease, you
12 would -- it's being sublet -- the property
13 that LUMCON occupies is on a piece of land
14 that's subleased from Nicholls to LUMCON, so
15 on its own chart --
16     MS. NORMAN:  Well, why not just lease
17 directly to LUMCON now and do a whole new
18 lease?  That's my whole point.
19     MS. SUBRAMANIAN:  But the lease does
20 not terminate until 2022 unless you want --
21 I want to make sure that you are not --
22     MR. MICHAEL PENEGUY:  Well, I think
23 what --
24     MS. NORMAN:  I'm just --
25     MR. SHERMAN:  Are you not the proper

Page 26

1  parties --
2      MS. SUBRAMANIAN:  Exactly.
3      MR. SHERMAN:  -- if we're talking about
4  a lease?
5      MS. NORMAN:  Okay.
6      MR. SHERMAN:  And who, in your opinion,
7  is that?
8      MS. NORMAN:  Yeah.
9      MS. GOODSON:  Well, okay.  Let me make
10 sure that -- go back to your point.
11     MR. SHERMAN:  Yeah.  So I think --
12     MS. GOODSON:  There is a committee.
13 All right.  In Higher Ed, I mean, there's
14 the Board of Regents, which we represent,
15 and there is all of Higher Ed, LSU, you
16 know, the UL system, the Southern system,
17 LCTCS system, LSU system, and then there's
18 these other entities, one is LUMCON, and the
19 other is LOSFA, and those two particularly
20 fall under the umbrella of the Board of
21 Regents, organizationally.
22     But LUMCON has another management
23 structure comprised of presidents of several
24 of the universities, who sit on a governing
25 board for LUMCON, to direct for research,

Page 27

1  organization, and that's who we --
2      MR. SHERMAN:  Let me just see if I can
3  skip to the end.  So the scope of what you
4  can address with us today is getting the
5  bulkhead fixed?  You're indicating LUMCON
6  wants to resume full use of the facility, or
7  continue; they want to fix it up, and
8  they're using FEMA funds to do it.  So
9  that's where we are, is that --
10     DR. GARDNER:  But Mr. Chairman --
11     MS. SUBRAMANIAN:  You were talking
12 about the --
13     DR. GARDNER:  And what I was asking is,
14 since you all are here, and we understand
15 that there are only certain parts that you
16 all actually have the control of or the
17 responsibility, but you all are here.
18     MS. GOODSON:  We're here.
19     DR. GARDNER:  You knew it was a tough
20 job when you took it.
21     MS. GOODSON:  Right.  We can handle it.
22     DR. GARDNER:  All I'm asking, and I
23 hope we're asking, is that since you all are
24 the people on point, that that's why I asked
25 for wherever these other pieces are, that

Page 28

1  you don't have any direct -- but, you know,
2  are you the best person to find that out?
3  And let us know.  Because these are issues
4  that won't go away because we're not talking
5  to the right folk.  It's still there.
6      MS. GOODSON:  I agree with you.  And
7  what we can do is serve as that conduit --
8      DR. GARDNER:  And that's what I meant,
9  yeah.
10     MS. GOODSON:  -- between this group and
11 that management board.  Because, as Uma
12 says, she has been in touch with Dr. Savoie,
13 Dr. Holbert, and, you know, what we need to
14 do is go meet with that governing board and
15 explain to them --
16     DR. GARDNER:  And what I'm -- yes,
17 ma'am.  And what I'm asking is that, in
18 addition to all of that, that you all take
19 the responsibility, or have someone, to
20 detail all of that stuff for us so we can
21 see it, okay.
22     MS. GOODSON:  Right.
23     MS. NORMAN:  Well, it would also help
24 if we knew who these people were.
25     MS. GOODSON:  We can do that.  We can

Professional Shorthand Reporters, Inc.                    1-800-536-5255
Offices in New Orleans and Baton Rouge                    www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 29

1    do that.
2        DR. GARDNER:  That's what I'm saying.
3        MS. NORMAN:  Yes, yes.  That's the
4    first thing we need.  Because my only
5    contact is Nancy Rabalais.
6        MS. GOODSON:  Would be Nancy, right.
7        MR. SHERMAN:  So we're going to be
8    relying upon you --
9        MS. SUBRAMANIAN:  Yes.
10       MR. SHERMAN:  -- upon you to make these
11   contacts and links so we can follow through?
12       MS. SUBRAMANIAN:  Yes.
13       MR. SHERMAN:  Any other thoughts with
14   LUMCON?  Any other questions or comments?
15       MR. MICHAEL PENEGUY:  Just an idea.
16   I'm just trying to get an idea of whether
17   you have any idea of the time that will be
18   required to get the bulkhead repaired.
19       MS. GOODSON:  Well, the last email that
20   we got from facility planning, which was
21   last week, was very good news.  What I need
22   to do is go back with them and see --
23   because I know that they're going --
24       DR. GARDNER:  Is that Mr. Rish?
25       MS. GOODSON:  Pardon?

Page 30

1        DR. GARDNER:  Is that Mr. Rish over
2    there now?
3        MS. GOODSON:  No.  Well, actually it's
4    a -- I'm not sure of the actual project
5    manager here in New Orleans.  I deal with
6    the director, John Davis, who's in Baton
7    Rouge.  And, I mean, just so you know, I was
8    in the division --
9        DR. GARDNER:  Yes, ma'am.
10       MS. GOODSON:  -- so I spent 1/3 of my
11   career there.  So, yes.  And they're right
12   across the hall, so -- but what we can do
13   is -- we need to -- I know that facility
14   planning, having worked with them, I know
15   that they're going to go back and continue
16   to fight for a complete solid steel
17   bulkhead, and I need to make sure that they
18   don't stall things by trying to get
19   everything they need, if there's some level
20   of compromise between the amount of money
21   that FEMA has said they will now contribute
22   and what facility planning thinks it would
23   take to do the job.  I just need to keep
24   them moving, you know.
25       MR. MICHAEL PENEGUY:  Okay.  But you

Page 31

1    can't -- at this time you can't estimate how
2    long it will take?
3        MS. GOODSON:  Well, I've got to make
4    sure that -- you know, I mean, I don't know
5    how much you deal with engineers, but
6    sometimes, you know, they -- you know,
7    they'll --
8        MR. MICHAEL PENEGUY:  Well, I have to
9    point out, I am an engineer, and I work
10   fast.
11       MS. NORMAN:  Jim, did you have any
12   suggestions on this?
13       MR. BURTON:  We need -- the only thing,
14   when we talked before, I got the impression
15   that we would be a little further along in
16   getting LUMCON into the process.  Because a
17   decision has to be made on whether they're
18   going to continue to operate --
19       MS. NORMAN:  Operate or not.
20       MR. BURTON:  -- and whether the
21   facility is so dangerous that it should be
22   closed.  So we really -- we really need to
23   emphasize that part of it and get that
24   resolved, because, I mean, that's the big --
25   the immediate issue is the potential

Page 32

1    liability.
2        MS. NORMAN:  And if not, we're going to
3    need --
4        MS. SUBRAMANIAN:  We have, in fact,
5    communicated that to them.  They have your
6    letter, the one that came from Mr. Burton.
7    They have that letter.  I have been in
8    contact with two of the executive board
9    members.  They have not officially met, but
10   they are aware of your request.  I don't
11   think a decision has been made to comply
12   with that request.  And, you know, things
13   like the terms of the lease, we'd be glad to
14   go back and communicate that to them, but I
15   don't think the lease is up for termination
16   until 2022, so --
17       MS. NORMAN:  You can -- I know.  I'm
18   just saying, it would be mutually beneficial
19   to renegotiate it.  I know it's not up until
20   2022.  I'm just saying it would be mutually
21   beneficial to both of us to -- for our
22   protection and many other things.
23       MS. SUBRAMANIAN:  We'd be glad to go
24   back and communicate that --
25       MS. GOODSON:  Right.

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 33

1    MS. SUBRAMANIAN: -- to them.
2    MS. NORMAN: Right.
3    MS. SUBRAMANIAN: But I don't think
4  that is --
5    MR. MICHAEL PENEGUY: In other words, I
6  don't think we want to run you off.
7    MS. NORMAN: No, we don't want to run
8  you off.
9    MR. MICHAEL PENEGUY: We want to just
10 improve things.
11   MS. NORMAN: We just want to
12 renegotiate it so that it has proper
13 language in there, for our protection, for
14 your protection. If you don't like the fact
15 that our guy -- you gave us permission.
16 This guy is out there on the property.
17 We'll carve that out of the lease so that
18 you don't have to worry about liability,
19 about him being out there. And there are
20 many other things that we need to -- that
21 might be mutually beneficial.
22   I mean, your uses of the facility
23 are very, very narrow, and after the oil
24 spill, it was leased to EPA to do work on
25 the oil spill, which is not research, and by

Page 34

1  any means, related to Louisiana's coastline.
2  So, I mean, that's another issue that we
3  could work out if -- and it might make the
4  whole facility more profitable for you.
5    MS. GOODSON: And I hear very much what
6  you're saying. Uma is our general counsel.
7  She -- and there is no other lawyer that
8  works for LUMCON, so, I mean, she really
9  would be the appropriate person to
10 represent, in all of the transactions, so --
11   MS. SUBRAMANIAN: Yes. For us to
12 adequately address the concerns that you
13 have, we have only been advised of the
14 concern about the bulkhead.
15   MS. NORMAN: Right.
16   MS. SUBRAMANIAN: We'd be glad to be,
17 like Barbara said, be the conduit, and, you
18 know, communicate your concerns to the board
19 and get their response.
20   MS. NORMAN: Because it's kind of --
21 yeah, I agree.
22   MS. SUBRAMANIAN: But we need to know
23 what those concerns are.
24   MS. NORMAN: Yeah.
25   DR. GARDNER: And just at a glance,

Page 35

1  from last meeting, there's nobody bashful on
2  this end, so you'll know about the concerns
3  here, and whomever you've got to communicate
4  with on the other end, they may quickly
5  determine that the bulkhead is the least of
6  their concerns; they ought to ratchet up
7  some priorities about some of these other
8  things, because the clock's ticking.
9    And they may have their timelines,
10 but, Mr. Chairman, correct me if I'm wrong,
11 there are timelines here that we have to
12 satisfy. And we don't want to throw the
13 baby out with the bath water or lose
14 anything in the process, and that means that
15 somewhere on that other end, with all those
16 other parts, there needs to be a similar
17 urgency on this.
18   MS. GOODSON: What are your timelines?
19   MS. NORMAN: Our timeline is -- we want
20 the facility closed because we're -- we're
21 at risk of being sued if someone is hurt out
22 there, and it's a dangerous situation.
23   MS. GOODSON: So that's what you're
24 referring to, on your timelines?
25   MR. SHERMAN: Yeah. And to the extent

Page 36

1  that you want to come back with a proposal
2  to us to shutter the facility, in an interim
3  capacity, or do intermediate measures to
4  make it safer, until such time as it can be
5  properly repaired, we're all ears. I think
6  Dr. Gardner said it right, that we support
7  the mission and want to help, but yet, we
8  have to also protect this tremendous asset
9  that we --
10   MS. SUBRAMANIAN: We understand.
11   MR. SHERMAN: Yeah, okay.
12   MS. SUBRAMANIAN: Let me go back and
13 talk to the executive board at their next
14 meeting. Right now I'm planning on one of
15 us going there and talking to them. If we
16 do, am I hearing right that there's some
17 concern, there's some interest from this
18 group to have the lease either terminated or
19 renegotiated?
20   MR. MICHAEL PENEGUY: Not terminated.
21   MS. SUBRAMANIAN: Is that what I'm
22 hearing?
23   MR. SHERMAN: "Renegotiate" was the
24 word.
25   MS. NORMAN: Renegotiate -- just -- no,

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 37

1   and that's secondary. That is totally
2   secondary. That's just something that we --
3   if you look for future things to bring to
4   the board -- I mean, you read the lease,
5   it's a lousy lease. It's a lousy lease for
6   you, it's a lousy lease for us. We just
7   think that a new lease would be best for
8   both of us.
9        DR. GARDNER: And, obviously -- and as
10  I said, we've got the attorneys here, and
11  Ms. Norman is one -- and I haven't read the
12  lease -- and if I did, I probably wouldn't
13  understand most of it -- what I suspect is
14  that things have changed, certainly relative
15  to things before Wisner, and so it -- I
16  don't see a harm and foul in reviewing that.
17  Some things may stay in place. There will
18  be better minds to make that decision.
19       MR. SHERMAN: Yeah.
20       MS. NORMAN: Yeah.
21       DR. GARDNER: Some things may be
22  changed -- need to change for either party.
23       MR. SHERMAN: So to bring closure,
24  we'll recommunicate to the two of you, all
25  of the concerns, and then why don't you work

Page 38

1   back with us, whether it's under your
2   purview now or finding the right folks.
3        MS. GOODSON: Well, I mean, we need --
4   we are happy to do that.
5        MS. SUBRAMANIAN: We'll be glad to help
6   you.
7        MR. SHERMAN: Well, thank you for
8   coming. We appreciate your time.
9        MS. NORMAN: Yes, thank you, and --
10       MR. MARK PENEGUY: I want to know what
11  happens in the meantime when we're at risk.
12  I think we need to shut this place down
13  until we find some way that -- if LSU
14  wants -- or if LUMCON wants to give us some
15  sort of a bond that protects us, that's
16  fine, but we're at risk right now, and
17  they've known this -- you ladies have not,
18  but LUMCON's known this for years and it's
19  time that the risk is taken away.
20       MS. GOODSON: Why don't -- let us
21  discuss that with risk management and the
22  division about what type of coverage that
23  they have on this property so that we can
24  give you some assurances as to what level of
25  insurance they cover, and get with -- an

Page 39

1   estimate from facility planning as to the
2   construction and repair timeline.
3        MR. MICHAEL PENEGUY: And I think along
4   that --
5        MS. SUBRAMANIAN: And we have consulted
6   with the attorney general's office and the
7   other entities and we are doing the best we
8   can. Immediate issue is not something
9   that anybody has talked about to us, and
10  that was not suggested by anybody, but we'll
11  be glad to go and communicate that to the
12  board and get back to you.
13       MR. MICHAEL PENEGUY: The other part
14  of --
15       MR. BURTON: Well, it was certainly
16  something we discussed on the phone, when
17  Cathy and I spoke.
18       MS. GOODSON: Well, she's talking about
19  with the -- any board members or --
20       MR. BURTON: Okay. But -- see, I had
21  the impression, when we talked before, that
22  you all would have spoken to your people you
23  needed to speak to, and we'd be a little
24  further along in resolving that, because
25  that is the immediate issue.

Page 40

1        MS. SUBRAMANIAN: We have spoken to the
2   individuals.
3        MR. BURTON: Right, I understand.
4        MS. SUBRAMANIAN: But they can --
5        MR. BURTON: But they don't --
6        MS. SUBRAMANIAN: Just like this
7   company cannot make any -- take any action
8   individually, the board cannot take any
9   action individually either. So we'd be glad
10  to go and talk to them about it, but we
11  believe that we are doing everything
12  possible and we don't think that it's enough
13  cause for -- we hope that we can resolve
14  this amicably, but if you think you need to
15  take some other course of action, you know,
16  we'll assess the need at that time.
17       MR. MICHAEL PENEGUY: And when you're
18  talking about the insurance coverage, I'd
19  like to ask you to consider an
20  indemnification clause for us. That way we
21  can work things out over a timely basis.
22  But if we can't work out some
23  indemnification, then we are going to be
24  forced to look at closure, you know, trying
25  to force a closure.

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 41

1    MS. GOODSON: I'll -- I'm not sure if I
2   will get with them this afternoon. They are
3   also in the same building where we work, but
4   I will try to reach the director today or
5   tomorrow, and ask them to begin preparing
6   some documentation so that we can share with
7   you all whatever the coverage is and
8   whatever the -- if there's any
9   indemnification that can be done, and try to
10  get some clarification on that.
11   DR. GARDNER: Could I request,
12  Ms. Goodson, that that communication be
13  something in writing, that's copied back to
14  the chair, so that we will know who's being
15  communicated with --
16   MS. GOODSON: Sure.
17   DR. GARDNER: -- and what's being said?
18  Conversations get lost. No offense to
19  anybody, but they get forgotten and get half
20  understood. You know, just whatever you're
21  asking, whoever that person is, and whether
22  it's Mr. Yarborough or someone else, we need
23  to start to track this, because I -- I don't
24  know about these people, I suspect, but --
25  well, that I do know, I just -- tick tock,

Page 42

1   tick tock, and either I'm just flat out old
2   and worn out or I -- but I just don't have
3   much patience for a lot.
4    MS. NORMAN: And also to our office, as
5   well.
6    MS. GOODSON: Yeah. I mean, Cathy
7   has -- I mean, she has been our primary
8   contact.
9    MR. MARK PENEGUY: That's the
10  appropriate contact, is Cathy.
11   MS. NORMAN: Yes.
12   MR. SHERMAN: And a "cc" to Jeff.
13   MS. SUBRAMANIAN: We'd be glad to come
14  and get back to you after we speak with the
15  board and --
16   DR. GARDNER: Thank you.
17   MS. SUBRAMANIAN: We appreciate this
18  opportunity to come and talk to you.
19   MS. NORMAN: Okay.
20   MR. SHERMAN: Thanks so much.
21   MS. NORMAN: Thank you.
22   MR. SHERMAN: Appreciate it.
23   DR. GARDNER: And when you communicate,
24  and I'm sorry for being redundant -- among
25  everything else, do not forget that

Page 43

1   liability and indemnification are paramount
2   at this time.
3    MR. MICHAEL PENEGUY: Right.
4    DR. GARDNER: That's a paramount issue,
5   among others.
6    MS. GOODSON: Okay.
7    MR. SHERMAN: All right. Moving on.
8    MS. NORMAN: Thank you so much.
9    MS. GOODSON: Thank you.
10   MS. SUBRAMANIAN: Thank you.
11   MR. SHERMAN: Moving on to old
12  business. And where is Amanda? I want to
13  thank Amanda for going back and working on
14  redacted versions. Unfortunately, I still
15  see a lot of stuff in here that is what
16  people said, what they asked, what they
17  commented, and from the City's side, I want
18  to, again, extend that, to the extent folks
19  feel a transcript is necessary, I'm happy to
20  support that from the City's side. To the
21  extent the family wants something more,
22  for those heirs who are not here, and those
23  beneficiaries who aren't present, I'm happy
24  to entertain that, but for the purpose of
25  minutes, which hold a special place -- and I

Page 44

1   have actually marked up a whole set -- and
2   Amanda, I would love to --
3    MS. PHILLIPS: It would be helpful,
4   because --
5    MR. SHERMAN: I'd love to sit with you
6   tomorrow or even this afternoon, or
7   Thursday, and I'd love to go through it with
8   you and then bring it back to the committee
9   at the next meeting.
10   MS. PHILLIPS: Because one of the
11  things is, if you look in our packet, there
12  are meetings from the Greater Lafourche Port
13  Commission meetings, where they make note of
14  specific things that have importance to the
15  motion that is made. And because not
16  everyone attends or can remember, because
17  they don't deal with this, except for once a
18  month, sometimes those things are helpful in
19  remembering why we made this motion.
20   First was the Lafourche -- the
21  South Lafourche Beachfront Development
22  District, which is more like the minutes for
23  the March 27th Executive Session that give
24  you absolutely no detail, and if you're
25  coming to prepare for a meeting, and you're

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 45

1  reading what happened at the last meeting to
2  prepare for this meeting, you may not have
3  enough detail to understand what the issue
4  was.
5      MR. SHERMAN: Yeah. I actually felt
6  those minutes were almost -- were very good.
7  I think, when there's a substance of an
8  issue discussed, you, in large part, mention
9  the issue -- I don't want -- guys, we have
10 too much important stuff today. What I'd
11 love to do is have an opportunity to sit
12 with you --
13     MS. PHILLIPS: Okay.
14     MR. SHERMAN: -- and bring them to
15 everyone for next month.
16     MS. NORMAN: And I would, and also --
17     MS. PHILLIPS: Can we get some comments
18 from other committee members, too, --
19     MS. NORMAN: Yes. Yeah.
20     MS. PHILLIPS: -- about what they would
21 like? Because this is something they use to
22 prepare for the meetings.
23     MR. SHERMAN: Please. No, the Peneguys
24 have stated to you that they want more
25 detailed comments.

Page 46

1      MS. PHILLIPS: Well, not necessarily --
2  yeah, but not just the Peneguys.
3      MR. SHERMAN: Yeah.
4      MS. PHILLIPS: I mean, Tulane, Charity,
5  Salvation Army, they're all -- and yourself,
6  you're all very busy, and I don't think
7  there's any way --
8      MS. NORMAN: And there are also new
9  members on the committee.
10     MR. SHERMAN: Sure.
11     MS. PHILLIPS: -- any of you all can
12 remember exactly what happened in every
13 meeting --
14     MS. NORMAN: The other thing that --
15     MS. PHILLIPS: -- in enough detail to
16 help us a bit. Because it's usually not --
17     MS. NORMAN: Yeah. The other thing is,
18 when we have special meetings -- I mean, we
19 have a special meeting, most of those
20 meetings are just discussion, so --
21     MR. MICHAEL PENEGUY: Yeah, and we
22 need --
23     MS. NORMAN: So what -- how do we
24 handle those minutes?
25     MR. MICHAEL PENEGUY: Right.

Page 47

1      MS. NORMAN: And so we need to figure
2  that out.
3      MR. SHERMAN: You know, I don't want to
4  take everyone -- we have a full group here.
5      MS. NORMAN: Okay. No, I agree.
6      MR. MICHAEL PENEGUY: Well --
7      MR. SHERMAN: And I'll give everyone
8  something -- and listen, for next month,
9  let's bring closure to it next meeting and
10 make a choice. But I want everyone to see
11 what the two choices are so they can be
12 comfortable. And, again, I extend my offer
13 again.
14     MS. NORMAN: Okay.
15     MR. SHERMAN: I'm happy to support --
16     MS. NORMAN: If you have comments, that
17 would be really helpful to us.
18     MR. SHERMAN: Cathy, let's move on.
19     MR. MICHAEL PENEGUY: I would make it a
20 point for now that we have quite a huge
21 amount of minutes backlogged --
22     MR. SHERMAN: We sure do.
23     MR. MICHAEL PENEGUY: -- and we need to
24 get --
25     MR. WILLIAM PENEGUY: Six months'

Page 48

1  worth, at least, huh?
2      MR. MICHAEL PENEGUY: Right.
3      MR. WILLIAM PENEGUY: Or close to it.
4      MS. NORMAN: Not any more. We're
5  now --
6      MR. SHERMAN: We're caught up through
7  April.
8      MS. NORMAN: Yeah.
9      MR. MICHAEL PENEGUY: They're the ones
10 that were approved, I'm talking about.
11     MS. NORMAN: Right, right.
12     MR. MICHAEL PENEGUY: Basically, I
13 counted up about eight of them that haven't
14 been --
15     MS. NORMAN: Approved.
16     MR. MICHAEL PENEGUY: -- that have not
17 been distributed, and five of them that have
18 been distributed and not approved.
19     MR. WILLIAM PENEGUY: Not approved,
20 yeah.
21     MR. MICHAEL PENEGUY: And that's
22 basically almost six months' worth.
23     MR. WILLIAM PENEGUY: It's a lot.
24     MR. SHERMAN: Duly noted. All right.
25     MR. MARK PENEGUY: And, Michael, I

Pages 45 to 48

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 49

1  thought that, in a meeting recently, you
2  presented the copy of Robert's Rules that
3  showed --
4      MR. MICHAEL PENEGUY:  Right.
5      MR. MARK PENEGUY:  -- that the minutes
6  we do are correct, and not --
7      MR. MICHAEL PENEGUY:  Yeah, that's
8  right.
9      MR. MARK PENEGUY:  So I --
10     MR. MICHAEL PENEGUY:  And I'll be glad
11 to provide that, a copy of that.
12     MR. SHERMAN:  And we have our Robert's
13 Rules, too, so let's -- let's all move on.
14 Let's not get stuck on minutes here.  Moving
15 on to new business, our Secretary-
16 Treasurer's Report.  Ms. Norman.
17     MS. NORMAN:  I'm going through very
18 quickly, okay.  I've got the outstanding
19 invoices and I -- oh, you know what?  My --
20 I don't think my -- oh, it came out today,
21 my expense account.  Yeah.  I don't know how
22 much it was, but it's in there.  It's like
23 $381.
24     MS. PHILLIPS:  381.34.
25     MS. NORMAN:  Yeah.  There are articles

Page 50

1  about BP, articles about sea level rise.
2  There's the income and expense report that
3  is given out for last month.  The audit was
4  given out today by Bourgeois Bennett.  They
5  are going to attend our next meeting to
6  discuss it.  We wanted to get it out to you
7  ahead of time so you could look over it and
8  then we'll have them come in.
9      There is an article about reef
10 building that I've put in.  This is an idea
11 of something we can do restoration-wise
12 along the eastern shore of the property,
13 should we have an influx of funds, that
14 could provide some protection.
15     MR. MICHAEL PENEGUY:  Now, that looked
16 like it would be better in the marsh.
17     MS. NORMAN:  Well, I'm talking about
18 the -- on the eastern shore, up along
19 Caminada Bay --
20     MR. MICHAEL PENEGUY:  Oh, okay.
21     MS. NORMAN:  -- is where we would do
22 something like that.  I don't know what it
23 costs.  I know the people who would do it.
24 Something that's not in my report, there was
25 a permit filed by the Greater Lafourche Port

Page 51

1  Commission to build a boat launch underneath
2  the abandoned Leeville Bridge.  This is
3  going to create a lot of potential trespass
4  issues on our property that was previously
5  the Wisner Wildlife Management Area.  There
6  was a letter to Plains, saying there was
7  money due -- outstanding money due because
8  they did not provide for the incremental
9  increase, annual increase, on their lease
10 that was paid.
11     MS. PHILLIPS:  They have paid it.
12     MS. NORMAN:  They have paid it now?
13     MS. PHILLIPS:  They have paid it.
14     MS. NORMAN:  Chevron tank farm, Mike
15 was kind enough to work up the increase on
16 that for -- which we will get paid for.
17 It's due October 1st.  That's always a nice
18 amount of money in September.  Chevron
19 royalty was 170,000 last month, down from
20 200,000 the previous month, which is
21 interesting, when you consider that even
22 that little tiny storm we had, in June,
23 caused a lot of the offshore rigs to shut
24 down for five or six days, and that -- even
25 that little bit affects our revenue from

Page 52

1  Chevron.
2      MR. MARK PENEGUY:  Of course it will
3  alter the oil.
4      MS. NORMAN:  In spite of -- in spite of
5  that, we have a really good month this
6  month.  I think close to $600,000 worth of
7  income.  We got 150,000 from BP, in the
8  settlement, as well as an extra 31,000, and
9  change, which paid for Waltzer & Wiygul's --
10 all of their fees associated with the filing
11 of the Motion for Summary Judgment.  That
12 was deposited in our account, as well as, we
13 got the invoice, and we will be paying that
14 invoice.
15     Forrest has a pretty long report
16 in here I urge you all to read.  It
17 includes pictures of the LUMCON facility,
18 and it's really not a pretty picture.
19     MR. SHERMAN:  Where are those invoices?
20     MS. NORMAN:  What invoices?
21     MR. SHERMAN:  The FET invoices.
22     MS. NORMAN:  You want copies of all the
23 invoices?
24     MR. SHERMAN:  Okay.
25     MS. NORMAN:  We have never provided

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 53

1  them before.
2      MR. SHERMAN:  Okay.
3      MS. PHILLIPS:  Well, we did, but then
4  Bill Parish from Charity Hospital --
5      MR. MICHAEL PENEGUY:  Right.
6      MS. NORMAN:  Yeah.
7      MS. PHILLIPS:  -- before Katrina, asked
8  that we stop because the Catholics were
9  getting sent there.
10     MR. SHERMAN:  So I will speak for
11  myself, but -- if we're approving invoices
12  for FET, Waltzer & Wiygul, Simon Peragine, I
13  would like to see copies of what we're
14  approving.  So I don't know if other members
15  of the -- I'm happy to see them
16  electronically, if it's a saving paper
17  issue.  I love working electronically.  I'm
18  happy to get them hard copy, whatever is
19  easiest for staff, and I'll defer to other
20  members of the Donation Advisory Committee,
21  if that's something that they would like.
22     MS. NORMAN:  So you want all invoices
23  for --
24     MR. SHERMAN:  Yes.
25     MS. NORMAN:  You want for our rent, for

Page 54

1  our phone, for everything?  I think that's a
2  little bit of micromanagement.
3      MR. SHERMAN:  All I'm asking is for a
4  copy of the invoices.
5      MR. MICHAEL PENEGUY:  I would think
6  that --
7      MS. NORMAN:  Okay.
8      MR. SHERMAN:  Certainly, for approving
9  a Secretary-Treasurer's Report, I'm
10  interested in seeing the line items that
11  we're approving.
12     MR. MICHAEL PENEGUY:  I would -- I
13  would try to limit that to the major
14  invoices, for instance, FET, and Waltzer &
15  Wiygul, and Simon Peragine.
16     MR. SHERMAN:  And let me say this.  I
17  appreciate that.  And if you don't need that
18  information, then don't get.  I'm happy to
19  come over here -- I'm happy to come over and
20  sit with you for an hour each month.  I'm
21  happy to come before this meeting, and I'll
22  send an email to everyone else, if they want
23  to come join me.  I'm happy to do that.  But
24  I -- on every other board I'm part of, if
25  we're approving some money, we'd see the

Page 55

1  invoice.
2      MS. PHILLIPS:  May I suggest, the items
3  that are approved in the budget, such as the
4  rent and the phone, which do not change and
5  vary, that I not provide you with those
6  invoices because they -- I mean, they're
7  approved in the budget, the annual report.
8  But the items such as the ones on the
9  Secretary-Treasurer's Report, I email you a
10  hard copy of?  Would that be --
11     MR. SHERMAN:  Listen, if there's
12  something on here, the Secretary-Treasurer's
13  Report invoice that we're approving, I'd
14  like to see that.
15     MS. PHILLIPS:  Okay.
16     MR. SHERMAN:  I think that's a fair
17  request.
18     MS. PHILLIPS:  Okay.
19     MR. SHERMAN:  We're asked to approve an
20  invoice for 13,850 for Simon Peragine, for
21  City Internal Governance.  I suspect that's
22  the lawsuit that was filed against the City
23  or something.  But whatever it is, I want to
24  see the invoice.  So that's my request.  I'm
25  happy to come over here.  I'm happy to get

Page 56

1  it electronically.  But I do not -- I need
2  to see invoices.
3      Now, for something like rent, I'm
4  happy to, you know -- I think that -- I
5  think rent or a couple other things like
6  that are in a different category, but part
7  of my request via email, which was cc'd back
8  to everyone, from Ms. Norman, is -- I think
9  it's fair to see all the disbursements, a
10  ledger, before the board.
11     One of our internal governance
12  findings -- one of our audit findings from
13  two years ago, before I was even part of
14  this committee, was that, because we have a
15  small staff, a lot of power is in a small
16  number of people.  I don't want to start
17  bringing up City boards around the City with
18  great people.  They have great executive
19  directors.  But it's a board's obligation to
20  monitor the money, so I think it is more
21  than reasonable, particularly in light of
22  that audit finding.
23     MS. NORMAN:  Well, it's an audit
24  finding they're going to have every year.
25     MR. SHERMAN:  Which is okay.

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 57

1   MS. NORMAN: Yeah.
2   MR. SHERMAN: Which is okay.
3   MS. NORMAN: Yeah. Because we're a
4   small --
5   MR. SHERMAN: And then our job, as a
6   board, is to pay a little bit closer
7   attention. So I'm asking --
8   MS. NORMAN: Okay.
9   MR. SHERMAN: -- for copies of
10  invoices.
11  MS. NORMAN: Okay.
12  MR. MARK PENEGUY: Any invoices that
13  contain privileged information, I do not
14  want shared with your BP counsel, for
15  example, since you're -- we know you're
16  sharing other information.
17  MR. SHERMAN: All right. We're talking
18  apples and oranges. Dr. Gardner.
19  DR. GARDNER: No, no, I was just --
20  MR. MARK PENEGUY: That's not -- wait,
21  that's not a joke, Mike Sherman. You're --
22  we know that you --
23  MR. SHERMAN: Thank you, sir.
24  MR. MARK PENEGUY: -- pass on
25  information. I don't want it shared. It's

Page 58

1   privileged.
2   MR. SHERMAN: Thank you, sir.
3   MR. MICHAEL PENEGUY: And that's the
4   way we ought to treat any invoices that we
5   have is basically it's only for the
6   committee members. It's not for anybody
7   outside the committee, because that's --
8   that's the purpose you want to review them,
9   that's the purpose you're asking for them.
10  MS. NORMAN: Right, I agree.
11  MR. MICHAEL PENEGUY: And there's no
12  reason to share any of that information with
13  anybody.
14  MR. SHERMAN: Dr. Gardner, please.
15  MR. JAMES PENEGUY: I would suggest
16  that he would come to the office and look at
17  those invoices --
18  MR. MARK PENEGUY: And not take them
19  out.
20  MR. JAMES PENEGUY: -- and not take
21  them out at all.
22  MR. MARK PENEGUY: That way you don't
23  have a risk.
24  MR. JAMES PENEGUY: That way you don't
25  have any problems, I mean --

Page 59

1   MR. SHERMAN: So I wholeheartedly
2   disagree. There's going to be documents
3   that I need copies of.
4   MR. JAMES PENEGUY: It's no bother.
5   You offered to come once a week for an hour.
6   MR. SHERMAN: I'm happy to come once a
7   week. I'm happy to come once a month.
8   MR. JAMES PENEGUY: Then why don't you
9   just do that.
10  MR. MARK PENEGUY: Do that.
11  MR. SHERMAN: But there are documents
12  that I'm going to need to make copies of and
13  bring back to the City and I can't make
14  any -- I cannot limit that I'm going to come
15  and look at something and not have the
16  opportunity to make a copy or -- that's an
17  unreasonable request for a trustee or a
18  chair of a committee to not have access to
19  the financials, so -- Dr. Gardner.
20  MR. MARK PENEGUY: But you're still
21  getting your access.
22  MR. SHERMAN: Dr. Gardner has the
23  floor.
24  MR. MARK PENEGUY: The problem is it's
25  confidential information.

Page 60

1   MR. JAMES PENEGUY: The problem is you
2   passed on information before.
3   MR. MARK PENEGUY: Passing confidential
4   information to other parties, that's what we
5   have a problem with.
6   MR. SHERMAN: Thank you so kindly.
7   Dr. Gardner.
8   DR. GARDNER: Well, I think -- and I
9   don't have a problem with that. I do have a
10  problem, but I think that should apply to
11  everything that we're talking about here,
12  indiscriminate disclosure of what we talk
13  about here. I don't care if it's about
14  finances or anything else. I would hope --
15  because I don't talk in my sleep. I don't
16  go back home, "Honey, guess what happened
17  today at Wisner." I would hope that these
18  things -- that we husband this information
19  that we get, certainly relative to financial
20  stuff.
21  I'm understanding, and you correct
22  me if I'm wrong; you can speak well for
23  yourself -- that you're asking for certain
24  items which you and Amanda will have to
25  recall. You want items that are

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

---

Page 61

1  cost-centered, and there was some blurb as
2  to what that was about.
3      MR. SHERMAN: That's it.
4      DR. GARDNER: Not the details of the --
5      MR. SHERMAN: The phone bill was $11, I
6  don't need the phone bill; it was $11. But
7  if we're approving a $6,000 invoice --
8      DR. GARDNER: Or, also, approving this
9  information, you're talking about, here's
10 the cost of it, here's how much it cost.
11 This is what counsel, --
12     MR. SHERMAN: That's it.
13     DR. GARDNER: -- legal fees for this,
14 so and so, fees for that.
15     MR. SHERMAN: That's exactly what I'm
16 asking.
17     DR. GARDNER: That's not something
18 that's major and I don't think we ought to
19 get stuck on that.
20     MR. MICHAEL PENEGUY: Along those
21 lines, I don't know how much trouble it
22 would be to scan all of that, though. I
23 know you all are scanning all the records
24 right now.
25     MS. PHILLIPS: Right.

Page 62

1      MR. MICHAEL PENEGUY: But that's a
2  separate issue.
3      MS. PHILLIPS: Because Ann is working
4  from the past, forward, and she -- I'm not
5  quite sure where she was when she stopped.
6  I don't know. She is scanning in things.
7  The document retention policy says we don't
8  keep hard copies of the invoices after two
9  years, I believe.
10     MR. MICHAEL PENEGUY: Right.
11     MS. PHILLIPS: And so she has scanned
12 in the past two years, I think.
13     MR. MICHAEL PENEGUY: Uh-huh.
14     MS. PHILLIPS: I would have to go back
15 and look, because it's been -- it's been a
16 month since she and I talked about that, and
17 a lot's happened.
18     DR. GARDNER: And I'm just saying
19 that --
20     MR. MICHAEL PENEGUY: You ought to scan
21 in --
22     DR. GARDNER: I'm sorry. Excuse me,
23 sir.
24     MR. MICHAEL PENEGUY: The rule --
25     MS. PHILLIPS: But she will be scanning

Page 63

1  currently. As soon as we've gotten all the
2  past stuff in, she will be working on a
3  current basis and having everything scanned
4  in.
5      MR. MICHAEL PENEGUY: Okay. Well,
6  that's the reason I'm asking is basically if
7  any other committee member wants to see
8  those invoices --
9      MS. PHILLIPS: Certainly.
10     MR. MICHAEL PENEGUY: -- then you could
11 scan them and --
12     MS. PHILLIPS: No problem.
13     MR. MICHAEL PENEGUY: -- and send them
14 by email.
15     MS. PHILLIPS: No problem. I just -- I
16 just need -- like your request was very
17 vague, and a list of all -- and do you want
18 me to put down "Check No. 1384" to
19 so-and-so, received check for $650 from
20 Lafarge Corporation, 108? I mean, I --
21     MR. SHERMAN: We should have a --
22 listen, I don't want to get sidetracked, but
23 that's a ledger. That's a ledger that
24 anyone -- that all businesses keep.
25     MR. MICHAEL PENEGUY: No, but

Page 64

1  basically --
2      MS. PHILLIPS: But the way we handle --
3  I mean, you need to come and see and I will
4  show you --
5      MR. SHERMAN: Yeah, I'd love to.
6      MS. PHILLIPS: -- how we handle that.
7      MR. SHERMAN: That would be great.
8      MS. PHILLIPS: Because the camp leases,
9  we have all 250 of them. I don't put them
10 in individually into QuickBooks --
11     MR. SHERMAN: That's fine.
12     MS. PHILLIPS: -- what they are. There
13 is a copy of the check attached to the
14 deposit receipt that is kept in our files,
15 but I cannot-- I will have to do an enormous
16 amount of work to give you a list of
17 every --
18     MR. SHERMAN: Well, then let's come and
19 talk.
20     MS. PHILLIPS: -- single check we've
21 received --
22     MR. SHERMAN: We'll find something
23 that's not overly burdensome.
24     MS. PHILLIPS: -- over the past two
25 years.

Pages 61 to 64

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 65

1     DR. GARDNER: Can I ask that you all
2  just talk and figure it out?
3     MR. SHERMAN: Yeah.
4     DR. GARDNER: And if there's a problem,
5  we'll have to come back to this, but we
6  can't work this out here. There's no --
7     MS. PHILLIPS: No, but if -- you are
8  correct.
9     DR. GARDNER: But those things you
10 said --
11    MS. PHILLIPS: You are correct. You
12 are very correct.
13    DR. GARDNER: Those things you said
14 make perfect sense.
15    MS. PHILLIPS: You're very correct.
16    DR. GARDNER: You need even more than
17 that. I'm just saying --
18    MS. PHILLIPS: I need -- I need some
19 direction and this isn't a good time to have
20 a --
21    MR. SHERMAN: Dr. Gardner, let me
22 just -- let me echo something you just said,
23 Dr. Gardner, because it -- it flipped a
24 switch that I want to make sure I'm
25 communicating something properly. If we are

Page 66

1  going to vote to cut a check, or to pay, or
2  to approve a $7,100 invoice, and the
3  information I have is "FET 7,100; FET,
4  6,150," I think it's reasonable that we see,
5  for those who want to, what the invoice is
6  that we're paying for, okay.
7        Separate and apart, if it's under
8  $500, if it's under a thousand dollars, if
9  it's a phone bill, that's not something that
10 I feel I need to see to approve. Although,
11 if any member of the Donation Advisory
12 Committee requested to come to the office
13 and see it, I think that's -- they should be
14 entitled to it. But, yes --
15    MS. NORMAN: Where is it in our bylaw?
16    MR. SHERMAN: I think there's a common
17 ground. I'd love to sit with you. And I
18 guess my request is just, if we're going to
19 approve a big invoice like this, over 500
20 bucks, over a thousand bucks, for those that
21 want to see a copy, they should.
22    MS. PHILLIPS: Well, do you want to set
23 a threshold at this point? I mean, it would
24 be easier if you want to set it at $500, you
25 want to set it at a thousand dollars, that

Page 67

1  you set it here, so then the next meeting we
2  have, I can give you what you want.
3     MR. SHERMAN: Does any -- yeah. Any
4  other comments from the -- first the
5  Donation Advisory Committee members, then
6  I'll recognize you, Mr. Peneguy. Anyone
7  else first? And then Mr. Peneguy.
8     MS. NORMAN: Well, I'd like to say
9  something.
10    MR. SHERMAN: Yeah.
11    MS. NORMAN: That during the last
12 month, Mike has requested all of our
13 records, all of our audits, all of these
14 things, and everything that he requested has
15 been given to his office, in one form or
16 another, over the past two years. The
17 audits have been delivered in quadruplicate
18 to the City's office.
19        All of the -- on a monthly basis,
20 we put what goes in and out of our account.
21 We do a budget every year. We have
22 operating procedures that we have been
23 following for a very long time, and to at
24 this time ask for -- and I said, "Why don't
25 you have the people who work for you look

Page 68

1  through your files and all the information
2  is there." Instead, he wants us to put it
3  together again.
4        We are at a -- we have two people
5  in our office. We are at a very, very busy
6  time in our schedule, and this is really a
7  burdensome project for us to undertake.
8        In addition to that, it was
9  requested that every single invoice that we
10 put in to BP be given out, be given to him,
11 that every claim we've put in, that who are
12 our experts, and all these other questions,
13 and this is a lot of extra work for us
14 and -- and I just -- I ask that you be
15 patient, because right now, we are very
16 busy, Mike.
17    MR. SHERMAN: And, Cathy, let me say --
18    MR. MICHAEL PENEGUY: They're just
19 human.
20    MR. SHERMAN: And Cathy, let me say,
21 I've been very patient. I've been very
22 patient. And the level of detail I'm asking
23 for has not been distributed in the monthly
24 meetings. That level -- so I'm happy to
25 come visit with you and Amanda. I actually

Pages 65 to 68

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 69

1   offer that. I have been very patient. I
2   haven't even had to follow up, and some of
3   the information is coming in, and I
4   appreciate you sending what you have.
5       MS. NORMAN: Okay.
6       MR. SHERMAN: But I have been
7   tremendously patient, and actually I do
8   think, if this is information that we don't
9   have easily available, I think we may need
10  to have a separate discussion later as to
11  why some of this information isn't in a form
12  that's more easy to set up.
13      MS. NORMAN: Well, then you're going to
14  have to hire an extra inhouse accountant to
15  handle it, --
16      MR. MICHAEL PENEGUY: Well, that's
17  right.
18      MS. NORMAN: -- because that's not what
19  we can do.
20      MR. MICHAEL PENEGUY: The problem here
21  is we don't know what -- from what I can
22  tell from the emails, we don't know what
23  detail you want.
24      MR. SHERMAN: And I offered to come
25  explain and come sit and -- and we'll do

Page 70

1   that. I recognize you, Mr. Peneguy.
2       MR. JAMES PENEGUY: Why would you set a
3   limitation?
4       MR. SHERMAN: On?
5       MR. JAMES PENEGUY: On any expenses you
6   receive. Why would you set any limitation?
7   Whether it's $50, a hundred dollars, what?
8   What would the theory behind that be?
9       MR. SHERMAN: I'm not setting a
10  limitation. I'm just saying, for the
11  purpose of a -- you have different levels of
12  authority. This is commonly done in
13  businesses, that for invoices that we're
14  going to approve, to not have an overly
15  burdensome request, that these invoices
16  listed right here, that the whole Donation
17  Advisory Committee gets to see those before
18  we -- before we --
19      MR. JAMES PENEGUY: All we have to do
20  is amend their accounting system to enter it
21  and print you out a report, because it's in
22  QuickBooks, and then they can do it if they
23  know how to use it. It's not a complex
24  thing.
25      MR. SHERMAN: I really appreciate you

Page 71

1   saying that.
2       MR. MICHAEL PENEGUY: Well, then why
3   did you --
4       MR. SHERMAN: I thought it was not a
5   complicated request.
6       MS. PHILLIPS: It's not, but I need to
7   know what it is you want.
8       MR. JAMES PENEGUY: But it will not
9   give you -- it will not give you a detail of
10  the actual invoice issued, because they
11  don't issue -- they do not input that.
12      MR. SHERMAN: But what you're
13  suggesting --
14      MR. JAMES PENEGUY: But the only way
15  you're going to get that is from the
16  different individuals. If you ask them,
17  they'll send it to you. It's not a complex
18  thing. But there's really nowhere to tie
19  the hours down to anything else, unless
20  you're an auditor like me; you go out and
21  visit.
22      MR. SHERMAN: Yeah. Well, I appreciate
23  that. What you suggest is what I was
24  requesting, but I think we can move forward.
25      MR. MICHAEL PENEGUY: Well, the --

Page 72

1       MR. SHERMAN: Cathy.
2       MR. MICHAEL PENEGUY: The problem --
3   the first thing I want to point out is in
4   respect to getting details on income and
5   distribution and all that, the distribution
6   is shown on the P & L statement, and I think
7   Amanda was willing to give that to everybody
8   at one point.
9       MS. PHILLIPS: I've done it since May.
10      MR. MICHAEL PENEGUY: Oh, she sent it
11  to me.
12      MR. SHERMAN: Yeah, I have not seen one
13  of those yet. I don't know such a document
14  exists.
15      MR. MICHAEL PENEGUY: Like you've
16  never --
17      MS. PHILLIPS: Mike, I've done it since
18  May. I have not handled the June one yet.
19      MR. SHERMAN: That document could be
20  everything we're looking for.
21      MR. MICHAEL PENEGUY: Let me explain
22  what happened with that. In -- I think it
23  was 1999 that we went through a review of --
24  we wanted to try to look at automatic
25  deposits to checking accounts and then

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 73

1    simplifying, sending out the statement,
2    because the statement had to be sent out
3    separately, because the bank statements
4    weren't received when the checks were
5    received, or were sent out, so we're asking
6    everybody to let us know if they would
7    prefer just getting a P & L statement or a
8    monthly statement by email, and I don't know
9    whether anybody on the committee answered
10   that, other than myself.
11       MS. NORMAN: Right.
12       MR. SHERMAN: Yeah.
13       MR. MICHAEL PENEGUY: And that's --
14       MS. NORMAN: And that's how it
15   happened.
16       MR. MICHAEL PENEGUY: Yeah, and that's
17   how it happened is --
18       MR. SHERMAN: I made the request. I'm
19   waiting for the document patiently --
20       MS. NORMAN: Okay.
21       MR. SHERMAN: -- and I look forward to
22   receiving it.
23       MS. NORMAN: Okay.
24       MR. MICHAEL PENEGUY: And that's --
25       MR. SHERMAN: Okay, Cathy, do you want

Page 74

1    to continue with the report?
2        MS. NORMAN: The only -- the last thing
3    on the report was an email from Scott
4    Elston. He is working on our oil, gas and
5    mineral audit for the -- I think the years
6    2008, '09 and '10.
7        MR. MICHAEL PENEGUY: Yeah.
8        MS. NORMAN: And he has not -- he said
9    he's continuing to work on it and making
10   progress, and he will have an audit to us
11   probably in the next month or two, so --
12       MR. MICHAEL PENEGUY: Okay. Well,
13   that's good, because I was going to ask you
14   about that.
15       MS. NORMAN: Right.
16       MS. PHILLIPS: I do know that he sent
17   the memo this morning.
18       MS. NORMAN: Yeah, here it is. And
19   that concludes my Secretary-Treasurer's
20   Report, with the invoices thereon, as well
21   as my expense account. Did you have an
22   expense account, Amanda?
23       MS. PHILLIPS: I had no time to do it.
24   I'll fit it in --
25       MS. NORMAN: Okay.

Page 75

1        MS. PHILLIPS: -- in September.
2        MS. NORMAN: Okay.
3        MR. MICHAEL PENEGUY: Okay. I'll move
4    that we approve the Secretary-Treasurer's
5    Report, with the additional expense
6    accounts.
7        DR. GARDNER: Second.
8        MR. SHERMAN: We have a motion. Is
9    there a second?
10       DR. GARDNER: Second.
11       MR. SHERMAN: Motion and a second. All
12   those in favor.
13       ALL: Aye.
14       MR. SHERMAN: Hearing no objections,
15   the motion carries. All right. Next up is
16   City of New Orleans, Wisner Land Trust
17   Proceeds Account. So in your packets, you
18   have this.
19       MR. MICHAEL PENEGUY: Yeah.
20       MR. SHERMAN: And one thing I want to
21   emphasize to everyone. I've said it at
22   every meeting. But this is the governing
23   philosophy of the Mayor. We are an open,
24   honest and transparent government. We have
25   put more online than any administration has

Page 76

1    in the history of New Orleans. We are a
2    best practice in the country, and every
3    month we continue to put more and more
4    things online.
5        For those of you who follow some
6    of the administration's progress, you know,
7    every month we're putting out -- every week
8    we're putting out stat readings from crime
9    stats to pothole stats. Every financial
10   document that we can get, we're putting
11   online. As we continue to upgrade to new
12   computer systems, more and more goes online.
13       MR. MICHAEL PENEGUY: Our focus --
14       MR. SHERMAN: So any -- excuse me,
15   please. Any requests that folks have, I
16   told you, just ask me. The purpose of this
17   committee is to manage this asset to
18   generate the most money we can, to properly
19   manage it, fulfilling our fiduciary
20   obligation, so we can enhance the
21   distributions to beneficiaries, and we all
22   benefit together, and I hope that common
23   logic continues to bring us together.
24       As for how the City uses it, this
25   is open to any and everyone to see. I had a

Pages 73 to 76

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 77

1  request.  We produced this document.  You
2  see not only the grants to cultural
3  organizations, but you have the balances on
4  here.  Cathy emailed me, and said, "Mike" --
5  and I gave this last month, at last month's
6  meeting, okay.  Cathy said, "Mike, that's
7  not how we've always gotten it."  I actually
8  think this is helpful, but she gave me a
9  document from September of 2011, showing
10  me -- I just got this -- you emailed this to
11  me Thursday or Friday or something like
12  that?  Showing me what it is that you're
13  looking for.  So I have got that --
14      MS. NORMAN:  Good.
15      MR. SHERMAN:  -- from January through
16  May.
17      MS. NORMAN:  Perfect.
18      MR. SHERMAN:  It's the same
19  information.  It's in a different form, as
20  you requested.  And I would encourage
21  everyone, including members of the family
22  who have a special connection to this
23  through your -- you know, to the extent you
24  want to visit or meet with the City on how
25  we use our funds, there's a budget process,

Page 79

1      MR. SHERMAN:  So I asked them to
2  coordinate with me --
3      MS. NORMAN:  Okay.
4      MR. SHERMAN:  -- because I wanted to
5  make sure what they got was what you asked
6  for.
7      MS. NORMAN:  Okay.
8      MR. SHERMAN:  Because the last time I
9  asked them for something --
10      MS. NORMAN:  Because --
11      MR. SHERMAN:  -- they produced this and
12  this was not satisfactory to you.
13      MS. NORMAN:  That's right.
14      MR. SHERMAN:  So I asked them to come
15  back to me, and I compare it to make sure
16  that it's the same type of information,
17  so --
18      DR. GARDNER:  I don't have a problem
19  with that, because if it's not right, you've
20  got to answer for it.
21      MR. SHERMAN:  That's right.
22      DR. GARDNER:  And you've got to answer
23  to the Mayor.  Same general message.  I
24  don't have a problem with that.  You know, I
25  don't think it ought to be bottle rockets

Page 78

1  that you can visit with Brooks Smith, you
2  can visit with any of us.  We are an open
3  and transparent government.  Always happy to
4  share anything.  So, Cathy, I'm going to
5  give that to you.  And whoever would like to
6  see that, please get it to them.
7      MR. MICHAEL PENEGUY:  I would
8  appreciate that.
9      MS. NORMAN:  I'll make copies.
10      MR. SHERMAN:  And happy to follow up.
11  That came from our finance department.
12      MS. NORMAN:  Who you told not to send
13  the things directly to us; you want
14  everything to go through you.
15      MR. SHERMAN:  Yeah, I had -- the
16  finance department --
17      MR. MARK PENEGUY:  Thought you were
18  open and transparent.
19      MR. SHERMAN:  Since I'm the
20  representative here, I'm the one charged
21  with -- I made a commitment last month.  I
22  made a commitment and I'm the one that's
23  going to fulfill that commitment, and I did
24  today.
25      MS. NORMAN:  Okay.

Page 80

1  with stuff coming out of everybody's hands.
2  I trust that Cathy, when she sends stuff,
3  it's properly vetted and stuff.  I trust in
4  the documents she sends me, even though I
5  know other folk may have seen that or had
6  something to do with it, because it's coming
7  from a central source.  That makes sense.
8      MR. MICHAEL PENEGUY:  Okay.  I'd like
9  to make a comment on that line.  Are you
10  going to continue to supply this?
11      MR. SHERMAN:  Request anything you'd
12  like from me.  Happy to assist.
13      MR. MICHAEL PENEGUY:  Well, in that
14  case, I'll make the general request that
15  this be sent monthly to us, okay.
16      MR. SHERMAN:  Not a problem.
17      MS. NORMAN:  We always had received a
18  monthly in the past.
19      MR. SHERMAN:  Not a problem.  All
20  right.  Moving forward, our next agenda item
21  is the BP Horizon Deepwater spill update.
22  Well, we left off last month with a motion.
23  It was a three to two motion authorizing the
24  City's publicly procured Joint Venture and
25  Waltzer & Wiygul to work out a co-counsel

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 81

1   arrangement.
2       MS. NORMAN: First, there was a motion
3   that we get an ethics opinion. That was the
4   first part of what -- and the motion was
5   contingent upon getting an ethics opinion,
6   by Mr. Gardner, who suggested that we get an
7   ethics opinion on whether there was a
8   conflict of interest for the co-counsel.
9   And I requested that ethics opinion and have
10  supplied it to the committee.
11      MR. MICHAEL PENEGUY: And then the
12  other part was --
13      MR. SHERMAN: That part of the history
14  confuses me a bit because that's not how I
15  remember it, how I remember the motion
16  going, but regardless, regardless --
17      MS. NORMAN: Does anyone else remember
18  there being a request for an ethics opinion?
19      MR. MICHAEL PENEGUY: Yes.
20      MS. NORMAN: Mr. Gardner?
21      MR. SHERMAN: Yeah, it was a separate
22  motion.
23      MR. MICHAEL PENEGUY: It was -- and I
24  think --
25      MR. SHERMAN: But there wasn't -- it

Page 82

1   wasn't even a motion.
2       MR. MICHAEL PENEGUY: I think it was a
3   separate motion, but at the same time, I
4   think Mr. Gardner also gave -- gave two
5   months -- two weeks.
6       MS. NORMAN: Don't you remember
7   accepting an ethics, a request for an ethics
8   opinion?
9       MS. PHILLIPS: I do.
10      MR. SHERMAN: Dr. Gardner, if you'd
11  like to --
12      DR. GARDNER: The one thing that I
13  motioned was that we give it a two more
14  weeks shot where the attorneys --
15      MR. SHERMAN: That's it.
16      DR. GARDNER: -- get together and -- if
17  it's to no good end -- and not that it has
18  been -- but that was just two more weeks out
19  of years of --
20      MR. SHERMAN: That's as I recall.
21  Please.
22      DR. GARDNER: All right.
23      MS. NORMAN: You don't remember
24  requesting an ethics opinion?
25      MR. SHERMAN: Let me say -- and I'll

Page 83

1   acknowledge you in a moment, sir. The --
2   this issue has come up for many months. We
3   don't agree on the outcome here. We tried
4   giving it a month for the groups to get
5   together. The result is they didn't.
6       MS. NORMAN: Yes, they did. I was at
7   the meeting.
8       MR. SHERMAN: No, no, no. They didn't
9   come -- reach an agreement, Cathy.
10      MS. NORMAN: Okay.
11      MR. SHERMAN: They met. They talked on
12  the phone. They did not reach an agreement.
13  So we're at a -- again, a critical time in
14  the history of this Donation with one of the
15  most important decisions we'll have to make,
16  and we can sit here for five minutes, we can
17  sit here for five hours, or we can sit here
18  for five days, and I am of the opinion, we
19  will not come to reach an agreement on this,
20  and it's time to bring closure, and that's
21  what this meeting is about. I do not think
22  that every member of the Donation Advisory
23  Committee, or Cathy, is going to walk out of
24  here happy today. I don't know what will
25  happen today. But as chair, we need to take

Page 84

1   some votes. We need to resolve the issue of
2   who is the counsel for the Donation Advisory
3   Committee. And I'm going to say this to
4   you, Robert and Joel, and Soren. It was the
5   wish of this committee, by a three to two
6   vote, so three members, that the two groups
7   would have worked out a co-counsel
8   arrangement.
9       MR. MARK PENEGUY: That is not what the
10  voting was.
11      MS. NORMAN: That is not what happened.
12      MR. MARK PENEGUY: You keep restating
13  it --
14      MR. SHERMAN: Please, I will not be
15  interrupted. You may speak when I'm done.
16  That did not happen. It is my wish, as
17  chair, that I think we could have put the
18  best possible team together for not a penny
19  more, for the Donation, by putting these two
20  groups together. However the path forward
21  comes through, I still hope at some point
22  that that's considered, but today's the day
23  where we need to pick who our counsel is,
24  moving forward.
25      MR. MARK PENEGUY: We did that in July

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

---

Page 85

1   of 2010.
2       MR. SHERMAN:  Mr. Peneguy, I'm going to
3   ask you to not interrupt me.  We'll
4   entertain discussion.  But what I'm going to
5   say is I don't think it serves any good to
6   discuss anything but new information, so
7   let's take a brief opportunity to -- or an
8   opportunity to go around and have discussion.
9       For the purpose of moving the thoughts
10  discussion forward, I do want to offer a
11  motion; I would ask for a second, so that we
12  can strategically have discussion.  So a
13  motion and a second, we'd have discussion,
14  and that we would not take a vote until we
15  have an opportunity to hear from folks.  So
16  I would ask for a second for the purpose of
17  moving this forward to discussion.
18      My motion, from the City's side,
19  which should not be a surprise, is that we
20  retain the City's publicly procured Joint
21  Venture to represent the Donation, moving
22  forward, and terminate the relationship with
23  Waltzer & Wiygul.
24      MS. NORMAN:  And create litigation.
25      MR. WILLIAM PENEGUY:  Yeah.

---

Page 86

1       MS. NORMAN:  And create litigation.
2       MR. WILLIAM PENEGUY:  And get sued.
3       MR. MARK PENEGUY:  That's what he's
4   waiting for.
5       MS. NORMAN:  And go in opposition of
6   the ethical --
7       MR. SHERMAN:  I'll explain more --
8       MS. NORMAN:  Of the ethics of the
9   Louisiana Bar Association.
10      MR. SHERMAN:  I'll explain more and
11  address that.  But for the purpose of moving
12  forward, I've offered a motion.  I would ask
13  for a second so we can move to discussion.
14      MR. MICHAEL PENEGUY:  Well, I don't
15  think you need to make a motion to discuss
16  something.
17      MR. SHERMAN:  But we can have a motion
18  on the table and a second to move it forward
19  to discussion.  If it doesn't -- if the
20  motion doesn't carry, after discussion, we
21  can entertain another motion, but I would
22  ask for a second so we can move this forward
23  to discussion.
24      MR. MICHAEL PENEGUY:  Well, wait.
25  First of all, what is the motion?

---

Page 87

1       MR. SHERMAN:  The motion is to
2   retain the City's publicly procured Joint
3   Venture --
4       MR. WILLIAM PENEGUY:  And fire Wiygul.
5       MR. MARK PENEGUY:  And fire Waltzer &
6   Wiygul.
7       MR. SHERMAN:  -- and to terminate the
8   relationship with Waltzer & Wiygul.
9       MR. WILLIAM PENEGUY:  Fire them.
10      MR. SHERMAN:  And I'll add more flavor
11  to it when we get to the discussion, and I
12  would ask for a second.
13      MR. LORINO:  I'll second the motion so
14  that we can discuss it.
15      DR. GARDNER:  For the benefit of
16  discussion -- there you go.
17      MR. SHERMAN:  Okay.  And I would say
18  this.  We have an ethics opinion that we
19  asked them to secure.  I'm going to send
20  this around.
21      MR. MARK PENEGUY:  Thanks for the last
22  minute.
23      MS. NORMAN:  Yeah.
24      MR. WILLIAM PENEGUY:  What is this for?
25      MR. MARK PENEGUY:  We appreciate that.

---

Page 88

1       MR. MICHAEL PENEGUY:  Who's that --
2   who's that ethics from?
3       MR. WILLIAM PENEGUY:  Who's it from?
4       MS. NORMAN:  Who's it from?
5       MR. WILLIAM PENEGUY:  From your own
6   attorney?
7       MR. SHERMAN:  Basile Uddo.  He's an
8   ethics attorney --
9       MR. MARK PENEGUY:  Yeah, one of the --
10  yeah.
11      MR. SHERMAN:  -- and professor, in
12  town.  Second is, I will say this, I would
13  love if this motion carries, and Soren, as a
14  representative of the Joint Venture, to ask
15  you to work with Waltzer & Wiygul --
16      MR. MICHAEL PENEGUY:  Uh-huh.
17      MR. SHERMAN:  -- and see if you could
18  still develop a relationship with them.
19      MR. MARK PENEGUY:  You've got to be
20  kidding.
21      MR. SHERMAN:  I am convinced that --
22      MR. WILLIAM PENEGUY:  You're thinking
23  of firing him and then rehiring him?
24      MR. SHERMAN:  -- with the City's
25  publicly procured Joint Venture --

---

Pages 85 to 88

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 89

1    MR. MARK PENEGUY: That is --
2    MR. SHERMAN: Please, I'm going to ask
3    that we respect each other. With the City's
4    publicly procured Joint Venture, and if you
5    bring Waltzer & Wiygul in, we end up where
6    we were hoping to end up last month, which
7    is two groups that will put this Donation in
8    the best possible position.
9    MR. MARK PENEGUY: That's a
10   (inaudible) --
11   MR. WALTZER: Hey, Mike.
12   MR. SHERMAN: Cathy, I want to tell
13   you, --
14   MR. WALTZER: Mike.
15   MR. SHERMAN: -- I know how you feel.
16   MR. MICHAEL PENEGUY: Oh, good.
17   MS. NORMAN: Well, I would like --
18   MR. SHERMAN: Mr. Peneguy, I also know
19   how you feel, and I'll listen to everyone's
20   thoughts now.
21   MS. NORMAN: Okay.
22   MR. MICHAEL PENEGUY: Well --
23   MR. SHERMAN: But at some point, you
24   need to bring closure to the matter rather
25   than dragging it out.

Page 90

1    MS. NORMAN: Right. And the way to
2    bring closure is to move forward with the
3    petition we were ready to file to ask
4    the Court for direction on who makes
5    decisions on behalf of the Edward Wisner
6    Donation. That was presented to this
7    committee in May, it did not pass, because
8    Mike came up with some other potential
9    solutions.
10   But now we need to revisit that.
11   We need to revisit the possibility of filing
12   that petition in Civil District Court and
13   asking them for direction on who -- who
14   has -- what the duties and responsibilities
15   of the trustee are, what the duties and
16   responsibility of the committee are and what
17   documents we look to for governance, and
18   that -- that is one suggestion.
19   MR. MARK PENEGUY: Cathy, is this still
20   a need?
21   MS. NORMAN: Can we -- will you please
22   not interrupt me, Mark?
23   MR. MARK PENEGUY: Sorry.
24   MS. NORMAN: The other thing I want to
25   say is that this Joint Venture team clearly

Page 91

1    said that they, in writing, that they were
2    not involved in the internal governance
3    issues of this committee. However, in an
4    email Soren sent out, he said very clearly
5    in his email -- and if you want, I can go
6    ahead and read it -- he said, "we suggest
7    you take the lead on issues" -- this was
8    directed to Joel -- "relating to the access
9    agreement and restoration. We would assist
10   you in claim preparation and work with you,
11   the Mayor and the committee regarding
12   overall settlement strategy, whether through
13   the existing settlement program or
14   otherwise. While your insights, Joel, and
15   the recommendations of the committee would
16   be important, the ultimate decision-making
17   authority would rest with the Mayor, as
18   trustee."
19   And to the beneficiaries of this
20   committee, I have to say that this is an
21   opportunity for a great deal of income to
22   come into your organizations, for Charity
23   and for Tulane. We're talking millions of
24   dollars. And if you would prefer to put
25   that risk -- that amount of money and say, I

Page 92

1    want the Mayor to make that decision instead
2    of this committee, and I want these
3    attorneys, who don't know anything about our
4    case, to make that decision instead of this
5    committee, that's fine.
6    But I am pointing out to you that
7    we're talking, in the case of Tulane, five
8    to $10 million. In the case of Charity
9    Hospital, five to $10 million. And to move
10   forward and put that decision in some
11   attorneys that we don't know, and in the
12   Mayor, who is not as familiar as we are with
13   what's going on, is absolutely, in my
14   opinion -- and I have professionally -- this
15   has been my career for 20 years -- I'm
16   astonished. I'm astonished that anyone on
17   this committee would want to move forward
18   with that motion.
19   MR. SHERMAN: Yeah. And let me just
20   dispel something you said and we'll get a
21   comment.
22   MS. NORMAN: Dispel something?
23   MR. SHERMAN: Yeah, let me dispel
24   something.
25   MR. MARK PENEGUY: Oh, good.

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 93

1     MR. SHERMAN: If the Mayor, as trustee,
2  had taken the tack of hiring his own
3  attorney and making his own decisions, we
4  wouldn't be here today.
5     MS. NORMAN: Well, if --
6     MR. SHERMAN: Please, please.
7     MS. NORMAN: Wait a minute.
8     MR. SHERMAN: Please.
9     MS. NORMAN: If Simon Peragine --
10    MR. SHERMAN: Please.
11    MS. NORMAN: -- hadn't had a
12 conflict --
13    MR. SHERMAN: Please.
14    MS. NORMAN: -- they would have
15 represented us --
16    MR. SHERMAN: Please stop.
17    MS. NORMAN: -- as they have.
18    MR. SHERMAN: Stop, please. I'm
19 speaking. The Mayor has directed me to come
20 work with the Donation Advisory Committee.
21 The reason we're here, the reason we're
22 discussing these issues is because the Mayor
23 wants to act with the advice and consent of
24 the Donation Advisory Committee. If the
25 Mayor --

Page 94

1     MR. MICHAEL PENEGUY: You're calling
2  that in good faith.
3     MR. SHERMAN: -- was to take any action
4  in contravention of the Donation Advisory
5  Committee, we wouldn't be here today, so --
6     MR. MICHAEL PENEGUY: We would be here
7  today.
8     MR. SHERMAN: -- when Waltzer & Wiygul
9  was presented to him, from the Donation
10 Advisory Committee, he said no --
11    MR. WILLIAM PENEGUY: He didn't say no.
12    MS. NORMAN: He doesn't have a power of
13 veto.
14    MR. MARK PENEGUY: He doesn't.
15    MS. NORMAN: Just like the airport.
16    MR. MARK PENEGUY: That's right.
17    MS. NORMAN: We've got an attorney
18 general's --
19    MR. SHERMAN: -- and sent it back to
20 the Donation Advisory Committee.
21    MS. NORMAN: -- opinion right here on
22 the airport where, --
23    MR. SHERMAN: Cathy, you're having --
24    MS. NORMAN: -- once again --
25    MR. SHERMAN: Cathy, you're having --

Page 95

1  Cathy, you're worked up and you're having
2  trouble --
3     MS. NORMAN: Yes.
4     MR. SHERMAN: -- following protocol and
5  letting the person who has the floor speak.
6  I will always offer you that courtesy and I
7  will ask that you offer me that courtesy, as
8  well.
9     MS. NORMAN: Okay.
10    MR. SHERMAN: We are here because the
11 Mayor is working through the Donation
12 Advisory Committee with the hope that we're
13 all on the same page. So let's go around --
14 I'll acknowledge you, Mr. Peneguy, first, or
15 second.
16    MR. JAMES PENEGUY: What is the point
17 of counsel when they've already hired one?
18 I don't understand the point and I'm
19 confused on this. I read all the minutes
20 and stuff, and basically what I came out
21 with was nobody even understood the
22 structure of this organization, much less
23 how it operates, and that's why I'm curious.
24 Can you explain to me why you would hire two
25 counsels when you already have one that's

Page 96

1  competent?
2     MR. SHERMAN: This is not a
3  question-and-answer session. I appreciate
4  your question and your comments. I'm not
5  going to sit here and be questioned by folks
6  on the committee. I'm happy to offer --
7     MR. MARK PENEGUY: It's because the
8  Mayor doesn't want them.
9     MR. SHERMAN: -- thoughts forward. I'm
10 happy to offer thoughts --
11    MR. MARK PENEGUY: He has no interest
12 in --
13    MR. SHERMAN: -- and I'll add
14 concluding remarks. Any other questions or
15 thoughts?
16    MR. MICHAEL PENEGUY: Yes.
17    MR. SHERMAN: Mr. Peneguy.
18    MR. MICHAEL PENEGUY: I've looked at
19 all the facts and basically I can go through
20 all the facts, if you want to.
21    MR. SHERMAN: I'd ask you to bring up
22 new facts.
23    MR. MICHAEL PENEGUY: I would -- I
24 would look at -- I would look at two options
25 we have. One, that we table all further

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 97

1    discussion until such time as Waltzer &
2    Wiygul may come back with a recommendation
3    to team up with the other attorneys. But I
4    know the City won't accept that, so the
5    only -- the only option we have is to go
6    with the petition. And I'm willing to make
7    the motion that we go to a petition after we
8    finish this discussion.
9         MR. SHERMAN: Okay.
10        MR. MICHAEL PENEGUY: Because basically
11   we're not going to iron this out today.
12        MR. WILLIAM PENEGUY: Why don't you go
13   with the motion now?
14        MR. MICHAEL PENEGUY: Because he's got
15   a motion.
16        MR. SHERMAN: I have a motion on the
17   table.
18        MR. WILLIAM PENEGUY: You can have
19   another one.
20        MR. MARK PENEGUY: Make a substitute
21   motion.
22        MR. WILLIAM PENEGUY: A substitute
23   motion.
24        MR. SHERMAN: Mr. Buddy, did you --
25        MR. MICHAEL PENEGUY: But he won't

Page 98

1    accept it.
2         MR. BUDDY: I have nothing to add.
3         MR. SHERMAN: Mr. Peneguy?
4         MR. MARK PENEGUY: I have a number of
5    them. I don't think there's any need for
6    any further action by this committee.
7    They've hired the team of Waltzer & Wiygul
8    and it was properly done by this committee
9    in July of 2010. The inclusion of new
10   attorneys, especially the Plaintiffs'
11   Steering Committee attorneys and the group
12   that they formed with the City, has a direct
13   conflict of interest with every member of
14   this committee. In fact, they have a
15   conflict of interest with the City of New
16   Orleans in that the Plaintiff Steering
17   Committee is interested in one thing and one
18   thing only, and that's their deal with BP,
19   to get their $600 million when this matter
20   resolves.
21        As a result of that, they don't
22   care what Wisner does or what the City does,
23   as long as they get their $600 million. And
24   then I will bet you -- I can't prove it, but
25   my theory is that they have an agreement

Page 99

1    with the other attorneys that are not on the
2    Plaintiffs' Steering Committee, to keep
3    quiet, we'll pay you a little piece of our
4    action once we get all this settled.
5         The only reason these people are
6    in here is because they need to settle the
7    Wisner matter, get it out of their way, so
8    that Wisner is no longer an impediment to
9    the settlement of this deal so they get
10   their $600 million payday. And if this
11   committee votes in favor of granting -- of
12   first of all, hiring these people, and in
13   addition, firing these people --
14        MR. JAMES PENEGUY: They can't do that.
15        MR. MARK PENEGUY: -- that is a
16   conflict of interest that affects me, as a
17   beneficiary.
18        MR. JAMES PENEGUY: And all of y'all.
19        MR. MARK PENEGUY: And I believe that
20   every single member of this committee has an
21   obligation to me, as a beneficiary, because
22   the committee is who makes these decisions,
23   not the Mayor of New Orleans. He made
24   decisions from August of 1914 until the
25   signing of a compromise agreement in 1929.

Page 100

1    From that point forward and the creation of
2    this committee, this committee makes these
3    decisions. The City has only one vote. And
4    if this committee decides to go with the
5    City in this conflict of interest, I will
6    look into suing each member of this
7    committee, because they have an obligation
8    to me. And this man sitting next to
9    Mr. Sherman has a conflict of interest with
10   my interest in this matter.
11        MR. JAMES PENEGUY: I agree.
12        MR. MARK PENEGUY: $600 million, --
13        MR. JAMES PENEGUY: I agree.
14        MR. MARK PENEGUY: -- remember that.
15   That's what's important to them.
16        MR. JAMES PENEGUY: Right.
17        MR. MARK PENEGUY: Not the Wisner
18   Donation, not the City of New Orleans.
19        MR. JAMES PENEGUY: Right.
20        MR. MARK PENEGUY: We don't know what
21   deal the Mayor has made with these people.
22   We know there's nothing online about this
23   so-called public procurement process. We've
24   looked for it. We keep being told it's
25   there, but nothing ever shows up. We asked

Pages 97 to 100

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 101

1    for the information, but Mr. Sherman, who
2    wants information from Cathy immediately --
3        MR. JAMES PENEGUY: Right.
4        MR. MARK PENEGUY: -- doesn't give the
5    information we request.
6        MR. JAMES PENEGUY: I agree.
7        MR. MARK PENEGUY: But at the same
8    time, he's asking you to trust him.
9        MR. JAMES PENEGUY: I know.
10       MR. MARK PENEGUY: And worse, these are
11   people that have a $600 million payday to
12   come along, to say, okay, we're going to
13   fire people, who are environmental
14   attorneys, when they have no experience in
15   what our claim is. It's unbelievable that
16   we're even talking about this again. This
17   should be shut down. There is no need for a
18   declaratory judgment. If the City wants to
19   file something against the committee, let
20   them do it. But this committee has been
21   properly constituted and it has an
22   obligation to each beneficiary. It doesn't
23   matter who you represent. You actually have
24   an obligation, under the law, to all of us.
25       MR. SHERMAN: Okay. Any other

Page 102

1    thoughts? Robert?
2        MR. WIYGUL: Yeah. Thank you, Mike.
3        MR. MARK PENEGUY: Raise your hand.
4        MR. JAMES PENEGUY: Please do one
5    thing. And he mentioned one thing, that it
6    was public procured. Can you show us where
7    that is? I mean, can you show it to Mr.
8    Burton? I have the City website up. You
9    told us you could find it. I'll gladly have
10   the internet here and we can -- and maybe
11   you can help us find it to get us on the
12   right track, at least, so we can research it
13   a little more.
14       MR. MICHAEL PENEGUY: Along that line,
15   there is an entry on that, but there's only
16   one bid showing.
17       MR. SHERMAN: Right.
18       MR. MARK PENEGUY: Right, but they
19   claim there are five.
20       MR. JAMES PENEGUY: Perhaps you can
21   show us.
22       MR. SHERMAN: I think I gave Cathy
23   the --
24       MR. JAMES PENEGUY: And if you can't
25   show us -- excuse me, Michael. Michael,

Page 103

1    you're not following protocol. You're
2    interrupting me.
3        MR. SHERMAN: I gave Cathy the bidder
4    responses. Yeah, Cathy has the bidder
5    responses.
6        MR. JAMES PENEGUY: Do you have the
7    bidder responses, Cathy?
8        MS. NORMAN: Uh-huh.
9        MR. JAMES PENEGUY: When did you get
10   them?
11       MS. NORMAN: I got them --
12       MR. SHERMAN: A couple of months ago?
13       MS. NORMAN: Maybe -- yeah. But they
14   don't show the formal bids. They just --
15   it's a list of bids.
16       MR. JAMES PENEGUY: Oh.
17       MR. MARK PENEGUY: Yeah. Well, that's
18   because we --
19       MS. NORMAN: A list of people who
20   bidded. Not the bids themselves.
21       MR. JAMES PENEGUY: Okay. That's not
22   what exactly we're looking for.
23       MS. BACUETES: You have a CD.
24       MR. MARK PENEGUY: No, of course not.
25   That's not what we're asking for.

Page 104

1        MS. BACUETES: If she has the CD, it's
2    already there.
3        MR. SHERMAN: Yeah.
4        MR. JAMES PENEGUY: And I would think
5    the (inaudible) that to make a proper
6    receipt of that.
7        MS. NORMAN: I didn't get a CD from
8    you.
9        MR. SHERMAN: I think you have
10   everything.
11       MS. NORMAN: Not the CD.
12       MR. JAMES PENEGUY: Do we have to pay
13   two attorneys?
14       MR. SHERMAN: No.
15       MR. WILLIAM PENEGUY: No, no. They're
16   going to fire these guys.
17       MR. MARK PENEGUY: They're going to
18   fire these guys. You know what they're
19   doing.
20       MR. JAMES PENEGUY: How do they fire
21   them when you already contracted with them?
22       MR. MARK PENEGUY: Because that's what
23   the -- the Mayor is all powerful.
24       MS. NORMAN: Which is a breach of his
25   fiduciary duty to this committee.

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 105

1    MR. SHERMAN: Okay. I want --
2    MR. MICHAEL PENEGUY: The committee
3    cannot --
4    MS. NORMAN: All right.
5    MR. SHERMAN: Team, I know we're not
6    all going to agree. I know there's passion
7    and emotion here. I'm going to ask everyone
8    again to please treat each other with
9    respect. And, again, I think, going into
10   this, we all have to acknowledge, we're
11   not all going to agree on everything.
12   Mr. Wiygul.
13   MR. WIYGUL: There's like three, but
14   thank you, Mike. Let me address several
15   things here. The first thing I'd like to do
16   is recap a little bit what our position has
17   been on this issue.
18        And you will recall, at the last
19   meeting, we expressed our opinion that it's
20   appropriate and prudent, a correct decision,
21   and necessary for the Donation to have
22   separate representation for its claims.
23   Cooperating, certainly. Doing everything we
24   can to work together with the City's
25   attorneys to try to get a good outcome for

Page 106

1    the Donation. But nonetheless, because the
2    City's claims would be negotiated alongside
3    and with the Donation's claim, otherwise,
4    when the City is only one beneficiary of the
5    Donation.
6        It's our judgment, in that
7    situation, that it calls for separate
8    representation, as a protective measure.
9    And I want to say something. Mark, this is
10   for you, Cathy, for you, you have -- in
11   here, I do not want to let it pass silent,
12   let anyone think that I agree with the idea
13   that Soren, or anyone on Soren's team, is
14   unethical, a bad person, out to do something
15   shifty here. That's not the case.
16        But you have to understand that
17   the ethical rules that we follow, as
18   attorneys, much like ethical rules that are
19   followed in other professions, are there to
20   ensure that there's full trust between the
21   parties, that people are not placed in a
22   position in which a bad decision might be
23   made. People are not placed in a position
24   in which there would be mistrust among
25   parties, among whom there ought to be full

Page 107

1    trust, and for that reason, the ethical
2    rules and rules on conflict of interest tell
3    us that there are situations that must be
4    avoided there.
5        For Dr. Gardner, you know, we have
6    peer review, in the academic community, not
7    because people make up their findings and
8    not because some people can't be trusted to
9    publish what's correct, but because peer
10   review helps to make sure that things work
11   out the way that they're supposed to, and it
12   avoids trouble down the road. That was our
13   opinion at that time.
14        The opinion from the Louisiana Bar
15   came out after that, and reviewed that.
16   They reviewed the situation. And if you'll
17   recall, we also sent around a memorandum
18   that proposed a structure that we hoped
19   would help us move forward in this issue,
20   and the key protection there was that the
21   beneficiary representatives would all agree
22   to any settlement, which would allow us, we
23   believe -- while not an optimum solution,
24   would certainly help us move forward in a
25   co-counsel relationship with the City's

Page 108

1    Joint Venture attorneys.
2        MR. JAMES PENEGUY: What percentage of
3    fees are you talking about?
4        MR. WIYGUL: We -- can I get to that at
5    the end of my talk?
6        MR. JAMES PENEGUY: Yeah. But I kind
7    of want that first.
8        MR. WIYGUL: You're getting my
9    narrative. And even my narrative is messed
10   up.
11        MR. JAMES PENEGUY: I do peer review,
12   too. Go ahead.
13        MR. WIYGUL: Yeah. We -- well,
14   actually what we have proposed was that
15   18 percent of the fee in our contractual
16   agreement would go to the City Joint Venture
17   attorneys, if they successfully assisted in
18   negotiating an agreement.
19        But let me explain that you
20   cannot -- here's the way that we believe
21   that has to work. And there are two factors
22   working together that lead us to remain at
23   that conclusion.
24        Our view of this claim, of this
25   factual situation, buttressed by the LSBA's

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 109

1   view and our own research, is that it's
2   prudent practice and protective for all
3   parties to maintain separate representation,
4   and that is particularly so, given that the
5   Mayor -- and, Mike, I have no opinion on
6   whether you're going to be ultimately
7   successful in this or not -- the City's
8   position is that the Mayor has the sole
9   authority to make the decision on any
10  settlement proposal.
11      MR. SHERMAN: That's not true.
12      MR. WIYGUL: Well, I'm -- and if I
13  misunderstood that --
14      MR. WILLIAM PENEGUY: Don't interrupt.
15      MR. SHERMAN: Yeah. I just wanted
16  to -- I'll address it later.
17      MR. WIYGUL: Yeah.
18      MR. SHERMAN: I just wanted you to know
19  that.
20      MR. WIYGUL: Yeah, that would be a good
21  plan.
22      MR. SHERMAN: Just don't restate what
23  we're saying, though, on the --
24      MR. WIYGUL: Well, Mike, with due
25  respect to you, I think that is the position

Page 110

1   that we've been given, and I'm happy to get
2   a better --
3       MS. NORMAN: It's in writing.
4       MR. WIYGUL: -- understanding of what
5   the position is here. It's certainly been a
6   very difficult and loaded conversation and I
7   think that --
8       MR. SHERMAN: Please, continue.
9       MR. WIYGUL: -- you'll agree that it
10  would be good to get that out on the table
11  and straighten it out.
12      So given that, those
13  understandings, it remains our position that
14  we need -- the Donation's claims need
15  separate representation, in full
16  cooperation, which we have pledged and
17  continue to pledge, with the City's Joint
18  Venture group, and they needed certainly
19  sharing of the attorneys' fees for the City
20  Joint Venture group.
21      Based on our assessment of the
22  situation, after the committee's instruction
23  and different information that we've
24  reviewed, that does remain our opinion.
25  And, Mike, I understand that that's

Page 111

1   something the City disagrees with, but
2   frankly, the possibility of sanction does
3   not affect my professional judgment. It is
4   what it is. That's what you get.
5       That's how we've gotten to the
6   point that we are today. There is a path
7   forward, which is for us to fully cooperate
8   with the City's attorneys and take advantage
9   of their undeniable resources, but we -- you
10  know, based on where things are today, that
11  it's my opinion that it needs to be done,
12  the Donation's claims having separate
13  representation. Full cooperation, good
14  working relationship and all of that, but
15  with separate representation.
16      MR. SHERMAN: Okay.
17      MR. WIYGUL: And that, I think -- Joel,
18  if you have anything to add, please state
19  it.
20      MR. WALTZER: Well, you know, I -- for
21  me, this is a calling, and what I'm doing
22  for you, as a lawyer, is something that
23  I'm -- I'm -- we do -- it's extremely labor
24  intensive. It's extremely important, and
25  for us, the money issue really is secondary

Page 112

1   to the ability for us to exercise our
2   independent judgment, based on the facts as
3   we see them, and based on the facts as we
4   develop them, and be able to give you an
5   independent judgment as to whether or not
6   you ought to take theirs. There are many
7   roads to go down. Whether you ought to
8   participate in the PSC/BP settlement
9   process, whether we ought to proceed
10  independently of that process, in the
11  negotiation, and third, whether we ought to
12  litigate the claim.
13      And we have articulated that. We
14  have articulated -- we have tried. We have
15  tried to come to an agreement with, Mike,
16  your Joint Venture team, with Soren. We've
17  done everything we've been asked to do.
18  We've put out proposals. We met.
19      The only thing that we cannot
20  compromise on is our ability to
21  independently exercise our judgment, and
22  frankly, to ensure, for ourselves, that in
23  our defining of a co-counsel relationship,
24  that you're going to be protected. And when
25  it was no longer possible, in our mind, to

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 113

1   structure a deal where all of the
2   beneficiaries would feel protected, you
3   know, I think it's safe to say, we've
4   reached an impasse, but it's not because we
5   haven't tried, and it's not because we don't
6   want -- we definitely do want what's best
7   for the Donation and all of the
8   beneficiaries. We're just at an impasse,
9   and it's an authority issue, and it's not a
10  fee issue, you know, and if your judgment is
11  that you're better off, that's your
12  judgment, I guess.
13      MR. JAMES PENEGUY: Haven't we already
14  invested quite heavily in your firm?
15      MR. WIYGUL: By the way, hang on. Let
16  me -- I do want to make this point.
17      MR. JAMES PENEGUY: What happens to
18  that?
19      MR. WIYGUL: Because -- well, the file
20  belongs to the client, the Donation Advisory
21  Committee, and the work that's gone into it
22  does. We have a separate issue about that
23  that needs to be discussed, but --
24      MR. JAMES PENEGUY: Right.
25      MR. WIYGUL: -- the question about the

Page 114

1   contract, the truth is, lawyers are not --
2   you have an absolute right to fire your
3   lawyer.
4       MR. JAMES PENEGUY: Even --
5       MR. WIYGUL: We have a right to get
6   paid for whatever work we've done, but, you
7   know --
8       MR. JAMES PENEGUY: And you all have
9   not been paid completely for everything
10  you've done so far, have you?
11      MS. NORMAN: Not even close.
12      MR. WALTZER: Not even remotely close.
13      MR. WIYGUL: No. We still have a
14  contingency aspect agreement out there.
15      MR. JAMES PENEGUY: Do you have an
16  idea, ballpark, what that would cost us, out
17  of curiosity?
18      MR. WALTZER: Well, we're going to --
19      MR. WIYGUL: Well, contingent fees are
20  enforced typically based on circumstances
21  that existed as of the time the contract was
22  confected, so they often are enforced just
23  on the terms of the contract, or if there
24  are other claims, then it gets worked out
25  through a concurrent site, so --

Page 115

1       MR. JAMES PENEGUY: So you're talking
2   about significant funds, if you were to
3   leave?
4       MR. WIYGUL: Well --
5       MR. JAMES PENEGUY: That we would owe
6   you?
7       MR. WIYGUL: Yeah, it would be a mess.
8   I think a mess would be a good way to put
9   it.
10      MR. JAMES PENEGUY: And you want to
11  expend more money? For what?
12      MR. SHERMAN: Mr. Wiygul has the floor.
13      MR. WIYGUL: And I just -- one other
14  thing -- and, Soren, I know you'll correct
15  me if I'm wrong about this -- I think Basile
16  is the ethics counsel to the Plaintiffs'
17  Steering Committee, is that correct?
18      MR. GISLESON: Yes, it is.
19      MR. MARK PENEGUY: Gee, what a
20  surprise.
21      MR. WALTZER: Is it really?
22      MR. WIYGUL: Well, he is.
23      MR. WILLIAM PENEGUY: Can't have a
24  conflict, so --
25      MR. WIYGUL: His hands are (inaudible)

Page 116

1   -- whatever it is, so he's got (inaudible)--
2       MR. MARK PENEGUY: Oh, I'm glad you
3   pointed that out.
4       MR. MICHAEL PENEGUY: Thank you for
5   bringing that up.
6       MR. WILLIAM PENEGUY: Yeah, thank you.
7       MR. MICHAEL PENEGUY: Oh, boy.
8       MS. NORMAN: Jim, do you have anything
9   to say?
10      MR. BURTON: I can certainly answer
11  questions. I mean, I agree with what the
12  law is.
13      MR. SHERMAN: I'll chair the meeting,
14  but --
15      MS. NORMAN: Okay.
16      MR. MARK PENEGUY: Oh, well.
17      MR. WALTZER: I want to also add one
18  more thing. We're at a very, very
19  important, time-critical, work-critical,
20  intensive phase of what we're doing.
21      MR. MICHAEL PENEGUY: Yeah.
22      MR. WALTZER: Every day, I'm working.
23  Every day, Robert's working. We're
24  evaluating the settlement. There's a lot of
25  work to be done. BP has produced tens of

Regular Meeting
Edward Wisner Donation Advisory Committee

---

Page 117

1  thousands of pages and tens of thousands of
2  documents. BP has produced GIS data that we
3  have been, every day, working extremely
4  hard, you know, at considerable sacrifice to
5  get down and to understand how the Wisner
6  Donation's claim is going to fare, under the
7  PSC's agreement with BP. We have a lot of
8  work to do. There are a lot of errors.
9       I have a presentation. If I'm
10  fired, I guess I won't have to give it to
11  you, but we have a presentation. It's a
12  considerable amount of money. Under the
13  constrained value, the agreement could be
14  $10 million, plus the restoration values.
15  Under -- when you take all of the
16  information that's been provided to us
17  through our access agreement that we
18  obtained and plug it in, it could be as high
19  as $50 million.
20       In addition to that, we have --
21  because we've been there every day and we
22  know where the damage is and we -- all the
23  response damage that's been done, all the
24  digging out, the deconsolidation of the
25  sand, all of these things have to go under

---

Page 118

1  the equation and can be presented to the
2  DHCC.
3       That said -- that said, we very
4  well may have to object to portions of the
5  settlement agreement, and in the settlement
6  agreement, it says that the PSC lawyers are
7  unable to object, and they are not able --
8  that they're to discourage any objections.
9  And it's just another reason -- not that why
10  we don't want to work with the PSC -- we
11  have worked with the PSC. In fact, we
12  tutored them on how to make contamination
13  claims --
14       MR. MICHAEL PENEGUY: Right.
15       MR. WALTZER: -- with members of -- the
16  same people we're talking to. But the --
17  it's not that -- it's just that we think
18  that the representation needs to be separate
19  to preserve the Donation all the options
20  that it should, to undertake.
21       MR. JAMES PENEGUY: Could you provide
22  us with an estimate of what we've sunk in
23  the hole so far so we can provide a suit
24  against the City for this, if they pass the
25  motion.

---

Page 119

1       MR. WIYGUL: Well --
2       MS. NORMAN: I can answer that
3  question. I think our unreimbursed expenses
4  are about, what, 800,000?
5       MR. WALTZER: But that's including
6  science. That's not us. That's including
7  science.
8       MS. NORMAN: That's including science
9  and --
10       MR. WALTZER: And I also want to --
11       MR. JAMES PENEGUY: And I'm just
12  looking for theirs. If they get kicked off,
13  I want to know what the dollar amount would
14  be, we'd end up owing them, so then I can go
15  ahead and file suit against Mark over here.
16       MR. WILLIAM PENEGUY: Not Mark.
17       MS. NORMAN: Mike.
18       MR. JAMES PENEGUY: Yeah.
19       MR. WALTZER: We are going to -- I
20  mean, certainly we would enforce our
21  contract.
22       MR. MARK PENEGUY: Mike.
23       MR. WALTZER: I mean, our contract
24  calls for a percentage of whatever --
25       MR. JAMES PENEGUY: Right.

---

Page 120

1       MR. WALTZER: -- the award is, and I
2  think a judge would have to decide what our
3  relative contribution was to anyone who came
4  after us.
5       MR. JAMES PENEGUY: Okay.
6       MR. WALTZER: And I think -- well,
7  there it is.
8       MR. SHERMAN: Okay. Mr. Peneguy, did
9  you want to --
10       MR. WILLIAM PENEGUY: I have some
11  questions, but I think -- my questions are
12  more questions to them than to anybody else.
13  The main thing I'm thinking about is how
14  much more do you think -- how much do you
15  think the beneficiaries are going to suffer
16  by not being able to object, as being part
17  of the PSC, or whatever this thing, group
18  is?
19       MR. WALTZER: I really think that we're
20  the only -- to my knowledge, we're one of
21  the only -- I think, the only, that I'm
22  aware of, landowner that's really in a
23  position to object, based on the evidence
24  that we've collected, because anyone can say
25  something's wrong, but you have to be able

---

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 121

1    to prove it for it to stick.
2        The primary objection is that the
3    settlement agreement -- compensation under
4    the settlement agreement, the PSC/BP
5    settlement agreement is dependent upon the
6    linear footage calculations that are drawn
7    up by BP, and we can prove that BP's own
8    stuff is false.
9        MR. WIYGUL:  Those are based on the
10   SCAT lines that we talked about.
11       MR. WILLIAM PENEGUY:  Yeah.
12       MR. WIYGUL:  And we've been working on
13   it.
14       MS. NORMAN:  And because we received
15   all of this information, because of the
16   access agreement, tens of thousands of
17   documents, without even filing a single
18   subpoena, because of the good work of these
19   attorneys, and my office, we have evidence
20   already.
21       MR. WILLIAM PENEGUY:  And that just
22   gets pushed aside, right?
23       MS. NORMAN:  Yes.  Well, no.  I mean,
24   it's -- we have all the evidence prepared, I
25   mean, in our lap.  All we have to do is use

Page 122

1    it, and say, "Look, this is not the way it
2    is."
3        MR. MICHAEL PENEGUY:  Yeah.
4        MR. MARK PENEGUY:  But it's pushed
5    aside if the Plaintiffs' Steering Committee
6    can't object.
7        MR. MICHAEL PENEGUY:  Right.  Yeah.
8        MR. MARK PENEGUY:  So, yeah, so it's
9    pushed aside.  We'll lose it, yes.
10       MR. WILLIAM PENEGUY:  Yeah, it's pushed
11   aside and we'll lose it.
12       MR. MARK PENEGUY:  If the Mayor gets
13   what he's trying to do.
14       MR. SHERMAN:  Any last thoughts?
15       MR. WILLIAM PENEGUY:  And --
16       MR. MICHAEL PENEGUY:  And that's
17   basically something --
18       MR. WILLIAM PENEGUY:  -- the SCAT maps
19   don't even show that we have oil on our
20   property, so --
21       MS. NORMAN:  There are several --
22       MR. WILLIAM PENEGUY:  -- so that's --
23   that's another loss, we're losing.
24       MS. NORMAN:  Well, there was some
25   explanation for it.  I don't remember what

Page 123

1    it was.
2        MR. WILLIAM PENEGUY:  Yeah.  But, I
3    mean, can they object?
4        MS. NORMAN:  In fact, the SCAT lines
5    that are shown on the map --
6        MR. MARK PENEGUY:  Caroline Fayard.
7        MS. NORMAN:  -- are very -- a small
8    portion, am I correct, of the SCAT lines
9    were actually done on our property --
10       MR. WALTZER:  There's at least twice as
11   much.
12       MS. NORMAN:  -- under the global
13   settlement.  It's a miniscule amount of the
14   SCAT lines and the information about oil on
15   our property, under the global settlement.
16       MR. SHERMAN:  Okay.  Anything else
17   left?  Any other questions?
18       MR. MICHAEL PENEGUY:  Yeah, I would
19   basically --
20       MR. SHERMAN:  Mr. Peneguy, you have the
21   floor.
22       MR. WILLIAM PENEGUY:  And you're -- and
23   if they take over and represent, they're
24   going to stay a part of the PSC, or
25   whatever, to where they can't object.

Page 124

1        MR. MICHAEL PENEGUY:  They can't get
2    out of it.
3        MR. WILLIAM PENEGUY:  They can't get
4    out of it, so --
5        MR. JAMES PENEGUY:  Either way, we're
6    damaged.
7        MR. WILLIAM PENEGUY:  So the best
8    summary I've got is you want the Donation to
9    just roll over and say, "Please give us
10   something," instead of fighting in court for
11   what we deserve.  That's what you --
12       MS. NORMAN:  Soren, is it true that if
13   you represent us, you have to encourage us
14   to settle?
15       MR. WILLIAM PENEGUY:  To settle.
16       MR. JAMES PENEGUY:  Opt out.
17       MR. WILLIAM PENEGUY:  That's the rule.
18       MS. NORMAN:  I thought that was -- that
19   was the rule.
20       MR. SHERMAN:  No.
21       MS. NORMAN:  No?
22       MR. WILLIAM PENEGUY:  What is the rule
23   then?
24       MR. GISLESON:  No.  The rule is, even
25   as a PSC member, you can represent clients

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 125

1    who opt out, and it is perfectly permissible
2    to advise your client to opt out. There's
3    even a significant threshold question as to
4    whether your claim is even potentially
5    within the settlement confines, because
6    arguably it's a quasi public body. So that
7    whole discussion about --
8         MR. WILLIAM PENEGUY: Well, wait.
9    Well, that's not -- that's not our
10   discussion.
11        MR. GISLESON: But that whole
12   discussion about whether there's a conflict
13   or someone's on the PSC is completely moot
14   and means nothing, and it's perfectly
15   acceptable. What Joel was trying to state
16   is the difference between an objection and
17   an opt-out, which are two completely
18   different things. Any single person, it's
19   their God-given right --
20        MS. NORMAN: To opt out.
21        MR. GISLESON: -- to opt out. And it
22   doesn't matter. If it's in your best
23   interest to opt out and we advise you to opt
24   out, you opt out.
25        MR. WILLIAM PENEGUY: Can the

Page 126

1    beneficiaries opt out?
2         MR. MARK PENEGUY: Except the Mayor
3    will decide for you, so --
4         MR. WIYGUL: Separately, separate
5    entity.
6         MR. SHERMAN: All right. Let's start
7    bringing this to closure. Any other
8    thoughts, Mr. Peneguy?
9         Okay. Well, I'll share a couple
10   of thoughts to clarify a few things.
11        MR. MICHAEL PENEGUY: Well, I have a
12   question. Do you have anything to offer
13   into the conversation?
14        MR. GISLESON: No. I don't think it
15   would probably be appropriate at this
16   juncture for me to offer anything.
17        MR. MARK PENEGUY: He wants to --
18        MR. SHERMAN: I asked -- I asked that
19   we only discuss new information today. I
20   think that's the one ground rule I want to
21   follow.
22        MS. NORMAN: Okay. Can I --
23        MR. SHERMAN: Listen, I think the --
24        MR. MICHAEL PENEGUY: Whoa, whoa, whoa.
25        MS. NORMAN: Can I offer some new

Page 127

1    information?
2         MR. MICHAEL PENEGUY: Whoa, whoa, whoa,
3    whoa, whoa.
4         MR. SHERMAN: I'm fine. I'm going to
5    make a comment now.
6         MR. MICHAEL PENEGUY: Wait, wait, wait.
7    You can't --
8         MR. SHERMAN: It's okay.
9         MR. MICHAEL PENEGUY: You can't limit
10   the discussion to just new information.
11        MR. SHERMAN: That was my request, as
12   chair, to try to move us forward.
13        MR. MICHAEL PENEGUY: You can do that,
14   but you can't force us --
15        MR. SHERMAN: Or we could sit here for
16   six days going through everything we've gone
17   through before.
18        I'm going to make a couple
19   comments. The Donation Advisory Committee
20   will not -- the Donation, none of the
21   beneficiaries, will be harmed in any way.
22   That was the motion that was brought up last
23   month and this month. It is my hope -- it
24   was my hope last month that the group sort
25   of work together, under the same contingent

Page 128

1    fee agreement. The motion last month was
2    that it doesn't change. We just get more --
3    the attorneys split that up, however they
4    want to split that up, and get
5    proportionately less.
6         Robert's right. It's our
7    determination about who our attorney is at
8    any point. It's a totally separate issue.
9    And the way my motion was structured last
10   month, and the same thing I would propose
11   now, is the Donation never pays any more
12   than we've already authorized to pay for
13   legal counsel.
14        Now, listen, the discussion has
15   further indicated what I suspected, ahead of
16   time, what I knew ahead of time, which is
17   that there's nothing anyone can say at this
18   table, I don't think, that's going to be
19   this earth-shattering moment, because we're
20   all so well researched and so well invested
21   in this. I know how Cathy feels. I know
22   how the Peneguys feel. Robert and Joel,
23   you've expressed yourself very well. And I
24   think you know exactly how the City feels.
25        So I think the question we're

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 129

1 getting to is one that was before us last
2 month, and, Dr. Gardner, I want to thank you
3 for your leadership in giving us another
4 month to try to kind of bring some agreement
5 here, but the truth is, there's only two
6 directions.
7        The Donation Advisory Committee
8 and the trustee are on the same page, and
9 then there is no litigation, or -- or the
10 Donation Advisory Committee and the trustee
11 cannot be on the same page, and it's been
12 mentioned twice today that we start, at this
13 critical time, rather than focusing all of
14 our efforts on the science and the
15 settlement and the litigation, that we sue
16 ourselves.
17        So we spent a significant amount
18 of time, again, at this meeting not talking
19 about strategy to pursue our claim. We're
20 spending time talking about internal
21 governance issues.
22        So what I would say is this. And
23 I see you and I will acknowledge you in a
24 moment, but feel free to keep your hand up.
25 This proposal last month was to get the two

Page 130

1 firms, on their own, to work it out. We
2 need a decision. We need closure. We can
3 talk today, next month, next year.
4        My motion today gives us that
5 closure. It puts the Donation Advisory
6 Committee and the trustee on exactly the
7 same page, so that issue is gone. There's
8 zero room between the two of them. And I
9 have told you once, Soren, and Robert and
10 Joel, and I'll tell you again, with this
11 motion today, that is not an indication that
12 you should never talk to those two folks to
13 see if you can still work out an
14 arrangement. This is the beginning, under a
15 new arrangement, to see, and --
16        MR. MARK PENEGUY: The motion -- you
17 just made a motion to fire them.
18        MR. SHERMAN: That's correct. And see
19 if you could bring them in as co-counsel.
20 But then the issue of authority is clear.
21 It would be great if everyone could get
22 together, but I'm not naive. I know that
23 probably --
24        MS. NORMAN: When you say the issue of
25 authority --

Page 131

1        MR. SHERMAN: Excuse me.
2        MS. NORMAN: -- is clear, what do you
3 mean, Michael?
4        MR. WILLIAM PENEGUY: Yes.
5        MR. SHERMAN: Okay. I thank you for
6 asking that.
7        MR. MARK PENEGUY: You won't answer it,
8 but --
9        MR. SHERMAN: Thank you for asking
10 that. Please, Mr. Peneguy, that's not
11 called for. Please. Cathy, thank you for
12 asking that question. What has the Mayor
13 done? He has sent me here to work with the
14 Donation Advisory Committee.
15        MR. JAMES PENEGUY: No, he didn't.
16        MR. SHERMAN: Please. I'm here right
17 now working with the Donation Advisory
18 Committee --
19        MR. JAMES PENEGUY: No, you're not.
20        MR. SHERMAN: -- as the chair --
21        MR. JAMES PENEGUY: You're dictating.
22        MR. SHERMAN: -- trying to get the
23 Donation Advisory Committee -- sir, this is
24 your first time here. We try to treat each
25 other with respect and not cut each other

Page 132

1 off.
2        MR. WILLIAM PENEGUY: Okay. Okay,
3 Mike. That's enough.
4        MR. SHERMAN: I would appreciate if you
5 would, as I gave you the courtesy of
6 listening to you --
7        MR. WILLIAM PENEGUY: Mike, don't take
8 it over there. Bring it to the table.
9        MR. SHERMAN: If you would give me the
10 courtesy of listening to me, okay.
11        MR. WILLIAM PENEGUY: Bring it to the
12 table.
13        MR. SHERMAN: The Donation Advisory
14 Committee, Cathy -- the Mayor's trying to
15 get the Donation Advisory Committee and the
16 trustee on the same page.
17        MS. NORMAN: As in who?
18        MR. SHERMAN: Despite the City going
19 through a public procurement process and
20 having counsel that we selected --
21        MR. WILLIAM PENEGUY: No, we haven't.
22        MR. SHERMAN: -- through a public
23 process. Last month's motion was to get
24 both firms together.
25        MR. MARK PENEGUY: We are not public,

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 133

1   though.
2       MR. SHERMAN: It was a compromise last
3   month.
4       MR. BUDDY: We're not.
5       MR. SHERMAN: It didn't work.
6       MR. MICHAEL PENEGUY: Well, what --
7       MR. SHERMAN: So today I'm trying to
8   get the Donation Advisory Committee and the
9   Mayor on the same page, again --
10      MR. MARK PENEGUY: He's lying.
11      MR. SHERMAN: -- by giving us a world
12  class group of attorneys, who have handled
13  environmental claims, who have
14  unprecedented, unrivaled access and
15  resources --
16      MR. MARK PENEGUY: That is right, they
17  didn't.
18      MR. SHERMAN: -- to settle this claim.
19      MR. JAMES PENEGUY: It doesn't sound
20  like it's a good time to talk about issues.
21      MS. NORMAN: But that --
22      MR. SHERMAN: And --
23      MS. NORMAN: But that, the issue of
24  authority, that's what I'm asking about.
25      MR. SHERMAN: Sure.

Page 134

1       MS. NORMAN: What is the issue of
2   authority?
3       MR. SHERMAN: I'm here today with the
4   hope that the Donation Advisory Committee
5   and trustee will be on the same page when we
6   leave, and my motion does that.
7       MR. MICHAEL PENEGUY: Well, wait now.
8       MS. NORMAN: And, wait, the issue of
9   authority, I'm still not sure what you mean
10  by the issue of authority. The authority of
11  the Mayor to hire who he wants? Is that the
12  issue of authority you're talking about?
13  I'm not sure what you mean by --
14      MR. SHERMAN: No.
15      MR. MARK PENEGUY: The decision's been
16  made.
17      MR. SHERMAN: Last month I came here
18  hoping that this compromise would work out.
19      MR. MICHAEL PENEGUY: But you'd still
20  have --
21      MR. SHERMAN: And that would have put
22  the Donation Advisory Committee and the
23  trustee on the same page. I'm sad it
24  didn't. I felt that was a fantastic
25  solution.

Page 135

1       MR. WILLIAM PENEGUY: It's amazing what
2   power this guy's got.
3       MR. SHERMAN: But we have to make a
4   tough choice. So today this puts the
5   Donation Advisory Committee --
6       MS. NORMAN: Except that --
7       MR. SHERMAN: -- and the trustee --
8       MS. NORMAN: Except that --
9       MR. SHERMAN: -- on the same page. And
10  as with all things in this matter, I will
11  come to the Donation Advisory Committee, the
12  attorneys will come to the Donation Advisory
13  Committee, and to settle matters, the
14  Donation Advisory Committee and trustee will
15  hopefully be on the same page.
16      MS. NORMAN: But --
17      MR. MARK PENEGUY: And if they don't?
18      MS. NORMAN: But they clearly --
19      MR. SHERMAN: There is no -- there is
20  no unilateral action that the Mayor has
21  done.
22      MS. NORMAN: What --
23      MR. SHERMAN: He is working through the
24  Donation Advisory Committee. I'm not going
25  to say it any more because that's the truth.

Page 136

1       MS. NORMAN: No, except that -- except
2   that --
3       MR. SHERMAN: The whole reason we're
4   here --
5       MS. NORMAN: Then why --
6       MR. SHERMAN: -- is because the
7   trustee --
8       MS. NORMAN: Why --
9       MR. SHERMAN: -- has not acted
10  unilaterally. He is acting with the
11  advice --
12      MS. NORMAN: Okay.
13      MR. SHERMAN: -- and consent, --
14      MS. NORMAN: Consent, okay.
15      MR. SHERMAN: -- with the hope of
16  having the advice --
17      MS. NORMAN: Okay.
18      MR. SHERMAN: -- and consent of the --
19      MS. NORMAN: Okay. But then why --
20      MR. SHERMAN: -- Donation Advisory
21  Committee.
22      MS. NORMAN: Why does the Mayor want
23  the ultimate authority to settle this case?
24  Why was that conveyed to us by his counsel?
25      MR. SHERMAN: I can best answer it this

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 137

1   way. I did not send that email.
2       MR. MARK PENEGUY: Oh.
3       MR. SHERMAN: When you read the --
4       MS. NORMAN: Mr. Sorenson --
5   Mr. Gisleson.
6       MR. SHERMAN: No, I'm giving you my
7   answer, from the City's side. That's from
8   the City's counsel.
9       MR. MICHAEL PENEGUY: Well, let's get
10  it from the person that made that statement.
11      MR. SHERMAN: The determination of
12  every Mayor -- and I have -- and this is
13  information that I know, because I've talked
14  to my predecessors and previous other
15  attorneys, is that the Donation Advisory
16  Committee is an advisory committee to the
17  trustee, --
18      MR. MARK PENEGUY: Oh, there it is.
19      MR. SHERMAN: -- that he acts with
20  advice and consent. I'm not reopening that
21  internal governance issue because this
22  matter's too important to open up internal
23  governance on. So what we're going to do --
24      MR. JAMES PENEGUY: There it is.
25      MS. NORMAN: Mike, just a minute.

Page 138

1       MR. SHERMAN: Stop, stop, please.
2       MS. NORMAN: Mike, just a minute.
3       MR. SHERMAN: Mr. Peneguy, please stop.
4       MR. MICHAEL PENEGUY: Well, I'm tired
5   of hearing it.
6       MR. SHERMAN: What I'm here to do is --
7       MR. MICHAEL PENEGUY: I'm tired of
8   hearing that clause.
9       MR. SHERMAN: -- hope that the Donation
10  Advisory Committee -- I'm going to ask you
11  to please show me the respect that I've
12  shown you when you've asked questions and
13  made comments.
14      MR. MICHAEL PENEGUY: You don't show
15  anybody any respect.
16      MR. LORINO: What is your motion? I
17  forgot what it was.
18      MS. NORMAN: The point -- the point --
19      MR. SHERMAN: So, Cathy, my answer is
20  nothing has changed, despite -- when you
21  look at the document, many mayors --
22      MS. NORMAN: So the internal
23  governance --
24      MR. SHERMAN: Many mayors --
25      MS. NORMAN: -- issue is still there,

Page 139

1   which is why --
2       MR. SHERMAN: Which we'll --
3       MS. NORMAN: -- the only solution we
4   have --
5       MR. SHERMAN: No, no.
6       MS. NORMAN: -- at this point is to --
7       MR. SHERMAN: We're deferring the
8   internal --
9       MS. NORMAN: -- is to file this --
10      MR. SHERMAN: We are -- stop, stop.
11      MS. NORMAN: -- petition to ask the
12  Court --
13      MR. SHERMAN: We are deferring the
14  internal governance issue --
15      MS. NORMAN: -- to tell us who makes
16  decisions.
17      MR. SHERMAN: -- by having the Donation
18  Advisory Committee and Mayor on the same
19  page.
20      MS. NORMAN: No.
21      MR. SHERMAN: We are not addressing
22  those. We decided, as a group, let's
23  address those in a nontime-sensitive way
24  with the extension of the Donation.
25      MR. WILLIAM PENEGUY: No, that's your

Page 140

1   agreement.
2       MS. NORMAN: That -- no.
3       MR. WILLIAM PENEGUY: The group didn't
4   agree to that.
5       MS. NORMAN: And --
6       MR. SHERMAN: You are not -- that is
7   not -- that's not a correct reflection.
8       MS. NORMAN: Okay.
9       MR. SHERMAN: We discussed -- we
10  absolutely discussed a bifurcated process.
11      MS. NORMAN: Well, let me say
12  something.
13      MR. LORINO: What's your motion?
14      MS. NORMAN: That the internal
15  governance issues, if there is a risk, even
16  a minute risk that the Mayor is going to
17  take over and want sole authority to settle
18  this lawsuit, once again, --
19      MR. MARK PENEGUY: That's not going to
20  happen.
21      MS. NORMAN: -- millions of dollars to
22  each of the beneficiaries --
23      MR. SHERMAN: He's never done that.
24      MS. NORMAN: It was in -- this is what
25  has been represented by his attorney, okay,

Pages 137 to 140

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 141

1    to us.  Now, that's No. 1.  And when we met,
2    we asked Soren to go back to him and say,
3    "That won't work for us."  Joel and I were
4    in that meeting.  Am I correct, Joel?
5         MR. WALTZER:  Yes.
6         MS. NORMAN:  And -- let me finish.
7    Now, okay.
8         MR. SHERMAN:  Yeah.  Yeah, okay.
9         MS. NORMAN:  Okay.  In the meantime,
10   this is an attorney general's opinion where
11   the exact same thing has occurred with the
12   airport board.  The St. Charles Parish
13   representative on the airport board died.
14   11 months later, the Mayor still refused to
15   accept the appointment of someone to that
16   board because he thought he had a power of
17   veto.  He wanted four people appointed --
18        MR. SHERMAN:  That's not correct.
19        MS. NORMAN:  -- and he wanted a choice.
20        MR. MICHAEL PENEGUY:  That is correct.
21        MS. NORMAN:  And they went all the way
22   to get --
23        MR. SHERMAN:  That's not correct.
24        MS. NORMAN:  -- an attorney general's
25   opinion, saying the Mayor doesn't have the

Page 142

1    power of veto.
2         MR. SHERMAN:  That's not correct.
3         MS. NORMAN:  And this is the same exact
4    case, the facts, as the case that we are in
5    currently.  They reference historical
6    documents, --
7         MR. SHERMAN:  Cathy.
8         MS. NORMAN:  -- they reference the
9    history of someone, how one operates -- wait
10   a minute.
11        MR. SHERMAN:  We won that case.
12        MR. MARK PENEGUY:  Don't interrupt her,
13   please.
14        MS. NORMAN:  You won that case?
15        MR. SHERMAN:  Yes.
16        MR. MICHAEL PENEGUY:  No.  No, you
17   didn't.
18        MR. WILLIAM PENEGUY:  No, you lost it.
19        MR. MICHAEL PENEGUY:  No, you didn't.
20   It didn't go to court yet.
21        MS. NORMAN:  It didn't go to court.
22        MR. SHERMAN:  Cathy, --
23        MS. NORMAN:  It didn't go to court.
24        MR. SHERMAN:  I'm happy to explain
25   that.  An attorney general opinion was

Page 143

1    issued because there was an internal fight
2    in St. Charles, not in Orleans.  The Parish
3    President and council in St. Charles
4    disagreed about --
5         MS. NORMAN:  Let me -- let me -- shall
6    I read part of it to you?
7         MR. SHERMAN:  Hang on.  The Parish
8    President --
9         MS. NORMAN:  They talk about the Home
10   Rule Charter in here.
11        MR. SHERMAN:  And the Home Rule Charter
12   applies, which is why the City Council of
13   New Orleans has the right to say "yes" or
14   "no."
15        MS. NORMAN:  Right.  And the Home Rule
16   Charter appears here.  In all cases, the --
17        MR. SHERMAN:  So the City was correct.
18        MS. NORMAN:  -- duties and
19   administration of this --
20        MR. SHERMAN:  The Home Rule Charter
21   applied.
22        MS. NORMAN:  Yes, in here, under the
23   Home Rule Charter, "Be it further ordained
24   that, subject to the control and direction
25   of the commission council, the powers,

Page 144

1    duties and functions of said committee shall
2    be the supervision, direction and
3    administration of all the lands, funds and
4    avails constituting and comprising the
5    Wisner Donation, or the avails and fruits
6    thereof, and to consult with and advise the
7    Mayor of the City of New Orleans, in his
8    capacity as trustee, on all matters.  But in
9    the first instance," --
10        MR. SHERMAN:  Keep reading.
11        MS. NORMAN:  -- "all matters relating
12   to the trust shall be in the first instance
13   referred to and handled by said committee."
14        MR. SHERMAN:  And that's why I'm here.
15        MR. MICHAEL PENEGUY:  Well, that's not
16   why you're here.
17        MR. SHERMAN:  So I'm confused what
18   you're concerned about.
19        MR. MICHAEL PENEGUY:  Wait, wait.
20        MR. SHERMAN:  Do you think the Mayor --
21        MR. MICHAEL PENEGUY:  Wait.
22        MR. SHERMAN:  I'm here because it was
23   first referred here.
24        MS. NORMAN:  Right, and we hired them.
25        MR. MARK PENEGUY:  That's right.

Pages 141 to 144

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 145

1     MR. SHERMAN: But the trustee --
2     MR. MARK PENEGUY: That's right.
3  That's the administration.
4     MR. SHERMAN: But the trustee did not
5  act.
6     MS. NORMAN: He didn't act.
7     MR. SHERMAN: We're goin in circles
8  right now.
9     MS. NORMAN: He didn't act. He doesn't
10 act. He doesn't have a right of veto.
11    MR. SHERMAN: He said no.
12    MR. MARK PENEGUY: He doesn't have a
13 right of veto.
14    MS. NORMAN: He doesn't have a veto
15 power.
16    MR. SHERMAN: Cathy, now you're getting
17 angry and you're --
18    MR. WILLIAM PENEGUY: No.
19    MR. SHERMAN: -- crossing the table
20 towards me. Please don't do that.
21    MR. MARK PENEGUY: Oh.
22    MR. SHERMAN: All right.
23    MR. MARK PENEGUY: This is great.
24    MR. JAMES PENEGUY: A squirrel in a
25 skirt.

Page 146

1     MS. NORMAN: Oh, I'm so dangerous.
2     MR. MARK PENEGUY: Don't worry, Mike,
3  I'll defend you. I'll pull Cathy off of
4  you.
5     MR. SHERMAN: Mr. Peneguy, please
6  maintain your composure and professionalism.
7  This is an important meeting.
8     MR. MARK PENEGUY: I'll do that. I'm
9  forewarned. Do you want my mommie's number?
10    MS. NORMAN: Okay. Well, --
11    MR. SHERMAN: Do we have a --
12    MR. WALTZER: This is the real
13 question, whether or not anyone else -- I
14 mean, you know, there's an opt out deadline
15 at the end of August, and this whole thing
16 needs to be evaluated, and we're in this two
17 years with thousands of hours of work. You
18 just need to make sure that you do something
19 that's going to preserve those rights.
20    MS. NORMAN: Well, it's obvious that
21 this -- you know, it's going to be damaging.
22    MR. WILLIAM PENEGUY: You know we're
23 not going to opt out.
24    MS. NORMAN: It's going to be damaging.
25 Also, one more thing. In a letter from BP,

Page 147

1  here we are, up to this point, we are duly
2  represented by Waltzer & Wiygul, and without
3  our permission, someone from the Mayor's
4  team keeps inserting themselves into the
5  legal process, an email from Greg Johnson,
6  concerning our proposed order to jointly
7  dismiss the case concerning the Motion for a
8  Summary Judgment, and in the email, he says
9  that BP won't sign unless Mr. Herman's
10 signature is on this.
11    Now, why in the world would the
12 Mayor's attorney, who represents the City,
13 need to sign an order of dismissal for a
14 case that Waltzer & Wiygul represents us on?
15 And who put that idea in anyone's head?
16    MR. SHERMAN: We're starting to get
17 circular here.
18    MS. NORMAN: No, that's not circular at
19 all. That's overstepping the bounds of
20 legal representation.
21    MR. SHERMAN: Well, I --
22    MR. JAMES PENEGUY: Mike, have you
23 thought about getting a substitute? Because
24 all you've done is create controversy.
25    MR. SHERMAN: So you're going to attack

Page 148

1  me personally, is that what you're doing
2  now?
3     MR. JAMES PENEGUY: No, I'm not saying
4  that. No. I'm saying, why don't you get a
5  substitute that can work with the committee?
6     MR. SHERMAN: I appreciate the Mayor,
7  as recently as today, has acknowledged to
8  the committee that I am his designee.
9     MR. MARK PENEGUY: That's great.
10    MR. SHERMAN: But thank you for making
11 a comment about me personally.
12    MR. WILLIAM PENEGUY: Oh, God.
13    MR. SHERMAN: I will avoid making
14 attacks against you.
15    MR. MICHAEL PENEGUY: Everything's
16 personal. I'm sorry about that, but --
17    MR. WILLIAM PENEGUY: He takes
18 everything out of context.
19    MR. SHERMAN: If there's anything new
20 to discuss, we can do it.
21    MR. MICHAEL PENEGUY: Yes, I think
22 there is some things. I also think --
23    MR. SHERMAN: I think we need to start,
24 rather than being here at 5:00 o'clock, and
25 going through the same issues --

Pages 145 to 148

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 149

1    MR. MARK PENEGUY: Michael Peneguy just
2  said there's something new to discuss.
3    MS. NORMAN: He just said there was
4  something new to discuss.
5    MR. MARK PENEGUY: Would you please let
6  him do that.
7    MR. SHERMAN: Mr. Peneguy, please sit
8  down. I'm the chair of this meeting.
9    MR. MARK PENEGUY: I am sitting down.
10   MR. SHERMAN: You're out of order, sir.
11  You're out of order, sir. You're out of
12  order, sir. Mr. Peneguy, if you need a
13  moment --
14   MR. JAMES PENEGUY: Mr. Peneguy was
15  sitting down when you said that.
16   MR. SHERMAN: -- to relax yourself --
17   MR. JAMES PENEGUY: He never stood up.
18   MR. SHERMAN: I'm going to ask you to
19  maintain order. I think we need to start
20  working towards calling the question,
21  because everyone's --
22   MR. MARK PENEGUY: There's still a
23  comment on the table.
24   MR. SHERMAN: Everyone's got -- no
25  one's moving here. We need to see where we

Page 150

1  are.
2    MR. MICHAEL PENEGUY: I have a comment.
3  You say the Mayor is trying to work with the
4  committee. The committee voted, in
5  July 2010, to hire the Waltzer & Wiygul law
6  firm to represent the City, to represent the
7  committee and the Donation for everything
8  including representation in any ensuing
9  litigation. If the Mayor's trying to work
10  with the committee, why has he not honored
11  that vote? And why have you not honored
12  that vote, as chairman of a committee, that
13  you're supposed to be doing? You're
14  supposed to be not only honoring it, but
15  supporting it, all the way.
16   MR. SHERMAN: Okay.
17   MR. MICHAEL PENEGUY: And my question
18  is, where is the cooperation? I don't see
19  any cooperation between you and the
20  committee, and I don't see any cooperation
21  between the Mayor and the committee. What I
22  see is one beneficiary holding up progress,
23  when a legitimate vote was taken, and no
24  support for that has occurred in the Mayor's
25  office at all.

Page 151

1    MR. SHERMAN: Thank you.
2    MR. WILLIAM PENEGUY: Nor is it
3  required.
4    MR. SHERMAN: Thank you.
5    MR. MICHAEL PENEGUY: Nor is it
6  required.
7    MR. SHERMAN: Well, I'd like to bring
8  closure. I want to dispel one more time
9  that the Mayor is in any sense attempting to
10  act unilaterally in the selection --
11   MR. WILLIAM PENEGUY: Oh, come on.
12   MR. SHERMAN: -- of counsel or
13  settlement.
14   MR. WILLIAM PENEGUY: Can you say that
15  with a straight face?
16   MR. MARK PENEGUY: Yeah.
17   MR. JAMES PENEGUY: He did.
18   MR. MARK PENEGUY: He did. That's the
19  problem.
20   MR. WILLIAM PENEGUY: Jesus, he's good.
21   MR. MARK PENEGUY: He's what makes
22  lawyers have a bad name.
23   MR. SHERMAN: I'm going to ask the
24  three Peneguy gentlemen, who are both out of
25  order and offensive, please maintain

Page 152

1  professionalism, okay.
2    MR. MICHAEL PENEGUY: I'll make a
3  statement along the lines that I --
4    MR. SHERMAN: I'd like to call the
5  question because --
6    MR. MICHAEL PENEGUY: I'd like to --
7    MR. SHERMAN: Mr. Peneguy, I'll be
8  finished in a moment. I'll acknowledge you.
9  And I want to dispel it one last time, but I
10  don't -- and every time it's said, I need to
11  refute it, but I don't want to be a broken
12  record and go circular here. The Mayor, in
13  terms of selection of counsel and in terms
14  of settlement, is doing exactly what I'm
15  doing here today, which is coming to the
16  committee.
17   MR. WILLIAM PENEGUY: So disgusting.
18   MR. SHERMAN: My hope is that we walk
19  out of here today, the committee and the
20  trustee are on the same page, and we avoid
21  litigation, especially with an opt out
22  deadline so near, especially with claims
23  being evaluated and, you know, offers being
24  made within 60 days. And, again, if this
25  motion passes, I hope that the groups will

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 153

1    still find it within them to work together.
2    But if not, we have clear direction.  We've
3    got the trustee and the Donation Advisory
4    Committee on the same page and we can move
5    forward and not discuss this issue and we
6    can start talking on the substance of the
7    case.
8         MR. MARK PENEGUY:  And if this vote
9    doesn't go your way --
10        MR. SHERMAN:  Mr. Peneguy, you have the
11   floor.
12        MR. WALTZER:  Can I ask just one
13   question?
14        MR. SHERMAN:  Sure.  Joel, I do want to
15   acknowledge Mr. Peneguy.  He can defer to
16   you, if he'd like.
17        MR. MICHAEL PENEGUY:  I'll defer to
18   you.
19        MR. SHERMAN:  Okay.
20        MR. WALTZER:  What have we done wrong?
21   I mean, --
22        MR. MICHAEL PENEGUY:  You haven't.
23        MR. WALTZER:  I mean, everything --
24   we've got an access agreement that probably
25   triples the value of your case.  It's an

Page 154

1    agreement that's unique to any landowner on
2    the entire Gulf of Mexico.  It codifies,
3    contractualizes your restoration rights,
4    your right to recover restoration damages.
5         We have structured our contract
6    with you in a way that allows us to shift
7    the cost of our attorneys' fees onto BP, to
8    the maximum extent possible, and we have
9    collected and participated in the Unified
10   Command, to the point where the Coast Guard
11   has sent us commendations, which assured
12   that all of the money we're spending is
13   going to be recoverable and reimbursable by
14   BP, as a response cost, under the Oil
15   Pollution Act and the Clean Water Act.  What
16   have we done wrong?  Because I'm really not
17   seeing it.  I think we've done everything we
18   can.
19        MR. MICHAEL PENEGUY:  I think that
20   needs to be answered for the committee
21   before a vote even takes place because
22   basically there's no legitimate reason to
23   fire them --
24        MR. JAMES PENEGUY:  I really don't
25   think he wants to be involved.

Page 155

1         MR. MICHAEL PENEGUY:  -- unless there
2    is something done wrong.
3         MR. JAMES PENEGUY:  I really don't.
4    Can we take a break?  I'd like to read this
5    document.
6         MR. SHERMAN:  Yeah, let's take a --
7    let's see.  Take a ten-minute break.  It's
8    2:00 o'clock.  We'll take a break until
9    2:00 -- it's 1:57 -- 2:10, so we'll stand
10   adjourned until 2:10.
11        (Break).
12        MR. SHERMAN:  A quorum is present.
13        MR. MICHAEL PENEGUY:  Ron's not here.
14        MR. SHERMAN:  He is.
15        MS. NORMAN:  Yeah.
16        MR. SHERMAN:  He's just getting some
17   water.
18        MR. MICHAEL PENEGUY:  Oh, okay.
19        MR. SHERMAN:  And why don't we -- you
20   know, let's bring closure and then move on
21   quickly.
22        MR. WILLIAM PENEGUY:  So we can get out
23   of here.
24        MR. MICHAEL PENEGUY:  Yeah, I want
25   closure.

Page 156

1         MR. SHERMAN:  To the extent that it
2    could help some things move forward.
3         All right.  So we had a motion.
4    We had a second.  We had discussion.  I'd
5    like to --
6         MS. NORMAN:  What was the motion and
7    what was the second?
8         MR. SHERMAN:  Sure.
9         MS. NORMAN:  The motion was for
10   discussion.
11        MR. SHERMAN:  That's right.
12        MR. WILLIAM PENEGUY:  Yeah, it was only
13   for discussion.
14        MS. NORMAN:  Okay.
15        MR. SHERMAN:  Yeah.
16        MS. NORMAN:  Okay.
17        MR. SHERMAN:  And let me just say, I
18   respect everyone in this room.
19        MR. WILLIAM PENEGUY:  No, you don't.
20        MR. SHERMAN:  I want you all to know
21   that.  I want everyone to know that.
22        MR. MARK PENEGUY:  He just doesn't like
23   us.
24        MR. SHERMAN:  Particularly to the
25   Peneguy family.  I want you to know I

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 157

1 respect you.
2      MR. MARK PENEGUY: You told them you
3 don't.
4      MR. SHERMAN: And I hope that we can
5 work together, okay.
6      MR. MARK PENEGUY: He's lying again.
7      MR. SHERMAN: But sometimes we're going
8 to have to disagree and sometimes it's
9 important, as a chair, to recognize when
10 there's a disagreement, so that way we don't
11 go around in circles. My hope, if this
12 motion carries, and I don't know that it
13 will, but if it carries, my hope is that
14 Soren, the City's publicly procured Joint
15 Venture, will get in a room --
16      MR. WALTZER: It's not going to happen.
17      MR. MARK PENEGUY: No.
18      MR. SHERMAN: -- and work with Waltzer
19 & Wiygul. It may, it may not.
20      MR. WALTZER: He's a liar.
21      MR. SHERMAN: But, Joel, even hearing
22 you say that makes me believe we've got to
23 bring closure to this and get the Donation
24 Advisory Committee and the trustee on the
25 same page. With that, my motion --

Page 158

1      MR. MARK PENEGUY: You lose.
2      MR. SHERMAN: -- is to retain --
3      MS. NORMAN: Shhhh.
4      MR. SHERMAN: -- the City's publicly
5 procured Joint Venture to represent the
6 Donation in the BP Deepwater Horizon matter;
7 terminate Waltzer & Wiygul. I think that's
8 it.
9      MR. WILLIAM PENEGUY: That's your
10 motion?
11      MR. SHERMAN: That is my motion. It's
12 been moved. It's been seconded.
13      MS. NORMAN: Who seconded it?
14      MR. MARK PENEGUY: By whom?
15      MR. WILLIAM PENEGUY: By whom?
16      MR. SHERMAN: Dr. Gardner seconded
17 it --
18      MR. MARK PENEGUY: No, he didn't.
19      MR. WILLIAM PENEGUY: No.
20      MR. MARK PENEGUY: You just made it.
21      MR. SHERMAN: -- for the purpose of
22 moving the discussion forward.
23      MS. NORMAN: He didn't second --
24      DR. GARDNER: Second.
25      MR. MARK PENEGUY: Oh, there you go.

Page 159

1 Well, he knew the second was coming on that
2 one.
3      MR. SHERMAN: I'll call the question.
4 All those in favor, please raise your hand.
5 Three votes.
6      MR. MARK PENEGUY: Oh, my God.
7      MR. SHERMAN: All those opposed, please
8 raise your hand, those opposed. Two?
9      MR. MICHAEL PENEGUY: Yes, right here.
10      MR. SHERMAN: Okay. The motion
11 carries.
12      MR. MICHAEL PENEGUY: And I object to
13 the vote.
14      MR. SHERMAN: Three to two.
15      MS. NORMAN: Okay.
16      MR. WILLIAM PENEGUY: Make sure you
17 write the vote down --
18      MR. MICHAEL PENEGUY: Yeah.
19      MR. WILLIAM PENEGUY: -- who voted for
20 it, --
21      MR. MICHAEL PENEGUY: Yeah.
22      MR. WILLIAM PENEGUY: -- because I want
23 that in the minutes.
24      MR. MICHAEL PENEGUY: Right.
25      MR. MARK PENEGUY: Yeah.

Page 160

1      MR. JAMES PENEGUY: Names, please.
2      MR. WILLIAM PENEGUY: Names.
3      MR. MICHAEL PENEGUY: Exactly.
4      MR. SHERMAN: The next matter on our
5 agenda is the Wisner Beach Update.
6      MR. WALTZER: I think we --
7      MS. NORMAN: I think at this point --
8      MR. WILLIAM PENEGUY: Why don't we
9 adjourn.
10      MR. JAMES PENEGUY: Let's adjourn.
11      MS. NORMAN: Yeah, I think we should
12 just adjourn this meeting.
13      MR. MARK PENEGUY: And contact our
14 attorney.
15      MS. NORMAN: Because I'm not sure that
16 I can continue on working with this
17 committee at this point in time.
18      MR. WILLIAM PENEGUY: We can't make any
19 decisions. The Mayor's making all of them.
20      (End of audio).
21            *    *    *
22
23
24
25

Professional Shorthand Reporters, Inc.                    1-800-536-5255
Offices in New Orleans and Baton Rouge                   www.psrdocs.com

Regular Meeting
Edward Wisner Donation Advisory Committee

Page 161

```
1        REPORTER'S CERTIFICATE
2
3
4
5        I, LINDA G. GRIFFIN, RPR, Certified
6    Court Reporter, in and for the State of
7    Louisiana, as the officer before whom this
8    audio tape was transcribed, do hereby
9    certify that this was transcribed by me, was
10   prepared and transcribed by or under my
11   personal direction and supervision, and is a
12   true and correct transcript, to the best of
13   my ability and understanding; that I am not
14   related to counsel or to the parties herein,
15   nor am I otherwise interested in the outcome
16   of this matter.
17
18
19
20
21        _____
             LINDA G. GRIFFIN, RPR
22           Certified Court Reporter
23
24
25
```

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge

1-800-536-5255
www.psrdocs.com