**DECLARATION OF ROBERT WIYGUL IN SUPPORT OF WALTZER WIYGUL &
GARSIDE'S APPLICATION FOR ATTORNEYS' FEES**

1.      I am a partner in the law firm of Waltzer Wiygul Garside, and I am one of the attorneys

who represented the Edward Wisner Donation in this matter for approximately two years.  I am

fully competent to make this declaration, and all of the statements in it are based on my personal

knowledge.

2.      Submitted with this declaration as Attachment A is a copy of my resume, which

summarizes my professional credentials.  For the past 24 years my practice has in large part, and

often exclusively, made up of environmental litigation on the plaintiff's side.  Before forming the

predecessor of my present law firm in 2001, I spent ten years as a staff attorney and managing

attorney for the Sierra Club Legal Defense Fund, now known as Earthjustice.  Waltzer Wiygul &

Garside currently has 6 attorneys, and maintains a substantial environmental practice representing

individuals, landowners and non-profit groups.  The types of cases I have handled over the years

include water pollution, air pollution, waste disposal, land contamination, public lands management,

marine fisheries management, and endangered species protection.  These cases have been in state

and federal courts nationwide, and have included the full panoply of federal and state environmental

and conservation statutes.  I have lost track of the number of environmental cases I have worked on,

but I would estimate that it is somewhere between 100 and 150.  A few of them include *Trehern v.

Macland Disposal Center, et al*, No. 2013-00182 (Circuit Court of Jackson County,

Mississippi)(catastrophic toxic exposure at landfill);  *Langley v. Plains Pipeline, L.P.*, No. 215-0042

(Circuit Court of Jasper County, Mississippi)(oil pipeline spill); *Sierra Club v. Louisiana DNR,* No.

60961 (25th Judicial District Court for Placquemines Parish, Louisiana December 23,

2014)(invalidating permit for coal terminal based on failure to consider less damaging alternatives);

*Moapa Band of Paiute Indians v. Nevada Power Co. et* al, No. 2:13cv01417(RCRA and Clean

Water Act contamination suit, $4.3 million settlement) Gulf *Restoration Network v. Jewell*, 161 F.Supp.3d 119 (S.D. Ala. 2016)(enjoining use of oil spill natural resource damage funds to build convention center);  *Southern Utah Wilderness Alliance v. Burke*, 2015 WL 5916815 (D. Utah 2013)(invalidating decision on off road vehicle use on public lands); *Walker v. Amid/Metro Partnership, LLC,* 109 So.3d 35 (La. App. 4th Cir. 2013)(class action on behalf of landowners with debris landfill on property); *Gulf Restoration Network v. Salazar*; 683 F.3d 158 (5th Cir. 2012)(challenging deepwater drilling plans);  *Sierra Club v. Mississippi Public Service Commission*,  82 So.3d 618 (Miss. 2012)(invalidating certificate for $2.8 billion power plant, ultimately settled for $15 million and shutdown of polluting power plants); *Board of Levee Commissioners v. U.S. E.P.A.*, 674 F.3d 409 (5th Cir. 2012)(affirming that destructive flood control project governed by NEPA); *Coastal Conservation Association v. Guttierez,* 512 F.Supp. 896 (S.D. Tex. 2007)(invalidating red snapper management plan); *Louisiana Environmental Action Network v. LWC Management Co.,*  619 F. Supp. 258 (W.D. La. 2007)(water pollution from treatment plants); *Forest Guardians v. Johanns*, 450 F.3d 455 (9th Cir. 2006)(forcing agency to consult on endangered species);  *U.S. Air Tour Association v. F.A.A.*, 298 F.3d 997 (D.C. Cir. 2002)(invalidating FAA decision on Grand Canyon National Park management); *Sierra Club v. U.S. Fish and Wildlife Service*, 245 F.3d 434 (5th Cir. 2001)(failure to designate critical habitat for endangered species invalidated); *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546 (5th Cir. 1996)(produced water discharge from oil wells).

3.      I am a member of the Louisiana, Mississippi and Colorado bars, and I have been admitted either *pro hac vice* or as a member of the bar to around 20 different state and federal courts.   I have often lectured at CLE events, law schools, and in other fora on environmental law issues.  I have also published several articles on various environmental law subjects.

4.      The field we generally refer to as "environmental law" is actually made up of several distinct areas of practice.  One is representing landowners with contaminated property, or individuals harmed by hazardous substances.  The causes of action in these cases are mostly the civil code or common law causes that underlie the general run of tort suits, although developing the technical and damages aspects of the cases can be quite specialized.  Another aspect of the practice is what we sometimes call "public law," which is citizen suits under statutes like the Clean Water Act or Endangered Species Act, and challenging actions by state or federal agencies like the Environmental Protection Agency or the Bureau of Ocean Energy Management, Regulation and Enforcement.  A third area involves regulatory law, which involves assessing compliance with agency regulations, and working through public participation and other procedures to influence agency action.

5.      There are not that many attorneys in private practice who work in all of these fields on the plaintiff's side.   My assessment is that this is primarily because it is not very easy to make this kind of practice work as business matter, particularly the specialized areas of non-tort, public and regulatory law.  Generally speaking, businesses have money to hire lawyers, individuals and non-profits less so.  Waltzer Wiygul & Garside is one of the very few firms that has experience in all of these fields, and has always stuck exclusively to the plaintiff's side of the practice.  While this has not always been the business plan that a firm focused on profit might follow, it has allowed us to develop some deep expertise in these areas and avoid conflicts of interest in representing our clients.

6.      Expertise in the area of environmental law and a lack of conflicts is basically the reason WWG was hired to represent the Donation in the first place.  The firm that usually represented the Donation in matters involving its property, Simone Peragine, had a conflict of interest

because the firm had represented BP in another matter.  One of the partners there was aware that WWG was known for its environmental docket.  This led to the firm being introduced to the Donation.  It bears noting that WWG and the Donation did not immediately sign a representation agreement.  Joel Waltzer and myself first undertook a review of the physical situation on the property, and came up with a strategy for the Donation.

7.     That strategy took into account the economic realities of litigating a property damage claim, and some specific provisions of the Oil Pollution Act.  The strategy also had to take into account the practical fact that both BP and the Donation had a live crisis going on, with massive quantities of oil washing onto Donation property and literally thousands of cleanup workers on Donation property.

8.     One economic reality of litigating a property damage claim is that, absent some fee shifting statute, the plaintiff has to bear all of the transaction costs of proving liability and damages.  The way an economist might put it is that the polluter gets an option to damage the property in exchange for paying actual damages, but the property owner has to bear all the costs to force the polluter to pay the option cost.  These costs include attorneys' fees, expert fees, and other expenses, and as the Court is aware it is common for such costs to run up to 50% of any recovery.  For an entity like the Wisner Donation, the Donation's small staff had to drop everything else they were doing, which introduced a lot of additional opportunity costs, and also work overtime and hire extra help.

9.     The Oil Pollution Act has a provision that we believed would help the Donation recover some of these costs.  33 U.S.C. § 2702 makes a responsible party like BP liable for "removal costs incurred by any person for acts taken by the person which are consistent with the National Contingency Plan."  However, we also knew that this provision needed some backstopping and a

process associated with it.  In addition, it was clear that huge amounts of information about quantities of oil, location and other key information were being generated on a daily and even hourly basis.  Particularly given the fact that a multi-district litigation process was in its infancy, we knew that getting a clear right to this information in real time and outside the litigation process would be critical to the Donation.

10.     Finally, it is hard now, six years later, to really picture the urgency we all felt in those days when the spill and response were ongoing.  Fourchon Beach was really ground zero in the effort, and oil was coming ashore in waves.  It was clear from our interactions with BP that the company was extremely anxious to avoid any disruption to the response effort there.  The Donation of course had no intention of slowing down the response in any way, but at the same time the urgency of the effort afforded us the chance to negotiate terms favorable to the Donation.  This included terms to which BP might not readily agree in a less dire situation.

11.     The Donation had a long-standing practice of requiring an access agreement from contractors, scientists, or others wishing to carry out some sort of operations on the Donation's property.  We advised folding additional terms into the Donation's access agreement, to grant the Donation a contractual right to its additional expenses as well as information about the response. As the Court will recall from the litigation regarding the Access Agreement, the agreement BP signed ultimately called for extensive information sharing, and further called for BP to reimburse the Donation for monitoring costs, the costs of assessing damage to the property from response operations, and the cost of restoration of damage caused by response operations.   About a year later, after things had calmed down considerably, one of BP's lawyers in essence told us that BP wished it had not signed that Access Agreement.  The fact that BP had some buyer's remorse is indicated by the fact that, as the Court is well aware, litigation was ultimately required to enforce

the information sharing and reimbursement terms of the agreement.  This underscores the fact

that in the late summer of 2010, there was really no time to be lost in protecting the Donation's

interests, and by acting quickly and aggressively to protect those interests, we were able to get

the Donation benefits that no other coastal landowner received.

12.     The contract that we executed with the Donation is a partial contingency fee contract.

The firm agreed to accept a reduced hourly rate, with a monthly cap, on the fees the Donation

would pay, and the Donation agreed to pay for costs such as experts. This was a structure that the

Donation wanted to put in place.  In exchange for this commitment, which reduced risk to the

law firm, WWG agreed to accept a stepped contingency rate that was lower than the rate which

was ultimately permitted by Judge Barbier's orders in the Deepwater Horizon litigation.  In

addition, the contract permitted the Donation to deduct any hourly compensation paid from the

ultimate contingency fee, even if the hourly compensation was reimbursed by BP.  Thus, for any

hourly charges reimbursed by BP, the Donation effectively gets a double credit.

13.     Environmental cases of any kind are not undertaken lightly, take a lot of time and money,

and have to be carefully researched, briefed and presented.  As in any case, whether tried to a

judge or jury, we never quite know at the beginning what evidence is going to be the most

important when it is time to go to court.  My experience has been that time spent insuring

evidence is properly documented at the beginning of a case ultimately nets efficiencies in the

form of avoided motion practice, trying to recreate ephemeral evidence, and the like.  Thus we

went to work immediately coordinating with the Donation's employees to insure that there was

extensive photographic and other documentation of oiling, the response effort, and other aspects

of the oil spill.

14.     An important aspect of this was immediately finding experts to begin tracking the impacts of the spill on the property.  For experts we immediately engaged Dr. John Pardue, the head of the environmental engineering program at LSU, Dr. Jeff Williams, a coastal geomorphologist recently retired from NOAA, and EcoNorthwest, a top notch environmental economics firm.  With Dr. Pardue and EcoNorthwest, we had the benefit of a level of trust established through prior relationships.

15.     Documenting the amount of oil on the property and its fate was a particularly important component, and required a technically competent expert, innovative thinking, and a full understanding of the protocols and guidelines followed by the Unified Command in directing oil cleanup operations.  This was like playing chess on several boards at the same time.

16.     Oil contamination at the Donation's Fourchon property was buried in the beach, in root channels in the marsh, and in some cases a couple of thousand feet from the Gulf due to the storm tides from tropical storms Alex and Bonnie.  Additional contamination washed on shore in the period after the oil spill from offshore tar mats.  Each of these areas of contamination and the fate of the oil had to be assessed in a way that would later stand up in court.

17.     The need to begin documenting contamination in a reliable way was driven in part by the nature of the response effort.   In the usual process, standards for soil contamination or discharge of pollutants are set through a regulatory process with an evaluation of the science, public input and a level of transparency.   In addition, the "No Further Treatment" standards and other guidelines used by the Unified Command were set through a non-public, non-regulatory process. This frequently resulted in vague standards like "No subsurface oil exceeding 1-3 cm in thickness and patchy (10---50% distribution) that is greater than Oil Residue."  This is quite a different standard than what a landowner would request or what might come out of a public

regulatory process, and reflected the fact that the response was an emergency situation, and one of unprecedented geographical scope. The response effort directed by the Unified Command was basically making sausage, and its standards and information gathering was not directed at assessing the volume of oil on the property or reliably documenting the residual contamination on the property.

18.     Understanding the differences between the standards used in the response effort, the underlying regulatory standards for oil and solid waste under state and federal law, and the causes of action and remedies available under maritime or potentially state law was important to representing a landowner like the Donation.   This called for a very deep dive in to the documentation used by the Unified Command, as well as the legal regime.  A full understanding of all of these overlapping and occasionally conflicting standards was critical to directing information gathering, advocating for more protective standards, and determining what relief might ultimately be available to the Donation.

19.     It should be noted that the time spent monitoring and influencing response and removal efforts, much of which was ultimately reimbursed by BP, also supplied the critical underpinnings for the ultimate damages case against BP.  For example, Dr. Pardue's work assessing the amount of oil on Donation property and tracking the breakdown of that oil was important to both monitoring the effectiveness of the response effort and documenting residual oil for purposes of damages.   In short, while we were working on the response effort, we were also gathering information that might ultimately be needed to prove damages.  There were many occasions on which I only billed a portion of the hours on a particular day, because I felt that some work was not properly characterized as response work that BP should be responsible for paying.  For example, I have a note in the file that on September 7, 2011, when I visited the beach in Fourchon, only half of that 10

hour day was billed to the Donation for passing on to BP.  In a few months I did actually record a rough count of hours which were not to be billed to BP, because the firm needed to have a sense of the kind of time being spent on the case.  For example, in June 2011 I have a timesheet indicating some 40 hours spent on Wisner matters that were not billed to BP.

20.     The part of the WWG-Wisner contract at issue here is the contingency fee.  Due to the contingency nature of the representation, I did not keep detailed time records of time that was not intended to be billed to BP as part of the response effort.  However, I did keep detailed files, including research files, email messages, evidence files, and the like.  From these files I can give an accurate depiction of the work that was performed on behalf of the Donation at various times.  *See Guillot v. DaimlerChrysler Corp.,* 113 So.2d 507, 513 (La. App. 4th Cir. 2013)(testimony and exhibits provided adequate documentation of work done even when contemporaneous timesheets not available).  Mr. Waltzer and myself have estimated some hours associated with various topic areas in the spreadsheet submitted with his declaration.  These are estimates, but I believe them to be conservative.  We spent a whole lot of time on the Wisner Donation, because it was an important, interesting representation that had implications not just for private parties but all the citizens of New Orleans and a good chunk of South Louisiana as well.  Like everyone associated with the Deepwater Horizon spill, we worked many 60 and 70 hour weeks in 2010 and 2011, and the Wisner Donation representation was a good chunk of those long weeks.

21.     Attachment B to this declaration gives a monthly description of the work that the firm did for the Donation from July 2010 to August 2012.  There was a lot to keep up with.  Ultimately we had about 23 gigabytes of data in this file, in about 23,000 separate files.

22.     We continued to do all of this work without complaint from anyone on the Wisner Donation Advisory Committee, and indeed with the support and praise of the Mayor's representatives on the

Committee.  We were aware of the tension between the Mayor and the Committee over the proper procedures to follow, but made it clear to all parties that internal governance issues were not something that we would get involved in.  We were basically trying to do a job and preserve the Donation's rights.

23.     In early April 2012 Mike Sherman, who was at that point the Mayor's representative on the committee, requested that Joel Waltzer and myself come to a meeting at City Hall to learn about the potential impact on the Donation of the then recently announced class settlement with BP.  When we arrived, we found that the entire Joint Venture attorney roster was there.  We were advised that the Mayor did not consider WWG to ever have been hired by the Donation, and there was a question about who could negotiate for the Donation with BP.  I don't recall the specifics of how all this was said, but it was clear that Mr. Sherman wished for the Joint Venture attorneys to be brought into the representation.

24.     In the ensuing months we were basically told that we could either co-counsel the Donation's case with the Joint Venture attorneys, or we would be fired.  One of the Joint Venture attorneys specifically advised me, in what I took to be an effort to be helpful, that "the mayor has the votes to fire you."  After a lot of research, we were concerned that the Joint Venture's representation of the City in its claim against BP, along with the Mayor's status as Trustee, posed a serious potential for conflict of interest.  This situation was exacerbated by the Mayor's recent insistence that he did not need the Advisory Committee's permission for many matters.  While the Mayor's claim that the Wisner Heirs' interest in the Donation actually belongs to the City had not come up at that point, it was clear that the Mayor was in an adversarial posture with a substantial number of the beneficiaries of the Donation.  As a consequence, we proposed mechanisms to ameliorate any potential conflict.

All of these were rejected.  I will note that no one ever had any complaints about our work.  Eventually, we were fired.  No cause for the firing was given.

25.     At the point that we were fired, I estimate that something over half the work that needed to be done to prepare the case for the Access Agreement litigation and eventual settlement through the Neutral process had been done.  A lot of it was fairly early on, getting the experts hired and the mechanisms for gathering data and evidence in place.  Of course, enforcement of the Access Agreement, once enforced, also gave us a tremendous amount of information about the situation on the Donation property.

26.     To the extent that the Court finds that an hourly rate has relevance in assessing the division of fees in this case, there are a couple of factors to consider.  One is that a reasonable hourly rate clearly has a market dimension.  This is similar to antitrust law, in which a "relevant market has both *product* and *geographic* dimensions."[1]  I am familiar with this Court's previous decisions about the correct geographical frame of reference for hourly rates in this forum.[2]  However, I would ask the Court to consider why a national rate should be considered the appropriate rate in the market we are talking about here.

27.     The product here is expertise in multiple areas of environmental law and litigation.  The geographic question is where you can find that particular product.  I am familiar with many of the attorneys nationally who have the kind of broad-ranging plaintiff's side environmental practice that we have.  There are probably a couple of hundred attorneys nationally who fit in that category, maybe less.  I am not aware of any other than myself, Joel Waltzer and Clay Garside who reside in the Eastern District of Louisiana.  Thus I think the market here is a national one, and the rates paid

---

[1] ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS (7th ed. 2012) vol. I at 228 [emphasis added].

[2] *Hornbeck Offshore Services, L.L.C v. Salazar,* 2011 WL 2214765 (E.D. La. June 1, 2011)(citing *Hopwood v. State,* 236 F.3d 256 (5th Cir. 2000).

on the national market should at least be considered. *See In Re Agent Orange Product Liability Litigation*, 611 F. Supp. 1296, 1308-1309 (E.D.N.Y. 1985), aff'd in pertinent part, 818 F.2d 226, 231-34 (2d Cir. 1987) (applying national rate in a toxic tort class action); *Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc*., 50 F.3d 253, 260 (3d Cir. 1995) ("The idea that a firm should be restricted to the hourly rate typical in the locale of the case 'is unduly parochial particularly in this age of national and regional law firms working on larger more complex bankruptcy cases of more than local import'").

28.     There are a number of sources that the courts have considered to establish attorney rates in a national market. One is the so-called Laffey Matrix, a compilation prepared by the U.S. Department of Justice which indicates rates for attorneys in the Washington D.C. area.[3] The Laffey Matrix receives an inflation adjustment each year. Other courts have used the Adjusted Laffey Matrix, which uses an inflation rate specifically tied to legal services.[4] The National Law Journal's billing survey also provides some information. For example, the highest partner rate for Kirkland & Ellis, one of the firms representing BP in the Wisner matter, was $995 per hour in 2014.[5]

29.     The hourly rates below give an illustration of what rates for Mr. Waltzer and myself look like in a national context, given that we both have 20 plus years of experience:

| Laffey Matrix rate | Adjusted Laffey Matrix rate | NLJ Survey Rate 2014 (Partner High, Kirkland & Ellis) |
|---|---|---|
| $568 | $826 | $995 |

---

[33] The most recent Laffey Matrix may be found at https://www.justice.gov/usao-dc/file/796471/download.

[4] http://www.laffeymatrix.com/see.html

[5] http://www.nationallawjournal.com/id=1202636785489/Billing-Rates-Across-the-Country?slreturn=20160209120734

30.     I do the vast majority of my work either on a contingency fee basis, or for non-profit environmental and conservation entities.  I do very little hourly billing for traditional business or private clients.  I have, however, frequently prepared attorneys' fee petitions in cases that involve fee shifting provisions, like the Clean Water Act.  The majority of those fee petitions are settled without any decision on a specific hourly rate.  However, about four years ago, I was awarded $625 per hour in the Northern District of California.  *See Center for Biological Diversity v. U.S. Bureau of Land Management,* 2012 WL 273604 (N.D. Cal. January 30, 2012)(defendants did not contest the hourly rate).  This is pretty close to the Adjusted Laffey Matrix rate for that particular time period (like everything else the Laffey Matrix is higher now).

31.     Taking all of this evidence together, and recognizing the Court's considerable discretion in the matter, it is my opinion that if we were talking about hourly rates, and not a mixed contingency fee contract, the reasonable national rates for Mr. Waltzer and myself would be in the $600-900 per hour range.  These rates reflect the specialized nature of the case, are conservative in a national context, and are reasonable in the context of the forum.  I am aware of course that the Court has stated that reasonable rates for very experienced attorneys in this forum are lower, in the $450 per hour range.

32.     Basic hourly rates do not, however, adequately compensate for the partial contingent nature of the case.  The example of the Exxon Valdez oil spill shows that it is quite possible to go a decade or so without collecting anything at all in an oil spill case.  Even in today's environment of restrained inflation the wait from 2010 to 2016 has diminished the value of any fee award by about 10%.

33.     In short, I believe that the fee requested is a fair and reasonable fee and reflects a fair and reasonable division of the overall contingent fee between WWG and the JV attorneys.

34.     The Court may also wish to note in the reasonableness analysis that the firm does not charge for routine Westlaw, copying and the like, and has not included any time for paralegals.  These are items which other firms routinely include in their costs and billing.

I declare under penalty of perjury that the foregoing is true and correct.  Dated this 18th day of November, 2016.

*/s/ Robert B. Wiygul*_____
Robert B. Wiygul

# ROBERT B. WIYGUL

**1011 Iberville Drive**
**Ocean Springs, MS 39564**
**(228) 872-1125**
**(228) 872-1128 (fax)**
**robert@wwglaw.com**

## EMPLOYMENT

March 2001 – Present:   **Resident Partner, Waltzer Wiygul Garside, Ocean Springs, Mississippi office**

- In March 2001, opened Biloxi office specializing in environmental and trial practice
- Litigating National Environmental Policy Act, Endangered Species Act, Clean Water Act, fisheries, and injury cases on behalf of private and public interest clients nationwide

February 1995 – February 2001:   **Managing Attorney, Earthjustice Legal Defense Fund (formerly the Sierra Club Legal Defense Fund) Rocky Mountain Office,** 1631 Glenarm Place, Suite 300, Denver Colorado 80202.

- Developed a broad-based litigation and counseling docket with clients across the Rocky Mountain region
- Sucessfully litigated and supervised litigation of cases involving wilderness protection, species protection, public land management, water  pollution and environmental justice
- Managed $750,000 budget
- Increased staff, budget and docket for five years straight, developed computer and geographical information systems capability for the office
- Worked with major donors and foundations
- Representative clients include Wyoming Outdoor Council, Colorado Environmental Coalition, Grand Canyon Trust and Southern Utah Wilderness Alliance

January 1991-February 1995:   **Staff Attorney, Sierra Club Legal Defense Fund Louisiana Office,** 400 Magazine Street, Suite 401, New Orleans, Louisiana 70130.

- One of the founding attorneys of the Legal Defense Fund's Louisiana office
- Developed a docket for the new office in wetlands, environmental justice, endangered species and water pollution issues
- Developed innovative legal strategies for impacted communities, including one of the first Title VI civil rights petition to the Environmental Protection Agency

<u>1990</u>: **Burlington Northern Fellow in Natural Resources Law,** University of Colorado School of Law, Campus Box 401, Boulder, Colorado 80309-0401.

- Awarded highly competitive fellowship for study of natural resource issues
- Authored articles and papers on environmental regulation of oil and gas development on the Outer Continental Shelf.
- Lectured to students and faculty on Outer Continental Shelf regulation

<u>1985-1990</u>:   **Gordon, Arata, McCollam & Duplantis,** 201 St. Charles Avenue, New Orleans, Louisiana 70170.

- Litigated complex contract, land ownership, and racketeering issues while maintaining an active community service and pro bono docket
- Served as lead counsel in successfully challenging the sentence of a Mississippi death row inmate

<u>1984-1985</u>:  **Clerk to the Honorable W. Eugene Davis, United States Court of Appeals for the Fifth Circuit,** Suite 300, 556 Jefferson Street, Lafayette, Louisiana 70501.

- Drafted opinions and helped prepare the judge for oral argument
- Worked on a diverse set of legal issues, with emphasis on admiralty, natural resources, and securities law

**EDUCATION**

**B.A. 1981, cum laude, Millsaps College**, Jackson, Mississippi**.**

**J.D. 1984, cum laude, University of Mississippi School of Law**, Oxford, Mississippi.

- Editor In Chief, Mississippi Law Journal
- Dean's list; American Jurisprudence Awards in Civil Procedure and Constitutional Law; N.S. Ethridge Memorial Scholarship; Mississippi Law Journal Best Casenote Award, Heidelberg, Woodliff and Franks Award.

**1992-93 Coursework in economics and statistical analysis,** Tulane University, New Orleans, LA.

**SELECTED PUBLICATIONS**

- **Enlibra Principles Ignore History, Realities**, 17 Environmental Forum  (2000).

- Wiygul and Weiner, **The Destruction of Critical Habitat**, 16 Environmental Forum 13 (1999).

- <u>**Gwaltney**</u> **Eight Years Later:  Proving Jurisdiction and Article III Standing in**

Robert Wiygul Resume
Page 3

**Clean Water Act Citizen Suits**, 8 Tulane Environmental Law Journal 435 (1995).

- Wiygul and Clipp, **Citizen's Guide to Louisiana Wetlands** (1995).

- Wiygul and Harrington, **RCRA, Communities and Environmental Justice,** 96 West Virginia Law Review 405 (1994).

- **Environmental Regulation of Outer Continental Shelf Oil and Gas Development: Sources, Problems and Opportunities for Change,** 12 J. Energy, Nat. Res. and Env. L. 75 (1992).

- **Uncertainty, Politics and Outer Continental Shelf Development,** University of Colorado Natural Resources Law Center Occasional Papers Series (1990).

- McCollam and Wiygul, **Contract Actions Under the Outer Continental Shelf Lands Act: Jurisdiction, Venue and Applicable Law,** Thirty-Eighth Annual Institute on Oil and Gas Law and Taxation, Southwestern Legal Foundation (1987).

- Note, **Bankruptcy - Chapter 13 - Good Faith Requirement Does Not Require Substantial Repayment of Unsecured Creditors,** 52 Miss. L.J. 957 (1982).

## BAR ADMISSIONS

- Mississippi, Louisiana, and Colorado

Attachment A to Declaration of Robert Wiygul

EXHIBIT B
DECLARATION OF ROBERT WIYGUL

| | |
|---|---|
| June 2010 | • Contacted by Simone Peragine regarding possible representation of Wisner Donation (WD). <br> • Reviewed materials re: WD background. <br> • Interviewed Cathy Norman, WD's Secretary-Treasurer about Donation background, BP spill overview. <br> • Wrote for and obtained LSBA Ethics Advisory Committee opinion re: possible Wisner conflict with WWG suits against City of New Orleans (CNO). <br> • June 29, met CNO City Attorney Nanette Brown concerning waiver of potential conflict. <br> • Began to develop a preliminary legal strategy and contract to fit the strategy. |
| July 2010 | • July 2, presented to WD Advisory Committee (WDAC) regarding spill representation. WDAC voted to hire WWG, 4-0, conditioned on CNO waiver. <br> • July 8, WD informs me CNO waived. Wrote all of our class representatives and plaintiffs to sign waiver. <br> • Multiple conferences regarding beach failures, tropical storms, aerial photography of spill, response and damages, MC252 Unified Incident Command (UIC) cleanup, Port Fourchon request for rent reduction (moratoria), and collection and preservation of evidence of same. <br> • Visited WD Office for extensive review of documents related to the Donation and the spill. <br> • July 21, all spent day at Fourchon Beach to learn the property, the natural environment, and observe spill and response. While there, observed oil stranded across nine miles of coast. <br> • Interviewed Cathy Norman regarding preservation evidence, experts, refined strategy, developed goals and benchmarks, discussed spill and response efforts. <br> • Interviewed Amanda Phillips, WD's finance officer, regarding record keeping related to spill, expenses associated with spill, interim claims presented to BP for payment. |

| | |
|---|---|
| | • Interviewed Forrest Travirca, WD's field agent at Fourchon, regarding spill and response efforts, data collection, evidence preservation, experts in the field, challenges, threats and opportunities.<br>• Interviewed attorneys who were forced to withdraw due to a conflict.<br>• Collected and preserved meteorological data and tropical storm data for use with contamination transport.<br>• Created Wisner BP Team and assigned roles and responsibilities relative to the spill.<br>• Reviewed Donation's standard access agreement documents.<br>• Reviewed Area Contingency Plan regarding spill response specific to WD region.<br>• Re-drafted standard Access Agreement contract, forwarded to WD on July 26.<br>• July 26, sent WWG contract for WD review. |
| August 2010 | • Reviewed WD OPA Interim Claims, request for BP vendor status.<br>• Re-wrote WD Access Agreement for BP, with shifted burden of proof (on BP to show oil was not BP's), required evidence production, restoration rights and contractual remedies.<br>• Negotiated and finalized Access Agreement with BP over two week period, including multiple conferences, redrafts.<br>• Separately revised and negotiated access agreements for journalists and scientists seeking research on Fourchon property, to assure access to work product for WD's later use in OPA trial.<br>• Extensive interactions with BP contractors who worked with state and federal agencies on Natural Resource Damage claims and oil identification work, procured and reviewed documentation they provided.<br>• During the first and second weeks in August, interviewed potential expert witnesses in biological sciences, coastal processes, and other relevant fields.<br>• By mid-August, negotiated and preliminarily engaged experts used later by JV team in the litigation.<br>• In mid-August, opened contact with BP attorneys at Liskow & Lewis on response issues and WD expense reimbursement.<br>• Continued to coordinate document and evidence collection. |

| | |
|---|---|
| | • Collected and sorted damage evidence generated by WD staff and third parties for later use including OPA trial. |
| | • Compiled scientific and other research relevant to the situation on the Donation's property. |
| | • On a daily basis, reviewed and advised on numerous communications received from and sent to WD, including UIC Branch Situation Unit reports, Field Agent, Forrest Travirca, BP, and MC252 Unified Incident Command (UIC) on daily cleanup efforts. |
| | • August 27, met onsite with UIC Port Fourchon Incident Commander LTC Ottenwaelder, discussed WD participation as cleanup partner and information sharing, and confirmed same in letter. |
| | • Tracked Natural Resource Damage Assessment structure as it evolved and gathered information relevant to WD's property claim. |
| | • Prepared WD OPA interim claim. |
| | • August 31, BP WD Access Agreement signed. |
| | • Review and respond to hundreds of daily communications received in August. |
| September 2010 | • On September 2, met with experts at Fourchon Beach for discussion of case, formation of plan to gather evidence for OPA damages case, identify response damages under Access Agreement, identified expert's areas of inquiry and specific tasks. |
| | • Sept. 11, created WD damage assessment outline with tasks for experts, in part based on earlier meeting. |
| | • Continued work with outside scientists needing access to the property, including Tulane, U.S. Fish & Wildife Service, and Biodiversity Research Institute. |
| | • Reviewed UIC best practices/cleanup standards. |
| | • Sept. 14, communicated with UIC about response methodology, best practices, and documentation, which was critical to assessing the damage to the property. |
| | • Gathered and reviewed relevant scientific and other research on coastal processes. |
| | • Reviewed UIC and WD personnel field reports and SCAT assessments. |
| | • Gathered and reviewed relevant scientific and other research on oiling damage, some sent to us directly from NOAA. |

| | |
|---|---|
| | • Created systems to archive case data, including scanning, optical character recognition, and filing procedures. |
| | • On Sept. 16, conference with experts, created blueprint regarding appropriate cleanup standards. |
| | • Sept. 16, coordinate Shoreline Cleanup Assessment Technique (''SCAT'')and archeology assessments on WD property. |
| | • Researched property boundary issues regarding WD lands. |
| | • Sept. 17, coordinate and permit LDEQ site visits, two hour conference with clients. |
| | • On September 28, wrote WWG report to the WDAC outlining WWG activities. |
| | • Sept. 19, coordinate field visit regarding NRDA shoreline damage assessment, highly relevant to WD OPA damages case. |
| | • Sept. 20, write National Incident Commander (NIC), request information, coordination, and input regarding removal efforts on Fourchon. |
| | • On September 29, met with NIC USCG Capt. Raymond Perry, WD Cathy Norman, BP's lead response, and LA's spill response lead to discuss WD's role and effort in cleanup. |
| | • Reviewed issues regarding HESCO baskets, interacted with WD Science team regarding compatibility of sands. |
| | • Coordinate BP attorney BP's first document drop. |
| | • Coordinate Shaw Group for long term chemical monitoring program. |
| | • Compiled WD interim claim to BP under OPA and Access Agreement in September, including 93 hours of WWG's billable time, many more WWG hours not invoiced. |
| October 2010 | • Continued with technical input on Shoreline Treatment Recommendations and other cleanup standards. |
| | • Continued with access agreements. |
| | • Researched regulatory status of oil, waste or exempt, on the property. |
| | • Interacted with UIC on proposed tilling of WD property and relayed scientific objections over deconsolidation and erosion. |
| | • Finalized hiring of experts Delaune and Pardue from LSU, Williams, and EcoNorthwest. |
| | • Planned expert meeting for November. |

|  | • Received and categorized information from experts, including oil sampling, for later use at trial. |
|  | • Review field reports on daily activities and SCAT reports, advise WD personnel on visits. |
|  | • Review and comment on new Shoreline Treatment Recommendations for next phase in cleanup. |
|  | • Prepare and send WD OPA interim claim to BP. |
|  | • Write for a meeting with CNO Brown re: CNO goals in WD claim. |
|  | • Written update for Advisory Committee. |
|  | • 86 hours of this time was invoiced to BP, much was not. |
| November 2010 | • Hosted expert meeting in Fourchon. |
|  | • Discussed WD interim claims with BP attorney |
|  | • Continued collecting information the extent of contamination, continuing oiling of the beach, erosion, and occupation by response efforts. |
|  | • Dealt with matters like intrusion on archaeological sites, unauthorized ''shaker test'' that would disperse oil throughout the sand beach. |
|  | • Nov. 9, received UIC intent on removing HESCO baskets installed to prevent oil penetration. |
|  | • Led WD interaction with UIC on HESCO basket removal, with experts and WD team. |
|  | • Reviewed Wisner grants for use with BP, UIC, and court interactions. |
|  | • Send WD response to UIC NIC re: Shoreline recommendations and cleanup standards. |
|  | • Attended Nov.12 meeting regarding alternative beach cleanup methods and conferred with state agency leads on new standards. |
|  | • Corresponded with NRDA lead scientist on tilling and oil weathering, obtained scientific materials from her and reviewed for use with UIC and in OPA case. |
|  | • Confer with experts on nearshore submerged tar mats that continually break apart and pollute WD lands. |
|  | • Continuing legal research on measure of damages, other legal standards. |
|  | • Continued drafting and supervision of access agreements. |

|  | <ul><li>Directed and reviewed loss of income claim as a result of rent loss with WD personnel.</li><li>Continued interaction with BP on invoices for expenses, etc.</li><li>Discussed erosion, oiled marsh and oiled mangrove assessment with WD Field Agent, NOAA NRDA lead, BP/NOAA inspections that month.</li><li>Prepared and presented at WDAC meeting the legal framework of WD's case to WDAC.</li><li>Worked with WD Field Agent regarding sampling and impacts.</li><li>Continued work with WD biologist regarding endangered species on WD property.</li><li>Consult with experts about sections of beach proposed for final closure of response, decided on ''adaptive cluster sampling'' program.</li><li>Worked with WD Field Agent to uncover buried oil in sections proposed for ''closing''.</li><li>Working with press, Ben Raines and others.</li><li>Prepare update for Advisory Committee.</li></ul> |
|---|---|
| December 2010 | <ul><li>Discussed Access Agreement non-compliance with BP lawyer, reviewed and rejected BP's proposal to pay a flat monthly rate and toss invoicing.</li><li>Continued work with experts on sand samples, oil sampling.</li><li>Developed with expert Jeff Williams plan for beach profiles and vibracoring for documentation of erosion damages.</li><li>Continued work on draft STR and other UIC guidance through communications with NOAA and other agency and UIC personnel.</li><li>Insured that beach is carefully monitored for tar mat pieces washed on beach after weather system came in.</li><li>Cataloged data from parties performing work on the Donation property.</li><li>Continued to assemble and catalog photos and evidence of oil.</li><li>Continued to draft and manage access agreements to insure access to data.</li><li>Continued efforts to have BP comply with access agreement on transfer of information and payment.</li><li>Wrote and distributed comprehensive report to Donation Advisory Committee.</li></ul> |

| January 2011 | <ul><li>Dealt with Bobcat sieving that would spread contamination across beach.</li><li>Continued discussions with UIC and with state on standards for ''how clean is clean''.</li><li>Worked with press on land contamination reporting.</li><li>Worked with WD experts and BP's Environmental liaison on Hesco basket removal and how to use the sand most efficiently and remove any contamination associated with the baskets.</li><li>Working through implications of the OSAT-2 process and document. We continued compiling photographs of the response and oil found on the beach. Continued interaction with Douglas McCollam and other members of the press.</li><li>Update for WD Advisory Committee.</li></ul> |
|---|---|
| February 2011 | <ul><li>Continued interaction with Kirstin Taylor and others in the spill response as to the sites with remaining contamination, and other aspects of response.</li><li>Continued to work with Greg Johnson of Liskow and Lewis as well as others to attempt to get the information sharing provisions of the Access Agreement implemented.</li><li>Continued discussions with response cost reimbursement – at one point BP wished to switch to a flat fee structure.</li><li>Continued work with Dr. Jeff Williams regarding beach profiles and the information necessary to determine damage to the beach.</li><li>Prepared for and attending a February 3 UAC meeting regarding Dr. Pardue's findings on contamination on the beach, methods of measuring contamination, and the results of coring in nearshore beach areas.</li><li>Followed up with additional communication on the appropriate response and additional sampling.</li><li>Gathered information about contamination in other areas, for example Pensacola Beach.</li><li>Worked on doing core sampling in key problem areas just off the beach in Fourchon.</li><li>Resisted BP's press for using of Bobcat shakers and beach tilling.</li></ul> |

| | |
|---|---|
| | • Strategized regarding damages caused by the moratorium, including claims which may be held by the Port of Fourchon. <br> • Continued to manage access agreements and information sharing with researchers. <br> • Continued interaction and negotiation with Drue Banta and Louisiana regarding access and damages. <br> • Worked with experts to refine plans to sample oil in the marsh and washover areas. <br> • Continued with monthly reporting to the Advisory Committee. <br> • Continued to oppose BP ''no further treatment'' recommendations. <br> • Gather evidence and analyze remaining oil, including extensive oil mats uncovered by a winter storm at the end of the month. <br> • Reporting to Advisory Committee. |
| March 2011 | • Worked with WD experts to characterize the remaining contamination. This included digging test pits which revealed buried layers of oil. <br> • Continued to track the development of the OSAT reports, especially issues relating to the persistence of oil in environments like Fourchon Beach. <br> • SCAT team continued ''no further treatment'' reviews, in connection with this we communicated with the Pensacola authorities who were having similar tar mat issues. <br> • Tracked and documented new oil that began to show up mid-March on Fourchon Beach. <br> • Continued to work with scientists and other who needed access agreements to the property. <br> • Drafted an Answer, Reconventional Demand, and Third Party Demand against BP(lawsuit) in the limitation proceeding. <br> • Compiled information out of the response, and arranged for private remote access to this information for Wisner personnel. <br> • Updated Advisory Committee. |
| April 2011 | • Tracked BP permitting and other planning for removal of the response related hard structures on Fourchon Beach, an extremely important and volatile issue. <br> • Researching interim remedies, given that BP was preparing to close response operations, including TROs, given there was clearly oil, and periodic active oiling, on WD property |

| | |
|---|---|
| | in violation of UIC ''No Further Treatment'' standards. <br> • Finished Answer and suit to file by the April 20 one year deadline. <br> • Continued to assist the Donation in dealing with the media. <br> • Explored alternatives for resolving the Donation's damage claims with the Donation staff. <br> • Continued to work with scientists on access agreements. <br> • Continued communication to UIC about the issues with response, particularly the adequacy of ''no further treatment'' standards. <br> • We also continued documenting issues with the NOAA response mapping, to insure that it accurately reflected the extent of oiling on Donation property. |
| May 2011 | • Continued research into interim remedies as well as ways of maximizing the quantum of damages done by trespass. <br> • Prepared a working draft of a preliminary injunction motion. <br> • Continued to manage the access agreement and information sharing process with scientists, including some complicated and time consuming negotiations given that some of the research was part of the Natural Resource Damage Assessment process through multiple levels of bureaucracy. <br> • Continued to track and lobby the Shoreline Treatment Recommendations and other response criteria. <br> • In order to keep the Donation's options in place prepared an intervention in the State of Louisiana's administrative enforcement action against BP with respect to the Deepwater Horizon spill. <br> • Continued to collect and catalog the photos and other documentation on the property. <br> • On May 10 forwarded an extensive letter regarding regulatory concerns to UIC and requested a meeting. <br> • Continued to follow up on submerged tar mat issues. <br> • Continued to make site visits to the beach on a regular basis, including a meeting of the full expert team on May 23. |

| June 2011 | • Continued efforts to discuss response endpoints with Unified Command and the State of Louisiana, as well as other safety and access issues on Fourchon Beach.<br><br>• Continued legal research into the nature of the waste on Fourchon beach, and the Donation's rights to be reimbursed for response costs as consistent with the NCP outside of the Access Agreement.<br><br>• As in previous months continued to collect the photographs and other information needed for the case.<br><br>• Reviewed draft Environmental Impact Statement for the Caminada project.<br><br>• Briefed Corps officials regarding possible impact of the oil contamination on the proposed Caminada Headlands project, a critical coastal restoration project slated to add sand to Fourchon Beach.<br><br>• Defined and drafted a settlement proposal for BP, including Caminada delay, funds for rehabilitating the beach, remaining oil and other issues. |
|---|---|
| July 2011 | • Continued negotiation and interaction with Louisiana authorities, including Garret Graves.<br><br>• At this point the UIC had referred all of our questions and issues to the state on scene coordinator, so we began interacting with Sam Broussard and Daniel Lambert, who were the SOSC personnel. The state appeared to know very little about the Shoreline Treatment Recommendations and other response documents and standards, so educating the state was key.<br><br>• Attended Louisiana Landowners Association meeting in Baton Rouge re NRDA and landowner damages.<br><br>• Continued to work with Jeff Williams and other experts on their needs for imagery and other data.<br><br>• At this point the UIC had declared that the beach needed no further treatment, so Dr. Pardue's work was critical in that it constituted the only solid evidence of the residual contamination.<br><br>• Continued to manage information sharing and access by outside scientists.<br><br>• Strategic planning for dealing with Caminada Headlands. This required substantial research into the history and current status |

| | |
|---|---|
| | of the project, including preparing for and meeting with the Corps of Engineers on July 18.<br><br>• Worked on commissioning a topographical survey in order to document impacts to the beach.<br><br>• Worked with UIC, which was continuing to evaluate the oiling condition and status of response on Fourchon Beach.<br><br>• Assisted client in thinking through Port of Fourchon proposed lease of additional land on Fourchon Island. This request had implications for the Caminada Headlands project and liability if contamination resurfaced at some point in the future.<br><br>• Continued to document the state of the beach and contamination through cataloging photos.<br><br>• Continued to manage and oversee the process of submitting costs to BP under the Access Agreement.<br><br>• Initial discussions about the possibility of settlement with BP. |
| August 2011 | • Continued to work with the experts to insure that their sampling protocols were valid, and assisted the Donation in coordinating comments on the Barataria Basin Shoreline Restoration Environmental Impact Statement.<br><br>• Worked with Dr. Pardue on preparing his mass oil estimate results.<br><br>• Pardue work in Zone 1 on Fourchon Beach found extensive subsurface contamination.<br><br>• We continued to communicate with the Corps of Engineers regarding the Caminada Headlands project. Among other complications the Corps needed to acquire a servitude or fee interest in the property for the project. The Donation needed to maintain its ability to monitor and respond to contamination on adjoining property. NOAA was also very involved with the funding side of this through Cheryl Brodnax.<br><br>• On August 18, along with Dr. Pardue, met with the Louisiana Office of Coastal Protection and Restoration in Baton Rouge to brief them on the situation on Fourchon Beach and its relation to the Caminada Headlands project.<br><br>• On August 25 met with Greg Johnson and Nathan Block representing BP to try to resolve issues related to reimbursement, and begin if possible settlement discussions. |

| | |
|---|---|
| | • Throughout the month developed on a settlement proposal to present to the Advisory Committee and ultimately to BP. |
| September 2011 | • Visited the WD property along with representatives of the City and staff of the Donation.  Tropical Storm Lee hit Fourchon Beach in early September, causing massive erosion, breaches through the beach to the marsh areas behind the beach ridge, and uncovering more residual oil, as well as oil ``snare,'' metal t posts, and other debris. |
| | • Contamination uncovered by TS Lee was documented through photos and visits to the site, including by Dr. Williams.  Presented this documentation to UIC and BP. |
| | • Worked with the experts and Donation staff to set up a defensible protocol for monitoring the breaches. |
| | • Responded to UIC concepts for plugging the breaches and putting board roads into the marsh.  Both of these operations involved potential damage and required oversight, and also involved questions of responsibility between BP and the federal response operation. |
| | • Dr. Pardue was also overseeing research regarding shear strength for documenting erosion. |
| | • We continued to vet other possible experts, for example Dr. Deepak Mishra of Mississippi State University, who specializes in assessing oil impacts on marsh through remote sensing technologies. |
| | • In addition, the response to Tropical Storm Lee required additional coordination with UIC and BP. |
| | • Natural Resource Damage Assessment researchers were also working on the property.  Researchers who were permitted to use the property were reporting data back to the Donation under the access agreements we had in place. |
| | • Continued to track the development of information regarding the spill and residual oil. |
| | • In early September updated our settlement proposal, finalized it and presented to BP on September 9. |
| | • Pursued Freedom of Information Act requests which were filed in July and August with the Coast Guard to obtain additional information |

| | |
|---|---|
| | about the response effort on Donation property.<br>• Continued to track, document and negotiate reimbursement under the Access Agreement. BP continued with pushback on extremely petty items. For example, in September BP requested extensive further information on items such as payroll, and expenses such as an $8.16 mileage charge.<br>• Continued to work with Drue Banta and others at the state regarding response issues relevant to Fourchon Beach.<br>• At the end of September BP's failure to comply with the information sharing obligations of the Access Agreement had become a critical issue. Began working on enforcement options for the Access Agreement. |
| October 2011 | • During October active response operations continued, with tar mats exposed by Lee being documented and removed with front end loaders.  Worked with expert Jeff Williams on a report to nail down specifics, causation and other aspects of the continuing deterioration of the breaches in the beach.<br>• Monitored and coordinated regarding plan by the Port of Fourchon to place geotubes in eroded areas of the beach, which would involve additional testing.<br>• Worked with Wisner Donation personnel to get a contract in place for a seismic review of the property to detect t-posts, etc.<br>• As new information about the spill became available continued to collect and organize it.<br>• The removal of board roads from the marsh in the least damaging way possible was an ongoing, serious and time consuming issue in early October, and required managing communication with Mike Taylor, Jake Rodriguez and others in BP and UIC.<br>• At this point relations with FOSC Julia Hein regarding operations on the property were becoming difficult. UIC was ready to be done with the response on the property. There were numerous other day to day response related issues going on at the same time.<br>• These included the ongoing problem of BP failing to produce the information required |

| | |
|---|---|
| | by the Access Agreement, despite attempts to resolve the problem. |
| November 2011 | • By early November it was clear that BP was not going to provide the information required by the access agreement.<br><br>• Began drafting a pleadings to get the matter before the Court.<br><br>• Began working on what items could constitute mitigation under the OPA.<br><br>• BP also began a rumor that the Donation had prevented response operations on Fourchon Beach, which required response.<br><br>• Discussions between the Donation and OCPR regarding the Caminada Headlands project were ongoing, and continued to monitor those for any conflict with damages or response efforts.<br><br>• Continued to gather beach profiles and other technical data.<br><br>• In early November the UIC released a new Shoreline Clean Up Completion Plan with significant implications for Fourchon Beach. This document included both the process for approving completion, and the completion endpoints.  The completion endpoints were especially problematic, because they included open-ended language such as ``as low as reasonably practicable.'' |
| December 2011 | • Continued to manage experts, including getting a proposal to locate residual oil in the marsh.<br><br>• Continued to track response and SCAT efforts.  Response largely closed down for the holidays.<br><br>• Continued to prepare the pleadings to enforce the Access agreement, including supporting declarations and exhibits. |
| January 2012 | • Continued to draft and support the motion for summary judgment on the Access Agreement claims. At the end of the month this was presented to the PSC for potential concurrence as required by court order.<br><br>• At this point the issue of removal of the hard structures installed on the beach early in the response was also in play, and called for coordination with the staff.<br><br>• Reported to the Committee on the effect of the order establishing the 6% holdback in the Deepwater Horizon litigation. |

| | |
|---|---|
| | • Continued to work with Dr. Pardue on the monitoring and testing work on the Donation property, especially moving into the marsh. Some locations would become inaccessible due to the Caminada Headlands project. At this point the experts had demonstrated that BP had underestimated the amount of oil on the property, made a sound estimate of the contamination, located the sources in offshore mats of continuing contamination, and characterized the rate of decay of residual oil.<br>• Continued to gather technical information. Some of the beach profiles BP had done were being withheld.<br>• During this period we were still attempting to get the issue resolved amicably.<br>• Updated the Advisory Committee. |
| February 2012 | • Continued to negotiate with Greg Johnson, Nathan Block, and others with BP to try to get the company to honor the information transfer and payment aspects of the Access Agreement.<br>• The motion for summary judgment, statement of undisputed material facts, and other supporting documents were filed on February 17, and the motion was referred to the magistrate at the end of the month.<br>• At this point the possibility of a major settlement in the Deepwater Horizon litigation was in the news media, and the Donation had to be kept abreast of the possibilities.<br>• Assisted the Donation staff in communicating with BP about continuing response.<br>• Continued information collection. |
| March 2012 | • In early March 2012 briefed the Donation on the status of the motion to enforce Access Agreement.<br>• Continued to work with the experts, who were proposing to bring in some outside scientists who had funding to work on issues like wildlife toxicology.<br>• The plan for removal of hard structures was moving forward, which required communication and advocacy with BP, the Donation staff and others about coordination and documentation of any residual contamination around the structures.<br>• We were reassessing and advising on possible settlement postures, since it was becoming |

|  | more clear that the Caminada Headlands project might be funded as an NRDA project. This included conversations with BP's Nathan Block re their response to our September offer. |
|  | • On March 15 the Court held a status conference on the motion to enforce the access agreement. |
|  | • BP immediately began accelerating its production of documents. Following the status conference the Court put us on a schedule to coordinate exchange of information about what documents the Donation had and what still needed to be produced.  All of this required considerable coordination with and reporting to the Donation, as well as editing our spreadsheet of produced material. |
|  | • At the end of the month BP produced CD's and a hard drive with a massive amount of information, all of which had to be processed and evaluated. |
|  | • Pressure was building for the Donation to grant a servitude to OCPR for the Caminada Headlands project, which would include removal of hard structures. This required time for assessing and advising on the possible implications for the BP claim.  For example, the Donation needed to take its own samples prior to work being done on these sites, which required contracting with Terracon to get coring done. |
| April 2012 | • In late March substantial oil was discovered in front of the hard structures. Engaged with BP to insure that this was handled in a way that would not endanger the Caminada Headlands project. |
|  | • Carried out essentially daily discussions and negotiations with BP, sometimes in face to face meetings, about resolving the payment issues under Access Agreement and the hard structure removal issues. |
|  | • Hard structure removal negotiations continued, including OCPR through its counsel Larry Marino. |
|  | • With respect to payment issues reached an "agreement in principle," pending approval by the Donation, to resolve the $750,000 in outstanding response costs BP had refused to pay (that amount in addition to the |

|  | $1,000,000 BP has already paid).  If approved, under the agreement, BP will pay $150,000 immediately.   The contested unpaid invoices would be submitted to a mutually agreed upon "neutral" who will decide whether the invoice is related to the MC252 response or related to litigation. If related, BP would pay 75% of the invoice with all parties "reserving rights" to the balance. |
|  | • At this point Mike Sherman, representing the Mayor, requested that the firm meet with the Joint Venture attorneys, supposedly to gain insight into the global BP settlement as it might relate to the Donation. |
|  | • At this meeting someone raised the issue whether the firm could represent the Donation in settlement negotiation. Later, Mr. Sherman asserted that the firm was not properly hired. |
|  | • Prepared several status reports to the Donation on all these issues. |
|  | • At the end of the month, after a report on the status of Access Agreement negotiations, Judge Wilkinson advised us that Judge Barbier had asked him to mediate whatever was necessary with respect to Wisner issues, and held the date of May 4 open.  This mediation would include the state and the parish if necessary. |
|  | • The last week in June reviewed, revised and advised on proposed changes to the access agreement to accommodate dealing with the hard structure removal. Reached an agreement after a number of days of intensive back and forth on April 28. |
|  | • Continued to collect information, for example at the end of April data came in from borings the port had made near the ''boudin bags. |
| May 2012 | • In early May finished the process of getting the hard structure removal agreements finished and signed. |
|  | • Also began planning with the experts for a restoration plan for the beach. |
|  | • In mid-May UIC/BP again raised the prospect of tilling the beach to break up residual oil, which the Donation had objected to in the past due to the potential for increased |

| | |
|---|---|
| | erosion.  Forced to revisit the issue with UIC again.<br>• In mid-July negotiations regarding an overall settlement with BP were not progressing, in part because someone was telling BP there was some question about who should be representing the Donation. This again caused us additional time and trouble.<br>• Began preparing a consent judgment to wrap up the Access Agreement litigation.<br>• Began working on a restoration estimate, on the chance that it would be possible to get a firm estimate from the class action settlement in time to compare it to estimate prior to the opt out date. |
| June 2012 | • Continued to attempt to get the consent judgment properly worded and signed and protect the Donation's interests, but the City's assertions that the Mayor's attorneys must be involved complicated any decision making. Eventually reached an agreement and reported to the Court.<br>• Continued to review and catalog the additional 10,000 documents we had received from BP under the Access Agreement. |
| July 2012 | • Continued documenting the file, but by July Mike Sherman, the Mayor's designee, was demanding that the firm co-counsel the case with the JV attorneys.<br>• Spent many hours dealing with this essentially political issue. On July 27, 2012, the firm was terminated without cause. |
| August 2012 | • During August 2012 the firm prepared the file for transfer to the Joint Venture attorneys. |