UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG DEEPWATER HORIZON IN THE GULF OF MEXICO, ON APRIL 20, 2010 | ) <br> ) <br> ) MDL No. 2179 <br> ) <br> ) Section: J |
| IN RE THE COMPLAINT AND PETITION OF TRITON ASSET LEASING GmbH, ET AL., IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY | ) <br> ) Judge: Barbier <br> ) <br> ) Magistrate: Wilkinson <br> ) |
| This Document Relates To: <br> 2:10-CV-02771; 10-8888; 10-9999; 13-1971; 14-1525 | ) <br> ) <br> ) <br> ) |

## DECLARATION OF JOEL WALTZER

I declare under penalty of perjury that the following statements are true and correct:

*Biographical Information Relevant to our Representation of the Wisner Donation*

1.

My name is Joel Waltzer. Along with Clay Garside and Robert Wiygul, I am a partner at intervenor Waltzer Wiygul & Garside, LLC, which was formerly known as Waltzer & Wiygul LLP and Waltzer & Associates (collectively hereinafter "WWG").

2.

I am a lifelong resident of New Orleans and graduate of Boston University, '85 (Bachelor of Science, Business Administration) and Harvard Law School, '88. After I completed my clerkship for Justice Pascal Calogero in 1990, I worked at the Tulane Environmental Law Clinic as an environmental law fellow. There, I appeared before state and federal courts, administrative agencies, and legislative bodies in a wide variety of cases, including permitting challenges,

1

regulatory actions, enforcement proceedings, and citizen suits, on behalf of non-profit organizations and community groups faced vexing pollution problems.

3.

After my fellowship ended in 1991, I joined an environmental law firm that litigated contamination and land use cases on behalf of landowners. Two year later, I joined Waltzer & Bagneris and continued to build my practice around environmental advocacy. I also came to serve individuals and businesses within the Vietnamese and Native American communities in coastal Louisiana. As such, my litigation experience expanded from environmental to include maritime, small business, and personal injury.

4.

I have litigated dozens of complex ground, air, and water pollution cases for environmental groups, communities, and landowners. Through these experiences, and because of my personal love for coastal hunting and fishing, I learned the land, water, law, and science applicable to the coastal zone - and what is at stake. Most of these cases involved extensive evidentiary records, historical research, and complex discovery. A short summary of my experiences that helped qualify me to represent the Wisner Donation is provided below:

1)   I litigated Clean Air Act citizen suit against Bayou Steel, then negotiated what was at the time the largest settlement of a citizen suit in Louisiana's history;

2)   My partner and I negotiated a multi-million dollar buyout program for a fence-line community being polluted by air contaminants adjacent to the Marathon Oil refinery;

3)   I successfully litigated a Clean Water Act citizen suit pollution case against Cintas on behalf of the Louisiana Environmental Action Network and negotiated a large settlement of that action;

2

4)   For decades, I have represented the Pointe-Au-Chien Indian Tribe, most often pro bono, in an aboriginal title case against oil industry landowners, in numerous land use disputes regarding mineral exploration on tribal lands, and in the tribe's quest for federal recognition. This latter effort has involved me gathering and reviewing hundreds of thousands of documents, needed to write their unwritten history.

5)   In the aftermath of Hurricane Katrina, I represented a broad coalition of environmental and community groups and litigated hurricane debris emergency response disposal standards and regulatory cleanup standards before multiple courts and administrative agencies.

6)   I successfully litigated the closure of the Chef Menteur landfill located in New Orleans East;

7)   I was appointed as class counsel in the Gentilly Landfill class action, a case involving the unauthorized disposal of millions of cubic yards of waste on 200 acres of private land in New Orleans East. We settled that trespass and takings case for $8 million dollars and appropriate protections regarding future environmental liability; and

8)   I successfully litigated a "no net loss" coastal wetlands case against the Corps of Engineers involving a proposed development in the vicinity of the Port of Fourchon.

5.

I served on a Louisiana Law Institute subcommittee tasked with re-writing Louisiana's Environmental Quality Act. I testified to the Louisiana Senate Natural Resources Committee regarding coastal land and the Public Trust doctrine. I have testified at numerous coastal restoration meetings regarding challenges and solutions associated with severe land loss. And I have presented in about a dozen continuing legal education programs on environmental law matters.

3

6.

While my environmental advocacy has resulted in special recognition from the Tulane Environmental Law Program (Lawyer of the Year), the Delta Club (Pelican Award), and the Louisiana Environmental Action Network (Scott Welsh Award for outstanding legal advocacy), and from magazines, and even three film makers, in truth my environmental resume' pales in comparison to that of my partner, Robert Wiygul. Robert would never say this, but my partner is in fact one of the most accomplished, sought-after environmental lawyers in the country.

7.

In early May 2010, I spent a large amount of time researching the statutory and regulatory regime and emergency response doctrine applicable to the MC252 oil spill. We filed suits on behalf of national environmental groups to redress the systemic regulatory failures that helped cause the spill. We exposed BP and Transocean's breach of the permitting regulations, the oil spill response planning requirements, the worst case discharge planning rules, and BP's failure to implement the "best available technology" standard in its oil spill response. I believe we also were first to identify the BOP failure as an MMS regulatory violation, which would nullify OPA's cap. These experiences later proved invaluable when addressing the Donation's case.

8.

Perhaps because of these actions, and our reputation and know-how, Robert and I were appointed by the MDL2179 Plaintiff Steering Committee as coordinators of the Regulatory and Injunctive Relief Working Group in around September of 2010. In that capacity, we coordinated the environmental public law and injunctive relief suits that were filed, helped draft the Master Complaint and other pleadings, and wrote white papers for the Plaintiff Steering Committee, including members of the Joint Venture legal group addressed below, to better inform them on the

4

law and strategies involved in land contamination cases.

*Waltzer & Wiygul's Engagement in the Wisner Donation Case*

9.

On June 15, 2010, Mr. Andy Wilson, an environmental attorney with the Simone Peragine law firm, called me regarding the Edward Wisner Donation (Donation). Mr. Wilson stated that Simone Peragine had long represented the Donation, but could not in the BP oil spill because of a conflict of interest.  He asked if Robert and I were interested in interviewing for the position. I told him that we were, but we would have to understand what that commitment would entail.

10.

I already knew a good deal about the Wisner Donation, though I had never before spoken to anyone within the organization. I knew that the Donation was managed by Cathy Norman, a stalwart within the coastal restoration community for decades, who emphasized the long term viability of coastal property. I knew that Ms. Norman was married to Shea Penland, the University of New Orleans professor who pioneered research on the causes of Louisiana coastal loss prior to his death. And I knew that the Donation owned most of the coast of Lafourche Parish, including Fourchon Beach and the Port of Fourchon.

11.

Shortly after I spoke with Mr. Wilson, Ms. Norman and I had a conversation about the Donation, its Oil Pollution Act (OPA) and General Maritime Law (GML) claims, and the oil spill emergency response on its Lafourche property in reaction to the BP oil spill. Ms. Norman told me that events were unfolding at an incredibly rapid rate, that the National Guard had plugged a number of channels that connected the Gulf to the marsh behind the beach, that the property had already received a massive oiling, and that the Unified Incident Command (UIC) emergency spill

response (response) was actively removing oil on Fourchon Beach. Ms. Norman, who is also a lawyer and was the Donation's Secretary-Treasurer, told me that she and her small staff were overwhelmed by work and worried about preserving evidence and hiring experts. She told me that she needed lawyers with real environmental experience, to assert control over the response on Donation property, as she had done in other contamination events in the past.

12.

After we discussed my firm's environmental background and experience with the MC252 spill, Ms. Norman asked if we would like to make a presentation to the WDAC. I told her what she already knew, that undertaking the Donation's case was a huge commitment, and that I would talk it over with Robert and get back with her.

13.

Given the complexity and environmental nature of the Donation's case, Robert and I knew we would personally have to do the work, and estimated that the case would take half of our time. Though we only had about a dozen private BP clients in June of 2010, we were already working long hours on the BP case for environmental groups and our docket of non-BP cases. We discussed the heavy time commitment it would take to do the Donation job right - work that could only come on top of our already heavy workload. We talked about the personal cost of undertaking the Donation's case - the time we both would have to spend away from our wives and children.

14.

We also discussed business risks. We knew that we would have to hire additional lawyers to help with our non-environmental docket. And we believed that the time we devoted to the case would likely preclude us from developing other BP work from our traditional constituencies in the Vietnamese and Native American communities. Finally, while BP ultimately was liable for OPA

damages to the Donation, we knew that the time we invested now could take decades to receive a return - as it had the Exxon Valdez spill. No matter how we structured the case, we knew we ran severe cash flow risks in investing so much time and resources in one case.

15.

On the positive side, Robert and I discussed the fact that the Donation case could well be the most important and lucrative property contamination case in the BP spill litigation, and that all of our past efforts and experiences had built to this exact opportunity. We discussed the importance of the Donation to our community and the importance of protecting the Fourchon/Caminada headlands, which is critical to the sustainability of southeast Louisiana. We knew we would be proud to represent the Donation and that the Donation's case closely matched our own personal professional missions.

16.

After weighing the personal and business risks against the benefits associated with the case, we decided that we wanted to represent the Donation on a contingency basis. But we also knew we had to address a potential ethics issue, whether representing the Donation as an entity presented a conflict of interest. The issue arose because of our work in the Gentilly Landfill case and in two other cases where the City of New Orleans (CNO) was a named defendant, and because here the City was a beneficiary, with the Mayor of New Orleans listed as Trustee.

17.

In mid-June, 2010, we consulted our ethics counsel and wrote to the LSBA Advisory Committee. We were advised that we could represent the Wisner Donation, but that we should obtain a waiver of the conflict of interest from the City and from our existing clients to be safe.

7

18.

I relayed our desire to undertake the case to Ms. Norman, but predicated our representation on obtaining a waiver of the potential conflict of interest from the City and our existing clients.

19.

On about June 23, Robert Wiygul and I met with the City Attorney of New Orleans, Ms. Nanette Jolivette-Brown. We explained the situation on the ground, our view of the case, the potential conflict, and the advice we received to obtain waivers. She knew both of us well as she too had worked at the Tulane Environmental Law Clinic, and afterwards in the environmental field. City Attorney Brown told us that she felt we were well qualified to represent the Donation, and that she would likely waive the conflict - but she had to check with the Mayor's office. Given the City Attorney's response, we pushed ahead to prepare a presentation for the WDAC.

20.

We developed a preliminary strategy based on our knowledge of contamination cases, which are very different from traditional tort cases (where the object is maximizing monetary damages). In contamination cases, the parties can control the mitigation of damages. Without adequate removal, contaminated property will fail environmental due diligence requirements, restricting the use of the property and causing the long term value of the property to plummet. If a landowner is successful in forcing the removal of contaminants to commercially acceptable levels, the cleanup itself is often far more expensive, but the long term damage to the property, in terms of lost use and value, is actually reduced. In most instances, landowners want both money and a clean, useable property, which requires lawyer to find non-traditional ways to monetize the case.

21.

Landowners monetize contamination cases by shifting the obligation to pay cleanup

8

expenses, expert costs and attorneys' fees to the responsible party, while retaining control over the actual cleanup and restoration on their property. Landowners also increase the value of these cases by asserting that higher end-point cleanup standards should be applied. But even where the law allows this, landowners often run into tort-based defenses where the cost of the rehabilitation exceeds the value of the property. Smart landowners address potential tort-based limitations by contractualizing their rights to removal and restoration, which in most jurisdictions allows a cleanup to exceed the property's market value. Landowners can also assert collateral pressure through administrative agencies to require compliance with different regulatory schemes. We felt we could increase the value of the case by accomplishing any of these goals. Our presentation to the WDAC was based on these ideas.

22.

Robert Wiygul and I discussed how to formulate a proposed contract with the Donation. I drafted a mixed fee agreement that directly reflected our chosen strategy of shifting fees and costs, and accounted for the fact that the case would consume our revenue generating capacity and preclude the development of other work. The agreement we proposed had two components: a contingent fee component and an hourly rate component for recoverable time. Any fees received by WWG as a result of its hourly billing would be deducted as an offset against the contingent fee owed at the conclusion of the case - thereby shifting a portion of the contingent fee unto BP.

23.

On July 1, 2010, Robert Wiygul and I prepared and detailed our qualifications, findings, strategy, and proposed contract to the Advisory Committee, which included the City's representative. We answered many questions regarding land contamination cases and the BP spill. And we obtained from the representatives their desired outcomes concerning the balance between

9

the rehabilitation of the property and monetary damages. We also discussed with the WDAC our proposal to charge a blended hourly rate and contingent fee as payment for our services. That was felt acceptable to all parties.

24.

After the discussion at the July 1, 2010 WDAC meeting, the WDAC voted to hire WWG, conditioned on the City signing a waiver of any conflicts. The WDAC instructed Secretary-Treasurer Norman and interested WDAC members to negotiate the proposed contract with us. See, WDAC Minutes, Exhibit 1.

25.

On July 8, 2010, I received an email from Ms. Norman, the Donation's Secretary-Treasurer, confirming that the City Attorney had agreed to waive the conflict and approved the WDAC's recommendation to engage us. See, Exhibit 2.

26.

Shortly thereafter, I went to the Donation's office, at Ms. Norman's suggestion, to scour its archives and begin to learn the case. I found that the Donation retained a very large repository of historical information concerning the physical characteristics and use of the Lafourche property, many of which would be difficult to obtain elsewhere. I spent days collecting and reviewing hundreds of documents of potential relevance to the case, including maps, surveys, geophysical data, research projects, coastal restoration evaluations, and documents related to previous restoration and remediation projects. I scanned, sorted, and graded those that I felt were important.

27.

Based on this review and our conversations with Ms. Norman, I confirmed what I knew to be true - that the Donation's Lafourche property was a highly dynamic, threatened environment.

10

Because the entire shoreline was retreating at a historical rate of about 40 feet per year, and because the marsh to the rear was subsiding and converting to open water, the physical damage caused to the property that was caused by the spill, and the cost of restoring same, could only be proven by capturing the *relative* increase in land loss. This underscored the importance of gathering and reviewing the scientific data and physical evidence generated by the Unified Command, Shoreline Cleanup Assessment Teams (SCAT), Rapid Assessment Teams (RAT), and the Natural Resource Damage Assessment teams (NRDA). Winning would lie in the details of injuries, such as sand removal, marsh platform loss, and scarping and erosion caused by forced hydrological changes.

28.

Around that same time, I met with Cathy Norman and Mike Peneguy to discuss a fee agreement. The agreement that I initially proposed was modified in these negotiations. We gave the Donation a basic choice: WWG would pay for the required experts if the Donation chose to pay a higher contingency fee percentage. If the Donation chose to pay for the experts itself, the Donation would pay on a greatly reduced sliding scale contingent basis, with recovery dependent on success. In any event, the Donation would not pay a contingent fee on case related funds it expended.

29.

The Donation's representatives at the negotiation considered the value of its case and chose the option of paying its own expenses, which would not be subjected to a contingent fee, and a lower contingency percentage. Second, because the Donation would pay for experts, the Donation felt it should not have to pay the full monthly invoice for WWG's hourly billings that were recoverable as response costs. The Donation agreed to pay 50% of WWG's hourly invoice, capped at $8,000 per month, until the invoice was actually reimbursed by BP. When BP reimbursed the

Donation, the balance of the invoice would be paid. Of course, these amounts would be offset against the ultimate contingency fee, meaning the Donation would pay no more than the contingency fee, less what fees BP reimbursed. On July 26, 2010, I sent the finalized WWG Retainer/Contingency Fee Agreement to Ms. Norman. I was told that she presented our contract to the Mayor for signature, along with several other important contracts and leases.

30.

On July 23, 2010, Robert Wiygul, Clay Garside, and I made the first of many on-scene visits, this one to gain familiarity with the Lafourche property. We toured the property with Forrest Travirca, an ex-Louisiana Wildlife and Fisheries agent who was the Donation's chief on scene investigator, and Secretary-Treasurer Cathy Norman. I remember being deeply moved as we walked through oil that washed ashore all across the nine mile coast that day. The magnitude of

the case really sank in, as did our resolve to make BP clean it up and restore the damage it caused. I took many pictures that day, one of which I provide here. Cathy Norman, the Donation's Secretary-Treasurer, is seen walking on the beach, in the upper right corner of the image.



31.

After our July trip, Robert and I broke down the Donation's unique challenges into four basic categories:  the Donation's legal relationship with BP, interaction with the Unified Command (BP, the Coast Guard and Louisiana agencies), residual regulatory concerns and the damages case.

12

Robert and I next developed what proved to be a unique 3-part strategy to address each area, with a necessary emphasis on protecting the headlands and ensuring resiliency through continually changing circumstances. Though time consuming, if done properly, this unique strategy was felt to incentivize BP to settle and to increase the overall value of the case.

32.

To accommodate the scale of contamination and to proactively assure the collection the evidence of damage caused by the spill and response, we proposed that the Donation actively participate as a partner in the UIC cleanup response on Donation property. By doing so, we would place the Donation in the best position possible to control the cleanup, to extend the clean-up, and to heighten the endpoint standards as well.

33.

Second, WWG proposed to document response costs, including expert expenses and legal fees, and present them as interim claims under OPA to the responsible party. Coupled with proof that we would develop concerning the Donation's consistency with the National Contingency Plan, we would shift expenses, expert fees, and legal fees to BP in this manner.

34.

And third, by participating in the cleanup and by asserting the value the Donation placed on the integrity of the land, WWG would prove that the Donation would use funds it received to actually restore the property, an important part of proving an entitlement to restoration damages in excess of property value.

35.

Thereafter, after Robert Wiygul and I identified the types of experts we felt were needed. Robert interviewed candidates in oil fate and remediation, coastal geomorphology (land loss), and

13

economics. I helped him vet and retain the experts selected. Each of the experts we hired were later used by the JV in the Access Agreement litigation.

36.

Also in late July, 2010, Cathy Norman wanted immediate help in drafting and negotiating an Access Agreement with BP. She had historically required persons seeking to access the property, for purposes of scientific studies, mineral exploration, remediation or otherwise, to sign an Access Agreement with the Donation. The Access Agreement that was traditionally used provided the Donation with liability protection from suits for injuries, some assurance that damage caused by the proposed activity would be repaired, and reimbursement of Donation expenses incurred in monitoring the work. Cathy Norman had asked BP to sign such an agreement, but BP resisted and she wanted legal assistance in tailoring the agreement to the spill.

37.

After reviewing the Donation's old Access Agreement, I felt that the Access Agreement could be modified for BP to accomplish much more - to contractualize the Donation's rights to interim payment of response costs under OPA and restoration remedies under federal or state tort law. If successful, I felt that we could largely avoid the legal pitfalls that historically adhered to contamination cases, including the election of remedies and limitation of restoration damages to the value of the land, and control the restoration done on the land. In late July to early August, I made the Access Agreement my top priority and found that BP was willing to engage.

38.

The Access Agreement BP signed enshrined BP's obligation to give the Donation response related evidence, to reimburse the Donation's response related expert fees and expenses, as well as the cost of restoring damage caused by the response. See, Exhibit 3. I felt that this last element

14

was critical. Because the response itself would cause so much damage, contractualizing the restoration removed the potential for a market value limitation on restoration damages and, even more importantly, made BP responsible for reimbursing the Donation's chosen restoration effort. BP also agreed to reimburse the Donation for the $139,208 for interim claims submitted by Secretary-Treasurer Norman before we were retained, as part of that negotiation. See Exhibit 4.

39.

Though WWG began to work in July of 2010, our contract - and apparently several other contracts - were not yet signed. In its September meeting, the WDAC voted to authorize the Donation's Secretary-Treasurer to execute the contract, which she did. See, Exhibit 5.

40.

Our strategy to insert the Donation into the UIC Response proved highly successful. The day after our contract was approved by the WDAC and signed by the Secretary-Treasurer, we met with the National Incident Commander (NIC) and BP's Incident Commander at the MC252 UIC headquarters in New Orleans. We were invited to participate in the response as interested landowners.

41.

We also met with Area Chief and UIC personnel at Fourchon. As a result of this work, we not only heightened the standards used in the cleanup, we obtained correspondence from the National Incident Commander lauding our partnership as a valued partner in the response on Donation land. This further established that our actions were consistent with the National Contingency Plan, a key pre-requisite to recovery of response costs under OPA and the Clean Water Act, which when the case finally settled still totaled about $250,000.

15

42.

I also wrote FOIA requests to the UIC and state agencies to obtain the official record of the spill response pertaining to Wisner land. I spent considerable time following up on these requests, and reviewed and catalogued thousands of records we obtained from the UIC and state government agencies - in addition to the documents we obtained from BP under the Access Agreement. I did this for purposes of developing the Donation's OPA damages case. Many of the response records were in fact used in the Donation's Access Agreement case.

43.

I also closely followed the NRDA process as it related to sediment contamination, oil transport and fate, oil weathering, land loss, and natural resource damages caused by the response. Though NRDA damages are not recoverable by private parties, the NRDA scientific studies could be used to support our private property damage claims. I personally reviewed a great number of documents that were generated in the NRDA process for this reason.

44.

The spill response doctrine called for a progression of stages, from "active response" to properties that were simply being observed in a "maintenance stage". When the UIC recommended that portions of the Donation property be moved out of active response, we often opposed the change, based on the science we had collected regarding residual oil that was not removed and based on the investigations provided by our on-scene investigator. As a result, BP remained in active response on large sections of the Donation's property – to my knowledge, longer than anywhere else along the Gulf.

45.

Through the interim claims we prepared and submitted to BP under OPA and the

16

Donation's Access Agreement, we were able to shift nearly $3,000,000 in costs, expert fees, and legal fees to BP, assuming the Donation is given the credit in this proceeding it deserves. As seen from the summary chart of invoices showing what Robert Wiygul and I billed BP on the right, I personally expended over 300 hours of my time on matters that was invoiced to BP as part of the Donation's response effort on the beach. A table summarizing our invoices to BP is attached hereto as Exhibit 6. I have reviewed the invoices and certify that the table is accurate.

46.

A large portion of our time was not contemporaneously recorded, because it was unrelated to the response and because WWG had a contingent fee agreement. Robert and I have gone through our Wisner file and generated a list of tasks for which we did not invoice, along with a conservative estimate of the time we expended on each. We have left off items that we believed was later used to benefit other clients or the common benefit. A table containing the task list and estimated time is attached hereto as Exhibit 7. I have reviewed the table with Robert Wiygul and certify we both believe the table is as accurate as possible.

47.

I have reviewed my partner Robert's month by month narrative regarding our representation, attached as Exhibit B to his declaration. Exhibit B captures most of the timing and substance of what we did during each monthly time period.

48.

I am reasonably certain that I personally spent more than 800 hours over a 24 month period on the Donation's case, prior to WWG's termination. In a normal 2000 hour year, 800 hours would consume approximately 20% of my practice. Those were not normal times. Particularly in the first six to eight months of our involvement in the case, I worked many 60-80 hour weeks - time away

17

from family and fun that I cannot get back.

49.

All of our efforts in the case, those we invoiced for purposes of recovery under OPA and the Access Agreement, and those that were not invoiced, were all part of the execution of our strategy in land contamination cases, as adapted to this case. The cumulative effect of our work was designed to develop the evidence needed at trial, and cost BP up front money, thereby increasing the likelihood that BP would come to the table with a substantial offer. Specifically, our efforts to engage in the UIC response served these dual purposes.

50.

I provide the following examples of the dual purpose nature of our response work. Forrest Travirca, the Donation investigator on the property each day, noted that contamination kept reappearing on parts of Fourchon Beach that were previously "cleaned". Forrest and Dr. John Pardue, our oil fate and transport expert, believed that the oil was coming from nearshore tarmats. We decided to undertake a preliminary investigation of the nearshore environment, which we suspected was the source of new contamination, and to measure the rate at which the PAHs in the oil were deteriorating. Dr. Pardue and Dr. Jeff Williams obtained sampling cores at fourteen transects along the beach on the beach and through the surf zone adjacent to the property. Analysis of these cores verified the presence of oil in the submerged waterbottoms, in both the crests and trenches, up to two hundred yards from the shoreline. We presented the findings to the National Incident Commander. BP and the Unified Command studied our conclusions and conceded that our science was right, that oil existed in these waterbottoms, that the anaerobic environment precluded its degradation, and that it would continue to contaminate the Donation's property as it breaks up. Ultimately, based in large part on our investigation, the NIC ordered that BP pay for a

study of nearshore areas along the entire coast, called OSAT-2. This work would have been invaluable in a future OPA case, had it come to trial. This work was billed to BP under the Access Agreement and OPA.

51.

In another example, large amounts of oil contaminated beach sediments. The UIC removal standard left contamination in place at a depth below 6 inches. Our scientists took statistically significant sampling to determine how much oil was remaining on the beach. The results of our study was shared with UIC and required sections of the beach to be placed back in active response. The work was thus recoverable under both OPA and the Access Agreement. Our science costs and legal time directing these studies were billed to BP. The results of these studies informed the total amount of oil left on the beach, and would have greatly benefitted the OPA case.

*Facts Surrounding the Termination of WWG*

52.

From July 2010 to April 2012, my firm had collected and organized much of the evidence needed to prove damages, engaged in a persistent response on Donation land, elongated the cleanup over large portions of Fourchon Beach, contributed to BP having to pay for a nearshore contamination study in waterbottoms across the Gulf, and pushed UIC to force BP to mitigate landowner losses through replacing the contaminated sediment BP removed from beaches.

53.

From July 2010 to April 2012, Robert and I drafted and filed a comprehensive Complaint on behalf of the Donation in federal court [10-cv-02771; Doc. 326], twice litigated BP's non-compliance with the Access Agreement we wrote, prepared a motion for a preliminary injunction, and even participated in state enforcement actions against BP. Through the claims we submitted

to BP under OPA and the Access Agreement, we forced BP to reimburse over $1,000,000 in investigatory costs and expert fees while we were in the case, and were in the midst of settling another $750,000 in unpaid interim claims. We had succeeded in attaining many of our goals and were applying consistent pressure on BP on multiple fronts.

54.

On March 30, 2012, I received a call from the Mayor's new designee to the WDAC, Mr. Mike Sherman. After generously lauding our work, Mr. Sherman noted that the JV team which represented the City wanted to brief my firm on how the Donation's real property claim would be calculated under the impending settlement methodology. We set a date for the briefing.

55.

On April 2, 2012, Robert and I went to City Hall. We were greeted by Mr. Sherman and members of the JV team. As soon as the meeting commenced, Calvin Fayard asked Mr. Sherman whether our firm or the JV team had the authority to represent the Donation in settlement negotiations with BP. Mr. Sherman replied that the answer related to a larger set of issues, which included the role of the trustee and the WDAC, and the authority of the WDAC or the Secretary-Treasurer to contract on behalf of the Donation. Mr. Sherman quickly adjourned the meeting, promising the Mayor would "make a fast decision". We learned nothing about the wetlands claim methodology.

56.

On April 4, 2012, we reported the meeting to the WDAC. We noted the posture of the case and the time sensitive matters on which we were working. We told the WDAC that BP may question the validity of the Access Agreement, which was signed by the Secretary-Treasurer and approved by the WDAC, if in fact all instruments not signed by the Mayor were invalid. We asked

20

the WDAC and Mayor to affirm our authority to represent the Donation or designate new counsel.

57.

On May 16, 2012 Mr. Steve Herman wrote this Honorable Court and requested to participate in a status conference regarding our enforcement of the Access Agreement, in his role as liaison counsel and member of the PSC, and on behalf of the Mayor at trustee. The letter did not indicate that WWG did not represent the Donation or that WWG had no authority to act. See Exhibit 8.

58.

At the June 7, 2012 meeting, WWG recommended to the WDAC that the Donation submit a wetland claim in the DHCC process, well in advance of the opt-out deadline. If the Donation's claim was not considered, or if the Donation was not satisfied with the amount of money that may be offered, the Donation could withdraw the claim and opt out. Agreeing that all options should be looked at, the WDAC approved of the submission in executive session.

59.

Thereafter, at that same WDAC meeting, the Mayor's representative, Mr. Mike Sherman, requested to replace WWG with the JV. The other four representatives refused in what grew to be a very contentious discussion.

60.

The following day, Steve Herman wrote to Ms. Norman and indicated that he was directed to coordinate litigation activities in the case, apparently by the Mayor. He also emailed Claims Administrator Juneau and BP's lead lawyers and stated he had learned that the Donation would be submitting a claim. He wanted to "put the claim on your radar, so that the Program will be able to make sure that the I's are dotted and the T's are crossed in terms of the Release."

21

61.

I found the timing of the JV's intercession - on the heels the private global settlement -
and content of the unpermitted disclosure, very troubling. We were in the midst of several
important efforts for the Donation, including reopening the response to remove newly discovered
contamination on Donation property, enforcing the Access Agreement (again) in this court, and
requiring the UIC to replace contaminated sediments that were removed from our property as a
mitigation requirement under the Clean Water Act. I felt we were being derailed.

62.

A week later, the Mayor demanded that WWG co-counsel the case with the JV attorneys.
We tried to work out the relationship with the JV, but because the Mayor's attorneys could not
assure our participation in all facets of the case - particularly in settlement discussions - or assure
that any proposed settlement would come to a vote of the WDAC, we reached an impasse.

63.

Thereafter, two beneficiaries changed their representatives on the WDAC and their vote.
On July 31, 2102, the WDAC voted 3-2 to terminate WWG's services after WWG had provided
thousands of hours of legal services, and drew the active praise of all parties, including the Mayor's
representatives.

*Facts Surrounding the Rehiring of WWG*

64.

On or around August 1, 2014, I received a call from Mark or Michael Peneguy. They
forwarded me a letter sent by JV lawyer Soren Giselson. Mr. Giselson advised that because the
trust had terminated, all beneficiaries should hire their own lawyers. See, Exhibit 9. The Peneguys
asked me if we would consider coming back into the case to represent the Wisner Family. Our

22

firm (now WWG) was ultimately hired on a contingent basis by 53 family members, who collectively held a 38% interest in the Donation.

65.

Despite the events that lead to our termination in July of 2012, Robert and I assisted in litigating the Access Agreement I helped draft, including providing memoranda to the JV lawyers about our strategies and what the contract allowed the Donation to collect and do (e.g. reimbursement related to the response). I suggested strategies, actions, responses to defenses, and discovery. I also attended hearings, participated in depositions, at least one in Houston, helped prepare experts, reviewed briefs and pleadings, and did whatever else I could without the benefit of a file, which my clients had requested of the JV team on an number of occasions. I estimate that I spent approximately 80 hours on this work prior to the settlement.

66.

This case was resolved on May 3, 2016, in the court mediated settlement process known as the "Neutral Process". Judge Magistrate Shushan provided the Donation with an offer in March of 2016. The terms of the settlement were contained in a proposed "Release Agreement." The JV team recommended to the WDAC that the Donation accept the offer as written.

67.

The lawyers present at the WDAC meeting asked Mr. Steve Herman for a settlement evaluation, including what was owed as costs and fees. The JV eventually provided a written evaluation of the case, including a differentiation of the value of the Access Agreement case from the OPA case, but would not provide any information concerning what overall costs and fees would apply against the settlement. The JV's Settlement Analysis is provided as Exhibit 10.

23

68.

My clients shared major concerns with the other beneficiaries (and their counsel) over some
of the terms contained in the Release Agreement. The provisions as written appeared to prohibit
the Donation from complying with its duty to report contamination to the National Response
Center, could be read as a contractual assumption of BP's designation as the Responsible Party on
Donation land, and the timing of the payments was felt to preclude the Donation from rehabilitating
the property.

69.

Subsequently, I worked with the non-JV lawyers for other beneficiaries, and with
Magistrate Shushan, to find an acceptable solution. As compared to the original, our work
contained the following major changes:

1)      Preserves the right of the Donation/Related Parties to report oil contamination to the
National Response Center. (§19);

2)      Prohibits BP from asserting any claim to reimbursement against you (including Donation
and Beneficiaries) if the government requires future cleanup on Donation property. (§12);

3)      Shifts $1.5Mm that was payable in 20-23 years to be payable in 3-5 years (thereby
increasing the overall present value of payments from $21.2Mm to $22.5Mm) (§2);

4)      Preserves your right to receive payment provided for by the $1.3Bb Halliburton/
Transocean Punitive Damage Class Settlement (which will come soon) (§1.p);

5)      Protects your ability to assign your beneficial interest in the Donation, including the BP
payments provided for in this Release, to your heirs, successors, and assigns. (§23);

6)      Preserves your personal lawsuits or claims against BP (and any claims held by Donation
employees and contractors), that are not related to damage to the Donation. (§1.p, §11);

7)      Reserves all of your rights, arguments, and claims relating to the Donation's internal
governance (§13.c);

8)      Removes the prohibition against making publicly disparaging comments about BP, unless
the disparaging remark is "with respect to this Release Agreement." (§18).

We ultimately produced a document that all parties, including the City, acknowledged was a
substantial improvement over the original.

24

70.

I was hired by the Wisner Family on a contingent basis after the trust terminated, so I did not keep time sheets for this work. But I estimate that I spent another 80 hours conferring, drafting, and conducting research related to the Release Agreement. The Release is attached hereto as Exhibit 11.

*Application of the WWG Contract to the Settlement*

71.

Under the terms of WWG's Retainer/Contingent Fee Agreement, WWG has no outstanding claim for hourly wages reimbursed by BP under §4(a), because WWG has received $358,969 for "removal/response related professional services." This includes $31,543 in attorney's fees that BP paid directly to WWG as a result of the motion for summary judgment WWG filed to enforce the Access Agreement. A true copy of WWG's accounting record as it relates to its representation of the Wisner Donation prior to WWG's termination is attached as Exhibit 12.

72.

The Donation received no "interim or partial payments of oil spill damages other than response/removal costs" at any time in this litigation. As a result, no funds are due to WWG under §4(b) of WWG's Retainer/Contingent Fee Agreement.

73.

The Neutral Process final settlement at issue here, which would include the portion of the first payment that was deposited into the registry of the court, was paid "in connection with physical damages and restoration costs, as well as final economic loss damages." §4(c). WWG is owed a contingent fee under §4(c).

25

74.

The contingent fee is based on the "gross present value of benefits" received by the Donation. $30,000,000 is clearly a "benefit" to the Donation. §4(c). Because the contract does not specify what discount rate should be applied, a reasonable rate should be applied. Assuming that a 3% discount rate is considered reasonable, the present value of the income stream generated by the final settlement is $24,434,103.

75.

The Donation decided to buy down the contingent fee rates by agreeing to pay the costs associated with the response, and to reimburse WWG for its expenses and expert fees up front. §7 provides that WWG will deduct case costs and common pro rata litigation related expenses which have not been paid by WWG. The example provided in §7 shows a deduction for the Donation's unreimbursed "costs related to the spill and its property" from the gross amount before application of the contingent fee percentage.

76.

According to the JV's "Wisner Summary of Damages", the Donation expended $229,386 in response costs that were not reimbursed by BP, and $375,100 in "expenses paid by Wisner, approx.", while the JV incurred $1,214,615 on the Access Agreement case. These expenses total $1,819,101. The present value of the settlement, less the costs and expenses, equals $22,615,002.

77.

The highest tier applies if the Donation "matter" resolved "after the first Order" or "an Order" was signed, setting "the case" for trial. §4(c)(iii). While the dispute over the Access Agreement was set for trial, the OPA and GML case was not. If the Court agrees that a reasonable interpretation of that provision would mean the case was set for trial, then the total attorneys' fee

26

would be calculated as $2,500,000 ($10,000,000 @ 25%), plus $2,270,700 ($12,615,002 @ 18%), for a total of $4,770,700.[1]

78.

Based on WWG's experience in successfully resolving hundreds of cases in the Neutral Process, and because case values were established by the Neutrals and Magistrate Shushan, I am reasonably certain that the case would have resolved around the same time as it did, and for the same amount, had we not been terminated. Because we already possessed a working knowledge of the file, had we not been terminated, I believe that Robert and I would have expended at most an additional 1,800 hours (6 full months) of time in the Donation's case prior to the case resolving.

79.

Robert Wiygul and I spent approximately 1960 hours working on the Donation's case, including 780 hours of time that we were able to invoice as related to the response, and 1180 hours of time that we were unable to invoice. As such, we had completed approximately 52% of the work required in the case at the time our firm was terminated.

80.

Applying the 52% completion percentage to the total gross fee of $4,770,700, before any offset for amounts previously paid, results in an earned fee of $2,480,764.[2]

---

[1] If the Court believes that the matter was set for trial, then the fee would be $1,800,000 plus $1,513,800, for a total of $3,313,800. Or the Court can apply a blended rate based on the JV's estimate of the value of the AA case relative to the value of the OPA/GML case. See, Exhibit 11. Doing so results in a rate of 20.31% for the first $10M, and 13.98% for each dollar paid over $10M. Applying this blended rate, the contingent fee would equal $2,031,000, plus $1,763,577, for a total of $3,794,577.

[2] Assuming that the court is inclined to disregard the dual purpose served by our response work, we completed 54% of our work. The gross fee would be $2,719,300. After deducting the offset for what we were paid, WWG should collect $2,399,300.

27

81.

Under § 4(a), fees paid for "removal/response related professional services"… "actually received by WWG will be credited as an offset against the contingent fee owed and payable under §4(c)." §4(a). After the $358,969 offset is deducted, WWG is owed $2,121,795.

82.

On October 1, 2016, BP paid the first installment of $5,000,000. Under §7 of WWG's contract, the case costs and litigation expenses are reimbursed to the Donation and to Wisner first, totaling $1,819,101. See, para. 75.  Then, WWG is to be paid its fee of $2,121,795.

83.

WWG has already proposed to spread its fee over time. WWG wants to assure that the Wisner can fund the remaining treatment needed to rehabilitate the land and avoid creating any unfunded tax liabilities for beneficiaries. WWG remains willing to discuss an appropriate payout over time.

Date: November 18, 2016                              /s/ Joel Waltzer (LA #19268)

28