# MINUTES OF THE EMERGENCY MEETING OF THE EDWARD WISNER DONATION ADVISORY COMMITTEE
## THURSDAY, JULY 1, 2010

**Present:**
Ashleigh Gardere, Representative, City of New Orleans
Dr. Sandra Robinson, Representative, Tulane University
Mike Peneguy, Representative Wisner Heirs
Dr. Everett Williams, Representative Medical Center of La. at New Orleans
Edward Buddy, Alternate, The Salvation Army
William Peneguy, Alternate, Wisner Heirs

**Staff:**
C. Cathy Norman, Secretary Treasurer/Land Manager
Amanda Phillips, Executive Assistant
Dawn Segura, Asst. City Attorney

**Guest:**
Mark Peneguy

Motion for Michael Peneguy to chair the meeting for Ashley Gardere at her request. Motion by Everett Williams, second by Dr. Sandra Robinson. Motion passed.

Meeting called to order at 2:30 pm.

### New Business Item 1.   Update BP Deepwater Horizon Oil Spill

Ms. Norman addressed the Committee and updated them on several issues. There are several major breaches on the shoreline. The largest breach is at an area referred to as Bayou Thunder. It is in fact Bayou Fer Blanc and is located 100% on Wisner property. The clean up crews, response groups and Parishes are treating it as the Parish line with much of the response coming from Jefferson Parish. A major land bridge was built on this location without permission from the Edward Wisner Donation. A formal survey of the Parish line has solved the problem. Ms. Norman will send the survey to both Parishes and will provide copies to the Coast Guard and BP response. Once the water in the area retreats, Forrest Travirca will put up signs. The area is already flagged.

Additionally there was a request to utilize "Tiger Dams" to block the wash over areas. These have been used on Grand Isle. These are rigid dams that they pump sea water into to form a dam. These are not as high as the Hesco baskets, so they probably will not work.

The Hesco baskets were breached during the recent storms. With the breaches, oil has intruded back into the marsh. Experts (for BP) including Dr. Duncan FitzGerald have informed Ms. Norman that the beach is in constant motion and that plants in the area will hold up to the oil intrusion. However he stated that the real damage to the area will occur from the structures that have been built and the collateral damage to the beach.

There have been a lot of people trespassing on the beach and the situation is still very chaotic. The Taylor Engineering group has been hassled by BP while trying to finish


EXHIBIT 1

their work on the Caminada Headlands project. There are 700 to 1000 people a day on the beach including 250 people at night doing night operations.

Lumcon has EPA utilizing the camp and they have brought in a pod to attach to the camp. Ms. Norman is trying to address the issue of damage to the property and the business relationship between EPA and LUMCON.

Joel Waltzer then arrived at the meeting to address the Committee.

**New Business Item 2.   Engagement of outside Counsel Discussion**

Joel Waltzer introduced himself and gave the Committee information about his experience and his background in environmental law. This included environmental cases, water cases, endangered species cases, NEPA cases and work at the Tulane Environmental Law Clinic. He is also very familiar with Coastal issues.
He then talked about the intersection of public and private environmental law. Private remedies that Wisner will have as well as public remedies covered by regulatory law, OPA 90, the Clean Water act, the Migratory Birds Act etc. There are two pieces to the spill. The first is in the response. Responsible parties are expected to clean it up. Emergency planning documents cover this under the Unified command. This includes the responsible party, the Federal Government, and the State.
The National Contingency Plan is the blueprint for response for such an event. Post 911 there are new emergency planning rules and there are state plans as well. The Coast Guard under law is supposed to be directing the response utilizing state and local government as well as the responsible party. Private land owners have a role in this as well as being directly affected. Land owners can take any action they desire to assist in protecting their property provided it is consistence with the National Contingency plan.
There are regional and area consistency plans as well. Mr. Waltzer indicated that Wisner was unique as an entity and there might be additional funding opportunities. He also indicated that the scenario changes everyday in a spill and it is always evolving. He indicated that the fox is guarding the hen house. BP will not do the assessment for Wisner or pay for a full restoration which we are entitled to as well as any permanent damage without legal action. Short term is protection and documenting the area. There was a discussion about the erosion in the area and the conveyance of oil in canals. The needs are to engage in an assessment, come up with the plan, but when do you get the funds to implement the plan protection and responses?

Ms. Norman inquired how we do an assessment when the oil is continuing to come ashore and may continue for another year. Mr. Waltzer mentioned a pre assessment of the property as well as a post spill assessment. Ms. Norman mentioned that BP will look at the erosion as our problem, when in fact it is delaying a project on our property. Currently there is aerial photography being flown to document the state of our property. The oil will also need to be fingerprinted to determine its source.

Mr. Waltzer indicated that there have been approximately 250 lawsuits filed so far. A majority are on the private side (class action), but also some public suits. The Multi District Litigation panel is meeting to determine the location of the suits, preferable the Eastern District of La. There is no race to sue BP according to Mr. Waltzer. Passage of 90 days after a claim is presented and denied is required.  Wisner's first claim was filed on May 25th. Dr. Williams recommended the engagement of the Waltzer firm. Ms. Norman raised the issues of the fee structure and the conflict of interest issue with the City. Ms. Gardere then strongly urged Ms. Norman to contact the City Attorney concerning the conflict issue to follow up the conversation that Joel Walzer had with the City Attorney. The Waltzer firm has litigation that involves the City of New Orleans as a defendant. The cases are unrelated. Mr. Waltzer pointed out that he

will represent the Wisner Donation in this matter and not the City. Nevertheless, Mr. Waltzer wants to get waivers from the City and Wisner as well as the other client that Waltzer represents. He already wrote the Bar Association for an opinion on the potential conflict.

Ms. Norman stated that what she needs is someone to advise her on how to proceed with the access agreements and engage outside experts to assist with the spill response and cleanup. Mr. Waltzer agreed that this is what they could provide.

Fee wise Mr. Waltzer indicated that he and his partner would really like to work on this project and they would do something reasonable. Possibly a blend of fees and contingency. The Wisner property is a microcosm of the coastal issues including erosion, the spill and the moratorium.

Emergency Response law is a large part of a spill event and sets up a shadow government system that you need to know how to navigate.

Ms. Norman then compared the current situation on Wisner beach to the attempts to cap the well. They are throwing out every idea they can and trying everything. But in spite of that there were 15 breaches on the beach as of yesterday due to the recent weather. Mr. Waltzer indicated that there was a lot of politics involved.

Mr. Waltzer indicated that the whole process is inconsistent and knowing the right person and correct procedures is very important. Knowing the emergency operating procedures is critical.

Ms. Norman emphasized her need for knowledge and emergency support for the response from outside counsel. She indicated that a large portion of the beach was inaccessible due to breaches and therefore there was no emergency response, no boom and no cleanup.

Ms. Norman then addressed the Committee concerning engaging the Waltzer firm. She requested an engagement letter from Mr. Waltzer and stated that she thought it was appropriate for this issue to be discussed with Nannette Jolivette Brown, the City Attorney, in reference to the potential conflict issue and in deference to the new administration. Ms. Norman also stated that the Committee has engaged outside counsel in the past without discussing it with the City or the City Attorney's office.

Ms. Norman asked the Committee if they would like to make a motion to engage the Waltzer firm subject to a discussion with the City Attorney's office concerning the conflict.

There was a motion by Dr. Everett Williams. He stated that the particulars could be worked out with the Waltzer firm. Seconded by Dr. Sandra Robinson and also by Michael Peneguy.

Ashleigh Gardere requested clarification on several points. In particular she requested that the motion include contact with the City Attorney's office to resolve the conflict issue. Dawn Segura of the City Attorney's office was asked to comment and she too stated that the City Attorney's office should be contacted to obtain a waiver of the potential conflict.

Once the conflict issue is resolved the Committee will proceed with an engagement letter.

1 The scope of the representation will include the spill response, filing of suit
2 should that move forward and the restoration of the property.

4 After the discussion with the City Attorney and resolution of the conflict issue
5 engagement letter will be presented by the Waltzer firm to the Committee.

7 Ms Norman indicated that there was a lot of baseline data and pictures on the
8 property. There have also been a lot of studies on the property.

10 Mr. Waltzer departed the meeting.

12 **The vote on the motion was reviewed and approved by a vote of four with**
13 **one abstaining.**

15 **New Business Item 3.   Greater Lafourche Port Commission – Drilling**
16                                       **Moratorium impacts. Proposal to reduce rentals**

18 Ms. Norman informed the committee that there was an update on the proposed
19 concessions by the port in response to the moratorium. The Port proposed that for the
20 next six months or until the moratorium is lifted, whichever comes first. The new
21 proposal is fairly severe and includes a waiver of the escalation of annual rentals as well
22 as a 30% reduction of rentals for the term of the moratorium. The original proposal was
23 a 20% reduction. Ms. Norman stated that this is a huge concession that will have an
24 impact on the Committee's monthly revenue to the tune of about $35,871 per month.

26 Ms. Norman recommends that the Committee give the Port tenants some relief.
27 There may be possible reimbursement from BP for this shortfall. Long term this relief
28 will provide tenants relief so that they do not pull out altogether. Ms. Norman suggested
29 that the Committee not sign a letter agreement as this may threaten possible
30 reimbursement. It was recommended that Ms. Norman discuss this with Simon,
31 Peragine. If the Committee just accepts this reduction, then we can claim the impact. If
32 the Port is reimbursed, they have an obligation under the lease to pay Wisner its share.

34 Ms. Norman stated that she thought there had to be a level of cooperation to
35 support the ongoing business at the Port.

37 Mike Peneguy indicated that the increase from 20% to 30% was difficult for the
38 Committee to agree to. He also stated that an agreement was not something that we
39 should sign. Also if there is any recovery of lost income, we should share in that.

41 The Committee discussed how to handle this and not put it in writing, but accept
42 the checks, acknowledge that they are not in accordance with the agreements and then
43 do nothing.

45 Ms. Norman then stated that the Committee should not set a precedent of
46 accepting less money. This is not a Force Majeur situation. Ms. Norman also suggested
47 that we be provided an accounting of what should have been paid. The figure of 30%
48 needs to be questioned. This is not what Wisner was originally provided in terms of
49 concessions. This agreement was made without our input. We can either accept or sue.
50 Wisner gets a percentage of the revenue collected.

52 Ms. Norman has looked at their lease and this issue is not addressed, meaning
53 that the Port can arbitrarily reduce the rentals. The old leases say rentals in the new
54 leases it is all revenues collected. The Caillouett Land Company called to see how Wisner
55 will handle this. Conoco Phillips has agreed to this.

There was a motion to agree to an informal 20% reduction, after speaking to Simon, Peragine. Motion by Dr. Sandra Robinson. Second by Dr. Everett Williams. **Motion passed.**

**New Business Item 4.    Other issues**

Ms. Norman pointed out the escalation of expenses due to the spill. Also she raised the issue of overtime which can be paid by BP. To date none of this overtime has been paid to Ms. Norman and Ms. Phillips. It can be claimed but has to be paid first. In reality you cannot be reimbursed for something that has not been paid out. In fact all time that is spent on BP should be paid by BP. Ms. Norman gets no overtime since she is salaried although Amanda is paid time and a half. BP should be reimbursing Wisner for all work hours that are spent on the spill.

The Committee then discussed the City's negotiations with BP about the prebursement claim. They are still in negotiations according to the information received from the City Attorney's office. Wisner's claim is still pending.

There was a discussion about the $2 Billion Feinberg fund. There was a discussion about whether that process will be faster. Current claim with BP seems stuck. If there is no relief within 90 days, Wisner can file suit.

Eventually, BP should pay for all time spent by Wisner employees on the BP spill. This actually will reduce Wisner's payroll.

Payment of overtime was approved on a motion by Dr Everett Williams, second by Ed Buddy. **Motion passed.**

Additionally, there is a need for an ATV for Forrest to traverse the beach. The ATV can be bought by and insured by FET. He will have to buy this and bill Wisner for the vehicle as an oil spill expense. The proposed cost is $14,445.07.

The payment of the invoice for the ATV was approved on a motion by Ed Buddy, second by Dr. Everett Williams. Forrest will be responsible for the maintenance and insurance. **Motion passed.**

The meeting was adjourned at 5 pm on a motion by Dr. Everett Williams, second by Ed Buddy. **Motion passed.**

RESPECTFULLY SUBMITTED BY:

_C. Cathy Norman_
C. Cathy Norman, Secretary Treasurer

AMENDED AND APPROVED AT ___10/26/10___ MEETING
DATE

**Joel Waltzer**

From: WISNERDONATION@aol.com
Sent: Thursday, July 08, 2010 4:10 PM
To: Joel Waltzer
Subject: Wisner
Attachments: WILDERCV.doc

Joel:
Finally heard from Nannette today waiving the City of New Orleans conflict issue and approving the board's recommendation to engage you. It was strictly a formality to get her approval but it has been given. I am headed down to Fourchon tomorrow. Let me know how we need to proceed with fee discussion, engagement letter, a waiver letter from Wisner if necessary and getting some experts in line. Our claims have now exceeded $150,000 and it is getting to be an issue for us financially. It has been nearly 6 weeks and our claim just got reassigned. I am headed to a public meeting in Lafourche Parish tonight and hope to make some contacts.

I am forwarding Nanette's email separately since it intimates that she wants to work closely with us. Also a copy of a resume from an expert that Andy Wilson recommended. I contacted him some time ago and I am impressed but wanted your opinion.

I will be around on Monday and Tuesday and Thursday of next week. Let's try to get together.

C. Cathy Norman

1





| | | | | |
|---|---|---|---|---|
| | 820 O'Keefe Avenue<br>New Orleans, Louisiana<br>70113-1116<br><br>p: (504) 581-4892<br>f: (504) 561-6024<br>e: Info@hhklawfirm.com<br><br>hhklawfirm.com | Harry Herman (1914-1987)<br>Russ M. Herman*<br>Maury A. Herman*<br>Steven J. Lane<br>Leonard A. Davis*<br>James C. Klick[1]<br>Stephen J. Herman<br>Brian D. Katz<br>Soren E. Gisleson<br>Joseph E. Cain | Jennifer J. Greene[2]<br>John S. Creevy<br>Aaron Z. Ahlquist[3]<br>Craig M. Robinson<br>Adam H. Weintraub[4]<br>Mikalia M. Kott[5]<br>Donald A. Mau<br>Danielle Treadaway Hufft<br><br>Of Counsel:<br>Herbert A. Cade<br>Morton H. Katz*<br>Joseph A. Kott, M.D., J.D. | This Firm and Its Partners Are Also<br>Partners in Herman Gerel, LLP<br><br>* A Professional Law Corporation<br>[1] Also Admitted in Texas<br>[2] Also Admitted in Arkansas<br>[3] Also Admitted in Tennessee<br>[4] Also Admitted in New Jersey<br>& Pennsylvania<br>[5] Also Admitted in Colorado |

July 22, 2014

**_Confidential Attorney Client Communication_**

_Via hand delivery_

Mr. Michael Peneguy
1541 Maplewood Drive
Slidell, LA 70458

      RE:   _Edward Wisner Donation v. BP_, No. 14-cv-01525-CJB
             Our File No. 27818.0936

Dear Mr. Peneguy,

     As everyone is aware, the various documents that establish the Donation appear to provide that the Donation may end on August 4, 2014. While it appears uncertain as to what that might mean, your Joint Venture counsel want to ensure that the BP-OIL litigation remains on the surest possible footing. As a result, Joint Venture counsel believe that, out of an abundance of caution, **all advisory committee members should intervene** into the following BP-OIL lawsuits: _Edward Wisner Donation v. BP, plc_, No. 13-1971 (Barbier, J.); _Edward Wisner Donation v. BP_, No. 14-01525 (Barbier, J.); and the Short Form Joinders filed in MDL 2179 through 10-9999 [Rec. Doc. 401], and 10-8888 [Rec. Doc. 133248]. As for the Wisner heirs, this would mean that each of them would need to intervene, not just their representative on the Committee. Joint Venture counsel assumes that the Wisner heirs will be contacted by and through their representative on the Advisory Committee.

     To achieve intervention, each of the advisory committee members should seek new counsel to represent them and file the appropriate pleadings in court. Please have them contact me, and I will assist them. Please note that the "Edward Wisner Donation" will remain as a plaintiff and that Joint Venture counsel will amend the Complaint to add the trustee the City of New Orleans as an added assurance that all rights are protected.

     At this time, we believe that it is best for you to consult with your own counsel to determine intervention in these actions. If you feel otherwise, please contact me separately to discuss. **Any and all interventions should be filed no later than August 4, 2014.** While we take no position as to what may happen on August 4, 2014 or what, if any, damages any committee member may



EXHIBIT 9

recover going forward, failure to intervene may result in the loss of any such right you may have.

Sincerely,

SØREN E. GISLESON, Esq.

cc: Amanda Phillips
Steve Herman, Esq.
Jim Roy, Esq.
Calvin Fayard, Esq.
Fred Herman, Esq.
Walter Leger, Jr.
Bob Wright, Esq.
Tom Barbera, Esq.
Blayne Honeycutt, Esq.

WISNER SUMMARY OF DAMAGES

ATTORNEY WORK PRODUCT
EXPERT/CONSULTANT WORK PRODUCT
ATTORNEY-CLIENT PRIVILEGE
JOINT-PROSECUTION/COMMON-INTEREST PRIVILEGE
SETTLEMENT MATERIALS PROTECTED BY COURT ORDER

| | DESCRIPTION | CLAIMED | OBSTACLES | REASONABLY EXPECTED JUDGMENT VALUE RANGE |
|---|---|---|---|---|
| Access Agreement – Whitclaw Summary | | | | |
| | Loss of Sand (a) from increased erosion rates and (b) removed and not replaced during clean up. | $21,159,210 - $89,510,022 | (1) The erosion analysis contained numerous assumptions that we may not have been able to establish at trial, such as extent of damage to post platform; (2) beach profile data did not support erosion analysis; (3) reliable evidence suggested increased erosion rates were due to tropical storms during the response; (4) no "damage" to the beach because the CAM project replaced more than 100x the amount of sand allegedly lost from erosion rates; (5) the beach today is healthier and stronger than before the spill; (6) Louisiana applied $50 million paid from BP in a previous settlement to fund, in part, CAM-2; (7) during the response, BP placed large quantities of sand on the beach from HESCO project and backfill at Breach 2 of which it would get credit; (8) beach actually enjoyed substantial accretion of sand at the breach sites. However, we believe he would have awarded us sights because of the hard structures; (9) the volume of sand estimated in erosion analysis was a massive range due to the broad estimate of the reasonable value to replace the removed cited sand deposits for the Caminada Headlands; (10) the unit cost of the sand was likely on the far low end due to the high volume of sand and material with olien, comparable sand, but used the the $25 unit cost paid by BP at breach 2; (11) BP Econcoast Services estimated, assuming any kind of sand loss, that range should be lower volume of sand at a lower cost. This would have $4.2 to $11.5 million; and (12) Fourchon Beach has the highest natural erosion rate in the country and one of the highest in the world. | Given the weight of the evidence, and the Court's previous statements, we believe that there was a substantial likelihood that the Court would have found that the cleanup operations did not increase erosion rates. However, we believe he would have awarded us material with olien, comparable sand, but used the lower volume of sand at a lower cost. This would have generally been around $500,000. |
| Access Agreement – Purdue Summary | | | | |
| | Equipment for in situ bioremediation implementation (5 sites) | $42,500.00 | Most of Purdue's opinions in this case address oil cleanup and not damages caused due to the cleanup operations. This was done in an effort to show the Court that the cleanup operations were ineffectual and to hopefully force BP to the table to resolve all issues globally. As a result, there is substantial overlap between these stated "access agreement" damages and those under OPA/GML. Given the above analysis, the line items concerning erosion could reasonably be removed, as well as the line items pertaining to the removal of any oil. As a matter of reality, removal of oil is not feasible because of the CAM projects, and to even try would cause more damage to the beach. Dr. Purdue testified in his depo (and has represented separately to the Advisory Committee) that his aeration system is performing well by degrading the buried oil through aeration without being invasive. Fortunately, this is also relatively inexpensive. Assessment and removal of any oiled material in the wetlands can also be discounted since the testimony established that any removal efforts would cause more damage than good. There also does not appear to be any lingering effects, other than the research Dr. Purdue is performing. The damages related to the LAASR project are also generally speculative, since the CAM projects have substantially remediated any missing sand and buried the small quantities (below end points) at these sites. | A reasonable estimate for these kinds of damages under the Access Agreement and OPA/GML is in the $10-$12 million range. |
| | Install of Ground Water Aeration system (5 sites) | 125,000.00 | | |
| | ORC application (5 sites) | 550,000.00 | | |
| | Maintenance of aeration system | 1,696,000.00 | | |
| | Confirmation sampling | 420,000.00 | | |
| | Assessment of Oil Remaining | 401,250.00 | | |
| | Mapping and transport assessment of B1 data | 142,500.00 | | |
| | Weathering assessment of oil from sites identified in B1 | 347,500.00 | | |
| | ORC Application | 265,550.00 | | |
| | Monitoring | 279,000.00 | | |
| | Nearshore oil assessment | 78,000.00 | | |
| | post-storm assessment | 353,700.00 | | |
| | Delineation and removal | 875,250.00 | | |
| OPA/General Maritime Damages | | | See above. | See above. |
| | Developing and implementation of a management plan to mitigate further erosion | 3,000,045.00 | | |
| | Assessing oil in wetlands and nearshore | 1,955,650.00 | | |
| | Remediation oil at the breaches | 4,528,500.00 | | |
| | Remediation of oil identified in LAASR project not addressed by actions in the breaches | 4,061,000.00 | | |
| | Future costs associated with oil on the WD property | 2,560,000.00 | | |


EXHIBIT 10

## WISNER SUMMARY OF DAMAGES

| Other Access Agreement Claims | | | |
|---|---|---|---|
| Litigation expenses (Paid by JV) | $ | 1,214,614.65 | The items identified in this category would likely not be fully reimbursed. Expert costs, expenses, and attorney time is compensable under the AA, but likely not under OPA/GhG. Under the AA, the Court could interpret "reasonable" to not allow costs, expenses, and attorney time related to the erosion analyses. As for the "client expenses" line item, it is unlikely that the Court would have revisited the Neutral's recommendation, even though all rights were reserved. |
| Expenses paid by Wisner (approx) | $ | 375,099.91 | |
| Attorneys' fees (approx) | $ | 1,330,296.60 | |
| Client expenses (20% left over from the Neutral, etc) | $ | 229,185.82 | The total for these line items is reasonably expected in the $1-$1.5 million range. |