## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TIFFANY ODOMS**, INDIVIDUALLY, AS GUARDIAN OF THE MINOR SURVIVING CHILDREN OF THE DECEDENT ALONZO ODOMS JR. **JOHN DOE, JANE DOE, JILL DOE, JACK DOE, JIM DOE, JAMES DOE, JOAN DOE**, AND **TAJA ODOMS** AS A QUALIFYING PERSONAL REPRESENTATIVE OF THE ESTATE OF **ALONZO ODOMS JR.**, DECEASED, <br><br> VS <br><br> **BP EXPLORATION & PRODUCTION, INC.**, A DELAWARE CORPORATION, **BP AMERICA PRODUCTION CO.**, A DELAWARE CORPORATION, **et al.** | MDL No. 2:10-md-02179 <br><br> JUDGE BARBIER <br><br> MAG JUDGE WILKINSON, JR. <br><br> CIVIL ACTION <br><br> CASE NO.: 2:16-cv-13201-CJB-JCW |

### AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Tiffany Odoms, as the surviving spouse of decedent, Alonzo Odoms Jr. ("Mr. Odoms"), and as Guardian of Mr. Odoms' surviving minor children; and Plaintiff Taja Odoms, as Mr. Odoms' eldest daughter and as a qualified personal representative of Mr. Odoms' Estate, by and through the undersigned counsel, hereby bring this cause of action against BP Exploration & Production, Inc. ("BP Exploration"), BP America Production Co. ("BP America"), Cameron International Corp., ("Cameron"), Triton Asset Leasing GmbH ("Triton"), "Transocean Holdings, LLC ("Transocean Holdings"), Transocean Deepwater, Inc. ("Transocean Deepwater"), Transocean Offshore Deepwater Drilling Inc. ("Transocean Offshore"), Halliburton Energy Services, Inc. ("Halliburton") and, Ameri-Force Craft Services Inc. ("Ameri-Force"), Ecolab, Inc. ("Ecolab"), Nalco Company ("Nalco"), Nalco Holdings, LLC ("Nalco Holdings"), Nalco Finance Holdings, LLC ("Nalco Finance"), and Nalco Holding Co.

("NHC"), (hereinafter collectively referred to as "Defendants"), and as for this Complaint allege the following upon information and belief:

## INTRODUCTION

1. This is an action for the Defendants' negligence resulting in Wrongful Death pursuant to La. C. C. art. 2315.2 and Survival Damages pursuant to La. C. C. art. 2315.1 for Mr. Odoms' death and injuries caused by exposure to toxic substances as a consequence of the worst environmental disaster in the history of the United States of America, the BP Deepwater Horizon Oil Spill on April 20, 2010 ("BP Oil Spill").

## PARTIES

2. Mr. Odoms, at all times relevant hereto, was a resident of the state of Louisiana. He suffered injuries and damages as a direct and/or proximate result of his exposure to Defendants' toxic substances. Mr. Odoms died in Harvey, Louisiana on October 6, 2014 (see Attached Exhibit A).

3. Plaintiff, Taja Odoms the ("Eldest Daughter"), at all times relevant hereto, was and currently is a resident and citizen of the state of Louisiana, and is Personal Representative of Mr. Odoms' Estate in accordance with the La. C. C. P. art. 3081, et. seq.

4. In accordance with La. C. C. art. 2315.1 and to La. C. C. art. 2315.2: Eldest Daughter brings this action on behalf of all survivors and derivative claimants of the Estate; and the survivors of the Estate of Mr. Odoms include the following:

   i. Tiffany Odoms (hereinafter "Mrs. Odoms") - surviving wife of Mr. Odoms.

   ii. Eldest Daughter - surviving child of her father, Mr. Odoms, born on or about August 14, 1994;

   iii. John Doe - surviving minor child of his father, Mr. Odoms, born on or about July 29,

2

1995;

   iv. Jill Doe - surviving minor child of her father, Mr. Odoms, born on or about August 24, 1995;

   v. Jack Doe - surviving minor child of his father, Mr. Odoms, born on or about January 9, 2002;

   vi. Jim Doe - surviving minor child of his father, Mr. Odoms, born on or about July 23, 2003;

   vii. James Doe - surviving minor child of his father, Mr. Odoms, born on or about May 31, 2008;

   viii. Joan Doe - surviving minor child of her father, Mr. Odoms, born on or about May 14, 2011; and

   ix. All surviving minor children are hereinafter collectively referred to as "Minor Children."

5. Eldest Daughter and Minor Children, except for Jim Doe, are the natural children of both Mrs. Odoms and Mr. Odoms. Jim Doe is the natural child of Mr. Odoms but not of Mrs. Odoms.

6. Mrs. Odoms, Eldest Daughter, and Minor Children are hereinafter collectively referred to as "Plaintiffs."

7. Mr. Odoms timely submitted his opt out of the Medical Benefits Settlement class.

8. At the time of the injury, Mr. Odoms and Plaintiffs resided in Harvey, Louisiana at 2429 Sunset Drive in the Parrish of Jefferson and continue to do so today.

## DEFENDANTS

### BP Exploration

9.  BP Exploration is a corporation organized under the laws of Delaware with its principal place of business located at 150 West Warrenville Rd. Naperville, Illinois 60563.

10. BP Exploration was a leaseholder and performed oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, (hereinafter the "Macondo Well") where the oil spill originated.

11. BP Exploration was designated as a "responsible party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714.

12. BP Exploration purposely availed itself of this state's personal jurisdiction by having performed various acts that were related to the BP Oil Spill including:

    i.  Managed clean-up and/or response activities in or around Louisiana at all relevant times;

    ii.  Pumped crude oil that ended up throughout the Louisiana coast;

    iii.  Directed and participated with Unified Command, contracting with various clean-up crew companies throughout Louisiana; and

    iv.  Engaged in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that include petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities.

### BP America

13. BP America is a Delaware corporation, with its principal place of business at 501 Westlake Park Blvd. Houston, Texas 77079.

14. BP America was a party to the drilling contract with Transocean Holdings for the drilling of

the Macondo Well.

15. BP America purposely availed itself of this state's personal jurisdiction by having performed various acts that were related to the BP Oil Spill including:

    i. Managed clean-up and/or response activities in or around Louisiana at all relevant times;

    ii. Pumped crude oil that ended up all throughout the Louisiana coast;

    iii. Directed and participated with Unified Command, contracting with various clean-up crew companies throughout Louisiana; and

    iv. Engaged in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that include petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities.

16. BP America and BP Exploration will hereinafter collectively be referred to as "BP Defendants".

## Cameron

17. Cameron is a Delaware corporation with its principal place of business located at 1333 West Loop South, Suite 1700 Houston, Texas 77027.

18. Cameron does business within this District, in the State of Louisiana, and throughout the United States.

19. Cameron is a global provider of pressure control, processing flow control, compression systems, as well as a provider for project management and aftermarket services for the oil and gas and process industries.

20. Cameron is the leading U.S. supplier of customized electrostatic de-salters used in the oil refining industry.

### Transocean

21. Transocean Holdings, Transocean Deepwater, and Transocean Offshore are Delaware corporations (hereinafter referred to collectively as "Transocean Defendants") with their principal place of business located at 4 Greenway Plaza Houston, Texas 77046.

22. Transocean Defendants purposely availed themselves of this state's personal jurisdiction by having performed various acts that were related to the BP Oil Spill, including:

    i.   Engaged in clean-up and/or response activities in or around Louisiana at all relevant times;

    ii.   Manned and guided the Deepwater Horizon Rig ("DHR"), which exploded while pumping crude oil, resulting all over the Louisiana coast;

    iii.   Directed and participated with Unified Command, contracting with various clean-up crew companies throughout Louisiana; and

    iv.   Engaged in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that included petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities.

### Triton

23. Triton is a foreign company operating as a subsidiary of Transocean Ltd., a parent company of Transocean Defendants, with their principle place of business at Turmstrasse 30, 6300 Zug, Switzerland.

### Halliburton

24. Halliburton is a Delaware Corporation with its principal place of business at 10200 Bellaire Blvd. Houston, Texas.

25. Halliburton purposely availed itself of this state's personal jurisdiction by having

manufactured, as a subcontractor for BP America and/or BP Exploration, a nitrogen foam cement slurry mixture (hereinafter "Cement Mixture"), to provide cementing and mudlogging services for the DHR.

### Ameri-Force

26. Ameri-Force is a Florida Corporation, with its principal place of business located at 9485 Regency Square Blvd. #300 Jacksonville, Florida 32225.

27. Ameri-Force is a private company subcontracted by BP America and/or BP Explanation as a disaster response staffing agency to help handle the recruitment and hiring of laborers for clean-up and relief efforts in Louisiana.

28. Ameri-Force is jointly, severally, and/or solidarily liable under various principles of State, and/or Federal tort law.

### Nalco Entities

29. Nalco is a Delaware company, at all pertinent times licensed to do business and doing business in the State of Louisiana and within this District, wholly owned by Nalco Holdings.

30. Nalco Holdings is a Delaware limited liability company, wholly owned by Nalco Finance.

31. Nalco Finance is a Delaware limited liability company wholly owned by NHC

32. NHC is a Delaware company.

33. At all pertinent times, NHC and its subsidiaries were doing business in the State of Louisiana.

34. Nalco is the manufacturer of the chemical dispersants purchased by BP Defendants for use in connection with clean-up efforts in response to the BP Oil Spill.

### Ecolab

35. Ecolab is a Delaware corporation whose registered office is located at 1209 Orange Street,

Wilmington, DE 19801.

36.  Ecolab merged with Nalco on or about December 7, 2011.

## JURISDICTION AND VENUE

37. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332(a) because complete diversity exists among the parties, as all Defendants are all incorporated and have their principal places of business in states other than the state in which Plaintiffs reside. Additionally, the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs.

38. Venue is proper in this District under 28 U.S.C. §1391(b)(2). Venue is also appropriate in this District consistent with both 28 U.S.C. § 1407 and the Transfer Order of the Judicial Panel on Multidistrict Litigation, which allows Plaintiffs to directly file complaints arising out of the BP Oil Spill in this District. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352 (J.P.M.L. 2010); *See Also Pretrial Order No. 20* (Rec. Doc. 904).

39. All other prerequisites to file this action have been satisfied by Plaintiffs.

## SUMMARY OF FACTS

### General Summary of Facts

40. Plaintiffs incorporate all findings of facts and conclusions of law detailed in *Findings of Fact and Conclusions of Law - Phase One Trial* ("Phase One Findings"), MDL No. 2179, Rec. Doc. 13355, (E.D. La. Sept. 4, 2014).

41. Pursuant to Federal and Louisiana Law, Phase One Findings are binding as to all Defendants listed within this Complaint, with the exception of Ameri-Force, Nalco and its subsidiaries and Ecolab.

42. All injuries detailed within this Complaint arise from the same transaction and/or occurrence relating to the BP Oil Spill, Deepwater Horizon explosion and subsequent oil spill related events.

**BP Oil Spill**

Deepwater Horizon

43. BP Oil Spill includes the events, actions, inactions, and omissions leading up to and including:

    i. The blowout of the Macondo Well which was drilled by the Transocean Marianas and Deepwater Horizon rigs on the outer continental shelf in the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana;

    ii. The explosions and fire on board the DHR on or about April 20, 2010;

    iii. The sinking of the DHR on or about April 22, 2010;

    iv. The release of oil, other hydrocarbons, and other toxic substances from the Macondo Well and/or the DHR and its appurtenances;

    v. The efforts to contain the Macondo Well; and

    vi. Response activities performed by clean-up workers under the direction of Unified Command.

44. On or about December 9, 1998, predecessors to all BP Defendants and all Transocean Defendants entered into a contract for the construction, use, and operation of the DHR.

45. BP Defendants were the operators of the Macondo Well under federal regulations of the Minerals Management Service ("MMS") therefore it was the entity the lessee(s) designated as having control or management of operations.

46. As operators and primary leaseholders, BP Defendants were responsible for but not limited to

assessing the geology of the site, engineering the well design, obtaining regulatory approvals for well operations, retaining, and overseeing the projects contractors, and working on various aspects of the well and drilling operations.

<u>DW Toxic Chemicals</u>

47. For purposes of this complaint, crude oil, hydrocarbons, benzene, or products containing benzene, associated with the clean-up efforts hailing from the Macondo Well and the DHR explosion, will collectively be known as "DW Toxic Chemicals."

48. The crude oil carried with it significant public health risks, containing many highly toxic chemical ingredients that can damage the various system in the body.

49. Crude oil contains benzene and other volatile organic compounds such as ethylbenzene, toluene, xylene and naphthalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes and heavy metals such as aluminum, cadmium, nickel, lead and zinc, all of which cause severe harm to human health.

50. Chemicals such as benzene, PAHs, and many other chemicals in crude oil are toxic, and move from the oil into the air. Once airborne, these chemicals, with pungent petroleum like odors, can blow over the ocean for miles, reaching communities far from the location of the spill.

51. According to the Agency for Toxic Substances and Disease Registry, which is part of the U.S. Department of Health and Human Services, benzene is a known mutagen and carcinogen. Benzene in crude oil can cause a variety of health complications, including ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain, and lethal central nervous system depression.

52. A 2007 Centers for Disease Control review of benzene toxicity concluded that there is substantial evidence that benzene causes leukemia, chromosomal abnormalities in lymphocytes and bone marrow cells, damage to the immune system, and abnormal development of blood cells. Long term, low-level oral and inhalation exposures to benzene have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping, memory loss, and even cancer.

53. As a result of the explosion of the DHR, DW Toxic Chemicals and many highly toxic dispersants were released from the Macondo Well and reached the shores of Louisiana.

Toxic Dispersants

54. Aside from DW Toxic Chemicals, BP defendants purchased highly noxious chemical dispersants from Nalco and/or its subsidiaries and sprayed them as part of the response activities performed in the clean-up efforts. These dispersants include Corexit EC9500A and Corexit EC9527A.

55. Corexit EC9527A contains 2-butoxyethanol, also known as EGBE. Repeated or excessive exposure to EGBE may cause injury to red blood cells, the kidneys, and the liver. EGBE may be carcinogenic to humans. It is an eye, nose, and throat irritant. It can cause nausea, vomiting, diarrhea, and abdominal pain. Exposure to EGBE can also cause headaches, dizziness, lightheadedness, and unconsciousness.

56. All of the aforementioned harmful dispersants, Corexit EC95001 and Corexit EC9527A, are hereinafter collectively referred to as "Toxic Dispersants."

57. According to the BP Deepwater Horizon Gulf Study, funded by BP Defendants themselves, it has been shown that upstream petrochemical workers, who are likely to have many exposures similar to that of oil spill clean-up workers, have reported experiencing leukemia,

multiple myeloma, melanoma, and esophageal adenocarcinoma.

58. BP Defendants, despite being aware of the risks that response vessels would face, failed to provide adequate training, inspect vessels, and respond to respond to worker safety concerns. BP Defendants ignored these concerns despite OSHA warnings, notifications by the U.S. Department of Health and Human Services, and complaints of illnesses from the clean-up workers after they were exposed to oil and dispersants.

59. According to BP's Gulf Study, based on the health effects of zone residents and clean-up workers around the BP Oil Spill, the toxic effects on the human body are 52 times more toxic when Corexit and crude oil are combined.

60. On or about April 23, 2010, BP Defendants and/or their agents began applying Toxic Dispersants to the oil on the surface of the Gulf of Mexico. Toxic Dispersants were sprayed onto the ocean surface from aircrafts that flew over areas with oil and dispensed chemicals from cargo holds, fountain type jets on the decks of boats, and smaller vessels onto the surface of the water. Toxic Dispersants were also injected immediately below the surface of the water from vessels, deep below the surface of the ocean, and even sprayed by hand. These Toxic Dispersants were sprayed day and night, exposing anyone near the coastal areas, despite warnings not to.

**Alonzo Odoms Jr.**

61. At all times relevant, Mr. Odoms resided in Harvey, Louisiana.

62. From on or about July, 2010 to on or about October 2010, Mr. Odoms was a clean-up worker and employed as an oil spill responder, regularly coming into contact with DW Toxic Chemicals and Toxic Dispersants.

63. As an oil spill responder, Mr. Odoms used booms and skimmers to retrieve oil from the Gulf,

which was mixed with DW Toxic Chemicals and Toxic Dispersants, and transferred them from the vessel to an old run down shrimp boat.

64. As a clean-up worker, Mr. Odoms was exposed to DW Toxic Chemicals and Toxic Dispersants and other harmful chemicals by, *inter alia*, inhalation, ingestion, direct contact, direct skin contact, as well as airborne, and dermal exposure.

65. BP Defendants' aerial spray planes negligently and/or intentionally sprayed Toxic Dispersants on the water, despite the presence of boats and their crews being in the vicinity of the spraying.

66. BP Defendants, aware of the risks that response vessels would face, failed to provide adequate training, inspect vessels, and respond to worker safety concerns. These acts continued despite OSHA warnings, notifications by the U.S. Department of Health and Human Services, and complaints of illnesses by exposed vessel workers in its Vessels of Opportunity program.

67. Mr. Odoms, along with many other clean-up workers, was not equipped with a respirator or other comparable safety devices. BP Defendants prevented clean-up workers from using proper safety devices, by threatening them with the loss of their jobs if they complained.

68. At no point did Mr. Odoms receive any "hands on" training, as per EPA requirements. Mr. Odoms' training consisted of merely being shown a film, in which he was told not to use masks while handling DW Toxic Chemicals.

69. Mr. Odoms was exposed to DW Toxic Chemicals and Toxic Dispersants not only as a clean-up worker, but also as a resident living in proximity to the Gulf of Mexico, where the harmful effects of the BP Oil Spill were most strongly felt.

70. The exposure to DW Toxic Chemicals and Toxic Dispersants was sufficient to be the legal

and proximate cause of Mr. Odoms' injuries, including the manifestation of the following conditions and diagnoses:

    i.   Cancer;

    ii.  Shortness of Breath;

    iii. Problems with Vision;

    iv. Pain in Throat, Nose, and Ears;

    v.   Skin Conditions;

    vi.  Headaches;

    vii. Nausea;

    viii.Vomiting;

    ix. Back Pain; and

    x.   Depression.

## COUNT I - BP AMERICA NEGLIGENCE

71. Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

72. Plaintiffs claim that BP America was negligent in its involvement in the BP Oil Spill, the aftermath which ultimately resulted in the death of Mr. Odoms.

73. At all times material hereto, BP America, its agents and/or assigns, whether employee(s) or independent contractor(s), owed duties of ordinary and reasonable care to Mr. Odoms, and in his death, to Plaintiffs.

74. BP America failed to use the standard of care that an ordinary, reasonable, and prudent person would use under similar circumstances.

75.  BP America  owed the following duties to Mr. Odoms:

i.   A duty to warn Mr. Odoms of the harmful effects of DW Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, a naturally occurring component in crude oil;

ii.  A duty to properly warn Mr. Odoms to avoid exposure to hazardous substances encountered in connection with the BP Oil Spill, including relief efforts;

iii. A duty of care to properly train Mr. Odoms as a clean-up worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

iv.  A duty of care to properly equip Mr. Odoms as a clean-up worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants by providing him, at a minimum, with the following:

   a.   Protective masks;

   b.   Protective gloves;

   c.   Protective skin gear;

   d.   Protective footwear; and

   e.   Protective eye gear

v.   A duty to properly supervise Mr. Odoms while performing response activities associated with the BP Oil Spill;

vi.  A duty to implement a mechanism to ensure the continued safety of Mr. Odoms when safety issues arose, such as but not limited to, foreseeable injuries;

vii. A duty to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

viii.  A duty to ensure that Toxic Dispersants were sprayed safely to avoid contact with people, including Mr. Odoms, and in a manner that would assure Mr. Odoms' health

and safety; and

ix. A duty to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Mr. Odoms.

75. BP America breached their duty of care when they:

i. Failed to warn Mr. Odoms of the harmful effects of DW Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, the naturally occurring component in crude oil;

ii. Failed to properly warn Mr. Odoms to avoid exposure to hazardous substances encountered in connection with the BP Oil Spill and relief efforts;

iii. Failed to properly train Mr. Odoms as a clean-up worker, despite the great dangers associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

iv. Failed to properly equip Mr. Odoms as a clean-up worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants by not providing them with the following:

    a.    Protective masks;

    b.    Protective gloves;

    c.    Protective skin gear;

    d.    Protective footwear; and

    e.    Protective eye gear

v. Failed to properly supervise Mr. Odoms as a clean-up worker while performing response activities associated with the DHR oil spill;

vi. Failed to implement a basic mechanism to ensure the continued safety of Mr. Odoms,

by allowing the spraying of Toxic Dispersants in the vicinity of Mr. Odoms and clean-up workers and permitting Mr. Odoms and clean-up workers to remove protective gear while performing response activities;

vii. Failed to abide by the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and in shallow waters;

viii.   Failed to ensure that Toxic Dispersants were sprayed in a manner that would avoid contact with Mr. Odoms and in a manner that would ensure Mr. Odoms health and safety; and

ix. Failed to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Mr. Odoms.

76. BP America breached its duties of care when it posed an unreasonable and foreseeable risk to Mr. Odoms. BP America was on notice of the importance of having dispersants on hand after the Exxon Valdez oil spill. BP America's failure of having dispersants on hand when the DHR exploded effectively increased the risk of harm to Mr. Odoms and all similarly situated clean-up workers.

77. As a direct and proximate result of BP America's breach of their above-mentioned duties, Plaintiffs suffered injury, loss, and damages. Due to BP America's negligence, Mr. Odoms was exposed to DW Toxic Chemicals and Toxic Dispersants, which resulted in his death.

WHEREFORE Plaintiffs respectfully demand judgment against BP America by awarding Plaintiffs damages pursuant to La. C. C. art. 2315, and any other relief at law that this Court deems just and proper.

## COUNT II- BP EXPLORATION NEGLIGENCE

78. Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

79. Plaintiffs claim that BP Exploration was negligent in its involvement in the BP Oil Spill, the aftermath which ultimately resulted in the death of Mr. Odoms.

80. At all times material hereto, BP Exploration, its agents and/or assigns, whether employee(s) or independent contractor(s), owed duties of ordinary and reasonable care to Mr. Odoms, and in his death, to Plaintiffs.

81. BP Exploration failed to use the standard of care that an ordinary, reasonable, and prudent person would use under similar circumstances.

82. BP Exploration owed the following duties to Mr. Odoms:

   i.   A duty to warn Mr. Odoms of the harmful effects of DW Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, a naturally occurring component in crude oil;

   ii.  A duty to properly warn Mr. Odoms to avoid exposure to hazardous substances encountered in connection with the BP Oil Spill, including relief efforts;

   iii. A duty of care to properly train Mr. Odoms as a clean-up worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

   iv.  A duty of care to properly equip Mr. Odoms as a clean-up worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants by providing them with the following:

      a.   Protective masks;

      b.   Protective gloves;

18

    c.     Protective skin gear;

    d.     Protective footwear; and

    e.     Protective eye gear

    v.  A duty to properly supervise Mr. Odoms while performing response activities associated with the BP Oil Spill;

    vi.  A duty to implement a mechanism to ensure the continued safety of Mr. Odoms when safety issues arose, such as but not limited to, foreseeable injuries;

    vii. A duty to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

    viii.  A duty to ensure Toxic Dispersants were sprayed safely to avoid contact with people, including Mr. Odoms, and in a manner that would assure Mr. Odoms' health and safety; and

    ix.  A duty to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Mr. Odoms.

83. BP Exploration breached their duty of care when they:

    i.  Failed to warn Mr. Odoms of the harmful effects of DW Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, the naturally occurring component in crude oil;

    ii.  Failed to properly warn Mr. Odoms to avoid exposure to hazardous substances encountered in connection with the BP Oil Spill and relief efforts;

    iii. Failed to properly train Mr. Odoms as a clean-up worker, despite the great dangers associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

iv. Failed to properly equip Mr. Odoms as a clean-up worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants by not providing them with the following:

    a.   Protective masks;

    b.   Protective gloves;

    c.   Protective skin gear;

    d.   Protective footwear; and

    e.   Protective eye gear

v. Failed to properly supervise Mr. Odoms as a clean-up worker while performing response activities associated with the BP Oil Spill;

vi. Failed to implement a basic mechanism to ensure the continued safety of Mr. Odoms, by allowing the spraying of Toxic Dispersants in the vicinity of Mr. Odoms and clean-up workers and permitting Mr. Odoms and clean-up workers to remove protective gear while performing response activities;

vii. Failed to abide by the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and in shallow waters;

viii. Failed to ensure Toxic Dispersants were sprayed in a manner that would avoid contact with Mr. Odoms and in a manner that would ensure Mr. Odoms health and safety; and

ix. Failed to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Mr. Odoms.

84. BP Exploration breached its duties of care when it posed an unreasonable and foreseeable

risk to Mr. Odoms. BP Exploration was on notice of the importance of having dispersants on hand after the Exxon Valdez oil spill. BP Exploraion's failure of having dispersants on hand when the DHR exploded effectively increased the risk of harm to Mr. Odoms and all similarly situated clean-up workers. As a direct and proximate result of BP Exploration's breach of their above-mentioned duties, Plaintiffs suffered injury, loss, and damages. Due to BP Exploration's negligence, Mr. Odoms was exposed to DW Toxic Chemicals and Toxic Dispersants, which resulted in his death.

WHEREFORE Plaintiffs respectfully demand judgment against BP Exploration by awarding Plaintiffs damages pursuant to La. C. C. art. 2315, and any other relief at law that this Court deems just and proper.

## COUNT III – BP AMERICA GROSS NEGLIGENCE

85. Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

86. Plaintiffs claim that BP America was grossly negligent in its involvement in the DHR explosion, the aftermath of which ultimately resulted in the death of Mr. Odoms.

87. At all times material hereto, BP America its agents and/or assigns, whether employee(s) or independent contractor(s), owed duties of ordinary and reasonable care to Mr. Odoms, and in his death, to Plaintiffs.

88. BP America's actions or omissions were willful, wanton, or reckless and were in utter disregard of the dictates of prudence, amounting to complete neglect of the rights of Mr. Odoms.

89. BP America owed the following duties to Mr. Odoms:

    i.  A duty to warn Mr. Odoms of the harmful effects of DW Toxic Chemicals, Toxic

Dispersants, and any other hazardous chemicals they contain, including benzene, a naturally occurring component in crude oil;

ii. A duty to properly warn Mr. Odoms to avoid exposure to hazardous substances encountered in connection with the DHR explosion, including relief efforts;

iii. A heightened duty of care to properly train Mr. Odoms as a clean-up worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

iv. A heightened duty of care to properly equip Mr. Odoms as a clean-up worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants by providing them with the following:

    a.   Protective masks;

    b.   Protective gloves;

    c.   Protective skin gear;

    d.   Protective footwear; and

    e.   Protective eye gear

v. A duty to properly supervise Mr. Odoms while performing response activities associated with the BP Oil Spill;

vi. A duty to implement a mechanism to ensure the continued safety of Mr. Odoms when issues arose such as, but not limited to, foreseeable injuries;

vii. A duty to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

viii. A duty to spray Toxic Dispersants were sprayed safely to avoid contact with people, including Mr. Odoms, and in a manner that would ensure Mr. Odoms health

and safety; and

    ix. A duty to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Mr. Odoms.

90. BP America breached their duty of care when they:

    i. Failed to warn Mr. Odoms of the harmful effects of DW Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, a naturally occurring component in crude oil;

    ii. Failed to properly warn Mr. Odoms to avoid exposure to hazardous substances encountered in connection with DHR explosion and relief efforts;

    iii. Failed to properly train Mr. Odoms as a clean-up worker, despite the great dangers associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

    iv. Failed to properly equip Mr. Odoms as a clean-up worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants by providing them with the following:

        a. Protective masks;

        b. Protective gloves;

        c. Protective skin gear;

        d. Protective footwear; and

        e. Protective eye gear

    v. Failed to properly supervise Mr. Odoms while performing response activities associated with the BP Oil Spill;

    vi. Failed to implement a basic mechanism to ensure the continued safety of Mr. Odoms,

by allowing the spraying of Toxic Dispersants in the vicinity of Mr. Odoms and clean-up workers and permitting Mr. Odoms and clean-up workers to reove protective gear while performing response activities.;

vii. Failed to abide by the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and in shallow waters;

viii.   Failed to ensure Toxic Dispersants were sprayed in a manner that would avoid contact with Mr. Odoms and in a manner that would ensure Mr. Odoms health and safety; and

ix. Failed to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Mr. Odoms.

91. BP America's actions were grossly negligent because they knew or should have known of the dangers involved with oil drilling and the danger of dealing with DW Toxic Chemicals and Toxic Dispersants, especially given their deficient safety record in the decade leading up to the blast.

92. BP America's history involves a distressing legacy of an unsafe corporate culture, riddled with routine deviations from corporate procedures, in its attempt to save money at the risk of casualty and/or loss of life.

93. As a direct and proximate result of BP America's breach of their above-mentioned duties, Mr. Odoms and Plaintiffs suffered injury, loss, and damages. Due to BP America's gross negligence, Mr. Odoms was exposed to DW Toxic Chemicals and Toxic Dispersants, and was diagnosed with cancer resulting in his death.

WHEREFORE Plaintiffs respectfully demand judgment against BP America by awarding Plaintiffs punitive damages, and any other relief at law that this Court deems just and proper.

## COUNT IV – BP EXPLORATION GROSS NEGLIGENCE

94. Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

95. Plaintiffs claim that BP Exploration was grossly negligent in its involvement in the DHR explosion, the aftermath of which ultimately resulted in the death of Mr. Odoms.

96. At all times material hereto, BP Exploration its agents and/or assigns, whether employee(s) or independent contractor(s), owed duties of ordinary and reasonable care to Mr. Odoms, and in his death, to Plaintiffs.

97. BP Exploration's actions or omissions were willful, wanton, or reckless and were in utter disregard of the dictates of prudence, amounting to complete neglect of the rights of Mr. Odoms.

98. BP Exploration owed the following duties to Mr. Odoms:

    i. A duty to warn Mr. Odoms of the harmful effects of DW Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, a naturally occurring component in crude oil;

    ii. A duty to properly warn Mr. Odoms to avoid exposure to hazardous substances encountered in connection with the DHR explosion, including relief efforts;

    iii. A heightened duty of care to properly train Mr. Odoms as a clean-up worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

    iv. A heightened duty of care to properly equip Mr. Odoms as a clean-up worker,

because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants by providing them with the following:

    a.    Protective masks;

    b.    Protective gloves;

    c.    Protective skin gear;

    d.    Protective footwear; and

    e.    Protective eye gear

v. A duty to properly supervise Mr. Odoms while performing response activities associated with the BP Oil Spill;

vi. A duty to implement a mechanism to ensure the continued safety of Mr. Odoms when issues arose such as, but not limited to, foreseeable injuries;

vii. A duty to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

viii. A duty to spray Toxic Dispersants were sprayed safely to avoid contact with people, including Mr. Odoms, and in a manner that would ensure Mr. Odoms health and safety.

ix. A duty to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Mr. Odoms.

99. BP Exploration breached their duty of care when they:

i. Failed to warn Mr. Odoms of the harmful effects of DW Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, a naturally occurring component in crude oil;

26

ii. Failed to properly warn Mr. Odoms to avoid exposure to hazardous substances encountered in connection with DHR explosion and relief efforts;

iii. Failed to properly train Mr. Odoms as a clean-up worker, despite the great dangers associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

iv. Failed to properly equip Mr. Odoms as a clean-up worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants by providing them with the following:

    a.    Protective masks;

    b.    Protective gloves;

    c.    Protective skin gear;

    d.    Protective footwear; and

    e.    Protective eye gear

v. Failed to properly supervise Mr. Odoms while performing response activities associated with the BP Oil Spill;

vi. Failed to implement a basic mechanism to ensure the continued safety of Mr. Odoms, by allowing the spraying of Toxic Dispersants in the vicinity of Mr. Odoms and clean-up workers and permitting Mr. Odoms and clean-up workers to reove protective gear while performing response activities.;

vii. Failed to abide by the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and in shallow waters;

viii.   Failed to ensure Toxic Dispersants were sprayed in a manner that would avoid contact with Mr. Odoms and in a manner that would ensure Mr. Odoms health and safety; and

      ix. Failed to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Mr. Odoms.

100.    BP Exploration's actions were grossly negligent because they knew or should have known of the dangers involved with oil drilling and the danger of dealing with DW Toxic Chemicals and Toxic Dispersants, especially given their safety record in the decade leading up to the blast.

101.    BP Exploration's history involves a distressing legacy of an unsafe corporate culture, riddled with routine deviations from corporate procedures, in an attempt to save money at the risk of casualty and/or loss of life.

102.    As a direct and proximate result of BP Exploration's breach of their above-mentioned duties, Mr. Odoms and Plaintiffs suffered injury, loss, and damages. Due to BP Exploration's gross negligence, Mr. Odoms was exposed to DW Toxic Chemicals and Toxic Dispersants, and was diagnosed with cancer resulting in his death.

    WHEREFORE Plaintiffs respectfully demand judgment against BP Exploration by awarding Plaintiffs punitive damages, and any other relief at law that this Court deems just and proper.

## COUNT V - CAMERON NEGLIGENCE

103.    Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

104.    Cameron manufactured and supplied the blow-out preventer ("BOP") used on the DHR, and as such, Plaintiffs claim that Cameron was negligent in its involvement in the DHR explosion, the aftermath of which ultimately resulted in the death of Mr. Odoms.

105.    At all times material hereto, Cameron owed duties of ordinary and reasonable care to Mr. Odoms. Cameron failed to use the standard of care which an ordinary, reasonable, and prudent person would use under similar circumstances.

106.    Cameron owed the following duties to Mr. Odoms:

    i.    Ensuring that the BOP shearing rams effectively sealed the Macondo Well in the event of a blowout;

    ii.    Ensuring that the remaining Defendants were informed that the BOP would not work as intended;

    iii.    Ensuring the types of drill pipes and casing assembly designs were ultimately suitable for the Macondo Well;

    iv.    Ensuring the design wasn't vulnerable to a single-point failure;

    v.    Ensuring a backup activation system was properly installed for the BOP;

    vi.    Ensuring that the adequate warnings, instructions and guidelines on the permissible uses, modifications, and applications of the BOP appurtenant to the vessel were provided; and

    vii.    Ensuring reasonable care in the operation, maintenance, handling, design, implementation and execution of the BOP to avoid harm to Mr. Odoms.

107.    Cameron breached its duty of care when it:

    i.    Failed to ensure that the BOP shearing rams would effectively seal the Macondo Well in the event of a blow out;

    ii.    Failed to warn the other Defendants that the BOP would not work as intended;

    iii.    Failed to ensure that the types of drill pipes and casing assembly designs were suitable for the Macondo Well;

iv. Failed to ensure that the BOP was not vulnerable to a single-point failure;

v. Failed to properly install a backup activation system for the BOP;

vi. Failed to give adequate warnings, instructions, and guidelines on the permissible uses, modifications, and applications of the BOP appurtenant to the vessel were provided;

vii. Failed to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the BOP to avoid harm to Mr. Odoms.

108. Cameron's breach of its duties posed an unreasonable risk of harm to Mr. Odoms.

109. As a direct and proximate result of Cameron's breach of their above-mentioned duties, Mr. Odoms and Plaintiffs suffered injury, loss, and damages. Due to Cameron's negligence, Mr. Odoms suffered exposure to DW Toxic Chemicals and Toxic Dispersants which resulted in his death.

WHEREFORE Plaintiffs respectfully demand judgment against Cameron by awarding Plaintiffs damages, and any other relief at law that this Court deems just and proper.

## COUNT VI - CAMERON PRODUCTS LIABILITY

110. Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

111. Cameron manufactured and/or supplied the BOP that was used on the DHR to prevent blowout of the vessel and is a manufacturer pursuant to La. Stat. § 9:2800.53 and applicable law.

112. The BOP at all relevant times was an appurtenance of the DHR and was a part of the equipment vessel.

113. Cameron's BOP was used in the manner intended, or in a reasonably anticipated manner, in connection with drilling operations on the DHR.

114.   At the time the BOP left Cameron's control, the BOP was unreasonably dangerous due to its construction and/or composition because it deviated from Cameron's specifications and/or performance standards for the product.

115.   The BOP was unreasonably dangerous because its shearing rams failed to effectively seal the Macondo Well during the blowout.

116.   The BOP was unreasonably dangerous because Cameron failed to provide adequate warnings, instructions and guidelines on the permissible uses, modifications, and applications of the BOP appurtenant to the vessel.

117.   Cameron failed to warn Mr. Odoms, a foreseeable plaintiff, that the BOP would not work as intended.

118.   Due to the above mentioned BOP defects, the DHR exploded and led to the release of millions of gallons of DW Toxic Chemicals and oil into the Gulf of Mexico.

119.   As a direct and proximate cause of the BOP defects and resulting DHR explosion, Mr. Odoms was exposed to DW Toxic Chemicals and Toxic Dispersants and was diagnosed with cancer and subsequently died.

120.   Plaintiffs suffered damages as a result of the acts/omissions of Cameron, who as a manufacturer is liable to Plaintiffs for damages proximately caused by the failure of its BOP.

121.   Plaintiffs are entitled to recover damages against Cameron for its violations to the Louisiana Products Liability Act.

WHEREFORE Plaintiffs respectfully demand judgment against Cameron by awarding Plaintiffs all damages allowed under Louisiana Products Liability Act, and any other relief at law that this Court deems just and proper.

## COUNT VII - TRANSOCEAN HOLDINGS NEGLIGENCE

122.   Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

123.   Transocean Holdings contracted with BP America for drill the Macondo Well.

124.   Plaintiffs claim that Transocean Holdings was negligent in its involvement in the DHR explosion, the aftermath of which ultimately resulted in the death of Mr. Odoms.

125.   At all times material hereto, Transocean Holdings owed a duty of ordinary and reasonable care to Mr. Odoms.

126.   Transocean Holdings owed the following duties to Mr. Odoms:

    i.   A duty to otherwise exercise reasonable care in the manning and directing by the DHR crew to avoid explosion and the release of crude oil and DW Toxic Chemicals;

    ii.   A duty to monitor the Macondo Well at all times;

    iii.   A duty to cease operations if the negative pressure test was unsuccessful;

    iv.   A duty to adequately and thoroughly interpret the negative pressure tests;

    v.   A duty to investigate the source of the abnormal drill pipe pressure and further explain or remediate it when it became abnormal;

    vi.   A duty to exercise well control in accordance with the standard of care applicable in the Deepwater oil exploration industry;

    vii.   A duty to abide by MMS regulations, such as 30 C.F.R. 250.401(a) (which states in relevant part "[Transocean Holdings] must take necessary precaution to keep wells under control at all times. [Transocean Holdings] must: Use the best available and safest drilling technology to monitor and evaluate well conditions and to minimize the potential for the well to flow or kick.")

127.    Transocean Holdings breached its duty of care when it:

i.   Failed to exercise reasonable care in the manning and directing by the DHR crew to avoid explosion and the release of crude oil and DW Toxic Chemicals;

ii.  Failed to monitor the Macondo Well at all times;

iii. Failed to cease operations after the negative pressure test yielded unsuccessful results;

iv.  Failed to adequately and thoroughly interpret the negative pressure tests;

v.   Failed to investigate the source of the abnormal drill pipe pressure and further explain or remediate it when it became abnormal;

vi.  Failed to exercise well control in accordance with the standard of care applicable in the Deepwater oil exploration industry;

vii. Failed to abide by MMS regulations, such as 30 C.F.R. 250.401(a) (which states in relevant part "[Transocean Holdings]  must take necessary precaution to keep wells under control at all times. [Transocean Holdings] must: Use the best available and safest drilling technology to monitor and evaluate well conditions and to minimize the potential for the well to flow or kick").

128.    Transocean Holdings failed to use the standard of care which an ordinary, reasonable, and prudent person would use under similar circumstances.

129.    Transocean Holding's breach of its duties posed an unreasonable risk of harm to Mr. Odoms.

130.    As a direct and proximate result of Transocean Holding's breach of their above-mentioned duties, Plaintiffs suffered injury, loss, and damages. Due to said negligence, Mr. Odoms suffered exposure to DW Toxic Chemicals and Toxic Dispersants in and around Louisiana, which resulted in his death.

WHEREFORE Plaintiffs respectfully demand judgment against Transocean Holdings by awarding Plaintiffs damages pursuant to La. C. C. art. 2315, and any other relief at law that this Court deems just and proper.

## COUNT VII - TRANSOCEAN OFFSHORE NEGLIGENCE

131.   Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

132.   Transocean Offshore employed the DHR onshore supervisory and managerial employees.

133.   Plaintiffs claim that Transocean Offshore was negligent in its involvement in the DHR explosion, the aftermath of which ultimately resulted in the death of Mr. Odoms.

134.   At all times material hereto, Transocean Offshore owed a duty of ordinary and reasonable care to Mr. Odoms.

135.   Transocean Offshore owed the following duties to Mr. Odoms:

    i.   A duty to otherwise exercise reasonable care in the manning and directing of the DHR crew to avoid explosion and the release of crude oil and DW Toxic Chemicals;

    ii.   A duty to monitor the Macondo Well at all times;

    iii.   A duty to cease operations if  the negative pressure test was unsuccessful;

    iv.   A duty to adequately and thoroughly interpret the negative pressure tests;

    v.   A duty to investigate the source of the abnormal drill pipe pressure and further explain or remediate it when it became abnormal;

    vi.   A duty to exercise well control in accordance with the standard of care applicable in the Deepwater oil exploration industry;

    vii.   A duty to abide by MMS regulations, such as 30 C.F.R. 250.401(a) (which states in relevant part "[Transocean Offshore] must take necessary precaution to keep wells

under control at all times. [Transocean Offshore] must: Use the best available and safest drilling technology to monitor and evaluate well conditions and to minimize the potential for the well to flow or kick.")

136. Transocean Offshore breached its duty of care when it:

   i. Failed to exercise reasonable care in the manning and directing of the DHR crew to avoid explosion and the release of crude oil and DW Toxic Chemicals;

   ii. Failed to monitor the Macondo Well at all times;

   iii. Failed to cease operations after the negative pressure test yielded unsuccessful results;

   iv. Failed to adequately and thoroughly interpret the negative pressure tests;

   v. Failed to investigate the source of the abnormal drill pipe pressure and further explain or remediate it when it became abnormal;

   vi. Failed to exercise well control in accordance with the standard of care applicable in the Deepwater oil exploration industry;

   vii. Failed to abide by MMS regulations, such as 30 C.F.R. 250.401(a) (which states in relevant part "[Transocean Offshore] must take necessary precaution to keep wells under control at all times. [Transocean Offshore] must: Use the best available and safest drilling technology to monitor and evaluate well conditions and to minimize the potential for the well to flow or kick").

137. Transocean Offshore failed to use the standard of care which an ordinary, reasonable, and prudent person would use under similar circumstances.

138. Transocean Offshore's breach of its duties posed an unreasonable risk of harm to Mr. Odoms.

139. As a direct and proximate result of Transocean Offshore's breach of their above-

mentioned duties, Plaintiffs suffered injury, loss, and damages. Due to said negligence, Mr. Odoms suffered exposure to DW Toxic Chemicals and Toxic Dispersants in and around Louisiana, which resulted in his death.

WHEREFORE Plaintiffs respectfully demand judgment against Transocean Offshore by awarding Plaintiffs damages pursuant to La. C. C. art. 2315, and any other relief at law that this Court deems just and proper.

## COUNT VIII - TRANSOCEAN DEEPWATER NEGLIGENCE

140.   Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

141.   Transocean Deepwater employed the crew of the DHR

142.   Plaintiffs claim that Transocean Deepwater was negligent in its involvement in the DHR explosion, the aftermath of which ultimately resulted in the death of Mr. Odoms.

143.   At all times material hereto, Transocean Deepwater owed a duty of ordinary and reasonable care to Mr. Odoms.

144.   Transocean Deepwater owed the following duties to Mr. Odoms:

   i.   A duty to otherwise exercise reasonable care in the manning and directing by the DHR crew to avoid explosion and the release of crude oil and DW Toxic Chemicals;

   ii.   A duty to monitor the Macondo Well at all times;

   iii.   A duty to cease operations if the negative pressure test was unsuccessful;

   iv.   A duty to adequately and thoroughly interpret the negative pressure tests;

   v.   A duty to investigate the source of the abnormal drill pipe pressure and further explain or remediate it when it became abnormal;

   vi.   A duty to exercise well control in accordance with the standard of care applicable in

the Deepwater oil exploration industry;

vii. A duty to abide by MMS regulations, such as 30 C.F.R. 250.401(a) (which states in relevant part "[Transocean Deepwater] must take necessary precaution to keep wells under control at all times. [Transocean Deepwater] must: Use the best available and safest drilling technology to monitor and evaluate well conditions and to minimize the potential for the well to flow or kick.")

145.   Transocean Deepwater breached its duty of care when it:

i.   Failed to exercise reasonable care in the manning and directing by the DHR crew to avoid explosion and the release of crude oil and DW Toxic Chemicals;

ii.   Failed to monitor the Macondo Well at all times;

iii.   Failed to cease operations after the negative pressure test yielded unsuccessful results;

iv.   Failed to adequately and thoroughly interpret the negative pressure tests;

v.   Failed to investigate the source of the abnormal drill pipe pressure and further explain or remediate it when it became abnormal;

vi.   Failed to exercise well control in accordance with the standard of care applicable in the Deepwater oil exploration industry;

vii. Failed to abide by MMS regulations, such as 30 C.F.R. 250.401(a) (which states in relevant part "[Transocean Deepwater] must take necessary precaution to keep wells under control at all times. [Transocean Deepwater] must: Use the best available and safest drilling technology to monitor and evaluate well conditions and to minimize the potential for the well to flow or kick").

146.   Transocean Deepwater failed to use the standard of care which an ordinary, reasonable, and prudent person would use under similar circumstances.

147. Transocean Deepwater's breach of its duties posed an unreasonable risk of harm to Mr. Odoms.

148. As a direct and proximate result of Transocean Deepwater's breach of their above-mentioned duties, Plaintiffs suffered injury, loss, and damages. Due to said negligence, Mr. Odoms suffered exposure to DW Toxic Chemicals and Toxic Dispersants in and around Louisiana, which resulted in his death.

WHEREFORE Plaintiffs respectfully demand judgment against Transocean Deepwater by awarding Plaintiffs damages pursuant to La. C. C. art. 2315, and any other relief at law that this Court deems just and proper.

## COUNT IX – TRITON NEGLIGENCE

149. Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

150. Triton owned the DHR and chartered it to Transocean Holdings.

151. Plaintiffs claim that Trident was negligent in its involvement in the DHR explosion, the aftermath of which ultimately resulted in the death of Mr. Odoms.

152. At all times material hereto, Triton owed a duty of ordinary and reasonable care to Mr. Odoms.

153. Triton owed the following duties to Mr. Odoms:

   i. A duty to ensure the DHR operated properly;

   ii. A duty to ensure that automatic safeguards were in place that would cease operations in the event a negative pressure test was unsuccessful;

   iii. A duty to ensure that automatic safeguards were in place that would cease operations in the event of any abnormal readings or test results;

    iv.  A duty to instruct or warn Transocean Holdings and its agents or subcontractors to cease operations in the event that test results or readings were not normal.

154.  Triton breached its duty of care when it:

    i.  Failed to ensure to ensure the DHR operated properly;

    ii.  Failed to ensure that automatic safeguards were in place that would cease operations in the event a negative pressure test was unsuccessful;

    iii.  Failed to ensure that automatic safeguards were in place that would cease operations in the event of any abnormal readings or test results;

    iv.  Failed to instruct or warn Transocean Holdings and its agents or subcontractors to cease operations in the event that test results or readings were not normal.

155.  Triton failed to use the standard of care which an ordinary, reasonable, and prudent person would use under similar circumstances.

156.  Triton's breach of its duties posed an unreasonable risk of harm to Mr. Odoms.

157.  As a direct and proximate result of Triton's breach of their above-mentioned duties, Plaintiffs suffered injury, loss, and damages. Due to said negligence, Mr. Odoms suffered exposure to DW Toxic Chemicals and Toxic Dispersants in and around Louisiana, which resulted in his death.

WHEREFORE Plaintiffs respectfully demand judgment against Triton by awarding Plaintiffs damages pursuant to La. C. C. art. 2315, and any other relief at law that this Court deems just and proper.

## COUNT X - TRANSOCEAN OFFSHORE GROSS NEGLIGENCE

158.  Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

159.   Transocean Offshore's actions or omissions were willful, wanton, or reckless and were in utter disregard of the dictates of prudence, amounting to complete neglect of the rights of Mr. Odoms.

160.   Transocean Offshore breached their legal duty to Mr. Odoms and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent manufacture, maintenance, and/or operation of the DHR vessel.

161.   Transocean Offshore owed the following duties to Mr. Odoms:

i.   A duty to otherwise exercise reasonable care in the manning and directing of the DHR crew to avoid explosion and the release of crude oil and DW Toxic Chemicals;

ii.   A duty to monitor the Macondo Well at all times;

iii.   A duty to cease operations if the negative pressure test was unsuccessful;

iv.   A duty to adequately and thoroughly interpret the negative pressure tests;

v.   A duty to investigate the source of the abnormal drill pipe pressure and further explain or remediate it when it became abnormal;

vi.   A duty to exercise well control in accordance with the standard of care applicable in the Deepwater oil exploration industry;

vii.   A duty to abide by MMS regulations, such as 30 C.F.R. 250.401(a) (which states in relevant part "[Transocean Offshore]  must take necessary precaution to keep wells under control at all times. [Transocean Offshore]  must: Use the best available and safest drilling technology to monitor and evaluate well conditions and to minimize the potential for the well to flow or kick.")

162.   Transocean Offshore breached its duty of care when it:

i.   Failed to exercise reasonable care in the manning and directing by the DHR crew to

avoid explosion and the release of crude oil and DW Toxic Chemicals;

ii. Failed to monitor the Macondo Well at all times;

iii. Failed to cease operations after the negative pressure test yielded unsuccessful results;

iv. Failed to adequately and thoroughly interpret the negative pressure tests;

v. Failed to investigate the source of the abnormal drill pipe pressure and further explain or remediate it when it became abnormal;

vi. Failed to exercise well control in accordance with the standard of care applicable in the Deepwater oil exploration industry;

vii. Failed to abide by MMS regulations, such as 30 C.F.R. 250.401(a) (which states in relevant part "[Transocean Offshore] must take necessary precaution to keep wells under control at all times. [Transocean Offshore] must: Use the best available and safest drilling technology to monitor and evaluate well conditions and to minimize the potential for the well to flow or kick").

163.    As a direct and proximate result of Transocean Offshore's breach of their above-mentioned duties, Plaintiffs suffered injury, loss, and damages. Due to Transocean Offshore's gross negligence, Mr. Odoms was exposed to DW Toxic Chemicals and Toxic Dispersants, and was diagnosed with cancer resulting in his death.

WHEREFORE Plaintiffs respectfully demand judgment against Transocean Offshores by awarding Plaintiffs punitive damages and any other relief at law that this Court deems just and proper.

## COUNT XI - TRITON PRODUCTS LIABILITY

164.    Plaintiff incorporates and re-alleges each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

41

165.   Cameron manufactured the BOP in conjunction with specifications, approval and/or supervision that was provided by Triton and/or Transocean entities.

166.   The BOP used on the DHR, was owned by Triton.

167.   Triton then conveyed title to and/or possession of the BOP to BP America in the form of a lease and is a manufacturer pursuant to La. Stat. § 9:2800.53.

168.   The BOP was used in the manner intended, or in a reasonably anticipated manner, in connection with drilling operations on DHR.

169.   At the time Triton conveyed possession of the BOP to BP America, the BOP was unreasonably dangerous due to its construction or composition when it deviated from the specifications and/or performance standards for the product.

170.   The BOP was unreasonably dangerous because its shearing rams failed to effectively seal the Macondo Well during the blowout.

171.   The BOP was unreasonably dangerous because Triton failed to provide adequate warnings, instructions and guidelines on the permissible uses, modifications, and applications of the BOP appurtenant to the vessel.

172.   Triton failed to warn that the BOP would not work as intended.

173.   Due to these BOP defects, the DHR exploded and led to the release of millions of gallons of DW Toxic Chemicals and oil into the Gulf of Mexico.

174.   Plaintiffs suffered damages as a result of Triton's acts and/or omissions and are liable to Plaintiffs for compensable damages for its violations of the Louisiana Products Liability Act.

WHEREFORE Plaintiffs respectfully demand judgment against Triton by awarding Plaintiffs all damages allowed under Louisiana Products Liability Act, and any other relief at law that this Court deems just and proper.

## COUNT XII – TRANSOCEAN HOLDINGS PRODUCTS LIABILITY

175.   Plaintiff incorporates and re-alleges each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

176.   Cameron manufactured the BOP in conjunction with specifications, approval and/or supervision that was provided by Triton and/or Transocean Holdings and/or other Transocean entities.

177.   The BOP used on the DHR, was owned and/or possessed by Transocean Holdings.

178.   Transocean Holdings then conveyed title to and/or possession of the BOP to BP America in the form of a lease and is a manufacturer pursuant to La. Stat. § 9:2800.53.

179.   The BOP was used in the manner intended, or in a reasonably anticipated manner, in connection with drilling operations on DHR.

180.   At the time Transocean Holdings conveyed possession of the BOP to BP America, the BOP was unreasonably dangerous due to its construction or composition when it deviated from the specifications and/or performance standards for the product.

181.   Transocean acknowledged in a 2003 report by Earl Shanks that the BOP had poor reliability, resulting in drilling rig downtime that was common, and costly, to Transocean.

182.   The BOP was unreasonably dangerous because its shearing rams failed to effectively seal the Macondo Well during the blowout.

183.   The BOP was unreasonably dangerous because Transocean Holdings failed to provide adequate warnings, instructions and guidelines on the permissible uses, modifications, and applications of the BOP appurtenant to the vessel.

184.   Transocean Holdings failed to warn that the BOP would not work as intended.

185.   Due to these BOP defects, the DHR exploded and led to the release of millions of gallons of DW Toxic Chemicals and oil into the Gulf of Mexico.

186.   Plaintiffs suffered damages as a result of Transocean Holding's acts and/or omissions and are liable to Plaintiffs for compensable damages for its violations of the Louisiana Products Liability Act.

WHEREFORE Plaintiffs respectfully demand judgment against Transocean Holdings by awarding Plaintiffs all damages allowed under Louisiana Products Liability Act, and any other relief at law that this Court deems just and proper.

## COUNT XIII - HALLIBURTON NEGLIGENCE

187.   Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

188.   Plaintiffs claim that Halliburton was negligent in its involvement in the DHR explosion, the aftermath of which ultimately resulted in the death of Mr. Odoms.

189.   Halliburton was contractually responsible to BP America and/or BP Exploration for the design, testing, and execution of cementing the production casing, and to provide mud pit monitoring for signs of a kick or blowout. Halliburton recommended the type of cement to be used for each casing string and the volumes and spacers to be used.

190.    At all times material hereto, Halliburton owed duties of ordinary and reasonable care to Mr. Odoms.

191.   Halliburton owed the following duties to Mr. Odoms:

   i.   A duty to use reasonable care when pressure testing and pumping the Cement Mixture;

   ii.  A duty to provide the final lightweight Cement Mixture at least twenty-four (24)

44

hours prior to BP America and/or BP Exploration running the productions casings;

iii. A duty to create a properly designed, tested, and stable Cement Mixture;

iv. A duty to ensure that the Cement Mixture in the Macondo Well provided a barrier to high pressure and high temperature hydro-carbon flow;

v. A duty to maintain a properly equipped and managed lab;

vi. A duty to design a Cement Mixture that would have a successful stability test before it was pumped into the Macondo Well;

vii. A duty to implement a process safety system to ensure that it would continuously reassess and update the risk assessment of the Cement Mixture and detect any risks with the chosen Cement Mixture;

viii.    A duty to run a cement bond log to evaluate the integrity of the cement job; and

ix. A duty to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement in the Macondo Well;

192.   Halliburton breached its duty of care when it:

i.   Failed to use reasonable care when pressure testing and pumping the Cement Mixture;

ii.  Failed to provide the final lightweight Cement Mixture at least twenty-four (24) hours prior to BP America and/or BP Exploration running the productions casings;

iii. Failed to create a properly designed, tested, and stable Cement Mixture;

iv. Failed to ensure that the Cement Mixture in the Macondo Well provided a barrier to high pressure and high temperature hydro-carbon flow;

v.  Failed to maintain a properly equipped and managed lab;

vi. Failed to design a Cement Mixture that would result in a successful stability test

45

before it was pumped into the Macondo Well;

vii. Failed to implement a process safety system to ensure that it would continuously reassess and update the risk assessment of the Cement Mixture and detect any risks with the chosen Cement Mixture;

viii.   Failed to run a cement bond log to evaluate the integrity of the cement job; and

ix. Failed to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement in the Macondo Well;

193.   Halliburton failed to use the standard of care that an ordinary, reasonable, and prudent person would use under similar circumstances and as a result of the breach of its duties, Halliburton created an unreasonable risk of harm to Mr. Odoms.

194.   As a direct and proximate result of Halliburton's breach of their above-mentioned duties, Mr. Odoms suffered exposure to DW Toxic Chemicals and Toxic Dispersants in and around Louisiana, which resulted in his death. As a result, Plaintiffs suffered injury, loss, and damages.

WHEREFORE Plaintiffs respectfully demand judgment against Haliburton by awarding Plaintiffs damages pursuant to La. C. C. art. 2315, and any other relief at law that this Court deems just and proper.

## COUNT XIV - HALLIBURTON GROSS NEGLIGENCE

195.   Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

196.   Halliburton recommended the type of cement to be used for each casing string and the volumes and spacers to be used. Plaintiffs claim that Halliburton was grossly negligent in its involvement in the DHR explosion, the aftermath of which ultimately resulted in the death of

Mr. Odoms.

197.   Halliburton's actions or omissions were willful, wanton, or reckless and were in utter disregard of the dictates of prudence, amounting to complete neglect of the rights of Mr. Odoms.

198.   Halliburton was contractually responsible to BP America and/or Exploration and to clean-up workers, such as Mr. Odoms, for the design, testing, and execution of cementing the production casing, and to provide mud pit monitoring for signs of a kick or blowout.

199.   At all times material hereto, Halliburton owed duties of ordinary and reasonable care to Mr. Odoms.

200.   Halliburton owed the following duties to Mr. Odoms:

   i.   A duty to use reasonable care when pressure testing and pumping the Cement Mixture;

   ii.   A duty to provide the final lightweight Cement Mixture at least twenty-four (24) hours prior to BP America and/or BP exploration running the productions casings;

   iii.   A duty to create a properly designed, tested, and stable Cement Mixture;

   iv.   A duty to ensure that the Cement Mixture in the Macondo Well provided a barrier to high pressure and high temperature hydro-carbon flow;

   v.   A duty to maintain a properly equipped and managed lab;

   vi.   A duty to design a Cement Mixture that would have a successful stability test before it was pumped into the Macondo Well;

   vii.   A duty to implement a process safety system to ensure that it would continuously reassess and update the risk assessment of the Cement Mixture and detect any risks with the chosen Cement Mixture;

viii.    A duty to run a cement bond log to evaluate the integrity of the cement job; and

ix. A duty to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement in the Macondo Well;

201.   Halliburton breached its duty of care when it:

i.   Failed to use reasonable care when pressure testing and pumping the Cement Mixture;

ii.  Failed to provide the final lightweight Cement Mixture at least twenty-four (24) hours prior to BP America and/or Exploration running the productions casings;

iii. Failed to create a properly designed, tested, and stable Cement Mixture;

iv.  Failed to ensure that the Cement Mixture in the Macondo Well provided a barrier to high pressure and high temperature hydro-carbon flow;

v.   Failed to maintain a properly equipped and managed lab;

vi.  Failed to design a Cement Mixture that would have a successful stability test before it was pumped into the Macondo Well;

vii. Failed to implement a process safety system to ensure that it would continuously reassess and update the risk assessment of the Cement Mixture and detect any risks with the chosen Cement Mixture;

viii.    Failed to run a cement bond log to evaluate the integrity of the cement job; and

ix. Failed to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement in the Macondo Well;

202.   Halliburton failed to use the standard of care which an ordinary, reasonable, and prudent person would use under similar circumstances and as a result of the breach of its duties, Halliburton posed an unreasonable risk of harm to Mr. Odoms.

203.   Halliburton's actions were grossly negligent because they knew or should have known of the dangers involved with oil drilling and the danger of dealing with Cement Mixing, especially given that Halliburton holds itself out as one of the world's leaders in cementing services.

204.   As a direct and proximate result of Halliburton's breach of their above-mentioned duties, Mr. Odoms suffered exposure to DW Toxic Chemicals and Toxic Dispersants, which resulted in his death. As a result, Plaintiffs suffered injury, loss, and damages.

WHEREFORE Plaintiffs respectfully demand judgment against Haliburton by awarding Plaintiffs punitive damages pursuant to La. C. C. art. 2315, and any other relief at law that this Court deems just and proper.

## COUNT XV - HALLIBURTON PRODUCTS LIABILITY

205.   Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

206.   Halliburton manufactured, designed, supplied, and/or installed the Cement Mixture that was used in connection with drilling operations by the DHR and is a manufacturer pursuant to La. Stat. § 9:2800.53.

207.   The Cement Mixture was intended to seal the Macondo Well and prevent the uncontrolled release of oil and other hydrocarbons.

208.   The Cement Mixture was used in the manner intended, or in a reasonably anticipated manner, in connection with drilling operations on the DHR.

209.   The Cement Mixture was, at all times relevant, under the control and/or possession of Halliburton and was unreasonably dangerous due to its construction or composition when it deviated from specifications and/or performance standards for the product.

210. The Cement Mixture was unreasonably dangerous when it failed to temporarily seal the Macondo Well and/or to otherwise operate as intended on April 20, 2010, ultimately causing the blowout and resulting explosion and oil spill.

211. The Cement Mixture was unreasonably dangerous because it failed to provide adequate warnings to foreseeable plaintiffs and/or other defendants.

212. Due to defects with the Cement Mixture, the DHR released millions of gallons of DW Toxic Chemicals and crude oil into the Gulf of Mexico.

213. As a direct and proximate cause of the Cement Mixture defects and the DHR explosion, Mr. Odoms was diagnosed with cancer and subsequently died.

214. Plaintiffs suffered damages as a result of the defective Cement Mixture that was manufactured and/or designed by Halliburton.

215. Halliburton is liable to Plaintiffs for damages for violations to the Louisiana Products Liability Act.

WHEREFORE Plaintiffs respectfully demand judgment against Haliburton by awarding Plaintiffs all damages allowed under Louisiana Products Liability Act, and any other relief at law that this Court deems just and proper.

## COUNT XVI - AMERI-FORCE NEGLIGENCE

216. Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

217. Plaintiffs claim that Ameri-Force was negligent in its involvement in the response activities conducted after the BP Oil Spill which ultimately led to Mr. Odoms death.

218. At all times material hereto, Ameri-Force acted as Mr. Odoms' employer while he performed response activities.

219. At all times material hereto, Ameri-Force, its agents and/or assigns, whether employee(s) or independent contractor(s), owed duties of ordinary and reasonable care to Mr. Odoms, and in his death, to Plaintiffs.

220. Ameri-Force failed to use the standard of care that an ordinary, reasonable, and prudent person would use under similar circumstances.

221. Ameri-Force owed the following duties to Mr. Odoms:

    i. A duty to warn Mr. Odoms of the harmful effects of DW Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, a naturally occurring component in crude oil;

    ii. A duty to properly warn Mr. Odoms to avoid exposure to hazardous substances encountered in connection with the BP Oil Spill, including relief efforts;

    iii. A duty of care to properly train Mr. Odoms as a clean-up worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

    iv. A duty of care to properly equip Mr. Odoms as a clean-up worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants by providing them with the following:

        a. Protective masks;

        b. Protective gloves;

        c. Protective skin gear;

        d. Protective footwear; and

        e. Protective eye gear

    v. A duty to properly supervise Mr. Odoms while performing response activities associated with the BP Oil Spill;

vi. A duty to implement a mechanism to ensure the continued safety of Mr. Odoms when safety issues arose, such as but not limited to, foreseeable injuries;

vii. A duty to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

viii.　A duty to ensure Toxic Dispersants were sprayed safely to avoid contact with people, including Mr. Odoms, and in a manner that would assure Mr. Odoms' health and safety; and

ix. A duty to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Mr. Odoms.

222.　Ameri-Force breached their duty of care when they:

i. Failed to warn Mr. Odoms of the harmful effects of DW Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, the naturally occurring component in crude oil;

ii. Failed to properly warn Mr. Odoms to avoid exposure to hazardous substances encountered in connection with the BP Oil Spill and relief efforts;

iii. Failed to properly train Mr. Odoms as a clean-up worker, despite the great dangers associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

iv. Failed to properly equip Mr. Odoms as a clean-up worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants by not providing them with the following:

    a.　Protective masks;

    b.　Protective gloves;

c.   Protective skin gear;

d.   Protective footwear; and

e.   Protective eye gear

v.   Failed to properly supervise Mr. Odoms as a clean-up worker while performing response activities associated with the BP Oil Spill;

vi.   Failed to implement a basic mechanism to ensure the continued safety of Mr. Odoms, by allowing the spraying of Toxic Dispersants in the vicinity of Mr. Odoms and clean-up workers and permitting Mr. Odoms and clean-up workers to remove protective gear while performing response activities;

vii.  Failed to abide by the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and in shallow waters;

viii.   Failed to ensure Toxic Dispersants were sprayed in a manner that would avoid contact with Mr. Odoms and in a manner that would ensure Mr. Odoms health and safety; and

ix.   Failed to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Mr. Odoms.

223.  Ameri-Force breached its duties of care when they posed an unreasonable and foreseeable risk to Mr. Odoms.

224.  As a direct and proximate result of Ameri-Force's breach of their above-mentioned duties, Plaintiffs suffered injury, loss, and damages. Due to Ameri-Force's negligence, Mr. Odoms was exposed to DW Toxic Chemicals and Toxic Dispersants, which resulted in his death.

WHEREFORE Plaintiffs respectfully demand judgment against Ameri-Force by awarding Plaintiffs damages pursuant to La. C. C. art. 2315, and any other relief at law that this Court deems just and proper.

## COUNT XVII – AMERI-FORCE GROSS NEGLIGENCE

225.    Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

226.    Plaintiffs claim that Ameri-Force was grossly negligent in its involvement in the response activities conducted after the BP Oil Spill which ultimately led to Mr. Odoms death.

227.    Ameri-Force's actions or omissions were willful, wanton, or reckless and were in utter disregard of the dictates of prudence, amounting to complete neglect of the rights of Mr. Odoms.

228.    At all times material hereto, Ameri-Force acted as Mr. Odoms' employer while he performed response activities.

229.    At all times material hereto, Ameri-Force, its agents and/or assigns, whether employee(s) or independent contractor(s), owed duties of ordinary and reasonable care to Mr. Odoms, and in his death, to Plaintiffs.

230.    Ameri-Force failed to use the standard of care that an ordinary, reasonable, and prudent person would use under similar circumstances.

231.    Ameri-Force  owed the following duties to Mr. Odoms:

    i.    A duty to warn Mr. Odoms of the harmful effects of DW Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, a naturally occurring component in crude oil;

    ii.   A duty to properly warn Mr. Odoms to avoid exposure to hazardous substances

encountered in connection with the BP Oil Spill, including relief efforts;

iii. A duty of care to properly train Mr. Odoms as a clean-up worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

iv. A duty of care to properly equip Mr. Odoms as a clean-up worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants by providing them with the following:

    a.    Protective masks;

    b.    Protective gloves;

    c.    Protective skin gear;

    d.    Protective footwear; and

    e.    Protective eye gear

v. A duty to properly supervise Mr. Odoms while performing response activities associated with the BP Oil Spill;

vi. A duty to implement a mechanism to ensure the continued safety of Mr. Odoms when safety issues arose, such as but not limited to, foreseeable injuries;

vii. A duty to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

viii. A duty to ensure Toxic Dispersants were sprayed safely to avoid contact with people, including Mr. Odoms, and in a manner that would assure Mr. Odoms' health and safety; and

ix. A duty to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Mr. Odoms.

232.    Ameri-Force breached their duty of care when they:

i.   Failed to warn Mr. Odoms of the harmful effects of DW Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, the naturally occurring component in crude oil;

ii.  Failed to properly warn Mr. Odoms to avoid exposure to hazardous substances encountered in connection with the BP Oil Spill and relief efforts;

iii. Failed to properly train Mr. Odoms as a clean-up worker, despite the great dangers associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

iv.  Failed to properly equip Mr. Odoms as a clean-up worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants by not providing them with the following:

  a.   Protective masks;

  b.   Protective gloves;

  c.   Protective skin gear;

  d.   Protective footwear; and

  e.   Protective eye gear

v.   Failed to properly supervise Mr. Odoms as a clean-up worker while performing response activities associated with the BP Oil Spill;

vi.  Failed to implement a basic mechanism to ensure the continued safety of Mr. Odoms, by allowing the spraying of Toxic Dispersants in the vicinity of Mr. Odoms and clean-up workers and permitting Mr. Odoms and clean-up workers to remove protective gear while performing response activities;

vii. Failed to abide by the provisions of the National Contingency Plan relating to the use

of aerial chemical dispersants in the proximity of vessels and in shallow waters;

viii.    Failed to ensure Toxic Dispersants were sprayed in a manner that would avoid contact with Mr. Odoms and in a manner that would ensure Mr. Odoms health and safety; and

ix. Failed to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Mr. Odoms.

233.   Ameri-Force breached its duties of care when they posed an unreasonable and foreseeable risk to Mr. Odoms.

234.   As a direct and proximate result of Ameri-Force's breach of their above-mentioned duties, Plaintiffs suffered injury, loss, and damages. Due to Ameri-Force's gross negligence, Mr. Odoms was exposed to DW Toxic Chemicals and Toxic Dispersants, which resulted in his death.

WHEREFORE Plaintiffs respectfully demand judgment against Ameri-Force by awarding Plaintiffs punitive damages pursuant to La. C. C. art. 2315, and any other relief at law that this Court deems just and proper.

## COUNT XVIII – NALCO NEGLIGENCE

235.   Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

236.   Plaintiffs are entitled to recover from Nalco for its negligence with respect to the design, manufacture, marketing, sale and/or distribution of Corexit 9500 and Corexit 9527A (collectively hereinafter referred to as "Corexit").

237.   At all times relevant hereto, Nalco was in the business of designing, manufacturing,

marketing, selling and/or distributing the dispersants used in response to oil spills.

238.    Nalco sold and delivered the Corexit to BP America, BP Exploration or their agents immediately after the Oil Spill and placed the Corexit in the stream of commerce.

239.    Nalco knew or should have known that the Corexit would be used without inspection for defects.

240.    Nalco knew or should have known that BP was spraying Corexit during daylight hours and within the close proximity of individuals, clean-up workers, and zone residents, including Mr. Odoms.

241.    Nalco knew or should have known that BP America, BP Exploration or their agents were spraying Corexit 9527A after it was advised by the EPA to stop using Corexit dispersants.

242.    Nalco continued to distribute Corexit 9527A until its supplies were exhausted. Nalco then began distributing Corexit 9500.

243.    Nalco knew that BP America, BP Exploration or their agents were notified to stop using Corexit all together, and continued to provide Corexit 9500 during the remainder of the clean-up efforts.

244.    Nalco's chemical dispersants were unreasonably dangerous to Mr. Odoms for their intended purpose when the dispersants left Nalco's control.

245.    At all times material hereto, Nalco's dispersants were used in the manner intended, or in a manner reasonably foreseeable.

246.    When the Corexit was used, it was in substantially the same condition as when it was sold.

247.    At the time the dispersants left Nalco's control, Nalco knew, or in light of reasonably

available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions that dispersants would present to Mr. Odoms.

248.   At the time the Corexit left Nalco's control, feasible design alternatives existed which would have, to a reasonable probability, prevented the harm suffered by Mr. Odoms, without impairing the utility, usefulness, practicality or desirability of the Corexit.

249.   Mr. Odoms was a foreseeable victim of the defects in the dispersants.

250.   The design defect in the Corexit is its toxicity to humans and its ability to cause physical injury and health issues.

251.   Nalco had actual and/or constructive knowledge of the facts and circumstances relative to the dispersants that caused or contributed to Mr. Odoms' injuries, and its actions and/or inactions were negligent.

252.   Nalco owed the following duties to Mr. Odoms

   i.   A duty to inform and/or warn BP America, BP Exploration, and/or its agents of the potential dangers associated with the use of Corexit, especially in combination with crude oil.

   ii.   A duty to inform and/or warn Mr. Odoms, clean-up workers, and other foreseeable plaintiffs of the potential dangers associated with the use of Corexit, especially in combination with crude oil.

   iii.   A duty to ensure that Corexit was not sprayed on top of or in very close proximity to Mr. Odoms, clean-up workers, and other foreseeable plaintiffs.

   iv.   A duty to provide BP America, BP Exploration, and/or its agents with a safer dispersant that would've prevented the harm to Mr. Odoms without impairing the

utility of the product.

252.   Nalco breached their duty of care to Mr. Odoms when they:

    i.   Failed to inform and/or warn BP America, BP Exploration, and/or its agents of the potential dangers associated with the use of Corexit, especially in combination with crude oil.

    ii.   Failed to inform and/or warn Mr. Odoms, clean-up workers, and other foreseeable plaintiffs of the potential dangers associated with the use of Corexit, especially in combination with crude oil.

    iii.   Failed to ensure that Corexit was not sprayed on top of or in very close proximity to Mr. Odoms, clean-up workers, and other foreseeable plaintiffs.

    iv.   Failed to provide BP America, BP Exploration, and/or its agents with a safer dispersant that would've prevented the harm to Mr. Odoms without impairing the utility of the product.

253.   As a direct and proximate result of the design defect, Mr. Odoms and Plaintiffs have suffered physical injury, damages, loss of income, loss of consortium and/or emotional distress, for which they are entitled to actual and compensatory damages.

WHEREFORE Plaintiffs respectfully demand judgment against Nalco by awarding Plaintiffs damages, and any other relief at law that this Court deems just and proper.

## COUNT XIX – NALCO HOLDINGS NEGLIGENCE

254.   Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

255.   Nalco is a Delaware company, wholly owned by Nalco Holdings.

256.   Plaintiffs are entitled to recover from Nalco Holdings for its negligence with respect to

the design, manufacture, marketing, sale and/or distribution of Corexit 9500 and Corexit 9527A.

257.   At all times relevant hereto, Nalco Holdings was in the business of designing, manufacturing, marketing, selling and/or distributing the dispersants used in response to oil spills.

258.   Nalco Holdings sold and delivered the Corexit to BP America, BP Exploration or their agents immediately after the BP Oil Spill and placed the Corexit in the stream of commerce.

259.   Nalco Holdings knew or should have known that the Corexit would be used without inspection for defects.

260.   Nalco Holdings knew or should have known that BP was spraying Corexit during daylight hours and within the close proximity of individuals, clean-up workers, and zone residents, including Mr. Odoms.

261.   Nalco Holdings knew or should have known that BP America, BP Exploration or their agents were spraying Corexit 9527A after it was advised by the EPA to stop using Corexit dispersants.

262.   Nalco Holdings continued to distribute Corexit 9527A until its supplies were exhausted. Nalco Holdings then began distributing Corexit 9500.

263.   Nalco Holdings knew that BP America, BP Exploration or their agents were notified to stop using Corexit all together, and continued to provide Corexit 9500 during the remainder of the clean-up efforts.

264.   Nalco Holdings' chemical dispersants were unreasonably dangerous to Mr. Odoms for their intended purpose when the dispersants left Nalco Holdings' control.

265.   At all times material hereto, Nalco Holdings' dispersants were used in the manner intended, or in a manner reasonably foreseeable.

266.   When the Corexit was used, it was in substantially the same condition as when it was sold.

267.   At the time the dispersants left Nalco Holdings' control, Nalco Holdings knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions that dispersants would present to Mr. Odoms.

268.   At the time the Corexit left Nalco Holdings' control, feasible design alternatives existed which would have, to a reasonable probability, prevented the harm suffered by Mr. Odoms, without impairing the utility, usefulness, practicality or desirability of the Corexit.

269.   Mr. Odoms was a foreseeable victim of the defects in the dispersants.

270.   The design defect in the Corexit is its toxicity to humans and its ability to cause physical injury and health issues.

271.   Nalco Holdings had actual and/or constructive knowledge of the facts and circumstances relative to the dispersants that caused or contributed to Mr. Odoms' injuries, and its actions and/or inactions were negligent.

272.   Nalco Holdings owed the following duties to Mr. Odoms

   i.   A duty to inform and/or warn BP America, BP Exploration, and/or its agents of the potential dangers associated with the use of Corexit, especially in combination with crude oil.

   ii.   A duty to inform and/or warn Mr. Odoms, clean-up workers, and other foreseeable

plaintiffs of the potential dangers associated with the use of Corexit, especially in combination with crude oil.

    iii. A duty to ensure that Corexit was not sprayed on top of or in very close proximity to Mr. Odoms, clean-up workers, and other foreseeable plaintiffs.

    iv. A duty to provide BP America, BP Exploration, and/or its agents with a safer dispersant that would've prevented the harm to Mr. Odoms without impairing the utility of the product.

273.    Nalco Holdings breached their duty of care to Mr. Odoms when they:

    i. Failed to inform and/or warn BP America, BP Exploration, and/or its agents of the potential dangers associated with the use of Corexit, especially in combination with crude oil.

    ii. Failed to inform and/or warn Mr. Odoms, clean-up workers, and other foreseeable plaintiffs of the potential dangers associated with the use of Corexit, especially in combination with crude oil.

    iii. Failed to ensure that Corexit was not sprayed on top of or in very close proximity to Mr. Odoms, clean-up workers, and other foreseeable plaintiffs.

    iv. Failed to provide BP America, BP Exploration, and/or its agents with a safer dispersant that would've prevented the harm to Mr. Odoms without impairing the utility of the product.

274.    As a direct and proximate result of the design defect, Mr. Odoms and Plaintiffs have suffered physical injury, damages, loss of income, loss of consortium and/or emotional distress, for which they are entitled to actual and compensatory damages.

WHEREFORE Plaintiffs respectfully demand judgment against Nalco Holdings by

awarding Plaintiffs damages, and any other relief at law that this Court deems just and proper.

## COUNT XX – NALCO FINANCE NEGLIGENCE

275.   Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

276.   Nalco Holdings is wholly owned by Nalco Finance.

277.   Plaintiffs are entitled to recover from Nalco Finance for its negligence with respect to the design, manufacture, marketing, sale and/or distribution of Corexit 9500 and Corexit 9527A.

278.   At all times relevant hereto, Nalco Finance was in the business of designing, manufacturing, marketing, selling and/or distributing the dispersants used in response to oil spills.

279.   Nalco Finance sold and delivered the Corexit to BP America, BP Exploration or their agents immediately after the BP Oil Spill and placed the Corexit in the stream of commerce.

280.   Nalco Finance knew or should have known that the Corexit would be used without inspection for defects.

281.   Nalco Finance knew or should have known that BP was spraying Corexit during daylight hours and within the close proximity of individuals, clean-up workers, and zone residents, including Mr. Odoms.

282.   Nalco Finance knew or should have known that BP America, BP Exploration or their agents were spraying Corexit 9527A after it was advised by the EPA to stop using Corexit dispersants.

283.   Nalco Finance continued to distribute Corexit 9527A until its supplies were exhausted.

Nalco Finance then began distributing Corexit 9500.

284. Nalco Finance knew that BP America, BP Exploration or their agents were notified to stop using Corexit all together, and continued to provide Corexit 9500 during the remainder of the clean-up efforts.

285. Nalco Finance's chemical dispersants were unreasonably dangerous to Mr. Odoms for their intended purpose when the dispersants left Nalco Finance's control.

286. At all times material hereto, Nalco Finance's dispersants were used in the manner intended, or in a manner reasonably foreseeable.

287. When the Corexit was used, it was in substantially the same condition as when it was sold.

288. At the time the dispersants left Nalco Finances' control, Nalco Finance knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions that dispersants would present to Mr. Odoms.

289. At the time the Corexit left Nalco Finance's control, feasible design alternatives existed which would have, to a reasonable probability, prevented the harm suffered by Mr. Odoms, without impairing the utility, usefulness, practicality or desirability of the Corexit.

290. Mr. Odoms was a foreseeable victim of the defects in the dispersants.

291. The design defect in the Corexit is its toxicity to humans and its ability to cause physical injury and health issues.

292. Nalco Finance had actual and/or constructive knowledge of the facts and circumstances relative to the dispersants that caused or contributed to Mr. Odoms' injuries, and its

actions and/or inactions were negligent.

293.   Nalco Finance owed the following duties to Mr. Odoms

i.   A duty to inform and/or warn BP America, BP Exploration, and/or its agents of the potential dangers associated with the use of Corexit, especially in combination with crude oil.

ii.   A duty to inform and/or warn Mr. Odoms, clean-up workers, and other foreseeable plaintiffs of the potential dangers associated with the use of Corexit, especially in combination with crude oil.

iii.   A duty to ensure that Corexit was not sprayed on top of or in very close proximity to Mr. Odoms, clean-up workers, and other foreseeable plaintiffs.

iv.   A duty to provide BP America, BP Exploration, and/or its agents with a safer dispersant that would've prevented the harm to Mr. Odoms without impairing the utility of the product.

294.   Nalco Finance breached their duty of care to Mr. Odoms when they:

i.   Failed to inform and/or warn BP America, BP Exploration, and/or its agents of the potential dangers associated with the use of Corexit, especially in combination with crude oil.

ii.   Failed to inform and/or warn Mr. Odoms, clean-up workers, and other foreseeable plaintiffs of the potential dangers associated with the use of Corexit, especially in combination with crude oil.

iii.   Failed to ensure that Corexit was not sprayed on top of or in very close proximity to Mr. Odoms, clean-up workers, and other foreseeable plaintiffs.

iv.   Failed to provide BP America, BP Exploration, and/or its agents with a safer

dispersant that would've prevented the harm to Mr. Odoms without impairing the utility of the product.

295.   As a direct and proximate result of the design defect, Mr. Odoms and Plaintiffs have suffered physical injury, damages, loss of income, loss of consortium and/or emotional distress, for which they are entitled to actual and compensatory damages.

WHEREFORE Plaintiffs respectfully demand judgment against Nalco Finance by awarding Plaintiffs damages, and any other relief at law that this Court deems just and proper.

## COUNT XXI – NHC NEGLIGENCE

296.   Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

297.   Nalco Finance is wholly owned by NHC.

298.   Plaintiffs are entitled to recover from NHC for its negligence with respect to the design, manufacture, marketing, sale and/or distribution of Corexit 9500 and Corexit 9527A.

299.   At all times relevant hereto, NHC was in the business of designing, manufacturing, marketing, selling and/or distributing the dispersants used in response to oil spills.

300.   NHC sold and delivered the Corexit to BP America, BP Exploration or their agents immediately after the Oil Spill and placed the Corexit in the stream of commerce.

301.   NHC knew or should have known that the Corexit would be used without inspection for defects.

302.   NHC knew or should have known that BP was spraying Corexit during daylight hours and within the close proximity of individuals, clean-up workers, and zone residents, including Mr. Odoms.

303.   NHC knew or should have known that BP America, BP Exploration or their agents were

spraying Corexit 9527A after it was advised by the EPA to stop using Corexit dispersants.

304.  NHC continued to distribute Corexit 9527A until its supplies were exhausted. NHC then began disributing Corexit 9500.

305.  NHC knew that BP America, BP Exploration or their agents were notified to stop using Corexit all together, and continued to provide Corexit 9500 during the remainder of the clean-up efforts.

306.  NHC's chemical dispersants were unreasonably dangerous to Mr. Odoms for their intended purpose when the dispersants left NHC's control.

307.  At all times material hereto, NHC's dispersants were used in the manner intended, or in a manner reasonably foreseeable.

308.  When the Corexit was used, it was in substantially the same condition as when it was sold.

309.  At the time the dispersants left NHCs' control, NHC knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the aforementioned unreasonably dangerous conditions that dispersants would present to Mr. Odoms.

310.  At the time the Corexit left NHC's control, feasible design alternatives existed which would have, to a reasonable probability, prevented the harm suffered by Mr. Odoms, without impairing the utility, usefulness, practicality or desirability of the Corexit.

311.  Mr. Odoms was a foreseeable victim of the defects in the dispersants.

312.  The design defect in the Corexit is its toxicity to humans and its ability to cause physical injury and health issues.

313.  NHC had actual and/or constructive knowledge of the facts and circumstances relative to the dispersants that caused or contributed to Mr. Odoms' injuries, and its actions and/or inactions were negligent.

314.  NHC owed the following duties to Mr. Odoms

    i.  A duty to inform and/or warn BP America, BP Exploration, and/or its agents of the potential dangers associated with the use of Corexit, especially in combination with crude oil.

    ii.  A duty to inform and/or warn Mr. Odoms, clean-up workers, and other foreseeable plaintiffs of the potential dangers associated with the use of Corexit, especially in combination with crude oil.

    iii. A duty to ensure that Corexit was not sprayed on top of or in very close proximity to Mr. Odoms, clean-up workers, and other foreseeable plaintiffs.

    iv. A duty to provide BP America, BP Exploration, and/or its agents with a safer dispersant that would've prevented the harm to Mr. Odoms without impairing the utility of the product.

315.  NHC breached their duty of care to Mr. Odoms when they:

    i.  Failed to inform and/or warn BP America, BP Exploration, and/or its agents of the potential dangers associated with the use of Corexit, especially in combination with crude oil.

    ii.  Failed to inform and/or warn Mr. Odoms, clean-up workers, and other foreseeable plaintiffs of the potential dangers associated with the use of Corexit, especially in combination with crude oil.

    iii. Failed to ensure that Corexit was not sprayed on top of or in very close proximity to

Mr. Odoms, clean-up workers, and other foreseeable plaintiffs.

iv. Failed to provide BP America, BP Exploration, and/or its agents with a safer dispersant that would've prevented the harm to Mr. Odoms without impairing the utility of the product.

316.   As a direct and proximate result of the design defect, Mr. Odoms and Plaintiffs have suffered physical injury, damages, loss of income, loss of consortium and/or emotional distress, for which they are entitled to actual and compensatory damages.

WHEREFORE Plaintiffs respectfully demand judgment against NHC by awarding Plaintiffs damages, and any other relief at law that this Court deems just and proper.

## COUNT XXII – ECOLAB NEGLIGENCE

317.    Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

318.   On or about December 7, 2011, Ecolab merged with NHC.

319.   This transaction was a consolidation or a merger and/or qualifies for the de facto merger exception.

320.   There is a continuation of enterprise, i.e. the physical location, assets, operations, management, employees, branding and/or clients are the same (or substantially similar) between NHC and Ecolab.

321.   A continuity of shareholders exists with ownership between NHC and Ecolab being substantially the same.

322.   NHC either ceased its operations or dissolved shortly after a sale of substantially all of its assets.

323.   Additionally, Ecolab either expressly or impliedly assumed the liabilities of NHC,

including but not limited to, customers, contractors, vendor agreements, leases, specific assets that were acquired, phone numbers, websites and domain names, and intellectual property.

324.   As a result, Plaintiffs are entitled to recover from Ecolab for its negligence with respect to the design, manufacture, marketing, sale and/or distribution of Corexit 9500 and Corexit 9527A.

325.   Ecolab, pursuant to the defacto merger exception, was in the business of designing, manufacturing, marketing, selling and/or distributing the dispersants used in response to oil spills.

326.   Ecolab, pursuant to the defacto merger exception, sold and delivered the Corexit to BP America, BP Exploration and/or its agents immediately after the BP Oil Spill and placed the Corexit in the stream of commerce.

327.   Ecolab, pursuant to the defacto merger exception, knew or should have known that the Corexit would be used without inspection for defects and/or a cursory inspection of Corexit, if performed, would not attenuate or supersede the actions of Ecolab.

328.   Ecolab, pursuant to the defacto merger exception, knew or should have known that BP America, BP Exploration and/or its agents were spraying Corexit during daylight hours and within the close proximity of individuals, clean-up workers, and zone residents, including Mr. Odoms.

329.   Ecolab, pursuant to the defacto merger exception, knew or should have known that BP America, BP Exploration, and/or their agents were spraying Corexit 9527A after it was advised by the EPA to stop using Corexit.

330.   Ecolab, pursuant to the defacto merger exception, continued to distribute Corexit 9527A

until its supplies were exhausted. Ecolab, pursuant to the defacto merger exception, then began distributing Corexit 9500.

331.  Ecolab, pursuant to the defacto merger exception, knew that BP America, BP Exploration, and/or their agents were notified to stop using Corexit all together, and continued to provide Corexit 9500 during the remainder of the clean-up efforts.

332.  Pursuant to the defacto merger exception, Ecolab's chemical dispersants were unreasonably dangerous to Mr. Odoms for their intended purpose when the Corexit left Nalco's control.

333.  Pursuant to the defacto merger exception, Ecolab's dispersants were used in the manner intended, or in a manner reasonable foreseeably and/or actually disclosed to BP prior to sale of the Corexit.

334.  When the Corexit was used, it was in substantially the same condition as when it was sold.

335.  Pursuant to the defacto merger exception, at the time the Corexit left Ecolab's control, Ecolab knew, or reasonably should have known, about the aforementioned unreasonably dangerous conditions that dispersants would present to Mr. Odoms, who was not properly equipped with protective gear.

336.  Pursuant to the defacto merger exception, when the dispersants used in response to the Deepwater Horizon disaster left Ecolab's control, feasible design alternatives existed which would have, to a reasonable probability, prevented the harm suffered by Mr. Odoms without impairing the utility, usefulness, practicality or desirability of the Corexit.

337.  At all relevant times, the dispersant was used in an intended and/or reasonably foreseeable manner.

338. Mr. Odoms was a foreseeable plaintiff and victim of the defects in the Corexit.

339. The design defect in the Corexit is its toxicity to humans and its ability to cause physical injury and health hazards.

340. Ecolab, pursuant to the defacto merger exception, had actual and/or constructive knowledge of the facts and circumstances relative to the dispersants that caused or contributed to Mr. Odoms' injuries, and its actions and inactions were negligent, grossly negligent, reckless, willful and/or wanton.

341. As a direct and proximate result of the design defect, Mr. Odoms and Plaintiffs have suffered physical injury damages, loss of income, loss of consortium and/or emotional distress, for which they are entitled to actual and compensatory damages.

WHEREFORE Plaintiffs respectfully demand judgment against Ecolab by awarding Plaintiffs damages, and any other relief at law that this Court deems just and proper.

## COUNT XXIII – WRONGFUL DEATH

342. Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

343. Pursuant to La. C. C. art. 2315.2, as personal representative of his Estate, Eldest Daughter, brings forth a wrongful death action to recover damages from each and every Defendant set forth in this complaint for the wrongful death of Mr. Odoms.

344. Eldest Daughter, as surviving child of Mr. Odoms, is entitled to share in his Estate.

345. Mrs. Odoms, individually and as Guardian of surviving Minor Children of Mr. Odoms, brings forth a wrongful death action against each and every Defendant set forth in this complaint to recover damages for the wrongful death of Mr. Odoms.

346. As the surviving spouse of Mr. Odoms, Mrs. Odoms is entitled to a share in his Estate.

347.    Minor Children as the surviving children of Mr. Odoms, are entitled to share in his Estate.

348.    Mr. Odoms was exposed to DW Toxic Chemicals and Toxic Dispersants, which was the direct and proximate result of his death.

349.    Plaintiffs claim damages for their pain and suffering endured as a result of the negligence for which each and every Defendant individually as set forth in this complaint are liable.

350.    As a result of the loss of their husband and father, Plaintiffs have suffered and will continue to suffer substantial damages, including:

i.    **Pecuniary loss**: the loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value;

ii.    **Loss of companionship and society**: the loss of love, affection, solace, comfort, companionship, and society that Eldest Daughter, Mrs. Odoms, and his Minor Children, in reasonable probability would have received from Mr. Odoms had he lived; and

iii.    **Mental anguish**: the emotional pain, torment, and suffering experienced by Eldest Daughter, Mrs. Odoms, and his Minor Children because of the death of Mr. Odoms.

iv.    **Loss of Consortium**: Mrs. Odoms has sustained a loss of marital consortium, which is the positive benefits flowing from the love, affection, protection, emotional support, services, companionship, care, and society of her husband; she will continue to suffer such loss into the future.

v.    Eldest Daughter has sustained a loss of parental consortium, which are the positive benefits flowing from the love, affection, protection, emotional support, services, companionship, care, and society of their father, and will continue to suffer such loss

into the future.

vi.    Mr. Odoms' Minor Children have sustained a loss of parental consortium which is the positive benefits flowing from the love, affection, protection, emotional support, services, companionship, care, and society of their father, and will continue to suffer such loss into the future.

WHEREFORE Plaintiffs respectfully demand judgment against each and every Defendant, individually, by awarding Plaintiffs damages in excess of $75,000 recoverable at law, including post judgment interest, cost, and any other relief at law that this Court deems just and proper.

## COUNT XXIV - SURVIVAL ACTION

351.    Plaintiffs incorporate and re-allege each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

352.    Mrs. Odoms and Minor Children, bring forth this survival action pursuant to La. C. C. art. 2315.1.

353.    Mrs. Odoms and Minor Children claim damages for the conscious pain and suffering undergone by Mr. Odoms as a result of the negligence for which each and every Defendant, individually, are liable.

354.    As a result of Mr. Odoms' death, Mrs. Odoms and Minor Children have been deprived of the earnings that Mr. Odoms could have earned during the remaining period of his life expectancy.

355.    Mrs. Odoms and Minor Children claim damages for pecuniary loss suffered by Mr. Odoms, as a result of his death.

356.    Mrs. Odoms and Minor Children also claim damages for conscious pain and suffering

experienced by Mr. Odoms, up to and including the time of his death.

357.    Mrs. Odoms and Minor Children are entitled to recover funeral expenses, medical expenses, lost wages and benefits, the value of lost household services, and any bills for damaged property resulting from the injuries and death of Mr. Odoms.

WHEREFORE Mrs. Odoms and Minor Children respectfully demand judgment against each and every Defendant, individually, by awarding Mrs. Odoms and Minor Children damages including post judgment interest, cost, and any other relief at law that this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against the above referenced Defendants as follows:

    i.    Economic and compensatory damages in amounts to be determined at trial;

    ii.    Punitive damages;

    iii.    Pre-judgment and post-judgment interest at the maximum rate allowable by law;

    iv.    Attorneys' fees and cost of litigation; and

    v.    Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

    vi.    Plaintiffs demand a trial by jury.

This complaint was filed by undersigned counsel this 23rd day of November, 2016.

[intentionally left blank]

Respectfully Submitted,

THE DOWNS LAW GROUP

By: /s/ Craig T. Downs
Co-Counsel for Plaintiffs
Craig T. Downs, Esq.
Fla. Bar. No. 801089
cdowns@downslawgroup.com
of the Downs Law Group along with

Vanessa E. Diaz
Fla. Bar. No. 120087
vdiaz@downslawgroup.com
3250 Mary Street, Suite 307
Miami, FL 33133
Telephone: (305) 444-8226
Facsimile: (305) 444-6773

Jose E. Aguirre
Fla. Bar. No. 92675
jaguirre@downslawgroup.com
3250 Mary Street, Suite 307
Miami, FL 33133
Telephone: (305) 444-8226

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2016, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following counsel of record: Don Keller Haycraft at dkhaycraft@liskow.com, attorney for Defendants.

/s/ Craig T. Downs.
Craig T. Downs

# EXHIBIT A

# STATE OF LOUISIANA
## CERTIFICATION OF VITAL RECORD

### CERTIFICATION OF DEATH

BIRTH NUMBER:

STATE FILE NUMBER: 2014-033-00689

**DECEDENT**

3957148

| DECEDENT'S NAME - (LAST, FIRST, MIDDLE, SUFFIX) | DATE OF BIRTH | DATE OF DEATH | | TIME OF DEATH |
|---|---|---|---|---|
| ODOMS JR , ALONZO | | 10/04/2014 | | 10:53 AM |
| PLACE OF BIRTH - (CITY, STATE, COUNTRY) | SEX | SOCIAL SECURITY NUMBER | | AGE |
| VICKSBURG, MS UNITED STATES | MALE | | | 48 YEARS |
| DECEDENT'S ALIAS NAME(S) - (LAST, FIRST, MIDDLE, SUFFIX) | | | WHEN CITY LIMITS? | PARISH/COUNTY |
| | | | NO | JEFFERSON |

**PERSONAL**

| EVER IN U.S. ARMED FORCES? | OCCUPATION | INDUSTRY OF OCCUPATION |
|---|---|---|
| NO | OIL SPILL | |
| MARITAL STATUS | | NAME OF SURVIVING SPOUSE (LAST, FIRST, MIDDLE, SUFFIX) |
| MARRIED | | SYLVESTER, TIFFANY |
| FATHER'S NAME - (LAST, FIRST, MIDDLE, SUFFIX) | FATHER'S PLACE OF BIRTH (CITY, STATE, COUNTRY) | |
| ODOMS SR , ALONZO | HERMANVILLE, MS UNITED STATES | |
| MOTHER'S NAME - (LAST, FIRST, MIDDLE, SUFFIX) | MOTHER'S PLACE OF BIRTH (CITY, STATE, COUNTRY) | |
| TERRELL, ROSIE | CARPENTER, MS UNITED STATES | |
| INFORMANT'S NAME - (LAST, FIRST, MIDDLE, SUFFIX) | RELATIONSHIP TO DECEDENT | INFORMANT'S ADDRESS |
| ODOMS, TIFFANY B | WIFE | 2429 SUNSET DR , HARVEY, LA 70058 UNITED STATES |
| EDUCATION ASSOCIATE DEGREE ( E.G. AS, AA) | | |
| OF HISPANIC ORIGIN? NO, NOT SPANISH/HISPANIC/LATINO | | |
| RACE: BLACK OR AFRICAN AMERICAN | | |

**DEATH INFO**

| PLACE OF DEATH | | |
|---|---|---|
| INPATIENT | FACILITY NAME | |
| | OCHSNER FOUNDATION HOSPITAL | |
| FACILITY ADDRESS - (STREET ADDRESS, CITY, STATE, ZIP CODE, COUNTRY) | | PARISH/COUNTY |
| 1514 JEFFERSON HWY , JEFFERSON, LA 70121-0000 UNITED STATES | | JEFFERSON |

**DISPOSITION**

| METHOD OF DISPOSITION | PLACE OF DISPOSITION |
|---|---|
| BURIAL | WOODLAWN PARK MEMORIAL CEMETERY |
| PLACE OF DISPOSITION (CITY, STATE, COUNTRY) | DATE OF DISPOSITION |
| WESTWEGO, LA UNITED STATES | 10/13/2014 |

**FUNERAL FACILITY**

| FUNERAL FACILITY NAME | ADDRESS OF FUNERAL FACILITY |
|---|---|
| DAVIS MORTUARY SERVICE, INC. , GRETNA | 230 MONROE ST , GRETNA, LA 70053 UNITED STATES |
| NAME OF FUNERAL DIRECTOR (LAST, FIRST, MIDDLE, SUFFIX) | LICENSE NUMBER | CORONER NOTIFIED? |
| DAVIS JR, WILLIE P | U1115 | N |
| SIGNATURE OF FUNERAL DIRECTOR | | DATE |
| *e-sign* | | 10/10/2014 |

**MEDICAL INFO**

| MANNER OF DEATH | NATURAL |
|---|---|
| IF FEMALE? | NOT APPLICABLE |
| DID TOBACCO USAGE CONTRIBUTE TO DEATH? | NO |

**INJURY INFORMATION**

| WAS AN AUTOPSY PERFORMED? | FINDINGS USED IN DETERMINING CAUSE? |
|---|---|
| NO | NOT APP. CASE |
| PLACE OF INJURY | DATE OF INJURY | TIME OF INJURY | INJURY AT WORK? | IF TRANSPORTATION INJURY, SPECIFY |
| | | | | |
| LOCATION OF INJURY - (STREET ADDRESS, CITY, STATE, ZIP CODE, COUNTRY) | | | | PARISH/COUNTY |
| DESCRIBE HOW INJURY OCCURRED | | | | |

**CERTIFIER**

I CERTIFY THAT I ATTENDED THE DECEDENT FROM 9/28/2014 TO 10/2/2014, AND THAT DEATH OCCURRED ON THE DATE AND HOUR STATED AND DUE TO THE CAUSE(S) AND MANNER STATED.

| SIGNATURE OF CERTIFIER | | |
|---|---|---|
| *e-sign* | DATE | 10/17/2014 |
| CERTIFIER NAME - (LAST, FIRST, MIDDLE, SUFFIX) | | |
| FOWLKES, JUSTIN DAVID | | |
| CERTIFIER TITLE: PRONOUNCING & CERTIFYING PHYSICIAN | | |
| CERTIFIER ADDRESS - (STREET ADDRESS, CITY, STATE, ZIP CODE, COUNTRY) | | |
| 1931 PERDIDO ST , APT/STE 3205 , NEW ORLEANS, LA 70112 UNITED STATES | | |
| BURIAL TRANSIT PERMIT | | |
| 100224 | | |

**REGISTRAR**

| PARISH OF ISSUE | DATE OF ISSUE | DATE FILED WITH REGISTRAR |
|---|---|---|
| ORLEANS | 10/06/2014 | 10/18/2014 |
| SIGNATURE OF REGISTRAR | DEVIN GEORGE *e-sign* | |
| ISSUED BY: BAR CODE | | Issued On: 11/5/2014 11:19:38 AM |

I CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF A CERTIFICATE OR DOCUMENT REGISTERED WITH THE VITAL RECORDS REGISTRY OF THE STATE OF LOUISIANA, PURSUANT TO LSA - R.S.40:32, ET SEQ.

DEVIN GEORGE
STATE REGISTRAR

A REPRODUCTION OF THIS DOCUMENT IS VOID AND INVALID IF NOT ALL PRESENT

*003957148*

WARNING: IT IS ILLEGAL TO ALTER OR COUNTERFEIT THIS COPY