## RETAINER AGREEMENT/CONTINGENT FEE AGREEMENT

(1) The **Edward Wisner Donation**, as authorized by vote of the Edward Wisner Donation Advisory Committee, and through its authorized agent whose signature is found below, does hereby appoint Joel Waltzer and Robert Wiygul, and the firm **Waltzer & Wiygul (formerly Waltzer & Associates)** to be its attorney regarding its interests in all matters arising from the BP/Deepwater Horizon Oil Spill.

(2) Definitions:
"Donation" refers to the Edward Wisner Donation, and its heirs, successors, beneficiaries, trustees, donees, legatees, reversionary interest holders and assigns.
"W&W" refers to the law firm of Waltzer & Wiygul, a law partnership.
"Oil Spill", "BP Oil Spill" or simply "Spill" refers to the oil contamination subsequent to the destruction of Transocean's Deepwater Horizon on April 20, 2010.
"Property" refers to all property owned and/or managed by the Donation.

(3) The Donation empowers W&W to take any and all actions and provide such legal advice as W&W deems appropriate, to investigate and prosecute all claims for damages and relief against any and all parties responsible for damage to Donation property and interests, whether corporeal or not. The Donation specifically authorizes W&W to file suit, litigate, negotiate, and gain any provisional and final relief, whether by judgment, administrative action or consent of the parties, on the Donation's behalf in any manner consistent with W&W's professional judgment. The scope of this agreement include all pollution response activities, remediation, mitigation, assessment, and restoration of Donation properties, all to be exercised in accordance with W&W's professional judgment on the Donation's behalf.

(4) In exchange for the provision of services as outlined above, the Donation will pay W&W as a fee for W&W's services as follows:

(a) For legal services reimbursed by BP as part of a claim for oil spill removal/response costs, the Donation agrees to pay W&W $365/hr for the services of Robert Wiygul, $355/hr for the services of Joel Waltzer, $265/hr for the services of Clay Garside and $85/hr for paralegal services, plus costs and expenses directly attributable to the prosecution of these claims.

The Donation will be invoiced for removal/response related professional services on a monthly basis. To assist the Donation with cash flow issues resulting from the increased burden placed on the Donation as a result of the oil spill, W&W agrees to accept 50% of the invoiced monthly total, subject to the cap on monthly payment set out below, within thirty days of receipt. The remainder of the invoiced monthly amount will be paid to W&W by the Donation within two weeks of the Donation's receiving BP's removal/response cost reimbursements for that same time period. If the BP payment fails to itemize what is included in its reimbursement, it will be presumed that the W&W invoice is paid within that payment. If BP pre-pays response costs, for example by establishing a fund for such costs, then the Donation agrees to pay the full amount of each monthly invoice in full within fourteen days of receipt.

While the parties acknowledge a large amount of work is front loaded into this case, the maximum monthly amount of legal fees (not including expenses) that the Donation will be asked to pay prior to receiving reimbursement from the responsible party for that monthly period will be $8,000. In the event that 50% of the invoiced amount exceeds $8,000 in any one month, the excess amount over $8,000 will be added to the amount of the next monthly invoice.

All monthly amounts actually received by W&W under this provision will be credited as an offset against any contingent fee owed and payable under paragraph 4(c).

(b) For W&W's services associated with obtaining interim or partial payments of oil spill damages other than response/removal costs (such as lost income or rent), Donation agrees to

1



pay W&W ten percent of the amount received from BP or Transocean, whether on a monthly, bi-annual or other basis. If interim payments of Oil Spill damages are made entirely without W&W's assistance, the Donation will owe no fee on that amount. If interim payment of Oil Spill damages is tendered without the assistance of W&W, and W&W's efforts subsequently result in a source agreeing to pay a greater amount, no matter how small, then the ten percent fee will be calculated based on the difference between the amount originally offered and the amount actually paid. Any payment of fees on interim payments will be deducted from any contingency fee calculated under Paragraph 4(c).

(c)     For services rendered in connection with physical damages and restoration costs, as well as final economic loss damages, the Donation will pay W&W a contingency fee based on the gross present value of benefits received by the Donation pursuant to a judgment or agreement involving any defendant, or any entity related to any defendant, in the following percentages:

For benefits received, up to $10,000,000:
(i) 10%  - if the matter is resolved without suit;
(ii) 18% - if the matter is resolved after suit but prior to a signed Order setting the case for trial;
(iii)25% - if the matter is resolved after the first Order is signed setting the case for trial.

For benefits received between $10,000,000 and $50,000,000:
(i)    6% - if the matter is resolved without suit;
(ii) 12% - if the matter is resolved after suit but prior to a signed Order setting the case for trial;
(iii) 18% - if the matter is resolved after an Order is signed setting the case for trial.

For benefits valued over $50,000,000:
(i) 3% - if the matter is resolved without suit;
(ii) 6% - if the matter is resolved after suit but prior to a signed Order setting the case for trial;
(iii) 9% - if the matter is resolved after an Order is signed setting the case for trial.

(5) The Donation understands that it is responsible for the payment of direct costs and expenses specifically connected to the pursuit of its claims, and agrees to reimburse W&W for these costs, if and when W&W requests the Donation to do so. The Donation also agrees to assist W&W in minimizing costs by timely responding to communications, obtaining necessary documents and assisting in the preparation of case or settlement documents, like responses to discovery and pleadings, as the need arises.

(6) The Donation understands that approximately 300 lawsuits, including many class actions, have been filed relating to the Oil Spill. W&W intends to represent the Donation in an independent lawsuit. It is possible that any action on behalf of the Donation will be consolidated or grouped with other actions at least until undersigned can break it out. As a result, the Donation may be responsible for a share of costs and expenses common to all plaintiffs as determined by the court. Examples of common expenses include, but are not limited to, travel expenses, deposition and court costs and expert witness fees. W&W agrees to share its fees with any other firm that may be awarded such a common fund attorneys fee, such that the liability for fees to Donation is not increased.

(7) The Donation and W&W agree that any amounts received in settlement or judgment will be distributed in this order: From the gross total amount, W&W will deduct case costs and common pro rata litigation related expenses which have not been paid by W&W, then attorneys fees, then all direct and pro rata expenses paid by W&W.

The following is an example of how attorneys fees would be calculated under this Paragraph and Paragraph 4. The assumptions for this example are as follows:
a. Donation expends $500,000 on costs related to the spill and its property.
b. BP pays Donation W&W removal/recovery attorneys fees totaling $100,000.
c. With W&W's help, BP pays Donation interim damages totaling $400,000. Donation in turn has already paid W&W $40,000 in fees for same pursuant to paragraph 4(b).

2

d. BP agrees to pay damages and restoration expenses with a net present value of $5,500,000.
e. Suit has been filed, but no order has been entered setting the case for trial.

On these assumptions, the fee would be calculated as follows: The contingent fee under 4(c) is calculated on gross value of the settlement less expenses paid by Donation ($5.5M-$.5M=$5.0M). From the gross contingency fee ($5M x .18 = $900K), fees already paid are deducted, totaling $760,000 ($900K - $100K - $40K = $760,000).

(8) The Donation agrees that nothing contained herein shall constitute an agreement for W&W to perform legal services that arise in a separate proceeding regarding the ownership, condition or use of the property not contemplated above, including, but not limited to, government administrative actions for clean up or remediation of the property or defending claims by adjoining or nearby landowners for damages resulting from Wisner's ownership of these properties or the operations thereupon.

(9) The Donation acknowledges that W&W represents plaintiffs in cases in which the trustee City of New Orleans is a defendant, including a class action entitled *Doretha Walker et al v. AMID/Metro Partnership, LLC, et al.* The pleadings in this suit are available for review by Committee Members at any time. All members of the Donation's Committee considered this potential conflict, had the opportunity to consult with outside counsel and determined to waive any potential conflict this may create, including the City of New Orleans.

(10) The Donation understands and agrees that Louisiana law governs this contract. The Donation authorizes W&W to associate other attorneys and to hire experts who in their judgment may help facilitate prosecution of the case.

(11) This contract alone governs the relationship between the parties, and it may be modified only in writing by the consent of both parties. This contract operates retroactively to commence on the date W&W was first asked to provide legal services.

Contract signed as per Resolution of the Edward Wisner Donation Advisory Committee, September 29, 2010, in New Orleans, Louisiana, this 4*th* day of Oct. 2010.

Waltzer & Wiygul

Joel Waltzer

The Edward Wisner Donation,

By: Cathy Norman
Cathy Norman, Secretary/Treasurer
/Land Manager, and authorized agent

3