UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG | : | MDL 2179 |
| "DEEPWATER HORIZON" IN THE | : | |
| GULF OF MEXICO, ON APRIL 20, 2010 | : | Section J |
| | : | |
| This Document Applies to: | : | Judge Barbier |
| | : | |
| *No. 12-970, Bon Secour Fisheries, Inc., et* | : | Mag. Judge Wilkinson |
| *al. v. BP Exploration & Production Inc., et al.* | : | |

MEMORANDUM IN SUPPORT OF MOTION OF THE DHECC FOR
RETURN OF PAYMENTS MADE TO CLAIMANTS JAMES AURELIO, OUTPOST
MARINE, INC., THEODORE WHEELER, STEPHEN FERRARA, CAROL NELSON,
AND THEIR CLAIMS PREPARER, WILLIAM A. BECKER CONSULTING, LLC

The DHECC moves to have claimants James Aurelio, d/b/a "Guy's Towing Sales &

Service"[3] ("Aurelio"); Outpost Marine, Inc. ("Outpost Marine");  Theodore Wheeler, d/b/a

"Anima Charters and sailing" ("T. Wheeler"); Stephen Ferrara ("Ferrara"), and Carol Nelson,

d/b/a "Carol Nelson Pro Cleaning" ("Nelson") (collectively "Claimants"), and their claims

preparer, William A. Becker Consulting LLC ("Becker"),[4] return payments the DHECC made

to them in reliance on false information and financial data they provided in support of their

Business Economic Loss ("BEL") claims.  Claimants and Becker submitted false information

and monthly profit and loss statements ("P&Ls") created to increase Claimants purported

economic losses suffered after the oil spill.  *See* Ex. A, Declaration of J. Lynn Barker (the

"Declaration").  Relying on these representations, the DHECC paid Claimants a total of

---

[3] Though the claim was filed by James Aurelio individually, based on the Florida Secretary of State's records, Guys Towing Sale & Service LLC is listed as a Florida limited liability company, incorporated on April 19, 2016, of which James Aurelio is a member. Ex. B

[4] William Becker, who managed William A. Becker Consulting LLC with Patricia Becker, died on July 10, 2014. Becker's last annual report shows Patricia Becker is now the sole manager and registered agent for service of process. *See* Ex. C, Florida Secretary of State records. Becker held itself out as the "the leading claims filing agency in Monroe County, FL, and dedicated customer of the BP Claim Pro Solution for filing BP oil spill claims for clients throughout the Florida Keys", and "processed claims valued in excess of $170 Million". *See id.*

$313,600.42, and Becker, as their claim preparer, received over $66,000 from those awards. *See* Exs. D, E.  Claimants' attorneys received additional contingency fee amounts. *Id.*

## A. *Background*

The Claims Administrator has authority to ensure the integrity of the DHECC by initiating proceedings to clawback awards based on fraudulent claims.  *See* Order of May 6, 2015 (Rec. Doc. 14543); Settlement Agreement at ¶ 4.3.10.  The Court retains continuing jurisdiction over the Settlement Agreement.  *Id.* at ¶¶ 4.4.7 and 18.1.  Disputes concerning enforcement of the Settlement Agreement are to be resolved by motion to the Court.  Id.

## B. *The DHECC Claims*

Claimants filed BEL claims with the DHECC, assisted by Becker, through William Becker (now deceased), who prepared the claims, communicated with the DHECC on Claimants' behalf, and provided documentation to the DHECC for its services to Claimants.

1.   General Requirements for Business Economic Loss Claims

The Settlement Agreement requires business claimants to provide the DHECC with, among other documents, federal tax returns and monthly P&Ls for the selected Benchmark Period, 2010, and, at times, 2011.  *See* Settlement Agreement Ex. 4A at ¶¶ 3-4.

The DHECC calculates compensation using the data provided by claimants.  The DHECC permits claimants, and the professionals retained by them, to create monthly P&Ls in instances where the claimants did not maintain such information during their normal course of business.  *See* DHECC Policy 286.  The P&Ls must be based on contemporaneous

source documents, such as bank statements, invoices, and purchase orders, and must show claimant's actual monthly revenues and expenses. *See* DHECC Policy 355 v.2.

The BEL compensation framework consists of two steps. The first step compensates claimants for certain reductions in their variable profits, by comparing variable profits for three or more consecutive months between May and December 2010 with variable profits for those same months during a Benchmark Period. The second step compensates claimants for the incremental profits they might have generated in the absence of the oil spill relative to revenue from a Benchmark Period. Claimants also receive a risk transfer premium to determine a total settlement award.

    2.    <u>Becker's Claims Preparation and the "4 Penny Method"</u>

Since Becker was not an accounting firm, Becker provided the DHECC with executed Sworn Written Statements for Claimant Accounting Support ("SWS-38"), representing that he worked "under the direct supervision of a Certified Public Accountant," whose license was active and in good standing, and the financial information provided to the DHECC was prepared on a consistent basis and the implications of information known or reasonably suspected to be untrue or inaccurate have not been ignored. *See* Ex. A, Declaration at ¶. Each SWS-38 was purportedly signed by the CPA, but in fact, that CPA has confirmed that she had no knowledge of any SWS-38, never signed one and prepared no P&Ls for Becker's clients, and photocopies of the signature were used based on Becker instructions to a former Becker employee to "cut and paste" the signatures. *Id*.

Becker also provided invoices for its services. In addition, as recited in law firm contingency fee contracts signed by each of the Claimants, each of the Claimants "has a preexisting contingency fee arrangement with William A. Becker Consulting, LLC". *See*, Ex

D, Contingency Fee Agreements (*in globo*), Ex E, Becker Consulting Disbursement Sheets

(showing that Becker received an aggregate of $61,720.08 from Claimants' DHECC awards

– in addition to his $1,000 claims preparation fees).

        a.     The "4 Penny Method"

Becker created and submitted to the DHECC P&Ls for each claimant not based on

contemporaneous records, but instead based on an impermissible fabricated method of

reporting which has been described as the "4 Penny Method" of reporting. *See* Ex. A,. at ¶ 3.

As the Declaration describes, this was discovered when forensic accountants noticed

anomalies in trend analyses of BEL claims prepared by Becker, leading to further

investigation which revealed that P&Ls of these Becker-assisted Claimants exhibited fixed

patterns reflecting "front loaded" revenues, thus creating losses for the compensation

calculation which otherwise would not have existed.  The Declaration shows that a

management system and claims estimator software program named "Goldmine" was

prepared for Becker as an estimation tool – not to compute any actual claim amount.

However, that program was used to support the claims filed by the Claimants. *Id.*

As explained in the Declaration, Becker's "4 Penny Method" is a privately-created

claims preparation template, designed to mimic the Monroe County 4 Penny Tax for motels,

hotels, and registered rental units.  The way it works is this: Monroe County, Florida

imposes a 4 cent tax, specifically designed to be a bed tax on motels, hotels, and rental units

to support the tourism industry in the county.  The Florida Department of Revenue issues a

management report that reflects this 4 cent tourism tax collected in Monroe County by

month, to calculate the monthly percentage of the total revenue collected for the year.

Generally stated, the "4 Penny Method" is utilized to track the monthly trends of the number of tourists staying in the Florida Keys (Monroe County).  *Id.*

Using the "4 Penny Method", Becker would create monthly P&Ls, applying the claimant's annual revenue and variable expenses as reported to the Monroe County Florida 4 penny tourist tax data, as opposed to reporting the contents of contemporaneous source documents, such as available bank records.  *Id.* at ¶¶ 3, 8-12.  As explained more fully in the Declaration and below, through the "4 Penny Method", Becker falsely allocated monthly revenue and variable expenses for each claimant, which affected the variable profits for the Benchmark and Compensation months used to calculate Claimants' awards.  *Id.*

Though the monthly percentages derived by this method may have some relationship to the percentage of revenues and variable expenses attributable to a tourism business on a monthly basis (since the higher the tax collected for the month, the higher the revenue would have been), it would have no relationship to the monthly revenues and variable expenses of businesses not impacted by increased tourism in certain months. For example, while this reporting method might correlate in a positive way with revenues generated by a hotel, there is no reason to assume that it would correlate in any way with monthly revenues and expenses generated by non-tourism dependent businesses, such as a dentist, a plumber, or an auto dealership, as examples.

Moreover, the monthly percentages derived by the "4 Penny Method" cannot reasonably be expected to provide the *actual* monthly revenues and expenses experienced by any business, as is required by the Settlement Agreement.  By presenting monthly revenues and expenses through this method – as opposed to through actual records – Becker effectively presents patterns of fixed revenue and expenses, similar to actual

revenue and variable expense patterns of tourism businesses, as though those patterns are similar to all businesses.  This distorted manner of presentation inflates compensation awards due to the months that happen to generate a greater percentage of the annual 4 cent tax.

b. <u>Describing the Effect of the "4 Penny Method" on Claims</u>

The following analysis will periodically discuss Becker's method in terms of "overstatement" and "understatement" of a claimant's revenue and variable profit. There are two perspectives from which to view this classification.  First, the 4 penny percentages Becker used to allocate annual revenue will always result in less revenue (understatement) for the Compensation Period (2010) and more revenue (overstatement) for the Benchmark Period (2007 - 2009)[5].  This general method of description of the "4 Penny Method's" effect will apply throughout to each claimant.  Second, the actual monthly revenue amount (or "net taxable deposit") may be larger or smaller than the monthly revenue calculated by the "4 Penny Method", thereby creating an "overstatement" or "understatement".  The second aspect is more clearly illustrated by the analysis charts below which compare the actual monthly revenue to the reported monthly revenue.  In all instances, the actual revenue was always greater than the calculated revenue for the Compensation Period and the Benchmark Period.

Becker ensured that for each claimant, the annual total revenue figure of 2010 would be less than that of 2007-2009, ensuring that his 4 penny percentage method would always overstate the benchmark month figure over its compensation period counterpart.

---

[5] This understatement/overstatement will occur in all cases, unless the claim preparer were to report a 2010 annual revenue total significantly larger than the corresponding annual total of the benchmark years.

His method was designed to artificially show a loss, no matter the claimant.  Becker's use of

this method in creating the Claimants' P&Ls taints all of these claims through distortions of

purported actual monthly revenues and expenses, all of which will be shown below, all

supported by and explained in more detail in the Declaration.

       3.    <u>Claimants' BEL Claims and Becker's Assistance</u>

      Aided by Becker, Claimants filed BEL claims with the DHECC.  Because the DHECC

will reimburse claimants for reasonable and necessary accounting fees related to the

preparation of claims, Claimants sought reimbursement for Becker's accounting support

services, and authorized Becker to communicate with the DHECC on their behalf.

        a.    <u>Claimant James Aurelio's BEL Claim and DHECC Payment</u>

      In August of 2011, Aurelio[6]  filed a claim with GCCF under the name Guys Towing

Sales & Service, and submitted his 2008-2010 federal income tax returns, 2009 and 2010

bank statements, and monthly P&Ls for 2010 prepared by H&R Block.  *Id.* at ¶ 8 and at Dec.

Exs. A through F.  On September 27, 2011, the GCCF issued a denial letter for insufficient

documentation to support the claim.  *Id.*

      In August of 2012, with the assistance of Becker, Aurelio filed a BEL claim with the

DHECC, supported by: (1) 2008-2010 tax returns which were consistent with the returns

Aurelio previously submitted to the GCCF; (2) a 2007 tax return; and (3) monthly P&Ls for

2007-2010[7] prepared by Becker using the 4 Penny Method. *See Id.* at Dec. Exs. A, B, C, G,

---

[6] See footnote 1 with respect to "Guy's Towing Sales & Service LLC".
[7] So, notwithstanding that H&R Block had prepared monthly P&Ls for 2010, which Aurelio submitted to the GCCF, rather than even those presumably-legitimate 2010 P&Ls being presented to the DHECC, the version later created and prepared by Becker were submitted to the DHECC.

and H.  The total annual revenue reported on those P&Ls is consistent with the gross receipts reported on Aurelio's tax returns. *Id*. at ¶ 8.

Relying on this documentation and the P&Ls Becker prepared which reflected total annual revenue consistent with the total revenue reported on the tax returns, the DHECC awarded and paid Aurelio $98,447.10. *Id*. The monthly figures were inaccurate and misleading because of the method used to prepare them.

### 1.    Evidence of Aurelio's Fraud

Key financial data in the P&Ls submitted to the DHECC contained artificial monthly revenue and expense amounts that inaccurately represented claimant's finances by misstating claimant's revenue for 2009 – 2010.  *Id*.  More specifically, Becker used the 4 Penny Method to falsely allocate monthly revenue and variable expenses which affected the variable profits for the Benchmark and Compensation months that are used for the award calculation.  *Id*.  As a result, the DHECC overpaid Aurelio by approximately $54,000.  *Id*.

Aurelio and Becker had contemporaneous financial data in the form of bank records available to them to create P&Ls (as evidenced by the 2010 P&Ls prepared by H&R Block), but instead chose to use the 4 Penny Method which falsely allocated revenue and expenses. *Id*.  The DHECC subpoenaed the 2008 bank statements from Keys Accounting and reviewed the 2009 and 2010 bank statements Aurelio submitted to the GCCF; each reflected monthly revenue inconsistent with the P&Ls submitted to the DHECC as illustrated in the charts below[8].  *Id*.

---

[8] More detailed charts follow the initial summary charts presented below with respect to each of the Claimants.

More specifically, for 2008, the net taxable deposits[9] reflected in the bank statements for the Benchmark Period/Months (BM) are $25,399.95 greater than the revenue reported on the P&Ls submitted to DHECC:

| Bank Statement Period | 2008 Actual Revenue | Revenue Reported on 2008 P&L Submitted to DHECC | Difference |
|---|---|---|---|
| Jan | 15,418.73 | 15,553.00 | -134.27 |
| Feb | 8,506.00 | 19,328.00 | -10,822.00 |
| Mar | 8,289.00 | 22,957.00 | -14,668.00 |
| Apr | 16,229.00 | 16,006.00 | 223 |
| May | 16,642.00 | 14,095.00 | 2,547.00 |
| June | 24,406.00 | 12,361.00 | 12,045.00 |
| July | 7,969.00 | 13,414.00 | -5,445.00 |
| Aug | 17,271.00 | 10,207.00 | 7,064.00 |
| Sept | 8,508.00 | 4,795.00 | 3,713.00 |
| Oct | 20,769.00 | 9,040.00 | 11,729.00 |
| Nov | 8,814.00 | 11,049.00 | -2,235.00 |
| Dec | 9,185.95 | 13,204.00 | -4,018.05 |
| | 162,007.68 | 162,009.00 | -1.32 |
| | | | |
| BM | 113,564.95 | 88,165.00 | 25,399.95 |

*Id.*

For 2009, the net taxable deposits reflected in the bank records totaled $155,473.22 which is $76,829 greater than the revenue reported on the P&Ls. In addition, the net taxable deposits for the Benchmark Months (BM) are $61,288.74 greater than the amount misrepresented in the P&Ls submitted to DHECC.

---

[9] Taxable deposits essentially equate to revenues.

| Bank Statement Period | 2009 Actual Revenue | Revenue Reported on 2009 P&L Submitted to DHECC | Difference |
|---|---|---|---|
| Jan | 13,034.90 | 7,998.00 | 5,036.90 |
| Feb | 9,929.00 | 8,832.00 | 1,097.00 |
| Mar | 11,102.58 | 9,807.00 | 1,295.58 |
| Apr | 16,471.00 | 8,360.00 | 8,111.00 |
| May | 6,845.00 | 6,826.00 | 19 |
| June | 30,513.25 | 6,480.00 | 24,033.25 |
| July | 13,147.00 | 7,306.00 | 5,841.00 |
| Aug | 13,103.00 | 5,694.00 | 7,409.00 |
| Sept | 13,084.00 | 3,657.00 | 9,427.00 |
| Oct | 7,190.09 | 3,775.00 | 3,415.09 |
| Nov | 9,140.40 | 4,286.00 | 4,854.40 |
| Dec | 11,913.00 | 5,623.00 | 6,290.00 |
|  | 155,473.22 | 78,644.00 | 76,829.22 |
|  |  |  |  |
| BM | 104,935.74 | 43,647.00 | 61,288.74 |

*Id.*

And for 2010, the net taxable deposits reflected in the bank statements total $111,806.23 which is $51,263 more than what claimant reported on the P&Ls submitted to the DHECC, notwithstanding the availability of the 2010 P&Ls prepared by H&R Block.  Also, the net taxable deposits for the Compensation Period are $50,851.86 more than the revenue reported on the P&Ls submitted to DHECC:

| Bank Statement Period | 2010 Actual Revenue | Revenue Reported on 2010 P&L Submitted to DHECC | Difference |
|---|---|---|---|
| Jan | 7,516.37 | 7,792.00 | -275.63 |
| Feb | 8,543.00 | 8,906.00 | -363 |
| Mar | 8,596.00 | 10,268.00 | -1,672.00 |
| Apr | 11,125.00 | 8,403.00 | 2,722.00 |
| May | 6,496.00 | 5,194.00 | 1,302.00 |
| June | 7,870.06 | 3,324.00 | 4,546.06 |
| July | 9,968.00 | 2,658.00 | 7,310.00 |
| Aug | 13,524.00 | 1,865.00 | 11,659.00 |
| Sept | 7,134.80 | 2,071.00 | 5,063.80 |
| Oct | 7,972.00 | 2,785.00 | 5,187.00 |
| Nov | 11,230.00 | 3,039.00 | 8,191.00 |
| Dec | 11,831.00 | 4,238.00 | 7,593.00 |
| | 111,806.23 | 60,543.00 | 51,263.23 |
| | | | |
| CP | 76,025.86 | 25,174.00 | 50,851.86 |

*Id.*

A DHECC investigator interviewed Aurelio, who could not explain the inconsistencies in his reported revenue. *Id.* In short, Aurelio and Becker did not use available source documents, *i.e.* claimant's bank statements, and instead Becker used the 4 Penny Method to falsely allocate revenue based on a tourism sales tax percentage. *Id.* The design of the "4 Penny Method", from a percentage perspective (as discussed in ¶ B.2.b. above), resulted in an overstatement of the revenue for the Benchmark months and understatement of the revenue for the Compensation months, thereby causing a larger variable loss in order to fraudulently increase the BEL award amount. *Id.* Relying on the tax returns and P&Ls Becker fabricated using the 4 Penny Method, the DHECC paid the claimant $98,447.10, approximately $54,000 more than that to which he would have been entitled. Id.

b.    Claimant Outpost Marine's BEL Claim and DHECC Payment

In July of 2012, with the assistance of Becker, Outpost Marine[10] filed a BEL claim

with the DHECC, supported by: (1) 2007-2010 corporate tax returns; and (2) monthly P&Ls

for 2007-2010 prepared by Becker using the 4 Penny Method. *See Id.* ¶ 9 and at Dec. Exs. L,

M, N, O and P.  Relying on the documentation Outpost Marine submitted and the P&Ls

Becker prepared, the DHECC awarded and paid Outpost Marine $91,002.01, including $1,000

for accounting support. *Id.* The monthly figures were inaccurate and misleading because of

the method used to prepare them

1.    Evidence of the Outpost Marine's Fraud

Key financial data in the P&Ls submitted to the DHECC contained artificial monthly

revenue and expense amounts that inaccurately represented Outpost Marine's finances.  *Id.*

More specifically, Outpost Marine overstated revenue for 2009 – 2010, and used the 4

Penny Method to falsely allocate monthly revenue and variable expenses which affected the

variable profits for the Benchmark and Compensation months used for the award

calculation.  *Id.* As a result, the DHECC overpaid Outpost Marine by approximately $24,000.

Outpost Marine and Becker had contemporaneous financial data in the form of bank

records which they chose not to use to create accurate P&Ls.  *Id.*  The DHECC subpoenaed

those bank statements, which reflected monthly revenue inconsistent with the P&Ls

submitted to the DHECC as illustrated in the charts below.  *Id.*

More specifically, for 2009, net taxable deposits totaled $153,006.61, which is

$16,959.61 more than the amount reported on the P&Ls submitted to the DHECC.  Also, the

---

[10] Outpost Marine is a recreational fishing corporation jointly owned by Fred and Penny Wheeler. *See* Dec. Ex. A at ¶ 9.

net taxable deposits for the Benchmark Months are $35,808.25 greater than the revenue reported on the P&Ls:

| Bank Statement Period | 2009 Actual Revenue | Revenue Reported on 2009 P&L Submitted to DHECC | Difference |
|---|---|---|---|
| 2/1/2009 | 11,680.13 | 13,836.00 | -2,155.87 |
| 3/1/2009 | 10,015.50 | 15,278.00 | -5,262.50 |
| 3/31/2009 | 5,400.00 | 16,965.00 | -11,565.00 |
| 4/30/2009 | 14,596.73 | 14,462.00 | 134.73 |
| 5/31/2009 | 16,449.70 | 11,809.00 | 4,640.70 |
| 6/30/2010 | 18,573.80 | 11,210.00 | 7,363.80 |
| 8/2/2010 | 21,137.00 | 12,639.00 | 8,498.00 |
| 8/31/2009 | 18,716.25 | 9,850.00 | 8,866.25 |
| 9/30/2009 | 9,590.00 | 6,326.00 | 3,264.00 |
| 11/1/2009 | 22,547.50 | 6,530.00 | 16,017.50 |
| 11/30/2009 | 4,300.00 | 7,415.00 | -3,115.00 |
| 12/31/2009 | 0 | 9,727.00 | -9,727.00 |
| | 153,006.61 | 136,047.00 | 16,959.61 |
| | | | |
| BM | 111,314.25 | 75,506.00 | 35,808.25 |

*Id.*

For 2010, the net taxable deposits total $138,809, which is $25,097 more than reported on the P&Ls used by DHECC to compute the award, and the net taxable deposits for the Compensation Period are $44,833 greater than the amount reported on those P&Ls: (see table on following page)

| Bank Statement Period | 2010 Actual Revenue | Revenue Reported on 2010 P&L Submitted to DHECC | Difference |
|---|---|---|---|
| 1/31/2010 | 8,450.00 | 14,635.00 | -6,185.00 |
| 2/28/2010 | 6,945.00 | 16,727.00 | -9,782.00 |
| 3/31/2010 | 19,700.00 | 19,286.00 | 414 |
| 5/2/2010 | 11,600.00 | 15,783.00 | -4,183.00 |
| 5/31/2010 | 27,650.00 | 9,756.00 | 17,894.00 |
| 6/30/2010 | 0 | 6,243.00 | -6,243.00 |
| 8/1/2010 | 25,521.00 | 4,992.00 | 20,529.00 |
| 8/31/2010 | 3,706.00 | 3,502.00 | 204 |
| 9/30/2010 | 23,320.00 | 3,889.00 | 19,431.00 |
| 10/31/2010 | 8,700.00 | 5,231.00 | 3,469.00 |
| 11/30/2010 | 3,217.00 | 5,708.00 | -2,491.00 |
| 12/31/2010 | 0 | 7,960.00 | -7,960.00 |
| | 138,809.00 | 113,712.00 | 25,097.00 |
| | | | |
| CP | 92,114.00 | 47,281.00 | 44,833.00 |

*Id.*

Outpost Marine and Becker did not use available source documents, *i.e.* claimant's bank statements to create accurate P&Ls, and instead Becker used the 4 Penny Method to falsely allocate revenue based on a tourism sales tax percentage. *Id.* By using the 4 Penny Method, the revenue for the Benchmark months was overstated and the revenue for the Compensation months was understated, thereby causing a larger variable loss to fraudulently increase Outpost Marine's BEL award. *Id.* Relying on the tax returns and P&Ls Becker fabricated using the 4 Penny Method, the DHECC paid the claimant $98,447.10, approximately $54,000 more than that to which he would have been entitled. *Id.*

c.   Claimant Theodore Wheeler's BEL Claim and DHECC Payment

In May of 2012, T. Wheeler, d/b/a Anima Charters & Sailing, filed a claim with the GCCF for an interim payment. *See Id.* ¶ 10. The GCCF Interim Payment Claim Form shows

Wheeler's personal and business address as 822 NE 16 Court, Ft. Lauderdale, FL.  *See Id*. at Dec. Ex. Q.[11]  According to the address locator on the DHECC website, Wheeler's Ft. Lauderdale address is not within the economic zone which would allow him to make a DHECC claim.  *See Id*. ¶ 10.

In October of 2012, Wheeler, with Becker's assistance, filed a BEL claim with the DHECC on behalf of Anima Charters & Sailing, supported by: (1) 2008-2010 tax returns; (2) IRS Form 1099-Misc for 2008-2010; and (3) monthly P&Ls for 2008-2010 prepared by Becker using the 4 Penny Method.  *See Id*. ¶ 10 and at Dec. Exs. T, U, V, W, and X.  The BEL Claim Form Wheeler submitted represents that his business is located at 924 NE 20 Avenue, Marathon, FL, within the DHECC economic claims zone, as opposed to his home address in Ft. Lauderdale, outside of the DHECC economic claim zone.  *See Id*. ¶ 10 and at Dec. Ex. S.

Relying on this information and documentation, the DHECC paid Wheeler $41,654.25, including $1,000 for accounting support. The monthly figures were inaccurate and misleading because of the method used to prepare them

### 1.    Evidence of the T. Wheeler's Fraud

Although T. Wheeler's claim also utilizes Becker's 4 Penny Method, T. Wheeler and Becker further misled the program by misrepresenting T. Wheeler's address as being within the compensation zone.  *See Id*. ¶ 10.  T. Wheeler's home and business are outside of

---

[11] The GCCF portal shows the claim as incomplete with no supporting documents submitted.

the DHECC claim zone; therefore, T. Wheeler was not entitled to any of the $41,654.25 the DHECC paid to him. *Id*.

Key financial data in the P&Ls submitted to the DHECC contained artificial monthly revenue and expense amounts that inaccurately represented Wheeler's finances. *Id*. More specifically, T. Wheeler's claim overstated revenues and expenses for 2009 and understated them for2010, using the 4 Penny Method to falsely allocate monthly revenue and variable expenses which affected the variable profits for the Benchmark and Compensation months used for the award calculation.

T. Wheeler and Becker had contemporaneous financial data, specifically IRS Forms 1099-Misc and payment statements from Blue Water Sailing School ("BWSS") issued to T. Wheeler. *Id*. The DHECC subpoenaed payment statements from BWSS, which reflected a minimal difference from the amount listed on the 1099's. Despite the minimal nature of the above described inconsistency, Becker's employment of the "4 Penny Method" to T. Wheeler's claim is clear, as illustrated in the referenced charts contained in the Declaration. Id at ¶10.c.7.

As stated above, T. Wheeler was not entitled to any of the $41,654.25 the DHECC paid to him as his home and business are outside of the DHECC claim zone. *Id*. More specifically, when he filed his GCCF claim, T. Wheeler provided a personal and business address in Ft. Lauderdale outside of the economic zone which would not allow him to make a DHECC claim. *Id*. T. Wheeler's tax returns identify that same Ft. Lauderdale home and business address. *Id*. However, when T. Wheeler and Becker submitted the BEL claim to the DHECC, they represented that T. Wheeler's business was located in Marathon, FL, not

Ft. Lauderdale. *Id*. Marathon is located within DHECC economic zone A, which would allow T. Wheeler to submit a DHECC claim. *Id*.

In September of 2015, a DHECC investigator questioned T. Wheeler about the conflicting information he provided concerning the location of his business. *Id*. **T. Wheeler admitted that the information shown on forms provided to the DHECC was incorrect, and further admitted that his business was located in Ft. Lauderdale, outside of the DHECC claim zone.** *Id*. As a result, T. Wheeler was not entitled to the $41,654.25 the DHECC paid to him.

    d.    <u>Claimant Stephen Ferrara's BEL Claim and DHECC Payment</u>

In November of 2012, with the assistance of Becker, Ferrara, a farrier[12] located in Key Largo, FL, filed a BEL claim with the DHECC, supported by: (1) 2007-2010 tax returns; (2) monthly P&Ls for 2007-2010 prepared by Becker using the 4 Penny Method. *See Id*. ¶ 11 and at Dec. Exs. Y, Z, AA, BB, and CC. The gross receipts reported on the tax returns are consistent with the annual revenue reported on these P&Ls. *See Id*. ¶ 11.

Relying on this information and documentation, the DHECC paid Ferrara $46,993.95, which includes $1,000 for accounting support. *See Id*. The monthly figures were inaccurate and misleading because of the method used to prepare them

    1.    <u>Evidence of Ferrara's Fraud</u>

Key financial data in the P&Ls submitted to the DHECC contained artificial monthly revenue and expense amounts that inaccurately represented claimant's finances. *Id*. More specifically, Becker used the 4 Penny Method to falsely allocate monthly revenue and variable expenses which affected the variable profits for the Benchmark and Compensation

---

[12] A "farrier" is a craftsman who trims and shoes horses' hooves.

months that are used for the award calculation. *Id.* As a result, the DHECC paid the claimant $46,993.95, when the claimant was not entitled to any award had revenues and expenses not been overstated and understated and thus falsely allocated to the Benchmark and Compensation periods. *Id.*

Ferrara and Becker had contemporaneous financial data in the form of bank records available to them to create P&Ls, but instead chose to use the 4 Penny Method which falsely allocated revenue and expenses. *Id.* The DHECC subpoenaed the bank statements which reflected monthly revenue inconsistent with the P&Ls submitted to the DHECC as illustrated in the charts below. *Id.*

Specifically, the 2008 net taxable deposits reflected in the bank records for September – December total $34,075, which is $15,622 greater than the revenue reported on the P&Ls for the same months:

| Time Period | 2008 Actual Revenue | Revenue Reported on 2008 P&L Submitted to DHECC | Difference |
|---|---|---|---|
| Sept | 9,800.20 | 2,323.00 | 7,477.20 |
| Oct | 6,285.00 | 4,380.00 | 1,905.00 |
| Nov | 9,435.00 | 5,353.00 | 4,082.00 |
| Dec | 8,555.00 | 6,397.00 | 2,158.00 |
| | 34,075.20 | 18,453.00 | 15,622.20 |

*See Id.*

Also, the 2009 net taxable deposits reflected in the bank records total $89,583.64, which is $22,336.64 more than the revenue reported on the 2009 P&Ls and tax return. And, the difference in net taxable deposits and revenue for the Benchmark months is $20,128.30, resulting in an understatement of the variable profit for the Benchmark months:

| Time Period | 2009 Actual Revenue | Revenue Reported on 2009 P&L Submitted to DHECC | Difference |
|---|---|---|---|
| Jan | 7,898.34 | 6,839.00 | 1,059.34 |
| Feb | 6,630.00 | 7,552.00 | -922 |
| Mar | 8,100.00 | 8,386.00 | -286 |
| Apr | 9,505.00 | 7,148.00 | 2,357.00 |
| May | 7,610.30 | 5,837.00 | 1,773.30 |
| June | 7,310.00 | 5,541.00 | 1,769.00 |
| July | 6,820.00 | 6,247.00 | 573 |
| Aug | 7,160.00 | 4,869.00 | 2,291.00 |
| Sept | 6,955.00 | 3,127.00 | 3,828.00 |
| Oct | 5,795.00 | 3,228.00 | 2,567.00 |
| Nov | 7,185.00 | 3,665.00 | 3,520.00 |
| Dec | 8,615.00 | 4,808.00 | 3,807.00 |
| | 89,583.64 | 67,247.00 | 22,336.64 |
| | | | |
| BM | 57,450.30 | 37,322.00 | 20,128.30 |

*See Id.*

The 2010 net taxable deposits reflected in the bank records total $84,818.94, which is $19,694.94 more than the revenue reported on the P&Ls and tax returns.  The difference in net taxable deposits and revenue for the Compensation Period is $28,619.94, which results in an understatement of variable profits (as illustrated below):

| Time Period | 2010 Actual Revenue | Revenue Reported on 2010 P&L Submitted to DHECC | Difference |
|---|---|---|---|
| Jan | 7,300.00 | 8,381.00 | -1,081.00 |
| Feb | 8,540.00 | 9,580.00 | -1,040.00 |
| Mar | 7,045.00 | 11,045.00 | -4,000.00 |
| Apr | 6,235.00 | 9,039.00 | -2,804.00 |
| May | 8,133.94 | 5,588.00 | 2,545.94 |
| June | 6,620.00 | 3,575.00 | 3,045.00 |
| July | 5,550.00 | 2,859.00 | 2,691.00 |
| Aug | 7,285.00 | 2,006.00 | 5,279.00 |
| Sept | 8,000.00 | 2,227.00 | 5,773.00 |
| Oct | 6,195.00 | 2,996.00 | 3,199.00 |
| Nov | 6,905.00 | 3,269.00 | 3,636.00 |
| Dec | 7,010.00 | 4,559.00 | 2,451.00 |
| | 84,818.94 | 65,124.00 | 19,694.94 |
| | | | |
| CP | 55,698.94 | 27,079.00 | 28,619.94 |

*See Id*.

Ferrara and Becker did not use available source documents, *i.e.* claimant's bank statements, and instead Becker used the 4 Penny Method to falsely allocate revenue based on a tourism sales tax percentage. *Id*. The DHECC recalculated the award using the financial data reflected in the contemporaneous bank records, and determined that Ferrara did not have a net variable loss and was not entitled to BEL claim payment. *Id*.

e.  **Claimant Carol Nelson's BEL Claim and DHECC Payment**

In May of 2011, Nelson filed a GCCF claim for an interim payment with Becker's assistance, and submitted 2008-2010 federal income tax returns prepared by Edna Horowitz ("Horowitz"). *Id*. at ¶ 12 and at Dec. Exs. DD through FF. In June of 2012, the GCCF sent a letter to Nelson, including a $7,988.44 interim payment. *Id*. at ¶ 12.

In July of 2012, with the assistance of Becker, Nelson filed a BEL claim with the DHECC, supported by: (1) 2008-2010 tax returns which were consistent with the returns she previously submitted to the GCCF; and (2) monthly P&Ls for 2007-2010 prepared by Becker using the 4 Penny Method. *See Id.* at Dec. Exs. DD, EE, FF, GG, HH, II, and JJ.  The total annual revenue reported on those P&Ls is consistent with the gross receipts reported on Nelson's tax returns. *Id.* at ¶ 12 and at Dec. Ex. GG.

Relying on this documentation and the P&Ls Becker prepared, the DHECC paid Nelson $43,491.55.  *Id.* The monthly figures were inaccurate and misleading because of the method used to prepare them.

### 1.    Evidence of Nelson's Fraud

In December of 2015, a DHECC investigator interviewed Horowitz who prepared Nelson's 2008, 2009 and 2010 tax returns.  *See Id.* ¶ 12 and at Dec. Exs. HH, II and JJ. Horowitz explained that in preparing the returns, she used contemporaneous records, including bank statements, cancelled checks and receipts to create P&Ls for Nelson, but neither Nelson nor Becker requested those monthly P&Ls from her.  *Id.* ¶ 12.  Instead, Becker created different P&Ls based on the 4 Penny Method.  *Id.* ¶ 12.

With Nelson's permission, the DHECC investigator obtained the P&Ls Horowitz prepared and compared them to the P&Ls Becker prepared and submitted to the DHECC.  *Id.* The comparison revealed that total revenue reflected on the P&Ls Horowitz prepared matched the total revenue reported on the P&Ls Becker prepared, but the monthly revenue did not.  *Id.* The charts below illustrate the inconsistencies.

Specifically, the 2008 P&Ls prepared by Horowitz show revenue for the Benchmark Months of $79,210.16, reflecting $13,707.16 more than the P&Ls Becker prepared using the 4 Penny method.  This resulted in an understatement of variable profits:

| Bank Statement Period | Revenue on 2008 Horowitz prepared P&L's | Revenue on 2008 Becker prepared P&L's reported to DHECC | Difference |
|---|---|---|---|
| Jan | 10,320.00 | 11,555.00 | -1,235.00 |
| Feb | 10,988.00 | 14,359.00 | -3,371.00 |
| Mar | 8,775.00 | 17,055.00 | -8,280.00 |
| Apr | 11,070.00 | 11,892.00 | -822 |
| May | 7,865.00 | 10,472.00 | -2,607.00 |
| June | 7,900.16 | 9,184.00 | -1,283.84 |
| July | 5,245.00 | 9,966.00 | -4,721.00 |
| Aug | 20,430.00 | 7,583.00 | 12,847.00 |
| Sept | 9,080.00 | 3,563.00 | 5,517.00 |
| Oct | 10,965.00 | 6,716.00 | 4,249.00 |
| Nov | 8,830.00 | 8,209.00 | 621 |
| Dec | 8,895.00 | 9,810.00 | -915 |
|  | 120,363.16 | 120,364.00 | -0.84 |
|  |  |  |  |
| BM | 79,210.16 | 65,503.00 | 13,707.16 |

The 2009 P&Ls prepared by Horowitz show revenue for the Benchmark Months of $47,902.40, reflecting $2,414.00 more than the P&Ls Becker prepared.  This difference has the effect of understating variable profits:

| Bank Statement Period | Revenue on 2009 Horowitz prepared P&L's | Revenue on 2009 Becker prepared P&L's reported to DHECC | Difference |
|---|---|---|---|
| Jan | 9,031.50 | 8,336.00 | 695.5 |
| Feb | 7,370.00 | 9,205.00 | -1,835.00 |
| Mar | 8,450.00 | 10,221.00 | -1,771.00 |
| Apr | 9,210.00 | 8,713.00 | 497 |
| May | 5,135.00 | 7,114.00 | -1,979.00 |
| June | 6,480.00 | 6,754.00 | -274 |
| July | 4,885.00 | 7,614.00 | -2,729.00 |
| Aug | 4,685.00 | 5,934.00 | -1,249.00 |
| Sept | 3,987.00 | 3,811.00 | 176 |
| Oct | 6,975.00 | 3,934.00 | 3,041.00 |
| Nov | 7,810.00 | 4,467.00 | 3,343.00 |
| Dec | 7,945.00 | 5,860.00 | 2,085.00 |
| | 81,963.50 | 81,963.00 | 0.5 |
| | | | |
| BM | 47,902.00 | 45,488.00 | 2,414.00 |

The 2010 P&Ls Horowitz prepared reflect $56,892.30 of revenue for the Compensation Period, which is $22,053.50 more than the Becker P&Ls.  This difference has the effect of understating variable profits:

| Bank Statement Period | Revenue on 2010 Horowitz prepared P&L's | Revenue on 2010 Becker prepared P&L's reported to DHECC | Difference |
|---|---|---|---|
| Jan | 6,600.00 | 10,784.00 | -4,184.00 |
| Feb | 5,610.00 | 12,325.00 | -6,715.00 |
| Mar | 8,605.00 | 14,210.00 | -5,605.00 |
| Apr | 6,080.00 | 11,630.00 | -5,550.00 |
| May | 6,478.00 | 7,189.00 | -711 |
| June | 5,445.00 | 4,600.00 | 845 |
| July | 6,950.00 | 3,678.00 | 3,272.00 |
| Aug | 6,147.50 | 2,581.00 | 3,566.50 |
| Sept | 8,040.00 | 2,866.00 | 5,174.00 |
| Oct | 7,187.00 | 3,854.00 | 3,333.00 |
| Nov | 9,365.00 | 4,206.00 | 5,159.00 |
| Dec | 7,280.00 | 5,865.00 | 1,415.00 |
|  | 83,787.50 | 83,788.00 | -0.5 |
|  |  |  |  |
| CP | 56,892.30 | 34,839.00 | 22,053.50 |

Nelson and Becker had contemporaneous financial data available to them, as well as the P&Ls Horowitz created based on that contemporaneous data, but instead chose to use the 4 Penny Method to create fraudulent P&Ls falsely allocating revenue and expenses to inflate Nelson's award. *Id.*

In sum, key financial data in the P&Ls Becker prepared and submitted to the DHECC inaccurately represented claimant's finances and falsely allocated monthly revenue and variable expenses which effected the variable profits for the Benchmark and Compensation months used to calculate the award. *Id.* As a result, the DHECC paid Nelson $43,491.55, when she was only entitled to approximately $500 had revenue and variable expenses not been falsely allocated to the Benchmark and Compensation. Thus, the DHECC overpaid Nelson by approximately $43,000. *Id.*

**C.** *__Claimants and Becker Submitted Fraudulent Claims to the DHECC__*

The totality of the record shows that there is no genuine issue as to any material fact and that the DHECC is entitled to a judgment against the Claimants and Becker as a matter of law. *See* Order & Reasons on Special Master's Motion for Return of Payment at 19 (Doc. Rec. 12794) (Apr. 29, 2014) (hereinafter "Order & Reasons").

Here, the record unquestionably reveals that Becker prepared and presented on behalf of the Claimants false information to the Court-supervised DHECC to obtain payments totaling $313,600.42 for their BEL claims from the Deepwater Horizon Trust. *See* Ex. A.

In addition, Claimants and Becker submitted P&Ls which contained artificial monthly revenue and expense amounts that misrepresented the Claimants' finances to increase the award amounts the DHECC paid to Claimants. *Id.* Moreover, T. Wheeler and Becker misrepresented T. Wheeler's address as being within the DHECC compensation zone, so for that additional reason, T. Wheeler received a payment from the DHECC when he was not entitled to one. *Id.* Not only is Becker responsible for all of the above misrepresentations, he also received a 20% of each claimant's award amount as a contingency fee, $61,720.08 in total, in addition to $1,000 in accounting support per claimant, totaling $66,720.08. Exs. D, E.

**D.** *__Legal Analysis__*

The Court's power to remedy fraudulent conduct is a broad, flexible and long-standing power. *See Hazel-Atlas Glass Co. v. Hartford Empire Co.,* 322 U.S. 238, 244 (1944) (affirming judicial power to set aside fraudulently begotten judgments as such cases present "a wrong against the institutions set up to protect and safeguard the public,

institutions in which fraud cannot complacently be tolerated consistently with the good

order of society"); Order & Reasons at 21.

      1.      <u>The Actions of Becker and Claimants Satisfy the Elements of Fraud</u>

To prove fraud in this context, the DHECC must show that Becker and Claimants: (1)

made a material representation; (2) their representation was false; (3) when they made the

representation, they knew it was false or made it recklessly without any knowledge of the

truth and as a positive assertion; (4) the representation was made with the intention that it

be acted upon by the DHECC; (5) the DHECC acted in reliance upon the representation; and

(6) the DHECC suffered injury.  Order & Reasons on Motion of the DHECC for Return of

Payments Made to Crystal Seafood Company, Inc. and Others at 6 (Rec. Doc.

18456)("Crystal Order")(citing *In re Deepwater Horizon*, No. 15-30574, 2016 WL 1397663

at *3, -- F. App'x – (5th Cir. April 8, 2016); Order & Reasons on Motion for Return of

Payments Made to Vernon Alfonso and Others, at 6-7, (Rec. Doc. 15400)).

Becker and Claimants made material representations when they submitted financial

documents purporting to accurately represent their financial status before and after the

spill.  As fully detailed in the attached Declaration, the evidence shows that these

representations made by Becker and Claimants through the claim filing were false.  The

evidence also shows that based on Claimants' position within their own businesses and

Becker's experience through the BP claims filing process, they knew the representations

were false when they made them, or at the very minimum, they made the representations

recklessly without any knowledge of the truth.  The very act of submitting these claims,

swearing under penalty of perjury to the truthfulness and accuracy of all information and

documentation contained within the claims, shows that Becker and Claimants made the

representations with the intention that the DHECC act upon them.  The DHECC relied on

the misrepresentations as seen through the eligibility notices to Claimants, and the DHECC

suffered injury as Becker and Claimants' false representations significantly inflated their

claim awards.

In light of the evidence, the DHECC seeks an order compelling Claimants and Becker

to return the payments made on these claim.  The return of these payments will make the

DHECC whole, deprive Claimants and claim preparer of an unjust enrichment, and deter

others from engaging in similar misconduct.  *See* Order & Reasons at 22. Based on

Claimants' and Becker's conduct, they should be held liable for the full amount paid by the

DHECC.

2.     Claimants and Becker Should Make Restitution to the DHECC
        Based on Misrepresentations of Monthly Financial Documents

The evidence shows that Claimants and Becker presented false information to the

DHECC to obtain compensation for Claimants and for Becker's fees.  They provided the

DHECC with false information and P&Ls showing annual amounts consistent with federal

tax returns created solely to support the claim, and in which the monthly revenue and

expense amounts were manipulated to increase the DHECC award.

Claimants and Becker failed to use contemporaneous records, based upon which

they had to know that the P&Ls were false and would be provided to and relied upon by the

DHECC in determining the claim.  Becker holds an obligation to those he actually knew

would rely on the misrepresentation in the claim accounting work.  *First National Bank of*

*Commerce v. Monco Agency Inc.*, 911 F.2d 1053, 1060-62 (5th Cir. 1990) (endorsing

application of misrepresentation standard for accountants under Louisiana law and Section

552); Restatement (Second) of Torts § 552 (providing liability for those who fail to exercise

reasonable care and, as a result, supply "false information for the guidance of others in their business transactions" and thereby cause a pecuniary loss).

Unlike cases where privity between the accounting work and the end user may be more remote, Becker prepared the accounting work specifically for presentation to the DHECC to induce payment of the claim.   Becker owed a duty of presenting accurate financial information to the DHECC, an entity charged with safeguarding a Trust benefitting those harmed by the spill.  *See United States v. Arthur Young & Co.*, 465 U.S. 805, 818 (1984) (accountants hold a "public watchdog" function that "requires complete fidelity to the public trust").

3.      Becker Should be Held Liable for 100% of the DHECC Loss, <u>In Solido with the Claimants</u>

In other clawback actions, the Court has ordered restitution in the first instance primarily against the claimant(s) to whom or for whose account the DHECC payment was made as a result of the claimant's fraudulent acts.  However, the Court has also previously imposed solidary liability upon claims preparers, attorneys or other third parties (even those whose fault was not apparent), to the extent they were "enriched" by contingency fee payments derived from the claimants' payment awards.  As the Court has noted, the restitution payments would be appropriate even without any wrongdoing or fault since the purpose of restitution is not to punish wrongdoing but to effect recovery of what was incorrectly and unjustifiably paid, in implementation of the Court's "well-recognized equitable power to devitalize a fraudulently obtained result".[13]

---

[13] Order & Reasons on Motion of the Special Master for Return of Payments Made to Casey Thonn and Others (Rec. Doc. 12794)

The DHECC paid Claimants $313,600.42, including $98,447.10 to James Aurelio, $91,002.01 to Outpost Marine, $41,654.25 to Theodore Wheeler, $46,993.95 to Stephen Ferrara, and $35,503.11 to Carol Nelson.  As claim preparer, Becker received a portion of each claimant's award, totaling $61,720.08 – plus a $1,000 claims preparation fee for each Claimant.  Becker not only profited from the Claimants' DHECC awards, but Becker also actively participated in the fraud upon the DHECC resulting in the payments made to Claimants.  Thus, this Court can and should order Becker to restore to the DHECC not only the amounts Becker actually received for services performed, but the entire amount of the loss suffered by the DHECC as a result of Becker's fraud - regardless of the amount of actual benefit – *in solido* with the Claimants.

This very Court has found a non-claimant jointly and severally liable for the full award amount with the claimant.  *See* Crystal Order.  Based on evidence presented by the DHECC in Crystal that shareholders Victor and Chris Tran actively participated in obtaining an inflated award for Crystal Seafood, Inc., the Court found it appropriate to pierce the corporate veil, holding each individual jointly and severally liable for the full award amount, regardless of whatever direct benefit each may have received based on percentage share.  *Id*, at 9, 10.  Here, as Becker actively participated and caused, through fraudulent claims preparation, each inflated award amount, Becker should be held liable for each full award amount, not solely for any lesser amount received directly by the company.

There is also additional substantial authority addressing whether a restitution order against a party committing fraud should be (a) limited to the amount or benefit actually received by that party, or (b) measured by the amount of loss suffered by the payor as a result of that fraud in the context of SEC civil enforcement actions.  For example, in *SEC v.*

*Contorinis*, 743 F.3d 296 (2d Cir. 2014), an insider trading case, the Court ordered the offending party to disgorge not only the profit he personally gained, but also all profits generated from his fraudulent actions.

As the *Contorinis* court noted in its footnote 5, there was earlier Fifth Circuit precedent that limited a violator's disgorgement to the amount of the fee actually received because anything above that would be considered a penalty assessment and thus be beyond the restitution remedy. *SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978). Though *Blatt*'s rationale was followed by the Southern District of Texas in 2010, *SEC v. Gunn*, 2010 WL 3359465 (N.D. Tex. 2010), and by the Northern District of Georgia in 2015, *SEC v. Megalli*, 2015 WL 9703789 (N.D. Ga. 2015), since *Blatt* - though without citing or addressing Blatt - the Fifth Circuit has appeared to order disgorgement in amounts exceeding the amounts to which the party committing the fraud actually benefited in two unreported[14] decisions. *See*, *SEC v. Halek*, 537 Fed. Appx. 576 (5th Cir. 2013); *SEC v. United Energy Partners, Inc.*, 88 Fed. Appx. 744 (5th Cir. 2004).

We recognize that the rules applicable to SEC enforcement actions, where deterrence is the key objective, may differ from actions between private parties. *See*, *SEC v. Tome*, 833 F.2d 1086, 1096 (2nd Cir. 1987); *SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, n. 24 (D.C. Cir. 1989). However, the rationale of cases like *Contorinis* is fully consistent with the Court's equitable power to fashion an appropriate restitution remedy, and is consistent with the Restatement of Restitution. As the introductory note to the "Measure of Recovery" topic of the *Restatement (First) of Restitution* I 8 2 (1937) recites:

> "In such cases [where the amount of gain may differ from the amount of loss] the
> measure of restitution is determined with reference to the tortiousness of the

---

[14] Under FRAP 32.1(a)(1), there is no prohibition against citing unreported decisions.

defendant's conduct or the negligence or fault of one or both of the parties in creating the situation giving rise to the right of restitution. **If the defendant was tortious in his acquisition of the benefit, he is required to pay for what the other has lost although that is more than the recipient is benefited**" [emphasis added].

*See also*, *Halladay v. Verschoor*, 381 F.2d 100, 113 (8th Cir. 1967) (allowing restitution recovery to the extent of the loss).

Furthermore, should the Court have any pause in casting Becker in judgment, *in solido* with the Claimants, for the full award based on an unjust enrichment/restitution analysis, there is ample alternative authority to do so.  Notwithstanding any issue of unjust enrichment/restitution, Becker patently committed the intentional tort of common law fraud against the DHECC, causing it foreseeable damages beyond any benefit it might have received.  As comment b to a later version of the Restatement recognizes:

> "With few exceptions, a claimant entitled to a disgorgement remedy in restitution might instead recover compensation for the injury caused by the defendant's tort or other breach of duty.
>
> Restatement (Third) of Restitution and Unjust Enrichment § 3 (2011).

This Court has already applied the elements of common law fraud as the predicate to its prior restitution orders, and the Court has those elements as recently adopted by the 5th Circuit in *Zirlott* and this Court in its *Crystal* Order before it in the instant motion.  (*See* p. 13, *supra*).  Those same elements are applicable to the intentional tort of fraud.  All of those elements are satisfied as to Becker, as previously set forth above.

Once the Court concludes that the DHECC's right to restitution is established under the Rule 56 summary judgment standard, the same standard should be satisfied for tort

purposes since that alternative cause of action would be based on the same facts - rendering Becker liable for all foreseeable tort damages.[15]

For these reasons, Becker should be cast in judgment for the full $313,600.42 the DHECC paid to Claimants.

4.      Claimants Should Make Restitution to the DHECC for
        <u>Amounts Overpaid because of the Misrepresentations to the DHECC</u>

Claimants may argue that Becker is responsible for the misrepresentations to the DHECC.  However, restitution is an equitable remedy that deprives a party of a benefit that in good conscience he ought not to keep, even though he may have received those benefits honestly in the first instance.  *Schock v. Nash*, 732 A.2d 217, 232-233 (Del. 1999); Order & Reasons on Special Master's Motion for Return of Payment at 20-21 & n.15 (Doc. Rec. 12794).  Whether or not Claimants knew of the misrepresentations made to the DHECC in connection with their claims, they nevertheless have been unjustly enriched through the misstatements.

The Claimants' fault or lack thereof, however, is not relevant to the obligation to make restitution of a payment not owed.  Had Claimants' provided accurate information and financial data, Claimants would have received only a fraction of the payment from the DHECC.  If Claimants were allowed to keep claim payments when such payments were not owed to them, Claimants would be unjustly enriched.

---

[15] Conversely, there should not be any requirement to file a separate complaint to allege fraud, or any proscription against combining restitution claims with fraud claims, where based on the same underlying facts.  As this Court has already explained in its *Thonn* decision, "the filing of a separate complaint has not historically been required when the movant seeks to reverse a judgment obtained through fraud", and relief can be granted by motion.  Thonn Order, at 15 (Rec. Doc. 12794).  Moreover, joinder of a restitution claim and an alternative tort claim is clearly permitted under FRCP 18.

Thus, Claimants should make restitution to the DHECC of the payments received on their claims based on the misrepresentations, less fees retained by Becker.

5.      The Court Should Order the Return of All Funds Received
        By Professionals Who Assisted Claimants to Submit False Claims

The professionals who helped Claimants with their BEL claims also should return any payments they received from those claims. *See* Order & Reasons at 26, *SEC v. Blatt*, 583 F.2d 1325, 1335-36 (5th Cir. 1978). Money paid by contingency fee arrangements may be recouped through restitution where the client's judgment is reversed or voided. *See Mohamed v. Kerr*, 91 F.3d 1124, 1126 (8th Cir. 1996); Order & Reasons at 22-23. Because no fee is due, retaining a payment made on a contingency fee contract under such circumstances would be an unjust enrichment. *Id.* at 24. Whether these professionals knew of the falsity of Claimants' BEL claims is immaterial to their duty to make restitution of sums that have been received as a result of these improper claims. Order & Reasons at 23; *Schock v. Nash*, 732 A.2d 217, 232-33 (Del. 1999).

Here, Claimants' lawyers who are identified in Exhibit B and who were to receive a 5% contingency fee (excluding fees owed to Becker) and Becker each received a percentage of the awards paid to them for their BEL claims based upon contingency fee contracts.  The contingency fees would not have been payable to these lawyers or Becker if the DHECC had not paid Claimants' fraudulent claims. The lawyers' contingency fees should be returned to the DHECC, and only in the alternative event that this Court does not find Becker responsible to return the full amount awarded to the Claimants, Becker should return a minimum its fees received in contingency and otherwise.

**E.  _Conclusion_**

For the reasons stated, the DHECC seeks entry of a judgment requiring Becker to make restitution to the DHECC for $313,600.42, and _in solido_ with him by the Claimants as follows:  $98,447.10 by Aurelio, $91,002.01 by Outpost Marine, $41,654.25 by T. Wheeler, $46,993.95 to Ferrara, and $35,503.11 to Nelson. Any other professionals who benefitted from these awards should also be found liable, also in solido, to the extent of any contingency fees they may have received, all up to a total recovery by the DHECC of $313,600.42.

Respectfully submitted,

Patrick Juneau
Claims Administrator

By:  ___/s/  Kevin Colomb_____
Kevin Colomb
Manager of Compliance and Internal Integrity

Dated:  November 23, 2016