# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on April 20, 2010 | MDL No. 2179 |
| | SECTION: J |
| This document relates to: | JUDGE BARBIER |
| Relevant Civil Actions Nos. 13-1971; 14-1525; 10-8888 Doc No. 133248; 10-9999 Doc. No. 401 | MAGISTRATE WILKINSON |

## JOINT VENTURE ATTORNEYS' OPPOSITION TO MOTION FOR FEES

NOW INTO COURT come the "Joint Venture Attorneys"[1] hired to represent the Edward Wisner Donation ("Wisner" or "Donation") and respectfully submit this Opposition to Motion for Attorneys' Fees filed by Waltzer, Wiygul & Garside, LLC, ("WWG") [Rec. Doc. 21922].[2]

WWG does not have a right to any *additional* attorney fee, whether by contract, *quantum meruit*, or equity for three reasons: (1) the Trustee never approved or executed WWG's contingency agreement; (2) the Trustee never waived WWG's conflict of interest; and (3) WWG

---

[1] These Joint Venture Attorneys (sometimes referred to as the "Joint Venture" or "Joint Venture Team") include the following five law firms: Herman Herman & Katz; Fayard & Honeycutt; Fred L. Herman; Leger & Shaw; and Domengeaux Wright Roy Edwards & Colomb.

[2] Although the Donation is named as a "Defendant" to WWG's Intervention, the true party in interest with respect to WWG's Motion is the Joint Venture Team.  Additionally, while the Joint Venture Team was hired to represent the collective interests of the Donation and its beneficiaries viz-a-vis BP and the other *Deepwater Horizon* Defendants, even after the Donation technically expired, (*see, e.g.,* HERMAN DECLARATION ¶¶10-12 (and Exhibits thereto)), the formal legal status of the former Donation is subject to potential question or dispute.   Therefore, and in any event, this Opposition is filed on behalf of the Joint Venture Attorneys, as the parties-in-interest, and not on behalf of the City of New Orleans, the Wisner Donation, or the Mayor, as Trustee.

was already paid its hourly rates and reimbursed any expenses for legal services performed BEFORE the Joint Venture replaced them.[3]

In addition, the Joint Venture, unlike WWG (which, in addition to being compensated on an hourly basis, had no responsibility to advance litigation costs), advanced almost a million dollars in litigation expenses, and conducted the discovery, expert, and other witness preparation work in advance of trial.   The Donation has already paid WWG hundreds of thousands of dollars, working under a conflict of interest, and under a contract that was never formally approved by the Trustee, without any risk or responsibility for payment of expenses.   Consequently, WWG's motion should be entirely denied without any award for an additional fee.

### Preliminary Statement

At the September 15, 2016 status conference, the Court informed the parties that the fee dispute would be handled on the briefs without discovery pursuant to Local Rule 54.2.   No party objected.   [Rec. Doc. 21679]   Instead, on October 17, 2016, WWG's lawyers submitted a public records request to the Donation, requesting records dating back to 2007, (*i.e.* five years before the Joint Venture was hired).   *Public Records Request*, attached as Exhibit "1".   The five page, single-spaced letter requests documents far ranging and vague, demanding copies of all agreements ever signed by certain Donation employees.   *Id.*

A Donation employee spent many hours over five to seven days to respond to this request. Ultimately, the Donation produced thousands of pages of documents.   After demanding so much from its former client, WWG's lawyers do not even bother to cull the documents to find what was

---

[3] *See, e.g., Declaration of Steve Herman*, at ¶¶18-19 (and exhibits thereto).

relevant or proper to this dispute, instead dumping almost 1,000 pages of documents into the Court record as attachments to its motion.   *See Declaration of Dylan Leach, Exhibit 6 to WWG Motion for Fees*, at 1-762 [Rec. Doc. 21922-6].

Such an affront to process, this Court's direction, and to any measure of efficiency, should be struck from the record.   This Court instructed the parties to address WWG's intervention through Local Rule 54.2, requiring little more than a declaration from the lawyers and support for any fees or costs.   Conducting discovery on the opposing party through a public records request undermines this Court's authority.[4]

## I.      Brief Factual Statement.

The Donation, through the Trustee, settled all of its BP-related claims earlier this year for $30 million to be paid out in 22 payments over 21 years.[5]   *Release*, at ¶ 2, attached as Exhibit "2".   The first payment of $5 million was made in October 2016.   $2,160,011.92 has been placed into the registry of the Court, representing a 25% fee ($1,250,000 less deduction for prior BP payments of $17,161.20) and $927,173.12 in litigation costs.   [Rec. Doc. 196]   The Release was signed by the Mayor as the claimant and by Stephen Herman as counsel.   *Release*, at ¶ 25.   No

---

[4] WWG also attached two questionable declarations.   The first is from a former Donation employee, Cathy Norman, who admittedly was paid by WWG after she left her employment with the Donation.   *Declaration of Cathy Norman*, at ¶ 61 [Rec. Doc. 21922-4].   She performed BP related work on behalf of WWG.   *Id.*   While she states that she was not paid for writing the Declaration, she fails to disclose how much she was paid by WWG and whether she is still working for them.   Her declaration discloses attorney client communication between the lawyers and the Donation, internal privileged communication during special sessions, and settlement communications.   *Id.* at ¶¶ 49-59. As a trained lawyer, Ms. Norman should have requested authorization from her former employer before unilaterally disclosing communications – a privilege that belongs to her former employer, not her.   The second declaration is from Michael Peneguy, a Wisner beneficiary with less than a 2% interest in the Donation, which was originally filed under seal as support for one of his frivolous bar complaints against the Joint Venture.   [Rec. Doc. 21922-5]   Judge Barbier and the Eastern District dismissed the complaint, though it is unclear whether his declaration was ever unsealed.

[5] Claims against TransOcean and Halliburton for punitive damages were reserved.

beneficiary objected to the Settlement.

The Joint Venture spent thousands of attorney hours, reviewed 100,000s of documents, took 36 depositions, traveled across the country, and spent almost $1 million in out of pocket expenses litigating the case. *Declaration of Soren Gisleson*, at ¶¶ 14-26, attached as Exhibit "3". The settlement in principle was reached one week before the March 7, 2016 trial date.

Before it filed and litigated No. 14-1525 in June 2014, the Joint Venture spent 23 months engaging in administrative oversight of the clean-up operations of the Donation's Property. *Id.* at ¶¶ 5-13. These administrative activities included overseeing two experts and an investigator (and his team) monitoring the clean-up efforts on Fourchon beach. The Joint Venture met with BP, the Coast Guard, and its own team to ensure the best, most responsible clean-up methods were employed. The Joint Venture also reviewed, preserved, and developed its own data, testing, and evidence which was later used for litigation purposes.

The Joint Venture's contract with the Donation and signed by the Trustee provides for a 25% fee for the first $10 million and an 18% fee for the remaining $20 million of the settlement. *Joint Venture Contract*, at ¶ 4(c) [Rec. Doc. 21922-9]. These percentages apply because some of the Donation's claims "for physical damages and restoration costs" were scheduled for trial through the Access Agreement dispute in No. 14-1525.[6] The litigation costs and relevant back-up were provided to the Trustee, through the City Attorney, months ago who is currently undergoing a review as to reasonableness. A separate application for payment of costs in the

_____

[6] Many of the claims for physical damages and restoration costs under the Access Agreement were inherently intertwined with the claims for physical damages and restoration costs under OPA and the general maritime law. While a separate (though largely duplicative and overlapping) trial for Wisner Donation-specific physical damages and restoration costs under OPA and the GML had not yet been formally scheduled, BP's liability under OPA and the GML was tried, by the Joint Venture Attorneys and other Common Benefit Attorneys, in two phases, in 2013.

registry of the Court will be made after the Trustee's representative makes a decision.

The Donation's BP claims were first handled by WWG for 23 months.   On September 28, 2010, the Advisory Committee for the Donation voted by Resolution to retain WWG, and a Donation employee Cathy Norman signed the WWG Agreement.   The Trustee of the Donation, the Mayor of the City of New Orleans, refused to sign the WWG Agreement.   *Declaration of Cathy Norman*, at ¶¶ 31-33[Rec. Doc. 21922-4].   In 2011, the City Attorney at that time, Mrs. (now Judge) Jolivette Brown, sent a letter stating that WWG's agreement was "null and void" because it was not signed by the Trustee and failed to obtain the Trustee's consent.   *LTR Nannette Joliette Brown to Susan Clade*, at 1 (2/16/11), attached as Exhibit "4".

WWG, among other things, had a conflict of interest with respect to the City of New Orleans, which was not only a beneficiary of the Donation but whose Mayor served as the Donation's Trustee.   Specifically, WWG had sued the City of New Orleans in *Doretha Walker v. AMID/Metro Partnership, LLC*, No. 2007-14794 (C.D.C.).   Neither the Mayor (as Trustee of the Donation) nor the City itself provided a formal, valid, informed, signed waiver to WWG.   To this day, the conflict has not been validly waived by both the City of New Orleans and the Donation thru the Trustee.

WWG acted on the Donation's behalf for approximately 23 months engaging in the same administrative oversight the Joint Venture performed before the Joint Venture filed suit.   WWG oversaw the same experts, conferred with the same investigator, and met with BP and Coast Guard representatives to perform the same functions as the Joint Venture lawyers for the same amount of time – 23 months.

The Donation never re-entered into any agreement with WWG for legal services after voting for the Joint Venture to replace them.   WWG was later hired by some Wisner heirs pursuant to a separate contingency fee agreement.   *Declaration of Joel Waltzer*, at ¶ 70.   At all times the Joint Venture contract signed by the Mayor, as Trustee, and with the consent and approval of a majority of the Advisory Committee, is the only viable contract since 2012 to represent the Donation's interests.

## II.   In Addition to the Absence of Approval by the Trustee, WWG Was Never Subject to a Public RFP Process in Connection with Macondo Spill related Claims.

Even assuming *arguendo* that Ms. Norman had apparent authority to enter into the WWG contingency fee agreement on behalf of the Advisory Committee, WWG has not established that the contract was actually approved by the Trustee.   Indeed, to the contrary, Ms. Norman attests that the Trustee refused to sign the contract.   *Declaration of Cathy Norman*, at ¶¶ 31-33 [Rec. Doc. 21922-4].

The Trustee had represented to Joint Venture members that at least part of his concern stemmed from the fact that the City issued an RFP for Macondo Spill related work, and the Joint Venture Team, not WWG, was selected.   Courts have held, in this regard, that the Donation, the Advisory Committee, and the Mayor are all public entities that meet the definition of a "public body" and, as a result, are subject to open meeting laws.   *In re Edward Wisner Donation*, 150 So.3d 391, 401-02 (La. App. 4th Cir. 2014) ("[I]t is glaringly obvious that the Advisory Committee meets the definition of a public body.").

In general, therefore, the hiring of counsel should be subject to a public bid process.   *Block Const., LLC v. Recreation & Park Comm'n for Par. of E. Baton Rouge*, 2015-1323 (La. App. 1st

Cir. 4/15/16) ("The Public Bid Law requires that all public work done by a public body be advertised for competitive bids and be awarded to the lowest responsible bidder who bid according to the contract, plans, and specifications as advertised.").   *See also* LA. REV. STAT. § 38:2211.

As recently as October 2016, the District Court held that the Donation was public:

The Wisner Donation appears to be a public or quasi-public entity.   The City's website lists the Edward Wisner Donation Advisory Committee under "Boards and Commissions." The Mayor of New Orleans serves as its trustee, and the *Advisory Committee was created and is subject to oversight by the New Orleans City Council*. The City itself is one of the primary beneficiaries of the trust. For these reasons, the Court finds that the confidentiality order issued by Judge Shushan should be amended.

*In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010*, at 2, MDL 2179 (emphasis supplied) [Rec. Doc. 21852].

WWG's contract was not publicly let and was not signed by the Trustee, the Mayor for the City of New Orleans.   *WWG Contingency Contract*, at 3.   Instead, it was signed by the then Wisner employee Cathy Norman who acted as the Secretary/Land Manager.   *Id.*[7]   Indeed, the City Attorney at that time, Mrs. (now Judge) Jolivette Brown, sent a letter objecting to Ms. Norman's unilateral "hiring" of WWG:

[The Trustee] has not executed any contracts or other agreements on behalf of Wisner recently because, in a meeting with Cathy Norman on September 27, 2010, she unequivocally advised us that she did not need the Mayor's signature or approval on any matter involving the Wisner Trust and would proceed without us. She demonstrated her resolve, we are advised, by entering into an agreement for legal services with a group of lawyers to represent Wisner in a matter involving the

---

[7] By contrast, the Joint Venture Team had already competed with WWG and numerous other law firms and joint ventures of firms when the City of New Orleans issued an RFP in connection with its *Deepwater Horizon* related litigation. As expressed to the Joint Venture Attorneys when they were hired in 2012, the Mayor therefore − and because of the conflict of interest − and/or perhaps for other reasons, believed that it was more appropriate that the Joint Venture represent the collective interests of the Donation.   With approval and consent of a majority of the Donations' Advisory Committee, WWG was discharged, and replaced by the Joint Venture Team. *See generally* HERMAN DECLARATION ¶¶ 6-9.

BP Oil Spill.   *Despite those actions, we consider that agreement null and void*.

*LTR Nannette Joliette Brown to Susan Clade*, at 1 (2/16/11) (emphasis supplied).

By circumventing the Trustee, WWG attempted to avoid a conflict of interest stemming from a WWG suit against the City.   The Trustee never waived that conflict and, as a result, (as well as for other reasons), no fee beyond what has already been paid to WWG is due.

## III.   WWG Has Not Established that Its Conflict of Interest Was Formally Waived by Either the City or by the Donation through its Trustee.

At the time WWG signed the contingency fee agreement with the Donation, it had a conflict with the Trustee.   WWG had sued the City of New Orleans in *Doretha Walker v. AMID/Metro Partnership, LLC*, No. 2007-14794 (C.D.C.).   With the Mayor as Trustee and the City of New Orleans a beneficiary, the suit created a conflict of interest.

While it is true that at some point the City Attorney sent an email to WWG stating that <u>the City</u> *intended* to waive the conflict, no written waiver was ever drafted or signed by the City – nor was any formal waiver executed (or, based on the current record, even informally approved) by <u>the Donation</u>, through its Trustee.   In response to the Donation's email acknowledging WWG's "conflicts with the City of New Orleans" and asking whether they have been resolved, the City Attorney wrote:

> I will waive any conflicts.   I would like to get together to strategize.   *I am putting out an RFP next week.*   I think we should coordinate our efforts if we can.

*07/07/10 EMAIL from Jolivette-Brown to Norman*, at 1 (emphasis supplied), attached as Exhibit "5".

No written, signed waiver was ever executed.[8]   Rule 1.7(b)(4) of the Rules of Professional conduct allow for waivers of conflict of interest in writing and fully disclosed.   *See Douglass v. Valteau*, No. 05-CA-662, 2005 WL 1431510, at *2 (E.D. La. 2005) (Wilkinson, M.J.) (emphasis in original) ("informed consent must be given *in writing*").   "Informed consent" is defined by Rule 1.0 as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."

The duty of full disclosure is owed by the conflicted attorney, even when his clients are also sophisticated attorneys or businessmen.   *See Hodges v. Reasonover*, 103 So. 3d 1069, 1077-78 (La. 7/2/12) (rejecting the attorneys' argument that full disclosure was not necessary because the clients were sophisticated business people who understood the effects of the agreement).   The above email, in and of itself, fails informed consent – it was sent to merely a Donation employee, and there is no evidence in the record that WWG discussed or explained the conflict, the material advantages or disadvantages of granting consent, or the implications of common representation, such as possible effects on loyalty, confidentiality and privilege, much less whether any other firm(s) were capable of comparable representation.

Three months elapsed between when the City Attorney sent the above email and when the client agreement was actually signed by Ms. Norman on October 4, 2010.   WWG attempted one final effort to obtain a waiver from the City.   WWG clearly understood that a waiver from the

---

[8]  In response to this email, Donation staff asked for clarification as to whether WWG needed to participate in the RFP.   *07/20/10 EMAIL from Philips to Nanette-Brown*, at 1, attached as Exhibit "7" (emphasis supplied) ("Is the RFP for outside counsel for the City and the City's suit against BP?   *Or is it for Wisner's hiring outside counsel in the BP matter?*").   No response can be found to this email.

9

City to WWG had *not* been perfected and so WWG sought to incorporate the waiver directly into their contingency agreement which reads:

> The Donation acknowledges that W&W represents plaintiffs in cases in which the Trustee City of New Orleans is a defendant, including a class action entitled *Doretha Walker et al v. AMID/Metro Partnership, LLC*. . . .   All members of the Donation's committee considered this potential conflict, had the opportunity to consult with outside counsel and determined to waive any potential conflict of interest this may create, including the City of New Orleans.

*WWG Contingency Agreement*, at ¶ 9.

However, when Ms. Norman sent the attorney client contract to the Trustee for his signature, the Trustee refused to sign.   *Norman Declaration*, at ¶¶ 29-32.   The Trustee's explicit refusal to sign the agreement, coupled with the City Attorney's 2011 letter expressly repudiating the contract, clearly expresses a refusal to waive the conflict.[9]   Only the City can waive its own conflict; the Donation cannot waive it any more than the City could waive a conflict for LSU, Tulane, the Salvation Army, or any other beneficiary to the Donation.[10]

To this day, neither the City nor the Donation have ever waived WWG's conflict of interest. As a result, WWG is not entitled to an *additional* fee beyond what has already been paid or for any work performed after WWG was terminated.

**IV.   WWG has no right to *additional* fees for work performed BEFORE or AFTER the Joint Venture replaced them because WWG has been fully compensated and the Donation never re-hired WWG.**

---

[9]   Ms. Norman appears to make a couple references in her declaration about being told of the waivers of a conflict of interest in different contexts.   Ms. Norman appears to fail to understand that she was a Donation employee. WWG (not Ms. Norman) should have secured formal written waivers, signed by an authorized representative of the City and by the Donation's Trustee.

[10]   Putting aside the issue of who has authority to hire counsel for the Donation, neither the Donation nor the other beneficiaries can waive a conflict of interest on behalf of the City.   WWG should have likely stepped aside, in recognition of its ethical obligations to, if not the Donation, than the City.

10

Even assuming that it is possible to get past the failure of WWG to obtain approval from the Trustee, engage in an RFP process, or obtain an informed written waiver from both parties, the traditional *quantum meruit* analysis under *Saucier* does not yield a traditional dispute.   WWG and the Joint Venture engaged in two radically different types of work.   WWG assisted a Donation employee in drafting an Access Agreement and administratively supervised two experts and an investigator perform work and oversight within the experts' areas of expertise.   The one time WWG did go to Court was to get the Donation reimbursed for payments to these experts.

On the other hand, the Joint Venture lawyers not only performed that same function from 2012-2014 but fought like dogs from 2014-2016 in court as lawyers do – spending upwards of $1 million, taking 36 depositions, traveling across the country, reviewing 100,000s of documents, and preparing for a trial that settled the week before.   WWG did none of that during its administrative oversight.   The two types of activities are hardly comparable.

WWG now claims (for the first time in its motion) that it is due compensation for work performed *post*-termination.   WWG is abjectly mistaken – its own lawyer represented to the Joint Venture in writing that the Complaint does not contain such a request for relief, the Joint Venture are the only lawyers who ever had the contractual right to represent the Donation even after the Donation ended, and WWG's contingency contract with the Wisner family is the proper place for WWG to seek payment for any post-termination activities.[11]   WWG is not entitled to any compensation for any work it alleges to have performed post-termination.

---

[11] *See generally Declaration of Stephen Herman*, at ¶¶ 11-12, 18-19 (and Exhibits thereto) attached as Exhibit "8".

A. **WWG has no right to claim fees for any alleged work performed *post-termination*.**

Before delving into an analysis of traditional considerations for fee divisions, there first needs to be a clear temporal line for when WWG can claim compensation for any alleged work. WWG is not entitled to any fees for any work performed after it was replaced by the Joint Venture for three simple reasons:  (1) WWG's lawyer admitted in an email to the Joint Venture lawyers that its Complaint did not seek a recovery for any post-termination work; (2) the Donation, through the Trustee or otherwise, never rehired WWG to perform any work on its collective behalf (nor could it with its conflict of interest); and (3) WWG's new contract with the Wisner family post-termination provided for its own payment obligations.

First, WWG's lawyer admitted in communication with the Joint Venture that WWG's Complaint does not include a request for compensation for any work performed post-termination. Stephen Gele wrote:   "Waltzer Wiygul & Garside LLC did not allege in its *Complaint* that Waltzer Wiygul & Garside LLC seeks fees for services provided after termination." *10/04/16 EMAIL from Stephen Gele to Stephen Herman*, at 1, attached as Exhibit "6".

Mr. Gele is correct.  The Complaint does not allege a claim for post-termination work. *Complaint for Attorneys' Fees*, at 1-4 [Rec. Doc. 21585].  The 11 paragraph complaint merely discusses WWG's retention, alleged work performed pre-termination, replacement, and no mention of anything post-termination.   No facts or legal theories are offered that would support a claim for any compensation for alleged post-termination work.   The Complaint's prayer for relief similarly contains no request for compensation for work performed post-termination.[12]

---

[12] WWG appears to place importance on a letter sent by the Joint Venture to the different beneficiaries informing

Second, the Donation never re-hired WWG.   This means that that WWG never had any contractual authority to perform any work on behalf of the Donation or the Trustee.   At no time, did the Joint Venture lawyers ever enter into a contractual relationship with WWG to share fees or costs.   The only fee agreement in effect is signed by the Donation and the Trustee and remains the one with the Joint Venture lawyers.   The Donation has never authorized entering into a new contractual relationship.[13]

"In order for an attorney to claim a contingency fee, the attorney must have a written contingency fee contract with the client."   *LeBlanc v. Appurao*, 138 So. 3d 1, 5 (La. App. 1 Cir. 2/13/14), *writ denied*, 2014-0498 (La. 4/17/14), 138 So. 3d 632.   *See also Dereyna v. Pennzoil Exploration,* 880 So.2d 124, 127 (La. App. 3rd Cir.8/4/04), *writ denied,* 888 So.2d 197 (La.11/19/04).   Rule 1.5(c) of the Louisiana State Bar Association Rules of Professional Conduct states, in pertinent part, "A contingent fee agreement shall be in a writing signed by the client." State Bar Articles of Incorporation, Art. 16, Rules of Prof. Conduct, Rule 1.5(c).

Tellingly, only WWG is seeking any kind of fee for any alleged work performed after it was terminated even though each beneficiary enrolled separate counsel as a precautionary measure.   Pacer shows that each beneficiary enrolled separate counsel after dissolution:   LSU

---

them that, out of an abundance of caution, they may wish to join separately into the lawsuits.   *07/22/14 LTR from Gisleson to Michael Peneguy*, attached as Exhibit 9 to *Waltzer Unredacted Declaration* ("Please note that the "Edward Wisner Donation" will remain as a plaintiff and that Joint Venture counsel will amend the Complaint to add the trustee . . . as an added assurance that all rights are protected.").   At no point was the letter intended, nor was it represented, that the Joint Venture ceased to represent the Donation's collective interests but rather as a reflection that with the dissolution of the legal entity of the Donation came uncertainty in the structure of the donation and how future decisions may be made.   Adding all beneficiaries individually into the lawsuits provided a separate level of protection and notice to each beneficiary when future decision making was unclear. At no point during the last two years has any beneficiary claimed that the Joint Venture does not represent its interests in the Donation in the BP litigation.

[13] Dissolution of the Donation does not equate to dissolution of the Joint Venture attorney-client contract signed with the Donation and Trustee.   Nor does WWG argue this.

and Tulane enrolled John P. Murrill of Taylor, Porter, Brooks & Phillips, LLP, the Salvation Army

enrolled Matthew James Fantaci of Carver, Darden, Koretzky, Tessier, Finn, Blossman & Areaux,

LLC, Catholic Charities enrolled Suzie Zerangue of Couhig Law Partners, LLC, and the Wisner

heirs retained WWG.   But, as this Court has previously held, and to which no beneficiary has

objected, these additional parties were added to the case in a nominal capacity only:

> The remaining plaintiffs are nominal, derivative plaintiffs whose interests in the
> Wisner Donation are passive at best.   They are named as plaintiffs – not because
> they have any actual role in or knowledge of the limited contractual transaction
> from which the claims and defenses in this case arises – but for technical reasons
> related to the nature of the principle plaintiff, the juridical entity known as the
> Wisner Donation.

*Edward Wisner Donation v. BP Exp. & Prod., Inc.*, No. 14-1525, at 2 [Rec. Doc. 128].[14]  *See also*

*Declaration of Stephen Herman*, at ¶¶ 10-12.

The same is true that *quantum meruit* will not be available for a discharged lawyer if there

is no agreement.   *Gulfstream Servs., Inc. v. Hot Energy Servs., Inc.*, 907 So. 2d 96, 100 (La. App.

1st Cir. 3/24/05), *writ denied*, 904 So. 2d 706 (La. 6/17/05) ("After finding that no agreement

existed in this case, the trial court could not use contractual *quantum meruit* as the basis for its

award.").

Third, while WWG may have done something after being replaced by the Joint Venture,

that work was performed pursuant to the attorney-client contract WWG had with its new clients

the Wisner heirs:  "*I was hired by the Wisner Family on a contingent basis after the trust*

---

[14] If WWG actually believed that it separately represented the interests of the Donation as it relates to the Wisner beneficiaries, it provided deficient involvement.   WWG only attended approximately 3 out of 36 depositions. WWG did not review any documents produced in discovery through the document review system established by HHK. WWG did not draft or involve itself in any pleadings or motion practice, other than responding to a motion to compel on behalf of its separate clients – which it lost.   WWG did not travel to any other city but Houston and only on one occasion.   WWG was not involved in any trial preparation, trial strategy, or settlement negotiations with the court appointed Neutrals.

*terminated*, so I did not keep time sheets for this work." *Declaration of Joel Waltzer*, at ¶ 70 (emphasis supplied).   Any fee WWG believes it is due for work performed post-termination should be due from this new contingency contract with the Wisner heirs.   *See Block v. Bernard, Cassisa, Elliott & Davis*, 927 So. 2d 339, 349 (La. App. 1 Cir. 11/4/05) (decrying scenarios where a lawyer would receive double payments for the same work).

        **B.**     **WWG has no right to *additional* fees for work performed BEFORE termination.**

The Donation paid WWG 100% of its time for work WWG performed before the Joint Venture.   The Donation also paid all costs and expenses related to the litigation.   In other words, WWG was playing risk free with the house's money – it had a guarantee that the Donation would pay all fees, costs, and expenses related to BP.   If BP refused to pay, or delayed payment, the Donation was on the hook, while WWG received full compensation.   The work WWG did perform was primarily administrative in nature and amounted to managing experts as they performed testing and analyses over the cleanup.

The Louisiana Rules of Professional Conduct outlines factors to consider for a reasonable attorney's fees that bear upon a division between predecessor and successor counsel:

> (1)   The time and labor required, the novelty and difficulty of the of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitation imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.

*Louisiana Rules of Professional Conduct* 1.5(a).

Each of these factors weigh conclusively in favor of a finding that WWG's previous payments of more than $350,000 is more than adequate compensation for its 23 months of administrative oversight over the clean-up efforts.

**1.     WWG's 23 months of administrative oversight of the Access Agreement.**

The first factor of Rule 1.5(a) concerns the length of time worked, the amount worked, and the nature of the work performed.   WWG was voted in as counsel on September 25, 2010 and was replaced by vote on July 31, 2012, a total of 23 months.   *Minutes of July 31, 2012 Meeting*, at 159 [Rec. Doc. 21922-6].   By contrast, the Joint Venture was voted as counsel on July 31, 2012 and continues to represent the Donation in all BP-related matters, including the Halliburton/Transocean settlements.   As such, the Joint Venture representation presently stands at approximately 4 and a half years, or 53 months, and counting.

In its motion, WWG did not submit its timesheets for work performed pre-termination.   It is unclear how many total hours WWG actually worked.   Nonetheless, WWG was paid all of its time on an hourly basis and all of its expenses for the work incurred before being replaced by the Joint Venture.   WWG's agreement provided for a blend of hourly and contingency.   *WWG Agreement*, at 1-2.   The Agreement provided for $365 per hour be paid to Robert Wiygul, $355 per hour be paid to Joel Waltzer, and $265 per hour be paid to Clay Garside.   *Id.* at ¶ 4(a).   While some terms existed to defer these hourly rates under certain conditions, *id.*, Wisner paid the invoices in full, both attorneys' fees and costs.   Ultimately, the Donation paid WWG all of its costs and more than $350,000 in attorney's fees.   *Declaration of Soren Gisleson*, at ¶¶ 11-12.

The Access Agreement, while an important document, became neither the holy grail nor the holy hammer that WWG makes it out to be.   This Court held on multiple occasions that the Access Agreement granted the Donation oversight and control only over the damages caused by clean-up operations and not damage caused by the oil spill itself.   [Rec. Doc. 174, at 7-10]

Even the Access Agreement appears as attributable to a former Donation employee, as it may be to WWG.   The former Donation employee apparently claims ultimate authorship credit for the Access Agreement:

> In order to establish consistent land management practices, I developed an Access Agreement format used to monitor all activity on Donation property.   The Access Agreement was utilized for all companies and individuals operating on Wisner property to insure that guidelines to protect the property from damage were followed.

*Declaration of Cathy Norman*, at ¶ 15.   According to Ms. Norman, WWG did little more than improve upon her work product.   *Id.*

As for the nature of the work performed, WWG's work is best characterized as engaging in the administrative oversight of experts.[15]   Because it was not involved in active litigation, WWG merely oversaw clean-up efforts that ebbed and flowed over their 23 months.   Three professionals were retained by WWG – Dr. John Pardue, an environmental engineer, Jeffress Williams, a coastal geomorphologist, and Forrest Traverica III, an investigator who (along with other members of his team) provided constant boots-on-the-ground presence during cleanup.   Dr. Pardue and Mr. Williams engaged in the heavy lifting of applying their knowledge, experience, and training to the clean-up activities on the property to ensure environmentally responsible

---

[15]  WWG did file a motion for partial summary judgment to collect reimbursements for past work from its experts of which it settled in a general sense.   It was up to the Joint Venture lawyers, however, to engage in the nitty gritty of effecting the settlement through a Neutral process which provided the ultimate means for recovery for the Donation.

17

practices.   Mr. Traverica exercised exceptional endurance by continuously documenting the cleanup activities and raising any concerns through Dr. Pardue and Mr. Williams, the Donation, BP, and even the Coast Guard directly.

The Joint Venture lawyers can confidently explain the nature of WWG's pre-termination work because the Joint Venture lawyers performed the same administrative work for just as long – from July 31, 2012 until suit was filed on June 6, 2014 – 23 months.   The Joint Venture lawyers monitored the clean-up activities, supervised experts, communicated with BP and the Coast Guard, reviewed the documentation that was produced, and attended numerous meetings with all of these parties.  *Declaration of Soren Gisleson*, at ¶¶ 5-13.   While the work was important and necessary, it did not tax the skill, resources, or weight of full blown complex litigation.   While the Donation paid WWG for its 23 months of administrative oversight, the Donation was not directly obligated by the Joint Venture who sought payment directly from BP either through the Access Agreement or through litigation.

The difficulty component of this first factor is clearly contrasted between the 23 months of administrative oversight WWG performed against the 23 months of administrative oversight the Joint Venture lawyers performed followed by another almost two years of intensive litigation until the week before trial.   While the administrative oversight (employed by both WWG and the Joint Venture lawyers) involved supervising an environmental engineer, a coastal geologist, and a private investigator, the scope and breadth of expertise in the litigation expanded to include those three same professionals as well as two economists (one from the University of Oregon and another from Harvard), another geologist, another hydromorphologist, sand remediation expert, three

18

experts in federal response, a land appraiser, and a certified public accountant.   *Declaration of Soren Gisleson*, at ¶¶ 22-23.

While the administrative oversight was limited to what was happening on Fourchon beach, the complexities of the litigation became a fight over the science, the history of the beach, the future of the beach, the nature of the beach, and it was fought from Alaska to Seattle, Portland, Chicago (twice), San Antonio, Texas City, Houston (thrice), Oklahoma City, Mobile, and Boston. *Id.* at ¶ 21.   Joint Venture lawyers documented more than 2,000 hours.[16]   *Declaration of Soren Gisleson*, at ¶ 20.   Many depositions were also taken in New Orleans.   Inspections on the beach, vetting of the test results, exchanges of expert reports, and countless hours vetting these reports were expended.   All total, 36 depositions were taken.

Other than the colossal litigation of the BP MDL, no other litigation came as close to conducting a merits trial concerning the amount of oil on a property, the nature of the oiling on the property, and how the oiling damaged the property.   In fact, this case was to be the only merits trial that placed a specific value of those damages on a particular claimant.

This is no small feat, and the Donation is no small victim.   As this Court is aware, and the pre-trial order explains (as well as numerous other pleadings), Fourchon beach, owned by the Donation, was one of the most oiled pieces of land in the entire Gulf Coast.   Tens of millions of pounds of oiled material were removed from the property without replacement.   In a dynamic

---

[16] In addition to the Wisner-specific hours that were logged and have been submitted to the Court in connection herewith, several members of the Joint Venture Team also contributed thousands and thousands of hours in discovery and trial work, which has been submitted to the Court as common benefit time, but which directly advanced the Donation's interests, in terms of establishing BP's liability under OPA and the general maritime law.   To be sure, members of the Joint Venture Team are seeking common benefit fees in connection with these efforts, but, notably, those common benefit fees (if any) are being paid in connection with the BP Class (and/or State and/or Halliburton/Transocean) settlements, and *not* in connection with the settlement of opt-out and/or excluded claims, like the Donation's.

environment such as Fourchon, significant expertise was dedicated towards substantiating (and BP trying to discredit) how a property such as this cycles through sand and how damages result and how remediation should occur.   These are issues that administratively monitoring the clean-up do not address.

WWG does deserve credit for having the Donation secure the expertise of Dr. Pardue, Mr. Williams, and Mr. Traverica.   These three talented and exceptional professionals worked hard to apply their expertise to monitor the clean-up operations and the oiled conditions of the Donation's property.   They conducted numerous field visits, drafted reports, took photos, and reviewed BP's work.   They exhibited such high levels of competence that WWG's job of monitoring their activities became administrative and remote.   During the life of the Access Agreement, BP reimbursed the Donation for their work; after the Access Agreement was cancelled and litigation commenced, the Joint Venture lawyers paid these experts directly.

The time expended by these three professionals during WWG's tenure dwarf the time and effort expended by WWG.   From the time they were hired until WWG was replaced, Mr. Traverica and his team spent 5,687 hours monitoring the clean-up activities; Dr. Pardue spent 867 hours overseeing clean-up activities; and Mr. Williams spent 418.25 hours applying his unique skills to the oversight effort.   The total from these professionals equals 6,972.25 – more than *seven times* the 947 hours the Donation paid WWG for this work.   *Declaration of Soren Gisleson*, at ¶ 12.

 After it performed the exact same work as WWG (administrative oversight) for the exact same period of time (23 months), the Joint Venture spent almost $1 Million, reviewed hundreds of thousands of documents, worked thousands of hours, deposed dozens of witnesses, traveled

cross country, and briefed numerous pleadings.  *Declaration of Soren Gisleson*, at ¶¶ 14-26.
After suit was filed on June 6, 2014, the Joint Venture lawyers expended more than 2,000 hours
and almost $1 million in expenses litigating the Donation's BP Oil claims.  *Id.*  The Joint Venture
lawyers took depositions in Alaska, Washington, Oregon, Oklahoma, Houston, Texas City, San
Antonio, Chicago, New Orleans, Mobile, and Boston.  *Id.*  They reviewed more than 450,000
pages of documents.  *Id.*  The Joint Venture lawyers litigated the case until a week before trial.

An instructive document that reflects the Joint Venture's efforts and the complexities of
the case is the *Pre-Trial Order*.  [Rec. Doc. 188]  The 125 page document identifies more than
1500 trial exhibits, dozens of trial witnesses, a host of evidentiary disputes, and subpoena issues
for a trial expected to last at least two weeks.   As with all pre-trial orders, it provided a road map
of contested issues, witnesses, and exhibits to be resolved by this Court.

While all beneficiaries and their separate counsel were identified in the *Pre-Trial Order*,
only the Joint Venture lawyers were identified as representing the "Edward Wisner Donation
Trust" and the Trustee.  *Id.* at 1.   On the signature block, only one lawyer from the Joint Venture
signed on behalf of all plaintiffs.  *Id.* at 125.   This Court presided over the pre-trial conference
and signed the pre-trial order.   *Id.*

Finally, this Court has the ability to use its own observation to determine the sheer amount
of effort expended by the Joint Venture.  *ORX Res., Inc. v. MBW Expl., L.L.C.*, 32 So. 3d 931,
938 (La. App. 4 Cir. 2/10/10), *writ denied*, 34 So. 3d 862 (La. 5/7/10) (finding that "the district
court, as the trier of fact, was in a superior position to observe the work and effort" to determine
the reasonable amount of attorneys for the case before it).   This Court has presided over numerous
discovery and merits hearings.   This Court oversaw the scheduling and management of the case.

21

This Court is uniquely situated to determine the amount of work performed by the Joint and Venture and not performed by WWG.

**2.      By being paid 100% of its time performing administrative oversight, WWG neither lost employment opportunities nor received a lower fee than typical of the locality.**

The second and third components of Rule 1.5 focus on whether the predecessor firm was precluded from other employment or paid less than in other locales.   Because it was paid 100% of all of its attorney's fees submitted to the Donation and all of its costs, WWG had a reliable source of income it appears to have maximized.   WWG billed hourly rates that are squarely within the higher tier in the metropolitan New Orleans area:  $365 per hour be paid to Robert Wiygul, $355 per hour be paid to Joel Waltzer, and $265 per hour be paid to Clay Garside.   *WWG Agreement*, at ¶ 4(a).   The Donation ultimately paid WWG more than $350,000.   *Declaration of Soren Gisleson*, at ¶ 11.

With a guaranteed hourly rate and all costs paid, WWG does not get to buy into the "sacrificial" component of the Rule 1.5 analysis.   WWG did not sacrifice its time or resources performing work for the Donation because it was fully compensated and reimbursed for that time and effort.   The desire to be paid more than 100% is inapposite to the Rule 1.5 analysis which implies some failure to pay fees that are due.   Here, there is no failure, WWG has been fully compensated.

The Joint Venture should similarly not be penalized because it is comprised of five different law firms with the means to pull lawyers and resources from five separate firms.   The Joint Venture has not been paid by the Donation and has almost $1 million dollars in expenses.

The Joint Venture incurred the risk and expense of intense litigation without remuneration whereas WWG was paid 100% for its administrative oversight.

### 3.     The Joint Venture Alone Obtained the Results Pursuant to Significant Time Constraints.

The $30 million settlement was the result of old fashioned hard-fought litigation.   The litigation justifies the recovery, not the administrative oversight.   Thousands of hours worked, 36 depositions across the country, 100,000s of documents reviewed, and almost $1 million spent is the force behind ultimate resolution.   Pressure and uncertainty yield finality in litigation.   The Joint Venture alone brought both to bear in No. 14-1525.

WWG's 23 months of administrative oversight did not provide either the pressure or the impetus for final resolution as reflected by the fact that the administrative oversight continued for another 23 months afterwards with the Joint Venture.   The litigation two years after WWG was replaced is the true credit for achieving the result.

The depositions, document review, and other litigation efforts were achieved on an expedited schedule.   While the original pleading seeking a declaratory judgment was filed on June 6, 2014 in MDL 2179, [Rec. Doc. 13002], No. 14-1525 did not actually receive a trial schedule until this Court's February 13, 2015 Scheduling Order, [Rec. Doc. 33].   This truncated discovery and trial scheduling was urged by the Joint Venture to maximize pressure for ultimate resolution.

### 4.     The Joint Venture's four and a half year representation of the Donation reflects its overwhelming competence.

The Joint Venture has represented, and continues to represent, the Donation in all of its BP litigation.   The Joint Venture has now been representing the Donation for 53 months and counting.

The Joint Venture is presently in the process of submitting the Donation's settlement claim for the TransOcean/Halliburton settlement.   This claim could take two or more years to process and pay. On the other hand, WWG represented the Donation for 23 months.   Its scope of representation was the same as the Joint Venture's.   The Joint Venture performed the same administrative duties as WWG and for the same length of time.

The experience of the Joint Venture has been confirmed by Judge Barbier.   Joint Venture lawyers Jim Roy and Steve Herman serve as co-lead counsel on behalf of plaintiffs in MDL 2179, maintaining roles as co-liaison, members of the executive committee, and members of the plaintiff's steering committee.   *Declaration of Stephen Herman*, at ¶¶ 2-3.   Calvin Fayard also serves on the Plaintiff Steering Committee.   Walter Leger served on the MDL-2179 trial team for Phase 1, along with Steve Herman and Jim Roy.   Fred Herman has tried dozens of cases in state and federal court.

The experience and involvement of the Joint Venture counsel in MDL 2179 cannot be overstated.   As members of the leadership, these Joint Venture lawyers were responsible for developing legal theories, understanding the science behind oil spills and remediation, and spearheading one of the largest MDLs in history that actually went to trial in 2013.   They have exclusively dedicated the last six and a half years of their professional lives litigating the BP Oil Spill.   They have dealt with just about every issue, type of witness, area of expertise, discovery concern, and defense counsel related to the Oil Spill.

The Joint Venture has no intention of disparaging WWG or its principals.   They are competent counsel with legitimate environmental experience.   The BP Spill, however, was the largest environmental disaster in the history of this country that spawned one of the most

complicated MDLs in history. Intimate involvement in the structuring of that litigation as it relates to environmental and maritime law is an almost unquantifiable benefit when litigating one part of the disaster like the Donation's lawsuit. Only the Joint Venture lawyers can claim this unique benefit.

### 5. WWG Took No Risk.

The last consideration under Rule 1.5 concerns whether the contract was fixed or contingent. This element again raises the issue of WWG's previous hourly payments that total more than $350,000. Again it highlights that WWG was paid 100% for its administrative oversight work and all of its costs.

In its motion, WWG engages in some mathematical acrobatics to argue what it believes may be a reasonable percentage of the Joint Venture's fee. However, the analysis is moot (if it could be followed in the first instance) because WWG is not entitled to any more than the 100% compensation it has already received.

Respectfully submitted:

S/Soren E. Gisleson
Stephen J. Herman (La. Bar #23129)
Soren E. Gisleson (La. Bar #26302)
HERMAN HERMAN & KATZ LLC

820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581 4892
Fax No. (504) 569 6024
E Mail: sherman@hhkc.com
E-Mail: sgisleson@hhkc.com

Walter J. Leger, Jr. (La. Bar #827 8)
Christine Sevin Fayard (La. Bar # 32683)
LEGER & SHAW
935 Gravier Street, Suite 2150
New Orleans, LA 70112
Phone: (504) 588 9043
Fax: (504) 588 9980
Email: wleger@legershaw.com
Email: csevin@legershaw.com

James Parkerson Roy (La. Bar #11511)
Bob Wright (La. Bar #1369 1)
DOMENGEAUX WRIGHT ROY & EDWARDS LLC
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233 3033
Fax No. (337) 233 2796
E Mail: jimr@wrightroy.com

Calvin C. Fayard, Jr. (La. Bar #5486)
C. Caroline Fayard (La. Bar #30888)
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726
Office: (225) 664 4193
Telefax: (225) 664 6925
EMail: calvinfayard@fayardlaw.com

Fred Herman (La Bar #6811)
Thomas J. Barbera (La Bar# 18719)
LAW OFFICES OF FRED HERMAN
1010 Common St., Suite 3000
New Orleans, LA 70112
Phone: 504 581 7068

26

Fax: 504 581 7083
Email: fherman@fredhermanlaw.com
tbarbera@fredhermanlaw.com

***Attorneys for the Edward Wisner Donation Trust,
Mayor Mitch Landrieu, Trustee, and the City of
New Orleans, Beneficiary*** [17]

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Joint Motion for Authority to Make Payment to the Escrow Agent for Settlement Fund will be served on all Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing will be electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedure established in MDL 2179, on this 9th day of December, 2106.

S/Soren E. Gisleson

---

[17]  As noted previously, this Opposition is filed on behalf of the Joint Venture Attorneys, as the parties-in-interest, and not on behalf of the City of New Orleans, the Wisner Donation, or the Mayor, as Trustee.