## SMITH & FAWER LLC
### A T T O R N E Y S   A T   L A W

201 St. Charles Avenue, Suite 3702 • New Orleans, Louisiana 70170
Telephone: (504) 525-2200 • Facsimile: (504) 525-2205

**VIA CERTIFIED MAIL**                    October 17, 2016

Edward Wisner Donation Advisory Committee
ATTN: Records Custodian
935 Gravier Street, Suite 825
New Orleans, Louisiana 70112

>        *Re:    Public Records Request*

Dear Sir or Madam:

Pursuant to the Public Records Act of Louisiana, R.S. 44:1, *et seq.*, I request the following public records be made available for inspection and/or copying:

1. A copy of any and all contracts, agreements, addendums, and/or amendments thereto and any and all purported contracts, agreements, addendums, and/or amendments thereto for legal services relating to and/or involving the Deepwater Horizon Oil Spill, clean-up of the Deepwater Horizon Oil Spill, or remediation of Louisiana's coasts, marshes, bayous, and/or any other waterway from the effects of the Deepwater Horizon Oil Spill, for the period April 19, 2010 through the present between, involving, signed on behalf of, and/or obligating The Edward Wisner Donation, and/or its Trustee the Mayor of New Orleans, and/or the Edward Wisner Donation Advisory Committee and one or more attorneys and/or law firms, including, but not limited to:

    a. Herman Herman & Katz, LLC;

    b. Leger & Shaw;

    c. Domengeaux Wright Roy & Edwards, LLC;

    d. Fayard & Honeycutt;

    e. The Law Offices of Fred Herman;

    f. Waltzer & Wiygul; and/or

    g. Waltzer Wiygul & Garside.

2. A copy of any and all meeting minutes of the Edward Wisner Donation Advisory Committee for any and all meetings held between January 1, 2007 and the present.



EXHIBIT
1

Edward Wisner Donation Advisory Committee
October 17, 2016
Page - 2 -

3. A copy of any and all transcripts and/or recordings of any and all meetings of the Edward Wisner Donation Advisory Committee held between January 1, 2007 and the present.

4. A copy of any and all notices of any and all meetings of the Edward Wisner Donation Advisory Committee held between January 1, 2007 and the present.

5. A copy of any and all correspondence regarding any contracts, agreements, addendums, and/or amendments thereto and/or any purported contracts, agreements, addendums, and/or amendments thereto for legal services relating to and/or involving the Deepwater Horizon Oil Spill, clean-up of the Deepwater Horizon Oil Spill, or remediation of Louisiana's coasts, marshes, bayous, and/or any other waterway from the effects of the Deepwater Horizon Oil Spill, for the period April 19, 2010 through the present between, involving, signed on behalf of, and/or obligating The Edward Wisner Donation, and/or its Trustee the Mayor of New Orleans, and/or the Edward Wisner Donation Advisory Committee and one or more attorneys and/or law firms, including, but not limited to:

   a. Herman Herman & Katz, LLC;

   b. Leger & Shaw;

   c. Domengeaux Wright Roy & Edwards, LLC;

   d. Fayard & Honeycutt;

   e. The Law Offices of Fred Herman;

   f. Waltzer & Wiygul; and/or

   g. Waltzer Wiygul & Garside.

6. A copy of any and all Requests for Proposals and all criteria, amendments, and/or addenda thereto, requesting legal services on behalf of The Edward Wisner Donation, and/or its Trustee the Mayor of New Orleans, and/or the Edward Wisner Donation Advisory Committee relating to the Deepwater Horizon Oil Spill, clean-up of the Deepwater Horizon Oil Spill, or remediation of Louisiana's coasts, marshes bayous, and/or any other waterway from the effects of the Deepwater Horizon Oil Spill, as well as any related submissions, ratings of submissions, panels, panel meeting notes, rankings, scores, and award letters for the period April 19, 2010 through the present, including but not limited to Solicitation Nos. 2310-01439 and 2340-01030.

7. A copy of any and all documents which established, amended, modified, and/or terminated the Edward Wisner Donation, including but not limited to the donation, the Consent Judgment entered in or about the year 1929, the Bylaws of the Edward Wisner Donation Committee adopted July 9, 1974 and any addendums or amendments thereto, and the Bylaws of the Edward Wisner Donation Committee effective April 29, 2003 and any addendums or amendments thereto.

Edward Wisner Donation Advisory Committee
October 17, 2016
Page - 3 -

8.  A copy of any and all documents relating to contracts, agreements, addendums, and amendments thereto for legal services relating to the Deepwater Horizon Oil Spill, clean-up of the Deepwater Horizon Oil Spill, or remediation of Louisiana's coasts, marshes, bayous, and/or any other waterway from the effects of the Deepwater Horizon Oil Spill, including but not limited to, letters, emails, text messages, notes, meeting minutes, calendar items, reports, resolutions, and memoranda for the period April 19, 2010 through the present.

9.  A copy of any and all conflict waivers, memoranda correspondence, and opinions related to or otherwise involving any contracts, agreements, addendums, and/or amendments thereto or any purported contracts, agreements, addendums, and/or amendments thereto for legal services relating to, involving, the Deepwater Horizon Oil Spill, clean-up of the Deepwater Horizon Oil Spill, or remediation of Louisiana's coasts, marshes, bayous, and/or any other waterway from the effects of the Deepwater Horizon Oil Spill, for the period April 19, 2010 through the present between, involving, signed on behalf of, and/or obligating The Edward Wisner Donation, and/or its Trustee the Mayor of New Orleans, and/or the Edward Wisner Donation Advisory Committee and one or more attorneys and/or law firms, including, but not limited to:

    a.  Herman Herman & Katz, LLC;

    b.  Leger & Shaw;

    c.  Domengeaux Wright Roy & Edwards, LLC;

    d.  Fayard & Honeycutt;

    e.  The Law Offices of Fred Herman;

    f.  Waltzer & Wiygul; and/or

    g.  Waltzer, Wiygul & Garside.

10. A copy of any and all contracts, agreements, addendums, and/or amendments thereto signed by C. Cathy Norman in her capacity as Secretary-Treasurer/Land Manager of the Edward Wisner Donation Advisory Committee, purporting to involve, be signed on behalf of, and/or obligate The Edward Wisner Donation and/or the Edward Wisner Donation Advisory Committee

    Under the provisions of R.S. 44:32, if you raise a question as to whether the record requested is a public record, you are required to notify me in writing of your determination and the reasons, including the legal basis therefore, within three (3) days of the receipt of the request, exclusive of Saturdays, Sundays, and legal public holidays.

Edward Wisner Donation Advisory Committee
October 17, 2016
Page - 4 -

Under the provisions of R.S. 44:33, if the public record is not immediately available, you are required to certify this in writing promptly, and in your certificate fix a day and hour within three (3) days, exclusive of Saturdays, Sundays, and legal public holidays, for the exercise of the right granted in the Public Records Act.

Under R.S. 44:4.1(C), if you are withholding any requested records under a claim of privilege or a claim that the record constitutes or reflects the mental impressions, conclusions, opinions or legal theories of any attorney or an expert, obtained or prepared in anticipation of litigation or in preparation for trial:

1. If your position is based upon a claim of privilege, then:

    a. State the entire basis for your claim of privilege, including all underlying facts;

    b. Identify all persons having knowledge concerning the facts, information, communications, or documents which you claim to be privileged; and

    c. Identify all persons having knowledge of the facts upon which you based your claim of privilege.

2. If your position is based upon a claim that any information or document is "work product" or "prepared in anticipation of litigation," then:

    a. State the complete basis for your claim that the information or document constitutes or reflects the mental impressions, conclusions, opinions, or legal theories of nay attorney or other person obtained or prepared in anticipation of litigation or in preparation for trial;

    b. Identify all persons having knowledge or copies of any information or documents which you claim to be or reflect mental impressions, conclusions, opinions, or legal theories for any attorney or the person to whose mental impressions, conclusions, opinions, or legal theories you refer; and

    c. Identify all persons having knowledge of the facts upon which you base your claims that the information or document is not a public record.

Under R.S. 44:34, "If any public record applied for by any authorized person is not in the custody or control of the person to whom the application is made, such person shall promptly certify this in writing to the applicant, and shall in the certificate state in detail to the best of his knowledge and belief, the reason for the absence of the record from his custody or control, its location, what person then has custody of the record and the manner and method in which, and the exact time at which it was taken from his custody or control. He shall include in the certificate ample and detailed answers to inquiries of the applicant which may facilitate the exercise of the right granted by this Chapter."

Edward Wisner Donation Advisory Committee
October 17, 2016
Page - 5 -

     If you are invoking R.S. 44:34 to deny this request, please answer the following questions in detail:

1. Is a copy of the requested public record usually located in your office?
2. Why is your copy of the requested public record absent from your office?
3. Where is your copy of the requested public record?
4. Who has received your copy of the requested public record?
5. How and from whom did the present custodian gain control of your copy of the requested public record?
6. What was the exact time your copy of the requested public record was taken from your custody and control?
7. When will your copy of the requested public record be returned to your office?
8. Is there any other public official who has a copy of the requested public record?
9. State the name or names of anyone who has A copy of the requested public record?
10. State the location(s) where the requested public record can be viewed.
11. State the hours and dates when the requested public record can be viewed.

     Please inform me of the volume of records requested so I can decide whether to have them copied or to inspect. I also prefer to receive records in electronic form, if possible.

     Thank you for your cooperation and assistance.

     If you have any questions or concerns regarding the above, please call me.

          Sincerely,

          Dylan T. Leach

DTL/sw

## FULL AND FINAL RELEASE, SETTLEMENT, AND COVENANT NOT TO SUE

1.  Definitions: For purposes of this Full and Final Release, Settlement, and Covenant Not to Sue ("Release Agreement"), the following definitions shall apply, and in the case of defined nouns the singular shall include the plural and vice versa:

    a.  "Affiliate" means, with respect to any entity, any natural person or other entity that directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such entity.

    b.  "BP Entities" shall mean BP p.l.c., BP America Production Co., BP Corporation North America Inc., BPXP, and any Affiliates, corporate parents, subsidiaries, predecessors, successors, indemnitors, subrogees, assigns, officers, directors, employees, agents, and representatives of any of the foregoing.

    c.  "BPXP" shall mean BP Exploration & Production Inc.

    d.  "Claimant" shall mean **EDWARD WISNER DONATION**, individually, and the Claimant's Related Parties.

    e.  "Claimant's Related Parties" shall mean Claimant's Affiliates, corporate parents, subsidiaries, predecessors, successors, indemnitors, subrogees, assigns, officers, directors, employees, agents, representatives, trustees, insurers, reinsurers, heirs, beneficiaries, estates, executors, administrators, receivers, conservators, personal representatives, and any natural, legal, or juridical person or entity entitled or empowered to assert any claim on behalf of or in respect of Claimant, including if Claimant is a natural person any spouse of Claimant and if Claimant is a sole proprietorship any spouse of Claimant's proprietor.

    f.  "CSSP" shall mean the *Deepwater Horizon* Court Supervised Settlement Program established in MDL 2179 pursuant to the EPD Settlement Agreement.

    g.  "CSSP Claims" shall mean any claims filed in the CSSP.

    h.  "*Deepwater Horizon* Incident" shall mean events, actions, inactions, and omissions leading up to and including the following: (i) all discharges of hydrocarbons or other substances from the Macondo Well, including discharges from, through, or into the *Deepwater Horizon* mobile offshore drilling unit (including its appurtenances), occurring on or after April 20, 2010, regardless of any subsequent movement of such hydrocarbons or other substances; (ii) the blow-out of the Macondo Well; (iii) the explosion and fire on the *Deepwater Horizon*; (iv) the sinking and/or loss of the *Deepwater Horizon*; (v) any and all containment efforts related to the Macondo Well; (vi) construction of relief wells related to the Macondo Well; (vii) any and all clean-up, remediation, removal, response, and/or restoration efforts related to the foregoing, including but not limited to the Vessels

<div style="border:2px solid black; display:inline-block; padding:4px; text-align:center;">

**EXHIBIT**

**2**

</div>

of Opportunity program, the application of dispersants, and any diversion of fresh water; and (viii) operations of any claims facility related to the foregoing.

i.  "Economic Claims" shall mean any claim or cause of action related to economic loss, lost profits, lost earnings, lost income, property damage (including without limitation physical damage, diminished value, stigma, and lost or diminished sales or rentals), lost commissions, lost donations, lost contributions, lost grants, business interruption, breach of contract, loss of royalties, loss of subsistence use of natural resources, operating costs, or any other costs, losses, or damages, including without limitation any claim arising out of the Oil Pollution Act ("OPA"), 33 U.S.C. § 2702(b), state or federal common law, statute, or regulation, maritime law, tribal law, or any other applicable provision of law.

j.  "EPD Settlement Agreement" shall mean the Economic and Property Damages Settlement Agreement executed April 18, 2012, and approved by the United States District Court for the Eastern District of Louisiana on December 21, 2012.

k.  "Macondo Well" shall mean: (i) Macondo Well 1 (including MC-252#1, Well No. 001ST00BP00, MC-252#1 ST1, Well No. 001ST00BP01), Macondo Well 2 (including MC-252#2, Well No. 003ST00BP00), and Macondo Well 3 (including MC-252#3, Well No. 002ST00BP00) within Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10 existing on or before the date of lodging of the Consent Decree; (ii) the *Deepwater Horizon* and its appurtenances, including the riser from the *Deepwater Horizon*; (iii) a coffer dam used in the course of removal work conducted during the discharge of oil from Block 252 of the Mississippi Canyon that began April 20, 2010; (iv) "the Macondo Well" as defined in the United States' Complaint in MDL 2179; and (v) the eight aliquots within Block 252, Mississippi Canyon, OCS Official Protraction Diagram, NH 16-10.

l.  "MDL 2179" shall mean the multidistrict litigation pending before the United States District Court for the Eastern District of Louisiana, titled *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* (MDL 2179), including any and all claims or causes of action or theories of loss or damage that have been filed within, referred to, or otherwise consolidated thereunder.

m.  "MDL 2185" shall mean the multidistrict litigation pending before the United States District Court for the Southern District of Texas, titled *In re: BP p.l.c. Securities Litigation* (MDL 2185), including any and all claims or causes of action or theories of loss or damage that have been filed within, referred to, or otherwise consolidated thereunder.

n.  "Medical Claims" shall mean claims or causes of action that have been or could have been brought in connection with (i) personal injury or bodily injury (including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life), and any progression and/or exacerbation of personal injury or bodily injury, where such injury, progression, and/or exacerbation in

whole or in part arose from, was due to, resulted from, or was related to, directly or indirectly, the *Deepwater Horizon* Incident, or wrongful death and/or survival actions as a result of such injury, progression, and/or exacerbation; (ii) loss of support, services, consortium, companionship, society, or affection, or damage to familial relations arising out of any personal injury or bodily injury (including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life) to another person, and any progression and/or exacerbation of personal injury or bodily injury to another person, where such injury, progression, and/or exacerbation in whole or in part arose from, was due to, resulted from, or was related to, directly or indirectly, the *Deepwater Horizon* Incident, or wrongful death and/or survival actions as a result of such personal or bodily injury; (iii) increased risk, possibility, or fear of suffering in the future from any disease, injury, illness, emotional or mental harm, condition, or death, in whole or in part arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the *Deepwater Horizon* Incident; and/or (iv) medical screening and medical monitoring for undeveloped, unmanifested, and/or undiagnosed conditions that may in whole or in part arise out of, result from, or relate to, directly or indirectly, the *Deepwater Horizon* Incident.

o.   "Moratoria" shall mean any federal or state governmental action or inaction directed at offshore oil or gas industry activity, including shallow water and deepwater operations, that occurred on or after April 20, 2010, including, but not limited to, the federal moratoria on offshore permitting and drilling activities, effective date May 30, 2010 (NTL No. 2010-N04), the increased safety measures issued by the U.S. Department of the Interior, effective date June 8, 2010 (NTL No. 2010-N05), the information requirements issued by the U.S. Department of the Interior, effective date June 18, 2010 (NTL No. 2010-N06), the federal deepwater drilling suspensions on or about July 12, 2010, and any other new or revised safety rules, regulations, inspections, permitting practices, restrictions, or suspensions.

p.   "Released Claims" shall mean any and all claims or causes of action, whether in law or in equity, known or unknown, direct or indirect, past, present, or future, arising from or related to the *Deepwater Horizon* Incident, or arising from or related to Moratoria. "Released Claims" includes but is not limited to (i) Economic Claims; (ii) CSSP Claims; (iii) Medical Claims; (iv) claims filed with any BP Entity, the Gulf Coast Claims Facility, the federal Oil Spill Liability Trust Fund, any state or local spill fund, and any other claims facility or fund; (v) any claims that were or could have been asserted by Claimant in MDL 2179, MDL 2185, or both; and (vi) any claims, including without limitation claims for economic damages, punitive damages, exemplary damages, liens, injunctive relief, or other liabilities, that were or could have been asserted by Claimant in any proceeding. For the avoidance of doubt, "Released Claims" includes any and all such claims or causes of action regardless of the legal or equitable theory or nature under which they are based or advanced including (but not limited to) legal and/or equitable theories under any federal, state, local, tribal, administrative, or international law, and including (without limitation) statutory law, codal law, regulation, common law, or equity,

and whether based in maritime law, strict liability, negligence, gross negligence, punitive damages, nuisance, trespass, or all other legal and equitable theories, whether existing now or arising in the future, arising from or in any way relating to the *Deepwater Horizon* Incident, or arising from or related to Moratoria. Notwithstanding the foregoing, "Released Claims" shall not include (i) claims for punitive or exemplary damages against Transocean Inc., Transocean Holdings LLC, Transocean Ltd., Transocean Deepwater Inc., Transocean Offshore Deepwater Drilling Inc., Triton Asset Leasing GmbH, Halliburton Energy Services Inc., and/or Halliburton Company, and/or (ii) CSSP Claims and individual lawsuits filed by one or more of the individual Claimant's Related Parties unrelated to any claimed or potential beneficial, ownership, and/or successor interest in Claimant or the Claimant's property.

q.   "Released Parties" shall mean anyone who is or could be responsible or liable in any way for the *Deepwater Horizon* Incident, Moratoria, or any damages related thereto, including (but not limited to) those liable for the Released Claims, whether a natural, legal, or juridical person or entity or a government entity, including but not limited to (i) the BP Entities; (ii) contractors and subcontractors of the BP Entities; (iii) the parties listed on Attachment A hereto and any related parties indemnified by any BP Entity with respect to the *Deepwater Horizon* Incident and/or Moratoria; (iv) the Deepwater Horizon Oil Spill Trust dated August 6, 2010; (v) the federal Oil Spill Liability Trust Fund and any state or local fund; and (vi) for each of the foregoing, their respective Affiliates, corporate parents, subsidiaries, predecessors, successors, indemnitors, subrogees, assigns, officers, directors, employees, agents, representatives, trustees, insurers, reinsurers, heirs, beneficiaries, estates, executors, administrators, receivers, conservators, and personal representatives.

r.   The verb "releases," "released," and its cognate forms shall mean all forms of acts or deeds to release, acquit, forever discharge, and covenant not to sue on any sort of claim.

2.   In consideration of the payment of a total of **$30,000,000** from BPXP, to be paid in portions in accordance with the payment schedule set forth in the table below, and any previous payments Claimant has received in respect of Released Claims, Claimant hereby releases and covenants not to sue BPXP, all other BP Entities, and all other Released Parties from and for any and all Released Claims that Claimant may have or purport to have.

| Date | Payment Amount |
| --- | --- |
| October 1, 2016 | $5,000,000 |
| October 1, 2017 | $5,000,000 |
| October 1, 2018 | $1,500,000 |
| October 1, 2019 | $1500,000 |
| October 1, 2020 | $1,500,000 |
| October 1, 2021 | $1,000,000 |
| October 1, 2022 | $1,000,000 |

| | |
|---|---|
| October 1, 2023 | $1,000,000 |
| October 1, 2024 | $1,000,000 |
| October 1, 2025 | $1,000,000 |
| October 1, 2026 | $1,000,000 |
| October 1, 2027 | $1,000,000 |
| October 1, 2028 | $1,000,000 |
| October 1, 2029 | $1,000,000 |
| October 1, 2030 | $1,000,000 |
| October 1, 2031 | $1,000,000 |
| October 1, 2032 | $1,000,000 |
| October 1, 2033 | $1,000,000 |
| October 1, 2034 | $1,000,000 |
| October 1, 2035 | $500,000 |
| October 1, 2036 | $500,000 |
| October 1, 2037 | $500,000 |

3.   Claimant agrees and understands that the consideration granted in Paragraph 2 above constitutes full, complete, sufficient, and total satisfaction of all Released Claims against all Released Parties.

4.   Claimant shall not assert against any Released Party any Released Claim, whether known or unknown, whether present or future, whether direct or indirect, and whether legal or equitable, arising from or in any way relating to the *Deepwater Horizon* Incident or arising from or in any way relating to Moratoria.

5.   **By executing this Release Agreement, Claimant warrants and understands that it is forever giving up and discharging, without any right of legal recourse whatsoever, any and all rights it has or may have to the Released Claims against the Released Parties. Claimant agrees that Claimant, and all other natural persons or entities claiming by, through, or on behalf of Claimant, including Claimant's Related Parties, will forever be barred and enjoined from commencing, filing, initiating, instituting, prosecuting, maintaining, or consenting to any judicial, arbitral, or regulatory action against the BP Entities and/or any other Released Parties with respect to the Released Claims.**

6.   **Claimant further warrants and understands that it is forever giving up and discharging any rights it may have as to any costs, damages, causes of action, claims, or other relief (including attorneys' fees) arising from or related to the *Deepwater Horizon* Incident, or arising from or in any way relating to Moratoria, even if Claimant is not currently aware of such costs or damages and even if such costs or damages arise in the future (e.g., additional oil impacts) or do not manifest themselves until some future date. Claimant expressly waives and releases with prejudice, and  shall be deemed to have released and waived with prejudice, any and all rights that it may have under any law, codal law, statute, regulation, adjudication, quasi-adjudication, decision, administrative decision, common law principle, or other source of legal, equitable, regulatory, or other authority, that would otherwise limit the effect of this Release Agreement to those claims or matters actually known or suspected to exist at the time**

**of execution of the Release Agreement. CLAIMANT ACKNOWLEDGES THAT THIS CERTIFICATION IS CONSPICUOUS AND AFFORDS FAIR AND ADEQUATE NOTICE.**

7.      To the extent that Claimant has retained, engaged, employed, or otherwise utilized a private attorney, accountant, expert, or other service provider to represent or otherwise assist Claimant in connection with a Released Claim, Claimant and Claimant's counsel acknowledge and agree that Claimant, and not the Released Parties, is solely responsible for any attorneys' fees and costs, accountants' fees and costs, experts' fees and costs, and other service providers' fees and costs.

8.      If Claimant commences, files, initiates, or institutes any new action or other proceeding for any Released Claim against any Released Party in any federal or state court, arbitral tribunal, or administrative or other forum, (a) such action or other proceeding shall be dismissed with prejudice and at Claimant's cost; provided, however, before any costs may be assessed, Claimant shall be given reasonable notice and an opportunity voluntarily to dismiss such new action or proceeding with prejudice; and (b) the respective Released Party shall be entitled to recover any and all related costs and expenses (including attorneys' fees) from any Claimant in violation or breach of its obligations under this Release Agreement.

9.      By executing this Release Agreement, Claimant acknowledges that it understands it has the right to consult an attorney of its choosing prior to accepting any settlement payment or signing any release of legal rights and warrants that it has done so to its satisfaction prior to execution of this Release Agreement.

10.     By executing this Release Agreement, Claimant warrants that it has read and understood the terms of the Release Agreement and that it executes the Release Agreement voluntarily and without being pressured or influenced by, or relying on, any statement or representation made by any person acting on behalf of any BP Entity or other Released Party.

11.     In consideration of the benefits provided under this Release Agreement, all Released Claims by or on behalf of Claimant against any and all Released Parties shall be dismissed with prejudice in any lawsuit in which Claimant is a party. Within ten (10) days of the date of execution of this Release Agreement by both Claimant and BPXP, Claimant shall file or cause to be filed a notice of dismissal with prejudice of any and all litigation concerning any Released Claims filed by or on behalf of Claimant against the BP Entities or any other of the Released Parties, in the form specified in Attachment B.  Also within ten (10) days of the execution of this Release Agreement by both Claimant and BPXP, Claimant shall file or cause to be filed a notice of withdrawal with prejudice of all pending CSSP Claims, Medical Claims, and claims filed with any BP Entity, the Gulf Coast Claims Facility, the federal Oil Spill Liability Trust Fund, any state or local spill fund, and any other claims facility or fund, by or on behalf of Claimant (if any). Claimant also will withdraw from any existing class action and will not join any new class actions or similar procedural devices concerning the Released Claims.  However, Claimant's Related Parties shall not be required to withdraw from the EPD Settlement Class, nor to withdraw any individual CSSP Claims or lawsuits by

Claimant's Related Parties that are unrelated to any claimed or potential beneficial, ownership, and/or successor interest in Claimant or the Claimant's property.

12.   As this Release Agreement is fully and completely resolving the Released Claims, the BP Entities are hereby subrogated to any and all rights that Claimant or any of Claimant's Related Parties have for Released Claims. This Release Agreement is not intended to prevent any BP Entity from exercising its rights of contribution, subrogation, or indemnity under OPA or any other law, other than the BP Entities warrant they will not seek to have Claimant or Claimant's Related Parties named as defendants or third-party defendants in any such subsequent proceeding. However, and for the avoidance of any doubt, neither Claimant nor Claimant's Related Parties shall have any obligation or duty to defend, indemnify, or hold the BP Entities harmless from any action or claim that may be taken or brought by the United States, the State of Louisiana, or other governmental body or authority against one or more of the BP Entities arising from or in any way relating to the *Deepwater Horizon* Incident or arising from or in any way relating to Moratoria.

13.   For any properties that are the subject of the Released Claims and were oiled as a result of the *Deepwater Horizon* Incident, Claimant agrees as follows:

    a.   Claimant shall record notice in the title for such property in the form attached hereto as Attachment C. The recording must be sufficiently descriptive so as to put any future owner(s) of the property or properties on notice of the oiling and of the releases as to such property or properties granted in this Release Agreement.

    b.   By signing this Release Agreement, Claimant understands and warrants that it is forever giving up and discharging any right to require any cleanup or remediation of the property or properties. The rights and releases granted in this Release Agreement, including the release of any right to require any cleanup or remediation of the property or properties, are covenants running with the land and are binding upon the heirs, administrators, successors, and assigns of Claimant, including any tenants or lessees of Claimant and any subsequent purchaser or owner of such property or properties, and inure to the benefit of the Released Parties.

    c.   Claimant warrants and represents, with respect to the Released Claims, that the Claimant and/or one or more of the Claimant's Related Parties collectively own, and was or were at the time of any alleged oiling or related response the owner(s), of 100 percent of the Edward Wisner Donation property or properties that are the subject of the Released Claims. Claimant and Claimant's Related Parties reserve any and all actions, rights, defenses and/or claims relating to any of their respective interests in the Edward Wisner Donation, including without limitation the governance, termination, continuation, succession, ownership, management, obligations, and incurrence or disposition of the revenues, expenses, property, assets, and/or liabilities of the Edward Wisner Donation; provided, however, that none of the BP Entities shall be named as defendants or third-party defendants by the Claimant's Related Parties in any such suits, actions, or claims.

14.   The payment to Claimant is made without any admission of liability or wrongdoing by BPXP, any other BP Entity, or any other Released Party, and is made purely by way of compromise and settlement.

15.   The United States District Court for the Eastern District of Louisiana will retain jurisdiction over this Release Agreement for the purposes of enforcement of the Release Agreement and any dispute(s) arising thereunder.

16.   Any and all disputes, cases, or controversies concerning this Release Agreement, including without limitation disputes concerning the interpretation or enforceability of this Release Agreement, shall be filed (a) in the United States District Court for the Eastern District of Louisiana accompanied by a legal request made on behalf of any complainant party (whether one or more of the Released Parties, the Claimant, any of the Claimant's Related Parties, or otherwise) for such dispute to be made part of MDL 2179, or (b) if, but only if, MDL 2179 has been terminated by the time any dispute concerning this Release Agreement is filed, in any United States District Court with venue. No action(s) concerning this Release Agreement shall be filed in any state court. Claimant and the Released Parties agree not to contest the existence of federal jurisdiction in MDL 2179 (or, if, but only if, MDL 2179 has been terminated by the time any dispute concerning this Release Agreement is filed, a United States District Court with venue).

17.   This Release Agreement constitutes the final, complete, and exclusive agreement and understanding between BPXP and Claimant and supersedes any and all other agreements, written or oral, between any BP Entity and Claimant with respect to such subject matter of this Release Agreement.

18.   Claimant shall not make any public statement disparaging any BP Entity with respect to this Release Agreement.

19.   Nothing contained in this Release Agreement shall change or be construed as changing any Released Parties duties or obligations to any federal or state governmental entity imposed under now existing applicable law, including the Oil Pollution Act, the Oil Spill Liability Trust or any other applicable federal, state or local law.

20.   In the event that any provision of this Release Agreement shall be found invalid, the other provisions of the Agreement are deemed to be separable and remain in effect.

21.   Payment shall be made according to the following instructions:

     Tax ID (SSN or EIN):          █████████

     W-9 Form Attached

     Payment Method (Check or Bank Wire):     Bank Wire

     Mailing Address (for Check):

          Mail To:     _____

          Street Address:     _____

          City/State/Zip Code:     _____

     Wire Transfer Instructions (for Bank Wire):

          Bank Name:     ████████████

          SWIFT/BIC Code (if applicable):WHITUS444

          Routing Transit Number:     █████████

          Bank Street Address:     228 St. Charles Avenue

          Bank City/State/Zip Code     New Orleans, La 70130

          Account Number█████████

          Name:     Edward Wisner Donation Advisory Committee

22.   This Release Agreement shall remain effective regardless of any appeals or court decisions relating in any way to the liability of the Released Parties.

23.   Claimant promises, agrees, acknowledges, represents, warrants, and covenants as follows: Claimant shall not assign or reassign, or attempt to assign or reassign, to any person or entity other than a BP Entity any rights or claims arising from or in any way related to the *Deepwater Horizon* Incident, or any rights or claims arising from or in any way related to Moratoria. Any such assignment or reassignment, or attempt to assign or reassign, to any natural person or entity other than a BP Entity shall be void, invalid, and of no force and effect. However, nothing in this Paragraph prevents any of Claimant's Related Parties from transferring any beneficial or successor interest, if any, that he, she, or it might have in some or all of the settlement proceeds due to Claimant.

24. Claimant represents and warrants that Claimant's undersigned representative has authority to execute this Release Agreement on behalf of Claimant and Claimant's Related Parties, and undersigned counsel hereby states that he or she verifies and is of the opinion that Claimant's undersigned representative has authority to execute this Release Agreement on behalf of Claimant and Claimant's Related Parties. Claimant further represents and warrants that (a) it is the sole and lawful owner of all right, title, and interest in and to every Released Claim and every matter that it purports to release; it is has not sold, assigned, transferred, hypothecated, pledged, or encumbered, or otherwise disposed of, in whole or in part, voluntarily or involuntarily, any Released Claim or any interest in such Released Claims; and no other party has any lien, security interest, or other legal or equitable right, title, or interest in any Released Claim; and (b) it has not made an insurance claim or received any insurance proceeds for any business or property claim arising from or in any way relating to any Released Claim. **CLAIMANT ACKNOWLEDGES THAT THIS CERTIFICATION COMPLIES WITH ANY REQUIREMENT TO EXPRESSLY STATE THAT LIABILITY FOR SUCH CLAIMS IS INDEMNIFIED AND THAT THIS CERTIFICATION IS CONSPICUOUS AND AFFORDS FAIR AND ADEQUATE NOTICE.**

25. If Claimant is a natural person who has a living spouse, such spouse must personally sign below. If Claimant is a sole proprietorship and the proprietor thereof has a living spouse, such spouse of such proprietor must personally sign below. If Claimant is jointly owned by natural persons married to one another, both such spouses must personally sign below. As to each signature referenced in this paragraph, an electronic signature is insufficient. By signing below, each spouse represents and warrants that such spouse intends to, and does, release all Released Claims, including for the avoidance of doubt any marital interest in any Released Claim.

| | |
|---|---|
| **Claimant:** | **EDWARD WISNER DONATION** |
| Claimant Signatory/Title (if applicable): | |
| Signed: | |
| Printed Signatory Name: | MAYOR MITCH LANDRIEU |
| Date: | MAY 17, 2016 |
| **Law Firm Name:** | |
| Signed: | |
| Printed Counsel Name: | |

24. Claimant represents and warrants that Claimant's undersigned representative has authority to execute this Release Agreement on behalf of Claimant and Claimant's Related Parties, and undersigned counsel hereby states that he or she verifies and is of the opinion that Claimant's undersigned representative has authority to execute this Release Agreement on behalf of Claimant and Claimant's Related Parties. Claimant further represents and warrants that (a) it is the sole and lawful owner of all right, title, and interest in and to every Released Claim and every matter that it purports to release; it is has not sold, assigned, transferred, hypothecated, pledged, or encumbered, or otherwise disposed of, in whole or in part, voluntarily or involuntarily, any Released Claim or any interest in such Released Claims; and no other party has any lien, security interest, or other legal or equitable right, title, or interest in any Released Claim; and (b) it has not made an insurance claim or received any insurance proceeds for any business or property claim arising from or in any way relating to any Released Claim. **CLAIMANT ACKNOWLEDGES THAT THIS CERTIFICATION COMPLIES WITH ANY REQUIREMENT TO EXPRESSLY STATE THAT LIABILITY FOR SUCH CLAIMS IS INDEMNIFIED AND THAT THIS CERTIFICATION IS CONSPICUOUS AND AFFORDS FAIR AND ADEQUATE NOTICE.**

25. If Claimant is a natural person who has a living spouse, such spouse must personally sign below. If Claimant is a sole proprietorship and the proprietor thereof has a living spouse, such spouse of such proprietor must personally sign below. If Claimant is jointly owned by natural persons married to one another, both such spouses must personally sign below. As to each signature referenced in this paragraph, an electronic signature is insufficient. By signing below, each spouse represents and warrants that such spouse intends to, and does, release all Released Claims, including for the avoidance of doubt any marital interest in any Released Claim.

| | |
|---|---|
| **Claimant:** | **EDWARD WISNER DONATION** |
| Claimant Signatory/Title (if applicable): | |
| Signed: | |
| Printed Signatory Name: | |
| Date: | |
| **Law Firm Name:** | Herman Herman & Katz, LLC |
| Signed: | |
| Printed Counsel Name: | Stephen J. Herman |

Date: _____

**Spouse (if applicable):**

Signed: _____NA_____

Printed Spouse Name: _____

Date: _____

**Accepted by BPXP:**

By: _Maria Travis_____

Date: _June 6, 2016_____

Attachment A

**Released Parties**

Airborne Support Inc.
Airborne Support International Inc.
Alaska Clean Seas, Inc.
Anadarko Exploration & Production LP
Anadarko E&P Company LP
Anadarko Petroleum Corporation
Art Catering, Inc.
Cameron Corporation
Cameron International Corporation
Cameron International Corporation f/k/a Cooper Cameron Corporation
Cameron International Corporation d/b/a/ Cameron Systems Corporation
Crowder Gulf Disaster Recovery
Court Supervised Settlement Program in MDL 2179
and its Administrators, Employees, and Agents
Deepwater Horizon Oil Spill Trust, Trustees and Employees
Det Norske Veritas (DNV)
Dril-Quip, Inc.
DRC Emergency Services, Inc.
DRC Marine, LLC
Dynamic Aviation
Kenneth Feinberg
Feinberg Rozen LLP
Fluor Corporation
Gulf Coast Claims Facility, Administrators, Employees, and Agents
Halliburton Company
Halliburton Energy Services, Inc.
International Air Response
LLOG Exploration Offshore, L.L.C.
LLOG Bluewater, L.L.C.
LLOG Bluewater Holdings, L.L.C.
Lloyd's Syndicate 1036 and other Lloyd's Syndicates named as defendants in MDL 2179
Lynden Companies
Marine Spill Response Corporation
Mitsui & Co., Ltd.
Mitsui & Co. (U.S.A.), Inc.
Mitsui Oil Exploration Co., Ltd.
Ministry of Economy, Trade and Industry of the Government of Japan
M-I Drilling Fluids L.L.C.
M-I, LLC a/k/a M-I Swaco
MOEX Offshore 2007 LLC
MOEX USA Corporation
Moran Environmental Recovery

Nalco Company
NALCO Holding Company
National Response Corporation
O'Brien's Response Management
Oceaneering International, Inc.
Oil Spill Liability Trust Fund
Parsons Commercial Technology Group, Inc.
QBE Marine & Energy Syndicate 1036
QBE Underwriting Ltd.
Schlumberger, Ltd.
SEACOR Marine
SEACOR Holdings, Inc.
SEACOR Offshore LLC
Sperry Drilling Services f/k/a Sperry Sun Drilling Services
The Response Group, LLC
Tidewater Inc.
Tidewater Marine, LLC
Transocean Deepwater Inc.
Transocean Holdings LLC
Transocean Inc.
Transocean Ltd.
Transocean Offshore Deepwater Drilling Inc.
Triton Asset Leasing GmbH
Weatherford International, Inc.
Weatherford U.S. L.P.
Witt O'Brien's
Worley Catastrophe Services LLC
Worley Companies Inc.

**Attachment B**

**Form of Notice of Dismissal**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL No. 2179 |
|     "Deepwater Horizon" in the Gulf of | * | |
|     Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| This Document Relates to: | * | JUDGE BARBIER |
| | * | |
| **EDWARD WISNER DONATION** | * | MAGISTRATE JUDGE |
| | * | SHUSHAN |
| Docket Number(s) | * | |
| Short Form Joinder Number(s) | * | |

## NOTICE OF VOLUNTARY DISMISSAL(S) WITH PREJUDICE

COME NOW the below-listed Plaintiff(s), each by and through the undersigned counsel, pursuant to Rule 41(a)(l)(A)(i) of the Federal Rules of Civil Procedure and the Full and Final Release, Settlement, and Covenant Not to Sue entered into by the parties, and hereby gives notice of the voluntary dismissal with prejudice of all actions, claims, causes of action, and short-form joinders against all Defendants, including but not limited to the action(s) and short-form joinders listed below, and withdrawal from any class (whether putative or certified), except that this dismissal does not extend to claims by Plaintiff(s) for punitive or exemplary damages against Transocean Inc., Transocean Holdings LLC, Transocean Ltd., Transocean Deepwater Inc., Transocean Offshore Deepwater Drilling Inc., Triton Asset Leasing GmbH, and Halliburton Energy Services Inc. (if any). Costs taxed as paid.

Case name(s) and docket number(s):

**EDWARD WISNER DONATION**

Short Form Joinder number(s) and identifying information:

_____

Respectfully submitted this ___ day of _____, 201_.


/s/ _____
Attorney Name:
Attorney Address:


ATTORNEY FOR PLAINTIFF(S)

## Attachment C

**Form of Notice**

*Notice of Deepwater Horizon Response Action*

The subject property was previously identified as potentially containing oil from the *Deepwater Horizon* oil spill. The process of investigating the property and decisions regarding the appropriate response action were overseen by the United States Coast Guard pursuant to the federal Clean Water Act and the Oil Pollution Act. Claimant **EDWARD WISNER DONATION** released and dismissed all claims, causes of action, and demands arising from or related to the potential oiling of the subject property, and those claims, causes of action, and demands have been fully compromised and settled. This notice is being filed in the public record to advise all future successors, transferees, and assigns of the Claimant, and any other party claiming any interest whatsoever in the subject property and/or any mineral leases or other agreements related to the subject property, of the potential oiling and of Claimant's subsequent release of all claims, causes of action, and demands arising from or related to the potential oiling. The terms and conditions of the release are binding on all of Claimant's successors, transferees, and assigns and on any other party claiming any interest whatsoever in the subject property and/or any mineral leases or other agreements related to the subject property.

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on April 20, 2010** | **MDL No. 2179** |
| *This document relates to:* | **SECTION: J** |
| No. 10 -2771 [Rec. Doc. 326]; Short Form Joinders filed in MDL 2179 through 10-9999 [Rec. Doc. 401] and 10-8888; Rec. Doc. 133248]; No. 13-1971, and No. 14-1525. | **JUDGE BARBIER** |
| | **MAGISTRATE JUDGE WILKINSON** |

## DECLARATION OF SOREN GISLESON

I, Soren Gisleson, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, recollection, and belief:

1. I am licensed to practice law in the State of Louisiana, the United States District Court for the Eastern District of Louisiana, and the U.S. Fifth Circuit Court of Appeals.

2. I am an equity partner with Herman, Herman & Katz, LLC. My practice consists of complex litigation, class actions, environmental litigation, insurance and business disputes, civil rights, and some criminal pro bono. Since April 2010, I have dedicated my practice full time to the BP Oil Spill in the MDL and for HHK client responsibilities. I acted as Steve Herman's second chair, serving on numerous subcommittees for the MDL, including the deposition team, expert preparation team, pleading team, and appeals team, among others. I am also the HHK partner in charge of BP clients including those in the Court Supervised Settlement Program and outside of it, such as Wisner.

3. I am a member of the "Joint Venture" Attorneys / Group / Team that was hired in 2012 to serve as *Deepwater Horizon*-related litigation counsel for the Edward Wisner Donation.[1]

---

[1] This Joint Venture Team includes the following five law firms: Herman Herman & Katz; Fayard & Honeycutt; Fred L. Herman; Leger & Shaw; and Domengeaux Wright Roy Edwards & Colomb.

1


EXHIBIT
3

4.     This declaration is submitted to address some of the issues raised by the Motion for Attorneys' Fees submitted by Waltzer Wiygul & Garside (WWG) on November 18, 2016, [Rec. Doc. 21922].

**The Joint Venture Attorney's First 23 Months of Administrative Oversight**

5.     I became the point person on behalf of the Joint Venture to manage and coordinate the administrative oversight under the Access Agreement and any and all litigation specific to the Donation.  I maintained client contact, oversaw the experts and professionals, and coordinated the five law firms to ensure appropriate clean-up efforts were being conducted.

6.     One of the first things I did upon taking over from WWG was to meet with the Donation employee to obtain status and strategy.  I had numerous meetings, phone calls, and emails with Donation employee Cathy Norman to develop a thorough understanding of the clean-up operations, duties under the Access Agreement, and steps going forward.

7.     It became clear that Ms. Norman developed the Access Agreement, possessed institutional knowledge about the property, and understood what constituted appropriate clean-up activities on the property.  It also became clear that she ultimately deferred to Dr. John Pardue and Jeffress Williams' collective expertise as to the appropriate clean-up operations.

8.     Another initial task I performed was to review all of the previous work performed by WWG.  I obtained a copy of what WWG represented to me was a complete copy of its Wisner file. I reviewed it in its entirety.  I developed an understanding of the work that WWG performed before the Joint Venture.

9.     WWG's work predominantly concerned the administrative oversight of the clean-up operations on Fourchon Beach.  WWG oversaw the work performed by Dr. John Pardue, an environmental engineer, Jeffress Williams, a coastal geomorphologist, and Forrest

---

Traverica III, an investigator who (along with his team) provided a presence on the property during the spill response.

10.   I have since reviewed the invoices submitted by these professionals before the Joint Venture replaced WWG.   During that time, Mr. Traverica and his team spent 5,687 hours monitoring the clean-up activities; Dr. Pardue spent 867 hours overseeing clean-up activities; and Mr. Williams spent 418.25 hours applying his unique skills to the oversight effort.   The total from these professionals equals 6,972.25.

11.   The Donation also provided me with an accounting of the attorney payments and cost reimbursements to WWG. *See Spreadsheet*, at 1, attached as Exhibit, "A".   The Donation paid Robert Wiygul $227,270.50 for his time, $115,081.45 for Joel Waltzer's time, and $14,684.54 in reimbursed expenses.   It does not appear that Clay Garside billed any time to the Donation.   In total, the Donation paid WWG $342,351.95 in attorney's fees and with expenses increases to $357,036.49.   All invoices were paid; no outstanding invoices exist.

12.   The amount of hours Mr. Wiygul and Mr. Waltzer worked can be extrapolated from these paid invoices.   WWG's contract provided that Mr. Wiygul would be paid $365 per hour and Mr. Waltzer would be paid $355 per hour.   Dividing the amount paid by the hourly rate demonstrates that Mr. Wiygul worked 622.7 hours and Mr. Waltzer worked 324.2 hours.

13.   For approximately 23 months, from the date the resolution was passed by vote to replace WWG (July 31, 2012) until suit was filed (June 6, 2014), the Joint Venture performed the same work as WWG.   Myself and other members of the Joint Venture oversaw BP and the Coast Guard's clean-up operations on Fourchon Beach through Mr. Traverica's daily presence, Dr. Pardue and Mr. William's expertise, and frequent contact with the client.   We attended meetings with all relevant parties, drafted proposals, and visited the property.   We conferred with numerous BP and Coast Guard personnel.

3

**21 Months of Access Agreement Litigation, No. 14-1525**

14.     The Joint Venture alone litigated BP's cancellation of the Access Agreement and resulting litigation.   On May 22, 2014, BP sent me a letter unilaterally canceling the Access Agreement.   After negotiating reinstatement of the Access Agreement failed, the Joint Venture lawyers filed an *Expedited Motion for Specific Performance* into MDL 2179 on June 6, 2014.  [Rec. Doc. 13002]  Judge Barbier referred the motion to this Court based on this Court's earlier involvement in Wisner.  [Rec. Doc. 13020]  This Court ruled on the motion and instructed Wisner to re-file the Access Agreement as its own stand alone lawsuit.  [Rec. Doc.  13122]  The Joint Venture then filed a separate Complaint which became No. 14-1525 ("Access Agreement case").

15.     The Access Agreement case became an incredibly hard fought, labor intensive litigation with no expense spared.  The Joint Venture lawyers incurred $927,173.12 in unreimbursed costs and expenses, reviewed 100,000s of documents, worked thousands of hours, took 36 depositions, traveled to eight cities across the country (some multiple times), waged a twelve expert battle, engaged in innumerable discovery disputes, and briefed numerous pleadings.

16.     The Joint Venture has $927,173.12 in unreimbursed litigation costs.  Over the course of the Access Agreement, the Joint Venture actually spent more than $2 million with all but $927,173.12 being reimbursed and/or incurred through litigation.  The costs can generally be broken down into four categories: expert/professional/consultant related expenses which comprise approximately 70%, depositions/discovery related costs approximately 20%, and miscellaneous litigation costs approximately 10%.

17.     A detailed, line item cost report and relevant supporting documentation was provided to the then Trustee designee Suchitra Satpathi almost three months ago in September 2016 and a second time shortly thereafter to the City Attorney Rebecca Dietz for her review. She is in the process of reviewing these costs and expenses to determine whether they are

4

reasonable and adequate.  We have engaged in some discussions as to what, if anything, should be removed.  As soon as we hear from the City Attorney as to whether it approves the expenses, we will inform the Court through a separate application for reimbursements of those costs held in trust.   Until that time, a line-item breakdown can be provided to the Court should it so request.

18. The Joint Venture lawyers spent hundreds of hours reviewing documents produced by BP before and after the Access Agreement litigation began.  BP produced 175,300 documents (or about 350,709 pages) that was reviewed by the Joint Venture.  These documents were processed and coded in the document review program *Eclipse*.  The Joint Venture also reviewed approximately 30,807 documents (or about 104,724 pages) from its own client to determine privilege and relevance and reviewed another 8,609 documents (or 46,437 pages) from Coastal Protection Restoration Authority.  In total, the Joint Venture reviewed more than 214,716 documents (or about 501,870 pages).  The production and review of documents became so onerous that HHK needed to purchase an additional server and software to process it on its network.

19. The Joint Venture attorneys worked thousands of hours.  While some members of the Joint Venture kept time records, others did not.  As the point person for administrative oversight of the Access Agreement, I contemporaneously kept time records.  I submitted appropriate time to BP during the life of the Access Agreement and was reimbursed $17,161.20.

20. Numerous other lawyers on the Joint Venture team who were involved only in litigation efforts did not always record all of their time.  As a contingency case, recordation of time related to litigation was not required.  The total amount of recorded attorney time until the date of the settlement equals 2,046 hours.  The best estimate of total time, recorded and unrecorded, actually spent by all Joint Venture lawyers confidently exceeds 2,500 hours. If paralegal and secretarial time were included, another 1,000 hours could be added.

21. Joint Venture lawyers travelled to ten cities, some multiple times, to take and/or defend 36 depositions.   On some occasions, the Joint Venture lawyers multi-tracked depositions  on

the same day.  The Joint Venture lawyers took and/or defended the following depositions
of the following witnesses at the identified locations:

| NAME | TITLE | PARTY | LOCATION |
|---|---|---|---|
| Byszinski, Brad | Deputy Incident Commander | BP - Fact | Chicago |
| Dunham, Gay | Deputy Operations Chief in charge of West Louisiana | BP - Fact | Anchorage |
| Fitzgerald, Duncan | Professor of Geology at Boston University | BP - Fact | New Orleans |
| Folse, Laura | Executive vice president of response and environmental restoration and the Gulf Coast Restoration Organization. | BP - 30(b)(6) | HOUSTON |
| Gardemal, Joseph | Certified Public Accountant | BP - Expert | New Orleans |
| Gisclair, Aric | MAG Run | Wisner - Fact | New Orleans |
| Harrison, Mike | BP Operations Section Chief | BP - Fact | San Antonio |
| Hayward, Gary | Response Efforts | BP - Expert BP - 30(b)(6) | New Orleans Houston |
| Holcomb, Stephen | BP Accountant | BP - Fact | Houston |
| Kulp, Mark | Erosion Rates | BP - Expert | New Orleans |
| Marshall, Eddie | BP Contractor/Project Manager | BP - Fact | Houston |
| Nepywoda, John | Environmental Unit Leader GCIMT | BP - Fact | Chicago |
| Norman, Cathy | Former Wisner Land Manager | Wisner - Fact | New Orleans |
| Norman, Don | Norman Wildlife (Birds) | Wisner - Fact | New Orleans |
| Pardue, John | Environmental Expert | Wisner - Expert | New Orleans |
| Paskewich, Frank | Marine safety including as a professional oil spill responder (FOSC Response) | BP - Expert | New Orleans |
| Pena, Jeffrey | Environmental Compliance Specialists | BP - Fact | New Orleans |
| Peneguy, Michael | Wisner Heir | Wisner - Fact | New Orleans |
| Phillips, Amanda | Wisner Land Manager | Wisner - Fact Wisner - 30(b)(6) | New Orleans |
| Rice, Kenneth | Natural Resource Advisory (NRA) Coordinator | BP - Fact | Mobile |
| Sanders, Floyd | State Planning Leader | BP - Fact | New Orleans |
| Scott, Blake | Operations Supervisor | BP - Fact | New Orleans |

| Stavins, Robert | Cost of Sand Removal – Whitelaw Rebuttal | BP - Expert | Boston |
| Taylor, Ancil | Cost of restoring sand to the shoreline of Fourchon Beach. | BP - Expert | New Orleans |
| Taylor, Elliot | Response planning organizations, development of contingency plans, and technical support for environmental issues in oil spill response | BP - Expert | New Orleans |
| Taylor, Mike | Louisiana Branch OPS Environmental Coordinator | BP - Fact | Oklahoma City |
| Traux, Michael | Louisiana State Certified General Real Estate Appraiser | BP - Expert | New Orleans |
| Travirca, Forrest, IV | FETI Investigations | Wisner - Fact | New Orleans |
| Travirca, Forrest | FETI Investigations | Wisner - Fact<br>Wisner - Trial | New Orleans<br>Lockport |
| Travirca, Allen | FETI Investigations | Wisner - Fact | New Orleans |
| Wallace, William Danny | Deputy Incident Commander | BP - Fact | New Orleans |
| Whitelaw, Ed | Economist Expert | Wisner - Expert | Portland |
| Williams, Jeffress | Coastal/Erosion Expert | Wisner - Expert | New Orleans |

22.    An extensive 'battle of the experts' occurred in this litigation.  The Joint Venture retained, prepped, and shepherded three litigation experts:  (1) Dr. John Pardue, environmental engineer, who provided an exhaustive report concerning clean-up operations, industry standards, violations, and proper protocol; (2) Jeffress Williams, coastal morphologist, who provided an exhaustive report concerning the unique nature and conditions of Fourchon Beach; and (3) Dr. Ed. Whitelaw, economist, who placed value on the damage caused by clean-up operations.

23.    BP responded with eight of its own experts – all of whom had to be researched, challenged, and deposed before trial.  BP retained the following experts:    (1) Joseph Gardemal, a certified public accountant; (2) Gary Hayward, oil spill response activities; (3) Mark Kulp, coastal geologist; (4) Frank Paskewich, oil spill response activities of the federal government; (5) Robert Stavins, value of sand; (6) Ancil Taylor,  cost of sand replacement

operations; (7) Elliott Taylor, response planning activities; and (8) Michael Truax, appraiser.

24.     The Joint Venture engaged in a continuing dialogue of discovery disputes throughout the discovery period.  I would speak with BP lead counsel Chris Esbrook on an almost daily basis to confer over depositions, documents, exhibits, expert concerns, and general logistics.   The complexities of discovery were demanding with depositions taking place across the country, hundreds of thousands of documents reviewed and/or contested (including more than 40,000 photographs), exhaustive privilege logs, and expert reports, reliance materials, and correspondence.

25.     The Joint Venture engaged in significant motion practice and general pleading practice in preparation for trial.  In addition to the *Expedited Motion for Specific Performance* filed in MDL 2179 and the *Complaint* filed in No. 14-1525, the Joint Venture drafted and filed the following: (1) *Motion in Limine to Consider Settlement Documents* [Rec. Doc. 12]; (2) *Opposition to BP Motion to Dismiss* [Rec. Doc. 13]; (3) *Reply in Support of Motion for Specific Performance* [Rec. Doc. 16]; (4) *Motion to Compel* [Rec. Doc. 66]; (5) *Opposition to BP Motion for a Protective Order* [Rec. Doc. 72]; (6) *Second Motion to Compel* [Rec. Doc. 103]; (7) *Opposition to BP Motion to Compel* [Rec. Doc. 112]; (8) *Reply in Support of Motion to Compel* [Rec. Doc. 118]; (9) *Reply in Support of Second Motion to Compel* [Rec. Doc. 121]; (10) *Motion for Partial Summary Judgment* [Rec. Doc. 132]; (11) *Opposition to BP Motion for Partial Summary Judgment* [Rec. Doc. 139]; (12) *Reply in Support of Motion for Partial Summary Judgment* [Rec. Doc. 142]; (13) *Motion to Strike Affidavits* [Rec. Doc. 148]; (14) *Consolidated Opposition to BP Motion to Exclude Evidence, Motion to Limit Testimony of John Pardue,* and *Motion to Limit Testimony of Jeffress Williams*; (15) *Witness and Exhibit List* [Rec. Doc. 163]; (16) *Opposition to BP Motion to Quash Subpoenas* [Rec. Doc. 186]; and (17) *Pre-Trial Order* [Rec. Doc. 188].

26.     The Access Agreement case while centering upon clean-up damages included an entire category of damages that are "physical damage and restoration costs".  The most obvious example is the sand replacement.  During clean-up, BP removed millions of pounds of sand

without ever replacing with clean comparable sand.  This sand removal, while performed in the context of clean-up operations, caused "physical damage" to Fourchon beach which necessitated Wisner to seek "restoration cost" in the Access Agreement case.

### Other Wisner Litigation Activities

27.    In addition to the Access Agreement litigation, the Joint Venture filed Short Form Joinders into the Limitation on Wisner's behalf in both 10-8888 and 10-9999, out of an abundance of caution.

28.    The Joint Venture also prepared an extensive Presentment submission to BP in January 2013 complete with expert reports from Dr. Pardue, Mr. Williams, and meteorologist Barry Keim in accordance with the Oil Pollution Act.   Presentment summarized large volumes of data of the previous two and a half years of oiling with projections and estimates for future concerns.

29.    After 90 days elapsed, the Joint Venture filed suit in what became known as No. 13-1971. This Complaint contained the most complete accounting of causes of action that was both timely and procedural proper.

Signed, under penalty of perjury, this 8th day of December, 2016, in New Orleans, Louisiana.

_____
Soren Gisleson

**2010 - 2012 LEGAL FEES AND EXPENSES**

### 2010

| INVOICE DATE | WALTZER FEES | WIYGUL FEES | WALTZER EXPENSES | EXPERT EXPENSES | WIYGUL EXPENSES | ADJUSTMENTS | INVOICE TOTAL | AMOUNT DUE | CHECK DATE | CHECK NUMBER | CHECK AMOUNT | WALTZER FEE PAYMENT | WIYGUL FEE PAYMENT | WALTZER EXPENSE PAYMENT | EXPERT EXPENSES | WIYGUL EXPENSE PAYMENT | ADJUSTMENTS | OUTSTANDING BALANCE | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/14/2010 | $12,390.00 | $18,323.00 | $4,632.75 | $0.00 | $378.34 | $0.00 | $35,724.09 | $20,367.69 | 9/16/2010 | 12832 | $20,367.69 | $6,195.10 | $9,161.50 | $4,632.75 | | $378.34 | | $15,356.40 | First month 50% of legal fees were due upon invoice receipt. |
| 10/27/2010 | 10,290.00 | 23,141.00 | 1,286.00 | | 179.75 | | 34,896.75 | 9,465.75 | 10/27/2010 | 12899 | 9,465.75 | 4,000.00 | 4,000.00 | 1,286.00 | | 179.75 | | 40,787.40 | Second month forward, legal fees capped at $8000. Balance rolled to next month with the full balance due upon receipt by BP |
| 11/8/2010 | 10,046.50 | 21,133.50 | 100.00 | | 180.00 | | 31,460.00 | 8,280.00 | 11/9/2010 | 12965 | 8,280.00 | 4,000.00 | 4,000.00 | 100.00 | | 180.00 | | 63,967.40 | |
| 11/30/2010 | 13,951.50 | | 3,804.22 | 23,092.65 | | | 40,848.37 | 34,896.87 | 12/20/2010 | 13044 | 34,896.87 | 8,000.00 | | 3,804.22 | 23,092.65 | | | 69,918.90 | |
| 11/30/2010 | | 25,039.00 | | 0 | 415.31 | | 25,454.31 | 415.31 | 12/27/2010 | 13045 | 415.31 | | | | | 415.31 | | 94,957.90 | |
| | $46,678.00 | $87,636.50 | $9,822.97 | $23,092.65 | $1,153.40 | $0.00 | $168,383.52 | $73,425.62 | | | $73,425.62 | $22,195.10 | $17,161.50 | $9,822.97 | $23,092.65 | $1,153.40 | $0.00 | 94,957.90 | |

### 2011

| INVOICE DATE | WALTZER FEES | WIYGUL FEES | WALTZER EXPENSES | EXPERT EXPENSES | WIYGUL EXPENSES | ADJUSTMENTS | INVOICE TOTAL | AMOUNT DUE | CHECK DATE | CHECK NUMBER | CHECK AMOUNT | WALTZER FEE PAYMENT | WIYGUL FEE PAYMENT | WALTZER EXPENSE PAYMENT | EXPERT EXPENSES | WIYGUL EXPENSE PAYMENT | ADJUSTMENTS | OUTSTANDING BALANCE | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/3/2011 | $10,383.75 | $7,373.00 | $350.00 | $9,277.00 | $180.00 | | $27,563.75 | $17,807.00 | 1/5/2011 | 13108 | $17,807.00 | $4,000.00 | $4,000.00 | $350.00 | $9,277.00 | $180.00 | | $104,714.65 | |
| 1/3/2011 | | | | 825.00 | | | 825.00 | 825.00 | 1/31/2011 | 13120 | 825.00 | | | | 825.00 | | | 104,714.65 | |
| 9/14/2010 | | | | | | | | | 1/31/2011 | 13130 | 15,356.60 | 6,195.10 | 9,161.50 | | | | | 89,358.05 | Final payment made on September 2010 Invoice |
| 2/7/2011 | 15,034.25 | 10,329.50 | 484.11 | | | | 25,847.86 | 8,484.11 | 2/10/2011 | 13187 | 8,484.11 | 4,000.00 | 4,000.00 | 484.11 | | | | 106,721.80 | |
| 3/10/2011 | 11,093.75 | 12,118.00 | | 16,249.50 | 188.49 | | 39,649.74 | 24,446.49 | 3/10/2011 | 13260 | 24,446.49 | 4,000.00 | 4,000.00 | | 16,258.00 | 188.49 | | 121,925.05 | |
| 12/30/2010 | | | | 16,580.69 | | | 16,580.69 | 16,580.69 | 3/30/2011 | 13263 | 16,580.69 | | | | 16,580.69 | | | 121,925.05 | |
| 11/8/2010 | | | | | | | | | 3/30/2011 | 13266 | 23,180.00 | 5,145.00 | 11,570.50 | | | | | 98,745.05 | Final payment made on November 8, 2010 Invoice |
| 10/27/2010 | | | | | | | | | 3/30/2011 | 13267 | 25,431.00 | 6,290.00 | 19,141.00 | | | | | 73,314.05 | Final payment made on October 2010 Invoice |
| 11/30/2010 | | | | | | | | | 3/30/2011 | 13268 | 30,990.50 | 5,951.50 | 25,039.00 | | | | | 42,323.55 | Final payment made on November 30, 2010 Invoice |
| 1/3/2011 | | | | | | | | | 3/30/2011 | 13269 | 9,756.75 | 6,383.75 | 3,373.00 | | | | | 32,566.80 | Final payment made on December 2010 Invoice |
| 2/7/2011 | | | | | | | | | 4/26/2011 | 13352 | 17,363.75 | 11,034.25 | 6,329.50 | | | | | 15,203.05 | Final payment made on January 2011 Invoice |
| 4/1/2011 | 1,579.75 | 4,562.50 | 31.22 | 35,569.46 | | | 41,742.93 | 41,742.93 | 4/28/2011 | 13356 | 41,742.93 | 1,579.75 | 4,562.50 | 31.22 | 35,569.46 | | | 15,203.05 | |
| 5/1/2011 | 568.00 | | 8.00 | 26,537.65 | | | 27,113.65 | 27,113.65 | 5/17/2011 | 13489 | 27,113.65 | 568.00 | | 8.00 | 26,537.65 | | | 15,203.05 | |
| 5/1/2011 | | 4,015.00 | | | | | 4,015.00 | 4,015.00 | 6/15/2011 | 13488 | 4,015.00 | | 4,015.00 | | | | | 15,203.05 | |
| 6/1/2011 | 3,798.50 | 11,826.00 | 6.00 | 20,549.71 | | | 36,180.21 | 28,555.71 | 6/15/2011 | 13489 | 28,555.71 | 3,798.50 | 4,201.50 | 6.00 | 20,549.71 | | | 22,827.55 | |
| 7/1/2011 | 2,946.50 | 7,811.00 | 5.00 | 25,496.86 | | (18.00) | 36,241.36 | 33,483.86 | 7/21/2011 | 13558 | 33,483.86 | 2,946.50 | 5,053.50 | 5.00 | 25,496.86 | | (18.00) | 25,585.05 | Error on BP Claim 13 resulted in $18 credit. Error on JW time sheet shows exp as $11,450, but is $10,450. Over paid by $1000. |
| 8/1/2011 | 603.50 | 4,489.50 | | 11,938.78 | | (1,000.00) | 16,031.78 | 16,031.78 | 9/13/2011 | 13697 | 16,031.78 | 603.50 | 4,489.50 | | 11,938.78 | | (1,000.00) | 25,585.05 | Payment reduced by $1000 because of an $1000 error on June bill |
| 9/1/2011 | 1,952.50 | 2,956.50 | | 18,135.48 | | | 23,044.48 | 23,044.48 | 9/27/2011 | 13713 | 23,044.48 | 1,952.50 | 2,956.50 | | 18,135.48 | | | 25,585.05 | |
| 3/5/2011 | | | | | | | | | 9/30/2011 | 13716 | 25,593.75 | 7,093.75 | 18,500.00 | | | | | (8.70) | Final payment made on February, April and June 2011 Invoices |
| 10/1/2011 | | 4,562.50 | | 38,369.76 | | | 42,932.26 | 42,932.26 | 10/13/2011 | 13771 | 42,932.26 | | 4,562.50 | | 38,369.76 | | | (8.70) | |
| 10/1/2011 | 1,508.75 | | | | | | 1,508.75 | 1,508.75 | 10/14/2011 | 13772 | 1,508.75 | 1,508.75 | | | | | | (8.70) | |
| 10/1/2011 | 6,478.75 | | 350.00 | | 400.00 | | 7,228.75 | 4,187.50 | 10/18/2011 | 13780 | 4,187.50 | 3,437.50 | | 350.00 | | 400.00 | | 3,032.55 | |
| 11/3/2011 | 2,662.50 | 5,292.50 | | 19,325.48 | 164.34 | | 27,444.82 | 27,441.82 | 11/30/2011 | 13855 | 27,441.82 | 2,662.50 | 5,292.50 | | 19,325.48 | 164.34 | | 3,035.55 | Invoice stated total amount due $27,441.82. When add totals, get $27,444.82 - $3 discrepancy |
| 3/7/2011 | | | | 7,587.00 | | | 7,587.00 | 7,587.00 | 12/16/2011 | 13921 | 7,587.00 | | | | 7,587.00 | | | 3,035.55 | |
| | $58,610.50 | $75,336.00 | $1,234.33 | $246,442.37 | $932.83 | ($1,018.00) | $381,538.03 | $325,788.03 | | | $471,460.38 | $79,150.85 | $140,248.00 | $1,234.33 | $246,450.87 | $932.83 | ($1,018.00) | 3,035.55 | |

### 2012

| INVOICE DATE | WALTZER FEES | WIYGUL FEES | WALTZER EXPENSES | EXPERT EXPENSES | WIYGUL EXPENSES | ADJUSTMENTS | INVOICE TOTAL | AMOUNT DUE | CHECK DATE | CHECK NUMBER | CHECK AMOUNT | WALTZER FEE PAYMENT | WIYGUL FEE PAYMENT | WALTZER EXPENSE PAYMENT | EXPERT EXPENSES | WIYGUL EXPENSE PAYMENT | ADJUSTMENTS | OUTSTANDING BALANCE | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/1/2011 | $0.00 | $7,117.50 | | $17,941.03 | | | $25,058.53 | $25,058.58 | 1/3/2012 | 13983 | $25,058.58 | | $7,117.50 | | $17,941.03 | | | $3,035.50 | |
| 12/1/2011 | 1,420.00 | | | | | | 1,420.00 | 882.50 | 1/18/2012 | 13990 | 882.50 | | | | | | | 3,573.00 | |
| 12/1/2011 | 2,573.75 | 7,811.00 | | 16,803.79 | 284.64 | | 27,473.18 | 25,058.43 | 1/25/2012 | 13995 | 25,058.43 | 2,573.75 | 5,426.25 | | 16,803.79 | 284.64 | | 5,987.75 | |
| 10/1/2011 | | | | | | | | | 2/28/2012 | 14075 | 5,963.50 | 3,578.75 | 2,384.75 | | | | | 24.25 | Final payment for September, November and December 2011 invoices. |
| 2/1/2012 | 1,242.50 | | | 4,950.00 | | | 6,192.50 | 6,192.50 | 3/2/2012 | 14128 | 6,192.50 | 1,242.50 | | | 4,950.00 | | | 24.25 | |
| 3/1/2012 | | | 35.00 | 13,138.06 | | (7,587.00) | 5,586.06 | 5,586.06 | 4/2/2012 | 14201 | 5,586.06 | | | 35.00 | 13,138.06 | | (7,587.00) | 24.25 | $7587 credit for double paying LSU invoice. Invoice submitted with W&W bill as well as separately by LSU |
| 4/1/2012 | | | | 12,817.24 | | | 12,817.24 | 12,817.24 | 4/26/2012 | 14219 | 12,817.24 | | | | 12,817.24 | | | 24.25 | |
| 5/1/2012 | | | | 10,460.52 | | | 10,460.52 | 10,460.52 | 5/22/2012 | 14283 | 10,460.52 | | | | 10,460.52 | | | 24.25 | |
| 3/1/2012 | 4,260.00 | 4,343.50 | | | | | 8,603.50 | 8,000.00 | 5/29/2012 | 14291 | 8,000.00 | 4,000.00 | 4,000.00 | | | | | 627.75 | |
| 6/1/2012 | | | | 16,277.55 | | | 16,277.55 | 16,277.55 | 6/7/2012 | 14351 | 16,277.55 | | | | 16,277.55 | | | 627.75 | |
| 2/1/2012 | | 6,314.50 | | | | | 6,314.50 | 6,314.50 | 6/14/2012 | 14352 | 6,314.50 | | 6,314.50 | | | | | 627.75 | |
| 4/1/2012 | | 14,527.00 | | | 360.00 | | 14,887.00 | 8,360.00 | 6/15/2012 | 14360 | 8,360.00 | | 8,000.00 | | | 360.00 | | 7,154.75 | |
| 6/1/2012 | | | | | | | | | 6/21/2012 | 14368 | 7,130.50 | 260.00 | 6,870.50 | | | | | 24.25 | Final payment for February and March 2012 invoices. |
| 7/1/2012 | | | | 52,864.68 | 465.37 | | 53,330.05 | 53,330.05 | 7/24/2012 | 14436 | 53,330.05 | | | | 52864.68 | 465.37 | | 24.25 | |
| 6/1/2012 | | | | | 396.00 | (681.00) | 31,543.00 | 31,543.00 | 7/25/2012 | 14438 | 31,543.00 | 2,080.50 | 29,747.50 | | | 396.00 | (681.00) | 24.25 | Total of invoices $681 higher than those paid by BP. W&W waived the $681 extra. |
| 6/1/2012 | 2,080.50 | 29,747.50 | | | | | | | | | | | | | | | | | |
| | $11,576.75 | $69,861.00 | $35.00 | $145,252.87 | $1,506.01 | ($8,268.00) | $219,963.63 | $209,880.93 | | | $222,974.93 | $13,735.50 | $69,861.00 | $35.00 | $145,252.87 | $1,506.01 | ($8,268.00) | 24.25 | |

### 2010-2012

| | WALTZER FEES | WIYGUL FEES | WALTZER EXPENSES | EXPERT EXPENSES | WIYGUL EXPENSES | ADJUSTMENTS | INVOICE TOTAL | AMOUNT DUE | | | CHECK AMOUNT | WALTZER FEE PAYMENT | WIYGUL FEE PAYMENT | WALTZER EXPENSE PAYMENT | EXPERT EXPENSES | WIYGUL EXPENSE PAYMENT | ADJUSTMENTS | OUTSTANDING BALANCE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $116,865.25 | $232,833.50 | $11,092.30 | $414,787.89 | $3,592.24 | ($9,286.00) | $769,885.18 | $609,094.58 | | | $769,860.93 | $115,081.45 | $227,270.50 | $11,092.30 | $414,736.39 | $3,592.24 | ($9,286.00) | $24.25 | |
| Total Legal Fees and Expenses | $364,383.29 | | | | | | | | | | $357,036.49 | | | | | | | | |



**EXHIBIT**

**A**



**CITY OF NEW ORLEANS**
**LAW DEPARTMENT**
**1300 PERDIDO STREET, 5TH FLOOR EAST**
**NEW ORLEANS, LOUISIANA 70112**
**TELEPHONE:  (504) 658-9800**
**TELECOPIER:  (504) 658-9868**

MITCHELL J. LANDRIEU
MAYOR

NANNETTE JOLIVETTE BROWN
CITY ATTORNEY

February 16, 2011

Susan Clade
Simone, Peragine Smith & Redfearn
1100 Poydras Street, 30th Floor
New Orleans, LA 70163

Dear Ms. Clade and Committee:

We are writing to you on behalf of Mayor Mitchell J. Landrieu in his capacity as Trustee of the Wisner Trust and out of respect for the Committee's Secretary-Treasurer Cathy Norman's instruction that we communicate with her through you, her attorney. We assume you are her personal attorney.

Please know Mayor Landrieu has assumed all of his duties and responsibilities as Trustee of the Wisner Trust. He has not, nor does he intend to, specifically delegate (as required by law) any of his fiduciary responsibilities, in his capacity, as Trustee. Although he does not believe that any of his responsibilities as Trustee have been delegated, he now specifically revokes any such delegation you believe has been made.

He has not executed any contracts or other agreements on behalf of Wisner recently because, in a meeting with Cathy Norman on September 27, 2010, she unequivocally advised us that she did not need the Mayor's signature or approval on any matter involving the Wisner Trust and would proceed without us. She demonstrated her resolve, we are advised, by entering into an agreement for legal services with a group of lawyers to represent Wisner in a matter involving the BP Oil Spill. Despite those actions, we consider that agreement null and void.

Ms. Norman's statement and action were the direct response to inquiry into the procurement procedures (or lack thereof) and hiring practices of her and the committee. Accordingly, our information leads us to believe that the Committee has not been open and transparent in its procurement and hiring practices, contrary to the Committee's representation in its January 31, 2011, letter to the Mayor.

EXHIBIT
4

She further advised us that she and her staff would no longer occupy space in City Hall in furtherance of her point that as Mayor of the City of New Orleans, Mayor Landrieu had no actual authority over Wisner Trust, and that the Committee, through her, has all of the power it needs to accomplish the goals of the Trust as it sees fit.

Upon eliciting our own outside legal advices, and considering recent communications to us by the Wisner Committee asking for the Mayor's signature on certain documents, clearly Cathy Norman was wrong. Neither the Wisner Committee, nor Cathy Norman have the authority to bind the Trust by contract or otherwise, without the Mayor's/Trustee's specific authorization.

Further, it appears, Bylaws were drafted and adopted by the Committee itself, without Mayoral/Trustee approval, in an improper attempt to extend and expand the powers of the Committee and Administrative Staff beyond the ministerial duties allowed by the applicable empowering documents and law. Consequently, we believe that the position of the Committee's letter of January 31, 2011, assuming the necessity for the Committee's approval over the Trustee's fiduciary obligation, unsupportable.

Please direct your client to promptly hand deliver any contracts, leases or other documents of the Wisner Trust to my office immediately. Further, please advise your client to cease improperly exercising the Mayor's sole authority as fiduciary of the Trust.

Sincerely,

Nannette V. Jolivette Brown
City Attorney

-----Original Message-----
From: Nannette V. Jolivette-Brown <njbrown@cityofno.com>
To: Edward W. Donation <wisnerdonation@aol.com>
Sent: Wed, Jul 7, 2010 8:52 pm
Subject: Re: Outside Counsel for the Edward Wisner Donation

I will waive any conflicts. I would like to get together to strategize. I am putting out an RFP next week. I think we should try to coordinate our efforts if we can.
Nannette

---

**From**: WISNERDONATION@aol.com <WISNERDONATION@aol.com>
**To**: Nannette V. Jolivette-Brown; Ashleigh G. Gardere
**Sent**: Wed Jul 07 16:57:53 2010
**Subject**: Outside Counsel for the Edward Wisner Donation

Nanette:


Just wanted to touch base with you again about the Wisner Emergency meeting held last Thursday at which the Committee approved hiring Joel Waltzer to represent Wisner for the BP spill. At this point we desperately need to get experts out onto the property to start collecting baseline information. Oil continues to heavily impact the property especially in light of the recent weather events. I am hesitant to hire a science expert without first engaging outside counsel.


Please let me know as soon possible if the conflicts with the City of New Orleans have been resolved and Wisner can proceed with engaging Mr. Waltzer.


Thanks you,




C. Cathy Norman

Secretary Treasurer/Landman
1300 Perdido, Room 8E06
New Orleans, La 70112
(504) 658-4060
Fax (504) 658 4065
wisnerdonation@aol.com

EXHIBIT
5

**From:** Stephen Gele [mailto:sgele@smithfawer.com]
**Sent:** Tuesday, October 04, 2016 5:41 PM
**To:** Steve Herman <SHERMAN@hhklawfirm.com>
**Cc:** Soren Gisleson <SGISLESON@hhklawfirm.com>; Fred Herman <fherman@fredhermanlaw.com>; Randall Smith <rasmith@smithfawer.com>
**Subject:** Re: BP Oil Spill Lit. - Waltzer & Wiygul vs. Wisner Donation, et al

Steve,

If you are proposing to divide the total contingency fee for the benefit of all of the lawyers who were hired by the beneficiaries and assisted in prosecution of the case at the request of Joint Venture counsel,  Waltzer Wiygul & Garside LLC would be happy to entertain such a division of the total contingency fee.

Otherwise, Waltzer Wiygul & Garside LLC did not allege in its *Complaint* that Waltzer Wiygul & Garside LLC seeks fees for services provided after termination.  As such, Waltzer Wiygul & Garside LLC is not obliged to provide Joint Venture counsel the requested documents.

We again request a counter proposal.  This ongoing dispute does not benefit the Donation.

Further, please respond to the question below: How did you determine or calculate the below amounts that were deposited into the registry of the court?

Stephen M. Gelé

Smith & Fawer, LLC

(504) 593-6085

EXHIBIT
6

(504) 237-6399


**From:** Steve Herman <SHERMAN@hhklawfirm.com>
**Date:** Friday, September 30, 2016 at 10:01 AM
**To:** Stephen Gele <sgele@smithfawer.com>
**Cc:** Soren Gisleson <SGISLESON@hhklawfirm.com>, Fred Herman <fherman@fredhermanlaw.com>,
Randall Smith <rasmith@smithfawer.com>
**Subject:** BP Oil Spill Lit. - Waltzer & Wiygul vs. Wisner Donation, et al


First of all, the notion that we are "harming the Donation" is absurd.


Secondly, WWG has never, to my knowledge, provided either the Trustee, the Advisory Committee, or the Joint Venture Attorneys, with:


a. The retainer agreement between WWG and the Wisner / Peneguy Heirs;


b. The fees that were paid to WWG by the Wisner / Peneguy Heirs for post-termination services;


c. The contemporaneous time records for post-termination services for which WWG claims it is owed additional compensation from the Donation / Trustee / Beneficiaries collectively; or


d. The invoices and/or receipts for post-termination litigation expenses (if any) advanced or incurred by WWG, which WWG claims should be reimbursed or paid by the Donation / Trustee / Beneficiaries collectively.


If and when those documents are received, we will be in a better position to consider a potential counter-offer.


Thanks.


On Sep 30, 2016, at 10:39 AM, Stephen Gele <sgele@smithfawer.com> wrote:

Soren,


Waltzer, Wiygul & Garside has no objection to amounts to be distributed as attorneys' fees and costs being deposited into the registry of the court.  However, it is the understanding of Waltzer, Wiygul & Garside that the Wisner Donation Advisory Committee has yet to approve the amounts to be paid in total as

attorneys' fees and costs.  How did you determine or calculate the below amounts that you propose to deposit into the registry of the court?

In the future we would appreciate more than half a day to respond to a request for consent for a motion.

We have been waiting for a counter proposal to our solicited proposal to resolve this matter, but have yet to receive such counter proposal.  Your delay in resolving this matter is needlessly harming the Wisner Donation.  Please submit a counter proposal expeditiously.

Stephen M. Gelé

Smith & Fawer, LLC

(504) 593-6085

(504) 237-6399

**From:** Soren Gisleson <SGISLESON@hhklawfirm.com>
**Date:** Thursday, September 29, 2016 at 12:19 PM
**To:** Stephen Gele <sgele@smithfawer.com>
**Cc:** Fred Herman <fherman@fredhermanlaw.com>, Steve Herman <SHERMAN@hhklawfirm.com>
**Subject:** BP Oil Spill Lit. - Waltzer & Wiygul vs. Wisner Donation, et al

Stephen,

We intend on filing a motion to deposit funds into the registry of the Court for the amount of fees and costs at issue.  We would like to file tomorrow morning.  Please advise if you object.  The amount to be deposited would be for costs (**$927,173.12)** and attys fees (**$1,232,838.80).**  If we do not hear from you, we will note as such in the motion.

Thank you,

Soren

Soren E. Gisleson, Esq.

Partner

Herman, Herman & Katz

820 O'Keefe Avenue

New Orleans, Louisiana 70113

Direct Dial: 504-680-0569/Office: 504-581-4892/Fax: 504-561-6024

*This e-mail message contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect) immediately at (504) 581-4892 and ask to speak with the message sender. Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you.*

**CONFIDENTIAL ATTORNEY WORK PRODUCT**

 Please consider the environment before printing this e-mail

**From:** Cathy <wisnerdonation@aol.com>
**To:** njbrown <njbrown@cityofno.com>; aggardere <aggardere@cityofno.com>
**Subject:** Hiring Joel Waltzer
**Date:** Tue, Jul 20, 2010 7:06 pm

Nanette-

Cathy realizes you are very busy. She would appreciate some clarification on an email she received from you on July 7th. In it you asked to strategize together and indicated that you were putting out an RFP the week of July 12th.

Is the RFP for outside counsel for the City and the City's suit against BP? Or is it for Wisner's hiring outside counsel in the BP matter? Ms. Norman would appreciate an answer as soon as possible so that Wisner can move forward in its actions.

I appreciate you taking the time to answer our question.

L. Amanda Phillips
Executive Assistant
**Edward Wisner Donation**
1300 Perdido St. Rm 8E06
New Orleans, LA 70112
phone: 504/658.4060
fax: 504/658.4065

Mailing Address:
  P. O. Box 52204
  New Orleans, LA 70152-2204

EXHIBIT
7

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on April 20, 2010** | **MDL No. 2179** |
| *This document relates to:* | **SECTION: J** |
| No. 10 -2771 [Rec. Doc. 326]; Short Form Joinders filed in MDL 2179 through 10-9999 [Rec. Doc. 401] and 10-8888; Rec. Doc. 133248]; No. 13-1971, and No. 14-1525. | **JUDGE BARBIER**<br><br>**MAGISTRATE JUDGE WILKINSON** |

## DECLARATION OF STEPHEN J. HERMAN

I, Stephen J. Herman, respectfully declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, recollection, and belief:

1. I am licensed to practice law in the State of Louisiana, the United States District Court for the Eastern District of Louisiana, the U.S. Fifth Circuit Court of Appeals, and the U.S. Supreme Court.

2. I teach a course on complex litigation as an adjunct professor at Tulane Law School, and a class action seminar as an adjunct professor at Loyola University College of Law.  I am the author of *America and the Law: Challenges for the 21st Century* and numerous speeches, articles, guest lectures, papers and presentations on class actions, complex litigation, legal ethics, and professionalism, (among a variety of other legal topics).  I served for six years as a Lawyer Chair for one of the LADB Hearing Committees, and currently serve on the LSBA Rules of Professional Conduct Committee.  I am a past president of the Louisiana Association for Justice (formerly the Louisiana Trial Lawyers Association) and the Civil Justice Foundation, and a fellow of the International Academy of Trial Lawyers and the Litigation Counsel of America.  Prior to the *Deepwater Horizon* incident, I had actively participated in numerous class actions, multi-district litigations and

| EXHIBIT |
|---|
| **8** |

other complex cases, including, for example: <u>In re: Vioxx Products Liability Litigation</u>, MDL No. 1657; <u>In re: Chinese-Manufactured Drywall Products Liability Litigation</u>, MDL No. 2047; <u>Scott v. American Tobacco</u>, 795 So.2d 1176 (La. 2001); 830 So.2d 294 (La. 2002); 949 So.2d 1266 (La. App. 4th Cir. 2/7/07), *writ denied,* 973 So.2d 740 (La. 2008), *cert. denied,* 128 S.Ct. 2908 (2008); 36 So.3d 1046 (La. App. 4th Cir. 4/23/2010), *writ denied,* 44 So.3d 686 (La. 2010), *cert. denied,* 131 S.Ct. 3057 (2011); <u>Oubre / Orrill v. Louisiana Citizens Fair Plan</u>, 26 So.3d 994 (La. App. 4th Cir. 12/09/09); 38 So.3d 457 (La. App. 4th Cir. 4/21/2010), *writ denied,* 45 So.3d 1035 (La. 2010); 79 So.3d 987 (La. 2011); <u>Bauer v. Dean Morris</u>, 2011 WL 3924963 (E.D.La. Sept. 7, 2011); <u>Schultz v. Texaco Inc.</u>, 127 F.Supp.2d 443 (S.D.N.Y. 2001); 308 F.Supp.2d 289 (S.D.N.Y. 2004); 2009 WL 455163 (S.D.N.Y. Feb. 24, 2009); and <u>Andrews v. TransUnion Corp.</u>, 917 So.2d 463 (La. App. 4th Cir. 8/17/2005), *writ denied,* 926 So.2d 495 (La. 2006); MDL No. 1350.

3. James Parkerson Roy and I were appointed by Judge Barbier to serve as Interim Co-Liaison Counsel for the plaintiffs in the consolidated cases that were pending in Section J of the Eastern District of Louisiana on or around June 4, 2010.[1]  We were appointed Plaintiffs' Co-Liaison Counsel in MDL No. 2179 on or around August 27, 2010.[2]  We were appointed Interim Co-Class Counsel for the BP Economic and Medical Settlement Classes on or around March 5, 2012,[3] and Co-Lead Class Counsel on or around May 2, 2012.[4]  We were appointed Lead Settlement Class Counsel for the Halliburton/Transocean Settlement Classes on or around April 12, 2016.[5]

4. I am also a member of the "Joint Venture" Attorneys / Group / Team that was hired in 2012 to serve as *Deepwater Horizon*-related litigation counsel for the Edward Wisner Donation.[6]

---

[1] *See* No.10-1222, Rec. Doc. 108, and No.10-1156, Rec. Doc. 100.

[2] Rec. Doc. 110.  [Unless otherwise indicated Rec. Doc. numbers refer to the Documents filed in the docket for MDL No. 2179 in the Eastern District of Louisiana, No. 10-md-2179.]

[3] Rec. Doc. 5960.

[4] Rec. Docs. 6418, 6419.

[5] Rec. Doc. 16183.

[6] This Joint Venture Team includes the following five law firms: Herman Herman & Katz; Fayard & Honeycutt; Fred L. Herman; Leger & Shaw; and Domengeaux Wright Roy Edwards & Colomb.

5.  This declaration is submitted to address some of the issues raised by the Motion for Attorneys' Fees submitted by Waltzer Wiygul & Garside (WWG) on November 18, 2016.[7]

## Discharge of WWG and Retention of the Joint Venture Attorneys

6.  Leading up to the original Phase One Liability Trial date of February 27, 2012 and the March 2, 2012 Agreement-in-Principle with BP, and while the BP Economic & Property Damages Class Settlement Agreement was being finalized for execution on April 18, 2012, there were ongoing discussions with BP about whether, and, if so, how, local government claims might or might not be settled – either within or outside of the BP Economic & Property Damages Class Settlement – and how, specifically, a "local government" or "quasi-government entity" in that final Settlement Agreement would be defined.

7.  While doing our best to reasonably respond to inquiries from existing clients and others within the limitations imposed by our various confidentiality obligations, the question was raised by Mayor Landrieu as to why the Joint Venture Team that had been hired by the City of New Orleans pursuant to an open formal request-for-proposal (RFP) process was not, at that time, representing the Wisner Donation? [8]

8.  There are arguably a number of reasons why it would have been preferable for the Joint Venture Team to represent the Donation, as opposed to WWG.  But I specifically recall being told that the Mayor, as Trustee, had not formally approved of the retention of WWG by the Donation;  that the Mayor questioned whether a contract should have been entered into with WWG in light of the City's RFP selection of a different group of lawyers;  and that the Mayor indicated that he would not have knowingly approved of the WWG-Wisner contract, as WWG was handling one or more lawsuits against the City.[9]

---

[7] Rec. Doc. 21922.

[8] I do not believe that I spoke to Mayor Landrieu personally during this time period.  I believe that this question was relayed to me by either Calvin Fayard, Mike Sherman, Sharonda Williams, Soren Gisleson, and/or Russ Herman.

[9] Again, I do not believe that I spoke to Mayor Landrieu about this directly.  While I do not specifically recall the details of any one specific conversation or conversations in particular, I believe that these sentiments were relayed to me by either Calvin Fayard, Mike Sherman, Sharonda Williams, and/or Soren Gisleson.

9. Subsequently, the Mayor, as Trustee, decided to discharge WWG and to hire the Joint Venture Team to represent Wisner, (under a contract that was more favorable to the Donation), with the consent and approval of a majority of the Donation's Advisory Committee.

**Clarification of the Joint Venture Team's Representation of the Collective Interests of the Beneficiaries, Following the Technical Expiration of the Donation**

10. Because of various and repeated requests, demands, objections, lawsuits and complaints made by the Wisner / Peneguy Heirs of and against the Joint Venture Attorneys, the Joint Venture Team, out of an abundance of caution, engaged in discussions with outside ethics counsel, Basile Uddo, as well as the City Attorney and other members of the Advisory Committee, once the Donation had technically expired, (and the Wisner / Peneguy Heirs and other beneficiaries had intervened, out of an abundance of caution, into the *Deepwater Horizon* litigation), in order to ensure that we were complying with all ethical and professional duties and responsibilities.

11. Over the course of those discussions, it was established and confirmed that:

    i.   The Joint Venture Team continued to represent the Donation interests with respect to all claims against BP and others arising out of the *Deepwater Horizon* Incident, despite the formal dissolution of the Donation itself. That the Joint Venture, in this regard, had been retained by the Trustee, with the consent and approval of a majority of the Advisory Committee, and continued to be retained to advance and protect the collective interests of all beneficiaries, whether in that ongoing capacity and/or as successors-in-interest, including the City, Tulane, LSU, the Salvation Army, the Wisner Heirs, and Catholic Charities, with respect to the Access Agreement and other *Deepwater Horizon* Incident claims.

    ii.  It was the City's then-current intention, following the formal dissolution of the Donation, to maintain the *status quo* for the general administration of the assets and income generated by the former Donation. And that the City had entered into a tentative agreement with the other beneficiaries to continue to administer the property and assets of the Donation through the Advisory Committee, for at least some designated period of time.

    iii. There existed no definitive written agreement or other determination as between and among the former trustee, the former beneficiaries, and the

potential successors, as to what would ultimately happen to the corpus of the Donation, including any proceeds, funds, or other remedies that may be recovered through the Access Agreement and/or other *Deepwater Horizon* Incident litigation.

The City further understood, acknowledged and agreed that the Joint Venture Lawyers were not retained by the City to provide representation regarding the allocation or distribution of litigation proceeds or other assets; had not provided the City with any such legal advice or representation; and could not be involved in any dispute that might arise regarding the ultimate allocation or distribution of property, assets, funds, or litigation recoveries between and among the former Donation beneficiaries.[10]

12. After Ms. Dietz succeeded Ms. Williams as City Attorney, Mr. Gisleson and I met with Ms. Dietz, who re-confirmed that:

    i.    The Joint Venture Team continued to be retained to advance and protect the collective interests of all beneficiaries, including the City, Tulane, LSU, the Salvation Army, the Wisner Heirs, and Catholic Charities, with respect to the Access Agreement and other *Deepwater Horizon* Incident claims.

    ii.    It was still the City's intention to maintain the *status quo* for the general administration of the assets and income generated by the former Donation.

    iii.    There was still no definitive written agreement or other determination as to what would ultimately happen to the corpus of the Donation, including any proceeds, funds, or other remedies that may be recovered through the Access Agreement and/or other *Deepwater Horizon* Incident litigation.[11]

## Settlement of the Wisner Claims with the Neutrals and BP

13. I personally participated in several in-person, telephonic, and e-mail communications with and/or among Magistrate Judge Shushan, the Liaisons to the Neutrals Mike Moore and Drake Martin, the Mayor, the City Attorney, the City's representative on the Donation's Advisory Committee Suchitra Satpathi, and attorneys representing the various beneficiaries including Mr. Waltzer, regarding the settlement, release, and guarantee of the Donation's *Deepwater Horizon* Incident and/or Access Agreement claims against BP.

---

[10] *See* Letter from Steve Herman to Hon. Sharonda Williams, dated July 2, 2015.

[11] *See* Letter from Steve Herman to Hon. Rebecca Dietz, dated February 1, 2016.

14. It was and remains my opinion that WWG's contributions were relatively inconsequential to the overall settlement.  Most of the questions posed by WWG to the Joint Venture Attorneys during this process were inappropriate and/or unfounded, and virtually all of the suggestions made by WWG with respect to the terms of the settlement were, in my opinion, unrealistic, unnecessary, and/or unwise.

15. Even without WWG's involvement, the Joint Venture Team had – in addition to securing the $30 million in payments – identified and either already clarified or already intended to raise most, if not all, of the significant issues presented by the Neutrals' standard Release, namely:

     a. A guarantee of the settlement payments by the London-based publicly-traded corporate parent entity, BP plc;

     b. A clarification that the Release would not extend to the release of punitive damages claims against Transocean and/or Halliburton;

     c. A written clarification from Mike Moore that the Release would not in any way release or otherwise prejudice claims by the individual beneficiaries in the BP Economic & Property Damages Settlement Program; and,

     d. An amendment to the Release clarifying that the agreement to defend, indemnify and hold BP harmless would *not* extend to any actions or claims by the United States against BP under the Consent Decree or other Federal Law.

16. It seemed unrealistic, to me, to believe that BP might accept an affirmative continuing obligation to assess and remove or remediate oil believed to be from the Macondo Well. Or to allow the Donation to potentially assert a future damages claim against the Oil Spill Liability Trust Fund, which would then have subrogation rights back against BP.[12]  The possibility that BP might, one day, sue the Donation for damages seemed fairly unlikely. As did the concern that a beneficiary might be fined by the Federal Government for failing to affirmatively report a future occurrence of suspected Macondo Oil on the property.  And, presumably, the owner or owners of the Wisner Donation property would be able to address any concerns about potential obligations to or future claims by land users or future property

---

[12] Indeed, Magistrate Judge Shushan seemed to express some level of incredulity at these two suggestions.

owners in the lease/use and/or any future purchase/sale agreement(s).[13]  Indeed, many of the WWG suggested edits to the written Release were rejected.

17. While, fortunately, BP was ultimately willing to accept the Release as executed, I also personally thought it was unwise for Mr. Waltzer to communicate to Magistrate Judge Shushan or to the Liaisons to the Neutrals that there might be some dispute about whether the Trustee – or, at the very least, the Trustee with the consent of a majority of the Advisory Committee – had the authority to execute the written document and/or to settle all of the relevant claims.   The Joint Venture Attorneys, in this regard, successfully developed representation and warranty language that was acceptable to BP, while at the same time preserving any and all rights and interests of the former Donation beneficiaries with respect to the ultimate ownership and/or internal allocation, distribution, and governance issues.

### WWG's Waiver of Any Fees for Post-Termination Legal Services Performed on Behalf of the Wisner/Peneguy Heirs Only

18. In connection with this fee dispute, I wrote to counsel for WWG on September 28, 2016, with the following preface and request:

> …the Joint Venture was hired and authorized by the Trustee and Advisory Committee to represent the collective interests of the Donation and its beneficiaries (including the Wisner / Peneguy Heirs) viz-a-vis BP and the other Defendants.
>
> **Therefore, any post-termination services that may have been performed by WWG were necessarily limited to the separate and individual interests of WWG's clients, the Wisner / Peneguy Heirs. (who elected to hire WWG, on some basis, in addition to the Joint Venture Attorneys).**
>
> To the extent that WWG now claims that they are allegedly owed separate and/or additional compensation for post-termination services from the Donation, the Trustee, and/or the Beneficiaries collectively, please provide:
>
> i.      A copy of the retainer agreement between WWG and the Wisner / Peneguy Heirs;

---

[13] I specifically recall Magistrate Judge Shushan's frustration, in this regard, over Mr. Waltzer's insistence on additional protections in the event that a child were to wander onto the Wisner property, eat a tarball, and then sue one or more of the beneficiaries for his or her personal injuries.  (Which, she pointed out, remained a risk – however remote – to the thousands of other property owners who had settled their claims with BP.)

ii.     Any and all invoices and/or payments relating to post-termination services and/or fees between and among WWG and the Wisner / Peneguy Heirs;

iii.    Contemporaneous time records for any post-termination legal work or services for which WWG now claims it is owed compensation from the Donation, the Trustee, and/or the Beneficiaries collectively; and,

iv.    Any invoices or receipts for litigation costs (if any) advanced or incurred by WWG post-termination, which WWG now claims should be paid and/or reimbursed by the Donation, the Trustee, and/or the Beneficiaries collectively.[14]

19. On October 4, 2016, counsel for WWG responded as follows:

> **Waltzer Wiygul & Garside LLC did <u>not</u> allege in its *Complaint* that Waltzer Wiygul & Garside LLC seeks fees for services provided after termination.** As such, Waltzer Wiygul & Garside LLC is not obliged to provide Joint Venture counsel the requested documents.[15]

Signed, under penalty of perjury, this <u>7th</u> day of <u>December</u>, <u>2016</u>, in New Orleans, Louisiana.

Stephen J. Herman

---

[14] *See* E-Mail from Steve Herman to Randy Smith and Stephen Gele, dated September 28, 2016, (emphasis supplied).

[15] *See* E-Mail from Stephen Gele to Steve Herman, dated October 4, 2016, (emphasis supplied).



**HERMAN**
**HERMAN & KATZ**
_____ L.L.C. _____
ATTORNEYS AT LAW
Est 1942

820 O'Keefe Avenue
New Orleans, Louisiana
70113-1116

p (504) 581-4892
f (504) 561-6024
e: info@hhklawfirm com

hhklawfirm.com

Harry Herman
Russ M. Herman*
Maury A. Herman*
Steven J. Lane
Leonard A. Davis*
James C. Klick[1]
Stephen J. Herman
Brian D. Katz
Soren E. Gisleson
Joseph E. Cain

Jennifer J. Greene[2]
John S. Creevy
Aaron Z. Ahlquist[3]
Craig M. Robinson
Adam H. Weintraub[4]
Mikalia M. Kott[5]
Donald A. Mau
Danielle Treadaway Hufft

Of Counsel
Herbert A. Cade
Morton H. Katz*
Joseph A. Kott M.D., J.D.

This Firm and its Partners Are Also
Partners in Herman Gerel, LLP

* A Professional Law Corporation
[1] Also Admitted in Texas
[2] Also Admitted in Arkansas
[3] Also Admitted in Tennessee
[4] Also Admitted in New Jersey
& Pennsylvania
[5] Also Admitted in Colorado

July 2, 2015

Hon. Sharonda Williams
City Attorney, City of New Orleans
1300 Perdido St.
New Orleans, LA 70112

             Re: <u>Wisner Donation v. BP plc, et al</u>
                **MDL 2179, E.D.La. Nos. 13-1971, 14-1971, et al**
                Our File No. 27818.936

Dear Sharonda,

      On behalf of the Joint Venture lawyers who were retained to represent the Wisner Donation, we write to confirm our understanding of three distinct matters which have been the subject of recent discussions with you and members of the Joint Venture.

      First, we understand that, from the Mayor and the City's perspective, the Joint Venture continues to represent the Donation interests with respect to all claims against BP and others arising out of the _Deepwater Horizon_ Incident, despite the formal dissolution of the Donation itself. The Joint Venture, in this regard, was retained by the Trustee, with the consent and approval of a majority of the Advisory Committee, and continues to be retained to advance and protect the collective interests of all beneficiaries, whether in that ongoing capacity and/or as successors-in-interest, including the City, Tulane, LSU, the Salvation Army, the Wisner Heirs, and Catholic Charities, with respect to the Access Agreement and other _Deepwater Horizon_ Incident claims.

      Second, we understand that the City's current intention, following the formal dissolution of the Donation, is to maintain the _status quo_ for the general administration of the assets and income generated by the former Donation. We understand that the City has entered into a tentative agreement with the other beneficiaries to continue to administer the property and assets of the Donation through the Advisory Committee.

Third, we understand that there has been no definitive written agreement or other determination as between and among the former trustee, the former beneficiaries, and the potential successors, as to what will ultimately happen to the corpus of the Donation, including any proceeds, funds, or other remedies that may be recovered through the Access Agreement and/or other *Deepwater Horizon* Incident litigation.   The City understands, acknowledges and agrees that the Joint Venture lawyers were not retained by the City to provide representation regarding such allocation or distribution of litigation proceeds or other assets, have not provided the City with any such legal advice or other representation, and cannot be involved in any dispute that may arise regarding the ultimate allocation or distribution of property, assets, funds, or litigation recoveries between and among the former Donation beneficiaries.

If our understanding is incorrect with respect to any of these issues, please let us know.

Please also do not hesitate to contact us with any other questions or concerns.

Sincerely,

Stephen J. Herman, Esq.

cc:  Calvin C. Fayard, Jr., Esq.
     Fred L. Herman, Esq.
     Walter J. Leger, Jr., Esq.
     Bob F. Wright, Esq.
     James Parkerson Roy, Esq.
     Soren E. Gisleson, Esq.



HERMAN
HERMAN & KATZ
——— L.L.C. ———
ATTORNEYS AT LAW
Est. 1942

820 O'Keefe Avenue
New Orleans, Louisiana
70113-1116

p: (504) 581-4892
f: (504) 561-6024
e: info@hhklawfirm.com

hhklawfirm.com

Harry Herman (1914-1987)
Russ M. Herman*
Maury A. Herman*
Steven J. Lane
Leonard A. Davis*
James C. Klick[1]
Stephen J. Herman
Brian D. Katz
Soren E. Gisleson
Joseph E. Cain

Jennifer J. Greene[2]
John S. Creevy
Aaron Z. Ahlquist[3]
Craig M. Robinson
Mikalia M. Kott[4]
Danielle Treadaway Hufft
Patrick R. Busby[5]
Madelyn O. Breerwood
Alexandra E. Faia
Anne E. DeVaughn
Charles M. King

Of Counsel:
Herbert A. Cade
Morton H. Katz*
Joseph A. Kott, M.D., J.D.

This Firm and its Partners Are Also
Partners in Herman Gerel, LLP

* A Professional Law Corporation
[1] Also Admitted in Texas
[2] Also Admitted in Arkansas
[3] Also Admitted in Tennessee
[4] Also Admitted in Colorado
[5] Also Admitted in Alabama
& Oklahoma

February 1, 2016

Hon. Rebecca H. Dietz
City Attorney, City of New Orleans
1300 Perdido Street
New Orleans, Louisiana 70112
E-Mail: rhdietz@nola.gov

Re: **Edward Wisner Donation v. BP**
**Exploration & Production, Inc.**
**Civil Action No. 14-1525**

Dear Rebecca,

On behalf of the Joint Venture lawyers who were retained to represent the Wisner Donation, we write to confirm our understanding of the issues outlined in our correspondence to Ms. Williams of July 2, 2015, as well as our recent discussions with you.

First, we understand that, from the Mayor and the City's perspective, the Joint Venture continues to represent the Donation interests with respect to all claims against BP and others arising out of the Deepwater Horizon Incident, despite the formal dissolution of the Donation itself. The Joint Venture, in this regard, was retained by the Trustee, with the consent and approval of a majority of the Advisory Committee, and continues to be retained to advance and protect the collective interests of all beneficiaries, whether in that ongoing capacity and/or as successors-in-interest, including the City, Tulane, LSU, the Salvation Army, the Wisner Heirs, and Catholic Charities, with respect to the Access Agreement and other Deepwater Horizon Incident claims.

Second, we understand that the City's current intention, following the formal dissolution of the Donation, is to maintain the *status quo* for the general administration of the assets and income generated by the former Donation. We understand that the City has entered into a tentative agreement with the other beneficiaries to continue to administer the property and assets of the Donation through the Advisory Committee, for at least some designated period of time.

Third, we understand that there has been no definitive written agreement or other determination as between and among the former trustee, the former beneficiaries, and the potential successors, as to what will ultimately happen to the corpus of the Donation, including any proceeds, funds, or other remedies that may be recovered through the Access Agreement and/or other Deepwater Horizon Incident litigation. The City understands, acknowledges and agrees that the Joint Venture lawyers were not retained by the City to provide representation regarding such allocation or distribution of litigation proceeds or other assets, have not provided the City with any such legal advice or other representation, and cannot be involved in any dispute that may arise regarding the ultimate allocation or distribution of property, assets, funds, or litigation recoveries between and among the former Donation beneficiaries.

If our understanding is incorrect with respect to any of these issues, please let us know.

Please also do not hesitate to contact us with any other questions or concerns.

Sincerely,

Stephen J. Herman, Esq.

cc: Hon. Suchitra J. Satpathi, Exec. Counsel
    Calvin C. Fayard, Jr., Esq.
    Soren E. Gisleson, Esq.
    James Parkerson Roy, Esq.
    Fred L. Herman, Esq.
    Walter J. Leger, Jr., Esq.
    Bob F. Wright, Esq.

| | |
|---|---|
| **From:** | Steve Herman |
| **To:** | RANDALL A. SMITH; Stephen M. Gele |
| **Cc:** | Fred Herman; Soren Gisleson |
| **Subject:** | BP Oil Spill Lit. - Waltzer & Wiygul vs. Wisner Donation, et al |
| **Date:** | Wednesday, September 28, 2016 3:25:46 PM |

As you know, the Joint Venture was hired and authorized by the Trustee and Advisory Committee to represent the collective interests of the Donation and its beneficiaries (including the Wisner / Peneguy Heirs) viz-a-vis BP and the other Defendants.

Therefore, any post-termination services that may have been performed by WWG were necessarily limited to the separate and individual interests of WWG's clients, the Wisner / Peneguy Heirs. (who elected to hire WWG, on some basis, in addition to the Joint Venture Attorneys).

To the extent that WWG now claims that they are allegedly owed separate and/or additional compensation for post-termination services from the Donation, the Trustee, and/or the Beneficiaries collectively, please provide:

    i.     A copy of the retainer agreement between WWG and the Wisner / Peneguy Heirs;

    ii.    Any and all invoices and/or payments relating to post-termination services and/or fees between and among WWG and the Wisner / Peneguy Heirs;

    iii.   Contemporaneous time records for any post-termination legal work or services for which WWG now claims it is owed compensation from the Donation, the Trustee, and/or the Beneficiaries collectively;  and,

    iv.   Any invoices or receipts for litigation costs (if any) advanced or incurred by WWG post-termination, which WWG now claims should be paid and/or reimbursed by the Donation, the Trustee, and/or the Beneficiaries collectively.

Thanks.

Stephen J. Herman, Esq.
Herman Herman & Katz LLP
Office (direct): (504) 680-0554

| | |
|---|---|
| **From:** | Stephen Gele |
| **To:** | Steve Herman |
| **Cc:** | Soren Gisleson; Fred Herman; Randall Smith |
| **Subject:** | Re: BP Oil Spill Lit. - Waltzer & Wiygul vs. Wisner Donation, et al |
| **Date:** | Tuesday, October 04, 2016 5:41:27 PM |

Steve,

If you are proposing to divide the total contingency fee for the benefit of all of the lawyers who were hired by the beneficiaries and assisted in prosecution of the case at the request of Joint Venture counsel,  Waltzer Wiygul & Garside LLC would be happy to entertain such a division of the total contingency fee.

Otherwise, Waltzer Wiygul & Garside LLC did not allege in its *Complaint* that Waltzer Wiygul & Garside LLC seeks fees for services provided after termination.  As such, Waltzer Wiygul & Garside LLC is not obliged to provide Joint Venture counsel the requested documents.

We again request a counter proposal.  This ongoing dispute does not benefit the Donation.

Further, please respond to the question below: How did you determine or calculate the below amounts that were deposited into the registry of the court?

Stephen M. Gelé
Smith & Fawer, LLC
(504) 593-6085
(504) 237-6399

---

**From:** Steve Herman <SHERMAN@hhklawfirm.com>
**Date:** Friday, September 30, 2016 at 10:01 AM
**To:** Stephen Gele <sgele@smithfawer.com>
**Cc:** Soren Gisleson <SGISLESON@hhklawfirm.com>, Fred Herman <fherman@fredhermanlaw.com>, Randall Smith <rasmith@smithfawer.com>
**Subject:** BP Oil Spill Lit. - Waltzer & Wiygul vs. Wisner Donation, et al

First of all, the notion that we are "harming the Donation" is absurd.

Secondly, WWG has never, to my knowledge, provided either the Trustee, the Advisory Committee, or the Joint Venture Attorneys, with:

a. The retainer agreement between WWG and the Wisner / Peneguy Heirs;

b. The fees that were paid to WWG by the Wisner / Peneguy Heirs for post-termination services;

c. The contemporaneous time records for post-termination services for which WWG claims it is owed additional compensation from the Donation / Trustee / Beneficiaries collectively; or

d. The invoices and/or receipts for post-termination litigation expenses (if any) advanced or incurred by WWG, which WWG claims should be reimbursed or paid by the Donation / Trustee / Beneficiaries collectively.

If and when those documents are received, we will be in a better position to consider a potential counter-offer.

Thanks.

On Sep 30, 2016, at 10:39 AM, Stephen Gele <sgele@smithfawer.com> wrote:

Soren,

Waltzer, Wiygul & Garside has no objection to amounts to be distributed as attorneys' fees and costs being deposited into the registry of the court.  However, it is the understanding of Waltzer, Wiygul & Garside that the Wisner Donation Advisory Committee has yet to approve the amounts to be paid in total as attorneys' fees and costs.  How did you determine or calculate the below amounts that you propose to deposit into the registry of the court?

In the future we would appreciate more than half a day to respond to a request for consent for a motion.

We have been waiting for a counter proposal to our solicited proposal to resolve this matter, but have yet to receive such counter proposal.  Your delay in resolving this matter is needlessly harming the Wisner Donation.  Please submit a counter proposal expeditiously.

Stephen M. Gelé
Smith & Fawer, LLC
(504) 593-6085
(504) 237-6399

---

**From:** Soren Gisleson <SGISLESON@hhklawfirm.com>
**Date:** Thursday, September 29, 2016 at 12:19 PM
**To:** Stephen Gele <sgele@smithfawer.com>
**Cc:** Fred Herman <fherman@fredhermanlaw.com>, Steve Herman <SHERMAN@hhklawfirm.com>
**Subject:** BP Oil Spill Lit. - Waltzer & Wiygul vs. Wisner Donation, et al

Stephen,

We intend on filing a motion to deposit funds into the registry of the Court for the amount of fees and costs at issue.  We would like to file tomorrow morning.  Please advise if you object.  The amount to be deposited would be for costs (**$927,173.12**) and attys fees (**$1,232,838.80**).  If we do not hear from you, we will note as such in the motion.

Thank you,

Soren

Soren E. Gisleson, Esq.
Partner
Herman, Herman & Katz
820 O'Keefe Avenue
New Orleans, Louisiana 70113