**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:  OIL SPILL BY THE OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE | * | |
| GULF OF MEXICO ON APRIL 20, 2010 | * | SECTION "J" |
| | * | |
| THIS DOCUMENTS RELATES ONLY TO: | * | JUDGE CARL J. BARBIER |
| Civil Action Nos. 10-2771; 10-8888; | * | MAGISTRATE JUDGE |
| 10-9999; 13-1971; and 14-1525 | * | JOSEPH C. WILKINSON, JR. |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

**REPLY MEMORANDUM IN SUPPORT OF**
**MOTION FOR ATTORNEY'S FEES**

**MAY IT PLEASE THE COURT:**

Waltzer, Wiygul & Garside, L.L.C., as successor of Waltzer & Wiygul, LLP and Waltzer & Associates, (hereinafter "WWG"), respectfully submits this *Reply Memorandum* in support of its *Motion for Attorney's Fees* (MDL Doc. 21922). As explained more fully below, the record facts and law warrant an Order enforcing WWG's contingency fee contract at an amount deemed appropriate by this court.  WWG respectfully suggests an award of fifty percent (50%) of the total contingency fee earned is appropriate and reasonable.

## I.    Undisputed Facts of Record.

None of the substance of WWG's *Motion for Attorney's Fees* is disputed by the Edward Wisner Donation Trust (the "Donation"), or any of the beneficiaries of the Donation, because neither the Donation nor the beneficiaries filed an opposition to WWG's motion. In fact, most of the substance of WWG's *Motion for Attorney's Fees* is not even disputed by the Joint Venture Attorneys (the "JV"),[1] who filed an opposition on their own behalf. The following facts and issues are either agreed upon, or conceded by, the JV and the Donation:

---

[1] The JV was and is comprised of the law firms:  Herman, Herman, Katz & Cotlar; Leger Shaw; Fayard & Honeycutt; the Law Offices of Fred L. Herman; and Domengeaux Wright Roy & Edwards.

- The Wisner Donation Advisory Committee's ("WDAC") 2003 Bylaws charge the WDAC with the "contracting of attorneys . . ., as needed, to assist in the exploitation, development and preservation of the Donation Properties" and charge the Secretary/Treasurer and Land Manager with authority to execute said contracts.

- The Donation has repeatedly contracted for professional services without a public procurement process and under the signature of its Secretary/Treasurer and Land Manager.[2]

- The Secretary/Treasurer and Land Manager executed the Access Agreement with BP that formed the basis for Civil Action No. 14-1525.

- When the Donation engaged WWG's services in June of 2010, time was of the essence, and active engagement by the WDAC and WWG in the UIC cleanup response was required both because of the scale of the contamination and to proactively assure preservation of evidence of damage caused by the spill and response.

- WWG was uniquely qualified with a breadth of experience in handling environmental law, with both Joel Waltzer and Robert Wiygul each having more than twenty (20) years of experience in the practice.

- WWG's experience with environmental claims and preexisting relationships with agency personnel and scientists allowed WWG to work under the intense time constraints created by the circumstances, insert themselves into the response, and more easily obtain advice and documentation from the agencies involved.

- WWG had to dedicate a high percentage of the time of its principals to the representation of the Donation for months, including many sixty (60) or seventy (70) hour weeks throughout 2010 and 2011.

- WWG's strategy using the Clean Water Act to shift attorney and expert fees for the Donation's response to the oil spill onto BP significantly increased the aggregate recovery for the Donation and significantly reduced the Donation's risk in pursuing the litigation.

---

[2] Despite its rather heated preliminary statement condemning WWG for informing this Court of the contents of public records of the Donation, the JV was copied on each email arranging the inspection and production of the public records and raised no objection. Because the JV had raised the issue of the validity of WWG's *Retainer/Contingent Fee Agreement* (the "Agreement"), WWG properly used this information to demonstrate that the Secretary/Treasurer routinely executed professional services contracts. Nothing in the Federal Rules of Civil Procedure nor the Local Rules prohibits the use of evidence in addition to an attorney's own declaration to support a motion for attorney's fees. Further, the challenges to Cathy Norman's Declaration and Michael Peneguy's affidavit are similarly baseless. As this Court reasoned in denying WWG's *Motion for Leave to File Under Seal an Unredacted Declaration*, the formerly protected communications have been placed "at issue," in this fee dispute. (Doc. 199). Therefore, although communications between the Donation's representatives and its attorneys may have been privileged, such privilege has been waived. *Id.*

- Active engagement by the WDAC and WWG in the Uniform Integrated Command ("UIC") cleanup response was required because of the scale of the contamination and to proactively assure preservation of evidence of damage caused by the spill and response. This strategy allowed the Donation to heighten the clean-up and preserve evidence proving the Donation's damages, producing an incentive for BP to settle and increasing the overall value of the case.

- WWG was not terminated for cause.

- The contingency fee to be apportioned pursuant to *Saucier v. Hayes Dairy Products, Inc.*, 373 So.2d 420 (La. 1976) is the one in the Agreement.

- Prior to WWG's termination, WWG provided approximately 2,000 hours of legal services to the Donation. 800 hours were invoiced to the Donation and paid. Those amounts were subsequently reimbursed to the Donation by BP.

- WWG reviewed its file and documented 1,200 hours that it expended solely on work that was not reimbursable under OPA or the Access Agreement. Mr. Gisleson, who reviewed WWG's file in its entirety, did not dispute that the work had been done or that WWG's estimate of time spent on each task was reasonable.

- The 1,200 hours of non-invoiced work have never been compensated, even partially, as had the 800 hours WWG invoiced to the Donation.[3]

## II.    The Agreement Was Valid And Should Be Enforced.

The JV's attacks upon the Agreement premised upon no public bid, no signature by the Mayor of New Orleans, and insufficient waiver of conflict of interest lack merit.

### A.  Contracts for Professional Services Are Not Subject to Louisiana's Public Bid Law or the Louisiana Procurement Code.

The statute and case cited by the JV purportedly requiring WWG to go through a bid process does not apply to contracts with attorneys.[4]  Louisiana law does require many contracts for public works projects to undergo some public bidding process. *See* La. R.S. 38:2212; *see also*

---

[3] The meeting minutes and transcripts of the WDAC demonstrate from the client's perspective the date, time involved, and nature of the legal services provided by WWG, pursuant to Local Rule 54.2. The fact that these meeting minutes and the Affidavit of Michael Peneguy were drafted independently of, and years before, WWG's *Motion for Attorney's Fees* should give additional weight to the quality and quantity of the evidence of the legal services provided to the Donation by WWG.
[4] The unpublished Louisiana First Circuit Court of Appeal opinion cited by the JV, purporting to support the supposition that the hiring of counsel should be subject to a public bid process involves a construction project for a pedestrian walkway project in Baton Rouge. *Block Construction, LLC v. Recreation & Park Comm'n for Par. Of E. Baton Rouge*, 2015-1323 (La. App. 1 Cir. 4/15/2016), 2016 WL 1545620.

La. R.S. 39:1551, *et seq.* (the Louisiana Procurement Code). Public works means the erection, construction, alteration, improvement, or repair of any public facility or immovable property owned, used, or leased by a public entity. La. R.S. 2211(12). However, "contracts for professional services may be awarded without the necessity of competitive bidding or competitive negotiation." La. R.S. 39:1617. Contracts for legal services are simply not subject to Louisiana's Public Bid Law. *La. Atty. Gen. Op.* No. 04-0284, 2004 WL 2843098 (November 23, 2004).[5]

## B.  If There Was a Conflict, It Was Waived.

In an abundance of caution, WWG decided to obtain a waiver of conflict from the City and their other non-Donation-related clients.[6] Subsequently, on June 23, 2010, Messrs. Waltzer and Wiygul met with then-City Attorney Nanette Jolivette-Brown. *Id.*, p. 8. They explained the situation on the ground, WWG's view of the Donation's case, the potential conflict, the cases involved (specifically the Gentilly Landfill case, of which the City Attorney was already well aware), and the advice they received to obtain waivers. *Id.* City Attorney Jolivette-Brown told them she would likely waive the conflict but had to check with the Mayor's office.  *Id.* WWG also provided this same information to the WDAC.[7] *Id.* A little more than two (2) weeks after WWG's initial meeting with her, City Attorney Jolivette-Brown emailed the Donation's

---

[5] The public procurement process through which the JV was hired by the City of New Orleans was for representing the City of New Orleans only, not the Donation, the WDAC, or even Mayor Landrieu as *ex officio* Trustee. In fact, an RFP was later published in 2013, but then withdrawn, apparently in recognition that no RFP was required.  If a public bidding process was required before the Donation could validly enter into a contract for legal services, then the JV's contingency fee contract is not valid either.

[6] Dec. of Waltzer, [Doc. 21922-4, p. 7].

[7] WWG never hid the fact that, at the time the Donation retained their services, they also represented plaintiffs in a completely unrelated lawsuit against the City. *See* Ex. 1 to Dec. of Waltzer Ex. 1 [Doc. 21922-3]. At this meeting, the City's representative told the WDAC and WWG that the City Attorney's office should be contacted to obtain a waiver. Moreover, this lawsuit was against the City, not the mayor as trustee of the Donation, and it is therefore questionable whether there was even a conflict. WWG has never represented client in a suit against the Donation. However, WWG's practice is to exercise an abundance of caution in any such situation, and so it obtained written consent from the City.

Secretary/Treasurer and Land Manager: "I will waive any conflicts. I would like to get together to strategize. I am putting out an RFP next week. I think we should try to coordinate our efforts if we can." [8] This email is most reasonably interpreted as meaning WWG should work collaboratively with the City's counsel for the City's claim, which WWG did. In fact, Stephen J. Herman implicitly recognized this separation in his May 16, 2012 letter to this Court.[9]

The JV evidently asserts some special form of written consent was required. Rule of Professional Conduct 1.7(B)(4) requires each affected client to give informed consent, in writing. Rule 1.0(n) of the Rules of Professional Conduct defines "writing" as "a tangible electronic record of a communication or representation, including handwriting, typewriting, printing . . . and electronic communication." City Attorney Jolivette-Brown's June 7, 2010 email is a tangible electronic record of a communication in which she stated, "I will waive any conflicts."[10] The remainder of the email, regarding cooperation and an RFP, in fact, recognizes that the City and the Donation are separate entities, and that the City would be getting its own counsel. There is no formality required by the Rules of Professional Conduct. The client does not have to get the waiver notarized. A simple writing confirming the client has given informed consent is all that is required.

---

[8] Ex. "I" to Dec. of Leach. [Doc. 21922-6].

[9] Exhibit 5 to Dec. of Norman [Doc. 21922-4, p. 86]. ("[A]s retained outside counsel to the City of New Orleans, a Wisner Donation beneficiary whose mayor serves as the Donation's trustee, we would respectfully request permission to attend the Court's Telephone Status Conference on May 29, 2012.")

[10] Even if City Attorney Jolivette-Brown did not waive the conflict, to wait more than two (2) years to cry foul is too long. *See Dalleo v. River Construction, Inc.*, Civ. Act. No. 01-2397 (E.D. La. April 14, 2003), 2003 WL 1903336 * 3. (17-month delay before asserting a conflict as a defense against a motion for attorney's fees was too long). Louisiana is not alone in prohibiting ambush tactics in holding the issue of conflict in reserve until an attorney requests payment of his or her fee. *See In re Estate of Gillies*, 830 So.2d 640, 648-49 (Miss. 2002).

**C. The JV Does Not Have Standing to Challenge the Authority of the Donation's Agent to Bind the Donation.**

Neither the Donation, nor the trustee or beneficiaries joined the JV's opposition. The JV, who filed its opposition on its own behalf, has no standing to assert that the Bylaws are invalid or that the WDAC was without authority to approve WWG's contract and authorize Ms. Norman to sign same.[11] In fact, the City's representative to the WDAC was present at the meeting of the WDAC on September 28, 2010, when the WDAC voted to authorize Ms. Norman to execute the Agreement.  In April of 2011, months after Ms. Jolivette-Brown wrote Susan Clade (and not WWG), City Attorney Richard Cortizas authorized WWG to file suit on behalf of the Donation.[12] Moreover, the JV spent twenty-one (21) months in front of this Court arguing the validity of the Access Agreement, which was also signed by Ms. Norman, not the Mayor *ex officio* as Trustee. Therefore, this Court should disregard the JV's self-interested collateral attack on the Donation's internal governance.

**III.    The JV Has Not Properly Inserted Itself In This Dispute.**

Although the Donation is a party to this attorney's fee dispute, it has chosen not to file a response to WWG's *Motion for Attorney's Fees*. Instead, its current counsel of record has filed a response on their own behalf.[13]  Despite being fully aware of WWG's *Motion to Intervene*[14] when it was filed on August 4, 2015, the JV failed to assert itself as "the true party in interest

---

[11] Louisiana law governs the rights and obligations of parties to the Agreement. *United States v. Chamberlain*, 341 F.App'x 963, 965 (5th Cir. 2009). "Relative nullity may be invoked only by those persons for whose interest the ground for nullity was established." La. Civ. Code art. 2031; *see Bass, Ltd. v. Gerald*, 954 So.2d 243, 247 (La. App. 3 Cir. 3/7/07). Assuming *arguendo* that the execution of the Agreement by Ms. Norman, as Secretary/Treasurer and Land Manager of the Donation, as authorized by majority vote of the WDAC on behalf of the Donation, presents a nullity, such a nullity could only be invoked by the Donation. The JV filed its *Opposition to Motion for Fees* on its own behalf, not on behalf of the Donation, the Mayor *ex officio* Trustee, nor the City of New Orleans. [Doc. 21969, p. 1, fn.1].
[12] Ex. "U" to Dec. of Leach [Doc. 21922-6].
[13] MDL Doc. 21969, p. 1, fn.2.
[14] MDL Doc. 14960.

with respect to WWG's Motion" until December 9, 2016 when it filed its *Opposition*.[15] However, the Donation answered WWG's *Complaint*, the JV did not.[16]

### IV. The Time Expended By WWG Is Reasonable And Supports An Award of Approximately One-Half of the Total Contingency Fee.

At the outset of the Donation's engagement of WWG's legal services, both the Donation and WWG acknowledged, "a large amount of work is front loaded into this case."[17] During the two (2) years in which WWG solely represented the interests of the Donation, WWG provided constant, intense, demanding, and specialized legal services to the Donation, consuming nearly two thousand (2,000) hours of WWG's time.[18] Now, the JV confirms that a large amount of work was indeed front loaded in this case. The JV's best estimate of attorney hours expended representing the Donation following WWG's termination is approximately two thousand five hundred (2,500) hours.[19] In order to compare the work performed by both sets of attorneys, the time required by the JV to review the client file compiled by WWG should be taken into account.[20] Even without discounting for the duplication of work caused by changing horses, WWG's two thousand hours represent forty-four percent (44%) of the attorney hours expended on behalf of the Donation in this matter.  Therefore, an award of approximately one-half of the contingency fee to WWG is reasonable.

---

[15] MDL Doc. 21969.

[16] In addition to the procedural issues created by the JV's failure to timely intervene as a party, the JV has created a question of jurisdiction, because the JV has not consented to proceed before a full-time United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c).

[17] MDL Doc. 14960-3, p. 1.

[18] Dec. of Norman, pp. 13 – 14; Dec. of Waltzer, p. 22; Affidavit of Peneguy, pp. 4 – 5.

[19] MDL Doc. 21969-1, p. 27.

[20] In August 2012, WWG had approximately twenty-three (23) gigabytes of data in the client file, contained within twenty-three thousand (23,000) separate files. Dec. of Wiygul, p. 9. The JV reviewed all of this work performed by WWG. Dec. of Gisleson, MDL Doc. 21969-1, p. 24. Presumably, absent the change in representation, this additional time would not have been required to successfully prosecute the Donation's claims.

The JV's assertion that Mr. Wiygul and Mr. Waltzer only provided "remote administrative oversight" is directly contrary to the record in this case and is disingenuous. The JV attorneys may have relatively limited experience in environmental matters, but they are experienced attorneys who know perfectly well that ephemeral evidence has to be documented, and that case strategy has to be developed early on. The JV does not even address the clear explanation and documentation in Mr. Wiygul and Mr. Waltzer's declarations of the time that was spent, and how it related to the OPA and Access Agreement damages claims.

In fact, in the Access Agreement complaint that the JV filed, significant sections are copied, at times verbatim, from the pleadings that WWG had earlier prepared and filed.  This is not to suggest that the JV is asserting it did work that WWG actually did, but rather to show that the JV's work was built on a foundation provided by WWG.

V.     **Application of the *Saucier*-factors to the Facts in the Record Supports WWG Receiving Fifty Percent (50%) of the Fee.**

A.     **Before the Donation Could File Suit, Significant Preparation Was Required of WWG.**

The wealth of experience and labor that was brought to the table by WWG laid the framework for the JV's subsequent work. Indeed, Mr. Hermann in his own sworn declaration on July 14, 2016, in support of a common benefit fee, recognizes the value of foundational work:[21] "These efforts . . . laid the ground work for not only the Frameworks and Matrixes contained within the BP Economic and Medical Settlements, but also the subsequent effort to defend those settlements and methodologies when attacked by BP."  *Id.*, p. 15. Similarly, WWG's efforts laid the foundation for the OPA/GML claims against BP,[22] which, when combined with the Access Agreement, allowed the Donation to settle its claims against BP for thirty million dollars

---

[21] [Doc. 21098-1].
[22] *See e.g., Answer in Limitation and Claim in Limitation, and Cross Claim for Damages, Declaratory and Injunctive Relief*, Doc. 326 in Civ. Act. No. 10-2771.

($30,000,000.00). WWG's work on behalf of the Donation preserved and collected the substantive evidence of the Donation's OPA claim against BP and increased the value of the Donation's case.

      **B.**        **WWG Provided Its Expertise To The Donation When The JV's Best Attorneys Were Consumed With MDL 2179.**

Although the JV's attorneys in aggregate did provide tremendous services on behalf of plaintiffs in MDL 2179 through their roles as co-lead counsel on behalf of plaintiffs, co-liaison counsel, members of the executive committee, and members of the plaintiff's steering committee, this is precisely why this Court awarded approximately five hundred fifty-five million, two hundred thousand dollars ($555,200,000.00) to Class Counsel and other common benefit attorneys collectively this past October.[23] However, the question at issue here is the experience, reputation, and ability of the lawyers who provided services to the Donation.

From June 2010 through July 2012, WWG provided the experience, reputation, and abilities of Robert Wiygul and Joel Waltzer to the Donation. Together, these attorneys possess more than five (5) decades of experience litigating environmental claims, brought to bear against BP's army of litigators flown in to minimize its exposure for the damage it caused along the Gulf Coast. Though the JV has not provided any detail concerning the efforts of its principals in regards to the Donation's case, upon information and belief, the vast majority of work was provided by Mr. Gisleson thereafter. While Mr. Gisleson is a capable lawyer, he does not have the environmental experience of either Messrs. Waltzer or Wiygul. When the WDAC voted to hire WWG in June 2010, WWG was ready to hit the ground running, and capably did.[24]

---

[23] [Doc. 21849].

[24] The other named partners in the JV appear to have done little to no actual work for the Donation. Only Soren Gisleson and Stephen J. Herman submitted declarations. No summary of the JV's hours has been submitted. No receipts, or even a summary, of the claimed unreimbursed costs the JV claims were submitted either.

## CONCLUSION

As attorneys who provided legal services to the Donation, WWG should be compensated pursuant to their valid contingency fee agreement. The *Saucier*-factors should be applied to apportion the total contingency fee to which the Donation agreed. Given the time and labor required of WWG, the novelty and difficulty of the questions involved at the outset of their representation, WWG's skill requisite to perform the legal services properly, WWG's preclusion of other employment as a result of representing the Donation, the time limitations imposed by the circumstances, WWG's unique experience, reputation, and ability, and the amount involved and results obtained, WWG should receive fifty percent (50%) of the total contingency fee.

Respectfully submitted,

*/s/ Stephen M. Gelé*
**RANDALL A. SMITH, T.A. (#2117)**
**STEPHEN M. GELÉ (#22385)**
   OF
**SMITH & FAWER, L.L.C.**
201 St. Charles Avenue, Suite 3702
New Orleans, Louisiana 70170
Telephone: (504) 525-2200
Telecopy: (504) 525-2205
Email: rasmith@smithfawer.com

***Counsel for Intervenor, Waltzer, Wiygul &
Garside, LLC, as successor of Waltzer & Wiygul,
LLP and Waltzer & Associates***

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of December, 2016, I caused to be served via Court's ECF electronic filing system the foregoing pleading on all counsel of record.

*/s/ Stephen M. Gelé*