# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | * | MDL 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| | * | JUDGE BARBIER |
| This Document Relates To: | * | |
| *Pleadings Bundle B1* | * | MAG. JUDGE SHUSHAN |

---

| | | |
|---|---|---|
| GAUCI'S CUSTOM BUILDING AND | * | |
| DEVELOPING LLC, TOARMINO'S PIZZA, | * | |
| SOUTH LLC, WINTER GARDEN ITALIAN | * | |
| AMERICAN BISTRO LLC AND JOSEPH V. | * | |
| GAUCI, INDIVIDUALLY AND KAREN GAUCI | * | |
| INDIVIDUALLY | * | |
| *Plaintiff,* | * | CIVIL ACTION |
| | | NO. 2:16-cv-07048 |
| | * | |
| v. | * | SECTION J |
| | * | |
| BP EXPLORATION AND PRODUCTION, | * | JUDGE BARBIER |
| INC., BP AMERICA PRODUCTION | * | |
| COMPANY, TRANSOCEAN | * | MAG. JUDGE SHUSHAN |
| OFFSHORE DEEPWATER DRILLING, INC., | * | |
| TRANSOCEAN HOLDINGS, LLC | * | |
| TRANSOCEAN DEEPWATER, INC., | * | |
| HALLIBURTON ENERGY SERVICES, INC. | * | |
| AND SPERRY DRILLING SERVICES | * | |
| | * | |
| *Defendants.* | * | |

---

### FIRST AMENDED COMPLAINT

COMES NOW, through their undersigned counsel, Pursuant to Pre-Trial Order 60

in the MDL 2179 the PLAINTIFF, GAUCI'S CUSTOM BUILDING AND

DEVELOPING, LLC, TOARMINO'S PIZZA SOUTH, LLC, WINTER GARDEN

ITALIAN AMERICAN BISTRO LLC AND JOSEPH V. GAUCI, INDIVIDUALLY

AND KAREN GAUCI INDIVIDUALLY, herein after referred to as PLAINTIFF,  and

files this First Amended Complaint against the Defendants identified below and aver as

follows: BP EXPLORATION AND PRODUCTION, INC., BP AMERICA PRODUCTION COMPANY, TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., TRANSOCEAN HOLDINGS, LLC, TRANSOCEAN DEEPWATER, INC., HALLIBURTON ENERGY SERVICES, INC. and SPERRY DRILLING SERVICES, Defendants herein, and for cause of action, would respectfully show unto the Court as follows

## I.

## INTRODUCTION

1.      This is a claim to recover damages suffered by Plaintiff as a result of the oil spill that resulted from the explosion, fire and subsequent sinking of the oil rig Deepwater Horizon (hereinafter "Deepwater Horizon" or "Oil Rig") on April 20, 2010 at about 10:00 p.m. Central Time from the Macondo Well in Mississippi Canyon Block 252 on the Outer Continental Shelf (the "Macondo Well"), off the Louisiana Coast. Following the sinking of the Oil Rig, over 200 million gallons of crude oil had been released. The oil slick reached the shore and detrimentally affected, damaged, depleted, and destroyed offshore, marine and coastal environments along the Gulf of Mexico.

2.      Given the magnitude of the *Deepwater Horizon* oil spill, it is uncertain what its impact on the marine and coastal environments and the residents and business along the Gulf Coast will be. Therefore, Plaintiff reserves Plaintiff's rights in full to amend this Complaint by, among other things, adding new claims and new defendants.

3.      Plaintiff has suffered economic injury, damage and/or losses as a direct and foreseeable result of the Oil Spill and its devastating impact on the marine and coastal environments.

## II. PARTIES

4.      Plaintiff has been impacted by the Oil Spill, with Plaintiff's primary residences and/or Plaintiff's principal places of businesses in the State of Mississippi (*See* Exhibits – Sworn Statements of Plaintiffs for Disclosures Regarding Remaining Non-Governmental Economic Loss and Property Damage Claims.) Plaintiff suffered serious economic loss as a result of the spill. The Plaintiff's claims are adopted and incorporated in the Exhibits and are incorporated as if set out in full. (*See* Exhibits for a comprehensive set of documents setting out with particularity the identity of the Plaintiff, the nature of Plaintiff's losses, and supporting documentation (Plaintiff's OPA Presentment).

5.      All Plaintiffs are related, either through blood or business, and therefore the filing of multiple Plaintiffs on the same filing is an compliance with Footnote 3 to P.T.O. 60.

6.      Defendant, BP EXPLORATION & PRODUCTION, INC., ("BP Exploration") is a Delaware Corporation with its principal place of business in Warrenville, Illinois, but doing business in the State of Louisiana and throughout the United States. BP Exploration was a lease holder, and the designated operator in the lease granted by the former Minerals Management Service ("MMS"), allowing it to perform oil exploration, drilling and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Spill originated.[1] BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U. S. C. § 2714. This Court has personal jurisdiction over BP Exploration because BP Exploration is registered to do business in Louisiana, does business in Louisiana and has a registered agent

---

[1] The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks" and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement ("BOEMRE") on June 18, 2010; however it shall be referred to as the MMS throughout this document.

in Louisiana. BP Exploration & Production Inc. is a foreign corporation doing business in the State of Louisiana and within this district

7.      Defendant, BP AMERICA PRODUCTION COMPANY ("BP America") is a Delaware Corporation with an office in Louisiana. BP America was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo Well by the Deepwater Horizon vessel. BP America Production Company is a foreign corporation doing business in the State of Louisiana and within this district.

8.      BP Exploration and BP America, are generally referred to herein collectively as the "BP Defendants" or "BP."

9.      Defendant, TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., ("Transocean Offshore"), is a corporation domiciled at 4 Greenway Plaza, Houston, and conducting business in the State of Louisiana. Transocean Offshore is a foreign corporation doing business in the State of Louisiana and within this district.

10.     Defendant, TRANSOCEAN HOLDINGS, LLC ("Transocean Holdings") is a Delaware Corporation with its principal place of business in Houston, Texas, and that at all pertinent times was registered to do business in and regularly conducted business in Louisiana. Transocean Holdings is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon*'s offshore oil drilling operations at the Macondo prospect, where the Spill originated. More specifically, Transocean Holdings is a party to the contract with BP regarding the lease of the *Deepwater Horizon* for drilling operations in the Gulf of Mexico. On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the blowout by the *Deepwater Horizon*.     Transocean

Holdings LLC is a foreign corporation doing business in the State of Louisiana and within this district.

11.     Defendant, TRANSOCEAN DEEPWATER, INC. ("Transocean Deepwater"), is a Delaware Corporation with its principal place of business in Houston, Texas, and that at all pertinent time was doing business in the State of Louisiana and within this district. Transocean Deepwater is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*. Transocean Deepwater Inc. is a foreign corporation doing business in the State of Louisiana and within this district.

12.     Defendants, Transocean Offshore and Transocean Holdings, Transocean Deepwater, Inc., are hereinafter referred to collectively as "Transocean." At the Macondo site, Transocean provided the *Deepwater Horizon* vessel and personnel to operate it. At all times relevant to the Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems. Transocean also provided operational support for drilling-related activities on board the *Deepwater Horizon*, as well as onshore supervision and support for those drilling activities at all times relevant to the Oil Spill.

13.     Defendant, HALLIBURTON ENERGY SERVICES, INC. ("HESI"), is a Delaware corporation. HESI is a foreign corporation doing business in the State of Louisiana and within this district.

14.     Defendant SPERRY DRILLING SERVICES (formerly Sperry Sun Drilling Services) (hereinafter, "Sperry") is a division of HESI and was responsible for mudlogging personnel and equipment on the *Deepwater Horizon*, including downhole drilling tools. Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations.

Sperry is a foreign corporation doing business in the State of Louisiana and within this district.

15.     Halliburton Energy Services, Inc. and its Sperry division are generally referred to herein collectively as "Halliburton."

### III. JURISDICTION AND VENUE

16.     This Plaintiff made an initial appearance in this Court as result of prior Conditional Transfer Orders and Removal Actions initiated by one or more Defendants, to which Plaintiff objected.  Without waiving rights to transfer back to Plaintiff's choice of forum and in compliance with P.T.O. 60, Plaintiff states as follows.

17.     To the extent Plaintiff's claims were previously filed and removed to Federal Court and/or transferred to the Eastern District of Louisiana, Plaintiff reserves the right to request remand back to the Plaintiff's forum Court, pursuant to the doctrine of *forum non conveniens* and the principals of equity of plaintiff's choice of forum.

18.     Jurisdiction is proper because this Court has jurisdiction under Section 1017(c) of the Oil Pollution Act of 1990. 33 U.S.C. § 2701 *et seq.* ("OPA"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1331.

19.     This Court also has jurisdiction over admiralty and maritime claims under 28 U.S.C. § 1333.

20.     This Court also has jurisdiction pursuant to 33 U.S.C. §2717, pursuant to the Oil Pollution Act of 1990.

21.     Prosecution of this action in this district is proper under 28 U.S.C. Sec. 1391 (a)(2) because all of the events or omissions giving rise to the claims asserted herein occurred in this district.

## IV. CONDITIONS PRECEDENT

22.     To the extent required by law and/or by consent and/or by stipulation by BP, Plaintiff has presented a demand for a sum certain as required by 33 U.S.C. §§ 2713(a) by the submission of its claims to BP OPA Claims Program, the Deepwater Horizon Court-Supervised Settlement Program and/or the Gulf Coast Claims Facility. Additionally, Plaintiff submitted a Claim, including a "sum certain" and a description of the claim as well as some supporting documentation to BP as the "responsible party" under OPA via certified mail and e-mail.

23.     BP failed to respond to the claim and did not settle the claim by payment within 90 days of presentment. Transocean has neither advertised nor established an OPA claims process.

## V. FACTUAL ALLEGATIONS

### A.      The Explosion April 20, 2010

24.     On or about April 20, 2010, the Deepwater Horizon drilling vessel experienced a well blowout and explosion killing 11 people and injuring dozens of others. The explosion and subsequent fire resulted in the sinking of the vessel and one of the largest oil spills in American history (the "Spill").

25.     The Deepwater Horizon was a multi-million dollar dynamically-position, semi – submersible drilling vessel owned by Transocean. At the time of the Spill, the Deepwater Horizon was drilling at a well in the Mississippi Canyon Block 252 (known as "Macondo") located off the coast of Louisiana in the Gulf of Mexico.   The Macondo well site was leased by BP from the United States Minerals Management Services ("MMS"). BP had also leased the Deepwater Horizon for the purposes of drilling an exploratory well at the Macondo site.

26.     BP and Transocean contracted with Halliburton to act as the cementing advisor and cement product and equipment company for the Macondo well during drilling. On information and belief, Halliburton provided engineering services, materials, testing, mixing and pumping for cementing operations onboard the Deepwater Horizon.

27.     On April 20, 2010 at approximately 9:45 p.m. CST, a well blowout caused explosions on the Deepwater Horizon, igniting a raging, gas-fueled fire on the vessel.  After burning for two days, the vessel sank to the ocean floor.

28.     As the Deepwater Horizon tipped into the sea, the long riser pipe connecting the vessel to the wellhead on the seafloor bent and broke, leaving the pipe leaking oil out of its now-open end, as well as through two breaks along its length. An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, and caused the blown-out well to spew oil into the Gulf waters.

29.     Each day during the course of the Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil, as well as spreading out in vast subsurface plumes. On the surface, the floating oil on top of the water was large enough to be visible from outer space, at times covering tens of thousands of square miles, and spreading with the wind and currents towards the Gulf States' coastlines, where oil made landfall on white sand beaches and in ecologically sensitive marshes and estuaries, damaging the environment, as well as real and personal property throughout the coastal zones of the Gulf States.  Under water, huge plumes of oil and dispersant chemicals swirled through the entire water column and came to rest on the seafloor at many different depths, damaging ecosystems and privately owned and leased sea beds throughout the Gulf of Mexico.

30.     At the time of the blowout, drilling at Macondo was months behind schedule and over budget, and Defendants repeatedly chose to violate industry guidelines and government regulations.  Defendants also ignored warnings from their own employees and contractors on board the vessel to reduce costs and save time.

31.     Prior to the blowout, Defendants made and/or acquiesced to a host of reckless decisions concerning well design, cementing, and integrity testing that prioritized speed and cost-savings over safety and industry best practices.

**B.     BP's Responsibility**

32.     BP leased and controlled the Macondo well, designed the Macondo well, and operated the Macondo well. BP Exploration & Production was expected to provide its parent company, BP PLC $7 billion in profits in 2010 in order to pay its share of the shareholder dividend. This financial pressure caused BP to speed up completion of the Macondo well.

33.     The Macondo well has been described as a "nightmare" well and a "well from hell." The Macondo well was 18,000 feet down (5,000 feet of water and 13,000 feet of dirt). The formation of the well was known by BP to involve extreme high pressures and temperatures. Additionally, it was in an unstable, no-salt formation that required additional safety precautions.  In the months preceding the Spill, there were four well-control events, known as "kicks" in the industry, and ten incidents of lost returns.

34.     BP chose to use a "long string" casing system instead of a "liner/tieback" design which would have provided more barriers against blowouts. Defendants were aware that the "long string" design was risky and not appropriate for a difficult well like Macondo." The liner/tieback was the original design until about a month before the disaster to save time and millions of dollars.

35.     There are numerous other examples of BP repeatedly choosing speed over safety:

- BP failed to perform a bottoms-up circulation test prior to allowing Halliburton to pump its cement;

- BP refused to use the recommended 21 centralizers;

- BP failed to wait for the foam cement stability test to be complete before the cement was poured;

- BP began its positive pressure test without waiting sufficient time for the cement to fully cure;

- BP displaced the riser before setting the cement plug, which would have been a real barrier;

- BP displaced the riser over 3,000 feet below the surface;

- BP ran the safety critical negative pressure test without a written procedure and with personnel who had never been given formal training on how to perform the test;

- BP refused to run a cement bond log to confirm the success or failure of the cement job despite the presence of a crew ready to do it;

- BP conducted simultaneous operations during the displacement without doing the required risk assessment, which significantly impaired the ability to recognize that a massive kick was occurring.

36.     BP's failures stem from a culture of poor process safety. Previous BP disasters should have taught BP this lesson, but BP failed to heed the warnings of the Prudhoe Bay Pipeline leak in 2006 and the BP Texas City Explosion in 2005. BP continued to place a high emphasis on short-term benefits despite the known risk that the choice of short-term benefits could result in major loss of life or an environmental disaster. In the years leading up to the Spill, BP management slashed costs by $4 billion and intended to cut them further in 2010.

37.     On the day of the Spill, Defendants BP and Transocean misinterpreted a negative pressure test run on the well.  The test clearly showed that there was 1,400 pounds of

pressure on the drill pipe and zero pressure on the kill line. In order to be deemed successful, both lines should have shown zero pressure. The failure to interpret this test correctly was a gross departure from the standard oilfield practice, rising to the level of gross negligence.

38.     The misreading of the test lead to the mistaken belief that the well was secure which resulted in a massive and unprecedented well "kick" when they began replacing heavy drilling mud with much lighter seawater. It took nearly an hour for Deepwater Horizon workers to notice the kick, and by that time it was too late to stop it.

**C.     Transocean's Responsibility**

39.     Because Transocean had experienced similar "loss of control" events previously, Transocean was aware that Transocean's personnel did not have adequate training in how to identify and deal with a kick like the one that occurred at the Macondo well. The recommendations from investigations into previous Transocean well control events were not put into place until after the Deepwater Horizon was at the bottom of the Gulf of Mexico. A previous gas kick on the Deepwater Horizon went undetected for 35 to 40 minutes.

40.     Once the kick was discovered, the poorly trained crew of the Deepwater Horizon failed to divert the kick through the emergency diverter system and instead diverted it to the mud-gas separator. The mud-gas separator was quickly overwhelmed by the high volume of gas and pressure and the entire vessel was engulfed in flammable gas. Had the emergency diverter system been used instead of the mud-gas separator, the Spill likely would not have occurred. Transocean willfully overrode several automatic functions of the integrated alarm and control system. This prevented the emergency shutdown system ("ESD") from activating. Despite this, the crew could have activated the emergency shutdown system but

waited until it was too late. The captain of the Transocean had to wait for approval of the offshore installation manager before he could authorize activating the emergency shutdown.

41.     The last line of defense against the spill was the blowout preventer ("BOP") at the bottom of the ocean. A BOP is a massive piece of equipment designed to withstand the extreme pressure and temperatures both from the depth of the ocean and from the well itself. However, the BOP with the Deepwater Horizon well was not capable  of withstanding the maximum pressure and temperature conditions of the Macondo well. Furthermore, the BOP was out of certification and in violation of industry standards. BP had knowledge, stemming from audits in 2005, 2008, and 2009, that the BOP on the Deepwater Horizon had maintenance problems and was insufficient for the Macondo well.

**D.     Halliburton's Responsibility**

42.     Halliburton was contractually responsible to BP for the design, testing, and execution of cementing the production casing, and to provide mud pit monitoring for signs of a kick or blowout. Halliburton recommended the type of cement to be used for each casing string and the volumes and spacers to be used. Halliburton's obligations included sole responsibility for pressure testing and pumping the cement as a well as a  safety leadership role. Halliburton was required to provide BP and Halliburton management the final lightweight slurry mixture 24 hours prior to BP running the productions casing, but failed to do so. As a result, Halliburton created cement that was poorly designed, unstable and not properly tested. Ultimately, the cement in the Macondo well failed to provide a barrier to high pressure, and high temperature hydro-carbon flow.

43.     Halliburton used cement leftover from a previous well that was at least five months old. The mix was a foam cement, which is known to present risks and potential complications not found in conventional cement.   Further exacerbating these risks, the

leftover mix contained a Halliburton proprietary de-foaming agent. Halliburton lab was overworked, understaffed and lacked adequate supervision. As a result the cement slurry did not have a single successful stability test before it was pumped into the Macondo well.

44.     Halliburton's mud loggers were not sufficiently trained and failed to catch the kick that caused the Deepwater Horizon to explode. Halliburton had no process safety system in place to fulfill its contractual requirement to continuously reassess and update Halliburton's risk assessment on an ongoing basis.. Such a risk assessment would have identified the devastating risks of Halliburton's chosen slurry mix.

E.     **The Spill was Preventable**

45.     Defendants could have prevented this catastrophe by using deepwater drilling best practices, following required safety protocols and precautionary procedures, properly maintain equipment, and using widely available emergency safety technology. However, with little regard for the risk to the vessel workers or the environment, defendants chose to violate or ignore operational discipline, and save money and time at the expense of safety. Their cost-cutting measures were outrageous—consistent with their long corporate histories of flagrant disregard for safety—and were taken with willful, wanton, and reckless indifference to the disastrous results to the workers aboard the vessel, the environment, and Plaintiff.

46.     Defendants repeatedly made decisions impacting the safety of the vessel, its workers, the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf States in the direction of short-term gain, through reduced schedule and reduced cost, rejecting adequate and responsible risk analysis checks and balances to weigh cost and time versus risk and safety. The result was both predictable in outcome and unprecedented in scale. Moreover, because their conduct endangered the health and safety of a large region

and population, caused and increased the risk of serious injury and bodily and emotional harm, and affected a financially vulnerable population dependent upon the Gulf of Mexico, the degree of reprehensibility of Defendants' conduct was at the highest level.

**F.     The Spill Had a Dramatic Impact on Gulf Coast Residents**

47.     The Spill began on April 20, 2010 and poured several million barrels of oil into the Gulf of Mexico over the course of that summer. BP did not achieve a "static condition" on the well until August 4, 2010 and did not declare that it was sealed until September 19, 2010.

48.     The Spill has impacted and continues to impact the Gulf Coast and the shorelines of Florida, Alabama, Mississippi, Texas and Louisiana. The Spill has grievously harmed the beaches, shores, marshes, harbors, estuaries, bayous, bays, and waters in these Gulf States.

49.     The Spill and the resulting contamination have caused and will continue to cause loss of revenue to individuals and businesses in and around the Gulf of Mexico.  Nearly everyone living in, working on, or who had business ties with the Gulf Coast was affected by the Spill. The simultaneous blow to four of the most import industries on the Gulf Coast resulted in a ripple that negatively affected nearly everyone with ties to the Coast. The damage to the environment and to the economy that the Spill caused was devastating.

**G.     BP Tried to Conceal the Extent of the Spill**

50.     The initial Coast Guard estimates regarding the spill were that 8,000 barrels a day could be spewing from the well. BP, however, originally reported the leak as only being 1,000 barrels a day. Eventually, the Flow Rate Technical Group ("FRTG") was established to help the United States federal government and Coast Guard measure the amount of oil being dumped into the Gulf. The FRTG was made up of scientists and engineers from all over the country. The FRTG determined that the well was discharging 62,000 barrels a day initially and BP's efforts to cap the well only reduced that to 53,000 barrels a day.   All told

an estimated 4.9 million barrels were spilled into the Gulf before BP finally announced the well was sealed on September 19, 2010.

51.     Additionally, BP intuitionally choose to use the Corexit dispersant because they knew that it would sing the oil to the bottom of the gulf, where it rests today, rather than allow an accurate count of how much oil was actually spilled.

52.     BP deliberately and fraudulently under-represented the scope, size, and breadth of the oil spill to the public; compounding matters, BP also overrepresented BP's own ability to cap the well. BP engaged in a massive marketing campaign where they saturated the media, television, radio, newspapers, the internet, social media and every other communication tool available. The campaign was designed to convince people that the Gulf of Mexico had not been harmed and that the industries in and around the Gulf were fine.

**H.     Prior Findings In the MDL 2179**

53.     Plaintiff adopts and incorporates, as if restated herein, the Substantive Findings of Facts stated in FINDINGS OF FACT AND CONCLUSIONS OF LAW PHASE ONE TRIAL Case 2:10-md-02179-CJB-SS Document 13355 Filed Sept. 14, 2014, p. 11-111.

54.     The U.S. District Court for the Eastern District of Louisiana conducted the "Phase 1 Liability Trial" and issued its Findings of Fact and Conclusions of Law governing General Maritime Law Claims and the comparative fault of BP (BP Exploration & Production Inc. and BP America Production Company, but not BP p.l.c.), Transocean (Transocean Holding, LLC, Transocean Deepwater Inc., and Transocean Offshore Deepwater Drilling Inc., but not Transocean Ltd. or Triton Asset leasing GmbH), and Halliburton (Halliburton Energy Service, Inc. and Halliburton's Sperry division) for the blowout, explosion, and oil spill. The Court ruled as follows:

The Court further finds that BP's conduct was reckless.  Transocean's conduct was negligent, Halliburton's conduct was also negligent.

The Court further concludes that the comparative fault of the Defendants, expressed as a percentage of the total liability, is as follows:

BP: 67%
Transocean: 30%
Halliburton: 3%

Finally, the Court finds that the conduct of BP's employees was egregious enough that exemplary or punitive damages would be appropriate.

See FINDINGS OF FACT AND CONCLUSIONS OF LAW PHASE ONE TRIAL Case 2:10-md-02179-CJB-SS Document 13355 Filed Sept. 14, 2014, p. 135 – 136.

55.     Because certain aspects of the ruling have been appealed, Plaintiff reserves the right to amend this Complaint.

56.     Issues still left to be determined are whether there was a duty owed by the Defendants to Plaintiff, whether that duty was breached, what injuries were sustained by the Plaintiff, and whether there was a causal connection between the Defendants' conduct and the Plaintiff's injuries.

57.     Plaintiff will prove at trial that Defendants did owe a duty to the Plaintiff, breached that duty, and were the cuase in fact and proximate cause of the injuries sustained by the Plaintiff.

## VI.  CLAIMS FOR RELIEF

1.      **Claims Under General Maritime Law**

      A.      **Negligence**

58.     Plaintiff re-alleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

59.     At all times material hereto, Defendants were participating in drilling operations onboard the Deepwater Horizon in the Gulf of Mexico.

60.     At all times material hereto, Defendants owed and breached duties of ordinary and reasonable care to Plaintiff in connection with the drilling operations of the Deepwater Horizon and the maintenance of the vessel, its accessories and equipment, and additionally owed and breached duties to Plaintiff to guard against and/or prevent the risk of an oil spill.

61.     The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

62.     Plaintiff is an owners,  lessors, lessees, employee, and/or operators of real property at or near the coast of the Gulf of Mexico and/or of business(es) that are dependent upon the Gulf of Mexico's marine and coastal environments for revenue and/or income and are within an appreciable zone of risk., As such, Defendants were obligated to protect Plaintiff and Plaintiff's interests.

63.     The blowout and explosions on the Deepwater Horizon, its sinking and the resulting Spill were caused by the joint and concurrent negligence of Defendants which renders them jointly and severally liable to Plaintiff.

64.     Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Plaintiff and the Gulf of Mexico's marine and coastal environments and estuarine areas.

65.     Defendants were under a duty to exercise reasonable care while participating in drilling operations on the Deepwater Horizon to ensure that a blowout and subsequent oil spill did not occur as a result of such operations.

66.     Defendants were under a duty to exercise reasonable care to ensure that if crude oil discharged in the event of a blowout, that it would be contained and/or stopped within the immediate vicinity of the Deepwater Horizon in an expeditious manner.

67.     Defendants knew or should have known that the acts and omissions described herein could result in damage to Plaintiff.

68.     Defendants respectively and collectively failed to exercise reasonable care to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the Deepwater Horizon in the event of a blowout, and thereby breached duties owed to Plaintiff.

69.     Defendants respectively and collectively failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrollable oil spill into the waters of the Gulf of Mexico, and thereby breached duties owed to Plaintiff.

70.     The conduct of the Defendants with regard to the manufacture, maintenance and/or operation of drilling operations and oil rigs such as the Deepwater Horizon and its accessories and equipment is governed by numerous state and federal laws and permits used under the authority of these laws. These laws and permits create statutory standards that are intended to protect and benefit Plaintiff. Defendants violated these statutory standards.

71.     The violations of these statutory standards constitute negligence *per se* under Louisiana, Texas, Mississippi, Alabama, Florida, and general maritime law.

72.     At all times material hereto, the Deepwater Horizon was owned, navigated, manned, possessed, managed, and controlled by Transocean.

73.     As the owner and manager of the Deepwater Horizon, Transocean owed duties of care to Plaintiff to, *inter alia*, man, possess, manage, control, navigate, maintain and operate the Deepwater Horizon with reasonable and ordinary care.

74.     Transocean breached its duties to Plaintiff by, *inter alia*, failing to properly manage, control, maintain and operate the Deepwater Horizon and its safety equipment, including the gas sensors, air intake valves, emergency shut-down systems, and BOP, and in disabling vital alarm systems on the Deepwater Horizon before the blowout.

75.     Transocean also breached its duties to Plaintiff by making and/or acquiescing to a series of reckless decisions concerning, *inter alia,* well design, the use of centralizers, mudding operations, cementing, integrity testing, deployment of the casing hanger lockdown sleeve, spacer material, and simultaneous operations causing worker confusion and loss of focus.

76.     Defendants also violated the International Safety and Management Code ("ISM"), as adopted by the International Convention for the Safety of Life at Sea ("SOLAS"), which provides rules and standards to ensure that ships are constructed, equipped, and manned to safeguard life at sea, by failing to properly maintain the vessel, train personnel, and perform appropriate risk assessment analyses. *See* 46 USC §§ 3201-3205 and 33 CFR §§ 96.230 and 96.250.

77.     At all times material hereto, the Deepwater Horizon was leased and operated pursuant to a contract between Transocean and BP. Together, Transocean, BP, and Halliburton were responsible for design and well control.

78.     BP owed duties to Plaintiff to, *inter alia*, exercise reasonable care to design, create, manage and control the well and the flow of hydrocarbons in a safe and prudent manner and to conduct its drilling operations with reasonable and ordinary care.

79.     BP breached its duties to Plaintiff by, *inter alia*:

19

- choosing and implementing a less expensive and less time-consuming long string well design, which had few barriers against a gas blowout, instead of a safer liner/tieback design which would have provided additional barriers to a gas blowout, despite its knowledge that the liner/tieback design was a safer option;

- using pipe material that it knew, and which it recognized before the blowout, might collapse under high pressure;

- using too few centralizers to ensure that the casing was centered into the wellbore;

- failing to implement a full "bottoms up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards;

- failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective;

- cancelling the cement bond log test that would have determined the integrity of the cement job;

- failing to deploy the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below;

- using an abnormally large quantity of mixed and untested spacer fluid;

- failing to train drilling vessel workers and/or onshore employees, and to hire personnel qualified in risk assessment and management of complex systems like that found on the Deepwater Horizon; all

- requiring simultaneous operations in an effort to expedite the project, making it difficult for workers to track fluid volumes in the wellbore.

80.    All of the foregoing acts and/or omissions by BP proximately caused and/or contributed to Plaintiff's injuries and damages.

81.    At all times material hereto, Halliburton was responsible for cementing the well that was the subject of the Spill and further was engaged in testing, analysis and monitoring of the aforementioned well.

82.     At all times material hereto, Halliburton owed duties to Plaintiff to, *inter alia*, exercise reasonable care in conducting its cementing, testing, analysis and monitoring of the Deepwater Horizon's well.

83.     Halliburton breached its duties to Plaintiff by *inter alia*, failing to exercise reasonable care in conducting its cementing, testing, analysis and monitoring of the Deepwater Horizon's well. Halliburton was negligent by *inter alia,* failing to use a full "bottoms up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards; failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective; cancelling, or acquiescing in the cancellation of, the cement bond log test that would have determined the integrity of the cement job; failing to deploy, or acquiescing in the decision not to deploy, the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below, all of which proximately caused and/or contributed to Plaintiff's injuries and damages.

84.     In addition to the negligent actions described herein, and in the alternative thereto, the injuries and damages suffered by Plaintiff were caused by the acts and/or omissions of Defendants that are beyond proof by the Plaintiff, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the blowout, explosions, fire, sinking, and Spill resulted from the negligence of Defendants.  The blowout, explosions, fire, sinking, and the resulting Spill would not have occurred had the Defendants satisfied the duty of care imposed on them and Plaintiff, therefore, plead the doctrine of *res ipsa loquitur*.

85.     In addition to the foregoing acts of negligence, Plaintiff avers that the blowout, explosions, fire and resulting Spill were caused by the joint, several, and solidarily negligence and fault of Defendants in the following non-exclusive particulars:

- Failing to properly operate the Deepwater Horizon;

- Operating the Deepwater Horizon in such a manner that a fire and explosions occurred onboard, causing it to sink and resulting in the Spill;

- Failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purpose;

- Acting in a careless and negligent manner without due regard for the safety of others;

- Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the Deepwater Horizon which, if they had been so promulgated, implemented and enforced, would have averted the blowout, explosions, fire, sinking, and Spill;

- Operating the Deepwater Horizon with untrained and unlicensed personnel;

- Negligently hiring, retaining and/or training personnel;

- Failing to take appropriate action to avoid or mitigate the accident;

- Negligently implementing or failing to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

- Failing to ascertain that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

- Failing to warn in a timely manner;

- Failing to timely bring the oil release under control;

- Failing to provide appropriate accident prevention equipment;

- Failing to observe and read gauges that would have indicated excessive pressures in the well;

- Failing to appropriately and timely react to danger signs; and

- Such other acts of negligence and omissions as will be shown at the trial of this matter; all of which acts are in violation of the general maritime law.

86.    Plaintiff is entitled to a judgment finding Defendants liable, jointly and severally, to Plaintiff for damages suffered as a result of Defendants' negligence; and awarding Plaintiff adequate compensation therefore in amounts determined by the trier of fact.

87.    The injuries to Plaintiff were also caused by and/or aggravated by the fact that Defendants failed to take necessary actions to mitigate the dangers associated with their operations.

**B.    Gross Negligence and Willful Misconduct**

88.    Plaintiff re-alleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

89.    Defendants breached their legal duty to Plaintiff and failed to exercise reasonable care and acted with reckless, willful and wanton disregard in the negligent manufacture, maintenance, and/or operation of the Deepwater Horizon.

90.    Defendants owed and breached duties of ordinary and reasonable care to Plaintiff in connection with the maintenance of, and drilling operation on, the Deepwater Horizon, and additionally owed and breached duties to Plaintiff to guard against and/or prevent the risk of the Spill. The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

91.    Defendant BP's actions, or lack thereof, are particularly reckless, willful and wanton disregard in light of BP's safety record in the decade leading up to the blast.    BP had

experienced major process safety issues at BP's Grangemouth refinery in England, a major rupture and leak on their BP's Alaskan pipeline, as well as numerous fatalities throughout the organization, include 15 deaths in the March 2005 BP Texas City explosion. BP's history was a sad legacy of an unsafe corporate culture where routine deviations occurred in attempts to save money at the risk of casualty and/or loss of life. BP had a habit and practice of trading safety for profit. Furthermore, the *Deepwater Horizon* explosion occurred while BP was on probation for admitted felony violations related to the BP Texas City explosion.

92.    BP Exploration has entered into a Guilty Plea Agreement with the U.S. Department of Justice in connection with the Oil Spill. In an exhibit to this Plea Agreement, BP Exploration admitted that if its case were to proceed to trial, the federal government could prove beyond a reasonable doubt that BP Exploration's negligence proximately caused the deaths of eleven men on board the *Deepwater Horizon* on April 20, 2010 and also proximately caused the discharge of large and harmful quantities of oil into the Gulf of Mexico, as well as a number of related facts overlapping with those alleged in and/or relevant to the allegations of this Complaint. *See* Exhibit A to Guilty Plea Agreement, Rec. Doc. 2-1 in Case No. 2:12-cr-00292 (E.D. La. Nov. 15, 2012).  The Court has accepted this Guilty Plea Agreement.  *See,* Reasons for Accepting Plea Agreement, Rec. Doc. 65 in Case No. 2:12-cr-00292 (E.D. La. Jan. 30, 2013).

93.    Transocean Deepwater has entered into a Plea Agreement with the U.S. Department of Justice in connection with the Oil Spill. In an exhibit to this Plea Agreement, Transocean Deepwater admitted that if its case were to proceed to trial, the federal government would be able to prove that Transocean Deepwater, together with others, negligently discharged, or caused to be discharged, oil into the Gulf of Mexico, as well as a number of related facts

24

overlapping with those alleged in and/or relevant to the allegations of this Complaint. *See,* Exhibit A to Cooperation Guilty Plea Agreement, Rec. 3-2 in Case No. 2:13-cr-00001 (E.D. La. Jan. 3, 2013). The Court has entered a judgment based on this Plea Agreement. *See* Judgment, Rec. Doc. 31 in Case No. 2:13-cr-00001 (E.D. La. Feb. 14, 2013).

94.     Defendants knew or should have known that their wanton, willful and reckless misconduct would result in a disastrous blowout and oil spill, causing damage to those affected by the Spill.

95.     Defendants acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia,* disabling the gas alarm system aboard the Deepwater Horizon.

96.     Defendants acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia,* failing to use a sufficient number of "centralizers" to prevent channeling during the  cement process; failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job; disregarding proper drilling, casing, mudding, and cementing procedures; failing to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico.

97.     Defendants acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia,* using an inappropriate cement mixture for the well; failing to appropriately test that cement mixture prior to using it in the well; failing to run a cement bond log to evaluate the integrity of the cement job; and failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

98.     Defendants acted with gross negligence, willful misconduct and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia,* using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

99.     Defendants acted with gross negligence, willful misconduct and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia,* defectively designing, recklessly maintaining and altering, and/or wantonly operating and/or using the BOP accessory to the Deepwater Horizon.

## 2.     The Oil Pollution Act

100.    Plaintiff re-alleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

101.    The Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* (the "OPA"), imposes liability upon a "responsible party for a … vessel or a facility from which oil is discharged … into or upon navigable waters of adjoining shorelines" for the damages that result from such incidents as well as removal costs.  33 U.S.C. § 2702.

102.    The Coast Guard has named BP as the responsible party for the down hole release of oil and Transocean as the responsible party for the release of diesel on the surface. Therefore, BP and Transocean are strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

103.    Defendants, BP and Transocean, are not entitled to limit their liability under Section 2704 (a) of the OPA because the Spill was proximately caused by their gross negligence, willful misconduct, and/or violations of applicable safety, construction or operating regulations.  33 U.S.C. § 2704(c).

104.    Moreover, in its "Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990," filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

105.    As a result of the Spill, Plaintiff has not been able to use natural resources (air and water, and potentially wetlands and other areas and spaces that have and/or may become contaminated by the spilled oil), and Plaintiff is entitled to recover from BP and Transocean for such damages in amounts to be determined by the trier of the fact, in addition to the damages as set forth below.

106.    In the alternative, Plaintiff avers that as a result of the Spill, Plaintiff is entitled to damages pursuant to Section 2702(b)(2)(B), which provides for recovery of damages to real or personal property including "[D]amages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property, including the diminution in the value of their property."

107.    In the alternative, Plaintiff avers that as a result of the Spill, Plaintiff is entitled to damages pursuant to Section 2702(b)(2)(C), which provides for recovery for "[D]amages for loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed or lost without regard to the ownership or management of the resources."

108.    In the alternative, Plaintiff avers that as a result of the Spill, Plaintiff is entitled to damages pursuant to Section 2702(b)(2)(E), which provides for "[D]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources which shall be recoverable by any claimant."

109.    To the extent required by law, and/or by consent or stipulation by BP, Plaintiff has

satisfied, or will have satisfied, all of the administrative requirements of 33 U.S.C. §§ 2713(2)

and (b) as to each and all Defendants, by the submission of Plaintiff's claim(s) to the Gulf

Coast Claims Facility (the "GCCF") and/or BP and/or its agents or designees.

In its "Statement of BP Exploration & Production Inc. Re Applicability Of Limitation Of

Liability Under Oil Pollution Act of 1990" filed on October 19, 2010, BP waived the

statutory limitation on liability under the OPA.  In the alternative, the limitations period does

not run until three years after the date on which the loss and the connection of the loss with

the discharge in question are reasonably discoverable with the exercise of due care.   33

U.S.C. 2701 § 1018(f)

### 3.    State Law Claims for Relief

#### A.    Fraudulent Concealment

110.    Plaintiff re-alleges each and every allegation set forth in all preceding paragraphs as if

fully restated here.

111.    To the extent available under state law, Plaintiff is entitled to recover against

Defendants, BP, Halliburton and Transocean for their fraudulent concealment of material

facts concerning the Spill.

112.    After the explosions, Defendant BP attempted to downplay and conceal the severity

of the Spill.  BP's initial leak estimate of 1,000 barrels per day was found by government

investigators to be a fraction of the actual leakage amount of 50,000 barrels of oil per day.

113.    Moreover, in the aftermath of the explosions, BP did not provide complete and

timely announcements and warnings about the severity, forecast and trajectory of the Spill.

114.    In addition, BP misrepresented its capabilities to respond to the Spill. BP overstated

its ability to handle a blowout in its Exploration Plan, wherein it claimed that in the event of

a blowout resulting in an oil spill, it was "unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses."

115.    In fact, BP did not have proven equipment and technology to respond to the Spill; instead, according to the letter to Attorney General Eric Holder by Members of Congress on May 17, 2010, it did not "in any way appear that there was 'proven equipment and technology' to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico." As noted further in that letter, "much of the response and implementation of spill control technologies appear[ed] to be taking place on an ad hoc basis."

116.    BP admitted on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involved significant uncertainties because they have not been tested in these conditions before."

117.    Despite its inability to adequately and timely respond to and control the Spill, BP resisted requests from scientists to use sophisticated instruments at the ocean floor that would have provided a more accurate picture of the amount of oil that was gushing from the well.

118.    BP did not in the aftermath of the blowout or since that time provide complete or timely announcements and warnings about the severity, forecast and trajectory of the Spill.

119.    The severity, forecast and trajectory of the Spill, and BP's ability to respond to the Spill, were material facts that BP had a duty to disclose.

120.    In addition, Defendant Halliburton misrepresented and concealed the stability of the cement used at the Macondo well, despite having performed three tests before the Spill, all of which demonstrated that the foam cement used at Macondo was unstable.

121.     The instability of the cement used at the Macondo well and the results of the testing performed before the Spill were material facts that Halliburton had a duty to disclose.

122.     Moreover, BP was aware before the Spill that Halliburton's testing had revealed that the concrete foam was unstable, yet BP concealed this material fact.

123.     For its part, Transocean misrepresented and concealed the condition of the Deepwater Horizon and the known hazards associated with the disabling of, and/or failure to maintain, the Deepwater Horizon's safety features and appurtenances, including, *inter alia,* its BOP.

124.     Transocean also misrepresented and concealed the safety record of the vessel, which was based on false data supplied by its personnel.

125.     Transocean misrepresented and concealed the condition of many key components, including, inter alia, the BOP rams and fail-safe valves, which had not been fully inspected for ten years before the blowout, and at least 36 components and systems on the vessel that were in "bad" or "poor" condition and which BP was aware might lead to loss of life, serious injury or environmental damage.

126.     The foregoing known hazards, poor condition and maintenance and safety issues associated with the Deepwater Horizon and its appurtenances and equipment were material facts that Transocean had a duty to disclose

127.     Defendants, Halliburton, BP and Transocean, failed to disclose or concealed the foregoing material facts, and their failure to do so induced Plaintiff to act or to refrain from acting to protect Plaintiff's property, businesses, livelihoods and and/or income.

128.     As a direct and proximate result of the fraudulent concealment of the foregoing material facts by Halliburton, BP and Transocean, Plaintiff suffered damage to Plaintiff's

business(es), livelihood, and/or income, and damage to and diminution in the value of Plaintiff's property, for which Plaintiff is entitled to compensation.

129. Moreover, the acts and misrepresentations and concealment of the foregoing material facts by Halliburton, BP and Transocean were willful, wanton and/or in callous disregard for the safety of others and, accordingly, Plaintiff is entitled to an award of punitive damages.

## The Florida Pollution Discharge Prevention and Control Act

130. To the extent that Florida law is applicable to Plaintiffs Claim, Plaintiff asserts his rights under the Florida Pollution Discharge, Prevention, and Control Act.

131. Plaintiff repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this Action and incorporates same by reference as though fully set forth herein.

132. At all relevant times, BP owned, leased, operated, and/or maintained the *Deepwater Horizon* and the Macondo Well. Following the April 20, 2010 explosions, fire, and ultimate sinking of the *Deepwater Horizon*, the Macondo Well began spewing crude oil into the Gulf of Mexico.

133. At all relevant times, BP had a statutory duty to Plaintiff to maintain and operate the *Deepwater Horizon* and the Macondo Well so as to not create or sustain hazardous conditions due to the discharge of pollutants as defined by the Florida Pollutant Discharge Prevention and Control Act (the "Florida Act"), Fla. Stat. § 376.031.

134. At all relevant times, BP breached its statutory duty to the Plaintiff by discharging, or allowing to be discharged, crude oil into the Gulf of Mexico and allowing the massive oil spill to migrate into Florida's marine and coastal areas, in violation of the Florida Act, Fla. Stat. §§ 376.011 -376.21.

135.     Pursuant to Section 376.041 of the Florida Act, the discharge of pollutants into or upon any coastal waters, estuaries, tidal flats, beaches, and lands adjoining the seacoast of the State of Florida is prohibited. The Florida Act holds "Responsible Parties" liable for the discharge of pollutants in violation of its provisions.

136.     Pursuant to Section 376.031(20)(a) and (c) of the Florida Act, BP is a "Responsible Party" and therefore liable under the Florida Act, because it was an operator of the *Deepwater Horizon* and a lessee of the area where the *Deepwater Horizon* and the Macondo Well were located. BP was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. §274.

137.     At all relevant times, BP breached its statutory duty to Plaintiff by discharging, or allowing to be discharged, crude oil and other pollutants and hazardous substances into the Gulf of Mexico and then negligently allowing or causing the massive oil spill to migrate into Florida's marine and coastal waters and shores in violation of the Florida Act. Once present there, BP's additional tortious misconduct added chemical dispersants onto the oil, creating and enlarging the pollutant hazards and their movement into Florida territorial waters and real property.

138.     BP is liable under the Florida Act for the discharge of pollutants or hazardous substances into or upon the surface waters of the state and lands, and failing to obtain required permits before discharging pollutants and hazardous substances into the surface waters of the state and lands Fla. Stat. §376.302.

139.     BP is strictly liable to Plaintiff under the Florida Act, § 376.205, which provides in pertinent part:

> … any person may bring a cause of action against a responsible party in a court of competent jurisdiction for damages, as defined in § 376.031, resulting from a discharge or other condition of pollution covered by §§376.011-376.21. In any such suit, it shall not be necessary for the person to plead or prove

negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it occurred.

140.    The Florida Act creates a private cause of action. *See* Fla. Stat. § 376.205. The Florida Act provides that "[e]ach responsible party is liable to any affected person for all damages as defined in s. 376.031, excluding natural resource damages, suffered by that person as a result of the discharge." Fla. Stat. § 376.12(5).

141.    The private cause of action under the Florida Act is a strict liability cause of action. Plaintiff "need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it occurred." Fla. Stat. § 376.205. The Oil Spill constitutes a prohibited discharge within the meaning of the Florida Act and it has occurred.

142.    The immediate discharge from the Oil Spill occurred into waters outside the territorial limits of Florida; however, lands and waters within the territorial limits of Florida have been directly affected by the discharge and are reasonably expected to continue to be so affected.

143.    The Florida Act provides that "[e]ach responsible party is liable to any affected person or all damages as defined in Section 376.031, excluding natural resource damages, suffered by that person as a result of the discharge." Fla. Stat. §376.12(5).

144.    The Florida Act defines "damage" as "the documented extent of any destruction to or loss of any real or personal property… including all living things except human beings, as the direct result of the discharge of a pollutant. Fla. Stat. §376.031(5).

145.    The Florida Act defines "persons" as "any individual, partner, joint venture, corporation; any group of the foregoing, organized or united for a business purpose; or any governmental entity, Fla. Stat. §376.031(4).

146.    As "persons" under the Florida Act, Plaintiff is entitled to damages for the destruction to or loss of any real or personal property.

33

147.     As the direct and proximate result of BP's breach of statutory duty to Plaintiff, the oil spill originating from the Macondo Well has resulted in detrimental effects upon some Plaintiff' property.

148.     As the direct and proximate result of BP's breach of statutory duty to Plaintiff, the Oil Spill originating from the Macondo Well and the post-Oil Spill remedial efforts and use of dispersants has resulted in detrimental effects upon Plaintiff's real and/or personal property and/or economic injury, damages, or loss to Plaintiff.

149.     As a result of the Oil Spill, Plaintiff has sustained economic injury, damages or losses and/or damage to their real and/or personal property. As a result of the post-Spill clean-up activity, and they are entitled to recover from BP Exploration and BP America for such damages in amounts to be determined by the trier of fact.

150.     Plaintiff is entitled to such damages pursuant to Fla. Stat. § 376.031(5), which defines "damages" as "the documented extent of any destruction to or loss of any real or personal property, or the documented extent, pursuant to § 376.121, of any destruction of the environment and natural resources, including all living things except human beings, as the direct result of the discharge of a pollutant."

151.     The Florida Act contains no presentation requirement. *See* Fla. Stat. § 376.205. The damages recoverable under the Florida Discharge Prevention and Control Act, Fla. Stat. §376.011, *et seq.*, Florida State law claims, and the General Maritime laws of the United States include, but are not limited to:

- Damages or destruction to real or personal property;
- Damage or destruction to all living things, excluding human beings;
- Reasonable attorney's fees;
- Expert witness costs; and
- Punitive Damages.

34

152.    By reason of the foregoing, Plaintiff has incurred damages in an amount to be determined at trial, and are entitled to compensatory and punitive damages, reasonable attorneys' fees, and expert witness costs.

**4.    Punitive Damages Under All Claims**

153.    Plaintiff re-alleges each and every allegation set forth in the preceding paragraphs as if fully restated here.

154.    Defendants, BP, Transocean and Halliburton engaged in conduct so reckless, willful and wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence. Plaintiff, society and the environment cannot afford, and should never be exposed to, the risks of another disaster of the magnitude caused by Defendants' misconduct herein.

155.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

156.    BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of lives; instead, it continued to place others at risk in the interests of cost cutting and financial gain.

157.    Transocean callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the Deepwater Horizon and prevented said system from operating properly and preventing or containing the explosions, fire and loss of life.

158.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by using a well design with too few barriers to gas flow.

159.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

160.    BP, Transocean and Halliburton focused primarily on profit while  disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to run a bottom up circulation of the drilling mud prior to beginning the cement job.

161.    BP, Transocean and Halliburton focused primarily on profit  while  disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well.

162.    BP, Transocean and Halliburton focused primarily on profit  while  disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to run a cement bond to evaluate the integrity of the cement job.

163.    BP, Transocean and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

164.    BP, Transocean and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

165.    BP, Transocean and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by ignoring and/or misinterpreting abnormal "red flag" pressure test results.

166.    BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their gross inadequate maintenance and reckless and improper operation and use of the BOP's appurtenant to the Deepwater Horizon.

167.    BP and Transocean recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately by contained within the immediate vicinity of the Deepwater Horizon in the event of a blowout.

168.    BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding and cement procedures.

169.    BP and Transocean recklessly, willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to

37

prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico.

170.    BP and Transocean recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

171.    In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality. As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf States.

  (a)    Defendants' conduct was oppressive, wanton, malicious, reckless or grossly negligent each time they: failed to properly maintain and/or operate the Deepwater Horizon;

  (b)    operated the Deepwater Horizon in such a manner the safety and integrity of the vessel and the well were disregarded to save time and money;

  (c)    ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

  (d)    failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the Deepwater Horizon;

  (e)    violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

  (f)    failed to take appropriate action to avoid or mitigate the accident;

  (g)    failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

(h)    failed to ensure that the Deepwater Horizon and its equipment were free from defects, properly maintained and/or in proper working order;

(i)    failed to provide appropriate disaster prevention equipment; and

(j)    failed to have an appropriate emergency spill response plan or readily available spill response equipment.

172.    Defendants' conduct, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because Defendants' conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage and loss to the livelihoods, businesses and properties of Plaintiff; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to Defendants; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish Defendants and deter further repetition by Defendants or others.

173.    Accordingly, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## VII.    JURY DEMAND

174.    Accordingly, Plaintiff demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment against Defendants, jointly, severally and solidarily, as follows:

(a)    Economic and compensatory damages in amounts to be determined at trial;

(b)    Punitive damages;

(c)    Pre-judgment and post-judgment interest at the maximum rate allowable by law:

(d)     Attorneys fees and costs of litigation;

(e)     Such other and further relief available under all applicable state and federal laws and any relief this court deems just and appropriate.

Respectfully submitted,

**BRENT COON & ASSOCIATES**

_____/s/  Brent W. Coon_____
Brent W. Coon
Federal Bar No. 9308
Texas Bar No. 04769750
Brent@bcoonlaw.com
Eric W. Newell
Texas Bar No. 24046521
Eric_newell@bcoonlaw.com
John R. Thomas
Texas Bar No. 19856400
John@bcoonlaw.com
Lori K. Slocum
Texas Bar No. 24048597
Lori.Slocum@bcoonlaw.com
Robert A. Schwartz_____
Texas Bar No. 17869670
Bob.schwartz@bcoonlaw.com
Mary Jacob
Texas Bar No. 24072165
Mary.jacob@bcoonlaw.com
215 Orleans, Beaumont,
Texas 77701
Tel.: (409) 835-2666
Fax: (409) 835-1912

ATTORNEY FOR PLAINTIFF(S)

# EXHIBIT A

05/24/16   10:44 PM                                                                                                    Page 6

Case 2:10-md-02179-CJB-DPC Document 22083-7 Filed 02/13/17 Page 43 of 45
Case 2:16-cv-17048-CJB-SCW Document 8-1-7 Filed 06/27/16 Page 2 of 4

Case 2:10-md-02179-CJB-SS   Document 16050-1   Filed 03/29/16   Page 1of 3

*2ea*

## EXHIBIT A

*In re: Oil Spill {by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010}*
Civil Action No. 10-MD-2179-CJB-SS

**SWORN STATEMENT** FOR DISCLOSURES REGARDING REMAINING
NON-GOVERNMENTAL ECONOMIC LOSS AND PROPERTY DAMAGE CLAIMS (BI CLAIMS)

| Last Name GAUCI | First Name KAREN | Middle Name/Maiden | Suffix |
|---|---|---|---|

| Phone Number 734-637-4627 | E-Mail Address GAUCI1@AOL.COM |
|---|---|

| Current Mailing Address 229 KLONDYKE RD | City / State / Zip LONG BEACH, MS 39560 |
|---|---|

| Attorney Name and Firm Brent W. Coon Brent Coon & Associates | Attorney E-Mail Address BPClaimsFax@bcoonlaw.com |
|---|---|

Any prior Mailing Address used by Plaintiff from April 2010 to present?

Any prior name used by Plaintiff from April 2010 to present?

The last 4 digits of the Plaintiff's social security number (if individual) or full Tax ID number in the case
of a business plaintiff:

   5851

Please indicate your status:

 X  Properly opted out of the Economic and Property Damages Settlement*

___ Not a member of the Economic and Property Damages Settlement Class

___Member of the Economic and Property Damages Settlement Class

___Other:_____

*If you opted out, a copy of your valid opt-out form must be included with your service of this Exhibit A

05/24/16  10:44 PM                                                    Page 7

Case 2:10-md-02179-CJB-DPC   Document 22083-7   Filed 01/13/17   Page 44 of 45
Case 2:16-cv-07048-CJB-SCW   Document 8-1   Filed 06/27/16   Page 3 of 4

Case 2:10-md-02179-CJB-SS    Document 16050-1    Filed 03/29/16    Page 2 of 3

*3a*

---

**You are pursuing a claim against at least one BI Defendant by way of** *(select all that apply):*

☐ Joinder in the Amended BI Master Complaint (Rec. Doc. 1128)*

☐ Individual Action, (including a new action filed because plaintiff previously only had short form joinder on file), Eastern District of Louisiana Case No.

☒ Individual Action filed because plaintiff previously was part of mass-joinder Complaint; list both prior Eastern District of Louisiana Case No. 13-6008_____ and new Individual Action Case No._____

☐ Other:____

\* A copy of your timely Short Form Joinder(s) (and any Plaintiff Profile Form(s)) must be included with your service of this Exhibit A.

**Presentment:**

Did you, the plaintiff seeking relief, present this claim at least 90 days prior to filing a lawsuit or joining the BI Complaint?

Yes____X_____    No_____

1. The program to which presentment was made by the plaintiff:    BP Claims Program_____

2. The date of presentment (MM/DD/YYYY):  01/15/2013

3. The claim number(s) (if available).  1056672

4. Did you execute a release of your claims upon receiving payment through any claims program: Yes_____    No____X_____

*If you need more space to detail your response, please attach additional pages if necessary. Make sure to indicate the question you are continuing to answer.*

_____
_____
_____

Page 8

Case 2:10-md-02179-CJB-DPC   Document 22083-7   Filed 01/13/17   Page 45 of 45
Case 2:16-cv-17048-CJB-JCW   Document 8-3-7   Filed 06/27/16   Page 45 of 4

Case 2:10-md-02179-CJB-SS   Document 16050-1   Filed 03/29/16   Page 3 of 3

*4a*

I state under penalty of perjury that the foregoing is true and correct. Executed on the following date at the following location:

Date: 24 May, 2016

Location (City and State): Long Beach, MS

Signature of Plaintiff *(Plaintiff's Attorney Cannot Sign on Plaintiff's Behalf)*

Karen Grauci

Print Name

The service of this sworn statement and supporting information pursuant to this Order must be on both Counsel for BP and the PSC on or before May 2, 2016. Service can be made via United States mail at the following addresses:

| Counsel for BP | MDL 2179 Plaintiffs' Steering Committee |
|---|---|
| Attn: J. Andrew Langan | Attn: Steve Herman or Jim Roy |
| Kirkland & Ellis LLP | The Exchange Centre, Suite 2000 |
| 300 North LaSalle St, | 935 Gravier Street |
| Suite 2400 | New Orleans, LA 70112 |
| Chicago IL60654 | |

Claimants represented by counsel may additionally or alternatively serve the sworn statements and any supporting information upon Plaintiffs' Steering Committee and Counsel for BP via File & ServeXpress ("F&S").