**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * | MDL NO. 2179<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE WILKINSON |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class,<br><br>Plaintiffs,<br>v.<br>BP Exploration & Production Inc., *et al.*,<br><br>Defendants. | * * * * * * * * * * * * * * | NO. 12-CV-968<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE WILKINSON |

**STATUS REPORT FROM THE *DEEPWATER HORIZON***
**MEDICAL BENEFITS SETTLEMENT CLAIMS ADMINISTRATOR**

The Garretson Resolution Group, the Claims Administrator of the *Deepwater Horizon* Medical Benefits Class Action Settlement (the "Settlement"), submits the following quarterly report to apprise the Court of the status of its work in processing claims and implementing the terms of the Medical Settlement Agreement (the "MSA") between October 1, 2016, and December 31, 2016, (the "Reporting Period").[1]  We have published 12 reports since Preliminary

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to their fully capitalized renderings in the MSA.

Approval in May 2012, and this marks the eighth quarterly report filed since the claims filing deadline of February 12, 2015.  This report will address the continued processing of claims received from 2012 to 2014 (collectively, the "2014 Claims")[2] and the claims received in 2015 and thereafter (the "2015 Claims").

This status report provides:

- an executive summary of claims processed during the Reporting Period;

- a summary of claims for Specified Physical Conditions ("SPC") and significant developments concerning these claims;

- an update on the operations and activities of the Class Member Services Center;

- an account of participation in the Periodic Medical Consultation Program ("PMCP");

- a summary of claims for Later-Manifested Physical Conditions; and

- a summary of the activities of the grantees of the Gulf Region Health Outreach Program ("GRHOP") and the operations of the Gulf Region Health Outreach Program Library.

## I.    <u>EXECUTIVE SUMMARY</u>

The Claims Administrator has received 37,249 unique claims for compensation for an SPC and/or participation in the PMCP through the end of the Reporting Period.  This status report will provide an overview of the claims processing forecast for all claims filed, the variables influencing the progression of those claims, and the outcome of claims as they progress through the stages of review.  In summary:

- the Claims Administrator has completed its review of 35,863 claims, or ninety-six percent (96%) of all claims filed, to determine whether they qualify for compensation for an SPC and/or participation in the PMCP.

---

[2] The 2014 Claims include all POCFs received by the Claims Administrator from the entry of Preliminary Approval on May 3, 2012 through December 31, 2014.  While the Claims Administrator was approved to receive claims after Preliminary Approval, the Claims Administrator was not approved to process claims beyond the Party-approved RAI process until the Effective Date of the Settlement.  Hence, all claims received in 2012, 2013, and 2014 are referred to as the 2014 Claims.

- o Of the 35,863 claims that the Claims Administrator has fully reviewed, 21,363, or sixty percent (60%), were approved for compensation for an SPC, and another 5,472, or fifteen percent (15%), were approved to participate in the PMCP.  Furthermore, 137, or twenty-one percent (21%), of the 659 claims currently going through the Notice of Defect process have received an "Approved with Defects" notice, meaning that the Medical Benefits Settlement Class Member ("Class Member") has been approved for at least one compensable SPC.

- o Overall, the claims filed in this settlement have been and continue to be impacted by high defect rates, with 28,852, or seventy-seven percent (77%), receiving either a Request for Additional Information ("RAI") or Notice of Defect during the life of the claim.  Additionally, 19,653, or fifty-three percent (53%), have been and continue to be impacted by changes or updates the claimants made to their Proof of Claim Forms or supporting documentation, which require the Claims Administrator to re-review the claims.

- o The Claims Administrator is still reviewing 1,386, or four percent (4%), of the claims filed in this settlement to determine whether they qualify for SPC compensation or to participate in the PMCP.  For the most part, the Claims Administrator was unable to render a final determination on these claims in 2016 because they (a) had not received Notices of Defect by the end of June 2016, (b) are pending retrieval of medical records, (c) are undergoing investigation or audit, and/or (d) had been denied but are now the subject of a Request for Review or a class membership denial challenge filed with the Court.  The Claims Administrator projects that it will be able to finish processing these claims by September 2017.  This estimate, however, is based on certain assumptions about how quickly third parties will provide the Claims Administrator with information it needs to finish processing the claims in categories (b) through (d), above, and thus is subject to change.

- The compensation allocated and paid to SPC-determined claims continues to increase.

  - o During the Reporting Period, the Claims Administrator approved 3,017 Medical Benefits Settlement Class Members ("Class Members") for nearly $10.9 million in SPC compensation.  Since the inception of the Settlement, the Claims Administrator has approved 19,691 Class Members for $53.7 million in SPC compensation.

  - o Additionally, the Claims Administrator determined that another 576 Class Members who had partially defective claims also had at least one valid SPC claim and that the total amount of compensation for which the Class Members were currently eligible on those claims was $4.6 million.  The Claims Administrator sent those claimants an "Approved with Defects"

notice, giving them the option of either attempting to cure the Defects in an effort to get greater compensation or accepting the compensation for which they currently qualify.

o   Between the amounts allocated through SPC-determined claims and the amounts to be allocated through the "Approved with Defects" claims, the total SPC compensation for which Class Members qualified as of the end of the Reporting Period amounted to more than $58.3 million.

o   Of the $53.7 million awarded to the 19,691 Class Members with approved SPC claims, $37.5 million has been paid to 15,856 Class Members.  The remaining 3,835 Class Members had not been paid as of the end of the Reporting Period because they had payment complications that had not yet been resolved.  Approximately forty-one percent (41%) of those Class Members had healthcare liens that were still being resolved because their claims had just reached a final determination in the third or fourth quarter of 2016.  In addition, approximately twenty percent (20%) of the Class Members who had not received payment by the end of the Reporting Period were impacted by pending bankruptcy and/or probate complications.  The remaining thirty-nine percent (39%) have other complications precluding payment, including child support obligations, liens asserted by settlement advance lenders or other persons or entities, general payment defects resulting from the Class Members' failure to provide necessary information on their POCFs, selection for random audit, and pending Requests for Review.

•   Class Members continue to be approved for enrollment in the PMCP.

o   During the Reporting Period, the Claims Administrator sent PMCP Notices of Determination to 1,237 Class Members, for a total of 26,033 over the life of the Settlement.

This information is discussed in greater detail below.

## II.   DETAILED CLAIMS PROGRESSION

Through the end of the Reporting Period, the Claims Administrator has received 37,249 unique claims for compensation for an SPC and/or participation in the PMCP.  Over the Reporting Period, the Claims Administrator received 1,413 changes or updates to those same claims forms.  The additional information must be processed through intake and then re-reviewed at each subsequent processing stage to determine its impact.  The number of total claims receiving a final determination or clearing lien resolution continued to increase

4

throughout the Reporting Period.  Of the 37,249 total claims filed, 35,863, or ninety-six percent (96%), have been processed to a final determination, and 1,386, or four percent (4%), require additional processing.

Of the claims reaching a final determination,

- 21,363, or sixty percent (60%), were approved for compensation for an SPC, with 19,691, or ninety-two percent (92%), of the 21,363 claims receiving a notice of final determination for compensation for an SPC and 15,856, or seventy-four percent (74%), of the 21,363 claims being paid;

- 1,001, or three percent (3%), did not seek the SPC compensation benefit and instead claimed and qualified for the PMCP benefit only;

- 4,471, or twelve percent (12%), proved they were Class Members and qualified to receive the PMCP benefit but failed to prove they qualified for SPC compensation; and

- 9,028, or twenty-five (25%), were denied because they (a) did not prove they were Class Members, (b) filed a valid opt-out, or (c) did not claim or prove a compensable SPC.

**Figure 1: Composition of All Finalized Claims**



Of the claims that require additional processing:

- twenty-nine (29), or two percent (2%), are pending Declaration Review or RAI processing;

- 659, or forty-eight percent (48%), have already received or are scheduled to receive a Notice of Defect and will need to submit additional information; and

- 698, or fifty percent (50%), are undergoing Medical Record Review.

**Figure 2: Composition of All Pending Claims**

Thus, the current overall composition of the all claims filed is as follows:

**Figure 3: Overall Composition of All Claims Filed**



### III.   CLAIMS FOR SPECIFIED PHYSICAL CONDITIONS

#### A.   Claimed Benefits and Compensation Level

For the total 37,249 Proof of Claim Forms ("POCFs") received, Table 1 provides a breakdown of those that sought compensation for an SPC and participation in the PMCP and those that sought only participation in the PMCP.

| TABLE 1: POCF FILINGS AVAILABLE FOR INITIAL CLAIMS REVIEW | |
|---|---|
| | **Total** |
| **Total POCF Filings Available for Initial Claims Review** | **37,249** |
| Claims for Compensation for Both SPCs and Participation in the PMCP | 36,369 |
| Claims for PMCP Only | 858 |

The graphs below provide a breakdown of the compensation levels claimed for all claims filed and a breakout for the 2014 and 2015 Claims, respectively:

**Figure 4: Compensation Level Composition of All Claims Filed**



**Figure 5: Compensation Level Composition of 2014 Claims**



**Figure 6: Compensation Level Composition of 2015 Claims**



Table 2, below, compares the composition of the claimed compensation levels in the 2014 Claims with those in the 2015 Claims and shows the percentage change between those two groups of claims.

| | A1 | A2 | A3 | A4 | B1 | Multiple | None | PMCP Only |
|---|---|---|---|---|---|---|---|---|
| **Table 2: Claimed Compensation Level** | | | | | | | | |
| Percentage of 2014 Claims | 31.06% | 8.47% | 5.55% | 2.12% | 12.59% | 19.64% | 15.70% | 4.86% |
| Percentage of 2015 Claims | 48.38% | 6.75% | 3.08% | 0.67% | 1.94% | 16.01% | 22.13% | 1.03% |
| Vintage Claim Comparison | 17.32% | (1.73%) | (2.47%) | (1.45%) | (10.65%) | (3.63%) | 6.43% | (3.83%) |

In Table 3 below, we provide statistics of the claimed compensation level in Section VII of the POCF as compared to the awarded compensation level.  In over eighty-two percent (82%) of claims where the Class Member has claimed a single compensation level, that same level of

compensation has been awarded.  For the eighteen percent (18%) not awarded the claimed compensation level, the Claims Administrator has awarded both higher and lower compensation levels based on review of the POCF and supporting documentation provided.  For claims where the Class Member selects multiple compensation levels or no compensation level in Section VII of the POCF, the rate of claims qualifying for A1-only compensation to those qualifying for A2 or higher compensation is approximately three to one (3:1), meaning that a greater number of these claims are qualifying for A1 compensation rather than A2 or higher compensation.  This ratio has not changed since the last reporting period.

| Table 3: Determined Compensation Level | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Qualified Compensation Level | A1 | | A2 | | A3 | | A4 | | B1 | | Grand Total |
| Section VII of POCF Claimed Compensation Level | Count | % | Count | % | Count | % | Count | % | Count | % | |
| A1 | 11,851 | 97.86% | 125 | 1.03% | 113 | 0.93% | 20 | 0.17% | 1 | 0.01% | 12,110 |
| A2 | 828 | 41.99% | 1,062 | 53.85% | 71 | 3.60% | 8 | 0.41% | 3 | 0.15% | 1,972 |
| A3 | 432 | 35.32% | 92 | 7.52% | 638 | 52.17% | 60 | 4.91% | 1 | 0.08% | 1,223 |
| A4 | 82 | 41.21% | 14 | 7.04% | 15 | 7.54% | 88 | 44.22% | | 0.00% | 199 |
| B1 | 562 | 50.49% | 430 | 38.63% | 94 | 8.45% | 9 | 0.81% | 18 | 1.62% | 1,113 |
| Multiple | 2,008 | 68.67% | 641 | 21.92% | 226 | 7.73% | 41 | 1.40% | 8 | 0.27% | 2,924 |
| None | 1,497 | 82.16% | 204 | 11.20% | 94 | 5.16% | 26 | 1.43% | 1 | 0.05% | 1,822 |
| Total | 17,260 | 80.79% | 2,568 | 12.02% | 1,251 | 5.86% | 252 | 1.18% | 32 | 0.15% | 21,363 |

**B.      Claims Requiring RAI and/or Notice of Defect**

As has been the case historically, the majority of claims have received an RAI and/or a Notice of Defect according to the requirements of the MSA.  During the Reporting Period, the Claims Administrator sent 18 RAIs and 148 Notices of Defect.  Since the inception of the Settlement, the Claims Administrator sent 29,179 RAIs and 21,473 Notices of Defect.

| TABLE 4: RAIS AND NOTICES OF DEFECT | | |
|---|---|---|
| **RAIs** | **Reporting Period** | **Total** |
| RAIs Sent | 18 | 29,179 |
| Responses to RAIs Received | 100 | 20,828 |
| **Defects** | **Reporting Period** | **Total** |
| Notices of Defect Sent | 148 | 21,473 |
| Defect Cure Materials Received | 2,215 | 10,068 |

1.    Requests for Additional Information

Of the 18 RAIs sent during the Reporting Period, fifty percent (50%) were RAI-Missing, and fifty percent (50%) were RAI-Incomplete.[3]   Seventeen percent (17%) were sent to unrepresented claimants, and eighty-three percent (83%) were sent to claimants represented by counsel.  More than sixty-five percent (65%) of the 2014 Claims have required at least one (1) RAI, and over twenty percent (20%) have required the maximum of two (2) RAIs. Approximately sixty-three percent (63%) of the 2015 Claims have required at least one (1) RAI, and over twelve percent (12%) have required the maximum of two (2) RAIs.   The overall response rate to RAIs was seventy-one percent (71%), with claimants represented by counsel responding at a higher rate (seventy-six percent (76%)) than those who are unrepresented (fifty-seven percent (57%)).   The overall cure rate for responding to RAIs for both claimants represented by counsel and those unrepresented is approximately fifty-eight percent (58%).

As previously reported, failure to respond to an RAI-Missing within the sixty-day (60-day) response period will not necessarily result in the denial of a claim; rather, the failure to respond to an RAI-Missing by submitting a first-party injury declaration in compliance with the

---

[3] Under the Party-approved RAI process, a claimant may receive an RAI-Missing for failing to submit a first-party injury declaration with his or her original POCF.  If the claimant submits a first-party injury declaration that omits necessary information, either in response to an RAI-Missing or at another point in the claims process, the claimant may receive an RAI-Incomplete.  For each RAI sent by the Claims Administrator, the claimant has sixty (60) days to respond.  A claimant may receive only one (1) RAI-Missing and one (1) RAI-Incomplete, as applicable.

Specified Physical Condition Matrix (the "SPC Matrix") will result in a Defect of "Missing Declaration of Injury Document" on a Notice of Defect.  The claimant would then have 120 days to cure that Defect and any other material Defects listed in the notice.

Similarly, failure to respond to or cure all deficiencies identified within an RAI-Incomplete will not necessarily result in the denial of a claim, because only some of a claimant's claimed or declared conditions may be deficient and included in the RAI.  In that circumstance, even if the claimant fails to respond to the RAI, the claimant might still receive compensation for the valid conditions in his or her declaration (assuming the claimant met the other requirements of the MSA).  These RAI processing standards and distinctions are highlighted in the "Frequently Asked Questions About Declarations and Requests for Additional Information" available on the Claims Administrator's website.  In addition, a copy of this FAQ is included with each RAI sent from the Claims Administrator, and we have call center representatives and firm liaisons available to provide assistance.

2.    <u>Notices of Defect</u>

Of the 21,473 Notices of Defect sent through the end of the Reporting Period, twenty-two percent (22%) were sent to unrepresented claimants or Class Members, and seventy-eight percent (78%) were sent to claimants or Class Members represented by counsel.  More than eighty percent (80%) were sent to Class Members claiming to be or approved as Clean-Up Workers.  Approximately fifty-two percent (52%) of the Notices of Defect sent listed multiple Defects.  More specifically, thirty percent (30%) identified two (2) through five (5) Defects, twelve percent (12%) identified six (6) through ten (10) Defects, and ten percent (10%) identified more than ten (10) Defects.

Of the 21,473 Notices of Defect sent through the end of the Reporting Period, fifty-six percent (56%) include Defects identified during initial claims review and prior to the Medical Record Review stage.  Sixteen percent (16%) of the 148 Notices of Defect sent during the Reporting Period identified at least one Defect prior to the Medical Record Review stage in the claims process.  The five (5) most common material Defects identified for the population are as follows:

- "Missing Declaration of Injury document";

- "Missing Medical Records documentation";

- "Documentation included with the claim does not establish that the claimant was employed as a Clean Up Worker between the dates of April 20, 2010 and April 16, 2012";

- "Missing Third Party Witness Injury Declaration document"; and

- "Proof Of Residency Documents Failed To Prove Residence For 60 Days Between April 20, 2010 And September 30, 2010 for Zone A."

Of the 21,473 Notices of Defect sent through the end of the Reporting Period, forty-four percent (44%) include Defects identified during the Medical Record Review process. Eighty-four percent (84%) of the 148 Notices of Defect sent during the Reporting Period identified at least one Defect subsequent to the Medical Record Review stage in the claims process. The five (5) most common material Defects identified during the Medical Record Review process are as follows:

- "No medical records were submitted or the documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION";

- Generally – "The medical records do not meet the criteria set forth in Level A2, A3, A4, and/or B1 of the Specified Conditions Matrix."  Specifically – "The date of first diagnosis for the claimed SPECIFIED PHYSICAL CONDITION occurred on or after April 16, 2012. This claimed condition does not qualify as a SPECIFIED PHYSICAL

CONDITION as set forth on the SPECIFIED PHYSICAL CONDITIONS MATRIX"[4];

- "The documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION";

- "The medical records do not meet the criteria set forth in Level A2 of the Specified Conditions Matrix: The medical records submitted do not support the assertions in the declaration concerning the time of onset of the claimed SPECIFIED PHYSICIAL CONDITION following the alleged exposure as set forth in the SPECIFIED PHYSICAL CONDITIONS MATRIX"; and

- "The third-party declaration does not meet the criteria set forth in Level A1 of the Specified Physical Conditions Matrix: The third-party declaration was not signed by the individual submitting the third-party declaration."

As of the end of the Reporting Period, the response period had expired for 20,873 (ninety-seven percent (97%)) of claims having received a Notice of Defect. The overall response rate was forty-eight percent (48%). The response rate for unrepresented claimants or Class Members was thirty-four percent (34%), while the response rate for represented claimants or Class Members was fifty-two percent (52%). As previously reported, failure to respond to or cure all Defects identified within a Notice of Defect will not necessarily result in the denial of a claim, because only some aspects of a claimant's claim may be defective and listed in a Notice of Defect. In that circumstance, even if the claimant failed to respond to the Notice of Defect or to cure all of the Defects listed in it, the claimant might still receive compensation. Specifically, of claimants or Class Members who received a Notice of Defect that included Defects identified during the Medical Record Review process, seventy-seven percent (77%) were subsequently found to qualify for SPC compensation. Furthermore, a claimant who has a Defect in his or her

---

[4] This Defect results from the Court's July 23, 2014 Order (Rec. doc. 12862) holding that all conditions first diagnosed after April 16, 2012 must be classified as Later-Manifested Physical Conditions. Notably, the Claims Administrator does not automatically deny claims where the medical records initially submitted with the claim indicate a date of first diagnosis after April 16, 2012. Rather, we issue a Notice of Defect to afford the Class Member the opportunity to provide medical record evidence of the diagnosis that pre-dates April 16, 2012. If the Class Member does not submit any such records, the Class Members claim for SPC compensation would be denied, but the Class Member would be free to pursue compensation for that condition as an LMPC.

claim for compensation for an SPC but has proven that he or she is a Class Member will receive a Notice of Determination for the PMCP benefit.  Hence, such Class Member can take advantage of that benefit while attempting to cure the Defects in his or her claim for SPC compensation.

### C.     Claims Processed Through Each Stage of Claims Review

As discussed above, a significant percentage of the POCFs submitted continue to contain one or more deficiencies or Defects.  These deficiencies and Defects not only increase the amount of time it takes for a claimant to reach the determination stage, but also increase the time it takes the Claims Administrator to process the claims.  The Claims Administrator must wait as long as sixty (60) or 120 days to receive the responses to the RAIs and/or Notices of Defects, respectively, and then must process the responses.

During the Reporting Period, the Claims Administrator has reviewed and/or processed the following numbers of claims through each of the following sequential stages in the claims review process:

| TABLE 5: CLAIM REVIEW PROCESSING | | |
|---|---|---|
| Processing Stage | Number of Claims[5] | |
| | Reporting Period | Total |
| Notice of Defect Gate One Process (Which Includes Class Membership Defects)[6] | 25 | 12,113 |
| Declaration Review Process[7] | 934 | 41,399 |
| RAI Process[8] | 18 | 29,179 |
| Medical Record Review Process[9] | 2,022 | 30,445 |
| Notice of Defect Gate Two Process[10] | 123 | 9,360 |

---

[5] Claims can move through Declaration Review (due to responses to RAI), the RAI Process (due to a defective response to an RAI-Missing, resulting in an RAI-Incomplete), and Medical Record Review (due to cure responses to originally defective claims) multiple times.

[6] Total claims with Gate One Defects, including basis of participation Defects, which received a Notice of Defect. Gate One Defects are those such as "Missing Declaration of Injury Document" or "Missing Medical Records Documentation," which prevent a claim from moving to Medical Record Review.

[7] Total number of injury declaration reviews completed.  A claim may go through this process more than once as a result of RAI responses.

[8] Total claims requiring an RAI that received a RAI.

[9] Total claims that were reviewed by Claims Administrator's Medical Record Review staff.

The Claims Administrator completed another 2,022 medical record reviews during the Reporting Period, bringing the total initial reviews completed since inception to 30,445.

**D.**   **Claims Sent Dispositive Correspondence for a Specified Physical Condition**

The overall percentage of 2014 Claims and 2015 Claims reaching final determination has increased over the Reporting Period to ninety-seven percent (97%) and ninety-six percent (96%), respectively.   The total number of claims approved for SPC compensation over the Reporting Period has continued to increase, due in part to the receipt of responses to previously pending RAIs and Notices of Defect for both the 2014 Claims and 2015 Claims, as well as improved processing speeds.

During the Reporting Period, we sent SPC Notices of Determination to 3,017 Class Members, approving them for $10,844,598 in compensation.   Since the inception of the Settlement, we sent SPC Notices of Determination to 19,691 Class Members, approving them for $53,703,648 in compensation.   Over this Reporting Period, the total percentage of finalized 2014 Claims moving to an approved determination increased to fifty-two percent (52%).   Over this Reporting Period, the total percentage of finalized 2015 Claims moving to an approved determination decreased to sixty-three percent (63%).

The Claims Administrator also sent 68 "Approved with Defects" notices during the Reporting Period, bringing the total number of "Approved with Defects" notices sent since inception to 3,052.  An "Approved with Defects" notice is sent to a Class Member who has at least one valid SPC but one or more other SPCs that contain a Defect and might result in an award of higher compensation.   A Class Member receiving this notice can choose either to attempt to cure the Defects and thus possibly receive greater compensation or to waive that

---

[10] Total claims that have completed Medical Record Review but that contain Defects preventing a final determination.

opportunity and proceed to determination on his or her valid SPC(s).    Two thousand four hundred seventy eight (2,478) of the 3,052 Class Members who received an "Approved with Defects" notice subsequently received an SPC Notice of Determination.  The total compensation for the remaining 576 Class Members who received an "Approved with Defects" notice but who have not yet received an SPC Notice of Determination is $4,643,036.    Therefore, the total amount allocated (by SPC Notices of Determination) and to be allocated (by "Approved with Defects" letters) is $58,346,684.

The Claims Administrator sent 2,732 Notices of Denial during the Reporting Period, for a total of 13,263 Notices of Denial from the inception of the Settlement through the end of the Reporting Period.  All of these claims have been denied because the claimant did not qualify as a Class Member, because the claimant opted out of the settlement, and/or because the claimant did not meet the criteria established by the MSA to receive compensation for an SPC.

A summary of the dispositive correspondence sent on claims for compensation for an SPC is set forth in Table 6, below.

| TABLE 6: CLAIMS DISPOSITION AND CORRESPONDENCE | | |
|---|---|---|
| **Approvals** | **Reporting Period** | **Total** |
| SPC Notices of Determination Sent — 2014 Claims | 529 | 5,783 |
| SPC Notices of Determination Sent — 2015 Claims | 2,488 | 13,908 |
| SPC Notices of Determination Sent Total | 3,017 | 19,691 |
| **Denials** | **Reporting Period** | **Total** |
| Notices of Denial Sent — 2014 Claims | 189 | 4,973 |
| Notices of Denial Sent — 2015 Claims | 2,543 | 8,290 |
| Notices of Denial Sent — Total | 2,732 | 13,263 |

E.    **Claims Approved for SPC Compensation**

During the Reporting Period, the amount of SPC compensation for which Class Members were approved increased, as reflected in Table 7, below.

| TABLE 7: APPROVED CLAIMS FOR SPCs[11] | | | | | |
|---|---|---|---|---|---|
| **SPC** | **Reporting Period Number Approved** | **Total Number Approved to Date** | **Reporting Period Amount Approved** | **Total Amount Approved to Date** | **Total "Approved with Defects" Amount Allocated to Date** | **Total Compensation Allocated to Date** |
| **A1** | 2,108 | 16,118 | $2,667,600 | $20,505,400 | $109,300 | $20,614,700 |
| **A2** | 743 | 2,156 | $6,106,064 | $16,760,114 | $2,571,650 | $19,331,764 |
| **A3** | 132 | 1,157 | $1,657,768 | $14,626,518 | $1,384,686 | $16,011,204 |
| **A4** | 29 | 241 | $115,416 | $687,816 | $91,800 | $779,616 |
| **B1** | 5 | 19 | $297,750 | $1,123,800 | $485,600 | $1,609,400 |
| | | | | | | |
| **Total** | 3,017 | 19,691 | $10,844,598 | $53,703,648 | $4,643,036 | $58,346,684 |

As set forth in the MSA, Class Members can only be paid once certain potential obligations to third parties are identified and resolved.  The resolution of these obligations is dependent upon the responsiveness of both governmental agencies and private interests in replying to the Claims Administrator's requests for information and resolution.  The obligations generally fall into two general categories: healthcare-related obligations and other obligations.

The resolution of healthcare obligations involves confirming whether a Class Member received benefits from a governmental payor (such as Medicare, Medicaid, or the Veterans' Administration) or a private healthcare plan for a compensable injury such that the Class Member must now reimburse those entities for the amounts they paid.  The processing phases

---

[11] Please note that the total volumes and total dollars approved are subject to change in each Reporting Period due to later received and processed Requests for Review.

include (1) confirming entitlement with the government agency or private plan, (2) receiving claims from the agency or plan, (3) auditing those claims and disputing any that are unrelated to the Class Member's compensable injury, and (4) final resolution.  Pursuant to the terms of the MSA, the Claims Administrator obtained an agreement from CMS establishing capped repayment amounts per SPC for Class Members who are or were beneficiaries of Medicare.  The Claims Administrator also negotiated with state Medicaid agencies to cap recovery for Medicaid-entitled Class Members.  Most states agreed to waive recovery rights for Class Members receiving compensation for an A1 claim.  Additionally, most state Medicaid agencies agreed to a twenty percent (20%) cap on and up to a thirty-five percent (35%) offset for fees and costs typically associated with their recovery, thereby allowing partial funding to the Class Member while full resolution is pending.  Processing times for Medicaid-entitled Class Members eligible for payment will vary. Each state has its own processing standards for responding to entitlement requests, producing claims, and finalizing lien amounts.

The resolution of non-healthcare-related obligations involves identifying the various types of obligations and working with the claimant or the claimant's representative to resolve them.  The processing phases include (1) identifying the obligation (through review of claim documents, PACER searches, and searches of the Louisiana Child Support Database), (2) sending correspondence seeking documentation that will resolve the complication, (3) reviewing the submitted documentation for sufficiency, and (4) final resolution.  The Claims Administrator tracks responses to its correspondence and sends a follow-up letter to non-responsive parties after thirty (30) to sixty (60) days have passed (with the length of time depending on the complication).  We will also send follow-up correspondence when the responses contain insufficient documentation.  The resolution time for payment complications

varies and remains heavily dependent upon the timeliness and sufficiency of the third parties' responses to our information requests. Through the end of the Reporting Period, the average age of claims awaiting payment from the date final determination is approximately 120 days depending on the complexity of the payment complications.

Once the obligations affecting a given claim are resolved and any liens or reimbursement obligations are paid, the Claims Administrator is able to disburse the balance of the Class Member's compensation.

### F.    Data Disclosure Form Submissions and Results

Data Disclosure Forms may be filed at any time during the claims review process by Natural Persons seeking information from the databases, data fields, and other documentary evidence provided by BP to the Claims Administrator. Notably, Data Disclosure Forms may continue to be filed *after* the submission of a Proof Claim Form and therefore can be filed *after* the claims filing deadline of February 12, 2015. Information provided via the submission of a Data Disclosure Form allows the Claims Administrator to make a determination concerning (a) the status of a Natural Person claiming to be a Clean-Up Worker and/or (b) a claim made by a Clean-Up Worker for compensation for a Specified Physical Condition. *See* MSA § XXI.B.

During the Reporting Period, the Claims Administrator received 104 Data Disclosure Forms, for a total of 27,211 Data Disclosure Forms since the approval of the MSA. The Claims Administrator responded to 83 Data Disclosure Forms during the Reporting Period, bringing the total number of responses to 32,924 since the approval of the MSA. Of the 27,211 Data Disclosure Forms received, 20,525 were related to unique claimants, while 6,686 were Data Disclosure Forms with additional information filed by the same claimants. Among the unique claimants filing Data Disclosure Forms, eighty-four (84%) were confirmed as Clean-Up Workers

by finding a match in at least one employer database other than the "Training" database. Twelve percent (12%) of those unique claimants were matched in the "Medical Encounters" database, while nineteen percent (19%) were matched in a medically relevant database, such as the "Traction" database or the "Injury/Illness" database.

## IV.     CLASS MEMBER SERVICES CENTER ACTIVITY

The Claims Administrator operates a Class Member Services Center located in New Orleans to communicate with Class Members and their attorneys and to assist them with filing their claims. During the Reporting Period, the Class Member Services Center received 9,226 telephone calls. Since opening, the Class Member Services Center has received a total of 193,808 telephone calls. The Class Member Services Center handled an average of 142 calls per day. The average length of each telephone call was eight minutes and thirty-one seconds, with an average wait time of four minutes. The Class Member Services Center also received 25 emails during the Reporting Period.

| TABLE 8: CLASS MEMBER SERVICES CENTER | | |
|---|---|---|
| | Reporting Period | Total |
| Calls Received | 9,226 | 193,808 |
| Average Length of Call (min:sec) | 8:31 | 6:38 |
| Average Wait Time (min:sec) | 4:00 | 0:46 |
| Emails Received | 25 | 3,015 |
| Walk-Ins | 0 | 734 |

## V.     PERIODIC MEDICAL CONSULTATION PROGRAM

### A.     Class Members Eligibility for and Participation in the PMCP

During the Reporting Period, the Claims Administrator approved 388 claims for participation in the PMCP and mailed 1,237 PMCP Notices of Determination. Since the inception of the Settlement, the total number of Class Members receiving a PMCP Notice of

Determination is 26,033.  The Claims Administrator received requests for and scheduled 456 physician visits during the Reporting Period, and Class Members attended 368 appointments in the Reporting Period.

| TABLE 9: PERIODIC MEDICAL CONSULTATION PROGRAM | | |
|---|---|---|
| | Reporting Period | Total |
| Class Members Approved to Receive Physician Visits[12] | 388 | 27,754 |
| PMCP Notices of Determination Sent | 1,237 | 26,033 |
| Physician Visits Requested and Scheduled | 456 | 2,931 |
| Appointments Attended by Class Members | 368 | 2,826 |
| Annual Update Letters Sent to Class Members | 4,324 | 21,221 |

### B.    Provider Network

During the Reporting Period, the Claims Administrator added nine (9) medical provider organizations, with nine (9) delivery sites, to its network of providers established to provide certain covered services to Class Members who participate in the PMCP, bringing the total number of medical provider organizations to 201.  These medical provider organizations represent 474 service delivery sites.  As a result of these additions, ninety-seven percent (97%) of eligible Class Members who have requested a PMCP evaluation resided within twenty-five (25) miles of a network provider at the conclusion of the Reporting Period.  The Claims Administrator continues to expand the medical provider network in its efforts to ensure that no Class Member will have to wait more than thirty (30) days or travel more than twenty-five (25) miles for an appointment.

### VI.    BACK-END LITIGATION OPTION

During the Reporting Period, twenty-two (22) Class Members filed Notices of Intent to Sue for compensation for a Later-Manifested Physical Condition, bringing the total number to

---

[12] The total physician visits will exceed the total number of Class Members qualified for the PMCP benefit, as Class Members may be referred to specialists and will eventually be eligible for subsequent primary visits.

437 Class Members to date.  Of the twenty-two (22) Notices of Intent to Sue filed in the Reporting Period, five (5) were denied and seventeen (17) contained deficiencies that could be corrected by the Class Member.

| TABLE 10: CLAIMS FOR LATER-MANIFESTED PHYSICAL CONDITIONS | | |
|---|---|---|
| | **Reporting Period** | **Total** |
| Notices of Intent to Sue Filed | 22 | 437 |
| Notices of Intent to Sue Approved | 0 | 40 |
| Notices of Intent to Sue Denied | 5 | 179 |
| Notices of Intent to Sue Deficient[13] | 17 | 218 |

Of the 179 claims denied to date, ninety-nine percent (99%) were denied because the conditions claimed were diagnosed on or before April 16, 2012 and therefore could not be claimed as Later-Manifested Physical Conditions.  The other reasons for denial include, among other things, that the claim was precluded by a previously filed workers' compensation claim.

Of the 218 defective claims to date, the three (3) most common material Defects identified are as follows:

- "Identification of BP defendants in Section VII is missing";

- "You must provide medical records indicating a date of diagnosis that is after April 16, 2012 or a completed Physician's Certification Form"; and

- "The date on which the claimed Later-Manifested Physical Condition(s) were first diagnosed in Section VI.A.2 is missing."

---

[13] Class Members who cure Defects within their original Notice of Intent to Sue will then be classified as "Approved" or "Denied" in future reporting, based on the responses received.

| TABLE 11: APPROVED NOTICES OF INTENT TO SUE | | |
|---|---|---|
| **Mediation Elections** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which at Least One BP Defendant Elected Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Pending a Decision from One or More BP Defendants Regarding Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims for Which No BP Defendants Elected Mediation | 0 | 40 |
| | | |
| **TOTAL:** | **0** | **40** |
| | | |
| **Results of Mediation** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims Settled by Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Settled by Mediation as to One but Not All BP Defendants Listed in the Notice of Intent to Sue | 0 | 0 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLAIMS MEDIATED:** | **0** | **0** |
| | | |
| **Back-End Litigation Option Lawsuit** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which No BP Defendant Elected Mediation | 0 | 40 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLASS MEMBERS ELIGIBLE TO FILE A BACK-END LITIGATION OPTION LAWSUIT**[14] | **0** | **2** |

Out of the forty (40) approved Notices of Intent to Sue to date, the BP Defendants did not elect

to mediate any of the claims.  Of the forty (40) claims eligible to file a Back-End Litigation

Option Lawsuit over the life of the Settlement, thirteen (13) had filed as of the end of the

---

[14] The total eligible for the Back-End Litigation Option over the life of the Settlement was forty (40).  However, of the forty (40), only two (2) are currently eligible for the Back-End Litigation Option.  The other thirty-eight (38) claims are no longer within the six-month (6-month) timeframe for properly and timely filing a Back-End Litigation Option Lawsuit.

Reporting Period. No Class Members became eligible to file a Back-End Litigation Option Lawsuit during the Reporting Period, bringing the total number of Class Members eligible to file a Back-End Litigation Option Lawsuit to two (2) through the end of the Reporting Period.

## VII. GULF REGION HEALTH OUTREACH PROGRAM

### A. Funding and Coordinating Committee Activities

In accordance with Section IX of the MSA, the Gulf Region Health Outreach Program ("GRHOP") was established in May 2012 to expand capacity for and access to high quality, sustainable, community-based healthcare services, including primary care, behavioral and mental health care and environmental medicine, in the Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle. The program consists of five (5) integrated projects: the Primary Care Capacity Project ("PCCP"), Community Involvement ("CI"), the Mental and Behavioral Health Capacity Project ("MBHCP"), the Environmental Health Capacity and Literacy Project ("EHCLP"), and the Community Health Workers Training Project ("CHWTP"). As of the end of the Reporting Period, the Claims Administrator disbursed $104,713,294 to the projects, as detailed in the chart below.

| TABLE 13: GRHOP | |
|---|---|
| **Project** | **Funding to Date** |
| Primary Care Capacity Project | $46,655,925 |
| Community Involvement | $3,213,491 |
| Mental and Behavioral Health Capacity Project ((Louisiana State University Health Sciences Center) | $14,359,145 |
| Mental and Behavioral Health Capacity Project (University of Southern Mississippi) | $8,256,486 |
| Mental and Behavioral Health Capacity Project (University of South Alabama) | $8,256,489 |
| Mental and Behavioral Health Capacity Project (University of West Florida) | $5,025,696 |
| Environmental Health Capacity and Literacy Project | $14,957,416 |
| Community Health Workers Training Project | $3,988,646 |
| | |
| **TOTAL:** | **$104,713,294** |

The final disbursement was made in May 2016, which accounted for an eighteen (18) month low-cost extension of the GRHOP, as agreed upon by the Parties and Coordinating Committee members. All projects, except for Community Involvement,[15] will participate in this extension period. Estimated administrative costs during the extension period, totaling $286,706, were accounted for by the Claims Administrator, with all projects contributing to these costs. Therefore, the May 2016 disbursement brought the total funding to the GRHOP to $104,713,294.

The GRHOP is governed by a Coordinating Committee that continues to function in a cooperative and integrated manner, with quarterly in-person meetings around the Gulf Coast, as well as monthly conference calls. These quarterly meetings offer the grantees the opportunity to share their progress, discuss challenges faced, and collaborate with their partners to work through issues that affect the GRHOP as a whole.

The Claims Administrator held a quarterly meeting on December 2, 2016, in New Orleans, Louisiana. This meeting encompassed discussion on a variety of topics, including, but

---

[15] Community Involvement has chosen not to participate in the eighteen (18) month low-cost extension.

not limited to, the activities of two (2) of the five (5) GRHOP subcommittees — the Evaluation Subcommittee and Publication Subcommittee.[16] These subcommittees work to increase collaboration and effectiveness of the projects, as well as assure positive impacts and sustainability within the communities that the GRHOP affects.[17] During the meeting, discussions were made regarding a special GRHOP issue for the Journal of Public Health Management and Practice.

Lastly, the Coordinating Committee also requested the Claims Administrator to establish a GRHOP website. This website contains detailed descriptions and notable accomplishments of each project, as well as information regarding the GRHOP Coordinating Committee, news/events, and publications. The website launched on July 3, 2014 and can be publicly accessed at www.grhop.org.

**B.    GRHOP Project Updates**

The GRHOP projects have made substantial progress in achieving the goals set forth in their Grant Proposals. Some notable accomplishments of the projects include:

- The **Primary Care Capacity Project**, led by the Louisiana Public Health Institute ("LPHI"), which has:

  o Continued to work towards its goal to expand access to integrated high quality, sustainable, community-based primary care with linkages to specialty mental and behavioral health, and environmental and occupational health services in the implicated seventeen (17) Gulf Coast counties and parishes.

  o Monitored cooperative agreements to provide funding and technical assistance to twenty-four (24) different community health centers ("CHCs");

  o Worked with partners to develop and implement nine (9) health system projects among the four (4) states that mainly support care coordination, quality

---

[16] The five (5) GRHOP subcommittees include: the Data Sharing Subcommittee, Evaluation Subcommittee, Health Promotions Subcommittee, Newsletter Subcommittee, and Publication Subcommittee. These subcommittees were formed during the July 31, 2014 quarterly meeting.

[17] The Claims Administrator will hold its next quarterly meeting on January 27, 2017 in New Orleans, Louisiana. The Claims Administrator will report on that meeting in its first quarterly report of 2017.

improvement initiatives, cross collaboration, health information exchanges, and health information technology;

o Continued pilot technical assistance engagements by providing practice coaching focused on improving select quality measures for selected community health centers;

o Fostered peer-to-peer learning opportunities to improve quality and effectiveness of health care services, to increase organizational capacity, and to improve sustainability of CHCs in the Gulf Region; and

o Developed the 2017 Regional Care Collaborative ("RCC") spring forum. The team has confirmed speakers and topics that align with the theme of "Beyond Sustainability: Growing and Thriving" to deliver a meaningful and relevant experience for an estimated 125 participants.

- **Alliance Institute's** outreach on behalf of the GRHOP and its partners has reached over 1,500 individuals across Louisiana, Mississippi, Alabama, and Florida.   Alliance Institute, the grantee responsible for Community Involvement, has:

  o Hosted a major donor training for sub-grantee community-based organizations ("CBOs");

  o Facilitated relationships with web designers for CBOs interested in updating their web presence; and

  o Hosted and facilitated a meeting of Emerging ChangeMakers Network and its partners to discuss partnership models for the Africatown project.

  o Notable highlights from Community Involvement CBOs include:

    ▪ First 72 Plus worked in partnership with the Southern Poverty Law Center and Louisiana Center on Children's Rights, to launch a peer mentor case management program;

    ▪ Boat People SOS hosted trainings at eight (8) government-funded social service organizations. Trainings were conducted to teach the legalities of Title VI of The Civil Rights Act of 1964, offer translation services, and create work plans to fully implement Title VI; and

    ▪ Movement for Change restarted a series of healthy living workshops. These workshops focus on nutrition, chronic disease, and behavior change.

- The **Environmental Health Capacity and Literacy Project** ("EHCLP"), with its grantee being Tulane University, has achieved the following:

  o Occupational and Environmental Health Specialty Network:

- The Association of Occupational and Environmental Clinics ("AOEC"), coordinated an educational session, "Taking an Occupational and Environmental Health History" at the University of Mississippi Medical Center in Jackson, Mississippi for eighty-seven (87) medical students and physicians in October 2016.

o Training and Leadership Development:

- Both Tulane and the University of Southern Mississippi hosted science teacher workshops during the Reporting Period for a total of fifteen (15) individuals.

- EHCLP hosted a retreat in Mobile, Alabama in October 2016 for the ten (10) staff and faculty involved in the Emerging Scholars Academies and Science Teacher Workshops at Tulane University, the University of West Florida, the University of Southern Mississippi, and the University of Southern Alabama.

o Community Resilience and Family Wellness

- Fussy Baby Network® New Orleans & Gulf Coast ("FBNNOGC") served twenty (20) families, with a total of sixteen (16) home visits and nine (9) phone sessions. In addition, the program served ten (10) families through parent education support groups.

- FBNNOGC team members presented a full-day pre-conference workshop and a poster at the Zero to Three National Conference in New Orleans, Louisiana in December 2016.

- Community health workers ("CHWs") employed at the health clinics and CBOs through subcontracts with EHCLP continued their valuable work assisting community members to access primary care services. For example, CHWs at Franklin Primary Health Center in Mobile, Alabama collaborated with the American Cancer Society on seven (7) outreach events at local Wal-Marts in Mobile and Baldwin counties. The events provided education on breast cancer and free clinical breast exams, resulting in one hundred thirty-two (132) clinical breast exams and thirty-one (31) scheduled medical appointments.

- The **Community Health Workers Training Project**, directed by the University of South Alabama's Coastal Resource and Resiliency Center ("CRRC"), has achieved the following:

  o Selena McCord (Training and Outreach Coordinator for CRRC) and Brandi Gilliam (Program Specialist) attended a Community Research Fellows Training and Information Meeting on October 11, 2016 in Bayou La Batre, Alabama.

- o Janel Lowman (Assistant Director of Training and Evaluation for CRRC) and Selena McCord attended a Cancer Control and Prevention Meeting on October 18, 2016 in Mobile, Alabama.

- o Janel Lowman and Selena McCord attended a Mobile Advisory Board Meeting on October 20, 2016 in Mobile, Alabama.

- o Brandi Gilliam and Alyssa Wood (Graduate Student) attended Bayou on the Move Health Fair on October 28, 2016 in Bayou La Batre, Alabama.

- o Janel Lowman attended a Centers for Disease Control and Prevention Lay Health Workers Work Group meeting on November 17-18, 2016 in Atlanta, Georgia.

- o Selena McCord attended a Climate Tools Round Table Discussion on December 5, 2016 in Mobile, Alabama.

- The **Mental and Behavioral Health Capacity Project**, implemented by a coalition of four (4) academic institutions (Louisiana State University Health Sciences Center ("MBHCP-LA"), the University of Southern Mississippi ("MBHCP-MS"), the University of South Alabama ("MBHCP-AL"), and the University of West Florida ("MBHCP-FL")), has achieved the following:

  - o MBHCP-LA has:

    - ▪ Continued to have success in developing and implementing efficient, high quality, integrated care services in communities with prior disparities in care. There has also been improvement in mental and physical health symptoms, along with high client and clinic satisfaction;

    - ▪ Provided services to meet acute, ongoing, and emergency behavioral health needs at Federally Qualified Health Centers ("FQHC") and community clinics, including psychiatric and psychological therapeutic services for adults and children;

    - ▪ Provided supportive strength-based services in clinics, schools, and communities to build mental health awareness, provide access to care, and contribute to sustainability;

    - ▪ Trained and supervised medical students, psychiatry residents, psychology interns, postdoctoral fellows, social work interns, physician assistant students, and behavioral health and primary care clinicians relating to patient/client care, integrated care, and telepsychiatry;

    - ▪ Continued collaboration with PCCP and the Alliance Institute regarding community stakeholder contacts, as well as through advisory board meetings to gather information about mental and behavioral health needs;

- Increased emphasis on sustainability through coordination with medical directors, clinic staff, and operating entities to integrate behavioral health services into their electronic medical records; and

- Evaluated project activities to better understand the contribution of each activity and its connection to outcome and sustainability efforts.

o MBHCP-MS has achieved the following:

- The Mississippi Integrated Health and Disaster Program ("M-IHDP") Clinical Director conducted a Motivational Interviewing ("MI") training for the community outreach and enrollment staff of FQHCs to help staff better engage patients, improve communication skills, and help facilitate and support patients in becoming more engaged in their health care.

- M-IHDP clinical and administrative staff participated in the classroom Health Navigator Training. The training focused on an introduction to the Health Care Marketplace, finding health insurance coverage for patients, and navigation through the health care systems.

- The Special Projects Coordinator and Research Assistant continued to provide clinical consultation to the Back Bay Mission for evaluation and assessment of homeless community members, with the goal to link homeless individuals to medical, mental health, dental, and optometry services at no cost.

- The M-IHDP administrative team continues to collaborate with United Health Care ("UHC") on the Diabetes Disparities pilot project to assist UHC members in reducing their Hemoglobin A1c levels through the use of social work led care teams.

- An Advanced Continuing Education Workshop, titled "Recognizing and Reporting Child Maltreatment," was held. The workshop focused on identifying, assessing, and reporting childhood physical abuse, emotional abuse, and neglect.

o MBHCP-AL has:

- Delivered quality services to over 1,700 individual patients and conducted approximately 2,700 chart reviews;

- Begun operations of the Attention Problems Presented in the Learning Environment ("APPLE") team.  The APPLE team has observed approximately twenty-two (22) students and completed six (6) assessments as part of an on-site coordinated school care team;

- Held a Youth Mental Health First Aid Training for multiple employees of the Mobile County Public School System on October 10, 2016;

31

- Held the Fourth Annual Generational Resilience Conference: Live Long and Prosper, on October 21, 2016. One hundred and fourteen (114) professionals and senior adult community members were brought together by University of South Alabama and University of West Florida in a one-day conference;

- Submitted one grant proposal on resilient communities (with GRHOP partners at University of Southern Mississippi), another grant proposal on trauma informed care and disaster response, and a project to consider the benefit of looping pharmacy into the integrated care process;

- Developed two research projects to evaluate and address key areas of need in Mobile and Baldwin counties. The research projects, developed by two postdoctoral fellows, are intended to evaluate the effectiveness of suicide risk assessment training, develop crisis response protocols, and evaluate the prevalence of traumatic life events to develop protocols for regular intimate partner violence screenings;

- Executed a contract with the Mobile Country Health Department division of Family Health Clinical Services in order to fund a licensed behavioral health provider to increase behavioral health capacity and access to behavioral health services for the customers of Family Health Clinical Services; and

- Published two (2) manuscripts, submitted two (2) journals, conducted six (6) oral presentations, and presented nine (9) posters at regional/national conferences.

- MBHCP-FL has:

  - Initiated a weekly group at a local Assisted Living Facility to work with and engage seniors through coloring and conversation;

  - Hosted the Fourth Annual Generational Resilience Conference in partnership with the University of South Alabama;

  - Attended the "Connected Community IT Summit" in Pensacola, Florida; and

  - Attended the "Bays and Bayous Symposium" in Biloxi, Mississippi.

## C. GULF REGION HEALTH OUTREACH PROGRAM LIBRARY

In accordance with Section IX.H of the MSA, the Claims Administrator has established a publicly accessible online library, which exists as a repository of information regarding information related to the health effects of the *Deepwater Horizon* incident, including, but not limited to: (a) the composition, quantity, fate, and transport of oil, other hydrocarbons, and other

substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and contaminants used in Response Activities; (b) health risks and health studies relating to exposure to oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and decontaminants used in Response Activities; (c) the nature, content, and scope of *in situ* burning performed during the Response Activities; and (d) occupational safety, worker production, and preventative measures for Clean-up Workers.

The library houses over 197,000 relevant documents, each tagged with a specific search category based on the type of information identified within the MSA.  The Claims Administrator will continue to add Library Materials in accordance with the MSA.

Respectfully submitted,

*DEEPWATER HORIZON* MEDICAL BENEFITS
CLAIMS ADMINISTRATOR


By: /s/ Matthew L. Garretson
        Matthew L. Garretson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of the electronic filing in accordance with the procedures established in MDL 2179, on this 14th day of February, 2017.

Respectfully submitted,

*/s/ Matthew L. Garretson*
Matthew L. Garretson

34