

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re: Oil Spill by the Oil Rig          MDL NO. 2179
     "Deepwater Horizon" in the Gulf
     of Mexico, on April 20, 2010          SECTION J

Applies to: *All Cases*          JUDGE BARBIER

---

**REPORT BY THE CLAIMS ADMINISTRATOR OF THE DEEPWATER HORIZON ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT ON THE STATUS OF CLAIMS REVIEW**

---

**FEBRUARY 14, 2017**



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  Oil Spill by the Oil Rig<br>         "Deepwater Horizon" in the Gulf<br>         of Mexico, on April 20, 2010 | MDL NO. 2179<br><br>SECTION J |
| Applies to: *All Cases* | JUDGE BARBIER |

**REPORT BY THE CLAIMS ADMINISTRATOR OF THE DEEPWATER HORIZON ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT ("THE AGREEMENT")**

**FEBRUARY 14, 2017**

Pursuant to this Court's December 16, 2016 Order [Rec. Doc. 22007] to inform the Court on the status of the Deepwater Horizon Economic and Property Damages Settlement Program ("the Settlement Program") in advance of the Court's Status Conference scheduled for February 17, 2017, the Claims Administrator of the Settlement Program submits this Report as of January 31, 2017 to the Court. The Claims Administrator will provide any other information in addition to this Report as requested by the Court.

I.      **TRANSITION PROCESS**

On March 8, 2012, the Court issued an Order creating the Transition Process, appointing Patrick A. Juneau as Claims Administrator of the Transition Process and of the proposed Settlement Program and appointing Lynn Greer as the Transition Coordinator of the Transition Process.

The purpose of the Transition Process was to evaluate claims currently pending with the Gulf Coast Claims Facility ("GCCF") and to evaluate any new claims submitted before the Settlement Program agreed to by the Parties was opened (collectively, the "Transition Claims"). The Transition Process was created upon the agreement of BP and Class Counsel and in

2

furtherance of the Agreement-in-Principle between the Parties to settle claims, which ultimately resulted in the Settlement Agreement preliminarily approved by the Court on May 2, 2012. The Transition Coordinator evaluated Transition Claims and, where appropriate under the existing GCCF rules, methodologies, and protocols, paid the amounts set forth in the Court's Order.

The Transition Process and the Transition Coordinator issued total payments in the amount of $404,087,746 on 15,764 Transition Claims during its nearly three month existence until the Settlement Program was opened on June 4, 2012.

## II. PRELIMINARY APPROVAL OF THE SETTLEMENT AGREEMENT AND OPENING OF THE SETTLEMENT PROGRAM

On April 18, 2012, counsel for BP and the Plaintiffs' Steering Committee (the "PSC") (collectively, "the Parties") submitted the Settlement Agreement to the Court for preliminary approval. By Order on May 2, 2012, the Court preliminarily approved the Settlement Agreement and appointed Patrick A. Juneau as the Claims Administrator to oversee the implementation of the Settlement Agreement. The Claims Administrator and the Court-appointed Vendors assisting him immediately undertook the task of building a system to receive and orderly process claims in accordance with the terms of the Settlement Agreement.

The Settlement Program's first priority was to design and construct everything necessary to open and to permit Claimants to submit claims by June 4, 2012. That step necessitated extensive planning, development, and implementation of the many components of the Settlement Program. The crucial preparatory steps included the following:

1) Working with the Parties to draft (i) a Registration Form to be used by Claimants to register with the Settlement Program, (ii) the various Claim Forms to be used by Claimants to submit

claims along with Instruction Booklets for each Claim Type to guide Claimants, and (iii) several Sworn Written Statement Forms to be utilized by Claimants in support of their claims;

2) Assisting in the issuance of Notice to the Class Members, including a personalized Notice mailed to over 1,000,000 potential Claimants and emailed to over 330,000 potential Claimants;

3) Designing a public website to provide materials and information to Claimants, including Alerts, FAQs, and downloadable and printable PDF versions of the Registration Forms, Claim Forms, Instruction Booklets, Sworn Written Statements, Tax Forms, and Attorney Representation Forms;

4) Developing an interactive online intake system through which Claimants could complete Registration Forms and Claim Forms and upload supporting documents instantaneously;

5) Developing extensive secure interactive web interfaces or "portals" for lawyers and *pro se* Claimants to submit claims and supporting documents, to receive notices, reports, information, and alerts from the Claims Administrator, and to view instantly the status of each claim submitted by a Claimant or counsel;

6) Obtaining and preparing for use all the data and documents relating to claims submitted to the GCCF as well as from several databases provided by the Parties necessary for claim review under the several Claim Types created by the Settlement Agreement;

7) Designing a system, and training reviewers on the steps necessary, to identify the industry by North American Industry Classification (NAICS) Code to be assigned to Claimants on Economic Loss Claim Types which classification would affect causation requirements, tourism designations, exclusions, etc.;

8) Building the claim review modules for each of the 10 different Claim Types, as well as their sub-Claim Types, along with claim reviewer training to ensure claim analysis consistent with the Settlement Agreement;

9) Implementing the Accountant Review function to perform the accounting review of Business Economic Loss claims, including the analysis of the Claimant's profit and loss statement revenue and expenses and tax returns, the classification of each of the Claimant's expense accounts as Variable or Fixed, as well as several other necessary portions of the detailed review to determine a claim's causation result and, if appropriate, compensation calculation;

10) Developing a special team and procedure to review requests for Claimant Accounting Support reimbursement of accounting fees incurred by Claimants in preparation of certain Economic Loss claims for submission to the Settlement Program;

11) Drafting all the various claim determination notices to inform Claimants of the results of the Settlement Program's claim review, to provide detail on the calculations and Award Amounts payable to eligible Claimants, to explain the basis for denials issued by the Settlement Program, and to detail what required documents are missing that Claimants must submit in order for their claims to be complete;

12) Developing the processes needed to generate and issue the Release that each Claimant would be required to execute before the Settlement Program could issue a claim payment and training reviewers on the criteria for acceptable and properly executed Releases;

13) Implementing processes for issuing payments by wire or check in the correct amounts to Claimants or their attorneys after the submission of properly executed Releases;

14) Designing the procedures for Claimants and/or BP to exercise their rights of secondary review as provided in the Settlement Agreement, including Reconsideration, Appeal, and Appeal for Insufficient Documentation;

15) Establishing procedures necessary to process payments for Claimants who were deceased, minor, incompetent, bankrupt, dissolved, and against whom liens have been filed with the Settlement Program;

16) Engaging in continual exchanges with the Parties on hundreds of questions regarding the Parties' intended meaning of specific provisions of the Settlement Agreement;

17) Locating and leasing offices for 19 Claimant Assistance Centers across the five Gulf States as well as a central claim office in New Orleans, Louisiana, and offices for certain Court-appointed Vendors;

18) Staffing, training, and operating the Claimant Assistance Centers as well as a toll-free call center to answer questions about the Settlement Program, provide updates about claim status, and assist Claimants in the filing of their claims; and

19) Locating and leasing an intake center in Hammond, Louisiana, for the receipt of hard copy materials from Claimants.

All of the above tasks were completed and the Claims Administrator opened the Settlement Program with needed functions staffed and operating by June 4, 2012, just over 30 days after the preliminary approval of the Settlement Agreement. The Settlement Program completed its first reviews and issued its first determination notices on July 15, 2012. First payments (other than Transition Process payments) were issued to Claimants on July 31, 2012.

### III. FAIRNESS HEARING, FINAL APPROVAL, AND CLAIM FILING DEADLINE

On November 8, 2012, the District Court held its Fairness Hearing as to the final approval of the Settlement Agreement. On December 21, 2012, the District Court issued an Order certifying the Class and granting final approval of the Settlement Agreement. As of the final approval of the Settlement Agreement just over six months after opening, the Settlement Program had issued payments totaling more than $940 million.

On December 8, 2014, the United States Supreme Court declined the request for a review of the ruling of the United States Court of Appeals for the Fifth Circuit (the "Fifth Circuit") upholding this Court's final approval Order of the Settlement Agreement. Accordingly, the

Effective Date of the Settlement Agreement was December 8, 2014, and the final deadline for filing all new claims occurred on June 8, 2015 except for the Seafood Compensation Program which had a claim filing deadline of January 22, 2013.

Between May 1, 2015 and the claim filing deadline of June 8, 2015, 71,915 new claims were filed with the Settlement Program. These claims spanned all Claim Types save for Seafood Compensation Program claims which deadline for submission had previously expired. This volume represented 19% of the total claims filed with the Settlement Program.

### IV. CLAIM PROCESSING

a. Total Claim Information

The Settlement Program received 388,055 Claim Form submissions. In reviewing these submissions, the Settlement Program issued 172,798 Eligibility Notices for a total amount of over $11.01 Billion as well as 143,879 Denial Notices and 71,722 Notices of Closure, Opt Out, or Withdrawal. Approximately 90% of the claims submitted to the Settlement Program have been resolved.

b. Seafood Compensation Program and Supplemental and Residual Distributions[1]

The Settlement Agreement called for a $2.3 Billion Seafood Compensation Program Settlement Fund. The Settlement Program received 24,039 Seafood Compensation Program claims, 10,500 of which were determined to be eligible, resulting in payments of $1,174,885,053 in the Initial Distribution; 8,367 of which were denied; 5,168 of which were withdrawn or otherwise closed; 2 of which remain unresolved; and 2 of which remain subject to various appellate processes discussed below.

---

[1] Untimely filed claims are excluded from this Section.

The Settlement Agreement states that any balance available after the Initial Distribution would be distributed to each claimant in proportion to the claimant's gross compensation, unless the Court-Appointed Seafood Neutrals recommend a different formula. The Court's Order on November 18, 2014, approved a partial Supplemental Distribution targeted at $500 million of the remaining undistributed portion of the aggregate $2.3 Billion Seafood Compensation Program Fund. The Supplemental Distribution took place in two waves. In all, the Settlement Program issued 5,730 Seafood Supplemental Distribution Eligibility Notices for a total value of $538,837,899. The Settlement Program issued Supplemental Distribution payments of $538,075,964 to 5,133 Claimants.

On October 4, 2016, the Claims Administrator began issuing Seafood Residual Distribution Notices allocating the remainder of the Seafood Compensation Program Settlement Fund. The Settlement Program has issued 5,502 Seafood Residual Distribution Notices for a total value of $521,626,754. The Settlement Program has issued Residual Distribution payments of $518,658,957 to 5,021 Claimants.

c. Other Substantially Completed Claim Types[2]

    i. *Coastal Real Property*

The Settlement Program received 42,124 Coastal Real Property claims, 29,789 of which were determined to be eligible in the total amount of $164,080,172; 8,518 of which were denied; 3,812 of which were withdrawn or otherwise closed; 3 of which remain unresolved; and 2 of which remain subject to various appellate processes discussed below and their associated deadlines. Review of these claims was substantially completed in September 2016.

---

[2] Untimely filed claims are excluded from this Section. Any claims in, or pending deadlines associated with, the various appellate processes described within this Report are not included in the eligibility and dollar amounts provided in this Section.

ii. *Real Property Sales*

The Settlement Program received 3,058 Real Property Sales claims, 870 of which were determined to be eligible in the total amount of $40,460,619; 935 of which were denied; and 1,253 of which were withdrawn or otherwise closed. Review of these claims was substantially completed in September 2016.

iii. *Vessel of Opportunity*

The Settlement Program received 8,927 Vessel of Opportunity claims, 7,140 of which were determined to be eligible in the total amount of $283,302,069; 1,439 of which were denied; and 348 of which were withdrawn or otherwise closed. Review of these claims was substantially completed in September 2016.

iv. *Vessel Physical Damage*

The Settlement Program received 1,548 Vessel Physical Damage claims, 872 of which were determined to be eligible in the total amount of $12,884,871; 484 of which were denied; 191 of which were withdrawn or otherwise closed; and 1 of which remains unresolved. Review of these claims was substantially completed in September 2016.

v. *Individual Periodic Vendor*

The Settlement Program received 385 Individual Periodic Vendor claims, 10 of which were determined to be eligible in the total amount of $93,497; 312 of which were denied; and 63 of which were withdrawn or otherwise closed. Review of these claims was substantially completed in September 2016.

d. Remaining Claim Types[3]

　　　　i. *Business Economic Loss (including Start-Up BEL and Failed BEL)*

The Settlement Program received 148,144 Business Economic Loss claims, 50,861 of which are resolved as eligible resulting in claims payable of $6,687,698,087; 43,368 of which are resolved as denied; and 36,325 of which were withdrawn or otherwise closed. The Settlement Program continues its review of the remaining 17,590[4] claims which represent only 12% of the total Business Economic Loss claims filed with the Settlement Program. However, of those remaining claims, 3,919 have received Settlement Program determinations for which deadlines associated with the appellate processes discussed below remain pending.

　　　　ii. *Subsistence*

The Settlement Program received 66,707 Subsistence claims, 32,839 of which are resolved as eligible resulting in claims payable of $340,427,725; 17,461 of which are resolved as denied; and 2,074 of which were withdrawn or otherwise closed. The Settlement Program continues its review of the remaining 14,333 claims which represent only 21% of the total Subsistence claims filed with the Settlement Program. However, of those remaining claims, 3,466 have received Settlement Program determinations for which deadlines associated with the appellate processes discussed below remain pending.

　　　　iii. *Individual Economic Loss*

The Settlement Program received 60,679 Individual Economic Loss claims, 9,565 of which are resolved as eligible resulting in claims payable of $97,127,047; 42,620 of which are resolved as denied; and 4,775 of which were withdrawn or otherwise closed. The Settlement Program

---

[3] Untimely filed claims are excluded from this Section. Any claims in, or pending deadlines associated with, the various appellate processes described within this Report are not included in the eligibility and dollar amounts provided in this Section.
[4] Included within this subset are claims for accompanying facilities of Claimants filing as consolidated under Exhibit 5 on Multi Facility BEL Claimants.

continues its review of the remaining 3,719 claims which represent only 6% of the total Individual Economic Loss claims filed with the Settlement Program. However, of those remaining claims, 954 have received Settlement Program determinations for which deadlines associated with the appellate processes discussed below remain pending.

> iv. *Wetlands Real Property*

The Settlement Program received 28,430 Wetlands Real Property claims, 11,016 of which are resolved as eligible resulting in claims payable of $209,614,376; 8,627 of which are resolved as denied; and 4,078 of which were withdrawn or otherwise closed. The Settlement Program continues its review of the remaining 4,709 claims which represent only 17% of the total Wetlands Real Property claims filed with the Settlement Program. However, of those remaining claims, 716 have received Settlement Program determinations for which deadlines associated with the appellate processes discussed below remain pending.

**V.   APPELLATE PROCESSES**

The Settlement Agreement sets forth an extensive set of processes by which Claimants and BP can request additional review of claim determinations to ensure the results reached by the Settlement Program are consistent with the applicable provisions of the Settlement Agreement.

First, Section 6 of the Settlement Agreement provides Claimants with the right to request Reconsideration whereby Claimants may request that the Settlement Program reconsider its prior determination in light of additional information or documentation submitted by the Claimant. The Settlement Program has received and processed 56,306 requests for Reconsideration.[5]

---

[5] In addition to the right of Reconsideration provided in the Settlement Agreement, the Claims Administrator implemented Policy 309 which provides Claimants with the right to request Re-Review in cases where there may be additional documents that could affect the value or eligibility of the claim or affect Claimant Accounting Support reimbursement as discussed previously in this Report. The Settlement Program has received and processed 28,986 requests for Re-Review.

11

Second, Section 6 of the Settlement Agreement affords the Claimant and BP the right to appeal determinations of the Settlement Program to an independent Appeal Panel comprised of persons who were appointed by the Court upon joint recommendation of the Parties. The Appeal Panel considers the positions of the Claimant and BP on Appeal and issues a determination as to which party's position is sustained under the applicable provisions of the Settlement Agreement. The Settlement Program has received 5,291 appeals by Claimants and 8,646 appeals by BP, totaling 13,937 appeals. 12,767 of these appeals have been resolved.

Third, Section 6 of the Settlement Agreement recognizes this Court's inherent jurisdiction over the Settlement Agreement and Settlement Program as well as this Court's discretionary right to review any determination of the Appeal Panel. As such, Claimants and BP may request Discretionary Court Review of decisions of the Appeal Panel. Discretionary Court Review of an Appeal Panel decision is a form of extraordinary relief that is conducted only in rare and exceptional circumstances. The Court has received 2,227 requests for Discretionary Review of which the Court has reviewed 1,938, granting 445 requests and denying 1,493 requests.

Fourth, following an opinion issued by the Fifth Circuit on May 8, 2015, Claimants and BP have the right to notice further appeals to the Fifth Circuit from rulings made by this Court on Discretionary Review of individual claims. The Claims Administrator finalized procedures with this Court to implement and facilitate the Fifth Circuit's rulings since changes were required with respect to the docketing of Discretionary Review requests and rulings as well as the creation of appellate records.

In addition to Reconsideration, Section 6 of the Settlement Agreement also creates a process for Claimants to request appeal of determinations by the Settlement Program that the Claimant has submitted insufficient documentation such that the claim cannot be fully processed

in whole or in part.[6]  Incompleteness Appeals are reviewed by Documentation Reviewers appointed by this Court.  There have been 8,535 Incompleteness Appeals filed to the Documentation Reviewers.

## VI. PROMOTIONAL FUND

A $57 million fund, the Gulf Tourism and Seafood Promotional Fund ("Promotional Fund"), was established to promote tourism and the seafood industries in Gulf Coast areas impacted by the Deepwater Horizon incident. In particular, one of the primary purposes of this Promotional Fund is to support programs directed towards the advertising, promotion, and/or marketing which supports Gulf tourism and the seafood industries.  In 2012 and 2013, the Promotional Fund received several hundred applications from public, quasi-public, non-profit, or other entities or organizations located within the Gulf States over the first and second rounds of distributions.  For the third round of distributions, each entity or organization receiving a grant in either of the first two rounds received an additional pro rata distribution.  For the fourth round of distributions, the Parties agreed to fund the parish/county convention and visitors' bureaus as well as the state organizations that promote tourism and/or seafood.  In total, the Promotional Fund has been used to award $68,625,989[7] in 358 grants to these organizations in the process.

## VII. CONCLUSION

The Claims Administrator offers this Report to ensure that the Court is informed of the status of the Settlement Program as of January 31, 2017.  If the Court would find additional

---

[6] The Claims Administrator also approved Procedure 469 implementing an incompleteness process that provides Claimants with two written Notices (an initial Incompleteness Notice and a Follow-Up Incompleteness Notice) informing the Claimant about the documents required to complete the claim submission before the Claims Administrator denies the claim for insufficient documentation.

[7] The total amount awarded exceeds the $57 million originally established in the Fund because fees paid by the parties for Appeals are added to the Promotional Fund under Section 6.1.3 of the Settlement Agreement.

information helpful, the Claims Administrator stands ready to provide it at the Court's convenience.

                                                          /s/ Patrick A. Juneau
                                            PATRICK A. JUNEAU
                                            CLAIMS ADMINISTRATOR

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to LexisNexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 14th day of February, 2017.

                                                /s/ Patrick A. Juneau
                                                PATRICK A. JUNEAU
                                                CLAIMS ADMINISTRATOR