**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | **MDL NO. 2179** |
| | * | **SECTION: J** |
| *This document relates to:* | * | |
| | | **JUDGE CARL J. BARBIER** |
| Nos. : 12-970, 15-4143, 15-4146, and 15-4654 | * | |
| | | **MAGISTRATE JUDGE** |
| | * | **JOSEPH C. WILKINSON, JR.** |

---

## ORDER AND REASONS
### [Granting Final Approval of the HESI and Transocean Punitive Damages and Assigned Claims Class Action Settlements]

On May 29, 2015, and September 4, 2015, Class Counsel for the *Deepwater Horizon* Economic and Property Damages Settlement Class ("DHEPDS Class")[1] and the Plaintiffs' Steering Committee (collectively, "PSC") filed two essentially and functionally identical settlement agreements in these proceedings: (1) the HESI Punitive Damages and Assigned Claims Settlement (Amended As of September 2, 2015) (and Addenda and Exhibits thereto) ("HESI Settlement Agreement") [Rec. Docs. 15322-1 through 15322-6]; and (2) the Transocean Punitive Damages and Assigned Claims Settlement Agreement (and Addenda and Exhibits

---

[1] The DHEPDS Class was defined and formally certified by this Court in its *Order and Judgment* of December 21, 2012. Rec. Doc. 8139.  This class certification and the class action settlement for which it was certified have been affirmed on appeal and are final and effective for the purposes of the DHEPDS Agreement, as amended on May 2, 2012, including exhibits thereto [Rec. Docs. 6430 through 6430-45], which provide for the assignment, to the DHEPDS Class, of the claims against HESI and Transocean that are proposed to be resolved by the HESI and Transocean Settlement Agreements.  *See In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014).  The class definition of the DHEPDS Class, as set forth in said December 21, 2012 *Order and Reasons* [Granting Final Approval of the Economic and Property Damages Settlement Agreement]; *Order and Judgment Granting Final Approval of Economic and Property Damages Settlement and Confirming Certification of the Economic and Property Damages Settlement Class*, and *Appendices* thereto [Rec. Docs. 8138, 8139] is hereby incorporated by reference and as fully set forth in this Order.

thereto) (the "Transocean Settlement Agreement") [Rec. Docs. 14644-1 through 14644-5] (collectively, "the Proposed Settlements").[2]

In a brief filed on August 5, 2016, the PSC requested that the Proposed Settlements be fully and finally approved.  Rec. Doc. 21423 at 21.

In sum, the Proposed Settlements create a "Punitive Damages Settlement Class" or "New Class" for purposes of effectuating allocation and distribution of a portion of the aggregate settlement benefits totaling $1,241,886,667.00, as between and among the New Class and the previously-certified DHEPDS Class, in order to resolve the bundle of claims that the DHEPDS Class received by assignment from BP and punitive damages claims that the New Class Members assert against HESI and Transocean in their Class Action Complaints.

Magistrate Judge Wilkinson, serving as Allocation Neutral under the Settlement Agreements, has determined that $903,638,743.58 (plus any interest earned in the Qualified Settlement Fund associated with this allocated amount) will be allocated to the New Class, and that $338,247,923.42 (plus any interest earned in the Qualified Settlement Fund associated with this allocated amount) will be allocated to the existing DHEPDS Class.[3]  Rec. Doc. 15652.

## I.    Factual and Procedural History

On April 20, 2010, a blowout, explosion, and fire occurred aboard the *Deepwater Horizon*, a semi-submersible mobile offshore drilling rig, as it was engaged in drilling activities on the "Macondo Well" on the Outer Continental Shelf off the coast of Louisiana.  These events

---

[2] For purposes of the Proposed Settlements and this Order, "HESI" means and includes Halliburton Energy Services, Inc. and Halliburton Company; and "Transocean" means and includes Triton Asset Leasing GmbH, Transocean Deepwater Inc., Transocean Offshore Deepwater Drilling Inc., and Transocean Holdings LLC.

[3] Originally, HESI agreed to an aggregate payment of $1,028,000,000 and Transocean agreed to an aggregate payment of $211,750,000, for a total of $1,239,750,000.  From this collective aggregate amount, Judge Wilkinson, sitting as the Allocation Neutral, allocated 72.8% to the New Class and 27.2% to the Old Class.  The collective aggregate amount was raised to $1,241,886,667 based on an increased final payment from HESI.  *See* Rec. Doc. 21573.  The allocation reflected above reflects the full $1,241,886,667 allocated according to the same percentages found appropriate by Judge Wilkinson.

led to eleven deaths, dozens of injuries, and a massive discharge of oil into the Gulf of Mexico that continued for nearly three months.  On August 10, 2010, the Judicial Panel on Multidistrict Litigation ("JPML") centralized all federal actions (excluding securities suits) in this Court pursuant to 28 U.S.C. § 1407.  Eventually, several thousand cases with over one hundred thousand claimants would be consolidated with this Multidistrict Litigation.

On October 19, 2010, the Court issued Pretrial Order 11 [Rec. Doc. 569] ("PTO 11"), creating pleading bundles for various types of claims.  Relevant here is the "B1 bundle," which encompasses all private claims for economic loss and property damage, as well as "Bundle C," which includes public claims for damages brought by local government entities. PTO 11 ¶ III(B1), (C).  In accordance with PTO 11, the PSC filed the B1 Master Complaint on December 15, 2010 [Rec. Doc. 879], a First Amended B1 Master Complaint on February 9, 2011 [Rec. Doc. 1128], and, in accordance with PTO 33, a voluntary Local Government Entity Master Complaint [Rec. Doc. 1510].  Numerous Defendants filed motions to dismiss the First Amended B1 Complaint and the Local Government Master Complaint. On August 26, 2011, and December 9, 2011, the Court issued Orders and Reasons granting in part and denying in part these motions. Rec. Docs. 3830, 4845.  HESI and Transocean also answered the First Amended Complaint. Rec. Docs. 1398 and 4118.  Phase One of a multi-phase trial in Transocean's Limitation and Liability Action, Case No. 10-2771, was originally scheduled for February 27, 2012.

During the pre-trial phase, the parties engaged in extensive discovery and motion practice, including taking over 311 depositions, producing over 90 million pages of documents, and exchanging more than 80 expert reports on an intense and demanding schedule.  Depositions were conducted on multiple tracks and on two continents.  Discovery was kept on course by

weekly discovery conferences before Magistrate Judge Shushan.  The Court also held monthly status conferences with the parties.

On March 2, 2012, the Court was informed that BP and the PSC had reached an Agreement-in-Principle on proposed settlements.  Consequently, the Court adjourned Phase One of the trial, because of the potential for realignment of the parties in this litigation and substantial changes to the current trial plan.  Rec. Doc. 5955.  On April 16, 2012, the PSC filed a new class action complaint to serve as the vehicle for the proposed DHEPDS Agreement, *see* No. 12-970, *Bon Secour Fisheries, Inc. et al. v. BP Exploration & Production Inc., et al.*, and submitted the proposed DHEPDS Agreement for preliminary approval, which was granted by Order dated May 2, 2012.  Rec. Doc. 6148.

The DHEPDS class notice and settlement approval process continued throughout 2012, culminating, after full hearing and consideration, in the Court's December 21, 2012 *Order and Reasons* [Rec. Doc. 8138] and *Final Order and Judgment* [Rec. Doc. 8139] granting final approval of the DHEPDS.  Appellate challenges followed, including some by the settling defendant BP, and the DHEPDS became final in 2014.  The DHEPDS claims deadline occurred on June 8, 2015, and the Claims Administration process continues.  As of December 31, 2016, over 387,000 DHEPDS claims have been filed, and over 148,000 claims, totaling over $9.6 billion, have been paid to DHEPDS class members.  Rec. Doc. 22149-1 .

The DHEPDS released class members' claims against BP and most of the other defendants, but retained punitive damages claims against HESI and Transocean, and further assigned BP's compensatory and punitive damages claims against the two companies to the DHEPDS Class.  Pursuant to the Agreement, BP would satisfy plaintiffs' compensatory damages claims against BP, HESI, and Transocean, but plaintiffs could pursue their punitive damage

claims against HESI and Transocean.  The Agreement further provided that plaintiffs would not execute on any future damages award against HESI and Transocean, including an award on BP's assigned claims (which included BP's contribution claims), unless and until a court finally determined that Transocean and HESI could not recover such damages from BP.  *See also* DHEPDS Ex. 21, Rec. Doc. 6430-39.

During and after the approval process for the DHEPDS, the Court conducted bench trials and issued findings on Phases One and Two of its multiphase trial plan, as described in its Findings of Fact and Conclusions of Law: Phase One Trial (revised) [Rec. Doc. 13381-1] ("Phase One Findings") and its Findings of Fact and Conclusions of Law: Phase Two Trial [Rec. Doc. 14021] ("Phase Two Findings").

On September 2, 2014, HESI filed its original Settlement Agreement resolving claims assigned to the DHEPDS Settlement Class and punitive damages claims made by the New Class.[4]  Rec. Doc. 13346.

On September 4, 2014, the Court issued its Phase One Findings (revised on September 9, 2014) [Rec. Doc. 13381-1], which held, among other things, that under the facts of this case, the negligent conduct of HESI and Transocean did not rise to the level of gross negligence, recklessness, or other egregious conduct.  Hence, no punitive damages against Transocean or HESI were warranted, nor was there any basis to invalidate the BP-HESI or BP-Transocean indemnity agreements and releases.

Due to the uncertainty of continuing litigation, Transocean ultimately reached a similar settlement agreement to that made by HESI, resolving the same sets of claims made against Transocean.  The Proposed Settlements, described below, feature Aggregate Payments totaling

---

[4] Given the uncertainty HESI faced regarding its liability following the Phase One trial, the Court finds that the HESI Settlement was reasonable as to the HESI Defendants given their potential exposure to the punitive damage claims and the Assigned Claims.

$1,241,886,667 for both the DHEPDS and New Classes; inter-class allocation by a court-appointed Allocation Neutral; and claims administration and distribution under Court auspices.

## II.     Overview of the Settlements[5]

The HESI Settlement and the Transocean Settlement are virtually identical in their operative terms and in terms of claims resolved.   Both Proposed Settlements resolve claims assigned from BP to the DHEPDS Class (the "Assigned Claims") as well as the claims of those purporting to have standing under general maritime law to bring claims against HESI and Transocean, respectively, for punitive damages (the "New Class Claims").   If final approval is granted, then, in exchange for the remedies summarized below, HESI and Transocean would obtain a full and final release from the DHEPDS Class for all Assigned Claims, as well as a broad classwide release for any and all claims asserted in the New Class Actions for punitive damages, save and except for the small number of claimants who are class members and who have validly opted out of the Settlements.

To effectuate the Proposed Settlements, DHEPDS Class Counsel has agreed on behalf of the DHEPDS Class, as a juridical entity, to accept the allocated amount of $338,247,923.42 (plus any interest earned in the Qualified Settlement Fund associated with this allocated amount) in full and final settlement of all Assigned Claims.   Further, on behalf of the New Punitive Damages Class (sometimes referred to as the "New Class"), New Class Counsel seek to certify a class pursuant to Fed. R. Civ. P. 23(a) and (b)(3) for settlement purposes only.   The putative New Class consists of private individuals, businesses, and Local Government entities defined by (1) geographic bounds and (2) the nature of their loss or damage.   Both criteria must be met in order

---

[5] While the HESI Settlement Agreement and the Transocean Settlement Agreement are both relatively short and straightforward, the Court here summarizes their most significant features.   In the unlikely event of any discrepancy between the Court's description of the Settlement Agreements and the actual terms of the Settlement Agreements, the Settlement Agreements control.   Unless otherwise indicated, capitalized terms in this Order and Reasons shall have the same meaning assigned to them in the Settlement Agreements.

for the person or entity to be within the settlement class.  Claims of non-class members are unaffected by the Proposed Settlements; and as to claims of class members, unless such claims are specifically excluded from the Proposed Settlements (as identified below), the Court finds that the New Class definition encompasses all claims of claimants with potential standing to bring punitive damage claims against HESI and/or Transocean under general maritime law.

The geographic bounds of the Proposed Settlements include: (1) Real Property that is adjacent to Identified Gulf Waters, which are waters within the territory of the States of Louisiana, Mississippi, and Alabama as well as certain counties in Texas and Florida; (2) Personal Property located in Gulf Coast Areas or Identified Gulf Waters; (3) Commercial Fishermen and Charterboat Operators who landed Seafood in the Gulf Coast Areas; and (4) Subsistence claimants who fished or hunted in the Identified Gulf Waters or Gulf Coast Areas.  Each of these geographic restrictions also carries with it a temporal restriction.  The Proposed Settlements recognize four categories of claimants: (1) Real Property claimants; (2) Personal Property claimants; (3) Commercial Fishermen and Charterboat Operators; and (4) Subsistence claimants.  The New Class definition also excludes specific claimants including the following:

(a)     any New Class Member who timely and properly elected to opt out of the New Class under procedures established by the Court;

(b)     defendants in MDL 2179;

(c)     the Court, including any sitting judges on the United States District Court for the Eastern District of Louisiana, their law clerks serving during the pendency of MDL 2179, and any immediate family members of any such judge or law clerk;

(d)     Governmental Organizations (not including any Local Government);

(e)     any Natural Person or Entity who or that made a claim to the GCCF, was paid, and executed a valid GCCF Release and Covenant Not to Sue, not including any GCCF Release and Covenant Not to Sue covering only Bodily Injury Claims;

(f)     BP Released Parties and individuals who were employees of BP Released Parties during the Class Period;

(g)     HESI and Individuals who were employees of HESI during the Class Period; and

(h)     Transocean and individuals who were employees of Transocean during the Class Period.

This Court appointed Magistrate Judge Jay Wilkinson to allocate the Aggregate Payment under the Proposed Settlements between the Assigned Claims and the New Class Claims.  By the terms of the allocation, which this Court has previously approved and approves again by the terms of this Order and Reasons, the maximum amount to be paid to DHEPDS Class members for the Assigned Claims is $338,247,923.42 (plus any interest earned in the Qualified Settlement Fund associated with this allocated amount).  The maximum amount to be paid to New Class members for New Class Claims is $903,638,743.58 (plus any interest earned in the Qualified Settlement Fund associated with this allocated amount).  Neither HESI nor Transocean will be liable to the DHEPDS Class or its members or New Class members above the Aggregate Payments made pursuant to the Settlement Agreements.

The Settlements, as they relate to the Assigned Claims, will be administered and implemented through the existing DHEPDS Class structure for Assigned claims (by and through Patrick Juneau, this Court's appointed claims administrator for the DHEPDS).  Patrick Juneau has previously filed his proposed Distribution Model for the funds allocated to the Assigned Claims.  Rec. Doc. 18796.[6]  This Court hereby approves the proposed Distribution Model for the funds allocated to the Assigned Claims.

---

[6] The Distribution Model submitted by Patrick Juneau provided generally that "the Aggregate Payment allocated to the DHEPDS Class … will be distributed on a pro rata basis to DHEPDS Class members based on the amount paid to each claimant by the DHEPDS Court-Supervised Settlement Program ('CSSP')."  In light of the process initiated by the Court-appointed Neutrals ("the Neutrals") in resolving various outstanding issues related to MDL 2179, the Court will consider a payment made pursuant to the Neutrals' process to be an "amount paid to [a] claimant by the

As they relate to New Class Claims, the Proposed Settlements will be administered and implemented by Michael Juneau, this Court's appointed Claims Administrator for the New Class Claims. Michael Juneau has previously filed a proposed Distribution Model for New Class Claims. Rec. Doc. 18797 (clarified in Rec. Doc. 21778). This Court hereby approves the proposed Distribution Model for the funds allocated to the New Class Claims. An extensive notice program has been employed by Michael Juneau as the New Class Claims Administrator, and clear direction has been given to the relatively small number of claimants who will be required to file a claim. 3,573 claims have been timely filed in the New Class settlement [Rec. Doc. 22177 at 4], which claims will be considered along with the previously-filed DHEPDS/Assigned Claims for which no new claim is necessary.

The Proposed Settlements provide a mechanism by which claimants may appeal their proposed award to this Court.[7] Additionally, the Settlements provide that any common benefit Class Counsel fees and costs awarded by the Court will not be deducted from the funds allocated to the DHEPDS Class for Assigned Claims or to the New Class for New Class Claims. Instead, these fees and costs will be paid by HESI and Transocean, according to the terms of their respective Settlement Agreements, in addition to the portions of the Aggregate Payments allocated to each respective class.

---

DHEPDS Court-Supervised Settlement Program" for purposes of the DHEPDS Class Distribution Model so long as that payment was related to a claim which at the time of settlement and withdrawal had not been fully and finally determined by the Settlement Program (i.e., all opportunities for Re-Review, Reconsideration and/or Appeal to the extent permissible had not been exhausted) and thus remained subject to the CSSP claims process.

[7] See Section 8(e) of the Proposed Settlements. In a Joint Clarification in Support of Final Approval, Class Counsel, Transocean, and HESI clarified that "the Claims Administrator and/or the Court shall have the flexibility to utilize one or more of the U.S. Eastern District of Louisiana Magistrate Judges to consider some or all of these appeals. In such cases, the magistrate's decision on any appeal involving the amount of any payment to any individual claimant (other than a determination that a claimant is not entitled to any payment due to a failure to meet the Class Definition) shall be final and binding, and there shall be no appeal to any other court including the U.S. Court of Appeals for the Fifth Circuit." Rec. Doc. 22178.

III.    **Legal Standards**

    A.    **Class Certification**

Rule 23 of the Federal Rules of Civil Procedure provides, in pertinent part:

(a) **Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

    (1) the class is so numerous that joinder of all members is impracticable;

    (2) there are questions of law or fact common to the class;

    (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

    (4) the representative parties will fairly and adequately protect the interests of the class.

(b) **Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

. . .

    (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

        (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

        (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

        (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

        (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(a), (b)(3).   "Subdivisions (a) and (b) focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997).  However, when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial.  But other specifications of the Rule—those designed to protect absentees by blocking unwarranted or overbroad class

definitions—demand undiluted, even heightened, attention in the settlement context." *Id.* at 620.[8]

Rule 23(a) contains an implied requirement that the class be adequately defined and clearly ascertainable by reference to objective criteria. *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012); *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008). In order to satisfy Rule 23(a)(1)'s numerosity requirement, the mover typically must show that joinder is impracticable through some evidence or reasonable estimate of the number of purported class members. *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000). Commonality under Rule 23(a)(2) requires "that all of the class members' claims depend on a common issue of law or fact whose resolution 'will resolve an issue that is central to the validity of each one of the [class member's] claims in one stroke.'" *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (emphasis omitted) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Thus, classwide proceedings must have the ability "to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (citation omitted). However, "even a single common question will do." *Id.* at 359 (quotations, brackets, and citations omitted). "The focus in the settlement context should be on the conduct (or misconduct) of the defendant and the injury suffered as a consequence." *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1053 (S.D. Tex. 2012) (citation and quotations omitted).

The typicality requirement under Rule 23(a)(3) is not demanding; "[i]t focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those

---

[8] The Proposed Settlements present a unique circumstance in that HESI finalized its Settlement prior to this Court's issuance of its Phase One Findings, while Transocean finalized its Settlement after issuance of the Phase One Findings. This Court's analysis will generally analyze the requirements for fairness of the Class Settlement using traditional analysis language, despite the fact that a trial has occurred in this matter regarding liability issues.

whom they purport to represent." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999), *abrogated in part by*, *Wal-Mart*, *supra*, *as recognized in M.D. ex rel. Sukenberg*, 675 F.3d at 839–40. "Typicality does not require a complete identity of claims. Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001), *abrogated in part by*, *Wal-Mart*, *supra*, *as recognized in M.D. ex rel. Sukenberg*, 675 F.3d at 839–40; *see also Mullen*, 186 F.3d at 625 ("Any variety in the illnesses the Named Plaintiffs and the class members suffered will not affect their legal or remedial theories, and thus does not defeat typicality."). Courts have held that "[t]he major concern under Rule 23(a)(3) is if unique defenses against a named plaintiff threaten to become the focus of the litigation," and that the key to the typicality inquiry is "whether a class representative would be required to devote considerable time to rebut the Defendants' claims." *In re Enron Corp. Secs. Litig.*, 529 F. Supp. 2d 644, 674 (S.D. Tex. 2006) (citation and quotation omitted).

Rule 23(a)(4)'s adequacy requirement "encompasses class representatives, their counsel, and the relationship between the two." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001). Thus, "the adequacy requirement mandates an inquiry into [1] the zeal and competence of the representatives' counsel and [2] the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of the absentees." *Id.* (citations, quotations, and alterations omitted). Finally, "'[t]he adequacy inquiry also serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent.'" *Id.* at 479–80 (quoting *Amchem*, 521 U.S. at 625).

Under Rule 23(b)(3), "common questions must predominate over any questions affecting only individual members; and class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy.  In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Amchem*, 521 U.S. at 615 (citations, quotations, and alterations omitted).  The predominance inquiry ordinarily "requires the court to assess how the matter will be tried on the merits, which 'entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class.'"  *In re Wilborn*, 609 F.3d 748, 755 (5th Cir. 2010) (quoting *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003)).  "[C]ommon issues must constitute a significant part of the individual cases."  *Mullen*, 186 F.3d at 626.  This is a matter of weighing, not counting, issues.  *Id.*  As mentioned above, the Court need not consider whether the class action would create intractable management problems.

**B.**     **Settlement Evaluation**

Proponents of a class settlement must show by a preponderance of the evidence that the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); *Wineland v. Casey's Gen. Stores, Inc.*, 267 F.R.D. 669, 676 (S.D. Iowa 2009).  The Fifth Circuit has articulated six factors to guide a court's review of whether a settlement is fair, reasonable, and adequate:

(1)     the existence of fraud or collusion behind the settlement;
(2)     the complexity, expense, and likely duration of the litigation;
(3)     the stage of the proceedings and the amount of discovery completed;
(4)     the probability of plaintiffs' success on the merits;
(5)     the range of possible recovery; and

(6)     the opinions of the class counsel, class representatives, and absent
        class members.

*Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).

**C.     Notice Criteria**

Where parties seek certification of a settlement class pursuant to Rule 23(b)(3) and

approval of a settlement pursuant to Rule 23(e), notice of the class settlement must meet the

requirements of both Rule 23(c)(2)(B) and Rule 23(e)(1).  *In re CertainTeed Roofing Shingle*

*Prods. Liab. Litig.*, 269 F.R.D. 468, 480 (E.D. Pa. 2010); *accord In re Serzone Prods. Liab.*

*Litig.*, 231 F.R.D. 221, 231 (S.D. W. Va. 2005); *see also* MANUAL FOR COMPLEX LITIGATION

(FOURTH) § 21.633 (2004) ("For economy, the notice under Rule 23(c)(2) and the Rule 23(e)

notice are sometimes combined.").  Rule 23(c)(2)(B) states:

> For any class certified under Rule 23(b)(3), the court must direct to class members
> the best notice that is practicable under the circumstances, including individual
> notice to all members who can be identified through reasonable effort. The notice
> must clearly and concisely state in plain, easily understood language:
>
> (i)     the nature of the action;
> (ii)    the definition of the class certified;
> (iii)   the class claims, issues, or defenses;
> (iv)    that a class member may enter an appearance through an attorney if the
>         member so desires;
> (v)     that the court will exclude from the class any member who requests
>         exclusion;
> (vi)    the time and manner for requesting exclusion; and
> (vii)   the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).

The notice requirements of Rule 23(e)(1) are less stringent: "The court must direct notice

in a reasonable manner to all class members who would be bound by the [settlement] proposal."

Subject to the requirements of due process, notice under Rule 23(e)(1) gives the Court discretion

over the form and manner of notice.  *See Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1059

(5th Cir. 1979).  Significantly, compliance with Rule 23(c)(2)(B) can satisfy the Due Process

Clause.  *See In re Enron Corp. Secs., Derivs., & "ERISA" Litig.*, No. MDL-1446, 2008 WL 4178151, at *2 (S.D. Tex. Sept. 8, 2008).

The Class Action Fairness Act ("CAFA") requires that notice of the proposed settlement be served "upon the appropriate State official of each State in which a class members resides and the appropriate Federal official."  28 U.S.C.§ 1715(b).  CAFA further states, "An order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice requirement under subsection (b)."  *Id.* § 1715(d).  Ninety days have passed between the time of the CAFA notices were served and the issuance of this Order and Reasons.

## IV.   <u>Discussion</u>

The HESI and Transocean Settlements have two components: the New Class Settlement and the Assigned Claims Settlement. Both are fair, reasonable, and adequate.

### A.      **The New Class Settlement**

#### i.      **This Settlement Class May Be Certified For Purposes of Settlement Only Pursuant to Rules 23(a) and (b)(3).**

For the reasons discussed below, the HESI and Transocean Punitive Damages Class (the "New Class," set out in Exhibit A to this Order and Reasons) may be certified pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), for purposes of settlement only.

The Court finds it telling that no class member has objected to or otherwise questioned the propriety of class treatment for settlement purposes under Rule 23(a) or (b)(3).  The Court will nevertheless analyze the proposed New Class under the Rule 23 criteria in order to fulfill its responsibility to the putative class.

Settlement classes are a typical feature of modern class litigation, and courts routinely certify them, under the guidance of *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), to

facilitate the voluntary resolution of legal disputes.  *See, e.g.*, *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, 2012 WL 92498, at *8–11 (E.D. La. Jan. 10, 2012); *Stott v. Cap. Fin. Servs.*, 277 F.R.D. 316, 324–26 (N.D. Tex. 2011); *see also* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.612 (2004) ("Settlement classes—cases certified as class actions solely for settlement—can provide significant benefits to class members and enable the defendants to achieve final resolution of multiple suits.").

Indeed, a larger class arising out of these same events was certified for settlement purposes and approved in *Deepwater Horizon II*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 754 (2014).

### a. This Settlement Class Satisfies the Ascertainability Requirement

The Punitive Damages Settlement Class is discrete and ascertainable. The class definition is geographically circumscribed to Louisiana, Alabama, Mississippi, and certain specified counties in Florida and Texas along the Gulf Coast, as well as Identified Gulf Waters.  Nothing in the New Class definition requires a determination on the merits or delves into any person's subjective mental state.  The definition is based on objective criteria such as where a person owned property or worked or engaged in subsistence fishing and hunting.  In sum, the New Class definition "is objective and precise and does not turn on the merits."  Klonoff Decl. ¶ 57.[9]

### b. This Settlement Class Meets Rule 23(a)'s Requirements.

### 1. Rule 23(a)(1): Numerosity

Based on the most recent DHEPDS Status Report, 113,912 people and businesses located in the Gulf Coast Area submitted 168,876 claims in the Seafood, Coastal, Wetlands, Subsistence, Vessel Damage, and Real Property Sales categories to the *Deepwater Horizon* Settlement Program, with 94,574 such claims determined to be eligible for compensation thus far.  Rec.

---

[9] Professor Klonoff's Declaration was submitted as Exhibit 1 of the PSC's Final Approval Brief. Rec. Doc. 21423-1.

Doc. 22149-1 at 1-2.  Many, if not all, of these claimants (as well as some people, businesses, and local government entities that opted out or were excluded from the BP Economic Class) fall within the New Class.  The Fifth Circuit has consistently held that classes only a fraction of this size satisfy Rule 23(a)(1)'s numerosity requirement.  *See, e.g.*, *Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (between one hundred and one hundred fifty); *Jack v. Am. Linen Supply Co.*, 498 F.2d 122 (5th Cir. 1974) (per curium) (fifty one); *Sagers v. Yellow Freight Sys.*, 529 F.2d 721, 734 (5th Cir. 1976) (approximately one hundred ten); *Jones v. Diamond*, 519 F.2d 1090, 1100 n.18 (5th Cir. 1975) (forty-eight).  In addition to the sheer size of the class, members are "geographically dispersed, decreasing the practicability of joinder into one action."  *Stott*, 277 F.R.D. at 324; *accord Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981) ("Thus, a number of facts other than the actual or estimated number of purported class members may be relevant to the 'numerosity' question; these include, for example, the geographical dispersion of the class . . . .").  As the Court preliminarily concluded on April 12, 2016, *see* Rec Doc. 16183 at 22, numerosity is plainly satisfied here.

## 2. Rule 23(a)(2): Commonality

Because "for purposes of Rule 23(a)(2) even a single common question will do," *Wal-Mart*, 564 U.S. at 359 (quotations, brackets, and citations omitted), "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions," *Amchem*, 521 U.S. at 609.  The Court accordingly explains in greater detail that the commonality standard is met in the context of establishing below that Rule 23(b)(3)'s predominance requirement is satisfied.

The commonality requirement is satisfied because members of the Punitive Damages Settlement Class share numerous common legal and factual questions, the resolution of which

would advance the ultimate determination of punitive damages, which the Supreme Court has emphasized relates primarily to defendants' conduct. *See Exxon Shipping*, 554 U.S. 471 at 504. This litigation arises out of a single incident, albeit one that unfolded over months, and what has become a similarly defined term of art (the "*Deepwater Horizon* Incident") in these and the prior BP settlement. Such questions evaluating the conduct of a defendant under federal maritime law, including the standards under which punitive damages are available, and the answers to these common questions are both critical to the litigation and have shaped the terms and conditions of the Proposed Settlements. The Class is united in interest in the pursuit of and recovery of punitive damages.  The Court confirms its preliminary conclusion, reached on April 12, 2016, that commonality is satisfied. *See* Rec. Doc. 16183 at 23.

### 3.        Rule 23(a)(3): Typicality

Typicality "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999).  Typicality is satisfied here, as the New Class representatives—like all New Class members—allege punitive damages stemming directly from the *Deepwater Horizon* spill.  The Class Representatives' claims arise from the same underlying event and course of conduct and the Class Representatives share the same maritime legal theories as the claims of the Class Members.

Here, the class representatives were all impacted by the single event of the oil spill, although they lived in different areas within the class geographic boundaries and were in engaged in various impacted activities.  Each and all of the class representatives have agreed to represent the entire class. No more is required.  *See, e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) ("Objectors . . . complain that class counsel did not provide clear documentation that each job category had a class representative for each type of discrimination

alleged.  That level of specificity is not necessary for class representatives to satisfy the typicality requirement."); *Stott*, 277 F.R.D. at 325 ("Although certain of the class members may have dealt with different individuals associated with Capital Financial, these factual differences are not sufficient to overcome the similarity of the nature of the Representative Plaintiff's claims."); *Cornn v. UPS, Inc.*, No. 03-2001, 2005 WL 588431, at *8 (N.D. Cal. Mar. 14, 2005) ("Rule 23 does not require a class representative for each job category that may be included in the class.").

The Court confirms its preliminary conclusion, reached on April 12, 2016, that typicality is satisfied.  *See* Rec. Doc. 16183 at 23–24.

### 4.    Rule 23(a)(4): Adequacy

"Rule 23(a)(4) is satisfied where: (1) the named plaintiffs' counsel will prosecute the action zealously and competently; (2) the named plaintiffs possess a sufficient level of knowledge about the litigation to be capable of taking an active role in and exerting control over the prosecution of the litigation; and (3) there are no conflicts of interest between the named plaintiffs and the absent class members."  *Hamilton v. First Am. Title Ins. Co.*, 266 F.R.D. 153, 163–64 (N.D. Tex. 2010), *vacated and remanded for reconsideration of predominance*, 423 Fed. App'x 425 (5th Cir. 2011); *see also Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 129 (5th Cir. 2005).  The Court confirms its preliminary conclusion that adequacy is satisfied.  *See* Rec. Doc. 16183 at 24–25.

### (A)    Class Counsel Are Adequate

Both the members of the New Class and the existing DHEPDS Class have been adequately represented throughout these proceedings, including the negotiation of the HESI and Transocean settlements.  Class Counsel regularly engage in complex litigation similar to the present case and have demonstrated their dedication by devoting substantial effort, energy, and resources to the prosecution of this action, including discovery, trials, and appeals; and by

negotiating, finalizing, and implementing the Proposed Settlements.  *See Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir. 2002).

### (B)      Class Representatives Are Adequate

The class representatives are clearly adequate, as they include individuals and businesses asserting loss from the same event.  The class representatives have remained reasonably informed about the settlement terms and process, which they have followed, participating in each approval process.  *Cf. Stott*, 277 F.R.D. at 325 (finding Rule 23(a)(4) satisfied where the class representative "will continue to take an active role in the prosecution of this class action and administration of this proposed settlement to its conclusion").  All class representatives have attested in declarations filed with the Court that they reviewed and discussed the Settlement provisions with New Class Counsel and they believe the New Class Settlement is fair to the entire class.  *See* Morales Decl. ¶¶ 5, 7; Petitjean Decl. ¶¶ 5, 7; Taliancich Decl. ¶¶ 5, 7; Yates Decl. ¶¶ 5, 7; Reels Decl. ¶¶ 5, 7; Morgan Decl. ¶¶ 5, 7.[10]

### (C)      There Are No Conflicts of Interest Among the Class.

This case suffers from none of the problems identified in *Amchem*, where the Court noted a potential intraclass conflict, in the context of a settlement with an overall cap, between individuals who had already been injured by asbestos and those who had only been exposed to it.  *Cf. Amchem*, 521 U.S. at 626 (explaining that "for the currently injured, the critical goal is generous immediate payments" whereas "exposure-only plaintiffs [have an interest] in ensuring an ample, inflation-protected fund for the future").  Rather, the proposed New Class consists exclusively of individuals and businesses that have already suffered loss and have potential

---

[10] The Class Representatives Declarations were submitted as Exhibit 5 of the PSC's Final Approval Brief. Rec. Doc. 21423-5.

standing to claim punitive damages.  The New Class settlement compensates class members for punitive damages through detailed, objective distribution criteria.

Both as a matter of process and as a matter of substance, this class settlement avoids all of the concerns that have prevented approval in cases such as *Amchem*, 521 U.S. 591, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), and *In re Katrina Canal Breaches Litig.*, 628 F.3d 185 (5th Cir. 2010).   All class members are protected by a specific, detailed, and objective framework that was developed and promulgated publicly by the Claims Administrator.  The differences within the framework are rationally related to the relative strengths and merits of similarly situated claims.

**c.**      **This Settlement Class Satisfies Rule 23(b)(3)'s Requirements**

**1.**      **Common Questions Of Law and Fact Predominate Over Individual Issues**

As the Court preliminarily concluded on April 12, 2016, predominance is clearly satisfied here.  Rec. Doc. 16183 at 25–26.

Where "defendants' liability predominates over any individual issues involving plaintiffs, and the Settlement Agreements will insure that funds are available" to compensate plaintiffs, predominance is satisfied.  *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2010 WL 92498, at *11 (E.D. La. Jan. 10, 2012).   The Phase One and Phase Two Trial proceedings conclusively demonstrate the existence of predominant issues that can (and, in fact, were) manageably and effectively tried on a common and essentially "class-wide" basis.  A phased trial investing significant time in resolving common questions of law and fact supports the conclusion that the settlement class can meet the Rule 23(b)(3) test for predominance.  *Madison v. Chalmette Ref., LLC*, 637 F.3d 551, 556 (5th Cir. 2011) (recognizing that a court's selection of a phased trial structure may be evidence of the importance of common questions and justify class

certification on liability) (citing *Watson v. Shell Oil*, 979 F.2d 1014, 1017–18 (5th Cir. 1992) and *Turner*, 234 F.R.D. at 601).

Whether HESI and Transocean's conduct warranted potential liability for punitive damages is "unquestionably an important and overarching issue that does not vary by class member."   Klonoff Decl. ¶ 77.   Such punitive damages claims are suitable for classwide treatment.   *See, e.g.*, *In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014) (approving certification of settlement class where common issues included "[w]hether punitive damages are available as a matter of law" (alteration in original)), *cert. denied sub nom. BP Expl. & Prod. Inc. v. Lake Eugenie Land Dev., Inc.*, 135 S.Ct. 754 (2014); *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 471 (5th Cir. 1982) (approving district court's certification of (b)(3) class of asbestos claimants in which the common issues included the amount of punitive damages for which defendants were liable); *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1019 (5th Cir. 1992) (affirming proposed trial plan for single-incident class action involving punitive damages claims).

Finally, as the Second Circuit has noted in a persuasive analysis of the predominance requirement as applied to settlement classes:

> While the predominance inquiry will sometimes be easier to satisfy in the settlement context, other requirements of Rule 23 "designed to protect absentees by blocking unwarranted or overbroad class definitions," such as the Rule 23(a)(4) requirement of adequate representation, will "demand undiluted, even heightened attention."   [*Amchem*, 521 U.S.] at 620; *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 308 (3d Cir. 1998) (suggesting that the key to *Amchem* appears to be the careful inquiry into adequacy of representation"); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 250–55 (2d Cir. 2011) (vacating certification of settlement class of copyright owners because of conflicts among different categories of class members).

*In re Amer. Int'l Group, Inc. Sec. Litig.*, 689 F.3d 229, 240 (2d Cir. 2012).   But as analyzed above, there are no adequacy of representation problems under Rule 23(a)(4) here, nor are there intraclass conflicts.

- 22 -

Nor is the class definition overbroad, improperly sweeping in too many absent class members.  As the Court discusses below, several non-class members have objected to being excluded from the New Class settlement.  The parties were careful in the boundary lines they drew in defining the class.  *See* New Class Definition in Appendix A.

### (A)    Common Questions of Fact Predominate Over Individual Issues

This case arises from the blowout of one well, starting on one date, and the discharge of oil from one location.  It is therefore clear that the vast majority of the contested factual questions are common to all class members and that the case includes a number of issues "whose resolution 'will resolve an issue that is central to the validity of each one of the class member's claims in one stoke.'"  *Stukenberg*, 675 F.3d at 840 (emphasis and alterations omitted) (quoting *Wal-Mart Stores*, 564 U.S. at 350).  As the Judicial Panel on Multidistrict Litigation explained in centralizing nearly all *Deepwater Horizon*-related litigation in this Court, actions arising from the *Deepwater Horizon* "indisputably share factual issues concerning the cause (or causes) of the *Deepwater Horizon* explosion/fire and the role, if any, that each defendant played in it." Rec. Doc. 1 at 3.

All of the key factual questions in this litigation are common among members of the class.  The question of whether the conduct of HESI or Transocean warrants punitive damages is a question of fact.  Assuming that punitive damages were justified, the determination of the overall amount of punitive damages is another question of fact common to the group.  These common issues of fact are relevant in spite of this Court's Phase One Findings of no recklessness or gross negligence on the part of HESI and Transocean.  *See In re Nassau County Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006) (noting that the fact an issue was resolved by stipulation "does nothing to alter the fundamental cohesion of the proposed class"); Klonoff Decl. ¶ 61

("The Phase One trial proves beyond question that the punitive damages issues can be tried—and, indeed, already have been tried—on an aggregate basis.").

If this case is not resolved as a class action, in theory each plaintiff might have to individually litigate each of these fact questions.  Each claimant might need to attempt to present proof of their individual damages.  In sum, litigation of these issues would "involve the same cast of characters, events, discovery, documents, fact witnesses, and experts."  Am. B1 Master Compl. (Rec. Doc. 1128) at 151.  Relitigating these issues *seriatim* "would be a massive waste of judicial resources, as the vast majority of the issues of law and fact in this case . . . are common to all the class members."  *In re Dell Inc.*, No. 06-726, 2010 WL 2371834, at *4 (W.D. Tex. June 11, 2010), *aff'd sub nom. Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632 (5th Cir. 2012); *see also In re Sch. Asbestos Litig.*, 789 F.2d 996, 1008 (3d Cir. 1986).

Because all members of the class trace their claims to a single known accident and a small group of defendants, this case bears no resemblance to *Amchem*, in which the class consisted of individuals "exposed to different asbestos containing products, for different amount of time, in different ways, and over different periods." 521 U.S. at 624 (quoting the Third Circuit). Nor does this case bear any resemblance to *Wal-Mart*, 564 U.S. 338 (2011), in which the Court found that plaintiffs had little in common other than "Wal-Mart's 'policy' of allowing discretion by local supervisors over employment matters." *Id.* at 355.  In contrast to *Wal-Mart*, in which the Court held that the cause of plaintiffs' injuries varied with respect to the manager to whom each was assigned, and how each manger interacted with the plaintiff in question, here each class member traces his injury directly to the same genesis—a single well blowout stemming from the same operative causes. *See* Klonoff Decl. ¶ 80.

**(B)      Common Questions of Law Predominate Over Individual Issues**

Just as common questions of fact clearly predominate over individual issues, so do common questions of law.  All of the New Class's claims for punitive damages arise under general maritime law (a species of federal common law).  Klonoff Decl. ¶ 79.  Accordingly, the applicable general maritime law unites the New Class, although that law does provide varying definitions for gross negligence and the imposition of punitive damages.  Nevertheless, this is not an *Amchem* scenario, in which the class is fragmented by a multiplicity of state laws that control the viability of claims.

While the New Class includes members from across the Gulf region, five states, rather than 50, are involved.  Moreover, in this case, involving a maritime casualty, state law is preempted by federal law.  *See, e.g.*, Bundle B1 Order (Rec. Doc. 3830) at 18, 38; Bundle C Order (Rec. Doc. 4578) at 17.

**(C)      Issues of Individual Injury Do Not Defeat Predominance for Purposes of Evaluating The New Class's Certification**

"[T]he necessity of calculating damages on an individual basis will not necessarily preclude class certification," particularly where damages may "be determined by reference to a mathematical or formulaic calculation." *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006); *accord Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306–07 (5th Cir. 2003); *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir. 2001); *Eatmon v. Palisades Collection LLC*, No. 08-306, 2011 WL 147680, at *12 (E.D. Tex. Jan. 18, 2011); *Moore v. Int'l Filing Co.*, No. 10-0086, 2010 WL 2733116, at *3 (S.D. Miss. July 8, 2010); *Lonergan v. A.J.'s Wrecker Serv. of Dallas, Inc.*, No. 97-1331, 1999 WL 527728, at *7 (N.D. Tex. July 8, 1999), *aff'd sub nom. AJ's*

*Wrecker Serv., Inc. v. City of Dallas*, 200 F.3d 816 (5th Cir. 1999).   Courts have repeatedly rejected the argument that different damages calculations for each class member defeats class certification.   *See, e.g.*, *Bell Atl.*, 339 F.3d at 306 (recognizing that "[e]ven wide disparity among class members as to the amount of damages suffered does not necessarily mean that class certification is inappropriate."); *Allapattah Servs. Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("[N]umerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate"), *aff'd sub nom. Exxon Mobil Corp. v. Allpattah Servs. Inc.*, 545 U.S. 546 (2005); *Brown v. Consumer Law Assocs., LLC*, 283 F.R.D. 602, 612 (E.D. Wash. 2012) (need for individualized proof of damages is insufficient to preclude class certification); *S. States Police Benev. Ass'n, Inc. v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 89 (D. Mass. 2007) ("[T]he possibility of differing damages calculations is insufficient to deny certification.").   Were the law otherwise, "the point of the Rule 23(b)(3) provision for class treatment would be blunted beyond utility, as every plaintiff must show specific entitlement to recovery, and still Rule 23 has to be read to authorize class actions in some set of cases where *seriatim* litigation would promise such modest recoveries as to be economically impracticable."   *Gintis v. Bouchard Transp. Co.*, 596 F.3d 64, 66–67 (1st Cir. 2010) (Souter, J., sitting by designation).

In this case, the mechanical task of allocating punitive damages is the only individualized issue.  Klonoff Decl. ¶ 78. These issues are resolved by the New Class Claims Administrator's Proposed Distribution Model.   Rec. Doc. 18797; *cf. Chavin v. Chevron Oronite Co.*, 263 F.R.D. 364, 371 (E.D. La. 2009) (explaining that the "critical calculation of damages on an individual basis will not preclude class certification unless this calculation cannot be made with some reference to a mathematical formula"); *City of San Antonio v. Hotels.com*, No. 06-381, 2008 WL

2486043, at *12 (W.D. Tex. May 27, 2008) (finding class certification appropriate where, among other things, the "alleged damages are subject to common proof and can be calculated on a formulaic basis").

> **(D)    Courts Have Certified Rule 23(b)(3) Classes in Environmental Accident and Other Mass Tort Suits**

Courts have repeatedly held that, in certain factual circumstances, common issues may predominate over individual issues in environmental and other mass tort cases.  *See* Klonoff Decl. ¶ 80.  This is one of those cases.  *Id.*  As the Supreme Court recognized in *Amchem*, where "mass tort cases aris[e] from a common cause or disaster," class certification may be appropriate, and "District Courts, since the late 1970's, have been certifying such cases in increasing number."  *Amchem*, 521 U.S. at 625.  The reason for this doctrine is that although each plaintiff might have suffered different damages, the heart of each plaintiff's complaint is common to the class.

In *Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992), the district court certified a class of 18,000 individuals harmed by an explosion at a Shell manufacturing facility in Norco, Louisiana.  Affirming, the Fifth Circuit observed that "[t]he class issues to be determined by the Phase 1 jury form integral elements of the claims asserted by each of the more than 18,000 plaintiffs," such that there "can be no serious contention that the district court abused its discretion in determining that these issues predominate for the purpose of class certification."  *Id.* at 1022–23.  The Fifth Circuit "has reaffirmed and relied upon *Watson*'s holding following *Amchem*."  *Madison*, 637 F.3d at 557 (Dennis, J., concurring) (citing *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603 (5th Cir. 2006); *Mullen*, 186 F.3d at 623, 628).  In *Mullen*, a single-site, long-term toxic exposure case, the Court upheld the certification of a class of casino employees harmed by a defective ventilation system "because the class is . . . linked by a

common complaint [and] the fact that the class is defined with reference to an ultimate issue of causation does not prevent certification." *Id.* at 624 n.1.

Courts in this District agree that it is appropriate, in circumstances where the underlying facts and nature of the case warrant, to certify class actions in environmental disaster and other toxic exposure cases. *See, e.g.*, *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 462 (E.D. La. 2006) ("Despite early skepticism, mass accident, or single-situs torts, have generally been susceptible to class certification."); *Turner*, 234 F.R.D. at 606 ("Defendant argues that the oil did not spread uniformly throughout the affected area, and that different homes in the area received differing degrees, if any, of oil contamination. However, ***the central factual basis for all of Plaintiffs' claims is the leak itself—how it occurred, and where the oil went***. There is a large area of factual overlap in the Plaintiffs' causes of action.") (emphasis added); *In re Shell Oil Refinery*, 136 F.R.D. 588, 589 (E.D. La. 1991) (noting that certification had been granted in a case arising "from the May 5, 1988 explosion in the catalytic cracking unit at the Shell Oil Refinery in Norco, Louisiana."), *aff'd sub nom. Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992).

Courts around the country agree. In *Loden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004), the Sixth Circuit affirmed the certification of a class of 3600 individuals whose ***property*** was damaged by toxic pollutants emitted from a cement manufacturing plant, explaining that while "individual damage determinations might be necessary . . . the plaintiffs have raised common allegations which would likely allow the court to determine liability (including causation) for the class as a whole." *Id.* at 508. In *Bell v. DuPont Dow Elastomers, LLC*, 640 F. Supp. 2d 890 (W.D. Ky. 2009), the court certified a class of individuals residing near a DuPont facility emitting air contaminants, explaining that the "air contamination affected Plaintiffs ***and***

*their properties* in similar ways under the law" even though "some class members disagree about the significance of the discharges each has experienced." *Id.* at 895 (emphasis added). In *Collins v. Olin Corp.*, 248 F.R.D. 95, 103–05 (D. Conn. 2008), the court certified a class of homeowners harmed by contaminated soil and groundwater, reasoning that "differences in the amount and recoverability of damages do not defeat predominance." *Id.* at 105. *Singleton v. Northfield Ins. Co.*, 826 So. 2d 55 (La. Ct. App. 2002), affirmed certification of a class seeking damages from a gas well blowout, holding that the "liability of the defendants is the central issue, which is obviously common to all of the claimants. Moreover, this issue of liability pre-dominates over any questions important to only individual members of the class, such as the type and extent of their damages." *Id.* at 68.

### 2.  Class Treatment Is Superior to Other Methods of Adjudicating the Controversy

As the Court preliminarily concluded on April 12, 2016, superiority is satisfied here. *See* Rec. Doc. 16183 at 26–27.

### (A)  Rule 23(b)(3)(A): Interest of Class Members in Individual Control

This factor strongly weighs in favor of class certification. Litigation of this type is extraordinarily complex and expensive, and the class action device was designed to allow individuals with comparatively modest claims to band together to bring such claims. *See, e.g.*, Class Action Fairness Act of 2005, Pub. L. No. 109-2, § 2(a)(1), 119 Stat. 4 ("Class action lawsuits are an important and valuable part of the legal system when they permit the fair and efficient resolution of legitimate claims of numerous parties by allowing the claims to be aggregated into a single action against a defendant that has allegedly caused harm."). If not barred by this Court's liability findings, many plaintiffs would be able to recover only relatively modest amounts of compensation, and as a result, they would have little interest in litigating

outside of a class context, with the enormous expenses that such litigation would entail.  *See, e.g.*, *Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  The class action solves this problem . . . ." (quotation omitted)).  The Phase One and Phase Two Findings that limit any New Class member's claim to punitive damages further indicates that class members do not have a strong interest in individually controlling their claims.

Finally, the New Class settlement preserved the Rule 23(b)(3) opt-out opportunity, and provided a generous opt-out period.  Any plaintiff who did not wish to take part in the New Class settlement was free to opt out of the New Class and pursue his own action.

### (B)      Rule 23(b)(3)(B): Extent of Any Litigation Already Begun

Both the Phase One and Phase Two trials have been completed. The New Class Settlement is extremely favorable to plaintiffs in light of the findings and conclusions of these trials.  Rec. Doc. 21423 at 9.  Consequently, no plaintiff's litigation efforts will be wasted by the Court's certification of the New Class.   Additionally, the Multidistrict Litigation Panel has centralized all the claims arising out of the *Deepwater Horizon* incident in this Court.  Therefore, there is no risk of competing litigation.  Klonoff Decl. ¶ 90.

### (C)      Rule 23(b)(3)(C): Desirability of Concentration in This Forum

Consistent with the orders of the Judicial Panel on Multidistrict Litigation, virtually all *Deepwater Horizon*-related litigation is already centralized in this District.  Thus, much of the litigation would have occurred in this district regardless of how the Court resolves this class certification motion.  *Cf. In re Wal-Mart Wage & Hour Employment Practices Litig.*, 2008 WL 3179315, at *20 ("The desirability of concentrating the litigation of the claims in this forum, at

least for pre-trial purposes, already has been decided by the MDL panel."); *In re Online DVD Rental Antitrust Litig.*, No. 09-2029, 2010 WL 5396064, at *12 (N.D. Cal. Dec. 23, 2010) ("[T]he present action has already been consolidated for case management before this court as part of a multidistrict litigation proceeding . . . . Concentrating the litigation of all claims in the instant forum also further promotes manageability and efficiency.").   Given the Court's familiarity with the myriad legal and factual issues at issue in this litigation, concentration is a desirable result for all parties.  *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. 2-1486, 2006 WL 1530166, at *11 (N.D. Cal. June 5, 2006) ("Concentrating the litigation of all claims in the instant forum—which has already heard all pretrial proceedings thus far—would further promote manageability and efficiency.").

### (D)      Rule 23(b)(3)(D): Likely Difficulties of Managing a Class Action

This factor is at least partially irrelevant because a trial on liability has already occurred. Nonetheless, the class settlement is far easier to manage than the thousands of individual actions could ever be.  Indeed, the Court "need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial."  *Amchem*, 521 U.S. at 620 (citation omitted).   The Court also may take notice of the fact that the New Class settlement agreements permit efficient and transparent payments to members of the proposed New Class far sooner, and with more efficient and cost-effective utilization of judicial resources, than individual actions ever could.

### ii.      The Settlement Is Fair, Reasonable, and Adequate.

As described below, the New Class settlement is clearly fair, reasonable, and adequate to putative New Class members.  Under the Court's Phase One and Phase Two Trial Findings, neither HESI nor Transocean has any exposure for punitive damages. Phase One Findings ¶¶

543, 583–85, 612, 615 (*In re Deepwater Horizon*, 21 F. Supp. 3d 657, 746–47, 752, 757 (E.D. La. 2014)); Phase Two Findings ¶ 250 ("the evidence in the Source Control segment does not change the Court's conclusions from Phase One"). Therefore, virtually any relief to a New Class Member would be fair, reasonable, and adequate under the facts and the law of this case.

### a. The Settlement Agreement Is Entitled to a Presumption of Fairness

The public interest strongly favors the voluntary settlement of class actions. *See* 4 NEWBERG ON CLASS ACTIONS § 11:55 (4th ed.); *Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 507 (5th Cir. 1981) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)); *Smith v. Crystian*, 91 F. App'x 952, 955 (5th Cir. 2004) (per curiam); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004); *In re Exxon Valdez*, 229 F.3d 790, 795 (9th Cir. 2000); *Lazar v. Pierce*, 757 F.2d 435, 440 (1st Cir. 1985). Because the public interest strongly favors the voluntary settlement of class actions, there is a strong presumption in favor of finding the settlement fair, reasonable, and adequate. *See Collins v. Sanderson Farms, Inc.*, 568 F. Supp. 2d 714, 720 (E.D. La. 2008); *accord, e.g.*, *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7–12 Litig.*, 447 F. Supp. 2d 612, 619 (E.D. La. 2006); *Neff v. VIA Metro. Transit Auth.*, 179 F.R.D. 185, 208 (W.D. Tex. 1998). The preference for settlement over the expenditure of scarce judicial resources gains added force under the OPA statute, which is designed to catalyze settlements. *See* 33 U.S.C. § 2713.

### b. The *Reed* Factors Weigh in Favor of Final Approval

#### 1. *Reed* Factor One: The Existence or Lack of Fraud or Collusion Behind the Settlement

The New Class settlements are the result of hard-fought, arm's-length negotiations by experienced counsel. Klonoff Decl. ¶ 99. This Court allowed and supervised settlement

negotiations throughout the first two phases of litigation.  This parallel track provided the parties with the unique opportunity to consider and negotiate a settlement fully informed by discovery, expert opinions, a trial, and other litigation events.

Magistrate Judge Shushan played an important role in mediating the New Class settlements.  Klonoff Decl. ¶ 99.  Her efforts further weigh in favor of a finding that the New Class settlements were fairly negotiated.  *See, e.g.*, *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995); *Collins*, 568 F. Supp. 2d at 725 (citing 4 NEWBERG ON CLASS ACTIONS § 11:51 (4th ed.)); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009), *aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010); *Smith v. Tower Loan of Miss., Inc.*, 216 F.R.D. 338, 353 (S.D. Miss. 2003), *aff'd sub nom. Smith v. Crystian*, 91 F. App'x 952 (5th Cir. 2004) (per curiam); *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 497 (N.D. Miss. 1996); Klonoff Decl. ¶ 99.

The New Class settlement leaves the allocation of New Class settlement funds to the New Class Claims Administrator, further ensuring transparency and fairness.  There is no evidence whatsoever of any fraud or collusion in the negotiation of the New Class settlements. Rather, the negotiation process was "the antithesis of collusion."  Klonoff Decl. ¶ 101.

### 2.    *Reed* Factor Two: The Complexity, Expense, and Likely Duration of the Litigation

This litigation has been complex and expensive.  The Court takes judicial notice of the open and obvious fact that the *Exxon Valdez* and *Amoco Cadiz* oil spill litigations took at least fifteen to twenty years to resolve.  The protracted *Exxon Valdez* litigation "produce[d] an independent secondary disaster" for the Alaska populace affected by the spill.  J. Steven Picou, *When the Solution Becomes the Problem*, 7 U. ST. THOMAS L.J. 68, 81 (2009).  The New Class settlement prevents the same from happening in *Deepwater Horizon*.

As of April 7, 2016, the day the Plaintiffs' Steering Committee filed its motion seeking preliminary approval of the HESI and Transocean settlements, the docket reflected approximately 16,000 entries. As of the date of this Order and Reasons, the docket for MDL 2179 exceeds 22,000 entries.  This litigation has taxed the resources of both the parties and the Court.  Absent these settlements, appeals and cross-appeals of the Court's Phase One and Phase Two Findings and Conclusions would continue to impose complexity and expense on all the parties.  Klonoff Decl. ¶ 105. Hence, the second *Reed* factor weighs strongly in favor of granting final approval to the New Class settlement.  *See In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009); *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992); *Billitteri*, 2011 WL 3586217, at *10; *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d at 726; *Faircloth v. Certified Fin. Inc.*, No. 99-3097, 2001 WL 527489, at *4 (E.D. La. May 16, 2001); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1127 (W.D. La. 1997); *Shell Oil*, 155 F.R.D. at 560; *Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 790 (5th Cir. 1986) (per curiam); *Ayers*, 358 F.3d at 369; *Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 469 (S.D. Fla. 2002); *Smith v. Ajax Magnethermic Corp.*, No. 02-0980, 2007 WL 3355080, at *6 (N.D. Ohio Nov. 7, 2007).

### 3.    *Reed* Factor Three: The Stage of the Proceedings and the Amount of Discovery Completed

This *Reed* factor asks "whether the parties have obtained sufficient information to evaluate the merits of the competing positions."  *In re Educ. Testing Serv.*, 447 F. Supp. 2d at 620 (quotation omitted).  "Thus, the question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed . . . ."  *Id.* at 620–21.  The parties

clearly had sufficient information to evaluate the merits of their competing positions.  In fact, "[f]ew class settlements can match this one in terms of the information known to the Court and the parties at the time of settlement." Klonoff Decl. ¶ 107.  In light of the amount of discovery produced and the completion of two trial phases resulting in detailed findings and conclusions, this *Reed* factor weighs strongly in favor of granting final approval to the New Class settlement agreements.  *See, e.g.*, *Turner*, 472 F. Supp. 2d at 847; *Feinberg v. Hibernia Corp.*, 966 F. Supp. 442, 445 (E.D. La. 1997).

### 4.  *Reed* Factors Four and Five: The Probability of Plaintiffs' Success on the Merits and the Range of Possible Recovery

These two related *Reed* factors require the Court to compare the settlement terms "with the likely rewards the class would have received following a successful trial of the case."  *Reed*, 703 F.2d at 172.  Thus, "the court must compare the terms of the compromise with the likely rewards of litigation."  *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 83 (S.D.N.Y. 2007) (quotation omitted).  The Court, however, "must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial." *Reed*, 703 F.2d at 172 (quotation and alteration omitted); *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1065.  The court determines "whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors" not by attempting the impossible task of deciding whether the parties have "reached 'exactly the remedy they would have asked the Court to enter absent the settlement,'" but instead by "'whether the settlement's terms fall *within a reasonable range of recovery*, given the likelihood of plaintiffs' success on the merits.'"  *Id.* (citing *Maher v. Zapata Corp.*, 714 F.3d 436, 460 (5th Cir. 1983)).

These two factors are strongly support the approval of the New Class.  Given the Court's finding of fact regarding HESI's and Transocean's lack of gross negligence and/or reckless

conduct, the plaintiffs could not have recovered punitive damages in a trial on the issue.  Klonoff Decl. ¶¶111–13.  Therefore, any recovery from the New Class Settlement more than adequately suffices for probable and reasonable recovery from a decision on the merits.

5. *Reed* **Factor Six: The Opinions of Class Counsel, Class Representatives, and Absent Class Members**

The Class Counsel, class representatives, and the vast majority of absent class members all agree that the New Class settlement agreements are a fair, reasonable, and adequate resolution of this litigation.

(A) **Class Counsel**

The members of the Plaintiffs' Steering Committee, as interim and proposed Class Counsel for the New Class, have significant experience in litigating and negotiating the settlement of complex litigation such as the instant dispute.  The Plaintiffs' Steering Committee has consistently stated that the New Class settlement is a fair, reasonable, and adequate resolution of this litigation.  *See* PSC's Preliminary Approval Brief (Rec. Doc. 16161-1) at 48 ("The Settlement Agreements are amply fair, have no obvious deficiencies, do not improperly grant preferential treatment to the Class Representatives or to segments of the Class, and do not grant excessive compensation to attorneys."); PSC's Final Approval Brief (Rec. Doc. 21423) at 9 ("[V]irtually any relief to . . . a New Punitive Damages Class Member would be fair, reasonable, and adequate, under the facts and the law of this case."); Herman–Roy Decl.[11] ¶ 104 ("We believe that the Halliburton and Transocean Assigned Claims and Punitive Damages Settlements are fair, reasonable, and adequate . . . ."); Klonoff Decl. ¶ 116.  The Plaintiffs' Steering Committee's judgment that the New Class settlement is fair, reasonable, and adequate weighs

---

[11] Mr. Herman and Mr. Roy's Declaration was submitted as Exhibit 2 of the PSC's Final Approval Brief. Rec. Doc. 21423-2.

strongly in favor of granting final approval.  *See DeHoyos*, 240 F.R.D. at 287; *Cotton*, 559 F.2d at 1330; *Turner*, 472 F. Supp. 2d at 852.

### (B)    Class Representatives

The class representatives uniformly believe that the New Class settlement is a fair, reasonable, and adequate resolution of this litigation.  *See* Morales Decl. ¶ 7; Petitjean Decl. ¶¶ 7; Taliancich Decl. ¶¶ 7; Yates Decl. ¶¶ 7; Reels Decl. ¶¶ 7; Morgan Decl. ¶¶ 7.  Klonoff Decl. ¶ 116.  The universal agreement of the class representatives that the New Class settlement is fair, reasonable, and adequate further weighs in favor of granting final approval to the New Class settlement agreements.

### (C)    Absent Class Members

As detailed below, the reaction of the absent class members to the New Class settlement has been overwhelmingly positive.

### (i)    The Number of Objections Is Low.

Under the Preliminary Approval Order, Class Members who wished to object to the New Class Settlement were required to submit a written statement of the objection(s) and to include in this statement "written proof that the individual or entity is in fact a New Punitive Damages Settlement Class member, such as proof of residency, ownership of property and the location thereof, and/or business operation and the location thereof" by September 23, 2016.  Rec. Doc. 16183 ¶ 30.  Under the Preliminary Approval Order, failure to comply with its objection provisions waived and forfeited any and all of a putative objector's rights to object to the Proposed Settlements, forever foreclosing the objector from making any objection to the Proposed Settlements, and binding the objector by all the terms of the Proposed Settlements and by all proceedings, orders and judgments in this matter.  *Id.*

As of October 14, 2016, the total number of purported objections filed was eight.  These objections were filed on behalf of an alleged 155 objectors.  *See* Rec. Docs. 21716 (one objector), 21718-1 (seventy-two objectors), 21719 (four objectors), 21723 (seventy-four objectors), 21740 (one objector), 21741 (one objector), 21745 (one objector), 21752 (one objector).

The total number of objectors—155—is small.  Analysis of the individual objections suggests that the number of valid and pertinent objections is zero.  Indeed, while some objectors take issue with the proposed Distribution Model, not one objector complains that either the Neutral's allocation or the New Class Settlement is not fair, reasonable, and adequate to the members of the New Class.   These objections are further analyzed in section IV.A.iv., *infra*.

**(ii)      The Number of Opt-Outs Is Low.**

Under the Preliminary Approval Order, Class Members who wished to opt out of the New Class were required to send a written exclusion request as specified in the Class Notice to the HESI/TO Punitive Damages & Assigned Claims Settlement Exclusions Department by September 23, 2016.  Rec. Doc. 16183 ¶ 31.

A total of thirty-six timely and procedurally valid opt-out requests have been submitted by potential New Class Members, six of which were later revoked.  Rec. Docs. 21900-3, 21888-1.  With at least 100,000 New Class members,[12] an infinitesimal amount of less than 0.030% chose to opt out of the New Class.  Indeed, further analysis reduces the number of valid and relevant opt-outs to only eight (i.e., less than 0.008%).

---

[12] According to the Settlement Program statistics, 10,543 Seafood claimants, 28,657 Coastal claimants, 4498 Wetlands claimants, 1610 Real Property Sales Loss claimants, 67,295 Subsistence claimants, and 1309 Vessel Damage claimants submitted claims to the DHEPDS Program.  Rec. Doc. 22149-1.  This does not include Charterboat Operators and other New Class members who may have opted out of or were excluded from the Old Class.

Twenty of the thirty opt-outs are seeking purely economic loss claims. Claimants pursuing purely economic loss are not members of the New Class.  These claimants cannot opt-out of a class of which they would not be members.

Two of the remaining ten opt-outs had their compensatory-damage claims denied under either DHEPDS or GCCF.  Rec. Doc. 21786 at 7.  Lacking compensatory damage claims, these opt-outs could not recover under the New Class Settlement. Therefore, the number of relevant opt-outs is reduced to eight.

> **(iii)** **The Low Numbers of Objections and Opt-Outs Are Evidence of the Settlement's Fairness.**

The low objections and opt-out rates are evidence of the Settlement's fairness.  Courts, including the Fifth Circuit, have approved settlements with far higher objection rates.  *See, e.g.*, *Reed*, 703 F.2d at 174–75 (objections by 30% of class); *see also Huguley v. Gen. Motors Corp.*, 925 F.2d 1464, at *3 (6th Cir. 1991) (table) (per curiam) (15% of the class); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir. 1987) (36% of the class); *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 891 (7th Cir. 1985) (15% of the class); *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803 (3d Cir. 1974) (20% of the class); *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 661 (N.D. Tex. 2010) ("significant portion of the class").  "While the fact that a relatively small percentage of the Class Members objects to a proposed settlement is not dispositive, '[c]ourts have taken the position that one indication of the fairness of a settlement is the lack of or small number of objections.'"  *Hammon v. Barry*, 752 F. Supp. 1087, 1092–93 (D.D.C. 1990) (alteration in original) (quoting 2 H. NEWBERG, NEWBERG ON CLASS ACTIONS § 11.47, at 463 (2d ed.)); *Cotton*, 559 F.2d at 1331 ("In assessing the fairness of the proposed compromise, the number of objectors is a factor to be considered . . . ."); *In re OCA, Inc. Sec. & Deriv. Litig.*, 2009 WL 512081, at *15 (same principle); *Quintanilla v. A & R Demolition Inc.*, No. 04-1965,

2008 WL 9410399, at *5 (S.D. Tex. May 7, 2008) (same principle); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) (same principle); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 (E.D. Mich. 2003) ("That the overwhelming majority of class members have elected to remain in the Settlement Class, without objection, constitutes the 'reaction of the class,' as a whole, and demonstrates that the Settlement is 'fair, reasonable, and adequate.'").

### iii.     The Notice Program Surpassed the Requirements of Due Process, Rule 23, and CAFA

Based on the factual elements of the Notice Program as detailed below, the Notice Program surpassed all of the requirements of Due Process, Rule 23, and CAFA.

Garden City Group initially sent 442,464 notices by First-Class U.S. Mail and 75,355 notices by email to known or potential New Class Members.  Cirami Decl. ¶ 5.[13]  Undeliverable emails were supplemented with mailed notices.  *Id.* at ¶ 6.  Garden City Group ensured that it sent notices to every PTO 60 compliant plaintiff.  *Id.* ¶ 8.  Garden City later mailed an additional 34,494 notices to persons who had requested a notice or whose notice was returned with an updated address.  Cirami Supp. Decl. [Rec. Doc. 21858-1] ¶ 2.

A neutral, informational notice web site was created to serve as the notice page for the New Class Settlement, and its web address was prominently displayed in all notice documents. *See* HALLIBURTON ENERGY SERVICES, INC./TRANSOCEAN PUNITIVE DAMAGES & ASSIGNED CLAIMS SETTLEMENTS, http://www.gulfspillpunitivedamagessettlement.com (last visited Feb. 10, 2017).  On the site, Class Members can obtain additional documents and information about the New Class Settlement. The site is available in English, Spanish, and Vietnamese.  As of

---

[13] Mr. Cirami's Declaration was submitted as Exhibit 3 to the PSC's Final Approval Brief. Rec. Doc. 21423-3

November 1, 2016, there have been 20,537 unique visitors and 23,401 total visits to this web site.  Cirami Supp. Decl. ¶ 5.

Additionally, this Court maintains its own web site to provide notices and information on MDL 2179 to the public.  Current developments are listed prominently at the top of this web page.  *See MDL – 2179 Oil Spill by the Oil Rig "Deepwater Horizon,"* U.S. DISTRICT CT. EASTERN DISTRICT OF LA., http://www.laed.uscourts.gov/OilSpill/OilSpill.htm (last visited Feb. 10, 2017).  This web site also provides a link to the informational notice web site run by Garden City Group.

By June 15, 2016, a toll-free number was operational.  The number provided an interactive voice response system to accommodate potential Old and New Class Members with questions about the Settlements.  Cirami Decl. ¶ 10.  As of November 1, 2016, the number had received 20,762 calls, including 9,887 calls with a live operator.  Cirami Supp. Decl. ¶ 4.

The Class Notices were "noticeable, clear, concise, substantive, and informative." Wheatman Decl. ¶ 4(b).[14]  The notice distribution method satisfied Rule 23(c)(2), as it was the "best notice that is practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2); *see* Wheatman Decl. ¶ 5.  The notice contents satisfied Rule 23(c)(2)(B)(i)–(vii), as it properly stated (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment under Rule 23(c)(3).  *See* Wheatman Decl. ¶¶ 33–37.  The notice complied with Rule 23(e), as it was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the [settlement] and afford them an opportunity to present their objections."

---

[14] Dr. Wheatman's Declaration was submitted as Exhibit 4 to the PSC's Final Approval Brief. Rec. Doc. 21423-4.

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *accord, e.g.*, *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 629 (6th Cir. 2007).

The parties fully satisfied all of their obligations under the Class Action Fairness Act, 28 U.S.C. § 1715.

### iv.    None of the Objections Warrant Denial of Final Approval.

None of the objections that have been filed prevent final approval.  Settlements are compromises, and the fact that some class members wish for different terms is no reason to reject the settlement.  Indeed, the fact that nearly half of the purported objectors (72 of 155) wish the New Class were expanded to include them is further evidence of the fairness, reasonableness, and adequacy of the Settlement Agreement.[15]  *See* Rec. Docs. 21717, 21718.

### a.    Standing Is Required to Present a Valid Objection.

Plaintiffs falling outside the settlement class are entirely unaffected by the Settlement, and thus lack standing to challenge it.  *See Feder v. Elec. Data Sys. Corp.*, 248 F. App'x 579, 580 (5th Cir. 2007) (per curiam); *Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989); 4 Newberg on Class Actions § 11:55 (4th ed.).  That doctrine stems from the fundamental purpose of fairness review under Rule 23(e)—to ensure that absent class members are not bound by an unfair settlement.  *Piambino v. Bailey*, 610 F.2d 1306, 1327 (5th Cir. 1980); *Pearson v. Ecological Sci. Corp.*, 522 F.2d 171, 176–77 (5th Cir. 1975).

---

[15] In addition to the properly filed objections discussed below, claimant Aaron Wallace filed a request to speak at the Final Fairness hearing.  *See* Rec. Doc. 21604.  The Court has no record of Mr. Wallace filing an objection as required under the Settlement Agreements, and the limited information available to the Court indicates that Mr. Wallace's claim relates to an allegation that he provided a solution for addressing the oil spill.  Based on this information, Mr. Wallace would not qualify as a member of the New Class.  Based upon his failure to comply with procedural requirements and his lack of standing, the Court does not consider Mr. Wallace's request to speak as a valid objection to the Settlement Agreements.

The Court has received an objection on behalf of the seventy-two South Texas Shrimpers who fall outside the New Class's geographic boundaries.  *See* Rec. Doc. 21718.  Because the New Class Settlement does not affect these persons' legal rights, their claims, if any, remain subject to the Court's findings and conclusions from the Phase One and Phase Two trial proceedings, but they lack standing to object.  For these reasons, and for substantially the same reasons identified by Class Counsel in their Opposition (Rec. Doc. 21784), the South Texas Shrimpers' Motion for Leave to Intervene (Rec. Doc. 21717) is denied.

### b.     The Court Has No Authority to Modify a Settlement Agreement That Is Fair, Reasonable, and Adequate.

The South Texas Shrimpers have requested that the Court expand the geographic scope of the New Class so that they are included in the New Class definition.  Rec. Doc. 21718.  Because the New Class Settlement is fair, reasonable, and adequate, however, the Court is not authorized to insist upon changes that, in its judgment, might lead to a superior settlement.  *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) ("It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness.  Neither the district court nor this court has the ability to delete, modify, or substitute certain provisions.") (citations and quotations omitted); *Dandridge v. Jefferson Parish Sch. Bd.*, No. 64-14801, 2009 WL 24461, at *3 (E.D. La. Jan. 5, 2009) ("It is also important to note that, although the Court has the power to approve or reject a settlement negotiated by the parties, the Court may not require the parties to accept a settlement or a consent order to which they have not agreed.").  Rather, the imposition of conditions upon a grant of final approval is ***only*** appropriate where, absent modifications, the settlement would fail to satisfy the Rule 23(e) analysis.

**c.      Objections to Determinations Under the New Class
Distribution Model Are Premature.**

The majority of objectors direct their concerns to the determinations under the New Class

Distribution Model rather than the underlying New Class Settlement or the Distribution Model

itself.  Because the New Class Claims Administrator's determinations can be appealed to this

Court, the objections are premature.  *See* Rec. Docs. 14644-1 at 22, 15322-1 at 23, 22178.

**1.      Objectors Who Failed to Comply with PTO 60 May
Appeal the Claims Administrator's Determination of
Their Claims.**

The New Class Claims Administrator has stated that New Class members who failed to

comply with PTO 60 have no likelihood of establishing a compensatory damage claim and,

consequently, will not receive New Class Settlement funds. Rec. Doc. 21778 at 2–3.  Seventy-

four objectors who failed to comply with PTO 60 now object to the impact this failure will have

on their New Class distribution.  Rec. Doc. 21723.  The Court makes no decision on the

propriety of the Claims Administrator's interpretation.  This objection is most properly

considered in an appeal to this Court after claim determinations are concluded.

**2.      Objectors Who Failed to Recover in the DHEPDS May
Appeal the Claims Administrator's Determination of
Their Claims.**

Seven objectors did not recover in the DHEPDS and now seek assurance that they will

recover in the New Class Settlement.  These include objectors who contend that certain of their

claims for their land parcels were improperly denied in the DHEPDS [Rec. Doc. 21719 at 2], an

objector who opted out of DHEPDS [Rec. Doc. 21745], and two entities whose filing does not

clearly state their reason for non-recovery [Rec Docs. 21740, 21741].  Assuming these objectors

are New Class Members, if they take issue with their award under the Claims Administrator's

Distribution Model, their proper remedy is an appeal to this Court.

**d.      The Tax-Exempt Entities' Requests for Clarification Are Moot.**

Plaquemines Parish and the City of Biloxi filed requests for clarification based on a concern that they did not have the documentation required by the New Class Claims Administrator.  Rec. Docs. 21716, 211752.  The New Class Claims Administrator has addressed these concerns with an assurance that "the New Class Distribution Model affords the New Class Claims Administrator discretion to adjust the documentation requirements as appropriate for extraordinary situations."  Rec. Doc. 21778 at 3.  Accordingly, the local governments' objections are moot.

None of the objections have shown the New Class Settlement to be anything other than fair, reasonable, and adequate.  All objections to the New Class Settlement are hereby overruled on the various grounds specified above.  The Court finds that the New Class Settlement should be approved as fair, reasonable, and adequate.

**B.      Settlement of the Assigned Claims**

The earlier BP settlement assigned BP's claims against HESI and Transocean to the DHEPDS Class as a juridical entity.   Because the DHEPDS Class already exists, the only relevant question is whether the allocation of funds between the DHEPDS Class and the New Class was fair to both classes.  Judge Wilkinson, the appointed Allocation Neutral, thoughtfully and comprehensively addressed this issue.  Klonoff Decl. ¶¶ 69–70.  No member of either class has objected to the allocation.  The Court affirms its finding that the allocation is fair, reasonable, and appropriate.  *See* Rec. Doc. 16183 ¶ 5.  The Court further expressly finds that the portion of the Settlements resolving the Assigned Claims is fair, reasonable, and adequate as to the DHEPDS Class as a juridical entity.

## V.      Approval of Class Counsel's Request for Common Benefit Fees

After the Aggregate Payments of $1,239,750,000[16] were negotiated and agreed to, HESI and Transocean agreed to pay up to an additional $124,950,000 in common benefits costs and/or fees, as may be approved and awarded by the Court.[17]

Although HESI and Transocean have agreed to pay up to $124.95 million in common benefit attorneys' fees and expenses—in addition to and separate from the Old Class and the New Class aggregate recoveries—and while the Court finds it telling that none of the New Class members have objected to or otherwise called into question the propriety of the requested fees, the Court has an independent duty to the class and public to ensure that such amounts are reasonable. *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227–28 (5th Cir. 2008); see also Fed. R. Civ. P. 23(h) ("In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or the parties' agreement." (emphasis added)).

The Court recently addressed the underlying work performed by Class Counsel and other Common Benefit Attorneys in this litigation,[18] the controlling legal fee approval analysis, and the application of the relevant factors to the facts and circumstances of the present case in the Court's recent Order and Reasons approving the Aggregate Common Benefit Cost and Fee Award associated with the BP Class Settlements [Rec. Doc. 21849], which is incorporated by reference herein.

As applied to the HESI and Transocean Settlements, when the $124.95 million in requested fees is added to the $1.24 billion in Aggregate Payments, the requested fee constitutes

---

[16] As noted *supra*, this aggregate amount was later increased to $1,241,886,667.  *See* Rec. Doc. 21573.
[17] *See* HESI Settlement, Sections 23(a) and 23(b) [Rec. Doc. 15322-1]; Transocean Settlement, Sections 23(a) and 23(b) [Rec. Doc. 14644-1].
[18] *See also* Herman–Roy Decl.

approximately 9.16% of the total benefits to the Old Class and the New Class collectively, which the Court finds reasonable. *See, e.g.*, Klonoff Decl. ¶¶ 121–23; Fitzpatrick Decl.[19] ¶¶ 23–31, Table 1, & ¶¶ 47–51.

The Court further notes, however, that when the HESI and Transocean Settlements are considered together with the BP Class Settlements, the total collective requested fees are only approximately 4.8% of the total estimated collective benefits to the members of the settlement classes. *See* Rec. Doc. 21423 at 15–16.

Viewing the BP Settlements together with the HESI and Transocean Settlements is likely more relevant when the Court is conducting its lodestar cross-check. The 527,000 hours and the $450 average/blended hourly rate that the Court started from in its recent analysis yields a time-fee value of $237,150,000. When the total potential percentage value of $680.15 million is divided by the time-fee value of $237.15 million, it produces a lodestar multiplier of approximately 2.87. Professor Fitzpatrick prepared a chart showing the lodestar multipliers in the eighteen cases with settlements at or above $1 billion where such information was provided. The average multiplier is 3.14 and the median is 2.80. Rec. Doc. 21423-6, Table 1. Thus, a lodestar multiplier of 2.87 is not anomalous for a settlement of this size. Moreover, considering the size and complexity of this case, the time and effort required of the petitioning attorneys, and the tremendous amount of recovery obtained through the Settlements; and further considering that the common benefit fee award is delayed compensation as well as the risk undertaken by the common benefit attorneys, the Court finds that a lodestar multiplier of 2.87 is reasonable for this case.

---

[19] Professor Fitzpatrick's Declaration was submitted as Exhibit 6 to the PSC's Final Approval Brief. Rec. Doc. 21423-6.

## VI.    <u>Conclusion</u>

Based on the foregoing and pursuant to Federal Rule of Civil Procedure 23(e), the Court finds the following to be fair, reasonable, and adequate:

(1)    The HESI Punitive Damages and Assigned Claims Settlement Agreement, Amended as of September 2, 2015, including all Exhibits thereto;

(2)    The Transocean Punitive Damages and Assigned Claims Settlement Agreement, including all Exhibits thereto;

(3)    The allocation of the Aggregate Payment under the HESI Settlement Agreement and the Transocean Settlement Agreement between the DHEPDS Class for the Assigned Claims and the New Class for the Punitive Damage Claims by the Allocation Neutral;

(4)    The DHEPDS Class Distribution Model and New Class Distribution Model;

(5)    The common benefit fee and costs award payments under the HESI Settlement Agreement and Transocean Settlement Agreement (together with any and all accrued interest), subject to later order of the Court regarding allocation and distribution of the same.

Signed in New Orleans, Louisiana, this 15th day of February, 2017.

CARL J. BARBIER
United States District Judge