UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on April 20, 2010 | MDL No. 2179 |
| | SECTION: J |
| This document relates to: | JUDGE BARBIER |
| Relevant Civil Actions Nos. 13-1971; 14-1525; 10-8888 Doc No. 133248; 10-9999 Doc. No. 401 | MAGISTRATE WILKINSON |

**JOINT VENTURE ATTORNEYS' MEMORANDUM IN SUPPORT OF
MOTION FOR FEES PURSUANT TO CONTINGENCY FEE AGREEMENT**

NOW INTO COURT come the "Joint Venture Attorneys"[1] hired to represent the Edward Wisner Donation ("Wisner" or "Donation") and respectfully submit this Memorandum in Support of Motion for Attorneys' Fees Pursuant to Contingency Fee Agreement.

**I.   Background.**

The Donation, through the Trustee, settled all of its BP-related claims for $30 million to be paid out in 22 payments over 21 years.[2] *Release*, at ¶ 2, attached as Exhibit "1". The first payment of $5 million was made in October 2016. $2,160,011.92 was placed into the registry of the Court, representing a 25% fee ($1,250,000 less deduction for prior BP payments of $17,161.20) and $927,173.12 in litigation costs.[3] [Rec. Doc. 196] The Release was signed by the Mayor as

---

[1] These Joint Venture Attorneys (sometimes referred to as the "Joint Venture" or "Joint Venture Team") include the following five law firms: Herman Herman & Katz; Fayard & Honeycutt; Fred L. Herman; Leger & Shaw; and Domengeaux Wright Roy Edwards & Colomb.

[2] Claims against Transocean and Halliburton for punitive damages were reserved.

[3] The Donation and the Joint Venture agreed on reimbursed costs of $909,024.49. [Rec. Doc. 22202] The remaining balance on the costs in the registry of the Court, $18,148.63, is to be returned to the Donation. *Id*

the claimant and by Stephen Herman as counsel.  *Release*, at ¶ 25.  No beneficiary objected to the Settlement.

The Joint Venture spent thousands of attorney hours, reviewed 100,000s of documents, took 36 depositions, traveled across the country, and spent almost $1 million in out of pocket expenses litigating the case.  *Declaration of Soren Gisleson*, at ¶¶ 14-26 [Rec. Doc. 21969-3] The settlement in principle was reached one week before the March 7, 2016 trial date.

Before it filed and litigated No. 14-1525 in June 2014, the Joint Venture spent 23 months engaging in administrative oversight of the clean-up operations of the Donation's Property.  *Id.* at ¶¶ 5-13.  These administrative activities included overseeing two experts and an investigator (and his team) monitoring the clean-up efforts on Fourchon beach.  The Joint Venture met with BP, the Coast Guard, and its own team to ensure the best, most responsible clean-up methods were employed.  The Joint Venture also reviewed, preserved, and developed its own data, testing, and evidence which was later used for litigation purposes.

While this administrative oversight also involved supervising an environmental engineer, a coastal geologist, and a private investigator, the scope and breadth of expertise in the litigation expanded to include those three same professionals as well as two economists (one from the University of Oregon and another from Harvard), another geologist, another hydromorphologist, sand remediation expert, three experts in federal response, a land appraiser, and a certified public accountant.  *Declaration of Soren Gisleson*, at ¶¶ 22-23.

While the administrative oversight was limited to what was happening on Fourchon beach, the complexities of the litigation became a fight over the science, the history of the beach, the future of the beach, the nature of the beach, and it was fought from Alaska to Seattle, Portland,

2

Chicago (twice), San Antonio, Texas City, Houston (thrice), Oklahoma City, Mobile, and Boston. *Id.* at ¶ 21.   Joint Venture lawyers documented more than 2,000 hours.   *Declaration of Soren Gisleson*, at ¶ 20.   Many depositions were also taken in New Orleans.   Inspections on the beach, vetting of the test results, exchanges of expert reports, and countless hours vetting these reports were expended.   All total, 36 depositions were taken.

Other than the colossal litigation of the BP-Oil MDL, no other litigation came as close to conducting a merits trial concerning the amount of oil on a property, the nature of the oiling on the property, and how the oiling damaged the property.   In fact, this case was to be one of only two cases with a trial date that placed a specific value of those damages on a particular claimant -- with the State of Alabama being the other.

This is no small feat, and the Donation is no small victim.   As this Court is aware, and the pre-trial order explains (as well as numerous other pleadings), Fourchon beach, owned by the Donation, was one of the most oiled pieces of land in the entire Gulf Coast.   Tens of millions of pounds of oiled material were removed from the property without replacement.   In a dynamic environment such as Fourchon, significant expertise was dedicated towards substantiating (and BP trying to discredit) how a property such as this cycles through sand and how damages result and how remediation should occur.   These are issues that administratively monitoring the clean-up do not address.

The Joint Venture's contract with the Donation and signed by the Trustee provides for a 25% fee for the first $10 million and an 18% fee for the remaining $20 million of the settlement. *Joint Venture Contract*, at ¶ 4(c) [Rec. Doc. 21922-9].   These percentages apply because some of the Donation's claims "for physical damages and restoration costs" were scheduled for trial

3

through the Access Agreement dispute in No. 14-1525.[4]

## II.     The Contingency Fee is Based on the *"Gross Present Value"* of the Settlement.

Under the Contract, the Joint Venture's attorney's fees are calculated pursuant to Paragraph 4(c) which provides as follows:

> For services rendered in connection with physical damages and restoration costs, as well as final economic damages, the Donation will pay Attorneys a contingency fee based on the *gross present value* of benefits received by the Donation pursuant to the a judgment or agreement involving any defendant, or any entity related to any defendant, in the following percentages . . . .

*Contingency Fee Agreement*, at ¶4(c) (emphasis supplied).

As the Release makes clear, the Settlement includes payment for any and all physical damages, restoration costs, and economic damages. The Release defines "economic claims" in part as "*economic loss*, lost profits, lost earnings, lost income, *property damage* (including without limitation physical damage, diminished value, stigma, and lost or diminished sales)" and defines "released claims" in part as "any and all causes of action, whether in law or equity, known or unknown, direct or indirect, past, present, or future, arising from or related to the Deepwater Horizon Incident". *Release*, ¶¶1(i)&(p) (emphasis supplied).

"Gross present value" means that the contingency fee percentage should be calculated from the $30 million discounted to today's dollars. While not defined in the Contingency Contract, "gross present value" is an amalgam of two conventional accounting terms – "gross" and "present

---

[4] Many of the claims for physical damages and restoration costs under the Access Agreement were inherently intertwined with the claims for physical damages and restoration costs under OPA and the general maritime law. While a separate (though largely duplicative and overlapping) trial for Wisner Donation-specific physical damages and restoration costs under OPA and the GML had not yet been formally scheduled, BP's liability under OPA and the GML was tried, by the Joint Venture Attorneys and other Common Benefit Attorneys, in two phases, in 2013.

4

value". "Gross" simply means the total value before deductions and expenses; "present value" simply means "current value of a future payment, or series of payments, discounted at some compound or discount rate." BLACK'S LAW DICTIONARY, at 1184 (6th ed. 1990). The gross present value calculation on the $30 million settlement, using a 3% discount rate, equals $24,840,876.06. *See Gross Present Value Calculation*, attached as Exhibit "2".

The next step under the Contingency Fee Agreement is to determine which of the three scaled fee percentages apply. The lowest percentage applies if the settlement occurred before suit was filed, the middle percentage applies if the settlement occurred after suit was filed but before an order was issued setting the case for trial, and the highest percentage applies if the settlement was reached "after an order is signed setting the case for trial". *Contingency Fee Agreement*, ¶4(c).

Here, the highest percentage applies for a number of reasons: (1) the case settled the week before trial; (2) the scheduled trial included numerous categories of damages for "physical damages and restoration costs", as well as "economic damages"; and (3) the Phase 1 and Phase 2 trials on BP's liability for damages under the general maritime law, (including liability for physical damages and restoration costs), had already been tried.[5]

---

[5] The Contingency Fee Contract does provide for an alternate calculation based on the calculation methodology in the City of New Orleans contract ("CNO"). *Contingency Fee Contract*, ¶5. However, that calculation yields a larger attorney fee for the Joint Venture, which is a disadvantage to the Donation and should not be used. Because the CNO contract does not include the term "present value" (or any comparable term), the fee is based upon the full $30 million value of the settlement benefits provided, (with a deduction for litigation expenses). Based on the completion of the Phase One and Phase Two trials, the 20% contingency rate under the CNO contract would apply to this settlement, as agreed and understood by the City when its separate claims were settled last year. The fee calculated using the CNO methodology is $5,818.195.10 ($30 MM minus $909,024.49 in costs, equals a net value of $29,090,975.51, with a 20% fee calculated from this).

As this Court discussed at the last hearing, the attorney fee percentage that applies to this settlement is 25% for the first $10 million and 18% for the remainder:[6]

> The contingency fee clause and the contracts of representation as a whole are clear. They are unambiguous. The recitation for services rendered in connection with physical damages and restoration costs as well as final economic loss damages is a broad-ranging legal undertaking that encompasses all elements of the work for which compensation is sought in this motion.
>
> I don't remember the date now, but my order which is in dispute I find was an order setting this matter for trial within the meaning of this agreement. Therefore, the higher percentages in paragraph 4(c) are triggered, and the fee should be calculated on the basis of 25 percent of the settlement amount for benefits received up to $10 million and 18 percent for the amounts between $10 million and $50 million.

*01/25/17 Excerpted Transcript*, at 5, attached as Exhibit 3. This Court set this matter for trial and presided over the pretrial proceedings. The settlement in principle was achieved the week before trial.[7]

Accordingly, the contingency fee of 25% of the first $10 million and 18% of the remainder of the "gross present value" ($24,840,876.06) equals **$5,171,357.69**. The Trustee has represented to the Joint Venture that this higher contingency fee percentage applies.[8]

---

[6] While the Court did issue a post-hearing clarification on the issue of "gross present value", the Court did not change its ruling as it related to the 25% and 18% percentages that apply to the fee calculation.   [Rec. Doc. 22134]

[7] Four of the 64 income beneficiaries have argued that the higher fee percentage does not apply because the trial scheduled in No. 14-1525 did not include OPA or GML claims.   This is a misreading of the Contingency Fee Agreement.   Even putting aside the Phase One and Phase Two trials on liability under OPA and the GML, the trial in No. 14-1525 included significant and inherently overlapping "economic loss damages" in addition to significant and inherently overlapping "physical damages and restoration costs" claims -- any of which trigger to the higher fee percentage.   *Contingency Fee Contract*, at ¶4(c).

[8] Four income beneficiaries have also argued that the Joint Venture's expenses and previous counsel's fees should be deducted from the contingency fee, arguing for a "net" fee calculation.   This interpretation is against the plain wording of the Contingency Fee Agreement and common sense, for the following reasons:   (1) Paragraph 4 limits the fee calculation to only one "of two methodologies", neither of which discuss "net" valuation, and are found only in paragraphs 4 and 5; (2) valuation of fees is only referred to with the term "gross" ; (3) paragraph 8 of the contract expressly directs that "attorneys fees" be deducted from the gross total amount *before* "direct and pro rata expenses paid by Attorneys";   (4) the hypothetical example provided in paragraph 8 of the Contract assumes a situation in which the Donation paid hourly fees and/or expenses as the litigation unfolded – neither of which happened here since the Joint Venture paid for expenses; and (5) the paragraph 8 hypothetical example assumes a situation where the

### III. The Discounted *Present* Value of Attorney's Fees Should Be Paid in The *Present*.

The Contingency Fee Contract provides that attorney's fees be paid first. By calculating the contingency fee on the "present value" of the settlement, the Contingency Fee Contract contemplates payment of the fee first – at the same time it is valued. If the parties intended to defer the fees until and as the settlement payments were received by the Donation, (as it turns out through the year 2037), then the fees would be calculated on the full value of the individual settlement payments at the time of receipt by the Donation, and it would make no sense to define the fee in terms of "present value".[9] The parties specifically negotiated to the contrary.[10]

There is only one paragraph in the Contingency Fee Contract that speaks to the timing of when the contingency fee should be paid. Paragraph 8 reads, in pertinent part, as follows:

> The Donation and Attorneys agree that any amounts received in settlement or judgment will be *distributed in this order*: from the gross total amount, Attorneys will deduct case costs and common pro rata litigation related expenses which have not been paid by Attorneys, then attorney's fees, then all direct and pro rata expenses paid by Attorneys.

*Contingency Fee Agreement*, ¶ 8.

The plain language of the contract clearly provides that all attorney's fees will be paid after payment of any outstanding litigation costs not advanced by the Attorneys. There is no language that defers the payment of fees to the timing of payments received by the Donation. Rather, the contract directs that fees be satisfied out of "*any*" amounts received by the Donation in

---

settlement (or judgment) provided for different categories of recovery, not one lump sum, as happened here.

[9] Indeed, the interpretation that has been suggested by four of the income beneficiaries would actually result in the payment of a "past value" attorney fee, discounted, in future years, on future payments, back to the year 2016.

[10] There are also numerous policy considerations that favor the payment of attorney's fees first: (1) the Donation, as a legal entity, no longer exists, having dissolved on its own terms in 2014; (2) the Donation has a history of internal litigation surrounding an uncertain leadership structure; and (3) the Trustee, the Mayor for the City of New Orleans, changes every four or eight years, leading to changing people, ideologies, parties, and priorities.

settlement. This is consistent with a discounting of the fees to present day value in the event of a scheduled pay-out to the Donation, over time.

This is in keeping with Louisiana law that provides for attorney's fees (and any resulting lien) be paid first out of any settlement.[11] LA. REV. STAT. § 9:5001 (A) ("A special privilege is hereby granted to attorneys at law for the amount of their professional fees on *all judgments* obtained by them . . . to take rank as a *first privilege thereon superior to all other privileges and security interests*[.]" (emphasis supplied)); LA. REV. STAT. § 37:218 (stating that when a case is settled, an attorney is afforded the same privilege they enjoy under La. R.S. 9:5001). *See also Bd. of Trustees v. All Taxpayers*, 361 So.2d 292 (La. App. 1st Cir. 1978) (determining that Louisiana law provides an attorney with both a "charging lien," the right to compensation for funds, and a "retaining lien," the right to retain possession of client's documents and money until payment is made by the client); *Pullen v. Ziegler*, 595 So.2d 1287 (La. App. 4th Cir. 1992) (holding that an attorney had privilege over other creditors on the proceeds of a tort judgment awarded to his client); *Irons v. U.S. Bank, Inc.*, 2007-0570 (La. App. 4th Cir. 8/14/07), 966 So.2d 646 (holding that an attorney's privilege for contingency fees in settlement funds it obtained for clients was superior to the mortgagee's interest as an additional loss payee under the insurance policies).

---

[11] Although the Trustee has not provided any alternate reading of the Contingency Fee Agreement that would provide for payment of the fee at the same time as payments are received by the Donation, he has suggested a preference for the Joint Venture to be paid over time.. While the Joint Venture is willing to work with the Trustee in this regard, we have never received a formal proposal.

**IV.     CONCLUSION**

Accordingly, the Joint Venture respectfully moves for an attorney fee award of $5,154,196.49, as follows:

| | |
|---|---|
| Total Settlement | $30,000,000.00 |
| Gross Present Value | $24,840,876.06 |
| | |
| 25% of $10,000,000.00 | $ 2,500,000.00 |
| 18% of $14,840,876.06 | $ 2,671,357.69 |
| | |
| Total Fee (JV and WWG) | $ 5,171,357.69 |
| Less Credit | -  $ 17,161.20 [12] |
| **Total** | **$ 5,154,196.49** |

The Joint Venture respectfully moves for the motion to be granted.

                        Respectfully submitted:

                        Stephen J. Herman (La. Bar #23129)
                        Soren E. Gisleson (La. Bar #26302)
                        HERMAN HERMAN & KATZ LLC
                        820 O'Keefe Avenue
                        New Orleans, Louisiana 70113
                        Telephone: (504) 581 4892
                        Fax No. (504) 569 6024
                        E Mail: sherman@hhkc.com
                        E-Mail: sgisleson@hhkc.com

                        Walter J. Leger, Jr. (La. Bar #827 8)
                        Christine Sevin Fayard (La. Bar # 32683)
                        LEGER & SHAW
                        935 Gravier Street, Suite 2150
                        New Orleans, LA 70112
                        Phone: (504) 588 9043
                        Fax: (504) 588 9980
                        Email: wleger@legershaw.com
                        Email: csevin@legershaw.com

---

[12]  The Joint Venture has elected, as a client courtesy, to deduct the fees paid to it directly by BP under the Access Agreement.

James Parkerson Roy (La. Bar #11511)
Bob Wright (La. Bar #1369 1)
DOMENGEAUX WRIGHT ROY & EDWARDS LLC
556 Jefferson Street, Suite 500
Lafayette, Louisiana 70501
Telephone: (337) 233 3033
Fax No. (337) 233 2796
E Mail: jimr@wrightroy.com

Calvin C. Fayard, Jr. (La. Bar #5486)
C. Caroline Fayard (La. Bar #30888)
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726
Office: (225) 664 4193
Telefax: (225) 664 6925
EMail: calvinfayard@fayardlaw.com


Fred Herman (La Bar #6811)
Thomas J. Barbera (La Bar# 18719)
LAW OFFICES OF FRED HERMAN
1010 Common St., Suite 3000
New Orleans, LA 70112
Phone: 504 581 7068
Fax: 504 581 7083
Email: fherman@fredhermanlaw.com
tbarbera@fredhermanlaw.com

*Attorneys for the Joint Venture*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing will be filed into the record, thereby effecting service through the Court's electronic filing system, and will further serve upon all counsel of record, including the City Attorney and counsel for members of the Advisory Committee, *via* email, this 17th day of February, 2017.

S/Soren E. Gisleson