# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  OIL SPILL by the OIL RIG | * | CIVIL ACTION |
| "DEEPWATER HORIZON" | * | |
| In the GULF OF MEXICO, on | * | MDL NUMBER: 2179 |
| APRIL 20, 2010 | * | |
| | * | SECTION  J |
| | * | |
| | * | |
| | * | Honorable CARL J. BARBIER |
| | * | |
| This document relates to: | * | |
| | * | |
| 10-CV-04573 | * | Magistrate Judge WILKINSON |
| | * | |
| | * | |
| | * | |
| | * | |
| *********************************** | * | |
| | * | |

## JOINT NOTICE OF APPEAL TO THE UNITED STATES COURT OF

## APPEAL FOR THE FIFTH CIRCUIT PURSUANT TO FRAP 3(b)(1) & 4

NOTICE IS HEREBY GIVEN that Plaintiffs, TOBATEX, INC. and M.R.M. ENERGY, INC. appeal to the United States Court of Appeal for the Fifth Circuit from the following judgment and orders of the District Court:

1. Final Judgment filed and entered on February 22, 2017, Document Number 22292. A true and correct copy of this Order is attached hereto as Exhibit "A."

2. Order entered on October 1, 2012, Document Number 7526, granting Defendants' Motion to Dismiss "BP Dealer Claims." A true and correct copy of this Order is attached hereto as Exhibit "B."

3. Order entered on March 29, 2016, Document Number 16050, dismissing the B1 Complaint which includes appellants' claims. A true and correct copy of this Order is attached hereto as Exhibit "C."

**RESPECTFULLY SUBMITTED BY:**

(s) Samuel T. Rees

Samuel T. Rees (LA Bar No. 30203)
26 Muirfield Place
New Orleans, Louisiana 70131
Telephone: (213) 220-9988
Fax: (323) 874-1234
STReesEsq@earthlink.net

AND

Thomas P. Bleau (CA Bar No. 152945)
Martin R. Fox (CA Bar No. 155783)
Bleau Fox
A Professional Law Corporation

3575 Cahuenga Boulevard West, Suite 580
Los Angeles, CA 90068
Telephone: (323) 874-8613
Fax: (323) 874-1234
tbleau@bleaufox.com
mfox@bleaufox.com

Attorneys for Plaintiffs and Appellants,
Tobatex, Inc. and M.R.M. Energy, Inc.

# Exhibit "A"

E-SERVICE
60246534
Feb 22 2017
05:22PM
File & ServeXpress


# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

In re:  OIL SPILL by the OIL RIG      *      CIVIL ACTION
     "DEEPWATER HORIZON"      *
     In the GULF OF MEXICO, on      *      MDL NUMBER: 2179
     APRIL 20, 2010      *
     *      SECTION  J
     *
     *
     *      Judge BARBIER
     *
This document relates to:      *
     *
10-CV-04573      *      Magistrate Judge WILKINSON
     *
     *
     *
     *
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*

## FINAL JUDGMENT

Considering Plaintiffs' Motion (Rec. Doc. 16649) and the Courts' Order of October 1, 2012 (Rec. Doc.  7526);

     IT IS HEREBY ORDERED AND ADJUDGED that Plaintiffs TOBATEX, INC. and M.R.M. ENERGY, INC. take nothing by their complaint and that all of their claims asserted in that Complaint or in any other complaint filed herein are hereby dismissed.

     New Orleans, Louisiana this 22nd day of February, 2017.

_____
United States District Judge

# Exhibit "B"



46742767

Oct 01 2012
05:00PM

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig | * | **MDL No. 2179** |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | **SECTION: J** |
| | * | |
| **Applies to:** | * | **JUDGE BARBIER** |
| *Pleading Bundle"B1"* | * | |
| | * | **MAGISTRATE JUDGE SHUSHAN** |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER & REASONS
### [As to the Motions to Dismiss the Pure Stigma, BP Dealer, and Recreation Claims]

Before the Court are certain Defendants'[1] motions to dismiss the "Pure Stigma Claims," "BP Dealer Claims," and "Recreation Claims."[2] Oral argument was held on September 14, 2012. Having considered counsel's arguments, the relevant record, and the applicable law, the Court finds the motions should be GRANTED as set forth below.

---

[1] Moving Defendants are BP Exploration & Production Inc., BP America Production Co., and BP p.l.c. (collectively, "BP"); Cameron International Corporation ("Cameron"); Halliburton Energy Services, Inc. ("Halliburton"); Transocean Offshore Deepwater Drilling, Inc. and Transocean Deepwater, Inc. (collectively, "Transocean"); and M-I L.L.C. ("M-I"). Halliburton, Transocean, and M-I filed joint briefing. BP and Cameron filed individual briefs.

[2] Motions respecting the "Pure Stigma Claims" appear at Rec. Docs. 6891 (Halliburton, et al.), 6895 (BP), and 6921 (Cameron). Opposition briefs appear at Rec. Docs. 7095 (Plaintiffs' Steering Committee) and 7099 (Gary Sellno, et al.). Reply briefs appear at Rec. Docs. 7193 (BP) and 7276 (Halliburton, et al.).

Motions respecting the "BP Dealer Claims" appear at Rec. Docs. 6892 (Halliburton, et al.), 6893 (BP), and 6922 (Cameron). Opposition briefs appear at Rec. Docs. 7096 (Plaintiffs' Steering Committee) and 7097 (Tobatex, Inc. and M.R.M. Energy, Inc.). Reply briefs appear at Rec. Docs. 7196 (BP), 7201 (Cameron), and 7274 (Halliburton, et al.).

Motions respecting the "Recreation Claims" appear at 6894 (BP), 6889 (Halliburton, et al.), and 6923 (Cameron). Opposition briefs appear at Rec. Docs. 7094 (Plaintiffs' Steering Committee) and 7099 (Gary Sellno, et al.). Reply briefs appear at Rec. Docs. 7195 (BP) and 7276 (Halliburton, et al.).

## I. PROCEDURAL AND FACTUAL BACKGROUND

This matter arises from the April 20, 2010 blowout, explosion, and fire aboard the DEEPWATER HORIZON semi-submersible drilling rig as it was engaged in oil exploration on the Outer Continental Shelf, and the subsequent discharge of millions of gallons of oil into the Gulf of Mexico. After cases were consolidated in a multidistrict litigation ("MDL") proceeding, the Court created various pleading bundles to manage the numerous and varied claims asserted. *See* Pretrial Order No. 11, Rec. Doc. 569. Relevant here is the "B1 Bundle," which concerns non-governmental claims for economic loss and property damage.

Pursuant to the Court's instruction, the Plaintiffs' Steering Committee ("PSC") filed a Master B1 Complaint, Rec. Doc. 879, and an Amended Master B1 Complaint, Rec. Doc. 1128 (collectively, "B1 Master Complaint"), which asserted claims under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701, *et seq.*, general maritime law, and state law. Many defendants moved to dismiss the B1 Master Complaint. On August 26, 2011, the Court issued an Order and Reasons granting in part an denying in part these motions ("B1 Order"). Rec. Doc. 3830, 808 F. Supp. 2d 943 (E.D. La. 2011). The B1 Order held, *inter alia*, that the DEEPWATER HORIZON was a vessel, the claims in the B1 Master Complaint fall within the Court's admiralty jurisdiction, and that general maritime law is not entirely displaced by OPA. *Id.* at 5-8, 18-27, 808 F. Supp. 2d at 950-51, 958–63. However, to the extent maritime law supplements OPA, traditional limitations such as the *Robins Dry Dock* rule (discussed below) remain in effect. *Id.* at 26, 808 F. Supp. 2d at 962. The B1 Order also held that state law was preempted by maritime law, notwithstanding OPA's state-law savings clause, 33 U.S.C. § 2718. *Id.* at 8-18, 808 F. Supp. 2d at 951-958; *see also* Order & Reasons of Nov. 14, 2011, Rec. Doc. 4578 at 6-17 & n.19, 2011 WL 5520295, at *3-8 & n.19 (finding penalties

asserted under state law are preempted by the CWA, notwithstanding OPA's savings clause).

On May 2, 2012, the Court preliminarily approved a proposed class-action settlement regarding many, but not all, claims by private parties for economic loss and property damage resulting from the oil spill. Rec. Doc. 6418. A final fairness hearing is scheduled for November 8, 2012. In the interim, the Court directed the parties to file motions addressing the viability of three types of claims outside the proposed settlement: the "Pure Stigma," "BP Dealer," and "Recreation Claims." Rec. Doc. 6657. BP, Cameron, Halliburton, Transocean, and M-I moved to dismiss these claims under Fed. R. Civ. P. 12(b)(6). The PSC filed oppositions to these motions. Additionally, the plaintiffs in member case 11-956, *Sellno v. BP Exploration & Production, Inc.* ("Sellno Plaintiffs"), filed an opposition to the motions targeting the Pure Stigma and Recreation Claims. The plaintiffs in member case 10-4573, *Tobatex, Inc. v. BP, p.l.c.* ("Tobatex"), filed an opposition to the motions targeting the BP Dealer Claims.

## II. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a claim for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To avoid dismissal, a complaint must plead enough facts to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is facially plausible when the factual allegations allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A court must accept all well-pleaded facts as true and must

draw all reasonable inferences in favor of the plaintiff.  *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232-33 (5th Cir. 2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).  The court is not, however, bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

## III.  PURE STIGMA CLAIMS

The Court's Order directing the parties to file the instant motions described the "Pure Stigma Claims" as "claims by or on behalf of owners, lessors, and lessees of real property that they have suffered damages resulting from the taint of their property caused by the oil spill, although no oil or other contaminant physically touched the property."  Rec. Doc. 6657 (emphasis added).  In light of the briefing submitted, the Court clarifies that "Pure Stigma Claims" means claims alleging a reduction in the value of real property caused by the oil spill or other contaminant even though (1) the property was not physically touched by oil and (2) the property was not sold.  Furthermore, "Pure Stigma Claims" do not include claims by a person who earns a living selling property, such as a real estate agent.  *See infra* note 6 and related text.

For illustrative purposes, the following Short-Form Joinders[3] reflect Pure Stigma Claims:

Mrs. Linda Hall ("Plaintiff") owns a condominium at the Phoenix VIII located . . . in Orange Beach, Alabama (residential).  Plaintiff has experienced a diminution on the value of her property because of the oil spill.  No known physical damage at this time.

Short-Form Joinder of Linda Hall, C.A. 10-8888, Rec. Docs. 245 (parentheticals appear in original).

My claim is for loss of value of my residence . . . in Orange Beach, Al.  No damage

---

[3] Short-Form Joinders permitted Plaintiffs/Claimants to file an answer and claim in Transocean's Limitation Action, C.A. 10-2771, and intervene in one or more of the Master Complaints without paying a filing fee.  *See* Pretrial Order No. 24, Rec. Doc. 982, Pretrial Order No. 25 ¶ 9, Rec. Doc. 983.  The Court established a special docket for Short-Form Joinders, C.A. 10-8888.

occurred to the property as a result of the spill. I had my property appraised in December 2005 @ $975,000. Another appraisal in December 2010 resulted in $470,000.

Short-Form Joinder of Philip Michael Reid, C.A. 10-8888, Rec. Doc. 34817.

With the exception of the Sellno Plaintiffs, the parties agree that under the Court's previous rulings the Pure Stigma Claims are not viable under general maritime law or state law. The PSC argues that the Pure Stigma Claims are recoverable under two of OPA's damages provisions, 33 U.S.C. § 2702(b)(2)(B) & (E). The Sellno Plaintiffs urge that, in addition to OPA, these claims are cognizable under general maritime law and Louisiana law.

The Court first considers the Sellno Plaintiffs' arguments regarding maritime law and Louisiana law. As mentioned above, the B1 Order held that maritime law applies to the claims in the B1 Master Complaint and state law is preempted. The B1 Order also held that OPA did not entirely displace general maritime law. However, a significant limitation under general maritime law is the *Robins Dry Dock* rule; i.e., maritime law bars unintentional tort claims for economic losses when they are unaccompanied by physical injury to the plaintiff's proprietary interest. *Louisiana ex re. Guste v. M/V Testbank*, 752 F.2d 1019, 1020 (5th Cir. 1985) (en banc). The Pure Stigma Claims concern property that was not physically touched by oil. Nevertheless, the Sellno Plaintiffs contend that their claims are not defeated by *Robins*, because they have alleged ***intentional*** tort claims.

The Sellno Plaintiffs correctly point out that the *Robins Dry Dock* rule, as stated in *Testbank*, is limited to unintentional torts; e.g., negligence. *See Testbank*, 752 F.2d at 1020 n.1. However, "[i]ntentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.'" *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998) (citing *Restatement (Second) of*

5

*Torts* § 8A, Comment a, p.15 (1964)).  Having reviewed the B1 Master Complaint and the Sellno Plaintiffs' complaint,[4] the Court finds that neither plausibly allege facts that would take the Pure Stigma Claims outside the *Robins Dry Dock* rule.  For example, although the Sellno Plaintiffs' repeatedly refer to Defendants' "intentional acts," they do not allege facts that would lead to the reasonable inference that the Defendants intended either the oil spill or the purported diminution in property value.  *See Iqbal*, 556 U.S. at 678 (2009) ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." (internal quotations omitted)).  Thus, the Sellno Plaintiffs' argument regarding intentional conduct is unavailing.

The Court also is not persuaded by the Sellno Plaintiffs' argument that the *Robins Dry Dock* rule was generally abrogated by a 1986 amendment to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), codified at 43 U.S.C. § 9607(h).  Neither the B1 Master Complaint nor the Sellno Plaintiffs' complaint assert a claim under CERCLA, and the Court is not persuaded that Congress intended to abrogate *Robins Dry Dock* outside the context of CERCLA.  Indeed, the Fifth Circuit has continued to apply the *Robins Dry Dock* rule in maritime cases after the 1986 amendment to CERCLA.  *See  Catalyst Old River Hydroelectric Ltd. v. Ingram Barge Co.*, 639 F.3d 207, 210-11 (5th Cir. 2011) (stating the *Robins Dry Dock* rule is "well settled

---

[4]  The Court refers to the B1 Master Complaint, because

[a]ny individual plaintiff who is a named plaintiff in a case that falls within Pleading Bundle B1 . . . is deemed to be a plaintiff in the applicable Master Complaint(s).

For the procedural and administrative purpose of answering or otherwise responding to the complaints in Pleading Bundles B1, B3 and D1, (and subject to the provisions of Paragraph 8), as to any Defendant named in one or more Master Complaint(s), the allegations, claims, theories of recovery and/or prayers for relief contained within the pre-existing petition or complaint are deemed to be amended, restated, and superseded by the allegations, claims, theories of recovery, and/or prayers for relief in the respective Master Complaint(s) in which the Defendant is named that apply to the pre-existing petition or complaint.

Pretrial Order No. 25¶¶ 5-6, Rec. Doc. 983.

under general maritime law," but finding that the facts of that case qualified as damage to proprietary interest); *Matheisen v. M/V Obelix*, 817 F.2d 345, 346-47 (5th Cir. 1987); *see also In re Exxon Valdez*, 270 F.3d 1215, 1253 (9th Cir. 2001) (holding that summary judgment was properly granted against plaintiffs that claimed stigma damages following an oil spill: "Even without *Robins Dry Dock*, these groups' damages were too remote").

Accordingly, to the extent Pure Stigma Claims are asserted under general maritime law, those claims are dismissed.

In an alternative argument, the Sellno Plaintiffs contend that the Pure Stigma Claims are viable under Louisiana law, because (1) the Admiralty Extension Act ("AEA")[5] does not extend admiralty jurisdiction to cases that do not concern physical damage to property; (2) the claims do not satisfy the four-part "maritime relationship" test established in *Kelly v. Smith*, 485 F.2d 520, 525 (5th Cir. 1973); and (3) OPA preserves state law claims. The Court is not persuaded. The Sellno Plaintiffs' argument respecting the AEA is foreclosed by cases such as *Testbank*, where, in a case involving a collision and chemical spill on navigable waters, the Fifth Circuit relied upon the AEA to hold that admiralty/*Robins Dry Dock* applied to claims for economic losses by onshore plaintiffs such as seafood restaurants and bait shops, even though those plaintiffs did not suffer physical damage to property. 752 F.2d at 1020-21, 1031-32. As to the Sellno Plaintiffs' second argument, the Supreme Court rejected *Kelly*'s four-factor test when it decided *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 544-48 (1995); *see also Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1118 (5th Cir. 1995) (en banc) (recognizing *Grubart* abrogated the *Kelly* test). As

---

[5] "The admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land." 46 U.S.C. § 30101(a).

7

discussed more fully in Part IV below, this Court applied *Grubart*'s test for admiralty tort jurisdiction when it found in the B1 Order that admiralty jurisdiction was present.  As to the Sellno Plaintiffs' third argument,  while the Court has recognized that OPA contains a savings clause, 33 U.S.C. § 2718, the Court also has rejected the contention that this clause prevents other federal laws from preempting state law.

Accordingly, to the extent Pure Stigma Claims are asserted under state law, including Louisiana law, those claims are dismissed.

The Court turns to whether the Pure Stigma Claims are viable under OPA.  Section 2702(a) contains OPA's general liability provision:

> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged . . . into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

33 U.S.C. § 2702(a).  Section 2702(b)(2) then enumerates six categories of damage, Subsections (A) through (F).  Plaintiffs urge that the Pure Stigma Claims are cognizable under two categories, Subsection (B) and Subsection (E).

The Court considers Subsection (E) first.  It states:

> (E) Profits and earning capacity
> Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant.

*Id.* § 2702(b)(2)(E).  This Court previously recognized that Congress intended OPA to allow a broader class of claimants to recover economic losses than allowed under general maritime law.  B1 Order p. 21, Rec. Doc. 3830, 808 F. Supp. 2d at 959.  Consistent with this intention, Subsection (E) does not require the plaintiff to be the owner of the property or natural resources injured, destroyed,

8

or lost in order to recover under that Section.  Thus, the *Robins Dry Dock* rule does not apply to a claim pursued under Subsection (E) of OPA.

Nevertheless, OPA is not without limits.  Notably, Subsection (E) only allows recovery for "loss of profits" or "impairment of earning capacity."  As explained above, the Pure Stigma Claims concern property that was not sold; they are claims for ***unrealized*** diminution of real property value.  Such claims concern neither a "loss of profits" nor "impairment of earning capacity."  Before real property is sold, there can be no "profits" to be lost.  Likewise, unrealized diminution of property value usually is not an "impairment earning capacity."[6]  Furthermore, until property is sold and a loss realized, damages are speculative—it is possible that the value of real property eventually may meet or exceed its pre-spill amount.  For these reasons, the Pure Stigma Claims are not viable under Subsection (E).[7]  Given this conclusion, the Court does not consider BP's alternative argument that the Pure Stigma Claims were not "due to" the injury, destruction, or loss of property or natural resources.

---

[6]  A possible exception might be a person who earns a living selling property.  As noted above, however, such a claim is outside the definition of "Pure Stigma Claim" and beyond the scope of this Order.

[7]  This reading  is consistent with the Coast Guard's regulations interpreting Subsection (E), which it does for purposes of administering the Oil Spill Liability Trust Fund.  Under the heading "Profits and Earning Capacity," compensation "is limited to the actual net reduction or loss of earnings or profits suffered."  *See* 33 C.F.R § 136.235.  To prove such a claim, the claimant must show, *inter alia*,

> (b) That the claimant's ***income*** was reduced as a consequence of injury to, destruction of, or loss of the property or natural resources, and the amount of that reduction.
> (c) The amount of the claimant's ***profits or earnings*** in comparable periods and during the period when the claimed loss or impairment was suffered, as established by income tax returns, financial statements, and similar documents.  In addition, comparative figures for profits or earnings for the same or similar activities outside of the area affected by the incident also must be established.
> (d) Whether alternative employment or business was available and undertaken and, if so, the amount of ***income*** received.  All ***income*** that a claimant received as a result of the incident must be clearly indicated and any saved overhead and other normal expenses not incurred as a result of the incident must be established.

*Id.* § 136.233 (emphasis added).

9

Turning to Subsection (B), that provision states:

> (B) Real or personal property
> Damages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property.

*Id.* § 2702(b)(2)(B).  In order to be viable under Subsection (B), a claim must concern "injury to" or "destruction of" one's property.  Pure Stigma Claims do not involve cases where oil contacted property; thus, they do not involve "destruction of" property.   Nor do these claims involve "injury to" property, because Subsection (B) is interpreted as requiring ***physical*** injury to the property.  *Sekco Energy, Inc. v. M/V Margaret Chouest*, 820 F. Supp. 1008, 1015 (E.D. La. 1993).

*Sekco* concerned an offshore drilling platform that was temporarily "shut in" by the now-defunct Minerals Management Service following reports of an unidentified sheen on the water near the platform.  The platform owner claimed that the source of the sheen was a seismic cable towed from a defendant's vessel that snagged on one of the platform's legs and consequently discharged a type of mineral oil.   The court specifically noted that the platform did not sustain "any compensable physical damage" from this incident.  *Id.* at 1010.  The court dismissed the platform owner's claim under Subsection (B), explaining:

> While plaintiff alleges a loss of personal property, i.e. revenue, plaintiff has not alleged ***injury*** to personal or real property.  The Court reads "injury" to mean physical injury; "injury" does not encompass economic loss because where Congress intended recovery for "loss," it specifically used that word.  For example, subsection (B) also allows recovery for "economic losses" resulting from the destruction of real or personal property.  While plaintiff claims a loss of revenue, that loss did not result from the destruction of any real or personal property.  Consequently, subsection (B) provides no relief for plaintiff.

*Id.* at 1015 (emphasis in original).[8]

Because the Pure Stigma Claims concern property that was not physically injured or destroyed, the Pure Stigma Claims are not viable under Subsection (B).

In addition to these reasons, the Court also notes that Cameron, Halliburton, and M-I are not liable to the plaintiffs/claimants under OPA, because they are not "responsible parties." *See* 33 U.S.C. §§ 2702(a), 2701(32). The PSC concedes this point and the Sellno Plaintiffs do not address it. As to Transocean, this Court previously held in the context of member case 10-4563, *United States v. BP Exploration & Production LP*, that it is not a responsible party under OPA with respect to the *sub*surface discharge of oil, as distinguished from a discharge that occurred at the water's surface. *See* Order & Reasons of Feb. 22, 2012, Rec. Doc. 5809 at 14-15, 844 F. Supp. 2d 746, 755-56. Consistent with this holding, Transocean argues that it cannot be liable under OPA with respect to any subsurface discharge, a point the PSC and Sellno Plaintiffs also concede. The Court has not

---

[8] The Coast Guard's regulations similarly reflect that Subsection (B) requires "physical injury." The regulations require the following proof to establish a claim for "injury to property":

    (1) An ownership or leasehold interest in the property;
    (2) That the property was injured or destroyed;
    (3) **The cost of repair or replacement**; and
    (4) The value of the property both before and after injury occurred.

33 C.F.R. § 136.215(a) (emphasis added). "Cost of repair or replacement" only makes sense in the context of physical injury. Likewise, compensation for injury to property is the lesser of:

    (1) Actual or estimated net cost of repairs necessary to restore the property to substantially the same condition which existed immediately before the damage;
    (2) The difference between value of the property before and after the damage; or
    (3) The replacement value.
    . . . .

*Id.* § 136.217(a). Perhaps if one were to read (2) in isolation, it might lead to the interpretation that a nonphysical injury to property is compensable under this regulation, and by extension, Subsection (B). When (1), and (3) are read with (2), however, it becomes clear that the regulation is aimed compensating physical injury to property. Diminution in property value is one of three ways to measure damages, but does not, standing alone, state a legally cognizable claim for injury to property.

11

addressed whether Transocean is liable under OPA for a surface discharge, assuming such a discharge occurred, but need not reach this issue in light of the conclusions above regarding Subsections (B) and (E).

In conclusion, the Court holds that the Pure Stigma Claims do not state a claim for which relief may be granted. Accordingly, the motions to dismiss (Rec. Docs. 6891, 6895, 6921) are **GRANTED** only insofar as they seek to dismiss "Pure Stigma Claims," as defined above. This order does not affect claims relating to property that was sold or property that was oiled, or any other claims that are outside the scope of "Pure Stigma Claims;" the Court expresses no opinion on the validity *vel non* of non-Pure Stigma Claims. While it is clear that Pure Stigma Claims are asserted in this MDL, at this time the Court will not delve into the Short-Form Joinders, the Sellno Plaintiffs' complaint, or any other complaints to specifically determine the Pure Stigma Claims that should be dismissed in accordance with this Order.

## IV. BP DEALER CLAIMS

The Order directing the parties to file the instant motions described the "BP Dealer Claims" as "claims by or on behalf of entities marketing BP-branded fuels that they have suffered damages, including loss of business, income, and profits, as a result of the loss of value to the 'BP' brand or name." Rec. Doc. 6657. After considering the parties' briefs, the Court narrows the definition of "BP Dealer Claims" to mean only those plaintiffs whose claims for economic loss are based ***solely*** on consumers' decisions not to purchase fuel or goods from BP fuel stations and convenience stores following the explosion and oil spill; i.e., claims solely based on consumer animosity toward BP. For clarity, a BP Dealer Claim is distinguished from, for example, a hypothetical claim by a BP franchisee whose gas station is located near the Gulf Coast (or located along a highway frequently

traveled by tourist heading to the Gulf Coast) alleging lost profits for reasons other than or in addition to consumer animosity toward BP, such as an area-wide decline in tourism. Again, the "BP Dealer Claims" concern only those plaintiffs/claimants whose claims are based *solely* on consumer animosity toward BP and the BP brand.

The Short-Form Joinder of Chmaysam Maher/East Main Getty is illustrative of a BP Dealer Claim:

> In 2009 BP converted nearly 250 Getty fuel stations in the New England area to the BP brand. All remaining Getty fuel stations remained Getty branded, however, each station purchased its fuel from BP. The oil spill in the Gulf of Mexico received world-wide attention. As a protest against BP and all things associated with BP thousands of drivers chose not to fill their vehicles at BP or BP associated fuel/service stations. As a result, my business [East Main Getty in Webster, Mass.] saw a dramatic decline in profits from which it has yet to recover.

C.A. 10-8888, Rec. Doc. 83422.

It is not disputed that under this Court's rulings the BP Dealer Claims are not viable under general maritime law. With the exception of Tobatex, the parties similarly agree that the BP Dealer Claims are not viable under state law. The PSC contends that the BP Dealer Claims are recoverable under Subsection (B) of OPA (quoted above). Tobatex contends that the BP Dealer Claims exist under state law, as well as under OPA.[9]

The Court first considers the arguments respecting OPA. The PSC appears to assert that the "injured property" for purposes of Subsection (B) is the "BP brand" leased by the BP Dealers. However, as explained in the context the Pure Stigma Claims, a claim under Subsection (B) requires a physical injury to the property leased or owned by the Plaintiff; e.g., a boat or real estate that is oiled. Because the "BP brand" is intangible property, it is not susceptible to physical injury.

---

[9] Although Tobatex did not plead claims under OPA, by operation of Pretrial Order 25, its complaint was amended to include assert that claim. Further, Tobatex explicitly adopts the OPA claims in the B1 Master Complaint.

Therefore, the BP Dealer Claims are not compensable under Subsection (B).

Although the PSC does not urge that the BP Dealer Claims are viable under Subsection (E),[10] the Court takes note of Professor David Robertson's article, cited by BP, which concluded that BP Dealer Claims likely would not be viable under Subsection (E).[11]  Although Tobatex adopted the PSC's brief insofar as it argued that the BP Dealer Claims were viable under OPA, Tobatex also states that its claims are viable under Subsection (E).  However, it appears that Tobatex refers to claims based on a decline in tourism, which are not "BP Dealer Claims."  *See* Tobatex Opp'n pp. 6-8, Rec. Doc. 7097 at 9-11.  In any respect, to the extent Tobatex argues that BP Dealer Claims—those claims based solely on consumer animosity toward BP and the BP brand—are viable under Subsection (E), the Court disagrees for reasons stated in Professor Robertson's article.

For these reasons, the BP Dealer Claims are not viable under OPA.  The Court also notes that the additional reasons for dismissing the Pure Stigma Claims brought under OPA and against Cameron, Halliburton, M-I, and Transocean apply equally here.

The Court turns to Tobatex's argument that its BP Dealer Claims are viable under state law. Tobatex does not dispute that its BP Dealer Claims would be precluded by the *Robins Dry Dock* rule; rather, it asserts that *Robins* does not apply to its claims because they arise under state common

---

[10]  The PSC does assert that BP dealers whose losses result from a decline in tourism may recover such losses under Subsection (E) of OPA.  As explained above, however, such claims are not "BP Dealer Claims."  Thus, the Court does not address this argument.

[11]  David W. Robertson, *The Oil Pollution Act's Provisions on Damages for Economic Loss*, 30 Miss. C. L. Rev. 157, 172-173 (2011) ("G owns a gas station in Boise, Idaho that sells Oil Co.-brand gasoline. Although G owns and operates the station as an independent franchise, his station becomes the target of a boycott by a local environmental group demanding greater corporate accountability. G claims lost income resulting from the boycott. . . . It seems unlikely that the existence of 'injury, destruction, or loss' of resources or property played any causal role in producing these damages. . . . [T]he boycott ... would probably have occurred as a result of the reputational effects of the spill, regardless of whether the spill had actually produced any 'injury, destruction, or loss' of anything physical").

14

law.[12] Tobatex points out that, unlike the B1 Master Complaint and the Sellno Plaintiffs' complaint, its complaint does not invoke admiralty jurisdiction.  Instead, Tobatex invokes diversity jurisdiction, 28 U.S.C. § 1332(a), and jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).

Although Tobatex's jurisdictional election might affect what remedies are available to it, its election does not necessarily determine the substantive law that will govern its claims.  If a claim falls within admiralty jurisdiction, then the substantive law of admiralty applies.  *See Grubart*, 513 U.S. at 545.  This is so even when an *in personam* claim is brought "on the law side" of the federal court, as opposed to a claim explicitly brought "in admiralty"—a concept sometimes referred to as the "Reverse-*Erie*" doctrine.  *See* 1 Robert Force & Martin J. Norris, *The Law of Seamen* §§ 1:9, 1:10 (5th ed. 2003) (citing *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207 (1986)); *see also Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 360 (1962).  Although state law may not be entirely irrelevant to admiralty—for instance, a court may look to state law to fill a substantive gap in an incomplete maritime system—state law cannot, for example, "'be employed to prejudice the characteristic features of the maritime law or to disrupt the harmony it strives to bring to international and interstate relations.'"  *See* 1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 4-3 (5th ed. 2011) (quoting *Exxon Corp. v. Chick Kam Choo*, 817 F.2d 307, 317-18 (5th Cir. 1987)*, rev'd on other grounds* 486 U.S. 140); *see also* B1 Order pp. 11-13, Rec. Doc. 3830, 808 F. Supp. 2d at 953-55.  In this respect, the preemption analysis is different from the more-familiar analysis that occurs outside of admiralty (i.e., express preemption, implied conflict preemption, etc.), although those concepts can apply in admiralty as well.  *See* Schoenbaum, *supra*.

---

[12] Tobatex does not identify what State's law it purports to bring its claims under, or whether such law would recognize its claims.  The Court will assume, however, that Tobatex's claims are asserted under a state law that would permit recovery for its BP Dealer Claims.

As explained above in the context of the Pure Stigma Claims, the *Robins Dry Dock* rule is a substantive rule of admiralty that bars unintentional tort claims for economic loss when they are unaccompanied by physical injury to a proprietary interest. Furthermore, when maritime law applies, state law may not be used to circumvent the *Robins Dry Dock* rule. *See Testbank*, 752 F.2d at 1031-32 (refusing to allow state law theories to avoid the *Robins Dry Dock*, because it is one of the "uniform rules of conduct" that advance the "federal interest in protecting maritime commerce" and provides "a workable and useful tool in our maritime jurisprudence"). Consequently, the question becomes whether Tobatex's claims fall within admiralty jurisdiction.

The Supreme Court in *Grubart* stated that the test for admiralty tort jurisdiction contains both locus and nexus components:

> A court applying the location [locus] test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. The connection [nexus] test raises two issues. A court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

*Grubart*, 513 U.S. at 534 (citations and quotations omitted). When this Court determined in the B1 Order that the allegations of the B1 Master Complaint—which include BP Dealer Claims—met *Grubart*'s test for admiralty jurisdiction, it stated:

> The location test, which is satisfied when the tort occurs on navigable water, is readily satisfied here. The B1 Master Complaint alleges that the blowout, explosions, fire, and subsequent discharge of oil, occurred on or from the DEEPWATER HORIZON and its appurtenances, which was operating on waters overlying the Outer Continental Shelf; i.e., navigable waters. The connection test is also met. First, there is no question that the explosion and resulting spill caused a disruption of maritime commerce, which exceeds the "potentially disruptive" threshold established in *Grubart*. Second, the operations of the DEEPWATER HORIZON bore a substantial relationship to traditional maritime activity. *See Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538–39 (5th Cir.1986) ("oil and gas

drilling on navigable waters aboard a vessel is recognized to be maritime commerce"). Further, injuries incurred on land (or in the seabed) are cognizable in admiralty under the Admiralty Extension Act, 46 U.S.C. § 30101.

B1 Order p. 8, Rec. Doc. 3830, 808 F. Supp. 2d at 951.

Tobatex attempts to escape this holding by arguing that its claims are different from those asserted in the B1 Master Complaint. Specifically, Tobatex states that because the wrongful conduct and Tobatex's resulting injury occurred on land, *Grubart*'s locus test is not met. Per Tobatex's brief:

> [Tobatex's] claim is based upon actions taken in the corporate offices of defendants both before and after the oil spill which had the effect of injuring the BP Dealers' franchise operations on dry land and [is] entirely unrelated to traditional maritime activities or commerce.
>
> . . .
>
> [M]any years ago BP adopted a corporate strategy of taking imprudent risks, violating statutes and regulations and failing to follow customary industry practices on land and at sea in order to maximize short term profits. This strategy has resulted in a number of incidents many of which occurred on dry land. The Deepwater Horizon incident is but the latest and clearly the largest incident to have resulted from this corporate strategy.
>
> . . .
>
> BP's response to the incident was to make on dry land the corporate decision to minimize the nature of the spill. BP made numerous public press releases estimating the magnitude of the spill which were constantly found to be false and readjusted. . . . Reports issued that BP was not serious in stopping the spill, instead attempting efforts which would preserve the well for later economic value. . . .
>
> Thus, it was the corporate decisions of BP, aided by the finger pointing of the other defendants, which caused injury to the BP brand and logo on which [Tobatex] relied.

Tobatex Opp'n pp. 10-11, 13-14, Rec. Doc. 7097 at 13-14, 16-17. Furthermore, Tobatex argues that the required maritime nexus is not present, because its claims

> involve the franchising and branding of service stations. This is not a maritime activity, traditional or otherwise. Service stations are almost entirely located on dry land. The franchise relationship is contractually based and is governed not only by the federal PMPA [Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801,-2806]

17

but also by laws in almost every state. Any impact on maritime commerce by service
station franchising is negligible.

*Id.* at 17, Rec. Doc. 7097 at 20.

Tobatex's argument respecting the locus test is belied by its complaint, which asserts that
a proximate cause of Tobatex's injury was the negligent operation of the DEEPWATER
HORIZON—which this Court has found to be a vessel—as it was drilling for oil offshore and the
resultant explosion, fire, and discharge of oil:

> Plaintiffs bring this action on behalf of themselves and all others similarly situated,
> . . . who have sustained any legally cognizable loss and/or damages ***as a result of the
> April 20, 2010 fire and explosion which occurred aboard the Deepwater Horizon
> drilling rig, the oil spill resulting therefrom***, and the conduct of Defendants, and
> each of them, related thereto." [Tobatex Compl. ¶ 14, C.A. 10-4573 (emphasis
> added)]
> . . .
> [The Transocean entities]. . . are on information and belief the owners and/or
> operators if the Deepwater Horizon semi-submersible oil drilling rig, which was
> performing drilling completion in Mississippi Canyon Block 252 (MC252) in the
> Gulf of Mexico on April 20, 2010 (hereinafter the "Site"). [*Id.* ¶ 21]
>
> On information and belief, Transocean was performing drilling operations at the Site
> for and on leases granted by the Minerals Management Service to Defendants BP .
> . . . . Transocean knew or should have known that its ***improper conduct at the Site
> would cause injury to the BP name and logo*** and to all persons and entities selling
> motor fuel and consumer products and services under that name and logo. [*Id.* ¶ 22
> (emphasis added)]
> . . .
> BP is the holder of a lease granted by the Minerals Management Service, which
> allows BP to drill for oil and perform oil-production-related operations at the Site of
> the oil spill, and on April 20, 2010, operated the oil well that is the source of the oil
> spill. [*Id.* ¶ 24]
> . . .
> ***The fire and explosion on the Deepwater Horizon, its sinking and the resulting oil
> spill and adverse public reaction throughout the United States were caused by the
> negligence of Defendants***, which renders them liable jointly, severally and in-solido
> to Plaintiffs and the Class Members for all their damages. [*Id.* ¶ 32 (emphasis
> added)]
> . . .
> ***Defendants, and each of them, were negligent***, grossly negligent, and/or acted with

18

> willful, wanton, and careless disregard for the rights of Plaintiffs and the Class **with regard to the operation of the Deepwater Horizon**. [*Id.* ¶ 41 (emphasis added)]

> As a direct and proximate result of the conduct, actions, inactions, and behavior of Defendants, and each of them, as more fully set forth in the preceding paragraphs, Plaintiffs and the Class have suffered or will suffer . . . loss of profits and goodwill or impairment of earning capacity due to the injury and destruction of the BP name and logo . . . . [*Id.* ¶ 45]

> . . . [T]he oil spill and the contamination therefrom have caused and will continue to cause a direct and proximate loss of revenue and/or loss of earning capacity to Plaintiffs and other members of the proposed class, including, but not limited to, the fact that Plaintiffs and the class members have lost, are losing, and will likely continue to lose customers due to animosity towards the BP name and logo. [*Id.* ¶ 48]

These allegations reflect that Tobatex's injury "suffered on land was caused by a vessel on navigable water." *Grubart*, 513 U.S. at 534. Furthermore, even if BP and other defendants made decisions on land, those decisions do not extract Tobatex's claims from admiralty. *See Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1042 n.16 (5th Cir. 1983) ("'[T]he fact that the decision to dispatch the crew boat was made on fixed ground hardly detracts from the maritime vessel-centered character of the negligence.'" (quoting *Offshore Logistics Servs., Inc. v. Mut. Marine Office, Inc.*, 462 F. Supp. 485, 490 (E.D. La. 1978))); *see also Matthews v. Grace Offshore Co.*, No. 93-3040, 1993 WL 241559, at *1-2, (5th Cir. June 18, 1993) (unpublished per curiam opinion) (same); *Randall v. Chevron U.S.A. Inc.*, No. 89-4346, 1990 WL 109289, at *3 (E.D. La. July 26, 1990) (rejecting the argument that land-based decisions to evacuate an offshore platform do not give rise to claims under maritime law). In a similar vein, *Grubart* explained that the presence of a land-based tortfeasor will not frustrate admiralty jurisdiction. *See* 513 U.S. at 545. For these reasons, the Court holds, as it did in the B1 Order, that the locus test is satisfied for Tobatex's claims.

With respect to maritime nexus, Tobatex's focus is misplaced and too narrow. With respect to the first part of the nexus test—where the Court must assess the general features of the type of

incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce—the Court agrees with Tobatex that "service station franchising" likely has a negligible impact on maritime commerce. However, service station franchising is not the relevant "incident." At best, this is an activity that was affected by the incident. Instead, the general features of the type of incident involved are an explosion aboard a vessel and the subsequent discharge of oil, which exceeds the threshold of "potentially disruptive of maritime commerce." Thus, the first part of the nexus test is met.

As to the second part of the nexus test—determining whether the general character of the activity *giving rise* to the incident shows a substantial relationship to traditional maritime activity—contrary to Tobatex's arguments, "franchising and branding of service stations" did not give rise to the incident, the explosion and discharge. Instead, the general character of the activity giving rise to the incident is oil and gas drilling from a vessel on navigable waters, and this shows a substantial relationship to traditional maritime activity.[13] Thus, the second part of the nexus test

---

[13] In addition to the case cited in the B1 Order to support the "substantial relationship" prong of the nexus test, *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538–39 (5th Cir.1986), the Court further notes *Coats v. Penrod Drilling Corp.*, which held that an injury to a worker while repairing and maintaining a jack-up rig in navigable waters satisfied *Grubart's* locus and nexus tests as well. With respect to the "substantial relationship" prong, *Coats* explained:

> [T]he repair and maintenance of a jack-up drilling rig on navigable waters is certainly a traditional maritime activity. Moreover, we note that this tort occurred aboard a vessel on navigable waters. Providing compensation for shipboard injuries is a traditional function of the admiralty laws. *See Sisson* [*v. Ruby*], 497 U.S. [358,] 368-75, 110 S. Ct. at 2898-2902 (Scalia, J., concurring) (arguing that all vessel-related torts fall within the admiralty jurisdiction). Thus, the activity giving rise to Coats' accident has a sufficient connection to traditional maritime activity to support exercise of our admiralty tort jurisdiction.

61 F.3d 1113, 1119 (5th Cir. 1995) (en banc); *see also Strong v. B.P. Exploration & Prod., Inc.* 440 F.3d 665, 669-670 (5th Cir. 2006) (holding maritime law applies to an injury occurring on a lift boat, despite being jacked up and not "under sail"). Furthermore, *Grubart* explained that the current test reflects the customary practice of finding admiralty jurisdiction present when the tort originates with a vessel on navigable waters, as occurred in this case; departure from the locality principle is to be treated as an exception to the norm. 513 U.S. at 547; *see also* Force, *supra* § 1:17, at 1-37 ("Ultimately, the locus test may once again become the sole criterion in tort cases involving vessels). This concept is arguably reflected in the quote from *Coates* above. *See also Conner v. Alfa Laval, Inc.*, 799 F. Supp. 2d 455, 467 n.13 (E.D. Pa. 2011) ("as *Sisson* and *Grubart* make clear, vessels need not be directly involved in maritime commerce at all (continued...)

is met.

In a footnote to its brief Tobatex requests that it be allowed to amend its complaint "to more accurately set forth [its] claims." Tobatex Opp'n p.10 n.6, Rec. Doc. 7097 at 13 n.6. Tobatex did not provide a proposed amended complaint, but states that its brief "will discuss the facts which such an amended complaint would allege." *Id.* Even if the Court were to grant this request, the result would not change.

Assuming Tobatex would merely add allegations focusing on the decisions BP made on land, such allegations would not remove the maritime flavor of this case. Where Tobatex's damages are caused by both maritime and non-maritime activity, the Court "need to look only to whether one of the arguably proximate causes of the incident originated in the maritime activity of a tortfeasor." *Grubart*, 513 U.S. at 541; *see also Helaire, supra.* Even if Tobatex's amended complaint deleted the existing allegations that referenced offshore events, such as those quoted above, there would still remain the similar allegations in the B1 Master Complaint, which Tobatex readily adopts in order to assert claims under OPA. Finally, assuming Tobatex deleted all references to the DEEPWATER HORIZON, the explosion, the oil spill, and any other sort of offshore or maritime activity, and abandoned its incorporation of the B1 Master Complaint, and further assuming Tobatex could do so and still manage to state a plausible claim to relief; the Court would not blind itself to facts that are generally known within its territorial jurisdiction or that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201; *see also Iqbal*, 556 U.S. at 679 (permitting a court to draw on its judicial experience and common sense

---

[13](...continued)
for maritime jurisdiction to apply so long as the incident at issue has a potentially disruptive impact on maritime commerce.").

in the context of a Rule 12 motion to dismiss). Notably, however, even Tobatex's carefully-worded brief cannot escape all references to the DEEPWATER HORIZON, the explosion, and the oil spill.[14] Accordingly, Tobatex's request to amend its complaint is **DENIED**.[15]

The Court finds that Tobatex's claims give rise to admiralty jurisdiction. Consequently, maritime law applies, state law is excluded, and the BP Dealer Claims are barred by the *Robins Dry Dock* Rule.

In conclusion, the Court finds that the BP Dealer Claims do not state a claim for which relief may be granted. Accordingly, the motions to dismiss (Rec. Docs. 6892, 6893, 6922) are **GRANTED** only insofar as they seek to dismiss the "BP Dealer Claims," as defined above. The Court expresses no opinion as to a claim for economic loss based upon a decline in tourism, a claim based on both a decline in tourism and consumer animosity, or any other claim outside the scope of "BP Dealer Claims." While it is clear that BP Dealer Claims are asserted in this MDL, at this time the Court will not delve into the Short-Form Joinders or any other complaints in an attempt to specifically determine what claims are BP Dealer Claims. Specifically with respect to Tobatex, it may be that its claimed losses are not based solely on consumer animosity; thus, dismissal is not appropriate at this time.

---

[14] "While there may have been a small amount of tortious conduct occurring on the 'vessel' . . . ." Tobatex Opp'n p.16, Rec. Doc. 7097 at 19. "However, had appropriate safeguards been taken, the Deepwater Horizon incident would have rapidly faded from public view and little damage to the brand would have occurred." *Id.* at 13, Rec. Doc. 7097 at 16. "[M]any years ago BP adopted a corporate strategy of taking imprudent risks, violating statutes and regulations and failing to follow customary industry practices on land and *at sea* in order to maximize short term profits." *Id.* at 13, Rec. Doc. 7097 at 16 (emphasis added).

[15] Tobatex similarly requested that its claims be severed from the MDL and the stay lifted. *See* Tobatex Opp'n p.20, Rec. Doc. 7097 at 23. These requests are also **DENIED**.

## V.  RECREATION CLAIMS

The Order directing the parties to file the instant motions described the "Recreation Claims" as "claims by or on behalf of recreational fishermen, recreational divers, beachgoers, recreational boaters, etc., that they have suffered damages that include loss of enjoyment of life from the inability to use portions of the Gulf of Mexico for recreation and amusement purposes."  Rec. Doc. 6657. The B1 Master Complaint provides an example of a Recreation Claim when it alleged:

> As a direct and proximate result of the Petitioners' negligence, the Recreation Claimants have suffered damages including, *inter alia*, loss of deposits for vacation rentals, loss of enjoyment of life from the inability to use the Gulf of Mexico for recreation and amusement purposes.

Rec. Doc. 1128 ¶ 158.  The Short-Form Joinder of Emily Wisniewksi similarly states:

> Emily Wisniewksi owns a 2009 19 foot Tahoe QSI recreational boat stored . . . in Fort Morgan, Alabama . . . . Due to the presence of oil in the Gulf of Mexico and Mobile Bay, boat traffic was restricted and waters were closed. Ms. Wisniewski was denied use of her boat for seven weeks (June 7, 2010 to July 26, 2010) due to the oil spill.  During this period, she paid for the upkeep and maintenance of the boat.

C.A. 10-8888, Rec. Doc. 49862.

BP interprets the B1 Master Complaint as advancing two types of Recreational Claims: (1) "Loss of Enjoyment" claims, which allege a loss of enjoyment from the plaintiffs' inability to engage in preferred recreational activities (e.g., fishing, diving, boating, or beachgoing), and (2) "Loss of Deposit" claims, which allege that plaintiffs wasted money spent in preparation for such recreational activities.  BP asserts that neither are recoverable here.

As occurred with the Pure Stigma Claims, all parties, save the Sellno Plaintiffs, agree that the Recreation Claims are not viable under general maritime law or state law given the Court's previous rulings.  The PSC argues only that the "Loss of Deposit" type of Recreation Claims are viable under OPA, apparently conceding that the "Loss of Enjoyment" Recreation Claims are not

23

recoverable under any theory.  The Sellno Plaintiffs contend that the Recreation Claims are viable under general maritime law.

With respect to OPA and the "Loss of Enjoyment" Recreation Claims, although no party appears to urge that these claims are compensable under OPA, the Court notes that these are not claims for "loss of profits" or "impairment of earning capacity," and, thus, would not be recoverable under Subsection (E).  *See supra* note 7 and accompanying text.  The "Loss of Enjoyment" claims that do not arise from a physical injury or destruction to property owned or leased by the plaintiff also are not recoverable under Subsection (B).  *See supra* note 8 and accompanying text.  To the extent a "Loss of Enjoyment" claim actually involved physical injury or destruction to one's property (e.g., where a pleasure boat was oiled), Subsection (B) does not compensate this type of emotional, non-pecuniary damage.  *Accord* 33 C.F.R. § 136.217.

As to the "Loss of Deposit" Recreation Claims, those claims are not available under Subsection (E) for the reasons just stated.  "Loss of Deposit" claims are also not available under Subsection (B), because they do not involve "injury to" or "destruction of" real or personal property owned or leased by the Recreation Claimants as contemplated by Subsection (B).  Although a monetary payment may qualify as "property" in some legal contexts, it does not qualify as property under Subsection (B) given that it is not capable of being "injured" or "destroyed" by oil pollution.  *Accord* 33 C.F.R. § 136.217 (b) ("Compensation for loss of use of noncommercial property is not allowable.").

The Court also notes that the additional reasons for dismissing the Pure Stigma Claims brought under OPA and against Halliburton, M-I, Cameron, and Transocean apply equally here.

Turning to general maritime law, the Sellno Plaintiffs urge, for nearly identical reasons

24

asserted with respect to the Pure Stigma Claims, that the Recreation Claims are viable under general maritime law. The only new argument advanced by the Sellno Plaintiffs is based on an exception to the *Robins Dry Dock* rule for commercial fishermen, which the Court recognized in the B1 Order. *See* Rec. Doc. 3830 at 19-20, 808 F. Supp. 2d at 958-59. The Sellno Plaintiffs argue that this exception should be expanded to include recreational boaters, recreational fishermen, recreational divers, and waterfront property owners. The Court is not persuaded by this new argument. *See Testbank*, 752 F.2d at 1020-21 & n.2 (affirming dismissal of recreational fishermen, among others, who did not suffer a physical injury to a proprietary interest from the Coast Guard's closure of a waterway due to a chemical spill that resulted from a collision between two ships). The Recreation Claims that do not include physical injury to a proprietary interest are dismissed.

Furthermore, even those claims that could satisfy *Robins Dry Dock*'s physical-injury-to-a-proprietary-interest requirement and, thus, might be entitled under general maritime law to recover some damages (e.g., the cost of repairing an oiled pleasure boat), the "Recreation Claims" sought here still would not be compensable. General maritime law does compensate the loss of use of a private pleasure boat. *See The Conqueror*, 166 U.S. 110, 125, 133-34 (1897); *Oppen v. Aetna Ins. Co.*, 485 F.2d 252, 257 (9th Cir. 1973). By analogy, other claims for loss of non-commercial recreational expectations, such as a claim for loss of recreational use and enjoyment of a beachfront vacation home, are not viable under general maritime law.

In conclusion, the Recreation Claims do not state a claim for which relief may be granted. Accordingly, the motions to dismiss (6889, 6894, 6923) are **GRANTED** only insofar as they seek to dismiss the "Recreation Claims," as defined above. While it is clear that Recreation Claims are asserted in this MDL, at this time the Court will not delve into the Short-Form Joinders, the Sellno

Plaintiffs' complaint, or any other complaints to specifically determine what claims are Recreation Claims.

## VI.  CONCLUSION

**IT IS ORDERED** that the Motions to Dismiss the Pure Stigma Claims (Rec. Docs. 6891, 6895, 6921), BP Dealer Claims (Rec. Docs. 6892, 6893, 6922), and Recreation Claims (Rec. Docs. 6889, 6894,6923) are **GRANTED** as set forth above.

New Orleans, Louisiana, this 1st day of October, 2012

_____
United States District Judge

# Exhibit "C"

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In re: Oil Spill by the Oil Rig      MDL NO. 2179
    "Deepwater Horizon" in the Gulf
    of Mexico, on April 20, 2010      SECTION J

Applies to:      JUDGE BARBIER
     MAGISTRATE JUDGE SHUSHAN

*ALL CASES IN PLEADING BUNDLE B1*

<u>PRETRIAL ORDER NO. 60</u>

**[As to All Remaining Claims in Pleading Bundle B1; Requiring B1 Plaintiffs to File a Complaint and/or Sworn Statement]**

1.      In order to facilitate the effective administration of this multidistrict litigation and the prosecution of the coordinated actions herein, the Court established eight separate "pleading bundles" for different categories of cases and claims. (PTO 11, Rec. Doc. 569). The "B1" Bundle included claims for Non-Governmental Economic Loss and Property Damages by Private Individuals and Businesses, and it was pled pursuant to a "B1" BUNDLE MASTER COMPLAINT. (Rec. Doc. 879, *amended* Rec. Doc. 1128).

2.      The Court previously employed the B1 Master Complaint as a procedural device for administrative purposes to facilitate the filing of short form joinders (SFJs) by plaintiffs. Plaintiffs were permitted to join in the B1 Master Complaint by filing short form joinders pursuant to Pretrial Orders 20, 24, and 25. (Rec. Docs. 904, 982, 983). Individual and business plaintiffs who filed individual lawsuits that raised non-governmental economic loss and property damages claims and were consolidated with these proceedings were deemed "B1" Plaintiffs, even if they did not also file a short form joinder. (Rec. Doc. 983 at 2).

3.      Considering that the subject oil spill occurred more than five (5) years ago, the Clerk was directed by Order dated September 4, 2015, to docket no further short form joinders in docket number 10-8888. (Rec. Doc. 15321).

4.      In addition, under its inherent power, the Court has entered a series of pretrial orders to effectively manage this multidistrict litigation. These pretrial orders have applied to all cases removed or transferred to this Court and to cases previously and subsequently filed in this Court that are within the subject matter of this MDL. Several pretrial orders have imposed requirements on plaintiffs to provide the Court and/or parties additional information necessary to the Court's management of the litigation. These have included PTO 11, PTO 24, PTO 25, and PTO 57, as well as the Court's November 2, 2010 Order Regarding Plaintiff Profile Forms ("PPF") (Rec. Doc. 642).

5.      The Court has previously issued an order dismissing aspects of the Amended B1 Master Complaint. (Rec. Doc. 3830). The Court now sees no further administrative or procedural benefit to maintaining the administrative Amended B1 Master Complaint. **Accordingly, the Court hereby DISMISSES the Amended B1 Master Complaint in its entirety.**

6.      To assist the Court in streamlining the remaining claims and to facilitate the administration of this MDL and the prosecution of the actions herein, the Court further ORDERS the following with respect to all plaintiffs who have timely filed a claim in the B1 pleading bundle and who **have not** released their claim(s) to date[1]:

---

[1] The Court will issue a separate Order with respect to dismissal of released claims.

**A.** **As to Plaintiffs who filed <u>Individual Lawsuits</u>.**[2]

(i)      Any plaintiff who previously filed an individual lawsuit must complete the **sworn statement** in the form reflected in **Exhibit A.** The completed sworn statement shall be attached to a **cover sheet** reflecting the caption of the individual lawsuit in the form of **Exhibit B.** Both the **cover sheet** and the attached **sworn statement** must be filed into the record of the plaintiff's individual lawsuit (as opposed to the master docket for MDL 2179) no later than <u>May 2, 2016</u>. Plaintiff also shall serve the **sworn statement** on the Plaintiffs' Steering Committee ("PSC") and counsel for BP no later than <u>May 2, 2016</u>, as described below in paragraph 7.

(ii)     Plaintiffs who previously filed an individual lawsuit and fail to comply with the above requirements by <u>May 2, 2016</u>, will have their complaints deemed dismissed with prejudice without further notice.

**B.** **Plaintiffs who DID NOT file <u>Individual Lawsuits</u>, (i.e., only filed a SFJ and/or were part of a "Mass Joinder" Lawsuit).**

(i)      Where Plaintiffs did not file an individual lawsuit, but instead filed a SFJ and/or were part of a complaint with more than one plaintiff,[3] **each such plaintiff** must, by <u>May 2, 2016</u>, file an individual lawsuit (Complaint) (one per plaintiff),

---

[2] This includes an individual claim filed in Transocean's limitation proceeding, No. 10-cv-2771.
[3] This does not include complaints that contain related parties such as a husband and wife or co-owners of a business. Where two or more related parties are joined in a single complaint, those plaintiffs will be considered as having filed an individual complaint.

using the caption reflected in **Exhibit C**.[4]  The Complaint should include as an

attachment the completed **sworn statement** in **Exhibit A**.  Each plaintiff also

must, by <u>May 2, 2016</u>, serve the PSC and Counsel for BP with a copy of the

completed **sworn statement**, as described below in paragraph 7.

    (ii)      Plaintiffs that did not file individual lawsuits, but instead filed a SFJ and/or

were part of a complaint with more than one plaintiff, who fail to comply with

the above requirements by <u>May 2, 2016</u>, will have their claims deemed dismissed

with prejudice without further notice.

7.      The service of the sworn statement and supporting information pursuant to this

Order must be on both Counsel for BP and the PSC on or before <u>May 2, 2016</u>. Service

should be made via United States mail at the following addresses:

| Counsel for BP | MDL 2179 Plaintiffs' Steering Committee |
|---|---|
| Attn: J. Andrew Langan | Attn: Steve Herman or Jim Roy |
| Kirkland & Ellis LLP | The Exchange Centre, Suite 2000 |
| 300 North LaSalle St, Suite 2400 | 935 Gravier Street |
| Chicago IL 60654 | New Orleans, LA 70112 |

Claimants represented by counsel may additionally or alternatively serve the sworn

statements and any supporting information upon the PSC and Counsel for BP via File &

ServeXpress ("F&S").

---

[4] A lawsuit is initiated by filing a written "complaint" with the Court.  A complaint must contain a short, plain statement of the plaintiff's claim. Plaintiffs who are not represented by an attorney can mail or hand deliver their complaints to: Clerk of Court, United States District Court, Eastern District of Louisiana, 500 Poydras Street, New Orleans, LA 70130.  Any plaintiff who is unable to pay the cost of filing a lawsuit may apply to proceed without prepaying court fees or costs.  An online form is available at http://www.laed.uscourts.gov/pro-se/ifp .

8.      Plaintiffs should be aware that compliance with this Order does not automatically make them eligible to receive any compensation for their damages. Rather, Plaintiffs who comply with this Order are subject to further proceedings in this Court.  Furthermore, mere compliance with this Order will not result in a Plaintiff submitting to this Court's jurisdiction for anything beyond pretrial purposes.

9.      The Provisions of PTO 1 ¶ 8 and PTO 25 ¶ 8 staying individual petitions or complaints that fall within pleading bundle B1, whether pre-existing or filed hereafter, remain in effect until further order of the Court.

10.     By <u>May 20, 2016</u>, the PSC and BP shall provide to the Court a list of all Plaintiffs who did **not** comply with this Order and whose claims are therefore subject to dismissal. For all other Plaintiffs, the Court will discuss procedures for addressing their claims at a hearing to be set by further Order of the Court.

11.     Following the issuance of this Order, all counsel of record should receive a copy via F&S pursuant to Pretrial Order No. 12. (Rec. Doc. 600). This Order will also be posted on the Court's website, http://www.laed.uscourts.gov/case-information/mdl-mass-class-action/oilspill. Counsel for BP shall mail this Order to all plaintiffs who opted out of the Economic and Property Damages Settlement, signed their opt-out forms and did not indicate in that form that the plaintiff was represented by counsel, as identified in the list to be provided to the Court, the PSC and BP by the Garden City Group, Inc.  Finally, to the extent practicable, the PSC shall email a copy of this Order to known counsel of record for Plaintiffs who joined in the Amended B1 Master Complaint, and/or opted out of the Economic and Property Damages Settlement and may therefore be subject to this Order.

5

This procedure is deemed sufficient to satisfy notice requirements for all Claimants with "B1" claims.

Accordingly, the Court hereby DISMISSES the Amended Master B1 Complaint and orders the designated plaintiffs to act in compliance with this Order or face dismissal of their claims with prejudice without further notice.

New Orleans, Louisiana, this 29th day of March, 2016.

_____
CARL J. BARBIER
United States District Judge

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing have been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 23rd day of March, 2017

/s/ Samuel T. Rees
Samuel T. Rees