UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | § | MDL NO. 2179 |
|  "DEEPWATER HORIZON" in the | § | SECTION J |
|  GULF OF MEXICO, on | § | |
|  APRIL 20, 2010 | § | JUDGE BARBIER |
| | § | MAG. JUDGE SHUSHAN |
| This Document Relates to: | § | |
| Pleading Bundle B1 | § | |

| | | |
|---|---|---|
| JOHN D. TUCCI | § | CIVIL ACTION  NO. _____ |
| | § | |
| | § | |
| | § | SECTION  J |
| VS. | § | |
| | § | |
| BP P.L.C.; BP AMERICA, INC.; BP | § | JUDGE BARBIER |
| PRODUCTS NORTH AMERICA, INC.; | § | |
| BP AMERICA PRODUCTION COMPANY; | § | MAG. JUDGE SHUSHAN |
| BP EXPLORATION & PRODUCTION, INC.; | § | |
| | § | |
| | § | JURY TRIAL DEMANDED |

**PLAINTIFF JOHN D. TUCCI'S COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff, **JOHN D. TUCCI**, complaining of the Defendants named herein, and files this Complaint, and in support thereof, would show as follows:

## I. **INTRODUCTION**

1.      This Court found Defendants' conduct egregious and held Defendants liable and apportioned the comparative fault of BP, Transocean, and Halliburton for the blowout,

explosion, and oil spill on April 20, 2010 involving the Deepwater Horizon.[1]    The Court found fault as follows: 67% BP, 30% Transocean, and 3% Halliburton.  Six years later, the victims of the spill still try to recover and reurge claims pursuant to the Court's Pre-Trial Order 60.[2]

      2.      Plaintiff seeks damages for loss of profits and was affected by the impact of the Gulf Oil Spill. Plaintiff does business along the Gulf Coast in the United States of America.

      3.      Plaintiff brings this suit against the Defendants for losses, injuries and damages, including actual, compensatory and punitive damages, arising out of the catastrophic and avoidable oil spill in the Gulf of Mexico caused by the April 20, 2010 explosion and fire aboard the Deepwater Horizon oil rig ("Deepwater Horizon"), and the resulting discharge of unprecedented volumes of crude oil into the Gulf of Mexico.  This massive and uncontrolled discharge of oil has polluted the waters and natural resources in the Gulf of Mexico and continues to threaten territorial waters and shores surrounding Texas, Louisiana and other shores along the Gulf Coast in the United States.

## II. **PARTIES**

   Plaintiff JOHN D. TUCCI is an individual that was impacted by the Oil Spill. Plaintiff worked as a welder for Easter Shipbuilding Group from January 2, 2007 to October 22, 2010, and suffered damages as his employer lost contracts due to the oil spill, and he was unable to continue working due to lay-offs and a reduction of work caused by the spill.

---

[1] *In Re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 21 F. Supp. 3d 746 (Ed.La. Sept. 2014).

[2] Plaintiff previously filed a lawsuit, and all claims previously asserted timely are incorporated herein. Plaintiff adopts, incorporates, and re-alleges the claims against Defendants from the Master Complaint (Rec. Doc. 879) for economic losses resulting from Defendants' conduct and the resultant oil spill which occurred on April 20, 2010, including any supplemental or amending complaints thereto and his/her/its previous joinder thereto as if fully set forth herein.

4.     Defendant BP Exploration & Production Inc. ("BPXP") is a Delaware corporation with its principal place of business in Warrenville, Illinois.   BPXP was a leaseholder and the designated operator in the lease granted by the former Minerals Management Service.[3] ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Oil Spill originated.   BPXP was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990, 33 U.S.C. § 2714.   This court has personal jurisdiction over BPXP, because BPXP is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

5.     Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas.   BP America was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the Deepwater Horizon vessel.   This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

6.     Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England.   BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo.   BP p.l.c. is one of the world's largest energy companies with over 80,000 employees and $239 billion in revenues in 2009.   BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division in which BPXP and BP America fall, through vertical business arrangements aligned by product or service groups.   BP

---

[3] The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE) on June 18, 2010; however, it shall be referred to as the MS throughout this document.

p.l.c.'s operations are worldwide, including in the United States.  Defendants BPXP and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally.

7.      BP p.l.c. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development.  A sampling of BP p.l.c.'s contacts with the U.S. are as follows:  (a) BP p.l.c.'s American Depository Shares are listed on the New York Stock Exchange and BP p.l.c. is one of the largest non-U.S. companies listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP p.l.c. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP p.l.c.'s fixed assets are located in the U.S. or the European Union; and (e) BP p.l.c. reports having 2,000 U.S.-based employees in non-Exploration & Production, non-Refining & Marketing BP entities.

8.      Alternatively, if BP p.l.c. contests that it is subject to jurisdiction under Louisiana's long-arm jurisdiction statute, then this Court may exercise personal jurisdiction over BP p.l.c. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, the federal long-arm jurisdiction provision, because claims in this action arise under federal law, the exercise of jurisdiction over BP p.l.c. is consistent with the United States Constitution and laws," and BP p.l.c. has been served with a summons on the original Master Complaint.

9.      This Court also has specific jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm specific jurisdiction provision (13 Louisiana Statute § 3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.  Plaintiff's causes of action arise out of wrongful conduct committed by BP p.l.c., directly or indirectly by its agents, which caused injury or damage in Louisiana by an offense or quasi offense committed through an act

or omission outside of Louisiana.  These acts or omissions took place both before the blowout resulting in the Oil Spill and in the negligent conduct of BP, p.l.c. after the blowout in attempting to contain the catastrophic damage caused by the Oil Spill.  BP, p.l.c. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana.  In addition, BP p.l.c. has had continuous and systematic contacts with Louisiana (and with the United States more generally), and has been served with a summons on the original Complaint.

10.    In addition, this Court also has personal jurisdiction over BP p.l.c. under agency principles, because BP p.l.c.'s agents, BP America and BPXP, do business in Louisiana. BP America and BPXP are both wholly-owned subsidiaries of BP p.l.c.  In BP p.l.c.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America and BPXP, BP p.l.c. states that it "controls" both BP America and BPXP, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities . . . ."

11.    BP p.l.c.'s direct, joint and/or assumed responsibility and/or liability for safety and well control, both before and/or after the explosions and blowout on April 20, 2010, is further evidenced by the announcement of the Macondo Project on the BP website hosted and copyrighted by BP p.l.c., the publication of information concerning the casualty and spill on the BP website hosted and copyrighted by BP, the express and/or implied acceptance of responsibility for the safety of BP operations in North America and the Gulf of Mexico in statements by officers of BP p.l.c., the presence (upon information and belief) of a BP p.l.c. officer or employee on the Deepwater Horizon for the celebration that occurred shortly before the explosions and fire, the direct participation of BP p.l.c. employees in

the post-casualty investigation, the direct participation of BP p.l.c. officers and employees in the Governmental post-casualty investigations, the direct participation of BP p.l.c. officers and employees in the post-casualty well-control efforts, and the direct participation of BP p.l.c. in the establishment and/or funding of the Escrow Fund and/or Gulf Coast Claims Facility.

12.     BPXP, BP America, and BP p.l.c. are generally referred to herein collectively as "BP."  As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

### III. <u>JURISDICTION AND VENUE</u>

13.     Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction."

14.     This Court has jurisdiction over these claims pursuant to the Oil Pollution Act, 33 U.S.C. § 2717 (b) (the "OPA").

15.     Prosecution and venue of this class action in this district is proper under 28 U.S.C. § 1391 because Defendants do business herein and the events or omissions giving rise to the claims asserted herein occurred in this district.  Venue is also proper pursuant to the OPA, 33 U.S.C. 2717 (b), as the discharge occurred in this district.  Venue is also appropriate in this district consistent with 28 U.S.C. § 1407 and the 2010 Transfer Order of the Judicial Panel on Multidistrict Litigation.  See *In re Oil Spill by the Oil Rig "Deepwater Horizon"* in the Gulf of Mexico, on April 20, 2010, 731 F. Supp. 2d 1352 (J.P.M.L. 2010) and this Court's Pretrial

Order No. 60 (Rec. Doc. 904), which directed plaintiffs to file their complaints arising out of the Deepwater Horizon Incident in this District.

16.     Plaintiff would show pursuant to §1007 of OPA (33 U.S.C. 2707), that they have all presented their claims in accordance with OPA guidelines and more than ninety (90) days has elapsed since said presentment without payment.  Said presentment of each claim was made to the Gulf Coast Claims Facility ("GCCF") in 2012, and again in January of 2013 directly to the BP Claims office in Houston, Texas.

## IV. FACTUAL  ALLEGATIONS

17.     On April 20, 2010, a well blowout on the oil rig Deepwater Horizon in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States and Mexico.   The uncontrolled blowout caused explosions and a raging fire aboard the Deepwater Horizon; after burning for two days, the rig sank,  commencing an oil spill of unprecedented proportion that damaged,  depleted,  and destroyed marine, estuarine, and coastal environments in the Gulf of Mexico, Louisiana, Mississippi, Alabama, Texas, and Florida (the "Oil Spill").  In fact, it is anticipated the entire Gulf of Mexico ecosystem will be affected for a decade or more.  In the twelve weeks it took to cap the blown-out well, over 210 million gallons of oil gushed unchecked into the Gulf of Mexico, causing  widespread  and  disastrous  environmental  and economic  damage  to  the  people, businesses, and environment of the Gulf of Mexico.

18.     This Complaint asserts claims under general federal maritime law, including federal common law and federal statutory law, specifically the Oil Pollution Act of 1990, seeking damages for the Plaintiff herein including actual, compensatory, and punitive damages, arising

from the well blowout, fire, and explosions aboard, and sinking of, the Deepwater Horizon on April 20, 2010, and the subsequent Oil Spill in the Gulf of Mexico.

19.     On April 20, 2010, at approximately 9:45 p.m. CST, an uncontrolled well blowout caused explosions on the Deepwater Horizon, an oil rig vessel engaged in oil exploration drilling operations in the Gulf of Mexico.  The explosions ignited a raging fire, fueled by gas spewing onto the vessel from the blown-out well.  After burning for two days, the Deepwater Horizon sank to the ocean floor.

20.     Each day during the course of the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil, as well as spreading out in vast subsurface plumes. Ultimately, almost five million barrels (210 million gallons) of crude oil spilled into the Gulf of Mexico.

21.     The Deepwater Horizon's well blowout and the subsequent explosions, fire, sinking, and Oil Spill were foreshadowed by a string of disastrous incidents and near misses in Defendants' operations on land and at sea, as well as poor decision-making by Defendants and their employees, as they ignored crucial safety issues, cut corners, and violated federal and state law to save time and money in favor of production and profit and at the expense of worker safety and environmental protection.   All the while, Defendants continued to evade and subvert industry regulations.

22.     Defendants could have prevented this catastrophe by using proper risk management practices, following deepwater drilling industry standards, following required safety protocols and precautionary procedures, properly maintaining equipment, and using widely available emergency safety technology but, with little regard for the risk to

the vessel workers or the environment, Defendants chose to violate or ignore operational discipline, and to save money and time at the expense of safety.  Their cost-cutting measures, consistent with their long corporate histories of flagrant disregard for safety, were taken with willful, wanton, and reckless indifference to the disastrous results to the workers aboard the vessel, the environment, and the economic interests, businesses, and property of Plaintiff herein.

23.     Defendants repeatedly made decisions impacting the safety of the vessel, its workers, the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states in the United States and Mexico in the direction of short-term gain, through reduced schedule and reduced cost, rejecting adequate and responsible risk-analysis checks and balances to weigh cost and time versus risk and safety.  The result was both predictable in outcome and unprecedented in scale.  Moreover, because their conduct endangered the health and safety of a large region and population, caused and increased the risk of serious injury and bodily harm, and affected a financially vulnerable population dependent on the Gulf of Mexico, the degree of reprehensibility of Defendants' conduct is at the highest level.

24.     The Oil Spill has caused, and continues to cause, devastating environmental and economic damage.  For example, there have been thousands of square miles of waters closed to fishing, swimming and/or boating, and thousands of square miles of historic coastal marshes, delicate estuaries, cypress forests, barrier islands, and white sand beaches compromised in both the United States and Mexico. Fishermen and marine-related businesses have lost and continue to lose income and their businesses; the tourism industry and hotels, resorts, restaurants, and other tourism-reliant businesses, including churches, have lost and continue to lose income; and

property owners have suffered the loss, damage and/or diminution of the value of their properties throughout the Gulf Coast Areas[4].

25.     Collectively, the well blowout, the explosions and fire aboard the Deepwater Horizon, the sinking of the rig, the subsequent Oil Spill, the efforts to cap the blown-out well, the clean-up efforts, and the operations surrounding those events and activities comprise the "Deepwater Horizon Incident."[5]

26.     Investigators also found that a stifling bureaucracy imposed by onshore management bred resentment among Transocean vessel workers.  Workers complained that past problems were only investigated by the company in order to place blame, rather than to learn from the mistakes.  Although workers "often saw unsafe behavior at the rig" many expressed fears of reprisals for reporting problems, especially to supervisors based in Houston. This tension between the vessel and the beach likely played a role in discouraging workers on Deepwater Horizon from reporting problems or anomalies like the abnormal negative pressure results to their supervisors onshore.

27.     As Defendants internally prioritize profits over safety at every level of their companies, they continue to resist and evade regulation of the oil exploration and production industry.   For example, despite the known vulnerabilities and shortcomings of BOPs in deepwater drilling, this year BP helped finance a study to support their argument that BOP

---

[4] As defined below, the "Gulf Coast Areas" are the States of Louisiana, Mississippi, and Alabama, the counties of Chambers, Galveston, Jefferson and Orange in the State of Texas, and the counties of Bay, Calhoun, charlotte, Citrus, Collier, Dixie, Escambia, Franklin, Gadsden, Gulf, Hernando, Hillsborough, Holmes, Jackson, Jefferson, Lee, Leon, Levy, Liberty, Manatee, Monroe, Okaloosa, Pasco, Pinellas, Santa Rosa, Sarasota, Taylor, Wakulla, Walton and Washington in the State of Florida.

[5] More specifically, the "Deepwater Horizon Incident" refers to the events, actions, inactions, and omissions leading up to and including (i) the blowout of the Macondo well on April 20, 2010, (ii) the explosions and fire aboard the Deepwater Horizon, (iii) the sinking of the Deepwater Horizon on April 22, 2010, (iv) the release of oil, other hydrocarbons, and other substances from the blown-out well and the Deepwater Horizon, (v) the efforts to contain the blown-out well, (vi) response activities, including the VoO Program; (vii) the operation of the Gulf Coast Claims Facility; and (viii) BP's public statements relating to all of the foregoing.

pressure tests should be required with less frequency — every 35 days rather than the current frequency of every 14 days.  This change would save the industry $193 million per year in "lost productivity."  BP has also actively opposed MMS rules requiring drilling vessel lessees and operators to develop and audit their own Safety and Emergency Management Plans, insisting that voluntary compliance will suffice.  The Deepwater Horizon disaster is a tragic example to the contrary.

28.    Decisions tradeoffs, actions, and inactions by Defendants, including the risky well design, inadequately tested cement, tests that were skipped or misinterpreted, and procedures that deviated from industry norms, all contributed to, and practically ensured the blowout of the Macondo well.   At no time did any of Defendants report regulatory violations to the authorities, or call to stop work because of unsafe decisions, plans, actions, or conditions in the well or on the vessel.   The carelessness, nonchalance, inexperience, and distraction of Defendants resulted in insufficient well monitoring and overlooking the signs of an influx for 49 minutes prior to the blowout.   Once the well blew out, Defendants' poor vessel maintenance and intentional bypass of alarms and emergency systems contributed to the failure of safety mechanisms, exacerbated the disaster, and likely caused the unnecessary deaths and injuries of vessel workers, and the destruction of the Deepwater Horizon.   Underlying it all, Defendants' corporate cultures of trading safety for speed, production, and profit, and encouraging their employees to do the same, sped the inevitable approach of catastrophe.

<u>Impact  of the Deepwater Horizon  Incident  on Plaintiff,  the Environment, </u><u>and Economy</u>

29.    For over twelve weeks, unprecedented amounts of raw crude oil, emulsified and weathered oil, natural gas, chemical dispersants, and other toxic pollutants spewed into the Gulf of Mexico — a total petroleum discharge of 6.9 million barrels, not including the 1.8

million gallons of chemical dispersants and any other toxic pollutants that were also released as a result of the Oil Spill.

30.     The oil released in the course of the Oil Spill contains benzene, toluene, polyaromatic hydrocarbons, and other compounds (collectively referred to as Total Petroleum Hydrocarbons, or "TPH"), all of which are known carcinogens.   Discharge of the toxic pollutants, as identified in 40 C.F.R. § 401.15, likely includes, but is not limited to, benzene, toluene, naphthalene, polynuclear aromatic hydrocarbons (including, but not limited to, phenanthrene, benzanthracenes, benzophyrenes, benzofloranthene, chrysenes, dibenzan-thracenes, and idenopyrenes), fluoranthene, arsenic, cadmium, copper, mercury, and nickel, all of which are hazardous to the health of humans and marine life. Upon information and belief, BP has analyzed and knows the exact concentrations of each of the toxic pollutants present in the oil coming from its wells.

31.     The chemical dispersants used by BP during the Oil Spill response may be harmful to the health of humans and marine life.   Over two million gallons of chemical dispersants were released into Gulf waters to disperse the oil coming from the damaged well. According to environmental experts in the Deepwater Horizon Study Group, oil recovery (such as skimming) is preferable to chemical dispersion because recovery actually removes the oil from the environment, rather than simply spreading it through the water column and sinking it to the sea floor, where it can continue to cause environmental damage to the Gulf ecosystem while no longer causing public relations damage to BP.  The environmental effects of using chemical dispersants in such magnitude and at such depths have never been tested.

32.     The Deepwater Horizon Incident has impacted and continues to impact Plaintiff and the shorelines, beaches, shores, marshes, harbors, estuaries, bayous, bays, and waters of the

Gulf of Mexico in both the United States and Mexico.  In fact, the use of the dispersants by BP caused the oil to stay under the surface of the Gulf moving in giant plumes throughout the entire Gulf of Mexico, destroying reefs and plankton which will affect the entire Gulf of Mexico for years.

33.     The Deepwater Horizon Incident and the resulting contamination of the Gulf of Mexico have caused and will continue to cause a loss of revenue for individuals and entities in both the United States and Mexico that rely on the use of the Gulf of Mexico and/or its marine life.

V. <u>CLAIMS  FOR RELIEF</u>

A.     <u>The Oil Pollution  Act ("OPA")</u>

34.     Plaintiff realleges each  and  every  allegation  set  forth  in  all  preceding paragraphs as if fully restated here.  Plaintiff have made "presentment" of their claims and have not been compensated by anyone.  Said presentments were reurged in January of 2013 to the BP claims office in Houston, Texas.

35.     The Oil Pollution Act, 33 U.S.C. §2701, et seq. (the "OPA"), imposes liability upon a "responsible party for a  …   vessel or a facility from which oil is discharged … into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs.  33 U.S.C. § 2702.

36.     The Coast Guard has named BP as the responsible party for the release of oil; thus, BP is strictly liable pursuant to §2702 of the OPA for all the damages resulting from the Deepwater Horizon Incident.

37.     As a result of the disaster and Defendants' gross negligence or willful misconduct with respect to the acts and omissions alleged herein, all responsible parties have caused and are

liable for the following past, present and future expenses and damages Plaintiff suffered, which damages are the type of damages that may be recovered pursuant to the Oil Pollution Act.

38.     Further, Plaintiff has not been compensated for their losses.

39.     Plaintiff demands compensation from Defendants in amounts to be determined by the trier of fact, said amounts to include:

> a.  Damages for injury to, or economic losses and damage resulting from destruction of sea life the Plaintiff relies on to make their living and their subsistence.

> b.  Damages equal to the loss of profits/earnings, or impairment of earning capacity, due to the injury, destruction, or loss of natural resources for which these Plaintiff relies.

40.     Defendants are not entitled to limit their liability under Section 2704(a) of the OPA because the Deepwater Horizon Incident was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations.  33 U.S.C. § 2704(c).

41.     Moreover, in its "Statement of BPXP & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990," filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

42.     As a result of the Deepwater Horizon Incident, Plaintiff has not been able to use natural resources (air and water, and potentially wetlands and other areas and spaces that have and/or may become contaminated by the spilled oil), and they are entitled to recover from Defendants for such damages in amounts to be determined by the trier of fact, in addition to the damages as set forth below.

43.     As a result of the Deepwater Horizon Incident, Plaintiff is entitled to damages pursuant to Section 2702(b)(2)(B), which provides for recovery of damages to real or

personal property, including "[D]amages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property, including the diminution in the value of their property."

44.    As a result of the Deepwater Horizon Incident, Plaintiff is entitled to damages pursuant to Section 2702(b)(2)(E), which provides for "[D]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

45.    To the extent required by law, and/or by consent or stipulation by BP, Plaintiff satisfied, or will have satisfied, all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), as to each and all defendants, by the submission of their claims to the Gulf Coast Claims Facility (the "GCCF") and/or BP and/or its agents or designees.

B. Punitive Damages for Gross Negligence and Willful Misconduct.

46.    Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here, and assert, in additional support of its claim for punitive damages under federal, statutory, maritime, and federal common law.

47.    Defendants engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the Deepwater Horizon Incident, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence.  Plaintiff, society and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by Defendants' misconduct herein. Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-

hazardous activities on the Deepwater Horizon by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

48.     Defendants' corporate culture caused and allowed them to disregard the lessons they should have learned and applied from previous incidents at their facilities that resulted in extensive damage and loss of life; instead, Defendants continued to place others at risk in the interests of cost-cutting and financial gain.

49.     Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by using a well design with too few barriers to gas flow.

50.     Defendants' conduct was oppressive, wanton, malicious, reckless, or grossly negligent each time they:

    a.  failed to properly maintain and/or operate the Deepwater Horizon;

    b.  operated the Deepwater Horizon in such a manner the safety and integrity of the vessel and the well were disregarded to save time and money;

    c.  ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

    d.  failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the Deepwater Horizon;

    e.  violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

    f.  failed to take appropriate action to avoid or mitigate the accident;

    g.  failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

    h.  failed to ensure that the Deepwater Horizon and its equipment were free from defects, properly maintained and/or in proper working order;

      i.   failed to provide appropriate disaster prevention equipment;

      j.   failed to have an appropriate emergency spill response plan or readily available spill response equipment.

51.      Accordingly, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

PRAYER FOR RELIEF

52.      WHEREFORE, Plaintiff demands judgment against Defendants, jointly, severally, and solidarily, as follows:

      a.   economic and compensatory damages in amounts to be determined at trial;

      b.   punitive damages;

      c.   pre-judgment and post-judgment interest at the maximum rate allowable by law;

      d.   costs of litigation;

      e.   declaratory and injunctive relief;

      f.   such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

Respectfully submitted,

**THE BUZBEE LAW FIRM**

By:    */S/ Anthony G. Buzbee*
        Anthony G. Buzbee
        Attorney in Charge
        State Bar No. 24001820
        S.D. Tex. I.D. No. 22679
        Caroline E. Adams
        State Bar No. 24011198
        S.D. Tex. I.D. No. 27655
        J.P. Morgan Chase Tower
        600 Travis, Suite 7300

Houston, Texas 77002
Telephone: (713) 223-5393
Facsimile: (713) 223-5909
www.txattorneys.com

**ATTORNEYS FOR PLAINTIFF**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing Plaintiff's Complaint has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12 and 60, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on March 27, 2017.

/s/ Caroline Adams_____
**CAROLINE E. ADAMS**

18