**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * | MDL NO. 2179<br><br>SECTION: J<br><br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE WILKINSON |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class,<br><br>Plaintiffs,<br>v.<br>BP Exploration & Production Inc., *et al.*,<br><br>Defendants. | * * * * * * * * * * * * * * | NO. 12-CV-968<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE WILKINSON |

**STATUS REPORT FROM THE *DEEPWATER HORIZON***
**MEDICAL BENEFITS SETTLEMENT CLAIMS ADMINISTRATOR**

The Garretson Resolution Group, the Claims Administrator of the *Deepwater Horizon* Medical Benefits Class Action Settlement (the "Settlement"), submits the following quarterly report to apprise the Court of the status of its work in processing claims and implementing the terms of the Medical Settlement Agreement (the "MSA") between January 1, 2017, and March 31, 2017, (the "Reporting Period").[1]  We have published 13 reports since Preliminary Approval

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to their fully capitalized renderings in the MSA.

in May 2012, and this marks the ninth quarterly report filed since the claims filing deadline of February 12, 2015.  This report will address the continued processing of claims received from 2012 to 2014 (collectively, the "2014 Claims")[2] and the claims received in 2015 and thereafter (the "2015 Claims").

This status report provides:

- an executive summary of claims processed during the Reporting Period;

- a summary of claims for Specified Physical Conditions ("SPC") and significant developments concerning these claims;

- an update on the operations and activities of the Class Member Services Center;

- an account of participation in the Periodic Medical Consultation Program ("PMCP");

- a summary of claims for Later-Manifested Physical Conditions; and

- a summary of the activities of the grantees of the Gulf Region Health Outreach Program ("GRHOP") and the operations of the Gulf Region Health Outreach Program Library.

## I.    EXECUTIVE SUMMARY

The Claims Administrator has received 37,230 unique claims for compensation for an SPC and/or participation in the PMCP through the end of the Reporting Period.  This status report will provide an overview of the claims processing forecast for all claims filed, the variables influencing the progression of those claims, and the outcome of claims as they progress through the stages of review.  In summary:

- the Claims Administrator has completed its review of 36,884 claims, or ninety-nine percent (99%) of all claims filed, to determine whether they qualify for compensation for an SPC and/or participation in the PMCP.

---

[2] The 2014 Claims include all POCFs received by the Claims Administrator from the entry of Preliminary Approval on May 3, 2012 through December 31, 2014.  While the Claims Administrator was approved to receive claims after Preliminary Approval, the Claims Administrator was not approved to process claims beyond the Party-approved RAI process until the Effective Date of the Settlement.  Hence, all claims received in 2012, 2013, and 2014 are referred to as the 2014 Claims.

- o Of the 36,884 claims that the Claims Administrator has fully reviewed, 22,527, or sixty-one percent (61%), were approved for compensation for an SPC, and another 4,884, or thirteen percent (13%), were approved to participate in the PMCP.  Furthermore, 29, or seventeen percent (17%), of the 166 claims currently going through the Notice of Defect process have received an "Approved with Defects" notice, meaning that the Medical Benefits Settlement Class Member ("Class Member") has been approved for at least one compensable SPC.

- o Overall, the claims filed in this settlement have been and continue to be impacted by high defect rates, with 28,858, or seventy-eight percent (78%), receiving either a Request for Additional Information ("RAI") or Notice of Defect during the life of the claim.  Additionally, 19,714, or fifty-three percent (53%), have been and continue to be impacted by changes or updates the claimants made to their Proof of Claim Forms or supporting documentation, which require the Claims Administrator to re-review the claims.

- o The Claims Administrator is still reviewing 346, or one percent (1%), of the claims filed in this settlement to determine whether they qualify for SPC compensation or to participate in the PMCP.  For the most part, the Claims Administrator was unable to render a final determination on these claims in 2016 because they (a) had not received Notices of Defect by the end of June 2016, (b) are pending retrieval of medical records, (c) are undergoing investigation or audit, and/or (d) had been denied but are now the subject of a Request for Review or a class membership denial challenge filed with the Court.  The Claims Administrator projects that it will be able to finish processing these claims by September 2017.  This estimate, however, is based on certain assumptions about how quickly third parties will provide the Claims Administrator with information it needs to finish processing the claims in categories (b) through (d), above, and thus is subject to change.

- The compensation allocated and paid to SPC-determined claims continues to increase.

- o During the Reporting Period, the Claims Administrator approved 2,403 Medical Benefits Settlement Class Members ("Class Members") for nearly $10 million in SPC compensation.  Since the inception of the Settlement, the Claims Administrator has approved 22,094 Class Members for $63.6 million in SPC compensation.

- o Additionally, the Claims Administrator determined that another 134 Class Members who had partially defective claims also had at least one valid SPC claim and that the total amount of compensation for which the Class Members were currently eligible on those claims was $924,650.  The Claims Administrator sent those claimants an "Approved with Defects"

3

notice, giving them the option of either attempting to cure the Defects in an effort to get greater compensation or accepting the compensation for which they currently qualify.

o Between the amounts allocated through SPC-determined claims and the amounts to be allocated through the "Approved with Defects" claims, the total SPC compensation for which Class Members qualified as of the end of the Reporting Period amounted to more than $64.5 million.

o Of the $63.6 million awarded to the 22,094 Class Members with approved SPC claims, $43.4 million has been paid to 17,528 Class Members. The remaining 4,566 Class Members had not been paid as of the end of the Reporting Period because they had payment complications that had not yet been resolved. Approximately forty-three percent (43%) of those Class Members had healthcare liens that were still being resolved because their claims had just reached a final determination in the third or fourth quarter of 2016. In addition, approximately twenty percent (20%) of the Class Members who had not received payment by the end of the Reporting Period were impacted by pending bankruptcy and/or probate complications. The remaining thirty-seven percent (37%) have other complications precluding payment, including child support obligations, liens asserted by settlement advance lenders or other persons or entities, general payment defects resulting from the Class Members' failure to provide necessary information on their POCFs, selection for random audit, and pending Requests for Review.

• Class Members continue to be approved for enrollment in the PMCP.

o During the Reporting Period, the Claims Administrator sent PMCP Notices of Determination to 959 Class Members, for a total of 26,992 over the life of the Settlement.

This information is discussed in greater detail below.

## II.   DETAILED CLAIMS PROGRESSION

Through the end of the Reporting Period, the Claims Administrator has received 37,230 unique claims for compensation for an SPC and/or participation in the PMCP. Over the Reporting Period, the Claims Administrator received 115 changes or updates to those same claims forms. The additional information must be processed through intake and then re-reviewed at each subsequent processing stage to determine its impact. The number of total claims receiving a final determination or clearing lien resolution continued to increase

throughout the Reporting Period.  Of the 37,230 total claims filed, 36,884, or ninety-nine percent (99%), have been processed to a final determination, and 346, or one percent (1%), require additional processing.

Of the claims reaching a final determination,

- 22,527, or sixty-one percent (61%), were approved for compensation for an SPC, with 22,094, or ninety-eight percent (98%), of the 22,527 claims receiving a notice of final determination for compensation for an SPC and 17,528, or seventy-eight percent (78%), of the 22,527 claims being paid;

- 984, or three percent (3%), did not seek the SPC compensation benefit and instead claimed and qualified for the PMCP benefit only;

- 3,900, or eleven percent (11%), proved they were Class Members and qualified to receive the PMCP benefit but failed to prove they qualified for SPC compensation; and

- 9,473, or twenty-six (26%), were denied because they (a) did not prove they were Class Members, (b) filed a valid opt-out, or (c) did not claim or prove a compensable SPC.

**Figure 1: Composition of All Finalized Claims**



Of the claims that require additional processing:

- twenty-four (24), or seven percent (7%), are pending Declaration Review or RAI processing;

- 166, or forty-eight percent (48%), have already received or are scheduled to receive a Notice of Defect and will need to submit additional information; and

- 156, or forty-five percent (45%), are undergoing Medical Record Review.

**Figure 2: Composition of All Pending Claims**



6

Thus, the current overall composition of the all claims filed is as follows:

**Figure 3: Overall Composition of All Claims Filed**



### III.   CLAIMS FOR SPECIFIED PHYSICAL CONDITIONS

#### A.   Claimed Benefits and Compensation Level

For the total 37,230 Proof of Claim Forms ("POCFs") received, Table 1 provides a breakdown of those that sought compensation for an SPC and participation in the PMCP and those that sought only participation in the PMCP.

| TABLE 1: POCF FILINGS AVAILABLE FOR INITIAL CLAIMS REVIEW | |
|---|---|
| | **Total** |
| **Total POCF Filings Available for Initial Claims Review** | **37,230** |
| Claims for Compensation for Both SPCs and Participation in the PMCP | 36,370 |
| Claims for PMCP Only | 860 |

The graphs below provide a breakdown of the compensation levels claimed for all claims filed and a breakout for the 2014 and 2015 Claims, respectively:

**Figure 4: Compensation Level Composition of All Claims Filed**



**Figure 5: Compensation Level Composition of 2014 Claims**



**Figure 6: Compensation Level Composition of 2015 Claims**



Table 2, below, compares the composition of the claimed compensation levels in the 2014 Claims with those in the 2015 Claims and shows the percentage change between those two groups of claims.

| Table 2: Claimed Compensation Level | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | A1 | A2 | A3 | A4 | B1 | Multiple | None | PMCP Only |
| Percentage of 2014 Claims | 31.07% | 8.47% | 5.55% | 2.12% | 12.61% | 19.65% | 15.66% | 4.88% |
| Percentage of 2015 Claims | 48.56% | 6.80% | 3.12% | 0.67% | 1.95% | 16.05% | 21.83% | 1.03% |
| Vintage Claim Comparison | 17.49% | (1.67%) | (2.43%) | (1.45%) | (10.66%) | (3.60%) | 6.17% | (3.84%) |

In Table 3 below, we provide statistics of the claimed compensation level in Section VII of the POCF as compared to the awarded compensation level. In over eighty-one percent (81%) of claims where the Class Member has claimed a single compensation level, that same level of

compensation has been awarded.  For the nineteen percent (19%) not awarded the claimed compensation level, the Claims Administrator has awarded both higher and lower compensation levels based on review of the POCF and supporting documentation provided.  For claims where the Class Member selects multiple compensation levels or no compensation level in Section VII of the POCF, the rate of claims qualifying for A1-only compensation to those qualifying for A2 or higher compensation is approximately three to one (3:1), meaning that a greater number of these claims are qualifying for A1 compensation rather than A2 or higher compensation.  This ratio has not changed since the last reporting period.

| Table 3: Determined Compensation Level | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Qualified Compensation Level | A1 | | A2 | | A3 | | A4 | | B1 | | Grand Total |
| Section VII of POCF Claimed Compensation Level | Count | % | Count | % | Count | % | Count | % | Count | % | |
| A1 | 12,148 | 97.78% | 140 | 1.13% | 114 | 0.92% | 21 | 0.17% | 1 | 0.01% | 12,424 |
| A2 | 901 | 42.56% | 1,130 | 53.38% | 74 | 3.50% | 9 | 0.43% | 3 | 0.14% | 2,117 |
| A3 | 452 | 35.56% | 99 | 7.79% | 656 | 51.61% | 63 | 4.96% | 1 | 0.08% | 1,271 |
| A4 | 85 | 41.67% | 15 | 7.35% | 15 | 7.35% | 89 | 43.63% | | 0.00% | 204 |
| B1 | 585 | 48.87% | 482 | 40.27% | 99 | 8.27% | 9 | 0.75% | 22 | 1.84% | 1,197 |
| Multiple | 2,187 | 67.11% | 756 | 23.20% | 257 | 7.89% | 50 | 1.53% | 9 | 0.28% | 3,259 |
| None | 1,655 | 80.54% | 240 | 11.68% | 127 | 6.18% | 32 | 1.56% | 1 | 0.05% | 2,055 |
| Total | 18,013 | 79.96% | 2,862 | 12.70% | 1,342 | 5.96% | 273 | 1.21% | 37 | 0.16% | 22,527 |

## B.    Claims Requiring RAI and/or Notice of Defect

As has been the case historically, the majority of claims have received an RAI and/or a Notice of Defect according to the requirements of the MSA.  During the Reporting Period, the Claims Administrator sent 30 RAIs and 128 Notices of Defect.  Since the inception of the Settlement, the Claims Administrator sent 29,171 RAIs and 21,467 Notices of Defect.

| TABLE 4: RAIS AND NOTICES OF DEFECT | | |
|---|---|---|
| **RAIs** | **Reporting Period** | **Total** |
| RAIs Sent | 30 | 29,171 |
| Responses to RAIs Received | 22 | 20,819 |
| **Defects** | **Reporting Period** | **Total** |
| Notices of Defect Sent | 128 | 21,467 |
| Defect Cure Materials Received | 206 | 10,254 |

1.      Requests for Additional Information

Of the 30 RAIs sent during the Reporting Period, twenty-three percent (23%) were RAI-Missing, and seventy-seven percent (77%) were RAI-Incomplete.[3]  Seven percent (7%) were sent to unrepresented claimants, and ninety-three percent (93%) were sent to claimants represented by counsel.  More than sixty-five percent (65%) of the 2014 Claims have required at least one (1) RAI, and over twenty percent (20%) have required the maximum of two (2) RAIs.  Approximately sixty-three percent (63%) of the 2015 Claims have required at least one (1) RAI, and over twelve percent (12%) have required the maximum of two (2) RAIs.   The overall response rate to RAIs was seventy-one percent (71%), with claimants represented by counsel responding at a higher rate (seventy-six percent (76%)) than those who are unrepresented (fifty-seven percent (57%)).   The overall cure rate for responding to RAIs for both claimants represented by counsel and those unrepresented is approximately fifty-nine percent (59%).

As previously reported, failure to respond to an RAI-Missing within the sixty-day (60-day) response period will not necessarily result in the denial of a claim; rather, the failure to respond to an RAI-Missing by submitting a first-party injury declaration in compliance with the

---

[3] Under the Party-approved RAI process, a claimant may receive an RAI-Missing for failing to submit a first-party injury declaration with his or her original POCF.  If the claimant submits a first-party injury declaration that omits necessary information, either in response to an RAI-Missing or at another point in the claims process, the claimant may receive an RAI-Incomplete.  For each RAI sent by the Claims Administrator, the claimant has sixty (60) days to respond.  A claimant may receive only one (1) RAI-Missing and one (1) RAI-Incomplete, as applicable.

Specified Physical Condition Matrix (the "SPC Matrix") will result in a Defect of "Missing Declaration of Injury Document" on a Notice of Defect.  The claimant would then have 120 days to cure that Defect and any other material Defects listed in the notice.

Similarly, failure to respond to or cure all deficiencies identified within an RAI-Incomplete will not necessarily result in the denial of a claim, because only some of a claimant's claimed or declared conditions may be deficient and included in the RAI.  In that circumstance, even if the claimant fails to respond to the RAI, the claimant might still receive compensation for the valid conditions in his or her declaration (assuming the claimant met the other requirements of the MSA).  These RAI processing standards and distinctions are highlighted in the "Frequently Asked Questions About Declarations and Requests for Additional Information" available on the Claims Administrator's website.  In addition, a copy of this FAQ is included with each RAI sent from the Claims Administrator, and we have call center representatives and firm liaisons available to provide assistance.

2.   <u>Notices of Defect</u>

Of the 21,467 Notices of Defect sent through the end of the Reporting Period, twenty-two percent (22%) were sent to unrepresented claimants or Class Members, and seventy-eight percent (78%) were sent to claimants or Class Members represented by counsel.  More than eighty percent (80%) were sent to Class Members claiming to be or approved as Clean-Up Workers.  Approximately fifty-two percent (52%) of the Notices of Defect sent listed multiple Defects.  More specifically, thirty percent (30%) identified two (2) through five (5) Defects, twelve percent (12%) identified six (6) through ten (10) Defects, and ten percent (10%) identified more than ten (10) Defects.

Of the 21,467 Notices of Defect sent through the end of the Reporting Period, fifty-six percent (56%) include Defects identified during initial claims review and prior to the Medical Record Review stage.  Thirty-three percent (33%) of the 128 Notices of Defect sent during the Reporting Period identified at least one Defect prior to the Medical Record Review stage in the claims process.  The five (5) most common material Defects identified for the population are as follows:

- "Missing Declaration of Injury document";

- "Missing Medical Records documentation";

- "Documentation included with the claim does not establish that the claimant was employed as a Clean Up Worker between the dates of April 20, 2010 and April 16, 2012";

- "Missing Third Party Witness Injury Declaration document"; and

- "Proof Of Residency Documents Failed To Prove Residence For 60 Days Between April 20, 2010 And September 30, 2010 for Zone A."

Of the 21,467 Notices of Defect sent through the end of the Reporting Period, forty-one percent (41%) include Defects identified during the Medical Record Review process. Sixty-seven percent (67%) of the 128 Notices of Defect sent during the Reporting Period identified at least one Defect subsequent to the Medical Record Review stage in the claims process. The five (5) most common material Defects identified during the Medical Record Review process are as follows:

- "No medical records were submitted or the documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION";

- Generally – "The medical records do not meet the criteria set forth in Level A2, A3, A4, and/or B1 of the Specified Conditions Matrix."  Specifically – "The date of first diagnosis for the claimed SPECIFIED PHYSICAL CONDITION occurred on or after April 16, 2012. This claimed condition does not qualify as a SPECIFIED PHYSICAL

CONDITION as set forth on the SPECIFIED PHYSICAL CONDITIONS MATRIX"[4];

- "The documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION";

- "The medical records do not meet the criteria set forth in Level A2 of the Specified Conditions Matrix:  The medical records submitted do not support the assertions in the declaration concerning the time of onset of the claimed SPECIFIED PHYSICIAL CONDITION following the alleged exposure as set forth in the SPECIFIED PHYSICAL CONDITIONS MATRIX"; and

- "The third-party declaration does not meet the criteria set forth in Level A1 of the Specified Physical Conditions Matrix:  The third-party declaration was not signed by the individual submitting the third-party declaration."

As of the end of the Reporting Period, the response period had expired for 21,318 (ninety-nine percent (99%)) of claims having received a Notice of Defect.  The overall response rate was forty-nine percent (49%).  The response rate for unrepresented claimants or Class Members was thirty-four percent (34%), while the response rate for represented claimants or Class Members was fifty-two percent (52%).  As previously reported, failure to respond to or cure all Defects identified within a Notice of Defect will not necessarily result in the denial of a claim, because only some aspects of a claimant's claim may be defective and listed in a Notice of Defect.  In that circumstance, even if the claimant failed to respond to the Notice of Defect or to cure all of the Defects listed in it, the claimant might still receive compensation. Specifically, of claimants or Class Members who received a Notice of Defect that included Defects identified during the Medical Record Review process, eighty-five percent (85%) were subsequently found to qualify for SPC compensation. Furthermore, a claimant who has a Defect in his or her claim

---

[4] This Defect results from the Court's July 23, 2014 Order (Rec. doc. 12862) holding that all conditions first diagnosed after April 16, 2012 must be classified as Later-Manifested Physical Conditions.  Notably, the Claims Administrator does not automatically deny claims where the medical records initially submitted with the claim indicate a date of first diagnosis after April 16, 2012.  Rather, we issue a Notice of Defect to afford the Class Member the opportunity to provide medical record evidence of the diagnosis that pre-dates April 16, 2012.  If the Class Member does not submit any such records, the Class Members claim for SPC compensation would be denied, but the Class Member would be free to pursue compensation for that condition as an LMPC.

for compensation for an SPC but has proven that he or she is a Class Member will receive a Notice of Determination for the PMCP benefit.  Hence, such Class Member can take advantage of that benefit while attempting to cure the Defects in his or her claim for SPC compensation.

### C.    Claims Processed Through Each Stage of Claims Review

As discussed above, a significant percentage of the POCFs submitted continue to contain one or more deficiencies or Defects.  These deficiencies and Defects not only increase the amount of time it takes for a claimant to reach the determination stage, but also increase the time it takes the Claims Administrator to process the claims.  The Claims Administrator must wait as long as sixty (60) or 120 days to receive the responses to the RAIs and/or Notices of Defects, respectively, and then must process the responses.

During the Reporting Period, the Claims Administrator has reviewed and/or processed the following numbers of claims through each of the following sequential stages in the claims review process:

| TABLE 5: CLAIM REVIEW PROCESSING | | |
|---|---|---|
| Processing Stage | Number of Claims[5] | |
| | Reporting Period | Total |
| Notice of Defect Gate One Process (Which Includes Class Membership Defects)[6] | 42 | 12,087 |
| Declaration Review Process[7] | 337 | 41,736 |
| RAI Process[8] | 30 | 29,171 |
| Medical Record Review Process[9] | 509 | 30,954 |
| Notice of Defect Gate Two Process[10] | 86 | 9,386 |

---

[5] Claims can move through Declaration Review (due to responses to RAI), the RAI Process (due to a defective response to an RAI-Missing, resulting in an RAI-Incomplete), and Medical Record Review (due to cure responses to originally defective claims) multiple times.

[6] Total claims with Gate One Defects, including basis of participation Defects, which received a Notice of Defect. Gate One Defects are those such as "Missing Declaration of Injury Document" or "Missing Medical Records Documentation," which prevent a claim from moving to Medical Record Review.

[7] Total number of injury declaration reviews completed.  A claim may go through this process more than once as a result of RAI responses.

[8] Total claims requiring an RAI that received a RAI.

[9] Total claims that were reviewed by Claims Administrator's Medical Record Review staff.

The Claims Administrator completed another 509 medical record reviews during the Reporting Period, bringing the total initial reviews completed since inception to 30,954.

**D.      Claims Sent Dispositive Correspondence for a Specified Physical Condition**

The overall percentage of all claims reaching final determination has increased over the Reporting Period to ninety-nine percent (99%).  The total number of claims approved for SPC compensation over the Reporting Period has continued to increase, due in part to the receipt of responses to previously pending RAIs and Notices of Defect for both the 2014 Claims and 2015 Claims, as well as improved processing speeds.

During the Reporting Period, we sent SPC Notices of Determination to 2,403 Class Members, approving them for $9,956,664 in compensation.   Since the inception of the Settlement, we sent SPC Notices of Determination to 22,094 Class Members, approving them for $63,660,312 in compensation.  Over this Reporting Period, the total percentage of finalized 2014 Claims moving to an approved determination increased to fifty-three percent (53%).   Over this Reporting Period, the total percentage of finalized 2015 Claims moving to an approved determination decreased to sixty-five percent (65%).

The Claims Administrator also sent 24 "Approved with Defects" notices during the Reporting Period, bringing the total number of "Approved with Defects" notices sent since inception to 3,040.  An "Approved with Defects" notice is sent to a Class Member who has at least one valid SPC but one or more other SPCs that contain a Defect and might result in an award of higher compensation.  A Class Member receiving this notice can choose either to attempt to cure the Defects and thus possibly receive greater compensation or to waive that opportunity and proceed to determination on his or her valid SPC(s).  Two thousand nine

---

[10] Total claims that have completed Medical Record Review but that contain Defects preventing a final determination.

hundred nine (2,909) of the 3,040 Class Members who received an "Approved with Defects" notice subsequently received an SPC Notice of Determination.  The total compensation for the remaining 131 Class Members who received an "Approved with Defects" notice but who have not yet received an SPC Notice of Determination is $924,650.  Therefore, the total amount allocated (by SPC Notices of Determination) and to be allocated (by "Approved with Defects" letters) is $64,584,962.

The Claims Administrator sent 64 Notices of Denial during the Reporting Period, for a total of 13,327 Notices of Denial from the inception of the Settlement through the end of the Reporting Period.  All of these claims have been denied because the claimant did not qualify as a Class Member, because the claimant opted out of the settlement, and/or because the claimant did not meet the criteria established by the MSA to receive compensation for an SPC.

A summary of the dispositive correspondence sent on claims for compensation for an SPC is set forth in Table 6, below.

| TABLE 6: CLAIMS DISPOSITION AND CORRESPONDENCE | | |
|---|---|---|
| **Approvals** | **Reporting Period** | **Total** |
| SPC Notices of Determination Sent — 2014 Claims | 606 | 6,389 |
| SPC Notices of Determination Sent — 2015 Claims | 1,797 | 15,705 |
| SPC Notices of Determination Sent Total | 2,403 | 22,094 |
| **Denials** | **Reporting Period** | **Total** |
| Notices of Denial Sent — 2014 Claims | 32 | 5,005 |
| Notices of Denial Sent — 2015 Claims | 32 | 8,322 |
| Notices of Denial Sent — Total | 64 | 13,327 |

### E.   Claims Approved for SPC Compensation

During the Reporting Period, the amount of SPC compensation for which Class Members were approved increased, as reflected in Table 7, below.

| TABLE 7: APPROVED CLAIMS FOR SPCs[11] | | | | | | |
|---|---|---|---|---|---|---|
| SPC | Reporting Period Number Approved | Total Number Approved to Date | Reporting Period Amount Approved | Total Amount Approved to Date | Total "Approved with Defects" Amount Allocated to Date | Total Compensation Allocated to Date |
| A1 | 1,585 | 17,703 | $1,953,300 | $22,458,700 | $44,200 | $22,502,900 |
| A2 | 626 | 2,782 | $5,090,800 | $21,850,914 | $556,550 | $22,407,464 |
| A3 | 150 | 1,307 | $1,919,164 | $16,545,682 | $247,000 | $16,792,682 |
| A4 | 27 | 268 | $82,900 | $770,716 | $16,200 | $786,916 |
| B1 | 15 | 34 | $910,500 | $2,034,300 | $60,700 | $2,095,000 |
| | | | | | | |
| Total | 2,403 | 22,094 | $9,956,664 | $63,660,312 | $924,650 | $64,584,962 |

As set forth in the MSA, Class Members can only be paid once certain potential obligations to third parties are identified and resolved. The resolution of these obligations is dependent upon the responsiveness of both governmental agencies and private interests in replying to the Claims Administrator's requests for information and resolution. The obligations generally fall into two general categories: healthcare-related obligations and other obligations.

The resolution of healthcare obligations involves confirming whether a Class Member received benefits from a governmental payor (such as Medicare, Medicaid, or the Veterans' Administration) or a private healthcare plan for a compensable injury such that the Class Member must now reimburse those entities for the amounts they paid. The processing phases include (1) confirming entitlement with the government agency or private plan, (2) receiving claims from the agency or plan, (3) auditing those claims and disputing any that are unrelated to the Class Member's compensable injury, and (4) final resolution. Pursuant to the terms of the

---

[11] Please note that the total volumes and total dollars approved are subject to change in each Reporting Period due to later received and processed Requests for Review.

MSA, the Claims Administrator obtained an agreement from CMS establishing capped repayment amounts per SPC for Class Members who are or were beneficiaries of Medicare. The Claims Administrator also negotiated with state Medicaid agencies to cap recovery for Medicaid-entitled Class Members. Most states agreed to waive recovery rights for Class Members receiving compensation for an A1 claim. Additionally, most state Medicaid agencies agreed to a twenty percent (20%) cap on and up to a thirty-five percent (35%) offset for fees and costs typically associated with their recovery, thereby allowing partial funding to the Class Member while full resolution is pending. Processing times for Medicaid-entitled Class Members eligible for payment will vary. Each state has its own processing standards for responding to entitlement requests, producing claims, and finalizing lien amounts.

The resolution of non-healthcare-related obligations involves identifying the various types of obligations and working with the claimant or the claimant's representative to resolve them. The processing phases include (1) identifying the obligation (through review of claim documents, PACER searches, and searches of the Louisiana Child Support Database), (2) sending correspondence seeking documentation that will resolve the complication, (3) reviewing the submitted documentation for sufficiency, and (4) final resolution. The Claims Administrator tracks responses to its correspondence and sends a follow-up letter to non-responsive parties after thirty (30) to sixty (60) days have passed (with the length of time depending on the complication). We will also send follow-up correspondence when the responses contain insufficient documentation. The resolution time for payment complications varies and remains heavily dependent upon the timeliness and sufficiency of the third parties' responses to our information requests. Through the end of the Reporting Period, the average age

of claims awaiting payment from the date final determination is approximately 158 days depending on the complexity of the payment complications.

Once the obligations affecting a given claim are resolved and any liens or reimbursement obligations are paid, the Claims Administrator is able to disburse the balance of the Class Member's compensation.

### F.   Data Disclosure Form Submissions and Results

Data Disclosure Forms may be filed at any time during the claims review process by Natural Persons seeking information from the databases, data fields, and other documentary evidence provided by BP to the Claims Administrator.  Notably, Data Disclosure Forms may continue to be filed *after* the submission of a Proof Claim Form and therefore can be filed *after* the claims filing deadline of February 12, 2015.  Information provided via the submission of a Data Disclosure Form allows the Claims Administrator to make a determination concerning (a) the status of a Natural Person claiming to be a Clean-Up Worker and/or (b) a claim made by a Clean-Up Worker for compensation for a Specified Physical Condition.  *See* MSA § XXI.B.

During the Reporting Period, the Claims Administrator received 20 Data Disclosure Forms, for a total of 27,231 Data Disclosure Forms since the approval of the MSA.  The Claims Administrator responded to 19 Data Disclosure Forms during the Reporting Period, bringing the total number of responses to 32,943 since the approval of the MSA.  Of the 27,231 Data Disclosure Forms received, 20,533 were related to unique claimants, while 6,698 were Data Disclosure Forms with additional information filed by the same claimants.  Among the unique claimants filing Data Disclosure Forms, eighty-four (84%) were confirmed as Clean-Up Workers by finding a match in at least one employer database other than the "Training" database. Twelve percent (12%) of those unique claimants were matched in the "Medical Encounters" database,

while nineteen percent (19%) were matched in a medically relevant database, such as the "Traction" database or the "Injury/Illness" database.

## IV.   CLASS MEMBER SERVICES CENTER ACTIVITY

The Claims Administrator operates a Class Member Services Center located in New Orleans to communicate with Class Members and their attorneys and to assist them with filing their claims.  During the Reporting Period, the Class Member Services Center received 6,090 telephone calls.  Since opening, the Class Member Services Center has received a total of 199,898 telephone calls.  The Class Member Services Center handled an average of 94 calls per day.  The average length of each telephone call was seven minutes and eighteen seconds, with an average wait time of four minutes.  The Class Member Services Center also received 26 emails during the Reporting Period.

| TABLE 8: CLASS MEMBER SERVICES CENTER | | |
|---|---|---|
| | Reporting Period | Total |
| Calls Received | 6,090 | 199,898 |
| Average Length of Call (min:sec) | 7:18 | 6:39 |
| Average Wait Time (min:sec) | 2:34 | 0:48 |
| Emails Received | 26 | 3,041 |
| Walk-Ins | 3 | 737 |

## V.   PERIODIC MEDICAL CONSULTATION PROGRAM

### A.   Class Members Eligibility for and Participation in the PMCP

During the Reporting Period, the Claims Administrator approved 147 claims for participation in the PMCP and mailed 959 PMCP Notices of Determination.  Since the inception of the Settlement, the total number of Class Members receiving a PMCP Notice of Determination is 26,992.  The Claims Administrator received requests for and scheduled 352

physician visits during the Reporting Period, and Class Members attended 298 appointments in the Reporting Period.

| TABLE 9: PERIODIC MEDICAL CONSULTATION PROGRAM | | |
|---|---|---|
| | **Reporting Period** | **Total** |
| Class Members Approved to Receive Physician Visits[12] | 147 | 27,142 |
| PMCP Notices of Determination Sent | 959 | 26,992 |
| Physician Visits Requested and Scheduled | 352 | 3,013 |
| Appointments Attended by Class Members | 298 | 2,936 |
| Annual Update Letters Sent to Class Members | 3,106 | 24,327 |

### B.     Provider Network

During the Reporting Period, the Claims Administrator added two (2) medical provider organizations, with two (2) delivery sites, to its network of providers established to provide certain covered services to Class Members who participate in the PMCP, bringing the total number of medical provider organizations to 203. These medical provider organizations represent 476 service delivery sites. As a result of these additions, ninety-eight percent (98%) of eligible Class Members who have requested a PMCP evaluation resided within twenty-five (25) miles of a network provider at the conclusion of the Reporting Period. The Claims Administrator continues to expand the medical provider network in its efforts to ensure that no Class Member will have to wait more than thirty (30) days or travel more than twenty-five (25) miles for an appointment.

### VI.     BACK-END LITIGATION OPTION

During the Reporting Period, twenty-four (24) Class Members filed Notices of Intent to Sue for compensation for a Later-Manifested Physical Condition, bringing the total number to 461 Class Members to date. Of the twenty-four (24) Notices of Intent to Sue filed in the

---

[12] The total physician visits will exceed the total number of Class Members qualified for the PMCP benefit, as Class Members may be referred to specialists and will eventually be eligible for subsequent primary visits.

Reporting Period, six (6) were approved, one (1) was denied and seventeen (17) contained deficiencies that could be corrected by the Class Member.

| TABLE 10: CLAIMS FOR LATER-MANIFESTED PHYSICAL CONDITIONS | | |
|---|---|---|
| | Reporting Period | Total |
| Notices of Intent to Sue Filed | 24 | 461 |
| Notices of Intent to Sue Approved | 6 | 46 |
| Notices of Intent to Sue Denied | 1 | 180 |
| Notices of Intent to Sue Deficient[13] | 17 | 235 |

Of the 180 claims denied to date, ninety-nine percent (99%) were denied because the conditions claimed were diagnosed on or before April 16, 2012 and therefore could not be claimed as Later-Manifested Physical Conditions. The other reasons for denial include, among other things, that the claim was precluded by a previously filed workers' compensation claim.

Of the 235 defective claims to date, the three (3) most common material Defects identified are as follows:

- "Identification of BP defendants in Section VII is missing";

- "You must provide medical records indicating a date of diagnosis that is after April 16, 2012 or a completed Physician's Certification Form"; and

- "The date on which the claimed Later-Manifested Physical Condition(s) were first diagnosed in Section VI.A.2 is missing."

---

[13] Class Members who cure Defects within their original Notice of Intent to Sue will then be classified as "Approved" or "Denied" in future reporting, based on the responses received.

| TABLE 11: APPROVED NOTICES OF INTENT TO SUE | | |
|---|---|---|
| **Mediation Elections** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which at Least One BP Defendant Elected Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Pending a Decision from One or More BP Defendants Regarding Mediation | 6 | N/A |
| Later-Manifested Physical Condition Claims for Which No BP Defendants Elected Mediation | 2 | 42 |
| | | |
| **TOTAL:** | **8** | **46** |
| | | |
| **Results of Mediation** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims Settled by Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Settled by Mediation as to One but Not All BP Defendants Listed in the Notice of Intent to Sue | 0 | 0 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLAIMS MEDIATED:** | **0** | **0** |
| | | |
| **Back-End Litigation Option Lawsuit** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which No BP Defendant Elected Mediation | 2 | 42 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLASS MEMBERS ELIGIBLE TO FILE A BACK-END LITIGATION OPTION LAWSUIT[14]** | **2** | **2** |

Out of the forty-six (46) approved Notices of Intent to Sue to date, the BP Defendants did not elect to mediate any of the claims.  Of the forty-two (42) claims eligible to file a Back-End Litigation Option Lawsuit over the life of the Settlement, thirteen (13) had filed as of the end of

[14] The total eligible for the Back-End Litigation Option over the life of the Settlement was forty-two (42).  However, of the forty-two (42), only two (2) are currently eligible for the Back-End Litigation Option.  The other forty (40) claims are no longer within the six-month (6-month) timeframe for properly and timely filing a Back-End Litigation Option Lawsuit.

the Reporting Period.  Two (2) Class Members became eligible to file a Back-End Litigation Option Lawsuit during the Reporting Period, bringing the total number of Class Members eligible to file a Back-End Litigation Option Lawsuit to two (2) through the end of the Reporting Period.

## VII.   GULF REGION HEALTH OUTREACH PROGRAM

### A.   Funding and Coordinating Committee Activities

In accordance with Section IX of the MSA, the Gulf Region Health Outreach Program ("GRHOP") was established in May 2012 to expand capacity for and access to high quality, sustainable, community-based healthcare services, including primary care, behavioral and mental health care and environmental medicine, in the Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle. The program consists of five (5) integrated projects: the Primary Care Capacity Project ("PCCP"), Community Involvement ("CI"), the Mental and Behavioral Health Capacity Project ("MBHCP"), the Environmental Health Capacity and Literacy Project ("EHCLP"), and the Community Health Workers Training Project ("CHWTP"). As of the end of the Reporting Period, the Claims Administrator disbursed $104,713,294 to the projects, as detailed in the chart below.

| TABLE 13: GRHOP | |
|---|---|
| **Project** | **Funding to Date** |
| Primary Care Capacity Project | $46,655,925 |
| Community Involvement | $3,213,491 |
| Mental and Behavioral Health Capacity Project ((Louisiana State University Health Sciences Center) | $14,359,145 |
| Mental and Behavioral Health Capacity Project (University of Southern Mississippi) | $8,256,486 |
| Mental and Behavioral Health Capacity Project (University of South Alabama) | $8,256,489 |
| Mental and Behavioral Health Capacity Project (University of West Florida) | $5,025,696 |
| Environmental Health Capacity and Literacy Project | $14,957,416 |
| Community Health Workers Training Project | $3,988,646 |
| | |
| **TOTAL:** | **$104,713,294** |

The final disbursement was made in May 2016, which accounted for an eighteen (18) month low-cost extension of the GRHOP, as agreed upon by the Parties and Coordinating Committee members. All projects, except for Community Involvement,[15] will participate in this extension period.  Estimated administrative costs during the extension period, totaling $286,706, were accounted for by the Claims Administrator, with all projects contributing to these costs. Therefore, the May 2016 disbursement brought the total funding to the GRHOP to $104,713,294.

The GRHOP is governed by a Coordinating Committee that continues to function in a cooperative and integrated manner, with quarterly in-person meetings around the Gulf Coast, as well as monthly conference calls. These quarterly meetings offer the grantees the opportunity to share their progress, discuss challenges faced, and collaborate with their partners to work through issues that affect the GRHOP as a whole.

---

[15] Community Involvement has chosen not to participate in the eighteen (18) month low-cost extension.

The Claims Administrator held a quarterly meeting on January 27, 2017, in New Orleans, Louisiana.[16]   This meeting covered the activities of one (1) of the five (5) GRHOP subcommittees — the Publication Subcommittee.[17] During the meeting, discussions were had regarding a special GRHOP issue for the Journal of Public Health Management and Practice. Writing teams from the Subcommittee reviewed contributions to the Journal, assigned lead authors to manage drafts and ensure completion of the final manuscript for submission, and composed a rigorous schedule to meet the anticipated publication date.

In addition to administering the conferences and quarterly meetings for the GRHOP Coordinating Committee, the Claims Administrator continues to manage the GRHOP website. The website launched on July 3, 2014 and can be publicly accessed at www.grhop.org.  The website contains detailed descriptions and notable accomplishments of each project, as well as information regarding the GRHOP Coordinating Committee, news/events, and publications.

## B.    GRHOP Project Updates

The GRHOP projects have made substantial progress in achieving the goals set forth in their Grant Proposals. Some notable accomplishments of the projects include:

- The **Primary Care Capacity Project**, led by the Louisiana Public Health Institute ("LPHI"), which has:

  o Continued implementation of final performance year agreements with directly funded coastal primary care practices, state partnership agreements with four (4) primary care associations ("PCA"), and state based systems projects. Funded partners focused on delivering upon contracted scopes of work, and PCCP internal members prioritized efforts related to sustaining the unique network of clinics, PCAs, and additional strategic partners. PCCP team members conducted strategy meetings with each state PCA to discuss interest, structure, and services that may exist in a formal network of coastal partners supported through LPHI;

---

[16] The Claims Administrator will hold its next quarterly meeting on April 21, 2017 in Long Beach, Mississippi. The Claims Administrator will report on that meeting in its second quarterly report of 2017.

[17] The five (5) GRHOP subcommittees include: the Data Sharing Subcommittee, Evaluation Subcommittee, Health Promotions Subcommittee, Newsletter Subcommittee, and Publication Subcommittee. These subcommittees were formed during the July 31, 2014 quarterly meeting.

- o Clinics participating in the Community Centered Health Homes ("CCHH") demonstration project continued to implement community projects with local community-based organizations;

- o The internal LPHI team worked towards sustainability efforts for CCHH, such as development of marketing materials for the program, participation in a national funder's forum, and partnership with clinics on joint grant proposals; and

- o Completed the Fifth Annual Regional Care Collaborative ("RCC") spring forum, "Beyond Sustainability: Growing and Thriving", in Pensacola, Florida.  The event welcomed one hundred and fifteen (115) participants, including representatives from funded clinics and partners, state PCAs, GRHOP partners, and public health institutes. The forum focused on peer exchange and training on areas related to population health management, data and analytics, emergency management, and other topics regarding the advancement of high quality primary care practices.

- **Alliance Institute's** outreach on behalf of the GRHOP and its partners has reached over 1,500 individuals across Louisiana, Mississippi, Alabama, and Florida. Alliance Institute, the grantee responsible for Community Involvement, has:

  - o Started the process of assisting community-based organizations ("CBOs") for the wind down of the program, including finalizing consultant processes.

  - o Notable highlights from Community Involvement CBOs include:

    - ▪ United Houma Nation began a two (2) year project to engage tribal members in studying impacts of climate change and land loss;

    - ▪ Zion Travelers held two (2) community Louisiana Safe Initiative meetings with Foundation of Louisiana, and a meeting on climate justice with the Plaquemines Parish president. Zion Travelers has continued to support youth groups in New Orleans to reduce community violence;

    - ▪ El Pueblo – Mujeres Unidas held a workshop for participants and service providers on how to support immigrant families in cases of deportation, including information on power of attorney, property transference, guardianship court support, and guardianship transference; and

    - ▪ National Association for the Advancement of Colored People Panhandle completed eighty (80) surveys with the Okaloosa County Health Department on the overall wellness of community members in the Okaloosa Country.

- The **Environmental Health Capacity and Literacy Project** ("EHCLP"), with its grantee being Tulane University, has achieved the following:

  - o Occupational and Environmental Health Specialty Network:

- The Association of Occupational and Environmental Clinics ("AOEC") coordinated an educational session on occupational asthma at PanCare of Florida, a federally qualified health center, for ninety-six (96) clinic staff members in March 2017. Tulane University provided continuing medical education credits to thirty-nine (39) participants.

o Training and Leadership Development:

- The Emerging Scholars Environmental Health Science Academies at Tulane University, University of South Alabama, and University of West Florida carried out recruitment and started planning for upcoming summer programs.

- The University of South Alabama hosted a teacher workshop for nine (9) teachers on environmental and health sciences.

- EHCLP hosted the Community Health Worker ("CHW") Annual Meeting for placed CHWs and supervisors in February 2017, in Biloxi, Mississippi. A total of forty-one (41) people attended the meeting, which provided professional development training on environmental health, obesity, hypertension, and diabetes.

o Community Resilience and Family Wellness

- Fussy Baby Network® New Orleans & Gulf Coast ("FBNNOGC") served nine (9) families, with a total of thirteen (13) home visits and seven (7) phone sessions. In addition, the program served forty (40) families through parent education support groups.

- The **Community Health Workers Training Project**, directed by the University of South Alabama's Coastal Resource and Resiliency Center ("CRRC"), has:

o Continued training of Lay Health workers to build social capital in the Gulf Coast communities;

o Held a Peer Health Advocate training session for twenty-one (21) trainees from Alabama, Florida, Louisiana, and Mississippi from March 5-8, 2017 in Mobile, Alabama;

o Planned a Community Health Worker evaluation retreat for August 20-22, 2017 in Mobile, Alabama, and a Chronic Disease Management training session for September 24-29, 2017 in Mobile, Alabama; and

o Submitted an article, "Training Community Health Workers to Enhance Disaster Resilience", on March 23, 2017 for publication in the GRHOP Special Issue, supported by the Journal of Public Health Management & Practice.

- The **Mental and Behavioral Health Capacity Project**, implemented by a coalition of four (4) academic institutions (Louisiana State University Health Sciences Center

("MBHCP-LA"), the University of Southern Mississippi ("MBHCP-MS"), the University of South Alabama ("MBHCP-AL"), and the University of West Florida ("MBHCP-FL")), has achieved the following:

o   MBHCP-LA has:

- Provided over 11,462 mental and behavioral health direct services, including therapeutic services, strength based supportive services, brief interventions and evaluations, community outreach, trainings, and workforce development;

- Continued collaboration with community partners as an integral part of the MBHCP-LA service provision and efforts toward sustainability;

- Continued implementation of telepsychiatry as an important component of treatment;

- Collaborated with GRHOP partners, under the direction of Dr. Howard Osofsky, for the Gulf of Mexico Oil Spill and Ecosystem Conference in February 2017;

- Implemented the Perinatal Maternal and Infant Health program to improve care for pre and post-natal depression and pre-natal substance use, and provide other supportive behavioral health services to support the needs of high risk mothers; and

- Held a meeting with representatives from the National Child Traumatic Stress Network, where discussions took place regarding ways to support trauma informed integrated pediatric care.

o   MBHCP-MS has achieved the following:

- The Mississippi Integrated Health and Disaster Program ("M-IHDP") Clinical Director conducted a leadership training for practice managers and the executive team of the Federally Qualified Health Centers ("FQHC") in January 2017.

- M-IHDP administrative staff attended a meeting with the Behavioral Health ("BH") Lead, BH Chief Executive Officer and a local hospital's case management team. The meeting focused on discussions on ways to link patients to health care services in the community and to reduce readmission rates.

- M-IHDP social workers continued to assist with Healthcare for the Homeless screenings in multiple clinic locations to obtain assistance for primary and specialty health care services, transportation, and reduced cost medication for their established homeless patients.

- An Advanced Continuing Education Workshop, titled "Shhh, Don't Tell! Ethics and Confidentiality in Health Care Social Work", was held on February 6, 2017. The workshop focused on the National Association of Social Workers ("NASW") Code of Ethics and the NASW Standards for Practice in Health Care.

- The M-IHDP Clinical Director provided an interactive training on Motivational Interviewing for the annual All Staff Training. The goal of the training was to help staff better engage patients, improve communication skills, and help facilitate and support patients in becoming more engaged in their health care.

o MBHCP-AL has:

- Delivered quality services to over 1,300 individual patients and conducted approximately 1,000 chart reviews;

- Continued operations of the Attention Problems Presented in the Learning Environment ("APPLE") team. The APPLE team has observed approximately seventeen (17) students and completed five (5) assessments as part of an on-site coordinated school care team;

- Shared program evaluations and scientific findings by publishing three (3) manuscripts, presenting two (2) posters at regional and national conferences, and delivering seven (7) oral presentations;

- Actively provided services for the Mobile County Public School System ("MCPSS"). Barbra Caddell, a Behavioral Health Provider, had over 272 individual patient encounters. She also led four (4) psycho-educational groups for elementary school students, affecting approximately seventy-five (75) students and four (4) teachers; and

- Supported a Youth Mental Health First Aid training effort by MCPSS for eighteen (18) people on March 17, 2017.

o MBHCP-FL has:

- Continued engagement with community partners for sustainability;

- Worked closely with FQHCs to provide assistance to further integrate mental and behavioral health services;

- Attended the Gulf of Mexico Oil Spill & Ecosystem Science Conference in New Orleans, Louisiana;

- Sponsored two (2) FQHC clinicians and one staff member to attend "The Immune System: The Mind-Body Connection" seminar;

- Sponsored one (1) FQHC clinician to attend a Trauma Competency seminar; and

- Sponsored Lynne Cunningham's breakout session, "The Missing Ingredient in Sustainability – Employee Engagement" at the Fifth Annual Regional Care Collaborative, hosted by LPHI.

## C.  GULF REGION HEALTH OUTREACH PROGRAM LIBRARY

In accordance with Section IX.H of the MSA, the Claims Administrator has established a publicly accessible online library, which exists as a repository of information regarding information related to the health effects of the *Deepwater Horizon* incident, including, but not limited to: (a) the composition, quantity, fate, and transport of oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and contaminants used in Response Activities; (b) health risks and health studies relating to exposure to oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and decontaminants used in Response Activities; (c) the nature, content, and scope of *in situ* burning performed during the Response Activities; and (d) occupational safety, worker production, and preventative measures for Clean-up Workers.

The library houses over 197,000 relevant documents, each tagged with a specific search category based on the type of information identified within the MSA. The Claims Administrator will continue to add Library Materials in accordance with the MSA.

Respectfully submitted,

*DEEPWATER HORIZON* MEDICAL BENEFITS
CLAIMS ADMINISTRATOR


By: /s/ Matthew L. Garretson
    Matthew L. Garretson

32

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of the electronic filing in accordance with the procedures established in MDL 2179, on this 8th day of May, 2017.

Respectfully submitted,

*/s/ Matthew L. Garretson*
Matthew L. Garretson