UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO ON APRIL 20, 2010 | MDL NO. 2179<br><br>SECTION "J" |
| THIS DOCUMENT RELATES ONLY TO:<br>Civil Action Nos. 13-1971;<br>10-8888 Doc No. 133248; 10-9999<br>Doc. No. 401 & 14-1525 | JUDGE BARBIER<br>MAG. JUDGE WILKINSON |

## ORDER AND REASONS ON MOTION

Plaintiff, the Edward Wisner Donation (the "Donation"), hired the Joint Venture Attorneys (the "Joint Venture")[1] to represent it in its claims against BP Exploration & Production, Inc. ("BP") for damages resulting from the Deepwater Horizon oil spill. The Joint Venture filed a Motion for Fees Pursuant to Contingency Fee Contract, seeking an award of attorney's fees from the Donation's settlement with BP. Record Doc. No. 22267.[2] Mark E. Peneguy, Edward W. Peneguy, Jr., Richard A. Peneguy, Jr. and Wendell H. Cook, Jr., who are some of Edward Wisner's heirs and some of the Donation's beneficiaries (the "Heirs"), filed a memorandum in partial opposition to the motion. Record Doc. No. 22378. The Joint Venture received leave to file a reply memorandum, Record Doc. Nos. 22392, 22443, 22447, and the Heirs received leave to file a surreply. Record Doc. Nos. 22451, 22469, 22471.

---

[1]The Joint Venture consists of the law firms Herman Herman & Katz; Fayard & Honeycutt; Fred L. Herman; Leger & Shaw; and Domengeaux Wright Roy Edwards & Colomb.

[2]All record document numbers refer to the record in the Deepwater Horizon multi-district litigation, 10-MD-2179, unless otherwise noted.

Having considered the complaint, the record, the submissions of the parties and the applicable law, and for the following reasons, IT IS ORDERED that the motion is GRANTED IN PART AND DENIED IN PART as follows.

I.     BACKGROUND

Waltzer, Wiygul & Garside, LLC (formerly Waltzer & Wiygul) ("Waltzer Wiygul") represented the Donation in its claims against BP, pursuant to a written Retainer/Contingent Fee Agreement, for two years until the Donation discharged Waltzer Wiygul without cause and hired the Joint Venture. The Joint Venture's Retainer/ Contingent Fee Agreement, signed on October 17, 2012, was based on and contains many terms identical to the Donation's prior contract with Waltzer Wiygul, including a fee calculation based on reducing the settlement amount to its present value.

The City of New Orleans (the "City") is a major beneficiary of and the Trustee of the Donation. When the Donation hired the Joint Venture, the Joint Venture also represented the City in its damages claims against BP. The Donation's contract with the Joint Venture incorporates the City's separate contingency fee contract with the Joint Venture as an alternate method for calculating the contingent fee. The Donation's contract provides that it will pay the Joint Venture the lesser of the fees calculated under the two methods.

In May 2016, the Donation settled with BP for $30,000,000 payable in defined installments over 21 years. BP paid the first $5,000,000 installment on October 1, 2016,

from which $2,160,011.92 was placed into the registry of this court because of a dispute about allocation of contingent fees between the two sets of attorneys. That amount included potential contingency fees, the Joint Venture's unreimbursed costs and some attorney's fees that BP had paid directly to the Joint Venture.

In January 2017, the court awarded contingent fees of $883,571.00 to Waltzer Wiygul, which had intervened in this action to seek its unpaid attorney's fees. Record Doc. Nos. 193, 200, 201 in C.A. No. 14-1525. After entry of judgment in Waltzer Wiygul's favor, the funds in the court's registry were withdrawn and distributed in the amounts of $883,571.00 to Waltzer Wiygul; $909,024.49 in agreed-upon litigation costs to the Joint Venture; and the remaining $18,148.63 to the Donation. Record Doc. No. 22234. After the parties finished briefing the instant motion, the Joint Venture audited its costs and filed a Notice of Correction that (1) reduced the amount of its reimbursable costs from $909,024.49 to $881,137.22; (2) advised that it had refunded the difference to the Donation; and (3) increased from $17,161.20 to $18,144.93 (a difference of only $983.73) the amount of attorney's fees that BP had paid directly to the Joint Venture. Record Doc. No. 22754.

II.   THE JOINT VENTURE'S CONTINGENCY FEE CONTRACT

Some issues relevant to the instant motion were resolved by my prior decision regarding Waltzer Wiygul's intervention, which involved a dispute between Waltzer Wiygul and the Joint Venture over the allocation between them of the single contingent

fee owed by the Donation. Record Doc. Nos. 200, 201 in C.A. No. 14-1525; see Saucier v. Hayes Dairy Prod., Inc., 373 So. 2d 102, 118 (La. 1978), on reh'g (1979) (The client should pay "only one contingency fee . . . , the amount of the fee to be determined according to the highest ethical contingency percentage to which the client contractually agreed in any of the contingency fee contracts which he executed. . . . [The] fee should . . . be allocated between or among the various attorneys involved in handling the claim on the basis of" the factors in the opinion). When the Joint Venture began representing the Donation, its contingency fee contract was largely based on the Donation's previous contract with Waltzer Wiygul, in many respects copying the Waltzer Wiygul contract verbatim. Thus, evidence in the record regarding the Waltzer Wiygul contract and some of the court's prior rulings with respect to that contract are relevant to the current motion. Ultimately, I awarded fees to Waltzer Wiygul based on the factors set forth in Saucier, 373 So. 2d at 116, which governs fee allocation disputes, rather than on the express terms of Waltzer Wiygul's contract with the Donation. My decision regarding the fee due to Waltzer Wiygul did not resolve how to calculate the contingent fee owed to the Joint Venture by the Donation under the contract between them. That question is now before the court.

The Joint Venture and the Donation changed some terms from the Waltzer Wiygul contract. One such term is the first sentence of paragraph 4, which in the Joint Venture's contract provides that "the Donation will pay Attorneys as a fee for Attorneys['] services

pursuant to the LESSER OF two methodologies." Retainer/Contingent Fee Agreement, Record Doc. No. 21922-9 at p. 2, ¶ 4.

The first method is set out in paragraphs 4(a), (b) and (c) in the Joint Venture's contract, which are identical to the same paragraphs in the Waltzer Wiygul contract. Paragraph 4(a) concerns "legal services reimbursed by BP as part of a claim for oil spill removal/ response costs," for which the Donation agreed to pay its attorneys at hourly rates, after BP reimbursed the Donation for the fees. Paragraph 4(b) addresses attorneys' "services associated with obtaining interim or partial payments of oil spill damages other than response/removal costs," for which the Donation would pay its attorneys as fees ten percent of the interim damages received from BP. Paragraphs 4(a) and 4(b) provide respectively that fees paid under those provisions "will be credited as an offset against any contingent fee awarded and payable under paragraph 4(c)" and "will be deducted from any contingency fee under paragraph 4(c)." Id. at p. 2, ¶ 4(a) and p. 3, ¶ 4(b).

In addition to those fixed rate fees, paragraph 4(c) defines the contingency fee:

For services rendered in connection with physical damages and restoration costs, as well as final economic loss damages, the Donation will pay Attorneys a contingency fee based on the gross present value of benefits received by the Donation pursuant to a judgment or agreement involving any defendant . . . in the following percentages:

For benefits received, up to $10,000,000:
. . .
(ii) 18% - if the matter is resolved after suit but prior to a signed Order setting the case for trial;
(iii) 25% - if the matter is resolved after the first Order is signed setting the case for trial.

5

> For benefits received between $10,000,000 and $50,000,000:
> . . .
> (ii) 12% - if the matter is resolved after suit but prior to a signed Order setting the case for trial;
> (iii) <u>18% - if the matter is resolved after the first Order is signed setting the case for trial</u>.

<u>Id.</u> at p. 3, ¶ 4(c) (emphasis added).

I held in connection with Waltzer Wiygul's intervention that an order "setting the case for trial' was entered in Civil Action No. 14-1525 before a settlement was reached. Thus, as both the Joint Venture and the Heirs acknowledge, the contingent fee under Waltzer Wiygul's and the Joint Venture's identical paragraph 4(c) is 25 percent of the first $10,000,000 of the settlement and 18 percent of the remaining $20,000,000.

Paragraph 8 of the Joint Venture's contract (identical to paragraph 7 in the Waltzer Wiygul contract) describes how "any amounts received in settlement . . . will be distributed." <u>Id.</u> at p. 4, ¶ 8. The funds "will be distributed in this order: From the gross total amount, Attorneys will deduct case costs and common pro rata litigation related expenses which have not been paid by Attorneys, then attorneys fees, then all direct and pro rata expenses paid by Attorneys." <u>Id.</u>

Paragraph 8 provides an "example of how attorneys fees would be calculated under this Paragraph and Paragraph 4." <u>Id.</u> The example makes five assumptions in subparagraphs 8(a) through 8(e). (a) The Donation "expends $500,000 on costs related to the spill"; (b) BP paid the Donation's attorneys "removal/recovery attorney's fees totaling $100,000" under paragraph 4(a); (c) BP paid the Donation interim damages of

$400,000, for which the Donation paid its attorneys[3] $40,000 in fees under paragraph 4(b); (d) BP settled with the Donation for "damages and restoration expenses with a net present value of $5,500,000;" and (e) an order setting the case for trial had <u>not</u> been entered, so the contingent fee rate is 18 percent under paragraph 4(c)(ii). <u>Id.</u>

> On these assumptions, the fee would be calculated as follows: The contingent fee under 4(c) is calculated on gross value of the settlement less expenses paid by Donation ($5.5M [<u>i.e.</u>, the "net present value" from ¶¶ 8(d) and 4(c)] [minus] $.5M [<u>i.e.</u>, the costs from ¶ 8(a)] = $5.0M). From the gross contingency fee ($5M x .18 = $900K), fees already paid are deducted, totaling $760,000 ($900K [minus] $100K [<u>i.e.</u>, the legal fees from ¶¶ 8(b) and 4(a)] [minus] $40K [<u>i.e.</u>, the legal fees from ¶¶ 8(c) and 4(b)]).

<u>Id.</u> (bracketed material inserted).

Paragraph 5 of the Joint Venture's contract with the Donation provides an alternate contingent fee method that was <u>not</u> in Waltzer Wiygul's contract. Paragraph 5 incorporates the Joint Venture's contract with the City, which is attached to the Donation's contract. The City contract provides for a contingency fee of 17.5 percent "on any recovery collected as part of a 'global settlement' or other negotiations after January 1, 2013, net of litigation costs or expenses," or a 20 percent contingency fee, "net of litigation costs or expenses, on any recovery requiring a formal trial of some or all of

---

[3] Paragraph 8(c) of the Joint Venture's contract failed to delete or change the term "W & W" (which was defined as Waltzer & Wiygul in the Donation's original with that firm) to "Attorneys" in this sentence, as was done in the remainder of the Joint Venture's contract where it copied from the Waltzer Wiygul contract. The term "W & W" is not defined in the Joint Venture's contract. The parties agree that "W & W" in this sentence means "Attorneys."

the claims of the [Donation] in order to secure a settlement or judgment." Id. at p. 8, ¶¶ 1(a)(iv), 1(a)(v).

Paragraph 9 of the Joint Venture's contract with the Donation adds another new term. It states that "the fees and costs outlined above are the most Donation will pay for these expenses and that any and all fees and costs that may be due and owing to previous counsel Waltzer & Wiygul will be deducted from the above fee and costs structure." Id. at p. 4, ¶ 9 (emphasis added).

## III.    THE ARGUMENTS OF THE PARTIES

The Joint Venture's motion originally sought a total contingency fee of $5,154,196.49. Record Doc. No. 22267-1 at p. 9. Paragraph 4(c) of the Joint Venture's contract provides that the contingent fee is "based on the gross present value of benefits received by the Donation." Record Doc. No. 21922-9, at p. 3, ¶ 4(c). Pursuant to this language, the Joint Venture in its motion reduces the settlement amount of $30,000,000 to a present value of $24,840,876.06, based on a 3 percent discount rate. Record Doc. No. 22267-1 at p. 5; Joint Venture's Exh. 2, Record Doc. No. 22267-3.

Under paragraph 4(c), the present value is then divided into the first $10,000,000, which is multiplied by 25 percent ($2,500,000.00), and the remaining $14,840,876.06, which is multiplied by 18 percent ($2,671,357.69), yielding a total contingent fee of $5,171,357.69 ($2,500,000.00 + $2,671,357.69). From that sum, the Joint Venture's motion deducts as a "client courtesy credit" $17,161.20 in attorney's fees that BP paid

directly to the Joint Venture, for a remaining fee of $5,154,196.49. The Joint Venture acknowledges that $883,571.00 in attorney's fees previously awarded to Waltzer Wiygul by this court must be deducted from this total, leaving $4,270,625.49 as the Joint Venture's net fee. The Joint Venture makes no other deductions.

Applying the revised numbers from the Joint Venture's Notice of Correction, which was filed after the parties finished briefing the instant motion, I calculate that the Joint Venture now seeks a corrected total contingent fee of $5,153,212.76. This consists of the original total of $5,171,357.69 minus $18,144.93 (corrected from $17,161.20) as a "client courtesy credit." Deducting the fee of $883,571.00 awarded to Waltzer Wiygul leaves a net contingent fee of $4,269,641.76 now sought by the Joint Venture.

The Joint Venture argues that, because the contingent fee is based on the "gross present value" of the settlement under paragraph 4(c) and the contract contains no language expressly deferring payment of fees in the event of a settlement paid out over time, the entire fee should be paid in the present, not in the future as BP pays each installment of the settlement. The Joint Venture contends that it would be an absurd reading of the contract to discount the settlement to present value and then pay fees in the future based on that value. The Joint Venture argues:

> If the parties intended to defer the fees until and as the settlement payments were received by the Donation, (as it turns out through the year 2037), then the fees would be calculated on the full value of the individual settlement payments at the time of receipt by the Donation, and it would make no sense to define the fee in terms of "present value."FN9

FN9 Indeed, the [contrary] interpretation that has been suggested by [the Heirs] would actually result in the payment of a "past value" attorney fee, discounted, in future years, on future payments, back to the year 2016.

Record Doc. No. 22267-1 at p. 7 & n.9. The Joint Venture asserts that paragraph 8 of its contract provides that, after payment of any outstanding litigation costs <u>not</u> advanced by the attorneys, attorney's fees will be satisfied next "out of '<u>any</u>' amounts received by the Donation in settlement. This is consistent with a discounting of the fees to present day value in the event of a scheduled pay-out to the Donation, over time." <u>Id.</u> at pp. 7-8.

As to the alternate method of calculating fees set out in the City's contract with the Joint Venture and incorporated in the Donation's contract, the Joint Venture contends that this method does not apply because it would result in a larger fee than the first method set out above. The Donation's contract requires it to pay "the LESSER [fee] OF two methodologies" under either paragraph 4 of the Donation's contract or paragraph 1 of the City contract. Record Doc. No. 21922-9 at p. 2, ¶ 4. Thus, the contingent fee must be calculated under both methods to determine which yields the lower fee.

The City contract provides for a fee of either 17.5 or 20 percent of the total settlement amount, net of litigation costs or expenses, with the higher percentage applicable only if "a formal trial of some or all of the" Donation's claims was held. <u>Id.</u> at p. 8, ¶ 1(a)(iv), (v). The Joint Venture argues that the Phase One and Phase Two trials held in 2013 in the multi-district litigation triggered the higher 20 percent rate.

Thus, the Joint Venture would deduct from the $30,000,000 settlement its expenses of $881,137.22 (corrected from $909,024.00 after all memoranda regarding the instant motion had been filed) and multiply the remainder of $29,118,862.78 by 20 percent to reach a total contingency fee of $5,823,772.556. This is <u>higher</u> than the total fee of $5,153,212.76 (as corrected) that the Joint Venture calculates under the first method. Therefore, if this calculation is correct, the alternate method would not apply. The Joint Venture does not present a fee calculation at 17.5 percent. Such a calculation results in a fee of $5,095,800.99 ($29,118,862.78 x .175), which is <u>less</u> than the fee of $5,153,212.76 that the Joint Venture calculates under the first method. If the Joint Venture's calculations under the first method are correct and if no formal trial of the Donation's claims was held, so that the lower percentage applies, this lower fee would be the correct fee.

Finally, the Joint Venture argues that the Heirs lack standing to participate in the instant motion.

The Heirs concede that the Joint Venture is entitled to a reasonable contingency fee and they do not dispute the Joint Venture's use of a three percent discount rate or its present value calculation. The court accepts the uncontested discount rate and present value as reasonable.

However, the Heirs contend that the Joint Venture calculates the fee incorrectly.

Under the first method in the Donation's contract, the Heirs argue that the Joint Venture's expenses of $881,137.22 <u>and</u> the Donation's unreimbursed expenses of $375,000.00 (as discussed below, this is an approximate number) should be deducted from the gross present value of $24,840,876.06 <u>before</u> applying the percentages to calculate the fee. These deductions yield a subtotal of $23,584,738.84. Applying 25 percent to the first $10,000,000 ($2,500,000.00) and 18 percent to the remaining $13,584,738.84 of the subtotal ($2,445,252.99) yields a total contingency fee of $4,945,252.99 ($2,500,000.00 + $2,445,252.99). The Heirs argue that <u>all</u> $1,242,540.00 in attorney's fees paid to Waltzer Wiygul, consisting of $358,969.00 paid during that firm's representation and $883,571.00 awarded by the court, should then be deducted from the total contingency fee to determine the amount awardable to the Joint Venture. Thus, the Heirs deduct $1,242,540.00 and the Joint Venture's "courtesy credit" of $18,144.93 (corrected from $17,161.20) from the total calculated fee of $4,945,252.99, leaving a contingency fee of $3,684,568.06 due to the Joint Venture. <u>Id.</u> at p. 5.

Under the alternate method in the City contract, the Heirs argue that the 20 percent rate was never triggered because there was no trial in Civil Action No. 14-1525. However, even at the lower 17.5 percent rate, the Heirs admit that their fee calculation under the City contract yields a <u>higher</u> total than their calculation under the first method in paragraph 4 of the Donation's contract. <u>Id.</u> at p. 7. Under the alternate method, the Heirs deduct from the total settlement amount the same expenses described in the

previous paragraph ($30,000,000 minus $881,137.22 minus $375,000.00) and multiply the remainder of $28,743,862.78 by 17.5 percent to reach a total contingent fee of $5,030,175.99, which is <u>greater</u> than the total fee of $4,945,252.99 that the Heirs calculate under the first method. A 20 percent rate would yield an even higher fee.

The Heirs make a convoluted argument that both of the possible fees under the City contract would be less than the fee under the first method of the Donation's contract, <u>if</u> the settlement amount is <u>not</u> discounted to present value under the first method. This argument is unsupported by the language of the contract and is rejected. Paragraph 4(c) of the Donation's contract clearly requires discounting to present value.

The Heirs contend that the contingent fee should be paid to the Joint Venture in installments when the Donation receives each of the future settlement payments from BP because the first calculation method in the contract states that the "'contingency fee is based on the gross present value of <u>benefits received</u>.'" <u>Id.</u> at p. 8 (quoting ¶ 4(c)) (emphasis added). The Heirs contend that this language "expressly stated that the payment of fees would correspond in time to the payments received by the Wisner Donation and that the client and the attorneys would share the risk of non-payment" and that the Donation never agreed to an up-front payment of the contingency fee. <u>Id.</u> at pp. 8-9. The Heirs attach to their memorandum a resolution of the Donation's Advisory Committee dated February 7, 2017, which states the Donation's intent to pay the Joint Venture's attorney's fees over the life of the settlement. Record Doc. No. 22378-1. This

self-serving, after-the-fact-of-the-contract resolution is irrelevant to interpretation of the clear and unambiguous contract that the Donation signed in 2012.

The Joint Venture responds in its reply memorandum that the only portion of Waltzer Wiygul's fee that is deductible from the total contingent fee owed by the Donation is $883,571.00, the amount for which this court entered judgment, not $1,242,540.00, as the Heirs argue. Record Doc. No. 22135. The Joint Venture argues that it should not be penalized for the court's decision to deduct from Waltzer Wiygul's total fees the $358,969.00 in fixed rate fees that Waltzer Wiygul had already been paid.

The Joint Venture further responds that the first method in its contract requires the fee to be "calculated from the gross value of the Settlement – not the net value." Record Doc. No. 22447 at p. 4. The Joint Venture argues that the Heirs impermissibly deduct the Joint Venture's and the Donation's expenses from the gross present value before applying the contractual percentages, which disregards the meaning of "gross value" and reduces the initial amount to a "net" value. The Joint Venture contends that paragraph 8 "squarely places the payment of fees before the client recovery" and that the example in that paragraph (which includes cost deductions from the gross present value) only applies when a recovery is broken down into multiple categories of damages, attorney's fees and expenses, but does not apply to a lump sum settlement. Id.

The Joint Venture also argues that the Heirs provide no evidentiary support for their proposed $375,000 deduction for the Donation's unreimbursed expenses. The Heirs

took this figure from an analysis of the proposed BP settlement in March 2016 that the Joint Venture provided to the Donation. Record Doc. No. 21922-11 at p. 10, Waltzer Wiygul Exh. 10. Citing Fed. R. Evid. 408, the Joint Venture objects to the Heirs' proffer of information that was used in settlement discussions.

Finally, the Joint Venture reiterates that the contract's basis of "present value" for the contingency fee must mean that the fee is to be paid in the present.

> [I]f the client is to wait for its money to be paid out over time, then the attorneys who are to be paid first should be paid at a discounted rate that calculates the contingency fee based on today's value of the settlement. Obviously, if the entire settlement was to be paid immediately and there was no payment over time, then "present value" would be meaningless. "Present value" only makes sense in the scenario where settlement payments are made over time.

Record Doc. No. 22447 at p. 6. The Joint Venture also cites paragraph 8 of the contract, which provides that settlement amounts "will be distributed in this order: From the gross total amount, Attorneys will deduct case costs and common pro rata litigation related expenses which have not been paid by Attorneys, then attorneys fees, then all direct and pro rata expenses paid by Attorneys." Record Doc. No. 21922-9 at p. 4, ¶ 8. The Joint Venture argues that case costs have been paid and attorney's fees are due to be paid now.

The Heirs respond in their surreply memorandum that the words "gross value" in paragraph 4(c) of the contract must be read in light of paragraph 8 and that the hypothetical example in paragraph 8 shows that the Donation's costs are deducted before the contingency fee percentage is applied.

The Heirs further contend that the Joint Venture cannot object on the basis of Fed. R. Evid. 408 to its own evaluation of BP's settlement proposal. The evaluation was provided to the Donation and its beneficiaries and included an entry for "Expenses paid by Wisner (approx) – $375,099.91." The evaluation is attached to the declaration of Joel Waltzer ("Waltzer") in support of Waltzer Wiygul's Motion for Attorney Fees, Record Doc. No. 21922-10 at p 23, ¶ 67; Record Doc. No. 21922-11 at p. 10, Waltzer Wiygul Exh. 10. The Heirs argue that Rule 408 does not apply because the evaluation was provided to the Joint Venture's own clients, not to an adverse party during settlement negotiations. The Heirs also point out that the Joint Venture does not specifically deny the accuracy of the figure, which the Heirs rounded to $375,000.00 in their calculations.

IV.   ANALYSIS

A.   Standing

The Joint Venture's argument that the Heirs lack standing to respond to its motion is rejected. "[S]tanding consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (citations omitted). "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Id. at 1548 (quotations and citation omitted).

The Heirs meet these requirements. As principal and income beneficiaries of the Donation, they are named plaintiffs in this action against BP. Amended Complaint, Record Doc. No. 59 in C.A. No. 14-1525. They were clients of the Joint Venture during some of the litigation, and they have personal interests in the amount of attorney's fees to be paid from the settlement in which they have beneficial interests. The Heirs are not required to intervene in this action, as the Joint Venture suggests, to respond to the Joint Venture's motion because they are already parties. The termination of the Donation according to its terms does not affect the Heirs' interests, because the Donation's assets pass by operation of law from the trustee to the beneficiaries upon termination. Roberts v. Anderson, 733 F. Supp. 1040, 1051 (E.D. La. 1990) (citing La. Rev. Stat. § 9:2029); McAllister v. FSLIC, 709 F. Supp. 697, 700 (M.D. La. 1989) (citing La. Rev. Stat. § 9:2029).

B.    Louisiana Law of Contract Interpretation

Determination of the Joint Venture's motion requires interpretation of its contingency fee contract with the Donation, which all parties agree is governed by Louisiana law. "Under Louisiana law, 'interpretation of a contract is the determination of the common intent of the parties.'" Apache Corp. v. W & T Offshore, Inc., 626 F.3d 789, 794 (5th Cir. 2010) (quoting La. Civ. Code art. 2045). "In addition, '[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.' Thus, [u]nder Louisiana law,

the interpretation of an unambiguous contract is an issue of law for the court." Id. (quoting La. Civ. Code art. 2046) (additional quotation omitted; brackets in original).

Mere disagreement over interpretation of a contractual provision or complexity of construction does not make the provision ambiguous. Id.; Mahaffey v. Gen. Sec. Ins. Co., 543 F.3d 738, 741 (5th Cir. 2008) (interpreting Louisiana law); Vaulting & Cash Servs. v. Diebold, 199 F.3d 440 (5th Cir. 1999) (citing Ellsworth v. West, 668 So. 2d 402 (La. App. 4th Cir. 1996)); Manale v. Paul Revere Life Ins. Co., No. 05-2546, 2007 WL 6799813, at *4 (E.D. La. May 24, 2007) (citing La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 630 So. 2d 759, 766 (La. 1994)). "[O]nly when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent . . . ." Angus Chem. Co. v. Glendora Plantation, Inc., 782 F.3d 175, 180 (5th Cir. 2015) (quotation omitted) (interpreting Louisiana law).

Contingency fee contracts are enforceable under Louisiana law. Foley & Lardner, L.L.P. v. Aldar Invs., Inc., 491 F. Supp. 2d 595, 606, 607 (M.D. La. 2007) (citing Hall v. St. Paul Fire & Marine Ins. Co., 868 So. 2d 910 (La. App. 5th Cir. 2004)). "It is well settled that a prohibition against unreasonable attorney fees exists, and it cannot be abrogated by a valid contingency fee contract." In re Succession of Bankston, 844 So. 2d 61, 64 (La. App. 1st Cir. 2003) (citations omitted). However,

> [a]bsent a showing that the fee charged was clearly excessive, a contractual relationship between an attorney and client should not be altered. . . . [U]nless the attorney-client contract produces an excessive, unearned, or incommensurate fee when measured by the factors in Rule 1.5(a) of the

Louisiana State Bar Association Rules of Professional Conduct . . . , the fee charged must be considered reasonable and enforceable.

Whitney Bank v. NOGG, L.L.C., 194 So. 3d 819, 823-24 (La. App. 1st Cir. 2016) (citation omitted).

C.     Calculation of Contingency Fee

I find that the Donation's contract with the Joint Venture is unambiguous and that all of the contract's provisions, including all of paragraph 8, apply to calculation of the contingency fee. I find that the calculations proposed by the Joint Venture and the Heirs are both incorrect in some respects. According to the contract's terms, the fee is calculated as follows.

The contract provides no support for the Joint Venture's arguments that, in the first method of calculating the contingent fee, unreimbursed expenses paid by the Donation should not be deducted from the gross present value of the settlement before applying the appropriate fee percentages or that the example in paragraph 8 does not apply when there is a lump sum settlement. Waltzer drafted the fee agreement between Waltzer Wiygul and the Donation, Record Doc. No. 14960-3, which the Joint Venture's contract with the Donation copied verbatim with respect to the first method of calculating a fee. Waltzer's declaration submitted with Waltzer Wiygul's motion for attorney's fees, Record Doc. No. 21922-10 at pp. 25-28, ¶¶ 71-77, 81-82, regarding calculation of the contingent fee is relevant to and consistent with the Joint Venture contract's language, structure and intent. Waltzer acknowledged that the Donation's unreimbursed expenses must be deducted

from the present value of the settlement under paragraph 7 of Waltzer Wiygul's contract, which is identical to paragraph 8 of the Joint Venture's contract.

That paragraph provides: "From the gross total amount, Attorneys will [first] deduct case costs and common pro rata litigation related expenses which have not been paid by Attorneys . . . ." The example that follows demonstrates that "gross total amount" as used in that sentence means the same thing as "net present value" in subparagraph 8(d) of the Joint Venture's contract. The hypothetical "net present value" in subparagraph 8(d) is $5,500,000 and the Donation's costs in subparagraph 8(a) are $500,000. The sentence following the five subparagraphs of assumptions states that, before the contingency percentages are applied, the first deduction from the "gross value of the settlement" is "expenses paid by Donation ($5.5M [minus] $.5M = $5.0M)." Record Doc. No. 21922-9 at p. 4, ¶ 8. Thus, the court agrees with the Heirs that the contract provides that the Donation's unreimbursed costs must be deducted from the gross present value of the settlement before calculating the contingent percentages.

The Joint Venture has provided no evidence of the Donation's costs because the Joint Venture contends they are irrelevant. The Heirs assert that these costs are $375,000.00 based on the only evidence in the record, consisting of the Joint Venture's evaluation for the Donation of BP's proposed settlement, which includes an entry for "Expenses paid by Wisner (approx) – $375,099.91." Waltzer declaration, Record Doc.

No. 21922-10 at p. 23, ¶ 67; Record Doc. No. 21922-11 at p. 10, Waltzer Wiygul Exh. 10 (emphasis added). The Heirs rounded this number to $375,000.00.

The Joint Venture's objection that its evaluation of BP's settlement proposal is inadmissible under Fed. R. Evid. 408 is overruled. The Joint Venture provided the evaluation to the Donation, which undoubtedly provided the information about its costs. The evaluation is not being offered to "prove or disprove the validity or amount of a disputed claim," Fed. R. Evid. 408(a) (emphasis added), because the evaluation is not "conduct or a statement made during compromise negotiations about the claim." Fed. R. Evid. 408(a)(2) (emphasis added); see Commonwealth Aluminum Corp. v. Stanley Metal Ass'n, 186 F. Supp. 2d 770, 773 (W.D. Ky. 2001) (citing 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 408.06 (2d ed. 2001)) (For Rule 408 to apply, "there must be an actual dispute or difference of opinion as to the validity or amount of the claim."). The recipients of the evaluation were in attorney-client and/or co-plaintiff relationships, all of them relying on the Donation's own cost information as they evaluated a compromise offered by their mutual opponent, BP.

In addition, there is no "disputed claim" about the costs now. The cost information is purely factual. The Joint Venture has stated that "case costs have been paid," Record Doc. No. 22447 at p. 6, but has neither offered evidence of the amount nor expressly disputed the amount proffered by the Heirs. Although the official comments to Rule 408 state that it "excludes compromise evidence even when a party seeks to

admit its own settlement offer or statements <u>made in settlement negotiations</u>," the reason is that a party's revelation of its own statement or offer "could itself reveal the fact that the <u>adversary</u> entered into settlement negotiations. The protections of Rule 408 cannot be waived unilaterally because the Rule, by definition, protects <u>both parties</u> from having the fact of negotiation disclosed to the jury." Fed. R. Evid. 408, official cmt. (2011) (emphasis added). That rationale is inapplicable here. The terms of the settlement with BP are final and known to the parties to the instant motion, who contest the entirely different matter of how to calculate the contingency fee admittedly owed to the Joint Venture under a contract that requires deduction of the Donation's costs. <u>See</u> <u>Catullo v. Metzner</u>, 834 F.2d 1075, 1078-79 (1st Cir. 1987) (citing <u>Reichenbach v. Smith</u>, 528 F.2d 1072, 1074 (5th Cir. 1976)) (Rule 408 "protects parties to a settlement negotiation from adverse consequences when the negotiations fail; admissions made during the course of the negotiations may not be introduced as evidence of liability on the underlying claim . . . . [T]he rule has limited application to completed settlements which fully resolve the dispute and preclude future claims arising out of the same transaction."); <u>Arvest Bank v. Byrd</u>, No. 10-2004, 2011 WL 13130915, at *2 (W.D. Tenn. Dec. 16, 2011) (quoting <u>Keybank Nat'l Ass'n v. Leff</u>, 276 F. App'x 486, 488 (6th Cir. 2008) ("Where, as here, the letter 'was not part of a settlement negotiation, and [ ] was not an offer to compromise,' Rule 408 does not bar introduction."). For present purposes, I have considered the approximate costs information contained in the evaluation.

However, _accurate_ costs information is necessary to a final calculation of the contingent fee under both contractual methods. Accordingly, **IT IS ORDERED** that, no later than fourteen (14) days from the date of entry of this order, _either_ (1) the parties must submit a written stipulation of the amount of the Donation's unreimbursed costs, _or_, if no stipulation is reached, (2) the Joint Venture, as counsel for the Donation, must submit to the court _evidence_ of the amount of these costs. In the latter event, **IT IS FURTHER ORDERED** that the Heirs will have seven (7) days after the evidence is submitted to file any countervailing evidence or memorandum to contest the Joint Venture's evidence. Pending receipt of that evidence, I use the approximate amount of $375,099.91 in my calculations to demonstrate how the final contingent fee will be calculated when the court receives an accurate costs figure.

I disagree with the Heirs' contention that, in addition to deducting the Donation's unreimbursed costs, the litigation costs advanced by the Joint Venture must be deducted from the gross present value of the settlement before applying the contingency percentages under the first method. Paragraph 8 of the contract states that "costs paid by Attorneys" are to be deducted from the settlement _after_ the contingent attorney's fees are calculated and distributed and the hypothetical in that paragraph contains no deductions for litigation costs paid by attorneys.

Accordingly, the fee is calculated as follows under the first method of the Joint Venture's contract. The gross present value of the $30,000,000.00 settlement is

$24,840,876.06. Deducting the Donation's (approximate) costs of $375,099.91 leaves $24,465,776.15. As paragraphs 4(c) and 8 of the Joint Venture's contract require, the first $10,000,000 of that amount is multiplied by 25 percent ($2,500,000.00) and the remaining $14,465,776.15 is multiplied by 18 percent ($2,603,839.71) to find the single contingency fee owed to all of the Donation's attorneys of $5,103,839.71.

From that "gross contingency fee," attorney's "fees already paid are deducted" (last sentence of paragraph 8 of the Joint Venture's contract and paragraph 7 of Waltzer Wiygul's contract). In the contractual example, fees already paid consisted of $100,000 under paragraph 4(a) and $40,000 under paragraph 4(b). Waltzer Wiygul actually received $358,969.00 in attorney's fees under paragraph 4(a) and no fees under paragraph 4(b). Waltzer acknowledged in his declaration, as did Waltzer Wiygul's counsel in its motion and at oral argument, and the court accepted (transcript of the court's oral ruling, Record Doc. No. 22267-4 at pp. 12-13), that the fees already received must be offset against the total contingent fee owed under paragraph 4(c). This is exactly what the example in paragraph 8 of the Joint Venture's contract (paragraph 7 of Waltzer Wiygul's contract) demonstrates: "From the gross contingency fee ($5M x .18 = $900K), fees already paid are deducted, totaling $760,000 ($900K [minus] $100K [minus] $40K)." Record Doc. No. 21922-9 at p. 4, ¶ 8.

Paragraph 9 of the Joint Venture's contract acknowledges that "the fees and costs outlined above are the most Donation will pay for these expenses and that any and all

24

fees and costs that may be due and owing to previous counsel Waltzer & Wiygul will be deducted from the above fee and costs structure." Id. at p. 4, ¶ 9 (emphasis added). Contrary to the Joint Venture's argument, it is immaterial that Waltzer Wiygul received $358,969.00 in fixed rate fees and $883,571.00 as a contingent fee. Paragraph 8 of the Joint Venture's contract requires and paragraph 9 expressly confirms that all fees owed to Waltzer Wiygul will be deducted from the contingency fee. The Heirs are correct that all of Waltzer Wiygul's fees totaling $1,242,540.00 must be deducted from the total contingent fee calculated under paragraphs 4(c) and 8 of the Joint Venture's contract.

In addition, the fees in the amount of $18,144.93 that the Joint Venture received directly from BP must also be deducted. The Joint Venture stated that it would voluntarily deduct this amount as a "client courtesy," but paragraphs 4(a) and 8 require the deduction of these already-paid attorney's fees.

Under the first method, the contingent fee due to the Joint Venture is as follows:

| | |
|---|---|
| Settlement amount | $30,000,000.00 |
| Reduced to gross present value | 24,840,876.06 |
| Less Donation's unreimbursed expenses (approx.) | -      375,099.91 |
| Subtotal | 24,465,776.15 |
| | |
| 25% of first $10,000,000.00 | 2,500,000.00 |
| 18% of remaining $14,465,776.15 | +  2,603,839.71 |
| Total contingency fee | $  5,103,839.71 |
| | |
| Less fees paid to Waltzer Wiygul | -  1,242,540.00 |
| Less fees already paid to Joint Venture | -       18,144.93 |
| Fees due to Joint Venture | $  3,843,154.78 |

Under the alternative method in paragraph 5 of the Joint Venture's contract with the Donation, which incorporates the Joint Venture's contract with the City, the fee percentage depends on whether a trial was held of some of the Donation's claims. The City contract provides for a contingency fee of 17.5 percent of the settlement amount if the claims settled before trial or 20 percent "on any recovery requiring a formal trial of some or all of the claims of the [Donation]," net of litigation costs or expenses in either case. Id. at p. 8, ¶¶ 1(a)(iv), 1(a)(v). I find that many of the claims for physical damages and restoration costs under the Access Agreement between the Donation and BP that was the subject of Civil Action No. 14-1525 were inherently intertwined with the claims for physical damages and restoration costs against BP under the Oil Pollution Act and general maritime law. BP's liability under those laws was tried by the Joint Venture and other attorneys in two phases in 2013, while the Joint Venture was representing the Donation. Thus, some of the Donation's claims went through a "formal trial" and the 20 percent rate is applicable.

The contingent fee due to the Joint Venture under the alternate method is calculated as follows:

| | |
|---|---|
| Settlement amount | $30,000,000.00 |
| Less Joint Venture's litigation expenses | -     881,137.22 |
| Less Donation's unreimbursed expenses (approx.) | -     375,099.91 |
| Subtotal | 28,743762.87 |
| Multiplied by 20 percent | x            .20 |
| Total contingent fee | $  5,748,752.57 |

| Less fees paid to Waltzer Wiygul | - 1,242,540.00 |
|---|---|
| Less fees already paid to Joint Venture | -      18,144.93 |
| Fees due to Joint Venture | $ 4,488,067.64 |

The total contingent fee of $5,748,752.57 under this method is <u>higher</u> than the $5,103,839.71 total fee calculated under the first method. Therefore, the alternative method does <u>not</u> apply. The first method is the applicable method.

The amount of the Donation's actual costs, when received, will not change this conclusion since it will be identical in both calculations. However, judgment for the amount of the contingency fee cannot be entered until the Joint Venture provides the court with evidence of the actual costs, as ordered above. I find that, once the actual costs have been provided, the contingent fee under the contractual calculation is a reasonable amount. <u>Whitney Bank</u>, 194 So. 3d at 823-24.

D.    <u>Payment in the Present</u>

The Joint Venture's contract neither states expressly nor implies in any way that payment of the attorney's fees must await the Donation's receipt of future settlement installments. I agree with the Joint Venture that the requirement to calculate the contingent fee based on the settlement's "present value" necessarily and unambiguously means that the fee will be paid in the present.

"Present value" is "[t]he sum of money that, with compound interest, would amount to a specified sum at a specified future date; future value discounted to its value today." <u>Black's Law Dictionary</u> (10th ed. 2014). A promise of a series of payments over

time "is worth less than an immediate payment of the same total amount because the [recipient] cannot use the money right away, inflation may cause the value of the dollar to decline before the [promisor] pays and there is always some risk of nonpayment." Till v. SCS Credit Corp., 541 U.S. 465, 474 (2004). The recipient of a promised future amount loses the ability to invest the money now and earn compound interest on the funds until the future payment date. Thus, a "present value analysis is used to ensure that a party is not overcompensated given the time-value of money. That is, it takes into account that, because of inflation and the ability to invest, the value of money obtained at a specific date is generally more valuable than that same nominal amount of money obtained at a future date." Altec Capital Servs., LLC v. Weir Bros., No. 3:11-CV-3409-D, 2013 WL 866193, at *4 (N.D. Tex. Mar. 8, 2013) (citation omitted). "[T]he whole purpose of discounting a future award is to allow for the difference in value of money received in the present" rather than the future. Shows v. Shoney's, Inc., 738 So. 2d 724, 729 (La. App. 1st Cir. 1999) (citation omitted).

In the instant case, there would be no point to reducing the settlement amount to present value if the attorney's fees were to be paid in installments. As the Joint Venture argues, doing so "would actually result in the payment of a 'past value' attorney fee, discounted, in future years, on future payments, back to the year 2016." Record Doc. No. 22267-1 at p. 7 & n.9. The contract should not be interpreted to render meaningless and superfluous the "present value" provision in paragraph 4(c). La. Civ. Code Ann. arts.

2046, 2049, 2050; <u>Naquin v. Elevating Boats, L.L.C.</u>, 817 F.3d 235, 239 (5th Cir. 2016); <u>Uptown Grill, L.L.C. v. Shwartz</u>, 817 F.3d 251, 258 (5th Cir. 2016) (citing <u>Lewis v. Hamilton</u>, 652 So. 2d 1327, 1330 (La. 1995)); <u>First Am. Bank v. First Am. Transp. Title Ins. Co.</u>, 585 F.3d 833, 837 (5th Cir. 2009); <u>Berk-Cohen Assocs., LLC v. Landmark Am. Ins. Co.</u>, No. 07-9205, 2009 WL 3738152, at *3-4 (E.D. La. Nov. 5, 2009). The only way to give meaning to the provision and to the parties' intent is to read the contract as requiring payment in the present of the fees based on the discounted present value of the settlement. Therefore, once the accurate costs figure is received, final judgment will be entered in favor of the Joint Venture for the full contingent fee owed to it, payable immediately.

<u>CONCLUSION</u>

Accordingly, IT IS ORDERED that the motion is GRANTED IN PART in that the Joint Venture is awarded a contingent fee pursuant to its contract with the Donation, which will be calculated by reducing the total settlement to its present value of $24,840,876.06 and deducting from that amount the Donation's unreimbursed case costs, of which the court does not yet have accurate evidence. After the court has received evidence of the actual costs, that number will be deducted from the present value of the settlement. The first $10,000,000 of that subtotal will be multiplied by 25 percent ($2,500,000) and the remainder will be multiplied by 18 percent. The sum of those two numbers will be the total contingency fee (approximately $5,103,839.71 on the current

record), from which all fees previously paid to Waltzer Wiygul ($1,242,540.00) and the Joint Venture ($18,144.93) will be deducted to calculate the contingent fee now due to the Joint Venture (approximately $3,843,154.78 on the current record). The Donation must pay the entire final contingent fee, once it is calculated, to the Joint Venture upon entry of judgment, rather than as the settlement installments are received.

IT IS FURTHER ORDERED that, no later than fourteen (14) days from the date of entry of this order, either (1) the parties must submit a written stipulation of the amount of the Donation's unreimbursed costs, or, if no stipulation is reached, (2) the Joint Venture, as counsel for the Donation, must submit to the court evidence of the amount of these costs. In the latter event, IT IS FURTHER ORDERED that the Heirs will have seven (7) days after the evidence is submitted to file any countervailing evidence or memorandum to contest the Joint Venture's evidence.

The motion is denied in all other respects.

New Orleans, Louisiana, this ____22nd____ day of May, 2017.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE