# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * * | **MDL NO. 2179**<br><br>**SECTION J**<br><br><br><br>**Honorable CARL J. BARBIER**<br><br>**Magistrate Judge WILKINSON** |

---

## BP EXPLORATION & PRODUCTION INCORPORATED, BP AMERICA PRODUCTION COMPANY, AND BP PLC'S MEMORANDUM IN SUPPORT OF MOTION TO CLARIFY OR, IN THE ALTERNATIVE, RECONSIDER THE COURT'S ORDERS IMPLEMENTING THE FIFTH CIRCUIT DECISION REVIEWING POLICY 495

**Counsel Listed on Signature Block**

## INTRODUCTION

BP Exploration & Production Inc., BP America Production Co., and BP P.L.C. ("BP")

request the Court clarify, or, in the alternative reconsider, its Order of July 5, 2017 (Rec. Doc.

23003), which in turn adopted as final the Interim Orders of May 25, 2017 and June 13, 2017

(Rec. Docs. 22872 and 22935).  Specifically, the Court stated:

> IT IS ORDERED that the Interim Orders be and are hereby amended so as to
> delete the 'Interim' designation therefrom.  IT IS FURTHER ORDERED that the
> Interim Orders be and are hereby amended so as to provide that the Claims
> Administrator may issue final determinations on and, if appropriate, pay claims
> that are subject to these Orders, but otherwise to remain in full force and effect in
> accordance with their terms.

These three post-remand orders state that they are intended to implement the Fifth

Circuit's recent Policy 495 decision.  There, the Fifth Circuit upheld Policy 495's Annual

Variable Margin Methodology ("AVMM") but invalidated its four Industry-Specific

Methodologies ("ISMs").  The Fifth Circuit drew that distinction because it understood the ISMs

to "go a significant step farther" than the AVMM.  *In re Deepwater Horizon*, 858 F.3d 298, 303

(5th Cir. 2017).  The Fifth Circuit remanded to this Court with a straightforward directive:  "[A]ll

claimants—including those engaged in construction, agriculture, education, and professional

services—shall, on remand, be subject to the AVMM."  *Id.* at 304.

Consistent with the Fifth Circuit's mandate, this Court's post-remand orders require the

Claims Administration to apply the AVMM for all business economic loss ("BEL") claims that

would otherwise be subject to the ISMs.  That is correct.  But the orders also state that the

Claims Administrator "shall not reallocate revenues, except for the purpose of correcting errors."

With respect, BP requests that the Court clarify or, in the alternative, reconsider its orders.  In

particular, BP asks that the Court clarify that certain type of revenue movements the AVMM

itself allows constitute "errors" as used in the Court's orders.  If the Court does not agree that

such revenue movements constitute "errors" as used in the Court's orders or can be used to solve for "mismatches," BP moves that those orders be reconsidered so that the AVMM, without modification, applies.  Likewise, in no event should claims to which the Claims Administrator has already applied the AVMM be remanded for additional analysis.

## RELEVANT BACKGROUND

1.     **Economic and Property Damages Settlement.**  As the Court knows well, in 2012, BP entered into a class settlement that establishes a Court Supervised Settlement Program ("CSSP").   The settlement compensates several categories of claimants, including BEL claimants, for "[l]oss of income, earnings or profit" "as a result" of the oil spill.  E&P Settlement § 1.3.1.2; *see also In re Deepwater Horizon*, 732 F.3d 326, 330 (5th Cir. 2013).

2.     **Policy 495 and Matching Expenses and Revenues.**  The settlement creates a "compensation framework" to calculate "the profit a claimant might have been expected to earn" but for the spill.  E&P Settlement, Ex. 4C.  The framework addresses the "Variable Profit" between a post-spill "Compensation Period" and "comparable" months in a pre-spill "Benchmark Period."  *Id.*  A claimant chooses three or more consecutive months between May and December 2010 as the "Compensation Period."  Variable Profit in each period is calculated by "[s]um[ming] the monthly revenue over the period" and "[s]ubtract[ing] the corresponding variable expenses from revenue over the same time period."  *Id.*

Several years ago, the Claims Administrator announced he would calculate compensation by considering revenues and expenses whenever they were ***recorded***, regardless of when revenue was actually earned or when associated expenses were actually paid.  *See In re Deepwater Horizon*, 732 F.3d at 330 (emphasis added).  The Fifth Circuit, however, in the so-called "Matching Appeal" (or "*Deepwater Horizon I*") rejected that interpretation.  *Id.* at 332-39.  The

Fifth Circuit recognized that "only matching provides a realistic chance of achieving the ostensible goal of the settlement of compensating claimants for real losses" and strongly "suggest[ed]" that the settlement should be read with an eye towards "general accounting and economic norms" to prevent awards that are "completely disconnected from any reasonable understanding of calculation of damages." *Id.* at 336-37, 339. The Fifth Circuit then remanded to this Court to confirm, as a factual matter, that the parties intended that "a matching principle should apply to all claims." *Id.* at 339.

On remand, this Court received evidence and briefing, and concluded—consistent with the settlement agreement's text and the Fifth Circuit's analysis—that the settlement requires "matching" of expenses and revenues. Specifically, this Court recognized that subtracting "corresponding" variable expenses "requires that revenue must be matched with the variable expenses incurred by a claimant in conducting its business, and that does not necessarily coincide with when revenue and variable expenses are recorded." *Order and Reasons* [*Responding to Remand of Business Economic Loss Issues*], E.D. La. MDL No. 2179, Rec. Doc. 12055 at 5 (Dec. 24, 2013). The Court noted that ordinarily such matching will occur naturally when claimants keep their records on an accrual basis. *Id.* at 5 n.5.

The Claims Administrator thereafter created a policy to ensure that the required matching would happen. The Claims Administrator thus announced Policy 495, which this Court approved in its final form on May 5, 2014. *See Order* [*Regarding Adoption of Policy No. 495*], E.D. La. MDL No. 2179, Rec. Doc. 12817 (May 5, 2014). Policy 495 originally consisted of five principal methodologies for calculating compensation: the AVMM and the four ISMs.[1]

The AVMM contains two related but separate steps. *First*, it authorizes the Settlement

---

[1] Other methodologies were adopted to govern failed and start-up businesses, but those are not at issue in this Motion. *See* Policy 495 at 7.

Program's accountants to make line-item level corrections to the claimant's profit and loss statements ("P&Ls") in order to address errors and mismatches of revenues and expenses; as explained below, this step often requires moving variable expenses, but sometimes also requires moving revenues. *Second*, if matching issues remain following the line-item corrections, the AVMM prescribes a formula that allocates variable expenses proportionally to revenue. Because the methodology moves expenses to revenue, it is imperative that the revenues have first been properly recorded. *See* **Exhibit 1** at ¶ 5 (Gaspardo Declaration). Otherwise, the AVMM would make the matching problem worse by moving expenses to the wrong months. *See id.* The ISMs, however, "go a significant step farther" than the AVMM. *Deepwater Horizon*, 858 F.3d at 303. For claimants in the construction, education, agriculture, and professional services industries, the ISMs significantly reallocated revenue. For instance, when it came to agriculture, the relevant ISM moved revenue across the crop season. *See id.*

As this Court has concluded, and as the text of the policy clearly states, ***Policy 495 allows for the AVMM to move revenue*** (and did the same as to the four ISMs, prior to their invalidation on appeal). For example, Policy 495 provides:

> Contemporaneous P&Ls submitted by the claimant will be restated if in analyzing and processing a claim, the CSSP Accounting Vendors identify ***either an error*** (as previously defined) ***or a mismatch of revenue and variable expenses*** which can be explained and supported by appropriate documentation. If matching issues remain after such restatements, ***revenue and/or variable expenses will be allocated*** as per one of the methodologies set forth in Attachments B through H.

Policy 495 at 7 (emphasis added). In reviewing settlement decisions, this Court has recognized that this language in Policy 495 authorizes the Settlement Program's accountants to make adjustments to both revenue and expenses in a claimant's P&Ls prior to applying the AVMM. *See, e.g.*, Order and Judgment, Civil Action No. 16-00426 (E.D. La. Feb. 24, 2016) (CSSP Appeal Decision No. 2015-1696); Order and Judgment, Civil Action No. 16-01369 (E.D. La.

Mar. 2, 2016) (CSSP Appeal Decision No. 2015-1765); Civil Action No. 16-442 (Feb. 24, 2016) (Decision No. 2015-1694) (allowing the accounting vendors to shift revenue as an appropriate "exercise[ of] "discretion" where a commercial landlord recorded late rent in the month in which it was received) (attached as **Exhibit 2**).

      **3.**      **The Fifth Circuit's Decision.**  Class Counsel appealed the Court's approval of Policy 495, challenging all five methodologies.  Following argument, however, a panel of the Fifth Circuit rejected a key part of Class Counsel's challenge, ***specifically upholding the AVMM in its entirety***.  At the same time, the Fifth Circuit rejected the ISMs.  In particular, the Court held that "the AVMM is consistent with the text of the Settlement Agreement, but the four ISMs are not." *Deepwater Horizon*, 858 F.3d at 301.

      The Fifth Circuit concluded that Policy 495's goal of "[m]atching unmatched profit and loss statements" comports with the text of the settlement.  *Id.* at 303.  The Court also upheld the AVMM's requirement of matching.  *Id.*  Indeed, the Fifth Circuit explained that "[m]atching unmatched profit and loss statements" carries out the parties' intent to ensure that "all 'similarly situated claimants must be treated alike.'"  *Id.* at 302.  The Fifth Circuit rejected the ISMs, however, because those methodologies "also require matching, but go a ***significant*** step farther, requiring the Claims Administrator to move, smooth, or otherwise reallocate revenue" for claimants in specific industries using industry-specific revenue reallocation approaches.  *Id.* at 303 (emphasis added).  It was that "significant step farther," the Fifth Circuit concluded, that rendered the ISMs inconsistent with the settlement.  *Id.*  Revenue movement incidental to the AVMM, however, was not invalidated by the Fifth Circuit's recent decision.

      Thus, the Fifth Circuit concluded, the AVMM should govern ***all*** claims, including those that would otherwise be subject to ISMs.  *See id.* at 304 ("Thus, we hold that all claimants—

including those engaged in construction, agriculture, education, and professional services—shall, on remand, be subject to the AVMM.").  The Fifth Circuit thereafter denied BP's petition for panel rehearing and the court's mandate issued on June 29, 2017.

4.    **This Court's Orders Implementing the Fifth Circuit's Decision**.  Following the Fifth Circuit's decision, this Court entered two interim orders, dated May 25, 2017 and June 13, 2017.  Then, on July 5, 2017, after the Fifth Circuit's mandate issued, this Court entered a final order that deleted the interim labeling from its earlier orders and amended them "so as to provide that the Claims Administrator may issue final determinations on and, if appropriate, pay claims that are subject to these Orders."  *Order*, [*Implementing Fifth Circuit Opinion Re Policy 495*], E.D. La. MDL No. 2179, Rec. Doc. 23003 at 1 (July 5, 2017).

Consistent with the Fifth Circuit's mandate, both the May 25 and June 13 Orders direct that BEL claims that would otherwise have been subject to ISMs shall be processed under Policy 495's AVMM.  *See Interim Order* [*Implementing Fifth Circuit Opinion Re Policy 495*], E.D. La. MDL No. 2179, Rec. Doc. 22872 at 1 (May 25, 2017) ("IT IS ORDERED that the Claims Administrator shall continue to process, but not issue final determinations on or pay, any and all BEL claims determined by the Claims Administrator to involve ISMs but in doing so shall apply the AVMM to such claims."); *Interim Order* [*Implementing Fifth Circuit Opinion re Policy 495 with Respect to Discretionary Review Claims*], E.D. La. MDL No. 2179, Rec. Doc. 22935 at 1 (June 13, 2017) (certain claims "are REMANDED to the Claims Administrator to be processed under the Annual Variable Margin Methodology").

Both orders, however, also could be interpreted as ordering that revenue may not be reallocated unless errors are found to exist.  On page 1, the May 25 Order "FURTHER ORDER[ED] that in processing any other BEL claims where the Claims Administrator uses the

AVMM to achieve sufficient matching, the Claims Administrator shall not reallocate revenues, except for the purpose of correcting errors." The June 13 Order requires use of the AVMM, "except that revenue shall not be reallocated, restated, smoothed, or moved unless done to correct an error." Based on this language, the Claims Administrator is applying a modified AVMM to several types of claims that, under the original AVMM, would require some revenue movement. *See* **Exhibit 1** at ¶¶ 8, 17, and 24-25. The Claims Administrator, consistent with this new practice, is expected to do so as to other types of claims as well. *See id.* at ¶¶ 27, 30.

## ARGUMENT

BP moves for the Court to clarify or, if need be, reconsider its post-remand orders pursuant to Federal Rule of Civil Procedure 59(e). This Court has "considerable discretion" to modify its own decisions. *See, e.g.*, *Gulf Fleet Tiger Acquisition, LLC v. Thoma-Sea Ship Builders, LLC*, 282 F.R.D. 146, 152-153 (E.D. La. 2012) (following *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993)). There are ample grounds for clarification or reconsideration, moreover, where, as here, failing to do so would result in "manifest error of law" or "manifest injustice." *Id.* at 152-53. Clarification or reconsideration is especially appropriate because BP has not yet had the opportunity to raise the arguments set forth in this Motion, so BP is certainly not "rehashing evidence, legal theories, or arguments." *Id.* at 153.[2]

The Fifth Circuit's mandate requires "that all claimants—including those engaged in construction, agriculture, education, and professional services—shall, on remand, be subject to the AVMM." *Deepwater Horizon*, 858 F.3d 298 at 304. This Court, however, on remand, may have gone beyond that when it stated that "the Claims Administrator shall not reallocate

---

[2] Alternatively, BP respectfully files this Motion pursuant to Federal Rule of Civil Procedure 54(b). The Fifth Circuit has recently explained that Rule 54(b) is designed to be "flexible" and that "the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Austin v. Kroger Texas, LP*, --- F.3d ----, 2017 WL 1379453, at *9 (5th Cir. 2017) (quotations omitted).

revenues, except for the purpose of correcting errors."  After all, the AVMM explicitly allows a limited, non-industry-specific revenue reallocation to be used in appropriate cases.  BP thus submits that unless the July 5 Order is clarified to ensure that it allows for such limited revenue reallocation including to solve such matching problems (consistent with the unaltered-by-the-Fifth Circuit terms of AVMM itself), the Court's modified AVMM will be interpreted by CSSP accountants in a way that conflicts with Policy 495, the Fifth Circuit's mandate, and the settlement agreement.  Indeed, the Claims Administrator has already begun interpreting the July 5 Order to achieve such an erroneous ends, *see* **Exhibit 1** at ¶¶ 8, 17, and 24-25, and may expand this error to other categories of claims, *see id.* at ¶¶ 27 and 30.

This issue is quite serious.  The Fifth Circuit's decision only requires ISM claims to be recalculated.  If AVMM claims also must be recalculated, the number of affected claims will skyrocket.  Indeed, because the AVMM is applied more often than any other methodology, this Court's post-remand orders may very well have a more significant impact on the settlement than the Fifth Circuit's decision.  None of this is consistent with the Fifth Circuit's holding.  There is no support for the idea that the Fifth Circuit intended that claims as to which the CSSP had already applied the AVMM should be remanded to the CSSP for additional analysis.

BP thus asks the Court to clarify its orders to ensure that the AVMM operates as designed and approved by the Fifth Circuit, which includes certain limited instances of revenue movement.  Specifically, BP asks the Court to clarify that the "errors" as used in its post-remand orders allows for certain movements of revenue consistent with the AVMM.  In the alternative, if the Court does not believe its orders can be so clarified, BP urges the Court to reconsider its order by removing any language suggesting the AVMM has been modified.  Under no circumstances should claims that have already been analyzed under AVMM be remanded.

## I.      The Court's Post-Remand Orders Should Be Clarified.

In light of the Fifth Circuit's command that "all claimants … shall … be subject to the AVMM," *Deepwater Horizon*, 858 F.3d at 304, this Court correctly ordered the Claims Administrator to use the AVMM, just as the Court correctly identified claims that may be affected.  The portions of the Court's orders addressing application of the AVMM, however, should be clarified.  In short, some revenue movement is necessary for the AVMM to work and is expressly provided for by Policy 495, as approved by the Fifth Circuit.  *See* **Exhibit 1** at ¶ 6 & n.1.  Therefore, unless the Court clarifies that certain types of accounting entries are "errors" that allow some movement of revenue under the AVMM, CSSP accountants may misunderstand this Court's post-remand orders and apply them in a manner that conflicts with the Fifth Circuit's instruction that the CSSP apply the unmodified AVMM to all claimants.  Unfortunately, this is not merely a "hypothetical" concern as CSSP accountants are already doing so.  *See id.* at ¶ 15.

"Errors" as used in Policy 495 is, by design, a very broad term.  It encompasses far more than technical or clerical mistakes, but rather captures:

> accounting transactions that have been identified in the ordinary course of processing to have been ***inappropriately recorded*** in the claimant's contemporaneous P&Ls ***and will include, but not be limited to***: duplicate accounting entries; debit entries recorded as credits or vice versa; mistakes in applying applicable accounting principles based on the claimant's method of accounting; oversights or misinterpretation of the facts; input or calculation errors; and/or postings to the incorrect revenue and/or expense categories.

Policy 495 B1 n.10 (emphasis added).  Policy 495 would not have used such a broad and highly detailed description of "errors" if something akin to a transposition of digits in an accounting entry were the only kind of mistake that could be corrected.  Indeed, as used in Policy 495, the term "errors" includes "mismatches."  Policy 495 first speaks of both terms, *see id.* at 7, but often uses the term "errors" as shorthand for both.  This is because the term is deliberately designed to be expansive.  Moreover, whether the terms "error" and "mismatch" overlap or not,

the AVMM, as affirmed by the Fifth Circuit, permits rectification of both types of accounting problems.

Attached to this Motion is a declaration by Brian L. Gaspardo (**Exhibit 1**), a certified public accountant, who details accounting practices being used by claimants that require some limited revenue movement in order for the AVMM to function as intended.  Indeed, as he explains, "[i]f these corrections are not made, matching problems go unaddressed, and similarly situated claimants will be treated very differently based simply on how they keep their books," *id.* at ¶ 31—contrary to the text and purpose of the settlement agreement and the repeated conclusions of both this Court and the Fifth Circuit.  *See, e.g., Deepwater Horizon*, 858 F.3d at 303 ("The parties intended for all 'similarly situated claimants [to] be treated alike.'  ***Matching unmatched profit and loss statements promotes this goal.***") (emphasis added).

*Lease Agreements & Rents Example.*  The first example that Mr. Gaspardo sets out relates to the situation in which a tenant pays rent in advance in one year but not another:

> [M]any leases provide for occupancy over a year and call for the payment of rent on the first day of each month.  Take for example the case of a landlord who, per the terms of a lease, earns $100,000 per month for the lease of a building in 2009. The lease is renewed in 2010 under the exact same terms, and the tenant pays the landlord the exact same amount in 2010:  $1,200,000.  However, in April of 2010 the tenant pays the landlord not only for April but also pays in advance for May, June, and July.  Because the landlord keeps its books on a cash basis, the landlord records $400,000 in revenue in April and $0 in revenue for May, June, and July. This gives the incorrect impression that the landlord lost $300,000 in May-July 2010 as compared to May-July 2009.  But, in reality, the landlord earned the exact same amount during the exact same months; it simply received an advance payment in April 2010.

*Id.* at ¶¶ 9-11 (paragraph breaks omitted).

As Mr. Gaspardo explains, if the amount of a claimant's compensation could turn on a bookkeeping variation such as this, "the BEL framework would calculate a large loss where none in fact exists," *id.* at ¶ 12, and "the AVM formula would move 4-months'-worth of costs of

renting the building to April, even though three months' worth of the costs have no relationship to April, and even though the landlord in fact incurred those particular costs and earned those particular rents in May, June, and July," *id.* at ¶ 13.  It is essential, therefore, that some movement of revenue be permitted, especially because doing so "does not constitute 'smoothing' [but rather] merely corrects the books to reflect the actual facts of the business."  *Id.* at ¶ 14. Hence, this Court should clarify that when a claimant includes such an entry in its books, it constitutes an "error" necessitating some movement of revenue.  This situation, moreover, is not academic.  Indeed, this Court has already addressed a variant of it.  *See* Order and Judgment, Civil Action No. 16-442 (Feb. 24, 2016) (Decision No. 2015-1694) (affirming even though "the Settlement Program Accounting Vendors exercised their discretion and adjusted claimant's P&L's to correct for obvious mismatches *of revenue* and expenses") (emphasis added); *see also* **Exhibit 1** at ¶ 16 (explaining how a similar correction was made as to Claim No. 278399).

     ***Grants Example.***  As Mr. Gaspardo explains, the lease context is not the only instance where some revenue must be moved for the AVMM to function as intended.  Rather, other examples abound.  For instance,

> Grants often specify a period of time, or offer direct reimbursement of expenses as incurred.  In either case, the grant revenues relate to the periods specified under the terms of the grant, which may be different than when the cash is received, and which also differ from the time the grant is pledged or finalized.  Exercising their discretion under the AVM Methodology, the CSSP accountants previously corrected such mismatches so that revenue is recorded in the months to which it is assigned in the underlying grant.  Failing to correct for such errors creates both overpayments and underpayments.

*Id.* at ¶ 18.  Mr. Gaspardo gives the example of Claim No. 21300 where failing to correct such errors would have resulted in an overpayment of $600,000 and Claim No. 173533 where failing to correct such errors would have resulted in an underpayment of $120,000.  Finally, as to grant-related errors Mr. Gaspardo gives two examples involving advocacy organizations receiving

grants where the CSSP accountants have, after the July 5 Order, ceased correcting errors like these.  This is both economically irrational and inconsistent with the terms of Policy 495 concerning AVMM, as written and affirmed by the Fifth Circuit.  *See id.* at ¶¶ 18-19.

*Completed Contract Example Based on Extraneous Tax Policy Objectives.*  Perhaps most remarkably, Mr. Gaspardo also gives the example of completed contract accounting. Certain construction firms are permitted to use this methodology for purposes of submitting their tax returns.  Hence, this accounting treatment is purely in the nature of an external, government-policy-driven tax benefit that effectively spends federal funds to subsidize a segment of the construction industry.  *See id.* at ¶¶ 20-22.  Yet, completed contract accounting "does not accurately reflect revenues, expenses, and profits in the period in which they are earned and incurred."  *Id.* at ¶ 21 (citation omitted).  Hence, the completed contract accounting method is wholly out of step with and extraneous to the settlement because it cannot assure a proper measurement of lost profit in economic or accounting terms.  *See id.* ("While the completed contract method is a permissible way for certain claimants to report their tax liability, it cannot be used in the BEL framework.  That is because it does not record revenues when earned or expenses were incurred.").

Moreover, the completed contract is usable only by the smaller contractors; larger contracts cannot use it.  *See id.* ¶ 22 ("[T]he completed contract method is only available for contractors with annual revenues less than $10 million.  The IRS requires all other contractors to use percentage of completion accounting which recognizes revenues as work is performed, and is consistent with the BEL framework.").  Yet businesses are supposed to be treated the same.  *See, e.g.*, *Deepwater Horizon*, 732 F.3d at 333, 339 (requiring matching, more commonly done by larger businesses using accrual accounting, even as to "very small and fledgling businesses

[which] keep their primary financial records in accordance with cash accounting principles"). Simply stated, there is no evidence that the settlement was designed to treat small and large contractors differently; certainly nothing in the text of the settlement supports such unequal treatment.  *See, e.g., Deepwater Horizon*, 858 F.3d at 303 ("The parties intended for all 'similarly situated claimants [to] be treated alike.'").  Large and small contractors are similarly situated within the meaning of the settlement.

The CSSP accountants' prior practice of correcting for any use of the completed contract method "consistently reflect[ed] work as performed, [thereby] treating all construction companies … in a similar manner."  **Exhibit 1** at ¶ 23.  That practice ensured "awards are not distorted through idiosyncratic accounting practices designed as subsidies to particular businesses delivered through the tax code."  *Id.*  Of course, as a matter of designing federal tax policy, Congress is entitled, as it sees fit, to allow a portion of the construction industry to use a counterfactual accounting method that "does not accurately reflect revenues, expenses, and profits in the period in which they are earned and incurred."  *Id.* at ¶ 21.  But nothing in the settlement mandates that BP provide a parallel subsidy to BEL claimants.  Rather, the settlement serves an entirely different purpose and thus has its own requirements and provisions.

As with the examples of rent and grant treatment, Mr. Gaspardo explains that there is nothing hypothetical about requiring the CSSP accountants to correct for this problem.  Prior to the Court's most recent July 5 Order, the CSSP accountants properly addressed the completed contract method in Claim 124234, thereby avoiding an overpayment of more than $1 million, and in Claim 212259, thereby avoiding an overpayment of more than $165,000.  *See id.* at ¶ 24. After the Court's Order, however, there was an overpayment of 40% to the tune of $40,000 in Claim 223569.  *Id.* at ¶ 25.  And there was also an overpayment of more than $100,000 in Claim

140773.  *Id.*

   ***Additional Examples of Anticipated Problems of a Similar Nature.***   Even if the foregoing real-world examples were not enough cause for alarm, other misapplications of the AVMM may soon arise.  As Mr. Gaspardo explains, there are other common scenarios in which some revenue must be moved for the AVMM to function.  Otherwise, the CSSP will function contrary to the Fifth Circuit's decision and to the text and purposes of the settlement.

* * *

   Accordingly, BP urges the Court to clarify that the examples in Mr. Gaspardo's declaration and others like them constitute "errors" for purposes of this Court's post-remand orders or, in any event, that the Court's use of the word "errors" in those orders necessarily includes remedying mismatches consistent with the AVMM.  Absent such clarification, the Claims Administrator and CSSP accountants may take the position that this Court's orders constitute a modification of the AVMM, rather than the mere application of it that the Fifth Circuit intended.  In fact, as Mr. Gaspardo explains, some claimants and CSSP accountants are already misinterpreting this Court's post-remand orders.  *See* **Exhibit 1** at ¶¶ 8, 17, and 24-25. Although BP disagrees with their reading of this Court's orders, clarification now is preferable to more litigation later, especially because the CSSP is nearing completion of its work.

## II.    In the Alternative, the Post-Remand Orders Should Be Reconsidered.

   If the Court, however, does not believe that the types of accounting entries set forth in Mr. Gaspardo's declaration constitute "errors" under the Court's post-remand orders, then BP respectfully submits that those orders should be reconsidered to delete any references to prohibiting the moving of revenues.  Likewise, no claims that have already been assessed under the AVMM should be remanded for additional analysis.  Otherwise, the Court's orders will conflict with the Fifth Circuit's mandates in both the Policy 495 and Matching Decisions.

## A.   Absent Clarification, the Post-Remand Orders Will Conflict with the Fifth Circuit's Mandate in the Policy 495 Appeal.

The Fifth Circuit's decision in the Policy 495 appeal is unambiguous.  The panel held that the AVMM is consistent with the settlement but the ISMs are not.  It thus remanded to this Court to apply the AVMM.  *See Deepwater Horizon*, 858 F.3d at 300-01 ("Because the AVMM is consistent with the text of the Settlement Agreement, but the four ISMs are not, we AFFIRM as to the AVMM, reverse as to the ISMs, and REMAND for proceedings consistent with this proceeding.").  Indeed, the Fifth Circuit's language could not be clearer: "Thus, we hold that ***all claimants***—including those engaged in construction, agriculture, education, and professional services—shall, on remand, be subject to the AVMM."  *Id.* at 304 (emphasis added).

The distinction drawn by the Fifth Circuit is that the ISMs all "go a ***significant*** step farther" than the AVMM's requirement of matching unmatched profit and loss statements.  *Id.* at 303 (emphasis added).  The Fifth Circuit concluded that the ISMs—which include substantial moving, "smooth[ing]" and reallocating—are not grounded in the settlement agreement.  The Fifth Circuit, however, did not suggest that no movement of revenue is allowed.  Such a reading of the opinion posits a false dichotomy between the ISMs, prior to their invalidation, on the one hand allowing revenue movement and the AVMM on the other hand not allowing revenue movement (which is not an accurate statement about the AVMM).  In other words, the Fifth Circuit cannot be read to have flatly prohibited all revenue movement while simultaneously blessing the AVMM because the AVMM expressly permits some revenue movement.  *See, e.g.*, Policy 495 at 7 (stating with regards to all the methodologies, including the AVMM, that "revenue and/or variable expenses will be allocated"); *id.* at B1-B2 (expressly allowing the vendors to "restate ***revenue*** and expense") (emphasis added).  As noted above, this Court has in the past itself repeatedly relied on this language to conclude that the AVMM authorizes the

CSSP accountants to make adjustments to both revenue and expenses prior to applying the AVM formula. *See, e.g.*, Order and Judgment, Civil Action No. 16-00426 (E.D. La. Feb. 24, 2016) (CSSP Appeal Decision No. 2015-1696); Order and Judgment, Civil Action No. 16-01369 (E.D. La. Mar. 2, 2016) (CSSP Appeal Decision No. 2015-1765); Order and Judgment, Civil Action No. 16-442 (Feb. 24, 2016) (CSSP Decision No. 2015-1694) (attached as **Exhibit 2**).

Given all of this, enacting a *new,* **per se** *prohibition* against reallocating revenue runs afoul of both the plain language of Policy 495 and the Fifth Circuit's instruction that this methodology be applied on remand to all claimants. The Fifth Circuit did not limit or qualify its approval of the AVMM—it expressly ordered that this methodology should apply across the board. *See Deepwater Horizon*, 858 F.3d at 304. By contrast, its disapproval of the ISMs was based specifically on "significant step[s] farther" embodied in those policies. *Id.* at 303. To be sure, the Fifth Circuit also remarked that the settlement grants claimants the right to choose their "Compensation Period" within certain parameters. *Id.* But the Fifth Circuit never suggested that any aspect of the AVMM is inconsistent with that right. To the contrary, it explicitly ordered the application of "the AVMM"—full stop. *Id.* at 304.

The Fifth Circuit surely knew how to reverse the AVMM *in part* if it had wanted to, yet it affirmed the AVMM *in its entirety*. Indeed, Class Counsel specifically objected to revenue movement in the resolution of AVMM claims. *See* Policy 495 Appeal, No. 15-30377, Class Br. at 13 (5th Cir. July 20, 2015) (objecting to decisions that "re-allocate revenues, even with respect to BEL Claims subjected to the general AVM methodology") If the Fifth Circuit had determined to eliminate all revenue movements, even those that are necessary for the AVMM to work and as expressly authorized by Policy 495, it would have said "the AVMM is affirmed except insofar as

its first step permits revenue moving, which is invalid."[3]   Of course, the Fifth Circuit said nothing of the kind, even though Class Counsel specifically argued to the Fifth Circuit that the AVMM, like the ISMs, should fall in its entirety.  *See id.* at 31.  Rather, the Fifth Circuit held that the Claims Administrator should apply the AVMM in all instances.

Accordingly, absent clarification of its orders, the Court should strictly adhere to the Fifth Circuit's mandate in the course of reconsidering those orders.  The Fifth Circuit specifically mandated application of the AVMM, not application of a modified AVMM.  Indeed, as Mr. Gaspardo notes, failing to allocate revenue to the proper periods followed by moving expenses to revenue ***exacerbates matching problems; it does not solve them.***   *See* **Exhibit 1** at ¶ 5. Likewise, claims to which the AVMM has already been applied should not be remanded.  Under no reasonable reading of the Firth Circuit's mandate should such claims be considered again.

The Fifth Circuit's mandate controls.  *See, e.g.*, *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 453 (5th Cir. 2007) ("The mandate rule requires a district court on remand to effect our mandate and to do nothing else.") (quotation omitted); *Tollett v. City of Kemah*, 285 F.3d 357, 364 (5th Cir. 2002) ("A district court is not free to deviate from the appellate court's mandate.").  The Fifth Circuit, moreover, made its decision with eyes wide open; it heard oral argument, considered full briefing, and no doubt carefully read both the text of the settlement and Policy 495.  When the Fifth Circuit ordered application of "the AVMM"—***without any modification***—it knew precisely what it was doing.  The Fifth Circuit's denial of a panel rehearing petition and issuance of the mandate made its ruling law of the case.  And, especially

---

[3] In its holding, the Fifth Circuit in the Policy 495 Appeal stated as follows:  "The district court's approval of the ISMs was in error *because the ISMs require the Claims Administrator to move, smooth, or otherwise reallocate revenue in violation of the Settlement Agreement*."  *In re Deepwater Horizon,* 858 F.3d at 304 (emphasis added).  If the Fifth Circuit had meant to prohibit the line-item specific revenue movement required in the AVMM it would not have said that it was the ISMs alone that "require the Claims Administrator to move, smooth, or otherwise reallocation revenue."  It would instead have made clear that the AVMM's revenue movement was also improper.

after years of litigation and claims practice applying AVMM as written, this Court should not

deviate from the path the Fifth Circuit has now clearly marked out.

> **B.     Unless Changed, the Post-Remand Orders Will Also Conflict with the Fifth
>           Circuit's Mandate in the Matching Appeal.**

Not only will the Court's post-remand orders (absent clarification) conflict with the Fifth

Circuit's holding in the Policy 495 appeal that "all claimants … shall … be subject to the

AVMM," *Deepwater Horizon*, 858 F.3d at 304, they also will conflict with the Fifth Circuit's

holding in the Matching Appeal that prompted Policy 495 to begin with.  There, the Fifth Circuit

recognized the importance of applying "general accounting and economic norms."  *Deepwater

Horizon*, 732 F.3d at 337.  Therefore, the Fifth Circuit was deeply skeptical of any reading of the

settlement that is "completely disconnected from any reasonable understanding of calculation of

damages."  *Id.* at 339.[4]

In light of this, it is unreasonable to conclude that the Fifth Circuit's 2017 opinion in the

Policy 495 appeal, read against the backdrop of its 2013 *Deepwater Horizon I* decision,

categorically barred the movement of revenue, no matter what.  Rather, the guiding star of its

analysis was "'economic reality'"—so long as that economic reality is permissible under the text.

*Deepwater Horizon*, 848 F.3d at 304 (quoting *Deepwater Horizon*, 732 F.3d at 339).  *See also id.*

("The parties intended for all 'similarly situated claims [to] be treated alike.'   Matching

unmatched profit and loss statements promotes this goal.").  To be sure, as the Fifth Circuit

further explained in the Policy 495 appeal, there are limits—shifting revenue can go too far, as it

---

[4] Take the issue of completed contract accounting.  That methodology indisputably fails to accord with economic
reality because it "does not accurately reflect[ing] revenues, expenses, and profits in the period in which they are
earned   and   incurred."   http://www.cpa-connecticut.com/completedcontractmethod.htmlhttp://www.cpa-
connecticut.com/completedcontractmethod.html, *quoted in* **Exhibit 1** at 21.  No reading of the Fifth Circuit's
sequence of opinions on the issue of matching and Policy 495 could be read to mandate that BP's settlement with
the economic loss class members at issue here must provide a private settlement subsidy that parallels and extends
the tax policy subsidy Congress opted to provide in general federal law.

was held to do as to the four industry-specific methodologies with their own industry-specific revenue-movement rules.  But at the same time, "the expenses to be subtracted must be those that 'correspond' *to the revenue earned*."  *Id.* at 337 (emphasis added).  Where that analysis cannot be done consistent with the AVMM because of quirks in how an individual claimant kept its books, line-item specific revenue movement is both appropriate and, in fact, required.  Proper accounting practices necessitate such movement.  *See id.*; *see also* **Exhibit 1** at ¶¶ 12 and 23.  Otherwise, there is no real matching at all, *see, e.g.*, *id.* at ¶¶ 12 and 23, and identically situated claimants will be treated markedly differently, based on nothing more than the happenstance of bookkeeping, *see id.* at ¶¶ 8 and 31.  Any such outcome is surely contrary to the Fifth Circuit's mandate from *Deepwater Horizon I*.

## III.    Clarification or Reconsideration Will Avoid Delay in the Orderly Closure of the Settlement Program.

Finally, especially to the extent the Court considers the question close or a matter of discretion, the Court should clarify or reconsider its orders to avoid disrupting the timely closure of the CSSP.  After several years of accepting claims, the final deadline for filing claims was June 8, 2015.  *See Status Report #54 by the Claims Administrator*, E.D. La. MDL No. 2179, Rec. Doc. 22769 at 3 (Apr. 27, 2017).  As of June 20, 2017, the CSSP has received more than 100,000 forms from BEL claimants and paid nearly $7 billion on those claims—as well as billions more to claimants with other types of losses (for a current total of $10.6 billion).  *See Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement* (June 20, 2017), at http://www.deepwaterhorizoneconomicsettlement.com/docs/statistics.pdfhttp://www.deepwaterh orizoneconomicsettlement.com/docs/statistics.pdf.  At this point—more than two years after the deadline for filing BEL claims, five years after the settlement, and seven years after the spill— the CSSP has paid billions of dollars to hundreds of thousands of claimants, and is on track to

close within a year.  Requiring that revenue be fixed in time according to the happenstance of a claimant's accounting practices threatens to delay the processing of a host of non-final claims and to delay the CSSP's closing by a year or perhaps more.  Where nothing in the Fifth Circuit's decision, the settlement agreement, or the AVMM requires that result, the Court should not impose additional requirements to bring that result about.

Indeed, the importance of timely resolution of claims cannot be overstated.  To be clear, for instance, BP believes that the word "error" in this Court's post-remand orders already captures all of the types of accounting entries identified by Mr. Gaspardo.  In those examples, revenue must be moved in order for the AVMM to work to achieve proper matching, so as to ensure that settlement payments accord with economic losses and are not "random"—principles that the Fifth Circuit endorsed in both the Matching Appeal and in the Policy 495 Appeal.[5]  And the text of Policy 495 says that revenue can be moved under the AVMM.  Indeed, this Court— following Policy 495's language—has itself repeatedly sanctioned the movement of revenue under the AVMM, and the Fifth Circuit's decision declares that "the AVMM" without modification is consistent with the settlement.  Lastly, Mr. Gaspardo explains why a failure to move revenues to the proper period as a first step in the AVMM cannot be remedied simply by moving expenses to revenues and shows that expense movement alone would indeed tend to make matching problems worse, not better.  *See* **Exhibit 1** at ¶ 5.

BP accordingly seeks clarification or reconsideration to avoid unnecessary delay.  Absent clarification or reconsideration, there is a danger that the Claims Administrator will continue to

---

[5] *See In re Deepwater Horizon*, 858 F.3d at 302 (quoting *In re Deepwater Horizon*, 732 F.3d at 339) ("In interpreting a settlement, surely some weight has to be given to what damages recoverable in civil litigation actually are.  If clear words in a settlement require the use of ***randomly associated numbers*** for calculating damages, even if there is little likelihood that, after subtracting one of those numbers from the other, the remainder will in fact show anything relevant to damages, then so be it.  We do not perceive such clarity here.") (emphasis added).  *See also In re Deepwater Horizon*, 732 F.3d at 332 (the "language in Exhibit 4C cannot be interpreted so that it always means cash received and cash disbursed").

conclude that no movement of revenue is allowed.  Such decisions will prompt additional

appeals—and that means lost time.  By contrast, Class Counsel would have no basis to appeal a

decision by this Court ordering the Claims Administrator to simply apply the AVMM.  The Fifth

Circuit, after all, has already ordered this Court to do just that.  Accordingly, not only would

clarification or reconsideration comport with the text of Policy 495, the Fifth Circuit's decision,

and the settlement itself, it would also expedite a full resolution of the settlement program.


August 2, 2017                                    Respectfully submitted,

                                                 /s/ *Don K. Haycraft*

J. Andrew Langan, P.C.                           Don K. Haycraft
KIRKLAND & ELLIS LLP                             Devin C. Reid
300 North LaSalle                                LISKOW & LEWIS LLP
Chicago, IL 60654                                701 Poydras Street, Suite 5000
Telephone:  (312) 862-2000                       New Orleans, LA 70139
Facsimile:  (312) 862-2200                       Telephone: (504) 556-4128
wendy.bloom@kirkland.com                         Facsimile: (504) 556-4108
martin.martos@kirkland.com                       dkhaycraft@liskow.com
                                                 dcreid@liskow.com

Jeffrey Bossert Clark
Aaron L. Nielson
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
jeffrey.clark@kirkland.com
aaron.nielson@kirkland.com

*Attorneys for BP Movants*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on August 2, 2017 a copy of the foregoing sent via electronic mail to all counsel of record.

<u>/s/ Don K. Haycraft</u>