# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * | MDL NO. 2179<br><br>SECTION: J |
| This document relates to all actions. | * * * * * * * | HONORABLE CARL J. BARBIER<br>MAGISTRATE JUDGE WILKINSON |

## DECLARATION OF BRIAN L. GASPARDO

I, Brian L. Gaspardo, declare and state as follows:

1. I am over the age of 18 and am a resident of the State of Illinois. Unless otherwise stated, I have personal knowledge of the facts set forth herein, and, if called to do so, could testify truthfully thereto.

2. I am the Managing Member of O'Neill & Gaspardo, LLC, a Consulting and CPA firm located in Mokena, Illinois. I am a Certified Public Accountant and have over 25 years of professional experience performing audit, tax, accounting, business valuation, financial analysis, and consulting services for clients throughout the United States. I received a B.A. in economics from Harvard University in 1991 and an M.B.A. from the University of Chicago in 2001. I serve on the Boards of Old Plank Trail Bank and La Rabida Children's Hospital in Chicago. I have testified and submitted reports as an expert witness on a variety of topics, including business performance, business valuation, accounting, and financial reporting.

3. BP retained me to assist in the review of the accounting records and claim files for numerous Business Economic Loss ("BEL") claims filed with the Court Supervised Settlement Program ("CSSP"). To date, my firm has reviewed thousands of BEL offers made by the CSSP

1

and the claim files associated with those claims.

4. I have been asked to explain the role and importance under the Annual Variable Margin ("AVM") Methodology of correcting mismatches of revenues and expenses (in addition to errors) before applying the AVM formula.

5. The AVM Methodology's formula achieves matching by allocating variable expenses proportionally to a claimant's revenue. Because the methodology moves expenses according to monthly revenues, it is imperative that the revenues are properly recorded. If they are not, then application of the AVM Methodology exacerbates the matching problem by moving expenses to the wrong months.

6. Recognizing the importance of having revenue in the correct months before matching expenses to the revenue, Policy 495 authorizes the Settlement Program's accountants to make corrections to a claimant's revenue (as well as expenses)—before proportionally allocating expenses—where either an error or a mismatch of revenues and expenses exists. Specifically, Policy 495 provides:

> Under the above methodologies [which include AVM], the guiding principle has been to utilize the claimant's contemporaneous P&Ls where there is no indicia of a mismatch of revenue and expenses. Where matching issues have been identified the approach will be, wherever possible, to amend the P&Ls utilized as inputs to the compensation calculation and to the extent possible calculate Step 1 and Step 2 compensation in accordance with the Settlement Agreement.
>
> **Contemporaneous P&Ls submitted by the claimant will be restated if in analyzing and processing a claim, the CSSP Accounting Vendors identify either an error (as previously defined) or a mismatch of revenue and variable expenses which can be explained and supported by appropriate documentation.** If matching issues remain after such restatements, revenue and/or variable expenses will be allocated as per one of the methodologies set forth in Attachments B through

2

H.[1]

Policy 495 at 7 (emphasis added).

7. It is not possible to catalogue every case in which it is important to address a mismatch of revenue and expenses before applying the AVM formula. Indeed, that is why the AVM Methodology grants the CSSP accountants discretion to address the issue as appropriate in a particular context. That said, certain situations merit special attention, for instance because they arise frequently or because the analysis is particularly straightforward or illustrative.

8. I have set forth below a number of representative examples of types of claims where the CSSP historically has found it necessary to make corrections to revenue prior to application of the AVM formula in order to achieve the purposes of the AVM Methodology. Such corrections are necessary to achieve matching. And without such corrections, similarly situated claimants would be treated differently to a drastic degree based on accounting choices unconnected to actual economic performance. I then provide, where they are available so soon after July 5, 2017, examples of how the Settlement Program, subsequent to the District Court's Final Order on that date, is no longer making the same type of necessary corrections to mismatches of revenue and is in fact citing to the District Court's Final Order as precluding such necessary corrections.

## Lease Agreements & Rents

9. A lease contract typically specifies the period over which occupancy will be granted and the compensation and payment terms related to those periods. For example, many leases provide for occupancy over a year and call for the payment of rent on the first day of each month.

---

[1] Attachment B to Policy 495 is the AVM Methodology, which I am informed was upheld by the Fifth Circuit. Attachments G and H are for failed/failed start-up and start-up businesses, respectively. Only Attachments C through F relate to the methodologies I am informed that the Fifth Circuit invalidated. These methodologies address construction, agriculture, educational institutions, and professional services claims, respectively. *See* Policy 495 at 7.

3

10. Take for example the case of a landlord who, per the terms of a lease, earns $100,000 per month for the lease of a building in 2009. The lease is renewed in 2010 under the exact same terms, and the tenant pays the landlord the exact same amount in 2010: $1,200,000. However, in April of 2010 the tenant pays the landlord not only for April but also pays in advance for May, June, and July.

11. Because the landlord keeps its books on a cash basis, the landlord records $400,000 in revenue in April and $0 in revenue for May, June, and July. This gives the incorrect impression that the landlord lost $300,000 in May-July 2010 as compared to May-July 2009. But, in reality, the landlord earned the exact same amount during the exact same months; it simply received an advance payment in April 2010.

12. This is precisely the type of mismatch of revenue that the AVM Methodology authorizes the CSSP accountants to address before applying the AVM formula. Absent the correction, the BEL framework would calculate a large loss where none in fact exists.

13. In addition, absent the correction before applying the formula, the AVM formula would move 4-months'-worth of costs of renting the building to April, even though three months' worth of the costs have no relationship to April, and even though the landlord in fact incurred those particular costs and earned those particular rents in May, June, and July.

14. Accurately reflecting when the revenue was earned, allocating the landlord's May, June, and July rental revenues to May, June, and July does not constitute "smoothing," which I understand to mean averaging revenues across months. Instead, doing so merely corrects the books to reflect the actual facts of the business.

15. This landlord example is no mere hypothetical. The CSSP accountants and the District Court have addressed this very type of scenario on multiple occasions. For example, in CSSP

4

Appeal Decision 2015-1732, the commercial landlord claimant recorded no revenue in May and October 2010, and double revenue in June 2010 and November 2010. In other words, the claimant recorded both May rent and June rent in June 2010, and both October rent and November rent in November 2010. The Settlement Program did precisely what the AVM Methodology and common sense authorize it do: It corrected the claimant's P&Ls to place May rent in May and October rent in October. The claimant challenged the CSSP's corrections, arguing that the Settlement Program had no authority to restate revenue that was recorded in the wrong month. The District Court disagreed, holding that the Settlement Program had properly exercised its authority:

> Claimant is a commercial landlord. The Settlement Program Accounting Vendors adjusted claimant's P&L's to correct for obvious mismatches of revenue and expenses—specifically, to **match rent revenue received with the months to which those rent amounts actually related**. Claimant argues that Policy 495 allows for adjustments only to correct actual accounting "errors". But Policy 495 provides that "Contemporaneous P&L's submitted by the claimant will be restated if in analyzing and processing a claim, the CSSP Accounting Vendors identify either an error (as previously defined) or a mismatch of revenue and variable expenses which can be explained and supported by appropriate documentation." (Policy 495, page 7, second paragraph). **Here, the Accounting Vendors reasonably exercised their discretion in addressing an obvious mismatch of revenue and expenses even in the absence of an actual accounting error.**

*See* Order and Judgment, *In re Deepwater Horizon*, No. 16-1395 (E.D. La. Mar. 2, 2016) (emphasis added).

16.     A similar issue arose in Claim No. 278399 (CSSP Appeal Decision 2015-1694). The claimant, a commercial lessor, received in September 2008 payment for July, August, and September rent. Claimant recorded all three months' rent in September, and did not record any rent in July or August. The Settlement Program appropriately corrected this mismatch by recording July rent in July and August rent in August. The District Court again affirmed this

5

exercise of discretion. *See* Order and Judgment, *In re Deepwater Horizon*, No. 16-442 (Feb. 24, 2016).

17.   After the District Court issued its July 5, 2017 Final Order, however, and despite this Court's previous decisions in cases like Civil Action Numbers 16-442 and 16-1395, it now appears the Settlement Program's accountants are no longer making corrections to rent recorded in the wrong month. For example:

- **Claim 384011**: Claimant is a lessor of commercial real estate that received a $70,000 award from the Settlement Program. With the exception of October and November 2011, Claimant records consistent amounts of revenue in each month between July, 2010 and December, 2011. In October and November 2011, Claimant had significant spikes in its rental revenue. The Settlement Program inquired about the increases in October and November, and the claimant stated that these were due to cash received in advance for 2012 rent. Unlike its earlier practice, the Settlement Program did not correct the mismatch of revenue in October and November, 2011. Instead, the Settlement Program left 2012 rent in October and November 2011. Had the Settlement Program made the corrections so that 2012 rent was recorded in 2012, Claimant would not have been entitled to any compensation.

- **Claim 298075**: Claimant is a lessor of commercial property that received an $88,000 award from the Settlement Program. For 2010, the claimant reports a generally consistent rental stream of $10,500 per month. However, no rental revenue is recorded in October 2010. The rental revenue recorded for November 2010 was twice the normal rate, indicating that the rental revenue earned in October was recorded in November. The CSSP did not correct this mismatch. If this mismatch had been corrected, the claimant would not be entitled to any compensation.

Grants

18.   Grants often specify a period of time, or offer direct reimbursement of expenses as incurred. In either case, the grant revenues relate to the periods specified under the terms of the grant, which may be different than when the cash is received, and which also differ from the time the grant is pledged or finalized. Exercising their discretion under the AVM Methodology, the CSSP accountants previously corrected such mismatches so that revenue is recorded in the months to which it is assigned in the underlying grant. Failing to correct for such errors creates both overpayments and underpayments. For example:

- **Claim 214300**: Claimant is a not-for-profit that received multiple grants with specified funding periods, many of which were for reimbursement of specific costs. For instance, the Florida Division of Historical Resources granted Claimant nearly $85,000 in the second two quarters of 2010 for reimbursement of expenses. Claimant told the Settlement Program that the designated funding period for these grants was July 1, 2009 through June 30, 2010. However, Claimant recorded the funds as revenue when received rather than the period specified under the grants. The Settlement Program accountants corrected this mismatch by placing the revenue in the months to which they belong under the grant. Absent this and other corrections, the award would have been *overstated* by more than $600,000.

- **Claim 231976**: Claimant is a not-for-profit that seeks to preserve Louisiana Cajun culture. The claimant recorded grant revenues when received. The CSSP inquired regarding the funding periods for the grants, and the claimant indicated that the funding periods were generally for the full year when the grant was received. Accordingly, the CSSP adjusted the P&Ls to reflect the revenue from the grants over each month of the year. In the absence of this correction, the award would have been *understated* by more than $33,000.

19. Yet since the District Court issued its July 5, 2017 Final Order, it appears that the Settlement Program accountants are no longer correcting mismatches of grant revenues. For example:

- **Claim 255411**: Claimant is a not-for-profit public policy advocate. The claimant receives grant revenues that are paid in bulk. Grant letters that were provided by the claimant detailed specific funding periods for the grants, but the Settlement Program did not correct the lump-sum recording of these grant revenues.

- **Claim 255188**: Claimant is a not-for-profit that provides advocacy and education for immigrants. The claimant's reported revenue stream is volatile due to grants being recorded when received. The claimant advised the Settlement Program that the grants cover a 12-month funding period. However, the Settlement Program did not correct this lump-sum reporting of grant revenues. If these grants are reflected over the 12-month funding period, the claimant would not be entitled to any compensation.

### Completed Contract Accounting

20. The IRS permits certain, but not all, construction companies to use a special kind of accounting that provides a tax advantage to contractors. Under this "completed contract" accounting method the company recognizes 100% of revenues and expenses when a project is completed. For example, a project may take place over 6 months and involve consistent work

7

and multiple payments over that period, but under "completed contract" accounting all of the revenues and expenses would be recorded in the month the project is closed.

21.     While the completed contract method is a permissible way for certain claimants to calculate their tax liability, it cannot be used in the BEL framework. That is because it does not record revenues when earned or expenses when incurred. See Hartford Construction Accountants CPA, *The Completed-Contract Method of Accounting* ("Although the completed-contract method does not accurately reflect revenues, expenses, and profits in the period in which they are earned and incurred, the tax advantages of the use of its method are obvious: the deferral of tax liability to future periods."), *available at* http://www.cpa-connecticut.com/completedcontractmethod.html (last visited August 2, 2017). The completed contract method incorrectly reports the timing of business activity to provide a pure tax subsidy to certain contractors, and does not match taxation to economic reality or reflect economic loss as intended by the Settlement Agreement. In fact, economists and tax policy experts often call favorable tax treatments such as completed contract accounting a "tax expenditure."[2]

22.     In addition, the completed contract method is only available for contractors with annual revenues less than $10 million. The IRS requires all other contractors to use percentage of completion accounting which recognizes revenues as work is performed, and is consistent with the BEL framework. Allowing different accounting methods would drastically change award calculations for similarly situated claimants based solely on a subsidy provided to certain smaller-sized construction companies in the tax code. Yet nothing in the Settlement Agreement

---

[2] *See, e.g.,* David A. Weisbach & Jacob Nussin, *The Integration of Tax and Spending Programs*, 113 YALE L.J. 955, 961 (2004) (referencing the long line of scholarship concluding that any government program can be implemented either as a direct spending program or as a "tax expenditure"); Susan J. Guthrie and James R. Hines, Jr., *U.S. Defense Contracts During the Tax Expenditure Battles of the 1980s*, 64 NAT'L TAX J. 731 (2011) (pointing to various pieces of legislation that limited the ability of the defense industry to make use of the specific tax expenditure known as the completed contract method).

8

indicates that small vs. large construction companies should be treated differently.

23. Prior to this Court's July 5, 2017 Order, the Claims Administrator recognized the inappropriateness of "completed contract" accounting in determining awards, and specifically corrected revenues from these projects across the months of activity based on information received from the Claimant. Importantly, this information is maintained in the normal course of business by virtually all construction companies regardless of their tax-reporting convention. By consistently reflecting work as performed, all construction companies are treated in a similar manner and awards are not distorted through idiosyncratic accounting practices designed as subsidies to particular businesses delivered through the tax code.

24. Examples of the Settlement Program accountants correcting mismatches in completed contract accounting include:

- **Claim 124234:** Claimant is a Zone-C paving contractor using "completed contract" accounting. For example, Claimant recorded over $2.6 million in June 2009 for a project completed that month, but Claimant's documents revealed that it earned revenue through this project each month starting a year earlier in June 2008. The Claims Administrator appropriately obtained job cost schedules from the claimant and attributed revenues and expenses to the months when work was performed. Absent these corrections, the award would have been overstated by more than $1 million. As a result, an otherwise identical claimant that happened to complete a given project a few days later could receive a very different award without such corrections.

- **Claim 212259:** Claimant is a Zone C home builder using "completed contract" accounting. For example, Claimant recorded over $1 million in September 2010 for two houses it sold, but Claimant's documents demonstrated that it worked on those projects beginning in January and February 2010. The Claims Administrator appropriately obtained job cost schedules from the claimant and attributed revenues and expenses to the months when work was performed. Without this correction, the award would have been overstated by more than $165,000.

25. Since the District Court issued its July 5, 2017 Final Order, the Settlement Program accountants are no longer making corrections to mismatches in P&Ls performed on a completed contract basis. For example,

- **Claim 223569:** Claimant is a Zone-D construction business that uses "completed

9

contract" accounting. The claimant provided job cost detail for a job that was completed in November 2011. The claimant recorded all of the revenue and expense for the job in November 2011 rather than when the revenue was earned and costs were incurred. The job cost detail indicated that a large portion (42%) of the expenses had been incurred in November and December 2010. The Settlement Program did not make any corrections to Claimant's P&Ls to reflect when the revenue was actually earned or when the costs were incurred. I estimate that the lack of corrections inflated the award by approximately $40,000 or 40%.

- **Claim 140773**: Claimant is a Zone D home builder and renovation contractor that uses "completed contract" accounting. The claimant stated that projects run as long as 12 months. Thus, the recording of revenue and expense at the end of the projects is significantly later than when the revenue was earned and the expenses incurred. The Settlement Program made no corrections to address this mismatch. I estimate that the lack of corrections inflated the award by more than $100,000.

### Annual Memberships, Assessments, and Contracts

26. Many organizations collect a single membership fee, assessment or contract payment to cover twelve months or more of activity. While payment may be made in lump sums, such payments are intended to finance an entire year (or other multi-month period) and are in return for services over that period of time. For example:

- **Claim 219976**: Claimant is a private club community. In 2009, Claimant issued 3 assessments of $1.2 million (July), $612,000 (August), and $615,000 (November) to cover a budget shortfall accumulated throughout the year In other words, members were paying in July, August, and November for common expenses that had not been adequately budgeted and previously assessed. Even though the assessment was made in July, August, and November, it was to cover expenses incurred during earlier months. Recognizing that the full amount of the assessment did not constitute revenue earned entirely in July, August, and November, the Settlement Program accountants corrected the mismatch and placed the revenue in the period covered by the assessment. Absent this correction, the award would have been overstated by more than $5 million.

- **Claim 151597**: Claimant is a condominium association that collects an annual assessment specifically for insurance policies on the property. These annual payments cover insurance premiums for the entire year from September 1 through August 31. Yet Claimant explained that, because of the vagaries of the timing of the association's meetings, the special assessments "could be collected as early as June or as late as October or November." And in fact Claimant's books recorded the annual assessments in June for 2008, but in October for 2010. The Settlement Program corrected the recording of the assessment to reflect the period to which the assessments actually apply. Absent the correction of the mismatch, the award would have been overstated by almost $700,000.

- **Claim 160928**: Claimant is a membership organization. Once a year, members pay an annual due that covers membership for the entire year. Differences in when the membership payments are received from year to year will distort the compensation calculation. Applying the first step of the AVM Methodology, the Settlement Program accountants properly corrected the dues and placed them in the 12-month period they covered. Absent this correction, the award would have been overstated by approximately $118,000.

27. Since the July 5, 2017 Final Order, O'Neill & Gaspardo, LLC has not reviewed claims of this nature. Nevertheless, based on how the CSSP is handling the other categories referenced in this Declaration, the risk is high that without further clarification from the Court as to how the AVM Methodology should work claims involving annual memberships, assessments, and contracts will similarly result in overpayments on such claims based on Settlement Program Accountants changing course from how they had previously applied that methodology.

## Event-Based Revenues

28. In certain circumstances, Claimants earn revenues through the performance of a specific event or series of events. In those instances, payments may be received sporadically in months before the event at issue but are contingent on the performance of the event. As a simple example, a sponsorship agreement for a golf outing may be executed and paid in May, but if the event does not take place until September the claimant does not, in fact, earn any revenues until that month. In fact, should the event be canceled the money would need to be returned. The effect can be even more pronounced for subscription payments covering an entire season of events (concerts, sporting events, etc.). Recording revenue when received rather than when the event occurs creates a mismatch that distorts claimant's economic performance.

29. The following are examples of claims involving event-based revenues where a correction of a mismatch was required under the AVM Methodology.

- **Claim 177095**: Claimant operates an opera house and generates significant revenues from the sale of subscription packages covering multiple performances. Claimant is

selling attendance at particular events and thus earns revenue when the events occur. Yet, claimant records revenue in the month in which the payment for the subscription is received, which often has no relationship to the performances being purchased. The Settlement Program accountants, pursuant to the AVM Methodology, properly corrected the revenue by recording it in the months of the events being purchased. Without this correction, the award would have been overstated by more than $400,000.

- **Claim 101675**: Claimant, a minor league baseball team, collects a substantial portion of ticket sales through season ticket packages encompassing multiple games. Claimant is selling attendance at the games, and earns the revenue when the games are played. Yet, claimant records the entirety of the revenue when the season ticket package is purchased, even if no games occur in that month. The Settlement Program accountants properly recorded the season ticket revenue when the games were played. Absent this correction, the award would have been overstated by approximately $180,000.

30. Since the July 5, 2017 Final Order, O'Neill & Gaspardo, LLC has not reviewed claims of this nature. Nevertheless, based on how the CSSP is handling the other categories referenced in this Declaration, the risk is high that without further clarification from the Court as to how the AVM Methodology should work claims involving annual memberships, assessments, and contracts will similarly result in overpayments on such claims based on Settlement Program Accountants changing course from how they had previously applied that methodology.

## CONCLUSION

31. In summary, the AVM Methodology expressly empowers the Settlement Program accountants to make the types of corrections detailed above prior to application of AVM's matching formula. If these corrections are not made, matching problems go unaddressed, and similarly situated claimants will be treated very differently based simply on how they keep their books.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and analysis.    Executed this 2nd day of August, 2017.

Brian L. Gaspardo
O'Neill & Gaspardo, LLC