UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUSIANIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf Of Mexico, on April 20, 2010 | * * * | MDL 2179 SECTION: J JUDGE BARBIER |
| This Document Relates To: *Pleading Bundle B1* | * | MAG. JUDGE WILKINSON |

| | | |
|---|---|---|
| JOHNNY'S CLAMS, (Plaintiff) | | CIVIL ACTION No. 2:16-cv-05541 |
| VERSUS BP EXPLORATION & PRODUCTION, INC., BP AMERICA PRODUCTION COMPANY, and BP P.L.C. (Defendants) | * * * | SECTION J JUDGE BARBIER MAG. JUDGE WILKINSON |

**PLAINTIFF'S RESPONSE AND MEMORANDUM IN OPPOSITION TO BP'S MOTION AS TO RELEASED CLAIMS PURSUANT TO PTO NO. 64, SECTION 1, B1**

Pursuant to Federal Rules of Civil Procedure 27(3) and PTO 64, Plaintiff, Johnny's Clams, respectfully files this Response and incorporated Memorandum in Opposition to BP's Motion as to Released Claims Pursuant to PTO No. 64, Section 1, B1 requesting the Court dismiss Plaintiff's claim be denied.

### BACKGROUND

Following the devastation caused by the *Deepwater Horizon* incident on April 20, 2010, BP, as the responsible party, started a claims program and multiple class settlements in order to begin compensating victims of the disaster. Among those parties affected by the disaster were seafood workers who were devastated by the oil spill's impact on the Gulf of Mexico. Under §2705 of Oil Pollution Act, BP, as the responsible party, was required to establish a procedure to

1

pay interim, short term damages to claimants who were affected by the oil spill. As these interim payments dried up, the Plaintiff, Johnny's Clams, a privately held business owned and operated by Mr. Johnny Sheridan who seeded and harvested clams with the help of his wife Candice and son was asked to sign a Quick Payment Final Claim form which contained releases and covenants not to sue BP through the Gulf Coast Claims Facility ("GCCF"). At a time when Mr. and Mrs. Sheridan were unable to earn a livelihood due to the conditions in the gulf caused by the Deepwater Horizon, Mr. and Mrs. Sheridan were asked to sign the release.

The local economy for the Gulf Coast was devastated. Orders for seafood from the Gulf were being cancelled. The health of the Gulf was not determined and it was totally unfair and unreasonable to not provide some compensation until the full nature and extent of the damage to the Gulf had been determined and that it was safe to harvest from the Gulf again. The fear of the public that seafood from the Gulf was unsafe also had to be overcome. As the Court is well aware, settling a personal injury claim before a personal injury client has achieved maximum medical improvement is tantamount to malpractice. Nowhere is this practice of getting premature release of claims more abhorrent than in the application to the seafood workers in the wake of the oil spill.

The GCCF releases were being signed by claimants before the full extent of the damage the oil spill caused the Gulf of Mexico could be ascertained and in many instances such as this claim, without legal representation. After the GCCF release was executed in 2011, studies were conducted to determine the impact on the Gulf. According to a 2016 analysis conducted by the Department of Interior,

> The study estimated that projections of revenue losses in the fisheries would likely range from $59 million to $89 million in 2011, $38 million to $56 million in 2012, and $18 million to $27 million in 2013. Using these estimates and projecting out impacts to the larger economy, lost fishing revenues resulting from short-term ecological effects experienced 2011 to 2013 were estimated to

>be between $285 million to $428 million, to result in the loss of between 2,700
>to 4,000 full time employees, and lost employee earnings of between $68
>million and $103 million.

Carroll, Michael; Gentner, Brad; Larkin, Sherry; Quigley, Kate; Perlot, Nicole, et al. 2016. *An analysis of the impacts of the Deepwater Horizon oil spill on the Gulf of Mexico seafood industry. U.S. Dept. of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region, New Orleans, LA. OCS Study BOEM 2016-020. 202 p.152.* During the OPA interim payment program, Johnny's Clams and Mr. Sheridan received one interim payment of $21,700 and a final payment of $25,000 in 2011. When the Sheridans were asked to execute the release in exchange for payment from the GCCF, they were told that if they did not execute the release, they would receive nothing for their claim in the future. At this time, Plaintiff was a member of the putative class of unrepresented claimants who were filing claims under the OPA through the GCCF. At the time, Johnny's Clams had no sources of income and Mr. and Mrs. Sheridan would sign anything necessary to meet their basic needs and to salvage the business they had worked so hard to create.  By their estimation, Johnny's Clams lost $195,129.00 for the years of 2010, 2011, and 2012 as compared to their clam sales in 2009, before the oil spill without accounting for projected sales growth. In order to survive they were forced to give up valuable aquaculture leaseholds in the Gulf which would have expanded their business after the spill.

## MEMORANDUM

The executed GCCF release not to sue should be found invalid and unenforceable. Maritime workers, like Mr. and Mrs. Sheridan who formed a privately held corporation, Johnny's Clams,   are provided additional protection under admiralty law. BP's Motion and accompanying Memorandum fail to address the fact that the release claimants like Mr. and Mrs. Sheridan are maritime workers. "Every court should watch with jealousy an encroachment upon

the rights of seamen, because they are unprotected and need counsel" *Harden v. Gordon*, 11 F. Cas. 480 (C.C.D. Me. 1823). The court in *Haden* found that:

> the most rigid scrutiny is instituted into the terms of every contract, in which they [seamen] engage. If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable.

When the Plaintiff was asked to sign the GCCF release, they were not represented by counsel and were advised by the representative of GCCF that they should not get an attorney. The release claimants were members of a putative class as described by this Court's order dated February 2, 2011 Granting in part Plaintiffs' Motion to Supervise Ex Parte Communications with Putative Class (Rec. Doc. 912). Many of the release claimants were not fully advised of their rights in accordance with the terms of the Order. In particular, Mr. and Mrs. Sheridan were advised that they should not hire a lawyer to review the release, in violation of the Court's order directing BP and the GCCF to "[r]efrain from giving or purporting to give legal advice to unrepresented claimants, including advising that claimants should not hire a lawyer." *Id.* The GCCF representative pressured the Plaintiffs into taking the final payment and signing the release after telling Plaintiffs that if they did not take the payment, they would get nothing for their claim.

The Supreme Court has recognized these additional protections afforded to seamen, particularly when it applies to releases signed by seamen giving up certain legal rights. "The wardship theory has, as was recognized by the courts below, marked consequence on the treatment given seamen's releases. Such releases are subject to careful scrutiny. 'One who claims that a seaman has signed away his rights to what in law is due him must be prepared to take the burden of sustaining the release as fairly made with and fully comprehended by the seaman.'" *Garrett v. Moore-McCormack Co.,* 317 U.S. 239, 247-48, 63 S. Ct. 246, 252 (1942). In *Garrett,*

4

the Supreme Court reversed the Pennsylvania Supreme Court's ruling that the burden of proof on releases was on Plaintiff; a maritime worker who claimed he did not remember signing the release and even if he did sign it, it was obtained by fraud under the belief it was for unpaid wages; to prove the release was signed by the Plaintiff. The Supreme Court found that under Federal law, the burden is on the party seeking to enforce the release to prove that the release is valid. BP argues that the inclusion of certain language "demonstrates that signatories executed the releases knowingly and voluntarily, and BP has no reason to believe otherwise." (BP's Memorandum in Support of Its Dispositive Motion as to Released Claims Pursuant to PTO No. 64, Section 1 B1, Page 6). The language included in the release alone does not meet the high burden set by the Supreme Court in *Garrett*, but merely suggests BP included language to try and protect themselves from questions over enforcement of the releases.

In *Garrett,* the Supreme Court held that "the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding." *Id at* 248. BP again has failed to meet this high burden to show that the Plaintiffs were fully apprised of their legal rights when executing these releases at a time when the extent of the damage to the Gulf was not yet fully understood. In Plaintiff's particular industry, clamming, the losses were realized later than most, with the biggest year of revenue losses coming in 2011 rather than 2010. The Plaintiff was pressured into signing the release after being unable to work due to the oil spill, while bills were piling up and he was desperate for any help. This court has a duty to protect seafood workers. "Seamen, of

course, are wards of admiralty whose rights federal courts are duty-bound to jealously protect." *Bass v. Phx. Seadrill/78, Ltd.,* 749 F.2d 1154, 1160-61 (5th Cir. 1985)

When Plaintiffs signed the release they were not fully aware of the legal rights they were signing away since they were not represented by an attorney and advised not to get one. The Fifth Circuit has held that when examining the validity of a release executed by a seaman, "[o]ur ultimate concern in these cases is not whether the seaman has received what the court considers to be adequate consideration for the rights he has relinquished; rather, we inquire whether the seaman relinquished those rights with 'an informed understanding of his rights and a full appreciation of the consequences' when he executed the release." *Id* at 1161. In *Bass*, the Fifth Circuit remanded the case to the District Court after it only examined whether or not Plaintiff received adequate compensation for his claim, which is just one of many factors that need to be examined when considering whether or not the seamen have a full understanding of their rights when they signed a release. BP's contention that the "Release and Covenant Not to Sue" included in the release was "unambiguous, valid and enforceable" does not explain how the Plaintiffs were fully apprised of the consequences of signing the release. Mr. and Mrs. Sheridan were advised by the GCCF representative that if they did not sign the release, they would receive nothing for their claim or would have to wait and go through a lengthy court battle before they saw any relief. The "Fifth Circuit has reiterated the need to protect seamen as wards of admiralty." *Asignacion v. Schiffahrts,* No. 11-627, 2011 U.S. Dist. LEXIS 55707, at 19 (E.D. La. 2011). BP, as the party seeking to enforce these releases, bears the burden of proving that the maritime workers were fully apprised of what legal rights they were signing away when they executed these releases and has not yet met that high burden.

BP's Motion and accompanying Memorandum argues that under both Louisiana and Florida Contract law, releases are contracts and are interpreted under contract law. Under maritime law, releases are not interpreted under contract law. "Applicable law requires that we scrutinize the validity of a seaman's release under principles of admiralty law analogous to the duty owed by a fiduciary to a beneficiary, not solely under principles of contract law." *Orsini v. O/S Seabrooke O.N.,* 247 F.3d 953 (9th Cir. 2001). The court should not allow the releases to be considered only under Florida contract law, but under Federal maritime law and as such, BP owed a fiduciary duty to Plaintiffs. As a fiduciary, the GCCF representatives owed a duty of loyalty and good faith and fair dealing to Plaintiffs to ensure that they would receive adequate compensation for their losses as a result of the BP oil spill and not mislead them by offering legal advice that was not in their best interest in violation of the Court's February 2, 2011 Order.

Even under Florida contract law, duress is an affirmative defense to the enforcement of a contract which was accepted by a party under duress. In the aftermath of the *Deepwater Horizon* incident, Plaintiff was desperate for help. In the Florida case of *Mullan v Bishop of the Diocese of Orlando* 540 So2d 174, 177 (Fla. 5th DCA l989) the Fifth District Court of Appeal discussed why acceptance of benefits alone is not sufficient to determine that a "ratification" has occurred. In *Mullan*, Plaintiff appealed a summary judgement which had been entered against him in his action for damages for being forced to resign from his employment contract under duress and threats of immediate dismissal without benefits. The court held in that case that the acceptance of those benefits did not constitute ratification. The court found that Mullen had "no choice" but to either accept what was offered to him or "let his family suffer". The court went on to state that "...an agreement, induced by duress has been ratified, should be rejected where it appears that at the time of the alleged ratification the duress which originally induced the agreement has

continued to operate." *Id* at 177. Like the Plaintiff in *Mullan*, Johnny's Clams was under extreme financial duress when Mr. and Mrs. Sheridan were pressured into signing the release, unable to operate their business, while the outstanding debts continued to mount.

## CONCLUSION

For the foregoing reasons, Plaintiff Johnny's Clams respectfully request that BP's Motion to Dismiss be denied.

Dated: August 8, 2017

**RESPECTFULLY SUBMITTED**,

/s/ Douglas S. Lyons
Douglas S. Lyons
Lyons and Farrar, P.A.
1637 Metropolitan Blvd., Suite A-2
Tallahassee, FL  32308
(850) 222-8811 - telephone
(850) 222-5583 - facsimile
Florida Bar No. 128277
doug.lyons@lyonsandfarrar.com

**Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Plaintiffs' Response to BP's Motion as to Released Claims Pursuant to PTO No. 64 has been served on all counsel by electronically uploading the same to File & Serve Xpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL No. 2179, on this  8th day of August, 2017.

/s/ Douglas S. Lyons
Douglas S. Lyons