**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | **MDL NO. 2179** |
| "Deepwater Horizon" in the Gulf of | * | |
| Medico, on April 20, 2010 | * | **SECTION J** |
| | * | |
| | * | **JUDGE BARBIER** |
| This Document Relates To: | * | **MAGISTRATE JUDGE WILKINSON** |
| | * | |
| Civil Action No. 2:13-cv-1076 | * | |
| *CRABCO and MR. PEEPER'S BEST,* | * | |
| *LLC v. BP Exploration & Production,* | * | |
| *Inc., et. al.* | * | |

---

**CRABCO & MR. PEEPER'S BEST, LLC'S RESPONSE TO**
**BP'S DISPOSITIVE MOTION AS TO RELEASED CLAIMS**

---

Pursuant to this Court's Order dated 18 July 2017 (Doc. 23048), Crabco and Mr. Peeper's Best, LLC (collectively, "Plaintiffs") hereby file their response to BP's Dispositive Motion as to Released Claims. In support of this response, Plaintiffs submit the accompanying Memorandum in Support of their Response to BP's Dispositive Motion as to Released Claims, which is fully incorporated by reference herein.

*[Remainder of the page intentionally left blank.]*

Respectfully Submitted,

**J. CHRISTOPHER DEAN LAW FIRM, PLLC**


*/s/ J. Christopher Dean*
J. Christopher Dean
Texas Bar No. 00793596
Federal Bar No. 266069
Email: dean@jamesdeanlaw.com
T. Danielle Ross
Texas Bar No. 24070530
Federal Bar No. 1102102
Email: ross@jamesdeanlaw.com
17225 El Camino Real, Suite 190
Houston, Texas 77058
T: 281-280-8900
F: 281-280-8901

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12 and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 8th day of August, 2017.


*/s/ J. Christopher Dean*
J. Christopher Dean

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In re: Oil Spill by the Oil Rig** | * | **MDL NO. 2179** |
| **"Deepwater Horizon" in the Gulf of** | * | |
| **Medico, on April 20, 2010** | * | **SECTION J** |
| | * | |
| | * | **JUDGE BARBIER** |
| **This Document Relates To:** | * | **MAGISTRATE JUDGE WILKINSON** |
| | * | |
| **Civil Action No. 2:13-cv-1076** | * | |
| ***CRABCO and MR. PEEPER'S BEST,*** | * | |
| ***LLC v. BP Exploration & Production,*** | * | |
| ***Inc., et. al.*** | * | |

---

**CRABCO & MR. PEEPER'S BEST, LLC'S MEMORANDUM IN SUPPORT OF THEIR**
**RESPONSE TO BP'S DISPOSITIVE MOTION AS TO RELEASED CLAIMS**

---

Pursuant to this Court's Order dated 18 July 2017 (Doc. 23048), Crabco and Mr. Peeper's Best, LLC (collectively, "Plaintiffs") respectfully request that the Court deny BP's Dispositive Motion as to Crabco and Mr. Peeper's Best, LLC (Peepers) and find that the GCCF release signed by Jerry Wayne Tharp (Tharp) for his independent oyster claim is irrelevant, void, or otherwise waived as to Crabco's and Peeper's valid seafood business claims.

**EXECUTIVE SUMMARY**

Crabco and Peeper's are owned and operated by Tharp, a veteran of the seafood industry.[1] Tharp's businesses are complex like many other seafood business owners working in the Gulf seafood industry. As a result of the Deepwater Horizon Oil Spill (the Spill), Tharp filed business economic loss claims for Crabco and Peeper's through the Gulf Coast Claims Facility (GCCF). Tharp also filed an individual economic loss claim through the GCCF for his lost wages from

---

[1] Exhibit A, Tharp Affidavit.

contract (supplemental) oyster work. As further discussed herein, the oyster claim was, with the assistance and advice of GCCF claims personnel, resolved through the GCCF process. Tharp received noticed from the GCCF that he was eligible to take home $68,226.03 for his oyster lost wage claim. Accordingly, Tharp signed the GCCF release in consideration for the payment of $68,226.03 for his oyster claim losses.  BP now argues that the GCCF release signed by Tharp in 2011 precludes the business loss claims of Crabco and Peeper's. For reasons discussed *infra*, BP's arguments should be dismissed because at all relevant times, Tharp's oyster lost wage claim was a separate and distinct claim from Crabco and Peeper's. For BP to argue otherwise contradicts its prior course of dealings not only with these plaintiffs, but with many claimants who filed claims for multiple businesses. Plaintiffs, Crabco and Peeper's, thus request that the Court deny BP's Dispositive Motion as to Released Claims as it pertains to Crabco and Peeper's.

**BACKGROUND**

### a. Crabco

Crabco was created in 2000 by Tharp to purchase, process and distribute Gulf coast crabs.[2] Crabco operates as a sole proprietorship and filed a separate claim for the losses it sustained as a result of the Deepwater Horizon Oil Spill. As evidence of its sole proprietorship, Crabco files taxes under a Schedule C, operates under a separate EIN, maintains its own Department of Wildlife & Fisheries ("DWF") license, and keeps its own accounting records.[3]

### b. Mr. Peeper's Best, LLC

In 2009, Tharp began the process of incorporating Mr. Peeper's Best, LLC.  Peeper's was created as a separate legal entity for the purpose of selling and marketing processed and live crabs

---

[2] Exhibit A – Affidavit of Tharp.
[3] *Id.*

purchased from Crabco using Tharp's patented seafood maintainer in grocery stores.[4]  Peeper's also maintains its own EIN, DWF license, accounting records, and tax returns.[5]  Prior to the spill, Tharp registered the Peeper's domain name and began developing labels for Peeper's products.[6] Tharp also applied to trademark the Peeper's name in January 2010 (Serial No. 77905418) with the U.S. Patent and Trademark Office ("USTPO").[7]  Prior to the Deepwater Horizon Oil Spill, Tharp actively negotiated with national grocery chains for the placement of the maintainer and Peeper's products.[8] As a result of the Deepwater Horizon Spill and the subsequent destruction of the seafood industry in the Gulf, Peepers, like many other seafood businesses, suffered financially.

### c. The GCCF

In August 2010, BP set up the GCCF to handle the presentment and payment of various claims for losses suffered by individuals and business affected by the Spill.  Claimants could submit their claims online or go to a GCCF service center for assistance in filing a claim.  Like many other claimants and businesses, Tharp had multiple claims as a result of the spill. These included claims for his individual lost wages for his oyster work and the business economic loss claims of Crabco and Peeper's. In late 2010, Tharp engaged undersigned counsel to assist him in the filing of his *business* claims, i.e. Crabco and Peeper's. Undersigned counsel ultimately filed a GCCF claim on Crabco's behalf on December 6, 2010. Crabco was assigned a GCCF claimant number of 01180295.[9]

During 2011, while GCCF evaluated Crabco's claim, Tharp was advised by GCCF claims center personnel to file a separate claim for his income from oyster sales based on a 1099 issued

---

[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] Exhibit B, Crabco GCCF Claim; Exhibit C, GCCF Letter Re: Crabco Claim Acknowledgement. The GCCF did not account for Peeper's claim.

to Tharp individually.[10] Tharp did not engage undersigned counsel to assist him with the oyster lost wage claim.  Instead, Tharp simply used the free services offered by GCCF to resolve his arguably less complex oyster claim. Tharp's individual lost wage claim was straightforward. Tharp had one 1099 issued by Bedrock Seafood, Inc., in 2008 that was used to support his oyster claim. Thus, Tharp elected to avoid additional legal fees and not to further engage undersigned counsel for what he believed, and was reassured several times by GCCF representatives, as an easy claim that would not affect his business claims.

Later, Tharp went to a local GCCF service centers in New Iberia and Berwick and spoke with multiple GCCF representatives. GCCF personnel helped Tharp file his oyster lost wage claim using his Social Security number.[11] The GCCF personnel at the claims center advised Tharp that the 1099 proceeds from income from oyster work were separate from his Crabco claim.[12]  Tharp was then instructed by the same GCCF personnel to file his oyster lost wage claim using his Social Security number and provide the 1099 and 2008 individual tax return as supporting documentation. Joe Ladd (Ladd), a representative of the GCCF in the Berwick service center, reassured Tharp that by filing his oyster claim using his Social Security number, there would be no conflict with his pending Crabco claim.[13] In fact, Ladd told Tharp that he could have several claims as long as they were filed under separate identification numbers (i.e. Social Security numbers or EINs).[14]  Relying upon the advice and representations made by Ladd on behalf of the GCCF, Tharp filed his oyster claim and was assigned Claimant No. 1033390. [15]

---

[10] Exhibit A.
[11] *Id.*.
[12] *Id.*.
[13] *Id.*
[14] *Id.*
[15] *Id.*

On 3 June 2011, GCCF issued Tharp a determination letter for his oyster claim with a final payment offer of $68,226.03.[16] Upon receiving the check, Tharp returned to the GCCF claims center in New Iberia GCCF and spoke with a representative named Reggie to ask specifically about whether acceptance of the check would interfere or otherwise negatively affect his Crabco claim.[17] Reggie reassured Tharp that payment of the oyster lost wage claim was separate and distinct from the Crabco business claim.[18] Relying upon Reggie's advice, who was again, acting on behalf of the GCCF,   Tharp signed the release ("the Tharp GCCF Release") and cashed the check.[19]

Several months later, GCCF issued a determination letter to Crabco, via undersigned Counsel, on 17 October 2011 with an offer of $146,676.46.[20] Tharp rejected this offer. On 2 March 2012 another determination letter was sent to Crabco with a final payment offer of $220,014.69.[21] Crabco declined the final payment offer at that time but accepted an interim payment of $90,527.63.  The interim payment award did not require Crabco "to release or give up any claims or to surrender any litigation rights."[22]

### d.   BP Claims Program

In June 2012, Peeper's filed a claim in the in the newly enacted BP Claims Program ("BPCP").[23]  This was the first time that Peeper's was able to present its claim since it was otherwise excluded from the GCCF model.  Peeper's BPCP Claim No. was 1085976-01.[24] Crabco also filed a claim in the BPCP and was assigned Claim No. 1085975-01.[25]

---

[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] Exhibit D, GCCF Determination Letter dated 17 October 2011.
[21] Exhibit E, GCCF Determination Letter dated 2 March 2012.
[22] *Id.*; *see also* Exhibit F, GCCF Interim Payment to Crabco.
[23] Exhibit H, Peeper's BPCP Claim Form.
[24] Exhibit J, BPCP Letter Re: Peeper's.
[25] Exhibit G, Crabco BPCP Claim Form; Exhibit I, BPCP Letter Re: Crabco;

### e.   DHECC

On 20 July 2012, Crabco also filed a Business Economic Loss (BEL) claim in the DWH Economic and Property Damages Settlement Agreement  (DHECC).[26]  It was assigned Claimant ID 1000038579 and its BEL Claim ID was 39232.[27]  Peeper's did not file a DHECC claim, as the Settlement Agreement's start-up claims did not fully account for Peeper's damages.  Thus, after a period of notices, Crabco, through counsel, served its opt-out notice via certified mail return receipt on 30 October 2012.[28]  Nevertheless, DHECC issued Crabco an Eligibility Notice on 18 December 2012 for $217,898.71, after applying the $90,527.63 offset for the GCCF payment to Crabco.[29] BP appealed and asserted for the first time that the GCCF release signed by Tharp in 2011 precluded Crabco's claim. [30]  BP's appeal contradicted itself and made no sense given that the GCCF made Crabco a separate offer months after Tharp accepted the check for his individual oyster lost wage claim.[31]  Regardless, the notice and appeal were moot as Crabco had timely opted out of the Settlement Agreement by the November 1, 2012 deadline.[32]

Despite the subsequent GCCF payment and DHECC offer, BPCP denied Crabco's claim based on Tharp's individual release in July 2013.[33]  BPCP never issued any determinations on Peeper's claim.

### f.   Neutrals Negotiations

In 2016, the Court appointed several individuals to act as neutrals for purposes of negotiating and resolved claims ("Neutrals").  During the course of negotiations, the Neutrals

---

[26] Exhibit K, Crabco DHECC Claim Submission.
[27] Exhibit L, DHECC Printout re: Crabco.
[28] Exhibit M, Crabco Opt Out Letter.
[29] Exhibit N, Crabco DHECC Eligibility Notice.
[30] Exhibit O, BP Appeal.
[31] Exhibit O, BP Appeal.
[32] Exhibit P, Crabco Response to BP Appeal.
[33] Exhibit Q, BPCP Letter Re: Crabco.

mentioned the release issue with Plaintiffs' counsel, who advised that the release was for an individual oyster lost wage claim that was distinct from Crabco's and Peeper's business loss claims.  The Neutrals never raised the release issue thereafter and instead continued to negotiate and make offers with undersigned counsel on the Crabco and Peeper's claims. In an effort to resolve these claims, the Neutrals made offers of $6,872 and $106,935.  Plaintiffs continued to reject these offers which were insufficient to compensate the losses sustained by Crabco and Peeper's as a result of the Spill.

## ARGUMENT & ANALYSIS

The issue here is simple and one that can and should easily be resolved in the Plaintiffs' favor.  Tharp filed two separate claims in the GCCF: one for his individual oyster claim and one for Crabco, his business claim. Evidence of the separate nature of each is demonstrated simply by fact that the GCCF assigned each claim its own separate Claimant Number. Further evidence of the separate nature of each claim comes from the very important fact that the GCCF issued an interim and final payment award to Crabco, approximately five months after Tharp's oyster claim was resolved, i.e. the release was signed and the check was cashed. Notably, BP fails to address this fact in its Motion to Dismiss instead making a broad argument that the release signed by Tharp for his individual oyster claim applied to all of his claims. BP's argument not only defies logic, it is squarely at odds with Tharp's actions throughout the past seven (7) years. The facts plainly indicate that Tharp would not have signed the release for his individual oyster claim had he been aware that the release would negate Crabco's and Peeper's claims. Tharp, as he attested in his affidavit, questioned the release to multiple representatives of the GCCF, who were at all times, acting as agents on behalf of BP. The GCCF representatives, on multiple occasions, reassured Tharp that by signing the release for his oyster lost wage claim, Tharp would *not* be signing away

his business claims for Crabco and Peeper's.  Tharp realized the value of the Crabco and Peeper's

claims. In fact, Plaintiffs turned down five (5) subsequent offers on behalf of BP.  This includes a

GCCF final payment offer of $220,014.69 for Crabo's BEL claim, a DWH Settlement Program

award of $217,898.71, and offers from the Neutrals of $106.935.  Given that Tharp has turned

down lucrative awards on behalf of Crabco and Peeper's, it is ridiculous to think that Tharp would

have accepted an award of $68,226.03 for all three claims. Yet, this is exactly what BP argues

now. For the reasons discussed below, BP's argument should be denied.

### A.  Two Contracts at Issue

There are essentially two contracts at issue: (1) the contract made by the acceptance of the

Determination of Final Payment Offer dated 3 June 2011 ("the Tharp GCCF Contract"); and (2)

the release signed by Tharp on 14 June 2011 ("the Tharp GCCF Release").  The Court of Appeals

found that the Determination of Final Payment Offer, if accepted, served as a valid contract in and

of itself.[34]   The terms of the Tharp GCCF Contract include that GCCF/BP would pay Tharp

$68,226.03 in exchange for a release.[35]  The Tharp GCCF Release is also its own contract, albeit

lacking some of the more intricate details included in the Tharp GCCF Contract.  BP moves now

to dismiss Crabco and Peeper's claims based strictly on the Tharp GCCF Release.  However, the

underlying contract provides the terms and basis for the release, which is the true issue in this

matter.

### B.  The Tharp GCCF Contract & Accompanying Release is Limited to Tharp's Individual Claim.

The Tharp GCCF Contract and accompanying release is limited to Tharp's individual

claims for lost income as a result of oyster sales.  The GCCF claims process allowed submissions

---

[34] *Johnson v. BP Exploration & Prod. (In re Deepwater Horizon),* 786 F.3d 344 (5th Cir. 2015).
[35] *Id.*; *see also* Exhibit A.

for each entity, much like the current Settlement Agreement and DHECC framework.  Tharp filed his individual claim based on income received from oyster work as reflected on his 1099.[36]  This was separate and distinct from Crabco's claim.[37]  GCCF, acting on behalf of BP, recognized it as such.[38]  This is not a scenario where Tharp has additional 1099 income that he is now suing for. Plaintiffs agree that the Tharp GCCF Release would rightly preclude such a claim.  However, the Tharp GCCF Release was based on the Tharp GGCF Contract which dealt solely with Tharp's claim for 1099 losses, as evidenced by the claim filed and its supporting documentation.  In fact, the determination letter and thus the Tharp GCCF Contract, clearly set forth the basis for the agreement, the methodology of calculating the consideration, the amount of consideration, and the terms and conditions of acceptance.[39]

The Determination of Final Payment Offer dated 3 June 2011 presented the offer of $68,226.03 for Tharp's oyster lost wage claim in exchange for a release.[40]  This offer was addressed to "Jerry Wayne Tharp, Claimant ID: 1033390."[41]  The Final Payment Offer calculated the May-December 2010 past losses based on Tharp's 1099 and tax return submissions, which was found to be $26,145.76.[42]  The offer then applied a Future Recovery Factor of 4 to arrive at the total loss of $104,583.03.[43]  GCCF offset BP's prior payments and emergency payments to result

---

[36] Exhibit A.
[37] *Id.*; *see also* Exhibit B.
[38] BP cannot argue that GCCF was separate and distinct from BP.  In fact, this Court has already determined whether GCCF was "actually BP", "an agent of BP" or some other sort of hybrid entity.  *In re Oil Spill by the Oil Rig Deepwater Horizon*, 2011 U.S. Dist. LEXIS 10497 at p. 12 (E. D. La., Feb. 2, 2011).  As this Court may recall, it found that the GCCF was not 100 percent neutral nor 100 percent BP but a hybrid structure so that "Mr. Feinberg and the GCCF cannot be considered 'neutral' or totally 'independent' of BP."  *Id.* at p. 19.  This Court further noted that any claimant information submitted to GCCF would be turned over to BP, with no restrictions as to its use.  *Id.* at p. 16.  Thus, BP cannot now argue that GCCF acted independently or that BP had no knowledge of the claims submitted to or paid by GCCF.
[39] Exhibit A.
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*

in the Final Payment Offer of $68,226.03.[44]   Again, this Determination of Final Payment Offer

spelled out the basis for such an offer in Attachment B to the offer.[45]   Thus, upon Tharp's

acceptance, the Determination of Final Payment Offer became a valid contract, as determined by

the Court of Appeals.[46]   The terms of this contract was a set of conditions: (1) BP would pay

$68,226.03 to Tharp; and (2) Tharp would execute a release.[47]   The conditions were agreed to and

ultimately met when Tharp signed and submitted the release and received the check in return.

However, BP's current argument attempts to enforce the release without addressing the

underlying contract to which the release was a condition: the Tharp GCCF Contract.   When

viewing the Tharp GCCF Release in light of the Tharp GCCF Contract, BP's motion must be

denied.   The Tharp GCCF Release and Contract are limited to Tharp's individual oyster lost wage

claim.   The offer of $68,226.03 was negotiated and based entirely upon Tharp's 1099 income from

2008.   It does not include and does not account for the business economic loss claims of Crabco

and Peeper's. This is supported by the initial GCCF offers made to Crabco of $146,676.46 and

$220,014.69, not to mention the subsequent offers of DHECC and the Neutrals.[48]   BP, through

GCCF, recognized that Tharp's 1099 losses were worth $68,226.03 when making the Final

Payment Offer on 3 June 2011.[49]   Likewise, BP, through GCCF, knew that Crabco's business

losses were worth at least $220,014.69, according to the GCCF recovery model, and were willing

to compensate Crabco for its own release separately in 2012.[50]   If taken together, Tharp's 1099

losses and Crabco's losses totaled $288,240.72 in GCCF's eyes.   Thus, the amount actually paid

represents less than 24% of the total recognized recovery model for Tharp's 1099 losses and

---

[44] *Id.*
[45] *Id.*
[46] *In re Deepwater Horizon),* 786 F.3d 344 (5th Cir. 2015).
[47] Exhibit A.
[48] *See* Exhibits D, E.
[49] Exhibit A.
[50] Exhibit D, E.

Crabco's business claims. Therefore, by its own admission, the offer and payment of $68,226.03 is only for the Tharp GCCF Release pertaining to any and all claims of Tharp individually (i.e. 1099 losses).

While the GCCF Release is intentionally broad to preclude litigation of already settled matters, whether known or unknown, BP's after-the-fact interpretation of the release to include claims that it carved out under a separate business claimant number is improper. GCCF, acting on behalf of BP, knew, by virtue of Tharp's application as well as the Crabco claim file, that Claimant No. 1033390 was (1) its own individual claim; (2) limited to Tharp's 1099 losses from oyster lost income; and (3) did not include Crabco's business economic loss claim. BP, through GCCF, knew and intended for Tharp's individual income losses and only those losses to be released. Tharp has complied with both contracts (i.e. the Tharp GCCF Contract and the Tharp GCCF Release) and has not brought suit in regards to his individual income losses.

### C. **Even if this Court finds that the Tharp Release applies to Crabco and Peeper's, the subsequent offers by GCCF to Crabco indicate a waiver by GCCF and BP to claim that the Release is applicable.**

Waiver is the intentional relinquishment of a known right made expressly or indicated by conduct that is inconsistent with an intent to claim the right.[51] Waiver is clearly shown in the instant case from GCCF's subsequent conduct and course of dealings with Crabco. Tharp signed the GCCF release for his oyster claim in June 2011.[52] Several months later on 17 October 2011, GCCF issued a determination letter to Crabco with an offer of $146,676.46.[53] If there was any issue as to whether Crabco's claim could proceed, certainly the GCCF, its representatives or other representatives acting on behalf of BP would have advised the Claimant. Instead, an offer was

---

[51] *Ratcliffe v. Acacia Mut. Life Ins. Co.,* 187 So. 329, 331 (La. App. Orl. Cir. 1939).
[52] Exhibit A.
[53] Exhibit D.

made.  Instead, the GCCF and BP were *fully willing* to pay Crabco for its BEL claim separate and aside from the Tharp GCCF Release.

Further, when the offer was rejected, GCCF/BP continued to negotiate and issued a second determination letter to Crabco on 2 March 2012 with a final payment offer of $220,014.69.[54] Again, GCCF and BP were fully willing to pay Crabco for its BEL claim separate and aside from the Tharp GCCF Release.  Crabco again rejected this offer but accepted an interim payment of $90,527.63, which was paid without necessity of a release.  The actions of GCCF and by virtue, BP, were and are inconsistent with BP's current argument that the Tharp GCCF Release estopped Tharp from pursuing his claims on behalf of Crabco and Peeper's.

   **D.  The Court should dismiss BP's argument because the Tharp GCCF Release was Fraudulently Induced.**

A court may set aside a settlement agreement induced by fraud.[55]  The fraud must be related to the agreement itself and not to the merits of the underlying claim that was settled.[56]  To prove fraudulent inducement, Plaintiffs must show: (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) the party acted in reliance on upon the representation; and (6) the party suffered injury.[57]

If the Court adopts BP's interpretation of the Tharp GCCF Release, Plaintiffs can prove that such a release, as BP interprets it, was induced by fraud on the part of GCCF and BP. The facts demonstrate that multiple GCCF representatives, acting on behalf of BP, consistently

---

[54] Exhibit E.
[55] *In re Deepwater Horizon,* 786 F.3d 344, 363 (5th Cir. 2015).
[56] *Id.*
[57] *Id.*

reassured Tharp that acceptance of the oyster lost wage claim would not affect his Crabco and Peeper's claims. Specifically, GCCF representatives stated to Tharp:

- Separate claims can be filed with different identification numbers;

- Tharp's individual claim under Claimant No. 1033390 was separate and distinct from Crabco's claims under Claimant No. 1180295;

- Tharp could sign the Tharp GCCF Release and cash the accompanying check without affecting Crabco's claims under Claimant No. 1180295 in 2011; and

- Crabco could accept an interim payment of $90,527.63 without signing a release or surrendering any litigation rights in 2012.

If BP's argument is accepted, then BP knowingly permitted GCCF representatives to make false representations to claimants like Tharp. As a direct result of the false representations made by GCCF representatives, Tharp now faces potential dismissal of Crabco's and Peeper's business claims despite the fact that the GCCF, Settlement Program and Neutrals made separate offers to Crabco and Peeper's several months *after* the Release was signed. The facts here support a claim of fraudulent inducement by BP and the GCCF. Thus, BP's Motion should be denied.

## E. The Tharp GCCF Release Should be Void as Against Public Policy and/or Unconscionable.

A contract that is against public policy cannot be enforced.[58]  BP's interpretation of the Tharp GCCF Release goes against the public policy established by this Court and the various recovery programs, including GCCF and DHECC.   These recovery programs and the Court-approved settlement were designed to provide recovery to affected individuals and entities.   In

---

[58] "LSA-C.C. art. 1966 provides that an obligation cannot exist without a lawful cause.  Cause is the reason that a party obligates itself.  LSA-C.C. art. 1967.  The cause of an obligation is unlawful when the enforcement of the obligation would produce a result prohibited by law or against public policy."  *Baker v. MacLay Props. Co.*, 94-1529 (La. 01/17/95); 648 So. 2d 888, 895.

fact, DHECC was tasked specifically with interpreting and working with each claim in accordance with the Settlement Agreement in whatever way would afford the best opportunity for eligibility and recovery to the claimant.[59]  Public policy requires fair, uniform, and just claims handling across all claimants.  The Court cannot allow BP to manipulate the terms of a Release and stretch its applicability to two other separate and distinct claims.

Likewise, an unconscionable contract cannot be enforced.[60]  If the Court adopts BP's argument, the results would be grossly unfair and one-sided.  Unconscionability is generally determined by how the parties arrived at the terms in controversy and whether there are legitimate commercial reasons justifying the terms.  As discussed at length above, the Determination of Final Payment Offer sets forth the clear and precise terms that result in the Tharp GCCF Contract and, in turn, the Tharp GCCF Release.  Both were drafted solely by BP and/or its representatives, with no opportunity for Tharp to negotiate the terms.  BP's interpretation of the terms of the Tharp GCCF Release would be wholly unfair and contradictory to the underlying determination letter.  To uphold the Tharp GCCR Release under BP's interpretation would be unconscionable and inapposite of true intention of the offer and acceptance for Tharp's 1099 lost wage claim.

### F.  The Court Must Allow an Evidentiary Hearing on Disputed Facts.

Given the plethora of disputed facts and issues, the Court is under an obligation to grant an evidentiary hearing on this matter.  It is clear that the Court has the ability to summarily enforce a settlement "if no material facts are in dispute," but is required to allow the parties an evidentiary hearing on disputed issues of the validity and scope of the settlement agreement.[61]

---

[59] DWH Economic & Property Settlement Agreement at 4.3.7.
[60] "Louisiana jurisprudence does recognize that certain contractual terms, especially when contained in dense standard forms that are not negotiated, can be too harsh to justly enforce. The theory of such decisions, often, is that an unconscionable contract or term can be thought of as lacking the free consent that the Code requires of all contracts. See generally Ronald L. Hersbergen, Unconscionability: The Approach of the Louisiana Civil Code, 43 LA. L. REV. 1315 (1983)." *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159, 167 (5th Cir. 2004).
[61] *In re Deepwater Horizon*, 786 F.3d 344, 354 (5th Cir. 2015).

**CONCLUSION & PRAYER**

The issue before the Court is simple: does payment and release of an individual oyster lost wage claim preclude separate and distinct business economic loss claims? BP argues that it should, despite the fact that GCCF disagreed, DHECC's Claims Administrator disagreed, the Neutrals disagreed, and Plaintiffs disagree. GCCF clearly and unequivocally treated Tharp's individual claim separate from the Crabco claim and represented the same to Tharp on multiple occasions. GCCF issued an interim payment to Crabco even after this alleged release, which BP completely ignores. BP's argument is completely illogical and contradicts its own actions in handling these three claims. The facts plainly show that Tharp would not have signed the release for his individual oyster claim had he been aware that the release would negate Crabco's and Peeper's claims. Given that Tharp has turned down lucrative awards on behalf of Crabco (of up to $291,236.94 from DHECC) and Peeper's, it is ridiculous to think that Tharp would have accepted an award of $68,226.03 for all three claims. Yet, this is exactly what BP argues now. For the reasons discussed above, BP's motion as Crabco and Mr. Peeper's Best, LLC should be denied.

*[Remainder of the page intentionally left blank.]*

Respectfully Submitted,

**J. CHRISTOPHER DEAN LAW FIRM, PLLC**
*/s/ J. Christopher Dean*
J. Christopher Dean
Texas Bar No. 00793596 & Federal Bar No. 266069
dean@jamesdeanlaw.com
T. Danielle Ross
Texas Bar No. 24070530 & Federal Bar No. 1102102
ross@jamesdeanlaw.com
17225 El Camino Real, Suite 190
Houston, Texas 77058
T: 281-280-8900
F: 281-280-8901

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Response has been served on All Counsel by electronically uploading the same to File & Serve Xpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 8th day of August, 2017.

*/s/ J. Christopher Dean*
J. Christopher Dean