UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUSIANIANA

| | | |
|---|---|---|
| **In Re: Oil Spill by the Oil Rig** | * | **MDL 2179** |
| "Deepwater Horizon" in the Gulf | | |
| Of Mexico, on April 20, 2010 | * | **SECTION: J** |
| | * | **JUDGE BARBIER** |
| **This Document Relates To:** | | |
| *Pleading Bundle B1* | * | **MAG. JUDGE WILKINSON** |

| | | |
|---|---|---|
| **JELP BARBER,** | | **CIVIL ACTION** |
| | | No. 2:16-cv--05533 |
| **(Plaintiff)** | | |
| | * | **SECTION J** |
| **VERSUS** | | |
| | * | **JUDGE BARBIER** |
| **BP EXPLORATION & PRODUCTION, INC.,** | | |
| **BP AMERICA PRODUCTION COMPANY,** | | |
| **and BP P.L.C.** | * | **MAG. JUDGE WILKINSON** |
| **(Defendants)** | | |

**PLAINTIFF'S RESPONSE AND MEMORANDUM IN OPPOSITION TO BP'S MOTION AS TO RELEASED CLAIMS PURSUANT TO PTO NO. 64, SECTION 1, B1**

Pursuant to Federal Rules of Civil Procedure 27(3) and PTO 64, Plaintiff, Jelp Barber, respectfully files this Response and incorporated Memorandum in Opposition to BP's Motion as to Released Claims Pursuant to PTO No. 64, Section 1, B1 requesting the Court dismiss Plaintiff's claim be denied.

## BACKGROUND

Following the devastation caused by the *Deepwater Horizon* incident on April 20, 2010, BP, as the responsible party, started a claims program and multiple class settlements in order to begin compensating victims of the disaster. Among those parties affected by the disaster were seafood workers who were devastated by the oil spill's impact on the Gulf of Mexico. Under §2705 of Oil Pollution Act ("OPA"), BP, as the responsible party, was required to establish a

1

procedure to pay interim, short term damages to claimants who were affected by the oil spill. As these interim payments dried up, Plaintiff was asked to sign a Quick Payment Final Claim form which contained releases and covenants not to sue BP through the Gulf Coast Claims Facility ("GCCF"). Mr. Barber was a member of the putative class receiving OPA payments who executed releases in exchange for Final Payments under the OPA without an attorney while under economic duress.

As a shrimper, Mr. Barber received a $40,000.00 Emergency Advance Payment in late September 2010 and one interim payment of $5,000.00. Mr. Barber promptly submitted all additional information to the GCCF as requested. The GCCF failed to make any additional interim payments and failed to ask Mr. Barber to submit a "Final Claim for Final Payment" as proposed by its September 25, 2010 letter enclosing the $40,000.00 Emergency Advance Payment.

Initially, the GCCF asked Mr. Barber to submit specific information to identify and quantify his losses and represented it would, within 90 days, begin making interim payments to partially compensate for the losses to sustain him and his family until the losses could be fully quantified and fairly compensated. Instead, after receiving the information it requested, the GCCF repeatedly asked Mr. Barber to submit additional information, much of which was duplicative, representing it would within 90 days thereafter begin making additional interim payments towards satisfaction of his claim. Mr. Barber dutifully complied with each request by promptly submitting all additional information GCCF requested of him. After the advance payment, Mr. Barber received no additional interim payments under the OPA from the GCCF.

Finally, nearly a year later in mid-August 2011, Mr. Barber received a "Determination Letter on Final Payment" from the GCCF dated August 9, 2011, enclosing a "Release and

2

Covenant Not to Sue." The Determination Letter on Final Payment Claim quantified Mr. Barber's economic losses resulting from the Oil Spill preventing him from being able to continue harvesting shrimp at $70,000.00, acknowledged it had already paid him $45,000.00 to compensate for those losses, and offered to pay him the $25,000.00 remainder in exchange for him signing and returning the "Release and Covenant Not to Sue" to extinguish his rights for recovery of any loss he sustained as a result of the oil spill.

Because he was experiencing extreme financial distress as a result of being unable to earn income by using the *Lady Louise*, which was used as a Vessel of Opportunity (VOO) in cleanup efforts for approximately 20 days but was not released back to Mr. Barber for nearly six months, to harvest shrimp from Gulf waters, and was limited to earning income from harvesting oysters from Apalachicola Bay to the extent permitted by Florida Wildlife Commission (FWC) regulation due to the Oil Spill, and could not afford to contest the determinations made in GCCF's Determination Letter and reject the relief that payment would give him, and was not represented by an attorney or otherwise benefited by advice of an attorney, Mr. Barber was unable to fully understand the intended effect of the Determination Letter on Final Payment Claim or of the Release and Covenant Not to Sue, or the legal rights and remedies available to him to challenge GCCF's disposition of his claim, he accepted that offer and on August 29, 2011 signed and returned the Releases and Covenant Not to Sue to GCCF. A few days later, Mr. Barber received a check from GCCF for $25,000.00 in final payment of his economic losses resulting from the Oil Spill.

The local economy for the Gulf Coast was devastated. Orders for seafood from the Gulf were being cancelled. The health of the Gulf was not determined and it was totally unfair and unreasonable to not provide some compensation until the full nature and extent of the damage to

3

the Gulf had been determined and that it was safe to shrimp in the Gulf again. The fear of the public that seafood from the Gulf was unsafe also had to be overcome. As the Court is well aware, settling a personal injury claim before a personal injury client has achieved maximum medical improvement is tantamount to malpractice. Nowhere is this practice of getting premature release claims more abhorrent than in the application to the seafood workers in the wake of the catastrophic BP oil spill.

The GCCF releases were being signed by claimants before the full extent of the damage the oil spill caused the Gulf of Mexico could be or was determined. After many of the GCCF claimants executed releases in 2011, studies were conducted to determine the impact on the Gulf. According to a 2016 analysis conducted by the Department of Interior,

> The study estimated that projections of revenue losses in the fisheries would likely range from $59 million to $89 million in 2011, $38 million to $56 million in 2012, and $18 million to $27 million in 2013. Using these estimates and projecting out impacts to the larger economy, lost fishing revenues resulting from short-term ecological effects experienced 2011 to 2013 were estimated to be between $285 million to $428 million, to result in the loss of between 2,700 to 4,000 full time employees, and lost employee earnings of between $68 million and $103 million.

Carroll, Michael; Gentner, Brad; Larkin, Sherry; Quigley, Kate; Perlot, Nicole, et al. 2016. *An analysis of the impacts of the Deepwater Horizon oil spill on the Gulf of Mexico seafood industry. U.S. Dept. of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region, New Orleans, LA. OCS Study BOEM 2016-020. 202 p.152.* Through the GCCF, Jelp Barber received interim and emergency advance payments in 2010 totaling $45,000 and a final payment of $25,000 in 2011.

As a result of the spill and the delay in releasing the *Lady Louise* and the actions of the GCCF and VOO have prevented Mr. Barber from making productive use of the *Lady Louise*. She has been tied to the dock since 2010 and, according to Captain Ric Corley, Certified Master Marine Surveyor, is so deteriorated that it is economically infeasible to restore her to seaworthy

condition and make her fit for use in commercial shrimping in Gulf waters. According to Captain Corley, in April 2010 the "Lady Louise" had a market value approximating $175,000.00, is now worthless, and constitutes an environmental hazard if not immediately removed from the waters in which she sits.

## MEMORANDUM

The executed GCCF release not to sue should be found invalid and unenforceable. Maritime workers, like Mr. Barber, are provided additional protection under admiralty law. BP's Motion and accompanying Memorandum fail to address the fact that the release claimants are maritime workers. "Every court should watch with jealousy an encroachment upon the rights of seamen, because they are unprotected and need counsel" *Harden v. Gordon*, 11 F. Cas. 480 (C.C.D. Me. 1823). The court in *Haden* found that:

> the most rigid scrutiny is instituted into the terms of every contract, in which they [seamen] engage. If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable.

When the Plaintiff was asked to sign the GCCF release, he was not represented by counsel and was under extreme economic duress due to the adverse effects of the spill. Mr. Barber complied with all of the GCCF inquiries and provided the requested documents, but was not given an adequate determination of his losses as a result of the oil spill.

The Supreme Court has recognized additional protections are afforded to seamen, particularly when it applies to releases signed by seamen giving up certain legal rights. "The wardship theory has, as was recognized by the courts below, marked consequence on the treatment given seamen's releases. Such releases are subject to careful scrutiny. 'One who claims that a seaman has signed away his rights to what in law is due him must be prepared to take the

burden of sustaining the release as fairly made with and fully comprehended by the seaman.'" *Garrett v. Moore-McCormack Co.,* 317 U.S. 239, 247-48, 63 S. Ct. 246, 252 (1942). In *Garrett,* the Supreme Court reversed the Pennsylvania Supreme Court's ruling that the burden of proof on releases was on Plaintiff; a maritime worker who claimed he did not remember signing the release and even if he did sign it, it was obtained by fraud under the belief it was for unpaid wages; to prove the release was signed by the Plaintiff. The Supreme Court found that under Federal law, the burden is on the party seeking to enforce the release to prove that the release is valid. BP argues that the inclusion of certain language "demonstrates that signatories executed the releases knowingly and voluntarily, and BP has no reason to believe otherwise." (BP's Memorandum in Support of Its Dispositive Motion as to Released Claims Pursuant to PTO No. 64, Section 1 B1, Page 6). The language included in the release alone does not meet the high burden set by the Supreme Court in *Garrett*, but merely suggests BP included language to try and protect themselves from questions over enforcement of the releases.

In *Garrett,* the Supreme Court held that "the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding." *Id at* 248. BP again has failed to meet this high burden to show that the Plaintiff was fully apprised of his legal rights when executing his release at a time when the extent of the damage to the Gulf was not yet fully understood. Mr. Barber felt pressured into signing the release after being unable to work due to the oil spill, while bills were piling up and he was desperate for any help. This court has a duty to protect seafood

workers. "Seamen, of course, are wards of admiralty whose rights federal courts are duty-bound to jealously protect." *Bass v. Phx. Seadrill/78, Ltd.,* 749 F.2d 1154, 1160-61 (5th Cir. 1985)

When Plaintiff signed the release he was not fully aware of the legal rights he was signing away since he was not represented by an attorney and had not fully realized his losses. The Fifth Circuit has held that when examining the validity of a release executed by a seaman, "[o]ur ultimate concern in these cases is not whether the seaman has received what the court considers to be adequate consideration for the rights he has relinquished; rather, we inquire whether the seaman relinquished those rights with 'an informed understanding of his rights and a full appreciation of the consequences' when he executed the release." *Id* at 1161. In *Bass*, the Fifth Circuit remanded the case to the District Court after it only examined whether or not Plaintiff received adequate compensation for his claim, which is just one of many factors that need to be examined when considering whether or not the seaman had a full understanding of his rights when he signed a release. BP's contention that the "Release and Covenant Not to Sue" included in the release was "unambiguous, valid and enforceable" does not explain how the Plaintiff was fully apprised of the consequences of his signing the release. The "Fifth Circuit has reiterated the need to protect seamen as wards of admiralty." *Asignacion v. Schiffahrts,* No. 11-627, 2011 U.S. Dist. LEXIS 55707, at 19 (E.D. La. 2011). BP, as the party seeking to enforce these releases, bears the burden of proving that the Plaintiff was fully apprised of what legal rights he was signing away when he executed his release and has not yet met that high burden.

BP's Motion and accompanying Memorandum argue that under both Louisiana and Florida Contract law, releases are contracts and are interpreted under contract law. Under maritime law, releases are not interpreted under contract law. "Applicable law requires that we scrutinize the validity of a seamen's release under principles of admiralty law analogous to the

7

duty owed by a fiduciary to a beneficiary, not solely under principles of contract law." *Orsini v. O/S Seabrooke O.N.,* 247 F.3d 953 (9th Cir. 2001). The court should not allow the release to be considered only under Florida contract law, but under Federal maritime law and as such, BP owed a fiduciary duty to Plaintiff. As a fiduciary, the GCCF representatives owed a duty of loyalty and good faith and fair dealing to Plaintiff to ensure that he would receive adequate compensation for his losses as a result of the BP oil spill. As a fiduciary, BP through the GCCF owed a duty of good faith and fair dealing and loyalty to Mr. Barber which they breached when they determined his final claim was only worth $25,000; when his losses were substantially higher and the documents he provided the GCCF confirmed such. Due to the undue delay in BP's releasing and detoxifying of the *Lady Louise*, Mr. Barber missed the entire 2010 shrimping season and was unable to afford to travel to warmer waters.

Even under Florida contract law, duress is an affirmative defense to the enforcement of a contract which was accepted by a party under duress. In the aftermath of the *Deepwater Horizon* incident, Plaintiff was desperate for help. In the Florida case of *Mullan v Bishop of the Diocese of Orlando* 540 So2d 174, 177 (Fla. 5th DCA l989) the Fifth District Court of Appeal discussed why acceptance of benefits alone is not sufficient to determine that a "ratification" has occurred. In *Mullan*, Plaintiff appealed a summary judgement which had been entered against him in his action for damages for being forced to resign from his employment contract under duress and threats of immediate dismissal without benefits. The court held in that case that the acceptance of those benefits did not constitute ratification. The court found that Mullen had "no choice" but to either accept what was offered to him or "let his family suffer". The court went on to state that "...an agreement, induced by duress has been ratified, should be rejected where it appears that at the time of the alleged ratification the duress which originally induced the agreement has

8

continued to operate." *Id* at 177. Like the Plaintiff in *Mullan*, Jelp Barber was in extreme financial duress when he was pressured into signing the release, unable to operate his business and provide for his family, while the outstanding debts continued to mount.

## CONCLUSION

For the foregoing reasons, Plaintiff Jelp Barber respectfully requests that BP's Motion to Dismiss be denied.

Dated: August 8, 2017

**RESPECTFULLY SUBMITTED**,

/s/ Douglas S. Lyons
Douglas S. Lyons
Lyons and Farrar, P.A.
1637 Metropolitan Blvd., Suite A-2
Tallahassee, FL  32308
(850) 222-8811 - telephone
(850) 222-5583 - facsimile
Florida Bar No. 128277
doug.lyons@lyonsandfarrar.com

**Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Plaintiffs' Response to BP's Motion as to Released Claims Pursuant to PTO No. 64 has been served on all counsel by electronically uploading the same to File & Serve Xpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL No. 2179, on this  8th day of August, 2017.

/s/ Douglas S. Lyons
Douglas S. Lyons