UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUSIANIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf Of Mexico, on April 20, 2010 | * | MDL 2179 |
| | * | SECTION: J |
| | * | JUDGE BARBIER |
| This Document Relates To: *Pleading Bundle B1* | * | MAG. JUDGE WILKINSON |

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR RESPONSE IN OPPOSITION TO BP'S MOTION AS TO RELEASED CLAIMS PURSUANT TO PTO NO. 64, SECTION 1, B1

Pursuant to Federal Rules of Civil Procedure 27(3) and PTO 64, Plaintiffs, putative class members who executed releases with GCCF acting on behalf of BP many of whom were without legal representation, respectfully request that BP's Motion as to Released Claims Pursuant to PTO No. 64, Section 1, B1 requesting the Court dismiss the claims of those Remaining B1 Plaintiffs be denied.

### BACKGROUND

Following the devastation caused by the *Deepwater Horizon* incident on April 20, 2010, BP, as the responsible party, started a claims program and multiple class settlements in order to begin compensating victims of the disaster. Among those parties affected by the disaster were seafood workers who were devastated by the oil spill's impact on the Gulf of Mexico. Under §2705 of Oil Pollution Act, BP, as the responsible party, was required to establish a procedure to pay interim, short term damages to claimants who were affected by the oil spill. As these interim payments dried up, Plaintiffs were asked to sign settlement agreements which contained releases and covenants not to sue BP. At a time when they were unable to earn a livelihood due to the

1

conditions in the gulf caused by the Deepwater Horizon, Plaintiffs, seafood workers in the Gulf, were asked to sign these releases.

The local economy for the Gulf Coast was devastated. Orders for seafood from the Gulf were being cancelled. The health of the Gulf was not determined and it was totally unfair and unreasonable to not provide some compensation until the full nature and extent of the damage to the Gulf had been determined, that it was safe to fish in the Gulf again and that the fear of the public that seafood from the Gulf was not safe to eat was overcome. As the Court is well aware, settling a personal injury claim before a personal injury client has achieved maximum medical improvement is tantamount to malpractice. Nowhere is this practice of getting premature release claims more abhorrent than in the application to seafood workers. Seafood workers should not have been required to sign releases of claims until the full nature and extent of the damage to the gulf and the seafood therein had been determined.

The GCCF releases were being signed by claimants before the full extent of the damage the oil spill caused the Gulf of Mexico. After many the GCCF claimants executed releases in 2011, studies were conducted to determine the impact on the Gulf. According to a 2016 analysis conducted by the Department of Interior,

> The study estimated that projections of revenue losses in the fisheries would likely range from $59 million to $89 million in 2011, $38 million to $56 million in 2012, and $18 million to $27 million in 2013. Using these estimates and projecting out impacts to the larger economy, lost fishing revenues resulting from short-term ecological effects experienced 2011 to 2013 were estimated to be between $285 million to $428 million, to result in the loss of between 2,700 to 4,000 full time employees, and lost employee earnings of between $68 million and $103 million.

Carroll, Michael; Gentner, Brad; Larkin, Sherry; Quigley, Kate; Perlot, Nicole, et al. 2016. *An analysis of the impacts of the Deepwater Horizon oil spill on the Gulf of Mexico seafood industry. U.S. Dept. of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region, New Orleans, LA. OCS Study BOEM 2016-020. 202 p.152.* The claimants,

who signed releases in 2010-2011, were not yet fully aware of the oil spills impact on the Gulf, nor the long-term effects the spill would leave on fisheries and the industry.  Plaintiffs were signing the releases before these losses were realized without legal representation.

In many instances these releases were obtained by misleading or deceptive practices representing that if they didn't sign this release they would receive nothing for their claim. The releases BP got claimants to settle were executed at a time when many of the claimants were unemployed or earning drastically less than they were earning before the oil spill. Many of the practices were coercive in obtaining the releases presented as a take it or leave it when claimants had no sources of income and were unable to provide for their families and would sign anything necessary to meet their needs and to salvage what they had.

Many of the claimants were receiving interim payments under the OPA through the GCCF. Per the procedures set up by the GCCF, many of the claimants would come to a local office, sign a form where they were instructed to sign, and picked up their checks. When the GCCF started to make final payments rather than interim payments, many of the release claimants were not fully aware of what this transition meant for their claims. Many of the putative class members who executed releases without legal representation were being given legal advice, instructing release claimants that they needed to take the final payments and execute the release or they would get nothing from BP, while others thought that they were getting additional payments after this quick payment. All of the GCCF payments should have been considered interim payments since the full extent of the oil spill's lasting effects were not yet realized, and wouldn't be for years to come. Until the effects of the oil spill were fully realized, the GCCF should not have been giving final payments, and it was premature to make these evaluations.

The release claimants were members of a putative class as described by this Court's order dated February 2, 2011 Granting in part, Plaintiffs' Motion to Supervise Ex Parte Communications with Putative Class (Rec. Doc. 912). Many of the release claimants were not fully advised of their rights in accordance with the terms of the February 2, 2011 order with many release claimants being given legal advice regarding their claims by GCCF employees. The court ordered BP and the GCCF to "[r]efrain from giving or purporting to give legal advice to unrepresented claimants, including advising that claimants should not hire a lawyer." *Id.* A common theme among many of the putative class members who executed releases were the circumstances surrounding the execution of the final payment claim forms and the accompanying covenants not to sue. Many were told that if they did not sign the Final Payment forms and releases, they would receive nothing for their claims at a time when they were under economic duress due to the catastrophic oil spill's effect on the region.

As Exemplars of some of the circumstances surrounding the execution of the GCCF releases:

A.  Fred Anthony ("Tony") Milender and Pamela Sue Milender

Mr. and Mrs. Milender were told they needed to sign the release or they weren't going to get anything from BP for their losses. The 2010 oyster season was actually a strong year. They over harvested the Oyster beds because they were told the oil was coming and to get them out now. They knew what had already happened in Louisiana and now the winds were changing direction. Mr. and Mrs. Milender were afraid they would suffer the same results as Louisiana. The marine patrol looked the other way and didn't enforce restrictions. Tony's wife, Pam, passed on April 10, 2016, she worked with him on the boat where they worked together but he has since

4

given up oystering and he has gone into shrimping.  He has given up his lifetime vocation as a result of the spill since the oysters have never recovered.

    B.  Christine Rosalie Oenes

Mrs. Ones harvested oysters, had her own boat, with one crew member named Carlos Russell. She moved from Tarpon Springs, FL in 1999 to harvest oysters in the Apalachicola Bay and did so for 11 years until the oil spill. She went to the local high school, where the GCCF had an office, and was told she would get $25,000 or she would get nothing. She didn't get any interim payments as provided by OPA, and was instead only offered a Final Payment. After the spill, oystering was so bad that she gave up her boat in 2012 and is now a housekeeper. She couldn't make enough money to live off harvesting oysters after the oil spill.

    C.  Maritha Argueta

Mrs. Argueta was harvesting oysters with her son and also shucking. She was shucking at her nephew's oyster house which shut down after the oil spill. No one was buying his oysters because people were afraid of consuming Gulf oysters. Her son has since gone into shrimping instead of oysters after the oil spill. She finally got a job shucking at another place where they imported the oysters so people would trust those oysters, but no longer harvests oyster. She went to the local high school, which was the GCCF office and was told that she had to sign the final payment if she wanted to get any money and release the claim. At the time, she had no other income other than one $1,000 interim emergency relief payment and $5,000 final payment. She is now over 60 years old and had just adopted her two youngest grandchildren, and was unable to find other employment.

    D.  Wade Barber

5

Mr. Barber was a shrimper who worked in the Gulf at the time of the oil spill. He gave up his job working for the state of Florida to go into the family business, shrimping. After the spill, Mr. Barber was unable to work in the gulf and sought assistance from the GCCF for interim payments under the OPA. Mr. Barber provided all the necessary information to the GCCF and was told that he would receive assistance. When he needed the interim payments, he was not getting them as was promised; the interim payments were smaller than what he needed and were late. When Mr. Barber was presented with the final payment form from the GCCF, he was facing eviction for failure to pay rent and was desperate for any help so he signed the release for drastically less than what his claim was worth out of desperation.

## ARGUMENT

The executed GCCF releases not to sue should be found invalid and unenforceable. In their statement of interest, the Attorney General of Mississippi stated:

> The GCCF Releases violate federal law: (1) by requiring the release of future damages in exchange for a payment from the OPA claims process, in contravention of the 1996 amendments to OPA (*See,* 33 U.S.C.A. §§ 2705(a), 2714(b)(2) and 2715(b)(2)); and (2) because obtained, in many instances, during a period in which BP and its agents intentionally failed to provide a process for presenting, processing and paying interim, short-term damages, in contravention of OPA mandates. (*See, e.g.* 33 U.S.C.A. §§ 2705(a) and 2714(b)(2)).

Under the OPA, BP, through the GCCF was required to promptly provide interim and emergency payments to affected parties, such as the release claimants. Rather than continue to provide interim payments, the GCCF sought to expedite the final payment process, before the extent of the damage was fully ascertained and to settle the claims before making additional interim payments. As the interim payments were delayed, the claimants became more desperate and were willing to settle for less money and execute the releases.

Maritime workers are provided additional protection under admiralty law. BP's Motion and accompanying Memorandum fail to address the fact that many of the remaining release claimants are maritime workers. "Every court should watch with jealousy an encroachment upon the rights of seamen, because they are unprotected and need counsel" *Harden v. Gordon*, 11 F. Cas. 480 (C.C.D. Me. 1823). The court in *Haden* found that:

> the most rigid scrutiny is instituted into the terms of every contract, in which they [seamen] engage. If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable.

When the release claimants were asked to sign the GCCF releases, they were not represented by counsel and many did not fully understand the terms of the documents they were signing. Many of the release claimants had been receiving the interim payments under the Oil Pollution Act and did not fully understand that these final payments would mean that they would get nothing else for their claims.

The Supreme Court has recognized these additional protections afforded to seamen, particularly when it applies to releases signed by seamen giving up certain legal rights. "The wardship theory has, as was recognized by the courts below, marked consequence on the treatment given seamen's releases. Such releases are subject to careful scrutiny. 'One who claims that a seaman has signed away his rights to what in law is due him must be prepared to take the burden of sustaining the release as fairly made with and fully comprehended by the seaman.'" *Garrett v. Moore-McCormack Co.,* 317 U.S. 239, 247-48, 63 S. Ct. 246, 252 (1942). In *Garrett,* the Supreme Court reversed the Pennsylvania Supreme Court's ruling that the burden of proof on releases was on Plaintiff; a maritime worker who claimed he did not remember signing the release and even if he did sign it, it was obtained by fraud under the belief it was for unpaid

wages; to prove the release was signed by the Plaintiff. The Supreme Court found that under Federal law, the burden is on the party seeking to enforce the release to prove that the release is valid. BP argues that the inclusion of certain language "demonstrates that signatories executed the releases knowingly and voluntarily, and BP has no reason to believe otherwise." (BP's Memorandum in Support of Its Dispositive Motion as to Released Claims Pursuant to PTO No. 64, Section 1 B1, Page 6). The language included in the release alone does not meet the high burden set by the Supreme Court in *Garrett*, but merely suggests BP included language to try and protect themselves from questions over enforcement of the releases.

In *Garrett,* the Supreme Court held that "the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. The adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding." *Id at* 248. BP again has failed to meet this high burden to show that the release claimants were fully apprised of their legal rights when executing these releases at a time when the extent of the damage to the Gulf was not yet fully understood. These releases were executed by seafood workers when they were unable to earn a living due to the BP Oil Spill and were desperate for any help. This court has a duty to protect these seafood workers. "Seamen, of course, are wards of admiralty whose rights federal courts are duty-bound to jealously protect." *Bass v. Phx. Seadrill/78, Ltd.,* 749 F.2d 1154, 1160-61 (5th Cir. 1985)

When these maritime workers and seamen were signing these releases, they were not fully aware of the legal rights they were signing away as many if not most were not represented by an attorney. The Fifth Circuit has held that when examining the validity of a release executed

8

by a seaman, "[o]ur ultimate concern in these cases is not whether the seaman has received what the court considers to be adequate consideration for the rights he has relinquished; rather, we inquire whether the seaman relinquished those rights with 'an informed understanding of his rights and a full appreciation of the consequences' when he executed the release." *Id* at 1161. In *Bass*, the Fifth Circuit remanded the case to the District Court after it only examined whether or not Plaintiff received adequate compensation for his claim, which is just one of many factors that need to be examined when considering whether or not the seaman had a full understanding of his rights when he signed a release. Defendant's contention that the "Release and Covenant Not to Sue" included in the release was "unambiguous, valid and enforceable" yet does not explain how the seafood workers, as wards of the court, were fully apprised of the consequences of signing the releases. BP has not provided the Court any reference to the amount of claimants who were represented by attorneys when executing these releases, what information was told to the seamen prior to signing the releases or any other factors. The "Fifth Circuit has reiterated the need to protect seamen as wards of admiralty." *Asignacion v. Schiffahrts,* No. 11-627, 2011 U.S. Dist. LEXIS 55707, at 19 (E.D. La. 2011). BP, as the party seeking to enforce these releases, bears the burden of proving that the seamen were fully apprised of what legal rights they were signing away when they executed these releases and has not yet met that burden.

  BP's Motion and accompanying Memorandum argues that under both Louisiana and Florida Contract law, releases are contracts and are interpreted under contract law. Under maritime law, the releases are not interpreted under contract law. "Applicable law requires that we scrutinize the validity of a seaman's release under principles of admiralty law analogous to the duty owed by a fiduciary to a beneficiary, not solely under principles of contract law." *Orsini v. O/S Seabrooke O.N.,* 247 F.3d 953 (9th Cir. 2001) The court should not allow the releases to

9

be considered only under Florida contract law, but under Federal maritime law and as such, BP owed a fiduciary duty to Plaintiffs.  As a fiduciary, the GCCF representatives owed a duty of loyalty and good faith and fair dealing to Plaintiffs to ensure that they would receive adequate compensation for their losses as a result of the BP oil spill and not mislead them by offering legal advice that was not in their best interest in violation of the Court's February 2, 2011 Order.

Even assuming the releases should be interpreted under Florida contract law, duress is an affirmative defense to the enforcement of a contract which was accepted by a party under duress. In the aftermath of the *Deepwater Horizon* incident, many local residents of the Gulf Coast were desperate for help. Many of the putative class members were in debt due to the continuation of bills while not being able to earn income or were earning substantially less. In the Florida case of *Mullan v Bishop of the Diocese of Orlando* 540 So2d 174, 177 (Fla. 5th DCA l989) the Fifth District Court of Appeal discussed why acceptance of benefits alone is not sufficient to determine that a "ratification" has occurred. In *Mullan*, Plaintiff appealed a summary judgement which had been entered against him in his action for damages for being forced to resign from his employment contract under duress and threats of immediate dismissal without benefits. The court held in that case that the acceptance of those benefits did not constitute ratification.  The court found that Mullen had "no choice" but to either accept what was offered to him or "let his family suffer". The court went on to state that "...an agreement, induced by duress has been ratified, should be rejected where it appears that at the time of the alleged ratification the duress which originally induced the agreement has continued to operate." *Id* at 177. Like the Plaintiff in *Mullan*, the release claimants were under financial duress when they were coerced into signing the release agreements in order to receive some compensation for their damages.

## CONCLUSION

For the foregoing reasons, Plaintiffs, individually and on behalf of a class of all others similarly situated, respectfully requests that BP's Motion as to Released Claims be denied.

Dated: August 8, 2017

**RESPECTFULLY SUBMITTED**,

/s/ Douglas S. Lyons
Douglas S. Lyons
Lyons and Farrar, P.A.
1637 Metropolitan Blvd., Suite A-2
Tallahassee, FL  32308
(850) 222-8811 - telephone
(850) 222-5583 - facsimile
Florida Bar No. 128277
doug.lyons@lyonsandfarrar.com

**Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Memorandum in Support of Plaintiffs' Response to BP's Motion as to Released Claims Pursuant to PTO No. 64 has been served on all counsel by electronically uploading the same to File & Serve Xpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL No. 2179, on this  8th day of August, 2017.

/s/ Douglas S. Lyons
Douglas S. Lyons