UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF FLORIDA

JAMES BRYANT, ET AL      * CIVIL ACTION NO. 13 - 2899
         Plaintiffs,      *
     *
VERSUS      * SECTION: "   "
     *
BP EXPLORATION & PRODUCTION, INC.,      * JUDGE
ET AL      *
         Defendants.      *
     * MAGISTRATE JUDGE
*********************************************

---

## COMPLAINT

---

**COME NOW THE** plaintiffs, through undersigned counsel, and file this complaint against the defendants and allege:

### I.    PARTIES

#### A.    PLAINTIFFS

Plaintiffs are citizens of Florida who have been exposed to harmful chemicals, odors and emissions during the clean-up following the Deepwater Horizon explosion. They fall into five basic categories:

1) Resident Plaintiffs who lived and/or worked in close proximity to areas that are the subject of Defendants' remedial activities. Due to their physical location, Resident Plaintiffs are subjected to fumes and odors from the oil and dispersants ("Resident Plaintiffs").

2) Boat captain involved in the Vessels of Opportunity program ("VoO program") who was exposed to harmful chemicals, odors and emissions during post-

explosion clean-up activities, and/or whose property was damaged as a result of their work in the VoO program ("VoO Plaintiff").

3) Vessel captain who was not involved in the VoO program but who was exposed to harmful chemicals, odors and emissions during post-explosion clean-up activities ("Vessel Plaintiff").

4) Workers involved in decontaminating vessels that came into contact with oil and/or chemical dispersants who were exposed to harmful chemicals, odors and emissions during post-explosion clean-up activities ("Decontamination Plaintiffs").

5) Clean-up workers and beach personnel who were involved in clean-up activities along shorelines and intercoastal and intertidal zones ("Onshore Plaintiffs").

Plaintiffs were otherwise exposed to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill.

The following individuals are Plaintiffs herein:

1) **James Bryant** - James Bryant is a resident of Century, Florida. Mr. Bryant worked for Plant Performance Services LLC (hereinafter "P2S") as a clean-up worker subsequent to the Deepwater Horizon disaster. Mr. Bryant was engaged in retrieving tar balls and oil on Pensacola Beach, Florida from May 2010 to August 2010. Following his employment with P2S, Mr. Bryant began to manifest symptoms including but not limited to: hemoptysis (vomiting blood), shortness of breath, sore joints, severe headaches, dizziness, tingling of the fingers, shaky hands, numbness in legs and arms, fever, esophageal acid reflux, rectal bleeding and polyps, blindness of the eyes, impotence, sclerosis of the skin, depression, severe anxiety, memory loss,

Case 3:13-cv-00789-MCR-EMT   Document 1-1   Filed 05/27/13   Page 3 of 35

severe sinus problems, loss of sense of smell, loss of hair, redness and swelling of the gums, and bleeding of the gums. Mr. Bryant's injuries are serious in nature and require continuing medical care and treatment and cannot be fully compensated under the Medical Benefits Settlement.

2) **Henry Jenkins** - Henry Jenkins is a resident of Pensacola, Florida. Mr. Jenkins worked for P2S as a clean-up worker subsequent to the Deepwater Horizon disaster. Mr. Jenkins was engaged in cleaning up debris that washed ashore, retrieving tar balls and soil covered animals, scooping dispersant material, cleaning equipment, and loading and unloading boom from vessels. While employed with P2S, Mr. Jenkins began to manifest symptoms including but not limited to: skin rashes, skin lesions, nausea, vomiting, diarrhea, cough, congestion, kidney stones, swelling and redness in his left eye, and abdominal pain. All of Mr. Jenkins' injuries are serious in nature and require continuing medical care and treatment and cannot be fully compensated under the Medical Benefits Settlement.

3) **Steven Burke** - Mr. Steven Burke is a resident of Navarre, Florida. Mr. Burke worked for P2S as a clean-up worker subsequent to the Deepwater Horizon disaster. From June 2010 to September 2010, Mr. Burke was engaged in skimming the Gulf of Mexico waters for oil and retrieving tar balls and other oil covered debris on or near Destin Beach and Okaloosa Island, Florida. Mr. Burke was exposed to oil, dispersants and/or other hazardous chemicals on his hands, chest, face, and eyes. Contemporaneous to his exposure, Mr. Burke began to manifest symptoms including but not limited to severe tooth loss, shoulder pain, dry eye syndrome with severe irritation, restlessness, loss of appetite, nausea, diarrhea, chronic coughing, and loss

of memory. All of Mr. Burke's injuries are serious in nature and require continuing medical care and treatment and cannot be fully compensated under the Medical Benefits Settlement.

4) **Willie Richardson** - Mr. Willie Richardson is a resident of Pensacola, Florida. Mr. Richardson worked for P2S as a clean-up worker subsequent to the Deepwater Horizon disaster. From June 2010 to July 2010, Mr. Richardson was engaged in picking up tar balls, skimming dispersant material, and shoveling and loading oil laden sand. In doing so, he was exposed to oil, dispersants and/or other hazardous chemicals on his hands, chest, face, feet, legs, and eyes. Contemporaneous to his exposure, Mr. Richardson began to manifest symptoms including but not limited to numbness from his knees to feet, headaches, severe sinus problems, loss of appetite, redness of the eyes, constant tearing, chronic cough, nose bleeds, constant sore throat, erectile dysfunction, diarrhea, back, joint, and muscle pain, seizures, moodiness, nervousness, rashes and itching of skin. All of his injuries are serious in nature and require continuing medical care and treatment and cannot be fully compensated under the Medical Benefits Settlement.

5) **Nathan S. Southern** – Nathan Southern is a resident of Cantonment, Florida. Mr. Southern was engaged in the oil spill clean-up activities employed with Aerotek, Inc. in Destin, Florida subsequent to the Deepwater Horizon Disaster when he began to manifest symptoms including but not limited to: fever, sinus problems, constant coughing and congestion, headaches, swelling in ankles, shortness of breath and runny nose. All of Mr. Southern's injuries are serious in nature and require continuing

medical care and treatment and cannot be fully compensated under the Medical Benefits Settlement.

6) **Marion G. Barefoot** – Marion G. Barefoot is a resident of Pensacola, Florida who lived and worked in close proximity to the areas subject to Defendants' remedial activities. Due to her physical location, Ms. Barefoot was exposed to oil, dispersants, and oil/dispersant mixtures which caused her to manifest symptoms including but not limited to: skin lesions, nausea, stomach ulcers, fever, sore throat, dispepsia (stomach indigestion), vomiting, diarrhea, fear of cancer, and stomach pain. Ms. Barefoot's injuries are serious in nature and require continuing medical care and treatment and cannot be fully compensated under the Medical Benefits Settlement.

7) **Baron Buskell** – Baron Buskell is a resident of Panama City Beach, Florida who lived and worked in close proximity to the areas subject to Defendants' remedial activities. Due to his physical location, Mr. Buskell was exposed to oil, dispersants, and oil/dispersant mixtures which caused him to manifest symptoms including but not limited to: skin lesions, white spots on skin, weakness, holes on arms, legs, and head, respiratory problems, severe twitching, memory loss, severe tooth loss, and severe weight loss. Mr. Buskell's injuries are serious in nature and require continuing medical care and treatment and cannot be fully compensated under the Medical Benefits Settlement.

8) **Johnnie Clopton** - Mr. Clopton is a resident of Milton, Florida. Mr. Clopton worked as a boat captain for the Vessels of Opportunity Program in Pensacola Bay, Florida and B.J. Martin, Inc. when he was exposed to oil, dispersants, and/or oil/dispersant mixtures. Due to said exposure, Mr. Clopton manifested symptoms including but not

limited to: right kidney tumor, shortness of breath, loss of balance, fainting, and loss of vision. All of Mr. Clopton's injuries are serious in nature and require continuing medical care and treatment and cannot be fully compensated under the Medical Benefits Settlement.

9) **Tommy Tripp** - Mr. Tripp is a resident of Pensacola, Florida. Mr. Tripp was engaged in the oil spill clean-up activities on the beach and aboard a vessel and/or fleet of vessels in Pensacola, Florida subsequent to the Deepwater Horizon Disaster when he was exposed to oil, dispersants, and/or oil/dispersant mixtures. Due to said exposure, Mr. Tripp manifested symptoms including but not limited to: respiratory problems, headaches, rash and lesions of the skin, facial skin cancer, skin cancer on arms, blurry vision, red eyes, watery eyes, itchy eyes, bloody nose, neck tumors, arm tumors, back tumors, gastrointestinal stomach tumor, foot tumors, and sinus infection. All of Mr. Tripp's injuries are serious in nature and require continuing medical care and treatment and cannot be fully compensated under the Medical Benefits Settlement.

## B. DEFENDANTS

Made defendants herein are as follows:

1) **BP Exploration & Production, Inc. (hereinafter "BP Exploration")** - a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration is subject to *in personam* jurisdiction of this Court because it purposefully availed itself of the laws and benefits of the state at the time of the accident giving rise to this litigation because it conducted sufficient business activities in the State of Florida and within the Federal District to confer same. Further, BP Exploration's activities in the State of Florida were substantial,

continuous, and systematic with respect to claims which are subject to this litigation. Finally, the harmful effects of BP Exploration's negligent conduct was felt in Florida.

2) **BP America Production Company (hereinafter, "BP America")** - a Delaware corporation with its principal place of business in Houston, Texas. BP America is subject to *in personam* jurisdiction of this Court because it purposefully availed itself of the laws and benefits of the state at the time of the accident giving rise to this litigation because it conducted sufficient business activities in the State of Florida and within the Federal District to confer same. Further, BP America's activities in the State of Florida were substantial, continuous, and systematic with respect to claims which are subject to this litigation. Finally, the harmful effects of BP America's negligent conduct was felt in Florida.

3) **BP p.l.c.** - a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division in which BP Exploration and BP America fall. BP p.l.c.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Florida and the U.S. more generally. BP p.l.c. is subject to *in personam* jurisdiction of this Court because it purposefully availed itself of the laws and benefits of the state at the time of the accident giving rise to this litigation because it conducted sufficient business activities in the State of Florida and within the Federal District to confer same. Further, BP p.l.c.'s activities in the State of Florida were substantial,

continuous, and systematic with respect to the claims which are subject to this litigation. Finally, the harmful effects of BP p.l.c.'s negligent conduct was felt in Florida.

4) **Transocean Ltd. ("Transocean Ltd.")** - a Swiss corporation that maintains U.S. offices in the state of Texas. Transocean Ltd. is subject to *in personam* jurisdiction of this state because the harmful effects of its negligent conduct was felt in Florida.

5) **Transocean Offshore, Inc. ("Transocean Offshore")** - a Delaware corporation with its principal place of business in Houston, Texas. Transocean Ltd. is subject to *in personam* jurisdiction of this state because the harm of its negligent conduct was felt in Florida. Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner pro hac vice, and/or operator of the Deepwater Horizon.

6) **Transocean Deepwater, Inc. ("Transocean Deepwater")** - a Delaware corporation with its principal place of business in Houston, Texas, and at all pertinent times was doing business in the State of Florida and within this district. Transocean Deepwater is subject to *in personam* jurisdiction of this state because the harm of its negligent conduct was felt in Florida.

7) **Transocean Holdings, LLC ("Transocean Holdings")** - a Delaware corporation with its principal place of business in Houston, Texas. Transocean Holdings is affiliated with Transocean Ltd. and is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings is subject to *in personam* jurisdiction of this state because the harm of its negligent conduct was felt in Florida.

8) **Triton Asset Leasing ("Triton")** - a Swiss limited liability company with its principal place of business in Zug, Switzerland. Triton is subject to *in personam*

jurisdiction of this state because the harm of its negligent conduct was felt in Florida. Triton is affiliated with Transocean Ltd. and is an owner, managing owner, owner pro hac vice, and/or operator of the Deepwater Horizon.

9) **Anadarko Petroleum Corporation Co. ("Anadarko")** - a Delaware corporation with its principal place of business in The Woodlands, Texas. Anadarko is subject to *in personam* jurisdiction of this state because the harm of its negligent conduct was felt in Florida. Further, Anadarko's activities in the State of Florida were substantial, continuous, and systematic with respect to claims which are subject to this litigation. Anadarko is an oil and gas exploration and production company. At all relevant times, Anadarko was a party to the Macondo Prospect Offshore Deepwater Operating Agreement ("Operating Agreement"), and held an ownership interest in the lease of the Macondo Prospect site in Mississippi Canyon Block 252 in the Gulf of Mexico.

10) **Anadarko E&P Onshore, LLC, formerly Anadarko E&P Company LP, ("Anadarko E&P")** - a Delaware limited partnership with its principal place of business in The Woodlands, Texas. Anadarko E&P is subject to *in personam* jurisdiction of this state because the harm of its negligent conduct was felt in Florida. Further, Anadarko E&P's activities in the State of Florida were substantial, continuous, and systematic with respect to claims which are subject to this litigation. Anadarko E&P is an oil and gas exploration and production company. At all relevant times, Anadarko E&P was a party to the Operating Agreement, and held an ownership interest in the lease of the Macondo Prospect site in the Mississippi Canyon Block 252 in the Gulf of Mexico.

11) **MOEX Offshore 2007 LLC ("MOEX Offshore")** - a Delaware corporation with its principal place of business in Houston, Texas. MOEX Offshore is subject to *in personam* jurisdiction of this state because the harm of its negligent conduct was felt in Florida. Further, MOEX Offshore's activities in the State of Florida were substantial, continuous, and systematic with respect to claims which are subject to this litigation. MOEX Offshore is a wholly-owned subsidiary of MOEX USA Corporation, which in turn is a wholly-owned subsidiary of Mitsui Oil Exploration Co., Ltd. ("MOECO"). However, MOEX Offshore is not a distinct corporate entity performing autonomous business activities, but is instead an entity wholly dominated and controlled by its ultimate parent company, MOECO, as alleged below. At all relevant times, MOEX Offshore was a party to the Operating Agreement, and held an ownership interest in the lease of the Macondo Prospect site in the Mississippi Canyon Block 252 in the Gulf of Mexico.

12) **MOEX USA Corporation ("MOEX USA")** is incorporated in Delaware and has its principal place of business in Houston, Texas. MOEX USA is subject to *in personam* jurisdiction of this state because the harm of its negligent conduct was felt in Florida. Further, MOEX USA activities in the State of Florida were substantial, continuous, and systematic with respect to claims which are subject to this litigation. MOEX USA is not a distinct corporate entity performing autonomous business activities, but is instead an entity created solely to serve as a holding company for other corporate entities, including MOEX Offshore, and is dominated and controlled by its parent company, MOECO, as alleged below.   MOEX USA is named as a defendant herein

because it is part of the corporate construct by which MOECO owns, dominates, controls, and benefits from the activities of MOEX Offshore.

13) **Mitsui Oil Exploration Co., Ltd. ("MOECO")** is incorporated in Japan and has its principal place of business in Tokyo, Japan. MOECO is subject to *in personam* jurisdiction of this state because the harm of its negligent conduct was felt in Florida. Further, MOECO's activities in the State of Florida were substantial, continuous, and systematic with respect to claims which are subject to this litigation and it has purposely availed itself of the protections, benefits, and privileges of American law. Therefore, it should have reasonably anticipated being involved in this litigation in the United States. MOECO wholly owns MOEX USA, which in turn wholly owns MOEX Offshore. As alleged more fully below, MOECO is named as a defendant herein because at all relevant times it dominated and controlled the activities of MOEX Offshore and MOEX USA, such that it is the alter ego of its subsidiaries, MOEX Offshore and MOEX USA, thus requiring that the liability of MOEX Offshore and/or MOEX USA be imputed to MOECO. Alternatively, as also alleged below, MOEX Offshore and MOEX USA acted at all relevant times as agents of MOECO, and the liability of those entities should therefore be imputed to MOECO. Moreover, because at all relevant times MOECO asserted domination and control over the business, operations and policy decisions of MOEX Offshore and MOEX USA, those U.S. companies were merely the alter egos and/or agents of MOECO. Thus, MOECO is subject to the exercise of both general and specific jurisdiction by this Court, an exercise of jurisdiction that will not offend traditional notions of fair play and substantial justice.

14) **Mitsui & Co., Ltd. ("Mitsui")** is incorporated in Japan with its domicile in Tokyo, Japan. Mitsui is a majority owner of MOECO and is a publicly traded company. Mitsui is subject to *in personam* jurisdiction of this state because the harm of its negligent conduct was felt in Florida. Further, Mitsui's activities in the State of Florida were substantial, continuous, and systematic with respect to claims which are subject to this litigation and it has purposely availed itself of the protections, benefits, and privileges of American law. MOECO is listed in Mitsui's consolidated financial statements and filings with the U.S. Securities and Exchange Commission as a "major" subsidiary of Mitsui. BP, Transocean, Moex, Anadarko, and Halliburton are collectively referred to herein as the "Drilling Defendants," as they were all involved in the drilling, cementing, and other temporary well abandonment activities of the Deepwater Horizon, and thus their actions caused and/or contributed to the Spill. Drilling Defendants are liable jointly, severally, and in solido under various principles of maritime and/or applicable State and/or Federal tort law.

15) **Halliburton Energy Services, Inc. ("Halliburton")** is a Delaware corporation with two headquarters, one in Houston, Texas. Halliburton is subject to *in personam* jurisdiction of this state because the harm of its negligent conduct was felt in Florida. Halliburton is one of the world's largest providers of products and services to the energy industry, with a special expertise in oil well cementing.   Aboard the Deepwater Horizon, Halliburton was responsible for cementing the well and overseeing the final well-capping procedure.

16) **Cameron International Corporation f/k/a Cooper Cameron Corporation ("Cameron")** is a Delaware Corporation with its principal place of business in

Houston, Texas. Cameron is subject to *in personam* jurisdiction of this state because the harm of its negligent conduct was felt in Florida. Cameron is a global provider of pressure control, processing, flow control, and compression systems as well as project management and aftermarket services for the oil and gas and process industries. Cameron manufactured and/or supplied the Deepwater Horizon's blowout preventer valve that failed to activate at the time of the explosion.

## II.    JURISDICTION AND VENUE

### 1.

All claims raised herein are brought pursuant to 28 U.S.C. §1333 and rule 9(h).

### 2.

This Court also has jurisdiction over this action pursuant to The Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

### 3.

This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

### 4.

The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and Claimants hereby designate this case as an admiralty or maritime case as provided in Rule 9(h).

**5.**

Venue is appropriate in this District under 28 U.S.C. § 1391, because the events or omissions giving rise to the claims asserted herein occurred in the Northern District of Florida.

**6.**

Plaintiffs' causes of action arise out of wrongful conduct committed by BP p.l.c., directly or indirectly by its agents that caused injury or damage in Florida by an offense or quasi offense committed through an act or omission outside of Florida, and BP, p.l.c. These acts or omissions took place both before the blowout resulting in the Oil Spill and after the blowout in attempting to contain the Oil Spill.

**7.**

In addition, this Court also has personal jurisdiction over BP p.l.c. under agency and alter ego principles, because BP p.l.c.'s agents, BP America and BP Exploration, have substantial contacts in the state of Florida.  BP America and BP Exploration are both wholly-owned subsidiaries of BP p.l.c.

**8.**

Moreover, BP p.l.c. undertook the duty for pay and/or gratuitously to clean up the Oil Spill and as a result is liable for its acts and omissions in the attempt to clean-up the Oil Spill.

**9.**

BP Exploration, BP America, and BP p.l.c. are generally referred to collectively as "BP." As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

## III.   FACTUAL ALLEGATIONS

### 10.

Plaintiffs adopt all allegations and/or causes of actions set forth in the Master Complaint, pleadings, and short for joinder filed within MDL No. 2179 in the Federal Eastern District of Louisiana.

### A.   The Deepwater Horizon Catastrophe

### 11.

On April 20, 2010, a well blowout caused explosions on the Deepwater Horizon, an oil vessel in the Gulf of Mexico, igniting a raging fire on the vessel. After burning for two days, the vessel sank to the ocean floor.

### 12.

As the Deepwater Horizon tipped into the sea, the long riser pipe connecting the vessel to the wellhead on the seafloor bent and broke, leaving the pipe leaking oil out of its now-open end, as well as through two breaks along its length. An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, causing the blown-out well to spew oil into the Gulf waters (the "Oil Spill").

### 13.

Each day during the course of the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil, as well as spreading out in vast subsurface plumes. On the surface, covered tens of thousands of square miles, and spreading with the wind and currents towards the Gulf States' coastlines, where oil made landfall on white sand beaches, marshes, and estuaries. Under water, immense plumes of oil and dispersant chemicals swirled through the entire water column.

**14.**

BP's response to its self-created disaster included the use of chemical dispersants that were intended to break down the oil into finely dispersed droplets.  Dispersants generally contain a solvent, a surfactant and other additives that break up the surface tension of an oil slick or sheen to make the oil more soluble in water.

**15.**

Chemical dispersants were sprayed onto the ocean surface from fly-over aircraft dispensing the chemicals from cargo holds, sprayed onto the ocean surface from fountain-type jets on the decks of boats, sprayed from smaller vessels onto the surface of the water, injected immediately below the surface of the water from vessels, injected deep below the surface of the ocean, and sprayed by hand.

**B.      Plaintiffs' Exposure to the Harmful Chemicals.**

**16.**

Onshore Plaintiffs, Bryant, Jenkins, Burke, Richardson, Southern, and Tripp assisted in the effort to prevent oil slicks from reaching the shore, or cleaned oil spill residue from the beaches, marshes and estuaries by participating in the relief effort orchestrated by BP.

**17.**

In this capacity, Onshore Plaintiffs laid and hauled boom, collected tar balls, and removed polluted sand contaminated with oil and/or dispersants and other activities. As such, Onshore Plaintiffs were exposed to crude oil and dispersants, oil/dispersant mixtures, and other harmful chemicals by inhalation, ingestion, dermal exposure, and through contact with the eyes.

**18.**

Defendant BP also engaged Decontamination Plaintiffs to decontaminate vessels that had came into contact with oil and/or chemical dispersants and/or other hazardous chemicals by spraying and cleaning said vessels. In this capacity, Decontamination Plaintiffs were exposed to crude oil, dispersants, oil/dispersant mixtures, and other harmful chemicals by inhalation, ingestion, dermal exposure, and through contact with the eyes from spray mist.

**19.**

Upon information and belief, Onshore and Decontamination Plaintiffs attempted to use goggles, gloves, respirators, masks, and other forms of protective gear while performing their tasks but were prevented by BP or BP hired contractors from doing so, as well as threatened Plaintiffs with loss of their clean up jobs if they did not abide by the instruction. Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon.

**20.**

Upon information and belief, when the chemical dispersants came into contact with eyes of Onshore and Decontamination Plaintiffs it caused irritation and when it came into contact with the skin it caused skin rashes, lesions, and burns.

**21.**

Among other adverse health effects associated with exposure to chemicals in the environment resulting from the Oil Spill, Onshore and Decontamination Plaintiffs complained of the noxious odors and experienced headaches, nausea, vomiting, respiratory problems and eye irritation.

**22.**

Furthermore, as part of its offshore containment response program, BP directed the use of vessels to recover oil coming to the surface of the Gulf of Mexico, the use of vessels to skim oil from the surface of the water, the use of vessels to conduct in situ burning of oil that reached the surface of the water; and the use of Vessels of Opportunity ("VoO").

**23.**

BP used at least 2,000 commercial and charter fishing vessels and other boats from communities along the shoreline to tow and deploy booms – floating barriers intended to contain, deflect, or hold back oil floating on the water's surface. Other VoOs worked with absorbent booms used to soak up some of the millions of gallons of oil coming to the surface of the Gulf. Still other VoOs supported in situ burning efforts. Some VoOs conducted skimming operations to skim oil off the surface. Other VoOs recover light oil and tar balls.

**24.**

Upon information and belief, Plaintiff Clopton was working on boats, which were part of the "Vessel of Opportunity" Program that were dispatched to lay boom to absorb the oil, or to haul in oil saturated booms, among other activities. In this capacity, Plaintiff Clopton was exposed to crude oil and/or crude oil mixed with chemical dispersants. In many instances, Plaintiff Clopton got sea water mixed with crude oil and/or chemical dispersants on this skin. He also inhaled fumes from the crude oil and/or chemical dispersants.

**25.**

Because Plaintiff Clopton was not deemed by BP to be working near the source of the Oil Spill, he was not outfitted with respirators or equivalent safety devices.

**26.**

Upon information and belief, Plaintiff Clopton was not supplied by BP with respirators or masks.

**27.**

Upon information and belief, when VoOs spotted oil slicks, they were instructed to contact BP directly and to provide BP with the coordinates of the slick. Upon receiving this information, spray from planes were dispatched from an airfield to the coordinates given and pilots were instructed to spray the chemical dispersant from its cargo hold.

**28.**

Upon information and belief, Plaintiff Clopton was not given warning by BP of the plane's approach and was either directly or indirectly in the path of the spray zone, and/or the chemical dispersant spray drifts over Plaintiff Clopton.

**29.**

Plaintiff Clopton's primary tasks were to lay boom to absorb the oil, or to haul in oil-saturated booms.  In this capacity, Plaintiff Clopton was exposed to crude oil, oil and dispersants and/or other harmful chemicals by inhalation, ingestion, dermal (skin) absorption, and through contact with the eyes when he hauled in the booms.

**30.**

Upon information and belief, Plaintiff Clopton did not receive warnings of aerial
dispersant missions and came into contact by inhalation and dermal exposure with dispersants
and oil/dispersant mixtures, oil and/or other harmful chemicals.

**31.**

Upon information and belief, Plaintiff Clopton was in the vicinity of aerial spraying while
working as boat captain with B.J. Martin, Inc. and was not warned of aerial dispersant missions
and came into contact by inhalation and dermal exposure with dispersants and oil/dispersant
mixtures, oil and/or other harmful chemicals.

**32.**

Upon information and belief, Plaintiff Tripp was in the vicinity of aerial spraying while
working aboard a vessel for TMC Services, Inc. and was not warned of aerial dispersant
missions and came into contact by inhalation and dermal exposure with dispersants and
oil/dispersant mixtures, oil and/or other harmful chemicals.

**33.**

Resident Plaintiffs, Barefoot and Buskell, due to the proximity of their homes and work
to the Gulf of Mexico, and the actions and omission by Defendants, have been exposed to oil,
dispersants, and other harmful chemicals.

**34.**

Exposure to chemicals in crude oil and chemical dispersants can cause a wide range of health problems. Crude oil has many highly toxic chemical ingredients that can damage every system in the body and many of the same organs including but not limited to: respiratory system, nervous system (including the brain), liver, reproductive/urogenital system, kidneys, endocrine system, circulatory system, gastrointestinal system, immune system, sensory systems, musculoskeletal system, hematopoietic system (blood forming), skin and integumentary system and disruption of normal metabolism.

**35.**

Damage to these systems can cause a wide range of diseases and conditions. Some of these diseases and conditions may be immediately evident, and others can appear months or years later. Many of the chemicals in crude oil and the dispersants target the same organs in the human body, and this increases the risk and may also increase the severity of harm. Many Plaintiffs have already experienced many of the symptoms associated with exposure to dispersants, oil, and/or oil/chemical mixtures as mentioned above.

**36.**

As such, actual, compensatory and punitive damages should be awarded to Plaintiffs for the injuries they have sustained as a result of Defendants' knowledge, conduct, acts and omissions as set forth herein.

**C.    The Willful and Wanton Conduct of the Defendants**

**37.**

Defendants, by their conscious and/or deliberate unreasonable acts and/or omissions complained of herein, and/or as the evidence may show, displayed gross negligence, reckless indifference, willfulness and/or wantonness.

**38.**

Defendants recklessly, willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico and to prevent injuring Plaintiffs.

**39.**

BP recklessly, willfully and/or wantonly failed to use reasonably safe dispersant chemicals or other chemicals in their attempts to respond to the Oil Spill, and thereby exacerbated the pollution of the Gulf of Mexico and injury to Plaintiffs.

**40.**

BP was aware of the risks that Plaintiffs would face but ignored worker safety concerns, even in the face of OSHA warnings and notification by the Department of Health and Human Services that workers were complaining of illnesses after being exposed to oil and dispersants.

**D.    Defendants' Knowledge of the Risks**

**41.**

At all times relevant to this litigation, Defendants knew or should have known that:

a)  Crude oil contains chemicals hazardous to human health;

b)  Chemical dispersants contain chemicals hazardous to human health;

c) Plaintiffs should have been adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances which they contain, which are being released into the environment; and,

d) Plaintiffs should have been equipped with proper protective gear, properly trained for avoiding exposure to the chemicals, and provided with material safety data sheets relevant to the chemicals used for recovery.

## IV.   DAMAGES AND OTHER RELIEF REQUESTED

**42.**

As a result of Defendants' acts or omissions, Plaintiffs have suffered the following physical injury damages:

a) Past, present, and future pain and suffering due to exposure to chemicals in crude oil that have caused adverse health effects;

b) Past, present, and future pain and suffering due to exposure to chemicals in dispersants that have caused adverse health effects;

c) Past, present, and future pain and suffering due to exposure to chemicals in crude oil/dispersant mixtures that have caused adverse health effects;

d) Past, present, and future pain and suffering due to exposure to chemicals in oil and dispersant mixtures that have caused adverse health effects;

e) Past, present, and future medical, hospital, and pharmaceutical expenses;

f) Past, present, and future mental anguish and emotional trauma;

g) Past, present, and future loss of enjoyment of life;

h) Past and present loss wages;

i) Past and future loss of earning capacity;

23

j)   Loss of consortium;

k)   Other damages itemized at the trial of this matter.

### 43.

Plaintiffs also demand injunctive and equitable relief and further, that Defendants be ordered to provide medical monitoring for Plaintiffs.

## V.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

*Negligence*

### 44.

Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated here.

### 45.

Plaintiffs contend that the combined conduct of the Defendants' is the cause-in-fact liable for their injuries and resulting damages were the cause-in-fact and proximate cause of the Defendants' breach of their duties of due care in the following non-exclusive respects:

a)   Failing to warn the Plaintiffs of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous, carcinogenic substances that they contain.

b)   Failing to properly train and equip Plaintiffs to avoid exposure to hazardous substances encountered in connection with relief efforts;

c)   Failing to abide by the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity in shallow waters;

d) Failing to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of Plaintiffs being exposed to aerial chemical dispersants; and,

e) Failing to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Plaintiffs.

### 46.

Defendants' breach of their duties posed an unreasonable risk of harm to Plaintiffs.

### 47.

At all times relevant to this litigation, Defendants knew or should have known that:

(a) Crude oil contains chemicals hazardous to human health;

(b) Chemical dispersants contain chemicals hazardous to human health;

(c) Plaintiffs should be adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances which they contain, which are being released into the environment; and

(d) Defendants' failure to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures would result in harm to Plaintiffs.

### 48.

Therefore, the danger and risk of harm to Plaintiffs was reasonably foreseeable to the Defendants.

**49.**

Further, at all times pertinent hereto, Defendants has direct control of their employee. As such, they are vicariously liable for the delictual actions of their employees.

**SECOND CLAIM FOR RELIEF**

*Gross Negligence*

**50.**

Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**51.**

Defendants had a heightened duty of due care to Plaintiffs because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals and breached their duty with reckless, willful, and wanton disregard of Plaintiffs' injuries which were reasonably foreseeable.

**52.**

As a cause-in-fact and proximate cause of Defendants' wanton or reckless acts, Plaintiffs have suffered physical injuries. Defendants' gross negligence, as described herein, entitles Plaintiffs to punitive damages. The amount of punitive damages recoverable by Plaintiffs is not lawfully limited to the amount of their compensatory damages, but rather should be multiplier of same sufficient to both punish Defendants and deter similar wrongdoing in the future.

## THIRD CLAIM FOR RELIEF

*Negligence Per Se*

### 53.

Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated here.

### 54.

Defendants' conduct with regard to the manufacture, maintenance and/or operation of drilling operations and oil vessels such as the Deepwater Horizon, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by numerous state and federal laws and permits issued under the authority of these laws. These laws and permits create statutory and regulatory standards that are intended to protect and benefit Plaintiffs, including, but not limited to, those set forth in Section 311 of the Clean Water Act, 40 C.F.R. § 300 App. E, 30 C.F.R. Part 254 and the Oil Pollution Act, 33 U.S.C. § 2702 (the "OPA") *et. seq.*.

### 55.

One or more of Defendants violated these statutory and/or regulatory standards.

### 56.

Defendants' violations of these statutory and/or regulatory standards constitute negligence per se under Florida law.

### 57.

As a cause-in-fact and proximate cause of Defendants' violation of statutory and/or regulatory standards, the Plaintiffs have suffered physical injuries.

## FOURTH CLAIM FOR RELIEF

*Chapter 376. Pollutant Discharge Prevention and Removal*

### 58.

Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated here.

### 59.

Throughout the summer of 2010 and thereafter, the defendants violated Florida Statutes Section 376.302 by permitting the pollution of Florida state waters and beaches with oil and Corexit.

### 60.

All of the defendants were well aware that the oil and Corexit contained contaminants which are pollutants and hazardous substances under Florida law.

### 61.

Agents and employees of the defendants directed the plaintiffs to come into contact with oil and Corexit.

### 62.

The plaintiffs were responsible for the removal of hazardous products containing petroleum and hazardous contaminants and therefore came into contact with these substances under the direction of these defendants.

### 63.

Additionally, on multiple occasions, agents and employees of the defendants instructed the plaintiffs to conceal oil and Corexit in the beach sand and to ignore oil washing ashore as well as contaminated seaweed on the beaches.

**64.**

The plaintiffs came into contact with these hazardous substances by virtue of inhalation, dermal contact, ingestion of contaminated food provided by the defendants, and hazardous substances being in contact with plaintiffs' eyes.

**65.**

The plaintiffs were not given access to information that would have allowed them to have knowledge of the hazards and therefore protect themselves from exposure.

The plaintiffs were actively misled about the hazards of tar balls and Corexit, not given appropriate safety equipment to prevent and/or minimize exposure, and given false information about safety equipment and protection.

**66.**

Safety equipment and protective gear were actively withheld from the plaintiffs.

**67.**

The defendants, and each of them, are responsible for the intentional exposure of the plaintiffs to contaminants known to cause serious bodily injury and therefore are strictly liable to plaintiffs pursuant to § 376.205, Florida Statutes.

**68.**

The defendants, and each of them, are liable for damages to the plaintiffs as defined in § 376.031 because the injuries resulted from a discharge or other condition of pollution pursuant to § 376.011-376.21, Florida Statutes.

**69.**

The plaintiffs need not establish negligence in any form or manner under this Chapter, but need prove only that the prohibited discharge or other pollutive condition and that it occurred.

**70.**

Pursuant to § 376.12(5), each defendant proven to be responsible is liable for damages, exclusive of natural resource damages, suffered by the plaintiffs as a result of the discharge or pollutive condition.

**71.**

The only defenses to Chapter 376's private right of action are set forth in § 376.12(7), Florida Statutes, which defenses are inapplicable and unavailable to these defendants.

The Deepwater Horizon Oil Spill itself constitutes a prohibited discharge within the meaning of Chapter 376.

**72.**

Under Cunningham v. Anchor Hocking Corporation, 558 So. 2d 93, 99 n.2 (Fla. 1st DCA 1990) and Section 376.313, Florida Statutes, the defendants considered to be employers of the plaintiffs cannot rely on the worker's compensation exclusive remedy as a defense.

**73.**

As a result of the defendants' violations of Chapter 376, Florida state lands and waters were polluted within the meaning of the Act.

**74.**

As a result of the defendants' violations of Chapter 376, the plaintiffs and each of them inhaled, ingested, or otherwise came into contact with pollutants or hazardous materials which

caused bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for enjoyment of life, expense of hospitalization, medical and treatment, loss of earnings, loss of ability to earn money, and aggravation of pre-existing conditions. The losses are permanent or continuing and plaintiffs will suffer the losses in the future.

**FIFTH CLAIM FOR RELIEF**

*Florida Medical Monitoring Claim*

### 75.

Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated here.

### 76.

As a direct and/or proximate result of Defendant's negligent conduct, Plaintiffs have been exposed to greater than normal levels of oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill which has created a significantly increased risk of contracting a serious latent disease.

### 77.

Plaintiffs have required medical treatment as a result of injuries caused by exposure to oil and/or chemical dispersants and other hazardous chemicals used to combat or resulting from the Oil Spill and have not reached maximum medical improvement.

### 78.

Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

**79.**

Plaintiffs will suffer irreparable harm if the Court does not render the medical monitoring relief prayed for herein and if Defendants are not ordered to create, fund and support a medical monitoring program.

**80.**

Plaintiffs demand injunctive relief and equitable relief, in the form of Defendants being ordered to provide continued medical monitoring for Plaintiffs.

**SIXTH CLAIM FOR RELIEF**

***Battery***

**81.**

Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated here.

**82.**

Defendants intentionally sprayed, and/or directed spraying, chemical dispersants in the immediate vicinity of Vessel Plaintiffs.

**83.**

Defendants' spraying of chemical dispersants in the immediate vicinity of Vessel Plaintiffs without warning or safety equipment has caused some Vessel Plaintiffs to be exposed to harmful chemicals and resulted the aforementioned symtomology.

**84.**

Vessel Plaintiffs are entitled to judgment finding the Defendants liable to the Plaintiffs for damages suffered as a result of subjecting Plaintiffs to harmful, offensive contact upon their bodies.

## SEVENTH CLAIM FOR RELIEF

*Punitive Damages*

### 85.

Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated here.

### 86.

Defendants engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire, spill, and clean-up efforts as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence. Plaintiffs, society, and the environment cannot afford and should never be exposed to the risks of another disaster of this magnitude.

### 87.

Defendants recklessly, willfully and/or wantonly failed to ensure that Plaintiffs would be adequately protected from exposure to harmful chemicals in oil, chemical dispersants, and other harmful chemicals resulting from the Oil Spill.

### 88.

Defendants willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico and the corresponding clean up response measures involving the use of chemical dispersants.

**89.**

BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Oil Spill, and thereby exacerbated the harm to persons working to contain or clean-up the Oil Spill.

**90.**

Defendants' conduct was at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because Defendants' conduct was motivated by financial gain; because it injured and endangered human health and safety; because it caused devastating damage and loss to the livelihoods, businesses, and properties of Plaintiffs; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to Defendants; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish Defendants and deter further repetition by Defendants or others.

**91.**

Accordingly, Plaintiffs are entitled to an award of punitive damages according §768.72, Fla. Stat., and/or general maritime law in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly and severally as follows:

1) Compensatory damages in amounts to be determined at trial;

2) Punitive damages;

3) Damages for medical screening and monitoring;

4) The implementation of a medical screening and monitoring program to be funded
   by the Defendants;

5) Pre-judgment and post-judgment interest at the maximum rate allowable by law;

6) Attorneys' fees and costs of litigation;

7) Injunction to require medical screening and monitoring;

8) Any other and further relief available under all applicable state and  federal laws;
   and

9) Any other and further relief the Court deems just and proper.

Respectfully submitted,


/s/ Allen W. Lindsay, Jr.           **AND**        /s/ Heather F. Lindsay
**LINDSAY & ANDREWS, P.A.**                        **LINDSAY & ANDREWS, P.A.**
Allen W. Lindsay, Jr. #104956                      Heather F. Lindsay # 073441
5218 Willing Street                                5218 Willing Street
Milton, FL  32570                                  Milton,  FL 32570
Phone:  850-623-3200                               Phone: 850.623.3200
Fax:  850-623-0104                                 Fax: 850.623.0104