# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | * | MDL NO. 2179 |
| "DEEPWATER HORIZON" IN THE | * | |
| GULF OF MEXICO, on APRIL 20, 2010 | * | |
| | * | |
| | * | |
| THIS DOCUMENT RELATES TO: | * | JUDGE BARBIER |
| | * | |
| ALL CASES | * | MAG. JUDGE SHUSHAN |
| | * | |

**********************************************

## PLAINTIFFS' SUPPLEMENTAL MEMORANDUM
## CONCERNING BP'S FAILURE TO COMPLY WITH THE MANDATES OF OPA

NOW INTO COURT come Plaintiffs, through undersigned counsel, who submit the instant "Supplemental Memorandum Concerning BP's Failure to Comply with the Mandates of OPA." The Court has requested additional briefing on the question of whether and how BP as the responsible party is fully complying with the mandates of OPA, in particular in the processing of claims for "interim, short-term damages," or "final damages," methodologies for evaluation of claims, and the release forms required of claimants. (Rec. Doc. 1098.)

The GCCF has made it clear time and time again that when faced with the choice between honoring its OPA-mandate to openly and fairly pay interim claims and following the BP-mandate to obtain as many releases as possible, it will follow the BP-mandate. Rather than publish a transparent, fair, and functional protocol for paying interim claims as required by OPA since the beginning, the GCCF developed the "quick pay" option for putative class members to obtain a flat $5,000 or $25,000 final payment in exchange for a release. Rather than explain to putative class

members why the documentation and explanation supporting their claim resulted in a full or partial denial, the GCCF offered the "quick pay" option – in exchange for signing a release, no documents had to be submitted.

For the past three months, the <u>only</u> compensation coming out of the GCCF has been "quick payments" in exchange for release of all claims. Claimants that do not want to sign a release have been cut off. The new protocol is not any better and shows yet again that the GCCF will choose the BP-mandate to get final releases over the OPA-mandate to fairly and transparently pay interim claims.

Plaintiffs submit that the final releases obtained by GCCF should be voided, that GGCF should be ordered to provide detailed reasons for denial of any claims and an explanation on methodology for paid and partially paid claims, and that any and all future dealings with putative class members should include an accessible calculation of the value of their claim to date. Finally, because "presentment" is inextricably tied to the process established by BP, the PSC requests the opportunity to participate in a Court-supervised process whereby the PSC and BP develop a joint methodology to satisfy interim claims.

## I.  PAST RELEASES SHOULD BE VOIDED.

The Releases represent a clear violation of the fundamental principles of OPA. OPA provides, in no uncertain terms, that the responsible party must pay for the damage it caused. BP is using OPA's presentment requirement as a means to take advantage of putative class members without telling them the true value of their claim. The Releases were also obtained pursuant to error and duress. Error resulted from the confusion and misrepresentations from Mr. Kenneth Feinberg's misleading drumbeat of "independence" and active deterrence of legal representation. Duress

resulted from the putative class members' relentless economic turmoil from their inability to earn a living and the need for immediate income.

**A.      OPA Prohibits the Release of Unpaid Claims**.

OPA unambiguously establishes the rule that a responsible party must pay all claims without limitation.  The requirement that a responsible party make continuing payment of interim damages without obtaining a release for more than it paid is woven throughout OPA and is an integral part of its goal of ensuring full compensation. Beginning at Section 1005(b), 33 U.S.C. § 2705(b), OPA mandates the "General Rule" regarding partial payment of claims:

> The responsible party shall establish a procedure for the payment or settlement of claims for interim, short-term damages.  Payment or settlement of a claim for interim, short-term damages <u>representing less than the full amount of damages to which the claimant</u> **<u>ultimately</u>** <u>may be entitled</u> **<u>shall not preclude recovery</u>** <u>by the claimant for damages not reflected in the paid or settled partial claim</u>."

33 U.S.C. § 2705(b) (emphases supplied.)

The provision for interim payment is so important that the responsible party is specifically required to advertise the exact statutory language above to all potential claimants. OPA § 1014(b)(2); 33 U.S.C. § 2714(b)(2).  The provision specifically contemplates that even <u>settlement</u> of a claim cannot prevent full recovery.  OPA contains no provision that authorizes a responsible party to obtain a release from a victim except for amounts it has already paid on the victim's claim.

The requirement for interim payment and the prohibition on broad release contained in Section 1005 are reinforced throughout the statute. For example, the presentment requirement of OPA only allows a claimant to sue or seek compensation from the Oil Spill Liability Trust Fund if the claim is denied or "not settled by any person <u>by payment</u> within 90 days." OPA § 1013(c)(2);

3

33 U.S.C. § 2713(c)(2) (emphasis supplied). See Johnson v. Colonial Pipeline Co., 830 F.Supp. 309, 311 (E.D.Va.1993) ("The settlement is to be in the form of 'payment within 90 days after the date upon which the claim was presented.'").

OPA's automatic subrogation clause provides further support that a responsible party cannot obtain a release for oil spill claims. OPA provides automatic subrogation as a matter of law to a responsible party who pays a claimant, but if less than the total losses are paid, subrogation "shall apply only with respect to the portion of the claim reflected in the paid interim claim." OPA § 1015(b)(1); 33 U.S.C. § 2715(b)(1) (emphasis supplied). The subrogation provision specifically emphasizes: "Payment of such a claim shall not foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under this Act or under any other law."

This point is further supported in Section 1017 authorizing a responsible party to file suit based upon subrogation: "No action based on rights subrogated pursuant to this Act by reason of payment of a claim may be commenced under this Act more than 3 years after the date of payment of such claim." OPA 1017(f)(4); 33 U.S.C. § 2717(f)(4) (emphasis supplied). OPA's automatic subrogation provisions represent a clear balance of interests. The victims cannot be forced to release more than they are compensated, but, on the other side of the ledger, a responsible party does not have to negotiate a release and subrogation agreement, and does not have to obtain the victim's consent or signature; the victim cannot extract further conditions or money in exchange for a right of subrogation. All the responsible party must do is pay what is owed, and it gains full release and subrogation rights by that act to the full extent that it has paid.

Even more support for the intent to protect vulnerable victims from broad contractual releases is found in the provisions dealing with contribution. A responsible party is specifically

4

allowed to seek contribution from other liable parties, but only in accordance with Section 1017. OPA § 1009; 33 U.S.C. § 2709.  Section 1017 provides: "No action for contribution for any removal costs or damages may be commenced more than 3 years after—(A) the date of judgment in any action under this Act for recovery of such costs or damages, or (B) the date of entry of a judicially approved settlement with respect to such costs or damages." OPA § 1017(f)(3); 33 U.S.C. § 2717(f)(3) (emphasis supplied).  See also General Elec. Co. v. U.S. Dept. of Commerce, 128 F.3d 767, 778 (D.C. Cir. 1997) (holding that OPA authorizes a claimant to make a claim for further restoration costs even after judgment is entered on a prior claim).

As the legislative history makes clear, one of the goals of OPA is to fully compensate victims and to place the costs of an oil spill on the polluter. See Rice v. Harken Exploration Co., 250 F.3d 264, 266 (5th Cir. 2001) (stating that the goals of OPA are "to streamline federal law and 'provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills within the petroleum industry'") (citing Senate Report No. 101-94, reprinted in 1990 U.S.C.C.A.N. 772, 723).

Congress set out to ensure that victims of oil spills would not be short-changed and that parties responsible for spills would bear the full cost of the damage resulting from their actions. The legislative history excerpts emphasized by BP in prior briefing to show the mandatory nature of presentment further bear out this intent.  "As Representative Hammerschmidt explained in urging passage of OPA, "[t]he system of liability and compensation provided for in the bill … is intended to allow for quick and complete payment of reasonable claims without resort to cumbersome litigation." 135 Cong. Rec. H7965 (daily ed. Nov. 2, 1989) (emphasis added).  See also 135 Cong. Rec. H7962 (daily ed. Nov. 2, 1989) ("The thrust of this legislation is to eliminate, to the extent

5

possible, the need for an injured person to seek recourse through the litigation process.") (Rep.

Lent)." Congress intended complete payment, which would eliminate the need for litigation; it did

not intend, and OPA does not provide, a process whereby BP can limit a victim's right to obtain

complete compensation by withholding payment subject to a full and final release. Two significant

points high-light this:

- **Nowhere in OPA is there authorization for a responsible party to secure a "final" release from a claimant by any mechanism other than payment of the full amount ultimately owed.** Noticeably absent is the right to seek contribution after a responsible party extracts a contractual release from the victim without court approval. And OPA repeatedly emphasizes that any settlement or payment cannot prevent a victim from claiming further damages beyond what is paid.

- **Coast Guard Regulations do not allow the sort of broad release and subrogation that the GCCF is obtaining on BP's behalf.** The Coast Guard is the federal agency charged with administration of the Oil Spill Liability Trust Fund. While an appeal to the Trust Fund differs in several respects from a formal lawsuit, in this narrow instance, the Coast Guard Regulations are instructive. Pursuant to OPA and 33 C.F.R. § 136.115, payment by the Fund "constitutes a release of the Fund for the claim" and "precludes the claimant from filing any subsequent action against any person to recover costs or damages which are the subject of the compensated claim." See e.g., 33 CFR § 136.115(a) (emphasis supplied). The Coast Guard does not require a claimant to release the responsible party, or others, from any and all damages, known or unknown, and all theories of liability. Under OPA it cannot. The Coast Guard obtains an automatic release for a compensated claim, just as OPA provides.

The requirement for complete compensation of claimants does not as a matter of course

impose endless or unforeseeable liability on a responsible party. OPA balances the victims' need

for complete compensation with the responsible party's potentially vast exposure by capping

liability on a responsible party, and steering victims whose damages would exceed the cap to the Oil

Spill Liability Trust Fund. OPA § 1004; 33 U.S.C. § 2704. However, where a responsible party's

own fault rises to a certain level, Congress has determined that the liability cap should not apply.

Id. BP has expressly waived the application of OPA's liability cap (Rec. Doc. 559), and so, having

admitted it is not eligible for the protections of the statute, it should not be heard to complain that the law requires it to completely compensate victims.

The unprecedented scale and potential duration of long-term effects emanating from the Deepwater Horizon spill warrant heightened scrutiny of these provisions and the entire claims process. OPA requires victims to approach the responsible party and negotiate compensation with it, but OPA also protects victims, who are perforce in a vulnerable position, from getting short changed in that negotiation.

The victims are not typically OPA experts and do not understand or appreciate the extent to which the Release is at odds with OPA. They cannot be expected to negotiate their claims at such a sophisticated level (especially given the GCCF's repeated mantra that claimants do not need lawyers). In fact, claimants have no real opportunity to negotiate around BP's Release demand at all. The Release is a quintessential, non-negotiable contract of adhesion, drafted to favor BP, to prejudice claimants, and to be unalterable. <u>See Iberia Credit Bureau, Inc. v. Cingular Wireless, L.L.C.</u>, 379 F.3d 159, 168 (5th Cir. 2004) (stating that where a party had no power to negotiate a contract, courts may disregard a particular clause when it is unduly burdensome or extremely harsh).

### B. Releases Obtained To Date (At Least from Unrepresented Parties) Are Also Invalid Due To The Misleading Representations Found By This Court.

This Court has previously found that "the hybrid role of Mr. Feinberg and the GCCF has led to confusion and misunderstanding by claimants, especially those who are unrepresented by their own counsel" and that the clear record in this case demonstrates that any claim of the GCCF's neutrality and independence is misleading to putative class members and is a direct threat to this ongoing litigation, as claimants must sign a full release against all potential defendants before obtaining final payments." (Rec. Doc. 1098 at 12-13.)

Error, fraud, and duress are universally recognized as legal grounds for invalidating a contract, and may well be found to justify the invalidation of numerous releases which may have been executed by unrepresented and misinformed parties.[1] At least one lawsuit has been filed in hopes of voiding the release by a claimant who accepted the quick pay option. See Petition, Knotty Girl Fishing, LLC, v. Worley Catastrophe Services, LLC et al., No. 2011-508 (Tangipahoa Parish), attached as Exhibit "1." Such concerns warrant, at the very least, monitoring by the Court, with an opportunity to challenge the releases in appropriate circumstances at the appropriate time.

     **C.**     **In the Alternative, the Court Should Limit the Release as Argued in Plaintiffs' Memorandum in Support of Motion to Supervise.**

In the event that the Court decides not to strike the Release, Plaintiffs re-urge as alternative relief the changes to the Release raised in their Memorandum in Support of Motion to Supervise Ex parte Communications, such as limiting the Release only to BP entities, releasing only OPA claims (not punitive damages or state law claims), clearly excluding mental anguish damages, and/or informing claimants of this litigation and their right to counsel. (Rec. Doc. 912-1.)

**II.**     **BP AND THE GCCF'S FIRST NINE MONTHS OF CLAIM PAYMENTS HAVE VIOLATED OPA'S MANDATE OF ESTABLISHING A FAIR AND OPEN INTERIM CLAIMS PROTOCOL BY FOLLOWING THE BP-MANDATE OF OBTAINING RELEASES.**

Some of the problems with the BP claims process are directly contrary to OPA. Other problems touch upon the need for basic fairness in handling a disaster of such magnitude. To date, there has been no discernible methodology for paying individual claims. Individual results appear to be dictated by caprice or luck of the draw regarding adjusters. The United States, through the

---

[1] The State of Mississippi has already provided the Court with a cogent argument that the releases GCCF have obtained are tainted by duress. (Rec. Doc. 1085.)

Department of Justice, itself has urged more transparency in the GCCF's processes and has stated unequivocally that "[f]or the GGCF to fulfill its mission, the interim payment process must be efficient, fair, and straight forward." 2/4/11 LTR from Thomas Perrelli to Kenneth Feinberg, at 2, attached as Exhibit "2." The overall result of the GCCF process, however, has been all too clear: attempt to limit access to courts while minimizing compensation.

OPA's mandate is clear: "The responsible party shall establish a procedure for the payment or settlement of claims for interim, short-term damages." OPA § 1005(b), 33 U.S.C. § 2705(b) (emphasis supplied). As Courts have consistently noted: "'Shall' means shall. The Supreme Court and this circuit have made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the command. See United States v. Monsanto, 491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (by using "shall" in civil forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied")." Forest Guardians v. Babbitt, 174 F.3d 1178, 1187 (10th Cir. 1999).[2]

OPA does not impose a specific procedure or methodology for evaluating claims. However, OPA does require that whatever procedures the responsible party implements must enable presentment, must pay interim damages, and must compensate claimants for all that they are ultimately entitled. In order to give effect to, rather than emasculate, the mandatory command of the statute, the claims procedure must be reasonably designed to achieve these purposes. See, e.g.,

---

[2] An equally familiar canon of statutory construction holds that the courts have a "duty to give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section". United States v. Menasche, 348 U.S. 528, 538-39 (1955) (internal quotation marks omitted). "It is well established that a statute should be construed so that each of its provisions is given its full effect..." Quarles v. St. Clair, 711 F.2d 691, 701 n.32 (5th Cir. 1983).

Loeffler v. Staten Island University Hosp., 582 F.3d 268, 274 -76 (2nd Cir. 2009) (holding that the Rehabilitation Act's mandate that hospitals "shall establish a procedure" to communicate with the hearing impaired requires meaningful access, such that a general procedure that does not actually provide an interpreter when needed violates the statute).

The same principle applied in Loeffler applies to the GCCF's obligation to establish a procedure for processing interim claims. By establishing a procedure that (a) compensates people on a random basis, (b) creates uncertainty and confusion, (c) leaves a lot of people uncompensated after many months, (d) completely lacks transparency, and (e) pushes people away from interim payments in favor of a "quick payment", GCCF violates OPA's mandate that it establish an interim claim procedure and that it actually work.

GCCF proposes to offer claimants three choices: quick payment claims, full final claims, and interim claims. Of the three types of claims paid by GCCF, only the interim claim process is contemplated by OPA. However, the GCCF has in various ways discouraged the use of the interim claim process in favor of the submission of "quick payment" or final claims. As of February 16, 2011, **89,206** quick payment final claims have been processed, with the mandatory broad contractual releases.[3] See GCCF Overall Program Statistics, attached as Exhibit "3." In contrast, and despite the fact that the most prominent command in OPA regarding compensation is to pay interim damages, only **1** interim claim has been paid. Id. In violation of OPA's requirement that a process

---

[3] Perhaps tellingly, when the GCCF's unsolicited claims package arrives to claimants, the quick payment claim form is the only one with the information pre-completed and ready to sign, despite the fact that the same information could just as easily be pre-completed on the interim claim package. Couple this fact with the fact that the claim is called "quick payment", and it is the same uniform $5,000 that BP was initially advancing to many claimants last summer, and the potential for confusion is apparent.

for paying interim claims be up and running within 15 days, the GCCF will not process interim claims until sometime after February 16, 2011, nearly ten months after the spill.[4]

### A.        Past OPA-Violating Problems With the GCCF Claims Protocol.

The GCCF focus on the BP-mandate of settling claims to avoid lawsuits has created (intentionally or otherwise) a system where the OPA-mandated interim claim is ignored in favor of payment options that have no basis in science, no consistent or transparent methodology, and no consideration of the specific situations of the individual claimants. "[The interim claims protocol] cannot be a disfavored fallback from the final claims process" 2/4/11 LTR from Thomas Perrelli to Kenneth Feinberg, at 2.

Inconsistency and secrecy are the source of many of the problems with the claim process. The GCCF requires the interim claimant to document past losses, but if the adjustor deems some information missing he or she will not inform the claimant.[5]  Instead of telling the claimant what information it deems lacking, thereby allowing the person to engage in meaningful negotiation, the GCCF will, after taking up to 90 days to review the claim, tender to the claimant an unexplained lower amount.[6]  Examples abound of restaurant workers being paid claims while the claim of their employer the restaurant itself are denied; of one deck hand being paid, while the other deck hand from the same boat who submitted the same documents is denied; of desperate claimants who are quickly paid following media exposure of their situation, despite no change in their claim documentation.  Such inconsistent results cannot be the outcome of a reasonable claim process.

---

[4] See Proposed Methodology, attached as Exhibit "4."

[5] See Final protocol, at 8, attached as Exhibit "5."

[6] FAQ 57, attached as Exhibit "6."

11

Below are a number of the larger problems with the claims process thus far and how they work to violate OPA by not paying claimants there interim claim.

- It has been nine months since the oil spill began and there has not been any interim claim process with any published methodology.

- Rejection letters are provided without any explanation as to the basis for the rejection.

- Hundreds of thousands of insufficient documentation letters have been sent out without identifying which documents were not submitted and how the claimant could fix the problem.

- The GCCF has not identified any eligibility requirements.

- The GCCF has failed to identify whether it is using some type of "proximity" requirement (such as only Gulf South residents and business will be eligible) in reviewing claims.

- The GCCF has inappropriately set up a different, smaller fund for real estate agent claims, implying that once that fund is exhausted there will be no more payments for this type of lost revenue.

- The GCCF has refused to pay for loss of property value claims and has been indecisive about paying lost profits claims from the sale of real estate at a loss.

- The GCCF has refused to pay lost income for "moratorium claims" despite many of these claims' direct connection to the oil spill.

- The GCCF, until very recently, utilized its own Claim Form that was over 13 pages long, but did not anywhere request a "sum certain" (as is arguably required under OPA in order to present a claim).[7]

- The GCCF has not paid any interest on any claim in the last nine months despite OPA's requirement that interest be paid on any payments past 30 days.  OPA § 1005(b); 33 U.S.C. § 2705(b).

---

[7] Plaintiffs maintain that filing any claim with the GCCF for any amount satisfies "presentment" under OPA but notes the inequity with the GCCF not providing any "sum certain" entry on its own claim form which it will presumably use as a basis for arguing that OPA presentment has not been made.

- As of December 14, 2010, over 31,000 subsistence use claims had been submitted to GCCF, and only 5 had been paid.[8] OPA § 1002(b)(2)(C); 33 U.S.C. § 1002(b)(2)(c).

OPA's mandate to pay interim claims is intended to keep individuals and businesses afloat as the ongoing damages they are suffering continue to emerge and manifest, thereby protecting victims from the coercive pressure of financial hardship. The able point is to protect claimants from "selling out" quickly to avoid instant ruin. No true economic recovery for individual claimants or for the Gulf Coast itself can occur if such a Hobson's choice is all the GCCF offers. The OPA system protects claimants from immediate privation without requiring them to foreclose on their economic futures. All along the Gulf Coast this protective system is failing. As noted by the State of Mississippi's Attorney General: "This quick payment scheme is thwarting the remedial purposes of OPA and violating public policy by using economic duress to secure impermissibly broad releases of BP and of all other responsible parties." (Rec. Doc. 1085 at 6.)

These concerns are not limited to the claimants and their advocates. The U.S. Department of Justice has written Mr. Feinberg at the GCCF to reiterate the federal government's view that "it is essential that the individuals and businesses most affected by the Deepwater Hoizon Oil Spill are fairly treated by the Gulf Coast Claims Facility." 2/4/11 LTR from Thomas Perrelli to Kenneth Feinberg, at 2. The federal government also requested several specific changes and urged the GCCF to meet OPA requirements. Id.

    **B.**     **By Failing to Provide Any Methodology for Interim Claims and By Hiding the Bases for Past Payments and Past Denials, GCCF Has Violated OPA and Upset the "Presentment" Requirement.**

---

[8] 12/14/10 Gulf Coast Claims Facility Status Report, attached as Exhibit "7."

OPA requires that "all claims for removal costs or damages shall be presented first to the responsible party." OPA § 1013(a); 33 U.S.C. § 2713(a).  The term "present" is not defined in OPA, but OPA is explicit that "'claim' means a request, made in writing for a sum certain, for compensation for damages or removal costs resulting from an incident." OPA § 1001; 33 U.S.C. § 2701. Therefore, under the plain terms of the statute, the "presentment" requirement is satisfied when a written request for a sum certain for covered damages is made to the responsible party. Presentment must inform the responsible party "of the nature and extent of the damages alleged and of the amount of monetary damages claimed." Johnson v. Colonial Pipeline Co., 830 F. Supp. 309, 311 (E.D. Va. 1993). The responsible party must publish the procedures by which a victim may present a claim within 15 days after designation as such.  OPA § 1014(b); 33 U.S.C. § 2714(b). However, the responsible party is not given the authority to define what "presentment" means for purposes of OPA.

BP suggests in its Memorandum in Opposition to the Motion to Supervise that it believes that no OPA claims have been presented. (Rec. Doc. 963 at 13.)  BP's suggestion underscores a serious flaw in its ever-shifting claims process. The ability of a claimant to present a claim is in some sense dependent upon the claims procedure set up by the responsible party.  BP and its "Facility" have frustrated the ability of victims to present their claims by delaying and repeatedly changing the claims procedure, by refusing to establish and/or disclose the calculations by which claims are evaluated, by refusing to inform denied or underpaid claimants of the reasons for denial, and by demanding specific documents while refusing to consider other valid sources of proof.

14

BP's argument before this Court indicates that it will seek to use the procedural deficiencies inherent in its own claims process as a litigation tool to deny the substantive claims of spill victims. For one thing, BP cannot simply restart the 90 day window of OPA § 1013 by issuing new claims procedures every few months. OPA requires that the claims procedure be in place and advertised within 15 days. All of those who presented a claim (as defined by OPA) to BP according to the initial advertised procedures this past summer have satisfied presentment. The same applies to all of those who first presented a claim according to the GCCF procedure first available on August 23, 2010, and to those who are first presenting a claim according to the revised GCCF procedure following November 23, 2010. Successive revisions of the advertised claims procedure cannot serve to invalidate the presentment or reset the clock of those claims that relied on prior procedures and complied with OPA.

Perhaps more importantly, the GCCF methodology for claims analysis has been so secretive that BP cannot be heard to complain that deficient supporting documentation (to the extent that is even required of claimants under OPA) is a jurisdictional bar to a claimant filing suit. GCCF has set up a system wherein they demand submission of a large amount of information from victims (including many admissions, signed statements, protectable confidential information, business plans, profit models, analyses on valuation, etc.), yet they provide no information in return – no reason for denial, no identification of which documents were not provided, and no explanation as to how payments were calculated.

For example, as the GCCF website statistics attest, only about 27% of the Texas claimants are being compensated.[9] If the GCCF has drawn lines of eligibility, whether geographic or based

---

[9] See Texas Status Report, attached as Exhibit "8."

on industry or any other criteria, it should make that fact known so that claimants are aware at the outset that the GCCF will not pay their claims.

As U.S. Representative Jo Bonner wrote to Mr. Feinberg:

> [I]t is imperative the GCCF include information on how payments are calculated, and if a denial is rendered, a reason must be offered. Ken, how many times do I need to make this request? Also, there appears to be far too much discretionary reasoning on behalf of the GCCF team. Decisions continue to be rendered by individuals who seem to be unfamiliar with the dynamics of a tourism economy and who appear to know nothing about the geography of our area. The proposed guidelines are extremely vague and leave a great deal of room for arbitrary decision-making.

2/15/11 LTR from Representative Jo Bonner to Kenneth Feinberg, at 2, attached as Exhibit "9."

When GCCF refuses to explain to claimants during its evaluation process what BP considers to be lacking in a claim or how it arrived at an amount, BP frustrates the presentment process by failing to "engage in meaningful substantive negotiations" that the presentment process was intended to foster. Johnson v. Colonial Pipeline Co., 830 F.Supp. 309, 311 (E.D.Va.1993).

GCCF cannot frustrate the Court's jurisdiction by providing an inadequate claims process. Neither can it claim on the one hand that it has sufficient information to determine a claimant's final damages, while on the other hand arguing that insufficient information has been "presented" to satisfy the jurisdictional condition precedent. The claim process must not be perverted from its intended function as a protective device into a trap for injured victims.

    **C.**    **In Order to Comply With OPA (and Out of Simple Fairness), the GCCF Must Inform Putative Class Members of All Reasons for Past Denials, All Bases for Past Payments, All Manner of Prior Calculations, and Identify What, if any, Additional Documentation May Be Lacking.**

Only transparency of past claim activities followed by an objective, open interim claim methodology can fairly meet BP's obligations under OPA. OPA requires that the responsible party

pay interim claims within 90 days and that interest will accrue after 30 days. It has now been over nine months since the oil spill and hundreds of thousands of people have been denied claims either unfairly or without an adequate explanation. Those that have received some payments do not know how they were calculated. In order to ensure that each putative class member will not be forced into a coercive situation, BP should be ordered to provide each person whose claim was denied with a written detailed explanation for the basis of denial. For every putative class member who received payment, BP should be ordered to provide a written explanation as to how that payment was calculated. To the extent that the GCCF used some type of formula and/or eligibility guidelines as to which claims should be paid, these should also be produced to each individual claimant and advertised on the GCCF's website and all public media outlets.

Only transparency of the past decisions will ensure that the interim claims in the future are fair. See 2/4/11 LTR from Thomas Perrelli to Kenneth Feinberg, at 2 ("It is similarly important that claimants have an understanding of why their claims are handled as they are, and I ask that the GCCF find ways to provide additional information about its decisions."). Payment of the interim claims in the future will likely be based in some part on how the past interim claims were calculated. In fact, the GCCF has stated that past payments will be deducted from any final offer. To determine whether any future final offers are fair, there should be full disclosure as to the factors and information on which past payments were based.

**III. THE NEW PROTOCOL IS AS DECEPTIVE AND MANIPULATIVE AS THE REPORTS USED TO SUPPORT IT AND DEMONSTRATES THAT THE GCCF IS PRIMARILY CONCERNED WITH THE BP-MANDATE OF OBTAINING RELEASES, NOT THE OPA-MANDATE OF FAIRLY CALCULATING INTERIM CLAIMS.**

On February 2, 2011, the GCCF, for the first time, announced a payment methodology for public comment. The GCCF stated that when the public comment period elapses on February 16, 2011, it may incorporate any suggestions it believes are warranted at some point afterwards. The new protocol was ostensibly based upon a scientific report and an economic report.

After a review of the interim claims protocol and the final claim protocol, only one conclusion can be made – the GCCF is motivated by the BP-mandate to obtain as many releases as possible. The GCCF has once again subverted its OPA-mandate to fairly and transparently pay interim claims. Nothing makes this clearer than the two reports the GCCF has touted as its justification for the final claims protocol. The GCCF's latest posturing also makes it clear that if this Court does not exercise control over the process now, it will be faced with potentially hundreds of thousands of lawsuits that could have been avoided if the GCCF had focused on paying what is due, not leaving before the full check is paid and the full cost of BP's disaster is calculable.

### A.    The New Protocol Is Fundamentally Flawed.

The problems with the proposed methodology are legion. The following list is merely a sampling of fundamental flaws in the methodology that serve to undercut compensation, thereby increasing the hardship on victims and the pressure to sign whatever document GCCF requires to stay afloat.[10]

- The protocol's one (or two) size(s) fits all approach to calculating damages may be expedient, but highly inaccurate. The lumping of virtually all businesses into a single category, standard formula, and methodology for damages calculation ignores a significant number of factors that would materially affect individual claimants' actual losses (such as

---

[10] See also 2/16/11 LTR from State of Florida Chief Financial Officer to Kenneth Feinberg, at 1 ("In short, the proposed methodology lacks transparency, fails to provide clear guidelines, and continues to play with the emotions of victims who simply want to be compensated for their financial losses."), attached as Exhibit "10."

nature of specific business, its size, geographic location, industry, or other circumstances that may apply to a particular claimant).

• The protocol fails to acknowledge that each region, to date, was exposed to a different quantity of oil and for different lengths of time. The structure of these economies varies significantly. Different industries felt different impacts and to varying degrees.

• The protocol fails to recognize that size, business type, age of the business, its customer base, the individual business' history, location in the county, cost structure and other factors will influence the individual claims that are forthcoming.

• Future losses are based upon actual losses for an approximately 8 month period (April 20 – December 31, 2010) and by multiplying this loss by a factor of 2 and reducing by payments made to date, the claimant is only actually compensated for a total of 16 months – not a 2 year period which would be 24 months.

• The Proposed methodology will under-compensate those claimants that were not impacted immediately by the Oil Spill. For example, if a claimant began to experience losses in October 2010 as a result of the Oil Spill, such a claimant would be limited to a recovery of only six months of loss (the three post Oil Spill months in 2010 times two).

• The protocol's geographic focus on coastal counties only arbitrarily limits the damages to a subset of the total damages. If there were billions of dollars of economic damage in coastal counties in Texas Louisiana, Mississippi, Alabama and Florida how can the ripple effect (indirect and induced impacts) to the rest of the non-coastal counties in these states not merit compensation? Does the GCCF just assume that they are negligible?

• The protocol does not account for the likelihood of future re-oiling events. GCCF interprets the data to indicate that there is evidence of a strong recovery underway which is uncertain and fails to account for the possibility of any re-oiling event due to hurricanes or other resurfacing of oil from the bottom of the Gulf, etc.

• The protocol appears to require unrealistic documentation of causation which should be obvious in many cases and where specific documentation may not always be available or exist.

• GCCF will not presume that a given loss was or was not caused by the Oil Spill even if an Emergency Advance Payment was made, evidencing yet another shift in the GCCF's shift of what is acceptable causation proof.

• GCCF will undertake a renewed evaluation of available data every 4 months, thus the final payment factors published today could decrease.

• GCCF does not provide any protocol for claims greater than $500,000.

19

- GCCF will determine Final Payments for claimants with losses greater than $500,000 on an individualized basis; thus there is no guidance at all that is proposed in the protocol for many claimants who have been significantly impacted and no assurances as to how those claims will be assessed and paid.

- The protocol offsets prior period Oil Spill losses with future profits even though those future profits may reflect growth unconnected to a "recovery" from oil spill losses.

- The protocol utilizes undefined terms in its calculation examples. "Other Offsets" and "Loss of Income (LOI) %" are not defined and could give the GCCF significant leeway in its determination of payments.

- The protocol does not account for the public perception of the leisure tourist and how future re-oiling events may extend public perception of the "perceived risk" as it applies to the beach, the water, and the seafood.

- The new protocol turns the interim claim into an alternative of the final claim to be bid against, rather than an amount that a claimant is due without limitations: "[i]n the event that the Claimant has submitted an eligible, substantiated claim, the GCCF will provide the Claimant with a payment determination for both an Interim Payment and Final Payment so that the Claimant can select which form of payment the Claimant desires."[11]

The above problems also demonstrate the pressure, subtle and overt, that the GCCF is exerting on putative class members to accept final claims. The subtle pressure includes misrepresenting the calculations of the 2010 losses as a "year's loss" and by presenting the putative class member with the option of selecting either an interim claim or a final claim – when OPA requires the GCCF to pay that interim claim. The subtle pressure also includes BP's failure to provide any methodology for interim claims in the first nine months of the spill and paying only six months worth of lost income for the past nine months. It is no coincidence that right when the putative class members are hurting the most (from being paid only six months of lost income for the last nine months), the GCCF presents the final claims process.

---

[11] See Final Protocol § IV.A..

20

The GCCFs' overt pressure is memorialized in the two reports that it commissioned to support its final claims protocol. Noticeably absent is any report (expert or otherwise) that purports to support the interim claims process as fair, objective, and transparent. Nonetheless, as seen below, the two reports are little more than the GCCF ignoring its OPA-mandate to pay what is owed in favor of its BP-mandate to get as many releases as possible.

**B.    The Reports Behind the New Protocol Unequivocally Demonstrate that the GCCF is following the BP-Mandate.**

In addition to showing the lengths to which the GCCF will undergo to follow the BP-mandate, the two GCCF Reports that purport to provide the purportedly scientific, factual, and economic basis for making final claims based on two years again demonstrate the need for this Court's oversight. These reports are transparently results oriented and are a product of the BP directive to settle claims now before suit is filed. Because these reports are being presented to putative class members as an "objective" "expert" bases for settling their litigious rights, this Court should step in and put an end to these representations and order the GCCF to produce all information and the bases for its position that the spill's effects will last only two years.

The "scientific" foundation for the GCCF's future payment methodology is a single report[12] from Dr. Wes Tunnell commissioned by Mr. Feinberg in mid-December for $225/hour with a two week deadline.[13] Dr. Tunnell's analysis is based on a review of literature, not empirical analysis of actual data. Ian MacDonald, professor of oceanography at Florida State University and a member

---

[12] Report of Dr. Wes Tunnell, attached as Exhibit "11."

[13] "On Gulf Oil Spill's Effects, Doing Science with a Deadline," THE NEW YORK TIMES, John Schwartz and Mark Schrope, (2/2/11), attached as Exhibit "12." See also "Report Foresees Quick Gulf of Mexico Recovery," THE NEW YORK TIMES, John Schwartz and Mark Schrope, (2/2/11), attached as Exhibit "13."

21

of the National Wildlife Federation's Gulf Oil Disaster Science Advisory Panel, noted that "[t]his is not a scientific report - it's an opinion. There's just no data here. It doesn't propose any methodology by which its assumptions and predictions could be tested." Id.

Dr. Tunnell's report itself repeatedly acknowledges that there is no way to accurately assess the long term impact of the spill. Dr. Tunnell candidly admits the true impetus behind his opinions: "In conclusion, making an exact call for the time of recovery of any fishery group after a major oil spill is impossible. However, it is realized that it is very important to settle claims with individuals and businesses on a timely basis, so the expert opinions for the four fishery groups given in this report are as reasonable as possible at this time." Id. (emphasis supplied). See also id. at 14 ("[N]ear impossibility in accurately predicting the environmental impact or time of recovery"); id. at 15 ("[D]etermining recovery to a certain endpoint may be ill-conceived"); id. ("Changes in feeding behavior or reproductive behavior could affect populations for years from re-oiling of submerged or hidden oil that was not removed. The unprecedented and unexpected crash in the herring fishery five years after the Exxon Valdez oil spill is a classic example."); id. at 22 ("The effects of oil on plankton (food for larvae of fish and invertebrates) are currently unknown, and may never be known. The effects of oil on trophic cascades and ecological interactions are also unknown"); id. at 37 ("Realistically, the true loss to the ecosystem and fisheries may not be accurately known for years, or even decades."); id. at 38 ("In conclusion, making an exact call for the time of recovery of any fishery group after a major oil spill is impossible."). These are remarkably unabashed statements that his report is not science but the result of a client directing him to put something together to achieve the purpose of getting putative class members to release their litigation rights.

The second basis for the final payment calculation methodology, ARPC's economic recovery analysis, is equally suspect and result driven.[14]  Some of the problems include the following: (1) Louisiana is largely left out of the calculation; (2) the Gulf Coast market is largely an auto-based market, but ARPC relies exclusively on airport arrivals to find little or no effect on the economy; (3) the Fall/Winter "recovery" claimed by ARPC reflects an entirely different type of tourism and is not indicative of the summer beach/leisure tourist season of the Gulf Coast; (4) the STR data used to support the methodology over-samples national chains whereas tax data, which include all businesses, show much larger declines and a longer recovery period; (5) the study assumes that the oil spill and its impact can be modeled as a spike in 2010 that rapidly decays eschewing any possibility that sub-surface or settled oil could be stirred up due to tropical storms or hurricanes in the Gulf of Mexico; (6) re-oiling could cause hysteria for these regions and lead to long lasting or permanent damage, changing the pattern of recovery and thus the possible damages caused by the spill; (7) the 2010 County Business Study used by ARPC only looks at four different industries – hotels, restaurants, retail and fishing; (8) the 2010 County Business Patterns are based on data from 2008 and would largely reflect the impact of the recession on the number of businesses and employees in these sectors – comparing payments made in 2010 to Census data from 2008 would bias the percentages upward making compensation rates appear more generous than they are; (9) GCCF relies upon a set recovery rate for the tourism industry and general Gulf economy when this set rate may not apply in a blanket fashion to all claimants. (i.e. puts all claimants in one formula without consideration for each specific business, industry, location); and (10) all indicators cited are

---

[14] See ARPC Report, attached as Exhibit "14."

on supply side of the ledger with no discussion of oil spill impact on the beach visitor or sport fishing visitor.[15]

C.     **The Court Should Oversee the Creation of a Legitimate, Transparent Interim Claims Protocol as Required by OPA.**

Given the crucial need for transparency, fixing the past claim errors, and the significant public interest, this Court should appoint a special master to oversee the creation of an interim claims protocol. Now is the time to fulfill the mandate of OPA, the promise of BP, and the legitimate expectations of the federal government, the Gulf States, and the residents, businesses, and workers of the Gulf for a fair, open, and effective claims system. The special master will bring BP, the GCCF, the PSC, the Gulf South States, and a cadre of experts to help develop the fastest, fairest, most open protocol for interim claims. Disputes or impasses can first be brought to the special master for resolution and, if necessary, appealed to this Court.

## CONCLUSION

Plaintiffs respectfully request that the Court order BP and the GCCF to perform the following in furtherance of their OPA mandated responsibilities:[16]

1.     Retrospectively void all final releases entered into between unrepresented putative class members and the GCCF – or, in the alternative, hold the issue open for further discovery, hearing and consideration;

---

[15] See also The University of W. Florida Dep't of Marketing & Econ. Comments on Methodology, attached as Exhibit "15."

[16] Plaintiffs reserve their right to address BP and the GCCF's potential violations of this Court's order that they cease engaging in misleading communications. The GCCF website appears to violate the spirit, if not the letter, of the Court's order, and BP's public posturing that the GCCF's claim calculations are "too generous" are intended to do nothing less than coerce putative class members into taking as many quick checks and sign as many releases as possible.

2.      Prospectively prohibit BP, the Feinberg Rozen Law Firm, and the GCCF from requiring a release or subrogation of claims beyond the amount that BP pays;

3.      Provide an interim payment calculation to each unrepresented putative class member who signed a release;

4.      Disclose all eligibility requirements in effect to date;

5.      Explain the bases for all previous denials.

6.      For all denials based on lack of documentation, inform the individual claimant which documentation was lacking;

7.      For all past payments, disclose to the claimant the calculation and all reasons thereof; and

8.      Appoint a special master to oversee the creation of an interim claims protocol with input from the PSC and BP.


Respectfully submitted,


    /s/   Stephen J. Herman                              /s/ James Parkerson Roy
Stephen J. Herman, La. Bar No. 23129          James Parkerson Roy, La. Bar No. 11511
HERMAN HERMAN KATZ & COTLAR LLP               DOMENGEAUX WRIGHT ROY & EDWARDS LLC
820 O'Keefe Avenue                            556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113                  Lafayette, Louisiana 70501
Telephone: (504) 581-4892                     Telephone: (337) 233-3033
Fax No. (504) 569-6024                        Fax No. (337) 233-2796
E-Mail: sherman@hhkc.com                      E-Mail: jimr@wrightroy.com
*Plaintiffs Liaison Counsel*                  *Plaintiffs Liaison Counsel*

**SOREN E. GISLESON**
**CLAY GARSIDE**
**ELIZABETH CABRASER**
**KEVIN DEAN**
**GARY E. MASON**
**RHON JONES**
**JULIA LeMENSE**

*On Brief.*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the above and foregoing Memorandum has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of February, 2011.

/s/  James Parkerson Roy and Stephen J. Herman

TWENTY-FIRST JUDICIAL DISTRICT COURT

TANGIPAHOA PARISH

STATE OF LOUISIANA

DOCKET: 2011- 0000508

DIVISION:

G

KNOTTY GIRL FISHING, L.L.C.

VERSUS

WORLEY CATASTROPHE SERVICES, LLC,

AND

BP EXPLORATION & PRODUCTION INC.

FILED: _____ FEB 1 4 2011 _____        _____ s/TAMMY COTTON _____

DEPUTY CLERK OF COURT

## PETITION FOR DECLARATORY JUDGMENT

The Petitioner Knotty Girl Fishing, L.L.C., upon the investigation made by and through its

attorneys, initiates this action pursuant to state law only, as follows:

1.

Made defendants herein are:

a.    Worley Catastrophe Services, LLC (hereinafter referred to as "Worley"), is a

non-Louisiana Limited Liability Company with its principal place of business

located in Tangipahoa Parish, State of Louisiana, and which may be served through

its registered agent for service of process: Mr. James R. Lewis, 450 Laurel Street,

Suite 1600, Baton Rouge, LA 70801; and

b.    BP Exploration & Production, Inc. (hereinafter referred to as "BP"), is a Delaware

corporation, which is licensed to and conducts extensive business in the state of

Louisiana, and which may be served through its registered agent for service of

process: CT Corporation System, 5615 Corporate Boulevard, Suite 4008, Baton

Rouge, LA 70808.

2.

The Petitioner is a maritime Louisiana Limited Liability Company with its principal place

of business located in Tangipahoa Parish, State of Louisiana.

3.

EXHIBIT 1

The Petitioner is a Louisiana entity which is licensed to conduct commercial maritime fishing in and upon the navigable waterways and commercial fishing waters of the state of Louisiana.

4.

In fact, the Petitioner operated a commercial maritime fishing vessel in and upon the navigable and commercial fishing waters of Louisiana.

5.

The Petitioner is a long established charter fishing venture and has a documented multi-year history of operating a commercial maritime vessel on or upon the navigable and commercial waterways of the State of Louisiana as a for-profit commercial fishing entity.

6.

The Petitioner brings this action under the provisions of the Louisiana Declaratory Judgment Act, Louisiana Code of Civil Procedure, articles 1871, *et seq.*, as this action involves a real controversy within this Court's jurisdiction, as further set forth herein.

7.

Furthermore, the Petitioner brings this action pursuant to Louisiana maritime law, Louisiana Unfair Trade Practices Act, and other state laws, only.

8.

On April 20, 2010, an oil and gas platform located in the Gulf of Mexico off the Louisiana coast exploded and capsized.

9.

As a result of this explosion, the platform, commonly referred to as the Deepwater Horizon, spewed millions of gallons of crude oil into the Gulf of Mexico, the exact discharge and harmful long term consequences being subject to vastly divergent opinions.

10.

State officials banned commercial fishing and navigation upon certain waterways of the State.

11.

As a direct and proximate result of the closure of these commercial and navigable waterways, the Petitioner suffered direct, substantial economic losses.

2

12.

The Petitioner's losses were the direct result of its inability to conduct maritime commerce upon the navigable maritime waterways of the State of Louisiana, creating a fear of economic deprivation and bankruptcy.

13.

In order to mitigate its interim losses, the Petitioner contacted the Gulf Coast Claims Facility ("GCCF") for the purpose of resolving its claim arising out of the BP catastrophic oil discharge . GCCF was originally created by BP to adjust the thousands of claims by natural and juridical persons impacted by the April 20, 2010, Deepwater Horizon explosion. GCCF was and is an unincorporated and unlicensed entity.

14.

After weeks of pressure from the White House, state governments, and the public, BP relinquished control of the GCCF, ostensibly reestablished and rebranded as an independent claims processing facility under the direct supervision and control of Kenneth R. Feinberg and his law firm, Feinberg Rozen, L.L.P., (Feinberg). Feinberg, in print, television, social media, and press releases, continuously and erroneously represented that Feinberg and the GCCF were separate, independent entities not in any manner controlled, supervised, and directed by BP.

15.

Petitioner was directed to pursue the claims process through the GCCF claims adjusting facility owned and operated by Worley in Hammond, Louisiana. The Petitioner, unable to conduct its maritime business upon the waters of the State of Louisiana, submitted a claim to what it understood to be independent, impartial entites, GCCF and Worley, each operating under the direct supervision of Feineberg as "claims czar" who in turn was operating under the supervision of the White House .

16.

The Petitioner, through a Member, informed Peinberg and GCCF of its dire economic situation and as directed corresponded with Worley regarding its situation on multiple occasions in December 2010.

17.

The GCCF's Administrator, Feinberg and its claims adjusting arm, Worley knew  the

3

Petitioner was unrepresented by counsel during the course of their multiple communications and negotiations.

18.

Feinberg, GCCF, and Worley knew the Petitioner, and others like it, was without income, was incurring onegoing expenses, and on the verge of loosing its vessel in foreclosure. Its long standing, ongoing business was on the brink of collapse but had to "negotiate" a fair resolution of its claims. Rather than "negotiate" ongoing interim payments, Feinberg, GCCF, and Worley devised a program that offered an arbitrary, final payment option regardless of the damages sustained.

19.

At all times, the Petitioner acted in good-faith and with the understanding Feinberg, GCCF, and Worley were also acting in good-faith such that Petitioner would receive all such compensation that was due commensurate with its damages, free of economic pressure, and evaluated independently according to reasonable, uniform policies.

20.

In fact,, Feinberg, GCCF, and Worley were not acting independently and at arms length from BP, but were functioning as an arm of the Defendant BP to economically coerce as many individuals and businesses like the Petitioner into a speedy, inadequate, final settlement, outside of the supervision of the Court even though such a settlement was prohibited by law.

21.

Kenneth R. Feinberg, GCCF, and Worley are agents of and an extension of BP and for all purposes herein are alleged to be the alter ego of the Defendant BP.

22.

On January 18, 2011, the Petitioner, financially hard-pressed, executed a Release and Covenant Not to Sue BP in exchange for the sum of $25,000.00. Member James Ray Peterson was required to forgo compensation of his personal lost wage claims as a condition of this final settlement.

23.

Petitioner's gross revenue for 2009 was approximately $120,000.00, or $10,000.00 per month. Petitioner has had no revenue following this catastrophe. Since this devastating oil spill,

4

Petitioner received interim payments totaling $41,400.00 and a final payment of $25,000.00 on January 26, 2011 or a total of $66,600.00. As of January 26, 2011 total losses approached a minimum of $100,000.00. Given the clear liability and responsibility for this spill under state law, the failure to fully tender an amount equal to the then extant losses of approximately $100,000.00 is convincing evidence of the coercive nature of this entire non-independent claims process. Either take what is offered or continue in a process that is inefficient and dilatory. The law does not support settlements supported by such economic leverage as asserted by BP through the Feinberg, GCCF, Worley process.

24.

The Release and Covenant Not to Sue, annexed hereto as Exhibit "A" included an impermissible waiver of claims in favor of BP which exist against BP, i.e., punitive damages, and other potential responsible parties.

25.

In an effort to advance this scheme of deceit and misinformation, BP, Feinberg, and GCCF recruited and retained the services of the Defendant Worley to provide "independent" claims adjusting and processing services. These services were provided by over 1100 claims adjusters employed by Worley at its principal place of business, Hammond, Louisiana

26.

Worley was directed by BP, and its alter egos, Feinberg and GCCF, to meet with the Petitioner and to provide a false and misleading evaluation of the Petitioner's potential claims against BP.

27.

Most notably, neither Worley nor Feinberg nor GCCF ever disclosed the lack of true independence and potential conflicts of interest between the Petitioner and the Defendants, Worley, GCCF and BP, and Feinberg..

28.

In fact, there were no negotiations, and Worley was simply another actor in BP's plan of manipulation and misinformation to attempt to obtain sweeping resolution of claims which it was not entitled to obtain by law.

5

29.

Worley feigned efforts were totally void of any methodology or scientific or mathematical basis for achieving an arms-length bargained for conclusion, in utter contrast to what Feinberg GCCF, and Worley were charged with accomplishing: the timely payment of all reasonable damages caused by the spill.

30.

Feinberg, GCCF, and Worley made no attempt to value the Petitioner's past or future losses; it simply played out its role in a scheme to misinform and mislead individuals and businesses into accepting an improper, inadequate resolution bearing virtually no relation to their true losses.

31.

Worley and GCCF, who were represented and/or directed by Feinberg, never disclosed to the Petitioner any of the legal impediments to accepting a final settlement in lieu of the legal requirements of BP to provide interim payments to impacted individuals and businesses.

32.

The law does not permit BP, through its actors Worley, Feinberg and GCCF, to obtain a final settlement of claims under the circumstances alleged herein.

33.

The defendants knew of the Petitioner's dire financial condition and used that knowledge to gain an unfair advantage over the Petitioner to secure its final release of claims in violation of the law.

34.

The Defendant's efforts constitute fraud and legal duress, and hence, any release is vitiated.

35.

The Release and Covenant to Sue is equally vitiated by error of cause to which the Petitioner would not have obligated itself but for the Defendants failure to disclose and provide knowledge the Defendants knew the Petitioner did not know nor could know absent full disclosure and truthful communication.

36.

Worley is a licensed adjusting firm in the State of Louisiana, and by law, is expected to perform to a degree of candor and ethics which they failed to satisfy as a member of the alleged

6

concerted action as plead herein.

37.

Worley worked in concert with BP and GCCF, and hence, all the Defendants are jointly and solitarily liable with each other for the harms sustained by the Petitioner all in accordance with Louisiana Civil Code article 2324.

38.

Additionally, Worley and GCCF knowingly provided false and misleading information to the Petitioner that was calculated and intended to misinform the Petitioner, all in violation of the Louisiana Unfair Trade Practices Act, La. R.S. ' 51:1401.

39.

But for the Defendant's fraudulent and misleading actions, the Petitioner would not have executed the Release and Covenant Not to Sue or accepted the $25,000.00 from the GCCF.

40.

The Defendant's failure to disclose their relationship and their joint effort to mislead the Petitioner into executing the Release and Covenant Not to Sue vitiates the Release as an improper Transaction or Compromise under Louisiana Civil Code article 3071 for lack of legal consent as provided in Louisiana Civil Code articles 1927, *et seq.*, and Louisiana Civil Code articles 1948, *et seq.*

41.

Paragraph 10 of the Release and Covenant Not To Sue signed by the Petitioner in this states as follows: "The provisions of this Release and all questions with respect to the construction and enforcement thereof and the rights and liabilities hereto shall be governed by, and construed and enforced in accordance with, the laws of the state of residence of the Claimant at the time of signing this Release without regard to conflicts of laws principles." Louisiana is the state of residence of the claimant /Petitioner in this matter, and thus Louisiana law governs the validity of the Release and Covenant Not To Sue.

42.

As a direct and proximate result of the Defendant's concerted actions and efforts, the Petitioner is entitled to a Declaratory Judgment, as follows:

a.    Its rights as a Louisiana commercial fishing venture to operate upon the maritime

7

waters of the State of Louisiana;

b.  A conflict of interest and an adversary relationship exists between the Petitioner
and the Defendants Worley, Feinberg, GCCF and BP;

c.  The Defendants knowingly failed to disclose the conflict of interest and adverse
relationship which existed;

d.  The Defendants knowingly failed to provide the requisite information to the
petitioner of the actual conflict which exists between the parties in this action;

e.  Any consent obtained from the Petitioner failed to satisfy the requisite threshold
standards required for the validity of conventional obligations, including but not
limited to complete disclosure and true informed consent;

f.  Any consent obtained from the Petitioner is null and void under state law; and

g.  Finally, a declaration that the Release and Covenant Not to Sue signed by the
Petitioner and any and all similar Releases are null and void as violating the law and
public policy of this State.

## PRAYER

WHEREFORE, the Petitioner prays the Defendants be served with a copy of the citation
and this Petition for Declaratory Judgment, and that after all legal delays have expired, that
Judgment be issued in favor of the Petitioner and against the Defendants Worley and BP, as
follows: (1) a declaration of its rights as a commercial fisherman under maritime law, (2) a
declaration finding the Defendant's actions and efforts to be in violation of the Louisiana Unfair
Trade Practices Act, (3) a declaration finding the Defendants acted in concert to mislead and
defraud the Petitioner, (4) a declaration finding the Defendants jointly and solidarily liable for the
action and/or inaction in improperly procuring the Petitioner's execution of the Release and
Covenant Not to Sue, (5) a declaration finding the Release and Covenant Not to Sue to be invalid
under state law as pled herein, and (6) a declaration of any other rights, title and interests to which

8

the Petitioner may be entitled to under state law.

Respectfully submitted,

John B. Edwards (La Bar No. 26274)
EDWARDS & ASSOCIATES LAW FIRM, LLC
208 East Oak Street
P.O. Box 974
Amite, LA 70422
Telephone: (985) 747-1088
Facsimile: (985) 747-1086
Email: john@edwardslaw.org

AND

Frank C. Dudenhefer, Jr. (La Bar No. 5117)
THE DUDENHEFER LAW FIRM, LLC
601 Poydras Street, Suite 2655
New Orleans, LA 70130
Telephone: (504) 525-2553
Facsimile: (504) 523-2508
Email: fcdlaw@aol.com

**PLEASE SERVE THE DEFENDANTS
AS PROVIDED HEREIN.**

9

| Name: | Knotty Girl Fishing | SSN or EIN: | 26-3377067 | Claimant #: | 01089206 |

| **FINAL PAYMENT AMOUNT** | **$25,000** |

To elect to be paid $25,000 in full settlement of all claims arising from the Deepwater Horizon "Incident" (as defined in Section C below), a Claimant must complete the Quick Payment Final Claim Form and sign the attached Release and Covenant Not to Sue.

1. **Basic Information.** If pre-filled information is incorrect, make corrections directly on this Form. Be sure to enter the Employer Identification Number.

2. **Authorized Signatory.** Business claimants must identify who will sign on behalf of the business.

3. **Spousal Information.** Spousal information is required for business claimants if the business is a sole proprietorship owned by a married individual, or if the business is jointly owned by a married couple.

4. **Payment Instructions.** Provide instructions on how you want to receive the $25,000. NOTE: legally authorized garnishments, liens or similar forms of attachments relating to your claim will be honored and deducted from any payment.

5. **Understanding your rights.** This Quick Payment Final Claim Form and Release contain important information about your legal rights, including giving up your right to sue BP and other parties. You must read the information before signing. **Do not sign the Release unless you understand and agree to its terms.**

6. **Attorney Representation.** If you are represented by an attorney in connection with your claim, do not submit this Form or sign the Release until you have conferred with your attorney about the decision to submit it and sign the Release.

7. **Required signatures.** By signing this Quick Payment Final Claim Form and Release on pages 2 and 4, you are electing to receive the $25,000 Quick Final Payment. If the business is a sole proprietorship owned by you and you are married or if the business is jointly owned by you and your spouse, your spouse must sign in each place as well.

8. **Originals required.** Return this original signed Quick Payment Final Claim Form and Release using the postage prepaid envelope or by overnight delivery. Facsimiles, PDFs, or copies of a signature will not be accepted.

9. **No modifications.** Do not mark through or try to change any of the language in the Release. Doing so will mean your Release cannot be accepted and we will not be able to process your settlement.

| Claimant ID#: | ICFD-1089206 | Employer Identification #: | 26-3377067 |
| Claimant Name: | Knotty Girl Fishing | | |
| Authorized Business Signatory: | First James Middle Ray Last Peterson Title Owner |
| Claimant Address: | Street 56011 North Cooper (P.O. Box 466) |
| | City Loranger State LA Zip Code 70446 |
| | Parish/County Tangipahoa Country USA |
| Telephone Number: | (985) 517-2191 |
| Spouse Name (if applicable): | First Tonya Middle V Last Peterson |
| Spouse Address (if different from Claimant Address): | Street 56011 North Cooper (PO Box 466) |
| | City Loranger State LA Zip Code 70446 |
| | Parish/County Tangipahoa Country USA |

Quick Payment Final Claim Form and Release and Covenant Not to Sue (Business) - Page 1 of 4

EXHIBIT A

| Name: KnoHy GirlFishing | SSN or EIN: 26-3377067 | Claimant #: 01089206 |
|---|---|---|

| **FINAL PAYMENT AMOUNT** | **$25,000** |
|---|---|

The attached Release and Covenant Not to Sue ("Release") is a binding legal document. By signing this document, you are forever waiving and releasing all claims that you may have against BP or any other party other than by shareholders of BP or other Released Parties for alleged violations of securities laws ("Securities Claim") in connection with the April 20, 2010 blowout of the Macondo Well, the sinking of Transocean's Deepwater Horizon drilling rig, and the subsequent oil Spill in the Gulf of Mexico (the "Incident").

You are under no obligation to accept the final payment offered to you by the Gulf Coast Claims Facility. You are free to reject the final payment offered by the Gulf Coast Claims Facility and to pursue other means of compensation. If you want to file a lawsuit regarding the Incident or make a claim against the Oil Spill Liability Trust Fund, do not sign this Release.

By signing the attached Release, you are forever giving up and discharging any rights which you may have for any costs, damages or other relief related to or arising from the Incident (excepting claims for Bodily Injury or Securities Claim), even if you are not currently aware of such costs or damages and even if such costs or damages arise in the future (i.e., additional oil impacts) or do not manifest themselves until the future.

By signing the attached Release, you acknowledge that you have read and understand the terms of the Release, and that you execute the release voluntarily and without being pressured or influenced by, and without relying upon, any statement or representation made by any person acting on behalf of BP or any other released party. **If you are represented by an attorney in connection with your Claim, confer with your attorney before submitting this Claim and signing this Release.**

The Quick Pay option is intended to provide an expedited settlement mechanism for those claimants who believe that the amount offered by the Quick Pay fully and fairly resolves their claim. Do not select the Quick Pay option if you believe you have a claim in an amount greater than the Quick Pay amount. If you elect the Quick Pay amount, you will not be permitted to later seek additional amounts.

If the business is a sole proprietorship and you are the owner and you are married, or if the business is jointly owned by you and your spouse, both you and your spouse must sign the Release. You and your spouse should not sign the Release unless you both intend to release all claims.

\* \* \*

Claimant acknowledges that claimant has read and understands the information in this Section C. Claimant elects to receive a $25,000 Quick Payment as a final settlement of all claims against any party in connection with the Incident (other than claims for Bodily Injury or Securities Claim).

Claimant consents to the use and disclosure by the GCCF and those assisting the GCCF of any information that it believes necessary and/or helpful to process claimant's claim for compensation and payment including any legitimate business purposes associated with administering the GCCF and providing adequate documentation for insurance coverage of responsible parties, and/or as otherwise required by law, regulation or judicial process.

_____  Date 1/18/2011
Signature of Business Claimant's Authorized Signatory

I acknowledge that I have read and understand the information in this Section C. I consent to the claimant's election to receive a $25,000 Quick Payment as a final settlement of all claims of claimant against any party in connection with the Incident (other than claims for Bodily Injury or Securities Claim).

_____  Date 1/18/2011
Spousal Signature (if applicable)

Quick Payment Final Claim Form and Release and Covenant Not to Sue (Business) - Page 2 of 4

| Name: Knotty Girl Fishing | SSN or EIN: 26-3377067 | Claimant #: 0108920b |
|---|---|---|

| **FINAL PAYMENT AMOUNT** | **$25,000** |
|---|---|

1. In consideration of payment in the amount of $25,000, Claimant hereby releases and forever discharges, and covenants not to sue BP Exploration & Production Inc. ("BP") and the other Released Parties, including but not limited to the parties listed in Attachment A to this Release, for any losses, damages, costs, expenses, injuries, claims, causes of actions, liabilities, or other relief that Claimant has or may have, whether known or unknown, whether present or future, whether direct or indirect, whether legal or equitable, arising from or relating in any way to the April 20, 2010 blowout of the Macondo Well, the sinking of Transocean's Deepwater Horizon drilling rig, and the subsequent oil spill in the Gulf of Mexico (the "Incident") (collectively, "Claims"), provided however that this Release does not apply to claims (i) for bodily injury (including claims alleging a mental health injury) ("Bodily Injury") or (ii) by shareholders of BP or other Released Parties for alleged violations of securities laws ("Securities Claim").

2. Claimant also, on behalf of Claimant's spouse, heirs, beneficiaries, agents, estates, executors, administrators, personal representatives, subsidiaries, parents, affiliates, partners, limited partners, members, joint venturers, shareholders, predecessors, successors, assigns, insurers, and attorneys (collectively, "Affiliates"), hereby releases and forever discharges, and covenants not to sue BP and the other Released Parties for any Claims released by Claimant pursuant to Paragraph 1 above.  With regard to an insurer of the Claimant, notwithstanding anything to the contrary in the foregoing, the execution of this Release by Claimant shall not release the claims of an insurer of Claimant if and only if the Claimant has disclosed in writing on Claimant's Full Review Final Claim Form for Final Payment or Emergency Advance Payment Claim Form submitted to the Gulf Coast Claims Facility the fact of a payment, and the amount of the payment, by the insurer to Claimant.

3. This Release applies to all Claims regardless of the legal or equitable theory (including legal and equitable theories under federal, state, local, and international law, and including without limitation statutory law, regulation, common law, maritime law, strict liability, negligence, gross negligence, punitive damages, nuisance, trespass, and all other legal and equitable theories), whether existing now or arising in the future, arising out of or in any way relating to the Incident, provided however that this Release does not apply to claims for Bodily Injury or Securities Claim.

4. Released Parties means anyone who is or could be responsible or liable in any way for the Incident or any damages related thereto, whether a person, company or governmental entity, including (but not limited to) BP, other potentially responsible or liable parties, including but not limited to the parties listed in Attachment A to this Release, the federal Oil Spill Liability Trust Fund and any state or local fund, and each of their respective Affiliates as defined above.

5. Claimant represents and warrants that Claimant (i) has authority to execute this Release; and (ii) has not sold or otherwise transferred or assigned any of the Claims, or any interests in such Claims.

6. Claimant represents and warrants that Claimant has not received any payment from any insurer or other party (other than BP or the GCCF) in connection with the Incident, other than payments disclosed on the Full Review Final Claim Form for Final Payment. However, the representation and warranty contained in this section (6) is not applicable to a Claimant electing to submit a Quick Payment Final Claim Form and receive a Quick Payment.

7. Claimant will dismiss with prejudice within 10 days of executing this Release any litigation concerning the Incident (other than litigation alleging only Bodily Injury or Securities Claim) filed by or on behalf of Claimant against BP or any other Released Parties.  Claimant also will withdraw (the obligation to withdraw is satisfied by affirmatively declining to participate if and when the Claimant receives any communication giving Claimant the option of participating or not participating in a class action or similar procedural device) from any existing and will not join any new class actions or similar procedural devices concerning or relating to the Incident (other than class actions or similar procedural devices alleging only Bodily Injury or Securities Claim).

8. This Release is not intended to prevent any of the Released Parties from exercising their respective rights of contribution, subrogation, or indemnity under the Oil Pollution Act of 1990 ("OPA") or any other law.  As this Release is fully and completely resolving, together with all other Claims, Claimant's claim under OPA, BP is hereby subrogated to any and all rights that Claimant has arising from the Incident.

9. The payment to Claimant is made without any admission of liability or wrongdoing, or any acknowledgment that the law recognizes any allegation referenced herein, by BP or any other Released Party.

10. The provisions of this Release and all questions with respect to the construction and enforcement thereof and the rights and liabilities hereto shall be governed by, and construed and enforced in accordance with, the laws of the state of residence of the Claimant at the time of signing this Release without regard to conflicts of laws principles.

11. This Release supersedes any and all other agreements, written or oral, between BP and Claimant with respect to such subject matter of this Release.

12. If there is no signature on the line below for Claimant's Spouse, Claimant represents and warrants that Claimant is not married.

Quick Payment Final Claim Form and Release and Covenant Not to Sue (Business) - Page 3 of 4

| Name: Knotty Girl Fishing | SSN or EIN: 26-337 7067 | Claimant #: 01089206 |
|---|---|---|

| FINAL PAYMENT AMOUNT | $25,000 |
|---|---|

As the authorized signatory of the claimant set forth in Section B of the attached Quick Payment Final Claim, I am signing this Release and Covenant Not to Sue:

| Signature: | |
|---|---|
| Printed Name: | James Ray Peterson |
| Title: | Owner |
| Date: | (Month/Day/Year): 1/18/2011 |

As the spouse of the individual signing above, I am signing this Release and Covenant Not to Sue:

| Signature: | Tonya Y Peterson |
|---|---|
| Printed Name: | Tonya Y. Peterson |
| Date: | (Month/Day/Year): 1/18/2011 |

Indicate either a wire transfer or check payment by checking the appropriate box below and completing the corresponding details. Payments will be reduced as necessary to satisfy legally authorized garnishments, liens or similar forms of attachments that have been presented to the GCCF. The GCCF will report annually to federal and state taxing authorities, using a form 1099 or state form equivalent, for certain payments made. The GCCF will send you a copy of that form, but cannot give you tax advice regarding any payment issued to you. You should consult with your own tax advisor to determine the impact of any payment you receive from the GCCF on your individual tax situation.

| ☐ | Wire the payment to the following account: |
|---|---|
| | Bank Name |
| | Bank Mailing Address |
| | Bank Telephone Number |
| | Bank Account Name |
| | *If the Account Name for your bank account differs from your name or the name of your business, please also explain the reason for the difference* |
| | Bank ABA/Routing Number: |  Bank Account Number: |

| ✗ | Mail a check to the following address: |
|---|---|
| | Street 56011 North Cooper or P.O. Box 466) Preferred Mail |
| | City Loranger |  State LA |  Zip Code 70446 |
| | Parish/County Tangipahoa |  Country USA |

Quick Payment Final Claim Form and Release and Covenant Not to Sue (Business) - Page 4 of 4

| Name: | KnoHy Girl fishing | SSN or EIN: | 26-3377067 | Claimant #: | 0108 9206 |
|---|---|---|---|---|---|

| **FINAL PAYMENT AMOUNT** | **$25,000** |
|---|---|

The attached Release and Covenant Not to Sue ("Release") is a binding legal document. By signing this document, you are forever waiving and releasing all claims that you may have against BP or any other party other than by shareholders of BP or other Released Parties for alleged violations of securities laws ("Securities Claim") in connection with the April 20, 2010 blowout of the Macondo Well, the sinking of Transocean's Deepwater Horizon drilling rig, and the subsequent oil Spill in the Gulf of Mexico (the "Incident").

You are under no obligation to accept the final payment offered to you by the Gulf Coast Claims Facility. You are free to reject the final payment offered by the Gulf Coast Claims Facility and to pursue other means of compensation. If you want to file a lawsuit regarding the Incident or make a claim against the Oil Spill Liability Trust Fund, do not sign this Release.

By signing the attached Release, you are forever giving up and discharging any rights which you may have for any costs, damages or other relief related to or arising from the Incident (excepting claims for Bodily Injury or Securities Claim), even if you are not currently aware of such costs or damages and even if such costs or damages arise in the future (i.e., additional oil impacts) or do not manifest themselves until the future.

By signing the attached Release, you acknowledge that you have read and understand the terms of the Release, and that you execute the release voluntarily and without being pressured or influenced by, and without relying upon, any statement or representation made by any person acting on behalf of BP or any other released party. **If you are represented by an attorney in connection with your Claim, confer with your attorney before submitting this Claim and signing this Release.**

The Quick Pay option is intended to provide an expedited settlement mechanism for those claimants who believe that the amount offered by the Quick Pay fully and fairly resolves their claim. Do not select the Quick Pay option if you believe you have a claim in an amount greater than the Quick Pay amount. If you elect the Quick Pay amount, you will not be permitted to later seek additional amounts.

If the business is a sole proprietorship and you are the owner and you are married, or if the business is jointly owned by you and your spouse, both you and your spouse must sign the Release. You and your spouse should not sign the Release unless you both intend to release all claims.

\* \* \*

Claimant acknowledges that claimant has read and understands the information in this Section C. Claimant elects to receive a $25,000 Quick Payment as a final settlement of all claims against any party in connection with the Incident (other than claims for Bodily Injury or Securities Claim).

Claimant consents to the use and disclosure by the GCCF and those assisting the GCCF of any information that it believes necessary and/or helpful to process claimant's claim for compensation and payment including any legitimate business purposes associated with administering the GCCF and providing adequate documentation for insurance coverage of responsible parties, and/or as otherwise required by law, regulation or judicial process.

_____     1/18/2011
Signature of Business Claimant's Authorized Signatory     Date

I acknowledge that I have read and understand the information in this Section C. I consent to the claimant's election to receive a $25,000 Quick Payment as a final settlement of all claims of claimant against any party in connection with the Incident (other than claims for Bodily Injury or Securities Claim).

_____     1/18/2011
Spousal Signature (if applicable)     Date

Quick Payment Final Claim Form and Release and Covenant Not to Sue (Business) - Page 2 of 4



**U. S. Department of Justice**

Office of the Associate Attorney General

---

The Associate Attorney General                    *Washington, D.C. 20530*

February 4, 2011

Mr. Kenneth Feinberg
Gulf Coast Claims Facility
The Willard Office Building
1455 Pennsylvania Avenue, Suite 390
Washington, DC 20004-1008

Dear Mr. Feinberg:

As I have previously discussed with you, it is essential that the individuals and businesses most affected by the Deepwater Horizon Oil Spill are fairly treated by the Gulf Coast Claims Facility ("GCCF"). Over the past nine months, that overarching goal and the need for the GCCF to comply with the Oil Pollution Act have led us to ask that you make several changes, from the continuation of interim payments to the payment of all emergency advance payments by December 15. Thank you for fulfilling those requests.

The GCCF is, however, entering another critical period for the people of the Gulf. April 20, 2010 ushered in a lost season for many in the Gulf, as communities, businesses, and workers that depend on a summer of strong revenue saw their bookings drop, their ships stay in port, and their hours cut. To ensure that 2011 is not a lost season as well, and to turn the page on the spill, the next few weeks and months will be critical. Businesses in the Gulf that have suffered harm as a result of the Deepwater Horizon explosion and oil spill need to be investing in their businesses and marketing themselves now to avoid losing another year of revenue and to continue the revitalization of the Gulf that is a national priority. This is a matter of urgency.

The impact of the spill on the lives of the people of the Gulf cannot be overstated. For them, the GCCF – an entity whose mission is to fulfill the obligations of responsible parties under the Oil Pollution Act and to make the people of the Gulf whole, consistent with that statute – has a critical role to play in the future of their communities. Resolving claims efficiently, fairly, and swiftly is more important than ever. There are several areas that I would highlight for your particular attention.

First, over the past several months, we have reiterated that the Oil Pollution Act requires BP and other responsible parties to pay for damages that arise "as a result of" the oil spill. Notwithstanding the terminology concerning causation used in the various GCCF protocols, you must apply OPA's standard.



In resolving claims, it is important to note that OPA does not create categories of eligible and ineligible claimants. Rather, in determining whether a particular damage resulted from the spill, the GCCF must examine the facts and circumstances of each claim and ascertain whether the harm asserted by the claimant occurred "as a result of" the oil spill and is a type of harm, such as lost profits, covered by OPA. In so doing, it is relevant to consider the nature of the economy from which the claim arises. In many parts of the Gulf, tourism is the economic engine on which many industries and professions depend.

As we enter this most critical period, I urge you to take a second look at the categories of eligible and ineligible claims that the GCCF applied with respect to emergency advance payments. As noted above, OPA does not create such categories. Rules of decision regarding a particular industry that may make sense further inland may be wholly inapplicable for that industry in a purely coastal community that depends on visitors whose plans changed as a result of the spill. Communities that can demonstrate pervasive effects of the spill on their overall economy should have that evidence credited. The National Pollution Funds Center will issue its rulings based on the particular facts and circumstances of these claims, and the GCCF should, too.

Second, as I previously urged and as the Oil Pollution Act requires, the GCCF has agreed to continue offering interim payments at the same time that it offers final, prospective payments that require prospective releases. This option could not be more important: With significant uncertainty about how long the effects of the spill will last, businesses and individuals ought not be forced to take the risk that the GCCF's estimate of the ongoing impact of the spill – however rigorously developed, and however well-intentioned – will ultimately prove incorrect. We appreciate your continuing to offer the interim payment option.

For the GCCF to fulfill its mission, the interim payment process must be efficient, fair, and straight forward. It cannot be a disfavored fallback from the final claims process. When a small business files for its interim claim every three months, and then waits 90 days for the claim to be resolved, its cash flow is already running six months behind – at the very moment when it needs to be getting back on its feet and investing in its future. Therefore, I ask that you ensure that the interim claims process functions efficiently and swiftly for claimants, including businesses that submit appropriate documentation of loss and that are attempting to keep their businesses alive in the face of significant uncertainty.

Similarly, when the three-month limit on filing interim claims puts a claimant in serious hardship, you committed to me that there would be a reasonable and efficient mechanism to prioritize resolution of that claim. I would like additional information from you about how the GCCF intends to fulfill this commitment.

Third, I urge you once again to make the GCCF's processes more transparent. The period you have provided for public comment on the final payment methodology is important, and I know that you will take the feedback received on that proposed methodology very seriously. It is similarly important that claimants have an understanding of why their claims are handled as they are, and I ask that the GCCF find ways to provide additional information about its decisions.

Finally, I note the negative public response to comments made by you concerning your view about the total amount of claims likely to be paid by the GCCF. I know those comments have been taken out of context, and that you have taken steps to clarify them. I will simply confirm what you have already said: The role of the GCCF is to satisfy the obligations of the responsible parties to compensate those harmed as a result of the Deepwater Horizon oil spill under the Oil Pollution Act – in whatever amount ultimately is required. It is not to preserve the $20 billion fund that BP has established or to return money to BP. As Judge Barbier's decision yesterday noted, "BP does not control [the GCCF's] evaluation of individual claims," and this is an element of your independence that must never be compromised.

Your immediate attention to these issues will go a long way toward fulfilling BP's commitment, and the GCCF's responsibility, to provide a fair and efficient process that serves the needs of the people of the Gulf.

Sincerely,

Thomas J. Perrelli

Thomas J. Perrelli



# GCCF  Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Overall Program Statistics
*(Status Report as of February 16, 2011)*



**Claimants by State**

LA ■ FL ■ AL ■ MS ■ TX ■ Others

| All Claimants | No. of Claimants |
|---|---|
| **Total Unique Claimants** | **490,532** |
| 1. Individual | 402,449 |
| 2. Business | 88,083 |
| *Represented Claimants: 14,714* | |

| Paid Claimants | Paid Claimants | Total Amount Paid |
|---|---|---|
| **Total Paid Claimants** | **168,842** | **$ 3,400,005,941.09** |
| Separate Fund for Real Estate Brokers and Agents | | $ 60,000,000.00 |
| | Total Paid: | **$ 3,460,005,941.09** |

| All Submitted and Paid Claimants<br>*(Claimants may have more than one Claim Category)* | Claimants with Filed Claims | Paid Claimants | Paid Claims | Amount Paid |
|---|---|---|---|---|
| 1. Emergency Advance Payment | 448,972 | 168,839 | 168,983 | $ 2,570,554,541.09 |
| 2. Final: Quick Pay | 92,557 | 89,179 | 89,206 | $ 819,255,000.00 |
| 3. Final: Full Review<br>*(net of Claimants with Quick Payment Issued)* | 99,157 | 2 | 2 | $ 10,007,500.00 |
| 4. Interim Payment<br>*(net of Claimants with Quick Payment Issued)* | 52,469 | 1 | 1 | $ 188,900.00 |
| **Total** | **693,155** | **258,021** | **258,192** | **$ 3,400,005,941.09** |

| Submitted and Paid Claimants - Individual<br>*(Claimants may have more than one Claim Category)* | Claimants with Filed Claims | Paid Claimants | Paid Claims | Amount Paid |
|---|---|---|---|---|
| 1. Emergency Advance Payment | 368,975 | 124,075 | 124,124 | $ 1,061,486,810.45 |
| 2. Final: Quick Pay | 73,219 | 70,503 | 70,510 | $ 352,515,000.00 |
| 3. Final: Full Review<br>*(net of Claimants with Quick Payment Issued)* | 83,967 | 1 | 1 | $ 7,500.00 |
| 4. Interim Payment<br>*(net of Claimants with Quick Payment Issued)* | 39,883 | 0 | 0 | $ - |
| **Sub-Total** | **566,044** | **194,580** | **194,635** | **$ 1,414,009,310.45** |

| Submitted and Paid Claimants - Business<br>*(Claimants may have more than one Claim Category)* | Claimants with Filed Claims | Paid Claimants | Paid Claims | Amount Paid |
|---|---|---|---|---|
| 1. Emergency Advance Payment | 79,997 | 44,763 | 44,859 | $ 1,509,067,730.64 |
| 2. Final: Quick Pay | 19,338 | 18,676 | 18,696 | $ 466,740,000.00 |
| 3. Final: Full Review<br>*(net of Claimants with Quick Payment Issued)* | 15,190 | 1 | 1 | $ 10,000,000.00 |
| 4. Interim Payment<br>*(net of Claimants with Quick Payment Issued)* | 12,586 | 1 | 1 | $ 188,900.00 |
| **Sub-Total** | **127,111** | **63,441** | **63,557** | **$ 1,985,996,630.64** |

| Separate Fund for Real Estate Brokers and Agents | | | | $ 60,000,000.00 |
|---|---|---|---|---|
| **Grand Total Paid to Date** | **693,155** | **258,021** | **258,192** | **$ 3,460,005,941.09** |

| Paid Claims by Category<br>*(Includes Individual and Business)* | No. of Claimants | No. of Claims | Amount Paid |
|---|---|---|---|
| 1. Removal and Clean Up Costs | 55 | 74 | $ 902,494.12 |
| 2. Real or Personal Property | 166 | 230 | $ 1,938,306.41 |
| 3. Lost Earnings or Profits | 168,657 | 257,803 | $ 3,396,918,148.49 |
| 4. Loss of Subsistence Use of Natural Resources | 13 | 15 | $ 79,285.71 |
| 5. Physical Injury / Death | 58 | 70 | $ 167,706.36 |
| **Total** | **168,949** | **258,192** | **$ 3,400,005,941.09** |

**EXHIBIT 3**



**GULF COAST CLAIMS FACILITY ANNOUNCEMENT**
**OF**
**PAYMENT OPTIONS, ELIGIBILITY AND SUBSTANTIATION CRITERIA, AND**
**FINAL PAYMENT METHODOLOGY**
February 2, 2011

**I.    INTRODUCTION**

The Gulf Coast Claims Facility ("GCCF") seeks public comment pertaining to the next phase of the claims process.  In particular, the GCCF invites all claimants and other interested parties to respond to the following draft proposal governing eligibility and substantiation criteria and payment methodologies for Final and Interim Claims.  (NOTE: the "Quick Payment" option is always available to any claimant who received an Emergency Advance Payment or an Interim Payment.)

The public comment period will be open from Wednesday, February 2 through Wednesday, February 16, 2011.   Thereafter, the GCCF will adopt final rules for adjudication and payment of all Final and Interim Claims.

During the past several months, the GCCF has sought the advice and guidance of experts who have studied the present and future condition of the Gulf.  In addition, the GCCF has benefitted from the valuable input of individuals and businesses whose economic livelihood depends upon Gulf resources, including those involved in all aspects of tourism, commercial and charter fishing and other industries including shrimping, crabbing, oyster harvesting, etc.  The GCCF has sought a comprehensive understanding of the impact caused by the Deepwater Horizon Incident (the "Oil Spill") and its aftermath.  Experts retained by GCCF have pored through various reports and studies pertaining to the future of the Gulf, and have compiled an extensive list of references.  Copies of the expert opinions and the reference materials used, are attached to this Announcement.  In adopting its final rules governing payment of all Final and Interim Claims, the GCCF is gathering facts from various sources in order to develop a credible and fair payment program.

1

EXHIBIT 4

The purpose of the two-week public comment period is to promote transparency and open discussion.  Written comments received by the GCCF during the two-week public comment period will be made publicly available on the GCCF website.    What follows is a <u>draft</u> proposal; it may be modified following input received during the comment period.

## II.    ELIGIBILITY AND SUBSTANTIATION CRITERIA

The GCCF proposes to adopt the following principles governing the eligibility and substantiation criteria applicable to Final and Interim Claims for individuals and businesses to receive a Final or an Interim Payment from the GCCF:

1. All individuals and businesses that incurred losses due to the Oil Spill are encouraged to file a Final or Interim Claim with the GCCF.  Documentation of damage <u>attributable to the Oil Spill</u> is essential.

2. Final and Interim Payments are available for those claimants who can prove their damages due to the Oil Spill, or who can establish a physical injury or death caused by the Deepwater Horizon Incident and its aftermath.

3. As expressly indicated from the very beginning of the Emergency Advance Payment Program, the documentation requirements for receiving either a Final Payment or an Interim Payment are more rigorous and exacting than the minimal documentation requirements that governed administration of the Emergency Advance Payment Program. Each claimant is required to establish both actual financial loss and the connection between the loss and the Oil Spill. More detailed guidance on required documentation will be posted on the GCCF website to assist claimants in providing all necessary supporting documentation and to reduce or eliminate delay due to deficient submissions.

4. The GCCF will not presume that a given loss was or was not caused by the Oil Spill, regardless of whether or not the claimant received an Emergency Advance Payment. Each claim stands on its own merits, and the GCCF will evaluate each submission to determine whether a loss was caused by the Oil Spill. In all cases, there must be an identifiable link between an actual loss

2

and the Oil Spill. Evidence establishing this connection is required. For example, a claimant might provide documentation of cancelled orders for goods or services, disruptions to the supply of Gulf seafood, a termination of employment or reduction in wages that an employer confirms was caused by the Oil Spill, etc. Likewise, the GCCF will not presume that a claimant's 2010 income or profits would have been greater or less than the claimant's 2009 income or profits. Providing financial information about losses sustained in 2010 is but one form of proof, and will not be sufficient documentation for many individuals and businesses other than those claiming injury to specific property or a specific natural resource, e.g., a beach, a swimming area, fishing grounds, etc. Documentation linking the sustained losses to the Oil Spill will be required.

Individuals claiming physical injury or death due to the Oil Spill will be eligible to receive compensation from the GCCF. Such claims must be documented, proving that the physical injury or death is attributable to the Oil Spill and not some other cause. In cases where claimants assert a disability caused by the Oil Spill, evidence of partial or permanent disability, such as a Social Security or State Workers' Compensation determination of disability, will be required in order to determine the extent of any long term impact on the ability of the claimant to work in his/her chosen profession.

### III.     CALCULATION OF AWARDS FOR FINAL AND INTERIM PAYMENTS

The GCCF has retained scientific and economic experts to comprehensively research and review studies pertaining to the impact of the Oil Spill on Gulf resources. These experts also reviewed numerous studies analyzing the economic recovery rates from other major catastrophic events affecting tourism. In addition, the GCCF consulted with numerous individuals and businesses located in the Gulf region in order to understand the possible impact to individuals and Gulf businesses due to the Oil Spill. The GCCF's goal is to determine the impact of the Oil Spill on seafood harvests, the recovery rate for the tourism industry and the general Gulf economy. An effort has

been made by the GCCF to determine the length of time to full economic recovery and the related pattern of gradual recovery over time.

The GCCF will base its calculation of awards for Interim Payments on actual documented losses incurred by a claimant during the period immediately following the Oil Spill on April 20, 2010 and the date the Interim Claim is filed.  For Final Payments, the GCCF will base its calculation on two important factors: (1) actual documented losses incurred by the claimant from the date the losses began since the Oil Spill on April 20, 2010, and (2) a future losses factor to value the risk of possible future losses as determined by the retained experts.

Having examined available expert opinions, studies, reports and comments the GCCF believes that based on the existing available data:

- There is evidence of a strong recovery underway.  However, the GCCF has concluded that it is reasonable to base its future payment calculations on the principle that a full economic recovery in the Gulf region is likely (but not certain) within two to three years from the date of the Oil Spill.

- Prediction is not an exact science.  In light of the uncertainty that remains, the GCCF believes that it is appropriate to provide claimants desiring to finally resolve their claim at this time with a payment that accounts for the inherent uncertainty concerning the future.

- The GCCF's conclusions are based on currently available data. The GCCF will undertake a renewed evaluation of available data every four months.  If such re-evaluation suggests a change in the relative uncertainty concerning the future that warrants an adjustment to the payment for future risk, the GCCF will make the appropriate adjustment and will apply the adjustment to all claims submitted from that date forward.  However, final claims previously submitted with complete documentation but not yet evaluated will be paid the higher of the future losses factor applicable at the time the claim submitted was completely documented, or the adjusted future losses factor.

- Any claimant who disagrees with the GCCF's approach regarding future payment calculations or is not ready to accept it, is free to opt for Interim Payments based

4

upon documented past damage, while awaiting further evidence of Gulf region economic recovery.

1.  Actual Documented Losses – Once claimants have demonstrated a direct connection linking the sustained losses for past and present damages to the Oil Spill, eligible claimants will be compensated for documented losses directly caused by the Oil Spill incurred during the period immediately following the Oil Spill on April 20, 2010 and the date of the filing of an Interim or Final Claim with the GCCF ("the loss period").  (For many claimants, much of this documented loss has already been compensated by BP and the GCCF Emergency Advance Payment Program.  Such compensation will be deducted from the claimant's total payment offer.)  The calculation of these actual documented losses will be based on a comparison to income from prior years for the same months (for example the average of income earned in  2008 - 2009 or another appropriate historical comparison deemed most relevant to the claimant's experience).  In these cases, the claimant's actual loss will be determined by taking the difference between the claimant's income during the loss period and the comparison period to arrive at the claimant's actual loss.   In other cases, for example for a "start-up" company which anticipated generating income in 2010, a different methodology will be employed.

2.  Calculation of Future Losses – The calculation of future losses will be based upon the actual losses incurred during the period immediately following the Oil Spill on April 20, 2010 through December 31, 2010.  The GCCF will use these actual documented 2010 losses to anticipate the gradual economic recovery expected to conclude within two to three years from the date of the Oil Spill.  It is anticipated that, for all businesses other than oyster harvesting, recovery will continue in 2011 with full recovery expected in 2012.   This gradual recovery anticipates that losses in 2011 will be approximately 70% of the actual documented losses in 2010.  With continuation of the recovery,

5

the GCCF expects claimants will experience losses in 2012, but at an average of approximately 30% of the actual documented losses in 2010.  <u>Adding together the effect over 2011 and 2012, the Final Payment Offer will be equal to two times the actual documented losses in 2010.</u>

The experts anticipate that individuals and businesses engaged in harvesting oysters destroyed as a result of the Oil Spill, or due to the diversion of fresh water into the Gulf in reaction to the Oil Spill, will likely require a longer recovery period than that experienced by other claimants, without the same degree of gradual recovery.  Accordingly, <u>the Final Payment Offer for those claimants will be equal to an amount four times the actual documented losses in 2010</u>.

For claimants with actual documented losses in 2010 of $500,000 or more, the GCCF will not automatically apply the future losses factor to claimant's actual 2010 total losses.  The Final Payment calculation for these claimants will be determined on an individualized basis after analyzing input from the claimant as well as the experts retained by the GCCF.  The Final Payment Offer will be the actual documented losses in 2010 and an additional amount to compensate for the recovery and risk of possible future losses.

3.  In sum, eligible claimants will be paid <u>two times</u> actual documented 2010 losses due to the Oil Spill to compensate for all past and anticipated future losses (except, as described above for claimants with 2010 losses of $500,000 or more).   Eligible oyster harvesters will be paid <u>four times</u> actual documented 2010 losses due to the Spill to compensate for all past and anticipated future losses. (The Final Payment Offer will be reduced by compensation already received in Emergency Advance Payments from BP, the GCCF and other offsets.)  <u>If any claimant believes that the future of the Gulf continues to be uncertain and is not yet prepared to file a Final Claim, that Claimant may continue to file Interim Claims with the GCCF</u>.

4.  Final Payments or Interim Payments – The GCCF will pay eligible individuals or businesses either a Final Payment or an Interim Payment, as the claimant may request.  The future losses factor, as determined by the GCCF, may be modified going forward as more information becomes available about the future of the Gulf Coast economy.  It is, therefore, entirely possible that the future losses factor for determining the future impact of the Oil Spill in the Gulf will be increased or reduced as more information becomes available.  Claimants should take this possibility into account in deciding whether to file an Interim Claim or a Final Claim.

For Claimants who have filed a Final Payment Claim with incomplete 2010 documentation, the GCCF will determine and calculate the claim based upon submitted documented actual 2010 losses.  Claimant will have the option to accept the Final Payment Offer based upon submitted 2010 documentation of actual loss that was available to the GCCF for determination and calculation, or accept the payment of an Interim Payment Claim as an installment on the Final Payment Offer and request the re-evaluation of the Final Payment Claim after they have submitted additional documentation of 2010 losses.

---

EACH CLAIMANT'S FINAL PAYMENT OFFER AMOUNT WILL BE THE LARGER OF:

(1)  Two times each eligible Claimant's 2010 Actual Documented Losses (except for claimants with 2010 losses in excess of $500,000); four times each eligible oyster harvester's 2010 Actual Documented Losses, or

(2)  The total actual documented losses through the date of the filing of the Final Claim.

---

7

Gulf Coast Claims Facility                                              Page 1 of 12
Case 2:10-md-02179-CJB-DPC   Document 23309-2   Filed 09/21/17   Page 52 of 184
Case 2:10-md-02179-CJB-JCW   Document 13309-1   Filed 02/28/17   Page 52 of 188

- En Español
- ភាសាខ្មែរ
- Bằng Tiếng Việt

# Gulf Coast Claims Facility Protocol
# for Interim and Final Claims
# February 8, 2011

## I. PURPOSE

This Protocol sets forth the procedure for the submission and resolution by the Gulf Coast Claims Facility ("GCCF") of Interim and Final Claims by Individuals and Businesses for costs and damages incurred as a result of the oil discharges from the April 20, 2010 Deepwater Horizon incident ("the Spill"). Claims for Emergency Advance Payments are governed by a separate protocol.

<u>A. Role</u>

The United States Coast Guard ("USCG") has designated BP Exploration & Production, Inc. ("BP") as a Responsible Party under the Oil Pollution Act of 1990 ("OPA") for oil discharges from the Deepwater Horizon facility. Under OPA, Responsible Parties must establish a claims process to receive certain claims by eligible claimants. BP accepted the USCG designation as a Responsible Party and established and advertised a single claims facility for all claimants.

The GCCF is intended to replace BP's claims facility for Individuals and Businesses. The GCCF and its Claims Administrator, Kenneth R. Feinberg, act for and on behalf of BP in fulfilling BP's statutory obligations as a "responsible party" under OPA. The GCCF (and the protocols under which it operates) are structured to be compliant with OPA.

Whether or not a claim has been presented shall be governed by OPA and applicable law. All documentation submitted by Individuals or Businesses in support of claims filed with the BP Claims Process have been transferred to the GCCF. BP has also authorized the GCCF to process certain non-OPA claims involving physical injury or death. Acceptance of payments offered pursuant to this Protocol shall be wholly voluntary, and participation in the GCCF shall not affect any right that the Claimant would have had absent such participation unless final resolution of the claim is achieved.

<u>B. Approach</u>

The following non-exclusive principles apply to the operation of the GCCF:

- The GCCF will evaluate all claims in a prompt and fair manner guided by applicable law.
- The establishment of the GCCF does not diminish any right of any Individual or Business that existed prior to the creation of the GCCF; Claimants have all of the same rights with respect to their various claims that they had prior to the creation of the GCCF and shall not be forced to relinquish any rights for the opportunity to seek compensation through the GCCF, provided that acceptance of a Final Payment will require the execution of a release of liability, as discussed below.
- A claimant has the right to consult with an attorney of his or her choosing prior to accepting any settlement or signing a release of legal rights. The GCCF provides access



Gulf Coast Claims Facility                                                                    Page 2 of 12
Case 2:10-md-02179-CJB-DPC   Document 23309-2   Filed 09/21/17   Page 2 of 184
Case 2:10-md-02179-CJB-JCW   Document 13305-1   Filed 08/23/11   Page 53 of 184

to free legal assistance, paid for by BP, from lawyers who exercise their independent professional judgment on behalf of claimants.
- The GCCF claims process is structured to comply with OPA and apply the standards of OPA.
- Under OPA a claimant must file a claim with BP or the GCCF for OPA damages prior to seeking payment from the National Pollution Fund Center or commencing an action in court.

The GCCF considers the views of all stakeholders. All stakeholders, including claimants, government entities, and BP, may provide input and comments regarding the GCCF process.

## II. ELIGIBILITY

A. Removal and Clean Up Costs

    1. Who may make a claim?

       Any Individual[1] or Business that incurred costs, as a result of the Spill for the removal of oil or to prevent, minimize, or mitigate oil pollution.

    2. Required Proof

- The actions taken were necessary for removal of oil discharged due to the Spill or to prevent, minimize, or mitigate oil pollution from the Spill;
- The removal costs incurred as a result of these actions are reasonable and necessary; and
- The actions taken to remove, prevent, minimize, or mitigate oil pollution were directed or approved by the Federal On-Scene Coordinator or are otherwise determined to be consistent with the National Contingency Plan.

    3. What information should the Claimant submit?

- Information or documentation (e.g., bills) showing the costs incurred after the Spill for removal of oil discharged as a result of the Spill or incurred after the Spill to prevent, minimize, or mitigate oil pollution from the Spill.
- Information or documentation explaining how the actions taken to remove oil discharged as a result of the Spill were necessary to prevent, minimize, or mitigate the effects of the Spill
- Information or documentation showing that the actions taken were approved by the Federal On-Scene Coordinator or were consistent with the National Contingency Plan.
- Information or documentation explaining why the costs were reasonable.

B. Real or Personal Property

    1. Who may make a claim?

       Any Individual or Business that owns or leases real or personal property physically damaged or destroyed as a result of the Spill.

       In order to avoid duplication of claims, an owner or lessee of the property must provide notice to all others with an ownership or lease interest in the property of the intent to file a claim. If duplicate claims are received, the GCCF will determine the appropriate claimant or claimants and their appropriate shares.

    2. What information should the Claimant submit?

Case 2:10-md-02179-CJB-DPC   Document 23309-2   Filed 09/21/17   Page 54 of 12
Case 2:10-md-02179-CJB-DCW   Document 13319-2   Filed 02/23/17   Page 54 of 184

- Information or documentation showing an ownership or leasehold interest in the property.
- Information or documentation showing the property was physically damaged or destroyed.
- Information or documentation showing the damages claimed were incurred as the result of the physical damage to or destruction of the property.
- Information or documentation showing the cost of repair or replacement of the property, or economic losses resulting from destruction of the property.
- Information or documentation showing the value of the property both before and after damage.

C. Lost Profits and Lost Earning Capacity

1.  Who may make a claim?

An Individual or Business that incurred a loss in profits or earning capacity due to the injury, destruction, or loss of real property, personal property or natural resources as a result of the Spill. The Individual or Business need not be the owner of the injured property or resources to recover for lost profits or earnings. An Individual or Business that incurred a loss in profits or earning capacity due to the injury, destruction, or loss of real property, personal property or natural resources as a result of the Spill. The Individual or Business need not be the owner of the injured property or resources to recover for lost profits or earnings.

2.  What information should the Claimant submit?

- Identification of injury, destruction, or loss to a specific property or natural resource.
- Information concerning the Claimant's lost profits or earnings that were caused by the injury, destruction, or loss of specific property or natural resource as a result of the Spill (such as lost earnings by a fisherman whose fishing grounds have been closed or a hotel or rental property that has had decreased profits because beaches, swimming, or fishing areas have been affected by the oil from the Spill).
- Reduction of earnings or profits, or increase in expenses resulting from such damage.
- Amount of profits and earnings or expenses in comparable time periods.
- Earnings received from alternative employment or business during the period when the loss was suffered, and expenses incurred in generating the alternative earnings.
- Savings to overhead and other normal expenses not incurred as a result of the Spill.

D. Subsistence Use of Natural Resources

1.  Who may make a claim?

Any Individual who uses the natural resources that have been injured, destroyed, or lost as a result of the Spill to obtain food, shelter, clothing, medicine, or other subsistence use. Any Individual who uses the natural resources that have been injured, destroyed, or lost as a result of the Spill to obtain food, shelter, clothing, medicine, or other subsistence use.

2.  What information should the Claimant submit?

- Identification of the specific natural resources that have been injured, destroyed or lost as a result of the Spill for which compensation for loss of subsistence use is being claimed. The Claimant need not own the affected natural resource.
- Description of the actual subsistence use made of each specific natural resource.
- Description of how and to what extent the subsistence use was affected by the injury to or loss of each specific natural resource as a result of the Spill.
- Description of expenditures made to replace or substitute for the subsistence use including any documentation verifying such expenditures.

E. Physical Injury or Death

    1.  Who may make a claim?

        A claim may be made by an injured Individual or the representative of a deceased Individual for economic and non-economic damages for a physical injury or death proximately caused by the Spill or the explosion and fire associated with the Deepwater Horizon incident, or by the clean-up of the Spill.

        Submitting a physical injury or death claim to the GCCF is entirely voluntary; a Claimant is not required to submit their physical injury or death claim to the GCCF in order to obtain a Final Payment for Removal and Clean up Costs, Real or Personal Property Damage, Lost Profits and Lost Earning Capacity, or Subsistence Use of Natural Resources. However, unlike claims under the Oil Pollution Act, claims for physical injury or death cannot be submitted to the National Pollution Funds Center.

    2.  What information should the Claimant submit?

- Medical records or death certificate demonstrating physical injury or death.
- Medical records reflecting diagnosis by a medical practitioner.
- Information concerning the cause of physical injury or death.
- Information concerning the circumstances of the physical injury or death and the location where the physical injury or death occurred.
- Information concerning any total or partial disability of the Claimant.
- Records showing expenditures for medical care.
- Proof of lost income, if the Claimant seeks compensation for such lost income.
- Information and documentation regarding health care insurance or disability insurance.

F. Costs of Estimating Damages Claimed

Damages for claims for Removal and Clean Up Costs, Damage to Real or Personal Property, Lost Profits and Lost Earning Capacity, and Subsistence Use of Natural Resources, include the reasonable cost of estimating the damages claimed, but not attorney's fees or other administrative costs associated with preparation of the claim.

G. Causation

The GCCF will only pay for harm or damage that is proximately caused by the Spill. The GCCF's causation determinations of OPA claims will be guided by OPA and federal law interpreting OPA. Determinations of physical injury and death claims will be guided by applicable law.


**III. FILING FOR COMPENSATION**

A. Attorney Representation

    1.  A claimant has the right to consult with an attorney of his or her choosing prior to accepting any settlement or signing a release of legal rights.
    2.  If a claimant is represented by an attorney, the GCCF will communicate with that attorney rather than directly with the claimant.
    3.  The GCCF provides access to free legal assistance for the GCCF Interim or Final Claims Process . These legal services are available through a network of nonprofit civil legal service

organizations in Alabama, Florida, Louisiana, Mississippi and Texas. The free legal services program is being administered by the Mississippi Center for Justice, a nonprofit public interest law firm. The free legal services program will not be providing assistance for litigation or claims filed with the National Pollution Funds Center. The funding for this program comes from BP. However, the Mississippi Center for Justice and the nonprofit civil legal service organizations providing the free legal assistance have no other connection to BP or GCCF. The funding does not affect the advice that a lawyer or any of the legal services organizations gives a claimant. Neither GCCF nor BP will interfere with the independent professional judgment of any of the legal services attorneys.

### B. Equal Access and Fair Adjudications in the Claims Process

All potential Claimants will be treated with respect, dignity, and fairness, without regard to race, color, sexual orientation, national origin, religion, gender, or disability. The GCCF shall strive to ensure that all Claimants can equally access the GCCF process, and that claims will be adjudicated fairly. Individuals with disabilities will be able to effectively communicate their claims and problems to the GCCF. Individuals with language barriers will have meaningful access to the process and to the GCCF. Individuals with low literacy will have documents and forms explained to them plainly and in a simple manner they understand.

### C. Claim Form

1. The Claimant will fill out a Claim Form for an Interim Claim or a Final Claim.
2. Claimants shall submit the documentation requested on the Interim or Final Claim Form or other similar information sufficient both to substantiate the claim and for the GCCF to review and process the Interim or Final Claim.
3. Legal Representatives of decedents, minors, incompetent or legally incapacitated persons may file on behalf of such claimants but will be required to show proof that the legal representative has been duly appointed.

### D. Process for Filing a Claim

An Interim or Final Claim Form may be obtained and submitted in any one of the following ways:

1. Via the Internet – Claimants may submit an Interim or Final Claim online by visiting the GCCF website: www.gulfcoastclaimsfacility.com. Claimants will be instructed to follow simple steps for completing an Interim or Final Claim Form. Interim and Final Claim Forms and Instructions will be available in English, Spanish, Vietnamese and Khmer. Claimants who have previously filed a claim for an Emergency Advance Payment will not be required to resubmit previously submitted documentation, but will be required to submit additional documentation necessary to substantiate the Interim or Final Claim. A Claim Form submitted via the Internet will require the electronic signature of the Claimant.
2. By Visiting a GCCF Claims Site Office – Claimants may visit one of the 35 Claims Site Offices established to assist Claimants with the claims submission process. The locations of the Claims Site Offices are posted on the GCCF website, www.gulfcoastclaimsfacility.com. If a visitor requires an interpreter and an interpreter is not available on site, the Claims Evaluator will make arrangements to provide these services either via conference call or a scheduled return trip to the Claims Site Office. A Claims Evaluator will assist the Claimant in completing an Interim or Final Claim Form. The Claimant will not be required to resubmit previously submitted documentation but will only be required to submit additional documentation necessary to substantiate the Interim or Final Claim. The Claim Form must be signed by the Claimant.

3.  Via U.S. Postal Service – Claimants may call the toll free, dedicated telephone line to request that an Interim or Final Claim Form be mailed via U.S. Postal Service. The Interim or Final Claim Form will be mailed via U.S. Postal Service to the Claimant. The Claimant will not be required to resubmit previously submitted documentation but will only be required to submit additional documentation necessary to substantiate the Interim or Final Claim. The Claim Form must be signed by the Claimant. The Claimant may return the completed form via:

- U.S. Postal Service:
  Gulf Coast Claims Facility
  P. O. Box 9658
  Dublin, OH 43017-4958
- Overnight, Certified or Registered Mail:
  Gulf Coast Claims Facility
  5151 Blazer Parkway, Suite A
  Dublin, OH 43017-4958
- Fax:
  1-866 682-1772
- Email:
  info@gccf-claims.com
- The toll-free telephone lines are as follows:

  - Toll Free Number: 1-800 916-4893
  - Multilingual Telephone Line: 1-800 916-4893
  - TTY Telephone Line: 1-866 682-1758

  All submitted Claim Forms, regardless of the method of submission, will be automatically forwarded to the Central Processing Database and integrated into a comprehensive GCCF Database.

## IV. APPLICATIONS FOR PAYMENT

Claimants have the option of submitting a claim for an Interim Payment or a Final Payment.

<u>A. Applications for Interim Payment</u>

An Interim Payment covers only substantiated, past damages. An Interim Payment does not cover any future damages.

The following principles will apply to claims for an Interim Payment:

- In order to receive an Interim Payment, a Claimant shall not be required to execute a release or waive any rights to assert additional claims, to file an individual legal action, or to participate in other legal actions associated with the Spill.
- A Claimant who seeks an Interim Payment may make a subsequent claim for an additional Interim Payment or a Final Payment.
- An Interim Claim may not be submitted more frequently than once per quarterly period, unless the Claimant is able to demonstrate the presence of exigent circumstances, in which case an Interim Claim may be submitted more than once per quarterly period. An Interim Claim for the first quarterly period may be submitted up to and including December 31. An Interim Claim for the second quarterly period may be submitted up to and including March 31. An Interim Claim for the third quarterly period may be

submitted up to and including June 30. An Interim Claim for the fourth quarterly period may be submitted up to and including September 30.

- When evaluating an Interim Claim, the GCCF will take into account and offset prior payments by BP, the GCCF, and collateral sources.
- In the event that the Claimant has submitted an eligible, substantiated claim, the GCCF will provide the Claimant with a payment determination for both an Interim Payment and Final Payment so that the Claimant can select which form of payment the Claimant desires.
- If the Claimant elects to receive an Interim Payment, should the Claimant make a subsequent claim for a Final Payment, GCCF's valuation of the Final Payment may change to reflect additional information and less uncertainty regarding damages.
- Any Interim Payment or Emergency Advance Payment made to a Claimant will be deducted from that Claimant's Final Payment.

B. Applications for Final Payment

By applying for a Final Payment, an applicant is seeking to resolve all claims including any claims for future damages resulting from the Spill. A Final Payment constitutes a complete and final resolution of all claims for any past, current, or future losses that a Claimant has or may have with regard to the Deepwater Horizon incident and oil spill against BP and all other potentially liable parties, except as otherwise noted in paragraph V.C. of this Protocol. Accepting a Final Payment requires the Claimant to sign a release of past and future claims. The Release is attached to this Protocol as Tab A. In determining the Final Payment, the GCCF will take into account and offset prior payments by BP, the GCCF, and collateral sources. A claimant has the right to consult with an attorney of his or her choosing prior to accepting any settlement or signing a release of legal rights.

**V. REVIEW PROCEDURES**

A. Determination of Claims

1. After an Interim Claim or a Final Claim is presented, the GCCF shall determine within 90 days whether to make a payment to the Claimant and if so the amount of such payment.
2. Determinations of claims asserted under OPA will be guided by OPA. Determinations of physical injury or death claims will be guided, as applicable, by other federal law and pertinent state law. If the GCCF determines that more information is necessary in order to resolve a claim, it will advise the Claimant promptly.
3. If the GCCF determines that more information is necessary in order to resolve a claim, it will advise the Claimant promptly.

B. Notification of GCCF Decision

The Claimant will be sent in writing: (1) the GCCF's decision regarding the claim, including the reason for any denial, reduction or increase to the claimed amount; (2) the amount of the determined compensation; and (3) in the case of an eligible claim for Final Payment, a Release to be signed by the Claimant. Offers of Final Payment shall be valid for 90 days, after which they are null and void. A claimant has the right to consult with an attorney of his or her choosing prior to accepting any settlement or signing a release of legal rights.

C. Acceptance of Final Payment

Claimant acceptance of a Final Payment is voluntary. Claimants who accept a Final Payment must sign a Release. A copy of the main Release is attached as Tab A. The Release will waive any rights the Claimant may have against BP and any other potentially liable parties to assert additional claims, to file an individual legal action, to participate in other legal actions associated with the Spill, or to submit any claim for payment by the National Pollution Funds Center. However, except where the Claimant accepts a Final Payment for physical injury or death, the Release will not waive the Claimant's rights with regard to a physical injury or death claim. If the Claimant elects to accept a Final Payment for a claim for physical injury or death, the Claimant will return to the GCCF a Release specifically waiving the Claimant's rights with regard to the Claimant's physical injury or death claim. A claimant has the right to consult with an attorney of his or her choosing prior to accepting any settlement or signing a release of legal rights.

## D. Rejection of Interim or Final Payment Determination

A Claimant may elect to reject an Interim or Final Payment determination and, as permitted by law, either present the claim to the National Pollution Funds Center or commence an action in court, including in the multidistrict litigation pending before the United States District Court for the Eastern District of Louisiana, titled, In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 MDL No. 2179. The multidistrict litigation is a consolidated grouping of federal law suits arising out of the Spill. A claim for physical injury or death is not a claim under OPA and therefore cannot be submitted to the National Pollution Funds Center.

## E. Denial of Interim or Final Claim

If an Interim or Final Claim is denied, or if the GCCF has not acted on the claim within 90 days of the date the claim was presented under OPA to BP or to the GCCF, the Claimant may, as permitted by law, either present the claim to the National Pollution Funds Center or commence an action in court, including in the multidistrict litigation pending before the United States District Court for the Eastern District of Louisiana, titled, In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 MDL No. 2179. The multidistrict litigation is a consolidated grouping of federal law suits arising out of the Spill. A claim for physical injury or death is not a claim under OPA and therefore cannot be submitted to the National Pollution Funds Center.

## F. Payment of Final Claims

Within fourteen (14) days of the receipt of the signed Release, the GCCF will issue payment to the Claimant.

## G. Collateral Source Compensation

The amount of compensation will be reduced by collateral source compensation that the Claimant has received due to the Spill where such collateral source compensation would be duplicative of payments by the GCCF.[2]

   1. Payments that constitute collateral source compensation.

      • Collateral source compensation includes, but is not limited to, insurance payments including health insurance payments, and payments by federal, state, or local governments related to the Spill, including unemployment benefits.
   2. Payments that do not constitute collateral source compensation.

- Charitable donations and the value of services or in-kind charitable gifts such as provision of emergency housing, food, or clothing distributed to the Claimant.

## VI. APPEAL PROCEDURES

### A. No Waiver of Rights

Appeal by a Claimant or BP of a Final Payment determination under this section is voluntary. Such appeal shall not waive any rights the Claimant has under OPA or other applicable law.

### B. The Right to Appeal Pursuant to this Protocol

1. The Claimant may appeal a Final Claim determination of the GCCF if a total monetary award (including any Emergency, Interim or Final Payment made by BP or the GCCF) is in excess of $250,000. BP may appeal a Final Claim Determination of the GCCF if a total monetary award (including any Emergency, Interim or Final Payment made by BP or the GCCF) is in excess of $500,000.
2. If either the claimant or BP asserts that the Final Claim: a) presents an issue of first impression under OPA; or b) that the determination of the GCCF is inconsistent with prior legal precedent under OPA and that the Final Claim is likely to be representative of a larger category of claims to be considered by the GCCF, then a right to appeal may be granted by the Claims Administrator in his sole discretion.

### C. Timing of Filing of Appeal

Any appeal pursuant to this Section must be made within fourteen (14) days of notification of the GCCF's determination of the Final Claim.

### D. Selection of Appeals Judges

1. The Claims Administrator shall select one distinguished member of the legal profession (e.g., a retired federal or state judge, respected legal academic, professional mediator or arbitrator) who will identify distinguished members of the legal community (e.g., retired federal or state judges, respected legal academics, professional mediators or arbitrators) to serve as impartial GCCF Appeals Judges.
2. When an appeal is certified, the Claims Administrator will assign the appeal to a panel of three approved GCCF Appeals Judges for decision.

### E. Claim File

For any claim that is appealed by a Claimant, the Claimant will approve disclosure of the complete claim file to both BP and the assigned Panel of Appeals Judges. For any claim that is appealed by BP, the Claims Administrator will release only such information from the claim file as is necessary for BP to evaluate the decision and a decision by the Panel of Appeals Judges.

### F. Timing of Appeal Decision

The Panel of Appeals Judges will decide the appeal within fourteen (14) days after receiving the claim file.

### G. Applicable Law Governing Appeals

Appeals of claims asserted under OPA will be guided by OPA. Appeals of non-OPA claims (physical injury or death) will be guided by applicable federal and state law.

H. Tolling Period

Once an appeal commences, a Claimant may not file a claim against the Oil Spill Liability Fund, or file a claim in court, until the appeal pursuant to this Section is either decided or withdrawn.

I. Impact of the Appeal Decision

Any decision of the Panel of Appeals Judges shall be deemed final as to BP only. If the Claimant does not agree with the decision of the Panel of Appeals Judges, the Claimant may reject the GCCF determination and pursue a claim in the courts or as otherwise permitted under OPA.


**VII. REPORTING**

The GCCF shall provide reports of non-personally identifiable information to state, local, and federal government officials and to BP to permit an evaluation of the claims process. The GCCF shall submit to interested parties, including BP, periodic reports of non-personally identifiable information regarding claims made and claims determinations.


**VIII. PERIOD FOR SUBMISSION OF CLAIMS**

Claims for an Emergency Advance Payment will not be accepted after November 23, 2010. Claims for an Interim or Final Payment may be submitted to the GCCF through August 23, 2013. After that date, BP will continue to receive claims as required by OPA; under OPA, any action in court to recover damages must be filed within three (3) years after the date on which the injury and its connection with the discharge in question were reasonably discoverable with the exercise of due care. The time limitations do not begin to run against: (1) a minor until the earlier of the date when the minor reaches 18 years of age or the date on which a legal representative is duly appointed for the minor; or (2) an incompetent person until the earlier of the date on which such incompetent's incompetency ends or the date on which a legal representative is duly appointed for the incompetent. Claimants should be aware of this limitation period in determining whether to present their claims to GCCF or BP.


**IX. PRIVACY**

Information submitted by a Claimant to the GCCF will be used and disclosed for purposes of: (1) processing the Claimant's claim for compensation and any award resulting from that claim; (2) legitimate business purposes associated with administering the GCCF, including the prevention of fraud and the determination of collateral source payments; and/or (3) as otherwise required by law, regulation or judicial process.


**X. QUALITY CONTROL AND PROCEDURES TO PREVENT AND DETECT FRAUD**

A. Review of Claims

For the purpose of detecting and preventing the payment of fraudulent claims and for the purpose of accurate and appropriate payments to Claimants, the GCCF shall implement procedures to:

1. Verify and authenticate claims.
2. Analyze claim submissions to detect inconsistencies, irregularities, and duplication.
3. Ensure the quality control of claims review procedures.

B. Quality Control

The GCCF shall institute periodic quality control audits designed to evaluate the accuracy of submissions and the accuracy of payments.

C. False or Fraudulent Claims

Each Claimant will sign an Interim or Final Claim Form at the time of application, stating that he or she certifies that the information provided in the Claim Form is true and accurate to the best of his or her knowledge, and that he or she understands that false statements or claims made in connection with that application may result in fines, imprisonment, and/or any other remedy available by law, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution. Claims filed via the Internet will require an electronic signature which shall be equally as binding upon the Claimant as a physical signature. The GCCF shall refer all evidence of false or fraudulent claims to appropriate law enforcement authorities.

---

[1] For purposes of this Protocol, the term "Individual" includes the representative of a minor or incompetent individual.

[2] The offset of collateral source compensation will be used to prevent duplicative payments to a Claimant. The rights, if any, of the entity that made the initial payment to the claimant will be determined by the applicable law.

- Privacy Policy |
- All Rights Reserved

- Home
- Important Notices
  and Information
- Frequently Asked Questions
- Town Hall Meetings / Events
- Press and News Releases
- Protocol for Interim
  and Final Claims
- Summary of Options
  for Filing Claims
- File a Quick Payment Final Claim Form

Case 2:10-md-02179-CJB-DPC   Document 23909-2   Filed 09/21/17   Page 63 of 184
Case 2:10-md-02179-CJB-JCW   Document 13119-1   Filed 02/23/17   Page 57 of 158

- <u>File a Full Review Final
  Claim Form Online</u>
- <u>File an Interim
  Claim Form Online</u>
- <u>File a Paper Interim or Full Review Final Claim Form</u>
- <u>Comments on Proposed Methodology</u>
- <u>Required Forms for Claimant Representatives</u>
- <u>Claims Site Offices</u>
- <u>Check Claim Status</u>
- <u>GCCF Program Statistics</u>
- <u>Free Legal Assistance</u>
- <u>To Report Fraud</u>
- <u>Contact Us</u>

regarding the multidistrict litigation may be obtained from the court's website at
www.laed.uscourts.gov. A claim for physical injury is not a claim under OPA and therefore cannot be
submitted to the NPFC.

(**back to top**)

# SECTION 6 – INFORMATION ON INTERIM PAYMENT CLAIMS

**54. What is an Interim Payment Claim?**

An Interim Payment Claim is a claim only for documented past damages caused by the Spill. An
Interim Payment is not an Emergency Advance Payment.

**55. How do I apply for an Interim Payment?**

You have to fill out, sign and send back to the GCCF an Interim Payment Claim Form, along with
documents to support your claim if you have not previously submitted those documents. If you
previously submitted an Emergency Advance Payment Claim to the GCCF, the GCCF will mail you a
packet containing the Interim Payment Claim Form. If you do not get that packet, see Section 8 –
How to File a Full Review Final Payment Claim or an Interim Payment Claim for the steps on how to
get the Full Review Final Payment Claim Form and how to submit it to the GCCF.

**56. I have already submitted a Final Claim. Can I now submit an Interim Claim?**

If you have already submitted to the GCCF a Claim Form in which you asserted a Final Payment
Claim and now would like to switch and seek an Interim Payment instead, you must submit an Interim
Payment Claim Form to the GCCF and check the appropriate box on the first page of the Claim Form
stating that you previously filed a Final Claim Form and now wish to file an Interim Payment Claim.
You cannot seek or receive an Interim Payment unless you have submitted an Interim Payment Claim
Form to the GCCF.

**57. What kind of claims can I make on an Interim Payment Claim?**

If you suffered damages or injuries caused by the Spill and are eligible to apply for a Full Review
Final Payment, you can submit an Interim Payment Claim for the same types of claims for which
Claimants could seek Emergency Advance Payments: Removal and Clean Up Costs, Damage to Real
or Personal Property, Lost Earnings or Profits, Loss of Subsistence Use of Natural Resources
(Individuals only), or Physical Injury or Death (Individuals only).

**58. What kind of losses will be paid on an Interim Payment Claim?**

An Interim Payment will cover only past losses caused by the Spill. An Interim Payment will not
compensate you for future losses or damages. For future losses or damages to be evaluated and paid,
you must submit a Full Review Final Payment Claim. If you have submitted an Interim Payment
Claim, you may submit a subsequent Full Review Final Payment Claim. If appropriate, the GCCF
will adjust the calculation of a previously paid Emergency Advance Payment and include any
additional compensation as part of the Interim Payment.

EXHIBIT 6



# GCCF Program Statistics - Overall Summary
### (as of December 14, 2010, 5:05 PM ET)

## Emergency Advance Claim Counts by Category
### *(Claimants may have more than one Claim Type)*

| Claims for Emergency Advance Payment | Claims Submitted | No. of Claims Paid | Amount Paid |
|---|---|---|---|
| 1. Removal and Clean Up Costs | 2,844 | 0 | $ - |
| 2. Real or Personal Property | 8,810 | 157 | $ 1,467,663.38 |
| 3. Lost Earnings or Profits | 450,508 | 166,306 | $ 2,467,154,491.00 |
| 4. Loss of Subsistence Use of Natural Resources | 31,024 | 5 | $ 13,000.00 |
| 5. Physical Injury / Death | 8,928 | 49 | $ 63,436.50 |
| **Total to Date** | **502,114** | **166,517** | **$ 2,468,698,590.88** |





EXHIBIT 7



# Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Texas Program Statistics
*(Status Report as of February 16, 2011)*

| All Claimants | No. of Claimants |
|---|---|
| **Total Unique Claimants** | **10,313** |
| 1. Individual | 7,522 |
| 2. Business | 2,791 |
| *Represented Claimants: 2,437* | |

| Paid Claimants | Paid Claimants | Total Amount Paid |
|---|---|---|
| **Total Paid Claimants** | 2,838 | $    109,460,500.00 |
| **Separate Fund for Real Estate Brokers and Agents** | | $                      - |
| | **Total Paid:** | **$    109,460,500.00** |

| All Submitted and Paid Claimants *(Claimants may have more than one Claim Category)* | Claimants with Filed Claims | Paid Claimants | Paid Claims | Amount Paid |
|---|---|---|---|---|
| 1. Emergency Advance Payment | 9,474 | 2,837 | 2,841 | $    91,260,500.00 |
| 2. Final: Quick Pay | 692 | 632 | 632 | $     8,200,000.00 |
| 3. Final: Full Review *(net of Claimants with Quick Payment Issued)* | 1,864 | 1 | 1 | $    10,000,000.00 |
| 4. Interim Payment *(net of Claimants with Quick Payment Issued)* | 736 | 0 | 0 | $                      - |
| **Total** | **12,766** | **3,470** | **3,474** | **$    109,460,500.00** |

| Submitted and Paid Claimants - Individual *(Claimants may have more than one Claim Category)* | Claimants with Filed Claims | Paid Claimants | Paid Claims | Amount Paid |
|---|---|---|---|---|
| 1. Emergency Advance Payment | 6,876 | 1,605 | 1,605 | $    23,512,200.00 |
| 2. Final: Quick Pay | 417 | 380 | 380 | $     1,900,000.00 |
| 3. Final: Full Review *(net of Claimants with Quick Payment Issued)* | 1,448 | 0 | 0 | $                      - |
| 4. Interim Payment *(net of Claimants with Quick Payment Issued)* | 515 | 0 | 0 | $                      - |
| **Sub-Total** | **9,256** | **1,985** | **1,985** | **$    25,412,200.00** |

| Submitted and Paid Claimants - Business *(Claimants may have more than one Claim Category)* | Claimants with Filed Claims | Paid Claimants | Paid Claims | Amount Paid |
|---|---|---|---|---|
| 1. Emergency Advance Payment | 2,598 | 1,232 | 1,236 | $    67,748,300.00 |
| 2. Final: Quick Pay | 275 | 252 | 252 | $     6,300,000.00 |
| 3. Final: Full Review *(net of Claimants with Quick Payment Issued)* | 416 | 1 | 1 | $    10,000,000.00 |
| 4. Interim Payment *(net of Claimants with Quick Payment Issued)* | 221 | 0 | 0 | $                      - |
| **Sub-Total** | **3,510** | **1,485** | **1,489** | **$    84,048,300.00** |

| | Claimants with Filed Claims | Paid Claimants | Paid Claims | Amount Paid |
|---|---|---|---|---|
| **Separate Fund for Real Estate Brokers and Agents** | | | | $                      - |
| **Grand Total Paid to Date** | **12,766** | **3,470** | **3,474** | **$    109,460,500.00** |

| Paid Claims by Category *(includes Individual and Business)* | No. of Claimants | No. of Claims | Amount Paid |
|---|---|---|---|
| 1. Removal and Clean Up Costs | 1 | 1 | $         169,100.00 |
| 2. Real or Personal Property | 4 | 5 | $           55,000.00 |
| 3. Lost Earnings or Profits | 2,833 | 3,465 | $    109,230,100.00 |
| 4. Loss of Subsistence Use of Natural Resources | 0 | 0 | $                      - |
| 5. Physical Injury / Death | 2 | 3 | $             6,300.00 |
| **Total** | **2,840** | **3,474** | **$    109,460,500.00** |

EXHIBIT 8



# Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Texas Program Statistics
*(Status Report as of February 16, 2011)*

### Individual Claims by Amount
*(Claimants may have more than one Claim Category)*

| Paid Claims by Amount | No. of Claims | Amount Paid |
|---|---|---|
| 1. $0.01 - $5,000.00 | 680 | $ 2,788,900.00 |
| 2. $5,000.01 - $10,000.00 | 400 | $ 3,174,100.00 |
| 3. $10,000.01 - $25,000.00 | 700 | $ 11,440,100.00 |
| 4. $25,000.01 - $100,000.00 | 203 | $ 7,772,100.00 |
| 5. $100,000.01 - $500,000.00 | 2 | $ 237,000.00 |
| 6. Over $500,000.00 | 0 | $ - |
| **Total** | **1,985** | **$ 25,412,200.00** |

### Individual Claims Paid by Value Range



### Individual Amount Paid by Value Range





# Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Texas Program Statistics
*(Status Report as of February 16, 2011)*

### Business Claims by Amount
*(Claimants may have more than one Claim Category)*

| Paid Claims by Amount | No. of Claims | Amount Paid |
|---|---|---|
| 1. $0.01 - $5,000.00 | 217 | $ 592,200.00 |
| 2. $5,000.01 - $10,000.00 | 233 | $ 1,812,600.00 |
| 3. $10,000.01 - $25,000.00 | 618 | $ 12,597,300.00 |
| 4. $25,000.01 - $100,000.00 | 314 | $ 16,674,100.00 |
| 5. $100,000.01 - $500,000.00 | 96 | $ 16,632,000.00 |
| 6. Over $500,000.00 | 11 | $ 35,740,100.00 |
| **Total** | **1,489** | **$ 84,048,300.00** |

### Business Claims Paid by Value Range



### Business Amount Paid by Value Range





# Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Texas Program Statistics
*(Status Report as of February 16, 2011)*

### Claims by Category and Amount
*(Claimants may have more than one Claim Category)*

| Paid Claims by Category and Amount | No. of Claims | Amount Paid |
|---|---|---|
| **1. Removal and Clean Up Costs** | | |
| a. $0.01 - $5,000.00 | 0 | $ - |
| b. $5,000.01 - $10,000.00 | 0 | $ - |
| c. $10,000.01 - $25,000.00 | 0 | $ - |
| d. $25,000.01 - $100,000.00 | 0 | $ - |
| e. $100,000.01 - $500,000.00 | 1 | $ 169,100.00 |
| f. Over $500,000.00 | 0 | $ - |
| **Sub-Total** | **1** | **$ 169,100.00** |
| **2. Real or Personal Property** | | |
| a. $0.01 - $5,000.00 | 3 | $ 7,300.00 |
| b. $5,000.01 - $10,000.00 | 1 | $ 7,400.00 |
| c. $10,000.01 - $25,000.00 | 0 | $ - |
| d. $25,000.01 - $100,000.00 | 1 | $ 40,300.00 |
| e. $100,000.01 - $500,000.00 | 0 | $ - |
| f. Over $500,000.00 | 0 | $ - |
| **Sub-Total** | **5** | **$ 55,000.00** |
| **3. Lost Earnings or Profits** | | |
| a. $0.01 - $5,000.00 | 891 | $ 3,367,500.00 |
| b. $5,000.01 - $10,000.00 | 632 | $ 4,979,300.00 |
| c. $10,000.01 - $25,000.00 | 1,318 | $ 24,037,400.00 |
| d. $25,000.01 - $100,000.00 | 516 | $ 24,405,900.00 |
| e. $100,000.01 - $500,000.00 | 97 | $ 16,699,900.00 |
| f. Over $500,000.00 | 11 | $ 35,740,100.00 |
| **Sub-Total** | **3,465** | **$ 109,230,100.00** |



# Gulf Coast Claims Facility
## www.GulfCoastClaimsFacility.com

## Texas Program Statistics
*(Status Report as of February 16, 2011)*

### Claims by Category and Amount
*(Claimants may have more than one Claim Category)*

| Paid Claims by Category and Amount | No. of Claims | Amount Paid |
|---|---|---|
| **4. Loss of Subsistence Use of Natural Resources** | | |
| a. $0.01 - $5,000.00 | 0 | $ - |
| b. $5,000.01 - $10,000.00 | 0 | $ - |
| c. $10,000.01 - $25,000.00 | 0 | $ - |
| d. $25,000.01 - $100,000.00 | 0 | $ - |
| e. $100,000.01 - $500,000.00 | 0 | $ - |
| f. Over $500,000.00 | 0 | $ - |
| **Sub-Total** | **0** | **$ -** |
| **5. Physical Injury / Death** | | |
| a. $0.01 - $5,000.00 | 3 | $ 6,300.00 |
| b. $5,000.01 - $10,000.00 | 0 | $ - |
| c. $10,000.01 - $25,000.00 | 0 | $ - |
| d. $25,000.01 - $100,000.00 | 0 | $ - |
| e. $100,000.01 - $500,000.00 | 0 | $ - |
| f. Over $500,000.00 | 0 | $ - |
| **Sub-Total** | **3** | **$ 6,300.00** |
| **6. Other Claims** | | |
| a. $0.01 - $5,000.00 | 0 | $ - |
| b. $5,000.01 - $10,000.00 | 0 | $ - |
| c. $10,000.01 - $25,000.00 | 0 | $ - |
| d. $25,000.01 - $100,000.00 | 0 | $ - |
| e. $100,000.01 - $500,000.00 | 0 | $ - |
| f. Over $500,000.00 | 0 | $ - |
| **Sub-Total** | **0** | **$ -** |
| **Total** | **3,474** | **$ 109,460,500.00** |



# Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Texas Program Statistics
*(Status Report as of February 16, 2011)*

### Individual Lost Earnings or Profits Claims Paid by Industry
*(Claimants may have more than one Claim Category)*

| Paid Claims By Industry | No. of Claims | Amount Paid |
|---|---|---|
| Fishing | 873 | $ 12,190,300.00 |
| Food, Beverage and Lodging | 209 | $ 1,624,500.00 |
| Rental Property(ies) | 37 | $ 354,100.00 |
| Retail, Sales and Service | 376 | $ 6,939,500.00 |
| Seafood Processing and Distribution | 474 | $ 4,147,000.00 |
| Tourism and Recreation | 10 | $ 143,200.00 |
| **Total** | **1,979** | **$ 25,398,600.00** |



**# of Individual Claims Paid by Industry**

- Seafood Processing and Distribution 23.95%
- Tourism and Recreation 0.51%
- Retail, Sales and Service 19.00%
- Rental Property(ies) 1.87%
- Food, Beverage and Lodging 10.56%
- Fishing 44.11%

**Amount of Individual Claims Paid by Industry**

- Seafood Processing and Distribution 16.33%
- Tourism and Recreation 0.56%
- Retail, Sales and Service 27.32%
- Rental Property(ies) 1.39%
- Food, Beverage and Lodging 6.40%
- Fishing 48.00%



# Gulf Coast Claims Facility
www.GulfCoastClaimsFacility.com

## Texas Program Statistics
*(Status Report as of February 16, 2011)*

### Business Lost Earnings or Profits Claims Paid by Industry
*(Claimants may have more than one Claim Category)*

| Paid Claims By Industry | No. of Claims | Amount Paid |
|---|---|---|
| Fishing | 1,011 | $ 36,872,600.00 |
| Food, Beverage and Lodging | 17 | $ 1,773,100.00 |
| Rental Property(ies) | 335 | $ 4,689,700.00 |
| Retail, Sales and Service | 44 | $ 12,254,100.00 |
| Seafood Processing and Distribution | 77 | $ 28,210,800.00 |
| Tourism and Recreation | 2 | $ 31,200.00 |
| **Total** | **1,486** | **$ 83,831,500.00** |

### # of Business Claims Paid by Industry



### Amount of Business Claims Paid by Industry



**JO BONNER**
1ST DISTRICT, ALABAMA

ASSISTANT REPUBLICAN WHIP

REPUBLICAN STUDY COMMITTEE

SERVING BALDWIN, CLARKE,
ESCAMBIA, MOBILE, MONROE AND
WASHINGTON COUNTIES

**Congress of the United States**
**House of Representatives**
**Washington, DC 20515**

February 15, 2011

ETHICS
CHAIRMAN

APPROPRIATIONS
SUBCOMMITTEES:
DEFENSE
COMMERCE, JUSTICE, SCIENCE
VICE CHAIRMAN
FINANCIAL SERVICES

ALAN C. SPENCER
CHIEF OF STAFF

Mr. Kenneth Feinberg
Administrator
Gulf Coast Claims Facility
PO Box 9658
Dublin, OH 43017

Dear Ken:

Thank you for your recent note dated January 31, 2011. Unfortunately, I have all but given up on any hope that you will ever become our Atticus Finch. I hope you enjoy the book regardless.

Just last week, Judge Barbier confirmed what so many others along the Gulf Coast have believed all along – that you are not independent of BP and that you represent their best interests, not ours. While this is most disappointing, it is not at all surprising. Perhaps this ruling was the impetus which prompted Louisiana, Mississippi, and Florida to finally speak out and make the same claims those of us in Alabama have been making for over 5 months now. You have commented on numerous occasions that Alabama is your "problem child," but it now appears the entire Gulf Coast is a problem for you.

Additionally, I read with interest Thomas Perrelli's most recent letter to you dated February 4, 2011. He specifically states, "OPA does not create categories of eligible and ineligible claimants," and "It is relevant to consider the nature of the economy from which the claim arises." Why is it that you and your team appear to be the only ones who do not clearly see the economic interdependence of each and every business in a tourism economy such as that along Alabama's coast? It is not rocket science, yet we continue to argue the point that there are individuals and businesses who are suffering because they have undoubtedly been damaged "as a result of" the oil spill, yet you have ruled them ineligible.

I found most interesting a comment by your public relations spokeswoman, Amy Weiss, who on February 4, was quoted in the *Press-Register* as saying, "No businesses are automatically ineligible, but they must document their losses." This statement is an outright lie, for we have email after email sent to our office by your people confirming there are ineligible industries. Jacqueline L. Gomes, senior project manager for The Garden City Group, stated, "*I can confirm that her [name redacted] employment with a title company was indeed recorded and reviewed as such. The ineligibility determination did take in to account her job and employer.*" Susan H. Puz, Senior Assistant General Counsel with The Garden City Group, stated in another email, "*Since Mr. Fienberg [sic] has stated to Congressman Bonner that title companies are ineligible for payment through the GCCF, I anticipate that the claim filed by this title company [name redacted] will be denied.*" From Cynthia in Jim

2236 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-4931
FAX: (202) 225-0562
www.house.gov/bonner

11 NORTH WATER STREET, SUITE 15290
MOBILE, AL 36602
(251) 690-2811
FAX: (251) 690-2815
TOLL FREE: 1-800-288-USA1

1302 NORTH MCKENZIE STREET
FOLEY, AL 36535
(251) 943-2073
FAX: (251) 943-2093


EXHIBIT 9

Mr. Kenneth Feinberg
Page two

Walker's office, "*Our liaison Ken contacted her [name redacted] this morning and discussed her claim with her. Unfortunately, at this time, she falls into a non-compensable industry.*" And last but not least, and straight from the horse's mouth, you left a voicemail on my cell phone saying, "*Title companies are not eligible.*" For you to report to the media there are no businesses deemed automatically ineligible is absolutely insulting.

The most interesting statement I have heard this week is one by your own Alabama representative, Jim Walker. In discussing a claimant's ineligibility, he stated, "*she comes to the office dressed to the nines...lives in a house worth several hundred thousand dollars...and it's not like she's living out of her car.*" I am appalled by these statements and am extremely concerned your lead man on the ground in my district appears to believe claimants should be *destitute* before their claim will be approved. In addition, he stated this woman's son-in-law is a "*millionaire*" insinuating her family has the means to take care of her. It should not matter if this woman's son-in-law is a millionaire or a pauper — if *she* has a legitimate claim, then it should be paid. I am disgusted by the arrogance of these statements and disturbed by the self-described means test being used to determine payments, or lack thereof, to my constituents. Moreover, I hope you will inform Mr. Walker — who was paid by the hard-working taxpayers of Alabama for 8 years — that, given his current attitude, he is no longer welcome in my office.

In addition to the specific concerns outlined in the attached document, it is imperative the GCCF include information on how payments are calculated, and if a denial is rendered, a reason must be offered. Ken, how many times do we need to make this request? Also, there appears to be far too much discretionary reasoning on behalf of the GCCF team. Decisions continue to be rendered by individuals who seem to be unfamiliar with the dynamics of a tourism economy and who appear to know nothing about the geography of our area. The proposed guidelines are extremely vague and leave a great deal of room for arbitrary decision-making.

In the meeting my staff had with Bill Mulvey and Jim Walker, Mr. Mulvey stated the GCCF was adequately funded by BP, meaning a lack of funding was not the reason why claims were being denied. So, Ken, what is the incentive for continuing to underpay claims and denying entire industries that have been impacted negatively "as a result of" the oil spill?

All in all, there are many more questions than answers provided by this document, and I implore you to not only seriously consider all of the comments you receive but to implement those which offer more clarity, transparency, and fairness to your process. Recovery of the Gulf Coast will not begin until the GCCF *fully* compensates *all* of those who have suffered a loss "as a result of" the oil spill.

Sincerely,

Jo Bonner
Member of Congress

In response to the request for public comments on your recently published criteria for determining interim and final claims, we have the following concerns:

### Page 2, Section II, #2
*"Payments are available for those claimants who can prove their damages due to the Oil Spill."*
There is no clarification in the guidelines as to how one "proves" his damages or what constitutes the direct link between the loss and the spill. The claimant should have to show only that there would have been no loss without the oil spill. Without detailing exactly what documentation is needed and informing claimants how to "prove" their losses, the door remains wide open for the GCCF to continue to deny legitimate claims.

### Page 2, Section II, #3
*"Documentation requirements...are more rigorous and exacting than the minimal documentation requirements that governed administration of the Emergency Advance Payment Program."*
Many of the EAP claims were denied due to a supposed lack of documentation. If the requirements are now *more* rigorous, what additional information do claimants need to submit?

*"Each claimant is required to establish both actual financial loss and the connection between the loss and the Oil Spill."*
How? For example, retail businesses in a tourist-based economy will not have cancelled orders or disruption of supply; they simply did not have customers come into the stores. They will only have financial figures detailing their lost revenue. They can show sales of previous years (number of items sold, etc.) compared to 2010, but that is still financial data.

### Pages 2-3, Section II, #4
*"There must be an identifiable link between an actual loss and the Oil Spill. Evidence establishing this connection is required....Providing financial information about losses sustained in 2010 is but one form of proof, and will not be sufficient documentation."*
As stated in #3, for many businesses, there will be no evidence other than financial information. While understanding the need to show losses were "as a result of" the spill and not simply a bad economy during a recession, there is concern for those businesses, retailers in particular, who have credible financial information detailing significant losses but are denied for insufficient documentation. Specify what other proof will be required.

### Page 4, Section III
*"There is evidence of a strong recovery underway.... A full economic recovery...is likely (but not certain) within two to three years from the date of the Oil Spill."*
There are serious concerns about the study conducted by ARPC to support this statement. For example, on page 10 of their report, they state that beachfront hotel revenues have a 15.4% growth rate for January-May post-spill as compared to 2009, a 26.8% decline for June-August, and a 15.1% growth rate for September-October.

However, on page 20 of this same report, the Gulf Shores and Orange Beach lodgings rental tax for 2010 as compared to the 2008-2009 average had a 0.7% growth rate for January-May, a 47.0% decline for June-August, and an 8.5% decline for September-October. If hotel revenues have increased 15.1% for the most recent time period, how in the world is there still an 8.5% decline in lodging rentals tax? There can be some skewing of the data based on the "beachfront hotel" categorization, but the lodging rental tax numbers speak for themselves. Clearly, the recovery has not even truly begun, so there is no way to predict it will be complete within two years. If this conflicting data is being used to support your recovery timeline, we have every reason to be gravely concerned.

Page 5, Section III, #2
There is no way to determine if any business or industry will completely recover in two years. We are almost one year after the spill, and recovery has yet to begin and cannot begin until people are fully compensated for their damages. The GCCF has proven that it is unable to manage the claims process effectively. If the GCCF cannot process claims efficiently/correctly, why in the world would we believe they will be able to predict an economic recovery? There is no reason to put any credibility in any of the predictions put forth.

Page 6, Section III, #2
*"The final payment calculation for these claimants will be determined on an individual basis after analyzing input from the claimant as well as the experts retained by the GCCF".*
Who are these "experts" and what type of qualifications do they have to process these claims appropriately?

Page 7, Section III, #4
This is a scare tactic to force claimants to take a final payment as you indicate, *"The future losses factor for determining the future impact of the Oil Spill in the Gulf will be increased or decreased as more information becomes available. Claimants should take this into account when deciding whether to file an interim or final claim."*
Exactly what information will be included in the recalculations? Who will decide whether there will be an increase or decrease...your experts who are being paid by BP?



CHIEF FINANCIAL OFFICER
**JEFF ATWATER**
STATE OF FLORIDA

February 16, 2011

Mr. Kenneth Feinberg
Administrator, BP Claims Fund
Willard Office Building, Suite 390
1455 Pennsylvania Avenue, NW
Washington, DC 20004-1008

Dear Mr. Feinberg:

Over the past two weeks, we have received input from claimants on the proposed methodology
your Gulf Coast Claims Facility (GCCF) is considering for use in calculating final and interim
payments for Deepwater Horizon Oil Spill victims. In addition, the staff of the Department of
Financial Services, which has extensive experience in handling claims, has also reviewed your
proposed methodology.

In short, the proposed system lacks transparency, fails to provide clear guidelines, and continues
to play with the emotions of victims who simply want to be compensated for their financial
losses. You were chosen to administer this fund fairly and equitably, yet your actions have
complicated the process by creating countless additional rules and regulations that increase the
complexity of obtaining redress for those simply seeking rightful compensation.

Your current timeframe of closing public comment on February 16 and using the formula for
issuing payments on February 18 begs the question of whether you intend to consider input from
claimants and the requisite experts to adequately and properly compensate the victims of BP's
Deepwater Horizon Oil Spill.

Floridians deserve real compensation, not a two-week public relations campaign.

While I firmly believe that there are no limitations to the terms and availability of long-term
compensation under the Oil Pollution Act, attached to this letter are suggested modifications to
your proposals my office has prepared, many of which are based on the thoughts and comments
of those most immediately affected by BP's behavior. I am expecting you and your staff to
review each one carefully and in its entirety, and to identify any other experts with whom you
have conferred when you developed your models. While distinguished in his credentials, the

EXHIBIT 10

Mr. Kenneth Feinberg
Page Two
February 16, 2011

opinion and research from your sole source on the current proposed methodology, Dr. John S. Tunnell, has not been subject to peer review.

Until a compensation model can be developed that will assist victims for the long term, someone needs to speak up for Floridians who have been victimized and harmed through no fault of their own by this tragedy.

When you accepted this job, I believe you did so knowing fully what the anticipated issues and obstacles would be. That being said, you chose this undertaking and with that choice came the assumption that you would carry through with the commitment BP made from day one to "make this right."

Ultimately, I believe your proposed payment scheme violates, at a minimum, the intent of OPA, which is to properly compensate individuals and businesses for losses incurred by an oil spill of this magnitude. However, to the extent that you apply your proposed methodology in the payment of any Floridian's claim, it is my duty to ensure that the payment process is fair, transparent, responsive and fully compensates the victims of this tragedy.

I look forward to hearing back from you or your office.

Sincerely,

Jeff Atwater
Chief Financial Officer

Attachment

# An expert opinion of when the Gulf of Mexico will return to pre-spill harvest status following the BP Deepwater Horizon MC 252 oil spill

by

John W. Tunnell, Jr.
Harte Research Institute for Gulf of Mexico Studies
Texas A&M University – Corpus Christi

for

Kenneth R. Feinberg
Claims Administrator
Gulf Coast Claims Facility
Feinberg Rozen, LLP
The Willard Office Building
1455 Pennsylvania Ave., N.W.
Washington, D.C.

*This expert opinion is endorsed by the Harte Research Institute for Gulf of Mexico Studies at Texas A&M University-Corpus Christi (see Endorsement on page iii of this report).*

31 January 2011

EXHIBIT 11

# Table of Contents

Endorsement………………………………………………………………………...   iii

Background and Purpose of Report……………………………………………………   1

The Gulf of Mexico Ecosystem………………………………………………………..   4

Oil Spills in the Marine Environment…………………………………………………   10

Sources of Oil in the Marine Environment……………………………………………   15

Lessons Learned From Previous Oil Spills……………………………………………   17

DWH Oil Spill and Fishery Species Recovery………………………………………...   18

Shrimp…………………………………………………………………………………   23

Crabs…………………………………………………………………………………..   26

Oysters…………………………………………………………………………………   29

Finfish…………………………………………………………………………………   33

Conclusions……………………………………………………………………………   36

Literature Cited………………………………………………………………………...   40

Appendix I: About the Author…………………………………………………………   44

Appendix II: Literature Reviewed……………………………………………………..   47

# Endorsement

The Harte Research Institute (HRI) for Gulf of Mexico Studies at Texas A&M University-Corpus Christi has reviewed and endorses this expert opinion report. As Dr. Wes Tunnell has noted in this opinion, establishing a recovery date or time is more difficult than determining the impact from the spill itself. In fact, establishing an exact recovery time is essentially impossible. However, HRI is committed to assisting with the recovery process and understands that claimants need to be reimbursed for their losses as soon as possible. As is thoroughly explained in Dr. Tunnell's expert opinion, there are many short-term and long-term biological and ecological circumstances that can impact Gulf of Mexico fishery species, some easily detected and others not showing up for years. However, we believe that his projected recovery times are reasonable estimates at this early stage in the process.

Dr. Wes Tunnell was paid as a consultant to develop this expert opinion during the university holiday season break in December 2010. HRI did not receive any funding for their review and endorsement of this report.

Larry D. McKinney, Executive Director
Harte Research Institute for Gulf of Mexico Studies
Texas A&M University-Corpus Christi

## An expert opinion of when the Gulf of Mexico will return to pre-spill harvest status following the BP Deepwater Horizon MC 252 oil spill

### Background and Purpose of Report

The BP Deepwater Horizon MC 252 Spill of National Significance (DWH oil spill) became the largest accidental marine oil spill in history after releasing over 200 million gallons of oil into the Gulf of Mexico from 20 April to 15 July 2010, a period of 87 days. Because of the high environmental and economic value of the Gulf of Mexico, extensive media coverage, public outcry, and scientific concern focused attention on the Gulf for months during mid 2010.

An unprecedented response of 1000s of workers and 100s of boats and ships continued cleanup and assessment into the fall after capping the well in July. To understand the true magnitude of the response to the spill, the National Oceanic and Atmospheric Administration (NOAA) produces a monthly activity report entitled the "NRDA (Natural Resources Damage Assessment) by the Numbers" report, and on 1 December 2010 the report listed: 29,599 environmental samples collected for analysis; 37,183 NRDA laboratory analyses conducted; almost 30,000 total samples include those collected by 83 offshore research cruises, including 17,026 water samples, 3,806 sediment samples, 5,007 tissue samples, and 1,917 tarball samples; 34,768 images, and over 4,000 linear miles of shoreline surveyed.[1]

---

[1] National Oceanic and Atmospheric Administration [Internet]: Gulf Spill Restoration. [cited 2010 December 23]. Available from: http://www.gulfspillrestoration.noaa.gov/

Regarding the overall economics of Gulf of Mexico commercial fisheries, fishermen harvested

1.27 billion pounds of shellfish and finfish that earned $659 million in total landings revenue in

2008 (NMFS 2010a). The economic multipliers of commercial fishing range from 2X to 3X

dockside value, conservatively, to 8X-10X demonstrating the significant impact all along the

value chain.[2] It is not just fishermen that are impacted but also the processor, distributor, retail

establishments, and restaurants.

In response to economic losses caused by the spill, the Gulf Coast Claims Facility (GCCF)

opened in June 2010 "as part of an agreement between the Obama Administration and BP to

assist claimants in filing claims for costs and damages incurred as a result of the oil spill

stemming from the Deepwater Horizon Incident".[3]  As of 13 December the GCCF had processed

over 463,000 claims and paid out about $2.5 billion to over 166,000 individuals and businesses.[4]

One significant, but difficult to assess, economic sector which the Gulf Coast Claims Facility

will have to deal with soon is the fishing industry of the Gulf of Mexico. NOAA Fisheries

Service worked in concert with the Food and Drug Administration (FDA), the Environmental

Protection Agency (EPA), and Gulf states to determine fishery closures in the northern Gulf of

Mexico as a result of the DWH oil spill. This action was "a precautionary measure to ensure

---

[2] Center for Natural Resource Economics & Policy [Internet]: Economic Impacts of Fisheries and Coastal Habitats. [cited 2010 December 23].  Available from: http://www.cnrep.lsu.edu/pdfs/LSG%20Oil%20Spill%20FAQs.pdf
[3] Gulf Coast Claims Facility [Internet]: Deepwater Horizon.  [cited 2010 December 23].  Available from: http://www.gulfcoastclaimsfacility.com/press1.php
[4] Gulf Coast Claims Facility [Internet]: Deepwater Horizon.  [cited 2010 December 23].  Available from: http://www.gulfcoastclaimsfacility.com/pressB.php

public safety and (to) assure consumer confidence in Gulf seafood" (NMFS 2010b).  Closures started on 2 May 2010 in the area around the well blowout and continued to expand through the middle of July, peaking at 84,101 square miles or 34.8% of the Gulf of Mexico U.S. Exclusive Economic Zone (EEZ).[5] Closures then decreased throughout the fall until 15 November when only the area around the MC252 well was closed, an area of 1,041 square miles or 0.4% of the U.S. Gulf EEZ. On 24 November an additional 4,213 square miles were added to the closure for royal red shrimp fishing only, as a result of the discovery of tar balls in some royal red shrimp trawls (NMFS 2010c).

The purpose of this report is to provide an expert opinion to the Gulf Coast Claims Facility regarding the duration of any negative biological effects of the DWH oil spill on those species commercially harvested in the Gulf of Mexico (primarily shrimp, crabs, oysters, and finfish). Because of great variability of the environment and natural populations, present-day, as well as historical, information and data, will be utilized, along with the scientific literature to give the best informed estimate of when fishery populations will be back to pre-spill conditions.

Before looking specifically at the species of concern and their recovery, it is important to understand the Gulf of Mexico ecosystem, as well as lessons learned from previous oil spills, particularly those in the Gulf of Mexico.

---

[5] National Oceanic and Atmospheric Administration [Internet]: National Marine Fisheries Service; fishery closures. [cited 2010 December 23].  Available from: http://sero.nmfs.noaa.gov/ClosureSizeandPercentCoverage.htm

**The Gulf of Mexico Ecosystem**

The Gulf of Mexico is the ninth largest body of water in the world, and it is economically and ecologically one of the most productive and important (Tunnell 2009). Geographically, the Gulf is located in the southeastern part of North America, and it is surrounded by three countries – the United States to the north, Mexico to the south, and the island of Cuba in the east. The Gulf is a Mediterranean-like basin connected to the Caribbean Sea via the Yucatan Strait and with the Atlantic Ocean by the Straits of Florida. The Gulf occupies a surface area of approximately 579,000 square miles, and it has a maximum depth of 12,632 feet (Darnell and Defenbaugh 1990). Although the straight-line length of the shoreline around the Gulf is about 4000 miles, when the intricacies of all the shorelines of all the estuaries, lagoons, and waterways are included, it totals over 47,000 miles (NOS/NOAA 2008).

The Gulf of Mexico is alternatively known as the American Mediterranean, America's Sea, the Energy Coast or Third Coast, and, unfortunately, the Forgotten Coast. The Gulf is a sea of contrasts, where a healthy environment and a healthy economy both coexist and contend with each other (McKinney, 2009).  Perhaps a positive outcome of the DWH oil spill is the increased awareness that focused attention on the Gulf and its strong economic and environmental value to the nation.

Economically, the five U.S. states that border the Gulf of Mexico have a gross domestic product of over $2.2 trillion, and the robust economy of the Gulf region provides jobs for more than 20 million people. Much of this economic activity is linked to Gulf of Mexico natural resources, such as tourism and recreation, commercial and recreational fishing, and petroleum production

and exploration (NOS/NOAA 2008). In a recent year (2006) 83% of the total US shrimp landings, 56% of the oyster landings, and 14% of the commercial fishery landings came from the Gulf of Mexico. The average number of pounds of commercial fishery landings coming from the Gulf totals 1.3 billion per year (in 2006) yielding a value of $662 million (NOS/NOAA 2008).

The oil and gas industry in the northern Gulf of Mexico is one of the most developed in the world, and it produces over 52 % of the crude oil production in the US, 54% of the natural gas production, and 47% of the crude oil refinery capacity (NOS/NOAA 2008). Over 107,000 petroleum related workers are employed in the Gulf with over $12.7 billion annual wages earned.

Biologically, the shallow waters of the northern Gulf are categorized as warm temperate and reside within the Carolinian Biogeographic Province (Briggs 1974). These are some of the most highly productive coastal waters in the world and include ecologically important habitats, such as barrier islands, tidal flats, coastal wetlands and marshes, oyster reefs, seagrass meadows, and open bay bottoms (NOS/NOAA 2008). These important habitats provide many ecological functions, such as feeding grounds, nursery grounds, nutrient sources, and structure to hide from predators. The fact that 95% of all commercially and recreationally important species depend on these estuarine and coastal habitats at some stage in their life cycle is strong evidence of their ecosystem value. The north-central Gulf of Mexico is sometimes referred to as the nation's "Fertile Crescent" due to the high productivity, plentiful nutrients, and abundance of critical nursery habitats (Moore et al. 1970, Darnell et al. 1983).

A high diversity of marine life, including over 15,400 species, exists in the Gulf of Mexico, making it one of the most biodiverse oceanic water bodies on Earth (Felder and Camp 2009).  In addition to the 1000's of invertebrates, including over 2400 seashells and over 2500 crustaceans, there are over 1500 species of fishes, 5 sea turtles, nearly 400 species of birds, and 30 species of marine mammals.  The Kemp's Ridley sea turtle is the most endangered in the world, but its numbers are now increasing after decades of decline and focused conservation attention.  In addition to the only wild population of Whooping Cranes in the world along the Texas coast, vast numbers of colonial waterbirds nest on rookery islands along Gulf shores, and hundreds of thousands of migrating shorebirds, song birds, raptors, and waterfoul (ducks and geese) use Gulf flyways (Tunnell 2009).  The most common coastal marine mammal, the bottle-nosed dolphin, has a population near 78,000 individuals in the northern Gulf of Mexico (Wursig et al. 2000).

Most Americans or visitors to the northern Gulf of Mexico have a misconception of this grand aquatic ecosystem. Their visits to Corpus Christi, Galveston, Biloxi, or Mobile often reveal brown, turbid waters in the Gulf with oil and gas platforms on the horizon and oil refineries on the mainland. However, just a short distance offshore and all the way to Mexico and Cuba, are clear and blue oceanic waters with a rich diversity of marine life and habitats.

Although Gulf waters are known to be highly productive and biodiverse, that does not mean they are without impacts and threats. Increasing population pressure and utilization of Gulf resources have caused considerable effects with a significant list of threat issues: loss of critical habitat, degradation of water quality, overfishing and poor fishing techniques, oil spills, nutrient enrichment with dead or low oxygen zones, invasive species, beach/shellfish closures, coastal

development, and harmful algal blooms (Kumpf et al. 1999). Following the suggestion of the

U.S. Commission on Ocean Policy (2004), the Gulf of Mexico region formed the Gulf of Mexico

Alliance (GOMA) to start addressing the above environmental issues.  GOMA is a partnership

between the five U.S. Gulf states and two federal agencies (EPA and NOAA), and they have

now produced two Action Plans to start addressing key environmental issues (GOMA 2006,

2009). Other organizations that focus primarily or exclusively on the Gulf include: Gulf States

Fisheries Commission, Gulf of Mexico Fisheries Management Council, EPA Gulf of Mexico

Program, NOAA Gulf Coast Service Center, Harte Research Institute for Gulf of Mexico

Studies, Northern Gulf Institute, Gulf of Mexico Foundation, and the Gulf Restoration Network.


Resiliency of the Gulf of Mexico is a key issue being addressed by GOMA and Gulf scientists.

Resilient coastal communities, like resilient natural populations, are those that are healthy and

diverse, and able to rebound after natural or anthropogenic catastrophes. Hurricanes *Katrina* and

*Rita* during 2005 severely tested both natural and human populations, and they encouraged future

focus on rebuilding and restoring both.  The DWH oil spill has now affected and tested some of

those same natural and human populations.


In a previous large Gulf of Mexico oil spill, the Gulf of Mexico displayed resiliency, and it

seemed to rebound or recover much faster than most people predicted. The Ixtoc I oil spill of

1979-80 was the world's largest accidental marine oil spill until the DWH spill, and it released

140 million gallons of oil into the Gulf over almost 10 months of time. Although small remnants

of Ixtoc tar mats can still be found today at a few remote Mexican localities, the majority of Gulf

species and habitats seem to have recovered. Unfortunately, there were no long-term

comprehensive studies done to confirm recovery, so we cannot be certain. In addition, it is unclear today whether the Gulf of Mexico is as resilient as it was 30 years ago, due to the many and continuing environmental impacts.

Before moving to the next section on lessons learned from previous oils spills, it is important to discuss and understand the role of natural seepages of hydrocarbons into the Gulf of Mexico. These natural seepages are well know and widespread throughout a large area of the Gulf, and they have been occurring for millennia. The seepages are very important for two reasons: 1) the Gulf is accustomed to assimilating these slow, chronic releases of oil and Gulf waters are inoculated with natural petroleum-eating microbes in almost all habitats, and 2) it means that natural seepage oil is widespread, so scientists must be careful to note the origin of oil affecting species or habitats.

Archaeological evidence reveals Karankawa Indians on Padre Island, Texas, used beach tars or asphalt to line and seal pottery as far back as Pre-Columbian times (Campbell 1952), and early Spanish explorers used beach tars and asphalt to caulk their boats (DeGolyer (1918). The first scientific report on floating oil fields in the Gulf of Mexico explained how widespread the natural seeps are (Soley 1910), and subsequent studies have shown how consistent and continuous the seepages remain today (MacDonald 1998, Garcia 2009). Analysis of satellite imagery reveals that there are over 1000 natural seeps in a wide area of the Gulf, but they are primarily clustered in the two major oil producing areas of the northwestern Gulf of Mexico and the southern Gulf of Mexico in the Bay of Campeche (Figure 1).





Figure 1. - Distribution of natural seeps within the Gulf of Mexico (a. Soley 1910 and b. image provided by I. MacDonald 2010).

Investigations of natural seepage sites in the northern Gulf of Mexico, beginning in the 1980s led to new discoveries of continental slope biota and unexpected new biota and habitats (Brooks et al. 1987, Kennicutt et al. 1988). After several decades of focus, these hydrocarbon seep communities of the northwestern Gulf are the best known in the world and show how these chemosynthetic communities utilize hydrocarbons to survive at the great depths where they occur (Cordes et al. 2007, 2010, Fisher et al. 2007). Recent tracking of surface sheens from seeps in the Bay of Campeche led to new discoveries of asphalt volcanism and chemosynthetic biota on the Campeche Knolls in the deep southern Gulf of Mexico (MacDonald et al. 2004). This brief overview of these hydrocarbon seep communities is simply to show the uniqueness of the Gulf of Mexico and its long term tolerance and adaptation to chronic additions of hydrocarbons over broad areas and the development of unique species and habitats in certain, select deep areas.

## Oil Spills in the Marine Environment

Oil and natural gas are the dominant fuels in the U.S. economy, and they provide 62% of the nation's energy and almost 100% of transportation fuels (NRC 2003). The birth of the oil industry in the U.S. is considered to have begun with the oil discovery and subsequent blowout at Spindletop near Beaumont in coastal southeast Texas in 1901. The first well drilled in the Gulf of Mexico was located one mile offshore near Cameron, Louisiana, in 14 feet of water in 1937 (T. Priest, pers. comm.).  From these slow beginnings and then with development of offshore technology, oil and gas exploration and production expanded across the continental shelf and down the slope of the northwestern Gulf of Mexico during the next seven decades. Today, about 3,500 exploration and production platforms exist in the northwestern Gulf, down from nearly

10

7,000 total, and including over 25,000 miles of pipeline and approximately 50,000 total wells drilled (multiple wells are drilled from most modern platforms).[6]

The wreck and spill of the tanker *Torrey Canyon* in southern England in 1967 and the blowout of a Santa Barbara, California, platform in 1969 ushered in the modern era of oil spill concern and awareness, prompting planning for oil spill response, clean up, contingency plans, and studies of major oil spills. In the U.S., Earth Day was created in 1970 because of the Santa Barbara spill, and the Clean Water Act was passed in 1972 in part because of these spills. The first oil spill training school in the U.S., the National Spill Control School (NSCS) at Texas A&M University-Corpus Christi, was developed as the first oil spill training facility in the U.S. in the mid 1970s because of these first major spills (CCSU 1978), and it remains active today. The NSCS was later named as the resource training program for the Oil Pollution Act of 1990.

The first scientific review of knowledge on the fate and effects of oil in the marine environment was carried out by leading oil spill and marine science experts for the National Research Council (NRC 1975) of the U.S. National Academy of Sciences. Because that study and compilation of knowledge were so useful with widespread distribution, it was repeated again by the NRC in 1985 and 2003 (NRC 1985, 2003) as more knowledge was gained about oil in the sea. The latter volume is the primary sourcebook in the U.S. of knowledge regarding the inputs, fates, and effects of oil in the sea today.

---

[6] Bureau of Ocean Energy Management, Regulation, and Enforcement [Internet]: Outer Continental Shelf Oil Production.  [cited 2010 December 23].  Available from: http://www.boemre.gov/stats/OCSproduction.htm

When the *Exxon Valdez* tanker ran aground in 1989 and spilled almost 11 million gallons of oil into the pristine environment of Prince William Sound, Alaska, another new era began in dealing with oil spills in the sea. In 1990 the U.S. Oil Pollution Act was passed, and a new structure was established in the U.S. for dealing with oil spills and the payment for recovery of damaged environments and economies (Natural Resource Damage Assessment program or NRDA) by the responsible party. Until the DWH oil spill, the *Exxon Valdez* spill was the largest and most significant in U.S. history.  Beyond the ecological damage, the *Exxon Valdez* disaster caused a fundamental change in the way the U.S. public viewed oil, oil transportation, and the oil industry (NRC 2003). Despite continuing heavy use of fossil fuels by society, "big oil" was suddenly seen as a necessary evil, and something that had to be feared and mistrusted. This reaction was quick and significant (NRC 2003).

The ecological consequences of oil spilled into the marine environment range from mild to severe. In any given spill the effects of an oil spill and the recovery time of the contaminated area will be influenced by many different variables (Tunnell 1978). Broadly speaking, the three main variables are: 1) the amount and type of oil spilled; 2) the environmental conditions at the time of the spill; and 3) the kind of environment(s) impacted by the spill. It is very important to note that the amount of crude oil spilled is not a sole measure of the ensuing damage (NRC 2003). This has been revealed time and time again in many spills, showing that the "dose" (the exact amount in a specific location at a particular time) of petroleum hydrocarbons into a particular habitat or on a particular species is the key element, not the total volume spilled.  This, of course, is very difficult to measure over a wide area in a major spill.

Regarding environmental conditions, spilled in warmer climates will weather (naturally break down) faster than oil spilled in colder climates. Physical, chemical, and biological processes speed up the natural degradation process of spilled oil. Moderate to heavy physical energy of waves and currents tend to break up and disperse the oil, and photo-oxidation speeds up the chemical breakdown and weathering process, including evaporation at the surface. Biologically, petroleum-eating bacteria and fungi feed upon the oil and speed up its breakdown, often becoming food available for other marine organisms.

As a warm water climate example of degradation and recovery, the largest oil spill in history occurred in the Arabian Gulf (Persian Gulf to some) region when approximately 520 million gallons of crude oil was released during the Iraq-Kuwait conflict (Tawfig and Olsen 1993). Although there were severe and significant shoreline impacts to marshes and intertital habitats (Gundlach et at. 1993, Jones et al. 1996), amazingly there were no significant long-term impacts to subtidal habitats or communities, including seagrass meadows, coral patch and fringing reefs, unvegetated sandy and silty substrates, and rocky outcrops (Kenworthy et al., 1993, Richmond, 1996).

In terms of environments impacted by oil spills the Environmental Sensitivity Index (ESI) is now the standard for environmental characterization used in the U.S. and many other countries of the world. The ESI was first developed by Research Planning Institute (RPI; Michel et al. 1978) and was first applied during the Ixtoc spill in South Texas in 1979-80 (Hayes et al. 1980). Shoreline habitats are ranked according to a scale relating to sensitivity, natural persistence of oil, and ease of clean-up. The scale of 1-10 includes the least sensitive environments and easiest to clean up as

13

Case 2:10-md-02179-CJB-JCW   Document 13108-1   Filed 02/23/17   Page 95 of 158

1 and the most sensitive and most difficult to clean up as 10 (1-exposed rocky shores or exposed man-made sea walls, bulk heads, and rock structures; 2-exposed rocky platforms; 3-fine-grained sand beaches; 4-course-grained sand beaches; 5-mixed sand and gravel beaches; 6-gravel beaches; 7-exposed tidal flats; 8-sheltered rocky shores or man-made sea walls, bulk heads, or rock structures; 9-sheltered tidal flats; and, 10-salt to brackish marshes and mangroves) (Gundlach and Hayes 1978). Today this scale is used to generate maps for contingency planning for oil spills and is placed in a GIS system for ease of use, broad accessibility, and updating. Specific biological resources, such as sensitive habitats and species, nesting grounds, etc., are added to the maps, along with human-use resources, such as marine sanctuaries and refuges or important cultural or historical sites. Because all U.S. shorelines have now been mapped using the ESI, it is a vital tool used by the NOAA Scientific Support Coordinator to inform the U.S. Coast Guard Federal On-Scene Coordinator during a spill.

The above complexities of oil spilled in the environment and the subsequent fate and effects clearly reveal the difficulty in assessing damages from a spill and the near impossibility in accurately predicting the environmental impact or time of recovery. As noted earlier, the effect of oil is not directly related to the amount released. It is instead a complex function of the rate of release, the nature of the released oil, and the local physical and biological ecosystem (NRC 2003).  Similar encounters or habitats can respond differently over short distances, depending on the exact amount of dosage at any given time.

Marine ecosystems and their varied components fluctuate on a variety of time scales ranging from hours to millennia, and on space scales ranging from feet to that of an ocean basin (NRC

2003). Therefore, in the absence of on-going local or regional monitoring, it is very difficult to quantify the effects from an oil spill, or to establish when recovery from such a pollution event is complete. Populations in an area may be in a long-term trend upwards or downwards resulting from, for instance, large scale climatic changes or physical alterations to the habitat. So, determining recovery to a certain endpoint may be ill-conceived, if the larger scale trend is unknown or is not factored into the recovery equation or model.

Catastrophic or acute oil spills are far different than the chronic natural seepage previously mentioned above. Acute effects may be of short duration and limited impact, or they may have significant long-term effects at the population or community level depending on the many factors mentioned above. Physical fouling or suffocation from heavy oiling and varied physiological and toxicological responses may be immediate, but they may also be chronic and/or sublethal and difficult to detect, even showing up months or years later. Changes in feeding behavior or reproductive behavior could affect populations for years from re-oiling of submerged or hidden oil that was not removed.  The unprecedented and unexpected crash in the herring fishery five years after the Exxon Valdez oil spill is a classic example of the unknown that can surprisingly appear years later (Peterson et al. 2003).

### Sources of Oil in the Marine Environment

After years of study and review of many sources of information the National Research Council (2003) categorized all petroleum input into the sea into four categories: natural seeps, petroleum extraction, petroleum transportation, and petroleum consumption. Table 1 summarizes the

Table 1.  Average, Annual Releases (1990-1999) of Petroleum by Source (best estimates in millions of gallons)(NRC 2003).

| Source | Gulf of Mexico | North America | Worldwide |
|---|---|---|---|
| **Natural Seeps** | 43.1 (82%) | 49.6 (63%) | 184.7 (83%) |
| **Extraction of Petroleum** (platforms, atmospheric deposition, produced waters) | 0.8 (2%) | 0.9 (1%) | 11.7 (5%) |
| **Transportation of Petroleum** (Pipeline spills, tanker spills, operational washings, coastal facility spills, atmospheric deposition) | 1.3 (2%) | 2.8 (4%) | 6.3 (3%) |
| **Consumption of Petroleum** (land-based, recreational, operational discharges, atmospheric deposition, jettisoned aircraft fuel) | 7.1 (14%) | 25.9 (33%) | 20.2 (9%) |
| **Total** | 52.3 | 79.2 | 222.9 |

average, annual releases of petroleum into the environment by source categories during 1990-1999 in gallons and percent per category for the Gulf of Mexico, North America, and Worldwide. Natural seeps dominate all three of the geographic categories. In the Gulf of Mexico during the decade of the 1990s, 82% of the input from coastal and offshore sources was from natural seeps. When only offshore sources are considered, 95% of inputs came from natural seeps (NRC 2003).  This percentage would obviously be different during the next decade due to the DWH oil spill.

## Lessons Learned from Previous Oil Spills

Although lessons can be learned from many previous oil spills, the most appropriate major spill for the Gulf of Mexico is the Ixtoc I spill. This platform blowout in the southern Gulf of Mexico, Bay of Campeche, 50 miles north of Ciudad del Carmen, Campeche, was very similar in many ways to the DWH oil spill, but it also had distinctive differences. The Ixtoc spill began on 3 June 1979 and ended on 23 March 1980, lasting almost 10 months and releasing about 140,000 million gallons. The burning platform sank several days after the blowout, and similar clean up strategies (burning, dispersant, booms, and skimmers), as well as containment strategies (top kill, junk shot, top hat called the sombrero, and relief wells) were utilized (Jernelov and Linden 1981). Besides extending for a much longer period of time than the DWH oil spill, the other main differences were the water depth, 170 feet for Ixtoc versus 5000 feet for DWH and the use of dispersants at great depth.

After 60 days of oil release into the southern Gulf and drifting on westward and northward moving currents, the oil reached Texas beaches and coated them with moderate to heavy oiling for over 150 miles north of the Rio Grande during August and September 1979 (ERCO 1982, Hooper 1981). The clean-up strategy in Texas was to let oil hit the outer barrier island beaches but boom off all tidal inlets to prevent oil entering the sensitive estuaries and lagoons of the South Texas coast. For the most part, this strategy worked well.

Unfortunately, as with most major spills, there were no long-term, ecosystem studies to monitor the affect of the spill in either Texas or Mexico. Short-term studies in Texas revealed impact and recovery of shorebirds (Chapman 1979, 1981) and beach biota (Tunnell et al. 1981, Kindinger

17

1981) after 1 and 2-3 years, respectively.  Besides some minor oiling of shorelines along jettied inlets and shorelines just inside inlets, no major estuarine impacts to habitats or species were reported. Offshore, one study compared the Ixtoc oil spill and *Burmah Agate* (a tanker spill off Galveston in 1979) to the large multi-year South Texas Outer Continental Shelf study completed several years prior to both spills and found no effects related to the spills in the outer shelf area (Lewbel 1985).

In Mexico only one overview report was published by a consortium of Mexican authorities, but it had little useful information on environmental impacts of the spill (PCEESC 1980).

**DWH Oil Spill and Fishery Species Recovery**

The DWH oil spill released over 200 million gallons of oil into the northern Gulf of Mexico for 87 days between 20 April and 15 July 2010. Approximately 1.84 million gallons of dispersants were added to help disperse the oil and keep it from washing ashore into sensitive coastal habitats, critical fishery areas, and places of high public use. The application of over 40% of the dispersants at depth near the wellhead caused great concern among the public and many scientists. In response, the federal government launched an unprecedented effort to study the effect of the sub-surface dispersants and the plumes of micro-droplets of oil in the deep water column during the fall of 2010. A summary report on these findings was released on 17 December 2010 by the Operational Scientific Advisory Team (OSAT) of the Unified Area Command (OSAT 2010). The U.S. Coast Guard is the designated Federal On-Scene Coordinator (FOSC), and NOAA (in marine spills) is the designated Scientific Support Coordinator (SSC) to

the FOSC and also leads the numerous trustees for the Natural Resource Damage Assessment (NRDA) process established in the Oil Pollution Act of 1990.

Some of the findings of the OSAT sub-surface report are important to the present report and will be used below, but a brief overview of their findings from the Executive Summary include: no liquid oil was found beyond the shoreline; no exceedences of the EPA Human Health or dispersant benchmarks were observed; less than 1% of the water samples exceeded EPA Aquatic Life benchmarks for polycyclic aromatic hydrocarbons (PAHs) but none were consistent with MC 252 oil; about 1% of sediment samples exceeded the PAH benchmarks but they were only the ones less than 2 miles from the wellhead; of the previously closed fisheries areas, 87,481 square miles have been reopened, with only 1,041 square miles around the wellhead still closed (on 24 November 2010 royal red shrimp were subsequently closed to fishing in a 4,213 square mile area near the wellhead); some drilling mud entrained with oil exists in an area near the wellhead; and, tar mats in shallow nearshore waters were identified as an area of sampling gap. A separate team has been tasked with surveying and understanding the extent of these tar mats. Toxicity testing of sediments was not available at the time of the 17 December OSAT report release, so that information will be released in a subsequent report in early 2011.

Compared to the Ixtoc I oil spill, the DWH oil spill affected a much smaller area of the Gulf (Figure 2). The DWH spill occurred during late spring and early summer when climatic conditions and sea conditions are generally calm in the northeastern Gulf near the well site, whereas the Ixtoc spill occurred from early summer to the following spring through all seasons of the year, including numerous winter fronts and several tropical storms. The DWH spill oiled a

19



Figure 2. - Location and distribution of spilled oil and oiled shorelines caused by the BP DWH oil spill and the Ixtoc I oil spill.

shoreline area of less than 400 linear miles, and the Ixtoc spill oiled over 1500 linear miles of the entire western and southern Gulf. This oiling of an area of less than 5% of the entire Gulf during the DWH spill is significant for the recovery process, since many northern Gulf species have a much wider distribution than the affected area, and therefore the ability to help recolonize impacted areas by prolific spawners with widely dispersed planktonic eggs and larvae. Ecologically the DWH spill occurred in a very sensitive area of the Gulf, which includes the highly productive coastal wetlands and marshes of the Mississippi Delta. These salt and brackish

marshes are a number 10 on the ESI scale, being sensitive to oiling and difficult to clean up. In fact, the usual clean-up strategy for marshes is to leave them alone and let natural cleaning process proceed, as any clean up activity tends to push oil deep into the sediments by clean-up crews and machinery, making recovery take much longer. In addition to these sensitive marshes, other highly productive, critical habitats in the Fertile Crescent shallow waters include oyster reefs and seagrass meadows. These highly productive and biodiverse habitats serve as feeding grounds and nursery grounds for many nearshore species. By comparison, regarding the Ixtoc oil spill, the fine-grained sand beaches of the western and southern Gulf are a number 3 on the ESI scale, so they are not as sensitive, and they can recover more quickly. These fine-grained sand beaches are found on almost continuous barrier islands and peninsulas west of the Mississippi Delta and provide natural barriers (or natural booms) for the more sensitive estuarine and lagoonal habitats inshore of them. In the northern Gulf a more open coast prevails with smaller and discontinuous barrier islands offshore, thus allowing oil to potentially reach sensitive inshore environments.

These highly productive nearshore environments are what make the northern Gulf a productive fishery area. Coastal fisheries (delineated by the 3-nautical mile state line from the shoreline for Louisiana, Mississippi, Alabama; Texas and Florida have a 9-nautical mile line) are under jurisdiction and regulation of each individual state, and offshore waters are under federal jurisdiction and regulation by the National Marine Fisheries Service (NMFS) of NOAA. The Gulf States Marine Fisheries Commission provides advisory information on coastal fisheries with representatives from each Gulf state. The Gulf of Mexico Fisheries Management Council is

one of eight regional fishery management councils in the U.S. and helps advise and manage Gulf of Mexico fisheries within the EEZ of the Gulf.

In addition to the obvious and direct death of biota or habitats that can occur during an oil spill, there are many possible sublethal effects which can occur, and they can be quite insidious and are very difficult to detect or measure. These effects might include reduced reproductive capacity, or sizes of individual organisms might be smaller as a result of exposure to oil components, or a result of reduced amounts of food or habitat. The effects of oil on plankton (food for larvae of fish and invertebrates) are currently unknown, and may never be known. The effects of oil on trophic cascades and ecological interactions are also unknown (T. Shirley, pers. comm.).

The charge of this report is to provide "an expert opinion as to the duration of any negative biological effects of the Deepwater Horizon oil spill on those species commercially harvested in the Gulf (primarily shrimp, crabs, oysters, and finfish)". The first three groups will be dealt with individually below to provide a best estimate of the time to recovery of the fishery to pre-spill status, or to the duration of any negative biological effects caused by the spill. The fourth category "finfish" will be dealt with as a group, as it was not requested, nor is it perhaps even practical or necessary, to deal individually with all the many species in this category. General and relevant information about the biology of each group will be presented, as well as potential impacts from the oil spill and duration of impacts on the species and fishery. A summary statement about recovery will be given in bold for each group near the end of each discussion.

**Shrimp**

The major shrimp fishery species in the Gulf of Mexico include the brown, white, and pink shrimp. The Gulf of Mexico regional shrimp landings are the largest in the U.S. with over 188 million pounds or 73% of the national total in 2008. The total dockside value that year was $367 million with Louisiana landing the largest catch at 89 million pounds and a dockside value of $130.6 million, followed by Texas at 63.8 million pounds and $157.2 million, Alabama at 17 million pounds and $38.4 million, West Florida at 9.9 million pounds and $23.3 million, and Mississippi at 8.6 million pounds and $17.1 million (NMFS 2010a).

These shrimp all have a distinctive and similar life cycle with adults living and spawning in the offshore Gulf of Mexico, releasing eggs into the Gulf that go through several life stages as they migrate towards the protective estuarine nursery grounds and grow as juveniles, and then head back out to the Gulf as large juveniles or subadults. Depending on the species, each shrimp can release anywhere from 250,000 to 1 million eggs. Feeding habits of these shrimp vary by species but are often omnivorous as larvae and can be scavengers or carnivores as adults, and they serve as very important food sources for many different finfish and other marine life. Adults generally live on the bottom. Eggs when first released settle to the bottom for a short while (less than 1 day). Larvae hatch and rise to the surface, and larval stages live in the water column, often migrating up and down with daylight and dark condition. Brown and white shrimp are more common in the northern and western Gulf, and pink shrimp are more common in the eastern Gulf. Brown shrimp is usually the largest harvest, followed by white and then pink shrimp. However, since brown and white shrimp are difficult to distinguish in the field, they are often lumped together in fishery harvest statistics. Shrimp are considered an "annual crop" for

harvesting purposes. Brown shrimp usually move out into the Gulf from February to April, and white shrimp move out from May through November (Patillo et al. 1997).

Unfortunately, there are few published field studies on the impact of oil spills on Gulf shrimp. However, several Mexican researchers with pre-spill data were able to document that two years after the Ixtoc oil spill, the Campeche shrimp fishery returned to pre-spill levels (Soto et al. 1981). In addition, on the South Texas continental shelf where considerable Ixtoc oil was present on the surface, there were no Ixtoc oil residues found in sediments of the shrimp grounds (Lewbel 1982), and an examination of Texas Commercial Harvest Statistics revealed no significant change in shrimp catches after the spill (Hamilton 1983).

In the case of the Arabian Gulf oil spill mentioned above, and in opposition to most subtidal habitats that did not have significant long-term impacts, shrimp stocks were severely impacted with drastic drops in spawning and total biomass (Matthews et al. 1993). Multiple causes for this collapse were attributed to such things as mass mortality of eggs, larvae, and juveniles resulting from oil exposure during the entire spawning season, emigration of adults out of the oiled area, mortality of adults, and heavy fishing of adults and juveniles. Later research, however, showed that the shrimp population rebounded to "better tan anyone could remember that it had ever been" (Jernelov 2010). A temporary shrimp closure and then new boats and equipment may have influenced these higher numbers.

Intuitively, because adult shrimp live on the bottom and spilled oil is generally on the surface, shrimp may not be directly affected. However, during the DWH oil spill, some eggs may have

encountered floating oil and larval stages may have encountered dispersed oil in the water column. In addition, some important nursery habitat (coastal marshes) of shrimp was impacted by the DWH oil spill. There is also the possibility that some oil or dispersed oil attached to sediment particles near shore and sank, later forming layers of oiled sediment and clean sediment. Microbial breakdown may be enhanced by this process, unless sediment becomes anoxic (without oxygen), wherewith the degradation process would be slowed or stopped. Also, food of larvae in the water column, and of juveniles and adults on the bottom may have been reduced in quantity or contaminated with oil.

However, shrimp have annual life cycles and can live up to two years, so after a spill, or any other event that could cause a lost year class, it is reasonable to expect that shrimp would recover after just one year, or two years at the maximum, unless there is a continuation of the insult or perturbation.

Interestingly, and significantly, research scientists in the northern Gulf of Mexico off Alabama have seen increases in both biodiversity and biomass of trawled marine organisms post-spill (J. Valentine, pers. comm.). For example, an increase in abundance of four times for shrimp was recorded. These increases are likely a function of the fishery closure and removal of fishing pressure, but it also shows that shrimp are not only present but very abundant during fall 2010.

**In summary, if potential impact scenarios stated above have not significantly impact 2010 shrimp populations and their life cycles, it is believed that shrimp catches for the brown, white, and pink shrimp in the northern Gulf of Mexico will likely continue along the same**

**harvest trends in recent years by 2011, and even more likely by 2012. Loss of Mississippi Delta nursery habitat could cause a percentage reduction in shrimp population size until marshes recover.**

There is a small but distinct fishery for royal red shrimp in deep offshore waters, and as indicated by the recent closure around the wellhead (NMFS 2010c), this fishery will need further scrutiny to determine when and if it should be opened.

## Crabs

Blue crab are the most economically valuable crab species for the northern Gulf of Mexico region and constitute the main crab fishery for the area. Two species of stone crabs are also harvested, but their numbers and value is not near that of the blue crab and many of them are taken incidental to the blue crab fishery. Louisiana lands the largest percentage of the harvest at 26% of the total blue crabs for the nation or 41.6 million pounds in 2008 (dockside value of $32 million).  Landings and dockside value for other Gulf states for 2008 include: West Florida at 2.7 million pounds and $3.3 million; Texas at 2.6 million pounds and $2.3 million; Alabama at 1.8 million pounds and $1.5 million; and, Mississippi at 450,000 pounds and $447,000.

Because blue crab populations are essentially entirely coastal in distribution, they are managed by each state fisheries agency and the Gulf States Marine Fisheries Commission.

Blue crab are a classic example of an estuarine-dependent species, and they are considered by some to be a good indicator species of estuarine health. Mating may occur all year round in

brackish areas of an estuary, while egg hatchings occurs in high salinity nearshore waters (Gillory et al. 2001). Early larval forms are generally found in nearhore-offshore waters and later larval forms migrate into the estuary, where juvenile crabs are widely distributed throughout the estuary. Adults are generally differentially distributed in an estuary with males preferring lower salinities near river inflows and females found in higher salinities towards the Gulf. Critical nursery habitats include intertidal marshes, sub-tidal seagrass beds, and unvegetated, soft sediment shorelines (Gillroy et al. 2001).

The peak reproduction period for blue crab is August-September and young crabs reach a harvestable size in the April-May timeframe. Estimated life span is 3-4 years. Blue crab are highly productive, producing 1.7 to 2.0 million eggs per hatching event (Patillo et al. 1997), and they are fast-growing and relatively short-lived. These reproductive characteristics indicate that the species can sustain high exploitation or heavy population reduction from an unnatural event and recover quite rapidly (Gillroy et al. 2001), if healthy environmental conditions exist and adjacent areas have adequate adult populations.

Although there are apparently no field studies on the impact of spilled crude oil on blue crab in the Gulf of Mexico, there is a considerable literature on lab experiments of various contaminants deleteriously affecting different life stages of blue crab from U.S. estuaries (Millikin and Williams 1984, Bookout et al. 1980, Schimmel and Wilson 1977, Bookout and Costlow 1975, to mention only a few). Regarding crude oil experimental testing in the laboratory, blue crab "juveniles were extremely tolerant to long-term petroleum aromatic hydrocarbon exposure" (Wang and Stickle 1987).

27

Scientists in the northern Gulf (H. Perry) reported oil droplets inside the shell of larval crabs during the DWH oil spill, but the outcome of that research is not available yet. There were no published or posted reports of blue crab die offs during the spill, even though light to medium oiling occurred in substantial areas of blue crab habitat. Some blue crab nursery habitat (coastal wetlands and marshes) was affected by the spill in the Mississippi Delta.

It is important to note that there has been a widespread multi-decadal decline in blue crab populations on the Atlantic coast and in the Gulf of Mexico. A definitive cause for this long-term and widespread decline has not been identified, but the declining trend should be considered in the Gulf impact and recovery from the DWH oil spill.

**In summary, because blue crab populations do not appear to have been significantly impacted by the DWH oil spill, and because they are a highly reproductive species with widespread distribution throughout the region, it is believed that their population levels will likely continue along the same harvest trends in recent years in 2011. As noted above, some local populations may be reduced by larval impacts from the oil (or oil and dispersants) or by reduction in nursery ground coastal marshes. As indicated with shrimp, this loss of nursery habitat could cause a percentage reduction in crab population size until the marshes recover.**

**Oysters**

The Gulf of Mexico leads the U.S. in the production of oysters, producing about 67% of the national total, including 20.6 million pounds and $60.1 million (in 2008). Louisiana leads the harvest with 12.8 million pounds and $38.8 million. Following Louisiana in harvest are: Texas at 2.7 million pounds and $8.83 million; Mississippi at 2.6 million pounds and $6.87 million; West Florida at 2.6 million pounds and $5.47 million; and, Alabama at 72,776 pounds and $243,414 (NMFS 2010a).

A recent and significant report on oyster reefs worldwide noted an 85% reduction or loss of this habitat on a global scale, and it noted that the most significant remaining oyster populations in the world exist in the Gulf of Mexico (Beck et al. 2009). This report, produced by The Nature Conservancy, sparked a widespread movement (by The Nature Conservancy and others) to enhance and restore Gulf oyster reefs in 2009 and 2010. Many new restoration projects were halted in the northern Gulf at the onset of the DWH spill.

Harvest methods for oysters include hand picking in shallows, tonging from boats, and dragging or dredging from boats. Most Gulf landings are from publicly owned oyster beds but about 30% of the harvest is from privately leased beds (Mackenzie 1989).  Commercial fishery regulations for oysters vary from state to state, but all oysters harvested must be at least three inches in length according to the Gulf States Marine Fisheries Commission. Depending on location and local growth rate, oysters are harvested at about 1.5-2 years of age and live up to about six years (Galtsolf 1964).

Oysters primarily live on self perpetuating oyster reefs, but they can grow on almost any hard substrate in estuaries and nearshore waters, and therein lies their greatest vulnerability. If oil should get into the interstitial spaces of oyster reefs, then it is likely that juvenile oysters settling on oiled shell will not fare well. Also, the degradation of oil in a reef will add to the biological oxygen demand, and low dissolved oxygen could harm growth of newly settled oysters (P. Montagna, pers. comm.).

These bivalve mollusks are filter feeders and in large concentrations can filter huge quantities of water and increase water clarity. Although oysters can tolerate a wide range of salinity, their optimal range is between 12-15 parts per thousand. Depending on the amount of freshwater inflow in a particular bay, this can place reefs in upper, mid, or lower reaches. Too much freshwater will kill oysters, although they can tolerate some freshwater flooding from time to time. They do not feed or reproduce when salinities are too low for extended periods of time. Likewise, they can exist in higher salinities, but in those areas they are susceptible to numerous parasites and predators, which take a heavy toll on survivorship.

Oysters are protandrous, starting life as males and then changing to females. This insures a large number of females in the older population, and they are highly productive, producing 15-115 million eggs in a single spawn (Galtsolf 1964). Because of the wide distribution of oysters in northern Gulf estuaries and this high productivity, there are always high numbers of oyster eggs and larval stages in the summer plankton. The limiting factor for most of these young stages is adequate hard substrate for settlement, which is rare in the soft sediment dominated region of the

northern Gulf.  Death of an oyster reef for whatever reason, however, can be quickly recolonized because of this natural condition of abundant eggs and larvae.

There is a significant, but old and little known, extensive study and literature on crude oil impacts to southern Louisiana oysters. Projects 9 and 23 were funded from 1947 through the early 1960s to study the impact of oil and gas activities on oysters in coastal Louisiana. Over 400 communications, including 200 reports, were filed as a result of this extensive multi-year, multi-institutional study (Texas A&M University, University of Texas, Texas Christian University, Louisiana State University, and others). Twenty eight universities received the major reports of the study, and three independent summaries were completed, with the primary one being an entire dedicated issue of the *Publications of the Institute of Marine Science* (Volume 7, 1961), published by the University of Texas, Institute of Marine Science (now Marine Science Institute). The primary paper summarizing all of the work in the dedicated issue was by Mackin and Hopkins (1961).

Years of dead or dying oysters in coastal Louisiana had been blamed on the developing and expanding oil and gas industry, so the initial question that started the projects in 1947 was "Has pollution by oil or oil well effluents, or seismographic exploration, caused mortality of oysters in Louisiana?" Years of work revealed that oysters were quite tolerant of light to medium oiling, and that a parasite new to science ("dermo", named after its first scientific name *Dermocystidium marinum,* now *Perkinsus marinus*) was the culprit killing the oysters. Another interesting revelation of the research was that oiling did kill barnacles, which are a major predator of

31

planktonic larval oysters, and oyster numbers did increase in certain areas when barnacles died off (S. Ray, pers. com., Mackin and Hopkins 1961).

Heavy oiling is known to kill most intertidal and shallow subtidal organisms, including oysters, due to suffocation, if not by emersion in toxic components of the spilled oil. Although there were no scientific surveys or reports, fishermen along the extensive mangrove shoreline north of Campeche, Yucatan Peninsula, reported that all mangrove oysters (not the same species as the American oyster discussed herein for the northern Gulf) died because of heavy oiling from Ixtoc oil and never returned.

During the DWH oil spill varying amounts of oil reached oyster fishing areas in Louisiana, but without detailed review (day by day) of oiling maps put on GeoPlatform by the NOAA shoreline teams (SCAT teams), it would be impossible to know exact dosages of oiling in the many specific local areas. A review of these maps would likely be helpful, but it might not be definitive enough to make conclusive decisions.

One complication of the oyster survival and future harvest scenario is that many oysters were partially or totally killed by the diversion of freshwater in the Barataria Bay system to push the oil away from oyster beds (E. Melancon, pers. com.). Other oysters were likely killed by overbank flooding of the lower Mississippi River.

**In summary, it is believed that oysters in most areas of the northern Gulf will likely continue along the same harvest trends in recent years in 2011. In areas where oysters died**

as a result of freshwater diversion and flooding, oyster reefs should be recolonized by young oysters in 2011 (assuming there are no large scale flooding events in 2011), but they will not likely be of harvestable size until late 2012 or 2013. In areas where oyster reefs were heavily oiled, oyster reefs may not recover for 6-8, or even 10 years.

## Finfish

There are over 1500 fish species known from the Gulf of Mexico (McEachran 2009). However, only a small percentage of those are taken for commercial purposes. In coastal waters most fish species are taken in the recreational fishery and managed by state fish and wildlife agencies in each state, along with overarching management by the Gulf States Marine Fisheries Commission. Many offshore species, however, utilize coastal nursery grounds as part of their life cycle, so there is an important linkage between offshore species and habitats. The commercial and recreational fishery offshore (outside state waters) is monitored and managed by the NOAA Fisheries Service and the Gulf of Mexico Fisheries Management Council. Most of the demersal (bottom living) species of fish mentioned below live on the continental shelf, not the deep Gulf.

Commercial finfish in the northern Gulf of Mexico are usually fished and monitored/managed in groupings of species. Gulf of Mexico Reef Fish is one example, and Coastal Migratory Pelagics another. There are 42 fish species within the first category including red grouper, gag grouper, tilefish, greater amberjack, and grey triggerfish, as well as some groupings which have multiple species, such as shallow water grouper and deep water grouper. Coastal Migratory Species include the two related species of king and Spanish mackerel. The reef fish group, of course,

33

includes species that are associated with reef or reef-like hard bottoms or topographic highs on the continental shelf. The mackerels are pelagic, or open water, species.

Red snapper is one of the most valuable reef fish species in the Gulf of Mexico, and it is taken in both inshore and offshore waters. Red snapper are taken both commercially and recreationally. In 2008, commercial landings for the Gulf totaled 2.37 million pounds for a dockside value of $7.95 million. Texas led the catches in weight with 869,966 pounds valued at $2.74 million followed by West Florida with 847,884 pounds at $2.94 million, Louisiana with 589,379 pounds at $2.03 million, and Alabama with 60,391 pounds at $237,141 (no data for Mississippi) (NMFS 2010a).

Shark species are another important group, and they are distributed widely throughout the Gulf and with high abundances in the central northern Gulf of Mexico from Louisiana to Alabama. Blacktip sharks are particularly abundant in this region, and they are one of the most important commercial shark species in the Gulf (NMFS 2010a). Blacktip sharks, as well as spinner sharks, Atlantic sharpnose sharks, and bull sharks are examples of species that are found in both coastal waters and offshore.

During an oil spill, most larger or adult fish species may simply leave the area where the water is contaminated, if possible, and move elsewhere to clean water. This is one reason why no large fish kills are seen associated with crude oil spills.

The two main concerns regarding the DWH oil spill and these fish species has been: 1) the dispersed oil at depth and deepwater plumes of oil; and, 2) the exposure of floating fish eggs (characteristic of most of the above mentioned species) to oil during the spill.

Because dispersants have never been used at a great depth, the scientific community was eager to study and track the sub-surface plumes. One research group noted that the dispersed hydrocarbon plume had stimulated petroleum degrading bacteria and that the plume was degrading faster than expected at the deep, cold temperatures (Hazen et al. 2010a). Another research group noted PAH levels considered to be toxic to marine life in discrete depth layers between 3,281-4,593 feet in the region southwest of the well head out to about 8 miles (Diercks et al. 2010). A third group tracked a continuous plume of hydrocarbons more than 22 miles in length at approximately 3,609 feet and concluded that it had persisted for months without substantial degradation (Camilli et al. 2010).

The second concern regarding floating fish eggs being impacted by oil, or an oil and dispersant mixture, cannot be answered at this time without any data available. However, some of the species of concern are widely distributed in the northern Gulf, and in some cases, the entire Gulf, and since the oil only impacted less than 5% of the Gulf, the species should not see significant overall reductions in the 2010 year class.

Another important open sea nursery habitat that was affected by the spill is the sargassum community. Over 100 species of biota are known to exist within these floating masses of brown algae, and the floating community serves to shade and protect many juvenile and adult species.

Overall impact from death of the sargassum community in the well site area and associated biota is not known at this time.

Lastly, it is likely that the fishery closure that covered an area much larger than was impacted by the DWH oil spill, may lead to enhanced recovery because of reduced fishing pressure during the summer of 2010.

**In summary, commercial finfish are not believed to have been significantly impacted by the DWH oil spill, except with the possibility of those in the floating fish egg stage. If the fish eggs were negatively affected for certain species, then short-term, and possible long-term consequences, are likely for those species. If recruitment classes were normal in 2010, then, the fishery will likely continue along the same harvest trends in recent years during 2011.**

### Conclusions

The BP Deepwater Horizon MC 252 Spill of National Significance (DWH oil spill) became the largest accidental marine oil spill in history after releasing over 200 million gallons of oil into the Gulf of Mexico from 20 April to 15 July 2010, a period of 87 days.

The Gulf of Mexico is the ninth largest body of water in the world, and it is economically and ecologically one of the most productive and important (Tunnell 2009). Commercial fisheries in the Gulf of Mexico in 2008 accounted for 1.27 billion pounds of shellfish and finfish that earned $659 million in total landings revenue (NMFS 2010a).

The DWH oil spill may have short-term or long-term environmental effects on the Gulf of Mexico ecosystem, and it may impact Gulf commercial fisheries in the near-term or long-term. Assessing recovery after a major pollution event is perhaps even more challenging and difficult than assessing the initial damage (NRC 2003), as has been reported in this present document. However, the Gulf Coast Claims Facility was set up to settle claims for individuals and businesses that lost revenue because of the spill, and the Facility needs to move as expediently as possible in settling these claims.

**The purpose of this report is to give the Claims Facility a best informed estimate to allow them to proceed with their claims process as soon as possible. Realistically, the true loss to the ecosystem and fisheries may not be accurately known for years, or even decades, but the four conclusions for the four requested groups (shrimp, crabs, oysters, and finfish) is the best informed estimate that can be given at this time.**

**Shrimp**:

**In summary, if potential impact scenarios stated above have not significantly impact 2010 shrimp populations and their life cycles, it is believed that shrimp catches for the brown, white, and pink shrimp in the northern Gulf of Mexico will likely continue along the same harvest trends in recent years by 2011, and even more likely by 2012. Loss of Mississippi Delta nursery habitat could cause a percentage reduction in shrimp population size until marshes recover.**

**Crabs:**

**In summary, because blue crab populations do not appear to have been significantly impacted by the DWH oil spill, and because they are a highly reproductive species with**

widespread distribution throughout the region, it is believed that their population levels will likely continue along the same harvest trends in recent years in 2011. As noted above, some local populations may be reduced by larval impacts from the oil (or oil and dispersants) or by reduction in nursery ground coastal marshes. As indicated with shrimp, this loss of nursery habitat could cause a percentage reduction in crab population size until the marshes recover.

Oysters:

In summary, it is believed that oysters in most areas of the northern Gulf will likely continue along the same harvest trends in recent years in 2011. In areas where oysters died as a result of freshwater diversion and flooding, oyster reefs should be recolonized by young oysters in 2011 (assuming there are no large scale flooding events in 2011), but they will not likely be of harvestable size until late 2012 or 2013. In areas where oyster reefs were heavily oiled, oyster reefs may not recover for 6-8, or even 10 years.

Finfish:

In summary, commercial finfish are not believed to have been significantly impacted by the DWH oil spill, except with the possibility of those in the floating fish egg stage. If the fish eggs were negatively affected for certain species, then short-term, and possible long-term consequences, are likely for those species. If recruitment classes were normal in 2010, then, the fishery will likely continue along the same harvest trends in recent years during 2011.

In conclusion, making an exact call for the time of recovery of any fishery group after a major oil spill is impossible. However, it is realized that it is very important to settle claims

with individuals and businesses on a timely basis, so the expert opinions for the four fishery groups given in this report are as reasonable as possible at this time.

## Literature Cited

Beck, M.W., R.D. Brumbaugh, L. Airoldi (3 of 14 authors). 2009. Shellfish reefs at risk: a global analysis of problems and solutions. Arlington, Virginia: The Nature Conservancy.

Bookout, C.G. and J.D. Costlow. 1975. Effects of mirex on the larval developments of blue crab. *Water, Air, Soil Pollution* 4: 113-126.

Bookout, C.G., J.D. Costlow, and R. Monroe. 1980. Kepone effects on larval developments of mud-crab and blue-crab. *Water, Air, Soil Pollution* 13: 57-77.

Briggs, J.C. 1974. *Marine zoogeography*. New York: McGraw-Hill Book Company.

Brooks, J.M., M.C. Kennicutt, C.R. Fisher, S.A. Macko, K. Cole, J.J. Childress, R.R. Bidigare, and R.D. Vetter. 1987. Deep-sea hydrocarbon seep communities: evidence for energy and nutritional carbon sources. *Science* 238: 1138-1142.

Campbell, T.N. 1952. The Kent-Crane site: a shell midden on the Texas Coast. *Texas Archeological and Paleontology Society* 23: 39-77.

Camilli, R., C.M. Reddy, D.R. Yoerger, B.A.S. Van Mooy, M.V. Jakuba, J.C. Kinsey, C.P. McIntyre, S.P. Sylva, J.V. Maloney. 2010. Tracking hydrocarbon plume transport and biodegradation at Deepwater Horizon. *Science* 330: 201-204.

CCSU (Corpus Christi State University). 1977. Spill training and educational program. Corpus Christi:

CCSU (Corpus Christi State University). 1978. Spill training and educational program. Corpus Christi, Texas: National Spill Control School.

Chapman, B.R. 1979. Effects of Ixtoc I oil spill on marine bird populations along the Texas coast. Final report to NOAA and Padre Island National Seashore. Corpus Christi, TX.

Chapman, B.R. 1981. Effects of the Ixtoc I oil spill on Texas shorebird populations. Proceedings of the 1981 Oil Spill Conference, 461-465. Washington, D.C.: American Petroleum Institute.

Cordes, E.E., S. Hourdez, and H.H. Roberts. 2010. Unusual habitats and organisms associated with the cold seeps of the Gulf of Mexico. In *The Vent and Seep Biota*, ed. S. Kiel, 315-332. *Topics in Geobiology*.

Cordes, E.E., S.L. Carney, S. Hourdez, R.S. Carney, J.M. Brooks, and C.R. Fisher. 2007. Cold seeps of the deep Gulf of Mexico: community structure and biogeographic comparisons to Atlantic equatorial belt seep communities. *Deep Sea Research Part I* 54: 637-653. Corpus Christi State University.

Darnell, R.M., J.A. Kleypas, and R.E. Defenbaugh. 1983. Northwestern Gulf shelf bio-atlas. Minerals Management Service Report 82-04.

Darnell, R.M. and R.E. Defenbaugh. 1990. Gulf of Mexico: Environmental overview and history of environmental research. *American Zoologist* 30: 3-6.

DeGolyer, E. 1918. The geology of Cuban petroleum deposits. *American Association of Petroleum Geologists Bulletin* 2: 133-167.

Diercks, A.R., R.C. Highsmith, V.L. Asper (3 of 12 authors). 2010. Characterization of subsurface polycyclic aromatic hydrocarbons at the Deepwater Horizon site. *Geophysical Research Letters* 37: 1-6.

ERCO (Energy Resources Co., Inc.). 1982. Ixtoc oil spill assessment. Final report-Executive summary. Report prepared for the Bureau of Land Management, AA851-CTO-71. Cambridge, MA.

Felder, D.L. and D.K. Camp. 2009. *Gulf of Mexico: origin, waters, and biota-Volume I, Biota.* College Station, Texas: Texas A&M University Press.

Fisher, C.R., H.H. Roberts, E.E. Cordes, and B. Bernard. 2007. Cold seeps and associated communities of the Gulf of Mexico. *Oceanography* 20: 118-129.

Galtsoff, P.S. 1964. The American oyster *Crassostrea virginica* (Gmelin). *Fisheries Bulletin*, U.S. 64: 1-480.

Garcia, O.G. 2009. Spatial and temporal analysis of oil slicks in the Gulf of Mexico based on remote sensing. PhD Dissertation, Texas A&M University-Corpus Christi.

GOMA (Gulf of Mexico Alliance). 2006. *Governors' action plan.*

GOMA (Gulf of Mexico Alliance). 2009. *Governors' action plan II.*

Guillory, V., H. Perry, P. Steele, T. Wagner (3 of 12 authors). 2001. The blue crab fishery of the Gulf of Mexico, United States: A regional management plan. Ocean Springs: Gulf States Marine Fisheries Commission.

Gundlach, E.R. and M.O. Hayes. 1978. Vulnerability of coastal environments to oil spill impacts. *Marine Technology Society Journal* 12(4): 18-27.

Gundlach, E.R., J.C. McCain and Y. Fadlallah. 1993. Distribution of oil along the Saudi Arabian coastline (May/June 1991) as a result of the Gulf War oil spills. Marine Pollution Bulletin 27: 93-96.

Hamilton, C.L. 1983. Texas commercial harvest statistics 1977-1982. Austin: Texas Parks & Wildlife Department, Coastal Fisheries Branch.

Hayes, M.O., D.D. Domeracki, C.D. Getter, T.W. Kana, and G. I. Scott. 1980. Sensitivity of coastal environments to spilled oil, South Texas coast (Rio Grande to Aransas Pass). Prepared by Research Planning Institute, Inc., for NOAA's Office of Marine Pollution Assessment, RPI/R/80/4/11-12, Boulder, CO.

Hazen, T.C., E.A. Dubinsky, T.Z. DeSantis (3 of 32 authors). 2010. Deep-sea oil plume enriches indigenous oil degrading bacteria. *Science* 330: 204-208.

Hooper, C.H. (ed.). 1981. The Ixtoc I oil spill: The federal scientific response. NOAA Hazardous Material Response Project. Boulder, CO.

Jernelöv, A. and O. Lindén. 1981. Ixtoc I: a case study of the world's largest oil spill. *Ambio* 10(6): 299-306.

Jernelöv, A. 2010. The threats from oil spills: Now, then, and in the future. *Ambio* 39:353-366.

Jones, D.A., I. Watt, J. Plaza, T.D. Woodhouse, and M. Al-Sanei. 1996. Natural recovery of the intertidal biota within the Jubail Mainre Wildlife Sanctuary after the 1991 Gulf War oil spill. In A marine wildlife sanctuary for the Arabian Gulf: Environmental research and conservation following the 1991 Gulf War oil spill. National Commission for Wildlife Conservation and Development, eds F. Krupp, A.H. Abuzinada, and I.A. Nader, 138-158. Riyadh, Saudi Arabia: Kingdom of Saudi Arabia, and Frankfurt Germany: Senchenberg Research Institute.

Kennicutt, M.C., J.M. Brooks, R.R. Bidigare, and G.J. Denoux. 1988. Gulf of Mexico hydrocarbon seep communities I. Regional distribution of hydrocarbon seepage and associated fauna. *Deep Sea Research A* 35: 1639-1651.

Kenworthy, W.J., M.J. Durako, S.M.R. Fatemy, H. Valavi, and G.W. Thayer. 1993. Ecology of seagrasses in northeastern Saudi Arabia one year after the Gulf War oil spill. Marine Pollution Bulletin 27:213-222.

Kindinger, M.E. 1981. Impacts of the Ixtoc I oil spill on the community structure of the intertidal and subtidal infauna along South Texas beaches. M.S. Thesis, Division of Biology, Corpus Christi State University. Corpus Christi, TX.

Kumpf, H., K. Steidinger, and K. Sherman. 1999. *The Gulf of Mexico Large Marine Ecosystem*: *assessment, sustainability, and management*. Malden, Massachusetts: Blackwell Science, Inc.

Lewbel, G.S. 1985. Strengths and weaknesses of damage assessment programs: the Ixtoc-I and *Burmah Agate* oil spills, and the benthic macroinfauna of the Texas continental shelf. *The Texas Journal of Science* 37(4): 269-310.

MacDonald, I.R., G. Bohrmann, E. Escobar (3 of 18 authors). 2004. Asphalt volcanism and chemosynthetic life in the Campeche Knolls, Gulf of Mexico. *Science* 304: 999-1002.

MacDonald, I.R. 1998. Natural oil spills. *Scientific American* November Issue 30-35.

MacKenzie, C.L., Jr. 1989. A guide for enhancing estuarine molluscan shellfisheries. *Marine Fisheries Review* 51(3): 1-47.

Mackin, J.G. and S.H. Hopkins. 1961. Studies on oyster mortality in relation to natural environments and to oil fields in Louisiana. *Publications of the Institute of Marine Science* 7: 1-131.

Matthews, C.P., S. Kedidi, N.I. Fita, A. Al-Yahya, and K. Al-Rasheed. 1993. Preliminar assessment of the effects of the 1991 Gulf War on Saudi Arabian prawn stocks. Marine Pollution Bulletin 27: 251-271.

McEachran, J.D. 2009. Chapter 75 – Fishes (Vertebrata: Pisces) of the Gulf of Mexico. In *Gulf of Mexico – origin, waters, and biota: Volume 1, Biota* eds. Felder, D.L. and D.A. Camp, 1223-1316, College Station: Texas A&M University Press.

McKinney, L. 2009. HRI News - Director's corner: Why the Gulf of Mexico? Summer 2009 Newsletter: Harte Research Institute for Gulf of Mexico Studies.

Michel, J. M.O. Hayes, and P.J. Brown. 1978. Application of an oil spill vulnerability index to the shoreline of lower Cook Inlet, Alaska. *Environmental Geology* 2(2): 107-117.

Millikin, M.R. and A.B. Williams. 1984. Synopsis of biological data on the blue crab, *Callinectes sapidus*. FAO Fish. Synop. No. 138, NOAA Tech. Rep. NMFS 1.

Moore, D., H.A. Brusher, and L. Trent. 1970. Relative abundance, seasonal distribution, and species composition of demersal fishes off Louisiana and Texas, 1962-1964. Contributions to Marine Science 15: 45-70.

NMFS (National Marine Fisheries Service). 2010a. Fish stocks in the Gulf of Mexico. Fact Sheet (April 2010, Southeast Regional Office).

NMFS (National Marine Fisheries Service). 2010b. Information about the federal fishing closure in oil-affected portions of the Gulf of Mexico. *Southeast Fishery Bulletin* FB10-063 (12 July 2010).

NMFS (National Marine Fisheries Service). 2010c. BP oil spill: NOAA closes federal water to royal red shrimp fishing. *Southeast Fishery Bulletin* FB10-102 (24 November 2010).

NOS (National Ocean Service), NOAA. 2008. Gulf of Mexico at a glance. Washington, D.C.: U.S. Department of Commerce, National Oceanic and Atmospheric Administration.

NRC (National Research Council). 1975. Petroleum in the marine environment. Washington, D.C.: National Academy Press.

NRC (National Research Council). 1985. Oil in the sea: inputs, fates, and effects. Washington, D.C.; National Academy Press.

NRC (National Research Council). 2003. Oil in the sea III: inputs, fates, and effects. Washington, D.C.: National Academy Press.

OSAT (Operational Science Advisory Team). 2010. Summary report for sub-sea and sub-surface oil and dispersant detection: sampling and monitoring. New Orleans, LA.

Pattillo, M.E., T.E. Czapla, D.M. Nelson, and M.E. Monaco. 1997. Distribution and abundance of fishes and invertebrates in Gulf of Mexico estuaries, Volume II: Species life history summaries. ELMR Rep. No. 11. NOAA/NOS Strategic Environmental Assessments Division. Silver Spring, MD.

PCEESC (Programa Coordinado de Estudios Ecologicos en la Sonda de Campeche). 1980. Informe de los trabajos realizados para el control del pozo Ixtoc I, el combate del derrame de petroleo y determinacion de sus efectos sobre el ambiente marino. Mexico: Instituto Mexicano del Petroleo.

Peterson, C.H., S.D. Rice, J.W. Short, D. Esler, J.L. Bodkin, B.E. Ballachey, and D.B. Irons. 2003. Long-term ecosystem response to the Exxon Valdez Oil Spill. *Science* 302:2082-2086.

Richmond, M.D. 1996. Status of subtidal biotopes of the Jubail Mainre Wildlife Sanctuary with special reference to soft-substrata communities. In A marine wildlife sanctuary for the Arabian Gulf: Environmental research and conservation following the 1991 Gulf War oil spill. National Commission for Wildlife Conservation and Development, eds. F. Krupp, A.H. Abuzinada, and I.A. Nader, 159-176. Riyadh, Saudi Arabia: Kingdom of Saudi Arabia, and Frankfurt, Germany: Senchenberg Research Institute.

Schimmel, S.C. and A.J. Wilson. 1977. Acute toxicity of Kepone to four estuarine animals. *Chesapeake Science* 18: 224-227.

Soley, J.C. 1910. The oil fields of the Gulf of Mexico, their geological place. *Scientific American Supplements.*

Soto, L.A., A. Gracia and A. V. Botello. 1981. Study of the penaeid shrimp population in relation to petroleum hydrocarbons in Campeche Bank. Proceedings of the 33th Annual Session, 81-100. University of Miami: Gulf and Caribbean Fisheries Institute.

Tawfig, N.I. and D.A. Olsen. 1993. Saudi Arabia's response to the 1991 Gulf oil spill. Marine Pollution Bulletin 27: 333-345.

Tunnell, J.W., Jr. 1978. Oil spills in the environment. In *Spill training and educational program*, CCSU, H 1-8. Corpus Christi, Texas: National Spill Control School.

Tunnell, J.W., Jr. 2009. Gulf of Mexico. In *Ocean: An illustrated atlas*, ed. S.A. Earle and L.K. Glover, 136-137. Washington, D.C.: National Geographic Society.

Tunnell, J.W., Jr., Q.R. Dokken, M.E. Kindinger, and L.C. Thebeau. 1981. Effects of the Ixtoc I oil spill on the intertidal and subtidal infaunal populations along lower Texas coast barrier island beaches. Proceedings of the 1981 Oil Spill Conference, 467-475. Washington, D.C.: American Petroleum Institute.

U.S. Commission on Ocean Policy. 2004. An ocean blueprint for the 21st century. Washington, D.C.: U.S. Commission on Ocean Policy.

Wang, S.Y. and W.B. Stickle. 1987. Bioenergetics, growth and molting of the blue crab, *Callinectes sapidus*, exposed to the water-soluble fraction of south Louisiana Crude Oil. In *Pollution physiology of estuarine organisms*, ed. W.B. Vernberg, A. Calabrese, F.P. Thurberg, and F.J. Vernberg. South Carolina: University of South Carolina Press.

Wursig, B., T.A. Jefferson, and D.J. Schmidly. 2000. *The marine mammals of the Gulf of Mexico.* College Station, Texas: Texas A&M University Press.

# Appendix I

## About the Author

   **Dr. John W. (Wes) Tunnell, Jr.** is Associate Director of Harte Research Institute for Gulf of Mexico Studies, Professor of Biology, Fulbright Scholar, and Regent's Professor at Texas A&M University-Corpus Christi (TAMU-CC).  After studies in Colorado, he received his B.S. (1967) and M.S. (1969) degrees in Biology from Texas A&I University (now Texas A&M University-Kingsville), and after studies in California and Florida, his Ph.D. in Biology (1974) from Texas A&M University.  He started his career at Texas A&I University at Corpus Christi (now TAMU-CC) in 1974.  At TAMU-CC Dr. Tunnell was founder and Director of the Center for Coastal Studies (1984-2009), creator of the co-location concept of state and federal natural resource agencies on campus (1980s-90s), developer of the Natural Resources Center (1996), and he assisted in the development of the Harte Research Institute (2001) and its building (2005).

   Dr. Tunnell is a marine biologist/ecologist focusing primarily on coastal and coral reef ecosystems.  He has extensive expertise working on coastal ecology in Texas and coral reef ecology in Mexico, but he has also studied reefs in the Bahamas, Persian Gulf, Great Barrier Reef, Panama, Honduras, Netherland Antilles, Palau, French Polynesia, Indonesia, and Okinawa. In addition, Dr. Tunnell has studied and published on vertebrate fossils from the seabed, sponges, brachiopods, mollusks (in particular), colonial seabirds, oil spill impacts, and Gulf of Mexico biodiversity.

Regarding his oil spill work, Dr. Tunnell:

1) helped develop the National Spill Control School (NSCS) at TAMU-CC during the mid 1970s, particularly in the biological and environmental impacts area;

2) wrote the "Oil Spills in the Environment" chapter for the NSCS training manual/book and taught that subject in training classes at TAMU-CC for almost 20 years;

3) became the Local Scientific Advisor for NOAA in Corpus Christi, Texas, during the Ixtoc I oil spill;

4) assisted Dr. Miles Hayes and Research Planning Institute (now Research Planning, Inc.) sample South Texas during Ixtoc oil spill and apply the Environmental Sensitivity Index mapping;

5) studied the impact of the Ixtoc oil spill on South Texas beaches with NOAA funding; published one paper on this work and directed one MS student thesis on this work;

6) presented four papers on Texas and Mexico impacts of Ixtoc oil spill at two separate conferences in Mexico, but the proceedings were never published;

7) tracked Ixtoc oil spill on southern Gulf of Mexico coral reefs, sandy beaches and rocky shores during July and August of 1980; continued some tracking for the following 30 years;

44

8) studied the impact of oil spills and deballasting on the coral reefs, sandy shores, and benthos of the Arabian Gulf in Abu Dhabi, United Arab Emirates, with Hazelton Environmental Sciences in 1979;

9) prepared a report for the Mobile District US Army Corps of Engineers on an impact assessment of the fate and effects of brine discharges from oil wells in Tallahala Creek Lake, Mississippi, in 1981;

10) worked with numerous oil companies in the 1980s to develop plans of operation in Padre Island National Seashore to keep them from causing environmental damage to sensitive habitats;

11) trained Kuwait government workers in Kuwait on oil spill contingency planning, clean-up, and response with the NSCS in 1984;

12) studied the environmental impact and recovery of the Exxon Pipeline oil spill and burn site in upper Copano Bay marshes from 1992-95; published several papers and reports related to this work;

13) worked with O'Brien Oil Pollution Services as an advisor to resource agencies on the *Berge Banker* oil spill affects on southern Matagorda Island in 1995;

14) worked with O'Brien Oil Pollution Services on two oil spill training excercises;

15) studied the impact of the *Berge Banker* spill on Padre Island National Seashore beaches;

16) worked with numerous media outlets giving expert opinion on the BP Deepwater Horizon oil spill and its comparison to the Ixtoc I oil spill 30 years earlier, including some trips to Mexico to see old remnant Ixtoc tar sites (New York Times, Washington Post, Time Magazine, National Geographic, Nature, ABC World News, CNN International, and many more);

17) lead a peer review panel (independent evaluation) of research proposals on the BP Deepwater Horizon oil spill for the Alabama Marine Environmental Science Consortium and Dauphin Island Sea Lab for $5 million in BP Gulf Research Initiative funding in October 2010;

18) was keynote speaker at two symposia in Finland, speaking on "Gulf of Mexico Oil Spills: Historically and Spatially", in November 2010;

19) was keynote speaker at Alabama-Mississippi Bays and Bayous Symposium, speaking on "Gulf of Mexico Oil Spills: Historical and Spatial Perspectives", in December 2010;

20) lead a peer review panel (independent evaluation) of research proposals on the BP
    Deepwater Horizon oil spill for the Northern Gulf Institute in Mississippi for $4 million
    of BP Gulf Research Initiative funding in January 2011; and,

21) was a panelist during "Oil Day" for the National Council for Science and the
    Environment Annual Conference on "Our Changing Oceans" at the Reagan Center in
    Washington, DC on 19 January 2011.

     Dr. Tunnell has received numerous awards, most notably a Fulbright Scholar Award to
Yucatan, Mexico (1985-86), Regent's Professor Award (1998), TAMU-CC Alumni
Distinguished Professor Award (2003), Gulf Guardian Award, Bi-National Category (2006,
2008) and the TAMU-CC Excellence in Scholarly Activity Award (2006-07).  He has published
over 75 peer-reviewed manuscripts and book chapters and over 60 technical reports, 5 books,
and received approximately 150 research grants and contracts.  He has advised or co-advised 55
M.S. students, 4 Ph.D. students, and 4 post doctoral research associates.

     Dr. Tunnell has also been very involved with community and professional service,
serving on many advisory councils and boards, as well as belonging to numerous societies.
Currently, he belongs to 10 professional organizations/societies, serves on 13 regional, national,
and international advisory boards, and is Past-President of the Southern Association of Marine
Labs.  Dr. Tunnell is also editor of two book-series, one newsletter, and one Gulf of Mexico
database website (www.gulfbase.org).  More information can be found on Wes Tunnell at
http://www.harteresearchinstitute.org/dr-wes-tunnell.

# Appendix II

## Literature Reviewed

AIBS (The American Institute of Biological Sciences). 1976. Sources, effects & sinks of hydrocarbons in the aquatic environment. Proceedings of the Symposium. Washington, D.C.: American University.

Alexander, S.K. and J.W. Webb, Jr. 1987. Relationship of *Spartina alterniflora* growth to sediment oil content following an oil spill. In *Proceedings: 1987 Oil Spill Conference,* 445-449. *American Petroleum Institute.*

Amos, A.F., S.C. Rabalais, and R.S. Scalan. 1983. Oil-filled *Callianassa* burrows on a Texas barrier island beach. *Journal of Sedimentary Petrology* 53(2): 412-416.

Amos, A.F. 1984. Persistence of Ixtoc-I oil along the South Texas coast. Proceedings, 4th Ann. Gulf of Mexico Inform. Trans. Mtg., USDI/MMS, OCS Rep. MMS-0026:206-210.

Anderson, J.W. 1979. An assessment of knowledge concerning the fate and effects of petroleum hydrocarbons in the marine environment. In *Marine Pollution: Functional Responses.* Academic Press, eds.W.B. Vernberg, F.J. Vernberg, A. Calabrese and F.P. Thurberg, 3-22.

Anderson, S., P. Boehm, D. Fiest, R. Howard, C. Lewbel, D. Pilson, and A. Wait. 1982. Ixtoc oil spill assessment. Final report for the U.S. Department of Interior, Bureau of Land Management, AA851-CTO-71. New Orleans, LA.

Anonymous. 1979. A contingency plan for protection of whooping cranes during a major spill in the Gulf of Mexico. 19 pp. + appendix. (typed document, no publisher listed).

Armstrong, H.W., K. Fucik, J.W. Anderson, and J.M. Neff. 1979. Effects of oilfield brine effluent on sediments and benthic organisms in Trinity Bay, Texas. *Marine Environmental Research* 2: 55-69.

Atlas, R.M. and C.E. Cerniglia. 1995. Bioremediation of petroleum pollutants. *BioScience* 45: 332-338.

Atwood, D.K., F.J. Burton, J.E. Corredor, G.R. Harvey, A.J. Matajimenez, A. Vasquezbotello, and B.A. Wade. 1987b. Petroleum pollution in the Caribbean. *Oceanus* 30: 28-32.

Baca, B.J., T. M. Schmidt, and J.W. Tunnell. 1982. Ixtoc oil in seagrass beds surrounding Isla de Media. Simposio Internacional Ixtoc I, Mexico City. 2-5 June 1982. (presented at oil spill symposium in Mexico City; proceedings never published).

Bak, R.P.M. 1987. Effects of chronic oil pollution on a Caribbean reef. *Marine Pollution Bulletin* 18: 534-539.

Baker, J.M. 1983. Impact of oil pollution on living resources. *The Environmentalist* 3(4): 1-48.

Baker, J.M., L.M. Guzman, P.D. Bartlett, D.I. Little, and C.M. Wilson. 1993. Long-term fate and effects of untreated thick oil deposits on salt marshes. Proceedings 1993 Oil Spill Conference., Washington, D.C., 395-399. *American Petroleum Institute.*

Boehm, P. and D. Fiest. 1982. Subsurface distributions of petroleum from an offshore well blowout. The IXTOC Blowout, Bay of Campeche. *Environmental Science and Technology* 16(2): 67-74.

Brooks, J.M., C. Fisher, H. Roberts, B. Bernard, I. MacDonald, R. Carney, S. Joye, E. Cordes, G. Wolff, and E. Goehring. 2009. Investigations of chemosynthetic communities on the lower continental slope of the Gulf of Mexico. New Orleans: Minerals Management Service.

Burns, K.A. and J.M. Teal.  1979.  The west Falmouth oil spill, hydrocarbons in the salt marsh ecosystem.  *Estuarine, Coastal and Shelf Science*  8: 349-360.

Burns, K.A. and A.H. Knap.  1988.  The Bahia Las Minas Oil Spill: Hydrocarbon uptake by reef building corals.  *Marine Pollution Bulletin*  20(8): 391-398.

Carr, R.S., D.C. Chapman, B.J. Presley, J.M. Biedenbach, L. Robertson, P. Boothe, R. Kilada, T. Wade and P. Montagna.  1996.  Sediment porewater toxicity assessment studies in the vicinity of offshore oil and gas production platforms in the Gulf of Mexico.  *Canadian Journal of Fisheries and Aquatic Sciences*  53: 2618-1628.

Caudle, C.  1995.  Impact assessment of produced water discharges to Nueces Bay—August 1993. Publ. No. AS-49/SR, Texas Natural Resources Conservation Commission. Austin, TX.

Casey, R., A. Amos, J. Anderson, R. Koehler, R. Schwarzer, and J. Sloan.  1980.  A preliminary report on the microplankton and microbenthon responses to the 1979 Gulf of Mexico oil spills (Ixtoc I and Burmah Agate), with comments on avenues of oil to the sediments and the fate of oil in the column and bottom.  *Transactions-Gulf Coast Association of Geological Societies*  XXX: 273-281.

Chapman, B.R.  1984.  Seasonal abundance and habitat-use patterns of coastal bird populations on Padre and Mustang Island barrier beaches (following the Ixtoc I oil spill). Report prepared for the U.S. Fish and Wildlife Service, FWS/OBS-83/31.

Chassé, C.  1978.  The ecological impact on and near shores by the AMOCO CADIZ oil spill.  *Marine Pollution Bulletin*  9(11): 298-301.

Cubias-Castro, B.  1980.  Estudio para determinar el efecto del derrarme de petroleo proveniente del Pozo Ixtoc No. 1 y de las aplicacion del dispersante COREXIT en plancton, camaron (juvenil) y ostion efectuado en Cd. del Carmen, Campeche. Congresso sobre Problemas Ambientales de Mexico Resumenes. Intituto Politecnico Nacional. 8-12 December 1980. Mexico City. p. 46. (Abstract; proceedings never published).

Dinnel, S. and T.W. Kana.  1980.  Continuing oceanographic surveys of South Texas tidal inlets for contingency planning. March 1980. Progress report to NOAA/MESA Program Office, RPI/R/80/4/25-16. Boulder, CO.

Farrington, J.W.  1981.  NOAA Ship Researcher/Contract Vessel Pierce Cruise to Ixtoc-1 Oil Spill: Overview and Integrative Data Assessment and Interpretation. Report prepared for the Office of Marine Pollution Assessment, NOAA, NA80RAC0017.

Fischel, M., W. Grip, and I.A. Mendelssohn.  1989.  Study to determine the recovery of a Louisiana marsh from an oil spill. In *Proceedings 1989 Oil Spill Conference*, Washington, D.C., 383-387. *American Petroleum Institute.*

García-Cuéllar, J.A.  2006.  Análisis del impacto de la industria petrolera en el ecosistema y su relación con las pesquerías de la sonda de Campeche, México. Doctor en Ciencias en el uso, manejo y preservación de los recursos naturales, orientación en ecología, Centro de Investigaciones Biológicas del Noroeste.

García-Cuéllar, J.A., F. Arreguín-Sánchez, S. Hernández Vázquez, and D.B. Lluch-Cota.  2004.  Impacto ecológico de la industria petrolera en la sonda de Campeche, México, tras tres décadas de actividad: una revisión.  *Interciencia*  29(6): 311-319.

Garmon, L.  1980.  Autopsy of an oil spill.  *Science News*  118(17): 267-270.

Getter, C.D., L.C. Thebeau, and G.I. Scott.  1980.  Chapter 6: Results of ecological monitoring at the Ixtoc I oil spill. Report prepared for NOAA's Office of Marine Pollution Assessment, RPI/R/80/7/30-20. Boulder, CO.

Grose, P., F. Everdale, and L. Katz.  1983.  Predicting the surface transport of oil pollutants in the Gulf of Mexico.  *Marine Pollution Bulletin*  14(10): 372-377.

Gundlach, E.R., P.D. Boehm, M. Marchand, R. Atlas, D.M. Ward, and D.A. Wolfe.  1983.  The fate of *Amoco Cadiz* oil.  *Science*  221(4606): 122-129.

Guzmán del Proós, S.A., E.A. Chávez, F.M. Alatriste, S. de la Campa, G. de la Cruz, L. Gómez, R. Guadarrama, A. Guerra, S. Mille, and D. Torruco.  1986.  The impact of the Ixtoc-1 oil spill on zooplankton.  *Journal of Plankton Research*  8(3): 557-581.

Hall, R.J., A.A. Belisle, and L. Sileo.  1983.  Residues of petroleum hydrocarbons in tissues of sea turtles exposed to the Ixtoc I oil spill.  *Journal of Wildlife Diseases*  19(2): 106-109.

Hardegree, B., D.W. Hicks, and J.W. Tunnell, Jr.  1996.  Evaluation of burning as an oil spill cleanup technique in a high marsh community along the South Texas coast.  Proceed. Gulf of México and Caribbean Oil Spills in Coastal Ecosystem:  Assessing Effects, Natural Recovery, and Progress in Remediation Research, 195-212. New Orleans, LA.

Hildebrand, H.H. and G. Gunter.  1954.  A report on the deposition of petroleum tars and asphalts on the beaches of the northern Gulf of Mexico, with notes on the beach conditions and the associated biota.  Port Aransas, Texas: University of Texas Institute of Marine Science.

Hill, G.  1979.  Ixtoc's Oil has a Silver Lining.  *Audubon*  81(6): 150-159.

Holt, S., S. Rabalais, N. Rabalais, S. Cornelius, and J. S. Holland.  1978.  Effects of an oil spill on slat marshes at Harbor island, Texas: I: Biology.  In *Proceedings of Conference on Assessment of Ecological Impacts of Oil Spills*, Washington, D.C., 344-352. *American Institute of Biological Sciences.*

Hyde, L.J., K. Withers, and J.W. Tunnell, Jr.  1998.  Coastal high marsh oil spill clean-up by burning: five-year evaluation.  Center for Coastal Studies Technical Report No. TAMU-CC-9811-CCS.  Texas A&M University-Corpus Christi. Corpus Christi, TX.

Kalke, R.D., T.A. Duke, and R.W. Flint.  1982.  Weathered Ixtoc I oil effects on estuarine benthos.  *Estuarine, Coastal and Shelf Sciences*  15: 75-84.

Keller B.D. and J.B.C. Jackson.  1993.  Long-term assessment of the oil spill at Bahia Las Minas, Pamana Synthesis Report. Volume I: Executive Summary and Volume II, Technical Report. Minerals Management Service, Gulf Of Mexico OCS Region, OCS Study MMS 93-0048.

Kiesling, R.W., S.K. Alexander, and J.W. Webb.  1988.  Evaluation of alternative oil spill cleanup techniques in a *Spartina alterniflora* salt marsh.  *Environmental Pollution*  55: 221-238.

Lizarraga-Partida, M.L., J. Munoz-Rubio, J. Porras-Aguirre, F.B. Izquierdo-Vicuna, and I. Wongchang.  1984.  Taxonomy and distribution of hydrocarbonoclastic bacteria from the Ixtoc-I area. 2. *Colloque International de Bacteriologie Marine*, 1-5.  Brest (France).

MacDonald, I.R.  1998.  Natural oil spills.  *Scientific American*  279: 56-61.

MacDonald, I.R., J.F. Reilly, Jr., W.E. Best, R. Venkataramaiah, R. Sassen, N.S. Guinasso, Jr., and J. Amos.  1996.  Remote sensing inventory of active oil seeps and chemosynthetic communities in the northern Gulf of Mexico. Hydrocarbon Migration and its Near-surface Expression, eds. D. Schumacher and M.A. Abrams. *American Association of Petroleum Geologists Memoir*  66: 27-37.

MacDonald, I.R., N.L. Guinasso, Jr., S.G. Ackleson, J.F. Amos, R. Duckworth, R. Sassen, and J.M. Brooks.  1993.  Natural oil slicks in the Gulf of Mexico visible from space.  *Journal of Geophysical Research*  98(C9): 16,351-16,364.

Mackin, J.G.  1971.  A study of the effect of oilfield brine effluents on benthic communities in Texas estuaries. Texas A&M Research Foundation, Project 735. Texas A&M University, College Station, TX.

McCauley, C.A. and R.C. Harrel.  1981.  Effects of oil spill cleanup techniques on a salt marsh. Proceedings, 1981 Oil Spill Conference, Washington, D. C, 401-407. *American Petroleum Institute.*

Mendelssohn, A.A., M.W. Hester, C. Sasser, and M. Fischel.  1990.  The effect of a Louisiana crude oil discharge from a pipeline break on the vegetation of a Southeast Louisiana brackish marsh.  *Oil and Chemical Pollution*  7: 1-15.

Mitchell, R., I.R. MacDonald, and K.A. Kvenvolden.  1999.  Estimation of total hydrocarbon seepage into the Gulf of Mexico based on satellite remote sensing images.  *Transactions, American Geophysical Union*  80(49): Ocean Sciences Meeting Supplement, OS242.

Montagna, P.A., and D.E. Harper, Jr.  1996.  Benthic infaunal long-term response to offshore production platforms.  *Canadian Journal of Fisheries and Aquatic Sciences*  53: 2567-2588.

Muir, J.M.  1936.  Geology of the Tampico region, Mexico.  Houston, Texas: Stephen F. Austin State University.

NOAA (National Oceanic and Atmospheric Administration) and USEPA (United States Environmental Protection Agency).  1978.  The AMOCO Cadiz oil spill: A preliminary scientific report.  Washington, D.C.: NOAA.

NOAA (National Oceanic and Atmospheric Administration) and USEPA (United States Environmental Protection Agency).  1979.  Ixtoc-I oil spill damage assessment program. A cooperative federal and state program.

NRC (National Research Council).  2005.  Oil spill dispersants: Efficacy and effects. Washington, D.C.: National Academy Press.

Payne, J.R, G.D. McNabb.  1984.  Weathering of petroleum in the marine environment.  *Marine Technology Society Journal*  18(3): 24-42.

Pearson, T.H. and R. Rosenberg.  1978.  Macrobenthic succession in relation to organic enrichment and pollution of the marine environment.  *Oceanography and Marine Biology Annual Review*  16: 229-311.

Programa Coordinado de Estudios Ecológicos en la Sonda de Campeche.  1980.  Informe de los trabajos realizados para el control del pozo Ixtoc I, el combate del derrame de petróleo y determinación de sus efectos sobre el ambiente marino. *Instituto Mexicano del Petroleo*.

Rabalais, S.C., C.R. Arnold, and N.S. Wohlschlag.  1981.  The effects of Ixtoc I oil on the eggs and larvae of red drum (*Scianops ocellata*).  *Texas Journal of Science*  XXXIII(1): 33-38.

Restrepo, C.E., F.C. Lamphear, C.A. Gunn, R.B. Ditton, J.P. Nichols, and L.S. Restrepo.  1982. Ixtoc I oil spill economic impact study. Report prepared for the Bureau of Land Management, AA-851-CTO-65. New Orleans, LA.

Sanders, H.L.  1978.  Florida oil spill impact on the Buzzard's Bay benthic fauna, West Falmouth. *Journal of Fisheries Research Board of Canada*  35: 717-730.

Sanders, H.L.  1981.  Environmental effects of oil in the marine environment. In *Safety and Offshore Oil: Background Papers of the Committee on Assessment of Safety of OCS Activities*, Washington, D.C., 117-146.  *National Research Council, National Academy Press.*

Sanders, H.L., J.F. Grassle, G.R. Hampson, L.S. Morse, S. Garner-Price, and C.C. Jones. 1980. Anatomy of an oil spill: Long-term effects from the grounding of the barge Florida off West Falmouth, Massachusetts. *Journal of Marine Research* 38: 265-380.

Straughan, D. and B.C. Abbott. 1971. The Santa Barbara oil spill: ecological changes and natural oil leaks. In *Water Pollution by Oil*, ed. P. Hepple, 257-262. *Institute of Petroleum*.

Surtevant, P. 1979. A survey of tar accumulation remaining on Texas beaches: Rio Grande river to Aransas Pass. Report to NOAA Damage Assessment Team, Corpus Christi, TX. (typed document, no publisher listed).

Texas House of Representatives Committee on Environmental Affairs. 1980. Report on the Ixtoc I Oil Spill.

Tunnell, J.W. 1978. Impact assessment of oil production at Tallahala Dam and Lake, Mississippi. Technical report to U.S. Army Corps of Engineers Mobile District. Contract No. DAC WO1-78-C-0211.

Tunnell, J.W. and Q.R. Dokken. 1979. Environmental directory of scientists, facilities, and projects along the central and south Texas coast. Report submitted to NOAA/OMPA, damage Assessment Prog., IXTOC I Oil Spill, Cont. No. NA 79RC00136.

Tunnell, J.W., Jr. and B.R. Chapman. 1980. Environmental effects of Ixtoc I oil spill on South Texas barrier island beaches. Congresso sobre Problemas Ambientales de Mexico Resumenes. Instituto Politecnico Nacional. 8-12 December 1980. Mexico City. (presented and submitted; proceedings never published).

Tunnell, J.W., Jr. and Q.R. Dokken. 1980. Observations on Ixtoc I oil impact of southwestern Gulf of Mexico coral reefs. Congresso sobre Problemas Ambientales de Mexico Resumenes. Instituto Politecnico Nacional. 8-12 December 1980. Mexico City. (presented and submitted; proceedings never published).

Tunnell, J.W. 1981. Impact assessment of the fate and effect of a brine spill into a freshwater environment (Tallahala Creek Lake, Mississippi). Technical Report to U.S. Army Corps of Engineers, Mobile District. Contract No. DACW01-81-M-9931.

Tunnell, J.W., Jr., B.R. Chapman, M.E. Kindinger, and Q.R. Dokken. 1982. Environmental impact of Ixtoc I oil spill on South Texas sandy beaches: Infauna and shorebirds. Simposio Internacional Ixtoc I, Mexico City. 2-5 June 1982. (presented and submitted; proceedings never published).

Tunnell, J.W. 1984. Oil spills in the environment. In *Workshop on oil spill prevention and control in the coastal and territorial water of Kuwait*, 27-30 May 1984. Environmental Protection Council of Kuwait and National Spill Control School, Corpus Christi State University, F-1 - F-20.

Tunnell, J.W., Jr., D.W. Hicks, and B. Hardegree. 1994. Environmental impact and recovery of the Exxon pipeline oil spill and burn site, Upper Copano Bay, Texas: year one. Center for Coastal Studies Technical Report No. TAMU-CC-9402-CCS. Texas A&M University-Corpus Christi. Corpus Christi, TX.

Tunnell, J.W., Jr., B. Hardegree, and D.W. Hicks. 1995. Environmental impact and recovery of a high marsh pipeline oil spill and burn site, upper Copano Bay, Texas. Proceedings, 1995 Oil Spill Conference, 133-138. Long Beach, CA.

Tunnell, J.W., Jr., B. Hardegree, K. Withers, and D.W. Hicks.  1995.  Environmental impact and recovery of the Exxon pipeline oil spill and burn site, upper Copano Bay, Texas:  year two.  Center for Coastal Studies Technical Report No. TAMU-CC-9501-CCS. Texas A&M University-Corpus Christi. Corpus Christi, TX.

Tunnell, J.W., K. Withers, and B. Hardegree.  1997.  Environmental impact and recovery of the Exxon Pipeline oil spill and burn site, upper Copano Bay Texas:  Final Report.  Center for Coastal Studies Technical Report No. TAMU-CC-9703-CCS.  Texas A&M University-Corpus Christi. Corpus Christi, TX.

Webb, J.W., S.K. Alexander, and J.K. Winters.  1985.  Effects of autumn application of oil on *Spartina alterniflora* in a Texas salt marsh.  *Environmental Pollution*  (A)38: 321-337.

Webb, J.W.  1996.  Effects of oil on salt marshes. In Symposium Proceedings: Gulf of Mexico and Caribbean Oil Spills in Coastal Ecosystems: Assessing Effects, Natural Recovery, and Progress in Remediation Research, eds. C.E. Proffitt and P.F. Roscigno, 55-64, OCS Study MMS 95-0063. Dept. of the Interior, Minerals Management Service. New Orleans, LA.

Withers, K., D. Rocha, S. Alvarado, and J.W. Tunnell.  1995.  Benthic invertebrate abundance and community structure in Gulf beach habitats on Padre Island National Seashore, Texas following the M/T *Berge Banker* oil spill.  Report to Beak Consultants and Eastham, Watson, Dale, and Foney, L.L.P., Center for Coastal Studies, Texas A&M University-Corpus Christi.  Corpus Christi, TX.

Woody, J.  1979.  Contingency plan-protection of Fall migrating peregrines Campeche oil well blowout. 7 pp. (typed document, no publisher listed).

Wes Tunnell's Report on Extent of Gulf Spill Damage - NYTimes.com                Page 1 of 4

Case 2:10-md-02179-CJB-DPC   Document 23309-2   Filed 09/21/17   Page 134 of 184
Case 2:10-md-02179-CJB-JCW   Document 13109-1   Filed 02/23/17   Page 108 of 158

**The New York Times** Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.



February 2, 2011

# On Gulf Oil Spill's Effects, Doing Science With a Deadline

By **JOHN SCHWARTZ** and **MARK SCHROPE**

In mid-December, Wes Tunnell's phone rang with a request that would ruin his holiday plans.

The team working with Kenneth R. Feinberg, the administrator of the $20 billion compensation fund for victims of the Gulf of Mexico oil spill, needed an expert opinion on how much time would pass before the gulf and its shrimp, fish, crabs and oysters would fully recover from the oil damage. What's more, they wanted it in two weeks.

"I just dove in," said Dr. Tunnell, a marine biologist, who worked nearly nonstop through Jan. 3, taking off only Christmas and a half-day on New Year's, to create a 39-page report. It was released on Wednesday as the scientific foundation for Mr. Feinberg's methodology for determining settlements from the fund.

Dr. Tunnell's report is a projection that falls somewhere between the deliberate pace of science and the deadline-driven needs of law — a report that puts an important marker down on the progress of the gulf recovery, but is much more an early stab than the last word.

"This is the first time anybody has stood up and said, 'Here's what we think is the future of the gulf,' " Mr. Feinberg said in an interview on Wednesday.

And the news, according to the report, is better than many expected: The gulf is undergoing a strong recovery, with overall fish populations potentially back to pre-spill levels by the end of 2012, though oyster beds and some other hard-hit areas could be ailing for a longer period of time, leading to reduced catches for some fishermen.

Working from those estimates, Mr. Feinberg's team developed a plan that calls for payments of twice the damages that most people are claiming for last year, and four times the damages for claims related to oysters last year.

EXHIBIT 12

The guidelines outlined by Mr. Feinberg relied on two reports, one by Mr. Tunnell and another by the Analysis Research Planning Corporation, an economics consulting firm with experience in evaluating disasters for litigation.

Mr. Feinberg said he chose Dr. Tunnell because "he doesn't pull punches — he tells it like it is, and that's what I wanted to know."

Dr. Tunnell is associate director of Texas A&M's Harte Research Institute in Corpus Christi, which focuses on the Gulf of Mexico and marine research. It brings together biologists and chemists, but its ranks also include an economist and an expert on marine law and policy.

Harte's executive director, Larry McKinney, said the spill was "exactly what we were put together to look at." The institute endorsed Dr. Tunnell's report.

The report, however, quickly drew criticism from spill victims and from environmentalists who said it underplayed the damage caused by BP's runaway well.

"This is not a scientific report — it's an opinion," said Ian MacDonald, a professor of oceanography at Florida State University and a member of the National Wildlife Federation's science advisory panel. "It doesn't propose any methodology by which its assumptions and predictions could be tested."

Dr. MacDonald added, "We can't use these early rosy scenarios as an excuse to not do what's necessary, which is once and for all establishing a health monitoring method and restoration program for the entire Gulf of Mexico ecosystem."

Another marine expert, James Cowan, a fisheries scientist at Louisiana State University, said the report "suffers from way too much lumping," by which he meant lumping together so many species that significant impact on some species might be glossed over.

"The question is, does it affect a small number of species more directly and indirectly — and that's the part that's missing," Dr. Cowan said.

Dr. Tunnell acknowledged Dr. MacDonald's criticisms, saying, "Yes, Ian is correct. It is an opinion." But he added that his report was based on a thorough review of the data available at this point.

He also said that his opinion did not conflict with the goals that Dr. MacDonald described. In fact, he said, the Harte Institute was "doing exactly what Dr. MacDonald is saying needs to be done," and was working on further evaluation, restoration and protection strategies for the gulf.

As for the lumping issue, he acknowledged it as a "weak point of the report," but added, "I doubt that anyone would be willing to write a species-specific report like that."

Dr. Tunnell said he was prepared from the start for strong reactions and even personal attacks. "With my 35 years of experience looking at other areas, this is the bottom line of what I think," he said, adding that he warns about areas of continuing concern, like damaged marshes and dead deep-sea corals.

"Time may tell that I'm wrong," he said, "but they needed to get on with settlement cases and I felt I could make that call"

Many early reports from environmental analysts, he said, were alarmist.

"When the spill first occurred, lots of people were crying alarm that all kinds of bad things were going to happen and that the whole Gulf of Mexico was going to die," he said. "It's unfortunate that even scientists would react like that because it gives us a bad name collectively when those things don't play out."

And while the report might seem optimistic to some, he is no pawn of industry, he said: "I've been training people in how to take care of the environment for decades."

Mr. Feinberg, the fund administrator, said that the report was not definitive, but that it set the basis for negotiating final settlements. "I don't claim to have a crystal ball — it is a murky world," he said. "But the law has deadlines, and this is the best I can do."

As for those who believe that the estimates are too optimistic and thus payouts from the fund will be too small, they can continue to watch and wait during the three-year span of the payment program to see how the gulf recovers, and file for interim payments during that time.

And ultimately, Mr. Feinberg said, pursuing a lawsuit instead of a settlement remained an option open to all.

"If you don't want it," he said, "don't take it."

Case 2:10-md-02179-CJB-DPC   Document 23309-2   Filed 09/21/17   Page 137 of 184
Case 2:10-md-02179-CJB-JCW   Document 1318-1   Filed 02/23/11   Page 137 of 158



𝕿𝖍𝖊 𝕹𝖊𝖜 𝖄𝖔𝖗𝖐 𝕿𝖎𝖒𝖊𝖘 Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to
your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit
www.nytreprints.com for samples and additional information. Order a reprint of this article now.

February 1, 2011

# Report Foresees Quick Gulf of Mexico Recovery

By **JOHN SCHWARTZ** and **MARK SCHROPE**

The Gulf of Mexico should recover from the environmental damage caused by the enormous BP oil spill last year faster than many people expected, according to new estimates in reports commissioned by Kenneth R. Feinberg, the administrator of the $20 billion compensation fund.

That prediction will be central to Mr. Feinberg's plan for paying people who claim their livelihoods were devastated by the spill. It is certain to be controversial among those who believe the damage will be longer-lasting and therefore should result in higher payouts for the spill's victims.

Mr. Feinberg's report, to be officially released Wednesday, will lay out for the first time the framework for deciding who gets final settlements for spill-related damage and how payments for future losses will be determined.

Based on the work of environmental scientists, economists and other experts, the report acknowledges that "prediction is not an exact science" but estimates that the gulf should recover by the end of 2012. The hardest-hit oyster beds could take much longer to come back, it says.

Based on those estimates, the damages paid out by the fund would be double the first year's losses for most of those filing claims, less any money previously paid by the fund. Those whose living is tied to oyster beds would receive four times their 2010 losses.

Mr. Feinberg, appointed in June by BP and the Obama administration, has given out more than $3.5 billion so far in emergency money to those affected by the spill.

But Gulf Coast residents have become increasingly angry over what they say are shortcomings of the program, including inconsistent payments and an opaque process. The methodology for final settlements is meant to answer those criticisms.

EXHIBIT 13

Mr. Feinberg has also been criticized by plaintiffs' lawyers who have filed complaints with the judge in New Orleans who is overseeing federal spill litigation. They have accused the administrator of not being truly independent from BP, and asked the judge to exercise authority over the compensation process.

On Tuesday, the governor and attorney general of Louisiana and the attorney general of Mississippi filed similar requests with the judge, Carl J. Barbier.

A key document used to formulate plans for commercial fishermen making claims was a report by Wes Tunnell, a marine biologist at Texas A&M's Harte Research Institute in Corpus Christi, who has extensive experience studying oil spills.

The 39-page report acknowledges that any definitive assessment at this point is impossible, and that fully understanding the spill's ecological effects will take years.

But Dr. Tunnell concluded over all that regional 2011 catches for blue crabs, shrimp, oysters and fin fishes should be in line with catches before the spill.

His report adds, however, that some oyster beds may not recover for 6 to 10 years, and that there will be fewer fish, shrimp and crabs in the nets in some areas.

Dr. Tunnell was paid $225 an hour by the claims fund, which is in turn financed by BP.

Under the new framework for claims, documentation requirements for spill-related damages are expected to be tougher than those under last year's emergency program, but no one is automatically excluded from filing a claim.

Wednesday's announcement will be followed by a two-week comment period in which people can argue with the estimates and methodology. The comments will be available online. Payments will begin after the comment period.

While the new report will define the parameters for future compensation, the settlements will be subject to negotiation.

Some 85,000 people have already reached a settlement with the fund through a quick-pay option that provides $5,000 to individuals and $25,000 to businesses with no additional documentation.

Those who might file claims and who believe that the damage will persist can wait to file for a settlement throughout the three-year life of the fund, and can receive interim payments while they watch and wait.

People dissatisfied with the final settlement offer can, under the Oil Pollution Act, appeal to the Coast Guard. So far 507 appeals have been filed with the Coast Guard, which has so far consistently agreed with the estimates of the Feinberg fund.

BP declined to comment.

A lawyer with thousands of clients along the coast said the new framework would lead him and dozens of other lawyers to the negotiating table with Mr. Feinberg.

"It's in my clients' interest to get this over with quickly," said Daniel E. Becnel Jr., a Louisiana lawyer who represents many coastal resorts and condo owners.

Stuart H. Smith, a lawyer in New Orleans who has said he would be interested in exploring settlements, said he had "serious concerns" about the plan. "I don't think that it sufficiently takes into consideration the uncertainty factor," Mr. Smith said.

A coastal fisherman was blunt in his criticism. "This is typical BP trying to get off the hook," said Ray Brandhurst, owner of a 47-foot shrimp boat. "I'm sure you're going to hear people screaming from across the Gulf Coast."

According to the report, two factors reduced the expected harm. First, the oil gushed for a shorter time than did the Ixtoc I spill off Mexico, which began in 1979, and, second, it occurred during months of relatively calm seas. Also, the closing of fisheries during the crisis allowed marine populations not directly affected by oil to prosper.

Marine experts differed over the conclusions of the Tunnell report. James Cowan, a biological oceanographer at Louisiana State University, said, "He may be right, and I hope he's right." But Dr. Cowan added: "It doesn't sit well with me. I think it's too soon to just write it off."

Dr. Cowan's group has been working with shrimp and fish both offshore and near shore, and he said the group members had found troubling signs of apparent oil damage. They have seen reduced growth and higher death rates of shrimp in the marshes, Dr. Cowan said, and significant declines in catch rates for red snapper and other reef fishes.

"In my mind, the long-term, indirect effects are going to be the most insidious and also the most difficult to ascertain," he said.

But another leading marine scientist applauded Dr. Tunnell's work. Steve Murawski, former chief science adviser for the National Marine Fisheries Service, said Dr. Tunnell had "done a great job" in a situation requiring quick analysis so people can move forward.

"Decisions have to be made," Mr. Murawski said, "and sometimes they are made with imperfect information."

# Measures of the Effects of the Gulf Oil Spill on Individuals and Businesses and Proposed Compensation Schema



*January 24, 2011*

EXHIBIT 14

# Agenda

- Impact of the oil spill on fishing harvests

- Measures of the impact and the sustainability of the impact of the oil spill on the Gulf economy

- Analysis of GCCF payments to claimants

- Recovery rate of tourism

- Compensation Methodology



# General Conclusions:

- Most of the waters have been re-opened for all types of harvests

- Effect on the Gulf economy
  - Significant effect on the economy in 2010
  - Evidence of recovery beginning in the fall (September and October)

- GCCF payments
  - Overwhelming percent of payments went to claimants with losses in the coastal counties
  - Payments appear reasonable for number of claimants, their location and the average amount paid
    - Very few Texas claimants

- Likely full economic recovery within 2 to 3 years (at 2.5 years the future recovery factor is 1.0)



3

# Conclusions: Fishing Harvests

- **Closed waters**
  - Initially nearly 40% of waters closed
  - Currently less than 1% of waters are closed to fishing
- **Percent of historical catch from closed waters**
  - Less than 5% from closed waters (excl. Oysters)
  - 8% for oysters
- **Change in shrimp harvest during 2010**
  - Pre oil spill – down 24%
  - Post oil spill
    - June to August – down 38%
    - September to October – down 6%
    - Louisiana shrimp season was extended
    - Prices uniformly higher by 20% to 40%



4

# Closed Waters: Federal and State, by Month in 2010

| MONTH | FEDERAL | ALABAMA | FLORIDA | LOUISIANA | MISSISSIPPI |
|---|---|---|---|---|---|
| May | 3% | 0% | 0% | 0% | 0% |
| June | 37% | 5% | 0% | 55% | 25% |
| July | 34% | 40% | 2% | 45% | 95% |
| August | 24% | 40% | 2% | 30% | 95% |
| September | 18% | 0% | 2% | 20% | 0% |
| October | 11% | 0% | 2% | 10% | 0% |
| November | 0.4% | 0% | 0% | 1.5% | 0% |
| December | 0.4% | 0% | 0% | 1.5% | 0% |



NOAA Fisheries Service, Deepwater Horizon/BP web site for both Federal closures and links to State sites for closures for each state.   http://sero.nmfs.noaa.gov/BPOilSpillArchives.htm

# Percent of 2009 Catch From Waters Closed to Fishing: Late September to Current

### % of 2009 Catch from Waters Closed on 9-22-2010

| State | Shrimp | Finfish | Oyster | Crab |
|-------|--------|---------|--------|------|
| Alabama | 23.4% | 12.2% | 0.0% | 0.0% |
| Florida | 2.0% | 6.9% | 0.6% | 1.7% |
| Louisiana | 19.3% | 9.5% | 38.4% | 11.9% |
| Mississippi | 32.5% | 0.2% | 97.0% | 0.0% |
| Texas | 1.7% | 0.0% | 0.0% | 0.0% |
| Total | 12.3% | 7.1% | 34.7% | 7.6% |

### % of 2009 Catch from Currently Closed Waters

| State | Shrimp | Finfish | Oyster | Crab |
|-------|--------|---------|--------|------|
| Alabama | 1.2% | 0.4% | 0.0% | 0.0% |
| Florida | 1.3% | 4.9% | 0.0% | 0.0% |
| Louisiana | 3.8% | 5.2% | 11.5% | 3.8% |
| Mississippi | 2.6% | 0.0% | 0.0% | 0.0% |
| Texas | 0.1% | 0.0% | 0.0% | 0.0% |
| Total | 1.8% | 4.3% | 7.9% | 2.2% |



From special request from ARPC to NOAA Fisheries Service. NOAA used Accumulated Landings System data. Closure Areas from prior page. Federal Statistical Fishing Areas are designated by NOAA.

6

# Change in Shrimp Harvest: 2008/2009 Average to 2010 Actual, By State

| State | January to May | June to August | September to October |
|---|---|---|---|
| Alabama | 50% | -94% | -64% |
| Florida | 18% | 39% | -6% |
| Louisiana | -56% | -47% | -3% |
| Mississippi | -29% | -88% | 6% |
| Texas | 24% | -9% | 9% |
| Total | -24% | -38% | -6% |

ᴙPC

NOAA Fisheries Market News Archive Summaries, 2008 – 2010 by Month from Fisheries Statistics Division, National Marine Fisheries Service.

7

# Conclusions: Impact and Sustainability of Oil Spill on the Gulf Economy

- Beachfront hotels
  - Down from pre to post oil spill
  - Significant recovery in the fall (Sept. and October)
- Tourism indicators
  - Airport arrivals - no apparent effect
  - Gaming revenues
    - No apparent effect
    - Increase in the fall
  - Sales and/or sales tax revenues
    - Mississippi coastal counties – no apparent effect (in fact an increase, then a further increase in the fall
    - Florida - slight deterioration post oil spill for all sectors
    - Texas – slight improvement post oil spill



8

# Conclusions: Impact and Sustainability of Oil Spill on the Gulf Economy (Cont'd)

- Tourism indicators (cont'd)
  - Specific areas
    - Alabama – significant deterioration post oil spill; significant recovery in the fall
    - Florida, Clearwater/St. Petersburg – no apparent effect of the oil spill; significant deterioration in the fall
    - Florida, Naples – deterioration post oil spill, significant recovery in the fall



9

# Beachfront Hotel Revenues: Pre and Post Oil Spill – Growth Rate from 2009

| Beachfront Region | Jan - May | June - Aug | Sept - Oct |
|---|---|---|---|
| Florida Panhandle | 1.6% | -13.4% | 1.0% |
| Florida West Coast | 1.6% | 1.7% | 8.9% |
| Collier County (incl. Naples) | 6.6% | -2.2% | 5.4% |
| Alabama | 15.4% | -26.8% | 15.1% |
| Mississippi | 16.8% | -5.5% | 8.1% |
| **Total** | **3.0%** | **-3.8%** | **6.9%** |

| Total Control Areas | 12.1% | 6.7% | 7.3% |
|---|---|---|---|



From Smith Travel Research customized reports generated in December 2010 for reporting hotels within 1 mile of Gulf Coast per request by ARPC.

# Percent Change in Number of Airport Passenger Arrivals: 2008/2009 Average to 2010

| Region | January - May | June-September |
|---|---|---|
| **Anticipated Most Effected Regions** | | |
| Florida Panhandle | -6% | 7% |
| Alabama | -5% | -3% |
| Mississippi | -4% | 8% |
| Louisiana | -1% | 6% |
| **Subtotal, Anticipated Most Effected Regions** | **-3%** | **6%** |
| **Anticipated Least Effected Regions** | | |
| Florida West Coast | -8% | -2% |
| Texas | -6% | 0% |
| **Subtotal, Anticipated Least Effected Regions** | **-6%** | **-1%** |
| **Total Coastal Counties** | **-6%** | **0%** |
| **Control Area (Florida East Coast)** | **-3%** | **2%** |



US Department of Transportation, Research and Innovative Technology Administration, Air Carrier Statistics Database, T-100 Traffic Data.

11

# Gaming Revenues: 2008/2009 Average to 2010 – Mississippi and Louisiana

| State | January to May | June to August | September to October |
|-------|----------------|----------------|----------------------|
| Mississippi | -8.79% | -8.91% | 1.22% |
| Louisiana | -7.95% | -6.47% | -0.84% |

# Change in Gross Sales for Selected Sectors: 2009 to 2010 - Mississippi Coastal Counties

| Effected Region | January to May | June to August | September to October |
|---|---|---|---|
| **Hancock Sales** | | | |
| Restaurants | -4% | 9% | 11% |
| Bars | 1% | 12% | 22% |
| Hotels | -14% | 2% | 4% |
| **Subtotal, Hancock Sales** | **-6%** | **8%** | **11%** |
| | | | |
| **Harrison Sales** | | | |
| Restaurants | 1% | 10% | 14% |
| Bars | 2% | 8% | 4% |
| Hotels | 14% | 14% | 21% |
| **Subtotal, Harrison Sales** | **3%** | **10%** | **13%** |
| | | | |
| **Jackson Sales** | | | |
| Restaurants | -5% | 6% | 9% |
| Bars | -21% | -20% | -17% |
| Hotels | 16% | 40% | 50% |
| **Subtotal, Jackson Sales** | **-3%** | **11%** | **14%** |
| | | | |
| **Total Mississippi Coastal Count** | **1%** | **10%** | **13%** |



Mississippi Development Authority, Tourism Division. Monthly summaries by county and type of business limited to categories above per ARPC request.

13

# Percent Change in Sales Tax Revenues for Accommodations: 2008/2009 Average to 2010 - Florida Locations

| Location | January to May | June to September |
|---|---|---|
| Panhandle | 0% | -14% |
| Collier (Naples) | -4% | -8% |
| Hillsborough (Tampa) | -15% | 3% |
| Other West Coast Coastal Counties | -4% | 1% |
| Other Florida Counties | -6% | 5% |



Florida Department of Revenue, Office of Tax Research
http://dor.myflorida.com/dor/taxes/colls_from_7_2003.html

14

# Percent Change in Sales Tax Revenues for Restaurants: 2008/2009 Average to 2010 - Florida Locations

| Location | January to May | June to September |
|---|---|---|
| Panhandle | -1% | -3% |
| Collier (Naples) | 2% | 0% |
| Hillsborough (Tampa) | -1% | 2% |
| Other West Coast Coastal Counties | -2% | 0% |
| Other Florida Counties | 0% | 2% |



Florida Department of Revenue, Office of Tax Research
http://dor.myflorida.com/dor/taxes/colls_from_7_2003.html

# Percent Change in Sales Tax Revenues for Amusements: 2008/2009 Average to 2010 - Florida Locations

| Location | January to May | June to September |
|---|---|---|
| Panhandle | -8% | -8% |
| Collier (Naples) | 9% | 14% |
| Hillsborough (Tampa) | -11% | -3% |
| Other West Coast Coastal Counties | 4% | 10% |
| Other Florida Counties | -2% | 8% |



# Percent Change in Sales Tax Revenues for Construction: 2008/2009 Average to 2010 - Florida Locations

| Location | January to May | June to September |
|---|---|---|
| Panhandle | -6% | -5% |
| Collier (Naples) | -17% | -7% |
| Hillsborough (Tampa) | -12% | -8% |
| Other West Coast Coastal Counties | -5% | -1% |
| Other Florida Counties | -17% | -12% |



Florida Department of Revenue, Office of Tax Research
http://dor.myflorida.com/dor/taxes/colls_from_7_2003.html

17

# Percent Change in Sales Tax Revenues for Seafood Dealers: 2008/2009 Average to 2010 - Florida Locations

| Location | January to May | June to September |
|---|---|---|
| Panhandle | -32% | 38% |
| Collier (Naples) | 11% | 17% |
| Hillsborough (Tampa) | -6% | -9% |
| Other West Coast Coastal Counties | 287% | 146% |
| Other Florida Counties | -13% | 7% |

# Percent Change in Sales Tax Revenues for Selected Sectors: 2008/2009 Average to 2010 - Texas Coastal Counties

| Sector | January to March | April to June |
|---|---|---|
| Construction | -36% | -18% |
| Real Estate, Rental and Leasing | -27% | -12% |
| Arts, Entertainment, and Recreation | -10% | -2% |
| Accommodation and Food Services | 0% | 2% |



Texas Comptroller of Public Accounts, Open Records Division
https://ourcpa.cpa.state.tx.us/allocation/HistSales.jsp

19

# Change in Tax Revenue: 2008/2009 Average to 2010 - Gulf Shores and Orange Beach Alabama

| Tax Revenue Category | January to May | June to August | September to October |
|---|---|---|---|
| Lodging Rentals Tax | 0.7% | -47.0% | -8.5% |
| Retail Sales Tax | -5.3% | -26.7% | 0.3% |



State of Alabama, Department of Revenue
http://www.revenue.alabama.gov/anlrpt.html

20

# Change in Tourism Indicators: 2008/2009 Average to 2010 – Clearwater/St. Petersburg, Florida

| Tourism Indicator | January to May | June to August | September to October |
|---|---|---|---|
| **Total Expenditures** | -4.54% | 4.93% | -8.48% |
| **Revenue Per Available Room** | -8.10% | -0.55% | -6.77% |
| **Total Visitors** | -2.31% | 10.29% | -13.69% |



St. Petersburg/Clearwater Area Convention and Visitors Bureau
http://www.pinellascvb.com/statistics/

21

# Change in Tourism Indicators: 2008/2009 Average to 2010 – Naples, Marco Island, Florida

| Indicator | January to May | June to August | September to October |
|---|---|---|---|
| Total Expenditures | -3.31% | -5.47% | 11.13% |
| Revenue Per Available Room | -9.90% | -10.31% | 7.31% |
| Total Visitors | 1.20% | -3.89% | 5.59% |



Convention and Visitors Bureau Naples/Marco Island / Everglades
http://www.paradisecoast.com/media_center/research.php

22

# Conclusions: GCCF Payments to Claimants Through December 7, 2010

- Nearly all paid claim activity in Gulf coastal counties
    - 98% of all paid claims
    - 97% of all paid amounts
- The restaurant, fishing and retail sectors account for 63% of all claim payments
- Virtually no payments to Texas claimants
- Sector analysis
    - Hotels – 28% of coastal employees; 36% of average annual wage
    - Restaurants – 16% of coastal employees; 54% of average annual wage
    - Retail – 19% of coastal employees; 41% of average annual wage
    - Fishing – 70% of employees/crew; 229% of average annual wage



23

# GCCF Claim Experience through 12-7-2010: Amount Paid and Claims by Geographic Area

| Sector | Claims | | Payments | |
|---|---|---|---|---|
| | Coastal County | All Other | Coastal County | All Other |
| Retail | 98.7% | 1.3% | 98.5% | 1.5% |
| Fishing | 91.0% | 9.0% | 92.3% | 7.7% |
| Seafood Proc./Dist. | 93.7% | 6.3% | 94.0% | 6.0% |
| Hotel | 99.7% | 0.3% | 99.2% | 0.8% |
| Construction | 98.3% | 1.7% | 98.4% | 1.6% |
| Restaurant | 99.2% | 0.8% | 99.2% | 0.8% |
| Tourism/Rec./Enter. | 99.4% | 0.6% | 99.2% | 0.8% |
| Rental property | 99.9% | 0.1% | 99.9% | 0.1% |
| Gambling | 90.0% | 10.0% | 97.0% | 3.0% |
| Other | 89.2% | 10.8% | 89.7% | 10.3% |
| Real Estate | 97.8% | 2.2% | 95.5% | 4.5% |
| Total | 97.9% | 2.1% | 97.1% | 2.9% |



From GCCF Claims Extract, 12/7/10

24

# GCCF Claim Experience through 12-7-2010: Amount Paid and Claims by Sector

("Total" in Millions)

| Sector | Businesses | | | Individuals | | | All Claims | |
|---|---|---|---|---|---|---|---|---|
| | Claims | Amount Paid | | Claims | Amount Paid | | Claims | Total Paid |
| | | Total | Average | | Total | Average | | |
| Restaurant | 2,996 | $165.8 | $55,332 | 47,287 | $348.1 | $7,361 | 50,283 | $513.8 |
| Fishing | 9,179 | $363.3 | $39,575 | 8,001 | $127.7 | $15,960 | 17,180 | $491.0 |
| Retail | 9,521 | $274.6 | $28,842 | 25,929 | $186.6 | $7,198 | 35,450 | $461.2 |
| Construction | 4,811 | $160.9 | $33,440 | 9,560 | $99.9 | $10,448 | 14,371 | $260.8 |
| Rental property | 11,321 | $161.2 | $14,237 | 2,226 | $20.3 | $9,125 | 13,547 | $181.5 |
| Hotel | 775 | $54.4 | $70,172 | 15,649 | $120.1 | $7,676 | 16,424 | $174.5 |
| Seafood Proc./Dist. | 831 | $80.6 | $96,939 | 4,602 | $50.2 | $10,907 | 5,433 | $130.8 |
| Tourism/Rec./Enter. | 590 | $33.5 | $56,834 | 3,052 | $28.3 | $9,276 | 3,642 | $61.8 |
| Other | 409 | $14.9 | $36,461 | 2,063 | $35.1 | $17,011 | 2,472 | $50.0 |
| Real Estate | 52 | $1.4 | $27,125 | 38 | $0.5 | $13,087 | 90 | $1.9 |
| Gambling | 0 | $0.0 | $0 | 10 | $0.1 | $10,000 | 10 | $0.1 |
| Total | 40,485 | $1,310.5 | $32,370 | 118,417 | $1,016.9 | $8,587 | 158,902 | $2,327.4 |



From GCCF Claims Extract, 12/7/10

25

# GCCF Claim Experience through 12-7-2010: Amount Paid and Claims by State

("Total" in Millions)

| State | Businesses | | | Individuals | | | All Claims | |
|---|---|---|---|---|---|---|---|---|
| | Claims | Amount Paid | | Claims | Amount Paid | | Claims | Total Paid |
| | | Total | Average | | Total | Average | | |
| Alabama | 8,804 | $252.4 | $28,665 | 16,690 | $162.0 | $9,704 | 25,494 | $414.3 |
| Florida | 17,624 | $497.6 | $28,235 | 45,545 | $359.6 | $7,895 | 63,169 | $857.2 |
| Louisiana | 10,464 | $420.7 | $40,201 | 44,742 | $397.2 | $8,879 | 55,206 | $817.9 |
| Mississippi | 2,735 | $105.6 | $38,624 | 10,362 | $84.9 | $8,192 | 13,097 | $190.5 |
| Texas | 714 | $29.7 | $41,535 | 889 | $11.6 | $13,053 | 1,603 | $41.3 |
| All Other | 144 | $4.6 | $31,622 | 189 | $1.6 | $8,656 | 333 | $6.2 |
| Total | 40,485 | $1,310.5 | $32,370 | 118,417 | $1,016.9 | $8,587 | 158,902 | $2,327.4 |



From GCCF Claims Extract, 12/7/10

26

# Hotels: Claim Experience Through 12-7-2010; Coastal Counties Only

|  | GCCF Claims Data | | | Census Data | | | |
|  |  |  |  | Employees | | Wages | |
| STATE | Number of Claims | Total Paid | Average Paid | Count | Percent Paid | Average | Percent Paid |
|---|---|---|---|---|---|---|---|
| AL | 1,161 | $8,734,200 | $7,523 | 3,111 | 37% | $18,873 | 40% |
| FL | 7,791 | $56,485,600 | $7,250 | 38,350 | 20% | $21,242 | 34% |
| LA | 6,035 | $51,208,700 | $8,485 | 12,121 | 50% | $24,149 | 35% |
| MS | 618 | $3,434,700 | $5,558 | 1,454 | 43% | $15,422 | 36% |
| Other/Unknown | 44 | $251,900 | $5,725 | na | na | na | na |
| Total | 15,649 | $120,115,100 | $7,676 | 55,035 | 28% | $21,595 | 36% |

# Restaurants: Claim Experience Through 12-7-2010; Coastal Counties Only

| | GCCF Claims Data | | | Census Data | | | |
| | | | | Employees | | Wages | |
| STATE | Number of Claims | Total Paid | Average Paid | Count | Percent Paid | Average | Percent Paid |
|---|---|---|---|---|---|---|---|
| AL | 5,414 | $43,393,000 | $8,015 | 20,719 | 26% | $11,710 | 68% |
| FL | 19,875 | $150,882,200 | $7,592 | 189,064 | 11% | $13,697 | 55% |
| LA | 17,964 | $129,628,300 | $7,216 | 63,820 | 28% | $14,191 | 51% |
| MS | 3,698 | $22,393,100 | $6,055 | 11,478 | 32% | $12,147 | 50% |
| Other/Unknown | 336 | $1,768,100 | $5,262 | na | na | na | na |
| Total | 47,287 | $348,064,700 | $7,361 | 285,080 | 16% | $13,601 | 54% |



GCCF Claims Extract, 12/7/10 for claims payments.  Employee counts and wages from US Census Department, County Business Patterns http://www.census.gov/econ/cbp/

28

# Retail: Claim Experience Through 12-7-2010; Coastal Counties Only

|  | GCCF Claims Data | | | Census Data | | | |
|  |  | | | Employees | | Wages | |
| STATE | Number of Claims | Total Paid | Average Paid | Count | Percent Paid | Average | Percent Paid |
|---|---|---|---|---|---|---|---|
| AL | 4,267 | 38,666,000 | $9,062 | 8,755 | 49% | $17,624 | 51% |
| FL | 9,118 | 64,750,500 | $7,101 | 94,239 | 10% | $17,827 | 40% |
| LA | 9,622 | 63,903,400 | $6,641 | 26,343 | 37% | $16,769 | 40% |
| MS | 2,600 | 17,026,000 | $6,548 | 4,363 | 60% | $16,865 | 39% |
| Other/unknown | 322 | $2,285,200 | $7,097 | na | na | na | na |
| Total | 25,929 | 186,631,100 | $7,198 | 133,700 | 19% | $17,574 | 41% |

# Fish Harvesters: Claim Experience Through 12-7-2010

|  | GCCF Claims Data | | | Census Data | | | |
|  |  | | | Owner/Cap't/Crew | | Income | |
| STATE | Number of Claims | Total Paid | Average Paid | Count | Percent Paid | Average | Percent Paid |
|---|---|---|---|---|---|---|---|
| AL | 1,744 | $44,365,400 | $25,439 | 1,418 | 123% | $13,635 | 187% |
| FL | 4,310 | $97,471,200 | $22,615 | 1,650 | 261% | $19,343 | 117% |
| LA | 8,049 | $262,456,400 | $32,607 | 14,927 | 54% | $11,131 | 293% |
| MS | 1,712 | $49,422,600 | $28,868 | 2,027 | 84% | $11,849 | 244% |
| TX | 1,241 | $33,896,000 | $27,313 | 4,998 | 25% | $14,077 | 194% |
| Other/Unknown | 124 | $3,339,300 | $26,930 | na | na | na | na |
| Grand Total | 17,180 | $490,950,900 | $28,577 | 25,019 | 69% | $12,461 | 229% |



GCCF Claims Extract, 12/7/10 for claims payments. Employee counts and wages from US Census Department, County Business Patterns http://www.census.gov/econ/cbp/

30

# Recovery from Events Affecting Tourism

| | 1 Year 0.00 | 2 Years 0.46 | 3 Years 0.95 | 4 Years 1.46 | 5 Years 2.00 |
|---|---|---|---|---|---|
| Implied Multiple[1] | | | | | |
| Oxford Economics[2] | \| ------ Expected Impact of Gulf Oil Spill (15 or 36 months) ------ \| <br> 15 months = 0.29    Estimated Multipliers    36 months = 0.88 | | | | |
| Literature Review | SARS - Korea (Kim, Chun & Lee)[3] <br> SARS - Hong Kong (Lo, Cheung & Law)[4] <br> SARS - Hong Kong (Siu & Wong)[5] <br> SARS - Taiwan[6] (Mao, Ding & Lee)[7] <br> Bali 2002 Bombing (Pambudi, McCaughey & Smyth)[8] <br> Foot & Mouth Disease - UK (Blake, Sinclair & <br> 9/11 - DC Hotels (Stafford, Yu & Armoo)[10] <br> Average of Hurricanes ex Katrina (Oxford)[2] <br> Average of Pandemics (Oxford)[2] <br> Average of Boxing Day Tsunami (Oxford)[2] | SARS - Taiwan[11] (Mao, Ding & Lee)[7] <br> Harmful Algae Bloom - Adriatic (Becheri)[12] <br> Exxon Valdez (Oxford)[2] <br> Average of Terrorist Attacks (Oxford)[2] | IXTOC Oil Spill (Restrepo)[13] <br> IXTOC Oil Spill (Oxford)[2] <br> 9/11 - New York (Oxford)[2] | Katrina (Oxford)[2] | 9/11 - US (Bonham)[14] |
| Empirical Analysis (Arrivals Data) | SARS (Malaysia, Singapore) | SARS (Hong Kong, Taiwan) | | | 9/11 (US) |



31

# Events Affecting Tourism (Footnotes)

Notes:

1 - Implied multiples are calculated using the various durations and a recovery path similar to that found in the Post-9/11 U.S. arrivals data, and in the Oxford Economics report.

2 - Oxford Economics, "Potential Impact of the Gulf Oil Spill on Tourism," prepared for the US Travel Association, July 2010.

3 - Kim, Chun & Lee, "Effects of SARS on the Korean Hotel Industry and Measures to Overcome the Crisis: A Case Study of Six Korean Five-Star Hotels," *Asia Pacific Journal of Tourism Research* 10 (4) December 2005.

4 - Lo, Cheung & Law, "The Survival of Hotels During Disaster: A Case Study of Hong Kong in 2003," *Asia Pacific Journal of Tourism Research* 11(1) March

5 - Siu & Wong, "Economic Impact of SARS: The Case of Hong Kong," White Paper 2004.

6 - Duration of iImpact on Taiwan for tourists from Hong Kong and the US was 1 year or less.

7 - Mao, Ding & Lee, "Post-SARS tourist arrival recovery patterns: An Analysis based on a catastrophe theory," *Tourism Management* 31 (2010) 855-861.

8 - Pambudi, McCaughey & Smyth, "Computable general equilibrium estimates of the impact of the Bali bombing on the Indonesian economy," *Tourism Management* 30 (2009).

9 - Blake, Sinclair & Sugiyarto, "Quantifying the impact of foot and mouth disease on tourism and the UK economy," *Tourism Economics* 9(4) 2009: 449-

10 - Stafford, Yu & Armoo, "Crisis Management and Recovery: How Washington, D.C., Hotels Responded to Terrorism," *Cornell Hotel and Restaurant Administration Quarterly* 43(5): Oct. 2002.

11 - Duration of impact on Taiwan for tourists from Japan was greater than 1 year but less than 2 years.

12 - Becheri, "Rimini and Co - the end of a legend? Dealing with the algae effect," *Tourism Management*, Sept. 1991.

13 - Restrepo & Associates, "IXTOC I Oil Spill Economic Impact Study," 1982.

14 - Bonham et al's paper, in January 2006, suggested that 4+ years later, "recovery of international travel to the U.S. may be a long way off." Bonham, Edmonds & Mak, "The Impact of 9/11 and Other Terrible Global Events on Tourism in the U.S. and Hawaii," Working Paper No. 06-2, Jan. 2006.



# Compensation Approach

- **Claimants are compensated for both:**
  - 2010 Actual Documented Losses
    - Losses incurred during the period between when losses began and December 31, 2010.
    - Based on a comparison to a historical period (generally 2008 – 2009)
  - Future Losses
    - Losses that are expected to occur after December 31, 2010.
      - Based on a multiple of Actual Documented Losses through the end of 2010.
      - The multiple (Future Recovery Factor) is 1.0 (3.0 for individuals and businesses harvesting oysters).
- **Final Payment is the sum of:**
  - 2010 Actual Documented Losses
  - Future Losses
  - Less: Other Compensation (BP, GCCF, Workers Compensation, etc)



33

# The University of West Florida
# Department of Marketing and Economics

Phone: (850) 474-2663
FAX: (850) 474-3069
E-Mail: RichardSjolander@uwf.edu

## COMMENTS ON:
## Draft Payment Options, Eligibility and Substantiation Criteria, and Final Payment Methodology, February 2, 2011

February 16, 2011

TO:            Gulf Coast Claims Facility (GCCF)

FROM:      Dr. Richard Sjolander, Professor and Director, International Business Programs (1)

REFERENCE:      COMMENTS ON: Payment Options, Eligibility and
                        Substantiation Criteria, and Final Payment Methodology (2)

Introduction:

The Gulf Coast Claims Facility (GCCF) released on February 2, 2010 the draft of its latest in a series of attempts to capture the best estimate of economic loss suffered by individuals both in the past since the April 20, 2010 Deepwater Horizon Incident (the "Oil Spill") and future until they have completely recovered from the effects of the incident. The comments contained in this document refer to the Final Payment Methodology proposed in that document at pages 5 and 6, numbers 1 through 3. In arriving at these conclusions I have reviewed the GCCF Draft Methodology, the ARPC Report Measures of the Effects of the Gulf Oil Spill on Individuals, and Businesses and Proposed Compensation Schema," dated January 24, 2011, listed on the GCCF website under references, Attachment C (3), and Oxford Economics, "Potential Impact of the Gulf Oil Spill on Tourism," prepared for the US Travel Association, July, 2010 (4), the major economic resource in the ARPC references.

## COMMENT1: Measurement of impact from time of event by Oxford Economics.

Oxford Economics summarizes the work of many other researchers in its publication. All of these researchers follow the standard procedure in impact studies of beginning their analysis at the time (date) of the event being modeled. This date is defined on page 3 of the report,

> "The Deepwater Horizon oil spill in the Gulf of Mexico is the largest offshore spill in U.S. history. Hundreds of millions of gallons have spilled since the explosion of the rig on April 20, 2010."

The Oxford Economic report goes on to illustrate ranges for the duration of Tourism Impacts from five past oil spill research studies, seven past hurricane research studies, four past pandemic events research studies, four Tsunami research studies and six Terrorism research studies. In each of the twenty-six

1

EXHIBIT 15

studies reported, the same methodology is followed: Impacts are measured in "Months after initial disruption for visitor spending to return to baseline." Reference the figures in their report at pages 12-13 (4). Oxford Economics then proceeds to derive an estimate of the duration of Horizon Deepwater Oil Spill impacts on tourism revenue. Reference in particular their figure on page 22, "Oil Spill Impacts on Tourism Revenue, US$, mns," (4). Here, too, though implicit in the figure, impacts begin in 2010, which consists of four quarters, as do the years 2011, 2012, and 2013. As the negative impacts from the Oil Spill begin at the start of 2010 it is clear that they are using a fiscal year beginning with the event date, defined by them as April 20, 2010. A fiscal year is any 12-month period that a company uses for accounting purposes. In the case of impact studies the fiscal year is generally accepted to start with date of the event being studied. Thus, when Oxford Economics states on page 14, "the Deepwater Horizon oil spill impact could reasonably extend to three years beyond the initial spill," (4) this means that these effects may be expected to last for thirty-six months from April 20, 2010, until April 19, 2013.

Summary on Comment 1: The methodology employed by Oxford Economics in arriving at their estimates, both high and low, of the Oil Spill impacts on tourism revenue are in agreement with standard procedure in the conduct of impact studies.

## COMMENT 2: Measurement of impact from time of event by GCCF in "Draft Report

The GCCF Draft agrees with the event date on page 4, "...following the Oil Spill on April 20, 2010..." (2).

The ARPC PowerPoint presentation, dated January 24, 2011, (3), based on what one can only assume was their written, proprietary report to the GCCF, which was not made available to this reviewer (6) by the GCCF, does not mention a date for the start of the event. However, this 'report' does seem to imply that losses begin during 2010, when they outline their Compensation Approach at page 33, "2010 Actual Documented Losses: Losses incurred during the period between when losses began and December 31, 2010." (3)

This is where the problem begins with the methods chosen by the GCCF for compensation of loss both past and future resulting from the Horizon Deepwater Oil Spill. If, as is standard procedure in impact studies that one defines the beginning of the first impact year as the date of the event, then the end of the first year, as correctly defined by Oxford Economics in developing their estimates of loss, must necessarily be April 19, 2011, not December 31, 2010. This error in definition of the first loss year in the GCCF Draft report has the effect of reducing the baseline year 1 loss – upon which years 2 and 3 are based – to only 256 days.

The net effect of this error is that the total compensation to be offered as final payment to claimants by the GCCF only covers approximately 24 months of loss. Let us examine what this means,

Compensable losses start on the event day, April 20, 2010. There is agreement on this start date.

At page 5, point 2 in the GCCF Draft Year 1 is defined as a part of the calendar year 2010, rather than a whole (fiscal) year (2).

2

"Calculation of Future Losses – The calculation of future losses will be based upon the actual losses incurred during the period immediately following the Oil Spill on April 20, 2010 through December 31, 2010."

This means that year 1 of the loss has been shortened by 109 days to 256 days. Thus, Year 1 of the impact, as defined, captures only 70% of the first Fiscal Year's losses following the incident.

"2. Calculation of Future Losses – The calculation of future losses will be based on the actual documented 2010 losses incurred during the period immediately following the Oil Spill on April 20, 2010 through December 31, 2010. The GCCF will use these actual documented 2010 losses to anticipate the gradual economic recovery expected to conclude within two to three years from the date of the Oil Spill" (2, at page 5).

The three year period for economic impacts to be felt from the incident is in agreement with the Oxford Economics study, which reports on page 14, "the Deepwater Horizon oil spill impact could reasonably extend to reasonably extend to three years beyond the initial spill" (4). However, the GCCF Draft incorrectly chooses to base future loss on an 8 month year, rather than the 12 month fiscal year forecast by Oxford Economics in arriving at its multipliers to be used in estimating future loss. As economic loss in years 2 and 3 of the impact are estimated on the basis of year 1 loss, it is critical that year 1 be properly defined. Shortening the first year to just over 8 months means that the Final Payment offer will only cover 24 months of documented and estimated losses from the time of the Oil Spill, rather than 36 months.

A numeric example may be useful to clarify the gravity of this methodological error. We know that the Deepwater Oil Spill event occurred on April 20, 2010 at about 10 pm CDT. This is defined as day 1 (Note that defining day 1 as the 20th is the most conservative definition, as the event occurred so late in the day). Assume that a claimant begins suffering economic loss due to the Oil Spill on April 21, 2010 (This is day 2 and any other date could be assumed, leading to an adjustment of the loss figures in the table). Further assume that this loss continues at a constant rate of $500 per day throughout the rest of the first fiscal year of loss (days 2 – 365). Oxford Economics, and the other reports referenced by them would then define the year 1 loss for this claimant as:

Year 1: The sum of day 1 loss through day 365 loss = 364 x $500 per day = $182,000.

The assumed multiplier for Year 2 loss is 0.7 of Year 1 loss:
        Therefore, Year 2 loss = 0.7 x $182,000 =                          $127,400.

The assumed multiplier for Year 3 loss is 0.3 of Year 1 loss:
        Therefore, Year 3 loss = 0.3 x $182,000 =                          $ 54,600.

The Final Payment then is the sum of Actual Documented Losses for fiscal year 2010 (April 20, 2010 through April 19, 2011), and Future Losses for the fiscal years 2011 and 2012 ending on April 19, 2013. The multiple (Future Recovery Factor) based on FY 2010 income is 1.0 and the total loss and Final Offer Amount is $364,000.

3

(see Table 1 below for details of the loss calculation.)

**TABLE 1: Corrected Methodology for Calculation of Impact of Deepwater
Oil Spill as Described in Oxford Economics Research Report, July, 2010**

| Event date | April 20, 2010, 10 pm CDT | | |
|---|---|---|---|
| Year 1 | Days | days 1 - 365 | |
| April 20 | 1 | no loss | |
| April 21-30 | 2 – 11 | @$500 per day | $5 000 |
| May 1-31 | 12 – 42 | @$500 per day | $15 500 |
| June 1-30 | 43 – 72 | @$500 per day | $15 000 |
| July 1-31 | 73 – 103 | @$500 per day | $15 500 |
| Aug. 1-31 | 104 – 134 | @$500 per day | $15 500 |
| Sept. 1-30 | 135 – 164 | @$500 per day | $15 000 |
| Oct. 1-31 | 165 – 195 | @$500 per day | $15 500 |
| Nov. 1-30 | 196 – 225 | @$500 per day | $15 000 |
| Dec. 1-31 | 226 – 256 | @$500 per day | $15 500 |
| Jan. 1-31 | 257 – 287 | @$500 per day | $15 500 |
| Feb. 1-28 | 288 – 315 | @$500 per day | $14 000 |
| Mar. 1-31 | 316 – 346 | @$500 per day | $15 500 |
| Apr. 1-19 | 347 – 365 | @$500 per day | $9 500 |
| | | | |
| Best Estimate | of Year 1 Loss | | $182 000 |
| | | | |
| Year 2 Loss | Multiplier = 0,7 of Year 1 Loss | | |
| Best Estimate | of Year 2 Loss | | $127 400 |
| | | | |
| Year 3 Loss | Multiplier = 0,3 of Year 1 Loss | | |
| Best Estimate | of Year 3 Loss | | $54 600 |
| | | | |
| Best Estimate | of Total Oil Spill Loss and | Final Payment Offer | $364 000 |

The loss calculation suggested in the GCCF Draft (2) and based on page 33 of the ARPC PowerPoint presentation dated January 24, 2011 (3) incorrectly defines the period to be covered by the first year of loss as covering only the loss suffered between April 20, 2010 and December 31, 2010. This assumption incorrectly underpays the claimant in our example by 30 percent. Clearly, the definition of year 1 or the impact of the event as April 20, 2010 through December 31, 2010 is not the standard definition of year 1 used in impact studies. By this methodology, the year 1 loss in an impact study would be determined to a great extent by the date on which the event occurred in the year, rather than the severity of the event! Putting numbers to the Draft methodology we find that as in the example above, the Deepwater Oil Spill event occurred on April 20, 2010 at about 11 pm EDT. This is defined as day 1. Assume again that a claimant begins suffering economic loss due to the Oil Spill on April 21, 2010 (day 2). Further assume that

4

this loss continues at a constant rate of $500 per day throughout the first year of loss. However, that year is now defined as only days 2 – 256, Dec. 31, 2010.

Year 1: The sum of day 1 loss through day 256 (Dec. 31) loss = 255 x $500 per day =$127,500.

The assumed multiplier for Year 2 loss is 0.7 of Year 1 loss:
      Therefore, Year 2 loss = 0.7 x $127,500 =                       $ 89,250.

The assumed multiplier for Year 3 loss is 0.3 of Year 1 loss:
      Therefore, Year 3 loss = 0.3 x $127,500 =                       $ 38,250.

The Final Payment then is the sum of Actual Documented Losses for Calendar year 2010 (April 20, 2010 through December 31, 2010), and Future Losses for the Calendar years 2011 and 2012 ending on December 31, 2012. The multiple (Future Recovery Factor) based on Calendar 2010 loss of income is 1.0 and the total loss is reduced to $255,000.

(see Table 2 below for details of the loss calculation.)

**TABLE2: GCCF Methodology for Calculation of Impact of Deepwater Oil Spill as stated in Draft Document dated February 2, 2011**

| Event date | April 20, 2010, 10 pm CDT | | |
|---|---|---|---|
| Year 1 | days | days 1 - 365 | |
| April 20 | 1 | no loss | |
| April 21-30 | 2 - 11 | @$500 per day | $5 000 |
| May 1-31 | 12 - 42 | @$500 per day | $15 500 |
| June 1-30 | 43 - 72 | @$500 per day | $15 000 |
| July 1-31 | 73 - 103 | @$500 per day | $15 500 |
| Aug. 1-31 | 104 - 134 | @$500 per day | $15 500 |
| Sept. 1-30 | 135 - 164 | @$500 per day | $15 000 |
| Oct. 1-31 | 165 - 195 | @$500 per day | $15 500 |
| Nov. 1-30 | 196 - 225 | @$500 per day | $15 000 |
| Dec. 1-31 | 226 - 256 | @$500 per day | $15 500 |
| Jan. 1-31 | 257 - 287 | | |
| Feb. 1-28 | 288 - 315 | | |
| Mar. 1-31 | 316 - 346 | | |
| Apr. 1-19 | 347 - 365 | | |
| | | | |
| Best Estimate | of Year 1 Loss | | $127 500 |
| | | | |
| Year 2 Loss | Multiplier = 0.7 of Year 1 Loss | | |
| Best Estimate | of Year 2 Loss | | $89 250 |
| | | | |
| Year 3 Loss | Multiplier = 0.3 of Year 1 Loss | | |
| Best Estimate | of Year 3 Loss | | $38 250 |
| | | | |
| Best Estimate | of Total Oil Spill Loss and | Final Payment Offer | $255 000 |

**COMMENT 3: Effect of the Methodology error on Claimant Payments:**

The methodology currently in the GCCF Draft underestimates claimant losses by approximately 30% of the loss Oxford Economics estimates of economic loss likely to occur as a result of the Deepwater Horizon Oil Spill. This error needs to be corrected to properly reflect the estimates made by Oxford Economics to model impacts of the Oil Spill on tourism.

In the example described in Tables 1 it is shown that according to the methodology developed by Oxford Economics, the correct estimate of loss for the hypothetical claimant over the three years to capture the impact of the Oil Spill, is $364,000. The Table 2 estimate derived using the GCCF Draft method underestimate the first year of impact, which leads to the claimant's Final Payment Loss being under estimated by $364,000 - $255,000 = $109,000.

6

**COMMENT 4: Suggested Remedy for Calculation of Actual Documented Losses and Future Losses for Final Payment based on the Partial Year Ending December 31, 2010.**

It is possible for the GCCF to both limit the period of Actual Documented Losses to end at December 31, 2010 and to compensate claimants for the expected future losses through the entire 36 month period suggested by Oxford Economics to be the expected period of impact from the Oil Spill. In other words a multiplier is needed to extend the documented losses for the period April 20 through December 31, 2010 to capture the expected loss for the entire first Fiscal Year. The suggested multiple is 1.42745 of the documented loss through December 31, 2010. By multiplying the losses found in partial year 1 in table 2, $127,500 by 1.42745 we arrive at the correct economic loss for the assumed claimant in Fiscal Year 1 of $182,000. Applying the multipliers found in the GCCF Draft for years 2 and 3 we arrive at the correct 36 month estimate of loss for Final Payment, as detailed in Table 1and shown below.

Fiscal Year 1 (Documented through 2010 and forecast) =    $182,000
Fiscal Year 2 @ Fiscal Year 1 Loss x 0.7 =    $127,400
Fiscal Year 3 @ Fiscal Year 1 Loss x 0.3 =    $ 54,600

And, Final Payment for the 3 years of loss =    $364,000

This is equal to the Final Payment of the loss shown in Table 1 = $364,000.

Alternately, the GCCF could wait until Documented Losses can be substantiated for the entire Fiscal Year 1 (after April 20, 2011) before considering any claims for final settlement.

**COMMENT 5: Change from Methodology used  For Calculation of the assumed Income Base (2008 and 2009) introduced in the  Draft  Final Payment Methodology: Creates a Negative Bias in Loss**

The methodology accepted both by BP until turning over the claims processing in July 2010 to the GCCF and continued by the GCCF under the Gulf Coast Claims Facility Protocol for Emergency Advance Payments, August 23, 2010, as interpreted by the GCCF located in Gulf Breeze, Florida (at least for business claims for loss of income/rents in the Pensacola, Fl. Region for Emergency Payments) has been changed in the Draft Methodology. Previously, claimants were allowed to choose **the higher of** a claimant's income during the corresponding month in 2008 OR 2009 as the base income for calculating loss for 2010. The Draft Methodology requires claimants to use **the average of** a claimant's income during the corresponding month in 2008 or 2009 as the base income for calculating loss for 2010. This change in the methodology creates a negative bias in estimates of loss as the average of the best and worst years must be used. It appears that under the Draft Methodology claimants will be required to go back and recalculate past losses even if they have already been compensated in filing additional interim or final claims. All claimants will see their losses reduced under the Draft Methodology. See example below using the income numbers found in ATTACHMENT B – SAMPLE CALCULATION FOR A BUSINESS CLAIMANT of the Draft Methodology, dated Feb. 2, 2011 (2). In developing this example I used the most conservative assumption about income: that it was earned at a constant rate during the eight months of each of the three years considered.

7

| Based on: ATTACHMENT B - SAMPLE CALCULATION FOR A BUSINESS CLAIMANT | | | | | | | |
| The data below includes revenues earned by the claimant during the time period shown below. | | | | | | | |

| May - Dec | 2008 | 2009 | Average of 2008-2009 | Better of 2008 or 2009 | 2010 | Proposed Methodology Best Estimate | Methodology Used until Proposed |
|---|---|---|---|---|---|---|---|
| Actual | $747 661 | $657 998 | $702 830 | $747 661 | $417 913 | $284 917 | $329 748 |
| Average monthly | | | | | | | |
| May | $93 458 | $82 250 | $87 854 | $93 458 | $52 239 | $35 615 | $41 219 |
| June | $93 458 | $82 250 | $87 854 | $93 458 | $52 239 | $35 615 | $41 219 |
| July | $93 458 | $82 250 | $87 854 | $93 458 | $52 239 | $35 615 | $41 219 |
| Aug | $93 458 | $82 250 | $87 854 | $93 458 | $52 239 | $35 615 | $41 219 |
| Sept | $93 458 | $82 250 | $87 854 | $93 458 | $52 239 | $35 615 | $41 219 |
| Oct | $93 458 | $82 250 | $87 854 | $93 458 | $52 239 | $35 615 | $41 219 |
| Nov | $93 458 | $82 250 | $87 854 | $93 458 | $52 239 | $35 615 | $41 219 |
| Dec | $93 458 | $82 250 | $87 854 | $93 458 | $52 239 | $35 615 | $41 219 |
| | | | | | TOTAL FOR MAY - DEC. 2010 | $284 917 | $329 748 |

| | MAY - DECEMBER | |
|---|---|---|
| | Average of 2008-2009 | Better of 2008 or 2009 |
| 2010 Projected Revenues (May-Dec) | $702 830 | $747 661 |
| Less: 2010 Actual Revenues | -$417 913 | -$417 913 |
| 2010 Lost Revenues (May-Dec) | $284 917 | $329 748 |
| Loss of Income % (LOI) | 50,70% | 50,70% |
| 2010 Business Losses (May-Dec) | $144 453 | $167 182 |

As is clearly shown in the example calculation above, the hypothetical claimant in the GCCF example has a lower 2010 estimate of Business Losses (May – December, 2010), $144,453, using the Draft Methodology than they had under the previously accepted GCCF methodology, $167,182.

There are two suggestions as to ways to reduce this negative bias in the calculation of Business Loss. First would be to continue with the previous GCCF methodology of allowing claimants to choose the better of the monthly income figures for 2008 or 2009 as the best estimate of 2010 income during the specific month for 2010. The second suggested remedy would be to allow claimants to show a growth estimate for 2010 income over the average of 2008 and 2009 income, such as was allowed in the settlement of the Santa Rosa Island Authority, Pensacola Beach, Florida claim, where this public authority was allowed to

8

show an expected growth in tax revenues during 2010 over the average tax revenues collected in 2008 and 2009.

## CONCLUSIONS:

First, an error has been pointed out in the definition of Year 1 in the GCCF Draft that, if left uncorrected, leads to an estimated 30% under compensation of claimant's losses, as defined by Oxford Economics, from the Deepwater Horizon Oil Spill. On the positive side, one could say that with the current Draft Methodology it is lucky that the Oil Spill did not occur later in the calendar year. Had this occurred, by the faulty logic used in the GCCF Draft, claimants would see their economic losses reduced even further. At the extreme, under the method chosen in the GCCF Draft, had the Oil Spill occurred on the 31st of December, claims for economic loss under their definition of year 1, starting with the date of the event and ending with December 31 of that year, year 1 impact of the event would equal $0 for virtually all claimants. Applying the multiplier of 0.7 times the Year 1 loss for Year 2 and 0.3 times the Year 1 loss for Year 3, claimants would be found to have $0 loss for the entire three year period, which is clearly not the case in the Oil Spill. This error is caused by the GCCF, following their consultant ARPC's definition of year 1 of the loss as being limited to the period of time from the date of the event until the end of the calendar year 2010.

Second, a change in the Draft Methodology proposed by the GCCF from the method used by the GCCF previously under the Gulf Coast Claims Facility Protocol for Emergency Advance Payments, August 23, 2010 introduces a negative bias to all claims of loss. This applies equally to individual and business claims, except in the unusual situation where monthly income during 2008 and 2009 are exactly equal. This negative bias results from the change in methodology from assuming the best estimate of income during any month in 2010 is the best of the actual income received during 2008 or 2009 to defining the best estimate of 2010 to be the average of 2008 and 2009 income.

The analysis in this report has not commented on the basic methodology used by Oxford Economics in arriving at either its estimate of the length of time that it will take before the effects of the Oil Spill are likely to end, nor on the timing of the incidence of claimant costs during the period of impact, which would affect the multiplier chosen. Analysis has focused exclusively on identifying and suggesting a method of correcting the error in specification of Year 1 in the GCCF Draft, titled "Payment Options, Eligibility and Substantiation Criteria, and Final Payment Methodology, dated February 2, 2011, and the ARPC PowerPoint presentation, dated January 24, 2011.

Notes and References:

1.    The author is a professor in the College of Business at the University of West Florida, and that he is a claimant in the current case concerning the Deepwater Horizon Incident (the "Oil Spill").

2.    Gulf Coast Claims Facility, "Payment Options, Eligibility and Substantiation Criteria, and Final Payment Methodology," released February 2, 2011 at the GCCF website, http://gulfcoastclaimsfacility.com/methodologylanding.php

3.     ARPC Report Measures of the Effects of the Gulf Oil Spill on Individuals, and Businesses and Proposed Compensation Schema," dated January 24, 2011, listed on the GCCF website under references, Attachment C

4.     Oxford Economics, "Potential Impact of the Gulf Oil Spill on Tourism," prepared for the US Travel Association, July, 2010, retrieved from the U.S. Travel Association website, on Feb. 3 at 4;30 pm
       http://www.ustravel.org/sites/default/files/page/2009/11/Gulf_Oil_Spill_Analysis_Oxford_Economics_710.pdf

5.     Carl Bonham, Christopher Edmonds, and James Mak The Impact of 9/11 and Other Terrible Global Events on Tourism in the U.S. and Hawaii, East-West Center Working Papers, Economics Series, No. 87, February 22, 2006, retrieved from the East-West website on Feb. 3, 2011 at 4 pm, http://www.ustravel.org/sites/default/files/page/2009/11/Gulf_Oil_Spill_Analysis_Oxford_Economics_710.pdf

6.     The author called the GCCF on February 3, 2011 and spoke with the Research Department at approximately 3 pm central standard time, and was informed by an employee identified only as Rochelle neither she, nor her supervisor, with whom she consulted, was authorized to release any further documents beyond what was on the website. As suggested by the GCCF, the author then emailed a request for the ARPC report to the GCCF at:
       MethodologyComments@gccf-claims.com   No response has been received as of Feb. 7. A follow-up call was made to the claims facility on Feb. 7 when my call was again directed to the Research Department. A supervisor there, who identified herself as Dirricsa (sp.) informed me that my request should be emailed to:
        info@gccf-claims.com
       My request was sent to that address on the 7th of February. No response has been received as of the 16th of February from the GCCF.