# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | * | |
| "Deepwater Horizon" in the Gulf of | | MDL 2179 |
| Mexico, on April 20, 2010 | * | |
| | | SECTION: J |
| This Document Relates To: | * | |
| | | JUDGE BARBIER |
| *Certain Cases Remaining in the B1* | * | |
| *Pleading Bundle* | | MAG. JUDGE WILKINSON |
| | * | |

## ORDER & REASONS
### [As to BP's Dispositive Motion as to Released Claims (Rec. Doc. 22479)]

Before the Court is BP's Dispositive Motion as to Released Claims (Rec. Doc. 22479),
responses by various plaintiffs,[1] and BP's reply (Rec. Doc. 23272). Pursuant to this Court's
instruction in Pretrial Order No. 64 ("PTO 64," Rec. Doc. 22297), BP moves to dismiss the
claims of 38 Remaining B1 Plaintiffs,[2, 3] urging that these plaintiffs have settled and released
their claims through either the Gulf Coast Claims Facility or by virtue of being a member of the
Deepwater Horizon Economic and Property Damages Settlement Class. Having considered the
parties' arguments, the relevant record, and the applicable law, the Court will grant in part and
deny in part BP's motion, as set forth below.

---

[1] Rec. Docs. 22553, 23058/23059/23081, 23158, 23159/23161, 23164, 23172, 23180, 23183, 23186, 23187, 23189, 23190, 23191, 23192, 23194, 23195/23197, 23196, 23198, 23199/23203, 23200, 23201, 23202, 23271, 23308, 23309, 23310, 23320, 23322. Documents 23320 and 23322 are motions for leave to file a sur-reply. The Court will grant these motions and has considered these sur-reply briefs.

[2] As used in PTO 64 and here, "Remaining B1 Plaintiffs" means those Plaintiffs with claims in the "B1 pleading bundle" who have complied with the requirements of PTO 60 and have not subsequently dismissed their claims. The "B1 pleading bundle" refers to non-governmental claims for economic loss and property damages allegedly due to the April 20, 2010 blowout of the Macondo Well and subsequent oil spill.

[3] BP's motion initially sought to dismiss 40 plaintiffs who were listed in Exhibit A to BP's motion. (Rec. Doc. 22476-6). After responses to BP's motion were filed, BP revised its motion so that it now seeks the dismissal of 38 plaintiffs, who are identified in Exhibit 2 to BP's reply. (Rec. Doc. 23272-2).

# I.    16 Plaintiffs Did Not Oppose BP's Motion

Sixteen of the plaintiffs targeted by BP's motion did not file responses. Consequently, the Court deems BP's motion to be unopposed with respect to these plaintiffs and will dismiss their claims:

| Plaintiff | Case No. | Reason for Release |
|---|---|---|
| Lamulle Construction, L.L.C. | 16-cv-04181 | GCCF Release |
| Alabama Roll, Inc. | 13-cv-02232 | E&PD Class Member |
| Cephas Concrete (Patrick D Franklin, Sr.) | 16-cv-06003 | E&PD Class Member |
| Cutting Horse Yachts, LLC d/b/a Chittum Skiffs | 16-cv-05831 | E&PD Class Member |
| Barry Gene Fanguy | 13-cv-01900 | E&PD Class Member |
| Sidney Rafael Floyd, Jr. | 16-cv-03804 | E&PD Class Member |
| Fred Gossen Co., LLC | 16-cv-07262 | E&PD Class Member |
| Mitchell Lee Galbreath | 13-cv-01626 | E&PD Class Member |
| Harris Builders, LLC | 16-cv-05451 | E&PD Class Member |
| Ryan C. Harry | 16-cv-03878 | E&PD Class Member |
| Kibbe & Company, Inc. | 13-cv-02677 | E&PD Class Member |
| Samuel Jay Lyons | 16-cv-05770 | E&PD Class Member |
| Nicole Moxey | 16-cv-05906 | E&PD Class Member |
| O'Brien Crab Company (Stacie T. O'Brien) | 16-cv-04799 | E&PD Class Member |
| Peyton Cottrell Interest, Inc. | 13-cv-01829 | E&PD Class Member |
| RK Turbine Consultants, LLC | 16-cv-06980 | E&PD Class Member |

# II.    GCCF Release

BP moves to dismiss seven plaintiffs on the grounds that they signed a release after settling their claims with the Gulf Coast Claims Facility ("GCCF"). Six of those seven plaintiffs filed oppositions, which are discussed below. The Court also received oppositions from plaintiffs who were not explicitly named in BP's motion.

By way of background, the Oil Pollution Act of 1990 ("OPA") typically requires claimants to first present claims for "removal costs" or "damages" to the "responsible party" and wait until that party denies all liability or until 90 days have passed before the claimant may commence an action in court or submit the claim to the Oil Spill Liability Trust Fund, which is administered by the Coast Guard's National Pollution Funds Center. *See* 33 U.S.C. § 2713;

*Nguyen v. Am. Commercial Lines L.L.C.*, 805 F.3d 134, 139 (5th Cir. 2015). OPA likewise requires the responsible party to promptly establish and advertise the procedures by which claims may be presented. 33 U.S.C. §§ 2705, 2714(b)(1). OPA explicitly requires that the responsible party's claim process include a "procedure for the payment or settlement of claims for interim, short-term damages," payment of which "shall not preclude recovery by the claimant for damages not reflected in the paid or settled partial claim." 33 U.S.C. § 2705(a); *see also* 33 U.S.C. §§ 2713(d), 2714(b)(2).

BP was designated by the Coast Guard as a "responsible party" for the DEEPWATER HORIZON/Macondo Well oil spill. Within days of the blowout and explosion, BP established a process to receive and pay claims arising from the oil spill ("Initial BP Claims Facility"). *See In re Oil Spill by the Oil Rig "Deepwater Horizon*," No. 10-md-2179, 2011 WL 323866, at *1 (E.D. La. Feb. 2, 2011); *see also* BDO Consulting, Independent Evaluation of the Gulf Coast Claims Facility Report of Findings & Observations to the Dept. of Justice at 11-12 (June 5, 2012), *available at* https://www.justice.gov/iso/opa/resources/66520126611210351178.pdf (hereinafter "BDO Report").[4] BP contracted with one or more claims adjusting firms to assist in handling claims. The Initial BP Claims Facility paid only interim claims for past damages; claimants were not required to release claims not covered by the interim payment (e.g., future damages). Between May 3, 2010 and August 22, 2010, the Initial BP Claims Facility made over 127,000 payments, totaling nearly $400 million, to over 30,000 claimants. BDO Report at 12.

Following discussions between BP and the U.S. Government, the White House announced on June 16, 2010, that BP would establish a $20 billion trust to fulfill BP's legal obligations, which would be administered by a new claims facility, the GCCF. Kenneth

---

[4] The U.S. Department of Justice engaged BDO Consulting to conduct an independent evaluation of the GCCF, the findings of which are contained in the BDO Report. BDO Report at 1 & Ex. A.

Feinberg was selected to administer the GCCF. On August 23, 2010, the GCCF replaced the Initial BP Claims Facility. During "Phase I," the GCCF processed and paid only "Emergency Advance Payment" ("EAP") claims. These were claims for documented losses sustained during the first six months following the spill. Claimants who accepted an EAP were not required to sign a release. The documentation requirements generally were less stringent for EAP claims than they were for Interim Payment Claims and Full Review Final Payment Claims, which became available later (discussed below). The GCCF stopped accepting EAP claims on November 23, 2010, although it continued to process and pay EAP claims through mid-February, 2011. The GCCF paid in excess of $2.5 billion to more than 169,000 claimants under the EAP process. *See* BDO Report at 29-30, 34, 36.

In "Phase II" of the GCCF, three types of claims were available: Interim Payment, Full Review Final Payment, and Quick Payment Final. Interim Payment Claims were for documented past losses which had not been previously compensated. Similar to the EAP process and the Initial BP Claims Facility, claimants did not have to sign a prospective release in order to receive an Interim Payment from the GCCF. In most instances, the GCCF permitted a claimant to submit an Interim Payment Claim once every three months. Full Review Final Payment was intended to resolve all losses, past and future, for which the claimant had not been previously compensated. The claimant was required to sign a prospective release and covenant not to sue, waiving all rights against BP and other parties for claims arising from the oil spill, in order to receive a Full Review Final Payment. As mentioned above, the GCCF's documentation requirements were generally more stringent for Interim Payment and Full Review Final Payment than they were for EAP claims. Finally, Quick Payment Final was available to claimants who had received a prior EAP or Interim Payment Claim. Under this option, claimants did not have

to provide further documentation (in contrast to Interim Payment and Full Review Final Payment) and would receive a one-time final payment of $5,000 (for individuals) or $25,000 (for businesses). As with Full Review Final Payment, Claimants accepting a Quick Payment Final were required to sign a full release and covenant not to sue. *See* BDO Report at 34-35 & Exs. L, P, Q, R.

The GCCF ended in 2012 after BP agreed to a class-wide settlement, the Deepwater Horizon Economic and Property Damages Settlement ("Economic Settlement").[5] (*See* March 8, 2012 Order Creating Transition Process (Amended), Rec. Doc. 5995). During its one-and-a-half-year existence, the GCCF processed over one million claims and paid over $6.2 billion to approximately 220,000 claimants. BDO Report at 59. In June 2012, BP instituted a new process to receive and pay claims that were not covered by the Economic Settlement.

### A. Richard Lee Blick, Richard E. Seward, Sr., and Richard E. Seward, Jr. ("Thiel Plaintiffs")

Richard Lee Blick (No. 16-4061), Richard E. Seward, Sr. (No. 16-4068), and Richard E. Seward, Jr. (No. 16-4072) (collectively, the "Thiel Plaintiffs"[6]) allege they are fishing guides in Florida who suffered business losses as a result of the oil spill; they raise identical arguments in opposition to BP's motion. (*See* Rec. Docs. 23308, 23309, 23310). The Thiel Plaintiffs assert that they each received interim payments from the Initial BP Claims Facility and then $25,000 from the GCCF under the Quick Payment Final Claim option. In connection with the Quick Payment Final Claim, the Thiel Plaintiffs each signed a release which, if valid, bars their present lawsuits. The Thiel Plaintiffs argue the release is invalid because (1) it violates OPA, (2) it was misleading, (3) they were fraudulently induced into signing it, and (4) they were under economic duress.

---

[5] The Economic Settlement is discussed further in Part III, below.

[6] "Thiel" refers to the attorney who represents these plaintiffs, Eric Thiel.

The Thiel Plaintiffs first argue that the release is void because it violated OPA's requirement that the responsible party "establish a procedure for the payment or settlement of claims for interim, short-term damages." 33 U.S.C. § 2705(a). The Thiel Plaintiffs assert that the GCCF stopped accepting and paying claims for interim damages once it replaced the Initial BP Claims Facility, making the releases they signed unenforceable as a matter of law. As explained above, however, the GCCF did in fact accept and pay interim claims without requiring a full and final release. This was in the form of EAPs and, later, Interim Payment Claims. *See* BDO Report at 29-36 & Exs. L, P, Q, R; *see also* GCCF Overall Program Statistics as of March 7, 2012 (Rec. Doc. 6831-2) (noting EAP payments totaling $2.58 billion to 169,203 claimants and Interim Payments totaling $501 million to 35,261 claimants). In fact, other plaintiffs who responded to BP's motion state that they received EAP and/or Interim Payments from the GCCF. *See* discussions *infra* re Jelp Barber, Johnny's Clams, Inc., and Crabco.[7] Quick Payment Final was one option offered by the GCCF, but it was not the only option. Thus, assuming without deciding that the failure to establish a procedure to receive and pay interim claims would make the release per se invalid, the record clearly establishes that the GCCF was accepting and paying interim claims. The Thiel Plaintiff's unsupported blanket assertion to the contrary does not create a genuine dispute as to a material issue of fact.[8] Their argument that the releases are void as a matter of law fails.

The Thiel Plaintiffs also argue that the release was misleading because it did not mention ongoing legal proceedings, that they might be class members, or advise them of the "claims

---

[7] Even some of the documents that the Thiel Plaintiffs attach to their response briefs reflect that the GCCF was receiving and paying interim claims without requiring a full and final release. *See* Letter of Feb. 4, 2011, Thomas Perrelli, U.S. Associate Attorney General, to Kenneth Feinberg ("[A]s I previously urged and as [OPA] requires, the GCCF has agreed to continue offering interim payments at the same time that it offers final, prospective payments that require prospective releases. . . . We appreciate your continuing to offer the interim payment option.").

[8] The Thiel Plaintiffs argue that a summary judgment standard applies to BP's motion, and BP does not argue otherwise.

process." (Rec. Doc. 23308 at 5). Under Florida law,[9] clear and unambiguous release provisions are enforceable, and the execution of a valid release results in the termination of all rights covered by the agreement. *Beck-Ford Constr., LLC v. TCA Global Credit Master Fund, LP*, 240 F. Supp. 3d 1256, 1279 (S.D. Fla. 2017); *see also Little v. Seterus, Inc.*, No. 16-cv-60700, 2017 WL 606340, *2 (S.D. Fla. Feb. 13, 2017) ("Releases are a form of contract, and therefore, must be interpreted pursuant to contract law. A party is bound by, and a court is powerless to rewrite, the clear and unambiguous terms of a voluntary contract." (citations omitted)). The release signed by the Thiel Plaintiffs was part of the Quick Payment Final Claim Form, which is a four-page document plus an attachment naming the "Released Parties." Page one of the Quick Payment Final Claim Form contains "Instructions" and states, in pertinent part (emphasis in original):

> **5. <u>Understanding your rights.</u>** The Quick Payment Final Claim Form and Release contain important information about your legal rights, including giving up your right to sue BP and other parties. . . . **<u>Do not sign the Release unless you understand and agree to its terms.</u>**
>
> **6. <u>Attorney Representation.</u> If you are represented by an attorney in connection with your claim, do not submit this Form or sign the Release until you have conferred with your attorney about the decision to submit it and sign the Release.**

Page two is titled "Important Information About the Attached Release and Covenant Not to Sue" and states, in pertinent part (emphasis in original):

> The attached Release and Covenant Not to Sue ("Release") is a binding legal document. By signing this document, you are forever waiving and releasing all claims that you may have against BP or any other party . . . in connection with the April 20, 2010 blowout of the Macondo Well, the sinking of Transocean's Deepwater Horizon drilling rig, and the subsequent oil Spill in the Gulf of Mexico (the "Incident").

---

[9] The release states that the law of the claimant's state of residence governs the release. BP and the Thiel Plaintiffs agree that Florida law governs these releases.

You are under no obligation to accept the final payment offered to you by the Gulf Coast Claims Facility. You are free to reject the final payment offered by the Gulf Coast Claims Facility and to pursue other means of compensation. If you want to file a lawsuit regarding the Incident or make a claim against the Oil Spill Liability Trust Fund, do not sign this Release.

By signing the attached Release, you are forever giving up and discharging any rights which you may have for any costs, damages or other relief related to or arising from the Incident . . . even if you are not currently aware of such costs or damages and even if such costs or damages arise in the future (i.e., additional oil impacts) or do not manifest themselves until the future.

By signing the attached Release, you acknowledge that you have read and understand the terms of the Release, and that you execute the release voluntarily and without being pressured or influenced by, and without relying upon, any statement or representation made by any person acting on behalf of BP or any other released party. **If you are represented by an attorney in connection with your Claim, confer with your attorney before submitting this Claim and signing this Release.**

The Quick Pay option is intended to provide an expedited settlement mechanism for those claimants who believe that the amount offered by the Quick Pay fully and fairly resolves their claim. Do not select the Quick Pay option if you believe you have a claim in an amount greater than the Quick Pay amount. If you elect the Quick Pay amount, you will not be permitted to later seek additional amounts.

. . .

Claimant acknowledges that claimant has read and understands [the preceding information]. Claimant elects to receive a $25,000 Quick Payment as a final settlement of all claims against any party in connection with the Incident . . . ."

The release required each of Thiel Plaintiffs to sign the bottom of page two, which they did.

Page three is titled "Release and Covenant Not to Sue" and states, in pertinent part:

In consideration of payment in the amount of $25,000, Claimant hereby releases and forever discharges, and covenants not to sue [BP] and the other Released Parties . . . for any losses, damages, costs, [etc.,]. . . or other relief that Claimant has or may have, whether known or unknown, whether present or future, whether direct or indirect, whether legal or equitable, arising from or relating in any way to the April 20, 2010 blowout of the Macondo Well, the sinking of Transocean's Deepwater Horizon drilling rig, and the subsequent oil spill in the Gulf of Mexico (the "Incident") . . . .

. . .

Claimant will dismiss with prejudice within 10 days of executing this Release any litigation concerning the Incident . . . filed by or on behalf of Claimant against BP or any other Released Parties. Claimant also will withdraw (the obligation to withdraw is satisfied by affirmatively declining to participate . . . in a class action or similar procedural device) from any existing and will not join any new class actions or similar procedural devices concerning or relating to the Incident . . . .

Page four was where the claimant would sign the Release and Covenant Not to Sue. Each of the Thiel Plaintiffs signed page four. (Rec. Doc. 22479-7 at 11-14).

The release was not misleading; rather, it clearly and repeatedly stated the implication of signing. The release specifically states that by signing it and in exchange for the $25,000 Quick Payment, "you are forever waiving and releasing all claims that you may have against BP or any other party . . . in connection with the . . . oil Spill in the Gulf of Mexico[,] . . . even if you are not currently aware of such costs or damages and even if such costs or damages arise in the future . . . . If you elect the Quick Pay amount, you will not be permitted to later seek additional amounts." Likewise, the release requires the claimant to dismiss any pending litigation and withdraw from any existing or future class actions. The release also made clear that accepting the Quick Payment was voluntary. It states that claimants "are under no obligation to accept" and "are free to reject the final payment offered by the [GCCF] and to pursue other means of compensation." Contrary to the Thiel Plaintiffs' claim that the release did not inform them of their options, the release specifically identifies two alternatives to accepting the GCCF'S offer: "file a lawsuit" or "make a claim against the Oil Spill Liability Trust Fund." Notably, these are the very options provided under OPA. *See* 33 U.S.C. § 2713(c).[10] Moreover, the release

_____

[10] On a related note, the Thiel Plaintiffs state, "As recognized by this Court, BP had a duty to inform unrepresented claimants of their options," (Rec. Doc. 23308 at 5) and reference the Court's decision of February 2, 2011. That decision did require that the GCCF's communications (including but not limited to release documents) to claimants to contain certain information, including that the communication "[f]ully disclose to claimants their options under OPA if they do not accept a final payment, including filing a claim in the pending MDL 2179 litigation." *In Re Oil Spill*, 2011 WL 323866, at *8. Although the release signed by the Thiel Plaintiffs did not specifically mention the MDL 2179 litigation (later versions did), it did, as explained above, inform claimants that

instructs claimants to **not** sign the release if they believe their claim is worth more than $25,000 or want to file a lawsuit or submit a claim to the Oil Spill Liability Trust Fund. Finally, the release tells claimants, in bold type and in two places, to confer with their attorney (if they have one) before accepting the offer and signing the release. The Thiel Plaintiffs' argument that the release was misleading is without merit.

The Thiel Plaintiffs also argue BP fraudulently induced them into signing the release. Fraudulent inducement under Florida law requires (1) a misrepresentation of a material fact, (2) knowledge by the person making the statement that the representation is false, (3) intent by the person making the statement that the representation would induce another to rely and act on it, and (4) that the plaintiff suffered injury in justifiable reliance on the representation. *Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 842 So. 2d 204, 209 (Fla. 3d Dist. Ct. App. 2003). The Thiel Plaintiffs contend that:

> After cutting off interim payments designed by [OPA] to provide immediate relief to victims of environmental crimes,[11] BP then specifically and fraudulently informed [the Thiel Plaintiffs] that the amount being offered was the most that would ever be offered and that if [the Thiel Plaintiffs] did not accept, the quick pay amounts would be decreased. BP also represented that if [the Thiel Plaintiffs] did not sign the Release, [they] would never recover anything, or it would take years. Clearly, these statements were false as BP subsequently entered into [the Economic Settlement] in which it has now paid out over $8 billion in claims. The statements made by BP to [the Thiel Plaintiffs] were clearly intended to induce [them] into accepting the quick pay and signing a release for an amount far less than they [otherwise would] have and far less than they would have been entitled to under the [Economic Settlement].

(Rec. Doc. 23308 at 7).

---

they could reject the GCCF's offer, "pursue other means of compensation," and specifically referenced filing a lawsuit and submitting a claim to the Oil Spill Liability Trust Fund. Furthermore, the Court did not rule in that order that a GCCF release was invalid. In fact, the Court ordered BP and the Plaintiffs' Steering Committee to submit additional briefing on, inter alia, release forms, *id.*, but the Court did not take further action after receiving those additional briefs.

[11] As stated above, this allegation is unsupported and flatly contradicted by record.

The Thiel Plaintiffs' fraudulent inducement argument fails because, given the language in the release, they cannot plausibly allege that they justifiably relied on the alleged statements. The Thiel Plaintiffs cannot establish justifiable reliance when the release itself instructs claimants that they should reject the GCCF's offer and "pursue other means of compensation" if the claimant believes his or her claim is worth more than the Quick Pay amount, and the release specifically mentions filing a lawsuit and submitting a claim to the Oil Spill Liability Trust Fund as possible alternatives. *See Leader Global Solutions, LLC v. Tradeco Infraestructura, S.A. de C.V.*, 155 F. Supp. 3d 1310, 1319 (S.D. Fla. 2016) (noting that reliance on fraudulent representations is unreasonable as a matter of law when a subsequent written contract contradicts the alleged fraud). Consequently, any reliance by the Thiel Plaintiffs on BP's or the GCCF's alleged statements was, as a matter of law, not justifiable.[12]

Finally, the Thiel Plaintiffs seek to invalidate the releases on the grounds that they were executed under economic duress. According to Richard Blick's brief[13]:

> First, it is clear that Mr. Blick was under severe financial distress at the time he entered into the GCCF Release. The BP oil spill devastated his business and finances. Upon taking over the claims processing, the GCCF immediately cut off any interim payments and then informed Mr. Blick that it would not provide any additional payment and then deliberately delayed its claims processing. Mr. Blick was unable to pay his bills. BP then unconscionably used the extreme financial hardship that Mr. Blick was placed in, because of BP's own actions, as leverage to force him into signing the GCCF Release. After cutting off pay and prolonging the claims process and providing him with the only option remaining, a promise for immediate cash, BP then provided Mr. Blick with lists of over 100 lawyers that it said would be defending BP and told him he would never see a dime. Because of BP's wrongful acts and coercion, and even though Mr. Blick knew that his losses would be far greater, he had no choice but to accept the minimal payment so he could survive. He accepted because he had no choice, and

---

[12] The Court adds that, to the extent BP made the statements (as claimed in the Thiel Plaintiffs' opposition briefs), BP was plainly adverse to the Thiel Plaintiffs, and "[a]s a matter of law, reliance is not justifiable when the parties are in adverse relationships." *Clear Marine Ventures, Ltd. v. Cazadores, Inc.*, No. 08-22418, 2010 WL 11504398, at \*5 (S.D. Fla. Jan. 26, 2010). The same doctrine might also apply if the GCCF made the alleged statements (as claimed in the Thiel Plaintiffs' declarations), but the Court need not decide that question.

[13] The briefs of the other two Thiel Plaintiffs make identical arguments.

> the fact that he had no choice was deliberately crafted by BP through its misuse of the GCCF claims facility. Clearly when viewed in the light most favorable to Mr. Blick, material facts exist to preclude dismissal of his Complaint as the release was signed under economic distress.

(Rec. Doc. 23308 at 8).

"Under Florida law, economic duress permits an aggrieved party to rescind an agreement that was entered into under severe financial anxiety or pressure." *Leader Global Solutions, LLC*, 155 F. Supp. 3d at 1317 (citation and footnote omitted). However, "[e]stablishing a case of economic duress is extremely difficult." *Id.* at 1317-18 (quotations omitted). To succeed, the Thiel Plaintiffs must show (1) wrongful acts or threats, (2) financial distress caused by the wrongful acts or threats, and (3) absence of a reasonable alternative course of action. *Id.* at 1318. "In essence, the party seeking to rescind the contract must show that the act sought to be set aside was effected involuntarily and thus not as an exercise of free choice or free will." *Id.* (quotations, citation, and ellipsis omitted).

Assuming the first two elements are met, the Thiel Plaintiffs cannot plausibly allege that they had no reasonable alternative course of action. As provided under OPA and as noted in the release itself, there were at least two reasonable alternatives to accepting the Quick Payment Final: file a lawsuit in court or submit a claim to the Oil Spill Liability Trust Fund. Even assuming, as the Thiel Plaintiffs' assert, that BP did "provide[] Mr. Blick with lists of over 100 lawyers that it said would be defending BP and told him he would never see a dime," such actions would not prevent the Thiel Plaintiffs from filing a claim in court or with the Oil Spill Liability Trust Fund. In fact, had the Thiel Plaintiffs chosen the latter course, BP's lawyers would be of no moment, as BP would not be a party to the proceeding before the National Pollution Funds Center. *See United States v. Am. Commercial Lines, L.L.C.*, 759 F.3d 420, 425 (5th Cir. 2014). Therefore, the Thiel Plaintiffs' economic duress argument fails as a matter of

law.  *Cf. Leader Global Solutions, LLC*, 155 F. Supp. 3d  at 1318 & n.8 (rejecting economic duress argument where defendant could have refused to execute the new contract and/or sued to enforce the parties' prior agreement); *Amoco Oil Co. v. Gomez*, 125 F. Supp. 2d 492, 503 (S.D. Fla. 2000) (rejecting gas station operator's economic duress argument where operator could have refused to sign the new contract with fuel supplier, continued under the terms of the existing agreement, and sold the business upon expiration of the lease; or sued to compel fuel supplier to perform its obligations under the terms of existing agreement); *Woodruff v. TRG-Harbour House, LTd.*, 967 So. 2d 248, 250 (Fla. 3d. Dist. Ct. App. 2007) (affirming dismissal of duress claim because allegations that seller's attorney went to purchaser's home and told her she committed fraud and would suffer unspecified serious consequences unless she agreed to cancel purchase agreement and forfeit deposit were insufficient to show purchaser had no alternative but to execute cancellation letter).

In conclusion, the Court finds that the GCCF release is valid and enforceable with respect to the Thiel Plaintiffs.  Accordingly, the Court will dismiss the Thiel Plaintiffs' claims.

### B.    Jelp Barber and Johnny's Clams, Inc.

Jelp Barber (No.16-5533) signed a full and final release on August 29, 2011, in exchange for a $25,000 Full Review Final Payment from the GCCF.[14]  Johnny's Clams, Inc. (No. 16-5441) signed a full and final release on July 24, 2011 in exchange for a $25,000 Quick Payment Final.[15] These plaintiffs argue that the maritime rule for a seaman's release announced in *Garrett v. Moore-McCormack Co.,* 317 U.S. 239 (1942), applies to the releases they signed and, under that

---

[14] Prior to receiving the Final Payment, Barber received a $40,000 EAP and a $5,000 Interim Payment from the GCCF.  It appears Barber also received $66,300 from the CSSP in October 2012 on a Vessel of Opportunity ("VoO") Charter Payment Claim.  (Complaint ¶ 12, No. 16-5533, Rec. Doc. 1; BP Reply, Ex. 2, Rec. Doc. 23272-2). The Economic Settlement permits a claimant to submit a VoO claim even if that claimant executed a GCCF release.  (Economic Settlement § 2.2.6, Rec. Doc. 6430).

[15] Prior to receiving the Quick Payment Final, Johnny's Clams, Inc. received an Interim Payment of $21,700.

standard, the releases are unenforceable. Alternatively, they argue that the releases are invalid under Florida law because they were executed under duress—similar to the arguments raised by the Thiel Plaintiffs above. (Rec. Docs. 23187, 23191, 23320, 23322).

In *Garrett*, a seaman sued his employer under the Jones Act and for maintenance and cure for injuries he received while working on the employer's vessel. *Id.* at 240. The employer argued that the seaman had executed a release in exchange for $100 and that, under Pennsylvania law, the burden was on the seaman to show by "clear, precise, and indubitable" evidence that the release was invalid. *Id.* at 241-42. Noting that a seaman is a "ward of the court," the Supreme Court held that "the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights." *Id.* at 248; *accord Bass v. Phoenix Seadrill/78, Ltd.*, 749 F.2d 1154, 1161 (5th Cir. 1985) ("We protect seamen's rights in the settlement context by requiring the proponent of a release that has been attacked to show that it was freely and knowingly executed.").

*Garrett* and the three other cases cited by Barber and Johnny's Clams concern releases executed by "seamen." *See Bass v. Phoenix Seadrill/78, Ltd.*, 749 F.2d 1154 (5th Cir. 1985); *Asignacion v. Schiffahrts*, No. 11-627, 2011 WL 2118740 (E.D. La. May 25, 2011), *abrogated by* 783 F.3d 1010 (5th Cir. 2015); *Orsini v. O/S Seabrooke O.N.*, 247 F.3d 953 (9th Cir. 2011). The Court is unaware of any cases where anyone other than a seaman was able to invoke the *Garrett* standard. "Seaman," of course, is a term with a distinct legal meaning. *See, e.g.*, *Naquin v. Elevating Boats, L.L.C.*, 774 F.3d 927 (5th Cir. 2014). Although Barber and Johnny's Clams repeatedly refer to themselves in their briefs as "maritime workers," they do not explicitly claim to be "seaman," nor do they provide any evidence to support such a claim.

Even assuming that Barber and Johnny's Clams do qualify as seamen,[16] the Court still would not apply *Garrett*'s standard to these releases. "Despite a long line of cases that describe seamen as 'wards of the court' needing special protections from potentially overreaching ship owners, the scope of these special protections is not unlimited." *Thorman v. Am. Seafoods Co.*, 421 F.3d 1090, 1097 (9th Cir. 2005) (quotations omitted). The *Garrett* standard is typically applied to a release of a seaman's claims against his employer and/or the vessel owner for personal injury or some benefit (e.g., wages) under the seaman's employment contract. *See, e.g., Karim v. Finch Shipping Co.,* 374 F.3d 302, 311 (5th Cir. 2004) ("[T]his solicitude for seamen's well-being is often associated with the burdens placed on an employer to prove the validity of a seaman's release or a settlement agreement.").[17] The GCCF and BP, however, do not employ these plaintiffs or own the vessel on which these plaintiffs may have worked, nor do the releases concern personal injury to these plaintiffs or their employment contracts. Plaintiffs cite no cases, nor has the Court found any, where a court applied the *Garrett* standard to a release of a seaman's pure economic-loss tort claim resulting from an oil spill and asserted against a non-employer, non-vessel owner, third-party.

Although the Fifth Circuit has referred to the ward of the court doctrine as "flexible" in application, *Karim*, 374 F.3d at 311, neither precedent nor policy supports its application here. "Invocation of the 'wards of the court' doctrine is to be linked to the specific policy reasons for its creation." *Huseman v. Icicle Seafoods, Inc.*, 471 F.3d 1116, 1124 (9th Cir. 2006). The *Garrett* Court found support for its decision in the fact that Congress and the courts had created

---

[16] The Court notes that the plaintiffs' briefs state that Barber is a shrimper and Johnny's Clams, Inc. harvests clams.

[17] The Court's own research uncovered one case where the Fifth Circuit invoked the "ward of the court" doctrine to reform a contract between a seaman and a non-employer/non-vessel owner. *See Karim, supra.* However, there the contract was between a seaman and his attorney who had represented the seaman in his personal injury suit against his employer. *Karim*, therefore, provides no help to Barber and Johnny's Clams.

special rights and remedies designed to protect seamen from the dangers of their workplace. *Garrett*, 317 U.S. at 246, 248. By contrast, the Court sees nothing in the text of OPA—the primary federal legislation governing oil spills and the statute that required Barber and Johnny's Clams to present their claims to the GCCF in the first place—to suggest that a seaman's economic loss claim is treated any differently from, say, a restaurant's economic loss claim. In fact, considering that the *Garrett* standard makes it significantly easier for a seaman to invalidate a release, applying such a rule to these releases would seem to create tension with the purpose of OPA's presentment procedure: "to temper [OPA's] increased liability with a congressional desire to encourage settlement and avoid litigation." *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co., Inc.*, 51 F.3d 235, 238-39 (11th Cir. 1995).

For the above reasons, Barber's and Johnny's Clams' arguments concerning *Garrett* and the "ward of the court" doctrine fail. As to their arguments regarding duress under Florida law, the Court rejects those arguments for essentially the reasons stated above with the Thiel Plaintiffs. The Court finds that the releases are valid and will dismiss the claims of Jelp Barber and Johnny's Clams, Inc.

### C. Crabco & Mr. Peeper's Best, LLC

Jerry Wayne Tharp filed a claim with the GCCF for his lost wages relating to oyster work he performed in 2008 for a company called Bedrock Seafood, Inc. ("the Bedrock" claim). Tharp filed another claim with the GCCF for the losses sustained by Crabco, which Tharp describes as his sole proprietorship through which he purchases, processes, and distributes crabs ("the Crabco claim"). The GCCF issued separate claimant numbers for the Bedrock claim and the Crabco claim. In June 2011, the GCCF offered Tharp a Full Review Final Payment of $68,226.03 on the Bedrock claim. Tharp states in an affidavit that a GCCF representative told him that accepting

the GCCF's offer on the Bedrock claim would not affect the Crabco claim. Tharp accepted the Final Payment offer and executed the GCCF's full and final release. In October 2011, the GCCF offered Tharp a Final Payment of $146,676.46 on the Crabco Claim. (Rec. Doc. 23189-1 at 87-96). Tharp rejected this offer. In March 2, 2012, the GCCF made a second Final Payment offer on the Crabco claim, this time for $220,014.69. (Rec. Doc. 23189-1 at 98-109). Tharp declined this offer as well, but he did accept an Interim Payment in the amount of $90,527.63 without signing a release.

Shortly thereafter BP and Class Counsel reached agreement on the Economic Settlement, and the GCCF ceased operations. In June 2012, the Court Supervised Settlement Program ("CSSP") opened to administer the Economic Settlement, and BP opened the BP Claims Program ("BPCP") to receive and process claims not covered by the Economic Settlement. Tharp filed the Crabco claim with both the BPCP and the CSSP. Tharp also filed a claim with the BPCP on behalf of another entity he owned, Mr. Peeper's Best, LLC ("Peepers").[18] Tharp did not file a claim for Peepers with the CSSP. Tharp/Crabco ultimately opted out of the Economic Settlement. In July 2013, the BPCP denied the Crabco claim on the grounds that Tharp had executed a release with the GCCF. The BPCP did not issue a formal determination on the Peepers claim.

BP argues that Crabco is merely a trade name registered by Tharp, not a separate and distinct legal entity. BP asserts that, because Crabco has no claims separate from Tharp, Crabco's claims were released when Tharp executed the GCCF release in June 2011. BP argues that Peeper's claims are also included in Tharp's release, because it is a joint venture with Tharp and Crabco, and the release extends to the claimant's "joint venturers" and "agents."

---

[18] Tharp states that Peepers was created in 2009 as a separate legal entity for the purpose of selling and marketing processed and live crabs purchased from Crabco.

Tharp and BP appear to agree that Louisiana law governs the release he executed in June 2011. Under Louisiana law, "[a] compromise settles only those differences that the parties clearly intended to settle, including the necessary consequences of what they express." La. Civ. Code Art. 3076. Furthermore,

> [t]he meaning and intent of the parties to a compromise is ordinarily determined from the four corners of the instrument, and extrinsic evidence is inadmissible to explain or to contradict the terms of the instrument. When a dispute occurs regarding the scope of a compromise, extrinsic evidence can be considered to determine exactly what differences the parties intended to settle, but absent some substantiating evidence of mistaken intent, no reason exists to look beyond the four corners of the instrument to ascertain the parties' intent.

*Trahan v. Coca Cola Bottling Co. United, Inc.*, 894 So. 2d 1096, 1107 (La. 2005) (citations omitted); *see also* La. Civ. Code Art. 3082 ("A compromise may be rescinded for error, fraud, and other grounds for the annulment of contracts. Nevertheless, a compromise cannot be rescinded on grounds of error of law or lesion.").

Tharp swears in an affidavit that a GCCF representatives repeatedly told him that accepting the settlement offer on the Bedrock claim would not affect the Crabco claim. Documents attached to Tharp's opposition show that, consistent with the GCCF's alleged statements, the GCCF twice offered to settle the Crabco claim after Tharp executed the release. Furthermore, although Tharp did not accept either offer of Final Payment on the Crabco claim, Tharp did accept an Interim Payment of $90,527.83 on the Crabco claim, which the GCCF paid. The Court finds that, notwithstanding any language to the contrary in the release, Tharp has produced substantiating evidence that both he ***and*** the GCCF intended to settle and release only the Bedrock claim—not the Crabco claim or Peeper's claim.[19] Consequently, the Court will not dismiss the claims asserted by Tharp/Crabco and Mr. Peeper's Best, LLC (No. 13-1076).

---

[19] The Court stresses that the subsequent offers to pay the Crabco claim after Tharp executed the release and the actual Interim Payment are critical to the Court's finding regarding the parties' intent.

**D.     Claims by a "Putative Class" of Plaintiffs Represented by Douglas Lyons**

Attorney Douglas Lyons filed two oppositions and a motion for leave to sur-reply on behalf of multiple individuals who executed a GCCF release (Rec. Doc. 22552, 23196, 23327). Except for Jelp Barber and Johnny's Clams, Inc. (discussed above), none of the clients identified in Lyons' filings are targeted in BP's motion. Consequently, the Court does not consider these filings and will deny the motion for leave to sur-reply.

**III.     E&PD Class-Wide Release**

On December 21, 2012, the Court certified the Economic and Property Damages Settlement Class ("E&PD class") and approved the Economic Settlement pursuant to Fed. R. Civ. P. 23. *In Re: Oil Spill by the Oil Rig "Deepwater Horizon"*, 910 F. Supp. 2d 891 (E.D. La. 2012*), aff'd sub nom. In Re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014); *see also* Order & Judgment (Rec. Doc. 8139). BP argues that the plaintiffs discussed below are members of the E&PD class, consequently, their claims are released pursuant to the class-wide release (Economic Settlement § 10, Rec. Doc. 6430) and the Order and Judgment of December 21, 2012 (Rec. Doc. 8139 ¶¶ 8-14).

**A.     The Alleged Opt-Out Plaintiffs**

Six plaintiffs—Perry Family Properties, LLC, Alton Rockford Meadows, David K. Edwards, Dach V. Hoang, Tuoi Pham, and DDK Partners—oppose BP's motion by arguing that they opted out of the E&PD Class.

Perry Family Properties, LLC (Nos. 16-3661, 16-3748): BP concedes in its reply brief that Perry Family Properties, LLC opted out of the E&PD class. (BP Reply at 8, Rec. Doc. 23272). Accordingly, BP withdrew its motion with respect to Perry Family Properties, LLC. The Court will also grant Perry Family Properties, LLC's motion to amend its sworn statement

(Rec. Doc. 23159) to correctly identify itself as a plaintiff that properly opted out of the E&PD class.

Alton Rockford Meadows (No. 13-1746):  Meadows asserts he timely opted out of the E&PD class.  (Rec. Doc. 23192).  According to Garden City Group's ("GCG")[20] report from November 2012 on valid and invalid opt-outs (hereinafter "2012 GCG Report"), Meadows's opt-out request was deemed invalid because it contained no request for exclusion from the E&PD class.  (2012 GCG Report, Ex. Q, Rec. Doc. 8001).  The Court has requested and reviewed the documents GCG received from Meadows, which are attached to this Order as EXHIBIT A, and agrees with GCG's conclusion.  The documents that Meadows submitted with his PTO 60 Sworn Statement, which do request exclusion, are not the documents he submitted to GCG.  (*Compare* Exhibit A to this Order *with* No. 13-1746, Rec. Doc. 8-2).  Accordingly, the Court finds that Meadows did not opt out of the E&PD class.

Nevertheless, BP does not request that Meadows's claims be dismissed at this time, because he may have a claim pending in the Economic Settlement and the CSSP might determine that Meadows or his claims are excluded from the Economic Settlement.  (BP Reply at 8, Rec. Doc. 23272).  Therefore, the Court will not dismiss Meadows at this time.

David K. Edwards (No. 16-6696):  Edwards claims he timely opted out of the E&PD class and notes that "David Edwards" is listed in the 2012 GCG Report as having submitted a timely and valid opt out.  (Rec. Doc. 23183).  The 2012 GCG Report identifies David *E.* Edwards of Houston, TX as having a valid opt-out.   David *K.* Edwards of Saint Petersburg, FL, however, is listed as an invalid opt-out, because he did not personally sign the opt-out request— rather, his attorney did.  (GCG Report, Ex. P, Rec. Doc. 8001).  Although the document attached to Edwards's opposition does appear to be signed by Edwards himself (Rec. Doc. 23183-1), this

---

[20] GCG is the claims administration vendor responsible for receiving and processing opt-outs.

is not the document that was sent to GCG, which is attached to this Order as EXHIBIT B. Because Edwards did not opt out of the E&PD class, the Court will dismiss his claims.

 *Dach V. Hoang (No. 16-6071) and Tuoi Pham (No. 16-6200)*:  Hoang and Pham both claim they opted out of the E&PD class.  (Rec. Docs. 23186, 23190).  While these plaintiffs are listed among the valid and timely opt-outs in the 2012 GCG Report, they later revoked their opt-outs. (*See* BP Reply, Ex. 4, Rec. Doc. 23272-5).  Consistent with their revocations, GCG did not include Hoang or Pham on a revised list of valid opt-outs filed on March 31, 2016.  (*See* Rec. Doc. 16069, hereinafter "2016 GCG Report").  The Court will dismiss the claims by Hoang and Pham.

 DDK Partners (No. 16-7155):  DDK Partners asserts that it opted out of the E&PD Class. (Rec. Doc. 23197 at 2-3).  DDK Partners is not listed among the valid and timely opt-outs on either the 2012 GCG Report or the 2016 GCG Report.  DDK Partners does not produce anything to suggest that it opted out of the E&PD class.  The Court finds DDK Partners did not opt out of the E&PD class and will dismiss its claims.

**B.      Plaintiffs with Pending Claims in the Economic Settlement/CSSP**

Eight plaintiffs—Gulf States Marine Technical Bureau, Inc. (No. 13-1974), Innovation Federal Credit Union (No. 16-6049), Spectrum Organization, Inc. d/b/a The Victorian Rental Pool (No. 14-0331), MB Industries, LLC (No. 16-7286), MBI Global, LLC (No. 16-7292), Deep South Machine, Inc. (No. 16-6384), Finance Motors of Crowley, LLC (No. 16-6383), and Adams Homes of Northwest Florida, Inc. (No. 13-1494)—assert that they are E&PD class members, but dismissal would be premature at this time because their claims are still pending in the CSSP and it is possible that they ultimately may be determined to be excluded from the

E&PD class.   These plaintiffs allegedly filed their lawsuits as a protective measure in the event

that they are determined to be excluded from the E&PD class.   As MB Industries, LLC states:

> BP could still take a contradictory position within the CSSP by arguing that [MP Industries, LLC] is not a member of the Economic Class, but rather an excluded entity.  . . . Although it would be prejudicial to both parties to force this lawsuit forward into discovery while its claim is pending before the CSSP, it would be even more prejudicial to dismiss this suit before the CSSP makes a final determination in the form of an Eligibility Notice or a final, non-appealable Denial Notice. . . . Once this claim has reached a final, non-appealable resolution within the CSSP, [MB Industries, LLC] will promptly move to dismiss this protective suit.  If, however, the CSSP determines [MB Industries, LLC] is excluded from the [E&PD class], then this lawsuit should still be available as a vehicle for [MB Industries, LLC] to pursue its claims against BP.

(Rec. Doc. 23199 at 1-2).  BP concedes that the CSSP has not issued any sort of determination

with respect to three plaintiffs—Adams Homes of Northwest Florida, Inc., Deep South Machine,

Inc., and The Victorian Rental Pool—therefore, it does not seek to dismiss those plaintiffs at this

time.  However, BP does move to dismiss the five other plaintiffs, since the CSSP has issued a

determination other than exclusion with respect to them.

The Court agrees with the plaintiffs.   Because it is possible that these plaintiffs could be

determined to be excluded from the E&PD Class, the Court will not dismiss their cases at this

time.   Once a claim reaches a final, non-appealable resolution within the CSSP (other than a

determination that the plaintiff or claim is excluded from the E&PD Class), then the plaintiff

should promptly dismiss its protective lawsuit.

### C.   Plaintiffs with "Expressly Reserved Claims"

Mark Mead (No. 10-3261) opposes dismissal insofar as BP's motion is directed toward

his claims for bodily injuries, emotional stress, etc.  (Rec. Doc. 23164).  Raymond Merchant

appears to oppose dismissal insofar as BP's motion is directed at bodily injury, moratoria loss, or

other claims that are "Expressly Reserved Claims" under the Economic Settlement.  (Rec. Doc.

23271).  BP replies that "[w]hile [it] does not seek to dismiss [Mead and Merchant's] personal injury claims in the Release Motion, to the extent their filed claims assert economic losses or property damage, BP asks that the Court dismiss those claim, as they have been released."  (Rec. Doc. 23272).  BP adds that Mead and Merchant are E&PD class members, which Mead and Merchant do not appear to dispute.

The Court will dismiss Mead's and Merchant's claims only insofar as they assert "Released Claims" as that term is defined under the Economic Settlement.  (*See* Economic Settlement, § 10.2, Rec. Doc. 6430-1).  Notably, "Bodily Injury Claims" and "Moratoria Losses" are not "Released Claims," but instead are "Expressly Reserved Claims."  (*Id.*)  Thus, to the extent Mead or Merchant assert in their lawsuits "Bodily Injury Claims," "Moratoria Losses," or any other "Expressly Reserved Claims," those claims are not dismissed.

### D. Patricia Bailey, Cornelius Johnson, Gilbert Johnson, James March, Steven Shivers, Sr.

Given the limited record before the Court, it is unclear whether Patricia Bailey (No.16-3822), Cornelius Johnson (No. 16-3828), Gilbert Johnson (No. 16-3831), James March (No. 16-3833), and Steven Shivers, Sr. (No. 16-6363) are E&PD class members and whether their claims are subject to the Economic Settlement's class-wide release.  Accordingly, BP's motion is denied without prejudice with respect to these plaintiffs.

## IV.    Conclusion

For the reasons set forth above,

IT IS ORDERED that BP's Dispositive Motion as to Released Claims (Rec. Doc. 22479)

is GRANTED IN PART and the following claims are DISMISSED with prejudice:

| | |
|---|---|
| Lamulle Construction, L.L.C. | 16-cv-4181 |
| Alabama Roll, Inc. | 13-cv-2232 |
| Cephas Concrete (Patrick D Franklin, Sr.) | 16-cv-6003 |
| Cutting Horse Yachts, LLC d/b/a Chittum Skiffs | 16-cv-5831 |
| Barry Gene Fanguy | 13-cv-1900 |
| Sidney Rafael Floyd, Jr. | 16-cv-3804 |
| Fred Gossen Co., LLC | 16-cv-7262 |
| Mitchell Lee Galbreath | 13-cv-1626 |
| Harris Builders, LLC | 16-cv-5451 |
| Ryan C. Harry | 16-cv-3878 |
| Kibbe & Company, Inc. | 13-cv-2677 |
| Samuel Jay Lyons | 16-cv-5770 |
| Nicole Moxey | 16-cv-5906 |
| O'Brien Crab Company (Stacie T. O'Brien) | 16-cv-4799 |
| Peyton Cottrell Interest, Inc. | 13-cv-1829 |
| RK Turbine Consultants, LLC | 16-cv-6980 |
| Richard Lee Blick | 16-cv-4061 |
| Richard E. Seward, Sr. | 16-cv-4068 |
| Richard E. Seward, Jr. | 16-cv-4072 |
| Jelp Barber | 16-cv-5533 |
| Johnny's Clams, Inc. | 16-cv-5541 |
| David K. Edwards | 16-cv-6696 |
| Dach V. Hoang | 16-cv-6071 |
| Tuoi Pham | 16-cv-6200 |
| DDK Partners | 16-cv-7155 |

IT IS FURTHER ORDERED that the claims of Mark Mead (No. 10-3261) and Raymond

Merchant (No. 15-4290) are DISMISSED IN PART and only insofar as they assert "Released

Claims" as that term is defined under the Deepwater Horizon Economic and Property Damages

Settlement.   (*See* Economic Settlement, § 10.2, Rec. Doc. 6430-1).   To the extent Mead or

Merchant assert "Bodily Injury Claims," "Moratoria Losses," or any other "Expressly Reserved

Claims," as defined under the Economic Settlement, those claims are NOT dismissed.

IT IS FURTHER ORDERED that Perry Family Properties, LLC's Motion to Amend Sworn Statement (Rec. Doc. 23159) is GRANTED. The Clerk is instructed to file the amended Sworn Statement (Rec. Doc. 23159-1) in case nos. 16-3748 & 16-3661.

IT IS FURTHER ORDERED that the motions for leave to file sur-replies by Jelp Barber and Johnny's Clams, Inc. (Rec. Docs. 23320, 23322) are GRANTED.

IT IS FURTHER ORDERED that the motion for leave to file sur-reply (Rec. Doc. 23327) is DENIED.


Signed in New Orleans, Louisiana, this 20th day of October, 2017.

United States District Judge

**Note to Clerk: Mail copy of this Order to Raymond Merchant (No. 15-4290), who is pro se.**