UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Oil Spill by the Oil Rig<br>"Deepwater Horizon"<br>in the Gulf of Mexico,<br>on April 20, 2010 | MDL No. 2179<br><br>SECTION: J |
| This Document Relates to:<br>Salvesen v. Feinberg, et al.,<br>2:11-cv-02533<br>Pinellas Marine Salvage Inc., et al. v. Feinberg, et al.,<br>2:11-cv-1987<br>Ditch v. Feinberg et al.,<br>2:13-cv-06014<br>_____/ | JUDGE BARBIER<br>MAG. JUDGE WILKINSON |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
TO REQUEST THIS COURT TO PLACE ON THE PUBLIC RECORD THE TOTAL
AMOUNT AND SOURCE OF COMPENSATION, *FROM ALL SOURCES*,
PAID TO ALL MEMBERS OF THE PSC, et al.**

## BACKGROUND

On June 15, 2011, Plaintiff Salvesen filed his action against Defendants Kenneth R. Feinberg, Feinberg Rozen, LLP, d/b/a GCCF, and William G. Green, Jr. in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County, Florida asserting claims for gross negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida state law. The case was subsequently transferred by the JPML to the MDL 2179 Court on October 6, 2011. On February 25, 2011, Plaintiffs Pinellas Marine Salvage Inc., et al. filed their action against Defendants Kenneth R. Feinberg and Feinberg Rozen, LLP, d/b/a GCCF, in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Florida asserting claims for gross negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida state

law. The case was subsequently transferred by the JPML to the MDL 2179 Court on August 9, 2011. On June 12, 2013, Plaintiff Ditch, a victim of Defendants' "Expedited EAP Denial" strategy, filed his action against Defendants in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County, Florida asserting claims for gross negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida state law. The case was subsequently transferred by the JPML to the MDL 2179 Court on October 2, 2013. Pursuant to this Court's Pretrial Order No. 15 (Rec. Doc. 676), "Pending further orders of this Court, all pending and future motions, including Motions to Remand [filed by Plaintiffs Salvesen, Pinellas Marine Salvage Inc., et al., and Ditch], are continued without date unless a motion is specifically excepted from the continuance by the Court." All motions filed by Plaintiffs since August 2011, including Motions to Remand, remain continued without date.

## INTRODUCTION

This is neither a Motion to Compel nor an Objection. This is a Motion by the plaintiffs to request this Honorable Court to conduct itself in a fully transparent manner by placing on the public record the total amount and source of compensation, *from all sources*, paid to all members of the PSC and the total amount and source of compensation paid to the legal experts, Special Masters, and Claims Administrator Patrick Juneau.

> The following issues have resulted in a complete loss of the public's trust in MDL 2179:
> (a) the excessive compensation paid to the MDL 2179 PSC attorneys;
> (b) as the parties were approaching the final fairness hearing in November 2012, the PSC, et al. colluded to intentionally mislead the plaintiffs;
> (c) the manner in which the FCC allocated the common benefit fees and costs award;
> (d) the fact that Mikal C. Watts was awarded $18,290,494.18 in common benefit fees; and
> (e) The failure of the PSC to adequately represent victims of the BP oil well blowout of April 20, 2010.

-2-

The potential harm to the public's perception of the judicial process is especially acute in MDL 2179 because of the large number of plaintiffs.

The total compensation paid to the 19 PSC attorneys and their law firms is guesstimated to be *$3.035 billion*. It is beyond cavil that a reasonable, objective observer would not conclude that this amount is out of all proportion to the value of the professional services rendered.

Plaintiffs respectfully point out to this Honorable Court that a narrow focus on judicial efficiency cannot allow the circumvention of the core democratic premises of representation, transparency, and accountability.

## **LAW AND ARGUMENT**

**I.     The Court's Inherent Authority to Exercise Ethical Supervision over the Parties**

The judiciary has well-established authority to exercise ethical supervision of the bar in both individual and mass actions. *In re Vioxx Prods. Liab. Litig.*, 574 F. Supp. 2d 606, 611 (E.D. La. 2008) (citing *In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006) (mass tort litigation is a "quasi-class action," requiring the "imposition of fiduciary standards to ensure fair treatment to all parties and counsel regarding fees and expenses")). Among the broad equitable powers of a federal court is its supervisory capacity over an attorney's contingent fee contracts. *Karim v. Finch Shipping Co., Ltd.*, 233 F. Supp. 2d 807, 810 (E.D. La. 2002), *aff'd*, 374 F.3d 202 (5th Cir. 2004). Even when the validity of the fee contract itself has not been challenged by the parties, it is within the court's inherent power of supervision over the bar to examine the attorney's fee for conformance with the reasonable standard of the Code of Ethics. *See Rosquist v. Soo Line R.R.*, 692 F.2d 1107, 1111 (7th Cir. 1982). *See Gair v. Peck*, 160 N.E.

2d 43, 48 (N.Y. 1959) ("contingent fees may be disallowed as between attorney and client in spite of contingent fee retainer agreements, where the amount becomes large enough to be out of all proportion to the value of the professional services rendered."). Transferee courts necessarily retain the authority to examine attorney fees *sua sponte* because the attorneys' interests in this regard are in conflict with those of their clients. *See In re Guidant*, 2008 WL 682174, at *18 ("As for the representative counsel involved, Plaintiffs' counsel have a built-in conflict of interest that is directly opposed to that of their clients."); *In re Zyprexa*, 424 F. Supp. 2d at 491-92 ("Plaintiffs' counsel have a built-in conflict of interest; and the defendant is buying peace and is generally disinterested in how the fund is divided so long as it does not jeopardize the settlement.").

In allocating fees, courts must "conform to 'traditional judicial standards of transparency, impartiality, procedural fairness, and ultimate judicial oversight.'" *In re* Vioxx Products Liability Litigation, 802 F.Supp.2d 740, 772 (2011). They do so with input from lead attorneys, but ultimate discretion lies with the transferee court, whose cost awards are subject to abuse of discretion review by the appellate court. *In re* San Juan Dupont Hotel Fire Litig., 111 F.3d 220, 228 (1st Cir. 1997). *See also* In re High Sulfur Content Gasoline Prod. Liability Litig., 517 F.3d 220, 227 (5th Cir. 2008) ("We must determine whether the record clearly indicates that the district court has….not proceeded in a summary fashion, and has arrived at an amount that can be said to be just compensation."). The transferee court cannot abdicate its responsibility of closely scrutinizing fee awards to appointed counsel. *See* High Sulfur Content Gasoline Prod. Liability Litig., 517 F.3d at 227.

As these global settlements occur more frequently and as the public consciousness focuses more closely on the outcome of mass tort litigations, there will also be a growing need to protect the public's trust in the judicial process. *See* In re Zyprexa, 424 F.2d at 494. ("Public understanding of the fairness of the judicial process in handling mass torts….is a significant aspect of complex national litigations involving thousands of parties.").

The potential harm to the public's perception of the judicial process is especially acute in the instant case because of the large number of claimants. *See id.* at 493 ("The risk of excessive fees is a special concern here because of the mass nature of the case.").

Plaintiffs respectfully point out to this Honorable Court that contingent fees are designed to increase proportionally alongside a plaintiff's recovery - to tie the fates of lawyer and client. When PSC attorneys take things one-step further and bargain for the defendant to pay their common benefit fees directly, they sever that tie. As a result, the attorneys' financial self-interest may no longer be linked to their clients' outcome, but to the defendant's wishes. This concern has long been recognized as one of structural collusion in the class context. John C. Coffee, Jr., *Rethinking the Class Action: A Policy Primer on Reform*, 62 IND. L.J. 625, 647-48 (1987). Courts have agreed. *E.g.,* Zucker v. Occidental Petroleum Corp., 192 F.3d 1323 (9th Cir. 1999).

## II.   The Basis of the Court's Authority to Conduct Itself in a Fully Transparent Manner

Our democratic society favors court transparency to encourage public confidence in our judicial system and avoid the perception that our courts are "star chambers." *See* Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1129 (5th Cir. 1991) (The term "star chambers" is the theoretical description of court orders and rulings that cannot be questioned and lack accountability.).

As Chief Justice Burger wrote, the First Amendment is intended to "prohibit government from limiting the stock of information from which members of the public may draw," then it makes sense to say that it prevents the government from closing court proceedings that have long been open to the public. *See* Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 576 (1980).

Justice Stevens further remarked on the significance of the Court's shift in his concurring opinion in *Richmond Newspapers*:

> "This is a watershed case. Until today the Court has accorded virtually absolute protection to the dissemination of information or ideas, but never before has it squarely held that the acquisition of newsworthy matter is entitled to any constitutional protection whatsoever….I agree that the First Amendment protects the public and the press from abridgment of their rights of access to information about the operation of their government, including the Judicial Branch…." *See* Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 582, 584 (1980).

As the California Supreme Court observed: "If public court business is conducted in private, it becomes impossible to expose corruption, incompetence, inefficiency, prejudice, and favoritism." *See* NBC Subsidiary (KNBC-TV), Inc. v. Superior Court, 980 P.2d 337, 360 n.28 (Cal. 1999) (quoting *In re* Estate of Hearst, 136 Cal. Rptr. 821, 824 (Ct. App. 1977)).

"Judges are not politicians, even when they come to the bench by way of the ballot," Chief Justice John Roberts Jr. observed in *Williams-Yulee v. Florida Bar,* 135 S. Ct. 1656 (2015). As he noted, "politicians are expected to be appropriately responsive to the preferences of their supporters," whereas this "is not true of judges." To the contrary, "a judge instead must 'observe the utmost fairness,' striving to be 'perfectly and completely independent.'" *Id.* (quoting Address of John Marshall (Dec. 11, 1829), *in* PROCEEDINGS AND DEBATES OF THE VIRGINIA STATE CONVENTION OF 1829–1830 615, 616 (1830)).

Judge Frank Easterbrook has noted: "The political branches of government claim legitimacy by election, judges by reason. Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat and requires rigorous justification." *See* Hicklin Eng'g, L.C. v. Bartell, 439 F.3d 346, 348 (7th Cir. 2006).

Although the Supreme Court has not directly addressed the issue of whether a First Amendment right of access extends to civil proceedings, it has noted that "historically both civil and criminal trials have been presumptively open." *See* Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580 n.17 (1980); *see also* Craig v. Harney, 331 U.S. 367, 374 (1947) ("A trial is a public event. What transpires in the court room is public property.").

Indeed, the Court has observed that "in some civil cases the public interest in access….may be as strong as, or stronger than, in most criminal cases." *See* Gannett Co. v. DePasquale, 443 U.S. 368, 386 n.15 (1979); *see also* Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1070 (3d Cir. 1984) ("Public access to civil trials, no less than criminal trials, plays an important role in the participation and the free discussion of governmental affairs."); Chi. Council of Lawyers v. Bauer, 522 F.2d 242, 258 (7th Cir. 1975) ("Civil litigation in general often exposes the need for governmental action or correction. Such revelations should not be kept from the public.").

III.   **Issues Which Have Resulted in a Complete Loss of the Public's Trust in MDL 2179**

    A.   **Excessive Compensation Paid to MDL 2179 PSC Attorneys**

Members of the PSC and their law firms in MDL 2179 are quadruple-dipping.

The known sources of compensation received by the members of the PSC and their law firms in MDL 2179 are: (a) Common Benefit Fees; (b) Contingent Fees; (c) Co-counsel Fees; and (d) Hold-Backs.

The most egregious form of compensation, in terms of pure greed, are co-counsel fees which are fees solicited and received by members of the PSC and their law firms for serving as co-counsel to non-member firms of the PSC. For example, on March 13, 2012, Plaintiffs' retained counsel received an unsolicited mass email from a member of the PSC. The email stated, in pertinent part, "Co-Counsel Opportunity for BP Oil Spill Cases: News of the recent BP Settlement has caused many individuals and businesses along the Gulf Coast to contemplate either filing a new claim or amending a claim that has already been submitted. *If you receive inquiries of this nature we would like you to consider a co-counsel relationship with our firm.* Even if someone has already filed a claim it is advisable to retain legal counsel to analyze the impact of this settlement on claimants and maximize recovery. If you receive inquiries and are interested in co-counseling with us on the BP claims, please email…."

The total compensation paid to the 19 PSC attorneys and their law firms is guesstimated to be *$3.035 billion*. This amount assumes that fifty percent (50%) of the paid claims are for clients of PSC attorneys and their law firms. Plaintiffs respectfully point out that due to the complete lack of transparency in MDL 2179 this amount is merely a guesstimate. However, it is not beyond the realm of possibility.

### B.     The PSC, et al. Colluded to Intentionally Mislead the Plaintiffs

Judge Barbier states, "….as the parties were approaching the final fairness hearing in November 2012, there was a concerted effort by the parties and claims facility to process a

-8-

substantial number of high value claims in order to demonstrate that the settlement program was working as intended….BP and Class Counsel were aware of the push to resolve claims, as was the Court. Although some of these claims were for clients of PSC members, according to Mr. Juneau over 60% of the claims were for clients of non-PSC attorneys….While the Settlement Agreement in general terms provides that claims will be processed in the order in which they are received….there is no evidence that the Claims Administrator acted improperly in this regard." (Rec. Doc. 13635 at 3, November 10, 2014).

In sum, the PSC members colluded with BP and Patrick Juneau, the claims administrator, to expeditiously process and inflate the amount of compensation received by some plaintiffs (just prior to the "fairness" hearing) in order to intentionally mislead the remaining plaintiffs into believing that the proposed settlement is fair, reasonable, and adequate. Approximately 40% of these "high value" claims were for clients of PSC members. Why would a plaintiff possibly want to opt-out of a settlement which is going to provide such generous compensation?

### C.     How the FCC Allocated the Common Benefit Fee and Costs Award

On July 15, 2015, Judge Barbier appointed a Common Benefit Fee and Cost Committee ("FCC") to be responsible for submitting to the Court an Aggregate Fee and Cost Petition and an Allocation Recommendation.

> The FCC is comprised of:
> (a) Stephen J. Herman of Herman, Herman & Katz, LLC, Co-Liaison Counsel in MDL 2179, who shall serve as Co-Chair and Secretary of the FCC.
> (b) James P. Roy of Domengeaux Wright Roy Edwards & Colomb LLC, Co-Liaison Counsel in MDL 2179, who shall serve as Co-Chair of the FCC.
> (c) Robert T. Cunningham of Cunningham Bounds, LLC.
> (d) Brian H. Barr of Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, PA.

(e) Calvin C. Fayard, Jr. of Fayard & Honeycutt, APC
(f) Robin L. Greenwald of Weitz & Luzenberg, P.C.
(g) Dawn M. Barrios of Barrios, Kingsdorf & Casteix, L.L.P.
(Rec. Doc. 14863 at 3, July 15, 2015).

It is interesting to note that six of the seven members appointed to the FCC are attorneys previously appointed by Judge Barbier to the MDL 2179 PSC. Plaintiffs respectfully point out that it doesn't take a great deal of imagination to figure out how the $720.15 million would be allocated.

| | |
|---|---:|
| Total Amount FCC Paid to Themselves | $321,602,542.45 |
| Total Amount Paid to Other PSC Members | $277,043,154.06 |
| Amount Paid to Barrios, Kingsdorf & Casteix, L.L.P. (a) | $    1,291,576.47 |
| Total Amount Paid to All PSC Members | $597,354,120.04 |

(a) Not an MDL 2179 PSC Member


Guesstimated Calculation of Common Benefit Fees Paid to 103 Non-PSC Attorneys

| | |
|---|---|
| Total Recommended Fee Allocations | US$704.500 million (b) |
| Total Compensation Paid to 19 PSC Attorneys | US$597.354 million |
| Total Compensation Paid to 103 Non-PSC Attorneys | US$107.146 million |

(b) According to the FCC, the proposed recommended fee allocations total approximately $704.5 million. This leaves a proposed reserve of approximately $15.65 million.

### D.     Mikal C. Watts was Awarded $18,290,494.18 in Common Benefit Fees

On October 8, 2010, Judge Barbier appointed Mikal C. Watts as one of the initial fifteen members to the MDL 2179 PSC. Watts was appointed based largely on the fact that he allegedly had more than 40,000 clients. On March 13, 2013, Watts resigned from the MDL 2179 PSC. On September 15, 2015, Watts and six codefendants were indicted by a federal grand jury on 95 counts of conspiracy, mail and wire fraud, identity theft, and aggravated identity theft.

As set forth in the indictment, the defendants, without contacting the individuals, would obtain names, addresses, dates of birth, and social security numbers from any source available to create "clients" for anticipated litigation as a result of the *Deepwater Horizon* Oil Spill. The indictment further alleges that the defendants fraudulently submitted names of over 40,000 individuals as plaintiffs represented by Mikal C. Watts in litigation related to the *Deepwater Horizon*/BP oil spill, knowing that the individuals had not consented to be represented by the firm, and/or that stolen and false social security numbers, dates of birth, addresses, and occupations were claimed. According to the indictment, the defendants attempted to obtain payments from the Gulf Coast Claims Facility for persons Mikal C. Watts claimed to represent and ultimately submitted 'Presentment Forms' to BP for each of the 40,000 plus individuals Mikal C. Watts claimed to represent. The indictment alleges that the total amount of claims submitted by the defendants to BP was in excess of $2 billion.

On April 11, 2017, the FCC filed its proposed fee allocation with the MDL 2179 Court. (Rec. Doc. 22628). The FCC recommended Watts Guerra LLP be allocated $16,790,494.18 in common benefit fees.

The FCC explains, "The Fee Committee has not taken into consideration any of the issues raised in BP's Complaint and Motion to Enjoin the Seafood Program [Civil Action No. 2:13-cv-6674]. Whether and/or how such allegations might or might not affect the allocation or award of common benefit fees to Watts Guerra is left to the sound judgment and discretion of the Court. The Fee Committee does note that Mr. Watts was acquitted by the jury in the criminal trial that was held in the Southern District of Mississippi."

On October 12, 2017, Special Master John W. Perry, Jr. filed "Special Master's Recommendations Concerning the Allocation of Common Benefit Fees and the Reimbursement of Shared Expenses and Held Costs" with the MDL 2179 Court. (Rec. Doc. 23491)

Special Master Perry recommended Watts Guerra LLP be allocated *$18,290,494.18* in common benefit fees.

On October 24, 2017, the Court issued its Order wherein Judge Barbier states, "The Court hereby adopts in full the Special Master's Recommendations Concerning the Allocation of Common Benefit Fees and the Reimbursement of Shared Expenses and Held Costs." (Rec. Doc. 23574)

How much would Mikal C. Watts have been allocated if his more than 40,000 "clients" were not phantoms? The MDL 2179 plaintiffs may never know.

### E.    The Failure of the PSC to Adequately Represent Victims of the BP Oil Well Blowout of April 20, 2010

On February 9, 2011, the PSC filed a First Amended Master Complaint. Rather than allege claims under the Oil Pollution Act of 1990 (OPA) (which governs the MDL 2179 cases alleging economic loss due to the BP oil well blowout) and the Outer Continental Shelf Lands Act (OCSLA) (which governs the MDL 2179 personal injury and wrongful death actions and borrows the law of the adjacent state as surrogate federal law), the PSC made the unfathomable decision to allege claims under admiralty law. In the 'B1' First Amended Master Complaint, the PSC clearly states, "The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiffs hereby designate this case as an admiralty or maritime case, and request a non-jury trial, pursuant to Rule 9(h)."

The OPA is a strict liability statute. In order to recover damages under the OPA, a claimant merely needs to show that his or her damages "resulted from" the oil spill or oil well blowout. As a result of the PSC intentionally circumventing the OPA by designating this case as an admiralty or maritime case, and requesting a non-jury trial, pursuant to Rule 9(h), the PSC limited BP's liability in the following manner.

(a) Kenneth R. Feinberg *denied payment to approximately 61.46%* of the claimants who filed claims with the GCCF; the average total amount paid per claimant was a paltry $27,466.47;

(b) Feinberg's "Release and Covenant Not to Sue" *excluded approximately 220,000* BP oil well blowout victims from the subsequent Deepwater Horizon Economic and Property Damages Class Settlement Agreement; and

(c) Patrick Juneau *has denied payment to approximately 60.03%* of the claims submitted to the DHCC; the average total amount paid per claim was a paltry $64,700.02.

### IV.   Plaintiffs Have a Right to Demand Court Transparency

#### A.   Violation of the Aggregate Settlement Rule by Members of the MDL 2179 PSC

Currently, the aggregate settlement rule (ASR) governs global MDL settlements.

In *Arce v. Burrow*, the Texas Supreme Court held that lawyers may be subject to total or partial fee forfeiture as a sanction for serious violations of an ethical rule. *Arce* involved allegations that mass tort lawyers breached their fiduciary duties to their clients by violating the ASR. *See, e.g.*, Arce v. Burrow, 958 S.W.2d 239, 249 (Tex. App. 1997).

The ASR is Rule 1.8(g) of the ABA *Model Rules of Professional Conduct* ("*Model Rules*"), and it states: "A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients….unless each client gives

informed consent, in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims….involved and of the participation of each person in the settlement."

In the mass tort context, two core questions arise with regard to the ASR: (1) When is a settlement an "aggregate settlement" covered by Rule 1.8(g), rather than simply a group settlement (to which Rule 1.8(g) may not apply)? And, (2) what disclosures must be made by the plaintiffs' attorney to the clients potentially eligible to participate in the aggregate settlement?

In February 2006, the ABA issued *Formal Ethics Opinion 06-438*, which acknowledged that the term "aggregate settlement" is not defined in the *Model Rules* and explicitly undertook to explain that term: "To the extent that this definition would include all situations 'when any two or more clients consent to have their matters resolved together,' it is broader than the definition offered by the *Arce* court. Indeed, the definition set out in the ABA *Opinion* seems to eliminate the space left after *Arce* between a group settlement and an aggregate settlement for purposes of Rule 1.8(g); all 'group' settlements are now arguably 'aggregate settlements' and must comply with the disclosure requirements of Rule 1.8(g)."

The ABA *Formal Ethics Opinion 06-438* interpreted Rule 1.8(g) to require a lawyer to disclose *at a minimum*, the following information to the clients for whom or to whom the settlement or agreement proposal is made:
> (a) *The total amount of the aggregate settlement*;
> (b) The existence and nature of all of the claims….involved in the aggregate settlement;
> (c) The details of every other client's participation in the aggregate settlement….whether it be their….settlement receipts…..or any other….receipt of something of value as a result of the aggregate resolution;
> (d) *The total fees and costs to be paid to the lawyer as a result of the aggregate settlement, if the lawyer's fees and/or costs will be paid, in whole or in part, from the proceeds of the settlement or by an opposing party or parties*; and

(e) *The method by which costs (including costs already paid by the lawyer as well as costs to be paid out of the settlement proceeds) are to be apportioned among them*. (Emphasis added).

The adoption of the ALI *Principles* in 2009 provided yet another view of the disclosures required under Rule 1.8. Section 3.17(a) of the ALI *Principles* states:

"Informed consent to an aggregate settlement requires that each claimant be able to review the settlements of all other persons subject to the aggregate settlement or the formula by which the settlement will be divided among all claimants. Further, *informed consent requires that the total financial interest of claimants' counsel be disclosed to each claimant*." (Emphasis added).

In the absence of Rule 1.8(g), an attorney who represents multiple clients against the same defendant and who receives an offer of a fixed sum from the defendant to resolve all of their claims would potentially have an irreconcilable client-client conflict. Every dollar of the lump sum which the plaintiffs' attorney allocates to Client A is one less dollar available to be allocated to any of the other clients.

In sum, an MDL PSC attorney owes fiduciary duties to each member of the settlement class. A lawsuit based on a violation of the ASR can be brought as a breach of fiduciary duty claim; the plaintiff need not show any economic loss from the attorney's breach in order to prevail; and full or partial forfeiture of the fees that the attorney received from the former client is the remedy. *See, e.g.*, Arce v. Burrow, 958 S.W.2d 239, 249 (Tex. App. 1997) (holding, in a lawsuit filed by former clients alleging, inter alia, that attorneys breached the aggregate settlement rule, that "fee forfeiture exists in Texas in the context of the attorney-client relationship, and that all the client need prove is a breach of fiduciary duty by the attorney"); Hole v. Wyeth-Ayerst Labs., No. 700000/98, 2007 N.Y. Slip. Op. 50647(U), 2007 WL 969426, at *3-4, *4 n.10 (Sup. Ct. Mar. 27, 2007) (noting that "no penalty is specified for a violation" of

the New York aggregate settlement rule, but citing *Arce* for proposition that "the remedy for violating the fiduciary duty to multiple clients might be as severe as complete fee forfeiture if the attorneys committed the breach intentionally, willfully, recklessly, maliciously, or with gross negligence").

V.   **Transparency and Accountability Dictate That This Honorable Court Places on the Public Record the Total Amount and Source of Compensation,** *From All Sources*, **Paid to All Members of the PSC, et al.**

As explained *supra*, court transparency promotes public confidence in our judicial system and avoids the perception that our courts are "star chambers." Nevertheless, Plaintiffs would respectfully agree that a transferee court which does not believe that its PSC attorneys should be held accountable negates the need for court transparency.

The ASR requires a lawyer to disclose, in pertinent part, the following information to the clients for whom or to whom the settlement or agreement proposal is made: (a) The total amount of the aggregate settlement; (b) The total fees and costs to be paid to the lawyer as a result of the aggregate settlement, if the lawyer's fees and/or costs will be paid, in whole or in part, from the proceeds of the settlement or by an opposing party or parties; and (c) The method by which costs (including costs already paid by the lawyer as well as costs to be paid out of the settlement proceeds) are to be apportioned among them. Further, informed consent requires that the *total financial interest of claimants' counsel* be disclosed to each claimant.

The members of the PSC failed to disclose to their clients that: (a) the total amount of the settlement is $20 billion; (b) Patrick Juneau would deny payment to approximately 60.03% of the claims submitted to the DHCC; (c) the total fees paid to members of the PSC would be

comprised of common benefit fees, contingent fees, co-counsel fees, and hold-backs; (d) the total compensation paid to the 19 PSC attorneys and their law firms would be $3.035 billion; (e) the plaintiffs were fraudulently induced not to opt-out of the settlement (*See supra* III B); (f) the costs incurred for retaining four experts in the law of class actions (the Court quotes from the opinions of these experts in its analysis of class certification issues in the settlement class action) and the costs incurred for retaining a fifth law professor to give his opinion on the Aggregate Fee Petition; and (g) the costs incurred for the Special Masters and Claims Administrator.

In the Court's Order & Reasons [Granting the Aggregate Common Benefit and Costs Award], Judge Barbier states, "Petitioning attorneys have performed an immense amount of work in this MDL….These lawyers spent days and weeks away from their homes and families. This resulted in a high level of collaboration, benefitting not only class members, but the entire litigation….That counsel were able to achieve so much speaks to their ability. This factor supports the reasonableness of the fee award….*the fees sought here are not only reasonable, they are arguably below what class counsel could have reasonably requested.*" (Rec. Doc. 21849 at 39, October 25, 2016). (Emphasis added). Plaintiffs respectfully disagree.

The amount of common benefit fees awarded to the members of the PSC should not be evaluated in a vacuum. In order to properly analyze the reasonableness of the common benefit award, the *total amount of compensation* received by the members of the MDL 2179, *from all sources*, must be taken into consideration. As noted *supra*, the total compensation (common benefit fees, contingent fees, co-counsel fees, and hold-backs) paid to the 19 MDL 2179 PSC attorneys and their law firms is guesstimated to be $3.035 billion. In other words, common

-17-

benefit fees represent only *19.68%* of the total compensation paid to the 19 MDL 2179 PSC attorneys and their law firms.

In sum, it is beyond cavil that a reasonable, objective observer would conclude that the common benefit fees sought by members of the MDL 2179 PSC "are not only reasonable, they are arguably below what class counsel could have reasonably requested."

### A.  The Total Amount and Source of Compensation, *From All Sources*, Paid to All Members of the MDL 2179 PSC

Plaintiffs respectfully request, for the purpose of transparency and accountability, that this Honorable Court places on the public record the total amount and source of compensation, from all sources (e.g., common benefit fees, contingent fees, co-counsel fees, and hold-backs), paid to the following members of the MDL 2179 PSC and their law firms.

Stephen J. Herman (Herman, Herman & Katz, LLC), James P. Roy (Domengeaux Wright Roy Edwards & Colomb LLC), Robert T. Cunningham (Cunningham Bounds, LLC), Brian H. Barr (Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, PA), Calvin C. Fayard, Jr. (Fayard & Honeycutt, APC), Robin L. Greenwald (Weitz & Luzenberg, P.C.), Jeffrey A. Breit (Breit Drescher Imprevento & Walker, P.C.), Elizabeth J. Cabraser (Lieff, Cabraser, Heimann & Bernstein, LLP), Philip F. Cossich, Jr. (Cossich, Sumich, Parsiola & Taylor), Alphonso Michael Espy (Morgan & Morgan, P.A.), Ervin A. Gonzalez (Colson Hicks Eidson), Rhon E. Jones (Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.), Matthew E. Lundy (Lundy, Lundy, Soileau & South, LLP), Michael C. Palmintier (deGravelles, Palmintier, Holthaus & Fruge'), Paul M. Sterbcow (Lewis, Kullman, Sterbcow & Abramson), Scott Summy (Baron & Budd, P.C.), Mikal C. Watts (Watts Guerra LLP), Joseph F. Rice (Motley Rice LLC), and Conrad S. P. "Duke" Williams (Williams Law Group, LLC).

### B.  The Total Amount and Source of Compensation, *From All Sources*, Paid to the Following Legal Experts

Plaintiffs respectfully request, for the purpose of transparency and accountability, that this Honorable Court places on the public record the total amount and source of compensation paid to the following legal experts.

John C. Coffee, Jr. (Columbia Law School), Samuel Issacharoff (NYU), Robert Klonoff (Lewis & Clark Law School), Arthur R. Miller (NYU), and Brian T. Fitzpatrick (Vanderbilt University).

Professor Fitzpatrick states that his compensation in this matter has been $595 per hour. (Rec. Doc. 21423-6, p. 35).

### C. The Total Amount and Source of Compensation, *From All Sources*, Paid to the Following Special Masters and Claims Administrator

Plaintiffs respectfully request, for the purpose of transparency and accountability, that this Honorable Court places on the public record the total amount and source of compensation paid to the following Special Masters and Claims Administrator.

Special Master John W. Perry, Jr., Special Master Louis J. Freeh,
Special Master Francis E. McGovern, and Claims Administrator Patrick Juneau

### CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Honorable Court place on the public record the total amount and source of compensation, *from all sources*, paid to all members of the MDL 2179 PSC and the total amount and source of compensation paid to the above-named legal experts, Special Masters, and Claims Administrator and any other further relief that the Court deems just and appropriate.

DATED: November 13, 2017                                Respectfully submitted,

/s/ Brian J. Donovan
Brian J. Donovan
Attorney for Plaintiffs
Florida Bar No. 143900
3102 Seaway Court, Suite 304
Tampa, FL 33629
Tel: (352)328-7469
BrianJDonovan@verizon.net