UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUSIANIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf Of Mexico, on April 20, 2010 | * * * | MDL 2179 SECTION: J |
| This Document Relates To: *Pleading Bundle B1* WILKINSON | * | JUDGE BARBIER MAG. JUDGE |

| | | |
|---|---|---|
| JELP BARBER, (Plaintiff) | | CIVIL ACTION No. 2:16-cv-05533 |
| VERSUS BP EXPLORATION & PRODUCTION, INC., BP AMERICA PRODUCTION COMPANY, and BP P.L.C. (Defendants) | * * * | SECTION J JUDGE BARBIER MAG. JUDGE WILKINSON |

### AFFIDAVIT OF JELP BARBER

BEFORE ME, the undersigned authority, personally appeared Jelp Barber, who, being duly sworn, deposes and says

1. My name is Jelp Barber. The statements made in this Affidavit are based on my personal knowledge and belief.
2. I was born in Kinard, Florida, on May 11, 1938, and lived there until 1942, when my family moved to Eastpoint, Florida. I lived there until 1969 when my wife and I purchased and moved into a home located at 225 Avenue E, Apalachicola, Florida 32320, which has since been my residence.
3. When I was growing up in Eastpoint, my father owned and operated shrimp boats and oyster boats and oyster and crab houses. I worked for him in those

1

businesses until 1957 when I bought a bay boat named the *Greyhound* and began commercial shrimping. After operating the *Greyhound* for several years, I replaced it with a larger shrimp boat named the *Miss Jean*. After operating the *Miss Jean* for several years, in 1979, I replaced it with a new, larger (85') wooden shrimp boat built by Landry Boat Works in Bayou La Batre, Alabama named the *"Lady Louise."* I operated the *"Lady Louise"* to harvest shrimp in Gulf waters from Key West, Florida, to Brownsville, Texas, until April 20, 2010, when BP's Deepwater Horizon Oil Rig/ Macondo Oil Well exploded and began spewing raw crude oil into the waters of the Gulf of Mexico. For the 53 years from the time I bought the *Greyhound* until the Deepwater Horizon explosion occurred, I earned my the majority of my livelihood operating my boats to harvest shrimp from Gulf waters, and to a lesser extent from harvesting oysters from Apalachicola Bay.

4. A few days after the explosion, the Federal government closed the Gulf of Mexico to commercial harvesting of marine life until BP capped the well and recovered, contained and removed or dispersed and sank the spilled oil, and decontaminated Gulf waters enough to permit commercial harvesting of marine life to resume, causing me to be unable to continue operating the *Lady Louise* to harvest shrimp and from harvesting oysters until such decontamination was achieved.

5. It was not until July 18, 2010, 89 days after the Deepwater Horizon explosion occurred, that BP capped the well and stopped the unrestricted flow of crude oil into the Gulf of Mexico. It took many more months to recover or contain and disperse and sink the millions of gallons of crude oil that flowed from the well. Because BP used toxic chemicals to disperse and sink most of the crude oil, I believe the damage to marine life in Gulf waters caused by the crude oil and use of toxic chemicals to disperse and sink it will continue for many years to come.

6. In order to keep the *"Lady Louise"* fit for commercial shrimping, I had to continually maintain the exterior and interior elements of the vessel, its gear, machinery and equipment. Every 12-18 months, I had to remove the vessel from the water onto a railway so I could repair and refinish its hull and other wooden elements and service and repair all gear, machinery and equipment

used in harvesting and processing shrimp, except in the event of unexpected damage that required me to remove her from the water to service and repair something vital to the boat's operation I followed that procedure from the time I purchased the *"Lady Louise"* in 1979 until the oil spill prevented me from continuing to harvest shrimp and earning the income I needed to pay the cost of operating the Lady Louise, continuing such maintenance and repair, meet my financial obligations to others, and otherwise support my family.

7. Within a short time after the Deepwater Horizon explosion, I heard BP had opened an office at the old school building in Apalachicola to receive claims from anyone damaged by the oil spill. I then went to the old school to see if what I had heard was true and if I was eligible to make a claim. I then found BP claims office, which later became known as BP's Gulf Coast Claims Facility (GCCF), with many people there making claims for damages caused by the oil spill, some of whom I knew. I got in line and waited to talk with one of the several men and women who appeared to be running the office. When it was my turn, I gave my name and address to the man waiting on me, and told him I was a commercial shrimper and oysterman damaged by the oil spill preventing me from continuing to harvest shrimp and oysters and earn the income that work provided. He gave me a form and told me to fill it out with the information requested to support my claim. I then filled it out and gave it back to him.

8. The man taking my claim then told me BP agreed it was liable for all damages caused by the oil spill and was obligated to pay all damages each person and business sustained. He said I would soon receive an emergency relief payment of $5,000.00 in part payment of my damages, I would be asked to periodically supplement the information I provided in support of my claim to enable BP to correctly quantify all my damages, and I would receive interim payments on a quarterly basis to sustain me land my family until my damages were quantified and the amount payable to compensate me for my damages was finally determined and fully paid.

9. When I left the claims office, I understood it would be unnecessary for me to do anything further to recover the sum payable for my damages other than

submit any additional information requested to support my claim to enable BP to quantify my damages and determine the amount payable to me to fully compensate me for my damages. A short time later, I received a letter enclosing a $5,000.00 check from GCCF for emergency relief in part payment of my damages. After receiving the letter and $5,000.00 check, I began receiving mail from GCCF asking me to submit more information in support of my claim and promptly did so in response to each such request.

10. In June 2010, BP's Vessels of Opportunity Program (VOP) recruited me, my 3-man crew, and the "*Lady Louise*" to help BP locate and contain crude oil released from the oil spill, conditioned on me and my crew first undergoing specialized training and achieving certification in oil spill work. The terms of the agreement between BP's VOP and me provided for BP to pay me $3,000.00 per day for use of the "*Lady Louise*," $200.00 per day for me to captain the vessel, and $100.00 per day for each member of my 3-man crew, for a total of $3,500.00 per day, and prohibited the "*Lady Louise*" from being used for any other purpose until BP no longer needed me, my 3-man crew, and the "*Lady Louise*" to perform such services and until BP's VOP inspected, detoxified, and released the "*Lady Louise*" for other use.

11. After successfully completing the specialized training in oil spill work BP required, on July 1, 2010, at BP's VOP direction, I, my 3-man crew, and the "*Lady Louise*" began searching for crude oil in Gulf waters, assisting BP in locating and containing the oil to enable BP to target aircraft spraying chemicals on the oil to dissolve and sink the oil. I, my 3-man crew, and the "*Lady Louise*" continued performing such services each day thereafter through July 19, 2010, when BP's VOP told me it no longer needed me, my crew, and the "*Lady Louise*" to perform such services. I then asked VOP to inspect, detoxify, and release the "*Lady Louise*" so I could get it cleaned up, fit, and ready for operational use when commercial shrimping was permitted to resume in Gulf waters. While awaiting VOP's inspection, detoxification, and release of the "*Lady Louise*," I kept her tied to the dock in Apalachicola.

12. On August 11, 2010, I received a check from Danos & Curole, a Louisiana accounting firm acting for BP's VOP, for $54,500.00 and on August 24, 2010, received another check from Danos & Curole for $18,000.00 for BP's VOP employing me, my 3-man crew and the "*Lady Louise*" from July 1 to

4

July 19, 2010.

13. Because repair of the hull of the *"Lady Louise"* was overdue, in September 2010, my crew and I took the *"Lady Louise"* to Pensacola, Florida, had it hauled onto a railway, and stripped, patched and painted the hull, but did not repair any of her other wooden elements or service or repair any of her gear, machinery and equipment because I could not afford the expense of doing so. When we finished that work, we took the *"Lady Louise"* back to Apalachicola and tied her back to the dock. Because VOP had not yet inspected, detoxified and released the *"Lady Louise"* and I could not operate her for any purpose other than oil spill clean up for BP until she was inspected, detoxified and released for use for another purpose, I remained unable to make productive use of the *"Lady Louise."*

14. On September 25, 2010, I received a letter from GCCF attaching a check for $40,000.00 payable to me. The letter said:

> "The check attached to this letter represents an Emergency Advance Payment from the Gulf Coast Claims Facility for damages suffered as a result of the Deepwater Horizon Oil Spill on April 20, 2010. The GCCF has calculated the amount of your Emergency Advance Payment according to the rules that apply uniformly to all claimants. The amount is a reasonable estimate only of your projected losses and cannot be changed or adjusted at this time. At the time of the submission of your Final Claim for Final Payment, you will at that point have the opportunity to present additional documentation and materials that you feel support your position. All such issues will be considered when determining the amount of any Final Payment for all losses."

15. Neither before nor after I received that letter, did BP, GCCF or any other person acting for BP ever furnish me a copy of "the rules that apply uniformly to all claimants" or any account of how GCCF "calculated" $40,000.00 was the amount of the "Emergency Advance Payment" then

5

payable to me according to those "rules," how GCCF determined that amount was "a reasonable estimate" of my "projected losses," or why that amount could "not be changed or adjusted" at that time. Without that information, I have been unable to verify the truth of the representations made in that letter and determine whether $40,000.00 was the correct amount I was then entitled to receive as an "Emergency Advance Payment."

16. When I received the September 25, 2010, letter and $40,000.00 check, I understood from what I had been told in my initial and subsequent visits to the GCCF office, in mail I had previously received requesting additional information, in earlier telephone conversations with GCCF representatives, and from the letter, the $40,000.00 "Emergency Advance Payment" was my first interim quarterly payment, and every 3 months I would receive an additional "Emergency Advance Payment" until all my damages were quantified and the amount payable for my damages was determined and fully paid. I further understood GCCF would later ask me to submit a "Final Claim for Final Payment, invite me to present additional information and materials I believed support such a Claim, fairly consider that Claim and all information necessary to correctly determine the amount payable for my damages, and then furnish me with a written explanation of its determination of that Claim for my review and approval.

17. Despite my repeated requests on and after July 19, 2010, VOP delayed inspecting, detoxifying, and releasing the "*Lady Louise*" for any use other than oil spill clean up operations until December 16, 2010, a period of 150 days. Neither BP, VOP nor any other person acting for BP ever offered to compensate me and my 3-man crew for preventing us from making productive use of the "*Lady Louise*" from July 10 to December 16, 2010, and thereafter.

18. When VOP inspected, detoxified and released the "*Lady Louise*" on December 16, 2010, she was not fit for ocean going operation to harvest shrimp from Gulf waters, the warm weather season for harvesting shrimp in the northern areas of the Gulf was over, and the only option for harvesting shrimp was to go to the warm waters in the southern areas of the Gulf. Because I was without adequate funds or credit to pay for the work required to get the "*Lady Louise*" fit for a long-term run to harvest shrimp in warm

Gulf waters, I was unable to resume operating the "*Lady Louise*" to harvest shrimp from Gulf waters.

19. On December 30, 2010, I received a check for $3,400.00 from Danos & Curole to reimburse me for the payments I had made to one of my 3-man crew who had not previously been approved and paid for his work in oil spill clean up operations from July 1 to July 19, 2010, increasing the total paid for VOP employing me, my 3-man crew, and the "*Lady Louise*" from July 1 to July 19, 2010, to $75,900.00.

20. When December 2010 came to an end without receiving another quarterly interim payment, I telephoned GCCF, referenced the claim I initially made to BP's claim office in Apalachicola, related what I understood GCCF's representative then said to me, referenced the letter enclosing a $5,000.00 check for emergency relief payment I received in May 2010 and the letter and $40,000.00 "Emergency Advance Payment" I received in September 2010, and related what I understood GCCF representatives had was said to me in subsequent conversations, reported I was without sufficient funds to meet my financial obligations and support my family because I had been unable to resume use of the "*Lady Louise*" to harvest shrimp from Gulf waters due to VOP failing to inspect, detoxify and release her to be used for purposes other than assisting BP locate and contain crude oil, had been unable to earn enough from harvesting oysters, asked when I could expect to receive the next quarterly interim payment, and said I desperately needed that payment to survive and begin getting the "*Lady Louise*" fit for ocean going use to harvest shrimp. The GCCF representative then told me my claim was still under review, asked me to submit additional information to update my claim, and said I should receive another interim payment within 90 days after such additional information was received. I then sent GCCF the additional information requested but did not receive another interim payment within the next 90 days.

21. Although I promptly submitted all additional information requested by GCCF, as of April 2011, I had not received another interim payment since receiving the $40,000.00 "Emergency Advance Payment with the September 25, 2010, letter from GCCF. I then telephoned GCCF, referenced my claim, related what I understood was said to me in my earlier conversations with

7

GCCF representatives, said my financial condition was distressed due to being unable to use my shrimp boat to harvest shrimp from Gulf waters, being unable to earn enough from harvesting oysters, and not receiving any payment on my claim for more than 6 months, and asked when I could expect to receive another interim payment. The GCCF representative then told me my claim was still under review, asked me to submit additional information to update my claim, and said I should receive another interim payment within 90 days after such additional information was received. I then sent GCCF the additional information requested but did not receive another interim payment within the next 90 days.

22. On August 15, 2011, I received an envelope from GCCF containing a 3-page form letter from Kenneth R. Feinberg dated August 9, 2011, 5 printed GCCF forms referenced as attachments A-E, and a printed GCCF form entitled "Election Form for Determination Letter on Lost Profits Claim." The printed forms referenced as attachments A-E explained GCCF's calculation of my lost profits from harvesting oysters in 2010 and 2011, my lost profits from harvesting shrimp in 2010 and 2011, its determination that the balance I was entitled to be paid for the damages I had and would sustain from April 20, 2010, through 2011, as a result of the oil spill approximated $25,000.00, and how my acceptance of the $25,000.00 final payment offered may not prevent me from filing future interim claims for additional losses. The "Election Form for Determination Letter on Lost Profits Claim" provided a place for me to sign my name to indicate my acceptance of the $25,000.00.

23. After I received the September 25, 2010, letter and $40,000.00 "Emergency Advance Payment" and before I received Mr. Feinberg's August 9, 2011, letter, I received no request from BP, GCCF or any other person acting for BP to submit a "Final Claim for Final Payment" or any request to submit any additional information or materials to support any such Claim. In the absence of such requests and my submittal of a "Final Claim for Final Payment" and the additional information needed to support such a Claim, I did not understand how GCCF could have properly determined the final payment I was due to receive for my damages.

24. On August 15, 2011, I signed, dated and returned to GCCF the "Election Form for Determination Letter on Lost Profits Claim" enclosed with Mr.

8

Feinberg's August 9, 2011, letter.

25. On August 29, 2011, I received a letter from Mr. Feinberg dated August 18, 2011, enclosing a 7-page GCCF printed form entitled "Release and Covenant Not to Sue." Mr. Feinberg's letter acknowledged receipt of the "Election Form for Determination Letter on Lost Profits Claim" I had signed and returned to GCCF and advised my wife and I had to sign, date and return the "Release and Covenant Not to Sue" to receive the $25,000.00 "Final Payment" offered by his August 9, 2011, letter. My wife and I then signed and returned the "Release and Covenant Not to Sue" to GCCF, and within a few days later received a check from GCCF for $25,000.00.

26. Long before I received the August 9, 2011, letter and its enclosures from Mr. Feinberg, I became convinced GCCF never intended to send quarterly interim payments to sustain me and my family until all my damages were fully quantified, as its representatives had continually promised, and instead intended to delay paying any more of my damages until I was so financially distressed I no longer had the capacity to act in the manner necessary to preserve and protect my right to prove my damages greatly exceeded the sum GCCF had determined and recover the unpaid balance of those damages.

27. In my many communications with GCCF representatives after September 2010, I repeatedly explained my need for the quarterly interim payments until all my damages were paid and pleaded for those payments to be made to allow me to repair the "*Lady Louise*" and get her fit for ocean going use to harvest shrimp so I could resume earning the income needed to sustain me, my family, and my crew. After I received the September 25, 2010, letter and $40,000.00 "Emergency Advance Payment," GCCF continually insisted I submit additional information I had already submitted and information that had no bearing on determining my damages, and promised it would send me another interim payment within 90 days after receiving such additional information, but failed to ever send me any further interim payment. I believe GCCF so acted to justify delaying sending me any further interim payment and determining the further payment I was due to receive for my damages, and to subject me to such financial distress I would be unable to say no to any determination offering me opportunity to receive a further

9

payment of any amount.

28. GCCF's actions in making the determinations stated in the August 9, 2011, letter and its attachments from Mr. Feinberg were taken without following the procedures stated in its September 25, 2010, letter; namely, its final determination of my claim would be made only after it gave me opportunity to submit a "Final Claim for Final Payment" and the additional information necessary to support that Claim. In denying me that opportunity and proceeding without notice to make such determinations while knowing I was financially distressed, GCCF increased the odds it would succeed in getting me to accept those determinations and the $25,000.00 as a "Final Payment" in the hope it would thereby extinguish my rights to recover all the damages I sustained as a result of the oil spill and the actions and inactions of BP and its affiliates in response to the oil spill.

29. Under those circumstances and because I knew of no other responsible alternative, I felt I had to sign and return to GCCF the "Election Form for Determination Letter on Lost Profits Claim" and the "Release and Covenant Not to Sue" and accept the $25,000.00 then being offered as a "Final Payment" to get desperately needed financial relief in the hope I would have a future opportunity to recover the balance I am entitled to receive from BP for my damages.

30. In November 2011, I received a letter from David Krause, Esquire, of Krause Lawdog, LLC, a Mississippi attorney who said he was representing many seamen who had used their vessels to work with VOP to assist in locating and containing crude oil in Gulf waters and had not been paid all they were due for their services, he had learned I, my crew, and the *"Lady Louise"* had worked with VOP in oil spill clean up operations, and asked me to contact him if I was owed anything for that work. I later telephoned Mr. Krause, explained I had been paid in full for the work we did, but had not been paid for being unable to make productive use of the *"Lady Louise"* for 150 days after VOP terminated our services because it failed to inspect, detoxify and release her for any use other than assisting BP locate and contain crude oil.

31. On or about December 9, 2011, I agreed to Mr. Krause making a claim to BP for the loss I sustained as a result of VOP delaying inspection

detoxification and release of the "Lady Louise" from July 19 to December 16, 2010, on the understanding I would not have to pay him anything unless he recovered money for me and in that event I would owe him 25% of the amount he recovered for me, plus any out-of-pocket expenses he incurred on my behalf

32. On May 12, 2012, I received a letter from Mr. Krause, directing me to sign and return a BP form of Final Release, Settlement and Covenant Not to Sue that referenced an enclosed 20-page document. Because I was continuing to suffer financial distress from being unable to resume making productive use of the "*Lady Louise*," had not received any further payment for the damages I sustained as a result of the oil spill, had not been able to earn much from harvesting oysters, was desperate to recover some money to pay some of my financial obligations, and believed Mr. Krause knew best, I signed and returned the form of Final Release, Settlement, and Covenant Not to Sue.

33. On May 31, 2012, I received a letter dated May 25, 2012, from GCCF that referenced "Deficiency Letter for Shrimp and Crab Harvester and Processor True-Up Payments" and advised that the Court on March 8, 2012, had issued a First Amended Order Creating Transition Process to settle numerous claims arising from the oil spill and appointed a Claims Administrator and Transition Coordinator to oversee a Transition Process, and the Claims Administrator and Transition Coordinator had determined even though I had signed a Release and Covenant not to sue my claim may be eligible for a true-up payment under the November 30, 2011, Second Modification to the Final Payment Methodology, determined that my file was missing certain documentation needed to for an updated review of my claim, and asked me to submit my tax returns for 2008, 2009 and 2010 and certain additional documentation to enable GCCF to determine if I, as a shrimp harvester, am entitled to receive a true-up payment. I immediately sent GCCF the tax returns and other documentation requested but have not since received any communication advising of any action taken to determine whether I am entitled to receive a true-up payment and, if so, how much and when it will be paid.

34. On October 12, 2012, Mr. Krause received a check for $66,300.00 in settlement of the claim he made for me against BP for being unable to make

11

productive use of the *"Lady Louise"* from July 19 to December 16, 2010. After deducting $16,575.00 for his 25% fee, the attorney sent me a check for $49,725.00.

35. Using the $3,000.00 BP agreed to pay for use of the *"Lady Louise"* from July 1 to July 19, 2010, to determine the loss resulting from me being unable to make productive use of the *"Lady Louise"* for the 150-day period from July 19 to December 16, 2010, the amount payable for that loss was $450,000.00. The $66,300.00 BP paid approximated 15% of that total, leaving $383,000.00 unpaid.

36. Because the oil spill and VOP's failure to promptly inspect, detoxify and release the *"Lady Louise"* caused me to be unable to earn the income needed to pay the cost of operating and maintaining her in the condition necessary to harvest shrimp, she remained unavailable for productive use after July 19, 2010. Since then, she has been tied to the dock in Apalachicola, except for the trip to Pensacola in September 2010, and continually deteriorating until it became economically infeasible to restore her to the condition required for use in commercial shrimping. Before that degree of deterioration occurred, the *"Lady Louise"* could have been so restored to such a condition and I could have continued to use her to harvest shrimp. I believe BP is obligated to pay me $3,000.00 a day for every day since December 16, 2010, that the *"Lady Louise"* has been unavailable for my productive use.

37. In May 2016, I engaged Captain Ric Corley, Certified Master Marine Surveyor, to inspect and make a marine survey of the *"Lady Louise."* The report Captain Corley prepared following his inspection and survey of the vessel, a copy of which is attached hereto, concluded the *"Lady Louise"* is so deteriorated that it is economically infeasible to restore her to seaworthy condition and make her fit for use in commercial shrimping in Gulf waters. According to Captain Corley, in April 2010 the *"Lady Louise"* had a market value approximating $175,000.00, is now worthless, and constitutes an environmental hazard if not removed from the waters in which she sits.

38. On July 5, 2016, I agreed to gift the *"Lady Louise"* to the City of Apalachicola on the understanding the City would remove the vessel from

the water, restore it to serve as a monument to the commercial shrimping industry, and locate it on City property for public display. Because the "Lady Louise" has been unavailable for ocean going use to harvest shrimp since the oil spill occurred, I have been limited to harvesting oysters from Apalachicola Bay to earn a livelihood. Due to a severe decline in oyster population in the Bay since the oil spill occurred, the Florida Wildlife Commission has restricted oyster harvesting to limited areas of the Bay, permitted such harvesting only from 6:00 A. M. to 3:00 P. M. Monday through Thursday except when the Bay is closed to oyster harvesting for lack of fresh water from the Apalachicola River, and limited the number of oysters that can be harvested to no more than three bags of 50 pounds each. Because of those conditions and because weather often prevents oyster harvesting from occurring, my opportunities to earn income from oyster harvesting have been and will remain very limited.

FURTHER AFFIANT SAYETH NAUGHT

*/s/ Jelp Barber*

JELP BARBER

STATE OF FLORIDA
COUNTY OF FRANKLIN

Sworn to and subscribed before me this 3 day of November, 2017, by Jelp Barber, who is personally known to me or who has produced _____ as identification and did ___/did not ___ take an oath.

*/s/ Collette Odom*
NOTARY PUBLIC, State of Florida

My Commission Expires: 5/7/18

[Notary Seal: CECELIA COLLETTE ODOM, NOTARY PUBLIC, STATE OF FLORIDA, My Comm. Expires May 07, 2018, No. FF 934720]

13