## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON       MDL NO. 2179
IN THE GULF OF MEXICO ON APRIL 20, 2010        2:10-md-02179, SECTION "J"

THIS DOCUMENT RELATES TO:        JUDGE BARBIER
Civil Action Nos. 12-970, 15-4143, 15-4146 and 15-4654        MAG. JUDGE WILKINSON

### BRIEF IN SUPPORT OF OBJECTION TO MAGISTRATE JUDGE'S CLAIMS APPEAL DETERMINATION AND REASONS

### INTRODUCTION

Claimants,[1] pursuant to 28 U.S.C. § 636, Rule 72 of the Federal Rules of Civil Procedure

and this Court's Referral Order (Doc. 23602), make objection to the "Claims Appeal

Determination and Reasons" (Doc. 23804) entered by the Magistrate Judge on January 4, 2018,[2]

in which the Magistrate Judge affirmed the decision of the Claims Administrator to deny

recovery to the claimants under the Halliburton and Transocean settlements.  As grounds for the

objection, claimants would show that the Claims Administrator's denial of recovery to these

claimants and his interpretations of PTO 60, the Settlement Agreements, and the Distribution Model

with respect to the claims at issue were erroneous and that the Magistrate Judge erred in affirming

the Claims Administrator's determinations.   In this respectful objection to the Claims

Administrator's and Magistrate Judge's reasoning, the argument must be read in light of the irony

and complete lack of equity in this result, which deprives the poorest socioeconomic class of

claimants (these menhaden fishermen), who are among the minority who actually possess legitimate

---

[1] The claimants bringing this objection are the menhaden fishermen referred to on page 2 of the Magistrate Judge's decision.  The names of the 63 claimants and the redacted claim numbers are set out in an addendum to the objection.  Undersigned counsel also submitted claims for five other claimants; those claims were also denied, and the initial appeals of the denials have only recently been denied by the Claims Administrator.  It is anticipated that those claimants will also request appeal to the Court, and, in that event, the grounds for this objection will likely apply to those appeals as well, although there may be additional grounds.

[2] Rule 72 provides that a party may file an objection to an order of the Magistrate Judge within 14 days after the order is served on the party.  In this case, it appears that the Magistrate Judge delivered the decision to the Claims Administrator, who then served copies of the order on the claimants by mailing them to claimants' counsel.  The copies were mailed on January 9, 2018.  Thus, claimants have 17 days from that date (14 plus three days for service by mail under Rule 6), or until January 26, 2018, to file the objection.

claims of economic harm directly caused by this spill, while billions of dollars were paid to claimants (albeit contractually legitimate) who frankly, in a relative sense, had little or no demonstrable injury and would have had a very difficult time proving causation.

The Court's Referral Order of November 2, 2017 (doc. no. 23602) referred all appeals of claim determinations by the HESI/Transocean settlements Claims Administrator to Magistrate Judge Wilkinson for decision.  Claimants interpret the Referral Order as providing that only decisions involving the amount of a payment to a claimant are "final and binding" and that decisions involving a determination that a claimant is not a member of the settlement class are not "final and binding" and are subject to objection under Rule 72.  Therefore, since the decisions of the Claims Administrator and the Magistrate Judge involve, in effect if not explicitly, a determination that non-compliance with PTO 60 excludes the claimants from the settlement class,[3] the Magistrate Judge's decision is reviewable by the District Judge.

If the Magistrate Judge's order is not reviewable by the District Judge under the Referral Order, then the claimants' avenue for review is a direct appeal from the Magistrate Judge's decision to the Court of Appeals.  Because it is not crystal clear from the Referral Order that the Magistrate Judge's decision even on class membership is subject to an objection to the District Judge, it will be necessary for the claimants, in order to avoid any possible waiver of the right to appeal, to proceed with an appeal to the Court of Appeals directly from the Magistrate Judge's ruling if this Court does not rule before the appeal deadline on whether the Magistrate Judge's decision is subject to review by the District Judge under the Referral Order.  Therefore, the claimants ask the Court to make an expeditious threshold ruling on reviewability prior to the appeal deadline if at all possible.

---

[3] The Claims Administrator's decision stated that the value of these claimants' claims was zero because they could not establish a present ability to recover compensatory damages from HESI or Transocean.  However, that decision is, in substance, that the claimants do not meet the definition of the New Class because they lack standing under maritime law to recover punitive damages from HESI and Transocean.  The Court should put substance over form. Moreover, the decision was not about the "amount of a payment," because the Claims Administrator ruled that the claimants were not entitled to any payment.

Even if the Magistrate Judge's decision is not subject to review by the District Judge under the Referral Order, the District Court may remand the decision for reconsideration in the event of a prejudicial procedural error.  Such an error occurred when the Magistrate Judge proceeded to consider the appeal based on the claimants' submissions to the Claims Administrator without giving the claimants an opportunity for full briefing of the issues.  The claimants submitted to the Court a request to permit an appeal to the Court, and that submission was limited to three pages, which of necessity were largely devoted to an explanation of why an appeal should be permitted and did not permit a full explication of the asserted errors in the Claim's Administrator's factual assumptions, reasoning, or interpretation of the pertinent documents.  Claimants' counsel anticipated that if the Court elected to permit the appeal, the Court would permit adequate space and opportunity to more fully address the issues.  Accordingly, if the Court finds that this objection is precluded by the Referral Order, the Court should remand the matter to the Magistrate Judge with instructions to reconsider the decision based on the arguments herein.

## ARGUMENT

**1. Reliance on PTO 60 to deny the claim is contrary to the terms of the Settlement Agreements in adding requirements for recovery that are not contained therein**.

The Settlement Agreements were intended to include the class of persons that includes these claimants (commercial fishermen).  For example, paragraph 3 of the Transocean Settlement Agreement states:

> It is the intent of the Parties to capture within the New Class definition all potential claimants who are not excluded from the New Class in accordance with Section 4(b) and who may have valid maritime law standing to make a Punitive Damages Claim under general maritime law against Transocean arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident.

Accordingly, carrying out that intent, paragraph 4(a)(3) of the Settlement Agreement included within the New Class:

> All Commercial Fishermen or Charterboat Operators who, anytime from April 20, 2009 through April 18, 2012, (a) owned, chartered, leased, rented, managed, operated, utilized or held any proprietary interest in commercial fishing or charter fishing Vessels that were Home Ported in or that landed Seafood in the Gulf Coast Areas, or (b) worked on or shared an interest in catch from Vessels that fished in Specified Gulf Waters and landed Seafood in the Gulf Coast Area.

In other words, the Settlement Agreements treated all such commercial fishermen or charterboat operators operating in the pertinent area at the pertinent time to have sustained damages that would give them standing to make a punitive damages claim under maritime law.

These claimants meet the criteria for New Class membership set out in paragraph 4(a)(3), and the Claims Administrator did not determine otherwise.[4]  The statement of intent in the Settlement Agreements, together with the description of included members in paragraph 4(a)(3), which does not include a separate requirement of standing, much less a requirement of having a contemporaneously pending individual suit for damages against BP, HESI, or Transocean, evince that it was the agreement of the settling parties that, at least for purposes of the Settlement Agreements, commercial fishermen such as these claimants are deemed to have sustained compensatory damages as a result of the oil spill and to have standing under maritime law to make a punitive damages claim.   In other words, the definition of New Class members in paragraph 4(a)(3) incorporates the "standing" criterion, since persons with standing are intended to be "capture[d] within the New Class definition."   As with matters of proof of causation in the BP settlement, this was a binding contractual concession by HESI and Transocean. *See Bon re Secour v. BP Exploration & Prod., Inc.*, 744 F.3d 370, 377 (5th Cir. 2014).

The description of the subclass of commercial fishermen in paragraph 4(a)(3) does not contain any additional requirement that a person must affirmatively join or intervene in any action, bring his own separate suit at any time, have a currently pending or settled claim for

---

[4] It is also uncontested that these claimants have met the documentation requirement for the menhaden fishermen category on p. 15 of the Distribution Model.

compensatory damages, take action to indefinitely preserve any currently held chose in action for compensatory damages asserted for him by the class representatives in a B1 class action complaint, or do anything else to preserve his position as a New Class member qualified to recover under the Settlement Agreements.  The absence of such other criteria means that, for purposes of the settlements, it is agreed that the New Class members as defined in paragraph 4 of the Settlement Agreements meet the agreed-upon requirements for recovery of punitive damages.

The Distribution Model, or the Claims Administrator's application of the Distribution Model, deviates from the terms and meaning of the Settlement Agreements to the extent it treats "standing" as a further requirement for recovery that is additional to (rather than included in) the New Class membership criteria in paragraph 4(a)(3), and particularly to the extent it determines that such standing can only be established (in the case of members of B1 class actions who were excluded from the DHEPDS) by having filed an individual lawsuit following the entry of PTO 60.  In short, the plain terms of the Settlement Agreements provide for recovery by commercial fishermen who are members of the New Class as described in paragraph 4(a)(3) without regard to further consideration of general (subclass-wide, based on the type of damages sustained) or personal standing.

By insisting that New Class members demonstrate a present ability to recover compensatory damages from HESI and Transocean in order to receive compensation under the settlements and to have an actual lawsuit pending (which he views as the only way to have a possibility of recovering compensatory damages) the Claims Administrator improperly holds these claimants to standards that would be applicable in a lawsuit seeking punitive damages (although, as noted below, other claimants are not held to such standards).  But the point of settlement is that the defendant waives its right to insist on strict compliance with and proof of the elements of the tort claim before it pays out money to the plaintiff.  That is what HESI and

Transocean did in the Settlement Agreements (as tacitly acknowledged by the Claims Administrator with respect to the other standing issues discussed above), since they agreed to pay settlement class members despite the arguable absence of general maritime law standing, lack of possibility of recovering compensatory damages in the case of the DHEPDS Class, and the absence of proof of intent or gross negligence, and did not impose in the Settlement Agreements any requirement of a pending individual lawsuit at time of claim submission as necessary to receive compensation.

This situation is analogous to that in *Bon re Secour*, where the settlement agreement at issue had a lenient standard for receiving compensation that did not require a claimant to submit evidence that his economic losses were traceable to the oil spill, but BP attempted to make claimants "prove, with trial-type evidence, that their losses were caused by the oil spill." *Bon re Secour*, 744 F.3d at 370. The court rejected that attempt, holding that the lenient standard for qualifying for compensation was "a contractual concession by BP to limit the issue of factual causation," and that BP thus could not substitute a more stringent proof requirement during the claims administration process, even though "traceability" was a normal requirement for recovery of damages. *Id.* at 377.

Similarly, the Claims Administrator has imposed, apart from the terms of the Settlement Agreements, a requirement that claimants make a "trial-type" showing of standing—that is, to make, not only a showing that they had suffered compensatory damages (which the Settlement Agreement concedes for settlement purposes in defining the commercial fishermen class only in terms of having operated in the relevant area during the relevant time period) but to make the same proof of standing that would be required to recover at trial: that they had recovered (or had pending actions to recover) actual damages. The Settlement Agreements have no requirement that a commercial fisherman submit any evidence of actual damages beyond those parameters,

even though actual damages are inextricably intertwined with punitive damages, because the size of a punitive damages award is limited by the actual damages, and even though the settlement awards are in proportion to a claimant's estimated actual damages.  Because there is no such requirement, it defies logic for the Claims Administrator to add a requirement that claimants go beyond that and demonstrate that they have an actual pending lawsuit seeking such damages.[5] Since the Settlement Agreements dispensed with proof of damages, resulting in compensation based on a damages schedule premised on estimated losses, it is patently inconsistent with the Settlement Agreements to insist on proof of the present ability to recover such damages in order to receive compensation.

There is nothing in the Settlement Agreements that even hints that a requirement for effective membership in the New Class and participation in the settlement distribution is the existence of a pending individual lawsuit for compensatory damages (as opposed to the mere possession of a viable non-time-barred chose in action, which the Settlement Agreements expressly acknowledged and preserved by the tolling provisions).  Therefore, mere membership in the New Class and the subclass of commercial fishermen as the requirement for compensation was a "contractual concession" of the defendants, which, under *Bon re Secour*, could not now be withdrawn by the defendants and which therefore may not properly be countermanded by the Claims Administrator or the Court.

Even in grafting on additional "standing" considerations, the Distribution Model treats the subclass of commercial fishermen as generally having standing to make punitive damages claims, despite the lack of clarity of the law as to whether persons may recover punitive damages under maritime law in the absence of physical injury to real or personal property. The

---

[5] The Claims Administrator's position permits the bizarre result that a claimant with a lawsuit pending will be compensated even though he can present no evidence at all of any actual injury (because, for example, his catch did not decline after the spill), while a claimant with abundant proof of actual loss is foreclosed from recovery simply because he has no lawsuit pending.

Distribution Model also treats the subclasses of charterboat operators and subsistence fishermen as having general standing and as eligible to recover despite acknowledging that such persons "do not have clear *Robins Dry Dock* standing under existing law."[6]  Thus, the Distribution Model takes a broad, lenient, and permissive view of general standing requirements—as it should, since it purports to have the purpose to compensate persons who have standing "pursuant to *Robins Dry Dock*" (arguably not including commercial fishermen, charterboat operators, and subsistence fishermen) *and* "as agreed to by the respective parties in both Settlement Agreements" (sweeping in those having no (or questionable) *Robins Dry Dock* standing).[7] However, the Distribution Model inexplicably takes an extremely crabbed view regarding the personal standing of these claimants.  It does so by ignoring the "agreed to by the respective parties" part and focusing entirely on "*Robins Dry Dock*" considerations and by focusing on standing at the time of distribution rather than at the time of settlement, holding that persons who are explicitly included in the New Class (and who are deemed generally permitted to recover despite serious questions about standing for their type of loss) are nevertheless barred from recovery based on a purported lack of specific or personal standing because they did not file individual lawsuits following the entry of PTO 60, which was not in effect at the time the parties entered into the Settlement Agreements.

Even if the Distribution Model were correct in grafting on a requirement, as described by the Magistrate Judge, "that a claimant establish a compensatory damages component of his or her claim as a prerequisite to payment," the Claims Administrator, in crafting the Distribution Model, wrongly concluded that the only way these claimants could make such a showing was by "compliance" with PTO 60 by filing individual suits following the dismissal of the B1 master

---

[6] Distribution Model, p. 2.
[7] Distribution Model, p. 1.

complaint.  The Claims Administrator reasonably could have, and should have, concluded that a New Class member established a compensatory damages component if he showed that, *at the time the settlement agreement was entered into*, he possessed a viable, non-time-barred claim for compensatory damages resulting from the oil spill.   These claimants possessed such viable claims at that time.  Their causes of action were (and are) not time-barred, because the statute of limitations on such claims was tolled by the filing of, and during the pendency of, the B1 class action in which they were absent class members, and by the subsequent filing of the HESI and Transocean class action suits and Settlement Agreements.  *See American Pipe v. Utah*, 414 U.S. 538, 553 (1974) (filing of class action tolls statute of limitations for all class members).  The statute of limitations would not have resumed running until, at the earliest, the dismissal of the B1 master complaint, which did not occur until several months after the HESI and Transocean class actions were filed and the parties entered into the HESI/Transocean Settlement Agreements. And the statute of limitations did not resume running upon the dismissal of the B1 master complaint, because the Settlement Agreements expressly tolled the statute of limitations and preserved "any and all claims" of the New Class members against HESI and Transocean for the duration of the class action suits and the Settlement Agreements.[8]   Thus, when the Settlement Agreements were entered into, prior to the entry of PTO 60, these claimants possessed the separate

---

[8] The Transocean Settlement Agreement provides at p.48:

> Upon filing of this SA with the Court, the statutes of limitation applicable to . . . any and all claims or causes of action that have been or could be asserted by or on behalf of any New Class Member are hereby tolled and stayed. The limitations period shall not begin to run again for any New Class Member unless and until (a) he, she, or it opts out of the New Class, or (b) this SA is terminated pursuant to Court order or otherwise.

The HESI Settlement Agreement contains a corresponding provision.  The Transocean Settlement Agreement was filed with the court on May 29, 2015, ten months before PTO 60 was entered.  The HESI Settlement Agreement was filed on September 4, 2015, over six months before PTO 60 was entered.

standing that the Claims Administrator views as necessary by virtue of their still-viable claims for damages as members of the New Class.[9]

Apparently the Claims Administrator agrees in principle that having a viable compensatory damages claim is sufficient to confer standing and permit recovery under the Settlement Agreements.  However, the Claims Administrator incorrectly and unreasonably required a viable claim to be in existence at the time of distribution (i.e., after the Distribution Model was approved) rather than at the time the Settlement Agreements were entered into; under the Claims Administrator's interpretation and application of PTO 60, these claimants had viable claims at the former time but not at the latter.  As a matter of contract interpretation if nothing else, membership in the New Class and eligibility to recover under the Settlement Agreements is properly determined and vested at the time the Settlement Agreements were entered into (subject to court approval of the settlements) rather than at the time of distribution.

Even if it were proper to base the right to compensation on standing at the time of distribution, thereby denying recovery to those who had viable claims for compensatory damages at the time of the Settlement Agreements but no longer possessed such claims at the time of distribution, the Claims Administrator incorrectly denied compensation to these claimants because, at least by virtue of the tolling provisions of the Settlement Agreements, these claimants had standing at the time they submitted their claims because their compensatory damages causes of action are not barred by the statute of limitations.

---

[9] The oil spill occurred on April 20, 2010.  The statute of limitations for these claimants' causes of action was tolled (if not sooner) by the filing of the B1 Master Complaint (Doc. 879), which contained class action allegations and described a plaintiff class that included the claimants, on December 15, 2015.  In light of the provisions of the HESI/Transocean Settlement Agreements, which were filed with the Court prior to the entry of PTO 60, the statute of limitations remains tolled despite the subsequent dismissal of the B1 Master Complaint by PTO 60. Consequently, all but approximately eight months of the statute of limitations remains.

The Claims Administrator incorrectly concluded that that the only way for these claimants to have a viable compensatory damages claim under the Settlement Agreements at the time of distribution was to have a pending individual lawsuit against BP, which in turn required the filing of such a suit within the deadlines set by PTO 60. However, the insertion in the Distribution Model of a requirement that claimants have recovered damages or have a pending claim for compensatory damages against some entity connected to the spill is a requirement that the parties did not agree to. The inclusion in the Settlement Agreements of the tolling provisions covering any causes of action that *could have been asserted* shows the intent of the Settlement Agreements to include in the New Class those who possessed unasserted causes of action as well as those who had pending claims. It would have made no sense for the Settlement Agreements to preserve claims that "could have been asserted" if the parties intended that bringing an actual individual suit could be made a requirement for inclusion in the New Class and recovery of compensation under the Settlement Agreements. In short, as stated by certain objectors to the Distribution Model, "[p]rior compliance with PTO 60 as a condition for receiving an award . . . effectively modifies the definition of the New Class, as agreed by the parties . . . and results in disparate treatment of the New Class Members who did not comply with PTO 60."[10] If the Claims Administrator's "class membership *plus* standing" interpretation of the Settlement Agreements is applied, the issue should be whether a claimant has a viable non-time-barred cause of action and not whether he has an actual pending suit for damages.

Had it been known at the time of the filing of the HESI and Transocean class actions that the Claims Administrator would subsequently invoke an as-yet-not-entered procedural order and impose a requirement of a pending or settled lawsuit against BP, HESI, and/or Transocean to qualify for recovery under the Settlement Agreements, New Class counsel would have been able to,

---

[10] "Objections to Final Confirmation and/or Approval of Proposed HESI and Transocean Settlement Agreements" (hereinafter "Objections") at 2, Doc. 21723.

and might well have, included in the class action complaints a claim for compensatory damages on behalf of members of the New Class, which should have satisfied the Claims Administrator's views on what constitutes standing.  These claimants possessed such causes of action, because they had been excluded from recovery of compensatory damages in the prior BP litigation and thus had not released their compensatory claims against HESI and Transocean as the DHEPDS class members had done.  Or the parties could have stated in the Settlement Agreements that a viable, non-time-barred claim was sufficient to confer standing, or that no subsequent procedural requirements by the Court would affect New Class members' entitlement to compensation.  But New Class counsel, like these claimants, had no notice that such action was needed in order to ensure that those New Class members would be compensated as the Settlement Agreements expressly intended and provided and to foreclose the imposition of any *post hoc* additional requirements for recovery by the Claims Administrator.  For the foregoing reasons, the Court should hold that these claimants are entitled to compensation by the clear and express terms of the Settlement Agreements and that the Claims Administrator's addition of a requirement for compliance with PTO 60 was improper and may not be used as a basis to deny compensation to these claimants.

> **2. The Claims Administrator and the Magistrate Judge erred in holding that compliance with PTO 60 was a prerequisite to compensation under the HESI and Transocean Settlement Agreements for these claimants (menhaden fishermen who were absent class members in a class action and not named plaintiffs in any action), because PTO 60 did not apply to these claimants and, in any event, PTO 60 did not cut off these claimants' economic damages claims against HESI and Transocean.**

Not only is the Claims Administrator's application of PTO 60 to these claimants to deny compensation contrary to the terms of Settlement Agreements, it is also not supported by the language and context of PTO 60.  The Claims Administrator, in formulating the Distribution Model, concluded that PTO 60 applied to all New Class members and required them to file individual lawsuit by the court-imposed deadline in order for their claims for economic damages not to be

barred.  Consequently, these claimants would have been afforded compensation but for the application of PTO 60.  The Claims Administrator incorrectly concluded that that the only way for these claimants to have a viable compensatory damages claim under the Settlement Agreements at the time they submitted their claims was to have a pending individual lawsuit against BP, which in turn required the filing of such a suit within the deadlines set by PTO 60.  For the reasons discussed below, the Claims Administrator and the Magistrate Judge were incorrect in concluding that PTO 60 precluded these claimants from having viable economic damages claims that would afford standing for a punitive damages claim and permit them to receive compensation under the Settlement Agreements.

In holding that PTO 60 applied to these claimants and required them to file individual lawsuits in MDL 2179 in order to preserve claims for economic damages against HESI and Transocean, the Magistrate Judge relied on the Court's holding that PTO 60 applied to bar post-PTO-60 suits against BP filed by persons who had only been class members in a class action prior to PTO 60 and had never been an actual plaintiff in any BP litigation.[11]  However, it does not follow from that ruling that these claimants are barred from receiving compensation under the Settlement Agreements simply because they did not file individual suits within the time specified in PTO 60.

It is respectfully submitted that the Court should reconsider its holding that PTO 60 applies to absent class members in class action suits.  In so holding, the Court pointed to the reference in PTO 60 to "suits having more than one plaintiff" and reasoned that class action suits have more than one plaintiff and thus are covered by PTO 60's individual-suit requirement.  However, that reference to multi-plaintiff suits should be interpreted in the context of the other provisions of PTO 60.  Paragraph 6 of PTO 60 designates the persons to whom it applies, and limits that coverage to two types of persons (described under subheadings "A' and "B" respectively): (1) persons who had

---

[11] "PTO 60 Reconciliation Order" p. 21 (Doc. 22003).

filed individual (one-plaintiff) lawsuits; and (2) persons who had filed short-form joinders (thus formally joining as a named plaintiff) and persons who were "part of a 'Mass Joinder' lawsuit." Thus, when the order refers to persons who had "filed a SFJ and/or were part of a complaint with more than one plaintiff," the latter description is properly interpreted as synonymous with "part of a Mass Joinder lawsuit."  And since the order by its terms applies only to individual plaintiffs, SFJ plaintiffs, and "mass joinder" plaintiffs (i.e., persons who are named plaintiffs in an action), it should not apply to persons who were merely members of a class on whose behalf a suit was filed and were never technically a "plaintiff," much less a named plaintiff in any suit.   A class action is not a "mass joinder" suit; there is a clear distinction between the two types of actions.   *See*, *e.g.*, *Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 519 (5th Cir. 2010); *1994 Exxon Chemical Fire v. Berry*, 558 F.3d 378, 387 (5th Cir. 2009), *Robertson v. Monsanto Co.*, 287 Fed. Appx. 354, 363 (5th Cir. 2008).  For example, each plaintiff in a mass-joinder action is a named plaintiff, and each must satisfy the jurisdictional amount-in-controversy requirement to avoid having his claim dismissed.  *Berry*, 558 F.3d at 387.  In contrast, represented members of a class need not individually satisfy the jurisdictional amount so long as the aggregate amount in controversy exceeds $5 million, 28 U.S.C. § 1332(d)(2), (6).

The foregoing interpretation is bolstered by the fact that PTO 60 goes on to prescribe the consequences for any "plaintiffs" who fail to not comply with PTO 60's requirement: they will have their claims dismissed with prejudice.  This clearly implies application only to persons who are formal parties to lawsuits which can be dismissed by name by the court.  Also, PTO 60 instructs the PSC and BP to furnish the Court "a list of all Plaintiffs who did not comply with this Order."  This also clearly implies non-application to class actions, since the PSC and BP could not have furnished a list of absent class members in class action suits.  For the foregoing reasons, the Court should now hold that PTO 60 has no application to absent class members in B1 class actions.

But even if the Court stands by its ruling in the PTO Reconciliation Order applying PTO 60 to absent class members seeking to file lawsuits against BP, that ruling does not control in the present situation.  That holding involved persons who were seeking to file individual suits for economic damages against BP, and the Court dismissed those suits because it held that PTO 60 cut off any claims not filed by the deadline set by PTO 60.  In contrast, these claimants are not seeking to file individual suits for economic damages against BP or other responsible entities, but are simply seeking to be recognized as members of the New Class entitled to compensation under the Settlement Agreements based on the clear provisions of the Settlement Agreements that afford them a right to recovery.  In other words, if PTO 60 applies to absent class members in B1 class action suits, then it would, at most, preclude these claimants from pursuing individual suits against BP in the MDL at this point, but properly would have no effect on the HESI and Transocean class actions and Settlement Agreements, which predated PTO 60 and expressly preserve compensatory damages claims against the settling parties.

The premise of the use of PTO 60 to dismiss later-filed suits for economic damages against BP appears to be that such claims are now time-barred, and the procedure available for preserving such claims against the statute of limitations—filing individual suits pursuant to PTO 60—is no longer available since the order's deadlines have passed.  However, that premise does not apply to any individual suits, much less any class action claims, against Transocean or HESI by New Class members, because, as noted above, the Settlement Agreements, which preceded PTO 60, explicitly tolled the statute of limitations for "any and all claims or causes of action that have been or could be asserted" by New Class members. Since these claimants' choses in action against HESI and Transocean are not barred by limitations under the terms of the Settlement Agreements (and as a matter of law in any event), then PTO 60, and any inability to proceed with an individual lawsuit

in the MDL because of PTO 60, does not extinguish the viability of their claims under the statute of limitations.

In short, the Claims Administrator and the Magistrate Judge concluded that, because of PTO 60, these claimants no longer have viable, non-time-barred claims and thus are not eligible to receive compensation.  As shown above, however, these claimants have viable, non-time-barred claims for economic damages *despite* PTO 60.

The Court has the power to correct the Distribution Model to preclude the application of PTO 60 to New Class members who were merely absent class members and whose claims are, in any event, subject to the tolling provisions of the Settlement Agreements.  In ruling on objections to the Distribution Model's use of PTO 60, the Court held that such objections were not ripe for consideration and could be addressed later through appeals from claims determinations, suggesting that the Court might accordingly modify the Distribution Model at the appropriate time.[12] Claimants suggest that the Court should do so now on the occasion of these appeals, because application of PTO 60 is contrary to the Settlement Agreements and because the order does not reach these claimants or divest them of benefits conferred before PTO 60 was entered.  Therefore, this Court should order that the Distribution Model be appropriately revised to conform to the express terms and intent of the Settlement Agreements and omit the use of PTO 60 to determine entitlement to compensation.

   3. **Noncompliance with PTO 60 should be excused because the Court's notice procedures and the terms of PTO 60 did not give adequate notice to claimants that they had to comply in order to be entitled to recovery under the HESI/Transocean settlements, which were agreed to several months before PTO 60 was entered.**

Even if PTO 60 applies to these claimants and would otherwise preclude their right to compensation under the Settlement Agreements, it would be inequitable and inconsistent with due

---

[12] Order and Reasons (Doc. 22252) p. 44.

process to bar these claimants from recovery on that basis, because these claimants were not given adequate and constitutionally sufficient notice that failure to file individual lawsuits following the entry of PTO 60 would exclude them from the New Class and disqualify them from compensation. In their appeals, the claimants represented that they had received no actual notice of the entry of PTO 60 until after the filing deadline had passed, and the Claims Administrator has not contested that fact.

As the Magistrate Judge noted, this court has excused parties from the strictures of PTO 60 on the ground that they did not receive adequate notice of its requirements due to a "notice gap." For instance, in the "PTO 60 Reconciliation Order" (Doc. 22003), the Court relieved Zat's Restaurant's Inc. ("Zat's") from compliance with PTO 60 because it had not been given adequate notice.  As the Court stated in that order, notice of PTO 60 was provided by four methods: (1) electronic notice to all counsel of record who signed up for electronic service with File & Serve, (2) notice by mail to persons who had opted out of the Economic Settlement and who stated on the opt-out form that they were unrepresented, (3) e-mail from the PSC to known counsel of record for plaintiffs who joined in the Amended B1 Master Complaint and/or opted out of the Economic Settlement, and (4) posting PTO 60 on the Court's website.  Zat's had opted out of the Economic Settlement at a time when it was represented by counsel (and thus did not get on the "mail" list, but was unrepresented at the time PTO 60 was entered (and thus would not have received notice through counsel by method (1) or (3).  Zat's argued, and the Court agreed, that none of the notice methods were effective for it.[13]

These claimants are similarly situated to Zat's with respect to a "notice gap." They were absent class members in the B1 class action and not actual parties to any lawsuit, they did not opt out of the Economic Settlement, and they were not represented by counsel.  Indeed, the notice

---

[13] "PTO 60 Reconciliation Order," pp. 12-13.

methods were even less likely to reach these claimants than they were to reach Zat's, because, unlike Zat's, the claimants had never been actual plaintiffs and had never been represented by counsel.  Since the Court relieved Zat's from the consequences of non-compliance with PTO 60 based on the "notice gap," the Court should likewise excuse these claimants' noncompliance because of the similar lack of adequate notice to them.

In addition to the notice gap related to the methods of notice, there was an additional notice gap for these claimants stemming from the terms of PTO 60, in that those terms did not adequately inform a person in the claimants' position that  PTO 60 applied to them at all as mere absent class members, much less that not filing an  individual suit would divest them of the already-accorded benefits of the HESI and Transocean Settlement Agreements that had been entered into and filed with the court several months prior to the entry of PTO 60.   The terms  of  PTO  60  that  should negate its application to mere absent class member of a class action have been discussed above and will not be revisited here.  In light of the text of PTO 60, even if the Court's prior interpretation of PTO 60 as applying to class action parties were the proper interpretation, that interpretation is so strained and contra-textual that it did not give adequate notice to persons who had participated in the B1 litigation only as absent class members that a failure to file an individual lawsuit pursuant to PTO 60 would cut off their potential causes of action for damages even though those causes of action were still viable and not even close to being time-barred.

Even if a person who had not been a named plaintiff in any MDL actions should have understood that PTO 60 applied to him, the only facially apparent consequences of not complying would be to lose the opportunity to maintain an individual lawsuit for economic damages rather than relying on a class-action recovery.  But being barred from proceeding with an individual suit in the MDL would have appeared to be of no consequence to those members of the New Class who were content to accept the compensation promised under the previously reached HESI/Transocean

settlements and had no interest in seeking additional recovery through an individual lawsuit with its attendant (and greatly disproportionate to that of a class action) expense and inconvenience.  Neither PTO 60 nor the Settlement Agreements gave any hint that not having an actual pending personal lawsuit in the MDL pursuant to PTO 60 would bar compensation under the HESI and Transocean settlements.

The Settlement Agreements, entered into several months prior to PTO 60, did not require a New Class member to become an actual litigant or take any other overt action besides submitting a claim to the Claims Administrator and establishing that he met the criteria in paragraph 4(a)(3) for inclusion in the New Class.  The terms of PTO 60, particularly in light of that aspect of the Settlement Agreements, did not give adequate notice to these claimants—who had participated in the B1 litigation only as absent class members and whom the Settlement Agreements had explicitly made New Class members entitled to compensation—that a failure to file an individual lawsuit pursuant to PTO 60 would result in an after-the-fact divestment of their membership in the New Class and their consequent entitlement to compensation under the HESI/Transocean settlements as provided by the Settlement Agreements.  Even under the Claims Administrator's view that standing is a separate requirement for compensation in addition to membership in the New Class, the Settlement Agreements required, at most, that a New Class member possess a viable non-time-barred cause of action, either asserted or unasserted, at that time.  Nothing in the subsequent PTO 60 adequately informed New Class members that the order, in effect, enacted an amendment to the Settlement Agreements, not agreed to by the parties, which imposed an additional requirement for compensation.  In fact, the first notice that a pending individual lawsuit was a requirement for compensation from the HESI/Transocean settlements was the Distribution Model, which was not issued until after PTO 60's deadline to file individual suits had passed and thus has an *ex post facto* quality when applied to these claimants.

In sum, even if PTO 60 did give notice to these claimants that they were required to file an individual suit in order to preserve B1 type claims against BP for compensatory damages, it did not give notice that such compliance with PTO 60 was required in order to avoid being divested of their status as members of the settlement class in the pre-existing HESI/Transocean Settlement Agreements.  The claimants' designation as members of the New Class, entitled to compensation, came at a time when they met all the criteria for recovery that would subsequently be grafted onto the Settlement Agreements by the Claims Administrator. Not only were their causes of action for compensatory damage still viable, but there was no procedural barrier at that time to prevent them from filing either individual suits, a mass joinder suit, or a class action to assert such claims.  What makes the denial of their claims even more inequitable and inconsistent with due process is that these claimants were not given notice that an actual individual suit was a prerequisite to recovery until after a procedural bar to maintaining such a suit had been erected by PTO 60.

Similarly, neither the Settlement Agreements nor the notices of settlement informed New Class members that they would be required to satisfy an additional requirement of standing in some as-yet-unspecified way that, that they could be required to file individual suits to avoid having their agreed-upon entitlement to compensation snuffed out, or that their entitlement to compensation could be cut off by a subsequent procedural technicality imposed by the Court or Claims Administrator.  As noted by the objectors referenced above,

> If a claim is certified and settled simultaneously, "[s]ufficient information about the case should be provided to enable class members to make an informed decision about their participation." Manual for Complex Litigation, Fourth, § 21.311. Here, the Notice of Settlements did not inform the New Class Members that in order to receive an award from the Proposed Settlements they had to maintain a claim (or suit) for economic damages against HESI and Transocean even after the date of the settlement, or comply with PTO 60, or settle with the Neutrals. This information was crucial to any class member who was trying to

decide if he needed to spend the necessary funds required to comply with PTO 60
and file a new suit, which is what PTO 60 required.[14]

Also, the claimants received no supplemental notices informing them that PTO 60 had or could have an effect on the HESI/Transocean settlements or their rights under the settlements. In short, New Class members did not receive adequate notice that their rights with respect to the HESI/Transocean class actions and settlements could be cut off based on a procedural technicality.

For these reasons, the lack of adequate notice—whether resulting from the limitations of the notification methods, the ambiguity of PTO 60, or the fact that applying PTO 60 in such fashion was so inconsistent with the terms of the Settlement Agreements that such application was not reasonably foreseeable—makes it inequitable and fundamentally unfair to use PTO 60 to deny compensation to these claimants. Therefore, the Court should excuse these claimants' noncompliance with the order and disallow that as a basis for denying compensation under the Settlement Agreements.

### 4. The exclusion of claimants based on the Distribution Model is inequitable and inconsistent with due process and equal protection in that, although the Claims Administrator purported to tie eligibility for compensation to maritime-law standing, he applied that criterion inconsistently and without a rational basis.

Even though the Distribution Model imposed a requirement for recovery that a claimant, even though he met the definition for a particular settlement class, also have standing under maritime law to assert claims for punitive damages against HESI or Transocean, the Distribution Model does not apply that requirement consistently. Thus, despite the emphasis on standing as the touchstone for recovery as a New Class member, the Distribution Model does not bar all claims by members of the settlement classes who may lack standing to recover punitive damages

---

[14] Objections, supra n. 10, at 9-10.

under maritime law. For example, the model provides for compensation to commercial fishermen despite acknowledging the absence of Fifth Circuit law holding that commercial fishermen have standing to pursue a claim for punitive damages under general maritime tort law based solely on economic loss.   The Distribution Model also allows recovery by charterboat operators and subsistence fishermen, even though it acknowledges that there is even less legal authority that those persons have such standing under maritime law.   And while the Claims Administrator relies on the Distribution Model to deny recovery to these claimants based on lack of standing because they purportedly have no viable claims for compensatory damages against HESI or Transocean, the Distribution Model permits recovery by members of the DHEPDS Class, even though they have no valid claims for compensatory damages against Transocean or HESI.[15] Under a consistent application of the requirement for maritime law standing, the DHEPDS Class would be not have standing, since a fundamental rule of punitive damages is that a plaintiff cannot recover punitive damages from a particular defendant unless *that* defendant caused compensatory damages to the plaintiff; thus, recovery from BP would not confer standing to recovery punitive damages from HESI and Transocean.   Yet the DHEPDS Class members are deemed eligible to receive compensation despite their lack of maritime law standing.

Similarly, the Distribution Model provides for compensation to the class members even though the trial court had ruled after a trial that HESI and Transocean had not been guilty of gross negligence, which is an essential element for the assessment of punitive damages--as much a requirement of the recovery of punitive damages as proving that the defendant is liable for compensatory damages.   As with the foregoing aspects of standing, that element of the claim is

---

[15] The DHEPDS class members have recovered from BP in the settlement, under which they released any claims against HESI and Transocean for compensatory damages.  Consequently, they have not recovered compensatory damages from HESI or Transocean, and have no viable cause of action for such damages against those entities.

disregarded with respect to recovery while the standing element allegedly lacking on the part of these claimants is arbitrarily invoked.

In other words, the Distribution Model affords payments to some New Class members who could not recover punitive damages in a maritime action (according to the Claims Administrator's view of the law) because they had dismissed their claims against HESI and Transocean (the DHEPDS Class) but denies payments to other New Class members who are similarly situated in purportedly not having prosecutable claims against HESI or Transocean. There is no rational basis for this disparate treatment, and thus New Class members deemed ineligible on this basis, such as these claimants, are being denied their right to equal protection and/or substantive due process, since they are arbitrarily excluded from compensation while similarly "standing-challenged" persons are granted recovery. Although the Magistrate Judge, in rejecting the claimants' due process and equal protection arguments, correctly noted that no suspect class or fundamental rights were at issue, those criteria only serve to heighten the scrutiny to be applied to the disparate treatment, and there must still be a rational basis for a classification or denial of rights to avoid a deprivation of constitutional rights.

The claimants agree that the foregoing elements of standing and recovery should be disregarded in the Distribution Model, since the definitions of the various settlement classes do not make any mention of those elements as requirements for membership in the respective classes. The inclusion of the foregoing groups in the settlement classes and providing for their compensation under the Settlement Agreements despite the inherent standing issues, demonstrates that, in agreeing to the settlement, HESI and Transocean agreed to dispense with the necessity of proving individual elements of a punitive damages claim such as standing and gross negligence. Thus, under a proper reading of the Settlement Agreements, they agreed to dispense with the necessity of independently proving standing to recover compensatory damages

by having a pending action for such damages.  In short, showing the existence of a pending lawsuit for compensatory damages should no more be deemed a condition of participating in the distribution under the Settlement Agreements than proving that HESI and Transocean were grossly negligent or establishing that a claimant's subclass generally has standing under the *Robins Dry Dock* principle.

## **CONCLUSION**

As set out above, the Settlement Agreements contain no additional requirement of standing for these claimants beyond the definition of the New Class and that of the subclass of commercial fishermen.  Thus, it was improper to deny compensation to the claimants.  Even if there were a separate requirement of standing, the only fair and equitable standard for recovery under the HESI/Transocean settlements by persons who were absent class members in a B1 class action lawsuit is not whether they filed an individual lawsuit following entry of PTO 60 but rather whether they had viable, non-time-barred claims at the time the Settlement Agreements were entered into. Since these claimants meet that criterion, they should be awarded compensation.

The inequity of denying compensation to these claimants on the dubious grounds used by the Claims Administrator is heightened by the fact that the HESI/Transocean settlement's inclusion of the New Class was expressly aimed at affording recompense to persons, including menhaden fishermen such as these claimants, who were deliberately excluded from the BP economic damages settlement. Contrary to that purpose, these claimants have now twice been excluded, in successive settlements of class actions in which they were in the plaintiff class, from recovery for the economic injury that they clearly have suffered.  In light of the avowed purpose of the HESI/Transocean settlements to include those injured persons who had been excluded from the DHEPDS, the Claims Administrator should be construing the Settlement Agreements liberally to do justice and, where reasonably possible, in favor of compensating those who have clearly suffered harm, rather than

erecting arbitrary and artificial barriers to recovery.  Therefore, the Court should hold—modifying the Distribution Model if necessary or appropriate—that these claimants were improperly excluded from recovery under the Settlement Agreements based on non-compliance with PTO 60 and are entitled to compensation.  Accordingly, the Court should overrule the decisions of the Claims Administrator and the Magistrate Judge and should remand the claims to the Claims Administrator with instructions to award compensation to the claimants based on the computation model for menhaden fishermen set out in the Distribution Model.

Respectfully Submitted,

s/  Michael D. Greer
MICHAEL D. GREER, MB# 5002
GREER, RUSSELL, DENT,
& LEATHERS, PLLC
POST OFFICE BOX 907
TUPELO, MISSISSIPPI 38802-0907
662-842-5345
mgreer@greerlawfirm.com

JOHN G. WHEELER, MB# 8622
MICHAEL CHASE, MB# 5969
MITCHELL, MCNUTT & SAMS, P.A.
POST OFFICE BOX 7120
TUPELO, MISSISSIPPI  38802-7120
662-842-3871
jwheeler@mitchellmcnutt.com
mchase@mitchellmcnutt.com

**<u>CERTIFICATE OF SERVICE</u>**

I certify that the foregoing document was filed with the Court through the Court's ECF system, which effected service on all necessary persons.

This, the 26th day of January, 2018.

s/ Michael D. Greer
MICHAEL D. GREER