# EXHIBIT A

BUNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| BOBBY LYNN BRADBERRY, JR.,<br>Plaintiff,<br><br>v.<br><br>BP EXPLORATION & PRODUCTION, INC.<br>& BP AMERICA PRODUCTION COMPANY,<br>Defendants.<br><br>Related to:    12-968 BELO<br>in MDL No. 2179 | CIVIL ACTION<br><br>CASE NO. 2:17-cv-04686<br><br>JUDGE BARBIER<br>MAG. JUDGE WILKINSON |

**BELO COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Plaintiff, BOBBY LYNN BRADBERRY, JR., who submits this Complaint and respectfully pleads as follows:

**INTRODUCTION**

1.      This is a Back-End Litigation Option ("BELO") lawsuit filed pursuant to the BELO provisions of the BP/*Deepwater Horizon* Medical Benefits Class Action Settlement Agreement in MDL No. 2179 as amended on May 1, 2012 ("MSA") and approved by this Court.  Record Doc No. 6427-1, Record Doc. No. 8218.

2.      As required by the MSA, Plaintiff has abided by the requirement to file a Notice of Intent to Sue.

3.      In accordance with the terms of the MSA, Plaintiff seeks compensatory damages, and related court costs for "Later-Manifested Physical Conditions"[1] ("LMPC") he suffered as both

---

[1]  "LATER-MANIFESTED PHYSICAL CONDITION shall mean a physical condition that is first diagnosed in a MEDICAL BENEFITS SETTLEMENT CLASS MEMBER after April 16, 2012, and which is claimed to have resulted from such MEDICAL BENEFITS SETTLEMENT CLASS MEMBER'S

1

a Clean-Up Worker and Resident of a coastal area affected by the BP/*Deepwater Horizon* Oil Spill ("Oil Spill") on April 20, 2010.

## PARTIES

4.      Plaintiff herein, BOBBY LYNN BRADBERRY, JR. ("Plaintiff"), is a citizen and resident of Metairie, Louisiana.  Plaintiff has been qualified by the Claims Administrator as a Clean-Up Worker as defined by the MSA.  In addition, at the time of the Oil Spill and at the time he performed oil clean-up work, Plaintiff lived in Grand Isle, Louisiana, one of the coastal areas affected by the Oil Spill.

5.      Pursuant to the terms of the MSA and this Court's BELO Cases Initial Proceedings Case Management Order ("BELO CMO"), BP EXPLORATION & PRODUCTION, INC., and BP AMERICA PRODUCTION COMPANY ("Defendants" or "BP") are made exclusive defendants herein.  Record Doc. 14099.  Both Defendants are incorporated in the State of Delaware and have corporate headquarters in Houston, Texas.  Defendants will be served pursuant to the BELO CMO.

## JURISDICTION AND VENUE

6.      Jurisdiction and venue are proper before this Court.

7.      This Court has jurisdiction pursuant to the MSA and approval order thereon.  "[T]he Court retains continuing and exclusive jurisdiction over the Parties, the Medical Benefits Settlement Class Members and this Medical Benefits Class Action Settlement Agreement, to interpret, implement, administer and enforce the Medical Benefits Class Action Settlement Agreement in accordance with its terms."  Record Doc. No. 8218 (approval order), Record Doc.

---

exposure to oil, other hydrocarbons, or other substances released from the MC252 WELL and/or the *Deepwater Horizon* and its appurtenances, and/or exposure to dispersants and/or decontaminants used in connection with the RESPONSE ACTIVITIES, where such exposure occurred on or prior to September 30, 2010, for ZONE A RESIDENTS; on or prior to December 31, 2010, for ZONE B RESIDENTS; and on or prior to April 16, 2012, for CLEAN-UP WORKERS." (MSA Sec. II, Para. VV).

No. 6427-1 (MSA § XXVII); see also, Record Doc No. 14099 (BELO CMO).  Therefore, this Court retains jurisdiction over the BELO plaintiffs, including Plaintiff herein.

8.      Jurisdiction also exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all cases of admiralty and maritime jurisdiction."

9.      This Court also has jurisdiction pursuant to 28 U.S.C. §1333; as well as the Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to "cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land."

10.     The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  Plaintiff therefore requests a non-jury trial.

11.     The MSA in MDL 2179 requires all such BELO actions to be initially filed in this Court.  The MSA, however, also provides that a BELO action may be later transferred to another district court if venue is more appropriate there.  MSA, § VIII.G.1.c.

12.     Venue is appropriate in this District Court pursuant to the BELO CMO as Plaintiff currently resides in this judicial district and was a resident of this judicial district at the time of exposure. *See*, BELO CMO in MDL 2179, p. 3, Record Doc. No. 14099.

13.     Venue is also proper in this District Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district and because Defendants do business in this district.

## FACTUAL BACKGROUND

A.     **The *Deepwater Horizon* Catastrophe**

14.     The *Deepwater Horizon* was an ultra-deepwater, dynamically-positioned, semi-submersible Mobile Offshore Drilling Unit ("MODU") used to drill an exploratory well in the Macondo prospect site in Mississippi Canyon Block 252 (also known as the "MC252" or "Macondo" well), located on the outer continental shelf in the Gulf of Mexico, about 50 miles from the Louisiana coast. As the leaseholder and designated operator of the Macondo well,[2] Defendants were required under Federal regulations to, *inter alia*, "protect health, safety, property, and the environment by . . . [p]erforming all operations in a safe and workmanlike manner." 30 C.F.R. §250.107(a)(1).

15.     On April 20, 2010, a well blowout that occurred on the *Deepwater Horizon* oil rig marked the beginning of what would become the most pervasive and devastating environmental disaster in U.S. history.  The uncontrolled blowout caused explosions and a raging fire aboard the *Deepwater Horizon* during which eleven people were tragically killed and at least 17 others injured.  The *Deepwater Horizon* burned for two days and eventually sank.  This resulted in an oil spill and environmental disaster of unprecedented proportions ("Oil Spill").  During the 87 days that it took Defendants to cap the blown-out well, an estimated 210 million gallons of crude oil gushed into the Gulf of Mexico, causing widespread and fatal environmental damage to the Gulf of Mexico, as well as the marine/coastal habitats and estuarine areas in and around Louisiana, Mississippi, Alabama and Florida.[3]

---

[2] This was pursuant to the lease granted by the former Minerals Management Service allowing defendants to perform oil exploration, drilling and production-related operations in MC252.

[3] Oil flowed within deep ocean water currents hundreds of miles away from the blown-out well, resulting in oil slicks that extended across more than 43,000 square miles, affecting water quality and exposing

**B.     BP Pled Guilty to Manslaughter and was Found Primarily Responsible for the Worst Oil Spill in U.S. History Due to BP's Gross Negligence, Willful Misconduct and Recklessness.**

16.     The Oil Pollution Act of 1990 ("OPA") imposes liability upon a "responsible party for a . . . facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702. After the Oil Spill, the U.S. Coast Guard designated BP as a "responsible party" under the OPA.

17.     Following an exhaustive investigation into the cause of this enormous disaster, a White House commission faulted BP and its partners for a series of cost-cutting measures that led to insufficient safety systems. In November 2012, BP pled guilty to 11 counts of manslaughter and one felony count of lying to Congress, for which the oil giant agreed to pay billions in criminal fines, penalties and restitution.

18.     On September 4, 2014, the Honorable Carl Barbier, Presiding Judge for the Eastern District of Louisiana, ruled in the Clean Water Act trial that BP was primarily at fault for the Oil Spill because of its gross negligence, willful misconduct and recklessness. (*U.S. v. BP Exploration & Production, Inc., et al.,* Findings of Fact and Conclusions of Law, Phase I, No. 10 – 4536 in MDL 2179, Doc. 13381-1, at pp.121–130, 135-136, 152).[4]

**C.     Dangers Posed by the Crude Oil from the Oil Spill to Gulf State Residents and Clean-Up Workers.**

19.     The crude oil from the Oil Spill, as well as the dispersants utilized to clean-up the Oil Spill, carried significant public health risks. Crude oil contains highly toxic chemical

---

aquatic plants and wildlife to harmful chemicals. Oil was deposited onto at least 400 square miles of the sea floor and washed up onto more than 1,300 miles of shoreline from Texas to Florida.

[4] *U.S. v. BP* Exploration *& Production, Inc.* included the United States' claim for civil penalties against BP Exploration, Inc. and BP American Production Company (defendants herein) and other entities contracted with BP on the *Deepwater Horizon* under Section 311(b) of the CWA, 33 U.S.C. section 1321(b) and OPA.

ingredients including Volatile Organic Compounds ("VOCs") such as benzene, ethylbenzene, toluene, xylene, and naphthalene; Polycyclic Aromatic Hydrocarbons ("PAHs"); and heavy metals such as aluminum, cadmium, nickel, lead and zinc.  Many of these crude oil chemicals including benzene and PAHs are toxic and volatile, moving from the oil into the air.  The air acts as a conduit or carrier; thereby causing the oil and dispersants to blow for miles, reaching communities far from the initial site of the Oil Spill.  Individuals living and working in the area recalled the smell of pungent petroleum odors.

20.     Oil has an adverse impact on the human body, marine life, birds, reptiles, mammals and the ecosystem.

21.     Dermal exposure to certain VOCs in crude oil can cause harmful health effects including, but not limited to, the following: redness, lesions, acne, swelling, dryness, irritation, rashes and blisters on the skin and in the mucous membranes.  Direct contact exposure to certain VOCs in crude oil have been known to cause a wide variety of harmful health effects including, but not limited to: ocular redness, soreness, watering and itching.  Inhalation of certain VOCs in crude oil has been documented to affect the respiratory system and include, but are not limited to, nausea, vomiting, sinus related symptoms and diagnoses (e.g., coughing, throat irritation and congestion), as well as symptoms (e.g., wheezing, shortness of breath and labored breathing) and diagnoses associated with respiratory airways dysfunction syndrome ("RADS"), which includes a multitude of respiratory conditions.  Neurologic system effects may include dizziness, irritability, confusion, depression, anxiety and weakness of extremities.  Ingestion of food or water containing VOCs from crude oil can cause adverse health effects such as nausea, vomiting and diarrhea.

22.     According to the Agency for Toxic Substances and Disease Registry, which is part of the U.S. Department of Health and Human Services, benzene is a known mutagen and

carcinogen.[5]  Benzene in crude oil can cause a variety of health complications, including, but not limited to, ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain, cancer and lethal central nervous system depression.  There is also substantial evidence that benzene causes chromosomal abnormalities in lymphocytes and bone marrow cells, damage to the immune system, and abnormal development of blood cells. Long-term, low-level, oral and inhalation exposures to benzene have also caused peripheral nervous system abnormalities, distal neuropathy, sleepiness and memory loss.

23.      PAHs are considered powerful carcinogens and are associated with toxins that adversely impact reproductive systems.

**D.      The Response Effort and the Use of Toxic Chemical Dispersants**

24.      After the disaster and pursuant to its duties for oil spill removal as a responsible party under the OPA, Defendants began an offshore containment response program[6] by which Defendants directed the use of vessels to skim oil from the surface of the water in the Gulf, conduct in-situ burning of oil that reached the surface and recover light oil and tar balls.  Defendants also employed vessels to tow and deploy booms - floating barriers intended to contain or hold back oil floating in the water's surface.[7]

---

[5] Agency for Toxic Substances and Disease Registry, *Public Health Statement for Benzene* (Aug. 2007), available at https://www.atsdr.cdc.gov/phs/phs.asp?id=37&tid=14.

Agency for Toxic Substances and Disease Registry, *Toxicological Profile for Benzene* (Aug. 2007), https://www.atsdr.cdc.gov/toxprofiles/TP.asp?id=40&tid=14.

[6] This was done with federal oversight, including the Coast Guard's Federal On-Site Coordinator (FOSC).

[7] A key component of BP's offshore containment response program was BP's Vessels of Opportunity ("VOO") Program, by which BP hired more than 9,000 private vessels to assist with the Oil Spill response.

25.     In an ill-conceived effort to further contain and remediate the spill, Defendants applied massive amounts of highly toxic chemical dispersants (including Corexit EC9500 and Corexit EC9527A) to the rapidly growing oil slick that were intended to break down the oil into finely dispersed droplets.

26.     On April 22, 2010, Defendants began subsea and aerial application of chemical dispersants to the Gulf.  Dispersants were sprayed from planes over the Gulf onto the water's surface and along the coast from fountain-type jets.  The fountain-type jets were also positioned on the decks of boats, sprayed from smaller vessels onto the surface of the water, injected immediately below the surface of the water from vessels, introduced deep below the surface of the ocean, and sprayed by hand.

27.     On May 20, 2010, the U.S. Environmental Protection Agency ("EPA") directed Defendants to identify a chemical dispersant less toxic than Corexit within 24 hours and begin using it within 72 hours.

28.     On May 20, 2010, Defendants objected to this order and notified the EPA that it would continue using Corexit, after which Defendants' use of Corexit skyrocketed (BP used 45,000 gallons on May 22, 2010 and 70,000 gallons on May 23, 2010).  Defendants only stopped using Corexit EC9527A on or about May 23, 2010, when supplies ran out and thereafter relied on Corexit EC9500.

29.     On May 26, 2010, after discussions with the EPA, the Coast Guard's Federal On-Site Coordinator (FOSC) directed Defendants to reduce overall use of Corexit by 75% and to stop using chemical dispersants on the water's surface except in rare cases (and only as a last resort) where an exemption was sought in writing from and approved by FOSC.  The goal of this directive was to focus Defendants' efforts on the use of potentially less harsh alternative response methods

including booming, skimming and in situ burning.  Defendants thereafter sought more than 40 exemption requests to use chemical dispersants on the surface of the Gulf of Mexico.

30.     According to the *Aerial Dispersants Operations – Houma Status Report*, by June 26, 2010, Defendants had ordered the application of dispersant covering approximately 291 square miles of the Gulf.

31.     On or about July 19, 2010, the time of the last recorded application of the chemical dispersants, Defendants and their contractors had ultimately applied more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico in response to the Oil Spill.  As a result, beaches, marshes, and wetlands were fouled not only by crude oil, but also toxic, chemical dispersants; and as such, were the focus of a variety of remedial efforts to remove the hazardous materials from these fragile areas.

32.     In response to criticism when Defendants began using Corexit in the Gulf, BP's Group Chief Executive at the time and current CEO, Bob Dudley, defended the use of Corexit, stating that "the toxicity of Corexit is about the same as dish soap, which is effectively what it is and how it works."[8]  He further misrepresented the danger by stating that the Gulf of Mexico is "an ecosystem that's used to oil.  So oil on the water is not something new."

33.     On the contrary, the two types of Corexit used in the cleanup (Corexit EC9500 and EC9527A) contain arsenic, cadmium, chromium, copper, lead, mercury, nickel, and zinc.  In

---

[8] K. Savage, *BP Head Bob Dudley Defends Dispersant Use, as Golf Coast Communities Speak Out at Shareholder Meeting (Apr. 17, 2013),* available at http://bridgethegulfproject.org/blog/2013/bp-head-bob-dudley-defends-dispersant-use-gulf-coast-communities-speak-out-shareholder.

addition, Corexit EC9527A contains 2-butoxyethanol ("EGBE"),[9] which may also be carcinogenic.

34.     The Material Safety Data Sheets ("MSDS") for both Corexit EC9500 and Corexit EC9527A indicate that the dispersants contain hazardous substances harmful to human health, for which dermal exposure, inhalation, and ingestion should be avoided.  The MSDS for Corexit EC9527A further states that it is an eye and skin irritant and may irritate the respiratory tract if inhaled; and, if ingested, Corexit EC9527A may cause liver and kidney effects and/or damage, or irritate the gastrointestinal tract.

35.     The toxic dispersants used by Defendants are known to cause harmful health effects including, but not limited to, headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation of the skin, eyes, nose, throat and lungs; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; cancer; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and developmental damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of chronic obstructive pulmonary disease.

36.     Moreover, the dispersants used are not only toxic on their own, but when combined with oil, the mixture becomes significantly more toxic than the oil or dispersants alone.

---

[9] EGBE is on the list of chemicals subject to reporting under section 313 of the Emergency Planning and Community Right-to-Know Act (EPCRA) and section 6607 of the Pollution Prevention Act. *See*, 80 FR 60818 (Oct. 8, 2015) (Pursuant to 40 C.F.R. §372, the EPA denied a petition to remove EGBE from EPCRA due to its potential to cause serious or irreversible chronic health effects in humans, specifically, liver toxicity and hematological effects).

**E.      Defendants' Knowledge and Disregard of the Risks to Clean-Up Workers**

37.      As part of this effort, both onshore and off-shore Clean-Up Workers, as well as residents, came into contact with crude oil, dispersants and oil/chemical mixtures as they worked and slept.[10]

38.      Even more disturbing, the Defendants' aerial spray planes both recklessly and intentionally sprayed chemical dispersants on the water despite the presence of VOO and other boats in the vicinity whose crews were performing offshore clean-up work, thereby misting or spraying Clean-Up Worker boat crews with these toxic dispersants.  These crew members also came into direct contact with oil, dispersants and harmful chemicals when the oily, toxin-laden Gulf water constantly splashed into the boats and onto the crew members as they were working. They were also constantly inhaling the airborne toxins, which often resulted in nausea, headaches and dizziness.

39.      In addition to the Clean-Up Workers working on VOO or other boats to assist in the offshore Oil Spill response, Defendants also hired, used, supervised or directed Beach Clean-Up Workers ("BCUW") to clean up beaches, marshes, wetlands and other onshore areas.  Their primary tasks included laying and hauling oil containment boom, installing other barriers, collecting tar balls, removing polluted sand contaminated with oil and/or dispersants, assisting with in-situ burning, spraying and cleaning vessels that came into contact with oil, dispersants and

---

[10] P. Williams and C. Grice, *Paper # 1152: Adverse Health Effects in Tar Ball Workers and Boat Crews from Crude Oil/Corexit Mixtures from the Deepwater Horizon Oil Spill*, A&WMA's 109th Annual Conference & Exhibition (June 20-23, 2016).

other harmful chemicals resulting from the Oil Spill, decontaminating oiled wildlife, and transporting contaminated boom and other clean-up equipment.

40.     The BCUW therefore came into direct contact with oil, dispersants and harmful chemicals. They encountered tar mats (large pieces of petroleum product) which were of such size that it was necessary to break them into pieces to lift and remove them. Some pieces contained a center which was gelatinous. When this material was exposed to the air, it began volatilization and "off-gassed" into the faces or otherwise onto the workers.

41.     BCUW were also sprayed with Corexit with the winds from the south blowing off the Gulf and onto the beaches. BCUW were instructed to enter certain waters in waders and had the product splashed over the tops of boots and onto their exposed skin.

42.     Clean-Up Workers hired to decontaminate thousands of vessels that were used in the Oil Spill remediation efforts at 17 different sites across the five Gulf Coast States were also exposed to oil, dispersants and harmful chemicals.

43.     Clean-Up Workers, whether working onshore or offshore, reported that they were provided minimal or no personal protective equipment on the job, including functional respirators or clothing capable of adequately protecting them. BP believed that allowing workers to wear respirators would "scare the tourists" and create a negative public image. BP therefore threatened Clean-Up Workers with termination when they tried to wear respirators or additional safety equipment on the job. Many received early termination notices after raising safety concerns on the job.

44.     As early as May 2010, federal regulators at the Occupational Safety and Health Administration ("OSHA") repeatedly raised concerns with BP over significant deficiencies in BP's Oil Spill response operations relating to worker safety.

45.     At all times relevant to this litigation, BP knew or should have known that: (a) crude oil and dispersants contain chemicals hazardous to human health; (b) Clean-Up Workers like Plaintiff herein were entitled to adequate and timely warning of the harmful effects of exposure to crude oil and chemical dispersants and the hazardous substances that crude oil and dispersants contain; (c) Clean-Up Workers should have been provided adequate personal protective equipment including respirators and protective clothing when engaged in Oil Spill clean-up activities; and (d) Clean-Up Workers should have been provided adequate safety training.

46.     BP, aware of the risks that Clean-Up Workers would face, failed to warn Clean-Up Workers of the risks of exposure to the oil and dispersants; failed to provide adequate respirators and protective gear/clothing; failed to provide adequate safety training; and ignored worker safety concerns, even in the face of OSHA warnings and notification by the U.S. Department of Health and Human Services that vessel workers in its VOO program, as well as other offshore and onshore Clean-Up Workers, were complaining of illnesses after being exposed to oil and dispersants.

**F.     Plaintiff's Exposure to Oil and Harmful Dispersants Causing Injuries and Damages**

47.     Plaintiff is one of many Class Members or Opt-outs of the Medical Benefits Class Action who were injured as a result of exposure to oil and/or oil dispersants by virtue of his employment as a Clean-Up Worker and because of his residence in one of the coastal areas affected by the Oil Spill. Plaintiff has subsequently been diagnosed with a variety of chronic conditions including, but not limited to, chronic rhinosinusitis, RADS, chronic ocular conditions, emotional distress, depression, anxiety, panic disorder and PTSD. Plaintiff also suffers from intermittent skin symptoms, although no formal diagnosis has been rendered. Plaintiff's symptoms and conditions are ongoing and continuous. Prior to his exposure to the Oil Spill, he had no health concerns, was involved in a long-term marriage and lived and worked in a place that he loved.

48.     Plaintiff lived and worked in Grand Isle, Louisiana and, as a result, was exposed to toxic chemicals.  The immediate aftermath of the explosion caused Grand Isle to reek of crude oil. Plaintiff smelled it at night when he tried to sleep and inhaled the toxic airborne fumes while he slept.

49.     Plaintiff was the Assistant Fire Chief, and an EMT for the Grand Isle Fire Department, as well as one of the First Responders to the *Deepwater Horizon* explosion.  He initially assisted in the search for dead bodies in the water immediately after the explosion.

50.     He also participated in the Oil Spill as a Clean-Up Worker and was a resident of one of the many coastal areas affected by the Oil Spill.  During this time, he was on duty 24 hours a day, 7 days a week and regularly slept at the fire department for all but a handful of nights.  His primary duties involved checking the booms to ensure they were working properly and monitoring the local coastline to call in any oil that washed ashore in Grand Isle.  He also investigated and evacuated people from areas of the island suspected of having dangerous levels of toxicity.  He witnessed people getting sick on a daily basis as a result of chemical exposure.

51.     Plaintiff was thus exposed to the oil, dispersants, and other harmful substances throughout the entire duration of his clean-up work and residence in Grand Isle after the Oil Spill.

52.     On or about May 15, 2010, while pulling oily booms out of the water, Plaintiff had direct contact with water contaminated with toxins when the contaminated water splashed into his eyes and onto his face.  Beginning within 24 hours of this exposure, itching and irritation developed followed by chronic and ongoing irritation, itching, burning, swelling, red eyes, crusting, swollen eye lids, blurry vision and pain.  His symptoms continued to persist and he was diagnosed with chronic damage to conjunctiva and cornea on July 2, 2014.  He was not previously diagnosed with these conditions.

53.     On or about May 20, 2010, while working with the booms, Plaintiff inhaled strong fumes that smelled like chemicals. Beginning within 24 hours of exposure, coughing and shortness of breath developed. This was followed by chronic and ongoing cough, sputum production, wheezing, chest tightness and shortness of breath. His symptoms continued to persist and he was diagnosed with Reactive Airways Dysfunction Syndrome ("RADS") on July 2, 2014. He was not previously diagnosed with this condition. Plaintiff had no history of respiratory disease prior to his exposure to fumes and toxins during the BP Oil Spill clean-up.

54.     Within 72 hours of exposure to these strong fumes, he began experiencing sinus pain, pressure and a runny nose, which was followed by chronic and ongoing drainage discharge, post-nasal drip, nasal obstruction stuffiness, facial sinus pain/pressure/fullness and decreased sense of smell. His symptoms continued to persist, despite the use of over-the-counter medications and steam; and eventually, he was diagnosed with chronic rhinosinusitis on July 2, 2014. He was not previously diagnosed with this condition and had no prior history of rhinosinusitis.

55.     On or about May 15, 2010, while pulling the oily booms up from the water to inspect them, Plaintiff had direct skin contact with water contaminated with chemicals to the hands, arms and face. Beginning within 72 hours of exposure, irritation and itching developed followed by chronic and ongoing itching, pain, burning, redness, blisters, dryness, flaking, peeling, welts, pimples and irritated skin on the areas exposed. Plaintiff still continues to suffer intermittently from the above-described skin symptoms due to his exposure.

56.     Plaintiff's above-referenced injuries were directly and proximately caused by his exposure to toxic chemicals as both a Clean-Up Worker and Resident of a coastal area affected by the Oil Spill described hereinabove.

57.     In addition, subsequent to the Oil Spill, Plaintiff was diagnosed with depression and anxiety.   On December 10, 2015, Plaintiff was diagnosed by a Neuropsychologist with emotional distress, depression, anxiety and panic disorder.   These injuries were directly and proximately caused by his traumatic involvement in the aftermath of the Oil Spill and exposure to toxic chemicals as both a Clean-Up Worker and resident of coastal areas affected by the Oil Spill.

58.     On December 10, 2015, Plaintiff was diagnosed by a Neuropsychologist with Post-Traumatic Stress Disorder ("PTSD") based on the criteria set forth in DSM-V.   Plaintiff's PTSD was directly and proximately caused by his traumatic involvement in the aftermath of the Oil Spill and exposure to toxic chemicals as both a Clean-Up Worker and resident of a coastal area affected by the Oil Spill.

59.     Defendants are therefore liable under state and federal law, and under the terms of the MSA.

60.     Because he was diagnosed with the above-referenced chronic conditions (B1 level injuries under the Matrix)[11] after April 16, 2012, Plaintiff is not entitled to recover as a Medical Benefits Class Member under the MSA by submitting a Proof of Claim Form to the Claims Administrator, for which he would have received a fixed amount of $60,700 upon approval. Instead, pursuant to this Court's Order on July 23, 2014,[12] Plaintiff is required to file the instant BELO lawsuit in order to recover because he is considered to have a LMPC (despite the fact that his B1 conditions manifested within 24-72 hours as required for recovery under the Matrix). Plaintiff has submitted the required Notice of Intent to Sue and all required materials referenced

---

[11] The Matrix (Exhibit 8 to the MSA) is the roadmap to recovery for Specified Physical Conditions, including the chronic conditions (known as level B1 injuries) alleged by Plaintiff herein.

[12] Court Order, Record Doc. No. 13179; *see also*, Court Order, Record Doc. No. 13733 in MDL 2179.

therein to the Claims Administrator to seek compensation for his chronic B1 injuries in the instant BELO lawsuit. (MSA, §VIII.A. and G). Since Defendants have elected not to mediate Plaintiff's claim, Plaintiff now timely files the instant BELO lawsuit in order to recover for his above-referenced chronic physical and emotional injuries in accordance with the MSA. (MSA, §VIII.C. and G).[13]

61.    Plaintiff has suffered, and will continue to suffer, physical, mental and emotional injuries and damages from his exposure to dangerous chemicals, including, but not limited to, physical injuries and diseases; accompanying physical, mental and emotional pain, suffering and anguish; the need for medical monitoring; costs and inconvenience of obtaining past and future medical treatment for exposure to chemicals; risk and fear of developing future diseases and dying from same; and becoming saddled with the financial burden, inconvenience and emotional strain of monitoring his compromised health.

## CAUSES OF ACTION

62.    Plaintiff incorporates by reference all prior allegations as though fully set forth herein.

63.    Pursuant to the MSA, the following issues need not be proven and may not be litigated at trial in this BELO lawsuit: (i) the fact or existence of the MSA, (ii) the alleged fault of

---

[13] "Any BACK-END LITIGATION OPTION LAWSUIT against a BACK-END LITIGATION OPTION DEFENDANT must be filed within 6 months of either: (a) notice by the CLAIMS ADMINISTRATOR to the MEDICAL BENEFITS SETTLEMENT CLASS MEMBER of the election of all BP defendants named in the NOTICE OF INTENT TO SUE not to mediate, or (b) written confirmation by the CLAIMS ADMINISTRATOR to the MEDICAL BENEFITS SETTLEMENT CLASS MEMBER and to all BP defendants named in the NOTICE OF INTENT TO SUE that the mediation did not resolve the MEDICAL BENEFITS SETTLEMENT CLASS MEMBER'S claim as to all BP defendants named in the NOTICE OF INTENT TO SUE." (MSA, § VIII.G (1) (b).

BP for the *Deepwater Horizon* Incident,[14] (iii) or Plaintiff's exposure to oil, other hydrocarbons and other substances released from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances, and/or dispersants and/or decontaminants used in connection with the Response Activities.[15]  (MSA, § VIII.G.3.b.; see also BELO CMO, at p. 3).

64.     Pursuant to the MSA, the only issues, elements and proofs that may be litigated at trial in this BELO lawsuit are the following: (i) the fact of diagnosis; (ii) the amount and location of oil and other substances released from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances, and/or dispersants and/or decontaminants used in connection with the Response Activities, and the timing thereof; (iii) the level and duration[16] of Plaintiff's exposure to oil, other hydrocarbons and substances released from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances, and/or dispersants and/or decontaminants used in connection with the Response

---

[14] The MSA defines the "DEEPWATER HORIZON INCIDENT" as "the events, actions, inactions, and omissions leading up to and including (i) the blowout of the MC252 WELL, (ii) the explosions and fire on board the *Deepwater Horizon* on or about April 20, 2010, (iii) the sinking of the *Deepwater Horizon* on or about April 22, 2010, (iv) the release of oil, other hydrocarbons, and other substances from the MC252 WELL and/or the *Deepwater Horizon* and its appurtenances, (v) the efforts to contain the MC252 WELL, and (vi) RESPONSE ACTIVITIES." (MSA §II.X.)

[15] The MSA defines "RESPONSE ACTIVITIES" as "the clean-up, remediation efforts, and all other responsive actions (including the use and handling of dispersants) relating to the release of oil, other hydrocarbons, and other substances from the MC252 WELL and/or the Deepwater Horizon and its appurtenances that were done under the auspices of the Unified Command, BP, or a federal, state, or local authority. (MSA §II.OOOO).

[16] This element ("level and duration" or "dose") is a toxic tort standard of proof for causation that would only apply to cancer BELO claims and not B1 BELO claims (chronic SPCs diagnosed after April 16, 2012 that were created as a new category of BELO claims by Court Order on July 23, 2014).  To prevail in a toxic tort case, a plaintiff must show both general causation (exposure to the toxin can cause injury) and specific causation (the toxin caused injury to the specific plaintiff). *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 779 - 800 (E.D. La. 2011); *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case."). This higher cancer standard of proof is therefore inapplicable to Plaintiff's B1 BELO claims herein for chronic conjunctivitis, rhinosinusitis, RADS, emotional distress and PTSD.

Activities, and the timing thereof; (iv) whether Plaintiff's LMPC was legally caused by his exposure to oil, other hydrocarbons, and other substances released from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances, and/or dispersants and/or decontaminants used in connection with Response Activities; (v) any alternative causes for Plaintiff's LMPC; and (vi) the amount, if any, of compensatory damages to which Plaintiff is entitled. (MSA, § VIII.G.3.a.).

65.     As previously set forth hereinabove, Plaintiff was diagnosed on July 2, 2014 with chronic damage to conjunctiva and cornea, RADS and chronic rhinosinusitis.  He was diagnosed with emotional distress, depression, anxiety, panic disorder and PTSD on December 10, 2015. Plaintiff's injuries were directly and proximately caused by his exposure to oil and dispersants while working as a Clean-Up Worker (as defined by the MSA) and while residing in Grand Isle, Louisiana.  Plaintiff accordingly seeks compensatory damages set forth below.

## DAMAGES

66.     By virtue of the contractual obligations in the MSA, Defendants are jointly and severally liable to Plaintiff for Compensatory Damages including:

a)     Past, present and future medical expenses;

b)     Past, present and future physical pain and suffering;

c)     Past, present, and future mental pain, anguish, distress, and suffering;

d)     Scarring and disfigurement;

e)     Permanent disability;

f)     Lost earnings and loss of earning capacity;

g)     Other economic loss;

h)     Loss of enjoyment of life;

i)     Increased risk and fear of developing a disease, dying and exacerbation of any pre-existing conditions;

j)     Costs for past and ongoing medical screening and monitoring;

k)     Costs of litigation; and

l)     Such other and further relief available under all applicable state and federal laws, as well as any relief the Court deems just and appropriate.

## REQUEST FOR WAIVER OF FILING FEES

As previously set forth hereinabove, this Court retains jurisdiction over the BELO plaintiffs, including Plaintiff herein, pursuant to the MSA and the court's approval thereon. Record Doc. No. 6427-1 (MSA § XXVII); Record Doc. No. 8218 (approval order); see also, Record Doc No. 14099 (BELO CMO). Plaintiff therefore requests a waiver of filing fees.

## PRAYER

WHEREFORE, Plaintiff prays that this Honorable Court grant him all relief to which he is entitled under the law and in equity against defendants BP EXPLORATION & PRODUCTION, INC. & BP AMERICA PRODUCTION COMPANY, including compensatory damages and costs.

Respectfully submitted,

/s/ Howard L. Nations

Howard L. Nations
Texas State Bar Number 14823000
The Nations Law Firm
3131 Briarpark Dr., Suite 208
Houston, Texas 77042
(713) 807-8400 (Phone)
(713) 807-8423 (Fax)

COUNSEL FOR PLAINTIFF, BOBBY LYNN BRADBERRY, JR.