# EXHIBIT J

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179<br><br>SECTION: J |
| | * * | |
| | * * | HONORABLE CARL J. BARBIER |
| | * * | MAGISTRATE JUDGE WILKINSON |
| | * * | |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class, | * * * | NO. 12-CV-968<br><br>SECTION: J |
| Plaintiffs, | * * | |
| v. | * | HONORABLE CARL J. BARBIER |
| BP Exploration & Production Inc., *et al.*, | * * | MAGISTRATE JUDGE WILKINSON |
| Defendants. | * * * * * | |

## STATUS REPORT FROM THE *DEEPWATER HORIZON* MEDICAL BENEFITS SETTLEMENT CLAIMS ADMINISTRATOR

The Garretson Resolution Group, the Claims Administrator of the *Deepwater Horizon* Medical Benefits Class Action Settlement (the "Settlement"), submits the following quarterly report to apprise the Court of the status of its work in processing claims and implementing the terms of the Medical Settlement Agreement (the "MSA") between July 1, 2017, and September 30, 2017, (the "Reporting Period").[1]  We have published 14 reports since Preliminary Approval

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to their fully capitalized renderings in the MSA.

in May 2012, and this marks the tenth quarterly report filed since the claims filing deadline of February 12, 2015. This status report provides:

- an executive summary of claims processed during the Reporting Period;

- a summary of claims for Specified Physical Conditions ("SPC") and significant developments concerning these claims;

- an update on the operations and activities of the Class Member Services Center;

- an account of participation in the Periodic Medical Consultation Program ("PMCP");

- a summary of claims for Later-Manifested Physical Conditions; and

- a summary of the activities of the grantees of the Gulf Region Health Outreach Program ("GRHOP") and the operations of the Gulf Region Health Outreach Program Library.

## I.   EXECUTIVE SUMMARY

The Claims Administrator has received 37,230 unique claims for compensation for an SPC and/or participation in the PMCP through the end of the Reporting Period. This status report will provide an overview of the claims processing forecast for all claims filed, the variables influencing the progression of those claims, and the outcome of claims as they progress through the stages of review. In summary:

- the Claims Administrator has completed its review of 37,053 claims, or ninety-nine percent (99%) of all claims filed, to determine whether they qualify for compensation for an SPC and/or participation in the PMCP.

    - Of the 37,053 claims that the Claims Administrator has fully reviewed, 22,683, or sixty-one percent (61%), were approved for compensation for an SPC, and another 4,801, or thirteen percent (13%), were approved to participate in the PMCP. Furthermore, 9, or thirteen percent (13%), of the 71 claims currently going through the Notice of Defect process have received an "Approved with Defects" notice, meaning that the Medical Benefits Settlement Class Member ("Class Member") has been approved for at least one compensable SPC.

    - Overall, the claims filed in this settlement have been and continue to be impacted by high defect rates, with 28,865, or seventy-eight percent (78%), receiving either a Request for Additional Information ("RAI") or

Notice of Defect during the life of the claim. Additionally, 19,734, or fifty-three percent (53%), have been and continue to be impacted by changes or updates the claimants made to their Proof of Claim Forms or supporting documentation, which require the Claims Administrator to re-review the claims.

o   The Claims Administrator is still reviewing 177, or one percent (1%), of the claims filed in this settlement to determine whether they qualify for SPC compensation or to participate in the PMCP.

- The compensation allocated and paid to SPC-determined claims continues to increase.

o   During the Reporting Period, the Claims Administrator approved 201 Medical Benefits Settlement Class Members ("Class Members") for nearly $1 million in SPC compensation. Since the inception of the Settlement, the Claims Administrator has approved 22,586 Class Members for $65.9 million in SPC compensation.

o   Additionally, the Claims Administrator determined that another 51 Class Members who had partially defective claims also had at least one valid SPC claim and that the total amount of compensation for which the Class Members were currently eligible on those claims was $329,400. The Claims Administrator sent those claimants an "Approved with Defects" notice, giving them the option of either attempting to cure the Defects in an effort to get greater compensation or accepting the compensation for which they currently qualify.

o   Between the amounts allocated through SPC-determined claims and the amounts to be allocated through the "Approved with Defects" claims, the total SPC compensation for which Class Members qualified as of the end of the Reporting Period amounted to more than $66.2 million.

o   Of the $66.2 million awarded to the 22,586 Class Members with approved SPC claims, $56.8 million has been paid to 20,899 Class Members. The remaining 1,687 Class Members had not been paid as of the end of the Reporting Period because they had payment complications that had not yet been resolved. Approximately thirty-seven percent (37%) of those Class Members had healthcare liens that were still being resolved because their claims had just reached a final determination in the third or fourth quarter of 2016. In addition, approximately twenty-three percent (23%) of the Class Members who had not received payment by the end of the Reporting Period were impacted by pending bankruptcy and/or probate complications. The remaining forty percent (40%) have other complications precluding payment, including child support obligations, liens asserted by settlement advance lenders or other persons or entities, general payment defects resulting from the Class Members' failure to

3

provide necessary information on their POCFs, selection for random audit, and pending Requests for Review.[2]

- Class Members continue to be approved for enrollment in the PMCP.

    o During the Reporting Period, the Claims Administrator sent PMCP Notices of Determination to 78 Class Members, for a total of 27,214 over the life of the Settlement.

This information is discussed in greater detail below.

## II.    DETAILED CLAIMS PROGRESSION

Through the end of the Reporting Period, the Claims Administrator has received 37,230 unique claims for compensation for an SPC and/or participation in the PMCP. The number of total claims receiving a final determination or clearing lien resolution continued to increase throughout the Reporting Period. Of the 37,230 total claims filed, 37,053, or ninety-nine percent (99%), have been processed to a final determination, and 177, or one percent (1%), require additional processing.[3]

Of the claims reaching a final determination,

- 22,683, or sixty-one percent (61%), were approved for compensation for an SPC, with 22,586, or ninety-nine percent (99%), of the 22,683 claims receiving a notice of final determination for compensation for an SPC and 20,899, or ninety-three percent (93%), of the 22,586 claims being paid;

- 983, or three percent (3%), did not seek the SPC compensation benefit and instead claimed and qualified for the PMCP benefit only;

- 3,818, or ten percent (10%), proved they were Class Members and qualified to receive the PMCP benefit but failed to prove they qualified for SPC compensation; and

---

[2] On December 12, 2017, after the end of the Reporting Period, the Court entered an order approving the *Deepwater Horizon* Medical Benefits Settlement Third-Party Lien Procedures (Rec. Doc. 23762). Those procedures establish a framework for resolving the claims asserted against Class Members' compensation by entities other than governmental and private health plans and should allow the Claims Administrator to clear a number of these complications in 2018.

[3] Over the Reporting Period, the Claims Administrator received 27 changes or updates to the 177 pending claims. The additional information must be processed through intake and then re-reviewed at each subsequent processing stage to determine its impact.

- 9,569, or twenty-six (26%), were denied because they (a) did not prove they were Class Members, (b) filed a valid opt-out, or (c) did not claim or prove a compensable SPC.

**Figure 1: Composition of All Finalized Claims**



Of the claims that require additional processing:

- twenty-four (24), or fourteen percent (14%), are pending Declaration Review or RAI processing;

- seventy-one (71), or forty percent (40%), have already received or are scheduled to receive a Notice of Defect and will need to submit additional information; and

- eighty-two (82), or forty-six percent (46%), are undergoing Medical Record Review.

**Figure 2: Composition of All Pending Claims**



Thus, the current overall composition of the all claims filed is as follows:

**Figure 3: Overall Composition of All Claims Filed**



III.   **CLAIMS FOR SPECIFIED PHYSICAL CONDITIONS**

A.   **Claimed Benefits and Compensation Level**

For the total 37,230 Proof of Claim Forms ("POCFs") received, Table 1 provides a breakdown of those that sought compensation for an SPC and participation in the PMCP and those that sought only participation in the PMCP.

| TABLE 1: POCF FILINGS AVAILABLE FOR INITIAL CLAIMS REVIEW | |
| --- | --- |
| | **Total** |
| **Total POCF Filings Available for Initial Claims Review** | **37,230** |
| Claims for Compensation for Both SPCs and Participation in the PMCP | 36,247 |
| Claims for PMCP Only | 983 |

The graph below provides a breakdown of the compensation levels claimed for all claims filed:

**Figure 4: Compensation Level Composition of All Claims Filed**



In Table 2 below, we provide statistics of the claimed compensation level in Section VII of the POCF as compared to the awarded compensation level. In over eighty-one percent (81%) of claims where the Class Member has claimed a single compensation level, that same level of compensation has been awarded. For the nineteen percent (19%) not awarded the claimed compensation level, the Claims Administrator has awarded both higher and lower compensation levels based on review of the POCF and supporting documentation provided.

| Table 2: Determined Compensation Level | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Qualified Compensation Level | A1 | | A2 | | A3 | | A4 | | B1 | | Grand Total |
| Section VII of POCF Claimed Compensation Level | Count | % | Count | % | Count | % | Count | % | Count | % | |
| A1 | 12,150 | 97.72% | 150 | 1.21% | 111 | 0.89% | 21 | 0.17% | 1 | 0.01% | 12,433 |
| A2 | 904 | 41.87% | 1,167 | 54.05% | 75 | 3.47% | 10 | 0.46% | 3 | 0.14% | 2,159 |
| A3 | 458 | 35.73% | 100 | 7.80% | 657 | 51.25% | 66 | 5.15% | 1 | 0.08% | 1,282 |
| A4 | 85 | 41.67% | 15 | 7.35% | 15 | 7.35% | 89 | 43.63% | | 0.00% | 204 |
| B1 | 589 | 48.52% | 493 | 40.61% | 101 | 8.32% | 9 | 0.74% | 22 | 1.81% | 1,214 |
| Multiple | 2,220 | 66.83% | 786 | 23.66% | 257 | 7.74% | 48 | 1.44% | 11 | 0.33% | 3,322 |
| None | 1,659 | 80.18% | 251 | 12.13% | 126 | 6.09% | 32 | 1.55% | 1 | 0.05% | 2,069 |
| Total | 18,065 | 79.64% | 2,962 | 13.06% | 1,342 | 5.92% | 275 | 1.21% | 39 | 0.17% | 22,683 |

### B.   Claims Requiring RAI and/or Notice of Defect

As has been the case historically, the majority of claims have received an RAI and/or a Notice of Defect according to the requirements of the MSA. During the Reporting Period, the Claims Administrator sent 4 RAIs and 60 Notices of Defect. Since the inception of the Settlement, the Claims Administrator sent 29,172 RAIs and 21,478 Notices of Defect.

| TABLE 3: RAIS AND NOTICES OF DEFECT | | |
|---|---|---|
| RAIs | Reporting Period | Total |
| RAIs Sent | 4 | 29,172 |
| Responses to RAIs Received | 4 | 21,088 |
| Defects | Reporting Period | Total |
| Notices of Defect Sent | 60 | 21,478 |
| Defect Cure Materials Received | 32 | 10,934 |

1.    Requests for Additional Information

Of the 4 RAIs sent during the Reporting Period, all were RAI-Incomplete.[4]  All RAIs sent during the Reporting Period were to claimants represented by counsel.  More than sixty-three percent (63%) of Claims have required at least one (1) RAI, and over fourteen percent (14%) have required the maximum of two (2) RAIs. The overall response rate to RAIs was seventy-one percent (71%), with claimants represented by counsel responding at a higher rate (seventy-six percent (76%)) than those who are unrepresented (fifty-seven percent (57%)).  The overall cure rate for responding to RAIs for both claimants represented by counsel and those unrepresented is approximately fifty-nine percent (59%).

As previously reported, failure to respond to or cure all deficiencies identified within an RAI-Incomplete will not necessarily result in the denial of a claim, because only some of a claimant's claimed or declared conditions may be deficient and included in the RAI.  In that circumstance, even if the claimant fails to respond to the RAI, the claimant might still receive compensation for the valid conditions in his or her declaration (assuming the claimant met the other requirements of the MSA).   These RAI processing standards and distinctions are highlighted in the "Frequently Asked Questions About Declarations and Requests for Additional Information" available on the Claims Administrator's website.  In addition, a copy of this FAQ is included with each RAI sent from the Claims Administrator, and we have call center representatives and firm liaisons available to provide assistance.

---

[4] Under the Party-approved RAI process, a claimant may receive an RAI-Missing for failing to submit a first-party injury declaration with his or her original POCF.  If the claimant submits a first-party injury declaration that omits necessary information, either in response to an RAI-Missing or at another point in the claims process, the claimant may receive an RAI-Incomplete.  For each RAI sent by the Claims Administrator, the claimant has sixty (60) days to respond.  A claimant may receive only one (1) RAI-Missing and one (1) RAI-Incomplete, as applicable.

2.    Notices of Defect

Of the 21,478 Notices of Defect sent through the end of the Reporting Period, twenty-two percent (22%) were sent to unrepresented claimants or Class Members, and seventy-eight percent (78%) were sent to claimants or Class Members represented by counsel. More than eighty-one percent (81%) were sent to Class Members claiming to be or approved as Clean-Up Workers. Approximately fifty-two percent (52%) of the Notices of Defect sent listed multiple Defects. More specifically, thirty percent (30%) identified two (2) through five (5) Defects, twelve percent (12%) identified six (6) through ten (10) Defects, and ten percent (10%) identified more than ten (10) Defects.

Of the 21,478 Notices of Defect sent through the end of the Reporting Period, fifty-six percent (56%) include Defects identified during initial claims review and prior to the Medical Record Review stage. Fifty-five percent (55%) of the 60 Notices of Defect sent during the Reporting Period identified at least one Defect prior to the Medical Record Review stage in the claims process. The five (5) most common material Defects identified for the population are as follows:

- "Missing Declaration of Injury document";
- "Missing Medical Records documentation";
- "Documentation included with the claim does not establish that the claimant was employed as a Clean Up Worker between the dates of April 20, 2010 and April 16, 2012";
- "Missing Third Party Witness Injury Declaration document"; and
- "Proof Of Residency Documents Failed To Prove Residence For 60 Days Between April 20, 2010 And September 30, 2010 for Zone A."

Of the 21,478 Notices of Defect sent through the end of the Reporting Period, forty-one percent (41%) include Defects identified during the Medical Record Review process. Forty-five

11

percent (45%) of the 60 Notices of Defect sent during the Reporting Period identified at least one

Defect subsequent to the Medical Record Review stage in the claims process. The five (5) most

common material Defects identified during the Medical Record Review process are as follows:

- "No medical records were submitted or the documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION";

- Generally – "The medical records do not meet the criteria set forth in Level A2, A3, A4, and/or B1 of the Specified Conditions Matrix." Specifically – "The date of first diagnosis for the claimed SPECIFIED PHYSICAL CONDITION occurred on or after April 16, 2012. This claimed condition does not qualify as a SPECIFIED PHYSICAL CONDITION as set forth on the SPECIFIED PHYSICAL CONDITIONS MATRIX"[5];

- "The documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION";

- "The medical records do not meet the criteria set forth in Level A2 of the Specified Conditions Matrix: The medical records submitted do not support the assertions in the declaration concerning the time of onset of the claimed SPECIFIED PHYSICAL CONDITION following the alleged exposure as set forth in the SPECIFIED PHYSICAL CONDITIONS MATRIX"; and

- "The third-party declaration does not meet the criteria set forth in Level A1 of the Specified Physical Conditions Matrix: The third-party declaration was not signed by the individual submitting the third-party declaration."

As of the end of the Reporting Period, the response period had expired for 21,404

(ninety-nine percent (99%)) of claims having received a Notice of Defect. The overall response

rate was forty-nine percent (49%). The response rate for unrepresented claimants or Class

Members was thirty-five percent (35%), while the response rate for represented claimants or

Class Members was fifty-three percent (53%). As previously reported, failure to respond to or

cure all Defects identified within a Notice of Defect will not necessarily result in the denial of a

---

[5] This Defect results from the Court's July 23, 2014 Order (Rec. doc. 12862) holding that all conditions first diagnosed after April 16, 2012 must be classified as Later-Manifested Physical Conditions. Notably, the Claims Administrator does not automatically deny claims where the medical records initially submitted with the claim indicate a date of first diagnosis after April 16, 2012. Rather, we issue a Notice of Defect to afford the Class Member the opportunity to provide medical record evidence of the diagnosis that pre-dates April 16, 2012. If the Class Member does not submit any such records, the Class Members claim for SPC compensation would be denied, but the Class Member would be free to pursue compensation for that condition as an LMPC.

claim, because only some aspects of a claimant's claim may be defective and listed in a Notice of Defect. In that circumstance, even if the claimant failed to respond to the Notice of Defect or to cure all of the Defects listed in it, the claimant might still receive compensation. Specifically, of claimants or Class Members who received a Notice of Defect that included Defects identified during the Medical Record Review process, eighty-seven percent (87%) were subsequently found to qualify for SPC compensation. Furthermore, a claimant who has a Defect in his or her claim for compensation for an SPC but has proven that he or she is a Class Member will receive a Notice of Determination for the PMCP benefit. Hence, such Class Member can take advantage of that benefit while attempting to cure the Defects in his or her claim for SPC compensation.

C.    **Claims Processed Through Each Stage of Claims Review**

As discussed above, a significant percentage of the POCFs submitted continue to contain one or more deficiencies or Defects. These deficiencies and Defects not only increase the amount of time it takes for a claimant to reach the determination stage, but also increase the time it takes the Claims Administrator to process the claims. The Claims Administrator must wait as long as sixty (60) or 120 days to receive the responses to the RAIs and/or Notices of Defects, respectively, and then must process the responses.

During the Reporting Period, the Claims Administrator has reviewed and/or processed the following numbers of claims through each of the following sequential stages in the claims review process:

| TABLE 4: CLAIM REVIEW PROCESSING | | |
|---|---|---|
| Processing Stage | Number of Claims[6] | |
| | Reporting Period | Total |
| Notice of Defect Gate One Process (Which Includes Class Membership Defects)[7] | 33 | 12,073 |
| Declaration Review Process[8] | 133 | 41,950 |
| RAI Process[9] | 4 | 29,172 |
| Medical Record Review Process[10] | 36 | 31,087 |
| Notice of Defect Gate Two Process[11] | 27 | 9,405 |

### D.   Claims Sent Dispositive Correspondence for a Specified Physical Condition

The overall percentage of all claims reaching final determination has increased over the Reporting Period to ninety-nine percent (99%). During the Reporting Period, we sent SPC Notices of Determination to 201 Class Members, approving them for $941,179 in compensation. Since the inception of the Settlement, we sent SPC Notices of Determination to 22,586 Class Members, approving them for $65,927,622 in compensation. Over this Reporting Period, the total percentage of finalized Claims moving to an approved determination remained at sixty-one percent (61%).

The Claims Administrator also sent eight (8) "Approved with Defects" notices during the Reporting Period, bringing the total number of "Approved with Defects" notices sent since inception to 3,043. An "Approved with Defects" notice is sent to a Class Member who has at least one valid SPC but one or more other SPCs that contain a Defect and might result in an

---

[6] Claims can move through Declaration Review (due to responses to RAI), the RAI Process (due to a defective response to an RAI-Missing, resulting in an RAI-Incomplete), and Medical Record Review (due to cure responses to originally defective claims) multiple times.

[7] Total claims with Gate One Defects, including basis of participation Defects, which received a Notice of Defect. Gate One Defects are those such as "Missing Declaration of Injury Document" or "Missing Medical Records Documentation," which prevent a claim from moving to Medical Record Review.

[8] Total number of injury declaration reviews completed. A claim may go through this process more than once as a result of RAI responses.

[9] Total claims requiring an RAI that received a RAI.

[10] Total claims that were reviewed by Claims Administrator's Medical Record Review staff.

[11] Total claims that have completed Medical Record Review but that contain Defects preventing a final determination.

award of higher compensation. A Class Member receiving this notice can choose either to attempt to cure the Defects and thus possibly receive greater compensation or to waive that opportunity and proceed to determination on his or her valid SPC(s). Two thousand nine hundred ninety-two (2,992) of the 3,043 Class Members who received an "Approved with Defects" notice subsequently received an SPC Notice of Determination. The total compensation for the remaining 51 Class Members who received an "Approved with Defects" notice but who have not yet received an SPC Notice of Determination is $329,400. Therefore, the total amount allocated (by SPC Notices of Determination) and to be allocated (by "Approved with Defects" letters) is $66,257,022.

The Claims Administrator sent 98 Notices of Denial during the Reporting Period, for a total of 13,380 Notices of Denial from the inception of the Settlement through the end of the Reporting Period. All of these claims have been denied because the claimant did not qualify as a Class Member, because the claimant opted out of the settlement, and/or because the claimant did not meet the criteria established by the MSA to receive compensation for an SPC.

A summary of the dispositive correspondence sent on claims for compensation for an SPC is set forth in Table 5, below.

| TABLE 5: CLAIMS DISPOSITION AND CORRESPONDENCE | | |
|---|---|---|
| Notice Type | Reporting Period | Total |
| SPC Notices of Determination Sent | 201 | 22,586 |
| Notices of Denial Sent | 98 | 13,380 |

### E.    Claims Approved for SPC Compensation

During the Reporting Period, the amount of SPC compensation for which Class Members were approved increased, as reflected in Table 6, below.

| SPC | TABLE 6: APPROVED CLAIMS FOR SPCs[12] | | | | | |
|---|---|---|---|---|---|---|
| SPC | Reporting Period Number Approved | Total Number Approved to Date | Reporting Period Amount Approved | Total Amount Approved to Date | Total "Approved with Defects" Amount Allocated to Date | Total Compensation Allocated to Date |
| A1 | 122 | 18,030 | $149,000 | $22,859,000 | $11,700 | $22,870,700 |
| A2 | 68 | 2,902 | $636,929 | $22,978,324 | $299,950 | $23,278,274 |
| A3 | 7 | 1,341 | $86,450 | $16,965,582 | $12,350 | $16,977,932 |
| A4 | 3 | 274 | $8,100 | $786,916 | $5,400 | $792,316 |
| B1 | 1 | 39 | $60,700 | $2,337,800 | $0 | $2,337,800 |
| Total | 201 | 22,586 | $941,179 | $65,927,622 | $329,400 | $66,257,022 |

As set forth in the MSA, Class Members can only be paid once certain potential obligations to third parties are identified and resolved. The resolution of these obligations is dependent upon the responsiveness of both governmental agencies and private interests in replying to the Claims Administrator's requests for information and resolution. The obligations fall into two general categories: healthcare-related obligations and other obligations.

The resolution of healthcare obligations involves confirming whether a Class Member received benefits from a governmental payor (such as Medicare, Medicaid, or the Veterans' Administration) or a private healthcare plan for a compensable injury such that the Class Member must now reimburse those entities for the amounts they paid. The processing phases include (1) confirming entitlement with the government agency or private plan, (2) receiving claims from the agency or plan, (3) auditing those claims and disputing any that are unrelated to the Class Member's compensable injury, and (4) final resolution. Pursuant to the terms of the

[12] Please note that the total volumes and total dollars approved are subject to change in each Reporting Period due to later received and processed Requests for Review.

MSA, the Claims Administrator obtained an agreement from CMS establishing capped repayment amounts per SPC for Class Members who are or were beneficiaries of Medicare. The Claims Administrator also negotiated with state Medicaid agencies to cap recovery for Medicaid-entitled Class Members. Most states agreed to waive recovery rights for Class Members receiving compensation for an A1 claim. Additionally, most state Medicaid agencies agreed to a twenty percent (20%) cap on and up to a thirty-five percent (35%) offset for fees and costs typically associated with their recovery, thereby allowing partial funding to the Class Member while full resolution is pending. Processing times for Medicaid-entitled Class Members eligible for payment will vary. Each state has its own processing standards for responding to entitlement requests, producing claims, and finalizing lien amounts.

The resolution of non-healthcare-related obligations involves identifying the various types of obligations and working with the claimant or the claimant's representative to resolve them. The processing phases include (1) identifying the obligation (through review of claim documents, PACER searches, and searches of the Louisiana Child Support Database), (2) sending correspondence seeking documentation that will resolve the complication, (3) reviewing the submitted documentation for sufficiency, and (4) final resolution. The Claims Administrator tracks responses to its correspondence and sends a follow-up letter to non-responsive parties after thirty (30) to sixty (60) days have passed (with the length of time depending on the complication). We will also send follow-up correspondence when the responses contain insufficient documentation. The resolution time for payment complications varies and remains heavily dependent upon the timeliness and sufficiency of the third parties' responses to our information requests. Through the end of the Reporting Period, the average age

of claims awaiting payment from the date of final determination is approximately 158 days depending on the complexity of the payment complications.

Once the obligations affecting a given claim are resolved and any liens or reimbursement obligations are paid, the Claims Administrator is able to disburse the balance of the Class Member's compensation.

### F.   Data Disclosure Form Submissions and Results

Data Disclosure Forms may be filed at any time during the claims review process by Natural Persons seeking information from the databases, data fields, and other documentary evidence provided by BP to the Claims Administrator. Notably, Data Disclosure Forms may continue to be filed *after* the submission of a Proof Claim Form and therefore can be filed *after* the claims filing deadline of February 12, 2015. Information provided via the submission of a Data Disclosure Form allows the Claims Administrator to make a determination concerning (a) the status of a Natural Person claiming to be a Clean-Up Worker and/or (b) a claim made by a Clean-Up Worker for compensation for a Specified Physical Condition. *See* MSA § XXI.B.

During the Reporting Period, the Claims Administrator received 6 Data Disclosure Forms, for a total of 27,245 Data Disclosure Forms since the approval of the MSA. The Claims Administrator responded to 9 Data Disclosure Forms during the Reporting Period, bringing the total number of responses to 32,958 since the approval of the MSA. Of the 27,245 Data Disclosure Forms received, 20,545 were related to unique claimants, while 6,700 were Data Disclosure Forms with additional information filed by the same claimants. Among the unique claimants filing Data Disclosure Forms, eighty-four (84%) were confirmed as Clean-Up Workers by finding a match in at least one employer database other than the "Training" database. Twelve percent (12%) of those unique claimants were matched in the "Medical Encounters" database,

while nineteen percent (19%) were matched in a medically relevant database, such as the
"Traction" database or the "Injury/Illness" database.

## IV.    CLASS MEMBER SERVICES CENTER ACTIVITY

The Claims Administrator operates a Class Member Services Center located in New
Orleans to communicate with Class Members and their attorneys and to assist them with filing
their claims.  During the Reporting Period, the Class Member Services Center received 5,399
telephone calls.  Since opening, the Class Member Services Center has received a total of
209,310 telephone calls.  The Class Member Services Center handled an average of 83 calls per
day.  The average length of each telephone call was seven minutes and thirty-nine seconds, with
an average wait time of fifty-five seconds.  The Class Member Services Center also received 29
emails during the Reporting Period.

| TABLE 7: CLASS MEMBER SERVICES CENTER | | |
|---|---|---|
| | Reporting Period | Total |
| Calls Received | 5,399 | 209,310 |
| Average Length of Call (min:sec) | 7:39 | 6:39 |
| Average Wait Time (min:sec) | 0:55 | 0:48 |
| Emails Received | 29 | 3,107 |
| Walk-Ins | 2 | 739 |

## V.    PERIODIC MEDICAL CONSULTATION PROGRAM

### A.    Class Members Eligibility for and Participation in the PMCP

During the Reporting Period, the Claims Administrator approved 147 claims for
participation in the PMCP and mailed 78 PMCP Notices of Determination.  Since the inception
of the Settlement, the total number of Class Members receiving a PMCP Notice of
Determination is 27,214.  The Claims Administrator received requests for and scheduled 184

physician visits during the Reporting Period, and Class Members attended 181 appointments in the Reporting Period.

| TABLE 8: PERIODIC MEDICAL CONSULTATION PROGRAM | | |
|---|---|---|
| | Reporting Period | Total |
| Class Members Approved to Receive Physician Visits[13] | 147 | 27,338 |
| PMCP Notices of Determination Sent | 78 | 27,214 |
| Physician Visits Requested and Scheduled | 184 | 3,269 |
| Appointments Attended by Class Members | 181 | 3,231 |
| Annual Update Letters Sent to Class Members | 5,996 | 38,680 |

### B.    Provider Network

During the Reporting Period, the Claims Administrator added one (1) medical provider organization, with one (1) delivery site, to its network of providers established to provide certain covered services to Class Members who participate in the PMCP, bringing the total number of medical provider organizations to 205. These medical provider organizations represent 478 service delivery sites. As a result of these additions, ninety-eight percent (98%) of eligible Class Members who have requested a PMCP evaluation resided within twenty-five (25) miles of a network provider at the conclusion of the Reporting Period. The Claims Administrator continues to expand the medical provider network in its efforts to ensure that no Class Member will have to wait more than thirty (30) days or travel more than twenty-five (25) miles for an appointment.

### VI.    BACK-END LITIGATION OPTION

During the Reporting Period, six (6) Class Members filed Notices of Intent to Sue for compensation for a Later-Manifested Physical Condition, bringing the total number to 480 Class Members to date. Of the six (6) Notices of Intent to Sue filed in the Reporting Period, five (5)

---

[13] The total physician visits will exceed the total number of Class Members qualified for the PMCP benefit, as Class Members may be referred to specialists and will eventually be eligible for subsequent primary visits.

contained deficiencies that could be corrected by the Class Member and one was pending review under the materiality assessment.

| TABLE 9: CLAIMS FOR LATER-MANIFESTED PHYSICAL CONDITIONS | | |
|---|---|---|
| | Reporting Period | Total |
| Notices of Intent to Sue Filed | 6 | 480 |
| Notices of Intent to Sue Approved | 0 | 53 |
| Notices of Intent to Sue Denied | 0 | 184 |
| Notices of Intent to Sue Deficient[14] | 5 | 242 |
| Notices of Intent to Sue Under Review | 1 | 1 |

Of the 184 claims denied to date, ninety-nine percent (99%) were denied because the conditions claimed were diagnosed on or before April 16, 2012 and therefore could not be claimed as Later-Manifested Physical Conditions. The other reasons for denial include, among other things, that the claim was precluded by a previously filed workers' compensation claim.

Of the 242 defective claims to date, the three (3) most common material Defects identified are as follows:

- "Identification of BP defendants in Section VII is missing";

- "You must provide medical records indicating a date of diagnosis that is after April 16, 2012 or a completed Physician's Certification Form"; and

- "The date on which the claimed Later-Manifested Physical Condition(s) were first diagnosed in Section VI.A.2 is missing."

---

[14] Class Members who cure Defects within their original Notice of Intent to Sue will then be classified as "Approved" or "Denied" in future reporting, based on the responses received.

| TABLE 10: APPROVED NOTICES OF INTENT TO SUE | | |
|---|---|---|
| **Mediation Elections** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which at Least One BP Defendant Elected Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Pending a Decision from One or More BP Defendants Regarding Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims for Which No BP Defendants Elected Mediation | 0 | 53 |
| | | |
| **TOTAL:** | **0** | **53** |
| | | |
| **Results of Mediation** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims Settled by Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Settled by Mediation as to One but Not All BP Defendants Listed in the Notice of Intent to Sue | 0 | 0 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLAIMS MEDIATED:** | **0** | **0** |
| | | |
| **Back-End Litigation Option Lawsuit** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which No BP Defendant Elected Mediation | 0 | 53 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLASS MEMBERS ELIGIBLE TO FILE A BACK-END LITIGATION OPTION LAWSUIT[15]** | **N/A** | **8** |

Out of the fifty-three (53) approved Notices of Intent to Sue to date, the BP Defendants did not

elect to mediate any of the claims.  Of the fifty-one (53) claims eligible to file a Back-End

Litigation Option Lawsuit over the life of the Settlement, eighteen (18) had filed as of the end of

---

[15] The total eligible for the Back-End Litigation Option over the life of the Settlement was fifty-three (53). However, of the fifty-three (53), only eight (8) are currently eligible for the Back-End Litigation Option. The other forty-five (45) claims are no longer within the six-month (6-month) timeframe for properly and timely filing a Back-End Litigation Option Lawsuit.

the Reporting Period. The total number of Class Members still eligible to file a Back-End Litigation Option Lawsuit through the end of the Reporting Period was eight (8).

## VII.   GULF REGION HEALTH OUTREACH PROGRAM

### A.   Funding and Coordinating Committee Activities

In accordance with Section IX of the MSA, the Gulf Region Health Outreach Program ("GRHOP") was established in May 2012 to expand capacity for and access to high quality, sustainable, community-based healthcare services, including primary care, behavioral and mental health care and environmental medicine, in the Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle. The program consists of five (5) integrated projects: the Primary Care Capacity Project ("PCCP"), Community Involvement ("CI"), the Mental and Behavioral Health Capacity Project ("MBHCP"), the Environmental Health Capacity and Literacy Project ("EHCLP"), and the Community Health Workers Training Project ("CHWTP"). As of the end of the Reporting Period, the Claims Administrator disbursed $104,713,294 to the projects, as detailed in the chart below.

| TABLE 11: GRHOP | |
|---|---|
| **Project** | **Funding to Date** |
| Primary Care Capacity Project | $46,655,925 |
| Community Involvement | $3,213,491 |
| Mental and Behavioral Health Capacity Project ((Louisiana State University Health Sciences Center) | $14,359,145 |
| Mental and Behavioral Health Capacity Project (University of Southern Mississippi) | $8,256,486 |
| Mental and Behavioral Health Capacity Project (University of South Alabama) | $8,256,489 |
| Mental and Behavioral Health Capacity Project (University of West Florida) | $5,025,696 |
| Environmental Health Capacity and Literacy Project | $14,957,416 |
| Community Health Workers Training Project | $3,988,646 |
| | |
| **TOTAL:** | **$104,713,294** |

The final disbursement was made in May 2016, which accounted for an eighteen (18) month low-cost extension of the GRHOP, as agreed upon by the Parties and Coordinating Committee members. All projects, except for Community Involvement,[16] will participate in this extension period. Estimated administrative costs during the extension period, totaling $286,706, were accounted for by the Claims Administrator, with all projects contributing to these costs. Therefore, the May 2016 disbursement brought the total funding to the GRHOP to $104,713,294.

The GRHOP is governed by a Coordinating Committee that continues to function in a cooperative and integrated manner, with quarterly in-person meetings around the Gulf Coast, as well as monthly conference calls. These quarterly meetings offer the grantees the opportunity to share their progress, discuss challenges faced, and collaborate with their partners to work through issues that affect the GRHOP as a whole.

---

[16] Community Involvement chose not to participate in the eighteen (18) month low-cost extension.

The Claims Administrator held a quarterly meeting on July 28, 2017, in New Orleans, Louisiana.[17]   This meeting covered the activities of two (2) of the five (5) GRHOP subcommittees — the Publication and Evaluation Subcommittees.[18] During the meeting, discussions were had regarding different forms of publication beyond traditional journal articles, as well as the continuation of collaborative publication efforts. The Evaluation Subcommittee reviewed strategies, including an enterprise approach, to assess the collective impact and sustainability of the projects. Additionally, each project gave an update on their activities in the last quarter. The members also discussed their priorities and goals for the remainder of the year, and for the following year.

In addition to administering the conferences and quarterly meetings for the GRHOP Coordinating Committee, the Claims Administrator continues to manage the GRHOP website. The website launched on July 3, 2014 and can be publicly accessed at www.grhop.org.   The website contains detailed descriptions and notable accomplishments of each project, as well as information regarding the GRHOP Coordinating Committee, news/events, and publications.

### B.    GRHOP Project Updates

The GRHOP projects have made substantial progress in achieving the goals set forth in their Grant Proposals. Some notable accomplishments of the projects include:

- The **Primary Care Capacity Project**, led by the Louisiana Public Health Institute ("LPHI"), which has:

  o Through the Technical Assistance ("TA") team, assisted Coastal Family Health Centers in planning and implementing a Medicare Chronic Care Management program. The TA team has also completed their engagement with Bayou Clinic to

---

[17] The Claims Administrator held its next quarterly meeting on November 17, 2017 in Pensacola, FL. The Claims Administrator will report on that meeting in its next status report.

[18] The five (5) GRHOP subcommittees include: the Data Sharing Subcommittee, Evaluation Subcommittee, Health Promotions Subcommittee, Newsletter Subcommittee, and Publication Subcommittee. These subcommittees were formed during the July 31, 2014 quarterly meeting.

improve Uniform Data System clinical quality measure for colorectal cancer screening and cervical cancer screening;

o   Presented the quarterly Regional Care Collaborative webinar on August 31, 2017. Richard Bell from Active Living by Design shared his organization's experiences, best practices, and lessons learned from implementation of the Community Centered Health Home model in North Carolina;

o   Facilitated final editing for the Emergency Management Initiative toolkit and hosted the release of the product to state Primary Care Associations ("PCA"). The toolkit includes fourteen (14) work-plan/coaching guides, over thirty (30) tools, and access to additional resources to best meet the needs of the PCAs and Community Health Centers;

o   Completed and disseminated a final report about the Community Centered Health Homes ("CCHH") demonstration project. The report summarized the Demonstration project, presented findings from the program evaluation, and outlined future opportunities for the CCHH model to provide value to healthcare organizations and their communities;

o   Continued to execute final closing efforts with each of the eleven (11) Federally Qualified Health Centers ("FQHC") participating in the Greater New Orleans PCCP Quality Incentive Initiative ("GNOPQii"); and

o   Continued to support two (2) system investments related to advancing health information technology and coordination in Mississippi and Alabama.

- **Alliance Institute's** outreach on behalf of the GRHOP and its partners has reached over 1,500 individuals across Louisiana, Mississippi, Alabama, and Florida. Alliance Institute, the grantee responsible for Community Involvement, has:

o   Disbursed approximately $1,700,000 in grants to community-based organizations ("CBOs") across  four Gulf states, including eight (8) in Louisiana, four (4) in Mississippi, three (3) in Alabama, and three (3) in Florida;

o   Provided community organizing training and capacity building assistance to achieve the goal of increasing economic and social equity through community engagement;

o   Established a Regional Coalition to examine and address issues with insurance in disaster prone areas;

o   Developed new partnerships between CBOs and GRHOP partners, as well as local community health clinics; and

o   Hosted a number of events across the Gulf states, including:

▪   "Affordable Care Act and Access to Health Care Along the Gulf Coast: A Symposium",

- Community involvement trainings for the Community Health Worker program, and

- Regional Community Involvement Convening to network, build programming skills, and focus on collaborative strategies.

- The **Environmental Health Capacity and Literacy Project** ("EHCLP"), with its grantee being Tulane University, has achieved the following:

  o Occupational and Environmental Health Specialty Network:

    - As of September 30, 2017, a total of 264 patients have been entered into The Association of Occupational and Environmental Clinics' ("AOEC") database of clinical environmental and occupational health visits. This includes thirty-six (36) patients for 2017.

  o Training and Leadership Development:

    - The three (3) Emerging Scholars Environmental Health Science Academies at Tulane University, University of Southern Alabama, and University of West Florida successfully finished two (2) months of training at the end of July for twenty-four (24) public high school students.

    - The University of Southern Mississippi held two (2) science teacher workshops in July for twenty-five (25) teachers.

  o Community Resilience and Family Wellness

    - Tulane Building Early Relationships Support and Services ("TBEARS") served thirty (30) families, with a total of seventeen (17) home or clinic visits and twelve (12) phone and/or warmline sessions. In addition, the program served twenty-five (25) families through parent education support groups.

    - EHCLP supported nine (9) GRHOP-placed community health workers ("CHW") to attend the Unity Conference, a national conference for and about CHWs, in Dallas, Texas. The conference was an excellent professional development experience for the CHWs. At the conference, Ginni Tran, a GRHOP CHW working at Mercy Housing and Human Development in Gulfport, Mississippi, received the Esther M. Holderby Dedicated CHW Award in recognition of a mid-career CHW who has overcome personal adversity to promote health in his or her community.

- The **Community Health Workers Training Project**, directed by the University of South Alabama's Coastal Resource and Resiliency Center ("CRRC"), has:

  o Notified selected participants of the Community Health Worker ("CHW") Evaluation Retreat and of the Chronic Disease Management Training session, obtained signed

27

participant agreements, and completed internal paperwork to arrange for payment of stipends;

o   Presented an "Array of Human Effects of Oil Spills," at a workshop sponsored by the National Academy of Sciences – "Preparing for a Rapid Response to Major Marine Oil Spills: A Workshop on Research Needs to Protect the Health and Well-being of Communities" – on August 2, 2017 in Washington, D.C.;

o   Hosted a CHW Evaluation Retreat in Mobile, Alabama on August 20-22, 2017. Participants included twenty-eight (28) CHWs and seven (7) CHW supervisors;

o   Attended the Mitchell Cancer Institute's Community Action Network Training on August 30, 2017; and

o   Hosted the Chronic Disease Management Training Session in Mobile, Alabama on September 24-29, 2017. Twenty-one (21) participants completed the rigorous training session.

• The **Mental and Behavioral Health Capacity Project**, implemented by a coalition of four (4) academic institutions (Louisiana State University Health Sciences Center ("MBHCP-LA"), the University of Southern Mississippi ("MBHCP-MS"), the University of South Alabama ("MBHCP-AL"), and the University of West Florida ("MBHCP-FL")), has achieved the following:

o   MBHCP-LA has:

 ▪   Continued to provide mental and behavioral health direct services, including therapeutic services, strength based supportive services, brief interventions and evaluations, community outreach, trainings, and workforce development;

 ▪   Continued to provide services for addiction psychiatry via telepsychiatry, which increased the availability of addiction specialists and supported patient privacy and treatment engagement;

 ▪   Made progress towards sustainable collaborative care in the FQHCs and Community Clinics by moving towards contract development with four (4) of the FQHCs;

 ▪   Completed initial complementary activities with the Gulf States Health Policy Collaborative ("GS-HPC") to strengthen the voice of local communities across a broad range of disaster and general health issues affecting the health and positive well-being of high-risk populations throughout the Gulf States. Future collaboration is planned to continue this initiative; and

 ▪   Extended clinical services for the Perinatal Maternal and Infant Health program at the University Medical Center Maternal Fetal Medicine Clinic to Touro Infirmary, the primary facility for delivery. The extension of services will allow for a continuum of care.

28

- o MBHCP-MS has achieved the following:

  - ▪ Twelve (12) Master of Social Work ("MSW") student interns began the integrated health internship with the Mississippi Integrated Health and Disaster Program ("M-IHDP") for the 2017-2018 academic year. The internship emphasizes the importance of interpersonal communication skills, interdisciplinary teamwork, clinical skill in assessment and intervention in a fast-paced primary care environment, and systems-oriented practice.

  - ▪ The Clinical Director, two (2) social work Team Leaders, and the Registered Dietitian attended the "12th Annual Obesity Summit: New Strategies for Diabetes, Obesity, and Cardiovascular Disease Management," hosted by the Cleveland Clinic and The National Diabetes and Obesity Research Institute. Attendance at this summit provided M-IHDP staff with helpful information in managing the needs of diabetic and obese patients.

  - ▪ M-IHDP social workers continued to assist with Health Care for the Homeless eligibility screening at various clinics. These screenings help homeless patients of the FQHC gain access to complementary medical and mental health services and no cost or reduced cost medications through the FQHC.

  - ▪ M-IDHP administration and staff continued to be involved in inter-professional collaboration and community initiatives designed to positively impact vulnerable populations served by the program, such as the Diabetes Coalition of Mississippi.

  - ▪ Care coordination services provided by Licensed Certified Social Workers continued to be an added sustainability measure for social workers within the FQHC.

  - ▪ The Clinical Director and the Research Assistant successfully completed the Youth Mental Health First Aid ("MHFA") Instructor certification. The certification prepares individuals to train the general public on the Youth MHFA curriculum, including education on the unique risk factors and warning signs of common mental health disorders seen in adolescence, understanding of the importance of early intervention, and skills necessary to provide help to an adolescent experiencing a mental health crisis.

- o MBHCP-AL has:

  - ▪ Advanced its mission to facilitate a trauma informed community by creating and filling a new position — Women's Mental Health and Trauma Services Coordinator. The coordinator, Dr. Candice Selwyn, and project leader, Dr. Jennifer Langhinrichsen-Rohling, are co-leading the Gulf Coast Behavioral Health and Resiliency Center's trauma-focused initiative. The initiative will include: screening for domestic violence in the women's health clinic; teaching trauma informed care to developing professionals, including those in the University of South Alabama Clinical and Counseling Psychology Doctoral

Program; partnering with law enforcement and the Rape Crisis Center on grant initiatives; partnering with Louisiana State University Health Sciences Center on their multi-state Trauma and Disaster Coalition for Children and Families; and analyzing and disseminating data associated with screenings for stress and trauma symptoms in primary care settings;

- Conducted six (6) session trainings on Brief Cognitive Behavioral Interventions with the Mobile Police Department's Family Intervention Team ("FIT"). The project has continued to provide mental health trainings to a broad swath of law enforcement officials participating in Crisis Interventional Team training;

- Returned to activity in the school system, including: providing Bullying 101 training to hundreds of children in Baldwin County; restarting the Attention Problems Presented in the Learning Environment ("APPLE") team; and hosting twenty-eight (28) International Baccalaureate students from Murphy High School; and

- Continued to promote integrated care in pediatric clinics, by presenting two (2) posters and a talk at the Developing and Researching Advanced Models of Integrated Primary Care Conference, and creating a pediatric psychology integrated care workgroup that meets for monthly case conferencing.

o MBHCP-FL has:

- Continued working with a local Assisted Living Facility to engage seniors through coloring and conversation. The project has also actively worked to recruit volunteers to sustain the engagement;

- Continued work with partner agencies to provide technical assistance as the project winds down; and

- Started recruitment for the group session, Down with Diabetes. The group session combines counseling services and diabetes education.

## C. GULF REGION HEALTH OUTREACH PROGRAM LIBRARY

In accordance with Section IX.H of the MSA, the Claims Administrator has established a publicly accessible online library, which exists as a repository of information regarding information related to the health effects of the *Deepwater Horizon* incident, including, but not limited to: (a) the composition, quantity, fate, and transport of oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and contaminants used in Response Activities; (b) health risks and health studies relating to exposure

to oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and decontaminants used in Response Activities; (c) the nature, content, and scope of *in situ* burning performed during the Response Activities; and (d) occupational safety, worker production, and preventative measures for Clean-up Workers.

The library houses over 197,000 relevant documents, each tagged with a specific search category based on the type of information identified within the MSA. The Claims Administrator will continue to add Library Materials in accordance with the MSA.

Respectfully submitted,

*DEEPWATER HORIZON* MEDICAL BENEFITS
CLAIMS ADMINISTRATOR

By: /s/ Matthew L. Garretson
     Matthew L. Garretson

### CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of the electronic filing in accordance with the procedures established in MDL 2179, on this 20th day of December, 2017.

Respectfully submitted,

/s/ Matthew L. Garretson
Matthew L. Garretson