**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * | **MDL NO. 2179**<br><br>**SECTION: J**<br><br><br>**HONORABLE CARL J. BARBIER**<br><br>**MAGISTRATE JUDGE WILKINSON** |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class,<br><br>     Plaintiffs,<br>v.<br>BP Exploration & Production Inc., *et al.*,<br><br>     Defendants. | * * * * * * * * * * * * * | **NO. 12-CV-968**<br><br>**SECTION: J**<br><br><br>**HONORABLE CARL J. BARBIER**<br><br>**MAGISTRATE JUDGE WILKINSON** |

**STATUS REPORT FROM THE *DEEPWATER HORIZON*
MEDICAL BENEFITS SETTLEMENT CLAIMS ADMINISTRATOR**

The Garretson Resolution Group, the Claims Administrator of the *Deepwater Horizon* Medical Benefits Class Action Settlement (the "Settlement"), submits the following quarterly report to apprise the Court of the status of its work in processing claims and implementing the terms of the Medical Settlement Agreement (the "MSA") between October 1, 2017, and December 31, 2017, (the "Reporting Period").[1]  We have published 15 reports since Preliminary

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to their fully capitalized renderings in the MSA.

Approval in May 2012, and this marks the eleventh quarterly report filed since the claims filing deadline of February 12, 2015.  This status report provides:

- an executive summary of claims processed during the Reporting Period;

- a summary of claims for Specified Physical Conditions ("SPC") and significant developments concerning these claims;

- an update on the operations and activities of the Class Member Services Center;

- an account of participation in the Periodic Medical Consultation Program ("PMCP");

- a summary of claims for Later-Manifested Physical Conditions; and

- a summary of the activities of the grantees of the Gulf Region Health Outreach Program ("GRHOP") and the operations of the Gulf Region Health Outreach Program Library.

## I.   **EXECUTIVE SUMMARY**

The Claims Administrator has received 37,226 unique claims for compensation for an SPC and/or participation in the PMCP through the end of the Reporting Period.  This status report will provide an overview of the claims processing forecast for all claims filed, the variables influencing the progression of those claims, and the outcome of claims as they progress through the stages of review.  In summary:

- the Claims Administrator has completed its review of 37,144 claims, or ninety-nine percent (99%) of all claims filed, to determine whether they qualify for compensation for an SPC and/or participation in the PMCP.

  - Of the 37,144 claims that the Claims Administrator has fully reviewed, 22,782, or sixty-one percent (61%), were approved for compensation for an SPC, and another 4,799, or thirteen percent (13%), were approved to participate in the PMCP.  Furthermore, eight (8), or seventeen percent (17%), of the forty-six (46) claims currently going through the Notice of Defect process have received an "Approved with Defects" notice, meaning that the Medical Benefits Settlement Class Member ("Class Member") has been approved for at least one compensable SPC.

  - Overall, the claims filed in this settlement have been and continue to be impacted by high defect rates, with 28,870, or seventy-eight percent (78%), receiving either a Request for Additional Information ("RAI") or

2

Notice of Defect during the life of the claim.  Additionally, 19,769, or fifty-three percent (53%), have been and continue to be impacted by changes or updates the claimants made to their Proof of Claim Forms or supporting documentation, which require the Claims Administrator to re-review the claims.

 o The Claims Administrator is still reviewing 164, or one percent (1%), of the claims filed in this settlement to determine whether they qualify for SPC compensation or to participate in the PMCP.

- The compensation allocated and paid to SPC-determined claims continues to increase.

 o During the Reporting Period, the Claims Administrator approved 167 Medical Benefits Settlement Class Members ("Class Members") for nearly $800,000 in SPC compensation.  Since the inception of the Settlement, the Claims Administrator has approved 22,730 Class Members for $66.7 million in SPC compensation.

 o Additionally, the Claims Administrator determined that another twenty-seven (27) Class Members who had partially defective claims also had at least one valid SPC claim and that the total amount of compensation for which the Class Members were currently eligible on those claims was $159,100.  The Claims Administrator sent those claimants an "Approved with Defects" notice, giving them the option of either attempting to cure the Defects in an effort to get greater compensation or accepting the compensation for which they currently qualify.

 o Between the amounts allocated through SPC-determined claims and the amounts to be allocated through the "Approved with Defects" claims, the total SPC compensation for which Class Members qualified as of the end of the Reporting Period amounted to more than $66.8 million.

 o Of the $66.7 million awarded to the 22,730 Class Members with approved SPC claims, $60.6 million has been paid to 21,573 Class Members.  The remaining 1,157 Class Members had not been paid as of the end of the Reporting Period because they had payment complications that had not yet been resolved.  Approximately twenty-two percent (22%) of those Class Members had healthcare liens that were still being resolved because their claims had just reached a final determination in the third or fourth quarter of 2016.  In addition, approximately thirty-three percent (33%) of the Class Members who had not received payment by the end of the Reporting Period were impacted by pending bankruptcy and/or probate complications.  The remaining forty-five percent (45%) have other complications precluding payment, including child support obligations, liens asserted by settlement advance lenders or other persons or entities, general payment defects resulting from the Class Members' failure to

3

provide necessary information on their POCFs, selection for random audit, and pending Requests for Review.[2]

- Class Members continue to be approved for enrollment in the PMCP.

    o During the Reporting Period, the Claims Administrator sent PMCP Notices of Determination to sixty-two (62) Class Members, for a total of 27,272 over the life of the Settlement.

This information is discussed in greater detail below.

## II.   DETAILED CLAIMS PROGRESSION

Through the end of the Reporting Period, the Claims Administrator has received 37,226 unique claims for compensation for an SPC and/or participation in the PMCP.  The number of total claims receiving a final determination or clearing lien resolution continued to increase throughout the Reporting Period.  Of the 37,226 total claims filed, 37,144, or ninety-nine percent (99%), have been processed to a final determination, and eighty-two (82), or one percent (1%), require additional processing.[3]

Of the claims reaching a final determination,

- 22,782, or sixty-one percent (61%), were approved for compensation for an SPC, with 22,730, or ninety-nine percent (99%), of the 22,782 claims receiving a notice of final determination for compensation for an SPC and 21,573, or ninety-five percent (95%), of the 22,730 claims being paid;

- 982, or three percent (3%), did not seek the SPC compensation benefit and instead claimed and qualified for the PMCP benefit only;

- 3,817, or ten percent (10%), proved they were Class Members and qualified to receive the PMCP benefit but failed to prove they qualified for SPC compensation; and

---

[2] On December 12, 2017, after the end of the Reporting Period, the Court entered an order approving the *Deepwater Horizon* Medical Benefits Settlement Third-Party Lien Procedures (Rec. Doc. 23762).  Those procedures establish a framework for resolving the claims asserted against Class Members' compensation by entities other than governmental and private health plans and should allow the Claims Administrator to clear a number of these complications in 2018.

[3] Over the Reporting Period, the Claims Administrator received 27 changes or updates to the 177 pending claims. The additional information must be processed through intake and then re-reviewed at each subsequent processing stage to determine its impact.

- 9,563, or twenty-six (26%), were denied because they (a) did not prove they were Class Members, (b) filed a valid opt-out, or (c) did not claim or prove a compensable SPC.

**Figure 1: Composition of All Finalized Claims**



Of the claims that require additional processing:

- eight (8), or ten percent (10%), are pending Declaration Review or RAI processing;

- forty-six (46), or fifty-six percent (56%), have already received or are scheduled to receive a Notice of Defect and will need to submit additional information; and

- twenty-seven (27), or thirty-three percent (33%), are undergoing Medical Record Review.

**Figure 2: Composition of All Pending Claims**



Thus, the current overall composition of all claims filed is as follows:

**Figure 3: Overall Composition of All Claims Filed**



### III.   CLAIMS FOR SPECIFIED PHYSICAL CONDITIONS

#### A.   Claimed Benefits and Compensation Level

For the total 37,226 Proof of Claim Forms ("POCFs") received, Table 1 provides a breakdown of those that sought compensation for an SPC and participation in the PMCP and those that sought only participation in the PMCP.

| TABLE 1: POCF FILINGS AVAILABLE FOR INITIAL CLAIMS REVIEW | |
|---|---|
| | **Total** |
| **Total POCF Filings Available for Initial Claims Review** | **37,226** |
| Claims for Compensation for Both SPCs and Participation in the PMCP | 36,244 |
| Claims for PMCP Only | 982 |

The graph below provides a breakdown of the compensation levels claimed for all claims filed:

**Figure 4: Compensation Level Composition of All Claims Filed**



In Table 2 below, we provide statistics of the claimed compensation level in Section VII of the POCF as compared to the awarded compensation level.  In over eighty-one percent (81%)

of claims where the Class Member has claimed a single compensation level, that same level of compensation has been awarded.  For the nineteen percent (19%) not awarded the claimed compensation level, the Claims Administrator has awarded both higher and lower compensation levels based on review of the POCF and supporting documentation provided.

| Table 2: Determined Compensation Level | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Qualified Compensation Level | A1 | | A2 | | A3 | | A4 | | B1 | | Grand Total |
| Section VII of POCF Claimed Compensation Level | Count | % | Count | % | Count | % | Count | % | Count | % | |
| A1 | 12,167 | 97.73% | 150 | 1.20% | 111 | 0.89% | 21 | 0.17% | 1 | 0.01% | 12,450 |
| A2 | 911 | 41.89% | 1,175 | 54.02% | 77 | 3.54% | 9 | 0.41% | 3 | 0.14% | 2,175 |
| A3 | 457 | 35.62% | 100 | 7.79% | 658 | 51.29% | 67 | 5.22% | 1 | 0.08% | 1,283 |
| A4 | 86 | 41.95% | 15 | 7.32% | 15 | 7.32% | 89 | 43.41% | | 0.00% | 205 |
| B1 | 594 | 48.41% | 501 | 40.83% | 101 | 8.23% | 9 | 0.73% | 22 | 1.79% | 1,227 |
| Multiple | 2,229 | 66.50% | 803 | 23.96% | 260 | 7.76% | 48 | 1.43% | 12 | 0.36% | 3,352 |
| None | 1,677 | 80.24% | 254 | 12.15% | 126 | 6.03% | 32 | 1.53% | 1 | 0.05% | 2,090 |
| Total | 18,121 | 79.54% | 2,998 | 13.16% | 1,348 | 5.92% | 275 | 1.21% | 40 | 0.18% | 22,782 |

B.      **Claims Requiring RAI and/or Notice of Defect**

As has been the case historically, the majority of claims have received an RAI and/or a Notice of Defect according to the requirements of the MSA.  During the Reporting Period, the Claims Administrator sent seven (7) RAIs and twenty-six (26) Notices of Defect.  Since the inception of the Settlement, the Claims Administrator sent 29,173 RAIs and 21,448 Notices of Defect.

| TABLE 3: RAIS AND NOTICES OF DEFECT | | |
|---|---|---|
| **RAIs** | **Reporting Period** | **Total** |
| RAIs Sent | 7 | 29,173 |
| Responses to RAIs Received | 6 | 21,093 |
| **Defects** | **Reporting Period** | **Total** |
| Notices of Defect Sent | 26 | 21,448 |
| Defect Cure Materials Received | 54 | 10,903 |

1.     Requests for Additional Information

Of the seven (7) RAIs sent during the Reporting Period, all were RAI-Incomplete.[4]  Six

(6) of the RAIs sent during the Reporting Period were to claimants represented by counsel.

More than sixty-three percent (63%) of Claims have required at least one (1) RAI, and over

fourteen percent (14%) have required the maximum of two (2) RAIs. The overall response rate to

RAIs was seventy-one percent (71%), with claimants represented by counsel responding at a

higher rate (seventy-six percent (76%)) than those who are unrepresented (fifty-seven percent

(57%)).  The overall cure rate for responding to RAIs for both claimants represented by counsel

and those unrepresented is approximately fifty-nine percent (59%).

As previously reported, failure to respond to or cure all deficiencies identified within an

RAI-Incomplete will not necessarily result in the denial of a claim, because only some of a

claimant's claimed or declared conditions may be deficient and included in the RAI.   In that

circumstance, even if the claimant fails to respond to the RAI, the claimant might still receive

compensation for the valid conditions in his or her declaration (assuming the claimant met the

other requirements of the MSA).   These RAI processing standards and distinctions are

---

[4] Under the Party-approved RAI process, a claimant may receive an RAI-Missing for failing to submit a first-party injury declaration with his or her original POCF.  If the claimant submits a first-party injury declaration that omits necessary information, either in response to an RAI-Missing or at another point in the claims process, the claimant may receive an RAI-Incomplete.  For each RAI sent by the Claims Administrator, the claimant has sixty (60) days to respond.  A claimant may receive only one (1) RAI-Missing and one (1) RAI-Incomplete, as applicable.

highlighted in the "Frequently Asked Questions About Declarations and Requests for Additional Information" available on the Claims Administrator's website.  In addition, a copy of this FAQ is included with each RAI sent from the Claims Administrator, and we have call center representatives and firm liaisons available to provide assistance.

2.   Notices of Defect

Of the 21,448 Notices of Defect sent through the end of the Reporting Period, twenty-two percent (22%) were sent to unrepresented claimants or Class Members, and seventy-eight percent (78%) were sent to claimants or Class Members represented by counsel.  More than eighty-one percent (81%) were sent to Class Members claiming to be or approved as Clean-Up Workers.  Approximately fifty-two percent (52%) of the Notices of Defect sent listed multiple Defects.  More specifically, thirty percent (30%) identified two (2) through five (5) Defects, twelve percent (12%) identified six (6) through ten (10) Defects, and ten percent (10%) identified more than ten (10) Defects.

Of the 21,448 Notices of Defect sent through the end of the Reporting Period, fifty-six percent (56%) include Defects identified during initial claims review and prior to the Medical Record Review stage.  Twenty-seven percent (27%) of the twenty-six (26) Notices of Defect sent during the Reporting Period identified at least one Defect prior to the Medical Record Review stage in the claims process.  The five (5) most common material Defects identified for the population are as follows:

- "Missing Declaration of Injury document";

- "Missing Medical Records documentation";

- "Documentation included with the claim does not establish that the claimant was employed as a Clean Up Worker between the dates of April 20, 2010 and April 16, 2012";

- "Missing Third Party Witness Injury Declaration document"; and

- "Proof Of Residency Documents Failed To Prove Residence For 60 Days Between April 20, 2010 And September 30, 2010 for Zone A."

Of the 21,448 Notices of Defect sent through the end of the Reporting Period, forty-one percent (41%) include Defects identified during the Medical Record Review process. Seventy-three percent (73%) of the twenty-six (26) Notices of Defect sent during the Reporting Period identified at least one Defect subsequent to the Medical Record Review stage in the claims process. The five (5) most common material Defects identified during the Medical Record Review process are as follows:

- "No medical records were submitted or the documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION";

- Generally – "The medical records do not meet the criteria set forth in Level A2, A3, A4, and/or B1 of the Specified Conditions Matrix."  Specifically – "The date of first diagnosis for the claimed SPECIFIED PHYSICAL CONDITION occurred on or after April 16, 2012. This claimed condition does not qualify as a SPECIFIED PHYSICAL CONDITION as set forth on the SPECIFIED PHYSICAL CONDITIONS MATRIX"[5];

- "The documentation submitted does not support the claimed SPECIFIED PHYSICAL CONDITION";

- "The medical records do not meet the criteria set forth in Level A2 of the Specified Conditions Matrix:  The medical records submitted do not support the assertions in the declaration concerning the time of onset of the claimed SPECIFIED PHYSICIAL CONDITION following the alleged exposure as set forth in the SPECIFIED PHYSICAL CONDITIONS MATRIX"; and

- "The third-party declaration does not meet the criteria set forth in Level A1 of the Specified Physical Conditions Matrix:  The third-party declaration was not signed by the individual submitting the third-party declaration."

---

[5] This Defect results from the Court's July 23, 2014 Order (Rec. doc. 12862) holding that all conditions first diagnosed after April 16, 2012 must be classified as Later-Manifested Physical Conditions.  Notably, the Claims Administrator does not automatically deny claims where the medical records initially submitted with the claim indicate a date of first diagnosis after April 16, 2012.  Rather, we issue a Notice of Defect to afford the Class Member the opportunity to provide medical record evidence of the diagnosis that pre-dates April 16, 2012.  If the Class Member does not submit any such records, the Class Members claim for SPC compensation would be denied, but the Class Member would be free to pursue compensation for that condition as an LMPC.

As of the end of the Reporting Period, the response period had expired for 21,390 (ninety-nine percent (99%)) of claims having received a Notice of Defect.  The overall response rate was forty-nine percent (49%).  The response rate for unrepresented claimants or Class Members was thirty-five percent (35%), while the response rate for represented claimants or Class Members was fifty-three percent (53%).  As previously reported, failure to respond to or cure all Defects identified within a Notice of Defect will not necessarily result in the denial of a claim, because only some aspects of a claimant's claim may be defective and listed in a Notice of Defect.  In that circumstance, even if the claimant failed to respond to the Notice of Defect or to cure all of the Defects listed in it, the claimant might still receive compensation. Specifically, of claimants or Class Members who received a Notice of Defect that included Defects identified during the Medical Record Review process, eighty-seven percent (87%) were subsequently found to qualify for SPC compensation. Furthermore, a claimant who has a Defect in his or her claim for compensation for an SPC but has proven that he or she is a Class Member will receive a Notice of Determination for the PMCP benefit.  Hence, such Class Member can take advantage of that benefit while attempting to cure the Defects in his or her claim for SPC compensation.

### C.   **Claims Processed Through Each Stage of Claims Review**

As discussed above, a significant percentage of the POCFs submitted continue to contain one or more deficiencies or Defects.  These deficiencies and Defects not only increase the amount of time it takes for a claimant to reach the determination stage, but also increase the time it takes the Claims Administrator to process the claims.  The Claims Administrator must wait as long as sixty (60) or 120 days to receive the responses to the RAIs and/or Notices of Defects, respectively, and then must process the responses.

During the Reporting Period, the Claims Administrator has reviewed and/or processed the following numbers of claims through each of the following sequential stages in the claims review process:

| TABLE 4: CLAIM REVIEW PROCESSING | | |
|---|---|---|
| Processing Stage | Number of Claims[6] | |
| | Reporting Period | Total |
| Notice of Defect Gate One Process (Which Includes Class Membership Defects)[7] | 7 | 12,042 |
| Declaration Review Process[8] | 70 | 42,020 |
| RAI Process[9] | 7 | 29,173 |
| Medical Record Review Process[10] | 23 | 31,110 |
| Notice of Defect Gate Two Process[11] | 19 | 9,406 |

### D.   Claims Sent Dispositive Correspondence for a Specified Physical Condition

The overall percentage of all claims reaching final determination has increased over the Reporting Period to ninety-nine percent (99%).   During the Reporting Period, we sent SPC Notices of Determination to 167 Class Members, approving them for $789,706 in compensation. Since the inception of the Settlement, we sent SPC Notices of Determination to 22,730 Class Members, approving them for $66,674,779 in compensation.   Over this Reporting Period, the total percentage of finalized Claims moving to an approved determination remained at sixty-one percent (61%).

---

[6] Claims can move through Declaration Review (due to responses to RAI), the RAI Process (due to a defective response to an RAI-Missing, resulting in an RAI-Incomplete), and Medical Record Review (due to cure responses to originally defective claims) multiple times.

[7] Total claims with Gate One Defects, including basis of participation Defects, which received a Notice of Defect. Gate One Defects are those such as "Missing Declaration of Injury Document" or "Missing Medical Records Documentation," which prevent a claim from moving to Medical Record Review.

[8] Total number of injury declaration reviews completed.  A claim may go through this process more than once as a result of RAI responses.

[9] Total claims requiring an RAI that received a RAI.

[10] Total claims that were reviewed by Claims Administrator's Medical Record Review staff.

[11] Total claims that have completed Medical Record Review but that contain Defects preventing a final determination.

The Claims Administrator also sent five (5) "Approved with Defects" notices during the Reporting Period, bringing the total number of "Approved with Defects" notices sent since inception to 3,048. An "Approved with Defects" notice is sent to a Class Member who has at least one valid SPC but one or more other SPCs that contain a Defect and might result in an award of higher compensation. A Class Member receiving this notice can choose either to attempt to cure the Defects and thus possibly receive greater compensation or to waive that opportunity and proceed to determination on his or her valid SPC(s). Three thousand twenty-one (3,021) of the 3,048 Class Members who received an "Approved with Defects" notice subsequently received an SPC Notice of Determination. The total compensation for the remaining 27 Class Members who received an "Approved with Defects" notice but who have not yet received an SPC Notice of Determination is $159,100. Therefore, the total amount allocated (by SPC Notices of Determination) and to be allocated (by "Approved with Defects" letters) is $66,833,879.

The Claims Administrator sent sixteen (16) Notices of Denial during the Reporting Period, for a total of 13,373 Notices of Denial from the inception of the Settlement through the end of the Reporting Period. All of these claims have been denied because the claimant did not qualify as a Class Member, because the claimant opted out of the settlement, and/or because the claimant did not meet the criteria established by the MSA to receive compensation for an SPC.

A summary of the dispositive correspondence sent on claims for compensation for an SPC is set forth in Table 5, below.

| TABLE 5: CLAIMS DISPOSITION AND CORRESPONDENCE | | |
|---|---|---|
| Notice Type | Reporting Period | Total |
| SPC Notices of Determination Sent | 167 | 22,730 |
| Notices of Denial Sent | 16 | 13,373 |

### E.    Claims Approved for SPC Compensation

During the Reporting Period, the amount of SPC compensation for which Class Members were approved increased, as reflected in Table 6, below.

| TABLE 6: APPROVED CLAIMS FOR SPCs[12] | | | | | | |
|---|---|---|---|---|---|---|
| SPC | Reporting Period Number Approved | Total Number Approved to Date | Reporting Period Amount Approved | Total Amount Approved to Date | Total "Approved with Defects" Amount Allocated to Date | Total Compensation Allocated to Date |
| A1 | 99 | 18,110 | $123,100 | $22,958,600 | $6,500 | $22,965,100 |
| A2 | 60 | 2,958 | $562,506 | $23,512,131 | $129,450 | $23,641,581 |
| A3 | 5 | 1,347 | $61,750 | $17,039,682 | $12,350 | $17,052,032 |
| A4 | 2 | 275 | $5,400 | $789,616 | $10,800 | $800,416 |
| B1 | 1 | 40 | $36,950 | $2,374,750 | $0 | $2,374,750 |
| | | | | | | |
| Total | 167 | 22,730 | $789,706 | $66,674,779 | $159,100 | $66,833,879 |

As set forth in the MSA, Class Members can only be paid once certain potential obligations to third parties are identified and resolved.  The resolution of these obligations is dependent upon the responsiveness of both governmental agencies and private interests in replying to the Claims Administrator's requests for information and resolution.  The obligations fall into two general categories: healthcare-related obligations and other obligations.

The resolution of healthcare obligations involves confirming whether a Class Member received benefits from a governmental payor (such as Medicare, Medicaid, or the Veterans' Administration) or a private healthcare plan for a compensable injury such that the Class Member must now reimburse those entities for the amounts they paid.  The processing phases

---

[12] Please note that the total volumes and total dollars approved are subject to change in each Reporting Period due to later received and processed Requests for Review.

include (1) confirming entitlement with the government agency or private plan, (2) receiving claims from the agency or plan, (3) auditing those claims and disputing any that are unrelated to the Class Member's compensable injury, and (4) final resolution.  Pursuant to the terms of the MSA, the Claims Administrator obtained an agreement from CMS establishing capped repayment amounts per SPC for Class Members who are or were beneficiaries of Medicare.  The Claims Administrator also negotiated with state Medicaid agencies to cap recovery for Medicaid-entitled Class Members.  Most states agreed to waive recovery rights for Class Members receiving compensation for an A1 claim.  Additionally, most state Medicaid agencies agreed to a twenty percent (20%) cap on and up to a thirty-five percent (35%) offset for fees and costs typically associated with their recovery, thereby allowing partial funding to the Class Member while full resolution is pending.  Processing times for Medicaid-entitled Class Members eligible for payment will vary. Each state has its own processing standards for responding to entitlement requests, producing claims, and finalizing lien amounts.

The resolution of non-healthcare-related obligations involves identifying the various types of obligations and working with the claimant or the claimant's representative to resolve them.  The processing phases include (1) identifying the obligation (through review of claim documents, PACER searches, and searches of the Louisiana Child Support Database), (2) sending correspondence seeking documentation that will resolve the complication, (3) reviewing the submitted documentation for sufficiency, and (4) final resolution.  The Claims Administrator tracks responses to its correspondence and sends a follow-up letter to non-responsive parties after thirty (30) to sixty (60) days have passed (with the length of time depending on the complication).  We will also send follow-up correspondence when the responses contain insufficient documentation.  The resolution time for payment complications

varies and remains heavily dependent upon the timeliness and sufficiency of the third parties' responses to our information requests. Through the end of the Reporting Period, the average age of claims awaiting payment from the date of final determination is approximately 158 days depending on the complexity of the payment complications.

Once the obligations affecting a given claim are resolved and any liens or reimbursement obligations are paid, the Claims Administrator is able to disburse the balance of the Class Member's compensation.

### F.    Data Disclosure Form Submissions and Results

Data Disclosure Forms may be filed at any time during the claims review process by Natural Persons seeking information from the databases, data fields, and other documentary evidence provided by BP to the Claims Administrator. Notably, Data Disclosure Forms may continue to be filed *after* the submission of a Proof Claim Form and therefore can be filed *after* the claims filing deadline of February 12, 2015. Information provided via the submission of a Data Disclosure Form allows the Claims Administrator to make a determination concerning (a) the status of a Natural Person claiming to be a Clean-Up Worker and/or (b) a claim made by a Clean-Up Worker for compensation for a Specified Physical Condition. *See* MSA § XXI.B.

During the Reporting Period, the Claims Administrator received fourteen (14) Data Disclosure Forms, for a total of 27,263 Data Disclosure Forms since the approval of the MSA. The Claims Administrator responded to nine (9) Data Disclosure Forms during the Reporting Period, bringing the total number of responses to 32,973 since the approval of the MSA. Of the 27,263 Data Disclosure Forms received, 20,538 were related to unique claimants, while 6,725 were Data Disclosure Forms with additional information filed by the same claimants. Among the unique claimants filing Data Disclosure Forms, eighty-four (84%) were confirmed as Clean-

Up Workers by finding a match in at least one employer database other than the "Training" database.  Twelve percent (12%) of those unique claimants were matched in the "Medical Encounters" database, while nineteen percent (19%) were matched in a medically relevant database, such as the "Traction" database or the "Injury/Illness" database.

IV.     **CLASS MEMBER SERVICES CENTER ACTIVITY**

The Claims Administrator operates a Class Member Services Center to communicate with Class Members and their attorneys and to assist them with filing their claims.  During the Reporting Period, the Class Member Services Center received 3,187 telephone calls.  Since opening, the Class Member Services Center has received a total of 212,497 telephone calls.  The Class Member Services Center handled an average of forty-nine (49) calls per day.  The average length of each telephone call was seven minutes and forty seconds, with an average wait time of one minute and twenty-one seconds.  The Class Member Services Center also received fourteen (14) emails during the Reporting Period.

| TABLE 7: CLASS MEMBER SERVICES CENTER | | |
|---|---|---|
| | **Reporting Period** | **Total** |
| Calls Received | 3,187 | 212,497 |
| Average Length of Call (min:sec) | 7:40 | 6:39 |
| Average Wait Time (min:sec) | 1:21 | 0:48 |
| Emails Received | 14 | 3,121 |
| Walk-Ins | 0 | 739 |

V.     **PERIODIC MEDICAL CONSULTATION PROGRAM**

A.     **Class Members Eligibility for and Participation in the PMCP**

During the Reporting Period, the Claims Administrator approved 134 claims for participation in the PMCP and mailed sixty-two (62) PMCP Notices of Determination.  Since the inception of the Settlement, the total number of Class Members receiving a PMCP Notice of

Determination is 27,272.  The Claims Administrator received requests for and scheduled 142 physician visits during the Reporting Period, and Class Members attended 130 appointments in the Reporting Period.

| TABLE 8: PERIODIC MEDICAL CONSULTATION PROGRAM | | |
|---|---|---|
| | Reporting Period | Total |
| Class Members Approved to Receive Physician Visits[13] | 134 | 27,472 |
| PMCP Notices of Determination Sent | 62 | 27,272 |
| Physician Visits Requested and Scheduled | 142 | 3,368 |
| Appointments Attended by Class Members | 130 | 3,337 |
| Annual Update Letters Sent to Class Members | 4,763 | 43,443 |

### B.    Provider Network

During the Reporting Period, the Claims Administrator did not add any medical provider organizations to its network of providers established to provide certain covered services to Class Members who participate in the PMCP; the total number of medical provider organizations remains at 205.  These medical provider organizations represent 478 service delivery sites.  Consistent with the most recent quarterly report, ninety-eight percent (98%) of eligible Class Members who have requested a PMCP evaluation resided within twenty-five (25) miles of a network provider at the conclusion of the Reporting Period.  The Claims Administrator continues to expand the medical provider network in its efforts to ensure that no Class Member will have to wait more than thirty (30) days or travel more than twenty-five (25) miles for an appointment.

### VI.    BACK-END LITIGATION OPTION

During the Reporting Period, Class Members submitted 174 Notices of Intent to Sue for compensation for a Later-Manifested Physical Condition.  One hundred sixty-eight (168) were original Notices of Intent to Sue, and six (6) were supplements to Notices of Intent to Sue that

---

[13] The total physician visits will exceed the total number of Class Members qualified for the PMCP benefit, as Class Members may be referred to specialists and will eventually be eligible for subsequent primary visits.

had already been submitted.  Of the 168, seventy-six (76) were compliant and were sent to BP for a mediation decision, sixty-one (61) contained Defects that could be corrected by the Class Member, none were denied, and thirty-one (31) were pending review.

From the inception of the Settlement through the end of the Reporting Period, Class Members submitted 713 Notices of Intent to Sue for compensation for a Later-Manifested Physical Condition.  Six hundred fifty-two (652) were original Notices of Intent to Sue, and sixty-one (61) were supplements to Notices of Intent to Sue that had already been submitted.  Of the 652, 134 were compliant and were sent to BP for a mediation decision, 300 contained Defects that could be corrected by the Class Member, 187 were denied, and thirty-one (31) were pending review.

| TABLE 9: NOTICES OF INTENT TO SUE | | |
|---|---|---|
| | **Reporting Period** | **Total** |
| Total Notices of Intent to Sue Filed | 174 | 713 |
| Original Notices of Intent to Sue Filed | 168 | 652 |
| Subsequent Notices of Intent to Sue Filed | 6 | 61 |
| Notices of Intent to Sue Approved | 76 | 134 |
| Notices of Intent to Sue Denied | 0 | 187 |
| Notices of Intent to Sue Deficient[14] | 61 | 300 |
| Notices of Intent to Sue Under Review | 31 | 31 |

Of the 187 claims denied through the end of the Reporting Period, ninety-nine percent (99%) were denied because the conditions claimed were diagnosed on or before April 16, 2012 and therefore could not be claimed as Later-Manifested Physical Conditions.  The other reasons for denial include, among other things, that the claim was precluded by a previously filed workers' compensation claim.

---

[14] Class Members who cure Defects within their original Notice of Intent to Sue will then be classified as "Approved" or "Denied" in future reporting, based on the responses received.

Of the 300 defective claims to date, the three (3) most common material Defects are as follows:

- "Identification of BP defendants in Section VII is missing";

- "You must provide medical records indicating a date of diagnosis that is after April 16, 2012 or a completed Physician's Certification Form"; and

- "The date on which the claimed Later-Manifested Physical Condition(s) were first diagnosed in Section VI.A.2 is missing."

Of the 134 compliant Notices of Intent to Sue sent to BP for a mediation decision, BP elected to mediate none of the claims, declined to mediate sixty-eight (68) of the claims, and is still considering whether to elect mediation on sixty-six (66) of the claims. With respect to the sixty-eight (68) claims that BP declined to mediate, the Class Members holding those claims became eligible to file them as Back-End Litigation Option Lawsuits once BP declined mediation. As of the end of the Reporting Period, Class Members had filed Back-End Litigation Option Lawsuits on eighteen (18) of those claims, were still within the time period for filing a Back-End Litigation Option Lawsuit for twenty-three (23) of those claims, and did not file a Back-End Litigation Option Lawsuit by the deadline for twenty-seven (27) of those claims.

| TABLE 10: COMPLIANT NOTICES OF INTENT TO SUE | | |
|---|---|---|
| **Mediation Elections** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which at Least One BP Defendant Elected Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Pending a Decision from One or More BP Defendants Regarding Mediation | 66 | 66 |
| Later-Manifested Physical Condition Claims for Which No BP Defendants Elected Mediation | 15 | 68 |
| | | |
| **TOTAL:** | **81** | **134** |
| | | |

| Results of Mediation | Reporting Period | Total |
|---|---|---|
| Later-Manifested Physical Condition Claims Settled by Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Settled by Mediation as to One but Not All BP Defendants Listed in the Notice of Intent to Sue | 0 | 0 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLAIMS MEDIATED:** | **0** | **0** |
| | | |
| **Back-End Litigation Option Lawsuit** | **Reporting Period** | **Total** |
| Total Claims That Have Been Eligible to Be Filed as Back-End Litigation Option Lawsuits[15] | N/A | 68 |
| Total Eligible Claims Filed as Back-End Litigation Option Lawsuits | N/A | 18 |
| Total Eligible Claims Still Within Time Period for Filing as Back-End Litigation Option Lawsuits | N/A | 23 |
| Total Eligible Claims Not Filed as Back-End Litigation Option Lawsuits by Deadline | N/A | 27 |

## VII.   GULF REGION HEALTH OUTREACH PROGRAM

### A.   Funding and Coordinating Committee Activities

In accordance with Section IX of the MSA, the Gulf Region Health Outreach Program ("GRHOP") was established in May 2012 to expand capacity for and access to high quality, sustainable, community-based healthcare services, including primary care, behavioral and mental health care and environmental medicine, in the Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle. The program consists of five (5) integrated projects: the Primary Care Capacity Project ("PCCP"), Community Involvement ("CI"), the Mental and Behavioral Health Capacity Project ("MBHCP"), the Environmental Health Capacity and Literacy Project ("EHCLP"), and the Community Health Workers Training Project

---

[15] This number is the sum of the "Later-Manifested Physical Condition Claims for Which No BP Defendant Elected Mediation" and the "Later-Manifested Physical Condition Claims Mediated but Not Settled."

("CHWTP"). As of the end of the Reporting Period, the Claims Administrator disbursed $104,713,294 to the projects, as detailed in the chart below.

| TABLE 11: GRHOP | |
| --- | --- |
| **Project** | **Funding to Date** |
| Primary Care Capacity Project | $46,655,925 |
| Community Involvement | $3,213,491 |
| Mental and Behavioral Health Capacity Project ((Louisiana State University Health Sciences Center) | $14,359,145 |
| Mental and Behavioral Health Capacity Project (University of Southern Mississippi) | $8,256,486 |
| Mental and Behavioral Health Capacity Project (University of South Alabama) | $8,256,489 |
| Mental and Behavioral Health Capacity Project (University of West Florida) | $5,025,696 |
| Environmental Health Capacity and Literacy Project | $14,957,416 |
| Community Health Workers Training Project | $3,988,646 |
| | |
| **TOTAL:** | **$104,713,294** |

The final disbursement was made in May 2016, which accounted for an eighteen (18) month low-cost extension of the GRHOP, as agreed upon by the Parties and Coordinating Committee members. All projects, except for Community Involvement,[16] will participate in this extension period. Estimated administrative costs during the extension period, totaling $286,706, were accounted for by the Claims Administrator, with all projects contributing to these costs. Therefore, the May 2016 disbursement brought the total funding to the GRHOP to $104,713,294.

The GRHOP is governed by a Coordinating Committee that continues to function in a cooperative and integrated manner, with quarterly in-person meetings around the Gulf Coast, as well as monthly conference calls. These quarterly meetings offer the grantees the opportunity to share their progress, discuss challenges faced, and collaborate with their partners to work through issues that affect the GRHOP as a whole.

---

[16] Community Involvement chose not to participate in the eighteen (18) month low-cost extension.

The Claims Administrator held a quarterly meeting on November 17, 2017, in Pensacola, Florida.[17]  This meeting covered the activities of three (3) of the five (5) GRHOP subcommittees — the Publication, Newsletter, and Evaluation Subcommittees.[18] Additionally, each project gave an update on their activities in the last quarter. CHWTP and MBHCP-FL gave final project updates.

In addition to administering the conferences and quarterly meetings for the GRHOP Coordinating Committee, the Claims Administrator continues to manage the GRHOP website. The website launched on July 3, 2014 and can be publicly accessed at www.grhop.org.  The website contains detailed descriptions and notable accomplishments of each project, as well as information regarding the GRHOP Coordinating Committee, news/events, and publications.

## B.    GRHOP Project Updates

The GRHOP projects have made substantial progress in achieving the goals set forth in their Grant Proposals. Some notable accomplishments of the projects include:

- The **Primary Care Capacity Project**, led by the Louisiana Public Health Institute ("LPHI"), which has:

  o Through the Technical Assistance ("TA") team, completed the last remaining direct TA engagement with Coastal Family Health Center. The TA team continued to assist Coastal in planning and implementing a Medicare Chronic Care Management program;

  o Presented the Regional Care Collaborative Forum in New Orleans, Louisiana on December 12-13, 2017. The theme of the Forum was "Population Health: Adding Value to Outcomes." The Forum gathered over 120 representatives from community health centers and stakeholders from the coastal regions of Louisiana, Mississippi, Alabama, and the panhandle of Florida to share information and ideas to improve primary health care in the region;

---

[17] The Claims Administrator held its next quarterly meeting on January 19, 2018 in New Orleans, LA. The Claims Administrator will report on that meeting in its next status report. The remaining quarterly meetings for 2018 will be held on April 20th, July 27th, and October 19th.

[18] The five (5) GRHOP subcommittees include: the Data Sharing Subcommittee, Evaluation Subcommittee, Health Promotions Subcommittee, Newsletter Subcommittee, and Publication Subcommittee. These subcommittees were formed during the July 31, 2014 quarterly meeting.

24

- o Continued engagement with the primary care associations in each state through state partnership cooperative agreements. Partners delivered on the primary focus of outreach and education related to the Emergency Management Initiative;

- o Closed out all contracts under the Community Centered Health Homes ("CCHH") Demonstration Project. Findings from the CCHH Demonstration Project continued to be shared with a national audience;

- o Continued to support two (2) system investments related to advancing health information technology and coordination in Mississippi and Alabama; and

- o Continued to confer with GRHOP partners, the PCCP funded state partners and local public health officials to coordinate local efforts and identify opportunities for leveraging among partners.

- **Alliance Institute's** outreach on behalf of the GRHOP and its partners has reached over 1,500 individuals across Louisiana, Mississippi, Alabama, and Florida. Alliance Institute, the grantee responsible for Community Involvement, concluded its grant on April 30, 2017.

- The **Environmental Health Capacity and Literacy Project** ("EHCLP"), with its grantee being Tulane University, has achieved the following:

  - o Occupational and Environmental Health Specialty Network:

    - ▪ The Association of Occupational and Environmental Clinics ("AOEC") participated in the exhibit hall at the annual Alabama Primary Health Care Association, as well as the Louisiana Primary Care Association Meeting, with information about the Environmental and Occupational Health program and other EHCLP activities.

  - o Training and Leadership Development:

    - ▪ Recruitment began in Orleans and Jefferson Parish high schools for the 2018 Emerging Scholars Environmental Health Sciences Academy.

    - ▪ The University of Southern Mississippi partnered with Gulfport High School and their Academic Academies to host Science Careers and Research Encounters Day on December 1, 2017.

  - o Community Resilience and Family Wellness

    - ▪ Tulane Building Early Relationships Support and Services ("TBEARS") served eighteen (18) families, with a total of forty-five (45) home or clinic visits and six (6) phone and/or warmline sessions. In addition, the program served thirty-five (35) families through parent education support groups.

- EHCLP attended the American Public Health Association Annual Meeting and presented insights on the Community Health Workers ("CHW") Placement Program in a CHW Section session on November 6, 2017.

- The **Community Health Workers Training Project**, directed by the University of South Alabama's Coastal Resource and Resiliency Center ("CRRC"), concluded its grant on December 31, 2017. In its last quarter, the project:

  o Attended the live streaming of the 4th Annual Community Engagement Institute's "Community Health from Engagement and Environmental Renewal for Civil Inclusion & Empowerment," hosted by the University of South Alabama's (USA) Center for Healthy Communities and the USA Office of Research and Learning in Mobile, Alabama on October 6, 2017;

  o Delivered a presentation entitled "Community Health Worker Training Project: Outcomes Update," at the GRHOP Coordinating Committee Quarterly Meeting in Pensacola, Florida on November 17, 2017;

  o Attended the USA Disaster & Trauma Alliance Meeting, hosted by the Gulf Coast Behavioral Health and Resiliency Center in Mobile, Alabama on October 17, 2017;

  o Assisted with the publication of October's GRHOP Newsletter; and

  o Attended the American Cancer Society's Community Network Partners Luncheon in Mobile, Alabama on December 6, 2017.

- The **Mental and Behavioral Health Capacity Project**, implemented by a coalition of four (4) academic institutions (Louisiana State University Health Sciences Center ("MBHCP-LA"), the University of Southern Mississippi ("MBHCP-MS"), the University of South Alabama ("MBHCP-AL"), and the University of West Florida ("MBHCP-FL")), has achieved the following:

  o MBHCP-LA has:

    - Continued to provide mental and behavioral health direct services, including therapeutic services, strength based supportive services, brief interventions and evaluations, community outreach, trainings, and workforce development;

    - Made progress towards sustainable collaborative care in the Federally Qualified Heath Centers ("FQHC") and Community Clinics by moving towards contract development with three (3) of the FQHCs;

    - Extended clinical services for the Perinatal Maternal and Infant Health program at the Touro Infirmary and the University Medical Center Maternal Fetal Medicine Clinic and general Obstetrical Clinic. These services provide prevention and intervention services for high-risk pregnant women and their infants. Institutional Review Board approval was obtained to expand services to Touro Infirmary,

which will allow for a continuum of care through childbirth and the perinatal and postnatal periods; and

- Completed output-focused data collection for supplemental therapeutic treatment in FQHCs and Primary Care Clinics that allow for a greater focus on project specific outcomes, final reporting, and dissemination.

o MBHCP-MS has achieved the following:

- Thirteen (13) Master of Social Work ("MSW") student interns completed their first semester as interns with the Mississippi Integrated Health and Disaster Program ("M-IHDP") for the 2017-2018 academic year. The internship emphasizes the importance of interpersonal communication skills, interdisciplinary teamwork, clinical skill in assessment and intervention in a fast-paced primary care environment, and systems-oriented practice.

- Services at the Back Bay Homeless Mission were reinstated and an additional intern was accepted to assist with community outreach, clinical consultation, and Healthcare for the Homeless ("HCH") eligibility screening. This community initiative assisted members of the homeless community to easily access medical and mental health treatment within an integrated system of care within the FQHC.

- M-IHDP social workers team leaders continued to provide bi-weekly in-service trainings to students to enhance their knowledge and skill-based competencies for integrated care and clinical practice. Trainings focused on trauma-informed care, child welfare, self-care, and professional development.

- The Coordinator of Clinical Programs and Training continued to be beneficial in overseeing clinic operations and providing necessary training for interns and staff. The Coordinator has also been useful in facilitating communication and collaboration among the M-IHDP staff and staff of the FQHC, providing direct services, and communicating any changes or needs of the patient population served by the FQHC.

- The M-IHDP social workers continued to assist with HCH eligibility screenings in multiple clinic locations to help homeless patients gain access to healthcare. They also continued to provide mental and behavioral health services to these patients.

o MBHCP-AL has:

- Completed over 2,000 individual patient encounters, and conducted over 700 chart reviews;

- Presented a talk entitled "Integrated Care: An Opportunity to Overcome Cultural Stigmas" at the Regional Care Collaborative in New Orleans;

- ▪ Shared program evaluation and scientific findings by disseminating results from the Crisis Evaluation study at the Mobile County Health Department Provider Meeting, presenting five (5) posters at national and international meetings, and publishing two (2) papers and a blogpost; and

- ▪ Through the Attention Problems Presented in the Learning Environment ("APPLE") team, continued to assess, analyze, and coordinate/craft treatment plans for referred students in the Mobile County Public School System.

o MBHCP-FL concluded its grant on September 30, 2017.

### C.    GULF REGION HEALTH OUTREACH PROGRAM LIBRARY

In accordance with Section IX.H of the MSA, the Claims Administrator has established a publicly accessible online library, which exists as a repository of information regarding information related to the health effects of the *Deepwater Horizon* incident, including, but not limited to: (a) the composition, quantity, fate, and transport of oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and contaminants used in Response Activities; (b) health risks and health studies relating to exposure to oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and decontaminants used in Response Activities; (c) the nature, content, and scope of *in situ* burning performed during the Response Activities; and (d) occupational safety, worker production, and preventative measures for Clean-up Workers.

The library houses over 197,000 relevant documents, each tagged with a specific search category based on the type of information identified within the MSA. The Claims Administrator will continue to add Library Materials in accordance with the MSA.

Respectfully submitted,

*DEEPWATER HORIZON* MEDICAL BENEFITS
CLAIMS ADMINISTRATOR


By: /s/ Matthew L. Garretson
      Matthew L. Garretson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of the electronic filing in accordance with the procedures established in MDL 2179, on this 22nd day of February, 2018.

Respectfully submitted,

*/s/ Matthew L. Garretson*
Matthew L. Garretson