## EXHIBIT A

*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*
No. 10-MD-2179

**PTO 65 VERIFIED STATEMENT REGARDING CAUSATION AND DAMAGES (B1 CLAIMS)**

| Last Name | First Name | Middle Name/Maiden | Suffix |
|---|---|---|---|
| Ericsson | John | | |

| Business Name | Last 4 digits of Plaintiff's social security number (if individual) or full Tax ID number (if business plaintiff) 31-1475321 (GMIT) 75-2309471 (BIOM) |
|---|---|
| Gulf Marine Institute of Technology BioMarine Technologies, Inc. | |

| MDL 2179 Member Case Number | Attorney Name and Firm |
|---|---|
| 13-02186 | Mario E. de la Garza GARCIA DE LA GARZA, LLP |

All "Remaining B1 Plaintiffs" (as defined in PTO 65) must answer the questions below regarding damages and causation. Responses must be as specific and accurate as practicable and shall be given under penalty of perjury. It is a violation of PTO 65 to submit an answer that is, for example, generic, vague, evasive, or misleading. **The plaintiff (not the plaintiff's attorney) must sign and date the verification and attestation at the end of this form.** Responses shall be filed in the record for the plaintiff's **individual lawsuit** (not the master docket for MDL 2179) by no later than **April 11, 2018**.

You may attach additional pages to this form if you need extra room to answer a question. Make sure to indicate the question you are continuing to answer.



1

**Question 1:** Describe specifically the compensatory damages that you claim in your lawsuit, including the nature of the damage, the date(s) of the damage, the amount of the damage, and the calculations used to arrive at that amount.

Please see Answers to Questions Pursuant to PTO 65, attached hereto, along with Appendix 1 and Exhibits

**Question 2:** Describe specifically the evidence you rely on to prove the damages you allege in response to Question no. 1.

Please see Answers to Questions Pursuant to PTO 65, attached hereto, along with Appendix 1 and Exhibits.

**Question 3:** Describe specifically how the Deepwater Horizon/Macondo Well incident and oil spill caused the damages you allege in response to Question no. 1.

Please see Answers to Questions Pursuant to PTO 65, attached hereto, along with Appendix 1 and Exhibits.

> **Question 4:** Do you have at this time an expert who will opine as to any of your responses to the above questions? (Yes or No)
>
> Yes.

By signing below, I declare and attest under penalty of perjury pursuant to 28 U.S.C. § 1746 that the answers provided to the above four questions are true and correct, and I specifically declare and attest under penalty of perjury pursuant to 28 U.S.C. § 1746 that the damages described in response to Question no. 1 were caused by the Deepwater Horizon/Macondo Well incident and oil spill.

Executed on the following date at the following location:

Date: _April 11_, 2018

Location (City and State): _Gulf Breeze, Florida_

_____
Signature of Plaintiff*

*Plaintiff's Attorney **Cannot** Sign on Plaintiff's Behalf. For businesses, the CEO, CFO, President, Owner, or similar senior corporate officer must sign.*

_John Ericsson_
Print Name

Managiing Director of Gulf Marine Institute of Technology
Chairman of the Board and President of BioMarine Technologies, Inc.
_____
Title/Position (if signed on behalf of a business or other entity)

**The verified statement, must be filed into the record of the plaintiff's individual lawsuit (as opposed to the master docket for MDL 2179) no later than April 11, 2018.**

ANSWERS TO QUESTIONS PURSUANT TO PTO 65
(BY BIOMARINE TECHNOLOGIES, INC. AND GULF MARINE INSTITUTE OF TECHNOLOGY)

**QUESTION 1: Describe specifically the compensatory damages that you claim in your lawsuit, including the nature of the damage, the date(s) of the damage, the amount of the damage, and the calculations used to arrive at that amount.**

BioMarine Technologies, Inc. ("BIOM") and Gulf Marine Institute of Technology ("GMIT") (collectively, "BIOM-GMIT") together claim **$26,555,053.00 (TWENTY-SIX MILLION FIVE HUNDRED FIFTY-FIVE THOUSAND FIFTY-THREE DOLLARS AND NO CENTS**) in compensatory damages in the way of lost profits.

BIOM-GMIT began suffering these damages on April 20, 2010 and continues to suffer these damages. For the calculations, please see **Economic Damage Calculations Pursuant to PTO 65, attached hereto as** *Appendix 1*. While these damages calculations are made in order to comply with PTO 65, BIOM-GMIT reserves the right to update and/or amend their damages calculations at or before the time of their expert designations under the Federal Rules of Civil Procedure.

**QUESTION 2: Describe specifically the evidence you rely on to prove the damages you allege in response to Question no. 1.**

BIOM-GMIT interpret this question to be limited to causation and damages and that it does not solicit information with regard to liability.[1] Accordingly, besides the footnote below, BIOM-GMIT will limit their response to a description of evidence in support of causation and damages.

---

[1] With regard to liability, BIOM-GMIT relies on other evidence, including the Court's prior rulings on these issues. *See In re: Oil Spill by the Oil Rig "DEEPWATER HORIZON" in the Gulf of Mexico, on April 20, 2010*, 844 F.Supp.2d 746, 755 (E.D. La 2012) (holding on summary judgment that BP is a "responsible party" under the OPA with respect to the subsurface discharge of oil); *In re: Oil Spill by the Oil Rig "DEEPWATER HORIZON" in the Gulf of Mexico, on April 20, 2010*, 21 F.Supp.3d 657 (E.D. La 2014) (Findings of Fact and Conclusions of Law Phase One of Trial).

In that respect, BIOM-GMIT rely on the following evidence to prove the damages they describe in response to Question 1. This list is not exhaustive but instead is meant to provide a general sense for the evidence that supports the damages. Scanned copies of these documents are included herewith. BIOM-GMIT reserve the right to update and/or amend this list and exhibits as appropriate as the claim proceeds.

1. Map of Fishery Closure Boundary, June 21, 2010;

2. Permits
   a. U.S. Environmental Protection Agency Site Permit Documents;
   b. U.S. Army Corp of Engineers Site Permit Documents;

3. Assets (either on hand at the time of the Spill or lost due to futility);
   a. Bridgestone Sea Cages
   b. Sea Cage Nets
   c. AKVA Feeder System
   d. Vessels (Hobgood, Sea Star, R/V Marie Hall, Wellcraft)
   e. Nursery System

4. Research and Development
   a. PowerPoint Presentation regarding FlorAbama Offshore Marine Sea Farming;
   b. FlorAbama Sea Farming Site Drawings;
   c. FlorAbama Feasibility Study;
   d. Development – Offshore FlorAbama Marine Sea Farming in the Gulf of Mexico. This binder contains, among other items, the *Mariculture Site Characterization & Environmental Assessment*.
   e. Gulf of Mexico Sea Farming Projects Assumptions;
   f. FlorAbama 7-year Project Proforma;

5. Media Coverage of the Spill and News Articles regarding Future Damages;

6. Affidavit of John D. Ericsson—September 27, 2012;

7. Business Information
   a. Commercial Joint Development Agreement;
   b. BIOM's Annual Franchise Tax Reports

8. Financial Information
   a. Audited financial statements of BioMarine Technologies, Inc.;
   b. GMIT Profit & Losses
   c. Tax Returns (additional returns may be available upon request)

9. Marine Harvest ASA 2009 – 2017 Financial Statements;

10. Leroy Seafood Group 2009 – 2016 Financial Statements;

11. Salmar ASA 2009-2016 Financial Statements; and

12. Oanda Corporation Historical Exchange Rates for Euro to Krone for 2015-2016.

**QUESTION 3: Describe specifically how the Deepwater Horizon/Macondo Well incident and oil spill caused the damages you allege in response to Question no. 1.**

The Deepwater Horizon/Macondo Well incident and oil spill on April 20, 2010 sent millions of barrels of crude oil into the waters of the Gulf of Mexico. Later, Defendants released well over a million gallons of toxic dispersants, including Corexit, into the Gulf waters, in an effort to disperse the oil. In June of 2010, the National Oceanic and Atmospheric Administration estimated that the spill had contaminated Gulf waters encompassing 86,985 square miles. As a result, the Federal Government closed all contaminated federal fishery waters.

BIOM-GMIT held federal permits covering 27.5 acres of waters in the Gulf of Mexico, located approximately 9.9 miles south of Perdido Pass, Alabama, to establish an aquaculture business (the "FlorAbama Aquaculture Business"). The permitted site was within the contaminated area. The waters at the location are 90 feet deep located on the outer continental shelf block 842, Latitude 30 9.4' North and Longitude 87 31.3' West.

As a result of the spill and subsequent release of dispersants, BIOM-GMIT's federally permitted 27.5 acre site, like much of the Gulf of Mexico, became contaminated and unsuitable for aquaculture. As a result, the various investments in time and money that BIOM-GMIT had made toward the FlorAbama Aquaculture Business project were lost.

With regard to assets, BIOM-GMIT had acquired sea cages, sea cage nets, an AKVA fish feeding unit, vessels for farming support, and laboratory and marine hatchery equipment. Because of the spill, these assets became futile.[2]

In addition, BIOM-GMIT had spent several years applying for and eventually securing the required federal permits—one from the U.S. Army Corp of Engineers and the other from the U.S. Environmental Protection Agency—to conduct aquaculture in the Gulf of Mexico. Those permits, renewed twice—once in 2008 and again in 2013—will sadly both expire this year. BIOM-GMIT will have to re-apply and wait another several years to obtain these permits.

Finally, as a result of the spill, BIOM-GMIT was unable to continue to raise the capital it would need to launch the FlorAbama Aquaculture Business as envisioned. With the Gulf waters contaminated, the investment interest in this project disappeared.

**QUESTION 4: Do you have at this time an expert who will opine as to any of your responses to the above questions? (Yes or No)**

Yes.

---

[2] Several of the assets were originally acquired with the intent of deploying them in an aquaculture business off the coast of Galveston, Texas, utilizing an abandoned oil platform that had been donated to GMIT. For legal, political, and/or administrative reasons, this project could not move forward. *See Dewhurst v. Gulf Marine Inst. of Tech.*, 55 S.W.3d 91 (Tex. App.—Corpus Christi 2001, pet. denied); *see also Patterson v. Gulf Marine Inst. of Tech.*, No. 13–06–067–CV, 2008 Tex. App. LEXIS 1462, at *15, 2008 WL 525424 (Tex. App.—Corpus Christi Feb. 28, 2008, pet. denied) (mem.op.). However, several of the assets acquired for this Texas project were transferable to the FlorAbama project, with the exception of the platform, which was stationary.