

**Chapter 1**

# Introduction

## System Description

The concept for an offshore finfish mariculture operation in the Northern Gulf of Mexico and the basis for this feasibility study includes use of the numerous oil, gas and/or sulfur production platforms located there. It has been estimated that there are more than four thousand platforms in the Northern Gulf off the coasts of Texas through Alabama. Although the majority of these are still in mineral production, approximately one hundred (on the average) are decommissioned each year. Decommissioning means the producing company does one of three things with the structure after its production service is completed: (1) remove the platform and transport to shore to sell as scrap; (2) remove the platform and place within a state-approved "rigs to reef" area to serve as marine habitat; or (3) if the platform still has useful life, it can be moved to another production area for service either by the original owner or another. The first two options above typically incur significant costs to the platform owner.

The study team evaluating a Northern Gulf mariculture operation believes that a platform owner should have a fourth option available. That option would include the use of the platform, after all remaining wells are properly plugged and abandoned and production equipment removed, as a center of operations of a mariculture operation. It is known that some previously proposed and currently planned offshore mariculture operations have contemplated using still operating platforms. The authors of this feasibility report believe that the complications arising from such joint use of the platform outweigh any potential benefits. First there is a requirement for a fairly significant amount of space required for mariculture equipment (feed storage and delivery



**WALDEMAR NELSON INTERNATIONAL INC.**

**1-1**

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**INTRODUCTION**

systems) which is typically not available on a still producing platform, fish cages surrounding the platform would obviously interfere with well workover or other activities, and both operations require routine access to the platform by marine vessels which would have to be closely coordinated.

The comprehensive, large-scale mariculture installation as envisioned in this report is composed of six basic components:

    1) Fish Cage Systems
    2) Cage Mooring systems
    3) Fish Feeding Systems
    4) Offshore Support Systems (Platform Operations & Maintenance)
    5) Onshore Operations
    6) Product Transportation Systems

In addition to these six components, offshore processing of raised finfish is a possibility and will be discussed in Chapter 5.

The system envisioned, as described herein, is a highly mechanized and automated one. Mechanization and automation is deemed necessary for the type system contemplated in this study because, for such a venture to be economically successful, the scale of the operation would require storage and distribution of large quantities of fish feed, efficient and high capacity product handling, electronic monitoring and control of grow-out facilities, up to date disease control and prevention technology, mass harvesting methods, and, sophisticated fish husbandry accounting procedures. Such a system would be generally arranged as follows:

    Fish grow-out containment cage systems, either floating or submerged, will be moored to the sea floor around an abandoned minerals production platform, spaced at distances from one another and the platform as determined by depth, wind, current and wave conditions at the site. The mooring systems will consist of arrays of dead weight anchors on the sea floor, connected to the cages by tensioned systems of cables and/or chains, arranged to hold the cages in position under



**WALDEMAR NELSON INTERNATIONAL INC.**

specified design storm conditions. Cages will be provided with navigational aids and warning markers in compliance with U.S. Coast Guard Regulations.

Fish fingerlings will be transferred to grow-out cages from hatchery(ies) located onshore in a specially constructed transfer tank installed on a tender/transport boat owned or leased by the mariculture company. Size of the fingerlings introduced into the offshore cages will be species dependent.

A mariculture operations and maintenance crew will man an operations center located on the platform on a full time basis to monitor and control fish feeding, fish health and growth, net maintenance, and installation security. When the fish reach target harvest weight or size they will be harvested by the crew, which may be augmented by additional personnel to assist in the operation.

Fish feeding will be accomplished by an automated feeding system, controlled by a PC-type computer. Specially prepared feed will be brought in bulk by tender boat to the platform, where it will be stored in hoppers or bulk containers, which in turn will supply – through a conveying system – an automatic feed distributor. For floating, or surface cage systems, dry feed will be conveyed to drop lines or blown pneumatically through flexible tubing from the distributor to the cages, where the feed will be discharged onto the surface of the water in the cages by spreader nozzles mounted on the cage flotation structure. For submerged cage systems, wet feed will be pumped by the distributor through flexible tubing down to the fish through discharge nozzles located inside the submerged containment cages. Feeding will take place automatically, multiple times per day in order to achieve optimum feeding efficiency. Feed quantity for each feeding will be calculated to ensure that a minimum of feed is lost through the net

without being consumed by the fish. The number and timing of the feedings will be determined to ensure that the fish consume enough feed each day to promote optimum growth rates. Carefully controlled feeding will allow the operation to reach optimum feed conversion ratios, that is, produce the maximum edible fish meat for the minimum quantity of feed.

The cages will be constantly monitored by underwater, remotely operated video systems in order to spot and treat possible diseases or other threats to the fish, to locate general and routine wear-and-tear damage to the nets, predator intrusion, etc. The operations and maintenance crew will have diving capabilities and all accessory equipment required to maintain and repair damage to nets and other equipment. The crew should be provided with a small boat for routine or daily use in maintaining equipment, observation of fish, minor repairs to cages, etc.

Depending upon species and size of fish, harvesting by operations in other countries is accomplished in two ways:

1) In large-sized surface cages fish are separated using a mini seine net which is gradually pulled in to crowd fish into a harvest space adjacent to the side of the harvest vessel. Fish are then either brailed using a large hydraulically driven winch system or, in the case of smaller fish, directly pumped aboard into an ice slurry.

2) In submersible cages the bottom of the net is attached to a winching system which enables the space within the net to be reduced. A harvesting cage is then attached to an opening in the main culture net below water level and then fish are herded into the harvesting cage in controlled numbers. These fish can then be brailed, pumped or lifted onto the harvest vessel.



Harvest rates of 30 tons per hour can be achieved with either of these two systems.

Grading at sea is undertaken for fish species up to 5 kg by a fish pump coupled directly to a grading unit. Using the vessel's wet holds, fish can then be pumped back over the side into a new cage or transported to a different site.

## Fish Cage Systems

There are two general types of mariculture cage systems: the floating or surface type and the submersible type. Each of these types is available in a wide variety of types, configurations and materials of construction. A typical surface cage system consists of a floating structure which is directly connected to the mooring and anchoring system, and supports underwater fish containment and predator net systems; an overhead bird predator net; personnel access and walkways; feeding accessories and/or control; and monitoring or navigational aid equipment. Submersible cage systems consist of a net system support structure, also directly connected to a mooring and anchoring system which, upon command, can be fully or partially submerged to a given controlled depth beneath the surface by means of various types of ballasting and floatation control systems. Many submersible-type cage systems could also be used as surface floating systems.

## Surface Cage Systems

Floating cage systems are manufactured in a variety of shapes, sizes and material configurations. Smaller sized cages (up to approximately 20 m²) or pens are generally rectangular in shape, and are often installed as group, in rectangular arrays of four or more cages interconnected by walkways and intermediate platforms. Larger cages are usually circular, hexagonal or octagonal in shape and, though moored to a common system of anchors and interconnected by tension lines, are spaced at some distance apart in the open sea. Many of the circular or hexagonal/octagonal types are provided with walkways or access platforms along the side or top of the flotation structure. Materials of construction of the rectangular-shaped cage system float structures vary by manufacturer,



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**INTRODUCTION**

from metal tubing, sheet metal and reinforced rubber hose tubing with metal couplings, to pin-coupled solid high density polyethylene (HDPE) blocks. Octagonal and hexagonal cages are generally built of pressurized, reinforced flexible rubber hose tubing (hose of the type used for pumping petroleum products from oil tankers to pipeline transfer buoys at sea) connected by heavy metal couplings to form the octagon or hexagon. Circular cages are usually constructed of heavy wall (50 mm) HDPE heat-fused pipe lengths filled with polyurethane foam. The circular HDPE cage flotation systems are manufactured in either a single or double pipe configuration, with heavy-duty plastic or metal stanchions installed at intervals to reinforce the pipe structures as well as net support systems, handrails, and walkways. All cage control, monitoring, accessory and navigational aid equipment is supported directly by the flotation structure.

In floating cage systems, the fish are contained within a net which hangs from the flotation structure to a desired depth beneath the water surface. When site water depth is not a limiting factor, net bottoms can reach a depth of up to 20 meters. Nets are weighted and stiffened in order to prevent the net from becoming greatly distorted by lateral currents or wave action. Fish containment nets are generally made of nylon or other synthetic materials, though natural fiber is used in some instances. Containment nets may be treated with various types of non-toxic chemical compounds for the prevention or retardation of marine growth. Marine growth can become a factor in blocking water passage, which in turn can cause severe drag on nets, thereby exacerbating subsurface distortion and stress from water current and wave action. Fish containment nets often incorporate zip-closure-type access openings near or in the bottom mesh for mortality removal and other access purposes.

Offshore marine cage systems are usually provided with a heavy gauge net called a "predator net" around the outside of the fish containment net or nets. Depending upon the location of the installation and the type of predators common to the area, the nets may be constructed of more or less heavy gauge metal or synthetic fiber material of a mesh size gauged to prevent access by sharks, seals, otters, etc. Predator nets are supported directly by the flotation structure, and are not attached to the fish containment nets.

Bird predator nets covering the fish containment nets are commonly installed as well, and are supported from the flotation structure and above the water surface by

 **WALDEMAR NELSON INTERNATIONAL INC.**

stanchions or purpose built stays. These nets are generally made of light gauge synthetic fiber material and are of a mesh size designed to deny access to all but the smallest birds.

## Submersible Cage Systems

Submersible cage systems differ from the floating type in that the containment and predator nets must totally surround the fish being grown out in the system. The cages must also have a mechanical system for submerging and rising to the surface. These systems are also available in a variety of configurations. The most common material used in the construction of submersible systems is lightweight metal, such as aluminum or titanium alloy tubing. Predator netting is attached to the outside of the cage structure and fish containment netting is supported on the inside of the structure. The structures themselves are usually supported by or built around a hollow central vertical spar, which can serve as ballast-flotation chamber, feeding conduit, personnel support spar, etc. Some submersible systems utilize slip rings and exterior net-support rings that allow the shape of the containment net to be altered in order to drive the fish inside into a smaller volume area for harvesting or transfer to another net. Nets are provided with zipper-type access ports for harvesting, inspection, mortality removal, etc. The cage structure is connected to a stationary anchoring and mooring system by adjustable cable and chain arrangements which maintain controlled tension on the cage at variable depths.

Submersion and re-surfacing of the system is accomplished either by mechanically producing positive or negative buoyancy through the introduction of water and/or air into ballast chambers located in the cage support structure, as in a submarine, or, by a system of cables and pulleys which pull a zero buoyancy cage up or down in the water.

## Cage Mooring Systems

Cages are moored to the sea floor using single or multi-point arrays of anchors and a system of cables and/or chains and buoys to maintain tension on the anchoring and positioning lines, which keep the cage system moored in position while allowing in situ movement due to wave and/or wind action.

Many types and sizes of anchors are available commercially and some dead weight-types may be easily manufactured using concrete and rebar, scrap iron, etc.

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**INTRODUCTION**

Generally, the anchors are positioned in evenly spaced arrays around the cage systems, attaching the cage structure(s) to the anchors with cables and/or chains.

The cages, cable systems and anchors may be interconnected in various configurations designed to hold the cage position steady while allowing an appropriate amount of vertical movement due to wave action and some surface translation due to changes in current and wind direction. The cables and chains are maintained under tension by use of flotation buoys.

Anchor type and sizing, mooring configurations and cable tensioning arrangements depend upon site weather conditions, ocean currents, typical and storm condition wave heights and frequency, as well as sea floor composition and topography. Because of the complexity and importance of this subject, a full technical discussion of cage mooring considerations and conclusions thereof is included in a separate section of this study.

## Fish Feeding Systems

Automatic fish feeding systems consist of (a) feed storage components, (b) feed conveying equipment, c) pump or blower and distribution apparatus, and (d) on-cage feed delivery components.

It is envisioned that an offshore mariculture operation will include platform-mounted bulk storage hoppers with capacity to store enough feed to supply grow-out cages for a planned number of days depending upon location, ease of access, etc. The hoppers will deliver feed through screw-type or gravity conveyors to an automatic distribution hopper, which forms part of the automatic feeding system. A rotary distributor mechanism will distribute feed to each separate cage pipe on a schedule programmed into a control computer. This will be through mostly horizontal conveyors to gravity drop lines or through blown-dry feed or pumped liquid feed.

Each cage would be supplied with feed through a flexible plastic pipe run from the platform floor (feed storage and distribution area) down into the water and out to a distribution or spreader nozzle mounted on each fish cage. The cage feed pipes will be clustered and run through protective steel pipe casing from the platform floor to beneath the water surface to a predetermined depth to protect the relatively flexible feed tubing

from damage by waves and wind. The feed tubes will then be run from the end of the protective casing out to the cage structures with feed discharge spreader nozzles on each floating cage structure.

Feed will be distributed to each cage and discharged for feeding as commanded by a computer program. Feed will be discharged into the cages multiple times per day during daylight hours in quantities determined by the number and weight of fish in each cage being fed. The computer program should be routinely updated to allow for calculation of quantities and frequency of feeding. Quantities will be based upon the amount of feed the fish in each cage will take before allowing unused feed to pass through the cage (wasted).

Optimum feeding is attained when the fish consume all feed provided at all feedings, allowing no waste to pass through the net area, and growing at maximum rate.

## Offshore Support Systems (Platform Operations & Maintenance)

An operations and maintenance (O&M) crew composed of a shift supervisor and support personnel will man the platform on a 24-hour per day basis. Duties of the crew will include controlling and monitoring fish feedings, inspecting cage and net installations, checking mooring systems, unloading and storing feed, performing routine maintenance of equipment and fish stock, offloading and transferring fingerlings to grow-out cages, and harvesting.

An Operations Center located on the platform would probably be equipped with a personal computer (PC) system, remote video monitors for viewing all above and below surface mariculture systems, all recording and monitoring instrumentation for observing and collecting data on water temperature, quality, current, etc., and telephone/radio equipment for communication with onshore operations.

Farm operating equipment should include a heavy duty diesel-powered crane for lifting and changing nets, for loading bulk feed containers, for lifting boats and personnel, and for lifting and transferring fish during harvesting or fingerling stocking as necessary. Electrical power generating capacity should be provided on the platform, complete with fuel storage tank(s), if necessary, and all electrical distribution wiring and switchgear necessary for the operation of automatic feed storage and distribution equipment, other operations center equipment, and platform security and operations lighting.



WALDEMAR NELSON INTERNATIONAL INC.

**1-9**

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**INTRODUCTION**

Crews will be provided with adequate living quarters that will include sleeping, cooking, food storage and recreational facilities. The installation will also be provided with quarters for visitors and temporary work crews.

## Onshore Operations

It is envisioned that onshore operations will include either a fish hatchery or, as a minimum, a fingerling holding and transfer facility in addition to mariculture company administration, sales, product distribution, and logistics operations.

If the mariculture operating company also decided to raise its own fingerlings, hatchery operations would have to be accessible to transport and tender boats or ships which will transport fingerlings from the hatchery to offshore operations. The same boats will supply fish feed, platform supplies, equipment and fuel, as well as transportation for crew shifts. The hatchery will be complete with spawning tanks or pools, larvae rearing areas, and fingerling grow-out pools or ponds, as well as equipment for the production of all food such as phytoplankton, zooplankton and organisms O&M deem necessary for the successful production of fingerlings of the different species being cultured offshore.

## Product Transportation Systems

The farm should own or lease a purpose-built transport/tender boat which will be used to transport fingerlings from the hatchery to the offshore installation(s). The transport hold or tank needs to have the capacity to re-circulate outside water for the purpose of acclimating fingerlings to the temperature, salinity and turbidity conditions of water in the location of the grow-out cages. The transport/tender boat should also be equipped with a crane and storage space for cage nets, ice, and other supplies necessary for the operation of the offshore station. The tender will also be used to transport shifts of O&M crews to and from the platform. The transport/tender boat could also be used to transport harvested fish to shore as necessary.

## Equipment Assessment

## Mariculture Cage Systems

Two general types of cage systems are used in open ocean mariculture today: the floating type and the submersible type. Each type is manufactured commercially in a wide variety of specific configurations and materials of construction.

Typical surface cage systems consist of a floating structure which supports underwater fish containment and predator net systems and which is kept in position on the open sea by a mooring and anchoring system. Overhead bird predator nets, personnel access platforms and walkways, and feeding accessories and/or control, monitoring or navigational aid equipment may also be supported by the flotation structure.

Submersible cage systems consist of a net system support structure which, upon command, can be fully or partially submerged to a given controlled depth beneath the surface by means of various types of ballasting and floatation control systems. The structure is directly connected to a seabed mooring and anchoring system, similar to surface system mooring. Many submersible-type cage systems may also be used as fully enclosed surface systems only.

## Surface Cage Systems

*Rectangular and Modular Pens:* This sub-group of cage- or pen-type is manufactured in several configurations by a number of manufacturers. Some of the types and manufacturers of this type cage are: The floating spar-type as manufactured by Ocean Spar Technologies, LLC, known as the Sea Cage System; Wavemaster Steel Pens, manufactured by Wavemaster Canada, Ltd. of British Columbia; articulated flexible hose-type Tempest Fish Cages and High Seas Fish Cages manufactured by Dunlop Aquaculture and Bridgestone Corporation, respectively. These cage systems are all viable and are widely used for near-shore installations around the world. Generally speaking, rectangular/modular systems are used in smaller installations, with cage sizes up to



WALDEMAR NELSON INTERNATIONAL INC.

J:\97066\Feasibility Study Report\Chapter 1_Introduction.doc

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**INTRODUCTION**

approximately 25 m, and are generally arranged in even numbers of modules as a system of multiple pens joined by common accessways and flotation structures.

*Floating Spar Buoy Systems:* The main structural component of this type system is the spar buoy, a metal tube reinforced by ring stiffener members spaced along its length which floats in a vertical position. Spar buoys support the net enclosures at corners with a system of tensioned shackle rigging connected to the top and bottom of the buoy. The tensioned connections to the buoys keep the net enclosures from becoming inoperably distorted by wave and ocean current action. The buoys are moored to the sea floor by a system of anchors and lines attached to middle ring stiffeners. Net enclosures may be arranged as rectangles (four buoys), pentagons (five buoys), hexagons (six buoys), etc. The square configurations are manufactured in sizes up to 24 meters on a side; the system may be configured with up to 10 sides (10 buoys) to obtain cage surface areas of up to approximately 3000 m².

*Modular Rigid Steel Pen Systems:* These systems are composed of integral galvanized steel members connected by articulated bushings to form rectangular modules up to 30 m on a side, supported by polystyrene-filled flotation tanks. The cage system is moored by standard anchoring systems. Net enclosures are supported by the structural members, and are weighted to form relatively stiff net panels underwater. Structural members serve as accessways and walkway platforms. These systems appear to function well in calm, protected inshore waters, but would probably not be well suited to rough weather in unprotected offshore waters. Although the modules are provided with some flexibility through articulated connections between main structural components, the relatively rigid structural system is probably not compatible with high frequency, short period ocean wave action as encountered in the open waters of the Gulf of Mexico.

*Circular Plastic Tubing Systems:* A single or double ring of heavy-walled, semi-rigid plastic tubes filled with polystyrene-type foam forms the flotation support structure of these systems. The tubing material is usually high-density polyethylene (HDPE) because of its rugged strength, wearing characteristics and ease of fusion for welding. Twenty to 50 centimeter (cm)-diameter pipe lengths of HDPE are welded or fused into continuous rings, and are held in shape by systems of metal or HDPE clamps, retaining rings and stanchions spaced evenly around the circumference of the structure. Handrails, walkways, net systems and mooring lines are connected to the structure by metal clamps



or hook and ring fittings that are incorporated into the stanchions. These systems are produced by a number of manufacturers in Europe, America and Australia, such as Polar Cirkel (Helkgeland Plast AS) of Norway, Wavemaster of Ireland and Canada, Global Contract Services of Australia, and others. These cage systems are manufactured in large sizes, up to 70m total diameter.

Particular advantages of HDPE tubing structures are a relatively low cost, simplicity of fabrication, and – because of the low weight of the structure material – ease of transport and installation.

The tubing used for the larger diameter cages is usually of heavy wall thickness, between 35 and 50 mm, and is therefore rugged and wear resistant. Welding (heat fusion) of pipe lengths together to form a continuous ring is easily accomplished on-site, and joints are reported to be reliable and strong. Since the pipe is filled with polystyrene foam, flotation is positive even when the pipe itself is damaged by collision or by some other event. Manufacturers and many users claim that the larger diameter (30m and above) cage structures are quite flexible, and therefore are well suited for installation in offshore areas where rough seas are common.

Fish containment nets are supported from stanchions along the inside diameter of the rings, and are maintained in a vertical position in the water by weights suspended from a bottom circumference metal ring or from stiffeners run vertically along the net sides.

*Petroleum Product Transfer Hose Sections – Articulated Flexible Cage Systems:* Several rubber specialty companies, notably Dunlop of Britain and Bridgestone of Japan, manufacture aquaculture cage systems utilizing rubber hose technology perfected for use in the petroleum industry.

Heavy duty reinforced rubber hoses, in combination with industrial-type corrosion-resistant steel couplings and reinforcement fittings, were developed by the above-mentioned companies for the purpose of transferring petroleum products from large sea-going tanker ships to underwater pipelines and dockside offloading manifolds. Because of the quantities and nature of the petroleum products handled, the hoses operate under high pressures and temperatures at sea, often in bad weather. Such duty requires extremely durable, flexible and strong construction. Having proven durability, seaworthiness, and flexibility, the hoses have been adapted for use as structural members



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**INTRODUCTION**

on open ocean, floating mariculture cages. These type cages have been utilized for open sea operations for a number of years in Europe, Japan and Austral-Asia, and generally have received high marks from aquaculture users for durability, reliability and efficiency.

This type cage system is built from sections of rubber oil-product hose with sealed, airtight coupling flanges connected to both ends. The end coupling flanges are constructed in various angle configurations for connecting different shaped cages, for example, 45° couplings are used to connect four sides of hose sections in a rectangle, 30° couplings connect six sides of hose sections to form a hexagon, and so on. This system is configured in rectangular, hexagonal, octagonal and circular shapes. Sections of hose and additional coupling may be added to increase the size of the net systems as required, in some configurations.

Circular cages are manufactured in various sizes ranging from 18m to 40m inside diameter, for enclosed surface cage areas from 255 to 1260 m². Hexagonal and octagonal cages are built in size ranges from 16m to 20m on a side, for enclosed surface areas of 670 to 1000 m² and 1,240 to 1,930 m² respectively. Square cages of this type range from 12 m to 20 m on a side. Fish containment nets for all of these systems can be installed for depths up to 25 m, in proportion to the surface configuration.

## Submersible Cage Systems

There are basically two types of submersible cage systems: "active" and "passive." The active-type system is based upon a variable buoyancy flotation structure. An example of such a system is the Ocean Spar Technologies, L.L.C. "Sea-Station," which incorporates a ballast valve in the central spar structure to vary its buoyancy.

The passive system depends on mechanical action acting upon a neutral or slightly positive buoyancy structure to raise or lower it in the water. This system requires mechanically adding weight (or downward force) to the system to submerge it and the mechanical release of the weight or force on the system to return it to the surface.

*Variable Buoyancy Systems:* There are several ballasted systems available commercially which employ variable structure buoyancy methods for submersion.

One is the Ocean Spar "Sea Station" system, mentioned above. Another is a Russian system, sold by SADCO-SHELF, Ltd. of St. Petersburg, which operates on a



**WALDEMAR NELSON INTERNATIONAL INC.**

principle similar to the submarine. Marvel Investment Corporation of Tel Aviv, Israel manufactures a system which employs a variable buoyancy buoy to act upon a slightly positive buoyancy cage. In this case, when air is expelled from the mooring buoy, its buoyancy becomes negative and the buoy sinks toward the sea bottom, pulling the slightly positive buoyancy cage system under water through a system of lines and pulleys; when air is pumped into the buoy, forcing water out of it, it becomes strongly buoyant, allowing the cage system to rise. The cage structure's degree of buoyancy is controlled by a calculated quantity of weights attached to it; quick-acting couplings may be actuated, as a fail-safe measure, to release the weights in an emergency to have the cage float to the surface quickly.

Another ballasted system worthy of mention, although it is not a true submersible one, is the "Floating Fish Farm" system manufactured in Spain by Marina System Iberica, S.L. This system consists of a steel platform structure floating on variable buoyancy structural columns which raise or lower the platform in relation to the surface of the water, raising it up to six meters above sea level as required, mainly to keep the platform structure above wave height during storms. Seawater is pumped into or let out of the flotation columns, lowering or raising the structure in relation to sea level. A core grouping of cages are incorporated into the structure itself, but the system may be expanded by adding separate and independently moored cages around the platform. The independent cages may be supplied with feed from the platform, and maintenance or inspection carried out by the floating platform crew as well.

Most variable ballast submersible cage systems operate on similar principles of ballast control. Although some such systems do function satisfactorily, mechanical valves, pumps, pulleys and other moving parts are complications which can contribute to the risk of malfunction and potential operational problems in the unforgiving environment of the open ocean.

FEASIBILITY STUDY – OFFSHORE MARICULTURE

INTRODUCTION

*Passive or Neutral Buoyancy Systems:* There are several commercially-available cage systems which may be submerged by mechanical means, either to grow out fish at depth or to escape violent sea states brought about by storms. In most cases, the cage systems are designed to have neutral or slightly positive buoyancy, which allows the system to be pulled easily to a desired depth by mechanical means, and then returned to the surface.

One such system is the "Trident" cage system manufactured by Coastal Services, Inc., which is built of tubular aluminum members connected in a "geodesic" structural pattern with patented bolted connectors to form a geodesic-type spherical enclosure. The system is modular. Because of its relatively light construction, the system in easy to rotate while in the water, which permits the cage netting attached to the inside of the structure to be exposed to sunlight, therefore eliminating some net bio-fouling and permitting inspection of the net for maintenance without divers. Since the cage is totally enclosed (spherical), it may be submerged by adding weight to it or by mechanically pulling it beneath the surface.

Some cage systems now being used in the Mediterranean, specifically in Italian waters, incorporate net enclosures only, without solid structural support, for the culture of sea bass and sea bream. Because of the net material's relatively light weight, the "free floating" net supported by floats or buoys, can be submerged and raised with a minimum of force. The system seems vulnerable to predators, but in areas where predators are scarce, it could be viable and certainly inexpensive.

## Containment Nets

Fish containment netting is available in a wide variety of types, material, sizes and meshes. Flexible netting is available in natural as well as synthetic fiber, but synthetic fibers such as nylon polyesters are the most widely used in today's mariculture systems. Nets made of this material are available with knotted and unknotted mesh, in a variety of colors, mesh sizes and cord thickness. Size mesh and cord weight will largely be determined by the size and type of fish being contained, and by whether the cage will be moved (towed) or used for product transfer and harvesting purposes. Stiff, extruded plastic netting is also available commercially, generally manufactured of high or medium



WALDEMAR NELSON INTERNATIONAL INC.

density polyethylene. This type netting is available in rolls and may be cut to size to form stiff panels or circular pens. Because of the thickness and inflexibility of this type netting, cages made up of it may become difficult to handle in rough weather or high sea-current situations.

All types of containment netting can be treated with anti-fouling compounds to reduce marine growth bio fouling at sea.

Whatever type or size netting is used, the system employed for attaching and detaching the nets from the structure must be simple and quick so that routine repairs, cleaning and net changing can be accomplished without major effort. The system should also incorporate zipper-closure-type access openings for removal of mortalities, diver inspections, and harvesting or fish transfer procedures.

## Mariculture Feeder Systems

### General

Commercial fish feeding systems for aquaculture are designed to distribute either dry or liquid feed to fish pens or tanks. This study will address the delivery of pelletized dry feed to floating or submersible cages in the open Northern Gulf of Mexico.

Feed can be delivered to the pens or cages by farm personnel, using methods as uncomplicated as manually throwing the feed from an open bucket directly onto the surface of the water from cage-side, or as complex as automatic delivery from large storage hoppers through a system of pipes or conveyors. Since the quantity of fish to be raised by the mariculture systems described herein is measured in tons, it is envisioned that the feed delivery systems employed will be fully automated, controlled by computer programs to obtain optimum consumption and fish grow-out rates at the lowest possible feed conversion ratio (FCR), designed to deliver large quantities of feed reliably and efficiently.

Dry feed delivery systems consist of the following elements: storage bins or hoppers, conveying ducts to transport measured quantities of feed from the hoppers to a distributor, conveying systems to transport the feed from the distributor to each individual cage, and spreader nozzles on the cage to "spray" pellets onto the water. A mechanism at the cage-end of a conveying duct spreads the feed over the surface of the



**WALDEMAR NELSON INTERNATIONAL INC.**

water in a manner designed to optimize access to the feed by the fish in the cage. The quantity of feed delivered to each cage is controlled by a computer, which is programmed to deliver optimum feed amounts per cage per feeding, based upon the number and size of the fish in the cage, the amount of feed consumed during each feeding, etc. Ideally, the program will deliver only the amount of pellets per feeding which can be consumed totally by the caged fish per cycle, each cycle repeated the number of times per day necessary to achieve optimum fish growth rates. The feeding program will be dependent upon information feedback from detection systems in the cages, comparison of actual growth rates to calculated rates, and operational experience with the species being raised.

*Auger or Disk Conveyor Delivery Systems:* In this type system, feed is delivered to a tubular (pipe) conveying duct from a storage hopper, through a rotating impeller which evenly controls the quantity of feed pellets fed into the duct. The feed is pushed or pulled through the duct system by a continuously rotating screw auger or by a series of cable connected disks. The operational speed of either system must be controlled to avoid crushing the pellets. Filters for collecting any fines generated by crushed feed are incorporated to avoid clogging downstream distribution elements. The feed is carried to individual drop units over each cage for delivery. The drop units may be sized on a volumetric or gravimetric basis to deliver a specific volume or weight of feed to each cage during each feeding cycle. The volumes or weights delivered by each drop unit may be set in accordance with a feed scheduling computer program.

This type system is very effective and efficient for delivery of feed to accessible and rigidly stationary cages or pens, such as tanks or pools in an onshore aquaculture operation. One positive advantage of these systems is the low electrical power consumption required to deliver relative large amounts of feed over a considerable distance and the ease of distribution to any number of cages.

The obvious disadvantage of using such a system in an open ocean installation is that the conveyor ducts must transport the feed from hoppers located on a high platform, down to and below the water surface, then up again to the cages for delivery in a corrosive atmosphere and in a constantly moving environment due to waves, wind and ocean currents.

*Air-Based (Blower) Feed Systems:* In these systems, dry pelletized feed is fed evenly through a rotating impeller or dosing valve from a storage hopper through a



pneumatic conveying tube to a blower unit, and into a rotating distributor unit. The rotating distributor selectively distributes feed to individual pneumatic pipes, one for each cage. The air blower system pushes the dry feed through pipes to each cage, where it is delivered through a "spreader"-type nozzle to the surface of the water over the cage enclosure. Some systems are capable of distributing large amounts of feed to up to 64 cages per blower system. The blower and distributor are capable of being controlled by remote computer to supply each cage with a specified amount of pelletized feed any number of times per day in accordance with a program.

Several specialized aquaculture equipment manufacturers produce this type system. This type system has been operated successfully for many years in almost every kind of open sea environment, domestically as well as overseas.

### *System Configuration*

Main components of air based systems are as follows:

*Air Blower:*  Generally a centrifugal fan-type blower, electrically driven by motors ranging between 7.5 kw to 20 kw, depending upon feed volumes and distance to cages. The blower units are equipped with pressure controls and monitors, and often include an air cooling system to cool the air before it reaches the storage hoppers. The cooler air reduces damage to the feed pellets and reduces feed dust and fish oil transmission into the system. The blower unit is mounted on a frame upstream of the storage hoppers.

*Feed Hoppers and Dosing Valves:*  Generally, a mariculture farm will use multiple separate hoppers, or silos, the number depending upon how many types of different feeds need to be distributed to different sizes or different species of fish. The size of the hoppers may vary but a common size is four to six tons, which measures approximately 8 x 8 feet wide by 8 to 10 feet high. Each hopper is equipped with a doser valve flange bolted onto the bottom. This valve contains a metal impeller, mounted horizontally, which is a rotor that turns slowly to drop feed evenly and accurately into the pneumatic stream in the supply conveyor. The doser valve is designed to prevent damaging or breaking up the feed as it transfers from the hopper into the conveying system and accelerates on its way toward the distributor unit.



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**INTRODUCTION**

_Distributor Unit:_  The conveyor pipe from the storage hoppers enters the distributor unit in its center. Inside the unit is a curved pipe that rotates, in either direction or in a complete circle, between 24 to 32 cage feeding pipe outlets. For larger farms, two distributors are mounted in a side-by-side configuration to service up to 64 cages per system. Bi-directional and 360 degree rotation allows the rotating pipe to switch to the next position between cages by the shortest route. HDPE feeder pipes to each cage are connected to feeder nipples, and then are bundled and passed through a long radius, heavy-duty strain relief bracket before dropping vertically into the water.

_Cage Feeder Pipe and Spreader Nozzles:_  Black high-density polyethylene (HDPE) is used exclusively as feeder pipe to the individual cages. HDPE is not water absorbent, and does not react with saltwater, sunlight, or the oils in fish feed. It is also relatively flexible and non-kinking, and is very durable and abrasion resistant. In an oil production platform scenario, an important consideration will be to secure these feeder pipes on the platform and down past the waterline to protect against damage in rough weather and from constant wave action. It is envisioned that this protection will be afforded through the use of large diameter steel well casing pipe, which will serve as a conduit from the platform floor to a safe depth below the waterline. At the cage-end of the feeder pipes specially designed spreader nozzles are installed to enable an even spreading pattern in order to minimize feed pellet breakage.

_Controls:_  Control cabinets and a computer are mounted in a control room on the platform. The computer (PC) is used as a communication terminal for the feed delivery system, and will control and monitor blower motors, valves, and sensors in the cages and feed system. The PC may be controlled remotely through a controller card and directional antenna, if so desired. A battery pack system and inverter/charger is connected to the control system for provision of stable power whenever the generator system is running or down.

## Worldwide Offshore Mariculture

Offshore mariculture was first investigated in Japan during the early 1970s. Consideration of offshore aquaculture at that time was due to Japan's diminishing catch of wild fish species, steady increase in demand for fresh finfish, improving aquaculture techniques and extremely limited access to inshore coastal resources used by traditional fishing and aquaculture industries. The Japanese company, Bridgestone, which manufactures large diameter flexible hoses for use in the dredging and mining industries, was the first offshore cage designer and fabricator to commence research on farming finfish species in exposed waters. It was seen as a positive diversification strategy for the company when increasing concerns with industrial and urban pollution were emerging within the Japanese aquaculture industry.

Research and manufacture for limited usage continued through the late 1970s but it was not until the early 1980s that the commercial demand for such cages led to full commercialization and manufacture, and increased commercial use in Japan, Russia and Norway.

By the late 1980s salmon production in Norway and Ireland had moved commercially into exposed regions leading to a new generation of farming systems being designed and manufactured. This was the second generation of semi-exposed finfish farms with automated feeding systems, rough weather cages, service vessels and operational techniques for efficient finfish management and harvesting.

In the early 1990s, the growth rate of new farms and farming areas for finfish slowed in Norway with efficiency of farm operations and economic returns becoming the main focus of the industry. At the same time, Japanese and Norwegian mariculture technology was being applied on a worldwide basis to new species such as southern bluefin tuna in Australia, sea bream and bass species in Greece and Italy, salmon in Chile, red drum and yellowtail in China, snapper and tuna species in Japan, and salmon and bass species in the North American region. Many of the countries had limited sheltered coastal resources so the offshore farming technology developed by Japan and Norway further expanded internationally.



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**INTRODUCTION**

By 1995 this worldwide expansion of offshore finfish aquaculture had produced a range of proven systems designed and commercially in use in exposed and formerly thought to be hostile farming locations. The technology has led to the successful commercial expansion of offshore farming operations for salmon farming in Ireland, Shetland Islands, Faeroe Islands, Canada and Australia; tuna farming operations in Australia, the Mediterranean and Japan; sea bream and bass farming in Italy and Greece, and yellowtail and snapper operations in Japan.

To summarize, the development of commercial offshore finfish farming is due to:

- Environmental concerns, limited availability and user conflicts in inshore areas
- Large useable offshore areas in the outer coastal zone
- Lower disease risks offshore
- Development of proven technology which is now available
- Increasing worldwide demand for fish
- Stagnant or decreasing supply from traditional  fisheries

In addition, commercial operations offshore in the last 10 years have shown:

- Possibilities of lower production costs per kilo of fish
- Better environmental, biological and growth conditions for fish
- Potential for larger, more flexible farming sites
- Potential for economies of scale through larger production volumes

## Trends

Current investment trends in the last five years within finfish farming and offshore finfish farming industries have seen the development of fully vertically integrated corporate structures in many countries, especially Italy, Greece, Spain, Norway, Chile, Australia and New Zealand. This breed of new companies has been formed either through merger of larger marine farming resources or through accumulative acquisition of smaller, less efficient operations within the industry. The new



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**INTRODUCTION**

companies have annual production capacities in excess of 2,000 tons and as high as 50,000 tons and are expanded capital investment structures involving both listed companies and large, privately operated ventures.

A further recent trend has been the investment by large fishing companies into aquaculture and offshore finfish farming through redeployment of previously under-utilized fishing vessels from within their fleet structures. This is especially apparent in Australia and is being promoted in the U.S. and Canadian industries through financial incentives and government support programs.

Offshore finfish farming requires a high level of initial capital investment in comparison to inshore operations; cages are larger, mooring systems heavier and operational support vessels for farm management more substantial. This limits smaller sized operators from individual entry but does create significant opportunities for subcontracting to large offshore operators. Smaller operators do not exist in the offshore environment except in Japan, where the collective co-operative fishing skills of a whole Prefecture have been combined into a single project with Prefecture financial backing.

Vertical integration begins at hatchery level with production of fingerlings or fry, includes raising of juvenile fish, subsequent grow-out activities, processing and final direct marketing of the company's finfish product. Marketing directly to large-sized end-product users is seen as essential to maximize farm returns while ensuring long-term supply contracts for increasing volumes of production. In many instances, the inclusion of a large distribution/retail partner in the enterprise is seen as essential to ensure market focus and contract-based production activity.

The above trends are expected to continue in the future due to the physical environment within which offshore finfish culture must operate and the level of capital investment required to achieve economies of scale in operations.

## Countries, Companies and Offshore Operations



JAPAN

### Japan

Japan's finfish aquaculture industry is spread from single working farmers as part of a larger fishing/aquaculture co-operative, to medium-sized companies farming at inshore sites, to recent "mega" sized company involvement in offshore finfish production, processing and marketing.

The development of flexible rubber cages has led the offshore industry since the 1970s with major interest in the farming of red sea bream and yellowtail species and, recently, trevally and tuna species. Recent pollution has pushed cage farming of finfish into more exposed areas and the requirement for an intermediate cost cage to handle four to five meter seas has been identified. Japan is adopting Norwegian and Australian technology in these areas due to cost of units and proven overseas success.

Recently, Japanese interest has been in the establishment of large offshore platform structures from which to base farming operations in open exposed conditions, including seasonal typhoons. Three newer large-scale platform finfish operations have been established since 1988. Two of these remain in full commercial operation. The other one was sunk due to a dispute between fishermen over traditional fishing ground access.

The platforms were constructed on a floating base which was then floated into position and jacked up to 60 feet clear of the sea surface. All feeding equipment, cage monitoring, dead fish removal and biomass estimation equipment was supplied from Norway for both projects, which are growing salmon and yellowtail species. The programs for platform development were promoted by the Japanese Ministry of Agriculture, Forestry and Fisheries and, so far, have proven operationally successful in a variety of seasonal weather patterns since 1992. One platform is financially backed by a large fishing co-operative in partnership with the local Prefecture administration. The

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**INTRODUCTION**

second platform is commercially backed by Mitsubishi Industries, a major steel manufacturer, working in co-operation with local fishermen.

Both platforms have produced fish for five years. The Northern Hokkaido platform has been through two typhoons with 10-meter seas without any recorded losses of equipment or fish. Both platforms have remote control capability for onshore management and monitoring of operations via VHF and short-wave video link.

Japan produced 833,000 metric tons of fish and shellfish; the two major fish species being yellowtail (165,000 tons) and sea bream  (80,000 tons) in 1996.



## Australia

In Australia the offshore industry group is comprised of two separate groups. The salmon farming group located in Tasmania and the southern bluefin tuna farming group in South Australia.

The Tasmanian Salmon Industry is dominated by three publicly listed companies; Nortass, Tassal and Aquatas, which are fully integrated enterprises created through purchase of smaller operators. They all manage their own hatchery facilities, grow-out, processing and marketing operations. Nortass has recently established a fully offshore farm area on the Southern East Coast using two 50-meter octagonal Bridgestone cages, with three units further proposed. Tassal and Aquatas are both expanding to offshore sites with large-sized polyethylene cages of 40-meter and 50-meter-diameter in 1997/1998. Combined production levels of the three companies were approximately 5000 metric tons in 1997.

The southern bluefin tuna farming operations in South Australia include 12 commercial farming operations, 17 farms, 80 large cages plus 8 research cages, 22 companies and approximately five hundred people directly involved in farm management – capture, feeding, harvesting and processing. All farms extensively utilize the latest generation of polyethylene single-collar and double-collar cages designed and manufactured in Australia. This industry purse seines southern bluefin tuna which are then transferred to 50-meter-diameter towing cages and towed up to 500 kilometers back



**WALDEMAR NELSON INTERNATIONAL INC.**

to farm sites ranging from one mile to eight miles offshore from land. During the tow, cages are exposed to extremely harsh conditions from full southerly exposure being at times up to 150 miles offshore. Individual tows can take up to one month to complete at an average cage speed of one knot.

In 1990, Bridgestone cages were used almost exclusively in a joint research effort between the South Australian Tuna Industry and Japanese research teams. Now single-ring, new generation polyethylene cages are being introduced for both towing units and offshore farming cages. The industry has grown from 50 fish in 1990 to a 2500-ton industry valued at close to $100 million dollars in just seven years. All companies are privately owned but operate with some Japanese investment funding and Japanese marketing co-ordination.

This technology is now being exported worldwide to Croatia, Italy, Greece, Spain, Malta, Libya, Southern Africa, China, Philippines, Indonesia, Canada and the U.S. The cost of cages and the increased returns from controlled marketing of wild captured fish to Asian and European markets are the driving forces for this development. Hatchery and juvenile rearing programs are currently being researched.

Polyethylene cages are now also being utilized for yellowfin capture fisheries and the aquaculture of snapper species in both Western Australia and Queensland, on the east coast of Australia.



## Northern Europe and Great Britain

The Norwegian salmon industry is progressing further toward offshore development based on requirements for expansion, disease risk reduction, water quality parameters and availability of farming space. Traditionally polyethylene has been used extensively for cage manufacture centered on two adjacent rings and a platform structure for working around the cages. Steel frame cages supported by large buoyancy units are also used in very sheltered waters.

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**INTRODUCTION**

The Norwegian salmon industry is dominated by the larger companies who own, operate and process their own fish and/or supplement processing volumes with contract grown fish from smaller growers. The majority of the larger sized companies are publicly listed with production volumes for a number of them exceeding 20,000 tons and for one company, exceeding 50,000 tons.

Due to EU and Norwegian Industry imposed production restrictions, industry focus has been directed to improving farm technology, automation and efficiency, thereby reducing production costs. Feed development and improving feed conversion ratios is also a continuing dynamic for the industry. Much of this inshore-based farm management technology is now being applied to offshore facilities and is successfully achieving operational economies both in Norway and on an international basis.

Ireland has what is regarded as one of the most successful offshore salmon industries in the world with approximately 30 percent of production claimed to come from exposed North Sea sites. Flexible rubber cages have now been used in this region for eight years and are produced locally in association with an Irish engineering company. A combination of square 20-meter cages and larger 40-meter octagonal units have been produced for the salmon industry. These have been successful in maintaining fish in all weather conditions with up to 10-meter seas. Five of the main companies use these units in exposed locations and have been in operation for up to eight years producing salmon. The companies are privately owned or partial co-operatives between traditional smaller growers.

The Scottish salmon industry has also adopted the same cage types with similar results at the exposed locations. In both Ireland and Scotland it has been observed that in extreme weather conditions fish will stop feeding for up to three weeks without noticeable loss in condition or growth rates when compared to inshore fish one month after the event.

Shetland Islands and Faeroe Islands both have exposed offshore salmon industries based on flexible rubber cage technology. Almost all farming operations in these two regions are exposed through a minimum of 180 degrees to North Sea weather conditions.

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**INTRODUCTION**



### Mediterranean

Until very recently the central focus of Mediterranean finfish farming production in Greece, Italy, Spain, Yugoslavia and other minor producers was directed toward inshore sea bream and sea bass culture. The first three countries, as well as more recently Malta and Croatia, have recently commenced building offshore farms at moderately exposed and fully exposed offshore sites with a variety of cage systems.

Surface cages initially were secured from Norwegian suppliers but performance in exposed conditions was found to have limitations. Submersible cages supplied by the Russian company SADCO have also been trialed very successfully in Italy, though cost and size limitations have appeared to restrict further sales in this region. Bridgestone cages and, more recently, Australian-made single-collar polyethylene cages have wide acceptance. The Australian cages are especially popular in the large sizes for use within the northern bluefin tuna industry, which the Australians are actively assisting to develop in Spain, Greece, Italy and Croatia.

Spanish constructors, MSI, have also built fully self-contained platform structures for four clients in exposed coastal areas. These cages feature a fixed steel structure, which can be raised or lowered several meters depending on sea conditions and stock densities in cages. The system has advantages in that it can be used for feeding to other cages attached to the perimeter of the structure and has loading capacity for all farm operations, feed storage, grading work and – due to the external frame work for each cage – loss of cage volume in high current flow or medium wave action is greatly reduced.

The trend to much larger sized production units for both tuna culture and sea bream farming operations has resulted in increased interest in both polyethylene cages and flexible rubber cages by all the major operators in open waters in this region. Yellowtail (amberjack), grouper, mahi mahi and local black sea bream are seen as future species for an expanding Mediterranean industry.

The trend in industry development is for large integrated companies to commence offshore operation establishment. Prior to this, family operations of limited size or medium-sized co-operatives of fishermen predominantly drove inshore farming.



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**INTRODUCTION**

Amalgamations between large-scale companies have seen the large vertically integrated producers extend their market reach from the Mediterranean throughout major markets in middle Europe such as France and Germany.



### Asia

Recent interest in offshore aquaculture from international funding agencies such as the World Bank and Asian Development Bank has resulted in projects being established in Philippines, Indonesia, Malaysia and China. Three cage systems have so far been used; polyethylene single collar cages, flexible rubber cages from Bridgestone and Dunlop, and the submersible system from Ocean Spar Technologies of the USA.

Extensive inshore pollution problems and limited near shore deep water in many parts of this region coupled with typhoon, hurricane and monsoon weather conditions throughout the equatorial sector have placed expansionary growth for finfish farming in the offshore regions where depths enable structural force reduction, improved fish growth and risk reduction to development funding agencies.

Inshore and inland aquaculture has historically been the basis of finfish aquaculture in these regions with current investment following proven international trends from the above advanced countries.

FEASIBILITY STUDY – OFFSHORE MARICULTURE

INTRODUCTION



### North America

Canada and the United States have been slow to adopt offshore technology due to the late development of finfish farming and more restrictive permitting processes in most inshore coastal regions. Recent development in offshore technology has induced a total reassessment, at State and Federal level, of the potential and impact of these industries. In 1996, 1997 and 1998 successful conferences on offshore aquaculture in Maine, Hawaii and Texas have attracted international participation and high levels of American and Canadian involvement.

Salmon farming in the Bay of Fundy has been successful despite extreme ice conditions, strong currents and, at times, gale force wind conditions. Ocean Spar Technologies has successfully developed both submersible and floating cages for the salmon industry in this region.

Recent successful trials growing northern bluefin tuna off the coast of Maine using Australian polyethylene technology cages has initiated a number of applications for offshore fish farms for the species around Newfoundland and Nova Scotia. Wild caught fish were penned 10 miles offshore and fed for an eight month period without apparent difficulty or equipment or biological problems. Growth rates were good. Permitting procedures may restrict further development of this offshore industry in Maine and Connecticut.

There have also been some attempts to establish offshore operations in thee Gulf of Mexico. These are detailed in Chapter 4 of this study.

FEASIBILITY STUDY – OFFSHORE MARICULTURE

ASSESSMENT OF CANDIDATE MARINE FINFISH



Chapter

2

# Assessment of Candidate Marine Finfish

## Summary of Species Assessment

Fifteen species of finfish were reviewed for suitability and biological feasibility for offshore mariculture in the Gulf of Mexico. Two of the species, red drum and striped bass, are already established in commercial culture. They are both suitable for cage culture and biologically feasible for offshore culture in the Gulf of Mexico. Red drum has already been reared in offshore cages on an experimental level (Miget 1995). Red drum and striped bass can serve as good "models" for development of production methods for finfish culture in the offshore environment. Several other very promising "high" value species are reviewed that might be quickly brought into production with the appropriate public and private investments in research. Development of commercial scale nursery and grow-out methods should be the first priority for the under-developed species. Grow-out technology will need to be developed that is specifically suited to the offshore environment. Strongly tied to successful grow-out will be the refinement of feeds specifically suited for high value marine species. Many of the species reviewed appear to have requirements for higher quality feeds than those currently used to rear other species. Disease problems will undoubtedly be an issue for all of these species and will need to be addressed as they are encountered. Disease detection and treatment methods that will be effective in the offshore environment will pose a special challenge for culture operations. In reviewing successful culture practices for high value species abroad, it is clear that many foreign culture operations preferentially use naturally produced seed and exploit low value finfish species as feed for culturing high value species. The cultural acceptance of these practices overseas may prove to be a major competitive advantage over efforts to develop high values species for mariculture in the U.S. Currently the use of bycatch in the U.S. is discouraged by management agencies.

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISIH**

However, this policy may need to be re-evaluated if mariculture in the U.S. is to be competitive in global aquaculture markets. Strong collaborations between public and private enterprise along with nationally supported regional mariculture centers have also been an important part of the successful development of mariculture in other countries. Many of the high value species reviewed in this assessment could be grown out by existing fish culture operations if reliable cost effective sources of fingerlings were available. The high costs and risks associated with the research, development and production of seed for high value species is currently a major impediment to expansion of existing culture operations and entry of new commercial ventures. The Gulf of Mexico has numerous marine finfish with strong potential for mariculture. A regional mariculture center could foster development of new species through research, technology transfer and production of seed for grow-out trials by private enterprise.

## Introduction

Global aquaculture production of finfish in 1995 was approximately 12.5 million mt. Currently, both world and U.S. production of finfish is dominated by freshwater species (FAO 1998), chiefly catfish and trout in the U.S. Furthermore, global mariculture is currently dominated by shellfish, rather than finfish production. Given the vastness of the ocean and its tremendous productivity, these patterns seem likely to change in the future. Unlike aquaculture production, world fisheries landings have always been dominated by marine fish and shellfish (New 1997). In the future, freshwater systems are likely to have limited potential to expand production compared to marine systems because of limitations of land, available clean fresh water and competition for these resources with other forms of agriculture. As the costs associated with land-based systems increase and land-locked aquaculture production peaks, pressure will increase to promote the development of marine species for culture. This, coupled with the recent changes in the more conservative management of fisheries in the U.S. mandated by the Magnuson-Stevens Act, results in a push for aquaculture enterprises to develop coastal and offshore culture systems to meet projected increased demands for seafood (New 1997). Many



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISIH**

coastal bays and estuaries are already faced with serious ecological problems from pollution and eutrophication (Caddy 1993), indicating that the future of mariculture may be in the offshore environment.

Offshore culture systems offer some unique problems and some advantages. Winter temperatures can limit production of land-based systems and can cause devastating winter mortality, even in southern climates (Lutz et al 1997). Within the Gulf of Mexico, offshore environments offer warmer winter temperatures for grow-out and cooler summer temperatures than shallow water systems and buffer abrupt temperature changes better than shallow systems. Another distinct advantage is the inherently better water quality and stable salinity regimes typical of offshore environments.

The following review is focused on marine finfish species believed to have potential for mariculture in the coastal and offshore environment of the northern Gulf of Mexico. Issues such as genetic diversity of hatchery produced fish, escapement of captive stocks and introductions of exotics have significant implications for management of wild fish stocks and threaten to complicate permitting for aquaculture in open water environments. Therefore, we have limited this assessment to species indigenous to the Gulf of Mexico and Caribbean region. These species have been selected because they are regarded as suitable or believed to have strong potential for development as mariculture candidates in the Gulf region. Each was also specifically evaluated with regard to their potential for offshore cage culture. In order to avoid an exhaustive list of species, the evaluation is focused on species that have had some level of development for culture. The review outlines their strengths and weaknesses as culture species, along with an evaluation of some of the fundamental research needed to make them biologically viable for culture. Fisheries economic issues are complex and prices fluctuate with market demand and availability from natural fisheries as well as price and availability of alternatives in the marketplace. Those issues are considered elsewhere in this report. However, the evaluation is also heavily weighted toward species that could be categorized as "high" value. Only a few of the species that have been evaluated are now in commercial culture in the Gulf region. With the exception of redfish and hybrid striped bass, each of the other species will require various levels of additional research before they will be viable for mass culture in offshore cages.

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISIH**

The following species were evaluated:

Amberjack, Greater, *Seriola dumerili*

Cobia, *Rachycentron canadum*

Flounder, Southern, *Paralichthys lethostigma*

Grouper, Nassau, *Epinephelus striatus*

Mahimahi, *Coryphaena hippurus*

Grouper, Red, *Epinephelus morio*

Grouper, Gag, *Mycteroperca microlepis*

Pompano, *Trachinotus carolinus*

Drum, Red, *Sciaenops ocellatus*

Snapper, Red, *Lutjanus campechanus*

Snapper, Gray, *Lutjanus griseus*

Snapper, Yellowtail, *Ocyurus chrysurus*

Snapper, Mutton, *Lutjanus analis*

Striped Bass, *Morone saxatilis* and SB hybrids

Tuna, Ocean Ranching

## How was this task completed?

Literature reviews were conducted in ASFA (Aquatic Sciences and Fisheries Abstracts), literature searches in databases held by FAO, NMFS, CSC, Sea Grant Sites, ICES and USDA. Literature and citations were compiled and reviewed for relevance. The Internet was also searched for aquaculture web sites and general web searches were conducted to locate recent and relevant information from institutional world wide web pages. Finally we relied to a lesser degree on interviews with culturists working in the areas and with the species of interest.

Each species was evaluated with regard to the following categories and associated criteria:

## Biological Profile and Rationale for Inclusion

Why target the species for mariculture?



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISIH**

What are some of the important ecological requirements and tolerances, spawning seasons and location, growth rates in the wild and status of natural stocks?

## Status of Nursery and Grow-out Methods

Nursery requirements - Are spawning methods established and suitable for production? Are broodstock readily available?

Larval rearing - What are the food size, salinity and temperature requirements?

Grow-out requirements - What are the temperature and salinity ranges and optima?

Is cannibalism an issue for a given species?

## Nutritional and feed issues

What type and quality of feed is needed for a particular culture species? (quality and type = dry or moist pellet, protein, lipid content).

## Suitability for cage culture

What is the track record for this or a related species in cage culture?

Are there any specific constraints related to offshore cage culture?

## Disease issues

Are there any known diseases or conditions specific to this species likely to be a serious threat to commercial culture?



**WALDEMAR NELSON INTERNATIONAL INC.**

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISIH**

### Potential limitations for culture

What are the known or likely constraints for this species?

What constraints might be predicted based upon best available knowledge?

### Special Considerations

Is Polyculture an option?

Are hybrids possible and potentially advantageous?

Are there issues or conflicts related to natural fisheries?

### A Note on the Bibliography and Citations

A bibliography is organized at the end of this document with compilations of both cited and uncited literature listed by species. For general fisheries and aquaculture references, they are either listed in a separate section titled "General Fisheries and Aquaculture" or where they are specific to a species, within their section.

### A Note on Abbreviations

p. o. = personal observation
p. c. = personal communication



**WALDEMAR NELSON INTERNATIONAL INC.**

FEASIBILITY STUDY – OFFSHORE MARICULTURE

ASSESSMENT OF CANDIDATE MARINE FINFISIH

## Species Assessments

### Amberjack, Greater, *Seriola dumerili*

#### Brief Biological Profile and Rationale for Inclusion

Members of the amberjack family are a group of widely distributed migratory species of significant commercial and recreational value as a fishery (Manooch and Potts 1997).Their strength and fighting ability is legendary among sport fishermen. Currently amberjacks are considered overfished in the Gulf of Mexico (NMFS 1997), possibly making the prospects for their future culture more economically feasible. Recreational limits have been reduced to one fish per day with a 28 inch size limit in the Gulf.

Commercial culture of amberjack has never been attempted in the U.S., but the Japanese and Chinese have researched culture of greater amberjack and the Koreans and Japanese have invested a significant effort into a closely related species, the yellowtail, *Seriola quinqueradiata* (Aoki 1995). Yellowtail culture has been one of the most successful marine species cultured over the past decade. Unfortunately, pressure on natural stocks from taking of fingerlings for seed and other problems have limited production in recent years (Aoki 1995; Furuya 1995). In Europe efforts are also underway to culture greater amberjack, *Seriola dumerili* and in Ecuador a related species, *Seriola mazatlana* is being researched (Bennetti et al 1994, 1995).

Amberjack are schooling fish that are often associated with structures such as oil rigs or wrecks. Greater amberjack grow rapidly and can reach a maximum size of around 68 kg and 1.5 meters in length in the wild (Manooch and Potts 1997). Because of their rapid growth rates, good palatability, and prolific spawning capability, greater amberjack and some closely related carangids have been recognized for their potential in commercial culture.

#### Status of Nursery and Grow-out Methods

Very little work on nursery and grow-out techniques for amberjacks has been reported for the United States. Therefore the review of nursery and grow-out will focus



**WALDEMAR NELSON INTERNATIONAL INC.**

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISIH**

on some of the research done on *Seriola dumerili* overseas and work on closely related species, such as yellowtail. Nursery and grow-out of yellowtail in Japan was recently reviewed (Aoki 1995).

Reproductive potential of amberjack is tremendous. Amberjack are serial spawners and have extensive spawning seasons in the Gulf of Mexico (Ditty et al 1988). Greater amberjack have been spawned in captivity by injection with salmon pituitary and genital hormone (Tachikara et al 1993). No reported spawning by temperature-photoperiod manipulations suggests that amberjacks may difficult to spawn by those methods. After injection the greater amberjack produced large broods of eggs. Amberjack eggs are relatively large (1.05-1.20 mm) and the larvae began feeding on rotifers at a size of 3.9 mm after 4 days at 25 °C (Tachihara et al 1993). In European growth experiments, larvae reached first feeding and a size of 5 mm after 6 days at 19°C (Lazzari 1991). In nature, greater amberjack can reach a length of 36 cm in a year (Manooch and Potts 1997) suggesting they would grow quickly in culture.

Cannibalism in intensive grow-out may be the biggest problem in the nursery phase (Sakakura and Tsukamoto 1996). Like many species of fast growing open water marine finfish adapted for culture, cannibalism is likely to be a problem in the juvenile phase. Studies with yellowtail, showed an onset of cannibalism shortly after metamorphosis to the juvenile stage (~10 mm TL) which coincided with formation of schools.

## Nutritional and Feed Issues

Successful grow-out trials with *Seriola dumerili* show that feed acceptance or development of appropriate feeds should not be a serious impediment to developing grow-out technology for greater amberjack. However, feeds specific to amberjack apparently will need to be developed by the U.S. feed industry. Amberjack apparently do not readily accept dry feeds and considerable research has been done to develop and test moist and semi-moist pellets and refine feeds for both yellowtail and amberjack in Japan and elsewhere (Di Bella et al 1991; Sekiya et al 1991; Shimeno et al 1992, 1993a,b,c; Watanabe et al 1992; Viyakarn et al 1992). Work with yellowtail has shown a need for HUFA's consistent with other marine fish and fish larvae (Di Bella et al 1991). Limited

nutritional work has been done specifically with greater amberjack, although the extensive nutritional development for both grow-out and spawning that has been done for yellowtail should be applicable in large part to the greater amberjack (Di Bella et al 1991).

## Suitability for Cage Culture

Given their requirements for high salinity and relatively warm temperatures, amberjack appear to be best suited to coastal cage and perhaps pond culture where high salinity water and warmer winter temperatures would be available. Based upon successes in cage culture of the yellowtail in Japan (Aoki 1995), in Korea (Kim and Myoung 1995) and trials with greater amberjack in China (Liao et al 1995) and Europe (Di Bella et al 1991), it seems likely that greater amberjack will be readily adaptable to cage culture in the GOM.

## Disease Issues

Significant problems with disease have developed in cage culture of yellowtail in Japan and significant mortalities have been reported (Aoki 1995). Much of this is reportedly due to very high stocking densities and stresses related to intensive culture in semi-enclosed basins.

## Potential Limitations for Culture

Although spawning technology has been developed for yellowtail, grow-out of yellowtail in Japan and greater amberjack in Europe have been largely supported by collections of wild fingerlings (Pillay 1990; Nakada and Murai 1991). Given the current trend in wild amberjack fisheries in the GOM and a different cultural view of exploiting wild seed for grow-out in the U.S., spawning and larval culture techniques will need to be developed before any efforts at commercial grow-out can be attempted.

FEASIBILITY STUDY – OFFSHORE MARICULTURE

ASSESSMENT OF CANDIDATE MARINE FINFISIH

## Special Considerations

Amberjack are very palatable, especially smaller fish. Because of the size restrictions placed upon capture fisheries by managers trying to protect spawning stocks, it may be possible to develop a market for smaller fish than can be taken in the commercial fishery with mariculture. Since amberjack grow quickly to a marketable size but don't reach sexual maturity to a size much larger than ideal market size (46-51 cm. or 18-20 in.), amberjack from cultured stock would potentially open up a unique market in the U.S. Another significant factor for amberjack is their reputation for accumulating ciquatoxin in tropical reef environments. Although this is not a problem in the northern GOM, cultured fish could be certified, potentially increasing their value in the marketplace.

Successful larval culture is an important component of any mariculture operation. Amberjack early life stages have some attributes which may enhance their grow-out potential. Their eggs are relatively large (1.05-1.20 mm) (Tachihara et al 1993) compared to some other subtropical fishes (i.e. Lutjanids) and for that reason may be somewhat easier to grow in the nursery phase. Cannibalism during intensive grow-out is likely to be the biggest problem in the nursery phase (Sakakura and Tsukamoto 1996).

## Research Needed to Reach Biological Feasibility

Virtually every phase of research and development needs more work for amberjack to reach biological feasibility. However, the research taking place in Europe and in Asia, with the same or similar species, should allow rapid development of amberjack culture in the U.S., if the appropriate infrastructure and avenues of technology transfer are developed.

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISIH**

## Cobia, *Rachycentron canadum*

### Brief Biological Profile and Rationale for Inclusion

Cobia (Ling, Lemonfish) is a widely distributed migratory species of significant commercial and recreational value as a fishery. Commercial landings of cobia in the Gulf and Atlantic region for 1991-1996 totaled 1,046 mt with an average ex-vessel value of $3.54 per kg (NMFS 1998). Commercial scale culture of cobia has never been attempted, but some preliminary studies on growth rates and spawning suggest it has excellent potential for mariculture (Hassler and Rainville 1975; Caylor et al 1994). Given their salinity and temperature requirements cobia appear to be best suited to coastal cage and perhaps brackish pond culture.  Cobia grow rapidly and can reach a maximum size of around 60 kg. (Vaught-Shaffer and Nakamura 1989). Because of their rapid growth rates, excellent palatability, and prolific spawning capacity they offer excellent potential for commercial culture. These characteristics of cobia have apparently been recognized in Taiwan as well, where they are reportedly under development as a mariculture species (Liao et al 1995).

In nature males can reach a length of 31 cm in a year and females grow somewhat faster reaching 36 cm after a single growing season (Richards 1977). Cobia males can mature as early as age 2 and females at age 2-3 (Richards 1967). Cobia fecundity is high with a 50 pound female carrying 3-4 million eggs (Richards 1967). Cobia are serial spawners that spawn in summer months, however the precise details and location of peak spawning in the Gulf of Mexico and elsewhere are currently unknown. Juveniles recruit to the coastal areas and are often captured in nets and by hook and line in late summer and early fall (E. Chesney, p. o.).

FEASIBILITY STUDY – OFFSHORE MARICULTURE
ASSESSMENT OF CANDIDATE MARINE FINFISH

## Status of Nursery and Grow-out Methods

Locally from late April to November, mature cobia concentrate along the Louisiana coast seaward of the barrier islands and around offshore structures such as oil platforms, providing excellent opportunity for brood stock collection (E. Chesney, p. o.). Cobia have been reared from field collected eggs to juveniles to assess their potential for mariculture (Hassler and Rainville 1975). Based on those initial results cobia were judged to have excellent potential for culture, but no work was done on spawning in captivity until recently. They have exceptional growth rates as larvae, growing more than a mm per day for the first thirty days of life (Hassler and Rainville 1975). As juveniles they can reach a length of 46 cm TL (18 in) in a year and maturity at 2 years and approximately 94 cm TL.

Cobia were recently spawned in captivity by U.S. scientists using hormone injections (Caylor et al 1994). Initial attempts lacked males to fertilize the eggs but subsequent attempts proved successful in generating viable eggs and larvae (J. Franks, personal comm.). Cobia have a relatively large egg (1.25 mm) and larva for a subtropical marine fish larva (3 mm at hatch). By first feeding they are 4-5 mm TL, thus they are capable of eating rotifers and then *Artemia* soon after first feeding and grow rapidly to metamorphosis (Hassler and Rainville 1975). Our own observations of field collected specimens of juveniles show that they could reach a marketable size (16-18 inches) within a single growing season if properly managed, including feeds of appropriate quality and palatability. Currently a 94 cm TL (37 inches) size limit and a two fish per day creel limit for recreational fishermen is in effect for cobia caught in U.S. waters. Both commercial and recreational fishing for cobia are now limited because of past over-exploitation, making the prospect for developing markets for a cultured product favorable.

## Nutritional and Feed Issues

In the wild, cobia eat large quantities of crustacea (primarily crabs) and fish (Franks et al 1996; Meyer and Franks 1996). This suggests that they will probably require a high quality diet to maximize growth. Cobia juveniles will accept a feed, but in experimental trials they were difficult to convert to a dry generic pellet (Chesney, p. o.).



**WALDEMAR NELSON INTERNATIONAL INC.**

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISH**

Research on both the quality of feeds and on feeding stimulants are likely to improve results for feed acceptance, growth and food conversion rates.

## Suitability for Cage Culture

When held in tanks cobia often lay on the bottom to rest (E. Chesney, p. o.). They grow to a size suitable for stocking in cages and are strong swimmers at an early age. Presumably the combination of good swimming ability and the ability to rest on the bottom of the cages would allow them to grow more efficiently than species that are constantly on the move when confined to a cage. Hassler and Rainville (1975) noted that even healthy larvae began to rest on the bottom when not feeding. They should be highly suited to cage culture in coastal and offshore environments since they can tolerate a range of temperature and salinity from moderate to high as larvae and juveniles (Hassler and Rainville 1975). However, specifically how reduced salinity might affect their growth rates has not been quantitatively assessed and may limit brackish water culture.

## Disease Issues

Since cobia have not been cultured extensively at high stocking densities, little is known about potential diseases that might afflict them in culture, hence problems with diseases would have to be solved after initial attempts at mass culture.

## Potential Limitations for Culture

Although cobia offer excellent potential for mass culture, research is needed on spawning and grow-out before mass culture can even be attempted. No commercially viable culture industry has been established to date and only a limited amount of work has been done on feeding in the larval phase and nothing has been found in the literature on feeding juveniles pelleted foods. Virtually nothing is known about nutritional requirements or feed acceptance of cobia. Based on limited work to date in the lab with juveniles it seems likely that cobia juveniles may be difficult to convert from live foods to feeds, although they can be successfully converted (E. Chesney, p. o.). Broodstock are



**WALDEMAR NELSON INTERNATIONAL INC.**

only readily available from May to October in the northern GOM, although some over-wintering fish occur offshore. Cobia can probably be conditioned to spawn with photoperiod-temperature manipulations but nothing has been published to date. Some anecdotal reports suggests it will be more difficult than for some species and may require hormone injections or implants. There is a strong potential for severely limited growth in winter because the majority of cobia are believed to migrate south in late fall. Almost nothing is known about their disease resistance.

## Special Considerations

Cobia are very palatable, especially at smaller sizes. They also grow quickly to a marketable size and will not reach sexual maturity during grow-out to a market size. Because female cobia reach maturity at age 2 and at a size of approximately 94 cm TL a size limit of 94 cm (37 inches) and a creel limit of 2 fish per day for recreational fishermen has been placed on cobia in U.S. waters. Smaller plate size cobia (45-50 cm or 18-20 inches) from cultured stocks would potentially open up a unique market for cobia in the U.S.

Successful larval culture is an important component of any mariculture operation. Cobia have several attributes which make them especially suited to grow-out. Their eggs (1.25 mm) and larvae are relatively large compared to other subtropical fishes and for that reason potentially easier to grow in the nursery phase than many other subtropical fishes. Some potential for cannibalism in cultures exist at all life stages, although if grow-out is carefully regulated that can be minimized.

## Research needed to Reach Biological Feasibility

Virtually all phases of development need additional research for cobia. However some of the major hurdles such as spawning and larval rearing have already been proven as feasible. With refinements to those areas and a serious effort to resolve nutrition and feed issues, cobia could quickly reach the status of biological feasibility.

## Flounder, Southern, *Paralichthys lethostigma*

### Brief Biological Profile and Rationale for Inclusion

Because of their delicate flavor and white flesh, flatfishes have always been prized as food fishes. Southern flounder are highly valued as a food fish and command a high market price. They are also a popular recreational species throughout the south. There is growing interest in the culture of flounders in the U.S. and by Gulf coast culturists currently targeting other species. Flounders appear to have good potential as a coastal pond and cage culture species in the northern GOM if spawning and grow-out technology can be fully developed. In 1994, the average price paid to commercial fishermen in Louisiana was $2.88/kg live weight (Adkins et al. 1996) which is over 1.5 times the price currently received by channel catfish producers. Global markets can undoubtedly bring even higher prices. Given more restrictive management initiatives now underway and declining harvest of natural stocks of southern and summer flounder, prices are likely to increase in the future.

In addition to a reasonably high market value, southern flounder tolerate a wide range of temperatures and salinity (Burke et al. 1991; Prentice 1989; Daniels et al 1996), and have exhibited growth rates of up to 1.5 kg per year in freshwater (Laswell et al. 1977). These characteristics make southern flounder an excellent candidate for mariculture in waters ranging from low salinity up to full strength sea water. At the 1998 world aquaculture meeting, research papers on pond production and spawning were presented, indicating a growing interest in the culture of this species.

### Status of Nursery and Grow-out Methods

While southern flounder were first spawned in captivity many years ago (Arnold et al 1977), research has only recently established hatchery procedures for spawning (Berlinsky et al. 1996) and larval production (Daniels et al. 1996) on an experimental level (Jenkins et al 1997). Production of juvenile and market-size fish has not been extensively investigated. Several research efforts to develop local knowledge and refine spawning



**WALDEMAR NELSON INTERNATIONAL INC.**

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISH**

methods for southern flounder are currently underway in Texas, Florida, South Carolina and North Carolina.

In the wild, summer flounder migrate offshore in the fall to spawn during late fall through winter (Reagan and Wingo 1985). Adults aggregate near barrier islands in late summer prior to their migration and can be captured for broodstock in shallow areas along the beaches with a seine. Researchers (Arnold et al 1977; Henderson-Arzapolo et al 1988) were able to tank spawn flounder without hormone injections, but this method has not proven to be reliable for summer flounder. Other researcher have had success using hormone injections (Lasswell et al 1978). Recent attempts have been most successful using hormone treatment, especially hormone implants along with photoperiod manipulation to extend the spawning period (Berlinsky et al 1996).

Larval grow-out trials with southern flounder have also been conducted (Daniels et al 1996). Stocking density, salinity and light intensity were evaluated. Good growth and metamorphosis to juveniles were observed at 20 and 30 ppt, but not at 0 and 10 ppt (Daniels et al 1996). Overall survival rates in these initial experiments were low (<10%) and improved culture methods will undoubtedly improve upon these results in the future.

## Nutritional and Feed Issues

Experimental grow-out trials in ponds have been attempted for southern flounder using salmon feeds (Jenkins et al 1997). Results were equivocal. Fish grew quickly at first, but growth slowed later in the experiment possibly due to increased summer temperatures (Jenkins et al 1997). Clearly significant work on optimizing feeds and feeding regimes needs to be done with southern flounder. As with other species, concurrent development with closely related species (*P. dentatus*) and species already well developed for commercial culture (*P. olivaceus*) should serve as good models.

## Suitability for Cage Culture

Successful commercial production utilizing cage culture with a related species of flounder (*Paralichthys olivaceus*) has been established in Japan and elsewhere (Matsuoka



**WALDEMAR NELSON INTERNATIONAL INC.**

1995; Seo-Min 1995). Many species of flatfish, when not actively swimming, are most comfortable lying on the bottom covered with sediment for camouflage. Offshore cages suspended in the water column may prove to be less suitable for flounder culture than cages in contact with bottom sediments, however suspended cages are currently in use and have been successful.

## Disease Issues

Flounder suffer from many of the same diseases that afflict other fishes (see Hawke, disease section). Albinism and ambicoloration are common problems in cultured flatfish that can affect their market value, but not necessarily the fishes health (Gartner 1986; Iwata and Kikuchi 1998). Although the exact causes for these phenomena are unknown they are believed to be related to diet and to rearing conditions (Denson and Smith 1997), since there is a very high incidence of these conditions in culture flatfish. Ambicoloration was reduced in Japanese flounder by giving them a granular substance with which to bury themselves (Iwata and Kikuchi 1998).

## Potential Limitations for Culture

Southern flounder are not currently in commercial production. There are currently several research efforts in the southern U.S. devoted to developing and refining spawning and grow-out techniques for southern flounder. Most finfish are produced by stocking juveniles into grow-out facilities to allow production of market-size fish. For example channel catfish and red drum are cultured by stocking juveniles of 5-7 cm fingerlings into grow-out systems which many growers purchase from a production facility (Lutz et al 1997). Spawning procedures may turn out to be too complicated for flounder for many growers to tackle, especially those already involved with grow-out of other species. Currently there are no commercial production facilities for southern flounder in the GOM. Thus for southern flounder culture to be widely successful in the GOM, a hatchery production facility may need to be established.

FEASIBILITY STUDY – OFFSHORE MARICULTURE

ASSESSMENT OF CANDIDATE MARINE FINFISIH

## Special Considerations

Polyculture has been evaluated for flatfish in net cages (Holm and Thoreson 1986). Flounder, *Platichthys flesus*, were cultured in conjunction with salmon to utilize uneaten feed that reached the bottom and went uneaten by the salmon (Holm and Thoreson 1986). Flounder apparently had no problem consuming feed that reached the bottom, thus reducing organic loading and improving efficiency of the system.

## Research Needed to Reach Biological Feasibility

Southern flounder are close to biological feasibility for grow-out, but substantial refinement and research still needs to be done. Much of the research and development (spawning, feeds, nutrition) taking place elsewhere with closely related species should be applicable to southern flounder (see Stickney 1997). Given the advances that have been made with related species in Asia and in northeast U.S., and the current efforts being devoted to this species throughout the south, a commercial venture seems likely in the foreseeable future.

## Groupers – Gag Grouper, *Mycteroperca microlepis*, Red Grouper, *Epinephelus morio*, Nassau Grouper, *Epinephelus striatus*

### Brief Biological Profile and Rationale for Inclusion

Grouper are sought by both recreational and commercial fishermen because of their exceptional palatability and high market value. Declines in catches in the Gulf and elsewhere and a desire for better management have resulted in size restrictions in U.S. waters to protect spawning stocks and aid recovery of natural populations. Commercial landings of all groupers, principally Black, Marbled, Nassau, Red, Snowy, Warsaw, Yellowedge and Yellowfin Grouper in the Gulf and Atlantic region for 1991-1996 totaled 23,301 mt with an average ex-vessel value of $4.33 per kg (NMFS 1998). There are several species of grouper with commercial value and potential for mariculture development in the Gulf and Caribbean region. Because only limited research and development has taken



WALDEMAR NELSON INTERNATIONAL INC.

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISIH**

place with just a few species of groupers in the U.S., they will be considered as a group. As far as we know, there are no commercial operations successfully culturing any grouper in the U.S. and only a small amount of grouper being produced worldwide, mostly in Asia.

Progress on spawning and/or grow-out has been made with several species of grouper that reside in the Gulf and Caribbean region. The red grouper, *Epinephelus morio*, the Nassau grouper, *Epinephelus striatus* and the Gag, *Mycteroperca microlepsis,* will be considered here. Red grouper are found exclusively in the Atlantic Ocean from the coast of Massachusetts southward to Brazil. It is most abundant along the western Florida shelf and off the north coast of the Yucatan Peninsula, Mexico (Richardson and Gold 1997). Nassau grouper are restricted to more tropical reef environments and are not known to occur in the northern Gulf (Heemstra and Randall 1993). Gag are very common throughout the northern Gulf and occur relatively close to shore in water depths of 40-100 m (Heemstra and Randall 1993). Juvenile Gag often occur inshore, showing they are likely to be somewhat more tolerant to reduced salinity than their adult counterparts and perhaps other groupers (Weaver 1996).

## Status of Nursery and Grow-out Methods

Groupers are protogynous hermaphoditic fishes, developing first as males then females as they grow (Heemstra and Randall 1993). Sex reversal is possible with hormone treatments and has been stimulated in red grouper with methyltestosterone implants (Neidig et al 1996). Numerous species of grouper from around the globe have been spawned in captivity and reared through the juvenile stage (Tucker 1994), although commercial grow-out in some countries still relies heavily on natural seed production because of unreliable methods and limited seed production success (Pillay 1990; Chen and Liao 1991; Ruangpanit and Yashiro 1995).

The Red, Nassau and Gag grouper have all been spawned in captivity by hormone injection (Head et al 1996; Watanabe et al 1995, 1996) and naturally by photoperiod-temperature cycles (Tucker 1994; Tucker et al 1996). The only limitation with groupers is that they tend to produce large, relatively synchronous spawns, especially when spawned with hormones (Tucker 1994). The eggs and subsequent larvae of the Red, Nassau and



**WALDEMAR NELSON INTERNATIONAL INC.**

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISIH**

Gag are relatively small (820-975 $\mu$m) and require small foods such as rotifers at first feeding (Tucker 1994; Watanabe et al 1995, 1996a). Nassau grouper eggs hatch in 20-26 h at 26-30°C and first feeding begins in about 3.5 days at 26°C (Watanabe et al 1995).

Commercial scale grow-out or grow-out trials through market size have not been reported for any of the species of grouper considered here. Commercial grow-out with other species in Asia suggests that with appropriate feeding and stocking densities groupers can reach a marketable size of 600-800 g in 8 months at 25-32 °C (Ruangpanit and Yashiro 1995).

## Nutritional and Feed Issues

Grow-out methods and research done in other countries with related species as well as studies done with the species reviewed here should allow rapid development of suitable feeds and grow-out procedures to support commercial production (Chen and Liao 1991; Ruangpanit and Yashiro 1995; Boonyaratpalin 1997). Research has shown that groupers need high protein and high energy level diets for proper growth (Chen and Liao 1991; Ellis et al 1996, 1997). Research on feed utilization and grow-out of Nassau and Red grouper (Ellis et al 1996, 1997) suggest that reasonable growth and food conversion rates are possible although more research is needed.

Growth and food conversion rates can be low for groupers and survival can be affected if feeds are not adequate (Chen and Liao 1991; Chen and Tsai 1994; Ellis et al 1996; Shiau and Lan 1996). For example, growth performance was significantly better with Nassau grouper juveniles fed a research diet high in protein (>55%) and lipids (Ellis et al 1996). Food conversion was also better on the higher protein diets (Ellis et al 1996), although growth rates were relatively slow (1-3% · d$^{-1}$) on all the diets tested.

## Suitability for Cage Culture

Grouper have a long history of being cultured in cages and appear to be very adaptable to confinement in cages (Teng et al 1978; Toledo et al 1993). Some grouper may be especially sensitive to low dissolved oxygen (Brule' et al 1996), which could be a consideration for cage culture in the northern Gulf of Mexico.



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISIH**

## Disease Issues

Very little specific information is available on diseases in culture of grouper. See Hawke's general discussion on diseases in culture.

## Potential Limitations for Culture

Since the northern Gulf is outside their natural range, Nassau grouper may not tolerate the winter temperatures and perhaps reduced salinity common in the northern Gulf of Mexico. However considerable progress has been made with development of this species and it shows good promise for culture in appropriate environments within the Gulf region. It also may be possible to culture them in closed indoor systems (Brule' et al 1996). Perhaps the best candidate for the northern Gulf is the Gag grouper. Progress to date shows that they are a viable candidate from the perspective of seed production and they are a relatively fast growing grouper in the wild. However, they still require considerable research and development before a commercial venture is feasible.

Spawning behavior of groupers is another potential limitation. The synchronous spawning habits and difficulty in producing eggs over a protracted time frame currently limits out of season seed production. Additional research may overcome this problem in the future.  As with many marine fishes, cannibalism in juvenile grouper can be a problem if fish are not properly graded and fed (Chen and Liao 1991).

## Special Considerations

Hybrid grouper have never been produced with any species indigenous to the Gulf, however grouper hybrids have been produced with two Asia Pacific species and the larvae have been successfully reared to juveniles (Tseng and Poon 1983). Given the diversity of groupers in the Gulf numerous possibilities for hybrids exist, especially if sperm of selected species could be cryopreserved.



**WALDEMAR NELSON INTERNATIONAL INC.**

## Research Needed to Reach Biological Feasibility

Some species of grouper are in commercial production around the world. Many of the early efforts and much of the progress in actual commercial production has taken place in China, Korea, Japan, Taiwan, Thailand, and Vietnam (Li 1995; Liao et al 1995; Ruangpanit and Yashiro 1995; Wong 1995). Nevertheless considerable progress has been made with species that are indigenous to the Gulf and Caribbean region. Improvements upon the established technology coupled with some additional interest and investment in development of grouper culture should allow commercial production of groupers in the Gulf in the foreseeable future. The areas of research and development that need the most attention are development of reliable methods for adequate seed production and advancements in feeds and grow-out strategies to promote rapid growth rates.

## Mahimahi, Common Dolphin, Dorado, *Coryphaena hippurus*

### Brief Biological Profile and Rationale for Inclusion

The common dolphin or mahimahi is an open ocean species found in tropical and subtropical seas throughout the world (Palko et al 1982). They are a popular gamefish because of their aggressive nature and fighting ability and valued as commercial catch because of their excellence as a foodfish and high value. Seasonally they appear in the northern Gulf of Mexico. Commercial landings of dolphin in the Gulf and Atlantic region for 1991-1996 totaled 4,715 mt with an average ex-vessel value of $3.19 per kg (NMFS 1998). The dolphin or mahimahi has long been recognized as a strong candidate for mariculture because of its rapid growth rate, high market value and palatability (Avault 1996). Mahimahi has recently been thoroughly reviewed with regard to development for aquaculture including the status of nursery and grow-out techniques and its potential as a culture species (Kraul 1991; Szyper 1991; Ostrowski 1995). Attempts at commercial scale culture are reportedly underway in the U.S. and Australia (Szyper 1991; Kraul 1993) although we are unable to report the current status of those efforts. Besides its tremendous potential for culture, grow-out technology has undoubtedly benefited



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISIH**

from interests by the state of Hawaii in stock enhancement, where it is a premier sport fish (Szyper 1991).

## Status of Nursery and Grow-out Methods

Several aspects of mahimahi biology make them seductive candidates for culture. Among the most appealing are the early maturity of female dolphin in captivity, their tremendous fecundity and their readiness to spawn in captivity (Kraul 1990; Szyper 1991; Ostrowski 1995). Mahimahi females can mature in captivity at 50 cm and 5-6 months of age (Kraul 1991; Szyper 1991; Ostrowski 1995). Mahimahi are serial spawners and early spawns can produce as many 15,000 eggs with subsequent spawns growing in size as females mature (Szyper 1991; Ostrowski 1995). Spawning stock requires special donut shaped holding facilities to reduce or avoid damage during bursts of activity such as chase (Szyper 1991).

Mahimahi eggs are pelagic and relatively large (1.4-1.6 mm diameter) and hatching occurs in 40 h at 26°C (Szyper 1991; Ostrowski 1995). Larvae are relatively large for a tropical marine fish larva (4.2 mmSL) and begin to feed 2-3 days after hatch. First feeding success is maximized when rotifers or a zooplankter of equivalent size are offered, however methods developed at the Oceanic Institute suggest that commercial rearing can produce adequate survival more economically by only offering *Artemia* (Ostrowski 1995). As with many marine fishes, mahimahi larvae don't grow or survive as well on *Artemia* as on natural plankton (copepods) because they lack the appropriate highly unsaturated fatty acids that are essential to marine species and commonly available in marine plankton (Watanabe 1983). This can apparently be overcome for mahimahi by enriching *Artemia* with HUFA's (Kraul 1990; Ostrowski and Divakaran 1990; Ostrowski 1995).

For grow-out, another appealing aspect of mahimahi culture is their rapid growth rates in both the larval and juvenile stage (Kraul 1991; Szyper 1991; Ostrowski 1995). Mahimahi larvae can grow 30-50% per day or more (Szyper 1991). Mortalities during grow-out can be a problem. Survival can be enhanced by tank designs that minimize chances for collision with hard walls, which can result in very high mortality rates in larger fish (Ostrowski 1995).



**WALDEMAR NELSON INTERNATIONAL INC.**

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISIH**

## Nutritional and Feed Issues

Conversion from live feeds to pelleted foods have been accomplished and details of the weaning process are outlined in Ostrowski 1995. Food conversion efficiencies of dolphin are reportedly high although they apparently require specialized feeds with very high protein and lipid content (Ostrowski 1995). Attention to the quality of feed is reportedly critical to any commercial ventures (Ostrowski 1995). Research at the Oceanic Institute has shown that juvenile mahimahi require feeds high in protein and moderate in lipids and carbohydrate (Ostrowski and Duerr 1994). Feeds containing 55-60% protein, 10-14% lipids and <12% carbohydrates are recommended for juveniles.

## Suitability for Cage Culture

Culture system design is a critical element of successful mahimahi grow-out. Even with the best available designs a significant level of mortality in mahimahi culture is associated with containment in tanks. Some of this mortality might be relieved if stocking into cages proved to be a less restrictive environment for juvenile mahimahi. We are unaware of any attempts to stock mahimahi into cages, but since they are an open ocean pelagic capable of quickly reaching high speeds, cages might prove to be a better venue for mahimahi culture if their other requirements can be met.

## Disease Issues

Agonistic behavior during the weaning phase can cause stress and lead to a high incidence of red tail disease, a problem associated with nipping (Ostrowski 1995). Once skin damage is prevalent, ambient infectious diseases can spread quickly if not treated. Presumably mahimahi are vulnerable to other disease problems as well (see Hawke section for general discussion of diseases).

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISIH**

## Potential Limitations for Culture

It is generally believed that although some limitations still exist for mahimahi culture, there are no insurmountable problems to limit commercial culture. In the ocean, common dolphin are generally restricted in their distribution by the 20°C isotherm (Palko et al 1982), suggesting they require water temperatures warmer than occur in the northern Gulf during winter. This may be a problem if grow-out cannot be completed in a single summer growing season. Salinity may also be a problem for mahimahi or for a hybrid (if one were produced), since the pompano dolphin are strictly found in open ocean environments (Palko et al 1982). Mahimahi larvae and juveniles may require salinity greater than 28 (Szyper 1991; Ostrowski 1995). Overall, improving survival throughout the grow-out process seems to be the single most important obstacle to overcome (Ostrowski 1995).

## Special Considerations

A hybrid between common and pompano dolphin is a possibility for grow-out (Hagood and Rothwell 1979). Since a hybrid would be sterile, a dolphin hybrid might reduce problems with slower growth in females when they reach maturity and might also reduce fears by managers of escapement of cultured fish into the wild.

## Research Needed to Reach Biological Feasibility

Mahimahi culture is biologically feasible at this time. Feed quality and culture system design are the two most critical factors for mahimahi culture. Poor survival rates in the larval phase due to cannibalism, expensive high quality feed requirements for grow-out and sources of unknown mortality (Ostrowski 1995) are probably the major factors that could potentially limit the economic success of a commercial venture at this time. Continued research with mahimahi will undoubtedly improve on the current technology.

FEASIBILITY STUDY – OFFSHORE MARICULTURE

ASSESSMENT OF CANDIDATE MARINE FINFISIH

## Pompano, *Trachinotus carolinus*

### Brief Biological Profile and Rationale for Inclusion

The Florida pompano was identified as a strong candidate for mariculture in the Southeastern U.S. in 1965 because of its high market value and excellence as a foodfish (Finucane 1972; Gilbert 1986; Avault 1996). It has recently been thoroughly reviewed with regard to it status and potential as a culture species along with two related species, the permit, *Trachinotus falcatus* and the palometa, *Trachinotus goodei* (Watanabe 1995).

Pompano are relatively abundant in coastal waters throughout the Gulf of Mexico (Gilbert 1986). A modest commercial fishery exists for pompano in the Gulf of Mexico and along the east coast of Florida (Watanabe 1995). Harvests peaked at about a million pounds in the Atlantic and Gulf region and have declined to about 376,000 lbs. in 1996. Commercial landings of pompano in the Gulf and Atlantic region for 1991-1996 totaled 1,675 mt with an average ex-vessel value of $6.69 per kg (NMFS 1998). For a species of such keen interest as a foodfish, the natural history is poorly understood. Pompano have a protracted spawning season ranging from April through October in the Gulf (Gilbert 1986). Data on age and growth in the field are lacking and age at maturity and fecundity data are limited.

In the late 1960's through the 1980's a considerable research effort was directed at developing pompano culture methods, although these early ventures met with limited commercial success (Finucane 1972; McMaster 1988). A commercially viable operation was temporarily in place but went out of business for reasons apparently unrelated to the biology (see McMaster 1988) suggesting that early efforts at pompano culture were not totally in vain. Many of the early problems identified in the literature, such as poor food conversion, appear to be solvable and a renewed interest in the culture of pompano and related species has emerged in the 90s. In Asia a closely related species, the permit, *Trachinotus blochii*, is being cultured in coastal sea farms (Chou et al 1995). Although this species is a relatively new introduction to the area, their modest success suggests that Florida pompano could be successfully cultured in the U.S. using similar methods.

FEASIBILITY STUDY – OFFSHORE MARICULTURE

ASSESSMENT OF CANDIDATE MARINE FINFISIH

## Status of Nursery and Grow-out Methods

Initially, fingerling production was a limiting factor for pompano (McMaster 1988; Avault 1996). Subsequently, pompano were spawned in captivity by both photo-period temperature manipulation and by hormone injection, including a commercial scale effort (Hoff et al 1972, 1978a,b; McMaster 1988). Unfortunately many of the early successes with breeding methods were by private enterprise and details remain unpublished. Nevertheless, successful breeding of closely related species (Chou et al 1995) and apparent success breeding pompano in Venezuela (Watanabe 1995) suggest they can be consistently spawned in captivity with appropriate methods.

Pompano are a hardy animal that can tolerate a wide range of temperature and salinity, are resistant to handling, crowding, and disease, and will readily eat a variety of foods in confinement including pelleted foods (Jory et al 1985). Broodstock are readily available seasonally throughout the northern GOM, spawning along the coast with juveniles recruiting to the beaches throughout the summer (Bellinger and Avault 1970; Gilbert 1986).

## Nutrition and Feed Issues

Poor food conversion and growth rates have been reported for pompano larger than 200g (McMaster 1985). However, subsequent research has shown that high energy feeds can greatly improve food conversion, growth rates and survival (Williams et al 1985). Furthermore the grow-out technologies available for intensive culture 10-15 years ago were limited compared to current methods and may have contributed to poor performance in the larger fish. It is likely the reported problem is solvable with better feeds and more efficient rearing systems. In Asia a related species, the permit, is fed minced trash and occasionally commercial pellets with reasonably high food conversion rates (Chou et al 1995). In recent feed trials with the palometa, *Trachinotus goodei*, juveniles were grown in tanks and fed 3 diets formulated for salmonids and a fourth diet formulated for a warm-water marine finfish containing 60% protein (Cole et al 1997). Good growth rates and food conversion efficiency were observed on all the feeds.



Pompano appear to be an especially good candidate for recirculating systems as well as coastal cage culture or some combination of both (Watanabe 1995).

## Suitability for Cage Culture

Pompano have been tested for cage and pond culture and in polyculture systems (Swingle 1972; Rossberg and Strawn 1980a,b; Avault 1996). Pompano and related carangids have also been cultured in cages in Venezuela and China (Carioli and Conroy 1987; Hongke 1994). Pompano have apparently not been extensively tested in cages placed in an open water environment (offshore), although they over-winter in that environment in the northern Gulf. One of the principal barriers to previous attempts at pompano culture in the U.S. is their sensitivity to temperature (Avault 1996). Pompano stop feeding at low temperatures and winter mortality can occur (10°C) and growth rates can be limited by their active nature and a need for high energy feeds (Allen and Avault 1970; Williams et al 1985; McMaster 1988; Avault 1996). Low temperature sensitivity might be detrimental to pompano held in cage systems placed in shallow coastal environments, especially in the Northern Gulf.

## Disease Issues

Very little is known or has been reported about specific diseases affecting pompano in captivity. Outbreaks of vibriosis and other diseases were reported for cage culture grow-out trials in Venezuela (Cairoli and Conroy 1987; Gomez-Gaspar 1987). See also disease section for general evaluation of diseases (Hawke).

## Potential Limitations for Culture in the GOM

In spite of several research efforts devoted to reaching commercial status, it is fair to say that considerable work still needs to be done on spawning and grow-out of pompano. Growth may be severely limited in winter and thermal mortality could be a problem if they are caged too far inshore. If problems of temperature and spawning can be overcome, prospect for pompano culture are likely to be high in the future, especially



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISH**

given the renewed interest in the culture of pompano and closely related species around the world (Trebaol. 1991; Hongke 1994; Watanabe 1995).

## Red Drum, *Sciaenops ocellatus*

### Brief Biological Profile and Rationale for Inclusion

Red drum, also commonly known as redfish or spot-tail bass, have been a focus for culture in the Southeastern U.S. and Caribbean for many years. In the United States it is one of the most well developed marine species currently in commercial culture. Because of its recognized potential for commercial culture, operations have developed in Taiwan and elsewhere around the world. Development of culture techniques have taken place for two principal reasons. Initially red drum culture was pursued by state agencies. Declines in natural stocks of red drum in some southern states lead to an interest in spawning adults and rearing the larvae for stock enhancement programs. As demands on natural fisheries increased and supplies of wild fish decreased, interest in red drum culture increased and it was soon recognized as a viable candidate for mariculture (Arnold 1988). Red drum stocks have rebounded, but conservation organizations have endeavored to preserve them for recreational interests, making the prospects for their culture commercially viable.

Red drum are estuarine dependent species which spawn near tidal passes and inlets along the Gulf coast in the fall (September-November) (Matlock 1987). Adults and juveniles tolerate a wide range of temperatures and salinity making them especially well suited to culture in cages and ponds (Neill 1987). Red drum are long lived and grow reasonably fast as juveniles, making it possible to produce a market size fish in less than 2 years and possibly in a single growing season if properly managed (Lutz et al 1997).

### Status of Nursery and Grow-out Methods

Nursery and grow-out techniques are well developed for red drum (Holt et al 1987; Arnold 1988) and have recently been reviewed (Henderson-Arzapalo 1995). Red drum can be spawned in captivity by both photoperiod-temperature manipulation (Arnold 1988) and by hormone injection (Thomas and Boyd 1988). Because they are a

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISIH**

serial spawners, multiple batches of eggs can be generated and with careful manipulation of temperature, spawners can be maintained in spawning condition for extended periods (Arnold 1988).

Red drum spawn at night shortly after dark. Eggs are pelagic and relatively small (0.9-1.0 mm) as are the larvae (~2.4 mm SL at first feeding). They hatch in about 24h at 25°C and larvae begin to feed about 2 days post hatch. Red drum larvae require small prey at first feeding. Typically rotifers are offered and eventually *Artemia*, although it is possible to begin weaning larvae on to a #1 crumble after only a few days of growth. As with other marine fish larvae, growth and survival rates can be enhanced by enriching zooplankton with HUFA's (Craig et al 1994).

The most significant issue to deal with in grow-out of red drum appears to be cannibalism in the late larval stages of development (Soletchnik et al 1988). Cannibalism occurs frequently during the period when larvae are weaned from zooplankton onto dry diets and is facilitated by variable growth rates among larvae within a culture unit. Cannibalism can dramatically reduce survival through the larval stage. Impacts can be reduced and largely eliminated by maintaining feeds during the critical phases and by grading larvae by size as they develop into juveniles.

## Nutritional and Feed Issues

Because red drum are currently being commercially cultured, numerous feed studies have been conducted and red drum nutrition has been reviewed (Robinson 1988; Henderson-Arzapalo 1995). Feeds which are suitable for red drum grow-out are commercially available from a number of different feed manufacturers and refinements to practical diets for red drum continue to be developed (Davis et al 1995; Craig and Gatlin 1997). Robinson et al (1990, 1991) estimated that a red drum diet for grow-out should contain 35-45% protein, 3.5-4.0 kilocalories of energy/g diet and 5-6% fat. Since red drum cannot fully utilize plant proteins, Ellis and Reigh (1992) found the best compromise between cost and efficiency for feed formulation was a 1:1 soy protein:fish protein diet.

Reported food conversion ratios for red drum are highly variable, reflecting different diets, culture environments and culture protocols. For the northern Gulf of Mexico, it is reasonable to assume that it is possible to produce a 1 kg red drum in about



FEASIBILITY STUDY – OFFSHORE MARICULTURE

ASSESSMENT OF CANDIDATE MARINE FINFISIH

14 months, depending upon temperature, culture conditions and food quality (Henderson-Arzapalo 1995).

## Suitability for Cage Culture

Temperature limitation for over-wintering of juveniles in ponds and cages is undoubtedly the major impediment to the widespread development of redfish culture (Henderson-Arzapalo 1995; Lutz et al 1997). Redfish appear to be highly suited to offshore cage culture in the north-central GOM for several reasons. Wild juvenile redfish normally prefer lower salinity, although they are more tolerant to cold stress when acclimated to higher salinity. Depending on the degree of acclimation to reduced temperature and salinity, they can tolerate temperatures down to about 3-5 °C before stress and then mortality occurs (Ward et al 1993). Feeding ceases between 7 and 9 °C. Offshore cage culture may avoid many of the problems encountered by inshore and land-based systems, because of the warmer winter temperature found offshore. Thirty to forty miles offshore winter water temperatures remain above 12-15 °C, thus avoiding any chance of thermal stress.

Previous attempts have been made to culture red drum in offshore cages with mixed success (Miget et al 1996). Many of the problems that this initial attempt reported were related to the engineering required to operate in the harsh offshore environment, although poor food conversions by the red drum in offshore cage was reported as a problem (Miget et al 1996). It is difficult to know whether the principal problem was related to biological performance of the fish or the delivery system for the feeds, although the latter seems more likely. Better delivery systems, refinements in the buoyancy of the food pellets in high salinity environments and a better understanding of the behavior of the fish in cages will probably greatly improve feeding success and food conversion. Another offshore cage culture effort growing redfish is currently underway off Texas. Progress made by this effort may portend the chances for success in future offshore enterprises.

FEASIBILITY STUDY – OFFSHORE MARICULTURE

ASSESSMENT OF CANDIDATE MARINE FINFISIH

## Disease Issues

Because red drum are native to the Gulf of Mexico and have been commercially cultured for several years the disease problems typically encountered with redfish culture are well established (Johnson 1987). See section on diseases (Hawke).

## Potential Limitations for Culture

There are no major problems related to the biology to prevent the development of cage culture of red drum in the northern Gulf of Mexico. Environmental requirement may affect growth rates somewhat in the offshore environment when fish are small since they typically inhabit estuarine environments, but those losses may be made up as the fish grow and by longer growing seasons in the offshore environment. Offshore culture will also offer more flexibility in harvest schedules (Lutz et al 1997).

## Special Considerations

Because red drum are an important recreational species in the Southeastern U.S. and the subject of significant conservation efforts in several southern states and are also commercially cultured, considerable potential exists for the illegal harvest and sale of wild caught red drum. In order to distinguish between wild and farm raised red drum law enforcement officials utilize fatty acid profiles in muscle as a forensic tool (Villarreal et al 1994). If a major culture operation for red drum were to be established it would be advisable to gather baseline information on fatty acid profiles of the cultured fish to avoid potential conflicts with enforcement efforts.

## Research Needed to Reach Biological Feasibility

Although refinement can always be made to culture procedures and techniques no further research is needed to reach biological feasibility for commercial culture of red drum.



**WALDEMAR NELSON INTERNATIONAL INC.**

FEASIBILITY STUDY – OFFSHORE MARICULTURE

ASSESSMENT OF CANDIDATE MARINE FINFISIH

## Red Snapper, *Lutjanus campechanus*

### Brief Biological Profile and Rationale for Inclusion

The commercial and recreational fishery for red snapper, *Lutjanus campechanus*, in the Gulf of Mexico and SE Atlantic is a valuable resource. Trends in commercial and recreational catches of red snapper indicate they were declining in the Gulf of Mexico from the early 1970's (Goodyear and Phares 1990). Total commercial and recreational landings declined from 14-15 million pounds in the early 1980's to 5-6 million pounds in 1987-1988. Red snapper CPUE as bycatch in the shrimp fishery also declined significantly, indicating a real decline in red snapper populations. Fishery independent statistics, such as the NMFS fall groundfish survey, indicated similar trends with CPUE of juvenile fish declining 3-5 fold since 1972. Although it is often difficult to identify specific cause and effect mechanisms for population declines, it appears that (1) overfishing by directed fisheries and (2) bycatch of juveniles in trawl fisheries are significant contributing factors. Both creel and size limits (currently 5 fish per day and a 16 in. TL size limit in federal waters) have been instituted for the recreational fishery and a catch quota has been instituted for the commercial fishery. Worldwide there is a strong interest in the culture of Lutjanids because of their excellence as a foodfish and suitability for confinement in tanks and cages.

### Status of Nursery and Grow-out Methods

Red snapper are serial spawners whose spawning season extends from May through October in the northern Gulf of Mexico. Batch fecundity is reasonably high with a 22 in. female capable of producing 255,000 eggs in a single spawn (Chesney and San Fillippo 1994). Both males and females mature at 2-3 years of age and a size of 31-41 cm TL(12-16 in.).

Attempts to spawn and rear red snapper have been underway for some time in the U.S. (Arnold et al 1978; Minton et al 1983). In spite of early success in spawning red snapper, rearing the larvae of red snapper, *Lutjanus campechanus*, has proven more difficult than for many other species, including other lutjanids. Successful spawning and

larval culture of other snappers such as the mangrove red snapper, *Lutjanus argentimaculatus*, in Asia (Chou et al 1995; Emata et al 1995; Liao et al 1995), the St. John's snapper, *Lutjanus johni* (Lim et al 1985) the lane snapper, *Lutjanus synagris* (Clarke et al 1992) and most recently the mutton snapper *Lutjanus analis* (Watanabe et al 1998), suggest that red snapper culture is highly feasible. Nevertheless, a significant effort has been made to culture red snapper through the larval phase with extremely limited success. A recent effort in Alabama was able to produce a few hundred red snapper juveniles, but no mass culture effort has succeeded thus far.

Red snapper larvae are relatively small at hatch (2.3 mm TL) but no smaller than other snappers, suggesting the problem in rearing red snapper may not be related to their small size or larval food. In the field,  summer spawned young-of-year snapper juveniles reach a size of  50-90 mm by August and September (Holt and Arnold 1982) and by age 2 they are 267-378 mm TL (Nelson and Manooch 1982). Only a small fraction of two year old fish reach sexual maturity (Chesney and SanFilippo 1994).

## Nutritional and Feed Issues

Because of difficulties with rearing the larvae, no extensive research has been done specifically on nutritional requirements of juvenile snapper or feed development. Juvenile red snapper can be readily adapted to commercial feeds in captivity with little or no mortality related to the weaning process (E. Chesney, p. o.). Experience with other snapper suggests they will require high quality feeds. In recent experimental spawning and grow-out studies with mutton snapper *Lutjanus analis*, juveniles were reared to an average size of 140 g in 168 days with a high survival (98%) and good food conversion (FCR=1.2) on a high protein pelleted feed (56% protein) (Watanabe et al 1998).  Similar results should be possible with red snapper.

## Suitability for Cage Culture

Cannibalism should not be a major problem in the culture of red snapper. Red snapper are tolerant to a wide range of temperatures and appear to prefer a moderate range of salinity from medium (25 ppt) to full strength seawater. This will make them a



good candidate for offshore cage culture but they may not do as well in cages located in low salinity environments (<25), although this needs to be tested. As reef fishes snappers are extremely structure oriented, associating with natural and artificial reefs, hard bottoms and structures such as oil platforms. Their strong schooling behavior and affinity for structure should make them highly suited for offshore cage culture.

## Disease Issues

Very little is known about specific diseases affecting red snapper in captivity. See disease section for general evaluation of diseases (Hawke).

## Potential Limitations for Culture

Considerable work needs to be done on spawning and grow-out of red snapper. No commercially viable mariculture industry has been established to date, because of the inability to grow-out larvae. These problems should be solvable with additional research effort. Broodstock are available year-round in the northern GOM and they have been conditioned to spawn with photoperiod-temperature manipulations (Arnold et al 1978), although hormone-induced methods may prove more reliable, so the potential to produce fingerlings will be strong once the larval rearing problems can be solved. Since they have not been mass cultured before, there are a number of unanswered questions about their growth, food conversion and disease resistance in culture that will need to be answered. When red snapper larvae have been successfully reared through the juvenile phase, agonistic or territorial behavior has been observed which can reduce growth of subordinate individuals or cause mortality (E. Chesney, p.o.). There is some potential for conflicts with commercial fisheries and fisheries regulations because of strict management regulations and harvest quotas now in place. However that might also prove to be an advantage for the development of red snapper culture since red snapper are a target for bycatch reduction and the fishery is currently in a recovery phase. There are also efforts underway to attempt stock enhancement of red snapper in the Gulf that would bolster initiatives to develop mass culture.



## Special Considerations

Red snapper are relatively slow growers in the wild and may require more than 1 growing season to produce a marketable size fish depending on market demands for size and their potential to grow faster in culture than in nature.

## Research Needed to Reach Biological Feasibility

Red snapper are a highly valued species with good potential for aquaculture. However, until the problems with larval grow-out can be overcome and grow-out trials conducted, biological feasibility will not be reached in the foreseeable future.

## Other Snappers – Mangrove Snapper, *Lutjanus griseus,* Mutton Snapper, *Lutjanus analis,* Yellowtail Snapper, *Ocyurus chrysurus*

The gray or mangrove snapper, *Lutjanus griseus* is a close relative of the red snapper that resides in reasonably large numbers in the northern Gulf of Mexico. Wild fish have the reputation of not taking dead baits as readily as the red snapper and consequently, are not captured as frequently as red snapper in directed hook and line fisheries. Mangrove snapper have several characteristics which make them a species worthy of consideration for culture. In terms of their biology they are very similar to red snapper. They are serial spawners and spawn throughout the summer offshore. Their larvae have been reared in the laboratory using standard methods (Richards and Saksena 1980) although no mass culture or grow-out research has been reported. They appear to be more tolerant to reduced salinity than red snapper, because both the adults and their juveniles reside in areas lower in salinity than their red snapper counterparts.

They, along with other Lutjanids residing in the Gulf, offer good prospects for developing hybrid snappers (Domier and Clark 1992). A hybrid would be likely to be more tolerant to reduced salinity, thus opening up the prospect of culturing them in coastal ponds.  Currently, we do not know of any effort to develop mangrove snapper for mariculture, although its potential for culture has been recognized in the literature.

Other relatively new candidates for mariculture within the GOM are the mutton snapper, *Lutjanus analis,* and the yellowtail snapper, *Ocyurus chrysurus.* In recently



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISH**

reported research, mutton snapper were successfully spawned in captivity with hormones and their larvae reared in significant numbers (>36,900) through the larval phase using standard techniques for rearing fish larvae (Watanabe et al 1998). Mutton snapper larvae are small and required a small food item (ss-type rotifers) at first feeding and then *Artemia*. Grow-out trials were also conducted with a portion of the juveniles (1,390). The mutton snapper juveniles were reared to an average size of 140 g in 168 days. Survival rate was high (98%) and food conversion was excellent (FCR=1.2) on a high protein pelleted feed (56% protein) (Watanabe et al 1998). Although limited research has been done with mutton snapper, prospects for this species appear to be good based upon their biological performance and adaptability to culture. The only potential limitation for culture of mutton snapper within the Gulf of Mexico may be the tropical nature of this species which could potentially limit its culture to warmer environments within the Gulf. More information on their temperature and salinity tolerances is needed to determine their environmental requirements.

The yellowtail snapper, *Ocyurus chrysurus*, is another tropical snapper which is indigenous to the Gulf of Mexico and has been targeted for mariculture. They have been spawned in captivity and their larvae reared (Soletchnik et al 1989; Riley et al 1995). Yellowtail are apparently easily spawned in captivity by either photoperiod-temperature manipulation or by hormone injection (Soletchnik et al 1989). Larval rearing has met with mixed success. Eggs are 0.96 mm in diameter (Riley et al 1995). First feeding larvae are 3.36 mm SL at 3 days post hatch (Riley et al 1995). In nature, yellowtail snapper grow at rates similar to other lutjanids suggesting they are a good candidate for culture (Mason and Manooch 1985). There are no literature reports of mass propagation through the juvenile phase, although some grow-out trials with juveniles have been conducted in cages where various diets were tested (Venchaurd 1988). Yellowtail snapper growth in cages was optimal on a diet containing 44% animal protein (fish meal) with a P/E ratio of 22 mg protein per kJ (Venchaurd 1988). Yellowtail snapper can be hybridized with lutjanids opening up the possibility of producing a variety of hybrid crosses for mariculture (Domeier and Clarke 1992; Loftus 1992). As with the mutton snapper the tropical nature of yellowtail snapper may limit locations for its culture within the Gulf, however hybrids with any of the many gulf snappers may prove to be a key to successful snapper culture in the future.



**WALDEMAR NELSON INTERNATIONAL INC.**

FEASIBILITY STUDY – OFFSHORE MARICULTURE

ASSESSMENT OF CANDIDATE MARINE FINFISIH

## Striped Bass and SB Hybrids, *Morone saxatilis*

### Brief Biological Profile and Rationale for Inclusion

Striped bass and striped bass hybrids have been a focus for culture in the U.S. and elsewhere for many years and culture methods have been reported and thoroughly reviewed (Stevens 1966; Bayless 1972; Bonn et al 1976; McCraren 1984; Rees and Harrell 1990). In the U.S., striped bass is one of the most well developed marine species currently in commercial culture as evidenced by the voluminous published literature on their culture (see bibliography). Because of its recognized potential for commercial culture, research and commercial ventures have developed throughout the world.

Development of culture techniques for striped bass and striped bass hybrids has taken place for two principal reasons. Initially striped bass culture was pursued by state agencies, first because they were recognized long ago as an excellent gamefish for stocking into reservoirs and elsewhere (Stevens 1966). More recently, striped bass research was stimulated by the declines in natural stocks of striped bass in the mid-Atlantic and Gulf states and California which lead to an interest in spawning adults and rearing the larvae for stock enhancement programs. As demands on natural fisheries increased and supplies of wild fish decreased, interest in striped bass culture heightened and it was eventually promoted as a viable candidate for commercial culture, especially as a hybrid.

Striped bass are anadromous, typically spawning just upstream of the freshwater-saltwater reaches of rivers along the Atlantic and Gulf coast in the spring. Adults and juveniles tolerate a wide range of temperatures and salinity making them especially well suited to culture in cages and ponds (Hodson 1991). Striped bass are long lived and grow reasonably fast, making it possible to produce a market size fish in less than 2 years.

### Status of Nursery and Grow-out Methods

Striped bass are the only anadromous species and only batch spawner to be included in this feasibility assessment. These attributes have probably slowed progress in developing year round spawning of striped bass in captivity. Nonetheless, out of season spawning in captivity has been successfully accomplished and other aspects of their biology make them especially well suited to culture. There are numerous commercial

producers of fingerlings and grow-out operations, as well as state and federal fingerling production programs, in the U.S. Spawning has been typically accomplished by capturing wild broodstock in reservoirs or on the spawning grounds of rivers and then injecting them with hormones. Domesticated strains are also available (Curry-Woods et al 1992; Hodson and Sullivan 1993; Harrell and Woods 1995). Striper males typically mature at an age of 2 years and females typically by age 3 (Setzler et al 1980; Olsen and Rulifson 1992). The best broodstock are believed to be larger, older females which produce larger, higher quality eggs (Zastrow et al 1989). At one time striped bass were typically strip-spawned (Stevens 1966; Bayless 1972; Bonn et al 1976), but as experience has increased more hatcheries have allowed fish to spawn in holding tanks. More recently, researchers have successfully used photoperiod-temperature manipulations and hormone implants to modify maturation rates of striped bass and produce spawns out of season (Blythe et al 1994; Tate and Helfrich 1995; Mylonas et al 1996). Striper sperm has been successfully cryopreserved, potentially facilitating production of hybrids (Kerby et al 1985).

Hybrids were first successfully produced for management purposes (Bayless 1972). Although many *Morone* hybrids combinations are possible, they are typically produced by crossing a striped bass female with a white bass male (*M. saxatilis* x *M. Chrysops*) (Hodson 1991). Eggs of SB hybrids hatch in 40-48 h at 16-20°C (Hodson 1991). The eggs and larvae (5.5 mm SL at first feeding) of stripers and their hybrids are relatively large (Zastrow et al 1989), especially compared to many of the other species evaluated in this assessment. First-feeding typically begins around 5 days after hatch at 19°C and larvae can be fed *Artemia* immediately. It is also possible to completely skip live foods and begin feeding larvae artificial feeds (Wawronowicz and Lewis 1979), although this may result in reduced survival. Striped bass and SB hybrid larvae can grow 15-20% per day at 19°C (Houde and Lubbers 1986; Chesney 1989) and metamorphose at 10-12 mm SL.

Striper larvae can be cannibalistic although this can be reduced or avoided with proper feeding procedures and grading (Ludwig and Tackett 1991). Poor swimbladder inflation is a common problem with striped bass larvae which can lead to reduced growth and poor survival in the larval phase (Bailey and Doroshov 1995). Minimizing stress during the early larval phase and good culture practices can minimize this problem.

## Nutritional and Feed Issues

Dietary requirements have been extensively tested in experimental feeding trials and commercial feeds specifically developed for striped bass and their hybrids and are available from several commercial feed producers (Zeigler et al 1984; Keembiyehetty et al 1992, 1993; Nematipour et al 1992; Brown et al 1993; Gatlin et al 1994). Procedures for weaning striped bass larvae onto dry diets are well established (Hodson 1991). Hybrids are typically weaned onto dry pellets at a length of 25 mm and fed a #1 crumble of the appropriate diet (Hodson 1991). Numerous studies have evaluated the growth performance and the fillet quality of cultured products relative to nutrition of striped bass and their hybrids (Fowler et al 1994; Gallagher 1994, 1995; Griffin et al 1994).

## Suitability for Cage Culture

Striped bass and their hybrids have been cultured in almost every venue possible. Most culture work to date has been done in ponds, tanks, raceways, and cages (Hodson 1991; Hogans 1994). The natural habitat for juvenile striped bass are the freshwater brackish areas of estuaries. Temperature and salinity regimes offshore might affect their growth rates and susceptibility to diseases, although given their proven performance in coastal cage culture in Louisiana this is unlikely to be a major problem. Many of the problems typically associated with brackish and freshwater pond production might also be avoided in the offshore environment.

## Disease Issues

Diseases afflicting striped bass in nature and in culture have been thoroughly studied and reviewed (Mitchell 1984; Wechsler et al 1986; Baya et al 1992, 1996; Harms et al 1996; Hrubec et al 1996). A major problem for the success of SB hybrids in coastal Louisiana has been a temperature specific disease commonly called Pasteurillosis (see Hawke, diseases). Culturing stripers at higher salinity may reduce this problem and other salinity associated problems such as *Saprolegnia* (a fungal infection) which have been reported for freshwater culture systems.



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISIH**

## Potential Limitations for Culture

In the case of striped bass and its hybrids, it is not a matter of whether it is possible to culture them or not in the Gulf, but whether it is the appropriate species for the chosen culture environment and method. Commercial operations along the Gulf coast have been trying to culture striped bass hybrids in cages for several years, with mixed success. The original appeal of striper hybrids was their good growth performance and better resistance to cold temperatures than red drum. An unpredictable problem in the culture of SB hybrids in coastal Louisiana has been a temperature specific disease, Pasteurillosis (see Hawke, diseases). It is possible that the impact of this disease might be reduced or avoided in the offshore environment since it has not been a serious problem in other parts of the country. Within Louisiana, Pasteurillosis has been primarily encountered by hybrid striped bass culture operations located in coastal brackish water ponds. Since the disease can lay dormant in sediments for months, it is possible that close contact with sediments may exacerbate contracting the disease in shallow pond culture.

## Special Considerations

Striped bass hybrids are believed to be superior for culture because they exhibit heterosis or hybrid vigor resulting in faster growth rates, greater disease resistance and higher survival than either parent species (Hogson 1991). Striped bass and their hybrids need to be tested in an offshore cage environment to see how their performance is affected by salinity, currents and unforeseen problems associated with the offshore environment.

## Research Needed to Reach Biological Feasibility

None.



**WALDEMAR NELSON INTERNATIONAL INC.**

## Ocean Ranching of Tuna

### Rationale for Inclusion

Tunas, especially bluefin, (*Thunnus thynnus*) bring premium prices if they are of the appropriate size and quality to be sold in Asian markets for sashimi (Nicoll 1992; O'Sullivan 1993; Anon-a. 1996). Ocean ranching has become increasingly commonplace throughout the world as an alternative method to commercial fishing for reliably producing high quality fresh tuna. Because of the extreme difficulty of spawning and rearing tunas in captivity, ocean ranching has emerged as an intermediate form of culture. Ocean ranching consists of capturing wild stocks of tuna at sea and confining them in sea cages. Cages are slowly towed to coastal areas where the tuna are fed and fattened on a diet of inexpensive fish and in some cases pelleted feeds. This practice has become more common wherever tuna of the appropriate size, species and value can be captured, such as in the Pacific, northwest Atlantic, the Mediterranean and Australian waters.

Reported FCRs have been very high for captive tunas, in the range of 25-35:1 for fish fed chopped fish and crude pelleted foods, however better results on a recently developed moist pellet (8:1 wet weight to wet weight basis) were reported at Aquaculture 98. Given their large size, high metabolic rates and active swimming behavior it seems unlikely that good FCRs will ever be achieved for tuna. This makes feed costs for ocean ranching operations very high.

### Research Needed to Reach Biological Feasibility

Ocean ranching of tunas is not a new concept, although production of fish via this method has grown significantly in the last several years and is projected to grow even further (Jeffriess 1993). Successful ocean ranching of tuna is not a matter of biological feasibility since the practice has primarily evolved among fishermen turned fish farmers and has been practiced since the late 1970s. The primary considerations are economic feasibility and cultural acceptance among resource users competing for tuna resources in the Gulf of Mexico. Yellowfin tuna are abundant in the Gulf during the entire year while bluefin are seasonal migrants that leave the Gulf after spawning in April through June

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF CANDIDATE MARINE FINFISIH**

(Magnuson et al 1994). Yellowfin tuna are more abundant in catches in the GOM, but of lesser value than bluefin. In 1995, exvessel value of bluefin was $23.19 per kg for bluefin compared to $4.63 per kg for yellowfin (NMFS 1998). The second most valuable tuna in the region has been the bigeye at $9.23 per kg (NMFS 1998). Catches of all three species have declined somewhat in recent years with yellowfin catches at 3,097 mt, bluefin at 918 mt and bigeye at 425 mt in 1996 in the Gulf and South Atlantic region (NMFS 1998). Pilot holding and culture trials with bluefin tuna have been attempted by the New England aquarium off Virginia (Plante 1996). However, given the current status of bluefin stocks in the western Atlantic, permitting for bluefin ranching and capture of bluefins is likely to be a serious impediment to extensive ocean ranching in the Gulf or elsewhere in U.S. waters in the foreseeable future (Magnuson et al  1994). Also recent economic downturns in Asian markets have changed the demand for premium grade tuna and could affect their marketability. An economic analysis, based on operations in other countries, could determine the economic feasibility of ranching tunas in the Gulf of Mexico. Significant amounts of finfish bycatch are produced by directed fisheries for shrimp in the northern Gulf (Adkins et al 1993). If properly handled, this could serve as a potentially inexpensive source of high quality protein to support ocean ranching of tunas in the future.

FEASIBILITY STUDY – OFFSHORE MARICULTURE

ASSESSMENT OF PLATFORM AVAILABILITY



**Chapter 3**

# Assessment of Platform Availability

## General Locations and Numbers

There are numerous oil and gas production platforms on the Outer Continental Shelf (OCS) in the Northern Gulf of Mexico (GOM) located off the coasts of Texas, Louisiana, Mississippi and Alabama. These platforms produce oil and gas primarily, and to a much lesser extent, sulfur. Exhibit 3-1 depicts the preponderance of production platforms in the northern Gulf and also shows the 100- and 200-foot depth contour lines. The reader should recall that a finfish mariculture operation was deemed by the project team to be most feasible if located within the 100- to 200-foot contours (see Chapter 1 for explanation).

According to records maintained by the Minerals Management Service (MMS) there are approximately 4000 platforms in the GOM at present.

The conventional types of platforms and configurations vary widely and they are generally found in water depths ranging from 10 to over 1000 feet. These conventional types of platforms range from single well caissons (steel pipes used to protect wells) to multi-pile jackets. A distribution chart of the platform types is shown in Exhibit 3-2. The largest concentration of the candidate platforms is found along the Louisiana continental shelf between the South Pass and West Cameron blocks with approximately 800 major structures in that area.



Exhibit 3-1
LOCATION OF OIL AND GAS PLATFORMS IN
THE GULF OF MEXICO

LEGEND

• Production Platform

— Depth Contour

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF PLATFORM AVAILABILITY**



Exhibit 3-2  Distribution of existing platforms in the Gulf of Mexico. Source: MMS (1994, 1995).

A caisson platform does not provide adequate deck space to allow storage of feed and necessary equipment, crew quarters, office space, etc., for a commercial scale mariculture operation. It has been calculated that a minimum of 500 square meters (approximately 5000 square feet) of deck space is required for the base case installation described in Chapter 1. This requirement necessarily means that a larger structure is required, most probably either a multi-deck four-pile jacket or larger single deck platform.

The MMS maintains a database of all platforms in the GOM. Data maintained include year of installation, type of platform, location (lease number, area and block number), owner, etc. By scanning and querying this database it is possible to estimate the number of platforms suitable for mariculture in the GOM. Exhibits 3-3 and 3-4 show the distribution of platforms in the GOM by depth and age. The project team estimates that there are approximately 900 platforms existing in the GOM which are larger platforms (four-pile or larger) and within the 100- to 200-foot depth contours. The ideal platform for mariculture use is one which has finished its service in oil and gas or sulphur production and would therefore be abandoned or "reefed" if another beneficial use were not found.

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF PLATFORM AVAILABILITY**



Exhibit 3-3   Platforms by depth.



Exhibit 3-4   Platforms by age.



**WALDEMAR NELSON INTERNATIONAL INC.**

J:\97066\Feasibility Study Report\Chapter 3_Platform Assessment.doc

FEASIBILITY STUDY – OFFSHORE MARICULTURE

ASSESSMENT OF PLATFORM AVAILABILITY

## Platforms Scheduled for Abandonment (Decommissioning)

In the years between 1988 and 1996, MMS records report that 1,035 platforms were removed from the GOM OCS for an average of 115 per year. The majority of the removals were shallow water structures; however, about 20% of the platforms removed were major platforms from production sites with greater than 100-foot water depths. The life expectancy is estimated to be 25 to 30 years for a major platform in waters greater than 100 feet deep (NRC 1996). MMS reports that there are 885 platforms 26 years or older on the GOM OCS (MMS 1997). The first oil and gas production platforms in water depths greater than 100 feet were established in 1955 (MMS 1996).

Once the decision is made to cease production at a given location, oil and gas operators must notify the MMS of their intent to plug the wells and cease production. MMS regulations at 30 CFR 250.112 mandate the oil and gas lessee/operator remove the production equipment and return the site to pre-production conditions. The lessee/operator must provide the MMS a surety bond to insure the removal of the platforms (see discussion in Chapter 4 following). NRC (1996) estimates that the cost to remove a typical four-pile platform from 100-foot depth begins at $620,000 and increases to $810,000 for an eight-pile platform – the prices do not include transportation time, well plugging, and site clearance verification costs. When these other items are added, the total cost to remove a structure in these depths will probably range between $1 and $2 million. These costs can be reduced somewhat if the platform is situated in a designated "rigs-to-reefs" area wherein the platform can be cut off below the mudline and toppled in-place after well plugging and removal of production equipment.

The MMS publishes a quarterly "Platform Removal Report" available to the public that lists all the platforms scheduled for removal along the OCS. The information contains the name of operator of the platform, the depth, location, method of removal, and name of the structure.

FEASIBILITY STUDY – OFFSHORE MARICULTURE

ASSESSMENT OF PLATFORM AVAILABILITY

## Areas of the Gulf of Mexico Suited for Mariculture

Water depths of 100 feet and greater generally provide safer conditions for open ocean mariculture operations along the Texas-Louisiana continental shelf. First, commercial scale open ocean net-pens may reach up to 50 meters in diameter and 20 meters in depth. Generally, a measure of clearance is desired below the net to allow fallout from uneaten feed and fecal materials to be swept away by ocean currents. Accumulation of such materials can promote disease among the culture organisms and water quality problems for net-pens (refer to environmental impact section). Second, zones of hypoxia cover portions of the Gulf floor during mid summer and early autumn along the inner continental shelf from the Mississippi delta to the upper Texas coast (Rabalais, 1994).

This hypoxic layer is less persistent in areas on the Louisiana continental shelf outside of the 100-foot contour. If hypoxic conditions do appear along the mid-shelf it is usually confined to the lower one-third of the water column. Estuarine influences can quickly change the water quality around the net-pens. Fresh water intrusion can be prevalent during spring and early summer months. Platforms close to the estuaries such as the Mississippi and the Atchafalaya may experience a temporal surface layer of turbid fresh water.

### Concentrations of Platforms Scheduled for Abandonment

Platforms are generally removed once the cost to maintain operations exceed the revenues generated from production. Fields play out and not all wells are successful and sometimes platforms cease operations after a couple years of production. On the other hand, successful drilling can generate up to 30 years of profitable production. Older successful fields along the outer continental shelf can be found in South Timbalier (ST), Ship Shoal (SS), and Eugene Island (EI) off Louisiana. In 1993 MMS reported that there were 42 major platforms in waters greater than 100-foot depths in the ST region that were 25 years or older. As of October 1997, 24 of these platforms had been removed.



WALDEMAR NELSON INTERNATIONAL INC.

FEASIBILITY STUDY – OFFSHORE MARICULTURE

ASSESSMENT OF PLATFORM AVAILABILITY

## Logistic Considerations

Choosing a mariculture site should involve careful analysis of logistic considerations. Transportation of culture organisms, equipment, and feed will contribute a significant percent of operational expenses. Moving west of the Mississippi, the Texas-Louisiana continental shelf broadens and the gradient to the continental slope is much shallower. The travel distance required to reach adequate mariculture depths of 100 feet south of Fourchon, Louisiana is 13 miles and near the Texas-Louisiana border, south of Port Arthur, Texas the distance from shore to 100 feet of water is 70 miles. Along the Texas coast south of Freeport, the 100-foot contour does move in closer to shore and there are a significant number of platforms in that area (Exhibit 3-1). Although there are numerous production platforms on the continental shelf as stated earlier, the presence of suitable ports along the coasts of Texas and Louisiana are somewhat limited. Inshore base operations will require a facility with vessel access to transport fingerlings and supplies to the offshore farm and harvested products back onshore. Reduction of travel time between the offshore farm and base camp will reduce the risk of damage to the culture organisms. There will also be more opportunity to take "quick trips" to the farm site during suitable weather windows. All future offshore mariculture ventures will have their own individual characteristics, but easy access between the base facilities and farms should be considered in selecting a farm location.

## Concerns of Platform Owners

A major concern of oil and gas companies is the successful transfer of liability from the oil and gas lessee. The mariculture company must demonstrate the capability to underwrite the long-term liability for the ultimate disposal of the platform. Should the operation fail and the mariculture company default on the decommissioning obligation, absent posting of sufficient security, liability for decommissioning the platform will probably fall back upon the previous owner (the oil and gas lessee). In addition, the mariculture operators must be responsible for personal injury and property damage

  **WALDEMAR NELSON INTERNATIONAL INC.**

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ASSESSMENT OF PLATFORM AVAILABILITY**

which might occur during mariculture operations, maintenance of navigational aids, platform repairs and maintenance of the structural integrity of the structure, and proper platform decommissioning at the end of the project (which may include platform removal, necessitating proper site clearance). These liability concerns will be addressed in more detail in Chapter 4.



**Chapter**

# 4

# Regulatory Environment

## Permitability Assessment of Commercial Project

### Summary

Currently, no federal legal structure exists to promote mariculture (i.e., no federal laws, agency, or programs specifically addressing mariculture), although affected federal and state agencies have created procedures which will enable a mariculture project to commence. The Department of Commerce has recently published a draft Aquaculture Policy (March 17, 1998) which, if adopted, could significantly promote the development of an offshore mariculture industry in the U.S. under existing statutes and regulations.

Two regulatory problems remain however for any project that pursues regulatory approvals. First, there is limited availability of property rights to protect the investment in the mariculture operator's project. Concerns arise regarding security of ownership of fish in cages and regarding the nature of the governmental authorization received by the mariculture operator. Second, in order to secure approval to possess species with minimum size or quota restrictions, an "exempted fishing permit" must be secured from the National Marine Fisheries Service. These permits are effective for a maximum of one year, but may be renewed upon re-application. Although this approach could at least enable the commencement of such projects, federal law should be implemented to exempt mariculture operations from these regulations in the future. All of these issues will be discussed in this chapter.



**WALDEMAR NELSON INTERNATIONAL INC.**

FEASIBILITY STUDY – OFFSHORE MARICULTURE

REGULATORY ENVIRONMENT

## Projects Proposed for Gulf of Mexico to Date

A listing of the proposed mariculture operations in the Gulf of Mexico known to date are the following:

**SeaFish Mariculture, L.L.C.:** Received final approval for mariculture project from the Corps of Engineers, Galveston District on July 3, 1997.

**SeaPride Industries:** Received final approval from Corps of Engineers, Mobile District, for project in Mobile Bay, Alabama (November 3, 1993), but after approval National Marine Fisheries Service expressed objection that insufficient opportunity for comment had been provided. That permit expired November 3, 1996.

**Watermark Corporation:** Submitted an application to the Corps of Engineers, New Orleans District, in August of 1994, to establish a platform supported fishery in Grand Isle Blocks 75 and 76. The application was returned to the applicant January 12, 1995.

**Marine Artificial Habitats, Inc.:** Submitted an application to the Corps of Engineers, New Orleans District, in 1994, to establish a privately managed artificial reef and processing plant in South Timbalier 176. The application was denied, then withdrawn by the applicant.

**Oxy-Texas A&M:** This small-scale research project was conducted off the Texas coast, involving an Occidental Petroleum platform.

## Permits Which Are or May Be Required for a Commercial Project

### Corps of Engineers Permit

*Permit Application:* A permit from the applicable district of the U.S. Army Corps of Engineers (COE) is the primary certificate of approval necessary for establishing a structure for a mariculture project. Applications for these permits are open for review and comment through public notice and notices sent directly to state and federal agencies, as well as concerned private interests (at the discretion of the applicable COE district engineer). It can be expected that these other agencies will participate in the permit



process through COE solicitation of evaluation and comment.  In state territorial waters, state authorization precedes federal approval.  The application form used to apply for a permit is Engineer Form 4345, "Application for a Department of the Army Permit." Copies of application materials can be obtained from the applicable Corps district office.

The application must include a series of drawings depicting the structure as it stands, one drawing of the structure's location and orientation within the permitted area including latitude and longitude and Louisiana Lambert coordinate readings (for structures off Louisiana's coast) for the four corners of the permitted area and fishing reef, and a plot of the location of the permitted units within the block, including all pipelines, structures and contour lines before and after placement of the structure.

In addition to the application and drawings, the COE will require the mariculture operator to provide an operational plan. A guide for preparation of this plan is provided by the New Orleans District Corps of Engineers letter of December 12, 1994, to the Watermark Corporation.

Consideration should be given to (1) choosing a platform in a designated "rigs-to-reefs" (artificial reef) site, or (2) having the area around a chosen platform designated as a rigs-to-reefs area, or (3) moving a chosen platform to an area already designated by either Louisiana or Texas as an artificial reef site, as this might help in the permitting process. As an aside, in the Louisiana and Texas rigs-to-reefs donation programs, state agencies handle the COE application as well as the "nav aids" application (to the Coast Guard) below.

*Agency Offices and Contacts:* <u>*U.S. Army Corps of Engineers:*</u> New Orleans District:  P.O. Box 60267, Foot of Prytania Street, New Orleans, Louisiana 70160-0267. Attn:  LMNOD-S. Permits: 504-862-2255.  Contacts:  Barton Rogers (862-2663) and Mike Farabee (862-2292).  Galveston District:  P.O. Box 1229, Galveston, Texas 77553-1229. Permits:  409-766-3941.  Mobile District:  P.O. Box 2288, Mobile, Alabama 36628-0001, Attn:  SAMOP-s.  334-690-3261 Contact:  John McFadyen.  Jacksonville District:  P.O. Box 4970, Jacksonville, Florida 322302-0019, Attn:  SAJRD.  904-791-1659.

*Enabling Acts and Implementing Regulations:* Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 401-687) prohibits the unauthorized construction in or over, obstruction or alteration of any navigable water of the United States. The legislative authority to prevent inappropriate obstruction to navigation was extended to installations and devices located on the seabed to the seaward limit of the Outer



Continental Shelf (OCS) by Section 4(e) of the Outer Continental Shelf Lands Act (OCSLA), as amended (43 U.S.C. 1333 [f]). Although the Corps of Engineers is the agency granted authority over "artificial islands, installations, and other devices" on the OCS, pursuant to 43 USC 1333 (e), the COE cedes its authority over OCS oil and gas drilling and production installations to the MMS under the COE's nationwide permit system, 33 CFR Part 330, Appendix A, Sec.B.8).

Structures placed within the territorial seas of a state must also comply with Section 404 of the Federal Water Pollution Control Act (Clean Water Act) of 1972 (PL 92-500; 33 U.S.C. 1251 et seq). Regulations promulgated under Section 404 (33 U.S.C. 1344) require that a Corps permit be obtained before dredge or fill material is discharged into any of the navigable waters of the United States and stipulate state certification of discharge projects. The term "discharge of fill material" is defined at 33 CFR 323.2(1).

The COE is required to conduct a "public interest review" pursuant to 33 CFR 320.4(a)(1), which involves a balancing of all the reasonably expected benefits and detriments to the public interest, including environmental, economic, aesthetic, navigation, property rights, and international interests. The COE is responsible for publishing the public notice for artificial reef and mariculture projects and for providing final approval of such projects.

## NMFS Exempted Fishing Permit

*Permit Application:* An "exempted fishing permit" (EFP) must be obtained from the National Marine Fisheries Service (NMFS) in order to avoid violating federal OCS fishing regulations. Depending upon the species being cultured, the operator may violate regulations by possessing fish that are less than minimum size, out of season, beyond regulated trip limits or fish that are altogether banned from possession in federal waters (such as redfish).

Cobia, snappers, groupers and amberjack have federally enforceable bag and size limits and tuna have minimum size limits in the Gulf of Mexico.

*Agency Offices and Contacts:* NMFS is under the National Oceanographic and Atmospheric Administration (NOAA) in the Department of Commerce. The Regional Director of the NMFS is Dr. Andrew J. Kemmerer at Southeast Region (9721 Executive



Center Drive N., St. Petersburg, Florida 33702). He sits on the Gulf of Mexico Fishery Management Council (GMFMC), Lincoln Center, Suite 331, 5401 W. Kennedy Boulevard, Tampa, Florida 33609-2486, 813-228-2815.

*Enabling Acts and Implementing Regulations:* The Magnuson Fishery Conservation and Management Act of 1976 (MFCMA) (16 U.S.C. 1801-1882) also known as the FCMA, or the Magnuson Act, established a fisheries conservation zone for the United States and its possessions and delineates an area from the States' seaward boundary out 200 nautical miles. The Act created eight Regional Fishery Management Councils (FMC's) and mandated a continuing planning program for marine fisheries management by the Councils. The Act, as amended, requires that a Fishery Management Plan (FMP) based upon the best available scientific and economic data be prepared for each commercial species (or related group of species) of fish that are in need of conservation and management within each respective region.

Applicable regulations are found at 50 CFR Parts 600 et seq., "Fishery Conservation and Management, National Oceanic Atmospheric Administration, Department of Commerce." Separate parts address shrimp, red drum (redfish), coastal migratory pelagic and reef fisheries of the Gulf of Mexico. The Magnuson Act, and the regulations adopted pursuant to it, also establish the regional fishery management councils.

Additionally, the regulations expressly recognize that certain actions taken by NOAA pursuant to the Magnuson Act will trigger the requirement that NOAA prepare a draft Environmental Impact Statement (EIS), or environmental assessment (EA). The purpose of conducting the EA is to confirm a "finding of no significant impact" in order for a proposal to proceed in accordance with the National Environmental Policy Act of 1970 (NEPA), 42 USC 4321 et seq. NMFS prepared an environmental assessment for issuance of the exempted fishing permit for the SeaFish Mariculture project off the Texas coast.

The authority of NMFS to regulate the placement and/or operation of mariculture facilities (referred to therein as "aquaculture facilities located in the U.S. exclusive economic zone [EEZ]") was addressed in a February 7, 1993, memorandum to James W. Brennan, then NOAA's Acting General Counsel, from Jay S. Johnson, Deputy General Counsel, and Margaret F. Hayes, Assistant General Counsel for Fisheries. This



FEASIBILITY STUDY – OFFSHORE MARICULTURE

REGULATORY ENVIRONMENT

memorandum was prompted by the question of whether NOAA had authority to regulate the mariculture proposal of American Norwegian Fish Farm, Inc. The memorandum concludes:

> Aquaculture facilities are subject to the Magnuson Fishery Conservation and Management Act because they engage in the "harvest" of fish from the EEZ. Barges and other vessels used to support such facilities are "fishing vessels" within the meaning of the Magnuson Act. U.S. vessels that support such facilities and that measure five net tons or larger must obtain Coast Guard documentation, including a "fishery endorsement." U. S. vessels are subject to additional regulations at the discretion of a Regional Fishery Management Council, subject to the approval of the Secretary of Commerce.

The rationale for this position follows:

_The Magnuson Act:_ NOAA's principal regulatory authority is the Magnuson Fishery Conservation and Management Act, 16 U.S.C. 1801 _et seq_. The Act contains an exceptionally broad definition of the term "fishing" [16 U.S.C. 1802 (10)] encompassing not only the catching of fish and "any other activity" expected to result in, or "other operations at sea in support of," the "catching, taking, or harvesting of fish." Use of the term "harvesting" is particularly significant since it adds an additional concept beyond "catching" or "taking" – harvesting connotes the gathering of a crop – which brings within the purview of the Act any aquaculture facility located in the EEZ.

The fact that Congress generally considers aquaculture to be equivalent to fishing is reinforced by the definition of "fisheries" in the Vessel Documentation Act [46 U.S.C. 1201 (a) (1)], which includes the terms "planting, cultivating, catching, taking, or harvesting fish . . . in the exclusive economic zone."



**WALDEMAR NELSON INTERNATIONAL INC.**

Additionally, regarding vessels:

> 46 U.S.C. 12108 (b) states that only a vessel holding a fisheries
> endorsement may be "employed in" the fisheries. Only such vessels
> may plant, cultivate, or harvest fish within the EEZ. Further, the
> Magnuson Act prohibits foreign fishing except by permit, 16 U.S.C.
> 1821 (a), defines foreign fishing as that done by a vessel "other than a
> vessel of the United States," 16 U.S.C. 1802 (12), and defines "vessel of
> the United States" so as to require Coast Guard documentation of
> vessels measuring five net tons or larger, 16 U.S.C. 1802 (31). In
> combination, these definitions require all large U.S. commercial fishing
> vessels to obtain U.S. documentation and a fisheries endorsement to
> avoid the application of the much more stringent provisions of the
> Magnuson Act that govern foreign fishing vessels.

NMFS regulations establish minimum size limits for certain species of finfish, require a vessel permit to fish for such species within the EEZ, and make it unlawful for anyone to possess any less-than-minimum-size specimens of the regulated species.

Additionally, to date, nine FMP's have been implemented by the GMFMC, including FMP's for reef fish in 1984 and for red drum in 1987. SeaFish Mariculture required authorization to harvest, possess, and sell red drum, greater amberjack and red snapper taken from the federal waters of the Gulf of Mexico. In addition, authorization was sought to possess or sell greater amberjack or red snapper below the minimum size limit, and to harvest or possess red snapper in excess of established trip limits and/or during a closed season. Some of these activities are prohibited by these FMP's. [See 50 CFR 622.4 (a) (v) and (ix); 622.32 (b) (2) (iii); 622.37 (d); 622.42 (a); 622.43 (a) (1); and 622.45 (b)].

In order to accommodate SeaFish Mariculture's plans, NMFS required of SeaFish Mariculture that it obtain an exempted fishing permit. This EFP is issued pursuant to 50 CFR 600.745, which provides that a NMFS Regional Director may authorize, for limited testing, public display, data collection, exploratory, health and safety, environmental



**WALDEMAR NELSON INTERNATIONAL INC.**

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**REGULATORY ENVIRONMENT**

cleanup, and/or hazard removal purposes, the target or incidental harvest of species managed under an FMP or fishery regulations that would otherwise be prohibited.

The regulation lists potential grounds for denial of an EFP, and also provides that, if granted, the EFP may contain terms and conditions consistent with the purpose of the exempted fishing. Pursuant to this regulation, NMFS made a preliminary determination in that SeaFish Mariculture's application contained all of the required information and that it constituted an activity appropriate for further consideration. NMFS then published a notice of receipt of an application for an exempted fishing permit and a request for public comments (62 FR 37034, July 10, 1997).

Before issuing the EFP to SeaFish Mariculture, NMFS conducted an environmental assessment (including in the title of the EA that the EFP was for "A Feasibility Study of Net Cage Culture of Finfish Associated with Offshore Oil and Gas Platforms in the Northern Gulf of Mexico"). The EA was completed in September of 1997.

## EPA NPDES Permit

*Permit Application:* At the same time as submittal of these above permits, application should be made to the Environmental Protection Agency for a permit for discharges to the waters of the Gulf pursuant to the National Pollutant Discharge Elimination System (NPDES). Until recently, marine aquaculture activities in the U.S. have been limited to state waters and therefore, all discharge permits and monitoring plans have been handled at the state level (Rieser 1996). In 1997, Seafish Mariculture initiated a feasibility pilot study of net-pen culture on an offshore oil and gas structure in federal waters. Since the Seafish Mariculture project intends to raise federally regulated species, it is necessary that the National Marine Fisheries Services (NMFS) issues an Exempted Fishing Permit (EFP) to allow for the harvest of regulated species in federal waters. During the 30 day public comment period for the federal (EFP), the U.S. Environmental Protection Agency (EPA) noted that the mariculture operations must apply for a discharge permit under the U.S.EPA NPDES discharge permit system.

*Agency Offices and Contacts: Environmental Protection Agency (EPA):* (For Texas and Louisiana) Region 6, 1445 Ross Avenue, Dallas, Texas 75203, Attention: Myron



**WALDEMAR NELSON INTERNATIONAL INC.**

Knudson.   214-665-6444.   (For   Mississippi,   Alabama   and   Florida)   Region   4

*Enabling Acts and Implementing Regulations:*   The EPA, pursuant to Section 402 of the Clean Water Act (33 USC 1342), has established the National Pollutant Discharge Elimination System (NPDES) for the permitting of discharge of pollutants into U.S. navigable waters. An NPDES general permit exists for OCS oil and gas activities. Presumably, because no general permit exists yet for mariculture activities, the EPA will have to issue a special permit for such discharges. However, there is a specific reference to aquaculture activities in 33 USC 1328, and authority exists for the establishment of a general permit for such activities in 40 CFR 122.25.

## Platform Abandonment Liability Bonding/Escrow Account with the MMS

*Permit Application:*   The Minerals Management Service should be consulted early in any planned OCS mariculture activity. The MMS will require some type of security to assure proper decommissioning (or "plugging and abandonment") of the platform and associated wells , and site clearance upon the conclusion of the mariculture operation. The MMS will require, as a condition of approval of ownership transfer, that a security bond be posted or some type of escrow account be established to cover the cost of decommissioning and site clearance in the event of default of the mariculture enterprise. The agency requires this of its oil and gas operators in the Gulf of Mexico (see 30 CFR 256.58-62, especially the revisions issued May 22, 1997, at 62 FR 27948). Although the basic rule is that before a lessee installs a platform to begin producing a lease it must post at least a $500,000.00 individual lease bond, the MMS regularly exercises its authority to require "supplemental bonding" over and above that level to ensure proper abandonment and lease site clearance.

Although there is no mechanism in place for the MMS to enforce its regulations on a mariculture enterprise, an illustration of what the MMS would require of OCS oil and gas operators is provided by the lessee's and operator's bond form, a copy of which can be obtained from the MMS.

*Agency   Offices   and   Contacts: Minerals   Management   Service   (MMS),   U.S. Department of the Interior:* Gulf of Mexico OCS Region, 1202 Elmwood Park Boulevard, New   Orleans,   Louisiana   70123-2394,   504-736-2894   for   platform   removal   approval



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**REGULATORY ENVIRONMENT**

(Arvind Shah), 504-736-2803 for platform abandonment liability security approval (Carrol Williams).

*Enabling Acts and Implementing Regulations:* Authority is pursuant to the Outer Continental Shelf Lands Act (OCSLA) of 1953, as amended in 1978 (43 U.S.C. 1331 et seq.) OCSLA established Federal jurisdiction over submerged lands on the OCS seaward of State boundaries (for Gulf coast states, 3 statutory miles from the coastline, except for Florida and Texas, which are 3 marine leagues [approximately 9 miles] from the coastline). Under the OCSLA, the Secretary of the Interior is responsible for the administration of hydrocarbon and mineral exploration and development of the OCS. Title 30 of the Code of Federal Regulations contains the implementing regulations for the agency pursuant to OCSLA.

*Plugging and Abandonment Requirements:* Oil and gas exploration and production operations on the OCS are conducted pursuant to oil and gas leases (and sulphur exploration and production operations on the OCS are conducted pursuant to sulphur leases) issued by the MMS. Leases in the water depths appropriate for mariculture are granted for primary terms of five years – it is highly unlikely a platform ready for decommissioning will be located on a lease within its primary term. According to 30 CFR 250.13, as to a lease beyond its primary term, no time lapse in production, drilling, or well-reworking operations of greater than 180 days shall continue the lease in effect unless production or other operations on the lease have been suspended in accordance with MMS approval. (Reasons for granting a suspension of production or other operations are provided in 30 CFR 250.10.) The MMS, in Section 22 of its standard lease, Form MMS-2005 (March 1986), provides that all structures shall be removed from a lease within one year after lease termination. Thus, as to leases beyond their primary term, all structures thereon must be removed within a year and a half from the date of cessation of production.

Per 30 CFR 250.112, all structures shall be removed down to a depth of 15 feet below the sea floor (i.e., 15 feet below the "mudline"). Per 30 CFR 250. 114, the lessee shall verify site clearance. Pursuant to this regulation, the MMS issued Notice to Lessees (NTL) 92-02 reiterating the requirement that all well and platform "locations" be cleared of all obstructions. The "location" is defined as a circle consisting of a radius of various lengths, based on the type of structure. For platforms, it is a 1,320-foot radius circle



**WALDEMAR NELSON INTERNATIONAL INC.**

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**REGULATORY ENVIRONMENT**

centered on the platform's geometric center (for single well caissons and well protectors, a 600-foot radius circle). For such structures located in water depths of greater than 300 feet, all that is required for site clearance verification is a sonar search of the location. For such structures located in water depths of less than 300 feet, 100% of the limits of the location must be trawled in two directions. This requirement potentially raises substantially the costs of removal operations. All objects caught in the trawl net must be brought to the surface for disposal. The states of Louisiana and Texas have adopted similar regulations for platforms in state waters.

The anticipated expense of site clearance may be reduced by donating the platform to either Louisiana's or Texas' "rigs-to-reefs" program (addressed in detail at the end of this section). The donor also donates one-half of anticipated savings to the appropriate state for maintenance of the site. Savings are realized from avoided expenses of hauling the platform to shore and disposing of the platform for scrap. Additional savings are realized where a platform qualifies for a donation in place. In such case, the site clearance expenses may be avoided.

Paragraph 5 of Article 5 of the 1958 Continental Shelf Convention, a treaty to which the United States is a party, states that any installations on the Continental shelf which are abandoned or disused must be entirely removed. The rationale behind removal is to allow for other uses of the OCS, such as shrimp trawling and commercial and recreational fishing. Additionally, left in place, platforms might pose a hazard to navigation. All structures on expired leases have to date been either toppled in place (their location having been designated a rigs-to-reef site), toppled and towed to a rigs-to-reef site, salvaged for reuse at another location, toppled and towed to shore for salvaging and disposal, or( in one case) donated in place to a rigs-to-reef program.

*Liability for Plugging and Abandonment Obligations:*  Formerly the MMS had stated the position that if it had unconditionally approved an assignment of a lease, the agency was required to look to the assignee solely for the all obligations under the lease, including platform abandonment. (This position was stated in letters dated June 6, 1988, from the MMS to Amoco Production Company, and November 6, 1989, from the Associate Director for Offshore Minerals Management to the Regional Director, Gulf of Mexico Region).



**WALDEMAR NELSON INTERNATIONAL INC.**

**4-11**

The MMS repudiated that position as "erroneous" and "mistaken" in the final rule on surety bond coverage issued August 27, 1993, at 58 FR 45255 (see, especially, p. 45257). The MMS later reiterated this position in NTL (Notice to Lessees) 93-2N, "Liability of Assignors, Assignees, and Co-lessees for Plugging of Wells and Removal of Property on Termination of an Outer Continental Shelf Oil and Gas Lease," issued October 6, 1993.

Revised MMS regulations took effect August 20, 1997, clarifying that an assignor of an OCS lease remains responsible for compliance with the lease abandonment obligations associated with structures set while the assignor was lessee. Additionally, the regulations clarify that co-lessees and operating rights owners are jointly and severally liable for compliance with the obligations imposed by MMS leases and regulations. The revised regulations, 30 CFR §§ 250.8, 250.110 and 256.62, were issued on May 22, 1997 (62 FR 27948).

## State Agencies to be Consulted

Although these agencies will not issue a permit, they should be consulted at the time of the above discussions. They will have much input regarding the Corps of Engineers' permitting process. For Louisiana:  Louisiana Department of Wildlife and Fisheries, P.O. Box 98000, Baton Rouge, Louisiana 70898-9000. Artificial Reef Coordinator: Rick Kasprzak.  504-765-2375.  For Texas:  Texas Parks and Wildlife Department, 4200 Smith School Road, Austin, Texas 78744.  Director, Coastal Fisheries Policy: Hal R. Osburn.  512-389-4862.  Additional State agency for Louisiana:  Coastal Management Division, Louisiana Department of Natural Resources, P.O. Box 44487, Baton Rouge, Louisiana 70804-4487.  Administrator:  Terry W. Howey.  504-342-7591.

The Coastal Zone Management Act (CZMA) (16 U.S.C. 1451 et seq.) was enacted by Congress in 1972 to improve the nation's management of coastal resources. Specific concerns were the loss of living marine resources and wildlife habitat, decreasing open space for public use, and shoreline erosion. Congress also recognized the need to resolve conflicts between various uses that were competing for coastal lands and waters (USDOC, NOAA, 1988a).

The basic goal of the CZMA is to encourage and assist coastal states to voluntarily develop comprehensive management programs. The CZMA established a State-Federal partnership in which the States take the lead in managing their coastal resources, while the Federal Government provides financial and technical assistance and agrees to act in a manner "consistent to the maximum extent practicable" with the federally-approved State management programs. The CZMA is administered by the Office of Ocean and Coastal Resource Management (OCRM), within NOAA's National Ocean Service.

The Coastal Zone Reauthorization Amendments of 1990 amended the Federal consistency provisions to address the Supreme Court's 1984 decision in <u>Secretary of the Interior</u> v. <u>California</u>. This clarified that all Federal agency activities, whether in or outside of the coastal zone, are subject to the consistency requirements of Section 307(c)(1) of the CZMA if such activity "affects" natural resources, land uses, or water uses in the coastal zone. 16 U.S.C. 1456(c)(1). In accordance with this provision, the Coastal Management Division exercises consultative authority, along with the Louisiana Department of Wildlife and Fisheries, over mariculture projects proposed for state and federal Gulf of Mexico waters off of the Louisiana coast. Similarly, the State of Texas exercises consultative authority over mariculture projects proposed for state and federal waters off the coast of Texas.

## U.S. Coast Guard Nav Aids Permit

*Permit Application:* After the required COE permit is obtained, application must be made to the U.S. Coast Guard to establish private aids to navigation. The Coast Guard exercises regulatory authority over artificial structures in OCS waters to ensure that obstructions in U.S. waters are properly marked for the protection of maritime navigation. Offshore oil and gas platforms are classified as obstructions to navigation and must be marked in accordance with current U.S. Coast Guard Eighth District (for offshore Louisiana) "Guidelines for marking submerged artificial structures in the Gulf of Mexico." The following criteria are general guidelines; specific decisions regarding each reef site are made on a case-by-case basis. Application for a permit is accomplished by completing and submitting a "Private Aid to Navigation Application Form CG-2554" to the proper U.S. Coast Guard District Office.



*Agency Offices and Contacts:* For offshore Texas, Louisiana, Mississippi, Alabama and Florida (west of Appalachicola): U.S. Coast Guard Eighth District, 501 Magazine Street, New Orleans, Louisiana 70130-3396, Attention: Aids to Navigation. 504-589-6234. For offshore Florida east of Appalachicola: U.S. Coast Guard Seventh District, Federal Building, 51 SW 1st Avenue, Miami, Florida 33130, Attention: Aids to Navigation. 305-350-5654.

*Enabling Acts and Implementing Regulations:* Authority is granted the Coast Guard under 43 U.S.C. 1333 (e), 14 U.S.C. 81-87, and 33 CFR, Parts 64-66). Under 43 U.S.C. 1333(e), the Secretary of Transportation has the authority to "promulgate and enforce such reasonable regulations" with respect to aids to navigation. Further, under 14 U.S.C. 81, the Coast Guard is given authority to establish and maintain a system aiding navigation for commerce and the armed forces. Under 14 U.S.C. 83-85, penalties are prescribed for establishing unauthorized aids to maritime navigation, for interference with aids to navigation, and for failure to comply with rules and regulations set forth in 33 CFR Parts 64 and 66. Under 43 U.S.C. 86, the owner of an obstruction is held liable to the United States for the cost of such marking "until such time as the obstruction is removed or its abandonment legally established or until such earlier time as the Secretary may determine."

Regulatory authority is delegated to the Coast Guard district commander (within the confines of his respective district) under 33 CFR 66.01-3. At the recommendation of the COE district engineer, the district commander will decide, on a case-by-case basis, if marking is required (33 CFR 64.30) and the type, number, and description of the required markings (Sec. 64.20-1).

## Platform Removal Application and Site Clearance Report

If it is decided that, as part of the mariculture project, a platform will be removed from one site to be moved to another, a platform removal application will have to be filed with the MMS. After the platform has been removed, site clearance will have to be conducted and a site clearance report will have to be filed. Also, even in the event that a platform acquired for a mariculture project remains in place, at the end of the useful life of the platform, the platform will have to be removed. The applicable regulations have been summarized above.

 **WALDEMAR NELSON INTERNATIONAL INC.**

## Other Environmental Issues

*Solid Waste:* The Corps, before it issues a permit, the Coast Guard, and the EPA will demand proof that proper disposal of wastes is going to be accomplished, whether that waste is disposed of onshore or in OCS waters. Disposal of any solid waste or garbage anywhere in the marine environment is prohibited under the regulations of the MMS (30 CFR 250), the EPA (40 CFR 435) and The Coast Guard (33 CFR 151).

The Marine Plastic Pollution Act of 1987 directed the Coast Guard to implement Annex V of MARPOL 73/78 (the International Convention for the Prevention of Pollution from Ships, 1973, as modified by the Protocol of 1978). The regulations adopted pursuant to this Act, codified in 33 CFR Part 151, regulate the disposal of solid wastes in OCS and state territorial waters, and require waste disposal plans and placement of placards summarizing solid waste disposal rules.

*Oil Spills:* The Coast Guard is also responsible for enforcement of Section 311 of the Clean Water Act, 33 U.S.C. 1321, as amended by the Oil Pollution Act of 1990, which governs oil spills. As with the above paragraph regarding solid waste disposal, no permit from the Coast Guard is required. However, in the event of a spill which creates a sheen, the Coast Guard will be the interested agency.

*Air Emissions:* The Clean Air Act Amendments of 1990 affirmed the authority of the MMS over air emissions from OCS oil and gas facilities off of Louisiana and Texas. However, EPA's Region 6 would, presumably, have authority over the air emissions from a mariculture operation. If the operation is placed within 100 km of the Breton Wilderness Area this could be problematic as the BWA is a Class I PSD Area (receiving EPA's highest level of protection under its "prevention of significant deterioration" of air quality program).

## Other Potential Permits

*Permit for Laying of Electrical Cables:* Pursuant to 33 CFR Part 330, although the laying of electrical cables offshore is covered by a Nationwide Permit, if the mariculture operation included the laying of electrical cables, drawings must be submitted to the COE and approval secured before commencement of cable laying operations.



**WALDEMAR NELSON INTERNATIONAL INC.**

## Major Potential Problem Areas and Recommendations for Fostering a Commercial Mariculture Industry in the Gulf of Mexico

The National Research Council (NRC) established a committee in 1992 under its Marine Board to assess the technology and opportunities for mariculture on U.S. territorial seas. This committee concluded that many of the problems that presently constrain mariculture could be resolved if "a reasonable and predictable regulatory framework" was developed. That such a framework does not yet exist even after Congress and the Executive Branch have twice (in 1980, with the "National Aquaculture Act" and 1985, with the "National Aquaculture Improvement Act") collaborated to pass sweeping legislation regarding aquaculture may not bode well for such an effort.

Additionally, Congress failed in 1995 and 1996 (in the 104th Congress) to pass Senate Bill S.1192, "The Marine Aquaculture Act of 1995", proposed on behalf of NOAA by Senators Kerry, Pell and Inouye. No attempt was made in 1997 (in the 105th Congress) to renew the effort. In a paper which provides an excellent overview of mariculture issues and critique of that bill, the author proposes, in lieu of a federally managed system, one in which oversight is delegated to the states (Rieser 1996). The author does not refer to the experiences of Texas and Louisiana regarding such a delegation of authority under a program with a related agenda, the National Fishing Enhancement Act of 1984, cited earlier. However, because the experiences of the affected state and federal agencies under the "rigs-to-reefs" program are relevant to this discussion, at the end of this section is a summary of federal and Louisiana law implementing this program.

It is not here recommended, however, that there be a renewal of an effort to provide an overall federal framework, nor is it recommended that there be a federal delegation to the states. There has been an offshore oil and gas industry for over fifty years in the Gulf of Mexico, and this has necessitated the cooperation of the same agencies involved in mariculture projects in the Northern Gulf of Mexico. Additionally, over the past ten years, the rigs-to-reefs program has brought the same federal and state agencies together in cooperation. Thus, as was stated at the beginning of this section, affected agencies are performing their respective functions regarding potential mariculture applications. Thus, concerns regarding enforcement of redundant regulations, poorly defined agency jurisdictions, and poorly defined standards that fail to reduce conflicts among competing users of federal waters, cited in the National Research Council's 1978

report (NRC 1978) are not problems which prompt a need for changes in federal law in order to foster a mariculture industry using oil and gas platforms in the Northern Gulf of Mexico.

However, there are several other potential problems that at least require clarification regarding federal law, and may require changes in federal law. Among these are inappropriate restrictions designed to protect wild fish stocks and limited availability of property rights or other interests that can secure a mariculture operator's investment (NRC 1978 and Rieser 1996). Additional concerns, unique to the use of oil and gas platforms in the Gulf of Mexico exist, as well. All of these concerns are addressed below:

*Fisheries Management Issues*

Standard 5 in NOAA's rules to the Regional Fisheries Management Councils regarding their Fisheries Management Plans (FMP's), found at 50 CFR Subpart B, Appendix A, provides:

> NOAA believes that an FMP should not restrict the use of productive and cost-effective techniques of harvesting, processing or marketing, unless such restriction is necessary to achieve the conservation or social objectives of the FMP.

The GMFMC has also issued the following "Mariculture Policy and Guidelines":

- The Council recommends that native species receive priority as candidate culture species. Exotics should be listed only after thorough investigation has demonstrated no detrimental impacts on native species. The Council opposes use of non-native species in mariculture systems unless demonstrated it has no detrimental impacts on native species.

- The Council recommends that mariculture activities are environmentally responsible and ensure that operations do not alter existing habitat with respect to habitat in that: existing shoreline, bottom and open-water habitats should be protected from physical alterations or degradation.



**WALDEMAR NELSON INTERNATIONAL INC.**

- The Council recommends that the ingress and egress of native wild organisms in natural and public waters should not be impeded by physical or water quality barriers; and navigation in natural and public waters should not be impeded.

- In regard to research and monitoring, the Council recommends that the mariculture industry demonstrate, in part, its stewardship of Gulf waters by: actively educating its member institutions about necessary regulation and permits; actively participating in cooperative research and monitoring to improve the understanding of mariculture's relationship to coastal and marine ecosystems; and participation in cooperative research to enhance knowledge of cultured species.

- The Council recommends that mariculture operations should be located, designed and operated to reduce, prevent, or eliminate adverse impact to estuaries and marine habitats and native fishery stocks. These impacts that cannot be fully mitigated in-kind. Conditions should be maintained to sustain healthy, diverse, native biological communities without the production of nuisance, toxic or oxygen demanding conditions. Standard operating procedures should contain methods to prevent escapement, accidental transport or release of cultured organisms.

- In regard to Water Quality, the Council recommends that mariculture facilities should be operated in such a manner that the impacts to the local environment by utilizing water conservation practices and discharging effluent that protect existing designated use of receiving water. Mariculture facilities are responsible for developing, implementing, and monitoring best management practices to conserve water and improve effluent water quality.

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**REGULATORY ENVIRONMENT**

- The mariculture activities should have procedures established that: prevent the importation or spread of pathogens or parasites; minimize impacts of disease outbreaks if they occur; and eliminate disease problems wherever possible.

NOAA and the GMFMC, acting in accordance with these policies, approved the EFP application of SeaFish Mariculture. It is expected that other technically sound proposals will be approved. While such policy endorsements are welcome, for mariculture to exist in the OCS there must be a legal provision that specifies private ownership of fish within the cage or netpen. Without such a provision, there is little incentive for private industry to invest under such financially risky circumstances (Kacergis, 1996). Also, the restrictions on species, circumvented in the short term by EFP's, must be addressed in order to foster the long-term future of the industry.

*Security of Ownership of Fish in the Cages:* Again, the Magnuson Act does not address mariculture or aquaculture in its text. It does state, however, "the United States claims . . . sovereign rights and exclusive management authority over all fish, and all Continental Shelf fishery resources, within the exclusive economic zone." Thus, as to fish in a mariculture cage, management authority rests with the federal government. Arguably, too, even though such fish may have been raised onshore and, if onshore, would be deemed to be owned by the mariculture operator, offshore they are owned by the federal government (Kacergis 1996). Appropriate language appears to exist with respect to mariculture projects in Canadian waters as the Canadian Aquaculture Act states in section 16 (5):

> All aquacultural produce of the species and strains specified in the aquaculture license, while constrained within the boundaries of the aquaculture site, are the exclusive personal property of the licensee until sold, transferred, or otherwise disposed of by the licensee.

*Security of Tenure:* A concern related to security of ownership of the fish in the cages is security of the interest the mariculture operator receives from the government (Rieser, 1996). Currently there are no provisions for the granting of a license or permit to



conduct a mariculture enterprise, nor are there, alternatively, provisions for the granting of a lease to operate in a specified area of federal waters. Also lacking are criminal sanctions and a civil right of action against individuals who violate the mariculture operator's rights as lessee of the seabed and water column or as licensee (Rieser 1996).

The Marine Aquaculture Act of 1995, cited previously, proposed to set up a system in which the Secretary of Commerce would issue permits authorizing the ownership, construction, or operation of a mariculture facility. The facility could be privately owned, but the area of the ocean where operations were conducted would remain in public ownership. The permit would be for ten years and be renewable, as well as revocable, for causes listed. Upon revocation, surrender, or expiration of the permit, the facility would have to be properly disposed of or removed as directed by the Secretary.

An example of the alternative approach to granting a license or a permit, that of granting a lease, is the mechanism used in the Outer Continental Shelf Lands Act, cited above. Such a lease conveys the right to private companies to explore for and develop oil and gas or sulphur resources found under a defined area of the seabed. The State of Maine also uses the lease for aquaculture in state waters (Rieser, 1996).

While there are advantages and disadvantages to each approach, the most important shared disadvantage is that, again, to implement a system to provide for administration of permits, licenses or leases would require a major piece of federal legislation. While in the future such a need may arise, it does not exist now, when there are no commercial scale operating mariculture facilities in the Gulf of Mexico.

*Restricted Species:* NMFS can use the EFP as a mechanism for circumventing its species-specific restrictions, however, the EFP is limited in the purposes for which it may be issued. NMFS issued SeaFish Mariculture an EFP for research purposes, and, presumably, a few more EFP's may be issued for this purpose. However, at some future point in time feasibility of mariculture projects will have been established, and NMFS will probably no longer be able to issue EFP's for such purpose.

Having established that the Magnuson Act covers mariculture, it must next be determined what is the best mechanism for exempting mariculture from species-specific restrictions. One option is to amend the Magnuson Act itself. A second option is for NMFS to exercise its authority, under the Magnuson Act as it exists now, to exempt



WALDEMAR NELSON INTERNATIONAL INC.

mariculture. A final option is for the GMFMC to amend FMP's for affected species in order to allow mariculture.

An additional problem exists, however, in the event that it is determined that the GMFMC has such authority. It must be determined whether this authority is, itself, sufficient enough to foster a mariculture industry, given the diversity of interests involved. For this reason, amendment to the Magnuson Act, or authorization from NMFS, would be preferable. It is recommended here that, as in the case of regulation of the proposal of American Norwegian Fish Farm, Inc., a memorandum opinion be requested on this subject from NOAA's Office of the General Counsel. In the event that it is determined NMFS lacks the requisite authority to provide the necessary exemptions for mariculture, then the option of changing federal law may be pursued. However, it should be argued that the intent of the Magnuson Act is to avoid the "tragedy of the commons," which can, and has, resulted in overfishing. Such concern does not apply to fish raised from hatchlings onshore, then moved offshore for growing.

## Structures Issues

*Platform Abandonment Liability:* If an oil and gas platform is to be acquired from an OCS (federal waters) lease operator, that operator and its partners (if any) must be satisfied that the platform will be properly disposed of and the site (assuming the platform is not moved) will be properly cleared of obstructions at the end of the project's life.

However, as discussed above, both the MMS, the agency in charge of regulating OCS oil and gas development, and the Corps of Engineers, the agency in charge of permitting structures for placement in U.S. navigable waters, will need such assurances, too.

The level of concern on the part of the MMS here can hardly be overstated. The agency fully recognizes the dearth of support for the offshore oil and gas industry outside of Louisiana and Texas. Also, there is currently no legislative mechanism in place to allow the MMS to take over a platform and conduct abandonment in the event of default of a bankrupt operator.

*Authorization to Leave the Structure on the OCS After MMS Removal Deadline:*



**WALDEMAR NELSON INTERNATIONAL INC.**

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**REGULATORY ENVIRONMENT**

Another potential problem area is whether the MMS has the legal authority to grant a mariculture enterprise the right to use an oil and gas platform on the OCS for a purpose other than oil and gas operations after the regulatory deadline for removal of the structure. OCSLA's provisions regarding the authority of the Secretary of the Interior, 43 USC 1334, specifically address the granting of oil and gas leases, the oversight of oil and gas operations, and the granting of pipeline rights-of-way.

The MMS has a mechanism for allowing a party to operate a platform on a former lease site after the lease has expired, the "right of use and easement," provided for under 30 CFR 250.7. However, this regulation is issued pursuant to 43 USC 1334 (a), which provides:

> "The regulations prescribed by the Secretary under this subsection shall include, but not be limited to, provisions . . . (6) for drilling or easements necessary for exploration, development, and production . . ."
> It is not clear that, under OCSLA, the MMS has the authority to grant a right of use and easement for purposes other than oil and gas exploration and production. The regulation itself limits issuance of rights of use and easement to installations "used for conducting exploration, development, and production activities or other operations on or off the lease which are related to such activities."

However, it is not clear that there needs to be a grant of authority to the MMS to allow a structure to remain on the site after expiration of the MMS's regulatory deadline for removal. Again, as stated above, the Corps of Engineers is the lead agency for granting approvals for the installation of devices located on the seabed of the OCS. Although the Corps' authorization of SeaFish Mariculture's project in the Brazos area was limited to the nets which were to be hung from a producing oil and gas platform (thus, the platform itself was authorized by MMS regulation), the Corps granted approval for a structure similar in size to an oil and gas platform to be placed in the OCS waters off of Alabama (in the permit application of SeaPride).

Additionally, the Corps grants permits to the states of Louisiana and Texas for



placement of artificial reefs in OCS waters (see the discussion regarding the "rigs-to-reefs" program below). Initially, such artificial reefs were entirely submerged. Recently, however, an "in-place" donation of a platform (the "Grand Isle" complex at Grand Isle Block 16) was authorized by the Corps (permit application was filed by the state of Louisiana on behalf of the operator, Freeport-McMoRan Resource Partners).

## An Aside—The "Rigs-to-Reefs" or Artificial Reef Program

The National Fishing Enhancement Act of 1984, Title II of Public Law 98-623, also known as the Artificial Reef Act, established broad artificial reef development standards and a national policy to encourage the development of artificial reefs that will enhance fishery resources and commercial and recreational fishing. The Secretary of Commerce developed a National Artificial Reef Plan that identifies design, construction, siting and maintenance criteria for artificial reefs and that provides a synopsis of existing information and future research needs. The Secretary of the Army (through the Corps of Engineers) issues permits to responsible applicants for reef development projects in accordance with the National Plan, as well as regional, state, and local criteria and plans (administered in waters off Louisiana and Texas by the above agencies). The law also limits the liability of reef developers complying with permit requirements and amends the Reefs for Marine Life Conservation Law to include the availability of all surplus Federal ships for consideration as reef development materials.

Although the Act mentions no specific materials other than ships for use in reef development projects, the Secretary of the Interior cooperated with the Secretary of Commerce in developing the National Plan, which identifies oil and gas structures as acceptable materials of opportunity for artificial reef development. The MMS adopted a "Rigs-to-Reef" policy in 1985 (Reggio,1987) in response to this Act and to broaden interest in the use of oil and gas platforms as artificial reefs.

The first step in providing authority for a Louisiana program was to enact enabling legislation. The Louisiana Fishing Enhancement Act (Act 100-1986), signed into law on June 25, 1986, provides for the following:

1. Establishment and administration of the Louisiana Artificial Reef



Development Program.

2.  Creation of the Louisiana Artificial Reef Council, consisting of the:

- Secretary, Louisiana Department of Wildlife and Fisheries (Chairman)
- Dean, Center for Wetland Resources, Louisiana State University
- Director, Louisiana Geological Survey

3.  The roles of the Louisiana Department of Wildlife and Fisheries, the Center for Wetland Resources, the Louisiana Geological Survey, the Louisiana Sea Grant College Program, and the Louisiana Artificial Reef Initiative.

4.  Establishment of the Artificial Reef Development Fund to provide monies for program development, operation, and research.

5.  Development of the Louisiana Artificial Reef Development Plan and its legislative approval.

6.  Establishment of the state of Louisiana as the permittee for artificial reefs developed under the plan and appointment of the Louisiana Department of Wildlife and Fisheries as agent for the state.

7.  Relief of the state, donors, and other participants in the program from liability, provided the terms and conditions of the federal artificial reef permits are met.

The Louisiana Artificial Reef Plan contains the rationale and procedures for the implementation and maintenance of the state artificial reef program. The plan is intended to serve as a flexible working document that will be periodically updated through the Council on the basis of the results of operation. However, neither the Plan nor the Act specifically addresses mariculture projects.



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**REGULATORY ENVIRONMENT**

*Act of Donation.* Pursuant to the National Fishing Enhancement Act of 1984 (the Artificial Reef Act) and the Louisiana Fishing Enhancement Act of 1986 (Louisiana Artificial Reef Act) for Louisiana, and the Artificial Reef Act of 1989 for Texas, a donor of an oil and gas platform to a rigs-to-reefs program can secure a release from potential future liability. The donor accomplishes this by signing an Act of Donation with the appropriate state, paying one-half of its savings (versus hauling to shore for salvage) to the state, then depositing the structure in the proper site.



# Economic Analyses

## Introduction

The economic feasibility of establishing an offshore finfish mariculture venture is dependent upon a number of factors including:

### Costs

- Start-up, Capital, Operation and Maintenance
- Financing, Engineering, Regulatory
- Base Facilities (support services)
- Offshore Facilities
- Acquisition of Fingerlings (private hatchery or commercial source)
- Personnel
- Platform and Platform Maintenance
- Feed (food conversion ratios)
- Extent of mortalities and when they occur in grow-out cycle
- Insurance



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**
**ECONOMIC ANALYSES**

### Revenues

- Species Raised (numbers, size, fillet yields)
- Market Value
- Ability to Deliver on Market Timing
- Quality of Product
- Sale to First Wholesaler or Company Processing

Obviously, all of the above cost and revenue figures are highly dependent upon the specific offshore operation proposed. The feasibility study team has attempted to provide estimates of costs where appropriate. Costs are presented for the "base case" scenario as described earlier. Some information is also provided on the revenue side including information on market demand for finfish, fillet yields for different candidate species and finally an analysis of the costs associated with setting up an offshore processing operation. More detailed revenue side numbers would have to be calculated by individual operators with specific knowledge of their proposed operation (species, numbers, etc.).

Following are sections on cost projections, forecast market demand for finfish, analyses of food conversion ratios, fillet yields for various candidate species and an assessment of the costs involved in setting up an offshore fish processing operation.

## Cost Projections – Capital, Operations & Maintenance

The start-up, capital, and operation and maintenance costs associated with an offshore finfish mariculture operation are obviously dependent upon the size and complexity of proposed operations. The costs presented in this report were derived based upon the assumption that the "base case" mariculture operation would be implemented. This "base case" is a commercial-scale operation using platforms in water depths between 100 and 200 feet. It also assumes that a new base camp installation will be built and operated as well as a hatchery operation capable of supplying the necessary number of



**WALDEMAR NELSON INTERNATIONAL INC.**

fingerlings to the farming operation offshore. Should a developing finfish mariculture operation elect to purchase fingerlings from either existing or future hatcheries, then considerable monies could be saved in the start-up and capital costs. Regardless of source of fingerling supply, an internal hatchery or purchase of fingerlings from commercial hatcheries, this could very easily be the most significant factor which limits the initial size and scale-up of an offshore mariculture industry.

The start-up, capital and operation and maintenance costs presented in this chapter were derived based upon the following assumptions:

1. Offshore Platform – This platform will be in 100 to 200 feet of water and will, in all likelihood, be an aging platform with significant costs necessary for refurbishing the platform to make it suitable for use as the base of an offshore farming operation. A crane to lift loads up to 15 tons onto the platform deck will be necessary. The platform will also require the installation of small crews' quarters and office space. Significant container storage of pelletized feed will be necessary on the platform. Feed distribution to the individual nets surrounding the platform will be computerized and via a pneumatic system.

2. Cages and Nets – The cages will be floating-type and will be of a size suitable for grow-out of up to 500,000 fish to harvest size (approximately 1 kilogram). The cages will be held in place by a tension buoy system with the tension buoys moored to the bottom. Bird and predator nets will be installed on each cage. A more complete description of these installations can be found in Chapter 1.

3. Base Camp – The base camp will contain office space and, depending upon location, quarters for the staff necessary to run the onshore operations. It will be located on navigable water so that a large vessel (70-120 feet) can tie to the docking facilities and be



loaded and unloaded. There will be several vehicles required at the base camp, including at least one vehicle with tankage capable of transporting fingerlings short haul distances.

4. Hatchery – The hatchery will include a relatively large climate-controlled building for holding the finfish broodstock and the larvae prior to being moved into grow-out ponds at the hatchery. Larvae feed production systems will be installed in this climate-controlled building. Intermediate grow-out tanks will be placed within a roofed enclosure. A water distribution system with temperature control will service these intermediate grow-out tanks. The fingerlings will be raised to a 3- to 6-inch size in aerated earthen ponds. A water flow-through system will be installed on these ponds with capacity for treatment of flow-through water prior to discharge.

The estimate for the start-up and capital costs associated with this mariculture operation is presented in Table 5-1. The total estimated start-up and capital cost for this type of installation is $7.5 million. This price includes two cages in-place for the first year of operation. Additional capital monies will have to be spent in subsequent years to allow for expansion.

The operation and maintenance costs associated with such an operation, including personnel, other operating costs, as well as maintaining equipment and the offshore platform itself is also estimated. It is envisioned that the crews for the offshore firm will work on a weekly shift basis similar to offshore oil and gas production facilities. Each three-person crew will work seven consecutive 12-hour days and then be replaced by another crew for the next seven-day period. The onshore base camp and hatchery staff will work normal 8-hour shifts except for night watchmen and maintenance staff on call.

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ECONOMIC ANALYSES**

| Table 5-1 Start-up and Capital Costs | | |
|---|---|---|
| Item | Unit Cost ($1000) | Cost ($1000) |
| _Start-up Costs_ | | |
| Land (Base Camp) – 2 acres | 40/acre | 80 |
| Land (Hatchery) – 30 acres | 25/acre | 750 |
| Permitting | | 100 |
| Platform Abandonment Escrow | | 500 |
| Engineering and Legal Fees | | 300 |
| Other Consultants | | 100 |
| Financing Costs | 2% | 200 |
| | | |
| _Capital Costs_ | | |
| | | |
| _Base Camp_ | | |
| Buildings (Trailers) | | 100 |
| Maintenance Shop | | 150 |
| Loading Dock with Crane | | 500 |
| Fuel Storage and Loadout Facilities | | 150 |
| Trucks/Service Vehicles | | 100 |
| Fish Transport Vehicle | | 100 |
| Camp Equipment | | 100 |
| | | |
| _Hatchery_ | | |
| Buildings | | 360 |
| Juvenile Feed Production | | 50 |
| Tanks | | 80 |
| Ponds (14 @ 50' x 100'), aerated | | 280 |
| Water Treatment and Distribution | | 200 |
| Laboratory | | 100 |
| | | |
| _Offshore Farm_ | | |
| Cages and Moorings (2) | 185/net | 370 |
| Power Generation and Tankage | | 100 |
| Feed Storage and Distribution | | 175 |
| Vessels (100'+, small outboard) | | 1,035 |
| Crane | | 200 |
| Buildings | | 80 |
| Platform Refurbishment | | 500 |
| | Subtotal = | 6,760 |
| | Contingencies (10%) = | 676 |
| **Total Estimated Start-up and Capital Costs = $7.5 million** | | |

Note: Costs above reflect purchase of land and vessel, both major expense items. Initial costs could be reduced by leasing/renting the land/vessel.



**WALDEMAR NELSON INTERNATIONAL INC.**

FEASIBILITY STUDY – OFFSHORE MARICULTURE

ECONOMIC ANALYSES

Other operation and maintenance costs include maintenance on the platform, i.e., routine painting, welding, maintenance of protective anode systems, etc. The anticipated operation and maintenance costs associated with the base case mariculture operation are shown in Table 5-2. These annual costs will be in the $2.2 million range for this scale of operation.

**Table 5-2**
**Annual Operating Costs**

| Item | Costs ($1000) |
|---|---|
| **Personnel** | |
| Manager | 110 |
| Supervisor | 70 |
| Farm Crew (3) | 150 |
| Vessel Crew (4) | 220 |
| Base Camp and Hatchery Staff (9) | 430 |
| **Operating Costs** | |
| Farm Insurance (4% of revenue) | |
| Other Insurance | 75 |
| Fuel | 100 |
| Equipment Maintenance | 250 |
| Platform Maintenance | 200 |
| Operations | 300 |
| Other | 75 |
| Subtotal = | 1,980 |
| Contingencies (10%) = | 198 |
| **Total Estimated Operating and Maintenance Costs = $2.2 million** | |

Note: Personnel costs are shown as burdened in table.

## Food Conversion Ratios

It has been reported that feed costs can be as high as 30% of total operational expenses for an aquaculture operation (NCR 1992). The majority of the feed costs occur after the cultured species reach the juvenile stage on to the point of harvest. Efficient food conversion of feed into fish flesh is measured frequently to control this important expense. Food conversion ratios (FCR) is a method commonly used to measure the



WALDEMAR NELSON INTERNATIONAL INC.

amount of feed that results in fish growth. This section focuses on the factors that influence food conversion ratios and compares results of various FCR studies for warm water finfish deemed to be potentially suitable for offshore mariculture in the Gulf of Mexico.

Food conversion ratios can be calculated by comparing weight of feed to growth of fish. FCR is the weight of feed offered divided by the weight gain of the fish. For example, a 1.0 kg fish fed 1 kg of feed and grows to 1.5 kg, the FCR is 2 (1 kg feed/0.5 kg weight gain = 2). The lower the number of the FCR the more efficient the cultured species is in converting a particular feed to flesh. FCR is influenced by food type and distribution, physical, chemical, and biological factors, and the type, size and general condition of the cultured species, and percent mortality experienced in grow-out phases.

## Feed Characteristics and Food Conversion Ratios

One of the goals of aquaculture is to produce a crop as rapidly as possible. Thus it is necessary to accelerate growth through dietary manipulation to optimize the FCR. Research is required to determine the nutritional requirements of any aquaculture species and a supply of adequate feed should be available in sufficient quantities to optimize the FCR. There are several types of potential feed which can be used: trash fish; minced fish; and pelletized feeds, either moist, semi-extruded or dry. Using fresh and frozen fish as feed would have FCRs in the range of 7 to 8, moist feeds in the range of 5 to 6, semi-extruded in the range of 4 to 5, and dry in the range of 1 to 2.5. Prepared moist feed can consist of minced fish, crustaceans, or various agriculture products. The FCRs for the moist feeds are higher due to water content.

Dry prepared diets can reach conversion ratios of 1 for some species. The feeds consist of various amounts of protein, carbohydrates, and lipids and are often supplemented with vitamins, fatty acids, and minerals. The size and shape of feed can affect the conversion rate. Food conversions improve when a suitable form of feed correlates with the age and size of culture organism and is easily digestible. The food portion should also be stable in water and remain intact while fish are feeding. If the food item falls apart before fish consume the pellet, the dissipation of food will obviously reduce the food conversion efficiency.



FCRs are affected by time of feeding, quantities of feed, presentation of feed, spatial distribution of feed, and number of feedings a day. Sedentary fish can grow rapidly at low feeding rates, whereas a highly active fish may require higher rates of feeding (Wedemeyer 1996). In order to optimize food conversion ratios, fish should be fed to satiation two to five times daily. Daily rations of feed offered to penned finfish should be determined independently for each species and can range from 1% to 25% of the cultured organism's body weight. FCRs become lower as the efficiency of feed utilization increases. Individual farm operators should experiment with various feeding strategies in order to minimize the FCR for that species.

Open ocean aquaculture operations can be subjected to fast currents where the feed may be swept away by the current before the culture organisms have an opportunity to consume the feed. An efficient feed distribution system should disperse food items to allow: (1) an even distribution to all organisms and (2) as close as possible to 100% consumption of the feed distributed. Food distribution efficiency should be frequently monitored to achieve low FCRs. Other mariculture operators around the world have successfully minimized food wastage by employing the video/sonar systems described in Chapter 1.

## Bio-energetics of Food Conversion Ratios

Metabolism is the result of all the chemical and energy transformations that occur within a living organism. Metabolism includes the storage of energy (anabolism) as fat, protein, and carbohydrate, and the transformation of these storage products into free energy (catabolism). The amount of energy expended for maintenance is typically about twice that devoted to growth, and can be affected by the species of fish, its age, the environmental conditions, dietary composition, reproductive state, and other factors (Lovell 1989). Since metabolic rate of most fishes is highly temperature-dependent, food conversion ratios can be expected to vary both seasonally and diurnally as fluctuations occur in water temperature of their environment (Wedemeyer 1989). Smaller animals generally have higher weight-specific metabolic rates than larger ones, although total metabolic costs of smaller/younger fish are less thus the weight-specific growth rates of smaller fish is greater than that of older individuals. As the total metabolic costs to



WALDEMAR NELSON INTERNATIONAL INC.

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**
**ECONOMIC ANALYSES**

support existing biomass climbs, individual growth rates and thus food conversion efficiencies generally decline. These principals are important building blocks for the efficient production of cultured fish.

## Food Conversion Rates for Candidate Species

The project team has compiled available data on FCRs for the candidate species (Table 5-3). Considerable caution should be observed when reviewing these food conversion data because of the array of different standards used in reporting FCRs. These FCRs we report were largely composed of investigations and controlled studies by governments or educational or nonprofit technological institutions rather than from commercial operations. A few FCR rates from private commercial ventures are presented in this report and are marked with an asterisk. The FCRs from commercial operations are from Asia and tend to be rather high because the culture organisms were fed trash fish and the FCRs are not based on a dry weight. The FCRs are reported on a dry weight basis whenever the results are available in dry weight, however, if the word "wet" is next to the FCR, it signifies that the FCR is on a wet weight basis. Also, for a given species FCRs are always better for juvenile fish than adults under ideal conditions, so under the section called "duration of study" when the time period begins with the word day – "day 30-60" – this indicates the age of the fish in days. Otherwise, the length of the study period is provided and the age of the fish was not available. Young fish tend to have lower FCRs between one and two, and adult fish tend to have higher FCRs between one and one-half and three. Whenever possible, FCRs of closely related species are presented to evaluate potential growth ratios for candidate species that lack FCR studies and reports. For example, Taiwanese red snapper (*Lutjanus argentimaculatus*) is provided as a surrogate species for evaluation of Gulf of Mexico red snapper (*Lutjanus campechanus*).

Absent in food conversion ratio literature from the United States are data on the greater amberjack (*Seriola dumerili*), cobia (*Rachycentron canadum*), southern flounder (*Paralichthys lethostigma*) and the snapper (*Lutjanidae*) family. These species have not been raised successfully for commercial application in U.S. coastal waters, although there is



**FEASIBILITY STUDY - OFFSHORE MARICULTURE**

**ECONOMIC ANALYSES**

Table 3-3
FOOD CONVERSION RATIOS FOR CANDIDATE SPECIES

| Author & Year of Pub. | Species of Fish | FCR wet/dry wt. | Temp. C | Dry, semi-moist, or moist | Duration of study | tanks, nets, or cages | Feed content or description of experiment |
|---|---|---|---|---|---|---|---|
| Ostrowski 1992 | Mahimahi | 1.1, 1.2 | 25-28C | moist &dry | day 60-164 | tanks | herring/fishsoybean |
| Ostrowski 1992 | Mahimahi | 0.6,0.9 | 25-27C | semi moist | day 42-56 | tanks | fishmeal |
| Benetti 1994 | Mahimahi | 1.6 | 25-27C | semi moist | 1yr.,9.5 mn. | tanks | squid/fish |
| Oceanic Institute 1993 | Mahimahi | 1.5 | 25-28C | semi moist | day 45-180 | tanks | 60% protein |
| Kraul 1993 | Mahimahi | 1.6 | | | | | |
| Hagood 1981 | Mahimahi | 3.3 wet | | | | | |
| Szyper 1990 | Mahimahi | 1.8,3.3 | 26C | semi-moist | juvenile | tanks | squid/menhaden |
| Garcia 1993 | Amberjack | | 13-26C | moist | day 40-150 | tanks | frozfish/(m)pellet |
| Cavalier 1989 | Amberjack | 3 | | | 110 days | tanks | fish&chicken liver |
| Greco 1993 | Amberjack | 4,5-wet | 14-22C | moist | 300 days | tanks | frozenfish/moist pellet |
| Nakada 1987 | Yellowtail | 8,3.4 | 11-26C | moist pellet | 2 yrs. | net-pens | |
| Shimeno 1993 | Yellowtail | 1.4,2.18 | not translated | dry & moist | 90 days | | 4 diets grain & meat |
| Shimeno 1992 | Yellowtail | 1.2,1.3 | 24.2-29.0 C | extruded pellet | 60 days | | soybean |
| Shimeno 1993 | Yellowtail | 2.0,2.15 | 18.4-29.0 C | dry | 120 days | cages | soybean |
| Aoki 1995* | Yellowtail | 1.0,2.5 | 17-19C | Pellet and fresh fish | 18 mn. | net-pens | formulated diets |
| Viyakarn 1992 | Yellowtail | 2.18,3.13 | 20.6-26.1 C | soft-dry pellet | 70 days | cages | soybean |
| Viyakarn 1992 | Yellowtail | 1.0,1.3 | 24.2-25.1 C | soft-dry pellet | 35 days | tanks | soybean |
| Watanabe 1995 | Pompano | 2.7, 5.91 | 17-34 C | dry, moist, fresh | duration of growout | cages | soybean,trash fish, and prepared meals |
| Williams 1985 | Pompano | 1.86, 2.04 | 28C | dry | 48 days | tanks | soybean diets |
| Tatum 1972 | Pompano | 3.47 | 15-28C | moist | 113 days | cages | menhaden/soy oil and trout chow |
| Finucane 1972 | Pompano | 1.0,2.0 | 15-28c | dry | 1yr.,9.5 mn. | cages/ponds | trout chow |
| Swingle 1972 | Pompano | 5.4 | >15 | dry | 90 days | cages | trout chow |



L197069FCR2.xls

FEASIBILITY STUDY - OFFSHORE MARICULTURE

ECONOMIC ANALYSES

Table 5-3
FOOD CONVERSION RATIOS FOR CANDIDATE SPECIES

| Author & Year of Pub. | Species of Fish | FCR wet/dry wt. | Temp. C | Dry, semi-moist, or moist | Duration of study | tanks, nets, or cages | Feed content or description of experiment |
|---|---|---|---|---|---|---|---|
| Liao 1995* | Pompano | 1.6,2 | 17-28 C | dry pellet | duration of growout | ponds | emphasize various size pellets |
| Colura 1989 | Red drum | 1.5,4.8 | >9C | dry | | ponds | trout/catfish feed |
| Boren 1995 | Red drum | 1.8,3.3 | 27C | dry | day 30-86 | tanks | theronine |
| Craig 1997 | Red drum | 1.13,1.42 | | dry | day 30-72 | tanks | lecithin&choline |
| Reigh 1992 | Red drum | 1.94 | | | | | |
| Jirsa 1997 | Red drum | 1.24,2.62 | 25-28C | moistt & dry | 70 days | tanks | 4 diets grain & meat |
| Sandifer 1993 | Red drum | 2.15,2.60 | 8.0-31.8C | dry | 547 days | ponds | trout pellets |
| Trimble 1979 | Red drum | 1.1 | | | | | |
| Miget 1995* | Red drum | 3.8 | 15-30C | dry | day 60-365 | offshore nets | 4 experimental diets of energy to protein ratio |
| Ellis 1996 | Grouper | 0.94,5.90 | 28-32C | dry | 56 days | tanks | semi-purified diets of various protein levels |
| Chen 1994 | Grouper | .94,1.38 | 27C | moist | 50 days | tanks | experimental diets of various protein levels |
| Shier 1996 | Grouper | 1.1,1.6 | 28 | dry | 56 days | tanks | feeding frequency of 51% protein diet |
| Kayano 1993 | Grouper | 1.28,.91 | 22-28 C | dry | day 90-130 | net-pens | |
| Liao 1995* | Grouper | 0.8 dry, 3.6 wet | 20-30 C | fresh fish | duration of growout | ponds | |
| Li 1995* | Grouper | 7.64 wet | 15-30C | fresh fish | duration of growout | net-pens | trash fish is most commonly used |
| Chou 1995* | Mangrove snapper | 4.0-5.0 wet | 17-32C | fresh fish | duration of growout | net-pens | trash fish is most commonly used |
| Liao 1995* | Snapper | 2.2,2.5 | 17-28 C | moist pellet | duration of growout | ponds | chopped trash fish is fed to snapper in nursery |
| Liao 1995* | Snapper | 7,9 wet | 17-28 C | trash fish | duration of growout | ponds | chopped trash fish is fed to snapper in nursery |

WALDEMAR NELSON INTERNATIONAL INC.

nelson

L:97066\FCR2.xls

significant aquaculture production of greater amberjack in Japan (FAO 1990) and encouraging results of snapper (*Lutjanus argentimaculatus*) in Australia (Chaitanawisuti 1994). Some preliminary studies of captive cobia (Caylor 1994) are currently underway in the Gulf of Mexico and cobia are being successfully raised in Taiwan (Liao 1995). The FCRs presented are the result of a conglomerate of studies that might not represent the conditions of a commercial operation very well. Because so many variables can affect FCRs of cultured finfish, any attempt at commercial culture should establish conversion ratios under their culture conditions.

## Revenue Potential

As stated previously, the project team did not attempt to fully analyze the revenue side of a prospective mariculture operation as that would be so highly dependent upon the types and numbers of fish raised, size at harvest, market conditions at harvest, etc. We did assess several factors which will be useful to potential operators in deriving their own revenue projections including an assessment of the potential U.S. market for finfish products and an analysis of fillet yields for some of the candidate species.

### Projected Demand

A detailed analyses of the possible future U.S. consumption of finfish was performed and is attached in its entirety in Appendix B. This analysis went into a number of different issues including past history of finfish landings, past history of prices paid for some of the candidate species, competing recreational harvest of certain species, assessment of the present level of fish processing capacity in the Gulf of Mexico area, and an analysis of consumption and projected U.S. consumption scenarios. The reader is advised to study the full report presented in Appendix B.

The analysis presents a forecast of U.S. consumption based upon two scenarios: (1) a worst case scenario whereby future consumption estimates are tied to a relatively low level of per capita consumption with increases due to expected population growth alone,



**WALDEMAR NELSON INTERNATIONAL INC.**

FEASIBILITY STUDY – OFFSHORE MARICULTURE
ECONOMIC ANALYSES

and (2) a best case scenario whereby future consumption estimates are based upon a higher growth rate reflective of increased consumption due to increased availability of finfish products reflective of the middle 1980s when consumption was increasing at an annualized rate of 4.4 percent. Using these two scenarios, one can predict an increase in seafood consumption in the U.S. over the next 10 years of 340 million pounds edible weight (one billion pounds live weight) and 2,774 million pounds edible weight (8 billion pounds live weight) for the worst and best case respectively. Based on these numbers, there is obviously a real and large potential market for farm raised products in the U.S. alone.

## Fillet Yields

Another factor which will influence the revenue side of a mariculture operation is the percent of edible meat obtained from a cultured species. Since it is the fillet portion of the fish that is often the only part of a fish eaten by the U.S. consumer, fillet yields inform the fish buyers of the percent of the fish that is edible. Defining the percent of fillet yields indicates the value of the whole fish. To determine the cost of a fillet, the price of a whole fish can be divided by the percent fillet yield. For example, a drawn fish may cost $2 a pound and have a fillet yield of 42%. This conversion can be calculated by dividing the whole cost of the fish by the percent yield of the fish ($2.00/.42=$4.76). The real cost to the purchaser is at $4.76 a pound for the edible portion of the fish. Also, if a percent yield is known (for example, 42%) the mariculturist can grow the fish to produce a certain size fillet. To produce two 8 oz. dinner fillets, the fish must be grown to (16 oz/.42=2.38 lbs). The length of required grow-out period can be determined if the producer knows the growth rates of the various fish species. In order to obtain this significant value of whole and drawn fish, a survey was conducted of several U.S. seafood processors to determine the percent yield of boneless, skinless fillets of the potential marine finfish species for culture in the Gulf of Mexico. The results are presented later in this section.

## Processing the Fillets

Most of the table fish commercially harvested in the Gulf of Mexico such as snapper, grouper, and amberjack, are distributed to processors fresh and drawn (whole with entrails removed). Fish processors can deliver whole fish to restaurants, grocery chains, seafood retailers or they can sell fish in the fillet form. Whole fish reassure seafood buyers of freshness allowing for examining the condition of gills, eye color, and firmness of the fish. Once the fish is filleted, the handling of this portion of the fish is exposed to decomposing producing bacteria and oxidative rancidity that can rapidly deteriorate the condition of the meat and reduce the shelf life of the fresh product with proper cooling. A fresh whole and drawn fish will have a shelf life of two weeks and a fillet will have a shelf life of three to seven days depending on how long after the harvest the fillet was cut from the whole or drawn form.

## Forms of Products

Several factors affect the percent of fillet yields for finfish. The size, shape, and bone composition changes from fish to fish and alters the resulting fillet. There are several methods to fillet a fish. In its simplest form, a fillet can refer to the portion of fish cut away, down the backbone, from both sides of a fish. A whole fillet can contain rib bones, pin bones, nape (the fatty flesh around the entrails), a bony tail, and can be with or without the skin intact. Boneless, skinless fillets are the most expensive form of a fish and are often most desired by retail consumers and restaurants.

Fresh and frozen fish are bought and sold in six general forms between seafood processors, brokers, wholesalers, retailers, restaurants, and consumers in the U.S. seafood market (different processing schemes can occur in global markets and should be investigated by farmers/processors attempting to serve those markets). The first and least expensive is the whole fish that has not been cut and with everything intact. This form is not as common as others, however, whole fish experience trade as a frozen product, industrial fish, or a low cost ground fish. Secondly, is the drawn or gutted form in which the entrails are removed. It is a common practice to gut a fish to remove the bacteria producing contamination found in the viscera. The third form removes the head, gills,



and guts and a fish processed in this manner is referred to as headed and gutted (H&G) in the seafood industry.

Large finfish such as swordfish and tuna are headed and gutted at sea by fishermen and are often traded widely until processed by retailers and restaurants where they are cut into steaks by the chef or butcher. Just as often processors will "loin" a tuna or a swordfish which involves cutting the top section of a large fish away free from backbone, bloodline, and rib bones. Tuna and swordfish loins are cut into steaks and sold to the consumer. Fish are also traded as roast. This form cuts across the fish from behind the rib bones and includes all the meat through the tail. Roasts are then cut into steaks that contain the large back bones. Finally, fillets are distributed by all sectors of the market and come in many forms. Depending upon species, fillets are often the most desired by consumers at retail outlets and restaurants.

## Survey of Fillet Yields

A survey was conducted to estimate the percent yield of fillets for several candidate species suitable for mariculture applications in the Gulf of Mexico. Contributions were made by New Orleans Fish House, David Junkart, P&L Seafood, LA Seafood, Bon Secour Fisheries, Seafood Handbook[1], Beaver Street Fisheries, and Louisiana Seafood Exchange.

## Discussion of Fillet Survey

Fillet yields showed some variation with all species of fish with survey contributors remarking that fillet yields are influenced by several factors. The first significant variation is the skill of the fish cutter. Survey participants remarked that a

---

[1] The Seafood Handbook *Everything You Need to Know About Seafood*, published by Seafood Business 1996 Portland ME, Phone: 207-842-5606.



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ECONOMIC ANALYSES**

proficient fish cutter can produce a three to seven percent increase in yields over an unskilled fish cutter. Some survey respondents remarked that warm and cold seasons can affect fillet yields significantly. Fish fatten up over winter and colder temperatures reduce catabolic rates. Feeding habits during the warm and cold seasons can affect the percent of fillet on a fish by two percent. The size of the organism at harvest can affect the fillet yield. Participants remarked that small fish compared to large fish usually result in lower prices and in lower fillet yields of two to three percent.

Most of the fillet yields were produced from wild caught fish with the exception of tilapia and red drum. Tilapia were all pond raised, however, the red drum were both wild caught and pond raised. Some survey participants remarked that aquaculture-raised red drum can have a two to three percent higher fillet yield than the wild caught red drum for the same size fish. It is not exactly known why the yields are higher, but there was speculation that the increase may be the result of high feeding rates and containment within a pond or cage. The fish discussed in the survey were pond raised fish contained in environments where the culture organisms were not swimming against a current. Mariculture fish raised in pens in open ocean settings with a pronounced current may exhibit the fillet yields of wild caught fish.

Table 5-4 presents the results of the survey on fillet yields.

| Species of Fish | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Average |
|---|---|---|---|---|---|---|---|---|
| Red Snapper | 35 | 35-40 | 40 | 38 | 40 | ~ | 33 | 37.28 |
| Grouper | 35 | 35-38 | 47 | 38 | 42-48 | 40-42 | 33 | 39.80 |
| Red Drum | 36-38* | 33 | 33 | 34 | 40 | ~ | 30 | 34.85 |
| Mahimahi | 50 | 65 | 52 | 52 | 40 | 40-45 | 49-43 | 48.44 |
| Flounder | 45 | 60 | 40-45 | 38 | 30 | 28-30 | 40-42 | 39.80 |
| Greater Amberjack | 43 | 45 | 45 | 38 | 65 | ~ | 38 | 45.67 |
| Cobia | 44 | 40 | 55 | 50 | 50-55 | ~ | 40 | 47.33 |
| Pompano | 60 | ~ | ~ | 55 | 30 | ~ | 40 | 43.33 |
| Tilapia | ~ | ~ | ~ | ~ | 30-35 | ~ | ~ | 32.50 |

Table 5-4
SURVEY RESPONSES
PERCENT YIELD OF FILLETS OF CANDIDATE SPECIES

~ no response

* figure distinguishes a pond raised product.

Note:   Participants were asked what they thought the fillet percent yield is for a boneless and skinless fillet taken from a whole drawn fish.



**WALDEMAR NELSON INTERNATIONAL INC.**

## Feasibility Analyses of Offshore Finfish Processing

In addition to performing a feasibility analysis on an offshore mariculture farming operation in the Gulf of Mexico, a cursory separate review of the feasibility of establishing a finfish processing plant offshore is presented herein. This was a designated scope item in the Cooperative Agreement with the National Marine Fisheries Service.

It became obvious early in the analysis of offshore processing that such a venture necessarily had to be located on its own offshore platform. The space requirements for a large farming operation would take up most of the usable deck space on even a large platform therefore it would not be feasible to try to set up a processing operation on the same platform as the farming operation. It might be possible to have co-use of some of the larger platforms, particularly the sulfur mining platforms.

An appraisal of independent offshore finfish processing was therefore conducted. This potential venture was assessed as an independent operation and not necessarily tied to joint farming and processing operations through a single corporate entity. There would obviously be some economies if the same company undertook both operations, i.e., crew transportation, joint use of vessels, base camps, etc. It should also be stated that there appears to be adequate existing capacity in onshore seafood processing facilities to handle the expected production from offshore farms, at least in the near future (see Ken Roberts report in Appendix B).

Implementing offshore processing would have some inherent advantages in that only the edible portions of the finfish product would be transported onshore rather than the whole fish. If the end market was frozen product it could also be frozen quicker, leading to a longer shelf life. It might also be possible to utilize some of the non-edible portion of the fish (head, bones and entrails) for producing either a food to supplement the pelletized feed used in the farming operation or in preparation of fish meal. The advantages and disadvantages of an offshore fish processing operation were not studied in detail in this project. It is obvious that extensive amounts of investigation, including a detailed environmental impact analysis, would be required prior to implementing such an operation.



FEASIBILITY STUDY – OFFSHORE MARICULTURE

ECONOMIC ANALYSES

Due to the high cost of sustaining a labor force offshore, the processing plant conceptualized for this appraisal consisted of an automatic processing train as opposed to labor intensive, hand processing systems. There is adequate technology to implement such an operation whereby facilities can process many thousands of tons per annum with relatively low labor requirements. In order to automatically fillet the fish, the fish must first be sent through a head machine, then a gut machine, and then through a fillet machine. Conveyor belts would channel the fish from machine to machine. One processing train shown schematically in Exhibit 5-1 can handle the expected production from a single offshore base case installation (4500 metric tons per annum). In the cost analyses presented later, there are two sets of equipment provided in case of breakdown, thereby supplying redundant capacity. A blast freezer is included to allow the option of quick freezing product offshore. Miscellaneous processing equipment includes tables, knives, supplies, etc. Operationally, it is anticipated that a supervisor and a crew of 14 persons could handle the processing train shown in Exhibit 5-1. As was the case for the farming operation, it is anticipated that the processing plant will be manned by two, 14 person crews (not counting the supervisor) which will work 12-hours per day for seven consecutive days. The crew will be replaced by another, similar crew to work the next one week period. Crews will reside in a quarters building located on the platform.

Optimally, a single processing train during a 12-hour shift can process approximately 80,000 pounds per day. This is based on the rate limiting equipment item which is the fillet machine. Ice production should be at least on a 1:1 ratio with two units capable of producing 80,000 pounds per day. (Depends on whether freezing product or distributing fresh.)

Forecast start-up, capital, and annual operation and personnel cost are shown in Tables 5-5 and 5-6. As can be seen, it is anticipated that an offshore processing plant will require an initial capital investment of approximately $6 million with annual costs anticipated to be in the $3.2 million range.

To assess the economic feasibility of implementing such a venture, an examination was made of different processing plant throughput rates. Intuitively, there should be a minimum throughput rate below which the operation does not make financial sense. It is common for onshore processing facilities in the Gulf to calculate the cost of fillets by first estimating the real value of the whole fish. Then the processors will add a processing cost





Exhibit 5-1 Fish Processing and Offal Recovery Systems

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**
**ECONOMIC ANALYSES**

and a sales margin. A summary spreadsheet was generated analyzing the attractiveness of such an investment. Assumptions made in the analysis included:

- Term of loan = 5 years
- Interest rates = 15%
- Cost data from Tables 5-5 and 5-6
- No sharing of infrastructure with farming operation
- Real value of whole fish = (whole fish ÷ fillet yield)
- Processing cost = 30¢/lb
- Sales margin = 20%

The financial analysis indicated that under these assumptions an offshore processing operation would need a throughput of approximately 5000 metric tons per annum in order to reach a break even point for the project.

It should also be mentioned here that an offshore processing operation does not necessarily have to rely only on processing farm raised product. It is obvious that should a processing operation be implemented offshore, that it could be set up to receive captured fish from commercial fishermen. The processing facility would presumably pay the commercial fisherman for his catch on a per pound basis with prices dictated by species, quality, size, etc. In this fashion, the processing facility could readily supplement the throughput expected from a farm-only operation. This potential practice of purchasing fish offshore from commercial fishermen could be of great benefit to the commercial fishing industry. If the commercial fishing industry had a market for its catch situated offshore, there would be obvious cost savings to the commercial fisherman with respect to reduced usage of ice, fuel, etc., and also allow the commercial fishing vessel to stay offshore for longer periods of time.

In summary, the potential for establishing an offshore processing entity is realistic, however, it would probably not be implemented early in an offshore farming operations life. It would probably require a throughput of at least 5000 metric tons per annum which would not necessarily have to be all from the farming operation but could be supplemented by purchase of catch from the commercial fishing industry.

**WALDEMAR NELSON INTERNATIONAL INC.**

**FEASIBILITY STUDY - OFFSHORE MARICULTURE**

**ECONOMIC ANALYSES**

### Table 5.3 PROCESSING PLANT COSTS START-UP COSTS

| Item | Qty | Unit cost | Total Cost |
|------|-----|-----------|-----------|
| Engineering | 1 | $ 200,000 | $ 200,000 |
| Permitting | 1 | $ 80,000 | $ 80,000 |
| Legal fees | 1 | $ 75,000 | $ 75,000 |
| Financing | 1 | $ 200,000 | $ 200,000 |
| Sub-Total | | | $ 555,000 |

**On-shore and Platform Related Costs**

| Item | Qty | Unit Cost | Total Cost |
|------|-----|-----------|-----------|
| Abandonment Escrow | 1 | $ 500,000 | $ 500,000 |
| Platform Refurbishment | 1 | $ 400,000 | $ 400,000 |
| Crane | 1 | $ 200,000 | $ 200,000 |
| Power Generation | 1 | $ 100,000 | $ 100,000 |
| Base Ops Facility | 1 | $ 60,000 | $ 60,000 |
| Base Crane | 1 | $ 100,000 | $ 100,000 |
| Office Operations | 1 | $ 80,000 | $ 80,000 |
| Truck and service vehicle (Base) | 2 | $ 50,000 | $ 100,000 |
| Sub-Total | | | $ 1,540,000 |

| Processing Equipment | | life expectancy 10 yrs on equipment | |
|------|-----|-----------|-----------|
| | Qty | Unit cost | Total Cost |
| Header | 2 | $ 35,000 | $ 70,000 |
| Fillet machine | 2 | $ 150,000 | $ 300,000 |
| Candling-Trimming unit | 2 | $ 20,000 | $ 40,000 |
| Scaling/skinner unit | 2 | $ 45,000 | $ 90,000 |
| Ice machine | 2 | $ 40,000 | $ 80,000 |
| Freezer | 2 | $ 40,000 | $ 80,000 |
| Refrig unit | 3 | $ 50,000 | $ 150,000 |
| Conveyor system | 14 | $ 10,000 | $ 140,000 |
| Processing building | 1 | $ 720,000 | $ 720,000 |
| Offal processor/fishmeal plant | 1 | $ 200,000 | $ 200,000 |
| Crew Qtrs. | 2 | $ 40,000 | $ 80,000 |
| Electrical service | 1 | $ 50,000 | $ 50,000 |
| Switchgear | 1 | $ 15,000 | $ 15,000 |
| Packing unit | 2 | $ 25,000 | $ 50,000 |
| Misc. processing equip. | 1 | $ 50,000 | $ 50,000 |
| Install expense 40% of equip. cost | 1 | $ 800,000 | $ 800,000 |
| Sub-Total | | | $ 2,915,000 |
| Miscellaneous 10% | | | $ 290,000 |
| Start-up cost (above) | | | $ 555,000 |
| Platform and Onshore cost | | | $ 1,540,000 |
| Sub-total | | | $ 5,200,000 |
| Contingencies 15% | | | $ 780,000 |
| **TOTAL CAPITAL COSTS** | | | $ 5,980,000 |



**WALDEMAR NELSON INTERNATIONAL INC.**

**FEASIBILITY STUDY - OFFSHORE MARICULTURE**

**ECONOMIC ANALYSES**

### TABLE 5-3
### ANNUAL COST ESTIMATES
### OFFSHORE FISH PROCESSING FACILITY

| OPERATIONAL AND MAINTENANCE COSTS Item | | | Annual Expense |
|---|---|---|---|
| Liability Insurance | | | 75,000 |
| Insurance | | | 75,000 |
| Vessel support | | | 500,000 |
| Tech. and Safety training | | | 20,000 |
| Platform maintenance | | | 200,000 |
| Catering Services | | | 120,000 |
| Fuel (Power Generation) | | | 75,000 |
| Fuel expense-Onshore | | | 40,000 |
| Sales support | | | 300,000 |
| Office operations | | | 50,000 |
| Equipment maintenance | | | 150,000 |
| Operations and Maintenance Costs | | | 1,605,000 |

*Packing materials are not included in operational cost or sales revenues.

| PERSONNEL COST Job Description | Qty. | Unit Cost | Yearly Expense |
|---|---|---|---|
| Management | 1 | 112,000 | 112,000 |
| Supervisor | 2 | 72,000 | 144,000 |
| Staff (offshore) | 28 | 34,000 | 952,000 |
| Base OPS staff | 4 | 34,000 | 136,000 |
| Personnel Cost | | | 1,344,000 |
| Operational cost (above) | | | 1,605,000 |
| Sub-total | | | 2,949,000 |
| Contingencies @ 10% | | | 295,000 |
| TOTAL OPERATIONAL COST | | | 3,244,000 |



**WALDEMAR NELSON INTERNATIONAL INC.**

L:\97066\processing spread with one fish.xls



# Environmental Impact Analyses

## Introduction

Aquaculture activities through the years have developed a reputation for causing moderate to severe impact to the environment. Historical practices have been mostly inland or coastal activities and there have been many instances internationally but also in the U.S. where an aquaculture site has caused water quality or biological problems in its area of impact. The list of potential negative impacts to the natural environment of an offshore open Gulf or ocean mariculture site should include:

- Water quality concerns,
- Potential spread of disease to native fish populations,
- Potential impact to the gene pool of native fish populations if captive fish were to escape the net pens, and
- Impact to protected marine species by interference with migratory routes or entanglement in nets.

Each of these issues will be addressed in the following Natural Environment section. Socioeconomic or impacts to the human environment will be discussed in the Socioeconomic section.



FEASIBILITY STUDY – OFFSHORE MARICULTURE

ENVIRONMENTAL IMPACT ANALYSES

## Natural Environment

## Water Quality Issues

The raising of marine finfish offshore has the potential to impact the quality of the surrounding water column due to discharges from the net pens or the platform (farm center) itself. Potential water quality impacts due to existence of one or multiple net pens depends upon a number of factors including the size of a given mariculture operation, its location in the Gulf of Mexico (currents, depths, existing water quality), and the type of feed used and method of feeding. Obviously a larger operation closer to shore in areas with existing water quality concerns would be expected to have the potential to further exacerbate those problems. The project team performed an extensive water quality impact analysis on discharges from the net pens of the defined "base case" mariculture operation. This operation was assumed to be in 100 to 200 feet of water depth and have current velocities representative of those water depths in the northern Gulf of Mexico. This entire analysis can be reviewed in Appendix E. A summary is presented here.

Research from major mariculture producing nations have noted in several studies the potential of intensive aquaculture to cause detrimental effects to regional coastal areas, enclosed bays, and estuaries (Rosenthal 1989, Hirata et al 1994, Gowen and Bradbury 1987, Gillibrand and Turrel 1997, EPA 1991, Aure and Stigebrandt 1990). Environmental concerns have initiated efforts around the globe to move aquaculture activities offshore of the sensitive coastal zones to open ocean areas in search of improved water quality conditions and to reduce potential harmful impacts of fish farming (Grove et al 1994, Burgrove et al 1994, Thompson 1996). The presence of currents and sufficient depths to distribute and dilute mariculture wastes are significant factors as to whether mariculture discharges will prove harmful to the surrounding environment (Penchage 1991, Gowen et al 1989). Current velocities of 20 to 30 cm/sec are common near the surface (Jochens and Nowlin 1995, Phillips and James 1988) along the Texas-Louisiana shelf although there can be episodic periods of calm and extreme sea states. At these current velocities, the volume of water passing through an offshore net-pen can replace the water within the net 200-1500

times a day. Miget 1994 reported that relative to inshore aquaculture, offshore culture on oil and gas platforms reduces the "potential for pollution of the receiving water via effluent". The high water exchange rates should assist in dispersal of wastes from the aquaculture site operations providing a good medium to fish culture.

## Source Description

The detailed water quality impact analysis evaluated impact potential from two sources: food not eaten by fish and thus escaping the net pens, and metabolic wastes from the cultured fish. The analysis used a figure of five percent of the feed distributed to fish escaping the nets. At a 5% feed loss and a 95% consumption, fecal materials contribute the majority of carbon and nitrogen loadings to the water column (bio-deposits represent 80% by weight of the particulate carbon and soluble nitrogen discharges). The two primary wastes of concern from mariculture activities are organics and nutrients. Phosphorus is present in uneaten food and particulate fecal materials, however, phosphorus discharges are more of a concern for fresh water aquaculture (EPA 1991). The principal nutrient of concern for mariculture discharges are nitrogenous compounds since nitrogen is a limiting factor to life in the marine waters of the Gulf and has been reported to cause nuisance plankton blooms (Rabalais et al 1996).

Food and fecal waste discharges contain both conventional and unconventional pollutants. Based on federal NPDES regulations (40 CFR 401. 16), the unconventional pollutants include turbidity, disease control medications (see Appendix A), nutrients (principally nitrogen compounds), and settleable solids. Conventional pollutants include biochemical oxygen demand (BOD), total suspended solids (TSS), and pH. Metabolic activity also results in oxygen consumption and consequent production of carbon dioxide waste. All food consumed by fish is eventually utilized for metabolic processes, synthesized into new tissue growth, or excreted as waste. Fecal wastes include dissolved $NH_3$ and $NH_4$ and particulate carbon and organic nitrogen (proteins). Marine fish excrete 60% to 90% of their waste nitrogen as soluble ammonia through the gills (Lovell 1989). An indigestible organic residue of 20% usually remains to be excreted as feces (Penczack et al 1982). Sources of carbon and nitrogen discharges are also released from the proteins,



FEASIBILITY STUDY – OFFSHORE MARICULTURE

ENVIRONMENTAL IMPACT ANALYSES

fats, and carbohydrates in the fish food not eaten by the cultured organisms. (See Figure 1).



FIGURE 1  DISTRIBUTION OF WASTE FROM A NET-PEN FACILITY

## Impact to the Environment

The decomposition of feed and organic wastes, fish respiration, and nitrification of metabolic wastes can lower dissolved oxygen levels in the water column in and down current of the net-pens. Dissolved oxygen and organic enrichment are interrelated in that organic enrichment fuels bacterial decomposition and can result in oxygen depletion



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ENVIRONMENTAL IMPACT ANALYSES**

(EPA 1991). This depletion occurs primarily by microbes in the water and sediment consuming oxygen as they decompose organic matter. The decay of solid wastes may also



FIGURE 2 AMOUNT OF CARBON AND NITROGEN DISCHARGE FROM THE CONSUMPTION OF FEED

result in alterations in the benthic community due to burial and chemical changes effected within the sediments. Nutrient enhancements from mariculture discharges have the potential to encourage nuisance plankton blooms by providing micro-environments



**WALDEMAR NELSON INTERNATIONAL INC.**

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ENVIRONMENTAL IMPACT ANALYSES**

and transport opportunities (Dortch 1998). Sedimentation and decomposition of solid waste discharges involve the release of potentially toxic de-cay byproducts like methane and disas-sociated hydrogen sulfide (Aure 1990). Decomposition of settled solid waste may result in the consumption of dis-solved oxygen contributing to hypoxic conditions common-ly found along the seafloor of the Texas-Louisiana shelf. Nutrients are also released during the decay of solid wastes, which may contribute to phytoplankton productivity.

The detailed water quality impact analyses (see Appendix E) indicated that the presence of 20 to 30cm/sec currents along the Texas-Louisiana 100-200 ft isobath should minimize the potential harmful conditions that may be caused by mariculture nutrient and organic effluents. In the areas subjected to these currents, the dilution of ammonium plumes should prevent the accumulation of soluble nitrogenous waste in the water column and minimize the risk of nuisance plankton blooms. The open Gulf environment should maintain safe levels of dissolved oxygen in and around the mariculture site. The dispersal rate of wastes and aerial extent of sedimentation will determine whether benthic communities in the vicinity will be impacted by net-pens. The sea-states and exchange of water should prevent harmful accumulation of feed wastes and feces in the areas beneath the net-pens. A more extensive review of the significance of feed and fecal effluents can be found in Appendix E. The marine chemical and biological processes affected by mariculture discharges are discussed in that analyses which used a base case scenario to estimate the impact of nitrogen and carbon loadings for a commercial scale operation.

The other potential issues concerning water quality are discharges from the farm center or platform itself. These really fall under two categories – routine discharges of sanitary waters and potential spills of materials such as fuels, paints, anti-fouling compounds, etc. A typical farm center crew stationed on the platform will probably not be composed of numerous persons. A well run and mostly computer operated and mechanized operation would probably not have more than three to five farm staff on the platform with the possible exception of stocking/harvest times. Flows from sanitary facilities for this small crew would not be significant and might even be stored on the platform for occasional transport back to shore. Should an operation want to treat and discharge these waters, they would have to abide by the USEPA NPDES rules and regulations. These regulations are specifically intended to minimize water quality impacts



**WALDEMAR NELSON INTERNATIONAL INC.**

**6-6**

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**
**ENVIRONMENTAL IMPACT ANALYSES**

to adjacent waters. Spills of fuels, chemicals, paints, etc., from the platform could also have an impact on water quality. Preliminary estimates of power requirements for the "base case" operation yielded a peak requirement of approximately 50 kw. Even for diesel powered generators this should not require diesel storage in excess of 300 gallons and adequate containment practices will significantly reduce release potential due to storage and loading fuels. This type of power requirement also lends itself to alternative energy sources including wind and solar.

In summary, the small amounts of fuels or chemicals stored or used on the platform, when adequately contained, should not be a serious water quality concern.

## Potential Impacts on Native Fish Stocks

The potential for introduced species or escaped cultured species to impact native wild stocks of aquatic organisms has become a major problem and concern around the world (Cataudella and Crosetti 1993; Bartley 1995; Burnham-Cutis 1995; Hilsdorf 1995). The principal problems that have developed are (1) displacement of indigenous species by the introduction or escapement of non-indigenous species into the wild (Keenan and Salini 1990; Dochoda and Billington 1991; Evan and Willox 1991;Ogutu-Ohwayo and Hecky 1991); (2) the threat of altered natural gene pools from the introduction or escapement of hatchery produced fishes with limited genetic diversity into the wild (Busack and Currens 1995; Benzie and Williams 1996; Mitrofanov and Lesnikova 1996); and (3) the transfer of diseases from cultured fish to native species. If aquaculture is to grow to meet future demands for seafood and play a more active role in rebuilding overfished stocks (Brown 1997), these issues will need to be addressed in hatchery and growout operations.

In a mariculture operation, the simple solution to avoid introduction of non-indigenous species is to only culture indigenous species, unless no possibility of escapement exists (such as with recirculating system technology). Net cages and floating net pens are potentially vulnerable to storm damage, predator damage and subsequent escapement of fish. Variation in size of fingerlings might also result in some escapement when stocking cages with small fish.



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ENVIRONMENTAL IMPACT ANALYSES**

There are several ways to address these problems in a finfish growout operation. Indigenous species can be collected from the local environment and used for broodstock. Escapement at stocking can be avoided by carefully grading fish before stocking. The simplest way to maintain genetic diversity would be to collect wild fingerlings and culture them as is done in some other parts of the world, but this practice would probably not be politically or socially acceptable in the U.S. The most feasible way to maintain genetic diversity of hatchery produced fingerlings is to develop protocols which diversify broodstock and produce genetically diverse batches of fingerlings. This can be accomplished by rotating male and female broodstock from duplicate brood tanks and by providing multiple males to spawn with each female. This approach is being adopted by many public and private hatcheries in the US and elsewhere. Broodstock rotation is most feasible if the fish are serial spawners which can be spawned repeatedly by photo-thermal manipulation. In cases where ripe broodstock are collected and spawned by hormone implant or hormone injection, fertilization of eggs by multiple males and spawning of multiple females may be the best option. Cryopreservation of sperm from multiple males can play an important role in maintaining genetic diversity of fingerlings in cases where broodstock are difficult to collect or in limited supply (Piironen 1993; Rana 1995). Although cryopreservation technology is a promising tool, methods will need considerable refinement and more broad scale development before they can be widely applied in mariculture (Rana 1995).

Producing hybrids is another option to consider that will minimize potential impacts of escapement on wild stocks. Hybrids can be produced for closely related species with similar spawning seasons or by cryopreservation of gametes for producing crosses between congeners with dissimilar spawning seasons. The many hybrids of striped bass that have been produced and stocked in reservoirs and lakes throughout the U.S. and also cultured in cages and ponds are a good example of this approach. Hybrids can eliminate the threat of escaped hatchery produced fingerlings breeding with native stocks and minimize impacts of escapement.

Protocols for the conservation of genetic diversity of various species of fish and shellfish produced by hatcheries have been developed and adopted (Doyle et al 1991; Hadley 1992; Mace and Harvey 1994; Bartley et al 1995; Hedgecock 1995). The degree of broodstock rotation depends on the genetic diversity of the natural populations of a given



species. For example, Florida has adopted a procedure for rotation of broodstock used to produce fingerlings for stock enhancement (Roberts et al 1994). A similar approach can be used in hatchery programs to support offshore mariculture. Genetic diversity of hatchery fingerlings and native stocks can be monitored with standard genetic methods (Wolfus et al 1997).

Disease-free fish are almost impossible to produce in a hatchery and impossible to maintain in an open environment. Furthermore, challenges to healthy, unstressed fish can be an important step in developing immunity to pathogens. Introduction of diseases from hatchery produced fish to wild fish can be avoided by subsampling a representative number of fingerlings from hatchery stocks and then certify their health through an aquatic veterinary clinic prior to stocking in cages. Naturally occurring diseases, toxic alga blooms, stress from low oxygen, cold stress, nipping or degraded feeds can all potentially cause mortality of fish reared in cages. If significant unexplained mortality occurs in any of the net cages after stocking, specimens should immediately be collected and the cause of death determined by a fish pathologist.

## Protected Species

### Potential Impacts to Marine Mammals and Endangered and Threatened Species

The purpose of this section is to review possible impacts of Gulf of Mexico mariculture activities on marine mammals and endangered/threatened species. The following text is a brief description of classified species and the activities that may create a potential impact to these animals. Analogies can be drawn from many of the day to day activities of offshore oil and gas production as they will be similar to offshore activities. Additionally, mariculture will involve net-pens and discharges of uneaten food and fecal material which could impact protected species. This section will review the common impacts of mineral production and mariculture and discuss how net-pens and fish waste may influence marine mammals and protected species. The text will not cover impacts as the result of oil and gas production, i.e., produced fluids, oil spills, etc. This information



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ENVIRONMENTAL IMPACT ANALYSES**

is available in a series of Environmental Impact Statements provided by the Minerals Management Service for the sale of mineral leases of OCS lands.

Potential impacts to protected species from mariculture operation in the open Gulf can be attributed to the following:

- Vessel traffic and noise.

- Use of explosives for platform removal (although mechanical removal methods are common along the 100- to 200-foot isobath).

- Accidental discarded trash and debris from service vessels and farm structures.

- Nuisance or toxic plankton growth due to increased nutrient loading.

- Reduction of dissolve oxygen within close proximity of net-pens.

- Entanglement in net-pens utilized in mariculture operations.

## Marine Mammals in the Gulf of Mexico

Thirty-three species of cetaceans have been identified in the Gulf of Mexico (Table 1). The majority of these species are typically found in deeper waters (the continental shelf edge and beyond), with the exception of the bottlenose dolphin and Atlantic spotted dolphin, which commonly inhabit nearshore and shelf waters (MMS EIS 1993). By an order of magnitude, the bottlenose dolphin is the most common marine mammal in this area. Information on the distribution, abundance, movements, and behavior of the other species is limited. Six endangered cetacean species have been reported in the Gulf of Mexico. They include the sperm, blue, sei, fin, right, and humpback whales. All are uncommon, and only the sperm, fin, and sei whales have been seen in the Central and Western Gulf of Mexico in recent years. Observations suggested that the sperm and fin whales have a resident population in the Gulf and that other species are occasional



migrants or vagrants (Tucker & Associates, Inc., 1990). Current information on the distribution, abundance, and movements of great whales in the Gulf is sketchy or nonexistent.

The blue whale *(Balaenoptera musculus)* is the largest and rarest of the great whales. Historical records suggest that it infrequently passed through the Gulf of Mexico. There have been only two recorded sightings: one off Louisiana in 1924 and another off Texas in 1940. The latter identification is questionable (Schmidly, 1981). The fin whale *(Balaenoptera physalus)*, the second largest of the baleen whales, feeds on krill and small schooling fish. Schmidly (1981) reported five strandings and four sightings in the northern Gulf, and the NMFS made several sightings off the Mississippi delta in 1989. Humpback whales *(Megaptera novaengliae)* are a coastal species and feed primarily on krill and fish. Humpbacks have been sighted in the Central Gulf in 1952 and 1957. They have also been found in the Eastern Gulf near the mouth of Tampa Bay in 1962 and 1983, and near Seahorse Key, Florida, in 1983 (Schmidly, 1981). There are no records suggesting that the humpback whale was ever more than an infrequent transient in the Gulf.

Right whales are the most endangered cetacean in the Western Hemisphere. Their population in the northwestern Atlantic Ocean is estimated at 250-350 individuals. The right whale has rarely been sighted in the Gulf of Mexico, the most recent observations occurring offshore of Brazoria County, Texas, in 1972 (Lowery, 1974). Sei whales *(Balaenopters borealis)* have been reported from the Gulf in 1956, 1973, and 1989. They usually travel in groups of two to five individuals. Their population is unknown and they feed on copepods, krill, and small schooling fish. The sperm whale *(Physeter catodon)*, the most abundant great whale in the Gulf of Mexico, has been sighted during all seasons by Fritts et al. (1983) and the DOC (USDOC, NMFS, 1988). Watkins (1977) noted that it inhabits offshore waters deeper than 1,000 m (3,281 ft). In the northern Gulf, it is most frequently sighted along the continental shelf break (Tucker & Associates, Inc., 1990).

## Potential Impact to Marine Mammals

Operational wastes can potentially impact cetaceans via displacement or removal of food sources or via the degradation of water quality. As was seen in the water quality analyses, most operational discharges will be rapidly diluted and dispersed when released



in offshore areas and are not considered to be lethal or detrimental to cetaceans. Indirect effects to cetacean food supply are not expected to occur due also to rapid dispersion of organic wastes.

Entanglement of marine mammals in fishing gear is a relatively common occurrence in the regional fisheries (MMS EIS 1993). The potential exists for marine mammals to become entangled in the net-pens at a mariculture operation. To mitigate this potential, the outer most predator nets should be weighted to keep the webbing taut to prevent the entanglement of marine mammals and other species. Miget 1997 reported in a pilot study of offshore mariculture there were no observed entanglement of cetaceans or sea turtles in net-pens nor any intrusion of sharks during the course of that particular project.

The passage of support vessels in proximity to cetaceans can elicit a startle response with subsequent avoidance or evasive behavior. This effect is sub-lethal, though it could temporarily disrupt ongoing feeding, mating, resting, or migratory behavior, or cause the dispersion of a social group. This behavioral response could be a result of noise and/or visual disturbance. The response of cetaceans to such noise is somewhat species specific and appears to be, in part, a function of sound intensity, distance, the fact that the noise source is in motion (compared to a static and non-changing source), season (primarily mating season), and individual variability in whale behavior (MMS EIS 1993). Evidence suggests that certain whales have reduced their utilization of certain areas heavily used by vessel traffic, though continued presence of various whale species in such areas indicates a considerable degree of tolerance to vessel noise and disturbance (Richardson et al, 1991). Groups of dolphins and porpoises are often attracted to vessels making way in order to bow ride or, in the case of fishing vessels, take advantage of discarded by-catch.

Support vessels involved in operations could presumably collide with and physically impact cetaceans, especially larger species and those that remain at the surface for extended periods of time (MMS EIS 1993). Many of the larger species of cetaceans are deep-diving odontocetes, which commonly spend extended periods of time at the surface in order to restore oxygen levels within their tissues. The normal distribution of these mammals appears to be beyond the continental shelf edge, well into the bounds of the continental slope. Cetaceans that inhabit the continental shelf and near-shore waters,



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ENVIRONMENTAL IMPACT ANALYSES**

TABLE 6.4
CETACEANS

| Sub-order | Family | Species | Common Name | Endangered | Abundance |
|---|---|---|---|---|---|
| Mysticeti | Balaenidae | *Eubalaena glacialis* | right whales | yes | rare |
| | Balaenopteridae | *Balaenoptera musculus* | blue whale | yes | rare |
| | | *Balaenoptera borealis* | sei whale | yes | rare |
| | | *Balaenoptera physalus* | fin whale | yes | rare |
| | | *Balaenoptera edeni* | Bryde's whale | no | rare |
| | | *Balaeanoptera acutorostrata* | Minke whale | no | rare |
| | | *Megaptera novaeangliae* | humpback whale | yes | rare |
| Odontoceti | Physeteridae | *Physeter macrocephalus* | great sperm whale | yes | common |
| | | *Kogia breviceps* | pygmy sperm whale | no | common |
| | | *Kogia simus* | dwarf sperm whale | no | uncommon |
| | Ziphiidae | *Mesoplodon densirostris* | Blainville's beaked whale | no | rare |
| | | *Mesoplodon europaeus* | Antillian beaked whale | no | uncommon |
| | | *Mesoplodon bidens* | North Sea beaked whale | no | rare |
| | | *Ziphius cavirostris* | goosebeaked whale | no | uncommon |
| | Delphinidae | *Orcinus orca* | killer whale | | |
| | | *Feresa attenuate* | pygmy killer whale | | |
| | | *Pseudorca crassidens* | false killer whale | | |
| | | *Globicephala macrorhynchus* | short-finned pilot whale | | |
| | | *Steno bredanensis* | rough toothed dolphin | | |
| | | *Delphinus delphis* | saddleback dophin | | |
| | | *Peponocephala electra* | melon-headed whale | | |
| | | *Grampus griseus* | grampus | | |
| | | *ursiops truncarus* | Atlantic bottlenose dolphin | | |
| | | *Stenella frontalis* | Atlantic spotted dolphin | | |
| | | *Stenella attenuate* | pantropical spotted dolphin | | |
| | | *Stenella clymene* | short-snouted spinner dolphin | | |
| | | *Stenella longirostiis* | long-snouted spinner dolphin | | |
| | | *Stenella coeruleoalba* | striped dolphin | | |
| Pinnipedia | Otariidae | *Zalophus califomianus* | California sea lion | introduced | rare |
| Sirenia | Trichechidae | *Trichechus manatus* | West Indian manatee | endangered | common |



**WALDEMAR NELSON INTERNATIONAL INC.**

most commonly bottlenose and spotted dolphins, are agile swimmers that often approach vessels making way, even when in the confines of narrow navigation passes and waterways, and seem well able to avoid such vessels when deemed necessary. The probability of OCS service-vessel collisions is therefore greater within areas of the Gulf that are off the shelf edge.

Removal of offshore platforms by means of explosive charges can directly impact cetaceans. The effects of underwater detonation of explosive charges is dependent upon the amount of explosive used, distance from the charge, and body mass. Hemorrhaging in and around the lungs is the primary source of injury to submerged mammals, as well as injuries from the effects of explosive impact upon gas bubbles within the intestines (Goertner, 1982). The effects of explosives could also damage the ears of submerged cetaceans, and thus affect intraspecie communication, feeding, and navigation. Although death and permanent injuries have been speculated, none have been documented. In order to minimize the likelihood of removals occurring when cetaceans may be nearby, MMS has issued a series of guidelines (NTL 92-02) for explosive platform removal to offshore operators. These guidelines specify platform removal only during daylight hours, staggered detonation of charges, placement of charges 5m below the seafloor, and extensive pre- and post-detonation surveys of surrounding waters.

Pollution of the marine environment with non-biodegradable plastic debris discarded from offshore sources (structures, and vessels) and coastal sources (litter and solid waste disposal) has become an issue of increasing concern, especially with regard to entanglement of and ingestion by marine mammals. Typically, marine mammals become entangled in various types of debris (mostly lines of various types) and inactive or active fishing gear. Plastic debris has also been reported in the gut contents of several stranded marine mammals. In some cases, ingestion of such material is believed to be the cause of death (Barros and Odell, 1990: Sadove and Morreale, 1990; Tarplev, 1990). It is believed that the animals either mistake the plastic material, which is in suspension in the water column, as a food item, or in the case of larger baleen whales, it is ingested along with prey species (Sadove and Morreale, 1990). The MMS prohibits the disposal of equipment, containers, and other materials into coastal and offshore waters by oil and gas lessees (30 CFR 250.40). Presumably, a mariculture operation would be under the same kind of prohibition. Prohibition of the discharge and disposal of vessel and offshore structure-



**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ENVIRONMENTAL IMPACT ANALYSES**

generated garbage and solid waste items into both offshore and coastal waters was established January 1, 1989, via the enactment of MARPOL, Annex V, Public Law 100-220 (101 Statute 1458), which is enforced by the U.S. Coast Guard.

## Conclusion

The impact of the proposed action on marine mammals is expected to result in primarily sublethal effects (behavioral effects and nonfatal exposure to or intake of aquaculture discharges or discarded debris) that are both chronic and sporadic. These impacts could cause acute or chronic physiological stress, alter normal behavioral patterns, and result in some degree of avoidance, either temporary or permanent, of the impacted area(s).

## Marine Turtles

The green turtle *(Chelonia mydas)* population in the Gulf once supported a commercial harvest in Texas and Florida, but the population has not completely recovered since the collapse of the fishery around the turn of the century. Reports of nesting in the northern Gulf are isolated and infrequent. The closest nesting aggregations are on the Florida east coast and the Yucatan Peninsula. Green turtles prefer depths of less than 20 m (66 ft), where seagrasses and algae are plentiful (NRC, 1990). Leatherbacks *(Dermochelys coriacea),* the most oceanic of the marine turtles, occasionally enter shallow water in more northern areas. Their nesting is concentrated on coarse-grain beaches in the tropical latitudes (Ogren et al, 1989), but there are rare occurrences on the Panhandle and Flagier County coasts in Florida. They feed primarily on jellyfish but also consume crustaceans, fish, and some algae.

The hawksbill *(Eretmochelys imbricate)* is the least commonly reported marine turtle in the Gulf. Texas is the only Gulf State where stranded turtles are regularly reported (Ogren et al, 1989), and these tend to be either hatchlings or yearlings. Northerly currents may carry them from Mexico, or their nesting range may be expanding northward into Texas. They are more frequent in the tropical Atlantic, Gulf



**WALDEMAR NELSON INTERNATIONAL INC.**

of Mexico, and Caribbean. Hawksbills prefer reefs and water less than 15 m deep where marine invertebrates are abundant.

The Kemp's ridley sea turtle *(Lepidochelys kenipi)* is the most imperiled of the world's marine turtles. The population of nesting females has dwindled from an estimated 47,000 in 1947 to 600 today (NRC, 1990). An estimated 800 nests are laid annually (NRC, 1990), primarily on a 17-km (10.5-mi) stretch of beach in Rancho Nuevo, Vera Cruz, Mexico (Thompson, 1988). Nesting in the United States occurs infrequently on Padre and Mustang Islands in south Texas from May to August (Thompson, 1988). Natural nesting is supplemented by a NMFS hatching and rearing program on Padre Island National Seashore. Female Kemp's ridleys appear to inhabit nearshore areas, and congregations of Kemp's have been recorded off the mouth of the Mississippi River (Byles, 1989).

The loggerhead sea turtle *(Caretta caretta)* occurs worldwide in depths ranging from estuaries to the continental shelf. It has been reported throughout the Atlantic from Newfoundland to Argentina (NRC, 1990). Nesting also occurs worldwide.

In the Central Gulf, loggerhead nesting has been reported on Gulf Shores and Dauphin Island, Alabama; Ship Island, Mississippi; and the Chandeleur Islands, Louisiana. Nesting in Texas occurs primarily on North and South Padre Islands, although occurrences are recorded throughout coastal Texas. Hildebrand (1982) noted that banks offshore the central Louisiana coast and near the Mississippi Delta are also important marine turtle feeding areas.

## Impacts to Marine Turtles

This section discusses the effect of the proposed action on the loggerhead, Kemp's ridley, hawksbill, green, and leatherback marine turtles of the Gulf of Mexico. Major impact-producing factors that may occur as a result of the proposed action are reviewed in detail in Decline of the Sea Turtles: Causes and Prevention (NRC. 1990) The major impact-producing factors related to the proposed action that may affect Gulf marine turtles include: operational discharges, entanglement in net-pen webbing, vessel traffic, explosive platform removals, OCS related trash and debris, and water quality degradation.



**WALDEMAR NELSON INTERNATIONAL INC.**

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ENVIRONMENTAL IMPACT ANALYSES**

Mariculture operation wastes could potentially impact marine turtles by displacement of food sources through the degradation of water quality. Our analyses do indicate however that operational discharges should rapidly dilute and disperse when released in offshore areas. Indirect effects to food supply are not expected to occur due also to rapid dispersion of organic waste.

Structure removal and water quality degradation may adversely affect marine turtle habitat through destruction of live-bottom communities used by marine turtles. Noise from service-vessel traffic may elicit a startle reaction from marine turtles and produce a temporary, sublethal stress (NRC, 1990). Service vessels could collide with and harm marine turtles while they are at the sea surface, but this appears to be less than 4 percent of their total time (Bytes, 1989; Lohoefener et al., 1990). Vessel-related injuries were noted in 9 percent of stranded marine turtles examined in the Gulf of Mexico during 1988, but this figure includes turtles that may have been struck by boats post mortem (USDOC, NMFS, 1989).

Explosive platform removals can cause capillary damage, disorientation, and loss of motor control in marine turtles (Duronslet et al., 1986). Although marine turtles far from the site may suffer disorientation, those near detonation sites could sustain fatal injuries. Deaths have been suspected but not documented in previous explosive platform removals.

Entanglement of marine turtles in fishing gear is a relatively common occurrence in the regional fisheries. The potential exists for marine mammals to snare up in net-pens. The NMFS protected species group was contacted regarding this possibility. They indicated that the predator nets be weighted to keep the webbing taut and use of a mesh size of four inches or less. This should reduce the entanglement of marine mammals and endangered species. Miget 1993 reported in a pilot study of offshore mariculture there were no observed entanglement of sea turtles during the course of the project.

Marine turtles can become entangled in monofilament fishing line, netting, 6-pack yokes, etc., which may cause injury or death. Marine turtles, particularly leatherbacks, are known to be attracted to floating plastic debris because it resembles their preferred food, the jellyfish. Ingestion of plastic and styrofoam materials could result in drowning, lacerations, digestive disorders or blockage, and reduced mobility resulting in starvation (MMS EIS 1993). The MMS prohibits the disposal of equipment, containers, and other



**WALDEMAR NELSON INTERNATIONAL INC.**

materials into offshore waters by structure lessees (30 CFR 250.40). In addition, MARPOL, Annex V, Public Law 100-220 (101 Statute 1458), prohibits the disposal of any plastics at sea or in coastal waters.

## Conclusion

Eventual explosive structure removal, if practiced, entanglement in mariculture net-pens, and vessel traffic resulting from mariculture operations could have an impact on marine turtles. Mariculture discharges could temporarily disturb some turtles and their habitats. The impact of future mariculture operations on marine turtles is expected to result in primarily sublethal effects (behavioral effects and nonfatal exposure to or intake of aquaculture discharges or discarded debris) that could be both chronic and sporadic.

## Coastal and Marine Birds: Endangered and Threatened Species

Of the endangered coastal and marine birds found in the Northern Gulf of Mexico, the brown pelican is likely to willingly venture out to an oil and gas structure along the 100 to 200 isobath. Brown pelicans inhabit the coast, rarely venturing into freshwater or flying more than 32 km (20 mi) offshore (MMS EIS 1993). Brown pelicans have been removed from the Federal endangered species list in Alabama and Florida but remain listed as endangered in Mississippi, Louisiana, and Texas. Their decline is primarily the result of hatching failure caused by ingestion of fish containing pesticides (MMS EIS 1993). Nesting occurs in colonies on coastal islands. Pelicans are known to get caught in fishing line and may ingest plastic debris mistaking it for potential food.

Interaction with plastic materials is therefore very serious, and can lead to permanent injuries and death. It is expected that coastal and marine birds will seldom become entangled in or ingest OCS-related trash and debris as a result of MMS prohibitions on the disposal of equipment, containers, and other materials into offshore waters by lessees (30 CFR 250.40). In addition, MARPOL, Annex V, Public Law 100-220 (101 Statute 1458), which prohibits the disposal of any plastics at sea or in coastal waters, went into effect January 1, 1989. For the purpose of this analysis, OCS oil- and gas-related plastic debris will seldom interact with coastal and marine birds, and therefore,



the effect will be negligible. The MMS prohibits the disposal of equipment, containers, and other materials into offshore waters by structure lessees (30 CFR 250.40). In addition, MARPOL, Annex V, Public Law 100-220 (101 Statute 1458), prohibits the disposal of any plastics at sea or in coastal waters.

## Conclusion

Brown pelicans and coastal and marine birds are commonly entangled and snared in discarded trash and debris. In addition, many species will readily ingest small plastic debris, either intentionally or incidentally. The brown pelican may encounter periodic disturbance from proposed activities. It is expected that the majority of effects from mariculture on coastal and marine birds are sublethal (nonfatal exposure to or intake of OCS-related discarded debris).

It is possible that brown pelicans could be ensnared in the bird netting placed atop of floating net pens. Operators should attempt to disengage these birds if it occurs. The problem will be reduced the farther offshore an operation is.

## Socioeconomic Environment

Since there are no commercial-scale mariculture operations in the Gulf of Mexico at present, any development of commercial-scale operations in a coastal community would obviously have some impact to the socioeconomic make-up of the community and region. The prediction of these impacts, both positive and negative, is obviously difficult without knowledge of where the facilities would locate along the Gulf of Mexico. Employment estimates for the "base case" operation include persons necessary for the offshore farm, base camp installation supporting the farm, staff for a hatchery – if that is in the plan of development – and possibly vessel crews to transport fingerlings and feed containers offshore, farm crew change-out, and product back onshore. Conservative estimates of employment for a start-up commercial-scale mariculture operation is 20 to 25 persons. Estimates of total annual salary for this staffing level is approximately



**WALDEMAR NELSON INTERNATIONAL INC.**

**FEASIBILITY STUDY – OFFSHORE MARICULTURE**

**ENVIRONMENTAL IMPACT ANALYSES**

$1,000,000. The impact to the local community closest to the onshore and offshore mariculture operations should not be too great for this size operation unless located in a very small town. Three quarters of this estimated staff is land-based therefore if they elected to live in the community, the multiplier effect (2.0) of indirect to direct labor could mean an increase in employment levels of 45 persons. It is doubtful whether even those numbers of direct and indirect employees plus spouses and children would cause a serious adverse affect on available infrastructure (roads, water, sewerage, drainage, hospitals, schools, etc.) on all but the smallest community. Obviously, as the industry expands and more operations are initiated the ripple effect could be significant and would have to be periodically evaluated.