**EXHIBIT A**

| | | | |
|---|---|---|---|
| *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*<br>No. 10-MD-2179<br><br>PTO 65 VERIFIED STATEMENT REGARDING CAUSATION AND DAMAGES (B1 CLAIMS) | | | |

| Last Name | First Name | Middle Name/Maiden | Suffix |
|---|---|---|---|
| Wright | Barbara | Jean | |

| Business Name<br>Barbara J. Wright<br>Owner of a Real Estate Broker &<br>Development Business with Husband | Last 4 digits of Plaintiff's social security number (if individual) or full Tax ID number (if business plaintiff)<br><br>1803 |
|---|---|
| MDL 2179 Member Case Number<br><br>2:13-cv-02420 | Attorney Name and Firm<br>Tucker H. Byrd<br>Byrd Campbell, P.A. |

All "Remaining B1 Plaintiffs" (as defined in PTO 65) must answer the questions below regarding damages and causation. Responses must be as specific and accurate as practicable and shall be given under penalty of perjury. It is a violation of PTO 65 to submit an answer that is, for example, generic, vague, evasive, or misleading. **The plaintiff (not the plaintiff's attorney) must sign and date the verification and attestation at the end of this form.** Responses shall be filed in the record for the plaintiff's **individual lawsuit** (not the master docket for MDL 2179) by no later than **April 11, 2018**.

You may attach additional pages to this form if you need extra room to answer a question. Make sure to indicate the question you are continuing to answer.

**Question 1:**  Describe specifically the compensatory damages that you claim in your lawsuit, including the nature of the damage, the date(s) of the damage, the amount of the damage, and the calculations used to arrive at that amount.

See attached.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Question 2:** Describe specifically the evidence you rely on to prove the damages you allege in response to Question no. 1.

See attached.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Question 3:** Describe specifically how the Deepwater Horizon/Macondo Well incident and oil spill caused the damages you allege in response to Question no. 1.

See attached.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Question 4: Do you have at this time an expert who will opine as to any of your responses to the above questions? (Yes or No)
**Yes.**

By signing below, I declare and attest under penalty of perjury pursuant to 28 U.S.C. § 1746 that the answers provided to the above four questions are true and correct, and I specifically declare and attest under penalty of perjury pursuant to 28 U.S.C. § 1746 that the damages described in response to Question no. I were caused by the Deepwater Horizon/Macondo Well incident and oil spill.

Executed on the following date at the following location:

Date:  June 15, 2018

Location (City and State): San Diego, California

*Barbara Jean Wright*

*Signature of Plaintiff*

*Plaintiff's Attorney **Cannot** Sign on Plaintiff's Behalf. For businesses, the CEO, CFO, President, Owner, or similar senior corporate officer must sign.*

Barbara Jean Wright

Print Name

**Owner**

Title/Position (if signed on behalf of a business or other entity)

**The verified statement, must be filed into the record of the plaintiff's <u>individual lawsuit</u> (as** opposed to the master docket for MDL 2179) no later than **April 11**, 2018.

5

## EXHIBIT A

## Question 1 - Compensatory Damages

The Plaintiff, BARBARA JEAN WRIGHT, is a lender to AMT, LLC. Prior to the *Deepwater Horizon* Oil Spill occurring, AMT, LLC owned beachfront property, Parcel B and Lot 160, located in Destin, Florida in an area known as Destin Pointe. AMT, LLC planned to develop the subject property into a condominium/residence resort facility and a beach club. See the AMT, LLC PTO 65 Verified Statement Regarding Causation and Damages (B1 Claims) attached hereto as **Exhibit "C."**[1]

Prior to the *Deepwater Horizon* Oil Spill occurring, the Plaintiff and her husband, Roderic Wright, who has filed his own claim [Case No. 2:13-cv-01091] entered into a loan agreement with AMT, LLC., wherein the Plaintiff and Roderic Wright loaned AMT, LLC $1,015,000.00 for the development of the Destin Pointe development project bearing 8% interest. As evidence, please see the September 7, 2008 Loan Agreement attached hereto as **Exhibit "A**."

Prior to the *Deepwater Horizon* Oil Spill occurring, AMT, LLC received financing commitments totaling $14,000,000.00 to proceed with the Destin Pointe development on the Destin Pointe property. As evidence, please see the March 11, 2010 commitment intent letter from DEFTCO. CORP. attached hereto as **Exhibit "B."**

The *Deepwater Horizon* Oil Spill has had a negative impact on Gulf Coast businesses and will continue to have a lingering impact on Gulf Coast businesses into the future. The ongoing impact of the Oil Spill is supported by data that recognize the perception—as documented by surveys of likely visitors to the area—that there have been lingering dangers to the environment and Gulf of Mexico wildlife.

The negative impact of the Oil Spill caused a high percentage of potential tourists to have and continue to have ongoing concerns about the health impacts of exposure to Gulf waters and consumption of Gulf seafood, resulting in potential tourists visiting alternative markets without the specter of contamination and causing tourist dollars to be spent away from the Gulf Coast.

---

[1] Because Plaintiff's claim derives in large part, and closely aligns with the claim of AMT, LLC, Plaintiff refers to the Verified Statement submitted by AMT in Member Case No. 2:13-cv-00974, as further evidence in support of his claim.

As a result, of the Oil Spill and lingering concerns about the impact of the Oil Spill, tourists that would have considered visiting the Gulf Coast, including Destin, FL, visited alternative markets resulting in a reduction in tourism in the Gulf Coast, including Destin, FL.

Tourism supports the coastal areas of the Florida Panhandle and the tourism industry in the coastal Florida Panhandle has and continues to suffer tremendously as a result of the Oil Spill.

As a result of the Oil Spill and the uncertainty surrounding the long term negative impact of the Oil Spill, the financing commitments provided to AMT, LLC for the Destin Pointe development project were cancelled.

AMT, LLC attempted in earnest to obtain replacement financing to proceed with the Destin Pointe development project after the initial commitments were cancelled, but due to the ongoing uncertainty surrounding the long term negative impact of the Oil Spill, AMT, LLC was unable to obtain financing for the project.

As a result of the Oil Spill, AMT, LLC suffered a significant decline in revenues and profits and ultimately AMT, LLC was unable to meet the financial obligations to maintain the beachfront property, Parcel B and Lot 160, it owned in Destin, Florida, resulting in AMT, LLC losing the property in foreclosure proceedings.

As a result of the Oil Spill causing AMT, LLC to lose financing for the Destin Pointe development project and losing the property in foreclosure, AMT, LLC was unable to honor the Loan Agreement with the Plaintiff.

As a result of the Oil Spill, the Plaintiff suffered significant losses, including, but not limited to, the loss of principal and interest from the September 7, 2008 loan.

Consequently, the Plaintiff seeks both compensatory and punitive damages in this action. As discussed generally above, Plaintiff's compensatory damages as a result of Defendants' acts and omissions include, but are not limited to, the following: a) Loss of principal and interest from the September 7, 2008 loan; b) All other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff's damages becomes available; and c) Other damages, losses or costs as will be shown at trial.

## **Question 2 – Evidence**

Plaintiff, BARBARA JEAN WRIGHT, relies on the following evidence:

1.      **Loan Agreement of Rod and Barbara Wright & ZTF Family, LP and Its Affiliates** dated September 7, 2008 [*see* **Exhibit "A"**].

2.      **Commitment Intent Letter** dated March 11, 2010 - [*see* **Exhibit "B"**]. The Commitment Intent Letter definitively establishes that AMT had financing for its Destin Pointe project prior to the Oil Spill, which would have prevented the eventual foreclosure of the property. The Commitment Intent Letter also establishes and supports the value of the property.

3.      **AMT, LLC PTO 65 VERIFIED STATEMENT** file April 11, 2018 [*see* **Exhibit C**].

4.      **Evidence Obtained/Developed in MDL 2179 –** Plaintiff will utilize all of the evidence and discovery obtained and developed in the MDL proceedings, where Plaintiff, BARBARA JEAN WRIGHT, is a member of MDL 2179.

### **Question 3 - Causation**

The *Deepwater Horizon* Oil Spill had a devastating impact on the Gulf Coast causing a high percentage of potential tourists to have ongoing concerns about the health impacts of exposure to the oil in the Gulf waters and consumption of Gulf seafood, resulting in potential tourists visiting alternative markets without the specter of contamination. This caused a ripple effect throughout the entire Gulf Areas, which affected every aspect of business on or near the Gulf of Mexico, including a halt on development in the region. Financing for developments on the Gulf Coast became non-existent.

The property owned by AMT was directly on and/or adjacent to the Gulf of Mexico in one of the most highly traveled tourist destinations in the Florida panhandle. The entryway into Destin basically dead-ends into Parcel B. Oil from the *Deepwater Horizon* Oil Spill was directly deposited on AMT's property and in the surrounding waters. Therefore, Plaintiff, BARBARA JEAN WRIGHT and AMT can sustain claims under the Oil Pollution Act *and* under *Robins Dry Dock,* which allows for punitive damages.

At the time of the Oil Spill, AMT had just secured a financing agreement with DeftCo to refinance its loan with Jefferson Bank, which had become due. In the "Commitment Intent Letter" dated March 11, 2010, DeftCo pledged funds in the amount of $14 million to AMT. The financing was to be provided on or before June 10, 2010. However, in the interim, the *Deepwater Horizon* Oil Spill occurred on April 20, 2010. After the spill, the financing from DeftCo was cancelled with DeftCo citing the *Deepwater Horizon* Oil Spill as the reason for cancellation.

After the Oil Spill, the CEO of DeftCo, Joseph F Dau, drafted a letter explaining the cancellation of the financing to AMT for the Destin Pointe development project. As evidence, please see the Letter dated September 28, 2011, attached hereto as **Exhibit "G" of Plaintiff's, BARBARA JEAN WRIGHT'S, Exhibit "C."** In the letter, Mr. Dau explains that DeftCo "had the money in place for this project" up until the effects of the Oil Spill

became apparent. However, DeftCo was forced to reconsider and cancel the loan financing "based upon the BP Oil spill and its consequences." Mr. Dau also cites the "long term environmental impact, health and safety impact issues, loss of reputation as a vacation destination.  As well as many other underwriting issues" as reasoning for cancelling the financing, adding these were "all caused by the BP spill."

With respect to Parcel B, there was a Pre-Spill appraisal in the amount of $28,760,000 on the property, which was conducted only months before the Oil Spill. However, after the Oil Spill, the property was foreclosed on by Jefferson Bank, with a Final Summary Judgement showing AMT owed Jefferson Bank approximately $4.9 Million. This definitively proves the properties could not be sold for more than $4.9 Million, or else AMT would have sold the properties to avoid the foreclosure. There were no other factors or intervening causes for AMT's losses. The decrease in amount from the 2007 appraisal ($53,600,000) and the 2009 appraisal ($28,760,000) on Parcel B had already taken into account the effects of the economy/housing market decline. Furthermore, the short timeframe between the appraisal, the loan commitment, the Oil Spill, the cancellation of the loan commitment, and the foreclosure establish that the only cause of Plaintiff, BARBARA JEAN WRIGHT's, and AMT's damages could have been was the *Deepwater Horizon* Oil Spill.

# EXHIBIT "A"

# LOAN AGREEMENT OF ROD AND BARBARA WRIGHT
## & ZTF FAMILY, LP AND ITS AFFILIATES

**THIS MASTER LOAN AGREEMENT** ("**Agreement**") is made and entered into as of the 7th day of September, 2008 (the "**Effective Date**"), by and between ROD M. WRIGHT & BARBARA J. WRIGHT both having their address of 625 Lagoon Drive, Unit 5, Destin, Florida 32541 (ROD and BARBARA are sometimes collectively referred to as the "Lenders") and AMT, LLC, a Florida limited liability company ("**AMT**" or "**Borrower**"), having the address of 480 Gulf Shore Drive, Destin, Florida 32541, ZTF Family, LP, a Missouri limited partnership ("**ZTF**" or "**Borrower**"), having the address of 480 Gulf Shore Drive, Destin, Florida 32541 and Stephen Bunyard ("**Bunyard**" or "Borrower") (AMT, ZTF and Bunyard are sometimes collectively referred to as the "**Owners**" or "Borrowers"), having the address of 480 Gulf Shore Drive, Destin, Florida 32541 or such other address or addresses as the parties may hereafter determine from time to time. For convenience, all the foregoing persons and entities may be referred hereinafter collectively as the "**Parties**".

## R E C I T A L S:

**WHEREAS:** Certain capitalized terms used in this Agreement are defined in Section 1 of this Agreement.

**WHEREAS:** AMT, L.L.C., a Florida limited liability company ("**AMT**") leases Parcel B (described hereinafter) under a long-term lease, and owns fee simple title to Lot 160 (described hereinafter).

**WHEREAS:** ZTF Family, LP, a Missouri limited partnership ("**ZTF**"), owns 100% of AMT. ZTF also owns 100% of Destin Pointe Realty, Inc., a Florida corporation (hereinafter referred to as "**DPRI**").

**WHEREAS:** ZTF, AMT and BUNYARD desire to borrow and **ROD and BARBARA WRIGHT** desire to loan ZTF, AMT and BUNYARD the sum of One Million Fifty Thousand Dollars ($1,015,000.00) (the "**Loan Amount**") which was loaned to "Borrowers" in the manner described hereinafter.

**WHEREAS:** The Parties intend to explore the potential development of Parcel B and Lot 160, and the Parties intend to modify and amend the Operating Agreement of **AMT** (and **ZTF** if necessary) and modify and amend the Bylaws of Destin Pointe Realty, Inc., ("**DPRI**") to reflect the ownership interests of the parties in the event an agreement is made to add "Lender" as new participants.

**WHEREAS:** The Parties have agreed to enter into this Agreement to describe more fully the transactions they intend to pursue that are generally described above.

**NOW, THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby enter into this Agreement and agree that it shall supersede and replace all prior or existing oral or written agreements between the Parties pertaining to the Properties as of the Effective Date of this Agreement, as follows:

## A G R E E M E N T:

The foregoing recitals are hereby incorporated by reference and made a part of this Agreement, provided however, that any inconsistencies between the recitals and the provisions of this Agreement shall be resolved in favor of the terms and conditions of the Agreement.

     1.   **DEFINITIONS:** The following terms shall have the following meanings when used in this Agreement:

     A.   **AMT** shall mean AMT, LLC, the Florida Limited Liability Company which hold title to Lot 160 and the long-term land lease on Parcel B. AMT, is owned by ZTF, Family LP.

     B.   "**DPRI**" shall mean Destin Pointe Realty, Inc.

     C.   "**Lot 160**" shall mean the lot identified by the same number within the Destin Pointe PUD that is owned by AMT and described on Exhibit A attached hereto.

     D.   "**Lot 160 Project**" shall mean the project to be developed on Lot 160.

     E.   "**Parcel B**" shall mean the 11.77 acres of real estate leased by AMT under a long-term lease as more fully described on Exhibit <u>B</u> attached hereto.

     F.   "**Pre-development Activities**" shall have the meaning assigned to such term in Section 3.B below.

     G.   "**Pre-development Work Product**" shall mean the results of the Pre-development Activities with respect to Parcel B and Lot 160, and includes, but is not limited to, all studies, engineering and architectural plans and specifications, reports, surveys, agreements, permits, development orders, development rights, surveys, title commitments, appraisals, etc.

     H.   "**Properties**" shall mean collectively the properties that are the subject of this Agreement, namely Parcel B, Lot 160, and **DPRI**.

     I.   "**LOAN AMOUNT**" shall mean the amount of $1,015,000.00.

     J.   "**ZTF**" shall mean **ZTF Family, LP**, a Missouri limited partnership ("**ZTF**"), which owns 100% of **AMT**. ZTF also owns 100% Destin Pointe Realty, Inc., a Florida corporation (hereinafter referred to as "**DPRI**").

     2.   **TERMS;** The terms and conditions in this Section 2 as expanded upon throughout the Agreement shall govern the "LOAN" made to the "Borrowers" (AMT, ZTF and BUNYARD).

     A.   The principal loan amount of $1,015,000.00, shall accrue annual interest in the amount of 8% (per cent) and shall be all due and payable to Lender when

one of the following occurs: (1) Borrowers refinance the existing loan with Jefferson Bank, or (2) Borrowers obtain funds from a Joint Venture Investor, or (3) Borrowers sell the properties known as Destin Pointe (Parcel B and Lot 160).

B.  Lender acknowledges that Lender has conducted its own due diligence with respect to Parcel B and Lot 160 prior to making the loan and is satisfied with the results of said due diligence.

C.  In the spirit of this Agreement, the Lender and the Borrowers shall be allowed a grace period of five (5) working days before either Party gives notice to the other Party of a breach of the Agreement. Also, each Party may request further assurances of the other Party's intentions at any time during this Agreement.

D.  No mortgage or security will be required to be given by either Party to the other Party.

## 3.  **DUE DILIGENCE AND PRE-DEVELOPMENT ACTIVITIES**:

A.  Borrowers shall provide Lender with continuing access to ALL Properties and records pertaining to the Properties owned by the Borrowers that are located in Destin Pointe, Destin, Florida. Lender, Rod M. Wright, has contracted with the Borrowers to perform services pursuant to a "CONSULTANT AGREEMENT" that was executed by the parties on October 5, 2007. Pursuant to that agreement, any and all documents pertaining to the Borrowers' Destin Pointe properties shall be made available for his review.

B. At all times it is acknowledged by all parties that Borrowers and Lender are not acting as developers in this transaction and that their collective interests are directed towards clearing all impediments which currently impact the properties' development potential thereby allowing the Borrowers to sell the properties to a developer.

## 4.  **Disclosures**.

A.  ZTF and AMT have disclosed to Lender that there are certain matters affecting Parcel B that will have to be resolved by AMT in order to develop Parcel B, including, but not limited to, a perpetual easement held by the Army Corps of Engineers over a portion of the land, a Navigational Servitude claimed by the Army Corps of Engineers, alleged wetlands located on a portion of Parcel B, and a possible lack of access.

B.  The Parties acknowledge and agree that certain developer rights were assigned to AMT pursuant to that certain Developer Rights and Indemnity Agreement dated April 24, 2003 executed by AMT and DGC1 (the **"Developer Rights Agreement"**), a copy of which has been provided to Lender. However, AMT makes no representations or warranties to Lender regarding the status of such developer rights, except the rights AMT acquired in its 2003 purchase of Parcel B, Lot 160, and the rights associated with the Destin Pointe PUD.

5. <u>**Warranties**</u>.

A.     Lender acknowledges that <u>**ZTF AND AMT ARE MAKING NO EXPRESS OR IMPLIED WARRANTIES CONCERNING PARCEL B OR LOT 160**</u>, and that neither ZTF nor AMT, nor anyone affiliated with AMT, shall have any liability to Lender for any defects in or problems with Parcel B or Lot 160, including, but not limited to, any soil, environmental or legal conditions, that may affect the value or use of Parcel B or Lot 160. Without limiting the preceding sentence, Lender agrees that it is relying on its own investigations of Parcel B and Lot 160 and any title information that ZTF and AMT may have provided about Parcel B and Lot 160.

6.     <u>**Representations and Covenants by Borrower.**</u>

A.     AMT is a duly organized and validly existing Florida LLC.

B.     ZTF is a duly organized and validly existing Missouri limited partnership.

C.     Execution of this Agreement has been duly authorized by AMT, ZTF and Bunyard, and this Agreement is binding on AMT, ZTF and Bunyard, their Successors and assigns, and is enforceable in accordance with its terms.

7.     <u>**Representations and Covenants by Lender.**</u>

A. Borrowers are only willing to enter into the transactions described in this Agreement because of their confidence in the experience and expertise of Roderic Wright. Mr. Wright shall at all times be actively involved in the projects described in this Agreement from the Effective Date until such Projects are completed and sold to a developer end user and shall devote such time to such projects as needed from time to time and as required pursuant to the CONSULTANT AGREEMENT referenced above.

B. Execution of this Agreement has been duly authorized by Borrowers, and this Agreement is binding on Borrowers, their successors and assigns time and enforceable in accordance with its terms. .

8.     <u>**Negative Covenants by Borrower.**</u>

The following negative covenants shall apply so long as Lender is not in default with respect to its obligations to Borrowers under this Agreement, and shall also terminate as specifically hereinafter provided.

A.     Each Borrower at its expense shall continue to own, operate and maintain the Property or Properties it currently owns which are the subject of this Agreement in a manner similar to the manner such Property or Properties has been maintained in the past.

B.     No new mortgages shall be recorded against **Parcel B**, or **Lot 160**, by the Borrowers, except as part of the payoff of the principal and interest due under this loan agreement.

C.    No new agreements that would materially affect the development of **Lot 160, or Parcel B** shall be recorded without the prior approval of any such agreements by Lender. However, this restriction shall not apply to any documents that Borrowers are already contractually obligated to sign or which they are required by law to sign.

A.    Each party shall bear the fees and charges of its respective attorneys, consultants, engineers, accountants, architects and other professionals and/or representatives.

B.    Borrowers shall pay the cost of all Pre-development Activities with respect to all of the Properties, including, but not limited to: (a) the cost of any surveys and any letters of reliance from the surveyor; (b) the cost for the Phase I Environmental Assessment and any letters of reliance from the engineer; (c) cost to issue the title commitment and the owner's and title insurance policies, if any; subject, however, to the provisions of Section 3 of this Agreement.

9.    **SEVERAL OBLIGATIONS:**

A.    Notwithstanding any provision in this Agreement to the contrary, ZTF, AMT, and BUNYARD shall only be liable for express covenants pertaining to the express obligations under this Agreement with respect to Parcel B, Lot 160, and DPRI.

B.    Notwithstanding any provision in this Agreement to the contrary, Bunyard shall only be liable for express covenants he has made in this Agreement and any express obligations or warranties he has made with respect to the **AMT, ZTF and DPRI**.

10.   **DEFAULT:**

A.    Default by AMT or ZTF or Bunyard:  If AMT or ZTF or Bunyard shall default in any material respect on any of the covenants and agreements contained herein to be performed by AMT or ZTF or Bunyard within the time for performance as specified herein (including their respective obligation to consummate the transactions contemplated hereby), Lender will be entitled to enforce any indemnities which by their terms are to survive this Agreement, or rights to recover attorney's fees pursuant to Section 27 below.

B.    Limitations for Limitations on Remedies: The limitations on remedies set forth in this Section 11 apply to the remedies available for failure to make any Payment under this Agreement, and do not limit any rights or remedies available with respect to enforcing any entity's operating agreement, or other operating or management documents of AMT, or DPRI, or other entities. Also, the limitations on remedies set forth in this Section 11 shall not limit the Parties rights or remedies available with respect to enforcing any other agreement between any of the parties hereafter entered into. Finally, no part of this Section 11 will be construed to benefit or be enforceable by any third person or entity that is not a party to this Agreement.

C. Definition of Default:  As used in this Agreement, the word **"default"** means that a party hereto has breached a term, covenant, or condition contained herein; and, the party has failed to cure same within thirty (30) days from the effective date of written notice from the other party specifying the nature of the alleged default (**"Cure Period"**). No default shall become actionable until the expiration of the aforesaid Cure Period with the default unremedied. A delay or omission in the exercise of any right or remedy accruing to one party upon any breach by the other party shall not impair such right or remedy.

D. <u>Waivers:</u> The waiver by one party of any condition or of any subsequent breach of the same or any other term, covenant, or condition herein contained shall not be deemed to be a waiver of any other condition, or deemed to be a continuing waiver of any subsequent breach of the same or any other term, covenant or condition contained herein.

11. **BROKERAGE:** Lender and Borrowers each represent and warrant to the other that Roderic M. Wright is the broker or finder in connection with the negotiations of this Agreement and/or the consummation of the agreement contemplated hereby and no other broker or other person, firm or entity is entitled to any commission or fees in connection with this transaction. Borrowers and Lender do each hereby indemnify, defend, protect and hold the other harmless from and against any costs, expenses or liability for compensation, commission or charges which may be claimed by any other broker, finder or other similar party by reason of any actions of the indemnifying party. Furthermore, it is agreed and understood that Roderic M. Wright, is an attorney and real estate broker and shall receive no commission or fee for the consummation of this Agreement and of the transactions described herein, other than the repayment of the loan principal and the interest earned. Further, he is not acting as a loan broker or an attorney in this transaction. Borrowers represent that they have consulted with their respective attorneys regarding this transaction and are executing this agreement on their own independent advice from their attorneys. This Section shall survive termination of this Agreement.

12. **RISK OF LOSS:** The parties recognize that AMT plans to demolish existing improvements on Parcel B and Lot 160. Accordingly, this Section is not intended to apply to Parcel B and Lot 160.

13. **NOTICES:** All notices, requests, demands or other communications hereunder shall be in writing and deemed to have been given only if and when hand-delivered or sent by nationally recognized overnight courier service (e.g., Federal Express, United Parcel Service) or certified or registered mail, return receipt requested, through the United States Postal Service with sufficient postage prepaid, to the parties hereto at their respective addresses set forth at the outset of this Agreement or such other address as either party shall designate by notice pursuant to this Section. Copies of all notices, requests, demands or other communications hereunder to Lender shall also be sent to their counsel, and copies of all notices, requests, demands or other communications hereunder to Rod M. Wright, 625 Lagoon Drive, Destin, Florida 32541 and, copies of all notices, requests, demands or other communications hereunder to AMT and ZTF shall also be sent to Owners, C/O Stephen Bunyard, 480 Gulf Shore Drive, Destin, Florida 32541, or such other address or addresses as the Parties may hereafter notify each other. Notices sent by hand delivery shall be effective on receipt. Notices send by mail shall be effective three business days after they are deposited with the U.S. postal system. Notices sent by overnight courier shall be effective on the next business day following the date on which they are delivered to the courier if they are set up for next day delivery.

It is expressly understood and agreed to between the parties that counsel for the Lender and Borrowers are authorized to give notice on behalf of their respective clients.

14. **FURTHER ASSURANCES:**

A.  The Parties agree that Lender shall have the right to negotiate future uses of Parcel B and Lot 160 with various governmental authorities, provided, however, Lender shall not have authority to bind Owners/Borrowers to any agreements, and any agreements with governmental authorities shall require the prior written approval of the Owners/Borrowers of the affected Property, which approval shall not be unreasonably withheld, conditioned or delayed. The parties are aware of the possible existence of certain "developer rights" that were reserved by Destin Guardian Corporation, Inc. ("**DGCI**"), the predecessor in interest to Parcel B and Lot 160. ZTF and AMT shall cooperate with Rod Wright, at the sole expense of Owners/Borrowers, with (a) the appropriate city, county, state, and national agencies (if any) for obtaining approvals for the proper permitting and development of the Parcel B and Lot 160 as contemplated by the CONSULTANT AGREEMENT referenced above, and (b) DGCI with respect to obtaining any "developer rights" under the Declaration; provided, however, that such cooperation shall not require ZTF and AMT to do anything that would affect the future development of Parcel B or Lot 160 without AMT's prior written approval. ZTF shall be required to cover the expense or liability in connection with its cooperation pursuant to this Section.

B.  In addition to the foregoing, the Parties hereto, at the time and from time to time, upon the request of any Party, agree to do, execute, acknowledge and deliver all such further deeds, assignments, transfers, conveyances, authorizations, filings, consents, and assurances, and other documents as may be reasonably required for the consummation of the transactions referred to in this Agreement.

15.  **CAPTIONS AND HEADINGS:** Captions and Section headings contained in this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement nor the intent of any provision hereof.

16.  **NO WAIVER:** No waiver of any provision of this Agreement shall be effective unless it is in writing, signed by the party against whom it is asserted and any such written waiver shall only be applicable to the specific instance to which it related and shall not be deemed to be a continuing or future waiver.

17.  **COUNTERPARTS:** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same Agreement. Acceptance by facsimile and facsimile signatures shall be deemed binding.

18.  **BINDING EFFECT:** This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, personal representatives, successors and assigns.

19.  **GOVERNING LAW:** This Agreement shall be construed and interpreted according to the internal laws of the State of Florida.

20.  **GENDER:** All terms and words used in this Agreement, regardless of the number and gender in which used, shall be deemed to include any other gender or number as the context or the use thereof may require.

21.  **INTERPRETATION:** This Agreement shall not be construed more strictly against one party than against the other merely by virtue of the fact that it may have been

prepared by counsel for one of the parties, it being recognized that **AMT, ZTF, DPRI, BUNYARD and Lender** have contributed substantially and materially to the preparation of this Agreement. Wherever used in this Agreement, "any" means "any and all"; "including" means without limitation; "indemnify" means that the indemnitor will defend, indemnify and hold the indemnitee harmless against any claims, demands, losses or liabilities asserted against or incurred by the indemnitee to any third party because of the subject matter of the indemnity; "may not" and other negative forms of the verb "may" each are prohibitory; and "will", "must" and "should" each are mandatory. Unless this Agreement expressly or necessarily requires otherwise (i) any time period measured in "days" means consecutive calendar days, except that the expiration of any time period measured in days that expires on a Saturday, Sunday or legal holiday automatically will be extended to the next day so that it is not a Saturday, Sunday or legal holiday; (ii) any action is at the sole expense of the party required to take it; (iii) the scope of any indemnity includes any costs and expenses, including reasonable attorneys' fees through all levels of proceedings incurred in defending any indemnified claim, or in enforcing the indemnity, or both.

22.    **ENTIRE AGREEMENT:** This Agreement and the Exhibits attached hereto contain the entire agreement between the parties with respect to the subject matter of this Agreement, and supersede all prior agreements between the parties with respect to the subject matter of this Agreement. There are no promises, agreements, conditions, undertaking, warranties, or representations, oral or written, express or implied between the parties other than as herein set forth. No amendment or modification of this Agreement shall be valid unless the same is in writing and signed by the parties hereto. No waiver of any of the provisions of this Agreement or any other agreement referred to herein shall be valid unless in writing and signed by the party against whom enforcement is sought.

23.    **TIME OF THE ESSENCE:** Time is of the essence in respect to this Agreement.

24.    **VENUE:** The Parties agree that the venue for any matters arising out of or in connection with this Agreement shall only be in the State or federal courts having jurisdiction over the County of Okaloosa, State of Florida.

25.    **RECORDATION OF AGREEMENT:** Neither this Agreement, nor any memorandum thereof, shall be recorded in any public records of any County, unless or until the Parties have agreed, in writing, to so do. The preceding sentence does not prohibit the recordation of deeds, assignments and mortgages executed pursuant to this Agreement.

26.    **ATTORNEYS FEES:** In connection with any litigation including appellate proceedings arising out of this Agreement, the prevailing party shall be entitled to recover from the losing party its reasonable attorneys' fees and costs incurred in enforcing its rights and remedies hereunder, including costs and expenses related thereto incurred prior to instigating litigation. The provisions in this Section shall survive termination of this Agreement.

27.    **WAIVER OF JURY TRIAL:** EACH OF THE PARTIES TO THIS AGREEMENT HEREBY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT. THIS WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY EACH PARTY AND EACH PARTY EXPRESSLY ACKNOWLEDGES THAT NEITHER THE OTHER PARTY NOR ANY PERSON ACTING ON BEHALF OF THE OTHER PARTY HAS MADE ANY REPRESENTATIONS OF FACT TO

INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. EACH PARTY ACKNOWLEDGES TO THE OTHER THAT HE HAS READ AND UNDERSTANDS THE MEANING AND EFFECT OF THIS WAIVER PROVISION.

28. **DISPUTE RESOLUTION PROCEDURES:** In the event of any dispute ("**Dispute**") arising out of or in any way related to this Agreement or any of the transactions or occurrences described or contemplated herein, the parties shall be obligated to follow the following dispute resolution procedures:

        A.      First, the Parties shall attempt to negotiate a resolution of the Dispute by direct discussions. Such negotiation shall be initiated by written demand by one Party to another, and the negotiations may occur with or without counsel, as the Parties elect.

        B.      Thereafter, any Party may give written notice to the other affected Party(ies), notifying the other affected Party(ies) that the Party giving notice has elected to submit the Dispute to binding arbitration ("**Notice of Arbitration**"). Once the Notice of Arbitration is given by one of the Parties with respect to a specified Dispute, the Parties are obligated to submit that Dispute to binding arbitration (unless and until the parties sign a written settlement of the Dispute). The decision of the arbitrator or arbitrators shall be final and binding. The parties shall first attempt to mutually agree to an arbitrator or arbitrators to decide the dispute, and the rules under which the arbitration shall proceed. In the event that they cannot do so within ten (10) days after the Notice of Arbitration is given, the arbitration shall be governed by the rules and procedures for commercial arbitration of the American Arbitration Association then in effect. The costs and expenses of arbitration shall be borne equally by the parties, except that the arbitrator may allocate such costs and expenses among the parties to the arbitration as the arbitrator deems appropriate, including requiring the losing party to pay the costs and expenses, including reasonable attorney's fees, of the prevailing party. Any award rendered by the arbitral tribunal shall be final and binding, and enforceable as a judgment upon confirmation thereof under the Florida Arbitration Code, or the Federal Arbitration Act by any court having jurisdiction. All parties to this Agreement agree that they may be served (in addition to personal service) with papers commencing any proceeding to confirm any arbitration award hereunder by either certified or registered mail, by hand delivery, or by recognized overnight courier.

29.      **ASSIGNMENT.**

        A.      Any Party may form one or more separate entities to own the membership interest(s) that such Party is entitled to receive in this Agreement.

        B.      Lender may assign this Agreement in whole, or in part, to an entity controlled in part by Rod Wright and Barbara Wright, provided that Rod Wright will continue to be involved in the projects described in this Agreement. This Agreement may not be assigned by Lender to an assignee in which Rod Wright is not involved without the prior written consent of Owners/Borrowers, which consent may be withheld in their sole discretion.

        C.      Borrowers may not transfer or mortgage the Properties or entities named in this Agreement without the knowledge and consent of the Lender and any transferee or mortgagee shall take its interest subject to the rights of Lender under this Agreement.

        D.      An assignment and assumption agreement shall be executed by the assignor and assignee with respect to any assignment of this Agreement, and a copy of that

executed assignment shall be delivered to the other Parties to this Agreement, along with notice of the assignment and notice of the name and address of the assignee. No assignment shall be binding on a Party hereto until such Party receives written notice of the assignment and a copy of the assignment.

       E.     No such assignment and assumption shall relieve any Party of its obligations under this Agreement.

## 30. SURVIVAL OF PROVISIONS:

**If any term or provision of this Agreement is deemed void, or unenforceable, by a mediator, arbitrator, or court of competent jurisdiction, then such finding shall affect only that specific term or provision, and that term or provision shall be stricken from the Agreement, and the remainder of the Agreement shall continue in full force and effect, and shall be binding on the Parties, their heirs, successors, and assigns.**

## 31. LIST OF EXHIBITS:

**EXHIBIT A:  Legal Description of Lot 160**

**EXHIBIT B:  Legal Description of Parcel B**

**EXHIBIT C:  Properties Data Required From Borrowers**

## (THE REMAINING PART OF THIS PAGE IS INTENTIONALLY LEFT BLANK)

///

///

///

///

///

///

**IN WITNESS WHEREOF**, the Parties hereto have duly executed this Agreement, as of the day and year first above written.

CONSULTANT

ROD M. WRIGHT

AMT, LLC, a Florida limited liability company

By:

Stephen Bunyard, Manager

LENDER

BARBARA J. WRIGHT

ROD M. WRIGHT

**ZTF**

ZTF Family, LP, a Missouri limited partnership

By ZTF Consulting Group, Inc., its general partner

By:

Stephen Bunyard

DESTIN POINTE REALTY, INC.

By:

Stephen Bunyard, President

BUNYARD

Stephen Bunyard

# EXHIBIT "B"

1

## COMMITMENT INTENT LETTER DATED MARCH 11, 2010

DEFTCO.CORP INTENDS TO PROVIDE THE PROJECT KNOWN AS THE FLORIDA EMERALD COAST OR DESTIN POINTE PROJECT LOCATED AT 11.77 ACRES REFERRED TO AS PARCEL B, WEST END OF HOLIDAY ISLE, OKALOOSA COUNTY, DESTIN POINTE, FLORIDA. THIS LOAN COMMITMENT INTENT OUTLINES THE GENERAL TERMS AND CONDITIONS UNDER WHICH THE LENDER WILL PROCEED.

**BORROWER:**  AMT, LLC

**LOAN TERMS:**  24 MONTHS – PREPAID INTEREST FOR 24 MONTHS (THERE WILL NOT BE ANY OTHER PAYMENTS DUE DURING THE 24 MONTHS, PRINCIPAL DUE IN 24 MONTHS.

**GUARANTORS:**  AMT, LLC

**ADDITIONAL COLLATERAL:**  NONE

**LOAN AMOUNT:**  $14,000,000. (FOURTEEN MILLION US DOLLARS) PLUS PRE-PAID INTEREST, POINTS AND CLOSING COSTS.

**INTEREST RATE:**  11.5%

**PREPAID INTEREST:**  24 MONTHS – *Subject to Page 2 of Attached Email from Joseph F. Day, CEO, which is incorporated herein by this reference. MBP*

**PREPAYMENT PENALTY:**  NONE

**POINTS PAID TO DEFTCO.CORP:**  6 PERCENT

**FUNDING DATE:**  FUNDING ESTIMATED TO BE ON OR BEFORE MARCH 30, 2010 PROVIDED THAT ALL DOCUMENTS REQUIRED TO CLOSE ESCROW AND THAT ALL CONDITIONS PRECEDENT HAVE BEEN RELEASED, APPROVED AND/OR WAIVED BY THE ESCROW HOLDER AND THAT ESCROW IS INSTRUCTED TO PROCEED TO CLOSE THIS ESCROW.

## DEFTCO.CORP

**Mailing Address:**
P.O. Box 421183
San Diego, California 92142
858-271-8900

**California Office:**
73-241 Highway 111
Palm Desert, California 92260
760-341-8225

**Nevada Office:**
723 South Casino Center Blvd.
Las Vegas, Nevada 89101
702-387-1020

**International Offices:**
Mexico
Canada

**Phone # 800-778-7802**

WORLD WIDE WEB http://www.deftco.com

Fax # 800-866-9755

2

**COLLATERAL SECURITY:** The loan shall be secured by a first mortgage on the property, an assignment of rents and profits upon the Property and a perfected security interest in ALL personal property and/ or equipment used in connection with this property. The mortgage and security interest shall constitute VALID FIRST LIENS, subject to NO other liens and or encumbrances, on the good leasehold title to subject property. No additional senior or secondary Financing will be permitted during the term of the loan, either secured or unsecured.

**DUE DILIGENCE:** Due Diligence, although may have been done, and yet may include but not limited to Lender completing, to its sole and absolute satisfaction, a complete further review of borrower's financials and credit, the property and surrounding market, title and insurance, Lender reserves the right to order and review an MAI certified appraisal, Phase I environmental report, Structural Engineering Report and any other reports deemed necessary by Lender in it's sole and absolute discretion. All reports will be paid by borrower.

**Guarantee:** 100% of the loan, plus ALL accrued interest, plus ALL costs of enforcement of the loan Plus any and all other sums due to Lender under the loan documents shall be guaranteed by **AMT, LLC** guarantors will be required to execute an environmental indemnity agreement in form and substance to the Lender. All of the above contractual arrangements are subject to the laws of the state of Florida and the state of California.

**DUE DILIGENCE MISSING:**

1. Property, filing against the property Tax ID #00-28-24-000-0022-000A to be 1st Trust Deed filing, LLC operating Articles and in good standing, business financials and taxes (2 years)

This instrument is not valid unless a copy of such commitment intent is dated, signed by Borrower, and returned to Lender with the commitment fee on or before **3/14/2010.**

1.
This Mandate is contingent upon its compliance as presently structured with all acceptable **State of California and the state of Florida** rules, regulations and statutes relative to commercial /investment financing transactions. The jurisdiction of **California** courts is acknowledged and agreed to by the Borrower. The laws of the jurisdiction shall govern all loan documents, in any way relating to this instrument, where the mortgage( and/or Property is located and all applicable laws of the **United States** of **America.**

2.
**Lender and/or Lenders** may, at any time, in its sole discretion, and without notice to or consent of Borrower, assign all of Lenders rights, title and

3

interest under this letter and pertinent loan documents.  Any and all
assignee or successor of Borrower or any subsequent assignee and
successor will be entitled to receive all right, title and interest of
Borrower under the **Lender and/or Lenders** and related loan documents.
Such assignment, without material alteration may only be given to a legal
organization operating under U.S. Laws unless approved by the Borrower.

3.   At least five (5) days prior to closing written confirmation from the title
insurer providing the specified and/or required insurance must show that it
has performed a search of all judgments, liens against the Borrower and the
general partner, if any, and the mortgaged Property.  No judgments or liens
are allowed.  Any recorded encumbrance instrument or implied
encumbrance must be fully satisfied for a funding to take place.

4.   The Parties hereto agree that this agreement and all documents, and
contracts regarding this transaction or any subsequent transaction are in
the English language.

**NOTE: There is a required Liquidated Damages fee of $5,000. due upon signing of this
Loan Commitment Intent and sent via Federal Express with delivery signatures required
or wire transfer to: DEFTCO.CORP, WELLS FARGO BANK Routing # 321270742 Account
# 2002695732, located 1121 Las Vegas Blvd., Las Vegas, NV 89104 If for any reason
DEFTCO.CORP is unable to fund or provide funding for this transaction the Liquidated
Damages fee will be refunded. If the borrower does not go forth with the funding, then the
commitment fee will be considered earned.**

THE ABOVE TERMS ARE ACCEPTABLE:

**AGREED:**   AMT, LLC ~~& ZTE FAMILY, LP~~           **DATED:** March 12, 2010

Name & Title   Michael B. Smallwood
Manager

**AGREED:**   Joseph Dau, CEO,
DEFTCO.CORP                    **DATED:** MARCH 6, 2010

## Smotkin, Howard

| | |
|---|---|
| **From:** | Stephen Bunyard [stevebunyard@sbcglobal.net] |
| **Sent:** | Tuesday, March 09, 2010 4:41 PM |
| **To:** | Stone, Steven; Smotkin, Howard; Mike Smallwood |
| **Cc:** | Jeff Burds |
| **Subject:** | Fw: Fwd: FW: Pre-Paid Interest |

----- Forwarded Message ----
**From:** Zak Freedman <zfreedman@bhcapitalgroup.com>
**To:** Stephen Bunyard <stevebunyard@sbcglobal.net>; stephenbunyard@earthlink.net
**Sent:** Tue, March 9, 2010 2:13:17 PM
**Subject:** Fwd: FW: Pre-Paid Interest

Here is the answer below to the pre paid interest concern:

Thank You,

Zak Freedman
Sr. Loan Officer
Black Hawk Capital Group

"Confidentiality Notice: This is a private communication. The information in this email and any attachments is privileged and confidential information intended only for the use of the person named as recipient. If you are not the named recipient, be advised that any unauthorized review, disclosure, reproduction, or dissemination of the contents of this message is strictly prohibited. If you have received this material in error, please delete this message and any attachments without storing it and notify the sender so that our address record can be corrected."

---------- Forwarded message ----------
From: **Steve Burington** <ocmoneyguy@yahoo.com>
Date: Tue, Mar 9, 2010 at 11:27 AM
Subject: FW: Pre-Paid Interest
To: Zak Freedman <zfreedman@bhcapitalgroup.com>

Zak,

The answer to the question is below in the body of the email that Eric sent over to Joe.
Steve B.
><>

Hello Joe,

A question came up from the Destin Pointe attorney. I think the answer is intuitively

1

obvious, however, I will ask it nevertheless.

If the loan is paid in full prior to the 24th month, is the remaining interest refunded ? In other words, is the interest due calculated on an accrued basis (pro-rata) ?

THE INTEREST COSTS ARE ADJUSTED AS TO USE OF FUNDS AND ANY OVERPAY SITUATIONS ARE CREDITED AGAINST THE FINAL PAY-OFF

Joseph F Dau, CEO

Sincerely,

DEF Holdings, LLC

Green Medical Capital Investments, LLC

Eric Petersen, General Manager

Direct 949-257-7758

Fax 949-858-2814

Email ericjpetersen@cox.net

2

# EXHIBIT "C"

**EXHIBIT A**

| *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* No. 10-MD-2179 | | | |
|---|---|---|---|
| PTO 65 VERIFIED STATEMENT REGARDING CAUSATION AND DAMAGES (B1 CLAIMS) | | | |
| Last Name | First Name | Middle Name/Maiden | Suffix |
| Business Name **AMT, LLC (as single member LLC of ZTF Family, LP)** | | Last 4 digits of Plaintiff's social security number (if individual) or full Tax ID number (if business plaintiff) **-5919** | |
| MDL 2179 Member Case Number **2:13-cv-00974** | | Attorney Name and Firm **Matt Conn** **Friedman, Dazzio, Zulanas & Bowling, P.C.** | |

All "Remaining B1 Plaintiffs" (as defined in PTO 65) must answer the questions below regarding damages and causation. Responses must be as specific and accurate as practicable and shall be given under penalty of perjury. It is a violation of PTO 65 to submit an answer that is, for example, generic, vague, evasive, or misleading. **The plaintiff (not the plaintiff's attorney) must sign and date the verification and attestation at the end of this form.** Responses shall be filed in the record for the plaintiff's **individual lawsuit** (not the master docket for MDL 2179) by no later than **April 11, 2018**.

You may attach additional pages to this form if you need extra room to answer a question. Make sure to indicate the question you are continuing to answer.

1

**Question 1:** Describe specifically the compensatory damages that you claim in your lawsuit, including the nature of the damage, the date(s) of the damage, the amount of the damage, and the calculations used to arrive at that amount.

See attached.

**Question 2:** Describe specifically the evidence you rely on to prove the damages you allege in response to Question no. 1.

<u>See attached.</u>

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

3

**Question 3:** Describe specifically how the Deepwater Horizon/Macondo Well incident and oil spill caused the damages you allege in response to Question no. 1.

**See attached.**

Question 4: Do you have at this time an expert who will opine as to any of your responses to the above questions? (Yes or No)
Yes.

By signing below, I declare and attest under penalty of perjury pursuant to 28 U.S.C. § 1746 that the answers provided to the above four questions are true and correct, and I specifically declare and attest under penalty of perjury pursuant to 28 U.S.C. § 1746 that the damages described in response to Question no. 1 were caused by the Deepwater Horizon/Macondo Well incident and oil spill.

Executed on the following date at the following location:

Date: **April 11, 2018**

Location (City and State): **St. Louis, Missouri**

Manageging Member

Signature of Plaintiff*

*Plaintiff's Attorney **Cannot** Sign on Plaintiff's Behalf. For businesses, the CEO, CFO, President, Owner, or similar senior corporate officer must sign.*

**Stephen Bunyard**

Print Name

**President/Managing Member**

Title/Position (if signed on behalf of a business or other entity)

The verified statement, must be filed into the record of the plaintiff's individual lawsuit (as opposed to the master docket for MDL 2179) no later than April 11, 2018.

5

## Question 1 – Compensatory Damages

AMT, LLC (hereinafter referred to as "AMT") was formed to obtain and develop real estate in Destin, Florida. On May 6, 2013, AMT purchased two parcels of property in Destin Pointe. As evidence, please see the "Partial Assignment of Sublease" and "Real Estate Mortgage" attached hereto as **Exhibit A**. The two parcels of property are hereinafter referred to as "Parcel B" and "Lot 160." Parcel B consists of approximately 11.77-acres (512,701 square feet) of vacant, beachfront property located just north of the Destin Pass and south of the Destin Harbor on Destin Pointe in Destin, Florida. As evidence, please see the Parcel Map for "Parcel B," attached hereto as **Exhibit B**. Lot 160 consists of .92 acre of mixed use commercial property at 480 Gulf Shore Drive in Destin, Florida. As evidence, please see the Parcel Map of "Lot 160" attached hereto as **Exhibit C**. From 2003 to 2010, Stephen Bunyard, the President and Managing Member of AMT, expended funds and time developing the properties with the intent to sell the properties, for a profit, to a developer and/or to develop the property.

### Parcel B

When Parcel B was first purchased by AMT, the property was believed to be undevelopable due to a dredging/spoils easement held by the Army Corp of Engineers (hereinafter referred to as "ACOE"). AMT hired surveyors and a land use attorney to investigate these issues and concluded that a large portion of Parcel

1

B was developable and would not be subject to the ACOE's easement. The developable area of Parcel B was zoned as high density residential, allowing for a variety of residential uses, with a maximum density allowance of 234 units. Numerous developers contacted AMT regarding acquiring the property outright and/or developing the property through a joint venture. AMT was constantly in discussions with developers and third parties with respect to developing Parcel B.

In July 2007, Parcel B was appraised at $53,600,000.00. However, due to a decline in the housing market, the property was then re-appraised in November 2009, a few months before the Oil Spill, at $28,760,000.00.

### Lot 160

When Lot 160 was purchased, the property was not zoned to where AMT could place a high-rise on the property, which was the intent of AMT. Throughout the relevant time period, Destin Pointe Realty operated its business in a building on Lot 160. AMT later received authorization to build a 10-story, 19-unit high-rise on Lot 160. Although there were multiple business plans and strategies which could have been implemented on Lot 160, the prevailing business model/strategy was to build a high-rise on the property. This high-rise would have housed Destin Pointe Realty on the ground floor. Then, the remaining portion of the building was going to be either (a) a medical facility or (b) condominiums. AMT was in discussions

2

with a high profile orthopedic practice that was going to lease the remainder, or a large portion of the remainder, of the building as its rehab facility.

In November 2009, Lot 160 was appraised for $1,640,000. The appraisal on the property did not take into account the authorization for a high-rise building. AMT's representative, Stephen Bunyard, believes the appraisal would have been at least 3 to 4 times the original appraised amount with the authorization to build the high-rise included in the development potential of the appraisal. To AMT's knowledge and belief, no appraisal has been conducted on the property for AMT taking into account the authorization for a high-rise.

### Financing

From the early 2000s to 2010, AMT's loan and credit line with Jefferson Bank and Trust Company (hereinafter referred to as "Jefferson Bank") grew to approximately $4.5 Million Dollars. In early 2010, Jefferson Bank informed AMT that it would call the note due. In preparation for this, AMT sought refinancing. Prior to the *Deepwater Horizon* Oil Spill, AMT received a financing commitment in the amount of $14 Million Dollars from Deftco.Corp (hereinafter referred to as "Deftco") to proceed with the Destin Pointe development on the subject property. As evidence, see the March 11, 2010 Commitment Intent Letter from Deftco, attached hereto as **Exhibit D**.

3

On April 20, 2010, the *Deepwater Horizon* Oil Spill began spewing millions of gallons of oil into the Gulf of Mexico. The funding from Deftco was to be provided on or before June 10, 2010. Prior to this date, as a result of the Oil Spill and the uncertainty surrounding the long-term negative impact of the Oil Spill, the financing commitment to be provided from Deftco to AMT for the Destin Pointe development project was cancelled. AMT attempted, in earnest, to obtain replacement financing to proceed with the Destin Pointe development project after the initial commitments were cancelled, but due to the ongoing uncertainty surrounding the long-term negative impact of the Oil Spill, AMT was unable to obtain replacement financing for the project.

On June 4, 2010, Jefferson Bank filed a "Notice of Lis Pendens" instituting a foreclosure action against the subject properties. As evidence, please see the "Notice of Lis Pendens" attached hereto as **Exhibit E**. On April 7, 2011, the Okaloosa County, Florida Circuit Court entered a final judgment in favor of Jefferson Bank against AMT in the amount of $4,892,231.19. As evidence, please see the "Final Summary Judgment" attached hereto as **Exhibit F**.

## Damage Calculation

AMT's damage is based on the current and best information available to AMT at this time. If any of the values or lost profit calculations are revised, based on further discovery or investigation in the ordinary course of litigation, then AMT

will revise the calculation accordingly. If litigation proceeds, AMT's damage calculation will be more fully developed by its experts and may include damages and a damage model for the lost profits from the potential development of the Destin Pointe project directly by AMT.[1]

At the time of the spill, the value of Parcel B was $28,760,000 and the value of Lot 160 was approximately $6,560,000 ($1,640,000 x 4) for a total property value of approximately $35,320,000. AMT owed approximately $4.9 Million Dollars on the property at the time of foreclosure. Therefore, AMT's compensatory damages for lost profits amount to **$30,420,000** as a direct result of the *Deepwater Horizon* Oil Spill.[2]

---

[1] At this time, a damage model has not been developed on the loss of development potential on the properties, assuming AMT would have developed the property itself, instead of selling the property to a developer. The development potential of these properties was much higher than the appraised values of the properties. AMT reserves the right to develop this damage model more fully in the future as the litigation proceeds.

[2] This amount does not take into account any other damages, including but not limited to interest, penalties, punitive damages, etc.

5

**Question 2 – Evidence**

AMT relies on the following evidence:

1. **Property Ownership Documents** – [See Exhibit A].
2. **Parcel Maps** – [See Exhibits B and C].
3. **Surveys, Maps, Sketches** – Showing potential development strategies.
4. **Appraisals** – The appraisals establish the values of the property, prior to the Oil Spill. Further, the difference between the 2007 and 2009 appraisals on Parcel B shows and takes into account the effect of the real estate market decline on the property, isolating the effect of the Oil Spill.
5. **Commitment Intent Letter Dated March 11, 2010** – [See Exhibit D]. The Commitment Intent Letter definitively establishes that AMT had financing for its Destin Pointe project prior to the Oil Spill, which would have prevented the eventual foreclosure of the property. The Commitment Intent Letter also establishes and supports the value of the property.
6. **Notice of Lis Pendens** – [See Exhibit E]. The Notice of Lis Pendens filed on June 4, 2010 was a direct result of the cancellation of the loan financing from DeftCo, which was caused by the *Deepwater Horizon* Oil Spill.
7. **Final Summary Judgment** – [See Exhibit F]. The Final Summary Judgment shows the final amount owed by AMT to Jefferson Bank, establishing the fact that AMT could not have sold the property, post-spill, for more than $4.9 million.
8. **Letter from Joseph F Dau, CEO of DeftCo** – [See Exhibit G]. This letter definitively proves and establishes DeftCo would have provided the $14 million in funding to AMT but for the *Deepwater Horizon* Oil Spill. Mr. Dau definitively states the *Deepwater Horizon* Oil Spill is the sole reason for the cancellation of the financing for AMT's Destin Pointe project.
9. **Tax Returns/Financial Documents**
10. **Correspondence Related to All Aspects of the Destin Pointe Project**
11. **Coast Guard Investigation of Oil From the *Deepwater Horizon* Oil Spill** – The Coast Guard's investigative materials will be used to show that oil from the *Deepwater Horizon* Oil Spill was caused to be placed on Parcel B.
12. **Evidence Obtained/Developed in MDL 2179** – AMT will utilize all of the evidence and discovery obtained and developed in the MDL proceedings, where AMT is a member of MDL 2179.

## Question 3 – Causation

The *Deepwater Horizon* Oil Spill had a devastating impact on the Gulf Coast causing a high percentage of potential tourists to have ongoing concerns about the health impacts of exposure to the oil in the Gulf waters and consumption of Gulf seafood, resulting in potential tourists visiting alternative markets without the specter of contamination. This caused a ripple effect throughout the entire Gulf Areas, which affected every aspect of business on or near the Gulf of Mexico, including a halt on development in the region. Financing for developments on the Gulf Coast became non-existent.

The property owned by AMT was directly on and/or adjacent to the Gulf of Mexico in one of the most highly traveled tourist destinations in the Florida panhandle. The entryway into Destin basically dead-ends into Parcel B. Oil from the *Deepwater Horizon* Oil Spill was directly deposited on AMT's property and in the surrounding waters. Therefore, AMT can sustain claims under the Oil Pollution Act *and* under *Robins Dry Dock*, which allows for punitive damages.

At the time of the Oil Spill, AMT had just secured a financing agreement with DeftCo to refinance its loan with Jefferson Bank, which had become due. In the "Commitment Intent Letter" dated March 11, 2010, DeftCo pledged funds in the amount of $14 million to AMT. The financing was to be provided on or before June 10, 2010. However, in the interim, the *Deepwater Horizon* Oil Spill occurred on April 20, 2010. After the spill, the financing from DeftCo was cancelled with DeftCo citing the *Deepwater Horizon* Oil Spill as the reason for cancellation.

After the Oil Spill, the CEO of DeftCo, Joseph F Dau, drafted a letter explaining the cancellation of the financing to AMT for the Destin Point development project. As evidence, please see the Letter dated September 28, 2011 attached hereto as **Exhibit G**. In the letter, Mr. Dau explains that DeftCo "had the money in place for this project" up until the effects of the Oil Spill became apparent. However, DeftCo was forced to reconsider and cancel the loan financing "based upon the BP oil spill and its consequences." Mr. Dau also cites the "long term environmental impact, health and safety impact issues, loss of reputation as a vacation destination as well as many other underwriting issues" as reasoning for cancelling the financing, adding these were "all caused by the BP spill."

With respect to Parcel B, there was a Pre-Spill appraisal in the amount of $28,760,000 on the property, which was conducted only months before the Oil Spill. However, after the Oil Spill, the property was foreclosed on by Jefferson Bank, with a Final Summary Judgement showing AMT owed Jefferson Bank approximately $4.9 Million. This definitively proves the properties could not be sold for more than $4.9 Million, or else AMT would have sold the properties to avoid the foreclosure. There were no other factors or intervening causes for AMT's losses. The decrease in amount from the 2007 appraisal ($53,600,000) and the 2009 appraisal ($28,760,000) on Parcel B had already taken into account the effects of the economy/housing market decline. Furthermore, the short timeframe between the appraisal, the loan commitment, the Oil Spill, the cancellation of the loan commitment, and the foreclosure establish that the only cause of AMT's damages could have been the *Deepwater Horizon* Oil Spill.

Exhibit A

This Document Prepared By:
A. ALAN MANNING, Esq.
Clark, Partington, Hart, Larry,
 Bond & Stackhouse
Post Office Box 13010
Pensacola, Florida 32591-3010
(850) 434-9200

```
                    ┌─────────────────────────────────────┐
                    │    ** OFFICIAL RECORDS **           │
                    │       BK 2434  PG 4987              │
                    │                                     │
                    │  FILE # 2013390  RCD: May 06 2003 @ 07:28AM │
                    │  Newman C. Brackin, Clerk, Okaloosa Cnty Fl │
                    │                                     │
                    │                                     │
                    │  Deed Doc Stamps    $7,000.00  D.C. ___ │
                    └─────────────────────────────────────┘
```

Parcel ID: 24-2S-000-1100000-160-0
                  and
          24-2S-000-00000-220-00A

## PARTIAL ASSIGNMENT OF SUBLEASE

    WHEREAS, **DESTIN GUARDIAN CORPORATION**, a Florida corporation, whose mailing address is 111 Center, Suite 1600, Little Rock, Arkansas 72201, hereinafter called "Assignor", desires to quitclaim, assign and transfer all of its right, title and interest in and to the real property described herein below to **AMT, L.L.C.**, a Florida limited liability company,  whose mailing address is 718 Highway 98, Destin, Florida 32541, hereinafter called "Assignee", and Assignees desire to accept this Assignment.

    NOW THEREFORE, KNOW ALL MEN BY THESE PRESENTS, that Assignor, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration to them paid aby the above Assignees, the receipt and sufficiency of which is hereby acknowledged, do hereby quitclaim, grant and assign to the aforesaid Assignees and their assigns, all of their right, title and interest in that certain property in Okaloosa County, Florida, more particularly described as follows:

### SEE EXHIBIT "A" ATTACHED HERETO AND INCORPORATED HEREIN

and in any Lease, Sublease, Partial Assignment or other leasehold document pertaining to the property above described and as to which the Assignor has any interest (collectively, the "Leases").

    TO HAVE AND TO HOLD the said premises unto the Assignees, their successors and assigns, for and during the full term and period of said Leases and any renewal periods, unless sooner terminated, upon the terms and condition set forth below.

-1-

1. This Assignment is made subject to any and all restrictive covenants, lease conditions, and other matters of record affecting the above-described real estate and leasehold interest therein, according to documents heretofore recorded in the Public Records of Okaloosa County, Florida, and real property taxes accruing for the year 2003 and subsequent years.

2. By acceptance hereof, Assignees covenant that they will perform all of the terms and conditions under the recorded Leases as they relate to the subject property.

3. Assignor warrants that it is well seized of a leasehold estate in the said property and has a good right to assign and convey the same; that said property is free from encumbrances except as set forth in Section 1 above, that Assignee, its successors and assigns, shall have the peaceable and quiet possession thereof, and that Assignor, its successors and assigns, shall fully warrant the title to said property and will defend the same against the lawful claims of all persons whomsoever.

IN WITNESS WHEREOF, Assignor has executed this instrument effective this _24th_ day of April, 2003.

SIGNED, SEALED AND DELIVERED
IN THE PRESENCE OF:

** OFFICIAL RECORDS **
BK 2434  PG 4988

WITNESS:
Print Name: Annette Herrington

DESTIN GUARDIAN CORPORATION,
a Florida corporation

WITNESS:
Print Name: Christopher R. Kent

By:
Name: Phil L. Herrington
Title: President

-2-

STATE OF Florida
COUNTY OF Okaloosa

The foregoing instrument was acknowledged before me this /st day of May, 2003, by Phil L. Herrington, the President of Destin Guardian Corporation, a Florida corporation, on behalf of the corporation. He (X) is personally known to me or ( ) has produced a driver license as identification.



Sandra Stephens Truman
MY COMMISSION # DD144555 EXPIRES
September 11, 2006
BONDED THRU TROY FAIN INSURANCE, INC.

Sandra Stephens Truman
Sandra Stephens Truman
(Print/Type Name)
NOTARY PUBLIC
Commission number:_____
My Commission expires:_____

(SEAL)

** OFFICIAL RECORDS **
BK 2434 PG 4989

-3-

EXHIBIT "A"

PARCEL I:

**LEGAL DESCRIPTION:** (PREPARED BY UNDERSIGNED)
LOT 160, DESTIN POINTE, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 14, PAGES 90-93, OF THE PUBLIC RECORDS OF OKALOOSA COUNTY, FLORIDA. BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGIN AT THE SOUTHERNMOST CORNER OF SAID LOT 160, SAID POINT LYING ON THE NORTHERLY RIGHT OF WAY LINE OF MELROSE AVENUE (44 FOOT PRIVATE RIGHT OF WAY); THENCE NORTH 81 DEGREES 39 MINUTES 05 SECONDS EAST ALONG SAID RIGHT OF WAY A DISTANCE OF 36.82 FEET TO A POINT OF CURVATURE OF A CIRCULAR CURVE TO THE LEFT; THENCE ALONG SAID RIGHT OF WAY LINE AND SAID CURVE TO THE LEFT (RADIUS = 106.79 FEET, CHORD = 95.50 FEET, CHORD BEARING = NORTH 55 DEGREES 05 MINUTES 25 SECONDS EAST, DELTA = 53 DEGREES 07 MINUTES 21 SECONDS) A DISTANCE OF 99.01 FEET TO A POINT OF COMPOUND CURVATURE OF A CIRCULAR CURVE TO THE LEFT; THENCE ALONG THE WESTERLY RIGHT OF WAY LINE OF WAVERLY CIRCLE (44 FOOT PRIVATE RIGHT OF WAY) AND SAID CURVE TO THE LEFT (RADIUS = 435.00 FEET, CHORD = 177.19 FEET, CHORD BEARING = NORTH 16 DEGREES 46 MINUTES 39 SECONDS EAST, DELTA = 23 DEGREES 30 MINUTES 10 SECONDS) A DISTANCE OF 178.44 FEET TO A POINT OF COMPOUND CURVATURE OF A CIRCULAR CURVE TO THE LEFT; THENCE ALONG SAID RIGHT OF WAY LINE AND SAID CURVE TO THE LEFT (RADIUS = 175.62 FEET, CHORD = 75.57 FEET, CHORD BEARING = NORTH 07 DEGREES 23 MINUTES 55 SECONDS WEST, DELTA = 24 DEGREES 50 MINUTES 59 SECONDS) A DISTANCE OF 76.12 FEET; THENCE SOUTH 70 DEGREES 44 MINUTES 25 SECONDS WEST A DISTANCE OF 101.01 FEET; THENCE SOUTH 17 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 16.00 FEET; THENCE SOUTH 87 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 28.00 FEET; THENCE SOUTH 51 DEGREES 30 MINUTES 00 SECONDS WEST A DISTANCE OF 18.00 FEET; THENCE SOUTH 05 DEGREES 00 MINUTES 00 SECONDS EAST A DISTANCE OF 26.00 FEET; THENCE SOUTH 22 DEGREES 13 MINUTES 40 SECONDS WEST A DISTANCE OF 126.67 FEET; THENCE SOUTH 17 DEGREES 30 MINUTES 00 SECONDS EAST A DISTANCE OF 105.00 FEET TO THE POINT OF BEGINNING. THE ABOVE DESCRIBED PARCEL CONTAINS 0.904 ACRES, MORE OR LESS, AND IS SUBJECT TO A 15 FOOT WIDE DRAINAGE EASEMENT LYING ON THE NORTHERLY PORTION OF THE ABOVE DESCRIBED LOT AS REFLECTED ON THE FACE OF SAID PLAT.

**## OFFICIAL RECORDS ##**
**BK 2434  PG 4990**

Page 1 of 2

** OFFICIAL RECORDS **
BK 2434 PG 4991

EXHIBIT "A"   (continued)

Parcel II:

COMMENCE AT THE NORTHWEST CORNER OF DESTIN POINTE, A PLANNED UNIT DEVELOPMENT OF A PORTION OF HOLIDAY ISLE, DESTIN, UNDIVIDED TOWNSHIP 2 SOUTH, RANGE 23 WEST, OKALOOSA COUNTY, FLORIDA AS RECORDED IN PLAT BOOK 14 AT PAGES 90 THROUGH 93 OF THE PUBLIC RECORDS OF OKALOOSA COUNTY, FLORIDA; THENCE PROCEED SOUTH 23 DEGREES 31 MINUTES 00 SECONDS WEST ALONG THE WEST LINE OF SAID DESTIN POINTE A DISTANCE OF 439.95 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE ALONG SAID WEST LINE OF DESTIN POINT THE FOLLOWING BEARINGS AND DISTANCES; SOUTH 23 DEGREES 31 MINUTES 00 SECONDS WEST, 218.94 FEET; NORTH 66 DEGREES 29 MINUTES 00 SECONDS WEST, 44.00 FEET; SOUTH 23 DEGREES 31 MINUTES 00 SECONDS WEST, 304.00 FEET; SOUTH 66 DEGREES 29 MINUTES 00 SECONDS EAST, 32.00 FEET; SOUTH 23 DEGREES 31 MINUTES 00 SECONDS WEST 346.24 FEET TO A POINT ON THE NORTH LINE OF AN EXISTING POND AS SHOWN ON THE AFORESAID PLAT OF DESTIN POINTE; THENCE DEPARTING SAID WEST LINE OF DESTIN POINTE, PROCEED ALONG THE NORTH LINE OF SAID POND THE FOLLOWING BEARINGS AND DISTANCES; NORTH 40 DEGREES 45 MINUTES 59 SECONDS WEST, 67.30 FEET; NORTH 80 DEGREES 30 MINUTES 02 SECONDS WEST 51.90 FEET; SOUTH 48 DEGREES 24 MINUTES 40 SECONDS WEST, 38.52; SOUTH 09 DEGREES 21 MINUTES 49 SECONDS WEST, 43.88 FEET; THENCE DEPARTING SAID NORTH LINE PROCEED NORTH 32 DEGREES 29 MINUTES 00 SECONDS WEST A DISTANCE OF 797.93 FEET; THENCE PROCEED NORTH 23 DEGREES 31 MINUTES 00 SECONDS EAST A DISTANCE OF 367.44 FEET; THENCE PROCEED SOUTH 60 DEGREES 26 MINUTES 29 SECONDS EAST A DISTANCE OF 400.00 FEET; THENCE PROCEED NORTH 23 DEGREES 31 MINUTES 00 SECONDS EAST A DISTANCE OF 200.00 FEET; THENCE PROCEED SOUTH 60 DEGREES 26 MINUTES 29 SECONDS EAST A DISTANCE OF 394.41 FEET TO THE POINT OF BEGINNING, LYING IN AND BEING A PORTION OF HOLIDAY ISLE, DESTIN, UNDIVIDED TOWNSHIP 2 SOUTH, RANGE 23 WEST, OKALOOSA COUNTY, FLORIDA AND CONTAINS 11.77 ACRES MORE OR LESS.

42.00
3500.00
2000.00

This document was prepared by   JEFFERSON BANK AND TRUST
COMPANY
State of Florida's Documentary Stamp Tax required by law in
the amount of $ _____ has been paid to the Clerk of
the Circuit Court (or the County Comptroller, if applicable) for
the County of UKALOOSA _____, State of Florida.

## ** OFFICIAL RECORDS **
BK 2434 PG 4992

FILE # 2013391   RCD: May 06 2003 @ 07:28AM
Newman C. Brackin, Clerk, Okaloosa Cnty Fl

☒ IF CHECKED, THIS IS A BALLOON MORTGAGE AND THE FINAL PRINCIPAL PAYMENT OR THE PRINCIPAL
BALANCE DUE UPON MATURITY IS APPROXIMATELY $ 768,690.30 _____ , TOGETHER WITH ACCRUED
INTEREST, IF ANY, AND ALL ADVANCEMENTS MADE BY THE MORTGAGEE UNDER THE TERMS OF THIS
MORTGAGE.
☐ IF CHECKED, THIS BALLOON MORTGAGE SECURES A VARIABLE RATE OBLIGATION AND THE BALANCE DUE
ASSUMES THAT THE INITIAL RATE OF INTEREST APPLIES FOR THE ENTIRE TERM OF THE MORTGAGE. THE
ACTUAL BALANCE DUE UPON MATURITY MAY VARY DEPENDING ON CHANGES IN THE RATE OF INTEREST.

———————— State of Florida ———————————— Space Above This Line For Recording Data ————

# REAL ESTATE MORTGAGE
(With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Mortgage is ____ April 24, 2003 _____ and the parties and their addresses
are as follows:
   MORTGAGOR: AMT, L.L.C. A FLORIDA LIMITED LIABILITY COMPANY
   718 US HIGHWAY 98
   DESTIN, FL 32541

   Mortgage Doc Stamps    $3,500.00
   Intangible Tax    $2,000.00   D.C

   ☐ Refer to the Addendum which is attached and incorporated herein for additional Mortgagors.
   LENDER: JEFFERSON BANK AND TRUST COMPANY
   Organized and existing under the laws of the United States of America
   12501 OLIVE BLVD.
   SAINT LOUIS, MO 63141

2. **MORTGAGE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure
the Secured Debt (hereafter defined), Mortgagor grants, bargains, conveys and mortgages to Lender the following
described property: LEGAL DESCRIPTION AS EXHIBIT "A" ATTACHED AS PAGE 9

The property is located in _____ OKALOOSA _____ at ___ 480 GULF SHORE _____
                                              (County)
_____ DRIVE _____ , _____ DESTIN _____ , Florida ___ 32541 ____
        (Address)                                  (City)                          (Zip Code)

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber, all
diversion payments or third party payments made to crop producers, and all existing and future improvements,
structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described
above (all referred to as "Property"). The term Property also includes, but is not limited to, any and all water wells,
water, ditches, reservoirs, reservoir sites and dams located on the real estate and all riparian and water rights associated
with the Property, however established.

FLORIDA - AGRICULTURAL/COMMERCIAL REAL ESTATE SECURITY INSTRUMENT (NOT FOR FNMA, FHLMC, FHA OR VA USE, AND NOT FOR CONSUMER PURPOSES)   (page 1 of 8)
                                                                                                            9
Expere⊥ © 1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO RESI FL 4/24/2002

## OFFICIAL RECORDS ##
BK 2434  PG 4993

3. **SECURED DEBT DEFINED.** The term "Secured Debt" includes, but is not limited to, the following:

    A. The initial indebtedness secured by this Mortgage is the debt incurred under the terms of all promissory note(s), contract(s), guaranty(ies) or other evidence of debt described below and all extensions, renewals, modifications or substitutions *(When referencing the debts below it is suggested that you include items such as borrowers' names, note amounts, interest rates, maturity dates, etc.)*:

    AMT L.L.C., FLORIDA LIMITED LIABILITY COMPANY

    NOTE AMOUNT:$1,000,000.00

    MATURITY DATE:    April 24, 2006

    B. All future advances made within 20 years from the date of this Mortgage from Lender to Mortgagor or other future obligations of Mortgagor to Lender pursuant to Section 4 of this Mortgage under any promissory note, contract, guaranty, or other evidence of debt existing now or executed after this Mortgage whether or not this Mortgage is specifically referred to in the evidence of debt.

    C. All obligations Mortgagor owes to Lender, which now exist or may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Mortgagor and Lender.

    D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Mortgage, plus interest at the highest rate in effect, from time to time, as provided in the Evidence of Debt.

    E. Mortgagor's performance under the terms of any instrument evidencing a debt by Mortgagor to Lender and any Mortgage securing, guarantying, or otherwise relating to the debt.

If more than one person signs this Mortgage as Mortgagor, each Mortgagor agrees that this Mortgage will secure all future advances and future obligations described above that are given to or incurred by any one or more Mortgagor, or any one or more Mortgagor and others. This Mortgage will not secure any other debt if Lender fails, with respect to such other debt, to make any required disclosure about this Mortgage or if Lender fails to give any required notice of the right of rescission.

4. **MAXIMUM OBLIGATION LIMIT; FUTURE ADVANCES.** The total principal amount of the Secured Debt (hereafter defined) secured by this Mortgage at any one time shall not exceed $ 1,000,000.00 . This limitation of amount does not include interest, loan charges, commitment fees, brokerage commissions, attorneys' fees and other charges validly made pursuant to this Mortgage and does not apply to advances (or interest accrued on such advances) made under the terms of this Mortgage to protect Lender's security and to perform any of the covenants contained in this Mortgage. Future advances are contemplated and, along with other future obligations, are secured by this Mortgage even though all or part may not yet be advanced. Nothing in this Mortgage, however, shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment would need to be agreed to in a separate writing.

5. **PAYMENTS.** Mortgagor agrees to make all payments on the Secured Debt when due and in accordance with the terms of the Evidence of Debt or this Mortgage.

6. **WARRANTY OF TITLE.** Mortgagor covenants that Mortgagor is lawfully seized of the estate conveyed by this Mortgage and has the right to grant, bargain, convey, sell, and mortgage the Property and warrants that the Property is unencumbered, except for encumbrances of record.

7. **CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Mortgage. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses which Mortgagor may have against parties who supply labor or materials to improve or maintain the Property.

8. **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property and that may have priority over this Mortgage, Mortgagor agrees:

    A. To make all payments when due and to perform or comply with all covenants.

    B. To promptly deliver to Lender any notices that Mortgagor receives from the holder.

    C. Not to make or permit any modification or extension of, and not to request or accept any future advances under any note or agreement secured by, the other mortgage, deed of trust or security agreement unless Lender consents in writing.

*(page 2 of 8)*

9

** OFFICIAL RECORDS **
BK 2434 PG 4994

9. **DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of any lien, encumbrance, transfer, or sale, or contract for any of these on the Property. However, if the Property includes Mortgagor's residence, this section shall be subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable. For the purposes of this section, the term "Property" also includes any interest to all or any part of the Property. This covenant shall run with the Property and shall remain in effect until the Secured Debt is paid in full and this Mortgage is released.

10. **TRANSFER OF AN INTEREST IN THE MORTGAGOR.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Lender may demand immediate payment if (1) a beneficial interest in Mortgagor is sold or transferred; (2) there is a change in either the identity or number of members of a partnership or similar entity; or (3) there is a change in ownership of more than 25 percent of the voting stock of a corporation or similar entity. However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Mortgage.

11. **ENTITY WARRANTIES AND REPRESENTATIONS.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Mortgagor makes to Lender the following warranties and representations which shall be continuing as long as the Secured Debt remains outstanding:

   A. Mortgagor is an entity which is duly organized and validly existing in the Mortgagor's state of incorporation (or organization). Mortgagor is in good standing in all states in which Mortgagor transacts business. Mortgagor has the power and authority to own the Property and to carry on its business as now being conducted and, as applicable, is qualified to do so in each state in which Mortgagor operates.

   B. The execution, delivery and performance of this Mortgage by Mortgagor and the obligation evidenced by the Evidence of Debt are within the power of Mortgagor, have been duly authorized, have received all necessary governmental approval, and will not violate any provision of law, or order of court or governmental agency.

   C. Other than disclosed in writing Mortgagor has not changed its name within the last ten years and has not used any other trade or fictitious name. Without Lender's prior written consent, Mortgagor does not and will not use any other name and will preserve its existing name, trade names and franchises until the Secured Debt is satisfied.

12. **PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor will give Lender prompt notice of any loss or damage to the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor will not initiate, join in or consent to any change in any private restrictive covenant, zoning ordinance or other public or private restriction limiting or defining the uses which may be made of the Property or any part of the Property, without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims, and actions against Mortgagor or any other owner made under law or regulation regarding use, ownership and occupancy of the Property. Mortgagor will comply with all legal requirements and restrictions, whether public or private, with respect to the use of the Property. Mortgagor also agrees that the nature of the occupancy and use will not change without Lender's prior written consent.

   No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Mortgage. Mortgagor shall not partition or subdivide the Property without Lender's prior written consent. Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Any inspection of the Property shall be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

13. **AUTHORITY TO PERFORM.** If Mortgagor fails to perform any of Mortgagor's duties under this Mortgage, or any other mortgage, deed of trust, security agreement or other lien document that has priority over this Mortgage, Lender may, without notice, perform the duties or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may do whatever is necessary to protect Lender's security interest in the Property. This may include completing the construction.

   Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Mortgage. Any amounts paid by Lender for insuring, preserving or otherwise protecting the Property and Lender's security interest will be due on demand and will bear interest from the date of the payment until paid in full at the interest rate in effect from time to time according to the terms of the Evidence of Debt.

14. **CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** If the Property includes a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

Experl © 1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO RESI FL 4/24/2002

## OFFICIAL RECORDS ##
BK 2434 PG 4995

**15. DEFAULT.** Mortgagor will be in default if any of the following occur:
- A. Any party obligated on the Secured Debt fails to make payment when due;
- B. A breach of any term or covenant in this Mortgage, any prior mortgage or any construction loan agreement, security agreement or any other document evidencing, guarantying, securing or otherwise relating to the Secured Debt;
- C. The making or furnishing of any verbal or written representation, statement or warranty to Lender that is false or incorrect in any material respect by Mortgagor or any person or entity obligated on the Secured Debt;
- D. The death, dissolution, or insolvency of, appointment of a receiver for, or application of any debtor relief law to, Mortgagor or any person or entity obligated on the Secured Debt;
- E. A good faith belief by Lender at any time that Lender is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment is impaired or the value of the Property is impaired;
- F. A material adverse change in Mortgagor's business including ownership, management, and financial conditions, which Lender in its opinion believes impairs the value of the Property or repayment of the Secured Debt; or
- G. Any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

**16. REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure, mediation notices or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Mortgage in a manner provided by law if this Mortgagor is in default.

At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the Evidence of Debt, other evidences of debt, this Mortgage and any related documents. All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether expressly set forth or not. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require full and complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

**17. EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Mortgagor agrees to pay all of Lender's expenses if Mortgagor breaches any covenant in this Mortgage. Mortgagor will also pay on demand all of Lender's expenses incurred in collecting, insuring, preserving or protecting the Property or in any inventories, audits, inspections or other examination by Lender in respect to the Property. Mortgagor agrees to pay all costs and expenses incurred by Lender in enforcing or protecting Lender's rights and remedies under this Mortgage, including, but not limited to, reasonable attorneys' fees, court costs, and other legal expenses. Once the Secured Debt is fully and finally paid, Lender agrees to release this Mortgage and Mortgagor agrees to pay for any recordation costs. All such amounts are due on demand and will bear interest from the time of the advance at the highest rate in effect, from time to time, as provided in the Evidence of Debt and as permitted by law.

**18. ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) "Environmental Law" means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) "Hazardous Substance" means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law. Mortgagor represents, warrants and agrees that, except as previously disclosed and acknowledged in writing:
- A. No Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.
- B. Mortgagor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.
- C. Mortgagor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor will take all necessary remedial action in accordance with Environmental Law.
- D. Mortgagor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Mortgagor or any tenant of any Environmental Law. Mortgagor will immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

Expere © 1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-FL 4/24/2002

## OFFICIAL RECORDS ##
BK 2434 PG 4996

E. Mortgagor and every tenant have been, are and shall remain in full compliance with any applicable Environmental Law.

F. There are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

G. Mortgagor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

H. Mortgagor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Mortgagor and any tenant are in compliance with applicable Environmental Law.

I. Upon Lender's request and at any time, Mortgagor agrees, at Mortgagor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

J. Lender has the right, but not the obligation, to perform any of Mortgagor's obligations under this section at Mortgagor's expense.

K. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Mortgagor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Mortgage and in return Mortgagor will provide Lender with collateral of at least equal value to the Property secured by this Mortgage without prejudice to any of Lender's rights under this Mortgage.

L. Notwithstanding any of the language contained in this Mortgage to the contrary, the terms of this section shall survive any foreclosure or satisfaction of this Mortgage regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

19. **CONDEMNATION.** Mortgagor will give Lender prompt notice of any action, real or threatened, by private or public entities to purchase or take any or all of the Property, including any easements, through condemnation, eminent domain, or any other means. Mortgagor further agrees to notify Lender of any proceedings instituted for the establishment of any sewer, water, conservation, ditch, drainage, or other district relating to or binding upon the Property or any part of it. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims and to collect and receive all sums resulting from the action or claim. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Mortgage. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

20. **INSURANCE.** Mortgagor agrees to maintain insurance as follows:

A. Mortgagor shall keep the improvements now existing or hereafter built on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt. The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld. If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Mortgage.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "lender loss payee clause." Mortgagor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Mortgagor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Mortgagor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Mortgagor.

Unless Lender and Mortgagor otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the Secured Debt, whether or not then due, with any excess paid to Mortgagor. If Mortgagor abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay the Secured Debt whether or not then due. The 30-day period will begin when the notice is given.

Experts © 1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-FL 4/24/2002

** OFFICIAL RECORDS **
BK 2434 PG 4997

Unless Lender and Mortgagor otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of scheduled payments or change the amount of the payments. If the Property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

B. Mortgagor agrees to maintain comprehensive general liability insurance naming Lender as an additional insured in an amount acceptable to Lender, insuring against claims arising from any accident or occurrence in or on the Property.

C. Mortgagor agrees to maintain rental loss or business interruption insurance, as required by Lender, in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing), under a form of policy acceptable to Lender.

21. **NO ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

22. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Mortgagor will provide to Lender upon request, any financial statement or information Lender may deem necessary. Mortgagor warrants that all financial statements and information Mortgagor provides to Lender are, or will be, accurate, correct, and complete. Mortgagor agrees to sign, deliver, and file as Lender may reasonably request any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Mortgage and Lender's lien status on the Property. If Mortgagor fails to do so, Lender may sign, deliver, and file such documents or certificates in Mortgagor's name and Mortgagor hereby irrevocably appoints Lender or Lender's agent as attorney in fact to do the things necessary to comply with this section.

23. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Mortgage are joint and individual. If Mortgagor signs this Mortgage but does not sign the Evidence of Debt, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debt and Mortgagor does not agree to be personally liable on the Secured Debt. Mortgagor agrees that Lender and any party to this Mortgage may extend, modify or make any change in the terms of this Mortgage or the Evidence of Debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Mortgage. The duties and benefits of this Mortgage shall bind and benefit the successors and assigns of Mortgagor and Lender.

If this Mortgage secures a guaranty between Lender and Mortgagor and does not directly secure the obligation which is guarantied, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation including, but not limited to, anti-deficiency or one-action laws.

24. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Mortgage is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Mortgage is complete and fully integrated. This Mortgage may not be amended or modified by oral agreement. Any section or clause in this Mortgage, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section or clause of this Mortgage cannot be enforced according to its terms, that section or clause will be severed and will not affect the enforceability of the remainder of this Mortgage. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Mortgage are for convenience only and are not to be used to interpret or define the terms of this Mortgage. Time is of the essence in this Mortgage.

25. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Mortgage, or to any other address designated in writing. Notice to one mortgagor will be deemed to be notice to all mortgagors.

26. **WAIVERS.** Except to the extent prohibited by law, Mortgagor hereby waives and releases any and all rights and remedies Mortgagor may now have or acquire in the future relating to: homestead, redemption, reinstatement, appraisement and marshalling of liens and assets.

27. **WAIVER OF JURY TRIAL. To the extent not prohibited by law, Mortgagor and Lender knowingly and intentionally waive the right, which the party may have, to a trial by jury with respect to any litigation arising from the Secured Debt, or any other agreement executed in conjunction with the Evidence of Debt and this Mortgage. Mortgagor and Lender each acknowledge that this section has either been brought to the attention of each party's legal counsel or that each party had the opportunity to do so.**

Experts™ © 1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-FL 4/24/2002

## ** OFFICIAL RECORDS **
## BK 2434 PG 4998

**28. U.C.C. PROVISIONS.** If checked, the following are applicable to, but do not limit, this Mortgage:

☐ **Construction Loan.** This Mortgage secures an obligation incurred for the construction of an improvement on the Property.

☒ **Fixture Filing.** Mortgagor grants to Lender a security interest in all goods that Mortgagor owns now or in the future and that are or will become fixtures related to the Property.

☐ **Crops; Timber; Minerals; Rents, Issues, and Profits.** Mortgagor grants to Lender a security interest in all crops, timber and minerals located on the Property as well as all rents, issues, and profits of them including, but not limited to, all Conservation Reserve Program (CRP) and Payment in Kind (PIK) payments and similar governmental programs (all of which shall also be included in the term "Property").

☒ **Personal Property.** Mortgagor grants to Lender a security interest in all personal property located on or connected with the Property. This security interest includes all farm products, inventory, equipment, accounts, documents, instruments, chattel paper, general intangibles, and all other items of personal property Mortgagor owns now or in the future and that are used or useful in the construction, ownership, operation, management, or maintenance of the Property. The term "personal property" specifically excludes that property described as "household goods" secured in connection with a "consumer" loan as those terms are defined in applicable federal regulations governing unfair and deceptive credit practices.

**29. OTHER TERMS.** If checked, the following are applicable to this Mortgage:

☐ **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Mortgage will remain in effect until released.

☐ **Additional Terms.**

---

☒ IF CHECKED, THIS IS A BALLOON MORTGAGE AND THE FINAL PRINCIPAL PAYMENT OR THE PRINCIPAL BALANCE DUE UPON MATURITY IS APPROXIMATELY $ 768,530.30 _____ , TOGETHER WITH ACCRUED INTEREST, IF ANY, AND ALL ADVANCEMENTS MADE BY THE MORTGAGEE UNDER THE TERMS OF THIS MORTGAGE.

☐ IF CHECKED, THIS BALLOON MORTGAGE SECURES A VARIABLE RATE OBLIGATION AND THE BALANCE DUE ASSUMES THAT THE INITIAL RATE OF INTEREST APPLIES FOR THE ENTIRE TERM OF THE MORTGAGE. THE ACTUAL BALANCE DUE UPON MATURITY MAY VARY DEPENDING ON CHANGES IN THE RATE OF INTEREST.

---

**SIGNATURES:** By signing below, Mortgagor agrees to the terms and covenants contained in this Mortgage and in any attachments. Mortgagor also acknowledges receipt of a copy of this Mortgage on the date stated above on Page 1.

Entity Name: __AMT, L.L.C. A FLORIDA LIMITED LIABILITY COMPANY__

| | | |
|---|---|---|
| _(signature)_ 4/24/2003 | | |
| (Signature) STEPHEN BUNYARD, - MANAGER (Date) | (Signature) | (Date) |
| | | |
| (Signature) (Date) | (Signature) | (Date) |

☐ Refer to the Addendum which is attached and incorporated herein for additional Mortgagors, signatures and acknowledgments.

**\*\* OFFICIAL RECORDS \*\***
**BK 2434 PG 4999**

## ACKNOWLEDGMENT:

STATE OF _____ , COUNTY OF _____ } ss.

(Individual)   This instrument was acknowledged before me this _____ day of _____

by _____

who is personally known to me or who has produced _____ as identification.

My commission expires:

(Seal)

_____

(Notary Public)

_____

(Printed Name of Acknowledger)

(Business or Entity Acknowledgment)   STATE OF **MISSOURI** _____ , COUNTY OF **ST. LOUIS** } ss.

This instrument was acknowledged before me this **17TH** day of **APRIL   2003**

by **STEPHEN BUNYARD, MANAGER** _____

_____ (Title(s))

of **AMT, L.L.C. A FLORIDA LIMITED LIABILITY COMPANY** _____ (Name of Business or Entity)

a ~~Florida~~   on behalf of the business or entity.

He/she is personally known to me or has produced _____ as identification.

My commission expires:   **MARCH 27, 2004**

(Seal)

*(signature)*

(Notary Public)

**RITA J. STAGGS**
(Printed Name of Acknowledger)

*(Notary seal:)*
RITA J. STAGGS
Notary Public - Notary Seal
State of Missouri
St Charles County
My Commission Expires Mar 27, 2004

Experts™  © 1993, 2001 Bankers Systems, Inc., St. Cloud, MN  Form AGCO-RESI-FL 4/24/2002

EXHIBIT "A"
LEGAL DESCRIPTION OF REAL PROPERTY

**PARCEL I:**

LOT 160, DESTIN POINTE, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 14, PAGES 90-93, OF THE PUBLIC RECORDS OF OKALOOSA, COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGIN AT THE SOUTHERNMOST CORNER OF SAID LOT 160, SAID POINT LYING ON THE NORTHERLY RIGHT OF WAY LINE OF MELROSE AVENUE (44 FOOT PRIVATE RIGHT OF WAY); THENCE NORTH 81 DEGREES 39 MINUTES 05 SECONDS EAST ALONG SAID RIGHT OF WAY A DISTANCE OF 36.82 FEET TO A POINT OF CURVATURE OF A CIRCULAR CURVE TO THE LEFT; THENCE ALONG SAID RIGHT OF WAY LINE, AND SAID CURVE TO THE LEFT (RADIUS - 106.79 FEET, CHORD - 95.50 FEET, CHORD BEARING - NORTH 55 DEGREES 05 MINUTES 25 SECONDS EAST, DELTA - 53 DEGREES 07 MINUTES 21 SECONDS) A DISTANCE OF 99.01 FEET TO A POINT OF COMPOUND CURVATURE OF A CIRCULAR CURVE TO THE LEFT; THENCE ALONG THE WESTERLY RIGHT OF WAY LINE OF WAVERLY CIRCLE (44 FOOT PRIVATE RIGHT OF WAY) AND SAID CURVE TO THE LEFT (RADIUS - 435.00 FEET, CHORD - 177.19 FEET, CHORD BEARING - NORTH 16 DEGREES 46 MINUTES 39 SECONDS EAST, DELTA - 23 DEGREES 30 MINUTES 10 SECONDS) A DISTANCE OF 178.44 FEET TO A POINT OF COMPOUND CURVATURE OF A CIRCULAR CURVE TO THE LEFT; THENCE ALONG SAID RIGHT OF WAY LINE AND SAID CURVE TO THE LEFT (RADIUS - 175.62 FEET, CHORD - 75.57 FEET, CHORD BEARING - NORTH 07 DEGREES 23 MINUTES 55 SECONDS WEST, DELTA - 24 DEGREES 50 MINUTES 59 SECONDS) A DISTANCE OF 76.17 FEET; THENCE SOUTH 70 DEGREES 44 MINUTES 25 SECONDS WEST A DISTANCE OF 101.01 FEET; THENCE SOUTH 17 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 16.00 FEET; THENCE SOUTH 87 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 28.00 FEET; THENCE SOUTH 51 DEGREES 30 MINUTES 00 SECONDS WEST A DISTANCE OF 18.00 FEET; THENCE SOUTH 05 DEGREES 00 MINUTES 00 SECONDS EAST A DISTANCE OF 26.00 FEET; THENCE SOUTH 22 DEGREES 13 MINUTES 40 SECONDS WEST A DISTANCE OF 126.67 FEET; THENCE SOUTH 17 DEGREES 30 MINUTES 00 SECONDS EAST A DISTANCE OF 105.00 FEET TO THE POINT OF BEGINNING. THE ABOVE DESCRIBED PARCEL IS SUBJECT TO A 15 FOOT WIDE DRAINAGE EASEMENT LYING ON THE NORTHERLY PORTION OF THE ABOVE DESCRIBED LOT AS REFLECTED ON THE FACE OF SAID PLAT.

**PARCEL II:**

COMMENCE AT THE NORTHWEST CORNER OF DESTIN POINTE, A PLANNED UNIT DEVELOPMENT OF A PORTION OF HOLIDAY ISLE, DESTIN, UNDIVIDED TOWNSHIP 2 SOUTH, RANGE 23 WEST, OKALOOSA COUNTY, FLORIDA AS RECORDED IN PLAT BOOK 14 AT PAGES 90 THROUGH 93 OF THE PUBLIC RECORDS OF OKALOOSA COUNTY, FLORIDA; THENCE PROCEED SOUTH 23 DEGREES 31 MINUTES 00 SECONDS WEST ALONG THE WEST LINE OF SAID DESTIN POINTE A DISTANCE OF 439.95 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE ALONG SAID WEST LINE OF DESTIN POINTE THE FOLLOWING BEARINGS AND DISTANCES; SOUTH 23 DEGREES 31 MINUTES 00 SECONDS WEST, 218.94 FEET; NORTH 68 DEGREES 29 MINUTES 00 SECONDS WEST, 44.00 FEET; SOUTH 23 DEGREES 31 MINUTES 00 SECONDS WEST, 304.00 FEET; SOUTH 66 DEGREES 29 MINUTES 00 SECONDS EAST, 32.00 FEET; SOUTH 23 DEGREES 31 MINUTES 00 SECONDS WEST 346.24 FEET TO A POINT ON THE NORTH LINE OF AN EXISTING POND AS SHOWN ON THE AFORESAID PLAT OF DESTIN POINTE; THENCE DEPARTING SAID WEST LINE OF DESTIN POINTE, PROCEED ALONG THE NORTH LINE OF SAID POND THE FOLLOWING BEARINGS AND DISTANCES; NORTH 40 DEGREES 45 MINUTES 59 SECONDS WEST, 67.30 FEET; NORTH 80 DEGREES 30 MINUTES 02 SECONDS WEST 51.90 FEET; SOUTH 48 DEGREES 24 MINUTES 40 SECONDS WEST, 38.52; SOUTH 09 DEGREES 21 MINUTES 49 SECONDS WEST, 43.88 FEET; THENCE DEPARTING SAID NORTH LINE PROCEED NORTH 32 DEGREES 29 MINUTES 00 SECONDS WEST A DISTANCE OF 797.93 FEET; THENCE PROCEED NORTH 23 DEGREES 31 MINUTES 00 SECONDS EAST A DISTANCE OF 367.44 FEET; THENCE PROCEED SOUTH 60 DEGREES 28 MINUTES 29 SECONDS EAST A DISTANCE OF 400.00 FEET; THENCE PROCEED NORTH 23 DEGREES 31 MINUTES 00 SECONDS EAST A DISTANCE OF 200.00 FEET; THENCE PROCEED SOUTH 60 DEGREES 28 MINUTES 29 SECONDS EAST A DISTANCE OF 394.41 FEET TO THE POINT OF BEGINNING. LYING IN AND BEING A PORTION OF HOLIDAY ISLE, DESTIN, UNDIVIDED TOWNSHIP 2 SOUTH, RANGE 23 WEST, OKALOOSA COUNTY, FLORIDA AND CONTAINS 11.77 ACRES MORE OR LESS.

# OFFICIAL RECORDS #
BK 2434 PG 5000

Copyright © 2011, qPublic.net



DESTIN HARBOR

CANAL PL

WAVERLY CIR

MELROSE AVE

ROSALIE DR

LANDS END DR

CHOCTAWHATCHEE BAY

GULF OF MEXICO

| 0 | 450 | 900 | 1350 | 1800 ft |
|---|-----|-----|------|---------|



## Okaloosa County Appraiser

Parcel: 00-2S-24-0000-0022-000A   Acres: 11.69

| Name: | AQUA DEVELOPMENT LLC | Land Value: | 1,108,368 |
|-------|----------------------|-------------|-----------|
| Site: | . | Building Value: | 0 |
| Sale: | $4,165,000 on 2012-09 Reason=V Qual=U | Misc Value: | 0 |
| Mail: | 415 SANDY CAY DR MIRAMAR BEACH, FL 32550 | Just Value: | 1,108,368 |
| | | Assessed Value | 478,119 |
| | | Exempt Value | 0 |
| | | Taxable Value | 478,119 |

Okaloosa County makes every effort to produce the most accurate information possible. No warranties, expressed or implied, are provided for the data herein, its use or interpretation. The assessment information is from the last certified taxroll. All data is subject to change before the next certified taxroll.
Date printed: 04/03/18 : 11:43:26



Copyright © 2011, qPublic.net

| Okaloosa County Appraiser | | |
|---|---|---|
| Parcel: 00-2S-24-0110-0000-1600 Acres: 0 | | |
| Name: | DESTIN PARCEL 160 LLC | Land Value: | 311,042 |
| Site: | 480 GULF SHORE DR DESTIN | Building Value: | 342,208 |
| Sale: | $600,000 on 2012-09 Reason=I Qual=U | Misc Value: | 19,591 |
| Mail: | 4471 LEGENDARY DR ATTN: TRACIE BLOCKER DESTIN, FL 32541 | Just Value: | 672,841 |
| | | Assessed Value | 672,841 |
| | | Exempt Value | 0 |
| | | Taxable Value | 672,841 |



Okaloosa County makes every effort to produce the most accurate information possible. No warranties, expressed or implied, are provided for the data herein, its use or interpretation. The assessment information is from the last certified taxroll. All data is subject to change before the next certified taxroll.
Date printed: 04/03/18 : 12:01:24

1

## COMMITMENT INTENT LETTER DATED MARCH 11, 2010

DEFTCO.CORP INTENDS TO PROVIDE THE PROJECT KNOWN AS
THE FLORIDA EMERALD COAST OR DESTIN POINTE PROJECT
LOCATED AT 11.77 ACRES REFERRED TO AS PARCEL B, WEST END OF
HOLIDAY ISLE, OKALOOSA COUNTY, DESTIN POINTE, FLORIDA. THIS
LOAN COMMITMENT INTENT OUTLINES THE GENERAL TERMS AND
CONDITIONS UNDER WHICH THE LENDER WILL PROCEED.

**BORROWER:**                    AMT, LLC

**LOAN TERMS:**       24 MONTHS – PREPAID INTEREST FOR 24 MONTHS
                      (THERE WILL NOT BE ANY OTHER PAYMENTS
                      DUE DURING THE 24 MONTHS, PRINCIPAL DUE
                      IN 24 MONTHS.

**GUARANTORS:**                  AMT, LLC

**ADDITIONAL
COLLATERAL:**                    NONE

**LOAN AMOUNT:**                 $14,000,000. (FOURTEEN MILLION US DOLLARS)
                                 PLUS PRE-PAID   INTEREST, POINTS AND
                                 CLOSING COSTS.

**INTEREST RATE:**               11.5%

**PREPAID INTEREST:**            24 MONTHS – Subject to Page 2 of Attached
                                 Email from Joseph F. Day, CEO,
**PREPAYMENT PENALTY:**   NONE   which is incorporated herein by
                                 this reference. MBJ
**POINTS PAID TO DEFTCO.CORP:**  6 PERCENT

**FUNDING DATE:** FUNDING ESTIMATED TO BE ON OR BEFORE MARCH 30, 2010
                  PROVIDED THAT ALL DOCUMENTS REQUIRED TO CLOSE ESCROW
                  AND THAT ALL CONDITIONS PRECEDENT HAVE BEEN RELEASED,
                  APPROVED AND/OR WAIVED BY THE ESCROW HOLDER AND THAT
                  ESCROW IS INSTRUCTED TO PROCEED TO CLOSE THIS ESCROW.

# DEFTCO.CORP

**Mailing Address:**
P.O. Box 421183
San Diego, California 92142
858-271-8900

**California Office:**
73-241 Highway 111
Palm Desert, California 92260
760-341-8225

**Nevada Office:**
723 South Casino Center Blvd.
Las Vegas, Nevada 89101
702-387-1020

**International Offices:**
Mexico
Canada

**Phone # 800-778-7802**

**WORLD WIDE WEB** http://www.deftco.com

*Fax # 800-866-9755*

2

**COLLATERAL SECURITY:** The loan shall be secured by a first mortgage on the property, an assignment of rents and profits upon the Property and a perfected security interest in ALL personal property and/ or equipment used in connection with this property. The mortgage and security interest shall constitute VALID FIRST LIENS, subject to NO other liens and or encumbrances, on the good leasehold title to subject property. No additional senior or secondary Financing will be permitted during the term of the loan, either secured or unsecured.

**DUE DILIGENCE:** Due Diligence, although may have been done, and yet may include but not limited to Lender completing, to its sole and absolute satisfaction, a complete further review of borrower's financials and credit, the property and surrounding market, title and insurance, Lender reserves the right to order and review an MAI certified appraisal, Phase I environmental report, Structural Engineering Report and any other reports deemed necessary by Lender in it's sole and absolute discretion, All reports will be paid by borrower.

**Guarantee:** 100% of the loan, plus ALL accrued interest, plus ALL costs of enforcement of the loan Plus any and all other sums due to Lender under the loan documents shall be guaranteed by **AMT, LLC** guarantors will be required to execute an environmental indemnity agreement in form and substance to the Lender. All of the above contractual arrangements are subject to the laws of the state of Florida and the state of California.

**DUE DILIGENCE
MISSING:** 1. Property, filing against the property Tax ID #00-28-24-000-0022-000A to be 1st Trust Deed filing, LLC operating Articles and in good standing, business financials and taxes (2 years)

This instrument is not valid unless a copy of such commitment intent is dated, signed by Borrower, and returned to Lender with the commitment fee **on or before 3/14/2010.**

1. This Mandate is contingent upon its compliance as presently structured with all acceptable **State of California and the state of Florida** rules, regulations and statutes relative to commercial /investment financing transactions. The jurisdiction of **California** courts is acknowledged and agreed to by the Borrower. The laws of the jurisdiction shall govern all loan documents, in any way relating to this instrument, where the mortgage( and/or Property is located and all applicable laws of the **United States of America.**

2. **Lender and/or Lenders** may, at any time, in its sole discretion, and without notice to or consent of Borrower, assign all of Lenders rights, title and

3

interest under this letter and pertinent loan documents. Any and all assignee or successor of Borrower or any subsequent assignee and successor will be entitled to receive all right, title and interest of Borrower under the **Lender and/or Lenders** and related loan documents. Such assignment, without material alteration may only be given to a legal organization operating under U.S. Laws unless approved by the Borrower.

3.  At least five (5) days prior to closing written confirmation from the title insurer providing the specified and/or required insurance must show that it has performed a search of all judgments, liens against the Borrower and the general partner, if any, and the mortgaged Property. No judgments or liens are allowed. Any recorded encumbrance instrument or implied encumbrance must be fully satisfied for a funding to take place.

4.  The Parties hereto agree that this agreement and all documents, and contracts regarding this transaction or any subsequent transaction are in the English language.

**NOTE: There is a required Liquidated Damages fee of $5,000. due upon signing of this Loan Commitment Intent and sent via Federal Express with delivery signatures required or wire transfer to: DEFTCO.CORP, WELLS FARGO BANK Routing # 321270742 Account # 2002695732, located 1121 Las Vegas Blvd., Las Vegas, NV 89104 If for any reason DEFTCO.CORP is unable to fund or provide funding for this transaction the Liquidated Damages fee will be refunded. If the borrower does not go forth with the funding, then the commitment fee will be considered earned.**

THE ABOVE TERMS ARE ACCEPTABLE:

**AGREED:** AMT, LLC & ZTF FAMILY, L.P.

Name & Title     MICHAEL B. SMALLWOOD
                 MANAGER

DATED: MARCH 12, 2010

**AGREED:** Joseph Dau, CEO,
DEFTCO.CORP

**DATED:** MARCH 6, 2010

## Smotkin, Howard

| | |
|---|---|
| **From:** | Stephen Bunyard [stevebunyard@sbcglobal.net] |
| **Sent:** | Tuesday, March 09, 2010 4:41 PM |
| **To:** | Stone, Steven; Smotkin, Howard; Mike Smallwood |
| **Cc:** | Jeff Burds |
| **Subject:** | Fw: Fwd: FW: Pre-Paid Interest |

----- Forwarded Message ----
**From:** Zak Freedman <zfreedman@bhcapitalgroup.com>
**To:** Stephen Bunyard <stevebunyard@sbcglobal.net>; stephenbunyard@earthlink.net
**Sent:** Tue, March 9, 2010 2:13:17 PM
**Subject:** Fwd: FW: Pre-Paid Interest

Here is the answer below to the pre paid interest concern:


Thank You,


Zak Freedman
Sr. Loan Officer
Black Hawk Capital Group


"Confidentiality Notice: This is a private communication. The information in this email and any attachments is privileged and confidential information intended only for the use of the person named as recipient. If you are not the named recipient, be advised that any unauthorized review, disclosure, reproduction, or dissemination of the contents of this message is strictly prohibited. If you have received this material in error, please delete this message and any attachments without storing it and notify the sender so that our address record can be corrected."


---------- Forwarded message ----------
From: **Steve Burington** <ocmoneyguy@yahoo.com>
Date: Tue, Mar 9, 2010 at 11:27 AM
Subject: FW: Pre-Paid Interest
To: Zak Freedman <zfreedman@bhcapitalgroup.com>


Zak,

The answer to the question is below in the body of the email that Eric sent over to Joe.
Steve B.
><>

Hello Joe,


A question came up from the Destin Pointe attorney. I think the answer is intuitively

1

obvious, however, I will ask it nevertheless.

If the loan is paid in full prior to the 24th month, is the remaining interest refunded ? In other words, is the interest due calculated on an accrued basis (pro-rata) ?

THE INTEREST COSTS ARE ADJUSTED AS TO USE OF FUNDS AND ANY OVERPAY SITUATIONS ARE CREDITED AGAINST THE FINAL PAY-OFF

Joseph F Dau, CEO

Sincerely,

DEF Holdings, LLC

Green Medical Capital Investments, LLC

Eric Petersen, General Manager

Direct 949-257-7758

Fax 949-858-2814

Email ericjpetersen@cox.net

Exhibit G



9/28/2011

To whom it may concern,

Subject: Destin Pointe – The Florida Emerald coast – loan#:DESTIN3102010

DEFTCO.CORP looked at this file in February of 2010 and decided to go forth with the investigation of the project. After consideration of the location and the marketing/travel area we sent a commitment letter dated 3/6/2010 with the terms of the loan.

After completing our due diligence, we determined that the long term environmental impact, health and safety impact issues, loss of reputation as a vacation destination as well as, many other underwriting issues such as the quality and sufficiency of the underlying security (property), all caused by the BP spill, was sufficient, perceivable, uncertain to complexity and scope, and very possibly detrimental to both us (the lender), financially speaking as well as, to tenants and visitors physically therefore, all of these items, caused our firm to reconsider the application for financing based upon the BP oil spill and its consequences.

When the BP oil spill occurred, we had our underwriting crew review the results to the location. The underwriters all declared that the damage from the oil spill made it very difficult to loan our money to this project. Up until that day, we had the money in place for this project. Therefore DEFTCO.CORP ended up losing a great deal of income from the interest we would have received and our expenses of setting up this loan for funding.

We then went to other lenders to see if we could "broker" the deal and to see if anyone else had any interest in financing the property. We were told that his area was damaged both physically, and its reputation, by the BP oil spill. With the high degree of uncertainty about the property's condition and damaged reputation, the other parties had no interest in lending any amount of money to the property.

DEFTCO does not deal in the predatory lending practices, therefore we could not give any further advice to the borrowers.

Sincerely,

Joseph F Dau, CEO

Mailing Address:
P.O. Box 421183
San Diego, CA. 92142

California Office:
73-241 Highway 111
Palm Desert, CA. 92260

Nevada Office:
723 So. Casino Center Blvd.
Las Vegas, NV. 89101

World Offices:
México
Canada

Phone # 800-778-7802          World Wide Web http://www.deftco.com          Fax # 800-866-9755

Exhibit E

IN THE CIRCUIT COURT, FIRST JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA, IN AND FOR OKALOOSA COUNTY

JEFFERSON BANK AND TRUST COMPANY,

    Plaintiff,

vs.

Case No.: 2010CA3282-8

AMT, L.L.C., a Florida limited liability company;
P. STEPHEN BUNYARD; P. STEPHEN BUNYARD,
as trustee of the P. Stephen Bunyard First Amended and
Restated Revocable Living Trust under instrument
Dated March 10, 1998, as amended and/or restated; ZTF
FAMILY, L.P., a Missouri limited partnership

    Defendants.

_____

## NOTICE OF LIS PENDENS

TO Defendants:      AMT, L.L.C., a Florida limited liability company;
                   P. STEPHEN BUNYARD; P. STEPHEN BUNYARD,
                   as trustee of the P. Stephen Bunyard First Amended and
                   Restated Revocable Living Trust under instrument
                   Dated March 10, 1998, as amended and/or restated; ZTF
                   FAMILY, L.P., a Missouri limited partnership; and
                   ALL OTHERS WHOM IT MAY CONCERN

YOU ARE NOTIFIED OF THE FOLLOWING:

(a)      The Plaintiff has instituted this action this date against you seeking to foreclose a

         mortgage with respect to the property described below;

(b)      The plaintiff in this action is Jefferson Bank and Trust Company;

(c)      The case number of the action is as shown in the caption;

(d)      The property that is the subject matter of this action is in Okaloosa County,
         Florida, and is described as follows:

         See Exhibit "A" as attached hereto and made a part hereof.



**2010 CA 003282 S**
HOKE, EDNA
6/4/10     LP          3.0000000

DATED this ____1____ day of June, 2010.

                                                         BARRON, REDDING, HUGHES,
                                                         FITE, SANBORN & KIEHN,
                                                         LEEBRICK & DICKEY P.A.

                                                         Brian D. Leebrick
                                                         Fla. Bar #172634
                                                         Clifford W. Sanborn
                                                         Florida Bar #0442143
                                                         P. O. Box 2467
                                                         Panama City, Florida 32402
                                                         (850) 785-7454
                                                         ATTORNEYS FOR PLAINTIFF

EXHIBIT A

PARCEL I

LOT 160, DESTIN POINTE, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 14, PAGES 90-93, OF THE PUBLIC RECORDS OF OKALOOSA COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGIN AT THE SOUTHERNMOST CORNER OF SAID LOT 160, SAID POINT LYING ON THE NORTHERLY RIGHT OF WAY LINE OF MELROSE AVENUE (44' PRIVATE R/W); THENCE NORTH 81 DEGREES 39 MINUTES 05 SECONDS EAST ALONG SAID RIGHT OF WAY A DISTANCE OF 36.82 FEET TO A POINT OF CURVATURE OF A CIRCULAR CURVE TO THE LEFT; THENCE ALONG SAID RIGHT OF WAY LINE AND SAID CURVE TO THE LEFT (RADIUS - 106.79 FEET, CHORD - 95.50, CHORD BEARING - NORTH 55 DEGREES 05 MINUTES 25 SECONDS EAST, DELTA - 53 DEGREES 07 MINUTES 21 SECONDS) A DISTANCE OF 99.01 FEET TO A POINT OF COMPOUND CURVATURE OF A CIRCULAR CURVE TO THE LEFT; THENCE ALONG THE WESTERLY RIGHT OF WAY LINE OF WAVERLY CIRCLE (44' PRIVATE R/W) AND SAID CURVE TO THE LEFT (RADIUS - 435.00 FEET, CHORD - 177.19 FEET, CHORD BEARING - NORTH 16 DEGREES 46 MINUTES 39 SECONDS EAST, DELTA - 23 DEGREES 30 MINUTES 10 SECONDS) A DISTANCE OF 178.44 FEET TO A POINT OF COMPOUND CURVATURE OF A CIRCULAR CURVE TO THE LEFT; THENCE ALONG SAID RIGHT OF WAY LINE AND SAID CURVE TO THE LEFT (RADIUS - 175.62 FEET, CHORD -75.57 FEET, CHORD BEARING - NORTH 07 DEGREES 23 MINUTES 55 SECONDS WEST, DELTA - 24 DEGREES 50 MINUTES 59 SECONDS) A DISTANCE OF 76.17 FEET; THENCE SOUTH 70 DEGREES 44 MINUTES 25 SECONDS WEST A DISTANCE OF 101.01 FEET; THENCE SOUTH 17 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 16.00 FEET; THENCE SOUTH 87 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 28.00 FEET; THENCE SOUTH 51 DEGREES 30 MINUTES 00 SECONDS WEST A DISTANCE OF 18.00 FEET; THENCE SOUTH 05 DEGREES 00 MINUTES 00 SECONDS EAST A DISTANCE OF 26.00 FEET; THENCE SOUTH 22 DEGREES 13 MINUTES 40 SECONDS WEST A DISTANCE OF 126.67 FEET; THENCE SOUTH 17 DEGREES 30 MINUTES 00 SECONDS EAST A DISTANCE OF 105.00 FEET TO THE POINT OF BEGINNING. THE ABOVE DESCRIBED PARCEL IS SUBJECT TO A 15 FOOT WIDE DRAINAGE EASEMENT LYING ON THE NORTHERLY PORTION OF THE ABOVE DESCRIBED LOT AS REFLECTED IN THE FACE OF SAID PLAT.

PARCEL II

COMMENCE AT THE NORTHWEST CORNER OF DESTIN POINTE, A PLANNED UNIT DEVELOPMENT OF A PORTION OF HOLIDAY ISLE, DESTIN, UNDIVIDED TOWNSHIP 2 SOUTH, RANGE 23 WEST, OKALOOSA COUNTY, FLORIDA AS RECORDED IN PLAT BOOK 14 AT PAGES 90 THROUGH 93 OF THE PUBLIC RECORDS OF OKALOOSA COUNTY, FLORIDA; THENCE PROCEED SOUTH 23 DEGREES 31 MINUTES 00 SECONDS WEST ALONG THE WEST LINE OF SAID DESTIN POINTE A DISTANCE OF 439.95 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE ALONG SAID WEST LINE OF DESTIN POINTE THE FOLLOWING BEARINGS AND DISTANCES; SOUTH 23 DEGREES 31 MINUTES 00 SECONDS WEST, 218.94 FEET; NORTH 66 DEGREES 29 MINUTES 00 SECONDS WEST, 44.00 FEET; SOUTH 23 DEGREES 31 MINUTES 00 SECONDS WEST, 304.00 FEET; SOUTH 66 DEGREES 29 MINUTES 00 SECONDS EAST, 32.00 FEET; SOUTH 23 DEGREES 31 MINUTES 00 SECONDS WEST 346.24 FEET TO A POINT ON THE NORTH LINE OF AN EXISTING POND AS SHOWN ON THE AFORESAID PLAT OF DESTIN POINTE; THENCE DEPARTING SAID WEST LINE OF DESTIN POINTE, PROCEED ALONG THE NORTH LINE OF SAID POND THE FOLLOWING BEARINGS AND DISTANCES; NORTH 40 DEGREES 45 MINUTES 59 SECONDS WEST, 67.30 FEET; NORTH 80 DEGREES 30 MINUTES 02

SECONDS WEST 51.90 FEET; SOUTH 48 DEGREES 24 MINUTES 40 SECONDS WEST, 38.52 FEET; SOUTH 09 DEGREES 21 MINUTES 49 SECONDS WEST, 43.88 FEET; THENCE DEPARTING SAID NORTH LINE PROCEED NORTH 32 DEGREES 29 MINUTES 00 SECONDS WEST A DISTANCE OF 797.93 FEET; THENCE PROCEED NORTH 23 DEGREES 31 MINUTES 00 SECONDS EAST A DISTANCE OF 367.44 FEET; THENCE PROCEED SOUTH 60 DEGREES 26 MINUTES EAST A DISTANCE OF 400.00 FEET; THENCE PROCEED NORTH 23 DEGREES 31 MINUTES 00 SECONDS EAST A DISTANCE OF 200.00 FEET; THENCE PROCEED SOUTH 60 DEGREES 26 MINUTES 29 SECONDS EAST A DISTANCE OF 394.41 FEET TO THE POINT OF BEGINNING. LYING IN AND BEING A PORTION OF HOLIDAY ISLE, DESTIN, UNDIVIDED TOWNSHIP 2 SOUTH, RANGE 23 WEST, OKALOOSA COUNTY, FLORIDA.

Exhibit F

IN THE CIRCUIT COURT, FIRST JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA, IN AND FOR OKALOOSA COUNTY

JEFFERSON BANK AND TRUST COMPANY,

     Plaintiff,

vs.                                     Case No.: 10CA3282-S

AMT, L.L.C., a Florida limited liability company;
P. STEPHEN BUNYARD; P. STEPHEN BUNYARD,
as trustee of the P. Stephen Bunyard First Amended and
Restated Revocable Living Trust under instrument
Dated March 10, 1998, as amended and/or restated; ZTF
FAMILY, L.P., a Missouri limited partnership

     Defendants.

---

## FINAL SUMMARY JUDGMENT

**THIS CAUSE** came before the Court for hearing on March 29, 2011, upon Plaintiff's Motion for Summary Judgment. Having reviewed the instant Motion and the supporting affidavits and the court file, having heard argument of counsel, and being otherwise fully advised in the premises, it is

**ORDERED AND ADJUDGED that:**

1.   The Court has jurisdiction of the subject matter and the parties of this cause.

2.   There are no genuine issues of material fact as to Counts I and II. Plaintiff's Motion for Final Summary Judgment on Counts I and II is **GRANTED**.

3.   Plaintiff is entitled to an award of reasonable attorney's fees in the total amount of $14,323.50 [at rate of $275.00/hour for 51.50 total *attorney* hours; at the rate of $70.00/hour for 2.3 total *paralegal* hours]. In awarding same, the Court has considered all of the criteria set forth in Florida Patients' Compensation Fund v. Rowe, 472 So. 2d 1145 (Fla. 1985).



**2010 CA 003282 S**
BROWN, KATHRYN
3/31/11    FJFC        35.000000

4. Plaintiff is due the following:

### As to Note 1 (loan number 12-6000069-5)

| | |
|---|---|
| Principal | $411,781.76 |
| Interest to the date of this Judgment | $ 52,833.12 |
| Late Charge | $ 105.00 |
| **Sub-Total As to Note 1** | $ 464,719.88 |

### As to Note 2 (loan number 6002222)

| | |
|---|---|
| Principal | $3,999,953.88 |
| Interest to the date of this Judgment | $ 410,884.78 |
| **Sub-Total As to Note 1** | $4,410,838.66 |
| Title search expense (as allowed) | $ 150.00 |
| Attorney's fees | $ 14,323.50 |

Court costs (itemize each here):

| | |
|---|---|
| Clerk's filing fee | $ 1,962.00 |
| Service of Process fee (# of Defendants: 4) | $ 237.15 |
| Other: [specify] | 0.00 |
| **TOTAL:** | **$4,892,231.19** |

Less:

| | |
|---|---|
| Undisbursed escrow funds | ($0.00) |
| Unearned insurance premiums, under the note and mortgage sued on in this action | ($0.00) |

making a **total sum** of $4,892,231.19, that shall bear interest at the rate of 6% per year, or as otherwise prescribed by law, whichever is less.

5.    Plaintiff holds a lien for the total sum superior to any claim or estate of Defendant(s) on the

following property in Okaloosa County, Florida, commonly known as 480 Gulf Shore Drive and vacant property located on Sunflower Court legally described as: the legal description is set forth in Attachment "A" to this Final Summary Judgment, and is incorporated herein.

6. If the total sum with interest at the rate described in paragraph 4 and all costs accrued subsequent to this judgment are not paid, the Clerk of Court shall set the property at the public sale on May 31, 20 11, at 11:00 a.m. (Central Time) or as soon thereafter as the sale may proceed, to the highest bidder for cash, except as prescribed in paragraph 8 below, at the website of www.okaloosa.realforeclose.com , in accordance with Chapter 45, section 45.031 , Florida Statutes.

7. Plaintiff may direct the clerk to sell the parcels separately, with the judgment amount allocated between the parcels in such amounts as the Plaintiff may direct.

8. Plaintiff shall advance all subsequent costs of this action and shall be reimbursed for them by the clerk if plaintiff is not the purchaser of the property for sale. If plaintiff is the purchaser, the clerk shall credit plaintiff's bid with the total sum with interest and cost accruing subsequent to this judgment, or such part of it, as is necessary to pay the bid in full.

9. On filing the certificate of title the clerk shall distribute the proceeds of the sale, so far as they are sufficient, by paying: first, all of plaintiff's costs; second, documentary stamps affixed to the certificate; third, plaintiff's attorney's fees; fourth, the total sum due to plaintiff, less the items paid, plus interest at the rate prescribed in paragraph 4 from this date to the date of the sale; and by retaining any remaining amount pending the further order of this court.

10. On filing the certificate of title defendant(s) and all persons claiming under or against defendant(s) since the filing of the notice of lis pendens shall be foreclosed of all estate or claim in the property and the purchaser at the sale shall be let into possession of the property.

11. Jurisdiction of this action is retained to enter further orders that are proper including,

without limitation, writs of possession and deficiency judgment.

      12.    **IF THIS PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THIS FINAL JUDGMENT. IF YOU ARE A SUBORDINATE LIENHOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN 60 DAYS AFTER THIS SALE. IF YOU FAIL TO FILE A CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.**

      **DONE AND ORDERED** in Chambers at Shalimar, Okaloosa County, Florida, this 29th day of March, 2011.

JOHN T. BROWN
**Circuit Judge**

### CERTIFICATE OF SERVICE

      **I HEREBY CERTIFY** that a copy of the foregoing Final Summary Judgment has been furnished to the following:

Brian D. Leebrick, Esq.
BARRON, REDDING, HUGHES,
FITE, SANBORN, KIEHN,
LEEBRICK & DICKEY, P.A.
P. O. Box 2467
Panama City, Florida 32402
ATTORNEY FOR PLAINTIFF

William E. Bond, Jr., Esq.
Robert J. Powell, Esq.
P.O. Box 13010
Pensacola, FL 32591
ATTORNEY FOR DEFENDANTS

by regular U.S. mail this 4 day of April, 2011.

**Clerk of Court**

BY: _____
Deputy Clerk

## ATTACHMENT "A"
### (Legal Description of Property)

PARCEL I

LOT 160, DESTIN POINTE, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 14, PAGES 90-93, OF THE PUBLIC RECORDS OF OKALOOSA COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGIN AT THE SOUTHERNMOST CORNER OF SAID LOT 160, SAID POINT LYING ON THE NORTHERLY RIGHT OF WAY LINE OF MELROSE AVENUE (44' PRIVATE R/W); THENCE NORTH 81 DEGREES 39 MINUTES 05 SECONDS EAST ALONG SAID RIGHT OF WAY A DISTANCE OF 36.82 FEET TO A POINT OF CURVATURE OF A CIRCULAR CURVE TO THE LEFT; THENCE ALONG SAID RIGHT OF WAY LINE AND SAID CURVE TO THE LEFT (RADIUS - 106.79 FEET, CHORD - 95.50 FEET, CHORD BEARING - NORTH 55 DEGREES 05 MINUTES 25 SECONDS EAST, DELTA - 53 DEGREES 07 MINUTES 21 SECONDS) A DISTANCE OF 99.01 FEET TO A POINT OF COMPOUND CURVATURE OF A CIRCULAR CURVE TO THE LEFT; THENCE ALONG THE WESTERLY RIGHT OF WAY LINE OF WAVERLY CIRCLE (44' PRIVATE R/W) AND SAID CURVE TO THE LEFT (RADIUS - 435.00 FEET, CHORD - 177.19 FEET, CHORD BEARING - NORTH 16 DEGREES 46 MINUTES 39 SECONDS EAST, DELTA - 23 DEGREES 30 MINUTES 10 SECONDS) A DISTANCE OF 178.44 FEET TO A POINT OF COMPOUND CURVATURE OF A CIRCULAR CURVE TO THE LEFT; THENCE ALONG SAID RIGHT OF WAY LINE AND SAID CURVE TO THE LEFT (RADIUS - 175.62 FEET, CHORD -75.57 FEET, CHORD BEARING - NORTH 07 DEGREES 23 MINUTES 55 SECONDS WEST, DELTA - 24 DEGREES 50 MINUTES 59 SECONDS) A DISTANCE OF 76.17 FEET; THENCE SOUTH 70 DEGREES 44 MINUTES 25 SECONDS WEST A DISTANCE OF 101.01 FEET; THENCE SOUTH 17 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 16.00 FEET; THENCE SOUTH 87 DEGREES 00 MINUTES 00 SECONDS WEST A DISTANCE OF 28.00 FEET; THENCE SOUTH 51 DEGREES 30 MINUTES 00 SECONDS WEST A DISTANCE OF 18.00 FEET; THENCE SOUTH 05 DEGREES 00 MINUTES 00 SECONDS EAST A DISTANCE OF 26.00 FEET; THENCE SOUTH 22 DEGREES 13 MINUTES 40 SECONDS WEST A DISTANCE OF 126.67 FEET; THENCE SOUTH 17 DEGREES 30 MINUTES 00 SECONDS EAST A DISTANCE OF 105.00 FEET TO THE POINT OF BEGINNING. THE ABOVE DESCRIBED PARCEL IS SUBJECT TO A 15 FOOT WIDE DRAINAGE EASEMENT LYING ON THE NORTHERLY PORTION OF THE ABOVE DESCRIBED LOT AS REFLECTED IN THE FACE OF SAID PLAT.

PARCEL II

COMMENCE AT THE NORTHWEST CORNER OF DESTIN POINTE, A PLANNED UNIT DEVELOPMENT OF A PORTION OF HOLIDAY ISLE, DESTIN, UNDIVIDED TOWNSHIP 2 SOUTH, RANGE 23 WEST, OKALOOSA COUNTY, FLORIDA AS RECORDED IN PLAT BOOK 14 AT PAGES 90 THROUGH 93 OF THE PUBLIC RECORDS OF OKALOOSA COUNTY, FLORIDA; THENCE PROCEED SOUTH 23 DEGREES 31 MINUTES 00 SECONDS WEST ALONG THE WEST LINE OF SAID DESTIN POINTE A DISTANCE OF 439.95 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE ALONG SAID WEST LINE OF DESTIN POINTE THE FOLLOWING BEARINGS AND DISTANCES; SOUTH 23 DEGREES 31 MINUTES 00 SECONDS WEST, 218.94 FEET; NORTH 66 DEGREES 29 MINUTES 00 SECONDS WEST, 44.00 FEET; SOUTH 23 DEGREES 31 MINUTES 00 SECONDS WEST, 304.00 FEET; SOUTH 66 DEGREES 29 MINUTES 00 SECONDS EAST, 32.00 FEET; SOUTH 23 DEGREES 31 MINUTES 00 SECONDS WEST 346.24 FEET TO A POINT ON THE

NORTH LINE OF AN EXISTING POND AS SHOWN ON THE AFORESAID PLAT OF DESTIN POINTE; THENCE DEPARTING SAID WEST LINE OF DESTIN POINTE, PROCEED ALONG THE NORTH LINE OF SAID POND THE FOLLOWING BEARINGS AND DISTANCES; NORTH 40 DEGREES 45 MINUTES 59 SECONDS WEST, 67.30 FEET; NORTH 80 DEGREES 30 MINUTES 02 SECONDS WEST 51.90 FEET; SOUTH 48 DEGREES 24 MINUTES 40 SECONDS WEST, 38.52 FEET; SOUTH 09 DEGREES 21 MINUTES 49 SECONDS WEST, 43.88 FEET; THENCE DEPARTING SAID NORTH LINE PROCEED NORTH 32 DEGREES 29 MINUTES 00 SECONDS WEST A DISTANCE OF 797.93 FEET; THENCE PROCEED NORTH 23 DEGREES 31 MINUTES 00 SECONDS EAST A DISTANCE OF 367.44 FEET; THENCE PROCEED SOUTH 60 DEGREES 26 MINUTES 29 SECONDS EAST A DISTANCE OF 400.00 FEET; THENCE PROCEED NORTH 23 DEGREES 31 MINUTES 00 SECONDS EAST A DISTANCE OF 200.00 FEET; THENCE PROCEED SOUTH 60 DEGREES 26 MINUTES 29 SECONDS EAST A DISTANCE OF 394.41 FEET TO THE POINT OF BEGINNING. LYING IN AND BEING A PORTION OF HOLIDAY ISLE, DESTIN, UNDIVIDED TOWNSHIP 2 SOUTH, RANGE 23 WEST, OKALOOSA COUNTY, FLORIDA.