**EXHIBIT A**

| *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*<br>No. 10-MD-2179<br><br>PTO 65 VERIFIED STATEMENT REGARDING CAUSATION AND DAMAGES (B1 CLAIMS) | | | |
|---|---|---|---|
| Last Name | First Name | Middle Name/Maiden | Suffix |
| Business Name<br><br>Destin Development, LLC | | Last 4 digits of Plaintiff's social security number (if individual) or full Tax ID number (if business plaintiff)<br>04-3699522 | |
| MDL 2179 Member Case Number<br><br>2:13-cv-00834 | | Attorney Name and Firm<br>Tucker H. Byrd<br>Byrd Campbell, P.A. | |

All "Remaining B1 Plaintiffs" (as defined in PTO 65) must answer the questions below regarding damages and causation. Responses must be as specific and accurate as practicable and shall be given under penalty of perjury. It is a violation of PTO 65 to submit an answer that is, for example, generic, vague, evasive, or misleading. **The plaintiff (not the plaintiff's attorney) must sign and date the verification and attestation at the end of this form.** Responses shall be filed in the record for the plaintiff's **individual lawsuit** (not the master docket for MDL 2179) by no later than **April 11, 2018**.

You may attach additional pages to this form if you need extra room to answer a question. Make sure to indicate the question you are continuing to answer.

**Question 1:** Describe specifically the compensatory damages that you claim in your lawsuit, including the nature of the damage, the date(s) of the damage, the amount of the damage, and the calculations used to arrive at that amount.

See attached.
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Question 3:** Describe specifically how the Deepwater Horizon/Macondo Well incident and oil spill caused the damages you allege in response to Question no. 1.

See attached.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

> Question 4: Do you have at this time an expert who will opine as to any of your responses to the above questions? (Yes or No)
> **Yes.**

By signing below, I declare and attest under penalty of perjury pursuant to 28 U.S.C. § 1746 that the answers provided to the above four questions are true and correct, and I specifically declare and attest under penalty of perjury pursuant to 28 U.S.C. § 1746 that the damages described in response to Question No. I were caused by the Deepwater Horizon/Macondo Well incident and oil spill.

Executed on the following date at the following location:

Date: June 15, 2018

Location (City and State): San Diego, California

**Signature of Plaintiff**

*\*Plaintiff's Attorney Cannot Sign on Plaintiff's Behalf. For businesses, the CEO, CFO, President, Owner, or similar senior corporate officer must sign.*

Roderic Mack Wright

Print Name

**PRESIDENT/CEO**

Title/Position (if signed on behalf of a business or other entity)

**The verified statement, must be filed into the record of the plaintiff's individual lawsuit (as** opposed to the master docket for MDL 2179) no later than **April 11, 2018**.

5

## <u>Question 1 - Compensatory Damages</u>

The Plaintiff, DESTIN DEVELOPMENT, LLC, is a corporation involved in real estate and development in the Florida Panhandle, in particular Destin, Florida. Prior to the *Deepwater Horizon* Oil Spill occurring, the Plaintiff owned beachfront property located in Destin, Florida in an area known as Norriego Pointe. Plaintiff planned to develop the subject property into a condominium/residence resort facility

The Plaintiff entered into a purchase and sale agreement with Pointe One, LLC to sell the Norriego Pointe property to Pointe One, LLC in May, 2004. (See Purchase and Sale Agreement dated May 24, 2004 attached as **<u>Exhibit "A."</u>**) The Plaintiff financed a portion of the sales price of the Norriego Pointe property to Pointe One, LLC and Pointe One, LLC owed a balance of $15,000,000.00 to the Plaintiff.

Prior to the *Deepwater Horizon* Oil Spill, Pointe One, LLC obtained a mezzanine loan on the Norriego Pointe property and some initial funds to eventually develop or sell the property.

The *Deepwater Horizon* Oil Spill has had a negative impact on Gulf Coast businesses and will continue to have a lingering impact on Gulf Coast businesses into the future. The ongoing impact of the Oil Spill is supported by data that recognize the perception—as documented by surveys of likely visitors to the area—that there have been lingering dangers to the environment and Gulf of Mexico wildlife.

The negative impact of the Oil Spill caused a high percentage of potential tourists to have and continue to have ongoing concerns about the health impacts of exposure to Gulf waters and consumption of Gulf seafood, resulting in potential tourists visiting alternative markets without the specter of contamination and causing tourist dollars to be spent away from the Gulf Coast.

As a result, of the Oil Spill and lingering concerns about the impact of the Oil Spill, tourists that would have considered visiting the Gulf Coast, including Destin, FL, visited alternative markets resulting in a reduction in tourism in the Gulf Coast, including Destin, FL.

Tourism supports the coastal areas of the Florida Panhandle and the tourism industry in the coastal Florida Panhandle has and continues to suffer tremendously as a result of the Oil Spill.

As a result of the Oil Spill and the uncertainty surrounding the long term negative impact of the Oil Spill, the financing commitments provided to the Pointe One, LLC for the Norriego Pointe property were cancelled and the lender refused to continue to fund the loans on the Norriego Pointe property.

Pointe One, LLC attempted in earnest to obtain replacement financing to proceed with the Norriego Pointe development project and maintain the property after funding was cancelled due to the Oil Spill, but due to the ongoing uncertainty surrounding the long term negative impact of the Oil Spill, Pointe One, LLC was unable to obtain financing for the project.

As a result of the Oil Spill, the Pointe One, LLC lost ownership of the Norriego Pointe property through bankruptcy.

As a result of the Oil Spill, the Plaintiff suffered a loss of income, revenue and profits arising from the Norriego Pointe property, including, but not limited to, the loss of sales proceeds, the loss of real estate commissions, the loss of financing provided to Pointe One, LLC for the Norriego Pointe property and the loss of the development opportunities.

Consequently, the Plaintiff seeks both compensatory and punitive damages in this action. As discussed generally above, Plaintiff's compensatory damages as a result of Defendants' acts and omissions include, but are not limited to, the following: a) Past, present and future lost income, revenue and profits; b) Loss of the $15,000,000.00 still owed to Plaintiff pursuant to the Purchase and Sale Agreement of May 24, 2004) All other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff's damages becomes available; and d) Other damages, losses or costs as will be shown at trial.

## **Damage Calculation**

Plaintiff, DESTIN DEVELOPMENT, LLC's damages are based on the current and best information available to him at this time. If any of the values or lost profit calculations is revised, based on further discovery or investigation in the ordinary course of litigation, then Plaintiff will revise the calculation accordingly. If litigation proceeds, Plaintiff's damage calculation will be more fully developed by his experts and may include damages and a damage model for the lost profits from the potential development of the Norriego Pointe project directly by DESTIN DEVELOPMENT, LLC's experts.[1&2]

---

[1] At this time, a damage model has not been developed on the loss of development potential on the properties, assuming DESTIN DEVELOPMENT, LLC would have developed the property itself, instead of selling the property to another developer. The development potential of these properties was much higher than the appraised values of the properties

[2] This amount does not take into account any other damages, including but not limited to interest, penalties, and punitive damages.

## **Question 2 – Evidence**

Plaintiff, DESTIN DEVELOPMENT, LLC, relies on the following evidence:

1.      **Property Ownership Documents.**

2.      **Parcel Maps.**

3.      **Surveys, Maps, Sketches - Showing potential development strategies.**

4.      **Appraisals.**

5.      **Commitment Intent Letter of Pointe One, LLC.** The Commitment Intent Letter definitively establishes that Pointe One, LLC had financing for its Norriego Pointe project prior to the Oil Spill, which would have prevented the eventual bankruptcy and loss of the property.

6.      **Bankruptcy Documents of Pointe One, LLC.**

7.      **Tax Returns/Financial Documents.**

8.      **Correspondence Related to All Aspects of the Norriego Pointe Project.**

9.      **Coast Guard Investigation of Oil from the Deepwater Horizon Oil Spill.** The Coast Guard's investigative materials will be used to show that oil from the Deepwater Horizon Oil Spill was caused to be placed on the Norriego Pointe property.

10.      **Evidence Obtained/Developed in MDL 2179** – DESTIN DEVELOPMENT, LLC will utilize all of the evidence and discovery obtained and developed in the MDL proceedings, where DESTIN DEVELOPMENT, LLC is a member of MDL 2179.

11.      **The Purchase and Sale Agreement for Norriego Pointe** dated May 24, 2004. [See **Exhibit "A."**]

12.      **The Development Order obtained in 2005** - Plaintiff for the Norriego Pointe Property consisting of a 79 Unit Residential Condominium Tower.

**Question 3 - Causation**

The *Deepwater Horizon* Oil Spill had a devastating impact on the Gulf Coast causing a high percentage of potential tourists to have ongoing concerns about the health impacts of exposure to the oil in the Gulf waters and consumption of Gulf seafood, resulting in potential tourists visiting alternative markets without the specter of contamination. This caused a ripple effect throughout the entire Gulf Areas, which affected every aspect of business on or near the Gulf of Mexico, including a halt on development in the region. Financing for developments on the Gulf Coast became non-existent.

The property owned by DESTIN DEVELOPMENT, LLC was directly on and/or adjacent to the Gulf of Mexico in one of the most highly traveled tourist destinations in the Florida panhandle. The entryway into Destin basically dead-ends into NORRIEGO POINTE. Oil from the *Deepwater Horizon* Oil Spill was directly deposited on DESTIN DEVELOPMENT, LLC/POINTE ONE LLC's property and in the surrounding waters. Therefore, Plaintiff, DESTIN DEVELOPMENT, LLC, can sustain a claim under the Oil Pollution Act *and* under *Robins Dry Dock,* which allows for punitive damages.

At the time of the Oil Spill, POINTE ONE, LLC had just secured a financing. However, in the interim, the *Deepwater Horizon* Oil Spill occurred on April 20, 2010. After the spill, the financing was cancelled by the lender citing the *Deepwater Horizon* Oil Spill as the reason for cancellation.

# EXHIBIT "A"

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") is made and entered into by and between DESTIN DEVELOPMENT, LLC, a Florida limited liability company (the "Seller"), and POINTE ONE, LLC, a Florida Limited Liability Company and/or its successor or assigns (the "Purchaser").

1.    PURCHASE AND SALE. Subject to the terms and conditions of this Agreement, and for and in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration to it in hand paid, the receipt and sufficiency of which are hereby acknowledged, Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller all of the following (collectively, the "Property"):

That certain real property lying and being in Lot 124, Block F, Holiday Isle, Destin, Okaloosa County, Florida, consisting of approximately 5.2 acres, as more particularly described on Exhibit "A" attached hereto and by this reference made a part hereof, including all right, title and interest of Seller in and to all riparian and other water and mineral rights, and all plants, shrubbery, trees, timber and all tenements, hereditaments, easements, access rights, and parking rights benefitting the Property (collectively, the "Land");

Together with all permits, applications, approvals, contract rights and other assets, both tangible and intangible, which are currently existing and necessary or appropriate to enable Purchaser to develop the Project (as hereinafter defined) on the Land, including, without limitation, the Governmental Approvals (as hereinafter defined) and all claims Wright has or might have against the City of Destin, Florida and/or its employees and all permits and other matters. All of which is made a part hereof (collectively, the "Property Rights").

2.    PURCHASE PRICE AND METHOD OF PAYMENT.

(a)    Subject to credits, adjustments and prorations for which provisions are hereinafter made in the Agreement, the purchase price ("Purchase Price") for the Property to be paid by Purchaser and received and accepted by Seller is Twenty-Two Million Three Hundred Sixty Thousand and No/100 Dollars ($22,360,000.00), subject to adjustment as set forth in this Agreement, which shall be payable as follows:

1.    Patrick Barcus ("Barcus"), and Anthony Cerqueira ("Cerqueira") have advanced certain funds to Wright toward the purchase of the land in the amount of Two Million Nine Hundred Fifty Thousand and No/100 Dollars ($2,950,000) or as ultimately determined, the receipt of which is hereby acknowledged (referred to herein as "Earnest Money") and the same is hereby acknowledged by the parties to be sufficient consideration for this Agreement and it shall be credited against the Purchase Price upon the closing of the Construction Loan (as hereinafter defined).

2. At the closing of the Construction Loan (which, as used in this Agreement, shall be defined to mean at a minimum that Purchaser has achieved the condominium unit pre-sales threshold required by its construction lender for the Project and Purchaser holds all Government Approvals [as hereinafter defined], whether through assignment from Seller or through acquiring the same independently, necessary to commence construction of the Project [excluding permitting of a marina]), Purchaser shall pay to Seller, in cash, Eleven Million One Hundred Eighty Thousand and No/100 Dollars ($11,180,000.00), less the Earnest Money, less the amounts necessary to satisfy Seller's portion of the amounts due under the Loans (as hereinafter defined), less repayment of the amounts advanced to Seller by and among Wright, Barcus and Cerqueira, and less any other obligations against the Property as set forth in Paragraph 6 below.

3. Purchaser shall pay an additional Eleven Million One Hundred Eighty Thousand and No/100 Dollars ($11,180,000.00) to Seller incrementally based on condominium unit sales in the Project (as hereinafter defined) after all expenses incurred in connection with the development of and sale of units in the of the Project (including without limitation marketing and development fees, and the construction debt) (collectively, the "Expenses") have been paid in full. The amount payable under this Paragraph 2(a)(3) shall be paid to Seller pro rata with payment to any members of Purchaser of any equity or other contributions made by such members in connection with the development of the Project (as hereinafter defined) pursuant to this Agreement and the Operating Agreement of the Purchaser. Seller and Purchaser acknowledge that Purchaser will develop the project (as hereinafter defined). Seller and Purchaser hereby acknowledge and agree that a development fee equal to three percent (3%) of the total costs of the Project (exclusive of land costs and development fees) shall be paid pursuant to the Operating Agreement of the Purchaser. Said development fee shall be deemed to be Expenses hereunder.

4. The marketing of the project shall be accomplished through an entity formed or agreed upon by Wright, Barcus and Cerqueira and owned equally by them with the intent that the real estate brokerage commissions (net of Expenses) will be paid to the new entity in connection with the condominium unit sales in the Project and be shared by the selling broker and the newly formed entity. This will be coordinated and discussed with Luke and Chuck before being submitted to the Company for final approval.

5. The Seller hereby reserves Eight (8) units in the Project. Said (8) units will be held for Wright, Barcus and Cerqueira and allocated among them as they decide. However, (1) of the (8) units shall be held by an entity formed by Wright, Barcus and Cerqueira and owned equally in one-third (1/3) interests. The costs of (7) units acquired by Seller shall be set off against the Purchase Price payable to Seller at the pre-construction price, and the cost of the (1) unit held by the Wright, Barcus and Cerqueira entity, shall be set off at construction cost (including the per unit average land costs). The difference between the construction cost of the unit and the pre-construction listing price will be set off against the Seller's profits.

2

6. The Agreement by and between Wright, Barcus and Cerqueira dated October 23, 2003 and the Addendum (undated, but entered into on or about March 24, 2004) and the terms and conditions contained within these two documents are hereby incorporated by reference and made a part of this Agreement as if fully set forth herein, except for the references to 8,000 square feet of condominium space, which has been replaced by the provisions in paragraph 5, above.

7. The balance of the Purchase Price to be paid to Seller shall be an amount equal to one-third (1/3) of the net profits of Purchaser after payment of Expenses and payment of any amounts to Seller or others as set forth in Paragraph 2(a)(3) above. The amounts due under this Paragraph 2(a)(4) shall be made pro rata with the payment of such net profits to the members of Purchaser.

3.    COVENANTS, REPRESENTATIONS AND WARRANTIES OF SELLER. Seller and Wright hereby covenant, represent and warrant to Purchaser that the following facts are, as of the date hereof, and will be, as of the date of Closing, true and correct:

(a)    There are no violations of any governmental laws, ordinances, rules, regulations or orders relating to pollution, safety, health, building, fire or zoning in connection with the Property of which the Seller is aware.

(b)    There are no arrangements or contractual obligations or assessments of any kind, including service or operating contracts or commitments to any third party that would affect or impose any obligation on the Purchaser or the Property subsequent to the Closing Date.

(c)    Seller is the record title owner of a leasehold interest in and to the Land pursuant to that certain Lease from Okaloosa Island Authority to C.B.S. Development Corporation, recorded in Official Records Book 209, Page 123, as amended in Official Records Book 244, Page 348, and Official Records Book 676, Page 108, as assigned in various Assignment of Lease and Deeds recorded in Official Records Book 657, Page 240, Official Records Book 1141, Page 267, Official Records Book 1208, Page 1438, Official Records Book 1209, Page 602, Official Records Book 1279, Page 443, Official Records Book 1388, Page 931, Official Records Book 1597, Page 864, Official Records Book 1597, Page 867, Official Records Book 2093, Page 909, Official Records Book 2170, Page 782, and Official Records Book 2367, Page 3843 of the Public Records of Okaloosa County, Florida (collectively, the "Lease")

(d)    Seller has the unqualified right to acquire fee simple title in and to the Land at will, pursuant to the Lease and in accordance with the ordinances of Okaloosa County, Florida.

(e)    Seller has full right, power and authority to execute, deliver and carry out the terms and conditions of this Agreement and all other documents to be executed and delivered by Seller pursuant to or in connection with this Agreement. All requisite resolutions, corporation or partnership, and any other consents, necessary for the consummation by Seller of the transaction herein described, have been or will be before Closing be duly adopted and obtained.

3

(f)    No person or entity has any right of first refusal or option to acquire the Property.  There are no parties in possession or with any possessory rights, including licenses, in respect to the Property.

(g)    Except as set forth on Exhibit "B" attached hereto and by this reference made a part hereof, there is no action or proceeding pending against Seller, or, to Seller's and/or Wright's knowledge, any part of the Property, which, if determined adversely as to the Seller and/or Wright, Purchaser or the Property, would have a material adverse effect on the Property or Purchaser's intended development of the Project (as hereinafter defined), and to Seller's knowledge, no such action is contemplated or threatened by any party.

(h)    The Property has full and free access to and from public streets or roads.

(i)    Except as set forth in Seller's Property Information (as hereinafter defined), Seller has not received any written notice from (and has no knowledge of the issuance of any notice from) any agency of any governmental agency or any other person or entity that the Property requires any actions, including cleanup or removal regarding any hazardous waste, hazardous material or any other substance regulated by any state or Federal environmental laws. To Seller's and/or Wright's knowledge, the issuance of such a notice is not threatened or contemplated by any such agency or other person or entity.  To Seller's and/or Wright's knowledge, there are no buried materials (whether subject to Environmental Protection Laws or not) on the Property and the Property has not been used for the purposes of storing, manufacturing or dumping and does not contain any hazardous waste or hazardous substances as defined in Federal Comprehensive Environmental Response Compensation and Liability Act of 1980 as amended or any other environmental protection laws (collectively "Environmental Protection Laws").

(j)    Seller and/or Wright have no knowledge of any non-monetary restrictions or encumbrances affecting the Property that would hinder or preclude the development of the Property as a multifamily high-rise condominium project containing approximately 300,000 square feet of floor area and approximately 92 residential units with related amenities, as proposed in the Development Agreement to be submitted to the City of Destin, and a proposed marina site on the northeastern boundary line of the Land (the "Project").

(k)    The Land is presently zoned RIA/HDR under the City of Destin, Florida Zoning ordinance, which allows Purchaser to develop the Project on the Land with the density set forth in the proposed Development Agreement.

(l)    Seller has heretofore delivered, discussed, and made available to Barcus and Cerqueira the following information ("Seller's Property Information"):

1.    Existing title commitment;
2.    Copies of title exceptions, including without limitation all memoranda of lease and all mortgages and other liens affecting the Land;
3.    The most current boundary survey of the property;
4.    Electronic copies of the latest, existing topographic surveys, if any;
5.    Property Tax Bills;

4

6.    The Lease;

7.    Governmental Approvals (as hereinafter defined), including without limitation development permits and approvals issued by, among others, the City of Destin, Florida DEP and USCOE;

8.    Architectural/engineering plans and specifications related to design of the seawall;

9.    Copies of fully executed construction contracts related to construction of the seawall and certificates of completion, if any;

10.   Zoning and land use confirmation from the City of Destin together with a complete copy of the applicable City of Destin zoning ordinance, with exhibits, granting the Land's present zoning classification;

11.   Copy of the fully executed Redemption Agreement used to redeem the interests of the other members of Destin Development, LLC;

12.   Copy of fully executed operating agreement of Destin Development, LLC;

13.   Copies of all fully executed instruments documenting the Loans (as hereinafter defined).

14.   Copy of the proposed Development Agreement, including all agreed upon provisions with the City of Destin and Okaloosa County, Florida.

Seller's Property Information substantially represents all of the material information regarding the Property in Seller's possession or control; and Seller shall deliver written updates to Purchaser in the event any of Seller's Property Information materially change. The matters described above and delivered to Purchaser as Seller's Property Information are true, correct and complete copies of all matters described therein. Notwithstanding any provision of this Agreement to the contrary, Seller shall also deliver to Purchaser a true, correct and complete copy of the most recent appraisal of the value of the Land that Seller has in its possession and/or control.

(m)    Roderic Wright and Barbara Wright are the sole members of Seller.

4.    **SELLER'S OBLIGATIONS.** The Seller shall have the following obligations:

(a)    The Seller is in the process of obtaining a Development Agreement with the City of Destin which will permit the use of the land desired by the Purchaser and the Seller will continue such efforts after closing and will, if required, assign to Purchaser such Development Agreement. Seller and Wright shall cooperate with Purchaser in obtaining any and all permits, licenses, variances, approvals, street and/or alley vacations and/or easements pertaining to the buildings, improvements, occupancy, land use designation, signs, curb cuts, parking areas, parking garages, driveways, ingress and egress to private thoroughfares, and zoning, utilities and environmental controls (collectively, the "Governmental Approvals") that are necessary to permit Purchaser to develop the Project on the Land, including without limitation, maintaining the permits and approvals granted to Seller to date. Seller and Wright shall not (i) agree to any special zoning conditions or other conditions affecting the Property (such as setback lines, height limitations, buffer requirements, or the like) proposed by any governmental agency or other party or (ii) seek or cause to be issued any final, non-appealable changes to the current zoning and land use status of the Land, without the prior written consent of Purchaser.

5

(b)   Seller has completed the construction of the seawall on the Land in accordance with the approvals and the contracts described in Paragraphs 3(I)(8) and (9).

(c)   Seller shall assign its leasehold interest under the Lease to POINTE ONE, LLC which includes the right to convert the leasehold to a fee simple title ownership pursuant to the Lease in accordance with the procedures and ordinances of Okaloosa County, Florida.

(d)   Seller shall (i) fulfill, perform and observe each and every condition and covenant of Seller contained in the Lease; and (ii) give prompt notice to Purchaser of any claim of default by any party under the Lease, together with a complete copy or statement of any information submitted or referenced in support of such claim.

(e)   Except as set forth in Paragraph 4(c) above, without the prior written consent of Purchaser, Seller will not (i) terminate or modify in any material respect the terms of the Lease, or (ii) waive or release any person from the satisfaction or performance of any liability or material obligation under the terms of the Lease.

(f)   Seller shall not voluntarily, without the prior written consent of Purchaser, convey any portion of the Property or any interest therein or enter into any agreement with respect to all or any portion of the Property which would, after the consummation of a sale of the Property to Purchaser, encumber the Land or otherwise bind Purchaser.

(g)   Seller shall allow Purchaser to participate in any litigation arising from claims against the City of Destin, Florida and/or its employees and Seller shall not compromise or release or waive any such claims or causes of action without the prior written consent of Purchaser.

(h)   Upon the performances set forth in this Agreement, the Seller shall have no lien, mortgage, or recorded security interest in the Property.

(i)   Except as required by the Operating Agreement of Purchaser, neither the Seller nor any member of the Purchaser shall be required to personally guarantee this Agreement or any performance under this Agreement including, but not limited to, the financing of the payoff of existing debts, construction loan financing, or other financial transactions that may be or become necessary for completing the development of the Property.

(j)   In the event that the Purchaser determines, in Purchaser's sole discretion, that Purchaser is ultimately unable to develop the Property, then this Agreement will be canceled and the Property, together with all rights and causes of action, will be returned and restored to the Seller, as if this Agreement had not been executed and the Property will be subject only to the funds advanced by Barcus, Cerqueira, the Purchaser and the debts and obligations incurred that are directly related to the Property and its development which funds are to be disbursed pursuant to the Operating Agreement of the Purchaser.

6

## 5.    CONDITIONS PRECEDENT TO PURCHASER'S PERFORMANCE.

(a)    Seller shall have timely performed Seller's obligations under this Agreement in all material respects.

(b)    As of the Closing Date (as hereinafter defined) and the closing of the Construction Loan as well as the dates of any other payments of Purchase Price to Seller as set forth in Paragraph 2(a) above, each of Seller's representations and warranties shall be true, correct and complete in all material respects.

(c)    Purchaser and Seller shall diligently and in good faith cooperate with and assist one another in the pursuit of the various Governmental Approvals necessary to develop the land as planned.

(d)    The terms of any covenants, conditions and restrictions agreement affecting the Property are satisfactory to Purchaser, in form and content.

## 6.    TITLE; LOANS AND INSPECTION PERIODS.

(a)    The Seller has delivered all documents necessary for the Purchaser to determine the quality of the Seller's title and interest in the Property. However, the Purchaser, at its expense, may obtain, a title insurance commitment for an owner's title insurance policy in the amount of not less than the Purchase Price, naming Purchaser as the proposed insured with respect to the Property (hereinafter referred to as the "Title Binder"). If the Title Binder reveals any exception to Seller's title to the Property which is not acceptable to Purchaser, then Purchaser shall deliver to Seller, with the Title Binder, a written notice describing in reasonable detail the existence and nature of any such title or Survey exception (hereinafter referred to as the "Notice of Defect"). Except as set forth below, any title or Survey exception disclosed by the Title Binder and Survey and not listed in such Notice of Defect shall be deemed a "Permitted Title Exception" (herein so called) under this Agreement. Seller shall have a period of fifteen (15) days (hereinafter referred to as the "Title Cure Period") after receipt of the Notice of Defect within which Seller shall have the right but not the obligation to correct or eliminate any title or Survey exception listed therein. If Seller shall fail to correct or eliminate any title or Survey exception listed in the Notice of Defect to the satisfaction of Purchaser in Purchaser's sole discretion within the Title Cure Period, then Purchaser may elect either to (a) accept the Property subject to such title or Survey exception (in which case such title exception shall become a Permitted Title Exception hereunder), or (b) terminate this Agreement at which point Purchaser may avail itself of any remedies available at law or in equity as a result of Seller's breach of any representation, warranty, covenant, condition or obligation contained herein. Purchaser shall exercise such election by written notice to Seller delivered within five (5) days following the end of the Title Cure Period, and the failure to deliver such election notice shall constitute an acceptance of the Property under the immediately preceding clause (a). Notwithstanding any provision of this Agreement to the contrary, no mortgage, security deed, lien, judgment, or other claim in a liquidated amount, which constitutes an exception to the title to the Property (whether or not the same is disclosed by the Title Binder or listed in the Notice of Defect) shall in any event be a Permitted Title Exception hereunder, but such claim shall be paid or satisfied out of the sums payable by Purchaser at Closing, and the proceeds

7

of sale payable to Seller shall be reduced accordingly. At any time prior to Closing, Purchaser shall have the right to notify Seller of any additional title or Survey exception which first appears of record or is disclosed by the Survey, as revised, after the effective date of the Title Binder, or otherwise becomes known to Purchaser, it being understood and agreed that no such additional title or Survey exception shall constitute a Permitted Title Exception hereunder unless Purchaser shall expressly approve the same.

(b)     Seller and/or Wright is presently obligated to repay the following loans (the "Loans"), secured by the Land, where indicated:

1.     Loans in the aggregate principal amount of $3,500,000.00 in favor of Allen R. Levin and Teresa Levin, husband and wife, and Robert L. Rinke and Abby L, Rinke, husband and wife, secured by a mortgage on the Land (the "Levin Notes");

2.     On or before May 30, 2004, the Purchaser will advance to the Seller $1,500,000 of the $3,500,000 pursuant to the Levin Notes by paying said $1,500,000 to the holder of the Levin Notes and such payment shall be a credit against that portion of the Purchase Price of the land payable to the Seller at the time of the closing of the construction loan.

3.     Loan in the principal amount of $300,000 in favor of Frederick S. Meyer, as Trustee, secured by a mortgage on the Land (the "300k Note");

4.     Loan in the principal amount of $650,000 in favor of William A. Welch/First City Bank (the "650k Note"); and

5.     Loan in the principal amount of $1,456,270 in favor of Levin/Rinke (the "1,456k Note").

(c)     Notwithstanding any other provision of this Agreement to the contrary, Purchaser hereby agrees that should Purchaser acquire the Property, it will do so subject to the Loans, subject to the provisions for Seller's and/or Wright's indemnity to Purchaser as set forth below in this Paragraph 6(b). Purchaser may elect, in Purchaser's sole discretion, to satisfy the Loans at Closing or any time thereafter prior to the closing of the Construction Loan through interim refinancing (provided that such refinancing must include the entire balance of any Loan so refinanced) or to satisfy the Loans upon the closing of the Construction Loan. Once the Loans are satisfied, the Purchase Price payable to Seller shall be reduced as set forth in Paragraph 2(a)(2) above, except as follows:

1.     Purchaser shall be responsible for payment of an amount equal to $2,000,000.00 of the principal necessary to satisfy the Levin Notes;

2.     Purchaser shall be responsible for payment of the principal of the 1,456k Note;

3.     Seller shall be responsible for payment of an amount equal to $400,000.00 of the combined 300k Note and 650k Note and Purchaser shall be responsible for payment of an amount equal to $550,000.00 of the principal of such combined notes; and

8

4. Any interest accrued or accruing on any of the Loans shall be the responsibility of the party responsible for paying the principal amount of such Loan. Seller agrees to provide Purchaser with written evidence that the proceeds of the 1,456k Note were used to pay for out-of-pocket pre-development costs incurred in regard to the development of the Land.

Upon Closing, Seller shall indemnify and hold harmless Purchaser from and against any and all liens, liabilities, claims, actions, obligations, damages, costs, and expenses arising out of or as a result of Seller's acts or omissions, breaches or failures to perform pursuant to the terms of the Loans up to and including the Closing Date. This obligation to indemnify and hold Purchaser harmless shall survive the Closing and any termination of this Agreement.

(d)     Purchaser shall have the privilege, during the existence of this Agreement, of going upon the Land to inspect, examine, survey and make engineering, environmental, or landscaping tests or such other studies or surveys which it may deem necessary in its sole discretion regarding the Land and the development thereof. Should anyone attempt to file a lien against the Land by reason of the Purchaser's activities, the Purchaser shall have the same canceled and discharged of record within thirty (30) days after Purchaser receives notice thereof. In the event Purchaser shall fail or refuse to cancel or discharge such lien, Seller may do so at Purchaser's cost and expense. Purchaser hereby indemnifies and agrees to hold Seller harmless from and against any and all liens, liabilities, claims, actions, damages, costs, and expenses, and against any and all claims for death or injury to persons or damage to properties to the extent arising out of or as a result of Purchaser's employees, or agents, or contractors, or other representatives, or their employees entering or going upon the Land pursuant to the provisions of this Paragraph or otherwise. This obligation to indemnify and hold Seller harmless shall survive the Closing and any termination of this Agreement. Purchaser shall promptly restore the Land to its condition on the date hereof to the extent practicable after all such tests or surveys. Purchaser's obligation so to restore shall survive any termination of this Agreement. Purchaser shall also be permitted to examine all records, real estate tax assessment information and all other information pertaining to the Land which is in the possession or control of Seller.

7.     CLOSING – CLOSING DOCUMENTS.  At the Closing of this transaction:

(a)     Seller shall deliver to Purchaser the following items, which items shall be in form and substance reasonably satisfactory to Purchaser:

1.  An assignment of all the Seller's right title and interest in and to said Property in recordable form conveying good and marketable title to the Property, subject only to the Permitted Exceptions, and a quitclaim deed, if necessary, to the Property based upon the Survey in form and substance reasonably satisfactory to Purchaser.

2.  A standard non-foreign affidavit stating Seller is not a foreign entity.

3.  An owner's affidavit in the form required by Purchaser's title insurance company.

9

4. Copies of all deeds, closing statements, certificates, affidavits, lien releases, resolutions, and any other items or documents delivered by any party in connection with the conversion of Seller's leasehold interest into fee simple title interest under the Lease which may be reasonably requested by the Purchaser or by Purchaser's title insurance company in order to comply with the terms of this Agreement.

5. Any other items or documents affecting the conveyance and sale of the Property which may be reasonably requested by the Purchaser or by Purchaser's title insurance company in order to comply with the terms of this Agreement.

(b)  Purchaser shall deliver to Seller:

1. A sale closing statement.

2. Any other items or documents affecting the conveyance and sale of the Property which may be reasonably requested by Seller or by Purchaser's title insurance company in order to comply with the terms of this Agreement.

(c)  Seller shall pay the cost of Seller's counsel, deed preparation, deed or transfer taxes, and real estate commissions. Purchaser will pay all other closing costs, including title examination fees and expenses and survey expenses.

8.  **PRORATIONS.**  All items of income and expense attributable to the Property, including all ad valorem taxes for the then current year, and other proratable items of income or expense shall be prorated as of 11:59 p.m. May 25, 2004, due to the Agreement of Wright, Barcus, and Cerqueira of that same date. If said May 25, 2004 date occurs before the ad valorem tax rate is fixed for the then current year, the apportionment of taxes shall be on the basis of the tax rate for the preceding year applied to the latest assessed valuation, such proration to be adjusted following Closing upon determination of the final tax amount (after appeal if appealed).

9.  **EMINENT DOMAIN – CONDEMNATION.**  If, prior to Closing, the Property or part thereof is subject to an eminent domain or condemnation proceeding, Seller, immediately upon learning thereof, shall give written notice to Purchaser. Thereafter, Purchaser shall have a period of thirty (30) days within which to elect, by written notice to Seller, to terminate the Agreement. If no such election is timely made, Purchaser shall be deemed to have waived its rights under this paragraph, except that, if the transaction contemplated hereby closes, Purchaser shall be entitled to the proceeds or the right to negotiate, settle and collect the proceeds of such condemnation award, and Seller shall execute and deliver all documents reasonably requested of Seller in order to effectuate this section.

10.  **CLOSING DATE.**  The Closing shall take place on or about May 25, 2004, or as soon as the conditions set forth in Paragraph 5 above, have been satisfied in full and/or the date when all Seller's obligations have been completed as set forth in Paragraph 4 above, whichever is later, at the offices of the Seller in Destin, Florida or other mutually agreeable location.

10

11. APPLICATION OF EARNEST MONEY AND REMEDIES UPON DEFAULT.

(a) Upon the Closing of the purchase and sale hereunder, the Earnest Money ( as defined and identified in Paragraph 2(a)(1) above, shall be applied to and credited toward the Purchase Price as provided for herein;

(b) If the purchase and sale hereunder are not closed by reason of Seller's default hereunder, or if Seller's default or breach of representation or warranty or covenant is discovered by Purchaser following Closing, Purchaser shall have all rights at law or in equity, including without limitation, as applicable, the right to (i) specific performance of this Agreement, (ii) pursue an action for damages, including consequential damages, or (iii) terminate this Agreement.

(c) SUBJECT TO THE PROVISIONS OF PARAGRAPH 13 BELOW, if the purchase and sale hereunder are not closed by reason of Purchaser's default hereunder, then, as full liquidated damages for such default by Purchaser, the Earnest Money shall be retained by the Seller. It is specifically understood and agreed that payment of the Earnest Money to Seller, as liquidated damages, shall be Seller's sole and exclusive remedy hereunder, and Seller is hereby specifically waiving and relinquishing any and all other remedies at law or in equity. The parties acknowledge that the actual amount of the damages which Seller would sustain as a result of Purchaser's breach of this Agreement are difficult or impossible to estimate and that the payment of Earnest Money to Seller represents the parties' best estimate of Seller's damages in the event of such breach and is not to be construed as a penalty or forfeiture. The said stipulated sum is a reasonable pre-estimate of the probable loss resulting from such a breach.

12. REPRESENTATIONS REGARDING BROKERS. Each party represents and warrants to the other that neither has employed, retained or consulted any other broker, agent, or finder in carrying on the negotiations in connection with this Agreement or the purchase and sale referred to herein, and Seller and Purchaser shall each indemnify and hold the other harmless from and against any and all claims, demands, causes of action, debts, liabilities, judgments and damages (including costs and reasonable attorneys' fees incurred in connection with the enforcement of this indemnity) which may be asserted or recovered against the indemnitor's breach of this representation and warranty. The indemnity in this Paragraph shall survive the Closing or any termination of this Agreement.

13. IMPOSSIBILITY OF PERFORMANCE. Upon Purchaser's termination of this Agreement pursuant to its rights under this Agreement due to impossibility of performance, Purchaser shall be entitled to have a lien against the Land to secure the monies paid or advanced to, or on behalf of, Seller under this Agreement, and Seller shall provide the Purchaser with said security against the Property, unless other suitable security is provided by Seller.

14. MISCELLANEOUS PROVISIONS.

(a) Assignment. Purchaser may not assign Purchaser's rights in this Agreement without the consent of Seller and Seller may not assign its rights in this Agreement without the prior written consent of Purchaser.

11

(b)    Notices.  Any notice, consent, approval, waiver, and election which any party shall be required or permitted to make or give under this contract shall be in writing and shall be deemed to have been sufficiently made or given if addressed to the respective parties at the addresses below:

TO SELLER:          Destin Development, LLC
                    124 Benning Drive, Suite 7
                    Destin, Florida 32541
                    Attn: Roderic Wright
                    Tel:  850-650-8451
                    Fax:  850-650-8452

TO PURCHASER:       POINTE ONE, LLC
                    3512 7th Avenue South
                    Birmingham, Alabama 35222
                    Tel:  205-251-2200
                    Fax:  205-252-0956

WITH A COPY TO:     Les W. Burke, Esq.
                    Burke, Blue & Hutchison, P.A.
                    221 McKenzie Avenue
                    Panama City, Florida 32401
                    Tel:  850-769-1414
                    Fax:  850-784-0857

WITH A COPY TO:     Patrick J. Barcus
                    c/o Paul Barcus
                    20485 Banegher Way
                    Deluth, Georgia 30097
                    Tel:
                    Fax:

WITH A COPY TO:     Anthony Cerqueira
                    9893 Grandview Drive
                    La Mesa, California 91941
                    Tel: 619-697-3301

WITH A COPY TO:     Joseph P. Bornstein, L.L.C.
                    7042 Vilamoura Place
                    Bradenton, Florida 34202
                    Tel:  941-907-1268
                    Fax:  941-907-2036

Any such notices shall be either (a) sent by overnight delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered one business day after deposit with such courier, (b) sent by facsimile, with written confirmation by overnight courier for next business day delivery, in which case notice shall be deemed delivered upon

12

(b)   Notices. Any notice, consent, approval, waiver, and election which any party shall be required or permitted to make or give under this contract shall be in writing and shall be deemed to have been sufficiently made or given if addressed to the respective parties at the addresses below:

TO SELLER:        Destin Development, LLC
                  124 Benning Drive, Suite 7
                  Destin, Florida 32541
                  Attn: Roderic Wright
                  Tel:  850-650-8451
                  Fax:  850-650-8452

TO PURCHASER:     POINTE ONE, LLC
                  3512 7th Avenue South
                  Birmingham, Alabama 35222
                  Tel: 205-251-2200
                  Fax: 205-252-0956

WITH A COPY TO:   Les W. Burke, Esq.
                  Burke, Blue & Hutchison, P.A.
                  221 McKenzie Avenue
                  Panama City, Florida 32401
                  Tel: 850-769-1414
                  Fax: 850-784-0857

WITH A COPY TO:   Patrick J. Barcus
                  c/o Paul Barcus
                  20485 Banegher Way
                  Duluth, Georgia 30097
                  Tel:
                  Fax:

WITH A COPY TO:   Anthony Cerqueira
                  9893 Grandview Drive
                  La Mesa, California 91941
                  Tel: 619-697-3301

WITH A COPY TO:   Joseph P. Bornstein, L.L.C.
                  7042 Vilamoura Place
                  Bradenton, Florida 34202
                  Tel: 941-907-1268
                  Fax: 941-907-2036

Any such notices shall be either (a) sent by overnight delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered one business day after deposit with such courier, (b) sent by facsimile, with written confirmation by overnight courier for next business day delivery, in which case notice shall be deemed delivered upon

and shall survive the Closing, as set forth herein.

(l)    Construction.    The parties acknowledge that each party and its counsel have reviewed and approved this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or exhibits hereto.

(m)    Business Days.    If the final day of any period or any date of performance under this Agreement falls on a Saturday, Sunday or legal holiday, then the final day of the period or the date of performance shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

(n)    Telecopies.    The parties hereto agree that documents transmitted by telecopy or facsimile transmission shall be deemed to be written instruments and shall be binding on the parties executing and delivering such documents.

(o)    Signatures.    The parties hereto agree that this Agreement and Modifications, if any, may be agreed to and acknowledged by facsimile signatures which, when received shall be effective and binding upon the signing party as if it were the original signature.

(The remainder of this page has been intentionally left blank.)

14

DATED this ____ day of _____, 2004, which is the date this Agreement has been signed by whichever of Purchaser or Seller is the last to sign this Agreement. All references to the "date of this Agreement" or similar references shall mean this date.

SELLER:

DESTIN DEVELOPMENT, LLC

By: _Roderic M. Wright_ _President_
Name: _Roderic M. Wright_
Title: _C.E.O. / President_
_May 21, 2004_
Date of Final Execution

WRIGHT:

_Roderic Wright, President, C.E.O._
Roderic Wright

_Barbara J. Wright, V.P._
Barbara J. Wright

_May 21, 2004_
Date of Final Execution

PURCHASER:

POINT ONE, LLC

By: _____
Name: _____
Its: _____

Date of Final Execution

REVIEWED AND APPROVED BY:

_____
PATRICK BARCUS

_____
Date of Final Execution

_____
ANTHONY CERQUEIRA

_____
Date of Final Execution

15

May 26 04 07:28a    Chuck Fuller              850-236-1167           ☒003    p.6
.May 25 04 06:02p    ...ick Fuller ___        85 ---236-1167                  p.1

DATED this 14 day of May , 2004, which is the date this Agreement has been signed by whichever of Purchaser or Seller is the last to sign this Agreement. All references to the "date of this Agreement" or similar references shall mean this date.

SELLER:

DESTIN DEVELOPMENT, LLC

By: _____
Name: _____
Title: _____

Date of Final Execution _____

WRIGHT:

_____
Roderic Wright

_____
Barbara Wright

Date of Final Execution _____

PURCHASER:

POINTE ONE, LLC

By: _____
    Pointe D, LLC
    As Its Manager

Date of Final Execution _____

REVIEWED AND APPROVED BY:

_____  5/24/2004
PATRICK BARCUS

Date of Final Execution _____

_____
ANTHONY CERVASQUERA
Date of Final Execution 5/24/04

15

05/28/2006 WED 07:28   [TX/RX NO 9060]  ☒006

## EXHIBIT "A"

### Legal Description

Commence at the Northernmost corner, Lot 124, Block F, Holiday Isle, Destin, Florida; Residential Section No. 5; thence S30°34'00"W 724.75 feet; thence N66°29'00"W, 1877.26 feet; thence N23°31'00"E 16.04 feet; thence N88°36'59"W 279.52 feet; thence N39°36'39"W 1,171.21 feet to the Point of Beginning; thence S67°13'00"W 231.85+/- feet to the waters edge of Gulf of Mexico; thence Northwesterly along waters edge 4254+/- feet; thence N44°19'00" 60+/- feet to a point on a line that bears N61°53'09"W 516.28 feet from the Point of Beginning; thence continue N44°19'00"E 200+/- feet to waters edge of Old Pass Lagoon; thence Southeasterly along waters edge 660+/- feet; thence S67°13'00"W 150+/- feet to the Point of Beginning. Less and Except 100' Okaloosa County road right of way.

## EXHIBIT "B"

[List Legal Claims by and against Seller involving the Property]

None.

17