## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SERGIO ALVARADO** | |
| Plaintiff, | **CIVIL ACTION NO.** |
| | **JUDGE** |
| **vs.** | **MAGISTRATE JUDGE** |
| | |
| **BP Exploration & Production, Inc.; BP America Production Company; BP P.L.C.; Transocean Ltd.; Transocean Offshore Deepwater Drilling, Inc.; Transocean Deepwater, Inc.; Transocean Holdings, LLC; Triton Asset Leasing GmbH; Halliburton Energy Services, Inc.; Sperry Drilling Services, a division of Halliburton Energy Services, Inc.; M-I, LLC; Cameron International Corporation f/k/a Cooper-Cameron Corporation; Anadarko Petroleum Corporation Anadarko E&P Company LP; MOEX Offshore 2007 LLC; MOEX USA Corporation; Mitsui Oil Exploration Co., LTD** | |
| Defendants, | |

## COMPLAINT FOR DAMAGES

**NOW COMES PLAINTIFF,** Sergio Alvarado, through his undersigned counsel, who does allege, avers and represents as follows:

## THE PARTIES, JURISDICTION AND VENUE

1. Plaintiff, Sergio Alvarado (hereinafter "Plaintiff"), is an individual over the age of majority who is a resident and citizen of Louisiana, domiciled in the Parish of Jefferson.

2. Plaintiff brings these claims pursuant to Federal General Maritime Law including/and/or under La. Civ. Code articles, 2315, 2316, 2317, 2317.1, 2320 and/or 2322.

3. Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime jurisdiction." In addition, jurisdiction in this case is asserted under the General Maritime Law of the United States, 28 USC §1333. The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiff hereby designates this case as an admiralty or maritime case, and requests a jury trial, pursuant to 28 U.S.C. § 1873. The Court also has jurisdiction over this action pursuant to The Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or

1

damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land. In the alternative, jurisdiction is asserted under the Outer Continental Shelf Lands Act (OCSLA), 43 USC § 1331 et seq.

4. In addition, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1333.

5. Venue is proper in this Honorable Court in the Eastern District of Louisiana given the events detailed hereafter and the litigation arising out of the Deepwater Horizon catastrophe.

6. The Plaintiff is not a class member of the Medical Benefits Settlement Class due to his timely opt-out.

7. Plaintiff was a resident of the City of Kenner, Parish of Jefferson, and was exposed near his home when he came in contact with water contaminated with oil and dispersant, which caused many medical problems.

8. Those injuries included, but were not limited to rashes, sinus problems, depression, ringing in the ears and severe eye irritation.

9. The Deepwater Horizon explosion and subsequent oil spill was proximately caused by the acts and omissions of one or more of the defendants, and by virtue of exposure and contact with dispersants, oil, oil bi-products, distillates, benzene, hexane and other chemicals which were used and or exposed from the oil spill, including dispersants that were authorized by and/or released by one or more of the defendants.

10. Defendant, BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a lease holder and the designated operator in the lease granted by the former Minerals Management Service ("MMS")[1] allowing it to perform oil exploration, drilling and production-related operations in Mississippi Canyon Block 252, the location known as "Macando" where the spill originated. This court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

---

[1] The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was recognized as the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE) on June 18, 2010. It shall, however, be referred to as the MMS throughout this Complaint.

11. Defendant, BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

12. Defendant BP P.L.C. is a British public limited company with its corporate headquarters in London, England. BP P.L.C. is the global parent company of the worldwide business operating under the "BP" logo. BP P.L.C. operates its various business divisions, such as the "Exploration and Production" division within BP Exploration and BP America, through vertical business arrangements aligned by product or service groups. BP P.L.C.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP P.L.C. and are sufficiently controlled by BP P.L.C. so as to be BP P.L.C.'s agents in Louisiana and the U.S. more generally. Plaintiff further adopts and incorporates by reference all jurisdictional allegations against BP P.L.C. set forth in Paragraphs 212-218 of the Amended B1 Master Complaint, Document No. 1128 filed in MDL No. 2179, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010.*

13. BP Exploration, BP America, and BP P.L.C. are generally referred to herein collectively as the "BP Defendants" or "BP."

14. Defendant, Transocean Ltd. ("Transocean Ltd.") is a Swiss corporation that maintains substantial U. S. offices in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. According to its Complaint and Petition for Exoneration from or Limitation of Liability in The MDL, Transocean Ltd. was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

15. Defendant, Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Offshore is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

16. Defendant, Transocean Deepwater, Inc. ("Transocean Deepwater"), is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent

times was doing business in the State of Louisiana and within this district. Transocean Deepwater is affiliated with Transocean Ltd. and was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

17. Defendant, Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Holdings is affiliated with Transocean Ltd. and is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings and party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico. On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the blowout by the Deepwater Horizon.

18. Defendant, Triton Asset Leasing GmbH ("Triton") is a Swiss limited liability company with its principal place of business in Zug, Switzerland. Triton is affiliated with Transocean Ltd. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

19. Defendants, Transocean Ltd., Transocean Deepwater, Transocean Offshore, Transocean Holdings, and Triton are hereinafter referred to collectively as "Transocean."

20. Defendant, Halliburton Energy Services, Inc. is a Delaware corporation with its principal place of business in Houston, Texas. Halliburton is registered to do and does business in the State of Louisiana. Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the Deepwater Horizon, as well as onshore engineering support for those operations.

21. Halliburton division Sperry Drilling Services (formerly Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the Deepwater Horizon, including downhole drilling tools. Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations. "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

22. Defendant M-I, LLC ("M-I") is a Delaware limited liability company with its principal place of business in Wilmington, Delaware, and at all relevant times was doing business in

4

Louisiana. M-I (also known as M-I SWACO) supplies drilling and completion fluids and additives to oil and gas companies in Louisiana and elsewhere, providing pressure control, vessel instrumentation, and drilling waste management products and services. On the Deepwater Horizon, M-I provided mud products, including drilling fluids and spacers, engineering services, and mud supervisory personnel, such as mud engineers and drilling fluid specialists, to manage the properties of those fluids in the well. M-I employees planned and/or supervised key fluid related activities at Macondo, such as the mud displacement that was occurring at the time of the April 20, 2010, blowout.

23. BP, Transocean, Halliburton, and M-I are collectively referred to herein as the "Drilling Defendants," as they were all involved in the drilling, cementing, and/or other temporary well abandonment activities of the Deepwater Horizon, and thus their actions caused and/or contributed to the Spill.

24. Defendant Cameron International Corporation f/k/a Cooper-Cameron Corporation ("Cameron") is a Delaware corporation with its principal place of business in Houston, Texas. Cameron does business in the State of Louisiana. Cameron manufactured, designed, supplied, and/or installed the Deepwater Horizon's sub-sea emergency well-closure device known as a blowout-preventer ("BOP"), which is, and was at all material times, an appurtenance of the vessel and a part of the vessel's equipment. The Cameron-made BOP that was installed at the Macondo wellhead failed to operate as intended at the time of the blowout on April 20, 2010, was improperly designed, was inappropriate for the intended environment or use, and/or possessed product defects.

25. Defendant Anadarko Petroleum Corporation ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas. Anadarko does business in the State of Louisiana. Anadarko is an oil and gas exploration and production company.

26. Defendant Anadarko E&P Company LP ("Anadarko E&P") is a Delaware limited partnership with its principal place of business in The Woodlands, Texas. Anadarko E&P does business in the State of Louisiana. Anadarko E&P is an oil and gas exploration and production company and has been recently renamed Anadarko E&P Onshore LLC.

27. Defendant MOEX Offshore 2007 LLC ("MOEX Offshore") IS a Delaware corporation with its principal place of business in Houston, Texas. MOEX Offshore does business in

the State of Louisiana. MOEX Offshore is a wholly-owned subsidiary of MOEX USA Corporation.

28. Defendant MOEX USA Corporation ("MOEX USA") is incorporated in Delaware and has its principal place of business in Houston, Texas. MOEX USA is the parent company of MOEX Offshore.

29. Defendant Mitsui Oil Exploration Co., Ltd. ("MOECO") is incorporated in Japan and has its principal place of business in Tokyo, Japan. As of June 30, 2010, MOECO identified itself as having the following U.S. subsidiaries or affiliates: MitEnergy Upstream LLC, MOEX USA Corporation, MOEX Offshore 2007 LLC, MOEX Gulf of Mexico Corporation, MOEX Oil & Gas Texas LLC, and Mitsui E&P USA LLC. Each of these subsidiaries of MOECO shares the same Houston, Texas, address.

30. Neither MOEX Offshore nor MOEX USA are distinct corporate entities that perform autonomous business activities. Instead, both entities are dominated and controlled by their ultimate parent company, MOECO, which wholly owns MOEX USA, which in turn wholly owns MOEX Offshore. Because MOECO is an alter ego of its subsidiaries (MOEX Offshore and MOEX USA), any and all liability of MOEX Offshore and MOEX USA is imputed to MOECO.

31. Defendants MOEX Offshore, MOEX USA, and MOECO are referred to collectively herein as "MOEX."

32. While BP was the sole lease operator of the Deepwater Horizon, Anadarko, Anadarko E&P, and MOEX were considered non-operational leaseholders. On October 1, 2009, BP Exploration, as operator, and MOEX Offshore, as non-operator, entered into the Macondo Prospect Offshore Deepwater Operating Agreement. On December 17, 2009, BP Exploration, MOEX Offshore, Andarko E&P, and Andarko executed a "Joinder" of the Operating Agreement. Subsequently, the parties to the Operating Agreement held the following ownership percentages in the Macondo Prospect: BP Exploration, 65%; MOEX Offshore, 10%; Anadarko E&P, 22.5%; and, Anadarko, 2.5%. According to the MMS's website, effective April 1, 2010, record title interest in the Macondo prospect was held as follows: BP Exploration, 65%; MOEX Offshore, 10%; and, Anadarko, 25%. As joint holders of a leasehold interest in an oil or gas lease on land beneath navigable waters, Defendants Anadarko, Anadarko E&P, and MOEX are jointly, severally, and solidarily

liable with their codefendants BP pursuant to the Oil Pollution Act. Anadarko, Anadarko E&P, and MOEX also had access to Halliburton/Sperry Sun INSITE real-time data that was transmitted from the Deepwater Horizon on April 20, 2010, and therefore knew or should have known of the red flags indicating a leak in the well in sufficient time to avert the disaster.

33. Drilling Defendants, Cameron, Anadarko, Anadarko E&P, and MOEX are jointly, severally, and solidarily liable under various principles of federal, maritime, and/or applicable State law, and under the Oil Pollution Act.

## FACTUAL BACKGROUND

### Macondo lease and BP's Exploration Plan and Drilling Permit

34. On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and exploit hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf 48 miles off the coast of Louisiana.

35. In the process of obtaining its lease, BP represented that it had planned and prepared its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices and would not cause undue or serious harm or damage to human or marine health or the coastal environment.

36. BP represented that it was unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. In the event that a spill did occur, BP predicted a worst case scenario of 162,000 gallons of oil per day, an amount which it assured the MMS that it was prepared to respond to and handle. BP also claimed the well's distance from the nearest shoreline would preclude any significant adverse impacts from a spill.

37. Based on these assurances, the MMS approved BP's Initial Exploration Plan ("EP") for the Macando prospect on April 6, 2009, including approval of a "categorical exclusion" from the full environmental analysis normally required under the National Environmental Policy Act.

38. After its EP was approved, BP sought a permit from the MMS authorizing it to drill up to a total depth of 19,650 feel at the Macondo site.

Defendants Action and/or Inaction Which Resulted in the Oil Spill

39. Defendants knew the cementing work the Deepwater Horizon was performing was especially risky. BP's mid-April plan review predicted cement failure, stating "[c]ement

simulations indicated it is unlikely to be a successful cement job due to formation breakdown." Yet, defendants made minimal efforts to contain the added risk. To save time and money, defendants chose not to run a 9-12 hour procedure called a cement bond log to assess the integrity of the cement seal. Defendants also failed to secure the wellhead with a lockdown sleeve, a critical apparatus that locks the wellhead and the casing in the deal assembly at the seafloor, before allowing pressure on the seal from below.

40. Based on testing performed before the final cement job at the Macondo well, Halliburton knew that its cement slurry design was unstable. In addition, Halliburton and BP had results in March 2010 showing that a very similar foam slurry design to the one actually pumped at the Macondo well would be unstable, but neither acted upon that data.

41. In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanisms, the blowout-preventer (BOP). Defendants were aware of the risk of BOPs failing at greater depths, yet did not install a backup BOP activation system or backup BOPs. Defendants were also aware that the industry and government had major concerns about the reliability of BOPs like the one installed on the Deepwater Horizon.

42. Defendants BP, Transocean and one or more of the other Drilling Defendants, failed to ensure that the BOP present on the Deepwater Horizon possessed reasonably safe, adequate, functional technology to prevent blowouts.

43. Defendants BP and Transocean, and one or more of the other Drilling Defendants, failed to ensure that all foreseeable repairs (if any) and foreseeable modifications (if any) to the Deepwater Horizon's BOP were performed, completed and tested with the drilling vessel's operations shut down and the well secured.

44. Defendants BP and Transocean and one or more of the other Drilling Defendants, failed to ensure that the testing of the Deepwater Horizon's BOP was comprehensive, reviewed and verified, and further failed to check and verify the BOP's entire operating and control system, including but not limited to, checking for with leaks with an ROV (remotely operated vehicle) at the connection points, and verifying the functionality of the automated mode function and/or autoshear.

45. Defendants BP, Transocean and one or more of the other Drilling Defendants could have

ensured that a BOP and/or backup BOP with sufficient strength and reliability for deep water drilling was present and available on the Deepwater Horizon, but did not do so.

46. Transocean, the vessel's owner, had a history or postponing and ignoring needed maintenance on the Deepwater Horizon. In the weeks before the blowout, the Deepwater Horizon suffered power outages, computer gliches and a balky propulsion system. In other cases, Transocean officials purposely overrode or disabled vital safety mechanisms and alarms. These events contributed to the events of the disaster or made it worse.

47. The other Drilling Defendants knew of the poor maintenance of the Deepwater Horizon by Transocean and its practice of disabling or bypassing vital safety systems and alarms, but they continued to operate the vessel and did not report the inadequacies.

48. Upon information and belief, in addition to the examples set forth above, other non-exclusive examples of defendants misconduct, negligence and wantonness include:

    A.     Utilizing a defective well casing that was prone to fail when under heavy pressure;

    B.     Failing to observe dangerous and recurring problems with highly flammable gaseous compounds and instituting risky cementing and drilling procedures hours before Deepwater Horizon explosion;

    C.     Failing to institute common industry measures necessary to detect the buildup of highly flammable, gaseous compounds before and during the cementing process;

    D.     Accelerating drilling operations in an effort to save money and pressuring employees hours before the Deepwater Horizon explosion to drill and penetrate the continental shelf faster while ignoring risks associated with dangerous gaseous compounds in the shelf's crust;

    E.     Using an improperly designed cement mixture (slurry) and failing to properly conduct or review lab tests of the slurry;

    F.     Failing to deploy a casing hanger lockdown sleeve;

    G.     Displacing mud in the well with less dense sea water before cementing fully set;

    H.     Using non-standard spacer fluid mixture and volume;

    I.     Continuing to operate the Macondo well after the well failed pressure test;

J.     Continuing to operate the Macondo well without repairing the blowout preventer annular after chunks of the annular had broken off and floated to the surface, thereby significantly decreasing the blowout preventers protective measures against a blow out;

K.     Failing to disclose or correct the fact that the battery on the BOP was weak and one of its control pods was broken;

L.     Consciously electing not to install an acoustically activated remote-control shutoff valve;

M.     Ordering drillers to extract drilling mud from the well before all of the concrete plugs were put in place in order to speed up the drilling process thereby creating high pressure instability in the well;

N.     Failing to install a deep water valve placed nearly 200 feet under the seafloor;

O.     Failing to recognize that pressure and flow data from the well were warning signs of a blowout;

P.     Failing to develop sufficient well control procedures for vessel workers to handle larger influxes into the well for a hydrocarbon influx as large as occurred, flow should have been diverted overboard, not to mud gas separator;

Q.     Failing to properly design, install or maintain power supply to the BOP, including without limitations the use of only one blind shear ram, faulty maintenance, faulty post-market modifications and other issues;

R.     Failing to properly design, install or maintain connections from the BOP's control panel to the BOP;

S.     Failing to properly maintain and repair the BOP: Drilling defendant officials were aware of the faulty solenoid valve, poor battery maintenance, hydraulic fluid leaks and aftermarket modifications on the Deepwater Horizon's BOP long before the April 20, 2010 oil spill, but no action was ever taken to address the problems. In addition to posing a significant safety risk drilling defendants choice to continue drilling with a faulty hydraulic system violated federal regulations, which require

companies to report problems to the MMS and stop drilling if either of a BOPs two control systems are not working properly; and

T.     Failing to equip the vessel with significant safety equipment including operational gas sensors and a gas alarm system.

49. The Drilling Defendants all knew, or should have known, of the acts and omissions outlined above, and were negligent, wanton, and reckless in continuing to drill in the face of these acts and omissions.

50. In sum, Defendants knew of the dangers associated with deep water drilling, and they knew of unique problems and shortcomings in the Macondo Well and Deepwater Horizon vessel. Yet, defendants failed to take appropriate measures to prevent damage to the Plaintiff.

**Defendants Conduct After the Explosion**

51. Defendants' conduct after the explosion was insufficient to minimize damage, and was in some cases just as negligent, wanton, and reckless as the conduct that led to the explosion.

52. Defendants failed to institute proper oil disaster response plans to contain the catastrophic oil release resulting from the Deepwater Horizon explosion, and they misrepresented their capability to safely conduct offshore drilling operations and contain oil releases that might occur in connection with such operations.

53. Defendants attempted to downplay and conceal the severity of the oil spill after the explosion. Defendants' leak estimate of 5,000 barrels per day was found by government investigators to be a fraction of the current official leak estimate of 60,000 barrels of oil per day. In addition, the worst case scenario estimate of 100,000 barrels of oil per day is over 100 times BP's initial estimate of 1,000 barrels per day.

53. Defendants were also slow and incomplete in their announcements and warnings to residents about the severity, forecast, and trajectory of the Spill.

54. Furthermore, the chemical dispersants used by Defendants to accelerate the dispersal of the oil has significant side-effects as well. Corexit EC9500A and Corexit EC9527A were the principal dispersants used. These dispersants are composed of several chemicals, including 2-Butoxy Ethanol, which was identified as a causal agent in the health

problems experienced by cleanup workers after the 1989 *Exxon Valdez* oil spill. In addition, the Hazardous Substance Fact Sheet for 2-Butoxy Ethanol warns that it may be a carcinogen in humans and that "[t]here may be no safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level." Further, the OSHA-required Material Safety Data Sheets ("MSDS") for both versions of Corexit used indicate they may have a potential to cause bioaccumulation in the tissues of fish or other organisms. Additionally, the MSDSs state that if the product becomes a waste, "it could meet the criteria of a hazardous waste as defined by the Resource Conservation and Recovery Act (RCRA) 40 CFR 261."

55. Corexit EC9500A and Corexit EC9527A are more toxic and less effective than at least twelve other EPA-approved dispersants and are banned from use on oil spills in the United Kingdom. Defendants stated that they chose to use Corexit because it was available the week of the rig explosion.

56. More than 1.84 million gallons of chemical dispersants were used by July 30, 2010, and additional dispersant use was reported by fishermen in mid-August. Dispersant use continued well after the Spill at the wellhead was stopped. The dispersants were employed both on the surface and at the wellhead 5,000 feet below the surface. Mixing the dispersants with the oil at the wellhead added toxicity to the spill and kept much of the oil below the surface, exposing organisms to widespread concentrations of oil.

57. Oil, dispersants, and other pollutants released by defendants remain in Gulf waters, the Gulf floor, Louisiana waters, and land owned and/or within the jurisdiction of the Plaintiff and continue to cause damage. Oil, dispersants and other pollutants have settled into the sediment on the Gulf floor and the bed underlying waters of Louisiana, where it has killed, is killing, and will continue to kill marine life and will continually discharge into, and cause damage to, the water and land.

### The *Deepwater Horizon* Catastrophe

58. The *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil vessel built in 2001. It was leased to BP through September 2013. It was one of the largest vessels of its kind.

59. BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf off the coast

of Louisiana.

60. On April 20, 2010, workers on the *Deepwater Horizon* oil rig lost control of the Macondo well just after the final cementing work was completed. During the course of the cementing work, an explosion occurred on the *Deepwater Horizon* and it caught fire.

61. The explosion and fire caused the deaths of 11 people and injuries of many other workers on the vessel. After burning for two days, the vessel sank to the ocean floor.

62. The *Deepwater Horizon* had been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser. As the *Deepwater Horizon* sank to the seafloor, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely. The riser, bent into a crooked shape under water, extended 1,500 feet above the sea bed and then buckled back down. Oil flowed out from the open end of the riser, as well as through two breaks along its length.

63. While crude oil was believed to be discharged before the *Deepwater Horizon* finally sank on April 22, 2010, the rate of discharge is believed to have increased once the *Deepwater Horizon* sank to the ocean floor.

64. After the explosions, BP attempted to downplay and conceal the severity of the Oil Spill. Its initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of its measured leakage amount of 50,000 barrels per day. Moreover, following the Oil Spill, BP did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the Oil Spill.

65. On or about June 20, 2010, Congressman Edward Markey released an internal BP document showing that the company's own analysis had actually revealed that the rate of oil spillage could reach 100,000 barrels, or 4,200,000 gallons per day.

66. The flow of oil continued unabated, and the ever-expanding oil slick made landfall on April 30, 2010, and will continue to affect greater areas of the Gulf Coastline

67. After the Oil Spill, an oil slick with a range of thousands of miles had formed and could be seen from outer space. Additionally, thick, voluminous plumes of oil were identified in deep waters within the Gulf of Mexico. The Oil Spill caused this slick and these plumes to form. Oil washed and is washing ashore in the Gulf of Mexico, posing significant environmental and public health risks.

67. As the oil made landfall along the Gulf Coast, it infiltrated and will continue to infiltrate

the delicate wetlands and intertidal zones that line the coast of Louisiana, Mississippi, Alabama, Texas and Florida, requiring clean up.

68. For 86 days, oil spewed into the Gulf of Mexico from the damaged well, dumping an estimated 200 million gallons of crude oil into sensitive ecosystems.

69. On July 15, 2010, almost four months after the explosion and fire on the *Deepwater Horizon*, BP finally capped the well.

70. The OPA imposes liability upon a "responsible party for a … facility from which oil is discharged … into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

71. After the Oil Spill, the Coast Guard formally and/or informally designated, *inter alia*, Defendants BP Exploration, Transocean Offshore, Transocean Deepwater, Transocean Holdings, Anadarko E&P and MOEX Offshore as "responsible parties" under the OPA.

72. The crude oil carried with it significant public health risks. Crude oil has many highly toxic chemical ingredients that can damage every system in the body.

### *The Response Effort and the Use of Chemical Dispersants*

73. In the wake of the disaster, and pursuant to its duties as a responsible party under the OPA, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States. This disaster response plan had three primary components: offshore containment; shoreline protection; and subsea response.

74. As part of its offshore containment response program, BP directed the use of vessels to recover oil coming to the surface of the Gulf of Mexico; the use of vessels to skim oil from the surface of the water; the use of vessels to conduct *in situ* burning of oil that reached the surface of the water; and the use of Vessels of Opportunity ("VoO").

75. Upon information and belief, Plaintiff was hired by BP, or BP's clean up and response contractors, to clean up beaches, marshes, wetlands and other onshore areas by removing polluted sand, collecting tarballs, laying or collecting boom, hand-applying dispersant in inland areas, and other related clean-up efforts.

76. In addition, BP's response plan included the use of chemical dispersants that were intended to break down the oil into finely dispersed droplets.

77. Upon information and belief, immediately after the *Deepwater Horizon* disaster, on or about April 23, 2010, BP began subsea and aerial application of chemical dispersants manufactured

by Nalco to the resulting oil slicks and sheens on the surface of the Gulf.

78. On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator directed BP within 24 hours of issuance to identify and to change to chemical dispersants that are less toxic than Nalco's Corexit dispersants BP had been using.

79. On May 20, 2010, BP objected to changing dispersants and notified the EPA that it would continue using Nalco's Corexit.

80. BP's use of chemical dispersants skyrocketed: on May 22, 2010, BP used 45,000 gallons and on May 23, 2010, it used 70,000 gallons.

81. On May 26, 2010, the EPA directed BP to reduce overall use of Nalco's Corexit by 75%. The May 26, 2010 EPA directive also required BP to eliminate use of chemical dispersants on the surface except in rare cases where an exemption is sought in writing from and approved by the On Site Coordinator.

Since the May 26, 2010 EPA directive, BP has sought more than 40 exemption requests to se chemical dispersants on the surface of the Gulf of Mexico.

81. According to the Aerial Dispersants Operations – Houma Status Report, as of June 26, 2010, BP has applied 933,023 gallons by aerial application. BP ordered the application by 386 flights, or sorties, as of that same date. BP has covered approximately 291 square miles of the Gulf with dispersant. As of June 26, 2010, 718,454 gallons of Nalco's Corexit 9500 have been sprayed on the Gulf and 214,569 gallons of Nalco's Corexit 9527.

82. Upon information and belief, immediately after the Deepwater Horizon disaster, on or about April 23, 2010, BP began authorizing the application of chemical dispersants manufactured by other companies to contaminated vessels, containment equipment and near-shore and onshore areas to disperse the oil and clean vessels and equipment.

83. The dispersants used by BP are known to cause, *inter alia*, headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation of the skin, eyes, nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and developmental damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of chronic obstructive pulmonary disease.

84. To date, BP and its contractors have used more than 1.8 million gallons of chemical

dispersants in the Gulf of Mexico in connection with the Oil Spill.

***Plaintiff's Exposure to Oil and Harmful Chemicals and Their Resulting Injuries and Damages***

85. After the time of the *Deepwater Horizon Explosion,* Plaintiff was employed as an Oil Spill Responder by Ameri-Force Craft Services, Inc. Prior to the *Deepwater Horizon Explosion,* Plaintiff was employed for approximately three (3) years as a carpenter by Classic Hardwood Floors, LLC, located in the City of New Orleans, Parish of Orleans. Subsequent to the *Deepwater Horizon Explosion*, Plaintiff was laid-off. Classic Hardwood Floors, LLC would not rehire Plaintiff and he was unemployed until around September 12, 2010, until he obtained employment from Brocks Services. Hence, Plaintiff has suffered a variety of lost wages as a result of Defendants' conduct.

86. At the time of the *Deepwater Horizon Explosion,* Plaintiff lived in the City of Kenner, State of Louisiana and thereby, was exposed to various toxins, causing injury, damages and/or harm.

87. Upon information and belief, Plaintiff was working on various boat(s) and/or vessel(s), dispatched to lay boom to absorb the oil, or to haul in saturated booms, among other activities. In this capacity, Plaintiff was exposed to crude oil, oil and dispersants and/or other harmful chemicals by inhalation, ingestion, dermal (skin) absorption, and through contact with the eyes.

88. Upon information and belief, Plaintiff was not outfitted with proper safety and/or protective

89. Upon information and belief, Plaintiff was employed in decontamination. As a decontamination employee, Plaintiff's primary task was to spray and clean vessels that came into contact with oil and dispersants and other harmful chemicals resulting from the Oil Spill and the application of dispersants. In this capacity, Plaintiff was exposed to crude oil and dispersants and other harmful chemicals by inhalation, ingestion, dermal exposure, and through contact with the eyes from spray mist.

90. Upon information and belief, Plaintiff was not outfitted with proper safety and/or protective equipment including, but not limited to respirators or equivalent safety devices.

91. Plaintiff worked in close proximity to the Gulf of Mexico and/or areas that are the subject

of the Defendants' remedial activities. Due to his physical location, Plaintiff has been exposed to oil, dispersants, and other harmful chemicals.

92. Plaintiff complains of the noxious odors and experience headaches, nausea, toxicity, respiratory problems and eye irritation, among other adverse health effects associated with exposure to crude oil and dispersants and other harmful chemicals in the environment resulting from the Oil Spill.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### Negligence Under General Maritime Law

93. Plaintiff re-alleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

94. At all times material hereto, Defendants were participating in drilling operations onboard the Deepwater Horizon in the Gulf of Mexico.

95. At all times material hereto, Defendants owed and breached duties of ordinary and reasonable care to Plaintiff in connection with the drilling operations of the Deepwater Horizon and the maintenance of the vessel, its appurtenances and equipment, and additionally owed and breached duties to Plaintiff to guard against and/or prevent the risk of an oil spill.

96. Additionally, Defendants owed and breached a duty to Plaintiff, as well as to all persons who might foreseeably be harmed, to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

97. The existence and breach of these legal duties are established under the General Maritime Law. The blowout and explosions on the Deepwater Horizon, its sinking and the resulting Spill were caused by the joint and concurrent negligence of Defendants.

98. Plaintiff suffered injury as a direct and proximate result of Defendants' negligent breach of their aforementioned duties and, therefore, Plaintiff is entitled to recover actual and punitive damages.

### SECOND CLAIM FOR RELIEF

### Gross Negligence Under General Maritime Law

99. Plaintiff re-alleges each and every allegation set forth in all preceding paragraphs as if

fully restated herein.

100. Defendants owed and breached duties of ordinary and reasonable care to Plaintiff in connection with the manufacture, maintenance and operation of the Deepwater Horizon, and additionally owed and breached duties to Plaintiff to guard against and/or prevent the risk of the Oil Spill which occurred herein. The existence and breach of these legal duties are established under the General Maritime Law.

101. Defendants have taken control and responsibility for all aspects of the recovery and relief effort to attempt to contain the Oil Spill, prevent oil from damaging the Gulf of Mexico and the shoreline, and to clean up the damage caused to date, including the use of Nalco's chemical dispersants. Defendants owed and breached a duty to Plaintiff, as well as to all persons who might foreseeably be harmed, to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures. The existence and breach of these legal duties are established under the General Maritime Law.

102. Defendants had a heightened duty of care to Plaintiff because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

103. Defendants breached their legal duty to Plaintiff and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent failure to contain the Oil Spill.

104. Defendants knew or should have known that their wanton or reckless conduct would foreseeably cause Plaintiff's injury and/or property damage.

105. As a direct and proximate cause of Defendants' wanton or reckless acts, Plaintiff has suffered a variety of physical injuries.

106. Defendants' wanton or reckless conduct, as described herein, entitles Plaintiff to punitive damages. The amount of punitive damages recoverable by Plaintiff is not lawfully limited to the amount of their compensatory damages, but rather should be a multiplier of same sufficient to both punish Defendants and deter similar wrongdoing in the future.

### THIRD CLAIM FOR RELIEF
### Negligence Per Se Under General Maritime Law

107. Plaintiff re-alleges each and every allegation set forth in all preceding paragraphs as if

fully restated herein.

108. Defendants have taken control and responsibility for all aspects of the manufacture, maintenance and/or operation of the Deepwater Horizon.

109. The conduct of Defendants with regard to the manufacture, maintenance and/or operation of drilling operations and oil rigs such as the Deepwater Horizon and its appurtenances and equipment is governed by numerous state and federal laws and permits issued under the authority of these laws. These laws and permits create statutory standards that are intended to protect and benefit the Plaintiff. One or more of the Drilling Defendants violated these statutory standards. The violations of these statutory standards constitute negligence per se under the law of Louisiana and the general maritime law, including (but not limited to) the Clean Water Act, 33 U.S.C. § 1311.

110. There are federal laws and regulations regarding the responsible party's duty to protect workers' safety in certain contexts, including hazardous waste activities and emergency responses.

111. These laws create statutory and regulatory standards that are intended to protect and to benefit Plaintiff, including, but not limited to, those set forth in 29 C.F.R. 1910.120 and 40 C.F.R. § 300.150.

112. BP violated these statutory and/or regulatory standards.

113. As a direct and proximate cause of BP's violation of statutory and/or regulatory standards, the Plaintiff has suffered injuries and is entitled to actual and punitive damages.

### FOURTH CLAIM FOR RELIEF
### <u>General Maritime</u>

(Medical Monitoring As An Element Of Damages)

114. The oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill are proven hazardous, dangerous, or toxic substances, to which Plaintiff has been exposed.

115. Plaintiff's exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely diagnosis and treatment.

116. The method and means for diagnosing the Plaintiff's potential medical problems are well-accepted in the medical and scientific community and will be of great benefit to

Plaintiff by preventing or minimizing health problems that Plaintiff may encounter as a result of the Oil Spill and from dispersants used to attempt to clean the Oil Spill.

117. As a proximate results of Plaintiff's exposure to oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill, Plaintiff has developed a significantly increased risk of contracting a serious latent disease.

118. The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

## FIFTH CLAIM FOR RELIEF
### The Oil Pollution Act

119. Plaintiff re-alleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

120. The Oil Pollution Act, 33 U.S.C. § 2701, et seq. (the "OPA"), imposes liability upon a "responsible party for a... vessel or a facility from which oil is discharged...into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

121. The Coast Guard has named BP as the responsible party for the downhole release of oil and Transocean as the responsible party for the release of diesel on the surface. Therefore, BP and Transocean are strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

122. Defendants Anadarko and MOEX held a leasehold interest in a lease granted by the MMS for Bloc 252, Mississippi Canyon (the Macondo lease"), an oil lease on lands beneath the navigable waters, before and/or at the time of the spill. As such, they were lessees of the area within which the well (an "offshore facility") was located at the time of the Spill and are responsible parties pursuant to Section 2701 (16) and (32) of the OPA. As such, they are strictly liable pursuant to Section 2702 of the OPA for all damages resulting from the Spill.

122. Defendants BP and Transocean are not entitled to limit their liability under Section 2704(a) of the OPA because the Spill was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 33 U.S.C. § 2704(c).

123. Moreover, in its "Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990," filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

124. As a result of the Spill, Plaintiff has not been able to use natural resources (air and water, and potentially wetlands and other areas and spaces that have and/or may become contaminated by the spilled oil), and they are entitled to recover from BP, Transocean, Anadarko, MOEX and MOECO for such damages in amounts to be determined by the trier of fact, in addition to the damages as set forth below."

125. As a result of the Spill, Plaintiff is entitled to damages pursuant to Section 2702(b)(2)(B), which provides for recovery of damages to real and personal property, including "[D]amages for injury to, or economic losses resulting from destruction of, real or personal property, which shall be recoverable by a claimant who owns or leases that property, including diminution in the value of their property."

126. As a result of the Spill, Plaintiff is entitled to damages pursuant to Section 2702(b)(2)(C), which provides for recovery for "[D]amages for the loss of subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to ownership or management of the resources."

127. As a result of the Spill, Plaintiff is entitled to damages pursuant to Section 2702(b)(2)(E), which provides for "[D]amages equal to the loss of profits or impairment of earning capacity due to injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

128. To the extent required by law, and/or by consent or stipulation by BP, Plaintiff has satisfied, or will have satisfied, all of the administrative requirements of 33 U.S.C. §§ 2713(a) and (b), as to each and all defendants, by the submission of their claims to the Gulf Coast Claims Facility (the "GCCF") and/or BP and/or its agents or designees.

## PRAYER FOR RELIEF

Plaintiff experienced the following damages:

      a.      Medical expenses, (Past, present and future);

      b.      Medical monitoring, (Past, present and future);

      c.      Loss of wages, (Past, present and future);

d.     Emotional distress, (Past, present and future);

e.     Mental anguish, (Past, present and future);

f.     Physical pain and suffering, (Past, present and future);

g.     Loss of life's pleasures and enjoyment, (Past, present and future);

h.     Loss of personal services, (Past, present and future);

i.     Intangible losses, (Past, present and future);

j.     Punitive damages;

k.     Compensatory damages in amounts to be determined a trial;

l.     Pre-judgment and post-judgment interest at the maximum rate allowable by law;

m.     Attorneys' fees and costs of litigation;

n.     Any and all other damages which may become known prior to the trial.

## **REQUEST FOR TRIAL BY JURY**

Plaintiff requests that the above and foregoing be heard at trial by a jury of peers.

<u>April 19, 2013</u>          Respectfully Submitted,

/s/ Douglas M. Schmidt
_____
Douglas M. Schmidt (Bar No. 11789)
Douglas M. Schmidt, APLC
335 City Park Avenue
New Orleans, LA 70116
Telephone No.: (504) 482-5711
Facsimile No.: (504) 482-5755
Attorneys for Plaintiff, Sergio Alvarado

**<u>Please serve the Defendants:</u>**

BP Exploration & Production, Inc.
*Through its registered agent for service of process*
C.T. Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808

BP American Production Company
*Through its registered agent for service of process*
C.T. Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808

BP p.l.c.
North American Headquarters
28100 Torch Parkway
Warrenville, IL 60555-3938
*Through the Louisiana Long Arm Statute,*
*LSA-R.S. 13:3201,*
*Pursuant to section 3204 of Title 13.*

Transocean Ltd.
4 Greenway Plaza
Houston, TX 77046
*Through the Louisiana Long Arm Statute,*
*LSA-R.S. 13:3201,*
*Pursuant to Section 3204 of Title 13.*

Transocean Offshore Deepwater Drilling, Inc.
4 Greenway Plaza
Houston, TX 77046
*Through the Louisiana Long Arm Statute,*
*LSA-R.S. 13:3201,*
*Pursuant to Section 3204 of Title 13.*

Transocean Deepwater, Inc.
4 Greenway Plaza
Houston, TX 77046
*Through the Louisiana Long Arm Statute,*
*LSA-R.S. 13:3201,*
*Pursuant to Section 3204 of Title 13.*

Transocean Holdings, LLC
4 Greenway Plaza
Houston, TX 77046
*Through the Louisiana Long Arm Statute,*
*LSA-R.S. 13:3201,*
*Pursuant to Section 3204 of Title 13.*

Triton Asset Leasing GmbH
c/o Transocean Ltd.
4 Greenway Plaza
Houston, TX 77046
*Through the Louisiana Long Arm Statute,*
*LSA-R.S. 13:3201,*
*Pursuant to Section 3204 of Title 13.*

Halliburton Energy Services, Inc.
*Through its registered agent for service of process*
C.T. Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808

Sperry Drilling Services
c/o Halliburton Energy Services, Inc.
*Through its registered agent for service of process*
C.T. Corporation System
5615 Corporate Blvd.
Suite 400B
Baton Rouge, LA 70808

M-I, LLC
*Through its registered agent of process*
National Registered Agents, Inc.

23

5615 Corporate Blvd
Suite 400B
Baton Rouge, LA 70808

Cameron International Corporation f/k/a
Cooper-Cameron Corporation
*Through its registered agent of process*
C.T. Corporation System
5615 Corporate Blvd
Suite 400B
Baton Rouge, LA 70808

Anadarko Petroleum Corporation
*Through its registered agent of process*
C.T. Corporation System
5615 Corporate Blvd
Suite 400B
Baton Rouge, LA 70808

Anadarko E&P Company LP
a/k/a Anadarko E&P Onshore LLC
*Through its registered agent of process*
C.T. Corporation System
5615 Corporate Blvd
Suite 400B
Baton Rouge, LA 70808

Moex Offshore 2007 LLC
9 Greenway Plaza
Suite 1220
Houston, Texas 77046
*Through the Louisiana Long Arm Statute,*
*LSA - R.S. 13:3201,*
*Pursuant to Section 3204 of Title* 13.

Moex USA Corporation
c/o Moex USA Corporation
9 Greenway Plaza
Suite 1220
Houston, Texas 77046
*Through the Louisiana Long Arm Statute,*
*LSA - R.S. 13:3201,*
*Pursuant to Section 3204 of Title* 13.

Mitsui Oil Exploration Co., Ltd.
c/o Moex USA Corporation
9 Greenway Plaza
Suite 1220
Houston, Texas 77046
*Through the Louisiana Long Arm Statute,*
*LSA - R.S. 13:3201,*
*Pursuant to Section 3204 of Title* 13.