# JOHNSON, RAHMAN & THOMAS

**Employees of Louisiana Workers' Compensation Corporation**

2237 S. Acadian Thruway | P.O. Box 98001
Baton Rouge, Louisiana 70898-8001
Telephone: (225) 231-0875
Facsimile: (225) 231-0986
Fax Server: (225) 929-5613

July 3, 2018

*Via UPS Next Day Air*

Counsel for BP
**Attn:  Mr. J. Andrew Langan**
Kirkland & Ellis LLP
300 N. LaSalle St., Suite 2400
Chicago, IL  60654

*Via UPS Next Day Air*

MDL 2179 Plaintiffs' Steering Committee
**Attn:  Mr. Steven J. Herman**
Herman, Herman & Katz, LLC
820 O'Keefe Ave.
New Orleans, LA  70113

   In Re: Oil Spill by the Oil Rig "Deepwater Horizon": in the Gulf of Mexico,
      On April 20, 2010
      MDL No.  :  10-2179; Section J

      Louisiana Workers' Compensation Corporation v. BP, PLC, et al
      Civil Action No.:  17-cv-03199

      Workers' Compensation Claim of Renyiell Jackson
      LWCC Claim No.:  158527

Dear Counsel:

   In compliance with Pretrial Order No. 66, with respect to the workers' compensation claim of Renyiell Jackson, enclosed please find the following documents:

   1.  Individual Particularized Statement of Claim;
   2.  Decision and Order from ALJ C. Richard Avery;
   3.  First Report of Injury;
   4.  Recent medical records; and
   5.  Claim payment report.

Mr. J. Andrew Langan
Mr. Steven Herman
July 3, 2018
Page 2


In total LWCC has paid $90,037.48 to and on behalf of Mr. Jackson as a result of his injuries suffered during the clean-up efforts following the Deepwater Horizon explosion. Louisiana Workers' Compensation Corporation is seeking recovery of all payments made to and on behalf of Mr. Jackson.

I hope this is satisfactory for your needs, however, in the event you have any questions or require any additional information, please do not hesitate to call.

With kind regards, I am

Very truly yours,

David K. Johnson

DKJ/fhj
Enclosures
cc:    Linda Dantini

**EXHIBIT A**

---

*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*
Civil Action No. 10-MD-2179-CJB-SS

**PTO 66 PARTICULARIZED STATEMENT OF CLAIM
FOR REMAINING B3 PLAINTIFFS**

---

**PLAINTIFF'S FULL NAME:** Louisiana Workers' Compensation Corporation

Please answer every question to the best of your knowledge.

You are signing and submitting this Particularized Statement of Claim under penalty of perjury and therefore must provide information that is true and accurate.

If you **cannot** recall all of the details requested, please provide as much information as you can.

For each question where the space provided does not allow for a complete answer, please attach as many additional sheets of paper as necessary to fully answer the question.

**NOTE:** Please provide information regarding the person **who claims injury or damages**. The terms "you" and "your" refer only to that person, not to the individual who may be completing this form in a representative capacity. If the person who claims injury or damages is deceased, the personal representative should respond as of the time immediately prior to his or her death unless a different time period is specified.

**A.      YOUR BACKGROUND INFORMATION**

1.      Current address:

Address Line 1:    2237 S. Acadian Thruway

Address Line 2:  _____

City:   Baton Rouge          State:  LA          Zip:  70808

2.      Telephone number:  (225) 924-7788

3.      Maiden or other names used or by which you have been known, and the dates during which you were known by such names:    N/A

4.      Date and Place of Birth:          N/A

5.      Male_____    Female_____

6. Each address (other than your current address) at which you have lived during the last ten (10) years, and list the dates of residence for each one:

| Address | Dates of Residence |
|---|---|
| N/A | |
| | |
| | |

7. Employment Information:

A. Current and past employer(s) over the last 10 years, 2008-2018 (if unemployed, last employer):

| Employer | Address | Dates of Employment | Occupation/Job Duties |
|---|---|---|---|
| N/A | | | |
| | | | |
| | | | |
| | | | |

8. Have you ever been out of work for more than thirty (30) days for reasons related to your health (other than pregnancy)? Yes _____ No_____ If "Yes," when were you out of work and why? ___N/A_____

_____

**B.** **THE PLAINTIFF AND THE *DEEPWATER HORIZON* OIL SPILL**

9. Did BP, a government entity, or another company or entity hire you to perform cleanup work in response to the oil spill?

   Yes _X_    No _____    ( Indirectly , see attached correspondence)

*If you responded "Yes" to Question No. 9, please proceed to Question No. 10.*

*If you responded "No" to Question No. 9, please skip to Question No. 14.*

   **1.** **Cleanup Workers**

(The term "cleanup worker" shall have the same meaning as that defined in the Medical Benefits Settlement Agreement.  (Rec. Doc. 6427-1 at 11-12, 25).)

10. Was your cleanup work performed onshore (on land) or offshore (on the water)?

   Onshore _____    Offshore _____    Both _X_

11. Were you hired as part of the Vessels of Opportunity ("VoO") Program?

   Yes _____    No _X_

12. Did you handle hazardous materials as part of your cleanup work?

   Yes _____    No _____

13. Please set forth the following information about your cleanup work:

   A.    Your employer(s): _Oil Mop LLC_

   B.    Your supervisor(s) at the employer(s) identified in Question No. 13(A):

   _unknown_

   C.    A description of the work performed for employer(s) identified in Question No.

   13(A): _preparing work boat when it was struck by another boat_

   D.    The date(s), time(s), and location(s) you performed the work described in Question

   No. 13(C): _unknown – several years_

E.  The names of any vessel(s) on which or facility(ies) where you performed the work described in Question No. 13(C): _____ Unknown _____

_____

F.  Any person(s) or entity(ies) other than your employer who oversaw, supervised, or managed your work described in Question No. 13(C): _____ Unknown _____

_____

### 2.  Residents/Tourists

14.  Do you allege that you were exposed to oil or chemical dispersants while a *resident* of a Gulf Coast State (*i.e.*, Alabama, Florida, Louisiana, Mississippi, or Texas)?

Yes_____  No_____

15.  Do you allege that you were exposed to oil or chemical dispersants while a *tourist* in a Gulf Coast State (*i.e.*, Alabama, Florida, Louisiana, Mississippi, or Texas)?

Yes_____  No_____

16.  List all address(es) at which you resided in 2010: _____

_____

## C.  INFORMATION ABOUT YOUR B3 CLAIM

17.  Are you claiming that you suffered damages from (*Check all that apply*):

_____Bodily injury from exposure to oil and/or dispersants

__X__Bodily injury other than from exposure to oil and/or dispersants

_____A breach of contract

*If you checked "Bodily injury from exposure to oil and/or dispersants," answer the questions in Parts D & F below.*

*If you checked "Bodily injury other than from exposure to oil and/or dispersants," answer the questions in Part E & F below.*

*If you checked "A breach of contract," answer the questions in Part G below.*

**D.     EXPOSURE CLAIMS**

18.     Were you exposed to oil, dispersants, or both?

   Oil_____          Dispersants_____          Both_____

19.     How were you exposed? (*Check all that apply*)

   A.     Inhalation               Yes_____     No_____

   B.     Dermal (skin) contact     Yes_____     No_____

   C.     Ingestion                 Yes_____     No_____

   D.     Other (please describe): _____

20.     What was the date(s) of your exposure?

   Day: _____     Month: _____     Year: _____

21.     How many time(s) were you exposed to oil or dispersants (for each time, please note whether the exposure was to oil, dispersants, or both)?

   _____

   _____

   _____

22.     What was the geographic location(s) of your exposure (for each location, please note on what date this exposure occurred and whether the exposure was to oil, dispersants, or both)?

   _____

   _____

   _____

   _____

23.     For each time that you were exposed to oil or dispersants or both, for how long were you exposed to this substance or chemical?

   _____

   _____

   _____

24. Describe in as much detail as possible the circumstance(s) in which your exposure to the oil spill and/or chemical dispersant occurred: _____

_____

_____

_____

25. *For cleanup workers only:* Did you report your exposure to oil and/or dispersants to your direct supervisor?

Yes_____      No_____

26. *If you answered "Yes" to Question No. 25,* Provide the name of the supervisor to whom you reported your exposure and the date you first reported the exposure:

_____

_____

_____

## E.   NON-EXPOSURE PERSONAL INJURY CLAIMS

27. For your non-exposure personal injury, please state:

A.   The nature of your injury: *See attached medical records*

B.   The date(s) of your injury: *7/2/2010*

C.   The location(s) of your injury: *Larose, LA*

D.   The work that you were performing when you sustained your injury: *Checking fuel levels on boat*

_____

E.   Identify any individual(s) who witnessed your injury: *Unknown.*

28. Describe in as much detail as possible the circumstance(s) of your injury: *See attached Decision and Order*

_____

_____

**F.    INFORMATION ABOUT YOUR INJURY OR ILLNESS**

29.   Describe in as much detail as possible the bodily injury (or medical condition) that you claim resulted from the spill or your cleanup work in response to the oil spill: _____

_____ See attached medical records _____

_____

_____

30.   Please explain how your injury (or medical condition) resulted from the spill or your cleanup work in response to the oil spill:

_____ See attached medical records & Decision and

Order _____

_____

_____

31.   On what date did you first report or seek treatment for your injury or illness: ___ 7/2/2010 ___

32.   On what date was your injury first diagnosed: ___ 7/2/2018 ___

_____

33.   Identify the doctor(s) (or other healthcare providers) who first diagnosed your injury (or condition):

| Name | Address |
|---|---|
|  | See attached medical records & |
|  | Decision and Order |

34.     Identify doctor(s) (or other healthcare providers) who have treated your injury (or condition):

| Name | Address |
|------|---------|
| | *See attached Medical records and decision and Order.* |
| | |
| | |
| | |

35.     Have you ever suffered this type of injury or condition before (i.e., before the date given in your answer to Question No. 32)? Yes _____ No _____. If "*Yes,*"   *Unknown*

A.      When? _____

B.      Who diagnosed the injury (or condition) at that time? _____

_____

_____

C.      Who treated the injury (or condition) at that time? _____

36.     Do you claim that your exposure to the oil spill and/or chemical dispersant worsened an injury (or condition) that you already had or had in part?

Yes _____ No_____. If "*Yes,*"

A.      What date did you first experience such injury or condition? _____

B.      What injury (or condition) was made worse? _____

_____

37. Please list your family and/or primary care physician(s) for the past ten (10) years:

| Name | Address |
|------|---------|
|  | Unknown |
|  |  |
|  |  |
|  |  |
|  |  |

38. Do you have in your possession, custody, or control, any medical records, bills, and any other documents, from physicians, healthcare providers, hospitals, pharmacies, insurance companies, or others who have provided treatment to you relating to the diagnosis or treatment of any injuries or illnesses arising from the *Deepwater Horizon* oil spill or response efforts, or that you otherwise identified in this Form?

Yes __X__ No _____

39. Describe specifically the compensatory damages that you claim in your lawsuit, including the nature of the damage, the date(s) of the damage, the amount of the damage, and the calculations used to arrive at that amount:_____

_____ recovery of medical expenses and weekly benefits per attached claim payment report _____

40. Have you received workers compensation or other compensation or reimbursement for the injury alleged or associated expenses?

Yes __X__ No_____

If "Yes":

A. From whom did you receive this compensation or reimbursement?_____

_____ LWCC _____

B.     When did you receive this compensation or reimbursement?_____

_____ *See attached claim payment report*

C.     What was the amount of the compensation or reimbursement?_____

_____ *See attached claim payment report*

## G.     CONTRACT CLAIMS

*(For plaintiffs claiming breach of contract.)*

41.    Is your claim based on a breach of contract?

Yes_____    No_____

42.    Was the contract that you claim was breached made as part of the VoO Program?

Yes_____    No_____

43.    Identify the contract that you allege was breached including any associated contract
number (e.g., MVCA number and the parties to the contract):

_____

_____

44.    Describe how the contract was breached:_____

_____

45.    *If you were part of the VoO Program*:  Describe whether or not you were placed on-hire
and, if applicable, the date(s) you were on-hire:

_____

_____

46.    *If you allege that you were placed on-hire:* Provide the date(s) you were placed off-hire:

_____

47.    Describe specifically the compensatory damages that you claim in your lawsuit, including
the nature of the damage, the date(s) of the damage, the amount of the damage, and the
calculations used to arrive at that  amount:_____

_____

_____

_____

48.  Describe specifically how the breach of contract you allege in response to Question No. 44 caused the damages you allege in response to Question No. 47.

_____

_____

_____

## ATTESTATION

By signing below, I declare and attest under penalty of perjury pursuant to 28 U.S.C. § 1746 that the answers provided to the above questions are true and correct, and I specifically declare and attest under penalty of perjury pursuant to 28 U.S.C. § 1746 that any damages described in response to Questions Nos. 39 or 47 were caused by any injury or breach of contract alleged in response to Questions Nos. 29 and 44.

I acknowledge that I have an obligation to supplement the above responses if I learn that they are in any material respect incomplete or incorrect.

Executed on the following date at the following location:

Date: _____July 5_____, 2018

Location (City and State): _____Baton Rouge La._____

_____
Signature of Plaintiff*

***Plaintiff's Attorney Cannot Sign on Plaintiff's Behalf.  For businesses, the CEO, CFO, President, Owner, or similar senior corporate officer must sign.***

____Michael Stolter____
Print Name

____SVP / General Counsel____
Title/Position (*if signed on behalf of a business or other entity*)

**By no later than <u>Monday, July 9, 2018</u>, this Particularized Statement of Claim must be served on Counsel for BP and the MDL 2179 Plaintiffs' Steering Committee by mailing it to the following addresses:**

| Counsel for BP | MDL 2179 Plaintiffs' Steering Committee |
|---|---|
| Attn:  J. Andrew Langan | c/o: Steve Herman |
| Kirkland & Ellis LLP | 820 O'Keefe Ave. |
| 300 North LaSalle St., Suite 2400 | New Orleans, LA 70113 |
| Chicago, IL 60654 | |

**U.S. DEPARTMENT OF LABOR**
Office of Workers' Compensation Programs
Division of Longshore and Harbor Workers' Compensation
P. O. Box 30728
New Orleans, LA 70190-0728

February 6, 2013

File Number: 07-189010
Re: Renyiell Jackson

Renyiell Jackson
Oil Mop, LLC
Louisiana Workers' Comp. Corp.
Francis I Spagnoletti, Esq.
David Johnson, Esq.
Honorable C. Richard Avery

The enclosed Decision and Order of the Administrative Law Judge is hereby served upon the parties to whom this letter is addressed. The decision was based on all of the evidence of record, including testimony taken at a formal hearing, and on the assumption that all available evidence has been submitted.

The transcript, pleadings, and compensation order have been dated and filed in the District Director's Office. Procedures for appealing are described on Page 2 of this letter.

The employer/insurance carrier is hereby advised that if the order awards compensation benefits, the filing of an appeal does not relieve that party of the obligation of paying compensation as directed in this order. The employer/insurance carrier is also advised that an additional 20 percent is added to the amount of compensation due if not paid within 10 days, notwithstanding the filing of an appeal, unless an order staying payments has been issued by the Benefits Review Board, U.S. Department of Labor, P. O. Box 37601, Washington, DC 20013-7601.

Sincerely,

David A. Duhon, District Director

Enclosure

**Include your address, ZIP code, and file number on all correspondence.**

Page 1 of 2

Form LS-020

**U.S. DEPARTMENT OF LABOR**
Office of Workers' Compensation Programs
Division of Longshore and Harbor Workers' Compensation
P. O. Box 30728
New Orleans, LA 70190-0728

File Number: 07-189010
Re: Renyiell Jackson

## Longshore and Harbor Workers' Compensation Act, as extended

A petition for reconsideration of a decision and order must be filed with the Office of Administrative Law Judge, who issued the attached decision and order, within 10 days from the date the District Director files the decision and order in his/her Office.

Any notice of appeal shall be sent by mail or otherwise presented to the Clerk of the Benefits Review Board in Washington, D.C., within 30 days from the date upon which a decision and order has been filed in the Office of the District Director, or within 30 days from the date final action is taken on a timely-filed petition for reconsideration. If a timely notice of appeal is filed by a party, any other party may initiate a cross-appeal or protective appeal by filing a notice of appeal within 14 days of the date on which the first notice of appeal was filed or within the 30-day period described above, whichever period last expires. A copy shall be served upon the District Director and on all other parties by the party who files a notice of appeal. Proof of service shall be included with the notice of appeal.

The date compensation is due is the date the District Director files the decision and order in his/her Office.

Page 2 of 2

*If you have a disability (a substantially limiting physical or mental impairment), please contact our office/claims examiner for information about the kinds of help available, such as communication assistance (alternate formats or sign language interpretation), accommodations and modifications.*

Form LS-020

**U.S. Department of Labor**

Office of Administrative Law Judges
5100 Village Walk, Suite 200
Covington, LA 70433

(985) 809-5173
(985) 893-7351 (Fax)

CASE NO.:   2011-LHC-1628

Issue Date: 05 February 2013

OWCP NO.: 07-189010

IN THE MATTER OF:

RENYIELL JACKSON

Claimant

v.

OIL MOP, L.L.C.

Employer

and

LOUISIANA WORKERS' COMPENSATION CORPORATION,

Carrier

APPEARANCES:

MARC EVAN KUTNER, ESQ.

For The Claimant

DAVID K. JOHNSON, ESQ.

For The Employer/Carrier

BEFORE:   C. RICHARD AVERY
Administrative Law Judge

# DECISION AND ORDER

This is a claim for benefits under the Longshore and Harbor Workers' Compensation Act, as amended, 33 U.S.C. § 901, *et seq.*, (herein the Act), brought by Renyiell Jackson (Claimant) against Oil Mop, L.L.C. (Employer) and Louisiana Workers' Compensation Corporation. (Carrier).

The issues raised by the parties could not be resolved administratively, and the matter was referred to the Office of Administrative Law Judges for hearing. Pursuant thereto, Notice of Hearing was issued scheduling a formal hearing, which was conducted on September 18, 2012, in Covington, Louisiana. Each party was represented by counsel, presented documentary evidence, examined and cross-examined the witnesses, and made oral and written arguments. The following exhibits were received into evidence[1]: Joint Exhibit 1; Claimant's Exhibits 1-8; and Employer/Carrier's Exhibits 1-7. This decision is based upon a full consideration of the entire record.

Post-hearing briefs were received from Claimant and Employer/Carrier. Based upon the stipulations of Counsel, the evidence introduced, and having considered the arguments presented, I make the following Findings of Fact, and Conclusions of Law and Order.

## STIPULATIONS

The parties stipulated (JX-1), and I find:

1. The LHWCA, 33 U.S.C. § 901 *et seq.*, as amended, applies to this claim.

2. The Claimant injured his lumbar spine on July 2, 2010.

3. The injury arose out of and in the course of Claimant's employment with Employer.

4. There was an Employer/Employee relationship at the time of the injury.

5. Employer was timely notified of the injury.

6. The claim was timely filed.

7. The Notice of Controversion was timely filed.

8. The District Director's Informal Conference was conducted on May 12, 2011.

9. Temporary total disability compensation has been paid from July 3, 2010, to December 9, 2010, at a weekly compensation rate of $892.22.

10. Medical benefits have been paid in the total amount of $17,414.92.

11. Claimant has not returned to his usual job.

---

[1] References to the transcript and exhibits are as follows: Trial Transcript: Tr. ___; Joint Exhibit: JX-___; Claimant's Exhibit: CX-___; Employer/Carrier's Exhibit: EX-___.

## ISSUES

The unresolved issues presented by the parties are:

1. Calculation of average weekly wage;

2. Claimant's choice of physician/healthcare provider;

3. Claimant's entitlement to past or future weekly compensation benefits;

4. Claimant's entitlement to future medical benefits;

5. Availability of suitable alternative employment;

6. Nature and extent of disability, if any;

7. Attorney's fees.

## STATEMENT OF THE EVIDENCE

### I.    Testimonial Evidence

#### A. Claimant

Born ▮▮▮▮▮▮▮ 1975, Claimant is 37 years old and completed the eleventh grade in school. His working career has involved heavy labor. When injured on July 2, 2010, Claimant was a working foreman with Employer for whom he had worked for four years. Claimant said he worked along with his crew earning $21.00 per hour plus overtime, and all the tasks involved standing and lifting.

On the date of his accident, July 2, 2010, Claimant was preparing a work boat for the day's activities when the boat, which was tied off, was struck by another boat. The impact knocked Claimant against the railing, injuring his right side, leg, and back. Following the event, Claimant was sent to Dr. Matherne, who prescribed medication and told Claimant to stay home. Subsequently, however, Dr. Matherne referred Claimant to Dr. Kinnard.

Claimant saw Dr. Kinnard several times, but was dissatisfied with his treatment and attitude. According to Claimant, Dr. Kinnard implied he was "faking" and opined Claimant had only a light bulging disc, which Dr. Kinnard attributed to Claimant's age, comparing it to a tire which wears over time. Despite his diagnosis, Claimant said Dr. Kinnard referred Claimant to physical therapy and provided him with medications before telling Claimant there was nothing more he could do for him.

-3-

On his own, and without seeking consent of Employer/Carrier, Claimant went to see Dr. Isaza in September of 2011, who he said recommended steroid injections. According to Claimant, he passed that recommendation to Dr. Kinnard who sent Claimant to Dr. Haydel for the injections. The injection offered only temporary relief and by January 11, 2011, Claimant said Dr. Kinnard suggested he see another doctor, although he had already gone to see Dr. Isaza months earlier.

As far as Employer's offer of light duty work on December 8, 2010 (EX-2, p. 34), Claimant denied Dr. Kinnard had released him to work at that time and said he called Ms. Janelle West with Employer and so advised. In fact, it is Claimant's testimony that during this time, Dr. Kinnard was telling Claimant to stay off of work and continue with physical therapy. After Dr. Kinnard's release, Claimant testified Dr. Isaza had Dr. April perform a discogram, which ruled out surgery. Thereafter, on October 24, 2011, Claimant underwent an FCE, which concluded at the least he could perform light to medium work.

Since the FCE, Claimant testified he tried rigging work with Longnecker for a month and a half at $170.00 per day, but because of back pain he could not continue.[2] Now, and since August 2, 2012, Claimant has worked for Hot Energy Services driving a delivery truck and earns $17.00 per hour working 40 hours per week.[3]

## II.    Medical Evidence

### A. Dr. Brian Matherne

Claimant presented to Dr. Matherne, his family physician, on July 2, 2010. (EX-6, p. 9). Claimant reported injuring his back and right side at work. On July 6, 2010, Claimant reported no improvement in his condition. (EX-6, p. 8). Dr. Matherne examined Claimant on several other occasions through July and October 2010.[4] An MRI was ordered on August 19, 2010, showing spinal stenosis and mild disk/osteophyte effacement at L5-S1. (EX-6, p. 5).

### B. Dr. William Kinnard

Dr. Matherne referred Claimant to Dr. Kinnard, an orthopedist with Houma Orthopedic Clinic. Claimant first presented to Dr. Kinnard on September 2, 2010, complaining of pain in his lower back on the right side, which started on July 2, 2010, the day of his workplace accident. (CX-1, p. 11; EX-4, p. 18). Claimant denied any prior history regarding back pain. (CX-1, pp. 3, 11). Upon examination, Dr. Kinnard observed evidence of symptom magnification and reported Claimant "has subjective complaints of severe pain with no objective findings." (CX-1, p. 11). Claimant's MRI showed minimal disc degeneration at L5-S1 with no evidence of disc herniation. He diagnosed Claimant with a lumbosacral strain. (CX-1, p. 12; EX-4, p. 19).

---

[2] According to Claimant's paystubs, Claimant received paychecks for work with Longnecker between May 3, 2012, and July 23, 2012. (EX-8, pp. 34-39). During that time period, Claimant earned a total of $9,430.00. (EX-8, pp. 34-39).

[3] See EX-9.

[4] These records were illegible.

- 4 -

Claimant followed up with Dr. Kinnard on September 23, 2010. (CX-1, p. 10; EX-4, p. 15). Claimant complained of some symptoms in his back, and Dr. Kinnard recommended he continue with physical therapy. He opined Claimant was nearing maximum medical improvement and released Claimant to return to light duty work. (CX-1, p. 10; EX-4, p. 17). On October 28, 2010, Claimant complained of pain in the lower back, but Dr. Kinnard observed no objective findings. (EX-4, p. 15). Dr. Kinnard completed a form indicating Claimant was unable to work at all. (EX-4, p. 14). However, on November 1, 2010, Dr. Kinnard released Claimant to return to light duty work. (EX-4, p. 13).

Dr. Kinnard examined Claimant on November 18, 2010, and noted progress in his condition. (CX-1, p. 9; EX-4, p. 10). He recommended Claimant continue with three more weeks of physical therapy and three more weeks off of work. In a letter to Ms. Janelle West of LWCC dated November 18, 2010, Dr. Kinnard expressed concerns regarding the validity of Claimant's complaints. (CX-1, p. 8; EX-4, p. 11). He recommended Claimant continue with physical therapy at that time. (CX-1, p. 8; EX-4, p. 11).

Claimant presented to Dr. Kinnard on December 9, 2010. (CX-1, p. 7; EX-4, p. 7). Dr. Kinnard reported Claimant had "significant subjective complaints with minimal to no objective findings." He noted the MRI dated August 19, 2010 revealed minimal disc bulging and a spur from degenerative disc disease at L5-S1. Dr. Kinnard opined these findings were consistent with Claimant's age and were pre-existing. (CX-1, pp. 7, 9). Dr. Kinnard released Claimant to return to work at light duty. He suggested that alternative treatments such as epidural steroid injections were an option. (CX-1, p. 7; EX-4, p. 8).

On January 11, 2011, Claimant complained of back and hip pain extending down into his legs, and reported no relief from the administered epidural steroid injection. (CX-1, pp. 1, 4, 7). Claimant denied any previous problems with back pain. (CX-1, p. 3). Dr. Kinnard did not feel Claimant would benefit long term from a series of epidural injections and stated there was not anything further he could do to help Claimant. He noted that Claimant had received a second opinion from "a physician in Baton Rouge" and suggested Claimant transfer his care to this other doctor. (CX-1, p. 7).

Dr. Kinnard again reported on March 15, 2011, he had nothing further to offer Claimant and released Claimant from his care. (CX-1, p. 6; EX-4, p. 4). He recommended Claimant undergo an FCE so that he could return to work, despite Claimant's persistent pain.

On November 29, 2011, Dr. Kinnard reviewed Claimant's FCE from October 24, 2011, and found Claimant capable of at least returning to work in a light to medium capacity with the potential to return to greater activities in the future. (EX-4, p. 1). He noted Claimant was at maximum medical improvement.

## C. Dr. Michael S. Haydel

Claimant presented to Dr. Haydel, board-certified in pain management and anesthesiology, on December 21, 2010. (CX-2, p. 13; EX-5, p. 11). Claimant indicated his pain began on July 2, 2010 in a work-related accident. He complained of constant low back and right lower extremity pain, loss of balance, and muscle weakness. (CX-2, pp. 19, 22). Based on Claimant's August 19, 2010 MRI, Dr. Haydel diagnosed Claimant with a lumbar disc/osteophyte

at L5-S1 with low back pain and right lower extremity pain suggestive of radiculitis. (CX-2, pp. 20, 35). Dr. Haydel administered lumbar epidural steroid injections on December 28, 2010, and on February 14, 2011. (CX-2, pp. 14-15, 28, 31). Claimant followed up with Dr. Haydel on January 24, 2011, and reported 25 percent relief after the first injection. (CX-2, p. 18; EX-5, p. 8). Dr. Haydel also noted Claimant was undergoing physical therapy at the time with little success. Claimant reported 50 percent relief after his second injection. (CX-2, p. 16; EX-5, p. 2). There were no other changes in Claimant's complaints or Dr. Haydel's impressions in his follow-up reports of February 14, 2011, and February 28, 2011. (CX-2, pp. 15-16; EX-5, pp. 1-2).

### D.  Dr. Jorge E. Isaza

Claimant first presented to Dr. Isaza on September 15, 2010, with complaints of low back pain, which he attributed to his July 2, 2010 workplace injury. (CX-4, p. 1). Claimant reported little results from the month of physical therapy he had attended at that point. Claimant denied any previous injuries. Upon examination, Dr. Isaza observed pain upon Claimant's attempt at extension of lower extremities, tenderness to palpation over the right lumbar paraspinal muscles, and back pain upon straight leg raising. (CX-4, p. 3). Dr. Isaza had not reviewed Claimant's MRI, but diagnosed Claimant with a lumbar strain, lumbar spondylosis, and transitional level of the lumbar spine. He prescribed pain medication and recommended Claimant continue with therapy.

On October 1, 2010, Claimant reported no improvement in his pain. (CX-4, p. 5). After reviewing the August 19, 2010 MRI, Dr. Isaza diagnosed Claimant with disk bulges at L3-4 and L4-5; a transitional level at L5-S1 with rudimentary disk; facet arthropathy at L4-5; mild-right-sided foraminal narrowing at L4-5; lumbar strain; and lumbar spondylosis. However, Dr. Isaza went on to state that the MRI findings were overall, "fairly benign." He opined that Claimant's injury was "more of a soft tissue injury than anything." He continued Claimant on anti-inflammatory medication and a muscle relaxer. Claimant was instructed to remain off of work for four more weeks, with his condition to be re-evaluated then. (CX-4, p. 6).

Claimant returned on October 29, 2010, with persistent low back pain and occasional numbness and tingling in his right thigh. (CX-4, p. 7). Upon examination, Dr. Isaza observed tenderness to palpation of the lumbar spine and the straight leg test produced right-sided low back pain. Dr. Isaza reported that Claimant would likely improve with more time, and he recommended continuing with any physical therapy and possibly seeing a chiropractor.[5] (CX-4, p. 8).

On November 29, 2010, Claimant reported his leg symptoms had become more constant and intense, he was experiencing numbness in the toes on his right foot, and his back pain persisted. (CX-4, p. 9). Dr. Isaza did not change his impression and recommended a right-sided transforaminal injection at L4-5; he referred Claimant to Dr. Allen Johnson for this injection. (CX-4, p. 10). On January 10, 2011, Claimant reported to Dr. Isaza feeling worse after the injection with Dr. Haydel, although he noted improvement in his lower extremity symptoms. (CX-4, p. 11). Dr. Isaza noted that he did not recommend surgery at that time and that Claimant remained "off of work per Dr. Kinnard." (CX-4, p. 12).

---

[5] There are no records of evidence to indicate Claimant sought treatment from a chiropractor.

Claimant followed-up on March 7, 2011, and complained of continuation of his low back pain and right leg symptoms. (CX-4, p. 13). Claimant reported no improvement from the epidural injections or physical therapy and that his pain was no longer tolerable. As such, Dr. Isaza recommended a lumbar discogram to further explore the source of Claimant's pain. Dr. Isaza referred Claimant to Dr. Charlie Aprill for this procedure. No improvement was reported on April 20, 2011, and Dr. Isaza again noted the discogram as an option. (CX-4, p. 15). However, Dr. Isaza only recommended surgery if Claimant found himself in intractable pain or if progressive neurological weakness developed. Claimant indicated he wanted to proceed with the discogram. (CX-4, p. 15).

As of August 15, 2011, the discogram had not been approved. (CX-4, p. 18). Dr. Isaza's recommendations remained unchanged. He refilled Claimant's medications. On September 21, 2011, Dr. Isaza reported Claimant's discogram, performed by Dr. Aprill, was negative and the etiology of Claimant's pain was therefore unclear. (CX-4, p. 19). As a result, Dr. Isaza did not recommend surgery and instructed Claimant to continue with pain management with Dr. Haydel. (CX-4, p. 19).

### E. Dr. Charles N. Aprill

Dr. Aprill, who specializes in radiology and spine interventions, evaluated Claimant on September 6, 2011, and performed lumbar discography at L4-5 and L5-S1. (CX-4, p. 20; CX-7, p. 1). He reported the results were normal. Based on Claimant's MRI, he noted findings of transitional lumbosacral segment with L5 partially sacralized. He opined that Claimant's pain is not likely related to the abnormality of the lumbar discs, and the etiology of Claimant's chronic back and right lower extremity complaints remains undetermined. (CX-4, p. 20; CX-7, p. 1).

### F. Functional Capacity Evaluation

Claimant was evaluated on October 24, 2011. (CX-5, p. 2).[6] The report indicated testing revealed poor validity of Claimant's disability and Claimant's efforts were submaximal. It was noted that the evaluation failed to find sufficient objective physiological signs to validate the severity of Claimant's subjective complaints. (CX-5, p. 4). A high probability of disability magnification behavior was indicated. (CX-5, p. 14). A physical demand level of light to medium work was demonstrated, but the evaluator indicated Claimant most likely has a greater physical ability due to his lack of effort during testing. (CX-5, p. 2). It was found Claimant is able to return to his previous work with the restrictions recommended, but it is likely that his ability is greater than demonstrated, meaning he could likely return to work without restrictions. The recommended work restrictions include: occasional lifting of up to 30 pounds to waist level and 15 pounds to shoulder level; frequent lifting of up to 15 pounds; occasional carrying of up to 20 pounds; and occasional sustained or repetitive trunk flexion. (CX-5, p. 4).

---

[6] The FCE report can also be found at Employer/Carrier's Exhibit 3.

### G. Physical Therapy

An initial evaluation of Claimant was conducted on July 26, 2010. (CX-5, p. 173).[7] Claimant complained of mid/low back pain and decreased functional ability. He also noted occasional right lower extremity posterior leg pain. Claimant presented for regular therapy sessions multiple times a week between July 28, 2010, and March 25, 2011. (CX-5, pp. 33-170).

Physical therapist Joseph H. Gray provided Dr. Matherne with a reassessment report on August 23, 2010. (CX-5, p. 146). Claimant had been to 11 sessions at that point. Mr. Gray noted Claimant reported approximately 20 percent improvement in his overall condition since the initial evaluation. Mr. Gray stated Claimant was making slow progress. Dr. Matherne responded to the report and recommended Claimant continue with physical therapy three times a week for two more weeks. (CX-5, p. 146).

October 21, 2010, Claimant reported about 50 percent improvement in his overall condition since starting PT. (CX-5, p. 110). However, he also reported pain levels in his back at times were lessened but ultimately remain relatively unchanged. On November 17, 2010, Mr. Gray reported that "Inconsistent findings remain present during treatment sessions." (CX-5, p. 88). By March 23, 2011, Claimant stated his side did not hurt anymore, only his back. (CX-5, p. 34).

Mr. Gray always reported Claimant was making "fair" progress in his recorded goal of improving his pain. There was no indication that Claimant was uncooperative in his therapy, however.

## III.   Vocational Rehabilitation

Mr. Allen L. Crane, a licensed rehabilitation counselor, performed a full duty job assessment on August 5, 2010, regarding the demands of Claimant's previous position with Employer. (EX-2, p. 38). Claimant and Employer agreed that this position was a semi-skilled job with duties in the sedentary, light, and medium physical demand levels. (EX-2, pp. 38, 41). It was noted at the end of the report that this job was available to Claimant upon medical approval. (EX-2, p. 41).

On August 5, 2010, Mr. Crane also provided a transitional duty job assessment for a Technician position with Employer. (EX-2, p. 42). The duties consisted of sedentary and light duty administrative functions in the office. Lifting and carrying tasks were limited to 10 pounds. The position allowed for constant sitting and alternate standing and short distance walking. Occasional local driving of a company truck would also be required. (EX-2, p. 43).

Mr. Allen wrote to Ms. Becky Causey of the Louisiana Workers' Compensation Corporation on November 15, 2010 with information that a transitional duty position was made available to Claimant by Employer on November 8, 2010. (EX-2, p. 32-33). Mr. Crane noted correspondence regarding that offer was sent to Claimant on November 8, 2010, and the position was available for Claimant to begin on November 15, 2010. (EX-2, pp. 32-35).

---

[7] Claimant's Physical Therapy records can also be found at Employer/Carrier's Exhibit 7.

On January 17, 2012, Mr. Crane met with Claimant to conduct a vocational assessment. (EX-2, p. 25). Additionally, Mr. Crane reviewed medical records from Dr. Kinnard and the October 26, 2011 functional capacity evaluation report. Mr. Crane administered vocational tests to measure Claimant's intellectual functioning and academic abilities. (EX-2, pp. 28-29).

On February 13, 2012, Mr. Crane provided Dr. Kinnard, Counsel for Claimant, and Claimant with a labor market survey, identifying the following positions consistent with Claimant's vocational qualifications, the physical restrictions defined by Dr. Kinnard on November 29, 2011[8], and within Claimant's "immediate geographical area" (EX-2, pp. 16-24):

1. **Custodian (Leonard J. Chabert Medical Center in Houma, Louisiana)** – Duties include cleaning bathrooms, offices, and hallways; emptying trash; and disposing of infectious waste. This full-time position is light to medium work requiring frequent lifting/carrying up to 25 pounds; frequent standing/walking; occasional to frequent bending/stooping; and rare climbing. Wage ranges from $7.25 to $13.51 per hour.

2. **Cook (Amelia Bell Casino in Amelia, Louisiana)** – Duties include performing short order cooking functions at a casino and assisting with kitchen cleaning. On-the-job training is provided. This position is light work requiring occasional lifting/carrying up to 25 pounds; frequent standing/walking; and occasional bending/stooping. Wages start at $9.00 per hour.

3. **Pizza Cook (Nicholls State University in Thibodaux, Louisiana)** – Duties include short order cooking and light cleaning functions. This full-time position is light to medium work requiring rare lifting up to 50 pounds and occasional lifting up to 30 pounds; frequent lifting/carrying up to 15 pounds; frequent standing/walking; and occasional bending/stooping. Wage ranges from $9.00 to $11.00 per hour.

4. **Assembler (John Deere in Thibodaux, Louisiana)** – Duties include working as part of the assembly team to assemble, disassemble, and perform assembly repair on engines, transmissions, axle housing, tagging and final assembly. This full-time position is light to medium work requiring occasional lifting/carrying up to 35 pounds; frequent standing/walking; occasional to frequent bending/stooping; and occasional climbing. Wages start at $15.58 per hour.

On March 6, 2012, Dr. Kinnard responded to Mr. Crane's labor market survey and indicated that Claimant is physically capable of performing all of these jobs. (EX-2, pp. 7-10). Mr. Crane informed Counsel for Claimant of Dr. Kinnard's opinion on March 23, 2012. (EX-2, pp. 3-6).

---

[8] At that time, Dr. Kinnard had indicated Claimant was capable of light to medium level duty work, with the potential of working at a greater level in the future.

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

The following findings of fact and conclusions of law are based upon my analysis of the entire record, arguments of the parties, and applicable regulations, statutes, and case law. My evaluation has been guided by the principle that the proponent of a rule bears the burden of persuasion. *Director, OWCP v. Greenwich Collieries*, 512 U.S. 267, 277-78 (1994) (citing *Steadman v. SEC*, 450 U.S. 91, 95 (1981)).

As trier of fact, I may accept or reject any part of the evidence, including that of medical witnesses, and rely on my own judgment to resolve factual disputes or conflicts in the evidence. *Todd Shipyards Corp. v. Donovan*, 300 F.2d 741, 742 (5th Cir. 1962). The "true doubt rule," which resolves conflicts in favor of the claimant when the evidence is balanced, violates Section 566(d) of the Administrative Procedures Act, and thus has not been employed in my review of this claim. *Greenwich Collieries*, 512 U.S. at 281.

## I.    Nature and Extent

In this instance the parties stipulated that the cause of Claimant's back injury was the July 2, 2010 workplace accident. However, nature and extent of Claimant's alleged disability remain in dispute. A claimant bears the burden of proving the nature and extent of his work-related injury. *Trask v. Lockheed Shipbldg. & Constr. Co.*, 17 BRBS 56, 59 (1986). A claimant's disability is permanent in nature if he has any residual disability after reaching maximum medical improvement (MMI). *Id.* at 60 (citing *McCray v. Ceco Steel Co.*, 5 BRBS 537, 540 (1977)). The date of MMI is defined as the date on which the employee has received the maximum benefit of medical treatment such that his condition will not improve. *Trask*, 17 BRBS at 60. The date of MMI is a question of fact based upon the medical evidence of record regardless of economic or vocational consideration. *La. Ins. Guar. Ass'n v. Abbott*, 40 F.3d 122, 125 (5th Cir. 1994). If MMI has not yet been reached, the disability is temporary.

On September 23, 2010 Dr. Kinnard opined Claimant was "nearing" MMI, and on January 11, 2011, Dr. Kinnard told Claimant there was nothing more he could do for Claimant's persistent pain. However, the record indicates that Claimant did continue to benefit, if only slightly, from additional modalities and physical therapy received after that point. Claimant sought a second opinion in Dr. Isaza who, as Dr. Kinnard eventually did, referred Claimant to another physician to receive lumbar epidural steroid injections. Claimant received one injection in January 2011, and another in February 2011. Claimant reported to Dr. Haydel improvement in his pain after each injection. The injections did not have an extended long-term benefit, and Claimant reported his pain continued. Claimant related to his physical therapist on March 23, 2011, that his side did not hurt anymore, only his back. While in March 2011, Dr. Kinnard reiterated that there was nothing more he could suggest for Claimant's condition, Dr. Isaza suggested a discogram to further explore the cause of Claimant's pain if it had become intolerable. Claimant chose to pursue this option and finally underwent a discogram in September 2011. Dr. Aprill, who performed the procedure, reported on September 21, 2011 the results were negative and that surgery was not indicated as an option in this case. On November 29, 2011, Dr. Kinnard reviewed Claimant's October 2011 FCE and opined that Claimant had reached MMI at that time. Therefore, I find Claimant's disability reached permanent status on November 29, 2011.

The question of extent of disability is an economic as well as medical concept. *Quick v. Martin*, 397 F.2d 644, 648 (D.C. Cir. 1968). Disability under the act means an incapacity, as a result of an injury, to earn the wages the employee was receiving at the time of the injury at the same or any other employment. 33 U.S.C. § 902(10). In order for a claimant to receive a disability award, he must have an economic loss coupled with a physical or psychological impairment. *Sproull v. Stevedoring Servs. Of America*, 25 BRBS 100, 110 (1991). A claimant will be found to have either no loss of wage-earning capacity, no present loss but a reasonable expectation of future loss (*de minimis*), a total loss, or a partial loss.

A claimant who is unable to return to his former employment due to his work-related injury establishes a *prima facie* case of total disability. *Elliot v. C & P Tel. Co.*, 16 BRBS 89, 92 (1984); *Harrison v. Todd Pacific Shipyards Corp.*, 21 BRBS 339, 342-43 (1988). Once he has done so, the burden shifts to the Employer/Carrier to show the existence of suitable alternative employment. *New Orleans (Gulfwide) Stevedores v. Turner*, 661 F.2d 1031, 1038 (5th Cir. 1981). The claimant remains entitled to total disability compensation until the date upon which the Employer/Carrier establishes the availability of such employment, at which point the disability becomes partial. *Rinaldi v. Gen. Dynamics Corp.*, 25 BRBS 128, 131 (1991).

To establish suitable alternative employment, an employer must prove the existence of realistically available job opportunities; the employer must take into account factors such as the claimant's age, education, employment history, and physical capabilities. *Turner*, 661 F.2d at 1042. The employer must also demonstrate the claimant could realistically secure the alternative employment if he diligently tried. *Id.* at 1042-1043. The *Turner* standard does not require the employer to seek out specific job offers for the claimant, but the employer must outline the specific terms, nature, and availability of the identified suitable alternative employment. *Turner*, 661 F.2d at 1041; *Thompson v. Lockheed Shipbuilding & Construction Co.*, 21 BRBS 94, 94 (1988).

Claimant was first released to light duty work by Dr. Kinnard on September 23, 2010. On October 28, 2010, Dr. Kinnard restricted Claimant from returning to any level of work activity. However, on November 1, 2010, Dr. Kinnard released Claimant to return to light duty work again. Employer offered Claimant a transitional duty job with duties at the light to sedentary level to begin on November 15, 2010. Dr. Kinnard took Claimant off of work again on November 18, 2010. On December 9, 2010, Dr. Kinnard allowed Claimant to return to light duty work. On November 29, 2011, after reviewing the October 2011 FCE, Dr. Kinnard opined Claimant could return to work in a light to medium capacity with the potential to return to greater activities in the future. Mr. Crane presented a labor market survey of jobs in the light to medium duty range on February 13, 2012, and Dr. Kinnard opined that Claimant was capable of performing the duties required of each of the four positions, if not a higher level of work duties.

Dr. Isaza gave instructions for Claimant to remain off of work for "four more weeks" on October 1, 2010. On January 10, 2011, Dr. Isaza noted Claimant remained "off of work per Dr. Kinnard." However, a month earlier Dr. Kinnard had released Claimant to return to light duty work. Dr. Isaza's records make no other recommendation or mention of Claimant's ability to work.

As Claimant was released to return to light duty work by Dr. Kinnard on November 1, 2010, and Employer/Carrier showed evidence of suitable alternative employment through the transitional duty job offered to Claimant starting November 15, 2010. However, Claimant chose not to return to this available position. Therefore, he is not entitled to receive compensation between November 15, 2010, and November 18, 2010, when Dr. Kinnard took Claimant off of work again. While Claimant was released to work at various periods thereafter, there is nothing of record indicating that Employer/Carrier's transitional duty position remained available at those times. Claimant's returned to total disability status on November 18, 2010.

The FCE indicated Claimant could return to light to medium duty work, and Dr. Kinnard agreed with these results on November 29, 2011. Mr. Crane's full job duty assessment of August 5, 2010 indicated Claimant's former technician duties only required a maximum level of medium duty work. As such, Claimant was able to return to his former position as of November 29, 2011. The FCE report found, and Dr. Kinnard agreed, that Claimant's efforts during evaluation were submaximal. It was indicated that the results were only an indicator of what Claimant was willing to do at the time, not what he was truly able to do. Longnecker's physical exam found Claimant was able to perform rigging work in April 2012, which required lifting up to 50 pounds.

Dr. Kinnard had indicated throughout his treatment that he suspected Claimant was exaggerating his symptoms, and the results of the FCE confirmed this point to him. Dr. Kinnard consistently reported throughout treatment with Claimant that no objective findings substantiating Claimant's subjective complaints were found. The FCE report also indicated the same observation. Furthermore, the discogram results were negative and surgery was not indicated as a viable option for Claimant. Dr. Isaza's records indicate that Claimant had misrepresented Dr. Kinnard's work restrictions as Claimant indicated he was taken off of work by Dr. Kinnard when he had actually released Claimant to return to light duty.

In light of the findings of the FCE report, Dr. Kinnard's observations, and the results of the discogram, I find Claimant was able to return to his former position as of November 29, 2011, and was no longer disabled from returning to his former position as of that date.

## II.   Average Weekly Wage

Section 10 of the Act sets forth three alternative methods for determining a claimant's average annual earnings, which are then divided by fifty-two, pursuant to Section 10(d), to arrive at an average weekly wage. 33 U.S.C. § 910(d)(1). Each of these methods seeks to establish a claimant's earning power at the time of the injury. *Johnson v. Newport News Shipbuilding & Dry Dock Co.*, 25 BRBS 340, 343 (1992).
Section 10(a) provides that when the employee has worked in the same employment for substantially the whole of the year immediately preceding the injury, his annual earnings are computed using his actual daily wage. 33 U.S.C. § 910(a). Section 10(b) provides that if the employee has not worked substantially the whole of the preceding year, his average annual earnings are based on the average daily wage of any employee in the same class who has worked substantially the whole of the year. 33 U.S.C. § 910(b). Section 10(c) applies when neither Section 10(a) nor Section 10(b) would provide a fair and reasonable calculation of the claimant's

earning power at the time of the injury. 33 U.S.C. § 910(c). The judge has broad discretion in determining annual earning capacity under Section 10(c). *Sproull v. Stevedoring Servs. of America*, 25 BRBS 100, 105 (1991); *Wayland v. Moore Dry Dock*, 25 BRBS 53, 59 (1991); *Lobus v. I.T.O. Corp. of Baltimore*, 24 BRBS 137, 139 (1990).

I find 10(c) applies in this case to determine Claimant's average weekly wage at the time of the July 2, 2010 injury. Payroll records of evidence show Claimant was working for Employer in that position for at least 52 weeks prior to his injury in 2010, and no evidence has been presented to allow calculation of Claimant's actual daily wage under 10(a). (EX-1). During the year before his injury on July 2, 2010, Claimant's gross pay amounted to $76,617.50.[9] When this is divided by 52 weeks, the calculation results in an average weekly wage of $1,473.41.

## III.   Section 7 Medicals

Where a claimant has established he has suffered from a compensable injury under the Act, the Employer/Carrier is liable for "medical, surgical, and other attendance or treatment, nurse or hospital service, medicine, crutches, and apparatus, for such period as the nature of the injury or the process or recovery may require." 33 U.S.C. § 907(a). For medical expenses to be assessed against the Employer/Carrier, the expense must be reasonable, necessary, and appropriate for the injury. *Pernell v. Capitol Hill Masonry*, 11 BRBS 532, 539 (1979); 20 C.F.R. § 702.402. A Claimant has established a *prima facie* case for compensable medical treatment where a qualified physician indicates treatment was necessary for a work-related condition.

The Employer/Carrier is liable for all medical expenses that are the natural and unavoidable result of the work injury, and not due to an intervening cause. *See Atlantic Marine v. Bruce*, 661 F.2d 898 (5th Cir. 1981). However, an employee cannot receive reimbursement for medical expenses under Section 7 of the Act unless he has first requested authorization, prior to obtaining the treatment, except in cases of emergency or refusal. 20 C.F.R. § 702.421; *Shahady v. Atlas Tile & Marble Co.*, 682 F.2d 968 (D.C. Cir. 1982) (per curium), *rev'g* 13 BRBS 1007 (1981), *cert. denied*, 459 U.S. 1146 (1983); *McQuillen v. Horne Bros., Inc.*, 16 BRBS 10 (1983); *Jackson v. Ingalls Shipbuilding Div., Litton Sys.*, 15 BRBS 299 (1983); *Schoen v. U.S. Chamber of Commerce*, 30 BRBS 112 (1996). Where an Employer/Carrier's physician's actions constitute a refusal of treatment, the employee is justified in seeking treatment elsewhere, without the Employer/Carrier's authorization, and is entitled to reimbursement for necessary treatment subsequently procured on his own. *Matthews v. Jeffboat, Inc.*, 18 BRBS 185 at 189 (1986); *Luna Rivera v. National Metal & Steel Corp.*, 16 BRBS 135 at 138 (1984).

---

[9] Employer/Carrier argue in brief that in order to calculate the correct average weekly wage, the first two paychecks listed in EX-1 should be deleted in their entirety as they allegedly encompass time periods prior to July 2, 2009. However, on its face the payroll record begins with a paycheck entry dated July 2, 2009, one year to the day before Claimant's 2010 workplace injury. The entries do not list any additional dates to delineate the dates of the pay period represented. As there is nothing further of record to substantiate Employer/Carrier's claim, these two initial entries have been included in Claimant's gross pay for the 52 weeks prior to his injury. Employer/Carrier go on to argue that the entries for overtime and vacation payments made should not be included in the calculation of Claimant's average weekly wage as these payments were made subsequent to the injury. (EX-1, p. 8). Again, Employer/Carrier have provided no other evidence beyond this assertion. As a result, these payments for benefits have been included in the calculation of Claimant's average weekly wage.

As the parties have stipulated that Claimant suffered back injuries related to his employment, he is entitled to, and Employer/Carrier is responsible for, reasonable and necessary medical care, which is a natural and unavoidable result of his work-related injuries. However, Employer/Carrier argue that Claimant's treatment with Dr. Isaza was not authorized; and therefore, the cost of his treatment is not reimbursable. While the record does not indicate Claimant sought authorization from Employer/Carrier prior to presenting to Dr. Isaza, I find Claimant is entitled to treatment with him after March 15, 2011. At that time Dr. Kinnard effectively denied treatment. Dr. Kinnard repeatedly told Claimant there was nothing more he could do for him and released Claimant from his care on March 15, 2011.

Dr. Isaza and Dr. Kinnard's treatment of Claimant substantially overlapped prior to March 15, 2011. Claimant may have been unsatisfied with Dr. Kinnard's treatment, but he continued to treat with him until March 2011 even though he had begun treating with Dr. Isaza in September 2010. Dr. Isaza did not provide any further treatment beyond that provided by Dr. Kinnard during that time of overlapping treatment. In fact, Dr. Isaza recommended Claimant continue with the physical therapy and medications originally prescribed by Dr. Kinnard. Both Drs. Kinnard and Dr. Isaza recommended Claimant try epidural steroid injections, and Claimant used the doctor Dr. Kinnard referred him to for such treatment. However, once Dr. Kinnard released Claimant from his care and offered nothing further to Claimant for his treatment, this amounted to Employer/Carrier effectively denying Claimant's treatment. Thereafter, Claimant had a right to seek treatment elsewhere without obtaining any further authorization from Employer/Carrier. I find treatments by both Drs. Kinnard and Isaza, including steroid injections, are reimbursable under the Act; however, Claimant is only entitled to reimbursement for treatment provided by Dr. Isaza after March 15, 2011.

ORDER

Based upon the foregoing Findings of Fact, Conclusions of Law, and upon the entire record, it is hereby ORDERED, ADJUDGED, AND DECREED that:

1. Employer/Carrier shall pay Claimant compensation benefits for temporary total disability from July 2, 2010, to December 14, 2012, and from December 18, 2010, to November 28, 2011, based on a calculated average weekly wage of $1,473.41, in accordance with the provisions of Section 8(b) of the Act. 33 U.S.C. § 908(b).

2. Employer/Carrier shall pay Claimant all reasonable and necessary medical expenses arising out of his work-related injuries pursuant to 33 U.S.C. § 907, as previously set out.

3. Employer/Carrier shall pay Claimant interest on any sums determined due and owing at the rate provided by 28 U.S.C. § 1961.

4. Employer/Carrier shall receive a credit for all compensation payments previously made to Claimant.

5. All computations of benefits and other calculations provided in this ORDER are subject to verification and adjustment by the District Director.

6. Claimant's attorney shall have thirty (30) days from the date of service of this decision by the District Director to file a fully supported fee application with the Office of Administrative Law Judges; a copy must be served on Claimant and opposing counsel who shall then have twenty (20) days to file any objections thereto.

So ORDERED this 5th day of February, 2013, at Covington, Louisiana.



Digitally signed by C. Richard Avery
DN: CN=C. Richard Avery,
OU=Administrative Law Judge, O=Office
of Administrative Law Judges,
L=Covington, S=LA, C=US
Location: Covington LA

**C. RICHARD AVERY**
**Administrative Law Judge**

## Interest Calculator for 07-189010 Renyiell Jackson

| Begin | End | WeeklyRate | CompAmt | SldPeriod | StrPeriod | SldInt | StrInt |
|-------|-----|-----------|---------|-----------|-----------|--------|--------|
| 12/10/2010 | | $0.00 | $701.63 | 0.00000 | 56.78571 | $0.00 | $3.22 |
| 12/18/2010 | | $0.00 | $48,552.24 | 0.00000 | 56.21429 | $0.00 | $220.45 |
| Total | | | $49,253.81 | 0.00000 | 113.00000 | $0.00 | $223.66 |

| | |
|--|--|
| Interest | 0.21% |
| Paid Date | 02/11/2013 |
| Total Int | $223.66 |

TOTAL DUE EMPLOYEE

    $ 49,253.82

+    223.66 (Interest)
    ―――――――――――

$ 49,477.48

The information in this report may be protected by the Privacy Act of 1974, as amended. By accessing this information you certify you are complying with all requirements under the Privacy Act, where applicable

**U.S Department of Labor**    Office of Administrative Law Judges
5100 Village Walk, Suite 200
Covington, LA 70433

985-809-5173
985-893-7351 (FAX)



MEMORANDUM FOR: **New Orleans(2) District Director**
New Orleans, LA

FROM:    **C. Richard Avery**
Administrative Law Judge

SUBJECT:    **JACKSON RENYIELL v. OIL MOP, LLC**
Case No. 2011LHC01628, OWCP No. 07-189010

In accordance with the Regulations implementing the Longshore and Harbor Workers'
Compensation Act, I am transmitting herewith my signed document this 5th day of February,
2013.

Six (6) Business Days from today, this Decision and Order will be posted on our website
(www.oalj.dol.gov); however, under the Act and regulations such posting will NOT constitute
official service, which is to be effected by your office.

FORWARDED:


Digitally signed by ELLEN ALES
DN: CN=ELLEN ALES, OU=LEGAL
ASSISTANT, O=Office of Administrative Law
Judges, L=Covington, S=LA, C=US
Location: Covington LA

**ELLEN ALES**
**LEGAL ASSISTANT**

Enclosure

cc: Clm Atty (w/o encl)
    Emp Atty (w/o encl)
    Sol (w/o encl)

**\*THE OFFICE OF ADMINISTRATIVE LAW JUDGES**
**SHOULD NOT BE CONTACTED**
**REGARDING SERVICE OF THE ABOVE DOCUMENT.**

## CERTIFICATE OF FILING AND SERVICE

I certify that on February 6, 2013, the foregoing Compensation Order was filed in the Office of the District Director, Seventh Compensation District, and that a copy thereof was mailed on said date by certified mail to the parties and their representatives at the last known address of each as follows:

Renyiell Jackson, 418 Naquin St., Houma, LA 70360

Francis Spagnoletti, Esq., 401 Louisiana St., 8th Floor, Houston, TX 77002

Louisiana Workers' Comp. Corp., 2237 S. Acadian Thruway, Ste 102, Baton Rouge, LA 70808

Oil Mop, LLC, P.O. Box 56981, New Orleans, LA 70156-6981

David Johnson, Esq., P.O. Box 98001, Baton Rouge, LA 70898


A copy was also mailed by regular mail to the following:

Judge C. Richard Avery, Office of Administrative Law Judges, 5100 Village Walk, Ste 200, Covington, LA 70433

David A. Duhon, District Director,
Seventh Compensation District
U. S. Department of Labor
Office of Workers' Compensation Programs

If any compensation, payable under the terms of an award, is not paid within ten days after it becomes due, there shall be added to such unpaid compensation an amount equal to 20 percent thereof. The additional amount shall be paid at the same time as, but in addition to, such compensation.

The date compensation is due is the date the District Director files the decision or order in his office.

Form LS-020

Employer's First Report of Injury
Or Occupational Illness
(See Instructions on reverse - Leave Items 1 and 2 blank)

**U.S. Department of Labor**
Employment Standards Administration
Office of Worker's Compensations Programs

OMB No. 1215-0031

| 1. OWCP No. | 2. Carrier's No. | 3. Date and Time of Accident | | | |
|---|---|---|---|---|---|
| | 158527-T4 | Mo. 07 | Day 02 | Yr. 10 | Hour 06:55 AM |

4. Name of Injured/Deceased Employee (Type or print - first, M.I., last)

RENYIELL   JACKSON                985-397-0108
                                 Telephone

5. Employee's Address (No., street, city, state, Zip code)

418 NAQUIN ST
HOUMA, LA  70630

6. Injury is Reported Under the following Act (Mark one)

A [X] Longshore and Harbor Workers' Compensation Act

B [ ] Defense Base Act

C [ ] Nonappropriated Fund Instrumentalities Act

D [ ] Outer Continental Shelf Lands Act

7. Indicate Where Injury Occurred (Longshore Act only) (Mark one)

A [X] Aboard Vessel or Over Navigable Waters
B [ ] Pier/Wharf
C [ ] Dry Dock
D [ ] Marine Terminal
E [ ] Building Way
F [ ] Marine Railway
G [ ] Other Adjoining Area

8. Sex [X] M [ ] F     9. Date of Birth ▓▓/75

10. Social Security No. (Required by Law)
▓▓▓ - ▓▓ - 4 6 9 8

11. Did Injury Cause Death?
[X] No     [ ] Yes - If yes, skip to 16

12. Did Injury Cause Loss of Time Beyond Day or Shift of Accident
[ ] Yes   [X] No

13. Date and Hour Employee First Lost Time Because of Injury    Mo. Day Yr. Hour

14. Did employee Stop Work Immediately? [ ] Yes [ ] No

15. Date and Hour Employee Returned to Work    07/02/10

16. Was Employee Doing Usual Work When Injured/Killed? (If no, explain in Item 26) [ ] Yes [ ] No

17. Did Injury/Death Occur on Employer's Premises [X] Yes [ ] No

18. Dept. in Which Employee Normally Works(ed)    LAROSE

19. Occupation    TECHNICIANS, N.E.C.

20. Date and Hour Pay Stopped

21. Which Days Usually Worked Per Week? (Mark (X) days)  S  M  T  W  T  F  S

22. Date Employer or Foreman First Knew of accident    07/02/10

23. Wages or Earnings (Include overtime, allowances, etc.)

| a. Hourly | $ |
| b. Daily | $ |
| c. Weekly | $ |
| d. Yearly | $ |

24. Exact Place Where Accident Occurred (See Instructions on reverse). This item should specify area if accident was in maritime employment and occurred in area adjoining navigable waters.
UNKNOWN

25. How was Knowledge of Accident or Occupational Illness Gained

26. Describe in full how the accident occurred (Relate the events which resulted in the injury or occupational   disease. Tell what the injured was doing at the time of the injury. Tell what happened and how it happened. Name any objects   or substances involved and tell how they were involved. Give full details on all factors which led or contributed to the accident.
THE EMPLOYEE WAS ON A BOAT CHECKING GAS LEVELS. THE BOAT WAS STRUCK BY A LARGER BOAT. UPON IMPACT, HE FELL AGAINST THE RAILING AND STRAINED HIS OF BACK.

27. Nature of Injury (Name part of body affected - fractured left leg, bruised right thumb, etc.) If there was amputation of a member of the body, describe.

SPRAINS STRAINS TEARS  BACK N.E.C.

28. Has Medical Attention Been Authorized [ ] Yes [ ] No

Name

29. Enter Date of Authorization

30. Was First Treating Physician Chosen by Employee? [ ] Yes [ ] No

31. Has Insurance Carrier Been Notified? [ ] Yes [ ] No

Address - Enter Name, Street, City, State, State, ZIP Code

32. Physician

FAMILY DOCTOR CLINIC APMC

33. Hospital

291 LIBERTY STREET
HOUMA, LA 70360

34. Insurance Carrier

LOUISIANA WORKERS' COMPENSATION CORPORATION

35. Employer

OIL MOP LLC

2237 S. ACADIAN THRUWAY
SUITE 102
BATON ROUGE, LA  70808

321 ST. CHARLES AVENUE
NEW ORLEANS, LA  70130

36. Nature of Employer's Business

LIMITED LIABILITY COMPANY (LLC)

37. Signature of Person Authorized to Sign for Employer

38. Offical Title of Person Signing This Report

| | 39. Date of This Report   07/08/10 |



William H. Kinnard, M.D.
H. Lawrence Haydel, II, M.D.
Michael A. LaSalle, M.D.
Brett E. Casey, M.D.
Christopher E. Cenac, Jr., M.D.

Dexter A. Gary, M.D., Retired
Richard M. Landry, M.D., Retired
Gary T. Guidry, M.D., Retired

A Medical Corporation

November 29, 2011

LWCC
Post Office Box 98054
Baton Rouge, Louisiana  70898

Re: Renyiell Jackson
     DOB: 02/17/55
     Claim #158527

To Whom It May Concern:

I have received a copy of the FCE performed on October 24, 2011.  The study indicates that there is poor validity with submaximal effort which would correspond to my own feeling of symptoms magnification.

He is at the very least capable of return to work in a light to medium capacity at this time but has the potential for return to greater work activities in the future.

As indicated in my office of March 15, 2011, I have nothing further to offer this patient.  He is considered a maximum medical improvement.

Sincerely,

William H. Kinnard, M.D.

WHK/ch

1001 School St.
Houma, LA 70360-4691
(985) 868-1540
FAX (985) 876-0759

1216 Victor II Blvd.
Suite 200
Morgan City, LA 70380
(985) 384-7001
FAX (985) 384-7009

# WorkSaver^sm FCE Report



Patient: **Jackson, Renyiell**
Date of Evaluation: October 24, 2011
Employer: Oil Mop
Occupation: Spill Hand
Age: 36
Height: 73.5 inches     Weight: 146 lbs
Date of Injury: July 2, 2010
Diagnosis: Low back pain
Medications Taken Prior To This FCE: None
Functional Capacity Evaluator: Trevor Bardarson PT, OCS

## Validity of Effort Analyzed

☐ **Good Validity of Disability Determination-** Client performed all tests safely and demonstrated consistent efforts which were determined to reasonably estimate true residual functional capacities.

☐ **Equivocal Validity of Disability Determination:** Equivocal results determined from this evaluation threatened the validity of accurately estimating true residual functional capacities.

☒ **Poor Validity of Disability-** Testing revealed inappropriate responses to valid tests and failed to find objective signs which validate the subjective presentation of the symptoms or impairment(s) of the client. This behavior threatens the validity of this report.

☒ **Submaximal Efforts Noted -** Certain effort(s) during this FCE were determined to be submaximal and threaten the validity of this report.

### Current Estimated Physical Demand Level (PDL) Capacity:
A physical demand level of light to medium was demonstrated but he most likely has a greater physical ability due to his lack of effort during testing

### Estimated Physical Ability To Return To Previous Employment:
Able with the restrictions recommended. His ability is likely greater than demonstrated meaning it is likely he could return without restriction.

Copyright1996RichardWBunch,PhD,P.T.          Trevor Bardarson PT,OCS    Rev. 6/10/06

**Client: Jackson, Renyiell**                    WorkSaver℠ Functional Capacity Evaluation Synopsis

## INTRODUCTION

Mr. Jackson is a 36 year old right handed male born on ▮▮▮▮▮▮1975, who stands at 73.5 inches tall and weighs 197 lbs. He was evaluated for residual estimated maximum functional capacities following an injury to the lower back which he claims resulted from being thrown against the dock, on or about July 2nd, 2010, while working as a Spill Hand, for Oil Mop. He has not worked since the date of the injury. He has received medical treatment consisting of orthopedic evaluation with Dr. Kinnard, MRI, discogram, ESI(2) and physical therapy. He has been referred to determine his estimated residual abilities for employment.

## Pre-FCE Status

His resting heart rate and blood pressure were determined to be 74 bpm and 104/70 mm Hg respectively. He reported to this FCE with complaints of right sided back pain. He rated pre-test pain severity on a standard 0-10 pain analog scale to be 6/10 (moderate). Patient denied taking any medications prior to this FCE.

A Polar heart rate monitor was placed on the client in order to monitor his heart rate during the entire examination. The safe maximum heart rate for this client was determined to be 184(220-age). To insure safety during this examination, the client's heart rate elevation was not allowed to exceed 156, the test termination heart rate, calculated as 85% of safe maximum heart rate.

## Post-FCE Status

Upon completion of this FCE his post-test pain rating was 8/10 (severe) and heart rate and blood pressure were 72 bpm and 110/80 mm Hg respectively, reflecting a post-test decrease in heart rate and an increase in blood pressure.

## Physical and Biomechanical Assessment Summary

A comprehensive neuromusculoskeletal examination found the following key clinical findings: (A detailed data collection form related to this assessment is available upon request.)

    1.) Lumbar ROM was limited due to subjective reports of pain as follows; flexion 34% limited, extension 60% limited and lateral flexion 60% limited. Straight leg raise was limited to 15 degrees on the right and 20 degrees on the left due to reports of low back pain. His seated straight leg raise was normal to 90 degrees.
2.) Strength 5/5/ all myotomes.
3.) Deep tendon reflexes were equal and symmetrical and graded 2+ in the bilateral patella and Achilles tendons.
4.) Normal tone in the lumbar paraspinal muscles.
5.) Essentially his subjective complaints due not correlate with the objective findings.

Client: Jackson, Renyiell                    WorkSaver™ Functional Capacity Evaluation Synopsis

## Validity Assessment

**Threatened Validity due to non-organic signs.**

The validity of this FCE was objectively assessed by analyzing physiological signs, identification of organic versus non-organic signs, cross-referencing consistency of efforts, cross referencing biomechanical patterns and cross referencing functional tests for signs of maximal or submaximal effort. This evaluation failed to find sufficient objective physiological signs to validate the severity of the subjective complaints of the client. Tests for maximum, consistent volitional efforts and non-organic signs were definitively positive for non-organic illness behavior. (See comprehensive summary for findings which form the foundation of these opinions). This indicates that the client may have attempted to control the results of this FCE.

Consequently, it is deemed likely that the findings of this evaluation do not provide a true representation of residual maximum functional capacities. Non-organic illness behavior can be superimposed over existing organic pathology, preventing true assessment of the effect of such pathology on functional abilities. Therefore, it is recommended that the results of this FCE be accepted as an indicator of what the client is <u>willing to do at this time</u> rather than as an indicator of true maximum functional capacities. The presence of symptom and disability magnification behaviors identified in a FCE may be conscious or unconscious in nature, the determination of which is beyond the scope of this evaluation.

**Threatened Validity due to signs of submaximal effort.**

There were definitive signs of inconsistencies and contradictory performances that indicated submaximal effort was given during this examination. This behavior is consistent with disability magnification <u>behavior</u> which may or may not be conscious in nature. The determination of sincerity of effort, or the degree which conscious behavior is directed at controlling the outcomes of this FCE, are beyond the scope of this examination.

## Estimated Residual Functional Capacity

Functional capacity tests addressing static/dynamic postural tolerances and material handling capacities were performed. A physical demand level can not be accurately determined as submaximal effort was demonstrated. However the client demonstrated the ability to tolerate activities in the physical demand level (PDL) of **light to medium** as defined in the Dictionary of Occupational Titles, 4th Edition (U.S. Dept. Of Labor) with the following restrictions:

    1.) Occasional lifting of up to 30 lbs to waist level and 15 lbs to shoulder level.
    2.) Frequent lifting of up to 15 lbs.
    3.) Occasional carrying of up to 20 lbs.

Client: Jackson, Renyiell                    WorkSaver℠ Functional Capacity Evaluation Synopsis

4.) Limit sustained or repetitive trunk flexion to occasional.
5.) Please see page # 6 for all estimated residual abilities.

**Based on these findings it is determined that the client has sufficient residual functional capacities to safely return to his prior job as a spill hand with the restrictions described above. Comparison of his demonstrated residual capacities to the demands of his current job should be used for return to work consideration at this time.**

## Summary Remarks

This FCE protocol follows AMA and APTA guidelines and represents a composite of clinical and functional based tests that are used commonly in clinical practice, impairment ratings, disability evaluations, and other types of functional capacity evaluations. The FCE is commonly used by medical physicians as a clinical tool to help determine whether or not a patient is ready to return to work with or without accommodations. The design of this FCE protocol has been presented at numerous medical conferences and published as a chapter in a medical book entitled AMA Guides to FCEs (Bunch, Richard W., PhD., P.T., *AMA Guide to Functional Capacity Evaluation*, Handbook of Lower Extremity Neurology, 2000, pp 197- 205).

A FCE should only be performed by licensed clinicians who possess skill sets in both patient evaluations and functional-based testing such as licensed physical and occupational therapists.
The testing procedures used in FCEs, to include clinical examinations, are based on clinical training, AMA and APTA guidelines, and peer reviewed studies. Clinical signs to assess responses to effort such as heart rate, blood pressure, muscle strength, reflexes, balance and coordination are based on many years of research-based sciences such as physiology, kinesiology, and anatomy, as well as numerous clinical-based research studies.

Overall, a FCE is the most valid and reliable clinical examination to determine if a physical impairment translates into occupational disability and whether or not a person can safely perform various components of a job with or without accommodations. Standardization of FCE tests provides inter- and intra-tester reliability. Content validation by having a person safely demonstrate the ability to perform job tasks while monitoring symptoms and physiological responses to the task provides information about work capacity that would otherwise be based on mere speculation.

It is the responsibility of the FCE evaluator to determine if symptoms and any related disabilities presented by the client during the FCE are valid in relationship to the nature, irritability, and severity of pathophysiological mechanisms. The evaluator must determine if there is an organic (physiological) basis for symptoms and if functional abilities are derived from maximum (best) efforts that do not provoke or aggravate symptoms when they do exist.

Variables challenging the validity of the FCE outcome related to symptom and/or disability magnification behaviors (also referred to as non-organic illness behaviors), regardless of the underlying cause, should be identified when present. When identified, further examination, such as a clinical psychological examination, may be required to clarify the basis of the identified non-organic illness behavior.

Copyright1996RichardWBunch,PhD,P.T.          4    Trevor Bardarson PT,OCS    Rev. 6/10/06

**Client: Jackson, Renyiell**                    **WorkSaver℠ Functional Capacity Evaluation Synopsis**

This FCE protocol has a comprehensive number of cross references to assess whether or not a test recipient's subjective report of symptoms are physiologically based and whether or not symptoms reported correlate to the severity, irritability and nature of a medical condition. Functional testing is also accessed via cross references to determine if efforts given are reasonable in light of the person's medical and fitness status, or if efforts were inconsistent and submaximal. Cross referencing for validity of efforts is important when attempting to accurately estimate the true residual functional capacities for a return to work determinations.

The findings of all the tests administered in this FCE along with considerations of age, gender, and medical history have been used by the evaluator to render an opinion as to abilities of the test recipient to perform work with or without accommodations. Therefore, opinions rendered are based upon reasonable probability as determined from testing based on peer-reviewed scientific methods, and specialized medical training and clinical experience of the evaluator.

The prognosis for successful return to work with physical demand requirements and restrictions recommended in this report were derived from the person's medical history, intake interview, findings derived from a comprehensive physical examination, and functional capacities demonstrated during work simulated functional capacities testing.  Although an opinion regarding work capacities can be based on physical abilities, successful return to work is also dependent on the client's level of motivation to return to work. Psychosocial issues can create functional or behavioral barriers to return to work that are independent of physical disabilities.

By my signature below I verify that the conclusions, impressions and/or recommendations rendered in this report are derived entirely from objective, unbiased assessments of the client. It is understood that information not made available to this evaluator prior to or at the time of this evaluation may or may not change the opinions rendered in this evaluation at a later date.  If additional information is provided for review at a later date, an additional report may be provided.

Trevor Bardarson PT, OCS
Certified Functional Capacity Evaluator

Date:  October 24, 2011

Phone # (985) 872-5911

Client: Jackson, Renyiell                    WorkSaver℠ Functional Capacity Evaluation Synopsis

## Estimated Functional Capacities Based On An 8 Hour Work Day

| Abilities: | WTR* | Constant 67-100% 5.5-8 hrs | Frequent 34-66% 2.5-5.5 hrs | Occasional 4-33% 30 min-2.5 | Rare 1-3% ≤30 min | Never 0% 0 |
|---|---|---|---|---|---|---|
| **Sustained (Static) Postures** | | | | | | |
| 01. Sit: Back Supported | NR | X | | | | |
| 02. Sit: Back Unsupported | NR | | X | | | |
| 03. Standing | NR | X | | | | |
| 04. Standing Trunk Flexion | P | | | X | | |
| 05. Seated Trunk Flexion | P | | | X | | |
| 06. Crouching | P | | | X | | |
| 07. Kneeling Sequence | P | | | X | | |
| **Dynamic Activities:** | | | | | | |
| 01. Using Hands Overhead (sustained) | P | | | X | | |
| 02. Using Hands Overhead (repeated) | P | | X | | | |
| 03. Hand Dexterity | NR | X | | | | |
| 04. Repetitive Squatting | P | | | X | | |
| 05. Walking | P | | X | | | |
| 06. Crawling | P | | | X | | |
| 07. Repeated Trunk Flexion | P | | | X | | |
| 08. Trunk Rotation Sitting | P | | X | | | |
| 09. Trunk Rotation Standing | P | | X | | | |
| 10. Stair Climbing | P | | X | | | |
| 11. Step Ladder Climbing | P | | | X | | |
| 12. Balancing | NR | X | | | | |
| 13. Grasp Objects | NR | X | | | | |
| 14. Manipulate Objects | NR | X | | | | |
| 15. Repetitive Hand Motions | NR | X | | | | |
| 16. Repetitive Foot Motions | NR | X | | | | |

*WTR = work tolerance restrictions *(Key: NR= no restrictions P= Pain restrictions B= Biomechanical restrictions S= Strength restrictions C= Cardiorespiratory restrictions NW= Not willing NT= Not tested O= Other)*

## Estimated US Dept of Labor Physical Demand Level (PDL) for Client

☐ Sedentary   ☒ Light   ☒ Medium   ☐ Heavy   ☐ Very Heavy

| PDL Key: | SEDENTARY | LIGHT | MEDIUM | HEAVY | VERY HEAVY |
|---|---|---|---|---|---|
| OCCASIONAL (01-33%) | Up to 10 Lbs | Up to 20 Lbs | Up to 50 Lbs | Up to 100 Lbs | Over 100 Lbs |
| FREQUENT (34-66%) | Negligible | 10 Lbs | 25 Lbs | 50 Lbs | Over 50 Lbs |
| CONSTANT (67-100%) | — | Negligible | 10 Lbs | 20 Lbs | Over 20 Lbs |
| | Sit | Stand/Walk | Stand/Walk | Stand/Walk | Stand/Walk |

Copyright1996RichardWBunch, PhD, P.T.          6     Trevor Bardarson PT, OCS     Rev. 6/10/06

**Client: Jackson, Renyiell**       WorkSaver℠ Functional Capacity Evaluation Synopsis

# Patient's Self-Perception of Disability Level

## Oswestry Disability Questionnaire - Score: 46 %  Interpretation of Scores:

☐ **No Disability (0%) :** Indicates that the patient failed to indicate any negative impact of current condition on functional activities.

☐ **Minimal Disability (1 - 20 %) :** Indicates that client can cope with most living activities. Usually no treatment is indicated, apart from advice on lifting, sitting, posture, physical fitness and diet. In this group some patients have particular difficulty with sitting, and this may be important if their occupation is sedentary.

☐ **Moderate Disability (21 - 40%) :** Patient experiences more pain and problems with sitting, lifting and standing. Travel and social life are more difficult and there is a tendency to take absence from work. Personal care, sexual activity and sleeping are not grossly affected, and the condition of the patient can usually be managed conservatively.

☒ **Severe Disability (41 - 60%) :** Pain remains the main problem, but travel, personal care, social life, sexual activity and sleep are also affected. This patient requires detailed investigation.

☐ **Crippled (61 - 80%) :** Pain impinges on all aspects of the life of the patient both at home and at work and positive intervention is required.

☐ **Symptom/Disability Magnification ( 81 - 100%):** This can be evaluated by careful observation of the patient during the medical examination.

## Dallas Pain Questionnaire - Client Self-Perceived Effect of Disability Per Category

| | | |
|---|---|---|
| Factor I - | Effect on Daily Activities: | 45 % |
| Factor II - | Effect on Work/Leisure Activities: | 30 % |
| Factor III - | Effect related to Anxiety / Depression: | 50 % |
| Factor IV - | Effect on Social Interests: | 15 % |

Literature indicates if:

☒ Factors I, II, III, & IV ≤ 50%: Conservative intervention - primary approach.

☐ Factors I & II ≥ 50% ; Factors III & IV ≤ 50%: Medical intervention - primary approach.

☐ Factors I & II ≤ 50% ; Factors III & IV ≥ 50%: Behavioral intervention - primary approach.

☐ Factors I, II, III & IV ≥ 50% Combined medical & behavioral intervention -primary approach.
**( Lawlis, et. al. The Development of the Dallas Pain Questionnaire. Spine, 14: 511-516, 1989.)**

**Client: Jackson, Renyiell**  WorkSaver℠ Functional Capacity Evaluation Synopsis

## Assessment of Current Attitude of Client To Return To Work

**Attitude About Returning To Previous Job:** "I would love to but I'm in pain you know."

**Attitude About Returning To Work In General:** "I'm a young man. I try to help myself if I could, you know. I'm willing to try but if I can't you know. I'm honest and I can't right now."

## Environmental Restrictions

|  | None | Mild | Moderate | Total |
|---|---|---|---|---|
| 1. Unprotected Heights | X | — | — | — |
| 2. Moving Machinery | X | — | — | — |
| 3. Dust/Fumes/Gasses | X | — | — | — |
| 4. Whole Body Vibration | X | — | — | — |
| 5. Extremity Vibration | X | — | — | — |
| 6. Hot Weather (> 80° F) | X | — | — | — |
| 7. Cold Weather (< 60° F) | X | — | — | — |

## Purpose of Functional Capacity Evaluation

☒ **Ability To Return to Work** - Analysis of client physical capacities in order to determine if return to current job can be accomplished safely with or without accommodation.

☒ **Physical Capacities for Employability** - Analysis to determine abilities to return to the general work force using guidelines established by the U.S. Department of Labor.

☐ **Determination of Need for Rehabilitation** - Analysis of current status of the neuromusculoskeletal system as it relates to impairments and functional capacities in order to determine if specific rehabilitation needs (e.g., physical therapy, work conditioning, work hardening, etc.) are recommended for the client to safely return to work.

☐ **Other** - _____

Client: Jackson, Renyiell                    WorkSaver℠ Functional Capacity Evaluation Synopsis

# COMPREHENSIVE SUMMARY COMMENTS

## INTAKE INTERVIEW
## Medical History:
X-rays, MRI, Injections, discogram, removal of a lipoma at Houma urgent care on his left leg, physical therapy

## Previous medical history:
none

## Family Background:
He reports both parents are still living. His mother reportedly suffers from diabetes and his father is in good health. He reports having 12 siblings all in good health. His mother is reported as being disabled secondary to AKA due to diabetes.

## Occupational History:
Oil Map - Spill Hand - 4 years
Gulf Island Fabrication - helper - 3 months

## Current Status
Client drove to the clinic in an automobile with automatic transmission which required approximately 15 minutes of travel time. Upon arrival to the clinic, the patient did not appear to be in apparent distress. He reported to the clinic with a pain intensity of 6/10(moderate), with pain indicated to exist in the right sided back region of the body.

Patient appeared relaxed during the intake interview which lasted approximately 1.5 hours. During this period of time the patient was able to sit without signs of discomfort or pain.

Information about the patient's occupation was derived by interview and/or from a copy of a job description from the patient's employer, and/or the Dictionary of Occupational Titles, 1991, 4th edition. The name of the job title is spill hand. The physical demand labor classification of the job is estimated to be medium to heavy.

He described the character of his back pain as being a Sharp / stabbing pain and pressure pain and pins and needles - posterior right leg . The pain constant which does vary in intensity.

**Client: Jackson, Renyiell**          WorkSaver℠ Functional Capacity Evaluation Synopsis

## Pain Behavior

Patient responded to the following pain behavior questions as follows:

1. Does pain awaken you at night ?  Yes

2. Is pain better in AM or PM?   PM

3. Is pain constant or intermittent?  Constant

4. Does pain vary in intensity?   Yes

5. Aggravated by sneezing, coughing and bowel movements?   No

6. Worse in sitting or standing?     No Difference

7. Worse while still or moving?    No Difference

8. How do you relieve pain?  "Medication "

9. Has your overall condition improved since injury / surgery?    Same

## Current Medications:

Vicodin ES, muscle relaxer (does not know the name)

## Medications Reported Taken Today:

## Social / Educational Background

The patient has 10 years of formal education and no special training. He is single and has four children. He is a smoker and smokes approximately 5 cigars a day. The patient indicates that he enjoys the following hobbies / sports: playing ball with his kids. The patient stated that he is not able to participate in these activities since his injury due to pain.

## Patient's Current Perception of His Disability

Results from psychometric testing indicate that the patient perceives symptoms to have a severe impact on major life functions.

**Goals:** The patient was asked to identify short and long term goals in his life at this time. He reports no goals and is living day to day.

Client: Jackson, Renyiell                    WorkSaver™ Functional Capacity Evaluation Synopsis

# TESTS FOR NON-ORGANIC SIGNS
## or
## INAPPROPRIATE ILLNESS BEHAVIOR

## Waddell Tests
( 3 or more positive Waddell categories indicate inappropriate illness behavior*)
**1. Simulation Tests:**
      Axial Loading
      Simulated Trunk Rotation:
**2. Distraction:**
      Sitting vs. Supine SLR Test
**3. Regional Disturbance**
      Cogwheel or Non-myotomic weakness
      Nonanatomic Sx Distribution           Negative
**4. Nonspecific Tenderness**                   Negative
**5. Overreaction**
      Excessive verbalization of pain
      Overreacting facial expressions for pain     Negative
      Collapsing episodes                 Negative
      Excessive sweating                 Negative
                                               Negative

Results: 3/ 5


* *Waddell G., McCulloch JA, Kummel E, Venner R, et al: Nonorganic physical signs in low back pain. Spine 1980 March/April; Vol: 5: Number 2: Page :117*

## Psychometric Tests Suggestive of Non-organic Illness Behavior
06. Psychometric Test - Oswestry: Scores >80%:
07. Psychometric Test - Pain Drawing - Non- Dermatomal Pattern:   Negative
08. Psychometric Test - Dallas Pain: Factors III & IV > 80 %:      Negative
                                                Negative

## Non-Organic Clinical Findings
09. Muscle tone and girth WNL despite report of prolonged disuse or non-weight bearing.
10. Back paraspinal muscle guarding behavior relieved by relaxing abdominal muscles upon command
11. Cervical rotation increases LBP                   Negative
12. Bowstring test result not consistent with report of sciatica    Negative
13. Inappropriate Response To Vibration Test:          Negative
14. Ankle Dorsiflexion Test While Sitting:             Negative
15. Bilateral Straight Leg Raise vs Unilateral SLR Test:

**Client: Jackson, Renyiell**                    **WorkSaver℠ Functional Capacity Evaluation Synopsis**

16. Passive Prone Knee Flexion Test:
17. Function Improves When Observed While Distracted:
18. Consistently Rates Pain at Level 8 Or Above Regardless of Activity:   Negative
19. HR/BP changes do not correlate with report of sudden increased pain:
20. Self-perceived Disability Not Consistent With Performance:   Negative
21. Reported Disability Does Not Correlate With Measured Impairments:
22. Hoover's Submaximal Effort Test:                    Negative

## Symptom Behaviors Suggestive of  Non-organic Illness Behavior

23. Pain At The Tip Of The Tailbone
24. Entire Limb Pain
25. Whole Leg Numbness
26. Whole Leg Giving Way
27. Complete Absence Of Spells With Very Little Pain In The Past Year
28. Has Gone Recently to the ER for Pain                    Negative
29. Pain Has Remained the Same or Become Worse Since Injury
30. Reports Severe Pain But Takes No Pain Medications:        Negative
31. Intolerance of, or reaction to, many treatments:            Negative

## Overt Pain Behaviors

32. Guarding - abnormally stiff, interrupted or rigid movement while moving
    from one position to another:                        Negative
33. Bracing - a stationary position in which a fully extended limb supports
    and maintains an abnormal distribution of weight:        Negative
34. Rubbing - any contact between hand and back, i.e. touching, rubbing or
holding the painful area:                            Negative
35. Grimacing - obvious facial expression of pain that may include
furrowed brow, narrowed eyes, tightened lips, corners of mouth pulled
back and clenched teeth:                            Negative
36: Sighing - obvious exaggerated exhalation of air usually accompanied
by the shoulders first rising and then falling. They may expand their cheeks first:  Negative

**Total   16/36**

---

Signs Suggestive Of:   __X__ High Probability of Nonorganic Symptoms, Illness Behavior,
Psychological Overlay. (10 or more positive)
_____ Questionable Nonorganic Symptoms (5 to 9 positive)
_____ Organic Symptoms (Less than 5 positive)

---

**Client: Jackson, Renyiell**                    WorkSaver℠ Functional Capacity Evaluation Synopsis

## Functional Validity Cross References:

01. Non-biomechanical pattern of dynamic lifts                                    Negative
02. Non-biomechanical correlation between dynamic horizontal lift
and  peak isometric (static) near arm lift force capacity.
03. Non-biomechanical correlation between dynamic floor to knuckles
lift capacity to peak static squat lift force capacity.                           Negative
04. Non-correlation of client's isometric strength to manual muscle testing. Negative
05. Horizontal isometric arm lift validity*                                       Negative
06. High COVs during isometric lift testing:
07. Submaximal isometric lift force curves:
08. Fails to use power grip during isometric and/or dynamic lift,
push or pull tests:
09. Non-recruitment of accessory muscles during material handling tests:  Negative
10. Inconsistent ROM limitations demonstrated in different tasks:
11. Inconsistent strength during different functional tasks:                      Negative
12. Standard grip test does not correlate to MVE test
13. MVE grip force curves fail to form bell curve
14. MVE grip test has 4 or more COVs $\geq$ 15%                                    Negative
15. Positive Rapid Exchange Grip Test                                             Negative
16. Tip pinch grip is equal to or greater than key pinch grip.                    Negative
17. Postural tolerance improves when distracted.
18. Heart rate increase does not correlate to perceived exertion.
19. Does not favor the effected extremity during functional testing               Negative
20. Inability to produce a force $\geq$ 20% of body weight during the
isometric push or pull test:
(* Analysis of the isometric near arm lift versus the isometric far arm lift should reveal a
physiologically appropriate near-to -far force ratio ( $\geq$1: 2 but not greater than 1:3)

## Total   10/20

Signs Suggestive Of:___X___ **High Probability of Disability Magnification Behavior.** (>5 positive)
_____ **Questionable Self Limiting Behavior( 3 to 5 positive)**
_____ **Consistent Effort (Less than 3 positive)**

**Hand Grip ▶**
**Strength**

The JAMAR hand dynamometer was used in order to quantify grip strength and determine whether Mr. Ranyiell Jackson exerted consistent effort during grip strength testing. Mr. Ranyiell Jackson was tested using the standard, maximum voluntary effort and rapid exchange hand grip protocols. Mr. Ranyiell Jackson is right hand dominant. Normative data is based on the assumption that right and left hand dominant subjects, analyzed separately show little functional difference between their mean scores.[1,2]

## Standard Hand Grip



The client squeezes the hand grip dynamometer for a three second trial duration. A rest period of 5 seconds is given before testing the other hand. This process is repeated three times. The average of the three trials is compared to published normative data[1,2]

Oct 24, 2011 11:02:13 AM



|  | Left | Right |
|---|---|---|
| Trial #1 | 62.9 lbs. | 49.9 lbs. |
| Trial #2 | 61.7 lbs. | 40.9 lbs. |
|  | 48.1 lbs. | 36.1 lbs. |
| Average | 57.6 lbs. | 42.3 lbs. |
| Maximum | 62.9 lbs. | 49.9 lbs. |
| COV | 11.7% | 13.5% |
| Diff L Vs. R |  | 36.2% |

Mr. Ranyiell Jackson's grip strength was compared to age and gender matched normative data. The published normal grip strength range for the left hand is from 91.2 lbs to 134.6 lbs.[1,2] Mr. Ranyiell Jackson displayed an average force of 57.6 lbs. which is considered significantly below the normal range when compared to the normal population of the referenced study. The published normal grip strength range for the right hand is from 95.7 lbs to 143.7 lbs.[1,2] Mr. Ranyiell Jackson displayed an average force of 42.3 lbs. which is considered significantly below the normal range when compared to the normal population of the referenced study. The coefficient of variation was 11.7% for the left hand and 13.5% for the right hand. Values greater than 15% may be an indicator of inconsistent effort.

## Maximum Voluntary Effort (MVE)



The hand dynamometer is set to each of the five available positions which vary the client's grip size. The results for each of the average maximum forces during each position are displayed by the corresponding bar graphs.

Oct 24, 2011 11:03:28 AM



|  | Left | COV | Right | COV |
|---|---|---|---|---|
| Pos #1 | 36.3 lbs. | 13.0% | 31.9 lbs. | 2.6% |
| Pos #2 | 26.6 lbs. |  | 30.1 lbs. |  |
| Pos #3 | 28.6 lbs. | 9.0% | 33.0 lbs. | 6.2% |
| Pos #4 | 25.8 lbs. | 2.2% | 27.9 lbs. | 9.4% |
| Pos #5 | 22.9 lbs. | 3.9% | 24.2 lbs. | 14.4% |
| St. Dev. | 4.5 Lbs. |  | 3.1 Lbs. |  |

Using the Maximum Voluntary Effort (MVE) protocol over a range of five positions on the hand dynamometer, it is expected that the strength graphs obtained results in a bell-shaped curve[9,11,12,13] even in a disabled population or if the client's hand is injured[9,13] with at least 6 of the 10 coefficients of variation within the acceptable 15% or less limit.[22]

The graph obtained for Mr. Ranyiell Jackson did not demonstrate a bell shaped curve which may be an indicator of submaximal effort and the coefficients of variation of the underlying data may be an indicator of consistent effort with 8 out of the 10 coefficients of variation within the 15% acceptable limit.

## Rapid Exchange Grip (REG)

Oct 24, 2011 11:10:49 AM



The hand dynamometer is set to position 1. The client applies a maximum force for a one second trial duration quickly alternating between hands. The average maximum force for all six trials is compared to the maximum voluntary effort value in the same position for reliability purposes.[13]

| | Left | Right |
|---|---|---|
| Trial #1 | 30.5 lbs. | 33.7 lbs. |
| Trial #2 | 28.1 lbs. | 24.9 lbs. |
| | 28.3 lbs. | 25.6 lbs. |
| | 29.6 lbs. | 30.2 lbs. |
| Trial #5 | 32.4 lbs. | 26.4 lbs. |
| Trial #6 | 26.4 lbs. | 27.5 lbs. |
| Average | 29.2 lbs. | 28.1 lbs. |
| Maximum | 32.4 lbs. | 33.7 lbs. |
| Diff L Vs. R | | 4.1% |

The peak average force value recorded during the maximum voluntary effort protocol was 36.3 lbs performed at position 1. The Rapid Exchange Grip (REG) protocol was therefore administered at this position. A negative rapid exchange grip (REG) occurs when the average of the values recorded during the rapid exchange grip protocol are less than the average of the values recorded during the maximum voluntary effort protocol in the same position and for the same hand. Conversely, a positive REG occurs when the average of the values recorded during the rapid exchange grip protocol exceed the average of the values recorded during the maximum voluntary effort protocol in the same position and for the same hand. A negative REG allows the evaluator to have more confidence that the evaluee is performing maximally.[13] A positive REG may be an indicator of submaximal effort.[13] Mr. Ranyiell Jackson produced an average value of 29.2 lbs for the left hand and 28.1 lbs for the right hand during the rapid exchange protocol. He produced an average value of 36.3 lbs for the left hand and 31.9 lbs for the right hand during the maximum voluntary effort protocol. Mr. Ranyiell Jackson therefore demonstrated a negative REG which may be an indicator of maximal effort.

## Cross-Reference Validity Check



% Diff from Standard: 53.5, 42.8, 32.1, 21.4, 10.7, 0.0

53.8    28.8

Maximum Voluntary Effort

**20% Cut Off Point**
(> 20% May Be An Indicator Of Submaximal Effort)

**Left Hand**
(Average Force % Difference From Standard Handgrip)

**Right Hand**
(Average Force % Difference From Standard Handgrip)

Tests repeated at intervals with full volitional effort should not have more than a 20% variation in force readings.[22, 33] The peak average force values obtained from testing in position 2 during the standard grip strength test were 57.6 lbs. for his left hand and 42.3 lbs. for his right hand. During the maximum voluntary effort protocol the peak average force in position 2 was 26.6 lbs. for his left hand and 30.1 lbs. for his right hand. These values should be within 20% of the standard handgrip results. Mr. Ranyiell Jackson's results for the left hand are within 53.8% and his right hand are within 28.8% of the standard handgrip. These results may be an indicator of submaximal effort.

[1] Mathiowetz V, Kashman N, Volland G, Weber K, Dowe M, Rogers S. 1985. Grip and pinch strength: normative data for adults. Arch Phys Med Rehabil 66:69-74.

[2] Mathiowetz V, Wiemer D, Federman S. 1986. Grip and pinch strength: norms for 6- to 19- year olds. Am J Occup Ther 40(10):705-11.

[3] Stokes H. 1983. The seriously uninjured hand - weakness of grip. J Occup Med 25(9):683-684.

[11] Niebuhr B, Marion R. 1990. Voluntary control of submaximal grip strength. J Occup Rehabil 69(2): 96-101.

[12] Matheson L, Carlton R, Niemeyer L. 1988. Grip strength in a disabled sample: reliability and normative standards. Ind Rehabil Q 1(3):9,17-23.

[13] Hildreth D, Breidenbach W, Lisiter G, Hodges A. 1989. Detection of submaximal effort by use of the rapid exchange grip. J Hand Surgery 14A(4): 742-745.

[22] Klimek E, Strait J. 1997. Volition in impairment rating: the validity of effort assessment. J Occup Med 6(2) 9-18.

[23] Janda D, Geiringer S, Hankin F, Barry D. 1987. Objective evaluation of grip strength. J Occup Med 29(7):569-571.

[33] American Medical Association. 1993. Guides to the Evaluation of Permanent Impairment, 4th Edition.

# Pinch Strength

The FOCUS pinch strength test is performed to quantify pinch strength as compared to population norms.† Mr. Ranyiell Jackson was asked to perform three forms of pinch strength tests including the tip, key and palmar pinch. The data demonstrated that Mr. Ranyiell Jackson's tip pinch strength was significantly low for both the left and right hand. His left hand was 0.9% weaker than the right hand. Key pinch strength was significantly low for both the left and right hand. His left hand was 2.2% weaker than the right hand. Palmar pinch strength was significantly low for both the left and right hand. His left hand was 18.7% weaker than the right hand which is not consistent with published population norms.



### Key Pinch Strength

Oct 24, 2011 11:11:52 AM

The client squeezes the pinch gauge using a key pinch for a three second trial duration. A rest period of 5 seconds is given before testing the other hand. This process is repeated three times. The average of the three trials is compared to published population normal values.†

|  | Left | Right |
| --- | --- | --- |
| Trial #1 | 8.5 lbs. | 8.4 lbs. |
| Trial #2 | 7.2 lbs. | 7.9 lbs. |
|  | 11.1 lbs. | 11.0 lbs. |
| Average | 8.9 lbs. | 9.1 lbs. |
| Maximum | 11.1 lbs. | 11.0 lbs. |
| COV |  | 14.9% |
| Diff L. Vs. R |  | 2.2% |

### Palmar Pinch Strength

The client squeezes the pinch gauge using a palmar pinch for a three second trial duration. A rest period of 5 seconds is given before testing the other hand. This process is repeated three times. The average of the three trials is compared to published population normal values.†

|  | Left | Right |
| --- | --- | --- |
| Trial #1 | 7.1 lbs. | 11.3 lbs. |
| Trial #2 | 7.7 lbs. | 7.0 lbs. |
|  | 7.6 lbs. | 9.4 lbs. |
| Average | 7.5 lbs. | 9.2 lbs. |
| Maximum | 7.7 lbs. | 11.3 lbs. |
| COV | 3.5% |  |
| Diff L. Vs. R |  | 18.7% |

### Tip Strength

The client squeezes the pinch gauge using a tip pinch for a three second trial duration. A rest period of 5 seconds is given before testing the other hand. This process is repeated three times. The average of the three trials is compared to published population normal values.†

|  | Left | Right |
| --- | --- | --- |
| Trial #1 | 9.4 lbs. | 7.5 lbs. |
| Trial #2 | 8.0 lbs. | 8.9 lbs. |
|  | 6.5 lbs. | 7.8 lbs. |
| Average | 8.0 lbs. | 8.1 lbs. |
| Maximum | 9.4 lbs. | 8.9 lbs. |
| COV | 14.8% | 7.5% |
| Diff L. Vs. R |  | 0.9% |

#### Pinch Strength Average Force Comparison

Tip: 8.0 / 8.1
Key: 8.9 / 9.1
Palmar: 7.5 / 9.2

Left Hand (Average Force)
Right Hand (Average Force)

† Mathiowetz V, Kashman N, Volland G, Weber K, Dowe M, Rogers S. 1985. Grip and pinch strength: normative data for adults. Arch Phys Med

Mr. Ranyiell Jackson

478 CORPORATE DR HOUMA LA 70360  (985) 872-5911



16

# UTM Far Arm Lift - Supinated

Test Date: Oct. 24, 2011 10:54:58 AM

**Combined Average Force: 8.8 lbs.**
**Pain Scale: 9**



| | | | | | | |
|---|---|---|---|---|---|---|
| **Trial 1: 6.8 lbs** | **Average:** 4.7 lbs | | | **Trial 1: 5.8 lbs** | **Average:** 4.1 lbs |
| **Trial 2: 4.1 lbs** | **COV:** | | | **Trial 2: 3.8 lbs** | **COV:** |
| 3.2 lbs | | **% Diff : 14.6%** | | 2.8 lbs | |

Mr. Ranyiell Jackson reached a combined average force of 8.8 lbs. during the UTM Far Arm Lift - Supinated test. The combined average is calculated by adding the average force of 4.7 lbs. for the left side and 4.1 lbs. for the right side for each trial then averaging over all the trials. This yields 14.6% difference between the sides. The coefficient of variation was 32.5% for the left side and 30.4% for the right side. Values greater than 15% may be an indicator of submaximal effort. Mr. Ranyiell Jackson rated his pain during testing at 9 on a ten-point scale.

**Evaluator Comments**
PTHR 80 bpm

► **UTM Near Arm Lift - Supinated**

**Test Date: Oct. 24, 2011 10:57:48 AM**

**Combined Average Force: 16.6 lbs.**

**Pain Scale: 8**



| | | | |
|---|---|---|---|
| **Trial 1:** 7.3 lbs | **Average:** 7.3 lbs | **Trial 1:** 9.1 lbs | **Average:** 9.3 lbs |
| **Trial 2:** 7.0 lbs | **COV:** 4% | **Trial 2:** 9.8 lbs | **COV:** 3.6% |
| 7.7 lbs | | **% Diff : 21.5%** 9.1 lbs | |

Mr. Ranyiell Jackson reached a combined average force of 16.6 lbs. during the UTM Near Arm Lift - Supinated test. The combined average is calculated by adding the average force of 7.3 lbs. for the left side and 9.3 lbs. for the right side for each trial then averaging over all the trials. This yields 21.5% difference between the sides. The coefficient of variation was 4% for the left side and 3.6% for the right side. Values greater than 15% may be an indicator of submaximal effort. Mr. Ranyiell Jackson rated his pain during testing at 8 on a ten-point scale.

**Evaluator Comments**
PTHR 77 bpm.

## ► UTM Standard Cart Height Pull Test

**Test Date:** Oct. 24, 2011 10:53:19 AM

**Combined Peak Force: 32.4 lbs.**



| | | | | |
|---|---|---|---|---|
| **Trial 1:** 14.5 lbs | **Average:** 16.6 lbs | | **Trial 1:** 15.0 lbs | **Average:** 16.2 lbs |
| **Trial 2:** 17.0 lbs | **COV:** 9.3% | | **Trial 2:** 16.0 lbs | **COV:** 6.3% |
| · · · 18.2 lbs | | **% Diff : 2.5%** | · · 17.5 lbs | |

Mr. Ranyiell Jackson reached a combined peak force of 32.4 lbs. during the UTM Standard Cart Height Pull Test test. The combined peak force is calculated by storing the combined maximum of the left and right force at any instant in time during each trial then averaging over all the trials. The average of the peak forces for the individual sides are 16.6 lbs. for the left side and 16.2 lbs. for the right side. This yields 2.5% difference between the sides. The coefficient of variation was 9.3% for the left side and 6.3% for the right side. Values greater than 15% may be an indicator of submaximal effort.

## ► UTM Standard Cart Height Push Test

**Test Date:** Oct. 24, 2011 10:52:28 AM

**Combined Peak Force: 46.1 lbs.**



| | | | | |
|---|---|---|---|---|
| **Trial 1:** 27.0 lbs | **Average:** 25.6 lbs | | **Trial 1:** 24.2 lbs | **Average:** 22.0 lbs |
| **Trial 2:** 23.5 lbs | **COV:** 5.9% | | **Trial 2:** 21.2 lbs | **COV:** 7% |
| · · · 26.2 lbs | | **% Diff : 16.4%** | ' · · · 20.7 lbs | |

Mr. Ranyiell Jackson reached a combined peak force of 46.1 lbs. during the UTM Standard Cart Height Push Test test. The combined peak force is calculated by storing the combined maximum of the left and right force at any instant in time during each trial then averaging over all the trials. The average of the peak forces for the individual sides are 25.6 lbs. for the left side and 22.0 lbs. for the right side. This yields 16.4% difference between the sides. The coefficient of variation was 5.9% for the left side and 7% for the right side. Values greater than 15% may be an indicator of submaximal effort.

**Dynamic Lifting - Floor to Waist Occasional**

Oct 24, 2011 10:28:49 AM

The Dynamic Lifting - Floor to Waist Occasional was conducted in Mr. Jackson's case in order to determine his ability to complete the task. A progressive loading method was used to determine Mr. Jackson's capacity for the performance of dynamic lifting activities on a safe and dependable basis. Lifting was conducted between floor height and waist height for a total of 1 repetition at each weight increment. The increase in the amount of weight lifted was in 10-pound increments.

In order to ensure safety in the administration of the testing protocol, Mr. Jackson's heart rate was monitored on a real-time basis. A cut-off of 156 beats per minute, based upon 85 percent of the age-predictive maximum heart rate was used in order to ensure the safe administration of the dynamic lifting protocol. A rating of perceived exertion was also used in order to make certain Mr. Jackson was capable of continuing in the protocol without risk of injury.

During the course of testing Mr. Jackson's heart rate increased from 81 beats per minute to a peak of 95 beats per minute at the final weight of 40 lbs. This represented a heart rate increase of 17% during the lifting protocol. Mr. Jackson's heart rate recovered to 88 beats per minute. The heart rate recovery was 6% for Mr. Jackson during the 1 minute recovery period.

Mr. Jackson demonstrated a safe weight lifting ability of 30 lbs. The reason for the conclusion of the dynamic lifting protocol was the fact Mr. Jackson stopped the test due to psychophysical factors.



| | |
|---|---|
| **Initial Heart Rate:** | 81 BPM |
| **Peak Heart Rate:** | 95 BPM |
| **Final Testing Heart Rate:** | 94 BPM |
| **% Heart Rate Increase:** | 17 % |
| **Final Recovery Heart Rate:** | 88 BPM |
| **Avg. Recovery Heart Rate** | 90 BPM |
| **Elapsed Time:** | 02:27 |
| **Recovery Time:** | 01:00 |

☐ During Testing   ■ Before & After Testing   – Maximum Allowable HR

| | | | |
|---|---|---|---|
| **Starting Height** | Floor Height | **Exertion Rating Stop Point** | Very Heavy |
| **Ending Height** | Waist Height | **Heart Rate Cut Off** | 85% of age adj. |
| **Initial Weight** | 10.0 lbs. | **Maximum Test Duration** | Unlimited |
| **Weight Increments** | 10.0 lbs. | **Maximum Allowed Weight** | None |
| **Repetitions Per Weight** | 1 Repetition | **Maximum Safe Weight Lifted** | 30 lbs. |
| **Rest Period Per Weight Cycle** | No Rest Period | | |

Mr. Ranyiell Jackson



**Dynamic
Lifting -
Floor to
Shoulder
Occasional**

Oct 24, 2011 10:32:34 AM

The Dynamic Lifting - Floor to Shoulder Occasional was conducted in Mr. Jackson's case in order to determine his ability to complete the task. A progressive loading method was used to determine Mr. Jackson's capacity for the performance of dynamic lifting activities on a safe and dependable basis. Lifting was conducted between floor height and shoulder height for a total of 1 repetition at each weight increment. The increase in the amount of weight lifted was in 10-pound increments.

In order to ensure safety in the administration of the testing protocol, Mr. Jackson's heart rate was monitored on a real-time basis. A cut-off of 156 beats per minute, based upon 85 percent of the age-predictive maximum heart rate was used in order to ensure the safe administration of the dynamic lifting protocol. A rating of perceived exertion was also used in order to make certain Mr. Jackson was capable of continuing in the protocol without risk of injury.

During the course of testing Mr. Jackson's heart rate increased from 80 beats per minute to a peak of 93 beats per minute at the final weight of 20 lbs. This represented a heart rate increase of 16% during the lifting protocol. Mr. Jackson's heart rate recovered to 84 beats per minute. The heart rate recovery was 10% for Mr. Jackson during the 1 minute recovery period.

Mr. Jackson demonstrated a safe weight lifting ability of 10 lbs. The reason for the conclusion of the dynamic lifting protocol was the fact Mr. Jackson stopped the test due to psychophysical factors.



**Initial Heart Rate:** 80 BPM
**Peak Heart Rate:** 93 BPM
**Final Testing Heart Rate:** 93 BPM
**% Heart Rate Increase:** 16 %
**Final Recovery Heart Rate:** 84 BPM
**Avg. Recovery Heart Rate** 85 BPM

**Elapsed Time:** 00:54
**Recovery Time:** 01:00

☐ During Testing  ■ Before & After Testing  – Maximum Allowable HR

| Starting Height | Floor Height | Exertion Rating Stop Point | Very Heavy |
|---|---|---|---|
| Ending Height | Shoulder Height | Heart Rate Cut Off | 85% of age adj. |
| Initial Weight | 10.0 lbs. | Maximum Test Duration | Unlimited |
| Weight Increments | 10.0 lbs. | Maximum Allowed Weight | None |
| Repetitions Per Weight | 1 Repetition | Maximum Safe Weight Lifted | 10 lbs. |
| Rest Period Per Weight Cycle | No Rest Period | | |

478 CORPORATE DR HOUMA LA 70360 (985) 872-5911

Mr. Ranyiell Jackson



**Dynamic Lifting - Waist to Shoulder Occasional**

Oct 24, 2011 10:26:30 AM

The Dynamic Lifting - Waist to Shoulder Occasional was conducted in Mr. Jackson's case in order to determine his ability to complete the task. A progressive loading method was used to determine Mr. Jackson's capacity for the performance of dynamic lifting activities on a safe and dependable basis. Lifting was conducted between waist height and shoulder height for a total of 1 repetition at each weight increment. The increase in the amount of weight lifted was in 10-pound increments.

In order to ensure safety in the administration of the testing protocol, Mr. Jackson's heart rate was monitored on a real-time basis. A cut-off of 156 beats per minute, based upon 85 percent of the age-predictive maximum heart rate was used in order to ensure the safe administration of the dynamic lifting protocol. A rating of perceived exertion was also used in order to make certain Mr. Jackson was capable of continuing in the protocol without risk of injury.

During the course of testing Mr. Jackson's heart rate increased from 84 beats per minute to a peak of 90 beats per minute at the final weight of 20 lbs. This represented a heart rate increase of 7% during the lifting protocol. Mr. Jackson's heart rate recovered to 82 beats per minute. The heart rate recovery was 9% for Mr. Jackson during the 1 minute recovery period.

Mr. Jackson demonstrated a safe weight lifting ability of 10 lbs. The reason for the conclusion of the dynamic lifting protocol was the fact Mr. Jackson stopped the test due to psychophysical factors.



| | |
|---|---|
| Initial Heart Rate: | 84 BPM |
| Peak Heart Rate: | 90 BPM |
| Final Testing Heart Rate: | 90 BPM |
| % Heart Rate Increase: | 7 % |
| Final Recovery Heart Rate: | 82 BPM |
| Avg. Recovery Heart Rate | 85 BPM |
| Elapsed Time: | 01:15 |
| Recovery Time: | 01:00 |

☐ During Testing   ■ Before & After Testing   – Maximum Allowable HR

| Starting Height | Waist Height | Exertion Rating Stop Point | Very Heavy |
|---|---|---|---|
| Ending Height | Shoulder Height | Heart Rate Cut Off | 85% of age adj. |
| Initial Weight | 10.0 lbs. | Maximum Test Duration | Unlimited |
| Weight Increments | 10.0 lbs. | Maximum Allowed Weight | None |
| Repetitions Per Weight | 1 Repetition | Maximum Safe Weight Lifted | 10 lbs. |
| Rest Period Per Weight Cycle | No Rest Period | | |



**Occasional - F.R.O.M.**
**Axial Rotation Reach**



The client while maintaining the assigned posture moves five rows of pegs from one panel to another and back using a hand to hand transfer. A total of five cycles are completed.

▶ The Sustained Standing Reach with Axial Rotation Evaluation protocol was used to determine Mr. Ranyiell Jackson's ability to perform axial rotation activities in a standing position and performing functional reaching on a sustained basis. Mr. Ranyiell Jackson was tested using the Functional Range of Motion (FROM) System and the performance was calculated using the internationally-recognized MTM (methods-time measurement) standard. Methods-Time Measurement (MTM) is the industrial engineering-based method for the determination of time-motion performance in conjunction with work-related activities. The MTM standard score allows for the means to determine an exact percentage score of performance against the most widely recognized criteria for the assessment of time-motion activities. MTM scoring is based on a criterion referenced time-motion standard to complete a task as opposed to an estimate of ability.

| Test Date | Time (min) | MTM Percentage | MTM Rating |
|---|---|---|---|
| Oct 24, 2011 11:15:40 AM | 05:48 | 99% | Competitive |

The test scoring is based upon the total time necessary to complete five cycles of the task. The time required to complete the test is converted automatically into the equivalent MTM (methods-time measurement) standard score. Mr. Ranyiell Jackson had a MTM score of 99% which correlates to a rating of competitive.

**Evaluator Comments**
Pre-test HR 72  PR 6/10.  Post-test HR 82  PR 6/10.

**Occasional - F.R.O.M.**
**Crouching/Squatting Reach**



The client while maintaining the assigned posture moves five rows of pegs from one panel to another and back using a hand to hand transfer. A total of five cycles are completed.

▶ The Sustained Crouching Reach protocol was used to determine Mr. Ranyiell Jackson's ability to perform crouching activities with functional reaching on a sustained basis. Mr. Ranyiell Jackson was tested using the Functional Range of Motion (FROM) System and the performance was calculated using the internationally-recognized MTM (methods-time measurement) standard. Methods-Time Measurement (MTM) is the industrial engineering-based method for the determination of time-motion performance in conjunction with work-related activities. The MTM standard score allows for the means to determine an exact percentage score of performance against the most widely recognized criteria for the assessment of time-motion activities. MTM scoring is based on a criterion referenced time-motion standard to complete a task as opposed to an estimate of ability.

| Test Date | Time (min) | MTM Percentage | MTM Rating |
|---|---|---|---|
| Oct 24, 2011 11:32:42 AM | 02:03 | 0% | Below Competitive |

The test scoring is based upon the total time necessary to complete five cycles of the task. The time required to complete the test is converted automatically into the equivalent MTM (methods-time measurement) standard score. Mr. Ranyiell Jackson had a MTM score of 0% which correlates to a rating of below competitive.

**Evaluator Comments**
Pre-test HR 74  PR 5/10.  Post test HR 80  PR 7/10.  Unable to complete test secondary to reports of increased pain.



**Occasional - F.R.O.M. Kneeling Reach**



The client while maintaining the assigned posture moves five rows of pegs from one panel to another and back using a hand to hand transfer. A total of five cycles are completed.

▶ The Sustained Kneeling Reach protocol was used to determine Mr. Ranyiell Jackson's ability to perform kneeling activities with functional reaching on a sustained basis. Mr. Ranyiell Jackson was tested using the Functional Range of Motion (FROM) System and the performance was calculated using the internationally-recognized MTM (methods-time measurement) standard. Methods-Time Measurement (MTM) is the industrial engineering-based method for the determination of time-motion performance in conjunction with work-related activities. The MTM standard score allows for the means to determine an exact percentage score of performance against the most widely recognized criteria for the assessment of time-motion activities. MTM scoring is based on a criterion referenced time-motion standard to complete a task as opposed to an estimate of ability.

| Test Date | Time (min) | MTM Percentage | MTM Rating |
|---|---|---|---|
| Oct 24, 2011 11:38:08 AM | 01:55 | 0% | Below Competitive |

The test scoring is based upon the total time necessary to complete five cycles of the task. The time required to complete the test is converted automatically into the equivalent MTM (methods-time measurement) standard score. Mr. Ranyiell Jackson had a MTM score of 0% which correlates to a rating of below competitive.

**Evaluator Comments**

Pre-test HR 73  PR 5/10. Unable to complete test secondary to reports of increased pain.

**Occasional - F.R.O.M Kneeling to Standing and Back Reach**



The client while maintaining the assigned posture moves five rows of pegs from one panel to another and back using a hand to hand transfer. A total of seven cycles are completed.

▶ The Sustained Kneeling Reach to Standing Reach and Return to Kneeling Reach Evaluation protocol was used to determine Mr. Ranyiell Jackson's ability to perform activities requiring going into and out of the kneeling position and performing functional reaching on a sustained basis. Mr. Ranyiell Jackson was tested using the Functional Range of Motion (FROM) System and the performance was calculated using the internationally-recognized MTM (methods-time measurement) standard. Methods-Time Measurement (MTM) is the industrial engineering-based method for the determination of time-motion performance in conjunction with work-related activities. The MTM standard score allows for the means to determine an exact percentage score of performance against the most widely recognized criteria for the assessment of time-motion activities. MTM scoring is based on a criterion referenced time-motion standard to complete a task as opposed to an estimate of ability.

| Test Date | Time (min) | MTM Percentage | MTM Rating |
|---|---|---|---|
| Oct 24, 2011 11:42:34 AM | 03:27 | 0% | Below Competitive |

The test scoring is based upon the total time necessary to complete seven cycles of the task. The time required to complete the test is converted automatically into the equivalent MTM (methods-time measurement) standard score. Mr. Ranyiell Jackson had a MTM score of 0% which correlates to a rating of below competitive.

**Evaluator Comments**

Pre-test hR 78  PR 6/10. Unable to complete test secondary to reports of increased pain.  HR 93  PR 7/10.



**Occasional - F.R.O.M. Stooping Reach**



The client while maintaining the assigned posture moves five rows of pegs from one panel to another and back using a hand to hand transfer. A total of five cycles are completed.

► The Sustained Stooping Reach protocol was used to determine Mr. Ranyiell Jackson's ability to perform stooping activities with functional reaching on a sustained basis. Mr. Ranyiell Jackson was tested using the Functional Range of Motion (FROM) System and the performance was calculated using the internationally-recognized MTM (methods-time measurement) standard. Methods-Time Measurement (MTM) is the industrial engineering-based method for the determination of time-motion performance in conjunction with work-related activities. The MTM standard score allows for the means to determine an exact percentage score of performance against the most widely recognized criteria for the assessment of time-motion activities. MTM scoring is based on a criterion referenced time-motion standard to complete a task as opposed to an estimate of ability.

| Test Date | Time (min) | MTM Percentage | MTM Rating |
|---|---|---|---|
| Oct 24, 2011 11:26:07 AM | 01:54 | 0% | Below Competitive |

The test scoring is based upon the total time necessary to complete five cycles of the task. The time required to complete the test is converted automatically into the equivalent MTM (methods-time measurement) standard score. Mr. Ranyiell Jackson had a MTM score of 0% which correlates to a rating of below competitive.

**Evaluator Comments**

Pre-test Hr 78  PR 6/10.  Post-test HR 81  PR 7/10.  Unable to complete test secondary to reports of increased pain.

**Occasional - F.R.O.M. Upper Level Reach**



The client while maintaining the assigned posture moves five rows of pegs from one panel to another and back using a hand to hand transfer. A total of five cycles are completed.

► The Sustained Upper Level Reach protocol was used to determine Mr. Ranyiell Jackson's ability to perform shoulder level and above reaching activities on a sustained basis. Mr. Ranyiell Jackson was tested using the Functional Range of Motion (FROM) System and the performance was calculated using the internationally-recognized MTM (methods-time measurement) standard. Methods-Time Measurement (MTM) is the industrial engineering-based method for the determination of time-motion performance in conjunction with work-related activities. The MTM standard score allows for the means to determine an exact percentage score of performance against the most widely recognized criteria for the assessment of time-motion activities. MTM scoring is based on a criterion referenced time-motion standard to complete a task as opposed to an estimate of ability.

| Test Date | Time (min) | MTM Percentage | MTM Rating |
|---|---|---|---|
| Oct 24, 2011 11:23:34 AM | 01:26 | 0% | Below Competitive |

The test scoring is based upon the total time necessary to complete five cycles of the task. The time required to complete the test is converted automatically into the equivalent MTM (methods-time measurement) standard score. Mr. Ranyiell Jackson had a MTM score of 0% which correlates to a rating of below competitive.

**Evaluator Comments**

Pre-test HR 76  PR 6/10.  Unable to complete test secondary to reports of increased pain.  7/10.

# Cardiovascular Intake  ►

Oct 24, 2011

|  | Resting Rate (Min) | Systolic (mm Hg) | Diastolic (mm Hg) |
|---|---|---|---|
|  | 74 | 104 | 70 |

| Result | Normal Heart Rate | Normal Blood Pressure | Normal Blood Pressure |
|---|---|---|---|





**Client: Jackson, Renyiell**          WorkSaver℠ Functional Capacity Evaluation Synopsis

## END REPORT

Thank you for this referral. Please call if there are any questions.(Phone # (985) 872-5911)

Trevor Bardarson PT, OCS
Certified Functional Capacity Evaluator

Date: _____

**Optional:**

**Reviewing Physician's Signature:** _____

**Physician's  Comments:**

## Description of Evaluation and Procedures

The WorkSaver℠ FCE is a comprehensive evaluation either performed in one day or two days, or modified for a shorter duration upon request of the referral source. This comprehensive evaluation includes a musculoskeletal, biomechanical and neurological examination. The opinions rendered in this case are derived solely from information obtained from a personal interview of the client, self-assessment psychometric tests, medical reports if listed herein, a comprehensive physical examination, and a systematic battery of functional tests.

All recommendations and/or opinions related to the client's ability to work, ability to participate in activities of daily living, consistency of effort, veracity of complaints, etc. provided in this report are given independently without regard to outside interests, financial gain and/or influence of the requesting agents. The opinions and recommendations in this report are based upon reasonable probability as determined from the specialized medical training and clinical experience of the evaluator.  Although the Client may appear, based on the findings of this FCE,

Copyright1996RichardWBunch,PhD,P.T.          Trevor Bardarson PT,OCS    Rev. 6/10/06

36

**Client: Jackson, Renyiell**        WorkSaver[sm] **Functional Capacity Evaluation Synopsis**

to be fit to participate in work at a specific physical demand level characterized by the U.S. Department of Labor, and in various types of other activities, there is no guarantee that the individual will not be re-injured, or suffer new or additional injury as a result of participating in certain types of activities. It is understood that information not made available to this evaluator prior to or at the time of this evaluation may or may not change the opinions rendered in this evaluation at a later date. If additional information is provided for review at a later date, an additional report may be requested.

## Criteria and Guidelines for Safe Testing

Safety during all procedures is emphasized. Testing is focused on the client's abilities to perform basic functions involving static or sustained postures (standing, sitting, kneeling, squatting, hands held overhead, etc.), dynamic activities (repetitive reaching and bending, walking, stair climbing, balancing, crawling, etc. and material handling (pushing, pulling, carrying and lifting). Throughout the examination the client's heart rate and brachial blood pressure are continually monitored. Both blood pressure and heart rate are recorded when the client reports any significant changes in symptoms. The client is allowed adequate rest intervals between functional activities. Symptoms are monitored prior to, during, and after all functional tests.

All material handling tests are conducted by the process of gradually increasing weights or forces. Maximum weight and force handled safely are determined by recording the maximum weight handled or force generated while maintaining proper body mechanics without pain/symptom production or aggravation and without exceeding 85% of predicted maximum safe HR for age. The client's abilities to safely perform the physical capacities tested are determined by analyzing body mechanics, grading the client's psychophysical response to the loads/forces handled and monitoring heart rate, blood pressure and respiration. During this process, the client is prohibited from obtaining awkward postures and/or compensatory movement patterns which place excessive torque/compression on the spine and other joints of the body.

## Assessment of Validity of Results

Throughout the examination, an analysis is directed toward determining the degree to which measured objective signs validate the examinee's subjective complaints or functional inabilities. This is performed by cross referencing demonstrated functional capacities and associated subjective complaints with:
1. baseline impairment/pain and self-perceived disability,
2. baseline joint range-of-motion, gross strength, coordination, balance, and neurological status,
3. consistency among different tasks requiring same or similar physical demands,
4. changes in cardiovascular responses,
5. consistency of effort as determined by coefficient of variation analysis, and
6. tests for non-organic signs.

Copyright1996RichardWBunch,PhD,P.T.        -    Trevor Bardarson PT,OCS   Rev. 6/10/06

27

Client: Jackson, Renyiell             WorkSaver™ Functional Capacity Evaluation Synopsis

## Informed Consent

The client is informed verbally and by a written consent form of the right to terminate any test at any time. The client is also informed that he/she is expected to give his/her best safe effort consistently so that test results will provide an accurate assessment of the client's true physical capacities. After explanation and demonstration, practice time is allowed for each functional activity prior to actual testing. The client is advised prior to physical and functional examinations that there may be some soreness, stiffness or aggravation of symptoms afterwards which should be transient and not persist more than 48 hours. The client is asked to call the clinic if any unusual post-test problems develop.

## References

1) Bunch, Richard W., Ph.D., P.T., AMA Guide to Functional Capacity Evaluation, Handbook of Lower Extremity Neurology, 2000, pp 197 - 205

2) Stokes, HM., Landrieu, KW., Domangue, B., Kunen, S. Identification of Low-Effort Patients through Dynamometry. The Journal of Hand Surgery/ Vol.20A No.6 November 1995. 1047 - 1056

3) Waddell G., McCulloch JA, Kummel E, Venner R, et al: Nonorganic physical signs in low back pain. Spine 1980 March/April; 5:117

4) Karas,R., McIntosh, G., Hall, H., Wilson, L., Melles, T., The Relationship Between Nonorganic Signs and Centralization of Symptoms in the Prediction of Return to Work for Patients With Low Back Pain. Physical Therapy. Vol. 77. Number 4. April 1997 354 - 360

5) Menard, M., Cooke, C., Locke, S., Beach, G., Butler, T., Pattern of Performance in Workers with Low Back Pain During a Comprehensive Motor Performance Evaluation. SPINE Vol. 19 Number 12 pp 1359 - 1366, 1994

6) Kaplan, G., Wurtele, S., Gillis, D., Maximum Effort During Functional Capacity Evaluations: An Examination of Psychological Factors. Archives Physical Medicine Rehabilitation, Vol. 77, February 1996     161 - 164

7) Chan, C., Goldman, S., Ilstrup, M., Kunselman, A., O'Neill, P., The Pain Drawing and Waddell's Nonorganic Physical Signs in Chronic Low-Back Pain. SPINE Vol. 18 Number 13, 1993 1717 - 1722

8) Menard, M., Hoens, A., Objective Evaluation of Functional Capacity: Medical, Occupational, and Legal Settings. JOSPT, Vol.19 Number 5, May 1994, 249 - 260

9) Novy, D., Collins, H., Nelson, D., Thomas, A., Wiggins, M., Martinez, A., Irving, G., Waddell Signs: Distributional Properties and Correlates. Archives of Physical Medicine and Rehabilitation. Vol. 79, July     1998 820 - 822

10) Smith, R., Therapists' Ability to Identify Safe Maximum Lifting in Low Back Pain Patients During Functional Capacity Evaluation. JOSPT Vol. 19, Number 5 May 1994 277 - 281

11) King, P., Tuckwell, N., Barrett, T., A Critical Review of Functional Capacity Evaluations. Physical Therapy Vol. 78 Number 8 August 1998 852 - 866

12) Conference. Physical Therapy. Vol 77 Number 4. April 1997 361 - 369

Copyright1996RichardWBunch, PhD, P.T.          Trevor Bardarson PT, OCS   Rev. 6/10/06

**Client: Jackson, Renyiell**                 **WorkSaver℠ Functional Capacity Evaluation Synopsis**

13) Waddell G., McCulloch JA, Kummel E, et al: Nonorganic physical signs in low back pain. Spine 1979; 5:117

14) Keefe F J, Block A R 1982 Development of an observation method for assessing pain behavior in chronic low back pain patients. Behavioral Therapy 13: 363 - 375.

15) Waddell G, Main C J, Morris E W, Di Paola M P, Gray I C M 1984 Chronic low back pain, psychological distress and illness behavior. Spine 9: 209-213

16) Waddell G, Pilowsky I, Bond M 1989 Clinical assessment and interpretation of abnormal illness behavior in low back pain. Pain 39: 41-53.



# *ISR* Physical Therapy

*A WorkSaver Systems*[SM] *Provider*

**Richard W. Bunch, Ph.D., P.T. • Trevor D. Bardarson, P.T., OCS • Marc D. Cavallino, P.T., OCS
Kristy Bourgeois, P.T. • Hunter Gray, PT, DPT • Jeanne Liner, PTA**

*Orthopedic & Sports
Injury Rehabilitation*

*Manual Physical Therapy*

*WorkSaver*[SM]
*Functional Capacity
Evaluations*

*Work Conditioining*

*Return to Work
Evaluations*

*Impairment and
Disability Assessments*

*Vestibular Rehabilitation*

*Worksite Analysis*

*Fitness Evaluations*

*Neuropathy Treatment*

*No Excuses,
Just Results!*

**Houma West**
478 Corporate Dr.
Houma, LA 70360
985-872-5911
fax: 985-872-6155

**Houma East**
814 Grand Caillou Rd.
Ste. 17
Houma, LA 70363
985-346-0383
fax: 985-346-0386

**New Orleans**
1516 River Oaks Rd. W.
Harahan, LA 70123
504-733-2111
fax: 504-733-5999

Toll Free: 1-866-902-6385

Website:
www.isrphyscialtherapy.com

*A Proactive Approach to Excellence in Occupational Health and Rehabilitation*

Date: October 26, 2011

Trevor Bardarson PT, OCS
478 Corporate Drive
Houma, LA 70360

**RE: Renyiell Jackson**

Dear Ms. Causey:

Please find enclosed the functional capacity evaluation report on Mr. Jackson. The report is designed to provide you with essential information at a glance. A short summary on the first five pages will provide you with the overall results. A comprehensive summary follows which provides detailed information.

I appreciate this referral and the opportunity to work with you. Please contact me if further clarification is required.

Regards,

Trevor Bardarson P.T., OCS

Enclosure

DATE: 06/25/2018
TIME: 03:43 pm

REPORT: CL150R
PAGE 1
OF 6

**LOUISIANA WORKERS' COMPENSATION CORPORATION**

**Claim Payments Report**

For Payment Dates 10/01/1992 Through 06/25/2018

For Claim Number 158527

Claimant Jackson, Renyiell

Medical Payments

| Pymnt Dt | Vendor | Vendor Name | Amount Paid | From Dt | Thru Dt | Check No |
|----------|--------|-------------|-------------|---------|---------|----------|
| 08/10/10 | 33106-6 | GRAY, JOSEPH H. | $197.97 | 07/26/10 | 07/26/10 | 3967214 |
| 08/13/10 | 33106-6 | GRAY, JOSEPH H. | $104.40 | 08/02/10 | 08/02/10 | 3968842 |
| 08/13/10 | 33106-6 | GRAY, JOSEPH H. | $111.60 | 07/30/10 | 07/30/10 | 3968842 |
| 08/16/10 | 33106-6 | GRAY, JOSEPH H. | $104.40 | 08/04/10 | 08/04/10 | 3969102 |
| 08/19/10 | 33106-6 | GRAY, JOSEPH H. | $132.30 | 07/28/10 | 07/28/10 | 3970817 |
| 08/20/10 | 36885-3 | PERFORMANCE REHABILITATION SERVICES LLC | $387.29 | 08/05/10 | 08/05/10 | 3971241 |
| 08/23/10 | 10008-1 | MATHERNE, BRIAN,MD J. | $50.00 | 08/19/10 | 08/19/10 | 3971406 |
| 08/23/10 | 33106-6 | GRAY, JOSEPH H. | $132.30 | 08/06/10 | 08/06/10 | 3971311 |
| 08/26/10 | 33106-6 | GRAY, JOSEPH H. | $132.30 | 08/12/10 | 08/12/10 | 3972837 |
| 08/26/10 | 10008-1 | MATHERNE, BRIAN,MD J. | $191.76 | 07/28/10 | 08/17/10 | 3972872 |
| 08/30/10 | 33106-4 | TROSCLAIR, KRISTY L. | $41.40 | 08/20/10 | 08/20/10 | 3973251 |
| 09/02/10 | 19518-0 | PHARMACY ASSOCIATES, INC. | $68.82 | 08/04/10 | 08/04/10 | 3975036 |
| 09/02/10 | 19518-0 | PHARMACY ASSOCIATES, INC. | $54.69 | 08/17/10 | 08/23/10 | 3975036 |
| 09/07/10 | 38908-0 | HOUMA MEDICAL IMAGING LLC | $945.90 | 08/19/10 | 08/19/10 | 3975385 |
| 09/08/10 | 10008-1 | MATHERNE, BRIAN,MD J. | $63.92 | 08/23/10 | 08/23/10 | 3976394 |
| 09/09/10 | 33106-6 | GRAY, JOSEPH H. | $132.30 | 08/23/10 | 08/23/10 | 3976661 |
| 09/09/10 | 33106-6 | GRAY, JOSEPH H. | $132.30 | 08/25/10 | 08/25/10 | 3976661 |
| 09/16/10 | 33106-6 | GRAY, JOSEPH H. | $132.30 | 08/31/10 | 08/31/10 | 3978431 |
| 09/21/10 | 258861-4 | KINNARD, WILLIAM, MD H. | $109.80 | 09/02/10 | 09/02/10 | 3979016 |
| 09/23/10 | 33106-6 | GRAY, JOSEPH H. | $264.60 | 08/09/10 | 08/10/10 | 3980459 |
| 09/23/10 | 33106-6 | GRAY, JOSEPH H. | $140.36 | 09/08/10 | 09/08/10 | 3980459 |
| 09/23/10 | 33106-6 | GRAY, JOSEPH H. | $76.50 | 09/10/10 | 09/10/10 | 3980459 |
| 09/23/10 | 10008-1 | MATHERNE, BRIAN,MD J. | $63.92 | 09/13/10 | 09/13/10 | 3980410 |
| 09/29/10 | 33106-6 | GRAY, JOSEPH H. | $55.80 | 09/10/10 | 09/10/10 | 3982113 |
| 09/30/10 | 33106-6 | GRAY, JOSEPH H. | $132.30 | 09/16/10 | 09/16/10 | 3982358 |
| 09/30/10 | 33106-6 | GRAY, JOSEPH H. | $132.30 | 09/14/10 | 09/14/10 | 3982358 |

* denotes a canceled transaction, and is not included in the total calculations

DATE: 06/25/2018
TIME: 03:43 pm

REPORT: CL150R
PAGE    2
OF      6

LOUISIANA WORKERS' COMPENSATION CORPORATION

Claim Payments Report

For Payment Dates 10/01/1992 Through 06/25/2018

For Claim Number 158527

Claimant Jackson, Renyiell

Medical Payments

| Pymnt Dt | Vendor | Vendor Name | Amount Paid | From Dt | Thru Dt | Check No |
|----------|--------|-------------|-------------|---------|---------|----------|
| 10/07/10 | 33106-6 | GRAY, JOSEPH H. | $264.60 | 09/21/10 | 09/23/10 | 3984559 |
| 10/07/10 | 25861-4 | KINNARD, WILLIAM, MD H. | $61.20 | 09/23/10 | 09/23/10 | 3984507 |
| 10/12/10 | 33106-0 | ISR PHYSICAL THERAPY OF HOUMA, LLC | $132.30 | 09/01/10 | 09/01/10 | 3985120 |
| 10/19/10 | 33106-6 | GRAY, JOSEPH H. | $132.30 | 10/05/10 | 10/05/10 | 3987220 |
| 10/22/10 | 33106-6 | GRAY, JOSEPH H. | $140.36 | 10/07/10 | 10/07/10 | 3988619 |
| 10/25/10 | 19518-0 | PHARMACY ASSOCIATES, INC. | $296.93 | 09/01/10 | 09/14/10 | 3988774 |
| 10/28/10 | 33106-6 | GRAY, JOSEPH H. | $132.30 | 10/12/10 | 10/12/10 | 3990529 |
| 10/28/10 | 33106-6 | GRAY, JOSEPH H. | $132.30 | 10/14/10 | 10/14/10 | 3990529 |
| 11/02/10 | 33106-6 | GRAY, JOSEPH H. | $132.30 | 10/18/10 | 10/18/10 | 3991067 |
| 11/05/10 | 19518-0 | PHARMACY ASSOCIATES, INC. | $17.78 | 10/28/10 | 10/28/10 | 3992718 |
| 11/05/10 | 33106-6 | GRAY, JOSEPH H. | $132.30 | 10/21/10 | 10/21/10 | 3992605 |
| 11/23/10 | 33106-6 | GRAY, JOSEPH H. | $132.30 | 11/02/10 | 11/02/10 | 3996948 |
| 11/24/10 | 33106-6 | GRAY, JOSEPH H. | $97.20 | 11/15/10 | 11/15/10 | 3998136 |
| 11/29/10 | 33106-6 | GRAY, JOSEPH H. | $132.30 | 11/03/10 | 11/03/10 | 3998333 |
| 11/29/10 | 33106-6 | GRAY, JOSEPH H. | $125.10 | 11/04/10 | 11/04/10 | 3998333 |
| 12/01/10 | 36885-3 | PERFORMANCE REHABILITATION SERVICES LLC | $205.34 | 11/02/10 | 11/08/10 | 3999681 |
| 12/02/10 | 19518-0 | PHARMACY ASSOCIATES, INC. | $19.29 | 11/18/10 | 11/24/10 | 3999811 |
| 12/03/10 | 33106-6 | GRAY, JOSEPH H. | $125.10 | 11/12/10 | 11/12/10 | 3999969 |
| 12/10/10 | 33106-6 | GRAY, JOSEPH H. | $125.10 | 11/19/10 | 11/19/10 | 4001766 |
| 12/10/10 | 33106-6 | GRAY, JOSEPH H. | $125.10 | 11/22/10 | 11/22/10 | 4001766 |
| 12/13/10 | 33106-6 | GRAY, JOSEPH H. | $69.30 | 11/30/10 | 11/30/10 | 4001874 |
| 12/13/10 | 25861-4 | KINNARD, WILLIAM, MD H. | $61.20 | 10/28/10 | 10/28/10 | 4001862 |
| 12/15/10 | 33106-6 | GRAY, JOSEPH H. | $96.30 | 12/02/10 | 12/02/10 | 4003176 |
| 12/17/10 | 19518-0 | PHARMACY ASSOCIATES, INC. | $8.04 | 12/13/10 | 12/13/10 | 4003467 |
| 12/17/10 | 33106-6 | GRAY, JOSEPH H. | $139.00 | 11/08/10 | 11/08/10 | 4003414 |
| 12/17/10 | 33106-6 | GRAY, JOSEPH H. | $139.00 | 11/10/10 | 11/10/10 | 4003414 |

* denotes a canceled transaction, and is not included in the total calculations

LOUISIANA WORKERS' COMPENSATION CORPORATION

Claim Payments Report

For Payment Dates 10/01/1992 Through 06/25/2018

For Claim Number 158527

Claimant Jackson, Renyiell

Medical Payments

| Pymnt Dt | Vendor | Vendor Name | Amount Paid | From Dt | Thru Dt | Check No |
|----------|--------|-------------|-------------|---------|---------|----------|
| 12/20/10 | 25861-4 | KINNARD, WILLIAM, MD H. | $61.20 | 11/18/10 | 11/18/10 | 4003621 |
| 12/21/10 | 33106-6 | GRAY, JOSEPH H. | $139.00 | 11/17/10 | 11/17/10 | 4004824 |
| 12/23/10 | 33106-6 | GRAY, JOSEPH H. | $97.20 | 12/07/10 | 12/07/10 | 4005216 |
| 12/28/10 | 33106-6 | GRAY, JOSEPH H. | $97.20 | 12/08/10 | 12/08/10 | 4006415 |
| 12/29/10 | 33106-6 | GRAY, JOSEPH H. | $69.30 | 12/10/10 | 12/10/10 | 4006651 |
| 12/31/10 | 33106-6 | GRAY, JOSEPH H. | $97.20 | 12/15/10 | 12/15/10 | 4006881 |
| 12/31/10 | 33106-6 | GRAY, JOSEPH H. | $97.20 | 12/14/10 | 12/14/10 | 4006881 |
| 01/03/11 | 19518-0 | PHARMACY ASSOCIATES, INC. | $18.75 | 12/23/10 | 12/30/10 | 4006981 |
| 01/05/11 | 33106-6 | GRAY, JOSEPH H. | $97.20 | 12/20/10 | 12/20/10 | 4008359 |
| 01/05/11 | 33106-6 | GRAY, JOSEPH H. | $97.20 | 12/17/10 | 12/17/10 | 4008359 |
| 01/07/11 | 25861-4 | KINNARD, WILLIAM, MD H. | $61.20 | 12/09/10 | 12/09/10 | 4008836 |
| 01/10/11 | 33106-6 | GRAY, JOSEPH H. | $108.00 | 12/22/10 | 12/22/10 | 4009104 |
| 01/10/11 | 10008-1 | MATHERNE, BRIAN,MD J. | $279.18 | 07/02/10 | 07/13/10 | 4009162 |
| 01/17/11 | 19518-0 | PHARMACY ASSOCIATES, INC. | $8.04 | 01/11/11 | 01/11/11 | 4011153 |
| 01/19/11 | 33106-6 | GRAY, JOSEPH H. | $180.00 | 12/29/10 | 01/04/11 | 4012490 |
| 01/19/11 | 32536-1 | HAYDEL, MICHAEL | $180.00 | 12/21/10 | 12/21/10 | 4012489 |
| 01/20/11 | 33106-6 | GRAY, JOSEPH H. | $97.20 | 01/11/11 | 01/11/11 | 4012661 |
| 01/27/11 | 33106-6 | GRAY, JOSEPH H. | $108.00 | 01/13/11 | 01/13/11 | 4014574 |
| 01/31/11 | 33106-6 | GRAY, JOSEPH H. | $97.20 | 01/17/11 | 01/17/11 | 4015078 |
| 02/01/11 | 19518-0 | PHARMACY ASSOCIATES, INC. | $11.69 | 01/21/11 | 01/21/11 | 4016478 |
| 02/02/11 | 32536-1 | HAYDEL, MICHAEL | $68.00 | 01/24/11 | 01/24/11 | 4016428 |
| 02/03/11 | 33106-6 | ISR PHYSICAL THERAPY OF HOUMA, LLC | $97.20 | 01/19/11 | 01/19/11 | 4016580 |
| 02/04/11 | 33106-6 | GRAY, JOSEPH H. | $97.20 | 01/21/11 | 01/21/11 | 4016818 |
| 02/04/11 | 33106-6 | GRAY, JOSEPH H. | $97.20 | 01/25/11 | 01/25/11 | 4016818 |
| 02/10/11 | 33106-6 | GRAY, JOSEPH H. | $125.10 | 01/26/11 | 01/26/11 | 4018512 |
| 02/17/11 | 33106-6 | GRAY, JOSEPH H. | $125.10 | 01/31/11 | 01/31/11 | 4020450 |

* denotes a canceled transaction, and is not included in the total calculations

DATE: 06/25/2018
TIME: 03:43 pm

LOUISIANA WORKERS' COMPENSATION CORPORATION

Claim Payments Report

For Payment Dates 10/01/1992 Through 06/25/2018

For Claim Number 158527

Claimant Jackson, Renyiell

## Medical Payments

| Pymnt Dt | Vendor | Vendor Name | Amount Paid | From Dt | Thru Dt | Check No |
|----------|--------|-------------|-------------|---------|---------|----------|
| 02/18/11 | 33106-6 | GRAY, JOSEPH H. | $125.10 | 02/02/11 | 02/02/11 | 4020672 |
| 02/21/11 | 39593-0 | GULF COAST SURGICAL CENTER | $1,049.25 | 12/28/10 | 12/28/10 | 4020947 |
| 02/25/11 | 33106-6 | GRAY, JOSEPH H. | $125.10 | 11/24/10 | 11/24/10 | 4022501 |
| 02/28/11 | 39593-0 | GULF COAST SURGICAL CENTER | $1,049.25 | 02/14/11 | 02/14/11 | 4022741 |
| 03/02/11 | 33106-6 | GRAY, JOSEPH H. | $41.40 | 02/15/11 | 02/15/11 | 4023966 |
| 03/02/11 | 33106-6 | GRAY, JOSEPH H. | $41.40 | 02/18/11 | 02/18/11 | 4023966 |
| 03/03/11 | 19518-0 | PHARMACY ASSOCIATES, INC. | $18.75 | 02/16/11 | 02/16/11 | 4024268 |
| 03/08/11 | 33106-6 | GRAY, JOSEPH H. | $247.00 | 02/07/11 | 02/09/11 | 4024687 |
| 03/09/11 | 32536-1 | HAYDEL, MICHAEL | $68.00 | 02/28/11 | 02/28/11 | 4025714 |
| 03/11/11 | 32536-1 | HAYDEL, MICHAEL | $285.00 | 02/14/11 | 02/14/11 | 4026165 |
| 03/11/11 | 39595-7 | HAYDEL, KARL G. | $300.00 | 02/14/11 | 02/14/11 | 4026169 |
| 03/14/11 | 33106-6 | GRAY, JOSEPH H. | $56.15 | 03/03/11 | 03/03/11 | 4026278 |
| 03/15/11 | 33106-6 | GRAY, JOSEPH H. | $125.10 | 02/22/11 | 02/22/11 | 4026536 |
| 03/17/11 | 33106-6 | GRAY, JOSEPH H. | $125.10 | 02/23/11 | 02/23/11 | 4027806 |
| 03/17/11 | 33106-6 | GRAY, JOSEPH H. | $125.10 | 02/28/11 | 02/28/11 | 4027806 |
| 03/22/11 | 33106-6 | GRAY, JOSEPH H. | $97.20 | 03/02/11 | 03/02/11 | 4028411 |
| 03/22/11 | 33106-6 | GRAY, JOSEPH H. | $97.20 | 03/10/11 | 03/10/11 | 4028411 |
| 03/22/11 | 33106-6 | GRAY, JOSEPH H. | $97.20 | 03/11/11 | 03/11/11 | 4028411 |
| 03/30/11 | 25861-4 | KINNARD, WILLIAM, MD H. | $94.50 | 03/15/11 | 03/15/11 | 4031240 |
| 04/01/11 | 33106-6 | GRAY, JOSEPH H. | $125.10 | 03/14/11 | 03/14/11 | 4031654 |
| 04/14/11 | 33106-6 | GRAY, JOSEPH H. | $125.10 | 03/21/11 | 03/21/11 | 4035107 |
| 04/15/11 | 39811-0 | MITCHELL INTERNATIONAL INC | $120.12 | 12/28/10 | 12/28/10 | 4035413 |
| 04/15/11 | 39811-0 | MITCHELL INTERNATIONAL INC | $120.12 | 02/14/11 | 02/14/11 | 4035413 |
| 04/15/11 | 33106-6 | GRAY, JOSEPH H. | $125.10 | 03/25/11 | 03/25/11 | 4035282 |
| 04/19/11 | 33106-6 | GRAY, JOSEPH H. | $139.00 | 03/16/11 | 03/16/11 | 4035641 |
| 04/22/11 | 33106-6 | GRAY, JOSEPH H. | $139.00 | 03/23/11 | 03/23/11 | 4037127 |

* denotes a canceled transaction, and is not included in the total calculations

LOUISIANA WORKERS' COMPENSATION CORPORATION

Claim Payments Report

For Payment Dates 10/01/1992 Through 06/25/2018

For Claim Number 158527

Claimant Jackson, Renyiell

## Medical Payments

| Pymnt Dt | Vendor | Vendor Name | Amount Paid | From Dt | Thru Dt | Check No |
|----------|--------|-------------|-------------|---------|---------|----------|
| 06/20/11 | 19518-0 | PHARMACY ASSOCIATES, INC. | $50.37 | 06/03/11 | 06/03/11 | 4052156 |
| 07/20/11 | 19518-0 | PHARMACY ASSOCIATES, INC. | $50.37 | 07/04/11 | 07/04/11 | 4060789 |
| 07/26/11 | 32536-1 | HAYDEL, MICHAEL | $285.00 | 12/28/10 | 12/28/10 | 4061409 |
| 11/14/11 | 33106-2 | BARDARSON, TREVOR | $599.40 | 10/24/11 | 10/24/11 | 4091308 |
| 02/03/12 | 36885-3 | PERFORMANCE REHABILITATION SERVICES LLC | $787.24 | 01/17/12 | 01/17/12 | 4112018 |
| 02/23/12 | 25861-4 | KINNARD, WILLIAM, MD H. | $200.00 | 02/23/12 | 02/23/12 | 4117195 |
| 03/01/12 | 36885-3 | PERFORMANCE REHABILITATION SERVICES LLC | $505.57 | 02/13/12 | 02/13/12 | 4118996 |
| 09/21/12 | 36885-3 | PERFORMANCE REHABILITATION SERVICES LLC | $505.57 | 09/06/12 | 09/06/12 | 4168810 |
| 10/04/12 | 25861-4 | KINNARD, WILLIAM, MD H. | $200.00 | 10/04/12 | 10/04/12 | 4172076 |
| 11/14/12 | 36885-3 | PERFORMANCE REHABILITATION SERVICES LLC | $5.57 | 10/25/12 | 10/25/12 | 4182167 |
| 12/18/12 | 19518-0 | PHARMACY ASSOCIATES, INC. | $4.03 | 08/04/10 | 07/04/11 | 12859A |
| 12/30/13 | 43045-0 | LOUISIANA MED PAY & QMEDTRIX SETTLEMENT | $99.48 | 12/28/10 | 12/28/10 | 28207A |
| 12/30/13 | 43045-0 | LOUISIANA MED PAY & QMEDTRIX SETTLEMENT | $99.48 | 02/14/11 | 02/14/11 | 28207A |

TOTAL: $18,331.05

* denotes a canceled transaction, and is not included in the total calculations

```
DATE:  06/25/2018                                                                    REPORT:  CL150R
TIME:  03:43 pm                                                                      PAGE      6
                                                                                     OF        6
                        LOUISIANA WORKERS' COMPENSATION CORPORATION

                                      Claim Payments Report
                          For Payment Dates 10/01/1992 Through 06/25/2018
                                      For Claim Number 158527
                                      Claimant Jackson, Renyiell
```

Indemnity Payments

| Payment Date | Comp Code | From Date | Thru Date | Type Comp | Days Pd | Gross | Adjust | Net | Check No |
|---|---|---|---|---|---|---|---|---|---|
| 07/29/2010 | TT | 07/03/2010 | 07/29/2010 | INITIAL | 27 | $3,441.42 | $0.00 | $3,441.42 | 3964795 |
| 08/03/2010 | TT | 07/30/2010 | 08/06/2010 | REGULAR | 8 | $1,019.68 | $0.00 | $1,019.68 | 3965859 |
| 08/10/2010 | TT | 08/07/2010 | 08/13/2010 | REGULAR | 7 | $892.22 | $0.00 | $892.22 | 3967836 |
| 08/17/2010 | TT | 08/14/2010 | 08/20/2010 | REGULAR | 7 | $892.22 | $0.00 | $892.22 | 3970038 |
| 08/24/2010 | TT | 08/21/2010 | 08/27/2010 | REGULAR | 7 | $892.22 | $0.00 | $892.22 | 3972142 |
| 08/31/2010 | TT | 08/28/2010 | 09/03/2010 | REGULAR | 7 | $892.22 | $0.00 | $892.22 | 3974201 |
| 09/07/2010 | TT | 09/04/2010 | 09/10/2010 | REGULAR | 7 | $892.22 | $0.00 | $892.22 | 3975917 |
| 09/14/2010 | TT | 09/11/2010 | 09/17/2010 | REGULAR | 7 | $892.22 | $0.00 | $892.22 | 3977736 |
| 09/21/2010 | TT | 09/18/2010 | 09/24/2010 | REGULAR | 7 | $892.22 | $0.00 | $892.22 | 3979682 |
| 09/28/2010 | TT | 09/25/2010 | 10/01/2010 | REGULAR | 7 | $892.22 | $0.00 | $892.22 | 3981656 |
| 10/05/2010 | TT | 10/02/2010 | 10/08/2010 | REGULAR | 7 | $892.22 | $0.00 | $892.22 | 3983750 |
| 10/12/2010 | TT | 10/09/2010 | 10/15/2010 | REGULAR | 7 | $892.22 | $0.00 | $892.22 | 3985799 |
| 10/19/2010 | TT | 10/16/2010 | 10/22/2010 | REGULAR | 7 | $892.22 | $0.00 | $892.22 | 3987806 |
| 10/26/2010 | TT | 10/23/2010 | 10/29/2010 | REGULAR | 7 | $892.22 | $0.00 | $892.22 | 3989523 |
| 11/02/2010 | TT | 10/30/2010 | 11/05/2010 | REGULAR | 7 | $892.22 | $0.00 | $892.22 | 3991673 |
| 11/09/2010 | TT | 11/06/2010 | 11/12/2010 | REGULAR | 7 | $892.22 | $0.00 | $892.22 | 3993722 |
| 11/16/2010 | TT | 11/13/2010 | 11/14/2010 | REGULAR | 2 | $254.92 | $0.00 | $254.92 | 3995634 |
| 05/19/2011 | TT | 11/15/2010 | 12/09/2010 | ONE TIME ONLY | 25 | $3,186.50 | $0.00 | $3,186.50 | 4044171 |
| 02/12/2013 | TT | 12/10/2010 | 12/14/2010 | ONE TIME ONLY | 5 | $701.63 | $0.00 | $701.63 | 4202369 |
| 02/12/2013 | TT | 07/03/2010 | 12/09/2010 | ADJUSTMENT | 160 | $2,058.51 | $0.00 | $2,058.51 | 4202370 |
| 02/12/2013 | TT | 12/18/2010 | 11/28/2011 | ONE TIME ONLY | 346 | $48,552.69 | $0.00 | $48,552.69 | 4202371 |

```
        TOTALS (excluding canceled transactions denoted by *):    $71,706.43            $0.00  $71,706.43
```

\* denotes a canceled transaction, and is not included in the total calculations