EXHIBIT A

> *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*
> Civil Action No. 10-MD-2179-CJB-SS
>
> PTO 66 PARTICULARIZED STATEMENT OF CLAIM
> FOR REMAINING B3 PLAINTIFFS

**PLAINTIFF'S FULL NAME:** Lawson Environmental Services, LLC

Please answer every question to the best of your knowledge.

You are signing and submitting this Particularized Statement of Claim under penalty of perjury and therefore must provide information that is true and accurate.

If you **cannot** recall all of the details requested, please provide as much information as you can.

For each question where the space provided does not allow for a complete answer, please attach as many additional sheets of paper as necessary to fully answer the question.

**NOTE**:  Please provide information regarding the person **who claims injury or damages**. The terms "you" and "your" refer only to that person, not to the individual who may be completing this form in a representative capacity.  If the person who claims injury or damages is deceased, the personal representative should respond as of the time immediately prior to his or her death unless a different time period is specified.

**A.     YOUR BACKGROUND INFORMATION**

1.     Current address:

Address Line 1:  2237 Denley Road

Address Line 2:

City:  Houma          State:  LA      Zip:  70363

2.     Telephone number:  (985) 876 - 0420

3.     Maiden or other names used or by which you have been known, and the dates during which you were known by such names:  N/A

4.     Date and Place of Birth:  N/A

5.     Male_____ N/A Female_____

6.　　Each address (other than your current address) at which you have lived during the last ten (10) years, and list the dates of residence for each one:

| Address | Dates of Residence |
|---|---|
| N/A | |
| | |
| | |

7.　　Employment Information:

　　A.　　Current and past employer(s) over the last 10 years, 2008-2018 (if unemployed, last employer):

| Employer | Address | Dates of Employment | Occupation/Job Duties |
|---|---|---|---|
| N/A | | | |
| | | | |
| | | | |
| | | | |

8.　　Have you ever been out of work for more than thirty (30) days for reasons related to your health (other than pregnancy)? Yes _____ N/A No_____ If *"Yes,"* when were you out of work and why? _____

_____

**B.  THE PLAINTIFF AND THE *DEEPWATER HORIZON* OIL SPILL**

9.  Did BP, a government entity, or another company or entity hire you to perform cleanup work in response to the oil spill?

Yes __✓__      No_____

*If you responded "Yes" to Question No. 9, please proceed to Question No. 10.*

*If you responded "No" to Question No. 9, please skip to Question No. 14.*

**1.  Cleanup Workers**

(The term "cleanup worker" shall have the same meaning as that defined in the Medical Benefits Settlement Agreement.  (Rec. Doc. 6427-1 at 11-12, 25).)

10.  Was your cleanup work performed onshore (on land) or offshore (on the water)?

Onshore_____      Offshore_____      Both __✓__

11.  Were you hired as part of the Vessels of Opportunity ("VoO") Program?

Yes __✓__      No_____

12.  Did you handle hazardous materials as part of your cleanup work?

Yes __✓__      No_____

13.  Please set forth the following information about your cleanup work:

A.  Your employer(s): ___BP___

B.  Your supervisor(s) at the employer(s) identified in Question No. 13(A):
___N/A___

C.  A description of the work performed for employer(s) identified in Question No. 13(A): ___Various___

D.  The date(s), time(s), and location(s) you performed the work described in Question No. 13(C): ___Various___

E.  The names of any vessel(s) on which or facility(ies) where you performed the work described in Question No. 13(C):_____Various_____

_____

F.  Any person(s) or entity(ies) other than your employer who oversaw, supervised, or managed your work described in Question No. 13(C):_____Various_____

_____

**2.  Residents/Tourists**

14. Do you allege that you were exposed to oil or chemical dispersants while a ***resident*** of a Gulf Coast State (*i.e.*, Alabama, Florida, Louisiana, Mississippi, or Texas)?

Yes_____   No_____      N/A

15. Do you allege that you were exposed to oil or chemical dispersants while a ***tourist*** in a Gulf Coast State (*i.e.*, Alabama, Florida, Louisiana, Mississippi, or Texas)?

Yes_____   No_____      N/A

16. List all address(es) at which you resided in 2010:_____N/A_____

_____

**C.  INFORMATION ABOUT YOUR B3 CLAIM**

17. Are you claiming that you suffered damages from (*Check all that apply*):

_____Bodily injury from exposure to oil and/or dispersants

_____Bodily injury other than from exposure to oil and/or dispersants

__X__A breach of contract

*If you checked "Bodily injury from exposure to oil and/or dispersants," answer the questions in Parts D & F below.*

*If you checked "Bodily injury other than from exposure to oil and/or dispersants," answer the questions in Part E & F below.*

*If you checked "A breach of contract," answer the questions in Part G below.*

**D.    EXPOSURE CLAIMS**

18.    Were you exposed to oil, dispersants, or both?

Oil_____                    Dispersants_____                    Both_____

19.    How were you exposed? (*Check all that apply*)

    A.    Inhalation                        Yes_____        No_____

    B.    Dermal (skin) contact        Yes_____        No_____

    C.    Ingestion                        Yes_____        No_____

    D.    Other (please describe):      _____

20.    What was the date(s) of your exposure?

Day: _____        Month: _____        Year: _____

21.    How many time(s) were you exposed to oil or dispersants (for each time, please note whether the exposure was to oil, dispersants, or both)?

_____

_____

_____

22.    What was the geographic location(s) of your exposure (for each location, please note on what date this exposure occurred and whether the exposure was to oil, dispersants, or both)?

_____

_____

_____

_____

23.    For each time that you were exposed to oil or dispersants or both, for how long were you exposed to this substance or chemical?

_____

_____

_____

24.    Describe in as much detail as possible the circumstance(s) in which your exposure to the oil spill and/or chemical dispersant occurred: _____

_____

_____

_____

25.    *For cleanup workers only*:  Did you report your exposure to oil and/or dispersants to your direct supervisor?

Yes_____    No_____

26.    *If you answered "Yes" to Question No. 25,* Provide the name of the supervisor to whom you reported your exposure and the date you first reported the exposure:

_____

_____

_____

**E.    NON-EXPOSURE PERSONAL INJURY CLAIMS**

27.    For your non-exposure personal injury, please state:

    A.    The nature of your injury:_____

    B.    The date(s) of your injury:_____

    C.    The location(s) of your injury:_____

    D.    The work that you were performing when you sustained your injury:_____

          _____

          _____

    E.    Identify any individual(s) who witnessed your injury:_____

          _____

28.    Describe in as much detail as possible the circumstance(s) of your injury: _____

_____

_____

_____

**F.    INFORMATION ABOUT YOUR INJURY OR ILLNESS**

29.    Describe in as much detail as possible the bodily injury (or medical condition) that you claim resulted from the spill or your cleanup work in response to the oil spill: _____

_____

_____

_____

30.    Please explain how your injury (or medical condition) resulted from the spill or your cleanup work in response to the oil spill:

_____

_____

_____

_____

_____

31.    On what date did you first report or seek treatment for your injury or illness:
_____

32.    On what date was your injury first diagnosed:_____

_____

33.    Identify the doctor(s) (or other healthcare providers) who first diagnosed your injury (or condition):

| Name | Address |
|------|---------|
|      |         |
|      |         |

34.   Identify doctor(s) (or other healthcare providers) who have treated your injury (or condition):

| Name | Address |
|------|---------|
|      |         |
|      |         |
|      |         |
|      |         |

35.   Have you ever suffered this type of injury or condition before (i.e., before the date given in your answer to Question No. 32)? Yes _____ No _____. If "*Yes*,"

    A.   When? _____

    B.   Who diagnosed the injury (or condition) at that time? _____

             _____

             _____

    C.   Who treated the injury (or condition) at that time? _____

36.   Do you claim that your exposure to the oil spill and/or chemical dispersant worsened an injury (or condition) that you already had or had in part?

    Yes _____ No_____. If "*Yes*,"

    A.   What date did you first experience such injury or condition?_____

    B.   What injury (or condition) was made worse?_____

             _____

37.   Please list your family and/or primary care physician(s) for the past ten (10) years:

| Name | Address |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

38.   Do you have in your possession, custody, or control, any medical records, bills, and any other documents, from physicians, healthcare providers, hospitals, pharmacies, insurance companies, or others who have provided treatment to you relating to the diagnosis or treatment of any injuries or illnesses arising from the *Deepwater Horizon* oil spill or response efforts, or that you otherwise identified in this Form?

         Yes _____   No _____

39.   Describe specifically the compensatory damages that you claim in your lawsuit, including the nature of the damage, the date(s) of the damage, the amount of the damage, and the calculations used to arrive at that amount:_____

         _____

         _____

         _____

40.   Have you received workers compensation or other compensation or reimbursement for the injury alleged or associated expenses?

         Yes _____   No _____

         If "Yes":

         A.      From whom did you receive this compensation or reimbursement?_____

                  _____

B.     When did you receive this compensation or reimbursement? _____

_____

C.     What was the amount of the compensation or reimbursement? _____

_____

**G.    CONTRACT CLAIMS**

*(For plaintiffs claiming breach of contract.)*

41.    Is your claim based on a breach of contract?

Yes ___✓___    No_____

42.    Was the contract that you claim was breached made as part of the VoO Program?

Yes ___✓___    No_____

43.    Identify the contract that you allege was breached including any associated contract number (e.g., MVCA number and the parties to the contract):

_Lawson managed the portions of the VoO program. As a result, Lawson was named as a defendant in various lawsuits. Lawson sought defense and indemnity from BP._

44.    Describe how the contract was breached: _Also, breach of work order from BP. Lawson contract attached._

_See attached Complaint._

_____

45.    *If you were part of the VoO Program*:  Describe whether or not you were placed on-hire and, if applicable, the date(s) you were on-hire:

_____ _N/A_ _____

_____

46.    *If you allege that you were placed on-hire:* Provide the date(s) you were placed off-hire:

_____ _N/A_ _____

47.    Describe specifically the compensatory damages that you claim in your lawsuit, including the nature of the damage, the date(s) of the damage, the amount of the damage, and the calculations used to arrive at that amount: _Please see the attached Complaint. Various lawsuits are still outstanding and damages are unknown at this time._

_____

_____

48.  Describe specifically how the breach of contract you allege in response to Question No. 44
     caused the damages you allege in response to Question No. 47.

_____ See  attached  Complaint. _____

_____

_____

## ATTESTATION

By signing below, I declare and attest under penalty of perjury pursuant to 28 U.S.C. § 1746 that the answers provided to the above questions are true and correct, and I specifically declare and attest under penalty of perjury pursuant to 28 U.S.C. § 1746 that any damages described in response to Questions Nos. 39 or 47 were caused by any injury or breach of contract alleged in response to Questions Nos. 29 and 44.

I acknowledge that I have an obligation to supplement the above responses if I learn that they are in any material respect incomplete or incorrect.

Executed on the following date at the following location:

Date: ___July 5___, 2018

Location (City and State): __Houma, Louisiana__

_____
Signature of Plaintiff*

***Plaintiff's Attorney Cannot Sign on Plaintiff's Behalf. For businesses, the CEO, CFO, President, Owner, or similar senior corporate officer must sign.***

__Ceal Lawson_____
Print Name

__President / CEO_____
Title/Position (*if signed on behalf of a business or other entity*)

**By no later than Monday, July 9, 2018, this Particularized Statement of Claim must be served on Counsel for BP and the MDL 2179 Plaintiffs' Steering Committee by mailing it to the following addresses:**

| | |
|---|---|
| Counsel for BP<br>Attn: J. Andrew Langan<br>Kirkland & Ellis LLP<br>300 North LaSalle St., Suite 2400<br>Chicago, IL 60654 | MDL 2179 Plaintiffs' Steering Committee<br>c/o: Steve Herman<br>820 O'Keefe Ave.<br>New Orleans, LA 70113 |

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **LAWSON ENVIRONMENTAL** | * | **NO.** |
| **SERVICES, LLC.** | * | **SECTION:** |
| | | |
| **VERSUS** | * | **JUDGE** |
| | | |
| **BP EXPLORATION AND** | * | |
| **PRODUCTION SERVICES** | * | **MAG. JUDGE** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT

**NOW INTO COURT** through undersigned counsel comes Plaintiff, Lawson Environmental Services, LLC, a domestic limited liability company authorized to do and doing business in the State of Louisiana, with its principal place of business in Terrebonne Parish, Louisiana who, respectfully represents:

## JURISTICTION/VENUE

### 1.

This is an Admiralty or Maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure; this Court has subject matter jurisdiction over the matter pursuant to 28 U.S.C. §1333 as the claims at issue are governed by Admiralty or Maritime law. In the alternative, this court has subject matter jurisdiction over the matter pursuant to the provisions of OCSLA, 43 USC § 1331 et seq.

### 2.

Venue lies in this Court under 28 U.S.C. §1391(b)(2), as the events giving rise to this claim occurred within this judicial district.

## PARTIES

3.

Plaintiff herein is Lawson Environmental Services, LLC (Lawson), a domestic corporation authorized to do and doing business in the state of Louisiana with its domicile in the State of Louisiana and it principal place of business in the Parish of Terrebonne, State of Louisiana.

4.

Made defendant herein is BP Exploration and Production Inc. (BP), a foreign corporation authorized to do and actually doing business in the State of Louisiana and within the jurisdiction of this Honorable Court.

## FACTS

5.

On or about April 20, 2010, the **DEEPWATER HORIZAN** rig leased by BP America Production Company exploded off the coast of Louisiana, releasing mass quantities of oil into the Gulf of Mexico.

6.

On or about July 11, 2010, Lawson entered into a Master Service Contract with BP with regard to BP's Oil Spill Response Project MC252, Contract No. HOU-WL4-3356, the terms and conditions of which are incorporated herein by reference thereto as if same were repeated verbatim and in *extenso*. (Exhibit A.)

7.

Pursuant to the terms and conditions of Lawson's Master Service Contract with BP, Lawson entered into contracts with qualified fishing boats and vessels (and their crews) under the "Vessels of Opportunity Program" to aid and assist in clean up of the oil spill catastrophe and to aid and assist in other efforts necessary and required of BP with regard to BP's Oil Spill Response Project MC 252.

8.

Lawson agreed to compensate the various vessels (and their crews) according to a schedule specific to each vessel.

9.

These vessels and their respective crews were placed into service with regard to BP's Oil Spill Response Project and these various vessels (and their crews) provided services until the agreements were terminated by order of BP and/or as their work/services were no longer required by BP.

10.

These various vessels and their crews were compensated by Lawson according to their respective schedules with regard to the actual days of service as was Lawson by BP.

11.

Lawson has been sued by a number of individuals whose vessels it had contracted pursuant to the work that it had contracted for with BP under the Master Service Agreement. *See Bertrand J. Knight v. Lawson Environmental Services, L.L.C.(Civil Action No.2:11-cv-00783-CJB-SS); Kip M. deLaune v. Lawson Environmental Services, L.L.C.( Civil Action No. 2:11-cv-00784-CJB-*

*SS); Ray Gaudet v. Lawson Environmental Services, L.L.C. (Civil Action No.*
*2:11-cv-02512); Dudley Foussell et al v. Lawson Environmental Services, L.L.C.*
*et al (Civil Action No. 2:11-cv-1195-CJB-SS);Boyd Daigle v. DRC Emergency*
*Services, L.L.C. and DRC Marine L.L.C. (Civil Action No. 2:11-cv-02499)*; all
have been transferred and/or consolidated into MDL No. 2779; Lawson has filed
its answers, general denials and defenses in these matters

12.

In addition to the lawsuits that were actually filed against Lawson,
numerous other individuals have filed so-called VoO Claims against Lawson
MDL No. 2179. (For a representative sampling, see Exhibit B.)

13.

All of these individuals allege, *inter alia,* that Lawson breached its
agreements with them by not compensating them for all of the days their
vessels/they were under contract with regard to BP's Oil Spill Response Project
and have demanded payment for all of those days rather than the actual days of
service.

14.

These individuals have demanded damages from Lawson for full payment
of the above referenced amounts, legal interest from the date of judicial demand
until paid as well as reasonable attorney's fees, punitive damages and all costs of
court.

15.

All of these claims against Lawson have been stayed pending resolution of the matters involved in MDL No. 2179.

16.

Lawson is also a third-party defendant in the matter of *D&S Marine Services LLC v. Lyle Properties LLC bearing Civil action No. 11-508-H(2)* on this Court's docket.

17.

In that litigation, D&S Marine Services, LLC sued Lyle Properties, LLC for Lyle Properties, LLC's allege breach of a Vessel Time Charter Agreement entered into for a vessel that provided services with regard to BP's Oil Spill Response Project.

18.

Lyle Properties, LLC third-partied Lawson alleging that if it was held responsible to D&S Marine Services, LLC for any damages, it had a claim over against Lawson alleging that it was entitled to recover from Lawson for any amount which it may be held liable to D&S Marine.

19.

Lyle Properties, LLC's third-party complaint alleges that when BP terminated Lawson's work for the chartered vessel, Lawson terminated its contract with Lyle Properties, LLC, causing it, in turn, to terminate its contract with D&S Marine.

20.

Lawson filed its answer, defenses and general denial to Lyle Properties, LLC's third-party complaint and moved that division of court to transfer the matter to MDL No. 2179 or in the alternative, sever and stay the third-party demand [No. 11-508-H(2), Docs 40 & 41].; that relief was denied (*Id.,* Doc. 51)

21.

Further, Lawson was promised work from BP for $40,000,000.00 pursuant to a "213 work order" agreement; that work was not let by BP, constituting a breach of contract between BP and Lawson.

22.

Lawson has filed in MDL No. 2179 its Direct Filing Short Form making a claim for payment for any and all amounts deemed to be owed to the VoO claimants/litigants, defense and indemnity from BP on the claims against it asserted by the VoO claimants and litigants, amounts owed to Lawson Environmental Services, LLC for all days which the VoO vessels were under contract as opposed to payment for just the days (Lawson Environmental Services, LLC got paid only for the days the VoO claimants/litigants/vessels worked) as well as defense and indemnity on the claims asserted against it by the third-party claim of Lyle Properties LLC and for any amounts that may be deemed to be owed to Lyle Properties, LLC; it also filed its own claim against BP for the work not let pursuant to the "213 work order" agreement. (Exhibit C.)

23.

Lawson alleges claims arising out of exploration and drilling operations on the OCS on the spill of the Gulf of Mexico-specifically, claims stemming from BP's federally require tried to clean-up effort through the contractual VoO Program.

**WHEREFORE**, the plaintiff, Lawson Environmental Services, LLC, prays for entry of Judgment in its favor and against Defendant, BP Exploration and Production, Inc., for any and all amounts deemed to be owed by it under the agreements that Lawson Environmental Services, LLC had with the various VoO claimants/litigants/vessels, and defense and indemnity on those claims, for any and all amounts deemed to be owed to Lyle Properties LLC on its third-party demand against Lawson Environmental Services, LLC as well as for defense and indemnity on those claims, for an amount representing payment to Lawson Environmental Services, LLC for all days under which the VoO vessels were under contract (as opposed to payment for only the days actually worked) together with the amount owed Lawson Environmental Services, LLC for the breach of the "213 work order" agreement it had with BP Exploration and Production, Inc., together with interest, attorneys fees and costs as well as any other items of damages that Plaintiff may be entitled to under the law and for all other relief, both general and equitable, that the justice of the cause may require and to which Lawson may otherwise be entitled.

**WHEREFORE**, the plaintiff, Lawson Environmental Services, LLC prays that all expert fees be taxed as costs.

**RESPECTFULLY SUBMITTED,**

**THE SCHWAB LAW FIRM**

***/S/ DANNA E. SCHWAB___***
Estelle E. Mahoney, (#08879) (T.A.)
Danna E. Schwab, (#20367)
7847 Main Street
Post Office Box 7095
Houma, Louisiana 70361
Telephone:  (985) 868-1342
Counsel for Lawson Environmental Service LLC

<u>**PLEASE SERVE:**</u>

**BP EXPLORATION & PRODUCTION INC.**
**Agent for Service of Process**
**5615 Corporate Blvd.**
**Ste. 400B**
**Baton Rouge, LA  70808**

AO 398 (Rev. 01/09) Notice of a Lawsuit and Request to Waive Service of a Summons

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Louisiana

Lawson Environmental Services LLC )
_____Plaintiff_____ )
v. )  Civil Action No. 2:12-CV-00740
BP Exploration & Production Services Inc. )
_____Defendant_____ )

## NOTICE OF A LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS

To: BP Exploration & Production Services Inc.
*(Name of the defendant or - if the defendant is a corporation, partnership, or association - an officer or agent authorized to receive service)*

**Why are you getting this?**

A lawsuit has been filed against you, or the entity you represent, in this court under the number shown above. A copy of the complaint is attached.

This is not a summons, or an official notice from the court. It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver. To avoid these expenses, you must return the signed waiver within 30 days *(give at least 30 days, or at least 60 days if the defendant is outside any judicial district of the United States)* from the date shown below, which is the date this notice was sent. Two copies of the waiver form are enclosed, along with a stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

**What happens next?**

If you return the signed waiver, I will file it with the court. The action will then proceed as if you had been served on the date the waiver is filed, but no summons will be served on you and you will have 60 days from the date this notice is sent (see the date below) to answer the complaint (or 90 days if this notice is sent to you outside any judicial district of the United States).

If you do not return the signed waiver within the time indicated, I will arrange to have the summons and complaint served on you. And I will ask the court to require you, or the entity you represent, to pay the expenses of making service.

Please read the enclosed statement about the duty to avoid unnecessary expenses.

I certify that this request is being sent to you on the date below.

Date: 3-19-12

_____
*Signature of the attorney or unrepresented party*

Estelle E. Mahoney
*Printed name*

7847 Main Street Houma, LA
*Address*

emahoney@theschwablawfirm.com
*E-mail address*

985-868-1342
*Telephone number*

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT
## for the

Lawson Environmental Services LLC
_____
Plaintiff
v.
BP Exploration & Production Services Inc.
_____
Defendant

)
)
)
)
)
)

Civil Action No. 2:12-cv-00740

## WAIVER OF THE SERVICE OF SUMMONS

To: Danna E. Schwab, Estelle E Mahoney
    (Name of the plaintiff's attorney or unrepresented plaintiff)   The Schwab Law Firm

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from   3.19.12   , the date when this request was sent (or 90 days if it was sent outside the United States). If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____

_____
Signature of the attorney or unrepresented party

BP Exploration Services Inc.
_____
Printed name of party waiving service of summons

_____
Printed name

_____
Address

_____
E-mail address

_____
Telephone number

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

## IN RE: OIL SPILL by "Deepwater Horizon"
## DIRECT FILING SHORT FORM[1]

Authorized by Order of the Court, Civil Action No. 10 md 2179 Rec. Doc. 982
(Copies of said Order having also been filed in Civil Actions No. 10-8888 and 10-2771)

| MDL 2179 | SECTION: J | JUDGE CARL BARBIER |
|---|---|---|

### CLAIM IN LIMITATION--JOINDER IN MASTER ANSWER--INTERVENTION AND JOINDER IN MASTER COMPLAINTS – PLAINTIFF/CLAIMANT PROFILE FORM

By submitting this document, I am asserting a claim in *Complaint and Petition of Triton Asset Leasing GmbH, et al.,* No. 10-2771; adopt and incorporate the Master Answer [Rec. Doc. 244] to the *Complaint and Petition of Triton Asset Leasing Gmbh, et al.,* in No. 10-2771; and/or intervene into, join and otherwise adopt the Master Complaint [Rec. Doc. 879] for private economic losses ("B1 Bundle") filed in MDL No. 2179 (10 md 2179); and/or intervene into, join and otherwise adopt the Master Complaint [Rec. Doc. 881] for post-explosion injuries ("B3 Bundle") filed in MDL No. 2179 (10 md 2179).

| Last Name | First Name | Middle Name/Maiden | Suffix |
|---|---|---|---|
| Lawson | Cecil | | |

| Phone Number | E-Mail Address |
|---|---|
| 985.876.0420 | cecil@leslic.net |
| Address | City / State / Zip |
| 2108 Denley Road | Houma, LA 70363 |

| INDIVIDUAL CLAIM ☐ | BUSINESS CLAIM ☑ |
|---|---|
| Employer Name | Business Name |
| | Lawson Environmental Services |
| Job Title / Description | Type of Business |
| | Environmental Services Company |
| Address | Address |
| | 2108 Denley Road |
| City / State / Zip | City / State / Zip |
| | Houma, LA 70363 |
| Last 4 digits of your Social Security Number | Last 4 digits of your Tax ID Number |
| | 2801 |

| Attorney Name | Firm Name |
|---|---|
| Estelle E. Mahoney | The Schwab Law Firm |
| Address | City / State / Zip |
| 7847 Main Street | Houma, LA 70360 |
| Phone Number | E-Mail Address |
| 985.868.1342 | emahoney@theschwablawfirm.com |

| Claim filed with BP? | YES ☐ NO ☑ | Claim Filed with GCCF?: | YES ☐ NO ☑ |
|---|---|---|---|
| If yes, BP Claim No.: | | If yes, Claimant Identification No.: | |

**Claim Type (Please check all that apply):**

| | | | |
|---|---|---|---|
| ☐ | Damage or destruction to real or personal property | ☐ | Fear of Future Injury and/or Medical Monitoring |
| ☑ | Earnings/Profit Loss | ☐ | Loss of Subsistence use of Natural Resources |
| ☐ | Personal Injury/Death | ☐ | Removal and/or clean-up costs |
| | | ☑ | Other: indemnity |

[1] This form should be filed with the U.S. District Court for the Eastern District of Louisiana, 500 Poydras Street, New Orleans, Louisiana 70130, in Civil Action No. 10-8888. While this Direct Filing Short Form is to be filed in CA No. 10-8888, by prior order of the Court, (Rec. Doc. 246, C.A. No. 10-2771 and Rec. Doc. 982 in MDL 2179), the filing of this form in C.A. No. 10-8888 shall be deemed to be simultaneously filed in C.A. 10-2771 and MDL 2179. Plaintiff Liaison Counsel, after being notified electronically by the Clerk of Court of the filing of this Short Form, shall promptly serve this form through the Lexis Nexis service system on Defense Liaison.

1

*The filing of this Direct Filing Short Form shall also serve in lieu of the requirement of a Plaintiff to file a Plaintiff Profile Form.*

EXHIBIT

C

**Brief Description:**

1.  For earnings/profit loss, property damage and loss of subsistence use claims, describe the nature of the injury. For claims involving real estate/property, include the property location, type of property (residential/commercial), and whether physical damage occurred. For claims relating to fishing of any type, include the type and location of fishing grounds at issue.

Under Lawson Environmental Services' agreement with BP and pursuant to the provisions of OPA, BP should have, but did not pay LES for all VoO charter vessel days from the date of the Master Service Agreement (July 11, 2010) between LES and BP and for all VoO charter vessel days from the commencement of the agreements between the various VoO charter vessels and LES until off-hire or decontamination. Additionally, LES was promised work from BP for $40,000,000.00 pursuant to a "213 work order" agreement. That work was not let by BP. Lawson has been sued by a number of VoO claimants with which it had VoO charter agreements for the payment of all days from the date of contract until off-hire or decontamination. LES is making a claim for defense and indemnity against BP on those claims.

2.  For personal injury claims, describe the injury, how and when it was sustained, and identify all health care providers and employers 2008 to present and complete authorization forms for each.

3.  For post-explosion claims related to clean-up or removal, include your role in the clean-up activities, the name of your employer, and where you were working.

LES entered into a Master Service Contract with BP Exploration and Production Inc., Contact Number HOU-WL4-3356, BP Oil Spill Response Project MC 252 and in turn contacted with various VoO vessels.

2

*The filing of this Direct Filing Short Form shall also serve in lieu of the requirement of a Plaintiff to file a Plaintiff Profile Form.*

**Please check the box(es) below that you think apply to you and your claims:**
**Non-governmental Economic Loss and Property Damage Claims (Bundle B1)**

☐ 1. Commercial fisherman, shrimper, crabber, or oysterman, or the owner and operator of a business involving fishing, shrimping, crabbing or oystering.

☐ 2. Seafood processor, distributor, retail and seafood market, or restaurant owner and operator, or an employee thereof.

☐ 3. Recreational business owner, operator or worker, including a recreational fishing business, commercial guide service, or charter fishing business who earn their living through the use of the Gulf of Mexico.

☑ 4. Commercial business, business owner, operator or worker, including commercial divers, offshore oilfield service, repair and supply, real estate agents, and supply companies, or an employee thereof.

☐ 5. Recreational sport fishermen, recreational diver, beachgoer, or recreational boater.

☐ 6. Plant and dock worker, including commercial seafood plant worker, longshoreman, or ferry operator.

☐ 7 Owner, lessor, or lessee of real property alleged to be damaged, harmed or impacted, physically or economically, including lessees of oyster beds.

☐ 8. Hotel owner and operator, vacation rental owner and agent, or all those who earn their living from the tourism industry.

☐ 9. Bank, financial institution, or retail business that suffered losses as a result of the spill.

☐ 10. Person who utilizes natural resources for subsistence.

☐ 11. Other:_____

**Post-Explosion Personal Injury, Medical Monitoring, and Property Damage Related to Cleanup (Bundle B3)**

☐ 1. Boat captain or crew involved in the Vessels of Opportunity program.

☐ 2. Worker involved in decontaminating vessels that came into contact with oil and/or chemical dispersants.

☐ 3. Vessel captain or crew who was not involved in the Vessels of Opportunity program but who were exposed to harmful chemicals, odors and emissions during post-explosion clean-up activities.

☐ 4. Clean-up worker or beach personnel involved in clean-up activities along shorelines and intercoastal and intertidal zones. .

☐ 5. Resident who lives or works in close proximity to coastal waters.

☐ 6. Other:_____

Both BP and the Gulf Coast Claims Facility ("GCCF") are hereby authorized to release to the Defendants in MDL 2179 all information and documents submitted by above-named Plaintiff and information regarding the status of any payment on the claim, subject to such information being treated as "Confidential Access Restricted" under the Order Protecting Confidentiality (Pre-Trial Order No. 11), and subject to full copies of same being made available to both the Plaintiff (or his attorney if applicable) filing this form and PSC through Plaintiff Liaison Counsel.

_____
Claimant or Attorney Signature

Estelle E. Mahoney
_____
Print Name

November 4, 2011
_____
Date

3

# EXHIBIT A

### IN RE: OIL SPILL by "Deepwater Horizon"
MDL 2179        SECTION: J        HON. CARL J. BARBIER

## VoO CONTRACT CLAIM PLAINTIFF FACT SHEET

Last Name _Dardar _____

First Name _Jerry _____

Middle/Maiden _____        Suffix _____

Street Address __3992 Hwy 665

City/State/Zip _____Montegut, LA 70377_____

Phone Number __504.581.9322_____ Email Address __jpieksen@cox.net_____

Employer Name _____self-employed_____

Job Title/Description ___self-employed commercial seafood harvester_____

Business Address _____same as above_____

Business City/State/Zip _____same_____

Attorney Name ____John O. Pieksen, Jr. (LA # 21023)_____

Law Firm _____John Pieksen & Associates, LLC_____

Attorney Address _____829 Baronne Street_____

Attorney City/State/Zip ____New Orleans, LA 70113_____

Original Case Caption (if applicable) Foussell, et al v. Lawson Environ. Serv., LLC et al

Originating Court _____USDC-EDLA_____

Original EDLA Civil Action No./Short Form 10-8888 Doc. Ref. No. _2:11-cv-01195/_58929__

Did you serve a PPF in MDL 2179: _x__ yes ___ no

If yes, date of PPF ___4-20-2011_____

Claim Filed with BP ___ yes _X_ no   If yes, BP Claim No. __N/A__

1



Claim Filed with GCCF _X_ yes ___ no      If yes, GCCF Claimant ID No. 1096203

<u>VoO Master Vessel Charter Agreement Number: No Number Assigned By Lawson/DRC</u>

Date of Contract ___May 26, 2010_____

Vessel Name: LA-5329ER

Daily Vessel Rate $1,200.00 per day_____

Dates Instructed to Work ____Entire Term of Contract___

From Whom Instruction to Work was Received Charles "Chuckie" Verdin; Cecil Lawson.

Wages received to date; ___$105,120.00_____

Did you receive safety training __X__ yes ___ no  If yes, when? ___6/1-8/2010_____

Was any vessel decontamination performed? _X_ yes ___ no

If yes, date of decontamination ___N/A_____

Was vessel decontamination completed? ___ yes _X__ no

If yes, date of decontamination completion ___N/A_____

Did you receive charter termination notification? ___ yes _X_ no

If yes, date received ___N/A_____

Did your vessel sustain damage? ___ yes _X__ no

Brief Description / Primary Valuation of Claim other than information provided above:

Claimant is entitled to $291,200.00 for the term of the Agreement (5/26/10 thru 11/28/10) for exclusive use of vessel, captain rate and 20% of deckhand rate: Claimant is still owed $ ___$186,080.00_____ , plus $1,000.00 in general repairs.


____/s/ John O. Pieksen, Jr._____     ___10-1-2011_____
**Attorney / VoO Plaintiff Signature    Date**
___John O. Pieksen, Jr._____
**Print Name**

LEXISNEXIS® FILE & SERVE
40178033
E-SERVICE
Oct 4 2011
3:05PM

# EXHIBIT A
## IN RE: OIL SPILL by "Deepwater Horizon"
MDL 2179          SECTION: J          HON. CARL J. BARBIER
## VoO CONTRACT CLAIM PLAINTIFF FACT SHEET

Last Name _Dardar _____

First Name _Kirk_____

Middle/Maiden _____Lee_____     Suffix _____

Street Address __3739 Hwy 665

City/State/Zip ____Montegut, LA 70377_____

Phone Number __504.581.9322_____   Email Address __jpieksen@cox.net_____

Employer Name ____self-employed_____

Job Title/Description __self-employed commercial seafood harvester_____

Business Address _____same as above_____

Business City/State/Zip _____same_____

Attorney Name ___John O. Pieksen, Jr. (LA # 21023)_____

Law Firm _____John Pieksen & Associates, LLC_____

Attorney Address _____829 Baronne Street_____

Attorney City/State/Zip ____New Orleans, LA 70113_____

Original Case Caption (if applicable) Foussell, et al v. Lawson Environ. Serv., LLC et al

Originating Court _____USDC-EDLA_____

Original EDLA Civil Action No./Short Form 10-8888 Doc. Ref. No. _2:11-cv-01195/_58908_____

Did you serve a PPF in MDL 2179: _x__ yes ____ no

If yes, date of PPF ____4-20-2011_____

Claim Filed with BP __ yes _X_ no   If yes, BP Claim No. __N/A __

1

Claim Filed with GCCF _X_ yes __ no    If yes, GCCF Claimant ID No. 1083442

<u>VoO Master Vessel Charter Agreement Number: No Number Assigned By Lawson/DRC</u>

Date of Contract ___May 26, 2010_____

Vessel Name: 2 boats: 1) 14 ft LA-4044FF; 2) 24 ft LA-7511FD

Daily Vessel Rate 2@$1,200.00 per day; total $2,400.00 per day_____

Dates Instructed to Work ___Entire Term of Contract_____

From Whom Instruction to Work was Received Charles "Chuckie" Verdin; Cecil Lawson.

Wages received to date;  $101,000.00_____

Did you receive safety training __X_ yes ___ no  If yes, when? ___6/1-8/2010_____

Was any vessel decontamination performed? _X_ yes ___ no

If yes, date of decontamination ___N/A_____

Was vessel decontamination completed? ___ yes _X__ no

If yes, date of decontamination completion __N/A_____

Did you receive charter termination notification? ___ yes _X_ no

If yes, date received ___N/A_____

Did your vessel sustain damage? ___ yes _X__ no

Brief Description / Primary Valuation of Claim other than information provided above:

Claimant is entitled to $582,400.00 for the term of the Agreement (5/26/10 thru 11/28/10) for exclusive use of vessel, captain rate and 20% of deckhand rate: Claimant is still owed $ __$481,400.00___, plus $1,000.00 in expenses for front end and console damage, and cleaning cost.


___/s/ John O. Pieksen, Jr._____    ___10-1-2011_____
**Attorney / VoO Plaintiff Signature    Date**
__John O. Pieksen, Jr._____
**Print Name**

2

## EXHIBIT A

### IN RE: OIL SPILL by "Deepwater Horizon"
MDL 2179         SECTION: J         HON. CARL J. BARBIER
## VoO CONTRACT CLAIM PLAINTIFF FACT SHEET

Last Name _Dardar _____

First Name _Lanny _____

Middle/Maiden _____ _____     Suffix ___Sr_____

Street Address __3854 Hwy 665 _____

City/State/Zip _____Montegut, LA 70377 _____

Phone Number __504.581.9322 _____ Email Address ___jpieksen@cox.net_____

Employer Name ____self-employed _____

Job Title/Description ___self-employed commercial seafood harvester _____

Business Address _____same as above _____

Business City/State/Zip _____same _____

Attorney Name ___John O. Pieksen, Jr. (LA # 21023) _____

Law Firm _____John Pieksen & Associates, LLC _____

Attorney Address _____829 Baronne Street _____

Attorney City/State/Zip ___New Orleans, LA 70113 _____

Original Case Caption (if applicable) Foussell, et al v. Lawson Environ. Serv., LLC et al

Originating Court _____USDC-EDLA _____

Original EDLA Civil Action No./Short Form 10-8888 Doc. Ref. No. _2:11-cv-01195/ 58388_____

Did you serve a PPF in MDL 2179: _x__ yes ___ no

If yes, date of PPF ___4-20-2011 _____

Claim Filed with BP ___ yes _X_ no   If yes, BP Claim No. __N/A__

1

Claim Filed with GCCF __ yes _X_ no     If yes, GCCF Claimant ID No. N/A

VoO Master Vessel Charter Agreement Number: No Number Assigned By Lawson/DRC

Date of Contract ___ May 26, 2010 _____

Vessel Name:  LA-1426BW

Daily Vessel Rate $1,200.00 per day_____

Dates Instructed to Work _____ Entire Term of Contract _____

From Whom Instruction to Work was Received Charles "Chuckie" Verdin; Cecil Lawson.

Wages received to date;  $139,628.97 _____

Did you receive safety training __X_ yes ___ no  If yes, when? ___ 6/1-8/2010 _____

Was any vessel decontamination performed? _X_ yes ___ no

If yes, date of decontamination ___ N/A _____

Was vessel decontamination completed? ___ yes _X__ no

If yes, date of decontamination completion ___ N/A _____

Did you receive charter termination notification? ___ yes _X_ no

If yes, date received ___ N/A _____

Did your vessel sustain damage? ___ yes _X__ no

Brief Description / Primary Valuation of Claim other than information provided above:

Claimant is entitled to $291,200.00 for the term of the Agreement (5/26/10 thru 11/28/10) for exclusive use of vessel, captain rate and 20% of deckhand rate: Claimant is still owed $ ___ $151,571.03 ___.


___ /s/ John O. Pieksen, Jr. _____     ___ 10-1-2011 _____
**Attorney / VoO Plaintiff Signature     Date**
___ **John O. Pieksen, Jr.** _____
**Print Name**

2

**EXHIBIT A**
**IN RE: OIL SPILL by "Deepwater Horizon"**
MDL 2179          SECTION: J          HON. CARL J. BARBIER
**VoO CONTRACT CLAIM PLAINTIFF FACT SHEET**

Last Name _____Dardar_____

First Name _____Walton_____

Middle/Maiden _____ Suffix _____Jr_____

Street Address _____331 Island Road_____

City/State/Zip _____Montegut, LA 70377_____

Phone Number __504.581.9322_____ Email Address __jpieksen@cox.net_____

Employer Name _____self-employed_____

Job Title/Description __self-employed commercial seafood harvester_____

Business Address _____same as above_____

Business City/State/Zip _____same_____

Attorney Name ___John O. Pieksen, Jr. (LA # 21023)_____

Law Firm _____John Pieksen & Associates, LLC_____

Attorney Address _____829 Baronne Street_____

Attorney City/State/Zip _____New Orleans, LA 70113_____

Original Case Caption (if applicable) Foussell, et al v. Lawson Environ. Serv., LLC et al

Originating Court _____USDC-EDLA_____

Original EDLA Civil Action No./Short Form 10-8888 Doc. Ref. No. _2:11-cv-01195/_____

Did you serve a PPF in MDL 2179: _x_ yes ____ no

If yes, date of PPF ____4-20-2011_____

Claim Filed with BP ____ yes ___X_ no  If yes, BP Claim No. ____

1

Claim Filed with GCCF __X_ yes ____ no     If yes, GCCF Claimant ID No. __not sure__

VoO Master Vessel Charter Agreement Number: No Number Assigned By Lawson/DRC

Date of Contract ___May 26, 2010_____

Vessel Name____LA9314ET_____

Daily Vessel Rate ___$1,200.00_____

Dates Instructed to Work ____Entire Term of Contract____

From Whom Instruction to Work was Received Charles "Chuckie" Verdin; Cecil Lawson.

Wages received to date ___$73,440.00_____

Did you receive safety training __X_ yes ___ no  If yes, when? ___6/1-8/2010_____

Was any vessel decontamination performed? _X__ yes ___ no

If yes, date of decontamination ___not sure_____

Was vessel decontamination completed? __X_ yes ___ no

If yes, date of decontamination completion __N/A_____

Did you receive charter termination notification? ___ yes _X_ no

If yes, date received ___N/A_____

Did your vessel sustain damage? ___ yes _X_ no

Brief Description / Primary Valuation of Claim other than information provided above:

Claimant is entitled to $291,200.00 for the term of the Agreement (5/26/10 thru 11/28/10) for exclusive use of vessel, captain rate and 20% of deckhand rate: Claimant is still owed $217,760.00.


___/s/ John O. Pieksen, Jr._____     ___10-1-2011_____
**Attorney / VoO Plaintiff Signature    Date**
__John O. Pieksen, Jr._____
**Print Name**

2

LEXSEE/NEXIS' FILE & SERVE
40176685
E·SERVICE
Oct 4 2011
2:02PM

## EXHIBIT A
### IN RE: OIL SPILL by "Deepwater Horizon"
MDL 2179          SECTION: J          HON. CARL J. BARBIER
## VoO CONTRACT CLAIM PLAINTIFF FACT SHEET

Last Name ___Foussell_____

First Name ___Dudley_____

Middle/Maiden _____ Suffix _____

Street Address ___106 Faith Trailer Court_____

City/State/Zip ___Houma LA 70364_____

Phone Number ___504.581.9322_____ Email Address ___jpieksen@cox.net_____

Employer Name ___self-employed_____

Job Title/Description ___self-employed commercial seafood harvester_____

Business Address _____same as above_____

Business City/State/Zip _____same_____

Attorney Name ___John O. Pieksen, Jr. (LA # 21023)_____

Law Firm _____John Pieksen & Associates, LLC_____

Attorney Address ___829 Baronne Street_____

Attorney City/State/Zip ___New Orleans, LA 70113_____

Original Case Caption (if applicable) Foussell, et al v. Lawson Environ. Serv., LLC et al

Originating Court _____USDC-EDLA_____

Original EDLA Civil Action No./Short Form 10-8888 Doc. Ref. No. _2:11-cv-01195/ 67687___

Did you serve a PPF in MDL 2179: _x_ yes ___ no

If yes, date of PPF ___4-20-2011_____

Claim Filed with BP _X_ yes ____ no   If yes, BP Claim No. ___6866124161377___

1

Claim Filed with GCCF _X_ yes ___ no    If yes, GCCF Claimant ID No. __1121471__

<u>VoO Master Vessel Charter Agreement Number: No Number Assigned By Lawson/DRC</u>

Date of Contract ___May 26, 2010_____

Vessel Name: 2 boats: 1) 19 ft LA-8305FB; 2) 14 ft LA-7293ET

Daily Vessel Rate ___$1,200.00 x 2 : $2,400/day total_____

Dates Instructed to Work ____Entire Term of Contract
From Whom Instruction to Work was Received <u>Charles "Chuckie" Verdin; Cecil Lawson.</u>

Wages received to date _$118,240.00_____

Did you receive safety training __X_ yes ___ no  If yes, when? ___6/1-8/2010_____

Was any vessel decontamination performed? _X__ yes ___ no

If yes, date of decontamination ___N/A_____

Was vessel decontamination completed? __X_ yes ___ no

If yes, date of decontamination completion __N/A_____

Did you receive charter termination notification? ___ yes _X_ no

If yes, date received ___N/A_____

Did your vessel sustain damage? ___ yes _X__ no

Brief Description / Primary Valuation of Claim other than information provided above:

Claimant is entitled to $584,400 for the term of the Agreement (5/26/10 thru 11/28/10) for exclusive use of vessel, captain rate and 20% of deckhand rate: Claimant is still owed $ _$466,160.00_ , plus $ _$3,500.00_ for repairs to vessel (19ft. broken rack and foot).


____/s/ John O. Pieksen, Jr._____     __10-1-2011____
**Attorney / VoO Plaintiff Signature    Date**
___John O. Pieksen, Jr._____
**Print Name**

2



# EXHIBIT A

### IN RE: OIL SPILL by "Deepwater Horizon"
MDL 2179          SECTION: J          HON. CARL J. BARBIER
## VoO CONTRACT CLAIM PLAINTIFF FACT SHEET

Last Name _____Guidry_____

First Name ____Adam_____

Middle/Maiden _____ Suffix ___ _____

Street Address _____1521 Hwy 665_____

City/State/Zip _____Montegut, LA 70377_____

Phone Number __504.581.9322_____ Email Address __jpieksen@cox.net_____

Employer Name ____self-employed_____

Job Title/Description __self-employed commercial seafood harvester___

Business Address _____same as above_____

Business City/State/Zip _____same_____

Attorney Name ____John O. Pieksen, Jr. (LA # 21023)_____

Law Firm _____John Pieksen & Associates, LLC_____

Attorney Address _____829 Baronne Street_____

Attorney City/State/Zip _____New Orleans, LA 70113_____

Original Case Caption (if applicable) Foussell, et al v. Lawson Environ. Serv., LLC et al

Originating Court _____USDC-EDLA_____

Original EDLA Civil Action No./Short Form 10-8888 Doc. Ref. No. _2:11-cv-01195__

Did you serve a PPF in MDL 2179: _x__ yes ___ no

If yes, date of PPF ___4-20-2011_____

Claim Filed with BP ___ yes ___X_ no    If yes, BP Claim No. ___

Claim Filed with GCCF __X_ yes ___ no    If yes, GCCF Claimant ID No. __not sure__

1

VoO Master Vessel Charter Agreement Number: No Number Assigned By Lawson/DRC

Date of Contract ___May 26, 2010___

Vessel Name: LA4614EP

Daily Vessel Rate: _$1,200.00_

Dates Instructed to Work ____Entire Term of Contract___

From Whom Instruction to Work was Received _Charles "Chuckie" Verdin; Cecil Lawson_.

Wages received to date ___$ Unknown_

Did you receive safety training __X__ yes ___ no If yes, when? __6/1-8/2010___

Was any vessel decontamination performed? _X__ yes ___ no

If yes, date of decontamination ___not sure___

Was vessel decontamination completed? __X__ yes ___ no

If yes, date of decontamination completion __N/A___

Did you receive charter termination notification? ___ yes _X_ no

If yes, date received ___N/A___

Did your vessel sustain damage? ___ yes _X__ no

Brief Description / Primary Valuation of Claim other than information provided above:

Claimant is entitled to $291,200.00 for the term of the Agreement (5/26/10 thru 11/28/10) for exclusive use of vessel, captain rate and 20% of deckhand rate: Claimant is still owed $291,200.00.


___/s/ John O. Pieksen, Jr.___          __10-1-2011___
**Attorney / VoO Plaintiff Signature     Date**
__John O. Pieksen, Jr.___
**Print Name**

2

**EXHIBIT A**
**IN RE: OIL SPILL by "Deepwater Horizon"**
MDL 2179        SECTION: J        HON. CARL J. BARBIER
**VoO CONTRACT CLAIM PLAINTIFF FACT SHEET**

Last Name _____Guidry_____

First Name _____Delvin_____

Middle/Maiden _____ Suffix ___ _____

Street Address _____384 Hwy 665_____

City/State/Zip _____Montegut, LA 70377_____

Phone Number __504.581.9322_____ Email Address __jpieksen@cox.net_____

Employer Name _____self-employed_____

Job Title/Description __self-employed commercial seafood harvester_____

Business Address _____same as above_____

Business City/State/Zip _____same_____

Attorney Name _____John O. Pieksen, Jr. (LA # 21023)_____

Law Firm _____John Pieksen & Associates, LLC_____

Attorney Address _____829 Baronne Street_____

Attorney City/State/Zip ____New Orleans, LA 70113_____

Original Case Caption (if applicable) _Foussell, et al v. Lawson Environ. Serv., LLC et al_

Originating Court _____USDC-EDLA_____

Original EDLA Civil Action No./Short Form 10-8888 Doc. Ref. No. _2:11-cv-01195_

Did you serve a PPF in MDL 2179: _x_ yes ___ no

If yes, date of PPF ____4-20-2011_____

Claim Filed with BP ___ yes ___X_ no  If yes, BP Claim No. ____

1

Claim Filed with GCCF __X_ yes ___ no     If yes, GCCF Claimant ID No. __not sure__

VoO Master Vessel Charter Agreement Number: No Number Assigned By Lawson/DRC

Date of Contract ___May 26, 2010_____

Vessel Name____2 boats: 1) LA3377AN; 2) 6BPKU1005212_____

Daily Vessel Rate _2 boats @ $1,200.00 per day; total of $2,400.00 per day_____

Dates Instructed to Work ____Entire Term of Contract____

From Whom Instruction to Work was Received Charles "Chuckie" Verdin; Cecil Lawson.

Wages received to date ___$70,160.00_____

Did you receive safety training __X_ yes ___ no  If yes, when? ___6/1-8/2010_____

Was any vessel decontamination performed?  _X__ yes ___ no

If yes, date of decontamination ____not sure_____

Was vessel decontamination completed? __X_ yes ___ no

If yes, date of decontamination completion __N/A_____

Did you receive charter termination notification? ___ yes __X_ no

If yes, date received ___N/A_____

Did your vessel sustain damage? ___ yes _X__ no

Brief Description / Primary Valuation of Claim other than information provided above:

Claimant is entitled to $582,400.00 for the term of the Agreement (5/26/10 thru 11/28/10) for exclusive use of vessel, captain rate and 20% of deckhand rate: Claimant is still owed $512,240.00.


___/s/ John O. Pieksen, Jr._____ _____10-1-2011_____
**Attorney / VoO Plaintiff Signature    Date**
__ John O. Pieksen, Jr._____
**Print Name**

2




# EXHIBIT A

### IN RE: OIL SPILL by "Deepwater Horizon"
MDL 2179          SECTION: J          HON. CARL J. BARBIER

## VoO CONTRACT CLAIM PLAINTIFF FACT SHEET

Last Name ___Hendon_____

First Name ___Clifton_____

Middle/Maiden _____     Suffix ___ _____

Street Address ____467 Island Road_____

City/State/Zip ____Montegut, LA 70377_____

Phone Number __504.581.9322_____     Email Address __jpieksen@cox.net_____

Employer Name _____self-employed_____

Job Title/Description ___self-employed commercial seafood harvester_____

Business Address _____same as above_____

Business City/State/Zip _____same_____

Attorney Name ____John O. Pieksen, Jr. (LA # 21023)_____

Law Firm _____John Pieksen & Associates, LLC_____

Attorney Address _____829 Baronne Street_____

Attorney City/State/Zip ____New Orleans, LA 70113_____

Original Case Caption (if applicable) Foussell, et al v. Lawson Environ. Serv., LLC et al

Originating Court _____USDC-EDLA_____

Original EDLA Civil Action No./Short Form 10-8888 Doc. Ref. No. _2:11-cv-01195

Did you serve a PPF in MDL 2179: _x__ yes ____ no

If yes, date of PPF ___4-20-2011_____

Claim Filed with BP ____ yes ___X_ no   If yes, BP Claim No. ___

1

Claim Filed with GCCF __X_ yes ____ no    If yes, GCCF Claimant ID No. __not sure__

VoO Master Vessel Charter Agreement Number: No Number Assigned By Lawson/DRC

Date of Contract ____May 26, 2010_____

Vessel Name:  LA9720BV

Daily Vessel Rate:  $1,200.00

Dates Instructed to Work _____Entire Term of Contract_____

From Whom Instruction to Work was Received Charles "Chuckie" Verdin; Cecil Lawson.

Wages received to date ____$ 85,280.00

Did you receive safety training __X_ yes ____ no  If yes, when? ___6/1-8/2010_____

Was any vessel decontamination performed? _X__ yes ___ no

If yes, date of decontamination ____not sure_____

Was vessel decontamination completed? __X_ yes ___ no

If yes, date of decontamination completion __N/A_____

Did you receive charter termination notification? ___ yes _X_ no

If yes, date received ___N/A_____

Did your vessel sustain damage? ___ yes _X__ no

Brief Description / Primary Valuation of Claim other than information provided above:

Claimant is entitled to $291,200.00 for the term of the Agreement (5/26/10 thru 11/28/10) for exclusive use of vessel, captain rate and 20% of deckhand rate: Claimant is still owed $205,920.00.


___/s/ John O. Pieksen, Jr._____      ___10-1-2011_____
**Attorney / VoO Plaintiff Signature     Date**
__John O. Pieksen, Jr._____
**Print Name**

# EXHIBIT A

## IN RE: OIL SPILL by "Deepwater Horizon"

MDL 2179          SECTION: J          HON. CARL J. BARBIER

## VoO CONTRACT CLAIM PLAINTIFF FACT SHEET

Last Name ____Hendon_____

First Name ____Jerry_____

Middle/Maiden _____ Suffix _____

Street Address ____116 Beth Ann Ave._____

City/State/Zip _____Montegut, LA 70377_____

Phone Number __504.581.9322_____ Email Address ___jpieksen@cox.net_____

Employer Name _____self-employed_____

Job Title/Description ___self-employed commercial seafood harvester_____

Business Address _____same as above_____

Business City/State/Zip _____same_____

Attorney Name ____John O. Pieksen, Jr. (LA # 21023)_____

Law Firm _____John Pieksen & Associates, LLC_____

Attorney Address _____829 Baronne Street_____

Attorney City/State/Zip ____New Orleans, LA 70113_____

Original Case Caption (if applicable) Foussell, et al v. Lawson Environ. Serv., LLC et al

Originating Court _____USDC-EDLA_____

Original EDLA Civil Action No./Short Form 10-8888 Doc. Ref. No. _2:11-cv-01195/_____

Did you serve a PPF in MDL 2179: _x__ yes ____ no

If yes, date of PPF ____4-20-2011_____

Claim Filed with BP ____ yes _X__ no    If yes, BP Claim No. ___N/A____

1

Claim Filed with GCCF _X_ yes __ no    If yes, GCCF Claimant ID No.   3004447

VoO Master Vessel Charter Agreement Number: No Number Assigned By Lawson/DRC

Date of Contract ___May 26, 2010_____

Vessel Name:  LA-3179EB05

Daily Vessel Rate ___$1,200.00_____

Dates Instructed to Work __Entire Term of Contract_____

From Whom Instruction to Work was Received Charles "Chuckie" Verdin; Cecil Lawson.

Wages received to date _$47,000.00_

Did you receive safety training __X_ yes ___ no  If yes, when? ___6/1-8/2010____

Was any vessel decontamination performed?  _X__ yes ___ no

If yes, date of decontamination ___N/A_____

Was vessel decontamination completed? __X_ yes ___ no

If yes, date of decontamination completion __N/A_____

Did you receive charter termination notification? ___ yes _X_ no

If yes, date received ___N/A_____

Did your vessel sustain damage? ___ yes _X__ no

Brief Description / Primary Valuation of Claim other than information provided above:

Claimant is entitled to $292,200 for the term of the Agreement (5/26/10 thru 11/28/10) for exclusive use of vessel, captain rate and 20% of deckhand rate: Claimant is still owed $__245,200.00___.


___/s/ John O. Pieksen, Jr._____        ____10-1-2011_____
**Attorney / VoO Plaintiff Signature    Date**
__John O. Pieksen, Jr._____
**Print Name**

2

## EXHIBIT A
### IN RE: OIL SPILL by "Deepwater Horizon"
MDL 2179          SECTION: J          HON. CARL J. BARBIER
## VoO CONTRACT CLAIM PLAINTIFF FACT SHEET

Last Name _____Hendon_____

First Name _____Randy_____

Middle/Maiden _____ Suffix _____

Street Address ____2534 Hwy 665_____

City/State/Zip _____Montegut, LA 70377_____

Phone Number ___504.581.9322_____ Email Address ___jpieksen@cox.net_____

Employer Name _____self-employed_____

Job Title/Description ___self-employed commercial seafood harvester_____

Business Address _____same as above_____

Business City/State/Zip _____same_____

Attorney Name ____John O. Pieksen, Jr. (LA # 21023)_____

Law Firm _____John Pieksen & Associates, LLC_____

Attorney Address _____829 Baronne Street_____

Attorney City/State/Zip ____New Orleans, LA 70113_____

Original Case Caption (if applicable) <u>Foussell, et al v. Lawson Environ. Serv., LLC et al</u>

Originating Court _____USDC-EDLA_____

Original EDLA Civil Action No./Short Form 10-8888 Doc. Ref. No. _2:11-cv-01195/_____

Did you serve a PPF in MDL 2179: _x__ yes ____ no

If yes, date of PPF ____4-20-2011_____

Claim Filed with BP ____ yes _X__ no    If yes, BP Claim No. ___N/A_____

1

Claim Filed with GCCF _X_ yes ___ no    If yes, GCCF Claimant ID No. __3004447__

VoO Master Vessel Charter Agreement Number: No Number Assigned By Lawson/DRC

Date of Contract ___May 26, 2010_____

Vessel Name:  LA-9261EE

Daily Vessel Rate ___$1,200.00_____

Dates Instructed to Work ___Entire Term of Contract____

From Whom Instruction to Work was Received _Charles "Chuckie" Verdin; Cecil Lawson._

Wages received to date __$37,280.00_____

Did you receive safety training __X_ yes ___ no  If yes, when? ____6/1-8/2010_____

Was any vessel decontamination performed? _X__ yes ___ no

If yes, date of decontamination ___N/A_____

Was vessel decontamination completed? _X__ yes ___ no

If yes, date of decontamination completion __N/A_____

Did you receive charter termination notification? ___ yes _X_ no

If yes, date received ___N/A_____

Did your vessel sustain damage? ___ yes _X__ no

Brief Description / Primary Valuation of Claim other than information provided above:

Claimant is entitled to $291,200 for the term of the Agreement (5/26/10 thru 11/28/10) for exclusive use of vessel, captain rate and 20% of deckhand rate: Claimant is still owed $__253,920.00___.


___/s/ John O. Pieksen, Jr._____     __10-1-2011_____
**Attorney / VoO Plaintiff Signature    Date**
__John O. Pieksen, Jr._____
**Print Name**

2



**EXHIBIT A**

**IN RE: OIL SPILL by "Deepwater Horizon"**

MDL 2179          SECTION: J          HON. CARL J. BARBIER

**VoO CONTRACT CLAIM PLAINTIFF FACT SHEET**

Last Name ___Hernandez_____

First Name ___Anna Lou_____

Middle/Maiden _____ Suffix _____

Street Address _____1521 Hwy 55_____

City/State/Zip _____Montegut, LA 70377_____

Phone Number ___504.581.9322_____ Email Address ___jpieksen@cox.net_____

Employer Name _____self-employed_____

Job Title/Description ___self-employed commercial seafood harvester_____

Business Address _____same as above_____

Business City/State/Zip _____same_____

Attorney Name ___John O. Pieksen, Jr. (LA # 21023)_____

Law Firm _____John Pieksen & Associates, LLC_____

Attorney Address ___829 Baronne Street_____

Attorney City/State/Zip ____New Orleans, LA 70113_____

Original Case Caption (if applicable) Foussell, et al v. Lawson Environ. Serv., LLC et al

Originating Court _____USDC-EDLA_____

Original EDLA Civil Action No./Short Form 10-8888 Doc. Ref. No. _2:11-cv-01195/_____

Did you serve a PPF in MDL 2179: _x__ yes ___ no

If yes, date of PPF ___4-20-2011_____

Claim Filed with BP ____ yes ____ no   If yes, BP Claim No. _____

1

Claim Filed with GCCF ___ yes ___ no     If yes, GCCF Claimant ID No. _____

VoO Master Vessel Charter Agreement Number: No Number Assigned By Lawson/DRC

Date of Contract ___May 26, 2010_____

Vessel Name___ LA1804EZ_____

Daily Vessel Rate ___$2,000.00_____

Dates Instructed to Work _____Entire Term of Contract____

From Whom Instruction to Work was Received Charles "Chuckie" Verdin; Cecil Lawson.

Wages received to date ___$174,280.00_____

Did you receive safety training __X__ yes ___ no  If yes, when? ____6/1-8/2010_____

Was any vessel decontamination performed? __X__ yes ___ no

If yes, date of decontamination ____not sure_____

Was vessel decontamination completed? __X__ yes ___ no

If yes, date of decontamination completion ___N/A_____

Did you receive charter termination notification? ___ yes __X__ no

If yes, date received ____N/A_____

Did your vessel sustain damage? ___ yes __X__ no

Brief Description / Primary Valuation of Claim other than information provided above:

Claimant is entitled to $292,200 for the term of the Agreement (5/26/10 thru 11/28/10) for exclusive use of vessel, captain rate and 20% of deckhand rate: Claimant is still owed $ $364,480.00___ .

____/s/ John O. Pieksen, Jr._____     ____10-1-2011_____
**Attorney / VoO Plaintiff Signature     Date**
____John O. Pieksen, Jr._____
**Print Name**

2



## EXHIBIT A
### IN RE: OIL SPILL by "Deepwater Horizon"
MDL 2179   SECTION: J   HON. CARL J. BARBIER
## VoO CONTRACT CLAIM PLAINTIFF FACT SHEET

Last Name _Levron _____

First Name _Dale _____

Middle/Maiden _____ Suffix _____

Street Address __2398 Hwy 665

City/State/Zip _____Montegut, LA 70377_____

Phone Number __504.581.9322_____ Email Address __jpieksen@cox.net_____

Employer Name _____self-employed_____

Job Title/Description __self-employed commercial seafood harvester_____

Business Address _____same as above_____

Business City/State/Zip _____same_____

Attorney Name ___John O. Pieksen, Jr. (LA # 21023)_____

Law Firm _____John Pieksen & Associates, LLC_____

Attorney Address _____829 Baronne Street_____

Attorney City/State/Zip _____New Orleans, LA 70113_____

Original Case Caption (if applicable) Foussell, et al v. Lawson Environ. Serv., LLC et al

Originating Court _____USDC-EDLA_____

Original EDLA Civil Action No./Short Form 10-8888 Doc. Ref. No. _2:11-cv-01195/ 70179_____

Did you serve a PPF in MDL 2179: _x_ yes ____ no

If yes, date of PPF ___4-20-2011_____

Claim Filed with BP __ yes _X_ no   If yes, BP Claim No. __N/A __

1

Claim Filed with GCCF _X_ yes __ no    If yes, GCCF Claimant ID No. 01141106

VoO Master Vessel Charter Agreement Number: No Number Assigned By Lawson/DRC

Date of Contract ___May 26, 2010_____

Vessel Name:  32 ft LA-5659AY

Daily Vessel Rate $1,500.00 per day_____

Dates Instructed to Work _____Entire Term of Contract_____

From Whom Instruction to Work was Received Charles "Chuckie" Verdin; Cecil Lawson.

Wages received to date;  _$135,500.00_____

Did you receive safety training __X_ yes ___ no  If yes, when? ___6/1-8/2010_____

Was any vessel decontamination performed?  _X_ yes ___ no

If yes, date of decontamination __not sure_____

Was vessel decontamination completed? ___ yes _X__ no

If yes, date of decontamination completion __N/A_____

Did you receive charter termination notification? ___ yes __X_ no

If yes, date received ____N/A_____

Did your vessel sustain damage? ___ yes _X__ no

Brief Description / Primary Valuation of Claim other than information provided above:

Claimant is entitled to $353,080.00 for the term of the Agreement (5/26/10 thru 11/28/10) for exclusive use of vessel, captain rate and 20% of deckhand rate: Claimant is still owed $ _$217,580.00____, plus $250.00 for damaged Prop.


____/s/ John O. Pieksen, Jr._____     ____10-1-2011_____
**Attorney / VoO Plaintiff Signature    Date**
__John O. Pieksen, Jr._____
**Print Name**

2

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LENNY FOUSSELL | * | CIVIL ACTION NO. |
| VERSUS | * | JUDGE: |
| LAWSON ENVIRONMENTAL SERVICE, L.L.C. | * | MAGISTRATE: |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff, LENNY FOUSSELL, a person of full age of majority and resident of the Parish of Terrebonne, who respectfully represents:

### JURISDICTION AND VENUE

### 1.

This is an admiralty and maritime action within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. Sec.1333(1) as the claims at issue concern a charter contract governed by Admiralty or Maritime law. Venue lies in this Court under 28 U.S.C. §1391(b)(2), as the events giving rise to this claim occurred within this judicial district.

147

PARTIES

2.

The plaintiff herein is LENNY FOUSSELL, a person of full age of majority and a resident of and domiciled in the State of Louisiana, Parish of Terrebonne.

Made defendant herein is Lawson Environmental Service, L.L.C. ("LES"), a Louisiana limited liability company with its principal place of business located in Houma, Louisiana, which is within the jurisdiction of the Court.

FACTS

3.

On or about April 20, 2010, the Deepwater Horizon rig leased by BP America Production Company ("BP") exploded off the coast of Louisiana releasing mass quantities of oil into the Gulf of Mexico.

4.

BP chartered qualifying fishing boats and vessels under the "Vessels of Opportunity Program" to aid and assist it in cleaning up the oil spill catastrophe. Mr. Foussell and his vessel # LA-2558-EK met the Vessel of Opportunity qualifications, and Mr. Foussell entered into a Vessel Charter Agreement (the "Charter") with LES on June 19, 2010.

5.

The Charter provided that Mr. Foussell would provide LES with the exclusive use of the vessel # LA-2558-EK and its crew in oil spill response activities on behalf of BP under the Vessel of Opportunity Program. Article 2(A) of the Charter states in pertinent part:

"During each CHARTER TERM, the VESSEL shall be employed exclusively for CHARTERER'S use for carriage of CHARTERER'S employees, contractors, business invitees, equipment and provision and in the performance of various tasks associated with oil spill response and containment efforts as directed by CHARTERER … The VESSEL shall be available and at CHARTERER'S disposal for operation twenty-four (24) hours per day. The VESSEL shall not be used for any purpose other than performance of SERVICES during the CHARTER TERM."

### 6.

LES agreed to compensate Mr. Foussell at the end of the Charter's term using the following rate of hire schedule:

1. $1,200.00 per 24 hour period for the Vessel;

2. $360.00 per 24 hour period for the Captain; and

3. $200.00 per 24 hour period for the Deckhand.

### 7.

The vessel # LA-2558-EK and its crew were placed into service by LES pursuant to the Charter from June 19, 2010 through October 3, 2010, when the vessel # LA-2558-EK was decontaminated and released. This totaled 107 days of service under charter.

### 8.

Article 10(E) of the Charter states that "[p]ayment of all sums due shall be made within fifteen (15) days of receipt of an invoice by CHARTERER." Mr. Foussell's invoices for the amount due herein have been submitted and a period well in excess of fifteen days has lapsed. LES has refused to make full payment of the amount owed.

### 9.

Mr. Foussell <u>was only paid for 56 days of service</u>. Mr. Foussell has not been paid for 51 days of the Charter's term at the following rates:

3

51 days x $1,200.00 per 24 hour period for the Vessel =   $ 61,200.00

51 days x $360.00 per 24 hour period for the Captain =   $ 18,360.00

51 days x $200.00 per 24 hour period for the Deckhand =   $ 10,200.00

**TOTAL**   **$ 89,760.00**

Therefore, LES owes Mr. Foussell $89,760.00 for 51 days of the Charter's term that has

not been paid.

### 10.

Mr. Foussell and LES entered into a valid charter contract for the use of the vessel # LA-

2558-EK and its crew for oil spill response activities. Mr. Foussell complied with his obligations

under the Charter. LES failed to make full payment to Mr. Foussell for the term of the Charter.

LES' refusal to pay the full amount owed pursuant to the Charter Agreement is a breach of

contract.

### 11.

LES' breach of the charter caused injury to Mr. Foussell. Mr. Foussell relied on and

complied with his obligations under the Charter, and refrained from using his vessel or crew for

other work ventures during the term of the Charter. As a result of LES' breach, Mr. Foussell has

suffered a loss of 51 days of unpaid invoices for the use of the vessel # LA-2558-EK, for the

Captain's compensation, for the Deckhand's compensation, and for the re-rigging and repairing

of his vessel.

### 12.

As a result of Lawson Environmental Services' breach of contract for failure to pay the

full amount owed under the Vessel Charter Agreement, Mr. Foussell is entitled to damages for

full payment of amounts owed under the Vessel Charter Agreement as outlined above, plus  legal

interest from the date of judicial demand, until paid, reasonable attorney fees and all costs of court;

**WHEREFORE**, the plaintiff, LENNY FOUSSELL, respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant, Lawson Environmental Service, L.L.C. for payment of the amounts still owed under the Vessel Charter Agreement and all damages as requested in this matter, together with legal interest from date of judicial demand, until paid, reasonable attorneys fees, interest and costs of court that Plaintiff may be entitled to under the law, and all other relief that is equitable under the law and as may be proved at the time of this trial.

**RESPECTFULLY SUBMITTED:**

/s/ Mary W. Riviere_____
Mary W. Riviere  (LSBA#19201)
Email: rmriviere@waitz-downer.com
Huntington B. Downer, Jr. (LSBA #05046)
Email: hunt.downer@waitz-downer.com
423 Goode Street
Houma, Louisiana 70360
Telephone (985) 876-0870
Facsimile: (985) 876-0213
Attorneys for plaintiff LENNY FOUSSELL

PLEASE SERVE:
Lawson Environmental Service, L.L.C.
through its registered agent:
Cecil B. Lawson
2108 Denley Road
Houma, LA  70363

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| FRED J. MATHERNE | * | CIVIL ACTION NO. |
| VERSUS | * | JUDGE: |
| LAWSON ENVIRONMENTAL SERVICE, L.L.C. | * | MAGISTRATE: |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

NOW INTO COURT, through undersigned counsel, comes Plaintiff, FRED J. MATHERNE, a person of full age of majority and resident of the Parish of Terrebonne, who respectfully represents:

### JURISDICTION AND VENUE

1.

This is an admiralty and maritime action within the meaning of Rule 9(h) of the federal Rules of Civil Procedure. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1333(1) as the claims at issue concern a charter contract governed by Admiralty or Maritime law. Venue lies in this Court under 28 U.S.C. § 1391(b)(2), as the events giving rise to this claim occurred within this judicial district.

This Court also has subject matter jurisdiction over this matter under 42 U.S.C. § 1981, providing for the redress of deprivation of the right to make and enforce contracts to the full and equal benefit of all laws as enjoyed by others.

## PARTIES

### 2.

The plaintiff herein is FRED J. MATHERNE, a person of full age of majority and a resident of and domiciled in the State of Louisiana, Parish of Terrebonne.

Made defendant herein is LAWSON ENVIRONMENTAL SERVICE, L.L.C. ("LES") a Louisiana limited liability company with its principal place of business located in Houma, Louisiana, which is within the jurisdiction of the Court.

## FACTS

### 3.

On or about April 20, 2010, the *Deepwater Horizon* rig leased by BP America Production Company ("BP"") exploded off the coast of Louisiana, releasing mass quantities of oil into the Gulf of Mexico.

### 4.

BP chartered qualifying fishing boats and vessels under the "Vessels of Opportunity Program" to aid and assist it in cleaning up the oil spill catastrophe. Mr. Matherne and his vessel # LA-2142-BD met the Vessels of Opportunity qualifications, and Mr. Matherne entered into a Vessel Charter Agreement (the "Charter") with LES on June 28, 2010.

### 5.

The Charter provided that Mr. Matherne would provide LES with the exclusive use of the vessel # LA-2142-BD and its crew in oil spill response activities on behalf of BP under the Vessels of Opportunity Program. Article 2(A) of the Charter states, in pertinent part:

> During each CHARTER TERM, the VESSEL shall be employed exclusively for CHARTERER'S use for carriage of CHARTERER'S employees, contractors, business invitees, equipment and provision and in the performance of various tasks associated with oil spill response and containment efforts as directed by CHARTERER ... The VESSEL shall be available and at CHARTERER'S disposal

- 2 -

for operation twenty-four (24) hours per day. The VESSEL shall not be used for any purpose other than performance of SERVICES during the CHARTER TERM."

6.

LES agreed to compensate Mr. Matherene at the end of the Charter's term using the following rate of hire schedule:

1. $1,500.00 per 24 hour period for the Vessel;

2. $360.00 per 24 hour period for the Captain; and

3. $200.00 per 24 hour period for the Crewmembers.

7.

The vessel #LA-2142-BD and its crew were placed into service by LES pursuant to the Charter from July 12, 2010, through November 26, 2010, when the vessel #LA-2142-BD was decontaminated and released. This totaled 138 days of service under charter.

8.

Article 10(E) of the Charter states that "[p]ayment of all sums due shall be made within fifteen (15) days of receipt of an invoice by CHARTERER." Mr. Matherene's invoices for the amount due herein have been submitted and a period well in excess of fifteen days has lapsed. LES has refused to make full payment of the amount owed. Over fifteen (15) days have elapsed since the end of the term of the Charter, and LES has failed to make full payment of the amount owed.

9.

Mr. Matherene and LES entered into a valid charter contract for the use of the vessel #LA-2142-BD and its crew for oil spill response activities. Mr. Matherene complied with his obligations under the Charter. LES failed to make full payment to Mr. Matherene for the term of the Charter. LES's refusal to pay the full amount owed pursuant to the Charter Agreement is a breach of contract.

- 3 -

10.

LES' breach of the charter caused injury to Mr. Matherene. Mr. Matherene relied on and complied with his obligations under the Charter, and refrained from using his vessel or crew for other work ventures during the term of the Charter. As a result of LES breach, Mr. Matherene has suffered a loss of unpaid invoices for the use of the vessel #LA-2142-BD, for the Captain's compensation, for Crewmember Compensation, and for other expenses arising as a result of the breach.

As a result of Lawson Environmental Services' breach of contract for failure to pay the full amount owed under the Vessel Charter Agreement, Mr. Matherene is entitled to damages for full payment of amounts owed under the Vessel Charter Agreement as outlined above, plus legal interest from the date of judicial demand until paid, reasonable attorney fees, punitive damages, and all costs of court.

11.

LES's breach of contract on the basis of race also violates 42 U.S.C. § 1981 and the Louisiana Unfair Trade Practices and Consumer Protection Act. As such, Mr. Matherne is entitled to treble damages, attorney's fees, and all costs of court;

**WHEREFORE,** the plaintiff, FRED J. MATHERNE, respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant, LAWSON ENVIRONMENTAL SERVICE, L.L.C., for payment of the amounts still owed under the Vessel Charter Agreement and all damages as requested in this matter, together with legal interest from date of judicial demand until paid, reasonable attorney's fees, interest and costs of court that Plaintiff may be entitled to under the law, and all other relief that is equitable under the law and as may be proved at the time of this trial.

- 4 -

Respectfully submitted,

**SANGISETTY & SAMUELS, L.L.C.**

By: _____ /s/ Ravi K. Sangisetty _____
     Ravi K. Sangisetty (LSBA # 30709)
     E-mail: rks@sangisettylaw.com
     Robert Lee Seegers, Jr. (LSBA # 32242)
     E-mail: lseegers@sangisettylaw.com
     610 Baronne Street, Third Floor
     New Orleans, Louisiana  70113
     Telephone:  (504) 558-9478
     Facsimile: (504) 558-9482

ATTORNEYS FOR PLAINTIFF, FRED J.
MATHERNE

IN RE: OIL SPILL by "Deepwater Horizon" Page 60 of 147
Case 2:10-md-02179-CJB-SCW Document 19 Filed 03/01/12 Page 60 of 147
MDL 2179 and Civil Action No. 10-2771

SECTION: J | JUDGE CARL BARBIER

## PLAINTIFF PROFILE FORM ["PPF"]

| | | |
|---|---|---|
| Last Name KNIGHT | First Name BERTRAND | Middle/Maiden J. | Suffix |
| Phone Number (985) 594-7689 | E-Mail Address NONE | |
| Address 3592 HIGHWAY 665 | City/State 1 Zip MONTEGUT, LA 70377 | |

| INDIVIDUAL CLAIM | BUSINESS CLAIM |
|---|---|
| Employer Name BERTRAND J. KNIGHT | Business Name |
| Job Title / Description VESSEL OWNER | Type of Business |
| Address 3592 HIGHWAY 665 | Address |
| City / State / Zip MONTEGUT, LA 70377 | City / State / Zip |
| Social Security Number 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 | Tax ID Number |

| | |
|---|---|
| Attorney Name ROBERT T. GARRITY, JR. | Firm Name LAW OFFICE OF ROBERT T. GARRITY, JR. |
| Address 1905 HICKORY AVENUE | City / State / Zip HARAHAN, LA 70123 |
| Phone Number (504) 738-1111 | E-Mail Address ROBERTTGARRITYJR@BELLSOUTH.NET |

| | | | |
|---|---|---|---|
| Claim filed with BP? | YES | NO ✓ | Claim Filed with GCCF?: ✓YES NO |
| If yes, BP Claim No.: | | | If yes, Claimant Identificatio No.: 1019445 |

**Claim Type (Please check all that apply):** Damage or destruction to real or personal property; ✓ Earnings/Profit Loss; Personal Injury/Death; Fear of Future Injury and/or Medical Monitoring; Loss of Subsistence use of Natural Resources; Removal and/or clean-up costs; Other

| | |
|---|---|
| Original Case Caption Bertrand J. Knight V. Lawson Environmental Services, LLC | Original Civil Action Number 2:11-CV-00783 |
| Originating Court U.S. DISTRICT COURT EASTERN DISTRICT OF LA | EDLA Civil Action Number 2:11-CV-00783 |

**Please check the box(es) below that you think apply to you and your claims:**

**Non-governmental Economic Loss and Property Damage Claims (Bundle B1)**

✓ Commercial fisherman, shrimper, crabber, or oysterman, or owner and operator of a business involving fishing, shrimping, crabbing or oystering.

Seafood processor, distributor, retail and seafood market, or restaurant owner and operator, or an employee thereof.

Recreational business owner, operator or worker, including a recreational fishing business, commercial guide service, or charter fishing business who earn their living through the use of the Gulf of Mexico.

Commercial business, business owner, operator or worker, including commercial divers, offshore oilfield service, repair and supply, real estate agents, and supply companies, or an employee thereof.

Recreational sport fishermen, recreational diver, beachgoer, or recreational boater.

Plant and dock worker, including commercial seafood plant worker, longshoreman, or ferry operator.

Owner, lessor, or lessee of real property alleged to be damaged, harmed or impacted, physically or economically, including lessees of oyster beds.

Hotel owner and operator, vacation rental owner and agent, or all those who earn their living from the tourism industry.

Bank, financial institution, or retail business that suffered losses as a result of the spill.

Person who utilizes natural resources for subsistence.

Other:_____

**PostExplosion Personal Injury, Medical Monitoring, and Property Damage Related to Cleanup (Bundle B3)**

✓ Boat captain or crew involved in the Vessels of Opportunity program.

Worker involved in decontaminating vessels that came into contact with oil and/or chemical dispersants.

Vessel captain or crew who was not involved in the Vessels of Opportunity program but who were exposed to harmful chemicals, odors and emissions during post-explosion clean-up activities.

Clean-up worker or beach personnel involved in clean-up activities along shorelines and intercoastal and intertidal zones.

Resident who lives or works in close proximity to coastal waters.

Other:_____

<u>MASTER TIME CHARTER</u>

This Charter is made and entered into this <u>12th</u> day of <u>July, 2010</u>, by and between Lyle Properties, L.L.C., a Louisiana limited liability company (hereinafter called "OWNER", the term OWNER as used below shall also include the actual OWNER of a Vessel or bareboat charterer as the case may be if Lyle Properties, L.L.C. is acting as a broker or sub-bareboat charterer of a vessel), and <u>Lawson Environmental Services, LLC</u>, (hereinafter called "CHARTERER").

## WITNESSETH:

WHEREAS, OWNER is the owner and/or operator of various tug, towing, utility and other vessels suitably equipped for CHARTERER's marine activities in the oil and gas industry, which vessels are hereinafter referred to as "OWNER vessels" or "OWNER vessel".

WHEREAS, OWNER also acts as the broker or bareboat charterer for the owners and/or operators of other such vessels suitably equipped for CHARTERER's offshore activities in the oil and gas industry, which vessels are hereinafter referred to as the "brokered vessels" or "brokered vessel".

WHEREAS, all of the above mentioned OWNER vessels and brokered vessels are hereinafter sometimes collectively referred to as "vessels" or "vessel".

WHEREAS, CHARTERER may from time to time desire to time charter one or more of said vessels for the purpose of performing such marine services in support of CHARTERER's operations.

NOW, THEREFORE, for and in consideration of the premises and mutual promises and agreements herein contained, OWNER, on its own behalf for the OWNER vessels and in its broker capacity for the brokered vessels, agrees to time charter and CHARTERER agrees to hire such of the vessels as OWNER and CHARTERER shall designate subject to the following terms and conditions:

I.

CHARTERER shall designate the vessel or vessels it desires from time to time to hire by notifying OWNER of the particular vessel CHARTERER desires to hire and by specifying the date that CHARTERER desires the vessel to be delivered. If OWNER has such a vessel available and if the parties reach agreement on the details particular to that vessel's charter (such as rate of hire), the vessel will be delivered to CHARTERER in accordance herewith. As soon thereafter as is practicable, OWNER shall fax or mail to CHARTERER a letter on a form substantially identical to the form attached hereto as Exhibit "A", which letter shall confirm the details of the charter of the said vessel as between the parties. Even if OWNER shall fail to send such letter or CHARTERER fails to acknowledge such letter, this Charter and the verbally agreed details shall apply to any vessel delivered to CHARTERER by OWNER in the absence of a separate charter covering such vessel.

II.

It is understood that OWNER is under no obligation to let any of the vessels and that CHARTERER is under no obligation to hire any of the vessels except that which CHARTERER may request or ask for during the term hereof; it being the intent of the parties hereto that this is a nonexclusive vessel rental contract, and that no vessel shall be considered let or hired until same is delivered to CHARTERER pursuant to mutual agreement.

III.

The vessel shall be delivered to CHARTERER at the port previously agreed upon with clear decks and being on her delivery properly equipped and in every respect seaworthy and in good running order and in every way fit and ready for CHARTERER's use and for the employment intended, so far as the exercise of due diligence can make her.

OWNER may at any time substitute a suitable replacement vessel, provided such substituted vessel is acceptable to CHARTERER.

The vessel (unless lost) shall, at the termination of each individual charter hereunder, be redelivered at the same port at which it was accepted by CHARTERER (unless a different port of redelivery is agreed upon).

Throughout the term hereof, there shall be maintained in full force and effect on the vessel any required United States Coast Guard documents and Inspection Certificates, together with any other documents required of the vessel.

IV.

For the use of said vessel, CHARTERER shall pay OWNER at the rate previously agreed upon and specified on Exhibit "B" for each day or each part of a day, beginning on the day said vessel is delivered to CHARTERER and ending on the day the vessel is redelivered. OWNER shall bill CHARTERER at 2108 Denley Rd. Houma, LA 70363, every fifteen days and CHARTERER shall pay OWNER within five (5) days after expiration of each billing period. Payment of charter hire shall continue until the day the vessel is redelivered to OWNER. If the vessel is lost, payment shall be made up to and including the date of her loss. Payment shall be made to OWNER, at 4428 Hwy 56 Chauvin, LA 70344, or elsewhere as designated. CHARTERER shall pay one and one-half percent (1½%) interest per month on all receivables due and payable to OWNER in arrears ten (10) days or more after the date of OWNER's invoices.

Should CHARTERER contest the amount of any invoice, it shall, within twenty (20) days from invoice receipt, notify OWNER of the contested amount and specify the reason(s) therefor, whereupon payment of the contested amount will be suspended until settlement of the dispute. The uncontested amount shall, however, be paid within the term set forth hereinabove.

V.

The vessel shall be used for the lawful movement of barges, cargo thereon or other materials and personnel incidental to CHARTERER's operations. For reasons of safety, the vessel shall not be used for live diving (also known as live boating).

CHARTERER agrees to comply with all laws, regulations and the vessel's U. S. Coast Guard Certificate of Inspection (COI) affecting the marine carriage and discharge of Noxious Liquid Substances (NLS) in bulk. CHARTERER may not load or cause to be loaded on the vessel any bulk NLS not authorized by the vessel's COI. Except and to the extent permitted by CHARTERER's National Pollution Discharge permit, no discharge of NLS residue into the sea is permitted; and CHARTERER agrees to indemnify, protect, defend and hold harmless OWNER, the vessel, its owner, operator, master, crew, and their respective underwriters from and against the results of any breach by CHARTERER of the aforesaid discharge prohibition. With respect to materials CHARTERER causes to be placed in the vessel's bulk tanks, CHARTERER shall, at its own expense, arrange for the cleaning of such tanks and for the removal and legal disposal of the resulting residues.

CHARTERER agrees to properly manifest all hazardous wastes and NLS wastes and solid wastes carried aboard the vessel and/or any barge transported by the vessel and to comply with all paperwork requirements imposed by law as a result of such carriage.

The vessel's master shall have sole discretion to refuse to transport barges he deems not capable of safe towage under existing or anticipated weather and sea conditions, and the master's exercise of such discretion shall not constitute default under this charter or provide a basis for withholding charter hire.

## VI.

The vessel shall be manned, victualed, maintained, navigated and supplied at no expense to CHARTERER. However, CHARTERER shall provide all fuel, oil, greases, fresh water, waste oil disposal, liquid bulk tank cleaning (for vessels so equipped), tow lines, cordage, chains, binders, dunnage, replacement bulk hoses and replacement wire rope for the vessel at its expense, or CHARTERER may direct OWNER to secure same and reimburse OWNER for the properly documented cost thereof plus a fifteen (15%) percent handling charge. Wharfage, port charges, dockage and safe berths will be provided by CHARTERER at its expense.

## VII.

The operation, navigation and management of OWNER vessels shall be under the exclusive control and command of OWNER, and the operation, navigation and management of brokered vessels shall be under the exclusive control and command of the owners and/or operators of said brokered vessels. Subject always to the right of the master to determine whether a movement may be undertaken, the vessels will be operated, and services herein described will be rendered, at times as requested by CHARTERER. OWNER and the owners and operators of brokered vessels are independent contractors and neither they nor their respective employees nor the vessels' masters or crews are servants, agents, or employees of CHARTERER, CHARTERER being interested only in the completed performance of the services herein provided.

Notwithstanding anything to the contrary herein, if any operation, voyage, movement, activity or inactivity on the part of a vessel is insisted upon by CHARTERER or its representative, and undertaken by the vessel's master under written protest on account of the

opinion of the master that said operation, voyage, movement, activity or inactivity is hazardous and likely to cause loss, damage or expense, or loss of life or personal injury, the responsibility for such loss, damage or expense, or loss of life or personal injury, shall thereupon become and remain solely CHARTERER's. The requirement of written protest shall be satisfied by an entry in the vessel's log immediately after the incident.

The vessel's crew will not be required to load or unload cargo or equipment.

OWNER shall have the right at any time to remove any of CHARTERER's personnel from the vessel, any barge or other cargo related to the vessel and to require CHARTERER to provide replacement personnel. OWNER shall have the right to require CHARTERER at any time to perform drug, controlled substance and alcohol screening of CHARTERER's personnel who are or may board the Vessel, barge or other work related to the charter.

VIII.

CHARTERER may install additional equipment in connection with its operations, provided that without the written consent of OWNER (for OWNER vessels) or the owners and/or operators of brokered vessels (for brokered vessels) no structural changes shall be made. All equipment installed by CHARTERER shall remain its property and shall be removed by it before redelivery, and the vessel must be restored to the same condition as it was prior to the installation of equipment or structural change, all at CHARTERER's expense.

IX.

CHARTERER shall not create, incur, or permit any liens to be imposed upon any vessel chartered under this charter.

X.

Should the vessel break down or become inoperative for any cause attributable to the vessel or OWNER, other than negligence of CHARTERER or for any cause attributable to CHARTERER or due to the nature of CHARTERER's cargoes attached to, laden upon or carried by the vessel, and such condition continues for as long as one (1) day in any calendar month (hereinafter referred to as "Compensable Downtime"), the vessel's agreed rate of hire shall cease for the time thereby lost in excess of said Compensable Downtime.

Should there be any unused Compensable Downtime from previous month(s), such time shall be accrued and applied to the current month, or used for regular drydocking and maintenance, but such Compensable Downtime shall not exceed a cumulative total of twelve (12) days at any one time. In addition to said Compensable Downtime, OWNER (for OWNER vessels) and the owners and/or operators of brokered vessels (for brokered vessels) shall be entitled to perform or have performed repairs or maintenance on the vessel without reduction of charter hire, provided that such repairs or maintenance do not interfere with CHARTERER's operations.

Any liability of OWNER (for OWNER vessels) or of the owners and/or operators of brokered vessels (for brokered vessels) to CHARTERER as a result of a vessel breaking down or becoming inoperative shall be limited to the interruption of charter hire as set forth above, and neither OWNER nor the owners and/or operators of brokered vessels shall be responsible for any resulting consequential or special damages, including, without limitation, loss of profit or loss of use.

Charter hire shall be due during any period in which the vessel is inoperable because of the negligence of CHARTERER or for any cause attributable to CHARTERER or due to the nature of CHARTERER's cargoes attached to, laden upon or carried by the vessel or any barge related to the charter. Charter hire shall be due during any weather downtime, downtime caused by a force majeure or by any cause related to Charterer and its customers.

XI.

During the term hereof, OWNER shall obtain and maintain (for OWNER vessels) and by the owners and/or operators (for brokered vessels) the following insurance:

(i) Hull and Machinery Insurance in the amount set forth in the letter agreement contemplated herein, which is agreed to be the market value of the vessel, on the American Institute Hull Clauses June 2, 1977 Form, or equivalent, including Collision/Towers Liability, with navigation limits adequate for the vessel's trade.

(ii) Protection and Indemnity Insurance covering the liabilities of OWNER (for OWNER vessels) and the owners and/or operators (for brokered vessels) in the amount of $1,000,000.00 on the Ocean P & I Clauses SP 23 Form or equivalent, and including $5,000,000 excess crew coverage, but excluding Cargo Liability and those risks, if any, assumed or insured by CHARTERER in this Charter.

The policies shall include CHARTERER in its capacity as time charterer of the vessel as an additional assured and shall contain a waiver of subrogation in favor of CHARTERER with respect to the operations of OWNER (for OWNER vessels) and the owners and/or operators (for brokered vessels), but such naming and waiving shall apply only to the extent of the risks specifically assumed in this Charter by OWNER (for OWNER vessels) and by the owners and/or operators of brokers vessels (for brokered vessels). The policies shall contain a provision requiring fourteen (14) days notice to CHARTERER from insurers prior to cancellation or substantial modification of such policies. CHARTERER shall be provided proper evidence of such insurance upon its request.

During the term hereof, CHARTERER shall obtain and maintain the following insurance:

(i) Hull and Machinery Insurance in the amount equal to the full replacement value of any barge which CHARTERER requests that the Vessel transport, on the American Institute Hull Clauses June 2, 1977 Form, or

equivalent, including Collision/Towers Liability, with navigation limits adequate for the vessel's trade.

(ii) Protection and Indemnity Insurance covering the liabilities of CHARTERER for all personnel on board the vessel or, any barge which the vessel is to transport, whether employed by CHARTERER or not, in the amount of $1,000,000.00 on the Ocean P & I Clauses SP 23 Form or equivalent, and including $5,000,000 excess crew coverage, but excluding Cargo Liability and those risks, if any, assumed or insured by CHARTERER in this Charter.

(iii) Unless otherwise included in the foregoing, CHARTERER shall provide insurance insuring all persons present on the vessel, any barge which the vessel will transport and any and all persons which may perform any work in connection with this charter, including but not limited to employees, customers and contractors of CHARTERER, from any disease, illness or death resulting or arising or in connection with CHARTERER's organization, including any pollution or contamination, including but not limited to hydrocarbons, or other contaminates arising from CHARTERER's use of the vessel.

(iv) Insurance to fully cover any and all liability (including fines and penalties) to anyone for pollution or contaminants of land, water or air arising from or in connection with CHARTERER's operations in any way related to the vessel or this charter, any barge which the vessel may transport or personnel, including any costs of responses contaminant, or clean up, and/or damage to the environment, including flora and fauna with minimum limits of $10,000,000.00. Any deductible shall be for CHARTERER's account.

The Charterer policies shall include Vessel Indemnitees (as defined below), in any capacity as an additional assured and shall contain a waiver of subrogation in favor of Vessel Indemnitees (as defined below), with respect to the operations of CHARTERER and contractual indemnity coverage. The Charterer policies shall require that all as owner, other than owner or equivalent clauses are deleted as respects the additional assured. The Charterer policies shall contain a provision requiring fourteen (14) days notice to OWNER from insurers prior to cancellation or substantial modification of such policies. OWNER shall be provided proper evidence of such insurance upon its request. OWNER may immediately cease transporting any barge or allowing CHARTERER to place personnel on board the vessel if CHARTERER has not provided proof of insurance. All deductibles shall be for CHARTERER's account. All CHARTERER insurance shall be primary to any insurance of the Vessel Indemnitees (as defined below).

XII.

CHARTERER shall pay or reimburse for all permits, clearance expenses, customs fees, duties (import or otherwise), pilotage fees, agency fees and related costs which result from

CHARTERER's use of the vessel or from the cargo carried for CHARTERER. CHARTERER shall also pay all taxes applicable to CHARTERER or to the operation or use of the vessel, but each party shall be responsible for its own income taxes.

XIII.

In consideration of the charter hire, neither OWNER, the vessels, their owners, bareboat charterers and operators, masters, crews, nor their respective officers, directors, members, employees and underwriters (hereinafter the "Vessel Indemnitees") shall have any liability whatsoever to whomsoever for loss, damage or expense to cargoes and/or equipment attached to, laden upon or carried by the vessel and for loss, damage or expense, pollution or contaminates or remediation thereof to any equipment or property owned or utilized by CHARTERER or its contractors or subcontractors on the project or job involving the vessel(s) chartered hereunder, including barges and cargo thereon, whether on the vessel or in the water, howsoever caused, arising or occurring, whether, in whole or in part, through the negligence of the Vessel Indemnitees, unseaworthiness (pre-existing or not) of the vessels, or otherwise. CHARTERER agrees to release, protect, defend, hold harmless, and indemnify the Vessel Indemnitees from and against any such loss, damage or expense. If CHARTERER causes any such cargo or equipment to be insured, CHARTERER further agrees to cause the Vessel Indemnitees to be named as additional assureds and to obtain insertion in such insurance of a waiver of subrogation against the Vessel Indemnitees.

In furtherance thereof, and notwithstanding anything to the contrary contained elsewhere herein, OWNER shall not be liable to CHARTERER for any consequential, special, incidental, indirect or punitive damages of any kind or character, including, but not limited to, loss of use, loss of profit, loss of anticipated profit, loss of bargain, loss of revenue, loss of product or production, reservoir damage however arising under this contract or as a result of, relating to or in connection with the work hereunder, and no such claim shall be made by any party against the other REGARDLESS OF WHETHER SUCH CLAIM IS BASED OR CLAIMED TO BE BASED ON NEGLIGENCE (INCLUDING SOLE, JOINT, ACTIVE, PASSIVE, CONCURRENT OR GROSS NEGLIGENCE), FAULT, BREACH OF WARRANTY, BREACH OF AGREEMENT, BREACH OF CONTRACT, STATUTE, STRICT LIABILITY OR ANY OTHER THEORY OF LIABILITY.

Whenever CHARTERER has chartered hereunder any vessel which transport barges which will carry or collect any hazardous substances, oil or other chemical, the responsibility for any pollution, injury, death or property damage resulting from the failure to properly load, un-load or store such cargoes upon the vessel or related barge or from pollution emanating from or relating to barge operations shall be and remain solely CHARTERER's, regardless of whether caused in whole or in part by the negligence or other fault of OWNER.

XIV.

In order that all operations contemplated herein can be safely undertaken, especially mooring and anchoring operations, it shall be the obligation of CHARTERER to provide safe berths where the vessel can load and discharge safely afloat, to provide accurate

charts and information for areas in which the vessel may have to anchor, and to provide adequate machinery and equipment to handle the loading and unloading of the vessel.

## XV.

Neither CHARTERER, its subsidiary and affiliated companies, nor their respective officers, directors, members, employees and underwriters (hereinafter "the CHARTERER Indemnitees") shall have any liability for damage to or loss of the vessel or its equipment, or the property or equipment of OWNER or of the owners and/or operators of brokered vessels, or for injury to, illness of or death of the crew of the vessel, employees of OWNER or of the owners and/or operators of brokered vessels, their respective contractors or subcontractors or their respective employees, however said damage, loss, injury, illness or death arises or occurs, whether, in whole or in part, through the negligence of the CHARTERER Indemnitees or otherwise. OWNER (solely with respect to the charter of OWNER vessels) and the owners and/or operators of brokered vessels (solely with respect to the charter of brokered vessels) agrees to release, protect, defend, indemnify and hold harmless the CHARTERER Indemnitees from and against any claim, suit, loss, liability, expense, demand, cost or damage as a result of such loss, damage, injury, illness or death "regardless of whether the damage is caused, in whole or in part, by the negligence of Charterer Indemnitees or the unseaworthiness of any vessel or barge.

The Vessel Indemnitees shall have no liability for injury to, illness of or death of the personnel or employees of CHARTERER, or of CHARTERER's contractors (excluding the Vessel Indemnitees) or subcontractors or their employees, however said injury, illness or death arises or occurs, whether, in whole or in part, through the negligence of the Vessel Indemnitees, unseaworthiness (pre-existing or not) of the vessel or otherwise. CHARTERER shall protect, defend, indemnify and hold harmless the Vessel Indemnitees from and against all claims, suits, losses, liabilities, demands, costs, damages or expense as a result of such illness, injury or death "regardless of whether the damage is caused, in whole or in part, by the negligence of Vessel Indemnitees or the unseaworthiness of any vessel or barge.

Notwithstanding anything to the contrary contained herein, it is expressly agreed by and between the parties hereto that, regardless of the negligence on the part of any party hereto or the unseaworthiness (pre-existing or not) of any vessel, or any charter breach, CHARTERER waives and releases any and all rights against the Vessel Indemnitees, and OWNER and the owners and/or operators of brokered vessels waive and release any and all rights against the CHARTERER Indemnitees, for any punitive, indirect, incidental, special or consequential damages of any kind or nature (including, but not limited to, loss of profits, loss of use, loss of hire or loss of production).

## XVI.

If CHARTERER shall fail to perform any of its duties or obligations or shall violate any of the prohibitions imposed upon it under this Charter, or if CHARTERER shall be dissolved or be adjudged a bankrupt or shall have a petition in bankruptcy filed against it, or shall make a general assignment for the benefit of creditors, or if a receiver shall be appointed for CHARTERER, OWNER (for OWNER vessels) and the owners and/or operators of brokered and

bareboated vessels (for brokered vessels) can give written notice thereof to CHARTERER. If CHARTERER fails to correct the circumstance in question within forty-eight (48) hours of receipt of said written notice, OWNER and the owners and/or operators of brokered vessels may, without prejudice to any other rights or claims which they may have under this Charter, withdraw and retake the vessel, wherever the same may be found, without legal process, and for that purpose may enter upon any premises where the vessel may be and take possession thereof and may bring said vessel to the redelivery point hereinabove provided, at the expense of CHARTERER. If CHARTERER fails to turn over possession and make redelivery, CHARTERER shall indemnify and hold OWNER and brokered vessels' owners and/or operators harmless against all cost and expense incurred by OWNER in obtaining possession and making such redelivery.

XVII.

Charter hire is based upon and determined by existing operating costs as of the date of each individual Charter. Should the term of such Charter extend for longer than one-hundred eighty (180) days and in the event there is an increase in any operating costs, OWNER shall have the right to request an increase in the hire which shall reflect such increased costs. OWNER shall present its request to CHARTERER in writing with proper support attached. If CHARTERER fails to agree to the request within thirty (30) days from date presented, OWNER may cancel such Charter. Any increased charter hire agreed to shall be effective as of the date of OWNER's request.

XVIII.

At CHARTERER's request, food and lodging for any personnel, other than crew members of the vessel will be furnished, at the rates reflected in the letter agreement setting forth the vessel's details of the Charter.

XIX.

All salvage and salvage towage, after payment of out of pocket expenses and awards to the master and crew, shall be divided equally between, on the one hand, CHARTERER and on the other hand, OWNER (for OWNER vessels) or the owners and/or operators of brokered vessels (for brokered vessels).

XX.

This Charter shall not be construed as a personal contract nor shall it deprive CHARTERER, OWNER (for OWNER vessels) or the owners and/or operators of brokered vessels (for brokered vessels), or the vessel, of any right to claim limitation of liability provided by any statute or law of any country having authority or jurisdiction over the vessel. However, no limitation of liability rights shall apply to obligations owed to CHARTERER under this Charter.

## XXI.

Neither CHARTERER, OWNER, nor the owners and/or operators of brokered vessels shall be liable for failure to perform any obligation hereunder (except release, defense, indemnity and payment obligations) in the event and to the extent that such performance is prevented or delayed by Acts of God, perils, dangers or accidents of the navigable waters, fire, explosion, stoppage of labor, strikes, lockouts, riots, civil commotions, differences with employees, laws, regulations, orders, acts of the United States or any State, City, Parish or County, or any other governmental authority, arrest or restraint by princes, rulers or people, but CHARTERER's obligation with respect to payment of the daily charter rate shall continue during the above periods.

## XXII.

This Charter may be terminated by either party on ninety (90) days notice delivered in writing; provided, however, that such cancellation shall not be effective as to any vessel which has been delivered to CHARTERER under the terms hereof until the Charter terms stipulated in such vessel's letter agreement has expired and such vessel is redelivered.

Notwithstanding the above, if the vessel suffers actual or constructive total loss, this Charter shall terminate immediately upon such loss, with no rights to further compensation except those sums due or accrued at the time of such loss. If the exact time of loss should be unknown, hire shall be payable only until the time of last communication from or last sighting of the vessel before loss.

## XXIII.

This Charter and the letter agreement contemplated herein (Exhibit "A"), including any attachments incorporated therein by reference, shall constitute the entire agreement between the parties for the charter of vessels by OWNER (on its own behalf for OWNER vessels or as broker for the owners and/or operators of brokered vessels) to CHARTERER in the absence of a separate time charter on a specific vessel. No changes, amendments, or variations of the terms and conditions shall be valid or binding on the parties hereto in any respect unless made in writing and signed by both parties hereto.

## XXIV.

It is agreed that the terms and provisions of this Charter shall be applicable separately to each and every vessel which OWNER (on its own behalf or as broker) charters to CHARTERER. Further, this Charter shall be subject to all applicable laws, orders, rules, regulations, and requirements of any State or Federal Government or any agency thereof.

## XXV.

Subject to obtaining the prior written approval of the other party, which approval shall not be unreasonably withheld, either party may assign this Charter. The assigning party shall have no liability to the other party to the Time Charter for the obligations and liabilities incurred by the assignee of the Time Charter after the effective date of the assignment.

## XXVI.

This Charter shall be construed in accordance with the admiralty and maritime laws of the United States of America.

## XXVII.

The provisions of this Charter are separable and severable. If any provision, item or application of this Charter shall be deemed invalid in whole or in part, such invalidity shall not affect other provisions, items or applications of this Charter which can be given effect without the invalid provision, item or application.

## XXVIII.

OWNER's address for sending notices under this Charter is 4428 Hwy 56 Chauvin, Louisiana 70344, and CHARTERER's address for sending notices under this Charter is 2108 Denley Rd. Houma, LA 70363. Any notices provided for herein shall be deemed to have been given at the time of mailing when sent by mail addressed to the recipient at the address hereinabove stated.

IN WITNESS WHEREOF, the parties hereto have caused this Charter to be executed by their duly authorized representatives in duplicate originals as of the date first above written.

WITNESSES:                                    CHARTERER:

_____             By: _____

_____             Its: _____

                                                    OWNER:

_____             By: _____

_____             Its: _____

Exhibit "A"

Company Name: <u>Lawson Environmental Services, LLC</u>
Address:          <u>2108 Denley Rd.</u>

          <u>Houma, LA 70363</u>

          _____

Attn:          <u>Cecil Lawson</u>

Re: Time Charter of M/V ____<u>Dustin D</u>_____

To Whom It May Concern:

        Pursuant to the terms and conditions of that certain Master Time Charter dated
_____<u>7/12/10</u>_____, entered into by and between Lyle Properties, L.L.C. and
<u>Lawson Environmental Services, LLC</u> ; this letter sets forth our understanding and agreement
that the:

*M/V* __<u>*Dustin D*</u>____ , Official Number ____<u>641293</u>_____ , has been time chartered subject to the
following:

1. Date of delivery, on or *about:* ___<u>*7/12/10*</u>___ *hours on* __<u>*1400*</u>__
2. Location of delivery: _____<u>**Pointe Aux Chene, Louisiana**</u>_____
           **or as mutually agreed upon**
3. Location of redelivery: _____<u>*Pointe Aux Chene, Louisiana*</u>_____ **or as**
           **mutually agreed upon**
4. Area of operations/navigation limits: _____<u>*Louisiana Gulf Coast*</u>_____
5. Term of charter: *From* _____<u>*7/12/10* to *1/12/11*</u>_____
6. Cancellation of charter with minimum ninety (90) days written notice by either party prior to
   the expiration of the term as specified in line 5.
7. Daily charter rate: <u>*$ 4800.00 per day*</u>
8. Party responsible for diesel fuel and related taxes:_<u>*Lawson Environmental Services, LLC*</u>
9. Party responsible for lube and related taxes: _____<u>*Lawson Environmental Services, LLC*</u>
10. Compensable downtime per calendar month: __<u>*0 hours*</u>__
11. Compensable downtime accumulable? Yes: ___ or No:_<u>x</u>__ *(Max 108 hrs.)*
12. Insured value of vessel: <u>*$ 750,000*</u>
13. Special Provisions: _____

_____

Please date and sign the duplicate copy of this letter in acceptance of the foregoing and return it to
us.

        Sincerely,

        Lyle Properties, L.L.C.

        By:_____

        Its:_____

Agreed and Accepted this <u>12</u><sup>th</sup> day of July, 2010

By:

# Master Service Contract

between

# BP Exploration & Production Inc.

and

# Lawson Environmental Service, LLC

## BP Oil Spill Response Project
## MC252

## Contract No. HOU-WL4- 3356

NOTICE: THIS CONTRACT CONTAINS INDEMNIFICATION, RELEASE, ASSUMPTION OF LIABILITY, AND HOLD HARMLESS PROVISIONS, SOME OF WHICH ARE IN ARTICLE 14 AND THE REMAINDER ARE FOUND THROUGHOUT THE CONTRACT.

Rev 3 approved by FC 6-4-08
File  C:\Documents And Settings\Gozah\Desktop\Contractors\Open Week\glLawson Environmental Service\Lawson Environmental Service LLC-MSC No. HOU-WL4-3356.Doc



EXHIBIT

A

# MASTER SERVICE CONTRACT

## TABLE OF CONTENTS

| Article | | Page No. |
|---|---|---|
| 1: | CONTRACT DOCUMENTS AND INTERPRETATION | 1 |
| 2: | DEFINITIONS | 2 |
| 3: | SCOPE OF WORK | 4 |
| 4: | TERM | 4 |
| 5: | PERFORMANCE | 4 |
| 6: | WARRANTY OF WORK AND EQUIPMENT | 4 |
| 7: | INDEPENDENT CONTRACTOR AND LOUISIANA STATUTORY EMPLOYEE | 5 |
| 8: | CONTRACTOR'S OBLIGATIONS AND ACCESS TO WORK SITE | 5 |
| 9: | COMPENSATION AND PAYMENT | 6 |
| 10: | TAXES, LIENS, AND CHARGES | 7 |
| 11: | CONFLICTS OF INTEREST | 7 |
| 12: | CONFIDENTIALITY | 7 |
| 13: | NOTICES | 8 |
| 14: | INDEMNITY | 9 |
| 15: | INSURANCE | 13 |
| 16: | FORCE MAJEURE | 16 |
| 17: | ASSIGNMENT OR SUBCONTRACT | 17 |
| 18: | DEFAULT AND INSOLVENCY | 17 |
| 19: | TERMINATION | 18 |
| 20: | COMPLIANCE WITH LAWS | 18 |
| 21: | HEALTH, SAFETY, SECURITY, AND ENVIRONMENTAL REQUIREMENTS | 20 |
| 22: | OWNERSHIP OF DEVELOPED INFORMATION AND INDEMNIFICATION | 20 |
| 23: | AUDIT | 21 |
| 24: | APPLICABLE LAW AND RESOLUTION OF DISPUTES | 21 |
| 25: | SURVIVAL, SEVERABILITY, AND WAIVER | 22 |
| 26: | THIRD PARTY BENEFICIARIES | 22 |
| 27: | CODE OF CONDUCT | 23 |
| 28: | ENTIRE CONTRACT, AMENDMENT | 23 |

Exhibit "A" – Work Release Form
Exhibit "B" – Change Order Form
Exhibit "C" – Compensation Schedule
Exhibit "D" – Health, Safety, Security, and Environmental Requirements
Exhibit "E" – Substance Abuse Policy

Table of Contents
Page i of i
Rev 3 approved by FC 1-1-08
Title C:\Documents And Settings\Gacnab\Desktop\Contractors\Open Working\Lawson Environmental Services\Lawson Environmental Service LLC-MSC No HOU-WL4-3356.Doc

Contract No.HOU-WL4-3356

# MASTER SERVICE CONTRACT

BETWEEN

## BP EXPLORATION & PRODUCTION INC.

AND

### LAWSON ENVIRONMENTAL SERVICE, LLC

THIS CONTRACT is made this 11th day of July 2010 (the Effective Date) by and between BP EXPLORATION & PRODUCTION INC. ( hereinafter referred to as "Company"), having an office at 501 WestLake Park Boulevard, Houston, Texas 77079, and LAWSON ENVIRONMENTAL SERVICE, LLC, (hereinafter referred to as "Contractor"), having an office at 2108 Denley Rd., Houma, LA 70363. The entity under this Contract acting as Company shall be determined by the ownership interest in the respective assets which are the subject of the services under this Contract at any given time; provided, however, in the event that no services are in progress, or other issues of Contract arise which do not pertain to one or the other entity, then both entities of Company shall act as Company. Company and Contractor may hereinafter be referred to collectively as "Parties" or individually as a "Party." In consideration of the covenants and provisions hereinafter provided, the Parties agree as follows:

## ARTICLE 1: CONTRACT DOCUMENTS AND INTERPRETATION

1.01    The following Contract documents together constitute this Contract:

Articles 1 to 28, inclusive
Exhibit "A" – Work Release Form
Exhibit "B" – Change Order Form
Exhibit "C" – Compensation Schedule
Exhibit "D" – Health, Safety, Security, and Environmental Requirements
Exhibit "E" – Substance Abuse Policy

1.02    Exhibits "A" to "E" inclusive are incorporated herein by reference and Contractor agrees to comply with all the provisions thereof.

1.03    Each Article in this Contract contains provisions that are sometimes referred to as a Section(s) of an Article(s). Unless the context otherwise requires, a general reference to any Article includes the entire Article and a reference to any specific Section(s) of an Article refers to the identified Section(s).

1.04    In the event of any conflict, inconsistency, or ambiguity between the Articles of this Contract and any of the Exhibits referred to above, the Articles shall prevail.

1.05    In the event of any conflict, inconsistency, or ambiguity among any of the Exhibits that are part of this Contract, they shall prevail in the order listed above except that in the event of a conflict between a Work Release and a Change Order to that Work Release, the Change Order shall prevail.

1.06    Reference to any statute, statutory provision, or statutory instrument includes a reference to that statute, statutory provision, or statutory instrument as from time to time amended, extended, or re-enacted.

1.07    Reference to the singular includes a reference to the plural and vice versa and reference to one gender includes a reference to the other gender.

1.08    Headings are used for convenience only and will not affect the construction or validity of this Contract.

1.09    The Parties agree that each has had the opportunity to review the terms and provisions of this Contract with counsel of their choosing and to request any desired changes or clarifications and that the terms of this Contract will not be interpreted against one Party or the other on the ground that such Party drafted or revised a

particular provision. Instead, in the event of any ambiguity, this Contract will be interpreted in accordance with the intent of the Parties as evidenced by the Contract taken as a whole.

1.10     The Parties agree that upon the Effective Date any pre-existing written master service agreement(s) between them that covers work or services that are of a nature that could be covered under this Contract is terminated, except with respect to work or services then in progress under such agreement.

## ARTICLE 2: DEFINITIONS

In this Contract, the words and phrases shall have the meanings ascribed below or as defined separately in the individual Articles of this Contract.

2.01     "Affiliate or Affiliates" of a company shall mean a current or future Person directly or indirectly controlling, controlled by, or under common control with such company. "Control" for this purpose shall, in the case of a corporation with outstanding voting stock, require the direct or indirect ownership of or power to vote with respect to outstanding shares of a corporation's capital stock constituting fifty percent (50%) or more of the votes of any class of such corporation's outstanding voting stock, and with respect to any Person other than a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of such person's management or policies.

2.02     "Change Order" shall have the meaning set out in Section 3.02.

2.03     "Claim/Loss" and "Claims/Losses" shall mean all claims and losses of all kinds and descriptions concerning bodily injury, personal injury, illness, death, and property damage including claims and/or losses for the above regardless of how such claims and/or losses may be characterized. Included, without limitation, are damages of all kinds and descriptions, liabilities, liens, privileges, and other encumbrances, causes of action (including actions in rem or in personam, at law or in equity) obligations, judgments, interest, costs, expenses, and awards whether created by law, contract, tort, arbitration, voluntary settlement (to the extent authorized by the Indemnitor), or otherwise, and shall, except as otherwise expressly provided, include claims based on contractual indemnity.

2.04     "Company" shall refer to either BP America Production Company or BP Exploration and Production Inc., or both, as determined in the preamble to this Contract.

2.05     "Company Group" shall mean the following Persons individually and collectively: Company and its Affiliates, its and their co-venturers, co-owners, co-lessees, co-working interest owners, joint venturers, partners, and all of their Affiliates, and the officers, directors, shareholders, employees, agents, and representatives of all those entities. Company Group does not include any Person who is a member of Contractor Group.

2.06     "Connected With" shall have the meaning set out in Section 14.01.

2.07     "Contract" shall have the meaning set out in Article 1 hereof.

2.08     "Contractor" shall refer to the Party designated in the preamble to this Contract.

2.09     "Contractor Group" shall mean the following Persons individually and collectively: Contractor and its Affiliates, its subcontractors and their Affiliates, and the officers, directors, shareholders, employees, agents, and representatives of all of those entities. Contractor Group does not include any Person who is a member of Company Group.

2.10     "Contractor's Property" shall mean all materials, supplies, equipment, or other property, real or personal, that is owned, leased, rented, chartered, or operated by Contractor Group in connection with the performance of the Contract.

2.11     "Creative Material(s)" shall have the meaning set forth in Section 22.02.

2.12 "Day or Days" shall mean calendar day or days.

2.13 "Defend" or "Defense" shall have the meaning set forth in Section 14.01.

2.14 "Developed Information" shall have the meaning set forth in Section 22.01.

2.15 "Existing Property" shall include all machinery, structures, equipment, risers, pipelines, wells, manifolds, wellheads, and other tangible property owned by Company Group that is located at, on, or adjacent to the Work Site(s) (including without limitation all property of Company Group identified in the applicable Work Release). The term "Existing Property" shall not be deemed or interpreted to include any of Contractor's Property.

2.16 "Effective Date" shall refer to the date set forth in the preamble of this Contract.

2.17 "Force Majeure" shall mean any event beyond the reasonable control of the Party claiming to be affected thereby including without limitation acts of God, storms named by the National Weather Service, war, fire, flood, nation or industry wide strikes, acts of the public enemy, terrorism, insurrections, riots, or rules or regulations of any governmental authority asserting jurisdiction or control, compliance with which makes continuance of the Work impossible. Notwithstanding the foregoing, Force Majeure shall not include events contributed to by the Negligence/Fault or gross negligence or willful misconduct on the part of the Party claiming Force Majeure nor shall Force Majeure include effects that could have been avoided or mitigated by the exercise of reasonable care on the part of the Party claiming Force Majeure. Inability of either Party to secure funds shall not be regarded as Force Majeure.

2.18 "Indemnify" or "Indemnification" shall have the meaning set forth in Section 14.01.

2.19 "Indemnitee" shall have the meaning set forth in Section 14.01.

2.20 "Indemnitor" shall have the meaning set forth in Section 14.01.

2.21 "Negligence/Fault" shall have the meaning set out in Section 14.01.

2.22 "Party" or "Parties" shall have the meaning set out in the preamble to this Contract.

2.23 "Person" or "Persons" shall include any natural person(s) as well as any legal entity including without limitation either Party or any member of Company Group or Contractor Group.

2.24 The term "subcontractor" or "subcontractors" when used in connection with Contractor shall include any subcontractor of any tier hired by Contractor to perform any services or furnish any materials or equipment at, on, or adjacent to, or in transit to or from, the Work Site, provided such services or materials or equipment are part of the Work to be performed by Contractor.

2.25 "Taxes" shall mean all applicable taxes, including all (federal, state, and local) ad valorem, income or net worth, property, occupation, payroll, employment, first use, gross receipts, privilege, sales, use, consumption, excise, and other governmental charges, duties, tariffs, levies, licenses, fees, permits, and assessments.

2.26 "Term" shall have the meaning set forth in Article 4.

2.27 "Third Party or Third Parties" shall mean any Persons not included in Company Group or Contractor Group.

2.28 "Work" shall mean the services furnished by Contractor to Company, and/or the furnishing of equipment, supplies, products, labor, or materials to Company by Contractor, pursuant to this Contract.

2.29 "Work Product(s)" shall refer to the site, equipment, supplies, products, etc., that are the tangible manifestation or object of the Work, including without limitation, Developed Information.

2.30 **"Work Site(s)"** shall mean the production facilities, well site(s), or other location(s) where Company requests Contractor to perform Work, and shall include, if applicable, without limitation, the facilities or location(s) of Contractor or its subcontractors or the facilities or location(s) of Company or any other contractor of Company.

2.31 **"Work Release"** shall refer to the request by Company for Contractor to perform Work, usually in the form attached as Exhibit "A," as more particularly described in Article 3. Company may issue purchase orders from Company's purchase to pay (P2P) system in lieu of Work Releases; in such cases P2P purchase order shall be substituted for all references to Work Release within this Contract.

## ARTICLE 3: SCOPE OF WORK

3.01 Company proposes from time to time to request from Contractor certain Work, as more specifically defined in each Work Release. It is agreed and understood that Company is not obligated to request Work hereunder, and that Contractor is not obligated to accept any Work Release issued by Company hereunder; however, Company and Contractor agree that the following general provisions shall at all times apply to and control all Work that may be conducted or carried out by Contractor for Company under any Work Release until such Work Release is canceled pursuant to Article 18 or Article 19 hereof. With respect to Work performed under this Contract, the Compensation Schedule set forth as Exhibit "C" shall apply. Any services performed by Contractor for Company that are not governed by another written master service agreement shall be considered as Work performed under this Contract irrespective of whether a written Work Release has been executed. In such instance, a reference in this Contract to a "Work Release" shall include Work being performed under an oral agreement.

3.02 From time to time Company's representative(s) may clarify, modify, expand, or reduce the Work by a written Change Order in the form of Exhibit "B" or a P2P purchase order change order. Contractor shall comply with directions in such Change Orders, provided that Contractor shall not be required to perform Work which is beyond the general scope of Work described in the Work Release.

## ARTICLE 4: TERM

4.01 Subject to Article 18 and Article 19, the term of this Contract shall be for an initial period of one (1) year, commencing on the Effective Date and, after such initial period, until terminated by either Party upon thirty (30) Days' written notice. Notwithstanding any termination date, the terms and conditions herein shall govern until any Work in progress is completed or otherwise terminated

## ARTICLE 5: PERFORMANCE

5.01 Contractor shall perform the Work in a diligent, skillful, safe, and workmanlike manner, and in accordance with good industry standards to prompt completion, subject to all of the terms and conditions of this Contract. Contractor shall use its best efforts to achieve the specified results on or before the date specified in each accepted Work Release; provided however, that if Company requests changes to the Work that affect the completion schedule, the Parties shall mutually agree upon an amended completion date to reflect such changes in Work in accordance with a Change Order issued pursuant to Section 3.02.

## ARTICLE 6: WARRANTY OF WORK AND EQUIPMENT

6.01 Contractor warrants that: (i) it is experienced and fully qualified to perform the Work; (ii) all Work will be performed safely and in a good and workmanlike manner and in full compliance with all applicable federal, state, and local laws, regulations, and standards; (iii) it has adequate equipment in good working order and fully trained personnel capable of efficiently and safely operating such equipment and performing Work for Company; (iv) it regularly conducts thorough training and implements safety programs applicable to the type of work performed; (v) all materials, equipment, goods, supplies, or manufactured articles furnished by Contractor in the performance of Work will be free from any defects and will be suitable for their intended purpose; (vi) the Work Product will be free from defects and will perform in accordance with the requirements of the applicable Work Release and this Contract; and (vii) Contractor, in conducting the Work, shall not employ any person whose employment would violate applicable labor laws

- 4 -

Rev 3 approved by FC 6-1-08
Title: C:\Documents And Settings\Gonzalo\Desktop\Contractors\Open Working\Lawson Environmental Services\Lawson Environmental Service LLC-MST No HOU-WL4-3356 Doc

6.02 Contractor further warrants that all Work performed by it hereunder will be performed in accordance with the most stringent environmental and safety regulations and by employing all necessary precautions and procedures and protective equipment and devices. Any breach of the obligations set forth in this Article shall constitute a default by Contractor of its obligations hereunder and will entitle Company to terminate the applicable Work Release or this Contract pursuant to the provisions of Article 18. Without limiting Company's remedies, Contractor agrees that any portion of the Work found to be defective or unsuitable for its intended use shall be corrected, or removed and replaced, without additional cost or risk to Company, or at Company's option, Company may correct or repair and replace the same and charge Contractor for the costs thereof. Except as provided in Article 14, Contractor agrees to Indemnify Company Group from any Claims/Losses Connected With any breach of the warranties provided for in this Article.

## ARTICLE 7: INDEPENDENT CONTRACTOR AND LOUISIANA STATUTORY EMPLOYEE

7.01 In the performance of the Work, Contractor is an independent contractor, shall control the performance of the details of the Work, and shall be responsible for the results as well as responsible for ensuring that the performance of the Work is conducted in a manner consistent with appropriate safety, health, and environmental considerations, including, but not limited to, Company's policies thereon. The Work as specified in any Work Release may be supplemented by instructions from Company's representative(s), and Company reserves the rights of observation and inspection to secure satisfactory completion of Work

7.02 The presence of and the observation and inspection by Company's representative(s) at the Work Site will not relieve Contractor from Contractor's obligations and responsibilities under this Contract. Neither Contractor, nor Contractor's employees, agents, representatives, or subcontractors, shall have authority to commit Company or any member of Company Group to any binding legal obligation nor shall any of them be deemed for any purpose to be agents, servants, or representatives of Company Group in the performance of the Work. Company shall have no direction or control of the members of Contractor Group and is interested only in the results obtained. Nothing contained in this Contract will be construed to be inconsistent with such independent contractor relationship

7.03 In all cases where Contractor's Employees (which for purposes of this Section 7.03, and only as between Contractor and Company Group, are defined to include Contractor's and its subcontractors' direct, borrowed, special, or statutory employees) are performing work in or offshore the State of Louisiana or are otherwise covered by the Louisiana Workers' Compensation Act, La. R.S. 23:1021 et seq., Company and Contractor agree that the Work performed by Contractor and Contractor's Employees pursuant to this Contract is an integral part of and are essential to the ability of Company to generate Company's goods, products, and services for the purpose of La. R.S. 23:1061 (A) (1). Furthermore, Company and Contractor agree that Company is the statutory employer of Contractor's Employees for purposes of La. R.S. 23:1061 (A) (3) and that Company shall be entitled to the protections afforded a statutory employer under Louisiana law. Irrespective of Company's status as the actual or alleged statutory or special employer (as defined in La. R.S. 23:1031 (C)) of any of Contractor's Employees, Contractor, as between Contractor and Company Group, shall remain primarily responsible for the payment of all workers' compensation and medical benefits to Contractor's Employees, and shall not be entitled to seek contribution for any such payments from Company or any other member of Company Group, and Contractor further agrees that it will Indemnify Company Group from and against any such payments and that Contractor will Indemnify Company Group from and against any and all Claims/Losses relating to or asserted by Contractor's Employees even if any such Contractor's Employee is also held to be an employee (whether a statutory, special or borrowed employee, or otherwise) of Company or any other member of Company Group and, as set forth in Article 14, regardless of any Negligence/Fault of Company Group.

## ARTICLE 8: CONTRACTOR'S OBLIGATIONS AND ACCESS TO WORK SITE

8.01 In the performance of the Work hereunder Contractor shall furnish at its own expense, cost, and discretion any and all necessary labor, personal protective equipment, machinery, equipment, tools, transportation, and whatever else is necessary in the performance and completion of the Work, except for such items as

Company specifically agrees, in writing, to furnish. At no additional cost to Company, Contractor shall replace any of its personnel whose presence is regarded by Company as detrimental to Company's operations at the Work Site.

8.02    If, in order to gain access to or return from the Work Site to be serviced, it is necessary to repair roadbeds, or to provide tractors, vessels, or other special means of transportation for the trucks, equipment, or personnel of Contractor, such shall be arranged and paid for by Company.

### ARTICLE 9: COMPENSATION AND PAYMENT

9.01    Contractor shall be paid, in full and complete satisfaction of all sums owed with respect to the Work, the amounts specified in Exhibit "C," provided, however, that Contractor shall not receive more than the Not To Exceed sum stated in each Work Release, unless the Parties mutually agree in writing to a greater sum by a duly executed Change Order. Unless otherwise agreed to in writing by Company, the rates established in Exhibit "C" shall be fixed for the duration of this Contract. Notwithstanding the provisions set forth in Exhibit "C," Company reserves the right to request at any time from Contractor additional proposals for the types of services contemplated hereunder, and to request proposals and to award contracts for such services to other contractors.

9.02    Compensation shall be in accordance with the attached Exhibit "C" — Compensation Schedule, and Contractor shall invoice Company in accordance with said Exhibit "C." Contractor shall make no changes to the attached Exhibit "C" without a duly authorized and executed Contract amendment, Work Release, or Change Order from Company approving said changes. No other documents revising Exhibit "C" will be acceptable. Only Company personnel, such as the responsible Supply Chain Specialist, Supply Chain Team Leader, Supply Chain Manager, or Supply Chain Director, with appropriate Delegation of Authority may authorize such changes to Exhibit "C." Contractor shall not invoice Company for any service, material, or equipment unless said service, material, or equipment has been appropriately documented as specified above. Company retains the right to reject any invoice that contains rates, prices, fees, charges, or surcharges that have not been appropriately approved, authorized, and documented by Company as specified above.

9.03    Contractor shall submit a documented and itemized invoice each month to Company covering the total for reimbursable costs and Work performed during the preceding month, as confirmed by Company's representative, all in accordance with the Exhibit "C," Compensation Schedule. Contractor shall identify each invoice with the Company name (as indicated on the Work Release) Paykey number to be supplied by the Company's representative, Contract Number (type contract number), Work Release Number (as indicated on the Work Release), and Project Identification (if applicable). Within thirty (30) Days after the receipt by Company of Contractor's invoice, Company shall pay Contractor, but only if Contractor has complied with all provisions of this Contract. Contractor shall mail the invoice to the following address or to such other address as may be formally advised in writing to Contractor:

Mailing Address:

BP Exploration & Production Inc.
Attention: Scanning Dept. S646
Paykey No. *(as indicated on Work Release)*
P. O. Box 22024
Tulsa, OK 74121-2024

FedEx/UPS Address:

BP Exploration & Production Inc.
Attention: Scanning Dept. S646
Paykey No. *(as indicated on Work Release)*
509 South Boston Avenue
Tulsa, OK 74103-4605

Contract No. HOU-WL4-3356

Rev 3 approved by FC 6-1-08
File: C:\Documents And Settings\Gaczak\Desktop\Contractors\Open Working\Lawson Environmental Services\Lawson Environmental Service LLC MSC No. HOU-WL4-3356.Doc

9.04    In the event Company disputes one or more items in an invoice, Company shall notify Contractor in writing of the item or items under dispute and the reasons therefor. Company shall have the right to withhold payment of the disputed items only, and payment as to the remainder will be made as provided herein; provided, however, that payment of any amount, including any disputed amount, by Company will not waive Company's right subsequently to contest the correctness of the amount and seek reimbursement from Contractor.

9.05    Other than as provided in Article 23, invoices received later than six (6) months after acceptance of the Work covered by a Work Release will be deemed invalid and Company will have no obligation or liability to pay same.

9.06    Contractor warrants that pricing, discounts, and terms for all Services, Work, and/or Materials under this Contract are equivalent to or less than those for comparable Contractor offerings to any other company. If, during the term of the Contract, Contractor provides more favorable terms for said offerings to another such company, the Contract shall be deemed to be amended, automatically and without any act required of any Party, to provide the same terms to Company. Contractor further warrants that the prices charged hereunder are in compliance with all applicable government laws, rules, and regulations.

## ARTICLE 10: TAXES, LIENS, AND CHARGES

10.01    Contractor agrees to pay its subcontractors and discharge all valid Taxes, liens, claims, charges, or other impositions imposed and to be imposed by law on Contractor Connected With the Work performed hereunder. **Contractor agrees to Indemnify Company Group from all Claims/Losses resulting from any failure of Contractor to comply with such obligations.** Prior to or upon the completion of any Work done pursuant to a particular Work Release, Company shall have the right to request, and Contractor shall furnish, proof satisfactory to Company that any such payments, Taxes, liens, claims, charges, or impositions are satisfied or discharged. Otherwise, Company shall have the right to withhold payment up to the amount of any such payments, Taxes, liens, claims, charges, or impositions until such have been paid. In addition, if any such obligations have not been satisfied in a timely manner, Company may pay or satisfy such amounts, in whole or in part, and deduct any such amount from amounts due Contractor.

## ARTICLE 11: CONFLICTS OF INTEREST

11.01    Contractor warrants that neither it nor any other Person in the Contractor Group has: (i) given any commissions, payments, gifts of substantial value, kickbacks, lavish or extensive entertainment, or other things of value to any officer, director, employee, agent, or representative of Company, or any family member thereof, or received same from any vendor, supplier, or contractor in connection with this Contract; or (ii) paid any fee, commission, rebate, or anything of value to or for the benefit of any governmental official having jurisdiction over the Work Site. Contractor acknowledges that the giving or receiving of any such payments, gifts, kickbacks, extensive entertainment, or anything of value is strictly in violation of Company's corporate policy and may result in the cancellation of this Contract and other contracts. Contractor shall notify Company's security department of any such solicitation as aforesaid. Contractor's compliance with the provisions of this Article 11 is subject to audit by Company under the provisions of Article 23 hereof.

## ARTICLE 12: CONFIDENTIALITY

12.01    Contractor agrees that Developed Information (as defined in Section 22.01) and any other technical or business information (hereinafter "Company Confidential Information") that is disclosed to Contractor or its subcontractors in connection with any Work hereunder by Company Group or Company's other contractors, either orally or in writing, is to be treated as confidential and proprietary. Contractor agrees that Company Confidential Information will be maintained in strict confidence and not used or disclosed to Third Parties other than in performing Work for Company. The requirement to maintain information in strict confidence, however, shall not apply to Company Confidential Information that: (i) is or becomes generally available to the public through no wrongful act of Contractor; (ii) was in the possession of Contractor prior to the time it

Rev. 3 approved by TC 6-1-28
File: C:\Documents And Settings\Gonzali\Desktop\Contractors\Open Working\Lawson Environmental Services\Lawson Environmental Service LLC-MSC No. HOU-WL4-3356.Doc

– 7 –

Contract No. HOU-WL4-3356

was acquired hereunder and was not acquired, directly or indirectly, from Company or its Affiliates or from others under an obligation of confidentiality; (iii) is independently made available as a matter of right to Contractor by a Third Party without obligations of confidentiality, provided that such Third Party did not acquire such information directly or indirectly from Company or its Affiliates; or (iv) is required by law to be divulged, provided that Contractor must notify Company prior to any disclosure, and must assist Company in minimizing the extent of disclosure.

12.02    Contractor acknowledges and agrees that Company, in its sole discretion, may deliver and/or store Company Confidential Information in digital form on the Internet, extranets and/or through public networks and service providers. Such digital information will be stored on internal or external computers and accessed from public telecommunications networks, and will be accessible by a controlled group of Persons (the "Controlled Group"). Contractor agrees that the delivery and storage of such Company Confidential Information in this manner must not be deemed as making the information generally available to the public, even if such Company Confidential Information is accessed by Persons who are not within the Controlled Group.

12.03    Contractor must not disclose Company Confidential Information to any Third Party or use it or any part thereof except in the performance of the Work. Contractor agrees to limit access to Company Confidential Information to its employees, agents, representatives, and subcontractors who reasonably require such access for purposes of this Contract. Contractor agrees to use its best efforts in requiring that its employees, agents, representatives, and subcontractors maintain Company Confidential Information in strict confidence. Contractor must not make nor permit the making of any copies, abstracts, derivatives, or summaries of any Company Confidential Information, except in the performance of the Work. Upon completion of Work for Company, or at Company's request, Contractor must return all Company Confidential Information (including, but not limited to, all copies, abstracts, derivatives, and summaries).

12.04    No press release or other public announcement or public disclosure having or containing any reference, either directly or by implication, to this Contract or the transactions herein contemplated, or to Company or any other Persons of Company Group, will be made or used by Contractor or on its behalf, unless the same has been approved in writing by an authorized officer of Company. This prohibition specifically includes, but is not limited to, any public release (either through print or broadcast news media), any articles prepared for internal or external publication, technical papers, and discussions with journalists or other Third Parties.

### ARTICLE 13: NOTICES

13.01    All notices to be given under this Contract shall be in writing and shall be delivered by (i) hand, (ii) registered or certified mail, or (iii) facsimile (provided there is confirmation of receipt of complete transmission), to the following address and to the attention of the person or job title below:

Company:

BP Exploration & Production Inc.
501 WestLake Park Boulevard
Houston, Texas 77079
Attention:  PSCM Manager
            Mail Code:  2039 WL4
            Telephone:  281-366-2241
            Fax:        281-366-7130

Rev 5 approved by PC 8-1-08
File: C:\Documents And Settings\Gazuh\Desktop\Contractors\Open Working\Lawson Environmental Services\Lawson Environmental Service LLC-MSC No. HOU-WL4-3356.Doc

Contractor:

Lawson Environmental Service, LLC
2108 Denley Rd.
Houma, LA 70363
Attention: Mr. cecil Lawson
    Telephone: (985) 876-0402
    Cell:     (504) 570-3172
    Fax:     (985) 876-0270

13.02    Notices delivered personally shall be effective when delivered. Notices sent by facsimile shall be effective on the first business Day following the date of complete transmission. Notices sent by registered or certified mail shall be effective when received.

## ARTICLE 14: INDEMNITY

14.01    **Special Definitions:** Except as provided below, when used in this Article or elsewhere in this Contract, all terms shall have the meanings set forth in Article 2 (Definitions), with specific reference to the definitions of Affiliate, Claims/Losses, Company Group, Contractor Group, Existing Property, Contractor's Property, Party, Person, and Work.

    14.01.01    "Indemnify" or "Indemnification" shall be deemed to include and stand for the following phrase: "release, protect, Defend, indemnify and hold harmless." For avoidance of doubt, if gross negligence or willful misconduct is alleged along with Negligence/Fault, the term "Indemnify" or "Indemnification" includes the duty to provide a full Defense even though gross negligence or willful misconduct are alleged and even though the Indemnitor is not obligated to pay any portion of an award of damages allocated to the Indemnitee's gross negligence or willful misconduct.

    14.01.02    "Indemnitor" shall refer to the Party against whom indemnity (or release) is sought under this Contract.

    14.01.03    "Indemnitee" shall refer to the Person seeking indemnity (or release) under this Contract.

    14.01.04    "Connected With" shall be deemed to include and stand for "directly or indirectly arising out of, resulting from, or in any way connected with or related to." For avoidance of doubt, the indemnities in this Contract are intended to be broad and cover all Claims/Losses in any way connected to the performance of the Contract or any Work Release, including any Claims/Losses associated with any presence on any premises, including any Claims/Losses associated with any ingress, egress, loading, or unloading, and transportation to and from the Work Site.

    14.01.05    "Defend" or "Defense" shall include the obligation to pay reasonable attorneys' fees, court costs, expert fees, and other reasonable costs incurred by the Indemnitor or the Indemnitee as a result of defending against a Claim/Loss as required by this Contract, or, at the election and cost of the obligor, the obligation to select and engage competent attorneys and experts to defend against a Claim/Loss as required by this Contract and Section 14.09.02.

    14.01.06    "Negligence/Fault" shall, except to the extent expressly otherwise provided, include negligence, strict liability, other premises liability, unseaworthiness, unairworthiness, liability for defective equipment, and breach of statutory duty, whether or not resulting from preexisting conditions, and, except to the extent expressly otherwise provided, whether or not such Negligence/Fault is sole, concurrent, joint, comparative, active, or passive.

14.01.07    The phrases "even if caused by the Negligence/Fault" or "even if contributed to by the joint or concurrent Negligence/Fault" shall, except to the extent expressly otherwise provided, mean that the Parties intend for the indemnity and other obligations to apply whether or not the Claims/Losses are contributed to by, occasioned by, or are the result of the Negligence/Fault of the Indemnitee or any other Person, and that, except to the extent expressly otherwise provided, the Parties intend for the indemnity and other obligations to apply;

     (i)    without regard to any conflicting rules of liability under any applicable law or regulation,

     (ii)    without regard to any successful limitation or exoneration of liability proceeding filed by or on behalf of the indemnifying Party pursuant to the laws of any state or country or the provisions of any international convention, and

     (iii)    without regard to whether the Claims/Losses in question are sought directly or indirectly by way of recovery, tort or contractual indemnification, or contribution by a Person against the Indemnitee.

It is expressly provided, however, that the phrases "even if caused by the Negligence/Fault" or "even if contributed to by the joint or concurrent Negligence/Fault" shall not apply to or include the gross negligence or willful misconduct of any Indemnitee.

14.02    **Contractor's General Indemnity Obligations:** Contractor shall Indemnify Company Group from and against all Claims/Losses for the following when Connected With this Contract:

   14.02.01    (i)    all injuries to, deaths, or illnesses of persons in Contractor Group, and

           (ii)    all damages to or losses of any of Contractor's Property,

          even if caused by the Negligence/Fault of Company Group or any other Person; and

   14.02.02    (i)    all injuries to, deaths, or illnesses of Third Parties,

           (ii)    all damages to or losses of Third Parties' property, and

           (iii)    all damage to or losses of Existing Property up to and including Two Hundred Fifty Thousand United States Dollars (US$250,000) per occurrence,

          to the extent caused by the Negligence/Fault of Contractor Group, even if contributed to by the joint or concurrent Negligence/Fault of Company Group or any other Person; provided that, in the event of joint or concurrent Negligence/Fault of Contractor Group and Company Group, Contractor's indemnification obligation hereunder shall be limited to Contractor Group's proportionate share of such Negligence/Fault.

14.03    **Company's General Indemnity Obligations:** Company shall Indemnify Contractor Group from and against all Claims/Losses for the following when Connected With this Contract:

   14.03.01    (i)    all injuries to, deaths, or illnesses of persons in Company Group, and

           (ii)    all damages to or losses of Existing Property in excess of Two Hundred Fifty Thousand United States Dollars (US$250,000) per occurrence,

          even if caused by the Negligence/Fault of Contractor Group or any other Person; and

14.03.02 (i) all injuries to, deaths, or illnesses of Third Parties, and

(ii) all damages to or losses of Third Parties' property,

to the extent caused by the Negligence/Fault of Company Group, <u>even if contributed to by the joint or concurrent Negligence/Fault</u> of Contractor Group or any other Person; provided that, in the event of joint or concurrent Negligence/Fault of Company Group and Contractor Group, Company's indemnification obligation hereunder shall be limited to Company Group's proportionate share of such Negligence/Fault.

14.04 <u>Cross Indemnity Provision</u>: To the extent Company's other contractor(s) executes cross indemnification and insurance and waiver provisions substantially similar to those contained in this Section 14.04:

14.04.01 Contractor agrees to Indemnify Company's other contractor(s) (and its subcontractors or Group as referred to in such other contractor's contract) from and against all Claims/Losses for the following when Connected With this Contract:

(i) all injuries to, deaths, or illnesses of persons in Contractor Group, and

(ii) all damages to or losses of Contractor's Property,

<u>even if caused by the Negligence/Fault</u> of Company's other contractor(s) (or its subcontractors or Group, as applicable) or any other Person.

14.04.02 Contractor agrees that it will support its mutual indemnity obligations in this Section 14.04 with insurance or qualified self-insurance with minimum limits not less than those set forth in Section 14.11 obtained for the benefit of such other contractor(s) (and its subcontractors or Group, as applicable) as indemnitees, but such minimum insurance requirements shall not limit Contractor's indemnity obligations except to the extent mandated by applicable law.

14.04.03 Contractor agrees that it will waive any Claims/Losses against Company's other contractor(s) (and its subcontractors or Group as referred to in such other contractor's contract) for punitive, exemplary, consequential or indirect damages Connected With this Contract, including without limitation, loss of profits, loss of production, or loss of use. The waiver afforded by this provision shall be applicable <u>even if such Claims/Losses are caused by the Negligence/Fault</u> of any other Person benefiting from the waiver. To the extent permitted by law, any statutory remedies that are inconsistent with this provision of the Contract are waived.

The Parties intend to create a third party beneficiary obligation of Contractor in favor of such other of Company's contractors that have included reciprocal cross indemnity, insurance support, and waiver provisions in their respective contracts with Company (and to extend such third party beneficiary obligation of Contractor to the subcontractors or Group, as applicable, of such other contractors).

14.05 <u>Pollution</u>: Contractor shall assume responsibility for, and shall Indemnify Company Group from and against, all liability relating to the control and removal of pollution or contamination:

14.05.01 that originates from spills of fuels, lubricants, motor oils, pipe dope, paint, solvents, ballast, bilge and garbage, debris, or any other substances in Contractor Group's possession or control or originating from Contractor's Property, <u>even if caused by the Negligence/Fault</u> of Company Group or any other Person, without monetary limit; or

14.05.02 that otherwise results from performance of the Work hereunder by Contractor Group, to the extent caused by the Negligence/Fault of Contractor Group <u>even if contributed to by the joint or concurrent Negligence/Fault</u> of Company Group or any other Person, but only to the extent of One Million United States Dollars (US$1,000,000) per occurrence.

Except as provided above in this Section 14.05, Company shall assume all responsibility for the control and removal of, and shall Indemnify Contractor Group from and against all liability relating to the control and removal of, pollution or contamination, <u>even if caused by the Negligence/Fault of Contractor Group or any other Person.</u>

Notwithstanding the foregoing, the assumptions of liability by Company and Contractor under this Section 14.05 apply only to the cost of and liability for control and removal of such pollution and contamination, and do not apply to Claims/Losses caused by such pollution or contamination and shall, in no event, alter, lessen or affect the liabilities or responsibilities of Contractor or Company specified elsewhere in the Contract.

14.06    <u>Fines and Penalties</u>:  Contractor agrees to assume responsibility for and to Indemnify Company Group from and against any fines or penalties resulting from Contractor's provision of the Work to the extent caused by the Negligence/Fault of Contractor Group, <u>even if contributed to by the joint or concurrent Negligence/Fault</u> of Company Group or any other Person.

14.07    <u>Underground Damage</u>:  Company shall Indemnify Contractor Group for the loss of or damage to any geological formation, strata, or oil or gas reservoir beneath the surface of the earth resulting from operations under the Contract, <u>even if caused by the Negligence/Fault</u> of Contractor Group or any other Person.

14.08    <u>Limitation on Damages</u>:  Company waives any Claims/Losses against Contractor Group for punitive, exemplary, consequential or indirect damages arising out of this Contract, including without limitation, loss of profits, loss of production, or loss of use.  Contractor waives any Claims/Losses against Company Group for punitive, exemplary, consequential or indirect damages arising out of this Contract, including without limitation, loss of profits, loss of production, or loss of use.  The waiver afforded each Party (and its Group) by this provision shall be applicable <u>even if such Claims/Losses are caused by the Negligence/Fault</u> of the Party (or its Group) or any other Person benefiting from the waiver.  To the extent permitted by law, any statutory remedies that are inconsistent with this provision of the Contract are waived.

14.09    <u>Notice and Defense</u>

    14.09.01    Contractor or Company, as the case may be, shall promptly give to the other Party notice in writing of (i) any Claim/Loss that has been made known to the representative of the Party as referenced in Article 13, or (ii) proceedings commenced for which Indemnification is claimed.  Such notice shall state with as much detail as is reasonably practicable the facts and circumstances giving rise to the Claim/Loss against the Indemnitee.  Notwithstanding the foregoing, if either Party is obligated to Indemnify the other Party (or any other Person pursuant to this Contract), lack of prompt notice shall not be a defense except to the extent prejudice has resulted from such lack of prompt notice.

    14.09.02    The Indemnitor shall confer with the Indemnitee concerning the Defense of any such Claim/Loss proceedings but, subject to the provisions of this Article 14 and any other applicable provisions of this Contract, if the Indemnitor has assumed the full Defense of the Claim/Loss without qualification, the Indemnitor or its insurer shall retain control of the conduct of such Defense, including but not limited to the selection and management of counsel.  Notwithstanding the foregoing, however, even if the Indemnitor has assumed the full Defense of the Claim/Loss without qualification, neither Party shall effect settlement of or compromise any such Claim/Loss proceedings without having obtained the prior written consent of the other Party.  If the Indemnitee does not consent to a settlement that the Indemnitor is willing to accept, then the Indemnitor's liability shall be limited to the amount for which the lawsuit could have been settled.  If the Indemnitor has assumed the full Defense of the Claim/Loss without qualification, the Indemnitee may, upon written notice to the Indemnitor and at the Indemnitee's sole cost and expense, select its own counsel to participate in and be present for the defense of any such Claim/Loss proceeding,

provided such counsel shall not take any action in the course of such Claim/Loss proceeding to prejudice the Indemnitor's Defense of such Claim/Loss proceeding. Where the Indemnitor's proffered Defense is limited to the proportionate Negligence/Fault of the Indemnitor, the Indemnitee may elect to Defend itself and obtain reimbursement of its Defense costs in proportion to the proportionate fault of the Indemnitor and its Group, or reimbursement of all Defense costs if a full Defense is determined to have been owed.

14.10    The Parties agree that in the event any Claims/Losses result from a gross deviation by Contractor from its obligations under this Contract, Company shall not be obligated to Indemnify Contractor Group.

14.11    Contractor and Company agree to support their mutual indemnity obligations in this Article 14 with insurance or qualified self-insurance with minimum limits not less than Five Million United States Dollars (US$5,000,000) obtained for the benefit of the other Party and its Group as Indemnitees. Except as otherwise expressly provided, or otherwise mandated by applicable law, all indemnity obligations of Contractor and Company as set out in this Article 14, shall be without monetary limit. Moreover, the indemnity obligations of Contractor as set out in this Article 14 are independent of any insurance requirements set out in Article 15 below, and such indemnity obligations shall not be limited by any insurance requirements and shall not be lessened or extinguished by reason of Contractor's failure to obtain the required insurance coverage or by any defenses asserted by Contractor's insurers.

## ARTICLE 15: INSURANCE

Contractor shall procure or cause to be procured and shall maintain in effect with respect to and for the duration of this Contract the insurance policies described below. The cost of such insurance policies shall be included in Contractor's rates under this Contract, and all premiums shall be for the sole account of Contractor.

15.01    Commercial General Liability Insurance

Contractor shall maintain commercial general liability (CGL) and, if necessary, commercial excess/umbrella insurance, with a minimum limit of not less than US$1,000,000 each occurrence. If such CGL insurance contains a general aggregate limit, it shall apply separately to this Contract.

15.01.01    CGL insurance shall be written on ISO occurrence form CG 00 01 07 98 (or a substitute form providing equivalent coverage) and shall cover liability arising from premises, operations, independent contractors, products-completed operations, personal injury and advertising injury, and blanket contractual liability coverage.

15.01.02    The status of Company Group as an insured under a CGL obtained in compliance with Section 15.08.01 of this Contract shall not restrict coverage under such CGL with respect to the escape of release of pollutants at or from a site owned or occupied by or rented or loaned to Company.

15.01.03    There shall be no endorsement or modification of the CGL limiting the scope of coverage for liability arising from pollution, explosion, collapse, underground property damage, or employment-related practices.

15.01.04    When Work is performed on, over, or in close proximity to navigable waters or vessels or in any way involves maritime workers, any exclusion for non-owned watercraft shall be deleted as respects liability coverage and contractual liability coverage.

15.02    Business Auto Liability Insurance

Contractor shall maintain business auto liability and, if necessary, commercial umbrella liability insurance, with a minimum limit of not less than US$2,000,000 each accident

15.02.01   Such insurance shall cover liability arising out of any auto (including owned, hired, and non-owned autos).

15.02.02   Business auto coverage shall be written on ISO form CA 00 01, CA 00 05, CA 00 12, CA 00 20, or a substitute form providing equivalent liability coverage.  If necessary, the policy shall be endorsed to provide contractual liability coverage equivalent to that provided in the 1990 and later editions of CA 00 01.

15.02.03   Pollution liability coverage equivalent to that provided under the ISO pollution liability-broadened coverage for covered autos endorsement (CA 99 48) shall be provided, and the Motor Carrier Act endorsement (MCS 90) shall be attached.

15.03   Workers Compensation and Employers Liability Insurance

Contractor shall maintain employers' liability insurance as well as workers compensation insurance that complies with the legal requirements of each state in which the Work is to be performed.

15.03.01   The commercial umbrella and/or employers liability minimum limits shall not be less than US$1,000,000 each accident.

15.03.02   If any Work to be performed under this Contract will be on, over, or in close proximity to navigable waters or vessels or in any way involves maritime workers, the U.S. Longshore and Harbor Workers Compensation Act endorsement shall be attached to the policy.

15.03.03   If any Work to be performed under this Contract will involve offshore platforms or any operations on the Outer Continental Shelf, the Outer Continental Shelf Lands Act endorsement (WC 00 01 09 A) shall be attached to the policy.

15.03.04   If any Work to be performed under this Contract will involve maritime workers or vessels, the Maritime Coverage endorsement (WC 00 02 01) shall be attached to the policy.

15.03.05   Contractor shall include an "alternate employer endorsement" in favor of Company.

15.04   Protection and Indemnity and Hull and Machinery Insurance

When Contractor or its subcontractors provide owned, chartered, hired, leased, or operated vessels in performing the Work, Contractor shall maintain or cause to be maintained protection and indemnity ("P&I") insurance on all such vessels with an overall minimum limit of US$5 million, or the value of each vessel, whichever amount is greater, and including coverage for collision and tower's liability, third party bodily injury and property damage liability, and pollution liability.  In addition, Contractor shall maintain or cause to be maintained hull and machinery insurance on all such vessels with a minimum limit of not less than the replacement value of each vessel.

With regard to all primary and excess P&I insurance, Company Group shall have no liability for calls or premium assessments due from the first named insured.  In addition, all primary and excess P&I insurance shall, to the extent of the risks and liabilities assumed by Contractor, be endorsed (i) to provide full coverage to Company Group as additional insured without limiting coverage to liability "as owner" of the vessel and to delete any "as owner" clause and any other language purporting to limit coverage to liability of an insured "as owner" of the vessel, and (ii) to delete any language limiting coverage for Company Group in the event of the applicability of any limitation of liability statute.

15.05   Aviation Liability Insurance
If Contractor or any subcontractor engaged by Contractor uses, owns, charters, rents, borrows, or leases an aircraft to be used in the performance of the Work, Contractor shall maintain or cause to be maintained aircraft liability insurance, with minimum limits of at least US$5 million per passenger or crew seat, subject to a minimum of US$25 million, or require equivalent insurance from the company providing the aircraft.

15.06  **Pollution Liability Insurance**

Contractor shall maintain in force for the duration of this Contract pollution legal liability insurance applicable to bodily injury; property damages, including loss of use of the damaged property or of property that has not been physically injured or destroyed; cleanup costs; and Defense, including costs and expenses incurred in the investigation or settlement of claims; all in connection with any loss arising from the insured facility. Coverage shall be with minimum limits of not less than US$1,000,000 per occurrence.

15.07  **Evidence of Insurance**

15.07.01   Upon request of Company, Contractor shall furnish Company with a certificate(s) of insurance, on a form that is satisfactory to Company or provided by Company, executed by a duly authorized representative of each insurer, evidencing compliance with the insurance requirements of this Article 15. Acceptance by Company of an incomplete or improper certificate, or failure of Company to identify a deficiency in coverage from the certificate submitted, shall not be construed as a waiver of Contractor's obligation to maintain in effect the coverages required by this Article. All certificates shall provide for 30 Days' written notice to Company prior to the cancellation or material change of any insurance referred to therein.

15.07.02   Within ten (10) Days of receipt of a written request of Company, Contractor shall provide certified copies of all insurance policies requested by Company.

15.08  **General Insurance Provisions**

15.08.01   To the maximum extent permitted by law, all insurance policies of Contractor in any way related to, or providing any coverage in connection with the Work, whether or not required by this Contract, shall be endorsed to waive all rights of subrogation against Company Group, and (except worker's compensation coverage and professional liability coverage) shall, to the extent of the risks and liabilities assumed by Contractor, name Company Group as an additional insured on a broad form endorsement with coverage no less broad than ISO form CG 20 10 A1 11 85.

15.08.02   All insurance policies of Contractor in any way related to or providing any coverage in connection with the Work, whether or not required by this Contract, shall to the extent of the risks and liabilities assumed by Contractor be primary as respects any other policies held by Company Group or any other policies providing any coverage in favor of any member of Company Group. The coverage afforded Company Group under such policies shall delete any excess clause or co-insurance clause that requires sharing or renders any insurance in favor of Company Group as primary. Such policies shall afford primary coverage to Company Group without any contributions or reimbursement, in whole or in part, by any insurance, or self-insured retention or account maintained by or in favor of Company Group.

15.08.03   Company does not represent that coverage and limits required in this Article 15 will be adequate to protect Contractor. Such coverage and limits shall not be deemed as a limitation on Contractor's liability under the other provisions of the Contract.

15.08.04   The insurance obligations required under this Article 15 are independent from all other obligations of Contractor under this Contract and apply whether or not required by any other provision of this Contract and shall not in any way limit Contractor's indemnity obligations except to the extent mandated by applicable law.

15.08.05   Company, at its sole discretion, may elect to provide any or all of the insurance required under this Article 15 for all or substantially all of the Work, covering the interests of all parties as provided herein. Company shall give Contractor thirty (30) Days' notice if it elects to provide any or all such insurances. Company shall not be responsible to reimburse Contractor for any insurance costs that Contractor incurs where the insurance is covered under the Company

Rev 3 approval by FC 6-3-08

File  C:\Documents And Settings\Conrad\Desktop\Contractors\Open Working\Lawson Environmental Services\Lawson Environmental Service 1 LLC-MSC No. HOU-WL4-3356-Doc

– 15 –

Contract No. HOU-WL4-3356

provided insurances. If Company provides all or part of the insurance coverages required under this Article 15 for Contractor, and if Contractor's charges, rates, or lump sum include amounts to compensate it for insurance required to be carried by it but that is provided by Company hereunder, then Contractor's compensation shall be reduced commensurately.

15.08.06   Reasonable deductibles for the policies required in this Article are permitted.

15.08.07   All insurance required of Contractor in this Contract shall be placed with insurers acceptable to Company. These insurers shall maintain a minimum rating of A- VII by the A.M. Best Company or equivalent.

15.08.08   Contractor shall immediately notify insurers of and shall furnish all necessary information concerning any occurrence which may give rise to a claim. Copies of all correspondence and documents related to any such occurrence or any claim shall be provided promptly to Company.

15.08.09   Contractor agrees that all insurance benefits and protections provided to Company Group under this Article 15 shall be extended to and benefit: (i) any entity to which Contractor owes Defense and/or indemnity and/or insurance protection or benefit under Section 14.04; and (ii) any Person to which Company has agreed in writing to provide insurance protection or benefit and/or to provide Defense and/or indemnity, including without limitation other contractors and subcontractors of Company to the extent Company has agreed in writing to provide them with insurance protection or benefit and/or Defense and/or indemnity.

15.09   Notwithstanding the insurance requirements of this Contract, Contractor may self-insure all or any part of the insurance coverage required, subject to Company's prior written consent. In addition, Company reserves the right to withdraw its consent to any self-insurance at any time with thirty (30) Days' written notice to Contractor. All deductibles and any self-insurance coverage or retention shall be treated as if they were insurance coverage or an insurance policy, and Company Group (and any Person entitled to insurance protection under Section 15.08.09 above) shall have the same benefits and protection from Contractor as if Contractor had obtained insurance coverage for that amount, and neither Company Group nor any Person entitled to insurance protection under Section 15.08.09 above shall be prejudiced in any way or lose any benefit or protection as a result of any decision by Contractor to self-insure or maintain any particular deductible(s) or self-insured retention. In addition, Contractor warrants that it will disclose its insurance deductibles (and any self insured retention(s)) to Company prior to execution of this Contract and that it will provide thirty (30) Days' advance written notice of any material change in any deductible.

15.10   The insolvency, liquidation, bankruptcy, or failure of any insurance company providing insurance for Contractor or its subcontractors or failure of any such insurance company to pay claims accruing, shall not be considered a waiver of, nor shall it excuse Contractor from complying with, any of the provisions of this Contract.

15.11   Contractor, as it deems necessary, shall cause each subcontractor employed by Contractor to perform any part of the Work to purchase and maintain policies of insurance as described in this Article as well as any other coverages that Contractor deems necessary. Such policies shall be endorsed in the same manner to waive subrogation against the Company Group, be primary, and name Company Group as an additional insured. Contractor shall obtain and furnish to Company (upon request) copies of certificates of insurance evidencing coverage for each subcontractor. Any deficiencies in insurance coverage of any subcontractor shall be the responsibility of Contractor.

## ARTICLE 16: FORCE MAJEURE

16.01   Except as may be specifically otherwise provided in this Contract, neither Party shall be liable for delays in performance or for nonperformance directly occasioned or caused by Force Majeure. Should conditions in the location where the Work is performed, in the reasonable opinion of Company, become such that continuance of the Work would be unduly hazardous, Company may suspend the Work and such suspension will be considered Force Majeure. Inability of either Party to secure funds will not be regarded as Force

– 16 –

Rev 3 approved by TCb 1-58.
File: C:\Documents And Settings\Garzab\Desktop\Contractors\Oper Wrckmg\Lawson Environmental Services\Lawson Environmental Service LLC-MSC No HOU-WL4-3356 Doc

Majeure. Upon the occurrence of Force Majeure, the Party affected shall give immediate notice thereof to the other Party and shall, at its cost and expense, do all things reasonably possible to remove or mitigate its effects.

## ARTICLE 17: ASSIGNMENT OR SUBCONTRACT

17.01   Contractor may not assign, sublet, or subcontract this Contract, or any part thereof, without the written consent of Company; provided, however, that Contractor shall retain the right to assign all or any part of the remuneration due, or which may become due, by virtue of Work performed under this Contract to the extent that such assignment would not violate the requirements of Article 10. Consent by Company to the assignment of this Contract, to the use of a specific subcontractor, or to the subletting or subcontracting of any Work to be performed hereunder, will not relieve Contractor of its obligations hereunder, including responsibility for performance of the part of the Work that is assigned or subcontracted. Contractor shall be responsible for all equipment and materials of, and all actions and inactions of, its subcontractors as if they were the employees of Contractor. In the event Contractor does subcontract any portion of the Work, each such subcontract will provide Company Group with indemnity, insurance, warranty, confidentiality, and other protections equivalent to those set forth in this Contract. No subcontract will create a contractual relationship between Company and the subcontractor, but each subcontract will contain a provision permitting the assignment of the subcontract to Company in all cases where Company may be entitled under the Contract to require that such assignment be effected. Under no circumstances will subcontractor, or its agents, servants, or employees, be considered employees of Company.

17.02   Company may assign its rights and obligations under this Contract to any member of Company Group without Contractor's consent. This Contract will inure to the benefit of and be binding upon the successors and permitted assigns of the Parties.

## ARTICLE 18: DEFAULT AND INSOLVENCY

18.01   If Contractor has failed to perform the Work expeditiously, and in a diligent, skillful, safe and workmanlike manner, in accordance with good industry standards, or has otherwise failed to comply with its obligations under this Contract (for whatever reason), Company may, at its sole option, either: (i) give Contractor written notice specifying the failure or default and the period of time within which Contractor shall be required to correct such failure or default in a manner satisfactory to Company, or (ii) by written notice to Contractor, immediately terminate this Contract or any applicable Work Release. If Contractor has been given a period of time to correct such failure or default and does not remedy the matters complained of within the time required, Company may immediately terminate this Contract or any applicable Work Release. In addition, Company shall have all other rights or remedies available to it by law, including, but not limited to, the right to demand specific performance and/or seek damages for breach, including attorneys' fees and costs.

18.02   If Contractor:   (i) becomes insolvent; (ii) makes an assignment for the benefit of creditors; (iii) is adjudicated a bankrupt; (iv) admits in writing its inability to pay its debts generally as the same become due; (v) institutes any proceedings under any State or Federal law for relief of debtors or for the appointment of a receiver, trustee or liquidator; (vi) files a voluntary petition in bankruptcy or for a reorganization or for an adjudication as an insolvent or a bankrupt; (vii) fails to remove any attachment levied on Contractor's Property within five (5) Days therefrom; or (viii) is unable to comply with its obligations under Article 10, then upon the occurrence of any such event, Company shall thereupon have the right to terminate this Contract or any Work Release, and to terminate immediately all Work then being performed by Contractor hereunder.

18.03   If Company terminates this Contract or any applicable Work Release pursuant to the provisions of this Article, Company shall have the right to take possession and control of all Work Product and proceed to carry out the Work herein provided to be performed by Contractor. Additionally, Company shall have the right to charge against and collect from Contractor all expenses incurred by Company to acquire equipment to perform such Work, together with any damages suffered by Company as a result of Contractor's failure to perform.

## ARTICLE 19: TERMINATION

19.01   Company may terminate, with or without cause, including the occurrence of a Force Majeure event, the Contract or any applicable Work Release at any time by giving five (5) Days' written notice to Contractor; however, except as provided in Article 18, no termination shall be effective until any and all Work in progress under any applicable Work Release is either satisfactorily completed or terminated by Company, at its option.

19.02   If Company should so terminate the Contract or any applicable Work Release, then the compensation due Contractor, in the absence of any breach or default and subject to the other provisions of this Contract, shall be:

19.02.01   the compensation owed Contractor under the applicable Work Release for Work performed prior to the date of termination less any monies previously paid to Contractor, or

19.02.02   in the event of a lump sum contract, the percentage of the compensation specified in the applicable Work Release that is proportionate to the Work performed prior to the date of termination less any monies previously paid to Contractor.

19.03   The provisions of Section 19.02 covering payment to Contractor will in no way apply to termination of the Contract or any applicable Work Release pursuant to the provisions of Article 18 governing default.

## ARTICLE 20: COMPLIANCE WITH LAWS

20.01   Contractor warrants that Contractor and its subcontractors are familiar with and knowledgeable about all relevant laws, rules, regulations, decrees, federal, state and local, which are now or may become applicable to the Contract and any Work performed in connection herewith, including without limitation, those pertaining to immigration, health, safety, security, and environmental protection (hereinafter sometimes referred to as the "Laws") and Contractor warrants that in conducting the Work hereunder it will comply with all such Laws.

20.02   Contractor shall not pay any fee, commission, rebate, or other value to or for the benefit of any governmental official having jurisdiction over the Work Site, if such payment would be inconsistent with or penalized by the laws and regulations of the United States.

20.03   Contractor and Company each agree and undertake to the other that in connection with this Contract and the transactions contemplated by this Contract, they will each respectively comply with all applicable law, rules, regulations, decrees, and/or official governmental orders of the United States (and the United Kingdom, if applicable) relating to anti-bribery and anti-money laundering.

20.03.01   Contractor agrees, undertakes, and confirms that each of the Persons in Contractor Group has not, in connection with the transactions contemplated by this Contract or in connection with any other business transactions involving the Company in the United States and the United Kingdom, if applicable, made, offered, or promised to make, and will not make, offer, or promise to make, any payment or other transfer of anything of value, including without limitation the provision of any service, gift or entertainment, directly or indirectly to: (i) any government official (including directors, officers, and employees of government-owned and government-controlled companies and public international organizations); (ii) any director, officer, or employee of the Company Group; (iii) any political party, official of a political party, or candidate for public office; (iv) an agent or intermediary for payment to any of the foregoing; or (v) any other Person for the purpose of obtaining or influencing the award of or carrying out this Contract, if, and to the extent that to do so is or would be in violation of or inconsistent with the anti-bribery or anti-money laundering laws of any relevant jurisdiction, including, without limitation, the U.S. Foreign Corrupt Practices Act, and, if applicable, the U.K. Anti-Terrorism, Crime and Security Act 2001 and successor legislation, the applicable country legislation implementing the OECD Convention on Combating Bribery of Foreign

– 18 –     Contract No. HOU-WL4-3356

Rev 3 approved by FC 6-1-08
File: C:\Documents And Settings\Garza\b\Desktop\Contractors\Oper. Working\Lawson Environmental Services\Lawson Environmental Service LLC-MSC No. HOU-WL4-3356.Doc

Public Officials in International Business Transactions.

For the purposes of this Section 20.03, the term "government official" shall mean any director, officer or employee of any government or any department, agency or instrumentality thereof, and/or of any enterprise in which a government owns an interest, and/or of any public international organization. This term also includes any Person acting in any official, administrative or judicial capacity for or on behalf of any such government or department, agency, instrumentality, company, or public international organization.

20.03.02    Contractor agrees and undertakes that in connection with this Contract and in connection with any other business transactions involving Company in the United States and United Kingdom, if applicable, Contractor and its Affiliates have and will apply effective disclosure controls and procedures; have and will maintain books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions undertaken and the disposition of assets; and have and will maintain an internal accounting controls system that is sufficient to ensure the proper authorization, recording and reporting of all transactions and to provide reasonable assurance that violations of the anticorruption laws of the applicable jurisdictions will be prevented, detected and deterred.

20.03.03    In the event that Company has any basis for a good faith belief that Contractor may not be in compliance with the undertakings and/or requirements set forth in this Section 20.03, Company shall advise Contractor in writing of its good faith belief and Contractor shall cooperate fully with any and all inquiries undertaken by or on behalf of Company in connection therewith, including the provision by Contractor of personnel and supporting documents and affidavits if reasonably deemed necessary by Company

20.03.04    Subject to the requirements of Section 20.03.03, and without prejudice to any other rights or remedies the Company may have hereunder or at law (including, as applicable, the right to damages for breach of contract), Company shall have the right to terminate this Contract with immediate effect if Company reasonably believes in good faith that any of the foregoing agreements, undertakings or requirements set forth in this Section 20.03 have not been complied with or fulfilled by Contractor; PROVIDED, HOWEVER, that Company shall have provided Contractor with written notice of its intention to terminate the Contract under the provisions of this Section 20.03.04 together with a summary of the reasons therefore and that Contractor has been unable within five (5) business Days of delivery of such notice to provide Company with evidence that demonstrates, to the reasonable satisfaction of the Company, that Contractor has not failed to comply with or fulfill any of the foregoing agreements, undertakings or requirements.

20.03.05    All payments by Company to Contractor shall be made in accordance with the terms of payment specified in this Contract. In the absence of any such specific payment instructions elsewhere in this Contract, payments by Company to Contractor shall only be made by check or wire transfer to a bank account, details of which shall be given by Contractor to Company in writing.

20.04    **Contractor agrees to Indemnify Company Group from and against any Claims/Losses resulting from Contractor's failure to comply with all applicable Laws.**

20.05    For the purposes of this Article 20, Contractor will include all members of Contractor Group.

20.06    If any portion of the Work will occur on the Outer Continental Shelf, then Contractor shall supply individuals who are authorized under the laws of the United States to perform the Work. Any individual who lacks such authorization will not be allowed to take part in the portion of the Work that occurs on the Outer Continental Shelf.

Rev. 3 approved by FC 6-1-08
File  C:\Documents And Settings\Gonzab\Desktop\Contractors\Open Working\Lawson Environmental Services\Lawson Environmental Service LLC-MSC No. HOU-WL4-3356.Doc

— 19 —

Contract No. HOU-WL4-3356

20.07  Additionally, in order to facilitate the expeditious commencement and completion of Work by Contractor, Company may, if applicable, undertake to comply with the Outer Continental Shelf Lands Act Amendments of 1978, 33 CFR Part 135 and the Oil Pollution Act of 1990, as applicable, and may transmit information to governmental agencies, fully or partially prepare "Facility Applications for Financial Responsibility" and forms for "Proof of Financial Responsibility" and take such other actions as may be necessary for compliance with the legislation and the regulations promulgated thereunder. However, Contractor shall remain responsible for compliance with these laws and regulations which govern its operations and facilities. If Company should act as a guarantor, indemnitor, or should it assist Contractor in the satisfaction of the financial responsibility requirements of the aforementioned laws or any regulations, such action shall not in any manner alter, modify or amend any provisions of the Contract, particularly those pertaining to indemnification for pollution damage and cleanup

### ARTICLE 21: HEALTH, SAFETY, SECURITY, AND ENVIRONMENTAL REQUIREMENTS

21.01  Exhibit "D" constitutes a summary of the key aspects of Contractor's Health, Safety, Security, and Environmental (HSSE) Policy ("HSSE Policy Summary"). Contractor understands and agrees that failure to comply with the applicable portions of the HSSE Policy Summary will constitute a material breach of the Contract.

21.02  Contractor shall ensure that all members of Contractor Group observe general safety and environmental protection guidelines and Company's Work Site specific safety rules and policy.

21.03  When applicable, Contractor and Company shall each designate an on-site representative for all HSSE-related matters.

21.04  To the extent required to comply with the Offshore Minerals Management Safety and Environmental Management Program ("SEMP") program or with any applicable reporting requirements, Contractor agrees to provide, upon request, any information or documentation requested by Company concerning Contractor's and Contractor's subcontractors' safety histories, accident statistics, and safety training programs.

### ARTICLE 22: OWNERSHIP OF DEVELOPED INFORMATION AND INDEMNIFICATION

22.01  Company shall own all right, title, and interest in and to all designs, plans, models, drawings, prints, samples, transparencies, specifications, reports, manuscripts, working notes, documentation, manuals, photographs, negatives, tapes, discs, databases, software, and other information, data, and items embodied in any tangible form (hereinafter referred to as "Developed Information") produced by Contractor in performance of the Work. All such Developed Information shall be clearly marked where possible as Company's property. Company shall have the right to photograph, reproduce, copy, duplicate, modify, alter, or make any use of such Developed Information, notwithstanding anything contained therein to the contrary. Contractor shall furnish a copy of all or any part of such Developed Information to Company upon request by Company.

22.02  All Developed Information in the form of original works of authorship which are fixed in any tangible form and created by or on behalf of Contractor hereunder (hereinafter collectively referred to as "Creative Materials") and which are covered by the definition of "work for hire" under 17-U.S.C. 101 of the U.S. Copyright Act of 1976, are considered a "work for hire," and Company is the owner of all copyrights in any such works. As to any such Creative Materials created for Company that are not covered under the aforementioned "work for hire" definition of the Copyright Act, such that Contractor is regarded as the copyright author and owner, Contractor agrees to assign and hereby assigns all such copyright ownership in the Creative Materials to Company. Contractor agrees to execute and deliver to Company any required documents and do all acts necessary to perfect Company's entire right, title, and interest in the Creative Materials.

**22.03  Contractor represents that it has not and will not breach or infringe any IP Rights (copyrights, patents, trade secrets, and other intellectual property rights) of any Third Party in performance of the Work and related to equipment, materials, services, computer software, processes or business methods supplied or employed by Contractor in performing the Work. Contractor must inform**

Company if Contractor requires any license or similar right under a Third Party's IP Rights, or the performance of the Work requires the payment of any royalty or similar fee by or for Company, Contractor shall Indemnify Company Group from all Claims/Losses arising from infringement or alleged infringement of any IP Right, breach of confidentiality or similar claim brought against Company Group, unless use of such equipment, materials, services, computer software, processes or business methods was expressly required by Company.

## ARTICLE 23: AUDIT

23.01   Company may, upon its request, inspect and audit any and all financial books, supporting records, or any other documentation of a business or technical nature (hereinafter referred to as "Documentation") of Contractor and any subcontractor relating to the performance of this Contract; provided, however, Contractor and subcontractor shall have the right to exclude any trade secrets or proprietary formulas from such inspection and audit. For purposes of this Article 23, trade secrets and proprietary formulas will not include any financial information or data. The right to inspect and audit by Company under the provisions hereof will include access to information, verbal or otherwise, from personnel of Contractor or its subcontractors.

23.02   Company shall have the right to inspect and audit the make-up and content of agreed lump sum amounts, including but not limited to, lump sums, unit rates, lump sum change orders, mark-up of rates, or multipliers in accordance with the provisions of Section 23.01. The scope of any such audit of agreed lump sum amounts by Company will be limited to the inspection and audit relating to: (i) any conflict of interest or fraudulent activity; (ii) worker's compensation claims; (iii) any duplicate recovery of reimbursable cost items; (iv) compliance with specifications; or (v) compliance of Contractor's or its subcontractors' performance with the terms and conditions of this Contract.

23.03   Contractor and its subcontractors agree to maintain complete and correct Documentation relating to the Work performed hereunder and to make such Documentation available to Company for inspection and audit at any time or times during the course of this Contract and up to two (2) years subsequent to the end of the calendar year in which the final invoice was paid.

23.04   Company may exercise its rights hereunder at its sole discretion by using its personnel or by using independent accountants.

23.05   Settlement will be made to Company or Contractor for any exceptions verified and documented during audit(s) performed under this Article. The responsible Party shall make every reasonable effort to make settlement to the other Party within thirty (30) Days from the date of issuance of the audit report.

## ARTICLE 24: APPLICABLE LAW AND RESOLUTION OF DISPUTES

24.01   This Contract may govern Work furnished by Contractor to Company in several different jurisdictions. With respect to the selection of governing law in this Article, the Parties stipulate that certainty of enforcement is an important expectation negotiated between the Parties in entering this Contract.

24.02   To the maximum extent permissible, this Contract, and any action Connected With this Contract brought by either Party (and any action brought by any member of Company Group or Contractor Group or any Third Party asserting a third party beneficiary claim pursuant to this Contract) shall be governed by the general maritime laws of the United States.

24.03   In the event maritime law is held to be inapplicable by a court of competent jurisdiction, except as otherwise provided in this Contract, the laws of the State of Texas shall apply, but provided further that for Work performed outside of the State of Texas, the Parties do not intend to apply, and hereby exclude, the Texas Oilfield Anti-Indemnity Statute, Chapter 127 of the Texas Civil Practice and Remedies Code, except to the extent, if any, that Texas Law mandates the application of such Chapter to such Work.

24.04    With respect to any law that the Parties select, the Parties agree that the law of the selected jurisdiction shall apply exclusive of any principles of conflicts of laws that would require application of the substantive laws of another jurisdiction.

24.05    In the absence of mutual agreement in writing, for any action Connected With this Contract brought by either Party (or any member of either Party's Group, or any Third Party pursuant to this Contract), venue shall be exclusively in federal district court situated in Harris County, Texas, or if there is no subject matter jurisdiction in federal court, then in the Texas State District Court situated in Harris County, Texas. The Parties (and any other Persons asserting any action pursuant to this Contract) submit to personal jurisdiction and waive any other venue that may be applicable to such action whether by reason of their present or future residence or domicile or otherwise. Notwithstanding the foregoing, if one or both of the Parties is involved in litigation in a forum other than in Harris County, Texas, the Parties may assert claims Connected With this Contract in such litigation to the extent, and only to the extent, necessary to avoid waiver of such claims. Each Party, knowingly and voluntarily, waives its respective right to a jury trial.

24.06    The Parties further agree that despite the existence of any claim, dispute, controversy, or pending action, Company may require Contractor: (i) to continue performing the Work; and/or (ii) to turn over possession of the Work Product and deliver it to Company. If Contractor fails to comply with any such requirement, the Parties agree, notwithstanding any other provision of this Contract, that such failure shall constitute irreparable injury to Company and that Company shall be entitled to obtain appropriate injunctive relief from a court of competent jurisdiction ordering Contractor to continue performing the Work as required by Company and/or to turn over possession of the Work Product and deliver it to Company as required by Company. Company's exercise of its right to injunctive relief shall not cause a termination pursuant to Article 18 or Article 19.

## ARTICLE 25:  SURVIVAL, SEVERABILITY, AND WAIVER

25.01    Termination of the Contract and/or Company's acceptance of the Work Product or any parts thereof will not release the Parties from obligations that expressly or by their nature survive or extend beyond the Contract, termination thereof, or any acceptance of the Work Product. Those obligations include, without limitation, all indemnity, warranty, confidentiality, insurance, and risk allocation provisions. This Article applies irrespective of whether this Contract terminates by Company or Contractor under Article 4, or is terminated by Company with or without cause under Article 18 or Article 19.

25.02    If any provision or portions, or applications thereof, of this Contract are held to be unenforceable, invalid or void by any court of competent jurisdiction, this Contract will be deemed to be amended to modify such provision or portion thereof partially or completely to the extent necessary to make it enforceable. If necessary, this Contract will be deemed to be amended to delete the unenforceable, invalid or void provision or portion thereof, in which event the validity and enforceability of the remaining provisions, or portions, or application thereof, will not be affected thereby.

25.03    None of the requirements of this Contract will be considered as waived by either Party unless the same is done in writing. Further, failure by either Party to enforce any rights will not waive those or other rights hereunder.

## ARTICLE 26:  THIRD PARTY BENEFICIARIES

26.01    Except as specifically provided in Article 14 and Article 15, nothing in this Contract will be construed to confer any rights or benefits in the Contract to anyone other than Company Group and Contractor Group, and all duties and responsibilities undertaken pursuant to this Contract will be for the sole and exclusive benefit of Company Group and Contractor Group and not for the benefit of any Third Party

## ARTICLE 27: CODE OF CONDUCT

27.01    In connection with Contractor's performance of this Contract, Contractor agrees to act consistently with the BP Code of Conduct (www.bp.com) and to adhere to the principles set out therein, including our principles of non-retaliation against "whistle blowers." Any failure to do so by Contractor Group shall be deemed a material breach of this Contract.

## ARTICLE 28: ENTIRE CONTRACT, AMENDMENT

28.01    This Contract constitutes the full understanding of the Parties, and is a complete and an exclusive statement of the terms of their agreement, and will exclusively control and govern all Work performed for Company. All representations, offers, and undertakings of the Parties made prior to the Effective Date hereof, whether oral or in writing, are merged herein

28.02    No other contract or agreement, whether executed prior or subsequent to the execution of this Contract, will in any way modify, amend, alter, or change any of the terms or conditions set out herein unless such contract or agreement: (i) is executed by persons of equal position and authority within their respective companies as those executing this Contract, and (ii) clearly expresses the specific intention of the Parties to amend this Contract by making specific reference thereto.

WITNESS THE SIGNATURES of the Parties hereto as set forth below.

**BP EXPLORATION & PRODUCTION INC.**
*COMPANY*

By: _____
                    *Signature*

_____
                    *Printed Name*

Title: _____

| Approved by: | |
|---|---|
| Legal | |
| Procurement & Supply Chain Management | |

**LAWSON ENVIRONMENTAL SERVICE, LLC**
*CONTRACTOR*

By: *Cecil Lawson*
                    *Signature*

*Cecil Lawson*
                    *Printed Name*

Title: *Pres / CEO*

Rev 3 approved by FC 3-1-29
File C:\Documents And Settings\Garzab\Desktop\Contractors\Oper Working\Lawson Environmental Services\Lawson Environmental Service LLC-MSC No HOU-WL4-3356.Doc

-- 23 --

Contract No. HOU-WL4-3356



# Exhibit "A"

# Work Release Form

Rev. 3 approved by TC 6-1-08
File: C:\Documents And Settings\Gerald\Desktop\Contractors\Open Working\Lawson Environmental Services\Lawson Environmental Service LLC-MSC No. HOU-WL4-3356 Doc.

Contract No. HOU-WL4-3356

WORK RELEASE AGAINST MASTER SERVICE CONTRACT

Date: July 5th 2010

Work Release requested by: Todd Gift

---

This Work Release is subject to the terms and conditions of <u>Master Services Agreement</u> No. **HOU-WL4-3356** between BP Exploration & Production and <u>Lawson Environmental Services, LLC.</u>
**NOTHING CONTAINED IN THIS WORK RELEASE SHALL BE CONSTRUED AS AN AMENDMENT TO THE TERMS OF THE REFERENCED MASTER SERVICE CONTRACT.**

---

| Contractor: | **Lawson Environmental Services** |
| | 2108 Denley Rd. |
| | Houma LA 70363 |
| | Attention: Cecil Lawson |
| | Phone: 985-876-0420 |
| | Fax: 985-876-0270 |
| | Email: cecil@lesllc.net |

Work Release No: **HOU-WL4-3356-R1**

Paykey No. ZKRAUMD252

WBS Z4-0059V-E:OILSPILLRESP

Project Identification: Macondo 252 Incident

Expected start date: June 1st 2010

Expected completion date: TBD

Maximum Total Amount: $5,000,000.00

Description/Scope of Work/Additional Terms and Conditions:

**This Work release is applicable to the MC252 Incident Only.**
**TOM-XXXX**

**Scope:**
Supplier shall provide the following services, equipment, materials and supplies in support of the MC252 incident:

- Provide OSRO services, management and oversight
- Manage OSRO and Oil Spill Responder Subcontractors
- Provide miscellaneous construction services
- Construction Management
- Materials management and logistics
- Inland waterway Oil Spill Response Management and oversight
- OSRO and responder integration
- Manage Responder Deployment
- Provide other services as requested and approved in response to the MC252 incident

**Rates:**
Rates charged shall be as specified in Rate Sheet from Lawson Environmental Service L.L.C. dated February 2010

---

**Budget:**
Not to exceed $5,000,000.00
Supplier shall notify BP representative when 80% of budget limit ($4,000,000.00) is reached to determine extension.

**Term:**
The term of this Work Release shall be determined

Payment information (PAYKEY) provided in this release is to be used only for the associated this scope of work and the work related to Maconda Horizon Deepwater incident.

**Billing Instructions: Please follow the attached billing instructions.**

Forward invoices/statements to:   BP Exploration and Production Company
                                  Attention:  Scanning Dept. S646
                                  P.O. Box 22024
                                  Tulsa, OK 74121-2024

Include on invoice:               Work Release No.:  BPR-HOU-0627-1243
                                  Paykey No.:        ZKRAUMD252
                                  WBS:       Z4-0059V-E:OILSPILLRESP

ACCEPTED BY: _Lawson Environmental Service_ APPROVED BY: _____
             Contractor                                                Company

NAME/TITLE: _Cecil Lawson_  Pres/CEO  NAME/TITLE: _____
             Contractor                                                Company

     Date: _7/11/2010_____          Date: _____

"This Agreement may be executed in multiple counterparts, each of which will be deemed an original, but all of which together will be one and the same instrument.  Facsimile signatures shall be deemed acceptable for all purposes and shall have the same force and effect as an original."

WORK RELEASE AGAINST MASTER SERVICE CONTRACT          EXHIBIT "A"

Date:                    7-11-2010

Work Release requested by:    _____

| This Work Release is subject to the terms and conditions of Master Service Contract No. HOU-WL4-3356 between BP Exploration & Production Inc. and Lawson Environmental Service, LLC, effective July 11, 2010.  NOTHING CONTAINED IN THIS WORK RELEASE SHALL BE CONSTRUED AS AN AMENDMENT TO THE TERMS OF THE REFERENCED MASTER SERVICE CONTRACT. |

Company:                 BP Exploration & Production Inc.

Contractor:              Lawson Environmental Service, LLC
                         2108 Denley Rd.
                         Houma, LA 70363
                         Attention: Cecil Lawson
                                     Telephone:  985-876-0420
                                     Fax:        985-876-0270
                                     e-mail:     cecil@leslc.net

Work Release No:         _____

Paykey No.               _____

Project Identification:  ZKRAUMD252

Value of Work Release:
   Not To Exceed:        _____

   Fixed Lump Sum:       _____

Expected start date:     _____

Expected completion date: _____

Description/Scope of Work/Additional Terms and Conditions:
_____
_____
_____
_____
_____
_____

Forward invoices/statements to:
                         BP Exploration & Production Inc.
                         Attention: Scanning Dept. S646
                         P.O. Box 22024
                         Tulsa, OK 74121-2024
                         Work Release No. _____
                         Paykey No.        ZKRAUMD252

ACCEPTED BY: _____     APPROVED BY: _____
                        Contractor                                   Company
       Date: _____            Date: _____

Exhibit "A" – Work Release Form
Page 1 of 2
Rev 3 approved by FC 1-1-08
File: C:\Documents And Settings\Gerald\Desktop\Contractors\Open Working\Lawson Environmental Services\Lawson Environmental Service LLC-MSC 8a  HOU-WL4-3356.Doc

                                                    Contract No. HOU-WL4-3356

Notices:

Contractor Representative:

Attention: _____
Mail Code: _____
Telephone: _____
Fax: _____
Email _____

Company Representative:

Attention: _____
Mail Code: _____
Telephone: _____
Fax: _____
Email _____

Return one fully executed original of this Release to:

Attention: _____
_____
_____

Exhibit "A" - Work Release Form
Page 2 of 2
Rev 3 approved by FC 6-1-05
File: C:\Documents And Settings\Garza\Desktop\Contractors\Open Working\Lawson Environmental Services\Lawson Environmental Service LLC-MSC No HOU-WL4-3356 Doc

Contract No. HOU-WL4-3356



**Exhibit "B"**

**Change Order Form**

EXHIBIT "B"

CHANGE ORDER TO WORK RELEASE ISSUED
UNDER
MASTER SERVICE CONTRACT
BETWEEN
BP EXPLORATION & PRODUCTION INC.
AND
LAWSON ENVIRONMENTAL SERVICE, LLC

> **NOTHING CONTAINED IN THIS CHANGE ORDER SHALL BE CONSTRUED AS AN AMENDMENT TO THE TERMS OF THE REFERENCED MASTER SERVICE CONTRACT.**

| | |
|---|---|
| Change Order Number: | _____ |
| Work Release Number: | _____ |
| Master Service Contract Number: | HOU-WL4-3356 |
| Project Code/Identification (if applicable): | _____ |
| Date: | _____ |
| Work Release requested by: | _____ |
| | *(Name)* |

1. DESCRIPTION OF CHANGE OF WORK

   *(A summary of clarification, modification, expansion or reduction of Work will be stated, and attachments, if any, will be listed.)*

2. COMPENSATION

   *(Any changes thereto will be stated.)*

3. COMPLETION DATE

   *(Any change to the Completion Date stated in the Work Release.)*

4. ORIGINAL WORK RELEASE VALUE                          _____

   VALUE OF APPROVED CHANGE ORDERS TO DATE      _____

   THIS CHANGE ORDER VALUE                                    _____

   TOTAL CURRENT WORK RELEASE VALUE               _____

_____    _____        _____    _____
COMPANY APPROVAL                              DATE          CONTRACTOR ACCEPTANCE                DATE

Return one fully executed original of this Change Order to:

Attention: _____
_____
_____



Exhibit "C"

Compensation Schedule

Rev'3 approved by FC 6-1-08
File C:\Documents And Settings\Garzab\Desktop\Contractors\Open Working\Lawson Environmental Service\Lawson Environmental Service LLC-MSC No HOU-WL4-3356.Doc

Contract No. HOU-WL4-3356

EXHIBIT "C"

## COMPENSATION SCHEDULE

Contractor shall provide any and all necessary labor, personal protective equipment, machinery, equipment, tools, transportation, and whatever else is necessary to perform the Work as described in the Work Release. Contractor shall perform the Work in accordance with the Work Release, this Contract, and the following schedule of reimbursement unless Company has requested and Contractor has agreed to a different pricing mechanism with respect to a particular Work scope.

Exhibit "C" – Compensation Schedule
Page 1 of 1
Rev 2 approved by FC 6-1-08
File  C:\Documents And Settings\Garzak\Desktop\Contractors\Open Working\Lawson Environmental Services\Lawson Environmental Service, LLC-MSC No. HOU-WL4-3356.Doc

Contract No. HOU-WL4-3356

# Exhibit "D"

## Health, Safety, Security, and Environmental Requirements

Rev 3 approved by FC 6-1-98
File: I:\Documents And Settings\Guerab\Desktop\Contractors\Open Working\Lawson Environmental Services\Lawson Environmental Service LLC-MSC No HOU-WL4-3356.Doc

Contract No. HOU-WL4-3356

EXHIBIT "D"

<u>HEALTH, SAFETY, SECURITY, AND ENVIRONMENTAL REQUIREMENTS</u>

The following constitute Health, Safety, Security, and Environmental (HSSE) Requirements for Contractor and any subcontractors performing work on Company Sites (real estate owned or leased by Company, where Company is the operator) and on Company Project Sites (where work is performed exclusively for Company). HSSE Requirements encompass compliance with all applicable federal, state/provincial, maritime, and local statutes, regulations, enforceable agreements, agency orders, permits, and contract documents. HSSE Requirements also include specific Company requirements as disclosed below and any site-specific requirements not specified below. Each Contractor will ensure that any subcontractor it employs meets these HSSE Requirements. Contractor will take any additional precautions necessary to prevent harm to personnel or damage to the environment, property, or Company's reputation.

Contractor's Program will strive to deliver an incident and injury-free work place and will achieve a total 12-month rolling recordable incident rate (TRIR) equal to, or better than, the TRIR hurdle set by the Company for work conducted on Company Sites and Company Project Sites. Company may revise the hurdle rate downward annually to achieve the incident and injury-free work place objective.

Contractor will provide, at Company's request, a monthly breakdown of hours worked and miles/kilometers driven (including subcontractors' hours and miles/kilometers) on Company Sites or Company Project Sites.

<u>Company Specific HSSE Requirements for all Contractors</u>

In order to meet Company's specific HSSE Requirements, Contractor will have a HSSE Program with a focus on continual performance improvement (or utilize Company's program). Company has the right to audit Contractor's HSSE Program and documents. At a minimum, the following elements will be included in Contractor's HSSE Program:

1) **Leadership**

   Contractor Leadership will actively communicate HSSE expectations and Company requirements, routinely monitor HSSE performance, develop action plans for continuous improvement, and actively take ownership of HSSE.

   Contractor will ensure that Contractor's employees understand Company's HSSE policy and comply with Company's Golden Rules of Safety for work performed on Company Project Sites.

2) **Behavior Based Safety**

   Contractor will have a behavior-based safety program which, at a minimum, will include a safety observation program (or utilize Company's program) with performance targets. Contractor will communicate to Contractor employees the expectation that everyone has an obligation to stop work that is unsafe.

   In addition, Contractor will have a hazard identification and risk assessment process for completing a daily pre-job task hazard analysis and/or work permitting system to identify and control the hazards to an acceptable level. At a minimum, a process for completing daily Job Safety Analysis (JSA), or Job Safety Environmental Analysis (JSEA), is required to facilitate the daily task hazard analysis.

3) **HSSE Meetings**

   Contractor will conduct or take part in regularly scheduled on-site or off-site HSSE meetings discussing, among other topics, facility and job hazards, incidents, near-misses, site-specific safety and health rules, and site-specific procedures.

Exhibit "D" – Health, Safety, Security, and Environmental Requirements*(rev 10-1-05)*
Page 1 of 3
Rev 3 approved by FC 6-1-05
File: C:\Documents And Settings\Garzah\Desktop\Contractors\Open Work\Legal\Lawson Environmental Services\Lawson Environmental Service, Llc-Msc No. Hou-Wl4-3356.Doc

Contract No. HOU-WL4-3356

4) **Incident Reporting and Investigations**

Contractor will immediately notify Company of all Contractor or subcontractor incidents resulting in personal injury, spills or releases, security issues, loss or damage to property, or near-misses. Company may require Contractor to conduct an investigation for any HSSE incident. Company retains the right to participate or conduct its own incident investigation. For all incident investigations, Contractor will provide a written investigation report to the Company. The investigation report shall identify possible root causes associated with the incident as well as proposals for corrective action. When requested, Contractor will furnish Company with a copy of non-privileged reports made by or on behalf of Contractor concerning an incident, including any non-privileged statements or other investigative material.

5) **Personal Protective Equipment**

Contractor will ensure Contractor employees have proper personal protective equipment (PPE) before work begins, and that PPE is worn as required. Contractor shall obtain and comply with individual site PPE requirements.

6) **Contractor Employee Conduct**

Contractor shall comply fully with the Substance Abuse Policy (Exhibit "E").

Company has the right to require Contractor to remove and bar from the Company Sites or Company Project Sites any personnel whose conduct (condition or action) jeopardizes the safety of any person. In addition, Contractor will not permit any barred person to work at any other Company Site or Company Project Site without prior Company written approval.

7) **Contractor Employee HSSE Competency**

Contractor will ensure that regulatory required training for Contractor's employees has been identified and completed. Competency must be demonstrated. Company may require reasonable additional site-specific training and documentation.

8) **Short Service Contractor Employee Policy**

Contractor will comply with its own or Company's site-specific short service employee policy, whichever policy is more restrictive.

9) **Preventative Maintenance Program**

Contractor will have a preventative maintenance program that includes, at a minimum, the identification and prioritization of maintenance for safety and/or environmental critical items.

10) **Chemicals Brought to Company Site**

Contractor will ensure Material Safety Data Sheets (MSDSs) are available at the Company Sites and/or Company Project Sites for all chemicals Contractor brings to the site, and that the MSDS is reviewed as part of the JSA/JSEA discussion.

Exhibit "D" – Health, Safety, Security, and Environmental Requirements/rev 10 1-05)
Page 2 of 3
Rev 3 approved by FC 6-1-08
File: C:\Documents And Settings\Gerald\Desktop\Contractors\Open Working\Lawson Environmental Services\Lawson Environmental Service, Llc-Msc No. Hou-W14-3356.Doc

Contract No. HOU-W14-3356

**Company Specific HSSE Requirements Specifically Selected for Certain Contractors (Company and Contractor will initial all those that apply). See web site for details:  http://nasupplierhsse.bpglobal.com.**

Initialed by: _Illegible_
Contractor          Company

[  ]          [  ]          1.  Contractor will have a written Waste Management plan at the Company Project Site for work performed that, at a minimum, requires identification of waste and disposal methods.

[  ]          [  ]          2.  Company requires Contractor to have an acceptable Contractor Environmental Management System (C-EMS).

[  ]          [  ]          3.  Contractors will meet or exceed BP's Driving Standard.

[  ]          [  ]          4.  Contractor will have and apply a Fitness-for-Duty program which includes assessment of the physical capability of employees to perform certain specific tasks and a physical agility testing component.

[  ]          [  ]          5.  Contractor will supply Company with a valid Certificate of Recognition applicable to Province of Operation certified by Petroleum Industry Training Service (PITS) or Contractor's Service Line certifying body.

[  ]          [  ]          6.  Contractor must have a working knowledge of the Drilling and Well Operations Policy.

Exhibit "D" – Health, Safety, Security, and Environmental Requirements(rev 10-1-05)
Page 3 of 3
Rev 1 approved by FT 6-1-88
File  C:\Documents And Settings\Gunzah\Desktop\Contractors\Open Working\Lawson Environmental Services\Lawson Environmental Service, Llc-Mac No  Hou-WL4-3356.Doc

Contract No. HOU-WL4-3356



**Exhibit "E"**

**Substance Abuse Policy**

Rev 3 approved by FC's 1-08
File: C:\Documents And Settings\Gonzale\Desktop\Contractors\Dper Working\Lawson Environmental Services\Lawson Environmental Service, LLC-MSC Ko HOU-WL4-3356.Doc

Contract No. HOU-WL4-3356

EXHIBIT "E"

## SUBSTANCE ABUSE POLICY

Company has a strong commitment to provide a safe work place for its employees and other persons working or visiting on its premises. In order to assist in maintaining a safe working environment and to protect Company property, this Policy concerning substance abuse is established.

Contractors, subcontractors, and vendors who perform labor or services on Company premises or on whose premises Company employees spend substantial time, hereinafter referred to as Contractors, must have and administer a formal substance abuse interdiction policy. Policies for Contractors and subcontractors must include substance testing of Contractor's employees entering Company premises.

The failure of a contractor to comply with the provisions of this policy constitutes cause for cancellation of Contract.

## ARTICLE I – POLICY STATEMENT

The use, possession, concealment, transportation, promotion, or sale of the following substances is strictly prohibited on Company premises, including all property owned, operated, leased by, or under the control of Company. Any contractor's employee in violation of this policy is prohibited from Company premises.

- Prohibited substances are defined as: (a) any alcoholic beverage, the use of which is not authorized by the Company, (b) any substance that an individual may not sell, possess, use, or distribute under the laws of the state in which the individual is employed or is working, and (c) any otherwise legal but illicitly-used substances.

- "Otherwise legal but illicitly-used substances" include (a) prescription drugs obtained without proper medical authorization, and (b) prescribed drugs, over-the-counter drugs, and other substances not being used for their intended purposes or at intended dosage.

- Drug paraphernalia and similar items used for substance abuse are likewise prohibited from Company premises.

Contractors shall submit a copy of their policy and program to Company employee designated to administer contracts or to a party as otherwise designated by Company. Such policy must provide for substance testing of employees and must meet the minimum standards as set forth in Article II below. Company reserves the right to withhold solicitation of bids or to deny entry to Company premises of any contractor, subcontractor, or vendor who fails to present a written policy that meets Company's minimum standards, or who fails to administer an acceptable policy.

A violation of this policy will subject the offending contractor's employee to denial of entry to Company premises and projects. Reinstatement of the access privilege may be made after one year upon request of the employing contractor. Such requests will be evaluated on the merits of each case. A request will be granted only upon receipt of evidence that the employee has successfully passed a substance screen within thirty (30) days of the request and has successfully completed an assessment by a Substance Abuse Professional ("SAP") and has complied with all recommended treatment or rehabilitation prescribed by the SAP.

## ARTICLE II – TESTING

A. DEFINITIONS

For the purpose of this policy:

1. "Substance testing" means the analysis of urine, saliva, or breath; however, at times circumstances may warrant additional testing methods.

Exhibit "E" – Substance Abuse Policy
Page 1 of 5
Rev 1 approved by FT 6-1-08
File C:\Documents And Settings\Conrad\Desktop\Contractors\Oper Working\Lawson Environmental Services\Lawson Environmental Service, Llc-Msc No 1hou-Wl4-3356 Doc

Contract No.HOU-WL4-3356

2. "Chain of custody" means the combination of procedures and documentation which provides a faithful and accurate written record of the custody of a biological specimen from time of initial collection of a specimen to final laboratory analysis.

3. "Negative test result" means a laboratory conclusion that the presence of a substance was not detected in a specimen at or above the screening and confirmation levels utilized.

4. "Screened positive result" means that an EMIT analysis has revealed one or more substances present at or above screening cut-off level.

5. "Presumptive positive result" means a laboratory conclusion that a specimen was found to contain the presence of a substance based on one or more analytical procedures which did include gas chromatography/mass spectrometry (GC/MS).

6. "Confirmed positive result" means a laboratory presumptive positive result that has been confirmed as a positive substance test by a Medical Review officer (MRO).

B. LABORATORY AND SAMPLING STANDARDS

1. Testing for the following substances, at the indicated screening and confirmation cutoffs, are recommended:

| Drug | EMIT Screen | GC/MS Confirmation Levels |
|------|-------------|---------------------------|
| Amphetamines | 1000 ng | 500 ng |
| Marijuana | 50 ng | 15 ng |
| Cocaine | 300 ng | 150 ng |
| Opiates | 2000 ng | 2000 ng |
| PCP | 25 ng | 25 ng |
| Alcohol | .02 BAC | .02 BAC |

Contractors subject to DOT testing should abide by appropriate levels.

2. The specimens of applicants and current employees will be tested using an enzyme immunoassay (such as EMIT) and/or a radioimmunoassay (approved on-site testing is permissible. In this testing scheme, a positive finding is called a screened positive. All screened positives will be further tested using GC/MS. In this testing scheme, a positive finding is called a presumptive positive. All presumptive positives will undergo MRO review.

3. Alcohol screening testing may include utilization of either breath or saliva testing. Tests which are screened positive will undergo confirmation via the use of an evidential-quality breathalyzer for confirmation of positive alcohol test results. MRO review is not required for positive alcohol test results.

C. CONFIDENTIALITY

When a contractor, subcontractor, or vendor conducts drug testing of its employees for the purpose of establishing eligibility to enter Company premises, such substance testing results which are positive will not be individually disclosed to Company. Company will require, however, that contractors, subcontractors, and vendors certify that each applicant assigned to work on Company premises has passed a substance test that meets the standards of this policy. Contractors must maintain records of drug substance testing results which are subject to audit by Company (see Articles IV and VI).



Contract No.HOU-WL4-3356



EXHIBIT

A cont'd

The results of substance tests performed for reasonable suspicion or accident/incident investigations as outlined below must be disclosed to local Company management upon request.

D.   TESTING

   1.   Contractors will conduct substance testing in these situations:

     a.   before a contractor's employee may enter Company premises for the first time.

     b.   at least annually for continuously employed workers.

     c.   upon reasonable suspicion by the contractor or Company that a contractor employee on Company premises is under the influence of or has consumed any substance or item prohibited by this policy.[3]

     d.   when designated by Company management, immediately following any incident which results in a recordable bodily injury as defined by OSHA, or damage to Company or contractor-owned property. Additionally, any substance testing, following an incident requiring DOT substance testing as regulated and described by DOT (FHA, RSPA, and USCG), must be strictly adhered to. (Note: Substance testing may also be required by the contractor or Company following a near-miss incident. A near-miss incident is any incident which, if it had proceeded to a reasonably possible and more serious level of development, would have had the potential for personnel injuries, property damage, or serious liability claims).

   2.   Contractors will assume all costs associated with testing.

   3.   The refusal of a contractor's employee to sign a consent form or submit to any testing will result in revocation of the person's access privileges.

E.   EXCEPTIONS

The following exceptions may be granted at the discretion of Company management:

   1.   Contractors and contractors' employees who are contracted or hired on short notice may be permitted to begin work on-site pending receipt of the results of pre-access substance testing. This permission will not extend beyond seven (7) calendar days from the first date after work starts by contractor.

     Any person working under this provision must be removed from the work site immediately upon receipt of a positive test result, or at the end of seven (7) calendar days if test results have not been reported.

     This provision is to allow work to begin on emergency or short notice situations only. Testing must be done as soon as reasonably feasible, and results must be available within the seven (7) calendar days allotted. This provision covers only employees needed for initial staffing and does not extend to those hired with sufficient time for pre-access testing (2-3 days after job begins).

   2.   Contractors or vendors whose need for site access poses a minimal safety risk may be exempted from pre-access substance testing by authorized Company management.

---

[3] *In many contracts Company reserves the right to remove a contractor's employees for any reason. In no way does this policy detract from that right.*

Exhibit "E" -- Substance Abuse Policy
Page 3 of 5
Rev 3 approved by TC 6-1-01
File: C:\Documents And Settings\Gorzak\Desktop\Contractors\Opus Working\Lawson Environmental Services\Lawson Environmental Service, LA-Misc No. Hou-WL4-3356.Doc

                                                                                      Contract No.HOU-WL4-3356

F.    VALIDITY PERIOD

A pre-access substance test must have been administered within ninety (90) days immediately preceding access. This requirement may be waived by local authorized Company management for persons who are regaining access after an absence of not more than ninety (90) days.

Company will recognize a substance test conducted of an employee while that employee worked for a different employer provided that (1) the test is conducted within the 90-day period required by this policy, and (2) the laboratory and sampling procedures meet the standards set forth in this policy. Company prefers that the testing requirements be verified by an independent agency such as the Contractor's Safety Council.

A continuously employed contract worker must be substance tested at least once every twelve (12) months with no more than six (6) hours' notice prior to testing. Any of the various situations that require testing (pre-access, accident, etc.) will satisfy this requirement.

## ARTICLE III – SEARCHES AND INSPECTIONS

Company reserves the right at all times on its premises to conduct unannounced substance screens, searches, and inspections of contractors, contractors' employees, vendors, and other persons, including their effects, lockers, baggage, desks, tool boxes, clothing, and vehicles. The purpose of such screens, searches, and inspections is to ensure compliance with this policy.

Any controlled substances or items prohibited by this policy, or any materials that are illegal to possess, will be retained by Company and may be destroyed or turned over to the appropriate law enforcement agency.

The refusal of a contractor's employee to submit to a search or inspection will result in the revocation of the person's access privileges.

## ARTICLE IV – COMPLIANCE AUDITS

Company reserves the right to periodically audit a contractor's records to verify compliance with this policy. Such verification will include, but not be limited to:

1.    examination of the contractor's substance abuse policy and its implementing directives and procedures;

2.    a determination that substance testing is being conducted in those situations which require it and that the testing meets the standards of this policy;

3.    examination of chain of custody procedures which ensure integrity of collected specimens; or

4.    evaluation of laboratory services.

Audit results will be treated as confidential so as to protect the privacy of tested persons.

## ARTICLE V – SUBCONTRACTS

In all cases where a contractor is permitted to employ a subcontractor, the contractor is responsible for insuring that the subcontractor and subcontractor's employees are in compliance with this policy. Contracts between contractors and subcontractors must stipulate that Company reserves the right to audit subcontractor's substance programs.

## ARTICLE VI – CONSENT FORMS

The contractor must obtain a signed consent demonstrating each employee's agreement to release to contractor and Company the results of any substance testing performed.

Exhibit "E" – Substance Abuse Policy
Page 4 of 5
Rev 3 approved by FC 6-1-18
File: T:\Documents And Settings\Genati\Desktop\Contractors\Open Working\Lawson Environmental Services\Lawson Environmental Service Llc-Msc No. How WL-3356 Doc

Contract No.HOU-WL4-3356

Company will look at substance test results only during occasional compliance audits as described in Article IV, or when testing is required by Company as described in Article II.

<u>ARTICLE VII – NOTICE</u>

The contractor must ensure that each of its employees and subcontractor employees is informed of the provisions of this policy and of the contractor's substance abuse policy. Notice will include the consequences of failure to comply, and notice will be made prior to entering Company premises.

<u>ARTICLE VIII – CONCLUSION</u>

Consideration for work on Company premises will be conditioned upon contractor's implementation of a policy that, in Company's sole judgment, conforms to the minimum standards expressed in this policy. Program development and implementation are the responsibility of the contractor.

The central goal of this policy is to provide a safe and efficient working environment for all persons on Company premises. Cooperation is vitally important to the achievement of this important goal.

Exhibit "E" – Substance Abuse Policy
Page 5 of 5
Rev 3 approved by FC 8-1-08
File: C:\Documents And Settings\Garza\Desktop\Contractors\Open Working\Lawson Environmental Services\Lawson Environmental Service, Llc-Mar No Hou WI4-3356.Doc

Contract No.HOU-WI4-3356

# Lawson Environmental Service L.L.C.
## 1800-407-0008*985-876-0420
## February 2010

## Table of Contents

**LABOR**
Industrial/Planned Action Work.................................................1
Oil Spill Emergency Response.................................................1
Emergency Response.................................................3

**VEHICLES, TRAILERS, VESSELS, HEAVY TRUCKS AND HEAVY EQUIPMENT**
Vehicles.................................................3
Vacuum Trucks and other Heavy Trucks.................................................3
Heavy Equipment.................................................3
Vessels.................................................3
Trailers.................................................4

**PUMPS, HOSE, FITTINGS AND ASSOCIATED EQUIPMENT**
Pumps.................................................5
Hose.................................................6
Associated Fittings and Capping Kits.................................................6

**BOOM, SKIMMERS AND SORBENTS**
Boom.................................................7
Skimmers.................................................8
Sorbents.................................................8

**HEALTH, SAFETY, MONITORING AND PERSONNEL PROTECTIVE EQUIPMENT**
Protective Clothing.................................................8
Fall Protection and Confined Spaces Entry Equipment.................9
Respiratory Protection.................................................9
Traffic Control Equipment.................................................10
Field Instrumentation and Supplies, Air Monitoring Equipment.....10
Testing/Sampling Equipment.................................................11

**DECONTAMINATION, CLEANING SUPPLIES AND NEUTRALIZING AGENTS**
Decontamination Equipment.................................................11
Cleaning Supplies, Neutralizing Agents and Inoculants...............11
Mercury Spill Control Equipment.................................................12

**COMUNICATIONS AND OFFICE EQUIPMENT**.................................13

**MISCELLANEOUS EQUIPMENT AND SUPPLIES**
Drums.................................................14
Lightning.................................................15
Pressure Washing Equipment.................................................15
Rope.................................................15
Tape.................................................15
Vacuum Equipment.................................................16

# Lawson Environmental Service L.L.C.
## 1800-407-0008*985-876-0420
## February 2010

Industrial/Planned Action Work: **Not Applicable to Emergency Response or Oil Spills.**

|  | Hourly Rate Straight Time | Hourly Rate Overtime |
|---|---|---|
| Senior Project Manager…………………………………… | $90.00 | $90.00 |
| Project Manager…………………………………………… | $70.00 | $70.00 |
| Certified Industrial Hygienist………………………….….. | $90.00 | $90.00 |
| Toxicologist…………………………………………………. | $90.00 | $90.00 |
| Chemist, Geologist, Biologist, or other professional position…. | $90.00 | $90.00 |
| Health and Safety Manager……………………………… | $50.00 | $75.00 |
| Supervisor…………………………………………………… | $55.00 | $82.50 |
| Foreman……………………………………………………… | $50.00 | $75.00 |
| Transportation and Disposal Coordinator………………… | $50.00 | $75.00 |
| Logistics Administrator…………………………………….. | $50.00 | $75.00 |
| Heavy Equipment Operator……………………………… | $45.00 | $67.50 |
| Boat Operator……………………………………………… | $40.00 | $60.00 |
| Mechanic…………………………………………………… | $40.00 | $60.00 |
| Recovery Technician……………………………………… | $36.00 | $54.00 |
| Field Clerk………………………………………………… | $40.00 | $60.00 |
| Truck Driver………………………………………………… | $40.00 | $60.00 |
| Vacuum Truck Operator………………………………… | $40.00 | $60.00 |

**Oil Spill Emergency Response:**
Oil is defined as crude oil, bunker oils or other petroleum products that are not listed or defined
as DOT hazardous materials; OSHA regulated hazardous substances, CERCLA hazardous
substances or RCRA hazardous waste.

|  | Straight Time | Overtime |
|---|---|---|
| Senior Project Manager…………………………………… | $120.00 | $180.00 |
| Project Manager…………………………………………… | $75.00 | $112.50 |
| Certified Industrial Hygienist………………………….….. | $90.00 | $135.00 |
| Toxicologist…………………………………………………. | $90.00 | $135.00 |
| Chemist, Geologist, Biologist, or other professional position…. | $90.00 | $135.00 |
| Health and Safety Manager……………………………… | $60.00 | $90.00 |
| Supervisor…………………………………………………… | $70.00 | $105.00 |
| Foreman……………………………………………………… | $60.00 | $90.00 |
| Transportation and Disposal Coordinator………………… | $45.00 | $67.50 |

2

# Lawson Environmental Service L.L.C.
## 1800-407-0008*985-876-0420
### February 2010

| | | |
|---|---|---|
| Logistics Administrator.................................. | $45.00 | $67.50 |
| Heavy Equipment Operator.............................. | $45.00 | $67.50 |
| Boat Captain (Boats over 20')......................... | $60.00 | $90.00 |
| Boat Operator (Boats under 20')....................... | $40.00 | $60.00 |
| Mechanic............................................. | $36.00 | $54.00 |
| Spill Technician..................................... | $44.00 | $66.00 |
| Field Clerk.......................................... | $40.00 | $60.00 |
| Truck Driver......................................... | $40.00 | $60.00 |
| Vacuum Truck Operator................................ | $40.00 | $60.00 |

## Emergency Response:
**Includes all materials not meeting the definition of "oil" referenced above.**

| | | |
|---|---|---|
| Senior Project Manager................................ | $105.00 | $157.50 |
| Project Manager...................................... | $80.00 | $120.00 |
| Certified Industrial Hygienist....................... | $105.00 | $105.00 |
| Toxicologist......................................... | $95.00 | $95.00 |
| Safety Professional/Industrial Hygienist............. | $80.00 | $120.00 |
| Chemist, Geologist, Biologist, or other professional position..... | $90.00 | $90.00 |
| Health and Safety Manager............................ | $60.00 | $90.00 |
| Supervisor........................................... | $75.00 | $112.50 |
| Foreman.............................................. | $55.00 | $82.50 |
| Transportation and Disposal Coordinator.............. | $50.00 | $75.00 |
| Logistics Administrator.............................. | $50.00 | $75.00 |
| Heavy Equipment Operator............................. | $50.00 | $75.00 |
| Boat Operator........................................ | $45.00 | $67.50 |
| Mechanic............................................. | $45.00 | $67.50 |
| Recovery Technician.................................. | $44.00 | $66.00 |
| Field Clerk.......................................... | $45.00 | $67.50 |
| Truck Driver......................................... | $40.00 | $60.00 |
| Vacuum Truck Operator................................ | $40.00 | $60.00 |

## VEHICLES, TRAILERS, VESSELS, HEAVY TRUCKS AND HEAVY EQUIPMENT

| Vehicles: | Rate | Unit |
|---|---|---|
| Vehicles – (Vehicle daily and mileage charges are portal-to-portal) | | |
| Automobile.......................................... | $250.00 | Day |
| Pick-up Truck, 2WD (F-150 to F-350 or equivalent)................. | $250.00 | Day |

3

# Lawson Environmental Service L.L.C.
## 1800-407-0008*985-876-0420
## February 2010

| | | |
|---|---|---|
| Pick-up Truck, 2WD (F-450 to F-550 or equivalent)................ | $300.00 | Day |
| Pick-up Truck, 4WD (F-150 to F-350 or equivalent)................. | $250.00 | Day |
| Pick-up Truck, 4WD (F-450 to F-550 or equivalent)................. | $350.00 | Day |
| Passenger Van, 16 Occupants.............................................. | $200.00 | Day |
| Stake Bed (One Ton 2WD).................................................. | $250.00 | Day |
| Stake Bed (One Ton 2WD), with hydraulic crane.................... | $250.00 | Day |

**Vacuum Trucks and other Heavy Trucks:** Charged portal-to-portal

| | | |
|---|---|---|
| Vacuum Truck, 70-80 Barrel (Operator not included)................ | $115.00 | Hour |
| Vacuum Truck Stainless Steel 130 Barrel (Operator not included).... | $155.00 | Hour |
| King Vac (Operator not included)......................................... | $175.00 | Hour |
| Guzzler (Operator not included)........................................... | $175.00 | Hour |
| Vacuum Truck Washout (Residue Only with Minimal Solids)........ | $175.00 plus rinsate disposal | |
| Mileage Charge on Vacuum Truck......................................... | $1.50 | Mile |
| Dump Truck, to 16 Cubic Yards (Driver not included)................ | $25.00 | Hour |
| End-Dump Trailer (Driver not included)................................. | $35.00 | Hour |
| Water Truck (Driver not included)........................................ | $45.00 | Hour |
| Mileage Charge on Dump and Water Truck............................. | $0.50 | Mile |
| Box Trailer, Grater than 40' with Tractor (Driver not included)...... | $80.00 | Hour |
| Box Trailer, Grater than 40' without Tractor........................... | $275.00 | Day |
| OTR with Roll-Off Frame (Driver not included)....................... | $95.00 | Hour |
| OTR Truck/Tractor Mileage................................................ | $1.50 | Mile |
| Low-Boy Trailer with Tractor (Driver and permits not included).... | $80.00 | Hour |
| Vacuum Box................................................................... | $50.00 | Day |

**Heavy Equipment:**

| | | |
|---|---|---|
| 4-WD Rubber-Tire Backhoe................................................ | $420.00 | Day |
| Forklift, to 5,500 LB Capacity............................................ | $300.00 | Day |
| Forklift, to 36,000 LB Capacity.......................................... | $600.00 | Day |
| Mini-Excavator.............................................................. | $450.00 | Day |
| Skid Steer Loader........................................................... | $400.00 | Day |
| Attachment for Backhoe or Skid Steer.................................. | $300.00 | Day |
| 450 Dozer..................................................................... | $500.00 | Day |
| Any other heavy equipment not listed will be quoted Per Occurrence. | | |

**Vessels:**

| | | |
|---|---|---|
| 105' to 110' OSRV, Rescue Vessel and Fire Fighting Capable...... | $4500.00 | Day |
| 50' to 60' OSRV, OSV and Fire Fighting Capable..............] ...... | $4000.00 | Day |
| 10' X 30' Barge Boat, Twin Outboards over 100-HP................. | $1250.00 | Day |
| 28' – 32' Fast Response Vessel, Twin Outboards over 200-HP...... | $950.00 | Day |
| 20' – 26' Fast Response Boat, Twin Outboards over 100-HP......... | $550.00 | Day |

4

# Lawson Environmental Service L.L.C.

## 1800-407-0008*985-876-0420

### February 2010

| | | |
|---|---|---|
| 20' – 26' Fast Response Boat, One Outboard over 200-HP............ | $850.00 | Day |
| 20' – 26' Fast Response Boat, Twin Outboards up to 100-HP......... | $650.00 | Day |
| 18' – 25' Fast Response Boat, Twin Outboards up to 100-HP......... | $500.00 | Day |
| 18' – 25' Fast Response Boat, One Outboard over 50-HP.............. | $450.00 | Day |
| 16' – 18' Work Boat over 20 –HP Outboard........................... | $200.00 | Day |
| 16' – 18' Work Boat with Go-Devil................................... | $250.00 | Day |
| 16' – 18' Work Boat without Motor.................................. | $100.00 | Day |
| 10' – 14' Flat-Bottom Boat with Motor.............................. | $150.00 | Day |
| 10' – 14' Flat-Bottom Boat without Motor........................... | $100.00 | Day |
| 20' Goo-Gobbler – Skimmer Response Vessel.......................... | $750.00 | Day |
| 26' Goo-Gobbler – Skimmer Response Vessel.......................... | $3,500.00 | Day |
| 30X120 Deck Barge.................................................. | $1,200.00 | Day |
| 30X120 Spud Barge.................................................. | $1,500.00 | Day |
| 600HP Tug.......................................................... | $4,000.00 | Day |
| 1,000HP Tug........................................................ | $5,800.00 | Day |

- Fuel for all vessels will be charged at Cost + 20 %
- Vessels are equipped with paddles and personal flotation devices for Lawson Environmental Service L.L.C personnel.

## Trailers:

| | | |
|---|---|---|
| 36' – 40' Response Trailer with Command Post...................... | $850.00 | Day |
| 32' – 35' Response Trailer (Enclosed)............................. | $550.00 | Day |
| 28' – 31' Response Trailer (Enclosed)............................. | $450.00 | Day |
| 20' – 27' Response Trailer (Enclosed)............................. | $225.00 | Day |
| Response Trailer, Less than 20' (Enclosed)........................ | $175.00 | Day |
| ATV (4-wheeler) Trailer........................................... | $50.00 | Day |
| ATV (4-wheeler) Trailer, All-Terrain.............................. | $75.00 | Day |
| Boom Trailer...................................................... | $150.00 | Day |
| Boom Trailer with Work Boat, Motor, Pump, Spill Supplies.......... | $250.00 | Day |
| Box Trailer (Greater than 40')................................... | $275.00 | Day |
| Command/Air Monitoring Equipment Trailer to 32'.................. | $450.00 | Day |
| Command/Communications Trailer, 45'-53'.......................... | $850.00 | Day |
| Drum Container Trailer............................................ | $175.00 | Day |
| Oil Spill Trailer (Enclosed) with Work Boat, Boom, Spill Supplies... | $300.00 | Day |
| Equipment Trailer, Greater than 20'.............................. | $175.00 | Day |
| Equipment Trailer, Less than 20'................................. | $125.00 | Day |
| Equipment Trailer with Hydraulic Crane........................... | $250.00 | Day |

## PUMPS, HOSE, FITTINGS AND ASSOCIATED EQUIPMENT

**Pumps:**

| | | |
|---|---|---|
| 2" Diesel Trash Pump.............................................. | $100.00 | Day |

5

# Lawson Environmental Service L.L.C.
## 1800-407-0008*985-876-0420
### February 2010

| | | |
|---|---|---|
| 2" Gas Trash Pump | $85.00 | Day |
| 3" Diesel Trash Pump | $135.00 | Day |
| 3" Gas Trash Pump | $100.00 | Day |
| 3" Diesel Diaphragm Pump | $225.00 | Day |
| 3" Polypropylene Air Diaphragm Pump | $350.00 | Day |
| 3" Aluminum Air Diaphragm Pump | $125.00 | Day |
| 2" Aluminum Air Diaphragm Pump | $100.00 | Day |
| 2" Stainless Steel Air Diaphragm Pump | $250.00 | Day |
| 2" Polypropylene Air Diaphragm Pump | $250.00 | Day |
| 2" Kynar Air Diaphragm Pump | $375.00 | Day |
| 1" Polypropylene Air Diaphragm Pump | $150.00 | Day |
| 1" Aluminum Air Diaphragm Pump | $100.00 | Day |
| Submersible Pump (to 3") | $150.00 | Day |
| 1" Lutz Pump | $125.00 | Day |
| Fuel Pump 12 Volt | $50.00 | Day |
| Rotary Petroleum Pump, Manual | $25.00 | Day |
| Drum Pump, Disposable | $25.00 | Each |
| Chemical Pump, Manual | $25.00 | Day |

**Hose:**

| | | |
|---|---|---|
| ¾ "Air Compressor Hose, 50' | $15.00 | Day |
| Fire Hose 1.7 5"- 3.0" | $0.75 | Foot/Day |
| Fire Hose 4.0" – 5.0" | $1.00 | Foot/Day |
| 4" – 6" Poly Hose, Flexible Corrugated | $1.95 | Foot |
| 1" Steam Hose, 20' | $15.00 | Day |
| 2" Steam Hose, 20' | $30.00 | Day |
| 1" Suction/Discharge Hose (Petroleum), 20' | $20.00 | Day |
| 2" Suction/Discharge Hose (Petroleum), 20' | $30.00 | Day |
| 3" Suction/Discharge Hose (Petroleum), 20' | $35.00 | Day |
| 2" Suction/Discharge Teflon Chemical Hose, 20' | $150.00 | Day |
| 1" Suction/Discharge Chemical Hose 20' (UHMWP) | $75.00 | Day |
| 2" Suction/Discharge Chemical Hose 20' (UHMWP) | $100.00 | Day |
| 3" Suction/Discharge Chemical Hose 20' (UHMWP) | $135.00 | Day |
| Ventilation Duct Hose (12"-18"), 25' | $50.00 | Day |
| Water Hose (1/2" – 1"), 50' | $25.00 | Job |

**Associated Fittings and Capping Kits:**

| | | |
|---|---|---|
| Betts Emergency Unloading Valve | $325.00 | Day |
| Butterworth Spin-Jet Nozzle, Stainless Steel | $175.00 | Day |
| Chlorine "A" Kit | $500.00 | Day |
| Chlorine "B" Kit | $500.00 | Day |
| Chlorine "C" Kit | $500.00 | Day |

6

# Lawson Environmental Service L.L.C.

## 1800-407-0008*985-876-0420

### February 2010

| | | |
|---|---|---|
| Conversion Kit, Metric Thread to Standard Pipe Thread............. | $250.00 | Day |
| Cylinder Coffin............................................................... | $750.00 | Day |
| Dom Lid Gasket.............................................................. | $125.00 | Each |
| Drum Vacuum, Stainless Steel, 2"....................................... | $225.00 | Day |
| Fittings Charge for Transfers.............................................. | $225.00 | Day |
| Foam Eduction Nozzle...................................................... | $50.00 | Day |
| 1" Gasket..................................................................... | $6.00 | Each |
| 1.5" Gasket................................................................... | $6.00 | Each |
| 2" Gasket..................................................................... | $9.00 | Each |
| 3" Gasket..................................................................... | $10.00 | Each |
| 4" Gasket..................................................................... | $12.00 | Each |
| 6" Gasket..................................................................... | $15.00 | Each |
| Gasket Cutter Kit............................................................ | $50.00 | Day |
| Gasket Material.............................................................. | $125.00 | 2'square sheet |
| H2S Capping Kit............................................................. | $500.00 | Day |
| High Pressure Gauge Test Kit............................................. | $35.00 | Day |
| "Lid Lock" Dome Clamp (MC-406/306 Model)....................... | $250.00 | Day |
| "Lid Lock" Dome Clamp (MC-407/307 Model)....................... | $350.00 | Day |
| Midland Capping Kit........................................................ | $800.00 | Day |
| Nitrogen Purge System (Includes 1 nitrogen cylinder)................ | $300.00 | Transfer |
| Rupture Disc.................................................................. | $65.00 | Each |
| Rupture Disc, ICD Intermodal Container................................ | $125.00 | Each |
| Sight Glass, 2" Stainless Steel............................................ | $75.00 | Day |
| Steam Gate Valve, 1" (800#).............................................. | $15.00 | Day |
| Steam Gate Valve, 2" (800#).............................................. | $25.00 | Day |
| Stinger, Stainless Steel or Polyethylene................................ | $50.00 | Day |
| Trident Quick Frame Magnetic Patch.................................... | $300.00 | Day |

*Upon completion of projects involving chemical transfers, equipment such as pumps, hoses, gaskets, elastomers, valves, etc. will be inspected for deterioration resulting from chemical degradation. Any repairs, including pump rebuilds that result from chemical degradation of equipment will be invoiced at cost with no mark-up.*

## BOOM SKIMMERS AND SORBENTS

**Boom:**

| | | |
|---|---|---|
| 18" Containment Boom...................................................... | $2.00 | Foot/Day |
| 10"-12" Containment Boom................................................ | $1.50 | Foot/Day |
| 4"-6" Containment Boom................................................... | $1.00 | Foot/Day |
| 22-Pound Boom Anchors................................................... | $65.00 | Job |
| 40-Pound Boom Anchors................................................... | $110.00 | Job |
| 65-Pound Boom Anchors................................................... | $210.00 | Job |
| Boom Lights, Electric Strobe.............................................. | $15.00 | Day |

# Lawson Environmental Service L.L.C.

## 1800-407-0008*985-876-0420

### February 2010

| | | |
|---|---|---|
| Boom Lights, 12 Hour Chemical……………………………… | $8.00 | Each/Day |
| Solar powered Boom Lights…………………………………… | $40.00 | Each/Day |

**Skimmers:**

| | | |
|---|---|---|
| Skimmer, Drum, 24"…………………………………………… | $475.00 | Day |
| Skimmer, Double Drum………………………………………… | $1100.00 | Day |
| Skimmer, Drum, 36"…………………………………………… | $550.00 | Day |
| Skimmer, Duck Bill…………………………………………… | $145.00 | Day |
| Skimmer, Weir, 18" to 24"…………………………………… | $125.00 | Day |

**Sorbents:**

| | | |
|---|---|---|
| Astrogel……………………………………………………… | $125.00 | Bag |
| Bio-Sorb……………………………………………………… | $90.00 | Bag |
| Cell-U-Sorb…………………………………………………… | $28.00 | Bag |
| Chemsorb Pillows……………………………………………… | $18.00 | Each |
| Fiberpearl…………………………………………………… | $28.00 | Bag |
| Floor Dry……………………………………………………… | $15.00 | Bag |
| Oil Gator……………………………………………………… | $25.00 | Bag |
| Oil Snare……………………………………………………… | $85.00 | Bag |
| Sorbent Boom 8"x10" Section (4 Sections per Bag)…………… | $165.00 | Bag |
| Sorbent Boom 5"x10" Section (4 Sections per Bag)…………… | $140.00 | Bag |
| Sorbent Pads, Chemicals, 100 per bale………………………… | $80.00 | Bale |
| Sorbent Pads, Petroleum, 100 per bale………………………… | $55.00 | Bale |
| Sorbent Roll………………………………………………… | $115.00 | Roll |
| Sorbent Sweeps……………………………………………… | $125.00 | Bale |
| Vermiculite…………………………………………………… | $28.00 | Bag |

## HEALTH, SAFETY, MONITORING AND PERSONNEL PROTECTIVE EQUIPMENT

**Protective Clothing:**

| | | |
|---|---|---|
| Acid Suit, Encapsulated……………………………………… | $160.00 | Each |
| Acid Suit, Two-Piece………………………………………… | $90.00 | Each |
| Boot Covers, Latex…………………………………………… | $8.00 | Pair |
| Chemical Resistant Boot, Steel Toe…………………………… | $35.00 | Pair |
| Chemical Resistant Duct Tape………………………………… | $25.00 | Roll |
| Chemical Resistant Suit (CPF-2) or equivalent………………… | $35.00 | Each |
| Chemical Resistant Suit (CPF-3) or equivalent………………… | $50.00 | Each |
| Chemical Resistant Suit (CPF-4) or equivalent………………… | $65.00 | Each |

8

# Lawson Environmental Service L.L.C.

## 1800-407-0008*985-876-0420

### February 2010

| | | |
|---|---|---|
| Chemical Resistant Suit, Tyvek/NexGen | $15.00 | Each |
| Firefighter Structural Turn-Out Gear/Bunker Gear | $250.00 | Day |
| Flame Retardant Coveralls | $25.00 | Day |
| Flash Suit, Level A, Disposable | $1800.00 | Each |
| Fully Encapsulated Level B (CPF-3) or equivalent | $125.00 | Each |
| Fully Encapsulated Level B (CPF-4) or equivalent | $185.00 | Each |
| Gloves/Boots Covers, SilverShield | $15.00 | Pair |
| Gloves-Butyl, w/inner gloves | $38.00 | Pair |
| Gloves, Inner | $1.00 | Pair |
| Gloves, Leather | $8.00 | Pair |
| Gloves-PVC, Nitrile, Neoprene, w/inner gloves | $12.00 | Pair |
| Gloves-Viton, w/inner gloves | $75.00 | Pair |
| Level A, Disposable | $750.00 | Each |
| Level A, Disposable equipped with breathing air pass-thought | $1450.00 | Each |
| Level A Suit Pressure test Kit | $25.00 | Test |
| Level D Modified (Includes 2 Tyvek/NexGen Coveralls or1 CPF-2 and 2 pair gloves | $80.00 | Man/Day |
| PVC-Coated Tyvek Suit | $20.00 | Each |
| Rain Suit | $20.00 | Each |
| Safety Vest, Fluorescent | $5.00 | Day |
| Splash Shield | $5.00 | Each |
| Survival Suit, Cold Weather Flotation | $35.00 | Day |
| Tyvek/NexGen | $15.00 | Each |
| Waders, Chest | $35.00 | Day |
| PPE | $80.00 | Day |

**Fall Protection and Confined Space Entry Equipment:**

| | | |
|---|---|---|
| Confined Space Rescue Equipment | $150.00 | Job |
| Full Body Harness | $35.00 | Day |
| Life Safety Rope | $1.25 | Foot |
| Log Out/Tag Out Kit | $50.00 | Job |
| Retrieval Tripod with Winch | $150.00 | Day |
| Tank Car Entry Ladder | $30.00 | Day |

**Respiratory Protection:**

| | | |
|---|---|---|
| Air Hose (50'section) | $10.00 | Section/Day |
| Air System Recharge Fee | $25.00 | Bottle |
| Breathing Air Trailer (Does not include ancillary equipment) | $250.00 | Day |
| Cascade System: | | |
| Per Person including hip mounted unit, 50' air hose and mask | $175.00 | Day |
| Dust Mask, Disposable | $2.50 | Each |
| Respirator Advantage 1000 Chem/Bio APR | $100.00 | Day |

9

# Lawson Environmental Service L.L.C.
## 1800-407-0008*985-876-0420
### February 2010

| | | |
|---|---|---|
| Respirator Cartridges, Advantage 100 Chem/Bio.................... | $50.00 | Each |
| Respirator Cartridges, Mercury...................................... | $40.00 | Pair |
| Respirator Cartridges, Organic...................................... | $35.00 | Pair |
| Respirator, Full Face, APR........................................... | $75.00 | Day |
| Self Contained Breathing Apparatus, 60-Minute.................... | $225.00 | Day |

**Traffic Control Equipment:**

| | | |
|---|---|---|
| Traffic Control Trailer with barrels, cones, signs, sign lights, signal flags, etc. for 0.25 – 1.0 mile of lane closure.......................... | $1000.00 | Day |
| Individual barrels, cones, signs, sign lights, signal flags, etc. for less than 0.25 or grater than 1.0 mile  lane closure.............. | $25.00 | Each/Day |
| Flashing Arrow Trailer, Solar Powered............................... | $250.00 | Day |
| Traffic Wand LED Light............................................... | $10.00 | Day |
| Traffic Safety Vest.................................................... | $5.00 | Day |
| Traffic Control Supervisor........................................... | $65.00/Hr | $97.50/OT |
| Traffic Control Technician............................................ | $42.00/Hr | $63.00/OT |
| Traffic Barricades, Water Filled...................................... | $30.00 | Day |

**Field Instrumentation and Supplies:**

**Air Monitoring Equipment**

| | | |
|---|---|---|
| 4-Gas Meter Plus PID................................................. | $225.00 | Day |
| Colorimetric Detector Tube (MSA and Draeger)..................... | $15.00 | Each |
| Colorimetric Tube Pump (MSA, Draeger)............................. | $65.00 | Day |
| Combustible Gas Indicator/4-Gas Meter.............................. | $125.00 | Day |
| Jerome 431-X Portable Mercury Vapor Analyzer..................... | $200.00 | Day |
| Laboratory Analysis for Filter Tubes, Vacuum Canisters And Tedlar Bags................................................. | Cost + 20% | |
| Lumex Mercury Analyzer............................................. | $400.00 | Day |
| Miran SappIRe Portable Ambient Air Analyzer....................... | $550.00 | Day |
| OVA (PID)............................................................. | $250.00 | Day |
| OVM (PID)............................................................. | $200.00 | Day |
| OVM (PID), ppb RAE.................................................. | $225.00 | Day |
| Random Aerosol Monitor (Mini Ram)................................. | $125.00 | Day |
| Sampling Pump, Personnel............................................ | $25.00 | Day |
| Sampling Tube, Charcoal............................................. | $10.00 | Tube |
| Sampling Tube, PUF.................................................. | $30.00-60.00 | Tube |

10

# Lawson Environmental Service L.L.C.
## 1800-407-0008*985-876-0420
### February 2010

| | | |
|---|---|---|
| Sampling Tube, Silica Gel | $12.00 | Tube |
| Sampling Tube, TDT | $65.00 | Tube |
| Sampling Tube, Teflon/Tygon, to 1/4" I.D. | $3.00 | Foot |
| Tedlar Bag | $60.00 | Bag |
| Toxic Gas Detector, Multiple Gases | $200.00 | Day |
| Toxic Gas Detector, Single Gas | $125.00 | Day |
| Vacuum Canister | $45.00 | Canister |
| Weather Station, Portable with Computer Interphase | $175.00 | Day |

**Testing/Sampling Equipment**

| | | |
|---|---|---|
| Bailer, Polyethylene (Disposable) | $18.00 | Each |
| Biological Threat Alert Kit | $250.00 | Day |
| Biological Threat Test | $75.00 | Each |
| Clor-N-Oil Test Kit | $25.00 | Each |
| Clor-N-Soil Test Kit | $35.00 | Each |
| Clor-N-Tect Test Kit | $30.00 | Each |
| Coliwasa, Disposable Glass | $15.00 | Each |
| Conductivity Meter | $50.00 | Day |
| HazCat Testing | | |
| HazCat Kit | $75.00 | Day |
| Portable Vented Hood with Explosion Proof Exhaust Fan | $150.00 | Day |
| Tests | $5.00 | Each |
| Ohm Meter for Ground Testing | $50.00 | Day |
| pH Indicator Spray | $12.00 | Liter |
| pH Indicator Strips | $20.00 | Pack |
| pH Meter | $50.00 | Day |
| pH Pen | $20.00 | Day |
| Radiation Survey Meter | $125.00 | Day |
| Sample Bottles, 4-12 ounce | $6.00 | Each |
| Sample Bottles, 16-32 ounce | $8.00 | Each |
| Sample Bottles, VOC | $3.50 | Each |
| Sample Kit | $25.00 | Each |
| Soil Auger, Stainless Steel | $50.00 | Day |
| Thermometer, Infrared Laser | $50.00 | Day |

## DECONTAMINATION, CLEANING SUPPLIES AND NEUTRALIZING AGENTS:

**Decontamination Equipment:**

| | | |
|---|---|---|
| Biological Agent Decontamination Kit | $50.00 | Day |
| Bloodborne Pathogen Decontamination Kit | $25.00 | Day |
| Decontamination Brushes | $15.00 | Each |

11

# Lawson Environmental Service L.L.C.
## 1800-407-0008*985-876-0420
### February 2010

| | | |
|---|---|---|
| Decontamination Pool (6' round)............................................ | $25.00 | Each |
| Decontamination Pool (20'X100')........................................... | $300.00 | Day |
| Emergency Shower, Portable.................................................. | $100.00 | Day |
| Eye Wash, Portable............................................................. | $20.00 | Day |
| Personnel Decon Station (1 poly pool, brushes, decon solution, | | |
| Rubber matting, 2 pump sprayers)........................................... | $90.00 | Job |
| Pump Sprayer.................................................................... | $30.00 | Job |

### Cleaning Supplies, Neutralizing Agents and Inoculants

| | | |
|---|---|---|
| Alcohol, Isopropyl (Pesticide Grade)....................................... | $20.00 | Liter |
| Bleach, Household Strength (5%)............................................ | $3.00 | Gallon |
| Citric Acid, 50 lbs.............................................................. | $68.00 | Bag |
| Citrus Cleaner.................................................................. | $18.00 | Gallon |
| Degreaser, General Purpose Petroleum Based.............................. | $25.00 | Gallon |
| Degreaser, Hot Tank, 55-Gallon Drum...................................... | $515.00 | Drum |
| Degreaser, Hot Tank........................................................... | $12.00 | Gallon |
| Degreaser, VC Cleaner........................................................ | $18.00 | Gallon |
| Degreaser, "Walter", 55-Gallon Drum...................................... | $385.00 | Drum |
| Degreaser, "Walter".......................................................... | $10.00 | Gallon |
| Detergent (Dawn, Joy etc.)................................................... | $4.00 | 12 oz. |
| Detergent Liqui-Nox........................................................... | $12.00 | Quart |
| Detergent Phosphate Free (Alconox, Alcojet), 4 lbs...................... | $25.00 | Box |
| Ferrous Sulfate, 50 lbs........................................................ | $25.00 | Bag |
| Hand Cleaner................................................................... | $5.00 | Tube |
| Hydrochloric/Muratic Acid (Minimum 30% Strength).................... | $8.00 | Gallon |
| Hydrochloric/Muratic Acid, 55-Gallon Drum.............................. | $285.00 | Drum |
| Hydrogen Peroxide, 55-Gallon Drum........................................ | $515.00 | Drum |
| Lime, Agricultural, 50 lbs..................................................... | $12.00 | Bag |
| Lime, Hydrated, 50 lbs........................................................ | $16.00 | Bag |
| Lubricant/Rust Inhibitor (WD-40, LPS, Liquid Wrench, etc.)........... | $25.00 | Gallon |
| Lubricant/Rust Inhibitor (WD-40, LPS, Liquid Wrench, etc.)........... | $8.00 | 12oz Spray |
| Micro Blaze..................................................................... | $195.00 | 5 Gallons |
| Simple Green.................................................................... | $18.00 | Gallon |
| Super Clean...................................................................... | $18.00 | Gallon |
| Soda Ash, 50 lbs............................................................... | $20.00 | Bag |
| Sodium Bicarbonate, 50 lbs (Industrial Grade)............................ | $36.00 | Bag |
| Sodium Hydroxide Solution (Minimum 50% Strength)................... | $5.00 | Gallon |
| Sodium Hydroxide Solution, 55-Gallon Drum.............................. | $185.00 | Drum |
| Sodium Hypochlorite Solution (Minimum 10% Strength)................. | $7.00 | Gallon |
| Sodium Hydroxide Solution, 55-Gallon Drum.............................. | $250.0 | Drum |
| Trisodium Phosphate, 50 lbs.................................................. | $50.00 | Bag |

# Lawson Environmental Service L.L.C.
## 1800-407-0008*985-876-0420
## February 2010

**Mercury Spill Control Equipment:**

| | | |
|---|---|---|
| Carpet Knives | $15.00 | Each |
| Exhaust Blower | $35.00 | Day |
| Heat Gun, Electric | $35.00 | Day |
| Heater, Room | $25.00 | Day |
| Heater, Torpedo | $50.00 | Day |
| Jerome 431-X Portable Mercury Vapor Analyzer | $200.00 | Day |
| Lumex Mercury Analyzer | $400.00 | Day |
| Mercon Solution | $125.00 | Gallon |
| Mercon Wipes (Package of 70) | $60.00 | Each |
| Mercury Check Swab | $10.00 | Each |
| Mercury Granular Absorbent | $125.00 | 2,500 grams |
| Mercury Indicator Powder | $50.00 | 250 grams |
| Mercury Vacuum | $175.00 | Day |
| Torch, Propane | $20.00 | Day |
| Propane Cylinders, 20 oz. | $3.00 | Each |

**COMMUNICATIOS AND OFFICE EQUIPMENT**

| | | |
|---|---|---|
| Cellular Phone | $45.00 | Day |
| Copier | $55.00 | Day |
| Digital Camera | $25.00 | Day |
| Electronic Copies of Reports, Documents, Photographs CD | $10.00 | Each |
| Fax Machine | $55.00 | Day |
| Global Positioning System Receiver | $20.00 | Day |
| Laptop Computer with Printer | $55.00 | Day |
| Radio, 2 way Hand-Held | $25.00 | Day |
| Radio, 2 way Hand-Held (Intrinsically Safe) | $50.00 | Day |
| Satellite Phone (Includes 30 minutes airtime) | $125.00 | Day |
| Video Camera | $75.00 | Day |

**MISCELLANEOUS EQUIPMENT AND SUPPLIES**

| | | |
|---|---|---|
| Air Compressor, to 12 CFM | $35.00 | Day |
| Air Compressor, trailer-mounted (110-185 CFM) | $150.00 | Day |
| Air Compressor, trailer-mounted (250 CFM) | $185.00 | Day |
| Air Horn/Coppus Blower | $35.00 | Day |
| ATV (4-wheeler) | $450.00 | Day |
| ATV (4-wheeler) Trailer | $50.00 | Day |
| ATV (4-wheeler) Trailer, All-Terrain | $75.00 | Day |
| Binoculars | $10.00 | Day |
| Bird Scare Gun with Propane Bottle | $35.00 | Day |

13

# Lawson Environmental Service L.L.C.
## 1800-407-0008*985-876-0420
### February 2010

| | | |
|---|---|---|
| Blast-Resistant Container Sample………………………………… | $225.00 | Day |
| Blower, Leaf…………………………………………………… | $75.00 | Day |
| Chain, 3/8" to 5/8" (25' Section)………………………………… | $15.00 | Day |
| Chain Saw……………………………………………………… | $75.00 | Day |
| Chop Saw……………………………………………………… | $75.00 | Day |
| Chop Saw Blade………………………………………………… | $20.00 | Each |
| Containment Berm, Portable (less than 10' X 10')…………… | $25.00 | Day |
| Containment Berm, Portable (10' X 50')………………………… | $50.00 | Day |
| Cutting Torch, Gauges & Gas (1 oxygen & 1 acetylene cyl.)…… | $150.00 | Day |
| Drill, Pneumatic………………………………………………… | $35.00 | Day |
| Drill Kit, Pneumatic for drilling tankers……………………… | $100.00 | Day |
| | | |
| **Drums:** | | |
| 110-Gallon Poly Overpack……………………………………… | $275.00 | Each |
| 95-Gallon Poly Overpack……………………………………… | $185.00 | Each |
| 85-Gallon Steel recovery……………………………………… | $150.00 | Each |
| 55-Gallon Closed/Open Top Steel……………………………… | $65.00 | Each |
| 55-Gallon Closed/Open Top Poly……………………………… | $60.00 | Each |
| 30-Gallon Steel Drum…………………………………………… | $40.00 | Each |
| 20-Gallon Pollution Can……………………………………… | $12.00 | Each |
| 5-Gallon Bucket with Lid……………………………………… | $12.00 | Each |
| 5-Gallon Lab-Pack Bucket with Screw Top…………………… | $18.00 | Each |
| Drum Dolly……………………………………………………… | $25.00 | Day |
| Drum Insert, 55-Gallon (Polyethylene)………………………… | $20.00 | Each |
| Drum Labels……………………………………………………… | $2.00 | Each |
| Drum Lift……………………………………………………… | $20.00 | Day |
| Drum Liners…………………………………………………… | $1.50 | Each |
| Drum Pump – Disposable……………………………………… | $25.00 | Each |
| Drum Wrench, Non-Sparking………………………………… | $10.00 | Day |
| Exhaust Blower, Non-Intrinsically Safe……………………… | $35.00 | Day |
| Extension Cord, Electrical……………………………………… | $8.00 | Day |
| Fan, Industrial 36" – 48", Non-Intrinsically Safe…………… | $35.00 | Day |
| Fan, Intrinsically-Safe Blower/Exhaust with 50' Duct………… | $75.00 | Day |
| Fence, Construction Safety, 100'……………………………… | $55.00 | Roll |
| Fence, Silt, 100'……………………………………………… | $38.00 | Roll |
| Fire Extinguisher to 20 lb……………………………………… | $10.00 | Day |
| Foam, AFFF…………………………………………………… | $150.00 | 5 Gallon |
| Foam Eductor………………………………………………… | $75.00 | Day |
| Form, Bill of Lading…………………………………………… | $5.00 | Each |
| Form, Waist Manifest………………………………………… | $5.00 | Each |
| Generator to 4 KW…………………………………………… | $100.00 | Day |
| Generator, 4.1 to 8.0 KW……………………………………… | $175.00 | Day |
| Generator, 8.1 to 12 KW……………………………………… | $225.00 | Day |
| Generator, 12.1 to 25 KW……………………………………… | $325.00 | Day |

14

# Lawson Environmental Service L.L.C.
## 1800-407-0008*985-876-0420
### February 2010

| | | |
|---|---|---|
| Generator, 25.1 to 40 KW................................................ | | |
| Generator, 40.1 to 50 KW................................................ | $400.00 | Day |
| Grounding/Bonding Equipment, Rods and Cables.................... | $550.00 | Day |
| Hand Tools/Pneumatic.................................................... | $10.00 | Each/Day |
| Heat Gun.................................................................... | $35.00 | Day |
| Heater, Room............................................................... | $35.00 | Day |
| Heater, Torpedo........................................................... | $25.00 | Day |
| Hose Wrap, 2".............................................................. | $50.00 | Day |
| Hose Wrap, 4".............................................................. | $1.20 | Per |
| Impact Wrench, 1"......................................................... | $1.80 | Per' |
| Inverter to 1000 Watts.................................................... | $50.00 | Day |
| Ladder, Step to Extension................................................ | $10.00 | Day |
| | $20.00 | Day |

**Lighting:**

| | | |
|---|---|---|
| Flashlight, Intrinsically Safe............................................ | | |
| Flashlight, Non-Intrinsically Safe...................................... | $10.00 | Day |
| Flood Light, Explosion Proof............................................ | $5.00 | Day |
| Light Plant, Trailer Mounted............................................ | $75.00 | Day |
| Light Stand, Portable..................................................... | $125.00 | Day |
| Lock Out/Tag Out Kit.................................................... | $25.00 | Day |
| NFPA 704 Marking System, Magnetic.................................. | $50.00 | Job |
| Nippers, Metal Cutting, Pneumatic..................................... | $10.00 | Day |
| Pallet Jack, Pneumatic.................................................... | $50.00 | Day |
| Pallet Puller................................................................ | $35.00 | Day |
| Paste, Kolor Kut........................................................... | $15.00 | Day |
| Pipe Cutter & Threader (Manual)....................................... | $5.00 | Tube |
| Plugging, Epoxy Stick.................................................... | $35.00 | Day |
| Plugging/Patching Kit.................................................... | $12.00 | Each |
| Polyethylene Sheeting (4-6 ml 40' X 100')............................ | $30.00 | Plug/Patch |
| Polyethylene Sheeting (4-6 ml 20' X 100')............................ | $125.00 | Roll |
| | $75.00 | Roll |

**Pressure Washing Equipment:**

| | | |
|---|---|---|
| Hydroblaster, to 10,000 psi.............................................. | | |
| Hydroblaster, 10,001 to 20,000 psi..................................... | $475.00 | Day |
| Pressure Washer........................................................... | $575.00 | Day |
| Pressure Washer Hose, 50' (3,500 psi)................................. | $400.00 | Day |
| Pressure Washer Nozzle, Turbo (3,500 psi)........................... | $25.00 | Day |
| Pressure Washer Wand, Telescopic (3,500 psi)....................... | $20.00 + Rebuild | Day |
| Steam Cleaner.............................................................. | $25.00 | Day |
| Steam Cleaner, trailer-mounted, self-contained..................... | $225.00 | Day |
| With water tank............................................................ | | |
| | $500.00 | Day |

**Rope:**

| | | |
|---|---|---|
| 1/4".......................................................................... | | |
| | $55.00 | Roll |

15

# Lawson Environmental Service L.L.C.
## 1800-407-0008*985-876-0420
## February 2010

| | | |
|---|---|---|
| 3/8".......................................................... | $75.00 | Roll |
| 1/2".......................................................... | $85.00 | Roll |
| 3/4".......................................................... | $100.00 | Roll |
| Shelter, Pop-up (10' x 10')............................ | $25.00 | Day |
| Shrink Wrap.............................................. | $20.00 | Roll |
| Silicone Caulk........................................... | $10.00 | Tube |
| "T" Post................................................... | $5.00 | Each |
| "T" Post Driver.......................................... | $10.00 | Day |
| Table, Polyethylene..................................... | $8.00 | Day |
| Tank, Polyethylene to 2,000 gallons................. | $50.00 | Day |
| Tank, Polyethylene 2,001 to 4,000 gallons.......... | $100.00 | Day |
| Tank, Polyethylene 4,001 to 6,000 gallons.......... | $150.00 | Day |
| Tank Gauging Stick, 10' – 12'......................... | $10.00 | Day |

**Tape:**

| | | |
|---|---|---|
| Barrier..................................................... | $35.00 | Roll |
| Chemical Resistant Duct Tape......................... | $25.00 | Roll |
| Duct........................................................ | $9.00 | Roll |
| Electrical.................................................. | $3.00 | Roll |
| Teflon Tape............................................... | $1.75 | Roll |
| Tape Measure, 100' – 300'............................. | $5.00 | Day |
| Tape, Oil Gauging (1/2" X 75')........................ | $20.00 | Day |
| Tape, Roller-Wheel...................................... | $20.00 | Day |
| Tarpaulin, 15' X 15'..................................... | $25.00 | Day |
| Teflon Packing Material................................. | $60.00 | 1-lb/Roll |

**Tools:**

| | | |
|---|---|---|
| Drill Kit, Pneumatic for drilling tankers.............. | $100.00 | Day |
| Electric/Battery-Powered Hand Tools (Skill Saw, Reciprocating, Saw, Drill, Band Saw, etc.)............................. | $25.00 | Day |
| Hand Tools (Shovels, Rakes, Nets, Pitchforks, etc.)............... | $20.00 | Each/Job |
| Hand Tools, Non-Sparking.............................. | $25.00 | Day |
| Hand Tools, Pneumatic, Miscellaneous............... | $35.00 | Day |
| Nippers, Metal Cutting, Pneumatic.................... | $50.00 | Day |
| Reciprocating Saw Blade................................ | $2.00 | Each |
| Tool Kit, Non-Sparking.................................. | $75.00 | Day |
| Tote Container, Polyethylene........................... | $25.00 | Day |
| Tubing, Teflon/Tygon, to ¼" I.D...................... | $3.00 | Foot |

**Vacuum Equipment:**

| | | |
|---|---|---|
| Drum Vacuum, Stainless Steel, 2".................... | $225.00 | Day |
| HEPA Vacuum............................................ | $125.00 | Day |
| Mercury Vacuum......................................... | $175.00 | Day |
| Wet/Dry Vacuum......................................... | $50.00 | Day |

16

# Lawson Environmental Service L.L.C.
## 1800-407-0008*985-876-0420
### February 2010

| | | |
|---|---|---|
| Weed Eater, Industrial.......................................................... | | |
| Weed Eater, Industrial, With Tiller Attachment.................... | $75.00 | Day |
| Welding Machine, Portable with rods, hood, hand tools, etc........... | $90.00 | Day |
| Wheelbarrow.......................................................................... | $225.00 | Day |
| | $25.00 | Day |

**Mileage charge for Vehicles and Trailers:**

| | | |
|---|---|---|
| Gallon of Fuel = $2.00............................................................ | | |
| Gallon of Fuel = $2.01 - $2.50................................................ | $1.00 | Mile |
| Gallon of Fuel = $2.51 - $3.00................................................ | $1.25 | Mile |
| Gallon of Fuel = $3.01 - $3.50................................................ | $1.50 | Mile |
| Gallon of Fuel = $3.51 - $4.00................................................ | $1.75 | Mile |
| Gallon of Fuel = $4.01 - $4.50................................................ | $2.00 | Mile |
| Gallon of Fuel = $4.51 - $5.00................................................ | $2.25 | Mile |
| | $2.50 | Mile |

1. Personnel will be charged portal to portal, with a (4) hour minimum upon activation. The client will be charged for the time required to service, repair and restock all vehicles and equipment used during the project. This fee will be charged at cost plus 20%.

2. Straight time rates apply to the first (1*) 8 hours "Worked" between 0800-1600, Monday through Friday. All worked, including Saturday and Sunday will be charged at the Overtime rate. Double Time (Double the straight time rate) will be charged for all LES holidays, which include Christmas day, New Years day, Mardi Gras day, Good Friday, Memorial day, Independence day, Labor day, and Thanksgiving day. When these holidays fall on a weekend, the nearer weekday will be charged at the Overtime rate.

3. Subsistence will be charged when an employee is performing work over fifty (50) miles from their normally assigned LES location (this being the farthest point work is being performed in the event the project requires marine operations) at a rate of $120.00 per/day-per/employee. When working in high cost areas as defined by the U.S. Government Travel Regulations, subsistence rates may increase.

4. Personnel travel time via air, land or water will be charged at LES's current rate sheet. Extraordinary travel expenses i.e. airline tickets, charter aircraft, taxi, parking, etc., will be charged at cost plus 20%. Travel expenses for long-term, onsite personnel who are permitted to return home every three (3) weeks will be charged at cost plus 20%

5. Personnel Protection Equipment not listed will be billed at cost plus 20%

6. **HEAT STRESS:** Due to working conditions and elevated temperatures, all personnel will be provided water and electrolyte drinks throughout the project in an effort to reduce heat related injuries.

7. **SITE SAFETY:** Due to the number of personnel or conditions at work site, LES may require a safety officer(s) to be dispatched to the site. The safety officers will remain on site and billed for until LES and Customer agree that the services are no longer needed.

8. Any additional or follow-up work; reports, permitting, meeting, meetings, consent orders, insurance meetings or any other commitment of time requested by client or required by government agencies, courts or other involved parties will be charged to the client at the applicable daily rate (not less than $500.00/day) plus transportation and subsistence.

9. LES reserves the right to bill client for all items and adjustments made by a third party negotiators(qualified individuals, adjusters, etc.).

10. LES reserves the right ti bill for adjustments made necessary due to quality assurance checks and/or internal audits.

11. LES will at no time allow post emergency response negotiated rates to become retroactive.

12. Equipment is charged portal-to-portal from time of activation.

17

# Lawson Environmental Service L.L.C.
## 1800-407-0008*985-876-0420
## February 2010

13. Upon completion of project the equipment will be returned to its condition at the time of activation. The client will be billed at the equipment rate while the equipment is being decontaminated and/or repaired. If, during the performance of a service and/or services for a client, equipment and/or material sustain damage which renders the equipment and/or material beyond repair or renders decontamination impossible, said equipment and/or materials will be subject to a replacement charge at LES's cost plus 20% unless said damages was sustained as a result of misuse by a LES personnel.

14. Personnel held in reserve, either on-site or at a dispatch point for the exclusive benefit of the client, will be charged at full rates.

15. Subsistence will be charged at the rate of $120.00 per/day/man will be charged when s standby employee is required to be held off-site.

16. Ratio of trucks to personnel will be one truck to every 4 employees except for project managers, supervisors, foreman, health and safety personnel who will have a ratio of one to one.

18



## Spill Response
### Horizon Incident
### <u>Billing Requirements Sheet</u>

| | |
|---|---|
| Project Description: | **Spill Response** |
| SAP Project Number: | **Z4-0059V** |
| Paykey Number: | ZKRAUMD252 |
| WBS Information: | Z4-0059V-E:OILSPILLRESP |

WBS to be used for all activity associated with the response to the spill of hydrocarbon into the GoM and related support activities.

| | |
|---|---|
| Invoices should be sent to: | BP Exploration and Production, Inc.<br>Attention: Scanning Department<br>P.O. Box 22024, Room S646<br>Tulsa, Oklahoma  74121-2024 |
| Vendor Hotline: | (800) 284-2244 Automated Line |

Please use the above information for <u>the Oil Spill Response only.</u>  Paykey and WBS numbers are scope specific and change with each scope of the Horizon Incident.

Each invoice presented must contain the following information:
- Short (high-level) remark / comment of activities performed or type of services provided
- Paykey Number and WBS (see notes above)
- Billing Period
- For reimbursable charges, all invoice copies/travel receipts should be attached
- Name of person ordering the materials/services or supervisor
- Signed/Approved Timesheet and/or Invoice (Signed by authorized BP employee with name of BP representative in PRINT)
- Your billing department contact and phone number
- Reasonable verification of services/goods rendered is requested

<u>Notice</u>: Your invoice(s) will be rejected if it does not contain reasonable support confirming services/goods rendered.  If this occurs, you will be notified and a new invoice should be sent to Tulsa for processing, thus delaying payment.

*This information is confidential and proprietary.  Receipt by anyone other than the intended recipient is prohibited.*



## Spill Response
### Horizon Incident
### Billing Requirements Sheet

Project Description:     **Spill Response**
SAP Project Number:     **Z4-0059V**
Paykey Number:           ZKRAUMD252
WBS Information:       Z4-0059V-E:OILSPILLRESP

WBS to be used for all activity associated with the response to the spill of hydrocarbon into the GoM and related support activities.

Invoices should be sent to:    BP Exploration and Production, Inc.
                           Attention: Scanning Department
                           P.O. Box 22024, Room S646
                           Tulsa, Oklahoma 74121-2024

Vendor Hotline:            (800) 284-2244 Automated Line

Please use the above information for the Oil Spill Response only. Paykey and WBS numbers are scope specific and change with each scope of the Horizon Incident.

Each invoice presented must contain the following information:
- Short (high-level) remark / comment of activities performed or type of services provided
- Paykey Number and WBS (see notes above)
- Billing Period
- For reimbursable charges, all invoice copies/travel receipts should be attached
- Name of person ordering the materials/services or supervisor
- Signed/Approved Timesheet and/or Invoice (Signed by authorized BP employee with name of BP representative in PRINT)
- Your billing department contact and phone number
- Reasonable verification of services/goods rendered is requested

Notice: Your invoice(s) will be rejected if it does not contain reasonable support confirming services/goods rendered. If this occurs, you will be notified and a new invoice should be sent to Tulsa for processing, thus delaying payment.

*This information is confidential and proprietary. Receipt by anyone other than the intended recipient is prohibited.*

Exhibit "C" – Compensation Schedule
Page 1 of 1
Rev 3 approved by PC 6-1-08
File: C:\Documents and Settings\Garza\Desktop\Contracts\Oper Working\Lawson Environmental Services\Lawson Environmental Service, LLC-MSC No. HOU-WLA-3356.Doc

Contract No. HOU-WLA-3356

# Lawson Environmental Service L.L.C.
## 1800-407-0008*985-876-0420
## August 23, 2010

**Oil Spill Emergency Response: Amended effective for BP August 23,2010**
**Oil is defined as crude oil, bunker oils or other <u>petroleum</u> products that are not listed or defined as DOT hazardous materials; OSHA regulated hazardous substances, CERCLA hazardous substances or RCRA hazardous waste.**

|  | Straight Time | Overtime |
|---|---|---|
| Senior Project Manager………………………………………… | $120.00 | $120.00 |
| Project Manager……………………………………………… | $75.00 | $75.00 |
| Certified Industrial Hygienist………….....……………….... | $90.00 | $90.00 |
| Toxicologist…………………………………………………… | $90.00 | $90.00 |
| Chemist, Geologist, Biologist, or other professional position…. | $90.00 | $90.00 |
| Health and Safety Manager………………………………… | $60.00 | $90.00 |
| Supervisor……………………………………………………… | $70.00 | $70.00 |
| Foreman………………………………………………………… | $60.00 | $60.00 |
| Transportation and Disposal Coordinator………………………… | $45.00 | $67.50 |
| Logistics Administrator………………………………………… | $45.00 | $67.50 |
| Heavy Equipment Operator…………………………………… | $45.00 | $67.50 |
| Boat Captain (Boats over 20')……………………………… | $60.00 | $60.00 |
| Boat Operator (Boats under 20')…………………………… | $40.00 | $60.00 |
| Mechanic……………………………………………………… | $36.00 | $54.00 |
| Spill Technician……………………………………………… | $44.00 | $66.00 |
| Field Clerk…………………………………………………… | $40.00 | $60.00 |
| Truck Driver…………………………………………………… | $40.00 | $60.00 |
| Vacuum Truck Operator……………………………………… | $40.00 | $60.00 |

**Vessels:**

| | | |
|---|---|---|
| 105' to 110' OSRV, Rescue Vessel and Fire Fighting Capable…… | $4500.00 | Day |
| 50' to 60' OSRV, OSV and Fire Fighting Capable…………..l…… | $4000.00 | Day |
| 30' Barge Boat, Twin Outboards over 100-HP………………………… | $1250.00 | Day |
| 32'………………………………………………………………… | $1500.00 | Day |
| 34'………………………………………………………………… | $1800.00 | Day |
| 36'………………………………………………………………… | $2000.00 | Day |
| 38'………………………………………………………………… | $2100.00 | Day |
| 28' – 32' Fast Response Vessel, Twin Outboards over 200-HP…… | $1500.00 | Day |
| 20' – 26' Fast Response Boat, Twin Outboards over 100-HP……… | $550.00 | Day |
| 20' – 26' Fast Response Boat, One Outboard over 200-HP………… | $850.00 | Day |
| 20' – 26' Fast Response Boat, Twin Outboards up to 100-HP……… | $650.00 | Day |
| 18' – 25' Fast Response Boat, Twin Outboards up to 100-HP……… | $500.00 | Day |
| 18' – 25' Fast Response Boat, One Outboard over 50-HP………… | $450.00 | Day |

1

# Lawson Environmental Service L.L.C.

## 1800-407-0008*985-876-0420

## August 23, 2010

| | | |
|---|---|---|
| 16' – 18' Work Boat over 20 –HP Outboard........................... | $200.00 | Day |
| 16' – 18' Work Boat with Go-Devil.................................... | $250.00 | Day |
| 16' – 18' Work Boat without Motor.................................... | $100.00 | Day |
| 10' – 14' Flat-Bottom Boat with Motor .............................. | $150.00 | Day |
| 10' – 14' Flat-Bottom Boat without Motor........................... | $100.00 | Day |
| 20' Goo-Gobbler – Skimmer Response Vessel....................... | $750.00 | Day |
| 26' Goo-Gobbler – Skimmer Response Vessel....................... | $3,500.00 | Day |
| 30X120 Deck Barge.................................................... | $1,200.00 | Day |
| 30X120 Spud Barge.................................................... | $1,500.00 | Day |
| 600HP Tug............................................................. | $4,000.00 | Day |
| 1,000HP Tug........................................................... | $5,800.00 | Day |

- Fuel for all vessels will be charged at Cost + 20 %
- Vessels are equipped with paddles and personal flotation devices for **Lawson Environmental Service L.L.C** personnel.

EXHIBIT "A"

### WORK RELEASE AGAINST MASTER SERVICE CONTRACT

Date:                               May 24, 2010

Work Release requested by:          Chatt Smith

This Work Release is subject to the terms and conditions of Master Service Contract No. HOU-WL4-3356 between BP Exploration & Production Inc. and Lawson Environmental Services, LLC, effective May 24th, 2010.   NOTHING CONTAINED IN THIS WORK RELEASE SHALL BE CONSTRUED AS AN AMENDMENT TO THE TERMS OF THE REFERENCED MASTER SERVICE CONTRACT.

Company:                            BP Exploration & Production, Inc.

Contractor:                         Lawson Environmental Services, LLC
                                    2108 Denley road
                                    Houma, LA 70363
                                    Attention: Cecil Lawson
                                               Telephone: 985-876-0420
                                               Fax:        985-876-0270
                                               e-mail:     cecil@lesllc.net

Work Release No:                    HOU-WL4-3356-001

Paykey No.                          ZKRAUMD252

Project Identification:             MC-252

Not To Exceed Value of
        Work Release :              $10,000,000.00

Fixed Lump Sum:                     N/A

Expected start date:                May 27, 2010

Expected completion date:           August 26, 2010

### Description/Scope of Work/Additional Terms and Conditions:

Scope of Work:

Provision of Oil Spill Response Organization ("OSRO") services, management and oversight and more specifically:

- Management of OSRO and Oil Spill Responder Subcontractors
- Construction Management and miscellaneous construction services
- Materials management and logistics
- Inland waterway Oil Spill Response Management and oversight
- OSRO and responder integration
- Management of Responder Deployment
- Labor, equipment and supplies required by the services rendered and approved by Company such as:
  - Labor (estimate):
    - Senior PM (1)
    - Supervisor (2)
    - Foreman (5)
    - Remediation Tech (45)

- Boat operator (15)
- Field clerk (4)
- Heavy equipment operator (2)
- ...
  - Equipment:
    - Pick up trucks
    - Trailers
    - Trucks
    - Command center
    - Boats
    - Supply vessels
    - Forklifts
    - Drum roller/paver
    - Bulldozer
    - Compressors
    - Generators
    - Offshore lights
    - Laptop computers & printers
    - Cell phones
    - GPS systems
    - Handheld radios,
    - .....
  - Supplies:
    - Safety glasses
    - Safety vests
    - First aid kits
    - Sunblock
    - Duct tape
    - Drum liners
    - Drinks/snacks
    - Fuel
    - ...

**Rates:**

All rates for labor, equipment, and supplies are specified in Exhibit "C" of the Master Services Contract with the exception of the following:

- Skilled Construction Labor:     $35.00/hour
- Unskilled Construction Labor:   $25.00/hour

**Additional terms and conditions:**

1. The value of this Work Release is not guaranteed. This is a 3 months Not To Exceed estimate to be drawn against.
2. Above services can be terminated at any time, partially or in their entirety and without cause by either party before the Not To Exceed value has been reached.
3. Daily work reports will be submitted for approval to a BP employee and will be attached to each invoice. Invoicing will be based on actual "usage" as supported by day rate logs and approved day rate sheets.
4. If Company deems necessary to extend this Work Release, a Chang Order will be issued by Company.

Forward invoices/statements to:    BP Exploration & Production Inc.
Attention: Scanning Dept. S646
P.O. Box 22024
Tulsa, OK 74121-2024
Work Release No. HOU-WL4-3356-001
Paykey No.        ZKRAUMD252

Facsimile signatures are acceptable for all purposes and shall have the same force and effect as an original.

*Lawson Environmental Service*

*by*

ACCEPTED BY: _Cecil Lawson_              APPROVED BY: _____
                    Contractor                                      Company

Date: _8-4-2010_                              Date: _8/23/10_

Notices:        Contractor Representative:
                  _Cecil Lawson_                   Company Representative:
                  Attention: _____
                  Mail Code: _____
                  Telephone: _(985) 876-0420_      Attention:  Tamara Garrett
                  Fax: _(985) 876-0270_            Mail Code:  WL4 1999D
                  Email _Cecil@les llc.net_        Telephone: 404-993-9898
                                                   Fax:      713-323-1101
                                                   Email  Tamara.Garrett@bp.com

Return one fully executed original of this Release to:

                              Attention: _____
                                         _____
                                         _____

<u>WORK RELEASE AGAINST MASTER SERVICE CONTRACT</u>

| | |
|---|---|
| Date: | August 20, 2010 |
| Work Release requested by: | Bob Talbot |
| Company Representative: | Branch Director or his/her designee |

> **This Work Release is subject to the terms and conditions of Master Service Contract No. HOU-WL4-3356 between BP Exploration & Production Inc. and Lawson Environmental Services, LLC, effective May 24th, 2010. NOTHING CONTAINED IN THIS WORK RELEASE SHALL BE CONSTRUED AS AN AMENDMENT TO THE TERMS OF THE REFERENCED MASTER SERVICE CONTRACT.**

**Company:**   BP Exploration & Production, Inc.

**Contractor:**   Lawson Environmental Services, LLC
2108 Denley road
Houma, LA 70363
Attention: Cecil Lawson
  Telephone: 985-876-0420
  Fax:  985-876-0270
  e-mail: cecil@lesllc.net

| | |
|---|---|
| Work Release No: | HOU-WL4-3356-002 |
| Paykey No. | ZKRAUMD252 |
| Project Identification: | MC-252 |
| Not To Exceed Value of Work Release : | $2,000,000.00 |
| Fixed Lump Sum: | N/A |
| Expected start date: | Immediately upon termination of the Oil Spill Event services by MSRC on or about August 20, 2010 |
| Expected Completion Date: | Up to 30 September 2010. |

**<u>Description/Scope of Work/Additional Terms and Conditions:</u>**

1.  This Work Release is limited to the MC-252 Deepwater Horizon Oil Spill Response (the "Oil Spill Event") and is a continuation of the services provided by Contractor to Marine Spill Response Corporation ("MSRC") for this Oil Spill Event under a Contractor Services Agreement between MSRC and Contractor. By executing this Work Release the intent of the parties is to avoid any interruption in the services/Work provided by Contractor when MSRC terminates Contractor Services Agreement as it pertains to the Oil Spill Event.

2.  In conjunction with this Work Release, Contractor shall receive from Company Representative written instruction detailing the Work requested, prior to commencing services on behalf of Company. Contractor shall attach a copy of such written instruction complete with any relevant supporting documentation, as outlined within Item 7.1.4 of this Work Release, to each referenced invoice. Work commenced and/or invoiced without such documentation, shall be deemed unauthorized Work and shall not be compensated.

---

3. All travel expenses will require Company Representative's prior approval.

4. Contractor is requested to provide the following Work: Provide OSRO services, management and oversight, Manage OSRO and Oil Spill Responder Subcontractors, Provide miscellaneous construction services, Construction Management, Materials management and Logistics, Inland waterway Oil Spill Management and oversight, Mange OSRO and Vessels of Opportunity integration and deployment, Decontamination (of vessels, equipment, boom), Waste Management, and provide other services as requested and approved in response to the MC252 incident.

5. Contractor shall be compensated in accordance with Exhibit "C" – Compensation Schedule of the Master Services Contract and this Work Release.

   Total compensation under this Work Release for its duration shall not exceed $2,000,000.00 without Company's prior approval. An estimated breakdown is provided in Attachment 1 to this Work Release.

6. Company can terminate this Work Release in whole or in part with a 24 hour notice.

7. Billing instructions:

7.1 Information to be included on the invoice:

   7.1.1 Contractor Information
   - Payee Name / Contractor Name
   - Contractor Address
   - Contractor Contact Info – Phone #
   - Payment Delivery Method:
     - Remit to Address - Address to send checks
       OR
     - Banking information for wire payment / electronic funds transfer

   7.1.2 Contract Information
   - BP Contract # / Work Release # / PO # / Requisition 213 # (TOM or MOB)
   - Project Description:      Spill Response
   - SAP Project Number:    Z4-0059V
   - Paykey Number:          ZKRAUMD252
   - WBS Information:        Z4-0059V-E:OILSPILLRESP
   - Name and Phone Number of BP person or representative having requested the equipment/services

   7.1.3 Invoice Details
   - Invoice date
   - Invoice number
   - Invoice amount detailing third party charges
   - Tax amount (if applicable)
   - Freight amount
   - Discounts (if applicable)
   - Due date (as per BP Work Release, PO or contract)
   - Description of the equipment/services provided
   - Item prices/rates (per unit and total) and/or labor rates (per labor category invoiced)
   - Location where equipment/services were provided
   - Ship to/from location (if applicable)

- Shipping date (if applicable)
- Reference to each piece of back up documentation

7.1.4 Supporting/Back up Documentation Showing:

- <u>That the equipment/services were ordered by Company</u>:
  - o Signed Work Release, or
  - o Signed PO, or
  - o Signed Contract, or
  - o Fully Approved 213 (4 signatures)
- <u>That they were provided</u>:
  - o Signed Receipt /Delivery ticket for equipment
  - o Detailed time sheet/daily work summary for time charged indicating:
    - ✓ Contractor's company name
    - ✓ Supervisor's name & title
    - ✓ Name & title of each person providing services
    - ✓ Dates worked
    - ✓ Time worked
    - ✓ Location worked
    - ✓ Description of their work activity
    - ✓ Specific operating condition or problem they are working on
  - o Third party charges should be supported by original invoice from the supplier(s)
- <u>That they were accepted by Company</u>
  - o Delivery ticket/time sheet/daily work summary signed by an authorized Company Representative (need BP or Agent Company Name, Signature, Printed Name, Telephone Number).

7.2 When several locations are being serviced all invoices should be split out by location and should have sections indicated by a colored sheet of paper. The structure should be as follows:

**7.2.1 Section 1**: Summary sheet with single line item showing the item/name and the amount for the following:

- Core Services (includes labor, equipment, and third party charges)
- Subcontractors (a line for each)

**7.2.2 Section 2**: Core Services cover sheet with following detail:

- Authorization for work – Work Release, PO, Contract or fully approved 213
- Labor charges by name, labor category, hours worked, rate
- Equipment charges by name, activity performed, quantity, rate
- Third party charges
- Back up documentation (see paragraph 7.1.4 above).

**7.2.3 Section 3**: Subcontractor #1 cover sheet will be the subcontractor invoice to the prime contractor. Support should include: Same as indicated for Section 2 above.

**7.2.4 Section 4**: Subcontractor #2 ...... same as Subcontractor #1

**7.2.5 Section 5**: Subcontractor #3 through #### should all have the same structure as Subcontractor #1.

7.3 Company's billing contact:

The BP Supplier Help Desk is available 6 days a week Mon - Sat from 8:00 am to 5:00 pm CST and can be reached: at 1 800-284-2244

**7.4** Invoices/statements must be sent to:

| **Mailing Address:** | OR | **Delivery by UPS or FedEx (overnight):** |
|---|---|---|
| BP Exploration and Production, Inc. | | IBM Tulsa Delivery Center – South 6 |
| Attention: Scanning Department | | BP |
| P.O. Box 22024, Room S646 | | 521 S. Boston |
| Tulsa, Oklahoma 74121-2024 | | Tulsa, OK 74103 |
| Work Release No. 002 | | Work Release No. 002 |
| Paykey No. ZKRAUMD252 | | Paykey No. ZKRAUMD252 |

**8** Facsimile signatures are acceptable for all purposes and shall have the same force and effect as an original.

Lawson Environmental Services, LLC                    BP Exploration & Production Inc.

ACCEPTED BY: _____*Cecil Lawson*_____          APPROVED BY: _____
                                    *Contractor*                                                              *Company*

                 Date: _August 25, 2010_____                        Date: _____

| Notices: | Contractor Representative: | | Company Representative: |
|---|---|---|---|
| Attention: | Cecil Lawson | Attention: | Anjelika Dilbazi |
| Mail Code: | _____ | Mail Code: | WL1 20.125C |
| Telephone: | (985) 876-0420 | Telephone: | 281-352-1379 |
| Fax: | (985) 876-0270 | Fax: | 713-323-1101 |
| Email: | cecil@lesllc.net | Email: | anjelika.dilbazi@bp.com |

---

7.4 Invoices/statements must be sent to:

| **Mailing Address:** | OR | **Delivery by UPS or FedEx (overnight):** |
|---|---|---|
| BP Exploration and Production, Inc. | | IBM Tulsa Delivery Center – South 6 |
| Attention: Scanning Department | | BP |
| P.O. Box 22024, Room S646 | | 521 S. Boston |
| Tulsa, Oklahoma 74121-2024 | | Tulsa, OK 74103 |
| Work Release No. 002 | | Work Release No. 002 |
| Paykey No. ZKRAUMD252 | | Paykey No. ZKRAUMD252 |

8 Facsimile signatures are acceptable for all purposes and shall have the same force and effect as an original.

Lawson Environmental Services, LLC

ACCEPTED BY: _Cecil Lawson_____
Contractor.

Date: August 25,2010_____

Notices:
Attention:
Mail Code:
Telephone:
Fax:
Email:

Contractor Representative:
Cecil Lawson

(985) 876-0420
(985) 876-0270
cecil@lesllc.net

BP Exploration & Production Inc.

APPROVED BY: _Mark Kehmeyer_____
Company

Date: 9/9/2010_____

Attention:
Mail Code:
Telephone:
Fax:
Email:

Company Representative:
Anjelika Dilbazi
WL1 20.125C
281-352-1379
713-323-1101
anjelika.dilbazi@bp.com

# A G R E E M E N T

This Amendment to Contract dated May 24th, 2010 between BP Exploration & Production, Inc., (BP) and Lawson Environmental Service, LLC ("Contractor) is issued to record changes to the subject Contract, as follows:

1. **Extension to Scope of Services**

   No Change

2. **Contract Programme**

   No Change

3. **Costs**

   Revised rates for Oil Spill Emergency Response, dated August 23rd, 2010  Rates to apply for all work completed after August 20th, 2010

4. **Limit of Financial Commitment**

   No Change

5. **Terms and Conditions**

   Except as herein expressly amended all other terms and conditions of Contract shall remain in full force and effect.


**IN WITNESS** whereof, the parties have executed this Amendment No 1 to the Agreement in duplicate upon the dates indicated below:

For BP                                        **For Contractor**


Name                                          Name
Title                                         Title

Dated: 9/9/2010                               Dated: 8/25/10