# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * | **MDL NO. 2179**<br><br>**SECTION: J**<br><br><br>**HONORABLE CARL J. BARBIER**<br><br>**MAGISTRATE JUDGE WILKINSON** |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class,<br><br>    Plaintiffs,<br>v.<br>BP Exploration & Production Inc., *et al.*,<br><br>    Defendants. | * * * * * * * * * * * * * * | **NO. 12-CV-968**<br><br>**SECTION: J**<br><br><br>**HONORABLE CARL J. BARBIER**<br><br>**MAGISTRATE JUDGE WILKINSON** |

## STATUS REPORT FROM THE *DEEPWATER HORIZON* <u>MEDICAL BENEFITS SETTLEMENT CLAIMS ADMINISTRATOR</u>

The Garretson Resolution Group, the Claims Administrator of the *Deepwater Horizon* Medical Benefits Class Action Settlement (the "Settlement"), submits the following quarterly report to apprise the Court of the status of its work in processing claims and implementing the terms of the Medical Settlement Agreement (the "MSA") between July 1, 2018, and September 30, 2018 (the "Reporting Period").[1]  We have published 18 reports since Preliminary Approval in

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to their fully capitalized renderings in the MSA.

May 2012, and this marks the forteenth quarterly report filed since the claims filing deadline of

February 12, 2015.  This status report provides:

- an executive summary of claims processed during the Reporting Period;

- a summary of claims for Specified Physical Conditions ("SPC") and significant developments concerning these claims;

- an update on the operations and activities of the Class Member Services Center;

- an account of participation in the Periodic Medical Consultation Program ("PMCP");

- a summary of claims for Later-Manifested Physical Conditions ("LMPCs"); and

- a summary of the activities of the grantees of the Gulf Region Health Outreach Program ("GRHOP") and the operations of the Gulf Region Health Outreach Program Library.

## I.   EXECUTIVE SUMMARY

The Claims Administrator has received 37,225 unique claims for compensation for an

SPC and/or participation in the PMCP through the end of the Reporting Period.  The Claims

Administrator has received 6,389 Notices of Intent to Sue ("NOIS") for claims for LMPCs.  This

status report will provide an overview of the claims processing forecast for all SPC and PMCP

claims and NOISs filed, the variables influencing the progression of those claims and NOISs,

and the outcome of the claims and NOISs as they progress through the stages of review.

Regarding the claims for compensation for an SPC and/or participation in the PMCP:

- the Claims Administrator has completed its review of 37,222 claims, or ninety-nine percent (99%) of all claims filed, to determine whether they qualify for compensation for an SPC and/or participation in the PMCP.

  o Of the 37,222 claims that the Claims Administrator has fully reviewed, 22,837, or sixty-one percent (61%), were approved for compensation for an SPC, and another 4,794, or thirteen percent (13%), were approved to participate in the PMCP.

  o Overall, the claims filed in this settlement were impacted by high defect rates, with 28,870, or seventy-eight percent (78%), receiving either a Request for Additional Information ("RAI") or Notice of Defect during

2

the life of the claim.  Additionally, 19,747, or fifty-three percent (53%), were impacted by changes or updates the claimants made to their Proof of Claim Forms or supporting documentation, which required the Claims Administrator to re-review the claims.

- o The Claims Administrator is still reviewing 3, or less than one percent (1%), of the claims filed in this settlement to determine whether they qualify for SPC compensation or to participate in the PMCP.[2]

- The compensation allocated and paid to SPC-determined claims continues to increase.

- o During the Reporting Period, the Claims Administrator approved 10 Medical Benefits Settlement Class Members ("Class Members") for nearly $45,000 in SPC compensation.  Since the inception of the Settlement, the Claims Administrator has approved 22,836 Class Members for $67.2 million in SPC compensation.

- o Of the $67.2 million awarded to the 22,836 Class Members with approved SPC claims, $64 million has been paid to 22,347 Class Members.  The remaining 490 Class Members had not been paid as of the end of the Reporting Period because they had payment complications that had not yet been resolved.  Approximately sixteen percent (16%) of those Class Members had healthcare liens that were still being resolved because their claims had just reached a final determination in the first or second quarter of 2018.  In addition, approximately forty percent (40%) of the Class Members who had not received payment by the end of the Reporting Period were impacted by pending bankruptcy and/or probate complications.  The remaining forty-four percent (44%) have other complications precluding payment, including child support obligations, liens asserted by settlement advance lenders or other persons or entities, general payment defects resulting from the Class Members' failure to provide necessary information on their POCFs, selection for random audit, and pending Requests for Review.[3]

- Class Members continue to be approved for enrollment in the PMCP.

---

[2] Approximately sixty-seven percent (67%) of these pending cases are anticipated to queue for final determination by the end of the fourth quarter of 2018, while the remaining thirty-three percent (33%) are anticipated to queue for final determination by the end of the first quarter of 2019.

[3] On April 3, 2018, after the end of the Reporting Period, the Court entered an order approving the *Deepwater Horizon* Medical Benefits Settlement Amended Third-Party Lien Procedures (Rec. Doc. 24247).  Those procedures establish a framework for resolving the claims asserted against Class Members' compensation by entities other than governmental and private health plans and should allow the Claims Administrator to clear a number of these complications in 2018.

- o During the Reporting Period, the Claims Administrator sent PMCP Notices of Determination to twenty-six (26) Class Members, for a total of 27,408 over the life of the Settlement.

Regarding the Notices of Intent to Sue for LMPCs:

- the Claims Administrator has completed its review of 6,339, or ninety-eight percent (98%) of the NOISs received, to determine whether they are timely and complete for submission to BP for its mediation decision.

  - o Of the 6,339 NOISs the Claims Administrator has reviewed, 4,080 were approved for submission to BP for a mediation decision, 506 were denied, and 1,753 were deficient.

  - o Similar to the claims for compensation for an SPC, the Claims Administrator has observed a higher than anticipated defect rate for the NOIS forms it received.

This information is discussed in greater detail below.

## II.     DETAILED CLAIMS PROGRESSION

### A.     Claims for Compensation for an SPC and/or Participation in the PMCP

Through the end of the Reporting Period, the Claims Administrator has received 37,225 unique claims for compensation for an SPC and/or participation in the PMCP.  The number of total claims receiving a final determination or clearing lien resolution continued to increase throughout the Reporting Period.  Of the 37,225 total claims filed, 37,222, or ninety-nine percent (99%), have been processed to a final determination, and three (3), or less than one percent (1%), require additional processing.

Of the claims reaching a final determination,

- 22,837, or sixty-one percent (61%), were approved for compensation for an SPC, with 22,836, or ninety-nine percent (99%), of the 22,837 claims receiving a notice of final determination for compensation for an SPC and 22,347, or ninety-eight percent (98%), of the 22,836 claims being paid;

- 982, or three percent (3%), did not seek the SPC compensation benefit and instead claimed and qualified for the PMCP benefit only;

- 3,812, or ten percent (10%), proved they were Class Members and qualified to receive the PMCP benefit but failed to prove they qualified for SPC compensation; and

- 9,591, or twenty-six (26%), were denied because they (a) did not prove they were Class Members, (b) filed a valid opt-out, or (c) did not claim or prove a compensable SPC.

**Figure 1: Composition of All Finalized Claims**



## B.  Notices of Intent to Sue for LMPCs

Through the end of the Reporting Period, the Claims Administrator has received 6,495 original NOISs. During the Reporting Period, the majority of NOISs (or subsequent NOISs) received have been reviewed within sixty (60) days of receipt.  The Claims Administrator anticipates that this processing pace will be maintained through the third quarter of 2018.  Of the 6,495 original NOISs filed, 4,080, or sixty-three percent (63%), were found to be compliant and were submitted to BP for a mediation decision:

- 506, or eight percent (8%), were denied;

- 1,753, or twenty-seven percent (27%), were found to be defective and were queued for Notice of Defect processing;

- 156, or two percent (2%), were pending review by the Claims Administrator.

**Figure 2: Notice of Intent to Sue Processing**



**III.**    **CLAIMS FOR SPECIFIED PHYSICAL CONDITIONS**

**A.**    **Claimed Benefits and Compensation Level**

For the total 37,225 Proof of Claim Forms ("POCFs") received, Table 1 provides a breakdown of those that sought compensation for an SPC and participation in the PMCP and those that sought only participation in the PMCP.

| TABLE 1: POCF FILINGS AVAILABLE FOR INITIAL CLAIMS REVIEW | |
|---|---|
| | **Total** |
| **Total POCF Filings Available for Initial Claims Review** | **37,225** |
| Claims for Compensation for Both SPCs and Participation in the PMCP | 36,243 |
| Claims for PMCP Only | 982 |

The graph below provides a breakdown of the compensation levels claimed for all claims filed:

**Figure 3: Compensation Level Composition of All Claims Filed**



In Table 2 below, we provide statistics of the claimed compensation level in Section VII of the POCF as compared to the awarded compensation level. In over eighty-one percent (81%) of claims where the Class Member has claimed a single compensation level, that same level of compensation has been awarded. For the nineteen percent (19%) not awarded the claimed compensation level, the Claims Administrator has awarded both higher and lower compensation levels based on review of the POCF and supporting documentation provided.

| Table 2: Determined Compensation Level | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Qualified Compensation Level | A1 | | A2 | | A3 | | A4 | | B1 | | Grand Total |
| Section VII of POCF Claimed Compensation Level | Count | % | Count | % | Count | % | Count | % | Count | % | |
| A1 | 12,161 | 97.71% | 151 | 1.21% | 112 | 0.90% | 21 | 0.17% | 1 | 0.01% | 12,446 |
| A2 | 908 | 41.79% | 1,175 | 54.07% | 77 | 3.54% | 10 | 0.46% | 3 | 0.14% | 2,173 |
| A3 | 456 | 35.54% | 100 | 7.79% | 659 | 51.36% | 67 | 5.22% | 1 | 0.08% | 1,283 |
| A4 | 86 | 41.75% | 15 | 7.28% | 15 | 7.28% | 90 | 43.69% | | 0.00% | 206 |
| B1 | 595 | 48.26% | 506 | 41.04% | 101 | 8.19% | 9 | 0.73% | 22 | 1.78% | 1,233 |
| Multiple | 2,233 | 66.34% | 811 | 24.09% | 261 | 7.75% | 49 | 1.46% | 12 | 0.36% | 3,366 |
| None | 1,711 | 80.37% | 258 | 12.12% | 126 | 5.92% | 33 | 1.55% | 1 | 0.05% | 2,129 |
| Total | 18,150 | 79.48% | 3,016 | 13.21% | 1,351 | 5.92% | 279 | 1.22% | 40 | 0.18% | 22,836 |

## B.      Claims Sent Dispositive Correspondence for a Specified Physical Condition

The overall percentage of all claims reaching final determination is ninety-nine percent (99%). During the Reporting Period, we sent SPC Notices of Determination to ten (10) Class Members, approving them for $43,950 in compensation. Since the inception of the Settlement, we sent SPC Notices of Determination to 22,836 Class Members, approving them for $67,239,229 in compensation. Over this Reporting Period, the total percentage of finalized Claims moving to an approved determination remained at sixty-one percent (61%).

The Claims Administrator sent sixty-two (62) Notices of Denial during the Reporting Period, for a total of 13,407 Notices of Denial from the inception of the Settlement through the end of the Reporting Period. All of these claims have been denied because the claimant did not qualify as a Class Member, because the claimant opted out of the settlement, and/or because the claimant did not meet the criteria established by the MSA to receive compensation for an SPC.

A summary of the dispositive correspondence sent on claims for compensation for an SPC is set forth in Table 3, below.

| TABLE 3: CLAIMS DISPOSITION AND CORRESPONDENCE | | |
|---|---|---|
| Notice Type | Reporting Period | Total |
| SPC Notices of Determination Sent | 10 | 22,836 |
| Notices of Denial Sent | 62 | 13,407 |

### C.      Claims Approved for SPC Compensation

During the Reporting Period, the amount of SPC compensation for which Class Members were approved increased, as reflected in Table 4, below.

| TABLE : APPROVED CLAIMS FOR SPCs[4] | | | | |
|---|---|---|---|---|
| SPC | Reporting Period Number Approved | Total Number Approved to Date | Reporting Period Amount Approved | Total Amount Approved to Date |
| A1 | 4 | 18,149 | $4,800 | $23,012,900 |
| A2 | 5 | 3,017 | $36,450 | $23,962,081 |
| A3 | 0 | 1,351 | $0 | $17,089,082 |
| A4 | 1 | 279 | $2,700 | $800,416 |
| B1 | 0 | 40 | $0 | $2,374,750 |
|  |  |  |  |  |
| Total | 10 | 22,836 | $43,950 | $67,239,229 |

As set forth in the MSA, Class Members can only be paid once certain potential obligations to third parties are identified and resolved.  The resolution of these obligations is dependent upon the responsiveness of both governmental agencies and private interests in replying to the Claims Administrator's requests for information and resolution.  The obligations fall into two general categories: healthcare-related obligations and other obligations.

---

[4] Please note that the total volumes and total dollars approved are subject to change in each Reporting Period due to later received and processed Requests for Review.

The resolution of healthcare obligations involves confirming whether a Class Member received benefits from a governmental payor (such as Medicare, Medicaid, or the Veterans' Administration) or a private healthcare plan for a compensable injury such that the Class Member must now reimburse those entities for the amounts they paid. The processing phases include (1) confirming entitlement with the government agency or private plan, (2) receiving claims from the agency or plan, (3) auditing those claims and disputing any that are unrelated to the Class Member's compensable injury, and (4) final resolution. Pursuant to the terms of the MSA, the Claims Administrator obtained an agreement from CMS establishing capped repayment amounts per SPC for Class Members who are or were beneficiaries of Medicare. The Claims Administrator also negotiated with state Medicaid agencies to cap recovery for Medicaid-entitled Class Members. Most states agreed to waive recovery rights for Class Members receiving compensation for an A1 claim. Additionally, most state Medicaid agencies agreed to a twenty percent (20%) cap on and up to a thirty-five percent (35%) offset for fees and costs typically associated with their recovery, thereby allowing partial funding to the Class Member while full resolution is pending. Processing times for Medicaid-entitled Class Members eligible for payment will vary. Each state has its own processing standards for responding to entitlement requests, producing claims, and finalizing lien amounts.

The resolution of non-healthcare-related obligations involves identifying the various types of obligations and working with the claimant or the claimant's representative to resolve them. The processing phases include (1) identifying the obligation (through review of claim documents, PACER searches, and searches of the Louisiana Child Support Database), (2) sending correspondence seeking documentation that will resolve the complication, (3) reviewing the submitted documentation for sufficiency, and (4) final resolution. The Claims

Administrator tracks responses to its correspondence and sends a follow-up letter to non-responsive parties after thirty (30) to sixty (60) days have passed (with the length of time depending on the complication).  We will also send follow-up correspondence when the responses contain insufficient documentation.  The resolution time for payment complications varies and remains heavily dependent upon the timeliness and sufficiency of the third parties' responses to our information requests.  Once the obligations affecting a given claim are resolved and any liens or reimbursement obligations are paid, the Claims Administrator is able to disburse the balance of the Class Member's compensation.

### IV.    CLAIMS FOR LATER-MANIFESTED PHYSICAL CONDITIONS

During the Reporting Period, Class Members submitted 1,540 NOISs to pursue claims for LMPCs.  One thousand five hundred twenty-five (1,525) were original NOISs, and fifteen (15) were supplements to NOISs that had already been submitted.  Of the 1,525, one thousand forty-nine (1,049) were compliant and were sent to BP for a mediation decision, three hundred ninety-four (394) contained curable Defects and were queued to receive a Notice of Defect, sixteen (16) were denied, and sixty-six (66) were pending review.

From the inception of the Settlement through the end of the Reporting Period, Class Members submitted 6,699 NOISs for compensation for a Later-Manifested Physical Condition.  Six thousand four hundred ninety-five (6,495) were original NOISs, and two hundred four (204) were supplements to NOIS that had already been submitted.  Of the 6,495, 4,080 were compliant with the MSAs requirements and were sent to BP for a mediation decision, 1,753 contained Defects that could be corrected by the Class Member, 506 were denied, and one hundred fifty-six (156) were pending review.

| TABLE 5: NOTICES OF INTENT TO SUE | | |
|---|---|---|
| | **Reporting Period** | **Total** |
| Total Notices of Intent to Sue Filed | 1,540 | 6,699 |
| Original Notices of Intent to Sue Filed | 1,525 | 6,495 |
| Subsequent Notices of Intent to Sue Filed | 15 | 204 |
| Notices of Intent to Sue Approved | 1,049 | 4,080 |
| Notices of Intent to Sue Denied | 16 | 506 |
| Notices of Intent to Sue Deficient[5] | 394 | 1,753 |
| Notices of Intent to Sue Under Review | 66 | 156 |

Of the 506 claims denied through the end of the Reporting Period, ninety-nine percent (99%) were denied because the Notice of Intent to Sue was not submitted within four (4) years of the Effective Date of the settlement or the first date of diagnosis of the Later-Manifested Physical Condition, whichever is later.

Of the 1,753 defective claims to date, the three (3) most common material Defects are as follows:

- "The claimed date(s) of first diagnosis listed in Section VI.A.2 of the Notice of Intent to Sue Form is not supported by date(s) of diagnosis in the Medical Record(s) and/or Physician's Certification Form."; and

- "The medical record(s) and/or Physician's Certification Form submitted does not support diagnosis of the condition(s) claimed in Section VI.A.1.

- "You must provide medical records or a completed Physician's Certification Form indicating a date of first diagnosis that is after April 16, 2012."

Of the 4,080 compliant NOISs sent to BP for a mediation decision, BP elected to mediate none of the claims, declined to mediate two thousand six hundred seventy-three (2,673) of the claims, and is still considering whether to elect mediation on one thousand four hundred seven (1,407) of the claims. With respect to the two thousand six hundred seventy-three (2,673) claims

---

[5] Class Members who cure Defects within their original Notice of Intent to Sue will then be classified as "Approved" or "Denied" in future reporting, based on the responses received.

that BP declined to mediate, the Class Members holding those claims became eligible to file them as Back-End Litigation Option Lawsuits once BP declined mediation.

| TABLE 6: COMPLIANT NOTICES OF INTENT TO SUE | | |
|---|---|---|
| **Mediation Elections** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims for Which at Least One BP Defendant Elected Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Pending a Decision from One or More BP Defendants Regarding Mediation | 1,207 | 1,407 |
| Later-Manifested Physical Condition Claims for Which No BP Defendants Elected Mediation | 2,054 | 2,673 |
| | | |
| **TOTAL:** | **3,261** | **4,080** |
| | | |
| **Results of Mediation** | **Reporting Period** | **Total** |
| Later-Manifested Physical Condition Claims Settled by Mediation | 0 | 0 |
| Later-Manifested Physical Condition Claims Settled by Mediation as to One but Not All BP Defendants Listed in the Notice of Intent to Sue | 0 | 0 |
| Later-Manifested Physical Condition Claims Mediated but Not Settled | 0 | 0 |
| | | |
| **TOTAL CLAIMS MEDIATED:** | **0** | **0** |
| | | |
| **Back-End Litigation Option Lawsuit** | **Reporting Period** | **Total** |
| Total Claims That Have Been Eligible to Be Filed as Back-End Litigation Option Lawsuits[6] | N/A | 2,673 |

## V.    CLASS MEMBER SERVICES CENTER ACTIVITY

The Claims Administrator operates a Class Member Services Center to communicate with Class Members and their attorneys and to assist them with filing their claims.  During the Reporting Period, the Class Member Services Center received 3,165 telephone calls.  Since

---

[6] This number is the sum of the "Later-Manifested Physical Condition Claims for Which No BP Defendant Elected Mediation" and the "Later-Manifested Physical Condition Claims Mediated but Not Settled."

opening, the Class Member Services Center has received a total of 221,285 telephone calls.  The

Class Member Services Center handled an average of forty-nine (49) calls per day.  The average

length of each telephone call was seven minutes and thirty-one seconds, with an average wait

time of two minutes and one second.

| TABLE 7: CLASS MEMBER SERVICES CENTER | | |
|---|---|---|
| | Reporting Period | Total |
| Calls Received | 3,165 | 221,285 |
| Average Length of Call (min:sec) | 7:31 | 6:39 |
| Average Wait Time (min:sec) | 2:01 | 0:48 |
| Emails Received | 55 | 3,191 |
| Walk-Ins | 0 | 739 |

## VI.    PERIODIC MEDICAL CONSULTATION PROGRAM

### A.    Class Members Eligibility for and Participation in the PMCP

Since the inception of the Settlement, the total number of Class Members receiving a

PMCP Notice of Determination is 27,408.  The Claims Administrator received requests for and

scheduled 172 physician visits during the Reporting Period, and Class Members attended 160

appointments in the Reporting Period.

| TABLE 8: PERIODIC MEDICAL CONSULTATION PROGRAM | | |
|---|---|---|
| | Reporting Period | Total |
| PMCP Notices of Determination Sent | 26 | 27,408 |
| Physician Visits Requested and Scheduled | 172 | 3,720 |
| Appointments Attended by Class Members | 160 | 3,682 |
| Annual Update Letters Sent to Class Members | 6,510 | 55,162 |

### B.    Provider Network

During the Reporting Period, the Claims Administrator added eight medical provider

organizations, representing 13 service delivery sites, to its network of providers established to

provide certain covered services to Class Members who participate in the PMCP; this brings the

total number of medical provider organizations to 213.  These medical provider organizations represent 491 service delivery sites.  Eighty-eight percent (88%) of eligible Class Members who requested a PMCP evaluation resided within twenty-five (25) miles of a network provider at the conclusion of the Reporting Period.  The Claims Administrator continues to expand the medical provider network in its efforts to ensure that no Class Member will have to wait more than thirty (30) days or travel more than twenty-five (25) miles for an appointment.

### VII.    GULF REGION HEALTH OUTREACH PROGRAM

#### A.    Funding and Coordinating Committee Activities

In accordance with Section IX of the MSA, the Gulf Region Health Outreach Program ("GRHOP") was established in May 2012 to expand capacity for and access to high quality, sustainable, community-based healthcare services, including primary care, behavioral and mental health care and environmental medicine, in the Gulf Coast communities in Louisiana, Mississippi, Alabama, and the Florida Panhandle. The program consists of five (5) integrated projects: the Primary Care Capacity Project ("PCCP"), Community Involvement ("CI"), the Mental and Behavioral Health Capacity Project ("MBHCP"), the Environmental Health Capacity and Literacy Project ("EHCLP"), and the Community Health Workers Training Project ("CHWTP"). As of the end of the Reporting Period, the Claims Administrator disbursed $104,713,294 to the projects, as detailed in the chart below.

| TABLE 11: GRHOP | |
| --- | --- |
| **Project** | **Funding to Date** |
| Primary Care Capacity Project | $46,655,925 |
| Community Involvement | $3,213,491 |
| Mental and Behavioral Health Capacity Project ((Louisiana State University Health Sciences Center) | $14,359,145 |
| Mental and Behavioral Health Capacity Project (University of Southern Mississippi) | $8,256,486 |
| Mental and Behavioral Health Capacity Project (University of South Alabama) | $8,256,489 |
| Mental and Behavioral Health Capacity Project (University of West Florida) | $5,025,696 |
| Environmental Health Capacity and Literacy Project | $14,957,416 |
| Community Health Workers Training Project | $3,988,646 |
| | |
| **TOTAL:** | **$104,713,294** |

The final disbursement was made in May 2016, which accounted for an eighteen (18) month low-cost extension of the GRHOP, as agreed upon by the Parties and Coordinating Committee members. All projects, except for Community Involvement,[7] will participate in this extension period.  Estimated administrative costs during the extension period, totaling $286,706, were accounted for by the Claims Administrator, with all projects contributing to these costs. Therefore, the May 2016 disbursement brought the total funding to the GRHOP to $104,713,294.

The GRHOP is governed by a Coordinating Committee that continues to function in a cooperative and integrated manner, with quarterly in-person meetings around the Gulf Coast, as well as monthly conference calls. These quarterly meetings offer the grantees the opportunity to share their progress, discuss challenges faced, and collaborate with their partners to work through issues that affect the GRHOP as a whole.

---

[7] Community Involvement chose not to participate in the eighteen (18) month low-cost extension.

The Claims Administrator held a quarterly meeting on July 27, 2018, in New Orleans, Louisiana.[8]  This meeting covered the activities of two (2) of the five (5) GRHOP subcommittees — the Publication and Evaluation Subcommittees.[9] The projects met to review and provide an update on the Enterprise Evaluation paper and to advance GRHOP's focus this year on dissemination and publications. Additionally, each project gave an update on their activities in the last quarter.

In addition to administering the conferences and quarterly meetings for the GRHOP Coordinating Committee, the Claims Administrator continues to manage the GRHOP website. The website launched on July 3, 2014 and can be publicly accessed at www.grhop.org.  The website contains detailed descriptions and notable accomplishments of each project, as well as information regarding the GRHOP Coordinating Committee, news/events, and publications.

### B.      GRHOP Project Updates

The GRHOP projects have made substantial progress in achieving the goals set forth in their Grant Proposals. Some notable accomplishments of the projects include:

- The **Primary Care Capacity Project**, led by the Louisiana Public Health Institute ("LPHI"), which has:

  o  Built upon its investments made in the infrastructure of the Greater New Orleans Health Information Exchange, as well as the capacity building efforts within primary care practices;

  o  Through the Technical Assistance ("TA") team, three (3) community health centers in New Orleans utilized population health software to support efforts related to quality improvement and population health;

  o  Advanced planning efforts related to the 7th Regional Care Collaborative ("RCC") event, scheduled for October 25, 2018 in New Orleans, Louisiana. The event will engage behavioral, clinical and social service leaders from across the southern coast

---

[8] The Claims Administrator held its final quarterly meeting on October 19, 2018 in New Orleans, LA. The Claims Administrator will report on that meeting in its next status report.
[9] The five (5) GRHOP subcommittees include: the Data Sharing Subcommittee, Evaluation Subcommittee, Health Promotions Subcommittee, Newsletter Subcommittee, and Publication Subcommittee. These subcommittees were formed during the July 31, 2014 quarterly meeting.

to focus on learning, networking and co-creating solutions to improve health for all; and

o Prepared a final report of the case study for Escambia Community Clinics, which includes a summary of the case study findings and specific recommendations on four (4) topic areas: site integration, outreach and marketing, behavioral health integration, and assessment and expansion.

- **Alliance Institute's** outreach on behalf of the GRHOP and its partners has reached over 1,500 individuals across Louisiana, Mississippi, Alabama, and Florida. Alliance Institute, the grantee responsible for Community Involvement, concluded its grant on April 30, 2017.

- The **Environmental Health Capacity and Literacy Project** ("EHCLP"), with its grantee being Tulane University, has achieved the following:

  o Occupational and Environmental Health Specialty Network:

    ▪ A new case study in environmental medicine on Occupational Asthma was presented at the Mississippi Primary Health Care Association annual meeting on August 2, 2018.

  o Training and Leadership Development:

    ▪ Emerging Scholars Environmental Health Sciences Academies at Tulane University, University of West Florida and University of Southern Mississippi concluded. Scholars completed and presented scientific posters based on their individual research projects.

  o Community Resilience and Family Wellness

    ▪ Tulane Building Early Relationships Support and Services ("TBEARS") served twenty-five (25) families, with a total of forty-one (41) home or clinic visits and thirty (30) phone and/or warmline sessions.

    ▪ EHCLP's manuscript on community health workers as organizational actors in clinical settings was finalized and submitted for peer review to the Journal of Ambulatory Care Management. The GRHOP enterprise evaluation manuscript in the Journal of Public Health Management and Practice was made available online in August 2018.

- The **Community Health Workers Training Project**, directed by the University of South Alabama's Coastal Resource and Resiliency Center ("CRRC"), concluded its grant on December 31, 2017.

- The **Mental and Behavioral Health Capacity Project**, implemented by a coalition of four (4) academic institutions (Louisiana State University Health Sciences Center ("MBHCP-LA"), the University of Southern Mississippi ("MBHCP-MS"), the University

18

of South Alabama ("MBHCP-AL"), and the University of West Florida ("MBHCP-FL")), has achieved the following:

o   MBHCP-LA has:

- Made progress towards collaborative care and expansion of services through Federally Qualified Heath Centers ("FQHC") and Community Health Centers in St. Bernard Parish, Jefferson Parish, Washington Parish and other parts of the state;

- Continued to provide onsite psychiatric and psychological services through the St. Bernard Health Center (SBHC) Primary Care Clinic, NOELA Community Health Center, Hackberry Rural Health Center, Robert F. Kennedy Lafitte Medical Clinic, and the Plaquemines Medical Center;

- Collaborated with communities, clinics, schools and other service agencies to continue to provide MBHCP-LA services, such as increased mental and behavioral billing options, expansion of services, telemedicine development, contract development, Electronic Health Record access, and consultation and mental health services; and

- Continued evaluation activities to better understand the contribution of the project's activities and its connection to outcome and sustainability efforts.

o   MBHCP-MS has achieved the following:

- The Mississippi Integrated Health and Disaster Program ("M-IHDP") Administration continued to provide behavioral health services at clinic locations in Biloxi, Pass Christian, Moss Point, and Gulfport.

- The M-IHDP social work Team Leaders continued to assist the FQHC with the Patient Assistance Program ("PAP"), helping low-income, uninsured, and underinsured individuals gain access to prescriptions at a reduced cost or no cost.

- The M-IHDP administration continued to be involved in the long-term plan for providing care coordination services within the FQHC. Training on chronic disease management, the Mississippi Health Information Network ("MS-HIN") direct messaging system, and Chronic Care Management Medicare services was implemented for the behavioral health staff within the FQHC.

- Data collection on specific interventions provided to patients was discontinued so that it can be sorted and analyzed to guide training, improve the use of effective interventions, and to inform integrated care projects.

- o MBHCP-AL has:

  - Shared program evaluation and scientific findings by giving multiple talks on trauma-informed care, resiliency, and integrated care with multiple groups, in local conferences and in classrooms;

  - Worked with the Mobile County Public School System to implement a model of a Trauma-Sensitive School;

  - Continued to develop professionals in all of the project's initiatives by hiring them as Behavioral Health providers, mentoring students in the doctoral program, helping to start and continue the child psychiatry residency program and promoting two (2) endowed scholarships; and

  - Established Project THRIVE as a city-wide trauma informed initiative that has been recognized and supported by a proclamation from the Mayor and the Mobile City Council.

- o MBHCP-FL concluded its grant on September 30, 2017.

### C.   GULF REGION HEALTH OUTREACH PROGRAM LIBRARY

In accordance with Section IX.H of the MSA, the Claims Administrator has established a publicly accessible online library, which exists as a repository of information regarding information related to the health effects of the *Deepwater Horizon* incident, including, but not limited to: (a) the composition, quantity, fate, and transport of oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and contaminants used in Response Activities; (b) health risks and health studies relating to exposure to oil, other hydrocarbons, and other substances released from the MC252 Well and the *Deepwater Horizon* and the dispersants and decontaminants used in Response Activities; (c) the nature, content, and scope of *in situ* burning performed during the Response Activities; and (d) occupational safety, worker production, and preventative measures for Clean-up Workers.

The library houses over 197,000 relevant documents, each tagged with a specific search category based on the type of information identified within the MSA. The Claims Administrator will continue to add Library Materials in accordance with the MSA.

Respectfully submitted,

*DEEPWATER HORIZON* MEDICAL BENEFITS
CLAIMS ADMINISTRATOR


By: /s/ Matthew L. Garretson
     Matthew L. Garretson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing document has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of the electronic filing in accordance with the procedures established in MDL 2179, on this 1st day of November, 2018.

Respectfully submitted,

*/s/ Matthew L. Garretson*
Matthew L. Garretson