# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

Kieth George,

      Plaintiff,

vs.

British Petroleum, *et al*.,

      Defendants.

_____/

**MDL No. 2170 (J)**

**JUDGE TRICHE MILAZZO**

**MAGISTRATE MEERVELD**

**Case No. 18-cv-06033**

**PLAINTIFF'S FIRST SET OF REQUESTS FOR**
**INTERROGATORIES TO DEFENDANT BPA**

      COMES NOW, the Plaintiff, Kieth George, by and through the undersigned counsel, pursuant to the Federal Rule of Civil Procedure 33, and hereby propounds Plaintiff's First Set of Request for Interrogatories on Defendant, British Petroleum America Production Company, ("BPA"), attached hereto, to be answered under oath and returned to Plaintiff's counsel within 30 days.

**INSTRUCTIONS**

    1.  Information supplied in response to these interrogatories shall reflect all information available to British Petroleum America Production Company, ("BPXP Inc.") including that held by its representatives, current and former counsel, agents, servants, employees, representatives, investigators, consultants, independent contractors, or other persons acting on behalf of British Petroleum America Production Company, as well as that known by officers and agents of any of the following entities: British Petroleum America Production  Company ("BPA Production Co."); British Petroleum America Inc. ("BPA Inc."); British Petroleum Company North America Inc. ("BPNA Co."); British Petroleum Corporation  North America Inc.; ("BPCNA"); the Savings Plan Investment Oversight Committee ("BP Oversight Committee"); British Petroleum Energy Company ("BP Energy"); British Petroleum Exploration (Alaska) Inc. ("BP Alaska"); British Petroleum Global Special Products (America) Inc. ("BP Global Special Products"); British Petroleum Holdings North America Limited ("BP Holdings"); British Petroleum p.l.c. ("BP p.l.c."); British Petroleum Products North America Inc. ("BP Products Inc."); and each of their respective officers and agents; and direct or indirect parents; subsidiaries, and subsidiary undertakings (as those terms are defined in the U.K. Companies Act of 2006), affiliates, divisions, and business units.

    2.  If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing BPA's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by: (1) specifying the records that must be reviewed, in sufficient detail to

enable the undersigned Plaintiff's counsel to locate and identify them as readily as you could; (2) give Plaintiff's counsel a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries.

3.  If any interrogatory cannot be answered in full, after exercising due diligence to secure the information to do so, please so state and answer the interrogatory to the extent possible, specifying the reasons for any inability to answer the remainder of any such interrogatory and stating whether information or knowledge presently is available concerning the portions of said interrogatory that could not be answered.

4.  These Interrogatories shall be deemed continuing and supplemental responses shall be required promptly if the Defendant directly or indirectly obtains further information.

5.  You are requested to answer the Interrogatories based upon information known to you and upon information contained within all documents in your possession and all documents available to you, not merely business records, but also all documents that are available to you, your employees, officers, agents, attorneys, and investigators, etc., by reason of inquiry including inquiry of their representatives.

6.  The following Interrogatories are served and propounded on you, Defendant, British Petroleum Exploration & Production Inc.

7.  Unless otherwise specified, each Interrogatory Request herein is meant to apply to the time period from 1960 until the present, and if not otherwise specified refers to the time period between April 20, 2010 and the date on which you last used or released the same onto and/or into the environment.

8.  Should the Defendant assert a privilege with respect to any information, Defendant is requested to provide the following as to each such document or item of information:

    a.  The type of document or information (e.g., letter, notebook, telephone conversation, etc.);

    b.  The date of the document or transaction involving the information;

    c.  Identification of the author and/or all participants with respect to the information;

    d.  Identification of the signatory or signatories of the document, if any;

    e.  Identification of the document's current custodian;

    f.  The present whereabouts of the document and/or the names of all persons with personal knowledge with respect to the information;

    g.  A statement of the grounds on which the claim of privilege rests with respect to each such document or piece of information withheld.

## DEFINITIONS

As used in these Interrogatories below, the following words and terms shall mean and include the following:

1.  **"Aerial"** means and refers to aerial spraying of spill-response chemicals, decontaminants, and/or other substances into the environment.

2.  **"Affiliate"** means with respect to any person or entity, any other person or entity that directly, or

indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such person or entity.

3. **"Associated Business Entity"** means any business entity that is and/or was a predecessor in interest, a division and/or a subsidiary of the answering Defendant.

4. **"BPA"** or **"BPA Inc.,"** refers to the entity itself as well as the officers and agents of the oil extraction, manufacture, and processing entity, department, or division collectively known as British Petroleum America Production Company, and this term also includes all officers and agents of the following entities: BPA, BPNA, BPCNA Inc., BP Oversight Committee, BP Energy, BP Alaska, BP Global Special Products, BP Holdings, BP p.l.c., BP Products, and any other affiliate and/or associated business entity.

5. **"BP"** or **"BP entities"** means and refers to the oil extraction, manufacture, and processing entity, department, or division known as British Petroleum America Production Company, and this term also includes all officers and agents of the following entities: BPA, BPNA, BPCNA Inc., BP Oversight Committee, BP Energy, BP Alaska, BP Global Special Products, BP Holdings, BP p.l.c., BP Products, and any other affiliate and/or associated business entity.

6. **"Clean-up site"** refers to any specific-site location geographical location in the Gulf or its coastal areas where oil and/or any spill-response chemical were released, used, observed, reported, found and/or collected.

7. **"Clean-up worker"** means any natural persons who performed Response Activities, including: Captains, crew, and other workers employed under the Vessels of Opportunity ("VoO") program who performed Response Activities; Workers employed to perform the decontamination of vessels involved in Response Activities; Captains, crew, and other workers on vessels other than VoO who performed Response Activities; Onshore personnel employed to perform Response Activities; and Persons involved in the recovery, transport, and decontamination of wildlife affected by an oceanic oil spill, including, but not limited to the Deepwater Horizon oil spill.

8. **"Claim"** means a demand in writing for a sum certain for compensation for damages or removal costs resulting from any injury or incident.

9. **"Coastal area"** is any United States waters subject to the tide, specified ports and harbors on inland rivers, waters of the contiguous zone, other waters of the high seas, and the land surface or land substrata, ground waters, and ambient air proximal to those waters.

10. **"Communication"** or **"correspondence"** means whether written or oral, to send, receive, notify, inform, acquire, email, call, text, or possess any advice, publication, statement, warning, order, directive, letter, memorandum, recommendation or document.

11. **"Consultant"** is meant to include any specialist in the above areas who was at least in part retained for his expertise and opinions in other than a full-time salaried position.

12. **"Defendant," "You,"** or **"BPA,"** or any synonym thereof means the defendant corporation answering these "interrogatories, as well as all, divisions, predecessors-in-interest, subsidiaries, agents, servants and employees, officers, executives, directors, private investigators, attorneys, representatives or others who are in possession of or who may have obtained information or knowledge for or on behalf of the defendant, collectively known as British Petroleum America Production Company, and includes all officers and agents of the following entities: BPA, BPNA, BPCNA Inc., BP Oversight Committee, BP Energy, BP Alaska, BP Global Special Products, BP Holdings, BP p.l.c., BP Products, and any other affiliate and/or associated business entity.

13. **"Deepwater Horizon oil spill"** means the events, actions, inactions, and omissions regarding the release of oil, chemical-oil dispersant, other hydrocarbons, and other substances from the Macondo Well also known as the MC252 Well, and/or the Deepwater Horizon oil rig and its appurtenances, and the efforts to contain the MC252 Well, and Response Activities.

14. **"Document"** is an all-inclusive term and means the original or any copy or reproduction of a writing or other form of a record preserving information, whether or not in the possession, custody or control of defendant and whether or not claimed to be privileged against discovery on any ground,, without limitation, the following: accounts, advertising, agreements, analyses, appointment books, appraisals, authorizations, bank statements, bills, blue prints, books, books of account, brochures, bulletins, calendars, catalogs, charts, checks, checkbooks, check stubs, circulars, communications, compilations, confirmations, contracts, correspondence, diaries, directives, drawings, drafts, evaluations, files, filings with any governmental agency, films, forms, graphs, hospital records, inspection reports, instructions, insurance policies, interviews, invoices, journals, letters, logos, and maintenance records, manuals, maps, medical records, memoranda, minutes, newspapers, notes, notebooks, note charts, office reports, opinions or reports of consultants, orders, paintings, pamphlets, periodicals, photographs and photographic negatives, plans, press releases, promotional literature, prospectuses, purchase orders, receipts and other records of payments, records, reports, reports of x-rays or laboratory tests, research data, schedules, scrapbooks, sketches, speeches, statements, studies, summaries or records of any transactions or occurrences including without limitation, conversations, interviews, meetings and conferences, summaries of any other documents including, without limitation, reports of investigations and reports of negotiations, studies, surveys, tables, or tabulations of data, tracings, telegrams, videotapes, vouchers, work papers, and/or worksheets.

15. **"Environment"** means the navigable waters, the waters of the contiguous zone, and the ocean waters of which the natural resources are under the exclusive management authority of the United States; and any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States, including the Gulf of Mexico and its U.S. coastal areas.

16. **"Exposure"** means human physical contact and/or inhalation of your oil released from the well and/or any spill-response chemical released in response to the Deepwater Horizon spill and/or response activities, and relates to factors effecting exposure including, but not limited to the timing, amount, location, duration, toxicity, intensity, level, dose, threshold, test, fate, transport, and/or studies about exposure to oil and/or any spill-response chemical.

17. **"Exposure assessment"** means the identification, characterization, estimation, and evaluation of exposures.

18. **"Facility"** means any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or any site or area, where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

19. **"Fate and transport"** refers to the process by which the oil and spill-response chemicals released went after released in and onto the environment and how they traveled through the water.

20. **"Human health effects"** specifically includes, but not limited to specified physical conditions, later manifested physical conditions, the onset of eye problems, head and neurological conditions, respiratory illnesses, sinus issues, skin conditions, stomach complications, and/or any condition, illness, or disease contained in the MSA.

21. **"Level"** is a quantifiable unit as measured by device or method to detect the toxic content or hazardous composition of oil and/or any spill-response chemical for a specific release and/or for a particular sampling during removal or collection, including, but not limited to the following: propylene glycol organic salts; dioctyl sodium sulfosuccinate; petroleum distillates; 2-butoxyethanol.

22. **"Manufacturer"** is any entity that manufactured any spill-response chemical ever purchased by you for the use, release injection, spraying, burning, and/or dumping during spill-response activities.

23. **"MC252 Well"** or **"Macondo Well"** means the exploratory well named "Macondo" that was being drilled by the Transocean Marianas and Deepwater Horizon rigs in Mississippi Canyon, Block 252 on the outer continental shelf in the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana.

24. **"Measurement"** refers to information about the following as to any given measurement: whether the particular theory can be (and has been) tested; whether it has been subjected to peer review and publication; the known or potential rate of error for a particular scientific technique; and whether the specific theory or technique has been generally accepted by the relevant scientific community.

25. **"MSA"** means the Medical Benefits Class Action Settlement, the settlement contemplated under the Medical Settlement Agreement.

26. **"NOAA"** means the United States of America National Ocean Service Atmospheric Administration, and collectively refers to the United States of America Department of Commerce's NOAA, National Ocean Service and Office of Response and Restoration.

27. **"Offshore facility"** means any facility of any kind located in, on, or under any of the navigable waters of the  United States, and any facility of any kind which is subject to the jurisdiction of the United  States and is located in, on, and/or under any other waters, other than a vessel or a public vessel.

28. **"Oil"** means crude oil in its naturally occurring composed of hydrocarbon deposits and other organic materials, released during any oceanic oil spill, including but not limited to oil from the Macondo Well.

29. **"Other hydrocarbon"** includes but is not limited to propylene glycol organic salts; dioctyl sodium sulfosuccinate; petroleum distillates; and/or 2-butoxyethanol.

30. **"Other substance"** is any product, other than a dispersant, sinking agent,  surface washing agent, surface collecting agent, bioremediation agent, burning agent, or sorbent  that can be used to enhance oil spill cleanup, removal, treatment, or mitigation, and those elements, compounds, or mixtures that coagulate, disperse,  dissolve, emulsify, foam, neutralize, precipitate, reduce, solubilize, oxidize, concentrate, congeal, entrap, fix, make the pollutant mass more rigid or viscous, or otherwise facilitate the mitigation  of deleterious effects or the removal of the pollutant from the water, biological additives, dispersants, sinking agents, miscellaneous oil spill control agents, and  burning agents, such as additives that, through physical or chemical means, improve  the combustibility of the materials to which they are applied, as well as sinking agents.

31. **"People affected"** or **"humans"** means and includes, but is not limited to clean-up workers, Zone A residents, Zone B residents, and Gulf Coast area fisherman and charter boat operators and guests, oil rig workers, oystermen, shrimpers, residents, vacationers, workers aboard vessels of opportunity.

32. **"Person,"** means an individual, firm, corporation,  association, partnership, consortium, joint venture, contractor, agent, employee, consultant, scientist, doctor, researcher, witness, commercial entity, United States government,   state, municipality, commission, political subdivision of a state, or any interstate body.

33. **"Plaintiff"** means Kieth George named as Plaintiff in the caption of these Requests.

34. **"Decontaminant"** means any agent that may present an imminent and  substantial danger to public

health or welfare of the United States including, but not limited to any element, substance, compound, or mixture, including disease-causing agents, which after release into the environment and upon exposure, ingestion, inhalation, or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease, behavioral abnormalities, cancer, genetic mutation, physiological malfunctions (including malfunctions in reproduction), or physical deformations, in such organisms or their offspring. The term does not include petroleum, including crude oil or any fraction thereof, nor does it include natural gas, liquified natural gas, or synthetic gas of pipeline quality (or mixtures of natural gas and such synthetic gas).

35. **"Predecessor"** means any corporation, entity, or assets at any time acquired or possessed by the defendant through any means including merger, consolidation, stock purchase, asset purchase, assumption).

36. **"Preliminary assessment"** means review of existing information and an off-site reconnaissance, if appropriate, to determine if a release may require additional investigation or action, and may include an on-site reconnaissance, if appropriate.

37. **"Release"** refers to any escaping, leaking, injecting, pumping, pouring, emitting, emptying, discharging, injecting, escaping, spilling, leaching, dumping, or disposing oil or spill-response chemicals onto and into the environment (including the abandonment or discarding of barrels, containers, and/or other closed receptacles containing any hazardous substance or pollutant or contaminant).

38. **"Release-amount"** is contextual as used herein in that it means the volume of the particular-release of inquiry as to oil and/or any spill-response chemical. For oil, this term refers to how much oil by volume escaped from the Macondo Well into the environment before the Well was completely capped. For all other releases, this term refers to the volume of each said release of any chemical-oil dispersant, other hydrocarbon, and/or other substance into the environment during spill-response activities at a particular specific release-site location.

39. "**Release-duration period**" is contextual as used herein in that it means the volume of the particular-release of inquiry as specified in the Request below related to any type of spill-response chemical, and refers to: a) the total time which elapsed between the time crude oil first began to escape from the Macondo Well and the time the Well was completely capped; and b) the period between the start time of a particular release or use of any chemical-oil dispersant, decontaminant, other hydrocarbon, and/or other substance as defined herein, and the end time and date of occurrence of each said release or use.

40. **"Release-site location"** means and refers to the identity, description, geographical coordinates, or name of a specific location where any spill-response chemical was released, used, burned, observed, reported, found, and/or collected from the environment during spill-response activities.

41. "**Release-time**" means the date, start time, and end time for a particular-release or use of any spill-response chemical.

42. **"Release-type"** means escaping, dispersing, injecting, aerial spraying, in-situ burning, emitting, dumping, pouring, dissolving, or other method of the myriad of ways and trade names for such uses in the utilization of spill-response chemicals for a sub-surface oceanic oil spill.

43. **"Removal"** or **"remove"** refers to the actual collection or removal of spilled oil from the environment and does not include mitigation or natural dispersing.

44. **"Removal-amount"** is contextual as used herein in that it means the volume of a particular-collection or removal of oil and/or spill-response chemical. Where in-situ burning was utilized, this term refers to the amount of each burning agent released into the ocean, for each said burning.

45. **"Removal-time"** means the date, start time, and method of a specific removal or collection of oil, chemical-oil dispersant, decontaminant, other hydrocarbon, other substance, and/or any mixture thereof.

46. **"Site specific-release location"** means and refers to the identity, description, physical address, geographical coordinates, or name of a particular place where any spill-response chemical was released, used, burned, observed, reported, found, and/or collected from the environment during spill-response activities.

47. **"Respond"** or **"response"** means remove, removal, including enforcement activities related thereto.

48. **"Sinking agent"** means those additives applied to oil discharges to sink floating pollutants below the water surface.

49. **"Site-specific data"** means information related to a particular clean-up site or release-site.

50. **"Specific clean-up site"** means and refers to the identity or name of a particular location its geographic information as to the areal extent of a particular clean-up site and dispersant-release site on-shore and off-shore where oil and/or any spill-response chemical was used, released, sprayed, found, collected, burned, sampled, tested and/or or otherwise removed, including operable-units, geographical portions of a site, specific site problems, or initial phases of an action, or may consist of any set of actions performed over time or any actions that are concurrent but located in different parts of a site.

51. **"Size class"** of releases refers to the following size classifications based on consideration of the particular release (e.g., size, location, impact, etc.):

    a. **"Minor release"** means a release of a quantity of hazardous substance(s), pollutant(s), or contaminant(s) that poses minimal threat to public health or welfare of the United States or the environment.

    b. **"Medium release"** means a release that does not fit criteria to constitute a minor or major release.

    c. **"Major release"** means a release of any quantity of hazardous substance(s), pollutant(s), or contaminant(s) that poses a substantial threat to public health or welfare of the United States or the environment or results in significant public concern.

52. **"Spill of national significance"** means a spill that due to its severity, size, location, actual or potential impact on the public health and welfare or the environment, or the necessary response effort, is so complex that it requires extraordinary coordination of federal, state, local, and responsible party resources to contain and clean up the discharge.

53. **"Spill-response"** means the response activities, clean-up, remediation efforts, and all other responsive actions (including the use and handling of spill-response chemicals) related to the release of oil and/or any spill-response chemical released in response to a particular oceanic oil spill, including, but not limited to the response to the Deepwater Horizon oil spill.

54. **"Spill-response chemical"** includes any chemical-oil dispersant, dispersed-oil mixture, decontaminant, decontaminant-oil mixture, other hydrocarbon, other substance, and/or any mixture thereof that was released in response to a particular oceanic oil spill, including, but not limited to the response to the Deepwater Horizon oil spill.

55. **"Sub-surface injection"** or **"injection"** means and refers to the underwater release of any spill-response chemical.

56. **"Test, study, and/or experiment"** means research or study of any kind related to oil from the Macondo Well to United States shorelines as it relates to amounts, locations, levels, duration periods, and

timing, and oil and/or any spill-response chemicals effect on human health, including, but not limited to any of the following types: exposure assessment, epidemiologic, toxicologic, hygienic, human, rat, animal, marine mammal, fish, aquatic, medical, genomic, scientific, reviews, investigations, experiment, analysis, health endpoints and outcomes evaluated, environmental sampling, aquatic toxicity, ecological effects, fate of oil, transport of oil, amount of oil, amount of oil-dispersant, duration of oil release, clean-up site exposure assessment, duration of dispersant released, toxicity levels detected for oil or dispersant, management of migration, other hydrocarbons, other substances, and/or any site-specific research or study of any kind.

57. **"United States of America," "United States,"** or **"State"** refers to all states affected by the Deepwater Horizon oil spill as contemplated under the MSA, as well as any other territory or possession over which the United States has  jurisdiction.

58. **"Vessel"** means every description of watercraft or other  artificial contrivance used, or capable of being used, as a means of transportation on water.

59. **"Well"** means the MC252 Well shall mean the exploratory well named "Macondo" that was being drilled by the Transocean Marianas and Deepwater Horizon rigs in Mississippi Canyon, Block 252 on the outer continental shelf in the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana.

60. **"You" or "Your"** means the responding Defendant, BPXP, including, but not limited to its officers and agents.

61. **"Zone A"** or **"Zone B"** means the geographic areas described in Exhibit 9 of the MSA, and depicted in the map contained in Exhibit 11 of the MSA. In the event of a conflict between the written description and the map, the written description shall govern.

62. **"Zone A Resident"** or **"Zone B Resident"** means and refers to such term  pursuant to Section I.A of the MSA.

## REQUEST FOR INTERROGATORIES

**REQUEST NO. 1:** Who verified your Responses to these Interrogatories on your behalf? For each said person, please state the following:

    A.  Her and/or his name(s);

    B.  Her and/or his present business address(es);

    C.  Her and/or his present job title(s);

    D.  Her and/or his first date of employment with you; and

    E.  Dates and titles of each job title she and/or he held while employed by you.

**REQUEST NO. 2:** How much oil and spill-response chemicals transported to land of the United States of America? If so, please identify the title, location, and custodian of all documents in existence referencing your answer.

**REQUEST NO. 3:** Please state the following for each:

A. Your correct corporate name;

B. The place of your incorporation;

C. The address of your principal place of business;

D. The dates and time-period during which you have held a certificate of authority to do business in the state of Florida; and

E. The dates and time-period during which you regularly conducted business in the United States of America.

**REQUEST NO. 4:** Describe in detail your complete corporate or business history for all associated business entities and affiliates that were involved, in any manner, in your response activities, including the purchase and/or acquisition and use of any spill-response chemical, including dates of incorporation, mergers, consolidations, reincorporation, and the like. Also provide historical information regarding all predecessors, prior names, asset purchases, acquisitions or spin-offs for all associated business entities that were involved, in any manner, in the mining, manufacture, processing, distribution, purchase and/or acquisition of oil, oil removal, oil-dispersant products and chemicals, including dates of incorporation, mergers, consolidations, reincorporation, and the like. In addition:

A. If you or any of your predecessors or subsidiaries at any time purchased or assumed any of the assets and/or liabilities of any corporation or entity which at any prior time engaged in the mining, manufacture, processing, distribution, purchase and/or acquisition of oil, oil dispersant products and chemicals, then please state the following as to each acquisition:

(1) The name or description of each corporation, entity or assets acquired by You, that entity's state of incorporation and principal place of business, its date of incorporation, and Your name at the time of acquisition;

(2) The manner of which each such corporation, entity or interest therein, was acquired (e.g., merger, consolidation, change of name, stock sale, transfer or purchase of assets or product line);

(3) The date of each such acquisition;

(4) The state in which each such acquisition was affected;

(5) The state law governing each such acquisition if specified by contract; and

(6) How the business or financial interest in that corporation or entity ended, if it ended. (e.g. dissolved the company, sold all stock, placed subsidiary in bankruptcy, etc.); and

(7) List all states where entity is or was registered to do business, including the dates of registration for each state.

**REQUEST NO. 5:**  Did you ever ship, transfer, deliver, and/or distribute any chemical-oil dispersant to an unrelated business entity located in the United States of America? If so, please state:

      A.  The name and address of the unrelated business entity;

      B.  The trade or brand name of the product that was sent;

      C.  The dates and years during which such activity took place; and

      D.  Identify your department or organizational unit so engaged.

**REQUEST NO. 6:**  Did you ever ship or distribute any spill-response chemical to (1) the United States Government; (2) the United States Air Force; (3) Army Air Force; (4) United States Army; (5) United States Navy; (6) United States Marine Corps; (7) General Services Administration; (8) Department of Defense; (9) United States Coast Guard; or (11) agency of the department of the state of Florida; (12) agency of the department of the state of Texas; (13) agency of the department of the state of Louisiana; (14) agency of the department of the state of Alabama; (15) agency of the department of the state of Mississippi; (16) EPA; (17) NOAA, or any other agency operated by the United States Government?  If so, please provide the following:

      A.  The names and last known address of the governmental agency;

      B.  Whether there was a written contract or sales agreement;

      C.  Identify all documents pertaining to the governmental contracts or agreements and custodian of said documents;

      D.  Whether the formula used in your supply was the same as the formula used in the manufacture, sale or distribution to non-governmental customers;

      E.  The extent to which sales to governmental agencies were handled through distributors or wholesalers as opposed to direct sales by Defendant;

      F.  The extent to which the physical appearance of the oil dispersants, chemicals, and/or products sold or distributed to a governmental agency differed from the physical appearance of the same when sold or distributed to non-governmental customers;

      G.  The extent to which the packaging and/or labelling of the product sold or distributed to a governmental agency differed from the packaging or labelling of the product sold or distributed to non-governmental customers; and

      H.  Identify Sales and shipment records for each governmental agency and the custodian thereof.

**REQUEST NO. 7:**   Since 1960, have you used any facility in the United states of America to store, maintain, process, and/or distribute any spill-response chemical? If so, please state the following regarding each said facility:

    A.  The name and address of the building or facility;

    B.  The inclusive dates the facility was in operation;

    C.  The function of the facility (e.g., manufacturing, warehousing, processing, etc.)

    D.  Facility managers and years of management;

    E.  Name and type of oil dispersants, chemicals, and/or products stored or processed at each facility; and

    F.  Identify oil-dispersant shipment records for each facility and the custodian thereof.

**REQUEST NO. 8:**   Did you release or request the release of any spill-response chemical into the environment in response to the Deepwater Horizon oil spill? If so, for each said release, please specify:

    A.  Spill-response chemical product or trade name;

    B.  Release-time;

    C.  Site specific-release location;

    D.  Release-amount;

    E.  Release-level;

    F.  Exposure-level;

    G.  Manner of each use or application (i.e. aerial spraying, sub-surface injection, in-situ burning, etc.)

    H.  The name(s) of all sellers, marketers, shippers, and/or distributors;

    I.  The person(s) or entities hired to perform each release;

    J.  Generic name;

    K.  Generic product;

    L.  Form;

    M.  Odor;

    N.  Taste;

    O.  Description of its actual use(s) during response activities;

P. Approximate chemical composition in percentage for each spill-response chemical which contains any of the following:

    (1) Benzene
        1. Content by weight;
        2. Content by volume;
        3. Type of Benzene by %

    (2) Arsenic
        1. Content by weight;
        2. Content by volume;
        3. Type of Arsenic by %

    (3) Propylene Glycol Organic Salts;
        1. Content by weight;
        2. Content by volume;
        3. Type of Propylene Glycol Organic Salts by %

    (4) Dioctyl Sodium Sulfosuccinate;
        1. Content by weight;
        2. Content by volume;
        3. Type of Dioctyl Sodium Sulfosuccinate by %

    (5) Petroleum Distillates;
        1. Content by weight;
        2. Content by volume;
        3. Type of Petroleum Distillates by %

    (6) 2-Butoxyethanol
        1. Content by weight;
        2. Content by volume;
        3. Type of 2-Butoxye-Thanol by %

Q. Manufacturing site(s);

R. Storage site(s);

S. Size(s) of shipment container(s);

T. Color(s) of shipment container(s);

U. Color of raw chemical;

V. Product literature;

W. Product picture(s);

X. Trademark name(s); and

Y. Patent number(s).

**REQUEST NO. 9:**    Did you ever request or specify for the change in composition, ingredients, compounds, and/or formula of any spill-response chemicals listed in your Response to Request No. 8? Please provide the date of each occurrence, the name of each dispersant, and whether any documents, correspondence, and/or memorandum exists reflecting said request and the location and custodian thereof.

**REQUEST NO. 10:**   Did you draft a plan for your response to the Deepwater Horizon oil spill? If so, please state the following:

    A. The date and place where it was designed and developed;

    B. The names and last known address of all persons who designed or developed it;

    C. The names of all your employees and/or agents who supervised any medical monitoring of any clean-up workers in connection with your response activities;

    D. The names of all persons and/or entities whom hired directly and/or indirectly in connection with said plan and/or your response activities;

    E. Was there a timeline of events expressly ordered or directed in the plan with deadlines for execution, and on what date was such order or directive issued; and

    F. If you ever tested any spill-response chemical and/or any mixture thereof prior to its use before you made it part of the plan? If so, provide the identity and present location of all records dealing with these tests (including testing concerning use, application, efficacy, toxicity, range of exposure, exposure assessment, etc.), and the location and custodian of said records.

**REQUEST NO. 11:**   For each spill-response chemical identified in your Response to Request No. 8, please provide a detailed description as to your findings or results, if any, as to the efficacy of each toward the mitigation of the fate, transport, and prevention of exposure to humans for each of the following:

    A. Oil from the Macondo Well;

    B. Propylene Glycol Organic Salts;

    C. Dioctyl Sodium Sulfosuccinate;

    D. Petroleum distillates;

    E. 2-Butoxyethanol;

    F. P-Xylene;

    G. Hexane; and/or

    H. Ethylbenzene.

**REQUEST NO. 12:**  Did you release or request for the release of any spill-response chemical that did not contain any of the compounds or agents listed above in Request No. 11 when released? For each said release in response to the Deepwater Horizon oil spill, please state:

     A.  Spill-response chemical product or trade name;

     B.  Release-time;

     C.  Site specific-release location;

     D.  Release-amount;

     E.  Release-level;

     F.  Exposure-level;

     G.  Manner of each use or application (i.e. aerial spraying, sub-surface injection, in-situ burning, etc.)

     H.  The name(s) of all sellers, marketers, shippers, and/or distributors;

     I.  The person(s) or entities hired to perform each release;

     J.  Generic name;

     K.  Generic product;

     L.  Form;

     M.  Odor;

     N.  Taste;

     O.  Description of its actual use(s) during response activities;

     P.  Manufacturing site(s);

     Q.  Storage site(s);

     R.  Size(s) of shipment container(s);

     S.  Color(s) of shipment container(s);

     T.  Color of raw chemical;

     U.  Product literature;

     V.  Product picture(s);

     W.  Trademark name(s); and

     X.  Patent number(s).

**REQUEST NO. 13:**  Do you have knowledge as to the existence and location of documents pertaining to and/or reflecting your purchase and/or release-amounts, specific release-site

locations, and/or release times of any spill-response chemical listed in your Response above to Request No. 8, including, but not limited to, invoices, orders, purchase records, sales records, confirmations, bills of lading, annual or other periodic summaries of sales or orders, accounts payable or accounts receivable records, etc.  If so, describe in detail the different types of documents that you have for each said spill-response chemical and state the following as to each type of document:

    A. The items of information contained on it (e.g., date of sale, dispersant type, chemical or product type, quantity, seller, shipment location, price, etc.);

    B. The years of purchase encompassed by documents still in existence;

    C. The current location of the documents;

    D. Identify the current custodian of the documents, as well as the current employee most familiar with the codes or system used on the documents; and

    E. List each office location where you purchased any spill-response chemicals used in your response to the Deepwater Horizon spill and/or during response activities thereafter, and for each please state:

        (1) Name and address;

        (2) Geographical areas for which each sales office was responsible;

        (3) Identify all managers and the years during which they served;

        (4) Identify all sales personnel and the years during which they served, and describe each person's sales jurisdiction or responsibility; and

        (5) Identify shipment records and/or correspondence for each shipment office and the custodian thereof.

**REQUEST NO. 14:**  What are the names and addresses of all the individuals and entities whom you have ever purchased or otherwise acquired spill-response chemicals from between January 1, 1960 and the present, including, but not limited to Corexit?

**REQUEST NO. 15:**  For all policies of insurance affording general liability, bodily injury liability, or catastrophic accident coverage, including primary policies, excess policies, policies of reinsurance, program of self-insured retention (SIR), and/or policies in which you are additionally insured, applicable to injuries allegedly caused by exposure to oil and/or any spill-response chemical, please provide the following information:

    A. Insurer: Specify exactly as named in the insurance policy or other evidentiary document of coverage;

B.  Insured: The insured named in the policy;

C.  Policy Period: Refer to the actual period for which the insurance policy is and/or was in effect;

D.  Policy Type: (i.e. primary, excess or self-insured, etc);

E.  Per Occurrence/Accident Limits: Refer to the limit for any one occurrence or any one accident;

F.  Liability Aggregate: Refer to the aggregate limit applicable to bodily injury liability coverage.  Certain insurance policies may contain a combined aggregate for bodily injury, property damage and other covered perils; if so, refer to the combined limit and so indicate;

G.  Policy Number: Specify exactly as contained on the insurance policy or other evidential document of coverage the policy number. Also, please provide the location(s) and custodian of the policy and/or document(s); and

H.  Insurer Objection: Specify the bases upon which the relevant insurer refuses to fully pay claims upon demand.  If the insurer has not objected to payment or is paying, note N/A.

**REQUEST NO. 16:**  Did you ever hire any person before April 20, 2010 to inform or report findings to you about potential medical, toxicological, or industrial hygiene aspects of oceanic oil spills and/or health effects on humans exposed to oil and/or chemical oi-dispersants released during response activities? If so, please state the type of use reviewed either surface or subsurface, along with the following as to each said person:

A.  Names of all said persons;

B.  Start date, end date, and period of service in this capacity;

C.  The job duties and/or responsibilities;

D.  Summary of the work performed;

E.  The physical address or location for performance of each part of the consultancy;

F.  Purposes for retaining the persons;

G.  Names of all your agents, representatives, and/or assigns who retained each said person(s) listed herein, as well as identify the same with whom each said person(s) met during the period of the employment or consultancy.

**REQUEST NO. 17:**  Did any industrial hygienist, toxicologist, safety specialist, occupational medical specialist, scientist, and/or physician ever make any statement, recommendation, suggestion and/or other communication to you pertaining to or relating to oil and/or any spill-

response chemicals released before, during, and/or after the Deepwater Horizon oil spill. If so, provide the following as to each such occasion (excluding said efforts made for the purposes of this lawsuit):

    A. The name of each person who made said recommendation(s);

    B. Dates of each recommendation;

    C. The names of all your officers and/or agents who received said recommendation(s);

    D. A brief statement as to the substance of said recommendation(s); and

    E. Please identify yes or no whether any documents and/or records of oral conversations embodying, pertaining to and/or confirming the existence of said recommendation(s), and if so please identify the custodian and location of each said record(s).

**REQUEST NO. 18:** Over the last sixty (60) years, did you ever conduct or direct that any test, study, or experiment to be conducted to research or study any potential human health effects associated between oil and/or any spill-response chemical released by you in response to any oceanic oil spill in the past, specifically including, but not limited to those released in response to the Deepwater Horizon oil spill (before, during, and after your spill-response efforts). If so, please provide the following information for each said test, study, and/or experiment (whether laboratory or field tests):

    A. Name all persons who requested that each said test, study, and/or experiment to be conducted;

    B. Name all persons and/or entities who performed each said test, study, and/or experiment;

    C. Specify all locations, dates, and durations for each test conducted including the department of the facility testing location for each said test, study, and/or experiment conducted, and name each corresponding owner and operator of each test-location;

    D. Describe the conditions of each test, including the measurement methodology;

    E. Indicate the efforts, if any, that were used in the test, study, and/or experiment to simulate the various conditions of possible or probable contact or exposure to or any spill-response chemicals, such as aboard a vessel;

    F. Name of the particular spill-response chemical, exposure levels measured, including the range median, and average measurements; and

    G. Name all persons to whom copies of the test results were sent or given to.

**REQUEST NO. 19:** Did you ever financially support more than a 10% contribution towards the total cost to the occurrence of any effort to monitor or review the professional literature regarding

the clinical, epidemiologic, toxicologic, hygienic, medical and/or scientific aspects of oil and/or any spill-response chemicals for any purpose, including, but not limited to conduct an exposure assessment or to determine the health risks and effects of said exposures?  If so, whether said effort focused on human health effects generally or specifically in connection with the Deepwater Horizon oil spill please state the following as to each effort (excluding any said efforts made for the purposes of this lawsuit):

    A.  Name all your officers and/or agents who authorized each study;

    B.  Name all persons or entities that conducted each study;

    C.  Dates and time periods each study was performed;

    D.  Description of the design and protocol for each study;

    E.  All results of each study, including conclusions and recommendations made;

    F.  Names of all of your officers and/or agents who received notice of each study or its results;

    G.  Identity of all documents related to any such study and the custodian thereof; and provide the location of said documents; and

    H.  If the study has been published, state the study title and citation.

**REQUEST NO. 20:**  Were you ever made aware or otherwise discover any harmful association between inhalation of or physical contact with oil and/or any spill-response chemical identified in your Response in Request No. 8, and human health effects, including, but not limited to Corexit. If so, please specify the below information surrounding your knowledge about each said disease, condition, and/or health effect:

    A.  When any of this knowledge was first acquired, how it was acquired, identify by whom it was acquired, and state the substance of the knowledge acquired;

    B.  As to each such occasion thereafter in which your knowledge as to any known health risks such as eye problems, heads & neurological conditions, respiratory illnesses, sinus issues, skin conditions, stomach complications increased either relative to the types of exposures (i.e., role in  response activities, etc.) and/or types of chemicals including oil dispersants which became associated with the development of any known health risks such as eye problems, heads & neurological conditions, respiratory illnesses, sinus issues, skin conditions, stomach complications state:

        (1)  When was this additional knowledge acquired; how was this additional knowledge acquired;

        (2)  Identify by whom it was acquired: state the substance of the additional knowledge acquired; and

(3) Identify all documents relevant to your acquisition of knowledge concerning the any known health risks such as eye problems, heads & neurological conditions, respiratory illnesses, sinus issues, skin conditions, stomach complications and the custodian thereof.

**REQUEST NO. 21:** Did you ever learn of an association between human inhalation of oil and/or any spill-response chemical, and the illness known as rhinosinusitis, tracheobronchitis, and/or bronchitis.  If so, please state for each disease:

A. When any of this knowledge was first acquired, how it was acquired, identify by whom it was acquired, and state the substance of the knowledge acquired;

B. As to each such occasion thereafter in which your knowledge as to rhinosinusitis, tracheobronchitis and/or bronchitis; increased either relative to the types of exposures (i.e. role during response activities, etc.), and/or types of chemicals including oil dispersants which became associated with the development of rhinosinusitis, tracheobronchitis and/or bronchitis state:

(1) When was this additional knowledge acquired;

(2) How was this additional knowledge acquired;

(3) Identify by whom it was acquired: state the substance of the additional knowledge acquired; and

(4) Identify all documents relevant to your acquisition of knowledge concerning the disease rhinosinusitis, tracheobronchitis and/or bronchitis and the custodian thereof.

**REQUEST NO. 22:** Did you publish or otherwise provide any instruction, caution, and/or statement to the Plaintiff which contained information about health effects associated with human exposure to oil and/or any spill-response chemical? If so, please state:

A. Date first given and method in which said instruction was provided;

B. Names of any person(s) and location(s) these instructions were made;

C. Provide the specific instructions given; and

D. Identify all oral communications and documents related to these instructions. If oral identify the approximate date of said communication and the parties involved, if written provide the custodian of said documents.

**REQUEST NO. 23:** Did you ever deliver, distribute, and/or ship to the Plaintiff any form of protective clothing, gear, and/or garment, including any disposable face mask or respirator? If so, please state:

A. Date this policy was created, and the date it was implemented;

B. Provide the address(es) of location(s) or names of site(s) where delivered;

C. Description of type of protective clothing, gear, or garment provided;

D. Description of the type of face mask(s) or respirator provided; and

E. Identify all oral communications and documents related to this policy, including all photographs and/or product materials related to each said face mask. If oral identify the approximate date of said communication and the parties involved, if written provide the custodian of said documents.

**REQUEST NO. 24:**  Please identify your employee(s) or former employee(s) most knowledgeable within the following areas. In your answer, please state the time-period during which each was the most knowledgeable as well as the positions each held in your company:

A. Any potential adverse health effects which may be associated with exposure to oil and/or any spill-response chemical;

B. Toxicological studies for oil and/or any spill-response chemical which you either conducted, coordinated or in which the you in any way participated between 1995 and the present;

C. All documents which you possess or possessed at any time between 1995 and the present which express the opinion or discuss the hypothesis that oil and/or any of the spill-response chemicals are not associated with any adverse health effects in humans or animals or which discusses the potential for oil and/or any of the spill-response chemicals to cause any adverse health effects in humans or in animals;

D. All documents which you possessed before 2005 which might reasonably be anticipated to express the opinion or hypothesis that oil and/or spill-response chemicals are not associated with any adverse health effects in humans or animals or which discusses the potential for oil and/or any spill-response chemical to cause any adverse health effects in humans or in animals.

**REQUEST NO. 25:**  Did you ever receive notice that any person filed a claim against you for injuries or illness related to exposure to crude oil and/or any spill-response chemical owned or released by you anywhere during anytime between January 1, 1995 and April 20, 2010?  If so, please state as to each such claim.

A. Names of all said claimants;

B. Date you received notice of each claim;

C. A description of each claim including the type of exposure experienced by the claimant

D. Type of injuries allegedly sustained by each claimant;

E. Caption, court, address of court or workers' compensation file number of each claim;

F.   Identify all documents relating to the claim and the custodian thereof.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on all counsel of record via electronic delivery on the CM/ECF E-Filing portal and on counsel of record for British Petroleum America Production Company, via e-mail to dcreid@Liskow.com, and  on this 11th day of January, 2019.

Respectfully Submitted,

**Dated**: January 11th, 2019

THE DOWNS LAW GROUP, P.A.
*Attorneys for Plaintiffs*
3250 Mary Street, Suite 307
Coconut Grove, Florida 33133
(305) 444-8226 Telephone

By: */S/* Michael D. Dunlavy
CRAIG T. DOWNS, ESQ.
Florida Bar. No.: 801089
NATHAN NELSON, ESQ.
Florida Bar No.: 1002523
MICHAEL D. DUNLAVY, ESQ.
Florida Bar No.: 114212