UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  OIL SPILL by the OIL RIG<br>"DEEPWATER HORIZON" in the<br>GULF OF MEXICO, on<br>APRIL 20, 2010<br><br>THIS DOCUMENT RELATES TO:<br><br>CASE NO. 2:19-CV-01418-CJB-JCW<br>AND<br>ALL CASES IN PLEADING BUNDLE B3<br><br>\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \* | \*<br>\*<br>\*<br>\*   MDL NO. 2179<br>\*<br>\*   SECTION: J<br>\*<br>\*   JUDGE BARBIER<br>\*<br>\*   MAG. JUDGE WILKINSON |

**MEMORANDUM OF LAW IN SUPPORT OF
RESPONDERS' MOTION TO LIFT THE MDL STAY**

O'Brien's Response Management, L.L.C. ("O'Brien's") and National Response Corporation ("NRC," and with O'Brien's, the "Responders") submit this memorandum of law in support of their motion to lift the stay imposed by Pretrial Order No. 25 (Rec. Doc. 983) ("PTO 25") as to their new action (the "Declaratory Judgment Action") against BP Exploration & Production Inc. and BP America Production Company (together, "BP").

**INTRODUCTION**

With each passing day, this indemnity dispute with BP leads to mounting uncertainty for and increasing prejudice to the Responders (and BP's other contractors during the *Deepwater Horizon* oil spill response and clean up (the "DWH Response")). More and more "B3" plaintiffs invoke their back-end litigation option ("BELO") rights under the Medical Benefits Class Action Settlement (the "Medical Settlement") on a regular basis. BP continues to actively defend those cases as it sees fit, despite the Responders' right to control the defense of these claims if there in fact were indemnity (which there is not). Without even consulting the Responders, BP has selected and retained its preferred counsel, experts, and consultants; determined which defenses

to assert and pursue; and made a number of strategic decisions with respect to these various cases, including as to consolidation and settlement. Compl. at ¶¶ 134-141.[1] BP wants to maintain this *status quo* in each individual case and continue to defend them without limitation, but still have the Responders reimburse them for all costs, expenses, and damages when all is said and done. BP's demand is staggering and without bound; lifting the stay will relieve the resulting uncertainty and prejudice to the Responders.

The Responders also submit that the state of play surrounding the "B3" litigation, and the status of proceedings in this MDL generally, support lifting the stay. In the eight years since this Court entered PTO 25, the bulk of the claims in the MDL have been resolved in some manner and this Court has been able to impose structure for moving forward those claims that remain pending. Allowing the Declaratory Judgment Action to proceed promptly and swiftly thus would not negatively impact the administration of any other aspect of the MDL. To the contrary, resolving this dispute, and providing the declaratory relief requested, will advance the MDL by providing necessary guidance to the Responders, and other interested parties, that BP alone is responsible for defending the BELO litigation arising from its Medical Settlement.

Under the appropriate balance of equities and relevant factors, there is no basis to maintain a stay. The Responders respectfully request that this Court lift the stay imposed by PTO 25, provide a date certain by which BP must answer the Complaint, and set a schedule for prompt resolution of the Declaratory Judgment Action.

## BACKGROUND

### *This Court Enters Pretrial Orders to Effectively Administer the MDL*

Since 2010, BP and the Responders have all been defendants in the MDL. (Rec. Doc.

---

[1] References to the Responders' Complaint refer to Rec. Doc. 1 in Civil Action No. 19-1418.

881). This Court entered Pretrial Order No. 11 (Case Management Order No. 1) (Rec. Doc. 569) ("PTO 11") and PTO 25 in October 2010 and January 2011, respectively. (Rec. Docs. 569, 983). Discovery was in its infancy and claims continued to be filed on a daily basis. In short, at the time, there was a "need for organization of this complex litigation." PTO 11 at 1.

Part of this Court's organizational effort entailed separating claims into pleading "bundles." By issuing PTO 11 and PTO 25, the Court established the "B3" bundle, which was defined to include, among other things, "**all** claims for personal injury and/or medical monitoring for exposure or other injury occurring after the explosion and fire of April 20, 2010." PTO 25 at 2 (emphasis added).

As another part of its effort to bring order to the MDL, this Court entered an automatic stay of most other claims that were not pled in a Master Complaint submitted pursuant to PTO 11. Specifically, this Court ordered that "[a]ll individual petitions or complaints that fall within Pleading Bundles B1, B3, D1, or D2, whether pre-existing or filed hereafter, are stayed until further order of the Court." PTO 25 at 4. The stay permitted this Court to effectively manage this vast MDL by allowing it to resolve threshold or categorical factual or legal issues in an orderly fashion, many of which were predicate to large numbers of claims. At the same time, this Court has permitted claims other than those pled in the Master Complaints to proceed, and lifted the stay for new cases where deemed appropriate. *See*, *e.g.*, (Rec. Doc. 12241).

### *BP Enters the Medical Settlement*

On April 18, 2012, BP publicly filed the Medical Settlement, which purported to settle the majority of personal injury and exposure claims that had been asserted against BP in the MDL (*i.e.*, with respect to the "B3" bundle of claims, as defined in PTO 11 and clarified in PTO 25). (Rec. Doc. 6273-1). In the Medical Settlement, BP agreed to the BELO provision, which

3

permits each and every class member to split their exposure-based claim into two component parts—that is, BP permitted each class member to receive a payout under the Medical Settlement around that time and then later pursue litigation for a LATER-MANIFESTED PHYSICAL CONDITION.[2] Medical Settlement at Section VIII.A. BP also agreed to waive certain affirmative defenses and eliminate certain issues or elements that need to be proven by any Plaintiff at any trial. *Id.* at VII.B. BP has conceded that the BELO provision made the Medical Settlement "unusual." Apr. 25, 2012 Hr'g Tr. at 89:21 (Rec. Doc. 6395).

### *BP Defends the "B3" Claims Submitted Via the BELO Without Involving the Responders*

Since the Medical Settlement became effective, Plaintiffs have continued to pursue their "B3" claims against BP pursuant to the BELO provision that BP unilaterally agreed to. Compl. ¶¶ 127-131. Hundreds of these "B3" claims have been refiled across the country with potentially thousands more waiting in the wings. *Id*.

BP has charged ahead in defending these claims without consulting the Responders. For example, BP appears to be making decisions to mediate, or not mediate, the claims of any "B3" plaintiff exercising their BELO rights on a regular basis. Compl. ¶ 134. Those "B3" plaintiffs continue to file BELO complaints in this Court as a result, leading to expenses that the Responders may not have chosen to incur. BP also continues to make other key litigation decisions in each such case: hiring at least eight different law firms to defend it, filing Answers, and moving for or stipulating to venue transfers in eight different judicial districts. Compl. ¶¶ 136–137, 139-140. In addition, BP is proceeding with discovery in the BELO actions,[3] and trial

---

[2] The term LATER-MANIFESTED PHYSICAL CONDITION is broadly defined at Section II.VV of the Medical Settlement as an exposure-based physical condition that is first diagnosed after April 16, 2012. Compl. ¶ 73.

[3] *See, e.g.*, *Rodriguez v. BP Expl. & Prod., Inc. et al.*, 1:18-CV-24388-MGC (S.D. Fla. Feb. 22, 2019) (Rec. Doc. 35) (minute entry for discovery hearing); *Robinson v. BP Expl. & Prod., Inc. et al.*, 5:18-cv-00260-RH-MJF (N.D. Fla. Feb. 19, 2019) (Rec. Doc. 15) (motion to compel discovery filed by BP); *De La Cruz v. BP Am. Prod. Co. et al*.,

dates have been scheduled in certain cases.[4]  Indeed, BP already has made significant strategic decisions in the "B3" BELO litigations without involving the Responders, including opposing consolidation.  Compl. ¶ 138.[5]  And in some instances, BP has reached settlements with Plaintiffs, without consulting the Responders prior to agreeing to those separate settlement terms.  Compl. ¶ 141.[6]

### *BP Demands Indemnity from the Responders*

Many years after unilaterally agreeing to the Medical Settlement that allowed these actions to proceed, BP asserted for the first time that O'Brien's and NRC must indemnify it in full for any "B3" claim pursued under the Medical Settlement's BELO provision by any clean-up worker who worked for O'Brien's or NRC, whether directly or indirectly, during the DWH Response.  Compl. ¶¶ 127, 130.  Specifically, BP has purported to tender thousands of exposure-based claims relating to the DWH Response to O'Brien's and NRC.  *Id.*  BP has similarly requested indemnity from other responder entities that served as contractors to BP during the DWH Response.  Compl. ¶ 133.

BP's indemnity demands have forced O'Brien's to, in turn, tender the O'Brien's Indemnity Demands down the contract chain to parties who served as subcontractors to O'Brien's during the DWH Response.  To date, O'Brien's has sent indemnity demands of its own to ten different subcontractors who worked for it during the DWH Response, all of whom

---

1:18-cv-00472-TFM-N (S.D. Ala. Feb. 5, 2019) (Rec. Doc. 29) (providing notice that BP had served written discovery requests).

[4] *See*, *e.g.*, *Roa v. BP Expl. & Prod., Inc. et al.*, 1:18-CV-24655-KMM (S.D. Fla. Dec. 8, 2018) (Rec. Doc. 18) (setting trial for September 16, 2019); *Oseguera v. BP Expl. & Prod., Inc. et al.*, 2:18-cv-06511-SM-KWR (E.D. La. Dec. 18, 2018) (Rec. Doc. 13) (setting trial for September 9, 2019) *Cabrera v. BP Expl. & Prod., Inc. et al.*, 8:18-CV-02938-JSM-AAS (M.D. Fla. Jan. 28, 2019) (Rec. Doc. 18) (setting jury trial for December 2020 term).

[5] *See also, e.g.*, Order, *De La Cruz v. BP Expl. & Prod., Inc., et al.*, No. 1:18-CV-00472-TM-N (S.D. Ala. Feb. 5, 2019) (Rec. Doc. 30 at 2) (noting that when the court discussed consolidating ten BELO cases at a scheduling conference, "[c]ounsel for Plaintiff expressed his client was in favor of consolidation, while counsel for Defendants expressed his clients were not in favor of consolidation").

[6] *See, e.g.*, *Chapa v. BP Expl. & Prod.*, *Inc. et al.*, 2:18-CV-08662-CJB-JCW (E.D. La. Jan. 9, 2019) (Rec. Doc. 5).

would owe O'Brien's indemnity if the Court denied the relief sought by the Responders.

### *The Declaratory Judgment Action*

On February 14, 2019, the Responders filed the Declaratory Judgment Action against BP requesting relief from this Court pursuant to 28 U.S.C. § 2201.  (Case No. 2:19-CV-01418-CJB-JCW, Rec. Doc. 1).  This Complaint alleges that BP's multi-year delay in seeking indemnification and its decision to unilaterally enter into the Medical Settlement have severely prejudiced the Responders to the point of extinguishing any indemnity or contribution rights BP may have once had.

The Complaint also alleges that, if the Responders actually owed BP indemnity (which they do not), BP would have to give them control over those actions it has tendered.  Compl. ¶¶ 144-47.  BP's control over the cases filed pursuant to the BELO provision, however, continues to this day and BP intends to keep it that way.  *See* Compl. ¶¶ 134-141; *supra* at 4-5.  BP has made clear that it (i) is not requesting that O'Brien's and NRC defend BP in the individual cases filed pursuant to the Medical Settlement's BELO provision, but rather, merely seeking reimbursement for litigation costs and expenses, and (ii) would like to both control the defense of all of these cases, without exception, and employ its selected litigation counsel.  Compl. ¶ 153.

### *This Court Consolidated the Declaratory Judgment Action to the MDL*

On February 15, 2019, the Responders filed a Notice of Collateral Proceeding pursuant to Local Rule 3.1, providing notice to this Court that the Declaratory Judgment Action related to the MDL.  (Case No. 2:19-CV-01418-CJB-JCW, Rec. Doc. 3).  On February 19, 2019, this Court entered several pretrial orders from the MDL into the record of the Declaratory Judgment Action, including PTO 11 and PTO 25, consistent with its prior approach when consolidating an individual action with the MDL.  (Rec. Docs. 5, 6).  As such, the automatic stay set forth in PTO

25 applies to the Declaratory Judgment Action at this time, and must be lifted by this Court in order for the Responders' claims against BP to proceed and be heard.[7]

## ARGUMENT

District courts have the inherent power to impose or lift stays and "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Water Works & Elec. Co.*, 299 U.S. 248, 254 (1936).  In weighing a motion to lift a stay, "courts should reconsider the fairness of a stay order in light of 'present day realities' . . . weigh the competing interests, as they now exist, and determine whether the equities continue to justify a stay."  *In re Beebe*, 56 F.3d 1384, *3-4 (5th Cir. 1995) (quoting *Landis*, 299 U.S. at 258).  If the "realities of the hardship of a stay" outweigh the benefits of a stay, the stay should be lifted.  *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 545 (5th Cir. 1983); *see also Landis*, 299 U.S. at 252–53.  Courts should consider "the purposes of expedition and certainty," particularly if the stay is of "indefinite" duration, in order to "prevent the ossification of rights which attends inordinate delay."  *Hines v. D'Artois*, 531 F.2d 726, 731-37 (5th Cir. 1976).

### I. THE DECLARATORY JUDGMENT ACTION SEEKS TO RESOLVE AN IMPORTANT AND GROWING ISSUE

The Responders, their subcontractors during the DWH Response, and other third parties all face mounting uncertainty as to their purported financial responsibility for the "B3" claims being pursued via the BELO provision of the Medical Settlement.  Absent action by this Court, that uncertainty will continue to grow as time passes.  Under the BELO regime, BP's potential liability and defense costs (and thus what it may ultimately seek from the Responders) are

---

[7] The Responders have asked BP if it will consent to lifting the stay governing the Declaratory Judgment Action, or if they object, what BP's basis for objection is.  BP has advised that it objects to lifting the stay in place pursuant to PTO 25 but has refused to provide the basis for its objection.  *See generally* Exhibit 1 (Feb. 25, 2019 and Feb. 28, 2019 emails between the Responders and BP).

7

unquantifiable, indefinite, and uncertain.  Indeed, the Medical Settlement does **not** set forth (1) a temporal window within which a physical condition must be diagnosed after it has manifested itself in order for a class member to be able to invoke his or her BELO rights and assert an exposure-based claim against BP; (2) a global temporal cutoff by which a physical condition must be diagnosed in order for a class member to be able to invoke his or her BELO rights and assert an exposure-based claim against BP; (3) a cap on the compensation any individual class member can seek or be awarded in any litigation filed pursuant to the BELO provision; or (4) an overall cap on the compensatory damages that BP can be held liable for in litigation brought by class members pursuant to the BELO provision.  Compl. ¶¶ 76-80.

It is one thing for BP to be subject to this uncertainty because BP unilaterally agreed to the BELO provision in the Medical Settlement.  It is quite another for the Responders, who did not agree to the BELO provision and were not aware of BP's intentions to seek indemnity until years later, to bear the hardship of indefinite financial uncertainty.  Expedient confirmation that BP is the party solely responsible for these claims will alleviate this hardship.

Such a timely ruling also will resolve whether the Responders are being prejudiced by BP's claims for indemnity while simultaneously denying the Responders' right to control the defense.  If, as the Responders contend, no indemnity is owed in the first place then there is no prejudice from BP's refusal to cede control over the defense of these claims.  But, as it stands now and during the pendency of any stay, BP will be permitted to claim indemnity while at the same time ignoring the Responders' rights if there were such indemnity.  BP's double-talk comes at the same time it unilaterally makes litigation decisions that could result in greater costs, expenses, and liability for the Responders.

Courts in this Circuit have lifted a stay in comparable circumstances.  For example,

where a plaintiff had no "adequate remedy for the delay it [would] suffer if the action [was] stayed," and "mere delay" may have been "calamitous in view of the amount of its claims," the Fifth Circuit vacated a stay, ruling that the plaintiff "should not be denied its day in court." *Itel Corp. v. M/S Victoria U*, 710 F.2d 199, 204 (5th Cir. 1983); *see also, e.g., Landis*, 299 U.S. at 251–53 (vacating stay where petitioners alleged that statute, which may not have been valid as applied to them, "obstructed their business and cast a cloud on its legality" during stay). Similarly here, the Responders remain under a cloud of uncertainty during the pendency of the stay, during which they have no visibility as to whether they owe indemnity, the scope and scale of any such indemnity, and whether and to what extent they are being prejudiced by BP's control of the defense of these claims if there is indemnity. *See supra* at 4-6.

These concerns are especially compelling here, where the effects of the stay are "indefinite" because PTO 25 has no set end date. PTO 25 at 4 (imposing stay "until further order of the Court"). In *Hines v. D'Artois*, the Fifth Circuit held that a stay should be lifted where it had no determinable end date and could place the parties "effectively out of court" with respect to their rights. 531 F.2d at 731-37 (5th Cir. 1976). Here, if indemnity is later found to be owed, the value of the Responders' rights to control the defense of these claims will be mooted if the litigations have progressed beyond the point where such control actually makes a difference.

Finally, promptly determining the Responders' claims in the Declaratory Judgment Action also will provide guidance and clarity to a host of other third parties, including other similarly-situated contractors from whom BP has sought indemnity and the subcontractor entities to which O'Brien's has tendered BP's indemnity demands. Until the Declaratory Judgment Action is resolved, these parties also remain in the dark, not knowing whether or not they will bear a potentially significant financial burden.

## II. **BP CANNOT MEET ITS BURDEN OF PROOF REQUIRED TO MAINTAIN THE STAY**

The proponent of a stay has "the burden of persuasion" and "'must make out a clear case of hardship or inequity in being required to go forward.'" *In re Papst Licensing GmbH Patent Litig.*, No. 99-MD-1298, 2006 WL 1004990, at *2 (E.D. La. Apr. 10, 2006) (Barbier, J.) (quoting *Landis*, 299 U.S. at 254-55) (stating that because "no set date for [the stay's] ending exist[ed]" and the "stay ha[d] already lasted quite a long time," "the reasons for its continuing should be strong"). Courts examine factors including potential "judicial inefficiency" and "discovery difficulties" in weighing whether a party has justified maintaining a stay. *See*, *e.g.*, *Wedgeworth*, 706 F.2d at 546-47. BP cannot meet this standard.

*First*, BP already is in the process of litigating all of the claims pursued pursuant to the Medical Settlement's BELO provision. *See supra* at 4-5. A prompt decision in the Declaratory Judgment Action, therefore, would impose no additional burden on them. In fact, certainty and clarity with respect to the indemnity demands BP itself has issued cannot produce any harm or prejudice unto them. If BP truly thinks its indemnity demands to the Responders are appropriate, it should have no objection to this Court evaluating the Responders' Declaratory Judgment Action on the merits in short order.

*Second*, lifting the stay would serve the interests of judicial economy. Courts enact and maintain stays in order to "avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *In re Papst Licensing*, 2006 WL 1004990, at *1-2 (quotation marks omitted). This Court, however, is the sole forum in which the Responders contest BP's indemnity demands. And the Responders seek a global, final resolution of that dispute in this Court, the forum best equipped to decide it. *See* Compl. ¶¶ 155-157, 159-161. Thus, as in *In re Papst Licensing*,

"[c]oncerns of conflicting outcomes, duplicative litigation, or a sister court's authority will not be implicated." *Id.*

*Third*, there is no concern for difficult discovery because the parties will be able to utilize much of the discovery already conducted in the MDL. *See Wedgeworth*, 706 F.2d at 545-46 (many discovery difficulties were obviated where much of the "pertinent" discovery could be found in "the filings in prior litigation"). For example, deciding the Responders' claims in the Declaratory Judgment Action will necessarily involve many of the same facts summarized in this Court's orders granting the Responders' summary judgment motions on immunity (the "2016 Immunity Orders"),[8] and whether these orders serve to bar BP's claims. These rulings came after the parties conducted "B3" fact discovery and engaged in a lengthy campaign of obtaining Plaintiff submissions in purported support of their claims. Ultimately, this Court found none of this warranted maintaining any individual "B3" claim against the Responders. Many of the same facts and discovery summarized in the 2016 Immunity Orders will be relevant in deciding the Declaratory Judgment Action. *See*, *e.g*, Compl. ¶ 161 & at 47.

*Finally*, the "present day realities" of the MDL have changed, such that allowing the Responders to prosecute their case would not disrupt the administration of other extant claims in the MDL. *See Landis*, 299 U.S. at 258 (noting that in test case, "the facts ha[d] now been settled by stipulation; the briefs ha[d] been prepared;" and "the case ha[d] been argued on the merits"). Far fewer claims remain pending in the MDL than did in 2010 and 2011 when the stay was first considered as a case administration mechanism and then imposed, and as a result, the factors that supported the automatic stay of claims under PTO 25 are, in large part, no longer present. The Responders' claims in the Declaratory Judgment Action thus may be decided without disrupting

---

[8] *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, 2016 WL 4091416 (E.D. La. Aug. 2, 2016); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, 2016 WL 614690 (E.D. La. Feb. 16, 2016).

other elements of the MDL and its administration that this Court has worked to organize. Lifting the stay in this one case will not upset the apple cart.

## **CONCLUSION**

For the foregoing reasons, the Responders respectfully request that the Court allow their case to proceed by lifting the stay in the Declaratory Judgment Action, providing a date certain by which BP must answer the Complaint and setting a schedule for prompt resolution of the Declaratory Judgment Action. A prompt decision will provide the Responders, BP's other contractors during the DWH Response, and other interested third parties with a final resolution regarding the various rights and obligations associated with these "B3" BELO claims against BP.

Dated: March 8, 2019

Respectfully submitted,

/s/ *Jeremy T. Grabill*

| | |
|---|---|
| Ivan M. Rodriguez (LA #22574)<br>Gary A. Hemphill (LA #6768)<br>Jeremy T. Grabill (LA #34924)<br>PHELPS DUNBAR LLP<br>365 Canal Street, Suite 2000<br>New Orleans, LA 70130-6534<br>Telephone: 504-566-1311<br>Facsimile: 504-568-9130<br>ivan.rodriguez@phelps.com<br>gary.hemphill@phelps.com<br>jeremy.grabill@phelps.com | Michael J. Lyle (DC #475078, IL #6199227)<br>(trial attorney)<br>Eric C. Lyttle (DC #482856)<br>QUINN EMANUEL URQUHART &<br>SULLIVAN, LLP<br>1300 I Street NW, Suite 900<br>Washington, DC 20005<br>Telephone: (202) 538-8000<br>Facsimile: (202) 538-8100<br>mikelyle@quinnemanuel.com<br>ericlyttle@quinnemanuel.com<br><br>Sylvia E. Simson (NY #4803342)<br>QUINN EMANUEL URQUHART &<br>SULLIVAN, LLP<br>51 Madison Avenue<br>New York, NY 10010<br>Telephone: (212) 849-7000<br>Facsimile: (212) 849-7100<br>sylviasimson@quinnemanuel.com<br><br>Attorneys for O'BRIEN'S RESPONSE MANAGEMENT, L.L.C. and NATIONAL RESPONSE CORPORATION |

**CERTIFICATE OF SERVICE**

    I hereby certify that the above and foregoing Memorandum of Law in Support of Responders' Motion to Lift the MDL Stay has been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 8th day of March, 2019.

                                                /s/ *Jeremy T. Grabill*
                                                Jeremy T. Grabill