**3.- THE EXCEPTION FOR LACK OF JURISDICTION.-** That which consists of the fact that the Mexican Courts do not have jurisdiction to resolve the dispute brought forth by the complainants, since just as the filing party states and acknowledges throughout its complaint, the alleged acts generating the *nonexistent and otherwise undemonstrated* alleged "damages" on which they intend to base the exercise of the inadmissible class action suits filed by said party, these being the spillage of crude oil deriving from the incident that took place on the *Deepwater Horizon* Platform and the actions taken to contain it and to carry out the respective cleaning, took place <u>outside</u> of the Mexican territory and, therefore, in all cases it is considered that both these, and any of the consequences they entail, will be in all cases subject to the territorial competence and jurisdiction of another sovereign State*, the United States of America*, which, in the opinion of my client, suffices in turn to confirm the full inadmissibility of the unfounded claim that is now being challenged, since, to the contrary, not only would it be invading the sphere of territorial sovereignty of the other State, but it would furthermore be violating international principles related to the spatial scope of application of the Mexican laws for which the infraction is being charged by the complainants, unjustifiably and improperly, within the initial libel that is being challenged with this motion.

Along this line, it must be noted that article 12 of the Federal Civil Code in force establishes that:

> **"Article 12.-** *The Mexican laws govern all persons in the Republic, as well as the acts and events that <u>take place in its territory or jurisdiction</u> and <u>those that are subject to said laws</u>, except when these foresee the application of a foreign law and, furthermore, excepting the provisions of the treaties and conventions to which Mexico is a party."*

> [Emphasis added]

Which, a contrario sensu, implies, clear as day, that the Mexican laws <u>do not govern</u> persons that are not within the territory of the Republic, <u>nor do they govern the acts or events that take place outside its territory or jurisdiction</u>, and they

[illegible seal:]
[emblem:] UNITED MEXICAN STATES
EIGHTH DISTRICT CIVIL COURT IN
MEXICO CITY

may not be considered applicable to persons who have not submitted to said laws, *as in this case, since it is clear that neither the operations of the Deepwater Horizon Platform nor the activities in exploration, exploitation, or extraction of hydrocarbons from the Macondo Well were subject to the jurisdiction, or competence, or territorial scope of the Mexican authorities and/or laws.*

Without prejudice to the foregoing, one must in turn remember what is established in article 24, section IV, of the Federal Code of Civil Procedures, the relative portion of which I allow myself to transcribe below:

> **"ARTICLE 24.-** *By reason of territory, the court with jurisdiction is:*
>
> *[...]*
>
> *IV.- <u>That of the domicile of the defendant, when dealing with suits involving real property or personal, **class action** or civil status suits;</u>*
>
> *[...]"*

[Emphasis added]

As is deduced from the transcription of the aforementioned article, the court with jurisdiction to hear class action suits will be the one where the defendant has its domicile; for the case concerning us, my client is a foreign legal entity that has its domicile and headquarters for both its business and its operations in the United States of America, *a aspect that in practice cannot in any way be dismissed by the fact that, for the simple purpose of not being in a state of lack of defense, it has distinctly indicated procedural domicile where it intended to have its summons sent for the present trial, which has been attended by a simple matter of consideration and respect for this legal body, but without it being able to go unnoticed that both the jurisdiction of the Court and strict adherence to applicable substantive laws, as well as with regard to due compliance with norms and principles of due process, constitute background matters which are absolutely essential, and should therefore be analyzed and weighted, even ex officio, by the judicial bodies at any given stage of the procedure, as they are not remediable matters, nor can they be co-validated in any way*; therefore, in this situation without conceding that it could be determined that my client might be considered as a defendant in this trial, it would be no excuse to stop considering both the lack of jurisdiction and competence of the Mexican courts, added to the fact that the Legal Action of the present trial is not exclusively reserved for national courts, i.e., the Legal Action of the present trial

[seal:]
[emblem:] UNITED MEXICAN STATES
EIGHTH DISTRICT CIVIL COURT IN
MEXICO CITY

does not fall within any of the situations contained in article 568 of the Federal Code of Civil Procedures.

The above is verified with the evidence from the trial, added to each and every document enclosed with the present motion, which have been appropriately listed in the *Recitals* chapter of the present document, specifically with the Convention signed with the Government of the United Mexican States in the month of February of this year, 2018, from which it is deduced that the latter recognized, among other things, that at that point there was no evidence that the multi-cited oil spill had in any way affected the Mexican seas, coasts, territory, fisheries, environment, or economy.

[seal:]
[emblem:] UNITED MEXICAN STATES
EIGHTH DISTRICT CIVIL COURT IN
MEXICO CITY



TLC
Teneo Linguistics Co.

# Certificate of Accurate Translation

## No. 20191130– 901

### Teneo Linguistics Company, LLC,

a translation company based in Tarrant County, state of Texas (TX state vendor ID: 120511285800), hereby certifies that the attached is a true and accurate translation of the original submitted, completed to the best of our knowledge, ability and belief by a qualified and certified translator of the Spanish and English languages. *

| | |
|---|---|
| Original Language: | Spanish |
| Target Language: | English |
| No. of pages: | 3 |
| File name: | **717.2012 - BP American Production Company's Answer** |
| | Case: 717/2012 |
| | Names: ELIDIO CEPEDA VELA ET AL. Vs. BP AMERICA PRODUCTION COMPANY ET AL. |
| | Pages: 66-68 / Section: 3 |
| Date of Translation: | 3/28/2019 |

This instrument was acknowledged
before me on

_March 28, 2019_ (date)

By _Cambria Morrow_

In the State of Texas, County of Tarrant.

_Cambria Morrow_
Cambria Morrow
Project Manager



HEATHER R. HEMER
Notary Public, State of Texas
Comm. Expires 05-19-2020
Notary ID 130668552

* Teneo Linguistics Co. does not warrant the authenticity of the original document.

4700 Bryant Irvin Court
Ste 301
Fort Worth, TX 76107

Tel. (817) 441 9974
Fax. (817) 231 0052



FORMA B-1

PODER JUDICIAL DE LA FEDERACIÓN

**ACTOR:** ELIDIO ZEPEDA VELA Y OTROS.

**DOMICILIO:** CALZADA MARIANO ESCOBEDO 476, PISO 12, SUITE 1263, COLONIA POLANCO, C.P. 11590, MÉXICO, DISTRITO FEDERAL.

# I N S T R U C T I V O

**QUE EN EL JUICIO:** ACCIÓN COLECTIVA **717/2012-I.**

**PROMOVIDO POR:** ELIDIO ZEPEDA VELA Y OTROS.

**EN CONTRA DE:** BP EXPLORATION & PRODUCTION, INC.

**SE DICTO UN ACUERDO QUE PARA SUS EFECTOS SE ACOMPAÑA COPIA DE FECHA:** 29 DE JUNIO DE 2018.

SE ANEXA COPIA DEL AUTO DE FECHA ANTES INDICADA

**LO QUE COMUNICO A USTED POR MEDIO DE INSTRUCTIVO EL QUE DEJO EN PODER DE:**

Rdardo Christian Escalante Aguilar
Col. 9385705

**HOY A LAS:** 10:15hr

**CIUDAD DE MÉXICO, A** 04 **DE** Julio **DEL 2018.**

Josefina**

EC ACREUARIO

LIC. MARCO ANTONIO RIOS PEREZ

3

401



FORMA B-2

Acción Colectiva 717/2012

PODER JUDICIAL DE LA FEDERACIÓN

Procesos
civiles o
administra
tivos

717/2012

**En veintinueve de junio de dos mil dieciocho,** la Licenciada **Berenice Contreras Segura,** Secretaria del Juzgado Octavo de Distrito en Materia Civil en la Ciudad de México,  - - - - - - - - C E R T I F I C A: - - - - - - - - - Que el término de **quince días** concedido a la demandada **BP AMÉRICA PRODUCTION COMPANY, INC.,** más los **quince días de prórroga** para dar contestación a la demanda instaurada en su contra, transcurre del **diecisiete de mayo al veintisiete de los corrientes,** descontándose de dicho lapso los días inhábiles.- Doy fe.

En esta misma fecha, la Secretaria **Berenice Contreras Segura**, da cuenta al Juez **Luis Alberto Ibarra Navarrete**, con la certificación que antecede y con un escrito registrado en el libro de correspondencia de este Juzgado con el número **12663. Conste.**

**CIUDAD DE MÉXICO, A VEINTINUEVE DE JUNIO DE DOS MIL DIECIOCHO.**

Visto el escrito de cuenta signado por **EDGAR ALEJANDRO GRAJEDA MUÑOZ**, representante de la parte demandada **BP AMÉRICA PRODUCTION COMPANY, INC.**, personalidad que tiene acreditada en autos, mediante el cual da contestación a la demanda instaurada en contra de su representada y opone la excepción de incompetencia; por tanto, con fundamento en los artículos 19, 34, 37, 38, 334, 359 y 360 del Código Federal de Procedimientos Civiles, se **ADMITE** a trámite la **INCOMPETENCIA POR DECLINATORIA**, opuesta por la demandada, misma que **SE ADMITE CON SUSPENSIÓN DEL PROCEDIMIENTO**, por lo que, con copia simple del escrito de cuenta, dése vista a la parte actora para que dentro del término de **tres días** manifieste lo que a su interés convenga.

En virtud de lo anterior, se reserva acordar lo



ELIDIO CEPEDA VELA Y OTROS.
Vs.
BP AMERICA PRODUCTION COMPANY Y OTROS.

<u>Acción Colectiva</u>

Expediente: 717/2012

Contestación de demanda

C. JUEZ OCTAVO DE DISTRITO EN MATERIA CIVIL
EN LA CIUDAD DE MÉXICO.

EDGAR ALEJANDRO GRAJEDA MUÑOZ, a nombre y en representación de la persona moral denominada **BP AMERICA PRODUCTION COMPANY**, personalidad que acredito y solicito me sea reconocida, en términos del testimonio notarial número 15,525, de fecha 1° de marzo de 2016, pasado ante la fe del Licenciado Guillermo Escamilla Narváez, titular de la Notaría Pública número 243 en el Distrito Federal (hoy Ciudad de México), mismo que se adjunta al presente como **Anexo 1**; señalando como domicilio para oír y recibir notificaciones el ubicado en la Calle de Montes Urales 632, piso 3, Colonia Lomas de Chapultepec, Delegación Miguel Hidalgo, Código Postal 11000, en esta Ciudad de México y designando en este mismo acto como mandatarios judiciales de **BP AMERICA PRODUCTION COMPANY** para que, en su nombre y representación, puedan llevar a cabo todas y cada una de las actuaciones, promociones y gestiones que al derecho de mi representada convengan dentro de este juicio, en amplios términos de lo dispuesto por el artículo 2586 y demás relativos del Código Civil Federal, en relación con lo dispuesto en el segundo párrafo del artículo 1° del Código Federal de Procedimientos Civiles, indistinta y separadamente, a los CC. licenciados en derecho **Ana Rosa Bobadilla Gallardo** con cédula profesional número 3594309 y/o **Jesús Manuel Gálvez Villaseñor** con cédula profesional número 5330850 y/o **Pablo Daniel Morán Salgado** con cédula profesional número 8298075 y/o **José Eduardo Saucedo Ortiz** con cédula profesional número 7519823 y/o **Leopoldo Burguete Stanek** con cédula profesional número 870267 y/o **Enrique Muñoz Guízar** con cédula profesional número 4516276 y/o **Carlos Castilla Cruz** con cédula profesional número 5172007 y/o **Paulina Poo Romano** con cédula profesional número 8545947 y/o **Diego Hugues Peñaloza** con cédula profesional número 10792878, todas emitidas por la Dirección General de Profesiones de la Secretaría de Educación Pública cuyas constancias se adjuntan a la presente contestación de demanda en copia, como **Anexo 2**; y autorizando, así mismo, para oír y recibir todo tipo de documentos y notificaciones, imponerse de los autos del presente juicio y sacar fotografías de los mismos, así como para recibir documentos y valores, a los CC. María Fernanda

Valdés Félix y/o Luis Alfonso Torres López y/o Natalia Patricia Patiño Espinosa, ante Usted C. Juez de Distrito, con el debido respeto comparezco y expongo:

Dentro del plazo de QUINCE DÍAS, con su respectiva prórroga de QUINCE DÍAS adicionales concedida por su Señoría en favor de mi representada por auto de fecha 01 de junio de 2018, notificado el día 04 del mismo mes y año -surtiendo sus efectos el 05 de junio del actual-, vengo en nombre de la sociedad denominada **BP AMERICA PRODUCTION COMPANY** a dar contestación a la demanda instaurada por la presunta colectividad actora que en los autos del juicio pretende estar representada por el señor ELIDIO CEPEDA VELA, NEGANDO de antemano la validez y/o procedencia de todas y cada una de las pretensiones planteadas por los pretensos demandantes, toda vez que en el caso particular a estudio NO se cumplen los elementos y requisitos indispensables para la procedencia tanto de la acción colectiva difusa, como de la acción colectiva en sentido estricto intentadas por la parte actora, ante la total inexistencia y falta de acreditación de los por demás especulativos, vagos e imprecisos daños y perjuicios en los que pretenden basar el ejercicio de sus infundadas acciones, aunado a la legalmente imposible imputación de la responsabilidad que pretenden hacer atribuible a la corporación que represento, a reserva y sin perjuicio de las demás consideraciones que serán hechas valer dentro de este ocurso, en los siguientes términos:

## INTRODUCCIÓN

Con el fin de facilitar la labor de su Señoría en cuanto a la debida contextualización de los hechos sometidos a su resolución, mi representada estima conveniente comenzar por señalar que lo único cierto de entre todo lo argumentado por los actores en su escrito inicial de demanda es que el 20 de abril de 2010, ocurrió una desafortunada explosión en la unidad móvil de perforación, mar adentro, denominada "*Deepwater Horizon*" en el pozo Macondo, ubicada aproximadamente a 68 kilómetros al sureste de la localidad de Venice, Louisiana, Estados Unidos de América, a más de 700 kilómetros de distancia de las costas mexicanas (en lo sucesivo, referido simplemente como el "*Pozo Macondo*" y/o la "*Plataforma Deepwater Horizon*", según corresponda).

Ahora bien, contrario a la falsa idea que los pretensos actores intentan infundir en el ánimo de su Señoría lo cierto es que, inmediatamente después de la explosión, a pesar de que se desconocía el hecho y la magnitud del derrame de petróleo, el consorcio BP comenzó a movilizar recursos, lanzando lo que se convirtió en un esfuerzo masivo, y sin precedentes, de respuesta a un derrame. Bajo la dirección del Gobierno de los Estados Unidos de América, el

3

consorcio BP destinó una gran cantidad de recursos a fin de montar una respuesta extraordinaria que limitara, en forma efectiva, el impacto del derrame.

El consorcio BP gastó por día, en el año 2010, un promedio de USD $100,000'000.00 (moneda de curso legal en los Estados Unidos de América, referidos en lo sucesivo simplemente como "Dólares") y más de USD $*27,000,000,000.00 de Dólares* en la respuesta para detener el derrame; también, llegó a incluir un total acumulado de más de 100,000 integrantes de personal de respuesta, 9,700 buques, 127 aviones y 4,100 kilómetros de barreras flotantes. El personal del consorcio de BP dedicó más de 70 millones de horas en la respuesta al derrame, es decir, el equivalente a 1.000 personas que trabajan 40 horas semanales durante más de 33 años.

Estos esfuerzos fueron efectivos.

Según estimaciones oficiales del Gobierno de los Estados Unidos de América, el consorcio BP y otros miembros del comando unificado recolectaron, removieron materia flotante, dispersaron químicamente y quemaron, en todas esas acciones, ***más de 2 millones de barriles de petróleo***. El gobierno de los Estados Unidos de América reconoció que, gracias a estos esfuerzos, la respuesta fue "finalmente exitosa" e "impidió que millones de galones de petróleo afectaran las delicadas costas de los estados del Golfo de México".

Lo anterior es un hecho notorio, pero además se corrobora con una copia del informe "On Scene Coordinator Report: Deep Water Horizon Oil Spill" (en lo sucesivo, el "**Informe FOSC**"), escrito por varias organizaciones gubernamentales de los Estados Unidos de América, el cual documenta ampliamente la respuesta al derrame de petróleo del pozo Macondo y se adjunta al presente escrito como **Anexo 3-Bis**.

Adicionalmente, como **Anexo 3** se adjunta al presente una impresión de la página de internet de la Comisión Nacional para el Conocimiento y Uso de la Biodiversidad *-entidad del Gobierno Mexicano cuya función se explica más adelante-*, la cual presenta los antecedentes del derrame del pozo Macondo en forma resumida.

Si bien el incidente de la Plataforma *Deepwater Horizon* afectó limitadamente la zona norte del Golfo de México, es decir a algunos de los estados de los Estados Unidos de América, debido a los esfuerzos de respuesta del consorcio de BP y a las condiciones naturales en el medioambiente del Golfo en ese tiempo, el impacto del derrame fue limitado en espacio y tiempo.

Además, como se muestra a continuación, el monitoreo, muestreo y análisis exhaustivos que emprendieron tanto el Gobierno Mexicano, como el Gobierno de los Estados Unidos de

4

América y el consorcio BP, desde el incidente, se demuestra que el *petróleo del derrame de Deepwater Horizon no llegó a las aguas ni a las costas mexicanas, así como tampoco afectó la industria pesquera mexicana ni otros recursos naturales.*

En particular, a las pocas semanas del derrame y hasta por lo menos el año 2012, el Gobierno Mexicano monitoreó de cerca el derrame, concluyendo que el petróleo no llegó a las aguas o costas mexicanas.

Asimismo, el Gobierno Estadounidense llevó a cabo la mayor investigación ambiental jamás emprendida, que incluyó más de 200 estudios ambientales, 2 millones de muestras analíticas, 500,000 observaciones de la vida silvestre, 1.5 millones de fotografías y el estudio de 4.000 millas de costas. Este trabajo también confirmó que el derrame no alcanzó a las aguas o costas mexicanas.

Al respecto, cabe desde ahora mencionar que todo lo anterior fue ampliamente confirmado por connotados expertos en la materia que se dieron a la tarea de analizar objetiva y exhaustivamente, si es que el petróleo del pozo Macondo llegó a las aguas o costas mexicanas, o si pudiera haber causado alguna afectación a los recursos pesqueros o ecosistemas mexicanos, y concluyeron que no fue así, tal y como al efecto se vio a su vez expresamente reconocido en el *"Convenio de Transacción y Exoneración"* suscrito el 15 de febrero de este año 2018 por el propio Gobierno Mexicano al que, por cuestión de orden, nos referiremos a detalle más adelante.

En efecto, el Dr. Robert I. Haddad, quién inclusive supervisó la investigación científica por parte del Gobierno de los Estados Unidos de América respecto del impacto ambiental del derrame, revisó los datos recolectados por los Estados Unidos de América respecto de las muestras de agua y sedimentos del Golfo de México y concluyó que ni el petróleo del derrame de *Deepwater Horizon,* ni los dispersantes utilizados para mitigar sus efectos, llegaron a las aguas o costas de México.

Por su parte, el Dr. Haddad concluyó que el área principal del derrame siempre quedó a una distancia muy considerable de aguas o costas mexicanas.

Por otro lado, el Dr. Jorge Zavala Hidalgo, del Centro de Estudios Atmosféricos de la Universidad Nacional Autónoma de México, validó los datos a los que se hizo referencia de manera previa y creó un modelo para el destino y desplazamiento del petróleo del pozo Macondo. Basado en su modelado, el Dr. Zavala concluyó que el petróleo del pozo Macondo no llegó a las aguas o costas mexicanas.

5

Aunado a lo anterior, el Dr. Adolfo Gracia, también de la Universidad Nacional Autónoma de México, revisó la captura y otros datos de los recursos pesqueros mexicanos a lo largo del tiempo y concluyó que el derrame de *Deepwater Horizon* no tuvo algún impacto negativo sobre esos recursos. De hecho, el Dr. Gracia encontró que la mayoría de las especies que se capturan en las aguas mexicanas del Golfo de México mostraron tendencias positivas por lo que hace a la captura por unidad.

Por último, se subraya que en plena concordancia con los estudios antes mencionados, derivado de un procedimiento judicial seguido ante los tribunales de los Estados Unidos de América, el día 15 de febrero de 2018, el Estado Mexicano suscribió con las sociedades denominadas BP Exploration & Production Inc., BP America, Inc., BP America Production Company y BP Products North America, Inc., un "*Convenio de Transacción y Exoneración*", mediante el cual el propio Gobierno de México reconoció, entre otras cosas, que hasta el momento no hay evidencias de que el derrame petrolero derivado del hundimiento de la Plataforma *Deepwater Horizon*, ni los dispersantes utilizados para mitigar dichos efectos, hayan dañado a los ecosistemas o el medio ambiente mexicano.

No obstante lo anterior y para el efecto de que su Señoría cuente con una visión integral y completa del desarrollo de este desafortunado asunto, inclusive, desde el punto de vista del Gobierno Mexicano; me permito exponer a continuación los siguientes antecedentes, lo cuales además de que se acreditan debidamente, son hechos públicos y notorios:

## A N T E C E D E N T E S

1.- Con fecha del 20 de abril de 2010, hubo una explosión e incendio de la plataforma del pozo Macondo ubicado en el yacimiento Mississippi Area Canyon, en su cuadrante MC 252, en donde se ubicaba la Plataforma Deepwater Horizon, a 68 kilómetros al sur-este de Venice, Louisiana, EE.UU.

Como **Anexo 3** se adjunta una impresión de la página de la Comisión Nacional para el Conocimiento y Uso de la Biodiversidad, cuya función se explica más adelante y que narra de manera sumaria, pero con claridad, los antecedentes del derrame petrolero del Pozo Macondo.

2.- Posteriormente, el 22 de abril de 2010, la Plataforma Deepwater Horizon se hundió y se empezó a advertir una mancha de petróleo, que, para el 6 de mayo de 2010, llegó a las orillas de Chandeleur Islands en las costas de Louisiana.

(Ver **Anexo 3**.)

De manera adicional, como **Anexo 3-Bis** se adjunta un ejemplar del "Reporte del Coordinador en la Escena Derrame de Petróleo *Deep Water Horizon*" (en lo sucesivo referido únicamente como el "Reporte FOSC"), que contiene un informe cuya finalidad es documentar de manera detallada la respuesta que se dio al derrame petrolero del Pozo Macondo en los Estados Unidos de América, ocasionado por la explosión y hundimiento de la Plataforma *Deepwater Horizon* y que fue elaborado por las múltiples autoridades y organizaciones en Estados Unidos que participaron en la respuesta a dicho incidente, con su correspondiente traducción al español por perito oficial.

## EL MONITOREO LLEVADO A CABO POR EL GOBIERNO MEXICANO DEMUESTRA QUE EL PETRÓLEO NO LLEGÓ A LAS AGUAS O COSTAS MEXICANAS NI OCASIONÓ ALGÚN DAÑO EN MÉXICO.

3.- Con motivo de la explosión y hundimiento de la Plataforma *Deepwater Horizon*, y consecuente derrame del Pozo Macondo, la Comisión Permanente del Congreso de la Unión de los Estados Unidos Mexicanos, con fecha el 6 de mayo de 2010, aprobó, por urgente resolución, los siguientes puntos de acuerdo: (i) exhortar al titular de la Secretaría del Medio Ambiente y Recursos Naturales a realizar un estudio exhaustivo del posible daño provocado al medio ambiente y a los ecosistemas de nuestro país por el derramamiento del petróleo derivado del hundimiento de la Plataforma *Deepwater Horizon*; (ii) exhortar al titular de la Secretaría de Agricultura, Ganadería, Desarrollo Rural, Pesca y Alimentación de México, a realizar un análisis exhaustivo y detallado de los costos que podría representar el daño en la actividad pesquera del país, por el derramamiento del petróleo derivado del hundimiento de la Plataforma Deepwater Horizon; (iii) exhortar al titular de la Secretaría de Relaciones Exteriores, a establecer una línea de comunicación con el Gobierno de los Estados Unidos de América y con los directivos del British Petroleum, con la finalidad de obtener información relativa al posible daño al medio ambiente de los Estados Unidos Mexicanos, por el derramamiento del petróleo derivado del hundimiento de la Plataforma *Deepwater Horizon*; (iv) exhortar al Ejecutivo Federal para que a través de la Secretaría de Energía, la Secretaría de Medio Ambiente y Recursos Naturales, la Secretaría de Relaciones Exteriores y Petróleos Mexicanos, iniciaran de inmediato las gestiones pertinentes de colaboración con el Gobierno de los Estados Unidos de América, para detener los impactos ecológicos y ambientales, por la explosión y hundimiento de la Plataforma Deepwater Horizon; e (v) instó a la Secretaría del Medio Ambiente y Recursos Naturales para que ésta a su vez rindiera un reporte detallado de cualquier efecto ecológico o ambiental que pudiera derivarse del hundimiento de la plataforma y del derrame.

En efecto, dada su importancia, me permito transcribir los puntos de acuerdo adoptados, aprobados y publicados en la Gaceta por la Comisión Permanente del Congreso de la Unión de los Estados Unidos Mexicanos, el 6 de mayo de 2010:

"PRIMERO.- La Comisión Permanente del Congreso de la Unión exhorta al titular de la Secretaría de Medio Ambiente y Recursos Naturales, a realizar un estudio exhaustivo del posible daño provocado al medio ambiente y a los ecosistemas de nuestro país, por el derramamiento de petróleo derivado del hundimiento de la plataforma petrolera Deepwater Horizon el pasado 22 de abril en aguas del Golfo de México.

SEGUNDO.- La Comisión Permanente del Congreso de la Unión exhorta al titular de la Secretaría de Agricultura, Ganadería, desarrollo Rural, Pesca y Alimentación de México, a realizar un análisis exhaustivo y detallado de los costos que podría representar el daño a la actividad pesquera del país, resultante, del derramamiento de petróleo derivado del hundimiento de la plataforma petrolera Deepwater Horizon el pasado 22 de abril en aguas del Golfo de México.

TERCERO.- La Comisión Permanente del Congreso de la Unión exhorta a la titular de la Secretaría de Relaciones Exteriores, a establecer una línea de comunicación con el gobierno de los Estados Unidos de América, así como, de ser posible, con directivos de la empresa petrolera British Petroleum, con la finalidad de obtener información relativa al posible daño al medio ambiente de nuestro país y el Golfo de México resultante del derramamiento del petróleo, derivado del hundimiento de la plataforma petrolera Deepwater Horizon el pasado 22 de abril en aguas del Golfo de México.

CUARTO.- La Comisión Permanente del Congreso de la Unión exhorta al Ejecutivo Federal para que, a través de las secretarias de Energía, de Medio Ambiente y Recursos Naturales; de Relaciones Exteriores y de Petróleos Mexicanos, inicien de inmediato las gestiones pertinentes de colaboración con el gobierno de los Estados Unidos de América, para detener los impactos ecológicos y medio ambientales derivados de la explosión y hundimiento de la plataforma petrolera Deepwater Horizon en el Golfo de México.

QUINTO.- La Comisión Permanente del Congreso de la Unión exhorta a la de Secretaría de Medio Ambiente y Recursos Naturales para que dé un informe detallado sobre los efectos ecológicos y medio ambientales ocasionados hasta el día de hoy y en lo subsecuente, por el accidente ocurrido en la plataforma petrolera Deepwater Horizon en el Golfo de México.

SEXTO.- La Comisión Permanente del Congreso de la Unión exhorta a la de Secretaría de Medio Ambiente y Recursos Naturales para que se entregue a esta soberanía un informe sobre la estrategia a seguir, para que dichos impactos ecológicos medio ambientales sean contrarestados y no lleguen a territorio nacional.

SÉPTIMO.- La Comisión Permanente del Congreso de la Unión exhorta a Petróleos Mexicanos a intensificar sus medidas de seguridad en las plataformas ubicadas en el Golfo de México, con el fin de evitar posibles accidentes en el corto, mediano y largo plazo.

OCTAVO.- La Comisión Permanente del Congreso de la Unión exhorta a Petróleos Mexicanos para hacer un monitoreo permanente en aguas nacionales del avance de la mancha de petróleo hacia costas nacionales. Lo anterior por la infraestructura con la que cuenta Petróleos Mexicanos."

Como **Anexo 4** se acompaña un ejemplar de la Gaceta de fecha 6 de mayo de 2010, a que se refiere este hecho.

4.- Posteriormente, mediante comunicado número 98, de fecha 29 de abril de 2010, la Secretaría de Marina-Armada de México, entre otras cosas informó que:

"...**en relación a la explosión de la plataforma petrolera Deepwater Horizon de la empresa Transocean LTD**, ocurrida el pasado 20 de abril a una profundidad de 740 metros, a 80 kilómetros al sureste de Venice, Estado de Lousiana, Estados Unidos de América, y por la cual se presentó una fuga de hidrocarburos, hace del conocimiento de la ciudadanía lo siguiente:

La mancha generada por el derrame de hidrocarburos, se ha dispersado desde dicha plataforma con un movimiento hacia el Este y Noroeste, en dirección a la costa de Lousiana E.U.A., con una longitud y ancho aproximado de 105 y 45 millas náuticas (195.3 y 83.7 kilómetros), respectivamente.

De acuerdo con los análisis de información oceanográfica y meteorológica prevalecientes en el Golfo de México se espera que la mancha se desplace, en las próximas 48 horas, hacia el Noroeste en dirección de la costa de Louisiana, debido a vientos provenientes del Sureste de hasta 25 nudos (46 kilómetros por hora) y olas de hasta 8 pies de altura (2.4 metros), en mencionada área.

**Esta situación hasta el momento no representa ningún riesgo para aguas marinas mexicanas ni costas mexicanas**; sin embargo, la Secretaría de Marina a través de la Dirección General Adjunta de Oceanografía, Hidrografía y Meteorología da seguimiento continuo a esta contingencia."

(El subrayado y negritas no son parte del texto original, se hace para resaltar su contenido.)

Como **Anexo 5**, se adjunta una impresión de la publicación a que se refiere este hecho y que puede ser localizada en http://calderon.presidencia.gob.mx/2010/04/la-secretaria-de-marina-mantiene-monitoreo-constante-a-la-contaminacion-provocada-por-contingencia-en-plataforma-petrolera-en-costas-de-estados-unidos/.

5.- Con fecha del 30 de abril de 2010, se convocó a la cuarta sesión ordinaria de enlaces de la Comisión Intersecretarial para el Manejo Sustentable de Mares y Costas, que es una comisión

integrada por la Secretaría de Gobernación, la Secretaría de Relaciones Exteriores. la Secretaría de Marina, la Secretaría de Desarrollo Social, la Secretaría de Medio Ambiente y Recursos Naturales, la Secretaría de Energía, la Secretaría de Economía, la Secretaría de Agricultura, Ganadería, Desarrollo Rural, Pesca y Alimentación, la Secretaría de Comunicaciones y Transportes y la Secretaría de Turismo (en adelante referida simplemente como "*CIMARES*"), y en ella se hizo una presentación del derrame del Pozo Macondo por la explosión y hundimiento de la Plataforma Deepwater, en la que se informó, entre otras cosas, lo siguiente: (i) el sistema de corrientes marinas del Golfo de México; (ii) la interacción de la "corriente de Lazo" en la formación de la parte inicial de la corriente del golfo; (iii) **que el mayor impacto de la mancha de petróleo será sobre la costa de Nuevo Orleans, Missisipi y Florida**; (iv) que el peligro para México, estaba latente ya que <u>podría</u> pasarse alguna mancha de petróleo en la contracorriente del Golfo de México; (v) que eventualmente podría afectar los estados de Tamaulipas y norte de Veracruz, **pero que la corriente de Lazo sería la que ayudaría de manera natural a sacar del Golfo de México todo ese petróleo**; (vi) que sería muy importante dar seguimiento con imágenes de satélite y contar con acceso a las fotografías de la Administración Nacional de Océanos y Atmósfera de los Estados Unidos ("**NOAA**" por sus siglas en inglés); (vii) **que era prácticamente imposible que el petróleo de este derrame llegara hasta las costas veracruzanas, ya que tendría que viajar más de 1200 kilómetros a contracorriente**; (viii) que el NOAA daba seguimiento continuo al desplazamiento de la mancha superficial de petróleo, observando en su desplazamiento por día que la mancha se dirigía hacia el norte y noroeste siguiendo el flujo de las corrientes del Golfo de México; y (ix) **que en el caso de usar dispersantes se recomendaba que sean biodegradables para prevenir daños colaterales**.

Como se puede advertir, desde los primeros días del derrame de petróleo del Pozo Macondo, el Gobierno Mexicano sabía que éste difícilmente llegaría a las aguas o costas mexicanas, precisamente por el lugar en donde ocurrió el derrame, ya que la distancia y las corrientes existentes en el Golfo de México favorecían para contener y desplazar el petróleo a las costas de Nuevo Orleans, Missisipi y Florida y también había dispuesto que en el caso de que fuera necesario usar dispersantes se recomendaba que fueran biodegradables para prevenir daños colaterales.

Como **Anexo 6** se adjunta una impresión de la presentación a que se refiere este hecho y que puede ser localizada en http://www.semarnat.gob.mx/temas/ordenamiento-ecologico/historico-cimares/sesiones-de-trabajo.

6.- Con fecha 12 de mayo de 2010, el Dr. José Sarukhan, quién era el Coordinador Nacional de la Comisión Nacional para el Conocimiento y Uso de la Biodiversidad ("*Conabio*")[1], un organismo intersecretarial del Gobierno Mexicano, hizo una presentación a medios en la que informaba a los mexicanos, en representación del Gobierno Federal; que "*El derrame ocurrió sobre la "zona muerta", por lo que no hay seria afectación sobre pesquerías costeras.*"; y que "*La SEMARNAT mantiene una alerta ante la posible llegada del hidrocarburo derramado el cual podría afectar gravemente a la tortuga lora.*".

Es decir, a veintidós días del derrame de petróleo, el Gobierno Mexicano, por conducto de la *Conabio,* afirmó que no hay afectación en pesquerías costeras mexicanas y dejó claro también simplemente una posibilidad, que evidentemente a la postre no sucedió, de afectación a la tortuga lora.

Como **Anexo** 7 se acompaña la presentación que realizó el Dr. José Sarukhán a que se refiere este hecho y que puede ser localizado en: http://www.conabio.gob.mx/web/medios/pdf/derrame_petroleo.pdf.

7.- Con esa misma fecha, es decir del 12 de mayo de 2010, con motivo de la presentación que realizó el Dr. José Sarukhán, la Secretaría de Marina-Armada de México, mediante comunicado de prensa número 108/2010, titulado "DERRAME DE PETRÓLEO NO AFECTA LAS AGUAS DE MÉXICO", entre otras cosas informó que:

> "El día de hoy el Almirante Mariano Francisco Saynez Mendoza, Secretario de Marina,  acompañado del Dr. José Sarukhán Kermez, Coordinador Nacional para el Conocimiento  y uso de la Biodiversidad de la Secretaría  del Medio  Ambiente  y Recursos Naturales,  y del Ingeniero  Carlos Morales  Gil, Director de PEMEX Exploración  y Producción, presidió  una conferencia de prensa para dar a conocer los posibles efectos en aguas de nuestro país en el Golfo  de México  por el derrame de petróleo  ocasionado por el hundimiento de la plataforma "Deepwater Horizon", ocurrido  el pasado 20 de abril al sur de la desembocadura del río Mississipi, en Estados  Unidos  de América.

---

[1] A finales de 1991, el Presidente de México anunció su decisión de crear la Comisión Nacional para el Conocimiento y Uso de la Biodiversidad; y el acuerdo correspondiente que formalizó esa decisión se publicó en el *Diario Oficial de la Federación* el 16 de marzo de 1992.

La *Conabio* se estableció como una comisión intersecretarial con carácter permanente, con el propósito de coordinar y promover acciones relacionadas con el conocimiento y el uso sustentable de la biodiversidad de México. Desde el inicio se encabezaba la Comisión por el Presidente de la República y estaba compuesta por los titulares de las siguientes diez secretarías de Estado: Medio Ambiente y Recursos Naturales; Agricultura, Ganadería, Desarrollo Rural, Pesca y Alimentación; Desarrollo Social; Economía; Educación Pública; Energía; Hacienda y Crédito Público; Relaciones Exteriores; Salud y Turismo.

11

La conferencia se llevó a cabo en un auditorio del edificio sede de la Secretaría de Marina, donde previamente se mostró una presentación acerca del incidente en la plataforma "Deepwater Horizon", en la que se pone de manifiesto que la Secretaría de Marina-Armada de México, a través de la Comandancia de la Primera Zona Naval, con sede en Tampico, Tamaulipas, está en comunicación permanente con el 11º Distrito del Servicio de Guardacostas de los Estados Unidos de América para llevar a cabo un seguimiento del incidente, además de un monitoreo permanente de la trayectoria de las manchas de petróleo, así como de las condiciones meteorológicas y oceanográficas que puedan modificar su deriva; aunado a que las Estaciones de Investigación Oceanográficas del Golfo y Mar Caribe realizan constante verificación de las aguas costeras.

Hasta el momento las corrientes costeras con comportamiento estacional han sido favorables para nuestro país, en virtud de que durante los meses de mayo hasta agosto, la dirección de estas corrientes es hacia el Norte, a través de las costas de Campeche, Tabasco, Veracruz y Tamaulipas, hasta las proximidades de la Isla del Padre, en Texas, Estados Unidos de América, por lo que las manchas producidas han estado derivando hacia el Norte, Noreste y Este, siguiendo el patrón predominante de las corrientes marinas en el Golfo de México, el cual se caracteriza por un importante ramal constituido por la Corriente del Golfo que ingresa por el Canal de Yucatán y sale por la Florida. Una pequeña fracción del petróleo ha derivado hacia el Noroeste, hacia la costa de Louisiana, donde pueden quedar sujetas a contracorrientes de baja intensidad y numerosos giros (remolinos).

En el supuesto caso de que el derrame no llegase a controlarse, existe la posibilidad de que la mancha de crudo se desplace a las aguas de nuestro país debido a que durante los meses de octubre a febrero el patrón de corrientes se revierte y las corrientes lleven una dirección paralela a la costa, hacia el Sur, provocando un posible desplazamiento de residuos de aceite hacia costas de Tamaulipas, que pudieran afectar los humedales y la pesca ribereña.

De darse un eventual arribo de petróleo a costas de Tamaulipas, éste sería Crudo intemperizado, es decir, hidrocarburo pesado que ha estado sujeto a las condiciones de la intemperie (sol, viento, altas temperaturas del agua y aire, olas, etcétera) por lo cual ha perdido sus fracciones ligeras y volátiles, las manchas se han fragmentado, y ha aumentado su densidad y viscosidad, llegando a arribar a la costa en forma de grumos, plastas y cordones de lo que comúnmente se denomina "chapo", así como espumas aceitosas. Las principales afectaciones de estos productos de baja toxicidad y alta persistencia ambiental, serían la impregnación de algunos organismos, artes de pesca y embarcaciones, así como su acumulación en las playas e ingreso a los esteros.

Se ha mencionado que uno de los principales impactos que tendrá el derrame de hidrocarburo será la afectación de la población planctónica en el área contaminada ocasionando una

elevada mortandad en la base de la cadena alimenticia de esa región; sin embargo, las comunidades planctónicas en aguas de México contribuirán a la recuperación de las zonas afectadas por el derrame, mediante el aporte de plancton y fitoplancton siguiendo las corrientes predominantes del golfo.

Alguna otra especie que pudiera resultar afectada son las tortugas marinas tanto en sus etapas adultas como en la de huevos y crías. El litoral de Tamaulipas se caracteriza por contar con playas que son importantes zonas de anidación de tortugas marinas, entre los que destaca la Tortuga Lora, que inició su temporada de reproducción en abril y termina en septiembre.

La afectación que pueden tener las aves marinas migratorias a causa del ingreso del petróleo a los humedales de Louisiana, Mississipi, Alabama y Florida, podría reflejarse en una disminución de las poblaciones que arriban a territorio mexicano.

<u>La Secretaría de Marina-Armada de México, ante este incidente, realiza las siguientes acciones: el monitoreo permanente de la trayectoria que lleven las manchas de petróleo, así como de las condiciones meteorológicas y oceanográficas que puedan modificar su deriva</u>; la protección de las áreas sensibles a la contaminación por petróleo o en las costas de Tamaulipas, principalmente los sistemas estuarinos y las playas de anidación de tortugas, además de la evaluación objetiva y científica de los daños a los recursos naturales que llegasen a ocurrir."

(El subrayado y negritas no son parte del texto original, se hace para resaltar su contenido.)

Tal y como se puede advertir de la nota transcrita, la propia Secretaría de Marina-Armada de México reconoció que el derrame del petróleo difícilmente llegaría a las costas mexicanas, precisamente porque "<u>las corrientes costeras con comportamiento estacional han sido favorables para nuestro país, en virtud de que durante los meses de mayo hasta agosto, la dirección de estas corrientes es hacia el Norte, a través de las costas de Campeche, Tabasco, Veracruz y Tamaulipas, hasta las proximidades de la Isla del Padre, en Texas, Estados Unidos de América, por lo que las manchas producidas han estado derivando hacia el Norte, Noreste y Este, siguiendo el patrón predominante de las corrientes marinas en el Golfo de México, el cual se caracteriza por un importante ramal constituido por la Corriente del Golfo que ingresa por el Canal de Yucatán y sale por la Florida.</u>", y sólo en el supuesto de que el derrame no se lograse contener antes de los meses de octubre a febrero, podría existir el riesgo de que la mancha se desplace hacia el sur dadas las corrientes de esa época –*lo que evidentemente no sucedió, porque el derrame se controló desde el mes de julio de 2010, como se verá más adelante*–

13

Como **Anexo 8** se adjunta una impresión de la publicación a que se refiere este antecedente y que puede ser localizada en la página http://2006-2012.semar.gob.mx/sala-prensa/comunicados-2010/1333-comunicado-de-prensa-108-2010.html.

8.- El 16 de mayo de 2010, se inserta un tubo en el pozo dañado y se logra capturar petróleo y gas, con lo que se logra disminuir en un 20% el derrame.

(Ver **Anexo 3**)

9.- El 1 de junio de 2010, el derrame del Pozo Macondo llegó a Alabama y Mississipi en los Estados Unidos de América.

(Ver **Anexo 3**)

10.- Con fecha del 10 de junio de 2010, es decir a 51 días de la explosión de la Plataforma Deepwater Horizon, la Secretaría de Medio Ambiente y Recursos Naturales, la Comisión Nacional para el Conocimiento y Uso de la Biodiversidad, la Comisión Nacional de Áreas Naturales Protegidas y el Instituto Nacional de Ecología, emitieron su Reporte número 1 respecto del derrame petrolero del Pozo Macondo y del cual se advierte con meridiana claridad que el derrame se encuentra muy lejano de las costas Mexicanas, tal y como se advierte de la siguiente imagen proporcionada por dicho organismo:





14

La anterior gráfica refleja la proporción del derrame respecto del Golfo de México y la distancia del derrame respecto de las costas mexicanas. Como claramente se desprende de la gráfica en comento, el derrame petrolero se encontraba situado a 810 kilómetros de distancia del punto más cercano de la costa de Tamaulipas y a 690 kilómetros de distancia de las costas de Quintana Roo y Yucatán.

Como **Anexo 9** se adjunta el reporte Número 1 a que se refiere este hecho, el cuál es un hecho público y notorio, que se encontraba en la página http://www.biodiversidad.gob.mx/pais/mares/petro_sat/bp/index.html#.

11.- El 23 de junio de 2010, es decir a 64 días de la explosión de la Plataforma Deepwater Horizon, el Presidente del República Mexicana, Felipe Calderón Hinojosa, emitió el comunicado que a continuación se transcribe:

> "La Presidencia de la República informa que el Presidente Felipe Calderón Hinojosa ha dado puntual seguimiento a la evolución del derrame de petróleo en el lado norteamericano del Golfo de México, registrado a partir de la explosión y hundimiento de la plataforma Deepwater Horizon de British Petroleum, el pasado 20 de abril.
>
> El día de hoy, durante su gira de trabajo por el Estado de Veracruz, el Mandatario mexicano supervisó los trabajos y medidas que han realizado en las últimas semanas las Secretarías de Marina y de Medio Ambiente y Recursos Naturales, principalmente, con el fin de hacer frente a los potenciales efectos y riesgos que este desastre ecológico puede representar para las costas mexicanas.
>
> En este marco, especialistas de la Marina presentaron al Mandatario la estrategia que dicha Secretaría ha implementado en esta materia, en coordinación con otras Dependencias Federales, y cuyas principales acciones son:
>
> 1.     La puesta en marcha del Plan Nacional de Contingencia y del Plan Conjunto de Contingencia entre México y los Estados Unidos.
>
> 2.     La comunicación constante con la Guardia Costera de Estados Unidos, la vigilancia de la zona costera y marítima, así como el monitoreo de la calidad del agua.
>
> 3.     El seguimiento del derrame a través de modelos de simulación de trayectoria y dispersión de la mancha de hidrocarburo.

4.        Informe semanal a los Gobernadores de los estados costeros del Golfo de México (Tamaulipas, Veracruz, Tabasco, Campeche y Yucatán)   sobre el seguimiento de la trayectoria y evaluación de la mancha.

5.        <u>Vuelos de reconocimiento frente a la Península de Yucatán, donde hasta el momento no se han visualizado manchas o residuos de hidrocarburos</u>.

Asimismo, los expertos explicaron al Presidente Calderón que personal de la Secretaría de Marina realiza simulacros en Ensenada, Baja California, y en Tampico, Tamaulipas, las ciudades más capacitadas en esta materia y las cuales forman parte de los equipos de respuesta conjunta del Plan Binacional México- Estados Unidos.  En esta parte, señalaron que se recibió un reconocimiento por parte de la Guardia Costera de Estados Unidos, ya que el desempeño  se observó por encima de las expectativas en cuanto al buen desarrollo del simulacro.

Este conjunto de acciones, expusieron los especialistas, permitirá una oportuna  detección de capas de petróleo que amenacen nuestro litoral,  así como la puesta en operación de las acciones preventivas y correctivas necesarias.  Agregaron que en coordinación con las dependencias Federales involucradas y con los gobiernos estatales de la zona costera del Golfo de México, la Marina Armada de México está lista para hacer frente a los dos potenciales riesgos relacionados con la trayectoria de la mancha de petróleo.

El primero, es que en la temporada otoño-invierno la mancha de combustible derive hacia las costas de Tamaulipas en forma de grumos, plastas y cordones, comúnmente conocidos como "chapo". Ello debido a que en los meses de octubre a febrero el patrón de la Corriente del Golfo cambia de dirección: de Norte a Sur, desde la desembocadura del Río Mississippi hasta los límites entre Tabasco y Veracruz.

El segundo factor de riesgo lo representa la temporada de huracanes, la cual inició el 1 de junio para el Golfo de México y el Mar Caribe. Durante un huracán sería sumamente difícil pronosticar hacia dónde derivará la capa de aceite y, además, ésta podría cubrir  una superficie mucho  mayor  y  sería más complicado controlarla debido a su fragmentación.

Finalmente, <u>los funcionarios de la Secretaría de Medio Ambiente informaron al Jefe del Ejecutivo que hasta el momento no hay registro de especies afectadas, y que el monitoreo  continuará  de manera permanente hasta que todo riesgo haya sido descartado.</u>

El Presidente Calderón estuvo acompañado por los Secretarios de Gobernación, Fernando Gómez Mont; Relaciones Exteriores, Patricia Espinosa Cantellano; Defensa, Guillermo Galván Galván; Marina, Francisco Saynez Mendoza, y Seguridad Pública, Genaro García Luna; el Gobernador de Veracruz, Fidel Herrera; la esposa del Presidente de la República, Margarita Zavala; entre otras autoridades Federales y locales de Veracruz."

Tal y como se advierte del propio reporte del Presidente de la República Mexicana, el derrame del pozo Macondo no tocó costas mexicanas, ni mucho menos afectó alguna especie, aunque, sin embargo, el monitoreo continuaría hasta que se descartara cualquier riesgo.

Como **Anexo 10** se adjunta una impresión de la publicación a que se refiere este antecedente y que puede ser localizada en http://calderon.presidencia.gob.mx/2010/06/da-presidente-calderon-puntual-seguimiento-al-derrame-de-petroleo/.

12.- Con fecha del 24 de junio de 2010, es decir a 65 días de la explosión de la Plataforma Deepwater Horizon, la Secretaría de Medio Ambiente y Recursos Naturales, la Comisión Nacional para el Conocimiento y Uso de la Biodiversidad, la Comisión Nacional de Áreas Naturales Protegidas y el Instituto Nacional de Ecología, emitieron su Reporte número 3, respecto del derrame petrolero del Pozo Macondo y del cual se advierte con meridiana claridad que el derrame se va disipando y continua estando muy lejano de las costas Mexicanas. Al respecto dicho reporte señala:

> "La parte norte de la mancha ha llegado a la costa del sur de EE.UU. entre Gulf Shores y Panama City. Además de llegar a las costas del Sur de EUA, la parte sur de la mancha principal continúa internándose dentro de la Corriente del Lazo (Fig. 2, 3 y 4), permitiendo que ésta pueda extenderse al SE del Golfo, con probabilidades de llegar a alcanzar en las próximas semanas a la Corriente de Florida y la Corriente del Golfo. La mancha principal presenta una extensión EO de 116 km y de NS de 128 km, a unos 953 km de Tamaulipas y 802 km de Quintana Roo (Tabla 1)"

Adjunto a dicho reporte, la *Conabio* incluyó la siguiente gráfica respecto de la ubicación del petróleo derramado a esa fecha, y de la cual se puede advertir que se encuentra muy lejana a las costas y territorio Mexicano:





Como **Anexo 11** se adjunta el reporte Número 3 a que se refiere este hecho, el cuál es un hecho público y notorio que se encontraba en la página www.semarnat.gob.mx/temas/ordenamiento-ecologico/historico-cimares/sesiones-de-trabajo

13.- Con fecha del 1 de julio de 2010, es decir a 72 días de la explosión de la Plataforma *Deepwater Horizon*, la Secretaría de Medio Ambiente y Recursos Naturales, la Comisión Nacional para el Conocimiento y Uso de la Biodiversidad, la Comisión Nacional de Áreas Naturales Protegidas y el Instituto Nacional de Ecología, emitieron su Reporte número 4, respecto del derrame petrolero del Pozo Macondo, y del cual se advierte con meridiana claridad que el derrame continua disminuyendo, se desplazó hacia las costas de los Estados Unidos de América y continua estando muy lejano de las costas Mexicanas. Al respecto dicho reporte señala:

> "Debido a los vientos superficiales generados por el Huracán Alex con dirección Norte, la mancha principal está sobre la costa Sur de los EE.UU. (Fig. 2, 3 y 4), con una extensión EO de 195 km y de NS de 100 km, a unos 961 km de Tamaulipas y 862 km de Quintana Roo (Tabla 1)"

Adjunto a dicho reporte, la *Conabio* incluyó la siguiente gráfica respecto de la ubicación del petróleo derramado a esa fecha, y de la cual se puede advertir la lejanía del derrame de las costas y territorio Mexicano:





Como **Anexo 12** se adjunta el reporte Número 4 a que se refiere este hecho, el cuál es un hecho público y notorio, que se encontraba en la página www.semarnat.gob.mx/temas/ordenamiento-ecologico/historico-cimares/sesiones-de-trabajo

14.- Con fecha del 7 de julio de 2010, el Dr. Sergio Cerdeira Estrada, de la Dirección de Geomática de la Comisión Nacional para el Conocimiento y Uso de la Biodiversidad, hizo una presentación absolutamente documentada para el "IV Congreso de la Asociación Mesoamericana de Ecotoxicología y Química Ambiental", para el Panel: "Evaluación Integral y Manejo del Gran Ecosistema Marino Golfo de México", en la que perfectamente explica que el derrame petrolero fue plenamente identificado y monitoreado vía satelital, inclusive haciendo una comparación del curso de la mancha de petróleo, entre el 9 de mayo de 2010 y el 24 de mayo de 2010, en la que se advierte con absoluta claridad que dadas las corrientes del Golfo de México, la mancha del petróleo se dirigía hacia el norte, es decir, hacia los Estado Unidos de América, a una distancia muy importante del territorio mexicano.



Como **Anexo 13** se adjunta la presentación a que se refiere este hecho.

15.- Con fecha 7 de julio de 2010, la *Conabio* realizó una presentación en el IV Congreso de la Asociación Mesoamericana de Ecotoxicología y Química Ambiental, en la que explica claramente, que:

a) La *Conabio* es una comisión permanente intersecretarial creada en 1992, dedicada a promover, coordinar, apoyar y llevar a cabo actividades encaminadas a incrementar la conciencia en la biodiversidad y su conservación en beneficio de la sociedad.

b) Que cuenta con tecnología de punta, incluyendo un Sistema Satelital de Monitoreo Oceánico denominado "SATMO".

c) Que el derrame del Pozo Macondo al 9 de mayo de 2010, se localizaba a 707 kilómetros de la península de Yucatán y 904 kilómetros de distancia a Tamaulipas.

d) Que el derrame del Pozo Macondo al 24 de mayo de 2010, se localizaba a 657 kilómetros de la península de Yucatán y 775 kilómetros de distancia a Tamaulipas.

e) Que México tendría el siguiente plan de acción: (i) "*El seguimiento de la trayectoria de la mancha superficial de crudo a cargo de la CONABIO; y una evaluación de la presencia de hidrocarburos y metales en el golfo de México, que llevará a cabo el Instituto Nacional de Ecología con el objeto de tener parámetros de comparación ante la eventualidad de que el derrame alcance aguas mexicanas*"; (ii) "*… capacitación tanto a personal de SEMARNAT como de diferentes comunidades costeras del golfo de México y organizaciones no gubernamentales que han manifestado interés de sumarse al esfuerzo del gobierno federal para atender esta contingencia.*"; y (iii) "*… diferentes actividades de prevención, mismas que se llevarán a cabo en colaboración con la Secretaría de Marina-Armada de México y Petróleos Mexicanos.*".

f) Además, el Gobierno Mexicano, coordinado por el Instituto Nacional de Ecología, iniciaría una campaña oceanográfica de 10 días frente a las costas de Tamaulipas y Veracruz, organizada por la SEMARNAT y la UNAM a bordo del buque Justo Sierra de la UNAM para verificar el estado de las aguas, tomando muestras de agua entre 0-1500 metros de profundidad y de sedimentos, al tiempo que se verificarían organismos vivos, peces y la presencia o no de hidrocarburos.

g) También se estarían haciendo sobrevuelos en aviones de la Armada de México sobre los diversos estados de la República Mexicana, para detectar cualquier posible contaminación o petróleo.

La publicación a que se refiere este antecedente, es la que se acompaña como **Anexo 13** del presente ocurso, del que se puede advertir que el Gobierno Mexicano dio puntal seguimiento al derrame de petróleo del Pozo Macondo.

16.- Con fecha del 8 de julio de 2010, es decir a 79 días de la explosión de la Plataforma *Deepwater Horizon* la Secretaría de Medio Ambiente y Recursos Naturales, la Comisión Nacional para el Conocimiento y Uso de la Biodiversidad, la Comisión Nacional de Áreas Naturales Protegidas y el Instituto Nacional de Ecología, emitieron su Reporte número 5, respecto del derrame petrolero del Pozo Macondo, del cual se advierte con meridiana claridad

que el derrame se encuentra muy lejano de las costas Mexicanas. Al respecto dicho reporte señala:

> "El derrame ya afecta todos los estados del Sur de los EUA (Texas, Louisiana, Mississippi, Alabama y Florida) (Fig. 2, 3 y 4) con reportes de presencia de alquitrán en lago Pontchartrain, tierra adentro y junto a Nueva Orleans. Hay que monitorear los efectos que sobre el derrame pudiera provocar la depresión tropical No. 2.
>
> La mancha principal presenta menor área superficial (534,500 ha) con respecto a la fecha anterior debido a los dispersantes, con una extensión EO de 152 km y de NS de 83 km, a unos 857 km de Tamaulipas y 791 km de Quintana Roo (Tabla 1)."

Adjunto a dicho reporte, la *Conabio* incluyó la siguiente gráfica respecto de la ubicación del petróleo derramado a esa fecha, y de la cual se puede advertir que la mancha empieza a desaparecer, ello con independencia de que se encuentra muy lejana a las costas y territorio Mexicano:





Como **Anexo 14** se adjunta el reporte Número 5 a que se refiere este hecho, el cuál es un hecho público y notorio, que se encontraba en la página www.semarnat.gob.mx/temas/ordenamiento-ecologico/historico-cimares/sesiones-de-trabajo.

17.- Con fecha del 15 de julio de 2010, se logró cerrar el Pozo Macondo, para iniciar con un periodo de pruebas a la campana colocada.

(Ver **Anexo 3.**)

18.- Con esa misma fecha del 15 de julio de 2010, la Secretaría de Medio Ambiente y Recursos Naturales, la Comisión Nacional para el Conocimiento y Uso de la Biodiversidad, la Comisión Nacional de Áreas Naturales Protegidas y el Instituto Nacional de Ecología, emitieron su Reporte número 6, respecto del derrame petrolero del Pozo Macondo y del cual se advierte con meridiana claridad que el derrame seguía estando muy lejano de las costas Mexicanas. Al respecto dicho reporte señala:

> "La mancha principal presenta mayor área superficial (649,040 ha) con respecto a la fecha anterior, con una extensión EO de 159 km y de NS de 119 km, a unos 855 km de Tamaulipas y 700 km de Quintana Roo (Tabla 1)"

Adjunto a dicho reporte la *Conabio* incluyó la siguiente gráfica respecto de la ubicación del petróleo derramado a esa fecha, y de la cual se puede advertir que se encuentra muy lejana a las costas y territorio Mexicano:



Como **Anexo 15** se adjunta el reporte Número 6 a que se refiere este hecho, el cuál es un hecho público y notorio, que se encontraba en la página www.semarnat.gob.mx/temas/ordenamiento-ecologico/historico-cimares/sesiones-de-trabajo.

19.- El 22 de julio de 2010, es decir a 94 días de la explosión de la Plataforma Deepwater Horizon, la Secretaría de Medio Ambiente y Recursos Naturales, la Comisión Nacional para el Conocimiento y Uso de la Biodiversidad, la Comisión Nacional de Áreas Naturales Protegidas y el Instituto Nacional de Ecología, emitieron su Reporte número 7, respecto del derrame petrolero del Pozo Macondo, y del cual se advierte con meridiana claridad que el derrame continua dispersándose y desapareciendo a esa fecha y que, con independencia de ellos, se encuentra muy lejano de las costas Mexicanas. Al respecto dicho reporte señala:

*"La mancha principal presenta menor área superficial (213,503 ha) con respecto a la fecha anterior, con una extensión EO de 177 km y de NS de 151 km, a unos 806 km de Tamaulipas y 808 km de Quintana Roo (Tabla 1).*

23

*El 15 de julio, y luego de 87 días de derrame continuo del petróleo, BP logra cerrar la fuga del pozo averiado e inicia un período de pruebas a la campana colocada. La reducción del área de petróleo superficial se pudiera deber a los 7 días sin vertido al mar, así como del constante vertido de dispersantes.*

*Las figuras 2 y 3 muestran un modelo de simulación de la circulación de las corrientes del Golfo de México así como la trayectoria actual y pronosticada del derrame de petróleo según OCG/CMS/USF."*

Adjunto a dicho reporte, la *Conabio* incluyó la siguiente gráfica respecto de la ubicación del petróleo derramado a esa fecha, y de la cual se puede advertir con absoluta claridad que la mancha de petróleo se ha reducido significativamente y que se encuentra muy lejana a las costas y territorio Mexicano





Como **Anexo 16** se adjunta el reporte Número 7 a que se refiere este hecho, el cuál es un hecho público y notorio, que se encontraba en la página http://www.biodiversidad.gob.mx/pais/mares/petro_sat/bp/index.html#.

20.- Con fecha del 29 de julio de 2010, es decir a 100 días de la explosión de la Plataforma Deepwater Horizon, la Secretaría de Medio Ambiente y Recursos Naturales, la Comisión Nacional para el Conocimiento y Uso de la Biodiversidad, la Comisión Nacional de Áreas Naturales Protegidas y el Instituto Nacional de Ecología, emitieron su Reporte número 8, respecto del derrame petrolero del Pozo Macondo, del cual se advierte con meridiana claridad que el derrame continua desapareciendo a esa fecha y que, con independencia de ello, se encuentra muy lejano de las costas Mexicanas. Al respecto dicho reporte señala:

> "La mancha principal presenta mayor área superficial (226,851 ha) con respecto a la fecha anterior, con una extensión EO de 95 km y de NS de 115 km, a unos 828 km de Tamaulipas y 740 km de Quintana Roo (Tabla 1).
> El 15 de julio, y luego de 87 días de derrame continuo del petróleo, BP logra cerrar la fuga del pozo averiado e inicia un período de pruebas a la campana colocada. La reducción del área de petróleo superficial se pudiera deber a los 14 días sin vertido al mar, así como del constante vertido de dispersantes."

Adjunto a dicho reporte, la *Conabio* incluyó la siguiente gráfica respecto de la ubicación del petróleo derramado a esa fecha, y de la cual se puede advertir que la mancha está desapareciendo y continúa estando muy lejana a las costas y territorio Mexicano:





Como **Anexo 17** se adjunta el reporte Número 8 a que se refiere este hecho, el cuál es un hecho público y notorio, que se encontraba en la página www.semarnat.gob.mx/temas/ordenamiento-ecologico/historico-cimares/sesiones-de-trabajo.

21.- Con fecha del 19 de septiembre de 2010 se declaró ya de manera oficial extinguido completamente el derrame del Pozo Macondo, tras concluir con las últimas pruebas, ello a pesar de haberse sellado desde el 15 de julio de 2010.

(Ver **Anexo 3.**)

22.- En resumen, es claro que el Gobierno Mexicano no advirtió ningún daño ambiental originado por la explosión de la Plataforma *Deepwater Horizon* y consecuente derrame del Pozo Macondo. Ello fue gracias a que el gobierno de los Estados Unidos de América, en unión con BP, implementaron un plan sin precedentes para contener y erradicar la contaminación causada a raíz del incidente, tanto que asignaron a más de 47,800 personas para su atención, consiguiendo así que el derrame fuera muy limitado en tiempo y espacio; es decir, el impacto del derrame petrolero causado por el hundimiento de la Plataforma *Deepwater Horizon*, y el consecuente derrame del Pozo Macondo, afectó únicamente una zona determinada de los Estados Unidos de América, por un periodo de tiempo breve, lo que a la postre **significó que la contaminación ocasionada por el derrame petrolero no afectó de manera alguna a las aguas mexicanas**, como bien lo confirma el Reporte FOSC a que se refiere el Antecedente 2.- de este escrito y correspondiente **Anexo 3 Bis**, en particular en la página XV del Resumen Ejecutivo, del capítulo de Conclusiones, el cual menciona literalmente:

> "*[…]*
> *La respuesta al derrame de petróleo de Deepwater Horizon fue, en definitiva, exitosa, esto debido a la unidad en el esfuerzo y la perseverancia de más de 1000 organizaciones que contribuyeron a esta respuesta inesperada.*
> *[…]*"

23.- En de noviembre de 2011, es decir a más de 1 año y 6 meses de la explosión de la Plataforma *Deepwater Horizon*, la Unión Geofísica Mexicana, A.C., que es una asociación que básicamente se encarga de: (i) promover el estudio científico de la Tierra, su medio ambiente en el espacio, y hacer del conocimiento público los resultados de dichos estudios; (ii) promover la cooperación entre organizaciones científicas cuyos objetivos incluyan el fomento del conocimiento de disciplinas en geociencias; (iii) iniciar y coordinar programas de investigación científica, incluyendo aquellos que dependan de la cooperación internacional; y (iv) promover

labores y actividades relacionadas con la enseñanza, difusión y divulgación de las ciencias de la Tierra y sus aplicaciones, así como la promoción o realización de otras actividades consecuentes con los propósitos anteriores, cuyos miembros son prestigiados investigadores, tanto del Sector Público como Académico, como son los científicos Eduardo Peters, Margarita Caso y Víctor Gutiérrez Avedo, entre otros, publicaron en una Sesión Especial denominada "*HACIA EL ESTABLECIMIENTO DE LA LÍNEA BASE DE LA CIRCULACIÓN, BIOGEOQUÍMICA Y ECOLOGÍA MARINA DEL GOLFO DE MÉXICO Y EVALUACIÓN DE POSIBLES IMPACTOS POR DERRAMES DE HIDROCARBUROS DE GRAN ESCALA*", de la publicación GEOS, Vol.31, No 1, Noviembre 2011, entre otras cosas, lo siguiente:

"**RESULTADOS PRELIMINARES SOBRE LA PRESENCIA DE HIDROCARBUROS DEL PETRÓLEO Y METALES EN LAS ZONAS COSTERAS DE VERACRUZ Y TAMAULIPAS EN EL GOLFO DE MÉXICO, JULIO, 2010**
Botello A.V., Ponce-Velez G. y Villanueva-Fragoso S.
*Instituto de Ciencias del Mar y Limnología, UNAM*
pomito69@gmail.com

Se analizaron 35 muestras de agua marina y sedimentos colectadas a bordo del Buque Justo Sierra, durante julio del 2010; para determinar la presencia de hidrocarburos del petróleo (HAP,S) y metales como niquel (Ni) Vanadio (V) y Cromo (Cr) que pudieran haber sido originados por el derrame de la plataforma petrolera Deepwater horizon en las costas de Lousiana. USA.
La metodología empleada fue la USEPA,1990;UNEP/IOC/IAEA,1992.
propuesta por
Los resultados obtenidos para la fracción disuelta en agua de los hidrocarburos aromáticos policíclicos y los compuestos alifáticos, mostró muy bajas concentraciones en la mayoría de las muestras y por debajo de los límites de detección del equipo de cromatografía empleado (< 0.003 - < 0.03 ugL-1), con la ausencia total del grupo de los naftalenos y sus metil derivados. Las concentraciones en los sedimentos marinos se mantuvieron en un rango de 0.01-0.70 uug-1 y por debajo de los criterios internacionales para provocar daños a las comunidades bentónicas.

Mediante el empleo de índices geoquímicas se estableció que el origen de los PAHs determinados fue de origen pirolítico y no proveniente del petróleo crudo del derrame. Solamente en algunas muestras se determinó una mezcla entre hidrocarburos petrogénicos y pirolíticos.

Para metales (Ni, V Cr) las concentraciones fueron muy bajas en sedimentos y su origen en los mismos es de tipo litogénico y no introducidos a las costas como una consecuencia del derrame.

27

<u>Estos resultados preliminares indican que las costas de Veracruz
y Tamaulipas, en el Golfo de México; no fueron impactadas por
la presencia de petróleo crudo proveniente del derrame</u>."

Es decir, basta dar lectura a la opinión de expertos, entre los que participó la propia
Margarita Caso Chávez, quién inclusive fungió como responsable del monitoreo del derrame
petrolero del Grupo de trabajo 7, "Grupo Intersecretarial de Coordinación para la Atención del
Caso de Derrame de Petróleo del Pozo Macondo MC 252/Plataforma Deepwater Horizon en el
Golfo de México", de la CIMARES, para advertir con absoluta claridad que **no obstante que se
recolectaron centenares de muestras que fueron debidamente analizadas, pudieron concluir que
las costas de Veracruz y Tamaulipas no fueron impactadas por el crudo proveniente del
derrame**.

Como **Anexo 18** se adjunta una impresión de la publicación a que se refiere este
antecedente.

24.- Con fecha 19 de abril de 2012, tuvo lugar la Octava Sesión Ordinaria de Enlaces y
Plenaria de Grupo de Trabajo de la CIMARES en la que, entre otras cosas, nuevamente se
revisaron los acuerdos de la QUINTA Sesión de Titulares, y en la que, además, se diera
seguimiento a los temas del grupo de trabajo 7, que corresponde a los del derrame del Pozo
Macondo, en los siguientes términos:

"Grupo 7
**Grupo Intersecretarial de Coordinación para la Atención del
Caso del Derrame de Petróleo del pozo Macondo MC 252/
Plataforma Deepwater Horizon en el Golfo de México:**
A cargo de los coordinadores de los Subgrupos:
<u>Subgrupo 1.- De Monitoreo</u>. Dra. Margarita Caso Chavez- INE
Subgrupo 2.- De Asuntos Jurídicos. Ministro Carlos Quesnel
Meléndez y/o Alfonso Ascencio Herrea- Relaciones Exteriores
Subgrupo 3 <u>para la Actualización del Plan Nacional de
Contingencia</u>. Tte. Francisco Velázquez Molina"

En dicha sesión la Dra. Margarita Caso Chávez, de la Dirección General de Investigación
en Ordenamiento Ecológico y Conservación de los Ecosistemas, del Instituto Nacional de
Ecología, presentó y concluyó el establecimiento de la línea base en los siguientes términos:

"1.- Campañas oceanográficas
2.- Identificación de hidrocarburos en huevos de tortuga como
ejemplo de organismos migratorios
3.- Impacto de los contaminantes en biota (estudios
ecotoxicológicos)
------4.- Aves Migratorias del Golfo de México
5.- Caracterización de ecosistemas costeros (pastos marinos)
6.-Modelo de dispersión del petróleo."

Adicionalmente, concluyó, en su parte conducente, lo siguiente:

"Estimaciones de petróleo derramado

60,000 barriles de petróleo/día

25% recuperado
25% evaporado o disuelto
25% dispersado en forma natural
25% permaneció en el ambiente

2.1 millones de galones de dispersantes
(Corexit 9500 y 9527)"

El evento sucedió durante la primavera-verano cuando las condiciones atmosféricas y oceánicas no favorecen el transporte hacia el occidente del Golfo de México.

De acuerdo con estos modelos, es poco probable que el petróleo haya llegado a aguas mexicanas por corrientes superficiales"

Es decir, que a esa fecha del 19 de abril de 2012, la Dra. Margarita Caso Chávez, de la Dirección General de Investigación en Ordenamiento Ecológico y Conservación de los Ecosistemas del Instituto Nacional de Ecología, concluyó que era muy poco probable que el petróleo hubiera llegado a aguas mexicanas dadas las corrientes superficiales y en virtud de que las condiciones atmosféricas y oceánicas, de ese periodo, no lo favorecían.

Se adjuntan las presentaciones que se mencionan en el presente numeral como **Anexo 19** y **Anexo 20**.

## EL MONITOREO LLEVADO A CABO POR EL GOBIERNO DE LOS ESTADOS UNIDOS DEMUESTRA QUE EL PETRÓLEO NO LLEGÓ A LAS AGUAS O COSTAS MEXICANAS NI OCASIONÓ ALGÚN DAÑO EN MÉXICO.

Independientemente de lo anteriormente expuesto, resulta importante mencionar las acciones llevadas a cabo en los Estados Unidos de América por el propio gobierno de ese país y varias entidades privadas. Dichas acciones tuvieron como consecuencia que la contaminación no afectara de manera alguna las aguas y costas mexicanas.

25.- Agencias estatales y federales de los Estados Unidos, así como otras instituciones privadas llevaron a cabo más de 200 investigaciones medioambientales, incluyendo más de 2 millones de muestras analíticas, 500,000 observaciones de vida salvaje, 1.5 millones de fotografías y 4,000 millas de costa revisadas.

26.- Como parte de la investigación, múltiples agencias científicas de los Estados Unidos emitieron el Reporte del Equipo de Análisis de Ciencias Operacionales ("OSAT" por sus siglas en inglés), el cual recolectó y analizó más de 11,000 muestras de agua y más de 1,500 muestras de sedimentos. Cuando se hizo el muestreo para detectar partículas de petróleo (PAHs por sus siglas en inglés), la gran mayoría de las muestras de agua y sedimentos (más del 98%), resultaron ser no tóxicas, ni excedieron los límites permitidos.

(Ver **Anexo 21**)

27.- El equipo OSAT concluyó, basándose en la información obtenida, que (i) no se detectaron niveles de PHAs por encima de los límites legales o de salud humana y (ii) no se observaron dispersantes por encima del nivel legal permitido en las muestras tomadas.

(Ver **Anexo 21**)

28.- De las 11,397 muestras de agua analizadas por el equipo del OSAT en busca de partículas de petróleo, se determinó que sólo 111 de las mismas, que es menos del 1% del total de las muestras, fueron potencialmente tóxicas para la vida acuática, y que eran consistentes con el tipo de petróleo del Pozo Macondo.

(Ver **Anexo 21**)

29.- Ninguna de las muestras recolectadas después del mes de agosto de 2010 que correspondiera al petróleo del Pozo Macondo fue tóxica. Todas las muestras que fueron consideradas como potencialmente tóxicas, (como se observa en la imagen que a continuación se transcribe) fueron tomadas cerca del pozo o en las costas de los Estados Unidos, pero ninguna de estas fue tomada cerca de las aguas o costas mexicanas. La muestra potencialmente tóxica más cercana a México, fue encontrada a cientos de millas de distancia de aguas mexicanas.



(Ver **Anexo 21**)

30.- La Administración Nacional de Océanos y Atmósfera de los Estados Unidos ("**NOAA**" por sus siglas en inglés) y otras agencias medioambientales del gobierno de los Estados Unidos, cuidadosamente siguieron la ruta del derrame petrolero durante el año 2010. La investigación siguió el derrame petrolero desde el punto en el que ocurrió hasta el punto más lejano alcanzado por el mismo. Los resultados del gobierno de los Estados Unidos mostraron que el punto más lejano que la mancha de petróleo alcanzó, fue a 212 km del punto en el que ocurrió el derrame, es decir, a más de 200 kilómetros de aguas mexicanas.





(Ver **Anexo 21**)

En efecto, el día 21 de abril de 2010, representantes de la Guardia Costera de Estados Unidos, el Departamento de Seguridad Nacional (DHS), la Administración Nacional Oceanográfica y Atmosférica (NOAA), el Departamento del Interior (DOI) y la Agencia de Protección Ambiental (EPA), así como representantes estatales y locales activaron el Equipo de Respuesta Regional (RRT). El RTT llevó a cabo planes para contener la contingencia, proveyó asesoría técnica, accedió a recursos y equipos de sus agencias miembro, y llevó a cabo la vigilancia de las labores de contención y limpia del derrame petrolero.

## LOS REPORTES DE LOS EXPERTOS DEMUESTRAN QUE NI EL PETRÓLEO NI LOS DISPERSANTES LLEGARON A AGUAS Y COSTAS MEXICANAS, Y NO OCASIONARON DAÑO ALGUNO A MÉXICO.

Como se anunció con antelación, reconocidos expertos han investigado la cuestión de si el petróleo del Pozo Macondo o los dispersantes utilizados para mitigar los efectos del derrame llegaron o no a aguas y costas mexicanas, o si el mismo dañó o no los recursos pesqueros mexicanos; de los cuales destacan los estudios efectuados por los tres expertos a los que a continuación nos referiremos, quienes concluyeron que el derrame petrolero ni los dispersantes llegaron a aguas y costas mexicanas, y que además no afectó los recursos pesqueros mexicanos.

31.- El análisis de datos y revisión de literatura académica del Dr. Robert I. Haddad, revela que el petróleo del Pozo Macondo y los dispersantes utilizados para mitigar los efectos del mismo, no llegaron a las aguas o costas mexicanas.

En efecto, el Dr. Robert I. Haddad, quien supervisó la investigación científica del gobierno estadounidense sobre el impacto ambiental del derrame de la Plataforma Deepwater Horizon en el Pozo Macando, evaluó las pruebas empíricas y la literatura disponible, concluyendo que ni el petróleo ni los dispersantes utilizados para mitigar los efectos del petróleo, llegaron a las costas o aguas mexicanas. En particular, el Dr. Haddad revisó los datos de los análisis de teledetección y los análisis de química analítica de superficie del gobierno de los Estados Unidos, los análisis de química analítica y forenses de aguas profundas del gobierno de los Estados Unidos y de BP, los análisis de química analítica y forenses de sedimentos bentónicos del gobierno de los Estados Unidos y de BP, las conclusiones alcanzadas por el gobierno estadounidense utilizando su calculadora presupuestaria sobre el destino del petróleo derramado, los resultados de estudios de modelado de destino y transporte, tanto académicos como del gobierno estadounidense, y los resultados de estudios de química de sedimentos y estructuras comunitarias ecológicas sobre sedimentos en aguas mexicanas. Basándose en lo anterior, el Dr. Haddad concluyó, en un informe de fecha de 29 de enero de 2018, mismo que se adjunta al presente como **Anexo 22**, que:

- Se recolectó y analizó una cantidad sin precedentes de datos ambientales de alta calidad para ayudar a entender el impacto ambiental del derrame de petróleo de *Deepwater Horizon*.

- No llegó petróleo ni dispersantes del derrame de petróleo del *Deepwater Horizon* a las aguas, sedimentos o costas de México.

- Los hallazgos anteriores no son sorprendentes dada la ubicación del derrame de petróleo de *Deepwater Horizon*, las condiciones favorables dentro del norte del Golfo de México, y los grandes esfuerzos emprendidos por el Gobierno de los Estados Unidos y BP en respuesta a este derrame.

Los datos de monitoreo y muestreo del gobierno estadounidense indican que el petróleo y los dispersantes del derrame no alcanzaron a las aguas o las costas mexicanas. En particular, los satélites y la observación aérea revelaron que la mayor parte del petróleo en la superficie del océano estuvo siempre a más de 180 km de las aguas mexicanas, mientras que áreas más pequeñas de petróleo superficial nunca estuvieron a menos de 60 km de las aguas mexicanas. El Dr. Haddad corroboró estos hallazgos analizando la concentración de hidrocarburos aromáticos policíclicos (HAP, o PAH, por sus siglas en inglés) en muestras de aguas superficiales.



La imagen de arriba ilustra la estimación del gobierno de los Estados Unidos de dónde se localizó el petróleo de superficie del pozo Macondo, siempre lejos de las aguas mexicanas.

Además, el petróleo y los dispersantes bajo la superficie y en el fondo marino tampoco llegaron a las aguas o costas mexicanas. A través de pruebas de agua, el gobierno de los Estados Unidos determinó que no se encontraron hidrocarburos del derrame de la plataforma *Deepwater Horizon* en aguas profundas dentro de los 170-185 km de las costas mexicanas o de los 50-60 km de las aguas mexicanas.

33

Asimismo, al examinar los resultados y datos del gobierno de los Estados Unidos con respecto al petróleo depositado en el lecho marino, el Dr. Haddad determinó que el petróleo proveniente del derrame no se depositó en el lecho marino en aguas mexicanas.



La imagen de arriba muestra la ubicación de los sedimentos en los que se encontró petróleo, cabe destacar que todos se encontraron al menos a 200 km de las aguas mexicanas.

Aunado a lo anterior, el Dr. Haddad comprobó que los resultados de varios modelos de destino y transporte utilizados por el gobierno de los Estados Unidos confirmaron que el petróleo derramado nunca llegó a las aguas o costas mexicanas. El Dr. Haddad también examinó la literatura académica disponible, centrándose en estudios académicos que utilizaban modelos de destino y transporte y estudios específicos para las aguas mexicanas, y comprobó que sus resultados eran coherentes con la conclusión del gobierno de los Estados Unidos, en el sentido de que el petróleo asociado al derrame de la plataforma *Deepwater Horizon* no llegó a las costas o aguas mexicanas.

Por último, el Dr. Haddad explicó que las filtraciones, o fugas naturales de hidrocarburos del suelo o del fondo marino, son comunes en todo el mundo. Las estimaciones indican que en el Golfo de México puede haber desde 600 a más de 1000 filtraciones. El petróleo liberado por estas filtraciones puede formar bolas de alquitrán, que pueden llegar a las costas desplazándose a lo largo de la superficie del océano. Una de las zonas de filtración más activas, conocida como el Complejo Cantrarell, se encuentra en la Bahía de Campeche frente a la costa de México. Por lo tanto, en la medida en que se encuentre petróleo o residuo de petróleo en aguas mexicanas, este petróleo puede haberse originado de filtraciones naturales de petróleo, y no del pozo Macondo. El Dr. Haddad explicó que atribuir el petróleo o los residuos de petróleo a una fuente específica requiere un análisis geoquímico forense apropiado.

34

32.- El modelado del Dr. Jorge Zavala Hidalgo, del Centro de Estudios Atmosféricos de la Universidad Nacional Autónoma de México, demuestra que el petróleo del Pozo Macondo no llegó a las costas o aguas mexicanas.

Como se explica en el informe que se adjunta a la presente como **Anexo 23**, el Dr. Zavala creó un modelo de destino y transporte de petróleo para evaluar independientemente si el petróleo del pozo Macondo llegó o no a aguas o costas mexicanas. Para llevar a cabo este análisis, utilizó las mejores estimaciones disponibles de la cantidad de petróleo derramado del Pozo Macondo, así como las cantidades eliminadas por diversos mecanismos. Luego simuló la descomposición y el movimiento del petróleo utilizando modelos estandarizados para corrientes de agua y viento (es decir, el Modelo Híbrido de Coordenadas Oceánicas (HYCOM); el Modelo de Investigación y Pronóstico del Tiempo (WRF), y un modelo lagrangiano de evolución del petróleo).

Basándose en este análisis, el Dr. Zavala concluyó que el petróleo del derrame de la plataforma *Deepwater Horizon* no llegó a aguas o costas mexicanas. Específicamente, el Dr. Zavala comprobó que la distancia a la cual se encontraba la cabeza del pozo de las aguas mexicanas, las corrientes oceánicas y los vientos, las tasas de decaimiento y otros procesos naturales, así como la cantidad de petróleo recuperado del medio ambiente a través de las actividades de respuesta, contribuyeron a prevenir que el petróleo derramado entrara en aguas mexicanas.

33.- El análisis de datos hecho por el Dr. Adolfo Gracia Gasca, también de la Universidad Nacional Autónoma de México, muestra que el derrame de la plataforma *Deepwater Horizon* no dañó las pesquerías mexicanas.

En relación con la actividad pesquera en el Golfo de México, el Dr. Adolfo Gracia redactó un informe titulado "Análisis del Efecto del Derrame de la Plataforma Deepwater Horizon en los Recursos de Pesca en las Aguas Mexicanas del Golfo de México", que se adjunta a la presente como **Anexo 24**, en el que analizó si el derrame del Pozo Macondo había tenido algún impacto negativo sobre los recursos pesqueros mexicanos en el Golfo de México. **En ese informe concluye que no hay pruebas de que el derrame de petróleo en el Pozo Macondo haya perjudicado de alguna manera a los recursos pesqueros mexicanos, por las razones que se exponen a continuación:**

En primer lugar, en consonancia con las conclusiones de los Dres. Haddad y Zavala, no hay pruebas de que el petróleo del Pozo Macondo ni los dispersantes utilizados para mitigar los efectos del derrame haya llegado a aguas mexicanas, especialmente dado que el derrame ocurrió lejos de dichas aguas, se limitó generalmente a un área de 20 kilómetros alrededor del pozo, y

que el petróleo derramado fue rápidamente removido, disuelto, degradado y evaporado. En segundo lugar, incluso si el petróleo del Pozo Macondo hubiera llegado a aguas mexicanas (que las pruebas aportadas demuestran que no ocurrió), no hubiera necesariamente dañado a las pesquerías mexicanas, que son resistentes a los derrames de petróleo debido a la presencia de fuentes naturales de petróleo en el Golfo de México. En tercer y más importante lugar, el Dr. Gracia consideró las pruebas que miden la salud de los recursos pesqueros del Golfo de México y concluyó que, de hecho, no se produjo algún daño a esos recursos. **Por el contrario, la abundancia de poblaciones ictícolas tras el derrame es coherente con las tendencias históricas y, en la mayoría de los casos, muestra una tendencia positiva en los años posteriores al derrame.**

Para llegar a esta última conclusión, el Dr. Gracia se basó en datos de los Anuarios Estadísticos sobre Pesca y de la Comisión de Acuicultura y Pesca, y de otros organismos oficiales como el Instituto Nacional de Pesca, SAGARPA, INAPESCA, y la Comisión Internacional para la Conservación del Atún Atlántico. El Dr. Gracia analizó las tendencias de captura de cinco especies que representan las especies económica y ecológicamente más importantes en las aguas mexicanas del Golfo de México. Estas especies incluyen: 1) camarón café, 2) huachinango, 3) pulpo, 4) atún de aleta amarilla y 5) atún de aleta azul. Mediante este análisis, el Dr. Gracia determinó que el derrame no impactó las tendencias de captura de estas especies de acuerdo con su captura por unidad de esfuerzo (CPUE), una métrica que mide la cantidad de una especie que puede ser capturada por esfuerzo (por ejemplo, horas) dedicado a la pesca. Esta es una mejor medida de los recursos pesqueros a lo largo del tiempo que los datos de captura por sí solos, porque la CPUE no se ve afectada por los cambios en la cantidad de tiempo dedicado a la captura de una especie en particular.

El Dr. Gracia no solo comprobó que las tendencias de captura no fueron afectadas por el derrame de la plataforma *Deepwater Horizon*, sino que comprobó que **todas las especies mostraron tendencias de captura positivas en los años posteriores al derrame**, con la excepción del atún de aleta amarilla que exhibió un rendimiento constante. Por ejemplo, el camarón café, que tiene el mayor valor comercial de todas las especies de camarón, es también la especie más cercana al área del derrame. Por lo tanto, el camarón café sería el recurso que probablemente se vería afectado por el derrame. Además, al igual que todos los camarones, el camarón café tiene un ciclo de vida anual y, por tanto, cualquier impacto en la población sería notable a partir de ese mismo año. No obstante, la tendencia de las capturas no indica algún impacto del derrame en la producción de camarón café, que de hecho presenta un crecimiento constante a partir del año 2000.



36



El Dr. Gracia también concluyó que, en los dos años posteriores al derrame, el volumen de las exportaciones de productos pesqueros mexicanos aumentó un promedio del 72%, aunque disminuyó en 2013, aunque siguió siendo mayor que en los años anteriores al derrame.



La imagen de arriba representa el volumen de exportación de recursos pesqueros desde México. No se dispone de registros estadísticos oficiales después de 2013.

Del mismo modo, el valor total de los productos pesqueros exportados aumentó en los años posteriores al derrame.





La imagen de arriba representa el valor de los productos pesqueros para la exportación desde México. No se dispone de registros estadísticos oficiales después de 2013.

El Dr. Gracia sugiere que el aumento de las exportaciones pesqueras mexicanas en los años posteriores al derrame puede deberse a una disminución de la oferta nacional de Estados Unidos de productos pesqueros del Golfo de México. Por lo tanto, el derrame no solo no tuvo un impacto negativo en los recursos pesqueros mexicanos, sino que de hecho podría haber beneficiado a la industria pesquera de México al aumentar la demanda de productos pesqueros.

## LOS DISPERSANTES UTILIZADOS EN LA RESPUESTA SON SEGUROS Y ESTÁN APROBADOS POR EL GOBIERNO MEXICANO

34- Por lo que hace a los dispersantes utilizados en Estados Unidos para contrarrestar los efectos del hundimiento de la Plataforma Deepwater Horizon, con independencia de que no hay evidencia alguna de que hayan llegado a México, sus mares o sus costas y que únicamente se utilizó para disolver el 25% (veinticinco por ciento) del petróleo derramado, tal y como lo reconoce la propia Dra. Margarita Caso Chávez, de la Dirección General de Investigación en Ordenamiento Ecológico y Conservación de los Ecosistemas, del Instituto Nacional de Ecología, en la exposición que realizó el 19 de abril de 2012, en la Octava Sesión Ordinaria de Enlaces y Plenaria de Grupo de Trabajo de CIMARES, es importante mencionar que, de conformidad con el "Acuerdo Secretarial número 249, por el cual se expide la versión abreviada del Plan Nacional de Contingencias para Derrames de Hidrocarburos y Sustancias Nocivaas Potencialmente Peligrosas en las Zonas Marinas Mexicanas" publicado en el Diario Oficial de la Federación el día 24 de octubre de 2016, se contempla en el "Anexo (G) Lista de dispersantes pre-aprobados por SEMARNAT para uso en las ZMM" al dispersante conocido como Corexit, el cual, como ya se ha mencionado anteriormente, fue utilizado en las labores llevadas a cabo para la contención, mitigación y respuesta del derrame petrolero.

Cabe mencionar que el documento que se menciona en el párrafo inmediato anterior establece los lineamientos de preparación para la atención de derrames y la organización nacional para llevar a cabo la respuesta a incidentes, así como los lineamientos para que las autoridades apliquen las mejores prácticas y estándares internacionales de preparación para emergencias y manejo de incidentes a nivel nacional, lo que implica que el uso del dispersante conocido como Corexit es considerado como seguro de conformidad con las mejores prácticas nacionales e internacionales, de ahí que el dispersante que fuera utilizado en Estados Unidos para contrarrestar los efectos del derrame petrolero, se encuentre aprobado por la autoridad competente en materia ambiental en México, es decir, el uso del Corexit se encuentra aprobado por la SEMARNAT.

Se adjunta al presente escrito el "Acuerdo Secretarial número 249, por el cual se expide la versión abreviada del Plan Nacional de Contingencias para Derrames de Hidrocarburos y Sustancias Nocivas Potencialmente Peligrosas en las Zonas Marinas Mexicanas" publicado en el Diario Oficial de la Federación el día 24 de octubre de 2016 como **Anexo 25**.

## EL GOBIERNO MEXICANO HA RECONOCIDO DE MANERA EXPRESA QUE NO HA DESCUBIERTO EVIDENCIA PALPABLE DE QUE EL DERRAME PETROLERO DEL POZO MACONDO HAYA AFECTADO DE MANERA ALGUNA A MÉXICO

35.- Como corolario de los antecedentes antes descritos, es de suma importancia mencionar que, derivado de un procedimiento judicial seguido ante los tribunales de los Estados Unidos de América iniciado por el Gobierno de los Estados Unidos Mexicanos, el día 15 de febrero de 2018, el Estado Mexicano suscribió con las sociedades denominadas BP Exploration & Production Inc., BP America, Inc., BP America Production Company y BP Products North America, Inc., un "*Convenio de Transacción y Exoneración*", por virtud del cual, entre otras cosas, se reconoció de manera expresa que el Gobierno Mexicano aún no ha descubierto evidencia de que el petróleo derramado por la explosión de la Plataforma *Deepwater Horizon*, ni los dispersantes utilizados para mitigar los efectos del mismo hayan llegado a las aguas o costas mexicanas, que hasta ahora, esto es, al año 2018 inclusive, no ha encontrado evidencia alguna de que dicho incidente haya afectado las aguas o pesquerías mexicanas o a la economía mexicana (en lo sucesivo y por cuestiones de brevedad, referido únicamente como el "**Convenio**"), permitiéndome transcribir para mayor claridad el considerando tercero y el numeral "*11.-*" del mismo:

"*[...]*

*CONSIDERANDO que, mediante su investigación y monitoreo, <u>México aún no ha descubierto evidencia palpable respecto a que el Petróleo y otros hidrocarburos o dispersantes asociados al Incidente de Deepwater Horizon han llegado a las aguas y costas mexicanas, y no ha encontrado, hasta la fecha del presente, evidencia alguna respecto a que el Incidente de Deepwater Horizon haya afectado las aguas o pesquerías mexicanas o la economía mexicana.</u>*

*[…]*

*11.- El pago de la compensación establecida anteriormente <u>no representa una admisión expresa o implícita respecto a que México haya sufrido Daños como resultado del Incidente de Deepwater Horizon o que cualquier Daño presuntamente sufrido por México haya sido resultado de negligencia, dolo o responsabilidad por parte de BP,</u> y BP niega expresa y especialmente en el presente Convenio dichas alegaciones. En su lugar, <u>dicha compensación se paga (i) para efectos de resolver las alegaciones controvertidas y hacer que las Partes eviten gastos, incertidumbres y riesgos de litigio y (2) para apoyar a los programas mexicanos de protección socioambiental, conservación y/o restauración del Golfo de México.</u>*

*[…]"*
[Énfasis añadido]

Como se desprende de la anterior transcripción, el Gobierno Mexicano reconoce expresamente que hasta la fecha de la suscripción del Convenio, esto es, hasta el mes de febrero de este año 2018, no se ha encontrado evidencia de que los hidrocarburos que se derramaron a raíz de la explosión de la Plataforma *Deepwater Horizon* en el Pozo Macondo, así como los dispersantes utilizados para mitigar los efectos de dicho derrame, hayan llegado a costas o aguas mexicanas, o de que los mismos hayan causado daños al medio ambiente, pesquerías o economía mexicana.

El "*Convenio de Transacción y Exoneración*" celebrado entre el Estado Mexicano y las sociedades denominadas BP Exploration & Production Inc., BP America, Inc., BP America Production Company y BP Products North America, Inc., que se menciona anteriormente, se adjunta al presente escrito junto con su debida certificación y apostilla y traducción al idioma español como **Anexo 26.**

Una vez expuesto lo anterior, a continuación me permito exponer las razones por las que esta parte considera que en el presente asunto no se reúnen, ni acreditan, los elementos necesarios para la procedencia de las infundadas y del todo improcedentes acciones colectivas -*difusa y en sentido estricto*- intentadas por la parte actora; permitiéndome al efecto dar contestación, en nombre de mi representada, a la demanda planteada por la parte actora, en el siguiente orden:

40

P R E S T A C I O N E S :

Por lo que respecta a las prestaciones que demanda la actora, consistentes, entre otras, en: (i) la restitución del equilibrio ambiental al estado que guardaba antes de la supuesta afectación o en su caso la reparación del daño y cumplimiento sustituto y (ii) el pago de los daños en forma individual a cada uno de los miembros del grupo demandante, **SE NIEGA la procedencia de todas y cada una de las prestaciones y/o pretensiones reclamadas por la parte actora,** para todos los efectos legales a que haya lugar.

Lo anterior en virtud de que, en primer lugar, en el caso particular a estudio no existen elementos para tener por acreditados los elementos esenciales de las acciones colectivas intentadas por la parte actora, particularmente en lo relativo a la existencia de los supuestos daños materiales a los ecosistemas inherentes a las aguas y sistemas costeros **mexicanos** a los que pretenden referirse los pretensos demandantes; y, mucho menos, para tener por acreditado el nexo causal que, como en toda acción de responsabilidad civil, tendría que encontrarse fehacientemente acreditado, en la forma imparcial y objetiva que exige la ley, entre: (**a**) los supuestos daños ambientales derivados del derrame petrolero relacionado con el incidente de la plataforma *Deepwater Horizon*; y (**b**) los supuestos efectos adversos ya sea al medio ambiente, o bien, a la economía individual o colectiva que, de forma tan por demás genérica, vaga y totalmente especulativa pretenden hacer parecer atribuibles al incidente petrolero en cuestión, como si ese sólo factor, individualmente considerado, pudiera bastar para explicar cualquiera de los supuestos fenómenos naturales, materiales y/o económicos a los que, sin más sustento que sus simples dichos, pretenden referirse los supuestos pescadores accionantes a lo largo de su escrito de demanda.

Lo anterior, aunado al hecho de que, contrario a las falsas impresiones que la parte actora pretende infundir en el ánimo de su Señoría con las genéricas referencias a la *"Demandada"* que utiliza a lo largo de su demanda, lo cierto es que en el caso particular a estudio no existen elementos para sustentar las pretensiones de la parte actora y, en segundo lugar, siendo que el propio Gobierno Mexicano ha reconocido expresamente que hasta ahora, esto es, hasta este año de 2018 inclusive, no ha encontrado evidencia alguna de que el derrame petrolero del Pozo Macondo originado por la explosión de la Plataforma Deepwater Horizon y el consecuente uso de dispersantes, hayan llegado a las aguas o costas mexicanos y, mucho menos, de que hubieren afectado de manera las aguas o pesquerías mexicanas o la economía mexicana; lo cual es un hecho objetivo y científicamente comprobado, como se ha visto ampliamente confirmado con los múltiples estudios e investigaciones llevados a cabo hasta el momento por diversas dependencias oficiales y connotados expertos en la materia -*clara muestra de los cuales son los múltiples estudios, informes y reportes a los que hicimos referencia en el capítulo de "Antecedentes" de*

*este escrito-* con los cuales se confirma que, contrario a lo que los demandantes pretenden alegar en su escrito de demanda, lo cierto es que en el caso particular que nos ocupa no existe evidencia objetiva de que el derrame petrolero del Pozo Macondo originado por la explosión de la Plataforma *Deepwater Horizon* y el consecuente uso de dispersantes haya afectado al ecosistema de las aguas, costas o estados de la República Mexicana ubicados en las zonas del Golfo de México, sus actividades económicas y/o comerciales ni a los habitantes de dichas regiones.

Pero además, desde ahora vale la pena señalar, que la forma en la cual se encuentran redactadas las prestaciones que se le reclaman a mi representada y la propia demanda son oscuras y por lo tanto contrarias a derecho, ya que no se establece de manera clara y precisa qué supuestos hechos son los que pretenderían estarle imputando, concretamente, a **BP AMERICA PRODUCTION COMPANY**, ni tampoco precisan qué es lo que pretenderían estarle demandando o reclamando a mi representada lo que evidentemente la deja en estado de indefensión.

Dicho lo anterior, a continuación me permito dar contestación al capítulo de antecedentes y hechos narrados por la parte actora en su escrito de demanda:

### POR CUANTO HACE A LOS *"ANTECEDENTES"* DE LA PARTE ACTORA:

Por la forma en la que se encuentra redactado el escrito inicial de demanda, en el presente capítulo se dará contestación primeramente a los presuntos *"antecedentes"* y posteriormente a los supuestos *"hechos"* narrados por la parte actora, refiriéndome de manera general a los antecedentes que señala; sin embargo, para efectos de veracidad y precisión, mi representada se remite a los antecedentes que quedaron debidamente expuestos en el capítulo respectivo del presente escrito, solicitando a esa H. Autoridad que se tengan por reproducidos como si a la letra se insertasen, para el efecto de evitar repeticiones inútiles.

Sin embargo, para los efectos legales a que haya lugar, mi representada <u>niega</u> en general las afirmaciones y suposiciones vertidas en los antecedentes marcados con los numerales *1.-* a *39.-* del escrito inicial de demanda, mismos que se controvierten, arrojando la carga de la prueba a la actora.

Sin perjuicio de lo cual, conviene a los intereses de mi representada realizar las siguientes precisiones:

Remitiéndome en lo conducente a lo manifestado en el capítulo de "Antecedentes" de este escrito, así como a lo que, al efecto, será debidamente hecho valer en el capítulo de "Excepciones y Defensas", en el caso particular es claro que, contrario a las especulaciones

planteadas por la parte actora en su escrito de demanda, lo cierto es que de los múltiples estudios e investigaciones efectuados hasta el momento, se desprende que no se ha encontrado evidencia de que el derrame de hidrocarburos haya afectado al ecosistema ubicado en el territorio nacional mexicano y, por tanto, no se puede hablar de un daño al medio ambiente, a la economía de los pescadores, de los prestadores de servicios o de algún otro habitante de los estados de la República Mexicana ubicados en la zona del Golfo de México o a las actividades económicas en dichas regiones; con lo cual se evidencia la inexistencia de los supuestos daños que, en base a meras especulaciones pretende referir la parte actora en su demanda, máxime que, se reitera, todos los supuestos daños se ven ampliamente contradichos y desacreditados, con todos y cada uno de los estudios, informes y reportes de incuestionable valor técnico-científico emitidos por las máximas autoridades gubernamentales y académicas nacionales e internacionales.

Por el contrario, existen evidencias suficientes para acreditar que las múltiples acciones llevadas a cabo en relación al derrame petrolero en el Pozo Macondo resultaron sumamente efectivas y disminuyeron de manera significativa el impacto en el medio ambiente, en el área posiblemente afectada, que es precisamente en los Estados Unidos de América. Ello se puede advertir de la simple lectura, entre otros, del Reporte FOSC, el cual menciona en la página 59 que "...*Todas esas medidas ayudaron a minimizar el impacto ambiental que tuvo el derrame petrolero en la Costa del Golfo...*".

Por otro lado y como se ha mencionado en el capítulo de antecedentes del presente escrito, no hay evidencia de que el dispersante conocido como Corexit pueda tener efectos nocivos sobre la salud de las personas o el ecosistema, tan es así que es el dispersante reconocido y autorizado por el Gobierno Mexicano; por tanto, contrario a lo que manifiesta la parte actora, no puede concederse razón a los infundados efectos que la parte actora pretende atribuir a la utilización de dicho dispersante, el cual, por cierto, se usó únicamente para el 25% del derrame petrolero.

En resumen, en obvio de repeticiones y por cuestión de economía, cabe destacar que la parte actora, en el capítulo de antecedentes de su demanda, hace una narrativa que contiene afirmaciones que no son verdaderas y/o suposiciones que carecen de sustento alguno o de prueba objetiva alguna, por lo que carecen de valor y desde este momento son expresamente negados, objetados y controvertidos en su conjunto por la parte demandada que represento, para todos los efectos legales a que haya lugar.

43

## RESPECTO DE LOS *"HECHOS"* RELACIONADOS EN EL APARTADO MARCADO CON EL NUMERAL "IX" DE LA DEMANDA:

1.- Por lo que hace al hecho correlativo que se contesta, el mismo se niega para los efectos legales a que haya lugar, se controvierte y arroja la carga de la prueba a la actora.

Sin embargo, conviene a los intereses de mi representada reiterar que, tal y como se desprende y acredita con los múltiples estudios, informes y reportes que, al efecto, se llevaron a cabo y fueron por diversas autoridades gubernamentales y académicas de alto nivel tanto internacional, como de nuestro País *-a los cuales nos referimos con antelación dentro de este escrito, adjuntando las constancias respectivas como anexos del presente ocurso-* lo cierto es que, contrario a lo sostenido por la parte actora, la contaminación derivada de dicho incidente no afectó de manera al ecosistema ubicado en el territorio mexicano y, a la fecha, no existe ninguna evidencia de que la contaminación derivada de dicho incidente haya afectado al ecosistema ubicado en el territorio mexicano tal y como ya ha sido reconocido por el Gobierno Mexicano en el Convenio aludido en el antecedente *"35.-"* de este ocurso *-que se acompaña como Anexo 26 del mismo-*, lo que sí es un hecho cierto e incontrovertible es que hasta el momento no hay evidencia de la existencia de ningún supuesto daño ni al medio ambiente ni a la economía de los pescadores, prestadores de servicios o a ningún otro habitante de los estados de la República Mexicana ubicados en la zona del Golfo de México o a las actividades económicas en dichas regiones, con motivo del incidente ocurrido.

Por último, la parte actora señala que, a la fecha de presentación de su demanda, había algunos estudios en los que se especulaba que el supuesto daño al medio ambiente al que pretenden referirse en su libelo, podría continuar por varios años o décadas; sin embargo, me permito hacer notar que la parte actora no exhibió ninguno de dichos estudios junto con su escrito de demanda, razón por cual precluyó su derecho para tal efecto y, por tanto, resulta material y jurídicamente imposible que su Señoría pudiera llegar a conceder valor alguno a las simples especulaciones, carentes de valor tanto legal como científico, planteadas por los pretensos demandantes tanto en el numeral que se contesta como, en general, a todo lo largo de su por demás infundada y del todo improcedente demanda.

En obvio de repeticiones, me remito a lo expuesto en el capítulo de antecedentes del presente escrito, solicitando se tenga aquí por reproducido como si a la letra se insertare en aras de economía procesal, para todos los efectos conducentes.

44

2.- Por lo que hace al hecho correlativo que se contesta, el mismo se niega para los efectos legales a que haya lugar, se controvierte y arroja la carga de la prueba a la actora.

No obstante, se amerita reiterar que, contrario a lo manifestado por la parte actora, en la especie no se acredita que el petróleo del derrame de la plataforma Deepwater Horizon haya llegado a las aguas o costas mexicanas, además de que no existe evidencia de que los dispersantes utilizados para mitigar dicho derrame, hubieran afectado de manera alguna los ecosistemas marinos o las costas mexicanas, lo cuál es evidente en virtud de todos los estudios y reportes emitidos por autoridades gubernamentales tanto mexicanas, como extranjeras, a los que nos hemos referido dentro de este ocurso, porque ni el derrame ni sus dispersantes llegaron a costas o mares mexicanos, lo cual se confirma con los estudios y reportes elaborados por los expertos Dr. Robert I. Haddad, Dr. Jorge Zavala Hidalgo y Dr. Adolfo Gracia Gasca, cuyos detallados reportes se adjuntan al presente escrito como **Anexo 22**, **Anexo 23** y **Anexo 24**.

3.- Por lo que hace al hecho correlativo que se contesta, el mismo se niega para los efectos legales a que haya lugar, se controvierte y arroja la carga de la prueba a la actora.

No obstante, se amerita reiterar que, tal y como ha quedado debidamente expuesto y demostrado en el cuerpo del presente escrito, la supuesta contaminación derivada de dicho incidente del Pozo Macondo evidentemente no afectó ni pudo haber afectado el ecosistema ubicado en el territorio nacional y, por tanto, no se puede hablar de un daño a la economía de los pescadores, prestadores de servicios o ningún otro habitante de los estados de la República Mexicana ubicados en la zona del Golfo de México o a las actividades económicas en dichas regiones.

Efectivamente, no hay prueba alguna de que el derrame petrolero en el Pozo Macondo haya perjudicado de manera alguna a los recursos pesqueros mexicanos, ya que, en primer lugar, el mismo ocurrió a una distancia muy considerable de las aguas y costas mexicanas, el derrame estuvo generalmente limitado a una zona reducida de 20 kilómetros alrededor del Pozo Macondo y en virtud de que el petróleo derramado fue rápidamente removido, disuelto, degradado y evaporado, y en segundo lugar, de los estudios llevados a cabo, se concluyó que la abundancia de las poblaciones ictícolas tras el derrame, son coherentes con las tendencias históricas y, en la mayoría de los casos, muestran una tendencia positiva en los años subsecuentes al derrame.

Lo anterior se acredita con todos los reportes emitidos por autoridades gubernamentales mexicanas y en particular con el reporte elaborado por el Dr. Adolfo Gracia Gasca, mismo que se adjunta al presente escrito como **Anexo 24**, remitiéndome de nueva cuenta a todo lo que, al

45

respecto, quedó debidamente expuesto y relacionado en el capítulo de antecedentes del presente ocurso.

4.- Por lo que hace al hecho correlativo que se contesta, el mismo se niega para los efectos legales a que haya lugar, se controvierte y arroja la carga de la prueba a la actora.

No obstante, cabe nuevamente hacer la acotación de que, contrario a lo que los pretensos actores pretenden alegar dentro del numeral que se contesta, lo cierto es que tal y como ha quedado debidamente expuesto y demostrado en el cuerpo del presente escrito, y como incluso ha sido reconocido por el propio Gobierno Mexicano en el Convenio, hasta ahora *-a más de 8 (ocho) años del incidente relativo a la Plataforma Deepwater Horizon-* no se ha encontrado, ni existe evidencia palpable de que la supuesta contaminación derivada de dicho incidente del Pozo Macondo, o las acciones de respuesta al mismo, hayan afectado el ecosistema ubicado en el territorio nacional y, por tanto, no se puede hablar de un daño a la economía de los pescadores, prestadores de servicios o ningún otro habitante de los estados de la República Mexicana ubicados en la zona del Golfo de México o a las actividades económicas en dichas regiones.

Luego entonces, no existe elemento de prueba alguno capaz de sustentar los elementos de la acción relativos a: (i) la acreditación objetiva de existencia del o los supuestos "daños" de los que pretenden dolerse los pretensos actores; (ii) el nexo causal y directo que en todo caso tendría que resultar objetivamente demostrable, entre el supuesto hecho originador y las presuntas consecuencias que se pretenda atribuirle.

Efectivamente, no hay prueba alguna de que el derrame petrolero en el Pozo Macondo haya perjudicado de manera alguna a los recursos pesqueros mexicanos, ya que, en primer lugar, el mismo ocurrió a una distancia muy considerable de las aguas y costas mexicanas, el derrame estuvo limitado a una zona reducida de 20 kilómetros alrededor del Pozo Macondo y en virtud de que el petróleo derramado fue rápidamente removido, disuelto, degradado y evaporado, y en segundo lugar, de los estudios llevados a cabo, se concluyó que la abundancia de las poblaciones ictícolas tras el derrame, son coherentes con las tendencias históricas y, en la mayoría de los casos, muestran una tendencia positiva en los años subsecuentes al derrame.

Mucho menos hay ninguna prueba, ni elemento objetivo alguno, capaces de sustentar las por demás unilaterales, subjetivas y del todo indemostradas afirmaciones de la parte actora en cuanto a la supuesta disminución en la captura de especies marinas y/o que el supuesto *"impacto negativo en sus ingresos"* a los que pretenden referirse, tengan relación objetiva y directa alguna con las supuestas derivaciones del derrame del Pozo Macondo.

46

Máxime siendo que, como de simple lógica resulta, las notas periodísticas carecen de valor técnico y jurídico para los efectos pretendidos por la parte actora, sin perjuicio de que, como de lógica elemental resulta, la supuesta disminución en la pesca y/o los supuestos efectos negativos en la economía de los individuos pertenecientes al gremio, podrían haber sido causados por una multiplicidad de factores totalmente ajenos e inimputables a los hechos con los que, con presumible afán meramente lucrativo, pretenden imputarle al desafortunado incidente de la plataforma petrolera *Deepwater Horizon*, sin que por tanto pueda concederse validez o procedencia legal algunos a cualquiera de las por demás subjetivas, unilaterales y del todo indemostradas especulaciones planteadas por la parte actora en su escrito inicial de demanda.

5.- Por lo que hace al hecho correlativo que se contesta, el mismo se niega para los efectos legales a que haya lugar, se controvierte y arroja la carga de la prueba a la actora.

Sin perjuicio de lo cual, se reitera que tal y como se ha demostrado en el cuerpo del presente escrito la supuesta contaminación derivada de dicho incidente del Pozo Macondo evidentemente no afectó ni pudo haber afectado el ecosistema ubicado en el territorio nacional, por la simple y sencilla razón de que no llegó a aguas o costas mexicanas.

Y por lo que hace a los dispersantes utilizados en Estados Unidos para contrarrestar los efectos del hundimiento de la Plataforma *Deepwater Horizon*, con independencia de que tampoco hay evidencia alguna de que hayan llegado a México, sus mares o sus costas y que únicamente se utilizó para disolver el 25% (veinticinco por ciento) del petróleo derramado, tal y como lo reconoce la propia Dra. Margarita Caso Chávez, de la Dirección General de Investigación en Ordenamiento Ecológico y Conservación de los Ecosistemas, del Instituto Nacional de Ecología, en la exposición que realizó el 19 de abril de 2012, en la Octava Sesión Ordinaria de Enlaces y Plenaria de Grupo de Trabajo de CIMARES, es importante mencionar que, de conformidad con el "Acuerdo Secretarial número 249, por el cual se expide la versión abreviada del Plan Nacional de Contingencias para Derrames de Hidrocarburos y Sustancias Nocivas Potencialmente Peligrosas en las Zonas Marinas Mexicanas" publicado en el Diario Oficial de la Federación el día 24 de octubre de 2016, se contempla en el "Anexo (G) Lista de dispersantes pre-aprobados por SEMARNAT para uso en las ZMM" al dispersante conocido como Corexit, que los pretensos demandantes refieren utilizado en las labores llevadas a cabo para la contención, mitigación y respuesta del derrame petrolero.

Cabe mencionar que el documento que se menciona en el párrafo inmediato anterior establece los lineamientos de preparación para la atención de derrames y la organización nacional para llevar a cabo la respuesta a incidentes, así como los lineamientos para que las autoridades apliquen las mejores prácticas y estándares internacionales de preparación para

emergencias y manejo de incidentes a nivel nacional, lo que implica que, contrario a la falsa idea que la parte actora pretende infundir, el uso del dispersante conocido como Corexit es considerado como seguro de conformidad con las mejores prácticas nacionales e internacionales, de ahí que el dispersante que fuera utilizado en Estados Unidos para contrarrestar los efectos del derrame petrolero, se encuentre aprobado por la autoridad competente en materia ambiental en México, es decir, el uso del Corexit se encuentra aprobado por la SEMARNAT.

Lo anteriormente expuesto se acredita con el "Acuerdo Secretarial número 249, por el cual se expide la versión abreviada del Plan Nacional de Contingencias para Derrames de Hidrocarburos y Sustancias Nocivas Potencialmente Peligrosas en las Zonas Marinas Mexicanas" publicado en el Diario Oficial de la Federación el día 24 de octubre de 2016, el cual se adjunta al presente escrito como **Anexo 25.**

**6.-** Por lo que hace al hecho correlativo que se contesta, el mismo se niega para los efectos legales a que haya lugar, se controvierte y arroja la carga de la prueba a la actora.

Sin perjuicio de lo cual, mi representada estima pertinente formular las siguientes precisiones:

Tal y como se ha demostrado en el cuerpo del presente escrito, en el caso particular hay evidencias más que suficientes, avaladas por los diversos seguimientos, estudios y reportes oficiales que, al efecto, fueron llevados a cabo y sustentados por las diversas dependencias gubernamentales y autoridades académicas que quedaron relacionadas en el capítulo de antecedentes del presente ocurso, de que   la supuesta contaminación derivada de dicho incidente del Pozo Macondo no afectó, ni pudo haber afectado el ecosistema ubicado en el territorio nacional y/o las actividades económicas desarrolladas en el mismo, por la simple y sencilla razón de que no llegó a aguas o costas mexicanas.

Por lo que hace a las supuestas "*bolas de chapopote*" que la parte actora refiere en el hecho correlativo que se contesta, cabe destacar que: (i) la actora no acredita de manera alguna su existencia; (ii) no detalla circunstancias de tiempo, modo o lugar en las que supuestamente hubieran sido encontradas; (iii) no refiere si supuestamente se encontraron en México o en Los Estados Unidos de América; (iv) no identifica a los pescadores que supuestamente las encontraron; (v) suponiendo sin conceder que efectivamente se hubiere tratado de rastros de hidrocarburos, la parte actora es omisa en probar que las mismas provinieran del derrame petrolero ocurrido en la Plataforma *Deepwater Horizon*; y (vi) por último, cabe reiterar que las supuestas notas periodísticas carecen de  valor probatorio para los efectos del presente juicio.

48

Al respecto, no está de más reiterar que, por el contrario, con los elementos aportados por mi representada, se demuestra y acredita que que: (i) el derrame de petrolero ocurrió a una distancia muy considerable de las aguas y costas mexicanas; (ii) que el movimiento de las corrientes oceánicas, los vientos, las tasas de decaimiento y otros procesos naturales, ayudaron a disolver o degradar el petróleo; y (iii) que el petróleo restante fue recuperado como parte de las actividades de respuesta, por lo que, como lo ha reconocido por el Gobierno Mexicano en el Convenio, hasta el año 2018 no existe evidencia de que se haya causado algún daño al medio ambiente mexicano, como infundadamente pretende sostener la parte actora.

Lo anterior, también se acredita con, entre otros, el reporte emitido por el Dr. Jorge Zavala Hidalgo, el cual se adjunta al presente escrito como **Anexo 23**.

Además, conviene a los intereses de mi representada reiterar que, con motivo de la firma del Convenio celebrado en el mes de febrero del año 2018, el Gobierno de México reconoció, entre otras cosas, que hasta la fecha de la suscripción del Convenio no existía evidencia palpable de que el petróleo derramado por la explosión de la Plataforma Deepwater Horizon o los dispersantes utilizados para mitigar los efectos del mismo hayan llegado a las aguas o costas mexicanas y que hasta ahora no se ha encontrado evidencia respecto a que dicho incidente haya afectado las aguas o pesquerías mexicanas o a la economía mexicana, permitiéndome transcribir para mayor claridad el considerando tercero y el numeral "*11.*" del mismo:

> "*[…]*
>
> *CONSIDERANDO que, mediante su investigación y monitoreo,* <u>*México aún no ha descubierto evidencia palpable respecto a que el Petróleo y otros hidrocarburos o dispersantes asociados al Incidente de Deepwater Horizon han llegado a las aguas y costas mexicanas, y no ha encontrado, hasta la fecha del presente, evidencia alguna respecto a que el Incidente de Deepwater Horizon haya afectado las aguas o pesquerías mexicanas o la economía mexicana.*</u>
>
> *[…]*
>
> *[…]*"
> [Énfasis añadido]

Como se desprende de la anterior transcripción, el Gobierno Mexicano reconoce expresamente que no existe evidencia alguna de que los hidrocarburos que se derramaron a raíz de la explosión de la Plataforma *Deepwater Horizon* en el Pozo Macondo, así como los dispersantes utilizados para mitigar los efectos de dicho derrame, hayan llegado a costas o aguas mexicanas o que los mismos hayan causado daños al medio ambiente, pesquerías o economía mexicana, lo cual es consistente con los estudios realizados por el propio Gobierno Mexicano en

los días cercanos al incidente y los estudios posteriores realizados por los expertos y diversas autoridades gubernamentales que han quedado señalados con anterioridad.

Dicho reconocimiento es absolutamente relevante para el caso que nos ocupa, ya que como se ha mencionado en reiteradas ocasiones a lo largo del presente escrito de contestación de demanda, la parte actora pretende engañar el recto arbitrio de su Señoría, haciéndole creer que el derrame petrolero ocurrido en el Pozo Macondo afectó al medio ambiente mexicano, a las pesquerías y a la economía mexicana, lo cual, se reitera es completamente falso.

Lo anterior se acredita con el "*Convenio de Transacción y Exoneración*" de fecha 15 de febrero de 2018, suscrito entre el Estado Mexicano y las sociedades del consorcio de BP, en idioma inglés, debidamente apostillado, junto con su debida traducción al idioma español, los cuales se adjuntan al presente escrito como **Anexo 26**.

7.- Por lo que hace al hecho correlativo que se contesta, el mismo se niega para los efectos legales a que haya lugar, se controvierte y arroja la carga de la prueba a la actora, remitiéndome a todo lo que al respecto ha quedado debidamente expuesto y demostrado en el cuerpo del presente ocurso, a cuyo contenido integral me remito en obvio de repeticiones y en aras de economía procesal.

## RESPECTO DE LOS *"FUNDAMENTOS DE DERECHO"* INVOCADOS POR LA ACTORA EN EL NUMERAL "X" DE LA DEMANDA:

Por todos los motivos expuestos, fundados y motivados dentro de este escrito, mi representada niega expresamente haber incurrido en violación de ninguno de los ordenamientos constitucionales y legales invocados por la actora en el respectivo apartado de su demanda y, por ende, se niega expresamente la aplicabilidad al caso particular a estudio tanto de los supuestos normativos, como de los preceptos adjetivos, invocados por la parte actora en el mismo; remitiéndome al respecto, en obvio de repeticiones y por economía procesal, al contenido integral del presente ocurso, para todos los efectos conducentes.

Lo anterior, a reserva y sin perjuicio que la propia parte actora manifiesta y reconoce a todo lo largo de su escrito de demanda, que los supuestos hechos generadores de los -*inexistentes y por demás indemostrados*- supuestos "daños" en que pretenden fundar el ejercicio de las improcedentes acciones colectivas intentadas por su parte, esto es, el derrame de crudo derivado del incidente suscitado en la Plataforma *Deepwater Horizon* y las acciones implementadas para contenerlo, tuvieron lugar fuera del territorio mexicano y, de hecho, reconocen a su vez que tanto esa plataforma petrolera, como el Pozo Macondo, estaban bajo la jurisdicción y competencia territorial de otro Estado -*los Estados Unidos de América*-, lo que, en opinión de mi

representada, basta para demostrar la improcedencia de todos y cada uno de los supuestos fundamentos, ordenamientos y normatividades aludidos en las páginas 21 a 23 del escrito inicial de demanda que se contesta.

### E X C E P C I O N E S   Y   D E F E N S A S :

1.- LA EXCEPCIÓN DE FALTA DE ACCIÓN Y DERECHO DE LA PARTE ACTORA.- Consistente y fundada en el hecho de que, contrario a las afirmaciones falsas planteadas por los demandantes en su escrito inicial de demanda, lo cierto es que en el caso particular a estudio no se reúnen ni, mucho menos, se acreditan, los elementos necesarios e indispensables para el ejercicio, configuración y procedencia de las acciones colectivas difusa y en sentido estricto que han pretendido ejercitar los demandantes dentro del presente juicio.

Lo anterior, en virtud de que en el caso particular a estudio existen elementos más que suficientes, avalados en los múltiples estudios y reportes técnico-científicos emitidos por las autoridades gubernamentales y diversos expertos del más alto nivel y hasta por el propio Gobierno Mexicano dentro del Convenio a los cuales nos referimos desde el capítulo de *Antecedentes* del presente ocurso, de que el petróleo derivado del incidente suscitado en la Plataforma *Deepwater Horizon* del Pozo Macondo y los dispersantes, no han afectado hasta la fecha el territorio nacional, las aguas nacionales del Golfo de México, la fauna y flora que en ellos habita, las actividades comerciales y/o económicas que dependen de las aguas mexicanas del Golfo de México o a los pobladores de los estados de la República Mexicana con litoral en el Golfo de México.

En este sentido, mi representada se permite hacer notar que, como lo podrá apreciar su Señoría, las particularidades inherentes a los derechos colectivos y/o difusos protegidos a través del tipo especial de acciones implementadas en el Libro Quinto del Código Federal de Procedimientos Civiles, de ninguna forma es óbice para dejar de considerar que, el simple hecho de que las acciones colectivas del tipo que nos ocupa se encuentren reguladas dentro del código adjetivo antes indicado, denota que las mismas se encuentran sujetas a las reglas y principios generales inherentes a los juicios civiles dentro del sistema de derecho procesal mexicano, dentro de los cuales revisten particular importancia los relativos al principio de la carga probatoria que, como de explorado derecho resulta, obliga a la parte actora a acreditar *-en la forma fehaciente, y objetiva que tanto la Ley, como las circunstancias de un caso como el que nos ocupa, requieren-* los extremos de sus pretensiones.

En este sentido, no está de más recordar que, efectivamente, en sede civil priva el principio que establece que quien afirma algo está obligado a probarlo, además de que, en caso de no aportar las pruebas conducentes, le precluye el derecho para hacerlo, además de que en

51

todo caso el Juez habrá de decidir mediante una valoración razonada de los elementos técnicos y jurídicos que se le hayan allegado para tal efecto, en base a los principios de estricto derecho, equidad procesal y derecho de contradicción con que debe cumplir todo procedimiento judicial tendiente a la resolución de una controversia entre particulares, conforme a los más altos estándares y principios en que descansa el sistema general de derecho mexicano.

Requisitos y principios rectores del sistema de impartición de justicia aplicable toda controversia de orden civil en México que, si bien pueden verse matizados en el tipo particular de acciones colectivas que nos ocupan, ello de ninguna forma es óbice para dejar de considerar que el sistema de valoración de pruebas en materia colectiva debe ser razonado y sustentado en las pruebas objetivas técnico-científicas pertinentes, dado que es responsabilidad del Juez cerciorarse de contar con las pruebas científicas y documentales correspondientes, para dictar su sentencia con razonamientos técnico jurídicos obligatorios para la materia de que se trate.

Todo lo cual resulta plenamente lógico y congruente, siendo como lo es que la naturaleza de las acciones colectivas reguladas en el Libro Quinto del Código Federal de Procedimientos Civiles no deja de ser, a final de cuentas, sino la de la **acción de responsabilidad civil** cuyos elementos esenciales deben, por tanto, verse objetiva y fehacientemente acreditados en juicio, de los cuales, y como de explorado derecho resulta, forman parte indispensable, entre otros elementos:

- La acreditación fehaciente y objetiva de la existencia del o los daños en que pretendan fundarse las acciones correspondientes;

- La acreditación fehaciente y objetiva del **nexo causal y directo** que necesariamente tendría que existir entre el supuesto hecho generador y los daños que pretendan derivarse del mismo; y

- La responsabilidad personal y directa que, en todo caso, también tendría que acreditarse fehaciente y objetivamente, respecto del demandado específico del que se trate, en cada caso individualmente considerado.

Elementos de la acción de responsabilidad civil, comunes a las de carácter colectivo, que, en el caso particular a estudio no puede estimarse reunidos y, mucho menos, *acreditados* por la presunta parte actora, siendo como lo es que, tal y como ha quedado ampliamente expuesto, fundado y motivado dentro del presente ocurso, pretenden hacer consistir en la supuesta responsabilidad que pretenden derivable de los supuestos daños ambientales que, a nivel meramente especulativo y por demás infundado, alegan hipotéticamente ocasionados al medio ambiente marino y costero mexicanos, con presunta repercusión en las actividades económicas

52

de los pescadores y otros prestadores de servicios o habitantes de los estados mexicanos adyacentes al Golfo de México, por el desafortunado incidente acontecido el 20 de abril del año 2010 en la Plataforma *Deepwater Horizon*, el derrame petrolero derivado del mismo y/o las acciones de contención, limpieza y saneamiento llevados a cabo bajo la más estricta supervisión y seguimiento que, al efecto, llevaron a cabo diversas autoridades tanto de los Estados Unidos de América -*en cuya jurisdicción territorial fue que, en todo caso, sucedieron los hechos y se habrían resentido sus efectos*- como de los Estados Unidos Mexicanos, así como reconocidos expertos en el ramo, dentro de los múltiples reportes e informes a los que nos hemos referido dentro de este ocurso, todos los cuales concluyeron, sin lugar a dudas, que ni el derrame petrolero, ni las acciones de contención y limpieza implementados, llegaron a las aguas ni al territorio mexicano, ni existe evidencia de que hayan provocado daño alguno a los ecosistemas, medio ambiente y/o a las actividades económicas mexicanos.

Lo anterior, en razón de que, tal y como se encuentra ampliamente expuesto y demostrado en los diversos apartados que conforman este escrito de contestación de demanda, en el caso particular a estudio no existen elementos para que, al momento de resolver en definitiva, este órgano jurisdiccional pudiera tener por acreditado que los presuntos daños ambientales derivados del incidente suscitado en la Plataforma Deepwater Horizon al que se refiere la parte actora, hayan llegado y/o afectado de manera alguna el territorio nacional, las aguas nacionales del Golfo de México, la fauna y flora que en ellos habita, las actividades comerciales y/o económicas que dependen de las aguas mexicanas del Golfo de México o a los pobladores de los estados de la República Mexicana con litoral en el Golfo de México, y mucho menos existe prueba alguna de que el supuesto decremento en la captura de especies marinas y/o los supuestos hallazgos de chapopote y, mucho menos, cualquier presunta afectación en las percepciones y/o el nivel adquisitivo de los pretensos demandantes o cualquier otro habitante de las zonas costeras mexicanas, pudieran estimarse objetiva y directamente atribuibles a mi representada, a despecho de cualquiera otro de los factores humanos, naturales y/o entidades privadas o gubernamentales que pudieran haber incidido en cualquiera de esos fenómenos y, eso, para el supuesto sin conceder de que cualquiera de los mismos se hubiera actualizado -*supuesto que, evidentemente, es completamente negado, rechazado y desconocido por la parte demandada a la que represento, arrojándose la carga de la prueba respectiva a la parte actora, para todos los efectos legales a que haya lugar-*

Por el contrario, en el caso particular se cuenta con evidencias más que suficientes para acreditar que diversas autoridades y comisiones oficiales pertenecientes al Gobierno Mexicano, así como diversos expertos y connotados académicos, llevaron a cabo amplios estudios e investigaciones tendientes a determinar, entre otros, si el derrame petrolero ocurrido en el Pozo Macondo afectó o no al territorio y aguas mexicanos, así como a la fauna y flora que en ellas

53

habita, o a las actividades económicas que pudieran haberse visto directamente afectadas por los hechos respectivos, llegando a la conclusión de que NO fue así.

En efecto, remitiéndome en obvio de repeticiones a lo que quedó debidamente expuesto tanto en el capítulo de *antecedentes* del presente ocurso, como en la contestación a los hechos de la demanda, de ninguna forma puede pasar inadvertido para su Señoría que:

La Secretaría de Marina-Armada de México, llevó a cabo diversas acciones de seguimiento y análisis pertinentes que le llevaron a informar al Gobierno Mexicano, que el derrame petrolero ocurrido en el Pozo Macondo no representó ningún riesgo para aguas marinas mexicanas ni costas mexicanas. (Ver el **Anexo 5**)

Por su parte, la Comisión Nacional para el Conocimiento y Uso de la Biodiversidad, un organismo intersecretarial del Gobierno Mexicano, también certificó, por conducto de su Coordinador Nacional, el Dr. José Sarukhan, entre otras cuestiones, que el derrame ocurrió sobre la "zona muerta", por lo que no había motivos objetivos para suponer ninguna afectación sobre pesquerías costeras. (Ver el **Anexo 7**)

Por otro lado, de los múltiples reportes emitidos por la Secretaría de Medio Ambiente y Recursos Naturales, la Comisión Nacional para el Conocimiento y Uso de la Biodiversidad, la Comisión Nacional de Áreas Naturales Protegidas y el Instituto Nacional de Ecología, se desprende y acredita que la contaminación derivada del derrame petrolero en el Pozo Macondo tuvo un desplazamiento hacia el norte y hacia el este, es decir, hacia aguas y costas de Estados Unidos, más NO hacia aguas y zonas costeras de México, por lo tanto, dicha contaminación no tuvo ningún impacto negativo en aguas ni en territorio nacional. (Ver **Anexo 9, Anexo 11, Anexo 12, Anexo 13, Anexo 14, Anexo 15, Anexo 16** y **Anexo 17**)

Adicionalmente a lo anterior, cabe reiterar que la Unión Geofísica Mexicana, A.C., concluyó, entre otras cosas, que los resultados de los estudios llevados a cabo indicaron que las costas de Veracruz y Tamaulipas, en el Golfo de México no fueron impactadas por la presencia de petróleo crudo proveniente del derrame. (Ver **Anexo 18**)

Sin que pueda tampoco pasar inadvertido que, con motivo de la firma del Convenio suscrito el día 15 de febrero de 2018, el propio Gobierno de los Estados Unidos Mexicanos reconoció de manera expresa que hasta el momento, esto es, a más de 8 (ocho) años después de ocurrido el incidente, no existe evidencia palpable de que el petróleo derramado a raíz de la explosión de la Plataforma Deepwater Horizon en Pozo Macondo y los dispersantes utilizados para mitigar los efectos del mismo, hayan llegado a aguas y costas mexicanas, así como tampoco

existe evidencia de que cualquiera de los mismos hayan afectado de manera alguna a la flora y fauna mexicana, a las pesquerías mexicanas o a la economía mexicanos.

Dicho documento resulta por demás relevante para el caso que nos ocupa, ya que, el hecho de que el Gobierno de los Estados Unidos Mexicanos haya reconocido dentro de un convenio celebrado ante una autoridad judicial extranjera, que no ha encontrado ninguna prueba de que el derrame petrolero del Pozo Macondo haya afectado al medio ambiente mexicano, a las pesquerías y a la economía, es una prueba contundente de que, como ya se ha mencionado en reiteradas ocasiones a lo largo del presente escrito y como ha quedado plenamente acreditado, de que la parte actora carece de derecho para demandarle a mi representada las prestaciones que precisa en su escrito inicial de demanda. (Ver **Anexo 26**)

Los ejemplos recién citados así como los que se mencionan en el capítulo de antecedentes del presente escrito, los cuales solicito se tengan por reproducidos como si a la letra se insertaran en obvio de innecesarias repeticiones, indican que la contaminación derivada del derrame petrolero del Pozo Macondo no tuvo impacto negativo alguno en las aguas ni en el territorio nacional, por lo tanto, es inconcuso decir que las actividades económicas como la pesca, el turismo y el mercado inmobiliario de las regiones costeras de la República Mexicana en el Golfo de México, no sufrieron impacto negativo alguno derivado del multicitado derrame petrolero.

Dicho lo anterior y partiendo de la base de que la parte actora no acredita haber sufrido ningún tipo de daño derivado del derrame petrolero en el Pozo Macondo, es inconcuso decir que, la parte actora carece de acción y derecho legal algunos para pretender reclamarle a mi representada todas y cada una de las infundadas, arbitrarias e improcedentes pretensiones relacionadas en su escrito inicial de demanda.

En virtud de que los supuestos antes mencionados no se satisfacen en el caso que nos ocupa, es por demás claro que no existe responsabilidad alguna por parte de mi representada frente a la parte actora.

Lo anteriormente expuesto se refuerza con el criterio jurisprudencial que a continuación me permito transcribir:

"*Época: Décima Época*
*Registro: 2006974*
*Instancia: Primera Sala*
*Tipo de Tesis: Aislada*
*Fuente: Gaceta del Semanario Judicial de la Federación*
*Libro 8, Julio de 2014, Tomo I*
*Materia(s): Civil*



55

*Tesis: 1a. CCLXXVI/2014 (10a.)*
*Página: 166*

*RESPONSABILIDAD CIVIL OBJETIVA. ELEMENTOS NECESARIOS PARA SU ACTUALIZACIÓN.*

*La responsabilidad civil extracontractual puede ser de naturaleza objetiva o subjetiva. Es objetiva la derivada del uso de sustancias, mecanismos, instrumentos o aparatos peligrosos que, por sí solos, es decir, por sus características, crean un estado de riesgo para los demás, independientemente de que la conducta del agente no fuere culposa, y de que no hubiere actuado ilícitamente. Ahora bien, la responsabilidad objetiva se apoya en un elemento ajeno a la conducta, en donde la noción de riesgo reemplaza a la de la culpa del agente como fuente de la obligación. Así, para que exista esta responsabilidad, es necesaria la concurrencia de los siguientes elementos: 1) el uso de sustancias, mecanismos, instrumentos o aparatos peligrosos, por sí mismos o por sus características; 2) la provocación de un daño; 3) la causalidad entre el uso y el daño referidos; y, 4) que no exista culpa o negligencia inexcusable de la víctima, entendida como culpa grave, debido a que el agente no puede ser responsable de la conducta ajena, cuando ésta fue la que dio lugar al daño.*

*Amparo directo en revisión 4555/2013. 26 de marzo de 2014. Cinco votos de los Ministros Arturo Zaldívar Lelo de Larrea, José Ramón Cossío Díaz, quien reservó su derecho para formular voto concurrente, Alfredo Gutiérrez Ortiz Mena, Olga Sánchez Cordero de García Villegas y Jorge Mario Pardo Rebolledo. Ponente: Jorge Mario Pardo Rebolledo. Secretaria: Rosa María Rojas Vértiz Contreras.*

*Esta tesis se publicó el viernes 11 de julio de 2014 a las 8:25 horas en el Semanario Judicial de la Federación.*
[Énfasis añadido]

En el caso que nos ocupa, el multicitado derrame petrolero no causo un daño al medio ambiente de las aguas y costas de la República Mexicana ubicados en el Golfo de México, por ende, no existe obligación alguna de mi representada ni de ninguna otra persona frente a la parte actora, por lo que su Señoría deberá de dictar una sentencia en la cual se absuelva a mi representada de todas y cada una de las prestaciones que la parte actora le demanda.

Por último, la presente excepción se relaciona con todos y cada uno de los antecedentes y hechos que se contestan con el presente ocurso.

**2.- EXCEPCIÓN DE FALTA DE LEGITIMACIÓN** *AD CAUSAM.* La cual se hace consistir en que la parte actora no acredita la titularidad de los derechos que menciona en su escrito inicial de demanda y que supuestamente se vieron afectados por el derrame petrolero derivado del hundimiento de la Plataforma Deepwater Horizon en el Pozo Macondo, por la simple y sencilla razón de que no acreditan haber sufrido las supuestas afectaciones que dicen resentir.

Lo anterior se robustece con los criterios jurisprudenciales que a continuación me permito transcribir:

"*Época: Novena Época*
*Registro: 163322*
*Instancia: Tribunales Colegiados de Circuito*
*Tipo de Tesis: Aislada*
*Fuente: Semanario Judicial de la Federación y su Gaceta*
*Tomo XXXII, Diciembre de 2010*
*Materia(s): Civil*
*Tesis: XV.4o.16 C*
*Página: 1777*

*LEGITIMACIÓN EN LA CAUSA. CONSTITUYE UNA CONDICIÓN DE LA ACCIÓN Y NO UN PRESUPUESTO PROCESAL.*

*Los presupuestos procesales son los requisitos sin los cuales no puede iniciarse ni tramitarse con eficacia jurídica un proceso. Por ello, se trata de cuestiones de orden público que deben ser analizadas incluso de oficio por el juzgador, antes de efectuar el estudio del fondo del asunto. Los presupuestos procesales deben distinguirse de las condiciones de la acción, ya que éstas son necesarias para que el actor obtenga una sentencia favorable. Entre los presupuestos procesales se encuentran la competencia, la procedencia de la vía, la personalidad y el litisconsorcio pasivo necesario. En cambio, entre las condiciones de la acción se encuentra la legitimación en la causa, que consiste en la calidad en virtud de la que una acción o derecho puede ser ejercido, por o contra una persona en nombre propio. Así, la legitimación en la causa puede ser vista desde dos ángulos: como la identidad de la persona del actor, con aquel a quien la ley concede la acción (legitimación activa), y como la identidad de la persona del demandado, con aquella contra la cual es concedida la acción (legitimación pasiva). La legitimación en la causa constituye una condición de la acción porque únicamente en el supuesto de que se acredite la legitimación del actor y del demandado, tiene posibilidad de éxito la demanda, pues si falta en una o en otra parte, la demanda tiene que ser desestimada.*

*CUARTO TRIBUNAL COLEGIADO DEL DÉCIMO QUINTO CIRCUITO.*

*Amparo directo 514/2010. BBVA Bancomer, S.A., Institución de Banca Múltiple, Grupo Financiero, BBVA Bancomer; antes Bancomer, S.A., Institución de Banca Múltiple; antes Bancomer, S.N.C. 7 de octubre de 2010. Unanimidad de votos. Ponente: Rubén David Aguilar Santibáñez. Secretario: Luis Fernando Zúñiga Padilla.*
[Énfasis añadido]

*Época: Novena Época*
*Registro: 204816*
*Instancia: Tribunales Colegiados de Circuito*

*Tipo de Tesis: Aislada*
*Fuente: Semanario Judicial de la Federación y su Gaceta*
*Tomo II, Julio de 1995*
*Materia(s): Civil*
*Tesis: X.1o.2 C*
*Página: 262*

*PERSONALIDAD, EXCEPCION DE FALTA DE, Y FALTA DE LEGITIMACION PASIVA. SON CUESTIONES JURIDICAS DISTINTAS.*

*La excepción de falta de personalidad en el demandado estriba en la inexistencia de un presupuesto procesal, consistente en que dicho demandado no tiene el carácter o la representación con la cual se le demanda; de proceder la excepción, los efectos son que no se tenga por entablada la relación procesal, sin perjuicio de que ésta se establezca posteriormente, al subsanarse el defecto, por tratarse de una excepción dilatoria. Pero si lo que se argumenta es que el demandado no es la persona obligada, esto implica alegar falta de legitimación pasiva, la cual constituye un requisito integrante de la acción sobre el cual debe resolverse en la sentencia.*

*PRIMER TRIBUNAL COLEGIADO DEL DECIMO CIRCUITO.*

*Amparo directo 228/95. Emilia Almazán Salas. 25 de mayo de 1995. Unanimidad de votos. Ponente: Fernando Hernández Piña. Secretaria: Adelita Méndez Cruz.*
[Énfasis añadido]

*Época: Séptima Época*
*Registro: 248925*
*Instancia: Tribunales Colegiados de Circuito*
*Tipo de Tesis: Aislada*
*Fuente: Semanario Judicial de la Federación*
*Volumen 187-192, Sexta Parte*
*Materia(s): Civil*
*Tesis:*
*Página: 107*

*PERSONALIDAD EN EL DEMANDADO, EXCEPCION DE FALTA DE, Y FALTA DE LEGITIMACION PASIVA. SON CUESTIONES JURIDICAS DISTINTAS.*

*La excepción de falta de personalidad en el demandado estriba en la inexistencia de un presupuesto procesal, consistente en que dicho demandado no tiene el carácter o la representación con la cual se le demanda; de proceder la excepción, los efectos son que no se tenga por entablada la relación procesal, sin perjuicio de que ésta se establezca posteriormente, al subsanarse el defecto, por tratarse de una excepción dilatoria. Pero si lo que se argumenta es que el demandado no es la persona obligada, esto implica alegar falta de legitimación pasiva, la cual constituye un requisito constitutivo de la acción sobre el cual debe resolverse en la sentencia.*

*TRIBUNAL COLEGIADO DEL NOVENO CIRCUITO.*

58

*Amparo en revisión 403/84. Rafael Castro Torres. 13 de septiembre de 1984. Unanimidad de votos. Ponente: Enrique Arizpe Narro. Secretario: Faustino Azpeitia Arellano.*

[Énfasis añadido]

Como se desprende de los criterios jurisprudenciales recién transcritos, la legitimación en la causa es un presupuesto procesal, es decir, la accionante tiene la obligación de acreditar tanto su legitimación en cuanto al fondo del juicio y que la parte en contra de la cual se dirige la acción es efectivamente la obligada; sin embargo, en el caso que nos ocupa, la parte actora es omisa en aportar elementos de prueba que acrediten cualquiera de dichos extremos.

En este orden de ideas, mi representada considera que al momento de entrar a resolver el fondo del presente juicio, su Señoría podrá advertir que del escrito inicial de demanda de acción colectiva se desprende, entre otras cosas, que la supuesta colectividad que se dice afectada por el derrame petrolero derivado del incidente de la Plataforma *Deepwater Horizon* en el Pozo Macondo, según ellos estaría compuesta por pescadores de ciertos estados del Golfo de México, supuestamente dedicados a la pesca comercial.

Ahora bien, partiendo de la base de que, como la propia actora lo manifiesta en su escrito inicial de demanda, la colectividad supuestamente afectada por el derrame petrolero que se describe en el párrafo inmediato anterior se compone de supuestos pescadores comerciales, es pertinente revisar a quiénes se les podría reconocer dicho carácter desde un punto de vista legal, de acuerdo a las leyes mexicanas.

De conformidad con lo establecido en los artículos 40, fracción I, y 41, fracción I, ambos de la Ley General de Pesca y Acuacultura Sustentables publicada en el Diario Oficial de la Federación el día 24 de julio de 2007 (en lo sucesivo, referida únicamente como la "<u>LGAPS</u>"), las personas que hagan de su ocupación la pesca comercial requieren, necesariamente, contar con una concesión y un permiso para llevar a cabo dicha actividad.

Por otro lado, el artículo 51 de la LGAPS establece que <u>los permisos de pesca tendrán una vigencia de 2 o hasta 5 años</u>, dependiendo de la pesquería que se trate y lo que determine el reglamento de dicha ley.

El último párrafo del artículo 50 del Reglamento de la LGAPS, publicado en el Diario Oficial de la Federación el día 29 de septiembre de 1999, establece que, en cada uno de los

permisos de pesca comercial, se consignará la vigencia de estos, es decir, de conformidad con lo expuesto en el párrafo inmediato anterior, en los propios permisos de pesca se establecerá la vigencia de los mismos.

Por último, la Ley de Pesca, abrogada el día 24 de julio de 2007 por la publicación de la LGAPS ("**Ley de Pesca**"), establecía en su artículo 11 que los permisos de pesca comercial tendrían una vigencia no podría exceder de 4 años.

Ahora bien, en el caso que nos ocupa, la demanda fue suscrita por 44 (cuarenta y cuatro) personas que se ostentan como supuestos pescadores, los cuales pretenden -*aunque de manera contraria a derecho*- acreditar su calidad de pescadores con copias certificadas de constancias de inscripción en el Registro Nacional de Pesca, sin embargo, tenemos que dichas copias certificadas:

1.  Cuarenta y tres de las cuarenta y cuatro[2] no son permisos de pesca, como lo establece la propia leyenda que se encuentra en el reverso de las mismas ("*EL PRESENTE CERTIFICADO NO CONSTITUYE PERMISO, CONCESIÓN O AUTORIZACIÓN PARA REALIZAR ACTOS DE PESCA*");

2.  Suponiendo sin conceder y en el remoto caso de que las mismas pudieran llegar a ser considerados como permisos de pesca, de conformidad con lo establecido en el artículo 51 de la LGPAS y el artículo 11 de la Ley de Pesca, 24 de las 44 se encontraban vencidos -*aún y cuando y suponiendo sin conceder que se hubieran otorgado por la vigencia máxima de 4 o 5 años respectivamente*- ya que 15 de ellos[3] fue expedido en el año 2004, 6 en el año de 2001[4], 2 en el año de 1999[5] y 1 en el año de 1989[6], y el derrame petrolero derivado del hundimiento de la Plataforma Deepwater Horizon en el Pozo Macondo tuvo lugar en el año 2010, es decir, en virtud de que los supuestos permisos de pesca fueron otorgados con fundamento en la Ley de Pesca, de conformidad con el artículo 11 de la abrogada ley, los supuestos permisos de pesca se encontraban vencidos hacía 2, 5, 7 y 17

---

[2] Sólo el de Jorge Bazan Cruz es un permiso de pesca, sin embargo, el mismo se había vencido 17 años antes de que sucediera el derrame petrolero derivado del hundimiento de la Plataforma Deepwater Horizon en el Pozo Macondo.
[3] Las constancias de registro en el Registro Nacional de Pesca expedidos en el año 2004 pertenecen a los CC. Juan de Dios Hernández Infante, Joaquín Cepeda Hernández, Raúl de Dios Hernández, Sergio Pérez García, Gregorio Rodríguez García, Martiniano Espino Cepeda, Gerardo Santiago García, Juan Hernández Aguirre, Marco Antonio Espino Cepeda, Arnulfo Pérez Cepeda, Antonio Cepeda Cortina, Héctor Cepeda García, Juan Carlos Guevara Abrajan, Apolinio Hernández Aguirre y Argelio Pérez García.
[4] Remigio Torres Arellano, Hilario Rivera Rodriguez, Octavio Guerra Quiñones, Jorge Luis Lozano Barrientos, Norberto Vela Peña y Juan Cepeda Vela.
[5] Rosendo Vela Chávez y Lucas García Salvador.
[6] Jorge Bazan Cruz.

años respectivamente, al momento de que sucedió el derrame petrolero antes mencionado;

3. Diez de cuarenta y cuatro[7] supuestos permisos de pesca, son ilegible, por lo que no puede ni debe considerarse como que los mismos se encontraban o se encuentran vigentes; y,

4. Diez de los cuarenta y cuatro[8] supuestos permisos de pesca fueron expedidos en el año 2011 al amparo de la LGPAS, es decir, al momento del derrame petrolero que se menciona anteriormente, 10 de las personas que firmaron la demanda (incluyendo al representante común el C. Elidio Cepeda Vela), no tenían el carácter de pescadores por lo tanto, es inconcuso decir que, suponiendo sin conceder que el derrame petrolero hubiera afectado al medio ambiente mexicano, los 10 supuestos pescadores antes mencionados no habrían sufrido afectación alguna, ya que ni siquiera eran pescadores al momento de tuvo lugar el multicitado derrame petrolero.

Dicho lo anterior, es inconcuso decir que los firmantes de la demanda que por la presente vía se contesta, no acreditan su carácter de pescadores y por lo tanto, no acreditan ser parte de la colectividad supuestamente afectada por el derrame petrolero derivado del hundimiento de la Plataforma Deepwater Horizon en el Pozo Macondo, ya que los documentos con los que pretenden acreditar dicho carácter (i) no son permisos de pesca, (ii) suponiendo sin conceder y en el remoto caso de que los mismos pudieran llegar a ser considerados como permisos de pesca, los varios de ellos no se encontraban vigentes al momento de que ocurrió el multicitado derrame petrolero, ni al momento de que se presentó la demanda de acción colectiva que nos ocupa, (iii) algunos de los supuestos permisos de pesca son ilegibles y (iv) algunos de los supuestos permisos de pesca fueron expedidos con posterioridad al derrame petrolero.

Por los motivos antes expuestos, desde este momento se controvierte y objeta en cuanto a su alcance y valor probatorio los documentos con los cuales los firmantes de la demanda de acción colectiva pretenden acreditar su carácter de pescadores de los estados del Golfo de México y por ende, su pertenencia a la colectividad supuestamente afectada por el derrame petrolero ocasionado por el hundimiento de la Plataforma Deepwater Horizon en el Pozo Macondo.

Aunado a lo anteriormente expuesto, se hizo una solicitud de información a la Dirección General de Ordenamiento Pesquero y Acuícola de la Comisión Nacional de Acuacultura y Pesca,

---

[7] Margarito Cepeda Quiñones, Pedro Iván Peña Rivera, Armando Cepeda Ochoa, Norberto Cepeda Vela, Jesús Vela Gamez, Santana Saldivar Quiñones, Luis Felipe Lozano Álvarez, Sosimo Vela Arellano
[8] Elidio Cepeda Vela, Julián García Cortina, Octavio Vela Cortina, Federico Vela Cepeda, Rosendo Cepeda Vela, Joel Cepeda Acosta, Inocencio García Pérez, Jaime Cortina Vela, Francisco Cepeda Espino y Martin Portillo García.

mediante la cual le solicitaba que se le informara "… *sobre la solicitud, alcance, vigencia y existencia de los permisos ya sean de pesca comercial en sus modalidades o de pesca de fomento, autorización para pescar en alta mar o en aguas de jurisdicción extranjera con embarcaciones de matrícula y bandera mexicanas y concesiones de pesca comercial para la captura y/o extracción de recursos pesqueros de…*" Elidio Cepeda Vela, Juan de Dios Hernández Infante , Joaquín Cepeda Hernández, Joaquín Hernández Cepeda, Remigio Torres Arellano, Margarito Cepeda Quiñones, Pedro Iván Peña Rivera, Julián García Cortina, Hilario Rivera Rodríguez, Jesús Vela Gámez, Armando Cepeda Ochoa, Norberto Vela Cepeda, Octavio Guerra Quiñones, Santana Saldivar Quiñones, Jorge Luis Lozano Barrientos, Luis Felipe Lozano Álvarez, Octaviano Vela Cortina, Federico Vela Cepeda, Sosimo Vela Arellano, Rosendo Cepeda Vela, Raúl de Dios Hernández, Norberto Vela Peña, Juan Cepeda Vela, Inocencio García Pérez, Salvador Lucas García, Rosendo Vela Yáñez, Pedro Cepeda Acosta, Sergio Pérez García, Gregorio Rodríguez García, Martiniano Espino Cepeda, Gerardo Santiago García, Jaime Cortina Vela, Francisco Cepeda Espino, Octavio Vela Cepeda, Martín Portillo García, Juan Hernández Aguirre, Marco Antonio Espino Cepeda, Arnulfo Pérez Cepeda, Antonio Cepeda Cortina, Héctor Cepeda García, Juan Carlos Guevara Abrajan, Apolonio Hernández Aguirre, Argelio Pérez García, Jorge Luis Bazán Cruz, Adalberto Cepeda Beas, Joel Cepeda Acosta, Jorge Aurelio Cepeda Ruíz , Arnulfo Espino Vela, Virgilio Hinojosa Arellano, Reyes Hinojosa Rivera, Germán Cepeda Hinojosa, Guadalupe Cepeda Portillo, Antonio Villareal Cepeda, Antonio Vela Cepeda, Jesús Espino Vela, Adrián Cortina Cruz, José Guadalupe Cepeda Mireles, Juan Espino Medina, Eliud García Villareal, Hermilio Ochoa Arellano, Eulogio Ochoa Cepeda, Andrés Cástulo Cepeda García, Ricardo Cepeda Hinojosa, Federico Cortina Vela, Omar González Cepeda, Jorge Cepeda Cepeda, Arturo Gámez Cepeda, Josué Mireles Cepeda, Silviano Padrón Cortina, Abelardo Cepeda Flores, Antonio Ortega Palacios, Alberto Velázquez Barajas, Guadalupe Álvarez Vázquez, Gilberto Cortina Vela, Tomas Melgarejo Callejas, José Manuel Bazán Cruz, Francisco Guerra Quiñonez y Leonel Hernández Herrera, solicitud a la cual le recayó el número de expediente 0819700001516 (en lo sucesivo referida únicamente como la "Solicitud 0819700001516"), la cual fue resuelta en la Segunda Sesión Ordinaria del Ejercicio Fiscal 2016 de la Comisión Nacional de Acuacultura y Pesca, de fecha 16 de febrero de 2016.

La respuesta que le recayó a la Solicitud 0819700001516 fue en el sentido siguiente:

"[…]

*Al respecto me permito informar a usted que esta Dirección General, realizó una búsqueda exhaustiva entre sus archivos físicos y digitales no encontrando información solicitada, relacionada con la petición de información de los permisos de pesca comercial en sus modalidades o de pesca de fomento, autorización para pescar en altamar o aguas de*

*jurisdicción extranjera con embarcaciones de matrícula y bandera mexicanas y concesión de pesca comercial para la captura y/o extracción de recursos pesqueros, de acuerdo a la relación proporcionada de pescadores por el solicitante.*

*[…]*

*En ese sentido y después del análisis y revisión a los oficios de respuesta correspondientes a las Direcciones Generales de Ordenamiento Pesquero y Acuícola, Inspección y Vigilancia, Planeación, Programación y Evaluación, Organización y Fomento, Infraestructura y a las Unidades de Asuntos Jurídicos y Administración, en los cuales declaran la inexistencia de la información solicitada, **el Comité de Información confirma la inexistencia de la información referente a los permisos de pesca comercial en sus modalidades o de pesca de fomento, autorización para pescar en altamar o aguas de jurisdicción extranjera con embarcaciones de matrícula y bandera mexicanas y concesión de pesca comercial para la captura y/o extracción de recursos pesqueros, de acuerdo a la relación proporcionada de pescadores,** lo anterior, de conformidad con lo establecido en artículo 46 de la Ley Federal de Transparencia y Acceso a la Información Pública Gubernamental y 70, fracción V de su Reglamento.*

*[…]"*

[Énfasis añadido]

Adjunto al presente como **Anexo 27** copia simple de la resolución que le recayó a la Solicitud 0819700001516.

En virtud de lo expuesto hasta aquí, es claro que todos o casi todos los supuestos pescadores de los estados del Golfo de México que promueven la demanda de acción colectiva que nos ocupa, no son titulares de los derechos que mencionan en su escrito inicial de demanda ya que en primer lugar, los mismos no tenían ni a la fecha tienen el carácter de pescadores de conformidad con la legislación aplicable, por lo que ni siquiera en el supuesto sin conceder que el derrame petrolero que se menciona a lo largo del presente escrito hubiera afectado el medio ambiente mexicano, es claro que la supuesta actividad económica de los pretensos no se habría visto afectada de manera alguna, y en segundo lugar, porque en el caso particular que nos ocupa no existe evidencia alguna de que dicho derrame petrolero haya afectado al medio ambiente mexicano o a la economía mexicana y mucho menos, a la actividad pesquera de los estados del Golfo de México.

63

Lo anteriormente expuesto, se robustece con los criterios jurisprudenciales que a continuación me permito transcribir:

*Época: Novena Época*
*Registro: 178189*
*Instancia: Tribunales Colegiados de Circuito*
*Tipo de Tesis: Aislada*
*Fuente: Semanario Judicial de la Federación y su Gaceta*
*Tomo XXI, Junio de 2005*
*Materia(s): Civil*
*Tesis: I.11o.C.133 C*
*Página: 813*

*LEGITIMACIÓN AD CAUSAM DEL ACTOR. DEBE EXAMINARSE EN LA SENTENCIA DEFINITIVA Y NO A TRAVÉS DE UN INCIDENTE.*

*De conformidad con la jurisprudencia 2a./J. 75/97, de la Segunda Sala de la Suprema Corte de Justicia de la Nación "Por legitimación procesal activa se entiende la potestad legal para acudir al órgano jurisdiccional con la petición de que se inicie la tramitación del juicio o de una instancia. A esta legitimación se le conoce con el nombre de ad procesum y se produce cuando el derecho que se cuestionará en el juicio es ejercitado en el proceso por quien tiene aptitud para hacerlo valer, a diferencia de la legitimación ad causam que implica tener la titularidad de ese derecho cuestionado en el juicio. La legitimación en el proceso se produce cuando la acción es ejercitada en el juicio por aquel que tiene aptitud para hacer valer el derecho que se cuestionará, bien porque se ostente como titular de ese derecho o bien porque cuente con la representación legal de dicho titular. La legitimación ad procesum es requisito para la procedencia del juicio, mientras que la ad causam, lo es para que se pronuncie sentencia favorable.". Así cuando el motivo para tratar de desconocer esa legitimación ad procesum o evidenciar que el actor adolece de ella radica en que no es titular del derecho sustantivo (porque confesó que cedió el crédito a otro) invariablemente se cae en el terreno de la legitimación en la causa, es decir, tal planteamiento incide esencialmente en el desconocimiento de la legitimación en la causa, pues se aduce que el actor dejó de ser el titular del derecho en disputa, lo que no significa otra cosa que se trata de una cuestión netamente perentoria que sólo debe examinarse en la sentencia definitiva que en el caso se dicte en el juicio natural. De este modo, si se aduce que el actor ya no es titular del derecho del crédito por haberlo cedido a otro y que, por ello, ha dejado de ostentarse como titular de ese derecho, no es otra cosa que el desconocimiento de la legitimación en la causa, pues se le pretende desconocer el derecho que ostenta, lo cual sólo puede ser materia de sentencia definitiva y no de un incidente, por mucho que el incidentista diga que él sólo quiere que se desconozca la legitimación procesal, pues ésta no se puede separar del derecho en la causa, por serle inherente, es decir, el legitimado en la causa lo está ad procesum; de ahí que no sea posible que con base en la misma causa (cesión del crédito) el actor pierda primero la legitimación procesal desatender que esa*

64

*legitimación es el complemento inseparable de la legitimación en la causa, la cual sólo puede desconocerse en el fallo definitivo y no antes. Esto es, mientras el actor tenga el derecho sustantivo, es decir, que sea titular del derecho a disputar (legitimación en la causa), y el cual sólo puede examinarse, declararse, reconocerse o extinguirse en la sentencia definitiva, entonces mientras no se llegue a ella, es evidente que si el juicio está vivo, el actor tiene legitimación ad procesum, la cual no se puede destruir con una situación que en el fondo mira a desconocer el derecho disputado. Por tanto, si la legitimación en la causa es la identidad de la persona que ejerce el derecho, con la titular de él, de tal suerte que sólo quien cuenta con ella puede obtener sentencia favorable, en la especie, tendrá legitimación en la causa quien sea dueño del crédito reclamado en el juicio natural quien, desde luego, tiene legitimación procesal para reclamar ese derecho, el cual sólo puede desconocerse en el fallo definitivo.*

*DÉCIMO PRIMER TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.*

*Amparo en revisión 377/2004. Francisco José Prisciliano Carriedo Martínez y otra. 24 de septiembre de 2004. Unanimidad de votos. Ponente: Indalfer Infante Gonzales. Secretario: Eduardo Jacobo Nieto García.*

*Véase: Semanario Judicial de la Federación y su Gaceta, Novena Época, Tomo XIV, julio de 2001, página 1000, tesis VI.2o.C. J/206, de rubro: "LEGITIMACIÓN, ESTUDIO OFICIOSO DE LA."*

*Nota: La tesis 2a./J. 75/97 citada, aparece publicada en el Semanario Judicial de la Federación y su Gaceta, Novena Época, Tomo VII, enero de 1998, página 351, con el rubro: "LEGITIMACIÓN PROCESAL ACTIVA. CONCEPTO."*
*[Énfasis añadido]*

*Época: Séptima Época*
*Registro: 248443*
*Instancia: Tribunales Colegiados de Circuito*
*Tipo de Tesis: Aislada*
*Fuente: Semanario Judicial de la Federación*
*Volumen 199-204, Sexta Parte*
*Materia(s): Civil*
*Tesis:*
*Página: 99*

*LEGITIMACION "AD-CAUSAM" Y LEGITIMACION "AD-PROCESUM".*

*La legitimación en el proceso y la legitimación en la causa son situaciones jurídicas distintas, toda vez que la primera de ellas, que se identifica con la falta de personalidad o capacidad en el actor, se encuentra referida a un presupuesto procesal, necesario para el ejercicio del derecho de acción que pretenda hacer valer quien se encuentre facultado para actuar en el proceso como actor, demandado o tercero; la falta de personalidad se refiere a la capacidad, potestad o facultad de una persona física o moral, para comparecer en juicio, a nombre o en representación de otra persona, en los términos de los artículos 44 a 46 del Código de*

65

*Procedimientos Civiles, por lo que si no se acredita tener personalidad," legitimatio ad procesum", ello impide el nacimiento del ejercicio del derecho de acción deducido en el juicio; es decir, la falta de dicho requisito procesal puede ser examinada oficiosamente por el Juez de la instancia, conforme lo dispone el artículo 47 del Código de Procedimientos Civiles, o bien opuesta como excepción por el demandado en términos de lo preceptuado por la fracción IV del artículo 35 de dicho ordenamiento, en cuyo caso, por tratarse de una excepción dilatoria que no tiende a destruir la acción ejercitada, sino que retarda su curso, y además de previo y especial pronunciamiento, puede resolverse en cualquier momento, sea durante el procedimiento o en la sentencia; en cambio, **la legitimación activa en la causa es un elemento esencial de la acción que presupone o implica la necesidad de que la demanda sea presentada por quien tenga la titularidad del derecho que se cuestiona, esto es, que la acción sea entablada por aquella persona que la ley considera como particularmente idónea para estimular en el caso concreto la función jurisdiccional**; por tanto, tal cuestión no puede resolverse en el procedimiento sino únicamente en la sentencia, por tratarse de una cuestión de fondo, perentoria; así, estima este Tribunal Colegiado que cuando la Suprema Corte de Justicia de la Nación alude a que la legitimación puede estudiarse de oficio en cualquier fase del juicio, se refiere a la legitimación "ad procesum", no a la legitimación ad causam. En consecuencia, si la parte demandada niega el derecho que hace valer la parte actora, por considerar aquélla que ésta no es la titular del derecho litigioso, resulta inconcuso que se trata de una excepción perentoria y no dilatoria que tiende a excluir la acción deducida en el juicio, por lo que tal cuestión debe examinarse en la sentencia que se llegue a pronunciar en el juicio.*

*TERCER TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.*

*Novena Epoca:*

*Amparo directo 6073/98. Alfredo Brum Guadarrama. 13 de agosto de 1998. Unanimidad de votos. Ponente: José Becerra Santiago. Secretario: Heriberto Pérez Reyes.*

*Séptima Epoca, Sexta Parte:*

*Volúmenes 199-204, página 99. Amparo en revisión 289/85. Julio Jalil Tame y otra. 31 de octubre de 1985. Unanimidad de votos. Ponente: José Rojas Aja. Secretario: Enrique Ramírez Gámez.*
[Énfasis añadido]

Como bien lo establecen los criterios jurisprudenciales antes transcritos, sólo aquellas personas que la ley considera titulares de un derecho pueden ejercitar la acción. En el caso que nos ocupa, sólo las personas que supuestamente sufrieron afectaciones en sus derechos por el derrame petrolero derivado del hundimiento de la Plataforma *Deepwater Horizon* en el Pozo Macondo, podrían llegar a ser considerados como titulares de los mismos, es decir, únicamente

aquellos que hubieran acreditado ser pescadores de los estados del Golfo de México de conformidad con la legislación aplicable, tendrían legitimación activa *ad causam* para promover demanda de acción colectiva.

3.- LA EXCEPCIÓN DE INCOMPETENCIA.- La cual se hace consistir en el hecho de que los Tribunales Mexicanos no son competentes para resolver la controversia planteada por los pretensos demandantes, toda vez que tal y como la propia parte actora manifiesta y reconoce a todo lo largo de su escrito de demanda, los supuestos hechos generadores de los *-inexistentes y por demás indemostrados-* supuestos "daños" en que pretenden fundar el ejercicio de las improcedentes acciones colectivas intentadas por su parte, esto es, el derrame de crudo derivado del incidente suscitado en la Plataforma *Deepwater Horizon* y las acciones implementadas para contenerlo y llevar a cabo la limpieza respectiva, tuvieron lugar <u>fuera</u> del territorio mexicano y, por ende, en todo caso es de considerar que tanto los mismos, como cualquiera de sus supuestas consecuencias, se encontrarían en todo caso sometidos a la competencia territorial y jurisdicción de otro Estado soberano *-los Estados Unidos de América-*, lo que, en opinión de mi representada, basta a su vez para confirmar la total improcedencia de la infundada demanda que ahora se contesta, ya que, de lo contrario, no sólo se estaría invadiendo la esfera de soberanía territorial de otro Estado, sino que además se estarían violentando los principios internacionales relativos al ámbito espacial de aplicación de las leyes mexicanas cuya supuesta infracción pretenden, injustificada e incorrectamente, alegar los pretensos demandantes dentro del libelo inicial que en este acto se contesta.

En este sentido, cabe recordar que el artículo 12 del Código Civil Federal vigente, establece que:

> *"**Artículo 12**.- Las leyes mexicanas rigen a todas las personas que se encuentren en la República, así como los actos y hechos <u>ocurridos en su territorio o jurisdicción</u> y <u>aquéllos que se sometan a dichas leyes</u>, salvo cuando éstas prevean la aplicación de un derecho extranjero y salvo, además, lo previsto en los tratados y convenciones de que México sea parte".*

[Énfasis añadido]

Lo que, a contrario sensu, implica con meridiana claridad que las leyes mexicanas <u>no rigen</u> a las personas que no se encuentren dentro del territorio de la República, así como <u>tampoco a los actos o hechos ocurridos fuera de su territorio o jurisdicción</u>, ni

pueden estimarse aplicables a personas que no se hayan sometido a dichas leyes *-como sucede en la especie, dado que es claro que ni la operación de la Plataforma Deepwater Horizon, ni las actividades de exploración, explotación o extracción de hidrocarburos del Pozo Macondo, se encontraron sometidas a la jurisdicción, ni a la competencia, ni al ámbito territorial de las autoridades y/o las leyes mexicanos-*.

Sin perjuicio de lo anterior, cabe a su vez recordar lo que establece el artículo 24, fracción IV, del Código Federal de Procedimientos Civiles, mismo que a continuación me permito transcribir en la parte conducente:

> "***ARTICULO 24.**- Por razón de territorio es tribunal competente:*
>
> *[…]*
>
> *IV.- <u>El del domicilio del demandado, tratándose de acciones</u> reales sobre muebles o de acciones personales, <u>**colectivas**</u> o del estado civil;*
>
> *[…]"*

[Énfasis añadido]

Como se desprende de la transcripción del artículo anterior, el juez competente para conocer de las acciones colectivas será aquel en el cual la parte demandada tenga su domicilio, en el caso que nos ocupa, mi representada es una persona moral extranjera que tiene su domicilio y principal asiento tanto de sus negocios, como de sus operaciones, en los Estados Unidos de América *-extremo que en la práctica no puede en forma alguna desvirtuado por el hecho de que, para el simple efecto de no quedar en estado de indefensión, haya señalado el domicilio netamente procesal en el que se pretendió llevar a cabo su emplazamiento al presente juicio, al que se ha atendido por una simple cuestión de consideración y respeto a este órgano judicial, pero sin que pueda pasar inadvertido que tanto la competencia del Tribunal, como el estricto acatamiento de las leyes sustantivas aplicables, así como el respeto al debido cumplimiento a las normas y principios del debido proceso, constituyen cuestiones de fondo del todo imprescindibles que, por tanto, deben ser analizadas y calificadas incluso de oficio por los órganos judiciales en cualquier etapa del procedimiento, por no tratarse de cuestiones subsanables, ni convalidables en forma alguna-*, por tanto, en el supuesto sin conceder de que se llegara a estimar que mi representada pudiera ser considerada como parte demandada en el presente juicio, no sería óbice para dejar de considerar tanto la falta de jurisdicción y competencia de los tribunales mexicanos, aunado al hecho de que la *Litis* materia del presente juicio no se encuentra reservada exclusivamente a los tribunales nacionales, es decir, la *Litis* materia del presente juicio

68

no se encuadra en ninguno de los supuestos contenidos en el artículo 568 del Código Federal de Procedimientos Civiles.

Lo anterior queda acreditado con las constancias del juicio, aunado a todos y cada uno de los documentos que se adjuntan al presente escrito y que han quedado debidamente relacionados en el capítulo de *antecedentes* del presente ocurso, en específico, con el Convenio firmado con el Gobierno de los Estados Unidos Mexicanos en el mes de febrero de este año, 2018, del cual se desprende que este último reconoció, entre otros, que hasta este momento no existe evidencia que el multicitado derrame petrolero haya afectado de manera alguna a los mares, costas, territorio, pesquerías, medio ambiente o economía mexicana.

**4.- LA EXCEPCIÓN DE FALTA DE LEGITIMACIÓN PASIVA.** La cual se hace consistir en que la parte actora demanda a una persona moral distinta a mi representada, ya que como se desprende del propio escrito inicial de demanda, la parte actora ejercita la acción colectiva en contra de la sociedad denominada "BP America Production Company **Inc.**", sin embargo, la denominación correcta de mi representada es BP America Production Company.

Es de explorado derecho y reconocida jurisprudencia que la legitimación en la causa es un presupuesto procesal, es decir, la parte actora tiene la obligación de acreditar que la parte en contra de la cual dirige su acción es efectivamente la obligada, permitiéndome transcribir los siguientes criterios jurisprudenciales para mayor claridad en la exposición:

> "*Época: Novena Época*
> *Registro: 163322*
> *Instancia: Tribunales Colegiados de Circuito*
> *Tipo de Tesis: Aislada*
> *Fuente: Semanario Judicial de la Federación y su Gaceta*
> *Tomo XXXII, Diciembre de 2010*
> *Materia(s): Civil*
> *Tesis: XV.4o.16 C*
> *Página: 1777*
>
> *LEGITIMACIÓN EN LA CAUSA. CONSTITUYE UNA CONDICIÓN DE LA ACCIÓN Y NO UN PRESUPUESTO PROCESAL.*
>
> *Los presupuestos procesales son los requisitos sin los cuales no puede iniciarse ni tramitarse con eficacia jurídica un proceso. Por ello, se trata de cuestiones de orden público que deben ser analizadas incluso de oficio por el juzgador, antes de efectuar el estudio del fondo del asunto. Los presupuestos procesales deben distinguirse de las condiciones de la acción, ya que éstas son necesarias para que el actor obtenga una sentencia favorable.*

*Entre los presupuestos procesales se encuentran la competencia, la procedencia de la vía, la personalidad y el litisconsorcio pasivo necesario. En cambio, entre <u>las condiciones de la acción se encuentra la legitimación en la causa</u>, que consiste en la calidad en virtud de la que una acción o derecho puede ser ejercido, por o contra una persona en nombre propio. <u>Así, la legitimación en la causa puede ser vista desde dos ángulos: como la identidad de la persona del actor, con aquel a quien la ley concede la acción (legitimación activa), y como la identidad de la persona del demandado, con aquella contra la cual es concedida la acción (legitimación pasiva). La legitimación en la causa constituye una condición de la acción porque únicamente en el supuesto de que se acredite la legitimación del actor y del demandado, tiene posibilidad de éxito la demanda, pues si falta en una o en otra parte, la demanda tiene que ser desestimada.</u>*

*CUARTO TRIBUNAL COLEGIADO DEL DÉCIMO QUINTO CIRCUITO.*

*Amparo directo 514/2010. BBVA Bancomer, S.A., Institución de Banca Múltiple, Grupo Financiero, BBVA Bancomer; antes Bancomer, S.A., Institución de Banca Múltiple; antes Bancomer, S.N.C. 7 de octubre de 2010. Unanimidad de votos. Ponente: Rubén David Aguilar Santibáñez. Secretario: Luis Fernando Zúñiga Padilla.*
[Énfasis añadido]

*Época: Novena Época*
*Registro: 204816*
*Instancia: Tribunales Colegiados de Circuito*
*Tipo de Tesis: Aislada*
*Fuente: Semanario Judicial de la Federación y su Gaceta*
*Tomo II, Julio de 1995*
*Materia(s): Civil*
*Tesis: X.1o.2 C*
*Página: 262*

**PERSONALIDAD, EXCEPCION DE FALTA DE, Y FALTA DE LEGITIMACION PASIVA. SON CUESTIONES JURIDICAS DISTINTAS.**

*La excepción de falta de personalidad en el demandado estriba en la inexistencia de un presupuesto procesal, consistente en que dicho demandado no tiene el carácter o la representación con la cual se le demanda; de proceder la excepción, los efectos son que no se tenga por entablada la relación procesal, sin perjuicio de que ésta se establezca posteriormente, al subsanarse el defecto, por tratarse de una excepción dilatoria. Pero <u>si lo que se argumenta es que el demandado no es la persona obligada, esto implica alegar falta de legitimación pasiva, la cual constituye un requisito integrante de la acción sobre el cual debe resolverse en la sentencia.</u>*

*PRIMER TRIBUNAL COLEGIADO DEL DECIMO CIRCUITO.*



*Amparo directo 228/95. Emilia Almazán Salas. 25 de mayo de*
*1995. Unanimidad de votos. Ponente: Fernando Hernández Piña.*
*Secretaria: Adelita Méndez Cruz.*
[Énfasis añadido]

*Época: Séptima Época*
*Registro: 248925*
*Instancia: Tribunales Colegiados de Circuito*
*Tipo de Tesis: Aislada*
*Fuente: Semanario Judicial de la Federación*
*Volumen 187-192, Sexta Parte*
*Materia(s): Civil*
*Tesis:*
*Página: 107*

**PERSONALIDAD EN EL DEMANDADO, EXCEPCION DE**
**FALTA DE, Y FALTA DE LEGITIMACION PASIVA. SON**
**CUESTIONES JURIDICAS DISTINTAS.**

*La excepción de falta de personalidad en el demandado estriba en*
*la inexistencia de un presupuesto procesal, consistente en que*
*dicho demandado no tiene el carácter o la representación con la*
*cual se le demanda; de proceder la excepción, los efectos son que*
*no se tenga por entablada la relación procesal, sin perjuicio de*
*que ésta se establezca posteriormente, al subsanarse el defecto,*
*por tratarse de una excepción dilatoria. Pero si <u>lo que se</u>*
*<u>argumenta es que el demandado no es la persona obligada, esto</u>*
*<u>implica alegar falta de legitimación pasiva, la cual constituye un</u>*
*<u>requisito constitutivo de la acción sobre el cual debe resolverse en</u>*
*<u>la sentencia.</u>*

*TRIBUNAL COLEGIADO DEL NOVENO CIRCUITO.*

*Amparo en revisión 403/84. Rafael Castro Torres. 13 de*
*septiembre de 1984. Unanimidad de votos. Ponente: Enrique*
*Arizpe Narro. Secretario: Faustino Azpeitia Arellano.*

[Énfasis añadido]

No omito hacer notar a su Señoría que, como se aprecia del escrito inicial de demanda, la parte actora demandó, entre otros, a la sociedad denominada BP America Production Company <u>Inc.</u>, siendo que el nombre correcto de mi representada es BP America Production Company, es decir, una sociedad distinta a la que la parte actora señala en su escrito inicial de demanda.

En efecto, su Señoría ordenó mediante acuerdo de fecha 2 de diciembre de 2015, emplazar a la sociedad denominada BP America Production Company <u>Inc.</u> para que esta última dé contestación a la demanda de acción colectiva instaurada en su contra, sin embargo, contrario a lo que ordenó su Señoría, se emplazó a mi representada al presente juicio para dar contestación a la demanda de acción colectiva; es decir, se emplazó a BP America Production Company en

lugar de BP America Production Company <u>Inc.</u>, para que, de conformidad con lo establecido en el artículo 592 del Código Federal de Procedimientos Civiles diera contestación a la demanda.

Lo anterior implica que la demanda fue incoada en contra de una persona moral distinta a mi representada, por tanto, deberá de ser esa persona moral la que sea emplazada al presente juicio y no mi representada, como ilegalmente aconteció.

Por lo anteriormente expuesto, su Señoría deberá de dictar una resolución en virtud de la cual se absuelva a mi representada de todas y cada una de las prestaciones que se le demandan, ya que como se ha mencionado anteriormente, mi representada no es la persona moral en contra de la cual la parte actora promueve su acción.

**5.- LA EXCEPCIÓN DE OBSCURIDAD Y FALTA DE ACCIÓN.-** Derivada de las irregularidades del escrito de demanda, que dejan en un estado de indefensión a mi representada, pues dichas omisiones e irregularidades le impiden preparar en forma oportuna y adecuada las excepciones y defensas.

El artículo 322 del Código Federal de Procedimientos Civiles, establece los requisitos que debe contener el escrito de demanda, a efecto de que se considere como legalmente planteada y permita a su contraparte defenderse legalmente en juicio, precepto legal que me permito transcribir en su parte conducente:

> "*ARTICULO 322.- La demanda expresará:*
>
> *I.- El tribunal ante el cual se promueva;*
>
> *II.- El nombre del actor y el del demandado. Si se ejercita acción real, o de vacancia, o sobre demolición de obra peligrosa o suspensión y demolición de obra nueva, o sobre daños y perjuicios ocasionados por una propiedad sobre otra, y se ignora quién sea la persona contra la que deba enderezarse la demanda, no será necesario indicar su nombre, sino que bastará con la designación inconfundible del inmueble, para que se tenga por señalado al demandado. Lo mismo se observará en casos análogos, y el emplazamiento se hará como lo manda el artículo 315;*
>
> *III.- <u>Los hechos en que el actor funde su petición, narrándolos sucintamente, con claridad y precisión, de tal manera que el demandado pueda producir su contestación y defensa;</u>*
>
> *IV.- Los fundamentos de derecho, y*
>
> *V.- Lo que se pida, designándolo con toda exactitud, en **términos claros** y precisos.*
> [Énfasis añadido]

Tales omisiones e imprecisiones quedaron debidamente precisadas en el cuerpo del presente escrito de contestación de demanda, a cuyo contenido integral me remito en obvio de repeticiones y por economía procesal, para todos los efectos legales a que haya lugar; sin que, al respecto, pueda en forma alguna pasar inadvertido que, tal y como de explorado derecho y conocida jurisprudencia resulta, no pueden subsanarse ni inferirse en las constancias que se acompañaron al escrito inicial de demanda, pues los hechos y sus especiales circunstancias, deben forzosa e imperativamente contenerse en dicho escrito, y no en otros documentos, pues en todo caso, los datos contenidos en estos últimos debieron transcribirse y precisarse expresamente en los hechos del escrito inicial de demanda y no inferirlos ni pretender subsanar sus omisiones remitiéndonos a al documento fundatorio de la acción.

Las dolosas imprecisiones y omisiones en los hechos que narra la parte actora en su escrito inicial de demanda, con las que pretende fundar su improcedente acción y, al mismo tiempo, confundir a su Señoría y a esta parte, impiden fundadamente, y en perjuicio del derecho fundamental de audiencia consagrado en el artículo 14 de nuestra Carta Magna, que mi representada despliegue de manera adecuada su defensa en juicio; considerar lo contrario implicaría el total estado de indefensión a mi representada, que dicho sea de paso, por la obscuridad e insuficiencia de la demanda que se contesta, se encuentra ya menoscabada.

Desde este momento pido a su Señoría se sirva tomar en consideración que a la parte actora no le será permitido con posterioridad, en ninguna de las etapas procesales subsecuentes, ahondar, aumentar o subsanar las deficiencias presentadas en su escrito de demanda, en virtud de que la *Litis* ya se encuentra fijada y la ley prohíbe cualquier modificación a la misma. A fin de fundamentar lo anteriormente expuesto, me permito transcribir la siguiente JURISPRUDENCIA:

> "*Época: Novena Época*
> *Registro: 190323*
> *Instancia: Tribunales Colegiados de Circuito*
> *Tipo de Tesis: Jurisprudencia*
> *Fuente: Semanario Judicial de la Federación y su Gaceta*
> *Tomo XIII, Febrero de 2001*
> *Materia(s): Civil, Común*
> *Tesis: VI.2o.C. J/198*
> *Página: 1654*
>
> *DEMANDA. LOS HECHOS CONSTITUTIVOS DE LA ACCIÓN QUE SE INTENTA DEBEN PRECISARSE Y NO INFERIRSE DE LAS PRUEBAS QUE SE ACOMPAÑEN.*
>
> *Resulta ilegal aceptar que se tengan como hechos de la demanda, los contenidos en las constancias que se ofrezcan como prueba y se acompañen a la misma, porque se deja en estado de indefensión a la parte demandada.*

*SEGUNDO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL SEXTO CIRCUITO.*

*Amparo directo 492/99. Bancomer, S.A., Institución de Banca Múltiple, Grupo Financiero. 12 de agosto de 1999. Unanimidad de votos. Ponente: Gustavo Calvillo Rangel. Secretario: Humberto Schettino Reyna.*

*Amparo directo 501/99. Banco Bilbao Vizcaya México, S.A., Institución de Banca Múltiple, Grupo Financiero BBV Probursa. 27 de agosto de 1999. Unanimidad de votos. Ponente: José Mario Machorro Castillo, secretario de tribunal en funciones de Magistrado por ministerio de ley, en términos del artículo 81, fracción XXII, de la Ley Orgánica del Poder Judicial de la Federación. Secretario: Gonzalo Carrera Molina.*

*Amparo directo 294/2000. Bancomer, S.A., Institución de Banca Múltiple, Grupo Financiero. 29 de junio de 2000. Unanimidad de votos. Ponente: Antonio Meza Alarcón. Secretario: Enrique Baigts Muñoz.*

*Amparo directo 558/2000. Bancomer, S.A., Institución de Banca Múltiple, Grupo Financiero. 11 de enero de 2001. Unanimidad de votos. Ponente: Gustavo Calvillo Rangel. Secretario: Humberto Schettino Reyna.*

*Amparo directo 584/2000. Multibanco Comermex, S.A., Institución de Banca Múltiple, Grupo Financiero Inverlat. 18 de enero de 2001. Unanimidad de votos. Ponente: Gustavo Calvillo Rangel. Secretario: Humberto Schettino Reyna.*

*Véase: Semanario Judicial de la Federación, Octava Época, Tomo IX, marzo de 1992, página 178, tesis VI.1o.83 C, de rubro: "DEMANDA. LOS HECHOS CONSTITUTIVOS DE LA ACCIÓN QUE SE INTENTA DEBEN PRECISARSE Y NO INFERIRSE DE LAS PRUEBAS QUE SE ACOMPAÑEN.".*

Todo lo anterior, evidencia la notoria oscuridad del escrito de demanda y la evidente falta de acción y carencia de derecho, lo cual hace procedente la presente excepción, por la desigualdad que implica a las partes y la indefensión que produce a mi representada, además de constituir una violación expresa a disposiciones procedimentales de orden público, lo que deberá de ser considerado en el momento procesal oportuno.

Por último, la presente excepción se relaciona con todos y cada uno de los antecedentes y hechos que se contestan con el presente ocurso.

6.- **SINE ACTIONE AGIS.** La que se hace consistir en todas y cada una de las excepciones y defensas derivadas del contenido integral del presente escrito, en todo lo que pueda favorecer a los intereses de mi representada, aunado a la negativa de los hechos y pretensiones planteados por los pretensos demandantes, revirtiéndose en consecuencia la carga de la prueba a la parte actora en el presente juicio, remitiéndome en obvio de repeticiones innecesarias a todos y cada

74

uno de los señalamientos que al efecto han quedado debidamente expuestos, fundados y motivados en el cuerpo del presente escrito, permitiéndome transcribir dada su importancia la siguiente JURISPRUDENCIA:

"*Época: Octava Época*
*Registro: 219050*
*Instancia: Tribunales Colegiados de Circuito*
*Tipo de Tesis: Jurisprudencia*
*Fuente: Gaceta del Semanario Judicial de la Federación*
*Núm. 54, Junio de 1992*
*Materia(s): Común*
*Tesis: VI. 2o. J/203*
*Página: 62*

*SINE ACTIONE AGIS.*
*La defensa de carencia de acción o sine actione agis, no constituye propiamente hablando una excepción, pues la excepción es una defensa que hace valer el demandado, para retardar el curso de la acción o para destruirla, y la alegación de que el actor carece de acción, no entra dentro de esa división. Sine actione agis no es otra cosa que la simple negación del derecho ejercitado, cuyo efecto jurídico, solamente puede consistir en el que generalmente produce la negación de la demanda, o sea, el de arrojar la carga de la prueba al actor, y el de obligar al juez a examinar todos los elementos constitutivos de la acción.*

*SEGUNDO TRIBUNAL COLEGIADO DEL SEXTO CIRCUITO.*

*Amparo directo 144/88. María Trinidad Puga Rojas. 6 de septiembre de 1988. Unanimidad de votos. Ponente: Gustavo Calvillo Rangel. Secretario: José Mario Machorro Castillo.*

*Amparo directo 68/89. Celia Alonso Bravo. 7 de marzo de 1989. Unanimidad de votos. Ponente: Gustavo Calvillo Rangel. Secretario: José Mario Machorro Castillo.*

*Amparo directo 442/89. Rodrigo Bernabé García y Sánchez y otro. 21 de noviembre de 1989. Unanimidad de votos. Ponente: Gustavo Calvillo Rangel. Secretario: José Mario Machorro Castillo.*

*Amparo directo 104/92. Flotilde Barcala Rubio. 25 de marzo de 1992. Unanimidad de votos. Ponente: Gustavo Calvillo Rangel. Secretario: Jorge Alberto González Alvarez.*

*Amparo directo 167/92. Fernando Ortiz Pedroza. 29 de abril de 1992. Unanimidad de votos. Ponente: Gustavo Calvillo Rangel. Secretario: Jorge Alberto González Alvarez.*

Por lo expuesto y fundado;

A USTED, C. JUEZ de la manera más atenta solicito se sirva:

**PRIMERO.-** Tenerme por presentado en los términos del presente escrito, con la personalidad con la cual me ostento como apoderado legal de BP AMERICA PRODUCTION COMPANY.

**SEGUNDO.-** Tener por contestada en tiempo y forma la demanda instaurada en contra de mi representada, al tenor de las manifestaciones que se hacen valer a lo largo del presente escrito.

**TERCERO.-** Previos trámites que en Derecho correspondan, dictar la sentencia que en derecho corresponde, en la que se declare la improcedencia de las acciones colectivas intentadas por la parte actora y se absuelva a mi representada de todas y cada una de las prestaciones reclamadas.

A t e n t a m e n t e

Ciudad de México, México, a la fecha de su presentación.

