UNITED STATES DISTRICT COUT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010 | * * * * * * | MDL No. 2179 |
| | | SECTION J |
| | | Honorable Carl J. Barbier |
| The document relates to: Case No. 2:13-cv-02026 | * * | Magistrate Judge Wilkinson, Jr. |

* * * * * * * * * * * * * * * * * *

## MEMORANDUM IN SUPPORT OF MOTION FOR AWARD OF ATTORNEYS' FEES

Plaintiff/Defendant in Intervention Talen's Marine & Fuel, LLC ("Movant" or "Talen's") files this Memorandum in Support of its Motion for Award of Attorneys' Fees. In support, Talen's alleges as follows:

### I.     ARGUMENT SUMMARY

This is a dispute regarding the allocation of attorneys' fees between Talen's previous counsel who was discharged for cause, Andry Lerner LLC ("Andry Lerner"), and Talen's subsequent counsel, The Law Offices of A. Craig Eiland, PC ("Eiland"). The fee at issue results from representing Talen's in its claims in *In Re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*; MDL No. 2179, which were ultimately ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

Under Louisiana law and the relevant facts, Andry Lerner is ultimately entitled to a zero to fifteen percent attorney fee allocation. When an attorney is discharged for cause, determining the fee allocation between discharged and subsequent counsel is a four-step process. First, the court will determine if the discharge was for cause. Second, the court will determine the amount of the fee according to the *Saucier* rule, by determining the highest ethical contingency fee contractually

agreed to by the client.  Third, the court allocates the fee between counsel based on the *Saucier* factors.  Fourth, the court then considers the "nature and gravity of the cause" which contributed to the dismissal and reduces by a percentage amount the portion discharged counsel otherwise would receive after the *Saucier* allocation.

Here, as explained below, the proper allocation based on the *Saucier* factors – and prior to the "for cause" percentage reduction – is a *minimum* sixty percent to Eiland and a *maximum* forty percent to Andry Lerner.  Significantly, however, after considering the nature and gravity of Andry Lerner's improper and unethical conduct, any fee allocated to Andry Lerner should be reduced by up to one-hundred percent.  The culpable conduct underlying Andry Lerner's discharge for cause is detailed in the September 6, 2013 report of Special Master Louis J. Freeh (Doc. 14221) and the findings of this Court.

Specifically, this Court found members of the Andry Lerner firm violated the following Louisiana Rules of Professional Conduct:

- 1.5(e) regarding the division of fees between lawyers who are not in the same firm;
- Rule 3.3 by making false statements during the course of the Special Master's investigation;
- Rule 8.4(c) by engaging in conduct involving dishonesty, deceit, and misrepresentations; and
- Rule 8.4(a) by assisting each other in violating the Rules of Professional Conduct.

In addition to these violations, this Court found that Jonathan Andry and Glen Lerner engaged in conduct that caused damage to the integrity of the Court Supervised Settlement Program ("CSSP") and was prejudicial to the administration of justice, a violation of Rule 8.4(d). In addition to this unethical conduct which violated the Rules of Professional Conduct, Talen's discharged Andry Lerner for "many egregious problems with [its] representation," including lack

2

of responsiveness to phone calls and requests for information, and lack of information regarding Talen's claim status. If an attorney is rewarded with a fee award following a pattern of disregard such as this, attorneys will have little incentive to comply with the rules or honor their obligations to clients and this Court. As such, Movant asks this Court to allocate one-hundred to eighty-five percent of the fee to Eiland and zero to fifteen percent of the fee to Andry Lerner.

## II.     PROCEDURAL AND JURISDICTIONAL STATEMENT

The parties have previously submitted themselves to the jurisdiction of this Court for the purposes of resolving this dispute. On April 6, 2016, Andry Lerner filed its Complaint of Intervention, seeking a judgment in an "amount commensurate with work performed" on behalf of Talen's. (Doc. 16150). On May 6, 2016, Talen's filed its Answer to Complaint of Intervention, asserting that Andry Lerner was not entitled to any fee and seeking a dismissal of the Complaint. (Doc. 17043). In addition, the Full and Final Release, Settlement, and Covenant Not to Sue, which was entered into by Talen's and the BP entities, provides that this Court has jurisdiction over any disputes arising thereunder.

## III.     CHRONOLOGY OF RELEVANT EVENTS

At all relevant times, Talen's was in the business of providing dock service facilities and supplying diesel fuel, motor fuel, and lubricants to the Gulf of Mexico and Gulf Coast marine industry and to vessels operating in both the Gulf and intercoastal waterways. Talen's served the following industries: fishing, seafood, coastal farming and ranching, drilling supply, international shipping, cruise ships, tourism, general marine commerce and transportation, and inland and offshore oil production. Talen's asserted seven separate claims in the CSSP; one for each of the following dock locations: Fourchon, Galveston, Houma, Lake Charles, Morgan City, Port Arthur, and 193 Dock.

On May 11, 2011, Talen's engaged Jonathan B. Andry to represent it "in all matters pertaining to any and all claims which [it has] or may have against any and all liable parties as a result of the explosion and oil spill that come from the Deepwater Horizon Drilling Rig, which occurred on or about April 21, 2010." (Exhibit 1 – Andry Contract).[1] The agreed to contingency fee was twenty percent. *Id*. Business Economic Loss claims were submitted on behalf of five Talen's locations on October 4, 2012, and on behalf of two additional locations on December 21, 2012. (Exhibit 2 – DHECC Claimant Activity). These two claims were later resubmitted as Start-Up Business Economic Loss claims on March 15, 2013. Talen's total claim for all seven entities was just over $13,000,000. *Id*.

Sometime around June 20, 2013, following allegations in the Associated Press concerning alleged improprieties at the DHECC involving Lionel Sutton and Andry Lerner, this Court imposed a stay on all Andry Lerner represented claims, including all of Talen's claims, pending further investigation. In July of 2013, this Court appointed Louis J. Freeh as Special Master to perform an independent investigation into the allegations of misconduct within the CSSP. On September 6, 2013, Special Master Freeh submitted his initial report to the Court. The report was filed into the public record. (Doc. 11287). In that report, Mr. Freeh concluded that Andry Lerner had engaged in unethical, deceitful conduct that included the following:

- That "Mr. Lerner and Mr. Jon Andry utilized and benefited from Mr. Sutton's attorney position inside the CAO in furtherance of their Andry Lerner clients' claims." (*Id*. at 5);

- That "[t]he evidence discloses repeated efforts by Mr. Sutton, at times acting for the specific behest and to the special advantage of Mr. Jon Andry and Mr. Lerner, to determine the status of their DHECC claims, facilitate their processing, and expedite payments." (*Id*. at 6);

---

[1] Talen's has not seen, and is unaware of the existence of, an attorney/client contract between it and Andry Lerner LLC.

4

- That "[t]he undisclosed financial interest between Mr. Sutton and Mr. Jon Andry tainted and corrupted the integrity of the DHECC process . . . ." (*Id*. at 10);

- ". . . evidence of an agreement among Mr. Sutton, Mr. Jon Andry, and Mr. Lerner to corrupt the DHECC process in order to enrich themselves." (*Id*. at 21); and

- That "Mr. Jon Andry's statements to the Special Master about his knowledge of these fees paid to Mr. Sutton, and when he knew it, are contradicted by his own contemporaneous email correspondence and phone and text messaging records." (*Id*. at 29).

Talen's claims were specifically discussed in the Special Master's report, wherein the Special Master discussed the following examples of misconduct:

- "Mr. Jon Andry sent Mr. Sutton two more text messages, followed minutes later with Mr. Sutton reviewing Mr. Jon Andry's Talen's Marine claim in the DHECC database . . . ." (*Id*. at 32);

- " . . . Mr. Sutton searched the DHECC database for a claim by Talen's Marine & Fuel, LLC, which was among the claimants included in Mr. Jon Andry's email to Mr. Patrick Juneau from the prior day. The Talen's claim had previously been disallowed by the GCCF because it was a moratorium claim. Between 9:55 a.m. and 11:10 a.m. that day, Mr. Sutton and Mr. Andry exchanged 11 text messages. At 4:21 p.m., Mr. Sutton again searched the DHECC database for a claim by Talen's Marine & Fuel, LLC. Mr. Sutton exchanged text messages with Mr. Jon Andry starting at 5:06 p.m." (*Id*. at 50);

- "Despite Mr. Jon Andry's claimed 'frustration' and lack of information, on the afternoon of March 7, within hours of the lunch, Mr. Sutton sent Mr. Jon Andry six text messages and appeared to speak by cell phone to both Messrs. Jon and Gibby Andry. Between these communications, Mr. Sutton reviewed DHECC records on the Talen's claim that were of interest to Mr. Jon Andry." (*Id*. at 51);

- "Mr. Sutton stated that Mr. Jon Andry had requested information about a specific claim concerning an entity named Talen's, which Mr. Patrick Juneau had asked him to review." (*Id*. at 52);

- "Mr. Sutton stated that Mr. Jon Andry was asking why the claim was taking so long to be processed, and Mr. Sutton explained that additional tax records were required. Mr. Sutton stated that Mr. Jon Andry 'didn't understand why he needed to do that.'" (*Id*.);

- "In a March 8, 2013 email, Mr. Sutton reported to Mr. Lerner: I had lunch with Jon yesterday. … I am working with him to get your Talens claim pushed through as quick as possible." (*Id*. at 52-53); and

5

- "Mr. Jon Andry also initiated several communications with CAO staff in order to expedite AndryLerner's Talen's Marine claim. Specifically, Mr. Jon Andry pressed Mr. Duval to reassign the Talen's claim to speed up processing." (*Id*. at 57).

While Andry Lerner may claim the improprieties found by the Special Master were misunderstood instances of zealous advocacy, the fact is that the above-described communications triggered "red flags" and additional scrutiny of Talen's claims, and the result was that Talen's claims were shuffled to the back of the line, re-reviewed, substantially delayed, and, perhaps, reduced in value.[2]

Following the Special Master's initial report, this Court ordered the parties to show cause as to why the Court should not adopt the Special Master's findings and recommendations. The parties filed extensive briefs, with supporting documents, and the Special Master filed a response.

On September 11, 2013, five days after the Freeh report was filed, Talen's contacted the Eiland firm and requested to discuss the handling of its BP claims. Talen's informed Eiland that it was terminating Andry's representation and hiring new counsel. Talen's vetted Eiland's qualifications and experience in handling BP cases over the course of the following weeks. On October 23, 2013, Talen's hired Eiland to represent the Talen's entities with respect to all claims relating to the Deepwater Horizon oil spill. (Exhibit 4 – Eiland Contract). The agreed upon contingency fee was twenty percent. *Id*.

In a letter dated October 24, 2013, after consulting with outside counsel, Talen's terminated Mr. Jon Andry's representation for cause with respect to all matters for which he was engaged. (See Exhibit 5 – Termination Letter). Talen's cited the Special Mater's report as a basis in support

---

[2] According to Andry, perhaps on inside information, Talen's claims were not subject to any moratoria issues and were designated as tourism by the respective reviewers. (Exhibit 3 – Email from Andry to Eiland). This, of course, turned out not to be the case after the settlement program was stopped and Talen's claims were flagged and re-reviewed.

of its "for cause" termination and identified other "egregious problems" with Mr. Andry's representation, including lack of responsiveness to phone calls and requests for information and failure to communicate regarding claim status. *Id*. On February 14, 2014, Andry Lerner filed into Talen's claim portal a Request to Withdraw as Primary Counsel for each Talen's entity; followed by filing a Notice of Lien on May 2, 2014. (Ex. 2 – DHECC Claimant Activity; Ex. 6 – Notice of Lien).

An evidentiary hearing on the recommendations contained in the Freeh Report was held on November 7, 2014, which was attended by Eiland attorneys. At the conclusion of the hearing, this Court discussed the harm arising from Andry Lerner's misconduct:

> The harm that's been done by all that's occurred in this case here is to the integrity of this Court Supervised Settlement Program, to the integrity of the legal system. The fallout from what started with Mr. Sutton's misconduct and mushroomed from there has caused or created a tremendous injury to what we are doing here. It ultimately led to much of what's happened since then in the sense of claims being delayed, the claims program being shut down for a period of time, a tremendous amount of adverse publicity, criticisms of Mr. Juneau, of the claims facility, of the Court, of everybody concerned with this. I'm not suggesting that Mr. Sutton and these others are responsible for all of that. I'm suggesting that this is where it started. So it's a contributing factor to all of that that's unfortunately occurred and we have had to deal with. So there has been harm.

(Doc. 13675 – Transcript of Evidentiary Hearing Before the Honorable Carl J. Barbier United States District Judge).

On February 26, 2015, this Court entered its Order Concerning the Special Master's Report of September 6, 2013. (Doc. 14221). After providing an overview of the parties' improper conduct, this Court found as follows:

> Sutton, Andry, and Lerner violated Rule 1.5(e) [of the Louisiana Rules of Professional Conduct] regarding the division of fees between lawyers who are not in the same firm. Likewise, Sutton and Andry violated Rule 3.3 by making false statements during the scope of the Special Master's investigation. Sutton, Andry, and Lerner violated Rule 8.4(c) by engaging in conduct involving dishonesty, deceit and misrepresentation, and Rule 8.4(a) by assisting each other in violating the Rules

7

>of Professional Conduct.  Each of these attorneys engaged in conduct that caused damage to the integrity of the CSSP and was prejudicial to the administration of justice, a violation of Rule 8.4(d).

*Id*. at 4.

This Court then sanctioned Jon Andry and Glen Lerner by disqualifying them from participating in the CSSP – in essence, confirming Andry's termination for cause.  In doing so, this Court stated that:

>these attorneys shall not represent any claimants in the program, shall withdraw from any current representations, and may not collect attorneys' fees in connection with the settlement program, except as follows: The Andry Lerner law firm will be allowed to collect fees for previous legal work actually performed on legitimate claims that qualify for payments from the CSSP.

Doc. 14221 at 5.

Despite Andry's representation to Eiland that Talen's claims were designated as tourism resulting in a huge award, the processing of Andry Lerner's current and former client's claims (including Talen's) resumed (with certain new procedures) in early 2014.[3]  The CSSP issued Incompleteness Notices for two Talen's entities in November of 2014.  (See Exhibit 2 – DHECC Claimant Activity).  Followed by two Follow-Up Incompleteness Notices on January 6, 2015 and five more Follow-Up Incompleteness Notices on May 27, 2015.  *Id*.  The Eiland Law Firm diligently responded to these requests over next five months.

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

---

[3] (See Doc. 21971 - Order Granting Motion to Modify (a) February 26, 2015 Order Concerning the Special Master's Recent Report of September 6, 2013 Imposing Certain Sanctions and (b) February 12, 2014 Amended and Superseding Order on Joint Motion to Modify January 2, 2014 Order Approving Procedure for Payment of Certain Claims of Clients of the AndryLerner Law Firm).  The January 2, 2014 and February 12, 2014 Orders are under seal, but presumably allowed for the processing of Talen's claim to resume.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████

     ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

The total attorney fee to be allocated is ███████████, plus any fee resulting from the HESI/Transocean settlement. The parties have agreed to hold the fee in trust until they reach an agreement or obtain a court order. The parties have attempted to reach an agreement. The parties have attempted in good faith to settle this instant dispute for months, including an unsuccessful mediation on March 28, 2019. Unfortunately, the parties are at an impasse.

### IV. ARGUMENT & AUTHORITIES

Andry Lerner should be awarded zero to fifteen percent of any attorney fee because the percentage penalty for the "nature and gravity" of its improper conduct is greater than any percentage allocated to Andry Lerner under *Saucier*. A court's apportionment of the attorneys' fee between discharged and subsequent counsel is a four-step process.

- First, the Court must first determine whether discharged counsel was terminated for cause.

- Second, once a "for cause" determination is made, the court must calculate the highest ethical contingency fee to which the client contractually agreed in any of the contingency fee contracts executed. *O'Rourke v. Cairns*, 683 S.2d 697, 704 (La. 1996).

- Third, the court should then allocate the fee between or among discharged and subsequent counsel based upon the *Saucier* factors. *Id*.

- Fourth, the court should consider the nature and gravity of the cause which contributed to the dismissal and reduce by a percentage amount the portion discharged counsel otherwise would receive after the *Saucier* allocation. *Id*.

Here, the nature and gravity of Andry Lerner's improper conduct is extraordinary, and the appropriate percentage reduction should be greater than the fee percentage allocated to Andry Lerner under *Saucier*. As such, one-hundred to eight-five percent of the attorney fee should be award to Eiland.

### A.     Andry Lerner Was Discharged for Cause.

Louisiana courts recognize that the attorney-client relationship is far more complex than simply whether the attorney is performing his or her duties in the proper manner. *Langley v. Norton*, 2003 U.S. Dist. LEXIS 15426, *17 (E.D. La., August 19, 2003) (citing *O'Rourke*, 683 So.2d at 703 n. 14). As such, under Louisiana law, a finding of discharge for cause does not simply depend upon a finding that the Rules of Professional Conduct were violated. *Id*. (citing *Osborne v. Vulcan Foundry, Inc.*, 699 So.2d 492, 497 (La. App. 4th Cir. 1997). Louisiana courts look to whether the client's confidence was eroded by the actions or in actions of the attorney. *Id*. Here, the client's lack of confidence triggered the discharge of Andry Lerner.

After consulting with independent outside counsel, Andry Lerner was terminated for cause in writing by Talen's on October 24, 2013. (See Ex. 5 – Termination Letter). The bases for the "for cause" discharge were the findings set out in the Freeh Report and the "many other egregious problems with [Andry's] representation" including lack of responsiveness to phone calls, requests

10

for information, and lack of information regarding the status of Talen's claim. On February 26, 2015, this Court did indeed find Andry Lerner violated several Rules of Professional Conduct and essentially terminated "for cause" Andry Lerner's representation of claimants in the CSSP. Given the facts in their totality, Andry Lerner cannot legitimately argue that Talen's confidence was not eroded because it clearly was. Therefore, this Court should conclude that Andry Lerner was discharged for cause.

### B.     The Highest Ethical Contingency Fee is Twenty Percent.

Both the Andry Lerner and Eiland attorney/client contracts provide for a twenty percent contingency fee. This is five percent below the Court mandated maximum attorney fee of twenty-five percent in cases resolved through the CSSP. A twenty percent contingency fee is both reasonable and ethical given the size and complexity of the Talen's claim. Given the fee agreements, the contingency fee for the purposes of this instant fee allocation must be twenty percent.

### C.     Attorney Fee Allocation Under the *Saucier* Factors.

Based on the *Saucier* factors, Eiland should receive a *minimum* sixty percent of the attorney fee; and a *maximum* forty percent should be allocated to Andry Lerner (only to then be reduced and reallocated to zero to fifteen percent as discussed below). Under *Saucier*, the proportionate legal services between discharged and subsequent counsel are determined according to the following factors contained in Rule 1.5(a) of the Rules of Professional Conduct:

(1)  The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) The fee customarily charged in the locality for similar legal services;

(4) The amount involved and the results obtained;

(5) The limitations imposed by the client or by the circumstances;

(6) The nature and length of the professional relationship with the client;

(7) The experience, reputation, and ability of the lawyer or the lawyers performing the services; and

(8) Whether the fee is fixed or contingent.

*Saucier v. Hayes Dairy Prods., Inc.*, 373 So. 2d 102, 116 (La. 1979).  Factors (2), (3), (5), and (8) do not appear to apply to the instant analysis.  Therefore, only the other factors will be addressed.

### 1. *The Time and Labor Required (Saucier Factor One)*

In the present context, this factor can be more accurately described as the work performed and time spent by each firm.  It is impossible to know the exact amount of time spent by either firm because Eiland, and it appears Andry, did not kept time records, as is typical when working under a contingency fee agreement.  Any attempts to accurately recreate time provides ample opportunity for subjectivity.  In this regard, Movant has serious concerns that any "time" provided by Andry Lerner could be inflated.  It is also no doubt lost on this Court that a substantial amount of the work done on large and complicated BP claims, such as Talen's, is performed by accountants, and this Court has limited Andry's recovery to "legal work actually performed." (Doc. 14221).  This work performed by accountants does not weigh in favor of either law firm.

Perhaps the best way to accurately consider the work performed by each firm is to consider the major categories of work / events with respect to Talen's claims.  In this regard, a review of the following documents is helpful: (1) Talen's claimant activity log on the DHECC portal (Exhibit 2); (2) Andry Lerner's Notice of Third-Party Lien (Exhibit 5); and (3) claim work spreadsheets

exchanged between Eiland and Andry Lerner.[4]  A review of the foregoing shows the firms engaged in the following general activities:

| *Andry Lerner* | *Eiland* |
| --- | --- |
| <ul><li>Filed claims with the GCCF (ultimately denied)</li><li>3 meetings with Mr. Feinberg</li><li>Reviewed and analyzed client's financial data</li><li>Communicated with client over a period of 29 months</li><li>Unsuccessful effort to get claim not classified as moratoria</li><li>Reviewed and analyzed expert reports</li><li>Communications with experts</li><li>Filed seven claims with the DHECC</li><li>Provided client's financial information to DHECC</li><li>Communicated with DHECC accountants</li><li>Responded to 7 Incompleteness Notices</li><li>Responded to 7 Follow-Up Incompleteness Notices</li></ul> | <ul><li>Reviewed and analyzed client's financial data</li><li>Communicated with client over a period of 63 months</li><li>Reviewed and analyzed expert reports</li><li>Provided client's financial documents to the DHECC</li><li>Communicated with DHECC accountants</li><li>Responded to Incompleteness Notices for 2 client entities</li><li>Responded to Follow-Up Incompleteness Notices for 7 client entities</li><li>Filed briefing with DHECC disputing the moratoria hold placed on the claims</li><li></li></ul> |

Regarding the volume of work performed, it appears that the volume for each firm was largely the same and included, namely, reviewing financial records.  However, for the sake of argument only, Andry Lerner may have done more work on the Talen's claim than Eiland and, therefore, *Saucier* Factor One may weigh in favor of Andry Lerner.  Accordingly, Movant submits to the Court that – as a starting point only – sixty percent to Andry and forty percent to Eiland is a proper allocation of the work performed and time spent on this claim.  This, however, is only the beginning of the *Saucier* allocation, and such an allocation would be incorrect once the other factors are applied, as further explained.

---

[4] See Exhibit 9 – Eiland Work; Exhibit 10 – Andry Work.

### 2.     *The Amount Involved and The Results Obtained (Saucier Factor Four)*

*Saucier* Factor four considers the "results obtained." Here, both firms performed work that contributed to Talen's claim ultimately being paid. However, as detailed above, Andry Lerner's conduct within the settlement program resulted in Talen's claim being stayed, re-reviewed and heavily scrutinized, and apparently placed at the end of the settlement line. The net result to Talen's was a significant delay in payment and, perhaps, a significant decrease in recovery. In contrast, Eiland was able to increase ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. This was an overwhelmingly positive result for Talen's and one that was unmatched by any comparable event Andry Lerner can claim to have achieved on behalf of the client. Clearly, *Saucier* Factor Four weighs in favor of Eiland.

### 3.     *The Nature and Length of the Professional Relationship with the Client (Saucier Factor Six)*

Eiland represented Talen's for approximately 63 months.[5] Andry Lerner represented Talen's for only 29 months.[6] *Saucier* Factor Six weighs heavily in favor of Eiland.

### 4.     *The Experience, Reputation, and Ability of the Lawyer(s) Performing the Services (Saucier Factor Seven)*

*Saucier* Factor Seven is particularly relevant given the reasons for the discharge of Andry Lerner. Lawyers market themselves as able and experienced but unless one has worked with or against a particular lawyer, it is difficult to truly gauge an attorney's experience, reputation, and ability. Here, Mr. Andry was admitted to the Louisiana Bar in 1990 and Mr. Eiland was admitted to the Texas bar in 1987. Their degree of experience is comparable on paper.

---

[5] See Ex. 4 – Eiland Contract and Ex. 8 – Talen's Settlement Agreement.

[6] See Ex. 1 – Andry Contract and Ex. 5 – Termination Letter.

14

With respect to reputation, Movant can only attest to what it has learned about Mr. Andry and Mr. Lerner during this dispute. Mr. Eiland has a "Preeminent" rating for the "Highest Ethical Standards and Professional Excellence" by national rating frim, Martindale Hubbell.[7] Mr. Eiland is also a member of the prestigious American Board of Trial Advocates. *Id*. And Mr. Eiland served twenty years (1995 to 2015) as a Texas State Representative. *Id*. No such similar accolades appear on Mr. Andry's website. Accordingly, *Saucier* Factor Seven weighs in favor of Eiland.

In conclusion, based on the *Saucier* analysis, Eiland asks this Court to allocate a *minimum* of sixty percent of the fee to Eiland and a *maximum* of forty percent of the fee to Andry Lerner. Next, we turn to the *O'Rourke* reduction of Andry Lerner's fee.

### D. The *O'Rourke* Reduction of Andry Lerner's Fee.

Following the fee allocation between discharged and subsequent counsel, the court next considers the nature and gravity of the cause which contributed to the dismissal and reduces by a percentage amount the portion discharged counsel otherwise would have received after the *Saucier* allocation. *O'Rourke*, 683 So.2d at 704. *O'Rourke* is the seminal case on attorney fee disputes when an attorney is discharged for cause. In *O'Rourke*, the discharged attorney's fee was reduced by twenty-five percent for what the Court characterized as nonfeasance – namely, lack of communication with the client. *Id*. As such, based on Andry Lerner's lack of communication alone, a minimum fee reduction of twenty-five percent is warranted.

Here, Andry Lerner's conduct also constitutes malfeasance. As detailed above, its conduct, which included multiple violations of the Rules of Professional Responsibility, resulted in a stay and re-review of Talen's claim, which had the effect of causing significant delay and possibly a significant decrease in recovery. In addition to its malfeasance, Andry Lerner was discharged for

---

[7] https://www.eilandlaw.com/about-the-attorneys.

nonfeasance which included "lack of responsiveness to [Talen's] phone calls and requests for information, as well as a lack of information regarding the status of [Talen's] claim . . .." (See Ex. 5 – Termination Letter).  This lack of responsiveness and information is not surprising given that it was the improper conduct of Andry Lerner which was negatively impacting Talen's claim.

Andry Lerner's improper conduct harmed Talen's, harmed other claimants, and tarnished the image of the CSSP and this Court.  Given such egregious conduct, the Court should reduce Andy Lerner's allocated attorney fee by a minimum of fifty percent and up to one-hundred percent.  As such, Movant asks the Court to reduce Andry Lerner's allocated fee accordingly and award Andry Lerner zero to fifteen percent of the fee and award Eiland eighty-five to one-hundred percent of the fee.

## V.     CONCLUSION

For the reasons explained, Movant asks the Court to (1) find that Andry Lerner was discharged for cause; (2) find that the contingency fee that applies is twenty percent; (3) order that fee allocation under the *Saucier* factors is a minimum sixty percent to Eiland and a maximum forty percent to Andry Lerner; (4) order that, under *O'Rourke*, the fee allocated to Andry Lerner is reduced by fifty to one-hundred percent; and (5) order that zero to fifteen percent of the fee is awarded to Andry Lerner and eighty-five to one-hundred percent of the fee is awarded to Eiland. Dated: April 4, 2019.

                                    Respectfully submitted:

                                    By:  /s/  A. Craig Eiland
                                    The Law Offices of A. Craig Eiland, PC
                                    2200 Market Street, Suite 501
                                    Galveston, TX  77550
                                    Telephone: 409-763-3260
                                    Facsimile: 409-763-8154
                                    Email: ceiland@eilandlaw.com

**CERTIFICATE OF SERVICE**

    I hereby certify that the above and foregoing Memorandum has been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 4th day of April, 2019.

                                                  ___/s/ A. Craig Eiland_____
                                                  A. Craig Eiland