UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: OIL SPILL BY THE OIL RIG "DEEPWATER HORIZON" IN THE GULF OF MEXICO, ON APRIL 20, 2010<br><br>APPLIES TO:<br>All Civil Actions of the all BELO Plaintiffs and all Opt-Out Plaintiffs | Civil Action No. 2:10-MD-02179<br><br>SECTION: J<br><br>JUDGE CARL BARBIER<br><br>MAG. JUDGE WILKINSON |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR STAY PENDING APPEAL OF THE ORDER OF APRIL 16, 2019, OR, ALTERNATIVELY FOR 45 DAYS**

Back End Litigation Option ("BELO") Plaintiffs as well as any and all Opt-Out Plaintiffs ("Plaintiffs"), which currently number an estimated 4,000 to 5,000 putative members, with 20 years or more to come with future BELO cases including cancer cases, by and through their undersigned counsel, have moved this Court for an emergency stay of its April 16, 2019 Order (Rec. Doc. 25593) ("the April 16 Order") granting Defendants' motion to dispose of certain physical evidence relevant to Plaintiffs' claims. Plaintiffs respectfully request this Court should stay enforcement of the April 16 Order. Plaintiffs file this as an emergency motion because, absent a stay, the April 16 Order permits Defendants to destroy or dispose of the evidence by May 21, 2019, which is the evidence most directly related to exposure.

Plaintiffs seek a stay lasting either of the two alternative durations: (1) pending disposition of Plaintiffs' interlocutory appeal of the April 16 order[1], or (2) forty-five (45) days to allow Plaintiffs sufficient time to make arrangements to take custody of the samples that are subject to disposal under the April 16 Order. If the Court grants the 45-day stay, then Plaintiffs will dismiss their appeal, as that would render it moot.

---

[1] On May 15, 2019, Plaintiffs filed a notice of appeal of this Court's April 16 Order. (Rec. Doc. 25617).

1

## RELEVANT FACTS

**A. Facts relevant to the merits of BP's Motion and the District Court's disposition of same**

1. On December 12, 2018, BP moved the Court for an order granting it permission to dispose of approximately 140,000 samples consisting of, *inter alia*, "water samples," "tissue and sediment samples," and "waste samples," which BP had collected and was preserving in connection with the multi-district litigation (the "Subject Samples"). (Rec. Doc. 25226-1).

### *BP's arguments for destroying the Subject Samples*

2. According to BP, the Subject Samples were collected "approximately four to eight and a half years" ago in connection with BP's response to the Deepwater Horizon oil spill. (Rec. Doc. 25226-1, at 2).

3. BP stated that it has been storing the Subject Samples employing "robust standard operating procedures…to minimize any loss and degradation," but that "[d]ue to the amount of time that has passed since the samples were initially collected, the degradation of these samples has rendered them virtually unusable." (Rec. Doc. 25226-1, at 2).

4. BP did not submit any expert affidavits to support its argument that the Subject Samples are now worthless, instead asserting that they have "exceeded the maximum time in which samples can be held before analysis and still yield results that are considered reliable and valid under US EPA sampling protocols." (Rec. Doc. 25226-1, at 2). BP's motion then cited an EPA protocol titled "Methods of Chemical Analysis of Water and Wastes, Sample Preservation." (Rec. Doc. 25226-1, at 2).

5. BP sought this Court's permission to destroy or dispose of the Subject Samples, citing the "high cost, and extremely limited value, of requiring BP to continue to maintain this material in this costly format." (Rec. Doc. 25226-1, at 3).

6. BP argued that any potential harm to current and potential future plaintiffs was eliminated or mitigated because the Subject Samples "consist *primarily* of samples that have been analyzed and for which data is already available." (Rec. Doc. 25226-1, at 2).

7. BP offered to make that data – at least with respect to the Subject Samples for which any exists – available to "all requestors." (Rec. Doc. 25226-1, at 2). BP further asserted that "any party with pending claims related to this proceeding may request, at its own cost, a sample of this material before it is destroyed." (Rec. Doc. 25226-1, at 2-3).

8. BP's motion was silent as to how its proposed destruction of evidence would affect future Plaintiffs, including those whose injuries have not yet manifested themselves or who have developed injuries but have yet to file suit in this litigation, as expressly authorized by this Court.

### *Plaintiffs' arguments opposing destruction of the Subject Samples*

9. Two groups of Plaintiffs filed substantive oppositions to BP's Motion. One was the Downs Group Plaintiffs, who include: (1) approximately 800 "BELO Plaintiffs," whose injuries manifested after April 16, 2012; and (2) a small number of "Opt-Out Plaintiffs," who affirmatively opted out of the Medical Class Settlement. (Affidavit of Craig T. Downs, Esq., at ¶¶ 3-4) (attached hereto as **Exhibit A**). The Downs Group Plaintiffs filed an opposition on January 31, 2019. (Rec. Doc. 25360).

10. Another group of Plaintiffs, represented by the Nexsen Pruet law firm, comprising approximately 780 Opt-Out Plaintiffs, also filed an opposition to BP's Motion. (Rec. Doc. 25311).

11. All Opt-Out Plaintiffs' cases have been stayed, by court order, since January 12, 2011, with no discovery permitted to date in any of those cases. (See Rec. Doc. 983).

### *Plaintiffs' sworn evidence that the Subject Samples are not "virtually unusable"*

12. Plaintiffs filed several supporting affidavits contradicting BP's assertion that the Subject Samples were "virtually unusable."

3

13. The Downs Group Plaintiffs submitted the sworn declaration of Ira Leifer, a well-published expert in "marine petroleum hydrocarbon processes and fate," who "led the NASA airborne remote sensing campaign during the Deepwater Horizon oil spill." (Declaration of Ira Leifer, Rec. Doc. 25360-1, at ¶ 1) (attached hereto as **Exhibit B**).

14. Mr. Leifer attested that oil samples contain a "complex mixture of a wide range of compounds." (Leifer Decl. at ¶ 3). Some of those compounds, known as "biomarker compounds" are "extremely resistant to degradation" and "do not need special storage." (Leifer Decl. at ¶ 4). Others, known as "light volatile compounds" may degrade but, "if stored properly, these compounds can be preserved for very long time periods of years to dozens of years." (Leifer Decl. at ¶ 5). Mr. Leifer concluded that "even without proper storage *the samples can still prove to be useful in understanding and characterizing the toxicity of the oil and dispersants...*" (Leifer Decl. at ¶ 9).

15. The Nexsen Pruitt Plaintiffs submitted the affidavit of Dr. Marco Kaltofen, a "civil engineer experienced in investigating the environmental fate and transport of petroleum, hazardous and radioactive materials." (Affidavit of Dr. Marco Kaltofen, Rec. Doc. 25311-1, at ¶ 1) (attached hereto as **Exhibit C**).

16. Dr. Kaltofen attested that BP's assertion that the Subject Samples "have degraded over the past eight or so years to the point of unreliability or uselessness is unfounded." (Kaltofen Aff. at ¶ 9). He added that the duration of storage "is not meaningful with respect to how useful or reliable any chemical and analytical data that can be extracted from it is." (Kaltofen Aff. at ¶ 10).

17. Dr. Kaltofen further attested that "there are many testing methods and analyses that produce concrete, reliable data on chemicals and samples such as [the Subject Samples] that exist outside of the US EPA's guide that BP references." (Kaltofen Aff. at ¶ 11).

4

18. Dr. Kaltofen also noted that many of the Subject Samples "have admittedly not been tested at all" (Kaltofen Aff. at ¶ 9), and that, as for the remainder, "[i]t is possible that the testing methods used to analyze the samples that have been analyzed were insufficient, incomplete or flawed." (Kaltofen Aff. at ¶ 12). He then proceeded to discuss several specific relevant analyses that BP may not have performed on the Subject Samples. (Kaltofen Aff. at ¶ 12).

### *Plaintiffs' sworn evidence demonstrating the relevance of the Subject Samples*

19. The Downs Group Plaintiffs also submitted the affidavit of Dr. Patricia M. Williams, a board-certified toxicologist and one of their experts on specific causation. (Affidavit of Patricia M. Williams, Rec. Doc. 25360-1) (attached hereto as **Exhibit D**).

20. Dr. Williams's Affidavit explained precisely how the Subject Samples are relevant to the Plaintiffs' cases — namely, by providing ***concrete evidence*** of exposure to harmful amounts of hazardous substances.

21. Dr. Williams began by observing that "[o]ne of the considerations included in rendering an opinion of Specific Causation is…Measure of Dose – Are there exposure measures that are applicable to the exposures of the individual?" (Williams Aff. at ¶ 6.0).

22. She then added that Plaintiffs "must have the opportunity to seek analysis techniques…to determine exposure of the plaintiffs in concentrations of exposure relevant to human health." (Williams Aff. at ¶ 8.0). Dr. Williams then quoted the Federal Judicial Center's *Reference Guide on Toxicology of the Reference Manual on Scientific Evidence* (the "Reference Manual"), a seminal treatise routinely used by federal judges to assist them with understanding scientific causation evidence. (Williams Aff. at ¶ 9.0).

23. Quoting the Reference Manual, Dr. Williams noted that one of the three accepted ways of measuring exposure to a harmful substance is that "exposure can be directly measured in the medium in question." (Williams Aff. at ¶ 9.0).

5

24. Dr. Williams then attested that, "[d]estruction of the [Subject Samples] *would prevent the analysis of the samples for the Direct Measurement of Exposure concentrations*, which is the primary method mentioned in the [Reference Manual]." (Williams Aff. at ¶ 9.0).

25. Thus, Dr. Williams made clear that destroying the Subject Samples would prevent Plaintiffs from being able to employ the "primary method" of establishing their level of exposure, a critical element of showing specific causation.

### *BP provides some additional information about the Subject Samples that further demonstrates their relevance*

26. On December 24, 2018, 12 days after filing its initial motion, BP made a supplemental filing providing some additional information concerning the Subject Samples. (Rec. Doc. 25243, 25243-1).

27. The filing included a 5,743-page spreadsheet listing the 140,000 Subject Samples, with columns for the following data: a sample identification number; the "physical media" in which the sample is being stored; the "matrix," which is a general description of the material; a sample collection date; latitude-and-longitude coordinates identifying where it was collected; and the state and county or parish where it was collected. (Rec. Doc. 25243-1). For many of the 140,000 Subject Samples, one or more categories of data is missing, particularly the collection date and/or geolocation. (*See* Rec. Doc. 25243-1).

28. Thus, having the Subject Samples would permit a plaintiff not only to demonstrate the presence of specific levels of hazardous substances (*see* ¶¶ 19-25 *supra* (discussing Williams Affidavit)), but would also permit that plaintiff to establish his or her proximity to those dangerous levels, based on the collection dates and latitude-longitude data, which is a mandatory requirement of the Master Settlement Agreement.

29. In order to match the collection date/location data of any given Subject Sample to an individual plaintiff, however, a plaintiff would require a list of the specific locations where he

6

or she performed cleanup operations. Due to the passage of time and the fact that many recovery workers labored for weeks or even months at many different locations across the Gulf Coast, most Plaintiffs do not have a detailed record of their exposure locations. (Craig Downs Aff. at ¶ 5). However, Plaintiffs are aware that BP has comprehensive lists of work locations for many, if not all, recovery workers — *i.e.*, the overwhelming majority of current and potential future plaintiffs in this litigation. (Craig Downs Aff. at ¶ 6).

30. In fact, since receiving the collection date and location data from BP, the undersigned Plaintiffs' counsel has been able to definitively establish that a Downs Group BELO Plaintiff was working at the sites where 90 Subject Samples were collected within approximately 100 feet of the client on or about the collection dates. (Craig Downs Aff. at ¶ 7). Once Plaintiffs' counsel are able to obtain work site locations for their individual plaintiffs during the course of discovery, counsel expects they will be able to establish similar matches for most Plaintiffs, thus providing critical evidence for proving general and specific causation. (Craig Downs Aff. at ¶ 8).

31. In short, while the Subject Samples in the aggregate are unquestionably highly relevant to Plaintiffs' claims, it is impossible for any individual plaintiff to make a meaningful evaluation as to which of the Subject Samples may be relevant to his or her specific case – at least not until Plaintiffs receive the necessary detailed work site information that is now in BP's exclusive possession and control.[2]

**B. Additional facts relevant to staying enforcement of the April 16 Order for at least 45 days to allow Plaintiffs to take custody of the Subject Samples**

32. After extensive briefing on BP's Motion, but without conducting an evidentiary hearing or considering oral argument, this Court entered the April 16 Order, granting BP's motion and directing as follows:

---

[2] This is known as Shoreline Coastal Assessment Technology or "SCAT data."

> Within 35 days of this Order, plaintiffs that have objected to BP's Motion may take custody of any samples BP seeks to dispose that plaintiffs wish to preserve, with shipping and storage of such requested samples to be at the objecting plaintiffs' expense;
>
> If within 35 days of this Order, plaintiffs do not elect to take custody of the samples as provided above, BP may dispose of the samples identified in its Motion at Exhibit A.

(Rec. Doc. 25593, at 2).

33. Under the Court's April 16 Order, the deadline for destruction or disposal of the Subject Samples is presently **May 21, 2019**.

34. Counsel for the Downs Group Plaintiffs subsequently engaged in negotiations with BP to arrange a visit to the storage facility where BP is storing the Subject Samples to evaluate the feasibility of the Downs Group Plaintiffs taking custody of some or all of the Subject Samples. (*See* Craig Downs Aff. at ¶ 9).

35. On Thursday, May 9, 2019, Craig T. Downs personally visited the storage facility in Fort Collins, Colorado, along with a licensed private investigator and two of the Downs Group Plaintiffs' experts (who photographed hundreds of samples and videotaped approximately each individual sample review) to gain a better understanding of the volume of the Subject Samples and determine what arrangements would be needed if the Downs Group Plaintiffs were to take custody of some or all of the Subject Samples. (Craig Downs Aff. at ¶¶ 9-10).

36. Based on that visit, the Downs Group Plaintiffs informed BP's counsel that they are willing to take custody of the Subject Samples and store them, at their expense, while they continue to inspect, analyze, and evaluate them. (Craig Downs Aff. at ¶ 11).

37. However, due to logistical challenges — including chain of custody issues and the need to transport and store such a large volume of hazardous materials under conditions suitable for maintaining their integrity so as to avoid potential degradation and/or spoliation — the Downs Group Plaintiffs are unable to take custody of the Subject Samples before the current May 21,

8

2019 destruction deadline imposed by the District Court's April 16 Order. (Craig Downs Aff. at ¶ 12-13).

38. Mr. Downs discussed those logistical concerns with BP's counsel during the on-site visit and in the following days. (Craig Downs Aff. at ¶ 14). During the on-site visit, it was represented to Mr. Downs by BP's counsel that they would not hold the Downs Group Plaintiffs to the May 21, 2019 destruction deadline. (Craig Downs Aff. at ¶ 14). Accordingly, the parties agreed at that time that Downs Group Plaintiffs would immediately begin formulating an initial plan by Tuesday May 14, 2019 for appropriate preparation, transportation, and storage of the Subject Samples on or before May 21, 2019. (Craig Downs Aff. at ¶ 14).

39. Since the on-site visit, the parties' counsel have been in frequent communication in furtherance of the transfer of custody of the Subject Samples. (Craig Downs Aff. at ¶ 15).

40. Based on conversations with their experts, the Downs Group Plaintiffs have made a good-faith determination that they will require approximately **45 days** to take custody of the Subject Samples. (Craig Downs Aff. at ¶ 16).

41. On May 14, 2019, counsel for the Downs Group Plaintiffs proposed to BP that the parties enter into and file a stipulation whereby BP would agree to forego enforcement of the April 16 Order for 45 days to allow the Downs Group Plaintiffs sufficient time to make arrangements to take custody of the Subject Samples. (Craig Downs Aff. at ¶ 17).

42. Notwithstanding their earlier representations during the on-site visit, BP's counsel responded that they would not agree to any extension of the May 21, 2019, destruction deadline. (Craig Downs Aff. at ¶ 18).

## ARGUMENT

The Fifth Circuit has articulated two alternative formulations of the test for determining whether to grant a stay pending appeal. In *Ruiz v. Estelle*, the court observed:

> These factors are (1) whether the movant has made a showing of likelihood of success on the merits, (2) whether the movant has made a showing of irreparable injury if the stay is not granted, (3) whether the granting of the stay would substantially harm the other parties, and (4) whether the granting of the stay would serve the public interest.

650 F.2d 555, 565 (5th Cir. 1981).

The circuit court explained that the first factor did not require a movant to show a mathematical "probability" of success on the merits. Instead, the court offered an alternative phrasing of the test, holding "the movant need not always show a 'probability' of success on the merits; instead, the movant need only ***present a substantial case on the merits when a serious legal question is involved*** and show that the ***balance of the equities weighs heavily in favor of granting the stay***." *Id.* In this alternative formulation, the "balance of the equities" simply refers to the last three factors in the four-part test. *See O'Bryan v. Estelle*, 691 F.2d 706, 708 (5th Cir. 1982) ("he must present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities (i.e., the other three factors) weigh heavily in favor of granting the stay").

A stay is warranted here because Plaintiffs have presented a substantial case on the merits when a serious legal question is involved and the equities weigh overwhelmingly in favor of granting the stay.

### A. Plaintiffs have presented a substantial case on the merits when a serious legal question is involved

The issue to be appealed involves a "serious legal question" because the imminent destruction of the Subject Samples threatens to destroy, or at least severely impede, the ability of literally ***thousands*** of current and potential plaintiffs to establish a critical element of their claims — namely specific causation. As noted above, the Downs Law Group represents more than 800 BELO Plaintiffs with filed cases, plus several more Opt-Out Plaintiffs, while the Nexsen Pruett

firm represents about 780 Opt-Out Plaintiffs. Also, in its status report filed with this Court last fall, the Medical Benefits Settlement Claims Administrator reported that there had been 6,389 Notices of Intent to Sue filed by potential BELO Plaintiffs as of September 30, 2018. (Rec. Doc. 25124). There can be no doubt that thousands more will ultimately file lawsuits in this multi-district litigation, joining the Plaintiffs already before this Court who are seeking to preserve evidence critical to their claims for many years to come. Per the Master Settlement Agreement, class members can file a BELO lawsuit four years from their date of diagnosis and many class members' latent injuries have not yet manifested.

Plaintiffs have also presented a "substantial case on the merits." As detailed above, Plaintiffs respectfully submit that this Court abused its discretion when it authorized BP to destroy the Subject Samples and left Plaintiffs only 35 days to make necessary arrangements to take custody of them. BP's motion (and, presumably this Court's reason for granting it) was based on bald assertions that the evidence was "virtually unusable." BP provided no sworn testimony to support that sweeping assertion and cited only a 36-year-old EPA standard. (Rec. Doc. 25226-1, at 2). Plaintiffs countered that with two sworn expert affidavits directly refuting BP's claims that the evidence was worthless.

Moreover, Plaintiffs also noted that the EPA standard relied upon by BP merely provides testing procedures that are approved for monitoring water supplies under federal safe water, waste management, and ambient water monitoring legislation. However, the standard itself acknowledges that its prescribed methods are not the only suitable means for testing: "Although other test procedures may be used, as provided in the Federal Register…the methods described in this manual will be used by the [EPA] in determining compliance with applicable water and effluent standards established by the Agency." U.S. Envt'l Protection Agency's Methods for Chemical Analysis of Water and Wastes. EPA-600/4-79-020 (US EPA 1983), at xiv.

Furthermore, although Amended Pretrial Order 39 lists the EPA standard as one acceptable guideline, it also expressly allows for employing "other analytical methods contained in regulations or guidance published by a federal agency, or any other widely accepted standard operating procedures." (Amd. PTO 39, at ¶ 9, Rec. Doc. 10231). Indeed, Dr. Kaltofen's expert affidavit stated "there are many testing methods and analyses that produce concrete, reliable data on chemicals and samples…that exist outside of the US EPA's guide that BP references." (Kaltofen Aff. at ¶ 11). In short, Plaintiffs' sworn declarations show that BP's casual reliance on the EPA standard does not support a finding that the Subject Samples are "virtually unusable."

Plaintiffs showed the Subject Samples are not only relevant to their claims, but they can provide compelling direct evidence of plaintiffs' specific levels of exposure to hazardous substances, a key element in proving specific causation. Dr. Williams's affidavit explained that allowing destruction of the Subject Samples "would prevent the analysis of the samples for the Direct Measurement of Exposure concentrations, which is the primary method mentioned in the [Reference Manual]." (Williams Aff. at ¶ 9.0).

In light of the above, the Subject Samples are highly competent and crucial evidence that is plainly relevant to Plaintiffs' claims. Accordingly, BP has a clear obligation to preserve that evidence. *See, e.g.*, *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) ("A party's duty to preserve evidence comes into being when the party has notice that the evidence is relevant to litigation or should have known that the evidence may be relevant."). As one district court stated in a seminal decision concerning the scope of a litigant's evidence preservation duties:

> [A]nyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary. While a litigant is under no duty to keep or retain every document in its possession…it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request.

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (quotations and citations omitted).

The fact that Plaintiffs were given 35 days to evaluate the Subject Samples and make arrangements to take custody of any samples they may want does not cure the problem, either. First, without knowing the specific dates and the locations where each of the Plaintiffs performed recovery work (information that BP has, but Plaintiffs do not) no plaintiff can intelligently evaluate which of the Subject Samples are relevant to his or her claim. In the case of the Opt-Out Plaintiffs, whose cases have been stayed for more than 8 years, their counsel cannot even propound discovery to seek that critical information. Even worse, future BELO Plaintiffs whose deadly diseases have not yet manifested themselves — as they are "Later Manifested Physical Conditions" as defined in the Master Settlement Agreement — will be unable to access this critical specific causation evidence because BP destroyed it, with court approval, years before their causes of action even accrued.

Notwithstanding all this, counsel for the Downs Group Plaintiffs is willing and ready to take custody of the Subject Samples. He has provided a sworn affidavit attesting to that willingness and merely seeks a relatively short stay of 45 days to make arrangements to assume custody of the Subject Samples. At a minimum, this Court should hold BP to its word that it just seeks to avoid the future burden of storing these samples – even though it is inequitable to shift BP's burden of preserving relevant evidence onto the very plaintiffs whom BP injured through its gross negligence. Ordering BP to preserve the Subject Samples a mere 45 additional days would do that, at least.

In sum, Plaintiffs have shown a "substantial case on the merits" involving a "serious question of law" as to whether this Court abused its discretion by authorizing BP to destroy the Subject Samples.

### B. The balance of the equities weigh heavily in favor of granting a stay

The equitable factors weigh overwhelmingly in favor of staying the April 16 Order.

Plaintiffs will suffer irreparable injury absent a stay for the obvious reason that the Subject Samples will no longer exist, having been destroyed after May 21, 2019, with this Court's approval. As the Fifth Circuit has held, "an injury is 'irreparable' only if it cannot be undone through monetary remedies." *City of Meridian v. Algernon Blair, Inc.*, 721 F.2d 525, 529 (5th Cir. 1983). Once the Subject Samples are destroyed, they are gone forever, and no amount of money damages can re-create them. Thousands of current and future plaintiffs will be forever deprived of this unique evidence which, as discussed above, is a critical link in the chain of specific causation.

The harm is not remedied by the fact that BP represents that it already conducted its *own testing* on *some* of the Subject Samples and has offered to make that testing data available to requesting plaintiffs. (*See* Rec. Doc. 25226-1, at 2). This is patently inadequate for at least two reasons. First, by its own admission, BP has not tested all of the Subject Samples (many of which were also missing key background data such as collection date and site), making it certain that at least some of the Subject Samples relevant to certain plaintiffs will be destroyed without ever having been tested. Second, Plaintiffs should not be limited to data collected by BP's chosen methods of testing. As discussed in Dr. Kaltofen's affidavit, "[i]t is possible that the testing methods used to analyze the samples that have been analyzed were insufficient, incomplete or flawed." (Kaltofen Aff. at ¶ 12). For instance, BP may not have tested for all of the hazardous substances Plaintiffs' experts deem relevant. Plaintiffs are entitled to have their own experts test the Subject Samples, applying their own preferred methodologies and testing for substances they believe are relevant to support Plaintiffs' claims.

14

Additionally, granting the stay would not "substantially harm" BP. This is true regardless of whether the Court imposes a stay for the duration of Plaintiffs' appeal or for the more limited 45 days. By its own admission, BP has been storing the Subject Samples for "approximately four to eight and a half years." (Rec. Doc. 25226-1, at 2). In 2018, BP was the world's eighth largest company, with revenues of more than $244 billion.[3] Requiring BP to store the Subject Samples another 45 days, or even for another year during the pendency of Plaintiffs' interlocutory appeal would impose only a minimal financial burden. Although BP made the conclusory assertion in its motion that it has "undertaken extensive and costly efforts to preserve these samples in a manner that minimizes any chemical, physical and biological degradation of these samples," (Rec. Doc. 25226-1, at 2), it did not submit any concrete information about the cost of ongoing storage. In any event, BP cannot argue with a straight face that paying to store the Subject Samples another 45 days, or even another year, would "substantially harm" this corporate behemoth.

Finally, granting the requested stay would plainly serve the public interest. The requested stay would ensure preservation of critical evidence until either (*i*) the Fifth Circuit can determine the propriety of this Court's April 16 Order authorizing destruction of the Subject Samples, or (*ii*) counsel for the Downs Group Plaintiffs can take custody of the Subject Samples. Simply put, there is no credible argument that the public interest would be served by the rushed destruction of relevant evidence. On the other hand, "the public interest will be promoted, and not disserved, by granting this temporary relief due to the public's interest in ensuring the preservation of documents and evidence for a full and fair trial of the matters in dispute." *Williams v. Fulford*, 2013 WL 12101102, *1 (S.D. Tex. Dec. 24, 2013). *See also F.T.C. v. Data Medical Capital, Inc.*, 2009 WL 2059442, *11 (C.D. Cal. July 13, 2009) ("Granting the requested injunctive relief serves

---

[3] *See Fortune Global 500*, available at: http://fortune.com/global500/list/; *Global Finance Magazine Online*, Nov. 30, 2018, available at: https://www.gfmag.com/global-data/economic-data/largest-companies

the public interest by…preventing evidence destruction."). *Accord Kettler Int'l, Inc. v. Starbucks Corp.*, 96 F. Supp. 3d 563, 573 (E.D. Va. 2015) (imposing spoliation sanctions and finding "the public interest in the integrity of the judicial process requires the preservation of evidence in order to promote the just, speedy, and inexpensive resolution of civil litigation.").

## CONCLUSION

For all the reasons stated above, Plaintiffs respectfully request the Court stay the Order of April 16, 2019.


Dated: May 15, 2019

Respectfully submitted,

 */s/ Craig T. Downs*
Craig T. Downs
Florida Bar No. 801089
Email: cdowns@downslawgroup.com
Nathan T. Nelson
Florida Bar No. 1002523
Email: nnelson@downslawgroup.com
The Downs Law Group, P.A.
3250 Mary Street, Suite 307
Coconut Grove, Florida 33133
Telephone:  (305) 444-8226
Facsimile: (305) 444-6773

*Attorneys for the Downs Law Group Plaintiffs*

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 15th day of May 2019.

                                        */s/ Craig T. Downs*
                                          Craig T. Downs