# Exhibit D

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OIL SPILL BY THE OIL RIG
"DEEPWATER HORIZON" IN THE GULF OF
MEXICO, ON APRIL 20, 2010

Civil Action No. 2:10-MD-02179

SECTION: J

JUDGE CARL BARBIER

MAG. JUDGE WILKINSON

APPLIES TO:

All Civil Actions of the Plaintiffs
Represented by The Downs Law Group
and all similarly situated Plaintiffs

## PRELIMINARY AFFIDAVIT OF PATRICIA M. WILLIAMS, PH.D.DABT

STATE OF LOUISIANA
PARISH OF JEFFERSON

All statements contained herein are true and correct and based upon my personal knowledge, education, and experience and I am a person of full age of majority, competent to execute this affidavit.

### 1.0 – Expert Witness Qualifications

My qualifications as expert witness include the following:

**Summary of expert qualifications:**

**Board certification:  Diplomate of the American Board of Toxicology 2006-2011; 2012-2016, 2017-2021**
**Tulane University, School of Medicine, Department of Anatomy, Ph.D., 1983.**
   **Major:  Anatomy;  Minor: Biochemistry**
**Louisiana State University in Baton Rouge; M.S. in Microbiology, 1975**
**Louisiana State University in Baton Rouge; B.S. in Medical Technology, 1966**
**Clinical Laboratory Scientist-Generalist, Louisiana License Number: G00023**
**Laboratory Director – CLIA Certification 19D0898394  (1993-2005)**
**Board certified by the American Society of Clinical Pathologists, 1966, #56466**

I am board-certified in Toxicology and a Diplomate of the American Board of Toxicology.  Currently, I serve as President of Environmental Toxicology Experts, LLC, my company formed for consulting and expert witnessing services since 2005. I have served as expert witness in toxic tort litigation and drug and alcohol hearings and litigation for over 25 years in Federal and State Courts, and Workers'

1

Compensation hearings in Louisiana, Mississippi, Texas, Florida, California, and West Virginia.

From 2005 to 2017, I also served as a tenured Associate Professor and Coordinator for Toxicology Research Laboratories of the Pontchartrain Institute for Environmental Sciences, University of New Orleans. In that capacity, I was also responsible for teaching courses in Toxicology to Graduate and Undergraduate students. I taught the following courses: Toxicology and Human Health, Ecotoxicology, Toxicology of Coastal Organisms, Environmental Toxicology, Toxicology of Metals, Reproductive and Developmental Toxicology, Embryology and Developmental Toxicology, Independent Research Courses in Toxicology, and Histology and Cytology.

From 1993 to 2005, I served for twelve years as Associate Professor of Medicine and the Director of the Occupational Toxicology Outreach Program of the Department of Medicine of the LSU Medical Center in Shreveport. In that capacity, I surveyed or evaluated over 17,000 workers or community members with occupational or environmental toxic exposures for adverse symptoms and health effects of such exposures. Environmental symptom surveys as well as disease/cancer histories were taken on each of these 17,000 workers to identify sources of environmental exposures. Additionally I assisted physicians in identifying the environmental and occupational etiology of diseases and cancers using the Environmental history survey (Patricia M Williams work product) which assessed symptoms and adverse health effects along with lifestyle, occupational, and environmental exposures. I was a tenured Associate Professor of Medicine of the Department of Medicine of LSU Medical School in Shreveport. Additionally, I served as the Laboratory Director of an in-house research laboratory for Medical Surveillance for adverse health effects of chemical exposure. In this capacity, I was responsible for identifying the laboratory parameters that are clinical indicators of environmental and occupational toxic exposure and for the interpretation of the laboratory parameters to the attending physicians. I am licensed by the State of Louisiana and certified by the American Society for Clinical Pathologists and meet the requirements of federal law, specifically, the Clinical Laboratory Improvement Act, to serve as the Laboratory Director. I have been certified and have had work experience in the performance and interpretation of clinical laboratory procedures for over thirty-nine years.

From 1985 to 1992, my work experience includes serving as Associate Professor and Department Head of Medical Technology, School of Allied Health Professions at LSU Medical Centers in New Orleans and Shreveport for seven years. In that capacity, I was responsible for the development, organization, administration, review, revision, and direction of the educational program to train students at the baccalaureate and masters levels in the performance and the interpretation of clinical laboratory procedures in the areas of hematology, immunology, immunohematology, microbiology, parasitology, urinalysis, clinical chemistry, toxicology, phlebotomy, and management. In that capacity, I also designed and

taught courses in the various areas of clinical pathology to cytotechnology students, pathology residents, and maxillo-facial surgery dental residents, as well as medical students. I also developed an in-house departmental clinical practicum, which was nationally accredited, in the performance and interpretation of laboratory procedures. This clinical practicum substituted for six months of the required hospital training program in the various areas of clinical pathology for the baccalaureate students.

By virtue of my doctoral degree in Anatomy, I have extensive training and teaching in the areas of gross anatomy, medical histology, embryology, neuroscience, and cell biology. I have a minor in biochemistry at the doctoral level with doctoral research in the areas of hematology, specifically megakaryocytopoiesis, thrombopoiesis, and erythropoiesis, and the stem cell compartment. Also, I have graduate credit in epidemiology from Tufts University New England Epidemiology Institute. I have performed health profiles and epidemiologic studies in communities to identify the evolution of disease in association with chemical exposure through the study of clinical symptoms, diagnosed diseases, lifestyle and behavior factors. I have taught in numerous HASMET (hazardous materials) conferences, workshops, and seminars for union workers and industrial corporations. I have assisted numerous physicians in the understanding of the etiology of occupational and environmental diseases and provided Continuing Medical Education for physicians and Continuing Education programs for Industrial Hygienists. I conducted disease prevention programs for workplace, communities, homes, and schools including prevention of prostate cancer, inhalant abuse, fetal alcohol syndrome, alcohol toxicity, and abuse of drugs and alcohol.

I lectured to second year medical students at LSU Medical Center in Shreveport on the "Environmental Etiology of Disease", which includes: recognizing the adverse health patterns commonly observed in chemically associated diseases, the multifactorial nature of disease, effects of chemical interactions in a mixture, dose-response, and the cellular effects of DNA reactive carcinogens.

I was commissioned to conduct a health assessment and medical surveillance using laboratory procedures of the people of Grand Bois who reside next to a Non-hazardous oilfield waste site that received shipments of Benzene-contaminated wastes that were ordered removed from an out-of-state facility because of the toxic nature of the wastes. The preliminary results of this study resulted in announcement of funding provided from the Department of Health and Hospitals budget by the then Governor of Louisiana, Mike Foster, for an additional medical surveillance research project of which I was designated the Principal Investigator. Internal Review Board approval from the LSU Medical Center in Shreveport was granted for the conduct of both research studies. Soon thereafter, the Louisiana Legislature granted an additional funding amount of $100,000 in the 1998 Legislative Session for additional medical surveillance of the adults and children of Grand Bois for the 1998-1999 fiscal year. This study was not related to litigation

3

and was an independent research project. The results of this study are located in all of the State Libraries throughout Louisiana. It consists of two volumes: Volume 1 consists of a "Retrospective Study of Health Effects of the Grand Bois Community" utilizing a health survey for data collection. Volume 2 consists of a one year medical surveillance project with the performance of clinical laboratory procedures that would serve as indicators of developing disease or indicators of abnormalities of concern with the potential for future disease development. As laboratory director under Federal Law, specifically the Clinical Laboratory Improvement Amendments Subpart A Section 493, I was responsible for ensuring that my consultation was available to the laboratory clients for the interpretation of the test results reported concerning specific patient conditions. (pg. 7176, Federal Register, vol 57, No. 40, Friday, February 28, 1992)

I have performed health profiles and epidemiologic studies in communities to identify the evolution of disease in association with chemical exposure through the study of clinical symptoms, diagnosed diseases, lifestyle and behavior factors. In the Combustion litigation of Livingston Parish in Louisiana, I served as the expert witness for a population of 10,000 who had exposures to benzene and other toxic chemicals. Leukemias and Neuroblastomas were prominent among the adverse consequences of chemical exposure. Another case of 4,000 individuals, in the Thompson Hayward Case in Orleans Parish of Louisiana, involved pesticide exposure. I examined the reproductive health outcomes from chemical exposure, which included spontaneous abortions, stillbirths, live births with short survival time, and children with birth defects and mothers with multiple children with birth defects. In the Lincoln Creosote case in Bossier Parish of Louisiana, I examined a population exposed to Benzene, creosote, Pentachlorophenol, Toluene, Styrene, and other toxic compounds. Leukemias, reproductive cancers, and birth defects were prominent among the adverse consequences of the toxic exposure in the Lincoln Creosote case. Two Worker Compensation cases and one toxic tort suit, each with single person complainants/plaintiffs, in which I served as Expert Witness or Consultant involved benzene-related hematologic malignancies.

I have conducted doctoral research on stem cell precursors for erythrocytic and megakaryocytic cell lineages. My doctoral research included characterization of megakaryocytopoiesis under the hormonal influence of thrombopoietin and the development of an in vitro assay for thrombopoietin. This was a study of stem cell precursors of the megakaryocytic cell line that differentiates into the mature cells that produce blood platelets. Further doctoral research included the immunocytochemical localization of erythropoietin receptors on the cell surface of early erythrocytic precursors at the ultrastructural level. For this research, I received the Arceneaux Memorial ward in Recognition of Outstanding Student Research in Electron Microscopy in May of 1981. I have conducted funded research by the American Heart Association on the development of an assay for thrombopoietin and an additional grant for the characterization of megakaryocytopoiesis. I conducted funded research from the American Cancer Society on an immunocytochemical characterization of skin biopsies in the

diagnosis of human acute Graft-versus-Host Disease in Leukemia. The American Heart Association further funded my research for the Isolation and Characterization of 4N and 8N Megakaryocytes. I served as a consultant to Karel A. Dicke, M.D., chief oncologist and Director of the Bone Marrow Transplantation Unit at M.D. Anderson Hospital for electron microscopic evaluation of in vitro chemotherapeutic treatment for autologous bone marrow transplantation therapeutic techniques. I have written, developed, and taught numerous courses and lectures in Hematology and Immunology to students at the associate, baccalaureate, and masters levels, as well as, medical students, pathology residents, and maxillo-facial surgery residents. I am qualified by both State and Federal Law to perform and interpret clinical laboratory procedures in the areas of hematology and immunology. I am further qualified by Federal Law (CLIA-Clinical Laboratory Improvement Act) to serve as a Laboratory Director for all levels of complexity in the interpretation of laboratory procedures, which include hematology and immunology. I served as the Laboratory Director of an in-house medical surveillance laboratory for ten years and have interpreted hematological parameters in a population of residents exposed to benzene and other toxic substances. I have also served as principal investigator in a project to screen for Lupus Erythrematosus, an autoimmune disease of the hematologic/immunologic systems of the body.

In the area of Forensic Drug Testing, I have served as an expert witness and consultant on collection of specimens, chain of custody, and drug-testing in the workplace to numerous clients, including the Department of Education, School Boards, Unions, Medical Care Corporations, municipalities, the State of Louisiana, and private entities, and served as consultant to a collection company for collection of forensic urine and blood specimens and, in that capacity, designed and oversaw the administration of chain of custody and collection procedures. Furthermore, I have served as expert witness in drug-testing litigation in State Court, Workman's Compensation and Unemployment compensation hearings, arbitration hearings, and criminal court as expert witness for the prosecution. I have served as expert witness in numerous legislative committees on the subject of drug-testing and minimal guidelines for collection and testing of forensic specimens. I drafted the bill for Louisiana Act 1036 of the 1990 Legislative Session establishing minimal guidelines for collection of forensic specimens and drug-testing in the State of Louisiana. Additionally, I drafted Act 396 of the 1993 Legislative Session for Mandatory Licensure of Clinical Laboratory Personnel and Certification of Phlebotomists in the State of Louisiana. I was the expert witness testifying for both bills at the request of Senators and Representatives, the Commissioner of Administration, the AFL-CIO, and the Louisiana State Society for Medical Technology during the course of passage into Law by the Louisiana Legislature.

By virtue of my educational, research, and work experience, I am qualified to identify and interpret patterns of development of disease in association with toxic exposure and to determine the etiology/causation of environmental and occupational diseases. I am qualified to conduct community health assessments and interpret the etiology/causation of environmental diseases and birth defects. I am

5

qualified to identify and interpret patterns of adverse reproductive outcomes, including fetal birth defects and embryonal tumors, in association with toxic exposure. I am qualified to review the scientific and medical literature, and medical and laboratory data associated with occupational and environmental exposures and to interpret said data as to the etiology/causation. I am qualified to perform and interpret medical surveillance utilizing laboratory procedures as to the development and causation of environmental and occupational diseases. I am qualified to interpret the causation of hematological diseases as related to environmental and occupational exposures.

Additionally, I am qualified to interpret the role of contributing factors in the development of cancer and birth defects. I have qualified as an expert in anatomy, hematology, toxicology, medical surveillance utilizing laboratory procedures, neuroanatomy, and performance and interpretation of health assessments of environmentally exposed communities.

In the areas of forensic drug testing, as a licensed Clinical Laboratory Scientist who is board-certified by the American Society of Clinical Pathologists, I am qualified to perform analytical testing for drugs, review and interpret medical and laboratory data, including the phlebotomy, chain of custody, and accessioning techniques utilized in the collection of medical and forensic drug specimens. As a toxicologist who is Board-certified in toxicology by the American Board of Toxicology, I am qualified to opine on the metabolism, biotransformation, and distribution of drugs, chemicals, and alcohol in the body. I am further qualified to interpret drug testing results with impairment correlation. Additionally, I testify for several District Attorneys in various Parishes in the State of Louisiana for criminal prosecution in matters of drug and alcohol intoxication and loss of life.

As a Board-certified Clinical Laboratory Scientist (Board certified by the American Society of Clinical Pathologists) who is licensed by the State of Louisiana and qualified by both State and Federal Law to perform and interpret clinical laboratory procedures in all areas of laboratory procedures at all levels of complexity, including the areas of hematology and immunology, I am qualified to review, interpret, and propose medical surveillance using laboratory procedures. I am further qualified by Federal Law (CLIA-Clinical Laboratory Improvement Act) to serve as a Laboratory Director for all levels of complexity in the interpretation of laboratory procedures, which include hematology and immunology  As a Board-Certified toxicologist holding the title of Diplomate of the American Board of Toxicology, I am qualified to interpret these procedures as to the resultant health effects of toxic chemicals.

**2.0**  Actual exposure to toxic substances is effected only if  there is a completed exposure pathway. A completed exposure pathway consists of the following five elements: a source of contamination, an environmental medium, a point of exposure, route(s) of exposure, and a receptor population. (LaDou, 1997)

**3.0** Some of the exposure pathways that should be considered include the following:

Direct or incidental ingestion of contaminated surface water
Incidental ingestion of contaminated soil and dust
Inhalation of contaminants that volatilize from water
Inhalation of contaminants that volatilize from soil and sand
Inhalation of contaminants in air
Inhalation of contaminants in dust and particles
Dermal absorption from contaminated dust and particles
Dermal absorption from contaminated water
Dermal absorption from contaminated soil
Dermal absorption from contaminated air
Dermal absorption from contact with dispersants/oiled seabirds

**4.0** Methods for causal reasoning in determining General and Specific Causation must be in accordance with the Reference Manual on Scientific Evidence 2nd and 3rd editions, including the Reference Guides on toxicology, epidemiology, and medical testimony that are used in the Federal Judicial System.

**5.0** An opinion of Specific Causation focuses on the question as to whether the toxic agent has caused the disease, cancer, or other health effects in the individual. One of the considerations included in rendering an opinion of Specific Causation is the following: Measure of Exposure or Dose -- Are there exposure measures that are applicable to the exposures of the individual?

**6.0** Measures of exposure must be applicable to human health effects with analysis detection levels that will allow for concentrations that can be compared to the scientific literature for causation of cancer and disease in humans.

**7.0** Analysis of crude oil for Regulatory Levels is often inadequate for interpretation to human health especially for Group 1 Human carcinogens such as benzene and arsenic which are constituents of crude oil and/or dispersants which have cancer associations at exposure concentrations less than 1 ppb.

**8.0** Plaintiffs counsel must have the opportunity to seek analysis techniques, such as ICP-MS, to determine exposures of the plaintiffs in concentrations of exposure relevant to human health which, for example, can be as low as 10 ppb (Arsenic) or 40 ppb (benzene).

**9.0** The Reference Guide on Toxicology of the Reference Manual on Scientific Evidence 3rd ed. of the Federal Judicial Center, 2011, states the following: (page 666-667) "Evidence of exposure is essential in determining the effects of harmful substances. Basically, potential human exposure is measured in one of three ways. First, when direct measurements cannot be made, exposure can be measured by mathematical modeling, in which one uses a variety of physical factors to estimate the transport of the pollutant from the source to the receptor." 'Second, exposure

7

can be directly measured in the medium in question..... "   "The third approach directly measures human receptors through some form of biological monitoring, such as blood tests to determine blood lead levels or urinalyses to check for a urinary metabolite indicative of pollutant exposure. "

**10.0**  Destruction of the crude oil samples in storage would prevent the analysis of the samples for the Direct Measurement of Exposure concentrations, which is the primary method mentioned above in The Reference Guide on Toxicology of the Reference Manual on Scientific Evidence of the Federal Judicial Center.  (9.0 "...when direct measurements cannot be made...")

**11.0**  Furthermore destruction of the crude oil samples in storage would prevent the use of instrumentation and detection levels that would be applicable to human health levels listed in the Scientific Body of Evidence.

**12.0**  As a Board-certified Clinical Laboratory Scientist (Board certified by the American Society of Clinical Pathologists) who is licensed by the State of Louisiana and qualified by both State and Federal Law to perform and interpret clinical laboratory procedures in all areas of laboratory procedures at all levels of complexity, and also qualified by Federal Law (CLIA-Clinical Laboratory Improvement Act) to serve as a Laboratory Director for all levels of complexity in the interpretation of laboratory procedures,  I have personal experience in interpretation of analyses of concentrations of solvents and metals in humans that are capable of causing adverse health effects.

**13.0**  Furthermore, as a Board-Certified toxicologist holding the title of Diplomate of the American Board of Toxicology, I am qualified to interpret laboratory procedures as to the resultant health effects of toxic chemicals.

**14.0**  Furthermore, in my experience in toxic tort litigation, I have been involved often with the chemists performing analyses on environmental substances to ensure that the instrumentation chosen and detection levels chosen can provide results that are pertinent to human health effects.

   I reserve the right to submit additional affidavits if deemed necessary.  Affiant further sayeth not.

1-31-19
**Date**

*Patricia M. Williams*

**Patricia M. Williams, PhD,  DABT**
**President, Environmental Toxicology Experts, LLC**