**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | ) | **MDL 2179** |
| "Deepwater Horizon" in the Gulf | ) | |
| Of Mexico, on April 20, 2010 | ) | **SECTION: J** |
| | ) | |
| This Document Relates  To 2:18-cv-11111 | ) | **JUDGE BARBIER** |
| | ) | **MAG. WILKINSON** |
| | ) | |
| | ) | **PLAINTIFF DEMANDS A TRIAL** |
| | ) | **BY JURY ON ALL CAUSES OF** |
| | | **ACTION** |

## FIRST AMENDED COMPLAINT

**NOW  COMES  PLAINTIFF,** MMR Group, Inc. d/b/a MMR Constructors, Inc.
through  undersigned counsel, and files its First Amended Complaint against the Defendants, as
follows:

## NATURE OF THE ACTION

1.     On or about April 20, 2010, a well blowout on vessel *Deepwater Horizon* in
the Gulf of Mexico marked the beginning of what would become one of the most pervasive
and  devastating environmental disasters in the United States. The blowout and subsequent
explosions, fire and sinking of the vessel resulted in an oil spill of unprecedented proportions
(the  "Oil Spill"). Over 200 million gallons of crude oil were released from the Macondo
Well  in  Mississippi Canyon Block 252 on the Outer Continental Shelf (the "Macondo Well"),
damaging,  depleting, and destroying offshore, marine, and coastal environments in the Gulf
of Mexico,  Louisiana, Mississippi, Alabama, Texas and Florida.

2.     Plaintiff has suffered economic injury, damage and/or losses as a direct and
foreseeable result of the Oil Spill and its devastating impact on the offshore, marine and coastal

environments.

3.      Given the nature of the Oil Spill, and its uncertain impact on nature and the Environment, the full extent of the Oil Spill's impact is not yet know, and Plaintiff reserves its rights in full to amend this Complaint by, among other things, adding new claims and new defendants.

## PARTIES

4.      Plaintiff, MMR Group, Inc. d/b/a MMR Constructors, Inc. (hereinafter "Plaintiff"), is a business that is domiciled in Louisiana, with its principle place of business/operations in Baton Rouge, Louisiana. Plaintiff suffered economic injury, damages and/or losses as a direct and proximate result of the Oil Spill and the associated environmental devastation.

5.      At all relevant times, the Plaintiff performed services as an electrical contractor licensed to do business in Louisiana, Texas, Mississippi, Alabama, Florida, and other states. The Plaintiff has several locations strategically located to service the industries in the Gulf of Mexico area.

6.      The Plaintiff submitted a Business Economic Loss claim to the *Deepwater Horizon* Court-Supervised Settlement Program implemented in connection with the *Deepwater Horizon* Economic and Property Damages Settlement Agreement, as amended on May 2, 2012. (Rec. Doc. 6430-1 in 2:10-md-2179). The Plaintiff is a member of the *Deepwater Horizon* Economic and Property Damages Settlement Class (the "Class").

7.      Defendant BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a lease holder and the designated operator in the lease granted by the former

Minerals Management Service ("MMS")[1] allowing it to perform oil exploration, drilling, and production- related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Spill originated. BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990, 33 U.S.C. § 2714. This Court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

8.      Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. BP America was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo Well by the *Deepwater Horizon* vessel. This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

9.      Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division within BP Exploration and BP America, through vertical business arrangements aligned by product or service groups. BP p.l.c.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally.

---

[1]   The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010; however, it shall be referred to as the MMS throughout this document.

10.     BP p.l.c. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development. A sampling of BP p.l.c.'s contacts with the U.S. are as follows: (a) BP p.l.c.'s American Depository Shares are listed on the New York Stock Exchange ("NYSE") and BP p.l.c. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP p.l.c. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP p.l.c.'s fixed assets are located in the U.S. or the European Union; and (e) BP p.l.c. reports having 2,100 U.S.-based employees in non-Exploration & Production, non-Refining & Marketing BP entities.

11.     This Court has general jurisdiction over BP p.l.c. pursuant to Louisiana's long- arm statute's general jurisdiction provision (La. Rev. Stat. Ann. § 13:3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure. BP p.l.c. does business in Louisiana, has had continuous and systematic contacts with Louisiana (and the U.S. more generally), and BP p.l.c. will be served with a summons and this Complaint.

12.     Alternatively, if BP p.l.c. contests that it is subject to jurisdiction under Louisiana's long-arm jurisdiction statute, then this Court may exercise personal jurisdiction over BP p.l.c. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, the federal long-arm jurisdiction provision, because claims in this action arise under federal law, the exercise of jurisdiction over BP p.l.c. is consistent with the United States Constitution and laws, and BP p.l.c. will be served with a summons and this Complaint.

13.     This Court also has specific jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm specific jurisdiction provision (La. Rev. Stat. Ann. § 13:3201), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure. Plaintiff's causes of action arise out of

wrongful conduct committed by BP p.l.c., directly or indirectly by its agents, which caused injury or damage in Louisiana by an offense or quasi-offense committed through an act or omission outside of Louisiana, and BP p.l.c. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana. These acts or omission took place both before the blowout resulting in the Oil Spill and in the negligent conduct of BP p.l.c. after the blowout in attempting to contain the catastrophic damage caused by the Oil Spill. In addition, BP p.l.c. will be served with a summons and this Complaint.

14.     In addition, this Court also has personal jurisdiction over BP p.l.c. under agency principles because BP p.l.c.'s agents, BP America and BP Exploration, do business in Louisiana. In BP p.l.c.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America and BP Exploration, BP p.l.c. states that it "controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities . . . ."

15.     BP p.l.c.'s direct, joint and/or assumed responsibility and/or liability for safety and well control, both before and/or after the explosions and blowout on April 20, 2010, is further evidenced by the announcement of the Macondo Project on the BP website hosted and copyrighted by BP p.l.c., the publication of information concerning the casualty and spill on the BP website hosted and copyrighted by BP, the express and/or implied acceptance of responsibility for safety of BP operations in North America and the Gulf of Mexico in statements by officers of BP p.l.c., the presence (upon information and belief) of a BP p.l.c. officer or employee on the *Deepwater Horizon* for the celebration that occurred

shortly before the explosions and fire, the direct participation of BP p.l.c. employees in the post-casualty investigation, the direct participation of BP p.l.c. officers and employees in the governmental post-casualty investigations, the direct participation of BP p.l.c. officers and employees in the post-casualty well-control efforts, and the direct participation of BP p.l.c. in the establishment  and/or funding of the Escrow Fund and/or Gulf Coast Claims Facility.

16.     Unless otherwise specified, BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as the "BP Defendants" or "BP."

17.     Defendant Halliburton Energy Services, Inc. ("HESI") is a Delaware corporation with its principal place of business in Houston, Texas. HESI is registered to do and does business in the State of Louisiana. HESI provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the *Deepwater Horizon*, as well as onshore engineering support for those operations. HESI was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo Well. At and before the time of the blowout, HESI was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil.

18.     Defendant Sperry Drilling Services (formerly Sperry Sun Drilling Services) (hereinafter, "Sperry") is a division of HESI and was responsible for mudlogging personnel and equipment on the *Deepwater Horizon*, including downhole drilling tools. Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations.

19.     Unless otherwise specified, Halliburton Energy Services, Inc. and its Sperry division are referred to herein collectively as "Halliburton."

20.     Defendant Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Offshore is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

21.     Defendant Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Holdings is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon*'s offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. More specifically, Transocean Holdings is a party to the contract with BP regarding the lease of the *Deepwater Horizon* for drilling operations in the Gulf of Mexico. On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the blowout by the *Deepwater Horizon*.

22.     Defendant Transocean Deepwater, Inc. ("Transocean Deepwater"), is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Deepwater is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon.*

23.     Defendant Transocean Ltd. ("Transocean Ltd.") is a Swiss Corporation that maintains substantial U.S. offices in Houston, Texas and that at all pertinent times was doing

business in the State of Louisiana and within this district. According to its Complaint and Petition for Exoneration from or Limitation of Liability, Transocean Ltd. was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon.*

24.     Defendant Triton Asset Leasing GmbH ("Triton") is a Swiss limited  liability company with its principal place of business in Zug, Switzerland. Triton is an owner,  managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*. Triton is  believed to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon and actions of Triton have had direct impacts within the State of Louisiana and within this District.

25.     Unless otherwise specified, Defendants Transocean Offshore, Transocean Holdings, Transocean Deepwater, Transocean Ltd., and Triton are hereinafter referred to collectively as "Transocean."  At the Macondo site, Transocean provided the *Deepwater Horizon* vessel and personnel to operate it. At all times relevant to the Oil Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems. Transocean also provided  operational support for drilling-related activities on board the *Deepwater Horizon*, as well as onshore supervision and  support for those drilling activities at all times relevant to the Oil Spill.

## JURISDICTION/VENUE

26.     Jurisdiction exists before this Court pursuant to the Oil Pollution Act ("OPA"), 33 U.S.C. § 2717(b).

27.     In addition, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

28.     In addition, to the extent that any claims do not give rise to jurisdiction under

28 U.S.C. § 1331 and/or 33 U.S.C. § 2717(b), this Court also has supplemental jurisdiction under 28 U.S.C. § 1367.

29.     Venue is appropriate in this District under 28 U.S.C. § 1391 because Defendants do business herein, a Defendant resides herein, or the events or omissions giving rise to the claims asserted herein occurred in this District.

30.     Venue is also proper pursuant to OPA, 33 U.S.C. § 2717(b), as the discharge occurred in this District.

31.     Venue is also appropriate in this District consistent with 28 U.S.C. § 1407 and the 2010 Transfer Order of the Judicial Panel on Multidistrict Litigation. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 1352 (J.P.M.L. 2010), and this Court's Pretrial Order No. 20 (Rec. Doc. 904), which allows plaintiffs to directly file their complaints arising out of the Oil Spill in this District.

## FACTUAL ALLEGATIONS

32.     Plaintiff adopts and incorporates as if fully restated herein the factual allegations raised in Paragraphs 258-543 of the Amended B1 Master Complaint, Document No. 1128 filed in MDL No. 2179, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010* (the "MDL B1 Master Complaint").

33.     BP and Transocean are "responsible parties" for the Oil Spill under OPA, 33 U.S.C. § 2714. Because of the strict liability of responsible parties for damages due to and arising from the Oil Spill and its environmental devastation, Plaintiff does not need to set forth factual allegations to support culpability under the OPA. Out of an abundance of caution and to support Plaintiff's other claims, as well as any relief the Court may deem just and proper, Plaintiff nevertheless include such allegations herein.

**BP's Macondo Lease, Exploration Plan and Drilling Permit**

34.     On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and exploit hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252, 48 miles off the coast of Louisiana.

35.     Before BP could begin operations at the  Macondo site, federal regulations required BP to submit an Exploration Plan ("EP") demonstrating that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment.  30 C.F.R. §§ 250.201, 250.202.

36.     Federal regulations required that the EP be accompanied by "oil and hazardous  substance spills information" and "environmental impact analysis information." C.F.R. §§  250.212, 250.219, 250.227.

37.     Among the information required to accompany the EP was a "blowout scenario,"  described as follows:

> A scenario for the potential blowout of the proposed well in your EP that you  expect will have the highest volume of liquid hydrocarbons. Include the estimated  flow rate, total volume, and maximum duration of the potential blowout. Also,  discuss the potential for the well to bridge over, the likelihood for surface intervention to stop the blowout, the availability of a rig to drill a relief well, and   rig package constraints. Estimate the time it would take to drill a relief well.

30 C.F.R. § 250.213 (g).

38.     The oil and hazardous spills information accompanying the EP was required to include an oil spill response plan providing the calculated volume of BP's worst case discharge scenario (*see* 30 C.F.R. 254.26(a)), and  a comparison of the appropriate worst case discharge scenario in [its] approved regional [Oil Spill Response Plan]  with the

worst case discharge scenario that could result from [its] proposed exploration activities; and a description of the worst case discharge scenario that could result from [its] proposed exploration activities, (*see* 30 C.F.R. 254.26(b), (c), (d), and (e)); 30 C.F.R. § 250.219.

39. Federal regulations required BP to conduct all of its lease and unit activities according to its approved EP, or suffer civil penalties or the forfeiture or cancellation of its lease. 30 C.F.R. § 250.280.

40. In February 2009, BP filed its 52-page Initial EP for the Macondo prospect site with the MMS. In the Environmental Impact Analysis section, BP repeatedly asserted that it was "unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities." In the unlikely event that a spill did occur, BP predicted a worst case discharge scenario of 162,000 gallons of oil per day, an amount it assured the MMS that it was prepared to respond to. BP also claimed the well's distance from the nearest shoreline would preclude any significant adverse impacts from a spill.

41. Based on these assurances, the MMS approved BP's Initial EP for the Macondo prospect on April 6, 2009, including the approval of a "categorical exclusion" from the full environmental analysis normally required under the National Environmental Policy Act. As detailed more fully below, the MMS' approval of BP's Initial EP and the categorical exclusion from environmental analysis were predicated on BP's flagrant misrepresentations about the risk of a surface or subsurface oil spill at Macondo, and its capability to respond to such a spill.

42. After its EP was approved, BP sought a permit from the MMS authorizing it to drill up to a total depth of 19,650 feet at the Macondo site.

### The *Deepwater Horizon*

43.     The *Deepwater Horizon* was a $560,000,000.00 ultra-deepwater, dynamically- positioned semi-submersible oil drilling rig built by Hyundai Heavy Industries Co., Ltd. of South Korea.

44.     The *Deepwater Horizon* was delivered to Transocean in February 2001.

45.     At times relevant herein, the *Deepwater Horizon* was owned by Transocean but leased to BP for a term continuing through September 2013.

46.     BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252 ("Macondo"), a location on the outer continental shelf in the Gulf of Mexico. As part of its agreement with BP, Transocean provided employees, contractors, and other officials who assisted BP in its oil exploration and production activities at the Macondo prospect.

47.     As a mobile offshore drilling unit, the *Deepwater Horizon* was utilized by the Defendants for, *inter alia*, drilling sub-sea wells for oil exploration and production in areas of depth in excess of 5,000 feet of water.

48.     The Defendants started drilling the Macondo Well on October 7, 2009, using the Marianas rig. This rig was damaged in Hurricane Ida on November 9, 2009. As a result, BP and the rig operator, Transocean, replaced the Marianas rig with the *Deepwater Horizon*. Drilling with the *Deepwater Horizon* stared on February 6, 2010.

49.     Prior to its destruction, the *Deepwater Horizon* was drilling at over 22,000 feet — 2,000 feet deeper than described in the BP Exploration Plan or allowed by any permits issued by the MMS to BP.

50.     The *Deepwater Horizon* rig was expensive. Transocean charged BP approximately $500,000 per day to lease the rig, plus contractors' fees. BP targeted drilling the well

to take 51 days and cost approximately $96 million.

51.     The *Deepwater Horizon* was supposed to be drilling at a new location as early as March 8, 2010. In fact, the Macondo well took considerably longer than planned to complete. By April 20, 2010, the day of the blowout, the rig was 43 days late for its next drilling location, which may have cost BP as much as $21 million in leasing fees alone. It also set the context for the series of decisions that BP made in the days and hours before the blowout.

## The Process of Ultra-Deepwater Offshore Drilling

52.     The process of ultra-deepwater offshore drilling generally involves several steps. First, seismic and/or magnetic surveys are undertaken to locate "traps," rock formations that may contain significant deposits of oil, natural gas, or other hydrocarbons.

53.     Upon locating a promising "trap," oil rigs such as the *Deepwater Horizon* are positioned on the sea surface above the proposed well site, and from there begin drilling an "exploratory" well to investigate the viability of the trap. Once the trap is determined to be a worthwhile source of hydrocarbons, the drilling vessel performs "completion" operations to transform the exploratory well into a "production" well that will extract oil or gas from the trap. At this point, well are sometimes temporarily abandoned — sealed with cement so they are secure against any influx of hydrocarbons from the reservoirs they have penetrated — so they can be reopened by a production vessel at some later date. At the time of the April 20, 2010 blowout, the *Deepwater Horizon* crew was in the process of preparing the Macondo Well for temporary abandonment.

54.     Once an oil rig such as the *Deepwater Horizon* has been properly positioned to drill an exploratory well, a wide-diameter hole is drilled into the seabed, generally to a depth of about 300 to 400 feet. This hole is known as a "pilot hole."

55.     Once drilled, the pilot hole is "cased." "Casing" describes both the actual pipe lining a well, in addition to the act of lining the drilled hole — the well bore — with such pipe.

56.     The combination of drilling the pilot hole and casing is known as "spudding in."

57.     The casing initially lowered into the pilot hole generally anchors a safety device known as the blowout preventer, or "BOP." The BOP is an appurtenance of the drilling vessel and a part of the vessel's equipment.

58.     The BOP is an assembly of hydraulically operated valves that sense pressure. It is designed to prevent a blowout from reaching an oil rig. Its valves are mounted in a direction perpendicular to the anticipated flow of oil. The BOP is equipped with a series of different "rams" which can be utilized to close off the well in various situations, depending on the presence or absence of the drill stem or casing in the shaft. The BOP on this well was a 53-foot-tall steel framed stack weighing 450 tons.

59.     BOP devices generally close within 30 seconds of activation. A BOP's rams can be manually activated from the drill rig. Likewise, BOPs generally feature a deadman's switch, which is intended to activate the device's rams if electrical and/or hydraulic connections to the oil rig are severed.

60.     BOP devices are also able to be activated by using remotely operated vehicles, or "ROVs," at the wellhead.

61.     The risk of a blowout is one of the most dangerous and common risks in deepwater drilling, hence the installation of the BOP so early in the well drilling process. The BOP is a crucial last line of defense for a drilling vessel and its workers if all other attempts to balance well pressure and counter an influx fail, and the well begins to flow out of control.

62.     Once the BOP is properly positioned and secured over the pilot hole, the drilling apparatus and additional casing sections are lowered down through the BOP into the well, while a pipe called a "marine riser" connects the wellhead to the drilling vessel at the surface.

63.     As the drill stem is passed through the marine riser and BOP, drilling fluid known as "mud" is pumped down the center of the drill pipe. This "mud," a thick mixture of barite, water, clay, and chemicals, cools and lubricates the drill bit and suspends and carries drilled rock fragments and other drilling debris to the surface as it flows upwards outside of the drill stem but inside the marine riser.

64.     Drilling mud is carefully formulated so that its hydrostatic pressure[2] slightly exceeds that of the ambient pressure conditions in the various rock formations encountered during the drilling process. The weight of the mud pushes back against the pressure of the hydrocarbons in those formations, helping to control against the ever-present risk of kicks and blowouts in the well.

65.     As the well bore is drilled deeper and deeper, additional sections of casing are added to line each newly-drilled open hole section with pipe. Each casing section is secured with a plug of cement. If a well is to be temporarily abandoned before production, then when drilling reaches the hydrocarbon reservoir, the cementing contractor temporarily seals the well off from the hydrocarbon reservoir it has penetrated, isolating the oil and gas to prevent it from leaking into the well, and then places a temporary cement plug below the BOP at the top of the well.

---

[2] Hydrostatic pressure is the pressure exerted by a fluid due to the force of gravity. The denser a fluid, the higher its hydrostatic pressure. Drilling mud is often very dense (12 to 16 pounds per gallon), so it can counter the highly pressurized hydrocarbons surrounding a well. In comparison, seawater is relatively light, only 8.6 ppg.

66.    Assuming the design of the well is stable, and proper testing and analysis confirm the integrity of the cement plugs, casing string, and other well components, the drilling vessel can disconnect from the well, temporarily abandoning it until a permanent oil production platform is put into place on the sea surface above the well to begin extracting oil or gas.

<u>**The Events Preceding the Oil Spill**</u>

67.    In the weeks and months before the Oil Spill, the Defendants were engaged in exploring and drilling the Macondo prospect onboard and below the *Deepwater Horizon*.

68.    The Macondo prospect site is in the Northern Gulf of Mexico, an area notorious in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak, brittle rock formations. At the Macondo site, the *Deepwater Horizon* was conducting drilling operations in excess of 18,000 feet. Defendants knew or should have known that the threat of blowouts increases as drilling depths increase, especially in an area with such troublesome geology as the Northern Gulf of Mexico.

69.    *Deepwater Horizon* workers reported that since drilling began on October 7, 2009, they had struggled to control the problematic well, as kicks of natural gas regularly burst into the well, halting the drilling progress. According to a NOAA Flow Rate Technical Group report, the hydrocarbon reservoirs the Macondo well drilled through have high ratios of gas to oil. The MMS had even warned BP that the gas buildup in this well was a concern and that BP should "exercise caution."

70.    On March 8, 2010, Defendants experienced particularly serious problems with the well, including a hydrocarbon influx into the well and loss of well control. Upon information and belief, the March 8, 2010, influx became a "near miss" of what could have

been a lethal blowout.

71.     Prior to the *Deepwater Horizon* Oil Spill, one or more of the Defendants knew that improving safety performance during offshore drilling operations was necessary. For example, prior to the Oil Spill, Mr. Steven L. Newman, chief executive of Transocean, admitted that "we have to improve our safety performance."

72.     Furthermore, the Defendants also knew or should have known that ultra-deepwater drilling carried significant safety and environmental risks.

73.     In the weeks and months before the Oil Spill, the operations at Macondo were experiencing delays. Upon information and belief, BP insisted that the Defendants increase the rate of their activities to expedite the placement of a permanent oil rig at the site to begin production. This emphasis on speed over safety led to errors and omissions by the Defendants, which in turn caused and/or contributed to the initial explosion and subsequent Oil Spill.

74.     For example, on April 9, 2010, the Defendants had largely finished the initial drilling of the last section of the well. The final section of the wellbore extended to a depth of 18,360 feet below sea level, which was 1,192 feet below the casing that had previously been inserted into the well.

75.     At this point, the Defendants had to make an important well design decision: how to secure the final 1,192 feet of the well.

76.     There were two primary options available to the Defendants. The first option involved hanging a steel tube called a "liner" from a liner hanger on the bottom of the casing already in the well and then inserting another steel liner tube called a "tieback" on top of the liner hanger.

77.     The second option available to the Defendants involved running a single string of steel casing from the seafloor all the way to the bottom of the well.

78.     The "Liner/Tieback Casing" (first option) provides advantage over full string casing (second option) with redundant barriers to annular flow. With a single string of casing, there are just two barriers to the flow of gas up the annular space that surrounds the casing: the cement at the bottom of the well and the seal at the wellhead.

79.     In contrast, the "Liner/Tieback" option provides four barriers to annular flow: (1) the cement at the bottom of the well, (2) the hanger seal that attaches the liner to the existing casing in the well (3) the cement that secures the tieback on top of the liner, and (4) the seal at the wellhead. The Liner/Tieback option also takes more time to install, requiring several additional days to complete.

80.     The Defendants were aware of the risks of the single casing approach. An undated "Forward Plan Review" that appears to be from mid-April recommended against the single string of casing because of the risks. According to this document, "Long string of casing... *was* the primary option" but a "Liner.., is now the recommended option."

81.     This Forward Review Plan noted that single string casing was risky because, *inter alia*, it could lead to the following:

a.      "Cement simulations indicate it is unlikely to be a successful cement job due to formation breakdown."

b.      "Unable to fulfill MMS regulations of 500' of cement above top HC zone;"

c.      Open annulus to the well head, with... seal assembly as only barrier;"

d.      "Potential need to verify with bond log, and perform remedial cement job(s);" and

82.     Conversely, the Forward Review Plan noted at least four advantages to

using the liner option. These included:

    a.    Less issue with landing it shallow (we can also ream it down);"

    b.    "Liner hanger acts as second barrier for HC in annulus;"

    c.    "Primary cement job has slightly higher chance for successful cement lift;" and

    d.    "Remedial cement job, if required, easier to justify to be left for later."

83.    Despite the risks, one or more of the Defendants chose to install the single string of casing instead of a liner and tieback. The decision to run a single string of casing was made, on information and belief, to save time and reduce costs.

84.    Defendants also made a risky choice for the casing pipe material itself, using metal well casings that raised concerns from their own engineers. Upon information and belief, internal documents cited by federal investigators showed that as early as 11 months before the blowout, BP engineers worried that the metal casings BP wanted to use might collapse under the high pressure at the bottom of the well, and using the metal casings also violated BP's own safety policies and design standards, but the riskier metal casings were nevertheless used after special permission was granted by BP supervisors.

85.    Moreover, one or more of the Defendants failed to ensure that appropriate "centralizer" devices were used in the casing the well.

86.    Centralizers ensure that the casing pipe is centered in the well bore; if the pipe is not centered, the cement placed around it often fails to create a secure seal against the highly-pressurized hydrocarbons surrounding the well. The cement around the casing is intended to seal the space (the "annulus") between the rock walls of the drilled out well bore hole and the casing that runs through the well bore. If the casing is not centered within the wellbore, the pipe can lay near or against the sides of the bore hole, creating too narrow of a

space for the cement to set properly and leaving "channels" of empty space or weak areas in the cement. Those channels and imperfections can allow hydrocarbons to escape out of the formations and into the well, causing a kick or a blowout. An email from shore-based BP Operations Vice President Brett Cocales to rig-based BP drilling engineer Brian Morel acknowledged the importance of centralizers, noting that "[e]ven if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it."

87.     The American Petroleum Institute's Recommended Practice 65 explains: "If casing is not centralized, it may lay near or against the borehole wall. ...It is difficult, if not impossible, to displace mud effectively from the narrow side of the annulus if casing is poorly centralized. This results in bypassed mud channels and inability to achieve zonal isolation.

88.     On or about April 5, 2010, BP notified one or more of the other Defendants that it was planning to use only six centralizers on the final casing section at the Macondo well. Halliburton engineer Jesse Gagliano spent a day running models to determine if six centralizers would be enough to prevent channeling that gaseous hydrocarbons could seep through. Halliburton's analysis concluded that 21 centralizers was the recommended number to ensure a secure cement job; using ten would result in a "moderate" gas flow problem and using only six would result in a "severe" gas flow problem. This information was provided to BP. Additional centralizers were available on the *Deepwater Horizon*, but BP well site leaders erroneously believed they were the wrong type, and did not want to wait for more. In the same email that had recognized the risks of proceeding with insufficient centralizers, BP official Brett Cocales shrugged off using only six, flippantly concluding, "who cares, it's done, end of story, will probably be fine."

89.     Halliburton, hired for its cementing expertise, was fully aware that the number of centralizers BP chose to use was unsafe. Halliburton employee Marvin Volek had warned the BP well site team that BP's cementing plan "was against our best practices." Yet even after running the models that made it clear proceeding with only six centralizers would lead to "failure of the cement job," Halliburton did not stop work or insist that BP use additional centralizers, instead recklessly proceeding with the cement job it knew was destined to fail.

90.     Another questionable decision by one or more of the Defendants was the failure to circulate fully the drilling mud in the well before cementing. This procedure, known as "bottoms up," involves circulating drilling mud from the bottom of the well all the way to the surface. Bottoms up has several purposes: it allows workers on the rig to test the mud for influxes of gas; it permits a controlled release of gas pockets that may have entered the mud; and it ensures the removal of well cuttings and other debris from the bottom of the well, preventing contamination of the cement.

91.     The American Petroleum Institute's guidelines recommend a full bottoms up circulation between running the casing and beginning a cementing job. The recommended practice states that "when the casing is on bottom and before cementing, circulating the drilling fluid will break its gel strength, decrease its viscosity and increase its mobility. The drilling fluid should be conditioned until equilibrium is achieved.... At a minimum, the hole should be conditioned for cementing by circulating 1.5 annular volumes or one casing volume, whichever is greater."

92.     The April 15, 2010 operations plan for the *Deepwater Horizon* called for a full bottoms up procedure to "circulate at least one (1) casing and drill pipe capacity, if hole conditions allow." Nevertheless, upon information and belief, the final procedure called

for circulating just 261 barrels of mud, just a small fraction of the mud in the Macondo Well.

93.     Mr. Roth of Halliburton has stated that one reason for the decision not to circulate the mud could have been a desire for speed, as fully circulating the mud could have added a much as 12 hours to the operation.

94.     Notwithstanding the Defendants' risky choices and skipped safety precautions up to this point, and despite knowing the risks of using insufficient centralizers and skipping bottoms up circulation, Halliburton began the cementing job on the Macondo Well.

95.     In a 2007 study, the MMS expressed concerns that oil rig blowouts can be caused by ineffective and/or improper cementing work. Although the study noted that the overall risk of blowouts has been declining, it suggested that blowouts related to cementing work continued with some regularity, and most frequently in the Gulf of Mexico.

96.     According to the 2007 study, cementing problems were associated with 18 of 39 blowouts that occurred between 1992 and 2006, and in 18 of the 70 blowouts that occurred from 1971 to 1991. Nearly all of the blowouts examined occurred in the Gulf of Mexico.

97.     The Defendants knew or should have known that careless, ineffective, negligent, or reckless cementing work caused an August 2009 blowout in the Timor Sea. During that incident, which shares similarities with the *Deepwater Horizon* Oil Spill, oil leaked from the Timor Sea site for ten weeks, causing damage over 200 miles from the well site.

98.     According to the *Associated Press*, MMS has implicated the cementing process as faulty or ineffective 34 times since 1978.

99.     The cementing job was intended to fill the annulus between the casing and the well bore and seal off the hydrocarbon-filled formations, as well as plug the bottom of the

casing pipe to prevent an influx. The composition of the cement mixture ("slurry") that Halliburton chose for the task would have to allow the cement to be effectively placed and fully set within the narrow range of safe operating pressures at the bottom of the well. During placement, the slurry would have to be light enough to avoid fracturing the brittle formations surrounding the well, but once set, the slurry would have to be strong enough to resist the intense, nearly 12,000 psi pressure of the hydrocarbon reservoirs within those formations, securely sealing the annular space between the casing and surrounding formations, isolating the hydrocarbon reservoirs from the well. Despite these challenges, Halliburton and the other Defendants improperly designed the cement slurry and failed to thoroughly conduct and/or review the results of laboratory testing of the cement slurry stability under conditions that would be found in the Macondo well.

100.    Halliburton ultimately recommended a foamed cement mixture to seal the bottom of the Macondo well. Foam cement is cement that has been injected with nitrogen gas to lower its density. But high temperatures and pressures in wells like Macondo can have unpredictable effects on the nitrogen in the cement, leading to instability and weakness that prevents the cement from forming a secure seal in the well.

101.    On October 28, 2010, Fred Bartlit, Jr., the lead investigator for the presidential commission investigating the Oil Spill, reported that tests conducted by Halliburton in February 2010 on a cement slurry similar to that used to secure the Macondo well showed instability under conditions like those found at the bottom of the Macondo Well.

102.    Halliburton and BP already knew the Macondo Well was located in brittle, variable, challenging rock formations laced with volatile high temperature, high pressure,

gaseous hydrocarbon reservoirs that had plagued drilling operations in the past.

103.    The presidential commission's investigators asked Halliburton to provide them with samples of materials like those used at the Macondo well; independent testing of those samples could not generate stable foam cement in the laboratory using the materials provided by Halliburton, which, according to Bartlit, strongly suggests that the foam cement used at Macondo was unstable during that cement job as well.

104.    Independent tests conducted for BP's investigation of the disaster were also unable to generate a stable slurry using a mixture as similar as possible to Halliburton's slurry in conditions like Macondo's.

105.    Prior to using its slurry mixture in the Macondo well, Halliburton conducted at least four foam stability tests on it, or on similar formulations, but the tests were incomplete and substandard, and mostly indicated the slurry would not be stable in the Macondo well.

106.    In February 2010, Halliburton conducted the first two tests on a cement slurry that was slightly different than that ultimately used; both tests indicated that this foam slurry design was unstable if used in Macondo conditions. According to Bartlit's report, Halliburton provided the results of the February testing to BP by e-mail on March 8, 2010.

107.    Halliburton conducted two other foam stability tests in April 2010, this time using the actual slurry mixture and design ultimately used in the Macondo Well. On April 13, seven days before the blowout, testing indicated the foam slurry design was unstable. Bartlit reports that the results of this test were reported internally within Halliburton by at least April 17, 2010. In a second April test, Halliburton modified the testing procedure and the data indicated, for the first time, that the foam slurry mixture would be stable if used at Macondo. It is not clear if BP received the results of either of the April tests from Halliburton before it

allowed Halliburton to begin cementing.

108.     Oil industry expert Robert Bea told the Washington Post that drillers will often run one test on a proposed cement mixture, then a second test as a backup. Bea considered Halliburton's four tests "unusual . . . [T]hat's telling me they were having trouble getting to a stable design."

109.     Despite the four tests Halliburton did run on the slurry mixture, the testing was not comprehensive, thorough, or consistent with industry standards. For example, as BP's investigation team noted, Halliburton did not provide results for such commonly tested cement slurry parameters as fluid loss, free water, foam/spacer/mud compatibility, static gel strength transition time, zero gel time, or settlement.

110.     Bartlit reported to the presidential commission that, taken together, the Halliburton documents indicated that:

a.     Only one of the four tests . . . that Halliburton ran on the various slurry designs for the final cement job at the Macondo well indicated that the slurry design would be stable;

b.     Halliburton may not have had — and BP did not have — the results of that test [showing stable results] before the evening of April 20, meaning that the cement job may have been pumped without any lab results indicating that the foam cement slurry would be stable;

c.     Halliburton and BP both had results in March showing that a very similar foam slurry design to the one actually pumped at the Macondo well would be unstable, but neither acted upon that data; and

d.     Halliburton (and perhaps BP) should have considered redesigning the foam

slurry  before pumping it at the Macondo well.

111.    In addition to having seen slurry test results showing the instability of Halliburton's proposed cement mixture, BP was also aware of the incomplete, substandard nature of Halliburton's  tests, which failed to provide results for  several commonly  tested parameters. Nevertheless, BP did not insist that Halliburton reformulate its cement slurry or perform the missing standard tests before proceeding with this tricky and important final cement job. Indeed, in its rush to complete the well, BP likely charged ahead having only ever seen Halliburton's first three slurry test reports — all of which indicated the cement would be unstable in the well.

112.    Unstable foam cement slurry can result in nitrogen breakout, when bubbles of nitrogen create tiny holes in the cement as it is setting, leaving the cement porous and unable to form a seal against the hydrocarbon pressure. Nitrogen breakout not only jeopardizes the foam cement itself, but can also contaminate the other types of cement it is pumped with, interfering with their proper placement and/or degrading their ability to form a secure seal. Nitrogen breakout in the unstable foam slurry used at Macondo could have weakened the denser, non- foamed cement used to plug the very bottom of the last casing pipe, leaving it also unable to withstand the pressure of the hydrocarbons surrounding the well.

113.    In addition to the formulation of the cement mixture, the volume of cement used is another factor in ensuring a successful cement job. Halliburton used a small volume of cement for this last section of the Macondo Well. According to the interim report by the National Academy of Engineering ("NAE") scientists investigating the Oil Spill, the concern with using a small volume of cement is "the potential for contamination of the entire slurry volume simply because less cement is present." This was especially relevant at Macondo,

where the high gas-to-oil ratio in the hydrocarbon reservoirs surrounding the well presented a risk of gas contaminating the cement during the setting process.

114.    The NAE panel also expressed concern that the flow rate Halliburton chose to use when pumping the cement into the well was too low to achieve "turbulent flow," a condition that helps push the mud out of the annulus during the cement placement.

115.    Given the extremely narrow range of safe operating pressures Defendants were faced with in this last section of the well, it was all the more important to monitor well flow during the cementing process, to ensure there were no indications of fluid loss or fracturing of the formations around the bottom of the well. By monitoring the flow of drilling fluid out of the well as the cement is pumped in, it can be confirmed that every barrel of injected cement is associated with a barrel of drilling fluid flowing out of the well. These "full returns" indicate that the cement is displacing mud from the annulus as planned. If less mud flows out of a well than the amount of cement that is pumped in, fluid is being lost, most likely into fractures in the brittle formations.

116.    Although BP claimed there were full returns during the last cementing job at Macondo, Halliburton cementer Nathaniel Chaisson testified that there was no monitoring system in place that could have confirmed full returns during cementing operations. Moreover, data presented to the congressional investigators by Halliburton cementer Vincent Tabler indicated that about 80 more barrels of cement were pumped into the well than barrels of mud that flowed out. This fluid loss would indicate that the brittle formations at the bottom of the well had fractured during the cementing process, allowing fluids and cement to escape into the fissures in the rock, and ruining the cement job. During its congressional testimony in September 2010, BP suggested that 50 barrels of the apparent fluid loss were due to compression

of nitrogen in the cement. Nevertheless, BP should have had a flow monitoring system in place during the cementing process, and any losses due to nitrogen compression should have been anticipated and compensated for during the interpretation of the flow monitoring data.

117.    One way to ensure the viability of cementing work is to conduct a "cement bond log." A cement bond log is an acoustic test that is conducted by running a tool inside the casing after the cementing is completed.  The cement bond log determines whether the cement has bonded to the casing and surrounding formations.  If a channel that would allow gas flow is found, the casing can be perforated and additional cement injected into the annular space to repair the cement job.

118.    Tommy Roth, a Halliburton Vice President of Cementing, has stated that BP should have conducted a cement bond log. According to Mr. Roth, "If the cement is to be relied upon as an effective barrier, the well owner must perform a cement evaluation as part of a comprehensive system integrity test."

119.    MMS regulations also appear to direct a cement bond log or equivalent test at the Macondo well. According to the regulations, if there is an indication of an inadequate cement job, the oil company must "(1) Pressure test the casing shoe; (2) Run a temperature survey; (3) Run a cement bond log; or (4) Use a combination of these techniques." 30 CFR § 250.428.

120.    One or more of the Defendants failed to perform a cement bond log test on the subject well. This decision was contrary to BP's own original drilling plan, which included the cement bond log test. Skipping the cement bond log test was also contrary to BP's own internal standards, which do not consider full fluid returns a "proven cement evaluation technique," and require a cement bond log test if a well's cement design provides for less

than 1000 feet of cement above the highest hydrocarbon layer. BP's Macondo plan only provided for 500 feet.

121.    The decision not to conduct the cement bond log test was, on information and belief, driven by concerns about expense and time.  The cement log would have cost $128,000 to complete. Moreover, Mr. Roth of Halliburton estimated that conducting the test would have taken an additional 9 to 12 hours. Remediating any problems found with the cementing job would have taken still more time.

122.    Gordon Aaker, Jr., P.E., a failure analysis consultant with the firm Engineering Services, LLP, retained by the U.S. House of Representatives Subcommittee on Oversight and Investigations, has opined that it was "unheard of ' not to perform a cement bond log on a well using a single casing approach, and he described the decision not to conduct a cement bond log as "horrible negligence." Another independent expert consulted by the House of Representatives, John Martinez, P.E., has opined that "cement bond or cement evaluation logs should always be used on the production string."

123.    BP also failed to deploy the casing hanger lockdown sleeve that would have prevented the wellhead seal from being broken by pressure from below. Upon information and belief, BP made this decision to save time and money. A casing hanger lockdown sleeve ties down the seal assembly at the top of a well, providing an extra layer of protection against a blowout. Usually the casing hanger lockdown sleeve is deployed before the heavy drilling mud is pumped out of the well, so that it can offer an extra shield against any problems during and after the mud displacement process.

124.    Contrary to industry standard, BP's plan was to deploy the casing hanger lockdown sleeve *after* the heavy mud had been displaced with seawater. A well design expert at

another major oil company expressed surprise at BP's choice to displace the mud before deploying the casing hanger lockdown sleeve, saying it was "not the norm." BP had chosen to shake the champagne bottle with only a faulty cork — Halliburton's unsound cement job – – standing in the way of disaster.

125.    On the morning of April 20, 2010, the day of the blowout, BP informed M-I, LLC drilling fluid specialist Leo Lindner that the mud displacement would be more substantial than usual, displacing the top 8,367 feet of mud in the riser and drilling string, instead of the typical 300 feet. In his congressional testimony, Lindner did not mention why BP was displacing almost 28 times the usual amount of heavy mud.

126.    Lindner calculated a mud displacement plan according to BP's specifications, including the suspension of the displacement procedure partway through to allow for pressure testing of Halliburton's recently completed cement job. Lindner testified that he distributed copies of his mud displacement plan to BP and Transocean employees on the drilling vessel; thus some, if not all, of the Defendants were aware of and complicit in BP's plan to displace an unusually large amount of mud from the well, without the added safety of the casing hanger lockdown sleeve, and beginning before the cement had even fully set and been pressure tested.

127.    At around noon on April 20, 2010, after the completion of the positive pressure test, drilling vessel workers began the mud displacement process. According to the mud displacement plan, the displacement would proceed until the spacer fluid had been pumped down to a level 12 feet above the BOP, after which the displacement would be suspended for the negative pressure test.

128.    The BOP's annular preventer was closed to seal casing string for the negative

test, but for some reason did not form a secure seal, which allowed about 50 barrels of spacer fluid to leak through the BOP and into the well. This meant that dense, viscous spacer fluid was across the inlets to several small-bore pipes that were to be used for the negative pressure test, rather than the plain seawater that should have been across the pipe inlets. Defendants were aware of this spacer fluid leakage and the potential for the viscous fluid to be blocking the small-bore pipes necessary for the negative pressure test, yet they took no steps to remedy the situation.

129.    The negative pressure tests were intended to assess the security of Halliburton's cement job at the bottom of the Macondo well. With the casing string sealed, pressure was bled off from inside the well, "underbalancing" it by reducing the pressure in the casing until the external pressure from the hydrocarbon reservoirs surrounding the well was greater than the internal pressure within the casing itself. If Halliburton's cement job had securely sealed the hydrocarbon reservoirs off from the well, there would be little to no fluid flow out of the well and the pressure in the casing would remain at the reduced, underbalanced level. An increase in pressure or flow would indicate that the cement job was not secure, and was allowing hydrocarbons to flow into the well and repressurize the casing string.

130.    Defendants' two negative pressure tests on the Macondo well both yielded abnormal results. In one instance, over four times the expected fluid returns spurted out of the well after the pressure was reduced to an underbalanced state. In the other test, the pressure in the well *increased* from 50 psi to 1,400 psi – a highly diagnostic "red flag" result indicating that Halliburton's cement job had failed to seal off the well from the surrounding hydrocarbon reservoirs. The 1,400 psi pressure response and the excess fluid returns were indications

that hydrocarbons were flowing into the well, re-pressurizing it after it had been underbalanced for the negative pressure test.

131.    It is also possible that the pressure tests themselves further damaged and weakened the cement in the well.  Not only were the tests performed before the cement had a full 72 hours to set completely, but contrary to common practice, the drill string was 10,000 feet above the bottom of the well during the tests.

132.    Experts later testified that BP's interpretation of the pressure tests was not industry standard, while BP itself admitted to Congressional investigators that continuing work on the well after such alarming test results might have been a "fundamental mistake." In May 2010, BP admitted to congressional investigators that these pressure test results were clear warning signs of a "very large abnormality" in the well.

133.    Later, in its September 8, 2010, disaster investigation report, BP concluded that the negative pressure test result of 1,400 psi was misinterpreted by Transocean and BP employees on the *Deepwater Horizon*, leading the vessel crew to the erroneous view that the test was a success and well integrity had been established. Moreover, BP's investigation found no evidence that the drilling vessel's workers consulted anyone outside their teams on the vessel or onshore about the abnormal pressure reading, as they should have, before coming to their incorrect conclusion that the well was secure. The well site leader should have called experts on the drilling vessel or on the beach to discuss the results, BP Vice President Steve Robinson testified in congressional hearings in December 2010.

134.    On December 7, 2011, the BSEE notified BP that its failure to conduct an accurate pressure integrity test violated 30 C.F.R. § 250.427.

135.    In their November 16, 2010, interim report, the NAE panel wrote that "it is

clear that pressure buildup or flow out of a well is an irrefutable sign that the cement did not establish a flow barrier" against the entry of hydrocarbons into the well. At Macondo, there was both pressure buildup to 1400 psi and unexpected flow out of the well during the negative pressure tests.

136.     There was only one appropriate response to these abnormal negative pressure test results: remedial cement work to correct Halliburton's obviously-flawed cement job and shore up the seal against the highly pressurized hydrocarbon reservoirs. Defendants, however, elected to ignore the "red flag" results of these, the only cement integrity tests they had even bothered to perform, and continue with their well completion plan as if Halliburton's cement job had been a success.

137.     During the mud displacement process, BP used an unconventional fluid mixture, and an unusually large volume of it, as "spacer" fluid. This novel composition and amount of fluid may have interfered with negative pressure test results and/or caused damage or clogging in the BOP.

138.     In addition to the acts and omissions described above, in the days immediately prior to the onset of the Oil Spill, BP made a series of unusual, rapid-fire requests to modify operational permits regarding the *Deepwater Horizon*. These requests were approved in an extremely expeditious fashion, one being "reviewed" and "approved" within five minutes.

139.     On April 14, 2010, one of these modifications included BP asking MMS if it could use a so-called "one-pipe" method, rather than a "two pipe" method to reach the oil and gas reservoir below the *Deepwater Horizon*. According to *The New York Times*, BP concluded that the one-pipe option was the "best economic case" despite having "some risk" of leaving an open path for gas to travel up outside the well. The two-pipe method,

according to some experts, is "more or less the gold standard," especially for high-pressure wells such as the one below the *Deepwater Horizon*.

140.    Upon information and belief, the two-pipe method was the safer option because it would have provided an extra layer of protection against gas traveling up the outside of the well to the surface.   However, the one-pipe method was easier and faster by about 7 days, saving BP nearly $7 million.

141.    The Defendants knew or should have known that the threat of blowouts increases as drilling depths increase. The Defendants were drilling in 5,000 feet of water and to a total depth in excess 18,000 feet below the sea floor. Some sources indicate that the *Deepwater Horizon* may have been drilling in excess of its permitted depth.

142.    The Defendants were also aware that ultra-deepwater drilling increases the risk and manifestation of product defects in the *Deepwater Horizon's* most critical blowout safety mechanism, the BOP.

143.    The Defendants were aware of the risk of the BOP failing at the great depths in which the *Deepwater Horizon* was operating, yet the Defendants failed to install a backup BOP activation system or a backup BOP, and to provide adequate warnings, instructions, or guidelines on permissible uses, modifications, and applications of the BOP.

144.    Moreover, a Transocean-commissioned independent audit of the vessel in April 2010, just before the blowout, again revealed a range of problems with the *Deepwater Horizon*'s BOP, including a leaking door seal, pump parts needing replacement, error-response messages, and "extraordinary difficulties" surrounding the maintenance of the BOP's annular valves. BP well site leader Ronald Sepulvado testified in August 2010 that he too had raised concerns about Transocean's maintenance of the BOP, reporting that several pieces of equipment

had been out of service for extended periods of time, but that Transocean "always told me that they didn't have the parts" to make the necessary repairs.

145.    Transocean had also failed to recertify the *Deepwater Horizon*'s BOP, as required by federal regulations, because recertification would require a full disassembly of the device and more than 90 days of downtime. In its disaster investigation, BP noted that Transocean did not record well control-related equipment maintenance, including that of the BOP, accurately or completely in the regular maintenance management system, sometimes even recording work performed on the BOP that could not possibly have taken place since the BOP was in use on the seafloor at the time of the supposed repair.

146.    After the explosions, as the *Deepwater Horizon* was burning on the surface, emergency responders sent ROVs to the sea floor to attempt to close the blind shear ram using the "hot stab" or autoshear functions. Several hot stab attempts to close the blind shear ram failed due to insufficient hydraulic pressure. Over the course of these events, a number of leaks were discovered in the BOP's hydraulic system, as well as incorrect hydraulic plumbing from the ROV intervention panel to the pipe rams, which was likely the result of aftermarket modifications to the BOP.

147.    Ultimately six leaks were discovered in the hydraulic system of the Macondo well's BOP. From investigation and testimony, Defendants were aware of at least two, but likely almost all, of these leaks prior to April 20, 2010. One leak was discovered as early as February 2010, but was never repaired or otherwise addressed by Defendants. Vessel workers testified to awareness of other leaks during their congressional testimony. Not least, the weekly BOP function tests should have made Defendants aware of the other hydraulic system leaks identified during the ROV intervention.

148.    Defendants' failure to properly maintain the *Deepwater Horizon*'s BOP was also a violation of federal regulations. On October 12, 2011, BSEE found that BP, Transocean, and Halliburton had each violated 30 C.F.R. § 250.446(a) by failing "to maintain the *Deepwater Horizon* BOP system in accordance to API RP 53 section 18.10.3."

149.    Defendants were also aware of the aftermarket modifications that hindered the emergency responders' ability to activate the BOP via hot stab procedures. In addition to incorrectly installed aftermarket hydraulic plumbing, Defendants had switched out one of the *Deepwater Horizon*'s variable bore rams with a non-functional test ram. But after the blowout, emergency responders spent a day futilely trying to close that missing variable bore ram, not knowing it had been replaced with a useless test part, because Defendants hadn't updated the BOP's schematic diagram to reflect the aftermarket changes – a violation of 29 C.F.R. § 1910.119, which requires, *inter alia*, up-to-date process and safety system equipment drawings as a part of basic process safety management.

150.    Defendant officials were aware of the faulty solenoid valve, poor battery maintenance, hydraulic fluid leaks, and aftermarket modifications on the *Deepwater Horizon*'s BOP long before the April 20, 2010, but no action was ever taken to address the problems, perhaps because additional delays and costs would accrue as all well work stopped and the BOP was raised from the sea floor for repairs. In addition to posing a significant safety risk, Defendants' choice to continue drilling with a faulty hydraulic system violated federal regulations, which require companies to disclose problems to the MMS and to stop drilling if either of a BOP's two control systems is not working properly.

151.    A 2004 study by Federal regulators showed that BOPs may not function in deep-water drilling environments because of the increased force needed to pinch and cut

the stronger pipes used in deep-water drilling. Only 3 of 74 rigs studied in 2004 had BOPs strong enough to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth. "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a Blowout," the study said.

152.     Moreover, approximately four weeks before the blowout and onset of the Oil Spill, the Defendants became aware of damage to the *Deepwater Horizon's* BOP. This included the intrusion of the drill pipe into the BOP, damaging the BOP's annular seal, a rubber gasket vital to the proper functioning of the device.

153.     As a result of this failure, foreign materials including chunks of rubber broken away from the annular seal floated to the surface of the *Deepwater Horizon* and were observed by BP and Transocean.

154.     In response to the discovery of pieces of the annular seal and other evidence in the drilling fluid, BP and Transocean failed to act to prevent or mitigate risk of the Oil Spill. Halliburton was also aware of this discovery, and similarly failed to report this information to outside sources. One or more of the Defendants acted unreasonably by ignoring this evidence and continuing drilling operations.

155.     In conjunction with their knowledge of the failure of the annular seal on the BOP device, BP and Transocean were also aware of inoperability of the pods used to control the BOP so that it could seal the oil well in the event of a blowout. Upon information and belief, BP and Transocean were aware of failures in the BOP's battery system and power source.

156.     BP and Transocean could have ensured that a BOP and/or back-up BOP with

sufficient strength for deepwater drilling were installed on the *Deepwater Horizon*, but did not  do so.

157.    BP and Transocean could have installed a back-up trigger to activate the BOP in  the event that the main trigger failed to activate.

158.    In fact, federal regulators at the MMS communicated to BP,  Transocean, and/or  Halliburton in 2000 that MMS considered a backup BOP activation system to be "an essential component of a deepwater drilling system."

159.    Despite  this notice, and although the  backup trigger  is a common drill-rig requirement in other oil producing nations, including other areas where the BP operates, the *Deepwater Horizon* was not equipped with this backup remote BOP trigger.

160.    The *Deepwater Horizon* was also not equipped with a second BOP, as are many newer oil rigs. Rather, the *Deepwater Horizon* only had one BOP installed, leaving the  well especially vulnerable to a blowout and subsequent oil spill.

161.    Unfortunately, the BOP was not the only part of the *Deepwater Horizon* that was poorly maintained and in disrepair at the time of the blowout. Transocean, the vessel's owner,  had a history  of postponing and ignoring needed maintenance on the *Deepwater Horizon*, despite concerns raised by its own employees and other vessel workers.  In  the  weeks before  the blowout, the *Deepwater Horizon* suffered power outages, computer glitches,  and a balky propulsion system. In some cases, Transocean officials even purposely overrode or disabled vital safety mechanisms and alarms. When the Macondo well blew out, the *Deepwater Horizon*'s shoddy maintenance facilitated a cascade of failures of multiple emergency systems,  exacerbating the disaster.

162.    According to testimony given before a federal panel by vessel engineers in

August 2010, the *Deepwater Horizon* had a number of ongoing equipment problems at the time of the blowout, some of which contributed to the failure of backup generators that should have powered safety and shutdown devices immediately after the blowout.

163.    Further, the computerized system used to monitor routine maintenance aboard the vessel was not working optimally because glitches from a recent computer system migration had not yet been resolved.  Sometimes the computer called for maintenance to be done on equipment that did not exist aboard the vessel, while some pieces of equipment that were aboard the vessel  and in need of maintenance were not registered by the computer.

164.    Even worse, some key safety systems and alarms on the *Deepwater Horizon* had been intentionally bypassed or disabled by Transocean. Mike Williams, a chief electronics technician working for Transocean aboard the *Deepwater Horizon*, testified that on the night of the blowout, a pressure regulator valve, which automatically cuts off gas flow at a certain pressure point and could have helped stop the blowout, was in "bypass" mode when the  gaseous  hydrocarbons blew out of the Macondo well. Williams had repeatedly expressed concern about bypassed safety systems to Transocean supervisors, only to be upbraided for his efforts. In one instance, Williams activated a gas safety valve that he thought was erroneously in "bypass" mode. Williams testified that Transocean subsea supervisor Mark Hay reprimanded him for it, saying: "'The damn thing has been in bypass for five years. Why did you even mess with it?' … And [Hay] said, 'As a matter of fact, the entire fleet [of Transocean drilling vessels] runs them in  bypass.'"

165.    Williams said a fire alarm system on the vessel was also partially disabled at the time of the blowout, and had been for at least a year since Williams first noticed it. The system was set to "inhibited" mode, meaning that the control panel would indicate a

problem, but a general alarm would not sound throughout the vessel unless manually activated. Transocean supervisors told Williams "they did not want people to wake up at 3 a.m. due to false alarms." Williams testified that he complained regularly about the practice of disabling and bypassing alarms and safety systems; his most recent complaint was just three days prior to the blowout.

166.    When the *Deepwater Horizon* lost power during the blowout, none of the backup or emergency generators were working — equipment that was on board for the very purpose of providing power to alarm and safety systems in just such an emergency. Transocean employee and *Deepwater Horizon* chief engineer Stephen Bertone testified that there was no general alarm, no internal communications, and no power to the vessel's engines. "We were a dead ship." Without power, the crew was also unable to engage the EDS that would have stopped the flow of gas fueling the fire on the vessel, and many other alarm and safety systems were rendered silent and useless.

167.    An equipment assessment commissioned by Transocean in April 2010, just before the blowout, revealed many key components on the Deepwater had not been fully inspected since 2005, and at least 36 components and systems on the vessel were in "bad" or "poor" condition, which "may lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment." The equipment assessment also found problems with the vessel's ballast system that they noted could directly affect the stability of the ship. The assessment found a malfunctioning pressure gauge and multiple leaking parts, and also faulted the decision to use a type of sealant "proven to be a major cause of pump bearing failure."

168.    The findings of the Transocean-commissioned equipment assessment echoed

the results of a similar BP-commissioned audit that had been conducted in September 2009, which found that Transocean had "overdue planned maintenance considered excessive — 390 jobs amounting to 3,545 man hours [of needed maintenance work]."

169.    In a confidential worker survey conducted on the *Deepwater Horizon* just weeks before the blowout, Transocean employees voiced concerns about poor equipment reliability. One worker noted that the drilling vessel had not once in its nine-year career been taken to dry dock for necessary repairs: "we can only work around so much." Another worker described Transocean's policy of running equipment to failure before making just the bare minimum repairs: "[r]un it, break it, fix it. . . . That's how they work."

170.    The other Defendants were all aware of Transocean's poor maintenance of the *Deepwater Horizon* and its practice of disabling or bypassing vital safety systems, and alarms, yet none of them called for work to stop until vessel safety was improved, and none of them reported Transocean's actions and inactions to the MMS.

171.    As noted in a May 25, 2010 memorandum authored by Congressmen Henry A. Waxman and Bart Stupak, Members of the House of Representatives' Committee on Energy and Commerce, in the hours and minutes immediately preceding the onset of the Oil Spill, BP, Transocean, and Halliburton were faced with clear signs that serious problems with the rig's operations were developing and manifesting.

172.    For example, as early as 5:05 p.m., almost 5 hours before the explosion, one or more of the Defendants observed an unexpected loss of fluid in the riser pipe, suggesting that there were leaks in the annular preventer in the BOP.

173.    Moreover, two hours before the explosion, during efforts to begin negative pressure testing, the system gained 15 barrels of liquid instead of the 5 barrels that were

expected, leading to one or more of the Defendants to become aware of the possibility that there was an "influx from the well."

174.     The Defendants conducted this negative pressure testing initially on the drill pipe rather than the kill line, even though the drill plan specified that it would be done on the kill line. The line was opened and pressure on the kill line was bled to 0 psi, while pressure on the drill pipe remained at 1400 psi. Officials from BP have admitted that this was a "fundamental mistake" as this difference in psi was an "indicator of a very large abnormality." Nevertheless, after anomalous results, the negative pressure testing was conducted on the kill line and ultimately accepted by the Defendants.

175.     Approximately 51 minutes before the explosion that began the Oil Spill, one or more of the Defendants knew or should have known that more fluid had begun flowing out of the well than was being pumped in. This was a clear indication to one or more of the Defendants of serious problems with the drilling operation.

176.     Approximately 41 minutes before the explosion that began the Oil Spill, one or more of the Defendants was aware that although the pump was shut down for a "sheen" test, the well continued to flow instead of stopping. Moreover, at this time one or more of the Defendants knew or should have known that the drill pipe pressure also unexpectedly increased.  These were additional, clear indicators of problems with the drilling operation.

177.     Approximately 18 minutes before the explosion that began the Oil Spill, one or more of the Defendants observed abnormal pressures and mud returns, and the pump was abruptly shut down. This was a further, clear indicator to the Defendants of problems with the drilling operation immediately prior to the explosion and Oil Spill.

178.     Data presented by BP to the United States House of Representatives'

Committee on Energy and Commerce suggests that the crew may have attempted mechanical interventions at that point to control the pressure, but soon after, the blow-out occurred, reservoir pressures became unstable resulting in massive quantities of flammable gases shooting to the surface resulting in the tragic and devastating explosion on board the *Deepwater Horizon*.

## The Explosion and Oil Spill

179.    On or about April 20, 2010, at approximately 9:45 p.m. CST, a series of explosions occurred on the *Deepwater Horizon*. These explosions ensued due the release of reservoir pressure and a blowout, which funneled flammable gases into the oil rig. These explosions killed eleven (11) crew members, and injured many more. Two days following the initial explosions, the remnants of the *Deepwater Horizon* sank to the ocean floor.

180.    Shortly before the explosions aboard the *Deepwater Horizon*, employees, agents, and/or contractors of one or more of the Defendants were participating in drilling-related activities, including cementing and mudding, to seal and plug the wellhead. Cementing is intended to, among other things, hold back the flow of oil and hydrocarbons from the well bore. Cementing and mudding are delicate activities, and each carries the risk of a blowout if not performed properly. Improper or ineffective cementing work and/or mudding operations performed by one or more of the Defendants was a cause or contributing factor to the Oil Spill.

181.    Immediately after the explosion, desperate vessel workers tried in vain to activate the emergency disconnect sequence on the *Deepwater Horizon*'s BOP. As reports and testimony have shown, problems and failures with each of the BOP's emergency activation

methods prevented the use of the *Deepwater Horizon*'s BOP to seal the well, paralyzing its powerful shear rams that should have slammed shut, severing the drill pipe, and quelling the blowout.

182.     The Macondo well's BOP had several emergency activation methods: the high-pressure closure of the blind shear ram, the emergency disconnect sequence[3] ("EDS"), the automatic mode function[4] ("AMF"), and activation via remotely operated vehicles (ROVs) on the seafloor using the "hot stab"[5] or autoshear[6] functions. None of these were able to activate the BOP to seal the well.   Almost immediately following the explosion, oil began to discharge into the Gulf of Mexico from a depth of 5,000 feet below the *Deepwater Horizon*.

183.     Before the Oil Spill, the *Deepwater Horizon* had been connected to the wellhead at the seafloor by a 5,000 foot pipe called a "riser." As the *Deepwater Horizon* sank to the seafloor, it pulled the riser down with it, buckling and eventually breaking the riser. This riser was connected to a well casing that ultimately linked the *Deepwater Horizon* to an oil field located thousands of feet below the ocean floor.

184.     While crude was believed to be discharged before the *Deepwater Horizon* finally sank on April 22, 2010, the rate of discharge is believed to have increased once the *Deepwater Horizon* sank to the ocean floor. Oil flowed out from the open end of the riser in at least two places. The Defendants permitted, allowed, and failed to properly monitor and

---

[3] The EDS disconnects the drilling vessel from the well by detaching the riser from the top of the BOP, allowing the vessel to move away from the well.  The EDS also triggers the closure of the blind shear ram to seal off the well itself.
[4] The AMF is activated when electricity, hydraulics, and communications from the drilling vessel are all severed. Powered by hydraulic pressure from accumulators and batteries on the BOP itself, the AMF's functionality is independent from the vessel and is not affected by loss of power or hydraulics on the vessel itself.
[5] An ROV can activate certain BOP functions, such as the blind shear ram, by performing a hot stab, injecting hydraulic fluid into dedicated ports on the BOP to close the rams.
[6] n ROV can activate the autoshear function by snipping a rod on the BOP, triggering the closure of the blind shear ram.

inspect pressure levels in the riser and the BOP valves.

185. Each day during the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface to form a widening slick that because large enough to see from outer space and also spreading into vast subsurface plumes. On the surface, the oil slick at times covered tens of thousands of square miles. It spread with the wind and currents, making landfall on white sand beaches and ecologically sensitive marshes and estuaries. Underwater, huge plumes of oil and dispersant chemicals swirled through the water column and came to rest on the sea floor at different depths, damaging ecosystems and privately owned and leased sea beds.

186. Oil flowed unchecked into the Gulf of Mexico for months. The Oil Spill necessitated an unprecedented response effort. During the response, massive amounts of chemical dispersants were sprayed from the air, at the surface of the Gulf and beneath the surface of the water.

187. The Macondo Well was ultimately declared sealed on September 19, 2010. Before that time, millions of barrels of oil had been discharged. A large volume of dispersant chemicals had also been applied.  The full scope of the disaster is not yet known.

188. The Defendants knew or should have known of the dangers associated with ultra-deepwater drilling and failed to take appropriate measures to prevent damage to Plaintiff and marine, coastal, and estuarine areas of the Gulf of Mexico and the  states bordering the Gulf of  Mexico.

189. Moreover, additional safety mechanisms, technologies, and precautions were known and available to one or more of the Defendants but the Defendants elected not to employ them on the *Deepwater Horizon.*

190.    Upon information and belief, BP also hindered efforts to kill the Macondo Well and stop the flow of oil and gas into the Gulf waters. Although engineers knowledgeable about blowout responses told BP how to kill the well as early as June 2010, BP, after conferring with its lease partners, chose to ignore the engineers' well-kill procedure because BP did not want to damage the well – or its chance to make a profit at Macondo. Because BP hoped to retap the well and profit from the large, valuable reservoirs beneath it, it ignored this expert information that could have stopped the Oil Spill many weeks earlier.

### The Economic Impact of the Oil Spill and Injuries to Plaintiff

191.    During the summer of 2010, an oil slick with a range of thousands of miles formed and could be seen from space. Additionally, thick, voluminous plumes of oil were identified in deep waters within the Gulf of Mexico. The Oil Spill caused this slick and these plumes to form. Oil washed ashore from the Gulf of Mexico and coastal waters and damaged marine animals' coastal habits.

192.    The Oil Spill has impacted and continues to impact the Gulf of Mexico, and the Gulf Coast's shorelines, threatening Plaintiff's livelihood and business operations.

193.    The oil from the *Deepwater Horizon* Oil Spill contains benzene, toluene, polyaromatic hydrocarbons and other compounds (collectively referred to as Total Petroleum Hydrocarbons, or "TPH"), all of which are known carcinogens. The oil from the *Deepwater Horizon* Oil Spill also contains mercury, lead and other heavy metals that are hazardous to the health of people and aquatic life.

194.    A study done for the U.S. Travel Association projected that the Oil Spill would result in at least $7.6 billion in lost tourism revenue in 2010 alone. Tourism accounts for approximately 46 percent of the Gulf Coast economy annually, and damage to this core

industry damages the broader economy of the Gulf Coast region as well.

195.    Tourism suffered not only in coastal areas and counties whose shores the oil reached, but across the entire Gulf Coast, including coastal areas that risked, but did not actually experience, contamination during the Oil Spill. By way of example, the Mississippi coast had a 50 percent cancellation rate on reservations generally; a May 2010 survey by the Louisiana Tourism Commission indicated that 26 percent of Americans who had planned to visit Louisiana were no longer planning to visit after the Oil Spill began; Alabama saw a dramatic drop in tourism, including a 60 percent drop in visitations and an 80 percent drop in home rentals; and, preliminary economic projections estimated that the impact to Florida's tourism economy alone could be in the billions of dollars.

196.    As the Oil Spill immediately damaged the seafood harvesting and processing industry and the immediate tourist trade, the integral nature of the economy of the Gulf Coast results in damage throughout the states of Mississippi, Alabama, Louisiana, Texas, and Florida. By way of example, when the fishermen are not able to harvest and the processors not able to sell, they are not able to make payments on their mortgages, which results in defaults in loans, and they are not able to maintain their employees, reducing the employees' income, which results in reduced spending, resulting in reduced sales at all retail establishments throughout the state. This chain of causation is continuous and not broken throughout the geographical area of the Gulf Coast.

## "Presentment" Under OPA

197.    To the extent required by law, and/or by consent and/or stipulation by BP, Plaintiff has satisfied all of the requirements of 33 U.S.C. §§ 2713(a) and (b) by the submission

of its claims to the *Deepwater Horizon* Court-Supervised Settlement Program.

198.    The Court's order dated October 3, 2018 specifically precludes BP from raising a defense based on presentment.

## Guilty Pleas

199.    BP Exploration has entered into a Guilty Plea Agreement with the U.S. Department of Justice in connection with the Oil Spill. In an exhibit to this Plea Agreement, BP Exploration admitted that if its case were to proceed to trial, the federal government could prove beyond a reasonable doubt that BP Exploration's negligence proximately caused the deaths of eleven men on board the *Deepwater Horizon* on April 20, 2010 and also proximately caused the discharge of large and harmful quantities of oil into the Gulf of Mexico, as well as a number of related facts overlapping with those alleged in and/or relevant to the allegations of this Complaint. *See* Exhibit A to Guilty Plea Agreement, Rec. Doc. 2-1 in Case No. 2:12-cr-00292 (E.D. La. Nov. 15, 2012). The Court has accepted this Guilty Plea Agreement. *See* Reasons for Accepting Plea Agreement, Rec. Doc. 65 in Case No. 2:12-cr-00292 (E.D. La. Jan. 30, 2013).

200.    Transocean Deepwater has entered into a Plea Agreement with the U.S. Department of Justice in connection with the Oil Spill. In an exhibit to this Plea Agreement, Transocean Deepwater admitted that if its case were to proceed to trial, the federal government would be able to prove that Transocean Deepwater, together with others, negligently discharged, or caused to be discharged, oil into the Gulf of Mexico, as well as a number of related facts overlapping with those alleged in and/or relevant to the allegations of this Complaint. *See* Exhibit A to Cooperation Guilty Plea Agreement, Rec. 3-2 in Case No. 2:13- cr-00001 (E.D. La. Jan. 3, 2013). The Court has entered a judgment based on this Plea Agreement. *See* Judgment, Rec. Doc. 31 in Case No. 2:13-cr-00001 (E.D. La. Feb. 14, 2013).

**<u>Willful, Wanton Conduct of the Defendants</u>**

201.     BP and Transocean, and/or Halliburton, emphasized profits over and safety while  undertaking their ultrahazardous activities on the *Deepwater Horizon*.

202.     BP and Transocean, and/or Halliburton, recklessly, willfully and/or wantonly caused or contributed to the catastrophic Oil Spill through their collective and  respective disregard for proper drilling, casing, mudding, and cementing procedures.

203.     BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Oil Spill by their tortious modifications to and/or operation and use of the BOPs.

204.     BP and Transocean, and/or  Halliburton, r e c k l e s s l y , willfully a n d /or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout.

205.     BP and Transocean, and/or  Halliburton, r e c k l e s s l y , willfully a n d /or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would  be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

206.     BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Oil Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

207.     BP and Transocean, and/or Halliburton, by their conscious and/or deliberate unreasonable acts and/or omissions complained of herein, and/or as the evidence may show, displayed negligence, gross negligence, reckless indifference, willfulness, and/or wantonness.

**<u>CLAIMS FOR RELIEF</u>**

## COUNT I
## THE OIL POLLUTION ACT ("OPA")
## (<u>Against BP & Transocean</u>)

208.     Plaintiff realleges each and every allegation set forth in all preceding paragraphs  as if fully restated here.

209.     The Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* (the "OPA"), imposes liability upon a "responsible party for a vessel or a facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs.  33 U.S.C. § 2702(a).

210.     The Coast Guard has named BP as the responsible party for the downhole release of oil and Transocean as the responsible party for the release of diesel on the surface. Therefore, BP and Transocean are strictly liable pursuant to § 2702 of the OPA for all the damages resulting from the Oil Spill.

211.     BP and Transocean are not entitled to limit their liability under § 2704(a) of the OPA because the Oil Spill was proximately caused by their gross negligence, willful misconduct, or violation of applicable safety, construction or operating regulations. 33 U.S.C. § 2704(c).

212.     Moreover, in its "Statement of BP Exploration & Production Inc. Re Applicability of Limitation of Liability Under Oil Pollution Act of 1990," filed on October 19, 2010, BP waived the statutory limitation on liability under the OPA.

213.     Plaintiff has suffered the loss of profits and/or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources. Plaintiff's customers reduced or eliminated the Plaintiff's services as a direct and proximate cause of the Oil Spill. The Oil Spill dramatically impacted the Plaintiff's customer base,

causing customers to reduce spending, cancel or reduce the Plaintiff's normal scope of work, and eliminate or cancel projects.

214.     As a result of the Oil Spill, Plaintiff is entitled to damages pursuant to § 2702(b)(2)(E), which provides for "[D]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

215.     The damages recoverable under the OPA include the costs of assessing the damages specified in § 2702(b), and Plaintiff is entitled to recover the costs of assessing its damages under the OPA.

216.     As a result of the Oil Spill, Plaintiff has not been able to use natural resources (air and water, and potentially wetlands and other areas and spaces that have and/or may become contaminated by the Oil Spill), and it is entitled to recover from BP and Transocean compensatory and punitive damages in amounts to be determined by the Jury.

WHEREFORE, Plaintiff demands a judgment against BP and Transocean for compensatory and punitive damages as determined by the Jury at trial, pre-judgment interest at the maximum rate allowed by law, litigation costs, and any other damages allowed by law.

## COUNT II NEGLIGENCE
### (Against BP & Halliburton)

217.     Plaintiff repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this action and incorporates same by reference as though fully set forth herein.

218.     All times material hereto, BP and/or Halliburton were participating in drilling operations onboard the *Deepwater Horizon* in the Gulf of Mexico. At all times material

hereto, BP and/or Halliburton were under a duty to utilize reasonable care in  undertaking and carrying  out their collective and respective activities onboard the *Deepwater Horizon*.

219.     At all times material hereto the *Deepwater Horizon* was owned, navigated, manned, possessed, managed, controlled, chartered and/or operated by BP.

220.     At all times material hereto, Halliburton was responsible for cementing the well that was the subject of the Oil Spill, and further was engaged in testing, analysis, and monitoring of  the aforementioned well.

221.     At all times material hereto, BP and/or Halliburton's onshore and offshore oil drilling and exploration operations involved locating, extracting, collecting, storing, and transporting pollutants and hazardous contaminants.

222.     At all times material hereto, BP and/or Halliburton's onshore and offshore oil drilling and exploration operations which involved locating, extracting, collecting, storing, and transporting pollutants and hazardous contaminants created an appreciable zone of risk within which the BP and/or Halliburton's were obligated to protect the Plaintiff, who was within the appreciable zone of risk created by BP and/or Halliburton's activities and would foreseeably be  exposed to harm due to those risks.

223.     BP and/or Halliburton were under a duty of care to refrain from negligent conduct that would cause pollution of the waters, beaches, and natural resources of the Gulf of Mexico and the Gulf Coast counties.

224.     BP and/or Halliburton were under a duty to exercise reasonable care while participating in drilling operations to ensure that an Oil Spill and subsequent discharge of oil did not occur.

225.     BP and/or Halliburton were under a duty to exercise reasonable care to ensure

that if crude oil discharged in the event of a blowout, that it would be contained and/or stopped within the immediate vicinity of the *Deepwater Horizon* in an expeditious manner.

226.    BP and/or Halliburton knew or should have known that the acts and omissions described herein could result in damage to Plaintiff.

227.    BP and/or Halliburton, respectively and collectively, failed to exercise reasonable care while participating in drilling operations, and thereby breached duties owed to Plaintiff.

228.    BP and/or Halliburton, respectively and collectively, failed to exercise reasonable care while participating in drilling operations to ensure that a blowout and subsequent Oil Spill did not occur, and thereby breached duties owed to Plaintiff.

229.    BP and/or Halliburton, respectively and collectively, failed to exercise reasonable care to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout, and thereby breached duties owed to Plaintiff.

230.    BP and/or Halliburton, respectively and collectively, failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico, and thereby breached duties owed to Plaintiff.

231.    BP and/or Halliburton were in violation of federal and/or state statutes and/or regulations.

232.    The blowout and subsequent Oil Spill was caused by BP and/or Halliburton and has resulted in an economic and ecological disaster that has directly and proximately caused injuries and damages to Plaintiff.

233.     As a result of the blowout and subsequent Oil Spill caused by BP and/or Halliburton, Plaintiff has suffered economic injury, damages and/or losses.

234.     Prior to the blowout and Oil Spill, BP and/or Halliburton had actual and/or constructive knowledge of the facts and circumstances leading to the Oil Spill. BP and/or Halliburton knew or should have known of no less than three flow indicators from the *Deepwater Horizon*'s well in the hours and minutes before the explosion and Oil Spill, all of which were clear evidence of significant problems with the rig's drilling operations. BP and/or Halliburton's actions and inactions were grossly negligent, reckless, willful, and/or wanton.

235.      Plaintiff is entitled to a judgment that BP and/or Halliburton are jointly and severally liable to Plaintiff for damages suffered as a result of BP and/or Halliburton's negligence, gross negligence, recklessness, willfulness or wantonness. Plaintiff should be compensated for damages in an amount to be determined by the trier of fact, including punitive damages for BP and/or Halliburton's conduct.

WHEREFORE, Plaintiff demands a judgment against BP and Halliburton for compensatory and punitive damages as determined by the Jury at trial, pre-judgment interest at the maximum rate allowed by law, litigation costs, and any other damages allowed by law.

### COUNT III NEGLIGENCE *PER SE* (Against BP & Halliburton)

236.     Plaintiff repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this action and incorporates same by reference as though fully set forth herein.

237.     BP and/or Halliburton's conduct with regard to the manufacture, maintenance,

and/or participation of drilling operations and oil rigs such as the *Deepwater Horizon* is governed by numerous state and federal laws, and permits issued under the authority of these laws.

238.    These laws and permits create statutory standards that are intended to protect and benefit Plaintiff, among others. BP and/or Halliburton violated these statutory standards. Such violations constitute negligence *per se*.

239.    BP and/or Halliburton's violations of these statutory standards caused Plaintiff economic injury, damages, and/or losses.

240.    BP and/or Halliburton's violations of these statutory standards proximately caused Plaintiff's injuries, warranting compensatory and punitive damages.

241.    BP and/or Halliburton had actual and/or constructive knowledge of the facts and circumstances leading to and causing this incident, which in turn caused Plaintiff's injuries, and their actions and inactions were grossly negligent, reckless, willful, and/or wanton.

242.    Plaintiff is entitled to a judgment finding BP and Halliburton liable to Plaintiff for damages suffered as a result of BP and Halliburton's negligence *per se* and awarding Plaintiff adequate compensation in an amount to be determined by the trier of fact, including punitive damages for BP and Halliburton's conduct.

WHEREFORE, Plaintiff demands a judgment against BP and Halliburton for compensatory and punitive damages as determined by the Jury at trial, pre-judgment interest at the maximum rate allowed by law, litigation costs, and any other damages allowed by law.

### COUNT IV
### GROSS NEGLIGENCE & WILLFUL MISCONDUCT
### (Against BP & Halliburton)

243.    Plaintiff repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this action and incorporates same by

reference as though  fully set forth herein.

244.    BP and/or Halliburton owed and breached duties of ordinary and reasonable care  to Plaintiff in connection with the maintenance of, and drilling operation on, the *Deepwater Horizon*, and additionally owed and breached duties to Plaintiff to guard against and/or prevent  the risk of the Oil Spill.

245.    BP and/or Halliburton breached their legal duty to Plaintiff and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent maintenance and/or operation of the *Deepwater Horizon*.

246.    BP and/or Halliburton knew or should have known that their wanton, willful, and reckless misconduct would result in a disastrous blowout and oil spill, causing damage to those affected by the Oil Spill.

247.    BP acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia*, failing to use a sufficient number of "centralizers" to prevent channeling during the cement process; failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job; disregarding proper drilling, casing, mudding, and cementing procedures; failing to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico.

248.    BP and Halliburton acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia*, using an inappropriate cement mixture for the well; failing to appropriately test that cement  mixture prior to using it in the well; failing to run a cement bond log to evaluate

the integrity of the cement job; and failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

249.    BP acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia*, using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

250.    BP acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia*, recklessly maintaining and altering, and/or wantonly operating and/or using the BOP appurtenant to the *Deepwater Horizon*.

251.    As a result of BP and/or Halliburton's gross negligence, willful misconduct, and reckless disregard and the safety and health of the environment Plaintiff suffered economic injury, damages, and/or losses.

252.    BP and/or Halliburton's gross negligence, willful misconduct, and reckless disregard and the safety and health of the environment proximately caused Plaintiff's injuries, warranting compensatory and punitive damages.

253.    Plaintiff is entitled to a judgment finding BP and Halliburton liable to Plaintiff for damages suffered as a result of BP and Halliburton's gross negligence and/or willful misconduct and awarding Plaintiff adequate compensation in an amount to be determined by the trier of fact, including punitive damages for BP and Halliburton's conduct.

WHEREFORE, Plaintiff demands a judgment against BP and Halliburton for compensatory and punitive damages as determined by the Jury at trial, pre-judgment interest at the maximum rate allowed by law, litigation costs, and any other damages allowed by law.

**COUNT V**
**(DECLARATORY JUDGMENT ACTION)**
**(<u>Against the Claims Administrator and BP</u>)**

254.    Plaintiff repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this action and incorporates same by reference as though fully set forth herein.

255.    Defendant Patrick Juneau (herein, the "Claims Administrator") was appointed by the Court to serve as the Claims Administrator pursuant to Section 4.3 in the Settlement Agreement.

256.    On August 15, 2013, the Plaintiff timely submitted a Business Economic Loss ("BEL") claim to the Deepwater Horizon Court Supervised Settlement Program ("CSSP") implemented in connection with the Deepwater Horizon Economic and Property Damages Settlement Agreement ("Settlement Agreement"), as amended on May 2, 2012. (Rec. Doc. 6430-1 in 2:10-md-2179). The Plaintiff's BEL claim has not been paid, even though it was submitted almost 6 years ago. The Plaintiff's BEL claim should be paid pursuant to the terms of the Settlement Agreement.

257.    The Plaintiff is a member of the Deepwater Horizon Economic and Property Damages Settlement Class (the "Class") as defined in Section 1 of the Settlement Agreement. The Court adopted the definition of the Class when it approved of the Settlement Agreement on December 21, 2012. <u>In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, On April 20, 2010</u>, 910 F.Supp.2d 891 (E.D. La. 2012), <u>aff'd</u> <u>In re Deepwater Horizon</u>, 739 F.3d 790 (5th Cir. 2014).

258.    The Plaintiff did not sustain "MORATORIA LOSSES" as that phrase is used and defined in Sections 3.3 and 38.93 in the Settlement Agreement, respectively. Section 3.3

states that "Claims of Natural Persons and Entities for **MORATORIA LOSSES**" are not recognized under the Settlement Agreement. Section 38.93 defines Moratoria Losses as meaning "any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity -- including shallow water and deepwater activity -- that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections or permitting practices."

259.   On May 27, 2010, the Secretary of the Interior ("Secretary") issued a report titled: "Increased Safety Measures for Energy Development on the Outer Continental Shelf." The following day the Secretary issued a memorandum (the "May Directive") to the director of MMS suspending deepwater drilling in the Gulf of Mexico and suspending deepwater drilling permit applications.[7] MMS then notified the affected lessees, owners, and operators. On July 12, 2010, the Secretary rescinded the May Directive and implemented a new directive that was similar in scope to the May Directive but with more explanation.[8] In the July Directive, the Secretary instructed BOEM to suspend "the drilling of wells using subsea blowout preventers (BOPs) or surface BOPs on a floating facility . . . . [and to] cease the approval of pending and future applications for permits to drill wells using subsea BOPs or surface BOPs on a floating facility."

260.   As to ongoing drilling operations, the May Directive and the July Directive were both limited to 33 offshore drilling rigs that had permits at the time.[9] The Plaintiff did not conduct business with these 33 offshore drilling rigs in 2009 or 2010, which were drilling

---

[7] May Directive (attached hereto as Ex. 1).
[8] July Directive (attached hereto as Ex. 2).
[9] Doc. 7-2 in case 2:10-cv-1663 (attached hereto as Ex. 3).

in  water depths ranging from 1,030 feet to 9,627 feet.  The Plaintiff's revenue was not impacted by  the May Directive or July Directive suspending the drilling activities being conducted by these 33 offshore drilling rigs in 2010.

261.   The Secretary lifted the July Directive on October 12, 2010.  In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, 168 F.Supp.3d 908 (E.D. La. 2016) (discussing the history of the May Directive and July Directive).

262.   BP and the Claims Administrator have the burden of proof to demonstrate that the  Plaintiff sustained Moratoria Losses.  The Plaintiff does not have to prove a negative.

263.   The Claims Administrator has a duty to follow the terms of the Settlement Agreement. Section 4.3.1. states that the "Claims Administrator shall be selected and appointed by the Court, and shall be responsible to the Court, serve as directed by the Court, and faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or as  approved  by  the  Court."  If  the  Claims  Administrator  fails  to  follow  the  Settlement Agreement, the Court has authority to direct the Claims Administrator to comply with its terms.

264.   Based  upon  information  and  belief,  the  Claims  Administrator  retained  the services  of a Moratoria Team pursuant to Section 16 in the Settlement Agreement to investigate potential  Moratoria Losses.

265.   The  Claims  Administrator  has  a  duty  to  direct  the  Moratoria  Team  if  the Moratoria Team mischaracterizes claimants as incurring Moratoria Losses. Section 4.3.2 provides  that  the  "Claims  Administrator  shall  head  the  Settlement  Program,  oversee  and supervise the **CLAIMS ADMINISTRATION VENDORS** (including  any  subcontractors) and  staff  in  the  processing  and  payment  of  Claims,  report  and  provide  information  to  the

Court, BP, and/or **LEAD CLASS COUNSEL** (or their designee) as may be requested on an ongoing basis and/or as the Court directs, and participate on the Claims Administration Panel. The Court shall retain ongoing and exclusive jurisdiction over the Settlement Program until the consideration and determination of all Claims is complete and the Settlement Program is terminated by the Court."

266.     The Plaintiff's NAICS code on its 2010 federal tax return was 238210. As indicated by its NAICS code, the Plaintiff is an electrical contractor. The Plaintiff is licensed to do business in Louisiana, Texas, Mississippi, Alabama, Florida, and other states. The Plaintiff's NAICS code does not appear in either Section I or Section II of Exhibit 19 in the Settlement Agreement. Therefore, the Plaintiff's BEL claim was not subject to automatic or possible review for Moratoria Losses by the Claims Administrator under the plain language in Sections 5.10.3.1.1 and 5.10.3.1.2 in the Settlement Agreement. The Claims Administrator erred by arbitrarily placing the Plaintiff's BEL claim in the Moratoria Hold.

267.     Even if the Claims Administrator had authority to reassign a different NAICS code to the Plaintiff so that the Plaintiff's BEL claim fell within Section I or Section II of Exhibit 19, which the Plaintiff disputes, a particular NAICS number does not determine if the Plaintiff or any other claimant incurred any Moratoria Losses. Rather, only a fact intensive and objective analysis can determine whether or not the Plaintiff actually incurred damages as a direct result of the federal government's action or inaction following the Oil Spill.

268.     The parties to the Settlement Agreement did not intend for claimants to be perpetually stuck in the Moratoria Hold if the claimant did not have a strong, meaningful business relationship with the offshore drilling industry. Section 5.10.3.1.2 provides that businesses with a NAICS code identified in Section II of Exhibit 19 are subject to the following

questions: "[i]n  2009, did your business provide significant services, goods, and/or supplies to businesses in the  offshore oil & gas industry in the Gulf of Mexico?" Section 5.10.3.1.2 further provides: "[i]f  the Claimant responds negatively, its Claim shall proceed under the Economic Damage Claim  Process." Reading  Sections  5.10.3.1.1  and  5.10.3.1.2  together, the  intent  of  the  Settlement  Agreement  was  to  allow  BEL  claimants  with  *insignificant* business connections to the offshore drilling industry to proceed under the BEL framework. Equally  clear  is  the  fact  that  the  Claims   Administrator  considered  and  represented  that *insignificant*  business meant up to 33.00% of the  claimant's 2009 net revenue.

269.    Question No. 10 on the BEL Claim Form states:

Businesses/employers that fall within the NAICS codes and descriptions marked with an  "x" in Exhibit 19, Section II must answer the following question:

> **In 2009, did your business provide significant services, goods, and/or supplies to businesses in the offshore Oil & Gas Industry in the Gulf of Mexico?** The Claims Administrator considers that an entity provided "significant" services, goods, and/or supplies to businesses in the offshore oil and  gas industry in the Gulf of Mexico in 2009 if 33.00% or more of its 2009 net revenue was derived from such activities.

270.    Approved Policy 304 (regarding "Moratoria Losses: Implementing Section II of  Exhibit 19") mirrors the definition of "significant" provided in Question 10 of the BEL Claim  Form, and provides, in pertinent part:

> Pursuant to Section II of Exhibit 19, Business Economic Loss claimants with a  NAICS Code and business activities marked with an "X" in Section II of Exhibit 19 must answer the following question: "In 2009, did your business provide  significant services, goods, and/or supplies to businesses in the offshore oil & gas  industry in the Gulf of Mexico? . . . To capture this information, the Claims  Administrator asks Business Economic Loss claimants this question in each Claim Form. If the business or employer responds negatively, the claim proceeds under normal processing,  without analysis for potential moratoria losses. The  Claims  Administrator  will  advise  claimants  that  the  Claims Administrator  considers that **an entity provided "significant" services**, goods, and/or supplies  to businesses in the offshore oil and gas industry in the Gulf of

Mexico in 2009 **if 33.00% or more of its 2009 net revenue was derived from such activities**. Subject to the analysis of claims to prevent fraud, **the Claims Administrator will observe the claimant's Claim Form answer to this question and will not independently determine whether the entity provided "significant" services, goods, and/or supplies to businesses in the offshore oil and gas industry in the Gulf of Mexico in 2009.**

271. The Plaintiff correctly answered question No. 10 on the BEL Claim Form in the negative. Accordingly, even if the Claims Administrator reassigned a NAICS code to match a NAICS code in Exhibit 19, the Claims Administrator did not have authority to arbitrarily keep the Plaintiff in a Moratoria Hold.

272. On October 7, 2014, the Plaintiff received a "Preliminary Notice Regarding Moratoria Losses Review" as to its 4 BEL claims.[10] The notices made clear that "[t]his is not a denial of your claim, but instead is a Preliminary Notice to update you on the status of your claim." Most importantly, the notice stated as follows:

> After we have completed reviewing your claim, we will send you a Notice explaining the outcome of that review. You will have the opportunity then to accept the outcome set forth in that Notice or, if applicable, request Re-Review or Reconsideration of all decisions made on your claim.

273. The Plaintiff relied on the statements made in the Preliminary Notice, reasonably believing that any written decisions made by the Claims Administrator would allow the Plaintiff to appeal to an Appeal Panel as described in the Settlement Agreement.

274. The Plaintiff complied with all requests made by the CSSP related to the Moratoria Team's investigation, producing all available records requested and answering all questions presented. The Plaintiff made a good faith effort to demonstrate why it did not belong in the Moratoria Hold.

---

[10] Preliminary Notices (attached hereto as Ex. 4.)

275.     The Plaintiff has been denied due process rights under the Settlement Agreement. Section 6 in the Settlement Agreement governs the Claims Appeal Process.  Section 6.1 states that claimants "will have up to three opportunities, depending on their circumstances, to have their Claims reconsidered and reviewed to assure accuracy, transparency, independence, and adherence by the Settlement Program to the terms of the Agreement." The Plaintiff never had an opportunity to have the Claims Administrator's decision reconsidered or reviewed. The Plaintiff never received a written notice from the Settlement Program explaining why its claim was placed in the Moratoria Hold or what information was needed to remove the claim from the Moratoria Hold. Instead, the Claims Administrator allowed the BEL claim to remain in limbo for years without sufficiently communicating how the federal government's directives allegedly impacted the Plaintiff's revenue.

276.     Section 6.1.2.2 governs appeals to the panels. Section 6.1.2.3 states that a "Claimant may Appeal within 30 days of the issuance of final written notice from the Settlement Program of a determination of final compensation award." The Plaintiff never received a Denial Notice giving it the opportunity to exercise its rights under § 6.1.2.3. Because it never received a Denial Notice, the Plaintiff did not have a procedural mechanism to appeal to an Appeal Panel.

277.     The Claims Administrator failed to comply with the terms and spirit of the Settlement Agreement.

278.     The Court entered an order on October 3, 2018 and excluded the Plaintiff from the CSSP prior to the Claims Administrator issuing any written notice to the Plaintiff explaining why the Plaintiff was not considered part of the Class or what part of its losses were allegedly Moratoria Losses. (Rec. Doc. 24945 in 2:10-md-2179).

### Declaratory Judgment

279.    The Plaintiff brings this claim for a declaratory judgment pursuant to Rule 57 of the Federal Rules of Civil Procedure, 28 U.S.C. § 2201, and Section 18.1 of the Settlement Agreement.

280.    The Plaintiff is a member of the Class as defined in Section 1 of the Settlement Agreement.  However, the Claims Administrator failed to enter an award in favor of the Plaintiff under the terms of the Settlement Agreement, in particular Exhibit 4B (Causation Requirements for BEL claims) and Exhibit 4C (Compensation Framework for BEL claims). The Claims Administrator instead placed the Plaintiff's BEL claim in the Moratoria Hold without any evidentiary support that the Plaintiff incurred  Moratoria Losses as that phrase is used and defined in Sections 3.3 and 38.93 in the Settlement Agreement,  respectively.

281.    A justiciable controversy exists between the  Plaintiff, the Claims Administrator, and BP over the interpretation of whether the Plaintiff's claim should be processed under Exhibit 4B and Exhibit 4C. The Plaintiff contends that the Claims Administrator misapplied and contradicted  the Settlement Agreement when he placed the Plaintiff's claim in the Moratoria Hold and when he failed to release the claim from the Moratoria Hold given the lack of any evidence that the Plaintiff sustained Moratoria Losses.  A declaratory judgment action is a proper procedural vehicle to resolve this type of dispute. Waldman v. Riedinger, 423 F.3d 145 (2nd Cir. 2005) (holding that the district court erred by excluding a claimant as a member of a class action).

282.    The Court should exercise its discretion to decide the justiciable c ontroversy described herein based on the factors discussed in The Sherwin-Williams Co. v. Holmes County, 343 F.3d 383, 388 (5th Cir. 2003) (analyzing the 7 factors identified in St. Paul Ins. Co.

v. Trejo, 39 F.3d 585 (5th Cir. 1994)). None of the Trejo factors favor dismissing this declaratory judgment action.

283.    The Court retained exclusive jurisdiction over the parties for the "purpose of enforcing, implementing, and interpreting" the Settlement Agreement. The Plaintiff, therefore, cannot bring its complaint for declaratory judgment in state court or another jurisdiction. At this point, this declaratory judgment action is an appropriate remedy for the Plaintiff.

284.    The Plaintiff never received a Denial Notice from the Claims Administrator and never had the opportunity to argue the merits of its position to an Appeal Panel.     Cf. Homes Motors, Inc. v. BP Exploration & Production, Inc., 829 F.3d 313 (5th Cir. 2016).  Accordingly, the Court's decision to review the merits of this justiciable controversy must be decided based on the factors stated in Holmes County, as opposed to the factors outlined in Claimant ID 100190818 v. BP Exploration & Production, Inc., 718 Fed. Appx. 220, 222 (5th Cir. 2018) (stating abuse-of-discretion factors).

285.    The Plaintiff respectfully requests the following relief:

a.      That the Court accept jurisdiction of this declaratory judgment action;

b.      That the Court ORDER, ADJUDGE and DECREE that this is a proper case for declaratory judgment relief and that there is a bona fide controversy between the parties as to their legal rights, status, and liabilities;

c.      That upon a final hearing on the merits of this cause of action, this Honorable Court declare the rights, status, and legal relations of the Plaintiff and the Defendants under the Settlement Agreement;

d.      That upon a final hearing on the merits of this cause of action, this Honorable Court ORDER, ADJUDGE and DECREE that the Plaintiff is a member of the Class as

defined in Section 1 of the Settlement Agreement;

e.     That upon a final hearing on the merits of this cause of action, this Honorable Court ORDER, ADJUDGE, and DECREE that the Plaintiff should not have been placed in the Moratoria Hold or, alternatively, that the Plaintiff should have been released from the Moratoria Hold given the lack of any evidence that the Plaintiff sustained Moratoria Losses;

f.     That upon a final hearing on the merits of this cause of action, this Honorable Court ORDER, ADJUGE and DECREE that the Claims Administrator shall process the Plaintiff's claim under the business economic loss framework in the Settlement Agreement and enter an appropriate award; and

g.     Any other relief this Honorable Court finds equitable and just.

## COUNT VI
## BREACH OF CONTRACT
## (<u>Against BP</u>)

286.     The Plaintiff repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this action and incorporates same by reference as though fully set forth herein.

287.   The Plaintiff's BEL claim should not have been subjected to Moratoria Loss review pursuant to Section 5.10.3 and Exhibit 19 in the Settlement Agreement, nor should the BEL claim have been indefinitely placed in the Moratoria Hold by the Claims Administrator.

288.   However, if the Claims Administrator had authority to place the Plaintiff's BEL claim in the Moratoria Hold for any amount of time, which the Plaintiff disputes, the Plaintiff's BEL claim should have been compensated under the terms of the Settlement Agreement.

289.   BP owed the Plaintiff, a member of the Class, a duty to act in good faith and fairly treat the Plaintiff and other claimants routed to the Moratoria Hold.  As more particularly described

below, BP breached the Settlement Agreement, acted in bad faith, tried to evade the spirit of the Settlement Agreement, and interfered with the Claims Administrator's ability to pay claimants routed to the Moratoria Hold.  Comar Marine Corp. v. Raider Marine Logistics, LLC, 2013 WL 2181036, *14 (W.D. La. May 20, 2013).

### Background

290.  Shortly after the Court entered its order on December 21, 2012 approving the Settlement Agreement, BP complained to the Court about certain policies adopted by the Claims Administrator pertaining to how the Claims Administrator was paying claimants.  BP began vigorously fighting the Claims Administrator's implementation of Exhibit 4B ("Causation Requirements for Business Economic Loss Claims") and Exhibit 4C ("Compensation Framework for Business Economic Loss Claims"), resulting in multiple appeals to the United States Court of Appeals for the Fifth Circuit.  In re Deepwater Horizon, 732 F.3d 326 (5th Cir. 2013) ("Deepwater Horizon I"); In re Deepwater Horizon, 739 F.3d 790 (5th Cir. 2014) ("Deepwater Horizon II"); In re Deepwater Horizon, 744 F.3d 370 (5th Cir. 2014) ("Deepwater Horizon III").  BP asserted, among other things, that the Claims Administrator was ignoring the terms of the Settlement Agreement by paying claimants who did not suffer any damages "due to" the Oil Spill.  BP insisted that the Claims Administrator expanded the class definition to include businesses who did not suffer any damages caused by the Oil Spill.

291. BP became so desperate to unravel the Settlement Agreement that it made arguments to the Court completely inconsistent with representations made to the Court prior to the Court approving the Settlement Agreement.  The inconsistent statements to the Court resulted in the Court finding on December 24, 2013 that BP was judicially estopped from arguing:

> (1) that Exhibit 4B is not the exclusive means of determining whether a business economic claim is 'as a result of' the Deepwater Horizon Incident for purposes of the

Settlement, including the Class Definition; (2) or that the Settlement contains, implicitly or explicitly, a causation requirement other than Exhibit 4B; (3) or that satisfying Exhibit 4B does not establish under the Settlement an irrebuttable presumption that a business' economic loss was 'as a result of' the Deepwater Horizon Incident; (4) or making similar arguments.

In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, On April 20, 2010, 2013 WL 10767663, *11 (E.D. La. Dec. 24, 2013).

292.  Ultimately, on March 3, 2014, the Fifth Circuit found that BEL claimants satisfied their burden of proof contemplated by the Settlement Agreement by signing a verified form stating that losses were caused by the Oil Spill.  Deepwater Horizon III, 744 F.3d at 376 ("the parties explicitly contracted that traceability between [BP's] conduct and a claimant's injury would be satisfied at the proof stage, that is, in the submission of a claim, by a certification on the document that the claimant was injured by the *Deepwater Horizon* disaster."); In re Deepwater Horizon, 756 F.3d 320 (5th Cir. 2014) (denying petition for rehearing en banc on May 19, 2014); BP Exploration & Production Inc. v. Lake Eugenie Land & Development, Inc., 135 S.Ct. 754 (2014) (denying petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit on December 8, 2014).

293.  BP's substantial efforts to avoid a key feature of the Settlement Agreement – Exhibit 4B – failed miserably.

294.  During BP's campaign to rewrite Exhibit 4B, BP realized that the uncapped Settlement Agreement would cost it billions more than originally anticipated.  BP had a severe case of "buyer's remorse".

## Oil & Gas Support Services Industry

295.  While BP was fighting the payment of claims under the terms of Exhibit 4B and 4C throughout 2013 and 2014, an issue arose as to how to interpret and implement the parts of the

Settlement Agreement related to businesses falling into the category of Oil & Gas Support Services Industry ("OGSSI").  Class Counsel and BP debated the proper way to decide which businesses should be subjected to automatic or potential review for Moratoria Losses and, once a claimant was routed to such a review process, how to distinguish between Moratoria Losses and Non-Moratoria Losses.  BP knew it was contractually obligated to pay for Non-Moratoria Losses for businesses who were categorized as part of the OGSSI.

296.  All of the positions taken by BP in 2013 and 2014 regarding the payment of Non-Moratoria Losses occurred while BP unsuccessfully argued to the Court and the Fifth Circuit that the Claims Administrator expanded the class definition beyond the Settlement Agreement to include claimants who did not suffer any damages as a result of the Oil Spill.

297.  Class Counsel and BP negotiated for months to try to agree on particular policies to supply to the Claims Administrator in the context of the OGSSI.  Once negotiations broke down, Class Counsel filed a motion on August 27, 2013 seeking an order from the Court authorizing and directing the Claims Administrator to interpret and implement the Settlement Agreement with respect to claimants in the OGSSI.   On September 9, 2013, BP filed its response in opposition to Class Counsel's motion.   Class Counsel then filed their reply to BP's opposition on September 20, 2013.  On October 4, 2018, the Court denied and/or mooted the motion filed by Class Counsel on August 27, 2013.

298.  BP did not negotiate in good faith with Class Counsel when addressing the causation burden for businesses in the OGSSI.  Exhibit 16 provides that the "standard business economic frameworks for **causation** shall apply to non-moratoria losses.  Causation shall be determined prior to the determination of the Moratoria Loss."  The parties generally intended for Exhibit 4B to apply to Non-Moratoria Losses claimed by businesses in the OGSSI, something the

Fifth Circuit noted that BP "accepted but now wishes it had not." Deepwater Horizon III, 744 F.3d at 377.  The Plaintiff's verified BEL claim form satisfied its causation burden as determined by the Fifth Circuit in Deepwater Horizon III.

299.  BP did not negotiate in good faith with Class Counsel when working on compensation criteria for businesses in the OGSSI.   Exhibit 16 provides as follows:

> In determinations of moratoria losses, the standard business economic framework shall not apply.  Rather, the Claims Administrator's dedicated team shall be given parameters **agreed upon by the parties** that must be applied to distinguish among economic losses due to or resulting from (i) moratoria and (ii) non-moratoria economic loss.

> BP and PSC to develop **agreed upon guidance** that the Claims Administrator shall apply in making **compensation** determinations that adhere to the moratoria exclusion in the settlement agreement.

> > In general, one of the parameters shall be that the Claims Administrator shall be directed to calculate the claimant's non-moratoria economic loss due to or resulting from the DWH Spill by isolating losses that occurred prior to imposition of the moratoria on May 28, 2010, and any continuation of such losses that might have been expected in the absence of the moratoria.  The incremental impact of the moratoria on claimant's losses generally would not be recoverable in the settlement.

300.  During negotiations with Class Counsel, BP drilled down on the "agreed upon guidance" language in Exhibit 16 to prevent the Claims Administrator from paying any claimants in the Moratoria Hold.  BP knew as long as it did not agree with Class Counsel as to how to compensate claimants who found their way into the Moratoria Hold it could effectively deny them any compensation or, at least, deny them fair compensation.  Hundreds of claimants suffered for years while BP submitted unreasonable criteria to Class Counsel and the Claims Administrator to pay for Non-Moratoria Losses.

301.  BP supplied the Claims Administrator with "guidance" that departed from the terms

and spirit of the Settlement Agreement which was not acceptable to Class Counsel.

302.  In the Settlement Agreement, BP agreed to pay claimants in the OGSSI for Non-Moratoria Losses.  It should not have been difficult for BP to agree to terms that "adhered" to the moratoria exclusion.   In fact, Exhibit 4B and Exhibit 4C provide a reasonable and fair compensation formula for claimants in the OGSSI seeking Non-Moratoria Losses.  It is consistent with the intent of the Settlement Agreement to treat claimants within the OGSSI the same as businesses outside the OGSSI when both are seeking Non-Moratoria Losses.

303.  Because BP disagreed with how Exhibit 4B and Exhibit 4C had been construed and implemented by the Claims Administrator, as reflected in Deepwater Horizon I, Deepwater Horizon II, and Deepwater Horizon III, BP deliberately impaired the Claims Administrator's ability to process claims in the Moratoria Hold and pay for Non-Moratoria Losses.   BP's intentional efforts to evade the terms of the Settlement Agreement were so egregious that punitive damages should be imposed.

304.  After the United States Supreme Court refused to review the 5th Circuit's decision in Deepwater Horizon III, BP should have withdrawn its argument regarding the causation burden for claimants.  Yet, BP still refused to negotiate in good faith regarding the causation burden of proof.  The Plaintiff has had to incur attorney's fees due to BP's bad faith negotiations.

305. Due to BP's refusal to negotiate in good faith with Class Counsel to develop appropriate "guidance" for the benefit of claimants in the OGSSI, the Court entered an order on October 3, 2018 and excluded the Plaintiff from the CSSP while also opening a window for the Plaintiff to pursue litigation against BP before the Court.

WHEREFORE, the Plaintiff demands a judgment against BP for  compensatory and punitive damages as determined by the Jury at trial, pre-judgment interest at  the maximum rate

allowed by law, litigation costs, attorney's fees, and any other damages allowed by law, as well as equitable relief as determined by the Court.

## PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CAUSES OF ACTION

Respectfully submitted,

*/s/ Rodi F. Rispone (with permission)*

Rodi F. Rispone,
Esq. LA Bar Roll
No. 23554 Attorney
at Law
19322 S. Lakeway Ave.
Baton Rouge, LA  70810
Tel. (225) 937-5986
Fax (225) 612-8134
rrispone@gmail.com

*/s/ WILLIAM G. CHASON*

RICHARD M. GAAL
State Bar No. ASB-3999-A58R
rgaal@mcdowellknight.com
WILLIAM G. CHASON
State Bar No. ASB-5462-151C
wchason@mcdowellknight.com
MORGAN S. HOFFERBER
State Bar No. ASB-1334-542X
mhofferber@mcdowellknight.com

OF COUNSEL:

McDOWELL KNIGHT ROEDDER & SLEDGE, L.L.C.
11 N. Water Street; Suite 13290
Mobile, Alabama  36602
Tel. (251) 432-5300
Fax (251) 432-5303

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this pleading has been served on All Counsel by electronically uploading same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this the 12 day of June, 2019.

<u>/s/ WILLIAM G. CHASON</u>