# Exhibit C
# Declaration of Michael D. Klein

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:<br><br>Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010<br><br>APPLIES TO:<br><br>All Civil Actions of the Plaintiffs Represented by Nexsen Pruet, LLC and Douglas M. Schmidt APLC | Civil Action No. 2:10-MD-02179<br><br>SECTION:"J"<br><br>JUDGE CARL BARBIER<br><br>MAGISTRATE JUDGE SALLY SHUSHAN |

## DECLARATION OF MICHAEL D. KLEIN

I, Michael D. Klein, being duly sworn, hereby declare as follows:

1. I am not a party to the action. I am a professional engineer registered by the National Council of Examiners for Engineering & Surveying (NCEES); licensed in twenty states. I hold degrees in Ocean Engineering and Civil Engineering. I am accredited by the Council of Engineering and Scientific Specialty Boards as a Certified Hazardous Materials Manager (CHMM) and by the National Association of Fire Investigators as a Certified Fire & Explosion Investigator (C.F.E.I.).

2. Throughout my more than twenty-five years in the field of engineering, I have conducted and directed environmental investigations, hazardous waste cleanup and site remediation per the Environmental Protection Agency (EPA) Resource Conservation and Recovery Act (RCRA) and Superfund requirements. I managed hazardous

materials under the regulatory framework administered by the Department of Energy (DOE), EPA, Occupational Safety and Health Administration (OSHA) and Department of Transportation (DOT).

3. On May 9, 2019, with the permission of BP's Counsel, I visited the warehouse facility in Fort Collins, Colorado (the "Facility") that is being utilized by BP to store 140,000 evidentiary samples (the "Samples") collected from the BP Gulf Oil Spill. It is my understanding that BP plans to destroy the Samples on July 5, 2019 if no parties take possession prior to that date.

4. I base my professional opinions on :

a). my site visit to the Facility

b). the Declaration of Dr. Oliver Pelz, a BP employee, that is attached hereto as Exhibit "A"

c). a letter from BP counsel dated May 3, 2019, a copy of which is attached hereto as Exhibit "B"

d). research and analysis of applicable industry regulations and standards

e). my experience and training

I offer all my professional opinions expressed herein within a reasonable degree of technical and engineering certainty, which are subject to change if additional information becomes available.

5. The purpose of my site visit to the Facility was to inspect the samples for possible selection to be transferred, and to determine the logistical feasibility of transfer.

6. The Facility is a very large warehouse containing ultra-low temperature top loading freezer units, top loading refrigerators and walk in refrigeration units. Each walk in refrigeration unit was arranged with multiple shelving based on the physical size of the sample container. It is my understanding that the entire Facility containing the freezers and refrigerators is leased by BP for the sole purpose of storing the samples collected from the BP Gulf Oil Spill.

7. At the site, I was advised by Counsel for BP that BP would continue to retain approximately 100,000 samples ("Retained Samples") after the transfer or disposal of the 140,000 samples at issue. The Samples and Retained Samples were stored in the Facility refrigerators and freezers and not segregated into separate storage areas. BP has identified what Samples are being destroyed. BP has not provided / disclosed information on the Samples that are being retained by BP at the Facility.

8. The Pelz Declaration generally describes the various categories of samples being stored by BP at the Facility. It states that "[s]ince January 2011, BP has spent approximately $13.8 million to store samples at a facility in Colorado." Exhibit "B" at paragraph 18.

9. The cost figure in the Pelz Declaration was further broken down in a letter from R. Keith Jarrett, Counsel for BP, dated May 3, 2019. Exhibit "B" at page 3. According to Mr. Jarrett, the initial costs from 2011-2015 were substantially higher than the costs since 2016. Mr. Jarrett listed the "ongoing costs" as follows: rent, utilities (*e.g.* water, electricity, gas, sewer, phone, and internet), insurance, taxes, maintenance for outside the facility, (*e.g.* snow removal, grass cutting), equipment rentals (*e.g.* forklifts), upkeep and maintenance of the facility itself (including maintenance and operation of its

fire alarm and sprinkler system), repairs, and upkeep and maintenance of the refrigerators and freezers.

10. Since BP is continuing to store approximately 100,000 unidentified samples in its single purpose facility, in my professional opinion the continuing costs of storage would not be significantly reduced by the transfer or disposal of the 140,000 samples at issue. The items listed in paragraph 9 above are essentially overhead items that would exist regardless of the number of samples stored in the Facility.

11. Additionally, it is my professional opinion that the cost of properly transferring the Samples and storing them in another facility, would be significantly more costly than BP continuing to maintain the possession of the Samples.

I declare under penalty of perjury under the laws of the State of South Carolina that the foregoing is true and correct. Executed in South Carolina this 11 day of June, 2019.

_____
Michael D. Klein, PE, CHMM, C.F.E.I.

Notarized in the State of South Carolina on June 11, 2019

*Rebecca L. Armond*
Rebecca L. Armond

My commission expires: August 28, 2019

[Notary Seal: Rebecca L. Armond, Notary Public, State of South Carolina, My Commission Expires August 28, 2028]



EXHIBIT A

#### UNITED STATES DISTRICT COURT
#### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL No. 2179 |
| | | SECTION: J |
| | * | JUDGE BARBIER |
| **This Document Relates to:** *All Claims In Pleading Bundle B3* | * * | MAG. JUDGE WILKINSON |

### DECLARATION OF DR. OLIVER PELZ IN SUPPORT OF BP'S MOTION FOR ENTRY OF AN ORDER RELATING TO THE DISPOSAL OF CERTAIN MATERIALS

I, Dr. Oliver Pelz, declare that the following is true and correct to the best of my knowledge, information, and belief:

1. My name is Dr. Oliver Pelz. I'm currently an Environmental Toxicologist at BP Exploration & Production, Inc. ("BP"). I have worked at BP for 14 years.

#### Educational Background & Experience

2. I received a degree in Biology from Technical University Braunschweig, Germany in 1995. I studied Biochemistry, Microbiology, and Ecology.

3. In 1999, I received a Doctorate in Natural Sciences from Technical University Braunschweig, Germany.

4. From 2003 to 2008, I attended the Toxicology Post-Graduate program by the German Society for Pharmacology & Toxicology ("DGPT"). At the end of the program, I became a European Registered Toxicologist, accredited by the Royal Society of Biology, UK Register of Toxicologists Panel.

5. From 1993-1995, I worked as a Research Technician at the United States Environmental Protection Agency ("EPA") in the National Health and Environmental Effects Research Laboratory. At the EPA laboratory, I investigated pollutant-degrading bacteria for the

## Sampling During the Deepwater Horizon Response Efforts

10. During the response, BP collected thousands of environmental samples for multiple purposes, including for the Natural Resource Damage Assessment ("NRDA") and to assist in the response efforts.

11. As part of the NRDA, BP and the federal and state trustees (the "Trustees") worked together on a cooperative assessment of potential damage to natural resources in the water and on shore from 2010 to 2014.

12. In parallel to the Natural Resource Damage Assessment, BP also independently collected environmental samples to assist in the response efforts. These field-collected samples were subsequently analyzed to inform real-time decision-making during the response efforts and to inform decision makers on how long to continue those efforts.

13. As part of my work during the response, I am generally familiar with the types of environmental samples that were collected during the NRDA and BP's testing and response efforts. As part of the NRDA and BP's response efforts, BP collected thousands of samples of water, sediment (sea floor), soil, animal tissue, animal feed, macroinvertebrates, and blanks, among other samples. The samples included in Exhibit A to BP's Motion filed on December 12, 2018 include these and other types of samples.

14. The animal feed samples included in BP's Motion consist of commercial bird feed used during avian toxicity studies to assess potential impacts of oil exposure to mallard ducks, an EPA standard species for avian toxicology studies, in a controlled laboratory environment. (Ex. A, animal feed sample photos) The commercial animal feed used during this study was never present in the Gulf environment. Rather, it was purchased by the lab and then further blended

4

and/or processed to be used in a controlled laboratory. The data from this study was shared with the Trustees.

15. Macroinvertebrates are organisms that lack a spine but are still large enough to see with the naked eye (*e.g.*, barnacles, worms, snails). (Ex. B, maroinvertebrates sample photos) Macroinvertebrates were collected to assist in decision-making during the response efforts, to assess the impact, if any, of the spill and/or response efforts on those organisms, and/or for taxonomic purposes.

16. Animal tissue samples are samples collected and further processed from a variety of organisms (including a variety of fish species, macroinvertebrates, and larval fish, among others) during the response effort and/or the NRDA. These organisms were collected to assist in decision-making during the response efforts, to assess the impact, if any, of the spill and/or response efforts on those organisms, and/or for taxonomic purposes.

17. Blanks are laboratory-provided, clean water used for quality control purposes during sample collection and transport to the laboratories.

18. Since January 2011, BP has spent approximately $13.8 million to store samples at a facility in Colorado.

March 19, 2019

Dr. Oliver Pelz

**EXHIBIT B**

# LISKOW&LEWIS
A Professional Law Corporation

One Shell Square
701 Poydras Street, Suite 5000
New Orleans, LA 70139
(504) 581-7979 Main
(504) 556-4108 Fax

822 Harding Street
Post Office Box 52008
Lafayette, LA 70505
(337) 232-7424 Main
(337) 267-2399 Fax

1001 Fannin Street
Suite 1800
Houston, TX 77002
(713) 651-2900 Main
(713) 651-2908 Fax

www.Liskow.com

May 3, 2019

Nathan Nelson, Esq.       **Via Email**
The Downs Law Group
3250 Mary Street, Suite 307
Coconut Grove, FL 33133

Re: *Thibodaux v. BP Expl. & Prod. Inc.*, C.A. 18-66 (E.D. La.)

Dear Nathan:

In conformance with Judge Morgan's May 1, 2019 Order (Rec. Doc. 36), BP provides the information below regarding the costs it has incurred to maintain and preserve certain environmental and other samples relating to the *Deepwater Horizon* spill and response.

Before listing that information, I must remind you that the issue of the samples and their future has already been resolved—for the entire BELO docket—by Judge Barbier in his order dated April 16, 2019 (Rec. Doc. 25593). Specifically, Judge Barbier ruled that: "(1) Within 35 days of this Order, plaintiffs that have objected to BP's Motion may take custody of any samples BP seeks to dispose of that plaintiffs wish to preserve, with shipping and storage of such requested samples to be at the objecting plaintiffs' exp[e]nse; (2) If within 35 days of this Order, plaintiffs do not elect to take custody of the samples as provided above, BP may dispose of the samples identified in its Motion at Exhibit A (Rec. Doc. 25226-2)." Your pattern using individual BELO cases to reargue issues involving these samples is inappropriate.[1]

Furthermore, because Judge Barbier's order provides that the plaintiffs are to take custody of the samples they want, and that BP will no longer be required to maintain them

---

[1] As you no doubt know, the Medical Settlement Agreement – of which this lawsuit is derivative – expressly preserves Judge Barbier's authority to address class-wide issues. MSA, Sect. XXVII.

at its storage facility, BP's historical storage costs are not helpful to your compliance with that order.

\*\*\*\*\*\*\*

Nevertheless, in compliance with Judge Morgan's Order we hereby provide the following information. As to the location of the samples, BP has already advised you that the facility is located at 1513 Webster Court, Fort Collins, Colorado. To reiterate our prior offer, BP is willing to discuss the details of a site visit which would permit your team to observe the samples for themselves.

What you have not understood, however, is that no "third party" is storing the samples at issue. Rather, BP is storing the samples itself in refrigerators, freezers, and storage units acquired and owned by BP, which are located at a facility leased by BP for that purpose. Since January 2011, BP has leased the warehouse in Fort Collins for the purpose of receiving, storing, and preserving samples related to the *Deepwater Horizon* incident and response. BP occupies the entire facility, which is secured. BP is the only company using the facility, which also stores samples in addition to those that are the subject of BP's disposal motion. (*See* Case 2:10-md-02179, Rec. Doc. 25226-2.)

When BP began to lease the warehouse in 2011, it was not set up to store samples. Thus, BP built out the entire facility at its own expense so that it would be configured to handle sample storage and preservation. This build-out included, among other items, purchasing and installing walk-in refrigerators and freezers and other cabinet-style (*i.e.*, non-walk-in) freezers and ultra-low temperature freezers, building a lab for sub-sampling purposes, and configuring the warehouse to accommodate receipt, shipment, and preservation of samples. All of this equipment and infrastructure is owned by BP.

BP employees manage all operations at this facility. BP contracts with AECOM Technical Services, Inc. to provide personnel on site to assist with operating the facility under BP's management and at BP's direction.

In addition to the cost of acquiring equipment and providing personnel to manage and oversee operations, BP has incurred a variety of additional costs to store and preserve samples at its facility since January 2011. These on-going costs include: rent, utilities (*e.g.*, water, electricity, gas, sewer, phone, and internet), insurance, taxes, maintenance for outside the facility (*e.g.*, snow removal, grass cutting), equipment rentals (*e.g.*, forklifts), upkeep and maintenance of the facility itself (including maintenance and operation of its fire alarm and sprinkler system), repairs, and upkeep and maintenance of the refrigerators and freezers.

In total, BP has spent approximately $13,900,000 to preserve all samples at the Colorado facility since January 2011. This total does not include costs that BP has incurred

to manage the facility and may not include all the costs BP incurred to build out the facility in 2011. This amount is broken out on an annual basis below:

| Annual Invoiced Amounts | |
| --- | --- |
| 2011 | $2,480,000 |
| 2012 | $2,380,000 |
| 2013 | $2,470,000 |
| 2014 | $2,420,000 |
| 2015 | $1,480,000 |
| 2016 | $993,000 |
| 2017 | $855,000 |
| 2018 | $786,500 |

Although monthly costs vary depending on factors including but not limited to the upkeep and/or maintenance required in any particular month, the average monthly costs over the last two years have ranged between $31,000 to $136,000, with an average of approximately $68,400 per month.

Please continue to engage with the Kirkland & Ellis firm on the samples issue as they are principally responsible for that issue on our end. They and we are happy to set up a telephone conference if you would like to discuss further.

Sincerely yours,

R. Keith Jarrett

Cc:   Katrine Jakola, Esq. (via email)
      Christina Briesacher, Esq. (via email)