UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  OIL SPILL BY THE OIL RIG     *     10-MD-2179
        *DEEPWATER HORIZON* IN THE    *
        GULF OF MEXICO ON             *     Section J
        APRIL 20, 2010                *
                                      *     June 19, 2019
                                      *
Applies to 12-CV-968:  BELO          *     New Orleans, Louisiana
                                      *
* * * * * * * * * * * * * * * * * *


TRANSCRIPT OF ORAL ARGUMENT BEFORE
THE HONORABLE CARL J. BARBIER
UNITED STATES DISTRICT JUDGE


Appearances:


For Plaintiffs:              The Lambert Firm, PLC
                             BY:  HUGH P. LAMBERT, ESQ.
                             701 Magazine Street
                             New Orleans, Louisiana 70130


For Plaintiffs:              Downs Law Group, PA
                             BY:  C. DAVID DURKEE, ESQ.
                             3250 Mary Street, Suite 307
                             Coconut Grove, Florida  33133


For Plaintiffs:              Falcon Law Firm
                             BY:  TIMOTHY J. FALCON, ESQ.
                             5044 Lapalco Boulevard
                             Marrero, Louisiana 70072


For Plaintiffs:              The Nations Law Firm
                             BY:  ALISON DIVINE, ESQ.
                             3131 Briarpark Drive, Suite 208
                             Houston, Texas 77042

Appearances:

For Defendants:                    Liskow & Lewis, APLC
                                   BY:  R. KEITH JARRETT, ESQ.
                                   701 Poydras Street, Suite 5000
                                   New Orleans, Louisiana 70130


For Defendants:                    Williams & Connolly, LLP
                                   BY:  KEVIN M. HODGES, ESQ.
                                        WENDY Z. ZUPAC, ESQ.
                                   725 Twelfth Street N.W.
                                   Washington, D.C 20005


Official Court Reporter:           Toni Doyle Tusa, CCR, FCRR
                                   500 Poydras Street, Room B-275
                                   New Orleans, Louisiana 70130
                                   (504) 589-7778




Proceedings recorded by mechanical stenography using
computer-aided transcription software.

## INDEX

|                              | Page |
|------------------------------|------|
| Downs Law Group's Motion     | 5    |
| Order to Show Cause          | 15   |
| Nations Law Firm's Motions   | 31   |
| BP's Motion                  | 39   |

<u>**PROCEEDINGS**</u>

**(June 19, 2019)**

**THE DEPUTY CLERK:**  MDL 2179, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, relating to 12-968 and all BELO cases.

**THE COURT:**  Okay.  Counsel, whoever is going to make an appearance, you need to announce yourselves now, please.

**MR. DURKEE:**  David Durkee on behalf of the Downs Law Group and the Downs Group plaintiffs, Your Honor.

**THE COURT:**  Okay.

**MR. LAMBERT:**  Hugh Lambert, Your Honor, here as local counsel for the Downs Group for this matter only.

**THE COURT:**  Okay.

**MS. DIVINE:**  Alison Divine on behalf of The Nations Law Firm.

**THE COURT:**  Okay.

**MR. FALCON:**  Good morning, Your Honor.  Tim Falcon here with the Falcon Law Firm.

**THE COURT:**  Okay.

**MR. HODGES:**  Good morning, Your Honor.  Kevin Hodges on behalf of the BP defendants.

**MS. ZUPAC:**  Wendy Zupac on behalf of the BP defendants.

**THE COURT:**  Okay.

**MR. JARRETT:**  Good morning, Your Honor.  Keith

09:46   1    Jarrett on behalf of BP.

2              **THE COURT:**  Good morning to everyone.  All right.  We

3    have several different matters this morning.  I thought we

4    should start -- because it may affect another thing we will do

5    here this morning -- with the Downs Law Group's motion for

6    reconsideration of the Court's order regarding plaintiff

7    signatures and initials.  This is the Court's order of

8    April 16, 2019, which is Rec. Doc. 25595 in the MDL docket.

9              Mr. Durkee.

10             **MR. DURKEE:**  Yes.  Good morning, Your Honor.

11             **THE COURT:**  Good morning.

12             **MR. DURKEE:**  First of all, I want to make sure that

13   the defendants and the Court know that we understand that the

14   PPF, the plaintiff profile form, and all these authorizations

15   are an extremely valuable tool for both the plaintiffs, the

16   defendants, and the Court.  One of the main factors it does, it

17   helps us separate the wheat from the chaff.  That's what we are

18   in the process of doing.  Getting through this PPF and making

19   sure they are buying into this and completing it and doing it

20   properly is a very valuable resource to all parties and to the

21   Court, and we are not trying to throw out the baby with the

22   bathwater.

23             What we are proposing -- and I did hand this to

24   the defendants this morning.  It may not have been very clearly

25   stated in our motion for reconsideration, but it's a very,

09:48   1   really small addendum.

2              The need for this addendum is because some of

3   these folks are in very low socioeconomic groups and on

4   occasion -- either because they are faxing it through a fax

5   machine at the UPS Store or because they didn't know how many

6   pages or whatever -- we get a couple of missed signatures on

7   the bottom of a page.  We are not talking about the

8   verification form where they are swearing under perjury that

9   they are filling this out completely and properly.  We are not

10  talking about the authorizations that they are going to execute

11  fully.  We are talking the initials on the --

12             **THE COURT:**  This is a 25-page plaintiff profile form

13  questionnaire, right?

14             **MR. DURKEE:**  That's correct, Your Honor, and they

15  have to initial every page.

16             **THE COURT:**  Your clients are required to fill it out.

17  Obviously, they have to furnish the information to you.

18             **MR. DURKEE:**  That's absolutely right, Your Honor.

19             **THE COURT:**  They fill out the form.  At the bottom of

20  every form, there's a place to initial, and then at the back

21  end there's a verification form that they sign under penalty of

22  perjury.

23             **MR. DURKEE:**  That's correct, Your Honor.

24             **THE COURT:**  Then there's some accompanying release

25  documents like for medical records and so forth.

09:49

1          **MR. DURKEE:**  Authorizations, Your Honor, correct.  I

2     believe there's about 10 or so.

3          **THE COURT:**  So what's the problem?  Why can't they

4     comply with that?

5          **MR. DURKEE:**  Your Honor, as I told you, I think it's

6     a very valuable tool, and it helps us figure out whether

7     clients are really wanting to participate or not.  The problem

8     is -- and it doesn't happen on very --

9          **THE COURT:**  Because they are supposed to fill out

10    these forms, not you.

11         **MR. DURKEE:**  Oh, absolutely.

12         **THE COURT:**  They have the information.  The problem

13    is we see this -- this is a recurring problem.  This is the

14    second or third time we have been in court.  I know Magistrate

15    Wilkinson has had to deal with this.  So it's a repetitive or a

16    repeating problem here in this case where, for whatever reason,

17    whoever's fault it is, the plaintiffs are not complying with

18    the requirement that they properly and timely fill out these

19    forms, submit them, and that they be properly signed.

20              We have had multiple instances of firms

21    apparently copying and pasting signatures.  We just can't keep

22    having this problem.  We've got -- you all have and we have.

23    We are dealing with thousands of cases here.  If we have to do

24    this every month, this kind of stuff, it's ridiculous.

25         **MR. DURKEE:**  I agree, Your Honor.

09:51

1    **THE COURT:**  We need compliance here is what we need.

2    **MR. DURKEE:**  Absolutely, Your Honor.  The only

3    proposal that I made to the defense -- and we have discussed

4    it; we did meet and confer and I did propose this to them --

5    was that if there are two pages or less of the initials that

6    are missing -- and sometimes that happens because these folks

7    don't have the world's greatest technology and it gets cut off

8    at the bottom of the page.

9    **THE COURT:**  I could understand that could happen

10   occasionally, you know, you might have a missing signature on

11   one page or something.

12   **MR. DURKEE:**  Right.

13   **THE COURT:**  But the problems we have been looking at,

14   as I sense, are a lot worse than that.

15   **MR. DURKEE:**  Oh, I agree with Your Honor.  I'm not

16   talking about substantive deficiencies, and I've told them

17   that.  We are not talking about substantive deficiencies in any

18   way, shape, or form.

19   **THE COURT:**  Okay.

20   **MR. DURKEE:**  If they are substantively deficient,

21   with the amount of time they have to complete this stuff,

22   they're probably not a good client.

23   **THE COURT:**  Right.

24   **MR. DURKEE:**  Before the Court, I will tell the Court

25   if a client can't complete this form and do it properly, I

1   don't want to represent them.

2          THE COURT:  So tell me what your proposal is that you

3   said you made this morning to counsel for BP.

4          MR. DURKEE:  Yes, Your Honor.  It specifically says

5   this is not for substantive deficiencies.  It's a technical

6   deficiency, and that technical deficiency is defined as two or

7   less -- basically one or two pages -- that they have failed to

8   initial for a technical problem or they just missed that page.

9          THE COURT:  Okay.

10         MR. DURKEE:  The attorney would then initial it, just

11  that one page and just the initial.  It's not the final page

12  where they have to sign it and swear under perjury.  It's not

13  the authorizations.  It's the one or two pages that they failed

14  to initial.  The attorney would then be initialing for the

15  client.  And when they are initialing, it's defined in my

16  addendum -- if you would like, Your Honor, I did propose this

17  in an addendum to your order, the document 25595 order, the

18  April 16, 2019, order.  I did prepare a quick addendum to that,

19  if I could proffer it to the Court.

20         THE COURT:  Send it up.

21         MR. DURKEE:  Then I will read it to the Court.  I did

22  provide this to defense counsel, and we did meet and confer on

23  it.

24         It basically says that if the client does, in

25  fact, personally participate in preparing and reviewing their

09:53

1    initial disclosures, including the plaintiff profile form, but
2    makes a technical error -- defined as a failure to initial no
3    more than two pages of the plaintiff profile form -- but has
4    otherwise initialed all other pages and has executed the
5    verification page and has executed all of the authorization
6    forms which are part of the plaintiff profile form, then
7    counsel for plaintiff can cure this technical defect, which I
8    defined, by initialing those one or two pages -- two pages
9    maximum -- on behalf of the client and executing a statement
10   that attests to the fact that the client adopts the responses
11   on these pages and attesting to the fact that the client did,
12   in fact, personally participate in preparing and reviewing
13   these particular pages.

14             This is a very small subgroup.  It's not the
15   substantive problems that your Court is having with -- I think
16   our firm is almost down to zero on these show cause hearings.
17   This is not addressing any of those substantive issues.

18        THE COURT:  Why can't you simply, if this occurs --
19   and I will wait to hear from Mr. Hodges, but my thought is why
20   can't you simply cure the problem by sending them back those
21   one or two pages and having them initial them and send them
22   back to you?  That should take a few days at most.

23        MR. DURKEE:  Yes, Your Honor, we could do that.  The
24   burden commensurate with the cure is heavy.  Some of these
25   folks, as I said, don't have a computer in their home.  The

09:54

1   ones that -- you know, this small subgroup, Your Honor, if
2   somebody --
3           THE COURT:  Do they get U.S. mail?
4           MR. DURKEE:  That's what I'm saying, Your Honor.  If
5   it's somebody that is not having a real technical problem or we
6   are not in the middle of a deadline, this is going to be solved
7   very easily, and there are not going to be very many people
8   that fall into this very, very small subgroup.  What we are
9   talking about is if we are up on a deadline, so that we don't
10  show up on a 1(A) or a 1(B) list or a 2 list and we can cure it
11  simply -- this is, like I said, a cure for something that's
12  very small and very minor -- then we should make that curing
13  process for these technical defects a little easier.
14          THE COURT:  I apologize, but I don't know where
15  Coconut Grove, Florida -- that's where your firm is, right?
16          MR. DURKEE:  Yes, Your Honor.
17          THE COURT:  What part of Florida is that located in?
18          MR. DURKEE:  That's a subpart of Miami.
19          THE COURT:  Okay.  Can you give me some idea of where
20  your clients are located?  Your firm has how many?  Thousands?
21  Hundreds?
22          MR. DURKEE:  We probably have at least 3,500.  I have
23  heard the number 4,000, but I've only been with the group for a
24  month.  That's one of the main things I'm doing, Your Honor --
25  and I know that all the firms are -- is trying to separate the

09:56   1   wheat from the chaff.  That's my directive and that's what I'm

2   doing.  If a client can't fill this out substantively, as I

3   said, I don't want to represent them.

4           THE COURT:  My question is more directed to whether

5   your clients tend to be in that general area, in South Florida.

6           MR. DURKEE:  Your Honor, we have clients that are in

7   the Northern District of Florida all the way up to Pensacola.

8   We have folks that are in the Middle District of Florida.  We

9   have folks in Louisiana, Alabama, Mississippi, Texas.

10              Like I said, a lot of these folks are in very

11  low socioeconomic groups that don't have real access to

12  scanners and computers and fax machines, so sometimes they have

13  to take, like, a half a day off of work, go down to the UPS

14  center, make sure it gets faxed properly, and then they go back

15  home.  And then we call them and say, "Listen, you missed a

16  couple of pages," and they have to go back to the UPS center

17  and, you know, miss some more work and try and overcome what is

18  truly a really small technical defect.

19          THE COURT:  All right.  Let me hear from Mr. Hodges

20  on this.

21          MR. DURKEE:  Thank you, Your Honor.

22          MR. HODGES:  Good morning, Your Honor.

23          THE COURT:  Good morning.

24          MR. HODGES:  Your Honor, the compromise Mr. Durkee

25  proposes is fine.  I believe, though, it will only apply to a

09:57

1  handful of cases.  So if we have a plaintiff who forgets to

2  initial one or two pages or if it didn't go through properly on

3  the fax and the lawyer wants to attest to that, we don't have a

4  problem in that circumstance, but this is a larger problem.

5          The docketwide problem is we are receiving

6  substantively incomplete responses and responses that have not

7  been signed.  So if we have an understanding that the wet ink

8  signature still applies across all BELO cases -- this is not a

9  retroactive agreement.  This was in CMO 1.  It was always

10  there.  It's been used throughout this MDL -- that the

11  plaintiff profile forms need to be substantively complete when

12  they are submitted and that in the rare cases -- and I think

13  these will be rare cases where a couple of pages are missing

14  and the attorney signs on behalf of the plaintiff -- if the

15  plaintiff is bound --

16          THE COURT:  Not the pages are missing, but just the

17  initials.

18          MR. HODGES:  Just the initials on the pages, correct.

19  If the plaintiff is going to be bound by that as if he had

20  signed it under penalty of perjury, then that's an acceptable

21  solution in those handful of cases.  We had understood that the

22  Downs firm was challenging whether the wet ink requirement

23  applied.

24          THE COURT:  Well, they were.  Apparently they are not

25  as of this morning.

09:58

1           **MR. HODGES:**  That's my understanding as well.  So in

2   these handful of cases, I am fine with the proposed compromise.

3   I would suggest that the parties meet and confer on a

4   stipulated order that would apply to those cases.

5           **THE COURT:**  Okay.  Mr. Durkee, you're okay with that?

6           **MR. DURKEE:**  Absolutely, Your Honor.  That's why I

7   thought the meet-and-confer was very valuable.  We didn't want

8   to waste your time, so I'm glad we were able to discuss it.  It

9   sounds like we have a compromise.  It will certainly address

10  our concerns from our firm, Your Honor.

11          **THE COURT:**  Okay.  Thank you.

12          **MR. DURKEE:**  Thank you, Your Honor.

13          **THE COURT:**  So you and Mr. Hodges get together and

14  just submit the appropriate language to the Court to modify

15  that.  Okay?

16          **MR. DURKEE:**  Very good, Your Honor.

17          **THE COURT:**  I would just state for the record,

18  though, that in terms of the requirement for a wet ink

19  signature, it was suggested that this was somehow a new

20  requirement that only came about from the Court's order of

21  April 16, 2019, when we were here in court when that issue

22  arose, but the truth is, as Mr. Hodges accurately pointed out,

23  this has always been a part of the Court's original case

24  management order, which clearly indicated -- it didn't use the

25  term *wet ink*, but it clearly said that the plaintiffs had to

10:00

1    sign these under penalty of perjury.  My point in issuing that
2    order on April 16 was merely to make that abundantly clear.  It
3    wasn't intended in any way to add a new or different
4    requirement.  Okay?
5           **MR. DURKEE:**  Understood completely, Your Honor.  As I
6    told the Court and defense counsel at this hearing, I think it
7    is a very valuable tool to separate the wheat from the chaff.
8    That's what we are in the process of doing, and that's what we
9    are going to get done for the Court, Your Honor.
10          **THE COURT:**  Okay.  Thank you.  Do you-all have
11   anything else on this docket this morning?  I don't recall.  I
12   think the Downs firm had three or four people on the show cause
13   order, but those were satisfied.  Right?
14          **MR. DURKEE:**  Those were satisfied, Your Honor.  I can
15   tell you my main directive hitting the ground running, being
16   the new kid on the block, is to make sure you don't see
17   anything on that list for show cause again.
18          **THE COURT:**  Well, that would be good news.
19          **MR. DURKEE:**  Thank you, Your Honor.
20          **THE COURT:**  Thank you.
21          The Court will take that motion under advisement
22   until you-all submit the proposed order.
23          Let's get to the show cause order.  The show
24   cause order is Rec. Doc. 25698 that the Court issued on June 6,
25   2019.  Case Management Order 1 requires these BELO plaintiffs

10:02

1  to provide the defendants with certain information and

2  materials within 90 days of the date the complaint was filed.

3  Then there's, I guess you could say, almost an automatic 30-day

4  extension that Judge Wilkinson is granting if they appear on

5  the 90-day list.  Only after they don't comply with Judge

6  Wilkinson's order do they then appear on this show cause order

7  that I issue.

8          This month there are 277 BELO plaintiffs

9  identified who failed to provide full and complete disclosures

10  by the initial 90-day deadline, were then granted an extension

11  and ordered to comply by the extended deadline, and then failed

12  to provide full and complete disclosures by the extended

13  deadline.

14          Now, as I said, three Downs firm plaintiffs have

15  now satisfied the show cause order, so those are moot.  I'm

16  going by the numbers that are in the show cause order, the

17  numbers of the cases, 1 through 277.

18          114, which was Jose Pena Ferrerira, Civil Action

19  18-11958, that show cause order is satisfied.  There are two

20  others from the Downs firm.  I just want to state those for the

21  record.  265 on the list, Civil Action 18-14111, Raven

22  Lieurance, that show cause order is satisfied.  The next one,

23  266, Civil Action 18-14123, Jason Woods, that show cause order

24  is satisfied.

25          There were also a couple of Frank D'Amico law

1    firm clients.  It was represented to the Court that those have

2    been satisfied now.  Is that correct?

3            **MS. ZUPAC:**  Your Honor, the cases from the D'Amico

4    law firm have actually been dismissed.

5            **THE COURT:**  Dismissed.  That's right.

6            **MS. ZUPAC:**  That's correct.

7            **THE COURT:**  They are moot.  There were two or three?

8            **MS. ZUPAC:**  There were two, Your Honor.

9            **THE COURT:**  Two.  Okay.  I'm looking at them.  107 on

10   the list, Civil Action 18-11838, Randall Tillman, that was

11   voluntarily dismissed by Mr. D'Amico.  So was his other case,

12   139, Civil Action 18-12249, Anthony Claxton.  Those two have

13   been dismissed.

14           **MS. ZUPAC:**  That's correct, Your Honor.

15           **THE COURT:**  Okay.  That leaves us with approximately

16   272 to go.  I know Mr. Falcon is here.

17               You have two, Mr. Falcon?  Do you want to talk

18   about your clients?

19           **MR. FALCON:**  Yes, sir.  Two, Your Honor.  Darlene

20   Brown, we are not challenging the dismissal at this time.

21           **THE COURT:**  Okay.

22           **MR. FALCON:**  For Michael Gideon, we filed a response,

23   Your Honor.  Mr. Gideon is incarcerated until 2027 with the

24   Department of Corrections in Florida.  We have made five

25   attempts since March 20 to get full and complete disclosures

10:06

1    and get these forms done.  The latest attempt was about a week

2    ago.  We would just ask the Court for 30 days.  This may

3    require an attorney visit to the prison that he is at so we can

4    try to get this done.

5                    **THE COURT:**  Where is he in prison?

6                    **MR. FALCON:**  He is in Florida, Your Honor.

7                    **THE COURT:**  Your co-counsel, Lindsay & Lindsay, where

8    are they located?

9                    **MR. FALCON:**  He is near Pensacola.

10                   **THE COURT:**  I guess what I'm trying to understand, is

11   the guy in prison somewhere in the general vicinity where

12   Lindsay & Lindsay are?

13                   **MR. FALCON:**  I believe so, Your Honor.

14                   **THE COURT:**  It might be worthwhile sending them.

15                   **MR. FALCON:**  That's what we would ask, if you would

16   give us 30 days to get an attorney to actually go visit him and

17   get this done.  If we can't get it done, then --

18                   **THE COURT:**  Okay.  Let me see if BP has any objection

19   to that.

20                   **MS. ZUPAC:**  Your Honor, the only thing we would note

21   with respect to Mr. Gideon is that he has already received one

22   30-day extension.  The Falcon Law Firm moved on April 1 to

23   allow them an additional 30 days and that was granted.

24                   **THE COURT:**  By me or Judge Wilkinson?

25                   **MS. ZUPAC:**  By Judge Wilkinson, Your Honor.

10:07

1    THE COURT:  Okay.

2    MS. ZUPAC:  The reason that they gave in that motion

3    was what Mr. Falcon is explaining now, that they had just found

4    out that Mr. Gideon was incarcerated and they were trying to

5    send materials to the prison.  We think given the description

6    Mr. Falcon has given of these multiple attempts to reach

7    Mr. Gideon and fact that Mr. Gideon has been nonresponsive --

8    THE COURT:  Well, in fairness, from what Mr. Falcon

9    has represented to the Court, he has not been totally

10   nonresponsive.  He has responded, but they have had a problem

11   with getting full responses, I guess.  He has responded to some

12   extent.

13   MR. FALCON:  Yes, sir.

14   THE COURT:  But it was incomplete and you-all have

15   sent it back to him and trying to get him to --

16   MR. FALCON:  We have been trying to do it through the

17   mail and the UPS system.  It looks like it requires an attorney

18   visit.

19   THE COURT:  All right.  I'm going to give Mr. Falcon,

20   on behalf of Mr. Gideon, 30 days.  These are somewhat

21   extenuating circumstances since this gentleman is not at

22   liberty, I guess we would say.

23   Mr. Falcon, if you can't comply by then, the

24   case is going to be dismissed.

25   MR. FALCON:  Understood, Your Honor.

10:08

1        THE COURT:  Are there any other -- oh, you are here,
2    I'm sorry, from Nations.  I thought someone was here from the
3    Nations firm.  You are the main culprit here.
4        MS. DIVINE:  Yes, Your Honor.
5        THE COURT:  Not you personally.
6        MS. DIVINE:  Thank you for acknowledging that.
7        THE COURT:  Okay.
8        MS. DIVINE:  I have a copy of a notice of compliance
9    that was filed last night and courtesy copies for opposing
10   counsel.
11       I understand you haven't had a chance to review
12   these cases, but there are 55 here.
13       THE COURT:  Are you just giving this to them now?
14       MS. DIVINE:  Well, we filed it late last night,
15   Your Honor.  As mentioned in our motion for reinstatement or
16   reconsideration, we have had a change of counsel at the firm,
17   and that has obviously affected our compliance with this
18   process.  We are just now getting back on track and complying
19   with this Court's fair show cause order.
20       Essentially, when this procedure was instituted
21   by Your Honor in April, it was not long after that that the two
22   lead attorneys handling this left the firm.  So I am new to the
23   case and I am learning what needs to be done.  I am in contact
24   with our staff, who are in contact with our clients.
25       We just ask that you not fault our clients for

1   our failure to get this list to you earlier, but these 55 have

2   complied, and we have the dates they were submitted to opposing

3   counsel.  We can provide further evidence of those submissions,

4   but the submission date shows when they were fully cured and

5   compliant.  It was a matter of reporting it.

6           The File & Serve notices essentially weren't

7   going to the right person at our firm to even know that we

8   should be fully complying when we changed counsel, which we

9   take full responsibility for.

10          Regarding this 277, we have 121 of them who have

11   been responsive, and we are waiting for the return of their

12   signed PPFs.  There are 94 that we would consider agreeing to

13   dismiss within this whole group of our clients.  I know this is

14   usually done before the hearing.  The reason we have so many is

15   we have not had a chance to confer with opposing counsel on

16   these due to the fact I have just joined this matter and

17   learned I was attending this hearing yesterday.

18          **THE COURT:**  Well, yes, because we were here last

19   month and nobody from your firm bothered to show up.

20          **MS. DIVINE:**  Yes, Your Honor.  We apologize for that.

21   We were not aware of the hearing.  I know there's not an excuse

22   for that because we get electronic notice, and it did go to

23   Mr. Nations via File & ServeXpress.  The paralegal who was

24   handling those services was just looking at the main MDL and

25   handling everything from the counsel who left.  The counsel who

10:11

1    left would have been the ones to notify us and the staff that
2    we needed to get this together for the hearing.
3            We apologize for missing that hearing.  It will
4    not happen again.  We are now doing our best to comply in the
5    time we have had since we realized what we had missed, which is
6    when we filed the motion for reconsideration, literally just
7    realizing that we needed to when it was due almost.
8            If Your Honor would consider not taking out this
9    fault on our clients and give us a brief extension to see if we
10   could get the signatured, signed PPFs from the 121, at the very
11   least, that have indicated they will return them --
12           **THE COURT:**  Wait.  I want to get the --
13           **MS. DIVINE:**  -- out of this 272.
14           **THE COURT:**  Wait.  You're throwing around a lot of
15   numbers here.
16           **MS. DIVINE:**  Yes, Your Honor.
17           **THE COURT:**  Let me make sure we know what we are
18   talking about.  According to my math, of the 277 on the show
19   cause order, 272 would be your clients.
20           **MS. DIVINE:**  Correct.
21           **THE COURT:**  Now, you have submitted this morning a
22   list saying that 55 of these 272 have complied.
23           **MS. DIVINE:**  Correct.
24           **THE COURT:**  I'll hear from the other side their
25   response to that, but now you are mentioning 121.

10:13

1          **MS. DIVINE:**  Yes, Your Honor.

2          **THE COURT:**  Who are the 121?  Are these 55 included

3     in the 121?

4          **MS. DIVINE:**  No.  No.  In addition.

5          **THE COURT:**  You're talking about 55 plus 121?

6          **MS. DIVINE:**  Correct, Your Honor.

7          **THE COURT:**  Why haven't they complied already?  When

8     were these people originally supposed to answer these?  Months

9     and months ago, right?

10          **MS. DIVINE:**  Well, Your Honor, to be fair, they have

11    answered these.  They just didn't have a wet signature.  To be

12    honest, we have been in contact with these people.  They have

13    provided the answers to the PPFs.

14          **THE COURT:**  "These people," the 272 --

15          **MS. DIVINE:**  Our clients.

16          **THE COURT:**  -- the 121, or the 55, or what?

17          **MS. DIVINE:**  The 121 and the 55, all of them.  They

18    have been responsive with us.  We speak with them.  Opposing

19    counsel alleging that they don't exist or they are not really

20    filling out their forms is just an allegation, and it's not

21    supported by any evidence in the record.

22               I am here to say that we have evidence.  The

23    information we have included on the PPFs, although deficient

24    with signatures, still came from those clients.  We have been

25    in touch with them.  We are now trying to comply and be sure

10:14

1    that we have the proper signatures, the proper initials.  So we

2    are resending them to people who we have already spoken with.

3              Since we are based in Texas and most of our

4    clients are in Louisiana, it takes time.  Like counsel from

5    Downs mentioned earlier, it does take time to mail it and get

6    it back.  In the past they weren't coming back completely

7    correct and we were having to remail them.  So we have had a

8    lot of the same issues where we are not getting it back in a

9    form that is compliant, and we are remailing it and waiting for

10   it back.

11             We have changed our procedures recently to send

12   multiple copies in case they are waiting to go to Kinko's,

13   sending return stamped envelopes, really calling them

14   constantly to try to urge them to return these.  We have

15   changed our procedure in the last week to try to ensure that it

16   gets done in a more timely manner, as this Court has required

17   and we completely acknowledge is what we should do.

18             **THE COURT:**  What we are looking at now is just a tip

19   of the iceberg in this case because we have -- maybe Mr. Hodges

20   can help me with this.

21             Mr. Hodges, does somebody know how many of these

22   BELO cases we have so far or how many we can expect?  I know

23   there's a number in the pipeline, a large number in the

24   pipeline.  It's like 5,000 or 6,000 or something like that?

25             **MR. HODGES:**  Yes, Your Honor.  Pending BELO lawsuits,

1   there are 3,180.  Those are the Nations cases.  I didn't know

2   if you wanted the entire docket.  The entire docket is 4,049.

3              In this 120-day process in this Court, the

4   Nations firm has 2,806 and in total there are 3,272.  These are

5   cases that are here and have not yet been transferred out.

6         THE COURT:  Ultimately, a fair number of these cases

7   typically get transferred elsewhere.  About half the cases, I

8   think, statistically are being transferred to other districts,

9   but that issue doesn't arise until this is resolved, until the

10  initial vetting is resolved.  Right?

11        MR. HODGES:  That's correct, Your Honor.

12        THE COURT:  So the problem we have is we have

13  thousands of cases that have already been filed, probably

14  several thousand more in the pipeline that will be filed.  We

15  have still only, between myself and Judge Wilkinson, been able

16  to vet several hundred of them.  We have a long way to go, yet

17  we are having all these problems.  I don't want to be here for

18  the next six or eight months doing this every month, having

19  hundreds and hundreds of noncompliant plaintiffs and having to

20  deal with those.

21             What I don't understand is the first case

22  management order -- Mr. Hodges, you can correct me if I'm wrong

23  on this because you were there and part of that.  I believe the

24  first case management order Judge Wilkinson put together for

25  the Court, with the input from counsel, included this plaintiff

10:18

1  profile form, this 25-page form.  Is that correct?

2          **MR. HODGES:**  That's correct, Your Honor.

3          **THE COURT:**  That occurred when?  Early this year?

4          **MR. HODGES:**  That was in 2015.

5          **THE COURT:**  2015, yes.  So the point is all the

6  lawyers who have these clients have known since 2015 that your

7  clients would have to complete this 25-page form.  It looks

8  like people are just waking up now and saying, "Oh, we have to

9  complete this form.  We have to have our clients complete this

10  form."  Even if your lawsuit hasn't been filed but you know you

11  are heading that way, you know what the form is.  You know the

12  information you need.  There's no reason you can't be having

13  all of your clients complete and sign these forms even long

14  before they have to be filed.

15          **MS. DIVINE:**  Yes, Your Honor.  We understand the

16  frustration.  We have been doing that.  We just weren't having

17  them with original signatures.  That's where we are playing

18  catch-up.  We have submitted forms.  They just weren't --

19          **THE COURT:**  Were you copying and pasting signatures

20  like we found in other cases?

21          **MS. DIVINE:**  I was not --

22          **THE COURT:**  Not you personally.

23          **MS. DIVINE:**  -- involved with that.

24          **THE COURT:**  Not you personally.  That's what we were

25  seeing.

10:19

1        **MS. DIVINE:**  I was not involved in that, and I do not
2  know the method --
3        **THE COURT:**  Somebody raised the issue of whether
4  electronic signatures would suffice.
5        **MS. DIVINE:**  That was not our firm.
6        **THE COURT:**  That's not an electronic signature if you
7  just photocopy somebody's signature and paste it into a
8  document.
9        **MS. DIVINE:**  True.  To be honest, that CMO 2 does ask
10 for signatures, but it does not specify wet ink, as Your Honor
11 mentioned earlier.  Up until this point, there hasn't been --
12       **THE COURT:**  If you tell somebody, "You have to sign
13 this under penalty of perjury," that tells me you have to sign
14 it.  Somebody else can't sign it for you.
15       **MS. DIVINE:**  Your Honor, I understand that's been
16 decided.  We agree and plan to comply completely with that.
17       **THE COURT:**  As Mr. Hodges accurately pointed out,
18 this is not the first instance in this whole MDL we have made
19 that.  We have had several requirements for so-called wet ink
20 signatures.
21       **MS. DIVINE:**  I'm aware of that just from looking at
22 other case law, but I know that our firm --
23       **THE COURT:**  No, I'm talking about in this case, in
24 MDL 2179.
25       **MS. DIVINE:**  Okay.

10:20

1    **THE COURT:**  We have had multiple instances where

2    different documents that had to be filed by the claimants or

3    plaintiffs themselves were required to be personally signed by

4    them.

5    **MS. DIVINE:**  We intend to have that done.  We are in

6    the process of doing that.

7    **THE COURT:**  All right.  Let me hear from Mr. Hodges

8    or whoever is going to respond to your response.

9    **MS. ZUPAC:**  Your Honor, I just want to start by

10   pointing out that the issue with the majority of the 270

11   Nations plaintiffs on this list is actually not anything to do

12   with wet ink signatures.  For the majority of these, we

13   actually have the problem where we received no production at

14   all, and that's described in Category 2 of the status report

15   that we submitted.  Then with a number of them, we don't have

16   signatures at all, wet ink or otherwise.

17   **THE COURT:**  In other words, they sent you a document

18   and they might have completed some information, but no

19   signatures?

20   **MS. ZUPAC:**  That's correct, Your Honor.  I have an

21   example if Your Honor would like to see it.

22   **THE COURT:**  Okay.

23   **MS. ZUPAC:**  So your Honor can see that this is the

24   plaintiff profile form for a plaintiff named Lee Edgar Sartain,

25   and there are no initials whatsoever.  The last page of the

10:22

1 verification form simply says "will supplement plaintiff's

2 signature."  More than that, Your Honor, if you look through --

3    THE COURT:  So this obviously was not filled out by

4 the client; it was filled out by the lawyers.

5    MS. ZUPAC:  Well, Your Honor --

6    THE COURT:  Well, it had to be.

7    MS. ZUPAC:  Presumably that is what happened,

8 Your Honor.  You can see throughout the form it's not just the

9 lack of a signature; it's a lack of substantive response.  So,

10 for example, Question 7 asks for addresses.  The response is

11 "will supplement."  The response to employment information is

12 "will supplement."  You flip through and there's simply

13 *will supplements* all over this form.

14    THE COURT:  So it's a bare-bone, incomplete, unsigned

15 document.

16    MS. ZUPAC:  That's correct, Your Honor.  More than

17 that, I mean, we have things that if a plaintiff was filling

18 this out, they would undoubtedly be able to answer the

19 questions.  For example, the question of have you ever been

20 married, spouse's name, "will supplement," medical

21 information --

22    THE COURT:  Maybe he forgot.

23    MS. ZUPAC:  They have an awful lot of clients that

24 have forgotten their spouse's name if that's the case,

25 Your Honor.

10:23

1      **THE COURT:**  Okay.

2      **MS. ZUPAC:**  We also have some where we do have an

3  issue with the wet ink signature or initials and similarly have

4  a problem with a lack of substantive responses, and I do have

5  an example of that.

6      **THE COURT:**  I did a quick count of the 277, the

7  reasons they were deficient -- or that you-all considered them

8  deficient, at least.  There were only about 20 for wet ink

9  issues.

10      **MS. ZUPAC:**  That's correct, Your Honor, and a number

11  of those are also substantively deficient.  We have an example

12  where we have copied-and-pasted initials.

13      **THE COURT:**  The biggest overarching issue here is

14  either lack of response at all or a clearly inadequate or

15  insufficient or incomplete response --

16      **MS. ZUPAC:**  That's correct, Your Honor.

17      **THE COURT:**  -- beyond the signature issue.

18      **MS. ZUPAC:**  Yes, Your Honor.  The signature issue is,

19  frankly, a very small portion of the Nations cases that are on

20  this status report.

21           The only other thing I will note, Your Honor, is

22  that we do have records of certain cases that were cured in

23  advance of the hearing, and I have that list right here.  Our

24  records show that 25 were cured.

25           I have just been handed this notice of

10:24

1  compliance.  Upon review of it, I think what has happened is

2  that the Nations firm has submitted some materials to us this

3  week or at the very end of last week.  The way the Nations firm

4  does their productions is they submit certain things to us

5  electronically via a drop box; but then they put other things,

6  including the PPFs and authorizations, in the mail.  So there

7  are a number of these cases where we just haven't received the

8  materials yet.  You can see on this list that near the end they

9  say submitted June 18, 2019.  That was last night.  I got an

10  email at 8:00 p.m. Eastern and haven't had a chance to go

11  through it yet.

12          I do have a list of 25, which I'm happy to go

13  over, where we agree that they have been cured.  But for, I

14  think, the other 30 on this list, we simply don't know standing

15  here today, and we haven't received all the materials to be

16  able to verify that.

17          **THE COURT:**  Well, this is sort of related because up

18  there they also -- let me see.  Hold on a second.

19          While we are on this whole subject, because this

20  is all related, the Nations Law Firm also filed two motions for

21  reinstatement or reconsideration of, looks like, about 20

22  plaintiffs whose cases were dismissed last month.  Have you

23  seen that now?

24          **MS. ZUPAC:**  We have, Your Honor.

25          **THE COURT:**  One motion, their motion, is 25723.  It's

10:26

1   on behalf of 11 plaintiffs that the Nations firm say that, on

2   behalf of those 11, they filed their required documents before

3   the Court issued its dismissal last month.

4            On the other motion, 25724, that's on behalf of

5   nine plaintiffs who they say mailed the required documents

6   after the dismissal was issued.  So those are separate from

7   these 55, I suppose.

8            MS. ZUPAC:  That's correct, Your Honor.

9            THE COURT:  So do you have a response to that?

10           MS. ZUPAC:  I do, Your Honor.  We are trading

11  counsel.

12           THE COURT:  Okay.  I'll let Mr. Hodges respond to

13  that.

14           MR. HODGES:  Thank you, Your Honor.

15           So, Your Honor, to put in perspective these 20

16  lawsuits, the group of 11 and the group of 9, these are

17  lawsuits where the disclosures were all due in January

18  originally under CMO 1.  They were the subject of a February 27

19  hearing before Judge Wilkinson.

20           Judge Wilkinson entered an order on February 28

21  compelling production and extending the due date for those

22  disclosures until March 29.  They still weren't produced.  They

23  were all listed on our May 1 status report, and they were the

24  subject of the show cause hearing before this Court on May 17.

25  No one from the Nations firm attended that hearing and so, of

course, we didn't hear about any of this until today.  These
are three to four months overdue by the time we get to that
point.

I don't think we have heard a good reason as to
why these particular plaintiff profile forms were not submitted
on time or why there was no appearance at the hearing or other
attempt to cure until now.  We heard that Nations was not aware
of the hearing, but we know from last time Howard Nations
received notice from File & Serve.  The public notice of the
hearing was published on the public website.  BP was aware.
Mr. Falcon was aware.  We both appeared at the hearing.

The Nations Law Firm had notice that these cases
were going to be up for hearing because we put them on our
May 1 status report.  We shared a draft five days in advance of
that.  The Nations firm was involved in crafting CMO 2, which
created the show cause hearing process, so he knew that by
having these cases on our status report that they would come
due for a show cause hearing.  So it really rings hollow to say
that that firm was not aware that this hearing would take
place.

We have heard that Mr. Kirby was in the process
of leaving the law firm, but there's no explanation as to why
his departure would have caused this particular issue.  In
fact, the show cause hearing was May 17.  Mr. Kirby sent an
email announcing his departure on May 21, which was after that

1    hearing, but in any event there's no connection between why his

2    departure should cause there to be no attempt to cure this

3    particular issue -- bring it to the Court's attention before

4    today.

5            Finally, we have heard this is a calendaring

6    error on the part of the Nations firm, and a calendaring error

7    is not consistent with the prior excuses of "We didn't know

8    about the hearing."  It suggests they did know but just put it

9    down for the wrong date.

10            Judge Wilkinson recently considered the issue of

11    calendaring errors in a BELO case called *Camille Farmer v. BP*.

12    He surveyed the law and found that courts have consistently

13    held that calendaring mistakes are not good cause, and

14    Your Honor just adopted that report and recommendation this

15    week, on June 17.  He did a pretty thorough analysis of the

16    law.

17            So there is no explanation for why this is being

18    brought to the Court's attention now months after these initial

19    disclosures were originally due.  The order dismissing these

20    cases was entered May 17.  These motions were not filed until

21    June 14.  It suggests to me that what has happened is the

22    Nations firm has become aware of the deficiencies, and they are

23    still out there trying to round up signatures from these

24    plaintiffs and effectively creating their own deadlines and not

25    following the deadlines that have been imposed by the Court.

10:30

1          This has the potential to become a recurring

2     problem when we have these show cause hearings, but then each

3     subsequent month we are going to see a list of more cases where

4     the Nations firm is asking to reopen and reinstate cases that

5     have already been dismissed.

6          If the Court is going to manage these BELO

7     cases, it must be able to set deadlines.  As the Fifth Circuit

8     has held, the Court has to be able to enforce those deadlines.

9     To set aside a judgment, the Nations firm needs to show good

10    cause.  Judgments are only set aside in extraordinary

11    circumstances such as change in law, new evidence, manifest

12    error of law.  None of those circumstances apply here.  We

13    believe that the motions for reconsideration should be

14    dismissed, certainly with respect to the cases that were not

15    cured or submitted until after the dismissals at the last show

16    cause hearing.

17         **THE COURT:**  Let me have opposing counsel respond to

18    that, if you would.

19         **MS. DIVINE:**  Thank you, Your Honor.

20         **THE COURT:**  Is this one one of yours, the example

21    that he gave?  Is that a Nations firm case?

22         **MS. DIVINE:**  I'm going to take them at their word

23    that it is.

24         **THE COURT:**  Okay.

25         **MR. HODGES:**  It is, Your Honor.

10:31

1    THE COURT:  Okay.

2    MS. DIVINE:  However, I do know that Judge Wilkinson

3  has since ordered that -- or at least this is what I

4  understand, is that he has said "will supplement" is not an

5  acceptable thing to put on the PPF, and our entire staff is now

6  aware of that.

7    THE COURT:  I think that should have been quite

8  obvious.

9    MS. DIVINE:  Yes, Your Honor, I agree.  So I don't

10  know when this particular one was submitted, but I suspect it

11  was before our staff got that directive, which may have come at

12  the hearing with Judge Wilkinson that gave the extension.  I do

13  not know the exact time, but we are no longer putting "will

14  supplement" on these.  One of the reasons --

15    THE COURT:  I don't know why anyone in your firm ever

16  thought that was satisfactory, that would comply with a

17  deadline.  Instead of substantively answering, you just put --

18  it's replete with "will supplement," "will supplement," "will

19  supplement," and then it's unsigned even.  It's not even signed

20  at all.  This is not a lack of a wetting; this is a lack of any

21  signature.

22    MS. DIVINE:  This should not have been submitted.

23    THE COURT:  Well, I think this is just an example.

24  This is not a one-off thing as far as I understand.

25    MS. DIVINE:  Well, if I might address as far as the

10:33
1   show cause hearing where opposing counsel was saying that, you
2   know, most of the things say no production at all.  Admittedly,
3   I'm looking at this after the fact.  But on that list, when we
4   did spot checks of the ones that say no production, we did find
5   some that were no production.  We did find some that did have
6   some production.  It's unclear the way the list has been put
7   out --

8           **THE COURT:**  You were supposed to file a response to
9   the show cause order before today, before appearing here and
10  starting to tell me these things now.  I gave everybody a
11  deadline.  If you have a response to make to the show cause
12  order, some explanation, you make it before you get to the
13  hearing.

14          **MS. DIVINE:**  Well, it said "may" make.  The wording
15  of the order said you "may" file.

16          **THE COURT:**  Okay.

17          **MS. DIVINE:**  So we took that to mean that we would be
18  allowed to come here --

19          **THE COURT:**  So "We have a response, but we don't
20  have to tell you until we get into court," huh?  Okay.

21          **MS. DIVINE:**  Well, Your Honor, we will file a
22  response, if this happens again, by your deadline.

23          **THE COURT:**  I guess I'm going to have to change "may"
24  to "shall," huh?

25          **MS. DIVINE:**  Well, it did say "may," so that's

10:34

1    what --

2            THE COURT:  Well, that's because you may not have a

3    response.

4            MS. DIVINE:  Well, to be honest, since just joining

5    this and learning of these deficiencies, we were trying to cure

6    as many as possible.  Admittedly, we filed this last night.

7            THE COURT:  Thank you.  Here's what I'm going to do.

8    I can't state for the record now which cases are being

9    dismissed and which might not be dismissed here on this show

10   cause order, but there are definitely a number of them that

11   clearly are going to be dismissed for lack of any response.

12   I'm going to allow counsel for BP seven days to respond to

13   their list of 55.

14            Mr. Hodges, if you want to make a written

15   response -- I know you made an oral response to their two

16   motions for reconsideration from last month's dismissals --

17   seven days to file that.

18            Then you can have seven days to reply to

19   whatever they --

20            MS. DIVINE:  Thank you, Your Honor.

21            THE COURT:  I don't know how many, right now, I'm

22   going to end up dismissing or not dismissing, but we just can't

23   have these continuing problems in this case.

24            MS. DIVINE:  Yes, Your Honor.

25            THE COURT:  Anybody need to say anything else on the

10:35

1   order to show cause?

2           **MS. DIVINE:**  No, Your Honor.

3           **THE COURT:**  I think the only thing that's left, that

4   we haven't talked about, is BP's motion to modify the BELO Case

5   Management Order 2.  Who is going to speak about that?

6               This is a timing problem, right?  You can go

7   ahead and explain what you are trying to do here.

8           **MS. ZUPAC:**  That's correct, Your Honor, it is a

9   timing problem.  Mr. Hodges discussed this at the last status

10  conference, the fact that the way the CMO 2 schedule is set up,

11  we will report cases in one month but not be able to actually

12  report which cases complied with the extended deadline until

13  two months later.

14              So, for example, on April 1 we reported 548

15  cases in Category 1.  Those were cases that had failed to

16  provide full and complete disclosures by the original deadline

17  set by CMO 1.  However, under CMO 2, Judge Wilkinson extended

18  those --

19          **THE COURT:**  He gives them another 30 days.

20          **MS. ZUPAC:**  He gave them another 30 days.

21          **THE COURT:**  Even though the initial case management

22  order says 90 days, effectively everybody has 120 days.

23          **MS. ZUPAC:**  Correct, Your Honor.

24          **THE COURT:**  It is automatic.

25          **MS. ZUPAC:**  It has been automatic as these things

10:37   1   have come through.

2                    So they received a 30-day extension until May 1.

3   Our next status report was due on May 1, but there was no way

4   that we could report the status of those 548 people when their

5   disclosures were actually due that day.  So they were carried

6   forward until this June report, and those are the cases that we

7   are discussing now.  We have tried to address that by dropping

8   a footnote noting that there are cases every month that are in

9   limbo, so to speak, but we think that one fairly easy fix to

10   that is simply to carve out the Category 2 reporting and to

11   report to Your Honor --

12            **THE COURT:**  Category 2 again, for the record, meaning

13   these are claimants who failed to submit the required documents

14   within the first 90 days --

15            **MS. ZUPAC:**  Correct.

16            **THE COURT:**  -- then were on Judge Wilkinson's list

17   and he gave them another 30 days, and they still failed to

18   comply after 120 days.  That's Category 2, right?

19            **MS. ZUPAC:**  Yes, that's correct, Your Honor.

20            **THE COURT:**  That's when it comes to my attention to

21   issue a show cause order.

22            **MS. ZUPAC:**  Correct, Your Honor.  These are

23   plaintiffs who failed to meet their original initial

24   disclosures deadlines, appeared on the Category 1 list that we

25   send to plaintiffs' counsel to meet and confer with them, and

10:38

1    then if they are not resolved through that meet-and-confer

2    process then end up on Category 1 of the status report.

3            **THE COURT:**  Explain to me what you are proposing.

4            **MS. ZUPAC:**  What we are proposing is to eliminate

5    Category 2 from the status report filed on the 1st of every

6    month, but rather file our Category 2 status report seven

7    calendar days after the due date that Judge Wilkinson gives

8    these plaintiffs.

9            **THE COURT:**  So you would know by then who had still

10   not complied with the additional 30 days.

11           **MS. ZUPAC:**  Correct, Your Honor.  So sticking with

12   the example of the April 1 plaintiffs, there were 548

13   plaintiffs who appeared on Category 1 of the April 1 list.

14   Their disclosure deadline was extended until May 1.  Our

15   proposal would have us reporting on May 8 which of those 548

16   plaintiffs had failed to comply with that extended deadline.

17           **THE COURT:**  Okay.  All right.  I think I understand.

18   Let me see if anybody wants to respond to this.

19           **MR. DURKEE:**  On behalf of the Downs law firm, we have

20   no objection to this, Your Honor.  We actually think it's a

21   good management tool.

22           **THE COURT:**  Okay.

23           **MS. DIVINE:**  On behalf of the Nations firm, I just

24   ask that it not be applied retroactively or that we have plenty

25   of notice --

10:39

1          **THE COURT:**  Well, I don't know how we could apply it
2    retroactively.  It's going to be starting --
3          **MS. DIVINE:**  This new list, will it --
4          **THE COURT:**  -- with the next month's list.
5          **MS. DIVINE:**  It will speed up -- the new people on
6    this additional list will basically now be added to show cause
7    orders a month earlier than previously done.  So if that's
8    going to be the case moving forward, we would just ask that
9    maybe there's one month adjustment or enough time -- we found
10   that, you know, some of these lists were coming out with people
11   we had very little time to cure.  So I'm just --
12         **THE COURT:**  Well, you have had the 90 days, then you
13   have had the 30 days that your client was ordered to cure it by
14   Judge Wilkinson --
15         **MS. DIVINE:**  Yes, Your Honor.
16         **THE COURT:**  -- and then you are going to have
17   probably at least another 30 days by the time we get to a show
18   cause hearing.  It's not like you're going to be ordered to
19   show up tomorrow or your case is going to be dismissed.
20         **MS. DIVINE:**  Okay.  Yes, Your Honor.  I guess based
21   on when you rule on this, if it's right before the deadline, I
22   just was hoping that if there is another list produced -- just
23   on the gap period between your ruling and when these people are
24   added to the list, that we might have additional time for that
25   new list to factor into our --

10:41

1      THE COURT:  I'm not entirely clear on what you are
2   asking me to do.
3      MS. DIVINE:  Well, I trust Your Honor will make the
4   right decision on this.
5      THE COURT:  Usually I try to do that.
6      MS. DIVINE:  I know.  Honestly --
7      THE COURT:  Occasionally I'm told I didn't.
8      MS. DIVINE:  -- I wasn't prepared to speak to this
9   issue, so I may not have all the facts.
10      THE COURT:  Okay.
11      MS. DIVINE:  I just want to be sure we can comply
12   with whatever is ordered.
13      THE COURT:  I'm going to grant this motion.  You-all
14   submitted a draft revised -- would this be Case Management
15   Order 3 or a revised Case Management Order 2?  What are we
16   doing here?
17      MS. ZUPAC:  Your Honor, we envisioned a revised
18   Case Management Order 2.  Our motion has both a clean copy at
19   Exhibit A, which I'm happy to hand up --
20      THE COURT:  I saw, like, a red-line copy.
21      MS. ZUPAC:  Yes.  Then the red-line copy showing the
22   changes from the current version, Exhibit A.
23      THE COURT:  I will grant that motion and we will
24   issue that order.
25      MS. ZUPAC:  Thank you, Your Honor.

10:42

1    **THE COURT:**  Okay.  Is there anything else?  Did we
2    miss anything?  Anybody?
3              I had -- well, we will take it up with
4    Mr. D'Amico.  I thought he would be here this morning until I
5    found out he had dismissed his two clients.
6              You-all may or may not be involved in this.  He
7    has three cases, 17 clients, that came back from the Fifth
8    Circuit.  Are you all familiar with what I'm talking about?
9    What I wanted to ask him is whether he has now complied.
10             He had never complied with our PTO 63 -- which
11   ordered him to file individual lawsuits on behalf of misjoined
12   clients and comply with PTO --
13             Is it 66, Ben?
14   **THE LAW CLERK:**  Correct.
15   **THE COURT:**  66.  Maybe he has done that by now.  I
16   don't know.  I was going to ask him this morning.  Do you-all
17   have any knowledge of that?
18   **MR. JARRETT:**  Keith Jarrett for BP.  I'm aware that
19   his claims have come back, but I don't know the answer to your
20   question.
21   **THE COURT:**  Okay.  We will follow up with him.  If he
22   was here and if he hadn't done that already, I was going to
23   give him a deadline to do that.  We will clear that up.
24             Anything else?
25   **MR. LAMBERT:**  Your Honor, Hugh Lambert, also known as

10:43   1   Skip.  David Durkee had to leave.  He has a court appearance at

2   11:00 in another matter.  He apologized for leaving early.

3               THE COURT:  Okay.  Everyone have a good day.

4               THE DEPUTY CLERK:  All rise.

5               (Proceedings adjourned.)

6                              * * *

7                            CERTIFICATE

8               I, Toni Doyle Tusa, CCR, FCRR, Official Court

9   Reporter for the United States District Court, Eastern District

10   of Louisiana, certify that the foregoing is a true and correct

11   transcript, to the best of my ability and understanding, from

12   the record of proceedings in the above-entitled matter.

13

14

15                            /s/ Toni Doyle Tusa
                              Toni Doyle Tusa, CCR, FCRR
16                            Official Court Reporter

17

18

19

20

21

22

23

24

25