## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | ✱ | **MDL NO. 2179** |
| **"Deepwater Horizon" in the Gulf of** | ✱ | |
| **Mexico, on April 20, 2010** | ✱ | **SECTION J** |
| | ✱ | |
| | ✱ | |
| **This Document Relates To:** | ✱ | **HONORABLE CARL J.** |
| | ✱ | **BARBIER** |
| **No. 15-4143, 15-4146 & 15-4654** | ✱ | |
| | ✱ | **CHIEF MAGISTRATE JUDGE** |
| | ✱ | **JOSEPH C. WILKINSON, JR.** |
| | ✱ | |

### DECLARATION OF MICHELLE M. LA COUNT
### REGARDING HESI AND TRANSOCEAN PUNITIVE DAMAGES
### SETTLEMENTS' ALLOCATIONS AND DISTRIBUTIONS

I, MICHELLE M. LA COUNT, declare as follows:

1.     I am a Senior Project Manager at Epiq Class Action and Claims Solutions, Inc.[1] (formerly an Assistant Director of Operations at Garden City Group, LLC ["GCG"]).   GCG was engaged by the Court appointed New Class Claims Administrator to assist him in implementing the Proposed HESI and Transocean Punitive Damages and Assigned Claims Class Action Settlements. Pursuant to the Court's April 12, 2016 Preliminary Approval Order as to the Proposed HESI and Transocean Punitive Damages and Assigned Claims Class Action Settlements (the "Preliminary Approval Order"), GCG was authorized to act as the Class Notice

---

[1] GCG was acquired by Epiq as of June 15, 2018 and is now continuing operations as part of Epiq.

Administrator in connection with the Settlements filed in MDL-2179.[2] The following statements are based on my personal knowledge and information provided by other experienced GCG and Epiq employees working under my supervision, and, if called on to do so, I could and would testify competently thereto.

## MAILING OF THE NOTICE

2.     Notice regarding the New Class Settlements was included in a combined notice along with details of the Old Class Settlements in one overarching notification to the Classes in order to achieve the most cost efficient notice campaign possible.  Details regarding the comingled notice campaign were provided to the Court in Section 2 of the Declaration of Michelle M. La Count (the "Old Class La Count Declaration") included as an exhibit to the Memorandum in Support of Motion for Approval of Distribution of the Assigned Claims Portion of the Halliburton Energy Services, Inc. and Transocean Ltd. Settlement Agreements [Rec. Doc. 25122-2].

## TELEPHONE HOTLINE

3.     Epiq has continued to maintain a toll-free telephone number (1-877-940-7792) and Interactive Voice Response ("IVR") system to accommodate potential Old and New Class Members who have questions about the Settlements.

---

[2] All terms with initial capitalization not otherwise defined herein have the meanings ascribed to them in the HESI Punitive Damages and Assigned Claims Settlement Agreement as amended on September 2, 2015, as well as the Transocean Punitive Damages and Assigned Claims Settlement Agreement dated May 29, 2015 (the "Settlements").

As of July 22, 2019, Epiq has received 70,262 calls to the toll-free helpline including 40,116 callers opting to speak with a live call center agent.

## WEBSITE

4.     Epiq continues to maintain the case website (www.GulfSpillPunitiveDamagesSettlement.com) dedicated to the Settlements in order to assist potential Old and New Class Members.

5.     The New Class Claims Administrator has provided EPIQ with updates to post to the public website along with administrative forms, frequently asked questions, Court Status Reports, and Court Orders, including the Order Capping Individual Attorneys' Fees in the HESI and Transocean Punitive Damages and Assigned Claims Settlement Agreements [Rec. Doc. 24470].

6.     Epiq has also continued to handle written correspondence via the dedicated email address, Questions@GulfSpillPunitiveDamagesSettlement.com, and to answer inquiries received by US Mail and courier services.

## PROCEDURES FOLLOWED IN COMPILING THE CLAIMS DATA FROM EXISTING DHEPDS CLAIM DETERMINATIONS

7.     DHEPDS Claims Data Transferred.     Pursuant to the direction of the New Class Claims Administrator[3], the underlying Deepwater Horizon Economic and Property Damages Settlement ("DHEPDS") Court Supervised Settlement

---

[3] The New Class Claims Administrator references either or both the initial named administrator, Michael Juneau, and/or his successor, Patrick Juneau, unless specified, as most of the events described herein were underway at the time of the transition.  Therefore, both parties played a role in directing Epiq's work on the administration of the Settlements.

Program (the "CSSP") data for New Class-applicable claim types was transferred to the HESI/Transocean Settlements Program (the "Settlements Program") in accordance with the Court's Order regarding the sharing of data between the CSSP and the Settlements Program [Rec. Doc. 16271]. The final determinations recorded in the CSSP data as of July 9, 2018 were utilized; claims that were not yet final at that time were identified as DHEPDS Reserve Claims (*see* Section 15 below). Statuses of "eligible" and "denied" claims were transferred. For "eligible" claims the recognized loss in line 1 of each Claimant's final DHEPDS Eligibility Notice, also known as the "base compensation" amount, was also transferred.[4] For those claims with a denial unrelated to a finding of Fraud, Waste, or Abuse ("FWA"), a general notation of prior denial by the CSSP was transferred. For those Claimants with CSSP data indicating there was an FWA-related denial, this information was transferred as well.

## NEW CLASS CLAIM FORM PROCESSING

8.   <u>Claim Form Processing</u>. The New Class Claims Administrator directed review of New Class Claim Forms ("Claim Forms") in accordance with the Distribution Model and provided the following opportunities for action to perfect a

---

[4] Pursuant to the Court-approved New Class Distribution Model (the "Distribution Model"), the base compensation amounts, also known as recognized loss amounts for DHEPDS-determined New Class-eligible claims, were transferred and utilized as the basis for the *pro rata* allocation of funds from the distribution fund pool for each of the claim types in question.

claim by the claimant and/or the claimant's legal representative (collectively, the "Claimant"):

(a) Identification of deficiencies and notification to the Claimant via US Mail of any missing or incomplete documentation for a claim, giving the Claimant 20 days from the date of the notice to respond with a 10-day grace period for receipt of responses thereafter before next steps would be taken;

(b) Issuance of a determination notice to the Claimant via US Mail as to any condition, including a failure to cure deficiencies previously identified in a deficiency notice to the Claimant, that would result in denial of the claim or a $0 value being assigned to the claim, along with the opportunity to respond within 20 days from the date of the determination notice, either (i) to correct any incompleteness issue(s) pursuant to the requirements of the various claim determination frameworks, or (ii) if incurable, to appeal to the equitable authority of the New Class Claims Administrator through the internal Settlements Program appeals process if the Claimant wished to seek further review;

(c) Issuance of a New Class Claims Administrator's appeal determination notice to the Claimant via US Mail, giving the Claimant 20 days from the date of the appeal determination notice to respond and request Court Review if the Claimant wished to seek further review;

(d) Issuance of a Court review determination notice to the Claimant via US Mail, to which there was no right of appeal except under limited circumstances.[5] Court determinations were also posted to the case website to provide guidance to other Claimants considering appealing to the Court.

**APPLICATION OF THE DISTRIBUTION MODEL TO ALL CLAIMS**

9. <u>New Class Claims Reconciliation Notices</u>. As previously reported to the Court, the New Class Claims Administrator issued letters to all potential New Class Members with either one or more transferred DHEPDS claims and/or one or more claims made via a Claim Form. This allowed for the reconciliation of claims and gave potential Class Members an opportunity to see the list of all claims being considered with the statuses of each, in order for such Claimants to be able to communicate any concerns to the New Class Claims Administrator for review and to potentially update the data being relied upon for award allocation to accurately reflect final DHEPDS determinations prior to distribution. Notices were sent to both attorneys of record as well as directly to Claimants given the time that had elapsed since the DHEPDS started operation in 2012. This also facilitated the opportunity for the New Class Claims Administrator to advise the potential New Class Members

---

[5] The Settlements indicated that appeal to the U.S. Court of Appeals for the Fifth Circuit is not permitted except under limited circumstances. Despite this, one filer of a series of claims has attempted to appeal on other grounds not permitted under the Settlements. This appeal remains pending before the Fifth Circuit as of this motion, so these potential claims are included in the New Class Reserve A Claims described in Section 15 below.

of the attorneys' fee Order entered by the Court [Rec. Doc. 24470] and enabled potential New Class Members to confirm legal representation as appropriate.

All New Class claims reconciliation notices included a form to be used by Claimants if the Claimant disagreed with the data provided in the New Class claims reconciliation notice. Claimants returned 4,864 of these forms to the Settlements Program. Of those, 2,671 were deemed to contain no actual, substantive information whatsoever even though the standardized form indicated the New Class Claims Administrator would not conduct substantive review if the form was incomplete.[6] Of the remaining 2,193 responses to the New Class claims reconciliation notices, the following data issues were identified and corrected for all similarly situated claims within the overall claims data set:

(a) The Settlements Program identified 844 claims for which the CSSP Eligibility Notice line 1 compensation amount was 100% offset by prior payments and for which the initially transferred data reflected the offset value of $0.00 rather than the accurate line 1 compensation value.

(b) The Settlements Program identified 28 Oyster Combined Harvester and Leaseholder claims where the CSSP Eligibility Notice line 1 compensation

---

[6] Incomplete forms were identified as those that contained no information that could be used for a substantive review. For example, forms lacking a Claim ID or failing to specifically raise an objection/issue as required by the instructions were considered incomplete. Given the number of prior communications from the DHEPDS, many Claimants simply signed the form and returned it. The potential for these types of submissions was anticipated by the Settlements Program, hence the planned process for resolving such unnecessary/non-substantive responses and the inclusion in the form of explicit instructions and the accompanying warning.

amount included Risk Transfer Premium ("RTP"), which amount needed to be subtracted out to establish the base compensation values.[7]

(c) The Settlements Program identified 1,826 Seafood Compensation Program - Shrimp claims where the CSSP Eligibility Notice line 1 compensation amount included RTP, which amount needed to be subtracted out to establish the base compensation values.[8]

(d) The Settlements Program identified 537 Claimants that had received an FWA denial at some point in the DHEPDS claim history, but those determinations were later reversed such that the FWA denial was not the final CSSP determination, thus requiring correction in the data set to avoid improperly denoting the entire Claimant as ineligible under the New Class Distribution Model.

(e) The Settlements Program identified 254 Claimants with differing representation between the CSSP and the New Class Settlements Program which have been

---

[7] After identifying this issue, the New Class Claims Administrator directed Epiq to confirm the Distribution Model's Oyster, Blue Crab, Finfish and Other Seafood Catch Types Compensation Chart, specifically to verify that the value for the Oyster Harvester & Leaseholder Lost Interest line item did not rely on historical DHEPDS data points that included RTP in determining the standardized claim value for this claim type.  It was confirmed that the RTP amounts were properly subtracted from the claims included in this analysis such that the chart value is an accurate reflection of the median recognized loss value pre-RTP for the Oyster Harvester & Leaseholder Lost Interest claim types.

[8] After identifying this issue, the New Class Claims Administrator directed Epiq to confirm the Distribution Model's Shrimp Compensation Chart did not rely on historical DHEPDS data points that included RTP when determining the standardized claim values described above.  It was confirmed that the RTP amounts were properly subtracted from the claims included in this analysis such that the chart values were an accurate reflection of the median recognized loss value pre-RTP for the various Shrimp claim types.

reconciled to account for unique representation at the claim (rather than the Claimant) level.

(f) The Settlements Program identified 98 Claimants with a prior GCCF Full and Final Release and Covenant Not to Sue ("GCCF Release") that had filed Vessel Physical Damage claims with the DHEPDS. Although these claims were allowed by the CSSP in accordance with the DHEDPS Agreement as those claims were reserved in the GCCF Release, the Claimants released HESI and Transocean with regard to punitive damages in the GCCF Release, thus they cannot be included in the New Class as eligible.

A list of claims with updates potentially affecting eligibility based on the data corrections described in this section is included as Exhibit A.

10.   <u>DHEPDS FWA Claim Determinations, Clawback Motions, or Other Findings of Fraud or Material Misrepresentation</u>.   Pursuant to page 27 of the Distribution Model as approved by the Court on February 15, 2017 [Rec. Docs. 18797 and 22252], to the extent a Claimant (1) received an FWA denial on one or more DHEPDS claims as the final action by the CSSP[9], (2) was the subject of a successful clawback motion filed with the Court, or (3) was subject of a finding of fraud or material misrepresentation, the Claimant is ineligible to participate in the Settlements Program.   Regardless of whether the Claimant's data was transferred

---

[9] With regard to Claimants who received an FWA denial on one or more DHEPDS claims but such claims were settled with the Neutrals during the pendency of that FWA denial, *see* Section 14(b) below for more detail.

from the CSSP or was processed from a Claim Form, or some combination thereof, such Claimants had all New Class claims denied without further review of the underlying claim information, and a denial notice was sent to this effect.

11.    Court-Appointed Neutrals' Settlements.  Pursuant to the New Class Distribution Model, unless a timely, fully-documented Claim Form was submitted for consideration to the Settlements Program, the mere existence of a Neutrals settlement for a particular individual or entity did not entitle him/her/it to consideration for participation in these Settlements (*see* Page 7 of the Distribution Model, "Should you file a New Class claim?" [Rec. Doc. 18797]).

12.    DHEPDS Excluded Parties and Opt Outs.  Parties/entities that were not allowed to participate in the DHEPDS a) because they were excluded under the DHEPDS Agreement or b) because they validly opted out of the DHEPDS Agreement, could file a Claim Form and were potentially eligible to recover punitive damages pursuant to the Distribution Model, so long as they 1) could demonstrate receiving compensatory damages for a New Class-eligible claim type through an individual lawsuit or a settlement whereby rights to pursue punitive damages from HESI and Transocean had not been surrendered, including a settlement brokered by the Court-appointed Neutrals, or 2) were in compliance with Pretrial Order 60 demonstrating they had reserved their right to potentially receive compensatory damages.  The Claim Form filing deadline was December 15, 2016.

13.   <u>Parties That Opted Out of the HESI/Transocean Settlements</u>.  A total of 36 parties opted out of the Settlements (*see* Supplemental Declaration of Stephen J. Cirami Regarding (A) Notice Plan Implementation; and (B) Report on Requests for Exclusion Received to Date [Rec. Doc. 21858]).  Pursuant to the direction of the New Class Claims Administrator, the claims database was checked to confirm no claims were received or processed for these parties.

14.   <u>Allowances for Equitable Treatment Made by the New Class Claims Administrator during the Course of Administration</u>.   The Distribution Model allowed for the New Class Claims Administrator to exercise equitable authority in his discretion as necessary during the course of the administration [Rec. Doc. 18797 at page 27].  The following equitable allowances were approved by the New Class Claims Administrator in order to efficiently and fairly assess claims in the exceptional situations noted below:

(a) Pursuant to discussion with the DHEPDS Claims Administrator and following a review of underlying claim data, the New Class Claims Administrator identified 51 Claimants who were in fact Charterboat Operators but for whom the DHEPDS database did not reflect the NAICS Code associated with Charterboat Operators (487210).  The New Class Claims Administrator therefore determined these Claimants should be included as Charterboat Operators and updated the data transferred from the DHEPDS accordingly.

(b) Some claims were identified as FWA denials in the data received from the DHEPDS, but were also settled through the Court-appointed Neutrals process. In some of these cases, the Claimants abandoned their DHEPDS claims in light of the Neutrals settlement without properly documenting his/her/its DHEPDS claim file or responding to the FWA denial. After receiving appeals from a number of Claimants in this situation, the New Class Claims Administrator decided that, pursuant to his equitable authority as per the Distribution Model and referenced herein, in instances where 1) a Claimant settled a claim pursuant to the Court-appointed Neutrals process, 2) that Claimant's DHEPDS claim remained pending and active at the time of its withdrawal pursuant to that Neutrals settlement and 3) that Claimant filed a Claim Form, the New Class Claims Administrator would not consider the Claimant to be entirely ineligible under the Distribution Model, as the purpose of the inclusion of that provision was based on the doctrine of "unclean hands" disqualifying all potential claims, which is not applicable or intended in these limited and exceptional circumstances where the DHEPDS claim was in essence abandoned in light of the Neutrals settlement.

(c) For Menhaden Commercial Fisherman claims, there was no base compensation amount for "Bosun" identified in the chart in Section III.A of the Commercial Fisherman & Charterboat Operators Claim Category - Menhaden Catch Type (the "Chart") in the Distribution Model, although a number of claims for the

position of "Bosun" were received and verified as being for Claimants employed on Menhaden vessels.  After conferring with experts in the area and reviewing tax documentation and other salary information, the New Class Claims Administrator determined that "Bosun" claims would be given the same rate as "Mate" claims for calculation purposes. Similarly, to the limited extent any other verified Menhaden fishermen with a boat-based job had a title that was not included on the Chart, the New Class Claims Administrator allowed for a claim determination based on the average annual salary of the unclassified position in comparison to the underlying salary data gathered to establish the Chart.

15.    <u>New Class Reserve A Claims</u>.  At this time the Court is only being petitioned for approval to pay claims in the following claim categories and underlying claim types (collectively, the "Distribution A Claims"):

(a) Personal Property claims, including Vessel Physical Damage, Coastal Real Property - Personal Property Damage, Wetlands Real Property - Personal Property Damage, and Personal Property Damage in Excess of $500;

(b) Charterboat claims for Operator and Charterboat Crew;

(c) Loss of Subsistence claims; and

(d) Commercial Fisherman claims including Menhaden, Shrimp, Oyster, Finfish, Blue Crab and Other Seafood, Individual Fishing Quota, and Seafood Crew.

All Coastal Real Property, Wetlands Real Property, Oyster Leaseholder, and Real Property Sales (the "Real Property Claims") will be held in reserve and, if eligible, paid in Distribution B anticipated to occur later in 2019.

In addition to the Real Property Claims, there are 461 Distribution A Claims that are currently pending in the various appellate processes provided in the Settlements and the Distribution Model. As such, these will also be held in reserve, with the maximum estimated value of these claims set aside for later distribution should the claims be found eligible.

Of the 887 DHEPDS claims identified as the DHEPDS Reserve Claim population prior to the Old Class distribution, only 39 are associated with New Class Distribution A-applicable claim types and remain unresolved.

In the aggregate, these 500 claims will be considered the "New Class Reserve A Claims," a list of which has been appended as Exhibit B. For these Claimants/claims, a New Class Reserve A Claims set-aside will be established taking into account each distribution pool from which payment would be made, and the *pro rata* share of the distribution pool attributable to that claim based on its potential maximum recognized loss will be set aside for each New Class Reserve A Claim for distribution if/when the New Class Reserve A Claim is determined to be eligible and no further due process rights remain.

## THIRD-PARTY CLAIMS AND BANKRUPTCY PROCESSING

16. <u>Eligible New Class Members with an Associated Third-Party Claim Record</u>. The Third-Party Claimants of record with claims for attorneys' fees, claims preparation liens, tax liens, child support liens, judgments, etc. shall be paid to the extent that the Third-Party confirmed that its lien transferred from records related to the original DHEPDS claim remains active. Alternatively, if the Third-Party Claimant has perfected its claim with the Settlements Program directly, no additional confirmation will be required. Third-Party Claimant response timeframes are governed by Court-Approved Procedure 3, and if adequate responses are not timely received, such Third-Party claims will not be honored by the Settlements Program which shall not be liable for any loss, damage or injury of any kind or character to any such non-responding Third-Party Claimant(s).

17. <u>Eligible New Class Members with Claims Previously Identified as Related to a Bankruptcy Proceeding</u>. The appropriate U.S. Trustees have been contacted and, during the pendency of the Motion for Approval of Partial Distribution of the Punitive Damages Portion of the Halliburton Energy Services, Inc. and Transocean Ltd. Settlement Agreements, updates will be made to the Claimant bankruptcy records based on responses by the U.S. Trustees. In the event the award is disclaimed by the Trustee, such amount shall be paid directly to the Claimant. Trustee response timeframes are governed by Court-Approved Procedure

4, and if adequate responses are not received, such bankruptcy-related claims will not be honored by the Settlements Program which shall not be liable for any loss, damage or injury of any kind or character to any such non-responding U.S. Trustees, bankruptcy estates, or creditors of the Claimant(s).

## QUALITY ASSURANCE, FRAUD PREVENTION AND REGULATORY COMPLIANCE

18.     Fraud Prevention Measures.  Epiq, prior to distribution, will review the database against its "watch list" of known potential fraudulent filers that it has developed throughout its over thirty years of experience as a claims and settlement administrator.

19.     OFAC Review.  In accordance with the Office of Foreign Asset Control ("OFAC") regulations and guidelines, Epiq will perform searches on payments to identify potential payees whose names may appear on the federal government's restricted persons list or who reside in countries to which payments are prohibited.   Epiq regularly monitors changes to OFAC regulations and guidelines in connection with its distributions.

## DISPOSITION OF CLAIMS

20.     Eligible Claims.  A total of 53,266 eligible claims for 47,061 unique Claimants were identified pursuant to the compilation procedures described in Sections 7, 9, 10, 12, and 14 (the "Transferred Eligible Claims").  In addition to the Transferred Eligible Claims, the Settlements Program received and processed Claim

Forms in accordance with the requirements of the Distribution Model. Those determined to be eligible are referred to herein as the "New Eligible Claims". The following chart breaks down the New Eligible Claims by fund distribution pool claim category and claim type, as applicable:

| Claim Category | Claim Type | Eligible Claims | Aggregate Value |
|---|---|---|---|
| **Personal Property** | Vessel Physical Damage | 54 | $ 1,438,800.00 |
| | Personal Property >$500 | 2 | $56,061.98 |
| | Coastal Real Property - Personal Property Damage | 0 | $0.00 |
| | Wetlands Real Property - Personal Property Damage | 0 | $0.00 |
| **Charterboat** | Operator | 50 | $1,135,000.00 |
| | Crew | 7 | $3,500.00 |
| **Loss of Subsistence** | | 436 | $87,200.00 |
| **Commercial Fisherman** | Menhaden | 500 | $5,364,000.00 |
| | Non-Menhaden | 283 | $2,192,528.76 |
| | Non-Menhaden Crew | 143 | $504,000.00 |

The Claim Forms resulting in the New Eligible Claims above were submitted by 1,171 additional unique Claimants. Together, the Transferred Eligible Claims and the New Eligible Claims shall be referred to as the "Eligible Claims".

21. <u>Denied Claims</u>. There are 40,692 claims falling into one of the applicable New Class claim categories/types that were denied by the CSSP. All of those determinations were automatically transferred from the DHEPDS to the Settlements Program (the "Transferred Denied Claims").

An additional 297 Claimants failed to meet the requirements identified in General Principles 14, 16, 17, and 19 of the Distribution Model, as further described at pages 6-9 of the same, such that their underlying claims yielded either denial determinations on the Claimant level or findings of a $0 punitive damages compensation as denoted below:

Claimant-Level Determinations

| Determination Reason | Quantity |
|---|---|
| Non-Compensable/Only Ineligible Claim Types Claimed | 29 |
| Duplicate of Another Claim | 4 |
| Not PTO 60/Prior Compensatory Damages Compliant | 114 |
| Late Claim | 141 |
| Prior FWA Denial | 9 |
| **Total** | **297** |

An additional 1,439 claims were deemed ineligible based on their underlying merits pursuant to the requirements of the Distribution Model and are broken out into the various determination categories below:

## Claim-Specific Ineligible Determinations by Claim Type

| Determination Reason | Personal Property | | | |
|---|---|---|---|---|
| | Vessel Physical Damage | Personal Property >$500 | Coastal Real Property - Personal Property Damage | Wetlands Real Property - Personal Property Damage |
| No Basis for Claim Provided | 1 | 10 | N/A | N/A |
| Failure to Cure Deficiencies/ Documentation Provided Did Not Support Eligibility | 4 | 7 | 4 | 6 |
| Prior Release Executed | 0 | N/A | N/A | N/A |
| Claim Not Settled via Neutrals Process/Covered by Individual Lawsuit | 0 | N/A | N/A | N/A |
| Damages Not Within the Scope of the Settlements | N/A | 27 | 93 | 16 |
| **Total** | **5** | **44** | **97** | **22** |

| | Charterboat | | Loss of Subsistence |
|---|---|---|---|
| | Operator | Crew | |
| No Basis for Claim Provided | 0 | 5 | 1 |
| Failure to Cure Deficiencies/ Documentation Provided Did Not Support Eligibility | 43 | 4 | 770 |
| Claim Not Settled via Neutrals Process/Covered by Individual Lawsuit | 1 | 1 | 17 |
| **Total** | **44** | **10** | **788** |

|  | Commercial Fisherman | | |
|---|---|---|---|
|  | Menhaden | Non-Menhaden | Non-Menhaden Crew |
| No Basis for Claim Provided | 0 | 0 | 0 |
| Failure to Cure Deficiencies/ Documentation Provided Did Not Support Eligibility | 31 | 233 | 91 |
| Claim Not Settled via Neutrals Process/Covered by Individual Lawsuit | 6 | 65 | 3 |
| **Total** | **37** | **298** | **94** |

Together, the Transferred Denied Claims and Claims noted in the above chart will be referred to as the "Denied Claims".  These claims are associated with 31,155 total, unique Claimants.

22.  <u>New Class Reserve A Claims Valuation and Real Property Claims</u>.  As noted above in Section 15, there are currently an additional 461 claims that are pending in the various appellate processes provided in the Settlements and the Distribution Model, in addition to the 39 New Class-relevant, DHEPDS Reserve Claims also discussed in Section 15.   A reserve value has been assigned to each claim (the "Reserve Claim Values") to establish the aggregate values below based on fund distribution pool claim category and type, as applicable.  Additionally, the chart below denotes the percentage of the New Class Net Settlement Funds that will be allocated to the Real Property claims, updated from 80% in the Distribution Model, pursuant to the equitable determinations of the Claims Administrator described in detail at Sections 28-31.

| Claim Category | Claim Type | Number of Reserve Claims | Estimated Maximum Reserve Recognized Losses |
|---|---|---|---|
| **Personal Property** | Vessel Physical Damage, Coastal Real Property - Personal Property, & Wetlands Real Property - Personal Property | 25 | $636,749.33 |
| | Personal Property >$500 | 8 | $141,700.00 |
| **Charterboat** | Operator | 19 | $449,710.06 |
| | Crew | 3 | $1,500.00 |
| **Loss of Subsistence** | | 143 | $28,600.00 |
| **Commercial Fisherman** | | 302 | $2,937,984.45 |
| **Real Property** | | N/A – All Claims in this category are set aside for Distribution B | 80.4458549% of Net Settlement Funds |

After allocation of the funds into the various subpools described further in Section 32, the New Class Claims Administrator has determined that funds should be set aside for the New Class Reserve A Claims based on their maximum, potential recognized losses after application of the *pro rata* for the claim types in question (*see* Sections 15, 22, and 32 for additional details).

## ESTABLISHMENT OF THE NET SETTLEMENT FUND

23.     <u>Administrative Fees/Expenses, Disbursements, and Administrative Fees/Expenses for Reserve</u>.   The Court has previously approved payments for administrative fees and expenses totaling $11,829.454.02 to date, of which $10,245.052.53 was attributable to the New Class.[10]   It is anticipated that the administrative fees and expenses to complete the New Class distributions for all claim categories and types, including the New Class Reserve A Claims, will be $8,125,000.00[11], based on the assumptions below:

(a) There will be a first distribution scheduled for New Class Distribution A Claims and a second distribution scheduled for New Class Distribution B Claims pending the separate Court Orders approving these distributions becoming final. Costs for any further distribution, to the extent deemed necessary and approved by the Court, have not been factored into this estimate and reserve.

---

[10] In the motion requesting approval of  the transfer of funds for the Old Class distribution, the value provided to Class Counsel for transfer to the HESI-Transocean Assigned Claims Combined Settlements Fund did not fully account for a proportional allocation of the first five administrative expense invoices approved by the Court, which invoices encompassed costs attributable to both the Old and New Class portions of the Settlements.  As such, it is requested that the Court approve a "true up" transfer of an additional $1,397,572.53 to the HESI-Transocean Assigned Claims Settlements Fund (the Old Class distribution account) to properly allocate the invoice values.  All subsequent discussion in this declaration of the Distribution A Net Settlement Fund assumes this accounting adjustment is acceptable to the Court.

[11] It is notable that through careful planning and execution of the most efficient and simplified process possible, the New Class Claims Administrator will complete the notification phase, claims data transfer, claims data analysis, claims review and claim determinations pursuant to the New Class Distribution Model, as well as the distribution to the New Class (based on estimated expenses), at a total administrative cost of approximately $18.25 million, which is less than 39%  percent of the interest earned on the fund, making the full value of the Settlements available for distribution to eligible New Class Members.

(b) Payments will be made for New Class Reserve A Claims  as they are finalized in conjunction with periodic check reissue runs.

(c) The administrative fee and expense reserve takes into account estimated federal taxes on interest earned and tax preparation through 2021; should additional taxes be due or filings be required, the Settlements Program will pay such sums out of interest earned on the funds during the pendency of the distributions.

(d) Escheatment is conducted in two rounds within one calendar year at the close of the Settlements Program.

The New Class Claims Administrator will reserve this amount, and during the pendency of Distribution A and the later anticipated Distribution B, the New Class Claims Administrator has advised he will continue to submit invoices for Court approval on a quarterly basis as fees and expenses are accrued prior to payment.

24.    New Class Distribution A Hold Back Funds.  Given the complexity and age of the data in some instances, the New Class Claims Administrator determined a holdback of $5,800,000.00 prior to *pro rata* allocation of the available funds is appropriate and necessary to ensure funds are available to remediate any issues that could arise post-distribution.

25.    Settlement Funds Allocated to the New Class.  The comingled HESI and Transocean Settlements proceeds totaled $1,239,750,000.00 (prior to earning interest, less any taxes due and administrative costs and fees) of which the

Allocation Neutral allocated to the New Class $902,083,250.00 (the "New Class Settlements' Proceeds") [Rec. Doc. 15653].

26.   <u>Estimated Comingled Net Settlement Fund Available for Division Amongst the Eligible Distribution A Claims</u>.  After the addition of interest earned through May 31, 2019, on the New Class Settlements' Proceeds and after deduction of (a) New Class administrative expense invoices approved by the Court in the amount of $10,245,052.53 and an offset for the "true up" adjustment to be transferred to the HESI-Transocean Assigned Claims Settlements Fund of $1,397,572.53 as per footnote 10, (b) the estimated future administrative costs and expenses in the amount of $8,125,000.00, (c) the New Class portion of taxes and tax preparation costs paid by the HESI and Transocean Settlements' Funds to date, (d) the payment of estimated future tax preparation costs in the amount of $30,000.00[12], (e) $5,800,000.00 for the hold back funds, and (f) 80.4458549% of the New Class allocated funds to be later distributed to the Real Property claims in New Class Distribution B, the Distribution A Net Settlement Fund value, inclusive of an allocation for any potential payments to New Class Reserve A claims that may still be deemed eligible, is $176,704,476.85.  This amount will be subject to adjustment once additional interest earned is added to the New Class Settlements' Proceeds.

---

[12] It was confirmed with the tax preparer that no additional tax payments will be required given the expense offset for future costs related to the upcoming distribution.

27.     Funds shall be transferred upon entry of an order by the Court authorizing this action.   Sections 36(g) below contains additional detail.   The remaining funds left in the escrow account shall continue to be invested by UBS (the "Escrow Agent") until Distribution B is approved by the Court, with such interest less any tax due being payable to the eligible Real Property Claimants only.

## NEW CLASS CLAIMS ADMINISTATOR'S DETERMINATION ON DISTRIBUTION POOL REALLOCATIONS

28.     Pursuant to the Allocation Amongst Claim Categories in the Distribution Model, the New Class Claims Administrator reserved the right to reallocate as much as 3% of the overall Settlement Funds between the claim categories prior to the first round of distributions.[13]

29.     After reviewing the pending New Class Loss of Subsistence claims (both those transferred from the DHEPDS and those based on Claim Forms), and after taking into consideration a) the original intent of the predecessor New Class Claims Administrator's logic for his proposed distribution pools, b) the breakdown based on the viability of all claim categories under *Robins Dry Dock* and its progeny, and c) the lower-than-anticipated additional quantity of eligible Loss of Subsistence claims, the New Class Claims Administrator has determined the Loss of Subsistence distribution pool shall be capped at $200.00 per eligible Claimant, plus a similar allocation of $200.00 per claim for all pending Loss of Subsistence claims in the

---

[13] *See* the Distribution Model at pages 26 - 27.

New Class Reserve A Claims population[14].  The aggregate reduction shall be added to the Real Property Claims distribution pool, given the concretely established standing of Real Property Claimants under *Robins Dry Dock*.

30.    Furthermore, for the same reasons noted above, and given the limited number of eligible claims for Personal Property Damage in Excess of $500 and the substantial number of New Class Claim Forms for Real Property Claims (many of which are anticipated to be eligible), the New Class Claims Administrator has determined that the distribution subpool for Personal Property Damage in Excess of $500 should be reduced to $7,500.00, with that aggregate reduction being added to the Real Property Claims distribution pool.[15]  This will better reflect an appropriate allocation of funds for the Personal Property claim category by bringing its allocation into alignment with the original intent of the predecessor New Class Claims Administrator, based on equity and the applicable law relied upon when setting the values for the various claims categories, thus ensuring that no claim category receives an unfair/excessive share of the punitive damages settlement fund relative to that claim category's recognized standing to assert claims under *Robins Dry Dock* and its progeny.

---

[14] The aggregate effect of this change to the Loss of Subsistence distribution pool is a reduction of the originally allocated $12,494,139.00 (Distribution Model at page 26) to $8,664,800.00, a difference of $3,829,339.00.

[15] The aggregate underlying compensatory damages for the property claims included in this category, inclusive of a 2.5 multiplier, totaled only $56,061.97 for eligible claims.  An additional $141.700.00 has been allocated as the maximum possible determination for claims still under Court review following denial by the Settlements Program. Based on the limited number of claims, the $50,000.00 distribution subpool would have yielded a *pro rata* inconsistent with the intent of the Distribution Model.

31.     Finally, the Commercial Fisherman claim type was reduced by a flat $1,000,000.00, after the New Class Claims Administrator considered the number of new Real Property Claims as compared to the number of new Commercial Fisherman claims and the level of preference over Commercial Fisherman claims that Real Property claims enjoy pursuant to *Robins Dry Dock* and its related jurisprudence.  This sum shall be reallocated to the Real Property claim category.

## ESTIMATED INITIAL DISTRIBUTION *PRO RATAS* FOR THE DISTRIBUTION POOLS

32.     Estimated *Pro Rata* Values for Each Distribution Pool Included in Distribution A.  Adjustments to the allocation percentages discussed in Sections 29-31 above are reflected in the calculations below and identifiable where there is a difference between the original allocation percentage from the Distribution Model and the final, adjusted percentage columns.  In total, Distribution A represents a distribution of 19.5541451% of the remaining New Class Net Settlement Funds, with the remaining 80.4458549% being allocated to New Class Distribution B.

Based on the estimated New Class Distribution A Net Settlement Fund value of $176,704,476.85 as described in Section 26, the estimated *pro ratas* for the claim categories included in Distribution A, including any subpool calculations, are as follows:

| Claim Category | Claim Type | Eligible Claims Count | Reserve Claims Count | Aggregate Recognized Loss Value - All Claims | Original Percentage of Net Settlement Funds Allocated to Pool | Final, Adjusted Percentage of Net Settlement Funds Allocated to Pool | Distribution Pool Value (with any subpool maximum value noted accordingly) | Estimated *Pro Rata* |
|---|---|---|---|---|---|---|---|---|
| **Personal Property** | Vessel Physical Damage, Coastal Real Property - Personal Property Damage & Wetlands Real Property - Personal Property Damage | 730 | 25 | $12,801,978.77 | 0.60% | 0.5951% | $5,370,701.70 | 41.9521% |
| | Personal Property >$500 | 2 | 8 | $197,761.98 | | | $7,500.00 | 3.7924%[16] |
| **Charter-boat** | Operator | 462 | 19 | $16,658,958.09 | 0.20% | 0.1999% | $1,756,900.57 | 10.5462% |
| | Crew | 96 | 3 | $296,913.45 | | | $50,000.00 | 16.8399% |
| **Loss of Subsistence** | | 43,181 | 143 | N/A | 1.40% | 0.9588% | $8,664,800.00 | N/A - per capita payment of $200 |
| **Commercial Fisherman** | | 10,269 | 302 | $161,703,789.52 | 17.80% | 17.6895% | $159,854,574.59 | 98.8856%[17] |

[16] For the Personal Property Damage in Excess of $500 claim type, the value of Reserve Claims far exceeds the value of the Eligible Claims at this time. Therefore, the New Class Claims Administrator requests the Court allow him, for this claim type only, to allocate any funds set aside for Reserve Claims to the Eligible Claims should the Reserve Claims' Court reviews uphold the underlying denial determinations, potentially raising the *pro rata* by more than the allowed shift of up to 0.5%.

[17] For the Commercial Fisherman claim category, the Estimated *Pro Rata* is higher when compared to those of the other claim categories, but the final payment will follow the stated intent of the Distribution Model as the recognized loss value for Commercial Fisherman claims transferred from DHEPDS records utilized only the initial compensation determination on line 1 of the DHEPDS Seafood Program Eligibility Notices after a reduction for any built-in RTP, as applicable. The recognized loss also excluded supplemental and residual payments that such DHEPDS Claimants received from the CSSP. This was done in order to simplify the data extractions and mathematical adjustments required to reduce the likelihood of errors. These simplified compensation amounts were also the values used to establish the New Class claim matrices for new Commercial Fisherman claims to ensure equal treatment under the Distribution Model for both new and DHEPDS transferred claims.

Each distribution pool includes an allocation of funds for each New Class Reserve A claim based on its potential, maximum recognized losses for the claim(s) in that distribution pool category.  As further described in Section 15, should these claims become eligible at a later date, these funds will be utilized to make those distributions.  The distribution value for the allocation to these New Class Reserve A Claims will change given it is established based on a *pro rata* allocation of the Distribution A Net Settlement Fund value, which must be finalized to account for additional interest earned between June 1, 2019 through July 31, 2019, tax reserves, etc.  Based on the estimated numbers in this declaration, the potential distribution value of the New Class Reserve A Claims is estimated to be $3,254,027.02.

### DISTRIBUTION TAX REPORTING

33.    <u>IRS Forms W-9 Required</u>.  Attorneys receiving aggregate payments of $600 or more and Claimants receiving a distribution of $600 or more must receive an IRS Form 1099-MISC as all punitive damages payments are reportable to the IRS regardless of the character of the underlying claim.  In order to facilitate accurate tax reporting, an IRS Form W-9 that matches the name and social security number or name and employer identification number issued by the IRS must be on file with the New Class Claims Administrator prior to payment being issued.  Otherwise, the Claimant's award may be subject to backup withholding.

34.    <u>IRS Backup Withholding</u>.  For individuals and entities that have previously been identified by the IRS as having provided inaccurate information to

the CSSP and to whom an IRS "B" Notice was issued by the CSSP pursuant to the request of the IRS, backup withholding of 24% may be paid to the IRS on the Claimant's behalf.  In his sole discretion, the New Class Claims Administrator may opt to withhold the 24% backup for eligible Claimants for whom the IRS has confirmed the information provided to the CSSP is inaccurate and who have not responded to the Settlements Program notices requesting an updated Form W-9; alternately, the New Class Claims Administrator may opt to temporarily hold the payments and allow the Claimant to respond prior to payment less the 24% withholding.

35.     Issuance of Forms 1099-MISC.  IRS Forms 1099-MISC will be issued as per the IRS deadline of January 31 of the year following the distribution.  Each law firm that receives aggregate payment(s) of $600 or more on behalf of its client(s) and each Claimant that has received $600 or more in the aggregate will receive an IRS Form 1099-MISC as all punitive damages payments are reportable to the IRS.

## PROPOSED DISTRIBUTION ORDER

36.     The Settlement Administrator respectfully requests the New Class Claims Administrator petition the Court for an Order approving the following to allow Epiq and other vendors to take the actions specified under the direction and supervision of the New Class Claims Administrator:

(a) Creation of a new, commingled Qualified Settlement Fund in the name of "HESI-Transocean Punitive Damages Combined Settlements Fund" with a distinct employer identification number;

(b) Establishing a distribution account with Huntington Bank such that funds will be secured by United States Government-backed Treasury instruments in the name of the HESI-Transocean Punitive Damages Combined Settlements Fund for the purpose of conducting New Class Distribution A;

(c) Making a "true up" transfer in the amount of $1,397,572.53 from the HESI and Transocean Settlement Funds currently held in escrow by the Escrow Agent to the HESI-Transocean Assigned Claims Combined Settlements Fund;

(d) Establishing the administrative expense and cost reserve of $8,125,000.00 to be held back from the New Class Settlements Fund prior to segregation into the Distribution A and Distribution B funding pools;

(e) Establishing the tax return preparation reserve of $30,000.00 to be held back from the New Class Settlements Fund prior to segregation into the Distribution A and Distribution B funding pools;

(f) Establishing a hold back fund of $5,800,000.00 from the New Class Net Settlement Fund;

(g) Directing the Escrow Agent fund the HESI-Transocean Punitive Damages Combined Settlements Fund account at Huntington Bank with 19.5541451% of

the remaining proceeds from the HESI and Transocean Settlement Funds *pro rata* from the HESI Settlement Fund Escrow Account and the Transocean Settlement Fund Escrow Account, plus a proportional share of the interest earned from June 1, 2019 through July 31, 2019, less holdback for tax liability of 40% of the interest earned for payment to the IRS. Such funds may be transferred from the Escrow Agent to Huntington Bank via wire transfer upon the Court entering the Order approving the Motion for Approval of Partial Distribution of the Punitive Damages Portion of the Halliburton Energy Services, Inc. and Transocean Ltd. Settlement Agreements and the New Class Claims Administrator making a request to the Escrow Agent for transfer of these funds;

(h) Approving the New Class Claims Administrator to re-calculate the New Class Reserve A Claims value once a final New Class Distribution A Net Settlement Fund amount is established, and to adjust the current reserve of $3,254,027.02 accordingly, including reallocation of any currently reserve funds for claims that have been finally determined as denied prior to initial distribution;

(i) Making any final updates to the estimated *pro ratas* included in Section 32 based on the final value of funds available or changes to eligible claims pursuant to the methodology stated herein, without the need for further approval of the Court as long as the adjustment to the *pro rata* is 0.5% or less, with the exception of the distribution *pro rata* for the Personal Property Damage in Excess of $500 claim type, for which

the Court explicitly grants the New Class Claims Administrator leeway for a shift of more than 0.5% based on the outcome of the New Class Reserve A Claims given the limited number of claims involved and limited funds available for this claim type;

(j) Approving the New Class Claims Administrator's claim determinations made pursuant to the methodology established based upon the Court's Order and Reasons [Rec. Doc. 22252], which included approval of the Distribution Model as discussed above;

(k) Issuing payments via wire or check, as appropriate, to the Claimant upon an Order of the Court approving distribution being final; however, reserving unto the New Class Claims Administrator the authority to hold back payments for (1) individuals/entities with missing, incomplete, or inaccurate IRS Forms W-9 or, in the New Class Claims Administrator's discretion, to withhold 24% of the payment for forwarding to the IRS as backup withholding, (2) unresolved liens/Third-Party claims, (3) unresolved issues surrounding the rights of a trustee in bankruptcy to the award or part of the award, and (4) New Class Reserve A Claims;

(l) Reissuing checks on a periodic basis along with first time payments for eligible New Class Reserve A Claims already approved for distribution by the Court that have been resolved in the month prior; initial payments will be made in a manner consistent with the methodology stated herein and with the *pro ratas* applied to the various claim categories and claim types included in Distribution A;

(m)   Issuing IRS Forms 1099-MISC to attorneys and Claimants with reportable distributions and filing the same information with the IRS annually until distribution is complete;

(n) Retaining the Court's jurisdiction over the HESI-Transocean Punitive Damages Combined Settlements Fund and the Reserve Fund; should the New Class Claims Administrator determine a further distribution is necessary, the New Class Claims Administrator shall file a motion with the Court for consideration; and

(o) Requiring the New Class Claims Administrator to close the HESI-Transocean Punitive Damages Combined Settlements Fund account for Distribution A one calendar year after issuance of the final eligible New Class Reserve A Claim payment, further ordering accelerated escheatment of any residual funds to the states by the New Class Claims Administrator at that time, unless a further distribution order is pending with or entered by the Court prior to closure of the account.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed in Franklin, Wisconsin, on July 23, 2019.

_____

Michelle M. La Count

34