E-SERVICE

57292615
May 26 2015
03:18PM

File & ServeXpress

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re: Oil Spill by the Oil Rig        MDL No. 2179
       "Deepwater Horizon"
       in the Gulf of Mexico,
       on April 20, 2010                SECTION: J

This Document Relates to:
Salvesen v. Feinberg, et al.,                JUDGE BARBIER
2:11-cv-02533                        MAG. JUDGE SHUSHAN
Pinellas Marine Salvage Inc., et al. v. Feinberg, et al.,
2:11-cv-1987
Ditch v. Feinberg et al.,
2:13-cv-06014
_____/

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO NULLIFY EVERY GULF COAST CLAIM FACILITY RELEASE AND COVENANT NOT TO SUE

## BACKGROUND

I.     **Salvesen v. Feinberg, et al., 2:11-cv-02533**

On June 15, 2011, Plaintiff Salvesen filed his action against Defendants Kenneth R. Feinberg, Feinberg Rozen, LLP, d/b/a GCCF, and William G. Green, Jr. in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County, Florida asserting claims for gross negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida state law. The case was subsequently transferred by the JPML to the MDL 2179 Court on October 6, 2011. Plaintiff re-filed his Motion to Remand and Memorandum in Support with this Honorable Court on November 14, 2011 (Rec. Doc. 4575). Plaintiff filed his Second Refiling of Motion to Remand and Memorandum in Support of His Second Refiling of Motion to Remand with this Honorable Court on November 13, 2012 (Rec. Doc. 7884, Exhibit B). Plaintiff filed his Motion to Remand or, in the Alternative, Motion to

Commence Formal Discovery and Memorandum in Support with this Honorable Court on May 21, 2015.

## II.     Pinellas Marine Salvage Inc., et al. v. Feinberg, et al., 2:11-cv-1987

On February 25, 2011, Plaintiffs filed their action against Defendants Kenneth R. Feinberg and Feinberg Rozen, LLP, d/b/a GCCF, in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Florida asserting claims for gross negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida state law. The case was subsequently transferred by the JPML to the MDL 2179 Court on August 9, 2011. Plaintiffs re-filed their Motion to Remand and Memorandum in Support with this Honorable Court on November 14, 2011 (Rec. Doc. 4574). Plaintiffs filed their Second Refiling of Motion to Remand and Memorandum in Support of Their Second Refiling of Motion to Remand with this Honorable Court on November 13, 2012. Plaintiffs filed their Motion to Remand or, in the Alternative, Motion to Commence Formal Discovery and Memorandum in Support with this Honorable Court on April 24, 2014 (Rec. Doc. 12708).

## III.    Ditch v. Feinberg et al., 2:13-cv-06014

On June 12, 2013, Plaintiff Ditch, a victim of Defendants' "Expedited EAP Denial" strategy, filed his action against Defendants in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County, Florida asserting claims for gross negligence, negligence, negligence per se, fraud, fraudulent inducement, promissory estoppel, and unjust enrichment under Florida state law. The case was subsequently transferred by the JPML to the MDL 2179 Court on October 2, 2013.

## LAW AND ARGUMENT

**I.     The Oil Pollution Act of 1990**

The Oil Pollution Act of 1990 (OPA) is a strict liability statute. In order to recover

damages under OPA, a claimant merely needs to show that his or her damages "resulted from"

the oil spill.

> OPA, in pertinent part, states:
> "The responsible party for a vessel or a facility from which oil is discharged, or which
> poses the substantial threat of a discharge of oil, into or upon the navigable waters or
> adjoining shorelines or the exclusive economic zone is liable for the removal costs and
> damages that result from such incident." See 33 U.S.C. § 2702(a).
>
> The damages referred to in 33 U.S.C. § 2702(a) include, but are not limited to:
> "Damages equal to the loss of profits or impairment of earning capacity due to the injury,
> destruction, or loss of real property, personal property, or natural resources, which ***shall
> be recoverable by any claimant***." 33 U.S.C. § 2702(b)(2)(E) (Emphasis added).
>
> OPA further provides:
> (a) "Payment or settlement of a claim for interim, short-term damages representing less
> than the full amount of damages to which the claimant ultimately may be entitled **shall
> not** preclude recovery by the claimant for damages not reflected in the paid or settled
> partial claim." 33 U.S.C. § 2705(a) (Emphasis added); and
>
> (b) "Payment of such a claim [i.e. payment to a claimant for interim, short-term damages
> representing less than the full amount of damages to which the claimant ultimately may
> be entitled] **shall not** foreclose a claimant's right to recovery of all damages to which the
> claimant otherwise is entitled under this Act or under any other law.'' 33 U.S.C. §§
> 2715(b)(1) and (2) (Emphasis added).

"Shall" means shall. The Supreme Court has made clear that when a statute uses the word

"shall," Congress has imposed a mandatory duty upon the subject of the command. See *United*

*States v. Monsanto*, 491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (Rec. Doc.

7473-1 at 8 - 9).

Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is mandatory and "may" is permissive. "The mandatory 'shall' ......normally creates an obligation impervious to judicial discretion." *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).

Justice Souter, in delivering the opinion of the *Lexecon* Court, explained, "If we do our job of reading the statute whole, we have to give effect to this plain command, see *Estate of Cowart* v. *Nicklos Drilling Co.*, 505 U. S. 469, 476 (1992), even if doing that will reverse the longstanding practice under the statute and the rule, *see Metropolitan Stevedore Co.* v. *Rambo* (1995) ("Age is no antidote to clear inconsistency with a statute." (quoting *Brown* v. *Gardner*, 513 U. S 115, 122 (1994))). The language is straightforward, and with a straightforward application ready to hand, statutory interpretation has no business getting metaphysical." (Id. at 9 -10).

As the Supreme Court further explained,

"[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

(Id. at 10).

## II.    OPA clearly prohibits Defendant Feinberg's "Release and Covenant Not to Sue."

This Honorable Court has held:

(a) "While OPA does not specifically address the use of waivers and releases by Responsible Parties, the statute also does not clearly prohibit it;" and

(b) "In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill." (Rec. Doc. 3830 at 34-35).

Plaintiffs respectfully point out that this Honorable Court's reasoning, while novel, is wrong for the following reasons.

The text and the legislative history of the OPA statute are clear. OPA *clearly* prohibits Responsible Parties from engaging in a "Delay, Deny, Defend" strategy wherein the victims of an oil spill are starved and ultimately forced to sign a "Release and Covenant Not to Sue" in order to receive an inadequate, miniscule payment amount for the damages, including future damages, they incur as a result of the oil spill.

As noted *supra*, "Shall" means shall. "The mandatory 'shall' ……normally creates an obligation impervious to judicial discretion." *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).

This Honorable Court further notes it has recognized that "one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill." Plaintiffs respectfully point out that OPA requires more than merely "speedy and efficient." OPA requires that all oil spill victims are fully compensated. Furthermore, the purpose of the Federal Rules of Civil Procedure is "to secure the *just*, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. A Plaintiff turns to the Court in search of <u>justice</u>, not merely a "speedy and efficient" determination of his or her case.

OPA's legislative history is shot through with general statements indicative of congressional intent to ensure that all oil spill victims are fully compensated. 135 CONG. REC. H7959 (daily ed. Nov. 2, 1989) (statement of Rep. Tauzin) ("ensure that all victims are **fully compensated**"); 135 CONG. REC. H7964 (daily ed. Nov. 2, 1989) (statement of Rep. Hammerschmidt) ("ensure that all justified claims for compensation are satisfied"); 135 CONG.

REC. H7969 (daily ed. Nov. 2, 1989) (statement of Rep. Dyson) ("assurances that damages arising from spills will be **completely compensated**"); 136 CONG. REC. H336 (daily ed. Feb. 7, 1990) (statement of Rep. Carper) ("ensure that those people or those businesses that are damaged by these spills are **fairly and adequately compensated**"); 136 CONG. REC. S7752 (daily ed. June 12, 1990) (statement of Sen. Mitchell) ("ensure **the fullest possible compensation** of oil spill victims"); S. REP. NO. 101–94, at 12 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 734. ("These provisions are intended to provide compensation for a wide range of injuries and are not so narrowly focused as to prevent victims of an oil spill from receiving reasonable compensation."); 135 CONG. REC. H7893 (daily ed. Nov. 1, 1989) (statement of Rep. Quillen) ("**full, fair, and swift compensation for everyone injured by oil spills.**").

Efficiency is not the only touchstone of justice. A substantial body of opinion and a respect for jurisdictional principles suggest that a plaintiff ordinarily has a right to a trial in the forum of his or her choosing. *See*, e.g., *Koster v. (Am.) Lumbermens Mut. Cas. Co*., 330 U.S. 518, 524 (1947) (noting that a plaintiff ordinarily should not be denied the advantages of his chosen jurisdiction). Aggregation of cases for the purpose of facilitating settlement is a byproduct of §1407, but is not its central statutory purpose. *See In re Patenaude*, 210 F.3d 135, 144 (3d Cir. 2000). *Id.*

Judicial economy is undoubtedly well-served by MDL consolidation when scores of similar cases are pending in the courts. Nevertheless, the excessive delay and marginalization of juror fact finding (i.e., dearth of jury trials) associated with traditional MDL practice are developments that cannot be defended. *Delaventura v. Columbia Acorn Trust*, 417 F. Supp. 2d at

153 (D. Mass. 2006). The appropriate focus for fund resolution of mass claims should be justice for the claimants, not merely judicial economy and closure for the corporate misfeasor.

III.    **A Feinberg-administered claims program like the GCCF does not provide a much-needed alternative to conventional mass tort litigation.**

   A.    **BP's Strategy**
      1.    **Establishment of the Pseudo Fund**

The BP oil spill victims compensation fund is not a "fund." It is in fact only a set-aside or promised commitment of assets by BP in an amount that on its face appears to be sufficient to settle claims arising from the spill. BP committed twenty billion dollars in assets to "pay all legitimate claims" - a meaningless statement since the company, designated as a "Responsible Party" under the OPA, is legally obligated to pay all legitimate claims.

BP agreed to transfer funds at the anticipated rate of five billion dollars per year to bank accounts owned by BP and make announcements on what had been paid, but there was no "fund" if what one means by a fund is an entity with meaningful juridical independence, such as a trust fund. Here the obligations remain BP's and any funds that remain at the close will revert to BP. In reality, the BP oil spill victims compensation fund is a "Liability Cap" which BP unilaterally established.

      2.    **Selection of the Perfect Fund Administrator**

Having determined the maximum amount that it would be willing to compensate claimants for damages resulting from the oil spill, BP's next step was to select a politically well-connected person who would be willing to say and do whatever was necessary to administer the fund ("enforce the liability cap"). BP selected Kenneth R. Feinberg.

Defendant Feinberg's law firm Feinberg Rozen, LLP bills itself as specialists in "comprehensive negotiations strategy," a firm which has "redefined the practice of law," lawyers "preeminent" in "preventing years of protracted, costly and uncertain litigation."

**B.      Defendant Feinberg's Strategy**

The agreement entered into between BP and Feinberg Rozen, LLP on June 15, 2010 clearly states, "Feinberg Rozen shall follow OPA as it operates and administers the GCCF." (Rec. Doc. 963-2 at 6). "Feinberg Rozen's determinations with respect to OPA Claims will be guided by OPA." (Id. at 24). "The GCCF (and the protocols under which it operates) are structured to be compliant with OPA." (Id. at 26). "The GCCF claims process is structured to comply with OPA and apply the standards of OPA." (Id. at 26).

This Honorable Court has also noted that "…the Gulf Coast Claims Facility ("GCCF"), spearheaded by Mr. Feinberg and his law firm, would replace the original BP claims process and *perform BP's obligations under OPA with respect to private economic loss claims*." (Rec. Doc. 1098 at 2) (Emphasis added). "[This] Court has the responsibility to ensure that the mandates of OPA are implemented." (Id. at 7).

On August 23, 2010, Feinberg Rozen, LLP, doing business as GCCF, replaced the claims process which BP had established to fulfill its obligations as a Responsible Party pursuant to OPA.

**1.      Defendant Feinberg's Use of Coercion and Fraudulent Inducement Was in Violation of OPA.**

Defendant Feinberg, in clear violation of OPA, used the fear of costly and protracted litigation to coerce victims of the BP oil spill to accept grossly inadequate settlements from

GCCF. During town hall meetings organized to promote GCCF, Feinberg repeatedly told victims

of the BP oil spill:

- "The litigation route in court will mean uncertainty, years of delay and a big cut for the lawyers."
- "I am determined to come up with a system that will be more generous, more beneficial, than if you go and file a lawsuit."
- "It is not in your interest to tie up you and the courts in years of uncertain protracted litigation when there is an alternative that has been created."
- "I take the position, if I don't find you eligible, no court will find you eligible."

Defendant Feinberg, in clear violation of OPA, repeatedly made the following false statement

of material fact to induce victims of the BP oil spill to accept grossly inadequate settlements

from GCCF:

- "The Gulf of Mexico will recover from the BP oil spill by the end of 2012."
- "Experts have determined that most of the oil would have dispersed and the economy picked up by the end of 2012."
- "There will be a 30% recovery in 2011."

"Gulf of Mexico 'to recover from BP spill by end 2012'," BBC News, February 3, 2011,
available at http://www.bbc.com/news/world-europe-12352051 (last visited May 20, 2015).

## 2. Defendant Feinberg's Payment Methodology Was in Violation of OPA.

During GCCF Phase I, which operated from August 23, 2010 through November 23,

2010, GCCF accepted Emergency Advance Payment ("EAP") claims. Over 475,000 EAP claims

were filed with GCCF by BP oil spill victims from August 23, 2010 through November 23,

2010. GCCF paid in excess of $2.5 billion to more than 169,000 Phase I claimants. In sum, the

average total amount paid per EAP claimant by GCCF was a paltry $14,793.00. A claimant who

received an EAP during Phase I was not required to execute a "Release and Covenant Not to

Sue" BP or any other party.

During GCCF Phase II, known as the "Interim Payment/Final Payment" claims process, GCCF received the following three types of claims: Quick Payment Final Claim, Interim Payment Claim, and Full Review Final Payment Claim.

Under the "Quick Payment Final Claim," a claimant who had received a prior EAP or Interim Payment from GCCF could receive, without further documentation of losses caused by the BP oil spill, a one-time final payment of $5,000 for individuals and $25,000 for businesses. Claimants seeking a Quick Payment were required to submit with their claim form a "Release and Covenant Not to Sue."

Defendant Feinberg cannot justify limiting payments under the "Quick Payment Final Claim" program to just $5,000 for individuals and $25,000 for businesses. There is no evidence that these amounts even remotely represent adequate consideration to compensate claimants for the damages that claimants did or will suffer as a result of the BP oil spill.

Under the "Interim Payment Claim," a claimant allegedly could elect to receive compensation for documented past losses or damages caused by the BP oil spill for which the claimant previously had not been compensated. A claimant seeking an Interim Payment was not required to sign a "Release and Covenant Not to Sue." A claimant was permitted to file only one Interim Payment Claim per quarter.

Under the "Full Review Final Payment Claim," a claimant could receive payment for all documented past damages and estimated future damages resulting from the BP oil spill. Claimants wishing to accept a Final Payment were required to sign and submit a "Release and Covenant Not to Sue." Any Full Review Final Payment awarded to a claimant was decreased by the amount of any previous payments received.

Claim forms for Phase II became available to the public on December 18, 2010. The

assessment of claimant eligibility and calculation of losses for those claims did not begin until

February 18, 2011.

In violation of OPA, Feinberg's approach to determining claimant eligibility was driven

by two factors: (1) loss location; and (2) claimant business type.

BDO Consulting, BDO USA, *Independent Evaluation of the Gulf Coast Claims Facility: Report
of Findings and Observations to the U.S. Department of Justice*, at 63 (June 5, 2012), available
at http://www.justice.gov/opa/documents/gccf-rptfind-obs.pdf  (last visited May 20, 2015).

### C.      The Ultimate Objective

Defendant Feinberg employed two strategies to limit BP's liability:

(a) a "Delay, Deny, Defend" strategy against legitimate oil spill victims. This strategy,
commonly used by unscrupulous insurance companies, is as follows: "Delay payment,
starve claimant, and then offer the economically and emotionally-stressed claimant a
miniscule percent of all damages to which the claimant is entitled. If the financially
ruined claimant rejects the settlement offer, he or she may sue;" and

(b) an "Expedited Emergency Advance Payment ("EAP") Denial" strategy. This strategy
is as follows: "Fail to verify, investigate, and appraise the amount of loss claimed by the
claimant in the EAP claim and deny the EAP claim without ever requesting supporting
documentation from the claimant."

The ultimate objective of Defendant Feinberg's "Delay, Deny, Defend" strategy and

"Expedited EAP Denial" strategy was to limit BP's liability by obtaining a signed "Release and

Covenant Not to Sue" from as many BP oil spill victims as possible.

The "Release and Covenant Not to Sue" requirement, which was the idea of Defendant

Feinberg, forces economically and emotionally-stressed victims of the BP oil spill to sign a

"Release and Covenant Not to Sue" in order to receive a miniscule payment amount for all

damages, including future damages, they incur as a result of the BP oil spill. Defendant

Feinberg's "Release and Covenant Not to Sue" requirement violates OPA, State contract law, and is contrary to public policy. (Rec. Doc. 7473-1 at 6 - 24).

The "Delay, Deny, Defend" strategy and "Expedited EAP Denial" strategy, although unconscionable, have proven to be very effective for Defendant Feinberg and BP.

The GCCF status report data indicates that a total of 574,379 unique claimants filed claims with the GCCF during the period from approximately August 23, 2010 to March 7, 2012. The GCCF paid only 221,358 of these claimants. In sum, the GCCF denied payment to approximately 61.46% of the claimants who filed claims; the average total amount paid per claimant was a paltry $27,466.47.

The status report data further indicates that the GCCF paid a total of 230,370 claimants who filed claims with the GCCF during the "Phase II" period. Of these, 195,109 were either Quick Pay or Full Review Final payments; only 35,261 were Interim payments. In sum, the GCCF forced **84.68%** of the claimants to sign a "Release and Covenant Not to Sue" in which the claimant agreed not to sue BP and all other potentially liable parties; only **15.31%** of the claimants were not required to sign a "Release and Covenant Not to Sue" in order to be paid.

Defendant Feinberg's "Release and Covenant Not to Sue" excluded approximately 200,000 BP oil spill victims from the MDL 2179 Economic and Property Damages Class Settlement Agreement.

As noted *supra*, Congress never intended that a claimant's recovery of damages under OPA be limited by geographic bounds, pertain solely to certain business activities, or require a heightened and vague proof of causation between his or her damages and the oil spill incident.

-12-

Moreover, OPA *clearly* prohibits Responsible Parties from engaging in a "Delay, Deny, Defend" strategy wherein the victims of an oil spill are starved and ultimately forced to sign a "Release and Covenant Not to Sue" in order to receive an inadequate, miniscule payment amount for the damages, including future damages, they incur as a result of the oil spill.

**IV.  A Feinberg-administered claims program like the GCCF is a cancer which is metastasizing.**

A Feinberg-administered claims program like the GCCF ought to be viewed with a significant degree of concern. The precedent established by the JPML and the MDL 2179 Court is clear:

A "Responsible Party" under OPA may now enter into a contract with a politically well-connected third party "Fund Administrator," e.g., Kenneth R. Feinberg and Feinberg Rozen, LLP, d/b/a GCCF. This third party "Administrator / Straw Person," *directly and excessively compensated by the party responsible for the oil spill incident*, may totally disregard OPA, operate the claims process of the responsible party as fraudulently and negligently as it desires for the sole purpose of limiting the liability of, and providing closure to, the responsible party, and the third party "Administrator / Straw Person" shall never be held accountable for its tortious acts.

**A.  Defendant Feinberg, in his never-ending effort to promote himself and Feinberg-administered claims programs, intentionally misled the U.S. Supreme Court.**

On September 4, 2014, Defendant Feinberg filed an amicus brief (No. 14-123) with the U.S. Supreme Court in support of BP. Two statements made by Defendant Feinberg in his brief are instructive.

-13-

**Statement No. 1: "Kenneth R. Feinberg was selected by Executive Branch officials."**

"Amicus Kenneth R. Feinberg was selected by Executive Branch officials to help design, implement, and administer two successful alternatives to the conventional tort litigation system [9/11 Fund and BP Oil Spill Fund]." Plaintiffs point out that this is true for the 9/11 fund, *not* for the BP oil spill fund.  It is important to note that Feinberg was "selected" by BP and merely presented at a June 2010 White House press conference. This Honorable Court has recognized that "Mr. Feinberg was appointed by BP, without input from opposing claimants or the Plaintiffs' Steering Committee ("PSC"), and without an order from the Court. It has been suggested by several non-PSC attorneys that Mr. Feinberg is a Presidential appointee and therefore a part of the Executive Branch. There is no evidence of such an appointment to support this contention." (Rec. Doc. 1098 at 9).

Plaintiffs understand Defendant Feinberg. "Selected by Executive Branch officials……." does sound a great deal more impressive than "hired by Defendant BP to limit its liability." However, Plaintiffs do not agree that self-promotion justifies Defendant Feinberg intentionally misleading the U.S. Supreme Court.

**Statement No. 2: "Administrative claims programs like the 9/11 and Deepwater Horizon funds provide much-needed alternatives to conventional mass tort litigation."**

Defendant Feinberg's amicus brief is replete with statements which are intended to support this statement. The following are a few examples.

(a) The Gulf Coast Claims Facility program "demonstrates that principled, transparent, and effectively administered claims programs can fairly compensate victims, conserve judicial resources, and efficiently resolve claims without the uncertainty and cost associated with conventional litigation."

(b) "Mr. Feinberg offers a unique perspective on effective alternatives to mass tort litigation - and has an interest in the continued viability of those alternatives. The September 11th Victim Compensation Fund and the Gulf Coast Claims Facility administered by Mr. Feinberg demonstrate that when designed and implemented appropriately, these alternatives to mass tort litigation can secure fair compensation for eligible victims, avoid delay, and alleviate crowded court dockets."

(c) "The Court should therefore grant the petition to ensure that a key alternative to the conventional tort system remains viable for the fair, efficient, and expeditious compensation of injured victims."

(d) "While these programs [the 9/11 Victim Compensation Fund and the GCCF Fund] have been extraordinarily effective, by any measure, at efficiently and fairly compensating individual victims, the Fifth Circuit's decisions in this case affecting the causation standard, if permitted to stand, threaten to make these sorely needed alternatives to mass tort litigation unlikely to be replicated."

(e) "The numbers confirm the success of both the 9/11 Fund and the Gulf Coast Claims Facility. An overwhelming percentage of eligible claimants chose to file a claim and receive compensation from the funds rather than litigate in court. And both programs worked precisely as intended. If a claimant could demonstrate causation - i.e., that the death, physical injury, or business loss was caused, respectively, by the terrorist attacks or the oil rig explosion - payment was authorized without having to resort to litigation. Instead of waiting years for an uncertain litigation outcome, hundreds of thousands of claimants received prompt, certain, and fair compensation with relatively minimal delay and cost."

(f) "The success of the 9/11 Fund and the Gulf Coast Claims Facility demonstrate that fair compensation can be efficiently delivered to thousands of eligible victims without the necessity of litigating for years in federal and state courts throughout the Nation."

These statements are blatantly false and misleading.

The 9/11 victim compensation fund was established because Congress was concerned that conventional mass tort litigation would threaten the financial viability of the Nation's airline industry. (Feinberg U.S. Supreme Court Amicus Brief, No. 14-123, at 9 (September 4, 2014)). The purpose of this fund, funded entirely by federal taxpayer dollars, was not to compensate

victims of the attacks in a prompt and fair manner.

"Victims' Kin Find Fault With Overseer Of 9/11 Fund," The New York Times, November 13, 2002, available at http://www.nytimes.com/2002/11/13/nyregion/victims-kin-find-fault-with-overseer-of-9-11-fund.html?smid=tw-share (last visited May 24, 2015). and
"7 Families Sue Administrator Of 9/11 Fund," The New York Times, January 27, 2003, available at http://www.nytimes.com/2003/01/27/nyregion/7-families-sue-administrator-of-9-11-fund.html?smid=tw-share (last visited May 24, 2015).

Similarly, the purpose of the GCCF was not to ensure that victims of the BP oil spill received prompt, certain, and fair compensation with relatively minimal delay and cost. The GCCF status report numbers confirm that the principal purpose of the GCCF, funded entirely by BP, was to limit BP's liability.

There is no doubt that the statements made by Defendant Feinberg in his amicus brief are false and misleading. However, this is not the first time that Defendant Feinberg has played so fast and loose with the court.

"Ken Feinberg's Retracted Affidavit Cited in Appeals Ruling Favoring Fen-Phen Lawyers," ABA Journal, February 18, 2011, available at http://www.abajournal.com/news/article/ken_feinbergs_retracted_affidavit_cited_in_appeals_ruling_favoring_fen-phen/ (last visited May 24, 2015). and
 "An Expert's Change of Mind Can be Shattering," BullsEye, available at http://documents.jdsupra.com/7156029b-7066-4404-acfd-b9a44531aa29.pdf (last visited May 24, 2015).

> **B.** **Defendant Feinberg, in his never-ending effort to promote himself and Feinberg-administered claims programs, continues to use the media to mislead the public.**

In a recent interview with investigative reporter David Hammer of WWLTV, Defendant Feinberg states,

> "I've never seen any evidence of duress." "I can either get a great deal more money with documentation, or I don't even need documentation and I can get a check in the next couple of weeks or months. I'm not surprised at all, human nature being what it is. I see no duress. I see each fisherman making the decision of what's best for the fisherman."

-16-

"…when it comes to compensating innocent people, I think that what we [Feinberg Rozen, et al.] did and what BP did deserves a great deal of praise."

"BP's oil spill payments: Are they enough?" WWLTV, April 17, 2015, available at http://www.wwltv.com/story/news/local/investigations/david-hammer/2015/04/17/bps-oil-spill-payments-are-they-enough/25915247/ and http://www.wwltv.com/videos/news/local/investigations/david-hammer/2015/04/17/25927209/ (last visited May 22, 2015).

Plaintiffs respectfully point out to this Honorable Court that duress was an essential element of Defendant Feinberg's "Delay, Deny, Defend" strategy. Without his unique ability to place BP oil spill victims under duress, Defendant Feinberg would not have been able to force economically and emotionally-stressed GCCF claimants to sign a "Release and Covenant Not to Sue" in order to receive a miniscule payment amount for all damages, including future damages, they incur as a result of the BP oil spill.

Plaintiffs respectfully point out to the Court that Defendant Feinberg should have said,

"I was never under any financial duress. I think that I deserve a great deal of praise for limiting BP's liability."

## C.    This Honorable Court Has an Obligation to "Make Things Right."

This Honorable Court has an obligation to "Make Things Right" by:

(a) eradicating the Feinberg-administered claims program cancer in MDL 2179; and

(b) preventing the Feinberg-administered claims program cancer from metastasizing to other multidistrict litigation Courts in the U.S.

As noted *supra*, the ultimate objective of every Feinberg-administered claims program like the GCCF is, and will continue to be, to force as many claimants as possible into signing a "Release and Covenant Not to Sue."

-17-

Defendant Feinberg, who markets himself as the "Master of Disasters," used coercion, fraudulent inducement, and a "Delay, Deny, Defend" strategy to starve, and ultimately force, BP oil spill victims into signing a "Release and Covenant Not to Sue" in exchange for an inadequate, miniscule payment amount for the damages, including future damages, they incur as a result of the mass tort. Accordingly, the most "speedy and efficient" way to eradicate the Feinberg-administered claims program cancer in MDL 2179 would be to surgically remove the tumor ("nullify every Release and Covenant Not to Sue").

Plaintiffs respectfully point out to this Honorable Court that "Enough is enough." Defendant Feinberg is not the "Master of Disasters." Defendant Feinberg is a "Master of Deception" and a "Master of Self-Promotion." Defendant Feinberg's blatantly false and misleading statements to BP oil spill victims, the U.S. Supreme Court, and the general public are reprehensible. If Defendant Feinberg is not held accountable, he will continue to play fast and loose with the Courts and continue to mislead the general public and future mass tort victims. What is life worth? Defendant Feinberg believes, for a few lucky claimants, it is worth $5,000 for an individual and $25,000 for a business. Plaintiffs and Plaintiffs' Counsel strongly disagree.

## <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiffs and Plaintiffs' Counsel respectfully request that this Honorable Court grant their Motion to Nullify Every Gulf Coast Claims Facility Release and Covenant Not to Sue.

-18-

DATED: May 26, 2015

Respectfully submitted,

**/s/ Brian J. Donovan**
Brian J. Donovan
Attorney for Plaintiffs
Florida Bar No. 143900
3102 Seaway Court, Suite 304
Tampa, FL 33629
Tel: (352)328-7469
BrianJDonovan@verizon.net