Exhibit B

Collusion: Judicial Discretion vs. Judicial Deception - The Impending Meltdown
of the United States Federal Judicial System
by Brian J. Donovan[(a)]

## ABSTRACT
(Citations Omitted)

**PROLOGUE**

The immediate cause of the meltdown of the U.S. federal judicial system will be MDL's
unregulated use of Kenneth R. Feinberg-administered victims' compensation funds on the
frontend and settlement class actions on the backend.

Meltdowns occur when judges cease to exhibit cold neutrality and impartiality. An MDL-
triggered meltdown of the U.S. federal judicial system is impending.

Multidistrict litigation has devolved to the point where: (a) justice is replaced by judicial
efficiency, (b) federal judges sanction fund approaches and settlement class actions which limit
the liability of defendants and (c) a relatively small group of elite and self-interested
"cooperative" attorneys are permitted to be grossly over-compensated for merely acting as
dealmakers. One of the most egregious examples of blatant collusion in multidistrict litigation
involves the well-known BP oil well blowout in the Gulf of Mexico on April 20, 2010.

**THE BIRTH OF MULTIDISTRICT LITIGATION**

The multidistrict litigation ("MDL") statute provides, in pertinent part, "When civil actions
involving one or more common questions of fact are pending in different districts, such actions
may be transferred to any district *for coordinated or consolidated pretrial proceedings*. Such
transfers shall be made by the judicial panel on multidistrict litigation authorized by this section
upon its determination that transfers for such proceedings will be *for the convenience of parties
and witnesses and will promote the just and efficient conduct of such actions*. Each action so
transferred *shall be remanded* by the panel at or before the conclusion of such pretrial
proceedings to the district from which it was transferred unless it shall have been previously
terminated."[7]

In plain English, the JPML was created to:
(a) determine whether civil actions pending in different federal districts involve one or more
common questions of fact such that the actions should be transferred to one federal district for
coordinated or consolidated pretrial proceedings;
(b) ensure such transfer of cases to one federal district will be for the convenience of parties and
witnesses and will promote the just and efficient conduct of such actions; and
(c) select the federal district and judge(s) best situated to handle the transferred cases.

Common questions of fact do not have to predominate over other questions, and arguments
against transfer because of the existence of non-common issues are unlikely to prevail.[8] The
JPML, driven by its charge for achieving judicial efficiency, liberally grants consolidation even
in the face of objections by the parties to the litigation.

Notwithstanding the clarity of purpose set forth in the MDL statute, facilitating global settlement is the main purpose of consolidation into an MDL. Indeed, settlement is the fate of almost all cases that are part of an MDL. Relatively few MDL cases are remanded to the district courts in which they were originally filed.[11] Parties to MDL cases and the transferee judges who preside over them face tremendous pressure to settle. Because a primary objective of consolidation into MDL is to avoid multiple federal judges having to deal with the same issues, some transferee judges perceive the inability to achieve a global settlement as a failure.[12]

In short, theoretically the JPML may only transfer cases into an MDL for pretrial matters; the transferee court's jurisdiction extends only that far. But as a practical matter, for almost all cases transferred into an MDL, there is no trial, let alone post-trial matters, left to conduct back in the transferor district. Settlement is the endgame in almost all instances. To get there, the transferee judge appoints a small group of attorneys to strategize, conduct discovery, and try test cases on behalf of the group of plaintiffs. This appointed group is frequently called a steering committee; it steers the strategy for discovery and guides the course for all other pretrial matters. The steering committee effectively replaces the plaintiffs' chosen representatives and is expected to represent the interests of all plaintiffs in the MDL, no matter how varied they may be. Every claimant enters an MDL having made the decision to hire a particular lawyer and file suit against a particular defendant in a particular jurisdiction. But once her case is transferred to an MDL, the transferee judge decides who will really represent her interests in the MDL. Suddenly, all of the decisions the claimant made about exercising her rights through litigation - which lawyer to hire, when and where to file a lawsuit, and against whom - have been replaced by decisions made by the transferee judge and the attorneys appointed by the transferee judge.[14]

**THE ISSUE OF REMAND**
Pursuant to Congressional intent and U.S. Supreme Court decisions, the endgame for MDL is remand. Accordingly, although transferee judges deem settlement a hallmark of their success, I believe it is important to appreciate the potential advantages of remand, rather than focusing solely on what transferee judges allege to be "judicial efficiency." Remand's scarcity is caused by the uniform interest of repeat players (transferee judges, cooperative attorneys appointed to PSCs, defendants and fund administrators) in settlement.

Indeed, "the panel has abdicated its proper role by providing no recourse to remedy or to exit an MDL black hole."[34]

A "pro-settlement stance has become standard operating procedure for transferee judges."[53] Judge Fallon conceded as much: The MDL transferee court theoretically oversees the discovery aspect of the case and remands various cases back to the transferor courts for further proceedings. In practice, however, it is not unusual for the transferee court to conduct bellwether trials and encourage a global resolution of the matter before recommending to the JPML that the case be remanded.[54] "According to this view, settlement is the solution and remand is a last resort."[55]

"So, even though coaxing settlement strays furthest from a judge's adjudicative role,[56] it is not a secret that transferee judges (like most federal judges) are pro-settlement."[57] But, as Judge William Young explained, "the 'settlement culture' for which the federal courts are so frequently criticized is nowhere more prevalent than in MDL practice."[58]

Conversely, failing to resolve cases quickly can subject transferee judges to scrutiny from the JPML.[61] As Judge Eduardo Robreno, who handled the asbestos MDL, observed, "As a matter of judicial culture, remanding cases is viewed as an acknowledgement that the MDL judge has failed to resolve the case, by adjudication or settlement, during the MDL process."[62] So, transferee judges have their own professional and reputational incentives to broker deals and thwart remand.[63]

If a shift away from judicial efficiency toward justice is to occur, the "remand-as-a-failure stigma must change."[64]

In short, remand occurs only if the transferee judge suggests it. And transferee judges prefer to avoid remand and the stigma of "failure" that accompanies it. Thus, when a transferee judge clings to cases in hopes of coercing a settlement,[65] there is no path around the bottleneck.[66]

"As long as the Panel continues to 'reward' transferee judges who quickly settle cases with new multidistrict assignments and quietly bemoan the rest, transferee judges will prefer to keep assignments as long as it takes to browbeat or starve the parties into settling."[67]

**THE 8-STEP PLAN TO MAXIMIZE JUDICIAL EFFICIENCY**
Step No. 1: Capture Market Share
From the moment a catastrophic mass tort like the BP oil well blowout occurs, attorneys must begin acquiring bargaining chips ("clients") as rapidly as possible. The efficiency with which they do so will ultimately determine if they are awarded with a lucrative appointment to the MDL PSC.

The following two statements made by Judge Barbier are instructive.

Statement No. 1
"Shortly after the events of April 20, 2010, various law firms who would eventually become Liaison Counsel, PSC members, Class Counsel, and other common benefit attorneys….started to coordinate with one another and to take actions, not only for the protection of their own individual clients, but with an eye towards the advancement and protection of the common and collective interests of others who were likely to become litigants at some point in time….Working together, the lawyers developed a formal limited joint-prosecution agreement to facilitate the coordination and sharing of information, research, and litigation strategy."[4]

Statement No. 2
"The Court's assessment of the significance of the relatively low number of opt-outs is also supported by the fact that most of the opt-outs occurred on a mass basis because they were not

individually signed. Additionally, counsel for such mass opt-outs may have breached their fiduciary and ethical duties to their clients; at the very least, the mass unsigned opt-outs are highly indicative of a conclusion that such counsel did not spend very much time evaluating the merits of whether or not to opt-out in light of the individual circumstances of each of their clients and in consultation with them. *See Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 353 (6th Cir. 2009) ('Attorney Hadden says….that he should have been permitted to represent class members and opted-out individuals simultaneously. Yet he fails to come to grips with the reality that this kind of dual representation likely would have run up against Michigan's ethics laws.').")[5]

Statement No. 1 was made by Judge Barbier when discussing his reasons for granting the petition for reimbursement of expenses and collective common benefit fee award filed by the MDL 2179 PSC and other attorneys who claim entitlement to an award for attorneys' fees for common benefit work in the amount of US$600 million.

Here, Judge Barbier praises the attorneys he appointed to the PSC for their initiative. Future PSC members signed up as many prospective clients as possible "shortly after the events of April 20, 2010…."

Statement No. 2 was made by Judge Barbier when discussing his reasons for granting final approval of the economic and property damages settlement agreement which he found to be "fair, reasonable, and adequate."

Here, Judge Barbier states that non-PSC counsel, who counseled their clients to opt-out of the settlement agreement, "may have breached their fiduciary and ethical duties to their clients; at the very least, the mass unsigned opt-outs are highly indicative of a conclusion that such counsel did not spend very much time evaluating the merits of whether or not to opt-out in light of the individual circumstances of each of their clients and in consultation with them." Judge Barbier cites a Michigan case which finds an attorney who represents class members and opted-out individuals simultaneously may "run up against Michigan's ethics laws."

Judge Barbier's statements raise several important questions.

(a) Each attorney appointed by the transferee judge to the PSC directly represents thousands or tens of thousands of clients. Are these PSC members breaching their fiduciary and ethical duties to their clients? Is this mass representation by each PSC member "highly indicative of a conclusion that such counsel did not spend very much time evaluating the merits of whether or not to opt-out in light of the individual circumstances of each of their clients and in consultation with them?"

(b) Judge Barbier praises the attorneys he appointed to the PSC for their initiative. Future PSC members signed up as many prospective clients as possible "shortly after the events of April 20, 2010…." but he simultaneously states that non-PSC attorneys may have breached their fiduciary and ethical duties to their clients when they counseled many of their clients to opt-out of the settlement agreement. Does this double standard establish a poisonous "Us vs. Them" mentality

in the MDL? In MDL 2179, "Us" principally means Judge Barbier, the cooperative attorneys appointed to the PSC by Judge Barbier, other common benefit attorneys, Kenneth R. Feinberg, Patrick Juneau and BP. "Them" means plaintiffs not directly represented by a member of the PSC, non-cooperative plaintiffs who brazenly elect to opt-out of the settlement agreement in search of justice, and the attorneys who the plaintiffs initially retained.

(c) In discussing the fiduciary and ethical duties that non-PSC members owe to their clients, Judge Barbier cites a Michigan case which finds an attorney who represents class members and opted-out individuals simultaneously may "run up against Michigan's ethics laws." Isn't this precisely what the PSC is required to do? The PSC represents every plaintiff in the MDL, class members and opted-out persons. If not, then who represents those plaintiffs who elect to opt-out? If not, does this mean that the settlement class action is the only game in town, "take it or leave it!" If not, is the Plaintiffs' Steering Committee ("PSC") a misnomer? Should it be called the Transferee Judge's Steering Committee ("TJSC")?

Litigation in the United States is adversarial. A plaintiff's counsel zealously advocates on behalf of her client. She goes to war on behalf of her client. In contrast, MDL is a perverted form of transactional law. In transactional law, both parties involved in the transaction should win. In an MDL, the PSC and the defendant both win. Heck, even the transferee judge wins. The only losers are the hapless plaintiffs.

Step No. 2: The JPML Transfer Order
The transfer order typically includes a brief discussion of the JPML's reasons for selecting the transferee court and the transferee judge. Recently, the transfer order also clearly states the JPML's desire that centralization may also facilitate closer coordination with the administration of a designated victims' compensation fund.

In hindsight, the Oil Pollution Act of 1990 ("OPA"), a strict liability statute, is one factor which the JPML must have strongly considered in its deliberations in regard to designating a transferee court which could maximize judicial efficiency. More specifically, the question was which transferee court would be the most capable of circumventing the OPA in the most credible manner.

Professor John J. Costonis points out, "The Fifth Circuit's pride in the exercise of admiralty jurisdiction on behalf of seafarers is evident throughout its…. jurisprudence. Rightly, the Fifth Circuit takes pride in its status as the nation's preeminent venue for the development of law at the intersection of admiralty and oil and gas operations.[8] The Fifth Circuit's preeminence appears in a comparison of the number of opinions on the issues decided by the Fifth Circuit and its district-level trial courts with those of the nation's other eleven federal circuits and their associated trial courts….It holds sway over an area of the lower 48 states in which the lion's share of United States' offshore drilling is conducted."[9]

The Eastern District of Louisiana would be the perfect transferee court to provide cover for the "cooperative" MDL 2179 PSC to make the unfathomable decision to allege claims in the "B1" Master Complaint as admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and request a non-jury trial, pursuant to Rule 9(h).

The JPML understands that there is no sense in allowing a strict liability statute and a jury to get in the way of judicial efficiency.

The Transferee Judge
The transferee judge must be "cooperative" and fully embrace judicial efficiency via (a) utilizing a victims' compensation fund and a settlement class action to eliminate as many claimants as possible as quickly as possible; (b) focusing on limiting the defendant's liability to provide closure for the defendant and its shareholders; and (c) ensuring maximum compensation for the "cooperative" repeat players he appoints to the PSC. The transferee judge's objective must be settlement, not remand.

Here, the transfer order for the BP oil well blowout MDL is instructive.

The JPML states, "Considering all of the applicable factors, we have asked Judge Carl J. Barbier to serve as transferee judge….Some parties have expressed concern that recusals among Eastern District of Louisiana judges unduly limit our choices, and that even Judge Barbier may be subject to recusal. Notwithstanding these concerns, the Panel is quite comfortable with its choice. Judge Barbier is an exceptional jurist, who would be a wise selection for this assignment even had those other judges in the district been available. Moreover, the Fifth Circuit recently denied the petition of certain defendants for a writ of mandamus directing Judge Barbier to recuse himself."[10]

The JPML knowingly appointed a transferee judge to preside over MDL 2179 who should have recused himself. However, never underestimate the JPML's sense of humor. In its transfer order of August 10, 2010, the JPML includes the following disclaimer: "The Panel, of course, has no authority to determine whether a particular judge should recuse himself or herself from presiding over a particular MDL."[11] In other words, "We just pick them, we don't vet them."

The inclusion of the Kenneth R. Feinberg victims' compensation fund in an MDL transfer order is an excellent example of how repeat players appointed to MDL PSCs are able to hone and fine-tune their craft. A victims' compensation fund is undoubtedly the brainchild of attorneys who have had extensive PSC experience. No longer does an MDL transferee judge have to rely solely on a settlement class action for judicial efficiency. Now, he has a victims' compensation fund, sanctioned by the JPML, to eliminate a substantial number of time-consuming, pesky claimants before negotiating and drafting the settlement class action.

Step No. 3: Establishment of the Kenneth R. Feinberg Victims' Compensation Fund
Kenneth R. Feinberg, masquerading as a "Fund Administrator," is employed by mass tort defendants to limit their liability. In reality, Feinberg is a defense attorney.

-6-

In the BP oil well blowout MDL, Feinberg used a "Delay, Deny, Defend" tactic against legitimate oil well blowout claimants/victims to limit BP's liability. This tactic, commonly used by unscrupulous insurance companies, is as follows: "Delay payment, starve claimant, and then offer the economically and emotionally-stressed claimant a miniscule percent of all damages to which the claimant is entitled. If the financially ruined claimant rejects the settlement offer, he or she may sue."

The ultimate objective of Feinberg's "Delay, Deny, Defend" tactic was to limit BP's liability by obtaining a signed "Release and Covenant Not to Sue" from as many BP oil well blowout victims as possible.

If an MDL which resorts to a settlement class action rather than remand has resulted in a loss of faith in the U.S. federal judicial system, then an MDL which employs a Kenneth R. Feinberg victims' compensation fund and a settlement class action virtually guarantees the eventual meltdown of the U.S. federal judicial system.

Step No. 4: Appointment of "Cooperative" Attorneys to the PSC
It is important to understand that judicial efficiency replaces justice in every MDL.

An MDL is not a litigation. Attorneys appointed to the PSC are not appointed by the transferee judge to be litigators. These attorneys are not selected for the purpose of zealously advocating on behalf of their clients. Attorneys appointed to the PSC are cooperative dealmakers. Describing an attorney appointed to the PSC as "cooperative" means the attorney would never consider rocking the metaphorical boat of judicial efficiency.

It is helpful to remember the three Cs of any successful PSC: cooperation, control and compensation. Greater cooperation (between the dealmakers) and control (in terms of a significant market share of plaintiffs) results in closing the deal faster with the defendant and clearing the docket faster which results in greater compensation. A happy transferee judge is a generous transferee judge. Obviously, I am referring to the compensation received by the members of the PSC. The hapless plaintiffs will most likely receive little or no compensation.

Step No. 5: Circumvention of Strict Liability Statutes
The OPA is a strict liability statute. In order to recover damages under the OPA, a claimant merely needs to show that his or her damages "resulted from" the oil spill or oil well blowout.

A strict liability statute, like the OPA, poses a problem for the MDL 2179 parties (e.g., the transferee judge, the PSC, and BP). Remember, MDL 2179 plaintiffs are commodities, not "parties."

Since the objective of an MDL is to maximize judicial efficiency via a Kenneth R. Feinberg victims' compensation fund and a subsequent settlement class action, it is of paramount importance to limit BP's liability in order to induce BP to settle as quickly as possible. A strict liability statute does just the opposite. Liability attaches without regard to the reasonableness or

blameworthiness of BP's conduct. Although liability under the OPA is subject to a monetary cap of $75,000,000 for each incident by each responsible party, there is no limit to liability if the damage was proximately caused by "gross negligence or willful misconduct." It is important to note that BP, the responsible party, waived the monetary cap of $75,000,000 for the BP oil well blowout incident in the Gulf of Mexico on April 20, 2010 and the MDL 2179 court found the damage to be proximately caused by "gross negligence or willful misconduct." Accordingly, in theory, there is no limit to BP's liability. MDL reality is so very different.

Rather than allege claims under the OPA, the "cooperative" PSC made the unfathomable decision to allege claims under a hodgepodge of statutes. In the "B1" Master Complaint, the PSC states, "The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiffs hereby designate this case as an admiralty or maritime case, and request a non-jury trial, pursuant to Rule 9(h)."[13] The PSC was concerned that a jury may not be "cooperative."

Filing of the "B1" Master Complaint as an admiralty or maritime case artfully circumvented the OPA. By doing so, the PSC assisted Judge Barbier in expeditiously being able to erroneously and incomprehensibly find, "….that nothing prohibits Defendants from settling claims for economic loss. While OPA does not specifically address the use of waivers and releases by Responsible Parties, *the statute also does not clearly prohibit it*. In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill."[14]

As a result of this finding by Judge Barbier, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action.

Circumventing the OPA also allowed the PSC/BP settlement to limit a claimant's recovery of damages by geographic bounds, pertain solely to certain business activities, and require a heightened and vague proof of causation between his or her damages and the BP oil well blowout incident.

Step No. 6: Approval of the Settlement Class Action
Congress and the U.S. Supreme Court clearly state that the MDL endgame is remand of the cases to their respective transferor courts. Unfortunately, the JPML and many transferee judges disrespectfully disagree. The MDL endgame has become judicially efficient settlement class actions.

The BP oil well blowout MDL is illustrative of the current state of settlement class actions in multidistrict "litigation."

In February 2011, only 4 months after Judge Barbier appointed his cooperative attorneys to the BP oil well blowout MDL PSC and Plaintiff Executive Committee, settlement negotiations

began in earnest. The PSC and BP negotiated a total amount which BP was willing to pay in order to settle the BP oil well blowout case.

Carefully implementing the above-described Steps No. 1 through No. 5, the PSC and BP worked backwards from that agreed upon total amount to draft the terms and conditions of the settlement.

The first step was to have Kenneth R. Feinberg eliminate as many claimants/plaintiffs as possible via his "Release and Covenant Not to Sue" requirement.

Just prior to the final fairness hearing in November 2012, BP, the PSC, the claims administrator, with the knowledge of the transferee judge, intentionally processed a substantial number of high value claims in an attempt to demonstrate that the settlement program was working as intended.[15] Here, the objective was to keep as many of the remaining claimants/plaintiffs in the settlement as possible. Opt-outs were seriously frowned upon. The settlement class action was the only game in tow. Take it or leave it!

<u>The Settlement Limits the Compensation Period to 2010</u>
The BP oil well blowout of April 2010 resulted in the largest environmental disaster in the history of the United States. An estimated 5.0 million barrels of crude oil gushed into the Gulf of Mexico.

The Honorable Carl J. Barbier clearly states, "*The long term effects [of the BP oil well blowout] on the environment and fisheries may not be known for many years*."[16] Nevertheless, in order to limit BP's liability, one tactic employed by BP and the PSC was to limit the compensation period to 2010.

Incredibly, Judge Barbier found that limiting the compensation period to 2010 is reasonable. He explains, "Certain objectors complain that the Economic Damage Claim Frameworks are unfair because they do not compensate persons who did not begin suffering losses until 2011. Yet this provision is reasonable for three reasons: (i) the Macondo well ceased flowing in July 2010; (ii) there is evidence that by late 2010, Gulf Coast tourism had returned to or surpassed 2009 levels; and (iii) as to claims by individuals and businesses in charter fishing, seafood processing, or other businesses relying on access to Gulf waters, nearly all federal and state waters were reopened for commercial fishing by November 2010. Thus, extending compensation to 2011 would cover losses not likely caused by the spill."[17]

<u>The Settlement's Causation Requirements Take Obfuscation to a New Level</u>
The BP oil well blowout settlement contains various causation requirements for Business Economic Loss ("BEL") claims. Two of the causation tests, the Modified V-test and the Decline-Only test, require a revenue calculation based on benchmark periods and, in addition, a decline in the share of total revenue generated by non-local customers or customers in Zones A to C as reflected in specified documentation.

In discussing the causation requirements for BEL claims, Judge Barbier explains, "Certain objectors contend that to invoke the Modified V-Test or the Decline-Only Test, they are required to satisfy the Customer Mix Test, which requires these businesses to establish where their customers are located. The objective evidence shows that the causation tests available under the Settlement Agreement are both economically reasonable and highly favorable to claimants, which is why they were negotiated by experienced counsel in consultation with their clients and experts….Other objectors complain that before they can invoke the V-Shaped Revenue Pattern test, they must demonstrate a 5% revenue recovery during the correlating months of 2011 as compared to the 2010 baseline period. This provision is reasonable, as *losses that continued after the spill are likely to be due to factors other than the spill*."[18]

The Settlement Includes a Magical RTP

Judge Barbier reassures BP oil well blowout claimants/plaintiffs that "the settlement claims program's Risk Transfer Premium ("RTP") enhances the compensation amount for, among other things, certain claimants whose damages could be recurring, to account for that risk of future damages:

(a) The RTP is specifically calculated to account for factors unique to each category of claim; and
(b) Unlike a simple multiplier, the RTP enhancement is a formula that calculates the product of RTP number and the base compensation amount, and then adds that product back to the base compensation amount. In other words, an RTP of 2 does not just double the base compensation amount, as a simple multiplier would - it doubles the base compensation amount and then adds that doubled number to the original base compensation amount - thus an RTP of 2 would be comparable to a multiplier of 3."

Judge Barbier further instructs, "RTP payments are meant to compensate class members for pre-judgment interest, the risk of oil returning, consequential damages, inconvenience, aggravation, the risk of future loss, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors."[19]

RTP payments are simply magical.

The Four Wise Men

Judge Barbier informs class members that "The parties have tendered either jointly or on their own behalf four experts in the law of class actions: Professors Coffee, Issacharoff, Klonoff, and Miller. The Court cites to, or in some instances quotes from, the opinions of these experts at various points in the analysis below of class certification issues. However, the Court underscores that at all times it has exercised its independent legal judgment on each and every class certification issue. The Court cites to the declarations of these experts where they summarize the governing legal rules embodied in the text of Rule 23 and/or in the case law of the federal courts. Since these same scholars have often criticized abusive class actions, however, it is significant that all four of them, from their various perspectives, support this class settlement and believe that it is certifiable."[20]

In short, if a settlement is not able to stand on its own legs as being "fair, reasonable, adequate, and free of collusion," just pay four law professors to give their "unbiased" opinions. For the record, any class member who believes these expert opinions are unbiased is certifiable.

Step No. 7: The Post-Settlement Mop-Up Procedure
Transferee judges tend to issue *Lone Pine* orders after most plaintiffs' cases are resolved through a comprehensive settlement. *Lone Pine* orders are usually issued with little advanced notice. Although plaintiffs may be relying on common evidence produced by the PSC, when they refuse to settle, *Lone Pine* orders might require a plaintiff to retain an individual expert and produce her opinion within a couple of weeks.[21] In short, *Lone Pine* orders require non-settling plaintiffs to provide some evidentiary support for their claims to avoid dismissal.[22]

An MDL Court's authority to enter a *Lone Pine* order stems from Federal Rule of Civil Procedure 16(c)(12).[23] A federal district court is afforded broad discretion in crafting and enforcing such case management orders.[24]

There is no need to resort to a *Lone Pine* order in cases where the system that the MDL Court has fashioned is working. A *Lone Pine* order greatly and unnecessarily increases the costs for the plaintiff. Removing the safeguards of the rules of civil procedure and requiring the expenditure of vast sums of money is simply unfair to those MDL plaintiffs who have not had the benefit of rulings and trials to guide their decisions.

An MDL Court should not allow a defendant to change the rules, or, more precisely, to create rules and procedures that simply do not exist, even if they seem like a "good idea" from the defendant's perspective.

MDL PSC members routinely argue that a *Lone Pine* order is appropriate as "a post-settlement mop-up procedure utilized to address those cases which either were not eligible for compensation through the MDL settlement program or which had opted-out of participation in the MDL settlement program." In reality, the purpose of a *Lone Pine* order is to eliminate those few remaining non-cooperating, pesky plaintiffs who have the audacity to demand justice. This is another reason why the "Plaintiffs' Steering Committee" is a misnomer. Again, I believe it is more appropriate to refer to it as the "Transferee Judge's Steering Committee."

Step No. 8: Clawback
Carefully implementing the above-described Steps No. 1 through No. 7, the PSC and BP eliminated, excluded or dismissed virtually all remaining claims against BP. A relatively small percentage of claimants/plaintiffs, primarily represented by members of the PSC and other common-benefit attorneys, were partially compensated for the damages resulting from the BP oil well blowout.

In the status report submitted to the BP oil well blowout court on February 14, 2017, attorneys for BP Exploration & Production Inc. and BP America Production Company state, "Following a show cause process, the MDL 2179 Court recognized approximately 1,000 remaining "B1"

plaintiffs to be compliant with PTO 60 and subject to further proceedings in MDL 2179. The claims of any other remaining "B1" plaintiffs were dismissed. Certain plaintiffs who were found noncompliant with PTO 60 and had their claims dismissed by the court's December 16, 2016 Reconciliation Order have filed motions for reconsideration and/or notices of appeal…BP believes that a very large number of these pending claims are subject to dismissal based upon the Court's prior orders, lack of OPA presentment, or release (including membership in the settlement classes and their attendant releases). Certain of these claims may require further proceedings, including but not limited to dispositive motion practice….*BP also reserves all of its rights concerning its arguments that OPA displaces all forms of maritime claims*."[36]

One purpose of the "clawback" order was allegedly to refund to BP the amount paid to claimants who had submitted fraudulent claims. However, the primary purpose was to burnish BP's tarnished image. Although only an infinitesimal percentage of submitted claims were found to be fraudulent, these claims were highly publicized and reported in the media. In short, any casual observer may conclude that BP was the only true victim of the oil well blowout disaster. Indeed, were there ever any real victims with legitimate claims?

There is something perverse about a legal system which guarantees justice for BP, the party responsible for the greatest environmental disaster in U.S. history, but denies each and every victim of the BP oil well blowout his or her day in court.

**THE OIL POLLUTION ACT OF 1990**
Following the *Exxon Valdez* oil spill disaster on March 4, 1989, President George H.W. Bush signed the Oil Pollution Act of 1990 ("OPA") into law on August 18, 1990. The Senate Public Works and Environmental Committee described OPA as a "single Federal law providing cleanup authority, penalties, and liability from oil pollution." Consolidated and harmonized within this single act were major elements of four existing oil pollution statutes (OCSLA's title III, the Deepwater Port Act of 1974, the Trans-Alaskan Pipeline Authorization Act and the Federal Water Pollution Control Act).

When Congress enacted the OPA, its main concern was ensuring that parties injured by an oil spill were adequately compensated for their damages.[1] Congress attempted to achieve this goal by doing the following: (1) rendering the responsible party *strictly liable*; (2) creating higher liability limits; (3) allowing claimants to recover economic losses in the absence of physical injury or property damage; and (4) allowing claimants to file successive claims to recover their "actual damages."[2]

The OPA is a *strict liability* statute. In order to recover damages under OPA, a claimant merely needs to show that his or her damages "resulted from" the oil spill or oil well blowout.

The OPA, in pertinent part, states:
"The responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages that result from such incident."[3]

-12-

The damages referred to in 33 U.S.C. § 2702(a) include, but are not limited to: "Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which ***shall** be recoverable by any claimant*."[4]

The OPA further provides:
(a) "Payment or settlement of a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled **shall not** preclude recovery by the claimant for damages not reflected in the paid or settled partial claim;"[5] and

(b) "Payment of such a claim [i.e. payment to a claimant for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled] **shall not** foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under this Act or under any other law."[6]

"Shall" means shall. The U.S. Supreme Court has made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the command.[7]

Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is mandatory and "may" is permissive. "The mandatory 'shall'….normally creates an obligation impervious to judicial discretion."[8]

Justice Souter, in delivering the opinion of the *Lexecon* Court, explained, "If we do our job of reading the statute whole, we have to give effect to this plain command,[9] even if doing that will reverse the longstanding practice under the statute and the rule,[10] The language is straightforward, and with a straightforward application ready to hand, statutory interpretation has no business getting metaphysical."

As the U.S. Supreme Court further explained, "In interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."[11]

In short, the chief compensatory vehicle through which MDL 2179 plaintiffs, both private and public, should recover for economic loss and clean-up costs is the OPA.[12]

Under the OPA, liability may be based simply on one's status as owner or operator of a vessel and does requires neither direct involvement nor control. Generally, under maritime law, a claimant is not entitled to recover economic losses in the absence of physical injury to his person or property.[14] However, under the OPA, all claimants who suffer from lost profits or impaired earning capacity are permitted to recover, even those claimants who neither own nor lease property that has been damaged.[15]

-13-

"The long term effects [of the BP oil well blowout] on the environment and fisheries may not be known for many years."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 3830 at 31, August 26, 2011).

The Feinberg-administered BP victims compensation "fund" is BP's attempt to contract out of the strict liability regime that is mandated under OPA 90.[46] The BP oil well blowout released hundreds of hazardous substances into the Gulf of Mexico. At present, the scope of the long-term environmental and economic damages caused by the discharge of the substances is uncertain, and Feinberg has failed to provide credible and reliable estimates of how long it will take for the Gulf of Mexico and its dependent industries to recover. Uncertainties about the scope of the long-term damage combined with Feinberg's unwillingness to release critical information regarding the methodology by which he determines claimants' future losses evokes serious fairness concerns.[47]

## THE TRANSFER ORDER

The JPML created MDL 2179 and transferred cases relating to the BP oil well blowout to the Eastern District of Louisiana on August 10, 2010.

The seven members of the JPML who signed the transfer order of August 10, 2010 which created MDL 2179 are: Judges John G. Heyburn II, Kathryn H. Vratil, W. Royal Furgeson, Jr., Barbara S. Jones, Robert L. Miller, Jr., David R. Hansen, and Frank C. Damrell, Jr.

The transfer order issued by the JPML is a matter of concern for the following three reasons: (a) the MDL case name is intentionally misleading; (b) the JPML instructs the transferee court to facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund; and (c) the JPML knowingly appointed a transferee judge to preside over MDL 2179 who should have recused himself.

The transfer order creating MDL 2179 states, in pertinent part, the following.

Some parties have expressed concern that recusals among Eastern District of Louisiana judges unduly limit our choices, and that even Judge Barbier may be subject to recusal. Notwithstanding these concerns, the Panel is quite comfortable with its choice. Judge Barbier is an exceptional jurist, who would be a wise selection for this assignment even had those other judges in the district been available. Moreover, the Fifth Circuit recently denied the petition of certain defendants for a writ of mandamus directing Judge Barbier to recuse himself.

Centralization under Section 1407 will eliminate duplicative discovery, prevent inconsistent pretrial rulings, including rulings on class certification and other issues, and conserve the resources of the parties, their counsel, and the judiciary. Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund. In all these respects, centralization will serve the convenience of the parties and witnesses and promote the more just and efficient conduct of these cases, taken as a whole.

-14-

The transferee judge has broad discretion to employ any number of pretrial techniques - such as establishing separate discovery and/or motion tracks - to address any differences among the cases and efficiently manage the various aspects of this litigation.

The JPML named the MDL 2179 case *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*. The MDL 2179 case should have been named *In Re: BP Oil Well Blowout in the Gulf of Mexico, on April 20, 2010*. The *Deepwater Horizon* is the name of a mobile offshore drilling unit, more specifically, a semi-submersible drilling rig, which is owned by Transocean. This incident is not an "oil spill." It is an oil well blowout. The President's Commission has estimated that the *Deepwater Horizon* rig accounted for only .0095 percent of the total amount of the estimated spill by the total BP oil well blowout. The party responsible for the blowout is BP, not Transocean. The name given to this case is important for two reasons. First, BP's name is not mentioned in the case name because in April 2010 BP was the single biggest supplier of fuel to the Department of Defense, with Pentagon contracts worth US$2.2 billion a year, according to government records. BP was also the largest producer of oil on federal waters in the Gulf of Mexico, which made it a significant contributor of revenue to the government. Second, by referring to this incident as an "oil spill" from a "semi-submersible drilling rig," the MDL 2179 court could limit BP's liability by arguing that this is an admiralty law case and thereby circumvent the OPA. As we shall see, this is precisely what was done.

Contrary to the MDL statute and U.S. Supreme Court decisions, JPML's endgame in this case is settlement, not transfer of civil cases with common issues of fact to MDL 2179 for coordinated or consolidated pretrial proceedings and subsequent remand at or before the conclusion of such pretrial proceedings to the district from which it was transferred. Judicial efficiency and limited liability for BP, not justice, are JPML's objectives.

Justice Souter, in delivering the opinion of the Court in *Lexecon*, explained 28 U. S. C. §1407(a) authorizes the Judicial Panel on Multidistrict Litigation (the "Panel") to transfer civil actions with common issues of fact "to any district for coordinated or consolidated pretrial proceedings," but imposes a duty on the Panel to remand any such action to the original district "at or before the conclusion of such pretrial proceedings." "Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated."[68]

Justice Souter pointed out that the Panel's instruction comes in terms of the mandatory "shall," which normally creates an obligation impervious to judicial discretion.[69]

Moreover, the U.S. Supreme Court found that neither the statute's language nor legislative history can unsettle §1407's straightforward language imposing the Panel's responsibility to remand, which bars recognizing any self-assignment power in a transferee court and consequently entails the invalidity of the Panel's Rule 14(b).

The legislative history tends to confirm that self-assignment is beyond the scope of the transferee court's authority. Justice Souter noted that the same House Report that spoke of the continued

vitality of §1404 in §1407 cases also said this: "*The proposed statute affects only the pretrial stages in multidistrict litigation. It would not affect the place of trial in any case or exclude the possibility of transfer under other Federal statutes....The subsection requires that transferred cases be remanded to the originating district at the close of coordinated pretrial proceedings. The bill does not, therefore, include the trial of cases in the consolidated proceedings*."[70]

The comments of the bill's sponsors further suggest that application of 28 U.S.C. §1407 would not affect the place of trial. See, e.g., Multidistrict Litigation: Hearings on S. 3815 and S. 159 before the Subcommittee on Improvements in Judicial Machinery of the Senate Comm. On the Judiciary, 90th Cong., 1st Sess. Pt. 2, p. 110 (1967) (Sen. Tydings) ("When the deposition and discovery is completed, then the original litigation is remanded to the transferor district for trial"). *Both the House and the Senate Reports stated that Congress would have to amend the statute if it determined that multidistrict litigation cases should be consolidated for trial*.[71]

**THE TRANSFEREE JUDGE**
Prior to the JPML's creation of MDL 2179, Cameron International Corporation ("Cameron"), Halliburton Energy Services, Inc., BP Products North America, Inc., and BP America, Inc. ("Petitioners") petitioned the U.S. Court of Appeals for the Fifth Circuit for a writ of mandamus directing U.S. District Court Judge Carl J. Barbier to recuse himself from any further proceedings involving cases related to the *Deepwater Horizon* oil rig.[82]

When the first *Deepwater Horizon* cases were assigned to Judge Barbier, he owned debt instruments issued by Halliburton and Transocean. Both Transocean and Halliburton appear as defendants in many of the *Deepwater Horizon* cases pending before Judge Barbier. Judge Barbier instructed his broker to sell the debt instruments on June 2, 2010. Judge Barbier stated on the record on June 4, 2010, that he was unaware that he owned the debt instruments until reports surfaced in the media, and that, though not required, he thought divestment the best policy to avoid the appearance of bias.

Judge Barbier's disclosure form lists "Halliburton Co. Debentures 3/01/21" as the "Description of the Assets." The income (from interest) during the reporting year (2008) was between US$1,001 and US$2,500. The gross value was between US$15,001 and US$50,000. Judge Barbier's disclosure form further lists "Transocean Sedco Forex Notes 4/15/18" as the "Description of the Assets." The income (from interest) during the reporting year (2008) was between US$1,001 and US$2,500. The gross value was between US$15,001 and US$50,000.

Notwithstanding the divestment, the petitioners moved to have Judge Barbier recuse himself from the proceedings based on 28 U.S.C. § 455(b), the federal recusal statute. The petitioners argued that the debt instruments were "financial interests" under the terms of the statute, and that, accordingly, recusal was mandatory.

Section 455 governs the disqualification or recusal of federal judges. Germane to the instant matter is § 455(b)(4), which provides, in relevant part: "(b) A judge shall....disqualify himself in the following circumstances: (4) He knows that he....has a financial interest in the subject matter

in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding…."

Judge Barbier orally denied the petitioners' motion for recusal, finding that "the ownership of a bond or debt instrument is not the ownership of a financial interest because when you own a bond, you do not own any part of the company…." Because the debt instruments were "not a legal interest in the corporation," they did not trigger § 455(b) and so did not require recusal. Judge Barbier reasoned that bond and stock ownership are vastly different because bond ownership does not imply any ownership interest in the company issuing the bond.

The Fifth Circuit saw no error in Judge Barbier's reasoning for denying the motion to recuse. However, the Court stated even if debt instruments do not qualify as a "financial interests….in a party" because they do not convey an ownership interest, they could nonetheless qualify as "financial interests in the subject matter in controversy." Furthermore, the second part of § 455(b)(4) speaks of "any other interest that could be substantially affected by the proceeding" as an alternative basis for disqualification. The Court further noted, "Ownership of any type of debt interest….may in some circumstances occasion disqualification if the judge's interest is such that it could be substantially affected by the outcome of the proceeding." Judge Barbier never reached the "substantially affected" issue because the petitioners' motion relied entirely on the "financial interest" prong of § 455(b)(4).

On July 22, 2010, the Fifth Circuit held, "In sum, because we find no error in the district court's conclusion that the debt instruments do not qualify as "financial interests….in a party to the proceeding," petitions for writ of mandamus are DENIED. The denial is without prejudice to Petitioners moving for recusal in the district court on the basis of either (1) the debt instruments being "financial interests in the subject matter in controversy," or (2) the possibility that the debt instruments "could be substantially affected by the proceeding."[83] We express no opinion as to the merits of either ground.

Following the Fifth Circuit's decision, and apparent guidance, Cameron filed a motion for judicial disclosure. Cameron asked Judge Barbier for a hearing on his holdings in Halliburton and Transocean as of April 30, 2010, the dates he bought and sold the bonds, and the prices. Judge Barbier scheduled a hearing for August 18, 2010.

On August 10, 2010, the JPML appointed Judge Barbier to serve as the transferee judge and preside over MDL 2179. Judge Barbier postponed Cameron's disclosure hearing to September 16, 2010. This delay resulted in Cameron owners changing their minds.

This would not have been the first time that the Fifth Circuit found Judge Barbier to have abused his discretion.

In the case of *Republic of Panama v. The American Tobacco Company, Inc., et al.*,[84] the Fifth Circuit held that the district court abused its discretion in denying defendants' motion to recuse. Prior to his appointment to the district court, Judge Barbier was President of the Louisiana Trial

Lawyer's Association ("LTLA") from approximately October 1989 - October 1990. In April 1991, LTLA submitted an amicus brief on behalf of the plaintiffs in a product liability suit against tobacco companies. The LTLA amicus brief alleged that smoking was addictive and caused cancer. The LTLA amicus brief also stated that the tobacco companies have known the dangers of smoking for decades. Judge Barbier's name was listed on the brief as President of LTLA, although at the time he was no longer the president. Listed on this brief with Judge Barbier as counsel for the brief was the lawyer who was also representing the plaintiff, Republic of Panama. Because the allegations against tobacco companies in the amicus brief were similar to the allegations of the plaintiff in this case, and because the lawyer for the plaintiff in this case was also on the brief with Judge Barbier, the Fifth Circuit held that a reasonable person might harbor doubts about the trial judge's impartiality. The court found that Judge Barbier's assertions that he did not participate directly in the writing or researching of the amicus brief do not dissipate the doubts that a reasonable person would probably have about the court's impartiality.

Legislative history indicates that Section 455(a) was meant to lessen the traditional "duty to sit," and, as the U.S. Supreme Court has indicated, to require avoidance of even the appearance of partiality.[85] Recusal may be required even in the absence of actual partiality if there is an objectively reasonable basis for doubting the judge's impartiality. See Code of Judicial Conduct, Canon 2 (1973): "A judge should avoid impropriety and *the appearance of impropriety* in all his activities." (Emphasis supplied).

The proper standard for ascertaining whether a judge's impartiality might reasonably be questioned under Section 455(a) is whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt, not in the mind of the judge, or even necessarily that of the litigant, but rather in the mind of the reasonable person.[86]

In *Republic of Panama v. The American Tobacco Company, Inc., et al.,* the Fifth Circuit pointed out that denial of recusal is reviewed for abuse of discretion.[87] Section 455(a) states that a judge should recuse himself "in any proceeding in which his impartiality might reasonably be questioned." "In order to determine whether a court's impartiality is reasonably in question, the objective inquiry is whether a well-informed, thoughtful, and objective observer would question the court's impartiality."[88] The review of a recusal order under § 455(a) is "extremely fact intensive and fact bound," thus a close recitation of the factual basis for the appellants recusal motion is necessary. The Fifth Circuit has previously pointed out, the purpose of § 455(a), and the principle of recusal itself is not just to prevent *actual* partiality, but to "avoid even the appearance of partiality."[89] The analysis of a § 455(a) claim must be guided, not by comparison to similar situations addressed by prior jurisprudence, but rather by an independent examination of the facts and circumstances of the particular claim.[90]

The Fifth Circuit also stated that, if the question of whether Section 455(a) requires disqualification is a close one, the balance tips in favor of recusal.[91]

In *Republic of Panama v. The American Tobacco Company, Inc., et al.,* the Fifth Circuit further held that if the district court judge should have recused himself any orders entered following

-18-

disposition of the recusal motion should be vacated.[92]

On June 4, 2010, Bloomberg News reported that, according to public records, six of twelve active judges assigned to the federal judicial district based in New Orleans have removed themselves from oil spill-damage lawsuits. The judges found conflicts tied to oil investments or personal relationships with lawyers or companies involved. Several additional federal judges in districts based in Lafayette, Louisiana, Mobile, Ala., and Pensacola, Fla., have also disqualified themselves from oil-spill cases. These judges, unlike Judge Barbier, recognize the need to avoid the appearance of impropriety and have demonstrated compliance with the canons of judicial conduct designed to maintain public confidence in the judiciary.

The JPML knowingly appointed a transferee judge to preside over MDL 2179 who should have recused himself. The JPML, however, carefully and conveniently points out in Footnote No. 4 of its Transfer Order of August 10, 2010, "The Panel, of course, has no authority to determine whether a particular judge should recuse himself or herself from presiding over a particular MDL."

## THE KENNETH R. FEINBERG FUND APPROACH

Victims' compensation funds should be evaluated by the core substantive values of democratic governance, which include the values of participation, accountability, transparency, rationality, personal autonomy, consent, equality, due process, and other social capital values necessary to promote civil society.[93]

Scholars have suggested that elements of procedural justice include: (1) whether procedures allow people an opportunity to state their case; (2) whether authorities are viewed as neutral, unbiased, honest, and principled in their decision making; (3) whether the authorities are seen as benevolent, caring, and trustworthy; and (4) whether the people involved are treated with dignity and respect.[94]

In short, the appropriate focus of a victims' compensation fund should be justice for the victims.

As noted above, the JPML states in its transfer order, "Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund."

Establishment of the Pseudo Fund

The BP compensation fund is not a "fund." It is in fact only a set-aside or promised commitment of assets by BP in an amount that on its face appears to be sufficient to settle claims arising from the blowout. BP committed twenty billion dollars in assets to "pay all legitimate claims" - a meaningless statement since the company, designated as a "Responsible Party" under the OPA, is legally obligated to pay all legitimate claims.

BP agreed to transfer funds at the anticipated rate of five billion dollars per year to bank accounts owned by BP and make announcements on what had been paid, but there was no "fund" if what one means by a fund is an entity with meaningful juridical independence, such as a trust fund.

-19-

Here, the obligations remain BP's and any funds that remain at the close will revert to BP. In reality, the BP compensation fund is a "liability cap" which BP unilaterally established.

Having determined the maximum amount (US$20 billion) that it would be willing to compensate claimants for damages resulting from the blowout, BP's next step was to select a politically well-connected person who, for a price, would be willing to say and do whatever was necessary to administer the fund ("enforce the liability cap"). BP selected Kenneth R. Feinberg.

Kenneth R. Feinberg refers to himself as the "Master of Disasters." Who is this humble soul?

Kenneth R. Feinberg worked for five years as an administrative assistant and chief of staff for U.S. Senator Ted Kennedy. There, he befriended the future Supreme Court Justice Stephen Breyer, then a fellow ambitious aide. Feinberg's political connections have opened doors for him throughout his career. Currently, he is the Chairman of the Board of Directors for the John F. Kennedy Library Foundation.

In addition to the "Master of Disasters," Feinberg describes himself, either directly or via third party promoters, as "a kind of Solomon after times of national crisis," "the pay czar," "the nation's arbitrator-in-chief," "an independent arbiter," "Mr. Fairness," "one of the singular figures in American legal history," "the Picasso of the legal field," "preeminent in achieving an effective resolution and preventing years of protracted, expensive, and uncertain litigation," and "a neutral claims administrator/evaluator in distributing the funds as specified in the settlement."

Feinberg is not the "Master of Disasters." He is, however, the "Master of Self-Promotion." "It's certainly a triumph of branding. There's no doubt about that," said George Conk, a law professor at Fordham University and an expert on torts law.[95]

Feinberg often dealt directly with claimants in a way that did not inform claimants that he represented BP - an apparent violation of the Rules of Professional Conduct. Rule 4.3 commands that when dealing with an unrepresented person "a lawyer shall not state or imply that the lawyer is disinterested."[96]

BP paid Feinberg approximately US$25 million to limit its liability ("administer the BP oil well blowout victims' compensation fund"). Feinberg was certainly not "disinterested."

<u>Feinberg's Strategy</u>
The agreement entered into between BP and Feinberg Rozen, LLP on June 15, 2010 clearly and repetitively states, "Feinberg Rozen shall follow OPA as it operates and administers the GCCF." "Feinberg Rozen's determinations with respect to OPA Claims will be guided by OPA." "The GCCF (and the protocols under which it operates) are structured to be compliant with OPA." "The GCCF claims process is structured to comply with OPA and apply the standards of OPA."[97]

The MDL 2179 court noted that "….the Gulf Coast Claims Facility ("GCCF"), spearheaded by Mr. Feinberg and his law firm, would replace the original BP claims process and *perform BP's obligations under OPA with respect to private economic loss claims*." "This Court has the responsibility to ensure that the mandates of OPA are implemented."[98]

On August 23, 2010, Kenneth R. Feinberg and Feinberg Rozen, LLP, doing business as GCCF, replaced the claims process which BP had established to fulfill its obligations as a Responsible Party pursuant to OPA.

Feinberg's Use of Coercion and Fraudulent Inducement Was in Violation of OPA
Kenneth R. Feinberg, in clear violation of OPA, used the fear of costly and protracted litigation to coerce victims of the BP oil well blowout to accept grossly inadequate settlements from GCCF. During town hall meetings organized to promote GCCF, Feinberg repeatedly told victims of the BP oil well blowout:

- "The litigation route in court will mean uncertainty, years of delay and a big cut for the lawyers."
- "I am determined to come up with a system that will be more generous, more beneficial, than if you go and file a lawsuit."
- "It is not in your interest to tie up you and the courts in years of uncertain protracted litigation when there is an alternative that has been created."
- "I take the position, if I don't find you eligible, no court will find you eligible."

Feinberg, in clear violation of OPA, repeatedly made the following false statement of material fact to induce victims of the BP oil well blowout to accept grossly inadequate settlements from GCCF:

- "The Gulf of Mexico will recover from the BP oil spill by the end of 2012."
- "Experts have determined that most of the oil would have dispersed and the economy picked up by the end of 2012."
- "There will be a 30% recovery in 2011."[99]

In violation of OPA, Feinberg's approach to determining claimant eligibility was driven by two factors: (1) loss location; and (2) claimant business type.[100]

The Ultimate Objective
Feinberg employed two tactics to limit BP's liability:
(a) a "Delay, Deny, Defend" tactic against legitimate BP oil well blowout victims. This tactic, commonly used by unscrupulous insurance companies, is as follows: "Delay payment, starve claimant, and then offer the economically and emotionally-stressed claimant a miniscule percent of all damages to which the claimant is entitled. If the financially ruined claimant rejects the settlement offer, he or she may sue;" and
(b) an "Expedited Emergency Advance Payment ("EAP") Denial" tactic. This tactic is as follows: "Fail to verify, investigate, and appraise the amount of loss claimed by the claimant in

the EAP claim and deny the EAP claim without ever requesting supporting documentation from the claimant."

The ultimate objective of Feinberg's "Delay, Deny, Defend" tactic and "Expedited EAP Denial" tactic was to limit BP's liability by obtaining a signed "Release and Covenant Not to Sue" from as many BP oil well blowout victims as possible.

The "Release and Covenant Not to Sue" requirement, which was Kenneth R. Feinberg's idea, forces economically and emotionally-stressed victims of the BP oil well blowout to sign a "Release and Covenant Not to Sue" in order to receive a miniscule payment amount for all damages, including future damages, they incur as a result of the BP oil well blowout. Feinberg's "Release and Covenant Not to Sue" requirement violates OPA, State contract law, and is contrary to public policy.[101]

The "Delay, Deny, Defend" tactic and "Expedited EAP Denial" tactic, although unconscionable, have proven to be very effective for Feinberg and BP.

Feinberg's "Release and Covenant Not to Sue" excluded approximately 220,000 BP oil well blowout victims from the MDL 2179 Economic and Property Damages Class Settlement Agreement.[102]

It is important to note that Congress never intended that a claimant's recovery of damages under OPA be limited by geographic bounds, pertain solely to certain business activities, or require a heightened and vague proof of causation between his or her damages and the oil spill incident.

OPA clearly prohibits Feinberg's "Release and Covenant Not to Sue."

Incredibly, the MDL 2179 Court still held:
(a) "While OPA does not specifically address the use of waivers and releases by Responsible Parties, the statute also does not clearly prohibit it;" and
(b) "In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill."[103]

This reasoning, while novel, is wrong for the following reasons.

The text and the legislative history of the OPA statute are clear. OPA clearly prohibits Responsible Parties from engaging in a "Delay, Deny, Defend" tactic wherein the victims of an oil well blowout are starved and ultimately forced to sign a "Release and Covenant Not to Sue" in order to receive an inadequate, miniscule payment amount for the damages, including future damages, they incur as a result of the oil well blowout.

As noted, "Shall" means shall. "The mandatory 'shall'….normally creates an obligation impervious to judicial discretion."[104]

-22-

Judge Barbier appears to believe that "shall" means "kind, sorta should."

The MDL 2179 court further notes it has recognized that "one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill." OPA requires more than merely "speedy and efficient." OPA requires that all BP oil well blowout victims are fully compensated. Furthermore, the purpose of the Federal Rules of Civil Procedure is "to secure the *just*, speedy, and inexpensive determination of every action and proceeding."[105]

In short, victims of the BP oil well blowout turn to the court in search of justice, not merely a "speedy and efficient" determination of their cases.

Efficiency is not the only touchstone of justice. A substantial body of opinion and a respect for jurisdictional principles suggest that a plaintiff ordinarily has a right to a trial in the forum of his or her choosing.[106] Aggregation of cases for the purpose of facilitating settlement is a byproduct of §1407, but is not its central statutory purpose.[107]

Judicial economy is undoubtedly well-served by MDL consolidation when scores of similar cases are pending in the courts. Nevertheless, the excessive delay and marginalization of juror fact finding (i.e., dearth of jury trials) associated with traditional MDL practice are developments that cannot be defended.[108]

The appropriate focus for fund resolution of mass claims should be justice for the claimants, not merely judicial economy and closure for the corporate misfeasor.

<u>A Kenneth R. Feinberg-Administered Claims Program Is a Cancer Which is Metastasizing</u>
A Feinberg-administered claims program, like the GCCF, ought to be viewed with a significant degree of concern. The precedent established by the JPML and the MDL 2179 Court is clear: A "Responsible Party" under OPA may now enter into a contract with a politically well-connected third party "Fund Administrator," e.g., Kenneth R. Feinberg and Feinberg Rozen, LLP, d/b/a GCCF. This third party "Administrator / Straw Person," *directly and excessively compensated by the party responsible for the oil well blowout incident*, may totally disregard OPA, operate the claims process of the responsible party as fraudulently and negligently as it desires for the sole purpose of limiting the liability of, and providing closure to, the responsible party, and the third party "Administrator / Straw Person" shall never be held accountable for its tortious acts.

**The BP Oil Well Blowout PSC**
On August 10, 2010, Judge Barbier issued Pretrial Order No. 1 wherein he states, "The Court expects, indeed insists, that courteous cooperation permeate this proceeding from now until this litigation is concluded…..The Court recognizes that cooperation by and among plaintiffs' counsel and by and among defendants' counsel is essential for the orderly and expeditious resolution of this litigation….It is the Court's intent to appoint a Plaintiffs' Steering Committee ("PSC") to conduct and coordinate the discovery stage of this litigation with the defendant's representatives or committee….The main criteria for membership in the PSC will be: (a) willingness and availability to commit to a time-consuming project; (b) ability to work

cooperatively with others; and (c) professional experience in this type of litigation….The Court will only consider attorneys who have filed a civil action in this litigation."

In short, the main criteria for membership in the MDL 2179 PSC is very simple:
(a) The attorney must be "cooperative;"
(b) The attorney must be a "repeat player;" and
(c) The attorney must have signed-up a large stable of clients which he or she is already directly representing.

On October 8, 2010, Judge Barbier issued Pretrial Order No. 8 wherein, in his sole discretion and without providing any reason for his selection, he appointed the following fifteen members to the MDL 2179 PSC: Brian H. Barr, Jeffrey A. Breit, Elizabeth J. Cabraser, Philip F. Cossich, Jr., Robert T. Cunningham, Alphonso Michael Espy, Calvin C. Fayard, Jr., Robin L. Greenwald, Ervin A. Gonzalez, Rhon E. Jones, Matthew E. Lundy, Michael C. Palmintier, Paul M. Sterbcow, Scott Summy, and Mikal C. Watts. Allegedly, these 15 attorneys were selected by Judge Barbier from a pool of 112 well-qualified applicants. On October 5, 2011, Judge Barbier issued Pretrial Order No. 46 wherein he appointed Joseph F. Rice and Conrad S. P. Williams to the PSC.

Additionally, Judge Barbier appointed Plaintiffs Liaison Counsel, James Parkerson Roy (The law firm of Domengeaux Wright Roy & Edwards) and Stephen J. Herman (The law firm of Herman, Herman, Katz & Cotlar, L.L.P.), together with Brian Barr (The Law Firm of Levin Papantonio Thomas Mitchell Rafferty & Proctor, P.A.) and Scott Summy (The Law Firm of Baron & Budd, P.C.), to comprise the Plaintiff Executive Committee.

In his Order, Judge Barbier explained that it shall be the Executive Committee's duty to coordinate the responsibilities of the PSC, schedule PSC meetings, keep minutes or transcripts of these meetings, appear at periodic court noticed status conferences, perform other necessary administrative or logistic functions of the PSC, act on behalf of the PSC between PSC meetings, and carry out any other duty as the Court may order.

In short, Judge Barbier's Order vests the PSC with complete control over the course of the litigation.

## HOW BP AVOIDED STRICT LIABILITY
Allegedly, in order to efficiently manage MDL 2179, the court consolidated and organized the various types of claims into several "pleading bundles" for the purpose of the filing of complaints, answers and any Rule 12 motions.[141]

The "B1" pleading bundle includes all claims for private or "non-governmental" economic loss and property damages. There were in excess of 100,000 individual claims encompassed within the "B1" pleading bundle. On December 15, 2010, in accordance with Case Management Order No.1, the PSC filed a "B1" Master Complaint.

On January 12, 2011, the MDL 2179 Court issued PTO No. 25, in order to clarify "the scope and effect" of the "B1" Master Complaint. The Court held that any individual plaintiff who is a named plaintiff in a case that falls within pleading bundle "B1" "is deemed to be a plaintiff in the "B1" Master Complaint. Also, "the allegations, claims, theories of recovery and/or prayers for relief contained within the pre-existing petition or complaint are deemed to be amended, restated, and superseded by the allegations, claims, theories of recovery, and/or prayers for relief in the respective "B1" Master Complaint(s) in which the defendant is named."

On February 9, 2011, the PSC filed a First Amended Master Complaint.[142]

Rather than allege claims under the Oil Pollution Act of 1990 ("OPA") (which governs the MDL 2179 cases alleging economic loss due to the BP oil well blowout) and the Outer Continental Shelf Lands Act ("OCSLA") (which governs the MDL 2179 personal injury and wrongful death actions and borrows the law of the adjacent state as surrogate federal law), the "cooperative" PSC made the unfathomable decision to allege claims under a hodgepodge of statutes.

In the "B1" First Amended Master Complaint, the PSC states, "The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiffs hereby designate this case as an admiralty or maritime case, and request a non-jury trial, pursuant to Rule 9(h)."

The PSC points out that the "B1" Master Complaint "is submitted pursuant to the MDL 2179 court's Case Management Order No. 1 as: (1) an administrative device to serve the functions of efficiency and economy; and (2) to present certain common claims and common questions of fact and law for appropriate action by the MDL 2179 court, including class certification and trial, in the context of this multidistrict proceeding."

The PSC appears to be more interested in ensuring significant judicial economy and efficiency in the administration of the MDL 2179 court rather than in obtaining justice for the MDL 2179 plaintiffs. As noted above, in its "B1" First Amended Master Complaint, the PSC alleges claims under general maritime law, not under OPA (a strict liability statute) and OCSLA, thereby assisting Judge Barbier in expeditiously being able to:

(a) Erroneously find, "The *Deepwater Horizon* was at all material times *a vessel in navigation.*"

(b) Erroneously find, "Admiralty jurisdiction is present because the alleged tort occurred upon navigable waters of the Gulf of Mexico, disrupted maritime commerce, and the operations of the vessel *bore a substantial relationship to traditional maritime activity*. With admiralty jurisdiction comes the application of substantive maritime law."

(c) Erroneously find, "State law, both statutory and common, is preempted by maritime law, *notwithstanding OPA's savings provisions*. All claims brought under state law are dismissed."

(d) Erroneously find, "General maritime law *claims that do not allege physical damage to a*

-25-

*proprietary interest are dismissed* under the *Robins Dry Dock* rule, unless the claim falls into the commercial fishermen exception."

Note: Moreover, the maritime rule in the Fifth Circuit is that operational recklessness or willful disregard is generally insufficient to visit punitive damages upon the employer. Rather, the conduct must emanate from corporate policy or that a corporate official with policy-making authority participated in, approved of, or subsequently ratified the egregious conduct. Accordingly, the MDL 2179 Court concluded that BP cannot be held liable for punitive damages under general maritime law. Judge Barbier further noted that, even if BP were liable for punitive damages, only commercial fishermen or those who could satisfy the "physical injury" threshold of the *Robins Dry Dock* rule would be entitled to such an award.

(e) Erroneously and incomprehensibly find, "…. That nothing prohibits Defendants from settling claims for economic loss. While OPA does not specifically address the use of waivers and releases by Responsible Parties, *the statute also does not clearly prohibit it*. In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill."[143]

Since the PSC requested a non-jury trial pursuant to Rule 9(h) and alleged claims under general maritime law, rather than OPA and OCSLA, the MDL 2179 court formulated a trial plan that dispensed with trial by jury and instead conducted a bench trial applying general maritime law.

While the PSC attorneys should have relied upon the OPA to recover the bulk of the economic losses incurred as a result of the BP oil well blowout, they also asserted a variety of state common law and statutory claims seeking additional compensatory and punitive damage awards.[144] These tort claims, including actions for trespass, nuisance, strict liability, and fraudulent concealment, were made based upon a savings clause in the OPA which provides, in relevant part, that "nothing in this Act….shall affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under…..State law, including common law."[145]

Judge Barbier, the "cooperative" transferee judge appointed by the JPML to the MDL 2179 court, dismissed all state common law and statutory claims, finding that these state law claims were preempted by federal maritime law, *notwithstanding the OPA's savings provisions*.[146]

OPA/OCSLA and General Maritime Law
Professor John J. Costonis is Professor of Law and former Chancellor at LSU Law Center. His research interests concern the role of federal environmental/maritime pollution law under such statutes as the Clean Water Act, the Outer Continental Shelf Lands Act, and the Oil Pollution Act of 1990 in relation both to federal admiralty and general maritime law and to the reserved police power of the states. He is one of the very few legal experts to question whether the BP oil well blowout of April 20, 2010 qualifies as an admiralty tort.

The Fifth Circuit's self-confessed appetite for the "reflexive invocation of admiralty jurisdiction," has been problematic.[176] The admiralty-aggressive outcomes of the Fifth Circuit are embraced and taken to the extreme by the collusive MDL 2179 court.

Why the "B1" Master Complaint is a Product of Collusion

OCS drilling operations and their governance are post-1950 developments that feature environmental, public safety, and liability allocation issues of profound scientific, economic, legal, and policy complexity.[186] Congress and federal agencies have been addressing these issues through myriad statutes, including OCSLA and OPA, that are grounded in the Property and Interstate and Foreign Commerce clauses, not in the Admiralty Clause.[187]

The BP oil well blowout most surely is the worst environmental-oil pollution discharge disaster in the nation's history. Judge-made general maritime law has proven itself no match for assessing or addressing an event of this character and magnitude. Were general maritime law up to the task, of course, there would have been no need for the federal government's lengthy, recurring efforts to detail the contours of a private cause of action, such as that originally defined in OCSLA's former title III, and since carried over into OPA.[188]

The question is whether the BP oil well blowout is an admiralty tort.

Historically, the U.S. Supreme Court has objected to "fortuitous, "perverse" or "absurd" results that may result from pinning the admiralty tail on disputes for which admiralty can claim no expertise. The U.S. Supreme Court undertook to discourage this practice in *Executive Jet Aviation Company v. City of Cleveland* by requiring a "substantial relationship" connecting the matter in question "to traditional maritime activity." "In determining whether there is admiralty jurisdiction over a particular tort or class of torts," the Court stated, "reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than a purely mechanical application of the locality test." Consonance requires that admiralty law, which Justice Holmes correctly described as a "very limited body of customs and ordinances of the sea," possesses the accumulated expertise with and experience in the matter in question to warrant passing judgment on the matter.

Hence, the Court's observation that "through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage and claims for salvage." Applying this criterion to an airline accident, it reasoned that admiralty law was not the appropriate choice because admiralty's "rules and concepts" are "wholly alien to air commerce." It assigned to "the familiar concepts of state tort law" a situation it deemed only fortuitously and incidentally connected to navigable waters and which bears no relationship to traditional maritime activities.[216]

General maritime law's judge-made principles do not enjoy a presumption against displacement by a federal statute. Despite idealized assertions of admiralty's capacity to resolve complex social or economic issues, the reality, as Justice Holmes counseled, is that general maritime law

is not a "corpus juris," but "a very limited body of customs and ordinances of the sea." Although committed to uniformity as the lodestar for resisting incursions on admiralty law, Robert Pelz readily agrees to an exception in the marine pollution sphere because "traditional maritime law simply does not address environmental or pollution disasters either because these issues did not exist in the past or were not considered important."[217]

It has fallen to Congress to formulate the federal pollution liability and compensation regime and to deputize numerous federal agencies to aid in its implementation. As Pelz recognizes, general maritime law simply lacks: the capacity or expertise, experience, and engagement to address purposes for which Congress designed the regime. The magnitude of the April 2010 BP oil well blowout in the Gulf of Mexico should have driven this point home for the MDL 2179 court.

It would be anomalous, moreover, to favor maritime law over OPA in light of the U.S. Supreme Court's endorsement in *Rodrigue* of congressional testimony that application of maritime law would be unwise because "maritime law in the strict sense has never had to deal with the resources in the ground beneath the sea, and its whole tenor is ill adapted for that purpose."[218]

The MDL 2179 Court's orders and reasoning are contrary to U.S. Congressional intent, the OCSLA, the OPA and U.S. Supreme Court decisions. The only logical conclusion is that they are the product of collusion.

<u>The MDL 2179 Court</u>
Pursuant to the MDL 2179 Court's Pretrial Order No. 15, "Pending further orders of this Court, all pending and future motions, including Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court." Furthermore, pursuant to the MDL 2179 Court's Pretrial Order No. 25, "All individual petitions or complaints that fall within Pleading Bundle "B1," whether pre-existing or filed hereafter, are stayed until further order of the Court."

In short, my clients are being indefinitely held hostage by the BP oil well blowout MDL Court. Escape is impossible.

The combined amount of judicial resources in: (a) the Florida state courts, (b) the U.S. District Court for the Middle District of Florida, (c) the United States Judicial Panel on Multidistrict Litigation, and (d) the MDL 2179 court which have already been unjustifiably wasted by Feinberg, et al. is reprehensible.

**THE AGREEMENT-IN-PRINCIPLE**
On March 2, 2012, the Court was informed that BP and the PSC had reached an Agreement-in-Principle on the proposed settlements.

On March 9, 2012, the MDL 2179 PSC released a summary of the agreement-in-principle allegedly entered into between Plaintiffs and BP. The summary states the following.

-28-

"OVERALL

(1) This Settlement is an *enormous victory* for Gulf Coast workers, businesses and families.

(2) The Settlement *does the most good for the greatest number of people* - encompassing the wide geographic region and many types of businesses affected by the BP Gulf Oil Spill.

(3) Contrary to what some news outlets have implied, the Settlement has *no cap or limit*. The only exception is the Seafood Program for commercial fishing vessel owners, captains and deckhands. BP has agreed to fund this Seafood Program at US$2.3 billion.

(4) The Settlement *holds BP accountable* - and still permits punitive damage and certain assigned claims to be pursued against Transocean and Halliburton.

(5) The parties *have not had any fee discussions to date* and will not have any such discussions until authorized to do so by the Court. The parties contemplate that such discussions will result in an agreement to pay attorneys' fees and costs for the Common Benefit of the Class as part of the settlement, over and above the claimants' recoveries, subject to Court approval.

(6) Many qualifying claimants may receive greater benefits from the Settlement Claims Programs than from the GCCF (as detailed more fully below).

(7) *Hundreds of thousands of victims of the BP Gulf Oil Spill will be made whole* as a result of this settlement - regardless of whether or not they previously joined the MDL lawsuit or filed a claim with the GCCF.

(8) The Settlement is comprised of two separate and distinct class actions: an Economic and Property Damages Class and a Medical Class, each with its own separate Claims Program.

(9) During a six-to-eight week Court-supervised transition period, the GCCF will be closed down and the new Settlement Claims Program for Economic and Property Damage Claims will be set up. Claims will continue to be processed during the transition period to ensure a seamless experience for claimants.

(10) Once the Settlement Claims Programs are set up, the Court will continue to supervise their operation in all respects throughout their duration to *ensure fairness, transparency, and efficiency*.

(11) Administration of the Settlement Claims Programs will be centralized locally, to ensure that it is fully accessible to claimants and accountable to the Court. The Claims Administrator will be a local, the Settlement Claims centers will be located in the Gulf region, and claims will be evaluated here, by *locals familiar with the unique characteristics and rhythms of the Gulf Coast economy*.

(12) A US$57 million marketing fund will be established to promote tourism and Gulf seafood.

(13) Accounting services incurred in the preparation of claims will be reimbursed on an approved scale and made available through class counsel.

Why the Settlement Claims Programs Are Fair
(1) The Settlement process and formulas used to calculate compensation will be *completely transparent* and applied with consistency.

(2) The Court will supervise the Settlement Claims process from start to finish to *ensure fair, impartial, and consistent processing and payment of claims*.

(3) Claimants, their accountants, and their lawyers will know the compensation formulas and *will be able to calculate compensation for specific claims before deciding whether to opt-out* or participate in the Settlement.

(4) The compensation *calculations have been carefully determined* to account for relevant economic factors and are flexible to each claimant's specific circumstances.

(5) The Settlement Claims Program will generally apply a larger enhancement to *account for potential future losses* and other risks than did the GCCF.

(6) Offsets for amounts already received from BP or the GCCF are deducted after the enhancement for future losses is applied.

(7) A Class Member *can choose to opt-out of the Settlement and instead prosecute their case in Court*. But if that Class Member changes his mind before a certain deadline, he can revoke his choice to opt-out, and can rejoin the Settlement.

(8) Businesses and individuals that are not Class Members, or whose claims are not included in the Settlement, *can generally continue to prosecute their cases in Court*.

More Details on the Economic and Property Damages Settlement Claims Program
(1) The Economic and Property Damages Settlement Claims Program is more expansive than the GCCF and will compensate more businesses and individuals for a broader array of claims than did the GCCF.

(2) Entire categories of economic and property damage claims not covered by the GCCF are included in the Economic and Property Damages Settlement, including:
(a) The loss of use and enjoyment of real property located in coastal regions;
(b) Property damage caused by oil spill cleanup activity;
(c) Losses from the sale of real property in coastal regions; and
(d) Oil- and cleanup-related damage to real property in wetlands areas.

(3) The Economic and Property Damages Settlement provides greater flexibility by allowing claimants to choose the Benchmark Period of pre-spill revenues against which post-spill losses will be measured.
(a) Settlement Claimants may use 2009; an average of 2008-2009; or an average of 2007-2009, whichever is more favorable.
(b) The choice of one, two, or three year averages allows claimants to select a Benchmark Period that most accurately reflects pre-spill revenues, and eliminates or reduces distortion related to the general economic downturn in 2009 and other extraneous factors.

(4) The Economic and Property Damages Settlement also allows claimants flexibility in defining their period of post-spill loss:
(a) Claimants can choose *any three or more consecutive months between May and December 2010 as their loss period.*
(b) This means claimants can exclude outlier months that, if included, might unfairly dilute the true severity of the spill's impact on the claimant's revenues. Unlike the GCCF, The Economic and Property Damages Settlement also provides that pre-spill growth trends will be considered. It includes factors addressing, pre-spill economy-wide growth expectations; and
(c) a particular claimant's unique pre-spill growth trends for claimants that can document such growth.

(5) The Settlement Claims *Program's Risk Transfer Premium ("RTP") enhances the compensation amount* for, among other things, certain claimants whose damages could be recurring, to account for that risk of future damages:
(a) The RTP is specifically calculated to account for factors unique to each category of claim.
(b) Unlike a simple multiplier, the RTP enhancement is a formula that calculates the product of RTP number and the base compensation amount, and then adds that product back to the base compensation amount. In other words, an RTP of 2 does not just double the base compensation amount, as a simple multiplier would - it doubles the base compensation amount and then adds that doubled number to the original base compensation amount - thus an RTP of 2 would be comparable to a multiplier of 3."

It is important to realize that *the plaintiffs* did not "reach an Agreement-in-Principle on the proposed settlements." The MDL 2179 PSC and BP entered into a court-sanctioned, mutually beneficial settlement. The plaintiffs in MDL 2179 were merely a commodity bargained for and sold by the PSC to BP.

After reading this book, I ask you to return and re-read this summary. This summary of the agreement-in-principle by the MDL 2179 PSC is so blatantly false and misleading that it borders on being comical. It may be suitable material for a SNL skit but it is certainly not representative of the settlement which was entered into by the MDL 2179 PSC and BP. The MDL 2179 PSC/BP settlement is not "an enormous victory for Gulf Coast workers, businesses and families."[231]

-31-

**THE PRELIMINARY APPROVAL ORDER**

"This is, unlike most mass torts, a single-incident disaster, governed predominantly by a single body of federal law including OPA and uniform federal maritime law ....In the absence of settlement,.... liability would be determined predominantly under a single body of federal statutory and/or common law." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 6418 at 28, May 2, 2012).

On May 2, 2012, the MDL 2179 Court issued a "Preliminary Approval Order as to the Proposed Economic and Property Damages Class Action Settlement." The following are excerpts from the 47-page Order.

After this brief synopsis, I will discuss why I believe Judge Barbier's reasoning is flawed.

First, it is important to understand that "settlement class action" means a case certified as a class action *solely* for settlement.

Judge Barbier, in his Preliminary Approval Order, incomprehensibly states, "However, extended litigation between or among adversaries, *as occurred here*, might bolster confidence that the settlement negotiations were at arm's length."[246]

"If, by contrast, the case is filed as a settlement class action or certified for settlement with little or no discovery, it may be more difficult to assess the strengths and weaknesses of the parties' claims and defenses, to determine the appropriate definition of the class, and to consider how class members will actually benefit from the proposed settlement....If the case has been litigated extensively, the judge may have sufficient reliable information to determine whether the class should be certified and whether the settlement terms are the fair, reasonable, and adequate result of arms-length negotiations."[247]

Judge Barbier emphasizes, in his opinion, "The Parties engaged in a multi-month, extensive, arms-length settlement process, *free of collusion*...The Parties engaged in substantial discovery and motion practice to evaluate the merits of the claims and defenses and extensively investigated and analyzed the facts and legal issues surrounding those claims and defenses. Pretrial discovery and trial preparation included approximately 311 depositions, the production, review, and analysis of millions of documents; the retention and discovery of numerous scientific, technical, and industry experts; and the extensive associated investigation and analyses of the facts and legal issues surrounding relevant claims and defenses....Over the course of these many months, the parties' counsel, assisted and informed by experts and colleagues with specialized knowledge of various aspects of the litigation and the array of claims categories, engaged in numerous and ongoing settlement discussions and negotiation sessions, both in person and via telephone conference. During these lengthy settlement negotiations, which commenced in February 2011 and continued for more than one year, the parties negotiated the detailed, complex, and carefully thought-out claims categories and benefits of this settlement."

Judge Barbier further explains, in his opinion, "The comprehensive system of claims frameworks featured in the Settlement Agreement is the product of many months of intensive negotiation, *provides for class recovery unlimited by any aggregate cap, does not constitute a limited fund to be divided among competing claimants* (with the sole exception of the US$2.3 billion Seafood Compensation Program, whose allocation was placed with a court-appointed neutral), and does not place class members in conflict or competition with each other. The settlement thus provides 'a procedure for distribution of the settlement fund that treats class claimants equitably amongst themselves.'"

Any Class Counsel fees and costs awarded by the Court will not be deducted from Class Members' recoveries or their private attorneys' fees but, according to Judge Barbier, will be paid by BP in addition to other class benefits.

Judge Barbier concludes, "At this stage, the Settlement Agreement appears fair, has no obvious deficiencies, does not improperly grant preferential treatment to the Class Representatives or to segments of the Class, and *does not grant excessive compensation to attorneys*. It falls within the range of possible judicial approval."

This preliminary approval is subject to further and final consideration at a Fairness Hearing, which shall be held at 8:30 a.m. on November 8, 2012.

**WHY JUDGE BARBIER'S REASONING IS FLAWED**
The following are 17 examples of Judge Barbier's flawed reasoning.

Example No. 1
"The class would consist of individuals and entities defined by (1) geographic bounds and (2) the nature of their loss or damage. If both criteria are not met, or the individual or entity opts out of the class, then the individual or entity is not within the settlement class….Individuals must have lived, worked, owned property, leased property, etc., in these areas between April 20, 2010 and April 16, 2012. Similarly, entities must have conducted certain business activity in these areas between April 20, 2010 and April 16, 2012."

"Moreover, OPA applies of its own force, because that act governs, *inter alia*, private claims for property damage and economic loss resulting from a discharge of oil in navigable waters." *See* 33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)."
     The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 3830 at 11, August 26, 2011).

The U.S. Senate explains, "OPA is a comprehensive statute addressing responsibility for oil spills, including the cost of clean-up, liability for civil penalties, as well as economic damages incurred by private parties and public entities. Indeed, the 1989 Senate Report provides that the Act 'builds upon section 311 of the Clean Water Act to create a single Federal law providing cleanup authority, penalties, and liability for oil pollution.'"[260]

-33-

It is obvious to any reasonable person that the MDL 2179 proposed settlement violates the OPA statute by defining class members by geographic bounds and certain business activities while requiring proof of a heightened, vague standard of causation.

Example No. 2
"The Proposed Settlement would replace the GCCF with a 'Court Supervised Settlement Program.'"

This statement is simply false and misleading. The "Court Supervised Settlement Program" does not actually replace the GCCF. The new and improved "Court Supervised Settlement Program" is the GCCF. The only difference between the GCCF and the "Court Supervised Settlement Program" is the fact that Kenneth R. Feinberg is replaced by Patrick Juneau as the claims administrator. Under the "Court Supervised Settlement Program," the evaluation and processing of claims shall continue to be performed by Garden City Group, Inc., BrownGreer, PLC, and PricewaterhouseCoopers, LLP. Accordingly, there is no reason to believe that the percentage of claimants denied payment and the average total amount paid per approved claimant will change under the Juneau-administered "Court Supervised Settlement Program."

Example No. 3
"The PSC and BP note that the Proposed Settlement is different from many other class settlements in that payments are not delayed pending the Court's fairness hearing and final approval process."

The PSC and BP are correct. This proposed settlement is different from any other class settlement. The payments are not delayed pending the court's fairness hearing and final approval process. During this period, the payments to some plaintiffs are intentionally increased and accelerated in order to mislead the remaining plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate." How do you say "judicially-sanctioned fraudulent inducement" in Cajun French?

Remember the admission by Judge Barbier on November 10, 2014, "….as the parties were approaching the final fairness hearing in November 2012, there was a concerted effort by the parties and claims facility to process a substantial number of high value claims in order to demonstrate that the settlement program was working as intended….BP and Class Counsel were aware of the push to resolve claims, as was the Court. Although some of these claims were for clients of PSC members, according to Mr. Juneau over 60% of the claims were for clients of non-PSC attorneys….While the Settlement Agreement in general terms provides that claims will be processed in the order in which they are received….there is no evidence that the Claims Administrator acted improperly in this regard."

Notwithstanding the collusive efforts to mislead the plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate," approximately 13,000 individuals and entities wisely submitted timely requests to opt-out of the E&PD Settlement Class.

Example No. 4
"In addition to baseline compensation payments, some claims also will receive a Risk Transfer Premium ("RTP"), which is a multiple of the baseline compensation ….there is no limit on the amount to be paid by BP….RTP payments are meant to compensate class members for pre-judgment interest, the risk of oil returning, consequential damages, inconvenience, aggravation, the risk of future loss, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors."

This settlement agreement is a business deal entered into between the PSC and BP for the benefit of both parties. This deal was consummated behind closed doors. Although there is no stated limit on the amount that BP is willing to pay, there is an absolute limit (US$20 billion) that BP is willing to pay. Otherwise, the defendant would not have agreed to the settlement terms and conditions. More importantly, the MDL 2179 Court conveniently fails to mention that although there is no stated ceiling, there is also no stated floor. BP is not obligated to pay any amount. BP and the PSC may argue that certain claims are not legitimate and the PSC may clawback "fraudulent" payments previously paid to BP oil well blowout victims.

Also, let's be honest for a moment. If the Honorable MDL 2179 Court believes magical RTP payments truly "compensate class members for pre-judgment interest, the risk of oil returning, consequential damages, inconvenience, aggravation, the risk of future loss, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors," the Honorable MDL 2179 Court, the MDL 2179 PSC and PricewaterhouseCoopers are all living in La La Land.

Example No. 5
"Causation is presumed for some claimants; other claimants must demonstrate that a loss is due to the oil spill as outlined by the Proposed Settlement."

This is nonsensical. The OPA is a *strict liability* statute. In order to recover damages under OPA, a claimant merely needs to show that his or her damages "resulted from" the oil spill or oil well blowout.

Example No. 6
"For existing businesses, economic loss claims are determined using a two-step process. Step one calculates the value of the business's reduction in profit during a claimant-selected loss period (any three or more consecutive months of the eight months following the spill). Step two accounts for expected profits by estimating the business's growth trend along with a general, economy-wide growth factor."

Here, again, the Honorable MDL 2179 Court completely and conveniently ignores the OPA. The "claimant-selected loss period (any three or more consecutive months of the eight months following the spill)" contravenes the OPA. "Expected profits by estimating the business's growth trend along with a general, economy-wide growth factor" contravenes the OPA and is merely more obfuscation on the part of the magical accounting firm PwC.

-35-

As explained previously in this book, the damages referred to in the OPA 33 U.S.C. § 2702(a) include, but are not limited to: "Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which ***shall*** *be recoverable by any claimant*."[262]

Example No. 7
"Finally, BP has agreed to pay any award for common benefit and/or Rule 23(h) attorneys' fees, as determined by the Court, up to US$600 million….the parties began negotiating this amount only after there was agreement on all material terms of this Proposed Settlement and….that information had been delivered to the Court."

I am lost for words. Who in the world would believe that "the parties began negotiating this amount only after there was agreement on all material terms of this Proposed Settlement and….that information had been delivered to the Court?" BP would factor the US$600 million payment "for common benefit and/or Rule 23(h) attorneys' fees," into the total amount BP would be willing to pay to settle this matter. The attorneys' fees had to be part of the backroom negotiations.

Example No. 8
"Approval of settlement class actions under Rule 23(e) requires closer judicial scrutiny than approval of settlements reached only after class certification has been litigated through the adversary process….However, 'extended litigation between or among adversaries,' as occurred here, 'might bolster confidence that the settlement negotiations were at arm's length.'"

"Extended litigation between or among adversaries" did not occur in this case. Negotiations were not at arm's length.

Litigation, extended or otherwise, never occurred in this case. The purpose of MDL 2179 is to make a judicially efficient deal which benefits BP and the PSC. The purpose of MDL 2179 is not to seek justice for the victims of the BP oil well blowout. The PSC and BP were never adversaries. Not a single bellwether trial was held in MDL 2179. The PSC certainly did not zealously advocate on behalf of the plaintiffs. In its transfer order the JPML instructs the transferee court to facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund. In short, the MDL 2179 Court is being instructed to limit BP's liability by sanctioning Feinberg's "Release and Covenant Not to Sue" tactic which excluded approximately 220,000 claimants from the settlement class action. Moreover, rather than allege claims under the OPA, a strict liability statute, the "cooperative" PSC made the unfathomable decision to allege claims under a hodgepodge of statutes. As noted above, in the "B1" First Amended Master Complaint, the PSC states, "The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiffs hereby designate this case as an admiralty or maritime case, and request a non-jury trial, pursuant to Rule 9(h)." The PSC was concerned that a jury may not be "cooperative."

Example No. 9
"The Court preliminarily and conditionally finds, for settlement purposes only, that the terms of the Proposed Settlement are sufficiently fair, reasonable, adequate, and consistent with governing law."

Any settlement class action which illegally excludes approximately 220,000 claimants, requires that a claimant's recovery of damages under OPA be limited by geographic bounds, pertain solely to certain business activities, and demands a heightened and vague proof of causation between his or her damages and the oil well blowout incident is not "fair, reasonable, adequate, and consistent with governing law."

In addition, although it may be judicially efficient to do so, the terms of this proposed settlement cannot be evaluated in a vacuum. Feinberg's "Release and Covenant Not to Sue" requirement violates OPA, State contract law, and is contrary to public policy.

Releases, compromises and settlement agreements are *contracts* and the rules of construction applicable to *all* contracts are used in the interpretation of such agreements.[265]

Whether a compromise, settlement or release is a *valid* contract between the parties is determined by reference to State substantive law governing contracts generally.[266] Whether a contract or a contractual provision is unconscionable or unenforceable on grounds of illegality or public policy is a question of law.[267]

In examining whether a contract is unconscionable, the court must determine whether one party lacked a meaningful choice and the contract terms were unreasonably favorable to the other party.[268]

Kenneth R. Feinberg's "Release and Covenant Not to Sue" violates State contract law and is contrary to public policy because it:
  (a) was obtained through the use of economic duress;
  (b) was obtained without free consent (Claimants did not consent to the release by *choice*, because the *only option* for receiving payment required Claimants to sign a release, the terms of which they had no opportunity to negotiate.);
  (c) was obtained through fraud;
  (d) requires Claimants to discharge, waive and release future claims (including those resulting from gross negligence) for costs and damages (including punitive damages) that are unknown and have not yet arisen. As Judge Barbier clearly states in his Order of August 26, 2011, "*The long term effects [of the BP oil well blowout] on the environment and fisheries may not be known for many years*;" (p. 31, Rec. Doc. 3830)
  (e) was obtained in exchange for inadequate consideration; and
  (f) has as its objective the circumvention of the OPA.

Accordingly, Kenneth R. Feinberg's "Release and Covenant Not to Sue" is void *ab initio*.[269]

Example No. 10

"The Court is further satisfied that, pursuant to the terms of the Proposed Settlement, Class Members who opt-out or who possess reserved claims will be able to pursue those claims effectively outside the Class Settlement."

On November 5, 2010 the MDL 2179 Court issued PTO No. 15 which states, "All pending and future motions, including the Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court."

On January 12, 2011, the MDL 2179 Court issued PTO No. 25 which states, "Any individual plaintiff who is a named plaintiff in a case that falls within Pleading Bundle B1, B3, D1, or D2, or any combination thereof, is deemed to be a plaintiff in the applicable Master Complaint(s)....All individual petitions or complaints that fall within Pleading Bundles B1, B3, D1, or D2, whether pre-existing or filed hereafter, are stayed until further order of the Court."

The MDL 2179 Court and the PSC made, and continues to make, it very clear that the settlement class action is the only game in town. Take it or leave it. It has been approximately seven years since the BP oil well blowout. PTO No. 15 and PTO No. 25 are still in force. Class Members who opted-out are still not able to pursue their claims.

Justice may be optional but judicial efficiency shall not be denied in MDL 2179!

Example No. 11

"Adequacy: "Rule 23(a)(4) is satisfied where: (1) the named plaintiffs' counsel will prosecute the action zealously and competently; (2) the named plaintiffs possess a sufficient level of knowledge about the litigation to be capable of taking an active role in and exerting control over the prosecution of the litigation....Here, the class representatives....will fairly and adequately protect the interests of the class....and are represented by qualified counsel who are competent to represent the Class and prosecute this litigation."

At the risk of being overly repetitive, the named plaintiffs' counsel (the PSC) never intended to prosecute this action zealously and competently. MDL 2179 is not a litigation. It is "Let's Make a Deal" hosted by a federal judge.

Example No. 12

"A class action procedure....is available here, and it is superior to other available methods for fairly and efficiently resolving this controversy. Rule 23(b)(3)'s superiority requirement is satisfied."

This settlement class action is not superior to the OPA (a strict liability statute). The only reason this settlement class action is available is because the cooperative PSC designated the "B1" Master Complaint as an admiralty or maritime case in order to limit BP's liability.

Example No. 13
"The Court preliminarily approves the….Settlement Agreement….as fair, reasonable, adequate, entered in good faith, *free of collusion*, and within the range of possible judicial approval….The Parties engaged in a multi-month, extensive, arms-length settlement process, free of collusion."

If this were the case, there would be no need to write this book.

Example No. 14
"Any Class Counsel fees and costs awarded by the Court will not be deducted from Class Members' recoveries or their private attorneys' fees, but will be paid by BP in addition to other class benefits."

This is also nonsensical. BP negotiated a settlement for a total sum certain. BP does not care if the total sum certain, or any lesser amount, is paid to the attorneys or the plaintiffs. In short, any fees not paid to the PSC attorneys would have been paid as compensation to the plaintiffs. This settlement, from BP's point of view, is a zero sum game.

Example No. 15
"The Settlement Agreement appears fair, has no obvious deficiencies ….does not grant excessive compensation to attorneys."

Again, although it may be judicially efficient to do so, the terms of this proposed settlement cannot be evaluated in a vacuum.

As explained later in the book, members of the MDL 2179 PSC "quadruple dip." The PSC members are compensated from at least four sources of revenue:
(a) Six percent (6%) of the gross monetary settlements, judgments or other payments made on or after December 30, 2011 through June 3, 2012 to any other plaintiff or claimant-in-limitation;
(b) BP has agreed to pay any award for common benefit and/or Rule 23(h) attorneys' fees, as determined by the Court, up to US$600 million;
(c) Contingent fees from clients directly "represented" by the PSC members; and
(d) Co-counsel fees received by members of the PSC for serving as co-counsel to non-member firms of the PSC.

Example No. 16
"All Economic Loss and Property Damage Class Members who do not timely and properly Opt-Out shall, in all respects, be bound by all terms of this Agreement and the Final Order and Judgment, and shall be permanently and forever barred from commencing, instituting, maintaining or prosecuting any action based on any Released Claim against any Released Parties in any court of law or equity, arbitration tribunal, administrative proceeding, or other forum."

This contravenes the intent of Congress in regard to the OPA. It is unfortunate for the victims of the BP oil well blowout that the MDL 2179 Court believes that the OPA is so judicially inefficient.

Example No. 17
"This is, unlike most mass torts, a single-incident disaster, governed predominantly by a single body of federal law including OPA and uniform federal maritime law. In the absence of settlement….liability would be determined predominately under a single body of federal statutory and/or common law."

The Honorable Carl J. Barbier is absolutely correct. If the collusive MDL 2179 did not yield this settlement, the victims of the BP oil well blowout would have been fully compensated because BP's liability would have been determined by the OPA.

The *Notice Regarding Factors to be Evaluated for Any Proposed Class Settlement*, set forth by Judge William Alsop of the U.S. District Court for the Northern District of California, is informative.

In sum, settlement fairness requires that the primary beneficiary of a settlement class action should be the class, rather than the PSC attorneys or the defendants; and that the MDL court scrutinizing settlements should value them based on what the class actually receives.

**THE "FAIRNESS" HEARING**
Similar to "Plaintiffs' Steering Committee," "Fairness Hearing" is a misnomer. There is nothing fair about this hearing.

On September 11, 2012, the court issued an "Order Regarding Procedures for the Fairness Hearing" wherein it sets forth its plans and expectations for the conduct of the final fairness hearing scheduled for November 8, 2012:

This hearing was merely a formality….It had no semblance of fairness for at least the following three reasons.

1. Time Allocated for Objections
"The Court presently intends to limit oral presentations by individual objectors (or their counsel, as applicable) to not more than 3 minutes each."

Given the six issues which the court considered at the hearing, allocating merely 3 minutes to each individual objector (or their counsel) is unbelievable. In truth, the purpose of the hearing was to allow the dealmakers (the cooperative members of the PSC and BP) to argue in favor of approval of the Economic and Property Damages Settlement. Claims Administrator Patrick Juneau and Michael Juneau also presented on the glorious status of the settlement and the virtually non-existent settlement opt-outs.[271]

In regard to the gloriously generous status of the settlement, it is important to again remember the following admission by the Honorable Carl J. Barbier on November 10, 2014:

"….as the parties were approaching the final fairness hearing in November 2012, there was a

-40-

concerted effort by the parties and claims facility to process a substantial "number of high value claims in order to demonstrate that the settlement program was working as intended….BP and Class Counsel were aware of the push to resolve claims, as was the Court. Although some of these claims were for clients of PSC members, according to Mr. Juneau over 60% of the claims were for clients of non-PSC attorneys….While the Settlement Agreement in general terms provides that claims will be processed in the order in which they are received….there is no evidence that the Claims Administrator acted improperly in this regard."

The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 13635 at 3, November 10, 2014).

2. Standing
"Plaintiffs who are not part of the class (including class members who have opted out in accordance with the requirements of the agreement, the class notice, and the Court's orders) may not participate in the fairness hearing."

A reasonable person would find it surprising that the court would not want to hear from at least a few class members who have opted-out. Why did they opt-out? The reason is that if that question is asked, it would be truthfully answered by the "Opt- Outs." The answers by these uncooperative "Opt-Outs" would not facilitate judicial efficiency.

3. Excluded BP Oil Well Blowout Victims
The MDL 2179 Court states, "This Settlement is nearly the epitome of how a class in a mass tort action ought to be defined, as it is objective, precise, and detailed, and does not turn on the merits….The class definition is geographically circumscribed to Louisiana, Alabama, Mississippi, and certain specified counties in Florida and Texas along the Gulf Coast, as well as Specified Gulf Waters….The Class is further delimited by providing that certain industries or types of businesses are expressly excluded and that only those business or individuals experiencing specified categories of damages are class members."

Again, it is important to note that Congress never intended that a claimant's recovery of damages under OPA be limited by geographic bounds, pertain solely to certain business activities, or require a heightened and vague proof of causation between his or her damages and the oil spill or oil well blowout incident.

The MDL 2179 Court further states, "The proposed Deepwater Horizon Economic and Property Damages Class Settlement Agreement excludes: Any Natural Person or Entity who or that made a claim to the GCCF, was paid and executed a GCCF Release and Covenant Not to Sue….."[274]

Feinberg's "Release and Covenant Not to Sue" excluded approximately 220,000 BP oil well blowout victims from the MDL 2179 Economic and Property Damages Class Settlement Agreement.

The OPA *clearly* prohibits Responsible Parties from engaging in a "Delay, Deny, Defend" tactic wherein the victims of an oil well blowout are starved and ultimately forced to sign a "Release

-41-

and Covenant Not to Sue" in order to receive an inadequate, miniscule payment amount for the damages, including future damages, they incur as a result of the oil well blowout. Feinberg's "Release and Covenant Not to Sue" requirement violates OPA, State contract law, and is contrary to public policy.[275]

After eliminating the class members who opted-out and the illegally excluded BP oil well blowout victims, the vast majority of remaining Plaintiffs are either comatose or are directly represented by members of the PSC. Those plaintiffs directly represented by members of the PSC know they shall be well-compensated because each must pay a contingent fee to his or her "cooperative" PSC attorney.

Settlement class action fairness requires that the primary beneficiaries of a settlement class action should be the members of the class. The primary beneficiaries of a settlement class action should not be the "cooperative" members of the PSC and the defendant.

Accordingly, a fairness hearing should at least answer the question "What does the class actually receive?"

**FINAL APPROVAL OF THE SETTLEMENT CLASS ACTION AGREEMENT**
"The long term effects [of the BP oil well blowout] on the environment and fisheries may not be known for many years."
> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 3830 at 31, August 26, 2011).

On December 21, 2012, the MDL 2179 Court issued an "Order and Reasons Granting Final Approval of the Economic and Property Damages Settlement Agreement."

**THE CWA PER-BARREL CIVIL PENALTY**
The Clean Water Act ("CWA") is also known as the Federal Water Pollution Control Act.

Section 311(b)(3) of the CWA prohibits the "discharge of oil….(i) into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, or (ii) in connection with activities under the Outer Continental Shelf Lands Act ("OCSLA")….in such quantities as may be harmful…."[301]

Where Section 311(b)(3) is violated, Section 311(b)(7) imposes a civil penalty: "Any person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3), shall be subject to a civil penalty in an amount up to US$25,000 per day of violation or an amount up to US$1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged."[302]

Federal regulations increased this amount to US$1,100 per barrel.[303] The maximum penal amount is increased in the event of gross negligence or willful misconduct.[304]

The Fifth Circuit has stated that the civil penalty in Section 311(b)(6) - which is functionally similar to, albeit smaller than, a (b)(7) penalty - is designed to "place a major part of the financial burden for achieving and maintaining clean water upon those who would profit by the use of our navigable waters and adjacent areas, and who pollute same."[306]

The MDL 2179 Court concluded that the discharge of oil was the result of BP's "gross negligence" and "willful misconduct" under the CWA.

<u>Liability Under General Maritime Law</u>
Here, the MDL 2179 Court determines under general maritime law the comparative fault of BP, Transocean, and Halliburton for the blowout, explosions, and oil spill. The Court also determines whether any Defendant may be liable for punitive damages under general maritime law.

The MDL 2179 Court concluded that each Defendant engaged in conduct that was negligent or worse and a legal cause of the blowout, explosion, and oil spill. The MDL 2179 Court further held that BP's conduct was reckless. Transocean's conduct was negligent. Halliburton's conduct was also negligent. The MDL 2179 Court concluded that the comparative fault of the Defendants, expressed as a percentage of total liability, is as follows: BP: 67%, Transocean: 30%, Halliburton: 3%.

Finally, the MDL 2179 Court held that the conduct of BP's employees was egregious enough that exemplary or punitive damages would be appropriate. *However, in light of Fifth Circuit precedent, the Court concluded that BP is not liable for punitive damages.* (Emphasis added)

<u>Fault Allocation and Degree</u>
Given the phased nature of these proceedings, the MDL 2179 Court was not concerned with questions of duty or causation as they relate to the plaintiffs (e.g., an onshore hotel that lost profits allegedly due to the oil spill). Instead, the MDL 2179 Court focused on whether any Defendant breached the applicable standard of care, the nature of that breach, and the causal connection, if any, between that breach and the blowout, explosion, and oil spill.

<u>Liability for Punitive Damages: Fifth Circuit Rule</u>
Punitive damages may be imposed under general maritime law for reckless, willful, and wanton conduct.

Under the facts of this case, as noted above, the MDL 2179 Court held that the conduct exhibited by BP's employees would make an award of punitive damages appropriate.

However, the maritime rule in the Fifth Circuit is that operational recklessness or willful disregard is generally insufficient to visit punitive damages upon the employer. Rather, the conduct must emanate from corporate policy or that a corporate official with policy-making authority participated in, approved of, or subsequently ratified the egregious conduct. Accordingly, the MDL 2179 Court concluded that BP cannot be held liable for punitive damages under general maritime law.

The MDL 2179 Court further noted that, even if BP were liable for punitive damages, only commercial fishermen or those who could satisfy the "physical injury" threshold of the *Robins Dry Dock* rule would be entitled to such an award.

BP's Flow Rate Misrepresentations
BP has admitted that it falsely "suggested," in its May 24, 2010 letter to a Committee of the United States House of Representatives, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day ("BOPD") was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded consistent results." In fact, BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command.

**THE POST-SETTLEMENT MOP-UP PROCEDURE**
Create means "to produce through imaginative skill." Judge Barbier, in lieu of initially issuing a *Lone Pine* order, created Pretrial Order No. 60 ("PTO 60") and Pretrial Order No. 64 ("PTO 64") to eliminate those few remaining non-cooperating, pesky plaintiffs who have the audacity to demand justice.

PTO 60
On March 29, 2016, the MDL 2179 Court issued PTO 60 wherein the court dismissed the amended "B1" Master Complaint as having "no further administrative or procedural benefit."

In PTO 60, the court required plaintiffs in pleading bundle "B1" who had filed a timely claim, and not previously released their claim, to file and serve on BP a sworn statement disclosing information regarding their claims. PTO 60, in pertinent part, states:

"A. As to Plaintiffs who filed Individual Lawsuits.
(i) Any plaintiff who previously filed an individual lawsuit must complete the sworn statement in the form reflected in Exhibit A. The completed sworn statement shall be attached to a cover sheet reflecting the caption of the individual lawsuit in the form of Exhibit B. Both the cover sheet and the attached sworn statement must be filed into the record of the plaintiff's individual lawsuit (as opposed to the master docket for MDL 2179) no later than May 2, 2016. Plaintiff also shall serve the sworn statement on the Plaintiffs' Steering Committee ("PSC") and counsel for BP no later than May 2, 2016."

In addition, the court required those "B1" plaintiffs who had not previously filed an individual complaint (defined as a complaint not joined in by any other plaintiffs) against BP to file a new individual complaint. PTO 60, in pertinent part, states:

"B. Plaintiffs who DID NOT file Individual Lawsuits, (i.e., only filed a SFJ and/or were part of a "Mass Joinder" Lawsuit).
(i) Where Plaintiffs did not file an individual lawsuit, but instead filed a SFJ and/or were part of a complaint with more than one plaintiff, each such plaintiff must, by May 2, 2016, file an individual lawsuit (Complaint) (one per plaintiff), using the caption reflected in Exhibit C. The

-44-

Complaint should include as an attachment the completed sworn statement in Exhibit A. Each plaintiff also must, by May 2, 2016, serve the PSC and Counsel for BP with a copy of the completed sworn statement.

(ii) Plaintiffs that did not file individual lawsuits, but instead filed a SFJ and/or were part of a complaint with more than one plaintiff, who fail to comply with the above requirements by May 2, 2016, will have their claims deemed dismissed with prejudice without further notice."

In short, plaintiffs who failed to comply with the sworn statement requirement or the new individual complaint requirement by the compliance deadline (May 2, 2016) were to have their claims deemed dismissed with prejudice without further notice.

Judge Barbier states that "the purpose of PTO 60 is to assist the Court in streamlining the remaining claims and to facilitate the administration of this MDL and the prosecution of the actions herein…."

Judge Barbier should say "the purpose of PTO 60 is to assist the Court in streamlining the dismissal of the remaining claims….herein. If necessary, to further facilitate the administration of this MDL, the Court shall issue *Lone Pine* orders."

PTO 60, in order to further assist the Court in streamlining the dismissal of the remaining claims, addresses the issue of "Presentment" under the OPA. PTO 60 asks any plaintiff who previously filed an individual lawsuit, "Did you, the plaintiff seeking relief, present this claim at least 90 days prior to filing a lawsuit or joining the "B1" Complaint?"

A logical question is: Why didn't the MDL 2179 PSC immediately ask each plaintiff if he or she presented his or her claim to BP (the "Responsible Party") at least 90 days prior to filing a lawsuit or joining the "B1" Complaint, as required under the OPA, when the plaintiff's case was transferred to MDL 2179 or when the plaintiff filed a SFJ?

On July 14, 2016, the MDL 2179 Court issued an Order (Re: Compliance with PTO 60 Regarding All Remaining Claims in Pleading Bundle "B1") wherein the court held "As to all Plaintiffs in the "B1" bundle, only those Plaintiffs who have not previously released their claims, have made timely presentment as required by OPA, have previously filed an individual lawsuit, and have otherwise complied with the requirements of PTO 60 have preserved their individual claims. All other B1 bundle claims are time-barred."

BP believes that a very large number of these approximately 1,000 remaining claims are subject to dismissal "based upon the MDL 2179 Court's prior orders, lack of OPA presentment, or release (including membership in the settlement classes and their attendant releases)." Certain of these claims may require further proceedings, including but not limited to dispositive motion practice.

Interestingly, and ironically, BP states that "it also reserves all of its rights concerning its arguments that *OPA displaces all forms of maritime claims*."

-45-

PTO 64
On February 22, 2017, the Court issued Pretrial Order No. 64/Case Management Order No. 6
("PTO 64," Rec. Doc. 22297), one of the goals of which was to identify those "Remaining B1
Plaintiffs" who could plausibly allege a claim under general maritime law.

As used in PTO 64, "Remaining B1 Plaintiffs" meant those plaintiffs who had been deemed
compliant with PTO 60 and who had not voluntarily dismissed their claims.

The MDL 2179 Court has previously ruled that "B1" plaintiffs may bring a claim under general
maritime law tort, in addition to or in alternative of a claim under the Oil Pollution Act of 1990,
33 U.S.C. § 2701, et seq. However, only commercial fishermen or those who suffered damage to
a proprietary interest have a cause of action under general maritime law.[318]

PTO 64 required that each Remaining B1 Plaintiff who wished to pursue a general maritime law
claim must complete and serve upon BP's counsel and the Plaintiffs' Steering Committee
("PSC") by April 5, 2017 a "Sworn Statement Regarding General Maritime Law Claims."

If a Remaining B1 Plaintiff failed to comply with PTO 64, then that plaintiff's general maritime
law claim(s) would be deemed waived and "any such general maritime law claims shall be
dismissed without further notice and with prejudice." (PTO 64 at 3).

## JUDICIAL DISCRETION vs. JUDICIAL DECEPTION
### Judicial Discretion
In the context of an MDL, judicial discretion means the power of the transferee judge to make
decisions based on fairness or a weighing of the facts and circumstances without being bound by
precedent or the strict rules of federal procedure. A federal court of appeals will usually confirm
decisions of a transferee judge when he or she exercises judicial discretion unless the decision is
overly broad, capricious, biased, or beyond the transferee judge's authority.

An "abuse of discretion" occurs when the transferee judge makes a decision which is clearly
against reason and evidence or against established law.

Professor Thomas O. Main points out, "By conferring discretionary authority, the judicial system
entrusts judges with the ability to make sound and informed judgments about the relative merits
of all the various lawful courses of action that fall within the frame of possibilities.[1] The grant of
authority is premised, first, on the notion that the trial judge is in the superior position to see,
hear, and evaluate the situation with firsthand knowledge.[2] A second (albeit less exalting)
justification recognizes that efficiency and finality in adjudication may be more important than
accuracy in every instance.[3] Judges are presumed to exercise their discretion in a fair and neutral
manner, and thus, the "abuse of discretion" standard of review insulates certain exercises of
discretion from rigorous reconsideration on appeal."[4]

Judicial discretion is understandable, indeed necessary, in order for a transferee judge to
efficiently manage the hundreds or thousands of cases which may be transferred to an MDL

court for coordinated or consolidated pretrial proceedings for the convenience of parties and witnesses and to promote the just and efficient conduct of such actions.

Judicial Deception
In the context of an MDL, judicial deception usually occurs when the transferee judge exceeds his or her scope of authority in order to maximize judicial efficiency.

In the BP oil well blowout MDL, Judge Barbier intentionally exercised judicial deception by allowing the Feinberg-administered victims' compensation fund to contravene the Oil Pollution Act of 1990 and by forcing the plaintiffs to enter into an unfair, inadequate, and unreasonable collusive class settlement agreement which contravenes the MDL statute, the U.S. Supreme Court's decision in the *Lexecon* case and the Oil Pollution Act of 1990.

**FIFTY EXAMPLES OF JUDICIAL DECEPTION BY THE MDL 2179 COURT**
On December 21, 2012, the MDL 2179 Court issued its "Order and Reasons Granting Final Approval of the Economic and Property Damages Settlement Agreement." This 125-page Order is replete with examples of judicial deception.

For the reasons set forth throughout this book, each of the following fifty deceptive statements is an example of the MDL 2179 Court contravening the MDL statute, the U.S. Supreme Court's decision in the *Lexecon* case, and the Oil Pollution Act of 1990.

Example No. 50
"….the procedures by which the Court conducted the fairness hearing were well within its discretion."

In regard to Example No. 50, it is important to remember the following.

"….as the parties were approaching the final fairness hearing in November 2012, there was a concerted effort by the parties and claims facility to process a substantial number of high value claims in order to demonstrate that the settlement program was working as intended….BP and Class Counsel were aware of the push to resolve claims, as was the Court. Although some of these claims were for clients of PSC members, according to Mr. Juneau over 60% of the claims were for clients of non-PSC attorneys….While the Settlement Agreement in general terms provides that claims will be processed in the order in which they are received….there is no evidence that the Claims Administrator acted improperly in this regard."
     The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 13635 at 3, November 10, 2014).

Judge Barbier believes that it is acceptable if he, the attorneys he appoints to allegedly represent the plaintiffs, the defendant, and the administrator of the proposed settlement fund secretly collude to inflate the amount of compensation received by some plaintiffs (just prior to the "fairness" hearing) in order to intentionally mislead the remaining plaintiffs into believing that

the proposed settlement is "fair, reasonable, and adequate." Why would a plaintiff possibly want to opt-out of a settlement which is going to provide such generous compensation?

Fraudulent inducement is not a procedure which is well within a Court's discretion when it conducts a fairness hearing.

## THE HIGHLY COMPENSATED "THOUGHT LEADERS"

Theoretically, a "Thought Leader" means one whose views on a subject are taken to be authoritative and influential. Thought leaders are the informed opinion leaders and the go-to people in their field of expertise. In reality, thought leaders are primarily academics who are highly compensated by an industry to either maintain the status quo of the industry or increase market share for their benefactors. It is important to remember that this requires more greed than thought on the part of these leaders.

The financial services industry, pharmaceutical companies, and, most recently, multidistrict litigation courts retain highly compensated thought leaders.

Multidistrict Litigation
In the BP oil well blowout MDL, Judge Barbier points out, "The parties have tendered either jointly or on their own behalf four experts in the law of class actions: Professors Coffee, Issacharoff, Klonoff, and Miller. The Court cites to, or in some instances quotes from, the opinions of these experts at various points in the analysis….of class certification issues."

These "unbiased" opinions are included to deceive the class members. If the MDL 2179 economic and property damages settlement agreement is indeed fair, reasonable, adequate, and free of collusion, it would be clearly obvious to anyone who reads the agreement. There would be no need to retain "four experts in the law of class actions" to try to lend a thin veneer of respectability to an otherwise abhorrent, one-sided agreement.

The following are sixteen of the "unbiased" opinions of these highly-compensated expert legal "Thought Leaders" in MDL 2179. Judge Barbier included each of these opinions in his Order granting final approval of the economic and property damages settlement agreement.

Opinion No. 16
"Other objectors complain that before they can invoke the V-Shaped Revenue Pattern test, they must demonstrate a 5% revenue recovery during the correlating months of 2011 as compared to the 2010 baseline period. *This provision is reasonable, as losses that continued after the spill are likely to be due to factors other than the spill*."[26] (Emphasis added)

## THE PERVERSION

Litigation in the U.S. is an adversarial system (Us vs. Them). Transactional law in the U.S. is, or should be, non-adversarial. Each party wins. MDL is not a form of litigation, at least not in the U.S. In MDL, the PSC zealously advocates on behalf of the transferee judge, not on behalf of the plaintiffs. MDL is not a form of transactional law. In MDL, only "Us" wins.

In an adversarial system, counsel zealously advocate on behalf of their clients. It is a battle between plaintiff and defense attorneys in a court of law before an impartial judge. Theoretically, allowing opposing counsel to fight it out under specific procedural rules that are allegedly put in place to guarantee fair play will hopefully yield the truth. It is not a perfect system but, usually, it does the job.

In an MDL, the "Us vs. Them" dynamic is perverted. The BP oil well blowout MDL ("MDL 2179") is an excellent example of this perversion.

In MDL 2179, "Us" principally means Judge Barbier, the cooperative attorneys appointed to the PSC by Judge Barbier, other common benefit attorneys, Kenneth R. Feinberg, Patrick Juneau and BP. "Them" means the plaintiffs not directly represented by a member of the PSC, non-cooperative plaintiffs who brazenly elect to opt-out of the settlement agreement in search of justice, and the non-PSC attorneys who the plaintiffs initially retained.

Judge Barbier does not exhibit the cold neutrality of an impartial judge. He is a fiery proponent of judicial efficiency. His objective is the settlement (for pennies on the dollar) or dismissal with prejudice of all cases, not remand.

Plaintiffs' Steering Committee ("PSC") is a misnomer. It should be called the Transferee Judge's Steering Committee ("TJSC"). The transferee judge selects, appoints, and approves compensation for the members of the steering committee. As a result, in reality, the cooperative members of the steering committee represent and seek to please the transferee judge. In other words, the steering committee zealously advocates on behalf of the transferee judge, not on behalf of the plaintiffs who had previously retained their own counsel and never wanted to be in the MDL to begin with. The obedient common benefit attorneys take their instructions from the cooperative PSC which decides how much work they receive and the amount the common benefit attorneys are compensated.

**"COME INTO THE FOLD," PAY US, AND KEEP QUIET**
On November 7, 2011, I sent a follow up letter via email to Steve Herman wherein I state the following.

"I refer to my letter, dated August 29, 2011, to Mr. James Roy and to our subsequent telephone conversation of September 8, 2011.

During our phone conversation you advised me that, as a result of the transfer of this case to MDL 2179, the extent of my representation of the plaintiffs in this case is now limited to three options. I may: (a) 'do nothing;' (b) 'come into the fold;' or (c) 'go off on my own and directly file pleadings with the court.'

Given the ongoing economic stress being experienced by my clients resulting from the 'Delay, Deny, Defend' strategy being employed by Kenneth R. Feinberg, et al., 'do nothing' is not a viable option.

-49-

I believe Option (b), 'come into the fold,' refers to your invitation to join the GCCF Jurisdiction Work Group (JWG), which has, for the past year, allegedly coordinated Plaintiffs' collective efforts regarding Feinberg and the GCCF in terms of information collection, jurisdictional issues, communications with claimants, OPA compliance, and the appropriate scope and effect of the GCCF release.

Unfortunately, since the Court has declined to permit formal discovery on Feinberg or the GCCF, my clients would not benefit from JWG's limited scope of discovery.

On November 14, 2011, after I had already rejected Herman's offer to "come into the fold" on November 7, 2011, I received an unsolicited GCCF Outreach Workgroup Invitation, GCCF Jurisdiction and Court Oversight Workgroup Invitation, Invoice and Limited Joint Prosecution and Confidentiality Agreement from Herman and Roy wherein they state the following.

"You have been invited by the PSC to serve as a member of the GCCF Outreach Workgroup and GCCF Jurisdiction and Court Oversight Workgroup of the PSC. As a work group member, your work will be under the supervision and direction of the work group Coordinators who are reporting directly to the PSC/EC and Liaison. Your common benefit time and expenses will be submitted with those of PSC members, workgroup coordinators, and work group members, for consideration by the Court in the event of recovery by settlement or judgment in connection with the MDL proceedings, in accordance with Pretrial Order No. 9. You will have access to the common work product that is developed, and will be invited to participate in various meetings from time to time.

By acceptance of your appointment as a member of the above-named workgroup, your personal time and financial obligations will be potentially significant. Work Group Member Assessments have been set by the PSC at 10% of PSC member assessments (which currently total $330,000); a work group member firm's assessments to date total $33,000.

Your appointment is at the discretion of the Executive Committee/PSC, subject to the requirements of Pretrial Order No. 9 and other Orders of the Court, and requires your payment of an initial assessment of at least $10,000 by December 1, 2011; staying current on future assessments; and continued contribution of PSC authorized common benefit work in furtherance of the workgroup for MDL 2179. Common benefit work and expenses will be done only upon written authorization and oversight of the PSC/EC/Liaison and/or upon direction of Workgroup Coordinators.

The Court will ultimately determine what return of costs and/or common benefit fee you may be entitled to. There are no guarantees that you (or the PSC or any work group coordinator or member) will receive any remuneration; such is dependent upon success of the litigation and determination by the Court of entitlement to common benefit cost reimbursement and/or fees.

Accordingly, if you accept this appointment, please sign where indicated below and FedEx this form and your $10,000 (to $33,000) assessment (payable to MDL 2179 PSC account) to:

-50-

Plaintiffs Steering Committee, c/o James P. Roy & Steve Herman.

The Limited Joint Prosecution and Confidentiality Agreement (BP Oil Spill Litigation), in pertinent part, states the following.

"Any and all documents, communications, information, strategy, experts, legal theory and/or other work product that is shared or exchanged by and through this Agreement shall be kept and remain confidential….This agreement is not a co-counsel agreement nor an agreement, whether express or implied, to share, claim, shift, or consent to an award of any type of client contingency, statutory and/or common benefit attorney's fee. The signatories may hereafter be referred to herein as the 'BP Gulf Spill Litigation Joint Prosecution Group.'….Signatories shall obtain signatures of associates and clerical staff working on these matters to assure their compliance with this agreement. Materials subject to this agreement will not be shown to non-group experts or non-group members without compliance with procedures to be established by Group….Any party hereto can withdraw at any time. If a member withdraws, he is still subject to this agreement's confidentiality."

MDL 2179 is so perverse that the PSC does not want the victims of the BP oil well blowout to even know that this confidentiality agreement exists. Paragraph 6 of the confidentiality agreement states, "This Agreement itself shall be confidential, and no counsel or party shall reference, cite or otherwise use the drafting, circulating, existence or use of this Agreement in any motion, petition or other application to be appointed, designated or otherwise recognized by any Court for any leadership position. The members agree that except as may be ordered by Court this agreement and its terms and conditions and the work product of the Group and/or its members will be kept strictly confidential and shall not be disclosed to any third party for any reason."

I find the last paragraph of the confidentiality agreement, which appears to be an afterthought, to be humorous. Paragraph 7, titled "Ethics and Conflicts Compliance" states, "Each member firm is responsible for doing its own conflict and individual ethics checks on an ongoing basis and otherwise in complying with all applicable Rules of Professional Responsibility."

I do not understand how any attorney could find MDL, specifically MDL 2179, to be ethical and in compliance with all applicable Rules of Professional Responsibility. MDL 2179's contravention of the MDL statute, the U.S. Supreme Court decision in *Lexecon*, and the Oil Pollution Act of 1990, use of a Feinberg- administered fund and a settlement class action treats the plaintiffs as nothing more than a commodity. Moreover, completely replacing justice with judicial efficiency is not remotely ethical.

**FOURTEEN QUESTIONS THE PSC REFUSED TO ANSWER**
On December 21, 2012, I sent a letter via email to Steve Herman and cc'd the letter to James Parkerson Roy, Brian H. Barr, and Scott Summy. In the letter I ask Herman the following ….questions.

"I am writing this open letter on behalf of my clients and all similarly-situated BP oil spill and Gulf Coast Claims Facility (GCCF) victims.

QUESTION No. 1
Why did the PSC designate the 'B1' Master Complaint as an admiralty or maritime case, and request a non-jury trial pursuant to Rule 9(h), rather than properly allege claims under the Oil Pollution Act of 1990 (OPA), a *strict liability* statute, and the Outer Continental Shelf Lands Act (OCSLA)?

QUESTION No. 2
Why has the PSC failed to inform Judge Barbier that the Honorable MDL 2179 Court has overreached its authority?

QUESTION No. 3
Why has the PSC failed to inform Judge Barbier that the E&PD class settlement violates the Oil Pollution Act of 1990 ("OPA")?

QUESTION No. 4
Why has the PSC failed to inform Judge Barbier that the honorable MDL 2179 Court has illegally excluded approximately 200,000 BP oil spill victims from the E&PD class settlement thereby greatly decreasing the bargaining power of the remaining class members?

QUESTION No. 5
Why has the PSC failed to inform Judge Barbier that the E&PD class settlement is not 'fair, reasonable, and adequate' and has not been entered into without collusion between the parties?

QUESTION No. 7
Why has the PSC allowed the MDL 2179 Court to decline to permit formal discovery on Feinberg, et al?

QUESTION No. 8
Why does the PSC allow its BP oil spill victim clients to receive grossly inadequate compensation?

QUESTION No. 10
Given the above-referenced was not merely the result of poor legal strategy, do you believe the MDL 2179 PSC's actions constitute legal malpractice?

QUESTION No. 11
Why did the PSC wait until one month before the claim filing deadline to notify all BP oil spill and GCCF victims (its clients) of the OPA 'Presentment' requirement?

QUESTION No. 12
Why has the PSC failed to notify all BP oil spill and GCCF victims (its clients) that a lawsuit may be filed against Kenneth R. Feinberg, et al. without having to fulfill the OPA Presentment requirement?

QUESTION No. 13
Why does the PSC, which failed to adequately challenge the legality of the GCCF Release and Covenant Not to Sue for the past two years, suddenly advise non-PSC attorneys to 'assemble and prepare the best case you can to support the argument that such Release was procured under fraud, error, or duress?'

QUESTION No. 14
Are you declining to answer these questions because you believe that an attorney-client relationship does not exist between the PSC and all BP oil spill and GCCF victims?

On December 31, 2012, Herman responded via email, "Not sure what you are trying to accomplish, but I think we have past the point of diminishing returns. Good luck."

Apparently, "Good Luck" is the only response the PSC is willing to give to attorneys who decide not to "come into the fold," pay the PSC at least $10,000, and keep quiet.

Over the years, I have touched base with the PSC to inquire as to when Judge Barbier will permit formal discovery on Feinberg or the GCCF. The following exchange of emails is typical.

On December 9, 2013, I email Herman, "I attach a copy of your email dated September 5, 2011. Please advise as to when the Court will permit formal discovery on Feinberg or the GCCF….Thank you." Email response from Herman: "No idea."

My email reply to Herman: "Would you be kind enough to attempt to find out when the Court will permit formal discovery on Feinberg or the GCCF?"

Herman's response: "Yes. At an appropriate time."

The question is "at an appropriate time" for whom?

**WHY IT IS DIFFICULT TO HOLD SELF-DEALING PSC ATTORNEYS ACCOUNTABLE**
Three factors inoculate the actions of self-dealing PSC attorneys from thorough appellate review.[37]

First, because most multidistrict litigations result in private settlements, they are not reviewable on appeal, even when subject to public judicial commentary.[38]

Second, because most interim rulings are not dispositive orders, they are reviewable only through an extraordinary writ of mandamus or subsequent dismissal.[39] Motions to disqualify a lead attorney, for example, are not immediately appealable as a matter of right even though an attorney could theoretically petition for mandamus.[40]

Third, even if the appellate court grants mandamus or reviews a dismissed case, it tends to do so using the highly deferential abuse-of-discretion standard.[41]

**THE PROFESSIONAL OBJECTORS**
On October 25, 2016, in his Order & Reasons [Aggregate Common Benefit Fee and Costs Award], Judge Barbier states, "Before the Court is a Petition for Reimbursement of Expenses and Collective Common Benefit Fee Award[42] filed by the Common Benefit Fee and Cost Committee ('Fee Committee'), Plaintiffs' Co-Liaison Counsel, Class Counsel/Plaintiffs' Steering Committee ('PSC'), and other attorneys who claim entitlement to an award for attorneys' fees for common benefit work (collectively, 'Petitioning Attorneys'). Also before the Court is an objection by four class members[43] and a reply/supplemental brief by the Petitioning Attorneys….This Court certified the Medical Class and gave final approval to the Medical Settlement on January 13, 2013.[44] A group of professional objectors appealed the settlement approval order, which class counsel successfully defended in the Fifth Circuit. Upon remand, after deposing the four objectors and providing the Court with a comprehensive submission, the appeal was voluntarily dismissed….On September 12, 2016, four class members filed an objection to the Aggregate Fee Petition….The Court has serious doubts as to whether these objectors have standing to object. As mentioned, any common benefit award does not reduce the objectors' recoveries, and the Court long ago found that the Settlements were fair, reasonable, and adequate to the Classes. It would appear, then, that the objectors have no stake in the outcome of the Aggregate Fee Petition. Petitioning Attorneys propose that true motivation here is bad faith - that these are 'professional objectors' who filed this untimely objection for the sole purpose of attempting to extract a side-deal pay-off to go away.[45] Petitioning Attorneys make a persuasive point."

Putting it mildly, Judge Barbier does not exhibit the cold neutrality of an impartial judge. Judge Barbier labels plaintiffs and plaintiffs' counsel as "professional objectors" if they have the audacity to object to a settlement approval order. Judge Barbier even goes as far as to accuse these "professional objectors" of filing their objections "for the sole purpose of attempting to extract a side-deal pay-off to go away."

I cannot fault Judge Barbier for taking this position. It is apparent that backroom "side-deal pay-offs" are the rule rather than the exception in MDL 2179.

**DEFINING JUSTICE**
"Over the course of the entire litigation, over 90 million pages of documents would ultimately be produced….the PSC and other common benefit attorneys collected, indexed, and produced over 10,000 articles….For approximately six months, there were typically two tracks of depositions, daily, reaching a climax in the summer of 2011, with seven depositions conducted, on two

-54-

continents, in one day. By the end of 2011, over 240 fact witness depositions had been taken, with 50 additional depositions of liability experts. Petitioning attorneys have performed an immense amount of work in this MDL. Counsel expended over 527,000 hours on common benefit work….These lawyers spent days and weeks away from their homes and families. This resulted in a high level of collaboration, benefitting not only class members, but the entire litigation….That counsel were able to achieve so much speaks to their ability. This factor supports the reasonableness of the fee award….the fees sought here are not only reasonable, they are arguably below what class counsel could have reasonably requested."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 21849, October 25, 2016).

Judge Barbier's praise for his cooperative attorneys is heartwarming. A casual observer could easily conclude that each attorney selected by Judge Barbier to serve on the MDL 2179 PSC is "America's Lawyer."

The Aggregate Fee Petition includes a declaration by Brian T. Fitzpatrick, a law professor at Vanderbilt University and an MDL 2179 "Thought Leader." Professor Fitzpatrick states, "I have never seen a case this complex nor one that required more of class counsel. The number of moving parts here was - and this is an understatement - dizzying. The law, the facts, the science - all of it was far more challenging than perhaps any class action case I have ever seen."[1]

Given the opinions of Judge Barbier and Professor Fitzpatrick, the victims of the BP oil well blowout are led to believe that "America's Lawyers" are zealously advocating on their behalf. Justice is most assuredly just around the corner.

Justice is defined by numbers, not by words. More to the point, it is defined by the amount of monetary compensation received by the plaintiffs, not by "the immense amount of work" allegedly performed by the dealmakers of the PSC.

Unfortunately for the victims of the BP oil well blowout, the amount of monetary compensation received from the GCCF and the DHCC is miniscule. Kenneth R. Feinberg and the MDL 2179 PSC have earned their money.

**COMPENSATION PAID TO MDL 2179 PSC ATTORNEYS AND THEIR LAW FIRMS**
Members of the PSC and their law firms in the BP oil well blowout MDL ("MDL 2179") are not double-dipping. They are quadruple-dipping.

The known sources of compensation received by the members of the PSC and their law firms in MDL 2179 are:

(a) Common Benefit Fees
BP has agreed to pay any award for common benefit and/or Rule 23(h) attorneys' fees, as determined by the MDL 2179 Court, up to $600 million.[3]

On October 25, 2016, Judge Barbier approved and awarded a common benefit fee and cost award of $600 million consisting of: "$37,597,151.98 in Shared Expenses, which have already been paid to third-party service providers and/or reimbursed to Common Benefit Attorneys, pursuant to previous Court orders; Up to $7,187,698.30 in claimed Held Expenses, which have been submitted to Court-appointed CPA Phil Garrett and the Fee Committee pursuant to PTO 9, (as amended), and PTO 59; and The remainder of the Settlements' Common Benefit Cost and Fee Award amount, of approximately $555.2 million, to Class Counsel and other common benefit attorneys collectively, for work performed to advance the common and collective interests of the Economic Class and the Medical Class."

During the summer of 2015, BP announced a global settlement with the United States, the five Gulf Coast States, and local governments, to resolve Clean Water Act, natural resource damage, and economic loss claims, damages, and penalties. In order to help facilitate that settlement, the existing hold-back on all state and local government recoveries was lifted, and a payment by BP of US$40 million to common benefit attorneys collectively was approved.[4] Halliburton and Transocean have agreed to pay up to US$124,950,000 in common benefit attorneys' fees and expenses in connection with the Halliburton and Transocean class settlements.

(b) Contingent Fees
The members of the PSC and their law firms have their own clients and have also received or will also receive a fee directly from them. (N.B. - On June 15, 2012, the MDL 2179 Court ordered that "contingent fee arrangements for all attorneys representing claimants/plaintiffs that settle claims through either or both of the Settlements will be capped at 25% plus reasonable costs.").[5]

(c) Co-counsel Fees
Co-counsel fees are received by members of the PSC and their law firms for serving as co-counsel to non-member firms of the PSC. For example, on March 13, 2012, I received an unsolicited mass email from a member of the PSC. The email stated, in pertinent part, "Co-Counsel Opportunity for BP Oil Spill Cases: News of the recent BP Settlement has caused many individuals and businesses along the Gulf Coast to contemplate either filing a new claim or amending a claim that has already been submitted. *If you receive inquiries of this nature we would like you to consider a co-counsel relationship with our firm.* Even if someone has already filed a claim it is advisable to retain legal counsel to analyze the impact of this settlement on claimants and maximize recovery. If you receive inquiries and are interested in co-counseling with us on the BP claims, please email…."

(d) Hold-Backs
The MDL 2179 Court issued a hold-back order which ultimately directed the defendants to hold back and place into escrow, from any judgment or settlement after December 30, 2011:
Six Percent (6%) of the recoveries of any private claimants or plaintiffs who, at any time, had an action that was filed in, removed to, or transferred to, the MDL;
Four Percent (4%) of the economic loss damages payable to the States of Alabama and/or Louisiana;

Four Percent (4%) of the recoveries of any local government entities located within the State of Alabama and/or the State of Louisiana, that, at any time, had an action that was filed in, removed to, or transferred to the MDL;

Six Percent (6%) of the recoveries of any local government entities in the States of Mississippi, Florida, and/or Texas, that, at any time, had an action that was filed in, removed to, or transferred to the MDL; and,

Six Percent (6%) of the economic loss damages payable to the States of Florida, Mississippi, and/or Texas, should they ever file actions in, be removed to, or be transferred to, the MDL.

The media has reported that members of the MDL 2179 PSC could receive more than US$2.5 billion in total compensation.[6] Due to the complete lack of transparency and backroom deals which occur in MDLs, this amount is merely a guesstimate. However, it is not beyond the realm of possibility.

### GUESSTIMATED CALCULATION OF COMPENSATION PAID TO 19 PSC ATTORNEYS AND THEIR LAW FIRMS

| Common Benefit Fees (a) | US$597.354 million |
|---|---|
| Contingent Fee (25%) (b) | US$   2.438 billion |
| Co-counsel Fee | Unknown |
| Hold-Backs (c) | Unknown |
| **Total Compensation Paid to PSC Attorneys** | **US$  3.035 billion (d)** |

Guesstimated Calculation of Common Benefit Fees Paid to
103 Non-PSC Attorneys

| Total Recommended Fee Allocations | US$704.500 million (e) |
|---|---|
| Total Compensation Paid to 19 PSC Attorneys | US$597.354 million |
| **Total Compensation Paid to 103 Non-PSC Attorneys** | **US$107.146 million** |

Notes
(a) Common Benefit Attorneys' Fees Are Generated From Three Sources

| BP Class Settlements | $555.20 million |
|---|---|
| Louisiana & Alabama Settlements | $  40.00 million |
| Transocean/Halliburton Settlements | $124.95 million |
| **Total** | **$720.15 million** |

(b) Contingent Fee (25%) is calculated from the following total amounts paid for submitted claims:

| Gulf Coast Claims Facility (GCCF) | US$6.1 billion |
|---|---|
| Transition Period: | US$405 million |
| Deepwater Horizon Claims Center (DHCC) | US$13 billion |
| **Total Amount Paid** | **US$19.505 billion** |

Assuming 40% of the paid claims were for clients of PSC attorneys and their law firms:
(19.505)(.40)(.25) = US$1.951 billion
Assuming 50% of the paid claims were for clients of PSC attorneys and their law firms:
(19.505)(.50)(.25) = US$2.438 billion
Assuming 60% of the paid claims were for clients of PSC attorneys and their law firms:
(19.505)(.60)(.25) = US$2.926 billion

(c) The hold-backs were ultimately released by Judge Barbier, the funds were returned, and no business, individual, or local government entity (nor their own individually retained attorneys) were required to make any common benefit cost contribution or pay any common benefit fee in MDL 2179. This amount is indicated to be "unknown" because it is not certain if the total amount of hold-backs was actually returned.[8]

(d) Assuming 50% of the paid claims were for clients of PSC attorneys and their law firms.

(e) According to the FCC, the proposed recommended fee allocations total approximately $704.5 million. This leaves a proposed reserve of approximately $15.65 million.

**How the Court Allocated the US$720.15 million to Common Benefit Attorneys**
The manner in which the MDL 2179 Court allocated the US$720.15 million to the PSC and other Common Benefit Attorneys is humorously instructive.

On July 15, 2015, Judge Barbier issued Pretrial Order No. 59 which….states, "Pursuant to the Court's inherent authority over this multidistrict litigation, the Court hereby appoints a fee committee and sets forth guidelines for common benefit fee and cost reimbursements."

It is interesting to note that six of the seven members appointed to the FCC are the same "cooperative" attorneys previously appointed by Judge Barbier to the MDL 2179 PSC.

No, it doesn't take a great deal of imagination to figure out how the US$720.15 million will be allocated.

On April 11, 2017, the FCC filed its proposed fee allocation with the MDL 2179 Court.

The FCC explains that it "did not employ a 'lodestar' or 'hourly rate' approach….the Fee Committee did not solicit from Common Benefit Attorneys what they might claim to be their own individual or average blended hourly 'rates'….Nor did the FCC interpret its task to simply apply a single blended hourly rate to all hours that had been submitted in the case….Rather, the Court asked the Fee Committee to rely, in part, upon '*the FCC's subjective understanding of the relevant contributions of each Fee Applicant*.'….the FCC considered the time submitted; the experience, skill and reputation of the firm's attorneys; and customary rates; but did not, at any time, assign particular 'rates', or 'multipliers', to a firm's accepted hours, and then use that to derive the ultimate fee recommendation."

-58-

Mikal C. Watts - A PSC Common Benefit Attorney

On October 8, 2010, Judge Barbier appointed Mikal C. Watts as one of the initial fifteen members to the MDL 2179 PSC. Watts was appointed based largely on the fact that he allegedly had more than 40,000 clients. On March 13, 2013, Watts resigned from the MDL 2179 PSC. On September 15, 2015, Watts and six codefendants were indicted by a federal grand jury on 95 counts of conspiracy, mail and wire fraud, identity theft, and aggravated identity theft.

As set forth in the indictment, the defendants, without contacting the individuals, would obtain names, addresses, dates of birth, and social security numbers from any source available to create "clients" for anticipated litigation as a result of the *Deepwater Horizon* Oil Spill. The indictment further alleges that the defendants fraudulently submitted names of over 40,000 individuals as plaintiffs represented by Mikal C. Watts in litigation related to the *Deepwater Horizon*/BP oil spill, knowing that the individuals had not consented to be represented by the firm, and/or that stolen and false social security numbers, dates of birth, addresses, and occupations were claimed. According to the indictment, the defendants attempted to obtain payments from the Gulf Coast Claims Facility for persons Mikal C. Watts claimed to represent and ultimately submitted 'Presentment Forms' to BP for each of the 40,000 plus individuals Mikal C. Watts claimed to represent. The indictment alleges that the total amount of claims submitted by the defendants to BP was in excess of $2 billion.

On April 11, 2017, the FCC filed its proposed fee allocation with the MDL 2179 Court. (Rec. Doc. 22628).

The FCC recommended Watts Guerra Craft, LLP be allocated $16,790,494.18 in common benefit fees.

The FCC explains, "The Fee Committee has not taken into consideration any of the issues raised in BP's Complaint and Motion to Enjoin the Seafood Program [Civil Action No. 2:13-cv-6674]. Whether and/or how such allegations might or might not affect the allocation or award of common benefit fees to Watts Guerra is left to the sound judgment and discretion of the Court. The Fee Committee does note that Mr. Watts was acquitted by the jury in the criminal trial that was held in the Southern District of Mississippi."

On October 12, 2017, Special Master John W. Perry, Jr. filed "Special Master's Recommendations Concerning the Allocation of Common Benefit Fees and the Reimbursement of Shared Expenses and Held Costs" with the MDL 2179 Court. (Rec. Doc. 23491). Perry recommended Watts Guerra Craft, LLP be allocated *$18,290,494.18* in common benefit fees.

On October 24, 2017, the Court issued its Order wherein Judge Barbier states, "The Court hereby adopts in full the Special Master's Recommendations Concerning the Allocation of Common Benefit Fees and the Reimbursement of Shared Expenses and Held Costs." (Rec. Doc. 23574)

How much would Watts Guerra Craft, LLP have been allocated if its more than 40,000 "clients" were not phantoms? The MDL 2179 plaintiffs may never know.

-59-

**CONSTITUTIONAL ISSUES**

Why hasn't the constitutionality of MDLs been questioned?

The simple answer to this question is that the JPML and the transferee judges appointed by the JPML are more interested in replacing justice with judicial efficiency than they are in the constitutionality of MDLs. However, there are other reasons.

**WHERE'S THE CASE OR CONTROVERSY?**

"Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund."

> The Honorable John G. Heyburn II, Chairman, Panel on Multidistrict Litigation, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Transfer Order, August 10, 2010).

"In February 2011, [only 4 months after I appointed my pre-selected cooperative attorneys to the PSC settlement,] negotiations began in earnest for the proposed Economic and Property Damages Settlement. Talks intensified in July 2011, occurring on an almost-daily basis."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 7138 at 3, December 21, 2012).

Article III extends federal judicial power solely to the adjudication of a "case" or a "controversy." "Case," in Article III, means a justiciable "action or suit," or an "argument." "Controversy" means a disagreement or a dispute between parties as to the suit's preferred outcome. Both a "case" and a "controversy" require an adversarial suit. For a suit to be justiciable, according to the U.S. Supreme Court, the parties must maintain "adverse legal interests" throughout, and their dispute must be "definite and concrete."[11] The Fifth Circuit has held that Article III plainly "requires that the parties be truly adverse."[12] Indeed, the U.S. Supreme Court has held that the case-or-controversy language of Article III mandates litigant adverseness.[13]

Professor Martin Redish argues, "On the most basic analytical level, the unconstitutionality of the settlement class action should be obvious, purely as a matter of textual construction. There is simply no rational means of defining the terms "case" or "controversy" to include a proceeding in which, from the outset, nothing is disputed and the parties are in complete agreement. Moreover, from both historical and doctrinal perspectives, U.S. Supreme Court decisions could not be more certain that Article III is satisfied only when the parties are truly "adverse" to one another, which, at the time the relevant proceeding is undertaken, they are not in the case of the settlement class action."[14]

The term "collusion," in the class action context, is used to refer to a secret, unethical agreement between the named plaintiffs and defendant. According to Professor Redish, "for purposes of Article III's adverseness requirement, however, the term has a far broader meaning. It includes any suit in which, from the outset, the parties are in agreement as to the outcome. It includes fully open pre-litigation agreements between the parties, and those that are not, on their face,

deemed to be unethical or unfair. Rather, Article III proceeds on the assumption that a showing of a lack of adverseness at the outset of a suit automatically establishes the improperly collusive nature of the suit. Article III adopts lack of adverseness as an ex ante, categorical basis on which to find inadequate representation of the interests of future litigants who are similarly situated....When the plaintiffs and defendant agree on settlement terms and the desirability of certification prior to coming to court, neither party has the incentive to challenge such important questions as whether class representation is "adequate" or the claims are "typical" of the class as a whole. This inherently deprives the court of the benefit of adversarial litigation concerning the satisfaction of Rule 23's requirements, thereby seriously limiting its ability to protect absent class members."[18]

In contrast to the case-by-case focus employed by class action scholars, Article III employs a far more categorical and prophylactic conception of "collusion." Article III makes an ex ante categorical judgment that a non-adversarial suit is inherently collusive and therefore in violation of constitutional norms. As the U.S. Supreme Court in *Poe v. Ullman*,[20] construing Article III, explained:

> "The case may not be 'collusive'....in the sense of merely colorable disputes got up to secure an advantageous ruling from the Court. But the Court has found unfit for adjudication any cause that 'is not in any real sense adversary,' that 'does not assume the honest and actual antagonistic assertion of rights' to be adjudicated - a safeguard essential to the integrity of the judicial process, and one which we have held to be indispensable to adjudication of constitutional questions by this Court."[21]

In short, Professor Redish maintains "the settlement class's fundamental constitutional defect is that *all* settlement classes - not merely those involving unethical attorney behavior - are, by definition, non-adversarial. An adversarial dispute cannot be said to exist at the time the class action proceeding begins. At that point, the litigants differ over absolutely nothing. They have agreed on the terms of both certification and settlement prior to the filing of the class proceeding. In fact, the only conceivable reason that class counsel in this position files a complaint and request for certification with the court, rather than simply embodying the terms of their private agreement in an enforceable contract, is to bind absent class members to a settlement negotiated in their absence."[22]


## WHERE'S THE DUE PROCESS?

"All motions, requests for discovery or other pre-trial proceedings with respect to plaintiffs shall be initiated by and/or coordinated through the Plaintiff Steering Committee ("PSC"), to be filed by and through Plaintiffs' Liaison Counsel. If the PSC does not support the motion, discovery or other requested proceeding, then the moving or requesting plaintiff shall be permitted to file such motion or request, but shall include a certificate of non-support."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 569 at 13, October 19, 2010).

"….all pending and future motions, including the Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 676 at 1, November 5, 2010).

"Any individual plaintiff who is a named plaintiff in a case that falls within Pleading Bundle B1, B3, D1, or D2, or any combination thereof, is deemed to be a plaintiff in the applicable Master Complaint(s)….All individual petitions or complaints that fall within Pleading Bundles B1, B3, D1, or D2, whether pre-existing or filed hereafter, are stayed until further order of the Court."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 983 at 2, 4, January 12, 2011).

Each claimant in an MDL has an individually held, constitutionally protected property right at stake. Those rights are guaranteed by the Fifth Amendment, which protects life, liberty, and property against deprivation absent due process of law.[23] The "property" at stake in an MDL is the "chose in action." This historically established concept refers to the right to sue to enforce a legally protected claim, even the unlitigated right to sue.[24] Under the Fifth Amendment, then, MDL claimants cannot be deprived of their rights to a chose in action without due process of law.[25] MDL is a collection of individual lawsuits; it is not a vindication of some kind of substantively established group-held right. The constitutionality of MDL must therefore be assessed from the perspective of each litigant on an individual basis. As in other consolidated representative litigation (for example, class actions), MDL raises concerns about whether collectivization unconstitutionally modifies the claimants' individually held rights. In MDL, individual litigants, for all practical purposes, lose a substantial degree of control over the procedural fate of their claims. In short, MDL fails to provide a constitutionally adequate opportunity to litigate.[26]

The right to one's own day in court means a right to meaningful control over litigation strategy and goals, including choice of legal representative.[31] It requires a "full and fair opportunity to litigate,"[32] which means a "full opportunity to prepare one's own arguments and evidence."[33] At base, meaningful participation in the adjudicatory process - the day-in-court ideal - includes, in the words of a respected scholar, "the right to observe, to make arguments, to present evidence, and to be informed of the reasons for a decision."[34]

In contrast, Redish points out, "the modern class action demands close linkage among the claims, for the very purpose of assuring due process. MDL claimants, on the other hand, are left in 'a procedural no-man's-land,' at the mercy of the transferee judge and attorneys whose obligations are to the interests of many plaintiffs, which may not necessarily align with those of an individual plaintiff."

The MDL judge's selection of lead counsel is not subject to effective appellate review, even though the choice may turn out to be outcome-determinative.

In sum, ignoring the claimant's choice of lawyer disrespects the claimant and undermines the procedural autonomy that the Due Process Clause is intended to protect. Similarly, the established process of appointing lead counsel and ceding control to the court-appointed committees further undermines the paternalism model of the day-in-court ideal by failing to build in safeguards to assure the choice of adequate representatives who are able to zealously advocate on behalf of *all* claimants.[61]

It is true that, theoretically, MDL only involves a temporary transfer for pretrial purposes; claimants' individual days in court await them back in the transferor courts. It is also true that no one is forcing these claimants to accept settlement offers in the transferee court; they can always hold out for remand to their preferred jurisdictions, where they will have the opportunity to have their personally chosen lawyers represent them, and can attempt to implement their own strategies. But this view demonstrates an incomplete understanding of the power of transferee courts.[69] In reality, the MDL endgame has very quietly become settlement (for pennies on the dollar) or dismissal with prejudice of all cases, not remand.

## OPT-OUT vs. OPT-IN

Professor Redish argues that the opt-out mechanism under Rule 23(b)(3) should be abandoned in favor of an opt-in mechanism that requires absent class members to take some affirmative action before being swept into a class action. Redish argues that allowing fundamental due process rights to be waived simply by inaction, as under the current version of the rule, does not sufficiently protect such constitutional rights.[72]

Generally a waiver of constitutional rights requires some affirmative action on the part of an individual holding such rights. However, the opt-out procedure allows waiver through inaction under circumstances in which such inaction is highly likely given that the effort it takes to affirmatively opt-out is outweighed by the marginal benefits of simply doing nothing.[73]

In short, constitutional rights cannot be sacrificed for mere judicial efficiency or convenience.

## HOW TO HOLD AN MDL ACCOUNTABLE

I. Failure of a Transferee Judge to Recuse Himself

MDL Plaintiffs should consider filing a Motion to Recuse if they believe that the transferee judge has a personal bias or prejudice concerning them, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding, or merely if his impartiality might reasonably be questioned.

28 U.S.C. § 455(a) provides, in relevant part:

"Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."[1]

28 U.S.C. § 455(b) provides, in relevant part:
"He shall also disqualify himself in the following circumstances:
Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;[2]
He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;[3] and
He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person: Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding."[4]

28 U.S.C. § 455(c) provides, in relevant part:
"A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household."
28 U.S.C. § 455(d) provides, in relevant part:
"For the purposes of this section….
'financial interest' means ownership of a legal or equitable interest, however small…."

In *Republic of Panama v. The American Tobacco Company, Inc., et al.,* citing *Tramonte v. Chrysler Corporation*, 136 F.3d 1025,1027-29 (5th Cir. 1998), the Fifth Circuit held that:
(a) "28 U.S.C. § 455(b)(4) requires recusal for even paltry financial interests."
(b) "According to 28 U.S.C. § 455(a), a judge should recuse herself from 'any proceeding in which his impartiality might reasonably be questioned.'"
(c) "We must enforce 28 U.S.C. § 455(b) by its strict terms. The hair trigger of 'any financial interest' may be unwise and may produce results difficult to defend. Its unforgiving bite was the creation of Congress. And relaxation of the rule of financial interest must come from that body."
(d) "If the district court judge should have recused himself any orders entered following disposition of the recusal motion should be vacated."

II. Violation of the Aggregate Settlement Rule by PSC Attorneys
In *Burrow v. Arce*, the Texas Supreme Court held that lawyers may be subject to total or partial fee forfeiture as a sanction for serious violations of an ethical rule.[5] *Burrow* involved allegations that mass tort lawyers breached their fiduciary duties to their clients by violating the aggregate settlement rule ("ASR").[6]

In sum, an MDL PSC attorney owes fiduciary duties to each member of the settlement class. A lawsuit based on a violation of the ASR can be brought as a breach of fiduciary duty claim;[11] the plaintiff need not show any economic loss from the attorney's breach in order to prevail;[12] full or partial forfeiture of the fees that the attorney received from the former client is the remedy;[13] MDL mass tort settlements in which the ASR potentially applies are for tens and hundreds of millions of dollars and involve contractual contingent attorneys' fees of one-third or more.[14]

The following opinion of Judge Barbier is an example of judicial deception and a clear violation of the ASR.

"Claimants have no right to know their exact compensation amount prior to the opt-out date….any class member seeking to determine his compensation may simply read the settlement agreements and determine how his circumstances fit into the frameworks….in all cases, the frameworks are detailed and transparent and a claimant can make a reasonable determination of how his claim will be resolved based on his or his business's circumstances….class members do not need to be able to pinpoint the compensation for which they will be eligible in order to decide whether to remain in the Settlement Class."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 8138 at 81, December 21, 2012).

A class member seeking to determine his compensation would not be able to simply read the settlement agreements and determine how his circumstances fit into the frameworks. The frameworks of the settlement agreements are certainly not detailed and transparent. A claimant could not possibly make a reasonable determination of how his claim will be resolved based on his or his business's circumstances. The drafters of these settlement agreements obviously worked under the premise that "if we can't dazzle them with brilliance, we will baffle them with obfuscation."

I disagree with Judge Barbier's opinion. I believe the BP oil well blowout victims would like to have known at least the following:

(a) The total amount of the settlement is $20 billion;

(b) The Deepwater Horizon Economic and Property Damages Settlement Agreement would deny payment to approximately 60.03% of the submitted claims;

(c) The average total amount paid per approved claim would be a paltry $64,700.02;[16] and

(d) The total compensation paid to the 19 MDL 2179 PSC attorneys and their law firms is guesstimated to be US$3.035 billion. This assumes that 50% of the paid claims were for clients of PSC attorneys and their law firms.

**COLLUSION**

"There is no evidence whatsoever of any fraud or collusion in the negotiation of the Settlement. Rather, any suggestion of fraud or collusion is baseless."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 8138 at 57, December 21, 2012).

The U.S. District Court for the Eastern District of Louisiana has defined "collusion" as the "lawful means for the accomplishment of an unlawful purpose" and as a "*secret understanding*

*between two or more persons prejudicial to another, or a secret understanding to appear as adversaries, though in agreement*." Collusion does not require fraudulent conduct.[1]

Based solely on the following numbers, it is beyond cavil that a reasonable, objective observer would not conclude that collusion permeates MDL 2179 and any MDL which incorporates a Feinberg-administered victims' compensation "fund" and/or a settlement class action.

The BP Oil Well Blowout MDL (MDL 2179) Numbers
**Compensation Paid to BP Oil Well Blowout Victims**
I. Feinberg-Administered Victims' Compensation "Fund" + Transition Period

| | |
|---|---|
| Total Number of Claimants (08/23/2010 to 06/04/2012) | 590,379 |
| Total Number of Claimants Paid | 237,358 |
| Total Amount Paid | $6,484,922,450.47 |
| Total Amount Paid Per Approved Claimant | $27,321.27 |

(Feinberg Status Report of March 7, 2012 + Transition Period)

The "Fair, Reasonable, and Adequate" Settlement Class Action

| | |
|---|---|
| Total Number of Submitted Claims (06/04/2012 to 03/29/2017) | 389,457 |
| Total Number of Claims Paid | 155,652 |
| Total Amount Paid | $10,070,688,009.00 |

(DHCC Status Report of March 29, 2017)

Notes:
(a) Kenneth R. Feinberg denied payment to approximately 61.46% of the claimants who filed claims.
(b) Since 2011, Judge Barbier has declined to permit formal discovery on Feinberg. In short, the lawsuits filed against Feinberg have been put on ice for more than [8] years.
(c) On March 8, 2012, Judge Barbier entered an Order creating a process to facilitate the transition from Feinberg to the Court Supervised Claims Program ("CSCP") envisioned by the settlement class action. This claims program was later renamed "The Deepwater Horizon Claims Center (DHCC)."
(d) The Transition Process commenced on March 8, 2012 and concluded on June 4, 2012 and ultimately paid approximately $405 million on nearly 16,000 claims.
(e) Feinberg's "Release and Covenant Not to Sue" excluded approximately 220,000 BP oil well blowout victims from the subsequent Deepwater Horizon Economic and Property Damages Class Settlement Agreement.
(f) The DHCC denied payment to approximately 60.03% of the submitted claims.

**Compensation Paid to Kenneth R. Feinberg by BP**
(From June 15, 2010 to April 15, 2012)                    **US$24.70 million**

**Compensation Paid to 19 PSC Attorneys and Their Law Firms**

| Common Benefit Fees | US$597.354 million |
| Contingent Fee (25%) | US$2.438 billion |
| Co-counsel Fee | Unknown |
| Hold-Backs | Unknown |
| **Total Compensation Paid to 19 PSC Attorneys/Law Firms** | **US$3.035 billion** |

Notes:

(a) As Professors Silver and Miller point out, "the defendant is happy to offer the PSC attorneys 'red-carpet treatment on fees' - higher common benefit fees cost the defendant nothing - in return for limited liability in the form of a smaller victims' compensation fund and/or a smaller settlement fund.

(b) In February 2011, only 4 months after Judge Barbier appointed his "cooperative" attorneys to the BP oil well blowout MDL PSC, settlement negotiations began in earnest. The PSC and BP negotiated a total amount (US$20 billion) which BP was willing to pay in order to settle the BP oil well blowout case. The PSC and BP were never adversaries.

(c) Not a single bellwether trial was held in MDL 2179. The PSC certainly did not zealously advocate on behalf of the plaintiffs. Clearly, the MDL 2179 settlement class action was not achieved in the full context of adversarial litigation.

**The CWA Civil Penalty**

| Total Amount of Oil Released from the Reservoir | 5,000,000 barrels |
| Total Amount of "Collected Oil" | 810,000 barrels |
| Net Discharge of Oil | 4,190,000 barrels |
| CWA Civil Penalty Due to BP's Gross Negligence | $4,300/discharged barrel |
| CWA Penalty BP *Should* Pay | $18.02 billion |
| Total CWA Penalty BP *Actually* Paid | $13.72 billion |
| Savings to BP (Due to Judge Barbier's "Calculations") | $4.30 billion |

Notes:

(a) The parties stipulated that during the spill response 810,000 barrels of oil were collected without contacting any ambient sea water ("Collected Oil"). Thus, while the parties present estimates of the total volume of oil that left the reservoir, they agree that 810,000 barrels should not be used to calculate the statutory maximum penalty under the CWA.

(b) The U.S Government found that 5.0 million barrels of oil exited the reservoir, resulting in a net discharge of 4.19 million barrels once adjusted for the collected oil.

(c) The MDL 2179 Court concluded that the discharge of oil was the result of BP's "gross negligence" and "willful misconduct" under the CWA.

(d) However, the MDL 2179 Court found, for whatever reason, that only 4.0 million barrels of oil released from the reservoir. After deducting the collected oil from this amount per the parties' stipulation, Judge Barbier found for purposes of calculating the maximum possible civil penalty

-67-

under the CWA that 3.19 million barrels of oil discharged into the Gulf of Mexico. In short, the maximum CWA civil penalty that could be assessed against BP is approximately US$13.72 billion (3,190,000 x US$4,300).

(e) If the Honorable Carl J. Barbier had not arbitrarily reduced the amount of oil released from the reservoir by 1.0 million barrels, the maximum CWA civil penalty that could be assessed against BP would have been approximately US$18.02 billion (4,190,000 x US$4,300).

**Government Entity Settlements**
On October 5, 2015, the U.S. lodged with the MDL 2179 Court a proposed Consent Decree between the United States, the Gulf States, and BP. By its terms, the Consent Decree fully and finally resolved as to BP any and all natural resource damages claims of the United States, the five Gulf States, and their respective natural resource trustees, all Clean Water Act penalty claims, and certain other claims of the United States and the Gulf States. In exchange, BP graciously agreed to pay:

US$5.5 billion to the United States as a civil penalty under the Clean Water Act, *payable over 15 years*;

US$7.1 billion to the United States and the five Gulf states for natural resource damages, *payable over 15 years*; and

US$4.9 billion to settle economic and other claims made by the five Gulf Coast states, *payable over 18 years*.

After a period of public comment, the MDL 2179 Court entered the Consent Decree on April 4, 2016.

As long as too many awkward questions are not asked, the gears of collusive judicial efficiency will mesh noiselessly. The JPML, the transferee judges and, absolutely, the cooperative and greedy PSC attorneys are praying that too many awkward questions will not be asked. As James Parkerson Roy and Stephen J. Herman like to say, "Laissez les bons temps rouler."

It is time for every U.S. citizen to ask "awkward questions." If you have not been a victim of MDL, or are not currently a victim of MDL, you may very well be one in the future.

**EPILOGUE**

"Equality before the law in a true democracy is a matter of right.
It cannot be a matter of charity or of favor or of grace or of discretion."
U.S. Supreme Court Justice Wiley Rutledge, 1941

The proliferation of CDOs, CDSs, and MDLs have something in common: each is the result of ego, greed, lack of transparency, and lack of accountability.

-68-

The Meltdown of the U.S. Federal Judicial System

Ego: Judge Alex Kozinski characterizes self-transfer in MDL as "a remarkable power grab by federal judges," because the practice exceeds the authority Congress granted to transferee judges.

Judge Patrick E. Higginbotham further explains, "The disconnect between the power of the transferee judge and the power that the judge exercises rests on a statute that authorizes only the transfer of cases to that judge for purposes of pretrial proceeding with return to their filing homes, as the U.S. Supreme Court made clear in *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*. The rest of the operation finds its footing in some form of consent and assertions of implied and inherent authority sometimes on little more than empty air."[6]

A transferee judge wants to be viewed as the hero who has resolved the disputes rather than the ineffectual colleague whose inability to achieve a settlement left his fellow trial judges with the task of trying each case individually. As a result, MDL cases most often result in settlement or other disposition before the transferee judge rather than proceed to final judgment. This increased pressure on transferee judges to promote an early settlement or dismiss cases, rather than remand, exists independently of the true value of the claims.

A transferee judge's ego will not allow him to appear as an "ineffectual colleague" who leaves his fellow trial judges with the task of trying each case individually. Unfortunately, this ego results in transferee judges replacing justice with judicial efficiency. The vast majority of transferee judges believe it is better to settle or dismiss cases in MDL, and be respected by their peers, rather than remand the cases and be viewed as a failure by their fellow trial judges.

Greed: The greed exhibited by attorneys appointed to an MDL PSC would make pre-2008 meltdown Wall Street investment bankers envious. For example, the attorneys appointed to the BP oil well blowout MDL were permitted by the Court to quadruple-dip. As a result, these 19 MDL 2179 PSC attorneys/law firms will collect approximately US$3.035 billion. Yes, that's a "b," not an "m."

Lack of Transparency: There is a reason why an agreement entered into between an MDL PSC and an MDL defendant is referred to as a "backroom deal." The deal is consummated behind closed doors. My goodness, it the deal were fully transparent, the current settlement-focused MDL would not be able to function.

The BP oil well blowout MDL plaintiffs were kept in the dark in regard to the following:

(a) In mid-2010, BP made the business decision to pay a total amount of US$20 billion to compensate all the BP oil well blowout victims.

(b) In February 2011, only four months after Judge Barbier appointed his cooperative attorneys to the PSC, settlement negotiations began "in earnest" between the PSC and BP. There was obviously no need to wait for discovery or conduct bellwether trials. As the PSC and BP were negotiating and drafting a class settlement agreement, Kenneth Feinberg was forcing claimants

to sign a "Release and Covenant Not to Sue" in order to receive an inadequate, miniscule payment amount for the damages, including future damages, they incur as a result of the oil well blowout. Feinberg's "Release and Covenant Not to Sue" excluded approximately 220,000 BP oil well blowout victims from the subsequent Deepwater Horizon Economic and Property Damages Class Settlement Agreement.

(c) On November 10, 2014, Judge Barbier states, "….as the parties were approaching the final fairness hearing in November 2012, there was a concerted effort by the parties and claims facility to process a substantial number of high value claims in order to demonstrate that the settlement program was working as intended." In sum, the MDL 2179 transferee judge, the PSC, BP, and the administrator of the proposed settlement fund secretly colluded to inflate the amount of compensation received by some plaintiffs (just prior to the "fairness" hearing) in order to intentionally mislead the remaining plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate." Why would a plaintiff possibly want to opt-out of a settlement which is going to provide such generous compensation?

(d) The MDL 2179 Court, the PSC, BP, and Patrick Juneau knew that BP would only pay a total amount of US$20 billion to BP oil well blowout victims. Accordingly, the plaintiffs should have been informed that Patrick Juneau would pay less than 40% of the submitted claims. Instead, in order to limit the number of plaintiffs who would opt-out, the MDL 2179 Court and PSC intentionally misled the plaintiffs by telling them that "the settlement has *no cap or limit*."

Lack of Accountability: It is currently very difficult, if not impossible, to hold federal judges accountable. Transferee judges, indeed all federal judges, draw upon the considerable public trust they enjoy as life-tenured independents. However, this well of trust from which transferee judges draw is not bottomless. When transferee judges sanction a Feinberg-administered compensation "fund" to illegally eliminate as many claimants as possible and approve a class settlement agreement which is unfair, unreasonable, and inadequate, all in the name of judicial efficiency, this well will quickly run dry.

On November 13, 2017, I filed a motion on behalf of my clients wherein I requested the MDL 2179 Court to place on the public record the total amount and source of compensation, from all sources, paid to all members of the PSC and the total amount and source of compensation paid to the legal experts, Special Masters, and Claims Administrator Patrick Juneau. This was neither a Motion to Compel nor an Objection. This was merely a motion by the plaintiffs to request the MDL 2179 Court to conduct itself in a fully transparent manner.

In the motion, I pointed out to the Court that the total compensation paid to the 19 PSC attorneys and their law firms is guesstimated to be $3.035 billion. It is beyond cavil that a reasonable, objective observer would not conclude that this amount is out of all proportion to the value of the professional services rendered. I further pointed out to the Court that a narrow focus on judicial efficiency cannot allow the circumvention of the core democratic premises of representation, transparency, and accountability.

On March 6, 2018, the MDL 2179 Court issued an Order wherein the Honorable Carl J. Barbier succinctly states, "Before the Court is a 'Motion to Request this Court to Place on the Public Record the Total Amount and Source of Compensation, From All Sources, Paid to All Members of the PSC, et al.' IT IS ORDERED that the Motion (Rec. Doc. 23677) is DENIED. New Orleans, Louisiana, this 6th day of March, 2018." Obviously, Judge Barbier does not believe that the plaintiffs in MDL 2179 have a right to know how much compensation the attorneys allegedly representing their interests are receiving.

The increase in the consolidation of civil cases in MDLs has resulted in a shift away from the rule of law to a system of arbitrary justice. In an MDL, mass tort defendants, the transferee judge and the MDL PSC are granted extraordinary flexibility to be innovative in their actions. Unlike class action lawsuits, MDLs are not restricted by the jurisdictional constraints of the class action rule.

Indeed, U.S. federal courts are fading into administrative bureaucracies in full embrace of judicial efficiency at the exclusion of justice.

[a] *Collusion: Judicial Discretion vs. Judicial Deception - The Impending Meltdown of the United States Federal Judicial System* by Brian J. Donovan
Copyright © 2018 Brian J. Donovan
Print ISBN: 978-1-63492-844-1
Publisher: Booklocker.com Inc.
Publication Date: 04/20/2018
Pages: 494
Available at: www.barnesandnoble.com/w/collusion-brian-j-donovan/1127702938