1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4    ****************************************************************

5

6    IN RE: OIL SPILL BY THE
     OIL RIG *DEEPWATER HORIZON*
7    IN THE GULF OF MEXICO ON
     APRIL 20, 2010

8
                              CIVIL ACTION NO. 10-MD-2179 "J"
9                             NEW ORLEANS, LOUISIANA
                              WEDNESDAY, AUGUST 28, 2019, 9:30 A.M.
10

11
     THIS DOCUMENT RELATES TO
12   ALL CASES IN THE B3
     PLEADING BUNDLE
13

14   ****************************************************************

15

16              TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
                HEARD BEFORE THE HONORABLE CARL J. BARBIER
17                    UNITED STATES DISTRICT JUDGE

18

19   APPEARANCES:

20

21   FOR THE PLAINTIFFS:

22                        PAUL A. DOMINICK, ESQUIRE
                          DOUGLAS M. SCHMIDT, ESQUIRE
23                        HUGH P. LAMBERT, ESQUIRE
                          C. DAVID DURKEE, ESQUIRE
24                        TIMOTHY J. FALCON, ESQUIRE
                          FRANK J. D'AMICO, JR., ESQUIRE
25

                         *OFFICIAL TRANSCRIPT*

```
 1    APPEARANCES CONTINUED:

 2

 3                            SPENCER DOODY, ESQUIRE
                             KACIE GRAY, ESQUIRE
 4                            D. C. PANAGIOTIS, ESQUIRE
                             CYNDI M. RUSNAK, ESQUIRE
 5                            THOMAS E. LOEHN, ESQUIRE

 6

 7                            CAYCE C. PETERSON, ESQUIRE
                             MATTHEW ROGERS, ESQUIRE
 8                            BRANDEN TAYLOR, ESQUIRE
                             STEPHEN J. HERMAN, ESQUIRE
 9                            STANLEY J. JACOBS, ESQUIRE

10

11    FOR THE DEFENDANTS:   MATTHEW T. REGAN, ESQUIRE
                            A. KATRINE JAKOLA, ESQUIRE
12                           MARSHA MONTGOMERY, ESQUIRE
                            T. JUSTIN SIMPSON, ESQUIRE
13                           TREVOR CUTAIAR, ESQUIRE

14

15                            SEAN P. BRADY, ESQUIRE
                             CHERYL L. BLOUNT, ESQUIRE
16                            ANDREW H. MEYERS, ESQUIRE

17

18    OFFICIAL COURT REPORTER:   CATHY PEPPER, CRR, RMR, CCR
                                 CERTIFIED REALTIME REPORTER
19                                REGISTERED MERIT REPORTER
                                 500 POYDRAS STREET, ROOM B-275
20                                NEW ORLEANS, LA  70130
                                 (504) 589-7779
21                                Cathy_Pepper@laed.uscourts.gov

22

23    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
      PRODUCED BY COMPUTER.

24

25
```

*OFFICIAL TRANSCRIPT*

1                              **I N D E X**

2

3                                                              <u>PAGE</u>

4

5    IN-COURT STATUS CONFERENCE TO FOLLOW UP ON OUR

6    PREVIOUS DISCUSSIONS REGARDING HOW THE COURT SHOULD

7    PROCEED ON THESE B3 BUNDLE CLAIMS, MOST OF WHICH ARE

8    MEDICAL CLAIMS.......................................    5

9    SUBMISSION ON BEHALF OF VICTORIA SANCHEZ, 25953......    6

10   CIVIL ACTION 12-2715, FOR A CLAIMANT OR PLAINTIFF

11   NAMED HANK KIFF......................................    8

12    I'M GOING TO ORDER THAT THOSE TWO CASES, THE

13   SANCHEZ CASE, 12-0164, AND THE KIFF CASE,

14   CIVIL ACTION 12-2715, BE SEVERED FROM THE MDL........    9

15   PROPOSED CASE MANAGEMENT ORDER, RECORD DOCUMENT

16   25928, FILED ON BEHALF OF A PLAINTIFF

17   CLAY WHITTINGHILL....................................    10

18   MR. WHITTINGHILL'S LAWSUIT IS CIVIL ACTION 10-1984

19   IN WHITTINGHILL V. ABDON CALLAIS, I'M GOING TO ORDER

20   NOW THAT ALL CLAIMS OF THE PLAINTIFF ARE DISMISSED

21   EXCEPT HIS FMLA CLAIMS AGAINST HIS EMPLOYER,

22   ABDON CALLAIS.  THOSE ARE RESERVED.  THEN I'M GOING

23   TO SEVER THAT CASE FROM THE MDL.....................    12

24

25   ....................................................

                        *OFFICIAL TRANSCRIPT*

1  JOINT SUBMISSION REGARDING A PROPOSED CASE

2  MANAGEMENT ORDER FOR THE B3 BUNDLE,

3  RECORD DOCUMENT 25947.  THIS WAS JOINTLY SUBMITTED

4  BY BP IN WHAT'S DESCRIBED AS *THE MAJORITY OF THEIR*

5  *REMAINING B3 PLAINTIFFS*.............................. 14

6  MS. JAKOLA........................................   15

7  MR. DOMINICK......................................   29

8  MR. FALCON........................................   39

9  MS. JAKOLA........................................   44

10  MR. FALCON........................................   45

11  MR. LOEHN.........................................   52

12  MR. JACOBS........................................   54

13  MS. JAKOLA........................................   56

14  MR. D'AMICO.......................................   62

15  MR. FALCON........................................   64

16  MR. SCHMIDT.......................................   67

17  MR. SIMPSON.......................................   69

18  MR. DOMINICK......................................   71

19  THE COURT.........................................   74

20  MS. JAKOLA........................................   75

21  MR. JACOBS........................................   76

22  MR. REGAN.........................................   77

23  THE COURT.........................................   78

24

25

*OFFICIAL TRANSCRIPT*

1                    P-R-O-C-E-E-D-I-N-G-S

2                  WEDNESDAY, AUGUST 28, 2019

3               M O R N I N G   S E S S I O N

4                   (COURT CALLED TO ORDER)

5

6

7        THE DEPUTY CLERK:  All rise.  Court is now in session.

8        THE COURT:  Please be seated.  All right.  Gail, call

9   the case.

10       THE DEPUTY CLERK:  MDL 2179, In re:  Oil Spill By the

11  Oil Rig *Deepwater Horizon* in the Gulf of Mexico on April 20,

12  2010, Relating To:  All Cases in the B3 Pleading Bundle.

13       THE COURT:  All right.  Has everyone here who needs to

14  show that you were here signed our attendance sheet?  If not,

15  you can do so afterwards.

16            All right.  We're here for an in-court status

17  conference to follow up on our previous discussions regarding

18  how the Court should proceed on these B3 bundle claims, most of

19  which are medical claims.

20            I think the last time we were here we already

21  severed out some of the B3 claims that were nonmedical.  There

22  were only contract claims.  Right, Ben?  We had 12 or 13.

23            We also issued an order last time to show cause

24  to a group of cases in which BP apparently believes these

25  claims may be subject to dismissal because they were class

                    *OFFICIAL TRANSCRIPT*

1  members who did not validly opt out, and that's all in progress

2  right now.

3           So before we get to the proposed case management

4  orders, there are one or two things I wanted to focus on

5  briefly.  There is a submission on behalf of Victoria Sanchez,

6  25953.  Is there someone here who represents Ms. Sanchez?

7           MS. RUSNAK:  Present, Your Honor.

8           THE COURT:  Do you want to come forward, ma'am.

9  Because this may be in the category, it appears to be a

10  nonexposure claim, right?

11           MS. RUSNAK:  Yes, sir.

12           THE COURT:  Tell me your name again.

13           MS. RUSNAK:  Cyndi Rusnak, R-U-S-N-A-K.

14           THE COURT:  Okay.  Are you with her?

15           MR. MEYERS:  Your Honor, my name is Drew Meyers.  I

16  represent the alleged Jones Act employer in that particular

17  case, American Pollution Control Corporation.

18           THE COURT:  Okay.  Ms. Rusnak?

19           MS. RUSNAK:  Yes, sir.

20           THE COURT:  Yeah.  What you allege is that your

21  plaintiff, your client, Victoria Sanchez, was employed as a

22  cleanup worker on a Vessel of Opportunity Program vessel

23  following a spill, and she suffered a nonexposure-related

24  physical injury when the vessel she was working on hit a swell,

25  and she was thrown onto the deck and rail of the vessel.  She's

*OFFICIAL TRANSCRIPT*

1    filed a Jones Act lawsuit in this court against AMPOL.

2                    That's your client?

3        MR. MEYERS:  Yes, Your Honor.

4        THE COURT:  And other defendants, which were swept up

5    into the MDL and grouped into the B3 pleading bundle.  You

6    assert in this document that plaintiff has no

7    dispersant-related inhalation medical claims; is that right?

8        MS. RUSNAK:  That is correct, Your Honor.

9        THE COURT:  She's not making any type of

10   exposure-related claims whatsoever?

11       MS. RUSNAK:  None, Your Honor.

12       THE COURT:  She's just claiming what, she fell and

13   hurt, what, her back or something?

14       MS. RUSNAK:  Yes, Your Honor, her back and neck.

15       THE COURT:  That's it?

16       MS. RUSNAK:  Yes, personal injuries only as a result of

17   the fall.

18       THE COURT:  Okay.  We have a similar case.  I don't

19   know if anyone is here.  Let me hear, first of all from -- I'm

20   sorry, your name is Drew --

21       MR. MEYERS:  Drew Meyers, Your Honor.

22       THE COURT:  Meyers.  Do you agree with what she just

23   said?

24       MR. MEYERS:  Yes, Your Honor.  The case was pending in

25   Judge Engelhardt's court, and we had a scheduling order, and we

                        *OFFICIAL TRANSCRIPT*

1    were on the way, and that's when it got swept up and sent over

2    here.

3          THE COURT:  Okay.  All right.  There is what appears to

4    be a similar case.  I don't know who represents it.  I don't

5    have any current submission by this plaintiff.  Hank Kiff,

6    K-I-F-F, which is -- by the way your case for Victoria Sanchez

7    is Civil Action 12-0164.

8          MS. RUSNAK:  Yes, Your Honor.

9          THE COURT:  There is a similar case,

10   Civil Action 12-2715, for a claimant or plaintiff named

11   Hank Kiff.  Is anyone here representing Mr. Kiff?  Not that

12   they have to be here, but I was just asking.

13             That case, from what we can tell, was actually

14   filed in the Southern District of Texas and then transferred

15   here, but it appears to be another case where there are no

16   exposure claims of any type, and it's strictly some type of

17   slip and fall or some type of injury on a vessel with a

18   physical injury.

19             I don't know if the defendants at BP or anybody

20   on this side has any information about the Kiff case.

21         MS. JAKOLA:  Good morning, Your Honor.  Katie Jakola on

22   behalf of BP.

23         THE COURT:  Hi.

24         MS. JAKOLA:  Obviously Mr. Kiff did not file a

25   submission or response to our proposed CMO.

                              *OFFICIAL TRANSCRIPT*

1          THE COURT:  Right.

2          MS. JAKOLA:  We are aware of the case, and our

3     understanding is the same as Your Honor's, that Mr. Kiff

4     alleges nonexposure-only claims.  That's our understanding,

5     Your Honor.

6          THE COURT:  Right.  You agree with what Ms. Rusnak

7     said?

8          MS. JAKOLA:  I do about Ms. Sanchez, purely

9     nonexposure, and we were prepared to respond to that submission

10    today.  We don't have an objection to that request because she

11    is very different than the other folks.

12         THE COURT:  Okay.  Very well.  Thank you.

13         MS. JAKOLA:  Thank you.

14         THE COURT:  Okay.  So with that said, unless somebody

15    else needs to be heard on those two cases, I'm going to order

16    that those two cases, the Sanchez case, 12-0164, and the Kiff

17    case, Civil Action 12-2715, be severed from the MDL.

18              The Sanchez case will be placed on the trial

19    docket and scheduling order.  We'll do a scheduling conference.

20    You'll get something from my case manager, okay?

21              The Kiff case, that will have to be transferred

22    here by the JPML, I suppose.  Ben, do you know?  Ms. Jakola, do

23    you know?  Is that how it got here?

24         MS. JAKOLA:  I will have to get back to Your Honor on

25    that.

*OFFICIAL TRANSCRIPT*

1        THE COURT:  I assume that's how it got here since it's

2    filed in Southern Texas.  If that's so, then we'll have to

3    issue a suggestion of remand to the panel.  I don't have

4    authority to remand that to the Southern District of Texas

5    myself, or it would go to the Southern District of Texas, and

6    then they would decide how to handle it from there.

7            Okay.  Does anybody have any questions about

8    those?

9        MS. RUSNAK:  Thank you, Your Honor.  May I be excused?

10        THE COURT:  Sure.  Yes.  Thank you.  Sorry it took so

11    long to get to that point.  It seems like we should have done

12    that years ago, probably.  There have been a few other things

13    we were doing.

14            Okay.  There is another case that's a little bit

15    unusual.  There is a proposed case management order,

16    Record Document 25928, filed on behalf of a plaintiff

17    Clay Whittinghill.  Is someone here representing

18    Mr. Whittinghill?

19        MR. DOODY:  Yes, Your Honor.

20        THE COURT:  Do you want to come forward.

21        MR. DOODY:  Spencer Doody on behalf of

22    Clay Whittinghill.

23        THE COURT:  Okay.  I'm reading your submission.  You

24    said your client was working for Abdon Callais, and your only

25    claims are under the Family and Medical Leave Act, the

*OFFICIAL TRANSCRIPT*

1    Jones Act, and general maritime law, but you do allege exposure
2    injuries, right?
3         MR. DOODY:  I do allege exposure injuries, Your Honor.
4    It's become apparent with the motion for judgment filed by BP,
5    who is not a party in our case, that the Jones Act, all
6    personal injury claims were released with the -- through the
7    MSA.  The only thing that would remain would be the Family and
8    Medical Leave Act claim.
9         THE COURT:  That would only be against Abdon Callais?
10        MR. DOODY:  Yes, Your Honor.
11        THE COURT:  He was directly employed by Abdon Callais?
12        MR. DOODY:  Yes, Your Honor.  He was a captain on a
13   vessel of opportunity.  He got sick.  The company doctor said
14   you can't work.  He was fired.  That's our only allegation.
15        THE COURT:  So, yeah, your client's claim was the
16   subject of a motion for summary judgment filed by BP as a
17   released claim under the medical settlement, right?  All the
18   exposure claims.
19        MR. DOODY:  Yes, Your Honor.  BP did not distinguish.
20   We opposed the summary judgment as it applied to the Family and
21   Medical Leave Act.  We also alleged that BP didn't have
22   standing as a nonparty to file that motion.
23        THE COURT:  But I have standing to determine if you're
24   a released party.
25        MR. DOODY:  I'm willing to concede that, Your Honor.

*OFFICIAL TRANSCRIPT*

1          THE COURT:  Okay.  Thank you.  Okay.  So I don't know

2     who wants to speak for BP on this, but what I was going to

3     suggest is that he's agreeing to dismiss all claims that are

4     released by the medical center, all medical-related claims but

5     reserve his rights against his employer, direct employer,

6     Abdon Callais, under the FMLA.

7          MS. JAKOLA:  Yes, Your Honor.  Understood.  I think

8     there was some suggestion by the named defendant,

9     Abdon Callais, that BP may be brought in or implicated later in

10    the suit, but that issue is not ripe before Your Honor, so we

11    agree with your thinking on this one.

12         THE COURT:  All right.  So with that understanding, and

13    Mr. Whittinghill's lawsuit is Civil Action 10-1984 in

14    Whittinghill v. Abdon Callais, I'm going to order now that all

15    claims of the plaintiff are dismissed except his FMLA claims

16    against his employer, Abdon Callais.  Those are reserved.  Then

17    I'm going to sever that case from the MDL.

18              That case, I assume, was filed here, Mr. Doody?

19         MR. DOODY:  Yes, Your Honor, it was.

20         THE COURT:  We'll have that placed on the trial

21    calendar also, so you'll get a notice of a scheduling

22    conference, a telephone conference with my case manager, okay?

23         MS. JAKOLA:  Thank you, Your Honor.

24         THE COURT:  Thank you.

25              Okay.  Those are the easy ones.  Does anybody

*OFFICIAL TRANSCRIPT*

1    have an easy one?

2            MR. FALCON:  Yes, Your Honor.

3            THE COURT:  I don't know about you, Mr. Falcon.  I

4    don't think yours is easy.

5            Okay.  Seriously, if anybody has anything.  Well,

6    I do want to bring up, going back to the first two cases we

7    talked about, Sanchez and Kiff, Ben tells me we had a note of

8    we think there are 59 other cases which allege -- most of the

9    cases in B3 allege only exposure claims; however, there is a

10   smaller universe of about 59, we think, that allege both

11   exposure and nonexposure claims of some sort.

12            I know sometimes when lawyers are pleading cases

13   they plead everything they possibly can, and I'm just wondering

14   if anybody is aware of within that universe of 59 -- it may not

15   be exactly 59; we think it is -- if there is anybody in that

16   group that may at this point want to or be inclined to dismiss

17   exposure claims and assert only nonexposure claims of some

18   sort?

19            If there are and we could put that on the record,

20   today or whenever, then I would be inclined to do with those

21   cases what I did with these others, sever them from the MDL and

22   either put them on a trial calendar here or send them back to

23   wherever they belong if they don't belong here.

24            So I'm just putting that on everybody's radar

25   screen.  If anybody wants to comment that on that now, I'll

*OFFICIAL TRANSCRIPT*

1    listen to it, but you don't have to.

2              Okay.  So with respect to the bulk of the claims,

3    the overwhelming bulk of the claims, as I said, they are

4    exposure only claims by, I think, mostly cleanup workers but

5    some who are noncleanup workers -- residents, tourists,

6    whatever.  The Court received a joint submission regarding a

7    proposed case management order for the B3 bundle,

8    Record Document 25947.  This was jointly submitted by BP in

9    what's described as *the majority of their remaining B3*

10   *plaintiffs*.

11             It's represented to the Court that the parties

12   agree that the Court should implement procedures regarding

13   certain general phases for future management of this B3 bundle

14   providing for, one, an exchange of certain preliminary or

15   initial disclosures; two, expert discovery focused on general

16   causation issues; and, three, certain additional discovery.

17             However, the parties have been unable to reach

18   any accord regarding conduct of what would follow that, that

19   is, either conduct of these pretrial phases as well as

20   appropriate approach to trial of the remaining B3 claims, in

21   particular, whether the B3 cases should be tried in so-called

22   *flights* or in single plaintiff trials as BP proposes.

23             Attached to that document are alternative or

24   competing, I guess you would say, proposed case management

25   orders.

                         **OFFICIAL TRANSCRIPT**

1          I don't know who wants to speak to this first on

2     behalf of either side.

3          MR. DOMINICK:  I'm happy to go first, Your Honor.

4          THE COURT:  Mr. Regan or Ms. Jakola.

5          MS. JAKOLA:  I'm happy to proceed, Your Honor.

6          THE COURT:  Okay.

7          MS. JAKOLA:  Thank you, Mr. Dominick.

8          Your Honor, as you saw, since our July 17th,

9     status hearing, we, along with counsel for the majority of the

10    B3 plaintiffs, have been working hard and, I believe, in good

11    faith to attempt to reach an accord on a joint submission.

12    Those efforts culminated in the joint submission Your Honor

13    just referenced.

14         As Your Honor noted, we have reached consensus,

15    at least on some conceptual next steps, including exchange of

16    some initial disclosures, an expert period focused on general

17    causation issues, and some streamlined discovery of BP on

18    issues of interest to the entire docket.

19         Where we primarily disagree is, as Your Honor

20    noted, what should happen next after that, whether we pursue

21    some idea of consolidated trial flights as the plaintiffs

22    propose or whether we proceed in single plaintiff trials, and

23    that's where we primarily diverge.

24         Each side, as Your Honor saw, made submissions

25    with the proposed CMO's outlining what they think should

*OFFICIAL TRANSCRIPT*

1   happen.  Your Honor, I submit that our proposal, the BP

2   proposal, would advance the largest number of cases across the

3   docket concurrently while honoring Fifth Circuit precedent and

4   precedent from this court and other courts that trial on the

5   merits of these cases involve such highly individualized issues

6   such as specific causation and damages, including on issues

7   such as emotional distress -- we have a lot of cases alleging

8   damages along those lines -- that render consolidation

9   inappropriate.

10              Plaintiffs' proposal, respectfully, Your Honor,

11  focuses on advancing the cases of really a smaller number of

12  plaintiffs, 20 plaintiffs, 10 plaintiffs proposed for each

13  flight, that really wouldn't give us lessons that would carry

14  over to other plaintiffs in the docket.  So, Your Honor, we

15  believe that the most efficient path forward for the docket as

16  a whole is to move forward as BP has proposed.

17              I would be happy to talk through more features of

18  the proposal and the three buckets.  There are some

19  disagreements, as Your Honor noted, about details of how those

20  pretrial phases would work that I would be happy to address as

21  well.

22      THE COURT:  Okay.  It seems to me the threshold

23  decision that I have to make is whether to continue to hold

24  these cases together here in my court and for how long.  I

25  mean, there are several options.  We could do something similar

**OFFICIAL TRANSCRIPT**

1    to what we've done in the BELO cases, which are very similar to

2    these cases in many ways.

3            I could just maybe require some additional

4    exchange of information.  For example, I don't know that the

5    plaintiffs have produced any medical.  I know they've answered

6    pretrial -- they've supplied information, but I don't think

7    either side has been required to produce any documents yet, so

8    we certainly could do that.

9            The next question would be where do we go from

10   there?  Do I want to keep the cases together, as you say, and

11   allow a period of discovery on general causation?  If we do

12   that, I guess we're talking about engaging in motion practice,

13   *Daubert*, and general causation.

14           Remind me.  I've read everything.  I've read a

15   lot of stuff here.  What is your timeframe, if we got that far,

16   how long would that take?

17       MS. JAKOLA:  Yes, Your Honor.  So on the first

18   question, we do believe that there are things this court could

19   do to efficiently advance all of these cases before they are

20   reallocated, if that was Your Honor's inclination, and those

21   are set forth in the proposal.

22           So on the initial exchange of information, we

23   would propose an initial disclosure process that mirrors the

24   BELO process that Judge Wilkinson put in place that now has

25   been as working very well where there is a 120-day period where

**OFFICIAL TRANSCRIPT**

1    the parties exchange information.  We took care, we tried to

2    take care in our proposal not to duplicate.  We have some

3    information in that process already from PTO 66.  We don't have

4    all of it.

5         THE COURT:  I understand you don't have any documents

6    yet.

7         MS. JAKOLA:  We don't have any documents.

8         THE COURT:  You don't have any medical records.

9         MS. JAKOLA:  Nor have we produced any documents.

10        THE COURT:  I understand.  In terms of information, I'm

11   looking at PTO 66, Exhibit A, the particularized statement of

12   claim that these plaintiffs were required to comply with.

13             There are a lot of questions about who are you,

14   where were you working, who were you working for, that sort of

15   thing.  I'm focusing mostly on cleanup workers now.  I know not

16   everyone was a cleanup worker.

17             Then, when it gets to exposure claims, what were

18   you exposed to, how were you exposed -- inhalation, dermal,

19   skin contacts, ingestion, whatever -- the dates, the times of

20   your exposure, how many times were you exposed, where were you

21   exposed?

22             Then, in Section F of that particularized

23   statement, starting at question 29, it requires them to

24   describe in as much detail as possible the bodily injury or

25   medical condition that you claim resulted from the spill or

*OFFICIAL TRANSCRIPT*

1    your cleanup work in response to the oil spill.

2              Number 30, explain how your injury, etcetera,

3    resulted from the spill or the cleanup work.  What date did you

4    first report or seek treatment and what date was your injury

5    first diagnosed?  Identify the doctors, healthcare

6    professionals who have treated you, blah, blah, blah.

7              So it's not clear to me what additional type of

8    information -- give me some sense of what you're talking about

9    that you don't have enough information yet.

10         MS. JAKOLA:  Absolutely, Your Honor.  There is really

11   two categories -- three categories.  First, the documents.

12         THE COURT:  Well, the documents, yes.

13         MS. JAKOLA:  That's the biggest.  That's clear.

14              The second category is information about the

15   specific condition that each plaintiff is claiming was caused

16   by the spill.  PTO 66 does ask for that information.

17   Your Honor identified the correct section.  Question 29 is the

18   one most on point.

19              What we received in response to that question

20   from a large number or even most plaintiffs was a very

21   overinclusive list of the ailments that they have suffered

22   since the spill.  When we were assessing compliance with PTO

23   66, we viewed that as a good-faith attempt to provide

24   information about their conditions.

25              Now we're at a point where we can't tell

*OFFICIAL TRANSCRIPT*

1   specifically what condition, what specific condition is being

2   claimed to have been caused by the spill, so we've got in most

3   cases just the plaintiffs just attached a chart or a list with

4   bullets of 50 or more symptoms or conditions that they've

5   experienced.  All we're asking for is just a simple

6   clarification what is it exactly that you're claiming on here

7   the spill caused?

8            As Your Honor probably knows, when cases come

9   through the BELO process, before the initial disclosure process

10  even starts, the 120-day process starts in the BELO cases, GRG

11  through the NOIS process requires each plaintiff to identify

12  the specific diagnosed conditions that they are claiming were

13  caused by the spill.

14           We don't have that level of detail here, and I

15  think it should be easy for the plaintiffs to tell us what it

16  is.  We're not requiring any more sworn statements on this.  We

17  just really want to match what plaintiff is claiming what

18  conditions.  We think that's pretty basic information, basic

19  discovery that we would like to have.

20           Your Honor, I do have an example, if it would be

21  helpful.

22           THE COURT:  Okay.

23           MS. JAKOLA:  Your Honor, may I approach?

24           THE COURT:  Sure.

25           MS. JAKOLA:  Your Honor, I've handed up an example of a

**OFFICIAL TRANSCRIPT**

1    PTO 66 submission made by Mr. Falcon on behalf of one of his

2    clients, Mr. Lorenzo Murphy.  Mr. Murphy was a cleanup worker

3    who pick up tar balls in Florida.

4          If you can turn to his answer to question 29 -- I

5    should just note for the record, this document, just for

6    clarity, is on the public record, so we don't believe there are

7    any HIPAA concerns with discussing his answers to these

8    questions.

9          Question 29 -- in response to question 29

10   Mr. Murphy responds by pointing to the addendum to Exhibit A,

11   which he attaches to his submission.  If Your Honor turns back

12   to that addendum --

13         THE COURT:  I have it, addendum to Exhibit A, his

14   answer to question 29, which looks like it has 30 or 40 bullet

15   points.

16         MS. JAKOLA:  It continues on the second page,

17   Your Honor.  There are 66.

18         THE COURT:  I didn't see the back page.

19         MS. JAKOLA:  Yes, Your Honor.  I counted 66 on this

20   one.

21         THE COURT:  Sixty-six.

22         MS. JAKOLA:  Symptoms and conditions.  This is

23   representative of the kind of responses we're seeing.

24         THE COURT:  You're seeing this over and over again,

25   this type of response?

*OFFICIAL TRANSCRIPT*

1    MS. JAKOLA:  In different formats.  For the next

2    plaintiffs we often get, like, a chart but with similar lists

3    of conditions or symptoms, and they are a mix of symptoms and

4    conditions.

5          For example, on this one, we just can't tell by

6    looking at this what specifically Mr. Murphy is claiming the

7    spill caused.  He's got a number of things that are symptoms --

8    hearing loss, weight loss, blurry eyes.  Then some things that

9    are conditions -- chronic dry eye syndrome.  Further down is

10   bilateral carpal tunnel syndrome.  I can't tell if he's saying

11   that those conditions were caused by the spill or which ones.

12         So what we would ask, and this is the most -- one

13   of the most important pieces of information BP needs as part of

14   this initial disclosure process, because it will help us

15   understand what the claims are even about, is for the

16   plaintiffs to just simply tell us for each of their plaintiffs

17   what are the conditions, the specific conditions they are

18   claiming were caused by the spill or the spill response.

19   That's one example, Your Honor.

20         THE COURT:  Okay.

21    MS. JAKOLA:  The third category of information that we

22   would ask to be provided in the initial disclosure process

23   relates to some categories of information that are provided in

24   the BELO that we didn't ask for in PTO 66.  This includes

25   additional questions about prior medical history, work history,

*OFFICIAL TRANSCRIPT*

1    family medical history.  Those were taken straight from the

2    BELO CMO.

3              Our PSOC, Particularized Statement of Claim Form,

4    was an abbreviated version, about 12 pages, of questionnaires.

5    The Plaintiff Profile Form that BELO plaintiffs have to submit

6    is much longer, 25 pages, so we tried to just catch up -- the

7    idea was to catch up the B3 plaintiffs to where the BELO

8    plaintiffs are.

9              THE COURT:  Basically it sounds like you want them to

10   be required to furnish information comparable to what the BELO

11   plaintiffs are required to produce.

12             MS. JAKOLA:  Yes, Your Honor.  Precisely.  To the

13   extent that we don't already have it.  Yes, Your Honor.

14             THE COURT:  What information would BP have to produce

15   or what documents would BP have to produce?

16             MS. JAKOLA:  The full suite of information that BP

17   produces to the BELO plaintiffs.  So information about badging

18   data or work to the extent that we have it.  If we have cleanup

19   workers, we're going to provide that information.  Contracts

20   between BP and their employers, invoicing information.  This

21   helps establish where plaintiffs were working and when and for

22   how long.

23             Then we've also submitted a list of additional

24   documents that we would agree to produce as well in the

25   proposal.  These are primarily documents that we have already

***OFFICIAL TRANSCRIPT***

1      provided to the BELO plaintiffs.  We want to make sure that our

2      B3 plaintiffs have access to the same information.  It should

3      be fair to us.

4            THE COURT:  How much of that information is

5      particularized to individual claimants as opposed to -- I don't

6      want to say generic but would be applicable to all claimants?

7            MS. JAKOLA:  The first piece I mentioned, the badging

8      data, the work history, the contracts, those are specific to

9      each plaintiff.

10            THE COURT:  Sure.

11            MS. JAKOLA:  And that takes quite a long time for BP to

12      process.  That's why we need some time to do it.  We know from

13      doing that through the BELO process, we have a good sense of

14      how long that takes.  It takes a while.

15                   The other documents I mentioned relate more

16      generally to plaintiffs as a whole, so that would include

17      things like dispersants application requests and approvals.

18            THE COURT:  That should be easily made available in

19      some database or something.

20            MS. JAKOLA:  Yes, Your Honor.  Then, in addition, we

21      have been receiving many questions about samples and sampling

22      results which we have agreed to provide.  We've already

23      provided much of the information.  We provided these to counsel

24      as well.

25            THE COURT:  Okay.

*OFFICIAL TRANSCRIPT*

1          MS. JAKOLA:  That's the idea behind the initial

2    disclosures phase.

3          THE COURT:  When you get past the initial disclosures

4    and then you all are suggesting a discovery period on general

5    causation, exchange of expert reports --

6          MS. JAKOLA:  Yes, Your Honor.

7          THE COURT:  -- expert deposition, *Daubert* motion

8    practice and so forth, how long do you envision all of that is

9    going to take?

10          MS. JAKOLA:  Our proposal and the plaintiffs' proposal

11    on general causation, expert hearing is not that different on

12    this issue of timing.  I think ours differ by about a month.

13               We have our expert reports due -- we have the --

14    we proposed the plaintiffs' expert reports due in December and

15    ours due in February with anticipated filing of a motion

16    shortly after that in March, so we're looking at hearings

17    possibly in April of next year.

18               I believe that the plaintiffs proposed submitting

19    expert reports in December and having BP's expert reports in

20    January, so just accelerated about a month from where we had

21    proposed.

22          THE COURT:  Okay.

23          MS. JAKOLA:  I do think, Your Honor, that this expert

24    discovery period on general causation, we believe -- I'm sure

25    the plaintiffs will disagree -- we believe a large number of

*OFFICIAL TRANSCRIPT*

1    these cases are not going to be able to survive that general

2    causation process.

3          THE COURT:  I don't know if you know this now --

4    certainly I'll ask the other side, too -- how many different

5    experts do you envision will be involved in this whole process?

6    I'm talking about general causation now.

7          MS. JAKOLA:  Yes, Your Honor.  Well, we went through a

8    similar process with Judge Morgan recently and with

9    Judge Rogers in the Northern District of Florida, who are both

10   looking at general causation issues, as Your Honor is probably

11   aware, and we just submitted expert reports with Judge Rogers.

12   We submitted five expert reports there.  It will be multiple

13   reports.

14         THE COURT:  You submitted five; BP submitted five?

15         MS. JAKOLA:  Yes, Your Honor.

16         THE COURT:  How many did the other side submit?

17         MS. JAKOLA:  We don't have the plaintiffs' reports yet.

18   We expect in the next month.  There would be multiple experts.

19   I think we would be in a better position to address that

20   question once we have the information we need about the

21   conditions.  Because the number of plaintiffs claiming which

22   condition is going to affect our thinking about what experts we

23   need, how many.  If people are claiming primarily eye

24   conditions or respiratory conditions, we may need --

25         THE COURT:  Here is the other question following up on

*OFFICIAL TRANSCRIPT*

1   all of that -- and I have had conversations with Judge Rogers,

2   not recently, but I've had multiple conversations with her, and

3   with Judge Morgan, of course, here -- I don't want to duplicate

4   what they are doing.  None those are BELO cases.  This is B3

5   but they are similar in so many ways in terms of the medical

6   issues.

7              I don't want to have a process going on over

8   there where there is exchange of expert reports, expert

9   discovery, *Daubert* motions, and then we're doing the same thing

10  here.  I mean, do you envision, do we know, are there a lot of

11  these experts going to be the same on both sides, both in the

12  BELO and in the B3 cases?

13         MS. JAKOLA:  Your Honor is spot on.  Same experts, many

14  of the same experts.  Many of the same conditions.  These folks

15  we have in B3 are primarily just opt-outs.  We're drawing from

16  the same patient population in general, with the exception that

17  we have a lot of residents in our B3 cases that we don't see in

18  BELO.

19             Judge Morgan has scheduled *Daubert* hearings in

20  November and December, as you probably know.  Our proposal

21  tried to take that into account so we're not duplicating

22  effort, because I we think the lessons from that process could

23  be informative to us here.

24             So what we would propose is let's get things

25  moving for all the plaintiffs.  Let's get going on initial

*OFFICIAL TRANSCRIPT*

1    disclosures.  We know we need to do that.  We could be working

2    on that while that process is playing out in front of

3    Judge Morgan and before Judge Rogers.

4              So we would spend the fall doing the work we need

5    to do to get ourselves caught up to where the BELO plaintiffs

6    already are.  While we're doing that, they are going to be

7    working on the general causation expert period in those cases,

8    and we can incorporate any learnings we need from that process

9    as part of this docket as well.

10             THE COURT:  Okay.  All right.  Anything else you wanted

11   to add on this --

12             MS. JAKOLA:  Unless Your Honor has questions about the

13   trial flights --

14             THE COURT:  I'm not even going to talk about that right

15   now because my view is that I'm not sure we need to talk about

16   that today.

17             MS. JAKOLA:  I agree.

18             THE COURT:  I understand the different ideas, and so I

19   don't know if we need to really discuss that in any detail

20   today.

21             MS. JAKOLA:  Yes, Your Honor.  Agreed.  No matter what,

22   we need to do the other things.  Yes, Your Honor.

23             THE COURT:  The other things.  Right.

24             MS. JAKOLA:  Thank you, Your Honor.

25             THE COURT:  Okay.  Thank you.

**OFFICIAL TRANSCRIPT**

1              All right.  Who wants to speak next?

2         MR. DOMINICK:  May it please the Court.  Your Honor,

3    I'm Paul Dominick, again, with the Nexsen Pruet Law Firm.

4              On behalf of my co-counsel, along with 16 other

5    law firms that have signed off on our proposed case management

6    order, I think what we presented is a fair and efficient

7    process for leading these cases, of course, to what we think

8    would be an appropriate trial flight process.  I know we're not

9    going to discuss that today.

10        THE COURT:  Putting aside the whole trial flight versus

11   individual trials and all that, putting that aside for now,

12   comment on what BP's proposed in terms of getting to that step.

13        MR. DOMINICK:  Yes, Your Honor.  I think we're in

14   general agreement on having some legal issues resolved, I

15   think, as far as punitive damages, certain issues that could be

16   resolved by the Court initially across the entire bundle that

17   would be helpful to move the things forward.

18              As far as the -- I mean, we have big problems

19   with the initial exchange of information.  I don't know how I'm

20   going to approach my clients to fill out another form asking

21   essentially the same questions that the clients responded to in

22   PTO 66, PTO 63.

23        THE COURT:  Well, did you submit something like

24   Mr. Falcon?

25        MR. DOMINICK:  No, sir.

                         *OFFICIAL TRANSCRIPT*

1          THE COURT:  I'm going to let Mr. Falcon defend himself

2    in a few minutes, but this is not satisfactory.  You can't just

3    throw 66 medical claims against the wall and hope that one of

4    them sticks.

5          MR. DOMINICK:  Yes, sir.

6          THE COURT:  So if you guys are doing this kind of

7    stuff, this is the first time I've seen this, that's not going

8    to fly, and I can certainly see why the other side wants more

9    information, more specific information.

10          MR. DOMINICK:  Correct, Your Honor.  Our particular

11    clients actually gave the detailed medical summaries and that

12    kind of thing, and we'll give the medical records.  I can't

13    speak for every one of our clients as to what was provided.

14               What I will say is these were addressed to the

15    clients to under oath what they felt like were conditions

16    caused by their exposure.  Now, our process that we've proposed

17    is that --

18          THE COURT:  What I'm curious about, and I'm only seeing

19    this one -- I haven't seen any of these submissions -- but what

20    I'm curious about is whether this same response, essentially,

21    is being made on behalf of essentially everybody.  You know, is

22    it you or the other lawyers just attaching these things on

23    behalf of your clients as their answers, their response to this

24    question?

25               Again, if that's the case, that's totally

**OFFICIAL TRANSCRIPT**

1     improper.  You're not conferring with your client individually

2     in good faith and finding out what is this client's particular

3     medical problem.

4              MR. DOMINICK:  Correct, Your Honor.

5              THE COURT:  Somebody has just come up with a laundry

6     list and saying, well, this is the easy way out.  I understand

7     you've got hundreds or you've got -- I don't know, you said you

8     started with thousand, and now you're down to hundreds,

9     something below a thousand, right?

10             MR. DOMINICK:  Seven hundred and --

11             THE COURT:  But it takes time.  You wanted to represent

12    all those people so now you do.

13             MR. DOMINICK:  Your Honor, don't paint me with a brush

14    based on one.

15             THE COURT:  I'm using this.  I haven't seen one of

16    yours.  I haven't seen one of yours.  Ms. Jakola, have you got

17    one of those?  Let me see what one of yours looks like.

18             MR. DOMINICK:  Fine.  They can pull out one.  That's

19    not really the issue, Your Honor.

20             THE COURT:  Well, that's one issue here that's

21    concerning to me.

22             MR. DOMINICK:  Okay.

23             THE COURT:  Because you're here saying, look, we've

24    already given them all this information.  Don't make us provide

25    any more information, and then I see this kind of response,

*OFFICIAL TRANSCRIPT*

1    which, to me, is not a response at all.

2         MS. JAKOLA:  Your Honor, if I might just for the

3    record, this submission I just handed up is from Ms. Moore, and

4    she similarly references an exhibit in response to question 29,

5    and it's Exhibit D, which is attached.

6         THE COURT:  Which exhibit?  What's the exhibit?

7         MS. JAKOLA:  Exhibit D.

8         THE COURT:  D?

9         MS. JAKOLA:  Yes, Your Honor.  To the submission, which

10   the pages aren't consecutively numbered, but towards the back

11   there is an Exhibit D with a chart.

12        THE COURT:  I see it.

13        MS. JAKOLA:  So this is the kind of format we received

14   primarily from Nexsen Pruet, where we have tables of

15   information.  This one is only one page.  Sometimes they are

16   two or three pages.  They do have entries of dates, but we

17   can't tell, again, these complaints, assessments, complaints.

18             Here, Your Honor, I just want to be sensitive to

19   Ms. Moore, because this record is not on the public docket.

20        THE COURT:  I'm just glancing at these, obviously.

21   This is a better response than the other one.

22        MS. JAKOLA:  Yes, Your Honor.  It has less of a laundry

23   list.  Some of them are more -- I have other examples of where

24   they are much longer.  This one highlights, though.  Symptoms

25   and conditions I can't tell.

                    *OFFICIAL TRANSCRIPT*

1          THE COURT:  I understand.

2          MS. JAKOLA:  Yes, Your Honor.

3          THE COURT:  Let's let Mr. Dominick get back.

4               Go ahead, sir.

5          MR. DOMINICK:  Thank you, Your Honor.

6               This goes back to our general causation proposal,

7     and this is why our proposal makes more sense.  What we have

8     said is in consultation with our experts on general causation,

9     we will look at all of our clients that are represented by

10    these 16 or 17 law firms, we will give a list of injuries or

11    disease that we assert are capable of being caused by exposure.

12               So there will be one list presented to BP for all

13    the clients, and then BP could look at that list and say --

14    well, let's say, for example, we say a skin rash, something in

15    the matrix, we put that as something that could be caused by

16    exposure to oil.  BP could either say "yes" or "no."

17               If they say "no," then the experts will provide

18    their reports on the contested conditions on those conditions,

19    and then the Court, after a period of discovery, could decide

20    which conditions we're going to be able to assert across the

21    entire bundle.

22               What BP wants to do is go into everybody, you

23    know, individually with more information that the clients feel

24    like, you know, they've already provided three times at least

25    in these cases, to go back with another questionnaire where we

can cut that process short.  The list we provide, those will be
the things that we will be able to, in good faith, assert in a
case that is part of the general causation.

Let's fight over what we disagree on and then let
the Court decide, and that moves the bundle, I think, much more
efficiently than what is being proposed by BP.  It's just to
ask these clients the same questions over and over, you know.
It's like they are looking for, you know, expert reports based
on all the clients, and that doesn't make sense.  If that's
what we're going to do --

THE COURT:  What's the problem with having you produce
medical records on each of your clients?

MR. DOMINICK:  We've agreed to that.  Yes, sir.  That's
in our proposal.

THE COURT:  That's not a problem.

MR. DOMINICK:  Not a problem.  We can do that tomorrow.

THE COURT:  Okay.

MR. DOMINICK:  That's not a problem.  I think -- but we
need information from BP.  They haven't provided us with
anything.

THE COURT:  I understand.  They are going to have to
produce information, too.  There is a lot of information that's
easily available.  I don't know what it would take, but I mean,
that's already been produced in the BELO cases.

Are you involved in the BELO process at all?

*OFFICIAL TRANSCRIPT*

1     MR. DOMINICK:  I don't have any BELO cases.

2     THE COURT:  There is a lot of information already

3 available there.  Then with regard to particular clients, then

4 they can produce that, too.

5     MR. DOMINICK:  We did have one BELO case, just for the

6 record, that we dismissed.

7         We need certain information from them because a

8 lot of the information that they are asking that they want from

9 our clients about where were you, what were you exposed to, I

10 mean, they really have better information on that than some of

11 our clients do from memory nine years ago.  They've got the

12 badge data.

13     THE COURT:  That may be true in some cases, but I think

14 your clients certainly could say, to the best of their

15 recollection, where they were working, who they were working

16 for, were you working in Florida, were you working in

17 Grand Isle, were you working on a beach, were you working on a

18 boat, some basic information.

19     MR. DOMINICK:  We absolutely did that in response to

20 PTO 66, Your Honor.  We absolutely did that to the best of

21 their ability, you know, what subcontractors they worked for,

22 where were they working, you know.  That kind of information

23 was provided to the best of their ability.

24         I think primarily, other than the trial flight

25 issue, the primary problem we've got with what BP is trying to

**OFFICIAL TRANSCRIPT**

do, they seem to want to go very specifically into issues with
each individual client that relates more to a defense they may
have to an individual client or specific causation issues, not
general causation issues.

I think the goal here is to move forward with a
general causation analysis.  If we could get that, it would be
huge.  Then our proposal would be to limit, the kind of
additional information they want, to limit that to the
trial flight plaintiffs.

I mean, rather than 930 plaintiffs having to come
up with expert reports, and, I mean, if we're going to do that,
you know, the cases just might as well get dispersed.  If we're
not going to do that, which I think could move the bundle
forward, which I think is the goal of the MDL -- Your Honor has
done a great job so far -- we just need your help to continue
that progress that the Court has made, and if we can focus on
whatever cases are going to be tried as far as the specific
causation information and the expert reports and that kind of
thing, then it's just more manageable, I think, for everybody,
Your Honor.

Your Honor understands, of course, these aren't
the BELO -- the BELO is the result of a settlement.  As part of
the settlement, the parties got together, the class members,
counsel agreed with BP, they came up with all of these
procedures and process, and all of those procedures and process

1   assumed that no information had been exchanged from the

2   plaintiffs.

3            Here you've got a totally different situation

4   where BP has lots of information that we've had to produce on

5   our individual clients, and just to go back through that

6   process again just seems to me to be very inefficient and

7   overly burdensome, Your Honor, to ask for.

8        THE COURT:  So what do we do with a response like that?

9   Do we just ignore it and say don't worry about it now?  That

10  seems like what you're suggesting.

11       MR. DOMINICK:  Well, I guess, you know, that client --

12  if that client is in a trial flight --

13       THE COURT:  I said using that as an example.  If

14  Ms. Jakola is right that they've seen this multiple times.

15       MR. DOMINICK:  All of that is going to be wiped out by

16  our general causation process because the lawyers with the

17  experts and the clients are going to list -- these are things

18  that we think -- these are the injuries and the disease that

19  our clients have that we think we can support to be generally

20  caused, capable of being caused by exposure.

21            It's going to be limited to what we think we can

22  prove, and our client is going to be bound by that.  Whatever

23  the client thinks -- you know, clients think all of their

24  problems are related to the cause.

25       THE COURT:  Do you have your experts already, your

**OFFICIAL TRANSCRIPT**

1   general causation experts?

2       MR. DOMINICK:  Yes, Your Honor.  We have a general

3   causation expert, and I think some of the other lawyers have

4   their experts, too.

5           So we're in consultation with them, and we're not

6   going to put anything on there that our general causation

7   experts can't back up.  If somebody says they had measles and

8   it was caused by exposure, that's not going to be on our list.

9   Why fight about that?  Why worry about it?

10          Let's get a list of what in reality the experts

11  can back up and then see what BP is going to contest.  They may

12  agree that -- to a lot of these things.  I mean, the matrix

13  certainly has things that I think they would be in agreement

14  with that are capable of being caused by exposure.

15      THE COURT:  Okay.  Anything else you want to add?

16          Oh, while you're up there, so are the

17  plaintiffs -- you said something a minute ago that reminded me

18  to ask.

19          Do you envision that if these cases are

20  litigated, you're going to be trying liability and punitive

21  damages?  Is that what you're wanting to do?

22      MR. DOMINICK:  Well, no, I don't think we envision

23  that.  I think there is an issue of punitive damages maybe

24  depending on the states where these people lived.  There may be

25  an issue there.  We want to get that resolved up front through

*OFFICIAL TRANSCRIPT*

1  motions practice.

2          As far as the trial flight cases, I mean, I think

3  liability has been established, of course, for the well

4  explosion and the oil being dispersed.  That's been -- so,

5  yeah, I don't see that we would try those issues.

6          Now, in the individual cases, you know, are they

7  going to raise an issue that maybe somebody -- whether there is

8  a protected equipment issue or something like that in the

9  individual cases, that may be something that they would assert,

10  but I don't know if I'm answering your question, Your Honor.

11          THE COURT:  I think you did.  Okay.  Thank you.

12          MR. DOMINICK:  Okay.

13          THE COURT:  Anybody else over here?  Mr. Falcon, you've

14  been mentioned prominently here this morning.  I'll give you a

15  chance to defend yourself.

16          MR. FALCON:  That would be great, Your Honor.

17          Tim Falcon for the plaintiffs, Your Honor.

18          As to the list and addendum, Exhibit A, these

19  people were systemically poisoned -- dermal exposure,

20  inhalation and ingestion of various and asundry poisons -- from

21  the crude oil, from the Corexit, from anything else that was

22  out there.

23          When we're starting out with a list which is

24  before we're really digging into the general causation

25  question, if we don't put something on here are they precluded

**OFFICIAL TRANSCRIPT**

1   from bringing that claim if later on it proves that it is

2   related?

3           THE COURT:  Well, let me just ask you a question:  Is

4   this a list you put together or did Mr. Murphy sit down and

5   give you 66 different things that he says he has that were

6   caused by this oil spill?

7           MR. FALCON:  This list was done with the client and in

8   consultation with our causation expert.  While you'll see there

9   is a lot of different listings, they are generally related to

10  vision problems and respiratory problems.  You can see there

11  are six or seven or eight of them are about vision.  There is

12  cardiovascular.  There are some blood problems in here that we

13  know that the benzene and other problems cause problems in the

14  blood.

15          All it is is an exhaustive listing of these

16  things.  Most of them are related to a systemic problem that's

17  going on.  Now, will some of them be eliminated as Mr. Dominick

18  has said?  Yes, as we go through the general causation

19  question.

20          Just for example, Your Honor, we have chest pain

21  and abnormal EKG.  We have been looking at the Gulf study, the

22  comprehensive epidemiological study that's being done on these

23  workers.  Just recently, I think, late in 2018 they have now

24  published a study saying that there is an increased incident of

25  cardiovascular problems with these cleanup workers, so if we

*OFFICIAL TRANSCRIPT*

1   hadn't put cardiovascular problems on there before that study

2   came out, are we precluded from bringing it when we get here to

3   go to trial?

4               It is comprehensive.  It's also as they play out.

5   I've talked to one of the lead epidemiologists in that study,

6   Dr. Stewart, and she says that we don't know yet what all the

7   problems that are going to be related.  These are still

8   unfolding.

9               These are latent diseases.  They are still doing

10   a massive study on these thousands -- tens of thousands of

11   workers, and these studies are being rolled out.  I think I can

12   defend my list.  This is the first list to put out there what

13   are the possible problems?  Will it be culled out?  I think

14   their suggestion is, and Mr. Dominick proposed this --

15               THE COURT:  How many claimants do you have in this

16   group?  I know you don't have the 800 like Nexsen Pruet.

17               MR. FALCON:  No.  We're probably 20 or 30 in our --

18               THE COURT:  Do they all have similar lists like that?

19               MR. FALCON:  I don't think they are all -- I haven't --

20   honestly I haven't looked through all of them.  I wasn't

21   prepared to discuss that today, Your Honor.

22               But I can say that as we work through this, as we

23   drill down into the causation and the actual general causation

24   questions, as Mr. Dominick pointed out, we can give them the

25   specific issues from this list that we will go forward with and

*OFFICIAL TRANSCRIPT*

1    present to this court on the general causation question.

2         THE COURT:  Well, if you give them a list like this or

3    anything close to it, it's useless.  That's my point I'm trying

4    to make here.  It's useless and --

5         MR. FALCON:  If I may -- I'm sorry to interrupt.

6         THE COURT:  Go ahead.

7         MR. FALCON:  Unless I have epidemiological studies,

8    unless I can show from animal studies, unless I can show from

9    all the requirements for a general causation opinion --

10        THE COURT:  That's not the question.  The question here

11   was what do you claim your injuries are?  It's not what some

12   expert says in their opinion might be caused by some exposure

13   to some chemical.  The question here was what do you claim your

14   injuries were?

15             I can't believe that this client sat down and

16   said I have 66 different problems that were caused.  That's my

17   problem, Mr. Falcon.  This is a lawyer-created thing or an

18   expert-created answer.  It's not coming from the claimant.

19        MR. FALCON:  Your Honor, if we simply ask the

20   plaintiff, how do they know?

21        THE COURT:  That's the question.  The question is,

22   "Describe in as much detail as possible the bodily injury or

23   medical condition that you claim resulted from the spill or

24   your cleanup work in response to the oil spill."  This is not

25   an appropriate response.

                         *OFFICIAL TRANSCRIPT*

1      MR. FALCON:  Then we must have misunderstood the

2  question.

3      THE COURT:  I can't believe that your client sat down

4  and, without being fed information, said this is the problems

5  I'm having.

6      MR. FALCON:  Your Honor, I will agree.  Maybe we

7  misunderstood the question.

8      THE COURT:  Now, if you want to have some expert or

9  some study later come up and say all these things could

10  potentially or theoretically or whatever be caused, that's a

11  different issue, but that's not a proper response to this

12  questionnaire.  It's just useless.  It's not helpful to moving

13  this case forward.

14          So, anyway, I didn't want to harp too much on

15  that, but I did, I guess.

16          Go ahead.  I'm not cutting you off, Mr. Falcon.

17      MR. FALCON:  Certainly at this point in time, with what

18  they are requesting and the proposed process is to cull it out,

19  and is the Court going to want to say what the client say are

20  related or now are we looking are what the expert say are

21  related?

22      THE COURT:  This is a question proposed, you could say,

23  like an interrogatory or a question in a deposition to the

24  client.  It's not to some expert.

25      MR. FALCON:  Just so I'm clear, if we leave here today,

**OFFICIAL TRANSCRIPT**

1     if they send us this question today, are we just to sit down

2     with our client to answer this question and say, "Client, what

3     do you say is related?"  Is that was BP is asking BP us to do?

4          THE COURT:  Well, that's what the question says.  I

5     didn't write the question.  I'm just reading the question.  Is

6     that what you all are looking for?

7          MS. JAKOLA:  Your Honor, respectfully this is --

8     Katie Jakola for BP.  This is basic discovery.  This is not --

9     this shouldn't be a gotcha.  We don't know what people are

10    claiming the oil spill caused, so I think this should be basic

11    information.  It's why did you bring this lawsuit?  How were

12    you hurt?

13              So I don't think this should be a difficult

14    exercise.  It's just even a -- we negotiated and offered even a

15    list of the plaintiff's name and the conditions with -- just

16    answer the question.  What is it?  For each plaintiff.  We

17    don't need to go back and get sworn signatures.  It can have

18    the effect of a PTO 66 supplement.  That's it.

19         THE COURT:  Then if somebody later goes to a doctor and

20    the doctor says that now you've developed a heart condition,

21    then that's another issue.  Answering this truthfully now

22    doesn't preclude something like that, right?

23         MS. JAKOLA:  You're right, Your Honor.  You can amend

24    if new things -- new information becomes available, but right

25    now there had to be some reason they brought the lawsuit, and

*OFFICIAL TRANSCRIPT*

1    we just want to know why.

2              THE COURT:  Okay.  Mr. Falcon.

3              MR. FALCON:  I understand what they are asking, and so

4    I don't know that gets us anywhere if we just asked our clients

5    what you say is related, what do you think is related?

6              THE COURT:  Well, it's done in every case, in every

7    personal injury case -- how do you allege you were injured?

8    What do you allege your injury is?  That's done in every

9    personal injury case, whether it's an exposure case or a slip

10   and fall or anything.

11             This would be like if you had a client that

12   slipped and fell on a boat, and they said, "What are your

13   injuries?"  And you said, "Well, you know, my expert says I

14   could have hit my head, I could have broken my neck, I could

15   have ruptured a disc in my back, or I could have hurt my knee."

16   All that could possibly result from that, but that's not what

17   you're claiming, right?

18             It's a pretty simple thing.  This is not rocket

19   science here, Mr. Falcon.

20             MR. FALCON:  I'm not trying to make it rocket science.

21   I'm trying to understand the process.

22             THE COURT:  I don't know if I can explain it any better

23   to you.

24             MR. FALCON:  The difference is what the clients are

25   going to say.

*OFFICIAL TRANSCRIPT*

1          THE COURT:  The clients are being asked what are you

2     alleging?

3          MR. FALCON:  Okay.  That's fine.

4          THE COURT:  What are you alleging your injuries are and

5     how were they caused by this oil spill?  That's it.

6          MR. FALCON:  Does that move us down the line?  If they

7     think my rectal bleeding is related --

8          THE COURT:  This is what they are being asked and they

9     should answer.  It's as simple as that.

10         MR. FALCON:  If they say I think my rectal bleeding is

11    related, and our expert is not going to support that, does it

12    make any sense for us to put that as the answer?

13         THE COURT:  No, but you put it on here whether your

14    expert -- you put it on here.  I suspect you're not going to

15    get an expert to come in and say these 66 conditions are caused

16    by the oil spill.

17         MR. FALCON:  No, but we will say which one are causally

18    related, and we'll specify the list and we'll give it to BP.

19    That's the process.

20         THE COURT:  Okay.  All right.

21         MR. FALCON:  We're not talking about flights today,

22    Your Honor?

23         THE COURT:  No, we're not talking about flights.

24         MR. FALCON:  Okay.  Thank you.

25         THE COURT:  Okay.  A lot of people are raising their

*OFFICIAL TRANSCRIPT*

1    hands here but let's take in this order.  I see two hands going

2    up.

3               Mr. Schmidt, do you want to be heard?  Aren't you

4    affiliated with Nexsen Pruet?

5         MR. SCHMIDT:  Yes.  We're co-counsel, Your Honor.

6            I wanted to address --

7         THE COURT:  Identify yourself for the record.

8         MR. SCHMIDT:  Douglas Schmidt, co-counsel with

9    Paul Dominick on 763 clients.

10              Your Honor, I was intricately (verbatim) with

11   filling out those forms.  What we did was we went through the

12   medical.  We talked with every client or either met with them

13   personally.

14              Our forms only gave the medical conditions that

15   they had seen a doctor for or reported to a doctor.  We didn't

16   have a checklist.  When I looked at the BP questionnaire, there

17   is so much repetition that we've already done in 63 -- PTO 63

18   and 66 that it would be a burden for us, because we took a long

19   time getting it done and we got it right.

20              You said ours was better.  Maybe they pulled out

21   the worst example, but we worked hard on those, a lot of hours

22   and a lot of time and money.  I know we have it but we worked

23   hard.

24              Our conditions were what they had, not anything

25   speculative, what a doctor diagnosed, what a specialist doctor

*OFFICIAL TRANSCRIPT*

1    would diagnose.  For us to have to go through and answer

2    another hundred questions to these same clients is overly

3    burdensome.  Now, if they want to go through our questionnaire

4    and then look what they propose, what we already have there we

5    shouldn't have to duplicate it.

6             Another thing, they want the client to sign it

7    again.  The client has already signed twice.  We feel that we

8    have the medical records there, we are officers of the court,

9    we should be able to go through our PTO 66 and call our clients

10   up, because we're getting medicals all the time in, Your Honor.

11            We're always trying to get medicals in.  We call

12   on our clients regularly to see how many times they've seen a

13   doctor, so we don't think we should have to put every question

14   that is the same ones as 66, and we don't think the clients

15   should have to sign it.

16            We're officers of the court.  They are going to

17   get the medical records to back it up, so what we put down

18   there, they are going to be getting the records anyway, and

19   they are going to be going through it like a fine-tooth comb

20   because they got a lot of people working for them.  They have a

21   lot of helpers that work, and staff, and they are going to be

22   going through it.  So if they see something that we put there

23   that's not, they are going to say, Oh, why did you put that

24   down?

25            If we have to send it to the client and the

*OFFICIAL TRANSCRIPT*

1  clients move all over the place and they get it out, they are

2  going to be back in this court trying to knock out another 40

3  clients because the client didn't sign it at the proper time or

4  something like that.

5          It's been nine years we have been keeping track

6  of these clients, and we have been working very diligently.

7  That's why we went from 3500 down to what we have now.  We just

8  didn't say we're professional opt-outers and just opt-out

9  anyone.  Over here you said it's a very serious condition, and

10 the ones we have are very serious.  That's what we put in.

11 They have a duplicate effort, for all of this is burdensome to

12 us.  It's not called for.

13          Now, Your Honor, certain people -- I realize what

14 you said with that checklist, and that is not responsive to

15 what you said.  Those ones should be sent by BP and say, Hey,

16 give us a proper response on this.  Because they've been having

17 PTO 66 for a long time, so they could have brought it up to the

18 Court way before today and said some of it is not responsive.

19 Let's see what's going on, Your Honor.  Let's get a hearing on

20 it, but to bring it up today at such late a date and to try to

21 lump my 763 clients, and there are only 900, so we're, like,

22 85 percent, to put a burden on our clients, I just think it's

23 unfair, Your Honor.

24          THE COURT:  The problem is -- I think I'll let them

25 speak for themselves.  I think what they are trying to do is

*OFFICIAL TRANSCRIPT*

1   get where they can see what the distribution of diagnoses is

2   across the universe of these B3 claimants.  They can't see

3   that, and your response -- don't overexaggerate what I said.  I

4   just said yours was better.  I didn't say it was satisfactory.

5   It may be.  I didn't say it was not, but it was better than the

6   other example.

7            Unless this information is satisfactorily

8   produced, then it just inhibits the whole process here that

9   we're trying to do.  I understand what you're saying about not

10  duplicating things, and I think BP needs to be sensitive to

11  that.

12           If you just send them the whole, and I have

13  haven't gone question by question through these proposed

14  questionnaires, but you shouldn't be asking the same questions

15  again.  Now, it's legitimate to say they didn't answer this

16  question properly in the first place.  That's another issue.

17           Ms. Jakola, you all are going to have to revisit

18  that proposal and limit any additional questions that I'll

19  allow you to ask, other than producing the documents, are going

20  to have to be something that's relevant and necessary and not

21  duplicative of what you've already gotten from them.

22           MS. JAKOLA:  Your Honor, may I respond?

23           MR. SCHMIDT:  Can I -- can I --

24           THE COURT:  Yeah, let him finish.

25           MR. SCHMIDT:  Your Honor, our 763 were answered very

**OFFICIAL TRANSCRIPT**

1     well.  Look at the atmosphere or the total range of injuries

2     from our 763.  We did it very specific.  It's not just that one

3     is a little bit better.  We really worked at it.  We went

4     through the medical records.  We went through the medical

5     records with the clients.  If you want to know what the range

6     of bucket is, we produced it.

7              THE COURT:  Okay.  I understand.  I understand what

8     you're saying.

9                  I understand that I've got a note here from one

10    of my earlier conversations with somebody, either here in court

11    or whatever, and that a large number of your clients actually

12    were diagnosed before April of 2012; is that accurate?  In

13    other words, we have that deadline.  That's what caused the

14    problem, a lot of the problem.

15             MR. SCHMIDT:  Are you talking about BELO or are you

16    talking about opt-outs?

17             THE COURT:  I'm talking about when your clients were

18    diagnosed.  It relates to the medical settlement and the fact

19    that you opted out, but you opted out a lot of clients.  I may

20    be wrong about this.  That's why I'm asking the question.

21                 You opted out a lot of clients, and you have a

22    right to opt out who would have otherwise qualified for a

23    payment under the medical settlement because they were

24    diagnosed -- a lot of people got thrown into this BELO process,

25    they didn't want to be there, but they got thrown in there

*OFFICIAL TRANSCRIPT*

1    because their diagnoses didn't come before April of 2012, but

2    my understanding is a lot of your clients, the overwhelming

3    majority were diagnosed before April 2012; is that right?

4            MR. SCHMIDT:  Yes, Your Honor, but it's the severity

5    why we opted them out.  It's not the condition.  It's the

6    severity.

7            THE COURT:  Okay.  I understand that.

8            MR. SCHMIDT:  Because a lot we put in.  We put a lot in

9    the settlement.  We had hundreds in the settlement.

10           THE COURT:  Okay.  All right.  Anybody else on this

11   side?  Yes.

12           MR. LOEHN:  Good morning, Your Honor.

13           THE COURT:  Good morning.

14           MR. LOEHN:  May it please the Court.  My name is

15   Thomas Loehn.  Fortunately or unfortunately, I only have one

16   client, my law partner, Charles Boggs, who lived on the

17   Mississippi coast.  What I heard earlier was that BP does not

18   have any of the medical records of these claimants, and I don't

19   want to be painted with a broad brush.

20               After the July 17th meeting here, I offered them

21   a CD of his entire medical records, and they said to please

22   mail it to us, and so I did, and so they have had all of his

23   medical records since July.

24               Mr. Boggs lived on the Gulf Coast directly north

25   of the well.  His house was coated with oil.  He lived in that

*OFFICIAL TRANSCRIPT*

1    home.  BP paid for the cleanup of his home.  They paid for the

2    cleanup of the pond around his home.  They know about him

3    already, and that is why I submitted a separate proposed case

4    management order.

5         THE COURT:  What's his allege medical condition?

6         MR. LOEHN:  He had a prior medical condition that was

7    aggravated by the exposure.  He had leukemia.  He has been to

8    M.D. Anderson, and he has been treated extensively for the

9    aggravated conditions.

10        THE COURT:  You supplied them with medical records or

11   expert reports alleging what you just said?

12        MR. LOEHN:  I have provided them with all of his

13   medical records.

14        THE COURT:  I understand he's got leukemia or had

15   leukemia, but do you have something saying it was made worse by

16   his exposure?

17        MR. LOEHN:  Yes, sir.  Yes, sir.

18        THE COURT:  Okay.

19        MR. LOEHN:  So I just didn't want for them to say that

20   they don't have any medical records.

21        THE COURT:  I think they were talking about the broad

22   scope of the claimants, not about each individual one.

23             Okay.  Thank you.

24        MR. LOEHN:  Thank you.

25        THE COURT:  Come up.

                              *OFFICIAL TRANSCRIPT*

1          MR. JACOBS:  Stanley Jacobs, Your Honor.

2                    Phil Cossich associated on these cases.  I have

3     six cases, all the same diagnosis, toxic encephalopathy.  Brain

4     damage cases.  We filed suit on two of the six.  It's Jones Act

5     cases, and they were swept up in Your Honor's division.

6                    My clients, four of the six of my clients, have

7     been seen by Dr. Daniel Trahant since 2011 every 90 days.  I've

8     had neuropsychological testing by Dr. Susan Andrews.  My

9     medical is consistent and it is concise.  I could get it to BP.

10    In fact, I've corresponded with you.

11                   I think you have some of my medical in the

12    Paul Hebert case, but if you look at Paul Hebert, you can see I

13    broke it down.  I've since even broke it down even more

14    concise -- narrative, neuropsychological testing, a

15    neurologist.

16                   I could give BP everything they want in a

17    heartbeat.  I've been waiting around nine years.  My clients

18    have been waiting around nine years.  Their specific

19    diagnosis -- I realize there is only six, but these are

20    exceptional cases, like everyone else here feels their cases

21    are exceptional as well, but I could supply them everything.

22    The vessels they were on.  Some of them have been tested.

23         THE COURT:  These are cleanup workers working on VOO

24    vessels?

25         MR. JACOBS:  I think one was.  I think the other

*OFFICIAL TRANSCRIPT*

1   ones -- two of them were on the VOO vessels.  The other ones

2   were on other vessels.  Ninety-seven days of exposure right

3   next to the blowout.  I mean, these are people at ground zero,

4   four of my six.  Two were not at ground zero.

5              I mean, I don't have a problem giving BP -- I

6   have 54 pages of medical for every 90 days on the Paul Hebert

7   case.  I apologize to the Court.  I need this to refer.  I have

8   54 pages every 90 days from Dr. Trahant, neurosurgeon --

9   board-certified neurologist from LSU Med School, who has been

10  following four of the six every 90 days since 2011.

11             I suggest to the Court that I could cut to the

12  chase, I know you're not discussing trial flights right now,

13  but my case would be wonderful for trial flights because they

14  are all the same diagnosis from the same doctors and the same

15  neuropsychological testing -- Susan Andrews,

16  Dr. Daniel Trahant, packaged.

17        THE COURT:  It sounds like four were working under the

18  same conditions and two were not.

19        MR. JACOBS:  Right.  Two were not.  They are separate.

20  They are not as strong as my four cases.

21        THE COURT:  Anything else, Mr. Jacobs?

22        MR. JACOBS:  No, sir.

23        THE COURT:  Thank you.

24             Okay.  Who wants to respond to everything you've

25  heard?

*OFFICIAL TRANSCRIPT*

1      Ms. Jakola.  Why don't you talk about these last

2  two attorneys first, their clients -- Mr. Loehn on behalf of

3  Mr. Boggs, and then Mr. Jacobs on behalf of his six clients.

4      MS. JAKOLA:  Yes, Your Honor.  I'm very sensitive, as

5  someone who has also been working on this case for nine years,

6  that we want to keep everything moving along.  I appreciate

7  their being proactive and providing us information.  We want to

8  move everybody along as quickly as we can, including them, and

9  so we think our proposal does that.

10      I have not had a chance to look at -- I did see

11  correspondence about the records coming across one.  I have not

12  had a chance to review it in more detail or Mr. Jacobs' clients

13  in more detail, but we don't see a reason to treat them

14  differently than the other plaintiffs claiming exposure through

15  similar ways and means, so we would propose to keep them in the

16  process moving forward for the next -- as we go through this

17  initial disclosures process.

18      THE COURT:  Okay.  Do you want to respond to what

19  Mr. Dominick says?

20      MS. JAKOLA:  Yes.  Just a point of clarification with

21  Mr. Schmidt, we are not suggesting that we need plaintiffs'

22  signatures again.  We agree these plaintiffs have already been

23  asked to sign forms.  We are willing to accept -- in our meet

24  and confer discussions they suggested that would be burdensome,

25  and we have agreed to accept plaintiff counsel signatures on

*OFFICIAL TRANSCRIPT*

1      behalf of their clients.

2                On the questionnaires, Your Honor, we were very

3      mindful of the fact that we do have information from folks

4      already.  We didn't just adopt wholesale the BELO Plaintiff

5      Profile Form, and we're happy to provide Your Honor with a

6      matrix or chart to show you what all the new questions are.

7      There were 19 questions we're proposing to ask people in

8      addition to getting some of the records we've talked about.

9                The ones that -- they are almost all new

10     questions that have not been asked before, and they come from

11     the BELO CMO, and we'd be happy to make a submission to

12     Your Honor with a chart tying everything together where

13     everything came from.

14               The ones that -- the questions that are -- that

15     do tie back to previous questions from the PTO 66 forms are

16     questions 1 through 3 in our questionnaire, and those were

17     designed to get the greater specificity about what is the

18     claimed question.

19          THE COURT:  Well, here is my question:  I'm looking at

20     what you've called a *supplemental particularized statement of*

21     *claim*.

22          MS. JAKOLA:  Yes, Your Honor.

23          THE COURT:  The first question, "The B3 plaintiff

24     claims that the following specific medical conditions resulted

25     from their exposure to oil or chemical dispersants during the

1    *Deepwater Horizon* spill.  List them."

2              Why do you think that's going to generate a

3    different answer than you got before?  That's the same

4    question, isn't it?

5         MS. JAKOLA:  Your Honor, it is.  We were just trying to

6    make it simple and have it in one place where we just could ask

7    the counsel to go back through and answer these questions.

8    Questions one -- and I believe I misspoke earlier, I said

9    three -- questions one through four are really designed to get

10   that greater clarity on the issues we need to get greater

11   question clarity on.  Questions five on are new questions, but

12   we would be happy to do it through just a supplement to the

13   prior answers as opposed to a new question.

14             What we're really looking for -- and if they've

15   already done the work, respectfully, Your Honor, it should be

16   easy to tell us -- what is the condition you're suing us for?

17             How are we going to proceed to discovery and

18   expert reports if we don't know what plaintiff is claiming what

19   conditions, so we're trying to get greater information about

20   the whole docket so we can proceed efficiently through the

21   expert phase and then onward from there.

22        THE COURT:  Well, you're going to have to redo this

23   proposed questionnaire because I think it is, in many ways,

24   duplicative of what you already asked for in PTO 66, and if

25   it's just the case that they didn't adequately respond, then

**OFFICIAL TRANSCRIPT**

1    you can raise that.

2              Again, what about Mr. Dominick's suggestion that

3    what you're after here more relates to specific causation as

4    opposed to general causation?  If I understood what he was

5    suggesting is that have the plaintiff lawyers in good faith,

6    hopefully in good faith, say these are the medical conditions

7    that the universe of our clients are alleging were caused by

8    their exposures to the oil or the chemicals, and have you

9    respond that we agree -- I suppose there are some medical

10   conditions, the acute type conditions that BP is not going to

11   contest could be caused by somebody exposed to oil or

12   chemicals, you know, watery eyes, coughing, sneezing, skin

13   rashes, the things that are in the matrix, for example.  I

14   suppose that's why they are in the matrix, because there was

15   general agreement that those could be caused by exposure.

16             There may be an issue of whether somebody could

17   have an acute symptom, whether it's now a chronic symptom.

18   That seems to be where most of the issues are in this case.  I

19   think there are some differences, some *unusual cases*, I'll call

20   them, but most of the cases seem to allege chronic development

21   of what otherwise seem to be acute conditions, right?

22        MS. JAKOLA:  Yes, Your Honor.  That's right.

23             In response, their suggestion was to just give us

24   a laundry list of conditions not tied to any plaintiffs, and

25   respectfully, Your Honor, I think that that is not going to be

*OFFICIAL TRANSCRIPT*

1   the most helpful way to proceed.

2           When we get to general causation issues, we're

3   going to need to know what conditions are being claimed by what

4   plaintiffs, including, because of the issue you're raising,

5   manifestation is important.

6           If someone is claiming that they -- our experts

7   will say and have said in the reports just submitted to

8   Judge Rogers that the medical literature does not support an

9   allegation that chronic condition first manifested after

10  exposure stopped.  So if someone -- and we do have large

11  numbers of plaintiffs.  This is what I was referring to

12  earlier, why we think -- one reason why we think the general

13  causation period will be very helpful us for docket wide.  We

14  have large numbers of plaintiffs who are claiming that

15  conditions manifested well after exposure stopped.  A chronic

16  condition.  So we're going to need to be --

17          THE COURT:  It's not a case if somebody had acute

18  symptoms which then became chronic.  What you're saying is they

19  first manifested symptoms after what would normally be the

20  acute period.

21          MS. JAKOLA:  Right.  So knowing when people first

22  started experiencing symptoms is going to be important to

23  general causation.  Also, the roots of exposure.  We're kind of

24  lumping in oil, dispersants and other stuff.  Not everybody is

25  claiming exposure to the same things.  How were they exposed,

*OFFICIAL TRANSCRIPT*

 1    and we don't need to go plaintiff by plaintiff, but having the

 2    distribution will help us not only be able to formulate expert

 3    reports on both sides but, also, where should we be spending

 4    our time?

 5            If we've got only a handful of people claiming

 6    certain condition relating to a heart condition, those are

 7    treated differently, but if we've got a large number, 600 or

 8    so, looking at conditions that are really common, that's going

 9    to be important to us, too.

10            That's consistent with what's being done right

11    now in the BELO process.  As Your Honor probably knows,

12    Judge Morgan is focused on a handful of plaintiffs, and

13    Judge Rogers is focused on a greater number in specific

14    conditions.

15            So our thinking is that when we get through the

16    national disclosure process, we would have additional

17    information about the conditions, as Your Honor said, the

18    distribution of conditions, and then together we would be happy

19    to continue working with the plaintiffs on what are those

20    conditions based on that information?  That would make sense to

21    proceed to the general causation expert process.

22        THE COURT:  Okay.  Again, I just have a lot of concern

23    that -- and maybe this is my fault in the way we started off.

24    The BELO case process is way ahead of the B3 claim process, but

25    I'm worried about duplication of effort here in terms of

**OFFICIAL TRANSCRIPT**

1    dealing with general causation issues.

2             Would just getting the medical records on each

3    plaintiff go a long way --

4         MS. JAKOLA:  That's going to help, Your Honor, but we

5    were --

6         THE COURT:  -- in advancing this?

7         MS. JAKOLA:  If we're going to get a group of medical

8    records, that's not going to tell us which ones they're

9    claiming were caused by the spill.  So all we're looking for is

10   just which ones of these conditions should we be focused on?

11            So we do appreciate and glad we reached an

12   agreement on the medical records being produced, but we won't

13   know which ones are relevant to the claims.

14        THE COURT:  Okay.  Somebody else wants to --

15   Mr. D'Amico.

16        MR. D'AMICO:  Yes, Your Honor.

17            Frank D'Amico, Jr., on behalf of 17 plaintiffs we

18   opted out.

19            I'm very mindful of what you brought up earlier,

20   Your Honor.  We have many of these cases that were BELO's by

21   accident, unintended consequence.  These 17 cases are a

22   different animal altogether.  They were opted out before.

23            One of the things that I just heard counsel for

24   BP argue was a confusion between specific causation and general

25   causation.  As it relates to the particular individual and

*OFFICIAL TRANSCRIPT*

1    whether or not their symptoms manifested past an acute period

2    of time where it should have, that's a specific question, and

3    we shouldn't even be going there at this time.

4               Judge Rogers expected, I believe, the defendant

5    BP to concede that many of the conditions in the matrix can be

6    caused by exposure to this oil and these chemicals; but, yet,

7    surprisingly, BP contested that, and so that's the paramount,

8    primary issue that we believe the Court could help move these

9    cases along and get them to where the BELO cases are, is if we

10   could try a flight first.

11              THE COURT:  We're not anywhere close to trying a flight

12   of anything, so don't even go there Mr. D'Amico.

13              MR. D'AMICO:  All right.  I won't go.  Let's just talk

14   about general causation.  If we could get the Court to assist

15   us with that issue that first, I think it would go a long way

16   to assist us to moving this case forward.

17              THE COURT:  Are you going to have the same experts here

18   as you have in Florida?

19              MR. D'AMICO:  Many.  Yes.

20              THE COURT:  Then, again, we're duplicating effort and

21   expense and everything here, it seems like to me.

22              MR. D'AMICO:  Unfortunately these cases are opted out.

23   They are not the same.

24              THE COURT:  It's doesn't matter if they are opted out

25   or not.  If it's the same expert and same medical issues, they

**OFFICIAL TRANSCRIPT**

1    are the same case essentially, not the legal procedure status,

2    but medically, it sounds like they are the same cases, same run

3    of cases, so to speak.

4         MR. D'AMICO:  They are going to be similar type of

5    injuries, yes.  They are.

6         THE COURT:  Yeah.  Okay.  Does anybody else have

7    anything to say on anything?

8         MR. FALCON:  Just for clarification, Your Honor, if I

9    may.

10        THE COURT:  Yes.

11        MR. FALCON:  So in reanswering the question about --

12   and I'm sorry if I'm not being -- I can't understand, but are

13   we looking for what the clients are going to say are related or

14   are we going to have them informed by the expert, to go through

15   the expert report, to go through the medical records, actually

16   diagnose conditions, and then through those diagnosed

17   conditions, these are the ones that the experts are going to

18   say are related.  I think that's what we're trying to get to

19   with this general causation question.

20             If they would like to say can the plaintiffs give

21   them numbers, I think we can with provide that, that out of

22   these 900, there are -- five of them have this one condition

23   and three have this heart condition.

24        THE COURT:  I don't think they want you to give them

25   the numbers.  I think they want to figure that out once they

**OFFICIAL TRANSCRIPT**

1    get the information.  I don't think they are going to just

2    accept some abstract number --

3         MR. FALCON:  (Speaking simultaneously) Not a number.

4    I'm sorry, Your Honor.

5         THE COURT:  -- claimants that have this condition.

6         MR. FALCON:  With the medical records that support the

7    condition, with an opinion from an expert to say that is

8    related to the condition.  That's where, you know, they are

9    trying to go beyond the general causation question, which I

10   think this court and all the courts are struggling with.  There

11   could be a threshold of time.  If you don't have this condition

12   by this period of time --

13        THE COURT:  You can have several variations on general

14   causation.  In other words, could this chemical cause this

15   medical condition?  Could it cause only acute symptoms or can

16   it cause chronic symptoms?  That's still general causation.

17        MR. FALCON:  Is there a threshold of exposure that you

18   have to meet before you are related?

19        THE COURT:  Right.  Right.

20        MR. FALCON:  That's general causation.  If we sort that

21   out and then we have here is what the science tells us and what

22   the Court accepts --

23        THE COURT:  But what you all are proposing is just to

24   list a bunch of conditions and admit or deny that these can be

25   caused by the oil spill.

*OFFICIAL TRANSCRIPT*

1        MR. FALCON:  No.

2        THE COURT:  That's what it sounded like.

3        MR. FALCON:  We're ready to come forward with the

4   causation experts with the reports answering those very

5   questions for the whole population.  At this certain date if

6   the scientific literature does support that if this condition

7   didn't manifest itself until four years later, there is still

8   scientific literature and science that supports that general

9   causation.

10       THE COURT:  Are we going to get a list of 66?

11       MR. FALCON:  No, you won't, Your Honor.  You'll get the

12  list of what our expert is saying are related based on the

13  scientific literature.

14       THE COURT:  I thought you told me that that's how you

15  developed this list.  You sat down with your client and your

16  expert, and that's what you came up with.

17       MR. FALCON:  It was a combination.  So we had the

18  combination of what our client said was related, and that's

19  where we may have gotten this off-the-wall stuff, and then we

20  have the stuff that's informed by the expert as well, so it was

21  a combination.  As we go forward, we're trying to get to what

22  can be supported by the science.

23       THE COURT:  Okay.

24       MR. FALCON:  This is what we're trying to get with

25  this, Your Honor.  I think those questions -- how much

**OFFICIAL TRANSCRIPT**

1    exposure, how much time of exposure, when did the injuries

2    manifest, what injuries start with, what injuries can this

3    cause, those are big, general questions that general causation

4    should take care of, and then once we have that decided, we can

5    go forward and decide which of these plaintiffs fit into which

6    of those categories.

7              Thank you, Your Honor.

8         MR. SCHMIDT:  Your Honor, can I ask a point of

9    clarification?

10        THE COURT:  Come up to the podium.

11        MR. SCHMIDT:  Douglas Schmidt again.

12             Your Honor, when you were talking about cases in

13   Judge Morgan and the other court, you were talking about BELO

14   cases.

15        THE COURT:  I know that.

16        MR. SCHMIDT:  No, I know that too.  What I'm saying is

17   but those clients have specific issues.  So when you're doing

18   general causation for my universe, the judge may just be ruling

19   on general causation for maybe conjunctivitis with that

20   specific case or he might be working on a rash.

21        THE COURT:  Well, the thing is it's becoming rather

22   obvious that the same plethora of medical conditions that your

23   clients are alleging and Mr. Falcon's clients are alleging, or

24   many of them, are the same types of conditions that are being

25   alleged in the BELO cases.  Medically they are the same types

*OFFICIAL TRANSCRIPT*

1    of cases.

2         MR. SCHMIDT:  But this is my point of clarification --

3         THE COURT:  I don't know what point you're trying to

4    make.

5         MR. SCHMIDT:  This is my point of clarification:  If a

6    judge rules and says, okay, this specific condition of

7    conjunctivitis can be caused by it, is that judgment of

8    causation that he's saying covers all the other ones (speaking

9    simultaneously) --

10        THE COURT:  -- as a matter of law but it certainly

11   could be helpful to you if your client raised the same

12   condition.  On the other hand, if Judge Rogers has a *Daubert*

13   hearing and says, the same experts can't meet *Daubert* in terms

14   of proving general causation for this or these types of

15   conditions, I can promise you they are going to be in here

16   arguing in front me that that's at least persuasive, and I

17   should pay attention to it, and I probably will pay attention

18   to it.  It doesn't mean I'll just automatically adopt it.  It

19   goes both way here.

20        MR. SCHMIDT:  I agree with that, Your Honor, but what

21   I'm saying is the ones they don't rule on.  How do we handle

22   that general causation?  I think it has to come up before you.

23   That's all I'm saying.

24        THE COURT:  I don't know.

25             A new contestant here.

                         ***OFFICIAL TRANSCRIPT***

1          MR. SIMPSON:  It's more like I'm a mosquito buzzing

2     around the room.

3               Your Honor, I'm Justin Simpson representing the

4     defendant, Larry Griffin Towing.

5          THE COURT:  You're these three or four people who are

6     out here floating around, no pun intended, somewhere?

7          MR. SIMPSON:  Yes, Your Honor.

8          THE COURT:  As I recall, you're still involved -- your

9     people were doing cleanup work, too?

10         MR. SIMPSON:  Yes, Your Honor.

11         THE COURT:  Response work but they didn't get dismissed

12    when all of the other responders got dismissed because they

13    weren't included in the general release or there is some other

14    reason, but remind me of why.

15         MR. SIMPSON:  That's generally correct.  We were not

16    included in that group of defendants.  There may be issues that

17    are different --

18         THE COURT:  But they are only involved in a handful of

19    cases, right?

20         MR. SIMPSON:  We don't know.  I only know that we're

21    involved in just a handful of cases.

22              In any case, we just -- well, we filed a response

23    ahead of when the joint submission was filed, and we filed it

24    in terms of inserts and contributions to the prior work that

25    had been done, all for the effort to get ourselves involved for

*OFFICIAL TRANSCRIPT*

1    judicial economy and economy for us as well.

2            So what we're asking for is to be included in the

3    disclosures and to receive the expert reports.

4            THE COURT:  To be included -- disclosures you have to

5    make, you mean?

6            MR. SIMPSON:  All.  We should make disclosures along

7    with BP and with the plaintiffs.  It's not a lot of additional

8    work for them.

9            THE COURT:  How many?  Am I right, you're involved in

10   like, five cases or something?  In other words, you don't have

11   900 people suing you?

12           MR. SIMPSON:  No.  No.  But with respect to -- mostly

13   with respect to specific causation and disclosures, we would

14   like to be included in that so we don't have to reinvent the

15   wheel.

16           Another issue that we had was that the proposal

17   as written only makes it binding and work to the benefit of BP

18   and plaintiffs, not any other defendants.  We would like to be

19   included in that as well.  It's in our proposal.

20           THE COURT:  We'll look into that, but right now --

21   honestly, no offense to you or your client -- I'm concerned

22   about the bulk of the cases, how we move them forward.

23           MR. SIMPSON:  I understand, and we're just trying to

24   tag along.

25           THE COURT:  I understand.

                         *OFFICIAL TRANSCRIPT*

1          MR. SIMPSON:  Thank you, Your Honor.

2          THE COURT:  All right.  Anybody else?

3               Mr. Dominick.

4          MR. DOMINICK:  I would like to say one thing,

5     Your Honor.  Again, Paul Dominick, Your Honor.

6               I'm just going to say one thing real quick just

7     to make sure I'm on the record.  The things we've talked about

8     as far as about being duplicative in the questionnaire we still

9     object to other items that are being asked for in the

10    questionnaire as going more to specific causation.

11              I think the perilous track that we're on with

12    BP's proposal, and I guess we would like at some point to have

13    the opportunity --

14         THE COURT:  Your clients are going to respond to that

15    at some point, unless all of your cases get thrown out on

16    general causation.

17         MR. DOMINICK:  Yeah, well, let's hope that doesn't

18    happen.

19         THE COURT:  Otherwise, they are going to have to answer

20    these questions at some point, some way, some fashion in some

21    forum.

22         MR. DOMINICK:  That's assuming that they are going to

23    be individual trials of all 930 cases, that's the case.

24         THE COURT:  Well, whether they are individual trials or

25    not, they are going to have to answer these questions, provide

                         *OFFICIAL TRANSCRIPT*

1    this information, right?

2          MR. DOMINICK:  Well, we're going to have to provide

3    certain information related -- kind of goes back to whether

4    we're doing trial flights or whether we're doing one by one

5    cases.  If it goes to specific causation and we're not trying

6    those cases --

7          THE COURT:  You can't prevail unless you get past

8    general and specific causation, so every case is either going

9    to be dismissed voluntarily or involuntarily, or if it gets to

10   a trial, whether you're in a flight or you're an individual

11   claimant, you're going to provide this information, right?

12         MR. DOMINICK:  Eventually, but I don't believe either

13   of the proposals go into the specific causation.  I mean, other

14   than --

15         THE COURT:  I guess what I'm saying, I'm not sure where

16   you're going with your comment.

17         MR. DOMINICK:  I'm saying, Judge, there are questions

18   in the questionnaire that are not appropriate at where we are

19   in the case and what we're trying to do.

20         THE COURT:  You're just trying to say ask us this

21   later, not now.

22         MR. DOMINICK:  I would like to be on record that I have

23   some problems with the other questions.  Also, what I wanted to

24   point out is in BP's proposal, BP specifically says there can

25   be no discovery related to plaintiff's specific or case

**OFFICIAL TRANSCRIPT**

1    specific issues or allegations would not be permitted against

2    BP; and, yet, all of this information in the digital

3    information has to be given by the plaintiffs.

4        THE COURT:  Well, they are going to give you documents

5    specific to your plaintiffs under their proposal.

6        MR. DOMINICK:  They are going to be documents that they

7    are going to provide us, but we're not going to be able to

8    subpoena other records.  We're not going to be able to ask them

9    any questions about plaintiff specific document.  We're

10   precluded from any of that type --

11       THE COURT:  Maybe you can propose what documents you

12   want that's not already in their -- they got a pretty extensive

13   list that I saw.

14       MR. DOMINICK:  Yeah, they have got a list of things.

15       THE COURT:  They've got databases of information on

16   these people.  If they were working out there, as I understand,

17   there are medical databases.  For example, if somebody went for

18   first aid or whatever on the job there, they've got medical

19   databases.  That's the kind of stuff you want, I suppose.

20       MR. DOMINICK:  I certainly want that.  We haven't

21   gotten any of that.

22       THE COURT:  Okay.  I think you're going to get that

23   under their proposal.

24       MR. DOMINICK:  Yes.  We need that information in order

25   to see which clients we would choose for, you know, for a trial

*OFFICIAL TRANSCRIPT*

1    or a trial flight or something.

2              THE COURT:  All right.

3              MR. DOMINICK:  Anyway, I wasn't meaning to make a big

4    point other than the fact that there are other things that they

5    have that we would object to and, you know, just reserve the

6    right to maybe address those issues later.

7              THE COURT:  Okay.  Well, as I said last time, the more

8    I talk about this with you all, the more it makes me want to

9    just say I'm cutting everybody loose, the hell with it, and

10   just send you off to wherever you're going to end up like they

11   did with the BELO cases and fight it out, but I don't know if

12   that makes sense here.

13             I would like to get something accomplished on a

14   larger scale if we can, but I think the most important thing to

15   me right now, the first thing that has to be done is plaintiffs

16   have to identify what their particular injuries are that they

17   are alleging and not to submit a laundry list.

18             Number 2, they have to produce their medical

19   records at a minimum, beyond answering whatever questions they

20   need to answer.

21             Then on the other side, BP has to produce the

22   same that they've produced in the BELO cases, including the

23   claimant's specific information from any databases or records

24   that they maintain or have access to.

25             That's the minimum that we need to do here, and I

*OFFICIAL TRANSCRIPT*

1   would think that could be done by, and you-all, I thought, had

2   proposed September 30th.  Is that realistic?

3            Ms. Jakola.

4       MS. JAKOLA:  Your Honor, we had proposed 120 days.

5       THE COURT:  I thought I saw September 30th.  Maybe I'm

6   conflating some different days.

7       MS. JAKOLA:  The plaintiffs had proposed

8   September 30th, but their disclosures --

9       THE COURT:  You ought to have an easier time than they

10  did producing this stuff.  I'm sure all you have to do is press

11  a button on one of your computers.

12      MS. JAKOLA:  We get that a lot but actually, no.  I

13  wish it was that simple, believe me.  No, it's not.  We have to

14  do manual searches of various databases for each of the 900.

15      THE COURT:  You haven't had somebody sitting in some

16  office somewhere in Wichita somewhere already doing that,

17  checking on every one of these named plaintiffs?

18      MS. JAKOLA:  We would use the same process we had been

19  using for BELO.  We have been doing it for the BELO cases as

20  well.

21      THE COURT:  You've got a lot higher volumes there.

22  You've got thousands there.  Now we're talking about hundreds.

23      MS. JAKOLA:  We want to get these folks caught up and

24  into that process, too, and that's on our proposal.  We would

25  put them through the same process.  It does take some time for

                    *OFFICIAL TRANSCRIPT*

1    us to do that, about 50 a week, but we can try to look at

2    accelerating that.

3            THE COURT:  I'm really reluctant to put these people

4    back through the grinder of answering another extensive

5    questionnaire.

6            MS. JAKOLA:  Yes, Your Honor.

7            THE COURT:  So I'm going to ask you to, in light of

8    some of the concerns that have been raised here today, to

9    rethink your proposed questionnaire, okay?

10           MS. JAKOLA:  Certainly, Your Honor, we can do that.

11           THE COURT:  Anybody else want to come in?

12           MR. JACOBS:  Judge, a point of clarification, please,

13   sir.

14           THE COURT:  Come on up.

15           MR. JACOBS:  Judge, Stanley Jacobs again.

16               Everything that BP requested today, I could give

17   it to her in two weeks.

18           THE COURT:  I understand that, but it's hard for me to

19   carve you out because then everybody else wants to be carved

20   out.  Everybody thinks they have a special case.  We had two

21   special cases that we started with this morning, but they were

22   different kinds of cases.

23               You see Mr. Herman back there, he hadn't said

24   anything, but he filed something or his law firm did, and they

25   have special cases.  They have five cases.  Everybody has got

                        *OFFICIAL TRANSCRIPT*

1    special cases.  I'm reluctant now.

2            If you want to send your information -- I think

3    you said you've already sent your information.

4            MR. JACOBS:  Only on one case.

5            THE COURT:  There is nothing to stop you, even if your

6    case is stayed -- I'll repeat this, what I said last time --

7    even if your case is stayed, BP has settled a lot of cases with

8    a lot of people outside the Court process informally, if you

9    want to say, through mediation or just sitting down with

10   somebody at BP and discussing cases.

11           If you've got what you think is a significant

12   case, significant enough that it's, I'm going to say maybe

13   yours is not the run of the mill, you send them your

14   information and tell them you want to discuss settlement with

15   somebody, maybe you'll get a positive response.

16           Mr. Regan, you guys have done that kind of stuff,

17   right?

18           MR. REGAN:  Matt Regan on behalf of BP.

19           We've had all types of variety as of cases in all

20   different economic and other spaces.  We endeavor and we didn't

21   mean to misstate and say that no one has sent us a medical

22   record, but we also have to manage the whole, so we're sort of

23   in a similar place.

24           We welcome someone to send information to us, but

25   we would reserve the right of what we could do once we saw it,

*OFFICIAL TRANSCRIPT*

1    just like in any other case anywhere around the world.

2              THE COURT:  I would suggest that if you've got, if

3    somebody has got significant -- and this goes for Mr. Loehn,

4    too.  Did you say you sent yours already, Mr. Loehn?

5              If you've got significant -- everybody thinks

6    they've got significant injuries, I understand that, but if

7    you've got pretty strong medical evidence, expert reports or

8    whatever saying my client has -- I'm just going to throw out

9    here, brain cancer, and you've got experts saying it was caused

10   by the spill, you send that to BP, maybe you'll get somebody's

11   attention over there, and maybe they might want to talk to you.

12   Just a thought.

13             MR. JACOBS:  Thank you, Your Honor.

14             THE COURT:  All right.  Okay.  Anything else?

15             Okay.  Everyone, have a good day.

16             I'll take another look at it, but I'm going to

17   give you all ten days to file anything further along the lines

18   we've discussed, and then I'll have to make a decision of where

19   we go.

20             Okay.  All right.  Thank you.

21             THE DEPUTY CLERK:  All rise.

22             (WHEREUPON, at 11:22 a.m., the proceedings were

23   concluded.)

24                          *    *    *

25

*OFFICIAL TRANSCRIPT*

1                         REPORTER'S CERTIFICATE

2

3          I, Cathy Pepper, Certified Realtime Reporter, Registered

4   Merit Reporter, Certified Court Reporter in and for the State

5   of Louisiana, Official Court Reporter for the United States

6   District Court, Eastern District of Louisiana, do hereby

7   certify that the foregoing is a true and correct transcript to

8   the best of my ability and understanding from the record of the

9   proceedings in the above-entitled and numbered matter.

10

11                              *s/Cathy Pepper*

12                              Cathy Pepper, CRR, RMR, CCR
                                Certified Realtime Reporter
13                              Registered Merit Reporter
                                Official Court Reporter
14                              United States District Court
                                Cathy_Pepper@laed.uscourts.gov
15

16

17

18

19

20

21

22

23

24

25

                         ***OFFICIAL TRANSCRIPT***