## IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
## IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
## CIVIL ACTION

BRIAN J. DONOVAN, ESQ.                              CASE NO.

      Plaintiff,

v.

STEPHEN J. HERMAN, ESQ.

      Defendant.

_____/

## COMPLAINT

COMES NOW Plaintiff, BRIAN J. DONOVAN, ESQ. (hereinafter "Donovan"), on behalf of himself, his clients, and all others similarly situated, files this action against Defendant STEPHEN J. HERMAN, ESQ., an individual (hereinafter "Herman") and alleges as follows.

## NATURE OF ACTION

1.  At approximately 10 p.m. on April 20, 2010, the U.S. Coast Guard District Eight command center in New Orleans, Louisiana received a report of an explosion and fire aboard the mobile offshore drilling unit *Deepwater Horizon*. On the morning of April 22, 2010, the *Deepwater Horizon* sank, resulting in a massive oil spill incident. Oil flowed into the Gulf of Mexico unchecked for months. Ultimately, the "Macondo Well" was finally sealed on September 19, 2010, nearly five months after the blowout began. By that time, millions of barrels of oil had been discharged into the Gulf of Mexico and upon adjoining shorelines, causing immense environmental and economic harm to the entire region.

2.  The British Petroleum ("BP") oil well blowout in April 2010 is arguably the largest and most egregious mass tort in U.S. history. It has affected hundreds of thousands of individuals and businesses along the U.S. Gulf Coast and beyond. The full extent of damages may never be known.

3.  On August 10, 2010, the Judicial Panel on Multidistrict Litigation ("JPML") centralized all federal actions (excluding securities suits) in MDL 2179 ("In Re: Oil Spill by the Oil Rig 'Deepwater Horizon' in the Gulf of Mexico, on April 20, 2010") pursuant to 28 U.S.C. § 1407.

4.  On August 10, 2010, the MDL 2179 Court issued Pretrial Order No. 1 ("PTO No. 1"). "It is the Court's intent to appoint a Plaintiffs' Steering Committee ("PSC") to conduct and coordinate the discovery stage of this litigation with the defendant's representatives or committee….The Court recognizes that cooperation by and among plaintiffs' counsel and by and among defendants' counsel is essential for the orderly and expeditious resolution of this litigation."

5.  On August 27, 2010, the MDL 2179 Court issued PTO No. 6 which states "IT IS ORDERED that Stephen J. Herman be hereby appointed Plaintiffs' Co-Liaison Counsel."

6.  At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly conceived, developed, and/or facilitated an eight-step plan to maximize his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP.

7.  "OPA applies of its own force, because that act governs, *inter alia*, private claims for

property damage and economic loss resulting from a discharge of oil in navigable waters." *See* 33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 3830 at 11, August 26, 2011).

8.  At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly designating the "B1" Master Complaint as an admiralty or maritime case, and requesting a non-jury trial pursuant to Rule 9(h), rather than properly alleging claims under the Oil Pollution Act of 1990 ("OPA"), a *strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA").

9.  At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly aiding and abetting the Kenneth R. Feinberg-administered victims' compensation fund to circumvent the OPA. As a result of Defendant Herman's fraudulent and negligent conduct, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action.

10.  At all times material herein, Defendant Herman, individually and/or in collusion

with the members of the MDL 2179 PSC and BP, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly aiding and abetting Kenneth R. Feinberg to use the fear of costly and protracted litigation in an attempt to coerce Plaintiff's clients and all others similarly situated to accept grossly inadequate settlements. During widely-reported town hall meetings, Kenneth R. Feinberg repeatedly told victims of the BP oil well blowout incident: "The litigation route in court will mean uncertainty, years of delay and a big cut for the lawyers….I take the position, if I don't find you eligible, no court will find you eligible."

11.  At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly circumventing the OPA by negotiating and drafting a settlement class action which limits a claimant's recovery of damages to  geographic bounds and certain business activities while requiring a heightened and vague proof of causation between his, her, or its damages and the BP oil well blowout incident.

12.  At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by failing to zealously and competently advocate on behalf of Plaintiff, Plaintiff's clients, and all others similarly situated.

13.  The purpose of the Federal Rules of Civil Procedure is "to secure the just, speedy,

-4-

and inexpensive determination of every action and proceeding." As a direct result of Defendant Herman fraudulently, recklessly, negligently and/or knowingly breaching his fiduciary and ethical duties to Plaintiff and Plaintiff's clients by failing to zealously and competently advocate on behalf of Plaintiff and Plaintiff's clients, as of the date of the filing of this Complaint, approximately eight years have passed since Plaintiff's clients filed their complaints in Florida State Court.

14.   At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by exercising oversight of a multidistrict litigation which is unconstitutional. MDL 2179, which employs a victims' compensation fund on the frontend and a settlement class action on the backend, involves no litigation and infringes individual claimants' procedural due process rights. The most serious problem with the MDL 2179 settlement class action is that by its nature it does not involve any live dispute between the parties that a federal court is being asked to resolve through litigation, and because from the outset of the proceeding Defendant Herman, the members of the MDL 2179 PSC, and BP are in full accord as to how the claims should be disposed of. There is missing the adverseness between the parties that is a central element of Article III case-or-controversy requirement.

15.   On November 10, 2014, Judge Barbier states, "….as the parties were approaching the final fairness hearing in November 2012, there was a concerted effort by the parties and claims facility to process a substantial number of high value claims in order to demonstrate that the settlement program was working as intended." At all times material herein, Defendant

Herman, the members of the MDL 2179 PSC, BP, and the administrator of the claims facility secretly colluded to inflate the amount of compensation received by some plaintiffs (just prior to the "fairness" hearing) in order to induce the remaining plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate."

16.  At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly failing to disclose to their clients that a class member seeking to determine his or her compensation would not be able to simply read the settlement agreements and determine how his or her circumstances fit into the frameworks. The frameworks of the settlement agreements are certainly not detailed and transparent. A claimant could not possibly make a reasonable determination of how his or her claim will be resolved based on his or his business's circumstances. Defendant Herman and the members of the MDL 2179 PSC drafted these settlement agreements under the premise that "if we can't dazzle them with brilliance, we will baffle them with obfuscation."

17.  At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly failing to disclose to Plaintiff, Plaintiff's clients, and all others similarly situated the material fact that contingent fees are designed to increase

proportionally alongside a plaintiff's recovery - to tie the fates of lawyer and client. When Defendant Herman and the MDL 2179 PSC attorneys take things one-step further and bargain for the defendant to pay their common benefit fees directly, they sever that tie. As a result, the attorneys' financial self-interest may no longer be linked to their clients' outcome, but to the defendant's wishes. This concern has long been recognized as one of structural collusion in the class context. John C. Coffee, Jr., *Rethinking the Class Action: A Policy Primer on Reform*, 62 IND. L.J. 625, 647-48 (1987). Courts have agreed. *E.g.,* Zucker v. Occidental Petroleum Corp., 192 F.3d 1323 (9th Cir. 1999).

18. At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly failing to disclose to their clients that: (a) the total amount of the settlement is $20 billion; (b) Patrick Juneau would deny payment to approximately 60.03% of the claims submitted to the DHCC; (c) the total fees paid to Defendant Herman and the members of the MDL 2179 PSC would be comprised of common benefit fees, contingent fees, co-counsel fees, and hold-backs; (d) the total compensation paid to Defendant Herman and the members of the MDL 2179 would be $3.035 billion; (e) the MDL 2179 plaintiffs were fraudulently induced not to opt-out of the settlement; (f) the costs incurred for retaining four experts in the law of class actions (the Court quotes from the opinions of these experts in its analysis of class certification issues in the settlement class action) and the costs incurred for retaining a fifth law professor to give his opinion on the Aggregate Fee Petition; and (g) the costs

-7-

incurred for the Special Masters and Claims Administrator.

19.  This case is brought by Plaintiff against Defendant Herman under the following causes of action: (a) Gross Negligence; (b) Negligence; (c) Negligence Per Se; (d) Fraud; (e) Fraudulent Inducement; (f) Promissory Estoppel; (g) Unjust Enrichment; (h) Breach of Fiduciary Duty; (i) Fraudulent Concealment; (j) Constructive Fraud; (k) Breach of Fiduciary Duty of Loyalty (Breach of the Aggregate Settlement Rule); and (l) Fraudulent Concealment (MDL 2179 Is Unconstitutional).

## JURISDICTION AND VENUE

20.  This is an action for damages which exceeds fifteen thousand dollars ($15,000.00).

21.  Venue in this judicial district is proper under Florida Statute § 48.193 because the tortious acts and injuries alleged in this action were committed in more than one judicial circuit in Florida, including the Thirteenth Judicial Circuit in and for Hillsborough County, Florida and Defendant operates, conducts, engages in, or carries on a business or business venture in Florida.

## PARTIES

22.  Plaintiff Donovan, a resident of Hillsborough County, Florida, is an individual and attorney admitted to practice law in the State of Florida, the U.S. District Court, Middle District of Florida, and the U.S. Court of Appeals for the Eleventh Circuit. Plaintiff Donovan's principal place of business is located in Hillsborough County at 3102 Seaway Ct., #304, Tampa, Florida 33629.

23.  At all times material herein, Defendant Herman, a resident of the State of Louisiana and a partner at the law firm Herman, Herman & Katz, LLC, served as pre-MDL Co-Liaison

Counsel for all cases, including cases initially filed in the State of Florida, consolidated in the EDLA, Co-Liaison Counsel MDL 2179, Co-Lead Class Counsel for the BP Settlement Classes, Co-Lead Settlement Class Counsel for the Halliburton/Transocean Settlement Class, member of the Plaintiffs' Executive Committee, Co-Chair of the Fee Committee, and *ex officio* member of the PSC. At all times material herein, Defendant Herman oversaw and steered the entire MDL 2179 "litigation" effort. This includes settlement negotiations with BP, Halliburton, and Transocean, as well as settlement approval, and settlement implementation, post-settlement administrative disputes, litigation, and appeals, approval, payment, and reimbursement of Shared Expenses and other general planning and administration, coordination with Defendants, Special Masters, the Court, the States, and the United States, case-management orders and procedures, public relations efforts, the monitoring of and coordination with the JPML, Government, and other satellite investigations, lawsuits, and proceedings, general communications, coordination, organization, and strategy. Defendant Herman's principal place of business is located at 820 O'Keefe Ave., New Orleans, Louisiana 70113.

24. On December 11, 2018, Judge Barbier issued an Order wherein he states, "Each year the Court has appointed or re-appointed attorneys to the Plaintiffs' Steering Committee ("PSC") for one-year terms. The most recent appointments to the PSC expired on September 30, 2018. (Rec. Doc. 23456). Considering the progress of the MDL, the Court finds it is unnecessary to appoint or re-appoint members to the PSC. The Court does, however, re-appoint Stephen J. Herman as Plaintiffs' Co-Liaison Counsel, effective October 1, 2018 through September 30, 2019."

## BACKGROUND FACTS

### I.  Defendant Herman's 8-Step Plan to Limit BP's Liability
### and Maximize His Compensation

25.  Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly conceived, developed, and/or facilitated the following eight-step plan to maximize his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP.

### A.  Step No. 1: Capture Market Share

26.  In MDL 2179, a victim of the BP oil well blowout is not a person. MDL 2179 plaintiffs are merely bargaining chips or commodities acquired by Defendant Herman and aspiring members of the PSC and later "sold" in bulk to the defendant.

27.  The MDL 2179 plaintiffs serve as a bargaining chips in four ways: (a) an attorney with a sufficient number of bargaining chips has a better chance to be awarded with a lucrative appointment to the MDL 2179 PSC by the transferee judge; (b) after the attorney has been appointed to the PSC, he pools his bargaining chips with the bargaining chips of the other members of the PSC to exert leverage on the defendant while graciously offering the defendant and the defendant's shareholders closure; (c) the settlement class action achieved by this leverage will hopefully result in significant judicial efficiency; and (d) this judicial efficiency, in turn, will result in the transferee judge ensuring that Defendant Herman and the cooperative PSC attorneys are excessively compensated for closing the deal with the defendant in a timely manner. Justice for the BP oil well blowout victims was never considered by Defendant Herman.

28.  Judge Barbier praises the attorneys he appointed to the MDL 2179 PSC for their

initiative, "Shortly after the events of April 20, 2010, various law firms who would eventually become Liaison Counsel, PSC members, Class Counsel, and other common benefit attorneys….started to coordinate with one another….Working together, the lawyers developed a formal limited joint-prosecution agreement to facilitate the coordination and sharing of information, research, and litigation strategy." Defendant Herman and each attorney appointed by Judge Barbier to the MDL 2179 PSC directly represents thousands or tens of thousands of clients.

29.  At all times material herein, Defendant Herman breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated. At all times material herein, Defendant Herman did not spend very much time, if any, evaluating the merits of whether or not to advise his thousands of clients to opt-out of the settlement class action in light of the individual circumstances of each of his clients and in consultation with them.

30.  Litigation in the United States is adversarial. A plaintiff's counsel zealously advocates on behalf of his client. He goes to war on behalf of his client. In contrast, MDL 2179 is a perverted form of transactional law. In transactional law, both parties involved in the transaction should win. In MDL 2179, Defendant Herman, the PSC, and the defendant win. The only losers are the comatose, hapless BP oil well blowout plaintiffs.

## B.  Step No. 2: The JPML Transfer Order

31.  In the transfer order for MDL 2179, the JPML states, "Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund."

-11-

32.  Defendant Herman did not have to rely solely on a settlement class action to limit BP's liability. From the very beginning, Defendant Herman also had a victims' compensation fund, sanctioned by the JPML, to eliminate a substantial number of claimants.

### C.  Step No. 3: Establishment of Feinberg's Victims' Compensation Fund

33.  Kenneth R. Feinberg, masquerading as a "Fund Administrator," was employed by BP to limit its liability.

34.  In violation of the OPA, but with the approval of Defendant Herman, Feinberg's approach to determining claimant eligibility was driven by two factors: (1) loss location; and (2) claimant business type.

35.  Feinberg's use of coercion and fraudulent inducement was also in clear violation of the OPA. Feinberg used the fear of costly and protracted litigation to coerce victims of the BP oil well blowout to accept grossly inadequate settlements.

36.  In MDL 2179, Feinberg used a "Delay, Deny, Defend" tactic against legitimate BP oil well blowout victims. This tactic, commonly used by unscrupulous insurance companies, is as follows: "Delay payment, starve claimant, and then offer the economically and emotionally-stressed claimant a miniscule percent of all damages, including future damages, to which the claimant is entitled. If the financially ruined claimant rejects the settlement offer, he or she may sue."

37.  This "Delay, Deny, Defend" tactic, although unconscionable, proved to be very effective for Defendant Herman, Feinberg, and BP.

38.  The ultimate objective of Feinberg's "Delay, Deny, Defend" tactic was to limit BP's

liability by obtaining a signed "Release and Covenant Not to Sue" from as many BP oil well blowout victims as possible. Feinberg's "Release and Covenant Not to Sue" requirement violates OPA, State contract law, and is contrary to public policy.

39.  Defendant Herman fully sanctioned and facilitated Feinberg's "Release and Covenant Not to Sue."

40.  Releases, compromises and settlement agreements are contracts and the rules of construction applicable to all contracts are used in the interpretation of such agreements.

41.  Whether a compromise, settlement, or release is a valid contract between the parties is determined by reference to State substantive law governing contracts generally. Whether a contract or a contractual provision is unconscionable or unenforceable on grounds of illegality or public policy is a question of law.

42.  In examining whether a contract is unconscionable, the court must determine whether one party lacked a meaningful choice and the contract terms were unreasonably favorable to the other party.

43.  Kenneth R. Feinberg's "Release and Covenant Not to Sue" violates State contract law and is contrary to public policy because it: (a) was obtained through the use of economic duress; (b) was obtained without free consent (Claimants did not consent to the release by choice, because the only option for receiving payment required Claimants to sign a release, the terms of which they had no opportunity to negotiate.); (c) was obtained through fraud; (d) requires Claimants to discharge, waive and release future claims (including those resulting from gross negligence) for costs and damages (including punitive damages) that are unknown and have not yet arisen. As Judge Barbier clearly states in his Order of August 26, 2011, "The

-13-

long term effects [of the BP oil well blowout] on the environment and fisheries may not be known for many years;" (e) was obtained in exchange for inadequate consideration; and (f) has as its objective the circumvention of the OPA.

44.   Accordingly, Defendant Herman's sanctioned "Release and Covenant Not to Sue" is void *ab initio*.

45.   Incredibly, the MDL 2179 Court still held: (a) "While OPA does not specifically address the use of waivers and releases by Responsible Parties, the statute also does not clearly prohibit it;" and (b) "In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill."

46.   The OPA requires more than merely "speedy and efficient." The OPA requires that all BP oil well blowout victims are *fully* compensated. Furthermore, the purpose of the Federal Rules of Civil Procedure is "to secure the *just*, speedy, and inexpensive determination of every action and proceeding (Emphasis added)."

47.   In sum, victims of the BP oil well blowout turn to the court in search of justice, not merely a "speedy and efficient" determination of their cases.

48.   Efficiency is not the only touchstone of justice. A substantial body of opinion and a respect for jurisdictional principles suggest that a plaintiff ordinarily has a right to a trial in the forum of his or her choosing. Aggregation of cases for the purpose of facilitating settlement is a byproduct of §1407, but is not its central statutory purpose.

49.   Judicial economy is undoubtedly well-served by MDL consolidation when scores of similar cases are pending in the courts. Nevertheless, the excessive delay and marginalization of juror fact finding (i.e., dearth of jury trials) associated with traditional MDL practice, such as

MDL 2179, are developments that cannot be defended.

50.  The appropriate focus for Defendant Herman's sanctioned Feinberg-administered victims' compensation fund resolution of mass claims should be justice for the claimants, not merely judicial economy and closure for BP.

51.  Feinberg denied payment to approximately 61.46% of the claimants who filed claims.

52.  The BP/Feinberg victims who executed a "Release and Covenant Not to Sue" (approximately 220,000 in number) were subsequently excluded by Defendant Herman from the settlement class action.

### D.  Step. No. 4: Appointment of "Cooperative" Attorneys to the PSC

53.  It is important to understand that Defendant Herman replaced justice with judicial efficiency in MDL 2179.

54.  MDL 2179 is not a litigation. Attorneys appointed to the MDL 2179 PSC are not appointed by the transferee judge to be litigators. These attorneys are not selected for the purpose of zealously advocating on behalf of their clients. Defendant Herman and attorneys appointed to the MDL 2179 PSC are cooperative dealmakers.

55.  In sum, the main criteria for membership in the MDL 2179 PSC is very simple: (a) The attorney must be "cooperative;" (b) The attorney should be a "repeat player;" and (c) The attorney must have signed-up a large stable of clients which he or she is already directly representing.

56.  It is helpful to remember the three Cs of any successful PSC: cooperation, control,

and compensation. Greater cooperation (between the dealmakers) and control (in terms of a significant market share of plaintiffs) results in closing the deal faster with the defendant and clearing the docket faster which results in greater compensation. A happy transferee judge is a generous transferee judge. A happy Plaintiffs' Co-Liaison Counsel is a generous Plaintiffs' Co-Liaison Counsel. In MDL 2179, the comatose, hapless plaintiffs received little or no compensation while the compensation paid to Defendant Herman and the members of MDL 2179 PSC is estimated to be *$3.035 billion*.

### E.  Step No. 5: Circumvention of OPA, a Strict Liability Statute

57.  "OPA applies of its own force, because that act governs, *inter alia*, private claims for property damage and economic loss resulting from a discharge of oil in navigable waters." *See* 33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 3830 at 11, August 26, 2011).

58.  The OPA is a *strict liability* statute. In order to recover damages under the OPA, a claimant merely needs to show that his or her damages "resulted from" the oil spill or oil well blowout.

59.  The OPA, in pertinent part, states: "The responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages that result from such incident."

60.  The damages referred to in 33 U.S.C. § 2702(a) include, but are not limited to:

"Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which *shall be recoverable by any claimant*." (Emphasis added)

61.  The OPA further provides: (a) "Payment or settlement of a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled **shall not** preclude recovery by the claimant for damages not reflected in the paid or settled partial claim;" and (b) "Payment of such a claim [i.e. payment to a claimant for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled] **shall not** foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under this Act or under any other law."

62.  "Shall" means shall. The U.S. Supreme Court has made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the command.

63.  Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is mandatory and "may" is permissive. "The mandatory 'shall'….normally creates an obligation impervious to judicial discretion."

64.  BP, the majority owner and operator of the Macondo Well, is a "responsible party" for this incident under the OPA, 33 U.S.C. §2702(a).

65.  Although liability under the OPA is subject to a monetary cap of $75,000,000 for each incident by each responsible party, there is no limit to liability if the damage was proximately caused by "gross negligence or willful misconduct." It is important to note that BP, the responsible party, waived the monetary cap of $75,000,000 for the BP oil well blowout incident in the Gulf of Mexico on April 20, 2010 and the MDL 2179 Court concluded that the

discharge of oil was the result of BP's "gross negligence" and "willful misconduct" under the Clean Water Act ("CWA"). Accordingly, in theory, there is no limit to BP's liability. Defendant Herman's perceived reality is so very different.

66.  Allegedly, in order to efficiently manage MDL 2179, the Court consolidated and organized the various types of claims into several "pleading bundles" for the purpose of the filing of complaints, answers, and any Rule 12 motions.

67.  The "B1" pleading bundle includes all claims for private or "non-governmental" economic loss and property damages.

68. On January 12, 2011, the MDL 2179 Court issued PTO No. 25, in order to clarify "the scope and effect" of the "B1" Master Complaint. The Court held that any individual plaintiff who is a named plaintiff in a case that falls within pleading bundle "B1" "is deemed to be a plaintiff in the "B1" Master Complaint. Also, "the allegations, claims, theories of recovery and/or prayers for relief contained within the pre-existing petition or complaint are deemed to be amended, restated, and superseded by the allegations, claims, theories of recovery, and/or prayers for relief in the respective "B1" Master Complaint(s) in which the defendant is named."

69.  Rather than allege claims under the OPA, the "cooperative" Defendant Herman made the unfathomable decision to allege claims under a hodgepodge of statutes. In the "B1" Master Complaint, Defendant Herman states, "The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiffs hereby designate this case as an admiralty or maritime case, and request a non-jury trial, pursuant to Rule 9(h)."

70.  Defendant Herman was concerned that a jury may not be "cooperative."

71. The U.S. Supreme Court has quoted testimony by an admiralty expert who stated "maritime law in the strict sense has never had to deal with the resources in the ground beneath the sea, and its whole tenor is ill adapted for that purpose." The Court then added that "since the Act [OCSLA] treats seabed, subsoil, and artificial islands the same, dropping any reference to special treatment for presumptive vessels, the most sensible interpretation of Congress' reaction to this testimony is that admiralty treatment was eschewed altogether…." The U.S. Supreme Court additionally stuns with its unqualified statement that it "*has specifically held that drilling platforms are not within admiralty jurisdiction.*" (Emphasis added)

72. The U.S. Supreme Court has reaffirmed as a basis for an admiralty tort that the wrong must bear a substantial relation to a traditional maritime activity in *Foremost Insurance Co. v. Richardson, Sisson v. Ruby, Grubart,* and, most recently, *Herb's Welding.* If the MDL 2179 Court were to apply this requirement in the BP oil well blowout litigation, Defendant Herman's claim of admiralty jurisdiction for the BP oil well blowout - the epitome of an oil and gas drilling operation - would have proven difficult, if not impossible, to sustain.

73. OCSLA's role as an essential component of the BP oil well blowout cannot be ignored. OCSLA, the U.S. Supreme Court has declared, "defines a body of law applicable to the seabed, the subsoil and the…structures…on the Outer Continental Shelf." OPA is no less essential to the tort, of course, because, as the MDL 2179 Court itself acknowledges, the statute "governs….private claims for property damage and economic loss resulting from a discharge of oil in navigable waters." The BP oil well blowout, in short, inextricably engages *both* statutes in this unique configuration. OCSLA, the U.S. Supreme Court declared in 1969 in *Rodrigue v. Aetna Casualty & Surety Company*, was intended to "define a body of law applicable to the

-19-

seabed, the subsoil and the….structures….on the Outer Continental Shelf." OCSLA's legislative

history, as carefully evaluated by *Rodrigue*, disdains admiralty law as OCS governing law.

Congress refashioned OCSLA in 1978 as a "new statutory regime" designed to "prevent or

minimize the likelihood of *blowouts, loss of well control,* fires….or other occurrences which may

cause damage to the environment or to property, or endanger life or health." Congress could not

have spoken more directly to BP oil well blowout's core issue and corresponding remedial

program, particularly as OCSLA was subsequently refined and expanded by OPA.

74.  Following the *Exxon Valdez* disaster in 1989, Congress unanimously adopted OPA,

which the Senate Public Works and Environmental Committee portrayed as a "single Federal

law providing cleanup authority, penalties, and liability from oil pollution." Consolidated and

harmonized within this single act were major elements of four existing oil pollution statutes,

including OCSLA's title III.

75.  The comprehensiveness of the displacement of general maritime law by the two non-

admiralty statutes, OCSLA and OPA, is evident on two fronts.

76.  The first is Congress's reformulation of general maritime law's episodic, conflicting,

and, at best, embryonic treatment of the tort. The second is Congress's own undertaking in OPA

to comprehensively incorporate and reformulate in a single federal statute its own work in the

four prior statutes. This extraordinarily extensive undertaking leaves negligible space for the

credibility of any claim that these efforts fall short of Congress's effective occupation of a field

coextensive with the boundaries delineated in the BP oil well blowout.

77.  In *Herb's Welding*, the U.S. Supreme Court excoriated as "*untenable*" the Fifth

Circuit's view that "*offshore drilling is maritime commerce.*" *Herb's Welding*'s explicit

-20-

confirmation of and reference to the U.S. Supreme Court's assessment in *Rodrigue* that OCSLA's legislative history "*at the very least forecloses the Court of Appeals' holding that offshore drilling is a maritime activity*…." would seem to leave precious little space for Defendant Herman's position.

78.  In *Rodrigue*, the U.S. Supreme Court clashed with the Fifth Circuit's *Snipes v. Pure Oil Company* decision, which, in another manifestation of the Fifth Circuit's reflexive admiralty-centrism, defined as "maritime" a tortious injury suffered by an OCS stationary platform worker at this OCSLA site. In *Rodrigue*, the U.S. Supreme Court held that admiralty law does not apply to torts originating on OCSLA situses unless Congress affirmatively expresses its "intent" favoring this override. The U.S. Supreme Court's language favoring this conclusion could not be more forthright: "Even if the admiralty law would have applied to the deaths occurring in these cases under traditional principles, OCSLA's legislative history shows that Congress did not intend that result. First, Congress assumed that the admiralty law would not apply to an OCSLA situs unless Congress made it apply, and then Congress decided not to make it apply." Earlier discussion disclosed Congress's 1978 institution of its "new OCSLA statutory regime." The Conference Committee explained that the former clarified that federal law is to be *applicable to all activities on all devices in contact with the seabed for exploration, development, and production.* The committee intends that federal law is, therefore, to be applicable to activities on drilling ships, *semi-submersible drilling rigs*, and other watercraft, when they are *connected to the seabed by drill string,* pipes, or *other appurtenances*, on the OCS for exploration, development, or production purposes. *Ships and vessels are specifically not covered only when they are being used for the purpose of transporting OCS mineral resources*.

79.  The House described title III's function as providing the "procedures to be followed in the event of an oil spill and compensation for cleanup costs and damages resulting from such a spill." The title limits the definition of "vessels" to watercraft operating in OCS or territorial waters and which transport "oil directly from an offshore facility." An "offshore facility," it stated, is "any oil refinery, or *drilling structure*,….which is used to *drill for*, produce,….or transport oil produced from the Outer Continental Shelf….." These definitions exclude semisubmersibles as "vessels" by including them under "any drilling structure." The term "vessel" is restricted to any watercraft used exclusively to "transport oil directly from an offshore facility." Hence the statement of the conferees: "*Once a drilling ship or other watercraft is attached to the seabed for exploration*, development or production, *it is to be considered an 'offshore facility' rather than a vessel*, for purposes of applying the differing requirements for a facility as compared to a vessel."

80.  In fact, OCSLA's section 1333(a), its title III OCS economic-and property-loss cause of action, and the latter's refinement and expansion in OPA are not creatures of admiralty at all. They are instead independently grounded in the Constitution's Property and Interstate and Foreign Commerce clauses, respectively.

81.  Historically, the U.S. Supreme Court has objected to "fortuitous," "perverse" or "absurd" results that may result from pinning the admiralty tail on disputes for which admiralty can claim no expertise. The U.S. Supreme Court undertook to discourage this practice in *Executive Jet Aviation Company v. City of Cleveland* by requiring a "substantial relationship" connecting the matter in question "to traditional maritime activity." "In determining whether there is admiralty jurisdiction over a particular tort or class of torts," the Court stated, "reliance

on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than a purely mechanical application of the locality test."

82.  General maritime law's judge-made principles do not enjoy a presumption against displacement by a federal statute. Despite idealized assertions of admiralty's capacity to resolve complex social or economic issues, the reality, as Justice Holmes counseled, is that general maritime law is not a "corpus juris," but "a very limited body of customs and ordinances of the sea."

83.  Defendant Herman's reasoning and the MDL 2179 Court's orders and reasoning are contrary to U.S. Congressional intent, the OCSLA, the OPA and U.S. Supreme Court decisions. The only logical conclusion is that they are the product of Defendant Herman acting, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC.

84.  Filing of the "B1" Master Complaint as an admiralty or maritime case artfully circumvented the OPA. By doing so, Defendant Herman assisted Judge Barbier in expeditiously being able to erroneously and incomprehensibly find, "….that nothing prohibits Defendants from settling claims for economic loss. While OPA does not specifically address the use of waivers and releases by Responsible Parties, the statute also does not clearly prohibit it. In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill."

85.  As a result of this finding by Judge Barbier, approximately 220,000 Kenneth R.

Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action. There is no evidence that these amounts even remotely represent adequate consideration to compensate claimants for the damages that claimants did or will suffer as a result of the BP oil well blowout.

86.  By alleging claims under general maritime law rather than under the OPA (a strict liability statute) and OCSLA, in the "B1" First Amended Master Complaint, Defendant Herman assisted Judge Barbier in expeditiously being able to:

(a) Erroneously find, "The *Deepwater Horizon* was at all material times *a vessel in navigation.*"

(b) Erroneously find, "Admiralty jurisdiction is present because the alleged tort occurred upon navigable waters of the Gulf of Mexico, disrupted maritime commerce, and the operations of the vessel *bore a substantial relationship to traditional maritime activity*. With admiralty jurisdiction comes the application of substantive maritime law."

(c) Erroneously find, "State law, both statutory and common, is preempted by maritime law, *notwithstanding OPA's savings provisions*. All claims brought under state law are dismissed."

(d) Erroneously find, "General maritime law *claims that do not allege physical damage to a proprietary interest are dismissed* under the *Robins Dry Dock* rule, unless the claim falls into the commercial fishermen exception."

87.  Moreover, the maritime rule in the Fifth Circuit is that operational recklessness or willful disregard is generally insufficient to visit punitive damages upon the employer. Rather, the conduct must emanate from corporate policy or that a corporate official with policy-making authority participated in, approved of, or subsequently ratified the egregious conduct.

88.  Accordingly, the MDL 2179 Court concluded that BP cannot be held liable for punitive damages under general maritime law. Judge Barbier further noted that, even if BP were

liable for punitive damages, only commercial fishermen or those who could satisfy the "physical injury" threshold of the *Robins Dry Dock* rule would be entitled to such an award.

89.  Since Defendant Herman requested a non-jury trial pursuant to Rule 9(h) and alleged claims under general maritime law, rather than OPA and OCSLA, the MDL 2179 Court formulated a trial plan that dispensed with trial by jury and instead conducted a bench trial applying general maritime law.

90.  Circumventing the OPA also allowed the settlement to limit a claimant's recovery of damages by geographic bounds, pertain solely to certain business activities, and require a heightened and vague proof of causation between his or her damages and the BP oil well blowout incident.

### F.  Step No. 6: Approval of the Settlement Class Action

91.  In February 2011, only 4 months after Judge Barbier appointed Defendant Herman and the other cooperative attorneys to the BP oil well blowout MDL PSC and Plaintiff Executive Committee, settlement negotiations began "in earnest." Defendant Herman and BP negotiated a total amount which BP was willing to pay in order to settle the BP oil well blowout case.

92.  Carefully implementing the above-described Steps No. 1 through No. 5, Defendant Herman and BP worked backwards from that agreed upon total amount to draft the terms and conditions of the settlement.

93.  Just prior to the final fairness hearing in November 2012, Defendant Herman, the members of the MDL 2179 PSC, BP, and the administrator of the claims facility intentionally processed a substantial number of high value claims in an attempt to demonstrate that the settlement program was working as promised by Defendant Herman. Here, the objective was to

keep as many of the remaining claimants/plaintiffs in the settlement class action as possible. Opt-outs were seriously frowned upon. The settlement class action was the only game in town. Take it or leave it!

94.  At the fairness hearing, Defendant Herman and the MDL 2179 Court limited oral presentations by individual objectors (or their counsel, as applicable) to not more than 3 minutes each.

95.  In sum, the purpose of the fairness hearing was to allow the dealmakers (Defendant Herman and BP) to argue in favor of approval of the Economic and Property Damages Settlement. Claims Administrator Patrick Juneau and Michael Juneau also presented on the glorious status of the settlement and the virtually non-existent settlement opt-outs.

96.  The BP oil well blowout of April 2010 resulted in the largest environmental disaster in the history of the United States. An estimated 5.0 million barrels of crude oil gushed into the Gulf of Mexico.

97.  The Honorable Carl J. Barbier clearly states, "The long term effects [of the BP oil well blowout] on the environment and fisheries may not be known for many years." Nevertheless, in order to limit BP's liability, one tactic employed by Defendant Herman and BP was to limit the compensation period to 2010.

98.  Incredibly, Judge Barbier found, and Defendant Herman agreed, that limiting the compensation period to 2010 is reasonable. The Court explains, "Certain objectors complain that the Economic Damage Claim Frameworks are unfair because they do not compensate persons who did not begin suffering losses until 2011. Yet this provision is reasonable for three reasons: (i) the Macondo well ceased flowing in July 2010; (ii) there is evidence that by late 2010, Gulf

Coast tourism had returned to or surpassed 2009 levels; and (iii) as to claims by individuals and businesses in charter fishing, seafood processing, or other businesses relying on access to Gulf waters, nearly all federal and state waters were reopened for commercial fishing by November 2010. *Thus, extending compensation to 2011 would cover losses not likely caused by the spill*." (Emphasis added)

99.  Defendant Herman's settlement causation requirements take obfuscation to a new level.

100.  The BP oil well blowout settlement contains various causation requirements for Business Economic Loss ("BEL") claims. Two of the causation tests, the Modified V-test and the Decline-Only test, require a revenue calculation based on benchmark periods and, in addition, a decline in the share of total revenue generated by non-local customers or customers in Zones A to C as reflected in specified documentation.

101.  In discussing the causation requirements for BEL claims, Judge Barbier explains, and Defendant Herman agrees, "Certain objectors contend that to invoke the Modified V-Test or the Decline-Only Test, they are required to satisfy the Customer Mix Test, which requires these businesses to establish where their customers are located. The objective evidence shows that the causation tests available under the Settlement Agreement are both economically reasonable and highly favorable to claimants, which is why they were negotiated by experienced counsel in consultation with their clients and experts....Other objectors complain that before they can invoke the V-Shaped Revenue Pattern test, they must demonstrate a 5% revenue recovery during the correlating months of 2011 as compared to the 2010 baseline period. This provision is reasonable, as *losses that continued after the spill are likely to be due to factors other than the*

*spill*." (Emphasis added)

102.  Defendant Herman fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by reassuring BP oil well blowout claimants/plaintiffs that the settlement claims program's Risk Transfer Premium ("RTP") enhances the compensation amount for, among other things, certain claimants whose damages could be recurring, to account for that risk of future damages.

103.  Defendant Herman further fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by supporting the Court's finding that, "RTP payments are meant to compensate class members for pre-judgment interest, the risk of oil returning, consequential damages, inconvenience, aggravation, the risk of future loss, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors."

104.  According to Defendant Herman, RTP payments are simply magical.

105.  Defendant Herman, the members of the MDL 2179 PSC, and BP tendered either jointly or on their own behalf four "experts" in the law of class actions: Professors Coffee, Issacharoff, Klonoff, and Miller. Indeed, Defendant Herman and the Court cites to, or in some instances quotes from, the opinions of these "Thought Leaders" at various points in its analysis of class certification issues.

106.  The following are a few examples of the quotes of these "Thought Leaders" and claims administrator.

(a)  The class definition is geographically circumscribed to Louisiana, Alabama, Mississippi, and certain specified counties in Florida and Texas along the Gulf Coast, as well as Specified Gulf Waters [in violation of the OPA].

-28-

(b)  According to Professor Coffee, such careful negotiation of the release was "an example of reasoned statesmanship [in violation of the OPA]."

(c) "Because a class action is the vastly superior method by which to resolve the impact of this mass disaster on the Gulf Coast Region, it would be a social tragedy if class certification were denied."

(d) "I've never been involved in a project that has gotten up this quick, had the involvement with the volume we had to deal with, and to either have started it earlier or gotten it paid this quickly. It's been a remarkable experience for me."

(e)  "The pace of payment determinations and payments is very high in comparison to other claims matters and is especially reasonable considering the other substantial responsibilities of the Settlement Program during this same period of time."

107.  Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by retaining, and highly compensating, four law professors/thought leaders to give their "unbiased" opinions in order to induce the plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate."

108.  Notwithstanding the opinions of Defendant Herman's four law professors, Plaintiff believes it is obvious to any reasonable person that Defendant Herman's negotiated settlement class action violates the OPA statute by defining class members by geographic bounds and certain business activities while requiring proof of a heightened, vague standard of causation.

109.  The MDL 2179 class settlement agreement is a business deal entered into between Defendant Herman, the members of the MDL 2179 PSC, and BP for their own personal benefit. This deal was consummated behind closed doors. Although there is no stated limit on the amount that BP is willing to pay, there is an absolute limit that BP is willing to pay. Otherwise, BP

would not have agreed to the settlement terms and conditions. More importantly, Defendant Herman conveniently fails to mention that although there is no stated ceiling, there is also no stated floor. BP is not obligated to pay any amount. Moreover, BP and Defendant Herman are able to argue that certain claims are not legitimate and Defendant Herman may clawback "fraudulent" payments previously paid to BP oil well blowout victims.

110.   After eliminating the class members who opted-out and the illegally excluded BP oil well  blowout victims, the vast majority of remaining Plaintiffs are either comatose or are directly represented by Defendant Herman and members of the PSC. Those plaintiffs directly represented by Defendant Herman and members of the PSC know they shall be well-compensated because each must pay a contingent fee to Defendant Herman or his or her "cooperative" PSC attorney.

### G.  Step No. 7: The Post-Settlement Mop-Up Procedures

111.   Transferee judges tend to issue *Lone Pine* orders after most plaintiffs' cases are resolved through a comprehensive settlement. *Lone Pine* orders are usually issued with little advanced notice. Although plaintiffs may be relying on common evidence produced by the PSC, when they refuse to settle, *Lone Pine* orders might require a plaintiff to retain an individual expert and produce her opinion within a couple of weeks. In sum, *Lone Pine* orders require non-settling plaintiffs to provide some evidentiary support for their claims to avoid dismissal.

112.   MDL PSC members routinely argue that a *Lone Pine* order is appropriate as "a post-settlement mop-up procedure utilized to address those cases which either were not eligible for compensation through the MDL settlement program or which had opted-out of participation

in the MDL settlement program." In reality, the purpose of a *Lone Pine* order is to eliminate

those few remaining non-cooperating plaintiffs who have the audacity to demand justice.

113.   In lieu of having the Court issue a *Lone Pine* order, Defendant Herman created

Pretrial Order No. 60 ("PTO 60") and Pretrial Order No. 64 ("PTO 64") to eliminate those few

remaining non-cooperating, pesky plaintiffs who have the audacity to demand justice.

114.   On March 29, 2016, the MDL 2179 Court issued PTO 60 wherein the Court

dismissed the amended "B1" Master Complaint as having "no further administrative or

procedural benefit."

115.   In PTO 60, the Court required plaintiffs in pleading bundle "B1" who had filed a

timely claim, and not previously released their claim, to file and serve on BP a sworn statement

disclosing information regarding their claims. PTO 60, in pertinent part, states:

> "A. As to Plaintiffs who filed Individual Lawsuits.
> (i) Any plaintiff who previously filed an individual lawsuit must complete the sworn
> statement in the form reflected in Exhibit A. The completed sworn statement shall be
> attached to a cover sheet reflecting the caption of the individual lawsuit in the form of
> Exhibit B. Both the cover sheet and the attached sworn statement must be filed into the
> record of the plaintiff's individual lawsuit (as opposed to the master docket for MDL
> 2179) no later than May 2, 2016. Plaintiff also shall serve the sworn statement on the
> Plaintiffs' Steering Committee ("PSC") and counsel for BP no later than May 2, 2016."

116.   In addition, the Court required those "B1" plaintiffs who had not previously filed an

individual complaint (defined as a complaint not joined in by any other plaintiffs) against BP to

file a new individual complaint. PTO 60, in pertinent part, states:

> "B. Plaintiffs who DID NOT file Individual Lawsuits, (i.e., only filed a SFJ and/or were
> part of a "Mass Joinder" Lawsuit).
> (i) Where Plaintiffs did not file an individual lawsuit, but instead filed a SFJ and/or were
> part of a complaint with more than one plaintiff, each such plaintiff must, by May 2,
> 2016, file an individual lawsuit (Complaint) (one per plaintiff), using the caption
> reflected in Exhibit C. The Complaint should include as an attachment the completed

-31-

sworn statement in Exhibit A. Each plaintiff also must, by May 2, 2016, serve the PSC and Counsel for BP with a copy of the completed sworn statement.

(ii) Plaintiffs that did not file individual lawsuits, but instead filed a SFJ and/or were part of a complaint with more than one plaintiff, who fail to comply with the above requirements by May 2, 2016, will have their claims deemed dismissed with prejudice without further notice."

117.  In sum, plaintiffs who failed to comply with the sworn statement requirement or the new individual complaint requirement by the compliance deadline (May 2, 2016) were to have their claims deemed dismissed with prejudice without further notice.

118.  PTO 60, allegedly in order to further assist the Court in streamlining the dismissal of the remaining claims, addresses the issue of "Presentment" under the OPA. PTO 60 asks any plaintiff who previously filed an individual lawsuit, "Did you, the plaintiff seeking relief, present this claim at least 90 days prior to filing a lawsuit or joining the "B1" Complaint?"

119.  Plaintiff Donovan believes a logical question is: Why didn't Defendant Herman immediately ask each Plaintiff if he or she presented his or her claim to BP (the "Responsible Party") at least 90 days prior to filing a lawsuit or joining the "B1" Complaint, as required under the OPA, when the plaintiff's case was transferred to MDL 2179 or when the plaintiff filed a SFJ?

120.  Following a show cause process, the MDL 2179 Court recognized approximately 1,000 remaining "B1" plaintiffs to be compliant with PTO 60 and subject to further proceedings in MDL 2179. The claims of any other remaining "B1" plaintiffs were dismissed.

121.  On July 14, 2016, the MDL 2179 Court issued an Order (Re: Compliance with PTO 60 Regarding All Remaining Claims in Pleading Bundle "B1") wherein the Court held "As to all Plaintiffs in the "B1" bundle, only those Plaintiffs who have not previously released their claims,

have made timely presentment as required by OPA, have previously filed an individual lawsuit, and have otherwise complied with the requirements of PTO 60 have preserved their individual claims. All other B1 bundle claims are time-barred."

122.   BP believes that a very large number of these approximately 1,000 remaining claims are subject to dismissal "based upon the MDL 2179 Court's prior orders, *lack of OPA presentment*, or release (including membership in the settlement classes and their attendant releases)." Certain of these claims may require further proceedings, including but not limited to dispositive motion practice.

123.   Interestingly, and ironically, BP states that "it also reserves all of its rights concerning its arguments that *OPA displaces all forms of maritime claims*."

124.   On February 22, 2017, the Court issued Pretrial Order No. 64/Case Management Order No. 6 ("PTO 64," Rec. Doc. 22297), one of the goals of which was to identify those "Remaining B1 Plaintiffs" who could plausibly allege a claim under general maritime law. As used in PTO 64, "Remaining B1 Plaintiffs" meant those plaintiffs who had been deemed compliant with PTO 60 and who had not voluntarily dismissed their claims.

125.   PTO 64 required that each Remaining B1 Plaintiff who wished to pursue a general maritime law claim must complete and serve upon BP's counsel and the Plaintiffs' Steering Committee ("PSC") by April 5, 2017 a "Sworn Statement Regarding General Maritime Law Claims."

126.   If a Remaining B1 Plaintiff failed to comply with PTO 64, then that plaintiff's general maritime law claim(s) would be deemed waived and "any such general maritime law claims shall be dismissed without further notice and with prejudice." (PTO 64 at 3).

-33-

**H.  Step No. 8: Clawback**

127.  Carefully implementing the above-described Steps No. 1 through No. 7, Defendant Herman, the members of the MDL 2179 PSC, and BP eliminated, excluded or dismissed virtually all remaining claims against BP. A relatively small percentage of claimants/plaintiffs, primarily represented by members of the PSC and other common-benefit attorneys, were partially compensated for the damages resulting from the BP oil well blowout.

128.  In the status report submitted to the BP oil well blowout Court on February 14, 2017, attorneys for BP Exploration & Production Inc. and BP America Production Company state, "Following a show cause process, the MDL 2179 Court recognized approximately 1,000 remaining "B1" plaintiffs to be compliant with PTO 60 and subject to further proceedings in MDL 2179. The claims of any other remaining "B1" plaintiffs were dismissed. Certain plaintiffs who were found noncompliant with PTO 60 and had their claims dismissed by the Court's December 16, 2016 Reconciliation Order have filed motions for reconsideration and/or notices of appeal…BP believes that a very large number of these pending claims are subject to dismissal based upon the Court's prior orders, lack of OPA presentment, or release (including membership in the settlement classes and their attendant releases). Certain of these claims may require further proceedings, including but not limited to dispositive motion practice….*BP also reserves all of its rights concerning its arguments that OPA displaces all forms of maritime claims*."

129.  One purpose of the "clawback" order was allegedly to refund to BP the amount paid to claimants who had submitted fraudulent claims. However, Defendant Herman's primary purpose was to burnish BP's tarnished image. Although only an infinitesimal percentage of submitted claims were found to be fraudulent, these claims were highly publicized and reported

in the media. In sum, any casual observer may conclude that BP was the only true victim of the oil well blowout disaster. Indeed, were there ever any real victims with legitimate claims?

## II.  Defendant Herman Breached His Fiduciary and Ethical Duties to Plaintiff

### A.  "Come Into the Fold," Pay Us, and Keep Quiet

130.  Upon transfer to MDL 2179, the attorneys which the BP oil well blowout plaintiffs initially retained are magically replaced by Defendant Herman and/or the cooperative attorneys appointed to the MDL 2179 PSC.

131.  The first lawsuit Plaintiff Donovan's clients filed against Feinberg, et al. was eventually transferred from the Florida State Court to MDL 2179 in August 2011. On August 29, 2011, Plaintiff emailed James Parkerson Roy, Plaintiffs' Co-Liaison Counsel for MDL 2179. Plaintiff introduced himself, attached a copy of the JPML transfer order, and stated, "I would like to commence discovery as soon as possible. Since this action does not involve common questions of fact with actions previously transferred to MDL 2179, please advise as to how we may most expeditiously initiate and coordinate discovery. I look forward to working with you on this case."

132.  On September 5, 2011, Plaintiff received an emailed response from Roy and Stephen J. Herman wherein they state, "We have received and appreciate your correspondence of August 29, 2011….Please be advised that the Court has declined to permit formal discovery on Feinberg or the GCCF….Should you desire to participate in the common benefit effort, we would welcome your inclusion in the GCCF Jurisdiction Work Group, which has, for the past year, coordinated Plaintiffs' collective efforts regarding

-35-

Feinberg and the GCCF in terms of information collection, jurisdictional issues, communications with claimants, OPA compliance, and the appropriate scope and effect of the GCCF release."

133.  Defendant Herman and the MDL 2179 PSC did not coordinate Plaintiffs' collective efforts regarding Feinberg and the GCCF in terms of OPA compliance and the appropriate scope and effect of the GCCF release.

134.  On November 7, 2011, Plaintiff sent a follow up letter via email to Defendant Herman wherein Plaintiff Donovan states the following.

135.  "I refer to my letter, dated August 29, 2011, to Mr. James Roy and to our subsequent telephone conversation of September 8, 2011.

136.  During our phone conversation you advised me that, as a result of the transfer of this case to MDL 2179, the extent of my representation of the plaintiffs in this case is now limited to three options. I may: (a) 'do nothing;' (b) 'come into the fold;' or (c) 'go off on my own and directly file pleadings with the Court.'

137.  Given the ongoing economic stress being experienced by my clients resulting from the 'Delay, Deny, Defend' strategy being employed by Kenneth R. Feinberg, et al., 'do nothing' is not a viable option.

138.  I believe Option (b), 'come into the fold,' refers to your invitation to join the GCCF Jurisdiction Work Group (JWG), which has, for the past year, allegedly coordinated Plaintiffs' collective efforts regarding Feinberg and the GCCF in terms of information collection, jurisdictional issues, communications with claimants, OPA compliance, and the appropriate scope and effect of the GCCF release.

-36-

139.  Unfortunately, since the Court has declined to permit formal discovery on Feinberg or the GCCF, my clients would not benefit from JWG's limited scope of discovery.

140.  As you had mentioned, Option (c), 'go off on my own and directly file pleadings with the Court,' would be ill-advised because such action would not be well-received by the Court. However, PTO No. 11 (Case Management Order No. l) requires that all motions or other pretrial proceedings with respect to plaintiffs shall be initiated by and/or coordinated through the PSC. If the PSC does not support the motion or other requested action, the moving or requesting party is permitted to file a motion or request, but must include a certificate of non-support. I believe this option is in the best interests of our clients. Rest assured, we will always confer with or act through the PSC or seek PSC consent prior to filing a motion or request and certificate of non-support."

141.  In his November 7, 2011 letter to Defendant Herman, Plaintiff Donovan also questions the decision of the Court not to permit formal discovery on Feinberg or the GCCF as follows. "When will the Court permit formal discovery on Feinberg and the GCCF?

142.  In your email, dated September 5, 2011, you state, '….the Court has declined to permit formal discovery on Feinberg or the GCCF.'

143.  The passage of time is the defendant's best friend. Memories fade, witnesses are more difficult to locate, and the plaintiffs lose the desire to continue to fight and either 'move on' or settle for less. By declining to permit formal discovery on Feinberg and the GCCF, the MDL 2l79 Court is ensuring that the defendants will not be held accountable and, more importantly, the claimants-turned-plaintiffs will not be fully compensated for damages.

144.  Discovery on Feinberg/GCCF and the associated pressure of a trial are required in

-37-

order exert pressure on the parties to negotiate a settlement which reflects the true value of the claims and not one which focuses on minimizing the liability of Feinberg Rozen, LLP, Feinberg/GCCF, and the responsible parties."

145.  On November 14, 2011, after Plaintiff had already rejected Defendant Herman's offer to "come into the fold" on November 7, 2011, Plaintiff Donovan received an unsolicited GCCF Outreach Workgroup Invitation, GCCF Jurisdiction and Court Oversight Workgroup Invitation, Invoice and Limited Joint Prosecution and Confidentiality Agreement from Defendant Herman and Roy wherein they state the following.

146.  "You have been invited by the PSC to serve as a member of the GCCF Outreach Workgroup and GCCF Jurisdiction and Court Oversight Workgroup of the PSC. As a work group member, your work will be under the supervision and direction of the work group Coordinators who are reporting directly to the PSC/EC and Liaison. Your common benefit time and expenses will be submitted with those of PSC members, workgroup coordinators, and work group members, for consideration by the Court in the event of recovery by settlement or judgment in connection with the MDL proceedings, in accordance with Pretrial Order No. 9. You will have access to the common work product that is developed, and will be invited to participate in various meetings from time to time.

147.  By acceptance of your appointment as a member of the above-named workgroup, your personal time and financial obligations will be potentially significant. Work Group Member Assessments have been set by the PSC at 10% of PSC member assessments (which currently total $330,000); a work group member firm's assessments to date total $33,000.

148.  Your appointment is at the discretion of the Executive Committee/PSC, subject to

the requirements of Pretrial Order No. 9 and other Orders of the Court, and requires your

payment of an initial assessment of at least $10,000 by December 1, 2011; staying current on

future assessments; and continued contribution of PSC authorized common benefit work in

furtherance of the workgroup for MDL 2179. Common benefit work and expenses will be done

only upon written authorization and oversight of the PSC/EC/Liaison and/or upon direction of

Workgroup Coordinators.

149. There are no guarantees that you will receive any remuneration; such is dependent

upon success of the litigation and determination by the Court of entitlement to common benefit

cost reimbursement and/or fees.

150. Accordingly, if you accept this appointment, please sign where indicated below and

FedEx this form and your $10,000 (to $33,000) assessment (payable to MDL 2179 PSC account)

to: Plaintiffs Steering Committee, c/o James P. Roy & Steve Herman.

151. The Limited Joint Prosecution and Confidentiality Agreement (BP Oil Spill

Litigation), in pertinent part, states the following.

> "Any and all documents, communications, information, strategy, experts, legal theory
> and/or other work product that is shared or exchanged by and through this Agreement
> shall be kept and remain confidential….This agreement is not a co-counsel agreement nor
> an agreement, whether express or implied, to share, claim, shift, or consent to an award of
> any type of client contingency, statutory and/or common benefit attorney's fee. The
> signatories may hereafter be referred to herein as the 'BP Gulf Spill Litigation Joint
> Prosecution Group.'….Signatories shall obtain signatures of associates and clerical staff
> working on these matters to assure their compliance with this agreement. Materials
> subject to this agreement will not be shown to non-group experts or non-group members
> without compliance with procedures to be established by Group….Any party hereto can
> withdraw at any time. If a member withdraws, he is still subject to this agreement's
> confidentiality."

152. MDL 2179 is so perverse that Defendant Herman does not want the victims of the

BP oil well blowout to even know that this confidentiality agreement exists. Paragraph 6 of the confidentiality agreement states, "This Agreement itself shall be confidential, and no counsel or party shall reference, cite or otherwise use the drafting, circulating, existence or use of this Agreement in any motion, petition or other application to be appointed, designated or otherwise recognized by any Court for any leadership position. The members agree that except as may be ordered by Court this agreement and its terms and conditions and the work product of the Group and/or its members will be kept strictly confidential and shall not be disclosed to any third party for any reason."

153.  Plaintiff Donovan finds the last paragraph of the confidentiality agreement, which appears to be an afterthought, to be humorous. Paragraph 7, titled "Ethics and Conflicts Compliance" states, "Each member firm is responsible for doing its own conflict and individual ethics checks on an ongoing basis and otherwise in complying with all applicable Rules of Professional Responsibility."

154.  Plaintiff Donovan does not understand how any attorney could find Defendant Herman and the members of the MDL 2179 PSC to be ethical and in compliance with all applicable Rules of Professional Responsibility. MDL 2179's contravention of the MDL statute, U.S. Supreme Court decisions, and the Oil Pollution Act of 1990, use of a Feinberg-administered fund and a settlement class action treats the plaintiffs as nothing more than a commodity. Moreover, completely replacing justice with judicial efficiency is not remotely ethical.

155.  Pursuant to the MDL 2179 Court's Pretrial Order No. 15, "Pending further orders of this Court, all pending and future motions, including Motions to Remand, are continued without

date unless a motion is specifically excepted from the continuance by the Court." Furthermore, pursuant to the MDL 2179 Court's Pretrial Order No. 25, "All individual petitions or complaints that fall within Pleading Bundle "B1," whether pre-existing or filed hereafter, are stayed until further order of the Court."

156.  In sum, Plaintiff, Plaintiff's clients, and all others similarly situated are being indefinitely held hostage by Defendant Herman. Escape is impossible.

## B.  Defendant Herman Refused to Answer Plaintiff's Questions

157.  On December 21, 2012, Plaintiff sent a letter via email to Defendant Herman and cc'd the letter to James Parkerson Roy, Brian H. Barr, and Scott Summy. In the letter, Plaintiff asks Defendant Herman the following questions.

158.  "I am writing this open letter on behalf of my clients and all similarly-situated BP oil spill and Gulf Coast Claims Facility (GCCF) victims.

159.  In sum, my clients were forced to be represented by the PSC. Accordingly, since you have stepped into my shoes, I, and all similarly-situated attorneys representing BP oil spill and GCCF victims, hold the PSC strictly accountable to zealously advocate on behalf of all MDL 2179 Plaintiffs.

160.  QUESTION No. 1: Why did the PSC designate the 'B1' Master Complaint as an admiralty or maritime case, and request a non-jury trial pursuant to Rule 9(h), rather than properly allege claims under the Oil Pollution Act of 1990 (OPA), a *strict liability* statute, and the Outer Continental Shelf Lands Act (OCSLA)?

161.  QUESTION No. 2: Why has the PSC failed to inform Judge Barbier that the Honorable MDL 2179 Court has overreached its authority?

162.  QUESTION No. 3: Why has the PSC failed to inform Judge Barbier that the E&PD class settlement violates the Oil Pollution Act of 1990 ("OPA")?

163.  QUESTION No. 4: Why has the PSC failed to inform Judge Barbier that the honorable MDL 2179 Court has illegally excluded approximately 200,000 BP oil spill victims from the E&PD class settlement thereby greatly decreasing the bargaining power of the remaining class members?

164.  QUESTION No. 5: Why has the PSC failed to inform Judge Barbier that the E&PD class settlement is not 'fair, reasonable, and adequate' and has not been entered into without collusion between the parties?

165.  QUESTION No. 7: Why has the PSC allowed the MDL 2179 Court to decline to permit formal discovery on Feinberg, et al?

166.  QUESTION No. 8: Why does the PSC allow its BP oil spill victim clients to receive grossly inadequate compensation?

167.  QUESTION No. 9: Why does the PSC allow for the E&PD class settlement to provide for a refund of approximately $6 billion to BP while granting *excessive* compensation to the PSC and other counsel allegedly performing "common benefit" work?

168.  QUESTION No. 10: Given the above-referenced was not merely the result of poor legal strategy, do you believe the MDL 2179 PSC's actions constitute legal malpractice?

169.  Since April 8, 2012, our firm has filed: (a) a Motion to Vacate Order and Reasons [As to Motions to Dismiss the B1 Master Complaint]; (b) three Motions to Vacate Preliminary Approval Order [As to the Proposed Economic and Property Damages Class Action Settlement]; and (c) a Motion to Nullify Each and Every Gulf Coast Claims Facility ("GCCF") "Release and

Covenant Not to Sue."

170.  In contrast, as noted *supra*, the PSC appears to be more interested in maximizing its compensation and ensuring significant economy and efficiency in the judicial administration of the MDL 2179 Court rather than in obtaining justice for the MDL 2179 plaintiffs.

171.  If you have any questions, please do not hesitate to contact me….I would be happy to provide the PSC with any and all supporting documentation."

172.  On December 21, 2012, shortly after he receives Plaintiff's open letter, Defendant Herman responds, "I respectfully decline to respond to your questions, which seem argumentative and disingenuous."

173.  On December 22, 2012, Plaintiff Donovan sends an email to Defendant Herman in which he states, "Thank you for your prompt response….Your decision not to address the issues raised in the open letter, although completely understandable, is disturbing….Last night, subsequent to your receipt of the open letter, Judge Barbier granted final approval to the E&PD class settlement agreement. Notwithstanding this fact, all victims of the BP oil spill and the 'Delay, Deny, Defend' strategy employed by Kenneth R. Feinberg, et al. have a right to clearly understand how and why they were represented by the PSC in MDL 2179. The PSC's clients are not being 'argumentative and disingenuous' when they demand to know why they have not been fully compensated for their damages."

174.  On December 25, 2012, Plaintiff receives an email from Defendant Herman wherein Defendant Herman states, "I suppose that you are free to attack the PSC and/or the Court in whatever way you deem appropriate. At the same time, I would suggest that your clients not participating in the Economic Settlement will best be served if you: (i) ensure that you and/or

they make Presentment of what you and/or they believe to be their full damages before January 18, 2013; and then, having made such presentment, (ii) file (or re-file) (and/or amend) suit on their behalf by April 20, 2013; and then (iii) with respect to any client whom you believe to have executed an invalid GCCF Release, assemble and prepare the best case you can to support the argument that such Release was procured under fraud, error, or duress."

175.  On December 31, 2012, Plaintiff sent a second letter via email to Steve Herman and cc'd the letter to James Parkerson Roy, Brian H. Barr, and Scott Summy. In the letter, Plaintiff states, in pertinent part, the following and asks Defendant Herman four additional questions.

176.  QUESTION No. 11: Why did the PSC wait until one month before the claim filing deadline to notify all BP oil spill and GCCF victims (its clients) of the OPA 'Presentment' requirement?

177.  Defendant Herman and the members of the PSC should have notified all BP oil spill and GCCF victims (their clients) of the Presentment requirement in October 2010, not in December 2012.

178.  QUESTION No. 12: Why has the PSC failed to notify all BP oil spill and GCCF victims (its clients) that a lawsuit may be filed against Kenneth R. Feinberg, et al. without having to fulfill the OPA Presentment requirement?

179.  Since Feinberg, et al. is not a 'Responsible Party' and therefore may not be sued under OPA, a lawsuit against Feinberg, et al. may be filed immediately because it does not require Presentment. Defendant Herman would, however, need to advise all GCCF victims in regard to the statute of limitations and the associated tolling of the statute of limitations for class actions and fraudulent concealment or a misrepresentation by the defendant.

180.  QUESTION No. 13: Why does the PSC, which failed to adequately challenge the legality of the GCCF Release and Covenant Not to Sue for the past two years, suddenly advise non-PSC attorneys to 'assemble and prepare the best case you can to support the argument that such Release was procured under fraud, error, or duress?'

181.  Steve, if the PSC had properly filed the 'B1' Master Complaint under OPA rather than alleging claims under admiralty law, Feinberg, et al. would never have been allowed to use the Release and Covenant Not to Sue to illegally exclude approximately 200,000 BP oil spill victims from the E&PD class settlement.

182.  It has been, and remains, the responsibility of the PSC to 'assemble and prepare the best case to support the argument that such Release was procured under fraud, error or duress.' On September 25, 2012, my clients filed their Motion to Nullify Each and Every Gulf Coast Claims Facility Release and Covenant Not to Sue. Please feel free to use the legal argument in this motion to assist with the preparation of the PSC case.

183.  QUESTION No. 14: Are you declining to answer these questions because you believe that an attorney-client relationship does not exist between the PSC and all BP oil spill and GCCF victims?

184.  Steve, please understand that these fourteen questions are directed to the PSC by me on behalf of my clients (now PSC's clients) and all similarly-situated BP oil spill and GCCF victims. These questions are not directed to the MDL 2179 Court. In sum, the PSC's clients merely seek a better understanding of their representation by the PSC.

185.  Defendant Herman, the members of the MDL 2179 PSC, and other counsel allegedly performing common benefit work in MDL 2179 initiated settlement negotiations 'in

earnest' merely four (4) months after Judge Barbier appointed members to the PSC. Clearly, the MDL 2179 settlement class action was not achieved in the full context of adversarial litigation.

186.  On December 31, 2012, Defendant Herman responded via email, "Not sure what you are trying to accomplish, but I think we have past the point of diminishing returns. Good luck."

187.  Apparently, "Good Luck" is the only response Defendant Herman is willing to give to attorneys who decide not to "come into the fold," pay the PSC at least $10,000, and keep quiet.

188.  Over the years, Plaintiff has touched base with Defendant Herman to inquire as to when Defendant Herman and Judge Barbier will permit formal discovery on Feinberg or the GCCF. The following exchange of emails is instructive.

189.  On December 9, 2013, Plaintiff emails Defendant Herman, "I attach a copy of your email dated September 5, 2011. Please advise as to when the Court will permit formal discovery on Feinberg or the GCCF….Thank you." Email response from Defendant Herman: "No idea."

190.  Plaintiff's email reply to Defendant Herman: "Would you be kind enough to attempt to find out when the Court will permit formal discovery on Feinberg or the GCCF?" Defendant Herman's response: "Yes. At an appropriate time."

## C.  Defendant Herman Violated the Aggregate Settlement Rule

191.  The aggregate settlement rule ("ASR") governs global MDL settlements.

192.  Defendant Herman breached his fiduciary duties to Plaintiff, Plaintiff's clients, and all others similarly situated by violating the ASR.

-46-

193.  Courts have long recognized that lawyers may be subject to total or partial fee forfeiture as a sanction for serious violations of the ASR. Plaintiff Donovan does not have to prove either causation or injury to be entitled to fee forfeiture as a remedy for Defendant Herman's breach of fiduciary duty.

194.  The ASR is Rule 1.8(g) of the ABA *Model Rules of Professional Conduct* ("*Model Rules*"), and it states: "A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients….unless each client gives informed consent, in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims….involved and of the participation of each person in the settlement."

195.  All "group" settlements are now "aggregate settlements" and must comply with the disclosure requirements of Rule 1.8(g).

196.  Rule 1.8(g) requires a lawyer to disclose *at a minimum*, the following information to the clients for whom or to whom the settlement or agreement proposal is made.

(a) The total amount of the aggregate settlement;

(b) The existence and nature of all of the claims….involved in the aggregate settlement;

(c) The details of every other client's participation in the aggregate settlement…. whether it be their….settlement receipts…..or any other….receipt of something of value as a result of the aggregate resolution;

(d) The total fees and costs to be paid to the lawyer as a result of the aggregate settlement, if the lawyer's fees and/or costs will be paid, in whole or in part, from the proceeds of the settlement or by an opposing party or parties; and

(e) The method by which costs (including costs already paid by the lawyer as well as costs to be paid out of the settlement proceeds) are to be apportioned among them.

197.  Informed consent to an aggregate settlement requires that each claimant be able to review the settlements of all other persons subject to the aggregate settlement or the formula by which the settlement will be divided among all claimants. Further, *informed consent requires that the total financial interest of claimants' counsel be disclosed to each claimant.*

198.  In sum, Defendant Herman and the members of the MDL 2179 PSC owe fiduciary duties to Plaintiff, Plaintiff's clients, and each member of the settlement class. A lawsuit based on a violation of the ASR can be brought as a breach of fiduciary duty claim; the plaintiff(s) need not show any economic loss from the attorney's breach in order to prevail; full or partial forfeiture of the fees that the attorney received from the former client is the remedy.

### D.  Defendant Herman Colluded with the Members of the MDL 2179 PSC and BP

199.  The U.S. District Court for the Eastern District of Louisiana has defined "collusion" as the "lawful means for the accomplishment of an unlawful purpose" and as a "*secret understanding between two or more persons prejudicial to another, or a secret understanding to appear as adversaries, though in agreement*." Collusion does not require fraudulent conduct.

200.  At all times material herein, Defendant Herman has fraudulently, recklessly, negligently and/or knowingly colluded with the members of the MDL 2179 PSC and BP to maximize his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP.

201.  Collusion permeates MDL 2179 and any MDL which incorporates a Feinberg-administered victims' compensation "fund" and/or a settlement class action.

## E.  Defendant Herman Did Not Hold BP Accountable

202.  Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by making false statements of material fact in order to induce Plaintiff, Plaintiff's clients and all others similarly situated into believing that the proposed settlement is "fair, reasonable, and adequate" for the purpose of maximizing his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP.

203.  The compensation paid to BP oil well blowout victims by the Kenneth R. Feinberg-administered victims' compensation fund was $6,079,922,450.47

204. The compensation paid to BP oil well blowout victims during the transition period was approximately $405,000,000.00

205.  In sum, the total compensation paid to BP oil well blowout victims from August 23, 2010 to June 4, 2012 was $6,484,922,450.47.

206.  In mid-2010, Defendant Herman and BP made the business decision to have BP pay a total amount of $20 billion to compensate all the BP oil well blowout victims in the settlement class action.

207.  On October 25, 2016, Judge Barbier stated that he believes that a conservative estimate of the total amount that will eventually be paid by just the Deepwater Horizon Claims Center is $13 billion.

208.  The Court could not predict, on October 25, 2016, that the total amount that will eventually be paid by just the Deepwater Horizon Claims Center is $13 billion unless the Court

knew Defendant Herman and BP made the business decision to have BP pay a total amount of $20 billion to compensate all the BP oil well blowout victims in the settlement class action.

209.  Defendant Herman also failed to hold BP accountable in regard to the Clean Water Act ("CWA") civil penalty as follows.

(a) The total amount of oil released from the reservoir was 5,000,000 barrels;

(b) The total amount of "collected oil" was 810,000 barrels;

(c) The net discharge of oil was 4,190,000 barrels;

(d) The CWA civil penalty due to BP's gross negligence is $4,300/barrel;

(e) The CWA penalty BP should pay is $18.02 billion; and

(f) The total CWA penalty BP actually paid is $13.72 billion.

210. Defendant Herman saved BP approximately $4.30 billion by agreeing that only 4.0 million barrels of oil, rather than 5.0 million barrels of oil, was released from the reservoir. Defendant Herman argued that for purposes of calculating the maximum possible civil penalty under the CWA that 3.19 million barrels of oil discharged into the Gulf of Mexico. In short, the maximum CWA civil penalty that could be assessed against BP is approximately $13.72 billion (3,190,000 x $4,300).

211.  Defendant Herman also negotiated the following very favorable payment schedule for BP in regard to the government entity settlements. BP is required to pay,

(a) $5.5 billion to the United States as a civil penalty under the Clean Water Act, *payable over 15 years*;

(b) $7.1 billion to the United States and the five Gulf states for natural resource damages, *payable over 15 years*; and

(c) $4.9 billion to settle economic and other claims made by the five Gulf Coast states, *payable over 18 years*.

### F. Defendant Herman Refuses to Be Fully Transparent and
### Defendant Herman Refuses to Be Held Accountable

212.  On November 13, 2017, Plaintiff filed a motion on behalf of his clients wherein Plaintiff requested the MDL 2179 Court to place on the public record the total amount and source of compensation, *from all sources*, paid to all members of the PSC and the total amount and source of compensation paid to the legal experts, Special Masters, and Claims Administrator Patrick Juneau. This was neither a Motion to Compel nor an Objection. This was merely a motion by the plaintiff, on behalf of himself and his clients, to request the MDL 2179 Court to conduct itself in a fully transparent manner.

213.  In the motion, Plaintiff pointed out to the Court that the total compensation paid to the 19 PSC attorneys and their law firms is guesstimated to be $3.035 billion. It is beyond cavil that a reasonable, objective observer would not conclude that this amount is out of all proportion to the value of the professional services rendered. Plaintiff Donovan further pointed out to the Court that a narrow focus on judicial efficiency cannot allow the circumvention of the core democratic premises of representation, transparency, and accountability.

214.  On March 6, 2018, the MDL 2179 Court issued an Order wherein the Honorable Carl J. Barbier succinctly states, "Before the Court is a 'Motion to Request this Court to Place on the Public Record the Total Amount and Source of Compensation, From All Sources, Paid to All Members of the PSC, et al.' IT IS ORDERED that the Motion (Rec. Doc. 23677) is DENIED. New Orleans, Louisiana, this 6th day of March, 2018." Obviously, neither Defendant Herman nor Judge Barbier believes that the plaintiffs in MDL 2179 have a right to know how much compensation the attorneys allegedly representing their interests are receiving.

-51-

### G.  Why It Is Difficult to Hold Defendant Herman and
### Self-Dealing PSC Attorneys Accountable

215.  Three factors inoculate the actions of Defendant Herman and the self-dealing

members of the MDL 2179 PSC from thorough appellate review.

216.  First, because most multidistrict litigations result in private settlements, they are not

reviewable on appeal, even when subject to public judicial commentary.

217.  Second, because most interim rulings are not dispositive orders, they are reviewable

only through an extraordinary writ of mandamus or subsequent dismissal. Motions to disqualify

a lead attorney, for example, are not immediately appealable as a matter of right even though an

attorney could theoretically petition for mandamus.

218.  Third, even if the appellate court grants mandamus or reviews a dismissed case, it

tends to do so using the highly deferential abuse-of-discretion standard.

### III.  Defendant Herman Intentionally and Systematically Misled Plaintiff,
### Plaintiff's Clients, and All Others Similarly Situated

### A.  The Agreement-in-Principle

219.  On March 9, 2012, Defendant Herman released a summary of the agreement-in-

principle which was allegedly entered into between the MDL 2179 plaintiffs and BP.

220.  In this summary, Defendant Herman made the following false statements of

material fact to Plaintiff, Plaintiff's clients, and all others similarly situated.

(a) This Settlement is an *enormous victory* for Gulf Coast workers, businesses and
families.

(b) The Settlement *does the most good for the greatest number of people* - encompassing
the wide geographic region and many types of businesses affected by the BP Gulf Oil
Spill.

(c) Contrary to what some news outlets have implied, the Settlement has *no cap or limit*. The only exception is the Seafood Program for commercial fishing vessel owners, captains and deckhands. BP has agreed to fund this Seafood Program at $2.3 billion.

(d) The Settlement *holds BP accountable*.

(e) The parties *have not had any fee discussions to date* and will not have any such discussions until authorized to do so by the Court.

(f) Many qualifying claimants may receive greater benefits from the Settlement Claims Programs than from the GCCF.

(g) *Hundreds of thousands of victims of the BP Gulf Oil Spill will be made whole* as a result of this settlement - regardless of whether or not they previously joined the MDL lawsuit or filed a claim with the GCCF.

(h) Once the Settlement Claims Programs are set up, the Court will continue to supervise their operation in all respects throughout their duration to *ensure fairness, transparency, and efficiency.*

(i) A $57 million marketing fund will be established *to promote tourism and Gulf seafood*.

221. Defendant Herman makes the following false statements of material fact to

Plaintiff, Plaintiff's clients, and all others similarly situated when he further tries to explain why

he believes the settlement claims program is fair.

(a) The Settlement process and formulas used to calculate compensation will be *completely transparent* and applied with consistency.

(b) The Court will supervise the Settlement Claims process from start to finish to *ensure fair, impartial, and consistent processing and payment of claims*.

(c) Claimants, their accountants, and their lawyers will know the compensation formulas and *will be able to calculate compensation for specific claims before deciding whether to opt-out* or participate in the Settlement.

(d) The compensation *calculations have been carefully determined* to account for relevant economic factors and are flexible to each claimant's specific circumstances.

(e) The Settlement Claims Program will generally apply a larger enhancement to *account for potential future losses* and other risks than did the GCCF.

-53-

(f) Offsets for amounts already received from BP or the GCCF are deducted after the enhancement for future losses is applied.

(g) A Class Member *can choose to opt-out of the Settlement and instead prosecute their case in Court*.

(h) Businesses and individuals that are not Class Members, or whose claims are not included in the Settlement, *can generally continue to prosecute their cases in Court*.

222.  On November 5, 2010, the MDL 2179 Court issued PTO No. 15 which states, "All pending and future motions, including the Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court."

223.  On January 12, 2011, the MDL 2179 Court issued PTO No. 25 which states, "Any individual plaintiff who is a named plaintiff in a case that falls within Pleading Bundle B1, B3, D1, or D2, or any combination thereof, is deemed to be a plaintiff in the applicable Master Complaint(s)….All individual petitions or complaints that fall within Pleading Bundles B1, B3, D1, or D2, whether pre-existing or filed hereafter, are stayed until further order of the Court."

224.  Defendant Herman and the MDL 2179 Court make it very clear that the settlement class action is the only game in town. Take it or leave it. It has been approximately nine years since the BP oil well blowout. PTO No. 15 and PTO No. 25 are still in force. Class Members who opted-out, including Plaintiff's clients, are still not able to pursue their claims.

225.  It is important to understand that *the MDL 2179 plaintiffs* did not reach an Agreement-in-Principle on the proposed settlements. Defendant Herman and BP entered into a mutually beneficial settlement. The plaintiffs in MDL 2179 were merely a commodity bargained for and sold by Defendant Herman to BP.

226.  Defendant Herman's negotiated settlement class action is not superior to the OPA (a strict liability statute). The only reason this settlement class action exists is because Defendant

Herman designated the "B1" Master Complaint as an admiralty or maritime case in order to limit BP's liability.

227.  The Defendant Herman/BP settlement is not "an enormous victory for Gulf Coast workers, businesses and families."

228.  Defendant Herman's negotiated settlement class action which illegally excludes approximately 220,000 claimants, requires that a claimant's recovery of damages under the OPA be limited by geographic bounds, pertain solely to certain business activities, and demands a heightened and vague proof of causation between his or her damages and the oil well blowout incident is not "fair, reasonable, adequate, and consistent with governing law."

229.  Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by making false statements of material fact in order to induce Plaintiff, Plaintiff's clients and all others similarly situated into believing that the proposed settlement is "fair, reasonable, and adequate."

## B.  The Highly Compensated "Thought Leaders"

230.  Theoretically, a "Thought Leader" means one whose views on a subject are taken to be authoritative and influential. Thought leaders are the informed opinion leaders and the go-to people in their field of expertise. In reality, thought leaders are primarily academics who are highly compensated by an industry to either maintain the status quo of the industry or increase market share for their benefactors. It is important to remember that this requires more greed than thought on the part of these leaders.

231.  The financial services industry, pharmaceutical companies, and, most recently, Defendant Herman in MDL 2179 retain highly compensated thought leaders.

232.  In the BP oil well blowout MDL, Defendant Herman retained four "experts" in the law of class actions: Professors Coffee, Issacharoff, Klonoff, and Miller.

233.  The "unbiased" opinions of these four individuals are included to deceive the class members. If the MDL 2179 economic and property damages settlement agreement is fair, reasonable, adequate, and free of collusion, it would be clearly obvious to anyone who reads the agreement. There would be no need to retain "four experts in the law of class actions" to try to lend a thin veneer of respectability to an otherwise abhorrent, one-sided, collusive agreement.

234.  Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by retaining these four legal thought leaders to make false statements of material fact in order to induce Plaintiff, Plaintiff's clients, and all others similarly situated into believing that the proposed settlement is "fair, reasonable, and adequate."

235.  The following are examples of the "unbiased" opinions of Defendant Herman's highly-compensated expert legal "Thought Leaders" in MDL 2179.

236.  Judge Barbier included each of these false statements of material fact in his Order granting final approval of the economic and property damages settlement agreement.

Opinion No. 1: "This Settlement is nearly the epitome of how a class in a mass tort action ought to be defined, as it is objective, precise, and detailed, and does not turn on the merits."

Opinion No. 2: "Since their appointment, members of the PSC have diligently prosecuted this litigation, consulted widely among class members in negotiating the Settlement, and aggressively represented the interests of their clients."

Opinion No. 3: "The proposed class in this case consists exclusively of individuals and businesses that have already suffered economic loss and property damage, and the Settlement compensates class members for their past losses through detailed, objective compensation criteria and for their anticipated potential future damages through RTP payments or through other methods that take into account risk of future loss."

Opinion No. 4: According to Professor Miller, this case is "perhaps the single most impressive class action settlement I have observed in nearly thirty years as a scholar, practitioner, and teacher in the field" in its structural features designed to avoid intraclass conflicts."

Opinion No. 5: "….the settlement terms for each identifiable subgroup were subjected to the approval of a seventeen-member Plaintiffs' Steering Committee. The PSC was consulted and participated throughout the settlement process. Whenever a particular category of claims was discussed during negotiations, lawyers who had clients with such claims took an active role in advising the negotiators."

Opinion No. 6: "….there was no discussion of attorneys' fees until all other terms of the agreement were negotiated, agreed upon, reduced to writing, and submitted to the Court, so Class Counsel could not have engaged in trading off the interests of class representatives or absent class members so as to maximize their fee recovery."

Opinion No. 7: "Because a class action is the vastly superior method by which to resolve the impact of this mass disaster on the Gulf Coast Region, it would be a social tragedy if class certification were denied." "Individual lawsuits are neither a feasible nor a sensible alternative to a class action in this case."

Opinion No. 8: "….the Settlement preserved the Rule 23(b)(3) opt-out opportunity, and provided a generous opt-out period that the Court later extended to November 1, 2012. Any plaintiff who does not wish to take part in the Settlement remained free to opt-out of the settlement class and pursue his own action."

Opinion No. 9: "The uncontroverted evidence establishes that the Settlement was reached only after many months of hard-fought negotiations that were conducted simultaneously with adversarial trial preparations."

Opinion No. 10: "Certain objectors complain that the Economic Damage Claim Frameworks are unfair because they do not compensate persons who did not begin suffering losses until 2011. Yet this provision is reasonable for three reasons: (i) the

Macondo well ceased flowing in July 2010; (ii) there is evidence that by late 2010, Gulf Coast tourism had returned to or surpassed 2009 levels; and (iii) as to claims by individuals and businesses in charter fishing, seafood processing, or other businesses relying on access to Gulf waters, nearly all federal and state waters were reopened for commercial fishing by November 2010. *Thus, extending compensation to 2011 would cover losses not likely caused by the spill*." (Emphasis added)

Opinion No. 11: "Other objectors complain that before they can invoke the V-Shaped Revenue Pattern test, they must demonstrate a 5% revenue recovery during the correlating months of 2011 as compared to the 2010 baseline period. *This provision is reasonable, as losses that continued after the spill are likely to be due to factors other than the spill*." (Emphasis added)

237.  The Aggregate Fee Petition includes a declaration by Brian T. Fitzpatrick, a law professor at Vanderbilt University and an MDL 2179 "Thought Leader." Professor Fitzpatrick states, "I have never seen a case this complex nor one that required more of class counsel. The number of moving parts here was - and this is an understatement - dizzying. The law, the facts, the science - all of it was far more challenging than perhaps any class action case I have ever seen."

238.  Given the opinions of Judge Barbier and Professor Fitzpatrick, the victims of the BP oil well blowout are led to believe that Defendant Herman and the members of the MDL 2179 PSC are zealously advocating on their behalf. Justice is most assuredly just around the corner.

### IV.  Defendant Herman Oversees and Steers a Multidistrict Litigation Which is Unconstitutional

239.  In a settlement class action, an agreement to resolve the dispute is reached by the parties involved prior to the district court's ruling on a motion to certify the class.

240.  In MDL 2179, Defendant Herman and BP are not adversaries. They are cohorts

expeditiously seeking the common objectives of closure, limited liability, and profit. Justice for the plaintiffs is optional.

241.  Defendant Herman and the MDL 2179 PSC attorneys/dealmakers are privy to the settlement matrix and the confidential guidance document given to the claims administrator, which explains qualifying criteria for recovery. This knowledge allows Defendant Herman and the PSC attorneys to tailor their own clients' claim submissions to maximize their payout (and the PSC attorneys' contingent fees). This insider information also prompts Defendant Herman and some PSC attorneys to seek and collect co-counsel fees for serving as co-counsel to non-PSC attorneys.

242.  The settlement class action is always unconstitutional because it involves no litigation. A typical class action is legitimate because the interests of the plaintiffs and defendant are adverse. In that scenario, the monetary interests of class counsel, which are contingent on class recovery, are aligned with the absent class members' interest in maximum redress, incentivizing a presentation of the issues that benefits both equally. These incentives break down in the context of the non-adversarial settlement class action. Because class counsel seeks the same outcome as the defendant, she has no reason to formulate her clients' arguments or destroy her opponent's case. Particularly, she lacks incentive to present to the Court evidence that may shed unfavorable light upon the non-adversarial agreement, even though that evidence may reveal critical details about the effect of the settlement on absent class members.

243.  The Court needs to consider class settlements in terms of separation of powers because maintaining the limits of Article III's "case or controversy" requirements is fundamental for protecting the individual liberties of all. By authorizing a federal court to redistribute

resources as a means of enforcing legislative directives absent an adversary adjudication, the settlement class action effectively transforms the Court into an administrative body, which is more appropriately located in the executive branch….and improperly transfers powers reserved to the executive branch to the federal judiciary, in clear contravention of separation-of-powers dictates.

## A.  Where's the Case or Controversy in MDL 2179?

244.  "Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund." The Honorable John G. Heyburn II, Chairman, Panel on Multidistrict Litigation, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Transfer Order, August 10, 2010).

245.  "In February 2011, [only 4 months after I appointed my pre-selected cooperative attorneys to the PSC] negotiations began in earnest for the proposed Economic and Property Damages Settlement. Talks intensified in July 2011, occurring on an almost-daily basis." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 7138 at 3, December 21, 2012).

246.  Article III extends federal judicial power solely to the adjudication of a "case" or a "controversy." "Case," in Article III, means a justiciable "action or suit," or an "argument." "Controversy" means a disagreement or a dispute between parties as to the suit's preferred outcome. Both a "case" and a "controversy" require an adversarial suit. For a suit to be justiciable, according to the U.S. Supreme Court, the parties must maintain "adverse legal interests" throughout, and their dispute must be "definite and concrete." The Fifth Circuit has held that Article III plainly "requires that the parties be truly adverse."

247.  On the most basic analytical level, the unconstitutionality of the settlement class action should be obvious, purely as a matter of textual construction. There is simply no rational means of defining the terms "case" or "controversy" to include a proceeding in which, from the outset, nothing is disputed and the parties are in complete agreement. Moreover, from both historical and doctrinal perspectives, U.S. Supreme Court decisions could not be more certain that Article III is satisfied only when the parties are truly "adverse" to one another, which, at the time the relevant proceeding is undertaken, they are not in the case of the settlement class action."

248.  The most serious problem with the settlement class action is that by its nature it does not involve any live dispute between the parties that a federal court is being asked to resolve through litigation, and because from the outset of the proceeding the parties are in full accord as to how the claims should be disposed of, there is missing the adverseness between the parties that is a central element of Article III case-or-controversy requirement. The settlement class action, in short, is inherently unconstitutional.

249.  The term "collusion," in the class action context, is used to refer to a secret, unethical agreement between the named plaintiffs and defendant. For purposes of Article III's adverseness requirement, however, the term has a far broader meaning. It includes any suit in which, from the outset, the parties are in agreement as to the outcome.

250.  Article III proceeds on the assumption that a showing of a lack of adverseness at the outset of a suit automatically establishes the improperly collusive nature of the suit. Article III adopts lack of adverseness as an ex ante, categorical basis on which to find inadequate representation of the interests of future litigants who are similarly situated.

251.  When the plaintiffs and defendant agree on settlement terms and the desirability of certification prior to coming to Court, neither party has the incentive to challenge such important questions as whether class representation is "adequate" or the claims are "typical" of the class as a whole. This inherently deprives the Court of the benefit of adversarial litigation concerning the satisfaction of Rule 23's requirements, thereby seriously limiting its ability to protect absent class members.

252.  In contrast to the case-by-case focus employed by class action scholars, Article III employs a far more categorical and prophylactic conception of "collusion." Article III makes an ex ante categorical judgment that a non-adversarial suit is inherently collusive and therefore in violation of constitutional norms. As the U.S. Supreme Court in *Poe v. Ullman*, construing Article III, explained: "The case may not be 'collusive'….in the sense of merely colorable disputes got up to secure an advantageous ruling from the Court. But the Court has found unfit for adjudication any cause that 'is not in any real sense adversary,' that 'does not assume the honest and actual antagonistic assertion of rights' to be adjudicated - a safeguard essential to the integrity of the judicial process, and one which we have held to be indispensable to adjudication of constitutional questions by this Court."

253.  The settlement class's fundamental constitutional defect is that *all* settlement classes - not merely those involving unethical attorney behavior - are, by definition, non-adversarial. An adversarial dispute cannot be said to exist at the time the class action proceeding begins. At that point, the litigants differ over absolutely nothing. They have agreed on the terms of both certification and settlement prior to the filing of the class proceeding. In fact, the only conceivable reason that class counsel in this position files a complaint and request for

-62-

certification with the Court, rather than simply embodying the terms of their private agreement in an enforceable contract, is to bind absent class members to a settlement negotiated in their absence."

## B. Where's the Due Process in MDL 2179?

254.  "All motions, requests for discovery or other pre-trial proceedings with respect to plaintiffs shall be initiated by and/or coordinated through the Plaintiff Steering Committee ("PSC"), *to be filed by and through Plaintiffs' Liaison Counsel*. If the PSC does not support the motion, discovery or other requested proceeding, then the moving or requesting plaintiff shall be permitted to file such motion or request, but shall include a certificate of non-support." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 569 at 13, October 19, 2010).

255.  "….all pending and future motions, including the Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 676 at 1, November 5, 2010).

256.  "Any individual plaintiff who is a named plaintiff in a case that falls within Pleading Bundle B1, B3, D1, or D2, or any combination thereof, is deemed to be a plaintiff in the applicable Master Complaint(s)….All individual petitions or complaints that fall within Pleading Bundles B1, B3, D1, or D2, whether pre-existing or filed hereafter, are stayed until further order of the Court." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 983 at 2, 4, January 12, 2011).

-63-

257.  Each claimant in an MDL has an individually held, constitutionally protected property right at stake. Those rights are guaranteed by the Fifth Amendment, which protects life, liberty, and property against deprivation absent due process of law. The "property" at stake in an MDL is the "chose in action." This historically established concept refers to the right to sue to enforce a legally protected claim, even the unlitigated right to sue. Under the Fifth Amendment, then, MDL claimants cannot be deprived of their rights to a chose in action without due process of law.

258.  In MDL 2179, individual litigants, for all practical purposes, lose a substantial degree of control over the procedural fate of their claims. In sum, MDL 2179 fails to provide a constitutionally adequate opportunity to litigate.

259.  The so-called "day-in-court ideal" is at the heart of constitutionally guaranteed procedural due process, according to the U.S. Supreme Court, and is central to the American conception of the adversarial model of litigation.

260.  MDL 2179 severely undermines the day-in-court ideal by depriving individual litigants of their opportunity to protect their interests through the litigation process.

261.  The right to one's own day-in-court means a right to meaningful control over litigation strategy and goals, including choice of legal representative. It requires a full and fair opportunity to litigate, which means a full opportunity to prepare one's own arguments and evidence. At base, meaningful participation in the adjudicatory process - the day-in-court ideal – includes, in the words of a respected scholar, "the right to observe, to make arguments, to present evidence, and to be informed of the reasons for a decision."

262.  The U.S. Supreme Court has identified the "two central concerns of procedural due

-64-

process" to be "the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decision making process." The day-in-court ideal takes account of both of these concerns. First, an individual day-in-court helps achieve accurate outcomes (thus avoiding "unjustified or mistaken deprivations") because the stakeholders, those who will be most affected by the outcome and are the most motivated to protect their own rights, participate in the decision-making process. In addition, individual participation is inherently valuable in a democratic system because it legitimizes the adjudicating entities in the minds of the litigants.

263. On the surface, MDL practice seems largely innocuous; the JPML merely temporarily transfers cases to a different district court for pretrial matters. But for a variety of reasons transfer effectively amounts to the end of the road for the overwhelming majority of cases. This is troublesome from a constitutional perspective, because not even the most minimal protection of the day-in-court ideal from the perspective of either the paternalism or autonomy models is satisfied.

264. MDL 2179 plaintiffs in no sense meaningfully participate in, much less control, their day-in-court. Nor are there any assurances that those in charge of the litigation are adequately representing the interest of the individual claimants.

265. One key way that litigants control their day-in-court is by selecting their attorneys. This is often the first expression of their autonomy: they seek the advice of counsel when they consider whether to even file a claim.

266. Permitting litigants to choose their representatives is central to providing a full and fair opportunity to litigate. The foundations of due process dictate that that choice belongs to the

parties alone. But claimants forced into an MDL are deprived of that essential choice. By virtue of his case's transfer into the MDL - a move that the plaintiff cannot prevent - his chosen lawyer will invariably not be the one actually representing his interests in the course of all the important MDL. Rather, the lawyers on the court-appointed steering committee will take over, and they will do so without the protective assurances of either there adequacy, their good faith, or the extent to which the interests of the absent litigants truly overlap or any other controls.

267.  When a transferee judge appoints a steering committee, he does so at his discretion, outside the strictures of any Federal Rule, or statute, or adversary proceeding. Appointment to the steering comes after nothing more than a judge-designated period of nominations and written objections. The process fails to guarantee that the appointed representatives will zealously advocate on behalf of absent litigants in the same way that their hired representative presumably would have. This is certainly the case in MDL 2179.

268.  In addition to the fact that appointed counsel are selected by the Court, rather than by the individuals they represent, MDL claimants do not enjoy a traditional attorney-client relationship with the members of the court-appointed steering committee. The small group of attorneys chosen for leadership roles is charged with representing all of the possibly thousands of plaintiffs, whose cases have facts that are often only loosely linked.

269.  MDL 2179 falls far short of providing the "deep-rooted historic tradition" of an individual's day-in-court.

270.  In consolidated proceedings, the attorney's loyalty divides not only between clients, but also between clients and self-interest. Compensation for attorneys who work on behalf of the group depends upon the value of every plaintiff's settlement or judgment. As a result, PSC

attorneys may push hard for settlement as opposed to remand, prefer a quick settlement in favor of a protracted discovery period, or advocate for settlement terms that may not be particularly favorable to some or many plaintiffs. The First Circuit has acknowledged existence of this "inherent conflict of interest" "between the PSC and individual plaintiffs in mass-tort MDLs.

271.  At the most basic level, MDL 2179 Plaintiffs are not given a meaningful opportunity to present their case(s), as demanded by the Due Process Clause.

### C.  Opt-Out vs. Opt-In

272.  Generally a waiver of constitutional rights requires some affirmative action on the part of an individual holding such rights.

273.  The opt-out mechanism under Rule 23(b)(3) should be abandoned in favor of an opt-in mechanism that requires absent class members to take some affirmative action before being swept into a class action. Allowing fundamental due process rights to be waived simply by inaction, as under the current version of the rule, does not sufficiently protect such constitutional rights.

274.  The existing Rule 23(b)(3) opt-out procedure also violates the Due Process Clause by departing from key notions of democratic theory.

275.  As a due process matter, rights belong to individuals and cannot be taken away by operation of a procedural rule unless individuals willingly choose to participate in that process. Another way of thinking about this is that litigants have a right to freedom of association or, rather, freedom to be free from association with a class.

276.  It might be argued that the individual litigants do have the right to opt-out of any settlement reached in the course of the MDL, and therefore their due process rights have not

been compromised. But it should be recalled that even if a litigant does withdraw from the collective settlement, his right to control adjudication of his own claim will have been substantially compromised by the collective, lowest-common-denominator control of the pre-trial process, including all important discovery and pre-trial motions.

277.  A narrow focus on result orientation cannot allow the circumvention of the Rules Enabling Act, basic separation-of-powers principles, the case-or-controversy requirement of Article III, or the core democratic premises of transparency, representation and accountability.

278.  In sum, Defendant Herman cannot be allowed to sacrifice constitutional rights for mere judicial efficiency or convenience.

### V.  Defendant Herman Excessively Compensated Himself and Members of the MDL 2179 PSC by "Quadruple Dipping"

279.  Defendant Herman and the members of the MDL 2179 PSC "quadruple dip."

280.  Defendant Herman and the MDL 2179 members are compensated from at least the following four sources of revenue.

(a) Six percent (6%) of the gross monetary settlements, judgments or other payments made on or after December 30, 2011 through June 3, 2012 to any other plaintiff or claimant-in-limitation;

(b) BP has agreed to pay any award for common benefit and/or Rule 23(h) attorneys' fees, as determined by the Court, up to $600 million;

(c) Contingent fees from clients directly "represented" by the PSC members; and

(d) Co-counsel fees received by members of the PSC for serving as co-counsel to non-member firms of the PSC.

281.  Mikal C. Watts of Watts Guerra could easily be the posterchild for how attorneys applying for a lucrative position on the MDL 2179 PSC should not try to capture market share

via signing up a large stable of "clients."

282.  Watts and six codefendants were accused in a federal fraud and identity theft indictment of orchestrating a scheme to defraud BP and the Courts by asserting claims on behalf of more than 40,000 phantom plaintiffs who purported suffered damages in the 2010 BP oil well blowout. The indictment against Watts was brought on behalf of the United States because this PSC attorney stands accused of corrupting the federal justice system to make money for himself and his investors.

283.  Though the Watts firm initially presented more than 44,000 claim forms to BP, including a nearly $46,000 claim by the dog Lucy Lu, it ended up asserting claims for just 786 clients. According to the indictment, only 4 were deemed eligible for payments.

### A.  Compensation Paid to Kenneth R. Feinberg by BP

284.  The following is an overview of the compensation which BP paid to Kenneth R. Feinberg.

| | |
|---|---|
| June 15, 2010 to January 15, 2011 | $ 5,950,000 |
| January 16, 2011 to April 15, 2012 | $18,750,000 |
| **Total Compensation Paid to Feinberg by BP** | **$24,700,000** |

### B.  Compensation Paid to BP Oil Well Blowout Victims by Kenneth R. Feinberg (GCCF Program Statistics)

285.  The GCCF status report of March 7, 2012 indicates that a total of 574,379 unique claimants filed claims with the GCCF during the period from approximately August 23, 2010 to March 7, 2012. The GCCF paid only 221,358 of these claimants. The total amount paid was $6,079,922,450.47. In sum, Kenneth R. Feinberg denied payment to approximately 61.46% of

the claimants who filed claims.

286.  The status report further indicates that the GCCF paid a total of 230,370 claimants who filed claims with the GCCF during the "Phase II" period. Of these, 195,109 were either Quick Pay or Full Review Final payments; only 35,261 were Interim payments. In sum, Kenneth R. Feinberg forced 84.68% of the claimants to sign a "Release and Covenant Not to Sue" in which the claimant agreed not to sue BP and all other potentially liable parties.

## C.  The Deepwater Horizon Claims Center
### (DHCC Program Statistics)

287.  The DHCC status report of March 29, 2017 indicates that a total of 389,457 claims were submitted to the DHCC during the period from approximately June 4, 2012 to March 29, 2017. The DHCC paid only 155,652 of these claims. The total amount paid was $10,070,688,009.00. In sum, the DHCC denied payment to approximately 60.03% of the submitted claims.

288.  On October 25, 2016, Judge Barbier stated that he believes that a conservative estimate of the total amount that will eventually be paid by just the Deepwater Horizon Claims Center is $13 billion.

## D.  Compensation Paid to Defendant Herman and MDL 2179 PSC Attorneys

289.  Defendant Herman and Members of the PSC and their law firms in the BP oil well blowout MDL ("MDL 2179") are not double-dipping. They are quadruple-dipping.

290.  The known sources of compensation received by Defendant Herman and the members of the PSC and their law firms in MDL 2179 are: common benefit fees, contingent fees, co-counsel fees, and "Hold-Backs."

**(1) Common Benefit Fees**

291.  BP has agreed to pay any award for common benefit and/or Rule 23(h) attorneys'

fees, as determined by the MDL 2179 Court, up to $600 million.

292.  On October 25, 2016, Judge Barbier approved and awarded a common benefit fee

and cost award of $600 million consisting of:

> "$37,597,151.98 in Shared Expenses, which have already been paid to third-party service
> providers and/or reimbursed to Common Benefit Attorneys, pursuant to previous Court
> orders;
>
> Up to $7,187,698.30 in claimed Held Expenses, which have been submitted to Court-
> appointed CPA Phil Garrett and the Fee Committee pursuant to PTO 9, (as amended),
> and PTO 59; and
>
> The remainder of the Settlements' Common Benefit Cost and Fee Award amount, of
> approximately $555.2 million, to Class Counsel and other common benefit attorneys
> collectively, for work performed to advance the common and collective interests of the
> Economic Class and the Medical Class."

293.  During the summer of 2015, BP announced a global settlement with the United

States, the five Gulf Coast States, and local governments, to resolve Clean Water Act, natural

resource damage, and economic loss claims, damages, and penalties. In order to help facilitate

that settlement, the existing hold-back on all state and local government recoveries was lifted,

and a payment by BP of $40 million to common benefit attorneys collectively was approved.

294.  Halliburton and Transocean have agreed to pay up to $124,950,000 in common

benefit attorneys' fees and expenses in connection with the Halliburton and Transocean class

settlements.

**(2) Contingent Fees**

295.  Defendant Herman and the members of the PSC and their law firms have their own

clients and have also received or will also receive a fee directly from them. (N.B. - On June 15,

2012, the MDL 2179 Court ordered that "contingent fee arrangements for all attorneys

representing claimants/plaintiffs that settle claims through either or both of the Settlements will be capped at 25% plus reasonable costs.").

### (3) Co-counsel Fees

296.  Co-counsel fees are received by Defendant Herman and the members of the MDL 2179 PSC and their law firms for serving as co-counsel to non-member firms of the PSC. For example, on March 13, 2012, Plaintiff Donovan received an unsolicited mass email from a member of the PSC. The email stated, in pertinent part, "Co-Counsel Opportunity for BP Oil Spill Cases: News of the recent BP Settlement has caused many individuals and businesses along the Gulf Coast to contemplate either filing a new claim or amending a claim that has already been submitted. *If you receive inquiries of this nature we would like you to consider a co-counsel relationship with our firm.* Even if someone has already filed a claim it is advisable to retain legal counsel to analyze the impact of this settlement on claimants and maximize recovery. If you receive inquiries and are interested in co-counseling with us on the BP claims, please email…."

### (4) Hold-Backs

297.  The MDL 2179 Court issued a hold-back order which ultimately directed the defendants to hold back and place into escrow, from any judgment or settlement after December 30, 2011:

> (a) Six Percent (6%) of the recoveries of any private claimants or plaintiffs who, at any time, had an action that was filed in, removed to, or transferred to, the MDL;
>
> (b) Four Percent (4%) of the economic loss damages payable to the States of Alabama and/or  Louisiana;
>
> (c) Four Percent (4%) of the recoveries of any local government entities located within the State of Alabama and/or the State of Louisiana, that, at any time, had an action that was filed in, removed to, or transferred to the MDL;

(d) Six Percent (6%) of the recoveries of any local government entities in the States of Mississippi, Florida, and/or Texas, that, at any time, had an action that was filed in, removed to, or transferred to the MDL; and,

(e) Six Percent (6%) of the economic loss damages payable to the States of Florida, Mississippi, and/or Texas, should they ever file actions in, be removed to, or be transferred to, the MDL.

**E.  Calculation of Compensation Paid to Defendant Herman and MDL 2179 PSC Attorneys**

298.  The following is an overview of the compensation paid to Defendant Herman and the MDL 2179 PSC attorneys.

| | |
|---|---|
| Common Benefit Fees | $597.354 million |
| Contingent Fee (25%) | $   2.438 billion |
| Co-counsel Fee | Unknown |
| Hold-Backs | Unknown |
| Total Compensation Paid to Defendant Herman and PSC | $ 3.035 billion |

**F.  Calculation of Compensation Paid to 103 Non-PSC Attorneys**

299.  The following is an overview of the compensation paid to 103 Non-PSC attorneys.

| | |
|---|---|
| Total Recommended Fee Allocations | $704.500 million |
| Total Compensation Paid to 19 PSC Attorneys | $597.354 million |
| Total Compensation Paid to 103 Non-PSC Attorneys | $107.146 million |

300.  Common benefit attorneys' fees are generated from the following three sources.

| | |
|---|---|
| BP Class Settlements | $555.20 million |
| Louisiana & Alabama Settlements | $ 40.00 million |
| Transocean/Haliburton Settlements | $124.95 million |
| Total | $720.15 million |

301.  Contingent Fee (25%) is calculated from the following total amounts paid for submitted claims.

| | |
|---|---|
| Gulf Coast Claims Facility (GCCF) | $    6.1 billion |
| Transition Period | $  405 million |
| Deepwater Horizon Claims Facility (DHCC) | $    13 billion |
| Total Amount Paid | $19.505 billion |

302.  According to the FCC, the proposed recommended fee allocations total approximately $704.5 million. This leaves a proposed reserve of approximately $15.65 million.

### G.  How the Court Allocated the $720.15 million to Common Benefit Attorneys

303.  The manner in which the MDL 2179 Court allocated the $720.15 million to the PSC and other Common Benefit Attorneys is humorously instructive.

304.  On July 15, 2015, Judge Barbier issued Pretrial Order No. 59 which, in pertinent part, states, "Pursuant to the Court's inherent authority over this multidistrict litigation, the Court hereby appoints a fee committee and sets forth guidelines for common benefit fee and cost reimbursements….The Court appoints a Common Benefit Fee and Cost Committee ("FCC") to be responsible for submitting to the Court, at an appropriate time, an Aggregate Fee and Cost Petition and an Allocation Recommendation."

305.  The FCC shall be comprised of: (a) Stephen J. Herman of Herman, Herman & Katz, LLC, Co-Liaison Counsel in MDL 2179, who shall serve as Co-Chair and Secretary of the FCC….

306.  The FCC shall recommend an allocation of the amounts awarded by the Court to compensate counsel for common benefit fees and reimbursement of reasonable expenses….The FCC shall evaluate the Fee Applicants' common benefit contributions, using objective measures and the FCC's subjective understanding of the relevant contributions of each Fee Applicant toward generating the benefits provided pursuant to…. the Economic Settlement, and/or otherwise substantially advancing the litigation on behalf of all claimants in MDL 2179, in accordance with established protocols, and make a recommendation to the Court for consideration as to each Fee Applicant.

307.  On April 11, 2017, the FCC filed its proposed fee allocation with the MDL 2179 Court.

308.  Defendant Herman and the FCC explains that it "did not employ a 'lodestar' or 'hourly rate' approach….the Fee Committee did not solicit from Common Benefit Attorneys what they might claim to be their own individual or average blended hourly 'rates'….Nor did the FCC interpret its task to simply apply a single blended hourly rate to all hours that had been submitted in the case….Rather, the Court asked the Fee Committee to rely, in part, upon '*the FCC's subjective understanding of the relevant contributions of each Fee Applicant*.'

309.  Defendant Herman and the FCC made the following final recommended allocation to each potential FCC and PSC Common Benefit Fee Applicant Firm.

Total Amount the FCC Members Paid to Themselves          $321,602,542.45
Total Amount Paid to Other PSC Members                   $277,043,154.06
Total Amount Paid a Non-PSC Member (Barrios, Kingsdorf & Casteix)   $   1,291,576.47

310.  Defendant Herman paid himself $87,827,200.35.

311.  On October 8, 2010, Judge Barbier appointed Mikal C. Watts as one of the initial fifteen members to the MDL 2179 PSC. Watts was appointed based largely on the fact that he allegedly had more than 40,000 clients. On March 13, 2013, Watts resigned from the MDL 2179 PSC. On September 15, 2015, Watts and six codefendants were indicted by a federal grand jury on 95 counts of conspiracy, mail and wire fraud, identity theft, and aggravated identity theft. As set forth in the indictment, the defendants, without contacting the individuals, would obtain names, addresses, dates of birth, and social security numbers from any source available to create "clients" for anticipated litigation as a result of the *Deepwater Horizon* Oil Spill. The indictment further alleges that the defendants fraudulently submitted names of over 40,000 individuals as

plaintiffs represented by Mikal C. Watts in litigation related to the *Deepwater Horizon*/BP oil spill, knowing that the individuals had not consented to be represented by the firm, and/or that stolen and false social security numbers, dates of birth, addresses, and occupations were claimed. According to the indictment, the defendants attempted to obtain payments from the Gulf Coast Claims Facility for persons Mikal C. Watts claimed to represent and ultimately submitted 'Presentment Forms' to BP for each of the 40,000 plus individuals Mikal C. Watts claimed to represent. The indictment alleges that the total amount of claims submitted by the defendants to BP was in excess of $2 billion.

312.  On April 11, 2017, the FCC filed its proposed fee allocation with the MDL 2179 Court. (Rec. Doc. 22628).

313.  The FCC recommended Watts Guerra Craft, LLP be allocated $16,790,494.18 in common benefit fees.

314.  The FCC explains, "The Fee Committee has not taken into consideration any of the issues raised in BP's Complaint and Motion to Enjoin the Seafood Program [Civil Action No. 2:13-cv-6674]. Whether and/or how such allegations might or might not affect the allocation or award of common benefit fees to Watts Guerra is left to the sound judgment and discretion of the Court. The Fee Committee does note that Mr. Watts was acquitted by the jury in the criminal trial that was held in the Southern District of Mississippi."

315.  On October 12, 2017, Special Master John W. Perry, Jr. filed "Special Master's Recommendations Concerning the Allocation of Common Benefit Fees and the Reimbursement of Shared Expenses and Held Costs" with the MDL 2179 Court. (Rec. Doc. 23491)

316.  Special Master Perry recommended Watts Guerra Craft, LLP be allocated *$18,290,494.18* in common benefit fees.

317.  How much would Watts Guerra Craft, LLP have been allocated if its more than 40,000 "clients" were not phantoms? The MDL 2179 plaintiffs may never know.

318.  Defendant Herman was able to grossly overcompensated himself and the members of the MDL 2179 PSC in exchange for limiting the liability of BP.

319.  MDL 2179 is an example of Louisiana judicial homecookin' at its very worst.

## COUNT I
## GROSS NEGLIGENCE

320.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

321.  "OPA applies of its own force, because that act governs, *inter alia*, private claims for property damage and economic loss resulting from a discharge of oil in navigable waters." 33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. *See* Doc. 3830 at 11, August 26, 2011).

322.  Defendant Herman owed a duty to Plaintiff, Plaintiff's clients, and all others similarly situated to exercise reasonable care in regard to Defendant's oversight of MDL 2179. At all times material herein Defendant Herman oversaw and steered MDL 2179. This includes oversight of the Gulf Coast Claims Facility, settlement negotiations with BP, Halliburton, and Transocean, as well as settlement approval, and settlement implementation, post-settlement administrative disputes, litigation, and appeals, approval, payment, and reimbursement of Shared

Expenses and other general planning and administration, coordination with Defendants, Special

Masters, the Court, the States, and the United States, case-management orders and procedures,

public relations efforts, the monitoring of and coordination with the JPML, Government, and

other satellite investigations, lawsuits, and proceedings, general communications, coordination,

organization, and strategy.

323.   Defendant had a heightened duty of care to Plaintiff, Plaintiff's clients, and all

others similarly situated because of the unprecedented environmental and economic harm

resulting from the millions of barrels of oil that had been discharged into the Gulf of Mexico and

upon adjoining shorelines by the Deepwater Horizon oil spill incident. The damages suffered by

Plaintiff, Plaintiff's clients, and all others similarly situated which resulted from this oil spill

incident, the Kenneth R. Feinberg-administered victims' compensation fund, and Defendant's

oversight of MDL 2179 are enormous and on-going. The damages suffered by Plaintiff,

Plaintiff's clients, and all others similarly situated include, but are not limited to, lost time value

of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss

of income, and other economic loss. The livelihoods of all persons, including Plaintiff's clients

and all others similarly situated, whose businesses rely on the natural resources of the Gulf Coast

are at risk. Recreational deep sea fishing boat operators, commercial fishermen, clam farmers,

oyster harvesters, shrimpers, and businesses involved, directly or indirectly, in processing and

packaging for the seafood industry will experience the end of a way of life that, in many cases,

has been passed down from one generation to the next.

324.   Defendant breached his legal duty to Plaintiff, Plaintiff's clients, and all others

similarly situated, failed to exercise reasonable care, and acted with reckless, willful, and wanton

disregard for the business and livelihood of Plaintiff, Plaintiff's clients, and all others similarly situated in his negligent oversight of MDL 2179 in the following manner.

325.  Again, Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint. The manner in which Defendant breached his heightened legal duty to Plaintiff, Plaintiff's clients, and all others similarly situated, failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for the business and livelihood of Plaintiff, Plaintiff's clients, and all others similarly situated in his negligent oversight of MDL 2179 includes, but is not limited to, the following.

326.  The Eight-Step Plan - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly conceived, developed, and/or facilitated an eight-step plan to maximize his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP. The purpose of Defendant's eight-step plan was <u>not</u> to zealously advocate on behalf of Plaintiff, Plaintiff's clients, and all others similarly situated.

327.  Circumventing the OPA - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all BP oil well blowout victims by fraudulently, recklessly, negligently and/or knowingly designating the "B1" Master Complaint as an admiralty or maritime case, and requesting a non-jury trial pursuant to Rule 9(h), rather than properly alleging claims under the Oil Pollution Act of 1990 ("OPA"), a

*strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA").

328.  Feinberg's Release and Covenant Not to Sue - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly aiding and abetting the Kenneth R. Feinberg-administered victims' compensation fund to circumvent the OPA. As a result of Defendant Herman's fraudulent and negligent conduct, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action.

329.  Defendant Herman's Refusal to Initiate and Conduct Discovery on Kenneth R. Feinberg - As of the date of the filing of this Complaint, approximately eight years have passed since Plaintiff's clients filed their complaints against Feinberg in Florida State Court.

330.  MDL 2179 is Unconstitutional - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by exercising oversight of a multidistrict litigation which is unconstitutional. MDL 2179, which employs a victims' compensation fund on the frontend and a settlement class action on the backend, involves no case or controversy and infringes individual claimants' procedural due process rights.

331.  Defendant knew or should have known that his wanton or reckless conduct would

-80-

foreseeably result in the financial ruin of Plaintiff's clients and all others similarly situated thereby causing irreversible damage to the health and the economic interests of Plaintiff's clients, their families, and the families of all others similarly situated.

332.   As a direct and proximate result of Defendant's wanton or reckless conduct, Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss.

333.   Defendant's wanton or reckless conduct, as described herein, constitutes such a conscious disregard or indifference to the rights and lives of Plaintiff, Plaintiff's clients, and all others similarly situated that it entitles Plaintiff, Plaintiff's clients, and all others similarly situated to punitive damages.

## COUNT II
## NEGLIGENCE

334.   Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

335.   "OPA applies of its own force, because that act governs, *inter alia*, private claims for property damage and economic loss resulting from a discharge of oil in navigable waters." 33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. *See* Doc. 3830 at 11, August 26, 2011).

336.   Defendant Herman owed a duty to Plaintiff to exercise reasonable care in regard to

Defendant's oversight of MDL 2179. At all times material herein Defendant Herman oversaw and steered MDL 2179. This includes oversight of the Gulf Coast Claims Facility, settlement negotiations with BP, Halliburton, and Transocean, as well as settlement approval, and settlement implementation, post-settlement administrative disputes, litigation, and appeals, approval, payment, and reimbursement of Shared Expenses and other general planning and administration, coordination with Defendants, Special Masters, the Court, the States, and the United States, case-management orders and procedures, public relations efforts, the monitoring of and coordination with the JPML, Government, and other satellite investigations, lawsuits, and proceedings, general communications, coordination, organization, and strategy.

337.  Defendant knew or should have known that his conduct would foreseeably result in the financial ruin of Plaintiff's clients and all others similarly situated thereby causing irreversible damage to the health and the economic interests of Plaintiff's clients, their families, and the families of all others similarly situated.

338.  Defendant breached his legal duty to Plaintiff, Plaintiff's clients, and all others similarly situated and failed to exercise reasonable care in his oversight of MDL 2179 in the following manner.

339.  Again, Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint. The manner in which Defendant breached his legal duty to Plaintiff, Plaintiff's clients, and all others similarly situated, failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for the business and livelihood of Plaintiff, Plaintiff's clients, and all others similarly situated in his negligent oversight of MDL 2179 includes, but is not limited to, the following.

340.   The Eight-Step Plan - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly conceived, developed, and/or facilitated an eight-step plan to maximize his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP. The purpose of Defendant's eight-step plan was not to zealously advocate on behalf of Plaintiff, Plaintiff's clients, and all others similarly situated.

341.   Circumventing the OPA - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all BP oil well blowout victims by fraudulently, recklessly, negligently and/or knowingly designating the "B1" Master Complaint as an admiralty or maritime case, and requesting a non-jury trial pursuant to Rule 9(h), rather than properly alleging claims under the Oil Pollution Act of 1990 ("OPA"), a strict liability statute, and the Outer Continental Shelf Lands Act ("OCSLA").

342.   Feinberg's Release and Covenant Not to Sue - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly aiding and abetting the Kenneth R. Feinberg-administered victims' compensation fund to circumvent the OPA. As a result of Defendant Herman's fraudulent and negligent conduct, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue"

-83-

in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action.

343.  Defendant Herman's Refusal to Initiate and Conduct Discovery on Kenneth R. Feinberg - As of the date of the filing of this Complaint, approximately eight years have passed since Plaintiff's clients filed their complaints against Feinberg in Florida State Court.

344.  MDL 2179 is Unconstitutional - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by exercising oversight of a multidistrict litigation which is unconstitutional. MDL 2179, which employs a victims' compensation fund on the frontend and a settlement class action on the backend, involves no case or controversy and infringes individual claimants' procedural due process rights.

345.  Defendant knew or should have known that his wanton or reckless conduct would foreseeably result in the financial ruin of Plaintiff's clients and all others similarly situated thereby causing irreversible damage to the health and the economic interests of Plaintiff's clients, their families, and the families of all others similarly situated.

346.  As a direct and proximate result of Defendant's negligent conduct, Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss.

347.  Defendant is further liable under the doctrine of *res ipsa loquitor* because the lost

time value of money and the excess legal expenses incurred, the loss of profit, loss of business

reputation, loss of livelihood, loss of income, and other health and economic loss by Plaintiff,

Plaintiff's clients, and all others similarly situated could not have occurred in the absence of the

negligence of Defendant Herman.

## <u>COUNT III</u>
## <u>NEGLIGENCE PER SE</u>

348.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth

herein each and every foregoing paragraph of this Complaint.

349.  "OPA applies of its own force, because that act governs, *inter alia*, private claims

for property damage and economic loss resulting from a discharge of oil in navigable waters."

33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)." The Honorable Carl J. Barbier, *In re: Oil*

*Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. *See*

Doc. 3830 at 11, August 26, 2011).

350.  As the Honorable Carl J. Barbier instructs, Defendant Herman's conduct with

regard to Defendant's oversight of MDL 2179 is governed by the Oil Pollution Act of 1990.

351.  The Oil Pollution Act of 1990 creates statutory standards that are intended to

protect and benefit Plaintiff, Plaintiff's clients, and all others similarly situated.

352.  Defendant Herman's violations of these statutory standards constitute negligence

*per se* under Florida law.

353.  Defendants' violations of these statutory standards proximately caused injuries to

Plaintiff, Plaintiff's clients, and all others similarly situated. Plaintiff, Plaintiff's clients, and all

others similarly situated  have suffered legal injury and damages, in an amount to be proven at

trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss, warranting compensatory and punitive damages.

## COUNT IV
## FRAUD

354.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

355.  Defendant Herman, knowing the representations were false at the time the representations were made, made the following false representations of fact to Plaintiff, Plaintiff's clients, all others similarly situated.

356.  On March 9, 2012, Defendant Herman released a summary of the agreement-in-principle allegedly entered into between MDL 2179 Plaintiffs and BP. Defendant Herman made the following false representations of fact in this summary.

(a) "This Settlement is an *enormous victory* for Gulf Coast workers, businesses and families;"

(b) "The Settlement *does the most good for the greatest number of people* - encompassing the wide geographic region and many types of businesses affected by the BP Gulf Oil Spill;"

(c) "Contrary to what some news outlets have implied, the Settlement has *no cap or limit*. The only exception is the Seafood Program for commercial fishing vessel owners, captains and deckhands. BP has agreed to fund this Seafood Program at $2.3 billion;"

(d) "The Settlement *holds BP accountable*;"

(e) "The parties *have not had any fee discussions to date* and will not have any such discussions until authorized to do so by the Court;"

(f) "Many qualifying claimants may receive greater benefits from the Settlement Claims Programs than from the GCCF;"

(g) "*Hundreds of thousands of victims of the BP Gulf Oil Spill will be made whole* as a result of this settlement - regardless of whether or not they previously joined the MDL lawsuit or filed a claim with the GCCF;"

(h) "Once the Settlement Claims Programs are set up, the Court will continue to supervise their operation in all respects throughout their duration to *ensure fairness, transparency, and efficiency*;" and

(i) "A $57 million marketing fund will be established *to promote tourism and Gulf seafood*."

357.  Defendant Herman further attempts to explain why the settlement claims program is fair by making the following false representations of fact to Plaintiff, Plaintiff's clients, all others similarly situated.

(a) "The Settlement process and formulas used to calculate compensation will be *completely transparent* and applied with consistency;"

(b) "The Court will supervise the Settlement Claims process from start to finish to *ensure fair, impartial, and consistent processing and payment of claims*;"

(c) "Claimants, their accountants, and their lawyers will know the compensation formulas and *will be able to calculate compensation for specific claims before deciding whether to opt-out* or participate in the Settlement;"

(d) "The compensation *calculations have been carefully determined* to account for relevant economic factors and are flexible to each claimant's specific circumstances;"

(e) "The Settlement Claims Program will generally apply a larger enhancement to *account for potential future losses* and other risks than did the GCCF;"

(f) "Offsets for amounts already received from BP or the GCCF are deducted after the enhancement for future losses is applied;"

(g) "A Class Member *can choose to opt-out of the Settlement and instead prosecute their case in Court*;" and

(h) "Businesses and individuals that are not Class Members, or whose claims are not included in the Settlement, *can generally continue to prosecute their cases in Court*."

358.  Defendant Herman made these false representations for the purpose of inducing

Plaintiff, Plaintiff's clients, and all others similarly situated to act in reliance on these false representations.

359.  Plaintiff, Plaintiff's clients, and all others similarly situated relied on Defendant's representations rather than elect to commence an action in Court against BP, the responsible party, or to present the claim to the OSLTF.

360.  The reliance by Plaintiff, Plaintiff's clients, and all others similarly situated, which was reasonable and foreseeable, resulted in the following damages: Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other health and economic loss.

### COUNT V
### FRAUDULENT INDUCEMENT

361.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

362.  On November 10, 2014, Judge Barbier states, "….as the parties were approaching the final fairness hearing in November 2012, there was a concerted effort by the parties and claims facility to process a substantial number of high value claims in order to demonstrate that the settlement program was working as intended."

363.  At all times material herein, Defendant Herman, the members of the MDL 2179 PSC, BP, and the administrator of the claims facility secretly colluded to inflate the amount of compensation received by some plaintiffs (just prior to the "fairness" hearing) in order to induce

the remaining plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate."

364.  If an attorney is guilty of deceit or collusion or consents thereto with intent to deceive the Court, judge or party, he shall forfeit to the injured party, treble damages to be recovered in a civil action.

365.  Defendant Herman made the following false statements of material fact to Plaintiff, Plaintiff's clients, and all others similarly situated:

(a) "This Settlement is an *enormous victory* for Gulf Coast workers, businesses and families;"

(b) "The Settlement *does the most good for the greatest number of people* - encompassing the wide geographic region and many types of businesses affected by the BP Gulf Oil Spill;"

(c) "Contrary to what some news outlets have implied, the Settlement has *no cap or limit*. The only exception is the Seafood Program for commercial fishing vessel owners, captains and deckhands. BP has agreed to fund this Seafood Program at $2.3 billion;"

(d) "The Settlement *holds BP accountable*;"

(e) "The parties *have not had any fee discussions to date* and will not have any such discussions until authorized to do so by the Court;"

(f) "Many qualifying claimants may receive greater benefits from the Settlement Claims Programs than from the GCCF;"

(g) "*Hundreds of thousands of victims of the BP Gulf Oil Spill will be made whole* as a result of this settlement - regardless of whether or not they previously joined the MDL lawsuit or filed a claim with the GCCF;"

(h) "Once the Settlement Claims Programs are set up, the Court will continue to supervise their operation in all respects throughout their duration to *ensure fairness, transparency, and efficiency*;"

(i) "A $57 million marketing fund will be established *to promote tourism and Gulf seafood*;"

-89-

(j) "The Settlement process and formulas used to calculate compensation will be *completely transparent* and applied with consistency;"

(k) "The Court will supervise the Settlement Claims process from start to finish to *ensure fair, impartial, and consistent processing and payment of claims*;"

(l) "Claimants, their accountants, and their lawyers will know the compensation formulas and *will be able to calculate compensation for specific claims before deciding whether to opt-out* or participate in the Settlement;"

(m) "The compensation *calculations have been carefully determined* to account for relevant economic factors and are flexible to each claimant's specific circumstances;"

(n) "The Settlement Claims Program will generally apply a larger enhancement to *account for potential future losses* and other risks than did the GCCF;"

(o) "Offsets for amounts already received from BP or the GCCF are deducted after the enhancement for future losses is applied;"

(p) "A Class Member *can choose to opt-out of the Settlement and instead prosecute their case in Court*;" and

(q) "Businesses and individuals that are not Class Members, or whose claims are not included in the Settlement, *can generally continue to prosecute their cases in Court*."

366.  Defendant Herman knew or should have known these statements were false.

367.  Defendant Herman made these false statements of material fact for the purpose of inducing Plaintiff's clients and all others similarly situated to enter into a settlement agreement BP.

368.  Plaintiff, Plaintiff's clients and all others similarly situated justifiably relied upon these false statements of material fact.

369.  Reliance on these false statements of material fact did, in fact, induce Plaintiff, Plaintiff's clients, and all others similarly situated to refrain from commencing an action in Court against BP, the responsible party, or presenting the claim to the OSLTF which proximately caused the following injury to Plaintiff, Plaintiff's clients, and all others similarly situated:

Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other health and economic loss.

370.  As a result of Defendant Herman's refusal to initiate and conduct discovery on Kenneth R. Feinberg, as of the date of the filing of this Complaint, approximately eight years have passed since Plaintiff's clients filed their complaints against Kenneth R. Feinberg in Florida State Court.

<u>**COUNT VI**</u>
<u>**PROMISSORY ESTOPPEL**</u>

371.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

372.  Defendant Herman made the following representations as to material facts that are contrary to Defendant Herman's current representations.

373.  On September 5, 2011, Plaintiff Donovan received an email from Defendant Herman wherein he states, "We have received and appreciate your correspondence of August 29, 2011….Should you desire to participate in the common benefit effort, we would welcome your inclusion in the GCCF Jurisdiction Work Group, which has, for the past year, coordinated Plaintiffs' collective efforts regarding Feinberg and the GCCF in terms of information collection, jurisdictional issues, communications with claimants, OPA compliance, and the appropriate scope and effect of the GCCF release."

374.  On December 9, 2013, Plaintiff Donovan emails Defendant Herman, "….Please

advise as to when the Court will permit formal discovery on Feinberg or the GCCF....Thank you."

375.  On December 9, 2013, in his email response to Plaintiff Donovan, Defendant Herman states, "No idea."

376.  On December 9, 2013, in his email reply to Defendant Herman, Plaintiff Donovan inquires, "Would you be kind enough to attempt to find out when the Court will permit formal discovery on Feinberg or the GCCF?"

377.  On December 9, 2013, Defendant Herman's responds, "Yes. At an appropriate time."

378.  Plaintiff, Plaintiff's clients, and all others similarly situated reasonably relied on Defendant Herman's representations that "the GCCF Jurisdiction Work Group....coordinated Plaintiffs' collective efforts regarding Feinberg and the GCCF in terms of information collection, jurisdictional issues, communications with claimants, OPA compliance, and the appropriate scope and effect of the GCCF release."

379.  Defendant Herman and the GCCF Jurisdiction Work Group never coordinated the MDL 2179 Plaintiffs' collective efforts regarding Feinberg and the GCCF in terms of information collection, jurisdictional issues, communications with claimants, OPA compliance, and the appropriate scope and effect of the GCCF release.

380.  This reasonable reliance of Plaintiff, Plaintiff's clients, and all others similarly situated on Defendant Herman's representations proximately caused the following injury to Plaintiff, Plaintiff's clients, and all others similarly situated: Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at

trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other health and economic loss.

381.  As a result of Defendant Herman's ongoing refusal to initiate and conduct discovery on Kenneth R. Feinberg, as of the date of the filing of this Complaint, approximately eight years have passed since Plaintiff's clients filed their complaints against Kenneth R. Feinberg in Florida State Court.

## COUNT VII
## UNJUST ENRICHMENT

382.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

383.  At all times material herein, Defendant Herman claims the protocols under which MDL 2179 and Kenneth R. Feinberg operate are structured to be compliant with the OPA and apply the standards of the OPA.

384.  At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly designating the "B1" Master Complaint as an admiralty or maritime case, and requesting a non-jury trial pursuant to Rule 9(h), rather than properly alleging claims under the Oil Pollution Act of 1990 ("OPA"), a *strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA").

385.  At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly aiding and abetting the Kenneth R. Feinberg-administered victims' compensation fund to circumvent the OPA. As a result of Defendant Herman's fraudulent and negligent conduct, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action.

386.  "OPA applies of its own force, because that act governs, *inter alia*, private claims for property damage and economic loss resulting from a discharge of oil in navigable waters." *See* 33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 3830 at 11, August 26, 2011).

387.  The OPA is a *strict liability* statute. In order to recover damages under the OPA, a claimant merely needs to show that his or her damages "resulted from" the oil spill or oil well blowout.

388.  The OPA, in pertinent part, states: "The responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages that result from such incident."

389.  The damages referred to in 33 U.S.C. § 2702(a) include, but are not limited to:

"Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which *shall be recoverable by any claimant*." (Emphasis added)

390.  The OPA further provides: (a) "Payment or settlement of a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled **shall not** preclude recovery by the claimant for damages not reflected in the paid or settled partial claim;" and (b) "Payment of such a claim [i.e. payment to a claimant for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled] **shall not** foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under this Act or under any other law."

391.  "Shall" means shall. The U.S. Supreme Court has made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the command.

392.  Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is mandatory and "may" is permissive. "The mandatory 'shall'….normally creates an obligation impervious to judicial discretion."

393.  At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly conceived, developed, and/or facilitated an eight-step plan to maximize his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP.

394.  In MDL 2179, as a direct result of Defendant Herman's actions, the comatose,

hapless plaintiffs received little or no compensation while Defendant Herman and the members of the MDL 2179 PSC have been enriched in an estimated amount of *3.035 billion*.

395.  As a result of limiting the liability of BP, Defendant Herman's plan to maximize his compensation and the compensation of the members of the MDL 2179 PSC did not rise to the standards expected of his profession.

396.  As a result of Defendant Herman's ongoing refusal to initiate and conduct discovery on Kenneth R. Feinberg, as of the date of the filing of this Complaint, approximately eight years have passed since Plaintiff Donovan's clients filed their complaints against Kenneth R. Feinberg in Florida State Court.

397.  As a direct and proximate result of Defendant Herman's negligent conduct, Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss.

398.  Defendant Herman lacks any legal justification for violating the rights provided to Plaintiff, Plaintiff's clients, and all others similarly situated under the OPA.

399.  Under the circumstances described herein it would be inequitable for Defendant Herman to retain the benefits of his actions without paying the value thereof to Plaintiff.

## COUNT VIII
## BREACH OF FIDUCIARY DUTY

400.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

401.  Liability for breach of fiduciary duty requires a Plaintiff to prove:

(a) the existence of a fiduciary duty relationship,

(b) breach of the fiduciary duty by the defendant, and

(c) damages proximately caused by the defendant's breach.

402.  "All motions, requests for discovery or other pre-trial proceedings with respect to plaintiffs shall be initiated by and/or coordinated through the Plaintiff Steering Committee ("PSC"), *to be filed by and through Plaintiffs' Liaison Counsel*. If the PSC does not support the motion, discovery or other requested proceeding, then the moving or requesting plaintiff shall be permitted to file such motion or request, but shall include a certificate of non-support." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 569 at 13, October 19, 2010).

403.  Pursuant to the MDL 2179 Court's Pretrial Order No. 15, "Pending further orders of this Court, all pending and future motions, including Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court."

404.  On January 12, 2011, the MDL 2179 Court issued PTO No. 25, in order to clarify "the scope and effect" of the "B1" Master Complaint. The Court held that any individual plaintiff who is a named plaintiff in a case that falls within pleading bundle "B1" "is deemed to be a plaintiff in the "B1" Master Complaint. Also, "the allegations, claims, theories of recovery and/or prayers for relief contained within the pre-existing petition or complaint are deemed to be amended, restated, and superseded by the allegations, claims, theories of recovery, and/or prayers for relief in the respective "B1" Master Complaint(s) in which the defendant is named."

405.  In sum, Plaintiff, Plaintiff's clients, and all others similarly situated were forced to

be represented by Defendant Herman and the MDL 2179 PSC. Since Defendant Herman stepped into the shoes of Plaintiff Donovan, Plaintiff Donovan, Plaintiff's clients and all others similarly situated hold Defendant Herman and the MDL 2179 PSC strictly accountable to zealously advocate on their behalf.

406.  A fiduciary duty relationship clearly exists between Defendant Herman and Plaintiff, Plaintiff's clients, and all others similarly situated.

407.  Defendant Herman has many fiduciary duties, including the duty of care, the duty of loyalty, the duty to zealously protect the interests of Plaintiff Donovan, Plaintiff's clients, and all others similarly situated, and the sacred duty of confidentiality.

408.  Defendant Herman breached his fiduciary duties to Plaintiff Donovan, Plaintiff's clients, and all others similarly situated when he failed to act with the knowledge, skill, and care of other qualified attorneys practicing under similar circumstances.

409.  The manner in which Defendant Herman failed to act with the knowledge, skill, and care of other qualified attorneys practicing under similar circumstances includes, but is not limited to, the following.

410.  The Eight-Step Plan - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly conceived, developed, and/or facilitated an eight-step plan to maximize his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP. The purpose of Defendant's eight-step plan was not to zealously advocate on behalf of Plaintiff, Plaintiff's clients, and all others similarly situated.

411.  Circumventing the OPA - At all times material herein, Defendant Herman,

individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all BP oil well blowout victims by fraudulently, recklessly, negligently and/or knowingly designating the "B1" Master Complaint as an admiralty or maritime case, and requesting a non-jury trial pursuant to Rule 9(h), rather than properly alleging claims under the Oil Pollution Act of 1990 ("OPA"), a *strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA").

412.  Feinberg's Release and Covenant Not to Sue - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly aiding and abetting the Kenneth R. Feinberg-administered victims' compensation fund to circumvent the OPA. As a result of Defendant Herman's fraudulent and negligent conduct, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action.

413.  The ultimate objective of Feinberg's "Delay, Deny, Defend" tactic was to limit BP's liability by obtaining a signed "Release and Covenant Not to Sue" from as many BP oil well blowout victims as possible. Feinberg's "Release and Covenant Not to Sue" requirement violates the OPA, State contract law, and is contrary to public policy.

414.  Defendant Herman fully sanctioned and facilitated Feinberg's "Release and

Covenant Not to Sue."

415.  Defendant Herman's Refusal to Initiate and Conduct Discovery on Kenneth R. Feinberg - As of the date of the filing of this Complaint, approximately eight years have passed since Plaintiff's clients filed their complaints against Feinberg in Florida State Court.

416.  MDL 2179 is Unconstitutional - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by exercising oversight of a multidistrict litigation which is unconstitutional. MDL 2179, which employs a victims' compensation fund on the frontend and a settlement class action on the backend, involves no case or controversy and infringes individual claimants' procedural due process rights.

417.  Defendant Herman breached his fiduciary duties to Plaintiff, Plaintiff's clients, and all others similarly situated by (a) asking clients to accept a minimal settlement when the facts indicate the client may have a bigger claim, (b) failing to offer appropriate advice, (c) filing an improper document, and (d) ignoring a conflict of interest.

418.  An attorney who undertakes representation of a client owes that client both a duty of competent representation and the highest duty of honesty, fidelity, and confidentiality.

419.  Defendant Herman's *intentional* misrepresentation to Plaintiff, Plaintiff's clients, and all others similarly situated during MDL 2179 where Defendant Herman represents Plaintiff, Plaintiff's clients, and all others similarly situated is clearly a violation of Defendant Herman's duty of honesty.

420.  Defendant knew or should have known that his wanton or reckless conduct would

-100-

foreseeably result in the financial ruin of Plaintiff's clients and all others similarly situated thereby causing irreversible damage to the health and the economic interests of Plaintiff's clients, their families, and the families of all others similarly situated.

421.  As a direct and proximate result of Defendant's wanton or reckless conduct, Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss. Plaintiff, Plaintiff's clients, and all others similarly situated would have won their cases and received compensation if Defendant Herman had not breached his fiduciary duties.

## COUNT IX
## FRAUDULENT CONCEALMENT

422.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

423.  To establish fraudulent concealment, a Plaintiff must prove that:

(a) the defendant owed the plaintiff a duty to disclose a material fact;

(b) the defendant failed to do so;

(c) the defendant intended to defraud or deceive the plaintiff;

(d) the plaintiff acted in justifiable reliance on the concealment; and

(e) the plaintiff was damaged as a result.

424.  The existence of a duty to disclose on the defendant's part is the threshold inquiry in a fraudulent concealment case.

425.  As fully explained *supra*, Defendant Herman owed Plaintiff, Plaintiff's clients, and all others similarly situated a duty to disclose material facts.

426.  A duty to disclose may be either legal or equitable, and may arise where the parties have a relation of trust and confidence or where there is inequality of condition and knowledge, or where there are other attendant circumstances.

427.  The defendant must have actual knowledge of the fact.

428.  Defendant Herman knowingly, deliberately, and/or with a reckless disregard of the truth actively concealed from Plaintiff, Plaintiff's clients, and all others similarly situated, with the intent to defraud or deceive Plaintiff, Plaintiff's clients, and all others similarly situated, the following material facts.

429.  In mid-2010, BP made the business decision to pay a total amount of $20 billion to compensate all the BP oil well blowout victims in the settlement class action.

430.  Defendant Herman, the members of the MDL 2179 PSC, and other counsel allegedly performing common benefit work in MDL 2179 initiated settlement negotiations with BP "in earnest" merely four (4) months after Judge Barbier appointed Defendant Herman and the members to the PSC. Clearly, the MDL 2179 settlement class action was not achieved in the full context of adversarial litigation.

431.  The Eight-Step Plan - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly conceived, developed, and/or facilitated an eight-step plan to maximize his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP. The purpose of Defendant's eight-step plan was <u>not</u> to

zealously advocate on behalf of Plaintiff, Plaintiff's clients, and all others similarly situated.

432.  "OPA applies of its own force, because that act governs, *inter alia*, private claims for property damage and economic loss resulting from a discharge of oil in navigable waters." 33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. *See* Doc. 3830 at 11, August 26, 2011).

433.  As the Honorable Carl J. Barbier instructs, Defendant Herman's conduct with regard to Defendant's oversight of MDL 2179 is governed by the Oil Pollution Act of 1990.

434.  The Oil Pollution Act of 1990 creates statutory standards that are intended to protect and benefit Plaintiff, Plaintiff's clients, and all others similarly situated.

435.  Circumventing the OPA - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all BP oil well blowout victims by fraudulently, recklessly, negligently and/or knowingly designating the "B1" Master Complaint as an admiralty or maritime case, and requesting a non-jury trial pursuant to Rule 9(h), rather than properly alleging claims under the Oil Pollution Act of 1990 ("OPA"), a *strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA").

436.  Feinberg's Release and Covenant Not to Sue - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, in order to limit BP's liability and thereby maximize his compensation and the

compensation of the members of the MDL 2179 PSC, has misled Plaintiff, Plaintiff's clients, and all others similarly situated by fraudulently, recklessly, negligently and/or knowingly aiding and abetting the Kenneth R. Feinberg-administered victims' compensation fund to circumvent the OPA. As a result of Defendant Herman's fraudulent and negligent conduct, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action.

437.  The ultimate objective of Feinberg's "Delay, Deny, Defend" tactic was to limit BP's liability by obtaining a signed "Release and Covenant Not to Sue" from as many BP oil well blowout victims as possible. Feinberg's "Release and Covenant Not to Sue" requirement violates the OPA, State contract law, and is contrary to public policy.

438.  Defendant Herman fully sanctioned and facilitated Feinberg's "Release and Covenant Not to Sue."

439.  MDL 2179 is Unconstitutional - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by exercising oversight of a multidistrict litigation which is unconstitutional. MDL 2179, which employs a victims' compensation fund on the frontend and a settlement class action on the backend, involves no case or controversy and infringes individual claimants' procedural due process rights.

440.  On November 10, 2014, Judge Barbier states, "….as the parties were approaching the final fairness hearing in November 2012, there was a concerted effort by the parties and

claims facility to process a substantial number of high value claims in order to demonstrate that the settlement program was working as intended."

441.  At all times material herein, Defendant Herman, the members of the MDL 2179 PSC, BP, and the administrator of the claims facility secretly colluded to inflate the amount of compensation received by some plaintiffs (just prior to the "fairness" hearing) in order to induce the remaining plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate."

442.  The MDL 2179 Court, Defendant Herman, the PSC, BP, and Patrick Juneau knew that BP would only pay a total amount of $20 billion to BP oil well blowout victims. Accordingly, the plaintiffs should have been informed that Patrick Juneau would pay less than 40% of the submitted claims. Instead, in order to limit the number of plaintiffs who would opt-out, the MDL 2179 Court and PSC intentionally misled the plaintiffs by telling them that "the settlement has *no cap or limit*."

443.  In MDL 2179, as a direct result of Defendant Herman's actions, the comatose, hapless plaintiffs received little or no compensation while Defendant Herman and the members of the MDL 2179 PSC have been enriched in the estimated amount of *$3.035 billion*.

444.  Defendant Herman and the FCC explain that it "did not employ a 'lodestar' or 'hourly rate' approach....the Fee Committee did not solicit from Common Benefit Attorneys what they might claim to be their own individual or average blended hourly 'rates'....Nor did the FCC interpret its task to simply apply a single blended hourly rate to all hours that had been submitted in the case....Rather, the Court asked the Fee Committee to rely, in part, upon '*the FCC's subjective understanding of the relevant contributions of each Fee Applicant*.'

445.  The total amount the FCC members paid to themselves is $321,602,542.45.

446.  Defendant Herman paid himself $87,827,200.35.

447.  Defendant Herman and Members of the PSC and their law firms in the BP oil well blowout MDL ("MDL 2179") are not double-dipping. They are quadruple-dipping.

448.  The known sources of compensation received by Defendant Herman and the members of the PSC and their law firms in MDL 2179 are: common benefit fees, contingent fees, co-counsel fees, and "Hold-Backs."

449.  Courts have consistently held that where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated.

450.  Plaintiff, Plaintiff's clients, and all others similarly situated acted in justifiable reliance on Defendant Herman's concealment; and Plaintiff, Plaintiff's clients, and all others similarly situated were damaged as a result.

451.  As a direct and proximate result of Defendant Herman knowingly, deliberately, and/or with a reckless disregard of the truth actively concealing from Plaintiff, Plaintiff's clients, and all others similarly situated, with the intent to defraud or deceive Plaintiff, Plaintiff's clients, and all others similarly situated, Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss.

452.  Plaintiff, Plaintiff's clients, and all others similarly situated would have been fully compensated for their damages by the OPA or won their cases and received compensation if

Defendant Herman had not concealed these material facts.

## COUNT X
## CONSTRUCTIVE FRAUD

453.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

454.  Black's law dictionary defines constructive fraud as "all acts, omissions, and concealments involving breach of equitable or legal duty, trust or confidence, and resulting in damage to another; i.e. no scienter is required. Thus the party who makes the misrepresentation need not know that it is false."

455.  Under contract law, a Defendant can be liable to a Plaintiff for constructive fraud if there was:

(a) a false misrepresentation;

(b) in reference to a material fact;

(c) for the purpose of inducing the other party to rely on such representation;

(d) on which the other party did justifiably rely;

(e) which resulted in damages or injury; and

(f) a fiduciary relationship between the parties.

456.  Bad intent or dishonesty is not a requirement to satisfy constructive fraud.

457.  In sum, the elements for actual and constructive fraud are the same with two exceptions: constructive fraud drops the element of scienter - knowledge on the part of the injurer of the representation's falsity - and adds the element of a fiduciary relationship.

458.  On March 9, 2012, as fully set forth in COUNT IV *supra*, Defendant Herman

released a summary of the agreement-in-principle allegedly entered into between MDL 2179

Plaintiffs and BP. Defendant Herman made the following false representations of material fact in

this summary.

> (a) "This Settlement is an *enormous victory* for Gulf Coast workers, businesses and families;"

> (b) "The Settlement *does the most good for the greatest number of people* - encompassing the wide geographic region and many types of businesses affected by the BP Gulf Oil Spill;"

> (c) "Contrary to what some news outlets have implied, the Settlement has *no cap or limit.* The only exception is the Seafood Program for commercial fishing vessel owners, captains and deckhands. BP has agreed to fund this Seafood Program at $2.3 billion;"

> (d) "The Settlement *holds BP accountable*;"

> (e) "The parties *have not had any fee discussions to date* and will not have any such discussions until authorized to do so by the Court;"

> (f) "Many qualifying claimants may receive greater benefits from the Settlement Claims Programs than from the GCCF;"

> (g) "*Hundreds of thousands of victims of the BP Gulf Oil Spill will be made whole* as a result of this settlement - regardless of whether or not they previously joined the MDL lawsuit or filed a claim with the GCCF;"

> (h) "Once the Settlement Claims Programs are set up, the Court will continue to supervise their operation in all respects throughout their duration to *ensure fairness, transparency, and efficiency*;" and

> (i) "A $57 million marketing fund will be established *to promote tourism and Gulf seafood*."

459.  Defendant Herman further attempts to explain why the settlement claims program is

fair by making the following false representations of material fact to Plaintiff, Plaintiff's clients,

all others similarly situated.

> (a) "The Settlement process and formulas used to calculate compensation will be *completely transparent* and applied with consistency;"

-108-

(b) "The Court will supervise the Settlement Claims process from start to finish to *ensure fair, impartial, and consistent processing and payment of claims*;"

(c) "Claimants, their accountants, and their lawyers will know the compensation formulas and *will be able to calculate compensation for specific claims before deciding whether to opt-out* or participate in the Settlement;"

(d) "The compensation *calculations have been carefully determined* to account for relevant economic factors and are flexible to each claimant's specific circumstances;"

(e) "The Settlement Claims Program will generally apply a larger enhancement to *account for potential future losses* and other risks than did the GCCF;"

(f) "Offsets for amounts already received from BP or the GCCF are deducted after the enhancement for future losses is applied;"

(g) "A Class Member *can choose to opt-out of the Settlement and instead prosecute their case in Court*;" and

(h) "Businesses and individuals that are not Class Members, or whose claims are not included in the Settlement, *can generally continue to prosecute their cases in Court*."

460.  Defendant made these false representations of material fact for the purpose of inducing Plaintiff, Plaintiff's clients, and all others similarly situated to act in reliance on these false representations of material fact.

461.  Plaintiff, Plaintiff's clients, and all others similarly situated relied on Defendant's representations rather than elect to commence an action in Court against BP, the responsible party, or to present the claim to the OSLTF.

462.  The reliance by Plaintiff, Plaintiff's clients, and all others similarly situated, which was reasonable and foreseeable, resulted in the following damages: Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income,

and other health and economic loss.

463.  As fully set forth in COUNT VIII *supra*, a fiduciary relationship exists between Defendant Herman and Plaintiff, Plaintiff's clients, and all others similarly situated.

464.  As noted *supra*, the elements for actual and constructive fraud are the same with two exceptions: constructive fraud drops the element of scienter - knowledge on the part of the injurer of the representation's falsity - and adds the element of a fiduciary relationship.

465.  Therefore, even if Defendant Herman did not know the representations of material fact were false at the time he made the false representations of material fact to Plaintiff, Plaintiff's clients, all others similarly situated, Defendant Herman can be liable to Plaintiff, Plaintiff's clients, and all others similarly situated for constructive fraud.

### COUNT XI
### BREACH OF FIDUCIARY DUTY OF LOYALTY
### (BREACH OF THE AGGREGATE SETTLEMENT RULE)

466.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

467.  The aggregate settlement rule ("ASR") governs global MDL settlements.

468.  Defendant Herman breached his fiduciary duties to Plaintiff, Plaintiff's clients, and all others similarly situated by violating the ASR.

469.  Courts have long recognized that lawyers may be subject to total or partial fee forfeiture as a sanction for serious violations of the ASR. The plaintiff does not have to prove either causation or injury to be entitled to fee forfeiture as a remedy for Defendant Herman's breach of fiduciary duty.

470.  The ASR is Rule 1.8(g) of the ABA *Model Rules of Professional Conduct* ("*Model*

-110-

Rules"), and it states: "A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients….unless each client gives informed consent, in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims….involved and of the participation of each person in the settlement."

471.  All "group" settlements are now "aggregate settlements" and must comply with the disclosure requirements of Rule 1.8(g).

472.  Rule 1.8(g) requires a lawyer to disclose *at a minimum*, the following information to the clients for whom or to whom the settlement or agreement proposal is made.

(a) The total amount of the aggregate settlement;

(b) The existence and nature of all of the claims….involved in the aggregate settlement;

(c) The details of every other client's participation in the aggregate settlement…. whether it be their….settlement receipts…..or any other….receipt of something of value as a result of the aggregate resolution;

(d) The *total fees and costs to be paid to the lawyer* as a result of the aggregate settlement, if the lawyer's fees and/or costs will be paid, in whole or in part, from the proceeds of the settlement or by an opposing party or parties; and

(e) The method by which costs (including costs already paid by the lawyer as well as costs to be paid out of the settlement proceeds) are to be apportioned among them.

473.  Informed consent to an aggregate settlement requires that each claimant be able to review the settlements of all other persons subject to the aggregate settlement or the formula by which the settlement will be divided among all claimants. Further, *informed consent requires that the total financial interest of claimants' counsel be disclosed to each claimant.* (Emphasis added)

474.  In sum, Defendant Herman and the members of the MDL 2179 PSC owe fiduciary duties to Plaintiff, Plaintiff's clients, and each member of the settlement class. A lawsuit based on a violation of the ASR can be brought as a breach of fiduciary duty claim.

475.  The plaintiff(s) need not show any economic loss from the attorney's breach in order to prevail.

476.  Full or partial forfeiture of the fees that the attorney received is the remedy.

477.  Generally, liability for breach of fiduciary duty requires a Plaintiff to prove:

(a) the existence of a fiduciary duty relationship,

(b) breach of the fiduciary duty by the defendant, and

(c) damages proximately caused by the defendant's breach.

478.  "All motions, requests for discovery or other pre-trial proceedings with respect to plaintiffs shall be initiated by and/or coordinated through the Plaintiff Steering Committee ("PSC"), *to be filed by and through Plaintiffs' Liaison Counsel*. If the PSC does not support the motion, discovery or other requested proceeding, then the moving or requesting plaintiff shall be permitted to file such motion or request, but shall include a certificate of non-support." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 569 at 13, October 19, 2010).

479.  Pursuant to the MDL 2179 Court's Pretrial Order No. 15, "Pending further orders of this Court, all pending and future motions, including Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court."

480.  On January 12, 2011, the MDL 2179 Court issued PTO No. 25, in order to clarify "the scope and effect" of the "B1" Master Complaint. The Court held that any individual plaintiff

who is a named plaintiff in a case that falls within pleading bundle "B1" "is deemed to be a plaintiff in the "B1" Master Complaint. Also, "the allegations, claims, theories of recovery and/or prayers for relief contained within the pre-existing petition or complaint are deemed to be amended, restated, and superseded by the allegations, claims, theories of recovery, and/or prayers for relief in the respective "B1" Master Complaint(s) in which the defendant is named."

481.   In sum, Plaintiff, Plaintiff's clients, and all others similarly situated were forced to be represented by Defendant Herman and the MDL 2179 PSC. Since Defendant Herman stepped into the shoes of Plaintiff Donovan, Plaintiff Donovan, Plaintiff's clients and all others similarly situated hold Defendant Herman and the MDL 2179 PSC strictly accountable to zealously advocate on their behalf.

482.   As fully set forth in COUNT VIII *supra*, a fiduciary duty relationship clearly exists between Defendant Herman and Plaintiff, Plaintiff's clients, and all others similarly situated.

483.   Defendant Herman has many fiduciary duties, including the duty of care, the duty of loyalty, the duty to zealously protect the interests of Plaintiff Donovan, Plaintiff's clients, and all others similarly situated, and the sacred duty of confidentiality.

484.   As explained *supra*, a lawsuit based on a violation of the ASR can be brought as a breach of fiduciary duty claim; the plaintiff(s) need not show any economic loss from the attorney's breach in order to prevail; and full or partial forfeiture of the fees that the attorney received is the remedy.

485.   Defendant Herman breached his fiduciary duty of loyalty to Plaintiff Donovan, Plaintiff's clients, and all others similarly situated when he clearly and seriously violated the ASR.

486.   Defendant Herman committed the breach of his fiduciary duty of loyalty knowingly and willingly, intentionally, willfully, recklessly, maliciously, and/or with gross negligence.

487.   Defendant Herman's conduct offends a public sense of justice and propriety.

488.   Defendant Herman, in violation of the ASR, refuses to disclose the following information to Plaintiff, Plaintiff's clients, and all others similarly situated.

(a) The total amount of the aggregate settlement;

(b) The existence and nature of all of the claims….involved in the aggregate settlement;

(c) The details of every other client's participation in the aggregate settlement…. whether it be their….settlement receipts…..or any other….receipt of something of value as a result of the aggregate resolution;

(d) The *total amount and source of compensation* and costs to be paid to Defendant Herman, to all members of the MDL 2179 PSC and the total amount and source of compensation paid to the legal experts, Special Masters, and Claims Administrator Patrick Juneau as a result of the aggregate settlement, if this compensation and/or costs will be paid, in whole or in part, from the proceeds of the settlement or by an opposing party or parties; and

(e) The method by which costs (including costs already paid by the lawyer as well as costs to be paid out of the settlement proceeds) are to be apportioned among them.

489.   Informed consent to an aggregate settlement requires that each claimant be able to review the settlements of all other persons subject to the aggregate settlement or the formula by which the settlement will be divided among all claimants. Further, *informed consent requires that the total financial interest of claimants' counsel be disclosed to each claimant.* (Emphasis added)

490.   Moreover, Defendant Herman, in violation of rules governing his professional conduct,

(a)  solicited business through a lay intermediary;

-114-

(b)  failed to fully investigate and assess individual claims;

(c)  failed to communicate offers received and demands made;

(d)  entered into an aggregate settlement with BP of all plaintiffs' claims without plaintiffs' approval; and

(e)  intimidated and coerced his clients into accepting the settlement.

491.  Defendant Herman signed up plaintiffs *en masse* to contingent fee contracts, often contacting plaintiffs through a lay intermediary.

492.  Defendant Herman settled all the claims in the aggregate and allocated dollar figures to the plaintiffs without regard to individual conditions and damages.

493.  MDL 2179 Plaintiffs were not allowed to meet with Defendant Herman or a member of the MDL 2179 PSC for more than a few minutes.

494.  Any MDL 2179 Plaintiff who expressed reservations about the settlement was threatened by Defendant Herman with being afforded no recovery at all.

495.  The U.S. Supreme Court, as well as Courts in the State of Florida, have held that fee forfeiture is appropriate without regard to whether the breach of fiduciary duty resulted in damages.

496.  Generally, where the claim rests on the disloyalty of the lawyer, and the remedy sought is fee forfeiture, rather than compensatory damages for poor service, the breach of the duty of loyalty *is* the harm, and the client is not required to prove causation or specific injury.

497.  It is Defendant Herman's disloyalty, not any resulting harm, that violates the fiduciary relationship and thus impairs the basis for compensation.

498.  Concern for the integrity of attorney-client relationships is at the heart of the fee forfeiture remedy.

499.  Forfeiture extends to *all* fees for the matter(s) for which Defendant Herman was retained.

## COUNT XII
## FRAUDULENT CONCEALMENT
## (MDL 2179 IS UNCONSTITUTIONAL)

500.  Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

501.  At all times material herein, Defendant Herman oversaw and steered the entire MDL 2179 "litigation" effort. This includes settlement negotiations with BP, Halliburton, and Transocean, as well as settlement approval, and settlement implementation, post-settlement administrative disputes, litigation, and appeals, approval, payment, and reimbursement of Shared Expenses and other general planning and administration, coordination with Defendants, Special Masters, the Court, the States, and the United States, case-management orders and procedures, public relations efforts, the monitoring of and coordination with the JPML, Government, and other satellite investigations, lawsuits, and proceedings, general communications, coordination, organization, and strategy.

502.  To establish fraudulent concealment, a Plaintiff must prove that:

(a) the defendant owed the plaintiff a duty to disclose a material fact;

(b) the defendant failed to do so;

(c) the defendant intended to defraud or deceive the plaintiff;

(d) the plaintiff acted in justifiable reliance on the concealment; and

(e) the plaintiff was damaged as a result.

503.  The existence of a duty to disclose on the defendant's part is the threshold

inquiry in a fraudulent concealment case.

504. As fully explained *supra*, Defendant Herman owed Plaintiff, Plaintiff's clients, and all others similarly situated a duty to disclose material facts.

505. A duty to disclose may be either legal or equitable, and may arise where the parties have a relation of trust and confidence or where there is inequality of condition and knowledge, or where there are other attendant circumstances.

506. The defendant must have actual knowledge of the fact.

507. Defendant Herman knowingly, deliberately, and/or with a reckless disregard of the truth actively concealed from Plaintiff, Plaintiff's clients, and all others similarly situated, with the intent to defraud or deceive Plaintiff, Plaintiff's clients, and all others similarly situated, the following four material facts:

(a) The fact that MDL 2179 is unconstitutional because there is no case or controversy.

(b) The fact that Article III makes an ex ante categorical judgment that a non-adversarial suit *is inherently collusive* and therefore in violation of constitutional norms.

(c) The fact that MDL 2179 is unconstitutional because there is no due process.

(d) The fact that the opt-out mechanism under Rule 23(b)(3) should be abandoned in favor of an opt-in mechanism that requires absent class members to take some affirmative action before being swept into a class action.

508. In a settlement class action, an agreement to resolve the dispute is reached by the parties involved prior to the district court's ruling on a motion to certify the class.

509. In MDL 2179, Defendant Herman and BP are not adversaries. They are cohorts expeditiously seeking the common objectives of closure, limited liability, and profit. Justice for

the plaintiffs is optional.

510.   Defendant Herman and the MDL 2179 PSC attorneys/dealmakers are privy to the settlement matrix and the confidential guidance document given to the claims administrator, which explains qualifying criteria for recovery. This knowledge allows Defendant Herman and the PSC attorneys to tailor their own clients' claim submissions to maximize their payout (and the PSC attorneys' contingent fees). This insider information also prompts Defendant Herman and some PSC attorneys to seek and collect co-counsel fees for serving as co-counsel to non-PSC attorneys.

511.   The settlement class action is always unconstitutional because it involves no litigation.

512.   A typical class action is legitimate because the interests of the plaintiffs and defendant are adverse. In that scenario, the monetary interests of class counsel, which are contingent on class recovery, are aligned with the absent class members' interest in maximum redress, incentivizing a presentation of the issues that benefits both equally. These incentives break down in the context of the non-adversarial settlement class action. Because class counsel seeks the same outcome as the defendant, she has no reason to formulate her clients' arguments or destroy her opponent's case. Particularly, she lacks incentive to present to the Court evidence that may shed unfavorable light upon the non-adversarial agreement, even though that evidence may reveal critical details about the effect of the settlement on absent class members.

513.   The Court needs to consider class settlements in terms of separation of powers because maintaining the limits of Article III's "case or controversy" requirements is fundamental for protecting the individual liberties of all. By authorizing a federal court to redistribute

resources as a means of enforcing legislative directives absent an adversary adjudication, the settlement class action effectively transforms the Court into an administrative body, which is more appropriately located in the executive branch….and improperly transfers powers reserved to the executive branch to the federal judiciary, in clear contravention of separation-of-powers dictates.

514.  There is no case or controversy in MDL 2179.

515.  "Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund." The Honorable John G. Heyburn II, Chairman, Panel on Multidistrict Litigation, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Transfer Order, August 10, 2010).

516.  "In February 2011, [only 4 months after I appointed my pre-selected cooperative attorneys to the PSC] negotiations began in earnest for the proposed Economic and Property Damages Settlement. Talks intensified in July 2011, occurring on an almost-daily basis." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 7138 at 3, December 21, 2012).

517.  Article III extends federal judicial power solely to the adjudication of a "case" or a "controversy." "Case," in Article III, means a justiciable "action or suit," or an "argument." "Controversy" means a disagreement or a dispute between parties as to the suit's preferred outcome. Both a "case" and a "controversy" require an adversarial suit. For a suit to be justiciable, according to the U.S. Supreme Court, the parties must maintain "adverse legal interests" throughout, and their dispute must be "definite and concrete."

518.  The Fifth Circuit has held that Article III plainly "requires that the parties be truly

adverse."

519.  On the most basic analytical level, the unconstitutionality of the settlement class action should be obvious, purely as a matter of textual construction. There is simply no rational means of defining the terms "case" or "controversy" to include a proceeding in which, from the outset, nothing is disputed and the parties are in complete agreement. Moreover, from both historical and doctrinal perspectives, U.S. Supreme Court decisions could not be more certain that Article III is satisfied only when the parties are truly "adverse" to one another, which, at the time the relevant proceeding is undertaken, they are not in the case of the settlement class action."

520.  The most serious problem with the settlement class action is that by its nature it does not involve any live dispute between the parties that a federal court is being asked to resolve through litigation, and because from the outset of the proceeding the parties are in full accord as to how the claims should be disposed of, there is missing the adverseness between the parties that is a central element of Article III case-or-controversy requirement.

521.  The settlement class action, in sum, is inherently unconstitutional.

522.  The term "collusion," in the class action context, is used to refer to a secret, unethical agreement between the named plaintiffs and defendant. For purposes of Article III's adverseness requirement, however, the term has a far broader meaning. It includes any suit in which, from the outset, the parties are in agreement as to the outcome.

523.  Article III proceeds on the assumption that a showing of a lack of adverseness at the outset of a suit automatically establishes the improperly collusive nature of the suit. Article III adopts lack of adverseness as an ex ante, categorical basis on which to find inadequate

-120-

representation of the interests of future litigants who are similarly situated.

524.  When the plaintiff and defendant agree on settlement terms and the desirability of certification prior to coming to Court, neither party has the incentive to challenge such important questions as whether class representation is "adequate" or the claims are "typical" of the class as a whole. This inherently deprives the Court of the benefit of adversarial litigation concerning the satisfaction of Rule 23's requirements, thereby seriously limiting its ability to protect absent class members.

525.  In contrast to the case-by-case focus employed by class action scholars, Article III employs a far more categorical and prophylactic conception of "collusion." Article III makes an ex ante categorical judgment that a non-adversarial suit is inherently collusive and therefore in violation of constitutional norms. As the U.S. Supreme Court in *Poe v. Ullman*, construing Article III, explained: "The case may not be 'collusive'….in the sense of merely colorable disputes got up to secure an advantageous ruling from the Court. But the Court has found unfit for adjudication any cause that 'is not in any real sense adversary,' that 'does not assume the honest and actual antagonistic assertion of rights' to be adjudicated - a safeguard essential to the integrity of the judicial process, and one which we have held to be indispensable to adjudication of constitutional questions by this Court."

526.  The settlement class's fundamental constitutional defect is that *all* settlement classes - not merely those involving unethical attorney behavior - are, by definition, non-adversarial. An adversarial dispute cannot be said to exist at the time the class action proceeding begins. At that point, the litigants differ over absolutely nothing. They have agreed on the terms of both certification and settlement prior to the filing of the class proceeding. In fact, the only

conceivable reason that class counsel in this position files a complaint and request for certification with the Court, rather than simply embodying the terms of their private agreement in an enforceable contract, is to bind absent class members to a settlement negotiated in their absence.

527.  There is no Due Process in MDL 2179.

528.  "All motions, requests for discovery or other pre-trial proceedings with respect to plaintiffs shall be initiated by and/or coordinated through the Plaintiff Steering Committee ("PSC"), *to be filed by and through Plaintiffs' Liaison Counsel*. If the PSC does not support the motion, discovery or other requested proceeding, then the moving or requesting plaintiff shall be permitted to file such motion or request, but shall include a certificate of non-support." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 569 at 13, October 19, 2010).

529.  "….all pending and future motions, including the Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 676 at 1, November 5, 2010).

530.  "Any individual plaintiff who is a named plaintiff in a case that falls within Pleading Bundle B1, B3, D1, or D2, or any combination thereof, is deemed to be a plaintiff in the applicable Master Complaint(s)….All individual petitions or complaints that fall within Pleading Bundles B1, B3, D1, or D2, whether pre-existing or filed hereafter, are stayed until further order of the Court." The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig*

-122-

*"Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 983 at 2, 4, January 12, 2011).

531.  Each claimant in an MDL has an individually held, constitutionally protected property right at stake. Those rights are guaranteed by the Fifth Amendment, which protects life, liberty, and property against deprivation absent due process of law. The "property" at stake in an MDL is the "chose in action." This historically established concept refers to the right to sue to enforce a legally protected claim, even the unlitigated right to sue. Under the Fifth Amendment, then, MDL claimants cannot be deprived of their rights to a chose in action without due process of law.

532.  In MDL 2179, individual litigants, for all practical purposes, lose a substantial degree of control over the procedural fate of their claims. In sum, MDL 2179 fails to provide a constitutionally adequate opportunity to litigate.

533.  The so-called "day-in-court ideal" is at the heart of constitutionally guaranteed procedural due process, according to the U.S. Supreme Court, and is central to the American conception of the adversarial model of litigation.

534.  MDL 2179 severely undermines the day-in-court ideal by depriving individual litigants of their opportunity to protect their interests through the litigation process.

535.  The right to one's own day-in-court means a right to meaningful control over litigation strategy and goals, including choice of legal representative. It requires a full and fair opportunity to litigate, which means a full opportunity to prepare one's own arguments and evidence. At base, meaningful participation in the adjudicatory process - the day-in-court ideal – includes, in the words of a respected scholar, "the right to observe, to make arguments, to present

evidence, and to be informed of the reasons for a decision."

536.  The U.S. Supreme Court has identified the "two central concerns of procedural due process" to be "the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decision making process." The day-in-court ideal takes account of both of these concerns. First, an individual day-in-court helps achieve accurate outcomes (thus avoiding "unjustified or mistaken deprivations") because the stakeholders, those who will be most affected by the outcome and are the most motivated to protect their own rights, participate in the decision-making process. In addition, individual participation is inherently valuable in a democratic system because it legitimizes the adjudicating entities in the minds of the litigants.

537.  On the surface, MDL practice seems largely innocuous; the JPML merely temporarily transfers cases to a different district court for pretrial matters. But for a variety of reasons transfer effectively amounts to the end of the road for the overwhelming majority of cases. This is troublesome from a constitutional perspective, because not even the most minimal protection of the day-in-court ideal from the perspective of either the paternalism or autonomy models is satisfied.

538.  MDL 2179 Plaintiffs in no sense meaningfully participate in, much less control, their day-in-court. Nor are there any assurances that those in charge of the litigation are adequately representing the interest of the individual claimants.

539.  One key way that litigants control their day-in-court is by selecting their attorneys. This is often the first expression of their autonomy: they seek the advice of counsel when they consider whether to even file a claim.

540.  Permitting litigants to choose their representatives is central to providing a full and fair opportunity to litigate. The foundations of due process dictate that that choice belongs to the parties alone. But claimants forced into an MDL are deprived of that essential choice. By virtue of his case's transfer into the MDL - a move that the plaintiff cannot prevent - his chosen lawyer will invariably not be the one actually representing his interests in the course of all the important MDL. Rather, the lawyers on the court-appointed steering committee will take over, and they will do so without the protective assurances of either there adequacy, their good faith, or the extent to which the interests of the absent litigants truly overlap or any other controls.

541.  When a transferee judge appoints a steering committee, he does so at his discretion, outside the strictures of any Federal Rule, or statute, or adversary proceeding. Appointment to the steering committee comes after nothing more than a judge-designated period of nominations and written objections. The process fails to guarantee that the appointed representatives will zealously advocate on behalf of absent litigants in the same way that their hired representative presumably would have. This is certainly the case in MDL 2179.

542.  In addition to the fact that appointed counsel are selected by the Court, rather than by the individuals they represent, MDL claimants do not enjoy a traditional attorney-client relationship with the members of the court-appointed steering committee. The small group of attorneys chosen for leadership roles is charged with representing all of the possibly thousands of plaintiffs, whose cases have facts that are often only loosely linked.

543.  MDL 2179 falls far short of providing the "deep-rooted historic tradition" of an individual's day-in-court.

544.  In consolidated proceedings, the attorney's loyalty divides not only between clients,

but also between clients and self-interest. Compensation for attorneys who work on behalf of the group depends upon the value of every plaintiff's settlement or judgment. As a result, PSC attorneys may push hard for settlement as opposed to remand, prefer a quick settlement in favor of a protracted discovery period, or advocate for settlement terms that may not be particularly favorable to some or many plaintiffs. The First Circuit has acknowledged existence of this "inherent conflict of interest" between the PSC and individual plaintiffs in mass-tort MDLs.

545.  At the most basic level, MDL 2179 Plaintiffs are not given a meaningful opportunity to present their case(s), as demanded by the Due Process Clause.

546.  In MDL 2179, the opt-out mechanism under Rule 23(b)(3) should be abandoned in favor of an opt-in mechanism that requires absent class members to take some affirmative action before being swept into a class action.

547.  Generally a waiver of constitutional rights requires some affirmative action on the part of an individual holding such rights.

548.  The opt-out mechanism under Rule 23(b)(3) should be abandoned in favor of an opt-in mechanism that requires absent class members to take some affirmative action before being swept into a class action. Allowing fundamental due process rights to be waived simply by inaction, as under the current version of the rule, does not sufficiently protect such constitutional rights.

549.  The existing Rule 23(b)(3) opt-out procedure also violates the Due Process Clause by departing from key notions of democratic theory.

550.  As a due process matter, rights belong to individuals and cannot be taken away by operation of a procedural rule unless individuals willingly choose to participate in that process.

Another way of thinking about this is that litigants have a right to freedom of association or, rather, freedom to be free from association with a class.

551.  It might be argued that the individual litigants do have the right to opt-out of any settlement reached in the course of the MDL, and therefore their due process rights have not been compromised. But it should be recalled that even if a litigant does withdraw from the collective settlement, his right to control adjudication of his own claim will have been substantially compromised by the collective, lowest-common-denominator control of the pre-trial process, including all important discovery and pre-trial motions.

552.  A narrow focus on result orientation cannot allow the circumvention of the Rules Enabling Act, basic separation-of-powers principles, the case-or-controversy requirement of Article III, or the core democratic premises of transparency, representation and accountability.

553.  In sum, Defendant Herman cannot be allowed to sacrifice constitutional rights for mere judicial efficiency or convenience.

554.  As the Honorable Carl J. Barbier instructs, Defendant Herman's conduct with regard to Defendant's oversight of MDL 2179 is governed by the Oil Pollution Act of 1990.

555.  The Oil Pollution Act of 1990 creates statutory standards that are intended to protect and benefit Plaintiff, Plaintiff's clients, and all others similarly situated.

556.  MDL 2179 is Unconstitutional - At all times material herein, Defendant Herman, individually and/or in collusion with the members of the MDL 2179 PSC and BP, fraudulently, recklessly, negligently and/or knowingly breached his fiduciary and ethical duties to Plaintiff, Plaintiff's clients, and all others similarly situated by exercising oversight of a multidistrict litigation which is unconstitutional. MDL 2179, which employs a victims' compensation fund on

the frontend and a settlement class action on the backend, involves no case or controversy and infringes individual claimants' procedural due process rights.

557.  The MDL 2179 Court, Defendant Herman, the PSC, BP, and Patrick Juneau knew that BP would only pay a total amount of $20 billion to BP oil well blowout victims. Accordingly, the plaintiffs should have been informed that Patrick Juneau would pay less than 40% of the submitted claims. Instead, in order to limit the number of plaintiffs who would opt-out, the MDL 2179 Court and PSC intentionally misled the plaintiffs by telling them that "the settlement has *no cap or limit*."

558.  In MDL 2179, as a direct result of Defendant Herman's actions, the comatose, hapless plaintiffs received little or no compensation while Defendant Herman and the members of the MDL 2179 PSC have been enriched in the estimated amount of *$3.035 billion*.

559.  Defendant Herman and Members of the PSC and their law firms in the BP oil well blowout MDL ("MDL 2179") are not double-dipping. They are quadruple-dipping.

560.  The known sources of compensation received by Defendant Herman and the members of the PSC and their law firms in MDL 2179 are: common benefit fees, contingent fees, co-counsel fees, and "Hold-Backs."

561.  Courts have consistently held that where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated.

562.  Plaintiff, Plaintiff's clients, and all others similarly situated acted in justifiable reliance on Defendant Herman's concealment; and Plaintiff, Plaintiff's clients, and all others similarly situated were damaged as a result.

563.   MDL 2179, which employs a victims' compensation fund on the frontend and a

settlement class action on the backend, involves no case or controversy and infringes individual claimants' procedural due process rights. As a direct and proximate result of Defendant Herman knowingly, deliberately, and/or with a reckless disregard of the truth actively concealing from Plaintiff, Plaintiff's clients, and all others similarly situated, with the intent to defraud or deceive Plaintiff, Plaintiff's clients, and all others similarly situated, the material fact that he exercised oversight of a multidistrict litigation which is unconstitutional, Plaintiff, Plaintiff's clients, and all others similarly situated have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, lost time value of money and the excess legal expenses incurred, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss.

564.  Plaintiff, Plaintiff's clients, and all others similarly situated would have been fully compensated for their damages by the OPA or won their cases and received compensation if Defendant Herman had not concealed these material facts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Donovan demands judgment against Defendant as follows:

(a) Economic and compensatory damages in amounts to be determined at trial;

(b) Punitive damages;

(c) Treble damages if Defendant is guilty of deceit or collusion or consented thereto with intent to deceive the court, judge or party ("If an attorney is guilty of deceit or collusion or consents thereto with intent to deceive the court, judge or party, he shall forfeit to the injured party, treble damages to be recovered in a civil action . . . .");

(d) Fee Forfeiture if Defendant Herman breached his fiduciary duties to Plaintiff,

Plaintiff's clients, and/or all others similarly situated;

(e) Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(f) Attorney's fees and costs of litigation;

(g) Such other and further relief as the Court may deem just and appropriate; and

(h) A trial by jury as to Defendant on all issues so triable.


DATED: February 12, 2019                         Respectfully submitted,

                                                 **/s/ Brian J. Donovan**
                                                 **Brian J. Donovan, Esq.**
                                                 Florida Bar No. 143900
                                                 Email Address:
                                                 brianjdonovan@verizon.net
                                                 3102 Seaway Court, Suite 304
                                                 Tampa, FL 33629
                                                 Tel: (352)328-7469
                                                 Plaintiff and Attorney for Plaintiffs