IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DARNETTA EATON** | * | |
| PLAINTIFF, | | |
| **VERSUS** | * | **CIVIL ACTION NO. 19-12694** |
| | | |
| **BP EXPLORATION & PRODUCTION,** | * | |
| INC., A DELAWARE CORPORATION, | | |
| **BP AMERICA PRODUCTION CO.,** | * | **JUDGE BARBIER** |
| A DELAWARE CORPORATION, | | |
| **CAMERON INTERNATIONAL CORP.,** | * | |
| A DELAWARE CORPORATION, | | |
| **TRANSOCEAN HOLDINGS, LLC.,** | * | **MAG. JUDGE WILKINSON** |
| A DELAWARE CORPORATION, | | |
| **TRANSOCEAN DEEPWATER, INC.,** | * | |
| A DELAWARE CORPORATION, | | |
| **TRANSOCEAN OFFSHORE** | * | |
| DEEPWATER DRILLING, INC., | | |
| A DELAWARE CORPORATION, | * | |
| **HALLIBURTON ENERGY SERVICES** | | |
| INC., A DELAWARE CORPORATION, | * | |
| | | |
| **DEFENDANTS.** | | |

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW,** Plaintiff, DARNETTA EATON ("Plaintiff"), by and through the undersigned counsel, and hereby brings this cause of action against BP Exploration & Production, Inc. ("BP Exploration"), BP America Production Co. ("BP America"), Cameron International Corp. ("Cameron"), Transocean Holdings, LLC ("Transocean Holdings"), Transocean Deepwater, Inc. ("Transocean Deepwater"), Transocean Offshore Deepwater Drilling Inc. ("Transocean Offshore"), Halliburton Energy Services, Inc. ("Halliburton"), hereinafter collectively referred to as ("Defendants"). Plaintiff alleges the following upon information and belief:

1

## INTRODUCTION

1. This is an action for the Defendants' negligence, gross negligence, and negligence per se resulting in serious injuries to the Plaintiff.

2. Plaintiff's injuries were caused by exposure to toxic substances due to the BP Deepwater Horizon Oil Spill on April 20, 2010 ("BP Oil Spill").

## PARTIES
### Plaintiff

3. Plaintiff at all times relevant hereto, was a resident of the State of Alabama. She suffered injuries and damages as a direct, proximate result, or both, of her exposure to Defendants' toxic substances, resulting from the BP Oil Spill.

4. Plaintiff was exposed to said harmful substances during her visits to Gulf Shores, AL.

5. At the time of her injury, Plaintiff resided in 1102 Forest Hill Drive, Mobile, AL 36618 and currently resides at 154 Park Drive, Mobile, AL 36606.

### Defendants
*BP Exploration*

6. BP Exploration is a Delaware corporation with its principal place of business located in Houston, Texas.

7. BP Exploration was a leaseholder and performed oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, (hereinafter the "Macondo Well") where the oil spill originated.

8. BP Exploration was designated as a "responsible party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714.

9. BP Exploration purposely availed itself of the Court's personal jurisdiction by having performed various acts that were related to the BP Oil Spill including:

    i. Managing clean-up and/or response activities in or around the shores of Alabama, Louisiana, Mississippi, Florida and Texas (hereinafter "Gulf States" at all relevant times;

    ii. Pumped crude oil that ended up throughout the coasts of the Gulf States;

    iii. Directed and participated with Unified Command, contracting with various clean-up crew companies throughout the Gulf States; and

    iv. Engaged in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that include petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities.

### *BP America*

10. BP America is a Delaware corporation with its principal place of business in Houston, Texas.

11. BP America was a party to the drilling contract with Transocean Holdings for the drilling of the Macondo Well.

12. BP America purposely availed itself of the Court's personal jurisdiction by having performed various acts that were related to the BP Oil Spill including:

    i. Managed clean-up and/or response activities in or around the Gulf States at all relevant times;

    ii. Pumped crude oil that ended up all throughout the coasts of the Gulf States;

    iii. Directed and participated with Unified Command, contracting with various clean-up crew companies throughout the Gulf States; and

    iv. Engaged in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that include petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities.

13. BP America and BP Exploration will hereinafter collectively be referred to as "BP Defendants".

### *Cameron*

14. Cameron is a Delaware corporation with its principal place of business located in Houston, Texas.
15. Cameron does business within this District and throughout the United States.
16. Cameron is a global provider of pressure control, processing flow control, compression systems, as well as a provider for project management and aftermarket services for the oil and gas and process industries.
17. Cameron is the leading U.S. supplier of customized electrostatic de-salters used in the oil refining industry.
18. Cameron was the manufacturer of the blow-out preventer ("BOP") used on the Deepwater Horizon Rig (hereinafter "DHR").

### *Transocean*

19. Transocean Holdings, Transocean Deepwater, and Transocean Offshore are Delaware corporations (hereinafter referred to collectively as "Transocean Defendants") with their principal place of business located in Houston, Texas.
20. Transocean Defendants purposely availed themselves of the Court's personal jurisdiction by having performed various acts that were related to the BP Oil Spill, including:
    i. Engaging in clean-up and/or response activities in or around the Gulf States at all relevant times;
    ii. Manned and guided the DHR, which exploded while pumping crude oil, resulting in the mass discharge and prolonged seepage of crude oil throughout the coasts of the Gulf States;

    iii. Directed and participated with Unified Command, contracting with various disaster response companies which supplied the clean-up workers tasked with removing and/or collecting oil from the beaches and shores of the Gulf States.

    iv. Engaged in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that included petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities.

*Halliburton*

21. Halliburton is a Delaware Corporation with its principal place of business in Houston, Texas.

22. Halliburton purposely availed itself of the Court's personal jurisdiction by having manufactured, as a subcontractor for BP America and/or BP Exploration, a nitrogen foam cement slurry mixture (hereinafter "Cement Mixture"), to provide cementing and mudlogging services for the DHR.

**JURISDICTION AND VENUE**

23. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332(a) because complete diversity exists among the parties, as all Defendants are all incorporated and have their principal places of business in states other than the state in which Plaintiff resides. Additionally, the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs.

24. This venue is proper for filing in this District pursuant to both 28 U.S.C. § 1407 and the Transfer Order of the Judicial Panel on Multidistrict Litigation, which allows Plaintiff to directly file complaints arising out of the BP Oil Spill in this District. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352 (J.P.M.L. 2010); *See Also Pretrial Order No. 20* (Rec. Doc. 904).

25. Additionally, this Court has Jurisdiction based on Federal Question under 28 U.S.C. §1331, in that Article III, Section 2 of the United States Constitution empowers the federal judiciary to hear "all cases of admiralty and maritime jurisdiction"

26. This Court also has jurisdiction pursuant to 28 U.S.C. §1333; as well as the Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to "cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land."

27. Notwithstanding the above, the most appropriate venue in accordance with U.S.C. §1391(b)(2) is the Southern District of Alabama, as Plaintiff was exposed in the Southern District of Alabama, the Plaintiff currently lives in the Southern District of Alabama, and Plaintiff's most relevant witnesses and evidence is located in the Southern District of Alabama. Considering the relative ease of access to sources of proof, the ability to secure attendance of witnesses and ability to minimize costs of witnesses, the appropriate venue for this cause of action is the Southern District of Alabama. Plaintiff may seek to have this matter transferred to the appropriate venue in the Southern District of Alabama.

28. All other prerequisites to file this action have been satisfied by Plaintiff.

**SUMMARY OF FACTS**
**General Summary of Facts**

29. Plaintiff incorporates all findings of facts and conclusions of law detailed in *Findings of Fact and Conclusions of Law - Phase One Trial* ("Phase One Findings"), MDL No. 2179, Rec. Doc. 13355, (E.D. La. Sept. 4, 2014).

30. Pursuant to Federal Law, Phase One Findings are binding as to all Defendants listed within this Complaint.

31. All injuries detailed within this Complaint arise from the same transaction and/or occurrence relating to the BP Oil Spill, Deepwater Horizon explosion and subsequent oil spill related events.

### BP Oil Spill
Deepwater Horizon

32. BP Oil Spill includes the events, actions, inactions, and omissions leading up to and including:

   i. The blowout of the Macondo Well which was drilled by the Transocean Marianas and Deepwater Horizon rigs on the outer continental shelf in the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana;

   ii. The explosions and fire on board the DHR on or about April 20, 2010;

   iii. The sinking of the DHR on or about April 22, 2010;

   iv. The release of oil, other hydrocarbons, and other toxic substances from the Macondo Well and/or the DHR and its appurtenances;

   v. The efforts to contain the Macondo Well; and

   vi. Response activities performed by clean-up workers under the direction of Unified Command.

33. On or about December 9, 1998, predecessors to all BP Defendants[1] and all Transocean Defendants[2] entered into a contract for the construction, use, and operation of the DHR.

34. BP Defendants were the operators of the Macondo Well under federal regulations of the Minerals Management Service ("MMS") therefore it was the entity the lessee(s) designated as having control or management of operations.

---

[1] The phrase "BP Defendants" is used hereinafter to refer to BP Exploration & Production, Inc. and BP America Production Co. collectively.
[2] Like the phrase "BP Defendants" before it, the phrase "Transocean Defendants" is used hereinafter to collectively refer to the various Transocean entities cited above.

35. As operators and primary leaseholders, BP Defendants were responsible for but not limited to assessing the geology of the site, engineering the well design, obtaining regulatory approvals for well operations, retaining, and overseeing the projects contractors, and working on various aspects of the well and drilling operations.

### DW Toxic Chemicals

36. For purposes of this complaint, crude oil, hydrocarbons, benzene, or products containing benzene, associated with the clean-up efforts hailing from the Macondo Well and the DHR explosion, will collectively be known as "DW Toxic Chemicals."

37. The crude oil carried with it significant public health risks, containing many highly toxic chemical ingredients that can damage the various system in the body.

38. Crude oil contains benzene and other volatile organic compounds such as ethylbenzene, toluene, xylene and naphthalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes and heavy metals such as aluminum, cadmium, nickel, lead and zinc, all of which cause severe harm to human health.

39. Chemicals such as benzene, PAHs, and many other chemicals in crude oil are toxic, and move from the oil into the air. Once airborne, these chemicals, with pungent petroleum like odors, can blow over the ocean for miles, reaching communities far from the location of the spill.

40. According to the Agency for Toxic Substances and Disease Registry, which is part of the U.S. Department of Health and Human Services, benzene is a known mutagen and carcinogen. Benzene in crude oil can cause a variety of health complications, including ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain, and lethal central nervous system depression.

41. A 2007 Centers for Disease Control review of benzene toxicity concluded that there is substantial evidence that benzene causes leukemia, chromosomal abnormalities in lymphocytes and bone marrow cells, damage to the immune system, and abnormal development of blood cells. Long term, low-level oral and inhalation exposures to benzene have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping, memory loss, and even cancer.

42. As a result of the explosion of the DHR, DW Toxic Chemicals and many highly toxic dispersants were released from the Macondo Well and reached the shores of the Gulf States.

Toxic Dispersants

43. Aside from DW Toxic Chemicals, BP Defendants purchased highly noxious chemical dispersants from Nalco and/or its subsidiaries and sprayed them as part of the response activities performed in the clean-up efforts. These dispersants include Corexit EC9500A and Corexit EC9527A.

44. The Material Safety Data Sheet ("Data Sheet")[3] for Corexit EC9500 indicates that it contains hazardous substances; it is harmful to human health; and that dermal exposure, inhalation, and ingestion should be avoided. The Data Sheet further states that Corexit EC9500 is an eye and skin irritant and may irritate the respiratory tract if inhaled. If ingested, it may cause chemical pneumonia.

45. Corexit EC9527A contains 2-butoxyethanol, also known as EGBE. Repeated or excessive exposure to EGBE may cause injury to red blood cells, the kidneys, and the liver. EGBE may be carcinogenic to humans. It is an eye, nose, and throat irritant. It can cause nausea, vomiting, diarrhea, and abdominal pain. Exposure to EGBE can also cause headaches, dizziness,

---

[3] A form that sets forth the properties of a particular substance, including its toxicity and health effects.

lightheadedness, and unconsciousness.

46. All of the aforementioned harmful dispersants, Corexit EC9500A and Corexit EC9527A, are hereinafter collectively referred to as "Toxic Dispersants."

47. According to the BP Deepwater Horizon Gulf Study, funded by BP Defendants themselves, it has been shown that upstream petrochemical workers, who are likely to have many exposures similar to that of oil spill clean-up workers, have reported experiencing leukemia, multiple myeloma, melanoma, and esophageal adenocarcinoma.

48. BP Defendants, despite being aware of the risks that response vessels would face, failed to provide adequate training, inspect vessels, and respond to worker safety concerns. BP Defendants ignored these concerns despite OSHA warnings, notifications by the U.S. Department of Health and Human Services, and complaints of illnesses from the clean-up workers after they were exposed to oil and dispersants.

49. According to BP's Gulf Study, based on the health effects of zone residents and clean-up workers around the BP Oil Spill, the toxic effects on the human body are 52 times more toxic when Corexit and crude oil are combined.

50. On or about April 23, 2010, BP Defendants and/or their agents began applying Toxic Dispersants to the oil on the surface of the Gulf of Mexico. Toxic Dispersants were sprayed onto the ocean surface from aircrafts that flew over areas with oil and dispensed chemicals from cargo holds, fountain type jets on the decks of boats, and smaller vessels onto the surface of the water. Toxic Dispersants were also injected immediately below the surface of the water from vessels, deep below the surface of the ocean, and even sprayed by hand. These Toxic Dispersants were sprayed day and night, exposing anyone near the coastal areas, despite warnings not to.

Plaintiff

51. At all times relevant, Plaintiff resided in 1102 Forest Hill Drive, Mobile, AL 36618.

52. While still residing in Mobile, AL, and on numerous occasions following the April 20, 2010 BP Oil Spill, Plaintiff spent considerable time on the beaches of Gulf Shores, AL and in the waters of the Gulf of Mexico. Particularly, Plaintiff vacationed with her family to the beaches of Gulf Shores, Alabama, on or about April 23, 2010, to April 29, 2010. Plaintiff spent hours swimming in the ocean on each day of her visit ("Gulf Shores, Alabama Beach Visit").

53. During the Gulf Shores, AL Beach Visit, Plaintiff was exposed to *DW Toxic Chemicals*. This exposure was sufficient to be the legal and proximate cause of Plaintiff' injuries, including Multiple Myeloma and dermal conditions.

54. The *Industrial Union Dep't AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607 (1980) decided that a link exists between benzene, one of the *DW Toxic Chemicals*, and Cancer.

55. BP Defendants' aerial spray planes negligently and/or intentionally sprayed Nalco's Toxic Dispersants on the water, despite the presence of boats and families being in the vicinity of the spraying.

56. BP Defendants, aware of the risks, failed to respond to civilian safety concerns. These acts continued despite OSHA warnings, notifications by the U.S. Department of Health and Human Services, and complaints of illnesses by exposed civilians.

57. Plaintiff was exposed to *DW Toxic Chemicals* and Toxic Dispersants as a resident living in proximity to the Gulf of Mexico and enjoying such waters of the Gulf, where the harmful effects of the BP Oil Spill were most strongly felt.

58. The exposure to *DW Toxic Chemicals* and Toxic Dispersants was sufficient to be the legal and proximate cause of Plaintiff' injuries, including the manifestation of Multiple Myeloma and dermal conditions.

## **COUNT I - NEGLIGENCE**

59. Plaintiff incorporates and re-alleges into Count I paragraphs 1 – 58 as if the same were specifically set forth herein, and further alleges:

58. Plaintiff claims that Defendants were negligent in its involvement in the BP Oil Spill, the aftermath which ultimately resulted in the injuries to Plaintiff.

59. At all times material hereto, Defendants owed duties of ordinary and reasonable care to Plaintiff.

60. Defendants failed to use the standard of care that an ordinary, reasonable, and prudent person would use under similar circumstances.

61. Defendants owed the following duties to Plaintiff:

   i. A duty to warn Plaintiff, public officials, and government agencies of the harmful effects of DW Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, a naturally occurring component in crude oil;

   ii. A duty to properly warn Plaintiff to avoid exposure to hazardous substances encountered in connection with the BP Oil Spill, including relief efforts because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

   iii. A duty to implement a mechanism to ensure the continued safety of Plaintiff when safety issues arose, such as but not limited to, foreseeable injuries;

   iv. A duty to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

- v. A duty to ensure that Toxic Dispersants were sprayed safely to avoid contact with people, including Plaintiff, and in a manner that would assure Plaintiff' health and safety;

- vi. A duty to coordinate and conduct aerial spraying in a manner so as to eliminate the risk to Plaintiff from being exposed to DW Toxic Chemicals;

- vii. A duty to maintain, monitor, and operate, the DHR in a reasonably safe manner so as not to avoid harm to foreseeable Plaintiffs like Plaintiff.

- viii. A duty to inspect the BOP to ensure that it was not faulty and would not fail during reasonable use so as not to avoid harm to foreseeable Plaintiffs like Plaintiff.

- ix. A duty to properly produce, manufacture and inspect cement slurry mixture before use so as not to avoid harm to foreseeable Plaintiffs like Plaintiff.

- x. A duty to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Plaintiff.

62. Defendants breached their duty of care when they:

- i. Failed to warn Plaintiff of the harmful effects of DW Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, the naturally occurring component in crude oil, which have come into contact with Plaintiff person and the local environment and ecosystem;

- ii. Failed to properly warn Plaintiff to avoid exposure to hazardous substances encountered in connection with the BP Oil Spill and relief efforts, despite the great dangers associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

- iii. Failed to implement a basic mechanism to ensure the continued safety of Plaintiff, by

       allowing the spraying of Toxic Dispersants in the vicinity of Plaintiff and other residents;

  iv. Failed to abide by the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and in shallow waters;

  v. Failed to ensure that Toxic Dispersants were sprayed in a manner that would avoid contact with Plaintiff and in a manner that would ensure Plaintiff health and safety; and

  vi. Failed to coordinate and conduct aerial spraying in a manner so as to eliminate the risk to Plaintiff from being exposed to *DW Toxic Chemicals*;

  vii. Failed to maintain, monitor, and operate, the DHR in a reasonably safe manner so as not to avoid harm to foreseeable Plaintiffs like Plaintiff.

  viii. Failed to inspect the BOP to ensure that it was not faulty and would not fail during reasonable use so as not to avoid harm to foreseeable Plaintiffs like Plaintiff.

  ix. Failed to properly produce, manufacture and inspect cement slurry mixture before use so as not to avoid harm to foreseeable Plaintiffs like Plaintiff.

  x. Failed to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Plaintiff.

63. The aforementioned Defendants' breach directly and proximately caused Plaintiff's injuries, which include Multiple Myeloma and dermal conditions.

64. As a direct and proximate result of Defendants' breach of their above-mentioned duties, Plaintiff suffered injury, loss, and damages. Due to Defendants' negligence, Plaintiff was exposed to DW Toxic Chemicals and Toxic Dispersants, which resulted in her injuries.

**WHEREFORE** Plaintiff respectfully demands judgment against Defendants by awarding

Plaintiff damages pursuant to Ala. Code § 6-11-1and any other relief this Court deems just and proper.

## COUNT II – GROSS NEGLIGENCE

65. Plaintiff incorporates and re-alleges into Count II paragraphs 1 – 64 as if the same were specifically set forth herein, and further alleges.

66. Plaintiff claims that Defendants were grossly negligent in their involvement in the DHR explosion, the aftermath of which ultimately resulted in her injuries.

67. At all times material hereto, Defendants' owed duties of ordinary and reasonable care to Plaintiff.

68. Defendants consciously or deliberately engaged in wantonness with regard to Plaintiff, in that its conduct was carried on with a reckless or conscious disregard of the rights and safety of Plaintiff.

69. Defendants owed the following duties to Plaintiff:

   i. A duty to warn Plaintiff, public officials, and government agencies of the harmful effects of DW Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, a naturally occurring component in crude oil;

   ii. A duty to properly warn Plaintiff to avoid exposure to hazardous substances encountered in connection with the BP Oil Spill, including relief efforts because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

   iii. A duty to implement a mechanism to ensure the continued safety of Plaintiff when safety issues arose, such as but not limited to, foreseeable injuries;

   iv. A duty to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

    v. A duty to ensure that Toxic Dispersants were sprayed safely to avoid contact with people, including Plaintiff, and in a manner that would assure Plaintiff' health and safety;

    vi. A duty to coordinate and conduct aerial spraying in a manner so as to eliminate the risk to Plaintiff from being exposed to *DW Toxic Chemicals*;

    vii. A duty to maintain, monitor, and operate, the DHR in a reasonably safe manner so as not to avoid harm to foreseeable Plaintiffs like Plaintiff.

    viii. A duty to inspect the BOP to ensure that it was not faulty and would not fail during reasonable use so as not to avoid harm to foreseeable Plaintiffs like Plaintiff.

    ix. A duty to properly produce, manufacture and inspect cement slurry mixture before use so as not to avoid harm to foreseeable Plaintiffs like Plaintiff.

    x. A duty to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Plaintiff.

70. Defendants breached their duty of care when they:

    i. Failed to warn Plaintiff of the harmful effects of *DW Toxic Chemicals*, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, the naturally occurring component in crude oil, which have come into contact with Plaintiff person and the local environment and ecosystem;

    ii. Failed to properly warn Plaintiff to avoid exposure to hazardous substances encountered in connection with the BP Oil Spill and relief efforts, despite the great dangers associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

    iii. Failed to implement a basic mechanism to ensure the continued safety of Plaintiff, by

16

        allowing the spraying of Toxic Dispersants in the vicinity of Plaintiff and other residents;

    iv. Failed to abide by the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and in shallow waters;

    v. Failed to ensure that Toxic Dispersants were sprayed in a manner that would avoid contact with Plaintiff and in a manner that would ensure Plaintiff health and safety; and

    vi. Failed to coordinate and conduct aerial spraying in a manner so as to eliminate the risk to Plaintiff from being exposed to *DW Toxic Chemicals*;

    vii. Failed to maintain, monitor, and operate, the DHR in a reasonably safe manner so as not to avoid harm to foreseeable Plaintiffs like Plaintiff.

    viii. Failed to inspect the BOP to ensure that it was not faulty and would not fail during reasonable use so as not to avoid harm to foreseeable Plaintiffs like Plaintiff.

    ix. Failed to properly produce, manufacture and inspect cement slurry mixture before use so as not to avoid harm to foreseeable Plaintiffs like Plaintiff.

71. Failed to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Plaintiff.

72. Defendants' actions were grossly negligent because they knew or should have known of the dangers involved with oil drilling and the danger of dealing with DW Toxic Chemicals and Toxic Dispersants, especially given their deficient safety record in the decade leading up to the blast.

73. Defendants' history involves a distressing legacy of an unsafe corporate culture, riddled with routine deviations from corporate procedures, in its attempt to save money at the risk of casualty and/or loss of life.

74. As a direct and proximate result of Defendants' breach of their above-mentioned duties, Plaintiff suffered injury, loss, and damages. Due to Defendants' gross negligence, Plaintiff was exposed to DW Toxic Chemicals and Toxic Dispersants and was diagnosed with Multiple Myeloma and dermal conditions.

    **WHEREFORE** Plaintiff respectfully demands judgment against Defendants by awarding Plaintiff punitive damages pursuant to Ala. Code § 6-11-20, and/or general maritime law in and an amount to be determined at trial and additionally any other relief this Court deems just and proper.

## **COUNT III – NEGLIGENCE PER SE**

75. Plaintiff incorporates and re-alleges into Count II paragraphs 1 – 74 as if the same were specifically set forth herein, and further alleges.

76. Plaintiff claims that Defendants involvement in the DHR explosion, the aftermath of which ultimately resulted in her injuries constitutes negligent per se.

77.  Defendants conduct with regard to the manufacture, maintenance and/or operations of drilling operations of DHR and release of DW Toxic Chemicals is governed by numerous state and federal laws and permits under the authority of these laws. These laws and permits create statutory and regulatory standards that are intended to protect and benefit Plaintiff, including but not limited to those set forth in Section 311 of the Clean Water Act, 40 C.F.R § 300 APP. E, 30 C.F.R. Part 254 and the Oil Pollution Act of 1990, 33 U.S.C. § 2717 (b).

78. Defendants violation of these statutory and/or regulatory standards constitutes negligence per se under Federal and Alabama laws.

    **WHEREFORE** Plaintiff respectfully demands judgment against Defendants by awarding Plaintiff damages pursuant to Ala. Code § 6-11-1, and any other relief this Court

deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against the above referenced Defendants as follows:

 i. Economic and compensatory damages in amounts to be determined at trial;
 ii. Punitive damages;
 iii. Pre-judgment and post-judgment interest at the maximum rate allowable by law;
 iv. Attorneys' fees and cost of litigation; and
 v. Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.
 vi. Plaintiff demands a trial by jury.

This Amended Complaint was filed by undersigned counsel this 14th day of October 2019.

Respectfully Submitted,

**THE DOWNS LAW GROUP, P.A.**

/s/ Nathan L. Nelson
**NATHAN L. NELSON, FL BAR #1002523**
3250 Mary Street, Suite 307
Coconut Grove, FL 33133
Telephone: (305) 444-8226
Facsimile: (305)-444-6773
Email: nnelson@downslawgroup.com
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct going of the foregoing instrument has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 14th day of October 2019.

                                                    */s/ Nathan L. Nelson*

                                                    Nathan L. Nelson Esq.