# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

February 04, 2020

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

        No. 18-31177    In re: Deepwater Horizon
                        USDC No. 2:10-MD-2179
                        USDC No. 2:12-CV-970

The court has granted the joint motion to supplement the record in this case with additional documents. The originating court is requested to add the attached motion to their court's docket, and add exhibit documents attached as Exhibit 1 and Exhibit 9 to their court's docket as those documents were not previously filed in the originating court; and then please provide us with a supplemental electronic record consisting of the exhibit documents outlined in the attached motion as Exhibits 1 through 25.

Counsel is reminded that any citations to these documents must cite to the supplemental electronic record.

                            Sincerely,

                            LYLE W. CAYCE, Clerk

                            *Dantrell Johnson*

                            By: _____
                            Dantrell L. Johnson, Deputy Clerk
                            504-310-7689

Mr. William Gray Chason
Ms. Kristina Morgan Sanders Hofferber
Mr. R. Stanton Jones
Mr. James Andrew Langan
Ms. Carol L. Michel
Mr. Matthew Regan
Mr. Devin Chase Reid

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

CASE NO, 18-31177

In re: Deepwater Horizon

---

LAKE EUGENIE LAND & DEVELOPMENT, INCORPORATED, ET AL
        Plaintiffs,

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP
AMERICA PRODUCTION COMPANY; BP, P.L.C
        Defendants-Appellees

v.

CLAIMANT ID 100118552; CLAIMANT ID 100282515
        Claimants-Appellants


CONSOLIDATED WITH 19-30267

TURBO PUMP SERVICES, INCORPORATED,
        Plaintiff-Appellant


PLAINTIFF-APPELLANT

v.

PATRICK JUNEAU; BP EXPLORATION & PRODUCTION,
INCORPORATED; BP AMERICA PRODUCTION COMPANY; BP,
P.L.C.
        Defendants-Appellees.

## JOINT MOTION TO SUPPLEMENT THE RECORD ON APPEAL

Comes now MMR Group, Inc. d/b/a MMR Constructors, Inc. ("MMR"), BP Exploration & Production, Inc., BP America Production Co., and BP, p.l.c   (collectively, "BP") pursuant to Rule 10 of the Rules of Appellate Procedure, and jointly move the Court to supplement the record on appeal.[1] On January 27, 2020, MMR's counsel and BP's counsel jointly stipulated certain materials to supplement into the record on appeal in this case.[2]

On December 20, 2018, BP's counsel, with approval from MMR's counsel, submitted a jointly stipulated Designation of the Record on Appeal to the district court. After the Designation of the Record on Appeal was submitted, MMR and BP became aware of certain additional materials that should be included in the record, as they give context to the dispute and will further aid the Court in its analysis of the issues on appeal. On January 23, 2020, the Court granted MMR's unopposed motion to supplement the record

---

[1] MMR is identified as Claimant ID 1001188552. Turbo Pump Services, Inc., identified as Claimant ID 100282515, settled its claims with BP.

[2] Rule 10 of the Federal Rules of Appellate Procedure states: "If anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected and a supplemental record may be certified and forwarded . . . on stipulation of the parties . . . ." Fed. R. App. P. 10(e)(2)(A).

on appeal with the materials in the motion.[3] However, there are additional

materials that MMR and BP believe should be present in the record on

appeal. Accordingly, MMR and BP move to supplement the record on

appeal with the following materials:

| District Court Docket No. | Description | Document No. | Date |
|---|---|---|---|
| 2:10-md-2179 | Transcript from 02/17/17 hearing on Class Counsel's motion to authorize Claims Administrator to implement the settlement agreement with respect to oil and gas support service industry claims | | 02/17/17 |
| 2:10-md-2179 | MMR's First Amended Complaint | 25714 | 06/12/19 |
| 2:10-md-2179 | Claims Administrator's Motion to Dismiss | 25244 | 12/26/18 |
| 2:10-md-2179 | MMR's Opposition and Response to the Claims Administrator's Motion to Dismiss | 25308 | 01/28/19 |

---

[3] Regarding the materials in the unopposed motion which were not supplemented into the record on appeal, the Court instructed MMR's counsel to review case 15-98007, which is designated for the electronic record for case 2:10-MD-2179, to ensure that none of the materials MMR seeks to supplement are present in that "master" record on appeal. The Court informed MMR's counsel that if the additional materials were not present in that record, MMR could file another motion to supplement the record on appeal with those materials. MMR's counsel has reviewed the record on appeal in case 15-98007, and the additional materials that MMR seeks to supplement into the record on appeal in this joint motion are not present in the record on appeal for that case.

3

| 2:10-md-2179 | Claims Administrator's Reply Memorandum in Support of Motion to Dismiss | 25416 | 02/27/19 |
|---|---|---|---|
| 2:10-md-2179 | Pretrial Order No. 67 | 25370 | 02/05/19 |
| 2:10-md-2179 | Claimant 100243047's Motion to Clarify, Alter or Amend the Court's October 3, 2018 Order | 25054 | 10/12/18 |
| 2:10-md-2179 | BP Defendants' Motion to Strike Claimant 100243047's Motion to Clarify, Alter or Amend the Court's October 3, 2018 Order | 26153 | 12/20/19 |
| 2:10-md-2179 | Proposed Rules For Challenging Determination that a Review for Potential "Moratoria Losses" is Required | | 12/27/14 |
| 2:10-md-2179 | Order Regarding Claims in CSSP Subject to Moratoria Hold | 22308 | 02/23/17 |
| 2:10-md-2179 | Order Regarding Insurance Proceeds for Transocean Personnel | 13424 | 09/22/14 |
| Deepwater Horizon Claims Portal—MMR filings | MMR's Deepwater Horizon Economic and Property Settlement Business Economic Loss Claim Form (original claim) | 16642215 | 09/12/12 |
| Deepwater Horizon Claims Portal—MMR filings | MMR's Deepwater Horizon Economic and Property Settlement Business Economic Loss Claim Form (Claim ID: 229610; Baton Rouge) | 19233735 | 08/15/13 |
| Deepwater Horizon Claims Portal—MMR filings | MMR's Deepwater Horizon Economic and Property Settlement Business Economic Loss Claim Form (Claim ID: 229615; Broussard) | 19233736 | 08/15/13 |

| | | | |
|---|---|---|---|
| Deepwater Horizon Claims Portal—MMR filings | MMR's Deepwater Horizon Economic and Property Settlement Business Economic Loss Claim Form (Claim ID: 229616; Belle Chasse) | 19233737 | 08/15/13 |
| Deepwater Horizon Claims Portal—MMR filings | MMR's Deepwater Horizon Economic and Property Settlement Business Economic Loss Claim Form (Claim ID: 229618; Kenner) | 19233738 | 08/15/13 |
| Deepwater Horizon Claims Portal—MMR Filings | Notice Regarding Potential Moratoria Losses (Claim ID: 229610; Baton Rouge) | 20799024 | 10/07/14 |
| Deepwater Horizon Claims Portal—MMR Filings | Notice Regarding Potential Moratoria Losses (Claim ID: 229615; Broussard) | 20896279 | 10/07/14 |
| Deepwater Horizon Claims Portal—MMR Filings | Notice Regarding Potential Moratoria Losses (Claim ID: 229616; Belle Chasse) | 20896298 | 10/07/14 |
| Deepwater Horizon Claims Portal—MMR Filings | Notice Regarding Potential Moratoria Losses (Claim ID: 229618; Kenner) | 20896303 | 10/07/14 |
| Deepwater Horizon Claims Portal—MMR Filings | MMR's Louisiana Business License | 16642210 | 12/11/10 |

| Deepwater Horizon Claims Portal—MMR Filings | MMR's 2010 U.S. Corporation Income Tax Return | 16642212 | |
| Deepwater Horizon Claims Portal—MMR Filings | Expert Correspondence | 19535492 | |
| Deepwater Horizon Claims Portal—MMR Filings | Correspondence with pwc | 24015491 | |
| Deepwater Horizon Claims Portal—MMR Filings | Expert Correspondence pwc | 24022939 | |

Copies of these documents are attached hereto as Exhibits 1-25.

Respectfully submitted,


/s/ WILLIAM G. CHASON
WILLIAM G. CHASON
State Bar No. ASB-5462-151C
wchason@mcdowellknight.com
MORGAN S. HOFFERBER
State Bar No. ASB-1334-542X
mhofferber@mcdowellknight.com

OF COUNSEL:

McDOWELL KNIGHT ROEDDER & SLEDGE, L.L.C.
11 N. Water Street; Suite 13290
Mobile, Alabama 36602
Tel. (251) 432-5300
Fax (251) 432-5303

/s/ R. Stanton Jones (with permission)
R. Stanton Jones
ARNOLD & PORTER
601 Massachusetts Ave.; NW
Washington, District of Columbia
    20001
Tel (202) 942-5765
Fax (251) 432-5303
Stanton.Jones@arnoldporter.com
Attorney for BP Exploration &
Production,  Inc., BP America
Production Co., BP, p.l.c

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

☒     this document contains 819 words, **or**

☐     this brief uses a monospaced typeface and contains
          _____ lines of text.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

☒     this document has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in size 14 Times New Roman font, **or**

☐     this document has been prepared in monospaced typeface using _____ with _____.

January 31, 2020.

_/s/ WILLIAM G. CHASON_____

## MOTION TO SUPPLEMENT RECORD ON APPEAL

## EXHIBIT LIST

| Exhibit No. | District Court Docket No. | Description | Document No. | Date |
|---|---|---|---|---|
| 1 | 2:10-md-2179 | Transcript from 02/17/17 hearing on Class Counsel's motion to authorize Claims Administrator to implement the settlement agreement with respect to oil and gas support service industry claims | | 02/17/17 |
| 2 | 2:10-md-2179 | MMR's First Amended Complaint | 25714 | 06/12/19 |
| 3 | 2:10-md-2179 | Claims Administrator's Motion to Dismiss | 25244 | 12/26/18 |
| 4 | 2:10-md-2179 | MMR's Opposition and Response to the Claims Administrator's Motion to Dismiss | 25308 | 01/28/19 |
| 5 | 2:10-md-2179 | Claims Administrator's Reply Memorandum in Support of Motion to Dismiss | 25416 | 02/27/19 |
| 6 | 2:10-md-2179 | Pretrial Order No. 67 | 25370 | 02/05/19 |
| 7 | 2:10-md-2179 | Claimant 100243047's Motion to Clarify, Alter or Amend the Court's October 3, 2018 Order | 25054 | 10/12/18 |

| 8 | 2:10-md-2179 | BP Defendants' Motion to Strike Claimant 100243047's Motion to Clarify, Alter or Amend the Court's October 3, 2018 Order | 26153 | 12/20/19 |
|---|---|---|---|---|
| 9 | 2:10-md-2179 | Proposed Rules For Challenging Determination that a Review for Potential "Moratoria Losses" is Required | | 12/27/14 |
| 10 | 2:10-md-2179 | Order Regarding Claims in CSSP Subject to Moratoria Hold | 22308 | 02/23/17 |
| 11 | 2:10-md-2179 | Order Regarding Insurance Proceeds for Transocean Personnel | 13424 | 09/22/14 |
| 12 | Deepwater Horizon Claims Portal—MMR filings | MMR's Deepwater Horizon Economic and Property Settlement Business Economic Loss Claim Form (original claim) | 16642215 | 09/12/12 |
| 13 | Deepwater Horizon Claims Portal—MMR filings | MMR's Deepwater Horizon Economic and Property Settlement Business Economic Loss Claim Form (Claim ID: 229610; Baton Rouge) | 19233735 | 08/15/13 |
| 14 | Deepwater Horizon Claims Portal—MMR filings | MMR's Deepwater Horizon Economic and Property Settlement Business Economic Loss Claim Form (Claim ID: 229615; Broussard) | 19233736 | 08/15/13 |

| 15 | Deepwater Horizon Claims Portal—MMR filings | MMR's Deepwater Horizon Economic and Property Settlement Business Economic Loss Claim Form (Claim ID: 229616; Belle Chasse) | 19233737 | 08/15/13 |
|---|---|---|---|---|
| 16 | Deepwater Horizon Claims Portal—MMR filings | MMR's Deepwater Horizon Economic and Property Settlement Business Economic Loss Claim Form (Claim ID: 229618; Kenner) | 19233738 | 08/15/13 |
| 17 | Deepwater Horizon Claims Portal—MMR Filings | Notice Regarding Potential Moratoria Losses (Claim ID: 229610; Baton Rouge) | 20799024 | 10/07/14 |
| 18 | Deepwater Horizon Claims Portal—MMR Filings | Notice Regarding Potential Moratoria Losses (Claim ID: 229615; Broussard) | 20896279 | 10/07/14 |
| 19 | Deepwater Horizon Claims Portal—MMR Filings | Notice Regarding Potential Moratoria Losses (Claim ID: 229616; Belle Chasse) | 20896298 | 10/07/14 |
| 20 | Deepwater Horizon Claims Portal—MMR Filings | Notice Regarding Potential Moratoria Losses (Claim ID: 229618; Kenner) | 20896303 | 10/07/14 |
| 21 | Deepwater Horizon Claims Portal—MMR Filings | MMR's Louisiana Business License | 16642210 | 12/11/10 |

| 22 | Deepwater Horizon Claims Portal— MMR Filings | MMR's 2010 U.S. Corporation Income Tax Return | 16642212 | |
|---|---|---|---|---|
| 23 | Deepwater Horizon Claims Portal— MMR Filings | Expert Correspondence | 19535492 | |
| 24 | Deepwater Horizon Claims Portal— MMR Filings | Correspondence with pwc | 24015491 | |
| 25 | Deepwater Horizon Claims Portal— MMR Filings | Expert Correspondence pwc | 24022939 | |

EXHIBIT 1

```
 1                        UNITED STATES DISTRICT
                      EASTERN DISTRICT OF LOUISIANA
 2

       ************************************************************
 3

       IN RE:  OIL SPILL BY THE              Docket No. MDL-2179
 4     OIL RIG DEEPWATER HORIZON             Section "J"
       IN THE GULF OF MEXICO ON              New Orleans, LA
 5     APRIL 20, 2010                        Friday, February 17, 2017
       CIVIL
 6

       ************************************************************
 7

                      TRANSCRIPT OF STATUS CONFERENCE
 8              HEARD BEFORE THE HONORABLE CARL J. BARBIER
                       UNITED STATES DISTRICT JUDGE
 9

10     APPEARANCES:
       FOR THE PLAINTIFFS:               HERMAN HERMAN & KATZ
11                                       BY:  STEPHEN J. HERMAN, ESQ.
                                         820 O'Keefe Ave.
12                                       New Orleans, LA 70113

13                                       DOMENGEAUX, WRIGHT, ROY & EDWARDS
                                         BY:  JAMES P. ROY, ESQ.
14                                       P. O. Box 3668
                                         556 Jefferson St.
15                                       Lafayette, LA 70502-3668

16     FOR BP AMERICA INC., BP
       AMERICA PRODUCTION COMPANY,
17     BP COMPANY NORTH AMERICA,
       INC., BP CORPORATION NORTH
18     AMERICA, INC., BP EXPLORATION &
       PRODUCTION INC., BP HOLDINGS
19     NORTH AMERICA LIMITED, BP
       PRODUCTS NORTH AMERICA INC.:      KIRKLAND & ELLIS
20                                       BY:  MATTHEW T. REGAN, ESQ.
                                              KRISTOPHER RITTER, ESQ.
21                                       300 N. LaSalle
                                         Chicago, IL 60654
22
                                         LISKOW & LEWIS
23                                       BY:  DON K. HAYCRAFT, ESQ.
                                         One Shell Square, Suite 5000
24                                       701 Poydras St.
                                         New Orleans, LA 70139
25
```

EXHIBIT 1

```
 1    FOR HALLIBURTON
      ENERGY SERVICES, INC.:       REED SMITH
 2                                 BY:  R. ALAN YORK, ESQ.
                                   811 Main St., Suite 1700
 3                                 Houston, TX 77002

 4
      FOR TRANSOCEAN HOLDINGS, LLC,
 5    TRANSOCEAN OFFSHORE DEEPWATER
      DRILLING INC., AND TRANSOCEAN
 6    DEEPWATER
      INC.:                        BAKER DONELSON
 7                                 BY:  KERRY J. MILLER, ESQ.
                                   201 St. Charles Ave., Suite 3600
 8                                 New Orleans, LA 70170

 9    FOR ORM/NRC/SEACOR:          QUINN EMANUEL URQUHART & SULLIVAN
                                   BY:  SYLVIA E. SIMSON, ESQ.
10                                 51 Madison Ave., 22nd Floor
                                   New York, NY 10010
11
      CLAIMS ADMINISTRATOR FOR
12    THE ECONOMIC AND PROPERTY
      DAMAGES SETTLEMENT:          Patrick A. Juneau
13                                 P. O. Box 1439
                                   Hammond, LA 70404-1439
14
      GARRETSON RESOLUTION GROUP:  HILARY CUMMINGS, ESQ.
15                                 JOE BRUEMMER, ESQ.
                                   6281 Tri-Ridge Blvd., Suite 300
16                                 Cincinnati, OH 45140

17    CLAIMS ADMINISTRATOR FOR
      THE HALLIBURTON AND TRANSOCEAN
18    PUNITIVE DAMAGES AND ASSIGNED
      CLAIMS SETTLEMENT AGREEMENTS: MICHAEL J. JUNEAU
19                                 P.O. Box 10260
                                   Dublin, OH 43017-5760
20
      COURT NEUTRALS:              MICHAEL MOORE
21                                 DRAKE MARTIN

22
      ALSO PRESENT:                ROGERS & HARDIN
23                                 BY:  ROBERT B. REMAR, ESQ.
                                        JEFFREY W. WILLIS, ESQ.
24                                 2700 International Tower
                                   229 Peachtree St. NE
25                                 Atlanta, GA 30303
```

Case: 18-31177    Document: 00515297113    Page: 16    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC    Document 26293    Filed 02/05/20    Page 17 of 1003

3

<pre>
 1                                    FISHMAN HAYGOOD
                                      BY:   JAMES R. SWANSON, ESQ.
 2                                    201 St. Charles Ave., 4600
                                      New Orleans, LA 70170
 3
                                      SHER GARNER CAHILL RICHTER
 4                                    KLEIN & HILBERT
                                      BY:   KEVIN M. McGLONE, ESQ.
 5                                    909 Poydras St., Suite 2800
                                      New Orleans, LA 70112
 6
                                      LAW OFFICES OF BRENT COON
 7                                    BY:  BRENT W. COON, ESQ.
                                      215 Orleans
 8                                    Beaumont, TX 77701

 9

10

11

12
     OFFICIAL COURT REPORTER:         Karen A. Ibos, CCR, RPR, CRR, RMR
13                                    500 Poydras Street, Room HB-406
                                      New Orleans, LA 70130
14                                    (504) 589-7776

15
          Proceedings recorded by mechanical stenography, transcript
16   produced by computer.

17

18

19

20

21

22

23

24

25
</pre>

P R O C E E D I N G S

(FRIDAY, FEBRUARY 22, 2017)


09:44:22  (OPEN COURT.)

09:44:22        THE COURT:  Good morning, Everyone.  Please be seated.

09:44:29  Welcome back to everyone.  It's been a long time since we've seen

09:44:33  all of these faces.  Did you all miss each other?  Okay.

09:44:40        We have a few things on the agenda today that we'll have

09:44:49  some discussion on.  Are there still some seats remaining?  Is

09:44:54  anyone trying to get in?  I can't tell if there's anyone out in the

09:44:59  hall.  If the courtroom gets filled, I don't allow standing in the

09:45:06  back and we don't have anyone standing now, but we do have Judge

09:45:10  Vance's courtroom down the hall that we have sound and the

09:45:14  audiovisual equipment set up.

09:45:17        All right.  You know, I was thinking this morning as I

09:45:20  was reflecting back to the Fall of 2010 when we had our first

09:45:30  in-court meeting in Judge Lemelle's ceremonial courtroom, which

09:45:37  holds about 250, 300 people and then I think we had two or three

09:45:41  other courtrooms.  I don't remember how many lawyers we had, but I

09:45:45  know we had four or 500 lawyers, I think, that showed up that day.

09:45:48  Many of whom couldn't get in the courtroom.

09:45:54        But I did make a statement then that I did not intend to

09:45:57  let this become an *Exxon Valdez* case that would go on for 20 years.

09:46:04  And I estimated that we would be essentially complete in five

09:46:08  years, so I kind of missed the mark by a couple of years; but I

09:46:13   1   think we're pretty far down the road at this point, and I am very

09:46:16   2   pleased with where we are.  We've come a long way in this massive

09:46:21   3   case.  Thanks to all of you.  We had a few rough spots along the

09:46:30   4   way, but I think, for the most part, that's behind us.

09:46:36   5          So, first, I want to thank all of the lawyers in the case

09:46:39   6   for the tremendous work and dedication all of you have done for

09:46:43   7   your clients and for the Court.  I want to again commend former

09:46:53   8   Magistrate Judge Sally Shushan for her tremendous role in this

09:46:59   9   case.  And she's now out there competing with all of you, so I'm

09:47:06  10   sure her hourly rate is a little more than she was making when she

09:47:11  11   was here at the Court.  But I saw her the other night, she is happy

09:47:14  12   and doing well.

09:47:19  13          And I want to also thank and commend our claims

09:47:25  14   administrators for all of the work they've done, starting

09:47:29  15   particularly with Mr. Juneau, Pat Juneau, and also Mike Juneau, and

09:47:33  16   their staffs who have done tremendous work in this case starting in

09:47:42  17   June of 2012, Mr. Juneau, you started I believe.  You were up and

09:47:47  18   running in June of 2012.

09:47:52  19          And then I just want to acknowledge some of the people

09:47:59  20   that's gotten us to where we are today.  Louis Freeh, who I had to

09:48:04  21   bring in under unpleasant circumstances into this case, but he and

09:48:11  22   his organization did great work for the Court in resolving some

09:48:18  23   difficult issues that we had to deal with at the time.  And then I

09:48:22  24   gave him another role because I had tasked Judge Shushan,

09:48:28  25   Mr. Juneau, and Mr. Freeh as neutrals to resolve all of the -- help

09:48:37 1   resolve all of the governmental claims, the federal government, the

09:48:41 2   five Gulf Coast states, and over 500 local government claims in a

09:48:46 3   relatively short period of time.  That was a tremendous effort.

09:48:55 4          So anyway, I want to thank all of you to getting us where

09:49:00 5   we are.

09:49:00 6          You know, when I'd see people outside of the court

09:49:03 7   sometime, the question I'd get is:  Can you see the light at the

09:49:05 8   end of the tunnel?  I said, hell, I haven't found the tunnel yet,

09:49:09 9   you know.  But now I think I'm in the tunnel, just a matter of

09:49:13 10  getting to the end of it and getting out.

09:49:17 11         Our court neutrals over here, Mike Moore and Drake

09:49:21 12  Martin, have done yeoman's work in the last -- when did you guys

09:49:25 13  start, about a year ago?

09:49:27 14         MR. MARTIN:  Two years.

09:49:28 15         THE COURT:  Two years now.  Time flies.  But in helping

09:49:31 16  to resolve sort of behind the scenes.  But they have been on a

09:49:38 17  mission to resolve as many of these remaining claims, cases as we

09:49:44 18  can, starting with -- they were also involved, I neglected to say,

09:49:50 19  in helping resolve the governmental claims, some of the

09:49:53 20  governmental claims.  But more recently resolving a lot of the opt

09:49:58 21  out and excluded claims that were out there, and now they've even

09:50:05 22  gone into and are helping Mr. Juneau's operation by offering people

09:50:12 23  options to settle outside of the settlement program, even if you're

09:50:16 24  a member of the class.  And that's a continuing ongoing effort

09:50:19 25  that's there.

09:50:23  1          So today I want to spend some time first talking about

09:50:27  2   what has occurred.  I'll let the claims administrators give some

09:50:33  3   brief highlights of what's been accomplished and what they see

09:50:36  4   remaining and how long they expect that to take.  And then we'll

09:50:41  5   talk about how we may be able to proceed forward on what's left.

09:50:47  6          So, Mr. Juneau, I would like you to go first.

09:50:53  7          MR. PATRICK JUNEAU:  Good morning, your Honor.

09:50:53  8          THE COURT:  Good morning.

09:50:55  9          MR. PATRICK JUNEAU:  I might add, your Honor, I have some

09:50:56 10   of my staff here, they were very nervous because anybody that knows

09:51:00 11   me, they saw a computer sitting in front of me and they know I

09:51:03 12   can't operate a computer, so.  That's why Katy is here and these

09:51:07 13   other people are here to rescue the Court in case I touch

09:51:11 14   something.

09:51:11 15          Your Honor, this case is American legal history.  Even

09:51:17 16   our country's most famous fiction writers couldn't have written

09:51:23 17   this story.  It's been an incredible journey.

09:51:26 18          My final report with the Court, which was filed earlier

09:51:30 19   this week, provides a detailed description of what we have done,

09:51:34 20   our work, and what we are doing presently today.  And what I am

09:51:40 21   going to do here today is give the Court a very, and those in

09:51:44 22   attendance, a very brief overview of that report which is filed of

09:51:50 23   record and is subject to public consumption.

09:51:52 24          Your Honor, pursuant to your appointment on March 8th,

09:52:00 25   2012, I was appointed as the claims administrator, and we started

09:52:04  1    with a staff of one and with the complement of the vendor

09:52:11  2    employees, that number at its peak period was up to 2,800 people.

09:52:18  3    It substantially declined, we're in the decline period, substantial

09:52:21  4    decline now, and that number is significantly reduced at the

09:52:25  5    present time.  It was no small operation.

09:52:28  6            Your Honor, in the early stages of this case we were

09:52:32  7    charged by this Court to complete claims that remained in the Gulf

09:52:38  8    Coast Claims Facility.  Contrary to our public knowledge, there was

09:52:42  9    a lot of work left to be done, which was outside of our program,

09:52:46 10    and through the direction and instructions of this Court, we were

09:52:51 11    instructed to proceed to complete under those prior methodologies

09:52:56 12    the claims that are made.  That was a very complex project.

09:53:02 13            What we did was develop a process to evaluate and process

09:53:07 14    those particular claims.  The process started shortly after May 8th

09:53:13 15    we were on the ground running with that matter instantly.  I was

09:53:17 16    assisted greatly by the vendors who were previously in this

09:53:22 17    program - Garden City and the BrownGreer Group - who were a

09:53:26 18    tremendous asset during that period of time.  We started on

09:53:30 19    March 8, 2012.  We completed that project on June 4, 2012.  We paid

09:53:39 20    15,794 of those claims for a total sum of 404 plus million dollars.

09:53:48 21            That's kind of been a lost figure in all of these reports

09:53:51 22    that have been out there, but that was a significant project, a

09:53:55 23    significant amount of money, and a major step for the completion of

09:53:59 24    claims that were really outside of our true jurisdiction of the

09:54:03 25    settlement.

09:54:04  1        Now, during this same period of time we created claim

09:54:10  2    forms and developed unique computer programs that were designed to

09:54:14  3    evaluate and process the ten different categories of claims.  There

09:54:20  4    are ten different categories of claims in this settlement program,

09:54:24  5    the *DEEPWATER HORIZON* settlement program.  We established

09:54:29  6    immediately and staffed 19 claims centers ranging from Clearwater,

09:54:33  7    Florida to Bridge City, Texas.  The doors to those claims centers

09:54:39  8    were opened on June 4th pursuant to the instruction.

09:54:42  9        I remember like it was yesterday, Judge Barbier, we were

09:54:46  10   in this court and you said get this thing started, I want this

09:54:49  11   thing started on June 4.  It was a tremendous challenge, but the

09:54:56  12   appropriate direction came from the Court and we did and we opened

09:54:59  13   on June 4th.

09:55:00  14       We received thousands of claims in those claim centers

09:55:05  15   and the portal access that we had created simultaneously.  In the

09:55:09  16   first three weeks of the opening of those claims centers, we

09:55:14  17   received over 13,000 claims.  We began paying the claims on

09:55:21  18   July 31, 2012.  That's within two months of the opening of the

09:55:26  19   claims center.

09:55:28  20       Now, over this period of time, and this is a considerable

09:55:33  21   period of time, your Honor, we developed over 500 policies, many of

09:55:35  22   the lawyers in this room are familiar with those policies.  That

09:55:39  23   allowed us, in my opinion, to clarify and assist in the

09:55:43  24   implementation of this 1,000-plus page settlement document, which

09:55:48  25   is the *DEEPWATER HORIZON* settlement document.  Believe me, that was

09:55:54   1   not an easy task and I commend everybody who was involved in that

09:55:57   2   from all sides.   And in some cases still live today, some of those

09:56:05   3   policies were created to conform with court rulings including the

09:56:09   4   rulings from the Fifth Circuit Court of Appeal.

09:56:14   5          Now, you might recall, your Honor, and I think this is

09:56:19   6   significant, that the deadline for filing claims, other than

09:56:25   7   seafood, was a moving target in this matter because of appeals that

09:56:31   8   were taken, it kept pushing out the period so we were never quite

09:56:34   9   sure when that period would exist.   Well, a final date did occur,

09:56:39  10   and the filing deadline wasn't established until June 8, 2015.   I

09:56:48  11   think this is a very significant number.   We received 70,000 claims

09:56:53  12   within one month of that deadline period June 8, 2015.

09:57:00  13          THE COURT:   Meaning the month right before the deadline?

09:57:04  14          MR. PATRICK JUNEAU:   That's correct, your Honor.   And the

09:57:07  15   chart that we have, it gives you a breakdown of the claims filed in

09:57:11  16   that time and it shows you the percentage of what the claims file

09:57:16  17   in that deadline as opposed to the overall claims filed by

09:57:22  18   category.   And I am calling the Court's attention to those claims

09:57:27  19   because those claims, your Honor, were not even in our wheelhouse

09:57:31  20   until May and June of 2015, which is a considerable period of time

09:57:36  21   after we started this project.

09:57:40  22          Now, your Honor, extensive activity by the program since

09:57:49  23   its inception can probably be best described and understood by this

09:57:53  24   timeline that we put together, it kind of gives you the sequence of

09:57:59  25   events which occurred.   Note that my appointment was on March 8,

09:58:08  1    2012, and the settlement program, the agreement itself wasn't

09:58:13  2    signed until April 18, 2012.  We began receiving claims on June 4,

09:58:19  3    and as I indicated earlier, the first payment was on July 31, 2012.

09:58:25  4              It's important to note, and this is very unique, your

09:58:28  5    Honor, at least it's a first for me, it's important to note that --

09:58:32  6    and because of an agreement by the parties, we actually started

09:58:37  7    paying claims, processing paying claims before there was actual,

09:58:43  8    the Court approval on December 12, 2012.  That's a very unique

09:58:51  9    process, it's normally -- that's not even get activated until

09:58:55  10   after --

09:58:55  11             THE COURT:  Well, not only that because then the appeals

09:58:58  12   drug the finality of the approval of that settlement out until

09:59:04  13   December 8th of 2014.  I am getting my years right, I think.  I

09:59:13  14   think that's when the Supreme Court denied cert.  So ordinarily,

09:59:16  15   you're right, I've never seen a settlement like this before either

09:59:19  16   where the claims are being paid for two years or plus two, three

09:59:23  17   years before the settlement is final, is finalized.  Thank

09:59:29  18   goodness, because otherwise you would be in the early -- we would

09:59:32  19   all be in the early stages here instead of in the final stages.

09:59:36  20             MR. PATRICK JUNEAU:  I wouldn't be giving you the numbers

09:59:39  21   I am giving you today had that not been true.  I would like to make

09:59:43  22   this one public comment, your Honor.  That's to the credit of the

09:59:44  23   parties, that was a major, major, major step --

09:59:44  24             THE COURT:  Absolutely.

09:59:47  25             MR. PATRICK JUNEAU:  -- by BP in this matter and by the

09:59:49  1    plaintiffs to activate that, because without that, you can add

09:59:53  2    another two or three years to what we're talking about right here

09:59:56  3    now.  That's a significant milestone in this case.

10:00:01  4         Now, your Honor, the payments continued, we continued to

10:00:04  5    make payments until October 3, 2013, when there was an injunction

10:00:12  6    that was entered that prohibited payment of the Business Economic

10:00:16  7    Loss claims.  Now, you can see from this chart, I had this chart

10:00:21  8    made because it affected staffing, it affected payments, it

10:00:28  9    affected a lot of moving parts to the whole process.  And what this

10:00:33 10    chart shows you is, you can see the payments before the injunction

10:00:39 11    and you can see the empty period in the middle, that's during the

10:00:44 12    injunction, and you can see the payments after the injunction.

10:00:48 13    That gives you an idea of the magnitude of the impact of payments

10:00:53 14    during that period of time.

10:00:55 15         This was a considerable adjustment period for us during

10:00:59 16    this time because we had this accounting staff that was engaged, we

10:01:03 17    continued to do the work but we were not putting out eligibility

10:01:06 18    notices, but we weren't trying to stop the process but we were

10:01:12 19    simultaneously trying not to do unnecessary work in these cases.

10:01:16 20         So what occurred was during that same period of time

10:01:23 21    Policy 495, which is well-known policy at this point, was approved

10:01:28 22    by the Court to implement the Fifth Circuit's instructions on

10:01:33 23    accounting.  We implemented that policy and again started paying

10:01:38 24    the BEL claims.  And you will note, during that same period of time

10:01:43 25    that all of this is going we continue -- you'll see the payments

10:01:48  1    continue to be made, that's indicated in red.

10:01:52  2          And I might add that during -- simultaneously with that,

10:01:56  3    we made three separate payments, period payments because it had to

10:02:01  4    be done like that, to the seafood program, which is in and of

10:02:04  5    itself its own entity.  And I am very pleased to announce to the

10:02:09  6    Court, which I've previously advised the Court, we've completed

10:02:12  7    that project.  That to me was a major step in this process --

10:02:17  8          THE COURT:  That was done over in three different --

10:02:19  9          MR. PATRICK JUNEAU:  Three different payments.

10:02:21  10         THE COURT:  -- payments.  And you've disbursed the entire

10:02:24  11   $2.3 billion?

10:02:25  12         MR. PATRICK JUNEAU:  Yes, sir.

10:02:26  13         THE COURT:  Okay.

10:02:27  14         MR. PATRICK JUNEAU:  And that project is completed.  I

10:02:30  15   think it's a sentinel part of this program.  This matter did happen

10:02:33  16   in the Gulf, the seafood industry, everything was affected there,

10:02:38  17   was primarily affected, so that to me is major.

10:02:41  18         Now, continuing toward the right side of the timeline,

10:02:47  19   you will note that on September 30, 2016, we actually completed, if

10:02:54  20   you'll see to the right up there, six of the categories of claims,

10:03:00  21   that just leaves us with four, and I'll cover that in just a

10:03:04  22   minute.  That's a major milestone in this case.  That's the second

10:03:09  23   major piece.

10:03:15  24         Now, what I would like to give you now, your Honor, is an

10:03:19  25   overview of where we are or were as of January 31, 2017.  Total

Case: 18-31177    Document: 00515297113    Page: 27    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC    Document 26293    Filed 02/05/20    Page 28 of 1003

14

10:03:26   1   number of claims were filed in our program - 388,055.  Declared

10:03:34   2   eligible claims were 172,798.  Total number of eligible awards that

10:03:43   3   went out -- there's a lot of subsets of that because you have

10:03:47   4   reconsiderations, a lot of maturations occur -- but that was just

10:03:51   5   over $11 billion.  Denied claims are 143,879.

10:04:00   6            One comment about that, your Honor.  There's a lot of

10:04:03   7   reason for denial of claims.  A lot of it is non-eligibility in the

10:04:07   8   claim because you're an excluded member, incompleteness of the

10:04:11   9   matter, do not provide documentation that's subject to the claim.

10:04:17   10           THE COURT:  As I recall, there were a fair number of

10:04:19   11  claims that were filed by people who had previously signed releases

10:04:22   12  with the Gulf Coast Claims Center.

10:04:25   13           MR. PATRICK JUNEAU:  Absolutely.  It's a multitude of

10:04:26   14  claims that fall in that category.  But I think I would be remiss

10:04:30   15  if I didn't make this statement.  We're still getting some articles

10:04:34   16  by some -- I don't know, in the present politics we call it fake,

10:04:42   17  fake news.  There's some articles that talk about the fraud --

10:04:46   18           THE COURT:  They're alternative facts.

10:04:48   19           MR. PATRICK JUNEAU:  Alternative facts.  I don't know

10:04:51   20  what alternative facts are, I do know what facts are.  What facts

10:04:55   21  are in this case, your Honor, is a very small percentage of claims

10:05:02   22  that were deemed fraudulent in this matter.  Just right, I say it's

10:05:08   23  right at one percent, just less than one percent.  We exhaustively

10:05:12   24  did that and got rid of those claims.  There's been a publication

10:05:17   25  by a few maverick publications that talked about some convictions

10:05:22  1    that were made.  I might add, 97 percent of those that were

10:05:26  2    reported in the newspaper didn't have anything to do with us, that

10:05:29  3    was under the Gulf Coast Claims Facility.

10:05:31  4          But my point is that's a very, very small subset of what

10:05:35  5    we're dealing with in this class.  But we've adjudicated, we've

10:05:39  6    addressed for a variety of reasons --

10:05:43  7          THE COURT:  Let me make a comment on that, I'm glad you

10:05:46  8    brought that up.  Because you're right, from time to time that

10:05:50  9    surfaces.  It's, I guess, an unfortunate part of human nature that

10:05:59 10    whenever you have a lot of money at stake, you're going to have

10:06:02 11    some amount of fraud.  We saw that in the Katrina litigation here,

10:06:08 12    we had I remember at one time we had I think 16,000 Katrina-related

10:06:12 13    lawsuits here, and every now and then I still on my criminal docket

10:06:17 14    have to sentence someone for Katrina-related fraud, you know.

10:06:22 15          And we've certainly had, as you said, there's been some

10:06:26 16    prosecutions, not only here but in other parts of the Gulf Coast

10:06:30 17    area, related to the BP oil spill.  And then your office has

10:06:36 18    identified and weeded out some small percentage of claims as

10:06:44 19    fraudulent and pursued some clawbacks where -- a lot of it was

10:06:51 20    stopped before the payments were made by your organization.

10:06:54 21          MR. PATRICK JUNEAU:  Yes.

10:06:55 22          THE COURT:  But those where payments were made

10:06:58 23    improperly, there have been clawback motions.  So that stuff is

10:07:03 24    unfortunate but it's being dealt with.

10:07:07 25          But what's really unfortunate is how it's misrepresented

10:07:12  1    by some folks in the media as some kind of rampant fraud that's

10:07:19  2    going on, and there's nothing further from the truth, at least in

10:07:24  3    this case in this program as far as I'm concerned.  So anyway, I

10:07:28  4    just wanted to make that comment.

10:07:30  5            MR. PATRICK JUNEAU:  That was a little bit of a

10:07:32  6    diversion, your Honor, but we're all subject to reading what we

10:07:35  7    read.

10:07:36  8            THE COURT:  Right.

10:07:36  9            MR. PATRICK JUNEAU:  Probably this diagram here shows,

10:07:44 10    your Honor, what's red is what's been done.  What's in blue is what

10:07:48 11    we got left to do here.  And you can see the categories to the

10:07:55 12    right which have been totally completed.

10:07:57 13            So the real issue on the table, and I know a concern and

10:08:01 14    questions asked of me every day, what remains to be done and when

10:08:05 15    in the hell are you going to finish what you're doing.

10:08:08 16            THE COURT:  Right.

10:08:09 17            MR. PATRICK JUNEAU:  Let me first say in this settlement

10:08:12 18    there were ten different categories.  Where we are today is the

10:08:14 19    remaining categories of Business Economic Loss, Individual Economic

10:08:21 20    Loss, Subsistence, you can see them there, and Wetlands.  We have

10:08:25 21    31,296 of those claims are left to be -- that are unresolved.

10:08:35 22            THE COURT:  Total in those four categories?

10:08:37 23            MR. PATRICK JUNEAU:  Total.  And that comes in a lot of

10:08:39 24    categories, how you count the numbers depends on reconsiderations

10:08:42 25    and status.  But all of the blue, all of the blue, that's what

10:08:46  1    remains to be done.

10:08:48  2            And the positive part of that, your Honor, we're on

10:08:52  3    target to complete all of that work within this calendar year.  And

10:08:58  4    let me add one reservation, because I haven't met a lawyer yet

10:09:02  5    that's not going to make a reservation to some extent.  That's my

10:09:05  6    goal, that's what I think we can do, and that's my forecast to

10:09:09  7    complete this work.  But I actually don't speak for the world or a

10:09:15  8    lot of people.  Somebody may want some appeal or some legal process

10:09:19  9    or some action that's filed that can derail this process, I hope

10:09:24  10   that doesn't happen, I don't think it's going to happen, but that's

10:09:29  11   the law that we live in.

10:09:31  12           So in brief summary, your Honor, that's kind of really

10:09:35  13   where we are today.  It's been quite an experience, and I would

10:09:41  14   like to make this one short comment.  We've come a long, long way,

10:09:50  15   and the end, as what was said here today, is clearly in sight, I am

10:09:55  16   saying that.

10:09:57  17           I want to thank you, Judge Barbier, and your staff.  I

10:10:04  18   want to thank retired Judge Shushan, who is not here with us today,

10:10:10  19   was one integral part of this whole operation.  I want to thank my

10:10:15  20   staff and those who stuck with us through quite an experience.  I

10:10:21  21   want to thank the PSC, every one of them.  I want to thank BP.  And

10:10:27  22   I want to thank the Court appointed venders and all of the

10:10:31  23   claimants and all of those who helped get this done.  It's a

10:10:38  24   journey but it's a journey that we're going to finish this year.

10:10:42  25           So that's my report, your Honor.  Thank you very much.

10:10:42  1                THE COURT:  All right.  Thank you very much.

10:10:46  2                All right.  Who is here to present on the medical, I

10:10:48  3      don't think Mr. Garretson is here, but you're here in his place?

10:10:48  4                MS. CUMMINGS:  Yes, I am.

10:10:59  5                THE COURT:  Okay.  Just hit the highlights, I think

10:11:01  6      mainly what we want to know in the medical settlement is what

10:11:07  7      number of claims you've paid, what the payments have been, and what

10:11:11  8      remains, and how long it's going to take to resolve the remaining

10:11:15  9      claims.  And I have a couple of questions about that the BELO cases

10:11:21  10     that I'm going to ask you after you complete that.

10:11:54  11               Technical problems?

10:11:57  12               MS. CUMMINGS:  I apologize, your Honor.

10:12:06  13               THE COURT:  Well, it's proved my belief that every time I

10:12:10  14     am in court something will not work right in this fancy technology

10:12:14  15     we have, you know.  Happens every time.

10:12:19  16               MS. CUMMINGS:  Always hope you're not the one that it

10:12:21  17     happens to.

10:12:22  18               THE COURT:  Why don't you go ahead and just give us the

10:12:25  19     data that you want to give us.

10:12:25  20               MS. CUMMINGS:  Certainly, your Honor.

10:12:28  21               First of all, I would just like to introduce myself,

10:12:31  22     Hillary Cummings.  I am the acting director for the medical

10:12:35  23     benefits settlement for Garretson Resolution Group.

10:12:39  24               THE COURT:  Spell your last name, it's C-U-M-M-I-N-G-S?

10:12:44  25               MS. CUMMINGS:  Yes, your Honor.

10:12:44  1          THE COURT:  Okay.  Thank you.

10:12:45  2          MS. CUMMINGS:  So the highlights that we would like to

10:12:47  3    review with the Court today are the total unique claims that were

10:12:51  4    filed through the end of the last reporting period, which was

10:12:56  5    December 31st, was 37,249 unique claims.  Of those we have

10:13:06  6    completed review of 96 percent or 35,863 of those claims.

10:13:20  7          When we look at the claims that have reached final

10:13:23  8    determination and have completed review, 60 percent of the claims

10:13:28  9    have been approved for compensation for at least one specified

10:13:35 10    physical condition.  Three percent of those claims actually did not

10:13:40 11    seek a specified physical condition, they sought only the periodic

10:13:45 12    medical consultation benefit.

10:13:48 13          Twelve percent of class members who applied for both

10:13:52 14    benefits received the periodic medical consultation visit, but did

10:13:58 15    not qualify for compensation.  So they proved that they were class

10:14:01 16    members under the settlement, but they were not able to prove a

10:14:07 17    compensable injury.

10:14:08 18          And then 25 percent of all claimants have been denied.

10:14:13 19    Primarily when we look into why those claims have been denied, the

10:14:19 20    vast majority were denied because they were unable to prove either

10:14:24 21    cleanup worker status or that they lived in either Zone A or

10:14:29 22    Zone B.

10:14:30 23          THE COURT:  So they were denied because they were not

10:14:32 24    members of the class essentially?

10:14:35 25          MS. CUMMINGS:  That's correct.  That's correct.

10:14:36   1          THE COURT:  And that's the only issue that can be

10:14:39   2   appealed to the Court, right?  Because I know I've seen a few of

10:14:42   3   those.

10:14:43   4          MS. CUMMINGS:  That is correct.

10:14:43   5          THE COURT:  Not many but we have had some appeals on that

10:14:46   6   issue.

10:14:47   7          MS. CUMMINGS:  That is correct.  And, your Honor, if you

10:14:50   8   don't mind I'll return to my presentation.

10:14:52   9          THE COURT:  Okay.  Go ahead.

10:14:55  10          MS. CUMMINGS:  We wanted to start with just a brief

10:14:57  11   overview of the claims review process just to refresh the Court

10:15:02  12   what our duty is under the settlement with relation to the

10:15:06  13   specified physical condition compensation.

10:15:08  14          We go through an initial claims review where we determine

10:15:13  15   whether or not the claimant is actually a class member.  All

10:15:17  16   claimants are required to present an injury declaration, a first

10:15:21  17   party injury declaration for all of the compensation levels, but

10:15:27  18   that is the minimum requirement for the A1 compensation level.

10:15:32  19          Because early on in the program we noticed that there was

10:15:36  20   a high deficiency rate with those first party injury declarations,

10:15:41  21   there was no form declaration to be used, the parties agreed on a

10:15:45  22   request for additional information process to ensure that we didn't

10:15:49  23   have an extremely high denial rate due to the first party

10:15:55  24   declaration.  And class members can submit that declaration if they

10:16:00  25   originally omit it, and if they have details that are missing

10:16:05  1    within the declaration they are able to correct those in advance of

10:16:11  2    the actual formal defect process.

10:16:14  3         Then we send our claims to medical record review.  Those

10:16:19  4    claims, if they are defective, then will receive a notice of

10:16:25  5    defect.  That process is 120 days.

10:16:28  6         Finally, we go through a final review in which we

10:16:32  7    determine if they're eligible to receive compensation or not.

10:16:35  8         One of the specific milestones that we set for the

10:16:40  9    program in 2016 was to ensure that all claimants who would require

10:16:46 10    a notice of defect, that 90 percent of those claimants would

10:16:51 11    receive a notice of defect before the end of June 2016.  And

10:16:56 12    because we were able to hit that goal, we were also able to hit

10:17:01 13    another milestone, which was to ensure that greater than 90 percent

10:17:05 14    of all claims did complete review by the end of calendar year 2016.

10:17:14 15         Once a claim is qualified for compensation, then we move

10:17:20 16    into payment and payment resolution processes.  In the MSA we are

10:17:26 17    also acting as the lien administrator, lien resolution

10:17:30 18    administrator and have to make sure that those complications are

10:17:33 19    resolved before payment is processed.

10:17:37 20         So again, moving to the specifics.  As I stated earlier,

10:17:43 21    37,245 (VERBATIM) unique claims for SPC or PMC benefits were filed

10:17:52 22    through the end of the year.  We achieved 96 percent of those

10:17:55 23    claims having been fully reviewed, leaving four percent that

10:17:59 24    require additional processing this year.

10:18:05 25         This is just a slide reviewing, again, the breakdown of

10:18:11  1   the claims that have been fully reviewed, where 60 percent of all

10:18:16  2   claims have been qualified for SPC compensation, 25 percent denied,

10:18:22  3   12 percent have qualified only for the PMC benefit, and we have

10:18:27  4   that small group of three percent that only the PMC benefit was

10:18:31  5   sought originally.

10:18:32  6        When we look at the number of claims that have received a

10:18:39  7   determination notice qualifying them for compensation, that number

10:18:42  8   is 19,961, and the compensation awarded on those claims is 53.7

10:18:53  9   million.

10:18:55 10        Regarding what has actually been paid through the end of

10:18:58 11   last year, 15,856 class members were paid a total of $37.5 million.

10:19:09 12        THE COURT:  What accounts for the difference between the

10:19:11 13   53 and the 35?

10:19:13 14        MS. CUMMINGS:  Sure.  So those are claims that have been

10:19:16 15   qualified and then have to go into lien resolution processes,

10:19:21 16   mandatory Medicare/Medicaid, other government resolution, as well

10:19:26 17   as other payment complications like bankruptcy and probate.

10:19:29 18        THE COURT:  Okay.

10:19:32 19        MS. CUMMINGS:  And of course this slide speaks to that.

10:19:36 20   When we look at the percentages, we had 41 percent that were

10:19:40 21   pending health care lien obligations, 20 percent impacted by

10:19:43 22   bankruptcy and probate, and the remaining 39 percent are impacted

10:19:47 23   by child support obligations, third-party liens, and then of course

10:19:53 24   claims where an appeal of the claim has been filed, a request for

10:19:58 25   review, or that a membership denial challenge has been filed with

10:20:02  1    the Court.

10:20:04  2            When we look at our target to complete review of claims

10:20:09  3    for the SPC compensation benefit, we are targeting September of

10:20:15  4    this year.  There are both external and internal dependencies that

10:20:22  5    could impact that completion date.  When we look at what needs to

10:20:26  6    be done, for example, related to external dependencies, we do still

10:20:30  7    have class members who have time periods to cure their notices of

10:20:35  8    defect that are still pending and we'll need to complete review

10:20:40  9    once those responses are received.  We have about 200 claims now

10:20:46 10    that are pending medical record retrieval, so we are relying on the

10:20:51 11    retrieval vendor to get us in records to complete review of those

10:20:55 12    claims.

10:20:56 13            We do have several cases that are in investigation and

10:21:02 14    audit where they've gone through the complete review process, but

10:21:07 15    there is something in their claim that we need to clear up, whether

10:21:09 16    it be an identity issue or something related to completing

10:21:14 17    information about the provider who diagnosed them.  And then, of

10:21:18 18    course, again, we have claims that -- appeals that requests for

10:21:23 19    review or denial challenges have been filed.

10:21:28 20            And, your Honor, that is all we have on the specified

10:21:34 21    physical condition benefit.

10:21:35 22            THE COURT:  Okay.  I have a couple of questions for you.

10:21:38 23            MS. CUMMINGS:  Certainly.

10:21:39 24            THE COURT:  Not dealing directly with that.  But on the

10:21:44 25    Back-End Litigation Option issue, if I am reading your report right

10:21:46  1    that you filed, it says that to date, as of the date of this

10:21:52  2    report, which was last week, there have been a total of 437 class

10:22:00  3    members who filed notices of intent to sue for compensation for a

10:22:06  4    later-manifested physical condition.  As I recall, the settlement

10:22:16  5    provides in essence that if you are claiming a chronic condition,

10:22:24  6    whether you're in the grid, so to speak, or you're outside depends

10:22:30  7    on the date of your diagnosis, which was April 16th of 2012 I

10:22:37  8    believe.

10:22:37  9            MS. CUMMINGS:  Correct.

10:22:38  10           THE COURT:  And so if you're outside, in other words, if

10:22:43  11   you were diagnosed with a chronic condition beyond that date, you

10:22:49  12   have to file -- you have to resort, if you want to pursue the claim

10:22:54  13   for a chronic condition to this Back-End Litigation Option.

10:22:59  14           MS. CUMMINGS:  Correct.

10:23:00  15           THE COURT:  And there's some hoops you have to jump

10:23:03  16   through, you have to file a notice of intent to sue and there's a

10:23:06  17   time period where BP can decide whether they want to go to

10:23:10  18   mediation or whatever.

10:23:12  19           I am looking at the numbers here and I am kind of

10:23:14  20   surprised by the small numbers, because it says, like I said,

10:23:19  21   there's been 437 class members who filed notices of intent to sue

10:23:25  22   for a later-manifested condition, and of that number 40 have been

10:23:35  23   approved, 179 were denied, and 218 were found to be deficient.

10:23:46  24           And I want to make sure I am understanding.  It says of

10:23:49  25   the 179 that were denied to date, 99 percent were denied because of

10:23:55  1   conditions claimed or diagnosed on or before April 16, 2012, and

10:24:00  2   therefore, cannot be claimed to be a later-manifested physical

10:24:04  3   condition, correct?

10:24:05  4       MS. CUMMINGS:  Correct.  So with the notice of intent to

10:24:09  5   sue form, the class member's required to either submit a physician

10:24:15  6   certification, which is an appendix to that form, or actual medical

10:24:20  7   records which show a diagnosis after April 16, 2012.  And what we

10:24:26  8   have seen there is submission of records and/or the physician

10:24:31  9   certification with dates of diagnosis that predate that and

10:24:35  10  automatically --

10:24:36  11      THE COURT:  So if you do that and you don't "approve,"

10:24:40  12  what's their option at that point?  That's what I am trying to

10:24:43  13  understand.  Does that mean they go back into the program, they

10:24:47  14  stay in the program, or can they still file something with the

10:24:51  15  Court, or how does that work?

10:24:54  16      MS. CUMMINGS:  They cannot file anything with the Court

10:24:56  17  to our understanding.  By definition the condition that they are

10:25:03  18  representing was not a later-manifested condition.  And to the

10:25:06  19  extent their remedy was to pursue that condition possibly as a

10:25:11  20  specified physical condition prior to the filing date in

10:25:17  21  February 2015, or that they would have had to opt out of the

10:25:21  22  settlement to pursue that condition separately.

10:25:24  23      THE COURT:  Well, it's kind of interesting to me that,

10:25:26  24  and maybe somebody else can talk about this later, but when this

10:25:32  25  whole issue arose about this diagnosis date, which was a highly

10:25:37 1   disputed issue as I recall, how to interpret the settlement

10:25:43 2   agreement, the plaintiffs were complaining about being thrown out

10:25:52 3   of the program, so to speak, and thrown into this Back-End

10:26:00 4   Litigation Option if they weren't diagnosed before April 16 of

10:26:06 5   2012.  But here, apparently, a large number of people who were

10:26:11 6   diagnosed before that date seem to want or trying to get into this

10:26:20 7   Back-End Litigation Option.  Am I reading that right, is that

10:26:24 8   what's happening?

10:26:25 9       MS. CUMMINGS:  It is.  But based on what I know about

10:26:27 10  when the majority of these notice of intent to sue forms were

10:26:33 11  filed.  First of all, I believe the majority of these were pro se

10:26:35 12  claimants, some of which at the time were filing basically all of

10:26:41 13  the forms that were available, so they would have filed both a

10:26:45 14  proof of claim form and a notice of intent to sue form for their

10:26:49 15  conditions; and therefore, to the extent that the date of diagnosis

10:26:54 16  was prior to and they pursued that condition under the SPC benefit

10:27:01 17  they would be --

10:27:01 18      THE COURT:  So they could be compensated under the other

10:27:05 19  benefit.

10:27:05 20      MS. CUMMINGS:  That's correct.

10:27:05 21      THE COURT:  I see.  Okay.

10:27:06 22      MS. CUMMINGS:  And I would say in relation to, of course,

10:27:08 23  the Court order that came down in 2014 relative to the definition

10:27:14 24  of an LMPC, I don't believe that we've actually seen the majority

10:27:19 25  of those claims for that benefit be filed yet.  So these -- it's

10:27:25  1    not the same bucket of claims that we're talking about.  We haven't

10:27:29  2    seen those claims that actually had those dates of diagnosis after

10:27:33  3    be filed today.

10:27:34  4         THE COURT:  Okay.  Okay.  All right.  Thank you very

10:27:38  5    much.

10:27:39  6         MS. CUMMINGS:  Thank you, your Honor.

10:27:42  7         THE COURT:  All right.  Mr. Juneau the younger.  Would

10:27:53  8    you like to give us a brief overview of where things stand on the

10:27:56  9    Halliburton and Transocean punitive damages and assigned claim

10:28:01 10    settlements?

10:28:02 11         MR. MICHAEL JUNEAU:  Yes, your Honor.  I'm Michael

10:28:05 12    Juneau, claims administrator in connection with the Halliburton and

10:28:09 13    Transocean settlements.

10:28:11 14         Everything that's been discussed thus far by Mr. Juneau

10:28:15 15    and Ms. Cummings have related to settlements funded by BP.  I am

10:28:20 16    now going to discuss a separate settlement, or two separate

10:28:25 17    settlements that claim later in time, and those are approximately

10:28:31 18    $1.2 billion paid by Transocean and Halliburton.  Those are more

10:28:35 19    recent in origin and your court, this court just this week approved

10:28:39 20    those settlements.  So they have just this week been granted final

10:28:45 21    approval by the District Court.

10:28:47 22         The total amount at issue is approximately $1.2 billion.

10:28:53 23    Magistrate Judge Wilkinson was appointed as a neutral to divide

10:28:57 24    that money up into two portions.  What we refer to as the old

10:29:04 25    class, which is everybody that's in the BP settlement, that the old

10:29:10  1   class consists of everybody there in that old class, and it

10:29:15  2   involves the claims that were assigned by BP to that class.  So we

10:29:20  3   call that the assigned claims.

10:29:22  4           The second portion is what we refer to as the new class,

10:29:26  5   and it's those people that arguably have a right to pursue punitive

10:29:31  6   damages against Transocean and Halliburton under maritime law.

10:29:36  7   That was a theoretical thing and, frankly, I think the ruling from

10:29:41  8   the Court has suggested that maybe nobody had that right, to be

10:29:44  9   honest with you.  But in the event, the settlement was reached at a

10:29:48 10   point in time when that was in question, so that is the new class

10:29:51 11   portion.

10:29:51 12           Magistrate Judge Wilkinson --

10:29:54 13           THE COURT:  Well, even after I made that ruling it was

10:29:56 14   still subject to appeal and being contested.  So it's not -- it was

10:30:02 15   never a final ruling on that, put it that way.

10:30:06 16           MR. MICHAEL JUNEAU:  That's correct, your Honor.  The

10:30:07 17   total of $1.2 billion was allocated by Magistrate Wilkinson -

10:30:12 18   approximately 900 million to this new class, the punitive damage

10:30:16 19   claimants, and approximately 330 million to the old class, which is

10:30:21 20   the whole group of BP claimants.  So that's money that's been

10:30:25 21   divided.  That settlement has now been approved by the District

10:30:30 22   Court, it is subject, I guess, to somebody appealing it to the

10:30:34 23   Fifth Circuit.  And if somebody does that and that may affect all

10:30:37 24   time delays and what not.

10:30:40 25           I am assuming that this Court's ruling will stand and

10:30:44  1   it's not going to be delayed by any further appeals.  So when I

10:30:48  2   talk about timing, I am assuming that that timing is not delayed by

10:30:52  3   any further legal efforts in the Fifth Circuit and briefing and

10:30:56  4   argument and that sort of thing.

10:30:58  5        With respect to the old class, that whole group of

10:31:02  6   claimants need do nothing.  They will just get a supplemental check

10:31:06  7   at some point in time.  So they have -- no new claim forms need to

10:31:10  8   be filed --

10:31:11  9        THE COURT:  It will be, as I appreciate it, that chunk of

10:31:16 10   money 300 and something million which represents settlement of the

10:31:21 11   so-called assigned -- the claims that BP had alleged in this

10:31:29 12   litigation against other parties and they assigned those claims to

10:31:32 13   the class, right?

10:31:35 14        MR. MICHAEL JUNEAU:  Correct.

10:31:37 15        THE COURT:  To the economic class.  So that 300 something

10:31:39 16   million will just be spread proportionately amongst all of the

10:31:43 17   people in that class who received a payment.  All of the people who

10:31:47 18   received a payment in that class will just get another check in the

10:31:50 19   mail at some point.

10:31:51 20        MR. MICHAEL JUNEAU:  That's correct.

10:31:52 21        THE COURT:  Of course we don't know how much that's going

10:31:54 22   to be, probably a relatively modest amount of money because there

10:31:58 23   are a lot of people in that class, but whatever it is, that's how

10:32:01 24   it's going to work, right?

10:32:03 25        MR. MICHAEL JUNEAU:  That's correct, your Honor.  And it

10:32:04  1   will be a small amount, because, frankly, there were lots and lots

10:32:07  2   of people, hundreds of thousands in the old class so that money

10:32:10  3   will be divided.

10:32:11  4          THE COURT:  Right.  But whatever it is, as we call it,

10:32:13  5   it's lagniappe, right?

10:32:15  6          MR. MICHAEL JUNEAU:  Sure.

10:32:16  7          THE COURT:  For people from New York, that's an extra

10:32:20  8   thing you get without asking for it.  Go ahead.

10:32:22  9          MR. MICHAEL JUNEAU:  And the timing of that, as Pat

10:32:25 10   Juneau had suggested, is the goal and the projection was the end of

10:32:30 11   this year the BP settlement would essentially be resolved, those

10:32:34 12   claims.  So that supplemental or that Halliburton distribution that

10:32:39 13   we talk about to the old class would be two or three months after

10:32:42 14   the BP program essentially resolved itself.

10:32:46 15          THE COURT:  So obviously none of these payments from

10:32:48 16   these new settlements can be made because they're all pegged in one

10:32:52 17   way or the other to final resolution of the economic settlement?

10:32:58 18          MR. MICHAEL JUNEAU:  Correct.

10:32:59 19          THE COURT:  Okay.

10:33:01 20          MR. MICHAEL JUNEAU:  And the projection is for the old

10:33:02 21   class, at least, it's going to take another two to three months for

10:33:06 22   that to happen.

10:33:06 23          THE COURT:  Two to three months after the completion of

10:33:09 24   that program?

10:33:10 25          MR. MICHAEL JUNEAU:  Correct.  Which would bring us into

10:33:12  1    the earlier part of 2018.

10:33:14  2         THE COURT:  Okay.

10:33:16  3         MR. MICHAEL JUNEAU:  For the second grouping, the new

10:33:18  4    class as I referred to it, the 900 million, the vast majority of

10:33:23  5    those people, again, need file no new claims, because, again, we're

10:33:27  6    taking the data from the BP settlement and we base evaluations

10:33:31  7    largely on that.

10:33:32  8         There is a group of people in this new class, though,

10:33:35  9    that didn't file claims in the BP settlement that are eligible.

10:33:39 10    People like local governments that might own property along the

10:33:43 11    coast, they were excluded from the BP settlement.  They are not

10:33:46 12    excluded from the Halliburton settlement.

10:33:48 13         THE COURT:  I want to make sure everybody understands.

10:33:51 14    This settlement is not -- these two settlements, Halliburton and

10:33:57 15    Transocean, is not to compensate anyone for -- not for economic or

10:34:02 16    compensatory damages.

10:34:04 17         MR. MICHAEL JUNEAU:  Correct.

10:34:05 18         THE COURT:  And it obviously would be limited to people

10:34:09 19    who at least would have a colorable claim for punitive damages

10:34:14 20    under General Maritime Law.  So, for example, they'd also have to

10:34:18 21    meet the Robins Dry Dock or overcome the Robins Dry Dock hurdle by

10:34:24 22    showing they had a proprietary interest in some real or personal

10:34:29 23    property that was affected, touched by oil, so to speak, for the

10:34:33 24    most part.  I mean, there are some exceptions like commercial

10:34:36 25    fishermen.

10:34:37  1           MR. MICHAEL JUNEAU:  Correct.  And, Judge, the vast

10:34:39  2    majority of this fall into two categories:  One is people that

10:34:43  3    owned property directly on the Gulf where oil could have washed up

10:34:47  4    onshore and actually touched their property, so they were owners of

10:34:51  5    the property right along the coast.  And the second group would be

10:34:55  6    commercial fisherman.  Those are the two big chunks of individuals.

10:34:59  7           THE COURT:  So I want to make sure just in case there's

10:35:02  8    anybody in the public aware of what's going on here, or the media,

10:35:07  9    that we're not talking about hotels and businesses in north

10:35:12 10    Louisiana or north Alabama or anywhere that -- or nowhere near the

10:35:16 11    coast, unless they happen to own some property on the coast.  The

10:35:19 12    people, all of those claimants who were part of the B1

10:35:27 13    economic-type claims, a lot of those won't be eligible for this

10:35:31 14    payment, right?

10:35:32 15           MR. MICHAEL JUNEAU:  That's correct, your Honor.  This

10:35:34 16    group is a much smaller group in the new class under this

10:35:38 17    Halliburton and Transocean punitive damages settlement.

10:35:38 18           THE COURT:  Right.

10:35:43 19           MR. MICHAEL JUNEAU:  So there have been to date -- or the

10:35:46 20    deadline for filing any new claims where they might have been

10:35:48 21    excluded in the BP settlement but they're eligible in this one, the

10:35:52 22    deadline has passed.  That deadline for filing a claim was

10:35:57 23    December 15th of last year.  So that deadline has passed us.  We

10:36:01 24    have received approximately 3,500 new claim forms, 3,580 actually,

10:36:08 25    new claim forms, and we're in the process of reviewing those and

10:36:11  1    beginning to process them.  But that's a relatively small number of

10:36:15  2    new claims that have been filed.

10:36:17  3              THE COURT:  And, again, the people who are in the old

10:36:19  4    class and who had the type of claim that might make them eligible

10:36:25  5    for a payment under these settlements don't have to file a new

10:36:29  6    claim?

10:36:30  7              MR. MICHAEL JUNEAU:  That data will automatically be

10:36:32  8    transferred from the economic property damage settlement to our

10:36:35  9    program and they need not file any claim forms.  It was designed

10:36:39 10    that way so it minimized the work and the burden on anybody,

10:36:43 11    frankly, and the cost to the class as a whole as well.

10:36:46 12              THE COURT:  Okay.

10:36:47 13              MR. MICHAEL JUNEAU:  So the deadline is passed.  If you

10:36:50 14    did have to file a new claim, which the vast majority of people did

10:36:53 15    not need to file a new claim, they were already covered by that.

10:36:57 16    But the deadline is passed.  We now have to process those, which

10:37:01 17    we're doing.  And the big thing we need to do is wait for the BP

10:37:06 18    economic program to finish so that we can then transfer that data,

10:37:10 19    take it and formulate the evaluations and the notices that we need

10:37:15 20    to send out to tell people this is what the value we have for you,

10:37:20 21    and that will take four to six months after the BP economic program

10:37:25 22    finishes.

10:37:27 23              So our projection is towards the summer of next year is

10:37:33 24    the timing that we're thinking the distributions for this new class

10:37:38 25    might be ready to be made.  So that's the timing in that respect.

10:37:41  1          THE COURT:  Okay.  Thank you very much.  Okay.  I don't

10:37:48  2    think we have anybody here from the government, but, Mr. Regan, do

10:37:53  3    you want to summarize for us what the governmental settlements

10:37:56  4    entailed and so forth?

10:37:59  5          MR. REGAN:  Yes, your Honor.  Matt Regan on behalf of BP.

10:38:01  6    And maybe the fact that no one is here shows what was accomplished.

10:38:05  7          THE COURT:  That's good news I guess.

10:38:06  8          MR. REGAN:  Well, after three significant trials in this

10:38:11  9    court in the summer of 2015, an agreement in principle was reached

10:38:15 10    between BP, the United States government, five Gulf states, and a

10:38:20 11    few others to settle a series of claims, which included natural

10:38:24 12    resource damage claims, a Clean Water Act claim, and some other

10:38:28 13    types of claims.  That then went to a consent decree process, it

10:38:32 14    was lodged with the Court in October of 2015, there was a public

10:38:36 15    comment period, and then the settlement -- the consent decree was

10:38:40 16    approved on April 4th, 2016.  So by effect of that settlement, that

10:38:47 17    resolved the vast majority of the government entity issues that

10:38:52 18    were in a bundle for the Court.

10:38:54 19          In addition to that government settlement, which is now

10:38:58 20    underway, there were a series of settlements that were reached in

10:39:03 21    the summer of 2015 with some local government entities, or LGE's,

10:39:09 22    and really, through the summer of 2015 and then an order from the

10:39:13 23    Court in late August of 2015 dismissing the master complaint for

10:39:19 24    the local government entities.

10:39:21 25          So the combination of those two settlements has left a

10:39:24  1    small number of local government entity active plaintiffs and two

10:39:31  2    foreign plaintiffs in the government space.  I can talk about them

10:39:34  3    now or later.

10:39:35  4              THE COURT:  I'm sorry, you what?

10:39:37  5              MR. REGAN:  I can talk about those right now or we can

10:39:39  6    talk about them in Section 2.

10:39:45  7              THE COURT:  Either way.  Go ahead if you want to talk

10:39:47  8    about them now.

10:39:48  9              MR. REGAN:  We have three local government entities that

10:39:51 10    are still are pending, and that's Plaquemines, Treasure Island,

10:39:59 11    and -- one other and I'll grab it here in a second.

10:39:59 12              THE COURT:  Is it Daphne?

10:40:02 13              MR. REGAN:  Daphne, exactly.  Daphne.

10:40:07 14              On the foreign side we have a Mexican federal claim, the

10:40:11 15    United Mexican States, and then we have the Mexican State of

10:40:14 16    Yucatan.  With the foreign claims, the Mexican State of Yucatan is

10:40:18 17    a claim that's similar to one of the claims that the Court

10:40:20 18    dismissed and went up on Fifth Circuit and were affirmed.  The

10:40:24 19    Mexican Federal case, the Mexican states case we also think has

10:40:28 20    some substantial defects.  So with respect to the remaining

10:40:32 21    government claims, we would anticipate some motion practice to

10:40:34 22    address the viability of those remaining claims.

10:40:38 23              THE COURT:  Okay.  Thank you very much.

10:40:42 24              Next thing that's on the agenda is settlement of opt out

10:40:46 25    and excluded claims in the B1 bundle.  That's really -- I don't

10:40:50  1    know if anybody wants to speak to that.  There's been a large --

10:40:53  2    this is what you guys have been doing, Mike and Drake have been

10:40:57  3    doing, and they have settled thousands of these claims.  Maybe we

10:41:05  4    should talk about what's left, the number that we estimate is left.

10:41:09  5             Mr. Regan, you wanted to speak to that?

10:41:12  6             MR. REGAN:  Yes, your Honor.

10:41:13  7             THE COURT:  As I recall, last year at some point we

10:41:17  8    thought we had about eighty -- somewhere around 75 - 85,000, claims

10:41:23  9    left.  We're talking now about claims outside of the settlement

10:41:27  10   programs.

10:41:28  11            And tell us where we are now, as best you believe the

10:41:33  12   situation is.

10:41:34  13            MR. REGAN:  So I would say as we sit here today we would

10:41:37  14   estimate that we have less than 1,000 remaining B1 claims, and

10:41:43  15   those are the economic claims brought by either someone who has

10:41:47  16   opted out or was excluded from the settlement and now someone who

10:41:50  17   is also complied with the Court's orders over the past year with

10:41:54  18   respect to those claims.  And most notably, that would be what was

10:41:58  19   styled PTO 60.

10:42:00  20            So the process of PTO 60 allowed us to identify who

10:42:04  21   really was left as a claimant and further solve the problem of

10:42:10  22   identifying the specific plaintiffs, because we had some complaints

10:42:13  23   that had a lot of plaintiffs and we also had short form joinders

10:42:18  24   which weren't complaints.

10:42:19  25            So putting all of that together and compressing it, we

10:42:22  1    estimate in the chart that we attached to the complaint -- to the

10:42:25  2    status report, a number of around 1,000.  That's not to say that we

10:42:31  3    think those are valid claims to go forward, there's been no

10:42:34  4    litigation of those claims per se.  But in terms of things that

10:42:37  5    remain from the B1 docket, I think it's correct that we have gone

10:42:41  6    from a number that was extremely high to a much more manageable

10:42:47  7    number.  Still more work to do, but I would say it's less than

10:42:50  8    1,000.

10:42:51  9          THE COURT:  In addition to the PTO 60 process, again,

10:42:54  10   what brought those numbers down greatly was the work of our

10:42:58  11   neutrals that are sitting over here (INDICATING).

10:42:59  12          MR. REGAN:  Correct.  I think more than 20,000, maybe

10:43:02  13   more than 25,000 voluntary dismissals through that process, so

10:43:06  14   substantial, significant work by the Court, by the neutrals to help

10:43:10  15   with that group of plaintiffs.

10:43:13  16          THE COURT:  Okay.  Does anybody else want to talk about

10:43:16  17   the excluded claims, Mike or Drake, you guys have anything to add

10:43:20  18   or say?

10:43:22  19          MR. MARTIN:  No, Judge.  I would just tell you, I think

10:43:24  20   probably, as this point they're coming in as we speak, they're

10:43:27  21   probably only going to be three or 400 cases left.

10:43:30  22          THE COURT:  They're sitting there receiving settlement

10:43:33  23   dismissals right now as we're speaking in court.  So it's been a

10:43:41  24   very, very productive process that they've undertaken.

10:43:49  25          So let's talk about -- well, we got into what's left and

10:43:55  1    the plan going forward.  There are -- maybe we should talk about

10:44:11  2    the -- in terms of what's on that agenda, 2a, plan for opt out and

10:44:15  3    excluded claims generally (economic, medical), this issue was put

10:44:21  4    on by the PSC; so where is Jim or Steve, do you all want to speak

10:44:26  5    to that issue?

10:44:28  6         MR. HERMAN:  Good morning, your Honor, Steve Herman for

10:44:31  7    the plaintiffs.

10:44:32  8         This was just a general question that we received from a

10:44:35  9    number of plaintiff lawyers in advance of the status conference,

10:44:41  10   and I kind of thought that we might get an indication from the

10:44:46  11   Court as to what the general plan is.  I kind of got a little

10:44:50  12   insight from the Court during the liaison conference meeting.  But

10:44:54  13   that's basically it.

10:44:56  14        THE COURT:  Well, generally the plan is to, first of all,

10:44:59  15   keep doing what we're doing, which is having the neutrals reach out

10:45:03  16   to people and try to resolve amicably and as efficiently as many of

10:45:09  17   these claims as we can.  It was a monumental task and they've made

10:45:15  18   a lot of progress, but it's a continuing ongoing effort.

10:45:23  19        Beyond that, the other thing that we've all been engaged

10:45:28  20   in for sometime now, as Mr. Regan alluded to, is just identifying

10:45:32  21   what's left.  That's been quite a process to begin with because we

10:45:39  22   had people who may have filed individual lawsuits, we had people

10:45:45  23   who did not file a lawsuit but filed just the short form joinders,

10:45:50  24   and then some of them may have also been members of the class, a

10:45:53  25   lot of them were members of the class, so sorting through all of

10:45:58  1   that has been quite a chore.  But I think it's gradually funneling

10:46:03  2   down the number of cases as you've heard.

10:46:08  3         And what I envision doing beyond what we just talked

10:46:22  4   about is we're planning to issue a couple more, a couple of other

10:46:44  5   case management or pretrial orders which are going to -- some of it

10:46:50  6   is going to be in the order of docket cleanup to try to, again,

10:46:54  7   figure out what's alive and what's not.  Because if you look at our

10:46:58  8   docket now, it shows I have 3,000 separate lawsuits pending,

10:47:03  9   BP-related lawsuits pending, but we know that numbers of those for

10:47:09 10   various reasons are probably subject to dismissal.

10:47:13 11         MR. HERMAN:  Right.

10:47:15 12         THE COURT:  So it's just figuring out what those are and

10:47:18 13   how to accomplish that.

10:47:20 14         And then we also have on the agenda, which is 2b, and

10:47:30 15   that's the responder defendant request, which is another category

10:47:34 16   of cases that we need to deal with.  Who is here to speak to that?

10:47:38 17   Yes, ma'am.

10:47:47 18         MS. SIMSON:  Good morning, your Honor.  Sylvia Simson,

10:47:50 19   Quinn Emanuel, defense counsel.

10:47:51 20         THE COURT:  Good morning.

10:47:53 21         MS. SIMSON:  Good morning, your Honor.

10:47:53 22         This was a request that we received from several folks

10:47:56 23   who represent various cleanup companies that worked during the

10:48:00 24   *DEEPWATER HORIZON* response who were not named in the B3 Master

10:48:03 25   complaint.  As your Honor is aware, you know, there's limited B3

10:48:07  1   discovery, summary judgment briefing, PTO 57 protocol, and then the

10:48:11  2   summary judgment decisions that were entered last year.  These

10:48:14  3   defendants have come forward asking what the status is of their

10:48:17  4   cases that have been stayed for some time.  Many of them were

10:48:21  5   consolidated with the MDL, you know, after the original summary

10:48:25  6   judgment briefing had been, you know, provided in 2012, many of

10:48:32  7   them I think were consolidated with the MDL in 2013.

10:48:37  8           Kirk Gasperecz of Adams and Reese is here today if you

10:48:41  9   would like to hear from one of these companies who has at least one

10:48:45  10  stayed case right now in the MDL.  But I understand that they, too,

10:48:49  11  believe that they are entitled to derivative immunity and

10:48:53  12  preemption like the cleanup responder defendants.

10:48:55  13          THE COURT:  Well, have either your clients or those

10:49:01  14  attorneys -- I mean, do you plan to file some sort -- obviously you

10:49:06  15  need to file a motion at some point so we can resolve that.  Seems

10:49:13  16  to me that's the next step.

10:49:15  17          But beyond that, I'm going -- and I'll hear from anyone

10:49:20  18  else if they want to speak to this.  But again, I am going to issue

10:49:23  19  another -- I am drafting, we are drafting another pretrial order

10:49:28  20  that will probably come out as Pretrial Order No. 63, although I

10:49:32  21  haven't issued it yet, which will specifically pertain to B3

10:49:37  22  pleading bundle cases.  And it's going to be similar to PTO 60,

10:49:42  23  it's going to try to flesh out what cases are out there and make

10:49:48  24  people who believe they still have a live claim come forward and

10:49:53  25  file a sworn statement, for example, identifying who they are and

10:49:57  1    what type of claim they have.

10:50:00  2           Let's see.  I've got, for example, it would ask them to,

10:50:08  3    of course, identify themselves and whether they opted out of the --

10:50:14  4    because if they didn't opt out of the medical benefits settlement,

10:50:18  5    then they probably released their claims there; or perhaps they

10:50:22  6    weren't a member of the medical benefits settlement class, just

10:50:29  7    explain why your claim is still alive here and then identify,

10:50:34  8    describe how they and where they participated in response

10:50:40  9    activities and what type of claim you're pursuing, whether you

10:50:45 10    filed an individual lawsuit or not, and so forth.

10:50:48 11           So we'll be issuing this order probably within the next

10:50:51 12    week or so.

10:50:53 13           MS. SIMSON:  Understood, your Honor.

10:50:56 14           THE COURT:  So that might help your clients in terms of

10:50:58 15    identifying what's left and trying to get something moving in these

10:51:05 16    cases.

10:51:05 17           MS. SIMSON:  Just to be clear, your Honor.  My clients

10:51:07 18    have already been dismissed as of last year in the 2016 summary

10:51:12 19    judgment decisions.  We were just coming forward since we had

10:51:16 20    received multiple inquiries from folks who are defendants in the B3

10:51:20 21    stayed cases, so as I was saying earlier --

10:51:24 22           THE COURT:  So are they paying your bill now?

10:51:27 23           MS. SIMSON:  No, we're just here as liaison counsel.

10:51:29 24           THE COURT:  Okay.

10:51:29 25           MS. SIMSON:  Some of them are in the courtroom today if

10:51:31  1    you would like to hear from them.

10:51:33  2         THE COURT:  Okay.  Well, if anyone else -- any of those

10:51:34  3    folks here?

10:51:34  4         MR. GASPERECZ:  Yes, your Honor.

10:51:35  5         THE COURT:  I'll hear from him briefly.

10:51:38  6         MS. SIMSON:  Sounds good, your Honor.  Thanks.

10:51:41  7         THE COURT:  But that's basically where we are, we see

10:51:44  8    that we'll issue this pretrial order which I think will help move

10:51:47  9    these cases along.

10:51:50  10         MR. GASPERECZ:  Yes, sir.  Absolutely.  It's Kirk

10:51:50  11    Gasperecz of Adams and Reese for ES&H.  I won't repeat anything she

10:51:55  12    just said.  Bottom line is in my case and others in the courtroom

10:51:59  13    and those listening on the phone, we have been stayed.  We are

10:52:02  14    similarly situated as the original 12 or 13 or so cleanup responder

10:52:07  15    defendants.

10:52:07  16         THE COURT:  Who is your client?

10:52:09  17         MR. GASPERECZ:  ES&H, Inc. and Team Labor Force.

10:52:13  18         THE COURT:  What is ES&H, Inc.?

10:52:16  19         MR. GASPERECZ:  They're an environmental company, cleanup

10:52:18  20    company.

10:52:18  21         THE COURT:  But they weren't part of the original master

10:52:21  22    complaint?

10:52:21  23         MR. GASPERECZ:  That's correct.  Yes, sir.  So our

10:52:23  24    clients weren't subject to the PTO 57 process with the

10:52:26  25    questionnaire and the show cause order, and of course the ultimate

10:52:30  1   judgment by the Court did not affect those claims against us.  So

10:52:33  2   what we would propose, actually alternatives, either the Court

10:52:37  3   utilize the same process the PTO 57 process with a questionnaire.

10:52:42  4              THE COURT:  That's what I just said I plan to do.

10:52:45  5              MR. GASPERECZ:  Good.  As it relates to our clients as

10:52:47  6   well.

10:52:48  7              THE COURT:  Yes, yes.  Well, it will relate to anybody

10:52:50  8   that's in any remaining B3 claims.

10:52:52  9              MR. GASPERECZ:  Okay.  Good.  That was our preference,

10:52:54 10   your Honor.  The other -- I'll leave it at that.  Thank you.

10:52:58 11              THE COURT:  Good.  You just won your argument.

10:53:06 12              Okay.  Did anybody else want to speak at all to this B3

10:53:11 13   issue?  Do we know how many of those claims are left, Mr. Regan?

10:53:16 14   What's your best estimate?

10:53:18 15              MR. REGAN:  In the B3 docket I think we have a little

10:53:20 16   over 1,000 opt outs and then we have thousands of short form

10:53:24 17   joinders, and about 200 complaints.  So the question is, our

10:53:28 18   anticipation is many, many of those plaintiffs actually are class

10:53:31 19   members are no longer active litigants, but without further case

10:53:36 20   management we can't answer that question.

10:53:39 21              THE COURT:  So this order that I've been talking about

10:53:40 22   should help flesh that out?

10:53:43 23              MR. REGAN:  Yes, I agree with that, your Honor,

10:53:45 24   definitely.

10:53:45 25              THE COURT:  All right.  Thank you.

10:53:51  1          I think there were -- Mr. York, did you want to speak to

10:53:57  2   some remaining issues, remaining claims against Halliburton and

10:54:03  3   Transocean?

10:54:03  4          MR. YORK:  Good morning, your Honor, Alan York on behalf

10:54:05  5   of Halliburton, and I believe speaking on behalf of Transocean as

10:54:09  6   well.

10:54:10  7          This falls right into the docket cleanup process.  There

10:54:14  8   are a number of claims that were filed in B1 that we've been

10:54:18  9   tracking that have since the PTO 60 compliance order that the Court

10:54:22 10   issued have dismissed claims against BP but retained claims

10:54:27 11   expressly against Halliburton and Transocean in order to preserve

10:54:30 12   their claims in the settlement.  Once the final approval order

10:54:35 13   becomes non-appealable, we will be in the process of going through,

10:54:39 14   clean those cases, those remaining cases off the Court's docket.

10:54:43 15   And then following the Court's B3 order process that will track

10:54:46 16   that PTO 60 process, we will be doing the same thing with B3.

10:54:50 17          So we just wanted the Court to be aware that there are

10:54:53 18   some remnants out there that even where the case has been dismissed

10:54:57 19   against BP, something still remains on the docket because it's

10:55:00 20   pending against Halliburton and Transocean and we'll be getting

10:55:03 21   those cleaned up.

10:55:04 22          THE COURT:  Okay.  Thank you.

10:55:10 23          All right.  On to Section 3.  These were all requested by

10:55:18 24   counsel, asked the Court to put these on the agenda.  Is there

10:55:24 25   anyone here, Mr. Herman, is there anyone here, or you're going to

10:55:31   1    talk about this 3a, class motion authorize claims administrator to

10:55:37   2    implement something regarding the moratoria?

10:55:40   3            MR. HERMAN:  Yes, your Honor.  We've had some good

10:55:42   4    discussions with BP in advance of this conference, and I think

10:55:44   5    hopefully if we have a little time to keep working on it we can try

10:55:48   6    to come to some resolution.

10:55:51   7            THE COURT:  For the benefit of everyone, these are, as

10:55:54   8    the Court appreciates it, there are on the order of 700 maybe

10:56:01   9    moratoria or purportedly claims that have been identified as

10:56:08  10    possible moratoria-related claims that are pending inside

10:56:13  11    Mr. Juneau's program and that have been kind of in a black hole

10:56:19  12    purgatory, whatever you want to call it, unable to be moved for the

10:56:23  13    last several years largely because they, at least this is the

10:56:29  14    dispute between the parties, a legal dispute, as I understand it,

10:56:33  15    has been that BP believes that the settlement agreement requires

10:56:37  16    that there be agreement between the parties, between class counsel

10:56:44  17    and BP as to what the criteria would be to identify whether a claim

10:56:52  18    is or isn't moritoria and a lot of these are probably mixed claims.

10:56:57  19    So how do you distinguish between the moratoria part of someone's

10:57:02  20    claim and the non-moratoria part?  And for whatever reason, I don't

10:57:05  21    want to rehash past history, those discussions broke down and that

10:57:09  22    agreement has never occurred.

10:57:11  23            So as I appreciate it, you all have had some recent

10:57:16  24    discussions and it seems that it would makes sense to give you all

10:57:21  25    maybe 60 days to see if you all can reach some consensus on that?

10:57:26  1          MR. HERMAN:  That would be great, your Honor.

10:57:27  2          THE COURT:  Which would allow, then, some kind of

10:57:31  3   protocol or policy to be adopted by Mr. Juneau to go forward with

10:57:34  4   those claims, one way or the other.

10:57:35  5          Meanwhile, I am going to continue to ask our Court

10:57:40  6   Neutrals to continue to try to resolve, you know, outside of the

10:57:45  7   program, so to speak, as many of those claims as they can.  So it's

10:57:48  8   possible that we'll get that number down substantially within the

10:57:51  9   next 30 to 60 days.  So that's the plan, I guess you could say, for

10:57:57  10  these moratoria-related claims.

10:57:59  11         MR. HERMAN:  Yes.  And I might mention something else

10:58:02  12  which might be helpful to them, and we get a lot of questions about

10:58:05  13  it, kind of relates to e and c above -- or actually I guess c.

10:58:13  14         When Mike and Drake are successful in settling a claim

10:58:16  15  that's currently inside the program, the process is that they

10:58:21  16  withdraw from the settlement program and then do that outside of

10:58:24  17  the settlement.

10:58:25  18         THE COURT:  Right.

10:58:26  19         MR. HERMAN:  And so the question has arisen by them and

10:58:28  20  their counsel, will they nevertheless be included in the assignment

10:58:33  21  portion of the Halliburton-Transocean settlement that's going to

10:58:37  22  the old class?

10:58:37  23         THE COURT:  The answer is yes.  We've already -- we've

10:58:39  24  had those discussions and Mr. Juneau is well aware of that and I

10:58:43  25  think everybody is aware of that.  They're able to give Mr. Juneau

10:58:49  1   whatever information he needs, whatever data, so I don't think that

10:58:52  2   should be of concern.

10:58:54  3          MR. HERMAN:  Yes, your Honor, just wanted to make that

10:58:55  4   clear.

10:58:56  5          THE COURT:  Right, Mr. Juneau?

10:58:58  6          MR. PATRICK JUNEAU:  That's correct, your Honor.

10:59:01  7          MR. HERMAN:  Thank you.

10:59:01  8          THE COURT:  Good.  The next one is claimant's motion to

10:59:07  9   interpret and enforce the settlement agreement regarding customer

10:59:11 10   mix test.  This was requested by some movant's counsel.

10:59:17 11          Mr. Swanson, do you want to come forward?

10:59:20 12          MR. SWANSON:  Yes, sir.  Good morning, your Honor, Jim

10:59:31 13   Swanson on behalf of the claimants.  I have cocounsel here from

10:59:34 14   Atlanta, Mr. Robert Remar, and I was going to let him, with the

10:59:39 15   Court's permission, address this issue with the Court.

10:59:41 16          THE COURT:  Okay.  Sure.

10:59:43 17          MR. SWANSON:  Thank you.

10:59:44 18          MR. REMAR:  Good morning, your Honor.

10:59:44 19          THE COURT:  Good morning.

10:59:46 20          MR. REMAR:  I am Robert Rimar with the firm of Rogers and

10:59:49 21   Harden in Atlanta.  My partner Jeff Willis is with me.

10:59:52 22          Your Honor, in May of 2015 we filed a motion on behalf of

10:59:57 23   four claimants who have substantial --

10:59:59 24          THE COURT:  I have it right in front of me, I am looking

11:00:01 25   at it as you speak.

11:00:03  1          MR. REMAR:  Yes, sir, your Honor.  As your Honor knows

11:00:07  2   from having reviewed that motion, the question is whether the

11:00:10  3   claims administrator's policy, which is Policy 345, Version 3, is

11:00:15  4   contrary to the express language of Exhibit 4b to the settlement

11:00:21  5   agreement.  And we would request that the Court set the matter down

11:00:25  6   for hearing so that BP can respond.  Because our position is set

11:00:30  7   forth in the motion, your Honor, is that the interpretation in that

11:00:35  8   policy is contrary to the express language of Exhibit 4b.

11:00:39  9          THE COURT:  This deals with where you can't -- people

11:00:44 10   have substantial cash customers, so to speak, and you can't

11:00:50 11   identify where they're located, right?

11:00:53 12          MR. REMAR:  That's correct, your Honor.

11:00:53 13          THE COURT:  That's what's at issue here.

11:00:56 14          MR. REMAR:  It involves the modified V and decline only

11:00:59 15   test under the customer mix portion of the settlement agreement.

11:01:03 16   And Exhibit 4b to the settlement agreement provides that if you can

11:01:09 17   show a ten percent decline in total revenue between the two

11:01:12 18   periods, you pass the test.

11:01:13 19          THE COURT:  I don't want to get down into the weeds or

11:01:16 20   the substance of the motion itself because BP hasn't had an

11:01:21 21   opportunity to respond, but I think what we can discuss today is

11:01:28 22   procedurally where we are on this.  So why don't we let Mr. Regan

11:01:33 23   respond to that.  Okay?

11:01:34 24          MR. REMAR:  All right.  Yes, your Honor.

11:01:35 25          THE COURT:  In other words, what is the proper procedural

11:01:38  1   vehicle to reach this issue?  First issue, excuse me, Mr. Regan.

11:01:43  2   First, these are four different claimants, right?

11:01:46  3              MR. REMAR:  That's correct, your Honor.

11:01:48  4              THE COURT:  Okay.  What's the status of these four

11:01:51  5   claims?

11:01:51  6              MR. REMAR:  The claims have been filed.  After we filed

11:01:54  7   them, Mr. Juneau was kind enough to give us the opportunity to

11:01:59  8   present our argument to him regarding the policy.  We met.

11:02:04  9   Mr. Juneau declined to change the policy.  The claims are still

11:02:07 10   pending and have not yet been settled.

11:02:09 11              THE COURT:  So they haven't been finally determined one

11:02:11 12   way or the other?

11:02:13 13              MR. REMAR:  They have not been finally determined.

11:02:15 14              THE COURT:  Okay.

11:02:16 15              MR. REMAR:  But our position, your Honor, of course as

11:02:18 16   you not you have the exclusive --

11:02:18 17              THE COURT:  Aren't you kind of putting the cart before

11:02:19 18   the horse here?  It seems to me your remedy would be once

11:02:24 19   Mr. Juneau -- I am assuming at some point he is going to determine

11:02:27 20   your claim, he may deny it, it sounds like what you're thinking he

11:02:31 21   may deny it, and then you'd have the right of appeal.  In other

11:02:35 22   words, there's a whole appellate process in place in this case, I'm

11:02:40 23   sure you're familiar with it, where if you get denied by his

11:02:44 24   office, you go to the appellate panel.  And if you get denied by

11:02:49 25   them, you have the right to request discretionary review from me.

11:02:53  1    And if I decline to grant discretionary review, you even can go to

11:02:58  2    the Fifth Circuit.

11:03:00  3            So why are we dealing with this in this format here?

11:03:03  4            MR. REMAR:  Well, two reasons:  One, your Honor, of

11:03:06  5    course your Honor under the settlement agreement has the authority

11:03:08  6    to interpret and enforce the settlement agreement.  No. 2, we

11:03:12  7    believe that having a uniform interpretation of this at the front

11:03:17  8    end would save both judicial resources and would advance the

11:03:21  9    interests of the claimants.  I would also note that we know of at

11:03:26 10    least once instance where this issue was presented to the appellate

11:03:31 11    panel and denied it but indicated that they thought that the

11:03:34 12    appropriate -- they thought that it was sufficiently significant

11:03:37 13    that this Court should review it.

11:03:39 14            THE COURT:  Is that your client or somebody else's

11:03:43 15    client?

11:03:43 16            MR. REMAR:  We don't know the names, your Honor, because

11:03:46 17    they're redacted.

11:03:47 18            THE COURT:  Was there ever a request for discretionary

11:03:49 19    review from that case?

11:03:51 20            MR. REMAR:  I don't know that, your Honor.  But the point

11:03:53 21    I am making is that the panel will deny us because of the policy.

11:03:56 22            THE COURT:  Well, that's fine.  But then your remedy is

11:03:59 23    to come up to here.  It just seems to me -- I don't want to get in

11:04:06 24    a situation where people try to bypass the process, the protocol

11:04:12 25    that's in place, and that's what it seems to me this motion is

11:04:15  1   asking me to do.

11:04:16  2              MR. REMAR:  Well, your Honor, this is not a fact specific

11:04:19  3   inquiry.  This is a policy that has been adopted that applies

11:04:23  4   across the board to all claimants who are seeking to meet this

11:04:26  5   test.

11:04:27  6              THE COURT:  Well, how many of these are you aware of?

11:04:30  7   How many claimants have been affected by this policy?  You

11:04:33  8   mentioned one that you say was denied by the appeal panel.  Has

11:04:38  9   anybody else -- has anybody ever brought this to my attention under

11:04:43 10   the discretionary appeal?

11:04:45 11              MR. REMAR:  Not that we know of, your Honor.

11:04:48 12              THE COURT:  Or to the Fifth Circuit?

11:04:49 13              MR. REMAR:  Not that we know of, your Honor.  Of course

11:04:53 14   we filed this motion in 2015.

11:04:54 15              THE COURT:  What I mean is we're pretty far down the road

11:04:57 16   with this case, and it seems like if this was sort of widespread,

11:05:02 17   we'd have seen this before, that's what I am kind of puzzled by.  I

11:05:06 18   would have seen it, maybe even the Circuit would have seen it by

11:05:10 19   now.

11:05:10 20              MR. REMAR:  Well, I am confident, your Honor, that there

11:05:12 21   are hundreds of claimants who are in this situation who have

11:05:15 22   substantial cash sales --

11:05:16 23              THE COURT:  Well, I don't know where they are, I haven't

11:05:18 24   seen them.

11:05:19 25              MR. REMAR:  Well, your Honor, our point is we have

11:05:22  1  clients with substantial claims, and we believe that resolving this

11:05:26  2  policy now would enhance the whole judicial review process.  We

11:05:32  3  would have a decision which Mr. Juneau could then interpret.

11:05:36  4         THE COURT:  I understand your argument.  Let me hear from

11:05:38  5  Mr. Regan.

11:05:41  6         MR. REGAN:  Your Honor, we have seen the motion, we agree

11:05:45  7  that there is a ripeness question with it.  We disagree that's not

11:05:49  8  factually dependent.  I think one of the things you get from the

11:05:51  9  motion is how factually dependent these issues are.  So we're happy

11:05:55  10  to file a response to the brief, and we would ask for time to do

11:05:58  11  that.

11:05:59  12         But we agree from a procedural standpoint, both the

11:06:03  13  specifics about these claimant situations and the way the policy

11:06:07  14  interacts with them, would be better developed through the process

11:06:10  15  that everyone else has been following, which is they get a

11:06:14  16  determination, they have an appeal, and at that point they can seek

11:06:18  17  discretionary review.

11:06:19  18         We would ask time to respond to the brief, but we do --

11:06:21  19  our first instinct is that it's an odd procedural posture.

11:06:27  20         There is also a confidentiality aspect to it where if

11:06:29  21  you're in that appellate process through the normal channels, it's

11:06:32  22  easier to actually discuss the case; whereas, right now we don't

11:06:37  23  know anything about those claimants respecting the confidentiality

11:06:41  24  of this process.  So it's -- we can make procedural arguments, but

11:06:45  25  the rest of it is very difficult for us to respond to respecting

11:06:48  1    the confidentiality of the claimants' information.

11:06:51  2            THE COURT:  Okay.  Let me ask Mr. Juneau.  I don't know

11:06:55  3    off the top of your head you would be able to answer this, but are

11:06:59  4    these types of claims -- do you have like a hold on these types of

11:07:02  5    claims or they're just still in whatever the ordinary process would

11:07:10  6    be?

11:07:10  7            MR. PATRICK JUNEAU:  They're throughout the process.

11:07:12  8            THE COURT:  They are not being held up because of this?

11:07:14  9            MR. PATRICK JUNEAU:  They're throughout the whole

11:07:16  10   process.

11:07:16  11           THE COURT:  So at some point in the ordinary course of

11:07:19  12   things you gave us the numbers as to what's left and when you

11:07:23  13   anticipate finishing up the claims that remain.  These claims will

11:07:28  14   be processed, granted, denied, whatever, but they will be

11:07:32  15   processed, right?

11:07:33  16           MR. PATRICK JUNEAU:  Yes, sir, the normal standard.

11:07:35  17           THE COURT:  Okay, that's all.  I just wanted to make sure

11:07:36  18   they weren't in some hole like the moratorium cases.

11:07:40  19           MR. PATRICK JUNEAU:  No.

11:07:42  20           THE COURT:  Okay.  Thank you.

11:07:44  21           Mr. Regan, how much time would you like to have to

11:07:46  22   respond to this?

11:07:49  23           MR. REGAN:  Fourteen or 21 days, your Honor.

11:07:50  24           THE COURT:  Okay.  I'll give you 21 days and then I'll

11:07:52  25   take that under advisement.  Okay?

| | | |
|---|---|---|
| 11:07:54 | 1 | MR. REGAN:  Thank you, your Honor. |
| 11:07:55 | 2 | MR. REMAR:  Thank you, your Honor. |
| 11:07:56 | 3 | THE COURT:  You're welcome. |
| 11:08:00 | 4 | Okay.  The last item on the agenda is again requested by |
| 11:08:06 | 5 | someone, I am not sure who requested that. |
| 11:08:18 | 6 | Good morning, Mr. McGlone. |
| 11:08:20 | 7 | MR. McGLONE:  Good morning, your Honor.  How are you, |
| 11:08:22 | 8 | sir? |
| 11:08:22 | 9 | THE COURT:  I'm good.  How are you? |
| 11:08:22 | 10 | MR. McGLONE:  I am fine.  Your Honor, Kevin McGlone on |
| 11:08:25 | 11 | behalf of a number of claimants.  My partner Martha Curtis had |
| 11:08:28 | 12 | submitted this request.  The issue, and it sort of follows what you |
| 11:08:32 | 13 | were talking about a moment ago with the motions and appeal panels. |
| 11:08:36 | 14 | There's -- we're dealing with a similar claim and we're looking to |
| 11:08:40 | 15 | appeal panel decisions trying to figure out what claims are on |
| 11:08:43 | 16 | appeal.  It's very tough to understand or know who is representing |
| 11:08:47 | 17 | anybody on appeal panels, on appeal decisions so that we can |
| 11:08:51 | 18 | compare notes, find out did you seek review to the Fifth Circuit, |
| 11:08:54 | 19 | did you seek review to your Honor on discretionary review, compare |
| 11:08:58 | 20 | briefing notes. |
| 11:08:59 | 21 | And if there was some procedure so that we could know who |
| 11:09:02 | 22 | is representing parties on appeal panel decisions, not -- we |
| 11:09:06 | 23 | understand the confidentiality of the parties themselves, but at |
| 11:09:10 | 24 | present the only way we can find out who is representing them is to |
| 11:09:14 | 25 | send an e-mail either to Mr. Herman or send an e-mail to somebody |

1   with the claims administrator's office who then has to reach out to

2   the lawyers involved to see if they're okay with us -- with their

3   name being released and then putting us in touch, and we're just

4   simply wondering if there was some way or some procedure that can

5   be put in place.

6       THE COURT:  Y'all don't have some kind of list serve?  I

7   would be shocked if you couldn't press a button on the e-mail and

8   go to all of the layers and say, "I've got this issue.  Anybody

9   handling a similar type case?"

10      MR. McGLONE:  The only one we're aware of, your Honor, is

11  simply going to the liaison counsel.  I don't think we have one

12  with individual lawyers who are before the appeal panels and in the

13  settlement program.

14      THE COURT:  I understand because in our liaison counsel

15  meetings, speaking of liaison counsel I asked about this, and

16  Mr. Herman can speak to it if he would like, I understand that he

17  has been -- they've been able to give you or Ms. Curtis this

18  information 99.99 percent of the time.  There was one single case

19  where for some reason they were unable to identify the lawyer, and

20  that one case caused her to file this request?

21      MR. McGLONE:  No, your Honor, I think it's simply trying

22  to take out the middle man.  If there was an easier way then having

23  to bother --

24      THE COURT:  Well, they're getting paid to be the middle

25  man, you know.

11:10:31   1          MR. McGLONE:  That's fine, your Honor.

11:10:33   2          THE COURT:  That's what liaison counsel means.

11:10:35   3          MR. McGLONE:  That's true, your Honor.  If they are

11:10:37   4  willing to do that, we were just simply trying to see if there was

11:10:40   5  a way to shortcut that.

11:10:41   6          THE COURT:  I don't think I am going to make a big deal

11:10:44   7  of trying to come up with some policy or something or order, it

11:10:47   8  seems like -- I am not making light of it, but it seems like

11:10:52   9  something that is working, can be worked out 99.9 percent of the

11:10:55  10  time, so I think you're okay.

11:10:56  11          MR. McGLONE:  Thank you, your Honor.  I appreciate it.

11:10:58  12          THE COURT:  Good.  Thank you.

11:11:00  13          MR. PATRICK JUNEAU:  Your Honor, we don't use the

11:11:04  14  terminology middle man, we go back to the ad that was in New

11:11:07  15  Orleans, "The Special Man".

11:11:09  16          THE COURT:  The Special Man.  You gotta see The Special

11:11:09  17  Man.

11:11:11  18          MR. PATRICK JUNEAU:  We just give it to them in this

11:11:15  19  case, another way around.

11:11:16  20          THE COURT:  Is that something you can provide or how do

11:11:20  21  they get that information?  Mr. Juneau, since you stood up, I'll

11:11:23  22  ask you.  You interjected yourself into this.  Do they get that

11:11:28  23  from you or they get that from -- how do they identify that?

11:11:32  24          MR. PATRICK JUNEAU:  Are you talking about?

11:11:33  25          THE COURT:  Yeah.

11:11:34  1          MR. PATRICK JUNEAU:  What we've done, your Honor, I think

11:11:37  2   you pretty well articulated it, through the system.  We followed

11:11:39  3   through the accounts and we are trying to accommodate that.  That's

11:11:43  4   what we did but we didn't want to violate confidentiality.  And the

11:11:46  5   reality of it is 99.9 percent of the cases, that's exactly how it

11:11:51  6   occurred.  I think you hit the nail on the head with what the issue

11:11:55  7   was.

11:11:56  8          THE COURT:  Okay.  Anybody else has anything else you

11:12:03  9   would like to raise?

11:12:06  10          MR. COON:  Real briefly, your Honor, if I may.

11:12:09  11          THE COURT:  Mr. Coon, you're still here?  I heard rumors

11:12:12  12   that they had settled all of your cases.

11:12:14  13          MR. COON:  I did want to say this, Judge, on behalf of

11:12:19  14   particularly with Drake and Mike.  My firm, as you know, your

11:12:23  15   Honor, we had probably 15,000 cases in these proceedings, some in

11:12:28  16   various classes.

11:12:29  17          THE COURT:  Did you identify yourself for the record?

11:12:31  18          MR. COON:  Yes, Brent Coon on behalf of plaintiffs.

11:12:34  19          THE COURT:  I'm sorry.

11:12:35  20          MR. COON:  But I did want to commend particularly these

11:12:38  21   gentlemen over here.  I spent the better part of last year going

11:12:40  22   through 8,000 cases individually one at a time.  We continued to do

11:12:43  23   so up through this morning.  And we have resolved all but about 20

11:12:49  24   of those 8,000 cases I've been dealing with them on.  And I know

11:12:53  25   that we aren't the only ones that have been involved in that

11:12:56  1    process, but it's been an incredible venture with these gentlemen.

11:13:01  2    I cannot imagine how they've been able to sustain that pace for

11:13:04  3    that long.

11:13:05  4         The Magistrate was extremely commendable in the whole

11:13:08  5    process too and is dearly missed.  But we commend the Court for

11:13:12  6    addressing those issues, very important to our clients who were

11:13:15  7    mostly opted out from the class settlements before to get the

11:13:18  8    attention of the Court, and the benefits of the experience of these

11:13:21  9    gentlemen.  So thank you, your Honor.

11:13:22  10        THE COURT:  Well, thank you.  Hopefully you'll say

11:13:25  11   something nice about them and us in your next media appearance.

11:13:30  12        MR. COON:  Definitely.

11:13:31  13        THE COURT:  Stop saying all of those bad things you were

11:13:33  14   saying about us.

11:13:34  15        MR. COON:  I am much happier these days.

11:13:37  16        THE COURT:  I see that.  Okay.  Anybody else have

11:13:44  17   anything else?

11:13:46  18        We're not holding these regular conferences, obviously,

11:13:49  19   anymore, it's been a long time since we had one.  But as it should

11:13:53  20   be obvious to anybody that's been involved in the case and

11:13:56  21   following, it doesn't mean that we all haven't been working in

11:13:59  22   terms of moving this case forward.  And as I started at the

11:14:04  23   beginning this morning, just say how much progress we've made, and

11:14:09  24   I am very, very pleased to be where we are.  We're not finished.

11:14:14  25   We still have some work to do.  And I am not going to make another

11:14:19  1   prediction as to when we're going to be finished, because it gets

11:14:22  2   to be at the end you have so many loose ends to tie up that it

11:14:28  3   becomes difficult to predict exactly how long that will take.

11:14:32  4        In addition to all of the issues we've been talking

11:14:43  5   about, I received a message, I don't think -- some kind -- it

11:14:52  6   wasn't even filed with the Court but it was forwarded to me by

11:14:55  7   Mr. Herman from someone else, a group who represent B3-type

11:15:01  8   claimants or medical class claimants, that wanted to advise the

11:15:09  9   Court that they may be filing up to 12,000 BELO claims, Back-End

11:15:16  10  Litigation Option claims.  I am not sure what I am supposed to do

11:15:18  11  with that information at this moment.

11:15:20  12       But, you know, if that comes to pass -- because we've

11:15:24  13  only seen a relative handful of those so far.  There is a protocol

11:15:28  14  in place, we have a Case Management Order in place by Judge

11:15:32  15  Wilkinson, who is now the Magistrate assigned to this case, is

11:15:36  16  primarily handling.  And as those cases come in, he first looks at

11:15:41  17  them to see they jump through the hoops that you have to jump

11:15:47  18  through in front of the claims administrator.  And if so, then he

11:15:51  19  will first decide whether the case -- all of those cases have to be

11:15:55  20  filed here in the first instance, but they are subject to being

11:15:58  21  transferred for venue to other district courts or somewhere in the

11:16:07  22  country, and he gives me a report every month.  Like I said, we've

11:16:10  23  only had a relative handful, I think it's less than two dozen,

11:16:14  24  maybe a dozen, 15, I don't know.  But he's primarily handling that.

11:16:20  25       And the ones that stay here, I've just instructed the

11:16:23  1   Clerk to just randomly allot those cases amongst the judges in our

11:16:27  2   court.  So they could end up with any judge here.

11:16:33  3         We obviously have a lot of work to do on the common

11:16:36  4   benefit fees, fee motions.  I've awarded -- I've set the aggregate

11:16:44  5   fees in the settlements that have been approved, but the next stage

11:16:48  6   will be the allocation of those common benefit fees.  And, you

11:16:59  7   know, at some point, you know, the Court will have to decide what

11:17:06  8   cases that are left remain here and what cases may have to be

11:17:13  9   ultimately transferred back, if they came through the MDL Panel as

11:17:19  10  a tag along case and they can't be resolved one way or another

11:17:24  11  here, at some point I may have to consider suggesting to the panel

11:17:28  12  that some these cases be remanded to other districts.

11:17:31  13        Although, I looked at the list that is attached to the

11:17:35  14  status report by liaison counsel, and it looks like a large, large

11:17:40  15  number were filed here.  So they would stay here and I've already

11:17:46  16  had -- we've given thought to that.  At some point, again, with

11:17:50  17  those, my plan would be to ask the Clerk to re-allot them randomly

11:17:54  18  amongst the judges in our court, those judges who would not be

11:17:58  19  recused for some reason.  Since we have 12 judges here -- 10 now

11:18:05  20  but we'll soon have 12 again, I think, 12 plus we could probably

11:18:11  21  easily, efficiently is a better word, handle whatever cases remain.

11:18:17  22        So unless someone has anything else, that concludes our

11:18:21  23  conference.  Thanks to everyone again for your cooperation.  We'll

11:18:28  24  follow through on what we said here today.

11:18:32  25        Thank you.  Court stands adjourned.

1:18:33    1          THE DEPUTY CLERK:  All rise.

1:18:34    2          (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

    3

    4                          * * * * * *

    5

    6                    REPORTER'S CERTIFICATE

    7

    8          I, Karen A. Ibos, CCR, Official Court Reporter, United

    9    States District Court, Eastern District of Louisiana, do hereby

   10    certify that the foregoing is a true and correct transcript, to the

   11    best of my ability and understanding, from the record of the

   12    proceedings in the above-entitled and numbered matter.

   13

   14

   15              ___/s/ Karen A. Ibos_____

   16              Karen A. Ibos, CCR, RPR, CRR, RMR

   17              Official Court Reporter

   18

   19

   20

   21

   22

   23

   24

   25

EXHIBIT 2

Case: 18-31177     Document: 00515297113     Page: 76     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 77 of 1003
Case 2:10-md-02179-CJB-DPC Document 25293-14 Filed 02/05/2019 Page 1 of 14

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | ) | MDL 2179 |
| "Deepwater Horizon" in the Gulf | ) | |
| Of Mexico, on April 20, 2010 | ) | SECTION: J |
| | ) | |
| This Document Relates  To 2:18-cv-11111 | ) | JUDGE BARBIER |
| | ) | MAG. WILKINSON |
| | ) | |
| | ) | PLAINTIFF DEMANDS A TRIAL |
| | ) | BY JURY ON ALL CAUSES OF |
| | | ACTION |

---

## FIRST AMENDED COMPLAINT

**NOW COMES PLAINTIFF,** MMR Group, Inc. d/b/a MMR Constructors, Inc. through undersigned counsel, and files its First Amended Complaint against the Defendants, as follows:

## NATURE OF THE ACTION

1.  On or about April 20, 2010, a well blowout on vessel *Deepwater Horizon* in the Gulf of Mexico marked the beginning of what would become one of the most pervasive and devastating environmental disasters in the United States. The blowout and subsequent explosions, fire and sinking of the vessel resulted in an oil spill of unprecedented proportions (the  "Oil Spill"). Over 200 million gallons of crude oil were released from the Macondo Well in  Mississippi Canyon Block 252 on the Outer Continental Shelf (the "Macondo Well"), damaging,  depleting, and destroying offshore, marine, and coastal environments in the Gulf of Mexico,  Louisiana, Mississippi, Alabama, Texas and Florida.

2.  Plaintiff has suffered economic injury, damage and/or losses as a direct and foreseeable result of the Oil Spill and its devastating impact on the offshore, marine and coastal

EXHIBIT 2

Case: 18-31177     Document: 00515297113     Page: 77     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 78 of 1003
Case 2:10-md-02179-CJB-DPC Document 23914 Filed 02/05/19 Page 2 of 100

environments.

3.      Given the nature of the Oil Spill, and its uncertain impact on nature and the Environment, the full extent of the Oil Spill's impact is not yet know, and Plaintiff reserves its rights in full to amend this Complaint by, among other things, adding new claims and new defendants.

## PARTIES

4.      Plaintiff, MMR Group, Inc. d/b/a MMR Constructors, Inc. (hereinafter "Plaintiff"), is a business that is domiciled in Louisiana, with its principle place of business/operations in Baton Rouge, Louisiana. Plaintiff suffered economic injury, damages and/or losses as a direct and proximate result of the Oil Spill and the associated environmental devastation.

5.      At all relevant times, the Plaintiff performed services as an electrical contractor licensed to do business in Louisiana, Texas, Mississippi, Alabama, Florida, and other states. The Plaintiff has several locations strategically located to service the industries in the Gulf of Mexico area.

6.      The Plaintiff submitted a Business Economic Loss claim to the *Deepwater Horizon* Court-Supervised Settlement Program implemented in connection with the *Deepwater Horizon* Economic and Property Damages Settlement Agreement, as amended on May 2, 2012. (Rec. Doc. 6430-1 in 2:10-md-2179). The Plaintiff is a member of the *Deepwater Horizon* Economic and Property Damages Settlement Class (the "Class").

7.      Defendant BP Exploration & Production, Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a lease holder and the designated operator in the lease granted by the former

Case: 18-31177    Document: 00515297113    Page: 78    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/20 Page 79 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/19 Page 3 of 100

Minerals Management Service ("MMS")[1] allowing it to perform oil exploration, drilling, and production- related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Spill originated. BP Exploration was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution of 1990, 33 U.S.C. § 2714. This Court has personal jurisdiction over BP Exploration, because BP Exploration is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

8.      Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. BP America was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo Well by the *Deepwater Horizon* vessel. This Court has personal jurisdiction over BP America, because BP America is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

9.      Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division within BP Exploration and BP America, through vertical business arrangements aligned by product or service groups. BP p.l.c.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally.

---

[1]    The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010; however, it shall be referred to as the MMS throughout this document.

Case: 18-31177     Document: 00515297113     Page: 79     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/20 Page 80 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/19 Page 4 of 100

10.     BP p.l.c. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development. A sampling of BP p.l.c.'s contacts with the U.S. are as follows: (a) BP p.l.c.'s American Depository Shares are listed on the New York Stock Exchange ("NYSE") and BP p.l.c. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP p.l.c. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP p.l.c.'s fixed assets are located in the U.S. or the European Union; and (e) BP p.l.c. reports having 2,100 U.S.-based employees in non-Exploration & Production, non-Refining & Marketing BP entities.

11.     This Court has general jurisdiction over BP p.l.c. pursuant to Louisiana's long- arm statute's general jurisdiction provision (La. Rev. Stat. Ann. § 13:3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure. BP p.l.c. does business in Louisiana, has had continuous and systematic contacts with Louisiana (and the U.S. more generally), and BP p.l.c. will be served with a summons and this Complaint.

12.     Alternatively, if BP p.l.c. contests that it is subject to jurisdiction under Louisiana's long-arm jurisdiction statute, then this Court may exercise personal jurisdiction over BP p.l.c. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, the federal long-arm jurisdiction provision, because claims in this action arise under federal law, the exercise of jurisdiction over BP p.l.c. is consistent with the United States Constitution and laws, and BP p.l.c. will be served with a summons and this Complaint.

13.     This Court also has specific jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm specific jurisdiction provision (La. Rev. Stat. Ann. § 13:3201), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure. Plaintiff's causes of action arise out of

Case: 18-31177    Document: 00515297113    Page: 80    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 81 of 1003
Case 2:10-md-02179-CJB-DPC Document 23714 Filed 06/05/19 Page 5 of 100

wrongful conduct committed by BP p.l.c., directly or indirectly by its agents, which caused injury or damage in Louisiana by an offense or quasi-offense committed through an act or omission outside of Louisiana, and BP p.l.c. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana. These acts or omission took place both before the blowout resulting in the Oil Spill and in the negligent conduct of BP p.l.c. after the blowout in attempting to contain the catastrophic damage caused by the Oil Spill. In addition, BP p.l.c. will be served with a summons and this Complaint.

14. In addition, this Court also has personal jurisdiction over BP p.l.c. under agency principles because BP p.l.c.'s agents, BP America and BP Exploration, do business in Louisiana. In BP p.l.c.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America and BP Exploration, BP p.l.c. states that it "controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities . . . ."

15. BP p.l.c.'s direct, joint and/or assumed responsibility and/or liability for safety and well control, both before and/or after the explosions and blowout on April 20, 2010, is further evidenced by the announcement of the Macondo Project on the BP website hosted and copyrighted by BP p.l.c., the publication of information concerning the casualty and spill on the BP website hosted and copyrighted by BP, the express and/or implied acceptance of responsibility for safety of BP operations in North America and the Gulf of Mexico in statements by officers of BP p.l.c., the presence (upon information and belief) of a BP p.l.c. officer or employee on the *Deepwater Horizon* for the celebration that occurred

Case: 18-31177     Document: 00515297113     Page: 81     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 82 of 1003
Case 2:10-md-02179-CJB-DPC Document 23974 Filed 02/05/2019 Page 6 of 100

shortly before the explosions and fire, the direct participation of BP p.l.c. employees in the post-casualty investigation, the direct participation of BP p.l.c. officers and employees in the governmental post-casualty investigations, the direct participation of BP p.l.c. officers and employees in the post-casualty well-control efforts, and the direct participation of BP p.l.c. in the establishment and/or funding of the Escrow Fund and/or Gulf Coast Claims Facility.

16.     Unless otherwise specified, BP Exploration, BP America, and BP p.l.c. are generally referred to herein collectively as the "BP Defendants" or "BP."

17.     Defendant Halliburton Energy Services, Inc. ("HESI") is a Delaware corporation with its principal place of business in Houston, Texas. HESI is registered to do and does business in the State of Louisiana. HESI provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the *Deepwater Horizon*, as well as onshore engineering support for those operations. HESI was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo Well. At and before the time of the blowout, HESI was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil.

18.     Defendant Sperry Drilling Services (formerly Sperry Sun Drilling Services) (hereinafter, "Sperry") is a division of HESI and was responsible for mudlogging personnel and equipment on the *Deepwater Horizon*, including downhole drilling tools. Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations.

19.     Unless otherwise specified, Halliburton Energy Services, Inc. and its Sperry division are referred to herein collectively as "Halliburton."

Case: 18-31177    Document: 00515297113    Page: 82    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 83 of 1003
Case 2:10-md-02179-CJB-DPC Document 25970-14 Filed 08/05/19 Page 7 of 100

20.    Defendant Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Offshore is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

21.    Defendant Transocean Holdings, LLC ("Transocean Holdings") is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Holdings is a wholly-owned subsidiary of Transocean Offshore. Transocean Holdings is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon* and participated in the *Deepwater Horizon*'s offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. More specifically, Transocean Holdings is a party to the contract with BP regarding the lease of the *Deepwater Horizon* for drilling operations in the Gulf of Mexico. On April 28, 2010, the U.S. Coast Guard named Transocean Holdings as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the blowout by the *Deepwater Horizon*.

22.    Defendant Transocean Deepwater, Inc. ("Transocean Deepwater"), is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district. Transocean Deepwater is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*.

23.    Defendant Transocean Ltd. ("Transocean Ltd.") is a Swiss Corporation that maintains substantial U.S. offices in Houston, Texas and that at all pertinent times was doing

Case: 18-31177    Document: 00515297113    Page: 83    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 84 of 1003
Case 2:10-md-02179-CJB-DPC Document 25974 Filed 08/05/19 Page 8 of 100

business in the State of Louisiana and within this district. According to its Complaint and Petition for Exoneration from or Limitation of Liability, Transocean Ltd. was an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon.*

24.    Defendant Triton Asset Leasing GmbH ("Triton") is a Swiss limited liability company with its principal place of business in Zug, Switzerland. Triton is an owner, managing owner, owner *pro hac vice*, and/or operator of the *Deepwater Horizon*. Triton is believed to have had a place of business and/or to have been doing business within this District and within the jurisdiction of this Court with respect to the matters sued upon and actions of Triton have had direct impacts within the State of Louisiana and within this District.

25.    Unless otherwise specified, Defendants Transocean Offshore, Transocean Holdings, Transocean Deepwater, Transocean Ltd., and Triton are hereinafter referred to collectively as "Transocean."  At the Macondo site, Transocean provided the *Deepwater Horizon* vessel and personnel to operate it. At all times relevant to the Oil Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems. Transocean also provided operational support for drilling-related activities on board the *Deepwater Horizon*, as well as onshore supervision and  support for those drilling activities at all times relevant to the Oil Spill.

## JURISDICTION/VENUE

26.    Jurisdiction exists before this Court pursuant to the Oil Pollution Act ("OPA"), 33 U.S.C. § 2717(b).

27.    In addition, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

28.    In addition, to the extent that any claims do not give rise to jurisdiction under

Case: 18-31177      Document: 00515297113      Page: 84      Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 85 of 1003
Case 2:10-md-02179-CJB-DPC Document 23714 Filed 02/05/2019 Page 9 of 14

28 U.S.C. § 1331 and/or 33 U.S.C. § 2717(b), this Court also has supplemental jurisdiction under

28 U.S.C. § 1367.

29.     Venue is appropriate in this District under 28 U.S.C. § 1391 because

Defendants do business herein, a Defendant resides herein, or the events or omissions giving

rise to the claims asserted herein occurred in this District.

30.     Venue is also proper pursuant to OPA, 33 U.S.C. § 2717(b), as the

discharge occurred in this District.

31.     Venue is also appropriate in this District consistent with 28 U.S.C. § 1407 and

the 2010 Transfer Order of the Judicial Panel on Multidistrict Litigation. *See In re Oil Spill by*

*the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp.

1352 (J.P.M.L. 2010), and this Court's Pretrial Order No. 20 (Rec. Doc. 904), which allows

plaintiffs to directly file their complaints arising out of the Oil Spill in this District.

## **FACTUAL ALLEGATIONS**

32.     Plaintiff adopts and incorporates as if fully restated herein the factual

allegations raised in Paragraphs 258-543 of the Amended B1 Master Complaint, Document

No. 1128 filed in MDL No. 2179, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the*

*Gulf of Mexico, on April 20, 2010* (the "MDL B1 Master Complaint").

33.     BP and Transocean are "responsible parties" for the Oil Spill under OPA,

33 U.S.C. § 2714. Because of the strict liability of responsible parties for damages due to

and arising from the Oil Spill and its environmental devastation, Plaintiff does not need to set

forth factual allegations to support culpability under the OPA. Out of an abundance of caution

and to support Plaintiff's other claims, as well as any relief the Court may deem just and

proper, Plaintiff nevertheless include such allegations herein.

## BP's Macondo Lease, Exploration Plan and Drilling Permit

34.      On June 1, 2008, BP acquired a ten-year lease from the MMS to search for and exploit hydrocarbon reservoirs at the Macondo prospect site in Mississippi Canyon Block 252, 48 miles off the coast of Louisiana.

35.      Before BP could begin operations at the  Macondo site, federal regulations required BP to submit an Exploration Plan ("EP") demonstrating that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment.  30 C.F.R. §§ 250.201, 250.202.

36.      Federal regulations required that the EP be accompanied by "oil and hazardous  substance spills information" and "environmental impact analysis information." C.F.R. §§  250.212, 250.219, 250.227.

37.      Among the information required to accompany the EP was a "blowout scenario,"  described as follows:

> A scenario for the potential blowout of the proposed well in your EP that you  expect will have the highest volume of liquid hydrocarbons. Include the estimated  flow rate, total volume, and maximum duration of the potential blowout. Also,  discuss the potential for the well to bridge over, the likelihood for surface intervention to stop the blowout, the availability of a rig to drill a relief well, and  rig package constraints. Estimate the time it would take to drill a relief well.

30 C.F.R. § 250.213 (g).

38.      The oil and hazardous spills information accompanying the EP was required to include an oil spill response plan providing the calculated volume of BP's worst case discharge scenario (*see* 30 C.F.R. 254.26(a)), and  a comparison of the  appropriate  worst case discharge scenario in [its] approved regional [Oil Spill Response Plan]  with the

worst case discharge scenario that could result from [its] proposed exploration activities; and a description of the worst case discharge scenario that could result from [its] proposed exploration activities, (*see* 30 C.F.R. 254.26(b), (c), (d), and (e)); 30 C.F.R. § 250.219.

39.     Federal regulations required BP to conduct all of its lease and unit activities according to its approved EP, or suffer civil penalties or the forfeiture or cancellation of its lease. 30 C.F.R. § 250.280.

40.     In February 2009, BP filed its 52-page Initial EP for the Macondo prospect site with the MMS. In the Environmental Impact Analysis section, BP repeatedly asserted that it was "unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities." In the unlikely event that a spill did occur, BP predicted a worst case discharge scenario of 162,000 gallons of oil per day, an amount it assured the MMS that it was prepared to respond to. BP also claimed the well's distance from the nearest shoreline would preclude any significant adverse impacts from a spill.

41.     Based on these assurances, the MMS approved BP's Initial EP for the Macondo prospect on April 6, 2009, including the approval of a "categorical exclusion" from the full environmental analysis normally required under the National Environmental Policy Act. As detailed more fully below, the MMS' approval of BP's Initial EP and the categorical exclusion from environmental analysis were predicated on BP's flagrant misrepresentations about the risk of a surface or subsurface oil spill at Macondo, and its capability to respond to such a spill.

42.     After its EP was approved, BP sought a permit from the MMS authorizing it to drill up to a total depth of 19,650 feet at the Macondo site.

**The *Deepwater Horizon***

43.     The *Deepwater Horizon* was a $560,000,000.00 ultra-deepwater, dynamically- positioned semi-submersible oil drilling rig built by Hyundai Heavy Industries Co., Ltd. of South Korea.

44.     The *Deepwater Horizon* was delivered to Transocean in February 2001.

45.     At times relevant herein, the *Deepwater Horizon* was owned by Transocean but leased to BP for a term continuing through September 2013.

46.     BP leased the *Deepwater Horizon* to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252 ("Macondo"), a location on the outer continental shelf in the Gulf of Mexico. As part of its agreement with BP, Transocean provided employees, contractors, and other officials who assisted BP in its oil exploration and production activities at the Macondo prospect.

47.     As a mobile offshore drilling unit, the *Deepwater Horizon* was utilized by the Defendants for, *inter alia*, drilling sub-sea wells for oil exploration and production in areas of depth in excess of 5,000 feet of water.

48.     The Defendants started drilling the Macondo Well on October 7, 2009, using the Marianas rig. This rig was damaged in Hurricane Ida on November 9, 2009. As a result, BP and the rig operator, Transocean, replaced the Marianas rig with the *Deepwater Horizon*. Drilling with the *Deepwater Horizon* stared on February 6, 2010.

49.     Prior to its destruction, the *Deepwater Horizon* was drilling at over 22,000 feet — 2,000 feet deeper than described in the BP Exploration Plan or allowed by any permits issued by the MMS to BP.

50.     The *Deepwater Horizon* rig was expensive. Transocean charged BP approximately $500,000 per day to lease the rig, plus contractors' fees. BP targeted drilling the well

to take 51 days and cost approximately $96 million.

51.     The *Deepwater Horizon* was supposed to be drilling at a new location as early
as  March 8, 2010. In fact, the Macondo well took considerably longer than planned to complete.
By April 20, 2010, the day of the blowout, the rig was 43 days late for its next drilling location,
which may have cost BP as much as $21 million in  leasing fees alone. It also set the  context
for  the series of decisions that BP made in the days and hours before the blowout.

### The Process of Ultra-Deepwater Offshore Drilling

52.     The  process  of  ultra-deepwater offshore drilling  generally  involves  several
steps. First, seismic and/or magnetic surveys are undertaken to locate "traps," rock formations
that may contain significant deposits of oil, natural gas, or other hydrocarbons.

53.     Upon  locating  a  promising  "trap,"  oil rigs  such  as  the  *Deepwater  Horizon*
are positioned on the sea surface above the proposed well  site, and from  there begin drilling
an "exploratory" well to investigate the viability of the trap. Once the trap is  determined to
be a worthwhile source of hydrocarbons, the drilling vessel performs  "completion" operations
to transform the exploratory well into a "production" well that will  extract oil or gas from
the trap. At this point, well are sometimes temporarily abandoned — sealed with cement
so they are secure against any influx of hydrocarbons from the reservoirs they have
penetrated — so they can be reopened by a production vessel at some later date. At the
time of the April 20, 2010 blowout, the *Deepwater Horizon* crew was in the process of
preparing the Macondo Well for temporary abandonment.

54.     Once an oil rig such as the *Deepwater Horizon* has been properly positioned
to drill an exploratory well, a wide-diameter hole is drilled into the seabed, generally to a
depth of about 300 to 400 feet.  This hole is known as a "pilot hole."

55.    Once  drilled, the pilot hole  is "cased." "Casing" describes both  the  actual pipe  lining a well, in addition to the act of lining the drilled hole — the well bore — with such pipe.

56.    The combination of drilling the pilot hole and casing is known as "spudding in."

57.    The  casing  initially   lowered  into  the  pilot  hole  generally   anchors  a safety device known as the blowout preventer, or "BOP." The BOP is  an  appurtenance  of  the  drilling vessel  and a part of the vessel's equipment.

58.    The BOP is an assembly of hydraulically operated valves that sense pressure. It is designed to prevent a blowout from reaching an oil rig. Its valves are  mounted  in  a  direction perpendicular  to  the  anticipated  flow  of  oil.  The  BOP  is  equipped  with  a  series of different "rams"  which  can  be  utilized  to  close  off  the  well  in  various  situations,  depending  on  the presence or absence of the drill stem or casing in the shaft. The BOP on this  well was a 53-foot-tall steel framed stack weighing 450 tons.

59.    BOP devices generally close within 30 seconds of activation. A BOP's rams can  be  manually  activated  from  the  drill  rig.  Likewise,  BOPs  generally  feature  a  deadman's switch,  which  is  intended  to  activate  the  device's  rams  if  electrical  and/or  hydraulic connections to the  oil rig are severed.

60.    BOP devices are also able to be activated by using remotely operated vehicles, or  "ROVs," at the wellhead.

61.    The  risk  of  a  blowout  is  one  of  the  most  dangerous  and  common  risks  in deepwater drilling, hence the installation of the BOP so early in the well drilling process. The BOP is a crucial last line of defense for a drilling vessel and its workers if all other attempts to balance well pressure and counter an influx fail, and the well begins to flow out of control.

62.    Once the BOP is properly positioned and secured over the pilot hole, the drilling apparatus and additional casing sections are lowered down through the BOP into the well, while a pipe called a "marine riser" connects the wellhead to the drilling vessel at the surface.

63.    As the drill stem is passed through the marine riser and BOP, drilling fluid known as "mud" is pumped down the center of the drill pipe. This "mud," a thick mixture of barite, water, clay, and chemicals, cools and lubricates the drill bit and suspends and carries drilled rock fragments and other drilling debris to the surface as it flows upwards outside of the drill stem but inside the marine riser.

64.    Drilling mud is carefully formulated so that its hydrostatic pressure[2] slightly exceeds that of the ambient pressure conditions in the various rock formations encountered during the drilling process. The weight of the mud pushes back against the pressure of the hydrocarbons in those formations, helping to control against the ever-present risk of kicks and blowouts in the well.

65.    As the well bore is drilled deeper and deeper, additional sections of casing are added to line each newly-drilled open hole section with pipe. Each casing section is secured with a plug of cement. If a well is to be temporarily abandoned before production, then when drilling reaches the hydrocarbon reservoir, the cementing contractor temporarily seals the well off from the hydrocarbon reservoir it has penetrated, isolating the oil and gas to prevent it from leaking into the well, and then places a temporary cement plug below the BOP at the top of the well.

---

[2] Hydrostatic pressure is the pressure exerted by a fluid due to the force of gravity. The denser a fluid, the higher its hydrostatic pressure. Drilling mud is often very dense (12 to 16 pounds per gallon), so it can counter the highly pressurized hydrocarbons surrounding a well. In comparison, seawater is relatively light, only 8.6 ppg.

66.    Assuming the design of the well is stable, and proper testing and analysis confirm the integrity of the cement plugs, casing string, and other well components, the drilling vessel can disconnect from the well, temporarily abandoning it until a permanent oil production platform is put into place on the sea surface above the well to begin extracting oil or gas.

## The Events Preceding the Oil Spill

67.    In the weeks and months before the Oil Spill, the Defendants were engaged in exploring and drilling the Macondo prospect onboard and below the *Deepwater Horizon*.

68.    The Macondo prospect site is in the Northern Gulf of Mexico, an area notorious in the industry for high temperature, high pressure, highly gaseous hydrocarbon reservoirs trapped in weak, brittle rock formations. At the Macondo site, the *Deepwater Horizon* was conducting drilling operations in excess of 18,000 feet. Defendants knew or should have known that the threat of blowouts increases as drilling depths increase, especially in an area with such troublesome geology as the Northern Gulf of Mexico.

69.    *Deepwater Horizon* workers reported that since drilling began on October 7, 2009, they had struggled to control the problematic well, as kicks of natural gas regularly burst into the well, halting the drilling progress. According to a NOAA Flow Rate Technical Group report, the hydrocarbon reservoirs the Macondo well drilled through have high ratios of gas to oil. The MMS had even warned BP that the gas buildup in this well was a concern and that BP should "exercise caution."

70.    On March 8, 2010, Defendants experienced particularly serious problems with the well, including a hydrocarbon influx into the well and loss of well control. Upon information and belief, the March 8, 2010, influx became a "near miss" of what could have

been a lethal blowout.

71.     Prior to the *Deepwater Horizon* Oil Spill, one or more of the Defendants knew that improving safety performance during offshore drilling operations was necessary. For example, prior to the Oil Spill, Mr. Steven L. Newman, chief executive of Transocean, admitted that "we have to improve our safety performance."

72.     Furthermore, the Defendants also knew or should have known that ultra-deepwater drilling carried significant safety and environmental risks.

73.     In the weeks and months before the Oil Spill, the operations at Macondo were experiencing delays. Upon information and belief, BP insisted that the Defendants increase the rate of their activities to expedite the placement of a permanent oil rig at the site to begin production. This emphasis on speed over safety led to errors and omissions by the Defendants, which in turn caused and/or contributed to the initial explosion and subsequent Oil Spill.

74.     For example, on April 9, 2010, the Defendants had largely finished the initial drilling of the last section of the well. The final section of the wellbore extended to a depth of 18,360 feet below sea level, which was 1,192 feet below the casing that had previously been inserted into the well.

75.     At this point, the Defendants had to make an important well design decision: how to secure the final 1,192 feet of the well.

76.     There were two primary options available to the Defendants. The first option involved hanging a steel tube called a "liner" from a liner hanger on the bottom of the casing already in the well and then inserting another steel liner tube called a "tieback" on top of the liner hanger.

77.    The second option available to the Defendants involved running a single string of steel casing from the seafloor all the way to the bottom of the well.

78.    The "Liner/Tieback Casing" (first option) provides advantage over full string casing (second option) with redundant barriers to annular flow. With a single string of casing, there are just two barriers to the flow of gas up the annular space that surrounds the casing: the cement at the bottom of the well and the seal at the wellhead.

79.    In contrast, the "Liner/Tieback" option provides four barriers to annular flow: (1) the cement at the bottom of the well, (2) the hanger seal that attaches the liner to the existing casing in the well (3) the cement that secures the tieback on top of the liner, and (4) the seal at the wellhead. The Liner/Tieback option also takes more time to install, requiring several additional days to complete.

80.    The Defendants were aware of the risks of the single casing approach. An undated "Forward Plan Review" that appears to be from mid-April recommended against the single string of casing because of the risks. According to this document, "Long string of casing... *was* the primary option" but a "Liner.., is now the recommended option."

81.    This Forward Review Plan noted that single string casing was risky because, *inter alia*, it could lead to the following:

a.    "Cement simulations indicate it is unlikely to be a successful cement job due to formation breakdown."

b.    "Unable to fulfill MMS regulations of 500' of cement above top HC zone;"

c.    Open annulus to the well head, with... seal assembly as only barrier;"

d.    "Potential need to verify with bond log, and perform remedial cement job(s);" and

82.    Conversely, the Forward Review Plan noted at least four advantages to

using the liner option. These included:

    a.    Less issue with landing it shallow (we can also ream it down);"

    b.    "Liner hanger acts as second barrier for HC in annulus;"

    c.    "Primary cement job has slightly higher chance for successful cement lift;" and

    d.    "Remedial cement job, if required, easier to justify to be left for later."

83.    Despite the risks, one or more of the Defendants chose to install the single string of casing instead of a liner and tieback. The decision to run a single string of casing was made, on information and belief, to save time and reduce costs.

84.    Defendants also made a risky choice for the casing pipe material itself, using metal well casings that raised concerns from their own engineers. Upon information and belief, internal documents cited by federal investigators showed that as early as 11 months before the blowout, BP engineers worried that the metal casings BP wanted to use might collapse under the high pressure at the bottom of the well, and using the metal casings also violated BP's own safety policies and design standards, but the riskier metal casings were nevertheless used after special permission was granted by BP supervisors.

85.    Moreover, one or more of the Defendants failed to ensure that appropriate "centralizer" devices were used in the casing the well.

86.    Centralizers ensure that the casing pipe is centered in the well bore; if the pipe is not centered, the cement placed around it often fails to create a secure seal against the highly-pressurized hydrocarbons surrounding the well. The cement around the casing is intended to seal the space (the "annulus") between the rock walls of the drilled out well bore hole and the casing that runs through the well bore. If the casing is not centered within the wellbore, the pipe can lay near or against the sides of the bore hole, creating too narrow of a

space for the cement to set properly and leaving "channels" of empty space or weak areas in the cement. Those channels and imperfections can allow hydrocarbons to escape out of the formations and into the well, causing a kick or a blowout. An email from shore-based BP Operations Vice President Brett Cocales to rig-based BP drilling engineer Brian Morel acknowledged the importance of centralizers, noting that "[e]ven if the hole  is  perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it."

87.     The American Petroleum Institute's Recommended Practice 65 explains: "If casing is not centralized, it may lay near or against the borehole wall. ...It is difficult, if not impossible, to displace mud effectively from the narrow side of the annulus if casing is poorly centralized. This results in bypassed mud channels and inability to achieve zonal isolation.

88.     On or about April 5, 2010, BP notified one or more of the other Defendants that it was planning to use only six centralizers on the final casing section at the Macondo  well. Halliburton engineer Jesse Gagliano spent a day running models to determine if six centralizers would be enough to prevent channeling that gaseous hydrocarbons could seep through. Halliburton's analysis concluded that 21 centralizers was the recommended number to ensure a secure cement job; using ten would result in a "moderate" gas flow problem and using only six would result in a "severe" gas flow problem. This information was provided to BP. Additional centralizers were available on the *Deepwater Horizon*, but BP well site leaders erroneously believed they were the wrong type, and did not want to wait for more. In the same email that had recognized the risks of proceeding with insufficient centralizers, BP official Brett Cocales shrugged off using only six, flippantly concluding, "who cares, it's done, end of story, will  probably be fine."

89.     Halliburton, hired for its cementing expertise, was fully aware that the number of centralizers BP chose to use was unsafe. Halliburton employee Marvin Volek had warned the BP well site team that BP's cementing plan "was against our best practices." Yet even after running the models that made it clear proceeding with only six centralizers would lead to "failure of the cement job," Halliburton did not stop work or insist that BP use additional centralizers,  instead recklessly proceeding with the cement job it knew was destined to fail.

90.     Another questionable decision by one or more of the Defendants was the failure to circulate fully the drilling mud in the well  before  cementing. This  procedure, known as "bottoms up," involves circulating drilling mud from the bottom of the well all the way to the surface. Bottoms up has several purposes: it allows workers on the rig to test the mud for influxes of gas; it permits a controlled release of gas pockets that may have entered the mud; and it ensures the removal of well cuttings and other debris from the bottom of the well, preventing  contamination of the cement.

91.     The American Petroleum Institute's guidelines recommend a full  bottoms up circulation between running the casing and beginning a cementing job.  The recommended practice states that "when the casing is on bottom and before cementing, circulating the drilling fluid will break its gel strength, decrease its viscosity and increase its  mobility. The drilling fluid should be conditioned until equilibrium is achieved.... At a  minimum, the hole should be  conditioned  for  cementing by circulating 1.5 annular  volumes  or one casing volume, whichever  is greater."

92.     The April 15, 2010 operations plan for the *Deepwater Horizon* called for a full bottoms up procedure to "circulate  at  least  one  (1)  casing  and  drill  pipe  capacity,  if hole conditions allow." Nevertheless, upon  information  and  belief, the final procedure  called

for circulating just 261 barrels of mud, just a small fraction of the mud in the Macondo Well.

93.     Mr. Roth of Halliburton has stated that one reason for the decision not to circulate the mud could have been a desire for speed, as fully circulating the mud could have added a much as 12 hours to the operation.

94.     Notwithstanding the Defendants' risky choices and skipped safety precautions up to this point, and despite knowing the risks of using insufficient centralizers and skipping bottoms up circulation, Halliburton began the cementing job on the Macondo Well.

95.     In a 2007 study, the MMS expressed concerns that oil rig blowouts can be caused by ineffective and/or improper cementing work. Although the study noted that the overall risk of blowouts has been declining, it suggested that blowouts related to cementing work continued with some regularity, and most frequently in the Gulf of Mexico.

96.     According to the 2007 study, cementing problems were associated with 18 of 39 blowouts that occurred between 1992 and 2006, and in 18 of the 70 blowouts that occurred from 1971 to 1991. Nearly all of the blowouts examined occurred in the Gulf of Mexico.

97.     The Defendants knew or should have known that careless, ineffective, negligent, or reckless cementing work caused an August 2009 blowout in the Timor Sea. During that incident, which shares similarities with the *Deepwater Horizon* Oil Spill, oil leaked from the Timor Sea site for ten weeks, causing damage over 200 miles from the well site.

98.     According to the *Associated Press*, MMS has implicated the cementing process as faulty or ineffective 34 times since 1978.

99.     The cementing job was intended to fill the annulus between the casing and the well bore and seal off the hydrocarbon-filled formations, as well as plug the bottom of the

Case: 18-31177     Document: 00515297113     Page: 98     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC  Document 26293-4  Filed 02/05/20  Page 99 of 1003
Case 2:10-md-02179-CJB-DPC  Document 26293  Filed 02/05/20  Page 99 of 1003

casing pipe to prevent an influx. The composition of the cement mixture ("slurry") that Halliburton chose for the task would have to allow the cement to be effectively placed and fully set within the narrow range of safe operating pressures at the bottom of the well. During placement, the slurry would have to be light enough to avoid fracturing the brittle formations surrounding the well, but once set, the slurry would have to be strong enough to resist the intense, nearly 12,000 psi pressure of the hydrocarbon reservoirs within those formations, securely sealing the annular space between the casing and surrounding formations, isolating the hydrocarbon reservoirs from the well. Despite these challenges, Halliburton and the other Defendants improperly designed the cement slurry and failed to thoroughly conduct and/or review the results of laboratory testing of the cement slurry stability under conditions that would be found in the Macondo well.

100.    Halliburton ultimately recommended a foamed cement mixture to seal the bottom of the Macondo well. Foam cement is cement that has been injected with nitrogen gas to lower its density. But high temperatures and pressures in wells like Macondo can have unpredictable effects on the nitrogen in the cement, leading to instability and weakness that prevents the cement from forming a secure seal in the well.

101.    On October 28, 2010, Fred Bartlit, Jr., the lead investigator for the presidential commission investigating the Oil Spill, reported that tests conducted by Halliburton in February 2010 on a cement slurry similar to that used to secure the Macondo well showed instability under conditions like those found at the bottom of the Macondo Well.

102.    Halliburton and BP already knew the Macondo Well was located in brittle, variable, challenging rock formations laced with volatile high temperature, high pressure,

gaseous hydrocarbon reservoirs that had plagued drilling operations in the past.

103.    The presidential commission's investigators asked Halliburton to provide them with samples of materials like those used at the Macondo well; independent testing of those samples could not generate stable foam cement in the laboratory using the materials provided by Halliburton, which, according to Bartlit, strongly suggests that the foam cement used at Macondo was unstable during that cement job as well.

104.    Independent tests conducted for BP's investigation of the disaster were also unable to generate a stable slurry using a mixture as similar as possible to Halliburton's slurry in conditions like Macondo's.

105.    Prior to using its slurry mixture in the Macondo well, Halliburton conducted at least four foam stability tests on it, or on similar formulations, but the tests were incomplete and substandard, and mostly indicated the slurry would not be stable in the Macondo well.

106.    In February 2010, Halliburton conducted the first two tests on a cement slurry that was slightly different than that ultimately used; both tests indicated that this foam slurry design was unstable if used in Macondo conditions. According to Bartlit's report, Halliburton provided the results of the February testing to BP by e-mail on March 8, 2010.

107.    Halliburton conducted two other foam stability tests in April 2010, this time using the actual slurry mixture and design ultimately used in the Macondo Well. On April 13, seven days before the blowout, testing indicated the foam slurry design was unstable. Bartlit reports that the results of this test were reported internally within Halliburton by at least April 17, 2010. In a second April test, Halliburton modified the testing procedure and the data indicated, for the first time, that the foam slurry mixture would be stable if used at Macondo. It is not clear if BP received the results of either of the April tests from Halliburton before it

Case: 18-31177    Document: 00515297113    Page: 100    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 101 of 1003
Case 2:10-md-02179-CJB-JCW Document 26293-14 Filed 02/05/2019 Page 25 of 1003

allowed Halliburton to begin cementing.

108.     Oil industry expert Robert Bea told the Washington Post that drillers will often run one test on a proposed cement mixture, then a second test as a backup. Bea considered Halliburton's four tests "unusual . . . [T]hat's telling me they were having trouble getting to a stable design."

109.     Despite the four tests Halliburton did run on the slurry mixture, the testing was not comprehensive, thorough, or consistent with industry standards. For example, as BP's investigation team noted, Halliburton did not provide results for such commonly tested cement slurry parameters as fluid loss, free water, foam/spacer/mud compatibility, static gel strength transition time, zero gel time, or settlement.

110.     Bartlit reported to the presidential commission that, taken together, the Halliburton documents indicated that:

a.     Only one of the four tests . . . that Halliburton ran on the various slurry designs for the final cement job at the Macondo well indicated that the slurry design would be stable;

b.     Halliburton may not have had — and BP did not have — the results of that test [showing stable results] before the evening of April 20, meaning that the cement job may have been pumped without any lab results indicating that the foam cement slurry would be stable;

c.     Halliburton and BP both had results in March showing that a very similar foam slurry design to the one actually pumped at the Macondo well would be unstable, but neither acted upon that data; and

d.     Halliburton (and perhaps BP) should have considered redesigning the foam

Case: 18-31177     Document: 00515297113     Page: 101     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 102 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/2019 Page 26 of 113

slurry  before pumping it at the Macondo well.

111.    In addition to having seen slurry test results showing the instability of Halliburton's proposed cement mixture, BP was also aware of the incomplete, substandard nature of Halliburton's  tests, which failed to provide results for  several commonly  tested parameters. Nevertheless, BP did not insist that Halliburton reformulate its cement slurry or perform the missing standard tests before proceeding with this tricky and important final cement job. Indeed, in its rush to complete the well, BP likely charged ahead having only ever seen Halliburton's first three slurry test reports — all of which indicated the cement would be unstable in the well.

112.    Unstable foam cement slurry can result in nitrogen breakout, when bubbles of nitrogen create tiny holes in the cement as it is setting, leaving the cement porous and unable to form a seal against the hydrocarbon pressure. Nitrogen breakout not only jeopardizes the foam cement itself, but can also contaminate the other types of cement it is pumped with, interfering with their proper placement and/or degrading their ability to form a secure seal. Nitrogen breakout in the unstable foam slurry used at Macondo could have weakened the denser, non- foamed cement used to plug the very bottom of the last casing pipe, leaving it also unable to withstand the pressure of the hydrocarbons surrounding the well.

113.    In addition to the formulation of the cement mixture, the volume of cement used is another factor in ensuring a successful cement job. Halliburton used a small volume of cement for this last section of the Macondo Well. According to the interim report by the National Academy of Engineering ("NAE") scientists investigating the Oil Spill, the concern with using a small volume of cement is "the potential for contamination of the entire slurry volume simply because less cement is present." This was especially relevant at Macondo,

Case: 18-31177    Document: 00515297113    Page: 102    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 103 of 1003
Case 2:10-md-02179-CJB-JCW Document 6293-14 Filed 04/05/12 Page 27 of 100

where the high gas-to-oil ratio in the hydrocarbon reservoirs surrounding the well presented a risk of gas contaminating the cement during the setting process.

114.    The NAE panel also expressed concern that the flow rate Halliburton chose to use when pumping the cement into the well was too low to achieve "turbulent flow," a condition that helps push the mud out of the annulus during the cement placement.

115.    Given the extremely narrow range of safe operating pressures Defendants were faced with in this last section of the well, it was all the more important to monitor well flow during the cementing process, to ensure there were no indications of fluid loss or fracturing of the formations around the bottom of the well. By monitoring the flow of drilling fluid out of the well as the cement is pumped in, it can be confirmed that every barrel of injected cement is associated with a barrel of drilling fluid flowing out of the well. These "full returns" indicate that the cement is displacing mud from the annulus as planned. If less mud flows out of a well than the amount of cement that is pumped in, fluid is being lost, most likely into fractures in the brittle formations.

116.    Although BP claimed there were full returns during the last cementing job at Macondo, Halliburton cementer Nathaniel Chaisson testified that there was no monitoring system in place that could have confirmed full returns during cementing operations. Moreover, data presented to the congressional investigators by Halliburton cementer Vincent Tabler indicated that about 80 more barrels of cement were pumped into the well than barrels of mud that flowed out. This fluid loss would indicate that the brittle formations at the bottom of the well had fractured during the cementing process, allowing fluids and cement to escape into the fissures in the rock, and ruining the cement job. During its congressional testimony in September 2010, BP suggested that 50 barrels of the apparent fluid loss were due to compression

Case: 18-31177    Document: 00515297113    Page: 103    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 104 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/20 Page 28 of 102

of nitrogen in the cement. Nevertheless, BP should have had a flow monitoring system in place during the cementing process, and any losses due to nitrogen compression should have been anticipated and compensated for during the interpretation of the flow monitoring data.

117.    One way to ensure the viability of cementing work is to conduct a "cement bond log." A cement bond log is an acoustic test that is conducted by running a tool inside the casing after the cementing is completed.  The cement bond log  determines  whether  the cement has bonded to the casing and surrounding formations.  If a channel that would allow gas flow is found, the casing can be perforated and additional cement injected into the annular space to repair the cement job.

118.    Tommy Roth, a Halliburton Vice President of Cementing, has stated that BP should have conducted a cement bond log. According to Mr. Roth, "If the cement is to be relied upon as an effective barrier, the well owner must perform a cement evaluation as part of a comprehensive system integrity test."

119.    MMS regulations also appear to direct a cement bond log or equivalent test at the Macondo well. According to the regulations, if there is an indication of an inadequate cement job, the oil company must "(1) Pressure test the casing shoe; (2) Run a temperature survey; (3) Run a cement bond log; or (4) Use a combination of these techniques." 30 CFR § 250.428.

120.    One or more of the Defendants failed to perform a cement bond log test on the subject well. This decision was contrary to BP's own original drilling plan, which included the cement bond log test. Skipping the cement bond log test was also contrary to BP's own internal standards, which do not consider full fluid returns a "proven cement evaluation technique," and require a cement bond log test if a well's cement design provides for less

than 1000 feet of cement above the highest hydrocarbon layer. BP's Macondo plan only provided for 500 feet.

121.    The decision not to conduct the cement bond log test was, on information and belief, driven by concerns about expense and time. The cement log would have cost $128,000 to complete. Moreover, Mr. Roth of Halliburton estimated that conducting the test would have taken an additional 9 to 12 hours. Remediating any problems found with the cementing job would have taken still more time.

122.    Gordon Aaker, Jr., P.E., a failure analysis consultant with the firm Engineering Services, LLP, retained by the U.S. House of Representatives Subcommittee on Oversight and Investigations, has opined that it was "unheard of ' not to perform a cement bond log on a well using a single casing approach, and he described the decision not to conduct a cement bond log as "horrible negligence." Another independent expert consulted by the House of Representatives, John Martinez, P.E., has opined that "cement bond or cement evaluation logs should always be used on the production string."

123.    BP also failed to deploy the casing hanger lockdown sleeve that would have prevented the wellhead seal from being broken by pressure from below. Upon information and belief, BP made this decision to save time and money. A casing hanger lockdown sleeve ties down the seal assembly at the top of a well, providing an extra layer of protection against a blowout. Usually the casing hanger lockdown sleeve is deployed before the heavy drilling mud is pumped out of the well, so that it can offer an extra shield against any problems during and after the mud displacement process.

124.    Contrary to industry standard, BP's plan was to deploy the casing hanger lockdown sleeve *after* the heavy mud had been displaced with seawater. A well design expert at

Case: 18-31177    Document: 00515297113    Page: 105    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 106 of 1003
Case 2:10-md-02179-CJB-DPCw Document 26293-14 Filed 02/05/2019 Page 36 of 100

another major oil company expressed surprise at BP's choice to displace the mud before deploying the casing hanger lockdown sleeve, saying it was "not the norm." BP had chosen to shake the champagne bottle with only a faulty cork — Halliburton's unsound cement job – – standing in the way of disaster.

125.    On the morning of April 20, 2010, the day of the blowout, BP informed M-I, LLC drilling fluid specialist Leo Lindner that the mud displacement would be more substantial than usual, displacing the top 8,367 feet of mud in the riser and drilling string, instead of the typical 300 feet. In his congressional testimony, Lindner did not mention why BP was displacing almost 28 times the usual amount of heavy mud.

126.    Lindner calculated a mud displacement plan according to BP's specifications, including the suspension of the displacement procedure partway through to allow for pressure testing of Halliburton's recently completed cement job. Lindner testified that he distributed copies of his mud displacement plan to BP and Transocean employees on the drilling vessel; thus some, if not all, of the Defendants were aware of and complicit in BP's plan to displace an unusually large amount of mud from the well, without the added safety of the casing hanger lockdown sleeve, and beginning before the cement had even fully set and been pressure tested.

127.    At around noon on April 20, 2010, after the completion of the positive pressure test, drilling vessel workers began the mud displacement process. According to the mud displacement plan, the displacement would proceed until the spacer fluid had been pumped down to a level 12 feet above the BOP, after which the displacement would be suspended for the negative pressure test.

128.    The BOP's annular preventer was closed to seal casing string for the negative

Case: 18-31177    Document: 00515297113    Page: 106    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 107 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/19 Page 107 of 1003

test, but for some reason did not form a secure seal, which allowed about 50 barrels of spacer fluid to leak through the BOP and into the well. This meant that dense, viscous spacer fluid was across the inlets to several small-bore pipes that were to be used for the negative pressure test, rather than the plain seawater that should have been across the pipe inlets. Defendants were aware of this spacer fluid leakage and the potential for the viscous fluid to be blocking the small-bore pipes necessary for the negative pressure test, yet they took no steps to remedy the situation.

129.    The negative pressure tests were intended to assess the security of Halliburton's cement job at the bottom of the Macondo well. With the casing string sealed, pressure was bled off from inside the well, "underbalancing" it by reducing the pressure in the casing until the external pressure from the hydrocarbon reservoirs surrounding the well was greater than the internal pressure within the casing itself. If Halliburton's cement job had securely sealed the hydrocarbon reservoirs off from the well, there would be little to no fluid flow out of the well and the pressure in the casing would remain at the reduced, underbalanced level. An increase in pressure or flow would indicate that the cement job was not secure, and was allowing hydrocarbons to flow into the well and repressurize the casing string.

130.    Defendants' two negative pressure tests on the Macondo well both yielded abnormal results. In one instance, over four times the expected fluid returns spurted out of the well after the pressure was reduced to an underbalanced state. In the other test, the pressure in the well *increased* from 50 psi to 1,400 psi – a highly diagnostic "red flag" result indicating that Halliburton's cement job had failed to seal off the well from the surrounding hydrocarbon reservoirs. The 1,400 psi pressure response and the excess fluid returns were indications

Case: 18-31177    Document: 00515297113    Page: 107    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 108 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/2019 Page 32 of 100

that hydrocarbons were flowing into the well, re-pressurizing it after it had been underbalanced for the negative pressure test.

131.    It is also possible that the pressure tests themselves further damaged and weakened the cement in the well.  Not only were the tests performed before the cement had a full 72 hours to set completely, but contrary to common practice, the drill string was 10,000 feet above the bottom of the well during the tests.

132.    Experts later testified that BP's interpretation of the pressure tests was not industry standard, while BP itself admitted to Congressional investigators that continuing work on the well after such alarming test results might have been a "fundamental mistake." In May 2010, BP admitted to congressional investigators that these pressure test results were clear warning signs of a "very large abnormality" in the well.

133.    Later, in its September 8, 2010, disaster investigation report, BP concluded that the negative pressure test result of 1,400 psi was misinterpreted by Transocean and BP employees on the *Deepwater Horizon*, leading the vessel crew to the erroneous view that the test was a success and well integrity had been established. Moreover, BP's investigation found no evidence that the drilling vessel's workers consulted anyone outside their teams on the vessel or onshore about the abnormal pressure reading, as they should have, before coming to their incorrect conclusion that the well was secure. The well site leader should have called experts on the drilling vessel or on the beach to discuss the results, BP Vice President Steve Robinson testified in congressional hearings in December 2010.

134.    On December 7, 2011, the BSEE notified BP that its failure to conduct an accurate pressure integrity test violated 30 C.F.R. § 250.427.

135.    In their November 16, 2010, interim report, the NAE panel wrote that "it is

Case: 18-31177    Document: 00515297113    Page: 108    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/20 Page 109 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/20 Page 108 of 1003

clear that pressure buildup or flow out of a well is an irrefutable sign that the cement did not establish a flow barrier" against the entry of hydrocarbons into the well. At Macondo, there was both pressure buildup to 1400 psi and unexpected flow out of the well during the negative pressure tests.

136.    There was only one appropriate response to these abnormal negative pressure test results: remedial cement work to correct Halliburton's obviously-flawed cement job and shore up the seal against the highly pressurized hydrocarbon reservoirs. Defendants, however, elected to ignore the "red flag" results of these, the only cement integrity tests they had even bothered to perform, and continue with their well completion plan as if Halliburton's cement job had been a success.

137.    During the mud displacement process, BP used an unconventional fluid mixture, and an unusually large volume of it, as "spacer" fluid. This novel composition and amount of fluid may have interfered with negative pressure test results and/or caused damage or clogging in the BOP.

138.    In addition to the acts and omissions described above, in the days immediately prior to the onset of the Oil Spill, BP made a series of unusual, rapid-fire requests to modify operational permits regarding the *Deepwater Horizon*. These requests were approved in an extremely expeditious fashion, one being "reviewed" and "approved" within five minutes.

139.    On April 14, 2010, one of these modifications included BP asking MMS if it could use a so-called "one-pipe" method, rather than a "two pipe" method to reach the oil and gas reservoir below the *Deepwater Horizon*. According to *The New York Times*, BP concluded that the one-pipe option was the "best economic case" despite having "some risk" of leaving an open path for gas to travel up outside the well. The two-pipe method,

according to some experts, is "more or less the gold standard," especially for high-pressure wells such as the one below the *Deepwater Horizon*.

140.    Upon information and belief, the two-pipe method was the safer option because it would have provided an extra layer of protection against gas traveling up the outside of the well to the surface.  However, the one-pipe method was easier and faster by about 7 days, saving BP nearly $7 million.

141.    The Defendants knew or should have known that the threat of blowouts increases as drilling depths increase. The Defendants were drilling in 5,000 feet of water and to a total depth in excess 18,000 feet below the sea floor. Some sources indicate that the *Deepwater Horizon* may have been drilling in excess of its permitted depth.

142.    The Defendants were also aware that ultra-deepwater drilling increases the risk and manifestation of product defects in the *Deepwater Horizon's* most critical blowout safety mechanism, the BOP.

143.    The Defendants were aware of the risk of the BOP failing at the great depths in which the *Deepwater Horizon* was operating, yet the Defendants failed to install a backup BOP activation system or a backup BOP, and to provide adequate warnings, instructions, or guidelines on permissible uses, modifications, and applications of the BOP.

144.    Moreover, a Transocean-commissioned independent audit of the vessel in April 2010, just before the blowout, again revealed a range of problems with the *Deepwater Horizon*'s BOP, including a leaking door seal, pump parts needing replacement, error-response messages, and "extraordinary difficulties" surrounding the maintenance of the BOP's annular valves. BP well site leader Ronald Sepulvado testified in August 2010 that he too had raised concerns about Transocean's maintenance of the BOP, reporting that several pieces of equipment

had been out of service for extended periods of time, but that Transocean "always told me that they didn't have the parts" to make the necessary repairs.

145.    Transocean had also failed to recertify the *Deepwater Horizon*'s BOP, as required by federal regulations, because recertification would require a full disassembly of the device and more than 90 days of downtime. In its disaster investigation, BP noted that Transocean did not record well control-related equipment maintenance, including that of the BOP, accurately or completely in the regular maintenance management system, sometimes even recording work performed on the BOP that could not possibly have taken place since the BOP was in use on the seafloor at the time of the supposed repair.

146.    After the explosions, as the *Deepwater Horizon* was burning on the surface, emergency responders sent ROVs to the sea floor to attempt to close the blind shear ram using the "hot stab" or autoshear functions. Several hot stab attempts to close the blind shear ram failed due to insufficient hydraulic pressure. Over the course of these events, a number of leaks were discovered in the BOP's hydraulic system, as well as incorrect hydraulic plumbing from the ROV intervention panel to the pipe rams, which was likely the result of aftermarket modifications to the BOP.

147.    Ultimately six leaks were discovered in the hydraulic system of the Macondo well's BOP. From investigation and testimony, Defendants were aware of at least two, but likely almost all, of these leaks prior to April 20, 2010. One leak was discovered as early as February 2010, but was never repaired or otherwise addressed by Defendants. Vessel workers testified to awareness of other leaks during their congressional testimony. Not least, the weekly BOP function tests should have made Defendants aware of the other hydraulic system leaks identified during the ROV intervention.

Case: 18-31177     Document: 00515297113     Page: 111     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 112 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/2019 Page 136 of 1003

148.    Defendants' failure to properly maintain the *Deepwater Horizon*'s BOP was also a violation of federal regulations. On October 12, 2011, BSEE found that BP, Transocean, and Halliburton had each violated 30 C.F.R. § 250.446(a) by failing "to maintain the *Deepwater Horizon* BOP system in accordance to API RP 53 section 18.10.3."

149.    Defendants were also aware of the aftermarket modifications that hindered the emergency responders' ability to activate the BOP via hot stab procedures. In addition to incorrectly installed aftermarket hydraulic plumbing, Defendants had switched out one of the *Deepwater Horizon*'s variable bore rams with a non-functional test ram. But after the blowout, emergency responders spent a day futilely trying to close that missing variable bore ram, not knowing it had been replaced with a useless test part, because Defendants hadn't updated the BOP's schematic diagram to reflect the aftermarket changes – a violation of 29 C.F.R. § 1910.119, which requires, *inter alia*, up-to-date process and safety system equipment drawings as a part of basic process safety management.

150.    Defendant officials were aware of the faulty solenoid valve, poor battery maintenance, hydraulic fluid leaks, and aftermarket modifications on the *Deepwater Horizon*'s BOP long before the April 20, 2010, but no action was ever taken to address the problems, perhaps because additional delays and costs would accrue as all well work stopped and the BOP was raised from the sea floor for repairs. In addition to posing a significant safety risk, Defendants' choice to continue drilling with a faulty hydraulic system violated federal regulations, which require companies to disclose problems to the MMS and to stop drilling if either of a BOP's two control systems is not working properly.

151.    A 2004 study by Federal regulators showed that BOPs may not function in deep-water drilling environments because of the increased force needed to pinch and cut

the stronger pipes used in deep-water drilling. Only 3 of 74 rigs studied in 2004 had BOPs strong enough to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth. "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a Blowout," the study said.

152.    Moreover, approximately four weeks before the blowout and onset of the Oil Spill, the Defendants became aware of damage to the *Deepwater Horizon's* BOP. This included the intrusion of the drill pipe into the BOP, damaging the BOP's annular seal, a rubber gasket vital to the proper functioning of the device.

153.    As a result of this failure, foreign materials including chunks of rubber broken away from the annular seal floated to the surface of the *Deepwater Horizon* and were observed by BP and Transocean.

154.    In response to the discovery of pieces of the annular seal and other evidence in the drilling fluid, BP and Transocean failed to act to prevent or mitigate risk of the Oil Spill. Halliburton was also aware of this discovery, and similarly failed to report this information to outside sources. One or more of the Defendants acted unreasonably by ignoring this evidence and continuing drilling operations.

155.    In conjunction with their knowledge of the failure of the annular seal on the BOP device, BP and Transocean were also aware of inoperability of the pods used to control the BOP so that it could seal the oil well in the event of a blowout. Upon information and belief, BP and Transocean were aware of failures in the BOP's battery system and power source.

156.    BP and Transocean could have ensured that a BOP and/or back-up BOP with

sufficient strength for deepwater drilling were installed on the *Deepwater Horizon*, but did not do so.

157.   BP and Transocean could have installed a back-up trigger to activate the BOP in the event that the main trigger failed to activate.

158.   In fact, federal regulators at the MMS communicated to BP, Transocean, and/or Halliburton in 2000 that MMS considered a backup BOP activation system to be "an essential component of a deepwater drilling system."

159.   Despite this notice, and although the backup trigger is a common drill-rig requirement in other oil producing nations, including other areas where the BP operates, the *Deepwater Horizon* was not equipped with this backup remote BOP trigger.

160.   The *Deepwater Horizon* was also not equipped with a second BOP, as are many newer oil rigs. Rather, the *Deepwater Horizon* only had one BOP installed, leaving the well especially vulnerable to a blowout and subsequent oil spill.

161.   Unfortunately, the BOP was not the only part of the *Deepwater Horizon* that was poorly maintained and in disrepair at the time of the blowout. Transocean, the vessel's owner, had a history of postponing and ignoring needed maintenance on the *Deepwater Horizon*, despite concerns raised by its own employees and other vessel workers. In the weeks before the blowout, the *Deepwater Horizon* suffered power outages, computer glitches, and a balky propulsion system. In some cases, Transocean officials even purposely overrode or disabled vital safety mechanisms and alarms. When the Macondo well blew out, the *Deepwater Horizon*'s shoddy maintenance facilitated a cascade of failures of multiple emergency systems, exacerbating the disaster.

162.   According to testimony given before a federal panel by vessel engineers in

August 2010, the *Deepwater Horizon* had a number of ongoing equipment problems at the time of the blowout, some of which contributed to the failure of backup generators that should have powered safety and shutdown devices immediately after the blowout.

163.    Further, the computerized system used to monitor routine maintenance aboard the vessel was not working optimally because glitches from a recent computer system migration had not yet been resolved.  Sometimes the computer called for maintenance to be done on equipment that did not exist aboard the vessel, while some pieces of equipment that were aboard the vessel  and in need of maintenance were not registered by the computer.

164.    Even worse, some key safety systems and alarms on the *Deepwater Horizon* had been intentionally bypassed or disabled by Transocean. Mike Williams, a chief electronics technician working for Transocean aboard the *Deepwater Horizon*, testified that on the night of the blowout, a pressure regulator valve, which automatically cuts off gas flow at a certain pressure point and could have helped stop the blowout, was in "bypass" mode when the gaseous hydrocarbons blew out of the Macondo well. Williams had repeatedly expressed concern about bypassed safety systems to Transocean supervisors, only to be upbraided for his efforts. In one instance, Williams activated a gas safety valve that he thought was erroneously in "bypass" mode. Williams testified that Transocean subsea supervisor Mark Hay reprimanded him for it, saying: "'The damn thing has been in bypass for five years. Why did you even mess with it?' … And [Hay] said, 'As a matter of fact, the entire fleet [of Transocean drilling vessels] runs them in  bypass.'"

165.    Williams said a fire alarm system on the vessel was also partially disabled at the time of the blowout, and had been for at least a year since Williams first noticed it. The system was set to "inhibited" mode, meaning that the control panel would indicate a

Case: 18-31177     Document: 00515297113     Page: 115     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/20 Page 116 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/2019 Page 116 of 1003

problem, but a general alarm would not sound throughout the vessel unless manually activated. Transocean supervisors told Williams "they did not want people to wake up at 3 a.m. due to false alarms." Williams testified that he complained regularly about the practice of disabling and bypassing alarms and safety systems; his most recent complaint was just three days prior to the blowout.

166.    When the *Deepwater Horizon* lost power during the blowout, none of the backup or emergency generators were working — equipment that was on board for the very purpose of providing power to alarm and safety systems in just such an emergency. Transocean employee and *Deepwater Horizon* chief engineer Stephen Bertone testified that there was no general alarm, no internal communications, and no power to the vessel's engines. "We were a dead ship." Without power, the crew was also unable to engage the EDS that would have stopped the flow of gas fueling the fire on the vessel, and many other alarm and safety systems were rendered silent and useless.

167.    An equipment assessment commissioned by Transocean in April 2010, just before the blowout, revealed many key components on the Deepwater had not been fully inspected since 2005, and at least 36 components and systems on the vessel were in "bad" or "poor" condition, which "may lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment." The equipment assessment also found problems with the vessel's ballast system that they noted could directly affect the stability of the ship. The assessment found a malfunctioning pressure gauge and multiple leaking parts, and also faulted the decision to use a type of sealant "proven to be a major cause of pump bearing failure."

168.    The findings of the Transocean-commissioned equipment assessment echoed

the results of a similar BP-commissioned audit that had been conducted in September 2009, which found that Transocean had "overdue planned maintenance considered excessive — 390 jobs amounting to 3,545 man hours [of needed maintenance work]."

169.    In a confidential worker survey conducted on the *Deepwater Horizon* just weeks before the blowout, Transocean employees voiced concerns about poor equipment reliability. One worker noted that the drilling vessel had not once in its nine-year career been taken to dry dock for necessary repairs: "we can only work around so much." Another worker described Transocean's policy of running equipment to failure before making just the bare minimum repairs: "[r]un it, break it, fix it. . . . That's how they work."

170.    The other Defendants were all aware of Transocean's poor maintenance of the *Deepwater Horizon* and its practice of disabling or bypassing vital safety systems, and alarms, yet none of them called for work to stop until vessel safety was improved, and none of them reported Transocean's actions and inactions to the MMS.

171.    As noted in a May 25, 2010 memorandum authored by Congressmen Henry A. Waxman and Bart Stupak, Members of the House of Representatives' Committee on Energy and Commerce, in the hours and minutes immediately preceding the onset of the Oil Spill, BP, Transocean, and Halliburton were faced with clear signs that serious problems with the rig's operations were developing and manifesting.

172.    For example, as early as 5:05 p.m., almost 5 hours before the explosion, one or more of the Defendants observed an unexpected loss of fluid in the riser pipe, suggesting that there were leaks in the annular preventer in the BOP.

173.    Moreover, two hours before the explosion, during efforts to begin negative pressure testing, the system gained 15 barrels of liquid instead of the 5 barrels that were

expected, leading to one or more of the Defendants to become aware of the possibility that there was an "influx from the well."

174.     The Defendants conducted this negative pressure testing initially on the drill pipe rather than the kill line, even though the drill plan specified that it would be done on the kill line. The line was opened and pressure on the kill line was bled to 0 psi, while pressure on the drill pipe remained at 1400 psi. Officials from BP have admitted that this was a "fundamental mistake" as this difference in psi was an "indicator of a very large abnormality." Nevertheless, after anomalous results, the negative pressure testing was conducted on the kill line and ultimately accepted by the Defendants.

175.     Approximately 51 minutes before the explosion that began the Oil Spill, one or more of the Defendants knew or should have known that more fluid had begun flowing out of the well than was being pumped in. This was a clear indication to one or more of the Defendants of serious problems with the drilling operation.

176.     Approximately 41 minutes before the explosion that began the Oil Spill, one or more of the Defendants was aware that although the pump was shut down for a "sheen" test, the well continued to flow instead of stopping. Moreover, at this time one or more of the Defendants knew or should have known that the drill pipe pressure also unexpectedly increased.  These were additional, clear indicators of problems with the drilling operation.

177.     Approximately 18 minutes before the explosion that began the Oil Spill, one or more of the Defendants observed abnormal pressures and mud returns, and the pump was abruptly shut down. This was a further, clear indicator to the Defendants of problems with the drilling operation immediately prior to the explosion and Oil Spill.

178.     Data presented by BP to the United States House of Representatives'

Committee on Energy and Commerce suggests that the crew may have attempted mechanical interventions at that point to control the pressure, but soon after, the blow-out occurred, reservoir pressures became unstable resulting in massive quantities of flammable gases shooting to the surface resulting in the tragic and devastating explosion on board the *Deepwater Horizon*.

## The Explosion and Oil Spill

179.    On or about April 20, 2010, at approximately 9:45 p.m. CST, a series of explosions occurred on the *Deepwater Horizon*. These explosions ensued due the release of reservoir pressure and a blowout, which funneled flammable gases into the oil rig. These explosions killed eleven (11) crew members, and injured many more. Two days following the initial explosions, the remnants of the *Deepwater Horizon* sank to the ocean floor.

180.    Shortly before the explosions aboard the *Deepwater Horizon*, employees, agents, and/or contractors of one or more of the Defendants were participating in drilling-related activities, including cementing and mudding, to seal and plug the wellhead. Cementing is intended to, among other things, hold back the flow of oil and hydrocarbons from the well bore. Cementing and mudding are delicate activities, and each carries the risk of a blowout if not performed properly. Improper or ineffective cementing work and/or mudding operations performed by one or more of the Defendants was a cause or contributing factor to the Oil Spill.

181.    Immediately after the explosion, desperate vessel workers tried in vain to activate the emergency disconnect sequence on the *Deepwater Horizon*'s BOP. As reports and testimony have shown, problems and failures with each of the BOP's emergency activation

methods prevented the use of the *Deepwater Horizon*'s BOP to seal the well, paralyzing its powerful shear rams that should have slammed shut, severing the drill pipe, and quelling the blowout.

182.     The Macondo well's BOP had several emergency activation methods: the high-pressure closure of the blind shear ram, the emergency disconnect sequence[3] ("EDS"), the automatic mode function[4] ("AMF"), and activation via remotely operated vehicles (ROVs) on the seafloor using the "hot stab"[5] or autoshear[6] functions. None of these were able to activate the BOP to seal the well. Almost immediately following the explosion, oil began to discharge into the Gulf of Mexico from a depth of 5,000 feet below the *Deepwater Horizon*.

183.     Before the Oil Spill, the *Deepwater Horizon* had been connected to the wellhead at the seafloor by a 5,000 foot pipe called a "riser." As the *Deepwater Horizon* sank to the seafloor, it pulled the riser down with it, buckling and eventually breaking the riser. This riser was connected to a well casing that ultimately linked the *Deepwater Horizon* to an oil field located thousands of feet below the ocean floor.

184.     While crude was believed to be discharged before the *Deepwater Horizon* finally sank on April 22, 2010, the rate of discharge is believed to have increased once the *Deepwater Horizon* sank to the ocean floor. Oil flowed out from the open end of the riser in at least two places. The Defendants permitted, allowed, and failed to properly monitor and

---

[3] The EDS disconnects the drilling vessel from the well by detaching the riser from the top of the BOP, allowing the vessel to move away from the well. The EDS also triggers the closure of the blind shear ram to seal off the well itself.
[4] The AMF is activated when electricity, hydraulics, and communications from the drilling vessel are all severed. Powered by hydraulic pressure from accumulators and batteries on the BOP itself, the AMF's functionality is independent from the vessel and is not affected by loss of power or hydraulics on the vessel itself.
[5] An ROV can activate certain BOP functions, such as the blind shear ram, by performing a hot stab, injecting hydraulic fluid into dedicated ports on the BOP to close the rams.
[6] n ROV can activate the autoshear function by snipping a rod on the BOP, triggering the closure of the blind shear ram.

Case: 18-31177     Document: 00515297113     Page: 120     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 121 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/20 Page 245 of 1003

inspect pressure levels in the riser and the BOP valves.

185. Each day during the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface to form a widening slick that because large enough to see from outer space and also spreading into vast subsurface plumes. On the surface, the oil slick at times covered tens of thousands of square miles. It spread with the wind and currents, making landfall on white sand beaches and ecologically sensitive marshes and estuaries. Underwater, huge plumes of oil and dispersant chemicals swirled through the water column and came to rest on the sea floor at different depths, damaging ecosystems and privately owned and leased sea beds.

186. Oil flowed unchecked into the Gulf of Mexico for months. The Oil Spill necessitated an unprecedented response effort. During the response, massive amounts of chemical dispersants were sprayed from the air, at the surface of the Gulf and beneath the surface of the water.

187. The Macondo Well was ultimately declared sealed on September 19, 2010. Before that time, millions of barrels of oil had been discharged. A large volume of dispersant chemicals had also been applied. The full scope of the disaster is not yet known.

188. The Defendants knew or should have known of the dangers associated with ultra-deepwater drilling and failed to take appropriate measures to prevent damage to Plaintiff and marine, coastal, and estuarine areas of the Gulf of Mexico and the states bordering the Gulf of Mexico.

189. Moreover, additional safety mechanisms, technologies, and precautions were known and available to one or more of the Defendants but the Defendants elected not to employ them on the *Deepwater Horizon*.

190.     Upon information and belief, BP also hindered efforts to kill the Macondo Well and stop the flow of oil and gas into the Gulf waters. Although engineers knowledgeable about blowout responses told BP how to kill the well as early as June 2010, BP, after conferring with its lease partners, chose to ignore the engineers' well-kill procedure because BP did not want to damage the well – or its chance to make a profit at Macondo. Because BP hoped to retap the well and profit from the large, valuable reservoirs beneath it, it ignored this expert information that could have stopped the Oil Spill many weeks earlier.

### The Economic Impact of the Oil Spill and Injuries to Plaintiff

191.     During the summer of 2010, an oil slick with a range of thousands of miles formed and could be seen from space. Additionally, thick, voluminous plumes of oil were identified in deep waters within the Gulf of Mexico. The Oil Spill caused this slick and these plumes to form. Oil washed ashore from the Gulf of Mexico and coastal waters and damaged marine animals' coastal habits.

192.     The Oil Spill has impacted and continues to impact the Gulf of Mexico, and the Gulf Coast's shorelines, threatening Plaintiff's livelihood and business operations.

193.     The oil from the *Deepwater Horizon* Oil Spill contains benzene, toluene, polyaromatic hydrocarbons and other compounds (collectively referred to as Total Petroleum Hydrocarbons, or "TPH"), all of which are known carcinogens. The oil from the *Deepwater Horizon* Oil Spill also contains mercury, lead and other heavy metals that are hazardous to the health of people and aquatic life.

194.     A study done for the U.S. Travel Association projected that the Oil Spill would result in at least $7.6 billion in lost tourism revenue in 2010 alone. Tourism accounts for approximately 46 percent of the Gulf Coast economy annually, and damage to this core

industry damages the broader economy of the Gulf Coast region as well.

195.    Tourism suffered not only in coastal areas and counties whose shores the oil reached, but across the entire Gulf Coast, including coastal areas that risked, but did not actually experience, contamination during the Oil Spill. By way of example, the Mississippi coast had a 50 percent cancellation rate on reservations generally; a May 2010 survey by the Louisiana Tourism Commission indicated that 26 percent of Americans who had planned to visit Louisiana were no longer planning to visit after the Oil Spill began; Alabama saw a dramatic drop in tourism, including a 60 percent drop in visitations and an 80 percent drop in home rentals; and, preliminary economic projections estimated that the impact to Florida's tourism economy alone could be in the billions of dollars.

196.    As the Oil Spill immediately damaged the seafood harvesting and processing industry and the immediate tourist trade, the integral nature of the economy of the Gulf Coast results in damage throughout the states of Mississippi, Alabama, Louisiana, Texas, and Florida. By way of example, when the fishermen are not able to harvest and the processors not able to sell, they are not able to make payments on their mortgages, which results in defaults in loans, and they are not able to maintain their employees, reducing the employees' income, which results in reduced spending, resulting in reduced sales at all retail establishments throughout the state. This chain of causation is continuous and not broken throughout the geographical area of the Gulf Coast.

## "Presentment" Under OPA

197.    To the extent required by law, and/or by consent and/or stipulation by BP, Plaintiff has satisfied all of the requirements of 33 U.S.C. §§ 2713(a) and (b) by the submission

of its claims to the *Deepwater Horizon* Court-Supervised Settlement Program.

198.    The Court's order dated October 3, 2018 specifically precludes BP from raising a defense based on presentment.

## Guilty Pleas

199.    BP Exploration has entered into a Guilty Plea Agreement with the U.S. Department of Justice in connection with the Oil Spill. In an exhibit to this Plea Agreement, BP Exploration admitted that if its case were to proceed to trial, the federal government could prove beyond a reasonable doubt that BP Exploration's negligence proximately caused the deaths of eleven men on board the *Deepwater Horizon* on April 20, 2010 and also proximately caused the discharge of large and harmful quantities of oil into the Gulf of Mexico, as well as a number of related facts overlapping with those alleged in and/or relevant to the allegations of this Complaint. *See* Exhibit A to Guilty Plea Agreement, Rec. Doc. 2-1 in Case No. 2:12-cr-00292 (E.D. La. Nov. 15, 2012). The Court has accepted this Guilty Plea Agreement. *See* Reasons for Accepting Plea Agreement, Rec. Doc. 65 in Case No. 2:12-cr-00292 (E.D. La. Jan. 30, 2013).

200.    Transocean Deepwater has entered into a Plea Agreement with the U.S. Department of Justice in connection with the Oil Spill. In an exhibit to this Plea Agreement, Transocean Deepwater admitted that if its case were to proceed to trial, the federal government would be able to prove that Transocean Deepwater, together with others, negligently discharged, or caused to be discharged, oil into the Gulf of Mexico, as well as a number of related facts overlapping with those alleged in and/or relevant to the allegations of this Complaint. *See* Exhibit A to Cooperation Guilty Plea Agreement, Rec. 3-2 in Case No. 2:13-cr-00001 (E.D. La. Jan. 3, 2013). The Court has entered a judgment based on this Plea Agreement. *See* Judgment, Rec. Doc. 31 in Case No. 2:13-cr-00001 (E.D. La. Feb. 14, 2013).

### Willful, Wanton Conduct of the Defendants

201.    BP and Transocean, and/or Halliburton, emphasized profits over and safety while  undertaking their ultrahazardous activities on the *Deepwater Horizon*.

202.    BP and Transocean,  and/or  Halliburton, recklessly, willfully and/or  wantonly caused  or  contributed  to  the  catastrophic  Oil  Spill  through  their  collective  and   respective disregard for proper drilling, casing, mudding, and cementing procedures.

203.    BP and Transocean recklessly, willfully and/or wantonly caused or contributed to  the catastrophic Oil Spill by their tortious modifications to and/or operation and use of the BOPs.

204.    BP and Transocean,  and/or  Halliburton, r e c k l e s s l y , willfully a n d /or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout.

205.    BP and Transocean,  and/or  Halliburton, r e c k l e s s l y , willfully a n d /or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would  be  readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of t h e Gulf of Mexico.

206.    BP recklessly,  willfully and/or wantonly failed  to  utilize reasonably safe dispersant  chemicals  in  its  haphazard  attempts  to  respond  to  the  Oil  Spill,  and  thereby exacerbated and worsened the pollution of the Gulf of Mexico.

207.    BP and Transocean, and/or Halliburton, by their conscious and/or deliberate unreasonable acts and/or omissions complained of herein, and/or as the evidence may show, displayed negligence, gross negligence, reckless indifference, willfulness, and/or wantonness.

### CLAIMS FOR RELIEF

## COUNT I
## THE OIL POLLUTION ACT ("OPA")
### (Against BP & Transocean)

208.     Plaintiff realleges each and every allegation set forth in all preceding

paragraphs  as if fully restated here.

209.     The Oil Pollution Act, 33 U.S.C. § 2701, *et seq.* (the "OPA"), imposes liability

upon a "responsible party for a vessel or a facility from which oil is discharged . . . into or

upon navigable waters or adjoining shorelines" for the damages that result from such incident

as well as removal costs.  33 U.S.C. § 2702(a).

210.     The Coast Guard has named BP as the responsible party for the downhole

release of oil and Transocean as the responsible party for the release of diesel on the surface.

Therefore, BP and Transocean are strictly liable pursuant to § 2702 of the OPA for all the

damages resulting from the Oil Spill.

211.     BP and Transocean are not entitled to limit their liability under § 2704(a) of the

OPA because the Oil Spill was proximately caused by their gross negligence, willful

misconduct, or violation of applicable safety, construction or operating regulations. 33 U.S.C. §

2704(c).

212.     Moreover, in its "Statement of BP Exploration & Production Inc. Re

Applicability of Limitation of Liability Under Oil Pollution Act of 1990," filed on October

19, 2010,  BP  waived the statutory limitation on liability under the OPA.

213.     Plaintiff has suffered the loss of profits and/or impairment of earning capacity

due to the injury, destruction, or loss of real property, personal property, or natural resources.

Plaintiff's customers reduced or eliminated the Plaintiff's services as a direct and proximate

cause of the Oil Spill. The Oil Spill dramatically impacted the Plaintiff's customer base,

causing customers to reduce spending, cancel or reduce the Plaintiff's normal scope of work, and eliminate or cancel projects.

214.    As a result of the Oil Spill, Plaintiff is entitled to damages pursuant to § 2702(b)(2)(E), which provides for "[D]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

215.    The damages recoverable under the OPA include the costs of assessing the damages specified in § 2702(b), and Plaintiff is entitled to recover the costs of assessing its damages under the OPA.

216.    As a result of the Oil Spill, Plaintiff has not been able to use natural resources (air and water, and potentially wetlands and other areas and spaces that have and/or may become contaminated by the Oil Spill), and it is entitled to recover from BP and Transocean compensatory and punitive damages in amounts to be determined by the Jury.

WHEREFORE, Plaintiff demands a judgment against BP and Transocean for compensatory and punitive damages as determined by the Jury at trial, pre-judgment interest at the maximum rate allowed by law, litigation costs, and any other damages allowed by law.

## COUNT II NEGLIGENCE
## (Against BP & Halliburton)

217.    Plaintiff repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this action and incorporates same by reference as though fully set forth herein.

218.    All times material hereto, BP and/or Halliburton were participating in drilling operations onboard the *Deepwater Horizon* in the Gulf of Mexico. At all times material

hereto, BP and/or Halliburton were under a duty to utilize reasonable care in  undertaking and carrying  out their collective and respective activities onboard the *Deepwater Horizon*.

219.    At all times material hereto the *Deepwater Horizon* was owned, navigated, manned, possessed, managed, controlled, chartered and/or operated by BP.

220.    At all times material hereto, Halliburton was responsible for cementing the well that was the subject of the Oil Spill, and further was engaged in testing, analysis, and monitoring of  the aforementioned well.

221.    At all times material  hereto, BP and/or Halliburton's onshore and  offshore oil drilling and exploration operations involved locating, extracting, collecting, storing, and transporting pollutants and hazardous contaminants.

222.    At all times material  hereto, BP and/or Halliburton's onshore and  offshore oil drilling and exploration operations which involved locating, extracting, collecting, storing, and transporting pollutants and hazardous contaminants created an appreciable zone of risk within which the BP and/or Halliburton's were obligated to protect the Plaintiff, who was within  the appreciable zone of risk created by BP and/or Halliburton's activities and would foreseeably be  exposed to harm due to those risks.

223.    BP and/or Halliburton were under a duty of care to refrain from negligent conduct that would cause pollution of the waters, beaches, and natural resources of the Gulf of Mexico and the Gulf Coast counties.

224.    BP and/or Halliburton were under a duty to exercise reasonable care while participating in drilling operations to ensure that an Oil Spill and subsequent discharge of oil did not occur.

225.    BP and/or Halliburton were under a duty to exercise reasonable care to ensure

Case: 18-31177    Document: 00515297113    Page: 128    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 129 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/2019 Page 338 of 1003

that if crude oil discharged in the event of a blowout, that it would be contained and/or stopped within the immediate vicinity of the *Deepwater Horizon* in an expeditious manner.

226.    BP and/or Halliburton knew or should have known that the acts and omissions described herein could result in damage to Plaintiff.

227.    BP and/or Halliburton, respectively and collectively, failed to exercise reasonable care while participating in drilling operations, and thereby breached duties owed to Plaintiff.

228.    BP and/or Halliburton, respectively and collectively, failed to exercise reasonable care while participating in drilling operations to ensure that a blowout and subsequent Oil Spill did not occur, and thereby breached duties owed to Plaintiff.

229.    BP and/or Halliburton, respectively and collectively, failed to exercise reasonable care to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout, and thereby breached duties owed to Plaintiff.

230.    BP and/or Halliburton, respectively and collectively, failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico, and thereby breached duties owed to Plaintiff.

231.    BP and/or Halliburton were in violation of federal and/or state statutes and/or regulations.

232.    The blowout and subsequent Oil Spill was caused by BP and/or Halliburton and has resulted in an economic and ecological disaster that has directly and proximately caused injuries and damages to Plaintiff.

233. As a result of the blowout and subsequent Oil Spill caused by BP and/or Halliburton, Plaintiff has suffered economic injury, damages and/or losses.

234. Prior to the blowout and Oil Spill, BP and/or Halliburton had actual and/or constructive knowledge of the facts and circumstances leading to the Oil Spill. BP and/or Halliburton knew or should have known of no less than three flow indicators from the *Deepwater Horizon*'s well in the hours and minutes before the explosion and Oil Spill, all of which were clear evidence of significant problems with the rig's drilling operations. BP and/or Halliburton's actions and inactions were grossly negligent, reckless, willful, and/or wanton.

235. Plaintiff is entitled to a judgment that BP and/or Halliburton are jointly and severally liable to Plaintiff for damages suffered as a result of BP and/or Halliburton's negligence, gross negligence, recklessness, willfulness or wantonness. Plaintiff should be compensated for damages in an amount to be determined by the trier of fact, including punitive damages for BP and/or Halliburton's conduct.

WHEREFORE, Plaintiff demands a judgment against BP and Haliburton for compensatory and punitive damages as determined by the Jury at trial, pre-judgment interest at the maximum rate allowed by law, litigation costs, and any other damages allowed by law.

### COUNT III NEGLIGENCE *PER SE*
#### (Against BP & Halliburton)

236. Plaintiff repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this action and incorporates same by reference as though fully set forth herein.

237. BP and/or Halliburton's conduct with regard to the manufacture, maintenance,

Case: 18-31177     Document: 00515297113     Page: 130     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 131 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/2019 Page 35 of 1003

and/or participation of drilling operations and oil rigs such as the *Deepwater Horizon* is governed by numerous state and federal laws, and permits issued under the authority of these laws.

238.     These laws and permits create statutory standards that are intended to protect and benefit Plaintiff, among others. BP and/or Halliburton violated these statutory standards. Such violations constitute negligence *per se*.

239.     BP and/or Halliburton's violations of these statutory standards caused Plaintiff economic injury, damages, and/or losses.

240.     BP and/or Halliburton's violations of these statutory standards proximately caused Plaintiff's injuries, warranting compensatory and punitive damages.

241.     BP and/or Halliburton had actual and/or constructive knowledge of the facts and circumstances leading to and causing this incident, which in turn caused Plaintiff's injuries, and their actions and inactions were grossly negligent, reckless, willful, and/or wanton.

242.     Plaintiff is entitled to a judgment finding BP and Halliburton liable to Plaintiff for damages suffered as a result of BP and Halliburton's negligence *per se* and awarding Plaintiff adequate compensation in an amount to be determined by the trier of fact, including punitive damages for BP and Halliburton's conduct.

WHEREFORE, Plaintiff demands a judgment against BP and Halliburton for compensatory and punitive damages as determined by the Jury at trial, pre-judgment interest at the maximum rate allowed by law, litigation costs, and any other damages allowed by law.

## COUNT IV
## GROSS NEGLIGENCE & WILLFUL MISCONDUCT
## (Against BP & Halliburton)

243.     Plaintiff repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this action and incorporates same by

Case: 18-31177     Document: 00515297113     Page: 131     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/20 Page 132 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/20 Page 336 of 1003

reference as though  fully set forth herein.

244.     BP and/or Halliburton owed and breached duties of ordinary and reasonable care  to Plaintiff  in connection  with the maintenance of, and drilling operation on, the *Deepwater Horizon*, and additionally owed and breached duties to Plaintiff to guard against and/or prevent  the risk of the Oil Spill.

245.     BP and/or Halliburton breached their legal duty to Plaintiff and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent maintenance and/or operation of the *Deepwater Horizon*.

246.     BP and/or Halliburton knew or should have known that their wanton, willful, and reckless misconduct would result in a disastrous blowout and oil spill, causing damage to those affected by the Oil Spill.

247.     BP acted with gross  negligence, willful  misconduct, and  reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia*, failing to use a sufficient number of "centralizers" to prevent channeling during the cement process; failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job; disregarding proper drilling, casing, mudding, and cementing procedures; failing to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico.

248.     BP and Halliburton acted with gross  negligence, willful  misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia*, using an inappropriate cement mixture for the well; failing to appropriately test that cement  mixture prior to using it in the well; failing to run a cement bond log to evaluate

the integrity of the cement job; and failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

249.    BP acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia*, using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

250.    BP acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiff by, *inter alia*, recklessly maintaining and altering, and/or wantonly operating and/or using the BOP appurtenant to the *Deepwater Horizon*.

251.    As a result of BP and/or Halliburton's gross negligence, willful misconduct, and reckless disregard and the safety and health of the environment Plaintiff suffered economic injury, damages, and/or losses.

252.    BP and/or Halliburton's gross negligence, willful misconduct, and reckless disregard and the safety and health of the environment proximately caused Plaintiff's injuries, warranting compensatory and punitive damages.

253.    Plaintiff is entitled to a judgment finding BP and Halliburton liable to Plaintiff for damages suffered as a result of BP and Halliburton's gross negligence and/or willful misconduct and awarding Plaintiff adequate compensation in an amount to be determined by the trier of fact, including punitive damages for BP and Halliburton's conduct.

WHEREFORE, Plaintiff demands a judgment against BP and Halliburton for compensatory and punitive damages as determined by the Jury at trial, pre-judgment interest at the maximum rate allowed by law, litigation costs, and any other damages allowed by law.

## COUNT V
## (DECLARATORY JUDGMENT ACTION)
## <u>(Against the Claims Administrator and BP)</u>

254.    Plaintiff repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this action and incorporates same by reference as though fully set forth herein.

255.    Defendant Patrick Juneau (herein, the "Claims Administrator") was appointed by the Court to serve as the Claims Administrator pursuant to Section 4.3 in the Settlement Agreement.

256.    On August 15, 2013, the Plaintiff timely submitted a Business Economic Loss ("BEL") claim to the Deepwater Horizon Court Supervised Settlement Program ("CSSP") implemented in connection with the Deepwater Horizon Economic and Property Damages Settlement Agreement ("Settlement Agreement"), as amended on May 2, 2012. (Rec. Doc. 6430-1 in 2:10-md-2179). The Plaintiff's BEL claim has not been paid, even though it was submitted almost 6 years ago. The Plaintiff's BEL claim should be paid pursuant to the terms of the Settlement Agreement.

257.    The Plaintiff is a member of the Deepwater Horizon Economic and Property Damages Settlement Class (the "Class") as defined in Section 1 of the Settlement Agreement. The Court adopted the definition of the Class when it approved of the Settlement Agreement on December 21, 2012. <u>In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, On April 20, 2010</u>, <u>910 F.Supp.2d 891</u> (E.D. La. 2012), aff'd <u>In re Deepwater Horizon</u>, <u>739 F.3d 790</u> (5th Cir. 2014).

258.    The Plaintiff did not sustain "MORATORIA LOSSES" as that phrase is used and defined in Sections 3.3 and 38.93 in the Settlement Agreement, respectively. Section 3.3

Case: 18-31177    Document: 00515297113    Page: 134    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 135 of 1003
Case 2:10-md-02179-CJB-DCW Document 26314 Filed 02/05/20 Page 35 of 1003

states that "Claims of Natural Persons and Entities for **MORATORIA LOSSES**" are not recognized under the Settlement Agreement. Section 38.93 defines Moratoria Losses as meaning "any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity -- including shallow water and deepwater activity -- that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections or permitting practices."

259.    On May 27, 2010, the Secretary of the Interior ("Secretary") issued a report titled: "Increased Safety Measures for Energy Development on the Outer Continental Shelf." The following day the Secretary issued a memorandum (the "May Directive") to the director of MMS suspending deepwater drilling in the Gulf of Mexico and suspending deepwater drilling permit applications.[7] MMS then notified the affected lessees, owners, and operators. On July 12, 2010, the Secretary rescinded the May Directive and implemented a new directive that was similar in scope to the May Directive but with more explanation.[8] In the July Directive, the Secretary instructed BOEM to suspend "the drilling of wells using subsea blowout preventers (BOPs) or surface BOPs on a floating facility . . . . [and to] cease the approval of pending and future applications for permits to drill wells using subsea BOPs or surface BOPs on a floating facility."

260.    As to ongoing drilling operations, the May Directive and the July Directive were both limited to 33 offshore drilling rigs that had permits at the time.[9] The Plaintiff did not conduct business with these 33 offshore drilling rigs in 2009 or 2010, which were drilling

---

[7] May Directive (attached hereto as Ex. 1).
[8] July Directive (attached hereto as Ex. 2).
[9] Doc. 7-2 in case 2:10-cv-1663 (attached hereto as Ex. 3).

in  water depths ranging from 1,030 feet to 9,627 feet.  The Plaintiff's revenue was not impacted by  the May Directive or July Directive suspending the drilling activities being conducted by these 33 offshore drilling rigs in 2010.

261.   The Secretary lifted the July Directive on October 12, 2010.  In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, 168 F.Supp.3d 908 (E.D. La. 2016) (discussing the history of the May Directive and July Directive).

262.    BP and the Claims Administrator have the burden of proof to demonstrate that the  Plaintiff sustained Moratoria Losses.  The Plaintiff does not have to prove a negative.

263.    The Claims Administrator has a duty to follow the terms of the Settlement Agreement. Section 4.3.1. states that the "Claims Administrator shall be selected and appointed by the Court, and shall be responsible to the Court, serve as directed by the Court, and faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court." If the Claims Administrator fails to follow the Settlement Agreement, the Court has authority to direct the Claims Administrator to comply with its terms.

264.    Based upon information and belief, the Claims Administrator retained the services  of a Moratoria Team pursuant to Section 16 in the Settlement Agreement to investigate potential  Moratoria Losses.

265.    The Claims Administrator has a duty to direct the Moratoria Team if the Moratoria Team mischaracterizes claimants as incurring Moratoria Losses. Section 4.3.2 provides  that the "Claims Administrator shall head the Settlement Program, oversee and supervise the **CLAIMS ADMINISTRATION VENDORS** (including any subcontractors) and staff in the  processing and payment of Claims, report and provide information to the

Court, BP, and/or **LEAD CLASS COUNSEL** (or their designee) as may be requested on an ongoing basis and/or as the Court directs, and participate on the Claims Administration Panel. The Court shall retain ongoing and exclusive jurisdiction over the Settlement Program until the consideration and determination of all Claims is complete and the Settlement Program is terminated by the Court."

266. The Plaintiff's NAICS code on its 2010 federal tax return was 238210. As indicated by its NAICS code, the Plaintiff is an electrical contractor. The Plaintiff is licensed to do business in Louisiana, Texas, Mississippi, Alabama, Florida, and other states. The Plaintiff's NAICS code does not appear in either Section I or Section II of Exhibit 19 in the Settlement Agreement. Therefore, the Plaintiff's BEL claim was not subject to automatic or possible review for Moratoria Losses by the Claims Administrator under the plain language in Sections 5.10.3.1.1 and 5.10.3.1.2 in the Settlement Agreement. The Claims Administrator erred by arbitrarily placing the Plaintiff's BEL claim in the Moratoria Hold.

267. Even if the Claims Administrator had authority to reassign a different NAICS code to the Plaintiff so that the Plaintiff's BEL claim fell within Section I or Section II of Exhibit 19, which the Plaintiff disputes, a particular NAICS number does not determine if the Plaintiff or any other claimant incurred any Moratoria Losses. Rather, only a fact intensive and objective analysis can determine whether or not the Plaintiff actually incurred damages as a direct result of the federal government's action or inaction following the Oil Spill.

268. The parties to the Settlement Agreement did not intend for claimants to be perpetually stuck in the Moratoria Hold if the claimant did not have a strong, meaningful business relationship with the offshore drilling industry. Section 5.10.3.1.2 provides that businesses with a NAICS code identified in Section II of Exhibit 19 are subject to the following

Case: 18-31177     Document: 00515297113     Page: 137     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 138 of 1003
Case 2:10-md-02179-CJB-JCW Document 26293-14 Filed 02/05/20 Page 32 of 100

questions: "[i]n  2009, did your business provide significant services, goods, and/or supplies to businesses in the  offshore oil & gas industry in the Gulf of Mexico?" Section 5.10.3.1.2 further provides: "[i]f the Claimant responds negatively, its Claim shall proceed under the Economic Damage Claim  Process." Reading Sections 5.10.3.1.1 and 5.10.3.1.2 together, the  intent  of  the  Settlement  Agreement  was  to  allow  BEL  claimants  with  *insignificant* business connections to the offshore drilling industry to proceed under the BEL framework. Equally  clear  is  the  fact  that  the  Claims   Administrator  considered  and  represented  that *insignificant* business meant up to 33.00% of the  claimant's 2009 net revenue.

269.    Question No. 10 on the BEL Claim Form states:

Businesses/employers that fall within the NAICS codes and descriptions marked with an  "x" in Exhibit 19, Section II must answer the following question:

**In 2009, did your business provide significant services, goods, and/or supplies to businesses in the offshore Oil & Gas Industry in the Gulf of Mexico?** The Claims Administrator considers that an entity provided  "significant" services, goods, and/or supplies to businesses in the offshore oil and  gas industry in the Gulf of Mexico in 2009 if 33.00% or more of its 2009 net revenue was derived from such activities.

270.    Approved Policy 304 (regarding "Moratoria Losses: Implementing Section II of  Exhibit 19") mirrors the definition of "significant" provided in Question 10 of the BEL Claim  Form, and provides, in pertinent part:

Pursuant to Section II of Exhibit 19, Business Economic Loss claimants with a  NAICS Code and business activities marked with an "X" in Section II of Exhibit 19 must answer the following question: "In 2009, did your business provide  significant services, goods, and/or supplies to businesses in the offshore oil & gas  industry in the Gulf of Mexico? . . . To capture this information, the Claims  Administrator asks Business Economic Loss claimants this question in each Claim Form. If the business or employer responds negatively, the claim proceeds under normal processing, without analysis for potential moratoria losses. The  Claims  Administrator  will  advise  claimants  that  the  Claims Administrator  considers that **an entity provided "significant" services**, goods, and/or supplies  to businesses in the offshore oil and gas industry in the Gulf of

Case: 18-31177   Document: 00515297113   Page: 138   Date Filed: 02/04/2020

Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/20 Page 139 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/2019 Page 138 of 1003

Mexico in 2009 **if 33.00% or more of its 2009 net revenue was derived from such activities**. Subject to the analysis of claims to prevent fraud, **the Claims Administrator will observe the claimant's Claim Form answer to this question and will not independently determine whether the entity provided "significant" services, goods, and/or supplies to businesses in the offshore oil and gas industry in the Gulf of Mexico in 2009.**

271.  The Plaintiff correctly answered question No. 10 on the BEL Claim Form in the negative. Accordingly, even if the Claims Administrator reassigned a NAICS code to match a NAICS code in Exhibit 19, the Claims Administrator did not have authority to arbitrarily keep the Plaintiff in a Moratoria Hold.

272.  On October 7, 2014, the Plaintiff received a "Preliminary Notice Regarding Moratoria Losses Review" as to its 4 BEL claims.[10] The notices made clear that "[t]his is not a denial of your claim, but instead is a Preliminary Notice to update you on the status of your claim." Most importantly, the notice stated as follows:

> After we have completed reviewing your claim, <u>we will send you a Notice explaining the outcome of that review</u>. <u>You will have the opportunity then to accept the outcome set forth in that Notice or, if applicable, request Re-Review or Reconsideration of all decisions made on your claim.</u>

273.  The Plaintiff relied on the statements made in the Preliminary Notice, reasonably believing that any written decisions made by the Claims Administrator would allow the Plaintiff to appeal to an Appeal Panel as described in the Settlement Agreement.

274.  The Plaintiff complied with all requests made by the CSSP related to the Moratoria Team's investigation, producing all available records requested and answering all questions presented. The Plaintiff made a good faith effort to demonstrate why it did not belong in the Moratoria Hold.

---

[10] Preliminary Notices (attached hereto as Ex. 4.)

Case: 18-31177     Document: 00515297113     Page: 139     Date Filed: 02/04/2020

Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 140 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293-14 Filed 02/05/19 Page 64 of 100

275.    The Plaintiff has been denied due process rights under the Settlement Agreement. Section 6 in the Settlement Agreement governs the Claims Appeal Process.  Section 6.1 states that claimants "will have up to three opportunities, depending on their circumstances, to have their Claims reconsidered and reviewed to assure accuracy, transparency, independence, and adherence by the Settlement Program to the terms of the Agreement." The Plaintiff never had an opportunity to have the Claims Administrator's decision reconsidered or reviewed. The Plaintiff never received a written notice from the Settlement Program explaining why its claim was placed in the Moratoria Hold or what information was needed to remove the claim from the Moratoria Hold. Instead, the Claims Administrator allowed the BEL claim to remain in limbo for years without sufficiently communicating how the federal government's directives allegedly impacted the Plaintiff's revenue.

276.    Section 6.1.2.2 governs appeals to the panels. Section 6.1.2.3 states that a "Claimant may Appeal within 30 days of the issuance of final written notice from the Settlement Program of a determination of final compensation award." The Plaintiff never received a Denial Notice giving it the opportunity to exercise its rights under § 6.1.2.3. Because it never received a Denial Notice, the Plaintiff did not have a procedural mechanism to appeal to an Appeal Panel.

277.    The Claims Administrator failed to comply with the terms and spirit of the Settlement Agreement.

278.    The Court entered an order on October 3, 2018 and excluded the Plaintiff from the CSSP prior to the Claims Administrator issuing any written notice to the Plaintiff explaining why the Plaintiff was not considered part of the Class or what part of its losses were allegedly Moratoria Losses. (Rec. Doc. 24945 in 2:10-md-2179).

Case: 18-31177     Document: 00515297113     Page: 140     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 141 of 1003
Case 2:10-md-02179-CJB-JCW Document 26293-14 Filed 02/05/2019 Page 65 of 143

## Declaratory Judgment

279.    The Plaintiff brings this claim for a declaratory judgment pursuant to Rule 57 of the Federal Rules of Civil Procedure, 28 U.S.C. § 2201, and Section 18.1 of the Settlement Agreement.

280.    The Plaintiff is a member of the Class as defined in Section 1 of the Settlement Agreement.  However, the Claims Administrator failed to enter an award in favor of the Plaintiff under the terms of the Settlement Agreement, in particular Exhibit 4B (Causation Requirements for BEL claims) and Exhibit 4C (Compensation Framework for BEL claims). The Claims Administrator instead placed the Plaintiff's BEL claim in the Moratoria Hold without any evidentiary support that the Plaintiff incurred Moratoria Losses as that phrase is used and defined in Sections 3.3 and 38.93 in the Settlement Agreement, respectively.

281.    A justiciable controversy exists between the Plaintiff, the Claims Administrator, and BP over the interpretation of whether the Plaintiff's claim should be processed under Exhibit 4B and Exhibit 4C. The Plaintiff contends that the Claims Administrator misapplied and contradicted the Settlement Agreement when he placed the Plaintiff's claim in the Moratoria Hold and when he failed to release the claim from the Moratoria Hold given the lack of any evidence that the Plaintiff sustained Moratoria Losses.  A declaratory judgment action is a proper procedural vehicle to resolve this type of dispute. Waldman v. Riedinger, 423 F.3d 145 (2nd Cir. 2005) (holding that the district court erred by excluding a claimant as a member of a class action).

282.    The Court should exercise its discretion to decide the justiciable controversy described herein based on the factors discussed in The Sherwin-Williams Co. v. Holmes County, 343 F.3d 383, 388 (5th Cir. 2003) (analyzing the 7 factors identified in St. Paul Ins. Co.

v. Trejo, 39 F.3d 585 (5th Cir. 1994)). None of the Trejo factors favor dismissing this declaratory judgment action.

283.    The Court retained exclusive jurisdiction over the parties for the "purpose of enforcing, implementing, and interpreting" the Settlement Agreement. The Plaintiff, therefore, cannot bring its complaint for declaratory judgment in state court or another jurisdiction. At this point, this declaratory judgment action is an appropriate remedy for the Plaintiff.

284.    The Plaintiff never received a Denial Notice from the Claims Administrator and never had the opportunity to argue the merits of its position to an Appeal Panel.    Cf. Homes Motors, Inc. v. BP Exploration & Production, Inc., 829 F.3d 313 (5th Cir. 2016). Accordingly, the Court's decision to review the merits of this justiciable controversy must be decided based on the factors stated in Holmes County, as opposed to the factors outlined in Claimant ID 100190818 v. BP Exploration & Production, Inc., 718 Fed. Appx. 220, 222 (5th Cir. 2018) (stating abuse-of-discretion factors).

285.    The Plaintiff respectfully requests the following relief:

a.    That the Court accept jurisdiction of this declaratory judgment action;

b.    That the Court ORDER, ADJUDGE and DECREE that this is a proper case for declaratory judgment relief and that there is a bona fide controversy between the parties as to their legal rights, status, and liabilities;

c.    That upon a final hearing on the merits of this cause of action, this Honorable Court declare the rights, status, and legal relations of the Plaintiff and the Defendants under the Settlement Agreement;

d.    That upon a final hearing on the merits of this cause of action, this Honorable Court ORDER, ADJUDGE and DECREE that the Plaintiff is a member of the Class as

defined in Section 1 of the Settlement Agreement;

      e.     That upon a final hearing on the merits of this cause of action, this Honorable Court ORDER, ADJUDGE, and DECREE that the Plaintiff should not have been placed in the Moratoria Hold or, alternatively, that the Plaintiff should have been released from the Moratoria Hold given the lack of any evidence that the Plaintiff sustained Moratoria Losses;

      f.     That upon a final hearing on the merits of this cause of action, this Honorable Court ORDER, ADJUGE and DECREE that the Claims Administrator shall process the Plaintiff's claim under the business economic loss framework in the Settlement Agreement and enter an appropriate award; and

      g.     Any other relief this Honorable Court finds equitable and just.

<div align="center">

**COUNT VI**
**BREACH OF CONTRACT**
**(<u>Against BP</u>)**

</div>

286.   The Plaintiff repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this action and incorporates same by reference as though fully set forth herein.

287.  The Plaintiff's BEL claim should not have been subjected to Moratoria Loss review pursuant to Section 5.10.3 and Exhibit 19 in the Settlement Agreement, nor should the BEL claim have been indefinitely placed in the Moratoria Hold by the Claims Administrator.

288.  However, if the Claims Administrator had authority to place the Plaintiff's BEL claim in the Moratoria Hold for any amount of time, which the Plaintiff disputes, the Plaintiff's BEL claim should have been compensated under the terms of the Settlement Agreement.

289.  BP owed the Plaintiff, a member of the Class, a duty to act in good faith and fairly treat the Plaintiff and other claimants routed to the Moratoria Hold.  As more particularly described

below, BP breached the Settlement Agreement, acted in bad faith, tried to evade the spirit of the

Settlement Agreement, and interfered with the Claims Administrator's ability to pay claimants

routed to the Moratoria Hold.  Comar Marine Corp. v. Raider Marine Logistics, LLC, 2013 WL

2181036, *14 (W.D. La. May 20, 2013).

### Background

290.  Shortly after the Court entered its order on December 21, 2012 approving the

Settlement Agreement, BP complained to the Court about certain policies adopted by the Claims

Administrator pertaining to how the Claims Administrator was paying claimants.  BP began

vigorously fighting the Claims Administrator's implementation of Exhibit 4B ("Causation

Requirements for Business Economic Loss Claims") and Exhibit 4C ("Compensation Framework

for Business Economic Loss Claims"), resulting in multiple appeals to the United States Court of

Appeals for the Fifth Circuit.  In re Deepwater Horizon, 732 F.3d 326 (5th Cir. 2013) ("Deepwater

Horizon I"); In re Deepwater Horizon, 739 F.3d 790 (5th Cir. 2014) ("Deepwater Horizon II"); In

re Deepwater Horizon, 744 F.3d 370 (5th Cir. 2014) ("Deepwater Horizon III").  BP asserted,

among other things, that the Claims Administrator was ignoring the terms of the Settlement

Agreement by paying claimants who did not suffer any damages "due to" the Oil Spill.  BP insisted

that the Claims Administrator expanded the class definition to include businesses who did not

suffer any damages caused by the Oil Spill.

291. BP became so desperate to unravel the Settlement Agreement that it made

arguments to the Court completely inconsistent with representations made to the Court prior to the

Court approving the Settlement Agreement.  The inconsistent statements to the Court resulted in

the Court finding on December 24, 2013 that BP was judicially estopped from arguing:

> (1) that Exhibit 4B is not the exclusive means of determining whether a business
> economic claim is 'as a result of' the Deepwater Horizon Incident for purposes of the

Settlement, including the Class Definition; (2) or that the Settlement contains, implicitly or explicitly, a causation requirement other than Exhibit 4B; (3) or that satisfying Exhibit 4B does not establish under the Settlement an irrebuttable presumption that a business' economic loss was 'as a result of' the Deepwater Horizon Incident; (4) or making similar arguments.

In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, On April 20, 2010, 2013 WL 10767663, *11 (E.D. La. Dec. 24, 2013).

292.  Ultimately, on March 3, 2014, the Fifth Circuit found that BEL claimants satisfied their burden of proof contemplated by the Settlement Agreement by signing a verified form stating that losses were caused by the Oil Spill.  Deepwater Horizon III, 744 F.3d at 376 ("the parties explicitly contracted that traceability between [BP's] conduct and a claimant's injury would be satisfied at the proof stage, that is, in the submission of a claim, by a certification on the document that the claimant was injured by the *Deepwater Horizon* disaster."); In re Deepwater Horizon, 756 F.3d 320 (5th Cir. 2014) (denying petition for rehearing en banc on May 19, 2014); BP Exploration & Production Inc. v. Lake Eugenie Land & Development, Inc., 135 S.Ct. 754 (2014) (denying petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit on December 8, 2014).

293.  BP's substantial efforts to avoid a key feature of the Settlement Agreement – Exhibit 4B – failed miserably.

294.  During BP's campaign to rewrite Exhibit 4B, BP realized that the uncapped Settlement Agreement would cost it billions more than originally anticipated.  BP had a severe case of "buyer's remorse".

### Oil & Gas Support Services Industry

295.  While BP was fighting the payment of claims under the terms of Exhibit 4B and 4C throughout 2013 and 2014, an issue arose as to how to interpret and implement the parts of the

Settlement Agreement related to businesses falling into the category of Oil & Gas Support Services Industry ("OGSSI"). Class Counsel and BP debated the proper way to decide which businesses should be subjected to automatic or potential review for Moratoria Losses and, once a claimant was routed to such a review process, how to distinguish between Moratoria Losses and Non-Moratoria Losses. BP knew it was contractually obligated to pay for Non-Moratoria Losses for businesses who were categorized as part of the OGSSI.

296. All of the positions taken by BP in 2013 and 2014 regarding the payment of Non-Moratoria Losses occurred while BP unsuccessfully argued to the Court and the Fifth Circuit that the Claims Administrator expanded the class definition beyond the Settlement Agreement to include claimants who did not suffer any damages as a result of the Oil Spill.

297. Class Counsel and BP negotiated for months to try to agree on particular policies to supply to the Claims Administrator in the context of the OGSSI. Once negotiations broke down, Class Counsel filed a motion on August 27, 2013 seeking an order from the Court authorizing and directing the Claims Administrator to interpret and implement the Settlement Agreement with respect to claimants in the OGSSI. On September 9, 2013, BP filed its response in opposition to Class Counsel's motion. Class Counsel then filed their reply to BP's opposition on September 20, 2013. On October 4, 2018, the Court denied and/or mooted the motion filed by Class Counsel on August 27, 2013.

298. BP did not negotiate in good faith with Class Counsel when addressing the causation burden for businesses in the OGSSI. Exhibit 16 provides that the "standard business economic frameworks for **causation** shall apply to non-moratoria losses. Causation shall be determined prior to the determination of the Moratoria Loss." The parties generally intended for Exhibit 4B to apply to Non-Moratoria Losses claimed by businesses in the OGSSI, something the

Fifth Circuit noted that BP "accepted but now wishes it had not." <u>Deepwater Horizon III</u>, <u>744 F.3d at 377</u>. The Plaintiff's verified BEL claim form satisfied its causation burden as determined by the Fifth Circuit in <u>Deepwater Horizon III</u>.

299.  BP did not negotiate in good faith with Class Counsel when working on compensation criteria for businesses in the OGSSI.   Exhibit 16 provides as follows:

> In determinations of moratoria losses, the standard business economic framework shall not apply.  Rather, the Claims Administrator's dedicated team shall be given parameters **agreed upon by the parties** that must be applied to distinguish among economic losses due to or resulting from (i) moratoria and (ii) non-moratoria economic loss.
>
> BP and PSC to develop **agreed upon guidance** that the Claims Administrator shall apply in making **compensation** determinations that adhere to the moratoria exclusion in the settlement agreement.
>
>> In general, one of the parameters shall be that the Claims Administrator shall be directed to calculate the claimant's non-moratoria economic loss due to or resulting from the DWH Spill by isolating losses that occurred prior to imposition of the moratoria on May 28, 2010, and any continuation of such losses that might have been expected in the absence of the moratoria.  The incremental impact of the moratoria on claimant's losses generally would not be recoverable in the settlement.

300.  During negotiations with Class Counsel, BP drilled down on the "agreed upon guidance" language in Exhibit 16 to prevent the Claims Administrator from paying any claimants in the Moratoria Hold.  BP knew as long as it did not agree with Class Counsel as to how to compensate claimants who found their way into the Moratoria Hold it could effectively deny them any compensation or, at least, deny them fair compensation.  Hundreds of claimants suffered for years while BP submitted unreasonable criteria to Class Counsel and the Claims Administrator to pay for Non-Moratoria Losses.

301.  BP supplied the Claims Administrator with "guidance" that departed from the terms

and spirit of the Settlement Agreement which was not acceptable to Class Counsel.

302.  In the Settlement Agreement, BP agreed to pay claimants in the OGSSI for Non-Moratoria Losses.  It should not have been difficult for BP to agree to terms that "adhered" to the moratoria exclusion.   In fact, Exhibit 4B and Exhibit 4C provide a reasonable and fair compensation formula for claimants in the OGSSI seeking Non-Moratoria Losses.  It is consistent with the intent of the Settlement Agreement to treat claimants within the OGSSI the same as businesses outside the OGSSI when both are seeking Non-Moratoria Losses.

303.  Because BP disagreed with how Exhibit 4B and Exhibit 4C had been construed and implemented by the Claims Administrator, as reflected in Deepwater Horizon I, Deepwater Horizon II, and Deepwater Horizon III, BP deliberately impaired the Claims Administrator's ability to process claims in the Moratoria Hold and pay for Non-Moratoria Losses.  BP's intentional efforts to evade the terms of the Settlement Agreement were so egregious that punitive damages should be imposed.

304.  After the United States Supreme Court refused to review the 5th Circuit's decision in Deepwater Horizon III, BP should have withdrawn its argument regarding the causation burden for claimants.  Yet, BP still refused to negotiate in good faith regarding the causation burden of proof.  The Plaintiff has had to incur attorney's fees due to BP's bad faith negotiations.

305. Due to BP's refusal to negotiate in good faith with Class Counsel to develop appropriate "guidance" for the benefit of claimants in the OGSSI, the Court entered an order on October 3, 2018 and excluded the Plaintiff from the CSSP while also opening a window for the Plaintiff to pursue litigation against BP before the Court.

WHEREFORE, the Plaintiff demands a judgment against BP for compensatory and punitive damages as determined by the Jury at trial, pre-judgment interest at  the maximum rate

allowed by law, litigation costs, attorney's fees, and any other damages allowed by law, as well as

equitable relief as determined by the Court.

### PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CAUSES OF ACTION

Respectfully submitted,

*/s/ Rodi F. Rispone (with permission)*

Rodi F. Rispone,
Esq. LA Bar Roll
No. 23554 Attorney
at Law
19322 S. Lakeway Ave.
Baton Rouge, LA 70810
Tel. (225) 937-5986
Fax (225) 612-8134
rrispone@gmail.com

*/s/ WILLIAM G. CHASON*

RICHARD M. GAAL
State Bar No. ASB-3999-A58R
rgaal@mcdowellknight.com
WILLIAM G. CHASON
State Bar No. ASB-5462-151C
wchason@mcdowellknight.com
MORGAN S. HOFFERBER
State Bar No. ASB-1334-542X
mhofferber@mcdowellknight.com

OF COUNSEL:

Case: 18-31177     Document: 00515297113     Page: 149     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293-4 Filed 02/05/20 Page 150 of 1003
Case 2:10-md-02179-CJB-JCW Document 26293-4 Filed 02/05/2019 Page 150 of 1003

McDOWELL KNIGHT ROEDDER & SLEDGE, L.L.C.
11 N. Water Street; Suite 13290
Mobile, Alabama 36602
Tel. (251) 432-5300
Fax (251) 432-5303

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on All Counsel by electronically uploading same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this the 12 day of June, 2019.

*/s/ WILLIAM G. CHASON*

MEMORANDUM

To:     Director, MMS

From:  Secretary

Re:     Suspension of Outer Continental Shelf (OCS) Drilling of New Deepwater Wells

Date:   May 28, 2010

The recent blow-out and oil spill in the Gulf of Mexico is new evidence of the serious risks associated with deepwater drilling, and presents new challenges for the Department to assure the American public that OCS deepwater drilling can be accomplished in a safe and environmentally sound manner.

Yesterday, I presented recommendations to the President based on a 30-day review of the BP Explosion and Oil Spill that began on April 20, 2010. Based on that review, the recommendations contained in the report to the President, and further evaluation of the issue, I find at this time and under current conditions that offshore drilling of new deepwater wells poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment as that is specified in 30 C.F.R. 250.172(b). I also have determined that the installation of additional safety or environmental protection equipment is necessary to prevent injury or loss of life and damage to property and the environment. 30 C.F.R. 250.172(c).

Therefore, I am directing a six month suspension of all pending, current, or approved offshore drilling operations of new deepwater wells in the Gulf of Mexico and the Pacific regions. This suspension does not apply to drilling operations that are necessary to conduct emergency activities, such as the drilling operations related to the ongoing BP oil spill. For those operators who are currently drilling new deepwater wells, they shall halt drilling activity at the first safe and controlled stopping point and take all necessary steps to close the well. In addition, MMS shall not process any new applications for permits to drill consistent with this directive. All applicable regulations shall apply to the implementation of this directive.

Please ensure that appropriate Letters of Suspension and any other appropriate documentation, including any additional instructions and details regarding this directive, are sent to all affected lessees, owners, and operators immediately.



EXHIBIT

1

## DECISION MEMORANDUM

**TO:**      Michael R. Bromwich
Director, Bureau of Ocean Energy Management, Regulation and
Enforcement

**FROM:**    Secretary

**SUBJECT:**  Decision memorandum regarding the suspension of certain offshore
permitting and drilling activities on the Outer Continental Shelf

## I.  INTRODUCTION

As Secretary of the Department of the Interior (Department), I take seriously the
Department's ongoing obligation, prescribed by the Outer Continental Shelf Lands Act
(OCSLA), to ensure that drilling activity undertaken on the Nation's Outer Continental
Shelf (OCS) is conducted in a manner that is safe for workers, coastal communities, and
the environment. *See* 43 U.S.C. §§ 1332(6), 1334(a), 1347 and 1348; 30 C.F.R. §
250.106. Applicable regulations provide that the Bureau of Ocean Energy Management,
Regulation and Enforcement may order suspensions of operations when activities "pose a
threat of serious, irreparable, or immediate harm or damage" to human or animal "life,
property, any mineral deposit or the marine, coastal, or human environment" or "[w]hen
necessary for the installation of safety or environmental protection equipment." 30
C.F.R. §§ 250.172(b)-(c). Pursuant to these authorities, this decision memorandum
directs you, as Director of BOEM, to direct the suspension of certain offshore permitting
and drilling activities on the OCS, as set forth in Section VI of this memorandum.

## II.  SUMMARY

Pursuant to 30 C.F.R. § 250.172(b)-(c), and with certain exceptions explained below, I
have determined that BOEM shall direct the suspension of the drilling of wells using
subsea blowout preventers (BOPs) or surface BOPs on a floating facility. I have also
determined that BOEM shall cease the approval of pending and future applications for
permits to drill wells using subsea BOPs or surface BOPs on a floating facility. These
directives and suspensions shall apply in the Gulf of Mexico and the Pacific regions
through November 30, 2010, subject to modification if I determine that the significant
threats to life, property, and the environment set forth in this memorandum have been
sufficiently addressed. The exceptions and other details of my decision are set forth in
Section VI below.

EXHIBIT

2

This suspension is required to mitigate a clear threat that additional deepwater drilling poses of serious, irreparable, or immediate harm to life, to property, or to the marine, coastal, or human environment. I have concluded, based on an extensive record, that this temporary pause in deepwater drilling will provide time for a number of important steps toward addressing this threat and improving the safety of drilling operations, including the following:

(1) the collection and analysis of key evidence regarding the potential causes of the April 20, 2010, explosion and sinking of the *Deepwater Horizon* offshore drilling rig, which caused the deaths of 11 workers and the subsequent and on-going release of millions of barrels of oil in the Gulf of Mexico (collectively referred to as the "BP Oil Spill"), and further efforts to determine the root causes of the accident, which can be considered and assessed in the context of new safety measures that I have directed BOEM to implement;

(2) the assessment of wild well intervention and blowout containment resources — which are not currently available to handle a blowout such as the one that has defied containment since April 20, 2010 – to determine the strategies and methods by which they can be made more readily available should another blowout occur; and

(3) the submission of evidence by operators demonstrating that they have the ability to respond effectively to a potential oil spill in the Gulf, given the unprecedented commitment of available oil spill response resources that are now being dedicated to the BP Oil Spill.

The BP Oil Spill is a dynamic situation, and new information is made available every day about the risks associated with deepwater drilling on the OCS, including: (1) systemic drilling and workplace safety issues, (2) the inadequacies of a variety of attempted wild well intervention and blowout containment strategies, and (3) the shortcomings of current oil spill response plans and resources. Recent events also have made clear that there are systemic problems that apply across different types of deepwater drilling, including, but not limited to, problems with BOPs, a lack of viable deepwater wild well intervention and blowout containment strategies and capabilities, and inadequacies in oil spill response plans and resources, particularly in light of the ongoing response to the BP Oil Spill. All of these factors are relevant to and form the basis for my decision.

In addition, suspending these particular operations until November 30, 2010, is necessary to provide time for you to submit a report to me no later than October 31, 2010 as a result of additional public outreach and information gathering and to allow me sufficient time to review and analyze your report, potentially conduct additional outreach, and make a determination as to whether additional action must be taken, including the potential for a modification to the scope or duration of this suspension decision. The November 30 date will also allow BOEM and the Department to develop the interim rules required to address the safety issues that have recently come to light. Some of these interim rules are expected to be issued within 120 days of the issuance of the May 27, 2010, Departmental

report entitled "Increased Safety Measures for Energy Development on the Outer Continental Shelf" (Safety Report), and additional time will be required after these rulemaking actions are completed for operators to implement the new requirements established by those rules. The Atlantic hurricane season also runs from June 1, 2010 until November 30, 2010, which is another reason for the duration of the suspension until this date. The November 30 end date also takes into account the expected killing or containment of the Macondo well, which is anticipated to occur by approximately mid-August 2010, and which may have an effect on the availability of spill containment and response capabilities for potential use in response to other incidents. Finally, the November 30 date accounts for the requirement that certain Technical Workgroups, established as part of the Government's response to the BP Oil Spill, provide recommendations to improve OCS drilling operations within 180 days of the issuance of the Safety Report.

In reaching this decision, I am aware that the suspension of deepwater drilling over the next few months will have a serious, negative impact on rig workers and those who support them. I also am aware that, as a general matter, the safety record for deepwater drilling has been good. Nevertheless, I am reminded daily that deepwater drilling accidents can have and in the case of the BP Oil Spill do have a profound, devastating impact on the economic and environmental health of an entire region. References to the track record for the deepwater drilling industry are of limited relevance, given that deepwater drilling is a relatively young and still-evolving enterprise (having only begun in earnest in the late 1990s), particularly given the reality that a devastating accident has, in fact, occurred, with the full dimensions and consequences of that accident still unfolding before us.

With regard to the first basis for my decision – the need to ensure that adequate safety measures are in place to address the risks of deepwater drilling – it is imperative that we have additional information about the causes of the BP Oil Spill and implement safety measures to address the risks associated with those causes. I note that several investigations and reviews to identify the root causes of the disaster are underway, including a joint BOEM/U.S. Coast Guard investigation, a review by the National Academy of Engineering (NAE), and on-going Congressional inquiries. Also, the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (Presidential Commission) is beginning its deliberations. I have been collecting information from some of these sources, and I will continue to do so as their deliberations proceed, so that I can make a more fully informed judgment regarding the safety of deepwater drilling. In that regard, I note that because the Macondo well still has not been contained, it is not yet possible to review key physical evidence that should help determine what caused the accident – the BOP that apparently failed remains on the seabed. In short, a threat exists, and we are in the midst of determining the full nature and extent of that threat. This is not to say that the Department intends to suspend drilling until all investigations have been completed, but additional time is critical to get the preliminary results of ongoing investigations to better inform our decisionmaking and longer term rulemaking throughout this process. Although some have suggested that the BP Oil Spill represents an anomalous situation and that it would therefore be

3

inappropriate to suspend other deepwater drilling activities, we simply do not know if the BP situation is unique. With regard to the performance of blowout prevention equipment, for example, it is noteworthy that there are only a small number of major manufacturers of the BOPs that are used by drilling contractors. Also, testing that has been required for the BOPs on the new relief wells has identified unexpected performance problems with those BOPs. This evidence suggests that the problems that lie at the heart of the BP Oil Spill are not unique to the *Deepwater Horizon* and Macondo well.

Second, this temporary pause in deepwater drilling will give industry time to take concerted action toward the development of more effective blowout containment strategies and capabilities for deepwater operations. The oil industry has limited capability to stop an uncontrolled blowout of an oil well in deepwater. BP's inability, after more than 80 days, to contain the Macondo blowout and spill provides continuing evidence that BP – and the rest of the industry, which has been cooperating with BP in its efforts to contain the on-going spill – had not prepared to contain a blowout in the deepwater environment. In Congressional testimony, industry executives have admitted that the industry is unprepared to stop deepwater oil well blowouts effectively, and that many of the containment methods attempted with respect to the Macondo blowout have been improvised and were untested. Although industry has begun to organize efforts to address strategies and options for subsea well control and blowout containment, much work remains to be done to develop effective containment and response options as well as to achieve an appropriate level of preparedness in the event of another deepwater wild well.[1] It may not be necessary or appropriate to wait for the full build-out of this capability before resuming deepwater drilling, but it is reasonable, before new deepwater drilling activities recommence, to require industry to develop workable plans to address a blowout in a more timely and effective manner than has been the case with the BP Oil Spill.

The third key reason for my decision is that the unprecedented deployment of spill response equipment and cleanup crews to address the massive BP Oil Spill raises serious legal and practical questions about whether other deepwater operators would be able to employ adequate quantities of skimmers, boom, and other oil spill response resources to address another spill if it occurs.[2] Simply put, there may be insufficient resources

---

[1]    *See* API submissions regarding "Enhanced Industry Capability for Offshore Operations" and "Joint Industry Task Force to Address Subsea Well Control and Oil Spill Response", July 6, 2010. The JITF document states that "The Joint Industry Task Force on Subsea Well Control and Containment has been formed to review current subsea well control preparedness and response options to determine their efficacy throughout all offshore operations." This task force "will review intervention and containment at the seafloor" and "will focus on other well control procedures including well shut in, kill methods, as well as subsea containment and collection methods" (emphasis in original).

[2]    Shallow water spills tend to be more confined and easier to address, if only because of the smaller geographic area affected by the spill. For example, with respect to the BP Oil Spill, it has been estimated that each molecule of oil can take as much as three hours to reach the surface, thereby creating conditions that allow for the spill to spread over a large geographic area. *See, e.g.,* David A. Fahrenthold and Juliet Eilperin, "Depth of Oil Spill Obscures Impact," (15 May 2010) ("[T]his oil is flowing out nearly a mile underwater, and takes, by one estimate, three hours to reach the surface.").

available to respond should another deepwater spill occur while the BP Oil Spill containment and clean-up efforts are at their peak. Before deepwater drilling activity resumes, oil spill response plans need to be reviewed under the changed circumstances presented by the BP Oil Spill to determine whether sufficient spill response resources are available to address another deepwater spill event.

Each of these three factors provides a strong, independent rationale for pushing the "pause" button on the drilling of new deepwater wells in the Gulf of Mexico. I do not believe that this stoppage, however, should continue for an indefinite period. I have identified November 30, 2010, as the end-date for the suspensions because it represents the period of time needed to address the three serious issues of deepwater drilling safety, blowout containment capabilities, and oil spill response capacity. I acknowledge a continuing sense of urgency in addressing these issues. For that reason, I am directing you, as the Director of BOEM, to engage in an active, public outreach effort in the weeks ahead on these issues with industry, academic experts, the public and other interested parties. I further direct you to issue a report to me no later than October 31, 2010 that contains your findings and recommendations as a result of your outreach efforts and any other information you have acquired in the interim. As discussed in Section VI of this memorandum, November 30 is an appropriate end date for this suspension. However, I reserve my statutory and regulatory authority to issue a new decision or to modify this decision based on new information that addresses, to my satisfaction, the need to ensure that particular deepwater drilling practices can be conducted safely.

## III.    BACKGROUND

This directive is based on my authority under OCSLA to ensure safe operations on the OCS, my consideration of materials in the decision file, including the documents summarized in Attachment 1 and significant information that has developed since the imposition of the original suspension, as well as my consideration of the following types of information that I have acquired through my own personal and extensive involvement in this matter:

(1) my review with you of potential options to ensure safe drilling operations on the OCS;

(2) the daily morning meeting updates over the last 2 months that I have convened with United States' officials and BP to review and oversee the multiple work streams to contain the blowout of the Macondo well;

(3) my review of the daily Unified Command Report submitted by BP at my direction and the direction of the National Incident Command Center on the numerous work streams associated with the blowout of the Macondo well;

(4) my review of the multiple daily Departmental oil spill incident reports since the blowout of the Macondo well detailing matters relating to the blowout, impacts to

5

ecological resources, including state and Federal sensitive wildlife areas and refuges and state and national parks;

(5)  my multiple visits to the area, including overflights of the Gulf of Mexico and the site of the *Deepwater Horizon* incident, which have allowed me to see first-hand the condition of the oil spill in the Gulf of Mexico and the impacts on the coastal environment and economy, including impacts on sensitive ecological, historical and restoration areas such as national wildlife refuges and national parks;

(6)  the legal authorities under the OCSLA and implementing regulations concerning safety and environmental protection, including the legislative history of OCSLA's 1978 amendments enacted in the wake of the 1969 Santa Barbara blowout and oil spill; and

(7)  my participation in the preparation of the Safety Report, which responded to the President's directive to report within 30 days, "what, if any, additional precautions and technologies should be required to improve the safety of oil and gas exploration and production operations on the outer continental shelf."[3]

The May 28, 2010, Suspension and Subsequent Judicial Action

The OCSLA authorizes the promulgation of regulations for the "suspension or temporary prohibition of any operation or activity, including production, pursuant to any lease or permit . . . if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, . . . or to the marine, coastal, or human environment . . . ." 43 U.S.C. § 1334(a)(1).  The BOEM regulations provide that the agency may order suspensions of operations when activities "pose a threat of serious, irreparable, or immediate harm or damage" to human or animal life, property, any mineral deposit, or the marine, coastal, or human environment as described in Section 1334(a)(1) above or "[w]hen necessary for the installation of safety or environmental protection equipment." 30 C.F.R. §§ 250.172(b)-(c).

On May 28, 2010, I directed the Minerals Management Service, now BOEM, to exercise its authority under OCSLA and its implementing regulations to suspend certain deepwater drilling activities.  Accordingly, BOEM issued a Notice to Lessees and Operators (NTL) suspending permitting and drilling operations in the Gulf of Mexico and the Pacific region for operations in water depths greater than 500 feet for a period of 6 months.  The 6-month duration of the May 28, 2010, suspension was intended, among other things, to minimize the possibility of another catastrophic event, particularly while we are still responding to the BP Oil Spill; to ensure that operators similarly situated to *Deepwater Horizon* were operating in a safe manner; to take into account the expected timeline for killing the Macondo well; and to provide adequate time to obtain information

---

[3]        Department of the Interior, *Increased Safety Measures for Energy Development on the Outer Continental Shelf* at 1 (May 27, 2010) (Safety Report).

from on-going investigations of the disaster and to develop regulations addressing the safety-related issues described in the Safety Report.

On June 7, 2010, certain providers of support services to offshore oil and gas operations in the Gulf of Mexico filed a lawsuit in the Federal District Court for the Eastern District of Louisiana seeking to invalidate the May 28, 2010, suspension (*Hornbeck* litigation). On June 22, 2010, the Court preliminarily enjoined enforcement of the suspension. The Department of the Interior appealed the Court's decision and requested that the U.S. Court of Appeals for the Fifth Circuit stay the injunction pending appeal. On July 8, 2010, the Fifth Circuit denied the stay motion on the grounds that the Department had not shown irreparable harm because there was no indication that the drilling activities subject to the suspension were likely to resume, but invited the Government to seek emergency relief if such activities had resumed or were imminent.

While we are complying with the Court's injunction in the *Hornbeck* litigation, as Secretary of the Interior, I have an ongoing obligation under OCSLA to manage the OCS in a safe and environmentally sound manner. As such, we have continued to review data and information concerning management of the OCS, and as a result of this continuing review, have further identified facts and risks associated with deepwater drilling that are addressed here.

## IV. IDENTIFIED RISKS TO CONTINUED DRILLING IN DEEPWATER

The OCSLA requires that operations on the OCS be conducted in a "safe manner . . . using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts, loss of well control, fires, spillages, physical obstruction to other users of the waters or subsoil and seabed, or other occurrences which may cause damage to the environment or to property, or endanger life or health." 43 U.S.C. § 1332(6). The following categories of risks related to deepwater drilling activities must be addressed to ensure fulfillment of the requirements of this law: (1) the current status of drilling and workplace safety and the implementation of safety measures; (2) the current status of well control and spill containment capabilities; and (3) the current status of spill response capabilities.

### A. Certain Drilling Activities and Conditions Involve Heightened Safety Risks

While all offshore drilling for oil and gas involves various risks, including the risk of equipment or systems failure, human error, and other occurrences that could threaten the safety of workers and endanger the environment, certain equipment and drilling conditions undertaken in the deepwater environment carry heightened risks of producing an event such as the BP Oil Spill.[4]

---

[4]    These conclusions are based on a memorandum prepared in consultation with senior BOEM staff who have engineering expertise and experience. *See* Memorandum from Walter Cruickshank, Deputy Director of BOEM (June 30, 2010) (Safety Report).

1.     Equipment – Blowout Preventers

Because of their essential role in the existing systems for preventing oil spills resulting from blowouts, it is critical that BOPs be as reliable and effective as possible. The statistical infrequency of deepwater blowouts accounts for only one of the factors that must be considered in evaluating whether it currently is safe to proceed with deepwater drilling in the OCS. Also relevant to the risk analysis are the catastrophic consequences – in terms of the health and safety of workers, effects on the regional and national economies, and damage to the environment – of an uncontrollable blowout and spill, regardless of the probability of such an event.

- Subsea BOPs. The control system for subsea BOPs is much more complex than the control system for a surface BOP, and subsea BOPs require regular testing to ensure that they will respond properly on demand. Also significant is the fact that subsea BOPs are less accessible to intervention, requiring the use of remotely operated vehicles (ROVs) to intervene, and that they are difficult to repair while attached to the wellhead. Their placement in deepwater also vastly complicates containment efforts in the event of an uncontrolled blowout – in a nutshell, the ability to contain a deepwater spill effectively and quickly when a subsea BOP stack fails does not exist.

- Surface BOPs on floating facilities. The operations of surface BOPs are not subject to all of the complicating factors associated with subsea BOPs, and they are more accessible for repair and intervention. However, surface BOPs that are placed on floating facilities (as opposed to jack-up rigs) present other significant risks. The high-pressure riser and casing from the seafloor to the rig can be exposed to dynamic stresses. A failure of a high-pressure riser due to these stresses can lead to uncontrolled flow below the surface BOP system located on the floating facility. Well operations from a floating platform with a surface BOP stack and a high pressure riser (through the water column) are higher risk operations than drilling from a jack-up rig or a fixed platform. The single high pressure riser (or in some cases, a dual riser system) used by floating platforms are subject to environmental forces such as vortex induced vibration (VIV) that make them more susceptible to stress fatigue. Jack-up rigs and fixed production platforms have more casing strings tied back to the surface of the rig or platform, which provide additional external support for the pressured casing. Also, because these tied back casing strings are used in shallower water operations with a shorter water column, they are less exposed to current induced stress.

The failure of the *Deepwater Horizon*'s subsea BOP to stop flow from the Macondo well underscores the risks associated with BOP failures in deepwater, although at this time the precise reasons for the *Deepwater Horizon* BOP's failure are not known. Indeed, as discussed above, the lack of knowledge about the root cause in and of itself poses a present and unacceptable risk to the extent that we have no guarantee that operators would not be engaging in the very same activity that led to the BP Oil Spill.

It is clear that the apparent performance problem with the *Deepwater Horizon's* BOP is not an isolated incident. Performance problems have also been identified in recent weeks with the BOPs on the relief wells that BP is drilling. The problems have been uncovered during new testing requirements that were imposed on the relief wells after the BP Oil Spill, thus providing more evidence that prior testing requirements were inadequate.[5] It is unlikely that these problems are unique to BP. The BOPs are manufactured by a very small number of companies, and BOPs used across the industry tend to employ standardized components.

### 2.     Factors That Correlate to Deepwater

Drilling that takes place in the deepwater environment poses more significant risks than drilling in shallow waters. The primary risk factors turn on the type of equipment that must be used in deeper water. More specifically, beyond approximately 500 feet in depth, floating facilities – rather than "jack-up" rigs – typically are used.[6] For purposes of this decision, I am defining "deepwater drilling" with reference to the type of blowout prevention equipment used in deepwater drilling operations, rather than to a specific water depth even though, as a practical matter, 500 feet of depth is the typical trigger for needing to use floating drilling facilities.[7]

In addition to the heightened risks associated with the use of floating rigs and platforms, deepwater wells can be very productive and have flow potentials that can be 5 to 10 times higher than shallow water wells. These characteristics have been fully demonstrated by the Macondo well. Accordingly, operators' worst-case discharge scenarios typically anticipate larger releases from deepwater wells.

---

[5]     Pursuant to NTL No. 2010-N05, we are seeking re-certifications from operators on their subsea BOP stacks and independent third party verifications that the BOP stack is designed for specific equipment and for the specific well design. We also will be imposing new secondary control requirements, remote operated vehicle capacity requirements, new testing requirements, and new reporting requirements, as well as new blind shear ram redundancy requirements. These measures apply to each operator and demonstrate the lack of sufficient safety measures shared by all operators using such BOPs.

[6]     In my May 28 suspension decision, I used a 500-foot water depth delineation as part of the description of the suspension. This 500-foot delineation served as a shorthand proxy for the risks associated with using subsea BOPs or surface BOPs on floating facilities. To avoid any possible confusion over the use of the proxy, I have chosen to make this new suspension decision in reference to the types of blowout prevention equipment used in deepwater operations, rather than in reference to the functionally equivalent concept of water depth.

[7]     A number of different water depths have been used to define "deepwater" on the OCS, and they generally have a basis in how technologies change with depth. These delineations have included: (1) 500 feet to reflect the change in drilling rigs from bottom founded jack-up rigs to floating rigs; (2) 200 meters (656 feet) in the Deep Water Royalty Relief Act of 1995, which varied royalty terms in water depths greater than 200 meters to reflect the greater cost of drilling in those depths; (3) 400 meters (1312 feet) and 800 meters (1968 feet) in BOEM regulations (30 C.F.R. § 256.37(a)(3)), which allow for setting the initial term of the lease based on water depth to reflect the greater time necessary to explore tracts in deep water; and (4) 1000 feet to reflect the change in development scenarios from bottom-founded to floating production facilities.

Also, over-pressured formations (defined as formations with pressures that exceed the normal pressure expected at a given depth) present special challenges in the deepwater drilling environment. Addressing over-pressured formations in deepwater drilling operations is more complex than in shallow water operations. In general, deepwater wells have more casing/liner strings, leaving less annular space between the casing and hole diameter. This makes cementing the hole more difficult. Higher than normal pressure formations further complicate the operation.

Finally, the BP Oil Spill response has demonstrated that water depth, pressure, and temperature are major factors affecting the ability of well control crews to bring deepwater blowouts under control. Complications associated with responding to a deepwater blowout include inaccessibility of the well, methane hydrate formation at lower seafloor water temperatures, longer times needed to move ROVs and equipment from the surface to the work zone, and the need to work with larger and less available support equipment due to the greater water pressure.[8]

   B.    **Drilling and Workplace Safety**

There is ample evidence that there is a need to temporarily pause certain drilling activity to allow for the installation of safety and environmental protection equipment. 30 C.F.R. § 250.172(c). As detailed in the Safety Report, substantial improvement in the industry's safety practices and procedures relating to offshore drilling, particularly with respect to deepwater drilling conducted from floating rigs and production facilities, is necessary.[9] While some of the drilling safety recommendations contained in the Safety Report are being implemented through industry compliance with NTL No. 2010-N05,[10] the Safety Report also describes regulatory gaps and other shortcomings in the Bureau's current regulatory scheme for offshore drilling. Some of the Safety Report's recommendations for filling regulatory gaps will be accomplished through a subsequent rulemaking, which BOEM plans to issue within 120 days from the issuance of the May 27, 2010, Safety Report. The Safety Report also anticipates that technical workgroups will be formed, and that they will provide recommendations within 180 days. Thus, only the NTL No. 2010-N05 safety measures will be implemented in the near term. Furthermore, fulfillment of NTL No. 2010-N05's requirements will not completely address all of the identified safety

---

[8]     *See*, Memorandum by Dr. Marcia McNutt, Director of the United States Geological Survey, regarding "USGS Support for Macondo Well Control and Containment; Observations Regarding Technical Problems with Deepwater Efforts," June 27, 2010.

[9]     *See also*, BP, Blowout Preventer Testing Memorandum, presented at the Hearing on "Inquiry into the Deepwater Horizon Gulf Coast Oil Spill" (May 12, 2010) (stating that "[s]hort and long term actions are required to improve subsea BOP stack testing, reliability and intervention"); API, "Joint Industry task Force to Address Subsea Well Control and Oil Spill Response" (July 6, 2010).

[10]     NTL No. 2010-N05, National Notice to Lessees and Operators of Federal Oil and Gas Leases, Outer Continental Shelf (OCS): Increased Safety Measures for Energy Development on the OCS (June 8, 2010).

concerns, and more time will be needed for rulemaking and assessment of the technical workgroups' recommendations. The November 30, 2010, date also allows time for the technical workgroups to provide an opportunity for them to provide input. I will ask these workgroups to provide me with interim progress reports, as necessary.

The BOEM is also considering further safety-related requirements relating to, for example, blind shear ram redundancy requirements and the establishment of deepwater well-control guidelines. In addition, I have requested that the Safety Oversight Board, chaired by Assistant Secretary for Land and Minerals Management, Wilma Lewis, provide input regarding inspections and other safety and enforcement-related issues by August 15, 2010, based on preliminary findings of the BOEM/United States Coast Guard ("USCG") Joint Investigation and other information gathered by the Safety Oversight Board.

Given this dynamic, on-going review of measures that are being considered to improve the safety of deepwater drilling, I cannot conclude at this time that deepwater drilling can move forward in a safe and environmentally sound manner. I note, in that regard, that the root cause of the BP Oil Spill has not yet been identified. I will be receiving additional information about the risk factors associated with deepwater drilling based on the many investigations that are now underway, including the investigation that my Department is actively engaged in with the USCG. Even if these investigations are not fully complete by November 30, 2010, we will by that time have the benefit of a great deal of additional information about the BP Oil Spill. To the extent additional information or changes in circumstances require specific modifications to this decision or a new decision, I will provide the basis for any such decision.[11]

The fact that the industry has a track record of relatively few accidents, and that the inspections of current deepwater rigs have uncovered only limited infractions, does not change the present risks or my conclusion. It is true that 27 of the 29 rigs in the Gulf of Mexico inspected by BOEM after the BP Oil Spill had no infractions. *See* MMS Deepwater Drilling Rig Inspection Report. It also is true that the *Deepwater Horizon* rig passed its most recent inspections prior to the explosion.[12] These facts provide very limited assurance, however, regarding the safety of deepwater drilling. The reality is that the BP Oil Spill disaster occurred, regardless of prior inspection results, and regardless of the prior accident history of the *Deepwater Horizon* and other, similar rigs. And, as discussed above, new evidence has emerged that suggests that the deepwater drilling industry may face some industry-wide risks (*e.g.*, with regard to BOPs) that should be addressed before new deepwater drilling goes forward. Until the Department can

---

[11]    Industry executives have acknowledged the relevance of the on-going investigations to determinations about deepwater drilling safety. *See e.g.*, Written Testimony of Steve Newman, Subcommittee on Oversight and Investigations, Hearing on "Inquiry into the Deepwater Horizon Gulf Coast Oil Spill" (May 12, 2010) ("Until we fully understand what happened on April 20, we cannot determine with certainty how best to prevent such tragedies in the future.").

[12]    BOEM Information Memorandum for the Secretary Re: Inspection History of Deepwater Horizon (May 15, 2010).

implement rules to address newly-identified deepwater drilling concerns, rig-by-rig compliance reviews conducted under the current regime cannot ensure safety.

In this regard, it is noteworthy that in establishing a "threat of serious, irreparable, or immediate harm or damage" to life or property or to demonstrate a need for "installation of safety or environmental protection equipment", 30 C.F.R. § 250.172(b)-(c), there is no requirement that "systematic noncompliance" must be demonstrated. The current regulatory regime for offshore operations is not sufficient to ensure safety and environmental protection, there is a need to bolster and improve safety measures. Testimony before the BOEM/USCG Joint Investigation by MMS inspectors has indicated that BOP inspection and testing requirements should be strengthened, a conclusion that my Safety Report also has endorsed. Simply put, there is an ample record supporting my conclusion that existing oversight mechanisms, including compliance with NTL No 2010-N05, are not, by themselves, adequate to prevent a catastrophic blowout and major spill.

## C.     Attention Must Be Devoted to Post-Blowout Containment Strategies and Capabilities

The BOEM regulations require those seeking to engage in offshore drilling to have an adequate response plan in the event of a catastrophe.[13] Specifically, the regulations require that an emergency response action plan include "methods to ensure the containment and recovery equipment as well as response personnel are mobilized and deployed at the response site." 30 C.F.R. § 254.23(g)(5). Lessees must also certify in writing that it has the capability to respond "to the maximum extent practicable, to a worst case discharge or a substantial threat of a discharge." 30 C.F.R. § 254.2(b).[14]

BP's inability, after more than 80 days, to contain the Macondo blowout and spill — despite the cooperation of other major oil companies — provides continuing evidence of industry's limited capability to stop an uncontrolled blowout of an oil well in deepwater. I have witnessed on a daily basis the results of inadequate equipment and planning to contain a deepwater blowout. This conclusion is chronicled by a long litany of failed or only partially successful attempt to contain the leak, even as hundreds of thousands of additional barrels of oil and large volumes of gas continue to pollute the Gulf of Mexico. Immediately after the accident, ROVs made many unsuccessful attempts to close the BOP's rams via "hot stabbing." Multiple attempts were made over many days on virtually all of the types of rams included in the BOP stack — all to no avail. Next a containment dome was lowered over the well, but the failure to anticipate the formation of hydrates in the deepwater environment led to its failure as hydrates formed quickly, making the dome buoyant, and virtually uncontrollable. After that, a hastily-engineered

---

[13]     See, e.g., 30 C.F.R. §§ 254.1(a); 254.23; §254.30; §254.2.

[14]     In the same vein, BOEM issued NTL No. 2010-N06 which requires all operators and lessees to provide a worst case discharge scenario, including all assumptions regarding well design, reservoir characteristics, and the daily discharge rate possible from the uncontrolled blowout portion of their worst case discharge scenario. This information is particularly relevant going forward.

"riser insertion tool" was installed at the end of the riser, providing limited containment, while the "kink" in the riser near the wellhead continued to fail and emerged as a major additional leak.

The rest of the story has been chronicled in the public eye: a multiple-week construction effort was undertaken to prepare a long-distance hook-up for a "top kill" operation, using heavy drilling mud. The top kill failed. Priorities then shifted back to containment, with efforts made to execute a "clean" cut of the riser near the top of the BOP stack and install a fitted cap over the riser. A more crude cut was accomplished and an ill-fitting "top hat" was installed. In the succeeding weeks, additional containment options have been pursued, with BP scrambling to identify ships and other equipment to undertake a large containment effort. All of these efforts have been greatly complicated by the lack of precise information regarding the size of the uncontained flow, and the fact that BP has not had the equipment available to measure the flow, either directly, or through the installation of pressure measurement equipment.

In Congressional testimony, industry executives have admitted that industry is unprepared to effectively stop deepwater oil well blowouts, and that many of the containment methods attempted with respect to the Macondo blowout have been improvised and were untested.[15] The BOEM's daily incident reports chronicle the multiple unsuccessful or partially successful attempts to contain the Macondo well blowout.

Although industry has begun to organize efforts to address strategies and options for subsea well control and blowout containment, much work remains to be done in order to develop viable containment and response options as well as to achieve an appropriate level of preparedness in the event of another deepwater blowout.[16] . It may not be necessary or appropriate to wait for the full build-out of this capability before resuming deepwater drilling, but it is reasonable to require industry to develop a plan to address a blowout in a more timely and effective manner than has been the case with the BP Oil Spill before new deepwater drilling activities recommence.[17]

---

[15]     *See*, McNutt Memo. *See also, e.g.*, Testimony of Rex Tillerson, Hearing on "Drilling Down on America's Energy Future: Safety, Security and Clean Energy," Subcommittee on Energy and Environment (June 15, 2010). *See also* Written Testimony of Lamar McKay, Chairman and President of BP America, Senate Environment and Public Works Committee, Economic and Environmental Impacts of the Recent Oil Spill in the Gulf of Mexico (May 11, 2010).

[16]     *See* API submissions regarding "Enhanced Industry Capability for Offshore Operations" and "Joint Industry Task Force to Address Subsea Well Control and Oil Spill Response", July 6, 2010.

[17]     The Department has also issued NTL No. 2010-N06, which directs operators and lessees to provide additional information in their exploration and development plans regarding addressing a blowout scenario involving a well that is expected to have high volumes of liquid hydrocarbons, the availability of a rig to drill a relief well, and the likelihood that surface intervention would be able to stop a blowout, among other things. This directive is consistent with BOEM's regulatory authority and will provide important information relevant to the evaluation of each operator's capacity to contain a blowout.

D.    **Limited Spill Response Resources Are Available to Battle Another Deepwater Spill**

The BOEM's regulations require that all owners and operators must have a spill response plan that demonstrates the ability to "respond quickly and effectively" whenever oil is discharged from their facility. 30 C.F.R. § 254.1(a). The regulations also require that an owner and operator must be able to take "all appropriate actions necessary to immediately abate the source of a spill and remove any spills of oil." 30 C.F.R. § 254.5(c).

The *Deepwater Horizon* incident has demonstrated the inadequacy of response plans, and steps must be considered to ensure that those engaged in drilling offshore are complying with current regulations. The current situation also poses a serious question as to whether industry is in compliance with existing regulatory requirements. The BP Oil Spill response effort has revealed major deficiencies with respect to the adequacy and functionality of the equipment that was staged and deployed in connection with attempts to contain the spill; the adequacy of the applicable Offshore Spill Response Plan (OSRP) components and their implementation; and the expertise and training of personnel involved in the BP Oil Spill containment efforts.

This is not a question of a specific operator's record, but a measure of the adequacy of the entire industry's containment plans and capacity to address major spills in the deepwater environment. BP was not the only operator drilling with inadequate plans. The House Subcommittee on Energy and Environment reviewed the preparedness plans of five major oil companies and concluded that they were no better prepared to deal with a major oil spill than BP, and if a major blowout had occurred at another operator's well, they would not have been any more prepared to respond.[18]

The unprecedented deployment of spill response equipment and cleanup crews to the vicinity of the Macondo well and regional shorelines in response to the BP Oil Spill raises serious concerns about the industry's and the government's current ability to respond in a meaningful way to another deepwater spill.[19]  There are insufficient resources currently available to respond should another deepwater spill occur while the BP Oil Spill containment and clean-up effort is ongoing. As an industry executive recently testified before Congress, "[regional response] plans look the same because in

---

[18]      Transcript of Hearing on "Drilling Down on America's Energy Future: Safety, Security and Clean Energy," Subcommittee on Energy and Environment (June 15, 2010); Opening Statement of Rep. Henry A. Waxman, Subcommittee on Energy and Environment, Drilling Down on America's Energy Future: Safety, Security and Clean Energy (June 15, 2010); Opening Statement of Rep. Edward J. Markey, Subcommittee on Energy and Environment, Drilling Down on America's Energy Future: Safety, Security and Clean Energy, (June 15, 2010); Opening Statement of Rep. Bart Stupak, Subcommittee on Energy and Environment, Drilling Down on America's Energy Future: Safety, Security and Clean Energy, (June 15, 2010).

[19]      Shallow water spills tend to be more confined and easier to address, if only because of the smaller geographic area affected by the spill.

14

fact they call upon the same resources to respond."[20] As late as March 2010, BP had submitted its report on cleanup capacity projecting the capacity to skim and remove 491,721 barrels of oil per day. As of July 5 their skimming operations have averaged less than 900 barrels per day equivalent.[21]

The BP Oil Spill alone is taxing these shared response resources to the limit. Industry executives have testified and stated repeatedly that they already have offered all available resources to the BP Oil Spill.[22] U.S. military and foreign resources are being utilized in the response effort.[23] The USCG has determined that the number of oil spill response vessels currently skimming oil is inadequate to recover the oil released from the BP Oil Spill, and additional skimming vessels are being ordered and manufactured to aid with the response.[24] Despite these efforts, the USCG recently determined that "There are simply not enough U.S. [oil spill response vehicles] capable of skimming oil available to keep up with the pace at which oil flows from the [Macondo] well."[25] Accordingly, the USCG and the Environmental Protection Agency ("EPA") amended their oil spill response time requirements to allow certain commercial and military vessels normally required to be available for spills in other regions to be deployed in support of the BP Oil Spill response.[26] In a June 28, 2010, meeting between Department officials and representatives from the drilling industry, the industry was unable to provide assurances that resources exist that would be available to address a second oil spill.

Finally, as concerns about the recent Tropical Storm Alex system in the Gulf of Mexico demonstrate, clean-up operations during hurricane season are subject to multiple weather-

---

[20]     Testimony by ExxonMobil CEO and Chairman Mr. Tillerson before the House Subcommittee on Energy and Environment, June 15, 2010.

[21]     Kindy Kimberly, Recovery Effort Falls Short of BP's Promises, The Washington Post, (July 6, 2010).

[22]     See, e.g., Testimony by BP, ExxonMobil, Chevron, and ConocoPhillips executives before the House Subcommittee on Energy and Environment Hearing, June 15, 2010.

[23]     Admiral Thad Allen, June 25, 10, and 1, 2010 briefings; Daily Administration updates on Deepwater Horizon response, June 28, 2010.

[24]     Memorandum from BP Deepwater Horizon Oil Spill Federal On-Scene Coordinator Rear Admiral Watson to National Incident Command (June 16, 2010); Admiral Thad Allen, June 25, 2010 briefing and June 18, 2010 briefing. See also 33 CFR 154, 155 & 40 CFR 112, Temporary Suspension of Certain Oil Spill Response Time Requirements to Support Deepwater Horizon Oil Spill of National Significance Response, 75 Fed. Reg. 37712, 37714 (June 30, 2010).

[25]     June 16, 2010 Memorandum from Rear Admiral Watson to the National Incident Command.

[26]     See "Temporary Suspension of Certain Oil Spill Response Time Requirements to Support Deepwater Horizon Oil Spill of National Significance Response." 75 Fed. Reg. 37712, 37714 (June 30, 2010).

related complications, difficulties, and delay.[27] For example, while Alex took a path away from the Macondo site, ocean conditions generated by the storm still necessitated that all 510 skimmers responding to the BP Oil Spill be temporarily recalled to shore.[28] Moreover, the storm surge from a hurricane or other significant storm could distribute oil over a wider area and carry the oil into the coastline and inland areas.[29] The Atlantic hurricane season, which includes the Gulf of Mexico, runs from June 1, 2010 until November 30, 2010.[30]

Therefore, under the present conditions, there are serious concerns about whether operators have the capacity to mount a prompt and effective containment and clean-up effort in the event of another significant deepwater spill, whatever its probability. Before deepwater drilling activity resumes, it is prudent – and necessary to ensure operators have adequate response plans as required by BOEM regulations – and for companies to work with BOEM, the USCG, and other authorities, to determine when adequate spill response resources are available to address a future deepwater spill event.

E.     Economic Impacts

The OCSLA does not require that I conduct a balancing of harms analysis in connection with the suspension of drilling operations. The statute requires only that I conclude that there is a threat of serious or irreparable harm to life, property, or the marine, coastal, or human environment. *Compare* 43 U.S.C. § 1334(a)(1) *with* 43 U.S.C. § 1334(a)(2)(i)-(iii). *See also* H.R. Rep. 95-590, at 132 (1977). Nevertheless, there are those that suggest that such a balancing of harms may be appropriate. Even if I had to engage in a balancing of the economic effects both of the BP Oil Spill and of the suspension of drilling operations, I would conclude that a temporary suspension of drilling operations is warranted.

I have reviewed the materials submitted by the State of Louisiana expressing its concerns over the economic effects of a temporary suspension of drilling operations, as well as the submissions made by the plaintiffs and *amici* in the *Hornbeck* litigation on the predicted economic effects of a temporary suspension of drilling operations. Even accepting their assessment of the economic impact of a suspension, I conclude that it is outweighed by economic impact of another catastrophic event like the blowout at the Macondo well, if

---

27     Admiral Thad Allen, June 25, 2010 Briefing (stating that a storm would have a "very negative effect" on containment efforts because it will require breaking production and getting production units to a safe locale. *See also* Admiral Thad Allen, June 26, 2010 Briefing and  28, 2010 Briefing (stating that if evacuation is required as a result of a tropical storm, the containment effort would be delayed by about 14 days).

28     "Waves from Storm Hinder Spill Effort," New York Times, June 30, 2010, citing statements by Coast Guard Rear Adm. Paul F. Zukunft.

29     Admiral Thad Allen June 28 Briefing; NOAA Hurricane Factsheet, http://www.deepwaterhorizonresponse.com/posted/2931/NOAA_fact_sheet_on_hurricanes_and_oil_spills.572167.pdf.

30     NOAA National Hurricane Center at http://www.nhc.noaa.gov/.

one were to occur. It is self-evident that the economic and environmental costs of the current spill, which even now has not been brought under control, outweighs the economic impacts of a temporary suspension of drilling activities, especially since production operations in the Gulf continue. The need to prevent another such occurrence fully supports the brief suspension – for approximately four and a half months until November 30, 2010 – of drilling activities, even on the assumption that I am required to take into account the economic impact of the suspension.

There is no question that a suspension of deepwater drilling will have a significant, negative economic impact on direct and indirect employment in the oil and gas industry, as well as other secondary economic consequences. These economic impacts must be considered against the backdrop of the substantial economic effects associated with the on-going BP Oil Spill and the potential economic damage that would be caused by another deepwater accident under the current circumstances. Therefore, while the economic effects of any drilling suspension – in terms of employment, spending, energy production, and government revenues – are and will be significant, another accident or oil spill would exacerbate the BP Oil Spill's effects on the economy and deal an unacceptable blow to the industry and the environment.

## V.    OPTIONS CONSIDERED BUT REJECTED

### A.    No suspensions of drilling.

Under this option, the Department would allow drilling to go forward under the workplace and drilling safety, blowout containment, and oil spill response conditions that currently exist. Compliance with the safety requirements of NTL No. 2010-N05 would still be required, but all previously permitted drilling activity, including deepwater exploratory drilling, could resume prior to any additional rulemaking or completion of the reviews of the *Deepwater Horizon* incident.

I have rejected this option because it would allow deepwater drilling operations with known safety risks – *i.e.*, operations that pose risks and involve the use of subsea BOPs or surface BOPs on floating facilities – to proceed before I can have confidence that all necessary safety measures have been implemented. While NTL 2010-N05 increases the level of safety for deepwater drilling, it does not implement all of the safety measures recommended in the Safety Report, and I cannot be sufficiently confident that compliance with the Safety NTL is sufficient to mitigate the threats posed by deepwater drilling before we know more about the exact causes of the BP Oil Spill. This option would allow deepwater drilling to go forward while the Macondo well remains uncontrolled and before tailored strategies and measures for containing deepwater blowouts and spills have been developed and implemented. Finally, I do not believe it would be prudent or responsible to allow deepwater drilling operations to proceed while available oil spill response capacity, particularly in the Gulf of Mexico region, is occupied with responding to the BP Oil Spill.

B.  **Moratorium on drilling, but with defined criteria for relief from suspensions.**

Under this option a drilling moratorium would prohibit deepwater drilling, but provide opportunities for an early exit from the moratorium for certain lower-risk deepwater drilling activities based on the satisfaction of specified requirements relating to the three topics discussed above: workplace and drilling safety, blowout containment, and oil spill response capacity. This option would allow time for the implementation of additional safety measures, the development of strategies for deepwater blowout containment, and the BP Oil Spill response to continue while reducing the risk of a second significant spill event. It also would provide operators with framework and guidance for relief from the moratorium. Further, though anticipation of an early exit from the moratorium may not prove sufficient to keep the entire current fleet in the Gulf of Mexico, it may potentially maintain some deepwater drilling presence in the Gulf of Mexico.

Unfortunately, I cannot take this approach at this time because there remain too many unanswered questions about specific workplace and drilling safety measures that may be needed to ensure safe deepwater drilling, strategies and alternatives for the containment of deepwater blowouts, and the status of oil spill response capacity and where the gaps in the current regulation on those matters lie. For this reason, I have directed you to aid in the effort to gain a more full understanding of the risks of deepwater drilling and the current shortcomings of containment and cleanup capacity by conducting public meetings and outreach to gather, on an expedited basis, additional information to augment the results of ongoing studies and investigations. I am hopeful that the exercise that you will engage in will provide the type of additional information to define the criteria for relief from suspensions. I have asked you to report to me the results of your findings and recommendations no later than October 31, 2010. We must have a firm understanding of the fundamental issues bearing on whether drilling in deepwater can proceed safely prior to allowing it to proceed at all, and for this reason I rejected this option.

C.  **Adopt recommendations from industry representatives regarding suspensions.**

Representatives from the oil and gas industry have offered various proposals that would allow industry to resume or continue certain drilling operations that they characterize as presenting a relatively low risk after the implementation of certain safety measures. The types of drilling that the proposals would permit, subject only to compliance with NTL No. 2010-N05, include: wells that are abandoned before reaching producing zones, disposal wells, development wells to known reservoirs, and delineation wells.

Although these types of drilling operations are characterized as "lower risk," they still pose an unacceptable level of risk at this time. Further, as discussed above, I have asked you to gather additional information about whether any such activities should be permitted prior to the expiration of any suspensions. The BP Oil Spill demonstrates the true magnitude of the risk that exists in what was considered a controllable environment. In light of the vulnerable status of the Gulf of Mexico and a desire to implement the

correct regulatory scheme that will be capable of supporting safe drilling on the OCS for the longer term, we must exercise caution. While my decision presented below does allow for some activities to continue based on our understanding of risks, responsible oversight and implementation of my duties under OCSLA require that I have more information about even relatively lower risk drilling activity before allowing any additional activity to go forward, particularly while the Macondo well remains uncontrolled and operators may be in non-compliance with regulations relating to oil spill response due to, among other things, inadequate spill response plans. Nevertheless, as I continue to receive the additional information I have requested, I will continue to review this option.

## VI.    DECISION

### A.    Affected Operators

For the reasons discussed above and pursuant to the provisions of OSCLA, including 43 U.S.C. § 1334(a)(1), and 30 C.F.R. § 250.172(b)-(c), and with certain exceptions set forth below, I am directing BOEM to direct the suspension of any authorized drilling of wells using subsea BOPs or surface BOPs on a floating facility. I further direct BOEM to cease the approval of pending and future applications for permits to drill wells using subsea BOPs or surface BOPs on a floating facility. These suspensions shall apply in the Gulf of Mexico and the Pacific regions through November 30, 2010, subject to modification if I determine that the significant threats to life, property, and the environment set forth in this memorandum have been sufficiently addressed. These suspensions do not apply to production activities; drilling operations that are necessary to conduct emergency activities, such as the drilling operations related to the ongoing BP Oil Spill; drilling operations necessary for completions or workovers (where surface BOP stacks are installed, they must be utilized during these operations); abandonment or intervention operations; or waterflood, gas injection, or disposal wells. The BOEM shall order any current drilling operations covered by this decision to proceed to the next safe opportunity to secure the well and take all necessary steps to cease operations and temporarily abandon or close the well. Pursuant to 30 CFR § 250.168(a), BOEM may direct a suspension for all or any part of a lease or unit area. Depending on the "nature of the suspended activity" the suspension is either of operations or production. 30 C.F.R.§ 250.168(b). In this case, BOEM will be suspending certain activity involving certain operations and will issue individual suspension letters to that effect.

My interpretation of OCSLA and its implementing regulations finds ample support in the legislative history of the statute. See Pub. L. No. 95-372, 92 Stat. 629 (1978); H.R. Rep. No. 95-590, at 55, 74 (1977); S. Rep. No. 95-284, at 43 (1977). Congress added 43 U.S.C. § 1334(a)(1) "to put some 'flesh on the bones'" of OCSLA by providing the Department with clear authority to suspend operations when there is a "threat" of "serious or irreparable" harm to the "marine, coastal, or human environment."

## B.    Duration of the Suspension

The basis for the November 30, 2010, end-date has been discussed throughout this memorandum. The duration of the suspension is the time needed to ascertain what is necessary to improve the safety of operations in the OCS and adequate containment and response capabilities. The time provided by the suspensions allows for the acquisition and development of additional information on the risks of deepwater drilling operations and the needed equipment and procedures to reduce those risks to an acceptable level. In addition to the third-party commissions and investigations referenced earlier, a number of which may provide valuable information before November 30, 2010, the Department is undertaking its own investigations that will yield vital information on safety measures during the next several months. For example, the Department's Outer Continental Shelf Safety Oversight Board, established by Secretarial Order will provide recommendations regarding interim measures that may enhance OCS safety and recommendations for improving and strengthening the Department's overall management, regulation and oversight of OCS operations. The Oversight Board will complete its report by August 15, 2010. Moreover, additional information development by the several investigations assigned to examine the causes of the *Deepwater Horizon* disaster, as well as the results of your public outreach efforts discussed in this memorandum, will be informative. With regard to your public outreach efforts, which I address in the next section, I will receive a report from you no later than October 31, 2010, containing your recommendations and analysis of any new information that you have received. In your discretion, I welcome the submission of preliminary input regarding the issues underlying this memorandum. I look forward to receiving the information that you are collecting through your review, which I will consider in determining whether additional action must be taken, including the potential for a modification to the scope or duration of this suspension decision.

The duration until November 30 also is designed to allow time for the killing or containment of the Macondo well, which is expected to be accomplished by approximately mid-August 2010, and which may have an effect on spill containment and response capabilities for potential use on other wells. Another important factor that explains the November 30 date is that the Atlantic hurricane season, which includes the Gulf of Mexico, runs from June 1 until November 30. As discussed herein, the ability to conduct containment activities and oil spill response can be compromised by hurricane storms. During this time of year, as we have already seen this year, the ability to contain and respond to a spill is often compromised by weather conditions.

Lastly, suspending these particular operations until November 30 will allow the BOEM and the Department to develop the interim rules required to address the safety issues that have recently come to light. Some of these interim rules are expected to be issued within 120 days of the issuance of the Safety Report, and additional time will be required after these rulemaking actions are completed for operators to implement the new requirements established by those rules. Other rules will have a longer development or implementation timeline, and I will determine whether their implementation is essential before suspended operations may resume. Finally, the November 30 date accounts for the requirement that certain Technical Workgroups established as part of the government's response to the BP

Oil Spill provide recommendations to improve OCS drilling operations within 180 days of the issuance of the Safety Report.

Based on what we know now and what we expect to learn in the next several months, November 30 is a reasonable end date for this suspension decision. However, I reserve my statutory right to issue a new suspension order which will be justified based on the circumstances that exist at the time and will contain a definitive end date.

### C.    Potential Lifting of Suspension

The suspension could be lifted earlier than November 30, 2010, if the BOEM assures me that the safety, containment and response issues that have created the need for a suspension have been resolved, or if those three issues are addressed to a degree that can be determined upon further study to ensure an acceptable margin of safety. If the results of the various investigations reveal significant unexpected risks, however, my duties under OCSLA could require me to extend the duration of the suspensions.

As noted above, I will continue to solicit and review information relevant to this matter, and I will remain open to potentially adjusting the suspension period based on additional information and analysis. In that regard, I direct you to conduct public meetings and outreach to gather additional information, on an expedited basis, on the primary issues that I have identified as raising the most significant risks regarding the resumption of deepwater drilling. You will be focusing on the following:

> a.    Drilling and workplace safety requirements as outlined in the Safety Report and a timeline for the implementation of such safety requirements and others that may be necessary to ensure safe drilling practices;

> b.    Well intervention and blowout containment technology and methodology designed to effectively address and expeditiously contain any blowouts that could occur;

> c.    A review of additional and necessary oil spill response plans for offshore drilling and production facilities, and an evaluation of industry capacity to address a worst case discharge scenario under 30 CFR part 254.

I further direct you to issue a report to me no later than October 31, 2010, that contains your findings and recommendations as a result of your outreach efforts and any other information you have acquired in the interim. This information gathering will be critical to addressing the serious risks presented by oil and gas drilling activities in deepwater environments. This additional information potentially could provide the basis for identifying conditions for resumption of drilling activities if certain conditions are met, and/or the identification of any oil and gas drilling activities that might be allowed prior to the expiration of the suspensions based on the relative level of risk associated with those activities.

## VII.  IMPLEMENTATION

Consistent with the above discussion and decisions, this memorandum replaces and supersedes the memorandum dated May 28, 2010, entitled "Suspension of Outer Continental Shelf (OCS) Drilling of New Deepwater Wells."  NTL No. 2010-N04, which was used to implement the decision made in the May 28, 2010, memorandum and is hereby rescinded.  I direct you to withdraw the suspension letters issued under NTL No. 2010-N04, and I direct you to issue new suspensions and to cease the approval of pending and future applications for permits to drill consistent with this decision, for all operations described in this decision.  To provide certainty to affected operators, please issue the suspension orders promptly.

ATTACHMENT 1

Date:  July 12, 2010
Summary of Decision File

The following is a non-exhaustive summary of documents and information included in the Decision File:

**30-Day Safety Report and Supporting Documents:** The Department of the Interior's May 27, 2010, Report entitled "Increased Safety Measures for Energy Development on the Outer Continental Shelf" (Safety Report), including, but not limited to, the following documents from the record that formed the basis for that report:

- The April 27, 2010, Memorandum from Wilma Lewis to the Secretary entitled, "Immediate Response Measures Pending Investigation of the BP oil spill;"
- Notes from Department of the Interior Meetings with Various Experts and Industry / NGO representatives;
- The API Joint Industry Task Force Recommendations;
- The "Fact Sheet Notebook" summarizing the events of the BP oil spill;
- Correspondence from various petroleum companies in response to the Secretary's request for recommendations;
- Comments and Recommendations from experts affiliated with the National Academy of Engineering;
- MMS Studies (Cited in Table 3 of the Safety Report).

**Information Provided by BOEM Internal Experts:**  Information obtained from consultation with BOEM internal experts, including experts from BOEM's Gulf of Mexico Region.  The BOEM experts provided comments regarding the risks inherent in certain offshore drilling equipment, water depth, and various drilling activities, as well as the adequacy of current response plans and containment resources.  They also suggested various options for addressing the risks of deepwater drilling.

**Information Provided by Industry Representatives:** Information provided in meetings between officials of the Department of the Interior and representatives of the drilling industry, including but not limited to:

- A June 21, 2010, meeting between the Secretary and industry consultants, in which the consultants made a PowerPoint presentation that discussed, among other things, claimed risks associated with suspension of drilling, suggested methods for reducing these claimed risks, and a proposal to allow drilling to resume in certain categories of wells;

- A June 28, 2010, meeting between Department officials and operators and rig owners currently operating in Federal waters in the Gulf of Mexico. Suggestions provided by various industry operators with regard to the resumption of drilling operations in the Gulf of Mexico, including suggestions for well design, operation procedures, rig equipment, safety and training risk management and well control system certification and maintenance.

**Daily Incident Reports:** Information contained in the daily reports from the site of the BP oil spill issued since the spill, including but not limited to:

- BOEM's Offshore Incident Report Daily Updates;

- U.S. Department of the Interior, Office of Emergency Management Emergency Daily Situation Reports;

- U.S. Department of the Interior, Office of Emergency Management Spot Reports.

**Briefings by National Incident Commander:** Information provided by Admiral Thad Allen in daily briefings from the National Incident Command Center.

**Macondo Well Intervention and Containment Efforts:** Information related to specific well control and containment efforts for the Macondo well blowout, as well as testing and performance difficulties encountered with the BOPs being used for the two relief wells being drilled to intercept and kill the Macondo well.

**Oil Spill Regional Response Plans:** The provisions of the Gulf of Mexico regional response plans of BP, Chevron, Conoco Phillips, ExxonMobil, and Shell.

**Congressional Hearing Testimony:** Information from Congressional testimony related to the BP oil spill, including testimony regarding the possible causes of the spill, the efforts to contain the spill, the environmental and economic impacts of the spill, the economic consequences of a possible moratorium on deep-sea drilling, the adequacy of current preparedness plans in responding to a similar incident, and the availability of resources to respond to another spill. The BOEM conducted a comprehensive review of transcripts, written testimony, and related documents from the following hearings:

- House Committee On Energy and Commerce, Subcommittee On Oversight and Investigations, *Inquiry into the Deepwater Horizon Gulf Coast Oil Spill* (May 12, 2010)

- House Committee on Transportation and Infrastructure, *Hearing on Deep Horizon Oil Spill Prevention and Response Measures and Natural Resource Impacts* (May 19, 2010)

- House Committee on Natural Resources, *Hearing on The Outer Continental Shelf Oil and Gas Strategy and Implications of the Deepwater Horizon Rig Explosion* (May 26, 2010)

- House Committee on Natural Resources, *Hearing on Outer Continental Shelf Oil and Gas Strategy and Implications of the Deepwater Horizon Rig Explosion* (May 27, 2010) House Committee on Energy and Commerce, Subcommittee on Energy and Environment, *Hearing on Response Efforts to the Gulf Coast Oil Spill* (May 27, 2010)

- House Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, *Hearing on the Local Impact of the Deepwater Horizon Oil Spill* (June 7, 2010)

- House Committee on Energy and Environment, *Hearing on Beneath the Surface of the BP Spill: What's Happening Now, What's Needed Next* (June 9, 2010)

- House Committee on Energy and Commerce, Subcommittee on Energy and the Environment, *Hearing on The BP Oil Spill: Human Exposure and Environmental Fate* (June 10, 2010)

- House Committee on Natural Resources, Subcommittee on Insular Affairs, Oceans and Wildlife, *Oversight Hearing on Our Natural Resources at Risk: The Short and Long Term Impacts of the Deepwater Horizon Oil Spill* (June 10, 2010)

- House Committee on Energy and Commerce, Subcommittee on Energy and Environment, *Hearing on Drilling Down on America's Energy Future, Safety Security and Clean Energy* (June 15, 2010)

- House Committee on Natural Resources, Subcommittee on Insular Affairs, Oceans and Wildlife, *Hearing on Ocean Science and Data Limits in a Time of Crisis: Do NOAA and Fish and Wildlife Service Have the Resources to Respond?* (June 15, 2010)

- House Committee on Energy and Commerce, Subcommittee on Health, *Hearing on Health Impacts of the Deepwater Horizon Oil Spill* (June 16, 2010)

- House Committee on Energy and Commerce, Subcommittee on Oversight and Investigation, *The Role of BP in the Deepwater Horizon Explosion and Oil Spill* (June 17, 2010)

- House Committee on Education and Labor, *Hearing on Worker Health and Safety Standards Related to the Oil Industry, Oil Rigs and Drilling* (June 23, 2010)

- House Committee on Natural Resources Hearing, *Hearing on State Planning for Offshore Energy Development: Standards for Preparedness* (June 24, 2010)

- Senate Committee on Commerce, Science and Transportation Hearing (May 18, 2010)

- Senate Committee on Energy and Natural Resources Hearing (May 11, 2010)

- Senate Committee on Environment and Public Works, *Hearing on Economic and Environmental Impacts of the Recent Oil Spill in the Gulf of Mexico* (May 11, 2010)

- Senate Committee on Homeland Security and Governmental Affairs, *Hearing on the Gulf Coast Catastrophe: Assessing the Nation's Response to the Deepwater Horizon Oil Spill* (May 17, 2010)

- Senate Committee on Commerce, Science and Technology, *Hearing on Potential Impacts of the Deepwater Horizon Oil Spill on Marine and Coastal Ecosystems* (May 18, 2010)

- Senate Committee on Environment and Public Works, *Hearing on Federal Response to the Recent Oil Spill in the Gulf of Mexico* (May 18, 2010)

- Senate Committee on Energy and Natural Resources Hearing (May 25, 2010)

- Senate Committee on Environment and Public Works, *Legislative Hearing on S. 3305, The Big Oil Bailout Prevention Liability Act of 2010* (June 9, 2010)

- Senate Committee on Homeland Security and Governmental Affairs, Subcommittee on State, *Hearing on Local and Private Sector Preparedness and Integration* (June 10, 2010)

- Senate Committee on Health, Education, Labor and Pensions, *Hearing on the Deepwater Horizon Oil Spill* (June 15, 2010)

- Senate Committee on Small Business Hearing (June 17, 2010)

- Senate Committee on Energy and Natural Resources Hearing (June 24, 2010)

**Information Provided by the U.S. Coast Guard:** Information provided by the U.S. Coast Guard relating to the BP Oil Spill and oil spill statistics and information in relation to the 1979 Cameche oil spill in Corpus Christi, Texas.

**Documents Related to the Joint Investigation of the BP Oil Spill:** Information provided during the public hearings in the joint Coast Guard - BOEM investigation of the causes of the BP oil spill, including but not limited to:

- Transcripts from USCG/BOEM Joint Investigation Public Hearings of May 11 – May 12, 2010;

- Transcripts from USCG/BOEM Joint Investigation Public Hearings of May 26 – May 29, 2010;

- Documents that have been made available in the course of the joint investigation.

**Notices to Lessees and Operators (NTLs):** A review of information contained in, and provided pursuant to, the following Notices to Lessees and Operators of Federal Oil and Gas Leases in the Outer-Continental Shelf:

- NTL No. 2010-N05: Increased Safety Measures for Energy Development on the OCS (effective June 8, 2010); and

- NTL No. 2010-N06: Information Requirements for Exploration Plans, Development and Production Plans, and Development Operations Coordination Documents on the OCS (effective June 18, 2010).

**Economic Impact Analysis:** Public records and internal memoranda analyzing the economic effects of a six-month suspension in deepwater drilling in the Gulf of Mexico, as well as the economic impacts of the oil spill on the local economy.

**Hornbeck Litigation Materials:** Court rulings, briefs, motions, declarations and other materials submitted in connection with the Hornbeck litigation, including but not limited to:

- The June 22, 2010, U.S. District Court Order and Reasons granting Motion for Preliminary Injunction

- The June 22, 2010, U.S. District Court Order Prohibiting US from Enforcing the Moratorium

- The July 7, 2010, Fifth Circuit Court Order Denying Motion to Stay Pending Appeal

**July 10, 2010 Memorandum from BOEM Director Michael Bromwich to Secretary Ken Salazar:** Memo from BOEM Director Michael Bromwich to Secretary Salazar entitled: "Options regarding the potential suspension of certain offshore drilling activities and permitting on the Outer Continental Shelf."

**Other Information Regarding Deepwater Drilling or the BP Oil Spill** including, but not limited to:

- Wood MacKenzie: *Deepwater Horizon* tragedy: near-term and long-term implications in deepwater Gulf of Mexico;

- Preliminary results of various investigations into the causes of the BP oil spill, including BP's own interim investigation briefings;

- The Joint Industry Task Force Recommendations to Improve Offshore Safety of Drilling & Completion Operations;

- Memorandum: The Department of the Interior and MMS's Economic Analysis of the 6-Month Moratorium (June 14, 2010);

- Memorandum from Dr. Marcia McNutt, Director of the United States Geological Survey regarding "USGS Support for Macondo Well Control and Containment: Observations Regarding Technical Problems with Deepwater Efforts" (June 28, 2010);

- MMS Economic Impact Assessment: Effects of Drilling Pause for 6 Months (June 10, 2010);

- Letter from Louisiana Governor Bobby Jindal to the President and the Secretary of the Interior, June 2, 2010, summarizing LA Department of Economic Development's analysis of employment impacts;

- Memorandum from BP Oil Spill Federal On-Scene Coordinator Rear Admiral Watson to National Incident Command (June 16, 2010);

- "Temporary Suspension of Certain Oil Spill Response Time Requirements to Support Deepwater Horizon Oil Spill of National Significance Response." 33 CFR 154, 155 and 40 CFR 112. (Sent to the Federal Register on June 28, 2010);

- Memorandum summarizing the activities of the Joint Industry Task Force to Address Subsea Well Control and Oil Spill Response;

28

- Memorandum entitled "Enhanced Industry Capability for Offshore Operations" summarizing improvements in regulatory, safety and response capabilities in the Gulf of Mexico;

- Memorandum from Solicitor Hilary Tompkins entitled "Overview of Blowout Causes;"

- Memorandum from BOEM Deputy Director Walter Cruickshank to Tommy Beaudreau entitled, "Relative Risk of Drilling Activities."

## Current Deepwater Activity

| Operator | Surface Area/ Block | Well Target Lease | Rig Name | Prospect Name | Water Depth (ft) |
|---|---|---|---|---|---|
| Shell Offshore Inc. | AC 859 | G20871 | NOBLE DANNY ADKINS | Tobago | 9,627 |
| Shell Offshore Inc. | AC 867 | G17565 | H&P 205 | Great White | 7,814 |
| ATP Oil & Gas Corporation | MC 305 | G19935 | DIAMOND OCEAN CONFIDENCE | Aconcagua | 6,997 |
| Kerr-McGee Oil & Gas Corporation | KC 875 | G21444 | NOBLE AMOS RUNNER | Lucius | 6,840 |
| Chevron U.S.A. Inc. | KC 736 | G22367 | T.O. DISCOVERER INSPIRATION | Moccasin (Chevron) | 6,750 |
| Statoil Gulf of Mexico LLC | WR 543 | G20341 | MAERSK DEVELOPER | Tucker | 6,667 |
| Chevron U.S.A. Inc. | KC 785 | G25806 | T.O. DISCOVERER CLEAR LEADER | | 6,690 |
| Noble Energy, Inc. | MC 519 | G27278 | ENSCO 8501 | Santa cruz | 6,500 |
| Marathon Oil Company | MC 993 | G24134 | NOBLE PAUL ROMANO | Innsbruck | 6,291 |
| Eni US Operating Co. Inc. | MC 728 | G16644 | T.O. MARIANAS | Triton (mc) | 5,380 |
| Anadarko Petroleum Corporation | GB 877 | G21408 | ENSCO 8500 | Red hawk | 5,334 |
| Shell Offshore Inc. | MC 687 | G05862 | T.O. DEEPWATER NAUTILUS | Mensa | 5,292 |
| BP Exploration & Production Inc. | MC 252 | G32306 | T.O. DEVELOPMENT DRILLER III | MACONDO | 5,159 |
| BP Exploration & Production Inc. | MC 252 | G32308 | GSF DEVELOPMENT DRILLER II | MACONDO | 5,132 |
| Noble Energy, Inc. | GC 723 | G21813 | NOBLE CLYDE BOUDREAUX | Deep Blue | 5,040 |
| Exxon Mobil Corporation | AC 25 | G10380 | NABORS MODS 201 | Hoover | 4,804 |
| Cobalt International Energy, L.P. | GB 959 | G30876 | DIAMOND OCEAN MONARCH | | 4,334 |
| BHP Billiton Petroleum (GOM) Inc. | GC 653 | G20084 | GSF C.R. LUIGS | Shenzi development p | 4,234 |
| Shell Offshore Inc. | MC 984 | G22919 | NOBLE JIM THOMPSON | Vito | 4,038 |
| Anadarko Petroleum Corporation | EB 602 | G14205 | T.O. DISCOVERER SPIRIT | Nansen | 3,681 |
| Hess Corporation | GC 469 | G25153 | STENA FORTH | Pony | 3,350 |
| Murphy Exploration & Production Company - | GC 338 | G21790 | NABORS MODS 200 | Front runner | 3,350 |
| Shell Offshore Inc. | GC 248 | G15566 | FRONTIER DRILLER | Glider | 3,243 |
| Eni US Operating Co. Inc. | GC 254 | G07049 | T.O. AMIRANTE | Allegheny | 3,226 |
| Shell Offshore Inc. | GC 158 | G07998 | H&P 202 | Brutus | 2,985 |
| Shell Offshore Inc. | GB 426 | G07493 | AUGER | Auger | 2,862 |
| Noble Energy, Inc. | EB 465 | G17269 | OLYMPIC INTERVENTION IV | Lost ark south | 2,722 |
| LLOG Exploration Offshore, Inc. | MC 503 | G32334 | NOBLE LORRIS BOUZIGARD | Appaloosa | 2,642 |
| Newfield Exploration Company | GB 293 | G32409 | DIAMOND OCEAN VICTORY | Pyranees | 2,095 |

EXHIBIT
3

| Operator | Surface Area/ Block | Well Target Lease | Rig Name | Prospect Name | Water Depth (ft) |
|---|---|---|---|---|---|
| StatoilHydro USA E&P, Inc. | MC 540 | G26265 | T. O. DISCOVERER AMERICAS | Krakatoa | 2,036 |
| Walter Oil & Gas Corporation | EW 834 | G27982 | DIAMOND OCEAN VOYAGER | Hummingbird | 1,183 |
| Stone Energy Corporation | MC 109 | G05825 | H&P 206 | Amberjack | 1,030 |

*Total Deep Water Prospects with Drilling/WO Activity*      32

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

## NOTICE REGARDING POTENTIAL MORATORIA LOSSES
### DATE OF NOTICE: October 7, 2014

### I. CLAIMANT AND CLAIM INFORMATION

| Claimant Name | Last/Name of Business MMR Group Inc DBA MMR Constructors Inc | First | Middle |
|---|---|---|---|
| Claimant ID | Redacted | Claim ID | 229610 |
| Claim Type | Business Economic Loss | | |
| Law Firm | Law Office of Kyle Whitaker | | |

### II.  PURPOSE OF THIS NOTICE

This Notice is an official communication from the Claims Administrator for the Deepwater Horizon Economic and Property Damages Settlement Program ("Settlement Program") and relates to the claim identified in Section I. This is not a denial of your claim, but instead is a preliminary Notice to update you on the status of your claim.

Section 38.93 of the Economic and Property Damages Settlement Agreement ("Settlement Agreement") excludes all Moratoria Losses from the Settlement Program. During our review of your claim, we identified indicia of potential Moratoria Losses. Your claim may require additional scrutiny to distinguish excluded Moratoria Losses, if any, from compensable non-Moratoria Losses. We do not currently require any additional information or response from you. After we have completed reviewing your claim, we will send you a Notice explaining the outcome of that review. You will have the opportunity then to accept the outcome set forth in that Notice or, if applicable, request Re-Review or Reconsideration of all decisions made on your claim.

### III. MORATORIA LOSSES DEFINITION

Section 38.93 of the Settlement Agreement defines Moratoria Losses as any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity, including shallow water and deepwater activity, that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections, or permitting practices. Claims for Moratoria Losses are expressly reserved claims and are excluded from the Economic and Property Damages Settlement Class.

To implement this exclusion, the Claims Administrator established a dedicated special review team to examine all economic loss claims that include potential Moratoria Losses. This special review distinguishes excluded Moratoria Losses from compensable non-Moratoria Losses and may require supplemental information. At present, BP and Class Counsel have not developed the requisite guidance for the Claims Administrator to use in making compensation determinations that adhere to the Moratoria Losses exclusion in the Settlement Agreement. Once the Claims Administrator receives this guidance, the dedicated special review team will resume working on your claim. At that time, we will contact you if we need any additional information or documents.

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or the status of your claim(s) or need help, contact the Claimant Communications Center at 1-800-353-1262 or send an email to **Questions@dhecc.com**. If you are a law firm or claims preparation company, call or email your designated DWH Contact for help or assistance. You also may visit a Claimant Assistance Center and talk with one of our representatives.  For a complete list of Claimant Assistance Centers, go to **www.deepwaterhorizoneconomicsettlement.com**.

EXHIBIT
4

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

## NOTICE REGARDING POTENTIAL MORATORIA LOSSES

### DATE OF NOTICE: October 7, 2014

### I. CLAIMANT AND CLAIM INFORMATION

| Claimant Name | Last/Name of Business<br>MMR Group Inc DBA MMR Constructors Inc | First | | Middle | |
|---|---|---|---|---|---|
| Claimant ID | Redacted | Claim ID | | 229615 | |
| Claim Type | Business Economic Loss | | | | |
| Law Firm | Law Office of Kyle Whitaker | | | | |

### II. PURPOSE OF THIS NOTICE

This Notice is an official communication from the Claims Administrator for the Deepwater Horizon Economic and Property Damages Settlement Program ("Settlement Program") and relates to the claim identified in Section I. This is not a denial of your claim, but instead is a preliminary Notice to update you on the status of your claim.

Section 38.93 of the Economic and Property Damages Settlement Agreement ("Settlement Agreement") excludes all Moratoria Losses from the Settlement Program. During our review of your claim, we identified indicia of potential Moratoria Losses. Your claim may require additional scrutiny to distinguish excluded Moratoria Losses, if any, from compensable non-Moratoria Losses. We do not currently require any additional information or response from you. After we have completed reviewing your claim, we will send you a Notice explaining the outcome of that review. You will have the opportunity then to accept the outcome set forth in that Notice or, if applicable, request Re-Review or Reconsideration of all decisions made on your claim.

### III. MORATORIA LOSSES DEFINITION

Section 38.93 of the Settlement Agreement defines Moratoria Losses as any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity, including shallow water and deepwater activity, that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections, or permitting practices. Claims for Moratoria Losses are expressly reserved claims and are excluded from the Economic and Property Damages Settlement Class.

To implement this exclusion, the Claims Administrator established a dedicated special review team to examine all economic loss claims that include potential Moratoria Losses. This special review distinguishes excluded Moratoria Losses from compensable non-Moratoria Losses and may require supplemental information. At present, BP and Class Counsel have not developed the requisite guidance for the Claims Administrator to use in making compensation determinations that adhere to the Moratoria Losses exclusion in the Settlement Agreement. Once the Claims Administrator receives this guidance, the dedicated special review team will resume working on your claim. At that time, we will contact you if we need any additional information or documents.

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or the status of your claim(s) or need help, contact the Claimant Communications Center at 1-800-353-1262 or send an email to **Questions@dhecc.com**. If you are a law firm or claims preparation company, call or email your designated DWH Contact for help or assistance. You also may visit a Claimant Assistance Center and talk with one of our representatives. For a complete list of Claimant Assistance Centers, go to **www.deepwaterhorizoneconomicsettlement.com.**

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

## NOTICE REGARDING POTENTIAL MORATORIA LOSSES
### DATE OF NOTICE: October 7, 2014

### I. CLAIMANT AND CLAIM INFORMATION

| Claimant Name | Last/Name of Business<br>MMR Group Inc DBA MMR Constructors Inc | First | | Middle | |
|---|---|---|---|---|---|
| **Claimant ID** | Redacted | **Claim ID** | | 229616 | |
| **Claim Type** | Business Economic Loss | | | | |
| **Law Firm** | Law Office of Kyle Whitaker | | | | |

### II.  PURPOSE OF THIS NOTICE

This Notice is an official communication from the Claims Administrator for the Deepwater Horizon Economic and Property Damages Settlement Program ("Settlement Program") and relates to the claim identified in Section I. This is not a denial of your claim, but instead is a preliminary Notice to update you on the status of your claim.

Section 38.93 of the Economic and Property Damages Settlement Agreement ("Settlement Agreement") excludes all Moratoria Losses from the Settlement Program. During our review of your claim, we identified indicia of potential Moratoria Losses. Your claim may require additional scrutiny to distinguish excluded Moratoria Losses, if any, from compensable non-Moratoria Losses. We do not currently require any additional information or response from you. After we have completed reviewing your claim, we will send you a Notice explaining the outcome of that review. You will have the opportunity then to accept the outcome set forth in that Notice or, if applicable, request Re-Review or Reconsideration of all decisions made on your claim.

### III. MORATORIA LOSSES DEFINITION

Section 38.93 of the Settlement Agreement defines Moratoria Losses as any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity, including shallow water and deepwater activity, that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections, or permitting practices. Claims for Moratoria Losses are expressly reserved claims and are excluded from the Economic and Property Damages Settlement Class.

To implement this exclusion, the Claims Administrator established a dedicated special review team to examine all economic loss claims that include potential Moratoria Losses. This special review distinguishes excluded Moratoria Losses from compensable non-Moratoria Losses and may require supplemental information. At present, BP and Class Counsel have not developed the requisite guidance for the Claims Administrator to use in making compensation determinations that adhere to the Moratoria Losses exclusion in the Settlement Agreement. Once the Claims Administrator receives this guidance, the dedicated special review team will resume working on your claim. At that time, we will contact you if we need any additional information or documents.

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or the status of your claim(s) or need help, contact the Claimant Communications Center at 1-800-353-1262 or send an email to **Questions@dhecc.com**. If you are a law firm or claims preparation company, call or email your designated DWH Contact for help or assistance. You also may visit a Claimant Assistance Center and talk with one of our representatives.  For a complete list of Claimant Assistance Centers, go to **www.deepwaterhorizoneconomicsettlement.com.**

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

## NOTICE REGARDING POTENTIAL MORATORIA LOSSES
### DATE OF NOTICE: October 7, 2014

### I. CLAIMANT AND CLAIM INFORMATION

| | Last/Name of Business | First | Middle |
|---|---|---|---|
| **Claimant Name** | MMR Group Inc DBA MMR Constructors Inc | | |

| **Claimant ID** | Redacted | **Claim ID** | 229618 |
|---|---|---|---|
| **Claim Type** | Business Economic Loss | | |
| **Law Firm** | Law Office of Kyle Whitaker | | |

### II. PURPOSE OF THIS NOTICE

This Notice is an official communication from the Claims Administrator for the Deepwater Horizon Economic and Property Damages Settlement Program ("Settlement Program") and relates to the claim identified in Section I. This is not a denial of your claim, but instead is a preliminary Notice to update you on the status of your claim.

Section 38.93 of the Economic and Property Damages Settlement Agreement ("Settlement Agreement") excludes all Moratoria Losses from the Settlement Program. During our review of your claim, we identified indicia of potential Moratoria Losses. Your claim may require additional scrutiny to distinguish excluded Moratoria Losses, if any, from compensable non-Moratoria Losses. We do not currently require any additional information or response from you. After we have completed reviewing your claim, we will send you a Notice explaining the outcome of that review. You will have the opportunity then to accept the outcome set forth in that Notice or, if applicable, request Re-Review or Reconsideration of all decisions made on your claim.

### III. MORATORIA LOSSES DEFINITION

Section 38.93 of the Settlement Agreement defines Moratoria Losses as any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity, including shallow water and deepwater activity, that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections, or permitting practices. Claims for Moratoria Losses are expressly reserved claims and are excluded from the Economic and Property Damages Settlement Class.

To implement this exclusion, the Claims Administrator established a dedicated special review team to examine all economic loss claims that include potential Moratoria Losses. This special review distinguishes excluded Moratoria Losses from compensable non-Moratoria Losses and may require supplemental information. At present, BP and Class Counsel have not developed the requisite guidance for the Claims Administrator to use in making compensation determinations that adhere to the Moratoria Losses exclusion in the Settlement Agreement. Once the Claims Administrator receives this guidance, the dedicated special review team will resume working on your claim. At that time, we will contact you if we need any additional information or documents.

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or the status of your claim(s) or need help, contact the Claimant Communications Center at 1-800-353-1262 or send an email to **Questions@dhecc.com**. If you are a law firm or claims preparation company, call or email your designated DWH Contact for help or assistance. You also may visit a Claimant Assistance Center and talk with one of our representatives. For a complete list of Claimant Assistance Centers, go to **www.deepwaterhorizoneconomicsettlement.com**.

EXHIBIT 3

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 188 of 1003
Case 2:10-md-02179-CJB-DPC   Document 24324   Filed 02/05/20   Page 1 of 5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  OIL SPILL by the OIL RIG          *     MDL No. 2179
"DEEPWATER HORIZON" in the GULF           *
OF MEXICO, on APRIL 20, 2010              *     SECTION J
                                          *
This Document Relates to:  18cv11111      *     JUDGE BARBIER
                                          *     MAGISTRATE WILKINSON
                                          *

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

## CLAIMS ADMINISTRATOR'S MOTION TO DISMISS
## AND ALTERNATIVE MOTION TO STAY PENDING APPEAL

Defendant Patrick A. Juneau, in his official capacity as Claims Administrator of the Deepwater Horizon Court Supervised Settlement Program administering the Deepwater Horizon Economic and Property Damages Settlement Agreement, and in his official capacity as Trustee of the Deepwater Horizon Economic and Property Damages Settlement Trust (the "Claims Administrator"), through undersigned counsel and pursuant to Federal Rule of Civil Procedure 12(b)(6), hereby moves to dismiss all claims against him in the Complaint filed MMR Group, Inc. d/b/a MMR Constructors, Inc. ("MMR") in Case No. 2:18cv11111 on the docket of this Court. Solely in the alternative, the Claims Administrator moves to stay this matter pending the outcome of a related appeal to the United States Court of Appeal for the Fifth Circuit in No. 18-31177 on the docket of the Fifth Circuit.

MMR has not stated a claim for declaratory judgment against the Claims Administrator because no "actual controversy" exists between MMR and the Claims Administrator. This Court deemed MMR's BEL claims excluded from the Settlement Agreement in its October 3, 2018 Order (MDL No. 2179, Rec. Doc. 24945) and the Claims Administrator has no discretion to disregard or act contrary to a standing Court order. To the extent MMR's claim for declaratory judgment against the Claims Administrator is not dismissed, in the alternative, the Claims Administrator requests a

1

EXHIBIT 3

Case: 18-31177    Document: 00515297113    Page: 188    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 189 of 1003
Case 2:10-md-02179-CJB-DPC Document 24325 Filed 02/26/18 Page 2 of 1

stay of this action pending the disposition of an appeal of the October 3, 2018 Order, as that appeal

may also dispose of the Claims alleged against the Claims Administrator.

WHEREFORE, the Claims Administrator prays that this motion be granted and that this

civil action be dismissed with prejudice insofar as it is brought against the Claims Administrator,

or only alternatively stayed.

Respectfully submitted,


/s/ Richard C. Stanley
Richard C. Stanley (La. Bar No. 8487)
Kathryn W. Munson (La. Bar No. 35933)
STANLEY, REUTER, ROSS, THORNTON & ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, LA  70112
Telephone: (504) 523-1580
rcs@stanleyreuter.com
kwm@stanleyreuter.com

-and-

J. David Forsyth (La. Bar. No. 5719)
SESSIONS, FISHMAN, NATHAN & ISRAEL, LLC
400 Poydras St, Suite 2550
New Orleans, La 70130
Telephone: (504) 582-1500
jdf@sessions-law.com

Attorneys for Patrick A. Juneau, as Claims Administrator

## CERTIFICATE OF SERVICE

I hereby certify that on December 26, 2018, the above and foregoing pleading has been
served on All Counsel by electronically uploading same to Lexis Nexis File & Serve in accordance
with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court
of the United States District Court for the Eastern District of Louisiana by using the CM/ECF
System, which will send a notice of electronic filing in accordance with the procedures established
in MDL 2179.

/s/ Richard C. Stanley

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | * | MDL No. 2179 |
| "DEEPWATER HORIZON" in the GULF | * | |
| OF MEXICO, on APRIL 20, 2010 | * | SECTION J |
| | * | |
| This Document Relates to:  18cv11111 | * | JUDGE BARBIER |
| | * | MAGISTRATE WILKINSON |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

### CLAIMS ADMINISTRATOR'S MEMORANDUM
### IN SUPPORT OF MOTION TO DISMISS
### AND ALTERNATIVE MOTION TO STAY PENDING APPEAL

Defendant Patrick A. Juneau, in his official capacity as Claims Administrator of the Deepwater Horizon Court Supervised Settlement Program administering the Deepwater Horizon Economic and Property Damages Settlement Agreement, and in his official capacity as Trustee of the Deepwater Horizon Economic and Property Damages Settlement Trust (the "Claims Administrator" or "Mr. Juneau"), through undersigned counsel, respectfully submits this memorandum in support of his motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) all claims against him in the Complaint filed by MMR Group, Inc. d/b/a MMR Constructors, Inc. ("MMR") in Case No. 2:18cv11111 on the docket of this Court, or, only alternatively, to stay this matter pending the outcome of a related appeal to the United States Court of Appeal for the Fifth Circuit in No. 18-31177 on the docket of the Fifth Circuit.

## I.    INTRODUCTION

In the aftermath of the Oil Spill, the federal government imposed a temporary moratorium on offshore drilling. The Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Settlement Agreement") provided compensation for economic harm to individuals and businesses in the Economic Class who were harmed by the oil spill, but the

Case: 18-31177     Document: 00515297113     Page: 190     Date Filed: 02/04/2020
Case: 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 191 of 1003
Case: 2:10-md-02179-CJB-JCW Document 26293-44 Filed 02/05/20 Page 2 of 4

Settlement Agreement expressly reserved claims for "Moratoria Losses," which losses were not "recognized or released under the [Settlement] Agreement, and are reserved to the Economic Class Members." Settlement Agreement § 3.3, Rec. Doc. 6430-1.[1] The Settlement Agreement defines a "Moratoria Loss" as "any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity—including shallow water and deepwater activity—that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections or permitting practices." *Id.* at § 38.93. The Settlement Agreement directs the Claims Administrator to identify claims for economic loss submitted by businesses in the oil and gas industry and those that provided support services to the oil and gas industry for review by a dedicated moratoria loss team to exclude moratoria losses. *See id.* at §§ 5.10.2–5.10.3.1.5.

The Claims Administrator determined that MMR's four business economic loss ("BEL") claims showed indicia of potential moratoria losses. *See* October 7, 2017 Notices, Complaint, Exh. 4.[2] The Settlement Agreement thus required a moratoria loss analysis to exclude moratoria losses (if any) from compensable non-moratoria losses. *Id.* As indicated in the Claims Administrator's Notices to MMR and pursuant to Exhibit 16 of the Settlement Agreement, the Settlement Program was working with BP and Class Counsel to "develop agreed upon guidance that the Claims Administrator shall apply in making compensation determinations that adhere to the moratoria exclusion in the settlement agreement." Settlement Agreement, Exh. 16, Rec. Doc. 6430-34 at 5.

---

[1] All record citations in this memorandum, unless otherwise stated, are to the MDL record in MDL No. 2179.

[2] Claimants with multiple facilities may file separate BEL claims for each facility address, which is why four notices were received by MMR this case.

Case: 18-31177     Document: 00515297113     Page: 191     Date Filed: 02/04/2020
Case: 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 192 of 1003
Case 2:10-md-02179-CJB-JCW   Document 29344   Filed 02/05/26   Page 9 of 1003

In the six years following the Settlement Agreement's execution, however, BP and Class Counsel did not "establish 'agreed' protocols or guidance to govern Moratoria Hold claims in the Settlement program." *See* October 3, 2018, Order, Rec. Doc. 24945 at 1. Without such guidance, the Claims Administrator could not process BEL claims subject to a Moratoria Hold or otherwise separate moratoria losses from non-moratoria losses.

Given this delay, on March 17, 2017, this Court granted claimants subject to a Moratoria Hold the option to exclude their claims from the Settlement Program and proceed in litigation. *Id.* The Neutrals process further substantially reduced by settlement a number of claims subject to moratoria hold. *Id.* at 2. Finally, on October 3, 2018, this Court entered an Order regarding the remaining moratoria hold claims which—absent the guidance from BP and Class Counsel required by the Settlement Agreement—the Claims Administrator "ha[d] no ability to process." *Id.* By this Order, all remaining unresolved claims subject to a "Moratoria Hold" in the Settlement Program, including MMR's BEL claims, were "**deemed hereby EXCLUDED** from the Settlement." *Id.* (emphasis in original). The Order further directs such claimants who wished to proceed in litigation to file individual lawsuits and sworn statements. *Id.* at 3.

MMR, however, has responded by seeking a declaratory judgment that it is a member of the Class as defined in the Settlement Agreement, that it did not sustain moratoria losses, and that orders the Claims Administrator to process its claims under the BEL framework. In addition to filing this declaratory judgment action against BP and others, MMR named the Claims Administrator, Patrick Juneau, as a Defendant.

Case: 18-31177     Document: 00515297113     Page: 192     Date Filed: 02/04/2020
Case: 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 193 of 1003
Case: 2:10-md-02179-CJB-JCW   Document 26294   Filed 02/05/20   Page 4 of 11

## II.  LAW AND ANALYSIS

### A.  Standard for dismissal under Rule 12(b)(6)

To state a claim upon which relief can be granted for purposes of a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Matter of ATP Oil & Gas Corp.*, 888 F.3d 122, 126 (5th Cir. 2018) (internal quotation marks omitted) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must set forth sufficient facts to support the plaintiff's alleged grounds for entitlement to relief. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). Dismissal is appropriate if the allegations in a complaint could not raise a claim of entitlement to relief. *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).

A plaintiff has stated a claim in a declaratory judgment action only where an "actual controversy" exists. *See* 28 U.S.C. § 2201(a); *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000). An actual controversy "exists where a substantial controversy of sufficient immediacy and reality exists between parties having adverse legal interests." *TOTAL Gas & Power N. Am., Inc. v. Fed. Energy Regulatory Comm'n*, 859 F.3d 325, 333 (5th Cir. 2017) (internal quotation marks and alterations omitted).

### B.  MMR has not stated a claim against the Claims Administrator.

Accepting all the facts of the Complaint as true, MMR has not stated a cause of action against the Claims Administrator, and its claim for declaratory judgment against him must be dismissed. There is no "actual controversy" between the Claims Administrator and MMR, whose claims the Court has deemed "**EXCLUDED** from the Settlement." October 3, 2018, Order, Rec. Doc. 24945 at 2 (emphasis in original).

Under the Settlement Agreement, the Claims Administrator *shall:*

- "*be responsible to the Court*;"
- "*serve as directed by the Court*;" and
- "*faithfully implement and administer the Settlement*, *according to its terms and procedures*, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or *as approved by the Court*."

Settlement Agreement at § 4.3.1 (emphasis added). Mr. Juneau, accordingly, is responsible to this Court in his official capacity as the Claims Administrator and must administer the Settlement Agreement as directed and approved by this Court. Mr. Juneau does not have the discretion or authority to implement the Settlement in any other manner.

This Court deemed MMR's BEL claims excluded from the Settlement Program, and the Claims Administrator is bound to serve as directed by the Court and consider the claims excluded. Consistent with his duties under the Settlement Agreement, the Claims Administrator simply may not disregard or act contrary to a standing Court order.

MMR may have disagreed with the Claims Administrator's earlier decision to subject its claims to Moratoria Hold review in the first instance, but that is no longer relevant. The Court has determined that all claims that were in this status as of October 3, 2018 are deemed excluded from the Settlement. Rec. Doc. 24945 at 2. Mr. Juneau, therefore, has no immediate and real "adverse legal interest" to MMR. *See TOTAL Gas*, 859 F.3d at 333. His only interest is to implement a Settlement Agreement "according to its terms and procedures, for the benefit of the Economic Class . . . and/or as agreed to by the Parties and/or as approved by the Court," s*ee* Settlement Agreement at § 4.3.1, which Agreement no longer covers MMR's BEL claims. Because the Court has deemed MMR's claims excluded, the Claims Administrator is bound to follow that determination unless and until he is directed otherwise.

Case 2:10-md-02179-CJB-JCW   Document 26293-1   Filed 02/05/20   Page 9 of 41

C.    In the alternative, the Claims Administrator requests a stay of this action pending an appeal of the October 3, 2018 Order.

In the alternative, the Claims Administrator requests a stay of this action pending the disposition of an appeal of the October 3, 2018 Order to the United States Court of Appeal for the Fifth Circuit in case No. 18-31177, to which the Claims Administrator has not been made a party. *See* Notice of Appeal, Rec. Doc. 25125 (appealing the October 3, 2018 Order excluding MMR's claims). "The district court has the inherent power to control its own docket, including the power to stay proceedings." *Datatreasury Corp. v. Wells Fargo & Co.*, 490 F. Supp. 2d 749, 754 (E.D. Tex. 2006); *see also Greco v. Nat'l Football League*, 116 F. Supp. 3d 744, 761 (N.D. Tex. 2015) ("A court is within its discretion to grant a stay when a related case with substantially similar issues is pending before a court of appeals."). In the event the Fifth Circuit affirms the October 3, 2018 Order, there certainly can be no actual controversy with the Claims Administrator for the reasons already discussed. Similarly, to the extent the Court might reverse or remand the October 3, 2018 Order, the Claims Administrator will be bound to follow the Court's further instructions as to the processing of moratoria hold claims. Therefore, a stay pending the outcome of the referenced appeal would serve the "interests of the parties, and appropriate conservation of judicial resources." *See id.*

## III.    CONCLUSION

Mr. Juneau should not have been named as a defendant in this declaratory judgment action and should be dismissed pursuant to Rule 12(b)(6) because no "actual controversy" exists between the Claims Administrator and MMR. Instead, the Claims Administrator is bound to follow the Court's October 3, 2018 Order excluding MMR's claims from the Settlement Program.  To the extent any claims against Mr. Juneau are not dismissed, he respectfully requests a stay of this

Case: 18-31177    Document: 00515297113    Page: 195    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 196 of 1003
Case 2:10-md-02179-CJB-JCW Document 25234 Filed 12/05/26 Page 7 of 4003

action pending the outcome of an appeal of the October 3, 2018 Order in Fifth Circuit case No.

18-31177.

Respectfully submitted,


/s/ Richard C. Stanley
Richard C. Stanley (La. Bar No. 8487)
Kathryn W. Munson (La. Bar No. 35933)
STANLEY, REUTER, ROSS, THORNTON & ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, LA  70112
Telephone: (504) 523-1580
rcs@stanleyreuter.com
kwm@stanleyreuter.com

          -and-

J. David Forsyth (La. Bar. No. 5719)
SESSIONS, FISHMAN, NATHAN & ISRAEL, LLC
400 Poydras St, Suite 2550
New Orleans, La 70130
Telephone: (504) 582-1500
jdf@sessions-law.com

Attorneys for Patrick A. Juneau, as Claims Administrator

**CERTIFICATE OF SERVICE**

I hereby certify that on December 26, 2018, the above and foregoing pleading has been served on All Counsel by electronically uploading same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

/s/ Richard C. Stanley

EXHIBIT 4

Case: 18-31177     Document: 00515297113     Page: 197     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 198 of 1003
Case 2:10-md-02179-CJB-JCW Document 26308 Filed 02/05/2019 Page 1 of 19

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig | ) | MDL 2179 |
|    "Deepwater Horizon" in the Gulf | ) | |
|    Of Mexico, on April 20, 2010 | ) | SECTION: J |
| | ) | |
| This Document Relates  To 2:18-cv-11111 | ) | JUDGE BARBIER |
| | ) | MAG. WILKINSON |
| | ) | |

## MMR'S OPPOSITION AND RESPONSE TO THE CLAIMS ADMINISTRATOR'S
## MOTION TO DISMISS, OR ALTERNATIVELY, MOTION TO STAY

Comes now Plaintiff MMR Group, Inc. d/b/a MMR Constructors, Inc. ("MMR") and files its opposition and response to Defendant Patrick A. Juneau's motion to dismiss filed pursuant to Rule 12(b)(6), or alternatively, motion to stay the declaratory judgment action pending resolution of an appeal.  Fed. R. Civ. P. 12(b)(6).  MMR has satisfied the "plausibility" standard by making specific allegations supporting relief against the Claims Administrator under the Declaratory Judgment Act, therefore, insufficient legal basis exists for the Court to dismiss Count V in the Complaint.  Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In addition, the Claims Administrator has not shown a "clear case of hardship or inequity" to support staying the declaratory judgment action or other causes of action.  Landis v. North America Co., 299 U.S. 248, 255 (1936).  It has been almost 9 years since the April 20, 2010 oil spill.  The Court should not stay the declaratory judgment action or any other causes of action in the Complaint.

### BACKGROUND

Pursuant to the Court's October 3, 2018 Order, MMR timely filed a complaint against Defendants BP Exploration & Production, Inc., BP America Production Company, BP p.l.c., Halliburton Energy Services, Inc., Sperry Drilling Services, a division of Halliburton Energy

EXHIBIT 4

Services, Inc., Transocean Holdings, LLC, Transocean Offshore Deepwater Drilling, Inc., Transocean Deepwater, Inc., Transocean Ltd., Triton Asset Leasing GmbH, and Patrick A. Juneau.[1]  Rec. Doc. 1-1 in 2:18-cv-11111.  The present motion to dismiss and opposition thereto only relate to Count V in the Complaint in which MMR asserted a declaratory judgment action against the Claims Administrator and BP.[2]  The Claims Administrator was not named as a party defendant in Counts I-IV.  MMR brings its declaratory judgment action pursuant to Rule 57 of the Federal Rules of Civil Procedure, 28 U.S.C. § 2201 (the "Declaratory Judgment Act"), and Section 18.1 of the Settlement Agreement.

A present, concrete controversy exists between MMR and the Claims Administrator as to whether four separate business economic loss ("BEL") claims submitted by MMR should have been placed in the Moratoria Hold by the Claims Administrator.   The controversy will continue to exist notwithstanding the result of MMR's appeal of the Court's October 3rd Order because MMR's appeal relates to procedural errors in the way its BEL claims were processed, such as the lack of transparency, the failure to apply the terms of the Settlement Agreement correctly, MMR's inability to have an Appeal Panel review the Claims Administrator's decisions, and MMR's inability to have the Court review decisions from an Appeal Panel.   The United States Court of Appeals for the Fifth Circuit will not have an opportunity to review the substance or merits of the Claims Administrator's decisions because a complete evidentiary record simply has not been developed.   There is no testimony from any fact or expert witness in the record on appeal for the Fifth Circuit to review as to the controversy of whether or not the Claims Administrator made an error by placing MMR's BEL claims in the Moratoria Hold.  Indeed, the

---

[1] MMR refers to Defendants BP Exploration & Production, Inc., BP America Production Company, and BP p.l.c. collectively as "BP".  MMR refers to Defendant Patrick A. Juneau as the Claims Administrator.
[2] Arguably, the Claims Administrator is a necessary party defendant with respect to Count V.  Fed. R. Civ. P. 19. BP and the remaining Defendants have not answered or otherwise responded to the Complaint.

controversy between the parties will continue to exist regardless of the outcome of MMR's appeal to the Fifth Circuit. It would not serve the interests of judicial economy for the Court to delay these proceedings.

## STANDARD OF REVIEW

When faced with a motion to dismiss filed by the defendant pursuant to Rule 12(b)(6), the district court should construe the "facts in the light most favorable to the [plaintiff], 'as a motion to dismiss under 12(b)(6) is viewed with disfavor and is rarely granted.'" Leal v. McHugh, 731 F.3d 405, 410 (5th Cir. 2013) (citation omitted). "Dismissal is appropriate only if the complaint fails to plead 'enough facts to state a claim to relief that is plausible on its face.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Yet, the complaint must allege enough facts to move the claim 'across the line from conceivable to plausible.'" Id. "Determining whether the plausibility standard has been met is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).

The Declaratory Judgement Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . . any court of the United States . . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "A federal district court must determine: (1) whether the declaratory judgment action is justiciable; (2) whether the court has the authority to grant declaratory relief; and (3) whether to exercise its discretion to decide or dismiss the action." Sherwin-Williams Co. v. Holmes Cnty., 343 F.3d 383, 387 (5th Cir. 2003).

As to the first step, whether or not an "actual controversy" exists, the Supreme Court of the United States has summarized that the dispute must be "definite and concrete, touching the

legal relations of the parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, **as distinguished from** an opinion advising what the law would be upon a hypothetical state of facts." Medimmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007) (emphasis added) (citations omitted).  The Fifth Circuit's jurisprudence speaks of the justiciability of a controversy in terms of "ripeness." Total Gas & Power North America, Inc. v. Fed. Energy Regulatory Comm'n, 859 F.3d 325, 333 (5th Cir. 2017).   "The ripeness doctrine seeks to separate matters that are premature for review because the injury is speculative and may never occur, from those cases that are appropriate for federal court action." Id.

Under the third step, the district court's decision whether to dismiss a declaratory judgment action is constrained by seven factors: "(1) whether there is a pending state action in which all of the matters in controversy may be fully litigated; (2) whether the plaintiff filed suit in anticipation of a lawsuit filed by the defendants; (3) whether the plaintiff engaged in forum shopping in bringing the suit; (4) whether possible inequities in allowing the declaratory plaintiff to gain precedence in time or to change forums exists; (5) whether the federal court is a convenient forum for purposes of judicial economy; (6) whether retaining the lawsuit would serve the purposes of judicial economy; and (7) whether the federal court is being called on to construe a state judicial decree involving the same parties and entered by the court before whom the parallel state suit between the same parties is pending."  Holmes Cnty., 343 F.3d at 388 (quoting St. Paul Ins. Co. v. Trejo, 39 F.3d 585 (5th Cir. 1994) (the "Trejo" factors)).

**ALLEGATIONS IN DECLARATORY JUDGMENT ACTION**

For the Court's convenience, MMR has re-stated the allegations in Count V of its Complaint below[3]:

**COUNT V**
**(DECLARATORY JUDGMENT ACTION)**
**(Against the Claims Administrator and BP)**

254.   Plaintiff repeats, realleges and makes a part hereof each and every allegation contained in the preceding sections of this action and incorporates same by reference as though fully set forth herein.

255.   Defendant Patrick Juneau (herein, the "Claims Administrator") was appointed by the Court to serve as the Claims Administrator pursuant to Section 4.3 in the Settlement Agreement.

256.   On August 15, 2013, the Plaintiff timely submitted a Business Economic Loss ("BEL") claim to the Deepwater Horizon Court Supervised Settlement Program ("CSSP") implemented in connection with the Deepwater Horizon Economic and Property Damages Settlement Agreement ("Settlement Agreement"), as amended on May 2, 2012. (Rec. Doc. 6430-1 in 2:10-md-2179).

257.   The Plaintiff is a member of the Deepwater Horizon Economic and Property Damages Settlement Class (the "Class") as defined in Section 1 of the Settlement Agreement. The Court adopted the definition of the Class when it approved of the Settlement Agreement on December 21, 2012.  In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, On April 20, 2010, 910 F.Supp.2d 891 (E.D. La. 2012), aff'd In re Deepwater Horizon, 739 F.3d 790 (5th Cir. 2014).

---

[3] MMR does not re-attach the exhibits to its Complaint.  Also, the numbering of footnotes in the Complaint do not mirror what is seen in this pleading due to software formatting issues.

258.    The Plaintiff did not sustain "MORATORIA LOSSES" as that phrase is used and defined in Sections 3.3 and 38.93 in the Settlement Agreement, respectively.  Section 3.3 states that "Claims of Natural Persons and Entities for **MORATORIA LOSSES**" are not recognized under the Settlement Agreement.  Section 38.93 defines Moratoria Loss as meaning "any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity -- including shallow water and deepwater activity -- that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections or permitting practices."

259.    On May 27, 2010, the Secretary of the Interior ("Secretary") issued a report titled "Increased Safety Measures for Energy Development on the Outer Continental Shelf." The following day the Secretary issued a memorandum (the "May Directive") to the director of MMS suspending deepwater drilling in the Gulf of Mexico and suspending deepwater drilling permit applications.[4]  MMS then notified the affected lessees, owners, and operators.  On July 12, 2010, the Secretary rescinded the May Directive and implement a new directive that was similar in scope to the May Directive but with more explanation.[5]  In the July Directive, the Secretary instructed BOEM to suspend "the drilling of wells using subsea blowout preventers (BOPs) or surface BOPs on a floating facility . . . [and to] cease the approval of pending and future applications for permits to drill wells using subsea BOPs or surface BOPs on a floating facility."

260.    As to ongoing drilling operations, the May Directive and the July Directive were

---

[4] *May Directive (attached hereto as Ex. 1).*
[5] *July Directive (attached hereto as Ex. 2).*

both limited to 33 offshore drilling rigs that had permits at the time.[6]  The Plaintiff did not conduct business with these 33 offshore drilling rigs in 2009 or 2010, which were drilling in water depths ranging from 1,030 feet to 9,627 feet.  The Plaintiff's revenue was not impacted by the May Directive or July Directive suspending the drilling activities being conducted by these 33 offshore drilling rigs in 2010.

261.    The Secretary lifted the July Directive on October 12, 2010.  _In re: Oil Spill be the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010_, _168 F.Supp.3d 908_ (E.D. La. 2016) (discussing the history of the May Directive and July Directive).

262.    BP and the Claims Administrator have the burden of proof to demonstrate that the Plaintiff sustained moratoria losses.  The Plaintiff does not have to prove a negative.

263.    The Claims Administrator has a duty to follow the terms of the Settlement Agreement.  Section 4.3.1. states that the "Claims Administrator shall be selected and appointed by the Court, and shall be responsible to the Court, serve as directed by the Court, and faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court."  If the Claims Administrator fails to follow the Settlement Agreement, the Court has authority to direct the Claims Administrator to comply with its terms.

264.    Based upon information and belief, the Claims Administrator retained the services of a Moratoria Team pursuant to Section 16 in the Settlement Agreement to investigate potential moratoria losses.

265.    The Claims Administrator has a duty to direct the Moratoria Team if the Moratoria Team mischaracterizes claimants as incurring moratoria losses.  Section 4.3.2

---

[6] Doc. 7-2 in case 2:10-cv-1663 (attached hereto as Ex. 3).

provides that the "Claims Administrator shall head the Settlement Program, oversee and supervise the **CLAIMS ADMINISTRATION VENDORS** (including any subcontractors) and staff in the processing and payment of Claims, report and provide information to the Court, BP, and/or **LEAD CLASS COUNSEL** (or their designee) as may be requested on an ongoing basis and/or as the Court directs, and participate on the Claims Administration Panel. The Court shall retain ongoing and exclusive jurisdiction over the Settlement Program until the consideration and determination of all Claims is complete and the Settlement Program is terminated by the Court."

266.    The Plaintiff's NAICS code on its 2010 federal tax return was 238210. The Plaintiff's NAICS code does not appear in either Section I or Section II of Exhibit 19 in the Settlement Agreement. Therefore, the Plaintiff's BEL claim was not subject to automatic or possible review for Moratoria Losses by the Claims Administrator under the plain language in Sections 5.10.3.1.1 and 5.10.3.1.2 in the Settlement Agreement. The Claims Administrator erred by arbitrarily placing the Plaintiff's BEL claim in the Moratoria Hold.

267.    Even if the Claims Administrator had authority to reassign a different NAICS code to the Plaintiff so that the Plaintiff's BEL claim fell within Section I or Section II of Exhibit 19, which the Plaintiff disputes, a particular NAICS number clearly does not determine if the Plaintiff or any other claimant incurred any moratoria losses. Rather, only a fact intensive and objective analysis could determine whether or not the Plaintiff actually incurred damages as a direct result of the federal government's action or inaction following the Oil Spill.

268.    The parties to the Settlement Agreement did not intend for claimants to be perpetually stuck in the Moratoria Hold if the claimant did not have strong, meaningful business relationship with the offshore drilling industry. Section 5.10.3.1.2 provides that businesses with

a NAICS code identified in Section II of Exhibit 19 are subject to the following questions: "[i]n

2009, did your business provide significant services, goods, and/or supplies to businesses in the

offshore oil & gas industry in the Gulf of Mexico?"  Section 5.10.3.1.2 further provides:  "[i]f

the Claimant responds negatively, its Claim shall proceed under the Economic Damage Claim

Process."  Reading Sections 5.10.3.1.1 and 5.10.3.1.2 together, the intent of the Settlement

Agreement was to allow BEL claimants with insignificant business connections to the offshore

drilling industry to proceed under the BEL framework.  Equally clear is the fact that the Claims

Administrator considered and represented that insignificant business meant up to 33.00% of the

claimant's 2009 net revenue.

269.    Question No. 10 on the BEL Claim Form states:

Businesses/employers that fall within the NAICS codes and descriptions marked with an
"x" in Exhibit 19, Section II must answer the following question:

**In 2009, did your business provide significant services, goods, and/or
supplies to businesses in the offshore Oil & Gas Industry in the Gulf of
Mexico?**   The Claims Administrator considers that an entity provided
"significant" services, goods, and/or supplies to businesses in the offshore oil and
gas industry in the Gulf of Mexico in 2009 if 33.00% or more of its 2009 net
revenue was derived from such activities.

270.    Approved Policy 304 (regarding "Moratoria Losses:  Implementing Section II of

Exhibit 19") mirrors the definition of "significant" provided in Question 10 of the BEL Claim

Form, and provides, in pertinent part:

Pursuant to Section II of Exhibit 19, Business Economic Loss claimants with a
NAICS Code and business activities marked with an "X" in Section II of Exhibit
19 must answer the following question: "In 2009, did your business provide
significant services, goods, and/or supplies to businesses in the offshore oil & gas
industry in the Gulf of Mexico? . . .  To capture this information, the Claims
Administrator asks Business Economic Loss claimants this question in each Claim
Form.  If the business or employer responds negatively, the claim proceeds under
normal processing, without analysis for potential moratoria losses.  The Claims
Administrator will advise claimants that the Claims Administrator considers that
**<u>an entity provided "significant" services</u>**, goods, and/or supplies to businesses in

*the offshore oil and gas industry in the Gulf of Mexico in 2009 **if 33.00% or more of its 2009 net revenue was derived from such activities**. Subject to the analysis of claims to prevent fraud, **the Claims Administrator will observe the claimant's Claim Form answer to this question and will not independently determine whether the entity provided "significant" services, goods, and/or supplies to businesses in the offshore oil and gas industry in the Gulf of Mexico in 2009.***

271.     *The Plaintiff answered question No. 10 on the BEL Claim Form in the negative. Accordingly, even if the Claims Administrator reassigned a NAICS code to match a NAICS code in Exhibit 19, the Claims Administrator did not have authority to arbitrarily keep the Plaintiff in a Moratoria Hold.*

272.     *On October 7, 2014, the Plaintiff received a "Preliminary Notice Regarding Moratoria Losses Review" as to its 4 BEL claims.[7]  The notices made clear that "[t]his is not a denial of your claim, but instead is a Preliminary Notice to update you on the status of your claim."  Most importantly, the notice stated as follows:*

> *After we have completed reviewing your claim, __we will send you a Notice explaining the outcome of that review.  You will have the opportunity then to accept the outcome set forth in that Notice or, if applicable, request Re-Review or Reconsideration of all decisions made on your claim.__*

273.     *The Plaintiff relied on the statements made in the Preliminary Notice, reasonably believing that any written decisions made by the Claims Administrator would allow the Plaintiff to appeal to an Appeal Panel as described in the Settlement Agreement.*

274.     *The Plaintiff complied with all requests made by the CSSP related to the Moratoria Team's investigation, producing all available records requested and answering all questions presented.  The Plaintiff made a good faith effort to demonstrate why it did not belong in the Moratoria Hold.*

275.     *The Plaintiff has been denied due process rights under the Settlement*

---

[7] *Preliminary Notices (attached hereto as Ex. 4.)*

Case: 18-31177     Document: 00515297113     Page: 207     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 208 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293-8 Filed 02/05/2019 Page 21 of 123

Agreement.  Section 6 in the Settlement Agreement governs the Claims Appeal Process.  Section 6.1 states that claimants "will have up to three opportunities, depending on their circumstances, to have their Claims reconsidered and reviewed to assure accuracy, transparency, independence, and adherence by the Settlement Program to the terms of the Agreement."  The Plaintiff never had an opportunity to have the Claims Administrator's decision reconsidered or reviewed.  The Plaintiff never received a written notice from the Settlement Program explaining why its claim was placed in the Moratoria Hold or what information was needed to remove the claim from the Moratoria Hold.  Instead, the Claims Administrator allowed the BEL claim to remain in limbo for years without sufficiently communicating how the federal government's directives allegedly impacted the Plaintiff's revenue.

276.     Section 6.1.2.2 governs appeals to the panels.  Section 6.1.2.3 states that a "Claimant may Appeal within 30 days of the issuance of final written notice from the Settlement Program of a determination of final compensation award."  The Plaintiff never received a Denial Notice giving it the opportunity to exercise its rights under § 6.1.2.3.  Because it never received a Denial Notice, the Plaintiff did not have a procedural mechanism to appeal to an Appeal Panel.

277.     The Claims Administrator failed to comply with the terms and spirit of the Settlement Agreement.

278.     The Court entered an order on October 3, 2018 and excluded the Plaintiff from the Settlement Agreement prior to the Claims Administrator issuing any written notice to the Plaintiff explaining why the Plaintiff was not considered part of the Class.  (Rec. Doc. 24945 in 2:10-md-2179).

### *Declaratory Judgment*

279.     The Plaintiff brings this claim for a declaratory judgment pursuant to Rule 57 of the Federal Rules of Civil Procedure, 28 U.S.C. § 2201, and Section 18.1 of the Settlement Agreement.

280.     The Plaintiff is a member of the Class as defined in Section 1 of the Settlement Agreement.  However, the Claims Administrator apparently found that the Plaintiff is not a member of the Class or its claim is not recognized because the Plaintiff purportedly incurred moratoria losses as used and defined in Sections 3.3 and 38.93 in the Settlement Agreement, respectively.

281.     A justiciable controversy exists between the Plaintiff, the Claims Administrator, and BP over the interpretation of whether or not the Plaintiff is a member of the Class and whether the Plaintiff's claim should be processed under the business economic loss framework. The Plaintiff contends that the Claims Administrator misapplied and contradicted the Settlement Agreement when he apparently concluded that the Plaintiff is not a member of the Class or found that the Plaintiff's claim is not recognized under the Settlement Agreement.  A declaratory judgment action is the proper procedural vehicle to resolve this type of dispute. Waldman v. Riedinger, 423 F.3d 145 (2nd Cir. 2005) (holding that the district court erred by excluding a claimant as a member of a class action).

282.     The Court should exercise its discretion to decide the justiciable controversy described herein based on the factors discussed in The Sherwin-Williams Co. v. Holmes County, 343 F.3d 383, 388 (5th Cir. 2003) (analyzing the 7 factors identified in St. Paul Ins. Co. v. Trejo, 39 F.3d 585 (5th Cir. 1994)).  None of the Trejo factors favor dismissing this declaratory judgment action.

283.    The Court retained exclusive jurisdiction over the parties for the "purpose of enforcing, implementing, and interpreting" the Settlement Agreement.   The Plaintiff, therefore, cannot bring its complaint for declaratory judgment in state court or another jurisdiction.  At this point, this declaratory judgment action is an appropriate remedy for the Plaintiff.

284.    The Plaintiff never had the opportunity to argue the merits of its position to an Appeal Panel after receiving a Denial Notice from the Claims Administrator.  Cf. Homes Motors, Inc. v. BP Exploration & Production, Inc., 829 F.3d 313 (5th Cir. 2016).  Accordingly, the Court's decision to review the merits of this justiciable controversy must be decided based on the factors stated in Holmes County, as opposed to the factors outlined in Claimant ID 100190818 v. BP Exploration & Production, Inc., 718 Fed. Appx. 220, 222 (5th Cir. 2018) (stating abuse-of-discretion factors).

285.    The Plaintiff respectfully requests the following relief:

a.    That the Court accept jurisdiction of this declaratory judgment action;

b.    That the Court ORDER, ADJUDGE and DECREE that this is a proper case for declaratory judgment relief and that there is a bona fide controversy between the parties as to their legal rights, status, and liabilities;

c.     That upon a final hearing on the merits of this cause of action, this Honorable Court declare the rights, status, and legal relations of the Plaintiff and the Defendants under the Settlement Agreement;

d.    That upon a final hearing on the merits of this cause of action, this Honorable Court ORDER, ADJUDGE and DECREE that the Plaintiff is a member of the Class as defined in Section 1 of the Settlement Agreement;

e.    That upon a final hearing on the merits of this cause of action, this Honorable

Case: 18-31177    Document: 00515297113    Page: 210    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 211 of 1003
Case 2:10-md-02179-CJB-JCW Document 25308 Filed 02/05/2019 Page 14 of 125

Court ORDER, ADJUDGE, and DECREE that the Plaintiff did not sustain Moratoria
Losses;

f.      That upon a final hearing on the merits of this cause of action, this Honorable
Court ORDER, ADJUGE and DECREE that the Claims Administrator shall process the
Plaintiff's claim under the business economic loss framework in the Settlement Agreement
and enter an appropriate award; and

g.      Any other relief this Honorable Court finds equitable and just.
Rec. Doc. 1-1 in 2:18-cv-11111.

## ANALYSIS

### I.      The Court Should Deny The Claims Administrator's Motion to Dismiss.

In his motion to dismiss, the Claims Administrator only argues that an "actual
controversy" does not exist between the Claims Administrator and MMR.[8]    The Claims
Administrator argues that "MMR may have disagreed with the Claims Administrator's earlier
decision to subject its claims to Moratoria Hold review in the first instance, but that is no longer
relevant."    Rec. Doc. 25244-1, at p. 5, in 2:10-md-2179.    In other words, the Claims
Administrator takes the position that a **past controversy** between the parties vanished when the
Court entered its October 3rd Order.[9]    But this is not correct – the controversy became "ripe"
when the Court entered its October 3rd Order – and a present, well-defined dispute continues to
exist.    When the Court entered its October 3rd Order, the Court was not reviewing the specific

---

[8] Not surprisingly, the Claims Administrator does not identify or argue that any of the Trejo factors support granting
its motion to dismiss.  None of the Trejo factors favor dismissing the declaratory judgment action.    Ironshore
Specialty Ins. Co.  v. Tractor Supply Co., 624 Fed. Appx. 159, 169 (5th Cir. 2015) ("we hold that the district court
abused its discretion in applying the Trejo factors and dismissing the action."); Sherwin-Williams Co. v. Holmes
Cnty., 343 F.3d 383 (5th Cir. 2003) (reversing the district court's order dismissing declaratory judgment action).
[9] If MMR would have filed its declaratory judgment action prior to the Court's October 3rd Order, the Claims
Administrator likely would have taken the position that the controversy was not "ripe" because the Claims
Administrator had the discretion to remove the claims from the Moratoria Hold and enter awards in favor of MMR.
Total Gas & Power America, Inc.v . Fed. Energy Regulatory Comm'n, 859 F.3d 325 (5th Cir. 2017).

allegations made by MMR in its declaratory judgment action describing how the Claims Administrator failed to comply with the terms of the Settlement Agreement. If MMR's allegations are proven to be true, the October 3rd Order should not apply to MMR's BEL claims submitted in the CSSP. The Claims Administrator should process MMR's BEL claims and enter awards in favor of MMR if the allegations in the declaratory judgment action are proven to be true.

Clearly, the Court should not grant the Claims Administrator's Rule 12(b)(6) motion to dismiss under the "plausibility" standard adopted by the Supreme Court of the United States in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) and Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter which, when taken as true, states 'a claim to relief that is plausible on its face.'" Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross and Blue Shield of Georgia, Inc., 892 F.3d 719, 726 (5th Cir. 2018). If MMR's allegations are true, which the Court should accept as true at this stage, MMR is entitled to the relief described in its declaratory judgment action. It is clearly plausible that the Claims Administrator made an error when he determined that MMR incurred moratoria losses. For the Court to dismiss the declaratory judgment action, the Court would have to find that it is inconceivable that the Claims Administrator could have made such a mistake.

In Innova Hospital, supra, a hospital filed a lawsuit against insurance companies and third-party administrators alleging violations of ERISA and breach of contract for failure to properly reimburse the hospital for covered claims at the applicable rates. The insurers filed a Rule 12(b)(6) motion to dismiss arguing that the complaint did not specifically identify the health-insurance plan documents that the insurers allegedly breached. The district court agreed with the insurers and granted the motion to dismiss. On appeal, the Fifth Circuit reversed the

district court's order after finding the allegations sufficient under the plausibility standard.   The court discussed the fact that the insurers had the health-insurance plan documents and objected to producing them to the hospital.   The court emphasized that "[o]ur holding underscores the principle that when discoverable information is in the control and possession of a defendant, it is not necessarily the plaintiff's responsibility to provide that information in her complaint."   Id. at 730.

While the Claims Administrator does not make the same type of argument made by the defendants in Innova Hospital, and MMR strongly denies that its allegations are deficient, MMR relies on the recent Fifth Circuit precedent to demonstrate a similar challenge met by MMR. MMR has alleged in its Complaint that it does not know what facts the Claims Administrator apparently relied upon to reach the conclusion that each BEL claim filed in the CSSP belonged in the Moratoria Hold.   MMR does not even know the identity of the Moratoria Team members retained by the Claims Administrator to help the Claims Administrator arrive at his conclusions, or the scope and depth of the Moratoria Team's investigations.   MMR has alleged that a settlement program that was supposed to guarantee a transparent, objective review of claims, re-review of claims, reconsideration of claims, and appellate rights to an Appeal Panel, deviated from that process and left MMR in limbo for years without any answers.   There is a definite and concrete controversy between MMR and the Claims Administrator in this case.

A case from the United States Court of Appeals for the Second Circuit squarely fits the fact pattern in front of the Court.   In Waldman v. Riedinger, 423 F.3d 145 (2nd Cir. 2005), a claims administrator was appointed by the district court to oversee a class action settlement program.   The settlement agreement related to the artificially inflated market value of a company's stock which violated federal securities laws.   The district court adopted the definition

of the class members as described in the settlement agreement.  The class members were "all persons and entities that purchased shares of common stock of Olsten Corporation ("Olsten") from February 5, 1996 through July 22, 1997."  Id. at 147.  The settlement agreement, however, did not distinguish between Olsten's two classes of stock:  Common Stock and Class B Common Stock.  Id.  Also, the settlement agreement excluded "affiliates" of certain categories of stockholders.  Id.  The claimant owned Class B Common Stock and was the nephew of the company's founder.  A dispute arose whether the claimant was a member of the class and whether he was excluded as an affiliate given his relationship to the founder of the company.  The claims administrator found that the claimant was not a member of the class.  Naturally, the claimant sought relief from the district court arguing that he was a member of the class.  After losing before the district court, the claimant successfully appealed his case to the Second Circuit.  Ultimately, the Second Circuit held that the claimant was a member of the class and was not excluded as an affiliate of the company's founder.

Like Waldman, MMR is requesting the Court to review the Claims Administrator's decision that MMR is not a member of the Class because it allegedly incurred moratoria losses.  MMR submitted four separate BEL claims which the Claims Administrator improperly placed in the Moratoria Hold.  The Court should review the merits of the Claims Administrator's decision for each BEL claim.   Indeed, the Settlement Agreement contemplates Class Members seeking the precise relief as sought by MMR in its declaratory judgment action.  Section 18.1 in the Settlement Agreement states as follows:

> Pursuant to the Final Order and Judgment, the Court shall retain continuing and exclusive jurisdiction over the Parties and their Counsel for the purpose of enforcing, implementing and interpreting this Agreement, including all issues relating to the scope, application and/or operation of the Release in Section 10 above, including jurisdiction over all Economic Class Members, and over the

administration and enforcement of the Agreement and the distribution of its benefits to Economic Class Members, and any dispute arising as to the action or election of any Party under Section 21 below regarding the enforceability or illegality of any provisions of this Agreement. Any disputes or controversies arising out of or related to the interpretation, enforcement or implementation of the Agreement and the Release shall be made by motion to the Court.  In addition, the Parties, including each member of the Economic Class as defined in the Final Order and Judgment, and their Counsel are hereby deemed to have submitted irrevocably to the exclusive jurisdiction of this Court for any suit, action, proceeding or dispute arising out of or relating to this Agreement.  The terms of the Agreement shall be incorporated into the Final Order and Judgment of the Court dismissing with prejudice all Released Claims by the Economic Class, Plaintiffs, and Economic Class Members against all Released Parties, which shall allow that Final Order and Judgment to serve as an enforceable injunction by the Court for purposes of the Court's continuing jurisdiction related to the Agreement.

Rec. Doc. 6430 in 2:10-md-2179.  MMR is turning to the Court to enforce its rights under the Settlement Agreement as anticipated by the Court when the Court approved of the Settlement Agreement.   For all of the reasons stated above, the Court should deny the Claims Administrator's motion to dismiss.

## II.  The Court Should Deny the Claims Administrator's Motion to Stay The Declaratory Judgment Action.

As alternative relief to his motion to dismiss, the Claims Administrator requests the Court to stay the declaratory judgment action pending the resolution of MMR's appeal of the Court's October 3rd Order.  However, the Claims Administrator overlooks the fact that the Fifth Circuit will not have the opportunity to review the merits of the Claims Administrator's decision to place MMR's claims in the Moratoria Hold because of the lack of a relevant and complete evidentiary record before the Court when the Court issued its October 3rd Order.  The record on appeal to the Fifth Circuit will not include the factual basis for the Claims Administrator's decision to not process MMR's BEL claims and enter awards in favor of MMR.  Absent from the

record on appeal is important testimony, such as testimony from the unknown Moratoria Team members who assisted the Claims Administrator in arriving at his decision to place the BEL claims in the Moratoria Hold. Only the declaratory judgment action can reach the merits of the Claims Administrator's decision after an evidentiary record is developed through the ordinary course of discovery. Staying the declaratory judgment action does not make sense because the appeal will not resolve the controversy between the parties – whether MMR is a member of the Class and not excluded by virtue of allegedly incurring moratoria losses.

The Claims Administrator only cited two cases for authority in support of his argument that the Court should stay the declaratory judgment action. See Datatreasury Corp. v. Wells Fargo & Co., 490 F.Supp.2d 749 (E.D. Tx. 2006) and Greco v. National Football League, 116 F.Supp.3d 744 (N.D. Tex. 2015). These cases are not analogous to the facts before the Court. The Claims Administrator cited Greco for the broad proposition that "a court is within its discretion to grant a stay when a related case with substantially similar issues is pending before a court of appeal." Id. at *761. Greco involved a very unique situation in which the legal issues on appeal would directly impact how the district court conducted bellwether trials in a class action case. The district court stated, "[s]hould the Fifth Circuit reverse any of this Court's significant rulings in *Ibe*, it would potentially necessitate a retrial of any bellwether trials conducted during the pendency of the *Ibe* appeal." Id. at *761.

In this case, however, the Court should not share the same concerns as expressed in Greco because any ruling by the Fifth Circuit will not reach the substantive issue of whether or not MMR is a member of the Class and its claims are not otherwise excluded by virtue of allegedly incurring moratoria losses. The Court should follow the reasoning of Caruso v. Allstate Ins. Co., Civ. No. 06-2613, 2007 WL 625830, at *3 (E.D. La. Feb. 26, 2007) where the

district court declined to stay proceedings when the appeal to the Fifth Circuit would not resolve the issues pending before the district court.  See also Miller Weisbrod, LLC v. Klein Frank, PC, Civ. No. 3:13-cv-2695, 2014 WL 2738231 (N.D. Tx. June 17, 2014) (rejecting the argument that a related appeal justified staying declaratory judgment action because the issues on appeal were different than the issue before the district court).  The district court in Miller Weisbrod also properly considered the Trejo factors when ruling on the motion to stay the proceedings, finding that the Trejo factors did not support staying the declaratory judgment action.

A district court's inherent authority to stay proceedings arises from Landis v. North America Co., 299 U.S. 248 (1936) (cited by the district courts in Datatreasury and Greco). There, the United States Supreme Court acknowledged that while the district court has authority to stay proceedings, the facts must be extraordinary to support such relief.  The Court opined that: "True, the suppliant for a stay must make out a **clear case of hardship or inequity** in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else. Only is **rare circumstances** will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." Id. at 255 (emphasis added).  In this case, the Claims Administrator has wholly failed to present a "clear case of hardship or inequity" to support his argument that the Court should stay the declaratory judgment action.   On the other hand, if the Court were to grant the Claims Administrator's motion to stay, the prejudice suffered by MMR would be real and substantial.  The April 20, 2010 oil spill happened almost 9 years ago.  MMR submitted its BEL claims to the CSSP around 5 ½ years ago.  For years MMR's claims remained pending before the Claims Administrator waiting to be processed according to the Settlement Agreement.  If the Claims Administrator erred by placing the BEL claims in the Moratoria Hold, which he did, the

Court's October 3rd Order should not apply to the claims and the Claims Administrator should enter awards consistent with the Settlement Agreement. Any further delays cannot be justified in these circumstances. Wedgeworth v. Fibreboard Corp., 706 F.2d 541, 545 (5th Cir. 1983) (relying on Landis to find that the district court abused his discretion by granting a stay of the proceedings); Archon v. Taylor & Tyler Inc., Civ. No. 18-6854, 2018 WL 5084875, at *2 (E.D. La. Oct. 18, 2018) (relying on Landis and finding that the "Defendants have not made a clear case of hardship in moving forward in light of the likelihood of prejudice to plaintiff, and judicial economy will not be promoted."); SP Plus Corp. v. IPT, LLC, Civ. No. 16-2474, 2017 WL 1423882, at *2 (E.D. La. March 23, 2017) ("In assessing the relative merits of a stay of proceedings, a court must also remember its 'paramount' obligation to timely hear the cases on its docket.").

MMR's appeal of the October 3rd Order should not be used to delay the declaratory judgment action. See generally U.S. v. Transocean Deepwater Drilling, Inc., 537 Fed. Appx. 358 (5th Cir. 2013). In Transocean, the district court ordered Transocean to comply with a subpoena served by the Chemical Safety and Hazard Investigation Board related to the April 20, 2010 oil spill. Transocean requested the Fifth Circuit to stay the case pending the resolution of its appeal of the order compelling it to respond to the subpoena. The Fifth Circuit found that the prospect of the appeal mooting the case did not support staying the case, calling the argument "absolutely meritless." Id. at 364.

Finally, MMR is entitled to simultaneously prosecute Count V (Declaratory Judgment Action), along with Count I (Oil Pollution Act), Count II (Negligence), Count III (Negligence *Per Se*), and Count IV (Gross Negligence and Willful Misconduct). Fed. R. Civ. P. 8(d) (the plaintiff may assert alternative and inconsistent forms of relief in its complaint); Leal v.

Case: 18-31177   Document: 00515297113   Page: 218   Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293-8 Filed 02/05/20 Page 219 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/2019 Page 22 of 23

McHugh, 731 F.3d 2013, 414 (5th Cir. 2013) (citing Rule 8(d) and rejecting the argument that the plaintiffs could not simultaneously pursue alternative or inconsistent theories).  MMR's claims for damages against the Defendants stated in Counts I-IV should not be delayed due to the declaratory judgment action against the Claims Administrator and BP in Count V.  MMR urges the Court to deny the motion to stay the declaratory judgment action and any other causes of action based on the law and facts stated herein.

## CONCLUSION

MMR satisfied the "plausibility" standard when it filed its declaratory judgment action against the Claims Administrator and BP.  Therefore, the Court should deny the Claims Administrator's motion to dismiss Count V.  Fed. R. Civ. P. 12(b)(6).  In addition, there is insufficient legal authority to support the Claims Administrator's motion to stay the declaratory judgment action or other causes of action.  Accordingly, the Court should deny the Claims Administrator's motion to stay.

Respectfully submitted,

/s/ WILLIAM G. CHASON
RICHARD M. GAAL
State Bar No. ASB-3999-A58R
rgaal@mcdowellknight.com
WILLIAM G. CHASON
State Bar No. ASB-5462-151C
wchason@mcdowellknight.com
MORGAN S. HOFFERBER
State Bar No. ASB-1334-542X
mhofferber@mcdowellknight.com

OF COUNSEL:

McDOWELL KNIGHT ROEDDER & SLEDGE, L.L.C.
11 N. Water Street; Suite 13290
Mobile, Alabama  36602
Tel. (251) 432-5300
Fax (251) 432-5303

Case: 18-31177     Document: 00515297113     Page: 219     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293-8 Filed 02/05/20 Page 220 of 1003
Case 2:10-md-02179-CJB-DPC Document 26293-8 Filed 02/05/2019 Page 23 of 23

## CERTIFICATE OF SERVICE

    I hereby certify that this pleading has been served on All Counsel by electronically uploading same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this the 28th day of January, 2019.


                         */s/ WILLIAM G. CHASON* _____

EXHIBIT 5

Case: 18-31177    Document: 00515297113    Page: 221    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 222 of 1003
Case 2:10-md-02179-CJB-JCW   Document 25415   Filed 02/27/19   Page 1 of 5

63008840
Feb 27 2019
02:34PM

E-SERVICE

File & ServeXpress

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  OIL SPILL by the OIL RIG | * | MDL No. 2179 |
| "DEEPWATER HORIZON" in the GULF | * | |
| OF MEXICO, on APRIL 20, 2010 | * | SECTION J |
| | * | |
| This Document Relates to:  18cv11111 | * | JUDGE BARBIER |
| | * | MAGISTRATE WILKINSON |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

### CLAIMS ADMINISTRATOR'S REPLY MEMORANDUM
### IN SUPPORT OF MOTION TO DISMISS
### AND ALTERNATIVE MOTION TO STAY PENDING APPEAL

Defendant Patrick A. Juneau, in his official capacity as Claims Administrator of the Deepwater Horizon Court Supervised Settlement Program (the "Claims Administrator" or "Mr. Juneau"), through undersigned counsel, respectfully submits this Reply memorandum in support of his motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) all claims against him in the Complaint filed by MMR Group, Inc. d/b/a MMR Constructors, Inc. ("MMR") in Case No. 2:18cv11111 on the docket of this Court, or, only alternatively, to stay this matter pending the outcome of a related appeal to the United States Court of Appeal for the Fifth Circuit in No. 18-31177 on the docket of the Fifth Circuit.

**A. MMR has not identified an actual controversy with the Claims Administrator to support its declaratory judgment claim.**

MMR argues that its declaratory judgment action against the Claims Administrator should not be dismissed and is ripe for review as an "actual controversy" because it "is requesting the Court to review the Claims Administrator's decision that MMR is not a member of the Class

EXHIBIT 5

because it allegedly incurred moratoria losses." MMR Opposition to Mtn. to Dismiss (Rec. Doc. 25308) ("MMR Opp.") at 17 (citing *Waldman v. Riedinger*, 423 F.3d 145 (2d Cir. 2005)).[1]

By way of clarification and correction, the Notices issued to MMR by the Claims Administrator on October 7, 2014 stated only that MMR's claims showed "*indicia of potential Moratoria Losses.*" *See* October 7, 2014 Notices, Complaint, Exh. 4 (emphasis added). The Settlement Agreement directs the Claims Administrator to identify claims with *potential* moratoria losses (which losses are excluded from the Settlement Agreement) for further review under a procedure the Parties agreed to establish at a later date. Settlement Agreement, Rec. Doc. 6430-1 at §§ 5.10.2–5.10.3.1.5; Exhibit 16, Rec. Doc. 6430-34 at 5. In the six years following the Settlement Agreement's execution, however, BP and Class Counsel did not "establish 'agreed' protocols or guidance to govern Moratoria Hold claims in the Settlement program." *See* October 3, 2018, Order (the "Moratoria Exclusion Order"), Rec. Doc. 24945 at 1. Therefore, on October 3, 2018, this Court entered an Order directing that all remaining unresolved claims subject to a Moratoria Hold in the Settlement Program, including MMR's BEL claims, were "**deemed hereby EXCLUDED** from the Settlement." *Id.* at 2. The decision to exclude remaining claims with potential moratoria losses from the Settlement was made by the district court, not the Claims Administrator. To the extent MMR seeks to establish through its declaratory judgment action that it has no *actual* moratoria losses and should not have been excluded from the Settlement, there is no controversy with the Claims Administrator who only identified claims with *potential* moratoria losses for further review as required by the Settlement Agreement.

---

[1] Indeed, in *Waldman*, upon which MMR primarily relies, the claims administrator whose determination as to class membership was placed at issue was not even made a party to the litigation. 423 F.3d at 146. *Waldman* certainly provides no authority or basis upon which to suggest that Mr. Juneau should be a party to MMR's complaint.

Case: 18-31177     Document: 00515297113     Page: 223     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC  Document 26293  Filed 02/05/20  Page 224 of 1003
Case 2:10-md-02179-CJB-JCW  Document 25415  Filed 02/27/19  Page 3 of 5

**B. The Relief Sought by MMR Would Require the District Court to Modify its Existing Order, Now on Appeal, Which the District Court Has No Jurisdiction to Do.**

Even accepting all MMR's allegations in the declaratory judgment claim as true for the purposes of a Rule 12 Motion, the relief sought against the Claims Administrator (ordering him to process MMR's claims in the Settlement Program) could not be granted without first vacating or modifying the existing Moratoria Exclusion Order that has excluded MMR's claims. The Moratoria Exclusion Order, however, was appealed by MMR to the Fifth Circuit on November 1, 2018 in case no. 18-31177 (the "Moratoria Appeal"). With the filing of the Moratoria Appeal, the district court was divested of jurisdiction over the Moratoria Exclusion Order and is presently unable to modify that Order absent leave to do so from the court of appeal. *See Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 329 (5th Cir. 2004) ("Once the notice of appeal has been filed, while the district court may consider or deny a Rule 60(b) motion (filed more than ten days after entry of the judgment), it no longer has jurisdiction to grant such a motion while the appeal is pending."). MMR cannot gain relief through an impermissible collateral attack on the Moratoria Exclusion Order while that order is on appeal in the guise of a declaratory judgment claim against a disinterested court-appointed administrator.[2] The district court simply cannot grant MMR's requested relief of ordering the Claims Administrator to "process the Plaintiff's claim under the business economic loss framework in the Settlement Agreement and enter an appropriate award," without first modifying the Moratoria Exclusion Order, which it cannot do while that order is on appeal.

---

[2] The Claims Administrator has no personal interest in whether MMR potentially recovers from other parties through the Settlement Agreement or through an individual lawsuit.

Case: 18-31177    Document: 00515297113    Page: 224    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-JCW    Document 26293    Filed 02/05/20    Page 225 of 1003
Case 2:10-md-02179-CJB-JCW    Document 25415    Filed 02/27/19    Page 4 of 6

C. **There is No Claim for Relief Against the Claims Administrator, Who is Bound to Execute the Settlement Consistent with the Existing Order.**

The Claims Administrator is bound to "faithfully implement and administer the Settlement ... as approved by the Court." *See* Settlement Agreement at § 4.3.1. The Claims Administrator, therefore, must consider MMR's claim excluded from the Settlement under the existing Moratoria Exclusion Order. Since the district court is unable to modify the Moratoria Exclusion Order while the Appeal is pending, and the Claims Administrator is bound to administer the settlement as directed by the Court, MMR has failed to state a claim upon which relief can be granted against the Claims Administrator, and its declaratory judgment claim against him should be dismissed. *See* Fed. R. Civ. P. 12(b)(6).

D. **Alternatively, as to the Claims Administrator, this Matter Should be Stayed Pending the Outcome of the Moratoria Appeal.**

If not dismissed, MMR's declaratory judgment claim, alternatively, should be stayed during the pendency of the Moratoria Appeal.[3] MMR's declaratory judgment claim depends entirely upon the district court's ability to modify an Order over which it has been divested of jurisdiction. It serves no purpose to litigate MMR's declaratory judgment action against the Claims Administrator while that Order is on appeal. MMR's declaratory judgment claim against the Claims Administrator, therefore, should be dismissed pursuant to Rule 12(b)(6) or, alternatively, stayed pending the outcome of the Moratoria Appeal.

---

[3] The Claims Administrator has not been made a defendant to the other counts (Counts I – IV) of MMR's Complaint. The Claims Administrator takes no position as to whether a stay also would be appropriate as to those claims pending the Moratoria Appeal.

Case: 18-31177    Document: 00515297113    Page: 225    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293-1 Filed 02/05/20 Page 226 of 1003
Case 2:10-md-02179-CJB-JCW Document 25415 Filed 02/27/19 Page 5 of 6

Respectfully submitted,

*/s/ Richard C. Stanley*
Richard C. Stanley (La. Bar No. 8487)
Kathryn W. Munson (La. Bar No. 35933)
STANLEY, REUTER, ROSS, THORNTON & ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, LA  70112
Telephone: (504) 523-1580
rcs@stanleyreuter.com
kwm@stanleyreuter.com

-and-

J. David Forsyth (La. Bar. No. 5719)
SESSIONS, FISHMAN, NATHAN & ISRAEL, LLC
400 Poydras St, Suite 2550
New Orleans, La 70130
Telephone: (504) 582-1500
jdf@sessions-law.com

*Attorneys for Patrick A. Juneau, as Claims Administrator*

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2019, the above and foregoing pleading has been served on All Counsel by electronically uploading same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

*/s/ Richard C. Stanley*

# EXHIBIT 6

Case: 18-31177     Document: 00515297113     Page: 227     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 228 of 1003
Case 2:10-md-02179-CJB-SCW   Document 25375   Filed 02/05/19   Page 1 of 9

62933856
Feb 05 2019
04:36PM
E-SERVICE
File & ServeXpress

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | **MDL 2179** |
| | * | **SECTION: J(2)** |
| This Document Relates To: | * | |
| | * | **JUDGE BARBIER** |
| *Remaining Cases in the B1 Bundle* | * | **MAG. JUDGE WILKINSON** |
| | * | |

## PRETRIAL ORDER NO. 67
## [CASE MANAGEMENT ORDER NO. 7, REGARDING REMAINING B1 CLAIMS]

In order to facilitate further the effective administration of this multidistrict litigation and the prosecution of the coordinated actions herein, the Court established eight separate "pleading bundles" for different categories of cases and claims. (Pretrial Order No. 11, Rec. Doc. 569). Under its inherent power, the Court also entered a series of pretrial orders to further manage this multidistrict litigation, including Pretrial Order No. 60 (Rec. Doc. 16050), which dismissed the Amended B1[1] Master Complaint and required all remaining B1 plaintiffs to proceed in individual lawsuits. In addition, the Court utilized a Court-sponsored Neutrals' process that resulted in the resolution of a large number of the former B1 cases.

Only those B1 plaintiffs who have complied with the Court's applicable pretrial orders to date (the "Remaining B1 Plaintiffs") are subject to further proceedings in MDL 2179. The Court now ORDERS this Case Management Order to assist the Court

---

[1]     The former "B1" Bundle included claims for Non-Governmental Economic Loss and Property Damages by Private Individuals and Businesses.

EXHIBIT 6

Case: 18-31177     Document: 00515297113     Page: 228     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPG   Document 26293   Filed 02/05/20   Page 229 of 1003
Case 2:10-md-02179-CJB-JCW   Document 25375   Filed 02/05/19   Page 2 of 1003

in its evaluation of the allocation of remaining private individual and business loss claims and trial needs across its docket.

To aid in the further administration of the Remaining B1 Plaintiffs, the Court **ORDERS AS FOLLOWS:**

I.    **CMO for Exhibit 1 B1 Plaintiffs:**

In order to proceed with their pending actions, any plaintiff set forth in Exhibit 1 attached hereto, (the "Exhibit 1 B1 Plaintiffs"), and the properly served defendants in their actions, shall produce and exchange the following initial documents within each action as set forth below.

   A.    **Initial Information Disclosures by Exhibit 1 Plaintiffs**

Each of the Exhibit 1 B1 Plaintiffs shall produce the categories of non-privileged documents and information listed on Attachment A by no later than **April 15, 2019**. A plaintiff's failure to comply with this document production deadline without good cause will be viewed by the Court as an affirmative failure to prosecute the action, and will result in dismissal of that pending action with prejudice.

   B.    **Initial Information Disclosures by Defendants**

In each action where the plaintiff timely complies with the production set forth in paragraph I.A of this Order, each properly served defendant in that action must then produce the categories of non-privileged documents and information listed on Attachment B by no later than **June 14, 2019**. If no properly served defendant in the action has responded to the plaintiff's production without good cause, it will be viewed by the Court as an affirmative failure to defend the action, and will result in a default judgment in that pending action.

2

## C.    Mandatory Mediation

In those actions where both plaintiffs and defendants have complied with the

above document production requirements in I.A and I.B, the Court orders those

parties to participate in good faith in a mandatory mediation session with Magistrate

Judge Sally Shushan (Ret.), or such other person that the Court may designate as a

mediator.

The Court-sponsored mandatory mediation session will be scheduled to begin

on or after July 15, 2019, on a mediation date set at the Mediator's discretion. The

Mediator also is authorized to require multiple Exhibit 1 B1 Plaintiffs to participate

in a single, joint mediation session at the Mediator's discretion.

To aid in the Mediations, the following dates apply once a mediation date has

been set:

- No later than **30 calendar days before the mediation date** the plaintiff is to have made an offer to settle the matter.

- No later than **15 calendar days before the mediation date**, the defendant is to have made a counter-offer/response to plaintiff's offer.

- No later than **10 calendar days prior to mediation date**, each party shall submit directly to the Mediator a confidential in-camera letter/memorandum in **native pdf** (not scanned). The confidential statement can be **NO LONGER THAN SEVEN PAGES DOUBLE SPACED**, should briefly outline the dispute, the damages, the value of the case, and what realistic amount the party would be willing to offer/accept to settle the matter. The confidential statements should also include the offers and responses previously exchanged between the parties. The letter/memorandum should be emailed to sallyshushan@gmail.com, or to the alternative Mediator if a different mediator has been designated for the mediation.

No additional information disclosure shall be required for the mediation.

However, if a party believes additional information may assist in the mediation or in

preparing the case for trial, it may make such disclosures without prejudice to any arguments it may wish to make in the future about the scope of potential future discovery. Such disclosures, if any, shall not waive any rights and protections provided to expert witnesses by Rule 26 of the Federal Rules of Civil Procedure.

The mediation sessions shall take place in New Orleans. Any individual who made a Pretrial Order 65 or Pretrial Order 66 attestation for the EXHIBIT 1 B1 Plaintiff shall attend. BP shall pay the costs of the mediation. It is important that the party representatives who attend the mediation session have adequate discretion, authority, and information to resolve the dispute. If a party representative cannot comply with this, it is imperative that the mediator and all counsel be notified as soon as possible.

At the conclusion of the mediation session, the Mediator shall report back to the Court on whether the case was resolved. For unresolved matters, the Mediator shall also report to the Court on whether the parties conducted the mediation in good faith.

To the extent that parties are unable to resolve their claims at the mediation, the Court will set forth a further scheduling order for remaining discovery, dispositive motions, and trial.

## II.    CMO for Exhibit 2 B1 Plaintiffs

As to those plaintiffs set forth in Exhibit 2 attached hereto, the provisions of PTO 1 ¶ 8 and PTO 25 ¶ 8 staying responsive pleadings in all MDL 2179 matters and staying individual petitions or complaints no longer applies to those listed actions. Instead, in accordance with this Order, Defendants shall file any dispositive motions

Case: 18-31177    Document: 00515297113    Page: 231    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPG   Document 26293   Filed 02/05/19   Page 232 of 1003
Case 2:10-md-02179-CJB-JCW   Document 25375   Filed 02/05/19   Page 5 of 1003

as to the Remaining B1 Plaintiffs identified in Exhibit 2 attached hereto within **30 days** of the date of this Order. The Remaining B1 Plaintiffs identified in Exhibit 2 shall file a responsive pleading, if any, within **30 days** from the date such a dispositive motion is filed.

### III.    Plaintiffs Jorey Danos and Clay Whittinghill

Plaintiff Jorey Danos (16-cv-5967 and 17-cv-3113) and Plaintiff Clay Whittinghill (10-cv-1984) should not be considered part of the B1 pleading bundle, as the claims they each allege are exposure type claims that are more appropriately dealt with in the B3 pleading bundle. For that reason, the Court orders that Plaintiff Jorey Danos's civil action 16-cv-5967 is deemed consolidated with his action number 17-cv-3113, and civil action 16-cv-5967 is ordered closed. Similarly, Clay Whittinghill's civil action 10-cv-1984 alleges claims more appropriately treated as a B3 claim, and for that reason, this action is excluded from Exhibit 1 or 2 to this Order and the provisions applicable to the B1 plaintiffs on those exhibits.

### IV.    Stay of Proceedings

Other than as specifically provided in this Order, the provisions of PTO 1 ¶ 8 and PTO 25 ¶ 8 staying responsive pleadings in all MDL 2179 matters and staying individual petitions or complaints that fall within pleading bundles B1 and B3 remain in effect until further order of the Court.

New Orleans, Louisiana, this 5th day of February, 2019.

United States District Judge

E-SERVICE
62933856
Feb 05 2019
04:36PM
File & ServeXpress

Attachment A-Documents and Information To Be Produced By Plaintiffs

- A written statement and supporting claimed loss calculation, no longer than five double-spaced pages, describing the EXHIBIT 1 B1 Plaintiff's claimed damages sought in this litigation.

- Any documents the EXHIBIT 1 B1 Plaintiff intends to offer as evidence in litigation in support of its claim that its losses were caused by the Gulf oil spill and the quantum of those losses;

- For the time period beginning January 1, 2007 (or with regard to claimed losses concerning real estate development or real estate, beginning in the earliest year in which planning was initiated for the business or asset at issue) through December 31 of the most recent year for which the EXHIBIT 1 B1 Plaintiff claims damages, the following business and financial records for the plaintiff (with consolidating detail if the plaintiff is part of a consolidated group for any items listed):

  o All income tax returns (Federal and state) filed by the EXHIBIT 1 B1 Plaintiff and/or each business for which losses are claimed with reconciliation of those returns to financial statements referenced below;

  o All financial statements prepared (including all audited financial statements) and general ledgers relating to each business and/or asset for which losses are claimed;

  o Valuations, appraisals, budgets, and projections relating to each business and/or asset for which losses are claimed;

  o Materials that the plaintiff has provided to any prospective or actual third party lenders, investors, or other financing sources relating to each business and/or asset for which losses are claimed;

  o Financing, property sale, and/or other business contracts (including without limitation draft contracts and contracts that were cancelled or amended) relating to each business and/or asset for which losses are claimed; and

  o Documents related to any bankruptcy proceedings, defaults or noncompliance with loan, financial or other contractual obligations, or foreclosure or other actions or proceedings concerning the same.

  o For claimed losses concerning loans, in addition to the forgoing, all records regarding loan performance and loan risks of the loans at issue;

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 234 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26237   Filed 12/05/20   Page 2 of 2

summaries concerning the performance of other loan portfolios held by the claiming entity.

- o For claimed losses concerning real estate development or real estate, in addition to the forgoing, sale and lease contract logs; records regarding forfeited deposits or cancelled contracts; records regarding pricing (including all price adjustments or changes in pricing); carrying costs per property/unit; closing costs per property/unit; commissions per property/unity; costs of equity; records relating to equity investments; monthly loan statements; market studies; permits; planning approvals; and zoning approvals.

- o For claimed losses concerning seafood, in addition to the forgoing, trip tickets; licenses and permits; and records of whether the seafood was harvested from the Gulf of Mexico.

- o Records reflecting any compensation, indemnification, and/or other financial recoveries received in connection with any losses claimed by the EXHIBIT 1 B1 Plaintiff and/or its Related Parties (defined below); and

- A disclosure of any related individuals and/or entities (1) that have an ownership interest in the EXHIBIT 1 B1 Plaintiff, (2) that have a financial interest in the outcome of any resolution of the disclosing EXHIBIT 1 B1 Plaintiff's claim, or (3) in which the EXHIBIT 1 B1 Plaintiff has an ownership interest (collectively "Related Parties").

Case: 18-31177    Document: 00515297113    Page: 234    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 235 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26293-70   Filed 02/05/19   Page 2 of 4

E-SERVICE
62933856
Feb 05 2019
04:36PM
File & ServeXpress

<u>Attachment B--Documents and Information to Be Produced By Defendants</u>

- Any non-privileged documents relating to the EXHIBIT 1 B1 Plaintiff's economic loss and property damage claims that exist in BP's databases for the time period beginning January 1, 2007 through December 31, 2018; and

- Any records of release, compensation, indemnification, and/or other financial recoveries provided to the EXHIBIT 1 B1 Plaintiff that exist in BP's databases in connection with any losses claimed by the EXHIBIT 1 B1 Plaintiff and/or its Related Parties.

# EXHIBIT 1

E-SERVICE

62933856
Feb 05 2019
04:36PM

File & ServeXpress

| Row | Plaintiff Name | Case No. |
|---|---|---|
| 1 | Alegion, Inc. | 16-cv-05409 |
| 2 | Allstar Pipe Services, Inc. | 13-cv-01658 |
| 3 | AMT, LLC | 13-cv-00974 |
| 4 | Andy's Motel and Apartments | 16-cv-04252 |
| 5 | Arc on Welding, Inc | 16-cv-06056 |
| 6 | Billy Richardson d/b/a Billy Richards, P.A. | 16-cv-05454 |
| 7 | Biloxi Gaming Partners I, LLC | 13-cv-01476 |
| 8 | BioMarine Technologies, Inc | 13-cv-01286 |
| 9 | Blanchard, Chad | 13-cv-00963 |
| 10 | Boatright, Michael | 16-cv-04801 |
| 11 | Builders Choice Cabinets, Inc | 16-cv-03768 |
| 12 | Capital Bank | 13-cv-06648 |
| 13 | Carson & Company, Inc. | 13-cv-01246 |
| 14 | Classy Cycles, Inc. | 16-cv-05923 |
| 15 | Claude Perry Enterprises, LLC | 16-cv-03661 |
| 16 | Coastal Community Investments, Inc. | 16-cv-06262 |
| 17 | Coastal Land Development Group, LLC | 16-cv-05941 |
| 18 | David Thomas (DTP Diecast Solutions, LLC) | 16-cv-05127 |
| 19 | Enviro Tech Systems, LLC | 18-cv-11120 |
| 20 | Evans, Robert | 16-cv-03966 |
| 21 | Fin & Feather Adventures, LLC; Fin and Feather Adventures Lodge | 16-cv-06126 |
| 22 | Fin & Feather Cabins, LLC; Fin and Feather Chalets, LLC | 16-cv-06131 |
| 23 | Fin & Feather, LLC | 16-cv-06118 |
| 24 | Freyou, John W. | 18-cv-10997 |
| 25 | Gaspard, Jamie (previously listed as "Pure Adrenaline (Fishing Vessel)"; revised per Rec. Doc. 23256) | 13-cv-04437 |
| 26 | Global Disaster Recovery & Rebuilding Services, LLC | 16-cv-06585 |
| 27 | Gulf Marine Institute of Technology | 13-cv-01286 |
| 28 | Gulf Shore Hospitality LLC | 16-cv-06379 |
| 29 | Gulfport Green Housing, L.L.C. | 13-cv-02400 |
| 30 | International Capital Properties, Inc. | 16-cv-05948 |
| 31 | Intradel Corporation | 13-cv-02416 |
| 32 | Island Way Charters, Inc. (Kristopher Sahr) | 16-cv-06611 |
| 33 | J Peaceful LC | 16-cv-06391 |
| 34 | Justice Design Group, LLC | 16-cv-05041 |
| 35 | Justice Design Studio, PC | 16-cv-05050 |
| 36 | Kay Eubanks (Forgotten Beach Coast Realty) | 16-cv-05093 |
| 37 | Lady Luck Bingo | 16-cv-04231 |
| 38 | Lartigue, Roger | 13-cv-01264; 17-cv-03353 |
| 39 | Lawson Environmental Services | 12-cv-00740 |
| 40 | Loggerhead Holdings, Inc. | 16-cv-05952 |
| 41 | Louisiana Blue Crab, LLC | 13-cv-04698 |
| 42 | Lucky Lady Fishing Ent., Inc. (John U. Hanks, Jr.) | 16-cv-04149 |
| 43 | MMR Group, Inc. d/b/a MMR Constructors, Inc. | 18-cv-11111 |
| 44 | Morganstern, Stephen B. | 13-cv-01189 |
| 45 | Murphy, Patrick | 16-cv-11769 |

## EXHIBIT 1

| Row | Plaintiff Name | Case No. |
|-----|----------------|----------|
| 46 | Nabaa Gas Montgomery Village, LLC | 16-cv-07488 |
| 47 | Neighborhood Development Cooperative | 13-cv-02400 |
| 48 | Odyssey Seafood, Inc.; Odyssey Seafood Traders Inc. | 16-cv-04082 |
| 49 | Page, James-Michael | 17-cv-06083 |
| 50 | Panama City Cycles | 16-cv-04864 |
| 51 | Perry Family Properties, LLC | 16-cv-03748 |
| 52 | Renascent Holdings LLC | 13-cv-02416 |
| 53 | Revelay Investments, LLC | 16-cv-06158 |
| 54 | S&K Machineworks & Fabrication, Inc. | 16-cv-05804 |
| 55 | SJMR Investments, LLC d/b/a Baymont Inn & Suites | 16-cv-06385 |
| 56 | Spanish Bluffs Apartments Limited Partnership; Steven Rupp d/b/a Spanish Bluffs Apartment Limited Partnership | 16-cv-05558 |
| 57 | Specialty Fuels Bunkering, LLC | 13-cv-01227 |
| 58 | Student Breaks, LLC | 16-cv-04259 |
| 59 | Sublett, James Randolph | 17-cv-06044 |
| 60 | Tannin Inc. | 13-cv-01583 |
| 61 | The Bird of Paradise, LLC | 16-cv-05277 |
| 62 | The Reefkeeper, LLC (Marine Gardens) | 16-cv-05955 |
| 63 | Thibodeaux, Donald M. | 18-cv-11122 |
| 64 | Topwater Charters, LLC | 16-cv-04743 |
| 65 | Wahl, Kenneth | 18-cv-11054 |
| 66 | Waldron, Brenda F. | 16-cv-06028 |
| 67 | Williams, Kirk | 13-cv-00948 |
| 68 | Winfield Resort Properties, Inc. | 13-cv-01235 |
| 69 | Zehner and Associates, LLC | 16-cv-05859 |

EXHIBIT 2

E-SERVICE

62933856
Feb 05 2019
04:36PM

File & ServeXpress

| Row | Plaintiff Name | Case No. |
|---|---|---|
| 1 | Alimentos Marinos Bagdad, S.C. De R.L. M.I. | 16-cv-04354 |
| 2 | Compra Venta de la Sociedad Cooperativa Tamiahua | 16-cv-04706 |
| 3 | Compra Venta del Mercado de Tuxpan | 16-cv-04866 |
| 4 | Cuellar, Fabian | 16-cv-04561 |
| 5 | Cuellar, Fernando | 16-cv-04570 |
| 6 | Despicadoras de Jaiva Los Higueros Artemio Aran | 16-cv-05710 |
| 7 | Despicadoras De La Isla De San Juan A Ramirez | 16-cv-04797 |
| 8 | Ferramad Max, S.C. De R.L. De M.I. | 16-cv-04391 |
| 9 | Fileteras de Mamey De Artemio Aran | 16-cv-04786 |
| 10 | Gallardo, Emilio | 16-cv-04593 |
| 11 | Gallardo, Felipe | 16-cv-04591 |
| 12 | Gallardo, Olga | 16-cv-04609 |
| 13 | Garcia, Juan Manuel | 16-cv-06305 |
| 14 | Grupo Cacharas Juan Ortega Romero Artemio Aran | 16-cv-04692 |
| 15 | Grupo La Esperanza Flor Idulia | 16-cv-04521 |
| 16 | Grupo La Jaiva Pescadores Alto del Tigre Artemio Aran | 16-cv-04700 |
| 17 | Grupo La Trucha Guillermina Hernandez | 16-cv-04567 |
| 18 | Grupo Libre la Chavelita Jose Luis Perez Cruz | 16-cv-04717 |
| 19 | Hinojosa, Hernina | 16-cv-06311 |
| 20 | La Sociedad Cooperativa De Produccion Pesquera Del Puerto De Tuxpan De Bienes Y Servisios Scl De CV | 16-cv-04730 |
| 21 | La Sociedad Cooperativa De Produccion Pesquera Grupo Unidos De Las Chacas Sc De Rl De CV | 16-cv-04349 |
| 22 | La Sociedad Cooperativa De Produccion Pesquera La Huasteca Veracruzan SC De RL De CV | 16-cv-04574 |
| 23 | La Sociedad Cooperativa de Produccion Pesquera Pescadores de Tamiahua S.C. de R.L. de C.V. | 16-cv-04724 |
| 24 | La Sociedad Cooperativa De Produccion Pesquera Pescadores Unidos De La Reforma Sc De Rl De CV | 16-cv-04499 |
| 25 | La Sociedad Cooperativa De Produccion Pesquera Riberena Pescadores De Cabo Rojo S.C. De R.L. De C.V. | 16-cv-04712 |
| 26 | La Sociedad Cooperativa de Produccion Pesquera Riverena Ostioneros de Saladero SCL | 16-cv-04345 |
| 27 | La Sociedad Cooperativa de Productores y Pescadores de Saladero Veracruz SC de RL | 16-cv-04788 |
| 28 | La Sociedad Cooperativa De Servicio Lancheros De San Jeronimo Sc De Rl De Cv, Et al | 16-cv-04594 |
| 29 | La Sociedad Cooperativa Denominada Camaroneros Unidos De Altamar Sc De Rl De Cv, Et al | 16-cv-04684 |
| 30 | La Sociedad Cooperative De Produccion Pesquera Denominada La Rivera De Tampico De Alto Sc De RL | 16-cv-04586 |
| 31 | La Sociedad Cooperative De Production Pesquera Riverena La Aurora Barra De Cazones Scl De Cv, Et al | 16-cv-04556 |
| 32 | La Sociedad Cooperative de Productores Acuicolas de Congregacion Anahuac SC de RL | 16-cv-04512 |
| 33 | La Sociededad Cooperative de Produccion Pesquera Riverena Ostioneros Del Sur SC de RL | 16-cv-04777 |
| 34 | Libres de Congregacion La Reforma Artemio Aran | 16-cv-05315 |

## EXHIBIT 2

| Row | Plaintiff Name | Case No. |
|-----|----------------|----------|
| 35 | Libres de Cucharitas 2 Guillermina Castro | 16-cv-04550 |
| 36 | Lopez, Enrique | 16-cv-04576 |
| 37 | Lopez, Miriam | 16-cv-04999 |
| 38 | Mejia Duran, Jesus | 16-cv-04506 |
| 39 | Perez, Martin | 16-cv-04548 |
| 40 | Permisionario Horacio Morales de la Isla De San Juan | 16-cv-04802 |
| 41 | Permisionario Joaquin Delgado Ortiz | 16-cv-04584 |
| 42 | Permisionario Maria Esther Castillo | 16-cv-04873 |
| 43 | Permisionario Rosalino Cruz y Pescadores de Camaron | 16-cv-04599 |
| 44 | Pescadores de Ilusion, S.C. de R.L. | 16-cv-05235 |
| 45 | Pescadores Libres de Cabo Rojito Abad | 16-cv-04571 |
| 46 | Pescadores Libres de Chiquila Quintana Roo | 16-cv-04563 |
| 47 | Pescadores Libres De Isla Aguada Campeche | 16-cv-04476 |
| 48 | Pescadores Libres de la Mata Norberto Hernandez | 16-cv-04769 |
| 49 | Pescadores Libres de Morales de Cabo Rojo | 16-cv-04697 |
| 50 | Pescadores Libres De Tonala Agua Dulce Veracruz, Et al | 16-cv-04783 |
| 51 | Pescadores Libres Y Fileteras Claudio Cruz Flores | 16-cv-04543 |
| 52 | Pescadores Y Cooperativas de Ciudad Del Carmen Campeche | 16-cv-05310 |
| 53 | Pescados y Mariscos Alexa | 16-cv-04415 |
| 54 | Ramos Capitaine, Jose Luis | 16-cv-05289 |
| 55 | Restaurante Veracruzano Tamiahua | 16-cv-04775 |
| 56 | Rodriguez, Ramona | 16-cv-04528 |
| 57 | Roman, Francisco | 16-cv-04573 |
| 58 | Rosas, Damaso | 16-cv-04583 |
| 59 | Rosas, Juan | 16-cv-04597 |
| 60 | S.C.C.P.P. Ejidal Teodoro Gonzalez Gaviro, S.C. de R.L | 16-cv-04376 |
| 61 | S.C.C.P.P. Mano de Leon, S.C. de R.L. | 16-cv-04366 |
| 62 | S.C.P. Riberena Acuicola de Bienes y Servicios La Jarocha S.C. de R.L. | 16-cv-05376 |
| 63 | S.C.P.P Carvajal, S.C. de R.L. | 16-cv-04691 |
| 64 | S.C.P.P. Acuicola y Bienes y Servicios el Senor de Las Maravillas S.C.L | 16-cv-05585 |
| 65 | S.C.P.P. Barra de Boca Ciega, S.C. de R.L. | 16-cv-04392 |
| 66 | S.C.P.P. Barra De Conchillal, S.C. de R.L. | 16-cv-04379 |
| 67 | S.C.P.P. Barra de Santa Maria, S.C. de R.L. | 16-cv-04487 |
| 68 | S.C.P.P. Coperativa Caudillos S.C. de R.L. | 16-cv-04385 |
| 69 | S.C.P.P. El Chamizal, S.C. de R.L. | 16-cv-04388 |
| 70 | S.C.P.P. Fco J. Mujica, S.C. de R.L. | 16-cv-04362 |
| 71 | S.C.P.P. Grupo Yosigamar, S.C. de R.L. de M.I. | 16-cv-04688 |
| 72 | S.C.P.P. Islas Unidas, S.C. de R.L. | 16-cv-04682 |
| 73 | S.C.P.P. La Marina S.C. de R.L. de C.V. | 16-cv-04413 |
| 74 | S.C.P.P. Lagunas Unidas al Sistema, S.C. de R.L. | 16-cv-04373 |
| 75 | S.C.P.P. Matamoros, S.C. de R.L. | 16-cv-04382 |
| 76 | S.C.P.P. Pescadores Unidos de La Trocha, S.C. de R.L. | 16-cv-05473 |
| 77 | S.C.P.P. Plan de Ayutla S.C. de R.L. | 16-cv-04393 |
| 78 | S.C.P.P. Punta de Piedra, S.C. de R.L. | 16-cv-04424 |
| 79 | S.C.P.P. Riberena Acuicola de Bienes y Servicios El Cangrejo Azul S.C. de R.L. | 16-cv-05380 |
| 80 | S.C.P.P. Riberena Acuicola de Bienes y Servicios Reyna Del Golfo S.C. de R.L. | 16-cv-05387 |
| 81 | S.C.P.P. Riberena Laguna Madre, S.C. de R.L. | 16-cv-04427 |

Case: 18-31177     Document: 00515297113     Page: 239     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293-70 Filed 02/05/20 Page 240 of 1003
Case 2:10-md-02179-CJB-JCW Document 26293-70 Filed 02/05/19 Page 9 of 9

## EXHIBIT 2

| Row | Plaintiff Name | Case No. |
|-----|----------------|----------|
| 82 | S.C.P.P. Rincon de las Flores, S.C. de R.L. | 16-cv-04320 |
| 83 | S.C.P.P. Tamiahua, S.C. de R.L. de C.V. | 16-cv-04429 |
| 84 | S.C.P.R.A. Unidos en Solidaridad, S.C. de R.L. | 16-cv-04394 |
| 85 | S.P.P. Acuicola y Bienes y Servicios Las Golondrinas de Sabanuy S.C. de R.L | 16-cv-05566 |
| 86 | S.S.S. Agua Rebuelta | 16-cv-04408 |
| 87 | S.S.S. Isla del Carrizal | 16-cv-04411 |
| 88 | S.S.S. Nuevo Dolores | 16-cv-04414 |
| 89 | S.S.S. Revolucion Y Progreso | 16-cv-04418 |
| 90 | Santisbon Herrera, Gilberto | 16-cv-05294 |
| 91 | Soc. De Sol. Social Jesus Maria DeCarbajal CNC | 16-cv-05829 |
| 92 | Soc. De Sol. Social Mobilisacion Social, CNC | 16-cv-05835 |
| 93 | Soc. De Sol. Social Pescadores De La Libertad CNC | 16-cv-05832 |
| 94 | Sociedad Cooperativa 9 Hermanos | 16-cv-05993 |
| 95 | Sociedad Cooperativa Bajo de Corsario | 16-cv-05983 |
| 96 | Sociedad Cooperativa Cabo Catoche | 16-cv-05984 |
| 97 | Sociedad Cooperativa Cholenco Tours | 16-cv-06025 |
| 98 | Sociedad Cooperativa Ensenada de Celestun | 16-cv-06297 |
| 99 | Sociedad Cooperativa Ensueno del Caribe | 16-cv-05979 |
| 100 | Sociedad Cooperativa Fraternidad Ambiental | 16-cv-06002 |
| 101 | Sociedad Cooperativa Isla Morena | 16-cv-05980 |
| 102 | Sociedad Cooperativa Isla Pasion | 16-cv-05981 |
| 103 | Sociedad Cooperativa La Pobre de Dios | 16-cv-06300 |
| 104 | Sociedad Cooperativa Laguna Rosada | 16-cv-06304 |
| 105 | Sociedad Cooperativa Lancheros Turisticos Damero | 16-cv-05995 |
| 106 | Sociedad Cooperativa Lancheros Turisticos Laguna de Yalahau | 16-cv-06007 |
| 107 | Sociedad Cooperativa Nohuch Cuch | 16-cv-06306 |
| 108 | Sociedad Cooperativa Pulperos del Caribe | 16-cv-06011 |
| 109 | Sociedad Cooperativa Vanguardia del Mar | 16-cv-05982 |
| 110 | Sociedad Cooperative El Meco Tours | 16-cv-06294 |
| 111 | Sociedad Cooperative Isla Holbox | 16-cv-06018 |
| 112 | Toral, Guillermina | 16-cv-04601 |
| 113 | Trabajadores De Tampico | 16-cv-04762 |
| 114 | Union de Fileteros de Cucharas Jose Luis Palacios Medina | 16-cv-04806 |
| 115 | Vela Gomez, Mario | 16-cv-05313 |

EXHIBIT 7

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010 | MDL NO. 2179<br><br>SECTION J |
| This document relates to:<br>No. 12-970 | JUDGE BARBIER<br><br>MAG. JUDGE SHUSHAN |
| Claimant ID 100243047, Claim ID 254194 | |

## CLAIMANT ID 100243047's MOTION TO CLARIFY, ALTER, OR AMEND THE COURT'S OCTOBER 3, 2018 ORDER

Pursuant to Federal Rules of Civil Procedure 23 and 59(e), as well as this Court's supervisory authority under the Settlement Agreement, Claimant ID 100243047 moves the Court to clarify that its October 3, 2018 Order (Rec. Doc. 24945) does not apply to Claim ID 254194 because the Moratoria Team has not completed its review of whether the Claim seeks to recover Moratoria Losses and should thus remain subject to any Moratoria Hold.

As set forth more fully in the accompanying Memorandum of Law, Claimant is in the unique position of having a multi-million dollar Business Economic Loss claim for which the Settlement Program (before the Order) was still actively considering whether to release a Moratoria Hold because the Claim does not seek to recover any Moratoria Losses.

Unlike other Remaining Moratoria Hold Claims, this Claim has not received the review required by Section 5.10.3.1.1 of the Settlement Agreement. In fact, the Moratoria Team has stated that the Claim "will be released" if Claimant provides sufficient evidence that the claiming facility did not sell products used in offshore oil and gas activities in the Gulf of Mexico from 2007–2011. In response, Claimant submitted definitive evidence, including expert testimony,

1

EXHIBIT 7

demonstrating that the facility sold *no* such products.  Because the Moratoria Team did not have

time to review this evidence—some of which was submitted on October 1—Claimant submits

that the Order is premature with respect to this particular Claimant.

The Order cut short the Settlement Program's ongoing review of the Claim based on the

factual assumption that the Settlement Program "has no ability to process" any remaining

Moratoria Hold claims because BP and Class Counsel cannot agree on guidance under

Exhibit 16 for making compensation determinations when a claim involves Moratoria Losses.

Order at 2.  But that factual assumption is not accurate in this particular case.  Here, the

Settlement Program *does* have the ability to decide—based on affidavits and other evidence that

Claimant submitted—that the Moratoria Hold should be released.  That determination does not

depend in any way on guidance under Exhibit 16.

WHEREFORE, Claimant ID 100243047 respectfully asks the Court to clarify that its

October 3, 2018 Order does not apply to Claim ID 254194 because the Moratoria Team has not

completed its review of whether or not the Claim seeks to recover Moratoria Losses.

Respectfully submitted, this 12th day of October, 2018.

*/s/ Jeffrey W. Willis*
Jeffrey W. Willis
Georgia Bar No. 766575
Michael L. Eber
Georgia Bar No. 859338
ROGERS & HARDIN LLP
2700 International Tower
Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA  30303-1604
Telephone: (404) 522-4700
Facsimile: (404) 525-2224
Email:  jwillis@rh-law.com
          meber@rh-law.com

*Counsel for Claimant ID 100243047*

2

Case: 18-31177     Document: 00515297113     Page: 243     Date Filed: 02/04/2020

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 244 of 1003
Case 2:10-md-02179-CJB-DPC   Document 25305   Filed 02/12/18   Page 3 of 3

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2018, I filed and served the foregoing pleading via Lexis/Nexis File & Serve and through this Court's CM/ECF Filing System with the Clerk of Court of the United States District Court for the Eastern District of Louisiana thereby effecting service on all counsel of record.

/s/ Jeffrey W. Willis
Jeffrey W. Willis
Georgia Bar No. 766575
ROGERS & HARDIN LLP
2700 International Tower
Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA  30303-1604
Telephone: (404) 522-4700
Facsimile: (404) 525-2224
Email: jwillis@rh-law.com

Counsel for Claimant ID 100243047

Case: 18-31177   Document: 00515297113   Page: 244   Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 245 of 1003
Case 2:10-md-02179-CJB-JCW Document 25084 Filed 10/05/18 Page 1 of 10

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010

This document relates to:
No. 12-970

Claimant ID 100243047, Claim ID 254194

MDL NO. 2179

SECTION J

JUDGE BARBIER

MAG. JUDGE SHUSHAN

## <u>MEMORANDUM OF LAW IN SUPPORT OF CLAIMANT ID 100243047's MOTION TO CLARIFY, ALTER, OR AMEND THE COURT'S OCTOBER 3, 2018 ORDER</u>

JEFFREY W. WILLIS
MICHAEL L. EBER
ROGERS & HARDIN LLP
2700 International Tower
Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA  30303-1604
Telephone: (404) 522-4700
Facsimile: (404) 525-2224
Email: jwillis@rh-law.com

*Counsel for Claimant ID 100243047*

Case: 18-31177    Document: 00515297113    Page: 245    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 246 of 1003
Case 2:10-md-02179-CJB-DPC Document 26294 Filed 05/21/18 Page 2 of 12

## PRELIMINARY STATEMENT

Claimant ID 100243047 is in the unique position of having a multi-million dollar Business Economic Loss claim for which the Settlement Program was still actively considering—until this Court's October 3, 2018 Order (Rec. Doc. 24945) ("Order")—whether to release a Moratoria Hold because the Claim does not include any Moratoria Losses. The Order cut short the Settlement Program's ongoing review of the Claim by ruling that all Remaining Moratoria Hold Claims are "deemed hereby EXCLUDED" from the Settlement. Order at 2 (emphasis omitted).

Unlike other Remaining Moratoria Hold Claims (for which exclusion may be appropriate), this Claim has not received the review provided for in Section 5.10.3.1.1 of the Settlement Agreement. In fact, the Moratoria Team has stated that the Claim "will be released" if Claimant provides sufficient evidence that the claiming facility did not sell products used in offshore oil and gas activities in the Gulf of Mexico from 2007–2011. In response, Claimant submitted definitive evidence, including expert testimony, demonstrating that the facility sold *no* such products. Because the Moratoria Team did not have time to review this evidence— some of which was submitted on October 1—Claimant submits that the Order is premature with respect to this particular Claimant.

The Court's ruling is based on the factual assumption that the Settlement Program "has no ability to process" such claims because BP and Class Counsel have failed to agree on the guidance contemplated by Exhibit 16 for making compensation determinations when a claim involves Moratoria Losses. Order at 2. But that factual assumption is not accurate in this particular case. Here, the Settlement Program *does* have the ability to decide—based on

affidavits and other evidence—that the Moratoria Hold should be released.  That determination

does not depend in any way on guidance under Exhibit 16.

Pursuant to <u>Federal Rules of Civil Procedure 23</u> and 59(e), as well as this Court's

supervisory authority under the Settlement Agreement, Claimant simply requests clarification

that the Order does not prevent the Moratoria Team from completing the review required by

Section 5.10.3.1.1 of the Settlement Agreement and—if it determines that the Claim is not

subject to the Moratoria Hold—releasing the Claim for further processing.

## **BACKGROUND**

Claimant ID 100243047 submitted a Business Economic Loss claim (Claim ID 254194)

to the Settlement Program for an iron foundry (the "Claim").

The Claims Administrator placed the Claim on Moratoria Hold because it made a

preliminary finding that Claimant manufactured "Valves, industrial-type (e.g., check, gate,

glove, relief, safety)," a business activity marked with an "X" on Exhibit 19 under NAICS Code

332911.  The claiming facility, however, did not engage in any such activity, or any other

activity requiring Moratoria Review under Exhibit 19, and did not sell any products used in

offshore oil and gas activities.  Thus, Claimant has been working with the Claims

Administrator's Moratoria Team for over a year to release the Moratoria Hold.

In June 2017, Claimant provided the Claims Administrator with Claimant's 10-K for

fiscal year 2010, showing that the business segment that operated the claiming facility produced

only ductile iron products, which are sold primarily to waterworks distributors, contractors,

municipalities, utilities, and other governmental agencies.  *See* Exhibit 1, Letter to Claims

Administration Reviewer, June 7, 2017, Doc ID 20715108.  This fact tended to confirm that the

claiming facility did not provide significant services, goods, or supplies to the offshore oil and

Case: 18-31177     Document: 00515297113     Page: 247     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 248 of 1003
Case 2:10-md-02179-CJB-JCW Document 22384-1 Filed 03/11/18 Page 4 of 11

gas industry.  The submission further stated that Claimant would determine whether the claiming

facility engaged in *any* manufacturing of "Valves, industrial-type (e.g., check, gate, glove, relief,

safety)," which is the only business activity marked with an "X" on Exhibit 19 under the NAICS

Code assigned to Claimant by the Claims Administrator.  *See id.* at 1.

In March 2018, Claimant followed up with a second submission, including an affidavit of

Claimant's Chief Financial Officer, demonstrating that the claiming facility engaged in ***no***

manufacturing of "Valves, industrial-type"—the sole activity that triggered Moratoria Review in

the first place.  *See* Exhibit 2, Letter to Claims Administration Reviewer, Mar. 27, 2018, Doc ID

20970271.  Claimant requested that the Claim be released from the Moratoria Hold.  *Id.* at 2.

In April 2018, the Claims Administrator responded with additional questions, as well as

helpful suggestions, from the Moratoria Team.  The Moratoria Team now focused on a broader

question of whether any of the claiming facility's products had been used in offshore oil and gas

activity in the Gulf of Mexico from 2007–2011.  The Claims Administrator made clear that the

Claim was still being processed and that "[a]fter additional review" it would be released from

Moratoria Hold "if the claim is determined to have no Moratoria Losses":

> If Counsel is able to provide additional documentation not already in the claimant
> file establishing that the claim does not include any Moratoria Losses, he should
> upload it to the Portal and let you know when complete so that we can advise the
> Moratoria Team of its submission and they can review. The relevant documents
> vary from business to business, but complete 2007-2011 customer lists are often
> helpful in this analysis. After additional review, if the claim is determined to have
> no Moratoria Losses, *we will release the Moratoria hold* and return the claim into
> the normal BEL review process.

Exhibit 3, Email from Jason Russell to Jeff Willis, Apr. 12, 2018 (emphasis added).

In June 2018, Claimant informed the Claims Administrator that it had obtained the 2007–

2011 customer lists suggested by the Moratoria Team.  Mr. Russell, on behalf of the Claims

Case: 18-31177    Document: 00515297113    Page: 248    Date Filed: 02/04/2020

Case 2:10-md-02179-CJB-DPC  Document 26293  Filed 02/05/20  Page 249 of 1003
Case 2:10-md-02179-CJB-JCW  Document 25034  Filed 05/11/18  Page 5 of 103

Administrator, responded, "I'll let the Moratoria Team [know] to keep an eye out." Exhibit 4, Email from Jason Russell to Jeff Willis, June 18, 2018.

Counsel undertook a thorough analysis of the 628 customers on the list to determine whether there was any likelihood that the facility's products had been purchased for use in offshore oil and gas activity. There was none. In July 2018, Claimant also engaged a petroleum engineer in California with expertise in the construction of water and wastewater transmission on offshore oil rigs so that Claimant could definitively address the Moratoria Team's question: whether the claiming facility's products were used in offshore oil and gas activity in the Gulf of Mexico from 2007 through 2011.

On October 1, 2018, Claimant provided the additional information to the Claims Administrator demonstrating that the Claim does not include Moratoria Losses. Exhibit 5, Letter to Claims Administrator Reviewer, Oct. 1, 2018, Doc. ID 20991298. This information includes a second affidavit from Claimant's Chief Financial Officer (*id.*, sub-exhibit A) and an affidavit from the expert in petroleum engineering and offshore oil and gas operations (*id.*, sub-exhibit B). The expert opined that, for at least seven enumerated reasons, "it is a ***virtual certainty*** that the [claiming] facility's products were not used in offshore oil and gas activities in the Gulf of Mexico in the years 2007 through 2011." *Id.*, Sub-exhibit B, ¶ 8 (emphasis added).

On October 3, 2018, the Court entered its Order Regarding Remaining Claims in the Economic and Property Damages Settlement that Are Subject to Moratoria Hold. (Rec. Doc. 24945.) The Order provides (in relevant part) that any "Remaining Moratoria Hold Claims"[1] "will be deemed hereby EXCLUDED from the Settlement and instead may proceed with its

---

[1] The Order defines "Remaining Moratoria Hold Claims" as any claim (i) for which the claimant "has received a notice from the Settlement Program that his, her, or its claim is subject to a 'Moratoria Hold'" and (ii) that "has not been resolved to date." Order at 2.

claim in litigation before this Court by compliance with the terms of this Order."  Order at 2
(emphasis omitted).  The Order is premised on the assumption that the Claims Administrator
"has no ability to process" any of the Remaining Moratoria Hold Claims.  *Id.*

On October 4, 2018, the Claims Administrator thanked Claimant's counsel for the
additional information regarding the Claim and said, "I have notified the Moratoria Team."
Exhibit 6, Email from Jason Russell to Brian Devine, Oct. 4, 2018.  On October 8, however, the
Claims Administrator notified Claimant's counsel that it is "closing" the Claim based on this
Court's ruling.  Exhibit 7, Email from Jason Russell to Brian Devine, Oct. 8, 2018.

## ARGUMENT

### A.    The Moratoria Team Should Be Allowed to Complete the Evaluation Required by Section 5.10.3.1.1

Section 5.10.3.1.1 provides that a dedicated team will review the claims of businesses
with certain NAICS codes and descriptions "to determine whether their losses, or any portion
thereof, constitute Moratoria Losses."  Settlement Agreement § 5.10.3.1.1; *see also id.*, Ex. 19.
If that review determines that the claim **does** include Moratoria Losses, then the claim is stuck in
Moratoria Hold because BP and Class Counsel have failed to provide guidance to the Claims
Administrator under Exhibit 16 on how "to distinguish among economic loss due to or resulting
from (i) moratoria and (ii) non-moratoria economic loss."  *Id.*, Ex. 16 at 4–5.  But if the
Moratoria Team determines that the claim **does not** include Moratoria Losses, then the failure of
Class Counsel and BP to agree to guidance under Exhibit 16 is completely immaterial. In that
case, the claim must be released from Moratoria Hold for further processing.

The Moratoria Team has been actively evaluating the Claim for this purpose—to
determine "whether . . . any portion" of Claimant's losses constitute Moratoria Losses—and has
been provided with definitive responses to its last set of questions.  Because the Claim was being

actively considered for release from Moratoria Hold, this is *not* a situation where the Claims Administrator "has no ability to process" the claim any further. *Cf.* Order at 2. Accordingly, the Claim should not be excluded from the Settlement.

The principle that "like cases should be decided alike" demands that the Moratoria Team have the opportunity to decide whether the Claim seeks to recover Moratoria Losses. When negotiating the Settlement, the parties "were in agreement that similarly situated claimants must be treated alike." *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL 2179, 2013 WL 10767663, at *2 (E.D. La. Dec. 24, 2013). And BP itself has recently emphasized that "[t]he rule that like claims should be treated alike . . . goes to the heart of Settlement's fairness." Brief of BP Appellants at 35–36, In re Deepwater Horizon, No. 17-30727, 5th Cir. Doc. No. 00514608517 (filed Aug. 20, 2018).

This principle is particularly relevant here because similarly situated BEL claimants got a completed Moratoria Review and release from Moratoria Hold. *See, e.g.*, Appeal Panel Decision 2016-402 (affirming award made after the Settlement Program issued a "Moratoria Team Determination Memo" finding that claimant should be released from Moratoria Hold); Appeal Panel Decision 2017-1212 (affirming award where Moratoria Team had determined "that Claimant's records do not reveal any such excluded losses"); Appeal Panel Decision 2017-1444 (affirming award where Moratoria Team concluded that "no moratoria losses were found and the claim should proceed under the BEL framework").[2] It would be fundamentally unfair for similarly situated claimants to have their claims approved while Claimant does not even get a full review of whether the Moratoria Hold is appropriate.

---

[2] For other instances where the Moratoria Team made a final determination that a claim should be released from Moratoria Hold, see Appeal Panel Decision 2017-1788; Appeal Panel Decision 2017-1913; Appeal Panel Decision 2017-2808; Appeal Panel Decision 2017-3864; Appeal Panel Decision 2017-4161; and Appeal Panel Decision 2018-365.

Case: 18-31177     Document: 00515297113     Page: 251     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 252 of 1003
Case 2:10-md-02179-CJB-JCW   Document 22984   Filed 06/22/18   Page 3 of 11

Excluding the Claim *before* the Claims Administrator decides whether or not the Claim actually seeks Moratoria Losses is contrary to the Settlement Agreement.  As explained above, Section 5.10.3.1.1 requires the Moratoria Team "to determine whether [Claimant's] losses, or any portion thereof, constitute Moratoria Losses."  That evaluation has not been completed.

In addition, Section 4.3.7 provides that "[t]he Settlement Program . . . *shall* use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the *best opportunity* to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement."  Settlement Agreement § 4.3.7 (emphasis added).  Here, Claimant would not receive "the best opportunity to be determined eligible" for compensation, *id.*, if the Court deems the Claim excluded before the Moratoria Team can review the materials that Claimant recently submitted.[3]  Those materials conclusively demonstrate that Claimant should be released from Moratoria Hold because the Claim does not seek to recover any Moratoria Losses.

Although the evidence in favor of removing the Moratoria Hold is compelling, Claimant is not asking the Court to decide that issue today.  Instead, Claimant simply requests an opportunity for the Moratoria Team to decide the issue.

Thus, Claimant asks the Court to clarify that the October 3 Order does not prevent the Moratoria Team from completing its review to determine whether to release the Claim from Moratoria Hold.

---

[3] Nor did Claimant receive "notice," § 4.3.7, that the Claim would be deemed excluded if the Moratoria Team did not release the hold before October 3, 2018.

**B.      This Motion Does Not Affect Claims Requiring the Application of Moratoria Guidance Under Exhibit 16**

In the Order, the Court ruled that claims on Moratoria Hold must be excluded from the Settlement because BP and Class Counsel are "at an unresolvable impasse" in trying to agree on guidance for the Claims Administrator to make compensation determinations that adhere to the moratoria exclusion in the Settlement Agreement.  Order at 1.  The Order states that the Claims Administrator, therefore, has "no ability to process those remaining, unresolved claims that are subject to a 'Moratoria Hold' in the Settlement Program."  Order at 2.

Claimant does not dispute the Court's general finding that the Claims Administrator is unable to process many (or even most) claims that are in Moratoria Hold.  But that finding is unwarranted with respect to *this* particular claim.  In this case, the Claims Administrator *does* have the ability to process—indeed, it was actively considering—whether Claim 254194 should be released from Moratoria Hold because it has no relationship to offshore oil and gas activity.

The fact that the Moratoria Team has not yet considered all the evidence submitted by Claimant also distinguishes this motion from those in which other claimants with Moratoria Hold claims have unsuccessfully sought relief from the Court.  *See* Order of Oct. 4, 2018, Rec. Doc. 24951 (ordering that such motions are denied and/or moot).  Those other claimants challenged final determinations by the Moratoria Team that that their claims included Moratoria Losses. For example, Claimant ID 100036154 and Claimant ID 100036101 essentially asked the Court to overrule the Moratoria Team's final determination that the claims should remain on hold.  *See* Rec. Doc. 23726-2 at 2 ("In response to Counsel's Moratoria Hold objections and additional submissions, the Moratoria Team has further reviewed its initial determinations regarding [two claimants] … [and] has determined that the claims must remain on Moratoria Hold").  Likewise,

Turner Industries Group, LLC, asked the Court to "*order the release* of its three Claims from their respective Moratoria holds."  Rec. Doc. 22755-1 (emphasis added).

Here, by contrast, the Moratoria Team has not considered all the evidence.  Claimant has not received a decision on whether the Claim includes Moratoria Losses.  And Claimant only seeks the limited relief of allowing the Moratoria Team to finish evaluating "whether [Claimant's] losses, or any portion thereof, constitute Moratoria Losses."  § 5.10.3.1.1.

## CONCLUSION

Claimant ID 100243047 respectfully asks the Court to clarify that its October 3, 2018 Order does not apply to Claim ID 254194 because the Moratoria Team has not completed its review of whether the Claim seeks to recover Moratoria Losses.  If the Court wishes to expedite the resolution of this issue, it could also instruct the Moratoria Team to make its final decision (whether to release the Moratoria Hold) by a specific date, as the Court deems appropriate.

Respectfully submitted, this 12th day of October, 2018.

> */s/ Jeffrey W. Willis*
> Jeffrey W. Willis
> Georgia Bar No. 766575
> Michael L. Eber
> Georgia Bar No. 859338
> ROGERS & HARDIN LLP
> 2700 International Tower
> Peachtree Center
> 229 Peachtree Street, N.E.
> Atlanta, GA  30303-1604
> Telephone: (404) 522-4700
> Facsimile: (404) 525-2224
> Email: jwillis@rh-law.com
>             meber@rh-law.com
>
> *Counsel for Claimant ID 100243047*

Case: 18-31177     Document: 00515297113     Page: 254     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 255 of 1003
Case 2:10-md-02179-CJB-JCW   Document 23034-1   Filed 05/29/18   Page 11 of 11

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2018, I filed and served the foregoing pleading via Lexis/Nexis File & Serve and through this Court's CM/ECF Filing System with the Clerk of Court of the United States District Court for the Eastern District of Louisiana thereby effecting service on all counsel of record.

*/s/ Jeffrey W. Willis*
Jeffrey W. Willis
Georgia Bar No. 766575
ROGERS & HARDIN LLP
2700 International Tower
Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA  30303-1604
Telephone: (404) 522-4700
Facsimile: (404) 525-2224
Email: jwillis@rh-law.com

*Counsel for Claimant ID 100243047*

Case 2:10-md-02179-CJB-JCW   Document 23054-2   Filed 05/22/18   Page 1 of 102

# Exhibit 1

# ROGERS & HARDIN

June 7, 2017

Jeffrey W. Willis
Direct: 404.420.4619
Direct Fax: 404.230.0978
Email: jwillis@rh-law.com

## BY ELECTRONIC SUBMISSION

Claims Administration Reviewer
Deepwater Horizon Economic Claims Center

> Re:    Mueller Water Products, Inc. (Claimant ID No. 100243047); Claim ID No. 254194

Dear Claims Administration Reviewer:

We represent Mueller Water Products, Inc. ("Claimant") in the Deepwater Horizon Economic and Property Damages Settlement Program (the "Settlement Program"), and write in response to the Preliminary Notice Regarding Moratoria Losses Review (the "Notice") issued to Claimant for Claim ID No. 254194, which is a ductile iron pipe manufacturing plant located in Bessemer, Alabama (the "Claim" or the "Bessemer facility").

The Settlement Program issued the Notice because it determined that the Bessemer facility's business activities included those described by NAICS code 332911, Industrial Valve Manufacturing, which is one of the NAICS codes listed on Exhibit 19. Businesses that fall within the NAICS codes on Exhibit 19 "shall be subject to automatic review to determine whether their losses, or any portion thereof, constitute Moratoria Losses." Settlement Agreement § 5.10.3.1.1.

The Claim is only subject to moratoria loss review, however, if it engaged in the activities marked with an "x" that are listed under the NAICS codes on Exhibit 19. *Id.* § 5.10.3.1.2. The only activity so marked under NAICS code 332911 is "Valves, industrial-type (e.g., check, gate, glove, relief, safety), manufacturing." Claimant is currently investigating whether the Bessemer facility manufactured any of these items in 2007–2011 and, if so, whether these products were sold to businesses engaged in the offshore oil and gas industry. Claimant expects to provide this information shortly.

Even if Claimant manufactured some products under this description, those products, and the revenues earned from their sale, did not make up a significant portion of all products manufactured nor all revenues earned by the Bessemer facility in 2007–2011.

Claimant's Form 10-K for the fiscal year ended September 30, 2010 described the business of U.S. Pipe, the business segment to which the Bessemer facility belonged, as follows:

> U.S. Pipe manufactures a broad line of ductile iron pipe, restraint joint products and other ductile iron products. U.S. Pipe products are sold primarily to waterworks distributors, contractors, municipalities, utilities and other governmental agencies. A substantial percentage of ductile iron pipe orders result from contracts that are bid by

Case: 18-31177    Document: 00515297113    Page: 257    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC    Document 26293    Filed 02/05/20    Page 258 of 1003
Case 2:10-md-02179-CJB-JCW    Document 23034-2    Filed 06/29/18    Page 8 of 102

# ROGERS & HARDIN

Claims Administration Reviewer
June 7, 2017
Page 2

contractors or directly issued by municipalities or utilities. We estimate that a substantial majority of U.S. Pipe's 2010 net sales were for infrastructure upgrade, repair and replacement. (2010 10-K, attached hereto as Exhibit A, at 11).

Furthermore, Claimant reported business activity code 332900, which it described as Manufacturing – Water Infrastructure, on Schedule K of its federal tax return for the same fiscal year. *See* 2009 Federal Corporate Income Return Form 1120, Schedule K (Doc ID No. 12910638).

Claimant did not, therefore, "provide significant services, goods, and/or supplies to businesses in the offshore oil & gas industry in the Gulf of Mexico" through the manufacture of "Valves, industrial-type (e.g., check, gate, glove, relief, safety)." Accordingly, the Claim should be processed under the Business Economic Loss framework of the Settlement Agreement. *See* Settlement Agreement § 5.10.3.1.2.

Thank you for your attention to this matter, and please feel free to contact me if you have any questions.

Sincerely,

Jeffrey W. Willis

Attachment

Case: 18-31177    Document: 00515297113    Page: 258    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 259 of 1003
Case 2:10-md-02179-CJB-JCW   Document 23034-2   Filed 05/22/18   Page 4 of 102

# Exhibit A

**Mueller Water Products**

2 0 1 0    A N N U A L    R E P O R T

Case 2:10-md-02179-CJB-DPC    Document 26203-1    Filed 02/05/20    Page 261 of 1003
Case 2:10-md-02179-CJB-JCW    Document 23934-2    Filed 02/12/18    Page 1 of 132

# Overview  Complete Water Transmission Solutions

As water flows from its source to treatment facilities to homes and businesses across North America, it flows through, is controlled by or measured by one of our products, making Mueller Water Products an integral part of the water infrastructure system. Some of our other products handle water behind the wall, including in HVAC and fire protection systems.



*This diagram is for illustrative purposes only.*  ● **Mueller Co.**  ● **Anvil International**  ● **U.S. Pipe**

**Mueller Water Products, Inc.** manufactures and markets products and services that are used in the transmission and distribution of safe, clean drinking water and in water treatment facilities throughout North America. Our broad product portfolio includes engineered valves, fire hydrants, pipe fittings, water meters and ductile iron pipe, which are used by municipalities, as well as the residential and non-residential construction industries. Approximately 77% of the Company's net sales in fiscal 2010 came from products for which management believes the Company has a leadership position.

**For more information visit www.muellerwaterproducts.com**

**LETTER FROM GREG HYLAND** | Chairman, President and Chief Executive Officer

TO MY FELLOW STOCKHOLDERS:

In fiscal 2010*, we focused on maintaining our best-in-class product positions, the reputation of our brands, our commitment to safe production and service to our customers while generating free cash flow, reducing debt and strengthening our capital structure. We accomplished all of these objectives and entered fiscal 2011 stronger and better positioned to meet the needs of our customers.

As municipalities across North America invest in repairing or replacing their aging water infrastructure, they are looking for a partner who can deliver quality products that will last for generations and reliable services that will increase the effectiveness of their systems. Building on a history of quality, service and innovation that stretches back more than 150 years, Mueller Water Products is that company.

We manufacture and market the valves, ductile iron pipe, hydrants and meters that are used to distribute clean drinking water.  From the source to the curb, water flows through, is controlled by or measured by one of our products. Some of our other products handle water behind the wall, including in HVAC and fire protection systems.  In fact, approximately 77 percent of our net sales in 2010 came from products that have earned a #1 or #2 position.

Today, we all benefit from a greater awareness of the issues we face with regard to water; namely, its availability and the infrastructure needed for its distribution and delivery. The need to upgrade or replace our water infrastructure continues to grow, and with our leadership positions, history of quality and innovation, and strong brand reputation, we believe no company is better positioned to lead our industry in supplying the products and services needed to ensure the reliability of North America's water infrastructure.

2010 Business Review

Net sales in 2010 were $1.34 billion compared to $1.43 billion in 2009.  We reported an adjusted net loss of $27.5 million for 2010 compared to an adjusted net loss of $35.7 million for 2009. On an adjusted basis, net loss per share was $0.18 in 2010 compared to $0.31 in 2009. Our adjusted EBITDA margin was 7.6% for both 2010 and 2009.

We saw a continued shift in terms of our end markets during the year. We estimate that 70% of our 2010 total net sales came from repair and replacement of water infrastructure, 25% from non-residential construction and 5% from investment in water infrastructure driven by residential construction for new community development.

*Unless specified otherwise, all years mentioned refer to the fiscal year ended September 30th of that year.

We believe that municipal spending on water infrastructure grew on a year-over-year basis in 2010; however, we saw a continued deterioration in demand from the residential construction market.  Non-residential construction, which drives our Anvil business, dropped significantly in 2010, but we believe it has begun to level off. As a measure of how significant the impact of the downturn in residential construction has been on our business, since 2006, our net sales associated with the residential construction market has declined from roughly 40% of our net sales in 2006 to 5% in 2010.

As we review 2010, we had very positive results at Mueller Co. Our Anvil business performed well in a very challenging non-residential construction market. And we took further restructuring actions at U.S. Pipe which we believe will contribute to an improved performance beginning in 2011.

We continued to strengthen our financial position, reduce fixed costs, improve operating leverage, better manage working capital and control capital expenditures to generate free cash flow, and focus on the quality and delivery of our products in our core businesses. In addition to offsetting some of the challenges in our end markets, we believe the actions we took during the year increase our competitiveness and strengthen our operating position.

In August 2010, we issued $225 million aggregate principal amount of unsecured senior notes due 2020, and we entered into a $275 million asset-based credit agreement. We used the net proceeds from the notes issuance, borrowings under the asset-based credit agreement and cash on hand to repay all of the existing debt under the 2007 Credit Agreement. We also reduced our debt by $48 million in 2010.  We have reduced our debt by $403 million since 2008, including through the use of $166 million received from the issuance of common stock in 2009 to strengthen our capital structure. These actions helped to provide us with a stronger and more flexible capital structure. We do not have any required significant debt payments until 2015.

Leveraging the investment we made in our ductile iron pipe manufacturing technology has enabled us to consolidate production, eliminate fixed costs and further improve productivity. We closed U.S. Pipe's North Birmingham ductile iron pipe manufacturing plant in 2010. We believe that we have sufficient capacity to meet any foreseeable increases in demand and can readily accommodate future increased capacity needs. Savings on an annualized basis from closing the North Birmingham plant are projected to be in the range of $20 to $25 million.

We also divested two non-core businesses during the year: Anvil's Canadian distribution business and Anvil's Picoma electrical fittings business.  The divestiture of Anvil's Canadian distribution business allows us to focus on our strength as a manufacturer while leveraging our relationship with our Canadian distributors.

Case 2:10-md-02179-CJB-DCW   Document 25984-2   Filed 02/12/18   Page 9 of 183

In addition to these actions, we continued to implement operational excellence initiatives throughout the organization which are improving workplace safety, product quality and delivery for our customers, and working capital efficiency while generating cost savings and free cash flow.  We benefitted from a net $17.2 million of manufacturing and other cost savings in 2010.

**Business Outlook**

Based on the current economic outlook, we believe our end markets hit bottom in 2010, with one of them showing early signs of recovery.  We do not anticipate dramatic improvements in market conditions in 2011, especially in residential construction. Overall, we expect revenue growth to be modest in 2011 and, given the steps we took in 2010 to strengthen our financial position, EBITDA to grow year-over-year.

We expect to see revenue growth and continuing improvement at Mueller Co. and improved performance at U.S. Pipe.  Anvil's end markets appear to have stabilized.  We see steady growth in 2011 and overall improvement in our financial performance but do not anticipate accelerated revenue growth until we see an appreciable rebound in the housing market.

**Strategy**

Mueller Water Products is the leading North American provider of water infrastructure and flow control products.  We are proud that we have the leading brands in the water infrastructure industry and one of the largest installed bases in the United States. Our valves or hydrants are specified in the 100 largest U.S. metropolitan areas.

Access to clean drinking water is essential to the physical and economic well-being of our municipalities.  As greater attention is paid to the need to repair or replace aging infrastructure, more investment will be made, and we believe that Mueller Water Products is in a prime position to benefit from this investment.

Our focus is to capitalize on the large, attractive and growing water infrastructure markets worldwide. We will do so by:

- Maintaining our leadership positions with our customers and end users,
- Continuing to enhance operational excellence, including our commitments to employee safety and environmental sustainability,
- Broadening the breadth and depth of our products, technologies and services, and
- Opportunistically expanding internationally.

Case: 18-31177     Document: 00515297113     Page: 264     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC     Document 26293-2   Filed 02/05/20   Page 265 of 1003
Case 2:10-md-02179-CJB-JCW     Document 26054-2   Filed 05/12/18   Page 10 of 32

We continue to look for ways to increase the value we offer our customers and develop the products and services that meet their evolving needs. For example, we are leveraging our strong brand name by investing in Advanced Metering Infrastructure systems and related products that are designed to make water infrastructure systems smarter. We continue to look for ways to further help utilities identify and resolve critical issues around water conservation, operational efficiency and workforce management.

**Summary**

I am proud of our employees and how they have performed in very challenging times with their focus on safely producing quality products and delivering exceptional customer service. Our leadership position in the market is a direct reflection of their commitment, and I thank them for their dedication and hard work.

We made great strides in 2010 in strengthening our financial and operating positions that have helped us manage through challenging economic conditions and make us an even stronger company as our end markets rebound.  We have improved our balance sheet, continued to generate positive free cash flow and are investing in new products and technology that will improve the effectiveness of water infrastructure systems. As I stated at the beginning of this letter, no company is better positioned to lead our industry in supplying the products and services needed to ensure the reliability of North America's water infrastructure than Mueller Water Products.

I look forward to updating you on our progress throughout the year. In the meantime, thank you for the trust you have invested in us.


Sincerely,

Gregory E. Hyland
Chairman, President
and Chief Executive Officer

Case: 18-31177     Document: 00515297113     Page: 265     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 266 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26057-3   Filed 12/15/20   Page 11 of 132

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

#### For the fiscal year ended September 30, 2010

#### OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

---
#### Commission file number: 001-32892
---

# MUELLER WATER PRODUCTS, INC.
#### (Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **Delaware** | **20-3547095** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification Number) |

**1200 Abernathy Road N.E.**
**Suite 1200**
**Atlanta, GA 30328**
(Address of Principal Executive Offices)

Registrant's telephone number: **(770) 206-4200**

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Series A Common Stock, par value $0.01** | **New York Stock Exchange** |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

<div align="center">☒ Yes ☐ No</div>

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.

<div align="center">☐ Yes ☒ No</div>

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

<div align="center">☒ Yes ☐ No</div>

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulations S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files.)

<div align="center">☐ Yes ☐ No</div>

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.505 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

☒ Large accelerated filer ☐ Accelerated filer ☐ Non-accelerated filer ☐ Smaller reporting company
<div align="center">(Do not check if a smaller reporting company)</div>

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). ☐ Yes ☒ No

There were 154,722,327 shares of Series A common stock of the registrant outstanding at November 14, 2010. At March 31, 2010, the aggregate market value of the voting and non-voting common stock held by non-affiliates was $732 million based on the closing price per share as reported on the New York Stock Exchange.

#### DOCUMENTS INCORPORATED BY REFERENCE

Applicable portions of the Proxy Statement for the Annual Meeting of Stockholders of the Company to be held January 26, 2011 are incorporated by reference into Part III of this Form 10-K.

Case: 18-31177     Document: 00515297113     Page: 266     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 267 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26267-2   Filed 10/25/19   Page 22 of 132

**Introductory Note**

In this annual report on Form 10-K (the "annual report"), (1) the "Company," "we," "us" or "our" refer to Mueller Water Products, Inc. and its subsidiaries, including Mueller Co., U.S. Pipe and Anvil International or their management; (2) "Mueller Co." refers to Mueller Co. Ltd., our subsidiary; (3) "U.S. Pipe" refers to United States Pipe and Foundry Company, LLC, our subsidiary; and (4) "Anvil International" refers to Anvil International, L.P., our subsidiary. With regard to the Company's segments, "we," "us" or "our" may also refer to the segment being discussed or its management.

Certain of the titles and logos of our products referenced in this annual report are our intellectual property. Each trade name, trademark or servicemark of any other company appearing in this annual report is the property of its holder.

Unless the context indicates otherwise, whenever we refer in this annual report to a particular year, we mean the fiscal year ended or ending September 30 in that particular calendar year. We manage our businesses and report operations through three business segments: Mueller Co., U.S. Pipe and Anvil, based largely on the products sold and the customers served.

**Industry and Market Data**

In this annual report, we rely on and refer to information and statistics from third-party sources regarding economic conditions and trends, the demand for our water infrastructure products, flow control and piping component system products and services and the competitive conditions we face in serving our customers and end users. We believe that these sources of information and estimates are reliable and accurate, but we have not independently verified them.

Most of our primary competitors are not publicly traded. Accordingly, other than certain trade data with respect to fire hydrants, ductile iron pipe and valves, no current public information is available with respect to the size of such markets or our relative strength or competitive position. Our statements in this annual report about our relative market strength and competitive position with respect to other products are based on our beliefs, studies and judgments concerning industry trends.

**Forward-Looking Statements**

This annual report contains certain statements that may be deemed "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. All statements, other than statements of historical fact, that address activities, events or developments that we intend, expect, plan, project, believe or anticipate will or may occur in the future are forward-looking statements. Examples of forward-looking statements include, but are not limited to, statements we make regarding general economic conditions, spending by municipalities, the outlook for the residential and non-residential construction markets and the recovery, if any, of our end markets and the impact of these factors on our businesses. Forward-looking statements are based on certain assumptions and assessments made by us in light of our experience and perception of historical trends, current conditions and expected future developments. Actual results and the timing of events may differ materially from those contemplated by the forward-looking statements due to a number of factors, including regional, national or global political, economic, business, competitive, market and regulatory conditions and the following:

- the spending level for water and wastewater infrastructure;
- the demand level of manufacturing and construction activity;
- our ability to service our debt obligations; and
- the other factors that are described under the section entitled "RISK FACTORS" in Item 1A of Part I of this annual report.

Undue reliance should not be placed on any forward-looking statements. We do not have any intention or obligation to update forward-looking statements except as required by law.

Case: 18-31177   Document: 00515297113   Page: 267   Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 268 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26293   Filed 10/05/20   Page 196 of 132

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---:|
| **PART I** | | |
| Item 1. | BUSINESS | 1 |
| | Our Company | 1 |
| | The Public Offerings and the Spin-off | 2 |
| | Business Strategy | 3 |
| | Description of Products and Services | 3 |
| | Sales, Marketing and Distribution | 5 |
| | Backlog | 7 |
| | Manufacturing | 7 |
| | Raw Materials and Purchased Components | 8 |
| | Research and Development | 8 |
| | Patents, Licenses and Trademarks | 8 |
| | Seasonality | 8 |
| | Competition | 9 |
| | Environmental Matters | 9 |
| | Safety | 12 |
| | Regulatory Matters | 12 |
| | Employees | 12 |
| | Geographic Information | 12 |
| Item 1A. | RISK FACTORS | 13 |
| | Risks Relating to Our Businesses | 13 |
| | Risks Relating to Our Relationship with Walter Energy | 21 |
| Item 1B. | UNRESOLVED STAFF COMMENTS | 22 |
| Item 2. | PROPERTIES | 23 |
| Item 3. | LEGAL PROCEEDINGS | 24 |
| **PART II** | | |
| Item 5. | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 27 |
| | Equity Compensation Plan Information | 27 |
| | Sale of Unregistered Securities | 27 |
| | Issuer Purchases of Equity Securities | 28 |
| | Stock Price Performance Graph | 29 |
| Item 6. | SELECTED FINANCIAL DATA | 30 |
| Item 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 32 |
| | Overview | 32 |
| | Results of Operations | 34 |
| | Financial Condition | 40 |
| | Liquidity and Capital Resources | 41 |
| | Off-Balance Sheet Arrangements | 44 |
| | Contractual Obligations | 44 |
| | Effect of Inflation; Seasonality | 45 |
| | Critical Accounting Estimates | 45 |
| Item 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK | 47 |
| Item 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 48 |
| Item 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 48 |
| Item 9A. | CONTROLS AND PROCEDURES | 48 |
| Item 9B. | OTHER INFORMATION | 49 |

|  |  | Page |
|---|---|---|
| PART III | | |
| Item 10* | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 50 |
| Item 11* | EXECUTIVE COMPENSATION | 53 |
| Item 12* | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 53 |
| Item 13* | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 54 |
| Item 14* | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 54 |
| PART IV | | |
| Item 15 | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 55 |

\* All or a portion of the referenced section incorporated by reference from our definitive proxy statement that will be issued in connection with the Annual Meeting of Stockholders to be held on January 26, 2011.

Case: 18-31177     Document: 00515297113     Page: 269     Date Filed: 02/04/2020

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 270 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26293   Filed 02/05/20   Page 270 of 1003

**PART I**

**Item 1.     BUSINESS**

**Our Company**

    Mueller Water Products, Inc. is a leading North American manufacturer and marketer of a broad range of products and services that are used in the transmission and distribution of drinking water and in water treatment facilities. Our product portfolio includes engineered valves, fire hydrants, pipe fittings, water meters and ductile iron pipe, which are used by municipalities, as well as the residential and non-residential construction industries, for heating, ventilation and air conditioning ("HVAC"), fire protection, industrial, energy and oil & gas applications. Our products enjoy leading positions due to their strong brand recognition and reputation for quality and service. We believe that we have one of the largest installed bases of iron gate valves and fire hydrants in the United States. At September 30, 2010, our installed products included more than 10 million iron gate valves and more than three million fire hydrants. Our valve or fire hydrant products are specified for use in the 100 largest metropolitan areas in the United States. Our large installed base, broad product range and well-known brands have led to long-standing relationships with the key distributors and end users of our products. Approximately 77% of our net sales during 2010 came from products for which we believe we have a leadership position in the United States and Canada. For 2010, our net sales were $1,337.5 million.

    We manage our businesses and report operations through three business segments, based largely upon the products sold and the customers served: Mueller Co., U.S. Pipe and Anvil.

    *Mueller Co.*

    Mueller Co. manufactures valves for water and gas systems, including iron gate, butterfly, tapping, check, plug and ball valves, as well as dry-barrel and wet-barrel fire hydrants and a broad line of metering and pipe repair products such as clamps and couplings used to repair leaks. The business also provides residential and commercial meter products. Sales of Mueller Co. products are driven principally by spending on water and wastewater infrastructure upgrade, repair and replacement and construction of new water and wastewater infrastructure, which is typically associated with construction of new residential community developments. Mueller Co. products are sold primarily to waterworks distributors. We estimate that a substantial majority of Mueller Co.'s 2010 net sales were for infrastructure upgrade, repair and replacement.

    *U.S. Pipe*

    U.S. Pipe manufactures a broad line of ductile iron pipe, restraint joint products and other ductile iron products. U.S. Pipe products are sold primarily to waterworks distributors, contractors, municipalities, utilities and other governmental agencies. A substantial percentage of ductile iron pipe orders result from contracts that are bid by contractors or directly issued by municipalities or utilities. We estimate that a substantial majority of U.S. Pipe's 2010 net sales were for infrastructure upgrade, repair and replacement.

    *Anvil*

    Anvil manufactures and sources a broad range of products including a variety of fittings, couplings, hangers, nipples, valves and related pipe products for use in all forms of non-residential construction for HVAC, fire protection, industrial, energy and oil & gas applications. Anvil sells primarily to distributors who then sell the products to a wide variety of end users. These distributors are serviced primarily through Anvil's distribution centers. We believe Anvil's network of distributors is the largest such distribution network serving similar end users.

Case: 18-31177    Document: 00515297113    Page: 270    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC    Document 26293    Filed 02/05/20    Page 271 of 1003
Case 2:10-md-02179-CJB-JCW    Document 26293    Filed 10/25/19    Page 13 of 12

*Major products and selected brand names*

The table below illustrates each segment's net sales during 2010, major product lines, product positions, selected brand names and primary end users.

| | Mueller Co. | U.S. Pipe | Anvil |
|---|---|---|---|
| Net sales (in millions) | $612.8 | $377.8 | $346.9 |
| Major product lines (product position in U.S. and Canada*) | Fire hydrants (#1) Iron gate valves (#1) Butterfly and ball valves (#1) Plug valves (#2) Brass water products (#2) | Ductile iron pipe (#1) | Pipe fittings and couplings (#1) Grooved products (#2) Pipe hangers (#2) |
| Selected brand names | Mueller® Pratt® Milliken™ Jones® Hersey® HydroGate® Canada Valve™ Mueller Service™ Mueller Systems™ Mi.Net™ Mi.Hydrant™ | U.S. Pipe® Tyton® Tyton Joint® TR Flex® Usiflex® Field Lok® MJ Field Lok® HP Lok ® Fast Fab® Trim Tyton® | Anvil® AnvilStar® SPF® Merit® Gruvlok® J.B. Smith™ Anvil-Strut® Catawissa™ |
| Primary end users | Water and wastewater infrastructure | Water and wastewater infrastructure | HVAC, fire protection, industrial, energy and oil & gas |

\*   Product position information is based on our estimates of our net sales compared to the net sales of our principal competitors for these product categories. Our estimates were based on internal analyses and information from trade associations and our distributor networks, where available.

**The Public Offerings and the Spin-off**

Mueller Water Products, Inc. is a Delaware corporation that was incorporated on September 22, 2005 under the name Mueller Holding Company, Inc. It is the surviving corporation of the merger on February 2, 2006 of Mueller Water Products, LLC and Mueller Water Products Co-Issuer, Inc. with and into Mueller Holding Company, Inc. We changed our name to Mueller Water Products, Inc. on February 2, 2006. On June 1, 2006, we completed an initial public offering of 28,750,000 shares of Series A common stock.

On December 14, 2006, Walter Energy, Inc. ("Walter Energy", formerly Walter Industries, Inc.) distributed to its shareholders 85,844,920 shares of our Series B common stock (the "Spin-off"). On January 28, 2009, each share of Series B common stock was converted into one share of Series A common stock.

On September 23, 2009, we completed a public offering of 37,122,000 shares of Series A common stock.

Our principal executive offices are located at 1200 Abernathy Road N.E., Suite 1200, Atlanta, Georgia 30328, and our main telephone number at that address is (770) 206-4200.

**Business Strategy**

Our business strategy is to capitalize on the large, attractive and growing water infrastructure markets worldwide. Key elements of this strategy are as follows:

### *We will maintain our leadership positions with our customers and end users.*

We will maintain our leadership positions with our customers and end users by leveraging our large installed base; the specification of our products (valves or fire hydrants) in all of the largest 100 metropolitan areas in the United States; our established and extensive distribution channels; and our broad range of leading water infrastructure, flow control and piping component system products, as well as by developing and introducing additional products and services.

### *We will continue to enhance operational excellence.*

We will continue to pursue superior product engineering, design and manufacturing by investing in technologically advanced manufacturing processes such as lost foam casting and automated molding machinery. We will also seek opportunities to improve manufacturing efficiency safely by increasing the use of automated ductile iron pipe processes and the use of our manufacturing facility in China and continuing our other cost-reduction and efficiency initiatives. We will continue to expand the use of LEAN manufacturing and Six Sigma business improvement methodologies where appropriate to safely capture higher levels of quality, service and operational efficiency. We will also continue to evaluate sourcing certain products wherever doing so will lower our costs while maintaining quality and service.

### *We will increase the breadth and depth of our products and services.*

We will continue to focus on delivering value to our customers and end users by increasing the breadth and depth of our products and services. Further, though acquisition and internal development of proprietary technologies and intellectual capital, we will continue to enhance and develop products and services that will be recognized for their quality and reliability.

### *We will expand internationally.*

We will selectively pursue attractive international opportunities, including potential acquisitions, that may enable us to enter new markets with growth potential, strengthen our current competitive positions, enhance our existing product offerings, expand our technological capabilities or provide synergy opportunities.

**Description of Products and Services**

We offer a broad line of water infrastructure, flow control and piping component system products in the United States and Canada. Our principal products are ductile iron pipe, water and gas valves, fire hydrants, water meters and systems and a broad range of pipe fittings, couplings, hangers and nipples. Our products are generally designed, manufactured and tested in compliance with industry standards.

### *Mueller Co.*

*Water and Gas Valves and Related Products.* Mueller Co. manufactures valves for water and gas systems, including iron gate, butterfly, tapping, check, plug and ball valves. Water and gas valves and related products accounted for $411.6 million, $370.0 million and $470.5 million of our gross sales during 2010, 2009 and 2008, respectively. All of our valve products are used to control transmission of potable (drinkable) water, non-potable water or gas. Water valve products typically range in size from ¾ inch to 36 inches in diameter, but we also manufacture significantly larger valves as custom order work through our Henry Pratt division. Most of these valves are used in water distribution and water treatment facilities.

Case 2:10-md-02179-CJB-JCW   Document 26523   Filed 10/25/20   Page 13 of 132

We also produce small valves, meter bars and line stopper fittings for use in gas systems. In addition, we manufacture machines and tools for tapping, drilling, extracting, installing and stopping-off, which are designed to work with our water and gas fittings and valves as an integrated system.

*Fire Hydrants.* Mueller Co. manufactures dry-barrel and wet-barrel fire hydrants. Sales of fire hydrants and fire hydrant parts accounted for $137.6 million, $114.4 million and $175.4 million of our gross sales in 2010, 2009 and 2008, respectively. We sell fire hydrants for new water infrastructure development, fire protection systems and water infrastructure repair and replacement projects.

Our fire hydrants consist of an upper barrel and nozzle section and a lower barrel and valve section that connects to a water main. In dry-barrel hydrants, the valve connecting the barrel of the hydrant to the water main is located below ground at or below the frost line, which keeps the hydrant upper barrel dry. We sell dry-barrel fire hydrants with the Mueller and U.S. Pipe brand names in the United States and the Mueller and Canada Valve brand names in Canada. We also make wet-barrel hydrants, where the valves are located in the hydrant nozzles and the barrel contains water at all times. Wet-barrel hydrants are made for warm weather climates in locations such as California and Hawaii and sold under the Jones brand name.

Most municipalities have a limited number of fire hydrant brands that are approved for installation within their system due to the desire to use the same tools and operating instructions across their system and to minimize inventories of spare parts. We believe that our large installed base of fire hydrants throughout the United States and Canada and our reputation for superior quality and performance, together with our incumbent specification position, have contributed to the leading positions of our fire hydrants. Our large installed base of more than three million fire hydrants also leads to recurring sales as components of an installed hydrant are replaced.

*Other Products and Services.* Mueller Co. manufactures a broad line of metering products for the water industry, marketed under the Mueller Systems and Hersey Meters names. These products have the capability to measure water from small residential flows to large fire and master meter applications. We also offer Automated Meter Reading and Advanced Meter Infrastructure metering solutions. Other products include pipe repair products, such as clamps and couplings used to repair leaks and municipal castings, such as manhole covers and street drain grates. We sell these products under the Mueller and Jones brand names. We also provide installation, replacement and maintenance services on new and existing valves, fire hydrants and service lines under the Mueller Service brand name. Services include wet taps, dry installs, line stops and main-to-meter connections with full excavation and refurbishment.

### U.S. Pipe

U.S. Pipe manufactures a broad line of ductile iron pipe, restraint joint products, fittings and other ductile cast iron products. Ductile iron is a cast iron that is heat-treated to make it less brittle. U.S. Pipe's net sales were $377.8 million, $410.9 million and $546.0 million during 2010, 2009 and 2008, respectively.

Our ductile iron pipe typically ranges from 4 inches to 64 inches in diameter and up to 20 feet in length. Ductile iron pipe is used primarily for potable water distribution systems, small water system grids, reinforcing distribution systems (including looping grids and supply lines), major water transmission mains, wastewater collection systems, sewer force mains and water treatment plants. We believe ductile iron pipe is preferred for most municipal uses because of its longevity, strength, ease of installation, lack of maintenance problems and environmental sustainability.

Our Fast Fabricators business manufactures and sells a broad line of fabricated pipe, coated pipe and lined pipe products used primarily in wastewater treatment facilities.

*Anvil*

Anvil products include a variety of fittings, couplings, hangers, nipples, valves and related pipe products for use in non-residential construction for industrial, power, HVAC, fire protection, energy and oil & gas applications. Anvil's net sales were $346.9 million, $469.9 million and $595.2 million in 2010, 2009 and 2008, respectively, of which $100.3 million, $179.5 million and $229.7 million, respectively, were of products manufactured by third parties.

The majority of Anvil products are not specified by an architect or an engineer, but are required to be manufactured to industry specifications, which could include material composition, tensile strength and various other requirements. Many products carry the Underwriters Laboratory ("UL"), Factory Mutual ("FM") or other approval rating.

*Fittings and Couplings.*  Anvil manufactures threaded and grooved pipe fittings. Pipe fittings and couplings join two pieces of pipe together. Listed below are the four primary categories of pipe fittings and couplings that we manufacture.

- *Cast Iron Fittings.*  Cast iron is the most economical threaded fittings material and is the standard used in the United States for low pressure applications such as sprinkler systems and other fire protection systems. We believe that the substantial majority of our cast iron products are used in the fire protection industry, with the remainder used in steam and other HVAC applications.

- *Malleable Iron Fittings and Unions*.  Malleable iron is a cast iron that is heat-treated to make it stronger, allowing a thinner wall and a lighter product. Malleable iron is primarily used to join pipe in various gas, plumbing and HVAC applications.

- *Grooved Fittings, Couplings and Valves.*  Grooved products use a threadless pipe-joining method that does not require welding.

- *Threaded Steel Pipe Couplings.*  Threaded steel pipe couplings are used by plumbing and electrical end users to join pipe and conduit and by pipe mills as threaded end protectors.

*Hangers*.  Anvil manufactures a broad array of pipe hangers and supports. Standard pipe hangers and supports are used in fire protection sprinkler systems and HVAC applications where the objective is to provide rigid support from the building structure. Special order, or engineered, pipe supports are used in power plants, petrochemical plants and refineries where the objective is to support a piping system that is subject to thermal, dynamic or seismic movement.

*Nipples.*  Anvil manufactures pipe nipples, which are used to expand or compress the flow between pipes of different diameters. The pipe nipples product line is a complementary product offering that is packaged with cast iron fittings for fire protection products, malleable iron fittings for industrial applications and our forged steel products for oil & gas and chemical applications. Pipe nipples are also general plumbing items.

*Other Products.*  Anvil also distributes other products, including forged steel pipe fittings, hammer unions, bull plugs and swage nipples used to connect pipe in oil & gas applications.

## Sales, Marketing and Distribution

We sell primarily to distributors. Our distributor relationships are generally non-exclusive, but we attempt to align ourselves with key distributors in every market we serve. We believe we have the most recognized brands in the water infrastructure industry.

*Mueller Co.*

Mueller Co. sells its products, primarily through distributors, to a wide variety of end user customers, including municipalities, water and wastewater utilities, gas utilities, and fire protection and construction contractors. Sales of our products are heavily influenced by the specifications for the underlying projects. Approximately 22%, 17% and 19% of Mueller Co.'s net sales were to Canadian customers in 2010, 2009 and 2008, respectively.

At September 30, 2010, Mueller Co. had 108 sales representatives in the field and 113 inside marketing and sales professionals, as well as 88 non-employee manufacturers' representatives. In addition to calling on distributors, these representatives also call on municipalities, water companies and other end users to ensure that the products specified for their projects are our products or comparable to our products. Municipalities often require contractors to use the same products that have been historically used by that municipality.

Mueller Co.'s large installed base, broad product range and well-known brands have led to many long-standing relationships with the leading distributors in the industries we serve. Our distribution network covers all of the major locations for our products in the United States and Canada. Although we have long-term relationships with most of our top distributors, we typically do not have long-term contracts with them. Distributors are generally able to carry competitor products and we do not have written contracts with our two largest distributors. These top two distributors together accounted for approximately 31%, 31% and 36% of Mueller Co.'s gross sales in 2010, 2009 and 2008, respectively. The loss of either of these distributors could have a material adverse effect on our business. See "Item 1A. RISK FACTORS—We depend on a small group of major distributors for a significant portion of our sales."

### U.S. Pipe

U.S. Pipe sells primarily to waterworks distributors, contractors, municipalities, utilities and other governmental agencies. A substantial percentage of ductile iron pipe orders result from contracts that are bid by contractors or directly issued by municipalities or utilities. An increasing portion of ductile iron pipe sales is made through independent waterworks distributors. We maintain numerous supply depots throughout the United States to better serve our customers.

At September 30, 2010, U.S. Pipe had a sales force of 35 sales representatives.

U.S. Pipe's top customer, HDS IP Holding, LLC ("HD Supply") with whom we do not have a written contract, represented approximately 14%, 15% and 17% of U.S. Pipe's gross sales in 2010, 2009 and 2008, respectively. The loss of this customer could have a material adverse effect on our business. See "Item 1A. RISK FACTORS—We depend on a small group of major distributors for a significant portion of our sales."

*Anvil*

Anvil sells primarily to distributors who then sell the products to a wide variety of end users, including commercial contractors. At September 30, 2010, Anvil's sales force consisted of 137 sales and customer service representatives and 25 independent sales representatives. Anvil ships products primarily from four major regional distribution centers, from which we are generally able to provide 24-hour turnaround. Approximately 14%, 26% and 26% of Anvil's net sales were to Canadian customers during 2010, 2009 and 2008, respectively.

Anvil generally does not have written contracts with its distributors, although it has long-term relationships with most of its top distributors. Anvil's top three distributors together accounted for approximately 14%, 12% and 13% of Anvil's gross sales in 2010, 2009 and 2008, respectively. The loss of any one of these distributors could have a material adverse effect on our business. See "Item 1A. RISK FACTORS—We depend on a small group of major distributors for a significant portion of our sales."

Case 2:10-md-02179-CJB-JCW   Document 26297-2   Filed 10/25/19   Page 27 of 132

**Backlog**

Our backlog is not significant, except for U.S. Pipe and the Henry Pratt division of Mueller Co. Henry Pratt manufactures parts for large projects that typically require design and build specifications. The delivery lead time for parts used for these projects can be as long as nine months. Backlog for U.S. Pipe and Henry Pratt is presented below.

|  | September 30, | | | |
|---|---|---|---|---|
|  | **2010** | | **2009** | |
|  | **(in millions)** | | | |
| U.S. Pipe | $ | 27.0 | $ | 58.3 |
| Henry Pratt | | 61.3 | | 63.8 |

**Manufacturing**

See "Item 2. PROPERTIES" for a description of our principal manufacturing facilities.

We will continue to expand the use of LEAN manufacturing and Six Sigma business improvement methodologies where appropriate to capture higher levels of quality, service and operational efficiency safely.

*Mueller Co.*

At September 30, 2010, Mueller Co. operated 13 manufacturing facilities in the United States, Canada and China. Our manufacturing operations include foundry, machining, fabrication, assembly, testing and painting operations. Not all facilities perform each of these operations. Our existing manufacturing capacity is sufficient for near-term requirements. We have no current plans to expand capacity.

Mueller Co. foundries use lost foam and green sand casting techniques. We utilize lost foam technology for fire hydrant production in our Albertville, Alabama facility and for iron gate valve production in our Chattanooga, Tennessee facility. The lost foam technique has several advantages over the green sand technique for high-volume products, including a reduction in the number of manual finishing operations, lower scrap levels and the ability to reuse some of the materials. The selection of the appropriate casting technique, pattern, core-making equipment, sand and other raw materials depends on the final product and its complexity, specifications, function and production volume.

*U.S. Pipe*

At September 30, 2010, U.S. Pipe operated two facilities in the United States for manufacturing ductile iron pipe. We utilize the DeLavaud centrifugal casting process, which consists of introducing molten iron into a rapidly turning steel mold and relying on the centrifugal force to distribute molten iron around the inner surface of the mold to produce ductile iron pipe of uniform thickness. Our Bessemer facility uses more automated machinery to improve manufacturing efficiency.

Fast Fabricators operates a small number of relatively small facilities throughout the United States that primarily fabricate, coat and line ductile iron pipe.

*Anvil*

At September 30, 2010, Anvil operated nine manufacturing facilities in the United States and Canada. Our manufacturing operations include foundry, heat treating, machining, fabricating, assembling, testing and painting

operations. Not all facilities perform each of these operations. Our foundry operations employ automated vertical and horizontal green sand molding equipment. Our products are made in a high volume production environment using high-speed computer controlled machines and other automated equipment.

**Raw Materials and Purchased Components**

Our products are made using several basic raw materials, including scrap steel, scrap iron, sand, resin, brass ingot, steel pipe, coke and various purchased components. These materials have been and are expected to continue to be readily available and competitively priced.

The average scrap iron price paid by U.S. Pipe during 2010 was $317 per ton compared to $224 per ton during 2009. The average price paid during the fourth quarter of 2010 was $325 per ton. Approximately 95% of the metal content of U.S. Pipe's ductile iron pipe has been recycled.

The average price paid for brass ingot at Mueller Co. in 2010 was approximately 48% higher than the average price paid in 2009.

We can give no assurance that the price of raw materials will remain at current levels or that we will be able to increase prices to our customers to offset any future cost increases. See "Item 1A. RISK FACTORS—The costs of our raw materials or purchased components can be volatile."

**Research and Development**

Our research and development ("R&D") facilities are located in Smithfield, Rhode Island for Mueller Co. and Anvil and Bessemer, Alabama for U.S. Pipe. The primary focus of these groups is to develop new products, improve and refine existing products and obtain and assure compliance with industry approval certifications or standards (such as American Water Works Association, UL, FM and The Public Health and Safety Company). At September 30, 2010, we employed 31 people dedicated to R&D activities. We actively seek patent protection where possible to prevent copying of our proprietary products.

In order for an R&D project to begin, manufacturing, marketing and R&D personnel must agree on the suitability of the project and determine an estimated return on investment. After approval, it typically takes six to 12 months to tool, test and start production. The R&D team typically works on various products simultaneously.

R&D expenses were $8.0 million, $6.9 million and $5.7 million during 2010, 2009 and 2008, respectively.

**Patents, Licenses and Trademarks**

We have active patents and trademarks relating to the design of our products and trademarks for our brands and products. Most of the patents for technology underlying our products have been in the public domain for many years, and we do not believe third-party patents individually or in the aggregate are material to our businesses. However, we consider the pool of proprietary information, consisting of expertise and trade secrets relating to the design, manufacture and operation of our products to be particularly important and valuable. We generally own the rights to the products that we manufacture and sell and we are not dependent in any material way upon any license or franchise to operate. U.S. Pipe has granted numerous trademark licenses around the world with respect to its ductile iron pipe accessories, such as joint restraint systems. See "Item 1A. RISK FACTORS—We may not adequately prevent others from using our intellectual property."

**Seasonality**

See "Item 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS—Effect of Inflation; Seasonality" and "Item 1A. RISK FACTORS—Sales of certain of our products are seasonal."

**Competition**

The U.S. and Canadian markets for water infrastructure, flow control and piping component system products are competitive. See "Item 1A. RISK FACTORS—Our industry is very competitive and some of our products are similar to those manufactured by our competitors." However, there are only a few competitors for most of our product offerings. Many of our competitors are well-established companies with strong brand recognition. We consider our installed base, product quality, customer service level, brand recognition, price, effectiveness of distribution and technical support to be competitive strengths.

The competitive environment for Mueller Co. products is mature and most end users are slow to transition to brands other than their historically preferred brand. It is difficult to increase market share in this environment. We believe that Mueller Co. fire hydrants and valves enjoy strong competitive positions based largely on their quality, dependability, installed base and strong brand names. Our principal competitors for fire hydrants and iron gate valves are McWane, Inc. and American Cast Iron Pipe Company. The primary competitors for our brass products are The Ford Meter Box Company, Inc. and A.Y. McDonald Mfg. Co. Many brass valves are interchangeable among different manufacturers.

The ductile iron pipe industry is highly competitive with a small number of manufacturers of ductile iron pipe and fittings. Our major competitors are McWane, Inc., Griffin Pipe Products Co., Inc. and American Cast Iron Pipe Company. Additional competition for ductile iron pipe comes from pipe composed of other materials, such as PVC, high-density polyethylene ("HDPE"), concrete, fiberglass reinforced plastic and steel. Existing pipes may also be re-lined as an alternative to replacing the pipe. Although ductile iron pipe is typically more expensive to purchase than most competing forms of pipe, ductile iron pipe has the advantages of longevity, strength, ease of installation, lack of maintenance problems and environmental sustainability.

The environment for Anvil's products is highly competitive, price sensitive and vulnerable to the increased acceptance of products produced in perceived low-cost countries, such as China and India. We compete primarily on the basis of availability, service, price and breadth of product offerings. Our primary competitors in the United States are Ward Manufacturing L.L.C. for cast iron and malleable iron fittings, Victaulic Company and Tyco International Ltd. for ductile grooved fittings and ERICO International Corporation, NIBCO INC. and Carpenter & Paterson, Inc. for pipe hangers. Our mechanical and industrial customers have been slower to accept products manufactured outside the United States other than our fire protection customers.

**Environmental Matters**

We are subject to a wide variety of laws and regulations concerning the protection of the environment, both with respect to the operations at many of our properties and with respect to remediating environmental conditions that may exist at our own or other properties. We strive to comply with federal, state and local environmental laws and regulations. We accrue for environmental expenses resulting from existing conditions that relate to past operations when the costs are probable and reasonably estimable. These expenses were $4.5 million, $4.3 million and $6.8 million during 2010, 2009 and 2008, respectively. We capitalize environmental expenditures that increase the life or efficiency of long-term assets or that reduce or prevent environmental contamination. Capital expenditures for environmental requirements are anticipated to be $1.8 million during 2011. Capitalized environmental-related expenditures were $1.8 million, $3.7 million and $2.9 million during 2010, 2009 and 2008, respectively.

In September 1987, we implemented an Administrative Consent Order ("ACO") for our Burlington property, which was required under the New Jersey Environmental Cleanup Responsibility Act (now known as the Industrial Site Recovery Act). The ACO required soil and ground water cleanup, and we have completed, and have received final approval on, the soil cleanup required by the ACO. We are continuing to monitor ground water at this site. Further remediation could be required. Long-term ground water monitoring is also required to verify natural attenuation. We do not know how long ground water monitoring will be required and do not

believe monitoring or further remediation costs will have a material adverse effect on our consolidated financial condition or results of operations.

In June 2003, Solutia Inc. and Pharmacia Corporation (collectively "Solutia") filed suit against U.S. Pipe and a number of co-defendant foundry-related companies in the U.S. District Court for the Northern District of Alabama for contribution and cost recovery allegedly incurred and to be incurred by Solutia in performing remediation of polychlorinated biphenyls ("PCBs") and heavy metals in Anniston, Alabama, pursuant to a partial consent decree with the United States Environmental Protection Agency ("EPA"). U.S. Pipe and certain co-defendants subsequently reached a settlement with the EPA concerning their liability for certain contamination in and around Anniston, which was memorialized in an Administrative Agreement and Order on Consent ("AOC") that became effective in January 2006. U.S. Pipe has reached a settlement agreement whereby Phelps Dodge Industries, Inc., a co-defendant and co-respondent on the AOC, has assumed U.S. Pipe's obligation to perform the work required under the AOC.

U.S. Pipe and the other settling defendants contend that the legal effect of the AOC extinguishes Solutia's claims and they filed a motion for summary judgment to that effect. Discovery in this matter had been stayed while the motion for summary judgment was pending. In June 2008, the court issued a summary judgment order, holding that plaintiffs' claims for contribution are barred by the AOC but giving plaintiffs the right to seek to recover cleanup costs they voluntarily incurred. The court granted a motion for immediate appeal to the Eleventh Circuit Court of Appeals, but the Eleventh Circuit declined to take the appeal. The parties engaged in fact discovery in 2009, and U.S. Pipe has moved for reconsideration of the June 2008 summary judgment order that permitted plaintiffs to proceed with their claims to seek recovery of cleanup costs under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act. On July 2, 2010, the court granted summary judgment on the cost recovery claims under Section 107(a) and dismissed those remaining counts against U.S. Pipe. On July 30, 2010, plaintiffs moved to clarify or amend the court's July 2, 2010 order to permit the plaintiffs to pursue a claim under Section 107(a) to recover costs that were not incurred under any removal order or settlement. On October 29, 2010, the district court denied plaintiffs' motion. The deadline for plaintiffs to appeal that order is November 29, 2010. We continue to have no basis to form a view with respect to the probability or amount of liability in this matter.

U.S. Pipe and a number of co-defendant foundry-related companies were named in a putative civil class action case originally filed in April 2005 in the Circuit Court of Calhoun County, Alabama, and removed by defendants to the U.S. District Court for the Northern District of Alabama under the Class Action Fairness Act. The putative plaintiffs in the case filed an amended complaint with the U.S. District Court in December 2006. The amended complaint alleged state law tort claims (negligence, failure to warn, wantonness, nuisance, trespass and outrage) arising from creation and disposal of "foundry sand" alleged to contain harmful levels of PCBs and other toxins, including arsenic, cadmium, chromium, lead and zinc. The plaintiffs originally sought damages for real and personal property and for other unspecified personal injury. In June 2007, a motion to dismiss was granted to U.S. Pipe and certain co-defendants as to the claims for negligence, failure to warn, nuisance, trespass and outrage. The remainder of the complaint was dismissed with leave to file an amended complaint. On July 6, 2007, plaintiffs filed a second amended complaint, which dismissed prior claims relating to U.S. Pipe's former facility located at 2101 West 10th Street in Anniston, Alabama and no longer alleges personal injury claims. Plaintiffs filed a third amended complaint on July 27, 2007. U.S. Pipe and the other defendants have moved to dismiss the third amended complaint. In September 2008, the court issued an order on the motion, dismissing the claims for wantonness and permitting the plaintiffs to move forward with their claims of nuisance, trespass and negligence. The court has ordered the parties to mediate the dispute. The parties have reached an agreement in principle to resolve the matter and submitted the settlement agreement to the court for approval on October 26, 2010. On October 27, 2010, the court entered an order preliminarily approving the settlement and setting the settlement fairness hearing for February 17, 2011. The anticipated settlement amount has been accrued at September 30, 2010.

Case: 18-31177    Document: 00515297113    Page: 279    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 280 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26293   Filed 10/25/19   Page 280 of 332

On July 13, 2010, Rohcan Investments Limited ("Rohcan"), the former owner of property leased by Mueller Canada Ltd. and located in Milton, Ontario, filed suit against Mueller Canada Ltd. and its directors seeking C$10 million in damages arising from the defendants' alleged environmental contamination of the property and breach of lease. Mueller Canada Ltd. leased the property from 1988 through 2008. We have tendered possible liabilities that might arise from this lawsuit to a former owner responsible for liabilities arising prior to the sale of Mueller Canada Ltd. to the Company and its predecessors. Based on the allegations stated in the complaint, the former owner has denied the tender. We have no basis to form a view with respect to the probability or amount of liability in this matter.

Environmental advocacy groups, relying on standards established by California's Proposition 65, are seeking to eliminate or reduce the content of lead in water infrastructure products offered for sale in California and other jurisdictions. Some of our subsidiaries previously entered into settlement agreements with environmental advocacy groups to modify products or offer substitutes for sale in California. California Assembly Bill No. 1953 redefined, as of January 1, 2010, the term "lead free" to refer to a weighted average lead content of the wetted surface area of the pipes, fittings and fixtures of not more than 0.25%. Mueller Co. ceased shipments of brass products not complying with this standard to customers in California in 2009. Legislation to substantially restrict lead content in water infrastructure products also has been introduced in the U.S. Congress. Congress or state jurisdictions may enact similar legislation to restrict the content of lead in products, which could require us to incur additional costs to modify our products. Although Mueller Co. now produces "lead free" brass products, most of Mueller Co.'s brass products contain small amounts of lead.

In March 2004, Anvil entered into a Consent Order with the Georgia Department of Natural Resources regarding alleged hazardous waste violations at Anvil's former foundry facility in Statesboro, Georgia. Pursuant to the Consent Order, we agreed to perform various investigatory and remedial actions at our former foundry and landfill. These costs have been accrued at September 30, 2010.

Some of our subsidiaries have been named as defendants in asbestos-related lawsuits. We do not believe these lawsuits, either individually or in the aggregate, are material to our consolidated financial position or results of operations.

No assurance can be given that we will not be required in the future to make material expenditures relating to environmental laws or legally mandated site cleanup. Except for the foregoing, we are not aware of compliance or cleanup costs associated with the current laws and sites for which we have cleanup liability or any other future sites that are likely to have a material adverse effect on our financial condition or results of operations.

In the acquisition agreement pursuant to which a predecessor to Tyco International Ltd. ("Tyco") sold our Mueller Co. and Anvil businesses to the prior owners of these businesses in August 1999, Tyco agreed to indemnify us and our affiliates, among other things, for all "Excluded Liabilities." Excluded Liabilities include, among other things, substantially all liabilities relating to the time prior to August 1999, including environmental liabilities. The indemnity survives indefinitely. In addition, Tyco's indemnity does not cover liabilities to the extent caused by us or the operation of our businesses after August 1999, nor does it cover liabilities arising with respect to businesses or sites acquired after August 1999. In June 2007, Tyco was separated into three separate publicly traded companies. Should Tyco's successors become financially unable or fail to comply with the terms of the indemnity, we may be responsible for such obligations or liabilities.

See "Item 3. LEGAL PROCEEDINGS".

Case: 18-31177     Document: 00515297113     Page: 280     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 281 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26247-3   Filed 10/25/19   Page 26 of 32

**Safety**

We continuously strive to reduce injuries at our properties. In 2010, our total recordable injury rate decreased by 13% to 2.3 injuries per 100 employees and our days away from work rate decreased by 15% to 0.4 cases per 100 employees, each compared to 2009. This resulted in 18 fewer injuries and two fewer days away from work cases in 2010 compared to 2009.

**Regulatory Matters**

The production and marketing of our products is subject to the rules and regulations of various federal, state and local agencies, including laws governing our relationships with distributors. Regulatory compliance has not had a material effect on our results to date. We are not aware of any pending legislation that is likely to have a material adverse effect on our operations. See "Item 3. LEGAL PROCEEDINGS," and "Item 1A. RISK FACTORS—Some of our brass products contain lead, which may be replaced in the future."

**Employees**

At September 30, 2010, we employed approximately 4,800 people, of whom approximately 93% work in the United States. At September 30, 2010, approximately 69% of our hourly workforce was covered by collective bargaining agreements. Our locations with employees covered by such agreements are presented below.

| Location | Expiration of current agreement(s) |
| --- | --- |
| Albertville, AL | September 2011 |
| Bessemer, AL | October 2010* |
| Union City, CA | December 2010 |
| Aurora, IL | August 2011 |
| Decatur, IL | June 2012 |
| University Park, IL | April 2014 |
| Burlington, NJ | March 2011 |
| Columbia, PA | May 2011 |
| Chattanooga, TN | September 2013 and September 2014 |
| Henderson, TN | December 2011 |
| St. Jerome, Canada | November 2011 |
| Simcoe, Canada | November 2013 |

We believe that relations with our employees, including those represented by collective bargaining agreements, are good.

* As of the date of this annual report, employees at this location continue to work under the terms of the expired agreement while negotiations are ongoing.

**Geographic Information**

Geographical net sales information is presented below.

| | United States | Canada | Other | Total |
| --- | --- | --- | --- | --- |
| | | (in millions) | | |
| Net sales: | | | | |
| 2010 | $1,109.0 | $186.3 | $42.2 | $1,337.5 |
| 2009 | 1,184.1 | 215.8 | 28.0 | 1,427.9 |
| 2008 | 1,543.8 | 292.3 | 23.2 | 1,859.3 |

## Item 1A.  RISK FACTORS

**Risks Relating to Our Businesses**

*Our end markets are subject to economic cycles.*

Our primary end markets in 2010 were the repair and replacement of municipal water distribution and treatment systems, non-residential construction and new water and wastewater infrastructure, which is dependent on residential construction associated with new community developments. Sustained uncertainty about these end markets could cause our distributors and our end use customers to delay purchasing, or determine not to purchase, our products. For example, our distributors and end customers may have been approaching their near-term spending decisions with caution given the uncertain economic climate. In addition, other factors, including high levels of unemployment and foreclosures, interest rate fluctuations, fuel and other energy costs, labor and healthcare costs, the state of credit markets (including mortgages, home equity loans and consumer credit), weather, natural disasters and other factors beyond our control, could adversely affect our sales, profitability and cash flows.

*Water and wastewater infrastructure spending construction activity may further decline.*

A portion of our business depends on local, state and federal spending on water and wastewater infrastructure upgrade, repair and replacement. A significant percentage of our products are ultimately used by municipalities or other governmental agencies in water transmission, distribution, collection and treatment systems.

A February 2010 report of the U.S. Conference of Mayors estimates that state and local government funding generally provides 98% of the total investment in public water and wastewater systems. Funds for water infrastructure repair and replacement typically come from local taxes or water rates and the ability of state and local governments to increase taxes or water rates may be limited. In addition, state and local governments that do not budget for capital expenditures in setting tax rates and water rates may be unable to pay for water infrastructure repair and replacement if they do not have other funding sources. It is not unusual for water projects to be delayed and rescheduled for a number of reasons, including changes in project priorities and difficulties in complying with environmental and other governmental regulations.

Some state and local governments have placed or may place significant restrictions on the use of water by their constituents. These water use restrictions have or may similarly lead to reduced water revenues by municipalities or other governmental agencies, which could similarly affect funding decisions for water-related projects.

Economic conditions may cause states and municipalities to receive lower than anticipated revenues, which may lead to reduced or delayed funding for water infrastructure projects. Even if favorable economic conditions exist, state and local governments may choose not to address deferred infrastructure needs among competing spending priorities.

As a result, our sales, profitability and cash flows could decline as a result of decreases in the number of projects undertaken by water agencies, government spending cuts, general budgetary constraints, difficulty in obtaining necessary permits or the inability of customers or end users to obtain financing.

*Non-residential construction activity may face continued reductions in demand.*

A portion of our business depends on non-residential construction, which is cyclical. Non-residential construction activity has declined significantly in 2010 and a continued reduction in non-residential construction could result in a decline in our sales, profitability and cash flows.

Case: 18-31177     Document: 00515297113     Page: 282     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 283 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26052-3   Filed 12/15/20   Page 283 of 332

*New residential construction activity may face continued reductions in demand.*

A portion of our business depends on new water and wastewater infrastructure spending, which in turn depends on residential construction, which is cyclical, and has historically represented a significant portion of our profitability and cash flows. Since January 2006, there have been steep declines in the construction of new homes in the United States, which has adversely affected our sales, profitability and cash flows. The disruption in the financial markets late in calendar 2008 exacerbated these declines. Independent forecasts of housing starts do not project a substantial near-term recovery in residential construction. Our residential construction related business recovery may lag any recovery in new home construction. A continued reduction in new residential construction activity or a failure of this market to recover substantially may continue to affect our sales, profitability and cash flows adversely.

*We depend on a small group of major distributors for a significant portion of our sales.*

We sell our products primarily to distributors and our success depends on these outside parties operating their businesses profitably and effectively. Their effectiveness can vary significantly from company to company and among regional groups served by the same company. Further, our distributors generally also carry competing products. We may fail to align our businesses with the most successful distributors in any market. For some of our products, we may have relationships with multiple distributors in a single market, or may use a national distributor in one market and a different national distributor in another market.

Approximately 33% of our 2010 gross sales were to our 10 largest distributors, and approximately 24% of our 2010 gross sales were to our three largest distributors: HD Supply, Ferguson Enterprises, Inc. and Mainline Supply Company. In 2010, HD Supply accounted for 15% and 14% of gross sales for Mueller Co. and U.S. Pipe, respectively.

While our relationships with our 10 largest distributors have been long-lasting, distributors in our industry have experienced consolidation in recent years. If such consolidation continues, our distributors could be acquired by other distributors who buy products from our competitors. Pricing pressure may also result if consolidation among distributors continues, which could lead to a decline in our sales, profitability and cash flows. The loss of any one of our major distributors in any market could also reduce our sales, profitability and cash flows.

*Sales of certain of our products are seasonal.*

Sales of some of our products, including ductile iron pipe, valves and fire hydrants are seasonal, with lower sales in our first and second quarters when weather conditions throughout most of North America tend to be cold resulting in lower levels of construction activity. In general, approximately 45% of a year's net sales occurs in the first half of the year with 55% occurring in the second half of the year. This seasonality in demand has resulted in fluctuations in our sales and operating results. In order to satisfy demand during expected peak periods, we may incur costs associated with inventory build-up, and our projections as to future needs may not be accurate. Because many of our expenses are fixed, seasonal trends can cause reductions in our profitability and profit margins and deterioration of our financial condition during periods affected by lower production or sales activity.

*Our business strategy partly depends upon executing current and future cost-control measures successfully.*

Part of our business strategy is to enhance our profitability by realizing cost savings. We have taken steps in recent years to lower our costs by reducing staff, compensation and employee benefits and implementing general cost-control measures, and we expect to continue some of these cost-control efforts for the foreseeable future. Our total operating costs may be greater than anticipated if we do not achieve the expected savings from, or if our operating costs increase as a result of, these initiatives. Reductions in staff, compensation and benefits could

Case: 18-31177    Document: 00515297113    Page: 283    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 284 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26267-3   Filed 10/25/19   Page 26 of 132

also adversely affect our ability to attract and retain key employees and directors. In addition, we operate with significant operating leverage. A significant portion of our expenses consists of fixed costs. As a result, we are limited in our ability to reduce costs in the short term. If we are unable to execute our current and future cost control measures successfully, our total operating costs would be greater than expected, which would adversely affect our profitability and cash flows.

### Our industry is very competitive and some of our products are similar to those manufactured by our competitors.

The U.S. and Canadian markets for water infrastructure, flow control and piping component system products are very competitive. While there are only a few competitors for most of our offerings, many of our competitors are well-established companies with strong brand recognition. We compete on the basis of a variety of factors, including the quality and price of our products and services. Anvil's products in particular also compete on availability and breadth of product and are sold in fragmented markets with low barriers to entry. Our ability to retain our customers in the face of competition depends on our ability to market our products and services to our customers effectively. Also, competition for ductile iron pipe sold by U.S. Pipe comes not only from ductile iron pipe produced by a concentrated number of other manufacturers, but also from pipe composed of other materials, such as PVC, HDPE, concrete, fiberglass reinforced plastic and steel.

In addition to competition from U.S. companies, we face the threat of competition from companies from other countries. The intensity of competition from these companies is affected by fluctuations in the value of the U.S. dollar against their local currencies, by the cost to ship competitive products into North America and by the availability of trade remedies. Competition may also increase as a result of U.S. competitors shifting their operations to low-cost countries or otherwise reducing their costs.

Our competitors may reduce the prices of their products or services, improve their quality, improve their functionality or enhance their marketing or sales activities. Any of these potential developments could adversely affect our sales, profitability and cash flows.

### The costs of our raw materials and purchased components can be volatile.

Our operations require substantial amounts of raw materials or purchased components, such as scrap steel, scrap iron, sand, resin brass ingot, steel pipe and coke. The cost and availability of these materials are subject to economic forces largely beyond our control, including North American and international demand, foreign currency exchange rates, freight costs and speculation. We generally purchase raw materials at current market costs and any hedging activities are small in relation to total purchases. We may not be able to pass on the entire cost of price increases for raw materials and purchased components to our customers or offset fully the effects of these higher costs through productivity improvements. In particular, when raw material and purchased component costs increase rapidly or to significantly higher than normal levels, we may not be able to pass cost increases through to our customers on a timely basis, if at all, which would reduce our profitability and cash flows. In addition, if raw materials or purchased components were not available, that would reduce our sales, profitability and cash flows. Our competitors could operate better under such changing market conditions than we do, which would give them a cost advantage compared to us.

### We partially rely on the labor of individuals represented by collective bargaining agreements to produce and distribute our goods.

We are subject to a risk of work stoppages and other labor relations matters because a large portion of our hourly workforce is represented by collective bargaining agreements. At September 30, 2010, approximately 69% of our hourly workforce was covered by these agreements. These employees are represented by locals from six different unions, including the Glass, Molders, Pottery, Plastics and Allied Workers International Union, which represents the largest number of our employees. If we are unable to negotiate acceptable new agreements

Case: 18-31177     Document: 00515297113     Page: 284     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 285 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26047-2   Filed 10/25/19   Page 36 of 132

with the unions representing our employees upon expiration of existing contracts, we could experience strikes, work stoppages or other forms of labor slowdowns. Such actions could cause a significant disruption of operations at our facilities, which could have an adverse impact on us. New agreements with unions representing our employees could call for higher wages or benefits paid to union members, which would increase our operating costs. Labor costs are a significant element of the total costs involved in our manufacturing process, and an increase in the costs of labor could reduce sales, profitability and cash flows.

In addition, the freight companies that deliver our products to our customers generally use truck drivers represented by collective bargaining agreements, and our businesses could be harmed if these truck drivers face work stoppages or support other work stoppages.

### *Normal operations at our key manufacturing facilities may be interrupted.*

Some of our key products, including fire hydrants, valves and ductile iron pipe, are manufactured at large manufacturing facilities that depend on critical pieces of heavy equipment that cannot be economically moved to other locations. We are therefore limited in our ability to shift production between locations. The operations at our manufacturing facilities may be interrupted or impaired by various operating risks, including, but not limited to:

- catastrophic events, such as fires, explosions, natural disasters or other similar occurrences;
- interruptions in the delivery of raw materials or other manufacturing inputs;
- adverse government regulations;
- equipment breakdowns or failures;
- information systems failures;
- violations of our permit requirements or revocation of permits;
- releases of pollutants and hazardous substances to air, soil, surface water or ground water;
- shortages of equipment or spare parts;
- labor disputes; and
- terrorist acts.

The occurrence of any of these events may impair our production capabilities and adversely affect our sales, profitability and cash flows.

### *Some of our brass products contain lead, which may be replaced in the future.*

Several states restrict the use of lead in water infrastructure products. In addition, California and other state legislatures have in recent years enacted laws that impose further restrictions on products used in water transmission and otherwise. Legislation to substantially restrict lead content in water infrastructure products also has been passed by the U.S. House of Representatives and introduced in the U. S. Senate.

Future legislation could further restrict the permitted amount of lead or other materials in products we sell. Complying with new restrictions could increase our manufacturing costs or influence our decisions regarding which markets to serve.

### *Transportation costs are relatively high for most of our products.*

Transportation costs are an important factor in a customer's purchasing decision. Increases in transportation costs could make our products less competitive with the same or alternative products from competitors.

We typically depend on rail, barge and trucking systems to deliver our products to customers. While our customers typically arrange and pay for transportation from our factory to the point of use, disruption of these

Case: 18-31177     Document: 00515297113     Page: 285     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 286 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26292-3   Filed 10/25/19   Page 33 of 132

transportation services because of weather-related problems, strikes, lock-outs or other events could temporarily impair our ability to supply our products to our customers, thereby resulting in lost sales, profitability and cash flows.

### We manage our business as a decentralized organization.

We have three business segments and operate under a decentralized organizational structure. Our operations have different business practices, accounting policies, internal controls, procedures and compliance programs. We continue to communicate such policies, controls, procedures and programs and it could take time for such implementation to be complete. Further, we may need to modify existing programs and processes to increase efficiency and operating effectiveness and improve corporate visibility into our decentralized operations. We also regularly update compliance programs and processes to comply with existing laws, new interpretations of existing laws and new laws, and we may not implement those modifications effectively. It could take time for any such modifications to be implemented across our operations. During the implementation periods, our decentralized operating approach could result in inconsistent management practices and procedures, which could adversely affect our businesses. Once achieved, it may also be difficult to maintain operational consistency across our businesses.

### We may be unsuccessful in identifying, acquiring or integrating suitable acquisitions.

A part of our growth strategy depends on expansion through acquisitions of businesses that can be integrated successfully into our existing businesses and that will provide us with complementary manufacturing capabilities, products, services, customers or end users. Any future growth through acquisitions will depend on the availability of suitable acquisition candidates at favorable prices and on satisfactory terms and conditions. In addition, if we identify a suitable acquisition candidate, our ability to complete the acquisition will depend on a variety of factors, including our ability to finance the acquisition. Our ability to finance an acquisition is subject to a number of factors, including the availability of adequate cash, cash flows from operations or acceptable financing terms and the availability of financing under our existing debt agreements. Moreover, other companies, some of which may have substantially greater financial resources, may compete with us for the right to acquire such businesses, and these companies may be able to offer better terms for an acquisition than we can offer. In addition, there may be many challenges to integrating acquired businesses into our Company, including eliminating redundant operations, facilities and systems, coordinating management and personnel, retaining key employees, managing different corporate cultures and achieving cost reductions and cross-selling opportunities. We may not be able to meet these challenges.

### We may not adequately prevent others from using our intellectual property.

Our businesses depend on our technology and expertise, which is largely developed internally and not subject to statutory protection. We rely on a combination of patent protection, copyright and trademark laws, trade secrets protection, employee and third party confidentiality and nondisclosure agreements and technical measures to protect our intellectual property rights. The measures that we take to protect our intellectual property rights may not adequately deter infringement, misappropriation or independent third-party development of our technology, and they may not prevent an unauthorized third party from obtaining or using information or intellectual property that we regard as proprietary or keep others from using brand names similar to our own. The disclosure, misappropriation or infringement of our intellectual property could harm our competitive position. In addition, our actions to enforce our rights may result in substantial costs and diversion of management and other resources. We may also be subject to intellectual property infringement claims from time to time, which may result in our incurring additional expenses and diverting our resources to respond to these claims.

*We have a significant amount of debt and we may not be able to increase our borrowings.*

At September 30, 2010, our total debt was $692.2 million compared to total assets of $1,568.2 million and total stockholders' equity of $405.3 million. We may have a need or desire to incur significant additional debt from time to time. The level of our debt could limit our ability to obtain additional debt financing in the future for working capital, capital expenditures, acquisitions or other purposes.

*We may not be able to generate sufficient cash flows from operating activities to service all of our debt.*

There is a risk that our businesses will not generate sufficient cash flows from operating activities, that anticipated revenue growth and operating improvements will not be realized or that future borrowings may not be available to us in an amount sufficient to enable us to pay our debt or to fund our other liquidity needs. We may not maintain a level of liquidity from operating activities sufficient to permit us to pay the principal and interest on our debt.

If our cash flows and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce investments and capital expenditures, sell assets, seek additional capital, restructure or refinance our debt. However, we may not be able to accomplish these actions on satisfactory terms, or at all. In addition, these actions, if accomplished, could adversely affect the operation and growth of our businesses and may not permit us to meet our debt service obligations.

*Certain of our debt instruments contain restrictive covenants.*

Our debt instruments contain various covenants that limit our ability to engage in certain transactions. The indentures governing our notes restrict our ability to, among other things, borrow money or issue preferred stock, pay dividends, make certain types of investments and other restricted payments, create liens, restrict dividend payments or other payments from subsidiaries, sell certain assets or merge with or into other companies, engage in sale and leaseback transactions and enter into certain transactions with affiliates. Our asset based lending agreement also requires the maintenance of a specified financial ratio when the excess availability is below a specified level.

Our ability to satisfy the financial ratio or other covenants can be affected by events beyond our control, and we may not meet those tests. A breach of any of these covenants could result in a default under our debt instruments. If an event of default were not remedied timely, the holders of our applicable debt would be able to declare the debt immediately due and payable; certain events of default cannot be remedied. Upon the occurrence of an event of default under our asset based lending agreement, the lenders could also terminate all commitments to extend further credit. If we were unable to repay those amounts, the lenders could proceed against the collateral granted to them to secure the debt under our asset based revolving credit agreement. We have pledged all of our U.S. receivables, inventories and certain other assets as security under our asset based lending agreement. If any lender is entitled to accelerate the repayment of borrowings, we may not have sufficient assets to repay these obligations.

*Our ability to borrow money may be impacted by changes in our credit ratings or macroeconomic conditions.*

Our cost of borrowing and ability to access the capital markets are affected not only by market conditions but also by the short- and long-term debt ratings assigned to our debt by major credit rating agencies. These ratings are based, in significant part, on our performance as measured by credit metrics, such as interest coverage and leverage ratios. Our Senior Unsecured Notes and Senior Subordinated Notes are each rated by Standard & Poor's and Moody's Investors Service and both series of notes are rated below investment grade by both rating agencies. Any future borrowings will reflect the impact of these ratings, and additional reductions in our credit

ratings could reduce our access to credit markets, make new borrowings more expensive, subject us to more onerous terms and reduce our borrowing flexibility. Such limitations on our financing options may affect our ability to refinance existing debt or fund major acquisitions or capital-intensive internal initiatives.

In addition, deteriorating economic conditions, including a recession, market disruptions, tightened credit markets and significantly wider corporate borrowing spreads, may make it more difficult or costly for us to finance significant transactions or obtain replacement financing for our existing debt.

***Our expenditures for postretirement benefits and pension obligations are significant and could be materially higher than we have predicted if our underlying assumptions prove to be incorrect.***

We provide a range of benefits to our current and retired employees, including pensions and postretirement healthcare. In determining our future payment obligations under the plans, we assume certain rates of return on the plan assets and growth rates of certain costs. We contributed $23.0 million, $24.0 million and $20.3 million for 2010, 2009 and 2008, respectively, to our pension plans. At September 30, 2010, the market value of our pension plan assets was approximately $313.1 million. The Pension Protection Act of 2006 ("PPA") generally targets U.S. plans to be fully funded by 2015. At September 30, 2010, our PPA-defined funded status was approximately 87%.

Assumed discount rates, expected return on plan assets, expected compensation increases and estimated healthcare cost trend rates have a significant effect on the amounts reported for the pension and healthcare plans. We expect that healthcare costs will increase generally at a rate above the rate of inflation. Our actual cost growth rates could be materially higher than projected. Further, significant adverse changes in credit and capital markets could result in actual rates of return on plan assets being materially lower than projected. As a result, we may be required to increase the amount of cash contributions we make into our pension plans and other plans in the future in order to meet funding level requirements. If adverse changes in credit and capital markets are particularly significant and sustained, our overall liquidity could be materially reduced, which could force us to reduce investments and capital expenditures, sell assets, seek additional capital or restructure or refinance our debt.

***We are subject to the newly adopted healthcare legislation.***

We provide a range of benefits to our current and retired employees, including healthcare coverage. In March 2010, the Patient Protection and Affordable Care Act and a reconciliation measure, the Health Care and Education Act of 2010 (collectively, the "Healthcare Reform Legislation") were signed into law in the United States. Provisions of the Healthcare Reform Legislation become effective at various dates over the next several years and a number of additional steps are required to implement these requirements, including further guidance and clarification in the form of implementing regulations. Due to the complexity of the Healthcare Reform Legislation, the pending status of implementing regulations and lack of interpretive guidance, and gradual implementation, the higher costs resulting from the Healthcare Reform Legislation on our business are not yet fully known and may not be known for several years.

***We may be subject to product liability or warranty claims.***

We are exposed to product liability, warranty and other claims in the event that the use of our products results, or is alleged to result in, bodily injury or property damage. We could incur product liability or warranty losses in the future, along with the related expenses to defend such claims, and such losses and expenses may be material and completely independent of the value of the underlying product or service. In some cases, replacement of our products can involve significant excavation and labor costs.

While we maintain product liability insurance, our product liability insurance coverage may not be adequate for liabilities that may ultimately be incurred or the coverage may not continue to be available on terms

Case: 18-31177    Document: 00515297113    Page: 288    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 289 of 1003
Case 2:10-md-02179-CJB-JCW   Document 25627-3   Filed 10/25/18   Page 389 of 132

acceptable to us. A successful product liability claim brought against us in excess of our available insurance coverage could require us to make significant payments or a requirement to participate in a product recall may harm our reputation.

### We rely on successors to Tyco to indemnify us for certain liabilities and they may become financially unable or fail to comply with the terms of the indemnity.

Under the terms of the acquisition agreement relating to the August 1999 sale by Tyco of the Mueller Co. and Anvil businesses to the prior owner of these businesses, we are indemnified by Tyco for all liabilities arising in connection with the operation of these businesses prior to their sale by Tyco, including with respect to products manufactured or sold prior to the closing of that transaction. The indemnity survives forever and is not subject to any dollar limits. In the past, Tyco has made substantial payments and/or assumed defense of claims pursuant to this indemnification provision. In addition, Tyco's indemnity does not cover product liabilities to the extent caused by our products manufactured after the date of that transaction. In June 2007, Tyco was separated into three separate publicly traded companies. Should any of Tyco's successors become financially unable or fail to comply with the terms of the indemnity, we may be responsible for such obligations or liabilities. See "Item 3. LEGAL PROCEEDINGS" for more information about our potential product liabilities.

### We are subject to complex corporate governance, public disclosure and accounting requirements.

We are subject to changing rules and regulations of federal and state government, as well as the stock exchange on which our common stock is listed. These entities, including the Public Company Accounting Oversight Board ("PCAOB"), the Securities and Exchange Commission ("SEC") and the New York Stock Exchange, have issued a significant number of new and increasingly complex requirements and regulations over the course of the last several years and continue to develop additional regulations and requirements in response to laws enacted by the U.S. Congress. For example, the Sarbanes-Oxley Act of 2002 and the rules and regulations subsequently implemented by the SEC and the PCAOB imposed and may impose compliance burdens and costs on us. Also, in July 2010, the Dodd-Frank Wall Street Reform and Protection Act (the "Dodd-Frank Act") was signed into law. The Dodd-Frank Act includes significant corporate governance and executive compensation-related provisions that require the SEC to adopt additional rules and regulations in these areas, such as say-on-pay and proxy access. Our efforts to comply with new requirements of law and regulation are likely to result in an increase in expenses and a diversion of management's time from other business activities. Also, those laws, rules and regulations may make it more difficult and expensive for us to attract and retain key employees and members of our Board of Directors and to maintain director and officer liability insurance, and we may be required to accept reduced coverage or incur substantially higher costs to maintain coverage.

### We may be subject to any new governmental legislation or regulation relating to carbon dioxide emissions.

Certain of our manufacturing plants use significant amounts of electricity and natural gas and certain of our plants emit significant amounts of carbon dioxide. Federal and state courts and administrative agencies are considering the scope and scale of carbon dioxide emission regulation under various laws pertaining to the environment, energy use and development and greenhouse gas emissions. For example the EPA has begun promulgating regulations governing carbon emissions. Additionally, the U.S. House of Representatives has passed legislation that would regulate carbon dioxide emissions through a cap-and-trade system, under which emitters would be required to buy allowances to offset emissions of carbon dioxide. Similar legislation has been introduced in the U.S. Senate. In addition, several states are considering various carbon dioxide registration and reduction programs. Final carbon dioxide legislation or regulation could increase the price of the electricity we purchase, increase costs for our use of natural gas, restrict access to or the use of natural gas or require us to purchase allowances to offset our own emissions. Further, federal, state and local governments may also pass laws mandating the use of alternative energy sources, such as wind and solar, which may increase the cost of energy used in our operations. The final details and scope of these legislative and regulatory measures are unclear, and their potential to increase our costs remains uncertain.

Case: 18-31177     Document: 00515297113     Page: 289     Date Filed: 02/04/2020

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 290 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26267-3   Filed 10/25/19   Page 390 of 1003

The potential physical impacts of climate change on our operations are highly uncertain. The EPA has found that global climate change could increase the severity and possibly the frequency of severe weather patterns, such as hurricanes. Although the financial impact of these potential changes is not reasonably estimable at this time, our operations in certain locations and those of our customers and suppliers could potentially be adversely affected. These effects could adversely affect our financial performance.

### *We are subject to environmental, health and safety laws and regulations.*

We are subject to various laws and regulations relating to the protection of the environment and human health and safety and must incur capital and other expenditures to comply with these requirements. Failure to comply with any environmental, health or safety requirements could result in the assessment of damages, the imposition of penalties, suspension of production, changes to equipment or processes or a cessation of operations at our facilities. Because these laws are complex, subject to change and may be applied retroactively, these requirements, in particular as they change in the future, may impair our sales, profitability and cash flows.

In addition, we incurred costs to comply with the National Emissions Standards for Hazardous Air Pollutants issued by the EPA for iron and steel foundries and for our foundries' painting operations. We may be required to conduct investigations and perform remedial activities that could require us to incur material additional costs in the future. Our operations involve the use of hazardous substances and the disposal of hazardous wastes. We may incur additional costs to manage these substances and wastes, and we may be subject to claims for damage for personal injury, property damage or damage to natural resources.

U.S. Pipe has been identified as a potentially responsible party liable under federal environmental laws for a portion of the cleanup costs with regard to two sites and is currently subject to an administrative consent order requiring certain monitoring and cleanup with regard to a property in New Jersey. Such cleanup costs could be substantial and could adversely affect our profitability and cash flows in any given reporting period. For more information about our environmental compliance and potential environmental liabilities, see "Item 1. BUSINESS—Environmental Matters."

## Risks Relating to Our Relationship with Walter Energy

### *We may have substantial additional liability for federal income tax allegedly owed by Walter Energy.*

Each member of a consolidated group for federal income tax purposes is severally liable for the federal income tax liability of each other member of the consolidated group for any year in which it is a member of the group at any time during such year. Each member of the Walter Energy consolidated group, which included us (including our subsidiaries) through December 14, 2006, is also jointly and severally liable for pension and benefit funding and termination liabilities of other group members, as well as certain benefit plan taxes. Accordingly, we could be liable under such provisions in the event any such liability is incurred, and not discharged, by any other member of the Walter Energy consolidated group for any period during which we were included in the Walter Energy consolidated group.

A dispute exists with regard to federal income taxes for years 1980 to 1994 and 1999 to 2001 allegedly owed by the Walter Energy consolidated group, which included U.S. Pipe during these periods. As a matter of law, we are jointly and severally liable for any final tax determination, which means that in the event Walter Energy is unable to pay any amounts owed, we would be liable.

### *The tax allocation agreement between us and Walter Energy allocates to us certain tax risks associated with the Spin-off.*

Walter Energy effectively controlled all of our tax decisions for periods during which we were a member of the Walter Energy consolidated federal income tax group and certain combined, consolidated or unitary state and

local income tax groups. Under the terms of the income tax allocation agreement between us and Walter Energy dated May 26, 2006, we generally compute our tax liability on a stand-alone basis, but Walter Energy has sole authority to respond to and conduct all tax proceedings (including tax audits) relating to our federal income and combined state returns, to file all such returns on our behalf and to determine the amount of our liability to (or entitlement to payment from) Walter Energy for such periods. This arrangement may result in conflicts of interests between us and Walter Energy. In addition, the tax allocation agreement provides that if the Spin-off is determined not to be tax-free pursuant to Section 355 of the Internal Revenue Code of 1986, as amended, we generally will be responsible for any taxes incurred by Walter Energy or its shareholders if such taxes result from certain of our actions or omissions and for a percentage of any such taxes that are not a result of our actions or omissions or Walter Energy's actions or omissions or taxes based on our market value relative to Walter Energy's market value. Additionally, to the extent that Walter Energy was unable to pay taxes, if any, attributable to the Spin-off and for which it is responsible under our tax allocation agreement, we could be liable for those taxes as a result of being a member of the Walter Energy consolidated group for the year in which the Spin-off occurred. Walter Energy's income tax returns for the year in which the Spin-off occurred are still open for federal examination.

**Item 1B.   UNRESOLVED STAFF COMMENTS**

None.

**Item 2.    PROPERTIES**

Our principal properties are listed below.

| Location | Activity | Size (sq. ft.) | Owned or leased |
|---|---|---|---|
| Mueller Co.: | | | |
| Albertville, AL | Manufacturing | 422,481 | Leased |
| Ontario, CA | Distribution | 72,994 | Leased |
| Aurora, IL | Manufacturing | 146,880 | Owned |
| Decatur, IL | Manufacturing and selling, general and administration | 467,044 | Owned |
| Hammond, IN | Manufacturing | 51,160 | Owned |
| Cleveland, NC | Manufacturing | 190,000 | Owned |
| Bethlehem, PA | Manufacturing | 104,000 | Leased |
| Chattanooga, TN | Manufacturing | 525,000 | Owned |
| Cleveland, TN | Manufacturing | 40,000 | Owned |
| Murfreesboro, TN | Manufacturing | 11,400 | Owned |
| Murfreesboro, TN | Manufacturing | 12,000 | Leased |
| Brownsville, TX | Manufacturing | 50,000 | Leased |
| Calgary, Alberta | Distribution | 11,000 | Leased |
| Barrie, Ontario | Distribution | 50,000 | Leased |
| St. Jerome, Quebec | Manufacturing | 55,000 | Owned |
| Jingmen, China | Manufacturing | 154,377 | Owned |
| | | | |
| U.S. Pipe: | | | |
| Bessemer, AL | Manufacturing | 962,000 | Owned |
| Birmingham, AL | Selling, general and administration | 66,000 | Owned |
| Union City, CA | Manufacturing | 139,000 | Owned |
| Burlington, NJ | Distribution | 158,289 | Owned |
| | | | |
| Anvil: | | | |
| University Park, IL | Distribution | 192,000 | Leased |
| Sparks, NV* | Distribution | 124,500 | Leased |
| Portsmouth, NH | Selling, general and administration | 13,740 | Leased |
| Columbia, PA | Manufacturing | 663,119 | Owned |
| Greencastle, PA | Manufacturing | 132,743 | Owned |
| Pottstown, PA* | Manufacturing | 46,000 | Owned |
| Waynesboro, PA | Manufacturing | 72,836 | Owned |
| North Kingstown, RI | Manufacturing | 170,822 | Leased |
| Henderson, TN | Manufacturing | 167,700 | Owned |
| Houston, TX | Manufacturing and distribution | 57,600 | Owned |
| Houston, TX | Manufacturing | 46,934 | Owned |
| Irving, TX | Distribution | 218,400 | Leased |
| Longview, TX | Manufacturing | 114,000 | Owned |
| Simcoe, Ontario | Distribution | 126,090 | Owned |
| Montreal, Quebec | Distribution | 36,559 | Leased |
| | | | |
| Corporate | | | |
| Atlanta, GA | Corporate headquarters | 24,728 | Leased |

* Subsequent to September 30, 2010, the facility at Sparks, NV was combined with the facility at Ontario, CA.
  The facility at Pottstown, PA was combined with the facilities at Greencastle, PA and Waynesboro, PA.

We consider our facilities to be well maintained and believe we have sufficient capacity to meet our anticipated needs through 2011. Our leased properties have terms expiring at various dates through August 2019.

## Item 3.    LEGAL PROCEEDINGS

We are involved in various legal proceedings that have arisen in the normal course of operations, including the proceedings summarized below. The effect of the outcome of these matters on our future results of operations cannot be predicted with certainty as any such effect depends on future results of operations and the amount and timing of the resolution of such matters. Other than the litigation described below, we do not believe that any of our outstanding litigation would have a material adverse effect on our businesses, operations or prospects.

*Environmental.*  We are subject to a wide variety of laws and regulations concerning the protection of the environment, both with respect to the operations at many of our properties and with respect to remediating environmental conditions that may exist at our own or other properties. We strive to comply with federal, state and local environmental laws and regulations. We accrue for environmental expenses resulting from existing conditions that relate to past operations when the costs are probable and reasonably estimable. These expenses were $4.5 million, $4.3 million and $6.8 million during 2010, 2009 and 2008, respectively. We capitalize environmental expenditures that increase the life or efficiency of long-term assets or that reduce or prevent environmental contamination. Capital expenditures for environmental requirements are anticipated to be approximately $1.8 million during 2011. Capitalized environmental-related expenditures were $1.8 million, $3.7 million and $2.9 million during 2010, 2009 and 2008, respectively.

In September 1987, we implemented an Administrative Consent Order ("ACO") for our Burlington property, which was required under the New Jersey Environmental Cleanup Responsibility Act (now known as the Industrial Site Recovery Act). The ACO required soil and ground water cleanup, and we have completed, and have received final approval on, the soil cleanup required by the ACO. U.S. Pipe continues to pump and treat ground water at this site. Further remediation could be required. Long-term ground water monitoring is also required to verify natural attenuation. We do not know how long ground water monitoring will be required, and do not believe monitoring or further remediation costs, if any, will have a material adverse effect on our financial condition or results of operations.

In June 2003, Solutia Inc. and Pharmacia Corporation (collectively "Solutia") filed suit against U.S. Pipe and a number of co-defendant foundry-related companies in the U.S. District Court for the Northern District of Alabama for contribution and cost recovery allegedly incurred and to be incurred by Solutia in performing remediation of polychlorinated biphenyls ("PCBs") and heavy metals in Anniston, Alabama, pursuant to a partial consent degree with the Environmental Protection Agency ("EPA"). U.S. Pipe and certain co-defendants subsequently reached a settlement with the EPA concerning their liability for certain contamination in and around Anniston, which was memorialized in an Administrative Order and Order on Consent ("AOC") that became effective in January 2006. U.S. Pipe has reached a settlement agreement whereby Phelps Dodge Industries, Inc., a co-defendant and co-respondent on the AOC, has assumed U.S. Pipe's obligation to perform the work required under the AOC.

U.S. Pipe and the other settling defendants contend that the legal effect of the AOC extinguishes Solutia's claims and they filed a motion for summary judgment to that effect. Discovery in this matter was stayed while the motion for summary judgment was pending. The court recently issued a summary judgment order, holding that plaintiffs' claims for contribution are barred by the AOC but giving plaintiffs the right to seek to recover cleanup costs they voluntarily incurred. The court granted a motion for immediate appeal to the Eleventh Circuit Court of Appeals, but the Eleventh Circuit Court of Appeals declined to take the appeal. The parties engaged in fact discovery in 2009, and U.S. Pipe has moved for reconsideration of the June 2008 summary judgment order that permitted plaintiffs to proceed with their claims to seek recovery of cleanup costs under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act. On July 2, 2010, the court

granted summary judgment on the cost recovery claims under Section 107(a) and dismissed those remaining counts against U.S. Pipe. On July 30, 2010, plaintiffs moved to clarify or amend the court's July 2, 2010 order to permit the plaintiffs to pursue a claim under Section 107(a) to recover costs that were not incurred under any removal order or settlement. On October 29, 2010, the district court denied plaintiffs' motion. The deadline for plaintiffs to appeal that order is November 29, 2010. We continue to have no basis to form a view with respect to the probability or amount of liability in this matter.

U.S. Pipe and a number of co-defendant foundry-related companies were named in a putative civil class action case originally filed in April 2005 in the Circuit Court of Calhoun County, Alabama, and removed by defendants to the U.S. District Court for the Northern District of Alabama under the Class Action Fairness Act. The putative plaintiffs in the case filed an amended complaint with the U.S. District Court in December 2006. The amended complaint alleged state law tort claims (negligence, failure to warn, wantonness, nuisance, trespass and outrage) arising from the creation and disposal of "foundry sand" alleged to contain harmful levels of PCBs and other toxins, including arsenic, cadmium, chromium, lead and zinc. The plaintiffs originally sought damages for real and personal property and for other unspecified personal injury. On June 4, 2007, a motion to dismiss was granted to U.S. Pipe and certain co-defendants as to the claims for negligence, failure to warn, nuisance, trespass and outrage. The remainder of the complaint was dismissed with leave to file an amended complaint. On July 6, 2007, plaintiffs filed a second amended complaint, which dismissed prior claims relating to U.S. Pipe's former facility located at 2101 West 10th Street in Anniston, Alabama and no longer alleges personal injury claims. Plaintiffs filed a third amended complaint on July 27, 2007. U.S. Pipe and the other defendants have moved to dismiss the third amended complaint. On September 24, 2008, the court issued an order on the motion, dismissing the claims for wantonness and permitting the plaintiffs to move forward with their claims of nuisance, trespass and negligence. The court has ordered the parties to mediate the dispute. The parties have reached an agreement in principle to resolve the matter and submitted the settlement agreement to the court for approval on October 26, 2010. On October 27, 2010, the court entered an order preliminarily approving the settlement and setting the settlement fairness hearing for February 17, 2011.

On July 13, 2010, Rohcan Investments Limited ("Rohcan"), the former owner of property leased by Mueller Canada Ltd. and located in Milton, Ontario, filed suit against Mueller Canada Ltd. and its two directors seeking C$10 million in damages arising from the defendants' alleged environmental contamination of the property and breach of lease. Mueller Canada Ltd. leased the property from 1988 through 2006 and paid rent until the lease expired in 2008. We have tendered potential liabilities that might arise from this lawsuit to a former owner responsible for liabilities arising prior to the sale of Mueller Canada Ltd. to the Company and its predecessors. Based on the allegations stated in the complaint, the former owner has denied the tender. We have no basis to form a view with respect to the probability or amount of liability in this matter.

Environmental advocacy groups, relying on standards established by California's Proposition 65, are seeking to eliminate or reduce the content of lead in water infrastructure products offered for sale in California and other jurisdictions. Some of our subsidiaries previously entered into settlement agreements with environmental advocacy groups to modify products or offer substitutes for sale in California. California Assembly Bill No. 1953 redefined, as of January 1, 2010, the term "lead free" to refer to a weighted average lead content of the wetted surface area of the pipes, fittings and fixtures of not more than 0.25%. Mueller Co. ceased shipments of brass products not complying with this standard to customers in California in 2009. Legislation to substantially restrict lead content in water infrastructure products also has been introduced in the U.S. Congress. Congress or state legislatures may enact similar legislation to restrict the content of lead in water products, which could require us to incur additional costs to modify our products. Although Mueller Co. now produces "lead free" brass products, most of Mueller Co.'s brass products contain small amounts of lead.

In March 2004, Anvil entered into a Consent Order with the Georgia Department of Natural Resources regarding alleged hazardous waste violations at Anvil's former foundry facility in Statesboro, Georgia. Pursuant to the Consent Order, we have agreed to perform various investigatory and remedial actions at our former foundry and landfill. These costs have been accrued at September 30, 2010.

Some of our subsidiaries have been named as defendants in asbestos-related lawsuits. We do not believe these lawsuits, either individually or in the aggregate, are material to our consolidated financial position or results of operations.

No assurance can be given that we will not be required in the future to make material expenditures relating to environmental laws or legally mandated site cleanup. Except for the foregoing, we are not aware of compliance or cleanup costs associated with the current laws and sites for which we have cleanup liability or any other future sites that are likely to have a material adverse effect on our financial condition or results of operations.

In the acquisition agreement pursuant to which a predecessor to Tyco sold our Mueller Co. and Anvil businesses to the prior owners of these businesses in August 1999, Tyco agreed to indemnify us and our affiliates, among other things, for all "Excluded Liabilities." Excluded Liabilities include, among other things, substantially all liabilities relating to the time prior to August 1999, including environmental liabilities. The indemnity survives indefinitely. In addition, Tyco's indemnity does not cover liabilities to the extent caused by us or the operation of our businesses after August 1999, nor does it cover liabilities arising with respect to businesses or sites acquired after August 1999. In June 2007, Tyco was separated into three separate publicly traded companies. Should Tyco's successors become financially unable or fail to comply with the terms of the indemnity, we may be responsible for such obligations or liabilities.

*Other Litigation.*  We are parties to a number of other lawsuits arising in the ordinary course of our businesses, including product liability cases for products manufactured by us or third parties. We provide for costs relating to these matters when a loss is probable and the amount is reasonably estimable. Administrative costs related to these matters are expensed as incurred. The effect of the outcome of these matters on our future results of operations cannot be predicted with certainty as any such effect depends on future results of operations and the amount and timing of the resolution of such matters. While the results of litigation cannot be predicted with certainty, we believe that the final outcome of such other litigation is not likely to have a materially adverse effect on our consolidated financial statements.

Case 2:10-md-02179-CJB-JCW   Document 26072-3   Filed 10/25/19   Page 41 of 32

# PART II

**Item 5.    MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

Our Series A common stock has been listed on the New York Stock Exchange under the trading symbol MWA since May 26, 2006. The shares of Series A common stock had identical rights as shares of Series B common stock except that the Series A common stock has one vote per share and the Series B common stock had eight votes per share. On January 28, 2009, each share of Series B common stock was converted into one share of Series A common stock.

Covenants contained in certain of the debt instruments referred to in Note 7 of "Notes to Consolidated Financial Statements" restrict the amount we can pay in cash dividends. Future dividends will be declared at the discretion of our Board of Directors and will depend on our future earnings, financial condition and other factors.

The range of high and low intraday sales prices of our common stock and the dividends declared per share is presented below.

|  | Series A | | Series B | | Dividends per share |
|---|---|---|---|---|---|
|  | High | Low | High | Low |  |
| Year ended September 30, 2010: | | | | | |
| 4th quarter | $    4.15 | $    2.21 | $    NA | $    NA | $    0.0175 |
| 3rd quarter | 5.99 | 3.33 | NA | NA | 0.0175 |
| 2nd quarter | 5.80 | 4.23 | NA | NA | 0.0175 |
| 1st quarter | 5.93 | 4.26 | NA | NA | 0.0175 |
| | | | | | |
| Year ended September 30, 2009: | | | | | |
| 4th quarter | $    5.81 | $    2.52 | $    NA | $    NA | $    0.0175 |
| 3rd quarter | 5.17 | 3.05 | NA | NA | 0.0175 |
| 2nd quarter | 8.47 | 1.48 | 8.42* | 6.28* | 0.0175 |
| 1st quarter | 9.07 | 3.40 | 8.44 | 3.33 | 0.0175 |

*  Through January 28, 2009.

At September 30, 2010, there were 137 stockholders of record for our Series A common stock.

**Equity Compensation Plan Information**

The information regarding our compensation plans under which equity securities are authorized for issuance is set forth in "Item 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS."

**Sale of Unregistered Securities**

We did not issue any unregistered securities during 2010.

Case 2:10-md-02179-CJB-JCW   Document 26547-2   Filed 10/15/20   Page 42 of 132

**Issuer Purchases of Equity Securities**

During the three months ended September 30, 2010, we repurchased shares of our Series A common stock as presented below.

| Period | Number of shares purchased (1) | | Average price paid per share | Total number of shares purchased as part of publicly announced plans or programs | Maximum number of shares that may yet be purchased under the plans or programs |
|---|---|---|---|---|---|
| July 1-31, 2010 | 1,310 | $ | 3.80 | - | - |
| August 1-31, 2010 | - | | - | - | - |
| September 1-30, 2010 | - | | - | - | - |

(1)  Consists of shares surrendered to the Company to pay the tax withholding obligations in connection with the vesting of restricted stock units issued to employees.

**Stock Price Performance Graphs**

The following graph compares the cumulative quarterly stock market performance of our Series A common stock with the Russell 2000 Stock Index ("Russell 2000") and the Dow Jones U.S. Building Materials & Fixtures Index ("DJ Building Materials & Fixtures"). Our Series A common stock first traded on May 26, 2006.

Total return values were calculated based on cumulative total return assuming (i) the investment of $100 in our common stock, the Russell 2000 and the DJ Building Materials & Fixtures on the dates indicated and (ii) reinvestment of all dividends.



## Item 6.    SELECTED FINANCIAL DATA

On October 3, 2005, Walter Energy acquired all outstanding shares of capital stock representing the Mueller Co. and Anvil businesses and contributed its U.S. Pipe business to form the Company. U.S. Pipe was deemed the acquirer of Mueller Co. and Anvil. The selected financial and other data presented below should be read in conjunction with, and are qualified by reference to, "Item 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS" and the consolidated financial statements and notes thereto included elsewhere in this annual report.

|  | 2010 | 2009 | 2008 | 2007 | 2006 |
|---|---|---|---|---|---|
|  | (in millions, except per share data) | | | | |
| Statement of operations data: | | | | | |
| Net sales | $ 1,337.5 | $ 1,427.9 | $ 1,859.3 | $ 1,849.0 | $ 1,933.4 |
| Cost of sales (1) | 1,101.1 | 1,171.0 | 1,420.3 | 1,385.8 | 1,525.7 |
| Gross profit | 236.4 | 256.9 | 439.0 | 463.2 | 407.7 |
| Selling, general and administrative expenses (2) | 219.3 | 239.1 | 274.6 | 253.2 | 250.1 |
| Impairment (3) | - | 970.9 | - | - | - |
| Restructuring (4) | 13.1 | 47.8 | 18.3 | - | 28.6 |
| Income (loss) from operations | 4.0 | (1,000.9) | 146.1 | 210.0 | 129.0 |
| Interest expense, net | 68.0 | 78.3 | 72.4 | 86.8 | 107.4 |
| Loss on early extinguishment of debt | 4.6 | 3.8 | - | 36.5 | 8.5 |
| Income (loss) before income taxes | (68.6) | (1,083.0) | 73.7 | 86.7 | 13.1 |
| Income tax expense (benefit) | (23.4) | (86.3) | 31.7 | 38.5 | 8.0 |
| Net income (loss) | $ (45.2) | $ (996.7) | $ 42.0 | $ 48.2 | $ 5.1 |
| Net income (loss) per share: | | | | | |
| Basic and diluted | $ (0.29) | $ (8.55) | $ 0.36 | $ 0.42 | $ 0.05 |
| Weighted average shares outstanding: | | | | | |
| Basic | 154.3 | 116.6 | 115.1 | 114.7 | 95.5 |
| Diluted | 154.3 | 116.6 | 115.5 | 115.3 | 95.5 |
| Other data: | | | | | |
| Depreciation and amortization | $ 84.6 | $ 90.2 | $ 93.1 | $ 101.4 | $ 96.9 |
| Capital expenditures | 32.8 | 39.7 | 88.1 | 88.3 | 71.1 |
| Cash dividends declared per share (5) | 0.07 | 0.07 | 0.07 | 0.07 | 5.32 |
| Balance sheet data (at September 30): | | | | | |
| Cash and cash equivalents | 83.7 | 61.5 | 183.9 | 98.9 | 81.4 |
| Working capital | 452.7 | 525.3 | 755.6 | 709.7 | 680.0 |
| Property, plant and equipment, net | 264.4 | 296.4 | 356.8 | 351.8 | 337.0 |
| Total assets | 1,568.2 | 1,739.5 | 3,090.2 | 3,009.2 | 2,989.9 |
| Total debt | 692.2 | 740.2 | 1,095.5 | 1,100.5 | 1,127.3 |
| Long-term obligations | 813.7 | 902.4 | 1,170.8 | 1,150.6 | 1,229.2 |
| Total liabilities | 1,162.9 | 1,303.2 | 1,761.3 | 1,698.2 | 1,762.9 |
| Stockholders' equity | 405.3 | 436.3 | 1,328.9 | 1,311.0 | 1,227.0 |

(1)  2006 includes $70.4 million of adjustments related to valuing Mueller Co. and Anvil inventory acquired on October 3, 2005 at fair value and $21.3 million of inventory write-offs and higher per unit overhead costs resulting from the closure of U.S. Pipe's Chattanooga, Tennessee plant.

(2)  Includes related party corporate charges from Walter Energy of $1.6 million and $8.0 million during 2007 and 2006, respectively.

(3)  In 2009, goodwill was determined to be fully impaired resulting in charges of $717.3 million for Mueller Co., $92.7 million for Anvil and $59.5 million for U.S. Pipe. Mueller Co.'s trademarks and trade names were determined to be partially impaired resulting in a charge of $101.4 million.

(4)  2010 includes $12.0 million resulting from actions to close U.S. Pipe's North Birmingham facility and $1.1 million related to severance and other closing activities. 2009 includes $38.5 million resulting from actions related to U.S. Pipe's North Birmingham facility to lower costs and reduce capacity and $9.3 million of primarily severance costs related to Company-wide workforce reductions in response to lower demand for our products. 2008 includes $18.3 million to cease manufacturing operations at U.S. Pipe's Burlington, New Jersey facility. 2006 includes $28.6 million to close U.S. Pipe's Chattanooga, Tennessee plant and transfer the valve and fire hydrant production of that plant to Mueller Co.'s Chattanooga, Tennessee and Albertville, Alabama plants.

(5)  During 2006, the Company declared dividends of $456.5 million to Walter Energy. The 85,844,920 shares of Series B common stock distributed to Walter Energy in December 2006 were deemed the only equity securities outstanding when these dividends were paid.

Case: 18-31177    Document: 00515297113    Page: 300    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 301 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26567-3   Filed 10/25/20   Page 40 of 132

**Item 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion should be read in conjunction with the audited consolidated financial statements and notes thereto that appear elsewhere in this annual report. This report contains certain statements that may be deemed "forward-looking statements" within the meaning the Private Securities Litigation Reform Act of 1995. All statements, that address activities, events or developments that the Company's management intends, expects, plans, projects, believes or anticipates will or may occur in the future are forward-looking statements. Examples of forward-looking statements include, but are not limited to, statements we make regarding general economic conditions, spending by municipalities, the outlook for the residential and non-residential construction markets and the recovery, if any, of our end markets and the impact of these factors on our businesses. Forward-looking statements are based on certain assumptions and assessments made by management in light of their experience and their perception of historical trends, current conditions and expected future developments. Actual results and the timing of events may differ materially from those contemplated by the forward-looking statements due to a number of factors, including regional, national or global political, economic, business, competitive, market and regulatory conditions and the following:*

- *the spending level for water and wastewater infrastructure;*
- *the demand level of manufacturing and construction activity;*
- *our ability to service our debt obligations; and*
- *the other factors that are described in the section entitled "RISK FACTORS" in Item 1A of this annual report.*

*Undue reliance should not be placed on any forward-looking statements. The Company does not have any intention or obligation to update forward-looking statements except as required by law.*

**Overview**

*Organization*

On October 3, 2005, Walter Energy acquired all outstanding shares of capital stock representing the Mueller Co. and Anvil businesses and contributed them to its U.S. Pipe business to form the Company. In December 2006, Walter Energy distributed to its shareholders all of its equity interests in the Company, consisting of all of the Company's outstanding shares of Series B common stock. On January 28, 2009, each share of Series B common stock was converted into one share of Series A common stock.

Unless the context indicate otherwise, whenever we refer to a particular year, we mean the fiscal year ended or ending September 30 in that particular calendar year. We manage our businesses and report operations through three business segments: Mueller Co., U.S. Pipe and Anvil, based largely on the products sold and the customers served.

*Business*

The impact of the overall weakness of the U.S. economy on our end markets continues to affect our operations adversely. Net sales have decreased significantly from 2008 levels, though shipment volumes in 2010 were higher than 2009. Our manufacturing operations include significant fixed costs. With relatively low shipment volumes, these fixed costs represent a relatively higher percentage of the total cost to manufacture our products and our profitability is reduced.

In August 2010, we entered into two new credit agreements. See "Liquidity and Capital Resources" for additional information regarding these new credit agreements.

A significant portion of our net sales is directly related to municipal water infrastructure, non-residential construction and residential construction activity in the United States. We expect non-residential construction to

Case: 18-31177    Document: 00515297113    Page: 301    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 302 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26267-3   Filed 10/25/20   Page 4 of 132

decrease in calendar 2010 as a result of a slowdown in general economic activity. Independent forecasts of calendar 2011 non-residential construction activity indicate a small increase compared to calendar 2010. Annualized housing starts in September 2010 were approximately 60% lower than the 50-year average of about 1.5 million units per year. Based on independent forecasts of housing starts, we do not expect substantial near-term recovery in residential construction, and we expect our related sales growth to lag any recovery in the residential construction market.

As a result, most of our manufacturing facilities are operating significantly below their optimal capacities. Since the end of 2008, we have reduced headcount, consolidated facilities, reduced operating days and reduced overall spending activities in response to lower demand for our products. Capacity utilization increased in 2010 in all three business segments and is expected to increase further in 2011. We continually monitor our production activities in response to evolving business conditions and expect to take additional steps to improve financial results.

U.S. Pipe closed its manufacturing facility in North Birmingham, Alabama and recorded a restructuring charge of $12.0 million during 2010, consisting of $4.4 million of asset impairment charges and $7.6 million of employee-related and other charges. We expect to record additional restructuring charges related to this closure of $1 million to $2 million in 2011.

In January 2010, Anvil sold its Canadian wholesale distribution business for $40.3 million, including post-closing adjustments. This business had 2009 net sales of approximately $107 million and its operating income was not material to the Company's operating income. We recorded a pre-tax gain of $2.8 million to selling, general and administrative expenses in connection with this transaction. Anvil also entered into a 3 ½ year supply agreement with the buyer requiring the buyer to purchase at least a specified amount of products from Anvil.

U.S. Pipe experienced a 12% decline in the ductile iron pipe average per ton sale price in 2010 compared to 2009. The average scrap iron price paid by U.S. Pipe during 2010 was 42% higher per ton than was paid during 2009. However, due to unusually high scrap iron prices in inventory at the end of 2008, scrap iron prices per ton reflected in cost of sales were lower in 2010 than 2009.

An analysis of the funded status of our U.S. pension plan as of January 1, 2011 will be performed for purposes of determining funding thresholds under provisions of the Pension Protection Act. A significant portion of the assets invested in our defined benefit pension plans is invested in equity securities. If we lower our estimated rate of return on these assets, this would cause pension expense to increase and require higher levels of Company contributions to these plans. The total market value of our U.S. pension plan assets was $301.9 million and $270.0 million at September 30, 2010 and 2009, respectively. During 2010, the investment performance of these assets was a gain of $32.0 million. We currently estimate contributing between $16 million and $20 million to our U.S. pension plan during 2011.

## Results of Operations

*Year Ended September 30, 2010 Compared to Year Ended September 30, 2009*

| | Year ended September 30, 2010 | | | | |
|---|---|---|---|---|---|
| | Mueller Co. | U.S. Pipe | Anvil | Corporate | Total |
| | (in millions) | | | | |
| Net sales | $ 612.8 | $ 377.8 | $ 346.9 | $ - | $ 1,337.5 |
| Gross profit (loss) | $ 170.3 | $ (22.7) | $ 88.8 | $ - | $ 236.4 |
| Operating expenses: | | | | | |
| Selling, general and administrative | 89.2 | 30.5 | 66.2 | 33.4 | 219.3 |
| Restructuring | 0.1 | 12.5 | 0.5 | - | 13.1 |
| | 89.3 | 43.0 | 66.7 | 33.4 | 232.4 |
| Income (loss) from operations | $ 81.0 | $ (65.7) | $ 22.1 | $ (33.4) | 4.0 |
| Interest expense, net | | | | | 68.0 |
| Loss on early extinguishment of debt | | | | | 4.6 |
| Loss before income taxes | | | | | (68.6) |
| Income tax benefit | | | | | (23.4) |
| Net loss | | | | | $ (45.2) |

| | Year ended September 30, 2009 | | | | |
|---|---|---|---|---|---|
| | Mueller Co. | U.S. Pipe | Anvil | Corporate | Total |
| | (in millions) | | | | |
| Net sales | $ 547.1 | $ 410.9 | $ 469.9 | $ - | $ 1,427.9 |
| Gross profit (loss) | $ 134.3 | $ (5.7) | $ 128.2 | $ 0.1 | $ 256.9 |
| Operating expenses: | | | | | |
| Selling, general and administrative | 84.2 | 35.6 | 84.9 | 34.4 | 239.1 |
| Impairment | 818.7 | 59.5 | 92.7 | - | 970.9 |
| Restructuring | 2.0 | 41.6 | 4.0 | 0.2 | 47.8 |
| | 904.9 | 136.7 | 181.6 | 34.6 | 1,257.8 |
| Loss from operations | $ (770.6) | $ (142.4) | $ (53.4) | $ (34.5) | (1,000.9) |
| Interest expense, net | | | | | 78.3 |
| Loss on early extinguishment of debt, net | | | | | 3.8 |
| Loss before income taxes | | | | | (1,083.0) |
| Income tax benefit | | | | | (86.3) |
| Net loss | | | | | $ (996.7) |

*Consolidated Analysis*

Net sales for 2010 decreased to $1,337.5 million from $1,427.9 million in 2009. Net sales decreased $90.0 primarily due to the divestiture of two Anvil businesses and $35.8 million due to lower pricing at U.S. Pipe. These decreases were partially offset by $20.5 million due to higher shipment volumes and $14.9 million due to favorable changes in Canadian currency exchange rates.

Gross profit for 2010 decreased to $236.4 million from $256.9 million in 2009. Gross profit decreased $35.8 million due to lower sales prices and $15.7 million due to the divestiture of two Anvil businesses. These decreases were partially offset by $17.2 million of manufacturing and other cost savings. Gross margin decreased to 17.7% for 2010 from 18.0% for 2009.

Selling, general and administrative expenses for 2010 decreased to $219.3 million from $239.1 million in 2009 primarily due to the divestiture of two Anvil businesses.

During 2009, we suspended production throughout the Company for varying time periods in response to reduced demand for our products, implemented temporary compensation reductions, furloughs and reduced work weeks for certain employees and directors and reduced headcount by approximately 17%. Restructuring activities at North Birmingham resulted in lower fixed costs, reduced capacity and a $38.5 million non-cash restructuring charge, primarily for impairment of property, plant and equipment. 2009 restructuring charges also included $9.3 million of mostly severance and other charges.

We closed U.S. Pipe's North Birmingham facility and recorded a restructuring charge of $12.0 million during 2010, consisting of $4.4 million of asset impairment charges and $7.6 million of employee-related and other charges. We expect to record additional restructuring charges of $1 million to $2 million in 2011 related to this closure.

During 2009, we recorded impairment charges of $970.9 million relating to goodwill and other intangible assets.

Interest expense, net was $68.0 million for 2010 compared to $78.3 million in 2009. The components of interest expense, net are detailed below.

|  | 2010 | | 2009 | |
|---|---|---|---|---|
|  | **(in millions)** | | | |
| 2007 Credit Agreement, including interest rate swap contracts | $ | 20.8 | $ | 37.6 |
| 7⅜% Senior Subordinated Notes |  | 31.0 |  | 31.0 |
| 8¾% Senior Unsecured Notes |  | 2.0 |  | - |
| Terminated interest rate swap contracts: |  |  |  |  |
| Costs deferred |  | (4.7) |  | - |
| Costs recognized |  | 12.7 |  | 6.3 |
| Deferred financing fees amortization |  | 2.9 |  | 2.2 |
| Other interest expense |  | 3.6 |  | 2.9 |
| Interest income |  | (0.3) |  | (1.7) |
|  | $ | 68.0 | $ | 78.3 |

Net interest expense for 2010 declined from 2009 primarily due to lower borrowing levels under the 2007 Credit Agreement resulting from principal prepayments in June 2009, August 2009, September 2009, January 2010 and the termination of this agreement in August 2010. Some of these prepayments led to the cancellation of

interest rate swap contracts. All deferred interest expense under interest rate swap contracts at such times was either immediately charged to expense or scheduled to be expensed over the remainder of the original term of the contracts.

Loss on early extinguishment of debt represents writing off deferred financing fees pursuant to debt prepayments. A net gain of $1.5 million from repurchasing $5.0 million of our 7⅜ Senior Subordinated Notes on the open market is also included in 2009.

The income tax benefit for 2010 included a $2.2 million expense related to the repatriation of earnings from Canada. After the divestiture of a Canadian business early in 2010, we determined the Canadian operations no longer needed approximately $21 million of cash, which we repatriated. Excluding this item, income tax benefit in 2010 would have resulted in an effective tax rate of 37%. There was very limited income tax benefit associated with the goodwill impairment recorded in 2009. Excluding goodwill impairment, the effective tax rate for 2009 was 38%. In 2010 and 2009, the other differences between income taxes and that expected using the U.S. federal statutory rate of 35% related primarily to state income taxes and non-deductible compensation.

*Segment Analysis*

*Mueller Co.*

Net sales for 2010 increased to $612.8 million from $547.1 million in 2009. Net sales increased primarily due to $55.7 million in higher shipment volumes.

Gross profit for 2010 increased to $170.3 million from $134.3 million in 2009. Gross profit increased $20.3 million due to higher shipment volumes and $16.8 million due to manufacturing and other cost savings. Gross margin was 27.8% in 2010 compared to 24.5% in 2009. Gross margin increased primarily due to manufacturing and other cost savings.

Selling, general and administrative expenses in 2010 increased to $89.2 million from $84.2 million in 2009. These expenses increased primarily due to additional development of our Mueller Systems meter and metering technology business.

We recorded in 2009 impairment and restructuring charges of $820.7 million. The impairment charges were $717.3 million against goodwill and $101.4 against other intangible assets.

*U.S. Pipe*

Net sales for 2010 decreased to $377.8 million from to $410.9 million in 2009. Net sales decreased $36.3 million due to lower prices.

Gross loss for 2010 increased to $22.7 million from $5.7 million in 2009. Gross loss increased primarily due to $36.3 million of lower sales prices. This increase was partially offset by $9.6 million of lower raw material costs and $10.9 million of manufacturing and other cost savings.

Selling, general and administrative expenses for 2010 decreased to $30.5 million from $35.6 million in 2009. The amount in 2009 included $3.2 million of bad debt expense for a specific customer. The decrease in these expenses is otherwise attributed primarily to lower headcount.

We closed our North Birmingham facility and recorded a restructuring charge of $12.0 million during 2010, consisting of $4.4 million of asset impairment charges and $7.6 million of employee-related and other charges. We expect to record additional restructuring charges of $1 million to $2 million in 2011.

Case: 18-31177    Document: 00515297113    Page: 305    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 306 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26367-3   Filed 10/25/19   Page 320 of 332

In 2009, we recorded impairment and restructuring charges of $101.1 million, which included goodwill impairment of $59.5 million and a non-cash restructuring charge of $38.5 million, primarily for impairment of property, plant and equipment, at our North Birmingham facility.

*Anvil*

Net sales for 2010 decreased to $346.9 million from $469.9 million in 2009. Net sales decreased $90.0 million due to divested businesses and $38.4 million due to lower shipment volumes.

Gross profit for 2010 decreased to $88.8 million from $128.2 million in 2009. Gross profit decreased $15.7 million due to divested businesses, $13.5 million due to lower shipment volumes and $10.4 million due to higher manufacturing and other costs. Gross margin was 25.6% in 2010 compared to 27.3% in 2009. Gross margin decreased primarily due to higher per-unit overhead costs, partially offset by eliminating the lower margin divested businesses.

Selling, general and administrative expenses for 2010 decreased to $66.2 million from $84.9 million in 2009. These expenses declined $16.3 million related to the divested businesses. The amount in 2010 included gains totaling $4.4 million from the sale of divested businesses. The amount in 2009 included a $3.5 million gain from the sale of a building.

We recorded impairment and restructuring charges of $96.7 million in 2009.

*Corporate*

Selling, general and administrative expenses for 2010 decreased to $33.4 million from $34.4 million in 2009. This decrease was primarily due to $1.2 million of fees incurred in 2009 related to the conversion of Series B common stock into Series A common stock.

*Year Ended September 30, 2009 Compared to Year Ended September 30, 2008*

| | Year ended September 30, 2009 | | | | |
|---|---|---|---|---|---|
| | **Mueller Co.** | **U.S. Pipe** | **Anvil** | **Corporate** | **Total** |
| | | | (in millions) | | |
| Net sales | $    547.1 | $    410.9 | $    469.9 | $        - | $ 1,427.9 |
| Gross profit (loss) | $    134.3 | $    (5.7) | $    128.2 | $    0.1 | $    256.9 |
| Operating expenses: | | | | | |
|   Selling, general and administrative | 84.2 | 35.6 | 84.9 | 34.4 | 239.1 |
|   Impairment | 818.7 | 59.5 | 92.7 | - | 970.9 |
|   Restructuring | 2.0 | 41.6 | 4.0 | 0.2 | 47.8 |
| | 904.9 | 136.7 | 181.6 | 34.6 | 1,257.8 |
| Loss from operations | $    (770.6) | $    (142.4) | $    (53.4) | $    (34.5) | (1,000.9) |
| Interest expense, net | | | | | 78.3 |
| Loss on early extinguishment of debt, net | | | | | 3.8 |
| Loss before income taxes | | | | | (1,083.0) |
| Income tax benefit | | | | | (86.3) |
| Net loss | | | | | $    (996.7) |

| | Year ended September 30, 2008 | | | | |
| | Mueller Co. | U.S. Pipe | Anvil | Corporate | Total |
| | | | (in millions) | | |
| Net sales | $ 718.1 | $ 546.0 | $ 595.2 | $ - | $ 1,859.3 |
| Gross profit | $ 218.4 | $ 43.8 | $ 176.2 | $ 0.6 | $ 439.0 |
| Operating expenses: | | | | | |
| Selling, general and administrative | 90.0 | 42.9 | 102.1 | 39.6 | 274.6 |
| Restructuring | - | 18.3 | - | - | 18.3 |
| | 90.0 | 61.2 | 102.1 | 39.6 | 292.9 |
| Income (loss) from operations | $ 128.4 | $ (17.4) | $ 74.1 | $ (39.0) | 146.1 |
| Interest expense, net | | | | | 72.4 |
| Income before income taxes | | | | | 73.7 |
| Income tax expense | | | | | 31.7 |
| Net income | | | | | $ 42.0 |

*Consolidated Analysis*

Net sales for 2009 decreased to $1,427.9 million from $1,859.3 million in 2008. Net sales decreased primarily due to $485.7 million of lower shipment volumes and $30.2 million due to unfavorable changes in Canadian currency exchange rates partially offset by $84.5 million of higher prices.

Gross profit for 2009 decreased $256.9 million compared to $439.0 million in 2008. Gross profit decreased $151.9 million due to lower shipment volumes, $106.7 million due to higher per-unit overhead costs due to lower production and $48.9 million due to higher raw material costs. These decreases were partially offset by higher sales prices and $45.2 million of manufacturing cost savings. Gross margin decreased to 18.0% for 2009 from 23.6% in 2008. Gross margin decreased approximately 3 percentage points due to lower shipments of relatively high margin products and higher per-unit overhead costs at Mueller Co. and decreased approximately 3 percentage points primarily due to higher per-unit overhead costs at U.S. Pipe.

Selling, general and administrative expenses for 2009 decreased to $239.1 million from $274.6 million in 2008. Anvil recognized a $3.5 million gain from the sale of a building during 2009. We recognized bad debt expense of $3.9 million related to a specific customer and fees of $1.2 million related to the conversion of Series B common stock into Series A common stock during 2009. Other decreases in selling, general and administrative expenses for 2009 from 2008 were due to lower shipment volumes and personnel related and other cost saving actions.

We recorded impairment charges of $970.9 million in 2009.

We suspended production throughout the Company for varying time periods during 2009 in response to reduced demand for our products, implemented temporary compensation reductions, furloughs and reduced work weeks for certain employees and directors and reduced headcount by approximately 17%. Restructuring charges recorded during 2009 totaled $47.8 million. Restructuring activities at U.S. Pipe's North Birmingham facility resulted in lower fixed costs, reduced capacity and a $38.5 million non-cash restructuring charge, primarily for impairment of property, plant and equipment. Restructuring charges of $18.3 million during 2008 related to the closure of manufacturing operation in Burlington, New Jersey.

The components of interest expense, net are presented below.

|  | 2009 | 2008 |
|---|---|---|
|  | (in millions) | |
| 2007 Credit Agreement, including interest rate swap contracts | $    37.6 | $    40.7 |
| 7⅜% Senior Subordinated Notes | 31.0 | 31.3 |
| Terminated interest rate swap contracts: | | |
|    Costs recognized | 6.3 | - |
| Deferred financing fees amortization | 2.2 | 1.7 |
| Capitalized interest | - | (1.0) |
| Other interest expense | 2.9 | 3.8 |
| Interest income | (1.7) | (4.1) |
|  | $    78.3 | $    72.4 |

Loss on the early extinguishment of debt includes write-offs of $5.3 million of unamortized deferred financing fees in connection with the June 2009 amendment to our 2007 Credit Agreement and subsequent prepayments of amounts outstanding under the amended 2007 Credit Agreement during 2009. In November 2008, we repurchased $5.0 million in principal of the 7⅜% Senior Subordinated Notes resulting in a gain of $1.5 million.

The income tax benefit of $86.3 million during 2009 represented an effective income tax rate of 8.0%. There was very limited tax benefit associated with the goodwill impairment. Excluding goodwill impairment, the effective tax rate for 2009 would have been 38% compared to the federal statutory rate of 35%. The effective tax rate for 2008 was 43%.

### Segment Analysis

#### Mueller Co.

Net sales for 2009 decreased to $547.1 million from $718.1 in 2008. Lower shipment volumes of $196.1 million were partially offset by higher sales prices of $33.0 million. Lower shipment volumes occurred for iron gate valves, fire hydrants and brass service products.

Gross profit for 2009 decreased to $134.3 million from $218.4 million in 2008. Gross profit decreased $76.3 million due to lower shipment volumes, $44.5 million due to higher per-unit overhead costs due to lower production and $12.9 million due to higher raw material costs, partially offset by higher sales prices of $33.0 million and manufacturing cost savings of $21.5 million. Gross margin was 24.5% for 2009 compared to 30.4% in 2008. Higher per-unit overhead costs reduced gross margin by approximately 5 percentage points and changes in product mix reduced gross margin by approximately 3 percentage points. Higher sales prices in excess of higher raw material costs increased gross margin by approximately 2 percentage points.

We recorded impairment and restructuring charges of $820.7 million in 2009.

Excluding the impairment and restructuring charges, income from operations during 2009 was $50.1 million compared to $128.4 million in 2008. This decline was primarily due to decreased gross profit.

#### U.S. Pipe

Net sales for 2009 decreased to $410.9 million from $546.0 million in 2008. Net sales decreased $149.8 million due to lower shipment volumes, but increased $14.7 million due to higher prices.

Case: 18-31177     Document: 00515297113     Page: 308     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 309 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26292-3   Filed 10/25/19   Page 309 of 32

Gross loss for 2009 was $5.7 million compared to gross profit of $43.8 million in 2008. Gross profit decreased $38.0 million due to lower shipment volumes, $30.7 million due to higher per-unit overhead costs due to lower production and $15.5 million due to higher raw material costs. These decreases were partially offset by $17.0 million of manufacturing cost savings and $14.7 million of higher sales prices. Gross margin was (1.4)% for 2009 compared to 8.0% in 2008. Gross margin decreased approximately 6 percentage points due to changes in product mix and decreased approximately 3 percentage points due to higher per-unit overhead costs.

We recorded impairment and restructuring charges of $101.1 million in 2009.

Excluding the impairment and restructuring charges, results from operations decreased $42.2 million during 2009 compared to 2008. This decrease was due to $49.5 million of lower gross profit partially offset by $7.3 million of lower selling, general and administrative expenses. Selling, general and administrative expenses declined due to lower shipment volumes and cost saving actions.

*Anvil*

Net sales for 2009 decreased to $469.9 million from $595.2 in 2008. Net sales decreased $139.8 million due to lower shipment volumes and $22.3 million due to unfavorable changes in Canadian currency exchange rates. These factors were partially offset by $36.8 million of higher prices.

Gross profit for 2009 decreased to $128.2 million from $176.2 million in 2008. Gross profit decreased $37.6 million due to lower shipment volumes, $31.5 million due to higher per-unit overhead costs due to lower production and $20.5 million due to higher raw material costs. These decreases were partially offset by $36.8 million of higher sales prices and $6.7 million of manufacturing cost savings. Gross margin was 27.3% in 2009 compared to 29.6% in 2008. Gross margin increased approximately 1 percentage point due to changes in product mix, increased approximately 1 percentage point due to higher sales prices exceeding higher raw material costs and decreased approximately 4 percentage points due to higher per-unit overhead costs.

We recorded impairment and restructuring charges of $96.7 million in 2009.

Excluding the impairment and restructuring charges, income from operations for 2009 was $43.3 million compared to $74.1 million in 2008. This decrease was due to $48.0 million of lower gross profit, partially offset by $17.2 million of lower selling, general and administrative expenses. Lower selling, general and administrative expenses were primarily due to a $3.5 million gain from the sale of a building during 2009, lower shipment volumes and cost saving actions.

*Corporate*

Corporate expenses in 2009 decreased to $34.4 million from $39.6 million in 2008. During 2009, $1.2 million of professional fees were expensed related to the conversion of the Series B common stock into Series A common stock. Corporate expenses otherwise decreased due to personnel and other related cost saving actions.

**Financial Condition**

Cash and cash equivalents were $83.7 million at September 30, 2010 compared to $61.5 million at September 30, 2009. Cash and cash equivalents increased during 2010 as a result of cash provided by operating activities and investing activities of $63.0 million and $23.6 million, respectively, offset by cash used in financing activities of $65.9 million. Cash and cash equivalents increased $1.5 million during 2010 due to changes in currency exchange rates.

Receivables, net were $202.5 million at September 30, 2010 compared to $216.3 million at September 30, 2009. Receivables at September 30, 2010 represented approximately 53.2 days net sales compared to

Case: 18-31177    Document: 00515297113    Page: 309    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 310 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26267-3   Filed 10/25/19   Page 51 of 32

September 30, 2009 receivables representing approximately 52.5 days net sales. We consider this variation in days net sales in receivables normal as this measure has been in the low to mid-50s in recent periods.

Inventories were $268.4 million at September 30, 2010 compared to $342.8 million at September 30, 2009. We continue improving our processes to minimize inventory levels. Inventory was $459.4 million at September 30, 2008. The divestiture of Anvil's Canadian distribution business also contributed to the decrease in inventory during 2010. Inventory turns per year at the end of 2010 were approximately 3.6, which was about half a turn faster than at the end of 2009.

Property, plant and equipment, net was $264.4 million at September 30, 2010 compared to $296.4 million at September 30, 2009. Capital expenditures were $32.8 million during 2010 with depreciation of $53.6 million.

Identifiable intangible assets were $632.4 million at September 30, 2010 compared to $663.6 million at September 30, 2009. Finite-lived intangible assets, $332.2 million of net book value at September 30, 2010, are amortized over their estimated useful lives. Such amortization expense was $31.0 million during 2010 and is expected to be a similar amount for each of the next five years. Indefinite-lived identifiable intangible assets, $300.3 million at September 30, 2010, are not amortized, but tested at least annually for possible impairment.

Accounts payable and other current liabilities were $183.0 million at September 30, 2010 compared to $209.1 million at September 30, 2009. Payment patterns for various purchases vary significantly, ranging from payroll which is paid very frequently to incentive compensation and customer rebates that might only be paid once per year.

Outstanding borrowings were $692.2 million at September 30, 2010 compared to $740.2 million at September 30, 2009. The decrease of $48.0 million during 2010 was due primarily to prepayments of $40 million of borrowings under the amended 2007 Credit Agreement in January 2010.

Deferred income taxes were net liabilities of $135.2 million at September 30, 2010 compared to net liabilities of $149.2 million at September 30, 2009. Deferred tax liabilities related to property, plant and equipment and identifiable intangible assets were $247.9 million and $251.1 million at September 30, 2010 and 2009, respectively.

**Liquidity and Capital Resources**

We had cash and cash equivalents of $83.7 million and $151.6 million of excess availability under our asset based lending agreement (the "ABL Agreement") at September 30, 2010.

Cash flows from operating activities are categorized below.

|  | 2010 | 2009 |
|---|---|---|
|  | **(in millions)** | |
| Collections from customers | $ 1,339.1 | $ 1,496.7 |
| Disbursements, other than interest and income taxes | (1,227.8) | (1,279.1) |
| Interest payments, net | (77.5) | (74.8) |
| Income tax refunds (payments), net | 29.2 | (12.3) |
| Cash provided by operating activities | $ 63.0 | $ 130.5 |

Collections of receivables were lower during 2010 compared to 2009. 2010 net sales were $90.4 million lower than 2009. 2009 collections also benefited from relatively high net sales prior to the end of 2008.

Reduced disbursements, other than interest and income taxes, during 2010 reflect timing differences and lower volumes of material, labor and overhead purchased. 2009 disbursements were relatively smaller compared to sales activity than 2010 due to larger inventory reductions occurring during 2009 than during 2010.

Interest payments include $18.3 million and $6.3 million to cancel interest rate swap contracts in 2010 and 2009, respectively. Interest payments do not include approximately $10 million in each of 2010 and 2009 that were capitalized as deferred financing fees.

An income tax refund was received in 2010 by carrying back the 2009 losses to earlier years.

Capital expenditures were $32.8 million during 2010 compared to $39.7 million during 2009. Also during 2009, Mueller Co. purchased data collection-related technology associated with its Hersey Meters products for $8.7 million. 2011 capital expenditures are estimated to be between $38 million and $42 million.

An analysis of the funded status of our U.S. pension plan as of January 1, 2011 will be performed for purposes of determining funding thresholds under provisions of the Pension Protection Act. A significant portion of the assets invested in our defined benefit pension plans is invested in equity securities. If we lower our estimated rate of return on these assets, this would cause pension expense to increase and require higher levels of Company contributions to these plans. We currently estimate contributing between $16 million and $20 million to our pension plans during 2011.

We anticipate that our existing cash, cash equivalents and borrowing capacity combined with our expected operating cash flows will be sufficient to meet our anticipated operating expenses, capital expenditures, pension contributions and debt service obligations as they become due through September 30, 2011. However, our ability to make these payments will depend partly upon our future operating performance, which will be affected by general economic, financial, competitive, legislative, regulatory, business and other factors beyond our control.

In August 2010, we issued $225.0 million principal amount of 8¾% Senior Unsecured Notes maturing September 1, 2020 (the "Senior Unsecured Notes") at 98.37% of their principal amount to yield approximately 9%. Concurrently with the closing of this agreement, we entered into the ABL Agreement. We used the net proceeds from the offering of the Senior Unsecured Notes, together with amounts borrowed under the ABL Agreement and cash on hand to repay all amounts outstanding under the 2007 Credit Agreement.

*ABL Agreement*

The ABL Agreement consists of a revolving credit facility of up to $275 million of revolving credit borrowings, swing line loans and letters of credit. The ABL Agreement also permits us to increase the size of the credit facility by an additional $150 million. We may borrow up to $25 million through swing line loans and have up to $60 million of letters of credit outstanding.

Borrowings under the ABL Agreement bear interest at a floating rate equal to LIBOR plus a margin ranging from 275 to 325 basis points, or a base rate as defined in the ABL Agreement plus a margin ranging from 175 to 225 basis points. At September 30, 2010, the applicable rate was LIBOR plus 300 basis points.

The ABL Agreement terminates in August 2015 and had outstanding borrowings of $49.0 million at September 30, 2010. We pay a commitment fee of 50 basis points for any unused borrowing capacity under the ABL Agreement. The borrowing capacity under the ABL Agreement is not subject to any financial maintenance covenants unless excess availability is less than the greater of $34 million and 12.5% of the aggregate commitments under the ABL Agreement. Excess availability has been reduced by outstanding borrowings, outstanding letters of credit and accrued fees and expenses.

Case: 18-31177    Document: 00515297113    Page: 311    Date Filed: 02/04/2020

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 312 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26572-3   Filed 10/22/20   Page 37 of 132

The ABL Agreement is subject to mandatory prepayments if total outstanding borrowings under the ABL Agreement are greater than the aggregate commitments under the revolving credit facility or if we dispose of overdue accounts receivable in certain circumstances. The borrowing base under the ABL Agreement is equal to the sum of (a) 85% of the value of eligible accounts receivable and (b) the lesser of (i) 65% of the value of eligible inventory or (ii) 85% of the net orderly liquidation value of the value of eligible inventory, less certain reserves. Prepayments can be made at any time with no penalty.

Substantially all of our U.S. subsidiaries are borrowers under the ABL Agreement and are jointly and severally liable for any outstanding borrowings. Our obligations under the ABL Agreement are secured by a first-priority perfected lien on all of our U.S. inventory, accounts receivable, certain cash and other supporting obligations.

The ABL Agreement contains customary negative covenants and restrictions on our ability to engage in specified activities, such as:

- limitations on other debt, liens, investments and guarantees;

- restrictions on dividends and redemptions of our capital stock and prepayments and redemptions of debt; and

- restrictions on mergers and acquisition, sales of assets and transaction with affiliates.

### 8¾% Senior Unsecured Notes

We owed $225 million of principal of 8¾% Senior Unsecured Notes at September 30, 2010. Interest on the Senior Unsecured Notes is payable semi-annually and the principal is due September 2020. We may redeem up to $22.5 million of the Senior Unsecured Notes at a redemption price of 103% plus accrued and unpaid interest once in each year ending September 1, 2011, 2012, and 2013. We may also redeem up to $78.8 million of the originally issued principal amount of the Senior Unsecured Notes at a redemption price of 108.75%, plus accrued and unpaid interest, with net cash proceeds from certain equity offerings prior to September 2013, provided that at least $146.2 million in principal amount of the Senior Unsecured Notes remains outstanding immediately after such redemption. After August 2015, the Senior Unsecured Notes may be redeemed at specified redemption prices plus accrued and unpaid interest. Upon a "Change of Control" (as defined in the indenture securing the Senior Unsecured Notes), we are required to offer to purchase the outstanding Senior Unsecured Notes at a purchase price of 101%, plus accrued and unpaid interest. The Senior Unsecured Notes are essentially guaranteed by all of our U.S. subsidiaries, but are subordinate to borrowings under the ABL Agreement.

### 7⅜% Senior Subordinated Notes

We also owed $420.0 million of principal of 7⅜% Senior Subordinated Notes ("Senior Subordinated Notes") at September 30, 2010. Interest on the Senior Subordinated Notes is payable semi-annually and the principal is due June 2017. After May 2012, we may redeem any portion of the Senior Subordinated Notes at specified redemption prices plus accrued and unpaid interest. Upon a "Change of Control" (as defined in the indenture securing the Senior Subordinated Notes), we are required to offer to purchase the outstanding Senior Subordinated Notes at a purchase price of 101%, plus accrued and unpaid interest. The Senior Subordinated Notes are secured by the guarantees of essentially all of our U.S. subsidiaries, but are subordinate to the borrowings under the ABL Agreement and the Senior Unsecured Notes.

Case: 18-31177    Document: 00515297113    Page: 312    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 313 of 1003
Case 2:10-md-02179-CJB-JCW Document 26572-3 Filed 10/25/20 Page 313 of 332

### Credit Ratings

Our credit ratings issued by Moody's and Standard & Poor's were as follows.

| | September 30, 2010 | | September 30, 2009 | |
|---|---|---|---|---|
| | Moody's | Standard & Poor's | Moody's | Standard & Poor's |
| Corporate credit rating | B2 | B | B2 | B |
| ABL Agreement | Not rated | Not rated | n/a | n/a |
| 2007 Credit Agreement | n/a | n/a | B1 | BB- |
| 8¾% Senior Unsecured Notes | B1 | B+ | n/a | n/a |
| 7⅜% Senior Subordinated Notes | B3 | CCC+ | Caa1 | B- |
| Outlook | Stable | Stable | Stable | Stable |

### Off-Balance Sheet Arrangements

We do not have any relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance or special purpose entities, which would have been established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes. In addition, we do not have any undisclosed borrowings or debt or any derivative contracts other than those described in "Item 7A. QUALITATIVE AND QUANTITATIVE DISCLOSURE ABOUT MARKET RISK" or synthetic leases. Therefore, we are not materially exposed to any financing, liquidity, market or credit risk that could arise if we had engaged in such relationships.

We use letters of credit and surety bonds in the ordinary course of business to ensure the performance of contractual obligations. At September 30, 2010, we had $39.2 million of letters of credit and $26.8 million of surety bonds outstanding.

### Contractual Obligations

Our contractual obligations at September 30, 2010 are presented below.

| | Less than 1 year | | 1-3 years | | 4-5 years | | After 5 years | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (in millions) | | | | | |
| Long-term debt: | | | | | | | | | | |
| Principal payments (1) | $ | 0.7 | $ | 0.8 | $ | 49.1 | $ | 645.2 | $ | 695.8 |
| Interest (2) | | 52.8 | | 104.7 | | 104.0 | | 160.4 | | 421.9 |
| Operating leases | | 9.4 | | 11.6 | | 5.2 | | 5.8 | | 32.0 |
| Unconditional purchase obligations (3) | | 46.2 | | 0.1 | | - | | - | | 46.3 |
| Other noncurrent liabilities (4) | | 16.8 | | - | | - | | - | | 16.8 |
| | $ | 125.9 | $ | 117.2 | $ | 158.3 | $ | 811.4 | $ | 1,212.8 |

(1)  The principal payments on long-term debt include $3.6 million of discount on the 8¾ % Senior Unsecured Notes.

(2)  Interest on the ABL Agreement is calculated using LIBOR of 0.29% at September 30, 2010. Actual interest payments will likely be different.

(3)  Includes contractual obligations for purchases of raw materials and capital expenditures.

(4)  Consists of obligations for pension plans and represents the estimated minimum payments required to meet funding obligations. Actual payments may differ. We have not estimated these payments beyond 2011.

**Effect of Inflation; Seasonality**

We experience changing price levels related to purchases of raw materials and purchased components. The average purchase price per ton of scrap iron at U.S. Pipe. in 2010 was 42% higher than in 2009. The average purchase price per ton of brass ingot at Mueller Co. in 2010 was 48% higher than in 2009. We do not believe that changing prices for other goods had a material impact on our financial position or results of operations in 2010 compared to 2009.

Our water infrastructure businesses are dependent upon construction activity, which is seasonal due to the impact of cold weather conditions on construction. Net sales and operating income have historically been lowest in the three-month periods ending December 31 and March 31 when the northern United States and all of Canada generally face weather conditions that restrict significant construction activity. In general, approximately 45% of a year's net sales occurs in the first half of the year with 55% occurring in the second half of the year. See "Item 1A. RISK FACTORS—Sales of certain of our products are seasonal."

**Critical Accounting Estimates**

The preparation of financial statements in accordance with accounting principles generally accepted in the United States requires us to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues, expenses and related disclosure of contingent assets and liabilities. These estimates are based upon experience and on various other assumptions that we believe to be reasonable under the circumstances. Actual results may differ from these estimates. We consider an accounting estimate to be critical if changes in the estimate that are reasonably likely to occur over time or the use of reasonably different estimates could have a material impact on our financial condition or results of operations. We consider the accounting topics presented below to include our critical accounting estimates.

*Revenue Recognition*

We recognize revenue when delivery of a product has occurred and there is persuasive evidence of a sales arrangement, sales prices are fixed and determinable and collectability from the customers is reasonably assured. Sales are recorded net of estimated discounts, returns and rebates. Discounts, returns and rebates are estimated based upon current offered sales terms and actual historical return and allowance rates.

*Receivables*

The estimated allowance for doubtful receivables is based upon judgments and estimates of expected losses and specific identification of problem accounts. Significantly weaker than anticipated industry or economic conditions could impact customers' ability to pay such that actual losses may be greater than the amounts provided for in this allowance. The periodic evaluation of the adequacy of the allowance for doubtful receivables is based on an analysis of prior collection experience, specific customer creditworthiness and current economic trends within the industries served. In circumstances where a specific customer's inability to meet its financial obligation is known to us (e.g., bankruptcy filings or substantial downgrading of credit ratings), we record a specific allowance to reduce the receivable to the amount we reasonably believe will be collected.

*Inventories*

We record inventories at the lower of first-in, first-out method cost or market value. Inventory cost includes an overhead component that can be affected by levels of production and actual costs incurred. We evaluate the need to record adjustments for impairment of inventory at least quarterly. This evaluation includes such factors as anticipated usage, inventory turnover, inventory levels and ultimate product sales value. Inventory that, in the judgment of management, is obsolete or in excess of our normal usage is written-down to its estimated market value, if less than its cost. Significant judgments must be made when establishing the reserve for obsolete and excess inventory.

### *Income Taxes*

We recognize deferred tax liabilities and deferred tax assets for the expected future tax consequences of events that have been included in the financial statements or tax returns. Deferred tax liabilities and assets are determined based on the differences between the financial statements and the tax basis of assets and liabilities, using enacted tax rates in effect for the years in which the differences are expected to reverse. A valuation allowance is provided to offset any net deferred tax assets if, based upon the available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized. If we were to reduce our estimates of future taxable income, we could be required to record additional valuation allowances against our deferred tax assets. Our tax balances are based on our expectations of future operating performance, tax planning strategies, interpretation of the tax regulations currently enacted and rulings in numerous tax jurisdictions.

We only record tax benefits for positions that we believe are more likely than not of being sustained under audit examination based solely on the technical merits of the associated tax position. The amount of tax benefit recognized for any position that meets the more likely than not threshold is the largest amount of the tax benefit that we believe is greater than 50% likely of being realized.

### *Accounting for the Impairment of Long-Lived Assets Including Goodwill and Other Intangible Assets*

We test long-lived assets, including goodwill and intangible assets that have an indefinite life, for impairment annually (or more frequently if events or circumstances indicate possible impairment). Finite-lived intangible assets are amortized over their respective estimated useful lives and reviewed if events or circumstances indicate possible impairment. We perform our annual impairment testing at September 1.

We test goodwill for possible impairment by first determining the fair value of the related reporting unit and comparing this value to the recorded net assets of the reporting unit, including goodwill. Fair value is determined using a combination of a discounted cash flow model and stock market comparable valuations for a peer group of companies. Significant judgments and estimates must be made when estimating future cash flows, determining the appropriate discount rate and identifying appropriate comparable companies.

### *Litigation, Investigations and Claims*

We are involved in litigation, investigations and claims arising out of the normal conduct of our businesses. We estimate and accrue liabilities resulting from such matters based on a variety of factors, including outstanding legal claims and proposed settlements; assessments by internal counsel of pending or threatened litigation; and assessments of potential environmental liabilities and remediation costs. We believe we have adequately accrued for these potential liabilities; however, facts and circumstances may change and could cause the actual liability to exceed the estimates, or may require adjustments to the recorded liability balances in the future.

### *Workers Compensation, Defined Benefit Pension and Other Postretirement Benefits, Environmental and Other Long-term Liabilities*

We are obligated for various liabilities that will ultimately be determined over what could be a very long future time period. We established the recorded liabilities for such items at September 30, 2010 using estimates for when such amounts will be paid and what the amounts of such payments will be. These estimates are subject to change based on numerous factors, including among others, regulatory changes, technology changes, the investment performance of related assets, the lifespan of plan participants and other individuals and changes to plan designs.

Case: 18-31177     Document: 00515297113     Page: 315     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 316 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26357-3   Filed 10/25/20   Page 31 of 132

## Item 7A.  QUALITATIVE AND QUANTITATIVE DISCLOSURE ABOUT MARKET RISK

We are exposed to various market risks, which are potential losses arising from adverse changes in market rates and prices, such as interest rates and foreign exchange fluctuations. We do not enter into derivatives or other financial instruments for trading or speculative purposes.

Our primary financial instruments are cash and cash equivalents. This includes cash in banks and highly rated, liquid money market investments. We believe that those instruments are not subject to material potential near-term losses in future earnings from reasonably possible near-term changes in market rates or prices.

### *Interest Rate Risk*

At September 30, 2010, we had fixed rate debt of $643.2 million and variable rate debt of $49.0 million. The pre-tax earnings and cash flow impact resulting from a 100 basis point increase in interest rates on variable rate debt, holding other variables constant, would be approximately $0.5 million per year.

### *Currency Risk*

We maintain assets and operations in Canada and, to a much lesser extent, China and Europe. The functional currency for these operations is their local currency. The assets and liabilities of non-U.S. subsidiaries are translated into U.S. dollars at currency exchange rates in effect at the end of each period, with the effect of such translation reflected in other comprehensive loss. Our stockholders' equity will fluctuate depending upon the weakening or strengthening of the U.S. dollar against these non-U.S. currencies. Net sales and expenses of non-U.S. subsidiaries are translated into U.S. dollars at the average currency exchange rate during the period. At September 30, 2010, $70.6 million of our net assets were denominated in non-U.S. currencies.

We also have relatively small amounts of receivables and payables denominated in currencies other than an entity's functional currency. Changes in currency exchange rates between when these balances originate and when they are settled result in foreign exchange gains and losses that are recognized as they occur.

We settled our outstanding foreign currency forward contracts during 2010 with a cash payment of $1.7 million.

### *Raw Materials Risk*

Our products are made using several basic raw materials, including scrap steel, scrap iron, sand, resin, brass ingot, steel pipe, coke and various purchased components. Product margins and the level of profitability can fluctuate if we do not pass changes in raw material and purchased component costs to our customers.

We experience changing price levels related to purchases of raw materials and purchased components. The average purchase price per ton of scrap iron at U.S. Pipe. in 2010 was 42% higher than in 2009. The average purchase price per ton of brass ingot at Mueller Co. in 2010 was 48% higher than in 2009. We do not believe that changing prices for other goods had a material impact on our financial position or results of operations in 2010 compared to 2009. We expect these prices to fluctuate based on marketplace demand. See "Item 1A. RISK FACTORS—The costs of our raw materials and purchased components can be volatile."

### *Commodities Risk*

We use natural gas to fuel our ductile iron pipe foundries. We generally purchase natural gas at prices fixed each month based on market rates for specified volumes. We are exposed to price changes from month to month.

Case: 18-31177    Document: 00515297113    Page: 316    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 317 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26293   Filed 02/05/20   Page 81 of 132

We use natural gas swap contracts to hedge against cash flow variability arising from changes in natural gas prices. These contracts fix our purchase price for a portion of our anticipated natural gas purchases at a price of $4.43 per MMBtu through September 2011 and are accounted for as effective hedges. The fair value of gas swap liability contracts was $0.1 million at September 30, 2010. We recorded in 2010 an immaterial unrealized loss from our swap contracts, net of tax, in accumulated other comprehensive loss.

## Item 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

Our consolidated financial statements and supplementary data are filed as part of this annual report beginning on page F-1 and incorporated by reference in this Item 8.

| Index to financial statements | Reference |
|---|---|
| Reports of Independent Registered Public Accounting Firm | F-1 |
| Consolidated Balance Sheets at September 30, 2010 and 2009 | F-3 |
| Consolidated Statements of Operations for the years ended September 30, 2010, 2009 and 2008 | F-4 |
| Consolidated Statements of Stockholders' Equity for the years ended September 30, 2010, 2009 and 2008 | F-5 |
| Consolidated Statements of Cash Flows for the years ended September 30, 2010, 2009 and 2008 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

## Item 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None

## Item 9A.   CONTROLS AND PROCEDURES

### *Evaluation of Disclosure Controls and Procedures*

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports we file or submit under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC and that such information is accumulated and communicated to our management, including the Chief Executive Officer and the Chief Financial Officer as appropriate, to allow timely decisions regarding required disclosure.

Our Chief Executive Officer and Chief Financial Officer evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this annual report. Based on this evaluation, those officers have concluded that our disclosure controls and procedures were effective at September 30, 2010.

### *Changes in Internal Control over Financial Reporting*

There were no changes in internal control over financial reporting during the quarter ended September 30, 2010 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Case: 18-31177      Document: 00515297113      Page: 317      Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 318 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26047-3   Filed 10/15/19   Page 83 of 112

*Management's Report on Internal Control over Financial Reporting*

Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act). Internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

We assessed the effectiveness of our internal control over financial reporting at September 30, 2010. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control-Integrated Framework*. Management has concluded that, at September 30, 2010, our internal control over financial reporting was effective.

The effectiveness of our internal control over financial reporting at September 30, 2010, has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report which is included in this annual report.

## Item 9B.   OTHER INFORMATION

None

Case: 18-31177    Document: 00515297113    Page: 318    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 319 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26293   Filed 02/05/20   Page 84 of 132

# PART III

## Item 10.   DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The name, age at November 15, 2010 and position of each of our executive officers and directors are presented below.

| Name | Age | Position |
|------|-----|----------|
| Gregory E. Hyland | 59 | Chairman of the Board of Directors, President and Chief Executive Officer |
| Robert Barker | 53 | Executive Vice President, General Counsel, Chief Compliance Officer and Corporate Secretary |
| Robert D. Dunn | 53 | Senior Vice President, Human Resources |
| Thomas E. Fish | 56 | President, Anvil |
| Evan L. Hart | 45 | Senior Vice President and Chief Financial Officer |
| Robert P. Keefe | 56 | Senior Vice President and Chief Information Officer |
| Robert G. Leggett | 51 | Executive Vice President and Chief Operating Officer |
| Kevin G. McHugh | 52 | Vice President and Controller |
| Gregory S. Rogowski | 51 | President, Mueller Co. |
| Paul Ciolino | 49 | President, U.S. Pipe |
| Marietta Edmunds Zakas | 51 | Senior Vice President, Strategy, Corporate Development and Communications |
| Donald N. Boyce | 72 | Director |
| Howard L. Clark, Jr. | 66 | Director |
| Shirley C. Franklin | 65 | Director |
| Jerry W. Kolb | 74 | Director |
| Joseph B. Leonard | 67 | Director |
| Mark J. O'Brien | 67 | Director |
| Bernard G. Rethore | 69 | Director |
| Neil A. Springer | 72 | Director |
| Lydia W. Thomas | 66 | Director |
| Michael T. Tokarz | 60 | Director |

*Gregory E. Hyland* has served as Chairman of the Board of Directors since October 2005 and as President and Chief Executive Officer since January 2006. Mr. Hyland served as Chairman, President and Chief Executive Officer of Walter Energy, a homebuilding, financial services and natural resources company, from September 2005 to December 2006. Prior to that time, Mr. Hyland served as President, U.S. Fleet Management Solutions of Ryder System, Inc. ("Ryder"), a transportation and logistics company, from June 2005 to September 2005. He served as Executive Vice President, U.S. Fleet Management Solutions of Ryder from October 2004 to June 2005. Mr. Hyland earned Bachelor and Master of Business Administration degrees from the University of Pittsburgh.

*Robert Barker* has served as our Executive Vice President, General Counsel, Chief Compliance Officer and Corporate Secretary since November 2006. Previously, he was a partner with the law firm of Powell Goldstein LLP in Atlanta, Georgia since August 2001. Mr. Barker earned an A.B. in History and Political Science from Stanford University and earned a Juris Doctor from the University of Virginia School of Law.

*Robert D. Dunn* has served as our Senior Vice President, Human Resources since November 2007. Previously, he served as Senior Vice President, Human Resources of Dean Foods Company (formerly Suiza Foods Corporation), a food and dairy company since 1999. Mr. Dunn earned a Bachelor of Science degree from Murray State University and a Master of Business Administration degree from Embry Riddle Aeronautical University.

50

*Thomas E. Fish* has served as President of our Anvil segment since 2000. From January 2005 through November 2005, Mr. Fish served as Mueller Co.'s Interim Chief Financial Officer. Mr. Fish earned a Bachelor of Science degree from the University of Rhode Island and is a certified public accountant.

*Evan L. Hart* has served as our Senior Vice President and Chief Financial Officer since July 2008, as our Controller from December 2007 to July 2008 and as Vice President of Financial Planning and Analysis from September 2006 to December 2007. Previously, Mr. Hart had been Vice President, Controller and Treasurer for Unisource Worldwide, Inc., a marketer and distributor of commercial printing & business imaging papers, packaging systems and facility supplies and equipment from 2002 to 2006. Mr. Hart earned a Bachelor of Science degree from Birmingham-Southern College and is a certified public accountant.

*Robert P. Keefe* has served as our Senior Vice President and Chief Information Officer since March 2007. Previously, Mr. Keefe was Corporate Vice President and Chief Information Officer at Russell Corporation, an athletic apparel, footwear and equipment company, from August 2002 to August 2006. Mr. Keefe is a director of the Society for Information Management, International (SIM), a non-profit trade organization. Mr. Keefe earned a Bachelor degree from the State University of New York at Oswego and a Master of Business Administration degree from Pace University.

*Robert G. Leggett* has served as our Chief Operating Officer since September 2008. Mr. Leggett served from 2002 to 2008 as a Senior Vice President for Armstrong World Industries, a global leader in the design manufacture of floors, ceilings and cabinets, primarily leading the America's Building Products business. Mr. Leggett earned a Bachelor of Science degree from the Pennsylvania State University.

*Kevin G. McHugh* has served as our Vice President and Controller since July 2008 and our Vice President, Financial Reporting from January 2008 to July 2008. Previously, he was Corporate Controller at Unisource Worldwide, Inc. from 2003 to 2007. Mr. McHugh earned a Bachelor of Business Administration degree from the University of Notre Dame and is a certified public accountant.

*Gregory S. Rogowski* has served as President of our Mueller Co. segment since May 2009. Previously he was President and Chief Executive Officer of Performance Fibers, Inc., a polyester industrial fibers business, since 2004. Mr. Rogowski earned a Bachelor of Science degree from Virginia Polytechnic Institute and State University, a Master of Science degree from the University of Akron and a Master of Business Administration degree from the University of Richmond.

*Paul Ciolino* has served as President of our U.S. Pipe segment since August 2010. Previously, he served as President of Griffin Pipe Products Co. Inc. ("Griffin"), a ductile iron pipe manufacturer. Mr. Ciolino joined Griffin in 2002 as Vice President of marketing and was named President of Griffin later that year. Prior to joining Griffin, Mr. Ciolino served as managing director of ASF-Keystone Europe, an engineered products and metals manufacturing business. Mr. Ciolino earned a Bachelor of Science degree from Cornell University and a Master of Business Administration degree from Rutgers University.

*Marietta Edmunds Zakas* has served as Senior Vice President, Strategy, Corporate Development and Communications, since November 2006. Previously Ms. Zakas served in various positions at Russell Corporation, from September 2001 to August 2006, culminating in her role as Corporate Vice President, Chief of Staff, Business Development and Treasurer. Ms. Zakas earned a Bachelor of Arts degree from Randolph-Macon Woman's College (now known as Randolph College), a Master of Business Administration degree from the University of Virginia Darden School of Business and a Juris Doctor from the University of Virginia School of Law.

*Donald N. Boyce* has been a member of our Board of Directors since April 2006. He was a director of Walter Energy, from August 1998 to April 2006. Mr. Boyce served as Chairman of the Board of Walter Energy from November 2000 to March 2002 and as Chairman of the Board, President and Chief Executive Officer of

Walter Energy from August 2000 to November 2000. During this time, Walter Energy owned U.S. Pipe. Mr. Boyce was Chairman of the Board of Directors of IDEX Corporation, a proprietary engineered industrial products manufacturing company, from April 1999 to March 2000, Chairman of the Board of Directors and Chief Executive Officer of IDEX Corporation from March 1998 to March 1999 and Chairman of the Board of Directors, President and Chief Executive Officer of IDEX Corporation from January 1988 to March 1998.

*Howard L. Clark, Jr.* has been a member of our Board of Directors since April 2006. He has been a director of Walter Energy since March 1995. Mr. Clark has been a Vice Chairman in the Investment Banking Division at Barclays Capital, an investment banking firm, since September 2008. He previously served as Vice Chairman of Lehman Brothers Inc., an investment banking firm, from February 1993 to September 2008 and, before that, as Chairman and Chief Executive Officer of Shearson Lehman Brothers Inc. Mr. Clark is also a director of United Rentals, Inc., an equipment rental company, and White Mountains Insurance Group, Ltd., a financial services holding company. Mr. Clark is a director of NIBCO Inc., a company that provides flow control solutions.

*Shirley C. Franklin* has been a member of our Board of Directors since November 2010. Ms. Franklin served as mayor of the city of Atlanta, Georgia from 2002 to 2009. She has served on a special task force for the Department of Homeland Security and serves on the board of directors of the United Nations Institute for Training and Research. In addition, Ms. Franklin is the Co-Chair of the Atlanta Regional Commission on Homelessness, Co-Chair of the board of directors of the National Center for Civil and Human Rights and Senior Advisor to the Alliance for Digital Equality.

*Jerry W. Kolb* has been a member of our Board of Directors since April 2006. He has been a director of Walter Energy since June 2003. Mr. Kolb previously served as a Vice Chairman of Deloitte & Touche LLP, a registered public accounting firm, from 1986 to 1988.

*Joseph B. Leonard* has been a member of our Board of Directors since April 2006. He was a director of Walter Energy from June 2005 to April 2007 and he rejoined that board in February 2009. In March 2010, he became Interim Chief Executive Officer of Walter Energy. Mr. Leonard was Chairman of AirTran Holdings, Inc., a full service airline company, from November 2007 to June 2008, Chairman and Chief Executive Officer of AirTran Holdings, Inc. from January 1999 to November 2007 and President of AirTran Holdings, Inc. from January 1999 to January 2001. Mr. Leonard is a director of Air Canada, a full service airline company.

*Mark J. O'Brien* has been a member of our Board of Directors since April 2006. He was a director of Walter Energy from June 2005 to April 2009. Since March 2006, Mr. O'Brien has served as Chairman and Chief Executive Officer of Walter Investment Management Corp. (formerly Walter Energy's Homes Business). Mr. O'Brien has served as President and Chief Executive Officer of Brier Patch Capital and Management, Inc., a real estate investment firm, since September 2004. Mr. O'Brien served in various executive capacities at Pulte Homes, Inc., a home building company, for 21 years, retiring as President and Chief Executive Officer in June 2003.

*Bernard G. Rethore* has been a member of our Board of Directors since April 2006. He has been a director of Walter Energy since March 2002. He has been Chairman of the Board Emeritus of Flowserve Corporation, a manufacturer of pumps, valves, seals and components, since April 2000. From January 2000 to April 2000, he served as Flowserve Corporation's Chairman. He had previously served as Chairman, Chief Executive Officer and President of Flowserve Corporation. Mr. Rethore is a director of Belden, Inc., a manufacturer of specialty signal-transmission products, and Dover Corp., a diversified manufacturer of a wide range of proprietary products.

*Neil A. Springer* has been a member of our Board of Directors since April 2006. He was a director of Walter Energy from August 2000 to April 2006. Mr. Springer has been managing director of Springer & Associates LLC, a board consulting and executive recruitment company, since 1994. Mr. Springer is a director of IDEX Corporation.

Case: 18-31177    Document: 00515297113    Page: 321    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 322 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26293   Filed 10/25/20   Page 87 of 132

*Lydia W. Thomas* has been a member of our Board of Directors since January 2008. She served as President and Chief Executive Officer of Noblis, Inc., a public interest scientific research, technology and strategy company, from 1996 to 2007. She was previously with The MITRE Corporation, Center for Environment, Resources and Space, serving as Senior Vice President and General Manager from 1992 to 1996, Vice President from 1989 to 1992 and Technical Director from 1982 to 1989. She is a director of Cabot Corporation, a global performance materials company, and Washington Mutual Investors Fund, a registered investment company.

*Michael T. Tokarz* has been a member of our Board of Directors since April 2006. He has served as non-executive Chairman of the Board of Walter Energy since December 2006. Since February 2002, he has been a member of the Tokarz Group, LLC, a venture capital investment company. From January 1996 until February 2002, Mr. Tokarz was a member of the limited liability company that serves as the general partner of Kohlberg Kravis Roberts & Co. L.P., a private equity company. From 2004 until 2010, he served on the board of directors of Dakota Growers Pasta Company, Inc., a manufacturer and marketer of dry pasta products. Mr. Tokarz is a director of IDEX Corporation, Conseco, Inc., an insurance provider, MVC Capital, Inc., a registered investment company, and Walter Investment Management Corp.

**Additional Information**

Additional information required by this item will be contained in our definitive proxy statement issued in connection with the 2011 annual meeting of stockholders filed with the SEC within 120 days after September 30, 2010 and is incorporated herein by reference.

Our website address is *www.muellerwaterproducts.com*. You may obtain free electronic copies of our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to those reports from the investors section of our website. These reports are available on our website as soon as reasonably practicable after we file them with the SEC. These reports should also be available through the SEC's website at *www.sec.gov*.

We have adopted a written code of conduct that applies to all directors, officers and employees, including a separate code that applies only our principal executive officer and senior financial officers in accordance with Section 406 of the Sarbanes-Oxley Act of 2002 and the rules of the SEC promulgated thereunder. Our Code of Business Conduct and Ethics is available in the corporate governance section of our website. In the event that we make changes in, or provide waivers from, the provisions of this Code of Business Conduct and Ethics that the SEC requires us to disclose, we will disclose these events in the corporate governance section of our website.

We have adopted corporate governance guidelines. The guidelines and the charters of our board committees are available in the corporate governance section of our website. Copies of the Code of Business Conduct and Ethics, corporate governance guidelines and board committee charters are also available in print upon written request to the Corporate Secretary, Mueller Water Products, Inc., 1200 Abernathy Road N.E., Suite 1200, Atlanta, GA 30328.

**Item 11.    EXECUTIVE COMPENSATION**

The information required by this item will be contained in our definitive proxy statement issued in connection with the 2011 annual meeting of stockholders is incorporated herein by reference.

**Item 12.    SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

Except for the information set forth below and the information set forth in Part II, Item 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES, the information required by this item will be contained in our definitive proxy statement issued in connection with the 2011 annual meeting of stockholders and is incorporated herein by reference.

Case: 18-31177    Document: 00515297113    Page: 322    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC  Document 26293  Filed 02/05/20  Page 323 of 1003
Case 2:10-md-02179-CJB-JCW  Document 26293  Filed 10/25/19  Page 82 of 132

*Securities Authorized for Issuance under Equity Compensation Plans*

We have two compensation plans under which our equity securities are authorized for issuance. The Mueller Water Products, Inc. 2006 Employee Stock Purchase Plan was approved by our sole stockholder in May 2006 and the Mueller Water Products, Inc. 2006 Stock Incentive Plan was approved by our sole stockholder in May 2006 and amended by our stockholders in January 2008 and January 2009. The following table sets forth certain information relating to these equity compensation plans at September 30, 2010.

| | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance |
|---|---|---|---|
| Equity compensation plans approved by stockholders: | | | |
| Mueller Water Products, Inc. 2006 Stock Incentive Plan | 6,820,259  (1) | $            - | 7,109,324  (2) |
| Mueller Water Products, Inc. 2006 Employee Stock Purchase Plan | - | - | 2,913,588  (3) |
| Total | 6,820,259 | | 10,022,912 |
| Equity compensation plans not approved by stockholders | - | - | - |

(1)  Consists of shares to be issued upon exercise of outstanding options granted under the Mueller Water Products, Inc. 2006 Stock Incentive Plan.

(2)  The number of shares available for future issuance under the Mueller Water Products, Inc. 2006 Stock Incentive Plan is 16,000,000 shares less the cumulative number of awards granted under the plan plus the cumulative number of awards cancelled under the plan.

(3)  The number of shares available for future issuance under the Mueller Water Products, Inc. 2006 Stock Purchase Plan is 4,000,000 shares less the cumulative number of shares issued under the plan.

## Item 13.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information required by this item will be contained in our definitive proxy statement issued in connection with the 2011 annual meeting of stockholders is incorporated herein by reference.

## Item 14.    PRINCIPAL ACCOUNTANT FEES AND SERVICES

The information required by this item will be contained in our definitive proxy statement issued in connection with the 2011 annual meeting of stockholders is incorporated herein by reference.

## PART IV

**Item 15.    EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

**(a)    Financial Statements**

| Index to financial statements | Page number |
|---|---|
| Reports of Independent Registered Public Accounting Firm | F-1 |
| Consolidated Balance Sheets at September 30, 2010 and 2009 | F-3 |
| Consolidated Statements of Operations for the years ended September 30, 2010, 2009 and 2008 | F-4 |
| Consolidated Statements of Stockholders' Equity for the years ended September 30, 2010, 2009 and 2008 | F-5 |
| Consolidated Statements of Cash Flows for the years ended September 30, 2010, 2009 and 2008 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

**(b)    Financial Statement Schedules**

Except for Schedule II, Valuation and Qualifying Accounts, the schedules for which provision is made in the applicable accounting regulations of the Securities and Exchange Commission are not required under the related instructions or are inapplicable and, therefore, have been omitted. The information required by Schedule II is included in the notes to consolidated financial statements.

**(c)  Exhibits**

| Exhibit no. | Document |
|---|---|
| 2.1 | Agreement and Plan of Merger dated as of June 17, 2005 among Mueller Water Products, Inc., Walter Industries, Inc., JW MergerCo, Inc. and DLJ Merchant Banking II, Inc., as stockholders' representative. Incorporated by reference to Exhibit 2.1 to Mueller Water Products, Inc. Form 8-K (File no. 333-116590) filed on June 21, 2005. |
| 2.1.1 | Letter Agreement dated as of February 23, 2006 between Walter Industries, Inc. and Mueller Water Products, Inc. Incorporated by reference to Exhibit 10.1 to Mueller Water Products, Inc. Form 8-K (File no. 333-131521) filed February 27, 2006. |
| 2.2 | Agreement and Plan of Merger, dated as of January 31, 2006, by and among Mueller Holding Company, Inc., Mueller Water Products, LLC and Mueller Water Products Co-Issuer, Inc. Incorporated by reference to Exhibit 2.1 Mueller Water Products, Inc. Form 8-K (File no. 333-116590) filed on February 3, 2006. |
| 3.1 | Second Restated Certificate of Incorporation of Mueller Water Products, Inc. Incorporated by reference to Exhibit 3.4 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on January 29, 2009. |
| 3.1.1 | Certificate of Merger, dated February 2, 2006, of Mueller Water Products, LLC and Mueller Water Products Co-Issuer, Inc. with and into Mueller Holding Company, Inc. Incorporated by reference to Exhibit 3.1.2 to Mueller Water Products, Inc. Form 8-K (File no. 333-116590) filed on February 3, 2006. |
| 3.2 | Amended and Restated Bylaws of Mueller Water Products, Inc. Incorporated by reference to Exhibit 3.1 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on August 22, 2008. |
| 4.1 | Indenture, dated as of April 29, 2004, between Mueller Holdings (N.A.), Inc. and Law Debenture Trust Company of New York for the 14.75% Senior Discount Notes due 2014. Incorporated by reference to Exhibit 4.1 to Mueller Water Products, LLC Registration Statement on Form S-1 (File no. 333-116590) filed on June 17, 2004. |
| 4.1.1 | Supplemental Indenture, dated as of October 3, 2005, by and among Mueller Water Products, LLC, Mueller Water Products Co-Issuer, Inc. and Law Debenture Trust Company of New York. Incorporated by reference to Exhibit 4.1 to Mueller Water Products, Inc. Form 10-Q (File no. 333-131521) filed on February 22, 2006. |
| 4.1.2 | Second Supplemental Indenture, dated as of February 2, 2006, between, by and among Mueller Holding Company, Inc., Mueller Water Products, LLC, Mueller Water Products Co-Issuer, Inc. and Law Debenture Trust Company of New York. Incorporated by reference to Exhibit 10.1 to Mueller Water Products, Inc. Form 8-K (File no. 333-116590) filed on February 3, 2006. |
| 4.1.3 | Third Supplemental Indenture, dated as of May 14, 2007, to the Indenture dated as of April 29, 2004 among Mueller Water Products, Inc. and Law Debenture Trust Company of New York, as trustee. Incorporated by reference to Exhibit 4.1.3 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on May 17, 2007. |
| 4.2 | Indenture dated as of May 24, 2007 among Mueller Water Products, Inc., the guarantors named on the signature pages thereto and The Bank of New York (including form of global notes). Incorporated by reference to Exhibit 4.6 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on May 30, 2007. |

Case: 18-31177     Document: 00515297113     Page: 325     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 326 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26347-3   Filed 10/25/20   Page 71 of 112

4.3   Indenture, dated August 26, 2010, among Mueller Water Products, Inc., the guarantors named on the signature pages thereto and The Bank of New York Mellon Trust Company, N.A., as trustee (including form of global notes). Incorporated by reference to Exhibit 4.6 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on August 27, 2010.

10.1   Amended and Restated Credit Agreement among Mueller Water Products, Inc., as Borrower, Mueller Group, LLC, as prior borrower, Bank of America, N.A., as Administrative Agent, Swing Line Lender, and an L/C Issuer, JPMorgan Chase Bank, N.A., as Syndication Agent, and an L/C Issuer and the lenders named on the signature pages thereto. Incorporated by reference to Exhibit 10.17 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on May 30, 2007.

10.1.1   Amendment No.1 to Amended and Restated Credit Agreement, dated as of June 21, 2007, among Mueller Water Products, Inc., Bank of America, N.A., and each of the guarantors named on the signature pages thereto. Incorporated by reference to Exhibit 10.20 to Mueller Water Products, Inc. Form 10-Q (File no. 001-32892) for the quarter ended June 30, 2007.

10.1.2   Amendment No. 2 to Amended and Restated Credit Agreement, dated as of June 18, 2009, among Mueller Water Products, Inc., Bank of America, N.A., and each of the guarantors named on the signature pages thereto. Incorporated by reference to Exhibit 10.1.2 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on June 18, 2009.

10.2   Income Tax Allocation Agreement by and among Walter Industries, Inc., the Walter Affiliates (as defined therein), Mueller Water Products, Inc. and the Mueller Affiliates (as defined therein). Incorporated by reference to Exhibit 10.2 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on May 30, 2006.

10.3   Mueller Water Products, Inc. Amended and Restated 2006 Stock Incentive Plan.

10.4   Mueller Water Products, Inc. Form of Notice of Stock Option Grant. Incorporated by reference to Exhibit 10.5.2 to Mueller Water Products, Inc. Form 10-Q for the quarter ended December 31, 2007 (File no. 001-32892) filed on February 11, 2008.

10.5   Mueller Water Products, Inc. Form of Restricted Stock Unit Award Agreement. Incorporated by reference to Exhibit 10.5.3 to Mueller Water Products, Inc. Form 10-Q for the quarter ended December 31, 2007 (File no. 001-32892) filed on February 11, 2008.

10.6   Mueller Water Products, Inc. 2006 Employee Stock Purchase Plan, as amended September 27, 2006. Incorporated by reference to Exhibit 10.5 to Mueller Water Products, Inc. Form 10-K (File no. 001-32892) filed on December 21, 2006.

10.7   Mueller Water Products, Inc. Directors' Deferred Fee Plan. Incorporated by reference to Exhibit 10.7 to Mueller Water Products, Inc. 8-K (File no. 001-32892) filed on May 30, 2006.

10.8   Form of Mueller Water Products, Inc. Director Indemnification Agreement. Incorporated by reference to Exhibit 99.2 to Mueller Water Products, Inc. 8-K (File no. 001-32892) filed on October 31, 2008.

10.9   Executive Incentive Plan of Mueller Water Products, Inc. Incorporated by reference to Exhibit 10.6 to Mueller Water Products, Inc. 8-K (File no. 001-32892) filed on May 30, 2006.

10.10   Mueller Water Products, Inc. Executive Deferred Compensation Plan. Incorporated by reference to Exhibit 99.3 to Mueller Water Products, Inc. 8-K (File no. 001-32892) filed on October 31, 2008.

10.11   Employment Agreement, dated September 15, 2008 between Mueller Water Products, Inc. and Gregory E. Hyland. Incorporated by reference to Exhibit 99.1 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on October 6, 2008.

10.11.1   Amendment, dated as of March 2, 2006, to Executive Employment Agreement dated September 9, 2005 between Walter Industries, Inc. and Gregory E. Hyland. Incorporated by reference to Exhibit 10.1 to Mueller Water Products, Inc. Form 8-K (File no. 333-131521) filed on March 3, 2006.

10.11.2   Amended and Restated Mueller Water Products, Inc. Supplemental Defined Contribution Plan, effective as of January 1, 2009. Incorporated by reference to Exhibit 10.13.2 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on February 9, 2009.

10.11.3   Amendment, dated December 1, 2009, to Executive Employment Agreement, dated September 9, 2005, between Mueller Water Products, Inc. and Gregory E. Hyland. Incorporated by reference to Exhibit 99.1 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on December 4, 2009.

10.12   Executive Employment Agreement, dated January 23, 2006, between Mueller Holding Company, Inc. and Dale B. Smith. Incorporated by reference to Exhibit 10.2 to Mueller Water Products, LLC Form 8-K (File no. 333-116590) filed on January 27, 2006.

10.12.1   Amendment dated as of November 1, 2007 to Employment Agreement with Dale B. Smith dated January 23, 2006. Incorporated by reference to Exhibit 99.2 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on November 2, 2007.

10.12.2   Amendment No. 2 dated as of October 1, 2008 to Employment Agreement with Dale B. Smith dated January 23, 2006. Incorporated by reference to Exhibit 99.1 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on October 31, 2008.

10.13   Employment Agreement, dated as of September 15, 2008, between Mueller Water Products, Inc. and Robert Leggett. Incorporated by reference to Exhibit 99.1 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on September 30, 2008.

10.13.1   Amendment, dated December 1, 2009, to Executive Employment Agreement, dated September 15, 2008, between Mueller Water Products, Inc. and Robert Leggett. Incorporated by reference to Exhibit 99.2 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on December 4, 2009.

10.14   Executive Employment Agreement, dated as of July 16, 2008, between Mueller Water Products, Inc. and Evan L. Hart. Incorporated by reference to Exhibit 10.18 to Mueller Water Products, Inc. Form 10-Q for the quarter ended June 30, 2008 (File 001-32892) filed on August 11, 2008.

10.14.1   Amendment, dated December 1, 2009, to Executive Employment Agreement, dated September 6, 2006, between Mueller Water Products, Inc. and Evan L. Hart. Incorporated by reference to Exhibit 99.3 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on December 4, 2009.

10.15   Employment Agreement, dated as of July 31, 2006, between Mueller Water Products, Inc. and Thomas E. Fish. Incorporated by reference to Exhibit 10.2 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on August 3, 2006.

10.15.1   Mueller Water Products, Inc. Special Bonus, Incentive Award and Termination Protection Program. Incorporated by reference to Exhibit 10.18 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on December 14, 2007.

10.15.2   Employment Agreement, dated as of February 22, 2010, between Mueller Water Products, Inc. and Thomas E. Fish. Incorporated by reference to Exhibit 99.1 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on February 26, 2010.

10.15.3   Executive Change-in-Control Severance Agreement, dated February 22, 2010, between Mueller Water Products, Inc. and Thomas E. Fish. Incorporated by reference to Exhibit 99.2 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on February 26, 2010.

| 10.16 | Employment Agreement, dated September 15, 2008, between Mueller Water Products, Inc and Raymond P. Torok. Incorporated by reference to Exhibit 99.2 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892 filed on October 6, 2008. |
|---|---|
| 10.16.1 | Amendment, dated December 1, 2009, to Executive Employment Agreement, dated July 12, 2004, between Mueller Water Products, Inc. and Raymond P. Torok. Incorporated by reference to Exhibit 99.4 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on December 4, 2009. |
| 10.16.2 | Second Amendment to Employment Agreement, dated August 2, 2010, between Mueller Water Products, Inc. and Raymond P. Torok. Incorporated by reference to Exhibit 10.1 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on August 6, 2010. |
| 10.17 | Joint Litigation Agreement dated December 14, 2006 between Walter Industries, Inc. and Mueller Water Products, Inc. Incorporated by reference to Exhibit 10.3 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on December 19, 2006. |
| 10.18 | Form of Executive Change-in-Control Severance Agreement. Incorporated by reference to Exhibit 99.3 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on October 6, 2008. |
| 10.19 | Form of Amendment to Executive Employment Agreement. Incorporated by reference to Exhibit 99.1 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on February 6, 2009. |
| 10.20 | Mueller Water Products, Inc. 2010 Management Incentive Plan. Incorporated by reference to Exhibit 10.20 to Mueller Water Products, Inc. Form 10-Q (File no. 001-32892) filed on February 9, 2010. |
| 10.21 | Second Amended and Restated 2006 Stock Incentive Plan. Incorporated by reference to Exhibit 10.21 to Mueller Water Products, Inc. Form 10-Q (File no. 001-32892) filed on February 9, 2010. |
| 10.22 | Amended and Restated 2006 Stock Incentive Plan. Incorporated by reference to Exhibit 10.22 to Mueller Water Products, Inc. Form 10-Q (File no. 001-32892) filed on February 9, 2010. |
| 10.23 | Employment Agreement, dated August 9, 2010, between Mueller Water Products, Inc. and Paul Ciolino. Incorporated by reference to Exhibit 10.20 to Mueller Water Products, Inc. Form 10-Q (File no. 001-32892) filed on August 9, 2010. |
| 10.23.1 | Executive Change-in-Control Severance Agreement, dated August 9, 2010, between Mueller Water Products, Inc. and Paul Ciolino. Incorporated by reference to Exhibit 10.21 to Mueller Water Products, Inc. Form 10-Q (File no. 001-32892) filed on August 9, 2010. |
| 10.24 | Purchase Agreement, dated August 19, 2010, between Mueller Water Products, Inc. and the Guarantors named therein and Banc of America Securities LLC. Incorporated by reference to Exhibit 10.22 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on August 20, 2010. |
| 10.25 | Credit Agreement, dated August 26, 2010, among Mueller Water Products, Inc. and the borrowing subsidiaries named on the signature pages thereto, each as a Borrower, certain financial institutions, as Lenders, JPMorgan Chase Bank, N.A., as Syndication Agent, Wells Fargo Bank, National Association and SunTrust Bank, as Co-Documentation Agents, Bank of America, N.A. as Administrative Agent and Banc of America Securities LLC and J.P. Morgan Securities Inc., as Joint Lead Arrangers and Joint Bookrunners. Incorporated by reference to Exhibit 10.23 to Mueller Water Products, Inc. Form 8-K (File no. 001-32892) filed on August 27, 2010. |
| 10.26** | Employment Agreement, dated April 10, 2009, between Mueller Water Products, Inc. and Gregory Rogowski. |
| 10.27** | Amendment to Employment Agreement, dated December 1, 2009, between Mueller Water Products, Inc. and Gregory Rogowski. |
| 10.28** | Executive Change-in-Control Severance Agreement, dated May 4, 2009, between Mueller Water Products, Inc. and Gregory Rogowski. |
| 12.1** | Computation of Ratio of Earnings to Fixed Charges. |

Case: 18-31177     Document: 00515297113     Page: 328     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 329 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26547-2   Filed 10/12/20   Page 74 of 132

14.1      Code of Business Conduct and Ethics for Mueller Water Products, Inc. Incorporated by reference to Exhibit 14.1 to Mueller Water Products, Inc. Form 10-K (File no. 001-32892) for the year ended September 30, 2008.

21.1**    Subsidiaries of Mueller Water Products, Inc.

23.1**    Consent of Ernst & Young LLP.

31.1**    Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

31.2**    Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

32.1**    Certification of Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

32.2**    Certification of Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

---

**    Filed with this annual report

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: November 23, 2010

<div align="right">

MUELLER WATER PRODUCTS, INC.

By:      /s/ Gregory E. Hyland

       Name: Gregory E. Hyland
       Title: *Chairman, President and Chief Executive Officer*

</div>

Pursuant to the requirements of the Securities Act of 1934, as amended, this report has been signed by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Gregory E. Hyland<br>Gregory E. Hyland | Chairman of the Board of Directors, President and Chief Executive Officer (principal executive officer) | November 23, 2010 |
| /s/ Evan L. Hart<br>Evan L. Hart | Senior Vice President and Chief Financial Officer (principal financial officer) | November 23, 2010 |
| /s/ Kevin G. McHugh<br>Kevin G. McHugh | Vice President and Controller (principal accounting officer) | November 23, 2010 |
| /s/ Donald N. Boyce<br>Donald N. Boyce | Director | November 23, 2010 |
| /s/ Howard L. Clark<br>Howard L. Clark | Director | November 23, 2010 |
| /s/ Shirley C. Franklin<br>Shirley C. Franklin | Director | November 23, 2010 |
| /s/ Jerry W. Kolb<br>Jerry W. Kolb | Director | November 23, 2010 |
| /s/ Joseph B. Leonard<br>Joseph B. Leonard | Director | November 23, 2010 |
| /s/ Mark J. O'Brien<br>Mark J. O'Brien | Director | November 23, 2010 |
| /s/ Bernard G. Rethore<br>Bernard G. Rethore | Director | November 23, 2010 |
| /s/ Neil A. Springer<br>Neil A. Springer | Director | November 23, 2010 |
| <br>Lydia W. Thomas | Director | |
| /s/ Michael T. Tokarz<br>Michael T. Tokarz | Director | November 23, 2010 |

[THIS PAGE INTENTIONALLY LEFT BLANK]

Case: 18-31177     Document: 00515297113     Page: 331     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 332 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26047-2   Filed 10/03/19   Page 77 of 132

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders of Mueller Water Products, Inc.

We have audited the accompanying consolidated balance sheet of Mueller Water Products, Inc. and subsidiaries as of September 30, 2010 and 2009, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended September 20, 2010. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Mueller Water Products, Inc. and subsidiaries at September 30, 2010 and 2009, and the results of their operations and their cash flows for each of the three years in the period ended September 30, 2010 in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Mueller Water Products, Inc.'s internal control over financial reporting as of September 30, 2010, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated November 23, 2010 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP

Atlanta, Georgia
November 23, 2010

Case: 18-31177    Document: 00515297113    Page: 332    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 333 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26272-3   Filed 10/25/19   Page 78 of 112

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders of Mueller Water Products, Inc.

We have audited Mueller Water Products, Inc. and subsidiaries' internal control over financial reporting as of September 30, 2010, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Mueller Water Products, Inc. and subsidiaries' management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Mueller Water Products, Inc. and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of September 30, 2010, based on the COSO criteria. We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Mueller Water Products, Inc. and subsidiaries as of September 30, 2010 and 2009 and the related consolidated statements of operations, stockholders' equity and cash flows for each of the three years in the period ended September 30, 2010 and our report dated November 23, 2010 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP

Atlanta, Georgia
November 23, 2010

Case: 18-31177     Document: 00515297113     Page: 333     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 334 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26547-3   Filed 10/05/20   Page 73 of 132

## MUELLER WATER PRODUCTS, INC. AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS

| | September 30, | |
| --- | --- | --- |
| | **2010** | **2009** |
| | **(in millions)** | |
| Assets: | | |
| Cash and cash equivalents | $ 83.7 | $ 61.5 |
| Receivables, net | 202.5 | 216.3 |
| Inventories | 268.4 | 342.8 |
| Deferred income taxes | 30.3 | 30.8 |
| Assets held for sale | - | 13.9 |
| Other current assets | 51.5 | 80.8 |
| Total current assets | 636.4 | 746.1 |
| Property, plant and equipment, net | 264.4 | 296.4 |
| Identifiable intangible assets | 632.4 | 663.6 |
| Other noncurrent assets | 35.0 | 33.4 |
| Total assets | $ 1,568.2 | $ 1,739.5 |
| Liabilities and stockholders' equity: | | |
| Current portion of long-term debt | $ 0.7 | $ 11.7 |
| Accounts payable | 93.2 | 111.7 |
| Other current liabilities | 89.8 | 97.4 |
| Total current liabilities | 183.7 | 220.8 |
| Long-term debt | 691.5 | 728.5 |
| Deferred income taxes | 165.5 | 180.0 |
| Other noncurrent liabilities | 122.2 | 173.9 |
| Total liabilities | 1,162.9 | 1,303.2 |
| Commitments and contingencies (Note 19) | | |
| Common stock: | | |
| Series A: 600,000,000 shares authorized, 154,708,474 and 153,790,887 shares outstanding at September 30, 2010 and 2009, respectively | 1.5 | 1.5 |
| Additional paid-in capital | 1,597.5 | 1,599.0 |
| Accumulated deficit | (1,123.5) | (1,078.3) |
| Accumulated other comprehensive loss | (70.2) | (85.9) |
| Total stockholders' equity | 405.3 | 436.3 |
| Total liabilities and stockholders' equity | $ 1,568.2 | $ 1,739.5 |

The accompanying notes are an integral part of the consolidated financial statements.

F-3

## MUELLER WATER PRODUCTS, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF OPERATIONS

|  | Year ended September 30, | | |
|---|---|---|---|
|  | 2010 | 2009 | 2008 |
|  | (in millions, except per share amounts) | | |
| Net sales | $ 1,337.5 | $ 1,427.9 | $ 1,859.3 |
| Cost of sales | 1,101.1 | 1,171.0 | 1,420.3 |
| Gross profit | 236.4 | 256.9 | 439.0 |
| Operating expenses: | | | |
| Selling, general and administrative | 219.3 | 239.1 | 274.6 |
| Impairment | - | 970.9 | - |
| Restructuring | 13.1 | 47.8 | 18.3 |
| Total operating expenses | 232.4 | 1,257.8 | 292.9 |
| Income (loss) from operations | 4.0 | (1,000.9) | 146.1 |
| Interest expense, net | 68.0 | 78.3 | 72.4 |
| Loss on early extinguishment of debt, net | 4.6 | 3.8 | - |
| Income (loss) before income taxes | (68.6) | (1,083.0) | 73.7 |
| Income tax expense (benefit) | (23.4) | (86.3) | 31.7 |
| Net income (loss) | $ (45.2) | $ (996.7) | $ 42.0 |
| Basic and diluted net income (loss) per share | $ (0.29) | $ (8.55) | $ 0.36 |
| Weighted average shares outstanding: | | | |
| Basic | 154.3 | 116.6 | 115.1 |
| Diluted | 154.3 | 116.6 | 115.5 |
| Dividends declared per share | $ 0.07 | $ 0.07 | $ 0.07 |

The accompanying notes are an integral part of the consolidated financial statements.

Case: 18-31177    Document: 00515297113    Page: 335    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 336 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26072-3   Filed 10/02/19   Page 336 of 1003

**MUELLER WATER PRODUCTS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

| | Common stock | Additional paid-in capital | Accumulated deficit | Accumulated other comprehensive income (loss) | Total |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| Balance at September 30, 2007 | $ 1.1 | $ 1,422.0 | $ (124.8) | $ 12.7 | $ 1,311.0 |
| Adjustment related to uncertain income tax positions | - | - | 0.6 | - | 0.6 |
| Balance at October 1, 2007 | 1.1 | 1,422.0 | (124.2) | 12.7 | 1,311.6 |
| Net income | - | - | 42.0 | - | 42.0 |
| Effect of changing pension plans' and other postretirement benefit plans' measurement dates to September 30 | - | - | 0.6 | - | 0.6 |
| Dividends declared | - | (8.1) | - | - | (8.1) |
| Stock-based compensation | - | 13.2 | - | - | 13.2 |
| Stock issued under stock compensation plans | 0.1 | 1.8 | - | - | 1.9 |
| Derivative instruments | - | - | - | (6.5) | (6.5) |
| Foreign currency translation | - | - | - | (2.7) | (2.7) |
| Minimum pension liability | - | - | - | (23.1) | (23.1) |
| Balance at September 30, 2008 | 1.2 | 1,428.9 | (81.6) | (19.6) | 1,328.9 |
| Net loss | - | - | (996.7) | - | (996.7) |
| Sale of common stock in public offering | 0.3 | 165.7 | - | - | 166.0 |
| Dividends declared | - | (8.1) | - | - | (8.1) |
| Stock-based compensation | - | 11.6 | - | - | 11.6 |
| Stock issued under stock compensation plans | - | 0.9 | - | - | 0.9 |
| Derivative instruments | - | - | - | (3.8) | (3.8) |
| Foreign currency translation | - | - | - | (3.4) | (3.4) |
| Minimum pension liability | - | - | - | (59.1) | (59.1) |
| Balance at September 30, 2009 | 1.5 | 1,599.0 | (1,078.3) | (85.9) | 436.3 |
| Net loss | - | - | (45.2) | - | (45.2) |
| Dividends declared | - | (10.8) | - | - | (10.8) |
| Stock-based compensation | - | 8.3 | - | - | 8.3 |
| Stock issued under stock compensation plans | - | 1.0 | - | - | 1.0 |
| Derivative instruments | - | - | - | 3.5 | 3.5 |
| Foreign currency translation | - | - | - | 3.4 | 3.4 |
| Minimum pension liability | - | - | - | 8.8 | 8.8 |
| Balance at September 30, 2010 | $ 1.5 | $ 1,597.5 | $(1,123.5) | $ (70.2) | $ 405.3 |

The accompanying notes are an integral part of the consolidated financial statements.

F-5

Case: 18-31177    Document: 00515297113    Page: 336    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 337 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26072-3   Filed 10/25/19   Page 82 of 132

**MUELLER WATER PRODUCTS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year ended September 30, | | |
|---|---|---|---|
| | **2010** | **2009** | **2008** |
| | **(in millions)** | | |
| Operating activities: | | | |
| Net income (loss) | $ (45.2) | $ (996.7) | $ 42.0 |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Depreciation | 53.6 | 59.5 | 63.6 |
| Amortization | 31.0 | 30.7 | 29.5 |
| Impairments and non-cash restructuring | 4.4 | 1,009.4 | 14.8 |
| Provision (benefit) for doubtful receivables | (0.6) | 6.4 | 3.7 |
| Loss on early extinguishment of debt, net | 4.6 | 3.8 | - |
| Stock-based compensation expense | 8.3 | 11.6 | 13.2 |
| Deferred income taxes | (21.1) | (57.8) | (4.2) |
| Gain on disposal of assets | (4.8) | (2.9) | (0.9) |
| Retirement plans | 8.1 | 5.2 | (0.9) |
| Interest rate swap contracts | 3.9 | - | - |
| Other, net | 1.0 | 2.9 | 3.8 |
| Changes in assets and liabilities, net of acquisitions: | | | |
| Receivables | 1.6 | 68.8 | (11.3) |
| Inventories | 54.3 | 109.8 | (18.2) |
| Other current assets and other noncurrent assets | 33.7 | (32.9) | 11.4 |
| Accounts payable and other liabilities | (69.8) | (87.3) | 35.5 |
| Net cash provided by operating activities | 63.0 | 130.5 | 182.0 |
| Investing activities: | | | |
| Capital expenditures | (32.8) | (39.7) | (88.1) |
| Acquisition of technology | - | (8.7) | - |
| Proceeds from sales of assets | 56.4 | 5.5 | 9.6 |
| Net cash provided by (used in) investing activities | 23.6 | (42.9) | (78.5) |
| Financing activities: | | | |
| Increase (decrease) in outstanding checks | 1.7 | (4.3) | (6.9) |
| Debt borrowings | 270.5 | 539.4 | - |
| Debt paid or repurchased | (318.5) | (893.1) | (5.0) |
| Common stock issued | 1.0 | 166.9 | 1.9 |
| Payment of deferred financing fees | (9.8) | (10.1) | - |
| Dividends paid | (10.8) | (8.1) | (8.1) |
| Net cash used in financing activities | (65.9) | (209.3) | (18.1) |
| Effect of currency exchange rate changes on cash | 1.5 | (0.7) | (0.4) |
| Net change in cash and cash equivalents | 22.2 | (122.4) | 85.0 |
| Cash and cash equivalents at beginning of year | 61.5 | 183.9 | 98.9 |
| Cash and cash equivalents at end of year | $ 83.7 | $ 61.5 | $ 183.9 |

The accompanying notes are an integral part of the consolidated financial statements.

Case: 18-31177     Document: 00515297113     Page: 337     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 338 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26072-3   Filed 10/25/19   Page 338 of 132

**MUELLER WATER PRODUCTS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1.     Organization**

Mueller Water Products, Inc., a Delaware corporation, together with its consolidated subsidiaries, operates in three business segments: Mueller Co., U.S. Pipe and Anvil. Mueller Co. manufactures valves for water and gas systems, including butterfly, iron gate, tapping, check, plug and ball valves, as well as dry-barrel and wet-barrel fire hydrants and a broad range of metering products for the water infrastructure industry. U.S. Pipe manufactures a broad line of ductile iron pipe, joint restraint products, fittings and other ductile iron products. Anvil manufactures and sources a broad range of products including a variety of fittings, couplings, hangers, nipples and related pipe products. The "Company," "we," "us" or "our" refer to Mueller Water Products, Inc. and its subsidiaries or their management. With regard to the Company's segments, "we," "us" or "our" may also refer to the segment being discussed or its management.

Our consolidated financial statements are prepared in conformity with accounting principles generally accepted in the United States of America, which require us to make certain estimates and assumptions that affect the reported amounts of assets, liabilities, sales and expenses and the disclosure of contingent assets and liabilities for the reporting periods. Actual results could differ from those estimates. All significant intercompany balances and transactions have been eliminated. Certain reclassifications have been made to previously reported amounts to conform to the current presentation.

Unless the context indicates otherwise, whenever we refer to a particular year, we mean the fiscal year ended or ending September 30 in that particular calendar year.

**Note 2.     Summary of Significant Accounting Policies**

*Revenue Recognition*—Revenue is recognized when delivery of products has occurred or services have been rendered and there is persuasive evidence of a sales arrangement, selling prices are fixed or determinable and collectibility is reasonably assured. Revenue, or net sales, is reported net of estimated discounts, returns and rebates.

*Shipping and Handling*—Costs to ship products to customers are included in cost of sales. Amounts billed to customers, if any, to cover shipping and handling costs are included in net sales.

*Stock-based Compensation*—Compensation expense for stock-based awards granted to employees and directors is based on the fair value at the grant dates. Stock-based compensation expense is a component of selling, general and administrative expenses.

*Cash and Cash Equivalents*—All highly liquid investments with remaining maturities of 90 days or less when purchased are classified as cash equivalents. Where there is no right of offset against cash balances, outstanding checks are included in accounts payable. At September 30, 2010 and 2009, checks issued but not yet presented to the banks for payment were $3.6 million and $1.9 million, respectively, and were included in accounts payable.

*Receivables*—Receivables relate primarily to amounts due from customers. To reduce credit risk, credit investigations are generally performed prior to accepting orders from new customers and, when necessary, letters of credit, bonds or other instruments are required to ensure payment.

The estimated allowance for doubtful receivables is based upon judgments and estimates of expected losses and specific identification of problem accounts. Significantly weaker than anticipated industry or economic conditions could impact customers' ability to pay such that actual losses may be greater than the amounts provided for in this allowance. The periodic evaluation of the adequacy of the allowance for doubtful receivables

F-7

is based on an analysis of prior collection experience, specific customer creditworthiness and current economic trends within the industries served. In circumstances where we expect a specific customer's inability to meet its financial obligations (e.g., bankruptcy filings or substantial downgrading of credit ratings), we record a specific allowance to reduce the receivable to the amount management reasonably believes will be collected.

The following table summarizes information concerning our allowance for doubtful receivables.

|  | 2010 | 2009 | 2008 |
|---|---|---|---|
|  |  | (in millions) |  |
| Balance at beginning of year | $ 4.7 | $ 6.7 | $ 4.9 |
| Provision charged (credited) to expense | (0.6) | 6.4 | 3.7 |
| Balances written off, net of recoveries | (1.2) | (8.4) | (1.9) |
| Reclassifications | 3.5 | - | - |
| Other | 0.1 | - | - |
| Balance at end of year | $ 6.5 | $ 4.7 | $ 6.7 |

*Inventories*—Inventories are recorded at the lower of first-in, first-out method cost or market value. We evaluate our inventory in terms of excess and obsolete exposures. This evaluation includes such factors as anticipated usage, inventory turnover, inventory levels and ultimate product sales value. Inventory cost includes an overhead component that is affected by levels of production and actual costs incurred. Management periodically evaluates the effects of production levels and costs capitalized as part of inventory.

The following table summarizes information concerning our reserves for excess and obsolete inventories and to reduce inventory balances to the lower of cost or market.

|  | 2010 | 2009 | 2008 |
|---|---|---|---|
|  |  | (in millions) |  |
| Balance at beginning of year | $ 27.5 | $ 27.6 | $ 28.1 |
| Provision charged to expense | 2.4 | 5.3 | 3.3 |
| Amounts written off | (4.9) | (4.7) | (3.4) |
| Other | (0.1) | (0.7) | (0.4) |
| Balance at end of year | $ 24.9 | $ 27.5 | $ 27.6 |

*Prepaid Expenses*—Prepaid expenses include maintenance supplies and tooling costs. Costs for perishable tools and maintenance items are expensed when put into service. Costs for more durable items are amortized over their estimated useful lives, ranging from 3 to 10 years.

*Property, Plant and Equipment*—Property, plant and equipment is recorded at cost, less accumulated depreciation and amortization. Depreciation is generally recorded using the straight-line method over the estimated useful lives of the assets. Estimated useful lives are 10 to 20 years for land improvements, 10 to 40 years for buildings and 3 to 15 years for machinery and equipment. Leasehold improvements are amortized using the straight-line method over the lesser of the useful life of the improvement or the remaining lease term. Gains and losses upon disposition are reflected in operating results in the period of disposition.

Interest costs associated with large asset construction projects are capitalized. Capitalized interest is treated as a component of the related asset's cost and depreciated accordingly.

Direct internal and external costs to implement computer systems and software are capitalized. Capitalized costs are depreciated over the estimated useful life of the system or software, generally 3 to 5 years, beginning when site installation or module development is complete and ready for use.

Liabilities are recognized at fair value for asset retirement obligations related to plant and landfill closures in the period in which they are incurred and the carrying amounts of the related long-lived assets are correspondingly increased. Over time, the liabilities are accreted to their estimated future values. At September 30, 2010 and 2009, asset retirement obligations were $3.3 million and $3.1 million, respectively.

*Accounting for the Impairment of Long-Lived Assets*— Management tests intangible assets that have an indefinite life for impairment annually (or more frequently if events or circumstances indicate possible impairments). Finite-lived intangible assets are amortized over their respective estimated useful lives and reviewed for impairment if events or circumstances indicate possible impairment. We perform our annual impairment testing at September 1.

Management tests goodwill for possible impairment by first determining the fair value of the related reporting unit and comparing this value to the recorded net assets of the reporting unit, including goodwill. Fair value is determined using a combination of a discounted cash flow model and stock market comparable valuations for a peer group of companies. Significant judgments and estimates must be made when estimating future cash flows, determining the appropriate discount rate and identifying appropriate comparable companies. At December 31, 2008, we reported estimated goodwill impairment charges of $59.5 million for U.S. Pipe, completely impairing its goodwill, and $340.5 million against Mueller Co.'s prior goodwill balance of $718.4 million, subject to additional fair value analysis. At that time, any additional impairment charge was not expected to exceed $200 million. During the three months ended March 31, 2009, our common stock began trading at prices significantly lower than prior periods, especially beginning in February. Our lower market capitalization prompted us to perform a second interim impairment assessment at March 31, 2009. This testing led to the conclusion that all of our remaining goodwill was fully impaired. During the three months ended March 31, 2009, we recorded additional goodwill impairment charges of $376.8 million for Mueller Co. and $92.7 million for Anvil. In performing these analyses, we relied upon both Level 2 data (publicly observable data such as market interest rates, our stock price, the stock prices of peer companies and the capital structures of peer companies) and Level 3 data (internal data such as our operating and cash flow projections).

In conjunction with the testing of goodwill for impairment, we also compared the estimated fair values of our identified other intangible assets to their respective carrying values and determined that the carrying amount of trade names at Mueller Co. had been impaired. At March 31, 2009, we recorded an impairment charge against these assets of $101.4 million. In performing this analysis, we relied upon both Level 2 data, most notably market interest rates and operating margins of peer companies, and Level 3 data, including our projections of Mueller Co. net sales and operating margins. Mueller Co.'s trade names have a remaining carrying value of $263.0 million at September 30, 2010.

*Workers Compensation*—Our exposure to workers compensation claims is generally limited to $1 million per incident. Liabilities, including those related to claims incurred but not reported, are recorded principally using annual valuations based on discounted future expected payments and using historical data combined with insurance industry data when historical data is limited. We are indemnified by a predecessor to Tyco International Ltd. ("Tyco") for all Mueller Co. and Anvil workers compensation liabilities related to incidents that occurred prior to August 16, 1999. See Note 19. On an undiscounted basis, workers compensation liabilities were $24.6 million and $27.2 million at September 30, 2010 and 2009, respectively. On a discounted basis, workers compensation liabilities were $22.1 million and $23.7 million at September 30, 2010 and 2009, respectively.

We apply a discount rate at a risk-free interest rate, generally a U.S. Treasury bill rate, for each policy period. The rate used is one with a duration that corresponds to the weighted average expected payout period for each policy period. Once a discount rate is applied to a policy period, it remains the discount rate for that policy period until all claims are paid.

*Warranty Costs*—We accrue for warranty expenses that can include customer costs of repair and/or replacement, including labor, materials, equipment, freight and reasonable overhead costs. We accrue for the

Case: 18-31177     Document: 00515297113     Page: 340     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 341 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26872-3   Filed 10/25/20   Page 84 of 132

estimated cost of product warranties at the time of sale if such costs are determined to be reasonably estimable at that time. Warranty cost estimates are revised throughout applicable warranty periods as better information regarding warranty costs becomes available.

Activity in accrued warranty, reported as part of other current liabilities, is presented below.

|  | 2010 | 2009 | 2008 |
|---|---|---|---|
|  | (in millions) | | |
| Balance at beginning of year | $    4.0 | $    6.5 | $    3.7 |
| Warranty expense | 4.2 | 4.7 | 8.2 |
| Warranty payments | (3.7) | (7.2) | (5.4) |
| Balance at end of year | $    4.5 | $    4.0 | $    6.5 |

*Deferred Financing Fees*—Costs of debt financing are charged to expense over the life of the related financing agreements, which range from 5 to 10 years. Remaining costs and the future period over which they would be charged to expense are reassessed when amendments to the related financing agreements or prepayments occur.

*Derivative Instruments and Hedging Activities*—Changes in the fair value of derivative instruments that are accounted for as effective hedges are recorded to accumulated other comprehensive loss and changes in the fair value of derivative instruments that are not accounted for as effective hedges are recorded to operating results as incurred. Gains and losses on derivative instruments representing either hedge ineffectiveness or hedge components excluded from the assessment of effectiveness are recognized in earnings.

*Income Taxes*—Deferred tax liabilities and deferred tax assets are recognized for the expected future tax consequences of events that have been included in the financial statements or tax returns. Such liabilities and assets are determined based on the differences between the financial statement basis and the tax basis of assets and liabilities, using tax rates in effect for the years in which the differences are expected to reverse. A valuation allowance is provided if, based upon the available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized.

We only record tax benefits for positions that management believes are more likely than not of being sustained under audit based solely on the technical merits of the associated tax position. The amount of tax benefit recognized for any position that meets the more likely than not threshold is the largest amount of the tax benefit that we believe is greater than 50% likely of being realized.

*Environmental Expenditures*—We capitalize environmental expenditures that increase the life or efficiency of noncurrent assets or that reduce or prevent environmental contamination. We accrue for environmental expenses resulting from existing conditions that relate to past operations when the costs are probable and reasonably estimable. We are indemnified by Tyco for certain environmental liabilities that existed at August 16, 1999. See Note 19.

*Research and Development*—Research and development costs are expensed as incurred.

*Advertising*—Advertising costs are expensed as incurred.

Case: 18-31177     Document: 00515297113     Page: 341     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 342 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26547-3   Filed 10/23/20   Page 87 of 132

*Translation of Foreign Currency*—Assets and liabilities of our businesses whose functional currency is other than the U.S. dollar are translated into U.S. dollars using currency exchange rates at the balance sheet date. Revenues and expenses are translated at average currency exchange rates during the period. Foreign currency translation gains and losses are reported as a component of accumulated other comprehensive loss. Gains and losses resulting from foreign currency transactions are included in operating results as incurred.

**Note 3.    Identifiable Intangible Assets**

Identifiable intangible assets are presented below.

| | September 30, | |
| --- | --- | --- |
| | **2010** | **2009** |
| | **(in millions)** | |
| Cost: | | |
| Finite-lived intangible assets: | | |
| Technology | $ 71.6 | $ 71.7 |
| Customer relationships | 409.1 | 409.2 |
| Indefinite-lived intangible assets: | | |
| Trade names and trademarks | 300.3 | 300.3 |
| | 781.0 | 781.2 |
| Accumulated amortization: | | |
| Technology | 37.9 | 29.3 |
| Customer relationships | 110.7 | 88.3 |
| | 148.6 | 117.6 |
| Net book value | $ 632.4 | $ 663.6 |

At September 30, 2010, the remaining weighted-average amortization period for the finite-lived intangible assets was 12.8 years. Amortization expense related to finite-lived intangible assets was $31.0 million, $30.7 million and $29.5 million for 2010, 2009 and 2008, respectively. Amortization expense for each of the next five years is scheduled to be $31.1 million in 2011, $29.9 million in 2012, $29.8 million in 2013, $28.7 million in 2014 and $26.2 million in 2015.

**Note 4.    Divestitures, Assets Held for Sale, and Acquisition**

Anvil sold certain of the assets of Picoma, its former electrical fittings business, in November 2009 in exchange for cash and certain assets of Seminole Tubular Company that complement our existing mechanical pipe nipple business. These Picoma assets were classified as held for sale at September 30, 2009. We recorded a pre-tax gain of $1.6 million to selling, general and administrative expenses in connection with this transaction. The book values of the assets sold and the fair values of Seminole assets acquired during 2010 and the estimated values of assets classified as held for sale at September 30, 2009, are presented below.

|  | Sold / acquired during 2010 | | September 30, 2009 | |
|---|---|---|---|---|
|  | **(in millions)** | | | |
| Assets sold: |  |  |  |  |
| Receivables | $ | 5.0 | $ | 5.2 |
| Inventories |  | 4.4 |  | 4.7 |
| Other current assets |  | 0.3 |  | - |
| Property, plant, and equipment |  | 2.5 |  | 2.7 |
| Identifiable intangible assets |  | 1.3 |  | 1.3 |
|  | $ | 13.5 | $ | 13.9 |
| Severance liability incurred | $ | 0.6 |  |  |
| Assets acquired: |  |  |  |  |
| Cash | $ | 12.3 |  |  |
| Receivables |  | 1.6 |  |  |
| Inventories |  | 1.3 |  |  |
| Identifiable intangible assets |  | 0.5 |  |  |
|  | $ | 15.7 |  |  |

In January 2010, Anvil sold its Canadian wholesale distribution business for $40.3 million, including post-closing adjustments. This business had 2009 net sales of approximately $107 million and its income from operations was not material to the Company's income from operations. We recorded a pre-tax gain of $2.8 million to selling, general and administrative expenses in connection with this transaction. We also entered into a $3\frac{1}{2}$ year supply agreement with the buyer requiring the buyer to purchase at least a specified amount of products from Anvil at market rates. The book values of assets sold and liabilities transferred during 2010 are presented below (in millions).

| | | |
|---|---|---|
| Receivables | $ | 15.8 |
| Inventories |  | 23.3 |
| Other current assets |  | 0.3 |
| Property, plant, and equipment, net |  | 4.9 |
| Identifiable intangible assets |  | 0.6 |
| Accounts payable and other current liabilities |  | (7.4) |
|  | $ | 37.5 |

**Note 5.     Restructuring Activities**

Activity in accrued restructuring is presented below.

|  | 2010 | 2009 | 2008 |
|---|---|---|---|
|  |  | (in millions) |  |
| Balance at beginning of year | $      3.4 | $      0.9 | $      0.9 |
| Additions | 8.7 | 9.3 | 3.2 |
| Payments and other | (11.3) | (6.8) | (3.2) |
| Balance at end of year | $      0.8 | $      3.4 | $      0.9 |

We closed U.S. Pipe's manufacturing facility in North Birmingham, Alabama and recorded a restructuring charge of $12.0 million during 2010 consisting of $4.4 million of asset impairment charges and $7.6 million of employee-related and other charges. We expect to record additional North Birmingham restructuring charges of $1 million to $2 million in 2011.

We experienced significant declines in the demand for our products in 2009, resulting in most of our manufacturing facilities operating significantly below their optimal capacities. We responded by reducing headcount, reducing operating hours and reducing overall spending activities. During 2009, we suspended production throughout the Company for varying time periods; consolidated facilities; implemented temporary compensation reductions, furloughs and reduced work weeks for certain employees and directors and reduced headcount by approximately 700 people. Cash restructuring charges, mostly severance, related to headcount reductions during 2009 were $9.3 million. Also in 2009, we reduced production capacity at U.S. Pipe's North Birmingham facility to reduce our fixed costs. We recorded a $38.5 million non-cash restructuring charge, primarily for impairment of property, plant and equipment. These assets were written down to estimated scrap value.

In 2008, we ceased U.S. Pipe's manufacturing operations in Burlington, New Jersey. We continue to use this facility as a full-service distribution center for customers in the Northeast. In connection with this action, we recorded restructuring charges of $18.3 million in 2008 that included $14.8 million of asset impairment charges. We do not expect any future charges related to the closure of manufacturing operations in Burlington to be significant.

**Note 6.     Income Taxes**

The components of income (loss) before taxes are presented below.

|  | 2010 | 2009 | 2008 |
|---|---|---|---|
|  |  | (in millions) |  |
| U.S. | $      (76.4) | $      (1,082.3) | $      68.7 |
| Non-U.S. | 7.8 | (0.7) | 5.0 |
| Income (loss) before taxes | $      (68.6) | $      (1,083.0) | $      73.7 |

Income tax expense (benefit) is presented below.

|  | 2010 | 2009 | 2008 |
|---|---|---|---|
|  |  | (in millions) |  |
| Current: |  |  |  |
| U.S.: |  |  |  |
| Federal | $    (3.7) | $    (27.3) | $    25.3 |
| State and local | (1.2) | (0.8) | 4.8 |
| Non-U.S. | 2.6 | (0.4) | 5.8 |
|  | (2.3) | (28.5) | 35.9 |
| Deferred: |  |  |  |
| U.S.: |  |  |  |
| Federal | (15.3) | (42.3) | (4.4) |
| State and local | (5.7) | (15.7) | 2.6 |
| Non-U.S. | (0.1) | 0.2 | (2.4) |
|  | (21.1) | (57.8) | (4.2) |
| Income tax expense (benefit) | $    (23.4) | $    (86.3) | $    31.7 |

The reconciliation between the U.S. federal statutory income tax rate and the effective tax rate is presented below.

|  | 2010 | 2009 | 2008 |
|---|---|---|---|
| U.S. federal statutory income tax rate | 35.0% | 35.0% | 35.0% |
| Adjustments to reconcile to the effective tax rate: |  |  |  |
| Nondeductible goodwill impairment | - | (27.7) | - |
| State income taxes, net of federal benefit | 6.7 | 0.9 | 6.5 |
| Nondeductible compensation | (2.0) | (0.1) | 2.0 |
| U.S. manufacturing deduction | (0.7) | - | (2.3) |
| Foreign income taxes | (0.2) | - | 1.6 |
| Repatriation of foreign earnings | (2.9) | - | - |
| Other nondeductible expenses | (1.0) | - | 1.0 |
| Other | (0.8) | (0.1) | (0.8) |
| Effective tax rate | 34.1% | 8.0% | 43.0% |

F-14

Deferred income tax assets (liabilities) are presented below.

| | September 30, | |
| --- | --- | --- |
| | 2010 | 2009 |
| | (in millions) | |
| Deferred income tax assets: | | |
| Receivable reserves | $ 1.1 | $ 1.8 |
| Inventory reserves | 13.7 | 13.9 |
| Accrued expenses | 21.6 | 23.4 |
| Pension and other postretirement benefits | 33.8 | 44.9 |
| Stock compensation | 7.6 | 6.1 |
| State net operating losses | 11.6 | 6.9 |
| Federal net operating losses and credit carryovers | 22.0 | - |
| All other | 2.7 | 6.3 |
| | 114.1 | 103.3 |
| Valuation allowance | (1.4) | (1.3) |
| Total deferred income tax assets | 112.7 | 102.0 |
| Deferred income tax liabilities: | | |
| Identifiable intangible assets | (220.6) | (228.6) |
| Property, plant and equipment | (27.3) | (22.5) |
| Other | - | (0.1) |
| Total deferred income tax liabilities | (247.9) | (251.2) |
| Net deferred income tax liabilities | $ (135.2) | $ (149.2) |

A valuation allowance is provided on deferred tax assets at September 30, 2010 since management believes it is more likely than not that a portion of our deferred tax assets will not be realized due primarily to a limitation on deductibility of executive compensation provided in Internal Revenue Code Section 162(m). Management believes that it will be able to recover all other deferred tax assets through taxable earnings from operations.

Activity in the valuation allowance for deferred tax assets is described below.

| | September 30, | |
| --- | --- | --- |
| | 2010 | 2009 |
| | (in millions) | |
| Balance at beginning of year | $ 1.3 | $ 4.3 |
| Additions | 0.4 | 0.4 |
| Deductions applied to restricted shares vested | (0.3) | (3.4) |
| Balance at end of year | $ 1.4 | $ 1.3 |

We have state net operating loss carryforwards of $248.2 million expiring beginning 2011. These loss carryforwards are subject to limitations in certain jurisdictions under Internal Revenue Code Section 382. State net operating loss carryforwards of $245.9 million expire after 2012, and management believes that these net operating loss carryforwards will be utilized before they expire.

The cumulative amount of undistributed earnings of foreign subsidiaries for which United States income taxes have not been provided was $52.4 million at September 30, 2010. It is not currently practical to estimate

Case: 18-31177     Document: 00515297113     Page: 346     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 347 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26027-3   Filed 10/25/19   Page 92 of 132

the amount of unrecognized United States income taxes that might be payable on the repatriation of these earnings.

On October 1, 2007, we adopted a new accounting standard related to uncertain income tax positions. As a result, we recorded a net increase of $1.0 million in the liability for unrecognized income tax benefits, a $0.6 million increase in the accumulated deficit and an increase of $0.4 million to goodwill.

A reconciliation of the beginning and ending amounts of gross unrecognized tax benefits is presented below.

|  | 2010 | | 2009 |
|---|---|---|---|
|  | (in millions) | | |
| Balance at beginning of year | $ 16.2 | $ | 22.3 |
| Increases related to prior year positions | 0.1 | | 1.4 |
| Decreases related to prior year positions | (3.3) | | (1.3) |
| Increases related to current year positions | 0.2 | | 0.3 |
| Payments and settlements | (2.6) | | (4.6) |
| Adjustment to reduce intangible assets and goodwill | - | | (1.9) |
| Balance at end of year | $ 10.6 | $ | 16.2 |

After September 30, 2010, all unrecognized tax benefits would, if recognized, impact the effective tax rate.

We expect to settle certain state and foreign tax audits within the next 12 months and believe it is reasonably possible that these audit settlements will reduce the gross unrecognized tax benefits by $1.5 million within the next 12 months.

We recognize interest related to uncertain tax positions as interest expense and would recognize any penalties that may be incurred as a component of selling, general and administrative expenses. At September 30, 2010, we had $2.0 million of accrued interest related to unrecognized tax benefits.

Mueller Co. and Anvil were under audit by the Internal Revenue Service ("IRS") for tax years ended September 30, 2005 and October 3, 2005. At September 30, 2009, we effectively settled those issues for $1.8 million and paid the tax to Walter Energy in accordance with our tax sharing agreement. Federal income tax returns for Mueller Co. and Anvil are closed for years prior to 2005. U.S. Pipe is not currently under audit by the IRS, but remains subject to statute extension agreements that may be applicable to Walter Energy. See Note 19. We have been notified by the IRS that the income tax returns filed for 2009, 2008 and 2007 have been selected for audit. This fieldwork examination has not commenced.

Our state income tax returns are generally closed for years prior to 2006. Our Canadian income tax returns are generally closed for years prior to 2004. We are currently under audit by several states at various levels of completion. We do not have any unpaid material assessments.

**Note 7.     Borrowing Arrangements**

In August 2010, we issued $225.0 million principal amount of 8¾% Senior Unsecured Notes maturing September 2020 at 98.37% of their face amount to yield approximately 9%. Concurrently with this offering, we entered into an asset based lending agreement ("ABL Agreement"). We used the net proceeds from the offering of the Senior Unsecured Notes, together with amounts borrowed under the ABL Agreement and cash on hand to repay all amounts outstanding under the 2007 Credit Agreement. We incurred a loss on early extinguishment of debt of $4.1 million in connection with this transaction. See Note 9.

In January 2010, we prepaid $40.0 million of term loan borrowings under the 2007 Credit Agreement and incurred a loss on early extinguishment of debt of $0.5 million.

In 2009, we amended the 2007 Credit Agreement and prepaid $343.0 million of borrowings under the agreement on a pro-rata basis between Term Loan A and Term Loan B. We incurred a loss on early extinguishment of debt of $5.3 million in connection with this amendment and prepayment.

The components of our long-term debt are presented below.

| | September 30, | |
| --- | --- | --- |
| | 2010 | 2009 |
| | (in millions) | |
| ABL Agreement | $ 49.0 | $ - |
| 8¾% Senior Unsecured Notes | 221.4 | - |
| 7⅜% Senior Subordinated Notes | 420.0 | 420.0 |
| 2007 Credit Agreement: | | |
| Term Loan A | - | 66.5 |
| Term Loan B | - | 252.0 |
| Other | 1.8 | 1.7 |
| | 692.2 | 740.2 |
| Less current portion | (0.7) | (11.7) |
| Long-term debt | $ 691.5 | $ 728.5 |

*ABL Agreement*.  At September 30, 2010, our ABL Agreement consists of a revolving credit facility for up to $275 million of revolving credit borrowings, swing line loans and letters of credit. The ABL Agreement also permits us to increase the size of the credit facility by an additional $150 million in certain circumstances subject to adequate borrowing base availability. We may borrow up to $25 million through swing line loans and may have up to $60 million of letters of credit outstanding. We estimate the fair value of the borrowings under the ABL Agreement approximates the carrying value.

Borrowings under the ABL Agreement bear interest at a floating rate equal to LIBOR plus a margin ranging from 275 to 325 basis points or a base rate, as defined in the ABL Agreement, plus a margin ranging from 175 to 225 basis points. At September 30, 2010, all borrowings were at LIBOR plus 300 basis points.

Our ABL Agreement terminates in August 2015. We pay a commitment fee of 50 basis points for any unused borrowing capacity and our obligations under this agreement are secured by a first-priority perfected lien on all of our U.S. inventory, accounts receivable, certain cash and other supporting obligations. The borrowing capacity under this agreement is not subject to any financial maintenance covenants unless excess availability is less than the greater of $34 million and 12.5% of the aggregate commitments under the ABL Agreement. The borrowing capacity is reduced by outstanding borrowings, outstanding letters of credit and accrued fees and expenses. Outstanding letters of credit and accrued fees and expenses totaled $39.4 million at September 30, 2010.

*8¾% Senior Unsecured Notes*. The 8¾% Senior Unsecured Notes ("Senior Unsecured Notes") mature in September 2020 and bear interest at 8.75%, payable semi-annually. Based on quoted market prices, the Senior Unsecured Notes had a fair value of $238.5 million at September 30, 2010.

We may redeem up to $22.5 million of the Senior Unsecured Notes at a redemption price of 103% plus accrued and unpaid interest once in each year ending September 1, 2011, 2012, and 2013.  We may also redeem

Case: 18-31177    Document: 00515297113    Page: 348    Date Filed: 02/04/2020

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 349 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26272-3   Filed 10/15/20   Page 349 of 132

up to $78.8 million of the originally issued principal amount of the Senior Unsecured Notes at a redemption price of 108.75%, plus accrued and unpaid interest, with net cash proceeds from certain equity offerings prior to September 2013, provided that at least $146.2 million remains outstanding immediately after such redemption. After August 2015, the Senior Unsecured Notes may be redeemed at specified redemption prices plus accrued and unpaid interest. Upon a "Change of Control" (as defined in the indenture securing the Senior Unsecured Notes), we are required to offer to purchase the outstanding Senior Unsecured Notes at a purchase price of 101%, plus accrued and unpaid interest. The Senior Unsecured Notes are subordinate to borrowings under the ABL Agreement.

The indenture securing the Senior Unsecured Notes contains customary covenants and events of default, including covenants that limit our ability to incur debt, pay dividends and make investments. Substantially all of our U.S. subsidiaries guarantee the Senior Unsecured Notes. We believe we were compliant with these covenants at September 30, 2010 and expect to remain in compliance through September 30, 2011.

*7⅜% Senior Subordinated Notes.* The 7⅜% Senior Subordinated Notes ("Senior Subordinated Notes") mature in June 2017 and bear interest at 7.375%, payable semi-annually. Based on quoted market prices, the outstanding Senior Subordinated Notes had a fair value of $369.6 million at September 30, 2010.

After May 2012, we may redeem any portion of the Senior Subordinated Notes at specified redemption prices plus accrued and unpaid interest. Upon a "Change of Control" (as defined in the indenture securing the Senior Subordinated Notes), we are required to offer to purchase the outstanding Senior Subordinated Notes at a purchase price of 101%, plus accrued and unpaid interest. The Senior Subordinated Notes are subordinate to the borrowings under the ABL Agreement and the Senior Unsecured Notes.

During 2009, we acquired $5.0 million in principal of the Senior Subordinated Notes in the open market for $3.4 million in cash. This resulted in a gain on repurchase of debt of $1.5 million after writing off related deferred financing fees of $0.1 million.

The indenture securing the Senior Subordinated Notes contains customary covenants and events of default, including covenants that limit our ability to incur debt, pay dividends and make investments. Substantially all of our U.S. subsidiaries guarantee the Senior Subordinated Notes. We believe we were compliant with these covenants at September 30, 2010 and expect to remain in compliance through September 30, 2011.

*2007 Credit Agreement.* At September 30, 2009 our amended credit agreement (the "2007 Credit Agreement") consisted of a $200 million senior secured revolving credit facility (the "Revolver"), a $66.5 million term loan ("Term Loan A") and a $252.0 million term loan ("Term Loan B"). All amounts outstanding under the 2007 Credit Agreement were repaid in 2010 and the 2007 Credit Agreement was cancelled.

Future maturities of outstanding borrowings at September 30, 2010 for each of the following years are $0.7 million for 2011, $0.5 million for 2012, $0.3 million for 2013, $0.1 million for 2014, $49.0 million for 2015 and $641.6 million after 2015.

**Note 8.    Derivative Financial Instruments**

We are exposed to commodity price risk relating to our ongoing business operations that we manage to some extent using derivative instruments. We enter into natural gas swap contracts to manage the price risk associated with future purchases of natural gas used in our manufacturing processes. In the past, we have entered into interest rate swap contracts to manage interest rate risk associated with our variable-rate borrowings and entered into foreign currency forward exchange contracts to manage foreign currency exchange risk associated with our Canadian-dollar denominated intercompany loan. During 2010, we terminated all of our remaining interest rate swap contracts and settled our only outstanding foreign currency forward contract.

We designated our interest rate swap contracts and natural gas swap contracts as cash flow hedges of our future interest payments and purchases of natural gas, respectively. As a result, the effective portion of the gain or loss on these contracts is reported as a component of other comprehensive loss and reclassified into earnings in the same periods during which the hedged transactions affect earnings. Gains and losses on those contracts representing either hedge ineffectiveness or hedge components excluded from the assessment of effectiveness are recognized in earnings.

*Interest Rate Swap Contracts.* During 2010, we recorded a non-cash net credit to interest expense and a pre-tax debit to accumulated other comprehensive loss of $4.7 million related to interest rate swap contracts that had been terminated in September 2009. This amount had been charged to interest expense during 2009. It should have been amortized to interest expense over the original term of the terminated contracts, which would have matured at various dates through May 2012.

During 2010, we recorded immediate pre-tax expense of $6.2 million in connection with termination of our interest rate swap contracts and pre-tax expense of $6.5 million of amortization of the remaining accumulated other comprehensive loss associated with these interest rate swap contracts. The unamortized portion remaining in accumulated other comprehensive loss was $7.9 million, net of tax, at September 30, 2010, and will be amortized to interest expense over the original term of the swap contracts, which would have matured at various dates through September 2012.

| | Hedged loan principal September 30, | |
| --- | --- | --- |
| Rate benchmark | 2010 | 2009 |
| | (in millions) | |
| 90-day LIBOR | $    - | $    275.0 |

The effects of our interest rate swap contracts on the consolidated statements of operations are presented below, net of tax.

| | 2010 | 2009 | 2008 |
| --- | --- | --- | --- |
| | (in millions) | | |
| Gain (loss) recognized in other comprehensive loss | $    (0.4) | $    (4.5) | $    (14.0) |
| Gain (loss) reclassified from accumulated other comprehensive loss into income | (8.1) | (10.4) | (2.5) |
| Ineffectiveness loss recognized in interest expense | (0.7) | - | - |

*Natural Gas Swap Contracts.* Our natural gas swap contracts result in a fixed natural gas purchase price of $4.43 per MMBtu through September 2011. Our outstanding natural gas swap contracts at September 30, 2010 and September 30, 2009 are presented below.

| | Hedged MMBtu September 30, | |
| --- | --- | --- |
| Commodity index | 2010 | 2009 |
| NYMEX natural gas | 458,000 | 434,000 |

The effects of our natural gas swap contracts on the consolidated statements of operations are presented below, net of tax.

| | 2010 | 2009 | 2008 |
| --- | --- | --- | --- |
| | (in millions) | | |
| Gain (loss) recognized in other comprehensive loss | $    - | $    0.7 | $    (1.8) |
| Gain (loss) reclassified from accumulated other comprehensive income into income | 0.2 | (2.2) | 0.5 |
| Ineffectiveness loss recognized in cost of sales | (0.5) | (0.3) | (0.1) |

*Foreign Currency Forward Contracts.* We settled our outstanding foreign currency forward contract during 2010 with a cash payment of $1.7 million. Our outstanding foreign currency forward contracts at September 30, 2010 and 2009 are presented below.

| | Hedged Canadian dollars September 30, | |
| Rate benchmark | 2010 | 2009 |
|---|---|---|
| | (in millions) | |
| Canadian dollar | - | 28.0 |

Gains and losses on our foreign currency forward contracts are included in selling, general, and administrative expenses, where they offset the transaction losses and gains recorded in connection with the intercompany loan. The effects of our foreign currency forward contracts on the consolidated statements of operations are presented below, net of tax.

| | 2010 | 2009 | 2008 |
|---|---|---|---|
| | | (in millions) | |
| Gain recognized in income | $ - | $ - | $ 1.3 |

Our derivative contracts were recorded at fair value using publicly observable data such as market interest rates and market natural gas prices. The fair values of our derivative contracts are presented below (in millions).

| | September 30, 2010 | | September 30, 2009 | |
|---|---|---|---|---|
| | Balance sheet location | Fair value | Balance sheet location | Fair value |
| Liability derivatives: | | | | |
| Derivatives designated as hedging instruments: | | | | |
| Interest rate swaps | Other noncurrent liabilities | $ - | Other noncurrent liabilities | $ 18.8 |
| Natural gas swaps | Other noncurrent liabilities | 0.1 | Other noncurrent liabilities | - |
| | | 0.1 | | 18.8 |
| Derivatives not designated as hedging instruments: | | | | |
| Foreign currency forward | Other noncurrent liabilities | - | Other noncurrent liabilities | 0.7 |
| | | $ 0.1 | | $ 19.5 |

## Note 9.    Deferred Financing Fees

In connection with the 2010 repayment of borrowings outstanding under the 2007 Credit Agreement discussed in Note 7, we wrote off unamortized deferred financing fees of $4.6 million related to the 2007 Credit Agreement and capitalized $9.8 million for the costs of the ABL Agreement and the offering of the Senior Unsecured Notes. Deferred financing fees of $15.4 million at September 30, 2010 are scheduled to amortize as follows: $4.8 million related to the ABL Agreement amortizes on a straight-line basis; $5.6 million related to the Senior Unsecured Notes amortizes using the effective-interest rate method; and $5.0 million related to the Senior Subordinated Notes amortizes using the effective-interest rate method. All such amortization is over the remaining term of the respective debt.

**Note 10.   Retirement Plans**

We have various pension and profit sharing plans covering substantially all our employees (the "Pension Plans"). We fund our retirement and employee benefit plans in accordance with the requirements of the Pension Plans and, where applicable, in amounts sufficient to satisfy the minimum funding requirements of applicable laws. The Pension Plans provide benefits based on years of service and compensation or at stated amounts for each year of service.

We also provide certain postretirement benefits other than pensions, primarily healthcare, to eligible retirees. Our postretirement benefit plans are funded as benefits are paid.

We closed U.S. Pipe's North Birmingham facility in 2010 and recorded pension curtailment expense of $2.6 million and an other postretirement benefit plan curtailment gain of $1.8 million as restructuring charges. We also recorded $0.4 million settlement cost for the divestiture of Anvil's Canadian wholesale distribution business in 2010. See Note 4.

During 2009, shutdowns at manufacturing operations at U.S. Pipe and Anvil resulted in a postretirement benefit curtailment gain of $1.1 million and a pension curtailment expense of $0.4 million, respectively. The curtailment expense at Anvil was included in restructuring charges in 2009.

During 2008, the shutdown of manufacturing operations at U.S. Pipe's Burlington facility resulted in a decrease in the funded status of the applicable plan of $7.7 million and an after-tax decrease in accumulated other comprehensive loss of $4.6 million. We recorded pension plan curtailment expense of $1.2 million and an other postretirement benefit plan curtailment gain of $0.8 million, which were included in restructuring charges in 2008.

For 2010, 2009 and 2008, the measurement date for all Pension Plans and other postretirement plans was September 30. In prior years, the measurement date for the U.S. Pipe pension plans and other postretirement benefit plans was June 30. During 2008, we recorded an adjustment to accumulated deficit of $0.6 million to account for the change in measurement dates to September 30.

Information for pension plans with accumulated benefit obligations in excess of plan assets is presented below.

|  | September 30, | |
|---|---|---|
|  | **2010** | **2009** |
|  | **(in millions)** | |
| Projected benefit obligations | $    390.0 | $    390.3 |
| Accumulated benefit obligations | 381.8 | 382.0 |
| Fair value of plan assets | 302.9 | 276.1 |

Information for pension plans with accumulated benefit obligations less than plan assets is presented below.

|  | September 30, | |
|---|---|---|
|  | **2010** | **2009** |
|  | **(in millions)** | |
| Projected benefit obligations | $    8.9 | $    5.4 |
| Accumulated benefit obligations | 8.8 | 5.4 |
| Fair value of plan assets | 10.2 | 7.0 |

Amounts recognized for our Pension Plans and other postretirement benefit plans are presented below.

| | Pension Plans | | Other plans | |
|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 |
| | (in millions) | | | |
| **Projected benefit obligations:** | | | | |
| Beginning of year | $ 395.7 | $ 317.9 | $ 6.9 | $ 8.0 |
| Service cost | 3.6 | 3.8 | 0.1 | 0.2 |
| Interest cost | 21.1 | 23.1 | 0.4 | 0.6 |
| Actuarial loss (gain) | 2.4 | 78.1 | - | (1.4) |
| Benefits paid | (24.1) | (25.7) | (0.4) | (0.4) |
| Currency translation | 0.6 | (0.5) | - | - |
| Decrease in obligation due to curtailment | (0.4) | (1.0) | (0.3) | (0.1) |
| End of year | $ 398.9 | $ 395.7 | $ 6.7 | $ 6.9 |
| | | | | |
| Accumulated benefit obligations at end of year | $ 390.6 | $ 387.4 | $ 6.7 | $ 6.9 |
| **Plan assets:** | | | | |
| Beginning of year | $ 283.1 | $ 284.6 | $ - | $ - |
| Actual return on plan assets | 32.5 | 0.9 | - | - |
| Employer contributions | 23.0 | 24.0 | 0.4 | 0.4 |
| Currency translation | 0.7 | (0.6) | - | - |
| Benefits paid | (24.1) | (25.7) | (0.4) | (0.4) |
| Settlement payments | (2.1) | (0.1) | - | - |
| End of year | $ 313.1 | $ 283.1 | $ - | $ - |
| | | | | |
| **Accrued benefit cost at end of year:** | | | | |
| Unfunded status | $ (85.8) | $ (112.6) | $ (6.7) | $ (6.9) |
| Recognized on balance sheet: | | | | |
| Other noncurrent assets | $ 1.4 | $ 1.6 | $ - | $ - |
| Other current liabilities | - | - | (0.7) | (0.7) |
| Other noncurrent liabilities | (87.2) | (114.2) | (6.0) | (6.2) |
| | $ (85.8) | $ (112.6) | $ (6.7) | $ (6.9) |
| **Recognized in accumulated other comprehensive loss before tax:** | | | | |
| Prior year service cost (gain) | $ 1.9 | $ 2.9 | $ (4.4) | $ (8.4) |
| Net actuarial loss (gain) | 127.5 | 145.7 | (14.2) | (15.3) |
| | $ 129.4 | $ 148.6 | $ (18.6) | $ (23.7) |

The components of net periodic benefit cost (gain) are presented below.

| | Pension Plans | | | Other Benefit Plans | | |
|---|---|---|---|---|---|---|
| | 2010 | 2009 | 2008 | 2010 | 2009 | 2008 |
| | | | (in millions) | | | |
| Service cost | $ 3.6 | $ 3.8 | $ 4.9 | $ 0.1 | $ 0.2 | $ 0.4 |
| Interest cost | 21.1 | 23.1 | 21.3 | 0.4 | 0.6 | 0.8 |
| Expected return on plan assets | (21.7) | (21.6) | (27.2) | - | - | - |
| Amortization of prior service cost (gain) | 0.7 | 0.8 | 0.8 | (2.5) | (3.3) | (3.2) |
| Amortization of net loss (gain) | 8.8 | 3.3 | 0.7 | (1.1) | (1.6) | (1.0) |
| Curtailment / special settlement loss (gain) | 3.0 | 0.4 | 1.4 | (1.8) | (1.1) | (0.8) |
| Other | - | 0.1 | 0.1 | - | - | - |
| Net periodic benefit cost (gain) | $ 15.5 | $ 9.9 | $ 2.0 | $ (4.9) | $ (5.2) | $ (3.8) |

Pension and other postretirement benefits activity in accumulated other comprehensive loss, before taxes in 2010, is presented below.

| | Pension benefits | Other post-retirement benefits |
|---|---|---|
| | (in millions) | |
| Balance at beginning of year | $ 148.6 | $ (23.7) |
| Amounts reclassified as amortization of net periodic cost: | | |
| Gain (loss) amortization | (9.8) | 1.1 |
| Prior year service gain (loss) amortization and curtailment | (1.0) | 4.0 |
| Gain during the year | (8.4) | - |
| Balance at end of year | $ 129.4 | $ (18.6) |

The components of accumulated other comprehensive loss related to pension and other postretirement benefits that management expects to be reclassified into income in 2011 are presented below.

| | Pension benefits | Other post-retirement benefits |
|---|---|---|
| | (in millions) | |
| Amounts expected to be amortized out of accumulated other comprehensive loss into net periodic benefit cost in 2011: | | |
| Amortization of unrecognized prior year service cost (credit) | $ 0.7 | $ (2.3) |
| Amortization of unrecognized gain (loss) | 7.6 | (1.2) |
| | $ 8.3 | $ (3.5) |

Case: 18-31177     Document: 00515297113     Page: 354     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 355 of 1003
Case 2:10-md-02179-CJB-JCW   Document 23604   Filed 10/29/18   Page 355 of 152

The U.S. discount rates were selected using a "bond settlement" approach, which constructs a hypothetical bond portfolio that could be purchased such that the coupon payments and maturity values could be used to satisfy the Pension Plans' projected benefit payments. The discount rate is the equivalent rate that results in the present value of the Pension Plan's projected benefit payments equaling the market value of this bond portfolio. Only high quality (AA graded or higher), non-callable corporate bonds are included in this bond portfolio. We rely on the Pension Plans' actuaries to assist in the development of the discount rate model.

Separate discount rates were selected for different Pension Plans due to differences in the timing of projected benefit payments. The discount rate model for plans covering participants in the United States reflected yields available on investments in the United States, while plans covering participants in Canada reflected yields available on investments in Canada.

Management's expected returns on plan assets and assumed healthcare cost trend rates were determined with the assistance of the Pension Plans' investment consultants.

A summary of key assumptions for our pension and other postretirement benefit plans is below.

| | Plan measurement date | | | | | |
| | Pension Plans | | | Other plans | | |
| | 2010 | 2009 | 2008 | 2010 | 2009 | 2008 |
| | | | (in millions) | | | |
| U.S. Pipe pension plans: | | | | | | |
| Weighted average used to determine benefit obligations: | | | | | | |
| Discount rate | 5.44% | 5.45% | 7.60% | | | |
| Rate of compensation increases | 3.50% | 3.50% | 3.50% | | | |
| Weighted average used to determine net periodic cost: | | | | | | |
| Discount rate | 5.45% | 7.60% | 6.25% | | | |
| Expected return on plan assets | 8.00% | 8.25% | 8.90% | | | |
| Rate of compensation increases | 3.50% | 3.50% | 3.50% | | | |
| | | | | | | |
| Mueller Co. and Anvil pension plans: | | | | | | |
| Weighted average used to determine benefit obligations: | | | | | | |
| Discount rate | 5.44% | 5.45% | 7.49% | | | |
| Rate of compensation increases | 3.50% | 3.50% | 3.50% | | | |
| Weighted average used to determine net periodic cost: | | | | | | |
| Discount rate | 5.45% | 7.43% | 6.27% | | | |
| Expected return on plan assets | 7.88% | 7.88% | 8.55% | | | |
| Rate of compensation increases | 3.50% | 3.50% | 3.50% | | | |
| | | | | | | |
| Healthcare plans: | | | | | | |
| Weighted average used to determine benefit obligations: | | | | | | |
| Discount rate | | | | 5.44% | 5.45% | 7.60% |
| Weighted average used to determine net periodic cost: | | | | | | |
| Discount rate | | | | 5.45% | 7.60% | 6.25% |
| Assumed healthcare cost trend rates: | | | | | | |
| Next year – pre-65 | | | | 7.90% | 8.90% | 9.90% |
| Ultimate trend rate – pre-65 | | | | 4.90% | 4.90% | 5.50% |
| Year ultimate trend rate achieved | | | | 2016 | 2016 | 2015 |

F-24

Case: 18-31177   Document: 00515297113   Page: 355   Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 356 of 1003
Case 2:10-md-02179-CJB-JCW   Document 25034   Filed 10/25/18   Page 151 of 152

Assumed healthcare cost trend rates, discount rates, expected return on plan assets and salary increases have a significant effect on the amounts reported for the pension and healthcare plans. A one-percentage-point change in the trend rate for these assumptions would have the following effects (in millions):

| | 1 Percentage point increase | | 1 Percentage point decrease |
|---|---|---|---|
| | (in millions) | | |
| Pension Plans: | | | |
| Discount rate: | | | |
| Effect on pension service and interest cost components | $ 0.5 | $ | (0.8) |
| Effect on pension benefit obligations | (40.4) | | 48.9 |
| Effect on 2011 pension expense | (2.3) | | 2.7 |
| Expected return on plan assets: | | | |
| Effect on current year pension expense | (3.1) | | 3.1 |
| Rate of compensation increase: | | | |
| Effect on pension service and interest cost components | 0.1 | | (0.1) |
| Effect on pension benefit obligations | 2.2 | | (2.0) |
| Effect on 2011 pension expense | 0.4 | | (0.4) |
| Other plans: | | | |
| Healthcare cost trend: | | | |
| Effect on total of service and interest cost components | - | | - |
| Effect on postretirement benefit obligations | 0.2 | | (0.2) |
| Discount rate: | | | |
| Effect on postretirement service and interest cost components | - | | - |
| Effect on postretirement benefit obligations | (0.5) | | 0.6 |
| Effect on 2011 postretirement benefits expense | - | | - |

We maintain a single trust to hold the U.S. pension plan assets. This trust's strategic asset allocations, tactical range at September 30, 2010 and actual asset allocations at September 30, 2010, 2009 and 2008, respectively, are presented below.

| | Strategic asset allocation | Tactical range | Actual asset allocations September 30, | | |
|---|---|---|---|---|---|
| | | | 2010 | 2009 | 2008 |
| Equity investments: | | | | | |
| Large capitalization stocks | 38% | 19-57% | | | |
| Small capitalization stocks | 8% | 4-12% | | | |
| International stocks | 14% | 7-21% | | | |
| | 60% | 50-70% | 58% | 69% | 61% |
| Fixed income investments | 40% | 30-50% | 39% | 26% | 35% |
| Cash | 0% | 0-5% | 3% | 5% | 4% |
| | 100% | | 100% | 100% | 100% |

Assets of the Pension Plan are allocated to various investments to attain diversification and reasonable risk-adjusted returns while also managing our exposure to asset and liability volatility. These ranges are targets and deviations may occur from time to time due to market fluctuations. Portfolio assets are typically rebalanced to the allocation targets at least annually.

Case: 18-31177    Document: 00515297113    Page: 356    Date Filed: 02/04/2020

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 357 of 1003
Case 2:10-md-02179-CJB-JCW   Document 25034   Filed 10/25/18   Page 357 of 152

Following is a description of the valuation methodologies used to measure the assets of the Pension Plans at fair value.

- Equity investments are valued at the closing price reported on the active market when reliable market quotations are readily available. When market quotations are not readily available, assets of the Pension Plans are valued by a method the trustees of the Pension Plans believe accurately reflects fair value.

- Fixed income investments are valued using the closing price reported in the active market in which the investment is traded or based on yields currently available on comparable securities of issuers with similar credit ratings.

- Other investments are valued as determined by the trustees of the Pension Plans based on their net asset values and supported by the value of the underlying securities and by the unit prices of actual purchase and sale transactions occurring at or close to the financial statement date.

The tables below set forth, by level within the fair value hierarchy, the assets of the Pension Plans at September 30, 2010:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| | | (in millions) | | |
| Equity | $ 145.5 | $ 38.1 | $ - | $ 183.6 |
| Fixed income | - | 1.9 | 117.9 | 119.8 |
| Cash | 0.3 | - | - | 0.3 |
| Other | - | - | 9.4 | 9.4 |
| Total | $ 145.8 | $ 40.0 | $ 127.3 | $ 313.1 |

The table below sets forth a summary of changes in the fair value of Level 3 assets of the Pension Plans for 2010:

| | Fixed income | Other | Total |
|---|---|---|---|
| | | (in millions) | |
| Balance at beginning of year | $ - | $ 12.8 | $ 12.8 |
| Realized gains | 0.8 | - | 0.8 |
| Unrealized gain (loss) related to instruments still held at the reporting date | 13.1 | - | 13.1 |
| Purchases, sales, issuances and settlements, net | 104.0 | (3.4) | 100.6 |
| Balance at end of year | $ 117.9 | $ 9.4 | $ 127.3 |

We currently estimate contributing between $16 million and $20 million to our Pension Plans during 2011. We also expect to contribute approximately $0.7 million to our other postretirement benefit plans during 2011. The estimated benefit payments, which reflect expected future service, as appropriate, are presented below.

| | Pension benefits | Other post-retirement benefits before Medicare subsidy |
|---|---|---|
| | (in millions) | |
| 2011 | $ 24.8 | $ 0.7 |
| 2012 | 25.3 | 0.6 |
| 2013 | 25.6 | 0.6 |
| 2014 | 25.9 | 0.5 |
| 2015 | 26.2 | 0.5 |
| 2016-2020 | 137.0 | 2.5 |

Of the total pension plan obligations at September 30, 2010, 97% relates to our U.S. plan.

*Defined Contribution Retirement Plan*—Certain U.S. employees participate in defined contribution 401(k) plans. We make matching contributions as a function of employee contributions. Matching contributions were $3.9 million, $4.4 million and $7.6 million during 2010, 2009 and 2008, respectively. Company matching contribution were suspended from April 2009 through December 2009.

**Note 11.    Capital Stock**

We completed a public offering of 37,122,000 shares of Series A common stock at $4.75 per share on September 23, 2009. Net proceeds from this offering were $166.0 million.

On January 28, 2009, each share of Series B common stock was converted into one share of Series A common stock. Holders of Series A common stock are entitled to one vote per share. Holders of Series B common stock were entitled to eight votes per share. Holders of Series A common stock and Series B common stock otherwise had identical ownership rights.

Series A common stock and Series B common stock share activity is presented below.

|  | Series A | Series B |
|---|---|---|
| Shares outstanding at September 30, 2007 | 29,006,267 | 85,844,920 |
| Exercise of stock options | 12,470 | - |
| Exercise of employee stock purchase plan instruments | 210,292 | - |
| Vesting of restricted stock units, net of shares withheld | 299,734 | - |
| Shares outstanding at September 30, 2008 | 29,528,763 | 85,844,920 |
| Conversion of Series B common stock into Series A common stock | 85,844,920 | (85,844,920) |
| Exercise of employee stock purchase plan instruments | 302,691 | - |
| Vesting of restricted stock units, net of shares withheld | 992,513 | - |
| Sale of common stock in public offering | 37,122,000 | - |
| Shares outstanding at September 30, 2009 | 153,790,887 | - |
| Exercise of stock options | 26,346 | - |
| Exercise of employee stock purchase plan instruments | 431,964 | - |
| Vesting of restricted stock units, net of shares withheld | 459,277 | - |
| Shares outstanding at September 30, 2010 | 154,708,474 | - |

**Note 12.    Stock-based Compensation Plans**

The Mueller Water Products, Inc. 2006 Stock Incentive Plan (the "2006 Plan") authorizes an aggregate of 16 million shares of Series A common stock that may be granted through the issuance of stock-based awards. Any awards cancelled are available for reissuance. Generally, all of our employees and members of our Board of Directors are eligible to participate in the 2006 Plan.

An award granted under the 2006 Plan becomes exercisable at such times and in such installments as set by the Compensation and Human Resources Committee of the Board of Directors, but no award will be exercisable after the tenth anniversary of the date on which it is granted. Stock option exercise prices equal the closing stock price on the grant date.

F-27

Case: 18-31177    Document: 00515297113    Page: 358    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 359 of 1003
Case 2:10-md-02179-CJB-JCW   Document 25034-3   Filed 10/29/18   Page 184 of 192

Outstanding stock options generally vest on each anniversary date of the original grant on a pro rata basis based on the total number of years until all awards are vested, usually three years. Outstanding restricted stock units generally vest either on each anniversary date of the original grant on a pro rata basis based on the total number of years until all awards are vested, usually three years, or cliff vest after either three years or seven years from the grant date. Awards that cliff vest after seven years generally provide for an acceleration of vesting if certain stock price performance targets are met.

Stock option activity under the 2006 Plan is summarized below.

| | Shares | | Weighted average exercise price per share | Weighted average remaining contractual term (years) | | Aggregate intrinsic value (millions) |
|---|---|---|---|---|---|---|
| Outstanding at September 30, 2007 | 996,260 | $ | 14.78 | 8.6 | $ | 0.7 |
| Granted | 1,147,419 | | 10.39 | | | |
| Exercised | (12,470) | | 3.65 | | | 0.1 |
| Cancelled | (180,424) | | 13.72 | | | |
| Outstanding at September 30, 2008 | 1,950,785 | | 12.37 | 8.5 | | 0.4 |
| Granted | 1,542,284 | | 5.60 | | | |
| Exercised | - | | - | | | - |
| Cancelled | (89,073) | | 9.99 | | | |
| Outstanding at September 30, 2009 | 3,403,996 | | 9.36 | 8.3 | | 0.2 |
| Granted | 1,630,424 | | 4.91 | | | |
| Exercised | (26,346) | | 4.45 | | | 0.1 |
| Cancelled | (283,528) | | 8.84 | | | |
| Outstanding at September 30, 2010 | 4,724,546 | $ | 7.89 | 7.9 | $ | - |
| Vested or expected to vest after September 30, 2010 | 4,598,631 | $ | 7.86 | 7.9 | $ | - |
| Exercisable at September 30, 2010 | 1,890,274 | $ | 11.18 | 6.8 | $ | - |

The exercise prices for stock options outstanding at September 30, 2010 range from $2.05 to $20.56 per share.

Restricted stock and restricted stock unit activity under the 2006 Plan is summarized below.

| | Shares | Weighted average grant date fair value per share | Weighted average remaining contractual term (years) | Aggregate intrinsic value (millions) |
|---|---|---|---|---|
| Outstanding at September 30, 2007 | 1,896,568 | $ 15.61 | 2.9 | $ 23.5 |
| Granted | 645,271 | 10.43 | | |
| Vested | (311,865) | 14.86 | | 2.7 |
| Cancelled | (234,050) | 15.00 | | |
| Outstanding at September 30, 2008 | 1,995,924 | 14.12 | 2.0 | 17.9 |
| Granted | 834,794 | 6.10 | | |
| Vested | (1,071,202) | 15.07 | | 4.2 |
| Cancelled | (45,025) | 10.08 | | |
| Outstanding at September 30, 2009 | 1,714,491 | 9.73 | 2.3 | 9.4 |
| Granted | 986,583 | 4.91 | | |
| Vested | (513,505) | 9.20 | | 2.5 |
| Cancelled | (91,856) | 8.00 | | |
| Outstanding at September 30, 2010 | 2,095,713 | $ 7.66 | 1.9 | $ 6.3 |
| Expected to vest after September 30, 2010 | 2,037,464 | $ 7.65 | 1.9 | $ 6.2 |

Compensation expense attributed to stock awards is based on the fair value of the awards on the date granted. Compensation expense is recognized between the grant date and the vesting date on a straight-line basis for each individual award share granted with cliff-vesting provisions, and on an accelerated basis for each individual award granted with ratable vesting provisions. Fair values of stock option awards are determined using a Black-Scholes model. Fair values of restricted stock units are determined using the closing stock price. The weighted average grant-date fair values of stock options granted and the weighted average assumptions used to determine these fair values are indicated below.

| | 2010 | 2009 | 2008 |
|---|---|---|---|
| Grant-date fair value | $ 1.66 | $ 2.07 | $ 3.76 |
| Risk-free interest rate | 2.47% | 2.21% | 3.54% |
| Dividend yield | 1.48% | 0.74% | 0.48% |
| Expected life (years) | 6.00 | 6.00 | 6.00 |
| Expected annual volatility | 0.3692 | 0.3786 | 0.3231 |

The risk-free interest rate is based on the U.S. Treasury zero-coupon yield in effect at the grant date with a term equal to the expected life. The expected dividend yield is based on our estimated annual dividend and stock price history at the grant date. The expected term represents the period of time the awards are expected to be outstanding. We determined the volatility assumption for calculating the fair value of our stock option grants based upon a group of peer companies. The average volatility for these peer companies has been used as we believe our volatility since our initial public offering in 2006 is not representative of expected volatility over the expected term of the option grants due to the historically unusual volatility in our end markets since the date of our initial public offering.

F-29

The number of instruments expected to vest is less than the number outstanding because management expects some instruments will be forfeited prior to vesting. Grants to members of our Board of the Directors are expected to vest fully. We expect grants to others to be forfeited at an annual rate of 3.0%.

The Mueller Water Products, Inc. 2006 Employee Stock Purchase Plan (the "ESPP") authorizes the sale of up to 4 million shares of our Series A common stock to employees. Employees may designate up to the lesser of $25,000 or 20% of their annual compensation for the purchase of stock. An employee's purchase during any three-month offering period is limited to 1,000 shares of Series A common stock. Any excess payroll withholdings are returned to the employee. The price for shares purchased under the ESPP is the lower of 85% of closing price on the first day or the last day of the offering period. Generally, all full-time, active employees are eligible to participate in the ESPP.

Compensation expense under the ESPP is equal to the sum of (1) 15% of the fair value of Series A common stock on the first day of the offering period and (2) the fair value of 85% of a Series A common stock call option at the first day of the offering period and 15% of a Series A common stock put option at the first day of the offering period. Fair values of these call and put options were determined using a Black-Scholes model. The weighted average grant-date fair values of ESPP instruments granted and the assumptions used to determine these fair values are indicated below.

|  | 2010 | 2009 | 2008 |
| --- | --- | --- | --- |
| Grant-date fair value | $ 1.27 | $ 2.38 | $ 2.73 |
| Risk-free interest rate | 0.20% | 0.34% | 1.96% |
| Dividend yield | 1.61% | 0.98% | 0.58% |
| Expected life (months) | 3.00 | 3.00 | 3.00 |
| Expected annual volatility | 0.7196 | 1.4774 | 0.6875 |

The risk-free interest rate is based on the U.S. Treasury zero-coupon yield on the first day of the offering period with a term equal to the expected life. The dividend yield is based on our actual dividend rate and stock price history at the grant date. The expected volatility is deemed to be equal to the historical volatility over a period ending on the date of grant.

Under the ESPP, employees purchased 335,100 shares, 339,440 shares and 226,304 shares of our Series A common stock during 2010, 2009 and 2008, respectively. At September 30, 2010, 2,913,588 shares were available for issuance under the ESPP.

At September 30, 2010, there was approximately $6.3 million of unrecognized compensation expense related to stock awards not yet vested. We expect to recognize this expense over a weighted average life of approximately 1.41 years.

The effect of stock-based compensation on our statements of operations is presented below.

|  | 2010 | 2009 | 2008 |
| --- | --- | --- | --- |
|  | (in millions, except per share data) | | |
| Decrease in income from operations | $ 8.3 | $ 11.6 | $ 13.2 |
| Decrease in net income | 5.2 | 7.2 | 7.5 |
| Decrease in basic and diluted net income per share | 0.03 | 0.06 | 0.07 |

Note 13.   Supplemental Balance Sheet Information

Selected supplemental balance sheet information is presented below.

|  | September 30, | | | |
|---|---|---|---|---|
|  | **2010** | | **2009** | |
|  | **(in millions)** | | | |
| Inventories: | | | | |
| Purchased materials and manufactured parts | $ | 41.6 | $ | 56.7 |
| Work in process | | 77.0 | | 83.8 |
| Finished goods | | 149.8 | | 202.3 |
|  | $ | 268.4 | $ | 342.8 |
|  | | | | |
| Other current assets: | | | | |
| Prepaid income taxes | $ | 12.2 | $ | 42.0 |
| Maintenance and repair tooling | | 30.9 | | 31.3 |
| Other | | 8.4 | | 7.5 |
|  | $ | 51.5 | $ | 80.8 |
|  | | | | |
| Property, plant and equipment: | | | | |
| Land | $ | 22.8 | $ | 24.9 |
| Buildings | | 89.2 | | 97.9 |
| Machinery and equipment | | 540.7 | | 633.8 |
| Construction in progress | | 13.7 | | 17.2 |
|  | | 666.4 | | 773.8 |
| Accumulated depreciation and amortization | | (402.0) | | (477.4) |
|  | $ | 264.4 | $ | 296.4 |
|  | | | | |
| Other current liabilities: | | | | |
| Compensation and benefits | $ | 40.4 | $ | 40.5 |
| Cash discounts and rebates | | 13.4 | | 14.2 |
| Taxes other than income taxes | | 6.1 | | 5.9 |
| Interest | | 12.3 | | 14.7 |
| Warranty | | 4.5 | | 4.0 |
| Severance | | 0.3 | | 0.2 |
| Restructuring | | 0.8 | | 3.4 |
| Income taxes | | 4.0 | | 4.5 |
| Environmental | | 0.3 | | 0.5 |
| Other | | 7.7 | | 9.5 |
|  | $ | 89.8 | $ | 97.4 |

Case: 18-31177    Document: 00515297113    Page: 362    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC  Document 26293  Filed 02/05/20  Page 363 of 1003
Case 2:10-md-02179-CJB-JCW  Document 25034  Filed 10/28/18  Page 363 of 152

**Note 14.    Supplemental Statement of Operations Information**

Selected supplemental statement of operations information is presented below.

|  | 2010 | 2009 | 2008 |
|---|---|---|---|
|  |  | (in millions) |  |
| Included in selling, general and administrative expenses: |  |  |  |
| Research and development | $ 8.0 | $ 6.9 | $ 5.7 |
| Advertising | $ 4.2 | $ 5.1 | $ 7.3 |
| Interest expense, net: |  |  |  |
| 2007 Credit Agreement, including interest rate swap contracts | $ 20.8 | $ 37.6 | $ 40.7 |
| 7⅜ Senior Subordinated Notes | 31.0 | 31.0 | 31.3 |
| 8¾ % Senior Unsecured Notes | 2.0 | - | - |
| Terminated interest rate swap contracts: |  |  |  |
| Costs deferred | (4.7) | - | - |
| Costs recognized | 12.7 | 6.3 | - |
| Deferred financing fees amortization | 2.9 | 2.2 | 1.7 |
| Capitalized interest | - | - | (1.0) |
| Other interest expense | 3.6 | 2.9 | 3.8 |
| Interest income | (0.3) | (1.7) | (4.1) |
|  | $ 68.0 | $ 78.3 | $ 72.4 |

**Note 15.    Comprehensive Income (Loss)**

Comprehensive income (loss) is presented below.

|  | 2010 | 2009 | 2008 |
|---|---|---|---|
|  |  | (in millions) |  |
| Net income (loss) | $ (45.2) | $ (996.7) | $ 42.0 |
| Other comprehensive income (loss): |  |  |  |
| Effect of net loss on derivatives | (0.7) | (6.2) | (10.8) |
| Income tax effects | 0.3 | 2.4 | 4.3 |
| Amortization of interest expense on terminated swap contracts | 6.5 | — | — |
| Income tax effects | (2.6) | — | — |
|  | 3.5 | (3.8) | (6.5) |
| Foreign currency translation | 3.4 | (3.4) | (2.7) |
| Minimum pension liability | 14.6 | (97.7) | (38.0) |
| Income tax effects | (5.8) | 38.6 | 14.9 |
|  | 8.8 | (59.1) | (23.1) |
|  | $ (29.5) | $ (1,063.0) | $ 9.7 |

Accumulated other comprehensive loss is presented below.

| | September 30, | | |
|---|---|---|---|
| | 2010 | | 2009 |
| | (in millions) | | |
| Net unrecognized loss on derivatives | $ (7.9) | $ | (11.4) |
| Foreign currency translation | 7.4 | | 4.0 |
| Minimum pension liability | (69.7) | | (78.5) |
| | $ (70.2) | $ | (85.9) |

### Note 16.   Net Income (Loss) Per Share

Net income (loss) per share information is presented below.

| | 2010 | | 2009 | | 2008 |
|---|---|---|---|---|---|
| | (in millions, except per share amounts) | | | | |
| Net income (loss) | $ (45.2) | $ | (996.7) | $ | 42.0 |
| | | | | | |
| Weighted average common shares outstanding | 154.3 | | 116.6 | | 115.1 |
| Effect of dilutive stock options and restricted stock units | - | | - | | 0.4 |
| | 154.3 | | 116.6 | | 115.5 |
| | | | | | |
| Net income (loss) per share (basic and diluted) | $ (0.29) | $ | (8.55) | $ | 0.36 |

We recorded net losses for 2010 and 2009. The effect of including normally dilutive securities in the earnings per share calculation would have been antidilutive. Therefore, all stock-based compensation instruments were excluded from the calculation of diluted net loss per share for 2010 and 2009. The effect of dilutive stock options and restricted stock units is determined using the treasury stock method. During 2008, 1.8 million outstanding stock options were excluded from the determination of the weighted average outstanding shares since their inclusion would have been antidilutive.

Case: 18-31177     Document: 00515297113     Page: 364     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 365 of 1003
Case 2:10-md-02179-CJB-JCW   Document 25034-23   Filed 10/29/18   Page 365 of 152

## Note 17.   Supplemental Cash Flow Information

During 2008, we amended a retiree medical coverage plan and a defined benefit pension plan, as well as recorded noncash activity by changing our pension plans' and other postretirement benefit plans' measurement dates to September 30 (see Note 10). We also recorded an adjustment related to uncertain income tax positions (see Note 6).

The impact these transactions had on our consolidated balance sheets is presented below.

| | 2010 | 2009 | 2008 |
|---|---|---|---|
| | | (in millions) | |
| Pension and other postretirement plans: | | | |
| Increase in current assets | $ - | $ - | $ 3.1 |
| Decrease in other noncurrent assets | - | - | (2.3) |
| Increase in other current liabilities | - | (0.1) | - |
| Increase in other noncurrent liabilities | 5.3 | (58.7) | (1.5) |
| Decrease in accumulated other comprehensive income | (5.3) | 58.8 | 0.7 |
| | $ - | $ - | $ - |
| Recognize funded status and change in measurement dates of pension and other postretirement plans: | | | |
| Decrease in other noncurrent assets | $ - | $ - | $ (5.3) |
| Increase in other current liabilities | - | - | 1.2 |
| Increase in other noncurrent liabilities | - | - | (15.9) |
| Decrease in retained earnings | - | - | (0.6) |
| Increase in accumulated other comprehensive income | - | - | 20.6 |
| | $ - | $ - | $ - |
| Uncertain income tax positions: | | | |
| Increase in current assets | $ - | $ 1.0 | $ - |
| Increase (decrease) in goodwill | - | (2.0) | 0.4 |
| Decrease in identifiable intangible assets | - | (1.5) | - |
| Increase in other noncurrent assets | - | - | 8.7 |
| Decrease in other current liabilities | - | 2.5 | 4.3 |
| Decrease in deferred income taxes | - | - | 3.7 |
| Increase in other noncurrent liabilities | - | - | (16.5) |
| Increase in accumulated deficit | - | - | (0.6) |
| | $ - | $ - | $ - |
| Cash paid, net of cash received: | | | |
| Interest | $ 77.5 | $ 74.8 | $ 70.5 |
| Income taxes | (29.2) | 12.3 | 7.7 |

**Note 18.   Segment Information**

Our operations consist of three business segments: Mueller Co., U.S. Pipe and Anvil. These segments are organized based on products sold and customers served and are consistent with how the segments are managed, how resources are allocated and how information is used by the chief operating decision maker. Mueller Co. manufactures valves for water and gas systems including butterfly, iron gate, tapping, check, plug and ball valves, dry-barrel and wet-barrel fire hydrants and a broad range of metering products for the water infrastructure industry. U.S. Pipe manufactures a broad line of ductile iron pipe, joint restraint products, fittings and other ductile iron products. Anvil manufactures and sources a broad range of products including a variety of fittings, couplings, hangers, nipples and related pipe products.

Intersegment sales and transfers are made at selling prices generally intended to cover costs. The determination of segment results does not reflect allocations of certain corporate expenses not directly attributable to segment operations and intersegment eliminations, which are designated as Corporate. Interest, loss on early extinguishment of debt and income taxes are not allocated to business segments. Corporate expenses include those costs incurred by our corporate function, such as finance, treasury, risk management, human resources, legal, tax and other administrative functions. Therefore, segment results are not reflective of their results on a stand-alone basis. Corporate assets principally consist of cash, income tax assets and deferred financing fees. Segment assets consist primarily of accounts receivables, inventories, property, plant and equipment and identifiable intangible assets.

Summarized financial information for our segments is presented below.

| | Mueller Co. | U.S. Pipe | Anvil | Corporate | Total |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| **Net sales, excluding intercompany:** | | | | | |
| 2010 | $ 612.8 | $ 377.8 | $ 346.9 | $ - | $ 1,337.5 |
| 2009 | 547.1 | 410.9 | 469.9 | - | 1,427.9 |
| 2008 | 718.1 | 546.0 | 595.2 | - | 1,859.3 |
| **Intercompany sales:** | | | | | |
| 2010 | $ 15.4 | $ 1.7 | $ 0.4 | $ - | $ 17.5 |
| 2009 | 18.6 | 2.2 | 0.5 | - | 21.3 |
| 2008 | 21.8 | 2.8 | 0.7 | - | 25.3 |
| **Income (loss) from operations:** | | | | | |
| 2010 | $ 81.0 | $ (65.7) | $ 22.1 | $ (33.4) | $ 4.0 |
| 2009 | (770.6) | (142.4) | (53.4) | (34.5) | (1,000.9) |
| 2008 | 128.4 | (17.4) | 74.1 | (39.0) | 146.1 |
| **Depreciation and amortization:** | | | | | |
| 2010 | $ 49.7 | $ 18.9 | $ 15.4 | $ 0.6 | $ 84.6 |
| 2009 | 50.9 | 21.1 | 17.6 | 0.6 | 90.2 |
| 2008 | 50.1 | 22.7 | 19.7 | 0.6 | 93.1 |
| **Restructuring and impairment:** | | | | | |
| 2010 | $ 0.1 | $ 12.5 | $ 0.5 | $ - | $ 13.1 |
| 2009 | 820.7 | 101.1 | 96.7 | 0.2 | 1,018.7 |
| 2008 | - | 18.3 | - | - | 18.3 |
| **Capital expenditures:** | | | | | |
| 2010 | $ 15.6 | $ 11.0 | $ 6.0 | $ 0.2 | $ 32.8 |
| 2009 | 16.2 | 11.2 | 11.9 | 0.4 | 39.7 |
| 2008 | 17.9 | 58.5 | 11.5 | 0.2 | 88.1 |
| **Total assets:** | | | | | |
| September 30, 2010 | $ 883.5 | $ 263.0 | $ 270.0 | $ 151.7 | $ 1,568.2 |
| September 30, 2009 | 945.8 | 287.9 | 368.6 | 137.2 | 1,739.5 |
| **Identifiable intangible assets, net:** | | | | | |
| September 30, 2010 | $ 551.6 | $ 9.5 | $ 71.3 | $ - | $ 632.4 |
| September 30, 2009 | 578.2 | 10.4 | 75.0 | - | 663.6 |

Geographical area information is presented below.

| | United States | | Canada | | Other | | Total |
|---|---|---|---|---|---|---|---|
| | | | (in millions) | | | | |
| Net sales: | | | | | | | |
| 2010 | $ 1,109.0 | $ | 186.3 | $ | 42.2 | | $ 1,337.5 |
| 2009 | 1,184.1 | | 215.8 | | 28.0 | | 1,427.9 |
| 2008 | 1,543.8 | | 292.3 | | 23.2 | | 1,859.3 |
| Property, plant and equipment, net: | | | | | | | |
| September 30, 2010 | $ 254.4 | $ | 6.6 | $ | 3.4 | $ | 264.4 |
| September 30, 2009 | 280.9 | | 12.0 | | 3.5 | | 296.4 |

Sales to HDS IP Holding, LLC ("HD Supply") comprised approximately 12%, 12% and 15% of our total gross sales during 2010, 2009, and 2008, respectively. In 2010, HD Supply accounted for 15%, 14% and 3% of gross sales for Mueller Co., U.S. Pipe and Anvil, respectively. Receivables from HD Supply totaled $30.2 million and $33.1 million at September 30, 2010 and 2009, respectively.

**Note 19.   Commitments and Contingencies**

We are involved in various legal proceedings that have arisen in the normal course of operations, including the proceedings summarized below. The effect of the outcome of these matters on our future results of operations cannot be predicted with certainty as any such effect depends on future results of operations and the amount and timing of the resolution of such matters. Other than the litigation described below, we do not believe that any of our outstanding litigation would have a material adverse effect on our businesses, operations or prospects.

*Environmental.*  We are subject to a wide variety of laws and regulations concerning the protection of the environment, both with respect to the operations at many of our properties and with respect to remediating environmental conditions that may exist at our own or other properties. We strive to comply with federal, state and local environmental laws and regulations. We accrue for environmental expenses resulting from existing conditions that relate to past operations when the costs are probable and reasonably estimable.

In September 1987, we implemented an Administrative Consent Order ("ACO") for our Burlington, New Jersey property, which was required under the New Jersey Environmental Cleanup Responsibility Act (now known as the Industrial Site Recovery Act). The ACO required soil and ground water cleanup, and we have completed, and have received final approval on, the soil cleanup required by the ACO. U.S. Pipe continues to pump and treat ground water at this site. Further remediation could be required. Long-term ground water monitoring is also required to verify natural attenuation. We do not know how long ground water monitoring will be required, and do not believe monitoring or further remediation costs, if any, will have a material adverse effect on our financial condition or results of operations.

In June 2003, Solutia Inc. and Pharmacia Corporation (collectively "Solutia") filed suit against U.S. Pipe and a number of co-defendant foundry-related companies in the U.S. District Court for the Northern District of Alabama for contribution and cost recovery allegedly incurred and to be incurred by Solutia in performing remediation of polychlorinated biphenyls ("PCBs") and heavy metals in Anniston, Alabama, pursuant to a partial consent degree with the Environmental Protection Agency ("EPA"). U.S. Pipe and certain co-defendants subsequently reached a settlement with the EPA concerning their liability for certain contamination in and around Anniston, which was memorialized in an Administrative Order and Order on Consent ("AOC") that became effective in January 2006. U.S. Pipe has reached a settlement agreement whereby Phelps Dodge Industries, Inc., a co-defendant and co-respondent on the AOC, has assumed U.S. Pipe's obligation to perform the work required under the AOC.

Case: 18-31177    Document: 00515297113    Page: 368    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC    Document 26293    Filed 02/05/20    Page 369 of 1003
Case 2:10-md-02179-CJB-JCW    Document 25054    Filed 10/29/18    Page 134 of 152

U.S. Pipe and the other settling defendants contend that the legal effect of the AOC extinguishes Solutia's claims and they filed a motion for summary judgment to that effect. Discovery in this matter was stayed while the motion for summary judgment was pending. The court recently issued a summary judgment order, holding that plaintiffs' claims for contribution are barred by the AOC but giving plaintiffs the right to seek to recover cleanup costs they voluntarily incurred. The court granted a motion for immediate appeal to the Eleventh Circuit Court of Appeals, but the Eleventh Circuit Court of Appeals declined to take the appeal. The parties engaged in fact discovery in 2009, and U.S. Pipe has moved for reconsideration of the June 2008 summary judgment order that permitted plaintiffs to proceed with their claims to seek recovery of cleanup costs under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act. On July 2, 2010, the court granted summary judgment on the cost recovery claims under Section 107(a) and dismissed those remaining counts against U.S. Pipe. On July 30, 2010, plaintiffs moved to clarify or amend the court's July 2, 2010 order to permit the plaintiffs to pursue a claim under Section 107(a) to recover costs that were not incurred under any removal order or settlement. On October 29, 2010, the district court denied plaintiffs' motion. The deadline for plaintiffs to appeal that order is November 29, 2010. We continue to have no basis to form a view with respect to the probability or amount of liability in this matter.

U.S. Pipe and a number of co-defendant foundry-related companies were named in a putative civil class action case originally filed in April 2005 in the Circuit Court of Calhoun County, Alabama, and removed by defendants to the U.S. District Court for the Northern District of Alabama under the Class Action Fairness Act. The putative plaintiffs in the case filed an amended complaint with the U.S. District Court in December 2006. The amended complaint alleged state law tort claims (negligence, failure to warn, wantonness, nuisance, trespass and outrage) arising from the creation and disposal of "foundry sand" alleged to contain harmful levels of PCBs and other toxins, including arsenic, cadmium, chromium, lead and zinc. The plaintiffs originally sought damages for real and personal property and for other unspecified personal injury. On June 4, 2007, a motion to dismiss was granted to U.S. Pipe and certain co-defendants as to the claims for negligence, failure to warn, nuisance, trespass and outrage. The remainder of the complaint was dismissed with leave to file an amended complaint. On July 6, 2007, plaintiffs filed a second amended complaint, which dismissed prior claims relating to U.S. Pipe's former facility located at 2101 West 10th Street in Anniston, Alabama and no longer alleges personal injury claims. Plaintiffs filed a third amended complaint on July 27, 2007. U.S. Pipe and the other defendants have moved to dismiss the third amended complaint. On September 24, 2008, the court issued an order on the motion, dismissing the claims for wantonness and permitting the plaintiffs to move forward with their claims of nuisance, trespass and negligence. The court has ordered the parties to mediate the dispute. The parties have reached an agreement in principle to resolve the matter and submitted the settlement agreement to the court for approval on October 26, 2010. On October 27, 2010, the court entered an order preliminarily approving the settlement and setting the settlement fairness hearing for February 17, 2011.

On July 13, 2010, Rohcan Investments Limited ("Rohcan"), the former owner of property leased by Mueller Canada Ltd. and located in Milton, Ontario, filed suit against Mueller Canada Ltd. and its directors seeking C$10 million in damages arising from the defendants' alleged environmental contamination of the property and breach of lease. Mueller Canada Ltd. leased the property from 1988 through 2008. We have tendered certain potential liabilities that might arise from this lawsuit to a former owner responsible for liabilities arising prior to the sale of Mueller Canada to the Company and its predecessors. Based on allegations stated in the complaint, the former owner has denied the tender. We have no basis to form a view with respect to the probability or amount of liability in this matter.

In the acquisition agreement pursuant to which a predecessor to Tyco International Ltd. ("Tyco") sold our Mueller Co. and Anvil businesses to the prior owners of these businesses in August 1999, Tyco agreed to indemnify us and our affiliates, among other things, for all "Excluded Liabilities." Excluded Liabilities include, among other things, substantially all liabilities relating to the time prior to August 1999, including environmental liabilities. The indemnity survives indefinitely. In addition, Tyco's indemnity does not cover liabilities to the extent caused by us or the operation of our businesses after August 1999, nor does it cover liabilities arising with

Case: 18-31177    Document: 00515297113    Page: 369    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC    Document 26293   Filed 02/05/20   Page 370 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26034-2 Filed 10/22/18   Page 135 of 152

respect to businesses or sites acquired after August 1999. In June 2007, Tyco was separated into three separate publicly traded companies. Should Tyco's successors become financially unable or fail to comply with the terms of the indemnity, we may be responsible for such obligations or liabilities.

*Other Litigation.* We are parties to a number of other lawsuits arising in the ordinary course of our businesses, including product liability cases for products manufactured by us or third parties. We provide for costs relating to these matters when a loss is probable and the amount is reasonably estimable. Administrative costs related to these matters are expensed as incurred. The effect of the outcome of these matters on our future results of operations cannot be predicted with certainty as any such effect depends on future results of operations and the amount and timing of the resolution of such matters. While the results of litigation cannot be predicted with certainty, we believe that the final outcome of such other litigation is not likely to have a materially adverse effect on our consolidated financial statements.

*Walter Energy-related Income Taxes.* Each member of a consolidated group for federal income tax purposes is severally liable for the federal income tax liability of each other member of the consolidated group for any year in which it is a member of the group at any time during such year. Each member of the Walter Energy consolidated group, which included us through December 14, 2006, is also jointly and severally liable for pension and benefit funding and termination liabilities of other group members, as well as certain benefit plan taxes. Accordingly, we could be liable under such provisions in the event any such liability is incurred, and not discharged, by any other member of the Walter Energy consolidated group for any period during which we were included in the Walter Energy consolidated group.

A dispute exists with regard to federal income taxes for years 1980 through 1994 allegedly owed by the Walter Energy consolidated group, which included U.S. Pipe during these periods. According to Walter Energy's last available public filing on the matter, Walter Energy's management estimated that the amount of tax claimed by the IRS was approximately $34.0 million for issues currently in dispute in bankruptcy court for matters unrelated to us. This amount is subject to interest and penalties. Of the $34.0 million in claimed tax, $21.0 million represents issues in which the IRS is not challenging the deductibility of the particular expense but only whether such expense is deductible in a particular year. Walter Energy's management believes that Walter Energy's financial exposure should be limited to interest and possible penalties and the amount of any tax claimed will be offset by refunds in other years.

In addition, the IRS previously issued a Notice of Proposed Deficiency assessing additional tax of $82.2 million for the fiscal years ended May 31, 2000, December 31, 2000 and December 31, 2001. The unresolved issues relate primarily to Walter Energy's method of recognizing revenue on the sale of homes and related interest on the installment notes receivable. The items at issue relate primarily to the timing of revenue recognition and consequently, should the IRS prevail on its positions, Walter Energy's financial exposure should be limited to interest and penalties. As a matter of law, we are jointly and severally liable for any final tax determination for any year in which any of our subsidiaries were members of the Walter Energy consolidated group, which means that we would be liable in the event Walter Energy is unable to pay any amounts owed. Walter Energy has disclosed that it believes its filing positions have substantial merit and that it intends to defend vigorously any claims asserted**.**

Walter Energy effectively controlled all of our tax decisions for periods during which we were a member of the Walter Energy consolidated group for federal income tax purposes and certain combined, consolidated or unitary state and local income tax groups. Under the terms of the income tax allocation agreement between us and Walter Energy dated May 26, 2006, we generally compute our tax liability on a stand-alone basis, but Walter Energy has sole authority to respond to and conduct all tax proceedings (including tax audits) relating to our federal income and combined state returns, to file all such returns on our behalf and to determine the amount of our liability to (or entitlement to payment from) Walter Energy for such previous periods. This arrangement may result in conflicts between Walter Energy and us. The separation of the Company from Walter Energy on

December 14, 2006 was intended to qualify as a tax-free spin-off under Internal Revenue Code Section 355. In addition, the tax allocation agreement provides that if the spin-off is determined not to be tax-free pursuant to Section 355, we generally will be responsible for any taxes incurred by Walter Energy or its shareholders if such taxes result from certain of our actions or omissions and for a percentage of any such taxes that are not a result of our actions or omissions or Walter Energy's actions or omissions or taxes based upon our market value relative to Walter Energy's market value. Additionally, to the extent that Walter Energy was unable to pay taxes, if any, attributable to the spin-off and for which it is responsible under the tax allocation agreement, we could be liable for those taxes as a result of being a member of the Walter Energy consolidated group for the year in which the spin-off occurred.

In accordance with the income tax allocation agreement, Walter Energy used certain tax assets of a predecessor to the Company in its calendar 2006 tax return for which payment to us is required. The income tax allocation agreement only requires Walter Energy to make the payment upon realization of the tax benefit by receiving a refund or otherwise offsetting taxes due. Walter Energy currently owes us $10.9 million that is payable pending completion of an IRS audit of Walter Energy's 2006 tax year and the related refund of tax from that year. We do not expect payment within a year from the current balance sheet date.

*Operating Leases.* We maintain operating leases primarily for equipment and facilities. Rent expense was $10.6 million, $14.0 million and $12.4 million for 2010, 2009 and 2008, respectively. Future minimum payments under non-cancelable operating leases are $9.4 million, $6.9 million, $4.7 million, $2.9 million and $2.3 million during 2011, 2012, 2013, 2014 and 2015, respectively. Minimum payments due beyond 2015 are $5.8 million.

### Note 20.   Subsequent Events

On October 27, 2010, we declared a dividend of $0.0175 per share on our Series A common stock, payable on November 22, 2010 to stockholders of record at the close of business on November 10, 2010.

### Note 21.   Quarterly Consolidated Financial Information (Unaudited)

|  | Quarter | | | |
|---|---|---|---|---|
|  | **Fourth** | **Third** | **Second** | **First** |
|  | **(in millions, except per share amounts)** | | | |
| 2010: | | | | |
| Net sales | $ 346.7 | $ 375.9 | $ 301.8 | $ 313.1 |
| Gross profit | 71.7 | 70.6 | 38.2 | 55.9 |
| Income (loss) from operations | 14.1 | 12.5 | (22.9) | 0.3 |
| Net loss | (7.0) | (3.8) | (23.7) | (10.7) |
| Net loss per share: | | | | |
| Basic and diluted | (0.05) | (0.02) | (0.15) | (0.07) |
| 2009: | | | | |
| Net sales | $ 374.8 | $ 363.2 | $ 322.2 | $ 367.7 |
| Gross profit | 69.2 | 57.8 | 54.9 | 75.0 |
| Income (loss) from operations | 12.9 | (8.5) | (618.2) | (387.1) |
| Net loss | (10.9) | (19.0) | (566.8) | (400.0) |
| Net loss per share: | | | | |
| Basic and diluted (1) | (0.09) | (0.16) | (4.90) | (3.47) |

(1)   The sum of quarterly earnings per share amounts is different from annual amounts due to relative weighting of each quarter's results to the full year.

Case: 18-31177    Document: 00515297113    Page: 371    Date Filed: 02/04/2020

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 372 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26034-23   Filed 10/29/18   Page 137 of 152

**Note 22.    Consolidating Guarantor and Non-Guarantor Financial Information**

The following information is included as a result of the guarantee by certain of our wholly-owned U.S. subsidiaries ("Guarantor Companies") of the Senior Unsecured Notes and the Senior Subordinated Notes. None of our other subsidiaries guarantee the Senior Unsecured Notes and the Senior Subordinated Notes. Each of the guarantees is joint and several and full and unconditional. Guarantor Companies are listed below.

| Name | State of incorporation or organization |
|---|---|
| Anvil 1, LLC | Delaware |
| Anvil 2, LLC | Delaware |
| Anvil International, LP | Delaware |
| AnvilStar, LLC | Delaware |
| Fast Fabricators, LLC | Delaware |
| Henry Pratt Company, LLC | Delaware |
| Henry Pratt International, LLC | Delaware |
| Hersey Meters Co., LLC | Delaware |
| Hunt Industries, LLC | Delaware |
| Hydro Gate, LLC | Delaware |
| J.B. Smith Mfg. Co., LLC | Delaware |
| James Jones Company, LLC | Delaware |
| MCO 1, LLC | Alabama |
| MCO 2, LLC | Alabama |
| Milliken Valve, LLC | Delaware |
| Mueller Co. Ltd. | Alabama |
| Mueller Financial Services, LLC | Delaware |
| Mueller Group, LLC | Delaware |
| Mueller Group Co-Issuer, Inc. | Delaware |
| Mueller International, L.L.C. | Delaware |
| Mueller International Finance, L.L.C. | Delaware |
| Mueller Service California, Inc. | Delaware |
| Mueller Service Co., LLC | Delaware |
| Mueller Technologies, LLC | Delaware |
| United States Pipe and Foundry Company, LLC | Alabama |
| U.S. Pipe Valve & Hydrant, LLC | Delaware |

**Mueller Water Products, Inc. and Subsidiaries**
**Consolidating Balance Sheet**
**September 30, 2010**

| | Issuer | Guarantor companies | Non-guarantor companies (in millions) | Eliminations | Total |
|---|---|---|---|---|---|
| Assets: | | | | | |
| Cash and cash equivalents | $ 50.8 | $ (1.9) | $ 34.8 | $ - | $ 83.7 |
| Receivables, net | 0.1 | 184.9 | 17.5 | - | 202.5 |
| Inventories | - | 250.9 | 17.5 | - | 268.4 |
| Deferred income taxes | 29.5 | - | 0.8 | - | 30.3 |
| Other current assets | 15.6 | 34.5 | 1.4 | - | 51.5 |
| Total current assets | 96.0 | 468.4 | 72.0 | - | 636.4 |
| | | | | | |
| Property, plant and equipment | 2.0 | 252.4 | 10.0 | - | 264.4 |
| Identifiable intangible assets | - | 632.4 | - | - | 632.4 |
| Other noncurrent assets | 31.2 | 2.5 | 1.3 | - | 35.0 |
| Investment in subsidiaries | (14.1) | 23.4 | - | (9.3) | - |
| Total assets | $ 115.1 | $ 1,379.1 | $ 83.3 | $ (9.3) | $ 1,568.2 |
| | | | | | |
| Liabilities and equity: | | | | | |
| Current portion of long-term debt | $ - | $ 0.7 | $ - | $ - | $ 0.7 |
| Accounts payable | 5.6 | 82.4 | 5.2 | - | 93.2 |
| Other current liabilities | 22.9 | 60.7 | 6.2 | - | 89.8 |
| Total current liabilities | 28.5 | 143.8 | 11.4 | - | 183.7 |
| | | | | | |
| Long-term debt | 690.6 | 0.9 | - | - | 691.5 |
| Deferred income taxes | 164.5 | - | 1.0 | - | 165.5 |
| Other noncurrent liabilities | 11.0 | 110.9 | 0.3 | - | 122.2 |
| Intercompany accounts | (1,184.8) | 1,137.6 | 47.2 | - | - |
| Total liabilities | (290.2) | 1,393.2 | 59.9 | - | 1,162.9 |
| Equity | 405.3 | (14.1) | 23.4 | (9.3) | 405.3 |
| Total liabilities and equity | $ 115.1 | $ 1,379.1 | $ 83.3 | $ (9.3) | $ 1,568.2 |

Case: 18-31177     Document: 00515297113     Page: 373     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 374 of 1003
Case 2:10-md-02179-CJB-JCW   Document 25034   Filed 10/22/18   Page 139 of 152

**Mueller Water Products, Inc. and Subsidiaries**
**Consolidating Balance Sheet**
**September 30, 2009**

| | Issuer | Guarantor companies | Non-guarantor companies | Eliminations | Total |
|---|---|---|---|---|---|
| | | | **(in millions)** | | |
| Assets: | | | | | |
| Cash and cash equivalents | $ 41.7 | $ (0.2) | $ 20.0 | $ - | $ 61.5 |
| Receivables, net | - | 183.1 | 33.2 | - | 216.3 |
| Inventories | - | 295.7 | 47.1 | - | 342.8 |
| Deferred income taxes | 30.4 | - | 0.4 | - | 30.8 |
| Assets held for sale | - | 13.9 | - | - | 13.9 |
| Other current assets | 44.7 | 33.9 | 2.2 | - | 80.8 |
| Total current assets | 116.8 | 526.4 | 102.9 | - | 746.1 |
| Property, plant and equipment | 2.4 | 278.5 | 15.5 | - | 296.4 |
| Identifiable intangible assets | - | 663.6 | - | - | 663.6 |
| Other noncurrent assets | 25.3 | 6.2 | 1.9 | - | 33.4 |
| Investment in subsidiaries | (90.6) | 21.7 | - | 68.9 | - |
| Total assets | $ 53.9 | $ 1,496.4 | $ 120.3 | $ 68.9 | $ 1,739.5 |
| Liabilities and equity: | | | | | |
| Current portion of long-term debt | $ 11.1 | $ 0.6 | $ - | $ - | $ 11.7 |
| Accounts payable | 4.7 | 95.2 | 11.8 | - | 111.7 |
| Other current liabilities | 29.5 | 62.3 | 5.6 | - | 97.4 |
| Total current liabilities | 45.3 | 158.1 | 17.4 | - | 220.8 |
| Long-term debt | 727.7 | 0.8 | - | - | 728.5 |
| Deferred income taxes | 179.4 | - | 0.6 | - | 180.0 |
| Other noncurrent liabilities | 32.7 | 140.8 | 0.4 | - | 173.9 |
| Intercompany accounts | (1,367.5) | 1,287.3 | 80.2 | - | - |
| Total liabilities | (382.4) | 1,587.0 | 98.6 | - | 1,303.2 |
| Equity | 436.3 | (90.6) | 21.7 | 68.9 | 436.3 |
| Total liabilities and equity | $ 53.9 | $ 1,496.4 | $ 120.3 | $ 68.9 | $ 1,739.5 |

Case: 18-31177   Document: 00515297113   Page: 374   Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 375 of 1003
Case 2:10-md-02179-CJB-JCW   Document 25034-23   Filed 10/29/18   Page 126 of 152

**Mueller Water Products, Inc. and Subsidiaries**
**Consolidating Statement of Operations**
**Year Ended September 30, 2010**

| | Issuer | Guarantor companies | Non-guarantor companies | Eliminations | Total |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| Net sales | $ - | $ 1,185.6 | $ 151.9 | $ - | $ 1,337.5 |
| Cost of sales | (0.3) | 968.6 | 132.8 | - | 1,101.1 |
| Gross profit | 0.3 | 217.0 | 19.1 | - | 236.4 |
| Operating expenses: | | | | | |
| Selling, general and administrative | 33.1 | 176.3 | 9.9 | - | 219.3 |
| Restructuring | - | 13.1 | - | - | 13.1 |
| Total operating expenses | 33.1 | 189.4 | 9.9 | | 232.4 |
| Income (loss) from operations | (32.8) | 27.6 | 9.2 | - | 4.0 |
| Interest expense, net | 68.0 | - | - | - | 68.0 |
| Loss on early extinguishment of debt | 4.6 | - | - | - | 4.6 |
| Income (loss) before income taxes | (105.4) | 27.6 | 9.2 | - | (68.6) |
| Income tax expense (benefit) | (37.3) | 11.0 | 2.9 | - | (23.4) |
| Equity in income of subsidiaries | 22.9 | 6.3 | - | (29.2) | - |
| Net income (loss) | $ (45.2) | $ 22.9 | $ 6.3 | $ (29.2) | $ (45.2) |

Case: 18-31177     Document: 00515297113     Page: 375     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 376 of 1003
Case 2:10-md-02179-CJB-JCW   Document 25984-23   Filed 10/29/18   Page 314 of 152

**Mueller Water Products, Inc. and Subsidiaries**
**Consolidating Statement of Operations**
**Year Ended September 30, 2009**

| | Issuer | Guarantor companies | Non-guarantor companies (in millions) | Eliminations | Total |
|---|---|---|---|---|---|
| Net sales | $ - | $ 1,190.2 | $ 237.7 | $ - | $ 1,427.9 |
| Cost of sales | - | 963.0 | 208.0 | - | 1,171.0 |
| Gross profit | - | 227.2 | 29.7 | - | 256.9 |
| Operating expenses: | | | | | |
| Selling, general and administrative | 33.7 | 179.6 | 25.8 | - | 239.1 |
| Impairment | - | 970.9 | - | - | 970.9 |
| Restructuring | 0.2 | 44.9 | 2.7 | - | 47.8 |
| Total operating expenses | 33.9 | 1,195.4 | 28.5 | - | 1,257.8 |
| Income (loss) from operations | (33.9) | (968.2) | 1.2 | - | (1,000.9) |
| Interest expense (income), net | 78.4 | (0.1) | - | - | 78.3 |
| Loss on early extinguishment of debt, net | 3.8 | - | - | - | 3.8 |
| Income (loss) before income taxes | (116.1) | (968.1) | 1.2 | - | (1,083.0) |
| Income tax expense (benefit) | (39.6) | (47.1) | 0.4 | - | (86.3) |
| Equity in income (loss) of subsidiaries | (920.2) | 0.8 | - | 919.4 | - |
| Net income (loss) | $ (996.7) | $ (920.2) | $ 0.8 | $ 919.4 | $ (996.7) |

Case: 18-31177    Document: 00515297113    Page: 376    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 377 of 1003
Case 2:10-md-02179-CJB-JCW   Document 25034-23   Filed 10/29/18   Page 122 of 152

**Mueller Water Products, Inc. and Subsidiaries**
**Consolidating Statement of Operations**
**Year Ended September 30, 2008**

| | Issuer | Guarantor companies | Non-guarantor companies | Eliminations | Total |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| Net sales | $ - | $ 1,555.7 | $ 303.6 | $ - | $ 1,859.3 |
| Cost of sales | - | 1,160.2 | 260.1 | - | 1,420.3 |
| Gross profit | - | 395.5 | 43.5 | - | 439.0 |
| Operating expenses: | | | | | |
| Selling, general and administrative | 37.7 | 200.7 | 36.2 | - | 274.6 |
| Restructuring | - | 18.3 | - | - | 18.3 |
| Total operating expenses | 37.7 | 219.0 | 36.2 | - | 292.9 |
| Operating income (loss) | (37.7) | 176.5 | 7.3 | - | 146.1 |
| Interest expense (income), net | 72.5 | 0.3 | (0.4) | - | 72.4 |
| Income (loss) before income taxes | (110.2) | 176.2 | 7.7 | - | 73.7 |
| Income tax expense (benefit) | (47.4) | 75.8 | 3.3 | - | 31.7 |
| Equity in income of subsidiaries | 104.8 | 4.4 | - | (109.2) | - |
| Net income | $ 42.0 | $ 104.8 | $ 4.4 | $ (109.2) | $ 42.0 |

**Mueller Water Products, Inc. and Subsidiaries**
**Consolidating Statement of Cash Flows**
**Year Ended September 30, 2010**

| | Issuer | Guarantor companies | Non-guarantor companies | Eliminations | Total |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| Operating activities: | | | | | |
| Net cash provided by (used in) operating activities | $ 76.9 | $ (27.8) | $ 13.9 | $ - | $ 63.0 |
| Investing activities: | | | | | |
| Capital expenditures | (0.2) | (32.0) | (0.6) | - | (32.8) |
| Proceeds from sales of assets | - | 56.4 | - | - | 56.4 |
| Net cash provided by (used in) investing activities | (0.2) | 24.4 | (0.6) | - | 23.6 |
| Financing activities: | | | | | |
| Increase in outstanding checks | - | 1.7 | - | - | 1.7 |
| Debt borrowings | 270.5 | - | - | - | 270.5 |
| Debt paid or repurchased | (318.5) | - | - | - | (318.5) |
| Common stock issued | 1.0 | - | - | - | 1.0 |
| Payment of deferred financing fees | (9.8) | - | - | - | (9.8) |
| Dividends paid | (10.8) | - | - | - | (10.8) |
| Net cash provided by (used in) financing activities | (67.6) | 1.7 | - | - | (65.9) |
| Effect of currency exchange rate changes on cash | - | - | 1.5 | - | 1.5 |
| Net change in cash and cash equivalents | 9.1 | (1.7) | 14.8 | - | 22.2 |
| Cash and cash equivalents at beginning of period | 41.7 | (0.2) | 20.0 | - | 61.5 |
| Cash and cash equivalents at end of period | $ 50.8 | $ (1.9) | $ 34.8 | $ - | $ 83.7 |

Case: 18-31177    Document: 00515297113    Page: 378    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 379 of 1003
Case 2:10-md-02179-CJB-JCW   Document 25034   Filed 10/29/18   Page 134 of 152

**Mueller Water Products, Inc. and Subsidiaries**
**Consolidating Statement of Cash Flows**
**Year Ended September 30, 2009**

| | Issuer | Guarantor companies | Non-guarantor companies (in millions) | Eliminations | Total |
|---|---|---|---|---|---|
| Operating activities: | | | | | |
| Net cash provided by operating activities | $ 68.0 | $ 51.6 | $ 10.9 | $ - | $ 130.5 |
| | | | | | |
| Investing activities: | | | | | |
| Capital expenditures | (0.4) | (35.8) | (3.5) | - | (39.7) |
| Acquisition of technology | - | (8.7) | - | - | (8.7) |
| Proceeds from sales of assets | - | 1.6 | 3.9 | - | 5.5 |
| Net cash provided by (used in) investing activities | (0.4) | (42.9) | 0.4 | - | (42.9) |
| | | | | | |
| Financing activities: | | | | | |
| Decrease in outstanding checks | - | (4.3) | - | - | (4.3) |
| Debt borrowings | 539.4 | - | - | - | 539.4 |
| Debt paid or repurchased | (893.1) | - | - | - | (893.1) |
| Common stock issued | 166.9 | - | - | - | 166.9 |
| Payment of deferred financing fees | (10.1) | - | - | - | (10.1) |
| Dividends paid | (8.1) | - | - | - | (8.1) |
| Net cash used in financing activities | (205.0) | (4.3) | - | - | (209.3) |
| | | | | | |
| Effect of currency exchange rate changes on cash | - | - | (0.7) | - | (0.7) |
| Net change in cash and cash equivalents | (137.4) | 4.4 | 10.6 | - | (122.4) |
| Cash and cash equivalents at beginning of period | 179.1 | (4.6) | 9.4 | - | 183.9 |
| Cash and cash equivalents at end of period | $ 41.7 | $ (0.2) | $ 20.0 | $ - | $ 61.5 |

Case: 18-31177    Document: 00515297113    Page: 379    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 380 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26034   Filed 10/22/18   Page 139 of 152

**Mueller Water Products, Inc. and Subsidiaries**
**Consolidating Statement of Cash Flows**
**Year Ended September 30, 2008**

| | Issuer | Guarantor companies | Non-guarantor companies (in millions) | Eliminations | Total |
|---|---|---|---|---|---|
| Operating activities: | | | | | |
| Net cash provided by (used in) operating activities | $ 100.3 | $ 86.3 | $ (4.6) | $ - | $ 182.0 |
| | | | | | |
| Investing activities: | | | | | |
| Capital expenditures | (0.2) | (85.0) | (2.9) | - | (88.1) |
| Proceeds from sale of assets | - | 9.6 | - | - | 9.6 |
| Net cash used in investing activities | (0.2) | (75.4) | (2.9) | - | (78.5) |
| | | | | | |
| Financing activities: | | | | | |
| Decrease in outstanding checks | - | (6.9) | - | - | (6.9) |
| Debt paid or repurchased | (5.0) | - | - | - | (5.0) |
| Common stock issued | 1.9 | - | - | - | 1.9 |
| Dividend payments | (8.1) | - | - | - | (8.1) |
| Net cash used in financing activities | (11.2) | (6.9) | - | - | (18.1) |
| | | | | | |
| Effect of currency exchange rate changes on cash | - | - | (0.4) | - | (0.4) |
| Net change in cash and cash equivalents | 88.9 | 4.0 | (7.9) | - | 85.0 |
| Cash and cash equivalents at beginning of year | 90.2 | (8.6) | 17.3 | - | 98.9 |
| Cash and cash equivalents at end of year | $ 179.1 | $ (4.6) | $ 9.4 | $ - | $ 183.9 |

F-49

**Exhibit 23.1**

### CONSENT OF INDEPENDENT REGISTERED ACCOUNTING FIRM

We consent to the incorporation by reference in (1) the Registration Statement (Form S-8 No. 333-134737) pertaining to the 2006 Employee Stock Purchase Plan of Mueller Water Products, Inc. (2) the Registration Statement (Form S-8 No. 333-157218) pertaining to the Second Amended and Restated 2006 Stock Incentive Plan and (3) the Registration Statement (Form S-3 No. 333-159845) of our reports dated November 23, 2010, with respect to the consolidated financial statements of Mueller Water Products, Inc. and the effectiveness of internal control over financial reporting of Mueller Water Products, Inc. included in this annual report (Form 10-K) for the year ended September 30, 2010.

/s/ Ernst & Young LLP
Atlanta, Georgia
November 23, 2010

Case: 18-31177    Document: 00515297113    Page: 381    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 382 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26034-93   Filed 10/28/19   Page 137 of 152

**Exhibit 31.1**

### CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Gregory E. Hyland, certify that:

1. I have reviewed this annual report on Form 10-K of Mueller Water Products, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: November 23, 2010

/s/  Gregory E. Hyland
_____

Gregory E. Hyland,
Chief Executive Officer

Case: 18-31177     Document: 00515297113     Page: 382     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 383 of 1003
Case 2:10-md-02179-CJB-JCW   Document 25034   Filed 10/22/18   Page 138 of 152

**Exhibit 31.2**

## CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Evan L. Hart, certify that:

1.  I have reviewed this annual report on Form 10-K of Mueller Water Products, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's Board of Directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: November 23, 2010

/s/  Evan L. Hart
_____

Evan L. Hart,
Senior Vice President
and Chief Financial Officer

Case: 18-31177    Document: 00515297113    Page: 383    Date Filed: 02/04/2020

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 384 of 1003
Case 2:10-md-02179-CJB-JCW   Document 25054-23   Filed 10/25/18   Page 139 of 152

<div align="right">**Exhibit 32.1**</div>

### CERTIFICATION PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
### (<u>18 U.S.C. SECTION 1350</u>)

In connection with the accompanying annual report on Form 10-K of Mueller Water Products, Inc. (the "Company") for the fiscal year ended September 30, 2010 (the "Report"), I, Gregory E. Hyland, Chief Executive Officer of the Company, certify, pursuant to <u>18 U.S.C. §1350</u>, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

(1)  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: November 23, 2010

/s/  Gregory E. Hyland

Gregory E. Hyland,
Chief Executive Officer

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 385 of 1003

**Exhibit 32.2**

## CERTIFICATION PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
### (18 U.S.C. SECTION 1350)

In connection with the accompanying annual report on Form 10-K of Mueller Water Products, Inc. (the "Company") for the fiscal year ended September 30, 2010 (the "Report"), I, Evan L. Hart, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

(1)  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: November 23, 2010

/s/  Evan L. Hart

Evan L. Hart,
Chief Financial Officer

## Board of Directors

**Gregory E. Hyland**
Chairman, President and
Chief Executive Officer
Mueller Water Products, Inc.

**Donald N. Boyce**
Retired Chairman and
Chief Executive Officer
IDEX Corporation

**Howard L. Clark, Jr.**
Vice Chairman,
Investment Banking Division
Barclays Capital

**Shirley C. Franklin**
Former Mayor of Atlanta

**Jerry W. Kolb**
Retired Vice Chairman
Deloitte & Touche LLP

**Joseph B. Leonard**
Interim Chief Executive Officer,
Walter Energy, Inc. and
Retired Chairman,
AirTran Holdings, Inc.

**Mark J. O'Brien**
Chairman and Chief Executive Officer
Walter Investment Management Corp.

**Bernard G. Rethore**
Chairman Emeritus
Flowserve Corporation

**Neil A. Springer**
Managing Director
Springer & Associates LLC

**Lydia W. Thomas**
Retired President and
Chief Executive Officer
Noblis, Inc.

**Michael T. Tokarz**
Chairman, Walter Energy, Inc.
and Chairman, MVC Capital, Inc.

## Executive Officers

**Gregory E. Hyland**
Chairman, President and
Chief Executive Officer

**Robert G. Leggett**
Executive Vice President and
Chief Operating Officer

**Paul T. Ciolino**
President, U.S. Pipe

**Thomas E. Fish**
President, Anvil International

**Gregory S. Rogowski**
President, Mueller Co.

**Robert Barker**
Executive Vice President,
General Counsel, Corporate Secretary
& Chief Compliance Officer

**Robert D. Dunn**
Senior Vice President
Human Resources

**Evan L. Hart**
Senior Vice President and
Chief Financial Officer

**Robert P. Keefe**
Senior Vice President and
Chief Information Officer

**Marietta Edmunds Zakas**
Senior Vice President,
Strategy, Corporate Development
and Communications

**Kevin G. McHugh**
Vice President and Controller

## Stockholder Information

**Annual Meeting**
The annual meeting of stockholders of
Mueller Water Products, Inc. will be
held January 26, 2011 at 10:00 A.M.

Grand Hyatt Atlanta
3300 Peachtree Road, N.E.
Atlanta, GA 30305

**Corporate Office**
Mueller Water Products, Inc.
1200 Abernathy Road, N.E.
Suite 1200
Atlanta, GA 30328
(770) 206-4200
www.muellerwaterproducts.com

**Investor Contact**
Investor Relations
Mueller Water Products, Inc.
1200 Abernathy Road, N.E.
Suite 1200
Atlanta, GA 30328
(770) 206-4237
Fax: (770) 206-4260

**Media Contact**
Corporate Communications
Mueller Water Products, Inc.
1200 Abernathy Road, N.E.
Suite 1200
Atlanta, GA 30328
(770) 206-4240
Fax: (770) 206-4235

**Form 10-K**
Copies of the Company's Annual Report
on Form 10-K for the fiscal year ended
September 30, 2010, including financial
statements, are available on the
Company's Web site at
www.muellerwaterproducts.com
or by written request to:

 Investor Relations
 Mueller Water Products, Inc.
 1200 Abernathy Road, N.E.
 Suite 1200
 Atlanta, GA 30328

**Common Stock**
Trading Symbol: MWA
New York Stock Exchange

**Transfer Agent and Registrar**
BNY Mellon Shareowner Services
480 Washington Boulevard
Jersey City, New Jersey 07310-1900
Toll Free Number: 877-296-3711
www.bnymellon.com/shareowner/isd

TDD for Hearing Impaired: 800-231-5469
Foreign Shareowners: 201-680-6578
TDD Foreign Shareowners: 201-680-6610

**Certifications**
Mueller Water Products, Inc. submitted
to the New York Stock Exchange (NYSE)
a certification, dated February 11, 2010,
by its Chief Executive Officer that he is
not aware of any violation by the
Company of NYSE corporate governance
listing standards. Mueller Water
Products, Inc. has also filed with the
Securities and Exchange Commission, as
exhibits to its Annual Report on Form
10-K for the year ended September 30,
2010, the certifications of its Chief
Executive Officer and Chief Financial
Officer required by Sections 302 and 906
of the Sarbanes-Oxley Act of 2002.

Case: 18-31177     Document: 00515297113     Page: 386     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 387 of 1003
Case 2:10-md-02179-CJB-JCW   Document 25054-2   Filed 10/22/18   Page 132 of 132

**Mueller Water Products**

1200 Abernathy Road, N.E., Suite 1200
Atlanta, GA 30328
www.muellerwaterproducts.com

©2010 Mueller Water Products, Inc.

Trademarks referred to herein are owned by Mueller International, Inc. or other affiliates of Mueller Water Products, Inc.

The 2010 Mueller Water Products, Inc. annual report saved the following resources by printing on processed-chlorine-free paper containing up to 10% post-consumer waste.

| trees | waste water | net energy | solid waste | greenhouse gases |
|---|---|---|---|---|
| 4 grown | 1,777 gallons | 1 million BTUs | 108 pounds | 369 pounds |

# Exhibit 2

Case: 18-31177    Document: 00515297113    Page: 388    Date Filed: 02/04/2020
Case: 2:10-md-02179-CJB-DPC    Document 26293    Filed 02/05/20    Page 389 of 1003
Case: 2:10-md-02179-CJB-JCW    Document 26293-4    Filed 11/20/2012    Page 2 of 5

# ROGERS & HARDIN

March 27, 2018

Jeffrey W. Willis
Direct: 404.420.4619
Direct Fax: 404.230.0978
Email: jwillis@rh-law.com

## BY ELECTRONIC SUBMISSION

Claims Administration Reviewer
Deepwater Horizon Economic Claims Center

Re:    <u>Mueller Water Products, Inc. **(Claimant ID 100243047); Claim ID 254194**</u>

Dear Claims Administration Reviewer:

We represent Mueller Water Products, Inc. (the "Claimant") in the Deepwater Horizon Economic and Property Damages Settlement Program (the "Settlement Program"), and write in further response to the Preliminary Notice Regarding Moratoria Losses Review (the "Notice") issued to Claimant for Claim ID 254194 (the "Claim"), which is a ductile iron pipe manufacturing plant located in Bessemer, Alabama (the "Bessemer facility").[1]

The Claim is subject to no Moratoria Loss review, and the Moratoria hold should be removed. The Settlement Program issued the Notice because the Claim had erroneously been assigned NAICS code 332911, Industrial Value Manufacturing, which is one of the codes listed on Exhibit 19. Businesses that fall within the NAICS codes on Exhibit 19 "shall be subject to automatic review to determine whether their losses, or any portion thereof, constitute Moratoria Losses." Settlement Agreement § 5.10.3.1.1. However, as has already been demonstrated, the business engaged in *no* such manufacturing whatsoever and the Claim can include *no* losses from such activity.

Under Section 5.10.3.1.2 of the Settlement Agreement, the Claim is subject to moratoria loss review only if it engaged in one of the activities marked with an "x" that are listed under the NAICS codes on Exhibit 19. *Id.* § 5.10.3.1.2. The single activity so marked under NAICS code 332911 is "Valves, industrial-type (e.g., check, gate, glove, relief, safety), manufacturing." As has already been shown through Claimant's 10-K, the Bessemer facility's entire business segment manufactured, not Valves, industrial type, but "ductile iron pipe, restraint joint products, and other ductile iron products," and sold its products, not to the oil and gas industry, but to "waterworks distributors, contractors, municipalities, utilities and other governmental agencies."

The attached Affidavit of Marietta Edmunds Zakas, Claimant's Chief Financial Officer, further establishes that, at all times from 2007 through 2011, the Bessemer facility manufactured

---

[1] This letter supplements Claimant's previous submissions, including the Claim Form, which states that the business provided no significant support to the oil and gas offshore industry in the Gulf, as well as our letter of June 7, 2017, which quotes Claimant's Form 10-K for the fiscal year ended September 30, 2010 and makes clear that the business did not manufacture any of the product that triggered the Moratoria Hold.

# ROGERS & HARDIN

Claims Administration Reviewer
March 27, 2018
Page 2

ductile iron pipe, *and no other products*. Affidavit of Marietta Edmunds Zakas ¶ 4, attached as Exhibit A. The Bessemer facility produced no valves, industrial-type whatsoever. *Id.*

Claimant did not, therefore, "provide significant services, goods, and/or supplies to businesses in the offshore oil & gas industry in the Gulf of Mexico" through the manufacture of "Valves, industrial-type (e.g., check, gate, glove, relief, safety)." Accordingly, the Claim is not subject to Moratoria Loss review, the Moratoria hold should be removed, and the Claim should be processed under the Business Economic Loss framework of the Settlement Agreement. *See* Settlement Agreement § 5.10.3.1.2.

Thank you for your attention to this matter, and please feel free to contact me if you have any questions.

Sincerely,

Jeffrey W. Willis

Attachment

Case: 18-31177     Document: 00515297113     Page: 390     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 391 of 1003
Case 2:10-md-02179-CJB-JCW   Document 23054-9   Filed 10/12/18   Page 4 of 9

# Exhibit A

## AFFIDAVIT OF MARIETTA EDMUNDS ZAKAS

Before the undersigned officer, duly authorized to administer oaths, comes Marietta Edmunds Zakas, who being duly sworn, says:

1.    I am over 21 years of age, and my testimony herein is based on my personal knowledge and upon business records of Mueller Water Products, Inc. ("Mueller Water Products").

2.    I am the Executive Vice President and Chief Financial Officer of Mueller Water Products. I have served continuously in senior positions within Muller Water Products since 2006.

3.    In preparing this Affidavit, I have relied on my personal knowledge of the company's business and products, my review of the company's Form 10-K for the 2010 fiscal year, and my review of the production volume for the facility in Bessemer, Alabama (the "Bessemer facility") for which we have filed a claim with the Deepwater Horizon Court Supervised Settlement Program.

4.    At all times from 2007 through 2011, the Bessemer facility was a manufacturer of ductile iron pipe. The Bessemer facility produced only ductile iron pipe. The Bessemer facility produced no valves, industrial-type (e.g., check, gate, globe, relief, safety) whatsoever. Nor did the Bessemer facility otherwise provide significant services, goods, and/or supplies to businesses in the offshore oil and gas industry in the Gulf of Mexico.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Marietta Edmunds Zakas

Sworn to and subscribed before me
this 26th day of March, 2018.

_____
Notary Public

My Commission Expires:
February 17, 2020

# Exhibit 3

**Devine, Brian P.**

| | |
|---|---|
| **From:** | Jason Russell <jrussell@dhecc.com> |
| **Sent:** | Thursday, April 12, 2018 8:28 AM |
| **To:** | Willis, Jeff |
| **Cc:** | Eber, Michael L.; Devine, Brian P. |
| **Subject:** | Re: Processing Stay Request - Rogers & Hardin LLP |

Jeff,

Here is the information the Moratoria team provided.

The Settlement Agreement prohibits the Claims Administrator from compensating claimants for any Moratoria Losses whatsoever. Accordingly, the Settlement Program is not permitted to process and pay claims that have losses related to the Moratoria unless and until the Parties reach agreement on how to remove those losses from the claim compensation, as the Parties are required to do under the terms of the Settlement Agreement.

In its review of Claim ID 254194, the Claims Administrator assigned NAICS Code 332911 (Industrial Valve Manufacturing), which is an Exhibit 19 NAICS Code that triggers Potential Moratoria Review to determine whether related claims require full Moratoria Losses Review. "Valves, industrial-type (e.g., check, gate, globe, relief, safety), manufacturing" is an X-marked business activity within Exhibit 19, Section I (NAICS Code 332911). Therefore, Mueller Water Products Inc. meets the DWH Exhibit 19, Section I potential moratoria loss criteria (Exhibit 19 Section I NAICS Code + engagement in one or more X-marked business activities within that NAICS Code), and related economic loss claims require Moratoria Losses Review.

In addition, the Claims Administrator's dedicated Moratoria Team determined the following: Claimant manufactures and markets products and services used in the transmission, distribution, and measurement of water. The company operates through two segments, Mueller Co. and Anvil. The Mueller Co. offers valves for water and gas systems, including iron gate, butterfly, tapping, check, plug, and ball valves; dry-barrel and wet-barrel fire hydrants; pipe repair products; small valves, meter bars, and line stopper fittings for use in gas systems; machines and tools for tapping, drilling, extraction, and installation; and municipal castings comprising manhole covers and street drain grates. The Anvil segment offers a range of products, including various fittings, couplings, hangers, valves, and related piping component system products for use in non-residential construction for fire protection, and engages in the design, engineering, fabrication and installation of petro-chemical and oilfield equipment. Anvil also manufactures a complete line of products used for oil & gas applications, including Catawissa wing unions, J.B. Smith swages and bull plugs, Gruvlok butterfly valves, and forged steel pipe fittings. Claimant's types of products and services are heavily utilized in the offshore oil and gas industry in the Gulf of Mexico, and therefore the claim may include Moratoria Losses."

If Counsel is able to provide additional documentation not already in the claimant file establishing that the claim does not include any Moratoria Losses, he should upload it to the Portal and let you know when complete so that we can advise the Moratoria Team of its submission and they can review. The relevant documents vary from business to business, but complete 2007-2011 customer lists are often helpful in this analysis. After additional review, if the claim is determined to have no Moratoria Losses, we will release the Moratoria hold and return the claim into the normal BEL review process. However, if the Team identifies any potential Moratoria Losses, the hold must remain in place until the Parties provide the requisite guidance for making compensation determinations that adhere to the Moratoria Losses exclusion in the Settlement Agreement.

Please let me know if you have any questions.

Case: 18-31177    Document: 00515297113    Page: 394    Date Filed: 02/04/2020
Case: 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 395 of 1003
Case: 2:10-md-02179-CJB-JCW   Document 26293-54   Filed 02/04/21   Page 9 of 40

Thank you,
Jason

-----Original Message-----
From: Willis, Jeff <JWillis@rh-law.com>
Sent: Friday, March 30, 2018 9:50 AM
To: Jason Russell <jrussell@dhecc.com>
Cc: Eber, Michael L. <meber@rh-law.com>; Devine, Brian P. <BDevine@rh-law.com>
Subject: Re: Processing Stay Request - Rogers & Hardin LLP

Jason,

Would you ask the Moratoria Team what else it might wish to see regarding this claim?  We have access to ample amounts of information and to personnel who can address any questions. We can, for example, submit materials showing how ductile iron pipe is used (to transport potable water), further demonstrating that the business was uninvolved in the offshore oil & gas business. Please let us know. Thanks.

Sent from my iPhone

On Mar 28, 2018, at 5:08 PM, Willis, Jeff <JWillis@rh-law.com<mailto:JWillis@rh-law.com>> wrote:

Jason, FYI.  Thanks again.

Jeff

Jeffrey W. Willis
Attorney at Law
ROGERS & HARDIN LLP
2700 International Tower | 229 Peachtree Street NE | Atlanta, GA 30303
T: 404.420.4619 | F: 404.230.0978 | Email: JWillis@rh-law.com<mailto:JWillis@rh-law.com>
Bio<http://www.rh-law.com/Attorneys/JeffreyWWillis> | vCard<http://www.rh-law.com/webportal/perform.v?obj=ve_oid:poid:Z1tOl9NPl0LPoDtRkfJDpKJE&action=vCard>
From: Willis, Jeff
Sent: Wednesday, March 28, 2018 5:08 PM
To: 'documents@liaisoncounsel.com<mailto:documents@liaisoncounsel.com>'
Cc: Mike Moore, Liaison Counsel; Drake Martin, Liaison Counsel; Patrick Juneau; Katy Askew; Patrick Hron
Subject: RE: Processing Stay Request - Rogers & Hardin LLP

All,

We request that the processing stay not be applied to the three claimants I have listed below. For various reasons, we will have a better chance at settling their claims through the Neutral process if the claims are allowed to proceed to notice. We understand that accounting review was nearly complete for the first two claimants prior to the implementation of the stay, and we need the Moratoria Team to review our pending request to release Mueller Water Products' claim from Moratoria Hold. Please let me know if you have any questions.

Mueller Copper Tube Company, Inc. (Claimant ID 100319411) Mueller Fittings LLC (Claimant ID 100327751) Mueller Water Products, Inc. (Claimant ID 100243047)

Thank you.

Case: 18-31177    Document: 00515297113    Page: 395    Date Filed: 02/04/2020
Case: 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 396 of 1003
Case: 2:10-md-02179-CJB-JCW Document 26954 Filed 02/05/21 Page 4 of 40

Jeff

Jeffrey W. Willis
Attorney at Law
ROGERS & HARDIN LLP
2700 International Tower | 229 Peachtree Street NE | Atlanta, GA 30303
T: 404.420.4619 | F: 404.230.0978 | Email: JWillis@rh-law.com<mailto:JWillis@rh-law.com>
Bio<http://www.rh-law.com/Attorneys/JeffreyWWillis> | vCard<http://www.rh-law.com/webportal/perform.v?obj=ve_oid:poid:Z1tOl9NPl0LPoDtRkfJDpKJE&action=vCard>
From: documents@liaisoncounsel.com<mailto:documents@liaisoncounsel.com>
[mailto:documents@liaisoncounsel.com]
Sent: Monday, March 26, 2018 1:38 PM
To: Willis, Jeff
Cc: Mike Moore, Liaison Counsel; Drake Martin, Liaison Counsel; Patrick Juneau; Katy Askew; Patrick Hron; Stephen Palmer
Subject: Re: Processing Stay Request - Rogers & Hardin LLP

All:

By agreement of the parties and the court, we are requesting an extension of the processing stay until April 6, 2018.

Thanks,
Drake & Mike

From: "documents@liaisoncounsel.com<mailto:documents@liaisoncounsel.com>"
<documents@liaisoncounsel.com<mailto:documents@liaisoncounsel.com>>
Date: Thursday, March 15, 2018 at 5:15 PM
To: Jeffrey Willis <JWillis@rh-law.com<mailto:JWillis@rh-law.com>>
Cc: Mike Moore Liaison Counsel Email <mike@liaisoncounsel.com<mailto:mike@liaisoncounsel.com>>, Drake Martin Liaison Counsel Email <drake@liaisoncounsel.com<mailto:drake@liaisoncounsel.com>>, Patrick Juneau <pjuneau@dheclaims.com<mailto:pjuneau@dheclaims.com>>, Katy Askew <kaskew@dheclaims.com<mailto:kaskew@dheclaims.com>>, Patrick Hron <phron@dheclaims.com<mailto:phron@dheclaims.com>>, Stephen Palmer <Stephen.Palmer@bp.com<mailto:Stephen.Palmer@bp.com>>
Subject: Processing Stay Request - Rogers & Hardin LLP

Jeff:

Please be reminded that your processing stay will expire on March 23, 2018. Per Judge Barbier, processing stay requests can not extend beyond two weeks.

In the event you have any upcoming deadlines, please note that the processing stay affects the review and processing of claims in the following manner:

New Determinations: The CSSP will not issue new determinations during the stay period.

CSSP Deadlines: Pre-existing, pending deadlines will continue to run unless you ask for extension. To request a deadline extension, "reply all" to this email with the following information:

  * Claimant ID;
  * Claim ID;

Case: 18-31177     Document: 00515297113     Page: 396     Date Filed: 02/04/2020
Case: 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 397 of 1003
Case: 2:10-md-02179-CJB-JCW   Document 26354   Filed 02/12/...   Page 9 of 40

* Claimant Name;
* Current Deadline;
* Extension Request.

Discretionary Court Review:  The Court will not issue Discretionary Review decisions while the stay is pending.  Any deadline to request Discretionary Review or object to a request for Discretionary Review that would expire during the stay period will be extended to two weeks following removal of the stay.  To request a deadline extension, "reply all" to this email with the following information:

* Claimant ID;
* Claim ID;
* Claimant Name;
* Current Deadline;
* Extension Request.

Fifth Circuit:  We do not have the authority or discretion to stay or extend Fifth Circuit deadlines.  Any request to extend a Fifth Circuit deadline must be handled directly with that Court.

Thanks,
Drake & Mike


--------------------------------------------------------------------------------


This message and any attachments are intended for the use of the addressee(s) only and may be confidential and covered by the attorney/client and other privileges. If the reader is not the intended recipient, DO NOT READ, notify sender and delete this message. In addition, be aware that any disclosure, copying, distribution or use of the contents of this message is stri

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 398 of 1003
Case 2:10-md-02179-CJB-JCW   Document 23054-9   Filed 10/12/17   Page 1 of 6

# Exhibit 4

Case: 18-31177     Document: 00515297113     Page: 398     Date Filed: 02/04/2020
Case: 2:10-md-02179-CJB-DPC  Document 26293   Filed 02/05/20   Page 399 of 1003
Case: 2:10-md-02179-CJB-JCW   Document 23954   Filed 12/05/17   Page 2 of 4

**Devine, Brian P.**

| | |
|---|---|
| **From:** | Jason Russell <jrussell@dhecc.com> |
| **Sent:** | Monday, June 18, 2018 3:16 PM |
| **To:** | Willis, Jeff |
| **Cc:** | Eber, Michael L.; Devine, Brian P. |
| **Subject:** | RE: Processing Stay Request - Rogers & Hardin LLP |

Thanks for letting me know, Jeff.  I'll let the Moratoria Team to keep an eye out.

---

**From:** Willis, Jeff JWillis@rh-law.com
**Sent:** Monday, June 18, 2018 1:58 PM
**To:** Jason Russell jrussell@dhecc.com
**Cc:** Eber, Michael L. meber@rh-law.com; Devine, Brian P. BDevine@rh-law.com
**Subject:** RE: Processing Stay Request - Rogers & Hardin LLP

Jason,

We have obtained the 2007-2011 customer lists that the Moratoria Teams references below.  We will provide them along with additional information shortly.  Thanks.

Jeff

**Jeffrey W. Willis**
**Attorney at Law**
**ROGERS & HARDIN LLP**
**2700 International Tower | 229 Peachtree Street NE | Atlanta, GA 30303**
**T: 404.420.4619 | F: 404.230.0978 | Email: JWillis@rh-law.com**
**Bio** | **vCard**

**From:** Jason Russell [mailto:jrussell@dhecc.com]
**Sent:** Thursday, April 12, 2018 8:28 AM
**To:** Willis, Jeff
**Cc:** Eber, Michael L.; Devine, Brian P.
**Subject:** Re: Processing Stay Request - Rogers & Hardin LLP

Jeff,

Here is the information the Moratoria team provided.

The Settlement Agreement prohibits the Claims Administrator from compensating claimants for any Moratoria Losses whatsoever. Accordingly, the Settlement Program is not permitted to process and pay claims that have losses related to the Moratoria unless and until the Parties reach agreement on how to remove those losses from the claim compensation, as the Parties are required to do under the terms of the Settlement Agreement.

In its review of Claim ID 254194, the Claims Administrator assigned NAICS Code 332911 (Industrial Valve Manufacturing), which is an Exhibit 19 NAICS Code that triggers Potential Moratoria Review to determine whether related claims require full Moratoria Losses Review. "Valves, industrial-type (e.g., check, gate, globe, relief, safety), manufacturing" is an X-marked business activity within Exhibit 19, Section I (NAICS Code 332911). Therefore, Mueller Water Products Inc. meets the DWH Exhibit 19, Section I potential moratoria loss

Case: 18-31177      Document: 00515297113      Page: 399      Date Filed: 02/04/2020
Case: 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 400 of 1003
Case: 2:10-md-02179-CJB-JCW   Document 23054-4   Filed 02/12/ Page 9 of 40

criteria (Exhibit 19 Section I NAICS Code + engagement in one or more X-marked business activities within that NAICS Code), and related economic loss claims require Moratoria Losses Review.

In addition, the Claims Administrator's dedicated Moratoria Team determined the following: Claimant manufactures and markets products and services used in the transmission, distribution, and measurement of water. The company operates through two segments, Mueller Co. and Anvil. The Mueller Co. offers valves for water and gas systems, including iron gate, butterfly, tapping, check, plug, and ball valves; dry-barrel and wet-barrel fire hydrants; pipe repair products; small valves, meter bars, and line stopper fittings for use in gas systems; machines and tools for tapping, drilling, extraction, and installation; and municipal castings comprising manhole covers and street drain grates. The Anvil segment offers a range of products, including various fittings, couplings, hangers, valves, and related piping component system products for use in non-residential construction for fire protection, and engages in the design, engineering, fabrication and installation of petro-chemical and oilfield equipment. Anvil also manufactures a complete line of products used for oil & gas applications, including Catawissa wing unions, J.B. Smith swages and bull plugs, Gruvlok butterfly valves, and forged steel pipe fittings.  Claimant's types of products and services are heavily utilized in the offshore oil and gas industry in the Gulf of Mexico, and therefore the claim may include Moratoria Losses."

If Counsel is able to provide additional documentation not already in the claimant file establishing that the claim does not include any Moratoria Losses, he should upload it to the Portal and let you know when complete so that we can advise the Moratoria Team of its submission and they can review. The relevant documents vary from business to business, but complete 2007-2011 customer lists are often helpful in this analysis.  After additional review, if the claim is determined to have no Moratoria Losses, we will release the Moratoria hold and return the claim into the normal BEL review process.  However, if the Team identifies any potential Moratoria Losses, the hold must remain in place until the Parties provide the requisite guidance for making compensation determinations that adhere to the Moratoria Losses exclusion in the Settlement Agreement.

Please let me know if you have any questions.

Thank you,
Jason

---

-----Original Message-----
From: Willis, Jeff JWillis@rh-law.com
Sent: Friday, March 30, 2018 9:50 AM
To: Jason Russell jrussell@dhecc.com
Cc: Eber, Michael L. meber@rh-law.com; Devine, Brian P. BDevine@rh-law.com
Subject: Re: Processing Stay Request - Rogers & Hardin LLP

Jason,

Would you ask the Moratoria Team what else it might wish to see regarding this claim?  We have access to ample amounts of information and to personnel who can address any questions. We can, for example, submit materials showing how ductile iron pipe is used (to transport potable water), further demonstrating that the business was uninvolved in the offshore oil & gas business. Please let us know. Thanks.

Sent from my iPhone

On Mar 28, 2018, at 5:08 PM, Willis, Jeff JWillis@rh-law.commailto:JWillis@rh-law.com wrote:

Jason, FYI.  Thanks again.

Case: 18-31177     Document: 00515297113     Page: 400     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 401 of 1003
Case 2:10-md-02179-CJB-JCW Document 26293-4 Filed 10/12/21 Page 4 of 10

Jeff

Jeffrey W. Willis
Attorney at Law
ROGERS & HARDIN LLP
2700 International Tower | 229 Peachtree Street NE | Atlanta, GA 30303
T: 404.420.4619 | F: 404.230.0978 | Email: JWillis@rh-law.commailto:JWillis@rh-law.com
Biohttp://www.rh-law.com/Attorneys/JeffreyWWillis | vCardhttp://www.rh-
law.com/webportal/perform.v?obj=ve_oid:poid:Z1tOl9NPl0LPoDtRkfJDpKJE&action=vCard
From: Willis, Jeff
Sent: Wednesday, March 28, 2018 5:08 PM
To: 'documents@liaisoncounsel.commailto:documents@liaisoncounsel.com'
Cc: Mike Moore, Liaison Counsel; Drake Martin, Liaison Counsel; Patrick Juneau; Katy Askew; Patrick Hron
Subject: RE: Processing Stay Request - Rogers & Hardin LLP

All,

We request that the processing stay not be applied to the three claimants I have listed below. For various reasons, we will have a better chance at settling their claims through the Neutral process if the claims are allowed to proceed to notice. We understand that accounting review was nearly complete for the first two claimants prior to the implementation of the stay, and we need the Moratoria Team to review our pending request to release Mueller Water Products' claim from Moratoria Hold. Please let me know if you have any questions.

Mueller Copper Tube Company, Inc. (Claimant ID 100319411) Mueller Fittings LLC (Claimant ID 100327751) Mueller Water Products, Inc. (Claimant ID 100243047)

Thank you.

Jeff

Jeffrey W. Willis
Attorney at Law
ROGERS & HARDIN LLP
2700 International Tower | 229 Peachtree Street NE | Atlanta, GA 30303
T: 404.420.4619 | F: 404.230.0978 | Email: JWillis@rh-law.commailto:JWillis@rh-law.com
Biohttp://www.rh-law.com/Attorneys/JeffreyWWillis | vCardhttp://www.rh-
law.com/webportal/perform.v?obj=ve_oid:poid:Z1tOl9NPl0LPoDtRkfJDpKJE&action=vCard
From: documents@liaisoncounsel.commailto:documents@liaisoncounsel.com [mailto:documents@liaisoncounsel.com]
Sent: Monday, March 26, 2018 1:38 PM
To: Willis, Jeff
Cc: Mike Moore, Liaison Counsel; Drake Martin, Liaison Counsel; Patrick Juneau; Katy Askew; Patrick Hron; Stephen Palmer
Subject: Re: Processing Stay Request - Rogers & Hardin LLP

All:

By agreement of the parties and the court, we are requesting an extension of the processing stay until April 6, 2018.

Thanks,
Drake & Mike

Case: 18-31177     Document: 00515297113     Page: 401     Date Filed: 02/04/2020
Case: 2:10-md-02179-CJB-DPC Document 26293   Filed 02/05/20   Page 402 of 1003
Case: 2:10-md-02179-CJB-JCW Document 23954-1 Filed 12/12/17 Page 9 of 10

From: "documents@liaisoncounsel.commailto:documents@liaisoncounsel.com"
documents@liaisoncounsel.commailto:documents@liaisoncounsel.com
Date: Thursday, March 15, 2018 at 5:15 PM
To: Jeffrey Willis JWillis@rh-law.commailto:JWillis@rh-law.com
Cc: Mike Moore Liaison Counsel Email mike@liaisoncounsel.commailto:mike@liaisoncounsel.com, Drake Martin Liaison
Counsel Email drake@liaisoncounsel.commailto:drake@liaisoncounsel.com, Patrick Juneau
pjuneau@dheclaims.commailto:pjuneau@dheclaims.com, Katy Askew
kaskew@dheclaims.commailto:kaskew@dheclaims.com, Patrick Hron
phron@dheclaims.commailto:phron@dheclaims.com, Stephen Palmer
Stephen.Palmer@bp.commailto:Stephen.Palmer@bp.com
Subject: Processing Stay Request - Rogers & Hardin LLP

Jeff:

Please be reminded that your processing stay will expire on March 23, 2018.  Per Judge Barbier, processing stay requests
can not extend beyond two weeks.

In the event you have any upcoming deadlines, please note that the processing stay affects the review and processing of
claims in the following manner:

New Determinations:  The CSSP will not issue new determinations during the stay period.

CSSP Deadlines:  Pre-existing, pending deadlines will continue to run unless you ask for extension.  To request a deadline
extension, "reply all" to this email with the following information:

  * Claimant ID;
  * Claim ID;
  * Claimant Name;
  * Current Deadline;
  * Extension Request.

Discretionary Court Review:  The Court will not issue Discretionary Review decisions while the stay is pending.  Any
deadline to request Discretionary Review or object to a request for Discretionary Review that would expire during the
stay period will be extended to two weeks following removal of the stay.  To request a deadline extension, "reply all" to
this email with the following information:

  * Claimant ID;
  * Claim ID;
  * Claimant Name;
  * Current Deadline;
  * Extension Request.

Fifth Circuit:  We do not have the authority or discretion to stay or extend Fifth Circuit deadlines.  Any request to extend
a Fifth Circuit deadline must be handled directly with that Court.

Thanks,
Drake & Mike


--------------------------------------------------------------------------------

4

Case: 18-31177    Document: 00515297113    Page: 402    Date Filed: 02/04/2020
Case: 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 403 of 1003
Case: 2:10-md-02179-CJB-JCW Document 26954 Filed 02/12/21 Page 9 of 10

This message and any attachments are intended for the use of the addressee(s) only and may be confidential and covered by the attorney/client and other privileges. If the reader is not the intended recipient, DO NOT READ, notify sender and delete this message. In addition, be aware that any disclosure, copying, distribution or use of the contents of this message is stri

--------------------------------------------------------------------------------

This message and any attachments are intended for the use of the addressee(s) only and may be confidential and covered by the attorney/client and other privileges. If the reader is not the intended recipient, DO NOT READ, notify sender and delete this message. In addition, be aware that any disclosure, copying, distribution or use of the contents of this message is strictly prohibited.

Case: 18-31177     Document: 00515297113     Page: 403     Date Filed: 02/04/2020

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 404 of 1003
Case 2:10-md-02179-CJB-JCW   Document 23094-5   Filed 07/21/18   Page 16 of 20

# Exhibit 5

Case: 18-31177    Document: 00515297113    Page: 404    Date Filed: 02/04/2020

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 405 of 1003
Case 2:10-md-02179-CJB-DPC   Document 26084   Filed 11/21/18   Page 2 of 20

# ROGERS & HARDIN

October 1, 2018

Jeffrey W. Willis
Direct: 404.420.4619
Direct Fax: 404.230.0978
Email:  jwillis@rh-law.com

**BY ELECTRONIC SUBMISSION**

Claims Administration Reviewer
Deepwater Horizon Economic Claims Center

Re:    <u>Mueller Water Products, Inc. (Claimant ID 100243047); Claim ID 254194</u>

Dear Claims Administration Reviewer:

We submit this for the Moratoria Team's use in connection with the claim of Mueller Water Products, Inc. (the "Claim").  The Claim is based on the losses of a single Mueller facility, an iron foundry in Bessemer, Alabama.

Thank you for providing the information from the Moratoria Team regarding the Claim on May 29.  The information indicates that the Claims Administrator assigned NAICS Code 332911 (Industrial Valve Manufacturing), an Exhibit 19 NAICS Code, to the Claim, which triggers Potential Moratoria Review to determine whether the claim requires full Moratoria Losses Review.  As further noted in the information, "Valves, industrial-type (e.g., check, gate, globe, relief, safety), manufacturing" is an X-marked business activity on Exhibit 19, Section I.  Finally, the information includes the Moratoria Team's observation that the Claimant operates through two business segments, Mueller Co. and Anvil, and that some of Claimant's types of products and services are utilized in the offshore oil and gas industry in the Gulf of Mexico, and that the Claim therefore may include Moratoria losses.  We address each issue below.

Two key facts are relevant to the Moratoria Team's questions.  First, as shown by an affidavit and business records submitted by the Claimant, the Bessemer facility produced no "Valves, industrial-type" whatsoever.  This fact resolves the specific inquiry that the Moratoria Team is required to make based on the NAICS Code assigned by the Claims Administrator.  Second, the Bessemer facility is an iron foundry and produced only one type of product, ductile iron pipe. As is clear in the Settlement Agreement itself, the Parties recognized that that the manufacture of ductile iron pipe would not result in Moratoria Losses—a recognition that is confirmed by ample factual evidence enclosed with this letter.

1.    *The Bessemer Facility Produced No Products Marked On Exhibit 19*

Exhibit 19 includes the NAICS Code that was assigned by the Claims Administrator to the Claim, NAICS Code 332911 (Industrial Valve Manufacturing).  Under that NAICS Code, only one activity is marked with an X:  "Valves, industrial-type (e.g., check, gate, globe, relief, safety), manufacturing."

Case: 18-31177    Document: 00515297113    Page: 405    Date Filed: 02/04/2020
Case 2:19-md-02179-CJB-DPC   Document 26293-4   Filed 02/05/20   Page 406 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26293-4   Filed 02/05/20   Page 3 of 100

**ROGERS & HARDIN**

Claims Administration Reviewer
October 1, 2018
Page 2

The Bessemer facility manufactured no such products from 2007 through 2011.  On March 27, 2018, we submitted the first Affidavit of Marietta Edmunds Zakas, the Executive Vice President and Chief Financial Officer of Muller Water Products.  In preparing her first Affidavit, Ms. Zakas reviewed, among other things, the production volume for the Bessemer facility for 2007 through 2011. (First Zakas Aff. ¶ 3).  At all times during this period, the Bessemer facility was a ductile iron foundry that produced only one product type:  ductile iron pipe.  (Id. ¶ 4).  The Bessemer facility produced no valves, industrial-type (e.g., check, gate, globe, relief, safety) whatsoever.  (Id.).

Therefore, the Claim involves no losses resulting from any business activity that is marked on Exhibit 19 under the NAICS Code assigned by the Claims Administrator.

2.    *The Settlement Agreement Recognizes That The Manufacture Of Ductile Iron Pipe Would Not Result In Moratoria Losses*

On the issue of whether a business activity indicates Potential Moratoria Losses, the Settlement Agreement controls.  Exhibit 19 to the Settlement Agreement identifies over 180 industry types that are subject to review by the Claims Administrator for Potential Moratoria Losses.  Those industry types are marked with an "X" where they appear beneath their NAICS Codes on Exhibit 19, some under Section I for "automatic" review and others under Section II for "possible" review.

The manufacture of ductile iron pipe is not one of the over 180 business activities that are marked with an "X" on Exhibit 19.  In fact, ductile iron pipe is not mentioned anywhere on Exhibit 19.  Nor does NAICS Code 331511—the NAICS Code for Iron Foundries, including "Ductile iron foundries"—appear anywhere on Exhibit 19.

The Parties went to great lengths to identify over 180 types of business activities that could conceivably lead to Moratoria Losses.  The omission of ductile iron pipe manufacturing from Exhibit 19 is compelling evidence that the Parties to the Settlement Agreement recognized that the manufacture of ductile iron pipe would not generate Moratoria Losses and would not warrant review for such losses.

3.    *Ductile Iron Pipe Is Not Used In Offshore Oil and Gas Activities*

We enclose two additional affidavits that explain what ductile iron pipe is and how it is used: (1) the Second Affidavit of Marietta Edmunds Zakas, Mueller Water Products' Executive Vice President and Chief Financial Officer (attached as Exhibit A), and (2) the Affidavit of Robert Schaaf, a chemical engineer and current Chairman of the Los Angeles Basin Section of the Society of Petroleum Engineers who has extensive experience with water systems in the offshore oil and gas industry (attached as Exhibit B).

# ROGERS & HARDIN

Claims Administration Reviewer
October 1, 2018
Page 3

Ductile iron pipe is produced primarily for the transmission and distribution of potable water in municipal water systems. (Second Zakas Aff. ¶ 5; Schaaf Aff. ¶ 5).[1]  Its secondary use is for the transport of wastewater in municipal wastewater systems. (Id.).  These two uses comprise almost all of the usages of ductile iron pipe. (Schaaf Aff. ¶  5).  Ductile iron pipe is typically laid underground, though a small percentage is installed above-ground over short distances to connect two areas that are separated by a small body of water, such as a stream or a ravine. (Id.).  A very small percentage is laid underwater across very small bodies of water, such as a pond or small lake. (Id.).

From 2004 through 2011, Mr. Schaaf managed all exploration and implementation projects (including offshore projects) for Aera Energy, LLC, an oil and natural gas exploration and production company jointly owned by Shell Oil Company and ExxonMobil.  He has had leading design and engineering roles on major oil and gas operations in California, the Gulf of Mexico, California, Africa, and the Middle East.  He has overseen the design, installation, and operation of numerous pipelines on offshore oil platforms including pipelines for water treatment, waterflooding, and wastewater systems.  Mr. Schaaf is very familiar with the different types of materials used in offshore oil and gas activities.  In all his experience, Mr. Schaaf has never seen or heard of ductile iron pipe being used in offshore oil rig water or wastewater systems, discharge systems, vessels that support offshore oil and gas activities, or pipelines between rigs or from rigs to shore. (Schaaf Aff. ¶¶ 2-3).

As stated in Mr. Schaaf's affidavit, ductile iron pipe is unsuitable for use in offshore oil and gas activities for numerous reasons.  First, ductile iron pipe is heavier than other available types of piping, such as steel, aluminum, brass, polyvinyl chloride (PVC), and fiberglass.  On offshore rigs and vessels, all other factors being equal, lighter weight material is preferred.  Second, ductile iron pipe is brittle compared to these other types of piping.  Therefore, it simply is not used in environments, like those of offshore vessels, oil rigs, and the ocean floor, that are subjected to significant (and often extreme) degrees of movement caused by ocean currents and wind.  Third, ductile iron pipe has limited definitive design specifications.  Materials used in offshore operations must meet certain standards, typically those of the API, for pressure, temperature, and torque, among other things.  Fourth, ductile iron pipe can handle only limited amounts of pressure.  Many offshore pipelines are required to handle higher pressures than ductile iron is capable of handling.  Fifth, iron pipe in general is not suitable for saltwater environments like the Gulf of Mexico because saltwater corrodes iron.  While coatings applied to ductile iron can sufficiently inhibit corrosion in some environments (such as underground municipal water systems near coastal areas), ductile iron pipe is

---

[1] As the Moratoria Team suggested, we also have enclosed a list of customers of the Bessemer facility for the years 2007-2011 as Exhibit C.  The list contains 628 customers ranked in order of sales volume.  The list confirms that virtually all sales were to waterworks suppliers and waterworks contractors.  One customer on the list, Kiewit Corporation, is an international conglomerate whose services include construction and engineering for water and wastewater projects as well as oil and gas projects.  Kiewit's purchases represent a miniscule portion of the Bessemer facility's total sales from 2007-11, less than two-tenths of one percent.  As shown below, those purchases of ductile iron pipe would not have been for offshore oil and gas activities in the Gulf of Mexico.

Case: 18-31177     Document: 00515297113     Page: 407     Date Filed: 02/04/2020

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 408 of 1003
Case 2:10-md-02179-CJB-JCW   Document 22984-5   Filed 06/02/18   Page 5 of 120

## ROGERS & HARDIN

Claims Administration Reviewer
October 1, 2018
Page 4

not graded for use in ocean environments because the corrosion factors are far too extreme for this type of material. (Schaaf Aff. ¶ 7).

For each of these reasons, it is a virtual certainty that ductile iron pipe was not used in offshore oil and gas activities in the Gulf of Mexico from 2007 to 2011. (Schaaf Aff. ¶ 8).

4.    *The Products Flagged By The Moratoria Team Are Not Relevant to the Claim*

As noted by the Moratoria Team, Mueller Water Products is a conglomerate with two business segments, Mueller Co. and Anvil. Listed by the Moratoria Team are various products sold by Mueller Co. and Anvil that according to the Moratoria Team are heavily utilized in the offshore oil and gas industry in the Gulf of Mexico.

Importantly, the Bessemer facility produced only ductile iron pipe (First Zakas Aff. ¶ 4), which is not among the products listed by the Moratoria Team. Further, the Bessemer facility had no relationship to the other products produced by Mueller Co. or Anvil other than common parent ownership. (Second Zakas Aff. ¶ 5).

In summary, the Bessemer facility engaged in no activities covered by Exhibit 19, the Parties recognized that the manufacture of ductile iron pipe does not require Moratoria Review, and ductile iron pipe is not used in offshore oil and gas activities. It is abundantly clear, therefore, that the Claim includes no Moratoria Losses. The Claimant respectfully requests that the Moratoria Team release the Claim to the Claims Administrator for processing.

Sincerely,

Jeffrey W. Willis

JWW/
Enclosures

Case: 18-31177     Document: 00515297113     Page: 408     Date Filed: 02/04/2020

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 409 of 1003
Case 2:10-md-02179-CJB-JCW   Document 23084-5   Filed 05/11/18   Page 6 of 20

# Exhibit A

## SECOND AFFIDAVIT OF MARIETTA EDMUNDS ZAKAS

Before the undersigned officer, duly authorized to administer oaths, comes Marietta Edmunds Zakas, who being duly sworn, says:

1.      I am over 21 years of age, and my testimony herein is based on my personal knowledge and upon business records of Mueller Water Products, Inc. ("Mueller Water Products").

2.      I am the Executive Vice President and Chief Financial Officer of Mueller Water Products, a manufacturer of a broad range of water infrastructure and flow control products for use in water distribution networks and treatment facilities. I have served continuously in senior positions within Muller Water Products since 2006.

3.      In preparing this Affidavit, I have relied on my personal knowledge of the company's business and products, my review of the company's Form 10-Ks, my review of the 2007-11 product volume for the Bessemer, Alabama facility on which this claim is based, and my review of certain portions of the North American Industry Classification System ("NAICS").

4.      The Bessemer facility is a ductile iron foundry and, as stated in my first Affidavit, at all times from 2007 through 2011 produced ductile iron pipe. Based on my review of NAICS materials, the NAICS code applicable to the activities of the Bessemer facility is 331511 – Iron Foundries, whose listed industries include "Ductile iron foundries." The Claims Administrator assigned NAICS code 332911 – Industrial Valve Manufacturing, to the claim, perhaps based in part on the IRS business activity code shown on Mueller Water Products' tax returns, 332900. At certain facilities other than Bessemer, different business segments and entities of Mueller Water Products (such as Anvil and Mueller Co) produced (i) valves for water and gas systems which were used to control transmission of potable (drinkable) water, non-potable water or gas,

as well as some valves used in water distribution and water treatment and (ii) products used for HVAC, plumbing, and industrial oil, gas and fire protection industries. The Bessemer facility had no relationship to these other products, segments or entities other than common parent ownership.

5.      Ductile iron pipe is produced primarily for the transmission and distribution of potable water in municipal water systems. A relatively small percentage of ductile iron pipe is used by municipalities for wastewater transmission. To my knowledge, ductile iron pipe has no application to offshore oil and gas drilling, production, or transmission.

6.      From 2007 through 2011, all or virtually all ductile iron pipe produced by the Bessemer facility was purchased for the construction or repair of water and wastewater infrastructure. Sales were made to waterworks distributors, waterworks contractors, municipalities, utilities, and other governmental agencies.

FURTHER AFFIANT SAYETH NAUGHT.

Marietta Edmunds Zakas

Sworn to and subscribed before me
this 25 day of September, 2018.

Dianne Ridgard
Notary Public

My Commission Expires:
February 22, 2020



Case: 18-31177     Document: 00515297113     Page: 411     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 412 of 1003
Case 2:10-md-02179-CJB-JCW   Document 23084-5   Filed 05/11/18   Page 3 of 20

# Exhibit B

STATE OF CALIFORNIA
COUNTY OF ORANGE

AFFIDAVIT

My name is Robert Schaaf. I am over twenty-one years of age and am competent to give this
Affidavit. I swear and affirm that the following facts are true to the best of my knowledge and belief:

1.      I have been engaged by Mueller Water Products, Inc. in connection with its claim filed with
the Deepwater Horizon Economic and Property Damages Settlement. In particular, I have been
asked to determine and testify whether products manufactured from 2007 through 2010 at the
Bessemer, Alabama facility of Mueller Water Products, Inc. (the "Bessemer Facility") were used in
offshore oil and gas activities in the Gulf of Mexico. For the reasons I give below, I believe it to be a
virtual certainty that the Bessemer Facility's products were not used in offshore oil and gas activities
in the Gulf of Mexico.

2.      I have a Bachelor's of Science in Chemical Engineering from the University of Southern
California. I am the Chairman of the Los Angeles Basin Section of the Society of Petroleum
Engineers. From 2004 to 2011, I managed all exploration and implementation projects in the Los
Angeles Basin (including offshore) for Aera Energy, LLC, an oil and natural gas exploration and
production company jointly owned by Shell Oil Company and ExxonMobil. I was a project
manager, engineer, and senior advisor for Chevron from 1979 to 2004.

3.      I have over 30 years' experience with petroleum engineering and oil and gas operations. My
expertise includes offshore oil and gas exploration, drilling, and production. I have had leading
design and engineering roles on major oil and gas operations in California (onshore and offshore),
the Gulf of Mexico, Texas, Louisiana, West Africa, and the Middle East. I have overseen the design,
installation, and operation of numerous pipelines on offshore oil platforms including pipelines for
water treatment, waterflooding (water injection), and wastewater systems. I am very familiar with
the different types of materials used for piping in offshore oil and gas activities.

4.      Upon being engaged in this matter, I inquired about all products manufactured or sold by the
Bessemer Facility during the years 2007 through 2011. Based on publicly available information, I
understand that the Bessemer Facility was a ductile iron foundry. I further understand that the only
product manufactured by the Bessemer Facility from 2007 through 2011 was ductile iron pipe.

5.      From my education and experience, I am knowledgeable about ductile iron pipe, its uses, and
its limitations. Ductile iron pipe is pipe manufactured from ductile cast iron. It is used primarily in
municipal water systems for the transport of potable water. It is used secondarily in municipal water
systems for the transport of wastewater. These two uses comprise almost all of the usages of ductile
iron pipe. Typically, ductile iron pipe is laid underground. A small percentage of ductile iron pipe is
installed above-ground over short distances in order to connect two areas of ground that are separated
by, for example, a stream or a ravine. An even smaller percentage of ductile iron pipe is laid
underwater across very small bodies of water, such as a pond or small lake. Ductile iron pipe is not
installed along the ocean floor, for numerous reasons stated later in this Affidavit.

6.      In all my experience with offshore oil rigs and offshore oil and gas activities, I have never
seen or heard of ductile iron pipe being used in offshore oil rig water or wastewater systems,

discharge systems, vessels that support offshore oil and gas activities, or pipelines between rigs or from rigs to shore. Moreover, it is inconceivable that ductile iron pipe would be used in such activities.

7.      What makes ductile iron pipe suitable for underground municipal water systems, which are designed to last many decades, and unsuitable for use offshore? First, ductile iron pipe is heavier than other available types of piping, such as steel, aluminum, brass, polyvinyl chloride (PVC), and fiberglass. On offshore rigs and vessels, all other factors being equal, lighter weight material is preferred. Second, ductile iron pipe is brittle compared to these other types of piping. It simply is not used in environments, like those of offshore vessels, oil rigs, and the ocean floor, that are subjected to significant (and often extreme) degrees of movement caused by ocean currents and wind. Third, ductile iron pipe has limited definitive design specifications. Materials used in offshore operations must meet certain standards, typically those of the API, for pressure, temperature, and torque, among other things. Fourth, ductile iron pipe can handle only limited amounts of pressure. Many offshore pipelines are required to handle higher pressures than ductile iron is capable of handling. Fifth, iron pipe in general is not suitable for saltwater environments like the Gulf of Mexico because saltwater corrodes iron. While coatings applied to ductile iron can sufficiently inhibit corrosion in some environments (such as underground municipal water systems near coastal areas, for example), ductile iron pipe is not graded for use in ocean environments because the corrosion factors are far too extreme for this type of material.

8.      For each of these reasons, it is a virtual certainty that the Bessemer facility's products were not used in offshore oil and gas activities in the Gulf of Mexico in the years 2007 through 2011.

_____

Robert Schaaf


A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

Subscribed and sworn to (or affirmed) before me
on this  28  day of  August , 20 18 ,
by  Robert Schaaf ,
proved to me on the basis of satisfactory evidence
to be the person(s) who appeared before me.

(Seal)

_____
Notary Public

NICOLAS ARMANDO AGUAYO
COMMISSION # 2242185
Notary Public - California
ORANGE COUNTY
My Comm. Expires May 12, 2022

2

Case: 18-31177    Document: 00515297113    Page: 414    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 415 of 1003
Case 2:10-md-02179-CJB-JCW   Document 23054-6   Filed 05/22/18   Page 12 of 26

# Exhibit C

| Customer | Total | Pct. |
|---|---|---|
| HD SUPPLY WATERWORKS | $170,074,613 | 16.81% |
| AWWS | $77,272,594 | 7.64% |
| C & B PIPING, INC. | $60,834,033 | 6.01% |
| FORTILINE | $48,644,875 | 4.81% |
| EL CONCORDE CONSTRUCTION LTD | $21,144,465 | 2.09% |
| MICHIGAN PIPE AND VALVE | $20,838,250 | 2.06% |
| A.A. BIN HINDI CONTRACTOR | $18,840,628 | 1.86% |
| CAPITOL / T. MINA | $18,809,997 | 1.86% |
| WINWHOLESALE, INC. | $17,046,570 | 1.69% |
| S & J Construction Co., Inc. | $16,331,436 | 1.61% |
| AQUA AMERICA, INC. | $14,836,253 | 1.47% |
| SORENSEN GROSS CONST. | $11,781,894 | 1.16% |
| H.D. FOWLER | $11,562,959 | 1.14% |
| STRACK INC. | $10,125,414 | 1.00% |
| AMERICAN INFRASTRUCTURE | $10,047,658 | 0.99% |
| LAYNE HEAVY CIVIL | $9,741,209 | 0.96% |
| MCWANE | $9,566,473 | 0.95% |
| EMERALD COAST UTILITIES A | $8,830,535 | 0.87% |
| SUMMIT SUPPLY COMPANY | $7,955,999 | 0.79% |
| BUCKEYE CONSTRUCTION CO. | $7,623,312 | 0.75% |
| REYNOLDS, INC. | $7,589,316 | 0.75% |
| SOUTHERN PIPE & SUPPLY | $7,565,254 | 0.75% |
| TUGALOO PIPELINE, INC | $7,158,100 | 0.71% |
| WATER WORKS SUPPLY CORP | $6,944,383 | 0.69% |
| METRA INDUSTRIES | $6,856,539 | 0.68% |
| UTILITY SERVICE & SUPPLY, INC. | $6,801,523 | 0.67% |
| ARCHER WESTERN CONTRACTOR | $6,136,582 | 0.61% |
| HEMPHILL CONST. CO., INC. | $6,123,995 | 0.61% |
| ARGO CONSTRUCTION CO. | $5,891,055 | 0.58% |
| FIRST SUPPLY GROUP | $5,880,888 | 0.58% |
| PARK CONSTRUCTION CORP. | $5,752,606 | 0.57% |
| STATE UTILITY CONTS. INC. | $5,547,773 | 0.55% |
| RICH & SONS, G. A. | $5,540,352 | 0.55% |
| ATLAS EXCAVATING, INC. | $5,496,080 | 0.54% |
| FRU-CON CONSTRUCTION | $5,080,733 | 0.50% |
| CORCEL CORP. | $4,912,512 | 0.49% |
| DISTRIBUTION ONE, LLC | $4,896,974 | 0.48% |
| YORK WATER COMPANY | $4,798,858 | 0.47% |
| SANDERS UTILITY CONST CO., INC. | $4,683,325 | 0.46% |
| HAJOCA CORPORATION | $4,475,248 | 0.44% |
| WATER WORKS SUPPLIERS CORP. | $4,423,363 | 0.44% |
| SMITH PIPELINE INC. | $4,308,527 | 0.43% |
| FERGUSON ENT | $4,117,289 | 0.41% |
| MIDWEST MUNICIPAL SUPPLY | $4,112,647 | 0.41% |
| MINNESOTA PIPE & EQUIPMENT | $3,757,149 | 0.37% |
| SKANSKA | $3,750,900 | 0.37% |

| Customer | Total | Pct. |
|---|---|---|
| ROSETTA CONSTRUCTION, INC | $3,688,504 | 0.36% |
| JONES BROTHERS CONSTRUCTI | $3,573,329 | 0.35% |
| METROFAB PIPE INC | $3,373,269 | 0.33% |
| ALLAN A. MYERS, INC. | $3,293,858 | 0.33% |
| EMPIRE PIPE AND SUPPLY | $3,249,683 | 0.32% |
| RARITAN SUPPLY CO. | $3,181,802 | 0.31% |
| T & N CHICAGO , INC. | $3,122,430 | 0.31% |
| PIEDMONT SUPPLY , INC. | $3,099,282 | 0.31% |
| JACK L. MASSIE CONTRACTORS INC. | $3,084,163 | 0.30% |
| CATHCART CONTRACTING COMP | $3,081,189 | 0.30% |
| MAYSE CONSTRUCTION CO. | $3,029,351 | 0.30% |
| HAZAMA CORP | $2,965,036 | 0.29% |
| UTILITY PIPE SALES, INC. | $2,856,230 | 0.28% |
| ILLINOIS METER | $2,830,930 | 0.28% |
| C.A.C. INDUSTRIES, INC. | $2,821,135 | 0.28% |
| JOINT CONTRACTING COMMAND-IRAQ | $2,775,258 | 0.27% |
| Woodruff And Sons  Inc. | $2,726,521 | 0.27% |
| BEEMER CONSTRUCTION CO., INC. | $2,694,673 | 0.27% |
| PALM BEACH COUNTY | $2,686,203 | 0.27% |
| CITY OF VALDOSTA GA | $2,656,290 | 0.26% |
| X-L CONTRACTING, INC. | $2,601,010 | 0.26% |
| CLAYTON COUNTY WATER AUTH | $2,553,211 | 0.25% |
| MASCI CORP. | $2,493,285 | 0.25% |
| HARGAN CONSTRUCTION CO INC | $2,468,853 | 0.24% |
| PACT CONSTRUCTION | $2,466,237 | 0.24% |
| MID EASTERN BUILDERS, INC | $2,451,531 | 0.24% |
| TRINITY CONSTRUCTION CO. | $2,446,968 | 0.24% |
| SUMMERS-TAYLOR, INC. | $2,329,003 | 0.23% |
| CITY OF CAPE CORAL FL | $2,328,033 | 0.23% |
| Villager Construction, Inc. | $2,281,909 | 0.23% |
| MUELLER COMPANY | $2,255,908 | 0.22% |
| CAROLINA PIPE CO., INC. | $2,237,258 | 0.22% |
| HIGHLANDER CONSTRUCTION | $2,208,135 | 0.22% |
| C.O. FALTER CONSTRUCTION | $2,196,581 | 0.22% |
| SEW CONSTRUCTION | $2,152,669 | 0.21% |
| CONSOLIDATED PIPE & SUPPLY | $2,073,031 | 0.20% |
| BRI UTILITY CONSTRUCTION | $2,030,868 | 0.20% |
| SEA SIDE ENVIRONMENTAL CONSTRUCTORS | $2,015,178 | 0.20% |
| Thompson Distribution Co., Inc. | $2,011,927 | 0.20% |
| PIPE PLUS | $1,993,128 | 0.20% |
| BLAIR CONSTRUCTION, INC. | $1,980,127 | 0.20% |
| BEAUFORT JASPER WATER & SEWER AUTH. | $1,940,447 | 0.19% |
| MARONA CONSTRUCTION COMPA | $1,923,194 | 0.19% |
| K.S. TUBERIA, S.A. DE C.V | $1,885,908 | 0.19% |
| KIEWIT CORPORATION | $1,865,399 | 0.18% |
| M.J. PIPE AND SUPPLY CORP | $1,848,130 | 0.18% |

| Customer | Total | Pct. |
|---|---|---|
| Stark Excavating  Inc. | $1,837,271 | 0.18% |
| PRINCE CONTRACTING CO., INC. | $1,795,489 | 0.18% |
| MS PIPE LLC | $1,760,683 | 0.17% |
| ZIEBELL WATER SERVICE | $1,750,509 | 0.17% |
| KAMMINGA & ROODVOETS, INC | $1,731,028 | 0.17% |
| PRUETT CONSTRUCTION CO. | $1,713,674 | 0.17% |
| JOHN HOADLEY & SONS, INC. | $1,711,502 | 0.17% |
| LOS ANGELES DEPT. OF WATER/POWER | $1,704,557 | 0.17% |
| ELLER CORPORATION | $1,695,738 | 0.17% |
| GFC CONSTRUCTION | $1,687,158 | 0.17% |
| AMERICAN CAST IRON PIPE | $1,642,635 | 0.16% |
| C.B. UTILITY COMPANY, INC | $1,641,085 | 0.16% |
| MCC PIPELINE | $1,632,215 | 0.16% |
| WOOD, WALTER A. SUPPLY | $1,595,144 | 0.16% |
| COHEN INDUSTRIAL SUPPLY CO. | $1,573,187 | 0.16% |
| EAST SIDE UTILITY DISTRICT | $1,566,737 | 0.15% |
| PIPELINES INC | $1,542,813 | 0.15% |
| Upper Peninsula Concrete Pipe Co. | $1,493,187 | 0.15% |
| MID-SOUTH BUILDERS, INC. | $1,479,691 | 0.15% |
| B.R.S., INC. | $1,468,629 | 0.15% |
| CARROLL WATER AUTHORITY | $1,440,899 | 0.14% |
| DOLI CONSTRUCTION CORP. | $1,440,755 | 0.14% |
| 1000 OAKS, INC. | $1,427,714 | 0.14% |
| L/B WATER SERVICE, INC. | $1,381,099 | 0.14% |
| UNITED WATER | $1,362,645 | 0.13% |
| JORDAN EXCAVATING | $1,354,477 | 0.13% |
| OPELIKA WATER WORKS BOARD | $1,345,764 | 0.13% |
| TIPPINS CONTRACTING CO. | $1,331,800 | 0.13% |
| RUSSELL ENGINEERING, INC. | $1,321,345 | 0.13% |
| GRIFFIN PLUMBING COMPANY | $1,315,614 | 0.13% |
| METRO EQUIPMENT SERVICE, | $1,309,949 | 0.13% |
| MCMILLAN CONSTRUCTION CO LLC | $1,281,507 | 0.13% |
| ROBERTS CONTRACTING CO. | $1,261,873 | 0.12% |
| WESTNEVADA | $1,235,254 | 0.12% |
| DLB, INC. | $1,230,590 | 0.12% |
| ATLANTIC PLUMBING SUPPLY | $1,229,064 | 0.12% |
| CENTRAL BUILDERS | $1,218,683 | 0.12% |
| TEXAS STERLING CONST. INC | $1,211,210 | 0.12% |
| MARKS CONTRACTING, LTD. | $1,179,095 | |
| PRIME CONSTR. GROUP, INC | $1,159,813 | 0.11% |
| EHRET, INC | $1,157,348 | 0.11% |
| CAPCO ENTERPRISES. INC. | $1,143,575 | 0.11% |
| MULTIFACET INDUSTRIAL | $1,140,785 | 0.11% |
| MAINE WATER WORKS SUPPLY | $1,131,367 | 0.11% |
| MOORE CONST. COMPANY | $1,121,791 | 0.11% |
| GLENN JOHNSTON, INC. | $1,099,134 | 0.11% |

| Customer | Total | Pct. |
|---|---|---|
| UTILITY PIPE SALES (WINTER HAVEN) | $1,098,120 | 0.11% |
| HOBBY CONSTRUCTION CO., INC. | $1,079,281 | 0.11% |
| THE BRIAR TEAM LLC | $1,065,999 | 0.11% |
| CITY OF BOYNTON BEACH FL | $1,060,716 | 0.10% |
| SMITH SUPPLY, LLC | $1,044,027 | 0.10% |
| HAYES PIPE SUPPLY, INC | $1,012,559 | 0.10% |
| SOUTHERN UTILITY SUPPLY CO. | $998,035 | 0.10% |
| VEOLIA WATER NORTH AMERICA | $996,826 | 0.10% |
| Trine Construction Corp. | $989,350 | 0.10% |
| EUBANK CONSTRUCTION CO. | $986,536 | 0.10% |
| G & W CONSTRUCTION CO., INC. | $984,214 | 0.10% |
| Teichert Construction | $984,162 | 0.10% |
| CAMPBELL FOUNDRY COMPANY | $983,775 | 0.10% |
| FOLEY COMPANY | $978,096 | 0.10% |
| JAMES M. COX CO., INC. | $969,439 | 0.10% |
| KENNEDY COMPANIES | $950,916 | 0.09% |
| LONG UTILITY CORP | $938,762 | 0.09% |
| O & G INDUSTRIES, INC. | $937,026 | 0.09% |
| PEPPER CONTR. SERVICES | $935,822 | 0.09% |
| HALL CONTRACTING CORP. | $934,257 | 0.09% |
| BELAIR ROAD SUPPLY | $930,560 | 0.09% |
| OCEAN BAY, INC. | $925,342 | 0.09% |
| KEYS MATERIALS & SUPPLY | $919,773 | 0.09% |
| ANRICH, INC. | $880,486 | 0.09% |
| GUYMANN CONST. CO. | $857,150 | 0.08% |
| PIONEER SUPPLY | $851,831 | 0.08% |
| P. GIOIOSO & SONS | $850,096 | 0.08% |
| PUBLIC WORKS SUPPLY CO. | $844,171 | 0.08% |
| ENCORE CONSTRUCTION CO. | $835,805 | 0.08% |
| SCHIAVONE | $835,252 | 0.08% |
| TRUMBULL CORP | $822,335 | 0.08% |
| PNP SUPPLY LLC | $802,735 | 0.08% |
| MCCART PIPELINE, INC. | $802,319 | 0.08% |
| PRILLAMAN & PACE INC | $784,900 | 0.08% |
| CITY OF INDEPENDENCE MO | $756,440 | 0.07% |
| RANDSCO PIPELINE, INC. | $750,558 | 0.07% |
| LOUISVILLE WATER COMPANY | $735,277 | 0.07% |
| J. CREAMER & SON, INC, | $733,304 | 0.07% |
| ALABASTER WATER & GAS | $729,813 | 0.07% |
| Vacri Construction Co. | $724,812 | 0.07% |
| AMERICAN INDIAN BUILDERS | $718,647 | 0.07% |
| Complete Construction Co | $716,715 | 0.07% |
| ALL STAR CONSTRUCTION & EQUIPMENT | $706,429 | 0.07% |
| P. CALIACCO, INC. | $701,931 | 0.07% |
| THERMACOR PROCESS, INC. | $687,030 | 0.07% |
| PERMA PIPE INC. | $686,233 | 0.07% |

| Customer | Total | Pct. |
|---|---|---|
| CALAMAR, INC | $676,989 | 0.07% |
| CHRISTOPHER PLBG. & ELECT | $670,632 | 0.07% |
| W.R. HALL, INC. | $665,898 | 0.07% |
| JRCRUZ CORP. | $654,094 | 0.06% |
| BULLDOG CONSTRUCTION, INC | $653,470 | 0.06% |
| NESLUND & ASSOCIATES, INC | $645,355 | 0.06% |
| R.E. GRILLS CONSTRUCTION INC | $639,791 | 0.06% |
| CITIZENS THERMAL ENERGY | $635,451 | 0.06% |
| GRANDVIEW PIPE AND SUPPLY | $631,333 | 0.06% |
| MARQUES PIPELINE, INC. | $631,040 | 0.06% |
| RESOURCE UTILITY SUPPLY | $627,968 | 0.06% |
| Sunrise Equipment Co. | $623,702 | 0.06% |
| E P E, INC. | $617,580 | 0.06% |
| PICONE | $615,894 | 0.06% |
| HI LINE SUPPLY CO., INC. | $611,604 | 0.06% |
| JOHNSON BROS. CORP. | $611,100 | 0.06% |
| Sanco | $610,274 | 0.06% |
| UTILITY EQUIPMENT COMPANY | $606,949 | 0.06% |
| CEDRONE TRUCKING, INC. | $606,003 | 0.06% |
| Western Water Works Supply Company | $599,756 | 0.06% |
| J & J MUNICIPAL SUPPLY, INC. | $597,272 | 0.06% |
| DEKALB COUNTY WATER SYSTE | $597,044 | 0.06% |
| LAN-CO DEVELOPMENT INC. | $587,833 | 0.06% |
| EAST VALLEY WATER DISTRICT | $572,225 | 0.06% |
| CITY OF SYRACUSE NY | $556,912 | 0.06% |
| CRYSTAL SEWER AND WATER, | $548,360 | 0.05% |
| T.K.C. General Engineering Contractor | $546,499 | 0.05% |
| MISSION CONSTRUCTION | $523,567 | 0.05% |
| RIC-MAN CONSTRUCTION | $522,424 | 0.05% |
| ATHENS-CLARKE COUNTY | $519,457 | 0.05% |
| COMMONWEALTH EXCAVATING INC | $518,710 | 0.05% |
| ISCO INDUSTRIES | $517,346 | 0.05% |
| HEADINGS EST LLC | $511,660 | 0.05% |
| R.R. SNIPES CONSTRUCTION CO., INC. | $504,753 | 0.05% |
| ARKANSAS WATER PRODUCTS | $499,740 | 0.05% |
| Suca Pipe Supply  Inc. | $495,941 | 0.05% |
| PACE SUPPLY CORP. | $493,200 | 0.05% |
| CFW, INC. | $490,391 | 0.05% |
| Acorn Supply & Distributing, Inc | $490,276 | 0.05% |
| PARAMONT GRADING COMPANY | $485,132 | 0.05% |
| N.L. CONSTRUCTION, INC. | $482,670 | 0.05% |
| Weka, Inc. | $481,281 | 0.05% |
| SEASIDE UTILITIES INC | $478,564 | 0.05% |
| FULLERFORM COMPANY | $471,712 | 0.05% |
| RHAWN FLANGE (DELANCO) | $467,060 | 0.05% |
| WATER & SEWER PIPE & SUPPLY, INC. | $466,728 | 0.05% |

| Customer | Total | Pct. |
|---|---|---|
| MARCELLUS CONSTRUCTION | $459,910 | 0.05% |
| PALM BEACH GRADING | $452,884 | 0.04% |
| RAMSEY CONSTRUCTORS | $449,755 | 0.04% |
| GERARDI SEWER & WATER INC | $448,043 | 0.04% |
| ELITE CONTRACTOR SUPPLY LLC | $446,363 | 0.04% |
| WDF Inc. | $444,697 | 0.04% |
| CITY OF CINCINNATI OH | $444,172 | 0.04% |
| PORTLAND UTILITIES CONST. | $428,658 | 0.04% |
| SB GENERAL CONTRACTING, INC. | $424,016 | 0.04% |
| MCJUNKIN RED MAN CORPORATION | $423,964 | 0.04% |
| NORTHDALE CONSTRUCTION CO | $420,558 | 0.04% |
| QUENTZEL PLUMBING SUPPLY | $417,161 | 0.04% |
| ANATEK INC | $414,573 | 0.04% |
| GENERAL UTILTIY PIPE | $408,116 | 0.04% |
| CARVER & CARVER PLUMBING, | $407,795 | 0.04% |
| R.H. PRICE, INC. | $407,615 | 0.04% |
| W.L. HAILEY AND COMPANY, | $405,349 | 0.04% |
| PETE & STEVE CONT. & ENG. | $400,840 | 0.04% |
| MURRAY SUPPLY COMPANY | $398,027 | 0.04% |
| MILLER CONTRACTORS, INC. | $385,652 | 0.04% |
| F.A . WILHELM CONSTRUCTION  CO INC | $385,206 | 0.04% |
| METRO TEX FABRICATORS INC | $381,805 | 0.04% |
| Underground Utilities, Inc. | $375,064 | 0.04% |
| CONSOLIDATED SUPPLY | $368,772 | 0.04% |
| PROPST CONSTRUCTION CO. INC. | $368,424 | 0.04% |
| CITY OF DALTON | $359,004 | 0.04% |
| A.E. SHULL CONTRACTOR | $357,217 | 0.04% |
| CIVIL CONSTRUCTOR, INC. | $354,543 | 0.04% |
| RIC-MAN INTERNATIONAL | $353,230 | 0.03% |
| C.H. KIRKPATRICK & SONS W | $353,217 | 0.03% |
| DAVE O'MARA | $352,543 | 0.03% |
| CITY OF BIRMINGHAM | $352,425 | 0.03% |
| J. DERENZO CO. | $351,666 | 0.03% |
| Smith Jan R. Constuction Company | $340,288 | 0.03% |
| Seravalli Construction Co. | $327,471 | 0.03% |
| H.R.P. CONSTRUCTION, INC. | $325,459 | 0.03% |
| FAMCON PIPE AND SUPPLY | $322,554 | 0.03% |
| BECHTEL POWER CORP | $320,727 | 0.03% |
| THALLE CONSTRUCTION CO. | $320,087 | 0.03% |
| LARKIN CONTRACTING, INC. | $318,119 | 0.03% |
| C.D. ROBERTS CONTRACTING | $317,514 | 0.03% |
| Wilson & Sons Inc. W. F. | $315,599 | 0.03% |
| EAGLE EXCAVATION, INC. | $313,099 | 0.03% |
| SHEA J. F. COMPANY INC. | $309,428 | 0.03% |
| R.H. MOORE CO., INC. | $307,155 | 0.03% |
| Unique Plbg. Company | $305,904 | 0.03% |

| Customer | Total | Pct. |
|----------|-------|------|
| D'AMBRA CONSTRUCTION CO. | $303,805 | 0.03% |
| GLF CONSTRUCTION CORP | $303,566 | 0.03% |
| DIXIE UTILITY SUPPLY CO. | $302,010 | 0.03% |
| G. P.'S ENTERPRISES, INC. | $301,954 | 0.03% |
| Westmoreland County Mun. Auth. | $300,461 | 0.03% |
| DELANEY CONSTRUCTION CORP | $298,217 | 0.03% |
| TRUCKEE MEADOWS WATER AUTHORITY | $292,350 | 0.03% |
| CATERINA SUPPLY INC. | $291,263 | 0.03% |
| Trax Co. Inc. | $281,859 | 0.03% |
| CARDINAL MECHANICAL | $279,868 | 0.03% |
| Titan Pipe & Supply Co., Inc. | $278,486 | 0.03% |
| KIMMINS CONTRACTING CORP. | $277,087 | 0.03% |
| CITY OF KANSAS CITY MO | $272,128 | 0.03% |
| HISCO, INC. | $270,037 | 0.03% |
| Selge Construction Company | $268,316 | 0.03% |
| PAVILION DRAINAGE SUPPLY CO.,INC. | $266,823 | 0.03% |
| STEAMBOAT SKI RESORT | $266,790 | 0.03% |
| COASTAL PLUMBING SUPPLY CO., INC | $265,307 | 0.03% |
| Walsh Contracting Corp. | $263,473 | 0.03% |
| TRIUMPH CONSTRUCTION CORP. | $259,633 | 0.03% |
| JERLOW CONSTRUCTION CO. | $256,552 | 0.03% |
| DEIG BROS. LUMBER & CONST | $255,243 | 0.03% |
| MID COAST PIPE & SUPPLY, | $252,465 | 0.02% |
| WEAVER, LLC | $247,571 | 0.02% |
| L.W., INC | $244,716 | 0.02% |
| JAMES T. O'HARA, INC. | $244,247 | 0.02% |
| FED CORP. | $242,643 | 0.02% |
| CITY OF GAINESVILLE GA | $240,042 | 0.02% |
| CITY OF ST LOUIS MO | $237,904 | 0.02% |
| CITY OF WINSTON-SALEM NC | $235,033 | 0.02% |
| TOM GIOIOSO | $234,375 | 0.02% |
| RUSSO BROTHERS, INC. | $233,587 | 0.02% |
| CITY OF TUSCALOOSA AL | $231,973 | 0.02% |
| G.L. HOWARD, INC. | $229,382 | 0.02% |
| UTILITY PIPE SALES CO., INC | $227,147 | 0.02% |
| PIRTANO CONSTRUCTION CO., | $224,408 | 0.02% |
| SOVEREIGN ENTERPRISES | $223,884 | 0.02% |
| P.J. HAYES, INC. | $220,945 | 0.02% |
| MCLAUGHLIN BROS. CONTR. C | $219,538 | 0.02% |
| VAIL RESORTS MANAGEMENT COMPANY | $217,533 | 0.02% |
| GILMOUR SUPPLY CO., INC. | $217,304 | 0.02% |
| GRIFFIN PIPE PRODUCTS | $217,183 | 0.02% |
| FLUOR-LANE LLC | $216,077 | 0.02% |
| 101 VERTICAL FABRICATION, INC. | $215,745 | 0.02% |
| R & B COMPANY | $213,196 | 0.02% |
| MUNICIPAL UTILITIES BD OF ALBERTVIL | $212,455 | 0.02% |

| Customer | Total | Pct. |
|---|---|---|
| MCDADE WATERWORKS, INC. | $211,473 | 0.02% |
| DEICHMAN EXCAVATING CO., | $211,411 | 0.02% |
| UTILITY SYSTEMS CONSTRUCTION INC | $208,978 | 0.02% |
| AIRD DORRANCE | $207,593 | 0.02% |
| KENNY CONSTRUCTION CO. | $205,758 | 0.02% |
| AIKEN GRADING COMPANY | $203,761 | 0.02% |
| PO BOYS PLUMBING, INC. | $202,918 | 0.02% |
| AMERICAN EXCAVATING CORP. | $202,812 | 0.02% |
| Underground Pipe And Valve  Inc. | $198,669 | 0.02% |
| D & M CONTRACTING, INC. | $197,739 | 0.02% |
| DECISION DISTRIBUTION | $197,569 | 0.02% |
| ENEBAK CONSTR. CO. | $195,216 | 0.02% |
| A.R. BUTLER CONST. CO. | $194,937 | 0.02% |
| DAHME MECHANICAL | $194,735 | 0.02% |
| COMMONWEALTH CONSTRUCTION | $190,897 | 0.02% |
| HOULE, INC., C.W. | $189,518 | 0.02% |
| MCCUEN COMPANY INC | $189,327 | 0.02% |
| SNOW MACHINES INC. | $188,155 | 0.02% |
| GIANNETTI CONTRACTING | $187,550 | 0.02% |
| CUSTOM PIPE & COUPLING | $185,583 | 0.02% |
| CASH SALES | $183,539 | 0.02% |
| Sedam Contracting Corp. | $182,971 | 0.02% |
| GROVE CONSTRUCTION INC. | $180,335 | 0.02% |
| CRESCENT & SPRAGUE SUPPLY CO. | $180,258 | 0.02% |
| SAEG ENGINEERING GROUP LLC | $177,390 | 0.02% |
| CITY OF BURBANK CA | $171,916 | 0.02% |
| LANIER MUNICIPAL SUPPLY CO | $171,381 | 0.02% |
| GHAREEB NINO AND PARTNERS CO | $166,038 | 0.02% |
| F.P. KANE CONSTRUCTION INC | $165,403 | 0.02% |
| TECHNOALPIN USA | $165,250 | 0.02% |
| C.I. THORNBURG CO., INC. | $164,916 | 0.02% |
| WESTERN NEVADA SUPPLY CO. | $162,660 | 0.02% |
| PETRONGOLO CONTRACTING | $161,457 | 0.02% |
| ADHAN PIPING COMPANY | $157,693 | 0.02% |
| MEMPHIS LIGHT,GAS & WATER | $157,624 | 0.02% |
| BLENHEIM CONSTRUCTION | $154,535 | 0.02% |
| BRICCO EXCAVATING INC | $154,457 | 0.02% |
| Superior Water Co.  Inc. | $152,195 | 0.02% |
| CANYON SPRINGS ENTERPRISES | $151,300 | 0.01% |
| DANA KEPNER CO. | $148,092 | 0.01% |
| JACKSON ENERGY AUTHORITY | $145,865 | 0.01% |
| VMS Construction | $145,462 | 0.01% |
| PIPE CONNECTION | $142,767 | 0.01% |
| CIMSCO, INC. | $141,739 | 0.01% |
| Utility Systems Of America  Inc. | $141,119 | 0.01% |
| SHAW CONSTRUCTION, CORP. | $140,726 | 0.01% |

| Customer | Total | Pct. |
|---|---|---|
| WM. SCHLOSSER, INC. | $139,694 | 0.01% |
| EAGLE VALLEY, INC. | $135,205 | 0.01% |
| MOORE & SONS SITE CONTRACTORS INC. | $135,125 | 0.01% |
| HOGAN CONTRACTING CORP. | $133,261 | 0.01% |
| G.E. FRISCO CO., INC. | $131,419 | 0.01% |
| ELLIJAY-GILMER COUNTY W&S | $127,775 | 0.01% |
| L G S PLUMBING INC. | $125,452 | 0.01% |
| BEDFORD PARK, VILLAGE OF | $124,293 | 0.01% |
| GSC Atlanta, INC | $123,591 | 0.01% |
| GATLIN PLUMBING & HEATING | $123,239 | 0.01% |
| GREENVILLE WATER WORKS | $120,375 | 0.01% |
| Stillwell Enterprises  Inc. | $120,113 | 0.01% |
| VALCO S.A. | $119,804 | 0.01% |
| HOBSON CONSTRUCTION CO. | $118,301 | 0.01% |
| CITY OF HOLLYWOOD FL | $117,169 | 0.01% |
| KENKO UTILITY SUPPLY | $117,041 | 0.01% |
| D.S. EAKINS CONST. CORP. | $116,696 | 0.01% |
| ALL-TEX PIPE & SUPPLY | $110,546 | 0.01% |
| DESERT PIPELINE INC. | $110,502 | 0.01% |
| CPF UNDERGROUND UTILITIES | $109,138 | 0.01% |
| IPMM SA DE CV | $108,369 | 0.01% |
| VANDERBURGH & CO INC | $105,381 | 0.01% |
| ISI HAWAII WATER SOLUTION | $103,542 | 0.01% |
| ASPEN SKIING CO. LLC | $102,851 | 0.01% |
| INSUL-PIPE SYSTEMS | $96,478 | 0.01% |
| SPRINGFIELD W&S COMMISSION | $94,420 | 0.01% |
| ISCO INDUSTRIES, LLC | $94,187 | 0.01% |
| Woszczak Mechanical Contractors Inc. | $92,686 | 0.01% |
| M&M CONTRACTING OF JASPER | $91,990 | 0.01% |
| Scott And Ritter  Inc. | $90,840 | 0.01% |
| NORTH WALES WATER AUTHORITY | $90,800 | 0.01% |
| DEER CREEK FLANGE PIPE CO INC | $90,245 | 0.01% |
| CITY OF TRUSSVILLE AL | $88,045 | 0.01% |
| LEWIS-SMITH PLUMBING | $85,880 | 0.01% |
| CONTRACK INTERNATIONAL | $84,620 | 0.01% |
| Sigma Corporation | $84,409 | 0.01% |
| GREENLAND CONSTRUCTION | $84,206 | 0.01% |
| DUPRIEST CONSTRUCTION CO INC | $84,095 | 0.01% |
| SWEENEY EXCAVATION, INC. | $83,825 | 0.01% |
| SCOCO SUPPLY, INC. | $82,045 | 0.01% |
| G.E. KLOOS MATERIAL CO. | $82,042 | 0.01% |
| CHICAGO UNITED INDUSTRIES LTD | $79,982 | 0.01% |
| WINTER SPORTS INC. | $79,836 | 0.01% |
| REVOLI CONSTRUCTION CO. | $78,440 | 0.01% |
| AMERICAN UNDERGROUND SUPPLY | $78,028 | 0.01% |
| VAN KIRK SAND & GRAVEL, INC. | $78,011 | 0.01% |

| Customer | Total | Pct. |
|---|---|---|
| HIXSON UTILITY DISTRICT | $76,183 | 0.01% |
| PARISI, CO. | $75,553 | 0.01% |
| WHITETAIL MOUNTAIN OPERATING CORP | $74,417 | 0.01% |
| B C & D ASSOCIATES, INC. | $73,657 | 0.01% |
| GRANITE WATER WORKS | $72,565 | 0.01% |
| K C ASSOCIATES | $72,258 | 0.01% |
| TOBIN BROS.,  INC. | $71,641 | 0.01% |
| PALM BEACH ATLANTIC UNIVERSITY | $70,445 | 0.01% |
| MIDCO SUPPLY | $70,207 | 0.01% |
| GENERAL PIPING INC | $70,099 | 0.01% |
| Rockdale Pipeline Inc. | $69,697 | 0.01% |
| CITY OF SPRINGFIELD MO | $68,473 | 0.01% |
| CARSON & ROBERTS SITE CONST. & ENG. | $65,242 | 0.01% |
| STEVENSON SUPPLY CO. | $63,611 | 0.01% |
| IAP, INC. | $62,414 | 0.01% |
| RED MAN PIPE & SUPPLY CO. | $61,632 | 0.01% |
| ELLIS CONTRACTING | $61,504 | 0.01% |
| W. ROGERS COMPANY | $61,061 | 0.01% |
| Shirley Contracting Corp. | $59,268 | 0.01% |
| DREIER & MALLER, INC. | $59,186 | 0.01% |
| BEXAR METROPOLITAN WATER | $57,198 | 0.01% |
| CMC SUPPLY INC. | $57,035 | 0.01% |
| CARR CONTRACTING INC | $56,686 | 0.01% |
| CROSS CONSTRUCTION, INC. | $56,129 | 0.01% |
| JONES GENERAL CONTRACTING LLC | $55,678 | 0.01% |
| KIEFT BROTHERS,INC. | $53,203 | 0.01% |
| OLYMPIC STEEL INC | $52,890 | 0.01% |
| BURLINGTON COUNTY | $48,604 | 0.00% |
| KENTUCKY STEEL & UTILITY | $48,351 | 0.00% |
| DAVIDSON GROUP | $47,610 | 0.00% |
| TOM WILLIAMS & ASSOCIATES | $47,596 | 0.00% |
| Southern California Pipeline | $45,436 | 0.00% |
| LAUREL CONSTR. CO., INC. | $45,143 | 0.00% |
| CITY OF LEBANON PA | $44,252 | 0.00% |
| CHERRY BROTHERS CONTR. CO | $43,721 | 0.00% |
| BOYS CONTRACTING LLC | $42,463 | 0.00% |
| CITY OF HAMMOND IN | $42,456 | 0.00% |
| FULTON COUNTY PUBLIC | $42,377 | 0.00% |
| CITY OF CHARLESTON SC | $41,595 | 0.00% |
| WILLIAMS PLUMBING & HEATING, INC. | $41,320 | 0.00% |
| FERRELL PAVING, INC. | $40,759 | 0.00% |
| SUPERIOR SALES,INC. | $40,324 | 0.00% |
| J & H CONSTRUCTION CO. | $38,979 | 0.00% |
| BENMARK SUPPLY CO., INC. | $38,950 | 0.00% |
| ELMORE COUNTY BOARD OF ED | $38,905 | 0.00% |
| MUNICIPAL SUPPLY | $38,361 | 0.00% |

| Customer | Total | Pct. |
|---|---|---|
| WATERWORK SPECIALTIES, INC. | $37,846 | 0.00% |
| POTOMAC VALLEY INDUSTRIAL SUPPLY | $37,382 | 0.00% |
| E.J. PRESCOTT | $37,333 | 0.00% |
| VELLANO BROTHERS INC | $36,589 | 0.00% |
| HOLBROOK PLASTIC PIPE SUP | $35,780 | 0.00% |
| PRECAST CONCRETE SALES CO | $34,848 | 0.00% |
| SITE UTILITY CONSTRUCTION INC | $34,847 | 0.00% |
| DELTA CONSTRUCTORS, INC. | $34,782 | 0.00% |
| PACIFIC PIPELINE SUPPLY | $34,550 | 0.00% |
| MORRIS AND COMPANY, INC. | $34,183 | 0.00% |
| J. DESIGIO CONSTRUCTION, | $33,001 | 0.00% |
| BALI CONSTRUCTION, INC. | $32,830 | 0.00% |
| PERRY & FECK, LLC | $32,800 | 0.00% |
| MARC KRESMERY CONSTRUCTION LLC | $32,492 | 0.00% |
| CITY OF PALM COAST FL | $31,076 | 0.00% |
| DANELLA COMPANIES, INC. | $31,062 | 0.00% |
| J.C. SMITH INC. | $30,697 | 0.00% |
| CUSTOM FAB, INC. | $30,549 | 0.00% |
| Scott Contractor Inc. | $30,190 | 0.00% |
| BRUCE SUPPLY CORP. | $30,023 | 0.00% |
| ALSTERDA CARTAGE & CONSTR | $29,861 | 0.00% |
| NORTH PENN WATER AUTHORITY | $29,380 | 0.00% |
| SUMMIT PIPE & SUPPLY CO., INC. | $29,216 | 0.00% |
| ETNA SUPPLY | $28,939 | 0.00% |
| CAJUN CONSTRUCTORS, INC. | $28,557 | 0.00% |
| STAR PIPE PRODUCTS | $28,399 | 0.00% |
| ANYTHING METAL DIST & FAB | $27,608 | 0.00% |
| MECCON INDUSTRIES, INC. | $27,461 | 0.00% |
| WASHINGTON SUBURBAN SANITARY CO. | $27,458 | 0.00% |
| EMCO, LTD. WATERWORKS | $27,409 | 0.00% |
| NEWMONT MINING CORPORATION | $27,008 | 0.00% |
| CUTTER DRILL | $26,701 | 0.00% |
| T.N. Walker, INC | $26,693 | 0.00% |
| ACT PIPE & SUPPLY, INC. | $26,613 | 0.00% |
| PIEDMONT PIPE SUPPLY LLC | $26,560 | 0.00% |
| DAVID MANCINI & SONS | $25,822 | 0.00% |
| MECHANICAL PIPE & SUPPLY | $25,320 | 0.00% |
| CRAWFORD GRADING & PIPELINE | $25,045 | 0.00% |
| PROFESSIONAL PIPELINE CON | $24,733 | 0.00% |
| AIRY'S INC. | $24,642 | 0.00% |
| CITY OF STEAMBOAT SPRINGS CO | $24,158 | 0.00% |
| PUTNAM | $24,049 | 0.00% |
| CADDICK CONSTRUCTION CO, INC. | $23,829 | 0.00% |
| ALPHA SPECIALTY SUPPLY INC. | $23,489 | 0.00% |
| Stevens Contractors Inc. | $22,697 | 0.00% |
| NASSAU CLAY PRODUCTS, INC | $22,292 | 0.00% |

Case: 18-31177     Document: 00515297113     Page: 426     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293-1   Filed 02/05/20   Page 427 of 1003
Case 2:10-md-02179-CJB-DPC   Document 26293-4   Filed 02/05/18   Page 12 of 14

| Customer | Total | Pct. |
|----------|-------|------|
| S & J Supply Company | $20,777 | 0.00% |
| SRS INC | $20,747 | 0.00% |
| AJL CORPORATION | $20,585 | 0.00% |
| R C FOSTER CORPORATION | $20,374 | 0.00% |
| Schuylkill County Municipal Authority | $20,208 | 0.00% |
| VARGAS MECHANICAL INC | $19,659 | 0.00% |
| Sully-Miller Contracting Co. | $19,197 | 0.00% |
| LABOV PLBG, & HTG. SUPPLY INC | $19,168 | 0.00% |
| DOBSON BROTHERS CONSTRUCT | $18,845 | 0.00% |
| CONTRACT MANAGEMENT INC. | $18,767 | 0.00% |
| SUPERIOR PRODUCTS DIST, INC. | $18,719 | 0.00% |
| MIDWEST PIPE SUPPLY, INC. | $18,404 | 0.00% |
| U.S. CONSTRUCTION SUPPLY CORP. | $18,291 | 0.00% |
| MTH PLUMBING SUPPLY | $17,923 | 0.00% |
| AMERIPIPE SUPPLY, INC. | $17,447 | 0.00% |
| JACKSON COUNTY PUBLIC WATER | $17,162 | 0.00% |
| CITY OF ATLANTA GA | $16,690 | 0.00% |
| JIM WALTER RESOURCES | $16,592 | 0.00% |
| P.K.F. - MARK III, INC. | $16,418 | 0.00% |
| D & E CONSTRUCTION CO., INC. | $16,377 | 0.00% |
| ENGINEERED FLUID, INC. | $16,017 | 0.00% |
| PERINI CORPORATION | $15,799 | 0.00% |
| S & K AIR POWER | $15,673 | 0.00% |
| DEBEX INC. | $15,525 | 0.00% |
| KIHO USA INC. | $15,514 | 0.00% |
| CAMPANELLI ASSOCIATES CON | $15,505 | 0.00% |
| COAST PIPE SUPPLY | $15,467 | 0.00% |
| CIRKO ENGINEERING INT'L, | $14,988 | 0.00% |
| NORTH FAYETTE CO. MUNICIPAL AUTH. | $13,973 | 0.00% |
| METRO VALVE & PIPE CO. | $13,873 | 0.00% |
| MORRISTOWN WATER SYSTEM | $13,248 | 0.00% |
| EDDIE WILSON CONSTRUCTION, INC. | $13,178 | 0.00% |
| INDEPENDENT WATER WORKS | $13,107 | 0.00% |
| THERMAL PIPE SYSTEMS | $13,025 | 0.00% |
| HARRINGTON MECHANICAL LTD | $13,020 | 0.00% |
| CITY OF BESSEMER AL | $12,778 | 0.00% |
| ESI CONTRACTING CORP. | $12,682 | 0.00% |
| RONDOUT CONSTRUCTORS JV | $12,591 | 0.00% |
| VIKING SUPPLY, INC. | $12,275 | 0.00% |
| AARON J. CONNER, INC. | $12,138 | 0.00% |
| K 2 CONSTRUCTION | $11,870 | 0.00% |
| SHANK / BALFOUR | $11,839 | 0.00% |
| C & M PIPE AND SUPPLY CO. | $11,737 | 0.00% |
| FEENEY CORPORATION | $11,371 | 0.00% |
| I. W. SALES, INC | $10,848 | 0.00% |
| ULLIMAN SCHUTTE CONSTRUCTION LLC | $10,706 | 0.00% |

Case: 18-31177 Document: 00515297113 Page: 427 Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293-4 Filed 02/05/20 Page 428 of 1003
Case 2:10-md-02179-CJB-DPC Document 25934-6 Filed 02/20/18 Page 429 of 1003

| Customer | Total | Pct. |
|---|---|---|
| NORMAN PLUMBING SUPPLY CO | $10,412 | 0.00% |
| DEKAYO CONSTRUCTION | $10,281 | 0.00% |
| E. KUSER, INC. | $10,020 | 0.00% |
| EAGLE VETERAN CONSTRUCTION SERVICES | $9,230 | 0.00% |
| Southern Sales & Services Co. Inc. | $8,981 | 0.00% |
| CITY OF ATHENS AL | $8,515 | 0.00% |
| PLASTIC WHOLESALE | $8,437 | 0.00% |
| PIONEER CONSTRUCTION CO., INC | $8,248 | 0.00% |
| BUSINESS PROMOTION CONSUL | $8,204 | 0.00% |
| T & K CONSTRUCTION LLC | $7,978 | 0.00% |
| West County Wastewater District | $7,867 | 0.00% |
| Wallace And Ferguson General Contractor | $7,767 | 0.00% |
| HUBBELL MECHANICAL SUPPLY | $7,350 | 0.00% |
| A.O. REED & CO. | $6,515 | 0.00% |
| TEC UTILITY SUPPLY INC | $6,315 | 0.00% |
| AMERICAN PIPE & SUPPLY CO | $6,183 | 0.00% |
| EXETER SUPPLY COMPANY | $6,102 | 0.00% |
| United Pipe & Supply Co. Inc. | $6,089 | 0.00% |
| HBH SOLUTIONS, LLC | $5,975 | 0.00% |
| GARNEY CONSTRUCTION CO. | $5,457 | 0.00% |
| JCC CONSTRUCTION CORP | $5,321 | 0.00% |
| NORTHERN KENTUCKY WATER | $5,216 | 0.00% |
| Wendler Inc. John M. | $5,155 | 0.00% |
| INNOFAB USA | $5,013 | 0.00% |
| MID-AMERICAN WATER, INC. | $4,553 | 0.00% |
| INDUSTRIAL SERVICES INC | $4,457 | 0.00% |
| Stevens Co. Inc. T.E. | $4,424 | 0.00% |
| COBB COUNTY WATER & SEWER | $4,227 | 0.00% |
| CITY OF ERIE PA | $4,052 | 0.00% |
| CERAMIC FIBER TECHNOLOGY | $3,554 | 0.00% |
| CITY OF HARRISONBURG VA | $3,512 | 0.00% |
| CASPER COLOSIMO & SONS | $3,183 | 0.00% |
| CITY OF PORTLAND OR | $2,724 | 0.00% |
| CITY OF ROCHESTER NY | $2,685 | 0.00% |
| GERARD PACKING & BELTING | $2,528 | 0.00% |
| LASER CONSTRUCTION, INC. | $2,484 | 0.00% |
| POWER DYNAMICS | $2,254 | 0.00% |
| DOMINGUEZ GENERAL ENG. | $2,144 | 0.00% |
| MUNICIPAL WATER WORKS SUPPLY LP | $2,081 | 0.00% |
| CUMBERLAND VALLEY CONSTRUCTORS INC | $2,069 | 0.00% |
| CIMMARON INTERNATIONAL CORP | $2,012 | 0.00% |
| South Walton Utility Company | $2,006 | 0.00% |
| S.J.W.D. WATER DISTRICT | $1,979 | 0.00% |
| ATLANTIC SUPPLY & EQUIPMENT | $1,946 | 0.00% |
| HUNTSVILLE UTILITIES | $1,907 | 0.00% |
| BRENT MATERIAL COMPANY | $1,870 | 0.00% |

| Customer | Total | Pct. |
|---|---|---|
| WESTERN VIRGINIA WATER AUTHORITY | $1,843 | 0.00% |
| RANGER PIPELINES, INC. | $1,535 | 0.00% |
| J.W. D'ANGELO COMPANY | $1,135 | 0.00% |
| Industrial Threaded Products INC | $868 | 0.00% |
| R J UNDERGROUND, INC. | $716 | 0.00% |
| CONEWAGO ENTERPRISES, INC | $668 | 0.00% |
| SOUTHWEST PLUMBING SUPPLY | $306 | 0.00% |
| F.W. SPENCER & SON, INC | $267 | 0.00% |
| NATCHEZ WATER WORKS | $261 | 0.00% |
| PLUMBERS SUPPLY CO., INC. | $206 | 0.00% |
| PLANT & FLANGED EQUIPMENT | $188 | 0.00% |
| KURVERS INC | $113 | 0.00% |
| VAL-MATIC VALVE & MFG. CO. | $106 | 0.00% |
| FOX & HEARN, INC. | $106 | 0.00% |
| C. WELLS PIPELINE (CORONA, CA) | $105 | 0.00% |
| PRO FASTENING SYSTEMS INC | $101 | 0.00% |
| COBURN SUPPLY COMPANY | $78 | 0.00% |
| PVF Industrial Supply Inc | $71 | 0.00% |
| LUDLOW CONSTRUCTION CO. | $60 | 0.00% |
| PIPING SUPPLY CO INC | $45 | 0.00% |
| LANE CONSTRUCTION CORP. | $44 | 0.00% |
| Sales Promotion | $16 | 0.00% |
| STEPHEN DORECK EQUIPMENT | $5 | 0.00% |
| OKLAHOMA CITY WATER UTILITIES TRUST | $0 | 0.00% |
| APOLLO TRENCHLESS, INC. | $0 | 0.00% |
| AUSTIN ENGINEERING COMPANY | -$176 | 0.00% |
| SPECIALIZED PIPING SYSTEMS | -$308 | 0.00% |
| 4 M TRENCHING, INC. | -$520 | 0.00% |
| J & M INC. | -$1,778 | 0.00% |
| ADAMS WATER & SEWER SUPPLY, INC. | -$46,940 | 0.00% |

Case: 18-31177     Document: 00515297113     Page: 429     Date Filed: 02/04/2020

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 430 of 1003
Case 2:10-md-02179-CJB-JCW   Document 23054   Filed 10/12/18   Page 1 of 2

# Exhibit 6

Case: 18-31177    Document: 00515297113    Page: 430    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 431 of 1003
Case 2:10-md-02179-CJB-JCW Document 26354 Filed 12/02/21 Page 2 of 2

## Devine, Brian P.

| | |
|---|---|
| **From:** | Jason Russell <jrussell@dhecc.com> |
| **Sent:** | Thursday, October 04, 2018 9:31 AM |
| **To:** | Devine, Brian P. |
| **Cc:** | Willis, Jeff; Tisa Adkins |
| **Subject:** | RE: Mueller Water Products, Inc. (100243047) |

Thank you, Brian. I have notified the Moratoria Team.

**From:** Devine, Brian P. <BDevine@rh-law.com>
**Sent:** Wednesday, October 03, 2018 4:17 PM
**To:** Jason Russell <jrussell@dhecc.com>
**Cc:** Willis, Jeff <JWillis@rh-law.com>
**Subject:** Mueller Water Products, Inc. (100243047)

Jason,

I wanted to let you know that we uploaded the attached letter to the portal on Monday regarding the designation of claim 254194 for moratoria losses review. Can you please let the moratoria losses review team know that this is available? It is Doc ID 20991298.

Thanks,
Brian

**Brian P. Devine**
Litigation Support Manager
**ROGERS & HARDIN LLP**
2700 International Tower | 229 Peachtree Street NE | Atlanta, GA 30303
T: 404.494.1412 | F: 404.230.1005 | Email: bdevine@rh-law.com

--------------------------------------------------------------------------------

This message and any attachments are intended for the use of the addressee(s) only and may be confidential and covered by the attorney/client and other privileges. If the reader is not the intended recipient, DO NOT READ, notify sender and delete this message. In addition, be aware that any disclosure, copying, distribution or use of the contents of this message is strictly prohibited.

# Exhibit 7

Case: 18-31177     Document: 00515297113     Page: 432     Date Filed: 02/04/2020
Case: 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 433 of 1003
Case: 2:10-md-02179-CJB-JCW Document 26293-54 Filed 12/04/21 Page 2 of 4

**Devine, Brian P.**

| | |
|---|---|
| **From:** | Jason Russell <jrussell@dhecc.com> |
| **Sent:** | Monday, October 08, 2018 11:49 AM |
| **To:** | Devine, Brian P. |
| **Cc:** | Willis, Jeff |
| **Subject:** | DWH - Unresolved Moratoria Claims Outreach - 10.8.18 - |
| **Attachments:** | Order Regarding Remaining Claims in the Economic and Property Damages Settlement that Are Subject to Moratoria Hold.pdf |

Brian,

On 10/3/18, the Court entered the attached Order, providing that any Claimant (i) who has received a notice from the Settlement Program that his, her, or its claim is subject to a "Moratoria Hold" and (ii) that claim has not been resolved to date is excluded from the Deepwater Horizon Economic and Property Damages Settlement and, instead, may proceed with its claim in litigation before the Court by compliance with the terms of the Order. We have uploaded a copy of the Order to your claimant file and are closing your claim based on the Court's ruling that it is excluded.

If you wish to litigate your claim, follow the instructions outlined in the Order, including filing an individual complaint and Sworn Statement that complies with the requirements of Pretrial Order No. 60 (Rec. Doc. 16050) by no later than November 16, 2018.

Thank you,
Jason
**Jason Russell**
**BROWNGREER PLC**
Law Firm Contact
250 Rocketts Way
Richmond, Virginia  23231
Telephone: (804) 214-2839 Ext. 5416
Facsimile:  (804) 521-7299

*This electronic mail is intended to be received and read only by certain individuals. It may contain information that is privileged or protected from disclosure by law. If it has been misdirected, or if you suspect you received this in error, please notify me by replying and then delete this message and your reply. These restrictions apply to any attachment to this email.*

# EXHIBIT 8

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010 | MDL NO. 2179 |
| | SECTION J |
| This document relates to: No. 12-970 | JUDGE BARBIER |
| | MAG. JUDGE WILKINSON |
| Claimant ID 100243047, Claim ID 254194 | |

## BP DEFENDANTS' MOTION TO STRIKE CLAIMANT ID 100243047's "MOTION TO CLARIFY, ALTER, OR AMEND THE COURT'S OCTOBER 3, 2018 ORDER"

Pursuant to Section 18.1 of the Economic and Property Damages Settlement Agreement ("Settlement Agreement"), Defendants BP Exploration & Production, Inc., BP America Production Company and BP p.l.c. ("BP") move to strike Claimant ID 100243047's (Mueller Water Products) Motion to Clarify, Alter or Amend the Court's October 3, 2018 Order (Rec. Doc. 25054) (the "Motion"). As explained in the accompanying memorandum, Mueller Water Products, through a subsidiary, previously sold in an equity transaction the entity that owned the claiming facility, and therefore has no right to bring the underlying claim or prosecute the Motion.

Pursuant to Section 18.2 of the Settlement Agreement, BP certifies that it has consulted with Claimant Mueller Water Products, but the parties were not able to come to an agreement on this dispute.

WHEREFORE, BP respectfully requests that the Court grant this motion and strike Mueller Water Products' Motion. BP further requests that the Court lift the automatic continuance for motions in this matter under Pre-Trial Order No. 15 for this motion, and set this motion for hearing.

EXHIBIT 8

December 20, 2019

Respectfully submitted,

*/s/ Devin C. Reid*

Devin C. Reid (Bar #32645)
R. Keith Jarrett (Bar #16984)
**LISKOW & LEWIS**
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Fax No. (504) 556-4108

Matthew T. Regan, P.C.
J. Andrew Langan, P.C.
Kristopher S. Ritter
**KIRKLAND & ELLIS LLP**
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Fax: (312) 862-2200

Christopher W. Keegan
Ashley Littlefield
Anna Terteryan
**KIRKLAND & ELLIS LLP**
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400

*Attorneys for BP America Production
Company, BP Exploration & Production Inc.,
and BP p.l.c.*

Case: 18-31177 Document: 00515297113 Page: 436 Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293 Filed 02/05/20 Page 437 of 1003
Case 2:10-md-02179-CJB-DPC Document 28155 Filed 02/20/19 Page 3 of 4

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 20th day of December, 2019.

/s/ Devin C. Reid
_____

Case: 18-31177    Document: 00515297113    Page: 437    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293-3 Filed 02/05/20 Page 438 of 1003
Case 2:10-md-02179-CJB-JCW Document 26293 Filed 12/20/19 Page 2 of 40

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010 | MDL NO. 2179 |
| | SECTION J |
| This document relates to: No. 12-970 | JUDGE BARBIER |
| | MAG. JUDGE WILKINSON |
| Claimant ID 100243047, Claim ID 254194 | |

### BP DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO STRIKE CLAIMANT ID 100243047's "MOTION TO CLARIFY, ALTER, OR AMEND THE COURT'S OCTOBER 3, 2018 ORDER"

Pursuant to Section 18.1 of the Economic and Property Damages Settlement Agreement ("Settlement Agreement"), Defendants BP Exploration & Production, Inc., BP America Production Company and BP p.l.c. ("BP") move to strike Claimant ID 100243047's (Mueller Water Product's) Motion to Clarify, Alter or Amend the Court's October 3, 2018 Order (Doc. 25054) (the "Motion"). That Motion asks the Court to reconsider the exclusion of Mueller Water Products from the Class. However, Mueller Water Products has no right to pursue the underlying claim and thus no right to seek reinstatement in the Class. Before it filed the underlying claim with the Settlement Program, Mueller Water Products, though its subsidiary, sold 100% of the equity interests in the company that owns the claiming facility. Under well-established principles of corporate law, the right to the claim conveyed with the sale of the equity. Therefore, as of the time of the equity sale, Mueller Water Products and its subsidiary no longer owned the rights to the claim that it now seeks to prosecute. Tellingly, the entity that Mueller Water Products sold and that owns the claiming facility filed its own claim under its own name in 2014.[1]  Because

---

[1] This fact was publicly disclosed in a filing with the Security and Exchange Commission. *See* Ex. 1, at 2 (2016 Stock Purchase Agreement).

Case: 18-31177     Document: 00515297113     Page: 438     Date Filed: 02/04/2020
Case: 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 439 of 1003
Case: 2:10-md-02179-CJB-JCW   Document 26293   Filed 12/20/19   Page 2 of 10

Mueller Water Products has no right to the underlying claim, its Motion is improper and should be stricken.[2]

## I.    **Background**

The claim underlying the Motion seeks to recover for alleged losses incurred by a Bessemer, Alabama facility owned by United States Pipe and Foundry Company LLC ("USPF").[3] Prior to 2012, USPF was a wholly-owned subsidiary of Mueller Group, LLC, which itself was wholly owned by claimant Mueller Water Products, Inc.[4]  On March 7, 2012, Mueller Water Products and Mueller Group entered into a Purchase Agreement with USP Holdings, Inc.  In the Purchase Agreement, the Mueller entities sold to USP Holdings, Inc. "all of the outstanding membership interests in [USPF]."[5]  Mueller Water Products did not reserve any rights with regard to claims by USPF.[6]

*After* selling its membership interests in USPF, Mueller Water Products filed a claim with the Claims Administrator seeking to recover for economic losses allegedly suffered by the Bessemer facility as a result of the Deepwater Horizon Oil Spill (the "Spill").[7]

Separately, on April 22, 2014, USPF, the owner of the Bessemer facility, filed its own claim also seeking to recover for alleged economic losses as a result of the Spill.[8]

On February 12, 2016, USP Holdings, Inc. in turn entered into a Stock Purchase Agreement wherein it sold to Forterra Pipe & Precast, LLC "all of the issued and outstanding shares of common stock" in several companies, including USPF.[9]  As part of that agreement, USP Holdings

---

[2] BP respectfully reserves the right to oppose the Motion if the Court does not strike the Motion.
[3] *See* Docs. 25054-2, 25054-6.
[4] Exhibit 2 (2012 Purchase Agreement).
[5] *Id*.
[6] *See id*.
[7] *see* Docs. 25054, 25054-2.
[8] *See* Ex. 1, at 2.
[9] Exhibit 1.

Case: 18-31177     Document: 00515297113     Page: 439     Date Filed: 02/04/2020
Case: 2:10-md-02179-CJB-DPC   Document 26283-3 Filed 02/05/20   Page 440 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26283-3 Filed 02/05/20   Page 9 of 40

assigned to Alabama Seller Rep Inc. (an agent of USP Holdings) "all of USPF's right, title and interest in or to" its claim under the Settlement Agreement.[10]

## II.     **Argument**

Mueller Water Products does not have the right to pursue a claim for losses allegedly incurred by the Bessemer facility and therefore has no right to prosecute its Motion.  Before it filed the underlying claim with the Settlement Program, Mueller Water Products, through its subsidiary, sold to USP Holdings Inc. 100% of the equity membership interests of USPF, the entity that owns the Bessemer facility.  Under the law, all rights to file a claim for the Bessemer Facility transferred with the sale of the equity.  Accordingly, Mueller Water Products had no right to file a claim in 2013 for losses allegedly incurred by USPF's Bessemer, Alabama facility, and has no right to seek reinstatement of the claim into the Class.

In an equity sale, the rights and liabilities of the entity being sold convey with the equity interests unless specifically excluded.  *In re KB Toys Inc.,* 340 B.R. 726, 728 (D. Del. 2006) ("[I]t is a general principle of corporate law that all assets and liabilities are transferred in the sale of a company by a sale of stock…."); *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 365 (3d Cir. 2002)("[B]y purchasing LCSDI's stock, and not just its assets, Kool Mann agreed to pay a particular price for LCSDI as a whole—its assets and liabilities.").  This rule flows from that fact that "the life of an entity continues in a stock sale." *Claimant ID 100009540 v. BP Expl. & Prod., Inc.*, 680 F. App'x 263, 267 (5th Cir. 2017) (citing BASIC LEGAL TRANSACTIONS § 28:7 (2011) (explaining that "in a sale-of-stock transaction, all assets owned by the corporation automatically become the purchaser's assets, since they are held in the corporate entity's name").  That rights and liabilities convey with the sale of equity applies equally to the sale of membership

---

[10] *Id.*, at 123.

interests in a limited liability company:   "The sale of a limited liability company's membership interest is equivalent to the sale of one hundred percent of a corporation's stock . . . Accordingly, the court finds that the sale of all of the membership interests in a limited liability company transfer the entirety of the entity, including both known and unknown assets (unless specifically excluded), to the purchaser."   *Spurlino v. Holcim (US) Inc.*, 2017 WL 3278880 (D. Utah 2017); *Excellence Cmty. Mgmt. v. Gilmore*, 351 P.3d 720, 722 (Nev. 2015) ("[T]he 100-percent membership sale of the LLC that took place in this case is equivalent to the sale of 100 percent of the stock in a corporation."); *Missett v. Hub Int'l Pa., LLC*, 6 A.3d 530, 537 (Pa. 2010) ("[W]e find that the structure of the sale of equity membership interests . . . to be akin to a sale of stock rather than an asset sale . . . .").

In   *Spurlino v. Holcim (US) Inc.*, the court considered whether a claim for losses from alleged conduct occurring prior to the sale of the membership interests in a limited liability company transferred with the sale of the LLC's equity.  The court answered the question in the affirmative: "Because the UUPA claim was not included among these Excluded Assets, it was necessarily transferred to Kilgore [the buyer] with the sale of the membership interest." 2017 WL 3278880 *6. Similarly, in *In re KB Toys Inc.* the court addressed the question of whether the right to tax refunds transferred with the sale of the stock of a company. 340 B. R at 728. Once again, the court said the answer was yes:  "The tax refunds 'belong' to the corporate entity whose stock was transferred. The Government owes those funds to no one else." *Id.*

The result is the same with regard to the sale of USPF.  When Mueller Group sold 100% of the membership equity interests in USPF to USP Holdings, the right to make a claim for alleged losses to USPF's Bessemer, Alabama facility transferred with the sale of the equity.  Accordingly,

Case: 18-31177    Document: 00515297113    Page: 441    Date Filed: 02/04/2020
Case: 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 442 of 1003
Case: 2:10-md-02179-CJB-JCW   Document 26293-3   Filed 02/05/20   Page 9 of 10

following that sale, USPF, and not Mueller Water Products or any other member of the Mueller corporate family, owned the rights to the claim.

To the extent that Mueller Water Products argues that it should be permitted to file a claim because its subsidiary owned the Bessemer Facility at the time of the alleged loss, this argument is entirely without merit. In all of the above-referenced cases, the question was whether claims arising from alleged pre-sale injury conveyed with the sale of an entity's equity. The courts have held that the answer is yes. Here, USPF remained in existence after the sale. Only the ownership of its equity changed. When USPF was sold, the claim transferred with it. In addition to being a core principle of corporate law, there is nothing inequitable about this doctrine. It simply means that when a corporation elects to sell its equity, it is selling both the assets/rights and the liabilities of the entity being sold, save those assets/rights or liabilities that are specifically excluded. The Mueller entities did not exclude any assets/rights or liability from the sale of the membership interests of USPF. Therefore, as a matter of law, all assets/rights and liabilities transferred with USPF, and Mueller Water Products has no right to make claims on behalf of the entity it sold.

The Court should likewise reject any argument that as a matter of "economic reality" Mueller Water Products' corporate family suffered the alleged loss for which the claim was filed. The economic and legal reality is that to the extent it incurred a loss in 2010, Mueller Water Products and its subsidiary elected to sell the claim with the membership interests in 2012.

Mueller Water Products may attempt to argue that it incurred the loss and therefore is the proper claimant. Such an argument fails for multiple reasons. As an initial matter, a parent and a subsidiary are not one and the same. *See, e.g., Dole Food Co. v. Patrickson*, 538 U.S. 468, 469, 123 S. Ct. 1655, 1657, 155 L. Ed. 2d 643 (2003) ("As a corporation and its shareholders are distinct entities, a corporate parent which owns a subsidiary's shares does not, for that reason alone, own

or have legal title to the subsidiary's assets.") (internal citation omitted); *Klauder v. Echo/RT Holdings, LLC*, 152 A.3d 581 (Del. 2016) ("Simply put, a parent's ownership of all of the shares of the subsidiary does not make the subsidiary's assets the parent's."); Del. Code tit. 6, § 18-701 ("A limited liability company interest is personal property. A member has no interest in specific limited liability company property.").  USPF, not its indirect parent Mueller Water Products, owned the Bessemer facility prior to the 2012 sale.  Thus, prior to the 2012 equity sale, the claim belonged to USPF, not Mueller Water Products.  Indeed, Mueller Water Products' counsel has strenuously and successfully argued to this Court and the Fifth Circuit that for purposes of the Settlement Agreement the focus is on the entity that owns the claiming facility and not its corporate parent.  *BP Expl. & Prod., Inc. v. Claimant ID 100211268*, 706 F. App'x 197, 198 (5th Cir. 2017).

That Mueller Water Products purportedly elected to treat USPF as a "disregarded entity" for federal income tax purposes does not change the result.  The IRS's "disregarded entity" rule simply allows the owner of a single member limited liability company to elect to report the LLC's income on the parent's tax return "for federal tax purposes."   26 C.F.R. § 301.7701-3(a). It does not otherwise change the corporate structure of an entity or long-standing principles of corporate separateness.  *See, e.g., Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 903 F. Supp. 2d 107, 119 (D. Mass. 2012) ("[26 C.F.R. § 301.7701–3] specifically limits its own application to 'Federal tax purposes.'. . . In fact, it is long-settled that state law, and not federal law, governs the bounds of corporate liability in the absence of a conflicting federal incorporation statute.").  And even if Mueller Water Products somehow was permitted to make a claim on behalf of the Bessemer facility prior to the 2012 equity sale, it sold that right when it and its subsidiary Mueller Group sold the membership interest of USPF to USP Holdings in 2012.

Case: 18-31177    Document: 00515297113    Page: 443    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 444 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26293   Filed 12/20/19   Page 7 of 9

Still further, the Court should reject as irrelevant any argument by Mueller Water Products questioning the validity of the assignment of the claim from USP Holdings (the entity that purchased USPF from the Mueller corporate family) to its agent in connection with the 2016 sale of the membership interests of USPF to Forterra Pipe & Precast, LLC. This subsequent sale from USP Holdings to Forterra is not relevant to the instant motion other than to demonstrate that USPF had filed its own claim after the entity was sold by Mueller Water Products and its subsidiaries. Whether that claim stayed with USP Holdings pursuant to the 2016 assignment or transferred with the equity does not matter. In either case, the claim does not belong to Mueller Water Products and its corporate family, which had sold the equity in USPF four years earlier.

Finally, to the extent that Mueller Water Products argues that it should be allowed to substitute in USPF as the claimant, that is incorrect. USPF has already submitted its own claim . USPF's rights under the Settlement Agreement are governed by the outcome of that claim. Mueller Water Products cannot resuscitate its own improper claim by replacing its name with that of USPF.

## III.  **Conclusion**

For all of the above reasons, the Court should strike the Motion.

December 20, 2019

Respectfully submitted,

/s/ Devin C. Reid

Devin C. Reid (Bar #32645)
R. Keith Jarrett (Bar #16984)
**LISKOW & LEWIS**
ATTORNEY
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone: (504) 581-7979
Fax No. (504) 556-4108

Matthew T. Regan, P.C.
J. Andrew Langan, P.C.
Kristopher S. Ritter
**KIRKLAND & ELLIS LLP**
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Fax: (312) 862-2200

Christopher W. Keegan
Ashley Littlefield
Anna Terteryan
**KIRKLAND & ELLIS LLP**
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400

*Attorneys for BP America Production*
*Company, BP Exploration & Production Inc.,*
*and BP p.l.c.*

Case: 18-31177    Document: 00515297113    Page: 445    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC Document 26293-3 Filed 02/05/20 Page 446 of 1003
Case 2:10-md-02179-CJB-JCW Document 26153 Filed 12/20/19 Page 9 of 9

## **CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 20th day of December, 2019.

/s/ Devin C. Reid
Devin C. Reid

Case: 18-31177    Document: 00515297113    Page: 446    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 447 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26253-2   Filed 12/20/19   Page 1 of 1003

# EXHIBIT 1

EX-2.6 7 d201367dex26.htm EX-2.6

**Exhibit 2.6**

Confidential
EXECUTION VERSION

STOCK PURCHASE AGREEMENT

BY AND AMONG

FORTERRA PIPE & PRECAST, LLC,

USP HOLDINGS INC.

THE STOCKHOLDERS AND OPTIONHOLDERS OF USP HOLDINGS INC.,

AND

ALABAMA SELLER REP INC., AS SELLER REPRESENTATIVE

Dated as of February 12, 2016

EX-2.6 Case: 18-31177    Document: 00515297113    Page: 448    Date Filed: 02/04/2020 136

Case 2:10-md-02179-CJB-DPC   Document 26293-2   Filed 02/05/20   Page 449 of 1003
Case 2:10-md-02179-CJB-DPC   Document 26293-2   Filed 02/05/19   Page 3 of 1003

**TABLE OF CONTENTS**

|  |  | **Page** |
|---|---|---|
| **Article I DEFINITIONS** |  | **2** |
| Section 1.1 | Certain Definitions | 2 |
| Section 1.2 | Other Definitional and Interpretive Matters | 18 |
| **Article II SALE AND PURCHASE OF SHARES; PURCHASE PRICE** |  | **20** |
| Section 2.1 | Sale and Purchase of Shares; Treatment of Options | 20 |
| Section 2.2 | Purchase Price; Calculation and Payment of Closing Consideration | 20 |
| Section 2.3 | Closing Amounts | 21 |
| Section 2.4 | Seller Payments | 25 |
| Section 2.5 | Tax Treatment of Payments | 25 |
| Section 2.6 | Reimbursement of Payments | 25 |
| Section 2.7 | Cancellation of Options | 26 |
| **Article III CLOSING** |  | **27** |
| Section 3.1 | Closing; Closing Date | 27 |
| Section 3.2 | Closing Deliveries | 27 |
| **Article IV TERMINATION** |  | **29** |
| Section 4.1 | Termination of Agreement | 29 |
| Section 4.2 | Procedure Upon Termination | 31 |
| Section 4.3 | Effect of Termination | 31 |
| Section 4.4 | Reverse Termination Fee | 31 |
| **Article V REPRESENTATIONS AND WARRANTIES OF HOLDINGS** |  | **33** |
| Section 5.1 | Organization and Good Standing | 33 |
| Section 5.2 | Authorization of Agreement | 33 |
| Section 5.3 | Conflicts; Consents of Third Parties | 33 |
| Section 5.4 | Capitalization | 34 |
| Section 5.5 | Subsidiaries | 35 |
| Section 5.6 | Financial Statements | 35 |
| Section 5.7 | Absence of Certain Developments | 36 |
| Section 5.8 | Taxes | 36 |
| Section 5.9 | Real Property | 38 |
| Section 5.10 | Tangible Personal Property | 39 |
| Section 5.11 | Intellectual Property | 39 |
| Section 5.12 | Material Contracts | 40 |
| Section 5.13 | Company Benefit Plans | 42 |
| Section 5.14 | Labor | 44 |
| Section 5.15 | Litigation | 45 |
| Section 5.16 | Compliance with Laws; Permits | 45 |
| Section 5.17 | Environmental Matters | 46 |
| Section 5.18 | Insurance | 46 |
| Section 5.19 | Brokers | 47 |

i

|   |   |   |
|---|---|---|
| Section 5.20 | Recalls; Product Liability | 47 |
| Section 5.21 | Customers and Suppliers | 47 |
| Section 5.22 | Inventory | 48 |
| Section 5.23 | Affiliate Interests and Transactions | 48 |
| Section 5.24 | No Other Representations or Warranties | 48 |
| **Article VI** | **REPRESENTATIONS AND WARRANTIES OF THE SELLERS** | **48** |
| Section 6.1 | Organization and Good Standing | 48 |
| Section 6.2 | Authorization of Agreement | 49 |
| Section 6.3 | Conflicts; Consents of Third Parties | 49 |
| Section 6.4 | Ownership and Transfer of Shares | 50 |
| Section 6.5 | Litigation | 50 |
| Section 6.6 | Brokers | 50 |
| Section 6.7 | No Other Representations or Warranties | 50 |
| **Article VII** | **REPRESENTATIONS AND WARRANTIES OF PURCHASER** | **50** |
| Section 7.1 | Organization and Good Standing | 50 |
| Section 7.2 | Authorization of Agreement | 50 |
| Section 7.3 | Conflicts; Consents of Third Parties | 51 |
| Section 7.4 | Litigation | 51 |
| Section 7.5 | Investment Intention | 52 |
| Section 7.6 | Brokers | 52 |
| Section 7.7 | Equity Commitment Letters | 52 |
| Section 7.8 | No Reliance; Access to Information | 53 |
| Section 7.9 | Condition of the Business | 54 |
| Section 7.10 | Solvency | 54 |
| **Article VIII** | **COVENANTS** | **55** |
| Section 8.1 | Access to Information | 55 |
| Section 8.2 | Conduct of the Business Pending the Closing | 55 |
| Section 8.3 | Regulatory Approvals | 58 |
| Section 8.4 | Further Assurances | 60 |
| Section 8.5 | Confidentiality | 60 |
| Section 8.6 | Indemnification, Exculpation and Insurance | 61 |
| Section 8.7 | Preservation of Records; Access to Employees | 62 |
| Section 8.8 | Publicity | 63 |
| Section 8.9 | Employee Benefit Arrangements | 63 |
| Section 8.10 | Letters of Credit | 64 |
| Section 8.11 | Exclusivity | 64 |
| Section 8.12 | Equity Commitment Letters. | 65 |
| Section 8.13 | Financing Cooperation | 65 |
| Section 8.14 | Non-Solicitation and Non-Compete | 68 |
| Section 8.15 | Waiver | 68 |
| Section 8.16 | Termination of Related Party Agreements | 69 |
| Section 8.17 | Cash Dividends | 69 |
| Section 8.18 | R&W Policy | 70 |
| Section 8.19 | Centerbridge Escrow | 70 |

ii

**Article IX CONDITIONS TO CLOSING**                                                          **70**
    Section 9.1    Conditions Precedent to Obligations of Purchaser                70
    Section 9.2    Conditions Precedent to Obligations of the Sellers             71
    Section 9.3    Frustration of Closing Conditions                              72

**Article X INDEMNIFICATION**                                                                 **72**
    Section 10.1    Survival of Provisions                                        72
    Section 10.2    Indemnification by Sellers                                    72
    Section 10.3    Indemnification by Purchaser                                  73
    Section 10.4    Indemnification Procedures                                    73
    Section 10.5    Certain Limitations on Indemnification                        75
    Section 10.6    Calculation of Losses                                         76
    Section 10.7    Exclusive Remedy                                              77
    Section 10.8    Offset/Setoff                                                 77

**Article XI TAX MATTERS**                                                                    **78**
    Section 11.1    Tax Returns                                                   78
    Section 11.2    Cooperation on Income Tax Matters                             79
    Section 11.3    Income Tax Refunds                                            79
    Section 11.4    Other Tax Matters                                             80
    Section 11.5    338 Election                                                  80
    Section 11.6    Payment of Sales, Use or Similar Taxes                        80
    Section 11.7    Survival                                                      80

**Article XII MISCELLANEOUS**                                                                 **81**
    Section 12.1    Expenses                                                      81
    Section 12.2    Submission to Jurisdiction; Consent to Service of Process; Waiver of Jury Trial    81
    Section 12.3    Entire Agreement; Amendments and Waivers; Exclusivity of Agreement; Specific Performance    82
    Section 12.4    Governing Law; Limitations on Suits against Financing Sources    83
    Section 12.5    Notices                                                       84
    Section 12.6    Severability                                                  85
    Section 12.7    Conflicts, Privilege and Seller Communications                85
    Section 12.8    Binding Effect; Assignment                                    86
    Section 12.9    Non-Recourse                                                  87
    Section 12.10   Counterparts                                                  87
    Section 12.11   Seller Representative                                         87

iii

**Exhibits**

Exhibit I      -    Seller Information
Exhibit II     -    Companies
Exhibit III    -    Excluded Net Working Capital Items
Exhibit IV     -    Form of Escrow Agreement
Exhibit V      -    Form of Griffin Minority Buyout Agreement
Exhibit VI     -    Form of BP Claim Assignment
Exhibit VII    -    Scrap Metal Calculation
Exhibit VIII   -    Net Working Capital Calculation

iv

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT, dated as of February 12, 2016 (the "Agreement"), by and among (i) Forterra Pipe & Precast, LLC, a limited liability company organized under the laws of Delaware (the "Purchaser"), (ii) USP Holdings Inc., a Delaware corporation ("Holdings"), (iii) the holders of common stock of Holdings listed on Exhibit I hereto under the heading "Stockholders" (each, a "Stockholder" and collectively, the "Stockholders"), (iv) the holders of Options (as defined herein) listed on Exhibit I hereto under the heading "Optionholders" (collectively with the Stockholders, the "Sellers" and each, individually, a "Seller"), and (v) Alabama Seller Rep Inc., a Delaware corporation, as designated agent on behalf of the Sellers ("Seller Representative"). Purchaser, Holdings, the Sellers and Seller Representative are each referred to in this Agreement as a "Party" and are collectively referred to in this Agreement as the "Parties."

## R E C I T A L S

WHEREAS, Holdings and each of the companies listed on Exhibit II hereto (including Holdings, each a "Company" and collectively with Holdings, the "Companies") are engaged in the design, manufacture, fabrication, production, distribution and sale of ductile iron pipe products and fittings, joint restraint products and other ductile iron products for use primarily in drinking water and wastewater infrastructure construction (the "Business");

WHEREAS, the Sellers in the aggregate (i) own all of the issued and outstanding shares of common stock of Holdings (collectively, the "Shares"), which Shares constitute all of the issued and outstanding shares of stock of Holdings, and (ii) hold all of the issued and outstanding Options;

WHEREAS, the Stockholders desire to sell to Purchaser, and Purchaser desires to acquire from the Stockholders, all of the issued and outstanding Shares, in each case, subject to the terms and conditions set forth herein;

WHEREAS, at the Closing (as defined below), all of the Options will be cancelled in exchange for payments, in each case, in accordance with the terms and subject to the conditions set forth herein;

WHEREAS, concurrently with the execution and delivery of this Agreement, and as an inducement to the Sellers' willingness to enter into this Agreement, Lone Star Fund IX (U.S.), L.P., a Delaware limited partnership (the "Guarantor"), has provided a limited guarantee (the "Limited Guarantee") to the Sellers with respect to certain of the Purchaser's obligations under this Agreement; and

WHEREAS, certain terms used in this Agreement are defined in Section 1.1.

## A G R E E M E N T

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

      **Section 1.1** <u>**Certain Definitions.**</u> For purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 1.1</u>:

      "<u>Accounting Principles</u>" means GAAP as consistently applied by Holdings in preparing the Financial Statements.

      "<u>Additional Purchaser Amount</u>" has the meaning set forth in <u>Section 2.3(g)(ii)</u>.

      "<u>Additional Seller Amount</u>" has the meaning set forth in <u>Section 2.3(g)(i)</u>.

      "<u>Affiliate</u>" means, (i) with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise, and (ii) in addition to the foregoing, with respect to any natural Person, such Person's spouse, former spouse, parents, children and siblings, including adoptive relationships and relationships through marriage, and any other relative of such Person that shares such Person's home.

      "<u>Agreement</u>" has the meaning set forth in the preamble.

      "<u>Allocation Certificate</u>" has the meaning set forth in <u>Section 2.2(i)</u>.

      "<u>Ancillary Agreements</u>" means the Purchaser Documents, the Seller Documents, and the Holdings Documents

      "<u>BP Claim</u>" means collectively, any all claims (including any cross-claims or counterclaims), causes of action, charges, complaints, litigation, demands, summons, subpoenas, inquiries, grievances, investigations, and disputes by United States Pipe and Foundry Company, LLC (or any other Company) relating to, arising from, or otherwise in connection with the Deepwater Horizon oil spill on or about April 20, 2010 involving BP, including, without limitation the claims made by United States Pipe and Foundry Company, LLC on or about April 22, 2014 pursuant to that certain Deepwater Horizon Economic and Property Settlement Business Economic Loss Claim Form and that certain Deepwater Horizon Economic and Property Settlement Start-Up Business Economic Loss Claim Form.

      "<u>BP Claim Assignment</u>" has the meaning set forth in <u>Section 3.2(a)(v)</u>.

      "<u>Business</u>" has the meaning set forth in the recitals.

      "<u>Business Day</u>" means any day of the year that is not a Saturday or Sunday on which national banking institutions in Detroit, MI are open to the public for conducting business and are not required or authorized to close.

<div align="center">2</div>

"Cap" means an amount equal to $8,000,000.

"Capitalized Lease" means, with respect to any Person, any lease of (or other agreements conveying the right to use) any property (whether real, personal or mixed) by such Person as lessee that, has been historically accounted for (or, with respect to leases entered into between the date hereof and the Closing, would be accounted for under application of the Accounting Principles) as a capital lease in the Financial Statements.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601 et seq.

"Claim" means any litigation, arbitration, written claim or other proceeding.

"Closing" has the meaning set forth in Section 3.1.

"Closing Balance Sheet" means the consolidated balance sheet of the Companies as of the Effective Time prepared in accordance with the Accounting Principles measured without giving effect to the consummation of the transactions contemplated hereby.

"Closing Company Cash" means the Company Cash as of the Effective Time determined in accordance with the Accounting Principles measured without giving effect to the consummation of the transactions contemplated hereby.

"Closing Consideration" has the meaning set forth in Section 2.2(b).

"Closing Date" has the meaning set forth in Section 3.1.

"Closing Scrap Metal" means the Scrap Metal as of the Effective Time.

"Closing Statement" means a closing statement setting forth Purchaser's calculation of (i) the Closing Balance Sheet and (ii) the following (calculated pursuant to the Closing Balance Sheet): (a) Closing Working Capital, (b) Closing Company Cash, (c) Closing Scrap Metal, (d) Debt Payoff Amount and (e) Transaction Expenses.

"Closing Working Capital" means the Net Working Capital as of the Effective Time determined in accordance with the Accounting Principles measured without giving effect to the transactions contemplated hereby.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Code § 4980B and any similar state Law.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral Source" means a source of (i) amounts recovered or recoverable by the indemnified party pursuant to any indemnification or contribution by, or indemnification, contribution or other agreement with, any third party, including any other purchase agreement relating to any of the Companies, or (ii) any insurance proceeds or other cash receipts or sources of reimbursement received or recoverable as an offset against a Loss (net of any costs incurred to recover such amounts), including under the R&W Policy.

3

"Collective Bargaining Agreement" has the meaning set forth in Section 5.14(a)(i).

"Companies" and "Company" have the meaning set forth in the recitals.

"Company Benefit Plan" means each "employee benefit plan" (as defined in Section 3(3) of ERISA, whether or not subject to ERISA), including, without limitation, any equity compensation, severance, termination pay, facility closing, redundancy, change-in-control, bonus, incentive, pension, savings, deferred compensation, supplemental pension, retirement, death benefit, health, life or disability insurance, dependent care, cafeteria, vacation, and all other compensation, benefit, fringe benefit and any other employee benefit or compensation plan, agreement, program, policy, or arrangement sponsored, maintained, contributed to, or required to be contributed to by the Companies, or to which the Companies is a party or has or could be expected to have any obligation or liability (whether actual or contingent), for the benefit of any current or former employee, officer, director or consultant of the Companies or any dependent or beneficiary thereof, excluding arrangements that the Companies are required to contribute to under Law, such as Social Security or workers compensation.

"Company Cash" means cash and cash equivalents of the Companies, as of the date of determination, less the amounts of any unpaid checks, drafts and wire transfers issued on or prior to the date of determination, calculated in accordance with the Accounting Principles (but without duplication of any such unpaid amounts being taken into account in the determination of the Net Working Capital, Estimated Working Capital or Closing Working Capital)).

"Company Employees" has the meaning set forth in Section 8.9(a).

"Company Group Employees" means, collectively, officers, directors and employees of the Companies and their respective Affiliates (other than Purchaser) and persons acting under any management, service, consulting, distribution, dealer or similar contract with respect to the Companies and their respective Affiliates (other than Purchaser).

"Company Insurance Policies" has the meaning set forth in Section 5.18.

"Confidentiality Agreement" means the confidentiality agreement executed by Purchaser on June 15, 2015.

"Contract" means any legally binding contract, agreement, commitment, deed, promise, undertaking, indenture, note, bond, mortgage, loan, instrument, lease or license or other legally binding understanding or arrangement, whether written or oral and whether express or implied.

"Copyrights" means all works of authorship, copyrights and registrations and applications thereto and therefor, and mask work rights.

"Current Assets" means, as of the date of determination, the aggregate consolidated amount of all current asset accounts of the Companies as of the Closing Date prepared in accordance with the Accounting Principles measured without giving effect to the consummation of the transactions contemplated hereby, but which shall exclude all items reflected on Exhibit III under the heading "Excluded Current Assets."

4

EX-2.6 Case: 18-31177    Document: 00515297113    Page: 456    Date Filed: 02/04/2020 136

Case 2:10-md-02179-CJB-DPC   Document 26293-2   Filed 02/05/20   Page 457 of 1003
Case 2:10-md-02179-CJB-DPC   Document 26193-2   Filed 02/05/2019   Page 571 of 1003

"Current Liabilities" means, as of the date of determination, the aggregate consolidated amount of all current liability accounts of the Companies as of the Closing Date prepared in accordance with the Accounting Principles measured without giving effect to the consummation of the transactions contemplated hereby, but which shall exclude all items reflected on Exhibit III under the heading "Excluded Current Liabilities."

"Debt Financing" has the meaning set forth in Section 8.13(a).

"Debt Payoff Amount" means the amount necessary to fully repay and discharge the Indebtedness of the Companies outstanding at and as of the Closing plus $10,000,000.

"Deductible" means an amount equal to $4,000,000.

"Disclosure Schedule" has the meaning set forth in Article V.

"Distribution Amount" means an amount equal to (i) the Closing Consideration plus (ii) the aggregate Exercise Price of the outstanding vested in-the-money Options (assuming the exercise thereof as of the Closing Date by payment of the Exercise Price in cash and not by a net exercise or other cashless exercise method).

"DOJ" means the Antitrust Division of the United States Department of Justice.

"Effective Time" means 11:59 p.m. Eastern Time on the Closing Date.

"Environmental Claims" means any written claims or notices of noncompliance or violation, or legal proceedings before any Governmental Authority alleging any violation, of any Environmental Law.

"Environmental Law" means any applicable federal, state, provincial, county, municipal or local Law, ordinance or regulation relating to the use, transportation, storage, disposal, release or threatened release of any Hazardous Materials, the protection of the environment or natural resources and human health and safety.

"Environmental Permits" means the Permits required under applicable Environmental Laws to operate the business of the Companies.

"Equity Commitment Letter(s)" has the meaning set forth in Section 7.7(b).

"Equity Financing" has the meaning set forth in Section 7.7(b).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity that is required to be aggregated with the Companies pursuant to Section 414 of the Code.

"Escrow Agent" means J.P Morgan Chase Bank National Association.

5

"Escrow Agreement" means the Escrow Agreement to be entered into at the Closing by the Seller Representative, Purchaser and the Escrow Agent, substantially in the form attached hereto as Exhibit IV.

"Estimated Balance Sheet" means the estimated consolidated balance sheet of the Companies as of the Effective Time without giving effect to the transactions contemplated hereby prepared in good faith.

"Estimated Closing Statement" has the meaning set forth in Section 2.3(a)(i).

"Estimated Company Cash" means the Company Cash estimated as of the Effective Time without giving effect to the transactions contemplated hereby as reflected on the Estimated Closing Statement and calculated pursuant to the Estimated Balance Sheet.

"Estimated Debt Payoff Amount" means the Debt Payoff Amount estimated as of the Effective Time without giving effect to the transactions contemplated hereby as reflected on the Estimated Closing Statement and calculated pursuant to the Estimated Balance Sheet measured without giving effect to the transactions contemplated hereby.

"Estimated Scrap Metal" means the Scrap Metal estimated in good faith by the Companies as of the Effective Time without giving effect to the transactions contemplated hereby as reflected on the Estimated Closing Statement.

"Estimated Transaction Expenses" means the Transaction Expenses estimated as of the Effective Time without giving effect to the transaction contemplated hereby as reflected on the Estimated Closing Statement and calculated pursuant to the Estimated Balance Sheet.

"Estimated Working Capital" means the Net Working Capital estimated as of the Effective Time without giving effect to the transactions contemplated hereby as reflected on the Estimated Closing Statement and calculated pursuant to the Estimated Balance Sheet.

"Excluded Matter" means any one or more of the following: (i) any change in the United States or foreign economies or securities or financial markets in general; (ii) any change that generally affects any industry in which any of the Companies operate; (iii) any change arising in connection with any natural or man-made disaster (including earthquakes, hurricanes, tornadoes or other acts of God), hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (iv) any action taken by Purchaser or its Affiliates with respect to the transactions contemplated hereby (excluding any action by Purchaser or its Affiliates in the exercise of their contractual rights arising under this Agreement or any of the other Contracts entered into in connection herewith); (v) any change in applicable Law or accounting rules, including GAAP occurring after the date hereof; (vi) any change or effect resulting from or relating to the pendency or public announcement of Purchaser as a party to this Agreement (or the transactions contemplated by this Agreement); or (vii) any failure of any of the Companies to meet any projection or forecast (provided that the exception in this clause (vii) shall not prevent or otherwise affect a determination that any circumstance underlying such failure has resulted in or contributed to a Material Adverse Effect); provided that in the case of clauses (i), (ii), (iii) and (v) above, change or failure does not have a materially disproportionate effect on the Companies, taken as a whole, compared to other companies in the same industry as the Companies.

6

"<u>Executive Payment</u>" means any bonus, change of control, severance, termination or other analogous payment due and payable by any of the Companies to any officer, director or employee of any of the Companies or any other Person upon (and as a direct or indirect result of) the consummation of the transactions contemplated by this Agreement (other than the Option Cancellation Payments and any payments or benefits (i) payable as a result of Purchaser offering, or Purchaser causing any of the Companies to offer, any such payment or benefit to any officer, director or employee of any of the Companies or (ii) potentially payable following the Closing pursuant to an agreement disclosed to Purchaser that would be triggered by a termination of employment or engagement of any officer, director or employee of any of the Companies on or following the Closing); <u>provided</u>, <u>however</u>, that Executive Payment shall not include any payment or obligation that has been paid or satisfied prior to the Closing.

"<u>Exercise Price</u>" means, with respect to any Option, the amount that would be required to be paid by the Optionholder to exercise such Option in full, whether or not such amount is actually paid.

"<u>FICA</u>" means the Federal Insurance Contributions Act, as amended.

"<u>Final Company Cash</u>" means Closing Company Cash (i) as shown in Purchaser's calculation delivered pursuant to <u>Section 2.3(b)</u> if no notice of disagreement with respect thereto is duly delivered pursuant to <u>Section 2.3(c)</u>; or (ii) if such a notice of disagreement is delivered, (A) as agreed by the Seller Representative and Purchaser pursuant to <u>Section 2.3(d)</u> or (B) in the absence of such agreement, as shown in the Independent Accountant's calculation delivered pursuant to <u>Section 2.3(d)</u>.

"<u>Final Debt Payoff Amount</u>" means the Debt Payoff Amount (i) as shown in Purchaser's calculation delivered pursuant to <u>Section 2.3(b)</u> if no notice of disagreement with respect thereto is duly delivered pursuant to <u>Section 2.3(c)</u>; or (ii) if such a notice of disagreement is delivered, (A) as agreed by the Seller Representative and Purchaser pursuant to <u>Section 2.3(d)</u> or (B) in the absence of such agreement, as shown in the Independent Accountant's calculation delivered pursuant to <u>Section 2.3(d)</u>.

"<u>Final Scrap Metal</u>" means Closing Scrap Metal (i) as shown in Purchaser's calculation delivered pursuant to <u>Section 2.3(b)</u> if no notice of disagreement with respect thereto is duly delivered pursuant to <u>Section 2.3(c)</u>; or (ii) if such a notice of disagreement is delivered, (A) as agreed by the Seller Representative and Purchaser pursuant to <u>Section 2.3(d)</u> or (B) in the absence of such agreement, as shown in the Independent Accountant's calculation delivered pursuant to <u>Section 2.3(d)</u>.

"<u>Final Transaction Expenses</u>" means the amount of any unpaid Transaction Expenses (i) as shown in Purchaser's calculation delivered pursuant to <u>Section 2.3(b)</u> if no notice of disagreement with respect thereto is duly delivered pursuant to <u>Section 2.3(c)</u>; or (ii) if such a notice of disagreement is delivered, (A) as agreed by the Seller Representative and Purchaser pursuant to <u>Section 2.3(d)</u> or (B) in the absence of such agreement, as shown in the Independent Accountant's calculation delivered pursuant to <u>Section 2.3(d)</u>.

7

"Final Working Capital" means Closing Working Capital (i) as shown in Purchaser's calculation delivered pursuant to Section 2.3(b) if no notice of disagreement with respect thereto is duly delivered pursuant to Section 2.3(c); or (ii) if such a notice of disagreement is delivered, (A) as agreed by the Seller Representative and Purchaser pursuant to Section 2.3(d) or (B) in the absence of such agreement, as shown in the Independent Accountant's calculation delivered pursuant to Section 2.3(d).

"Financial Statements" means, excluding any Companies prior to their direct or indirect acquisition by Holdings (i) the consolidated audited balance sheet and the related consolidated statements of results of operation, cash flows and stockholders' equity of the Companies for the fiscal years ended September 30, 2013, September 30, 2014 and September 30, 2015 and (ii) the consolidated unaudited balance sheet and the related consolidated statements of results of operations, cash flows and stockholders' equity of the Companies for the three-month period ended at December 31, 2015, in each case including the related notes and schedules thereto (except as otherwise noted in Section 5.6).

"Financing Sources" means the lenders and the other parties to the Debt Financing, if any, and any fee letters, engagement letters, joinder agreements, credit agreements, purchase agreements (other than this Agreement), indentures or other definitive agreements executed in connection with the Debt Financing, together with their Affiliates and such Persons' and their Affiliates' respective direct or indirect current, former and future directors, officers, employees, partners, attorneys, controlling persons, managers, advisors, agents, members, shareholders and representatives and their respective successors and assigns.

"Foreign Competition Laws" shall mean foreign (including supranational) statutes, ordinances, rules, regulations, orders, decrees, administrative and judicial directives, and other foreign (including supranational) laws, that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization, lessening of competition or restraint of trade or creating or strengthening a dominant position.

"Forward-Looking Data" has the meaning set forth in Section 7.8(a).

"FTC" means the United States Federal Trade Commission.

"Fully Diluted Ownership Percentage" means the percentage set forth opposite a Seller's name on Exhibit I under the heading "Fully Diluted Ownership Percentage."

"Fundamental Representations" has the meaning set forth in Section 9.1(a).

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Guarantor" has the meaning set forth in the recitals.

8

"Governmental Authority" means any government or governmental, administrative or regulatory body thereof, or political subdivision thereof, whether federal, state, local, foreign or supranational, or any department, agency, instrumentality or authority thereof, or any court, tribunal, self-regulatory body or arbitral or judicial body (including any grand jury).

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs and any related stockholders agreements, investors rights agreements, voting agreements, and other analogous agreements to which such Person is a party. For example, the "Governing Documents" of a corporation formed under the laws of one of the states of the United States are its certificate of incorporation and by-laws and the "Governing Documents" of a limited liability company formed under the laws of one of the states of the United States are its certificate of formation and its operating agreement or limited liability company agreement.

"Griffin" has the meaning set forth in this Section 1.1.

"Griffin Minority Buyout Amount" means $40,000,000.

"Griffin Minority Buyout Agreement" has the meaning set forth in Section 3.2(a)(iv).

"Griffin Member Agreement" has the meaning set forth in this Section 1.1.

"Griffin Minority Interest Buyout" means (i) the purchase by Purchaser of the 30% equity ownership interest of Griffin Pipe Products Co., LLC ("Griffin") held as of the date hereof by Amconstruct Corporation ("Amconstruct") or its Affiliates, pursuant to the terms of the Member Agreement, dated January 31, 2014, by and among Griffin, Holdings, Amconstruct and the other parties thereto (the "Griffin Member Agreement"), (ii) the termination of the Griffin Member Agreement and (iii) the resignation of any managers appointed by Amconstruct or its Affiliates to the board of managers of Griffin and of any observers appointed by Amconstruct or its Affiliates to the board of directors of Holdings.

"Hazardous Materials" means (i) any petroleum or petroleum products, radioactive materials, friable asbestos, urea formaldehyde and polychlorinated biphenyls; and (ii) any substance or chemical that falls within the definition of a "hazardous substance," "hazardous waste," or "hazardous material" under any Environmental Law.

"Holdings" has the meaning set forth in the preamble.

"Holdings Closing Certificate" has the meaning set forth in Section 3.2(a)(i).

"Holdings Documents" means the other agreements, documents, instruments and certificates contemplated by this Agreement to be executed by Holdings in connection with the consummation of the transactions contemplated by this Agreement.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

9

"Income Tax" means any Tax based upon, measured by, or calculated with respect to (i) net income or profits or overall gross income or gross receipts (including any capital gains or alternative minimum Tax) or (ii) multiple bases (including a corporate franchise, doing business, or occupation Tax) if one or more of the bases on which the Tax may be measured or calculated is described in clause (i) of this definition.

"Income Tax Return" means any return, report or statement required to be filed with respect to any Income Tax (including any attachments thereto, and any amendment thereof), including any information return, claim for refund, amended return or declaration of estimated Income Tax.

"Indebtedness" of any Person means, without duplication (i) the principal, accreted value, accrued and unpaid interest, prepayment and redemption premiums or penalties (if any), unpaid fees or expenses and other monetary obligations in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all liabilities in respect of Capitalized Leases; (iii) all obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance, surety bond or similar instrument (but only to the extent such amounts are then due and payable); (iv) all outstanding obligations of such Person for the deferred purchase price of property or services, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (including any earn out liabilities associated with past acquisitions but excluding (1) trade accounts payable, (2) any additional amounts payable as a result of an election by Holdings under Code § 338(h)(10) made with respect to the Custom Fab Inc. acquisition after the Closing and (3) any consulting fees or bonuses payable to Mark Meyer and Manuel Ruiz Rodriguez (or their Affiliates); (v) all outstanding obligations of such Person under interest rate or currency swap or other hedging transactions or agreements (valued at the termination value thereof and net of all payments owed to such Person or its Affiliates thereunder); (vi) all accumulated or declared but unpaid dividends of such Person; (vii) liabilities with respect to any current or former employee, officer or director of such Person or any of its subsidiaries that arise before or on the Closing Date relating to deferred compensation other than any consulting fees or bonuses payable to Mark Meyer and Manuel Ruiz Rodriguez (or their Affiliates); (viii) all deposits and moneys received by such Person in the form of an advance and all deferred revenue, including all liabilities with respect to customer or vendor cash deposits or advances held by the Company or any of its Subsidiaries; (ix) all unpaid management fees owed to any investor in or Affiliate of such Person; (x) all obligations of the type referred to in clauses (i) through (xi) of any Person the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise; and (xii) all obligations of the type referred to in clauses (i) through (xi) of any third Person secured by (or for which the holder of such obligations has an existing right, contingent or otherwise, to be secured by) any Lien on any property or asset of such first Person (whether or not such obligation is assumed by such first Person) or of any Subsidiary of such first Person. For clarity, Indebtedness of any Person shall not include any of the items set forth on Section 1.1(a) of the Disclosure Schedule.

"Indemnification Notice" has the meaning set forth in Section 10.4(a).

10

EX-2.6 Case: 18-31177    Document: 00515297113    Page: 462    Date Filed: 02/04/2020136

Case 2:10-md-02179-CJB-DPC    Document 26293-2    Filed 02/05/20    Page 463 of 1003
Case 2:10-md-02179-CJB-DPC    Document 26133-2    Filed 02/05/2019    Page 376 of 1003

"Indemnification Percentage" means, with respect to each Seller, such Seller's Fully Diluted Ownership Percentage.

"Indemnitees" mean the individuals who on or prior to the Closing Date were directors, officers or managers of any of the Companies.

"Indemnity Escrow Amount" means an amount equal to $8,000,000.

"Independent Accountant" means an independent accounting firm mutually agreeable in writing to the Seller Representative and Purchaser.

"Initial Purchase Price" has the meaning set forth in Section 2.2(b).

"Intellectual Property" means (i) all Patents, (ii) all Marks, (iii) all Copyrights and (iv) all Software and Technology.

"Interest Rate" means a rate per annum equal to the rate of interest published from time to time by *The Wall Street Journal*, Eastern Edition, as the "prime rate" at large U.S. money center banks during the period from the applicable due date of a payment to the date of actual payment.

"IP License" has the meaning set forth in Section 5.11(b).

"IRS" means the United States Internal Revenue Service and, to the extent relevant, the United States Department of the Treasury.

"Knowledge of Holdings" means the actual knowledge of Paul Ciolino, Bradley Overstreet, Robert Waggoner, Norbert Gross, Scot Aler and Pam Johnson after reasonable inquiry of each such person.

"Law" means any applicable foreign, supranational, federal, state or local law, statute, code, ordinance, rule or regulation.

"Lease" means any lease, sublease, license, concession or other right to occupy real property, including all assignments and amendments thereto and any guaranties thereof.

"Leased Real Property" means all real property leased, subleased or licensed to any Company or which any Company has a right or option to use or occupy, together with all structures, facilities, fixtures, systems, improvements and items of property previously or hereafter located thereon, or attached or appurtenant thereto, and all easements, rights and appurtenances relating to the foregoing.

"Legal Proceeding" means any judicial, administrative or arbitral, action, suit, audit, Claim or proceeding (public or private) by or before a Governmental Authority, and any other arbitration, mediation or similar body.

11

"Lien" means any lien, encumbrance, pledge, mortgage, security interest, charge (whether legal or equitable and whether fixed or floating), limitation, hypothecation, equitable interest, right of possession, use lease, tenancy, easement, encroachment, covenant, order, reservation, option or right of first refusal, imperfection of title, condition or restriction of any nature or other analogous item of any kind.

"Limited Covenants" means the covenants set forth in Sections 8.2(b)(ix), (x) (other than with respect to Material Contracts described in Section 5.12(a)(iii)), (xii), (xvi), and (xvii) (as it relates to any of the foregoing subsections of Section 8.2(b)).

"Limited Guarantee" has the meaning set forth in the recitals.

"Losses" has the meaning set forth in Section 10.2(a).

"Marks" means all trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, Internet domain names and corporate names, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof.

"Material Adverse Effect" means (a) with respect to the Companies, an event, occurrence, change, result, state of facts or effect that, individually or in the aggregate with other changes, conditions, occurrences, developments, events or effects, is or would reasonably be expected to be materially adverse to the business, assets, liabilities, results of operations or financial condition of the Companies, taken as a whole, excluding any event, occurrence, change or effect relating to or resulting from an Excluded Matter, and (b) with respect to the Sellers, Holdings and Purchaser, any change, condition, occurrence, development, event or effect that, individually or in the aggregate with other changes, conditions, occurrences, developments, events or effects, (i) materially impairs, or would reasonably be expected to materially impair, the ability of such Person to perform its obligations under this Agreement or (ii) prevents or materially delays, or would reasonably be expected to prevent or materially delay, the consummation of the transactions contemplated by this Agreement.

"Material Contracts" means all of the Contracts listed, or required to be listed on Section 5.12(a) of the Disclosure Schedule.

"Multiemployer Plan" has the meaning set forth in Section 5.13(e).

"Multiple Employer Plan" has the meaning set forth in Section 5.13(e).

"Net Working Capital" means, as of the date of determination, an amount equal to the Current Assets minus the Current Liabilities as of such date, in each case as determined in accordance with the Accounting Principles. Exhibit VIII hereto sets forth a sample calculation of Net Working Capital as of December 31, 2015, which calculation provides an example of the application of the methodologies and principles for determining Net Working Capital.

"Non-Recourse Party" has the meaning set forth in Section 4.4(d).

"Option" means any and all options, warrants or other rights to purchase or acquire capital stock of Holdings that are outstanding immediately prior to the Closing, including any option to purchase or acquire shares of stock of Holdings granted pursuant to that certain USP Holdings Inc. 2012 Stock Option Plan.

12

"Option Cancellation Payment" has the meaning set forth in Section 2.7(a).

"Option Taxes" means, with respect to any payment to be made by Holdings to any Optionholder through the payroll system of any of the Companies, the employee's portion of any and all Taxes attributable to such payment, including the employee's share of FICA, Medicare and similar employment Taxes and any applicable federal, state, local or foreign employment or payroll Taxes required to be deducted or withheld from such payment under applicable Law.

"Optional Put" means the put right described in Section 10(a) of the Griffin Member Agreement.

"Optionholder" means a holder of an Option immediately prior to the Closing.

"Optionholder Gross Closing Amount" means the sum of the gross amount of all Option Cancellation Payments to be paid to the Optionholders pursuant to Section 2.7.

"Optionholder Percentage" means the sum of all Optionholders' Fully Diluted Ownership Percentage.

"Order" means any order, injunction, judgment, decree, ruling, determination, award or writ of a Governmental Authority.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Companies consistent with past practice.

"Owned Real Property" means any real property owned by any Company, together with all buildings or other structures, facilities, fixtures, systems or improvements now or hereafter located thereon or attached or appurtenant thereto and all easements, licenses, rights and appurtenances related thereto.

"Parties" and "Party" have the meaning set forth in the preamble.

"Patents" means all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon.

"Payoff Letters" means the payoff letters setting forth (a) the respective amounts to be paid in order that the Debt Payoff Amount shall be paid at the Closing as provided under Section 2.2(c) and Section 3.2(d)(ii) and (b) that all Liens relating to such corresponding Indebtedness of the Companies are released.

"Permits" means any approvals, consents, licenses, permits, waivers, exemptions, orders, registrations, notices, certificates or other authorizations of a Governmental Authority.

"Permitted Liens" means (i) statutory Liens for current Taxes not yet due or delinquent (or which may be paid without interest or penalties) or the validity or amount of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP, (ii) mechanics', carriers', workers', repairers' and other similar Liens arising or incurred in the Ordinary Course of Business relating to obligations as to

13

which there is no default on the part of the Companies, or the validity or amount of which is being contested in good faith by appropriate proceedings, or pledges, deposits or other liens securing the performance of bids, trade contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation) for which adequate reserves have been established in accordance with GAAP, (iii) zoning, entitlement, conservation restriction and other land use or environmental regulations by Governmental Authorities, in each case, which individually and in the aggregate do not materially impair the present use of the properties or assets of any Company , (iv) Liens or restrictions under the Securities Act or any other federal or state securities Laws, and (v) all recorded exceptions, restrictions, easements, imperfections of title, charges, rights-of-way and other Liens that do not materially interfere with the present use of the assets of the Companies.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity.

"Personal Property Lease" means any lease of personal property by the Companies as lessee.

"Post-Closing Tax Period" means the period that begins on the day after the Closing Date and the portion of any Straddle Period beginning on the day after the Closing Date.

"Pre-Closing Taxes" means any Taxes of any of the Companies for any Pre-Closing Tax Period.

"Pre-Closing Tax Period" means any taxable period that ends on or before the Closing Date and, with respect to a Straddle Period, the portion of the taxable period that ends on and includes the Closing Date.

"Pre-Closing Covenant" means a covenant or other agreement set forth in this Agreement that by its nature is required to be performed at, by or prior to the Closing.

"Price Per Ton" means the Companies' weighted average purchase price per Ton of scrap metal during the 30-day period preceding the Closing.

"Purchase Price" has the meaning set forth in Section 2.2(a).

"Purchaser" has the meaning set forth in the preamble.

"Purchaser Closing Certificate" has the meaning set forth in Section 3.2(d)(v).

"Purchaser Documents" means the other agreements, documents, instruments and certificates contemplated by this Agreement to be executed by Purchaser in connection with the consummation of the transactions contemplated by this Agreement.

"Purchaser Indemnified Parties" means Purchaser, the Companies (after Closing), and their respective directors, managers, officers, employees, Affiliates, stockholders, members, agents, attorneys, representatives, successors and permitted assigns.

14

"Recent Balance Sheet" means the consolidated unaudited balance sheet as of the Recent Balance Sheet Date.

"Recent Balance Sheet Date" means December 31, 2015.

"Regulatory Law" means the Sherman Act, as amended, the Clayton Act, as amended, the HSR Act, the Federal Trade Commission Act, as amended, and all other Laws, including Foreign Competition Laws, that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization, lessening of competition or restraint of trade or creating or strengthening a dominant position.

"Release" has the meaning set forth in Section 101(22) of CERCLA (42 U.S.C. § 9601(22)).

"Related Party" means, with respect to any specified Person (i) any Affiliate of such specified Person, and any director, officer, executive employee, general partner or managing member of such Affiliate and (ii) any Person who serves as a director, officer, executive employee, partner, or member, of, or in a similar capacity for, such specified Person.

"Representatives" means, with respect to any Person, the officers, directors, principals, employees, agents, auditors, advisors, bankers, attorneys and other representatives of such Person.

"Reverse Termination Fee" has the meaning set forth in Section 4.4(a).

"R&W Policy" means a buyer's-side representation and warranty insurance policy that is being purchased and conditionally bound by Purchaser as of the date hereof.

"Scrap Metal" means Tons of scrap metal within finished goods and raw material inventory, less Tons of scrap metal within accounts payable and accrued receipts that were received by the Companies but unpaid as of the Closing.

"Scrap Metal Inventory" means Scrap Metal within finished goods and raw materials inventory. The value of the scrap tons component of finished goods will be calculated based on the number of finished good Tons in inventory per the Company's SAP system, multiplied by the weighted average manufactured cost of scrap in the 30 days prior to the Closing, and the value of the scrap raw material and the raw material Tons of scrap will be calculated based on the values in the Company's SAP system; provided that, in determining the foregoing, the Company shall use the same costing methodology and system generated reports used to generate the schedule set forth as Exhibit VII hereto and provided further that if the number of finished good Tons and raw material Tons as per the Company's SAP system deviates from the actual physical Tons on hand and owned by the Company by more than 2,500 Tons, the actual physical Tons on hand shall be used in place of the values in the Company's SAP system.

"Scrap Metal Payables" means Scrap Metal related payables within accounts payable and accrued receipts. The value of the scrap Tons in accounts payable and accrued receipts will be calculated as the sum of payables to all scrap vendors for Scrap Metal Inventory received prior to the Closing. The Tons of scrap in accounts payable and accrued receipts will be the aggregate

15

long tons due to all scrap vendors multiplied by 1.12. The Tons related to the payable due to each scrap vendor shall be calculated on a vendor-by-vendor basis by dividing the value of the scrap in accounts payable and accrued receipts by the price per Ton for each vendor in the corresponding invoice (or purchase order, in the event the Company has not been invoiced).

"Securities Act" means the Securities Act of 1933, as amended.

"Seller Closing Certificate" has the meaning set forth in Section 3.2(c)(ii).

"Seller Documents" means the other agreements, documents, instruments and certificates contemplated by this Agreement to be executed by a Seller or the Seller Representative in connection with the consummation of the transactions contemplated by this Agreement.

"Seller Funds" means Wynnchurch Capital Partners III, L.P., Comvest U.S. Pipe Holdings, LLC, Ocean Avenue Special Situations Fund, L.P., Ocean Avenue Fund II-A, L.P., and their affiliated funds.

"Seller Indemnified Parties" means the Sellers and their respective directors, managers, officers, employees, Affiliates, stockholders, members, agents, attorneys, representatives, successors and permitted assigns.

"Seller Objection" has the meaning set forth in Section 2.3(c).

"Seller Representative" has the meaning set forth in the preamble.

"Sellers" and "Seller" have the meaning set forth in the preamble.

"Shares" has the meaning set forth in the recitals.

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, and (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise.

"Stockholders" and "Stockholder" have the meaning set forth in the preamble to this Agreement.

"Stockholder Closing Amount" means an amount equal to (a) the Distribution Amount minus (b) the aggregate Exercise Price of the outstanding vested in-the-money Options, minus (c) the Optionholder Gross Closing Amount.

"Straddle Period" has the meaning set forth in Section 11.1(a).

"Subsidiary" means any Person, of which Holdings owns, directly or indirectly, any of the outstanding share capital, voting securities or other voting equity interests.

"Target Net Working Capital" means $125,160,000.

"Target Scrap Metal" means 38,752 Tons.

16

"Tax" or "Taxes" means, with respect to any Company: (a) all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees and assessments of any kind whatsoever, and any interest, penalty, addition to tax or additional amount with respect thereto, that are imposed, assessed, or collected on or from the Company by any Taxing Authority; (b) any liability of the Company for payment of amounts described in clause (a) of any other Person as a result of transferee liability, of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise through operation of law; (c) any liability for the payment of amounts described in clauses (a) or (b) as a result of any tax sharing, tax indemnity or tax allocation agreement or any other express or implied agreement to indemnify any other Person (other than commercial contracts, the principal subject matter of which is not Taxes, entered into in the Ordinary Course of Business containing customary Tax indemnification provisions); and (d) any Loss in connection with the determination, settlement, or litigation of any of the foregoing.

"Tax Matter" means any inquiry, claim, assessment, audit or similar event with respect to Income Taxes for which the Sellers may be liable under this Agreement.

"Tax Representations" has the meaning set forth in Section 10.1.

"Tax Return" means any return, declaration, report, statement, information statement, worksheet, schedule or other document filed, required to be filed or required to be prepared (including any documentation required to be prepared in connection with any applicable transfer pricing Law) with respect to Taxes, including any claims for refunds of Taxes and any amendments or supplements of any of the foregoing.

"Taxing Authority" means the IRS and any other Governmental Authority responsible for the administration of any Tax.

"Technology" means, collectively, all information, designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein.

"Termination Date" has the meaning set forth in Section 4.1(a).

"Third Party Claim" means any Legal Proceeding instituted, or any Claim asserted, by any third party (other than any of the Purchaser Indemnified Parties or Seller Indemnified Parties) in respect of which payment may be sought by any of the Purchaser Indemnified Parties or Seller Indemnified Parties under Section 10.2 or Section 10.3 of this Agreement.

"Threshold" means Seventy-Five Thousand Dollars ($75,000).

17

"Tons" means two thousand pounds.

"Transaction Expenses" means obligations of the Companies or the Sellers for all legal and other fees, costs and expenses incurred in connection with the process of selling the Companies, the negotiation, preparation and execution of this Agreement, the Seller Documents, the Purchaser Documents, and the performance and consummation of the transactions contemplated herein and therein, including the Executive Payments and the employer's share of Medicare and similar employment Taxes and any applicable federal, state, local or foreign payroll Taxes required to be paid by any of the Companies in connection with the payment of the Option Cancellation Payments, the Executive Payments and any Transaction Expenses that are compensation payments, other than the employer's share of Social Security Taxes; provided, however, that Transaction Expenses shall not include any Option Cancellation Payments and that Transaction Expenses shall not include any obligations or expenses that are paid or satisfied prior to the Effective Time. To the extent that any Transaction Expense becomes payable after completion of the purchase price true-up in Section 2.3 (such as employer-paid taxes on amounts payable to the Optionholders from release of the Indemnity Escrow Amount), the Sellers shall promptly reimburse the Purchaser for such Transaction Expenses.

"Transfer Taxes" means sales, use, value added, goods and services, documentary, transfer, stamp, stock transfer, real property transfer or gains or similar taxes, fees or charges (together with any interest, penalties or additions in respect thereof) imposed by any Governmental Authority as a result of, or payable or collectible or incurred in connection with, the transactions contemplated by this Agreement.

"Unresolved Objections" has the meaning set forth in Section 2.3(d)(ii).

"WARN" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and the rules and regulations promulgated thereunder, as well as any similar foreign, state or local law, regulation or ordinance.

**Section 1.2 Other Definitional and Interpretive Matters.**

(a) Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i) Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii) Dollars. Any reference in this Agreement to "Dollars" or "$" shall mean U.S. dollars.

(iii) Exhibits/Schedules. The Exhibits and Schedules, including the Disclosure Schedule, to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. Any matter or item disclosed for one item or section of the Disclosure Schedule shall be deemed to have been disclosed on each other

18

item or section of the Disclosure Schedule to the extent it is reasonably apparent on the face of such disclosure that such disclosed information is applicable thereto. Holdings and the Sellers may, at their option, include in the Disclosure Schedule matters or items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such matters or items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. No disclosure on the Disclosure Schedule relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv) <u>Gender and Number</u>. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v) <u>Headings</u>. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Article" or "Section" are to the corresponding Article or Section of this Agreement unless otherwise specified.

(vi) <u>Herein</u>. The words such as "<u>herein</u>," "<u>hereinafter</u>," "<u>hereof</u>," and "<u>hereunder</u>" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii) <u>Including</u>. The word "<u>including</u>" or any variation thereof means (unless the context of its usage otherwise requires) "<u>including, without limitation</u>" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. The word "<u>or</u>" shall be inclusive and not exclusive unless the context otherwise requires.

(viii) <u>Dates and Times</u>. With respect to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

(b) The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

(c) References to documents or other materials "provided" or "made available" to Purchaser shall mean that such documents or other materials were present at least one (1) Business Day prior to the date of this Agreement in the on-line data room maintained by the Companies for purposes of the transactions contemplated herein and accessible by Purchaser.

19

## ARTICLE II
## SALE AND PURCHASE OF SHARES; PURCHASE PRICE

**Section 2.1** **Sale and Purchase of Shares; Treatment of Options**. Subject to the terms and conditions hereof, at the Closing, (a) each Stockholder shall sell, assign, transfer and convey to Purchaser, and Purchaser shall purchase, acquire and accept from such Stockholder, free and clear of any Liens, the Shares set forth opposite such Stockholder's name on Exhibit I attached hereto and (b) Options shall be cancelled and extinguished in accordance with Section 2.7 below.

**Section 2.2** **Purchase Price; Calculation and Payment of Closing Consideration.**

(a) The aggregate purchase price consideration ("Purchase Price") to be paid for all of the Shares and Options is (i) the Closing Consideration, as hereinafter defined, subject to adjustment in accordance with Section 2.3 plus (ii) any amounts paid to the Sellers out of the Indemnity Escrow Amount.

(b) At the Closing, Purchaser shall pay to the Sellers (including the Optionholders) (i) Seven Hundred Eighty Million Dollars ($780,000,000) (the "Initial Purchase Price") plus (ii) the amount, if any, by which Estimated Working Capital exceeds Target Net Working Capital; minus (iii) the amount, if any, by which Target Net Working Capital exceeds Estimated Working Capital; plus (iv) (x) the amount, if any, by which Estimated Scrap Metal exceeds Target Scrap Metal, multiplied by (y) Price Per Ton; minus (v) (x) the amount, if any, by which Target Scrap Metal exceeds Estimated Scrap Metal, multiplied by (y) Price Per Ton (provided, however, that for purposes of computing the Closing Consideration, in no event will the aggregate amount payable by Purchaser pursuant to clauses (ii) through (v) exceed $10,000,000, although such limitation shall have no effect on the calculation of the Final Working Capital); plus (vi) the amount of any Estimated Company Cash; minus (vii) the Estimated Debt Payoff Amount, minus (viii) the amount of any Estimated Transaction Expenses, minus (ix) the Indemnity Escrow Amount, minus (x) the Griffin Minority Buyout Amount (but only to the extent the Optional Put is not exercised and closed prior to Closing). The foregoing amount paid at Closing is referred to as the "Closing Consideration." The Closing Consideration is subject to adjustment following the Closing as set forth in Section 2.3 hereof and shall be paid as set forth in this Section 2.2.

(c) At the Closing, Purchaser shall, by wire transfer of immediately available funds, deliver on behalf of the Companies the Estimated Debt Payoff Amount to the Persons owed the Debt Payoff Amount (as set forth in the Payoff Letters) as directed in writing by Holdings.

(d) At the Closing, Purchaser shall, by wire transfer of immediately available funds, pay the Stockholder Closing Amount to the Stockholders in accordance with the Allocation Certificate (as defined below).

(e) At the Closing, Purchaser shall deliver to Holdings, for the benefit of the Optionholders, the Optionholder Gross Closing Amount by wire transfer of immediately available funds, as directed in writing by Holdings, for payment by Holdings to such Optionholders through Holdings' or any of its Subsidiaries' payroll system;

20

(f) At the Closing, Purchaser shall, by wire transfer of immediately available funds, pay on behalf of the Companies the Transaction Expenses due at Closing as directed in writing by Holdings; provided that, if so directed by Holdings, any such amounts which constitute compensation payments shall instead be delivered to Holdings for payment by Holdings (reduced by the amount of any Taxes that are required to be deducted and withheld with respect to such payment) to such individual through Holdings' or any of its Subsidiaries' payroll system.

(g) At the Closing, Purchaser shall deposit or cause to be deposited the Indemnity Escrow Amount with the Escrow Agent by wire transfer in immediately available funds, to be managed and paid out by the Escrow Agent pursuant to the terms of the Escrow Agreement.

(h) At the Closing, if the Optional Put has not been exercised and closed prior to Closing, Purchaser shall, by wire transfer of immediately available funds, pay the Griffin Minority Buyout Amount to Amconstruct Corporation in accordance with the terms of the Griffin Minority Buyout Agreement.

(i) At least three (3) Business Days prior to the Closing Date, the Seller Representative, on behalf of the Sellers, shall deliver to Purchaser a certificate (the "Allocation Certificate") setting forth (i) for each Stockholder the portion of the Stockholder Closing Amount to which such Stockholder is entitled pursuant to this Agreement in exchange for all Shares held by such Stockholder immediately prior to the Closing, (ii) the Optionholder Gross Closing Amount, and (iii) the gross amount of each Option Cancellation Payment to be paid to each Optionholder pursuant to Section 2.7 below. The Allocation Certificate shall be used for purposes of determining the amounts paid hereunder on the Closing Date. Purchaser shall be entitled to rely on, and each Seller shall be bound for all purposes under this Agreement by, the Allocation Certificate.

### Section 2.3 Closing Amounts.

(a) At least three (3) days prior to the Closing Date, Holdings shall deliver to Purchaser (i) a statement prepared in good faith (the "Estimated Closing Statement") setting forth (A) the Estimated Balance Sheet, (B) the Estimated Working Capital, (C) the Estimated Company Cash, (D) the Estimated Scrap Metal, (E) the Debt Payoff Amount and (F) the outstanding Transaction Expenses and (ii) the executed Payoff Letters in form reasonably satisfactory to Purchaser.

(b) As promptly as practicable, but no later than ninety (90) days after the Closing Date, Purchaser shall cause to be prepared and delivered to the Seller Representative, on behalf of the Sellers, the Closing Statement.

(c) If the Seller Representative disagrees with Purchaser's calculation of the items set forth in the Closing Statement delivered pursuant to Section 2.3(b), the Seller Representative may, within forty-five (45) days after delivery of the Closing Statement to the

21

Seller Representative, deliver a notice (a "Seller Objection") to Purchaser stating that the Sellers disagree with such calculation and specifying in reasonable detail those items or amounts as to which the Sellers disagree and the nature, amount and basis therefor (and any amount or calculation not so objected to shall become final and binding on all the Parties). If no such Seller Objection shall have been so delivered within such time period, the Closing Statement shall become final and binding on all parties hereto.

(d) If the Seller Representative timely delivers a Seller Objection, all objections set forth therein shall be resolved as set forth below.

(i) If a Seller Objection shall be duly delivered pursuant to Section 2.3(c), the Seller Representative, on behalf of the Sellers, and Purchaser shall, during the thirty (30) days following such delivery, use their commercially reasonable efforts to reach agreement in good faith on the disputed items or amounts in order to determine, as may be required, the amount of Closing Working Capital, Closing Company Cash, Closing Scrap Metal, the Debt Payoff Amount and/or Transaction Expenses. If Purchaser and the Seller Representative are able to resolve any or all such objections within such 30-day period, the Purchaser and the Seller Representative shall, within such 30-day period, jointly prepare and sign a statement setting forth in reasonable detail the calculation of all amounts included in the Closing Statement and the deviation of such amounts from those included in the Closing Statement, which such calculations shall be final and binding on all parties hereto.

(ii) If during such period, the Seller Representative and Purchaser are unable to reach such agreement on all objections set forth in the Seller Objection, then either the Seller Representative or Purchaser shall, within 15 days after the expiration of such 30-day period, submit to the Independent Accountant for resolution of the disputed items or amounts which remain unresolved (as provided in the Closing Statement and Seller Objection) (the "Unresolved Objections") for the purpose of calculating Closing Working Capital, Closing Company Cash, Closing Scrap Metal, the Debt Payoff Amount and/or Transaction Expenses. Each of Purchaser and the Seller Representative agrees to execute, if requested by the Independent Accountant, a reasonable engagement letter. Purchaser and the Seller Representative shall cooperate with the Independent Accountant and promptly provide all documents and information requested by the Independent Accountant. In making such calculation, the Independent Accountant shall be empowered and authorized only to resolve the Unresolved Objections and may not assign a value to any item greater than the greatest positive or negative adjustment requested by Seller Representative in the Seller Objection or Purchaser in the Closing Statement for such item. The Independent Accountant shall deliver to the Seller Representative and Purchaser, as promptly as practicable (but in any case no later than sixty (60) days from the date of engagement of the Independent Accountant), a written report setting forth its calculation of such Unresolved Objections. Such report shall be final and binding upon the Sellers and Purchaser, and, absent a showing of fraud or manifest error, none of Purchaser or the Sellers shall seek further recourse to courts or other tribunals, other than to enforce such report. Judgment may be entered to enforce such report in any court of competent jurisdiction. The fees and expenses of the review and report incurred by the Independent Accountant shall be allocated to and borne by Purchaser and the Sellers

22

based on the inverse of the percentage that the Independent Accountant's determination (before such allocation) bears to the total amount of the items in dispute as originally submitted to the Independent Accountant. For example, should the amount of the items in dispute total $1,000 and the Independent Accountant awards $600 in favor of the Sellers' position, 60% of the costs of its review would be borne by Purchaser and 40% of the costs would be borne by the Sellers. The fees, costs and expenses of the accountants, attorneys and other representatives of each Party incurred in connection with the matters described in this <u>Section 2.3</u> shall be borne by such Party.

(e) The Sellers, Purchaser and Holdings shall, and shall cause their respective representatives to, reasonably cooperate and assist in the review of the Closing Statement and the calculation of Closing Working Capital, Closing Company Cash, Closing Scrap Metal, the Debt Payoff Amount and Transaction Expenses and in the conduct of the review referred to in this <u>Section 2.3</u>, including reasonable access during normal business hours to the necessary books, records, work papers and personnel to the other Parties. Without limiting the foregoing, from and after the date of the delivery of the Closing Statement until the time payments in accordance with this <u>Section 2.3</u> are finally determined, Purchaser shall, and shall cause the Companies to, provide reasonable access during normal business hours to the Companies' contracts, books, records (including accounting or financial records), work papers, personnel (including accounting or financial personnel and counsel of Purchaser or the Companies) and advisors and representatives, in each case to the extent relevant to the verification of the Closing Statement (or the calculation of Closing Working Capital, Closing Company Cash, Closing Scrap Metal, the Debt Payoff Amount or Transaction Expenses), to the Seller Representative, its accountants, counsel, financial advisors and other representatives (and Purchaser shall reasonably cooperate with and provide reasonable assistance to, and shall cause the personnel, advisors and representatives of Purchaser and the Companies to reasonably cooperate with and provide reasonable assistance to, the Seller Representative, its accountants, counsel, financial advisors and other representatives and the Independent Accountant) for the purpose of conducting the review by the Seller Representative or the Independent Accountant, as applicable, of the Closing Statement (or the calculation of Closing Working Capital, Closing Company Cash, Closing Scrap Metal, the Debt Payoff Amount or Transaction Expenses), and the resolution of any disputes relating thereto; provided, that, notwithstanding anything to the contrary in this <u>Section 2.3</u>, such access shall not (i) unreasonably disrupt the normal operations of such first party or any of its Affiliates, (ii) include access to materials that are subject to any attorney-client, work-product or other privilege legally available to Purchaser or (iii) include any access to any working papers of any independent accountant unless customary confidentiality and hold harmless agreements have been first executed.

(f) Upon determination of Final Working Capital, Final Company Cash, Final Scrap Metal, the Final Debt Payoff Amount, the Final Transaction Expenses, the following adjustments to the Purchase Price shall be made:

(i) If Final Working Capital exceeds the Estimated Working Capital, the Purchase Price shall be increased, in the manner provided in <u>Section 2.3(g)</u>, by the amount of such excess.

23

(ii) If Final Working Capital is less than the Estimated Working Capital, the Purchase Price shall be decreased, in the manner provided in Section 2.3(g) and Section 2.4, by the amount of such deficiency.

(iii) If Final Company Cash exceeds the Estimated Company Cash, the Purchase Price shall be increased, in the manner provided in Section 2.3(g), by the amount of such excess.

(iv) If Final Company Cash is less than the Estimated Company Cash, the Purchase Price shall be decreased, in the manner provided in Section 2.3(g) and Section 2.4, by the amount of such deficiency.

(v) If Final Scrap Metal exceeds the Estimated Scrap Metal, the Purchase Price shall be increased, in the manner provided in Section 2.3(g), by the amount of such excess.

(vi) If Final Scrap Metal is less than the Estimated Scrap Metal, the Purchase Price shall be decreased, in the manner provided in Section 2.3(g) and Section 2.4, by the amount of such deficiency.

(vii) If the Final Debt Payoff Amount exceeds the Estimated Debt Payoff Amount, the Purchase Price shall be decreased, in the manner as provided in Section 2.3(g) and Section 2.4, by the amount of such excess.

(viii) If the Final Debt Payoff Amount is less than the Estimated Debt Payoff Amount, the Purchase Price shall be increased, in the manner as provided in Section 2.3(g), by the amount of such deficiency.

(ix) If the Final Transaction Expenses exceed the Estimated Transaction Expenses, the Purchase Price shall be decreased, in the manner as provided in Section 2.3(g) and Section 2.4, by the amount of such excess.

(x) If the Final Transaction Expenses are less than the Estimated Transaction Expenses, the Purchase Price shall be increased, in the manner as provided in Section 2.3(g), by the amount of such deficiency.

(g) Within five (5) Business Days after Final Working Capital, Final Company Cash, Final Scrap Metal, the Final Debt Payoff Amount and the Final Transaction Expenses have become final and binding:

(i) if the net Purchase Price adjustment amount pursuant to Section 2.3(f) is positive (such amount, the "Additional Seller Amount"), then Purchaser shall, by wire transfer of immediately available funds:

(a) pay each Stockholder an amount equal to (1) the Additional Seller Amount multiplied by (2) such Stockholder's Fully Diluted Ownership Percentage; and

24

(b) pay to Holdings, for the benefit of the Optionholders, a gross amount equal to the Optionholder Percentage of the Additional Seller Amount (and each Optionholder shall be entitled to receive through the payroll system of Holdings, or any of its Subsidiaries, such Optionholder's Fully Diluted Ownership Percentage of the Additional Seller Amount less the amount of Option Taxes with respect to such payment).

(ii) if the net Purchase Price adjustment amount pursuant to Section 2.3(f) is negative (the "Additional Purchaser Amount"), then, subject to Section 2.4, the Sellers shall, by wire transfer of immediately available funds, pay the Additional Purchaser Amount to Purchaser by wire transfer of immediately available funds.

(iii) All payments under this Section 2.3 shall be without interest, except any amounts not paid when required by this Section 2.3 shall bear interest from the date due pursuant to this Section 2.3(g) to, and including, the date of payment, at the Interest Rate. Such interest shall be payable at the same time as the payment to which it relates and shall be calculated daily on the basis of a year of 365 days and the actual number of days elapsed.

Section 2.4 **Seller Payments.** Notwithstanding anything to the contrary in this Agreement, to the extent that the Sellers shall be obligated to make any payment pursuant to Section 2.3(g)(ii), the Sellers shall be so obligated severally, and not jointly, and each Seller shall only be obligated to pay an amount equal to the applicable Seller's Fully Diluted Ownership Percentage of the aggregate amount payable by the Sellers; provided, that, notwithstanding the foregoing, Purchaser shall have the right, but not the obligation, to obtain any such amounts payable by the Sellers from the Indemnity Escrow Amount, in which case, Purchaser and the Seller Representative shall provide joint written instructions to the Escrow Agent directing the Escrow Agent to release to Purchaser such amount.

Section 2.5 **Tax Treatment of Payments.** Any payments made with respect to adjustments made pursuant to Section 2.3 and any indemnity payments made pursuant to Article X or any other provision of this Agreement shall be deemed to be, and the Sellers and Purchaser agree to treat such payments as, an adjustment to the Purchase Price for Tax purposes, except as otherwise required by applicable Law.

Section 2.6 **Reimbursement of Payments.** In the event that on or after the Closing the Sellers (and/or any Seller's Affiliates) receive any payment either (i) belonging to Purchaser or the Companies or (ii) inadvertently paid by Purchaser to any Seller, such Seller (and/or such Seller's Affiliates) shall hold such payment in trust for Purchaser or the Companies, as applicable, and remit such payment to Purchaser or the Companies, as applicable, in the form received within five (5) Business Days of receipt of such payment. In the event that on or after the Closing the Companies or Purchaser (and/or any of Purchaser's Affiliates) receive any payment (i) belonging to any Seller or (ii) inadvertently paid by any Seller to Purchaser or the Companies, the Purchaser, the Companies or such Purchaser Affiliate, as applicable, shall hold such payment in trust for such Seller and remit such payment to such Seller in the form received within five (5) Business Days of receipt of such payment. All payments under this Section 2.6 shall be without interest, except any amounts not paid when required by this Section 2.6 shall

25

bear interest from the date due pursuant to this Section 2.6 to, and including, the date of payment, at the Interest Rate. Such interest shall be payable at the same time as the payment to which it relates and shall be calculated daily on the basis of a year of 365 days and the actual number of days elapsed.

### Section 2.7 Cancellation of Options

(a) At the Closing, by virtue of the Closing and without any further action on the part of any of the Companies or any Optionholder, each Option shall automatically be cancelled and extinguished. In consideration for the cancellation and extinguishment of each Optionholder's vested Options (including, for the avoidance of doubt, any Option that by its terms vests as a result of the transactions contemplated hereby), the Optionholder shall only have the right to receive from Holdings the following payments (to be made in each instance in accordance with Section 2.7(b)): (A) at the Closing, a single lump sum cash payment equal to such Optionholder's Fully Diluted Ownership Percentage of the Distribution Amount with respect to such Optionholder's vested Options less the aggregate Exercise Price for such Optionholder's Options (the "Option Cancellation Payment"), (B) if applicable, such Optionholder's Fully Diluted Ownership Percentage of any Additional Seller Amount pursuant to Section 2.3(g)(i)(b)), (C) if applicable such Optionholder's Fully Diluted Ownership Percentage of any refund of Income Taxes for any Pre-Closing Tax Period, payable at the time set forth in Section 11.3, and (D) if applicable, such Optionholder's Fully Diluted Ownership Percentage of any distribution from the Indemnity Escrow Amount, payable at the time set forth in the Escrow Agreement. No consideration shall be paid for the cancellation and extinguishment of any unvested Options.

(b) Each payment to an Optionholder hereunder shall be made as soon as practicable following the relevant payment triggering event (and in all events by the first payroll date that occurs at least five Business Days following the relevant payment triggering event) through the payroll system of Holdings or one of its Subsidiaries and shall be reduced by the amount of Option Taxes that are required to be deducted and withheld with respect to such payment. Holdings shall, in a timely manner, pay all amounts withheld from payments to Optionholders to the appropriate Taxing Authorities. To the extent that Option Taxes are deducted and withheld, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Optionholders in respect of which such deduction and withholding was made. For the avoidance of doubt, the Option Cancellation Payments (A) shall be deemed made on the Closing Date and any corresponding Tax deductions shall be allocated to the taxable period (or portion thereof) ending on the Closing Date and (B) shall be includible in each Optionholder's income on the Closing Date.

(c) From the date of this Agreement until the earlier of (i) the Closing (in which case the Options will be cancelled as set forth in this Section 2.7) and (ii) the termination of this Agreement pursuant to its terms, each Optionholder agrees that it shall not, and shall not be entitled to, exercise any Options held by such Optionholder. For the avoidance of doubt, from and after the Closing, the Optionholders shall cease to have any rights with respect to such Optionholder's Options except as otherwise provided for under this Agreement.

26

## ARTICLE III
## CLOSING

**Section 3.1 <u>Closing; Closing Date</u>.** Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place (a) at the offices of Foley & Lardner, LLP, 500 Woodward Ave, Suite 2700, Detroit, MI 48226 on the date that is thirteen (13) Business Days following the satisfaction or waiver of all conditions precedent specified under <u>Article IX</u> hereof (except for those conditions which by their terms are to be satisfied at Closing, but subject to the satisfaction or waiver of such conditions), provided that if such date is earlier than April 15, 2016, then the Closing shall take place on April 15, 2016 or any earlier date as may be specified by Purchaser on no fewer than three (3) Business Days' prior notice or (b) on such other date and at such other place and time as Purchaser and Seller Representative may agree in writing (such date, the "<u>Closing Date</u>"). The Closing shall be deemed to occur at the Effective Time.

**Section 3.2 <u>Closing Deliveries</u>.**

(a) At Closing, Holdings shall deliver or cause to be delivered to Purchaser:

(i) an officer's certificate, dated as of the Closing Date, duly executed by an authorized officer of Holdings, relating to the satisfaction of the Closing conditions set forth in <u>Section 9.1(a)</u> (as it relates to Holdings), <u>Section 9.1 (b)</u> and <u>Section 9.1(e)</u> (the "<u>Holdings Closing Certificate</u>");

(ii) a certificate of the Secretary of Holdings certifying that attached thereto is a true and complete copy of resolutions adopted by the board of directors of Holdings authorizing the execution, delivery and performance of this Agreement and the Holdings Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby;

(iii) a resignation from each of the Companies, as applicable, of each officer or director of the Companies listed in <u>Section 3.2</u> of the Disclosure Schedule, effective as of the Closing;

(iv) if the Optional Put has not been exercised and closed prior to Closing, evidence reasonably satisfactory to Purchaser that the Griffin Minority Interest Buyout has been consummated or will be consummated concurrently with the Closing, in all material respects in the form attached hereto as <u>Exhibit VI</u> (the "<u>Griffin Minority Buyout Agreement</u>"); and

(v) a counterpart of the assignment and assumption agreement related to the BP Claim in substantially the form attached hereto as <u>Exhibit VII</u> (the "<u>BP Claim Assignment</u>"), duly executed by the applicable Company.

(b) At Closing, each Seller shall deliver or cause to be delivered to Purchaser original stock certificate(s) or affidavits of lost stock representing the Shares, as applicable, owned by such Seller, duly endorsed in blank or accompanied by applicable transfer powers.

27

(c) At Closing, the Seller Representative shall deliver (or shall cause to be delivered) to Purchaser:

(i) an executed counterpart to the Escrow Agreement;

(ii) an officer's certificate, dated as of the Closing Date, duly executed by an authorized officer of the Seller Representative on behalf of each of the Sellers, relating to the satisfaction of the Closing conditions set forth in Section 9.1(a) (as it relates to each such Seller) and Section 9.1(b) (as it relates to each such Sellers) (the "Seller Closing Certificate"); and

(iii) either (A) a duly executed certificate, in compliance with Treasury Regulations Sections 1.897-2(h) and 1.1445-2(c)(3), certifying that the shares of stock of Holdings are not United States real property interests within the meaning of Code Section 897(c) and that the transactions contemplated by this Agreement are exempt from withholding under Code Section 1445, and a form of notice to the Internal Revenue Service in accordance with the requirements of Treasury Regulations Section 1.897-2(h)(2), each in a form acceptable to the Purchaser, or (B) certifications of non-foreign status executed by each Seller (or, if any Seller is a disregarded entity for U.S. federal income tax purposes, a certificate from such Seller's regarded owner for such purposes) and satisfying the requirements of § 1.1445-(b)(2)(i), of the United States Treasury Regulations promulgated under the Code, certifying that the transactions contemplated by this Agreement are exempt from withholding under Section 1445 of the Code, each in a form acceptable to the Purchaser; provided that notwithstanding Section 9.1 (f) such delivery shall not be a condition to the obligation of Purchaser to consummate the transactions contemplated by this Agreement, but if Seller Representative fails to deliver such certificates Purchaser shall be permitted to withhold from the consideration payable pursuant to this Agreement the amount required by Section 1445 of the Code.

(d) At Closing, Purchaser shall deliver (or cause to be delivered) or shall pay (or cause to be paid) by wire transfer of immediately available funds pursuant to written instructions delivered to Purchaser prior to Closing, as the case may be:

(i) to each Stockholder, the amounts payable to such Stockholder pursuant to Section 2.2(d);

(ii) to each Person owed the Debt Payoff Amount (or portion thereof), an amount equal to the Debt Payoff Amount (or portion thereof) owed to such Person (as set forth in the Payoff Letters) as directed in writing by Holdings;

(iii) to Holdings, for the benefit of the Optionholders, the Optionholder Gross Closing Amount by wire transfer of immediately available funds, as directed in writing by Holdings, for payment by Holdings to such Optionholders through Holdings' or one of its Subsidiaries' payroll systems;

28

(iv) to each Person or Persons owed any Transaction Expenses, an amount equal to the Transaction Expenses owed to such Person or Persons as directed in writing by Holdings; provided that, if so directed by Holdings, any such amounts which constitute compensation payments shall instead be delivered to Holdings for payment by Holdings to such individual through Holdings' or one of its Subsidiaries' payroll systems;

(v) to the Sellers, an officer's certificate, dated as of the Closing Date, duly executed by an authorized officer of Purchaser, relating to the satisfaction of the Closing conditions set forth in Section 9.2(a) and Section 9.2(b) (the "Purchaser Closing Certificate");

(vi) to the Sellers, a certificate of the Secretary of Purchaser certifying that attached thereto is a true and complete copy of resolutions adopted by the board of managers of Purchaser authorizing the execution, delivery and performance of this Agreement and the Purchaser Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby; and

(vii) to the Seller Representative, an executed counterpart to the Escrow Agreement.

(e) As soon as practicable following Closing (following Holdings receipt of the payment contemplated by Section 2.2(d) above), Holdings shall pay to the Optionholders the Option Cancellation Payments (less the amount of Option Taxes with respect to such Option Cancellation Payments) pursuant to Section 2.7.

(f) Purchaser or Seller, as applicable, shall be entitled to deduct and withhold from the payments otherwise payable pursuant to this Agreement such amounts (or portions thereof) as Purchaser or Seller is legally required to deduct and withhold with respect to the making of such payment under the Code, the rules and regulations promulgated thereunder or any provision of applicable Law. To the extent that amounts are so deducted or withheld and paid over to the appropriate Governmental Authority by Purchaser or Seller, as the case may be, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made by Purchaser or Seller.

(g) Notwithstanding anything to the contrary herein, but without limiting Purchaser's obligations hereunder (including Purchaser's obligation to pay the Closing Consideration), Purchaser shall be entitled at the Closing to direct that any of the Shares be transferred by the Sellers to one or more of the Purchaser's Affiliates in lieu of any such transfer to Purchaser itself.

## ARTICLE IV
## TERMINATION

Section 4.1 **Termination of Agreement.** This Agreement may be terminated on any date prior to the Closing as follows:

29

(a) by either the Seller Representative or Purchaser on or after the date which is seventy-five (75) days from the date hereof, if the Closing shall not have occurred by the close of business on such date (the "Termination Date"); provided, however, that (1) no Party shall have the right to terminate this Agreement pursuant to this paragraph (a) if the failure of such Party to perform or comply in all material respects with the covenants and agreements of such Party set forth in this Agreement shall have been the primary cause of, or primarily resulted in, the failure of the Closing to be consummated by the Termination Date and (2) Seller Representative or Purchaser may elect to extend the Termination Date to the date which is one hundred fifty (150) days from the date hereof by providing written notice thereof to the other Party on the date that is seventy-five (75) days after the date hereof to the extent that on the date that is seventy-five (75) days after the date hereof all of the conditions set forth in Sections 9.1 (in the case of an extension by Seller Representative) or Section 9.2 (in the event of an extension by Purchaser) have been satisfied or waived, other than the conditions (i) with respect to actions the relevant Party is required to take at the Closing itself as provided herein and (ii) set forth in Section 9.1(c) or (d) (in the case of an extension by Seller Representative) or Section 9.2(c) or (d) (in the event of an extension by Purchaser), and with regard to Section 9.1(c) or Section 9.2(c) to the extent related in whole or in part to or arising under any Regulatory Laws. In the event of such extension, the "Termination Date" shall be the date which is one hundred fifty (150) days from the date hereof, or such other date as the Parties agree in writing;

(b) by mutual written consent of the Seller Representative and Purchaser;

(c) by the Seller Representative or Purchaser if there shall be in effect a final nonappealable Order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the Parties shall promptly appeal any adverse determination which is appealable (and pursue such appeal with reasonable diligence); provided, however, that the right to terminate this Agreement under this Section 4.1(c) shall not be available to a Party if such Order was primarily due to the failure of such Party to perform any of its obligations under this Agreement;

(d) by Purchaser, if Holdings or the Sellers shall have breached or failed to perform any of its or their representations, warranties, covenants or agreements set forth in this Agreement or any Seller Document, or if any representation or warranty of Holdings or the Sellers shall have become untrue, which breach or failure to perform or to be true, either individually or in the aggregate, if occurring or continuing at the Closing, (i) would result in the failure of any of the conditions set forth in Section 9.1 and (ii) cannot be or has not been cured by the earlier of (A) the Termination Date and (B) 45 days after the giving of written notice by Purchaser to the Seller Representative of such breach or failure; provided, that Purchaser shall not have the right to terminate this Agreement pursuant to this paragraph (d) if Purchaser is then in material breach of any of its representations, warranties, covenants or agreements (other than those that by their nature are to be performed at Closing) set forth in this Agreement.

(e) by the Seller Representative, if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or agreements set forth in this Agreement or any Purchaser Document, or if any representation or warranty of Purchaser shall have become untrue, which breach or failure to perform or to be true, either individually or in the

30

aggregate, if occurring or continuing at the Closing, (i) would result in the failure of any of the conditions set forth in Section 9.2 and (ii) cannot be or has not been cured by the earlier of (A) the Termination Date and (B) 45 days after the giving of written notice by the Seller Representative to Purchaser of such breach or failure; provided, that the Seller Representative shall not have the right to terminate this Agreement pursuant to this paragraph (e) if any Seller is then in material breach of any of its representations, warranties, covenants or agreements (other than those that by their nature are to be performed at Closing) set forth in this Agreement.

(f) by the Seller Representative, if the Closing shall not have occurred on or before the date required by Section 3.1, all of the conditions set forth in Section 9.1 would be satisfied at the time of such termination if the Closing were held at the time of such termination (other than conditions that, by their nature, are to be satisfied at the Closing), and the Sellers stood ready, willing and able to complete the Closing on the date required by Section 3.1 and at the time of termination.

Section 4.2 **Procedure Upon Termination.** In the event of a valid termination of this Agreement by Purchaser or the Seller Representative pursuant to Section 4.1 hereof, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate, and the purchase of the Shares hereunder shall be abandoned, without further action by Purchaser, Holdings or the Sellers.

Section 4.3 **Effect of Termination**. In the event that this Agreement is validly terminated in accordance with Section 4.1 and 4.2, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to any of the Parties (or any of the Companies); provided, that no such termination shall relieve any Party from liability for any breach of this Agreement or for fraud, in which case the non-breaching Party shall be entitled to all rights and remedies available at law or in equity; provided, further, that the obligations of the Parties set forth in the Confidentiality Agreement, this Article IV (Termination), Section 5.19 (Brokers), Section 6.6 (Brokers), Section 7.6 (Brokers), Section 8.5 (Confidentiality), Section 8.8 (Publicity), Section 8.14(a) (Non-Solicitation) (with respect to the period prior to termination) and Article XII hereof shall survive any such termination and shall be enforceable hereunder.

Section 4.4 **Reverse Termination Fee.**

(a) In the event that this Agreement is terminated by the Seller Representative pursuant to Section 4.1(e) or Section 4.1(f), then the Purchaser shall pay to Holdings a fee of $40,000,000 (the "Reverse Termination Fee"), it being understood that in no event shall the Purchaser be required to pay the Reverse Termination Fee on more than one occasion. The parties hereto agree that the Reverse Termination Fee is a liquidated damage, and not a penalty.

(b) Payment of the Reverse Termination Fee shall be made by wire transfer of immediately available funds pursuant to written instructions delivered to Purchaser by Holdings as promptly as reasonably practicable after termination of this Agreement (and, in any event, within three (3) Business Days thereof). The Parties acknowledge that the agreements contained in this Section 4.4 are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, the Parties would not enter into this Agreement; accordingly, if

31

Purchaser fails to promptly pay the amount due pursuant to Section 4.4(a), and, in order to obtain such payment, the Seller Representative (on behalf of Holdings and the Sellers) commences a suit that results in a judgment against Purchaser for the amount set forth in Section 4.4(a), Purchaser shall pay to the Seller Representative or its designee its reasonable out-of-pocket costs and expenses paid to independent third parties (including attorneys' fees) in connection with such suit, together with interest on such amount at the Interest Rate on the date such payment was required to be made through the date of payment, but subject to Section 4.4(c) ("Seller's Collection Fees and Expenses").

(c) Notwithstanding anything to the contrary in this Agreement, and without limiting to the Seller's right in respect of specific performance pursuant to Section 12.3(c), upon payment of (i) the Reverse Termination Fee and (ii) any other amounts payable or reimbursable to the Seller Representative, Sellers or Holdings pursuant to this Agreement or any other Ancillary Agreements, including Seller's Collection Fees and Expenses, if any, pursuant to Section 4.4(b) (the aggregate of the amounts referred to in (i) – (ii) above, the "Aggregate Termination Amount"), none of the Purchaser or the Guarantor shall have any further liability or obligation to the Sellers or their Affiliates relating to or arising out of this Agreement, the Limited Guarantee, the Equity Commitment Letters, the Equity Financing or the failure of the acquisition of the Company or any other transaction contemplated hereby or in any other agreement set forth above to be consummated, or in respect of any oral representation made or alleged to be have been made in connection herewith or therewith, whether in equity or at law, in contract, in tort or otherwise, and in such event, the Sellers shall not and shall cause their Affiliates not to seek to recover any money damages or obtain any equitable relief from the Purchaser or the Guarantor.

(d) No Non-Recourse Party shall have any monetary liability to any Person for any loss suffered as a result of any breach of this Agreement (including any claim for failure to pay the Reverse Termination Fee), the Limited Guarantee or the Financing Commitments or the failure of the Closing to occur or any other transaction contemplated hereby to be consummated, whether in equity or at law, in contract, in tort or otherwise. "Non-Recourse Party" means any current, former or future directors, officers, general or limited partners, stockholders, members, managers, controlling persons, Affiliates, employees, representatives or agents of the Purchaser, the Guarantor, or the Equity Financing Source provided, however that the term "Non-Recourse Party" shall not include the Purchaser or the Guarantor.

(e) Notwithstanding anything to the contrary in this Agreement, and without limiting to the Seller's right in respect of specific performance pursuant to Section 12.3(c), the Parties acknowledge and agree that, unless the Closing occurs, the maximum aggregate liability of Purchaser and the Guarantor under this Agreement or relating to the transactions contemplated hereby (inclusive of payment of the Reverse Termination Fee) shall be limited to an amount equal to the Aggregate Termination Amount, and in no event shall the Sellers, the Company or any other Person seek to recover any money damages in excess of such amount. Sellers shall be entitled to pursue both a grant of specific performance under Section 12.3(c) and the payment of the Aggregate Termination Amount under this Section 4.4, but under no circumstances shall Sellers be permitted or entitled to receive both a grant of specific performance under Section 12.3(c) and an award of money damages, including all or any portion of the Reverse Termination Fee.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF HOLDINGS

Subject to the exceptions disclosed in the corresponding sections or subsections of the disclosure schedule delivered by Holdings to Purchaser (the "Disclosure Schedule"), Holdings hereby represents and warrants to Purchaser as of the date hereof and, provided the Closing occurs, as of the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case, as of such earlier date) that:

**Section 5.1 Organization and Good Standing.** Each Company is a corporation, limited liability company or other entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization as set forth in Section 5.1 of the Disclosure Schedule. Each Company is duly qualified or authorized to do business as a foreign entity or a foreign-invested entity and is in good standing under the Laws of each jurisdiction in which it owns real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not, individually or in the aggregate, have a Material Adverse Effect. Holdings has provided to Purchaser a complete and correct copy of the certificate of incorporation and bylaws and other Governing Documents, each as amended to date, of each Company. Such documents are in full force and effect, and none of the Companies is in material violation of any of the provisions thereof.

**Section 5.2 Authorization of Agreement.** Holdings has all requisite power and authority to execute and deliver this Agreement and each other Holdings Document and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Holdings Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Holdings. This Agreement has been, and each of the Holdings Documents will be at or prior to the Closing, duly and validly executed and delivered by Holdings and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each of the Holdings Documents will, when so executed and delivered, constitute, the legal, valid and binding obligations of Holdings, enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 5.3 Conflicts; Consents of Third Parties.**

(a) Except as set forth in Section 5.3(a) of the Disclosure Schedule, none of the execution and delivery by Holdings of this Agreement or the Holdings Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Holdings with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or, in the case of clause (iii) and (iv) only, a material violation of or material default (with or without notice or lapse of time, or both) under, result in the creation of any Lien under, or give rise to a right of termination, modification, acceleration or cancellation under, any provision of (i) the Governing Documents

33

of the Companies; (ii) any Order of any Governmental Authority applicable to the Companies or by which any of the properties or assets of the Companies are bound; (iii) any applicable Law; or (iv) any Material Contract or Lease to which any Company is a party or by which any Company or any of its properties, assets or rights is bound.

(b) Except as set forth in Section 5.3(b) of the Disclosure Schedule and except as would not result in a Material Adverse Effect, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Governmental Authority or party to any Material Contract to which any Company is a party or by which the Companies or any of their properties, assets or rights is bound, is required on the part of Holdings or any other Company in connection with the execution and delivery of this Agreement or the Holdings Documents by Holdings, or the compliance by Holdings with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby, except for (i) the filing of notification and report forms with the FTC and the DOJ under the HSR Act and the expiration or termination of any applicable waiting period thereunder and (ii) the filing of all applications and notices, as applicable, with Governmental Authorities under the Foreign Competition Laws, the issuance of consents, authorizations or approvals of such applications by such authorities, if required, and the expiration or termination of any applicable waiting periods thereunder.

**Section 5.4 Capitalization.**

(a) The authorized capital stock of Holdings consists of 150,000 shares of common stock, and 150,000 shares of preferred stock. There are 0 shares of preferred stock issued and outstanding and 84,782.378 shares of common stock issued and outstanding, which constitute all of the Shares. Each outstanding share of capital stock or other equity or ownership interest of each of the Companies, including the Shares, is duly authorized, validly issued, fully paid and non-assessable. Except as set forth in this Section 5.4 or in Section 5.4(a) of the Disclosure Schedule, Holdings has no other class or series of authorized, issued or outstanding shares of capital stock. Exhibit I sets forth a true and complete list of the name and address of each Stockholder together with the number and class of Shares held by such Stockholder, and the name and address of each Optionholder. Section 5.4(a) of the Disclosure Schedule sets forth the number of Options held by such Optionholder and the vesting terms and Exercise Price(s) of such Options.

(b) Except as set forth in Section 5.4(b) of the Disclosure Schedule, the Companies have not issued or granted or agreed to issue or grant any: (i) capital stock or other equity or ownership interests; (ii) options, rights, warrants, calls or other outstanding securities convertible into or exercisable or exchangeable for shares of capital stock of any Company, or any outstanding subscriptions, options, rights, warrants, calls, rights of first refusal or offer, or other Contracts (contingent or otherwise) obligating any Company to issue or transfer from treasury any shares of its capital stock or to issue, grant or sell other securities of any Company or securities convertible into or exchangeable for shares of its capital stock; or (iii) bond, debenture or other Indebtedness having the right to vote or convertible or exchangeable or exercisable for securities having the right to vote; and there are no subscriptions, options, warrants, calls, rights, commitments or agreements of any character to which any Company is a party or by which it is bound obligating or permitting any Company to purchase, redeem or otherwise acquire the securities of any Person.

34

(c) Except as set forth in Section 5.4(c) of the Disclosure Schedule, there are no (i) shares of capital stock reserved for issuance or outstanding or authorized stock appreciation, phantom stock, or other equity equivalent or equity-based awards or rights or similar rights with respect to any Company or (ii) voting trusts, stockholders agreements, registration rights agreements, proxies or any other agreements or understandings with respect to the voting, holding, transfer registration or disposition of the capital stock of any Company, including the Shares.

(d) Holdings has provided a Sale Notice (as defined in the Mueller Purchase Agreement) in compliance with the right of first refusal granted to Mueller Water Products, Inc. pursuant to Section 5.19 of the Purchase Agreement, dated as of March 7, 2012, by and among USP Holdings Inc., Mueller Group, LLC and Mueller Water Products, Inc. (the "Mueller Purchase Agreement") and Mueller Water Products, Inc. failed to respond to the Sale Notice within the Exercise Period (as defined in the Mueller Purchase Agreement).

**Section 5.5 Subsidiaries.** Section 5.5 of the Disclosure Schedule sets forth a true and complete list of (a) each Subsidiary (each of which, for the avoidance of doubt, is also listed on Exhibit II hereto), (b) each Subsidiary's jurisdiction of incorporation or organization, (c) the amount of each Subsidiary's outstanding capital stock (and other equity interests or securities) and (d) the holders of the issued and outstanding capital stock (or other equity interests) of each Subsidiary. Except as set forth in Section 5.5 of the Disclosure Schedule, all the outstanding shares of capital stock (or other equity interests or securities) of each Subsidiary are owned by Holdings or by another wholly owned subsidiary of Holdings, free and clear of all Encumbrances. Except as set forth in Section 5.5 of the Disclosure Schedule, Holdings does not, directly or indirectly, own any capital stock or other equity interests, or any interest convertible into, exercisable for or exchangeable for any such capital stock or other equity interests, in any other Person. No Company is under any current obligation to form or participate in, provide funds to, make any loan, capital contribution or other investment in, or assume any liability or obligation of, any person.

**Section 5.6 Financial Statements.**

(a) Section 5.6(a) of the Disclosure Schedule contains true and complete copies of the Financial Statements. Except as set forth in the notes thereto and subject to, in the case of the unaudited interim financial statements, ordinary course year-end adjustments that are not individually or in the aggregate material and the absence of footnote disclosure, each of the Financial Statements has been prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated and presents fairly in all material respects the consolidated financial position, consolidated results of operations and consolidated cash flows and stockholders' equity of the Companies as at the dates and for the periods indicated therein.

(b) Except as set forth on Section 5.6(b) of the Disclosure Schedule, to the Knowledge of Holdings there are no debts, liabilities or obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or determinable, of any of the

35

Companies, other than any such debts, liabilities or obligations (i) to the extent accrued or reserved against in the Recent Balance Sheet, (ii) incurred in the Ordinary Course of Business of the Companies since the Recent Balance Sheet Date, (iii) for obligations arising under Company Benefit Plans (excluding any obligations related to the breach or other violation thereof) and Contracts to which any of the Companies are party and that have been disclosed to Purchaser prior to the date hereof or that are not required to be disclosed pursuant to the terms of this Agreement (excluding any obligations related to the breach or other violation thereof) or (iv) that are not material to the Companies, taken as a whole.

Section 5.7 **Absence of Certain Developments.** Except as contemplated by this Agreement or as set forth in Section 5.7 of the Disclosure Schedule, since the Recent Balance Sheet Date, (a) the Companies have conducted their respective businesses in the Ordinary Course of Business; (b) there has not been any event, occurrence, change, result, state of facts or effect that, individually or in the aggregate, has had or is reasonably likely to have a Material Adverse Effect; and (c) none of the Companies has taken any action that, if taken after the date of this Agreement, would constitute a breach of any of the covenants set forth in Section 8.2.

Section 5.8 **Taxes.** Except as set forth in Section 5.8 of the Disclosure Schedule:

(a) (i) All Income Tax Returns required to be filed by or with respect to the Companies have been timely filed and (ii) all such Tax Returns are true, correct and complete in all material respects. All Taxes due and payable by the Companies have been timely paid in full (whether or not such Taxes were shown or reportable on any Tax Return). The Companies have established reserves on their Financial Statements, in accordance with GAAP, that are adequate for the payment of any Pre-Closing Taxes that are not yet due and payable. All Taxes for which any of the Companies has become liable since the end of the most recent period included in the Financial Statements have been incurred in the ordinary course of business and adequate reserves for their payment have been established by the Companies consistent with past custom and practice.

(b) No Company (i) is a party to or bound by any Tax allocation, sharing, or indemnification agreement (other than commercial contracts, the principal subject matter of which is not Taxes, entered into in the ordinary course of business and containing customary Tax indemnification provisions) or (ii) has any liability for the Taxes of any Person (other than the Companies) under Treasury Regulation §1.1502-6 (or any similar provision of any Law) or as a transferee or successor.

(c) No Tax deficiencies have been proposed, asserted or assessed against any Company in writing that are still pending. No Tax Return of any of the Companies is being examined or audited by any Taxing Authority, and no such examination or audit is proposed or threatened in writing against any of the Companies. There is no refund litigation, proposed adjustment or matter in controversy with respect to any Taxes due and owing by any of the Companies. Any deficiency resulting from any completed audit or examination relating to Taxes by any Taxing Authority has been timely paid.

36

(d) None of the Companies is subject to a waiver of any statute of limitations in respect of Taxes or any extension of the time to assess or collect any Taxes of any Company. None of the Companies is subject to or has any outstanding request for any private ruling from any Taxing Authority. None of the Companies is currently the beneficiary of any extension of time within which to file a Tax Return. No power of attorney has been executed by or on behalf of any of the Companies with respect to Taxes that is currently in force.

(e) No claim has been made by any Taxing Authority in any jurisdiction where any of the Companies does not file Tax Returns that any of the Companies is or may be subject to Tax by that jurisdiction.

(f) None of the assets of any of the Companies is subject to any encumbrance for Taxes, other than Permitted Liens.

(g) None of the Companies has (i) taken a reporting position on a Tax Return that, if not sustained, would be reasonably likely to give rise to a penalty for substantial understatement of federal income Tax under Section 6662 of the Code (or any similar provision of state, local or foreign Law), without regard to any disclosure thereof, (ii) engaged in any transaction that would constitute a "reportable transaction" within the meaning of Section 6111 of the Code (or any similar provision of state, foreign or local Law), or (iii) participated in any transaction that would reasonably be likely to require the filing of an IRS Schedule UTP (determined without regard to any asset threshold that may avoid the requirement of filing such schedule).

(h) None of the Companies is a party to or bound by any closing agreement, offer in compromise, gain recognition agreement, or other agreement with any Taxing Authority.

(i) All transactions among the Companies within the 4-year period ending on the Closing Date have been conducted at arm's-length and comply with section 482 of the Code and comparable provisions of applicable foreign Tax Law.

(j) None of the Companies will be required to include any material item of income or gain or exclude any material item of deduction or loss from taxable income for any taxable period or portion thereof after the Closing as a result of (i) any change in method of accounting made or imposed prior to the Closing pursuant to Section 481(a) of the Code or any similar provision of state or local law, or otherwise; (ii) closing agreement under Section 7121 of the Code (or any corresponding provision of applicable Law) executed prior to the Closing; (iii) installment sale or open transaction disposition consummated prior to the Closing; (iv) prepaid amount received prior to the Closing; (v) indebtedness discharged in connection with any election under Section 108(i) of the Code (or any corresponding provision of applicable Law) made prior to the Closing; or (vi) deferred intercompany gain or excess loss account under Treasury Regulations under Section 1502 of the Code (or any corresponding provision of applicable Law) in connection with a transaction consummated prior to the Closing.

(k) There is no application pending with any Taxing Authority requesting permission for any change in accounting method that relates to the business or assets of any of the Companies.

37

(l) None of the Companies has been a "distributing corporation" or a "controlled corporation" in connection with a distribution described in Section 355 of the Code.

(m) Each of the Companies has withheld and paid to the appropriate taxing authority all Taxes required to have been withheld and paid by it in connection with any amounts paid by the Companies to any employee, independent contractor, creditor, stockholder, or other Person. Each of the Companies is in compliance with, and its records contain all information and documents necessary to comply with, all applicable information reporting and withholding requirements under all applicable Tax Laws.

(n) Notwithstanding any other provision of this Agreement, Holdings makes no representation or warranty regarding the amount, availability, or use of any Tax attributes (including net operating loss carry forwards, Tax credits and Tax bases) of the Companies after the Closing.

**Section 5.9 Real Property.**

(a) Section 5.9(a) of the Disclosure Schedule sets forth a complete list of all Owned Real Property, together with a true, correct and accurate street address or similar identifying description for each Owned Real Property. Other than the Owned Real Property set forth on Section 5.9(a) of the Disclosure Schedule and other than any real property transferred to Mueller Water Products, Inc., Mueller Group, LLC or any of their respective Affiliates in connection with the transactions contemplated by that certain Purchase Agreement dated as of March 7, 2012 by and among such parties and Holdings, none of the Companies has owned any interest in real property since April 1, 2012. Except as set forth in Section 5.9(a) of the Disclosure Schedule, the Companies (i) have good and valid fee title to all Owned Real Property, free and clear of all Liens, other than Permitted Liens, and (ii) have not leased any parcel or any portion of any parcel of any Owned Real Property to any other Person. Holdings has made available to Purchaser copies of recent title commitments for each parcel of Owned Real Property and all title insurance policies and surveys relating to the Owned Real Property, in each case to the extent in its possession or control. Sellers have made available to Purchaser true and accurate legal descriptions for all of the Owned Real Property.

(b) Section 5.9(b) of the Disclosure Schedule lists the address of each parcel of Leased Real Property and the identity of the lessor, lessee, current occupant (if different from lessee) and the term of each Lease for Leased Real Property. Except as set forth in Section 5.9(b) of the Disclosure Schedule, Holdings (i) has made available to Purchaser true and complete copies of the Leases relating to the Leased Real Property and (ii) has paid all base rents, deposits and additional rents due pursuant to such Leased Real Property (and no security deposit or portion thereof has been applied in respect of a breach or default under such Leased Real Property that has not been redeposited in full). Except as set forth in Section 5.9(b) of the Disclosure Schedule, there has not been any sublease or assignment entered into by any Seller in respect of the leases relating to such Leased Real Property, no other party to any lease with respect to the Leased Real Property is an Affiliate of, or otherwise has any economic interest in, any Seller and no Seller has subleased, licensed or otherwise granted any Person the right to use or occupy any Leased Real Property or any portion thereof. Except as set forth in Section 5.9(b) of the Disclosure Schedule, the Leases relating to the Leased Real Property are in full force and effect and no Company is in breach of or default under in any material respect, or has provided or received any written notice of any intention to terminate, any Lease.

38

(c) The Owned Real Property, the Leased Real Property and the Leases constitute all interests in real property currently used, occupied or held for use by the Companies in connection with the Business. There are no condemnation, expropriation or other proceedings in eminent domain pending or, to the Knowledge of Holdings, threatened, with respect to any Owned Real Property or Leased Real Property.

(d) To the Knowledge of Holdings, the current use and occupancy of the Owned Real Property and the operation of the business therein does not violate in any easement, covenant, condition, restriction or similar provision in any instrument of record or other unrecorded agreement in a manner which would have a Material Adverse Effect. Except for the vacant land located in Lynchburg, Virginia, all of the improvements on the Real Property abut on and have direct vehicular access to a public road or has access to a public road via a permanent, irrevocable, appurtenant easement benefiting the Real Property and comprising a part of the Real Property. No Company has received any notice of any violation of any easement, covenant, condition, restriction or similar provision in any instrument of record or other unrecorded agreement which would have a Material Adverse Effect. To the Knowledge of Holdings, there is no existing or proposed eminent domain proceeding that would result in the taking of all or any part of any Real Property or that would prevent or hinder the continued use of any Real Property as heretofore used. To the Knowledge of Holdings, there are no public improvements in progress or proposed that will result in special assessments against or otherwise adversely affect any of the Real Property in any material respect.

(e) There are no outstanding options or rights of first refusal or rights of first offer to purchase any of the Owned Real Property, any portion thereof or any similar agreement that would have priority over the Companies' respective rights to title of, or a leasehold interest in, the Owned Real Property or Leased Real Property or any portion thereof or interest therein upon consummation of the transactions contemplated by this Agreement.

**Section 5.10 Tangible Personal Property.** The Companies own title to, or have a valid and enforceable Personal Property Lease or license with respect to, all material tangible personal property presently used in the operation of the Business by the Companies and none of such tangible personal property is subject to any Lien, except for Permitted Liens. None of the Companies, and to the Knowledge of Holdings, no other party is in default under any of the Personal Property Leases, licenses or other Contracts pursuant to which any Company holds or operates such tangible personal property or assets. All tangible personal property owned or leased by the Companies have been maintained in all material respects in accordance with generally accepted industry practice, are in all material respects in reasonable operating condition and repair, ordinary wear and tear excepted.

**Section 5.11 Intellectual Property.**

(a) Section 5.11(a) of the Disclosure Schedule contains a complete and accurate list of all issued and applied for Patents, registered and applied for Marks, material unregistered Marks, and registered and applied for Copyrights of the Companies.

39

EX-2.6 Case: 18-31177 Document: 00515297113 Page: 491 Date Filed: 02/04/2020 02/04/2020136

Case 2:10-md-02179-CJB-DPC Document 26293-2 Filed 02/05/20 Page 492 of 1003
Case 2:10-md-02179-CJB-DPC Document 26193-2 Filed 02/05/2019 Page 426 of 1003

(b) Section 5.11(b) of the Disclosure Schedule sets forth a complete and accurate list of all agreements (other than agreements with respect to "off-the-shelf" Software with a replacement cost or annual license fee of less than $250,000 in the aggregate) between any Company, on the one hand, and any other Person, on the other hand, (i) granting any other Person the right to use or practice any rights under any of the Intellectual Property owned by the Companies other than non-exclusive licenses entered into in the Ordinary Course of Business or (ii) granting the Companies the right to use or practice any rights under any Intellectual Property owned by another Person (collectively, the "IP Licenses").

(c) Except as set forth in Section 5.11(c) of the Disclosure Schedule, (i) the material Intellectual Property used by the Companies is not the subject of any written challenge received by the Companies and (ii) the Companies have not received any written notice of any material default or any event that with notice or lapse of time, or both, would constitute a material default under any IP License.

(d) The Companies have taken commercially reasonable steps to safeguard and maintain the secrecy and confidentiality of, and any proprietary rights in, all trade secrets included in the Intellectual Property used by the Companies in the operation of the Business. The conduct of the Business has not infringed, misappropriated, or otherwise violated, and does not infringe, misappropriate, or otherwise violate, any Intellectual Property of any Person. The Companies have not authorized the disclosure of, and to the Knowledge of Holdings no current or former employee, officer, consultant or contractor of the Companies has disclosed, any such trade secret except under obligations of confidentiality.

(e) The Companies have taken commercially reasonable steps and implemented commercially reasonable safeguards intended to cause the computer, information technology and data processing systems, facilities and services owned or controlled by the Companies and used by the Companies in connection with the conduct of the Business ("Systems") to be secure from unauthorized access and free from any material defects, disabling codes or instructions, spyware, trojan horses, worms, viruses or other software routines that permit or cause unauthorized access to, or disruption, impairment, disablement, or destruction of, Software, data or other materials. In the two (2)-year period prior to the date hereof, there has been no failure, breakdown or continued substandard performance of any Systems that has caused a disruption or interruption in or to any use of the Systems or the conduct of the Business, except where such failure, breakdown or substandard performance was not material to the Business. The Companies have implemented and maintained security, backup and disaster recovery policies, procedures and systems with respect to the Business consistent with generally accepted industry standards.

**Section 5.12 Material Contracts.**

(a) Section 5.12(a) of the Disclosure Schedule sets forth all of the following Contracts to which any Company is a party or by which it is bound as of the date hereof:

(i) Contracts with any Seller or any current officer or director of the Companies or any other Related Party of any Seller or Company; excluding any arm's-length Contracts entered into in the Ordinary Course of Business with (A) portfolio companies of any Seller Funds and (B) limited partners of any Seller Fund and/or any of such limited partners' respective portfolio companies;

40

(ii) employment or consulting Contracts, other than Contracts for employment covered in clause (i) above, providing for annual base compensation in excess of $100,000 annually;

(iii) Contracts materially limiting or restraining the Companies from engaging or competing in any lines of business with any other Person or restricting the right of any Company to sell to or purchase from any Person or that contain any other provisions granting "exclusivity";

(iv) Contracts or letters of intent for the sale, purchase or disposition of any of the assets of the Companies other than in the Ordinary Course of Business, which both (A) are for consideration in excess of $1,000,000 and (B) either (1) have been entered into during the last two (2) years or (2) contain obligations of any party thereto, which remain outstanding;

(v) Contracts relating to any acquisition to be made by the Companies of any material assets, operating business or the capital stock of any other Person, which both (A) are for consideration in excess of $1,000,000 and (B) either (1) have been entered into during the last three (3) years or (2) contain obligations of any party thereto, which remain outstanding;

(vi) Contracts relating to the incurrence of Indebtedness, or the making of any loans;

(vii) Guarantees of the payment or performance of any other Person;

(viii) Contracts relating to any Company's ownership of or investment in any Person (other than a Company), including partnership and joint venture Contracts;

(ix) Contracts with any labor union;

(x) Contracts that may give rise to Executive Payments;

(xi) Contracts that grant the counterparty or any third Person "most favored nation" status;

(xii) Contracts that grant any party thereto (other than any of the Companies) a right of first refusal, first offer or first negotiation; and

(xiii) Contracts which require the expenditure or receipt of more than $1,000,000 in the aggregate during the one (1) year period beginning on January 1, 2015 or more than $2,500,000 in the aggregate over the current contract term that is not terminable by the applicable Company without penalty on notice of 60 days or less, other than purchase orders with customers and suppliers entered into in the Ordinary Course of Business.

41

(b) Except as set forth in Section 5.12(b) of the Disclosure Schedule, (i) neither the Companies nor, to the Knowledge of Holdings, any other party thereto is in material breach or default of any Material Contract and no default, condition or event that with notice or lapse of time, or both, has occurred that would constitute a material breach or default by the Company under any Material Contract, nor, to the Knowledge of Holdings, by any other party to any Material Contract, nor have the Companies received any written, or to the Knowledge of Holdings, other notice of any default, condition or event; and (ii) each Material Contract is valid and binding on the applicable Company and, to the Knowledge of Holdings, each counterparty thereto, in accordance with its terms, and each Material Contract is in full force and effect, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity.

Section 5.13 **Company Benefit Plans**. Section 5.13 of the Disclosure Schedule sets forth a true and complete list of all Company Benefit Plans. Except as set forth in Section 5.13 of the Disclosure Schedule:

(a) The Companies do not maintain, administer, contribute to or have any liability with respect to any Company Benefit Plan.

(b) Except as required by COBRA, the Companies have not promised to any current or former employee, officer, director or consultant of any of the Companies, or any dependent or beneficiary thereof, coverage under any retiree or post-employment welfare benefit plan.

(c) None of the Companies have any liability with respect to or in connection with benefit plans of an ERISA Affiliate.

(d) With respect to each Company Benefit Plan sponsored or maintained by a Company or under which any Company could have any liability:

(i) The plan is in writing and complies, in form and operation, in all material respects, with all applicable Laws, including ERISA and the Code; the plan has been administered in compliance in all material respects with its terms; all premiums for coverage or other contributions due under the plan required to be paid by the Companies have been paid on a timely basis;

(ii) each Company Benefit Plan that is intended to qualify under Code §401(a) meets, in all material respects, all requirements for qualification under Code §401(a) and the Treasury Regulations thereunder (except for insignificant operational errors which were eligible for and have been fully corrected under the Self Correction Program provisions of IRS Rev. Proc. 2013-12); and a favorable determination letter (or opinion letter that may be relied on) as to the qualification under the Code of each of the Company Benefit Plans intended to comply with Code §401(a) has been issued by the IRS and no facts or events have occurred since the date of such letters that could adversely affect the qualified status of any such Company Benefit Plan; the Sellers or the Companies have made available to Purchaser a copy of the most recent favorable determination or opinion letter issued by the IRS concerning such Company Benefit Plan's qualification;

42

(iii) all reports and information relating to each Company Benefit Plan required to be filed with any Governmental Authority have been timely filed, all reports and information relating to each Company Benefit Plan required to be disclosed or provided to participants or their beneficiaries have been timely disclosed or provided, all material contained therein was true, correct and complete in all material respects, and, none of the Companies, any director, officer and employee thereof, or, to the Knowledge of Holdings, any other fiduciary of any Company Benefit Plan has committed a material breach of any responsibility or obligation imposed upon fiduciaries under Title I of ERISA with respect to such Company Benefit Plan;

(iv) the Sellers or the Companies have made available to Purchaser currently effective copies of: (A) the plan document and all amendments thereto, (B) the summary plan description together with each summary of material modifications (if required under ERISA), (C) all trust agreements, insurance contracts, or other documents which establish the funding vehicle for such Company Benefit Plan and the latest financial statements thereof, (D) all investment management agreements, administrative services contracts, or other third-party agreements relating to the ongoing administration and investment of such Company Benefit Plan, and (E) the two most recently filed IRS Form 5500s; and

(v) except for claims for benefits arising in the ordinary course, there are no Claims pending or, to the Knowledge of Holdings, threatened with respect to any Company Benefit Plan or any fiduciary or assets thereof, and, to the Knowledge of Holdings, no Company Benefit Plan is under audit, investigation or examination by any Governmental Authority.

(e) None of the Company Benefit Plans is a multiemployer plan within the meaning of Section 3(37) or 4001(a) (3) of ERISA (a "Multiemployer Plan") or a single employer pension plan within the meaning of Section 4001(a)(15) of ERISA for which the Company or any of its Subsidiaries could incur liability under Section 4063 or 4064 of ERISA (a "Multiple Employer Plan").

(f) There has not been any non-exempt prohibited transaction, within the meaning of Section 406 of ERISA or Section 4975 of the Code, with respect to any Company Benefit Plan for which a correction has not been made in full. No Company has incurred any liability under, arising out of or by operation of Title IV of ERISA, other than liability for premiums to the Pension Benefit Guaranty Corporation arising in the Ordinary Course of Business, including any liability in connection with (i) the termination or reorganization of any employee benefit plan subject to Title IV of ERISA or (ii) the withdrawal from any Multiemployer Plan or Multiple Employer Plan, and no fact or event exists that would give rise to any such liability. As of the Closing Date, no Company Benefit Plan that is subject to Title IV of ERISA will have an "unfunded benefit liability" within the meaning of Section 4001(a)(18) of ERISA.

43

(g) None of the Company Benefit Plans: (i) provides for the payment of separation, severance, termination or similar-type benefits to any Person; (ii) obligates any Company to pay separation, severance, termination or similar-type benefits solely or partially as a result of the transactions contemplated by this Agreement; or (iii) obligates any Company to accelerate or make any payment (other than the Option Cancellation Payments) or provide any benefit solely or partially as a result of the transactions contemplated by this Agreement.

(h) No Company has any express or implied commitment (A) to create, incur liability with respect to or cause to exist any other employee benefit plan, program or arrangement, (B) to enter into any Contract to provide compensation or benefits to any individual or (C) to modify, change or terminate any Company Benefit Plan, other than with respect to a modification, change or termination required by ERISA or the Code.

(i) With respect to each Company Benefit Plan that is a "nonqualified deferred compensation plan" (as defined for purposes of Section 409A(d)(1) of the Code), (i) such plan or arrangement has been operated since January 1, 2005 in compliance with Section 409A of the Code and all applicable IRS guidance promulgated thereunder to the extent such plan or arrangement is subject to Section 409A of the Code and so as to avoid any tax, interest or penalty thereunder; (ii) the document or documents that evidence each such plan or arrangement have conformed to the provisions of Section 409A of the Code and the final regulations under Section 409A of the Code since December 31, 2008; and (iii) as to any such plan or arrangement in existence prior to January 1, 2005 and not subject to Section 409A of the Code, has not been "materially modified" (within the meaning of IRS Notice 2005 1) at any time after October 3, 2004. No Option (whether currently outstanding or previously exercised) is, has been or would be, as applicable, subject to any tax, penalty or interest under Section 409A of the Code.

(j) Each of the Company Benefit Plans is maintained in the United States and is subject only to the Laws of the United States or a political subdivision thereof.

(k) The Companies are not obligated to make any payments, including under any Company Benefit Plan, that reasonably could be expected to be "excess parachute payments" pursuant to Section 280G of the Code.

### Section 5.14 Labor.

(a) Except as disclosed in Section 5.14(a) of the Disclosure Schedule:

(i) no Company is a party to, or bound by, any collective bargaining agreement or other labor agreement with any union, guild shop committee, employee association or other labor group ("Collective Bargaining Agreement");

(ii) there is no (and in the past three (3) years has not been any) labor strike, lockout, coordinated work slowdown or stoppage; organizing effort, demand for recognition, or question concerning representation; or organized labor dispute, either pending or, to the Knowledge of Holdings, threatened against any Company;

(iii) no Company has breached or otherwise materially failed to comply with the provisions of any Collective Bargaining Agreement and there are no material pending or threatened union grievances or material unfair labor practice charges against any Company;

44

(iv) each Company is (and for the past three years has been) in compliance in all material respects with all Laws that relate to employment, equal employment opportunity, wages, hours, classification for overtime purposes, leaves, workers' compensation, worker health and safety, disability, immigration, collective bargaining, contractors and temporary employees, other employment terms and conditions and plant closings and layoffs;

(v) there is (and in the past three years has been) no pending, or to the Knowledge of Holdings threatened, material administrative charge, investigation, complaint, or court proceeding against or involving any Company concerning labor or employment practices, including without limitation any proceedings before or involving the National Labor Relations Board, the Equal Employment Opportunity Commission, the U.S. Department of Labor or any similar Governmental Authority;

(vi) each Company has paid to all workers or accrued (to the extent required by GAAP) all wages, salaries, commissions, bonuses, benefits and other compensation due to or on behalf thereof; and

(vii) there have been no layoffs or reductions in force by any Company in the preceding 90 days, other than terminations in the Ordinary Course of Business.

(b) Holdings' representations and warranties set forth in this <u>Section 5.14</u> shall constitute Holdings' only representations and warranties regarding labor and employment matters.

**Section 5.15 <u>Litigation</u>.** Except as set forth in <u>Section 5.15</u> of the Disclosure Schedule, there are no (a) material Legal Proceedings pending or, to the Knowledge of Holdings, threatened against the Companies or (b) outstanding or unsatisfied Orders to which any of the Companies are subject.

**Section 5.16 <u>Compliance with Laws; Permits</u>**.

(a) The Companies possess all material Permits required in order for the Companies to lawfully conduct the Business as presently conducted and to own and operate their respective assets as presently owned and operated. All such material Permits are listed in <u>Section 5.16(a)</u> of the Disclosure Schedule, are in full force and effect and to the Knowledge of Holdings, no event or condition has occurred or exists which, with notice or the lapse of time or both, would constitute a material default thereunder or material violation thereof. Except as disclosed in <u>Section 5.16(a)</u> of the Disclosure Schedule, the Companies are, and have been for the past three years, in compliance in all material respects with all such Permits and with all Laws and Orders applicable to the Companies and the Business.

(b) Except as set forth in <u>Section 5.16(b)</u> of the Disclosure Schedule, during the past three years, no Company has received written notice of any material violation of any Laws or Orders.

45

(c) Neither the Companies nor any Affiliate of the Companies, nor to the Knowledge of Holdings, any director, officer, employee, agent or other authorized representative of any of the Companies, has directly or indirectly (a) made, offered or promised any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment or thing of material value to any Person in violation of any applicable Law or (b) established or maintained any fund or asset with respect to the Companies that has not been recorded in the books and records of the Companies. Each of the Companies utilizes controls procedures reasonably sufficient to provide reasonable assurances that violations of applicable anti-bribery or anti-money laundering Laws will be prevented and detected.

(d) Notwithstanding the foregoing, no representation or warranty is made under this <u>Section 5.16</u> in respect of any matter relating to (i) Taxes that are addressed in <u>Section 5.8</u> (and as to which no representation or warranty is made except as set forth in <u>Section 5.8</u>), or (ii) environmental matters, which are addressed in <u>Section 5.17</u> (and as to which no representation or warranty is made except as set forth in <u>Section 5.17</u>).

Section 5.17 <u>Environmental Matters.</u> The representations and warranties contained in this <u>Section 5.17</u> are the sole and exclusive representations and warranties of Holdings pertaining or relating to any environmental, health or safety matters, including any arising under any Environmental Laws. Except as set forth in <u>Section 5.17</u> of the Disclosure Schedule:

(a) the operations of the Companies are, and have been for the last three years, in compliance with all applicable Environmental Laws and Environmental Permits;

(b) the Companies possess all applicable Environmental Permits that are required for the operation of the Business as presently operated and for the ownership and use of their assets (including the Owned Real Property and the Leased Real Property) as presently owned and used;

(c) There are no pending or, to the Knowledge of Holdings, threatened Environmental Claims against the Companies;

(d) No Releases of Hazardous Materials have occurred, and no Hazardous Substances are present on any of the properties owned or leased, or formerly owned or leased, by the Companies that would reasonably be expected to give rise to an Environmental Claim against the Companies;

(e) The Companies have delivered to, or have otherwise made available for inspection by, Purchaser, such written reports of environmental investigations, studies, audits, and tests in the possession, control or custody of the Companies sufficient to disclose any environmental conditions that would reasonably be expected to give rise to an Environmental Claim against any of the Companies.

Section 5.18 <u>Insurance.</u> <u>Section 5.18</u> of the Disclosure Schedule contains a true and complete list of all policies of fire, liability, workers' compensation, property, casualty and other forms of insurance owned or held by, or maintained with respect to, the Companies ("<u>Company Insurance Policies</u>"). All Company Insurance Policies are in full force and effect.

46

All premiums with respect thereto have been paid to the extent due. The Companies have not received any notice of, nor to the Knowledge of Holdings is there threatened, any cancellation reduction of coverage, material premium increases or non-renewal with respect to any Company Insurance Policy. The types and amounts of coverage provided by the Company Insurance Policies are customary in the context of the businesses and operations in which the Companies are engaged.

Section 5.19 **Brokers.** Except as set forth in Section 5.19 of the Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Companies in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

Section **5.20 Recalls; Product Liability.**

(a) Section 5.20(a) of the Disclosure Schedule sets forth a description of all (i) pending product recalls involving Companies' products and (ii) recall campaigns to which the Companies have been subject in the past three (3) years.

(b) For the past two (2) years, none of the products manufactured or sold by the Companies have given rise to any Legal Proceeding involving product liability or, to the Knowledge of Holdings, any written threat of such Legal Proceeding that has resulted or would reasonably be expected to result, in material liability to the Companies.

Section 5.21 **Customers and Suppliers**.

(a) Section 5.21(a) of the Disclosure Schedule lists (i) the fifteen (15) largest suppliers of the Companies (based on expenditures of the Companies as set forth on Section 5.21(a) of the Disclosure Schedule), and (ii) the fifteen (15) largest customers of the Companies (based on revenues of the Companies as set forth on Section 5.21(a) of the Disclosure Schedule), each for the 12-month period ended September 30, 2015. Except as set forth in Section 5.21(a)(iii) of the Disclosure Schedule, the Companies have not received written notice of any termination, cancellation or material and adverse modification by any such supplier or customer relating to its business relationship with the Companies and, to the Knowledge of Holdings, no such termination, cancellation or material and adverse modification has been threatened in writing by any such supplier or customer.

(b) Since January 1, 2015, each of the Companies has engaged in and accounted for all revenue, pricing, sales, receivables and payables practices in accordance with GAAP and otherwise in the Ordinary Course of Business and have not, other than in the Ordinary Course of Business, engaged in (i) any trade loading practices or any other promotional, sales, rebate or discount activity with any customers, registrars, reseller or distributors with the effect of accelerating to pre-Closing periods sales that would otherwise be expected (based on past practice) to occur in post-Closing periods, (ii) any practice which would have the effect of accelerating to pre-Closing periods collections of receivables that would otherwise be expected (based on past practice) to be made in post-Closing periods, (iii) any practice which would have the effect of postponing to post-Closing periods payments by the Company that would otherwise be expected (based on past practice) to be made in pre-Closing periods or (iv) any other promotional, sales, rebate or discount activity or deferred revenue activity, in each case in this clause (iv), in a manner outside the Ordinary Course of Business.

47

Section 5.22 **Inventory.** The inventories of the Companies reflected on the Balance Sheet and existing as of the Closing are or will be generally of a quality and quantity usable or salable in the Ordinary Course of Business.

Section 5.23 **Affiliate Interests and Transactions**. Except as set forth on Section 5.23 of the Disclosure Schedule, and for the Ancillary Agreements and those Contracts that will be released, discharged or terminated prior to the Closing or as of the Closing and excluding any arm's-length Contracts entered into in the Ordinary Course of Business with (A) portfolio companies of any Seller Funds and (B) limited partners of any Seller Fund and/or any of such limited partners' respective portfolio companies, no Related Party of any Company: (i) owns or has owned at any time since January 1, 2013, directly or indirectly, any equity or other financial or voting interest in any competitor, registrar, reseller, supplier, licensor, licensee, lessor, lessee, distributor, independent contractor or customer of the Companies; (ii) owns or has owned at any time since January 1, 2013, directly or indirectly, any interest in, any property (real or personal, tangible or intangible) that any of the Companies uses or has used in or pertaining to the businesses of the Companies; (iii) has or has had at any time since January 1, 2013 any business dealings or a financial interest in any transaction with the Companies involving any assets or property of any of the Companies; or (iv) is or has been at any time since January 1, 2013 employed by any of the Companies. Ownership of securities that are registered under the Securities Exchange Act of 5% or less of any class of such securities shall not be deemed to be a financial interest for purposes of this Section 5.23.

Section 5.24 **No Other Representations or Warranties.** Except for the representations and warranties contained in this Article V and Article VI hereof (as modified by the Disclosure Schedule) and the representations and warranties contained in the Exhibits, the Holdings Closing Certificate and the Seller Closing Certificates, neither the Companies, the Sellers, nor any of their respective directors, officers, employees, Affiliates, stockholders, partners, members, managers, accountants, legal counsel, agents or other representatives (or any Affiliate of any of the foregoing) or any other Person on behalf of any of the foregoing makes any other express or implied representation or warranty with respect to the Companies, the Sellers or the transactions contemplated by this Agreement.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Each Seller, solely as to itself, hereby represents, severally and not jointly, to Purchaser as of the date hereof and, provided Closing occurs, as of the Closing Date that:

Section 6.1 **Organization and Good Standing.** If such Seller is a legal entity, such Seller is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has all necessary corporate, limited liability company or limited partnership (as applicable) power and authority to own, lease and operate its properties and to carry on its business.

48

Section 6.2 __Authorization of Agreement.__ If such Seller is a legal entity, such Seller has full corporate, limited liability company or limited partnership (as applicable) power and authority to execute and deliver this Agreement and each of the Seller Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. If such Seller is a natural person, such Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and each of the Seller Documents to which it or he is a party, to perform its or his obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each of the Seller Documents to which it or he is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all required individual, corporate or other legal entity (as applicable) action on the part of such Seller. This Agreement has been, and each of the Seller Documents to which it or he is a party will be at or prior to the Closing, duly and validly executed and delivered by such Seller, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Seller Document to which it or he is a party, when so executed and delivered will constitute, the legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 6.3 __Conflicts; Consents of Third Parties.__

(a) Except as set forth in Section 6.3(a) of the Disclosure Schedule, none of the execution and delivery by such Seller of this Agreement or the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by such Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or with respect to clause (iii) or (iv) only any material violation of or material default (with or without notice or lapse of time, or both) under, result in the creation of any Lien under, or give rise to a right of termination, acceleration or cancellation under, any provision of (i) for each Seller that is an entity, the Governing Documents of such Seller, (ii) any Order of any Governmental Authority applicable to such Seller or by which any of the properties or assets of such Seller are bound; (iii) any applicable Law; or (iv) any material Contract to which such Seller is party or by which such Seller or any of its or his properties, assets or rights may be bound or affected, except with respect to matters that, individually or in the aggregate, would not reasonably be expected to materially impair or materially delay such Sellers' ability to effect the transactions hereunder.

(b) Except as set forth in Section 6.3(b) of the Disclosure Schedule, no consent, waiver, approval, Order, Permit or authorization of, declaration or filing with, or notification to, any Governmental Authority or party to any material Contract to which such Seller is a party or by which such Seller is otherwise bound is required on the part of such Seller in connection with the execution and delivery of this Agreement or the Seller Documents by such Seller, or the compliance by such Seller with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby, except for (i) the filing of notification and report forms with the FTC and the DOJ under the HSR Act and the expiration or termination of any applicable waiting period thereunder, (ii) the filing of all applications and notices, as

49

applicable, with Governmental Authorities under the Foreign Competition Laws, the issuance of consents, authorizations or approvals of such applications by such authorities, if required, and the expiration or termination of any applicable waiting periods thereunder, and (iii) such items for which the failure to make or obtain, individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect.

Section 6.4 **Ownership and Transfer of Shares**. Such Seller is the record and beneficial owner of the Shares or Options, as applicable, indicated as being owned by such Seller on Exhibit I free and clear of any and all Liens. If such Seller owns Shares, such Seller has the power and authority to sell, transfer, assign and deliver such Shares as provided in this Agreement, and such delivery will convey to Purchaser, good, valid and marketable title thereto, free and clear of any and all Liens. If such Seller holds Options, such Seller holds the number of Options listed as being held by such Seller on Exhibit I at the Exercise Price listed thereon.

Section 6.5 **Litigation.** There are no Legal Proceedings pending or, to the knowledge of such Seller, threatened that, individually or in the aggregate, seek to or would be reasonably expected to prohibit, delay or restrain the ability of such Seller to enter into this Agreement or consummate the transactions contemplated hereby.

Section 6.6 **Brokers.** Except as set forth in Section 6.6 of the Disclosure Schedule, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for such Seller in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

Section 6.7 **No Other Representations or Warranties**. Except for the representations and warranties contained in this Article VI (as modified by the Disclosure Schedule), none of the Sellers nor any other Person on behalf of any of the Sellers makes any other express or implied representation or warranty with respect to any of the Sellers.

<div align="center">

**ARTICLE VII**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

</div>

Purchaser hereby represents and warrants to the Sellers as of the date hereof and, provided the Closing occurs, as of the Closing Date that:

Section 7.1 **Organization and Good Standing.** Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate properties and carry on its business.

Section 7.2 **Authorization of Agreement.** Purchaser has full limited liability company power and authority to execute and deliver this Agreement and each of the Purchaser Documents, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary limited liability company action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto

<div align="center">50</div>

and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

        **Section 7.3 <u>Conflicts; Consents of Third Parties</u>.**

        (a) None of the execution and delivery by Purchaser of this Agreement or Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, result in the creation of any Lien under, or give rise to a right of termination or cancellation under, any provision of (i) the Governing Documents of Purchaser; (ii) any Order of any Governmental Authority applicable to Purchaser or by which any of the properties or assets of Purchaser are bound; (iii) any applicable Law; or (iv) any material Contract to which Purchaser is party or by which such Purchaser is part or by which Purchaser or any of its properties, assets or rights may be bound or affected, except with respect to matters that, individually or in the aggregate, would not reasonably be expected to materially impair or materially delay Purchaser's ability to effect the transactions hereunder.

        (b) Except as set forth in <u>Section 7.3(b)</u> of the Disclosure Schedule, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Governmental Authority or party to any Contract to which Purchaser is a party or by which Purchaser is otherwise bound is required on the part of Purchaser in connection with the execution and delivery of this Agreement or Purchaser Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Purchaser of any other action contemplated hereby, except for (i) the filing of notification and report forms with the FTC and the DOJ under the HSR Act and the expiration or termination of any applicable waiting period thereunder, (ii) the filing of all applications and notices, as applicable, with Governmental Authorities under the Foreign Competition Laws, the issuance of consents, authorizations or approvals of such applications by such authorities, if required, and the expiration or termination of any applicable waiting periods thereunder, and (iii) such items for which the failure to make or obtain, individually or in the aggregate, would not reasonably be expected to materially impair or materially delay Purchaser's ability to effect the transactions hereunder.

        **Section 7.4 <u>Litigation</u>.** There are no Legal Proceedings or Orders pending or, to the knowledge of Purchaser, threatened that seek to or would be reasonably likely to prohibit, delay or restrain the ability of Purchaser to enter into this Agreement or consummate the transactions contemplated hereby, and, as of the date hereof, there is no transaction pending by Purchaser or any of its Affiliates, in each case, that, individually or in the aggregate, would be reasonably expected to have the effect of preventing, materially delaying, making illegal or otherwise interfering in any material respect with any of the transactions contemplated by the Agreement.

<div align="center">51</div>

Section 7.5 <u>**Investment Intention.**</u> Purchaser is acquiring the Shares for its own account, for investment purposes only and not with a view to the distribution (as such term is used in Section 2(11) of the Securities Act) thereof. Purchaser understands that the Shares have not been registered under the Securities Act or any state securities laws and the Shares cannot be sold or transferred unless subsequently registered under the Securities Act or an exemption from such registration is available (and such sale or transfer complies with state securities laws and regulations).

Section 7.6 <u>**Brokers.**</u> No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

Section 7.7 <u>**Equity Commitment Letters**</u>.

(a) Purchaser acknowledges and agrees that Purchaser's performance of its obligations under this Agreement is not in any way contingent upon the availability of financing to Purchaser.

(b) Purchaser has furnished Seller Representative with true, complete and correct copies as of the date of this Agreement of the executed commitment letter, dated as of the date of this Agreement, among Purchaser and Lone Star Fund IX (U.S.), L.P. (the "<u>Equity Financing Source</u>") (including all exhibits, schedules, annexes and amendments, restatements, supplements, replacements or other modifications thereto, the "<u>Equity Commitment Letters</u>"), pursuant to which the Equity Financing Source has committed, subject to the terms and conditions set forth therein, to invest the cash amount set forth therein (the "<u>Equity Financing</u>"). As of the date hereof, none of the Equity Commitment Letters previously delivered to the Seller Representative has been amended or modified, and the respective commitments contained in the Equity Commitment Letters have not been withdrawn or rescinded in any respect. As of the date hereof, there are no side letters or other Contracts to which Purchaser is a party related to the funding or investing, as applicable, of the full amount of the Equity Financing other than to which the Sellers are a party or as expressly set forth in the Equity Commitment Letters (other than customary engagement letters, fee letters, side letters and ancillary agreements none of which adversely affect the amount or conditionality of the Equity Financing), and there are no conditions precedent related to the funding of the full amount of the Equity Financing other than as may be set forth in any letter to which the Sellers are a party or the Equity Commitment Letters, as applicable. The Equity Commitment Letters are (i) legal, valid and binding obligations of Purchaser and the other parties thereto, as applicable and (ii) enforceable in accordance with their respective terms against Purchaser and the other parties thereto, as applicable, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). As of the date hereof, no event has occurred which, with or without notice, lapse of time or both would reasonably be expected to constitute a default or breach on the part of Purchaser or the other parties to the Equity Commitment Letters, as applicable. All commitments and other fees required to be paid by Purchaser under the Equity Commitment Letters prior to the date of this Agreement have been paid in full. The amount of funds contemplated to be provided pursuant to the Equity Commitment Letters, when and if funded in accordance with the terms and conditions

52

of the Equity Commitment Letters, together with available cash of Purchaser, will be sufficient to (a) pay the amounts required to be paid at Closing and (b) pay any and all fees and expenses required to be paid by Purchaser at the Closing under this Agreement in connection with the transactions contemplated by this Agreement, including the Equity Financing on the Closing Date.

           **Section 7.8 <u>No Reliance; Access to Information</u>**.

        (a) In connection with its decision to purchase the Shares, Purchaser, for itself and on behalf of its Affiliates and related parties, acknowledges, understands and agrees that: (a) Purchaser is a sophisticated party with such knowledge and experience in business and financial matters as to be capable of evaluating the merits and risks of purchasing the Shares and consummating the transactions contemplated hereby; (b) Purchaser is entering into this Agreement and the transactions contemplated by this Agreement solely based on its investigation of the Companies and the representations and warranties of Holdings set forth in <u>Article V</u> of this Agreement and in any of the Holdings Documents and the representations and warranties of the Sellers or the Seller Representative, as applicable, set forth in <u>Article VI</u> of this Agreement and in any of the Seller Documents and not in reliance upon any written or oral statements made by any other Person; (c) Purchaser is not relying upon any forward-looking projections, forecasts, budgets, financial data or other forward-looking information (written or oral), including any memoranda prepared by the Companies' investment bankers with respect to the Shares or the Companies (including the Business or prospects of the Companies) prepared by or furnished to Purchaser by or on behalf of any Seller or the Companies ("<u>Forward-Looking Data</u>"); and (d) Purchaser recognizes that significant uncertainties are inherent in Forward-Looking Data and that neither the Companies, the Sellers, nor any of their respective directors, officers, employees, Affiliates, stockholders, partners, members, managers, accountants, legal counsel, agents or other representatives (or any Affiliate of any of the foregoing) or any other Person on behalf of any of the foregoing have made any representations or warranties, express or implied, relating to any Forward-Looking Data.

        (b) Purchaser has had an opportunity to discuss, with the management of the Companies, the management and financial affairs of the Companies. Purchaser has had an opportunity to ask questions and receive answers from the Companies regarding the Companies, and has had access to and the opportunity to inspect and review various records, instruments, documents, financial statements, reports and budgets and other information of the Companies which have been provided to Purchaser by the Companies or the Sellers and/or which have been requested by Purchaser.

        (c) Notwithstanding anything to the contrary in the foregoing, nothing in this <u>Section 7.8</u> shall limit or modify the representations and warranties of Holdings set forth in <u>Article V</u> of this Agreement or in any of the Holdings Documents or the representations and warranties of the Sellers or the Seller Representative, as applicable, set forth in <u>Article VI</u> of this Agreement or in any of the Seller Documents. Notwithstanding anything to the contrary in the foregoing, nothing in this <u>Section 7.8</u> will limit or otherwise restrict in any respect any claim for fraud.

<div align="center">53</div>

Section 7.9 **Condition of the Business.** Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that neither the Companies, the Sellers, nor any of their respective directors, officers, employees, Affiliates, stockholders, partners, members, managers, accountants, legal counsel, agents or other representatives (or any Affiliate of any of the foregoing) or any other Person on behalf of any of the foregoing is making any representations or warranties whatsoever, express or implied, beyond those expressly given by Holdings and the Sellers or the Seller Representative, as the case may be, in Article V and Article VI and in any of the Holdings Documents and Seller Documents, respectively (as modified by the Disclosure Schedule), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the assets and the businesses of the Companies are being transferred on a "where is" and, as to condition, "as is" basis. Except for instances of fraud, any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of Holdings or the Sellers or the Seller Representative, as applicable, set forth in Article V or Article VI of this Agreement, respectively (as modified by the Disclosure Schedule) or in any of the Holdings Documents or Seller Documents, respectively. Purchaser further represents that, except for instances of fraud and with respect to the representations and warranties of Holdings or the Sellers or the Seller Representative, as applicable, set forth in Article V or Article VI of this Agreement, respectively (as modified by the Disclosure Schedule), none of the Companies, the Sellers, any of their respective directors, officers, employees, Affiliates, stockholders, partners, members, managers, accountants, legal counsel, agents or other representatives (or any Affiliate of any of the foregoing) or any other Person will have or be subject to any liability to Purchaser or any of its Affiliates directly resulting from the distribution to Purchaser or its representatives or Purchaser's use of, any confidential memoranda distributed by or on behalf of the Companies or Sellers relating to the Companies or other publications or data room information provided to Purchaser or its representatives, or any other document or information in any form provided to Purchaser or its representatives in connection with the sale of the Companies or the transactions contemplated hereby. Purchaser acknowledges that it has conducted to its satisfaction, its own independent investigation of the condition, operations and business of the Companies and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied on the results of its own independent investigation. Notwithstanding anything to the contrary in the foregoing, nothing in this Section 7.9 is intended to limit or modify the representations and warranties of Holdings set forth in Article V of this Agreement or in any of the Holdings Documents or the representations and warranties of the Sellers or the Seller Representative, as applicable, set forth in Article VI of this Agreement or in any of the Seller Documents.

Section 7.10 **Solvency.** Immediately after giving effect to the Closing (and any transactions related thereto or incurred in connection therewith), and assuming that the representations and warranties made by the Sellers and Holdings herein are true and correct in all material respects, each of Purchaser, Holdings and the other Companies shall be able to pay their respective debts as they become due and shall own property which has a fair saleable value greater than the amounts required to pay their respective debts (including a reasonable estimate of the amount of all contingent liabilities). Immediately after giving effect to the Closing (and any transactions related thereto or incurred in connection therewith), and assuming that the representations and warranties made by the Sellers and Holdings herein are true and correct in all material respects, each of Purchaser, Holdings and the other Companies shall have adequate

54

capital to carry on its businesses. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Purchaser, Holdings and the other Companies.

## ARTICLE VIII
## COVENANTS

Section 8.1 <u>Access to Information</u>.

(a) Prior to the Closing, the Sellers and Holdings shall, and shall cause the other Companies to, permit Purchaser and its officers, employees and representatives (including its legal advisors and accountants) reasonable access (including for inspection and copying) to the properties, books and records of the Companies as Purchaser reasonably requests. Any such access shall be during regular business hours upon reasonable advance written notice and under reasonable circumstances, shall not interfere with the operations of the Companies and shall be subject to restrictions under applicable Law. Notwithstanding anything herein to the contrary, (a) no such access shall be permitted to the extent that it would require the Companies to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which any Company is bound, (b) prior to the Closing, without the prior written consent of the Seller Representative, Purchaser shall have no right to perform invasive or subsurface investigations of any real property leased, owned, used or occupied by any of the Companies (including the Owned Real Property and the Leased Real Property); <u>provided</u> that the foregoing shall not prohibit the completion of customary "Phase I" environmental site assessments. All requests by Purchaser for access or information shall be in writing and submitted or directed exclusively to the Seller Representative or an individual or individuals to be designated by the Seller Representative in writing.

(b) Prior to the Closing, with advance notice to (email being sufficient), and in cooperation with, the Seller Representative (whose consent, for the avoidance of doubt, shall not be required) Purchaser shall be entitled to contact any customer, vendor, supplier, partner, employee or consultant of the Companies in relation to the Companies or the transactions contemplated hereby.

Section 8.2 <u>Conduct of the Business Pending the Closing</u>.

(a) Prior to the Closing, except (i) as required by applicable Law, (ii) as contemplated by <u>Section 8.2</u> of the Disclosure Schedule, (iii) as otherwise contemplated by this Agreement, (iv) as reasonably necessary to comply with the terms of the Griffin Agreement in the event of an exercise by Amconstruct Corporation of the Optional Put or (v) with the prior written consent of Purchaser (which, with respect to the Limited Covenants only, such consent shall not be unreasonably withheld, delayed or conditioned), Holdings shall, and shall cause the other Companies to (A) conduct the business of the Companies in the Ordinary Course of Business; and (B) use their commercially reasonable efforts to (1) preserve the present business operations of the Companies, (2) preserve the present relationships with customers, suppliers and employees of the Companies and any other Persons with whom any Company has significant business relations and (3) keep and maintain their assets and properties in reasonable repair and normal operating condition, excluding ordinary wear and tear.

55

(b) Except (i) as required by applicable Law, (ii) as otherwise contemplated by this Agreement, (iii) as set forth in <u>Section 8.2</u> of the Disclosure Schedule or (iv) with the prior written consent of Purchaser (which, respect to the Limited Covenants only, consent shall not be unreasonably withheld), Holdings shall not, and shall cause the other Companies not to, directly or indirectly:

(i) transfer, issue, sell, pledge, dispose of or encumber any Shares or other securities of the Companies or grant options, warrants, calls or other rights to purchase or, otherwise acquire Shares or other securities of any Company;

(ii) except as reasonably necessary to comply with the terms of the Griffin Agreement in the event of an exercise by Amconstruct Corporation of the Optional Put, amend the Governing Documents of the Companies;

(iii) reclassify, combine, split, subdivide or redeem, or purchase or otherwise acquire (other than the acquisition of an ownership interest in Griffin in the event of an exercise by Amconstruct Corporation of the Optional Put), directly or indirectly, any of the capital stock or other equity or ownership interest, or make any other change with respect to the capital structure, of any Company;

(iv) adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of any Company or otherwise alter any Company's corporate or organizational structure (other than the acquisition of an ownership interest in Griffin in the event of an exercise by Amconstruct Corporation of the Optional Put);

(v) except as reasonably necessary to comply with the terms of the Griffin Agreement in the event of an exercise by Amconstruct Corporation of the Optional Put, incur any Indebtedness or issue any debt securities or assume, guarantee or endorse, or otherwise become responsible for, the obligations of any Person, or make any loans or advances, except in the Ordinary Course of Business; provided, that in no event shall any Company (i) incur, assume or guarantee any long-term indebtedness for borrowed money or (ii) make any optional repayment of any indebtedness for borrowed money;

(vi) declare, set aside, make or pay any non-cash dividend or other distribution on or with respect to any of its capital stock or other equity or ownership interest;

(vii) acquire any corporation, partnership, limited liability company, other business organization or division or material assets thereof, or enter into any binding or non-binding letter of intent, joint venture, strategic alliance, exclusive dealing, noncompetition or similar contract or arrangement (other than the acquisition of an ownership interest in Griffin in the event of an exercise by Amconstruct Corporation of the Optional Put);

56

(viii) other than in accordance with the Companies' capital expenditure budget, which is set forth in Section 8.2(b)(viii) of the Disclosure Schedule, or for sales to customers in the Ordinary Course of Business, acquire or lease any Real Property, properties or assets or sell, assign, license, transfer, convey, lease or otherwise dispose of or subject to any Liens any Real Property, properties or assets of any Company with a value greater than $5,000,000 in the aggregate for all such items of Real Property, properties or assets;

(ix) (i) enter into any Lease of real property or any renewal thereof, or (ii) fail to exercise any rights of renewal with respect to any Leased Real Property that by its terms would otherwise expire;

(x) other than in the Ordinary Course of Business and other than inter-company Contracts between the Companies, (i) amend, waive, modify or consent to the termination of any Material Contract or any Company's rights thereunder, or (ii) enter into any Contract that would constitute a Material Contract;

(xi) except as reasonably necessary to comply with the terms of the Griffin Agreement in the event of an exercise by Amconstruct Corporation of the Optional Put, pay, discharge or satisfy any Claim, liability or obligation (absolute, accrued, asserted or unasserted, contingent or otherwise), or cancel, compromise, waive or release any right or Claim, in each case other than in the Ordinary Course of Business;

(xii) commence any Legal Proceeding;

(xiii) enter into any Contract with any Related Party of any of the Companies, excluding: a) any arm's-length Contracts entered into in the Ordinary Course of Business with portfolio companies of any Seller Funds and b) for clarity, any arm's-length Contract entered into in the Ordinary Course of Business with limited partners of any Seller Fund and/or any of such limited partners' respective portfolio companies;

(xiv) except as required to ensure that any Company Benefit Plan is not then out of compliance with applicable Law, or as required by the terms of any Collective Bargaining Agreement disclosed to the Purchaser, (A) increase the compensation payable or to become payable or the benefits provided to its directors, officers, employees or consultants, except in the Ordinary Course of Business with respect to employees who are not directors or officers of any Company and who receive less than $100,000 in annual base cash compensation from the Companies, (B) grant any severance or termination payment to, or loan or advance any amount to, any director, officer, employee or consultant, or (C) establish, adopt, enter into or amend any Company Benefit Plan;

(xv) make, change, or rescind any material Tax election, file any material amended Tax Return, adopt or change any material accounting method in respect of Taxes, change any accounting period or commence, settle or otherwise compromise any material Tax claim, consent to any extension or waiver of the limitation period applicable to any claim or assessment in respect of a material amount of Taxes or enter into a closing agreement or other agreement with respect to a material amount of Taxes;

57

(xvi) make any material changes in any method of accounting or accounting practice or policy other than as required by GAAP; or

(xvii) announce an intention, enter into any formal or informal agreement, or otherwise make a commitment to do anything prohibited by this Section 8.2.

### Section 8.3 Regulatory Approvals.

(a) The Sellers and Purchaser shall, as promptly as practicable but in any event not more than five (5) Business Days after the date hereof, file, or cause to be filed, all required notification and report forms under the HSR Act with the FTC and the DOJ in connection with the transactions contemplated by this Agreement. Each Party shall (i) request early termination of the waiting period under the HSR Act and other applicable Regulatory Laws; and (ii) respond at the earliest practicable date, and shall as necessary or appropriate cause its Affiliates to respond at the earliest practical date, to any inquiries or requests made by any Governmental Authority (including complying at the earliest practical data with any requests for additional information and documentary material from the FTC or DOJ). In furtherance and not in limitation of the foregoing, the Sellers shall permit Purchaser to participate in the defense and settlement of any claim, suit or cause of action relating to the regulatory approvals in this Section 8.3 or the transactions contemplated hereby, and the Sellers shall not settle or compromise any such claim, suit or cause of action without Purchaser's written consent.

(b) Purchaser, on the one hand, and the Sellers, on the other hand, shall each be responsible for and pay 50% of any and all filing fees in connection with any filings that must be made by any of the Parties under the HSR Act. Neither Purchaser and its Affiliates nor the Sellers and their Affiliates shall directly or indirectly extend any waiting period under any applicable Regulatory Law or enter into any agreement to delay or not to consummate the transactions contemplated by this Agreement except with the prior written consent of, in the case of Purchaser and its Affiliates, the Seller Representative, and in the case of Sellers and their Affiliates, Purchaser. Purchaser and its Affiliates that are part of the Forterra Building Products portfolio company investment of Lone Star Funds will not pursue or enter into any agreement with regard to any transactions that individually or in the aggregate would reasonably be expected to have the effect of preventing, materially delaying, making illegal or otherwise interfering in any material respect with any of the transactions contemplated by the Agreement.

(c) Purchaser, on behalf of itself and each of its Affiliates, further agrees that Purchaser and its Affiliates will take at their own cost and expense any and all commercially reasonable steps necessary (i) to avoid or eliminate each and every impediment under any Regulatory Law that may be asserted by any Governmental Authority or other Person, and (ii) to obtain all approvals, waivers, consents, and expirations or terminations of waiting period under any Regulatory Laws in each case so as to enable Closing to occur as promptly as possible. Notwithstanding the foregoing or any other provision hereof, Purchaser and its Affiliates shall

58

not be required to take, or agree to take, any action, including entering into any consent decree, hold separate order, divestiture or other arrangement or agreement, that would reasonably be expected to result in a loss by Purchaser and its Affiliates of a material benefit arising from or relating to the transactions contemplated by this Agreement, provided that responding to any inquiries or requests for information made by any Governmental Authority (including complying at the earliest practical date with any requests for additional information and documentary material from the FTC or DOJ) and/or engaging in litigation shall not be considered an action that would reasonably be expected to result in a loss of a material benefit arising from or relating to the transactions contemplated by this Agreement. Any proposing, negotiating, committing to and effecting any divestiture, sale, disposition, hold separate, or limitation on freedom of action with regard to any aspect of the Companies or any of their Subsidiaries that is part of the proposed acquisition by Purchaser under this Agreement shall, at the sole discretion of Seller Representative, be subject to the consummation of the transactions contemplated hereby, and in any event nothing in this Agreement imposes any obligation on Sellers or their respective Affiliates, with regard to any divestiture, sale, disposition, hold separate, or limitation on freedom of action as to any other interests or holdings of Sellers or their respective Affiliates, either prior to or after the Closing.

(d) In connection with this <u>Section 8.3</u>, the Parties shall, and shall cause their respective Affiliates to (i) cooperate in all respects with each other in connection with any filing, submission, investigation, action, or inquiry, (ii) promptly inform the other Parties of any communication received by such Party from, or given by such Party to any Governmental Authority and of any material communication received or given in connection with any proceeding by a private party, in each case, regarding any of the transactions contemplated hereby, (iii) have the right to review in advance, and to the extent practicable, each shall consult the other on and consider in good faith the views of the other Parties in connection with, any filing made with, or written materials to be submitted to any Governmental Authority or, in connection with any proceeding by a private party, any other Person, in connection with any of the transactions contemplated hereby, (iv) make available to the other Parties copies of all filings, notices and other written communications submitted or made by any Party or its Affiliates to any Governmental Authority or received from any Governmental Authority in connection with any of the transactions contemplated hereby, and (v) consult with each other in advance of any meeting, discussion, telephone call or conference with any Governmental Authority or, in connection with any proceeding by a private party, with any other Person, and to the extent not expressly prohibited by the Governmental Authority or Person, give the other Parties the opportunity to attend and participate in such meetings and conferences, in each case, regarding any of the transactions contemplated hereby. The Parties may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this <u>Section 8.3</u> as for the recipient's outside counsel only. With regard to any sharing of information between the Parties contemplated under this <u>Section 8.3</u> (A) any disclosure of information shall been done in a manner consistent with applicable Law and subject to the confidentiality provisions of this Agreement, (B) information may be withheld as necessary to address reasonable attorney-client privilege concerns or as necessary to comply with restrictions set forth in any Contract, (C) any Party may, as it deems advisable or necessary, reasonably designate any confidential or competitively sensitive information as for "outside counsel only," and (D) materials provided to the other Parties or their counsel may be redacted to remove references concerning the valuation of the Companies.

59

Section 8.4 **Further Assurances**.

(a) Subject to, and not in limitation of, Section 8.3, each of Purchaser, the Sellers, the Seller Representative and Holdings shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement; (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement and (iii) obtain all such nongovernmental third party consents listed on Section 8.4 of the Disclosure Schedule that are required to be obtained prior to or as a result of the transactions contemplated hereby.

(b) The Parties shall execute and deliver any additional instruments reasonably necessary to consummate the transactions contemplated by, and to fully carry out the purposes of, this Agreement.

Section 8.5 **Confidentiality**.

(a) Purchaser acknowledges and agrees that the information provided to it (and its Affiliates, officers, employees or representatives (including its legal advisors and accountants and Financing Sources and their legal advisors and accountants)) in connection with this Agreement and the transactions contemplated hereby (including information provided pursuant to Section 8.1) pursuant to the terms of the Confidentiality Agreement, the terms of which are incorporated herein by reference. Purchaser shall cause its officers, employees and representatives (including its legal advisors and accountants) to keep all such information confidential and comply with the Confidentiality Agreement to the same extent as if such Persons were party thereto. Effective upon, and only upon the Closing, the Confidentiality Agreement shall terminate.

(b) (i) Until the Closing Date, Sellers, the Seller Representative and Holdings shall, and shall cause their Affiliates and Representatives to, keep confidential, disclose only to its Affiliates or representatives and use only in connection with the transactions contemplated by this Agreement, all information and data obtained by them from Purchaser or its Affiliates or Representatives relating to Purchaser or the transactions contemplated hereby (other than information or data that (w) is or becomes available to the public other than as a result of a breach of this Section 8.5, (x) is or becomes available to Sellers, the Seller Representatives, Holdings or any of their respective Affiliates or Representatives from third parties on a non-confidential basis, (y) was within Sellers, the Seller Representatives, Holdings or any of their respective Affiliates' or Representatives' possession prior to its being furnished to them by or on behalf of Purchaser, or (z) is independently developed by Sellers, the Seller Representatives, Holdings or any of their respective Affiliates or Representatives without use of or reference to such data or information), unless disclosure of such information or data is required to consummate the transactions contemplated hereby or required by applicable Law; and (ii) for a period of thirty (30) months following the Closing Date, the Sellers shall not, and the Sellers shall cause their Affiliates and the respective Representatives of the Sellers and their Affiliates not to, use for its or their own benefit or divulge or convey to any third party, any information and data relating to the Companies or the transactions contemplated hereby (other than data or information that (y) is or becomes available to the public other than as a result of a

60

breach of this Section 8.5 or (z) is or becomes available to Sellers, their Affiliates or any of their respective Representatives from third parties on a non-confidential basis), unless disclosure of such information or data is required by applicable Law. Notwithstanding anything to the contrary in this Section 8.5(b)(ii), the Sellers, their Affiliates, and their respective Representatives may disclose any data and information in connection with routine supervisory audit or regulatory examinations (including, without limitation, by regulatory or self-regulatory bodies) to which they are subject in the course of their respective businesses without liability hereunder, provided that such routine audit or examination does not specifically target the Companies. Furthermore, notwithstanding anything to the contrary in this Section 8.5(b), Purchaser acknowledges that (i) the Seller Funds and their Affiliates (including, for clarity, their affiliated investment funds and portfolio companies) are engaged in the business of private equity investing and may from time to time invest in entities that develop and utilize technologies, products or services that are similar to or directly or indirectly competitive with those of Purchaser, the Companies and their respective Affiliates, and (ii) except insofar as this Section 8.5 restricts the disclosure of the data and information specified herein, this Agreement shall not prevent the Seller Funds or any of their Affiliates from (a) engaging in or operating any business, (b) entering into any agreement or business relationship with any third party, or (c) evaluating or engaging in investment discussions with, or investing in, any third party, whether or not competitive with Purchaser, the Companies or any of their Affiliates.

#### Section 8.6 Indemnification, Exculpation and Insurance.

(a) Purchaser agrees that all rights of the Indemnitees to indemnification and exculpation from liabilities for acts or omissions occurring on or prior to the Closing Date as provided in the Governing Documents of the Companies as now in effect, and any indemnification agreements or arrangements of the Companies (which indemnification agreements or arrangements are listed in Section 8.6 of the Disclosure Schedule) shall survive the Closing Date and shall continue in full force and effect in accordance with their terms. Such rights shall not be amended, or otherwise modified in any manner that would adversely affect the rights of the Indemnitees, unless such modification is required by Law.

(b) Purchaser, from and after the Closing Date, shall cause the respective certificate of incorporation, by-laws, limited liability company agreement and partnership agreement, as applicable, of the Companies (including the certificate of incorporation and by-laws of Holdings) to contain provisions no less favorable to the Indemnitees with respect to limitation of certain liabilities of directors, officers, employees and agents and indemnification than are set forth as of the date of this Agreement in the Governing Documents of the Companies (including the certificate of incorporation and by-laws of Holdings).

(c) The Companies shall obtain (at their sole cost and expense, which shall be reflected as Transaction Expense) prior to or upon the Closing, and for the six (6) year period commencing immediately after the Closing shall maintain in effect, a "tail" directors' and officers' and errors and omissions liability insurance policies with a reputable insurance company covering acts or omissions relating to the Companies occurring on or prior to the Closing Date with respect to those directors and officers of the Companies who are currently covered by directors' and officers' and errors and omissions liability insurance policies, on terms with respect to such coverage and amounts no less favorable to the Companies' directors and officers currently covered by such insurance than those of such policies in effect on the date hereof.

61

(d) The provisions of this Section 8.6 (i) are intended to be for the benefit of, and shall be enforceable by, each Indemnitee, his or her heirs and his or her representatives; and (ii) are in addition to, and not in substitution for, any other rights to indemnification or contribution that any such Person may have by Contract or otherwise. In the event that Purchaser or any of its successors or assigns (A) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger; or (B) transfers or conveys all or substantially all of its properties or assets to any Person, then, and in each such case, proper provision shall be made so that the successors and assigns of Purchaser shall assume all of the obligations thereof set forth in this Section 8.6.

(e) The obligations of Purchaser under this Section 8.6 shall not be terminated or modified in such a manner as to adversely affect any Indemnitee to whom this Section 8.6 applies without the written consent of the affected Indemnitee (it being expressly agreed that the Indemnitees to whom this Section 8.6 applies shall be third party beneficiaries of this Section 8.6).

**Section 8.7 Preservation of Records; Access to Employees.**

(a) From and after the Closing, the Sellers, Holdings and Purchaser shall preserve and keep the records held by them or their Affiliates (including the Companies) relating to the business of the Companies for a period of seven (7) years from the Closing Date and shall, upon reasonable notice, make such records and personnel available to the other Parties as may be reasonably required by any such Party in connection with, among other things, any insurance claims by, Legal Proceedings or Tax audits against or governmental investigations of the Sellers or Purchaser or any of their Affiliates, any evaluation of any claim for indemnification hereunder or in order to enable the Sellers or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. Purchaser or the Seller Representative may request, fifteen (15) Business Days prior to the end of such period, at the requesting party's expense, to obtain any such items prior to their disposal by the other party, and the other party shall comply with such request to the extent permitted to do so by applicable Law or Order, or by a contractual obligation.

(b) For a period of three (3) years following the Closing (and thereafter, for so long as a Tax Matter or Third Party Claim is pending), Purchaser and Holdings shall afford the Seller Representative and its representatives access, upon reasonable advance notice and during normal business hours (provided that (i) such access does not materially interfere with the conduct of the business of the Companies, (ii) the Seller Representative coordinates such access with Holdings' Chief Financial Officer, and (iii) such access does not include access to materials that are subject to the attorney-client, work-product or other privilege or access to any working papers of any independent accountant unless customary confidentiality and hold harmless agreements have been first executed), to records and information of the Companies as the Seller Representative may reasonably request in connection with any Third Party Claims or the preparation of Income Tax Returns.

62

Section 8.8 <u>Publicity</u>. The Parties shall, and shall cause each of their Affiliates and representatives to, maintain the confidentiality of this Agreement and shall not, and shall cause each of their Affiliates not to, issue or cause the publication of any press release or other public announcement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of Purchaser, Holdings and the Seller Representative; <u>provided</u>, <u>however</u>, that a Party may, without such prior consent, issue or cause publication of any such press release or public announcement to the extent that such Party reasonably determines, after consultation with outside legal counsel, such action to be required by Law or by the rules of any applicable self-regulatory organization, in which event such Party shall use its commercially reasonable efforts to allow Purchaser, Holdings and the Seller Representative, as the case may be, reasonable time to comment on such press release or public announcement in advance of its issuance <u>provided</u>, <u>further</u>, that the Seller Funds may disclose on a confidential basis (A) details of the transactions contemplated hereby in a manner consistent with their respective past practices regarding transactions to their respective existing or potential limited partners, the Seller Funds or their respective Affiliates; (B) details regarding their respective investments and overall return on such investments at their respective annual meetings or similar meetings with limited partners (whether or not attendees at the meeting include Persons who are not limited partners); (C) details regarding their respective investments and overall return on such investments in any offering memoranda or other marketing materials distributed to prospective investors in any then-existing or proposed fund that is (or will be) an Affiliate of any Seller Fund, as applicable; and (D) disclose the transactions contemplated hereby in their respective audited financial statements to the extent required by GAAP.

Section 8.9 <u>Employee Benefit Arrangements</u>.

(a) Purchaser shall ensure that all Persons who were employed by the Companies immediately preceding the Closing, including those on vacation, leave of absence or disability leave (the "Company Employees"), will remain employed in a comparable position on and immediately after the Closing Date, at not less than the same base salary, wages or commissions (as applicable). Purchaser shall not, at any time prior to 180 days after the Closing Date, directly or indirectly, effectuate a "mass layoff" as that term is defined in WARN, or comparable conduct under any applicable state Law, affecting in whole or in part any facility, site of employment, operating unit or employee of the Companies without complying fully with the requirements of WARN or such applicable state Law.

(b) For a period of one (1) year from the Closing, Purchaser shall provide employee benefit and compensation plans, programs and arrangements for the Company Employees that are either (1) substantially similar in the aggregate to the employee benefit and compensation plans, programs and arrangements provided to similarly situated employees of the Purchaser, or (2) substantially similar in the aggregate to the employee benefit and compensation plans, programs and arrangements provided to the Company Employees immediately prior to the Closing, and shall use commercially reasonable efforts to ensure that such employee benefit and compensation plans count employment with the Companies prior to the Closing as service for all purposes including without limitation eligibility, vesting and accrual of benefits; provided that the foregoing shall not require any duplication of benefits.

63

(c) Purchaser acknowledges that from and after the Closing, Purchaser shall assume and fulfill all of the Companies' obligations with respect to the Company Benefit Plans. Notwithstanding the foregoing, no provisions of this Section 8.9 shall (i) create any rights or interest, except as among the parties to this Agreement, and no former, present or future employees of any such party or its affiliates (or any dependents of such individuals) will be treated as third-party beneficiaries in or under the provisions of this Section 8.9; and (ii) limit the right of the Purchaser to amend, modify or terminate any Company Benefit Plans, in accordance with the terms thereof.

Section 8.10 **Letters of Credit**. Prior to the Closing, Purchaser shall substitute the letters of credit that are issued under or in connection with the Indebtedness being paid off as part of the Debt Payoff Amount described on Section 8.10 of the Disclosure Schedule with replacement letters of credit, guarantees, cash collateral or other support arrangements acceptable to the beneficiary of such letters of credit. The Sellers and the Companies shall cooperate reasonably with Purchaser in order to obtain such substitutions.

Section 8.11 **Exclusivity**. Prior to the Closing, the Sellers and Holdings shall not, and shall take all action necessary to ensure that the other Companies and their Affiliates or representatives shall not, directly or indirectly (a) solicit, initiate, or accept any proposal or offer that constitutes or would reasonably be expected to lead to an Acquisition Proposal, or (b) initiate any discussions, conversations, negotiations or other communications regarding, or furnish to any other Person any information with respect to, or otherwise cooperate in any way with, or assist or participate in, or facilitate the submission of, any proposal that constitutes, or could reasonably be expected to lead to, an Acquisition Proposal. The Sellers and Holdings shall immediately cease and cause to be terminated all existing discussions, conversations, negotiations and other communications with any Persons conducted heretofore with respect to any of the foregoing, and shall direct its investment bankers to request that all such Persons promptly return or destroy all confidential information regarding the Companies previously delivered thereto. The Sellers and Holdings shall notify Purchaser promptly, but in any event within two (2) Business Days, orally and in writing if any Acquisition Proposal, or any proposal or offer that could reasonably be expected to lead to an Acquisition Proposal, is made, or any inquiry or other contact with any Person is made with respect thereto. Such notice to Purchaser shall include the material terms and conditions thereof. The Sellers and Holdings shall not, and shall cause the other Companies not to, release any Person from, or waive any provision of, any confidentiality agreement to which any Company or Seller is a party, without the prior written consent of Purchaser. "Acquisition Proposal" means any offer or proposal for, or any indication of interest in, any of the following: (i) any direct or indirect acquisition or purchase, in one transaction or a series of transactions, of (A) all or any portion of the capital stock or other equity interests any of the Companies or (B) a substantial portion of the assets of the Companies, (ii) any merger, consolidation or other business combination relating to or involving the any of the Companies or (iii) any recapitalization, reorganization or other extraordinary business transaction involving or otherwise relating to any of the Companies.

64

Section 8.12 **Equity Commitment Letters**.

(a) Purchaser shall seek the Equity Financing contemplated by the Equity Commitment Letters upon satisfaction or waiver of the conditions to Closing in Section 9.1 (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions). Purchaser shall not, and Purchaser shall cause the Equity Financing Source not to, agree to or permit any amendment, supplement or other modification of, or waive any of its material rights under, any of the Equity Commitment Letters without Seller Representative's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed); provided that, for the avoidance of doubt, without the consent of Seller Representative, Purchaser may correct typographical errors. Upon any such amendment, supplement or modification of the Equity Commitment Letters in accordance with this Section 8.12, the term "Equity Commitment Letters" shall mean the Equity Commitment Letters as so amended, supplemented, modified or waived.

(b) Purchaser shall use its reasonable best efforts to keep Seller Representative reasonably informed on a reasonably current basis in reasonable detail of the status of its efforts to arrange the Equity Financing. Without limiting the generality of the foregoing, Purchaser shall give Seller Representative prompt written notice of (i) any material breach or default by any party to the Equity Commitment Letters or definitive documents relating to the Equity Financing, in each case, of which Purchaser becomes aware and to the extent such material breach or default would reasonably be expected to delay the Closing when required pursuant to Section 3.1 or prevent the Closing, and (ii) any termination or cancellation of the Equity Commitment Letters.

(c) Notwithstanding anything to the contrary contained in this Agreement, nothing contained in this Section 8.12 or elsewhere in this Agreement shall require, and in no event shall the "reasonable best efforts" of Purchaser be deemed or construed to require, Purchaser to seek the Equity Financing from any source other than those counterparty to, or in any amount in excess of that contemplated by, the Equity Commitment Letters.

Section 8.13 **Financing Cooperation**.

(a) Upon the reasonable request of Purchaser, the Sellers shall cause the Companies to provide, and to use their reasonable best efforts to cause their respective Representatives, including their legal, tax, regulatory and accounting Representatives, to provide, such cooperation in connection with the arrangement of any debt financing of the transactions contemplated hereby (the "Debt Financing") as may be reasonably requested by Purchaser prior to the Closing Date and that is necessary, customary or advisable in connection with Purchaser's efforts to obtain the Debt Financing (provided that such requested cooperation does not unreasonably interfere with the ongoing operations of any of the Companies), including the following actions by the Companies:

(i) participating in a reasonable number of meetings taking into account the nature of the Debt Financing (including using reasonable efforts to participate in a reasonable number of one-on-one meetings with the parties acting as lead arrangers or agents for, and prospective lenders and purchasers of, the Debt Financing, and using reasonable efforts to cause the members of senior management and Representatives of the Companies to participate in such meetings), rating agency presentations, road shows, due diligence and drafting sessions and sessions with prospective Financing Sources and investors, and cooperating reasonably with the marketing efforts of the Purchaser and the Financing Sources, in each case in connection with all or any portion of the Debt Financing;

65

(ii) assisting the Purchaser and the Financing Sources in the preparation of rating agency presentations, offering documents, private placement memoranda, bank information memoranda, business projections, lender and investor presentations, prospectuses and other similar materials for any bank or other debt financing and similar documents required in connection with any of the Debt Financing, including using reasonable efforts to cause the execution and delivery of reasonable and customary representation letters in connection with the bank information memoranda;

(iii) cooperating reasonably with the Financing Sources' customary due diligence;

(iv) using reasonable efforts to obtain, in cooperation with the Purchaser and the Financing Sources, from the Companies' auditor such accountants' comfort letters and reports and the consent of such auditor to the use of its reports in any materials relating to the Debt Financing, and using reasonable efforts to obtain such hedging agreements, legal opinions, appraisals, surveys, engineering reports, title insurance and other documentation and items as may be reasonably requested by the Purchaser and as are customary for financings similar to the Debt Financing;

(v) (A) using reasonable best efforts to provide monthly unaudited financial statements (excluding footnotes) consisting of the consolidated balance sheets and the related consolidated statements of results of operations, cash flows and stockholders' equity of the Companies within 25 days of the end of each month prior to the Closing Date; and (B) providing the unaudited consolidated balance sheets and the related consolidated statements of results of operations, cash flows and stockholders' equity of the Companies, prepared in accordance with the Accounting Principles, within 45 days of the end of each fiscal quarter prior to the Closing Date;

(vi) executing and delivering, at and effective as of the Closing, such definitive financing documents, including any credit or purchase agreements, guarantees, pledge agreements, security agreements, mortgages, deeds of trust and other security documents, borrowing base certificates, solvency certificates or other certificates, documents and instruments relating to guarantees, the pledge of collateral and similar documents, as may be reasonably requested by the Purchaser in connection with the Debt Financing, and otherwise reasonably facilitating the pledging of collateral, at and effective as of the Closing, and cooperating reasonably in connection with the pay-off of existing indebtedness and the release of related Liens, and Purchaser's efforts to effect the replacement or backing of any outstanding letter of credit maintained or provided by the Companies at and effective as of the Closing;

(vii) taking all corporate or other actions and providing such other assistance, taking into account the nature of the Debt Financing, as reasonably requested by the Purchaser to permit the Financing Sources to conduct audit examinations, appraisals and other evaluations with respect to the Companies' current assets and other collateral, and to evaluate its cash management and accounting systems, policies and procedures relating thereto for the purposes of establishing collateral arrangements;

66

(viii) at least three Business Days prior to Closing, providing all documentation and other information about the Sellers and the Companies that is reasonably requested by the Financing Sources and the Financing Sources reasonably determine is required by applicable "know your customer" and anti-money laundering rules and regulations including without limitation the USA PATRIOT Act; and

(ix) taking all corporate actions, effective as of the Closing, reasonably requested by the Purchaser to permit the consummation of the Debt Financing and to permit the proceeds thereof to be made available to the Purchaser at the Closing to consummate the transactions contemplated by this Agreement, <u>provided</u> that none of the Companies shall be required to pay any commitment, premium, legal expense, survey or other similar fee or incur any other liability in connection with the Debt Financing prior to the Closing for which it is not reimbursed or indemnified by the Purchaser.

Notwithstanding anything to the contrary in this <u>Section 8.13</u>, none of the Sellers shall (A) be required to pay any commitment or other similar fee, have any liability or obligation under any loan agreement and related documents, or incur any other liability in connection with the Debt Financing, or (B) be required to take any action that will conflict with or violate any Seller's Governing Documents or any Law.

(b) The Sellers hereby consent to the use of the Companies' logos in connection with the Debt Financing, provided that such logos are used solely in a manner that does not harm or disparage the Companies or any of their Affiliates or their reputation or goodwill. All non-public information regarding the Companies and the Business, the Sellers and their Affiliates provided to any of the Purchaser, the Financing Sources or their respective Representatives pursuant to this <u>Section 8.13</u> shall be kept confidential by them in accordance with the Confidentiality Agreement, except for disclosure to potential lenders and investors and their respective Representatives that is reasonably required in connection with the Debt Financing subject to customary confidentiality protections.

(c) <u>Reimbursement; Indemnification</u>. The Purchaser shall, promptly upon the written request of any Seller or Company reimburse such Person for all reasonable and documented out-of-pocket third-party costs and expenses incurred by such Person or any of its Representatives in connection with the cooperation provided for in <u>Sections 8.13(a)</u> and <u>8.13 (b)</u> (such reimbursement to be made promptly and in any event within three (3) Business Days of delivery of reasonably acceptable documentation evidencing such cost and expenses) and shall indemnify and hold harmless such Person and its Representatives from and against any and all Losses suffered or incurred by them in connection with their respective obligations under this <u>Section 8.13</u> and/or the arrangement of the Debt Financing and any information utilized in connection therewith (other than information provided by the Companies).

67

Section 8.14 **Non-Solicitation and Non-Compete.**

(a) Beginning on the date of this Agreement and continuing through a period of five years following the Closing, the Sellers shall not, and shall cause their respective Affiliates not to, directly or indirectly through any Person or contractual arrangement, solicit, recruit or hire (i) any person who at any time on or prior to the Closing is a Company Group Employee or (ii) any person listed on Section 8.14(a) of the Disclosure Schedule; provided, that the foregoing shall not prohibit (A) a general solicitation to the public or general advertising or similar methods of solicitation by search firms not specifically directed at Company Group Employees or (B) the Sellers or any of their Affiliates from soliciting, recruiting or hiring any Company Group Employee who has ceased to be employed or retained by the Companies, Purchaser or any of their respective Affiliates for at least 12 months.

(b) For a period of five years following the Closing, the Sellers, other than the Seller Funds, shall not, and shall cause their respective Affiliates not to, directly or indirectly through any Person or contractual arrangement:

(i) engage in any business that competes in whole or in part with the Business anywhere in the United States or Mexico, or perform management, executive or supervisory functions with respect to, own, operate, join, control, render financial assistance to, receive any economic benefit from, exert any influence upon, participate in, render services or advice to, any business or Person that competes in whole or in part with the Business; provided, however, that the foregoing shall not prohibit the holding and making of passive investments in publicly traded securities or other publicly traded equity interests which do not exceed two percent (2%) of the outstanding shares or interests of the issuer thereof; or

(ii) approach or seek competitive business from, or refer competitive business to any Person or be paid commissions based on sales received from, any Person to whom the Sellers or the Companies or any of their respective Affiliates provided products or services during the 36-month period prior to the date of this Agreement; provided, that the foregoing shall not prohibit any referral of business by the Sellers to the Companies or Purchaser.

Section 8.15 **Waiver.**

(a) The Seller Representative, on behalf of the Sellers, may (i) extend the time for the performance of any of the obligations or other acts of Purchaser or, after the Closing, any of the obligations or other acts to be performed by Purchaser or the Companies, (ii) waive any inaccuracies in the representations and warranties of Purchaser contained herein or in any document delivered by Purchaser pursuant hereto, or (iii) waive compliance with any of the agreements or conditions of Purchaser contained herein or, after the Closing, compliance with any of the agreements of Purchaser or the Companies contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Seller Representative.

68

(b) Purchaser may (i) extend the time for the performance of any of the obligations or other acts of Holdings, any of the Sellers or the Seller Representative, (ii) waive any inaccuracies in the representations and warranties of any of the Sellers or Holdings contained herein or in any document delivered by any of the Sellers, Holdings or the Seller Representative pursuant hereto, or (iii) waive compliance with any of the agreements of Holdings, the Sellers or the Seller Representative contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by Purchaser.

(c) Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition, of this Agreement. The failure of any Party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

Section 8.16 **Termination of Related Party Agreements**. On or prior to the Closing, the Sellers and Holdings shall, and shall cause their respective Affiliates to:

(a) terminate, cancel, retire, payoff or otherwise extinguish all Contracts (such Contracts, the "Terminated Agreements") between any of the Companies, on the one hand, and any Seller, any Affiliate of such Seller (other than the Companies) and each Related Party of the foregoing (other than the Companies), on the other hand, except for (A) those Contracts set forth in Section 8.16 of the Disclosure Schedule, (B) this Agreement and the Ancillary Agreements and (C) (1) any arm's-length Contracts entered into in the Ordinary Course of Business with portfolio companies of any Seller Funds and (2) for clarity, any arm's-length Contract entered into in the Ordinary Course of Business with limited partners of any Seller Fund and/or any of such limited partners' respective portfolio companies; and

(b) cancel, retire, payoff or otherwise extinguish (by way of capital contribution, cash settlement or as otherwise reasonably determined by the applicable Seller) all payables and receivables under the Terminated Agreements, and all other intercompany advances, accounts, payables and receivables between and of the Companies, on the one hand, and any Seller, any Affiliate of such Seller (other than the Companies) and each Related Party of the foregoing, on the other hand.

In accordance with the foregoing, the Sellers acknowledge and agree that each of (i) the Subscription Agreement, dated March 7, 2012, by and among Holdings, the Seller Funds and the other parties thereto, and (ii) the Stockholders Agreement, dated April 2, 2012, by and among Holdings, the Seller Funds and the other parties thereto, as amended, is hereby terminated effective upon the Closing, and thereafter shall be of no further force or effect such that no party to either such agreement shall have any right, duty, liability or obligation thereunder from and after the Closing.

Section 8.17 **Cash Dividends**. Prior to the Closing Date, Holdings shall cause (a) all Company Cash located in the United States in excess of $1,000,000 and (b) all Company Cash located in Mexico in excess of $500,000 to be dividended to the Sellers or used to pay down any Indebtedness; provided, however, that a breach hereof will not affect the determination of the Final Company Cash and will not be subject to indemnity pursuant to Article X.

69

Section 8.18 **R&W Policy**. Purchaser shall cause the R&W Policy to expressly provide that the insurer writing such policy shall not pursue any subrogation rights against any Seller, Seller Representative or any of their Affiliates and/or any of their respective equityholders, officers, directors, employees, agents, advisors or representatives under this Agreement or any other Ancillary Agreement, except in the case of fraud by such Seller or Seller Representative, as applicable. From and after the date hereof, Purchaser shall not (and shall cause its Affiliates to not) grant any right of subrogation or otherwise amend, modify, terminate or waive any term or condition set forth in the R&W Policy in a manner inconsistent with the immediately preceding sentence.

Section 8.19 **Centerbridge Escrow**. To the extent that as of the Closing, all funds in the escrow account established by the Escrow Agreement, dated October 23, 2015, between Centerbridge Advisors III, LLC, USP Holdings Inc., and Wilmington Trust, N.A. have not been released, Purchaser shall promptly assign any and all rights to any such remaining funds to Seller Representative on behalf of the Sellers (such assignment to be in form reasonably satisfactory to Purchaser and Seller Representative).

## ARTICLE IX
## CONDITIONS TO CLOSING

Section 9.1 **Conditions Precedent to Obligations of Purchaser**. The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or prior to the Closing, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a) the representations and warranties of Holdings and of the Sellers (i) set forth in <u>Sections 5.1</u>, <u>5.2</u>, <u>5.4</u>, <u>5.19</u>, <u>6.1</u>, <u>6.2</u>, <u>6.4</u> and <u>6.6</u> of this Agreement (the "<u>Fundamental Representations</u>") shall be true and correct on and as of the Closing Date as though made on and as of the Closing Date or, in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date, and (ii) set forth in any other Section of this Agreement shall be true and correct on and as of the Closing Date as though made on and as of the Closing Date, or in the case of representations and warranties that are made as of a specified date, such representations and warranties shall be true and correct as of such specified date, except, in each case under this clause (ii), where the failure to be so true and correct (without giving effect to any limitation or qualification as to "materiality," including the words "material" or "Material Adverse Effect," set forth therein) would not, individually or in the aggregate, have a Material Adverse Effect;

(b) Holdings and the Sellers shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by them on or prior to the Closing Date (without giving effect to any limitation or qualification as to "materiality," including the words "material" or "Material Adverse Effect," set forth therein); <u>provided</u>, <u>however</u>, that with respect to the Sellers' and Holdings' obligations under <u>Section 8.13</u>, the condition in this <u>Section 9.1(b)</u> shall only require Holdings and the Sellers to have performed and complied in all material respects with all obligations and agreements in <u>Section 8.13</u> to the extent reasonably achievable on or prior to the Closing Date (with the Closing Date for purposes of this proviso being determined ignoring the requirements of <u>Section 8.13</u>);

70

(c) there shall not be in effect any Order by a Governmental Authority of competent jurisdiction prohibiting the consummation of the transactions contemplated hereby;

(d) the waiting period applicable to the transactions contemplated by this Agreement under the HSR Act shall have expired or early termination shall have been granted;

(e) since the date of this Agreement, there shall not have occurred any event, occurrence, change, result, state of facts or effect that has had or would reasonably be expected to have a Material Adverse Effect; and

(f) Holdings the Sellers and the Seller Representative shall have delivered or caused to be delivered to Purchaser all of the certificates and other documents set forth in Sections 3.2(a), 3.2(b), and 3.2(c).

**Section 9.2 <u>Conditions Precedent to Obligations of the Sellers</u>**. The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or at the Closing, of each of the following conditions (any or all of which may be waived by the Seller Representative in whole or in part to the extent permitted by applicable Law):

(a) the representations and warranties of Purchaser set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing Date, except to the extent such representations and warranties relate to a specified date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such specified date);

(b) Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, (without giving effect to any limitation or qualification as to "materiality," including the words "material" or "Material Adverse Effect," set forth therein);

(c) there shall not be in effect any Order by a Governmental Authority of competent jurisdiction prohibiting the consummation of the transactions contemplated hereby;

(d) the waiting period applicable to the transactions contemplated by this Agreement under the HSR Act shall have expired or early termination shall have been granted; and

(e) Purchaser shall have taken all of the actions, and delivered or caused to be delivered to the Sellers all of the certificates and other documents, set forth in Section 3.2(d).

71

Section 9.3 **Frustration of Closing Conditions.** None of Purchaser or the Sellers may rely on the failure of any condition set forth in Section 9.1 or Section 9.2, as the case may be, if such failure was principally caused by such Party's failure to comply with any provision of this Agreement.

# ARTICLE X
# INDEMNIFICATION

Section 10.1 **Survival of Provisions.** The representations and warranties of the Parties contained in this Agreement shall survive the Closing for a period of 548 days following the Closing Date, provided that (i) the Fundamental Representations and shall survive the Closing for a period of six (6) years and (ii) the representations and warranties contained in Section 5.8 (relating to Taxes) (the "Tax Representations") shall survive the Closing Date until the date that is 60 days following the expiration of the applicable statute of limitations with respect to each such representation and warranty and (iii) the representations and warranties contained in Section 5.17 (relating to environmental matters) shall survive the Closing Date for a period of six (6) years. Each of the Pre-Closing Covenants shall survive for a period of one (1) year following the Closing Date. Each of the covenants and agreements of the parties set forth in this Agreement requiring performance after the Closing Date shall survive indefinitely. If any Indemnification Notice is given in accordance with the terms of Section 10.4 within the applicable survival period set forth in this Section 10.1, each claim set forth in the Indemnification Notice shall survive until such time as such claim is finally resolved.

Section 10.2 **Indemnification by Sellers.**

(a) Subject to the other terms, conditions and limitations set forth in this Article X, from and after the Closing, the Sellers shall severally, and not jointly, indemnify and hold the Purchaser Indemnified Parties harmless from and against (without duplication) any and all losses, liabilities, judgments, damages, fines, interest, penalties, claims, suits, actions, and reasonable documented third-party costs and expenses (individually, a "Loss" and, collectively, "Losses") resulting from:

(i) the breach of any of the representations, or warranties (other than the Tax Representations) made by the Companies in this Agreement, the Holdings Closing Certificate or any other certificate or document delivered by the Companies pursuant to this Agreement;

(ii) the breach of any of the Tax Representations made by the Companies in this Agreement, the Holdings Closing Certificate or any other certificate or document delivered by the Companies pursuant to this Agreement; or

(iii) the breach of any covenant on the part of any Company contained in this Agreement or any other certificate or document delivered by the Companies pursuant to this Agreement required to be performed by any Company prior to the Closing.

(b) Subject to the other terms, conditions and limitations set forth in this Article X, from and after the Closing, each of the Sellers shall, severally and not jointly, indemnify and hold the Purchaser Indemnified Parties harmless from and against (without duplication) any and all Losses resulting from:

72

(i) the breach of any of the representations or warranties made by such Seller in this Agreement, the Seller Closing Certificate or any other certificate or document delivered by the Sellers pursuant to this Agreement; or

(ii) the breach of any covenant on the part of such Seller contained in this Agreement, the Seller Closing Certificate or any other certificate or document delivered by the Sellers pursuant to this Agreement.

(c) Purchaser shall take and shall cause its Affiliates (including each of the Companies from and after the Closing) to take all commercially reasonable steps to mitigate any Loss upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto.

(d) Notwithstanding anything to the contrary in this Agreement, for purposes of determining the accuracy of any representation or warranty subject to indemnification under this Section 10.2 and for purposes of determining the amount of Losses resulting from any inaccuracy of any such representation or warranty, all "material," "materially," "in all material respects," "Material Adverse Effect," and other like qualifications shall be disregarded.

### Section 10.3 Indemnification by Purchaser.

(a) Subject to the other terms, conditions and limitations set forth in this Article X, Purchaser shall indemnify and hold the Seller Indemnified Parties harmless from and against (without duplication) any and all identifiable Losses resulting from:

(i) the actual breach of any of the representations or warranties made by Purchaser in this Agreement;

(ii) the actual breach of any covenant on the part of Purchaser contained in this Agreement; or

(iii) the actual breach on the part of Holdings of any covenant contained in this Agreement that by its nature is to be performed after Closing.

(b) Each of the Sellers shall take and cause its Affiliates to take all commercially reasonable steps to mitigate any Loss upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto.

### Section 10.4 Indemnification Procedures.

(a) A claim for indemnification for any matter not involving a Third Party Claim may be asserted by written notice (an "Indemnification Notice") to (i) the Seller Representative, on behalf of each of the Sellers, in respect of a claim for which indemnification is sought under Section 10.2(a), (ii) to the applicable Seller, in respect of a claim for which indemnification is sought under Section 10.2(b), and (iii) to Purchaser, in respect of a claim for which indemnification is sought under Section 10.3, in each case prior to expiration of the survival period for the provision or obligation forming the basis thereof. Each Indemnification Notice (x) must include, in reasonable detail, the basis for the claim made by the indemnified

73

party, including the section of this Agreement under which the claim is being made, and (y) must specify the amounts, if available, to which the indemnified party claims it is entitled with respect to or in connection with such claim. As used in this agreement, (i) "indemnified party" means the party seeking indemnification pursuant to this Article X and (ii) "indemnifying party" means the party required to provide indemnification pursuant to this Article X.

(b) In the event of any Third Party Claim, the indemnified party shall reasonably promptly cause written notice of the assertion of such Third Party Claim to be forwarded to (i) the Seller Representative, on behalf of each of the Sellers, in respect of a Third Party Claim for which payment may be sought under Section 10.2(a), (ii) to the applicable Seller, in respect of a Third Party Claim for which payment may be sought under Section 10.2(b), and (iii) to Purchaser, in respect of a Third Party Claim for which payment may be sought under Section 10.3. The failure of the indemnified party to give reasonably prompt notice of any such Third Party Claim shall not release, waive or otherwise affect the indemnifying party's obligations with respect thereto except to the extent that the indemnifying party is prejudiced as a result of such failure. The indemnifying party shall have the right, at its sole option and expense, to control such Third Party Claim including to be represented by counsel of its choice and to defend against, negotiate, settle or otherwise deal with any Third Party Claim which relates to any Losses indemnified against by it hereunder if, taking into account the limitations on indemnification set forth in Section 10.5(a), the indemnifying party would be required to indemnify the indemnified party for more than 50% of the Losses claimed; provided that the indemnifying party shall in no event consent to the entry of any judgment or enter into any settlement with respect to such Third Party Claim without the prior written consent of the indemnified party unless such judgment or settlement provides solely for the payment of money, the indemnifying party makes such payment in full and the indemnified party receives an unconditional release with respect to such Third Party Claim. If the indemnifying party elects to defend against, negotiate, settle or otherwise deal with any Third Party Claim which relates to any Losses indemnified by it hereunder, it shall notify the indemnified party of its intent to do so and shall fully indemnify the indemnified party for all Losses relating to such Third Party Claim subject in all respects to the Threshold and the Deductible where applicable in accordance with Section 10.5(a). If the indemnifying party elects not to defend against, negotiate, settle or otherwise deal with any Third Party Claim which relates to any Losses indemnified by it hereunder, the indemnified party may in good faith defend against, negotiate, settle or otherwise deal with such Third Party Claim.

(c) If the indemnifying party shall assume the defense of any Third Party Claim, the indemnified party may participate, at his or its own expense, in the defense of such Third Party Claim; provided, however, that such Person shall be entitled to participate in any such defense with separate counsel at the expense of the indemnifying party if (i) in the reasonable opinion of counsel to the indemnified party, a material conflict exists between the indemnified party and the indemnifying party that would make such separate representation advisable, (ii) the Third Party Claim is for equitable or injunctive relief or that would impose criminal liability or criminal damages, (iii) the Third Party Claim seeks an injunction or equitable relief against the indemnified party; and provided, further, that the indemnifying parties shall not be required to pay for more than one such counsel and one local counsel for all indemnified parties in connection with any Third Party Claim. The Parties shall cooperate fully with each other in connection with the defense, negotiation or settlement of any such Third Party

74

Claim. Notwithstanding anything in this <u>Section 10.4</u> to the contrary, the indemnifying party shall not, without the written consent of the indemnified party (which consent shall not be unreasonably withheld, conditioned or delayed), settle or compromise any Third Party Claim or permit a default or consent to entry of any judgment unless the claimant unconditionally releases the indemnified party from all liability with respect to such Third Party Claim. Notwithstanding the foregoing, if a settlement offer solely requesting money damages is made by the applicable third party claimant, and the indemnifying party notifies the indemnified party in writing of the indemnifying party's willingness to accept the settlement offer and, subject to the applicable limitations of this <u>Section 10.4</u>, pay the amount called for by such offer, and the indemnified party declines to accept such offer, the indemnified party may continue to contest such Third Party Claim, free of any participation by the indemnifying party, and the amount of any ultimate liability with respect to such Third Party Claim that the indemnifying party has an obligation to pay hereunder shall be limited to the lesser of (A) the amount of the settlement offer that the indemnified party declined to accept plus the Losses of the indemnified party relating to such Third Party Claim for which the indemnified party is entitled to be indemnified pursuant to this <u>Article X</u> through the date of its rejection of the settlement offer or (B) the aggregate Losses of the indemnified party with respect to such Third Party Claim.

(d) After any final decision, judgment or award shall have been rendered by a Governmental Authority of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the indemnified party and the indemnifying party shall have arrived at a mutually binding agreement with respect to a claim for indemnification hereunder, the indemnified party shall forward to the indemnifying party notice of any sums due and owing by the indemnifying party pursuant to this Agreement with respect to such matter.

(e) Following the determination of any applicable amount that the Sellers shall be obligated to indemnify pursuant to <u>Section 10.2(a)</u> or <u>Section 10.2(b)</u>, the Seller Representative shall notify the Sellers and the Escrow Agent so that payment may be made from the Indemnity Escrow Amount to the applicable Purchaser Indemnified Party.

**Section 10.5 <u>Certain Limitations on Indemnification</u>.** Notwithstanding the other provisions of this <u>Article X</u>:

(a) The Sellers shall not have any indemnification obligations for Losses under <u>Section 10.2(a)(i)</u> or <u>Section 10.2(b)(i)</u>, unless the aggregate amount of all Losses relating thereto for which the Sellers would be liable exceeds the Deductible, and then only to the extent of such excess. In no event shall the aggregate indemnification for which the Sellers are obligated under <u>Section 10.2(a)(i)</u> and <u>Section 10.2(b)(i)</u> exceed the Cap. In no event shall the aggregate indemnification for which the Sellers are obligated under <u>Section 10.2(a)(i)</u>, <u>Section 10.2(a)(ii)</u>, <u>Section 10.2(a)(iii)</u> (only with respect to any breach of any Limited Covenant) and <u>Section 10.2(b)(i)</u> exceed an amount equal to the Cap <u>plus</u> the Deductible. No amount shall be payable by the Sellers under <u>Section 10.2(a)(i)</u> or <u>Section 10.2(b)(i)</u> for any individual claim or series of related claims (including where such claims arise out of substantially the same facts, events, circumstances, acts, courses of action or omissions) where the Losses relating to such claim or claims are less than the Threshold, and such amounts shall not be applied against the Deductible. Notwithstanding the foregoing, in no event shall any limitations on indemnification

75

obligations set forth in this Section 10.5(a) be applicable to (i) breaches of Fundamental Representations, (ii) claims relating to fraud, (iii) breaches of covenants (other than Limited Covenants) or (iv) breaches of Limited Covenants to the extent that (A) prior to the Closing, any cash or cash equivalents generated or received as a result of such breach are paid or distributed by any of the Companies to the Sellers, Related Parties, or any of the Companies' or the Sellers' Affiliates, or (B) the underlying cause of such Losses was made known to Purchaser by Holdings or the Sellers prior to the Closing.

(b) Notwithstanding anything herein to the contrary, other than in the event of fraud by such Seller, in no event shall: (i) a Seller be liable under this Article X for any amount (taking into account all liabilities of such Seller under this Agreement) in excess of its respective portion of the proceeds hereunder that are actually received by such Seller pursuant to this Agreement, (ii) a Seller be obligated under Section 10.2(a) to indemnify a Purchaser Indemnified Party for an amount greater than such Seller's Indemnification Percentage of the applicable Loss, or (iii) a Seller have any liability, obligation or responsibility under this Article X with respect to the breach of any (A) of the representations or warranties made by any other Seller or (B) covenant on the part of any other Seller.

(c) No Purchaser Indemnified Party shall make any claim for indemnification under this Article X in respect of any matter that is taken into account in the calculation of Final Working Capital or any adjustment to the Purchase Price pursuant to Section 2.3, including through reserves and accruals included in Final Working Capital. In the event Purchaser believes there are any facts or circumstances that are the basis for any adjustments to the Estimated Working Capital delivered by Holdings pursuant to Section 2.3(a), Purchaser shall be permitted, at its election, to pursue a remedy based on such facts or circumstances as an adjustment in the Closing Statement by establishing a specific accrual or reserve with respect to such facts or circumstances in Purchaser's calculation of Closing Working Capital or may pursue a remedy based on such facts or circumstances as an indemnification claim, but not both.

(d) No Purchaser Indemnified Party shall make any claim for indemnification under this Article X, and no Seller shall have any indemnification obligations for, any Losses in respect of any matter listed in Section 1.1(a) of the Disclosure Schedule, except to the extent that it is determined that any of the individuals listed in the definition of "Knowledge of Holdings" had actual knowledge of the facts or circumstances giving rise to such breach.

**Section 10.6 Calculation of Losses.**

(a) The amount of any Losses for which indemnification is provided under this Article X shall be net of any (i) net Tax benefit realized in the form of an actual cash reduction in Taxes of the indemnified party (or credits against Taxes) as a result of such Loss in the taxable year of the Loss or the year thereafter (determining such net Tax benefit after taking into account the Tax effect of the receipt of the indemnity payment hereunder with respect to such Loss) and (ii) insurance proceeds or other cash receipts or sources of reimbursement actually received as an offset against such Loss (net of any costs incurred to recover such amounts and any increase in premiums resulting directly from such claim), but in no event including amounts recovered under the R&W Policy. The Parties acknowledge and agree that no right of subrogation shall accrue or inure to the benefit of any Collateral Source hereunder and Purchaser shall use its best efforts to cause the insurers of any Purchaser Indemnified Party to waive subrogation against the Sellers other than in the event of a claim for fraud.

76

EX-2.6 Case: 18-31177    Document: 00515297113    Page: 528    Date Filed: 02/04/2020 02/04/2020136

Case 2:10-md-02179-CJB-DPC    Document 26293-2 Filed 02/05/20 Page 529 of 1003
Case 2:10-md-02179-CJB-DPC    Document 26193-2 Filed 02/05/2019 Page 529 of 1003

(b) Notwithstanding anything to the contrary elsewhere in this Agreement, no Party shall, in any event, be liable to any other Person under this <u>Article X</u> for punitive damages (other than with respect to punitive damages awarded in connection with Third Party Claims).

(c) Anything herein to the contrary notwithstanding, no breach of any representation, warranty, covenant or agreement contained herein shall give rise to any right on the part of Purchaser, after the consummation of the transactions contemplated hereby, to rescind this Agreement or any of the transactions contemplated hereby other than in the event of fraud.

**Section 10.7 <u>Exclusive Remedy</u>.** From and after the Closing, the sole and exclusive remedy for any and all claims arising out of, in connection with or relating to the Companies, the Business, the Shares, this Agreement, the Holdings Closing Certificate, the Seller Closing Certificate, the negotiation and execution of this Agreement (except to the extent otherwise expressly set forth herein) or the performance by the Parties of its terms, shall be indemnification in accordance with this <u>Article X</u> or in accordance with <u>Article XI</u>, and no other remedy shall be had pursuant to any contract, misrepresentation, strict liability or tort theory or otherwise by any Party and its officers, directors, employees, agents, affiliates, attorneys, consultants, insurers, successors and assigns, all such remedies being hereby expressly waived to the fullest extent permitted under applicable Law (including claims under CERCLA); <u>provided</u>, that the foregoing shall not limit the ability of any party to the Griffin Minority Buyout Agreement or the BP Claim Assignment from enforcing its rights under such agreements. In furtherance of the foregoing, from and after the Closing, each of the Parties hereby waive, to the fullest extent permitted by applicable Law, any and all other rights, claims, remedies and causes of action (including rights of contributions, if any) known or unknown, foreseen or unforeseen, which exist or may arise in the future, that such Party (or any Purchaser Indemnified Party or Seller Indemnified Party) may have against any of the Parties arising under, based upon or relating to this Agreement or the transactions contemplated by this Agreement (including under any federal, state or local Law). Notwithstanding the foregoing, this <u>Section 10.7</u> shall not (i) apply to claims for specific performance, (ii) apply to claims for fraud, (iii) claims made under any of the Ancillary Agreements (other than the Holdings Closing Certificate or Seller Closing Certificate) or (iv) operate to interfere with or impede the operation of the provisions of <u>Section 2.3</u> (providing for the resolution of certain disputes relating to the Closing Statement (or the calculation of Closing Working Capital or Closing Company Cash). FOR AVOIDANCE OF DOUBT AND WITHOUT LIMITATION, THE REMEDY OF PURCHASER AGAINST THE SELLERS FOR ANY CLAIM REGARDING ANY RELEASE OF HAZARDOUS MATERIALS, OR OTHER CLEANUP, REMEDIAL OR REMOVAL ACTION UNDER CERCLA OR OTHER ENVIRONMENTAL LAW SHALL BE LIMITED TO INDEMNIFICATION UNDER THIS AGREEMENT, AND GOVERNED BY THIS <u>ARTICLE X</u>.

**Section 10.8 <u>Offset/Setoff</u>.** Neither the Sellers nor Purchaser shall have any right to offset or setoff any payment due pursuant to <u>Sections 2.2</u> or <u>2.3</u> against any other payment to be made under any Seller Documents, Holdings Documents or Purchaser Documents (other than any other payment due under <u>Sections 2.2</u> or <u>2.3</u>) or otherwise (including against indemnification).

77

# ARTICLE XI
# TAX MATTERS

**Section 11.1 <u>Tax Returns</u>.**

(a) <u>Straddle Period Tax Returns</u>. In the case of any period that begins on or before, and ends after, the Closing Date (a "<u>Straddle Period</u>"), (a) non-Income Taxes that are calculated on an annual basis (including property Taxes) for the portion of the Straddle Period ending on the Closing Date shall be equal to the amount of such property Taxes for such entire Straddle Period multiplied by a fraction, the numerator of which is the number of days during the Straddle Period that are in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the number of days in the Straddle Period; and (b) all other Taxes for the portion of the Straddle Period ending on the Closing Date shall be determined based on an actual closing of the books used to calculate such Taxes as if such Tax period ended as of the close of business on the Closing Date (and for such purpose, the Tax period of any partnership or other pass-through entity in which any of the Companies hold a beneficial interest shall be deemed to terminate at such time). In the case of clause (b), exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions computed as if the Closing Date was the last day of the Straddle Period) shall be allocated between the portion of the Straddle Period ending on the Closing Date and the portion of the Straddle Period thereafter in proportion to the number of days in each such portion.

(b) <u>Post-Closing Tax Returns</u>. Purchaser shall cause the Companies to file all Tax Returns of the Companies for Pre-Closing Tax Periods that are required to be filed after the Closing Date (taking into account extensions), including Income Tax Returns for any Straddle Period. Sellers shall timely pay and discharge all Taxes required to be shown as due on such Tax Returns (taking into account all estimated Tax payments) to the extent that such Taxes (and such estimated Tax Payments) are attributable to a Pre-Closing Tax Period and were not taken into account in the determination of Final Working Capital. All such Tax Returns shall be prepared in a manner consistent with the prior practice of the Companies, unless otherwise required by applicable Law. Not less than 20 days prior to filing any Tax Return that covers, in whole or in part, a Pre-Closing Tax Period, Purchaser shall submit a copy of such Tax Return in draft form to Seller Representative for its review and approval, which approval shall not be unreasonably withheld, conditioned or delayed. Sellers shall severally, and not jointly, indemnify and hold the Purchaser, the Companies and their respective Affiliates harmless from and against (x) all Taxes required to be shown on any Tax Return filed pursuant to this <u>Section 11.1(b)</u>, to the extent such Taxes are attributable to a Pre-Closing Tax Period (and are not taken into account in the determination of Final Working Capital) and (y) reasonably documented third-party costs and expense incurred in connection with therewith (regardless of whether such Taxes, costs or expenses are incurred at the time of filing such Tax Returns or in connection with a Tax audit or otherwise); provided, however, that, other than in the event of fraud by such Seller, in no event shall a Seller be obligated under this <u>Section 11.1(b)</u> to indemnify Purchaser, the Companies or their respective Affiliates for an amount greater than such Seller's Indemnification Percentage of the applicable liability. Payment by the Sellers of any amount due under this <u>Section 11.1(b)</u> to

78

Purchaser, any Company or any of their respective Affiliates shall be paid within 10 days following written notice that payment is due. For purposes of this Agreement, any Tax liability or withholding Tax obligation incurred by any of the Purchaser, the Companies or their respective Affiliates in connection with or resulting from the BP Claim or the BP Claim Assignment shall be treated as a Tax attributable to a Pre-Closing Tax Period, and any Tax Return prepared pursuant to this Section 11.1(b) shall take the position that the value of the BP Claim upon its assignment pursuant to the BP Claim Assignment shall be an amount to be agreed upon by the Parties in good faith prior to the Closing; provided that such amount shall not exceed, and, absent such agreement, shall be, $1,000,000.

### Section 11.2 Cooperation on Income Tax Matters.

(a) The Sellers and Purchaser shall, and Purchaser shall cause the Companies to, cooperate fully, as and to the extent reasonably requested by the other Party or Parties, in connection with the filing of Tax Returns pursuant to this Article XI and any Claim or Legal Proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other Party's request and expense) the provision of records and information which are reasonably relevant to any such Claim or Legal Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

(b) The Sellers and Purchaser shall, and Purchaser shall cause the Companies to, upon request, use their reasonable efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Income Tax that could be imposed with respect to the transactions contemplated hereby.

### Section 11.3 Income Tax Refunds.

(a) From and after the Closing, at the request of the Seller Representative and at the Sellers' sole expense, Purchaser shall cause the Companies to use commercially reasonable efforts to collect any Income Tax refund with respect to any Pre-Closing Tax Period. Within fifteen (15) days after the Companies receive a refund of Income Taxes with respect to a Pre-Closing Tax Period, Purchaser shall cause the Companies to pay (i) to Seller Representative for the benefit of the Stockholders an amount equal to each Stockholder's Fully Diluted Ownership Percentage of such refund of Income Taxes of the Companies in respect of any Pre-Closing Tax Period, together with any interest thereon and (ii) to each Optionholder, through the payroll system of Holdings or any of its Subsidiaries, such Optionholder's Fully Diluted Ownership Percentage of such refund and interest less the amount of the Option Taxes required to be withheld from such payment; provided, that the amounts payable to the Seller Representative under this sentence shall be reduced by any costs and expenses incurred by Purchaser, the Companies or any of their Affiliates in connection with the collection of such refund or the payment of such refund to the Seller Representative and/or each Optionholder; provided, further, that the Stockholders and Optionholders shall be required to promptly repay their respective shares of any refunds of Income Taxes received pursuant to this sentence to the Purchaser to the extent the Companies (or any of their Affiliates) are subsequently required to return such refunds to a Taxing Authority. Purchaser and the Sellers shall cooperate fully, as and

79

to the extent reasonably requested by the other Parties and at the requesting Party's or Parties' expense, in connection with efforts following the Closing to pursue a refund of Income Taxes for any Pre-Closing Tax Period. For the avoidance of doubt, nothing in this <u>Section 11.3</u> shall be construed to require Purchaser to carryback any Tax asset or attribute to a taxable period or portion thereof ending on or before the Closing Date.

(b) Unless otherwise required by any Income Tax Law, the Parties agree to treat any Income Tax deduction of a Company attributable to Transaction Expenses and Option Cancellation Payments as a deduction for Income Tax purposes on such Company's Income Tax Return for the taxable period ending as of the Closing Date (including the portion of any Straddle Period that ends on the Closing Date).

**Section 11.4** <u>Other Tax Matters</u>.

(a) Purchaser shall not cause or permit (i) the amendment of any Income Tax Return of the Companies for a Pre-Closing Tax Period, or (ii) the carryback of an item on a Company's Income Tax Return for a Post-Closing Tax Period to a Pre-Closing Tax Period, in either case without the prior written consent of the Seller Representative, unless such action by Purchaser or the Companies would not result in any Income Tax liability to the Sellers or any Affiliate thereof or such action is required by applicable Law.

(b) Purchaser shall have the power to control all actions relating to Taxes and to settle, compromise or litigate all Tax matters relating to the Companies, except that to the extent the matter relates to a Pre-Closing Tax Period and reasonably could be expected to give rise to an indemnification obligation on the part of any Seller pursuant to this Agreement, in which case (i) the Seller Representative shall have the option to participate in the Proceeding at its cost and (ii) Purchaser shall not settle or compromise such matter without the Seller Representative's written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

**Section 11.5** <u>338 Election</u>. Purchaser shall not and shall cause its Affiliates (including the Companies) not to make an election under Section 338 of the Code or under any similar law of any state with respect to the transactions contemplated by this Agreement.

**Section 11.6** <u>Payment of Sales, Use or Similar Taxes</u>. Purchaser and Sellers shall each be liable for fifty percent (50%) of any and all Transfer Taxes. Purchaser and Sellers agree to cooperate to enable Purchaser to comply with any filing requirements. No later than five (5) Business Days after Purchaser notifies the Seller Representative that Transfer Taxes are due, each Seller shall pay to Purchaser, by wire transfer of immediately available funds to an account or accounts designated by Purchaser, its Fully Diluted Ownership Percentage of the amount of Transfer Taxes that are the Seller's responsibility under this <u>Section 11.6</u>; <u>provided</u>, <u>however</u>, that each of the Sellers shall be severally, and not jointly, liable for the payment of all Transfer Taxes for which the Sellers are responsible under this <u>Section 11.6</u>.

**Section 11.7** <u>Survival</u>. Notwithstanding anything to the contrary in <u>Article X</u>, the obligations pursuant to this <u>Article XI</u>, and any claim for breach thereof, shall terminate at the close of business on the 120th day following the expiration of the applicable statute of limitations with respect to the Tax liabilities in question (giving effect to any waiver, mitigation or extension thereof).

80

## ARTICLE XII
## MISCELLANEOUS

**Section 12.1 <u>Expenses</u>.** Except as otherwise provided in this Agreement (including <u>Section 8.3(b)</u>), (a) Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby and (b) the Companies shall bear all expenses incurred by the Companies and the Sellers in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby, including any expenses incurred in connection with, or relating to, the Seller Representative.

**Section 12.2 <u>Submission to Jurisdiction; Consent to Service of Process; Waiver of Jury Trial</u>.**

(a) Except as otherwise provided for herein (including <u>Section 12.4(b)</u>), the Parties hereby irrevocably submit to the exclusive jurisdiction of any federal or state court located in Wilmington, Delaware over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each Party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action or proceeding related thereto may be heard and determined in such courts. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b) Each of the Parties hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by the delivery of a copy thereof in accordance with the provisions of <u>Section 12.5</u>.

(c) THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING (INCLUDING ANY CLAIM, CAUSE OF ACTION OR LEGAL PROCEEDING INVOLVING ANY OF THE FINANCIAL SOURCES), DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE DEBT FINANCING OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY) (INCLUDING THOSE CONTEMPLATED BY <u>SECTION 12.4(b)</u>). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTIES WOULD NOT, IN THE EVENT OF

81

LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, BY AND AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 12.2</u>. THE EQUITY FINANCING SOURCES ARE INTENDED THIRD PARTY BENEFICIARIES OF THIS <u>SECTION 12.2(c)</u>.

Section 12.3 <u>Entire Agreement; Amendments and Waivers; Exclusivity of Agreement; Specific Performance.</u>

(a) This Agreement (including the schedules and exhibits hereto), the Seller Documents, the Holdings Documents, the Purchaser Documents and the Confidentiality Agreement represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and thereof and, subject to <u>Section 8.5</u>, supersede all prior understandings and agreements, both written and oral, with respect to such matters.

(b) This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. Notwithstanding anything to the contrary contained herein, <u>Sections 4.3</u>, <u>12.2</u>, <u>12.4</u>, <u>12.8</u>, <u>12.9</u> and this <u>Section 12.3</u> (and any provision of this Agreement to the extent a modification, waiver or termination of such provision would modify the substance of <u>Sections 4.3</u>, <u>12.2</u>, <u>12.4</u>, <u>12.8</u>, <u>12.9</u> and this <u>Section 12.3</u>) may not be modified, waived or terminated in a manner that impacts or is adverse in any respect to the Financing Sources without the prior written consent of the Financing Sources.

(c) The Parties have voluntarily agreed to define their rights, liabilities and obligations respecting the subject matter of this Agreement exclusively in contract pursuant to the express terms and provisions of this Agreement; and the Parties expressly disclaim that they are owed any duties not expressly set forth in this Agreement. Except for claims for fraud or specific performance, the sole and exclusive remedies for any breach of the terms and provisions of this Agreement (including any representations and warranties set forth herein) shall be those remedies available at law or in equity for breach of contract only (as such contract remedies are further limited or excluded pursuant to the express terms of this Agreement). The parties agree that irreparable damage would occur in the event that the Parties do not perform the provisions of this Agreement in accordance with their specific terms or otherwise breach such provisions and that any non-performance or breach of this Agreement by any Party hereto could not be adequately compensated by monetary damages alone and that the parties hereto would not have any adequate remedy at law. Notwithstanding the foregoing and subject to the rights of the parties to the Debt Financing, if any, under the terms thereof, none of the Sellers or any of their Affiliates (including Holdings), shall have any rights or claims (whether in contract or in tort or otherwise) against any Financing Sources or any Affiliate thereof, solely in their respective

82

capacities as lenders, agents or arrangers in connection with the Debt Financing. Notwithstanding anything herein to the contrary, the parties hereby acknowledge and agree that the Sellers shall be entitled to specific performance to cause the Purchaser to consummate the Closing and/or to cause Purchaser to draw down the full proceeds of the Equity Financing, in accordance with the terms hereof; provided, however, that the Sellers shall be entitled to such specific performance only if:

(i) all conditions in Section 9.1 (other than those conditions that by their nature are to be satisfied at the Closing, but subject to such satisfaction or waiver) have been satisfied or waived;

(ii) the Purchaser has failed to consummate the Closing by the date required pursuant to Section 3.1; and

(iii) the Sellers have confirmed that if specific performance is granted, then they will take such actions as are within their control to cause the Closing to occur.

**Section 12.4 <u>Governing Law; Limitations on Suits against Financing Sources</u>.**

(a) Except as otherwise provided in Section 12.4(b) of this Agreement, and all claims or causes of action (whether based on contract, tort or any other theory) that may be based upon, arise out of or related to this Agreement or the negotiation, execution or performance of this Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware applicable to contracts negotiated, made and performed in such State without giving effect to the choice of law principles of such state that would require or permit the application of the Laws of another jurisdiction.

(b) Notwithstanding anything in this Agreement to the contrary, each of the parties hereto agrees that (x) it will not bring or support any action, cause of action, claim, cross claim or third-party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against the Financing Sources, if any, in any way relating to this Agreement or any of the transactions contemplated by this Agreement, including any dispute arising out of or relating in any way to the Debt Financing, if any, or the definitive agreements executed in connection therewith or the performance thereof, in any forum other than the Supreme Court of the State of New York, County of New York, or, if under applicable law exclusive jurisdiction is vested in the federal courts, the United States District Court for the Southern District of New York (and appellate courts thereof) and (y) any such action, cause of action, claim, cross-claim or third-party claim shall be governed by the laws of the State of New York. The Sellers also agree that (a) neither they nor any of their respective Affiliates (including Holdings) will bring or support any action, cause of action, claim, cross-claim or third-party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Financing Source in any way relating to this Agreement or the transactions contemplated hereby, including any dispute arising out of or relating in any way to the Debt Financing, if any, or the definitive agreements executed in connection therewith or the performance thereof and (b) no Financing Source, if any, shall have any liability (whether in contract or in tort or otherwise) to the Sellers or any of their Affiliates (including Holdings) or

83

their directors, officers, employees, agents, partners, managers, members or equity holders for any obligations or liabilities of any Party under this Agreement or for any right or claim based on, in respect of, or by reason of, the transactions contemplated hereby or in respect of any oral representations made or alleged to have been made in connection herewith.

    Section 12.5 <u>Notices.</u> All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision):

    If to Holdings (prior to the Closing), to:

    USP Holdings Inc.
    c/o Wynnchurch Capital, Ltd.
    6250 N. River Road, Suite 10-100
    Rosemont, IL 60018
    Facsimile: (847) 604-6105
    Attention: Terry M. Theodore and Christopher P. O'Brien

    with a copy (which shall not constitute notice) to:

    Foley & Lardner LLP
    500 Woodward Avenue, Suite 2700
    Detroit, MI 48226
    Facsimile: (313) 234-2800
    Attention: Tom Spillane and Omar Lucia

    If to the Seller Representative, to:

    Alabama Seller Rep Inc.
    c/o Wynnchurch Capital, Ltd.
    6250 N. River Road, Suite 10-100
    Rosemont, IL 60018
    Facsimile: (847) 604-6105
    Attention: Terry M. Theodore and Christopher P. O'Brien

    with a copy (which shall not constitute notice) to:

    Foley & Lardner LLP
    500 Woodward Avenue, Suite 2700
    Detroit, MI 48226
    Facsimile: (313) 234-2800
    Attention: Tom Spillane and Omar Lucia

84

If to any Seller, to:

such Seller's address set forth on Exhibit I hereto

with a copy (which shall not constitute notice) to:

Foley & Lardner LLP
500 Woodward Avenue, Suite 2700
Detroit, MI 48226
Facsimile: (313) 234-2800
Attention: Tom Spillane and Omar Lucia

If to Purchaser, to:

Forterra Pipe & Precast, LLC
300 E. John Carpenter Freeway, Suite 800
Irving, TX 75062
Attention:        Lori M. Browne
Facsimile:        (469) 586-1414
E-mail:           lori.browne@forterrabp.com

with a copy (which shall not constitute notice) to:

Gibson, Dunn & Crutcher LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75210
Attention:        Jeffrey Chapman
                  Jonathan Corsico
Facsimile:        (214) 571-2920
                  (202) 530-4218
E-mail:           jchapman@gibsondunn.com
                  jcorsico@gibsondunn.com

　　　　**Section 12.6 Severability.** If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

　　　　**Section 12.7 Conflicts, Privilege and Seller Communications.** Purchaser and the Companies agree that, notwithstanding any current or prior representation of the Companies by Foley & Lardner LLP ("Foley"), Foley shall be allowed to represent any Seller or any of their Affiliates in any matters or disputes (or any other matter), including in any matter or dispute

85

adverse to Purchaser or the Companies that either is existing on the date hereof or that arises in the future and relates to this Agreement or the transactions contemplated hereby, and Purchaser and the Companies hereby (i) waive any claim they have or may have that Foley has a conflict of interest or is otherwise prohibited from engaging in such representation and (ii) agree that, in the event that a dispute arises after the Closing between Purchaser, the Companies and any Seller or any of their Affiliates, Foley may represent such Seller or Affiliate in such dispute even though the interests of such Seller or Affiliate may be directly adverse to Purchaser or the Companies and even though Foley may have represented the Companies in a matter substantially related to such dispute, or may be handling ongoing matters for Purchaser or the Companies. Purchaser and the Companies also further agree that, (x) as to all communications prior to Closing among Foley and the Companies, the Sellers and their Affiliates that relate in any way to the transactions contemplated by this Agreement, the attorney-client privilege and the expectation of client confidence belongs to the Sellers and may be controlled by the Sellers and shall not pass to or be claimed by Purchaser or the Companies and (y) as to all communications prior to Closing among the Companies, the Sellers and their Affiliates (including communications with other advisors prior to Closing) that relate in any way to the transactions contemplated by this Agreement, such communications belong to the Sellers and may be controlled by the Sellers and shall not pass to or be claimed by Purchaser or the Companies. Notwithstanding the foregoing, in the event that a dispute arises between Purchaser, the Companies and a third party other than a Party to this Agreement after the Closing, the Companies may assert the attorney-client privilege to prevent disclosure of confidential communications by Foley to such third party; provided, however, that the Companies may not waive such privilege without the prior written consent of the Seller Representative.

        **Section 12.8 Binding Effect; Assignment.** This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Except as set forth in the immediately following sentence, nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a party to this Agreement except as set forth in Section 8.6 and except for the Seller Indemnified Parties and the Purchaser Indemnified Parties with respect to their indemnity rights pursuant to Article X and Article XI. The Financing Sources shall be express third party beneficiaries of, and shall be entitled to rely on and enforce the provisions of, Sections 4.3, 12.2, 12.3, 12.4, 12.9 and this Section 12.8. Notwithstanding anything to the contrary herein, this Agreement shall not affect in any respect the rights, obligations and liabilities of the parties to each other relating to the Debt Financing, and nothing herein shall be deemed to modify or limit any such rights, obligations or liabilities. No assignment of this Agreement or of any rights or obligations hereunder may be made by the Sellers, Holdings or Purchaser, directly or indirectly (by operation of law or otherwise), without the prior written consent of the other Parties and any attempted assignment without the required consents shall be void provided, however, (a) that Purchaser may assign its rights and obligations under this Agreement to an Affiliate without the prior consent of the other Parties, (b) no such assignment of any of Purchaser's rights or obligations hereunder will relieve Purchaser of any of its obligations hereunder and (c) that Purchaser shall have the right to assign its rights hereunder to a Financing Source as collateral security in connection with the Debt Financing, provided that such assignment is effected only for security purposes and shall not permit any foreclosure or other execution on such assignment prior to the Closing Date. No assignment of any obligations hereunder shall relieve the Parties of any such obligations. Upon any such permitted assignment, the references in this Agreement to any Party shall also apply to any such Party's assignee unless the context otherwise requires.

86

Section 12.9 **Non-Recourse.** This Agreement may only be enforced against the named Parties (which, for the avoidance of doubt, do not include the Financing Sources). Following the Closing (i) all claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may be made only against the entities that are expressly identified as Parties hereto and (ii) except as expressly provided hereunder, no past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of any Party (including any Person negotiating or executing this Agreement on behalf of a Party) shall have any liability or obligation with respect to this Agreement or with respect to any claim or cause of action that may arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement.

Section 12.10 **Counterparts.** This Agreement may be executed in one or more counterparts (including by facsimile, e-mail or other electronic transmission), each of which shall be deemed to be an original copy of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. At the request of any Party, the other Parties shall re-execute an original form of this Agreement and deliver it to the requesting Party. No Party shall raise the use of facsimile, e-mail or other means of electronic transmission or similar format to deliver a signature page as a defense to the formation of a contract and each such Party forever waives any such defense.

Section 12.11 **Seller Representative.**

(a) Alabama Seller Rep Inc., as the Seller Representative pursuant to a Seller Representative Agreement (herein so called) and this Agreement, is hereby designated as the agent of the Sellers (and, prior to the Closing, Holdings) with exclusive authority to make all decisions and determinations and to take all actions (including giving consents and waivers to this Agreement) required or permitted hereunder and under the Seller Documents on behalf of the Sellers (and, prior to the Closing, Holdings) or the Seller Representative, and any such action, decision or determination so made or taken shall be deemed the action, decision or determination of the Sellers (and, prior to the Closing, Holdings), or the Seller Representative, and any notice, document, certificate or information required to be given to any Seller shall be deemed so given if given to the Seller Representative. Without limiting the generality of the foregoing, such powers and authority shall include, without limitation, acting in the name of and on behalf of the Sellers with respect to:

(i) the execution, delivery, receipt and acceptance of delivery of, such notices, releases, instruments and other documents as the Seller Representative determines, in its sole discretion, to be appropriate to consummate the transactions contemplated by this Agreement and the Seller Documents;

87

(ii) providing the calculations and other instructions contemplated by <u>Article II</u> of this Agreement, any adjustments to the Purchase Price, and negotiating any disputes in connection therewith;

(iii) the investigation, prosecution, defense and/or settlement of any claims or potential claims pursuant to <u>Article X</u> of this Agreement, or otherwise related to this Agreement, any Seller Document, the transactions contemplated hereby or the operations of the Companies prior to the Closing;

(iv) any Tax matters as described in <u>Article XI</u>;

(v) negotiating disputes arising under, or relating to, this Agreement or any of the Seller Documents, Holdings Documents or Purchaser Documents;

(vi) the distribution of any portion of the Escrow Amount to the Sellers;

(vii) making all decisions in connection with any amendment to this Agreement or any other document related to the transactions contemplated by this Agreement;

(viii) the approval of the Allocation Certificate; and

(ix) any other action expressly set forth in this Agreement (including the exercise of the power to (A) agree to, negotiate, enter into settlements and compromises of, and comply with the Orders of courts with respect to any claims for indemnification and (B) take all actions necessary in the judgment of the Seller Representative to accomplish any of the foregoing tasks).

(b) Each Seller, for itself and its successors and assigns, together with, in the case of any Seller that is an individual, his heirs and personal representatives, hereby constitutes and appoints the Seller Representative as its or his attorney-in-fact, with full power of substitution, with full power and authority to perform any action described above in the foregoing provisions or this <u>Section 12.11</u>, it being understood that the foregoing power of attorney shall be deemed to be coupled with an interest and shall survive the death, incapacity, liquidation, dissolution or other termination of any Seller.

(c) All actions, decisions and instructions of the Seller Representative taken, made or given pursuant to the authority granted to the Seller Representative pursuant to this <u>Section 12.11</u> and pursuant to the Seller Representative Agreement shall be final, conclusive and binding upon all Sellers (and, prior to the Closing, Holdings). The power and authority of the Seller Representative, as described in this Agreement, and in the Seller Representative Agreement shall continue in full force until all rights and obligations of Sellers under this Agreement, any Seller Document and the Seller Representative Agreement shall have terminated, expired or been fully performed.

88

(d) Purchaser, its Affiliates and, after the Closing, the Companies, shall be entitled to rely conclusively on the instructions, decisions and actions of the Seller Representative in all matters in which action by the Seller Representative is required or permitted, or otherwise contemplated to be taken by, the Seller Representative under this Agreement, any Seller Document or the Seller Representative Agreement, and Purchaser, its Affiliates and, after the Closing, the Companies are hereby released and relieved from any liability to any Person for (i) any acts or omissions by any of them in accordance with any instructions (including payment instructions), decisions or acts of the Seller Representative and (ii) any instructions, decisions or actions of the Seller Representative in all matters in which action by the Seller Representative is required or permitted, or otherwise contemplated to be taken by, the Seller Representative under this Agreement, any Seller Document or the Seller Representative Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

89

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized officers, as of the date first written above.

FORTERRA PIPE & PRECAST, LLC

By: /s/ Jeffrey K. Bradley
        Name: Jeffrey K. Bradley
        Title: President

[Signature Page to Stock Purchase Agreement]

EX-2.6 Case: 18-31177    Document: 00515297113    Page: 542    Date Filed: 02/04/2020136

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 543 of 1003
Case 2:10-md-02179-CJB-DPC   Document 26193-2   Filed 12/15/2019   Page 376 of 193

USP HOLDINGS INC.

By: /s/ Paul Ciolino
　　Name: Paul Ciolino
　　Title: Chief Executive Officer

[Signature Page to Stock Purchase Agreement]

ALABAMA SELLER REP INC.

By: /s/ Christopher O'Brien
      Name: Christopher O'Brien
      Title: President and Treasurer

[Signature Page to Stock Purchase Agreement]

**SELLERS:**

Wynnchurch Capital Partners III, L.P.

By: Wynnchurch Partners III, L.P.
Its:  General Partner

    By Wynnchurch Management, Ltd.
    Its: General Partner

By:  /s/ John Hatherly
    Name: John Hatherly
    Title: President

[Signature Page to Stock Purchase Agreement]

Comvest U.S. Pipe Holdings, LLC

By: /s/ John Caple

    Name: John Caple
    Title: Manager

[Signature Page to Stock Purchase Agreement]

Ocean Avenue Special Situations Fund, L.P.

By: /s/ Jacques Youssetmir
    Name: Jacques Youssetmir
    Title: Manager of its general partner

Ocean Avenue Fund II-A, L.P.

By: /s/ Jacques Youssetmir
    Name: Jacques Youssetmir
    Title: Manager of its general partner

[Signature Page to Stock Purchase Agreement]

EX-2.6 Case: 18-31177    Document: 00515297113    Page: 547    Date Filed: 02/04/2020 0136

Case 2:10-md-02179-CJB-DPC   Document 26293-2   Filed 02/05/20   Page 548 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26293-2   Filed 02/05/20   Page 162 of 407

<div style="text-align:right">

/s/ Paul Ciolino
Paul Ciolino, an individual

/s/ Dave Hiestand
Dave Hiestand, an individual

/s/ Dave Mize
Dave Mize, an individual

/s/ Robert Waggoner
Robert Waggoner, an individual

/s/ Brad Overstreet
Brad Overstreet, an individual

/s/ Robert Zeeb
Robert Zeeb, an individual

/s/ Norb Gross
Norb Gross, an individual

/s/ Pamela Johnson
Pamela Johnson, an individual

</div>

[Signature Page to Stock Purchase Agreement]

## EXHIBIT I
## SELLER INFORMATION

| Stockholder | Address | Number of Shares | Fully Diluted Ownership Percentage |
|---|---|---|---|
| Wynnchurch Capital Partners III, L.P | c/o Wynnchurch Capital, Ltd. 6250 N. River Road, Suite 10-100 Rosemont, IL 60018 Attn: Christopher P. O'Brien And c/o Wynnchurch Capital, Ltd. 39400 Woodward Avenue, Suite 185 Bloomfield Hills, MI 48304 Attn: Terry M. Theodore | 38,489.730 | 42.222% |
| Comvest U.S. Pipe Holdings, LLC | c/o The Comvest Group 525 Okeechobee Blvd., Suite 1050 West Palm Beach, FL 33401 Attn: John Caple | 41,988.796 | 46.060% |
| Ocean Avenue Special Situations Fund, L.P. | 401 Wilshire Boulevard, Suite 230 Santa Monica, CA 90401 | 2,344.374 | 2.572% |
| Ocean Avenue Fund II-A, L.P. | 401 Wilshire Boulevard, Suite 230 Santa Monica, CA 90401 | 1,154.692 | 1.267% |
| Paul Ciolino | 417 Colfax Clarendon Hills, IL 60514 | 699.813 | 0.768% |
| Dave Hiestand | 10 Abbey Street San Francisco, CA 94114 | 69.981 | 0.077% |
| Dave Mize | 2509 Panorama Place Vestavia Hills, AL 35216 | 34.991 | 0.038% |

| Optionholder | Address | Number of Options | Fully Diluted Ownership Percentage |
|---|---|---|---|
| Paul Ciolino | 417 Colfax Clarendon Hills, IL 60514 | 3,398.876 | 3.728% |
| Robert Waggoner | 2N835 Bowgren Drive Elburn, IL 60119 | 1,195.309 | 1.311% |
| Brad Overstreet | 116 Oak View Lane Helena, AL 35080 | 679.775 | 0.746% |
| Robert Zeeb | 78 Waverly Avenue Clarendon Hills, IL 60514 | 254.916 | 0.280% |
| Dave Hiestand | 10 Abbey Street San Francisco, CA 94114 | 169.944 | 0.186% |
| Norb Gross | 1577 Clemson Drive Naperville, IL 60565 | 509.831 | 0.559% |
| Pamela Johnson | 1081 S. Hampton Place Birmingham, AL 35242 | 169.944 | 0.186% |

**EXHIBIT II**

**COMPANIES**

United States Pipe and Foundry Company, LLC

US Pipe Fabrication, LLC

Mill Handling LLC

DIP Acquisition LLC

Fab Pipe LLC

Griffin Pipe Products Co., LLC (30% owned by Amconstruct Corporation)

U.S. Pipe Mexico, S. de R.L. De C.V.

Custom Fab Inc.

EXECUTION VERSION

## EXHIBIT III

### EXCLUDED NET WORKING CAPITAL ITEMS

Excluded Current Assets:

- Company Cash

- Scrap Metal Inventory

- Any items related to Income Taxes

Excluded Current Liabilities:

- Indebtedness

- Scrap Metal Payables

- Any liabilities related to Income Taxes

- Management fees

- Any consulting fees or bonuses payable to Mark Meyer and Manuel Ruiz Rodriguez (or their Affiliates)

- Any liabilities relating to the items listed on Schedule 1.1(a); provided in the event that any items listed on Schedule 1.1(a) have not been specifically excluded from the example Net Working Capital Calculation on <u>Exhibit VIII</u>, such items shall be treated as Current Liabilities for purposes of calculating Net Working Capital.

**EXHIBIT IV**

**FORM OF ESCROW AGREEMENT**

**EXHIBIT IV**

## ESCROW AGREEMENT

This ESCROW AGREEMENT (as the same may be amended or modified from time to time pursuant hereto, this "Agreement") is made and entered into as of            , 2016 (the "Effective Date") by and among Forterra Pipe & Precast, LLC, a limited liability company organized under the laws of Delaware (the "Purchaser"), Alabama Seller Rep Inc., a Delaware corporation (the "Seller Representative"), in its capacity as the Seller Representative pursuant to the Purchase Agreement defined below (together with the Purchaser, sometimes referred to individually as a "Party" or collectively as the "Parties"), and JPMorgan Chase Bank, National Association (the "Escrow Agent"). Capitalized terms used in this Agreement without definition shall have the respective meanings given to such terms in the Purchase Agreement (as defined below); *provided,* that the Escrow Agent shall not be charged with or deemed to have any knowledge of such defined terms unless such definitions are set forth herein.

WHEREAS, the Parties are parties to a Stock Purchase Agreement dated as of February 12, 2016 (the "Purchase Agreement").

WHEREAS, at the closing under the Purchase Agreement (the "Closing"), pursuant to the Purchase Agreement and concurrently with the execution of this Agreement (the "Closing Date"), the Purchaser shall deposit, or cause to be deposited, in escrow with the Escrow Agent $8,000,000 in cash US dollars (the "Escrow Amount") to be held in a separate account with the Escrow Agent (the "Escrow Account") and the Parties wish such deposit to be held in escrow subject to the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the Parties and the Escrow Agent agree as follows:

SECTION 1. Appointment. The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein.

SECTION 2. Escrow Amount. At the Closing, the Purchaser shall deposit, or cause to be deposited, with the Escrow Agent, by wire transfer of immediately available funds, to be managed and paid out by the Escrow Agent pursuant to the terms of this Agreement, to the Escrow Account, the Escrow Amount. For purposes of this Agreement, "Escrow Amount" shall refer to the initial Escrow Amount deposited with the Escrow Agent at the Closing, less any amount disbursed therefrom in accordance with this Agreement and the Purchase Agreement. The Escrow Agent shall hold the Escrow Amount, less any amounts disbursed therefrom in accordance with this Agreement and the Purchase Agreement, in the Escrow Account subject to the terms and conditions hereof and shall invest and reinvest all such amounts and the proceeds thereof as directed in Section 3.

SECTION 3. Investment of Escrow Amount. During the term of this Agreement, the Escrow Agent shall hold the Escrow Amount in non-interest bearing demand deposit accounts. Any investment of the Escrow Amount is expressly prohibited by this Agreement. Following the end of each calendar month during which the Escrow Agent holds any Escrow Amount pursuant to this Agreement and at such other times as any Party may

reasonably request, the Escrow Agent shall provide to each of the Parties a statement detailing, for the Escrow Account, the total amount of the Escrow Amount that remains in escrow, all transactions and investments involving such Escrow Account (if any) and any disbursements made from such Escrow Account pursuant to this Agreement, in each case, during such calendar month. This statement shall be provided without any additional cost to any Party.

SECTION 4. <u>Disposition and Termination</u>. The Escrow Agent shall hold the Escrow Amount in its possession in the Escrow Account, and shall make payments from the Escrow Account only as provided in this Section 4.

(a) <u>Disbursements from the Escrow Account</u>. At any time that Purchaser is entitled to receive any amount pursuant to the indemnification provisions of Article X of the Purchase Agreement, the Parties shall promptly deliver a joint written instruction executed by Authorized Representatives of each of the Parties to the Escrow Agent instructing the Escrow Agent to disburse such amount from the Escrow Account, and the Escrow Agent shall thereupon disburse as promptly as practicable (but, in no event later than three (3) Business Days after receipt of such notice and satisfaction of any security procedures) by wire transfer of immediately available funds to the person or persons specified in such notice the applicable amounts of cash from the Escrow Account.

(b) <u>Final Release of the Escrow Amount</u>. On the date which is 548 days from the Closing Date, the Escrow Agent shall disburse to the Seller Representative or its designee (on behalf of the Sellers), 100% of any and all amounts then remaining in the Escrow Account, if any; <u>provided</u>, <u>however</u>, that, if prior to such date, the Purchaser shall have previously made a claim for indemnification in accordance with <u>Section 10.4</u> of the Purchase Agreement and the Purchaser shall have prior to 5:00 p.m. EST on the Business Day prior to such date, delivered written notice executed by an Authorized Representative of the Purchaser, of such unresolved claim, describing in reasonable detail the basis for the claim, including the section of the Purchase Agreement under which the claim is being made and the amounts to which the Purchaser claims it is entitled with respect to or in connection with such claim (and if such amounts are not known and quantifiable, a reasonable estimate of the amount of such claim), concurrently to the Escrow Agent and the Seller Representative, the Escrow Agent shall retain in the Escrow Account the amount so specified in the Purchaser's notice (a "<u>Retained Amount</u>"), in which case 100% of the then outstanding amount of the Escrow Amount, less any Retained Amount shall promptly be paid to the Seller Representative or its designee (on behalf of the Sellers) by wire transfer of immediately available funds pursuant to wire instructions provided by Seller Representative to the Escrow Agent for such payment. Upon final resolution of any resolved claim in accordance with the Purchase Agreement, the Escrow Agent shall thereafter release from the Escrow Account to the party entitled thereto all portions of the Retained Amount as and when it receives a joint written instruction executed by an Authorized Representative of each of the Parties.

(c) <u>Court Order</u>. Notwithstanding anything to the contrary herein, the Escrow Agent shall disburse the Escrow Amount, or any portion thereof, in accordance with a certified copy of any final and nonappealable order or judgment of a court of competent jurisdiction directing such disbursement, accompanied by a written certification from counsel for the instructing Party attesting that such order is final and not subject to further proceedings or appeal

2

along with a written instruction from an Authorized Representative of the instructing Party given to effectuate such order or judgment and the Escrow Agent shall be entitled to conclusively rely upon any such certification and instruction and shall have no responsibility to review the order or judgment to which such certification and instruction refers or to make any determination as to whether such order or judgment is final.

(d) <u>Termination</u>. Upon delivery of the entirety of the Escrow Amount by the Escrow Agent in accordance with this Agreement, this Agreement shall terminate and the related account shall be closed.

(e) Notwithstanding anything to the contrary set forth in Section 9 of this Agreement, any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution from the Escrow Account, must be in writing, executed by the appropriate Party or Parties as evidenced by the signatures of the person or persons signing this Agreement or one of their designated persons as set forth on the Designation of Authorized Representative attached hereto as <u>Schedule 1-A and 1-B</u> (each an "<u>Authorized Representative</u>"), and delivered to the Escrow Agent only by confirmed facsimile or as a Portable Document Format ("PDF") attached to an email on a Business Day only at the fax number or email address set forth in Section 9 below. Each Designation of Authorized Representatives shall be signed by a duly authorized officer of the named Party. No instruction for or related to the transfer or distribution of the Escrow Amount shall be deemed delivered and effective unless (i) the Escrow Agent actually shall have received it on a Business Day by facsimile or as a PDF attached to an email only at the fax number or email address set forth in Section 9 and as evidenced by a confirmed transmittal to the Party's or Parties' transmitting fax number or email address and (ii) the Escrow Agent has been able to satisfy any applicable security procedures as may be required hereunder. The Escrow Agent shall not be liable to any Party or other person for refraining from acting upon any instruction for or related to the transfer or distribution from the Escrow Account if delivered to any other fax number or email address, including but not limited to a valid email address of any employee of the Escrow Agent.

SECTION 5. <u>Escrow Agent</u>.

(a) The Escrow Agent shall have only those duties as are specifically and expressly provided herein, which shall be deemed purely ministerial in nature, and no other duties, including but not limited to any fiduciary duty, shall be implied. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, in connection herewith, if any, including without limitation the Purchase Agreement and any ancillary agreements thereto (other than this Agreement) (collectively, the "<u>Underlying Agreements</u>"), nor shall the Escrow Agent be required to determine if any person or entity has complied with any Underlying Agreement, nor shall any additional obligations of the Escrow Agent be inferred from the terms of any Underlying Agreement, even though reference thereto may be made in this Agreement. In the event of any conflict between the terms and provisions of this Agreement and any schedule or exhibit attached to this Agreement, on the one hand, and any Underlying Agreement or any other agreement among the Parties, on the other hand, in any such case with respect to the duties and obligations of the Escrow Agent (but not with respect to the duties and obligations of the Parties), the terms and conditions of this Agreement and any

3

schedule or exhibit attached to this Agreement shall control. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any written notice, document, instruction or request furnished to it in accordance with the terms hereof and reasonably believed by it to be genuine and to have been signed by an Authorized Representative(s), as applicable. The Escrow Agent shall not be liable to any Party, any beneficiary or any other person for refraining from acting upon any instruction setting forth, claiming, containing, objecting to, or related to the transfer or distribution of the Escrow Amount, or any portion thereof, unless such instruction shall have been delivered to the Escrow Agent in accordance with Section 10 below and the Escrow Agent has been able to satisfy any applicable security procedures as may be required thereunder. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Account.

(b) The Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that the Escrow Agent's fraud, gross negligence or willful misconduct was the cause of any direct loss to either Party. The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through affiliates or agents. The Escrow Agent may consult with counsel, accountants and other skilled persons to be selected and retained by it. The Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in good faith in accordance with, or in reliance upon, the advice or opinion of any such counsel, accountants or other skilled persons. In the event that the Escrow Agent shall be uncertain or believe there is some ambiguity as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to: (i) refrain from taking any action and its sole obligation shall be to keep safely all property (including without limitation the Escrow Amount) held in escrow until it shall be given (y) a joint written direction executed by Authorized Representatives of both the Parties which eliminates such ambiguity or uncertainty to the satisfaction of the Escrow Agent or (z) a court order issued by a court of competent jurisdiction (it being understood that the Escrow Agent shall be entitled conclusively to rely and act upon such court order and shall have no obligation to determine whether any such court order is final); or (ii) file an action in interpleader. The Parties agree to pursue any redress or recourse in connection with any dispute without making the Escrow Agent a party to the same. Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, incidental, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

SECTION 6. Succession.

(a) The Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving thirty (30) days' advance notice in writing of such resignation to the Parties specifying a date upon which such resignation shall take effect. The Escrow Agent's sole responsibility after such 30-day notice period expires shall be to hold the Escrow Amount and to deliver the same to a designated substitute escrow agent, if any, appointed by the Parties, or such other person designated by the Parties, or in accordance with a final court order at which time of delivery the Escrow Agent's obligations hereunder shall cease and terminate. If the

4

Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent, or to instruct the Escrow Agent to deliver the Escrow Amount to another person as provided above, or if such delivery is contrary to applicable law, at any time on or after the effective resignation date, the Escrow Agent either (i) may interpleaded the Escrow Amount with a court located in the State of New York and the costs, expenses and reasonable attorney's fees which are incurred in connection with such proceeding may be charged against and withdrawn from the Escrow Amount; or (ii) appoint a successor escrow agent of its own choice. Any such resulting appointment shall be binding upon all of the Parties hereto and no appointed successor escrow agent shall be deemed to be an agent of the Escrow Agent. The Escrow Agent shall deliver the Escrow Amount to any appointed successor escrow agent, at which time the Escrow Agent's obligations under this Agreement shall cease and terminate.

(b) Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all its escrow business may be transferred, shall be the Escrow Agent under this Agreement without further act.

SECTION 7. <u>Compensation/Acknowledgment</u>. The Escrow Agent shall not charge any fees or other like amounts for its services hereunder other than as set forth in <u>Schedule 2</u>. Each of the Parties further agrees to the disclosures and agreements set forth in <u>Schedule 2</u>.

SECTION 8. <u>Indemnity</u>. The Purchaser and the Seller Representative (on behalf of the Sellers in its capacity as the Seller Representative, and not in its individual capacity) shall severally, and not jointly, defend and save harmless the Escrow Agent and its affiliates and their respective successors, assigns, agents and employees (the "<u>Indemnitees</u>") from and against any and all reasonable and documented losses, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, costs or expenses (including, without limitation, the reasonable and documented fees and expenses of outside counsel and experts and their staffs and all expense of document location, duplication and shipment, collectively "<u>Losses</u>"), arising out of or in connection with (i) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, or (ii) the Escrow Agent's following any instructions or other directions, whether joint or singular, from the Parties, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof; <u>provided</u>, <u>however</u>, that, notwithstanding anything to the contrary in this Agreement, the Parties shall have no obligation to indemnify any Indemnitee for any Losses to the extent such Losses are finally determined by a court of competent jurisdiction to arise out of or be incurred in connection with any fraud, gross negligence or willful misconduct of any Indemnitee. The indemnity obligations set forth in this Section 8 shall survive the resignation, replacement or removal of the Escrow Agent or the termination of this Agreement. Each of the Parties agrees between themselves that each of the Purchaser and the Seller Representative (on behalf of the Sellers in its capacity as the Seller Representative, and not in its individual capacity) shall be responsible for one-half of the amounts owed to any Indemnitee under this Section. For the avoidance of doubt, it is understood and agreed that the intent of the parentheticals "(on behalf of the Sellers and not in its individual capacity)" in this

5

EX-2.6 Case: 18-31177    Document: 00515297113    Page: 557    Date Filed: 02/04/2020 0136
Case 2:10-md-02179-CJB-DPC    Document 26293-2 Filed 02/05/20 Page 558 of 1003
Case 2:10-md-02179-CJB-JCW    Document 26293-2 Filed 02/05/20 Page 112 of 1003

Section 8 is to clarify that the Purchaser and Sellers are the parties with economic interests in the Purchase Agreement, and the Sellers shall ultimately be responsible to the Seller Representative for any indemnification obligations or liabilities that the Seller Representative has to the Escrow Agent hereunder. Accordingly, such clauses clarify the Seller Representative recourse to the Sellers and are not meant to limit the Seller Representative's capacity or liability as between itself and the Escrow Agent under the Indemnity in this Section 8 or under any other provision in this Agreement. It is understood and agreed that the Escrow Agent does not have a contractual right of set-off or a contractual security interest under this Agreement; *provided, however*, that nothing herein shall be construed as a waiver of any statutory or common law rights to which the Escrow Agent may otherwise be entitled with respect thereto.

       SECTION 9. <u>Notices</u>. All communications, except as set forth in Section 4(e), hereunder shall be in writing or set forth in a PDF attached to an email, and all instructions from a Party or the Parties to the Escrow Agent shall be executed by an Authorized Representative thereof, and shall be delivered in accordance with the terms of this Agreement by facsimile, email or overnight courier only to the appropriate fax number, email address, or notice address set forth for each party as follows:

    (i)   if to the Seller Representative,

        Alabama Seller Rep Inc.
        c/o Wynnchurch Capital, Ltd.
        6250 N. River Road, Suite 10-100
        Rosemont, IL 60018
        Facsimile: (847) 604-6105
        Attention: Terry M. Theodore and Christopher P. O'Brien

        with a copy to (which shall not constitute notice):

        Foley & Lardner LLP
        500 Woodward Avenue, Suite 2700
        Detroit, MI 48226
        Facsimile: (313) 234-2800
        Attention: Tom Spillane and Omar Lucia

    (ii)   if to the Purchaser,

        Forterra Pipe & Precast, LLC
        300 E. John Carpenter Freeway, Suite 800
        Irving, TX 75062
        Attention:      Lori M. Browne
        Facsimile:      (469) 586-1414
        E-mail:       lori.browne@forterrabp.com

        with a copy to (which shall not constitute notice):

        Gibson, Dunn & Crutcher LLP

6

2100 McKinney Avenue, Suite 1100
Dallas, TX 75210
Attention:    Jeffrey Chapman and Jonathan Corsico
Facsimile:   (214) 571-2920
            (202) 530-4218
E-mail:    jchapman@gibsondunn.com
            jcorsico@gibsondunn.com

    (iii) if to the Escrow Agent,

JPMorgan Chase Bank, N.A.
Escrow Services
4 New York Plaza, 11th Floor
New York, NY 10004
Email: ec.escrow@jpmorgan.com
Facsimile: (212) 552-2812
Attention: Natalie Pesce/Magan O'Toole

Notwithstanding the above, in the case of communications delivered to the Escrow Agent, such communications shall be deemed to have been given on the date received by an officer of the Escrow Agent or any employee of the Escrow Agent who reports directly to any such officer at the above-referenced office. In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate. For purposes of this Agreement, "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which the Escrow Agent located at the notice address set forth above is authorized or required by law or executive order to remain closed.

    SECTION 10. Security Procedures.

    (a) In the event funds transfer instructions are received by the Escrow Agent in accordance with Section 4(e), the Escrow Agent is authorized to seek confirmation of such instructions by a single telephone call-back to one of the Authorized Representatives, and the Escrow Agent may reasonably rely upon the confirmation of anyone purporting to be that Authorized Representative. The persons and telephone numbers for call-backs may be changed only in a writing executed by Authorized Representatives or duly authorized officer of the applicable Party setting forth such change and actually received and acknowledged by the Escrow Agent via facsimile or as a PDF attached to an email. Except as set forth in Section 4(e) above, no funds will be disbursed until an Authorized Representative is able to confirm such instructions by telephone callback. The Escrow Agent, any intermediary bank and the beneficiary's bank in any funds transfer may rely upon the identifying number of the beneficiary's bank or any intermediary bank included in a funds transfer instruction provided by a Party or the Parties and confirmed by an Authorized Representative. Further the beneficiary's bank in the funds transfer instruction may make payment on the basis of the account number provided in such Party's or the Parties' instruction and confirmed by an Authorized Representative even though it identifies a person different from the named beneficiary.

7

(b) The Parties acknowledge that the security procedures set forth in this Section 10 are commercially reasonable and that there are certain security, corruption, transmission error and access availability risks associated with using open networks such as the Internet and the Parties hereby expressly assume such risks.

SECTION 11. <u>Compliance with Court Orders</u>. In the event that a legal garnishment, attachment, levy restraining notice or court order is served with respect to any of the Escrow Amount, or the delivery thereof shall be stayed or enjoined by any order of a court, or any order, judgment or decree shall be made or entered by any court affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other person, entity, firm or corporation, by reason of such compliance.

SECTION 12. <u>Miscellaneous</u>.

(a) <u>Amendment</u>. The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by the Escrow Agent and the Parties.

(b) <u>Assignment</u>. Except as provided in Section 6, neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by the Escrow Agent or any Party without the prior consent of the Escrow Agent and the Parties.

(c) <u>Governing Law</u>. The interpretation and construction of this Agreement, and all matters relating hereto, shall be governed by the Laws of the State of Delaware, without reference to the conflicts of laws principles thereof that would result in the application of any laws other than the Laws of the State of Delaware.

(d) <u>Submission to Jurisdiction; Waiver of Jury Trial</u>. WITH RESPECT TO ANY LAWSUIT OR PROCEEDING ARISING OUT OF OR BROUGHT WITH RESPECT TO THIS AGREEMENT, EACH PARTY AND THE ESCROW AGENT IRREVOCABLY (A) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES FEDERAL AND STATE COURTS LOCATED IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK; (B) WAIVES ANY OBJECTION IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT; (C) WAIVES ANY CLAIM THAT SUCH PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM; AND (D) FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDINGS, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.

EACH PARTY AND THE ESCROW AGENT HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING UNDER OR RELATED TO THIS AGREEMENT, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE.

8

(e) Force Majeure. Neither Party nor the Escrow Agent shall be liable to any other Party or the Escrow Agent for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control.

(f) Counterparts. This Agreement and any joint written instructions may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of the Parties and the Escrow Agent may be transmitted by facsimile or by PDF attached to an email, and such facsimile or PDF will, for all purposes, be deemed to be the original signature of the person whose signature it reproduces.

(g) Severability. If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

(h) Enforcement. Nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder. A person who is not a party to this Agreement shall have no right to enforce any term of this Agreement.

(i) Compliance with Law. Each Party and the Escrow Agent represents, warrants and covenants to each other that (i) each document, notice, instruction or request provided by it shall comply with applicable laws and regulations, (ii) such Party and Escrow Agent has full power and authority to enter into, execute and deliver this Agreement and to perform all of the duties and obligations to be performed by it hereunder; and (iii) the person(s) executing this Agreement on such Party's behalf and certifying Authorized Representatives in the applicable Schedule 1 have been duly and properly authorized to do so, and each Authorized Representative of such Party has been duly and properly authorized to take the actions specified for such person in the applicable Schedule 1.

(j) Information. The Parties authorize the Escrow Agent to disclose information with respect to this Agreement and the account(s) established hereunder, the Parties, or any transaction hereunder if such disclosure is: (i) necessary or desirable, in the Escrow Agent's good faith opinion, for the purpose of allowing the Escrow Agent to perform its duties and to exercise its powers and rights hereunder; (ii) to a proposed assignee of the rights of the Escrow Agent; (iii) to a branch, affiliate, subsidiary, employee or agent of the Escrow Agent or to their auditors, regulators or legal advisers or to any competent court; (iv) to the auditors of any of the Parties; or (v) required by applicable law, regardless of whether the disclosure is made in the

9

EX-2.6 Case: 18-31177    Document: 00515297113    Page: 561    Date Filed: 02/04/2020136

Case 2:10-md-02179-CJB-DPC   Document 26293-2   Filed 02/05/20   Page 562 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26293-2   Filed 02/05/2019   Page 11 of 107

country in which each Party resides, in which the Escrow Account is maintained, or in which the transaction is conducted. The Parties agree that such disclosures by the Escrow Agent and its affiliates may be transmitted across national boundaries and through networks, including those owned by third parties.

(k) <u>Miscellaneous</u>. To the extent that in any jurisdiction either Party may now or hereafter be entitled to claim for itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process, such Party shall not claim, and hereby irrevocably waives, such immunity.

[The next page is the signature page.]

10

EX-2.6 Case: 18-31177     Document: 00515297113     Page: 562     Date Filed: 02/04/2020 0136

Case 2:10-md-02179-CJB-DPC     Document 26293-2     Filed 02/05/20     Page 563 of 1003
Case 2:10-md-02179-CJB-JCW     Document 26293-2     Filed 02/25/2019     Page 31 of 157

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

ALABAMA SELLER REP INC., in its capacity as
the Seller Representative

By

    Name:
    Title:

FORTERRA PIPE & PRECAST, LLC, as the Purchaser,

By

    Name:
    Title:

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,
as the Escrow Agent

By

    Name:
    Title:

[SIGNATURE PAGE TO ESCROW AGREEMENT]

<div align="center">

**SCHEDULE 1-A**

Forterra Pipe & Precast, LLC

**DESIGNATION OF AUTHORIZED
REPRESENTATIVES**

</div>

The undersigned, [•], being the duly elected, qualified and acting [•] of Forterra Pipe & Precast, LLC (the "Purchaser"), does hereby certify:

1. That each of the following persons is at the date hereof an Authorized Representative, as such term is defined in the Escrow Agreement, dated          , 2016, by and among the Purchaser, the Seller Representative and the Escrow Agent (the "Escrow Agreement"), that the signature appearing opposite each person's name is the true and genuine signature of such person, and that each person's contact information is current and up-to-date at the date hereof. Each of the Authorized Representatives is authorized to issue instructions, confirm funds transfer instructions by callback and effect changes in Authorized Representatives, all in accordance with the terms of the Escrow Agreement.

| NAME | SIGNATURE | TELEPHONE NUMBERS |
|------|-----------|-------------------|
|      | _____ |          |
|      | _____ |          |

2. That pursuant to the Purchaser's governing documents, as amended, the undersigned has the power and authority to execute this Designation on behalf of the Purchaser, and that the undersigned has so executed this Designation this          day of          , 2016.

Signature: _____

Name:

Title:

<div align="center">

**FOR YOUR SECURITY, PLEASE CROSS OUT ALL UNUSED SIGNATURE
LINES ON THIS SCHEDULE 1-A**

</div>

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile or set forth in a PDF attached to an email, must include the signature of the Authorized Representative authorizing said funds transfer on behalf of such Party.

**Schedule 1-B**

Alabama Seller Rep Inc.

**DESIGNATION OF AUTHORIZED**
**REPRESENTATIVES**

The undersigned, Rick Fink, being the duly elected, qualified and acting [•] of Alabama Seller Rep Inc. (the "Seller Representative"), does hereby certify:

1. That each of the following persons is at the date hereof an Authorized Representative, as such term is defined in the Escrow Agreement, dated           , 2016, by and among the Purchaser, the Seller Representative and the Escrow Agent (the "Escrow Agreement"), that the signature appearing opposite each person's name is the true and genuine signature of such person, and that each person's contact information is current and up-to-date at the date hereof. Each of the Authorized Representatives is authorized to issue instructions, confirm funds transfer instructions by callback and effect changes in Authorized Representatives, all in accordance with the terms of the Escrow Agreement.

| NAME | SIGNATURE | TELEPHONE NUMBERS |
|------|-----------|-------------------|
| | _____ | |
| | _____ | |

2. That pursuant to the Seller Representative's governing documents, as amended, the undersigned has the power and authority to execute this Designation on behalf of the Seller Representative, and that the undersigned has so executed this Designation this          day of          , 2016.

Signature: _____

Name:

Title:

**FOR YOUR SECURITY, PLEASE CROSS OUT ALL UNUSED SIGNATURE LINES ON THIS SCHEDULE 1-B**

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile or set forth in a PDF attached to an email, must include the signature of the Authorized Representative authorizing said funds transfer on behalf of such Party.

EX-2.6 Case: 18-31177     Document: 00515297113     Page: 565     Date Filed: 02/04/2020 0136

Case 2:10-md-02179-CJB-DPC     Document 26293-2 Filed 02/05/20   Page 566 of 1003
Case 2:10-md-02179-CJB-JCW     Document 26293-2 Filed 02/25/19   Page 512 of 1003

## SCHEDULE 2

### J.P.Morgan

#### Schedule of Fees and Disclosures for Escrow Agent Services

**Account Acceptance Fee**                                      waived

Encompassing review, negotiation and execution of governing documentation, opening of the accounts, and completion of all due diligence documentation. Payable upon closing.

**Annual Administration Fee**                                  waived

The Administration Fee covers our usual and customary ministerial duties, including record keeping, distributions, document compliance and such other duties and responsibilities expressly set forth in the governing documents for each transaction. Payable upon closing and annually in advance thereafter, without pro-ration for partial years.

**Extraordinary Services and Out-of Pocket Expenses**

Any additional services beyond our standard services as specified above, and all reasonable out-of-pocket expenses including attorney's or accountant's fees and expenses will be considered extraordinary services for which related costs, transaction charges, and additional fees will be billed at the Escrow Agent's then standard rate. Disbursements, receipts, investments or tax reporting exceeding 25 items per year may be treated as extraordinary services thereby incurring additional charges. Upon the occurrence of events unknown or unforeseen by the Escrow Agent as of the date hereof, the Escrow Agent may impose, charge, pass-through and modify fees and/or charges for any account established and services provided by the Escrow Agent, including but not limited to, transaction, maintenance, balance-deficiency, and service fees, agency or trade execution fees, and other charges, including those levied by any governmental authority.

**Fee Disclosure & Assumptions:** Please note that the fees quoted are based on a review of the transaction documents provided and an internal due diligence review. The Escrow Agent reserves the right to revise, modify, change and supplement the fees quoted herein if the assumptions underlying the activity in the account, level of balances, market volatility or conditions or other factors change from those used to set our fees.

The escrow deposit shall be continuously held uninvested.

#### Disclosures and Agreements

**Representations Relating to Section 15B of the Securities Exchange Act of 1934 (Rule 15Ba1-1 et seq.) (the "Municipal Advisor Rule"). Each Party represents and warrants to the Escrow Agent that for purposes of the Municipal Advisor Rules, none of the funds (if any) currently invested, or that will be invested in the future, in money market funds, commercial**

paper or treasury bills under this Agreement constitute or contain (i) proceeds of municipal securities (including investment income therefrom and monies pledged or otherwise legally dedicated to serve as collateral or a source or repayment for such securities) or (ii) municipal escrow investments (as each such term is defined in the Municipal Advisor Rule). Each Party also represents and warrants to the Escrow Agent that the person providing this certification has access to the appropriate information or has direct knowledge of the source of the funds to be invested to enable the forgoing representation to be made. Further, each Party acknowledges that the Escrow Agent will rely on this representation until notified in writing otherwise.

**Patriot Act Disclosure.** Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it. Accordingly, you acknowledge that Section 326 of the USA PATRIOT Act and the Escrow Agent's identity verification procedures require the Escrow Agent to obtain information which may be used to confirm your identity including without limitation name, address and organizational documents ("identifying information"). You agree to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such identifying information required as a condition of opening an account with or using any service provided by the Escrow Agent.

**OFAC Disclosure.** The Escrow Agent is required to act in accordance with the laws and regulations of various jurisdictions relating to the prevention of money laundering and the implementation of sanctions, including but not limited to regulations issued by the U.S. Office of Foreign Assets Control. The Escrow Agent is not obligated to execute payment orders or effect any other transaction where the beneficiary or other payee is a person or entity with whom the Escrow Agent is prohibited from doing business by any law or regulation applicable to the Escrow Agent, or in any case where compliance would, in the Escrow Agent's opinion, conflict with applicable law or banking practice or its own policies and procedures. Where the Escrow Agent does not execute a payment order or effect a transaction for such reasons, the Escrow Agent may take any action required by any law or regulation applicable to the Escrow Agent including, without limitation, freezing or blocking funds. Transaction screening may result in delays in delays in the posting of transactions.

**Abandoned Property.** The Escrow Agent is required to act in accordance with the laws and regulations of various states relating to abandoned property and, accordingly, shall be entitled to remit dormant funds to any state as abandoned property in accordance with such laws and regulations.

THE FOLLOWING DISCLOSURES ARE REQUIRED TO BE PROVIDED UNDER APPLICABLE U.S. REGULATIONS, INCLUDING, BUT NOT LIMITED TO, FEDERAL RESERVE REGULATION D. WHERE SPECIFIC INVESTMENTS ARE NOTED BELOW, THE DISCLOSURES APPLY ONLY TO THOSE INVESTMENTS AND NOT TO ANY OTHER INVESTMENT.

**Demand Deposit Account Disclosure.** The Escrow Agent is authorized, for regulatory reporting and internal accounting purposes, to divide an escrow demand deposit account maintained in the U.S. in which the Escrow Account is held into a non-interest bearing demand deposit internal account and a non-interest bearing savings internal account, and to transfer funds on a daily basis between these internal accounts on the Escrow Agent's general ledger in accordance with U.S. law at no cost to the Parties. The Escrow Agent will record the internal accounts and any transfers between them on the Escrow Agent's books and records only. The internal accounts and any transfers between them will not affect the Escrow Amount, any investment or disposition of the Escrow Amount, use of the escrow demand deposit account or any other activities under this Agreement, except as described herein. The Escrow Agent will establish a target balance for the demand deposit internal account, which may change at any time. To the extent funds in the demand deposit internal account exceed the target balance, the excess will be transferred to the savings internal account, unless the maximum number of transfers from the savings internal account for that calendar month or statement cycle has already occurred. If withdrawals from the demand deposit internal account exceeds the available balance in the demand deposit internal account, funds from the savings internal account will be transferred to the demand deposit internal account up to the entire balance of available funds in the savings internal account to cover the shortfall and to replenish any target balance that the Escrow Agent has established for the demand deposit internal account. If a sixth transfer is needed during a calendar month or statement cycle, it will be for the entire balance in the savings internal account, and such funds will remain in the demand deposit internal account for the remainder of the calendar month or statement cycle.

**MMDA Disclosure and Agreement.** If MMDA is the investment for the escrow deposit as set forth above or anytime in the future, you acknowledge and agree that U.S. law limits the number of pre-authorized or automatic transfers or withdrawals or telephonic/electronic instructions that can be made from an MMDA to a total of six (6) per calendar month or statement cycle or similar period. The Escrow Agent is required by U.S. law to reserve the right to require at least seven (7) days notice prior to a withdrawal from a money market deposit account.

**Unlawful Internet Gambling.** The use of any account to conduct transactions (including, without limitation, the acceptance or receipt of funds through an electronic funds transfer, or by check, draft or similar instrument, or the proceeds of any of the foregoing) that are related, directly or indirectly, to unlawful Internet gambling is strictly prohibited.

**EXHIBIT V**

**FORM OF GRIFFIN MINORITY BUYOUT AGREEMENT**

## FORM OF BP CLAIMS ASSIGNMENT AND ASSUMPTION AGREEMENT

This BP Claims Assignment and Assumption Agreement (this "Agreement") is entered into as of [          ], 2016, by and between United States Pipe and Foundry Company, LLC, an Alabama limited liability company ("USPF"), and Alabama Seller Rep Inc., a Delaware corporation ("Seller Representative"). USPF and Seller Representative are parties to that certain Stock Purchase Agreement by and among (i) [HBP Pipe & Precast LLC], a Delaware limited liability company, (ii) USP Holdings Inc., a Delaware corporation ("Holdings"), (iii) the holders of common stock of Holdings and the holders of Options (as defined therein), and (iv) Seller Representative dated as of December [    ] 2015 (the "SPA"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the SPA.

## BACKGROUND

WHEREAS, USPF has taken certain actions to enforce its rights with respect to the BP Claims to the claims administrator for the BP Claims (the "Claims Administrator"). USPF desires to assign to Seller Representative, and Seller Representative desires to accept from USPF, all of USPF's right, title, and interest in and to the BP Claims and the Assigned Rights (as defined below). USPF desires to assign to Seller Representative, and Seller Representative desires to assume from USPF, all of USPF's Liabilities in connection with the BP Claims.

NOW, THEREFORE, for good and valuable consideration, the receipt and accuracy of which is hereby acknowledged, and subject to the terms and conditions set forth in this Agreement, the parties agree as follows:

## AGREEMENT

1. Assignment of Claims. Subject to the terms and conditions set forth herein, USPF hereby irrevocably, absolutely and unconditionally sells, conveys, transfers and assigns to Seller Representative all of USPF's right, title and interest in and to (i) the BP Claims, including, without limitation, all of USPF's rights to receive all principal, interest, fees, expenses, damages, penalties and other amounts or distributions of any kind in respect of or in connection with the BP Claims and all of USPF's rights to receive cash, securities, instruments and/or other property or distributions issued in connection with the BP Claims (collectively with the BP Claims, the "Assigned Rights").

2. Assumption of Liabilities. USPF hereby assigns to Seller Representative, and Seller Representative accepts and assumes from USPF all Liabilities of the Companies with respect to the BP Claims and the other Assigned Rights (the "Assumed Liabilities"), including any fees of counsel in connection with the BP Claims, and agrees to pay, perform and discharge, as and when due, all of the Assumed Liabilities.

3. Forwarding of Notices and Payments.

(a) USPF agrees to forward to Seller Representative all notices and other written information received from the Claims Administrator or any third party with respect to the Assigned Rights and to take such other and further actions with respect to the Assigned Rights as Seller Representative may from time to time request (provided that any such action shall be at the sole cost and expense of Seller Representative). Further, in the event that an objection to the BP Claims is received by USPF, upon USPF's receipt of notice of such objection, USPF shall promptly notify Seller Representative in writing.

(b) USPF further agrees that, if USPF receives any payments or other distributions on account of the Assigned Rights, whether in the form of cash, securities, instruments or any other property, and whether from the Claims Administrator or any other person or entity, such payment or distribution (as the case may be) shall constitute property of the Seller Representative included in the Assigned Rights to which the Seller Representative has an absolute right. USPF shall accept the same for the sole benefit of Seller Representative, and shall promptly deliver the same forthwith to Seller Representative in the same form received (free of any withholding, set-off, claim or deduction of any kind), within three (3) business days, which, in the case of securities, are in good deliverable form, with the endorsement of USPF when necessary or appropriate.

4. Filings with Claim Administrator; Assignability of BP Claims. USPF and Seller Representative shall make such filings with the Claims Administrator as reasonable and necessary to evidence the transfer of the Assigned Rights from USPF to Seller Representative. Notwithstanding anything to the contrary in this Agreement, the BP Claims shall not be deemed sold, transferred or assigned to Seller Representative pursuant to this Agreement if the attempted transfer or assignment thereof to Seller Representative without the consent or approval of any other person or entity would be ineffective or would constitute a breach of contract or a violation of any law or order, and such consent or approval is not obtained at or prior to the date hereof. In such case (a) the beneficial interest in or to the Assigned Rights (collectively, the "Beneficial Rights") shall in any event pass on the date hereof to Seller Representative under this Agreement; and (b) pending such consent or approval, Seller Representative shall discharge the Liabilities of USPF under such Beneficial Rights as agent for Seller Representative, and Seller Representative shall act as USPF's agent in the receipt of any benefits, rights or interest received from the Beneficial Rights. The parties shall use their respective reasonable best efforts to obtain and secure all consents and approvals that may be necessary to effect the legal and valid sale, transfer, assignment or assumption of the Assigned Rights underlying the Beneficial Rights and the Assumed Liabilities to the Seller Representative without any change in any of the material terms or conditions of such Assigned Rights and Assumed Liabilities.

5. Notices. All notices, requests, instructions and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), as of the date received, (ii) when sent by facsimile (with written confirmation of transmission) or email, as of the date received (provided, that, in the event of any email or facsimile transmission of such notice, request, instruction or other communications is received after 5:00 pm on a Business Day as of the place of receipt, then such notice, request, instruction, consent and other communication will be deemed to have been received on the immediately succeeding Business Day at the place of receipt), or (iii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision):

-2-

If to USPF, to:

United States Pipe and Foundry Company, LLC
[          ]

with a copy (which shall not constitute notice but shall be required for proper notice to be given) to:
[          ]

If to Seller Representative, to:

Alabama Seller Rep Inc.
c/o Wynnchurch Capital, Ltd.
6250 N. River Road, Suite 10-100
Rosemont, IL 60018
Facsimile: (847) 604-6105
Attention: Terry M. Theodore and Christopher P. O'Brien
Email:     ttheodore@wynnchurch.com
              cobrien@wynnchurch.com

with a copy (which shall not constitute notice but shall be required for proper notice to be given) to:

Foley & Lardner LLP
500 Woodward Avenue, Suite 2700
Detroit, MI 48226
Facsimile: (313) 234-2800
Attention: Tom Spillane and Omar Lucia
Email:  tspillane@foley.com
              olucia@foley.com

6. Successors and Assigns. The provisions of this Agreement shall bind and inure to the benefit of USPF and Seller Representative and their respective successors and permitted assigns.

7. Terms of the Purchase Agreement. USPF and Seller Representative acknowledge and agree that all representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby, and in the event of any conflict or inconsistency between the terms of the Purchase Agreement and this Agreement hereof, the terms of the Purchase Agreement shall govern.

8. Execution in Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

9. Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).

[Signatures on next page]

-3-

EX-2.6 Case: 18-31177    Document: 00515297113    Page: 572    Date Filed: 02/04/2020 136

Case 2:10-md-02179-CJB-DPC    Document 26293-2   Filed 02/05/20   Page 573 of 1003
Case 2:10-md-02179-CJB-JCW    Document 26293-2   Filed 02/25/2019   Page 112 of 137

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

UNITED STATES PIPE AND FOUNDRY
COMPANY, LLC

By:    _____
Name:
Title:

ALABAMA SELLER REP INC.

By:    _____
Name:
Title:

*[Signature Page to BP Claims Assignment and Assumption Agreement]*

## EXHIBIT VI

### FORM OF BP CLAIM ASSIGNMENT

EX-2.6 Case: 18-31177    Document: 00515297113    Page: 574    Date Filed: 02/04/2020 0136

Case 2:10-md-02179-CJB-DPC    Document 26293-2 Filed 02/05/20 Page 575 of 1003
Case 2:10-md-02179-CJB-JCW    Document 26293-2 Filed 02/25/2019 Page 575 of 1003

Exhibit VI

## FORM OF BP CLAIMS ASSIGNMENT AND ASSUMPTION AGREEMENT

This BP Claims Assignment and Assumption Agreement (this "Agreement") is entered into as of [          ], 2016, by and between United States Pipe and Foundry Company, LLC, an Alabama limited liability company ("USPF"), and Alabama Seller Rep Inc., a Delaware corporation ("Seller Representative"). Reference is made to that certain Stock Purchase Agreement by and among (i) Forterra Pipe & Precast, LLC, a Delaware limited liability company, (ii) USP Holdings Inc., a Delaware corporation ("Holdings"), (iii) the holders of common stock of Holdings and the holders of Options (as defined therein), and (iv) Seller Representative dated as of February [12],2016 (the "Purchase Agreement"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement.

### BACKGROUND

WHEREAS, USPF has taken certain actions to enforce its rights with respect to the BP Claims (as defined in the Purchase Agreement) to the claims administrator for the BP Claims (the "Claims Administrator"). USPF desires to assign to Seller Representative, and Seller Representative desires to accept from USPF, all of USPF's right, title, and interest in and to the BP Claims and the Assigned Rights (as defined below). USPF desires to assign to Seller Representative, and Seller Representative desires to assume from USPF, all of USPF's Liabilities in connection with the BP Claims.

NOW, THEREFORE, for good and valuable consideration, the receipt and accuracy of which is hereby acknowledged, and subject to the terms and conditions set forth in this Agreement, the parties agree as follows:

### AGREEMENT

1. Assignment of Claims. Subject to the terms and conditions set forth herein, USPF hereby irrevocably, absolutely and unconditionally sells, conveys, transfers and assigns to Seller Representative all of USPF's right, title and interest in and to (i) the BP Claims, including, without limitation, all of USPF's rights to receive all principal, interest, fees, expenses, damages, penalties and other amounts or distributions of any kind in respect of or in connection with the BP Claims and (ii) all of USPF's rights to receive cash, securities, instruments and/or other property or distributions issued in connection with the BP Claims (collectively with the BP Claims, the "Assigned Rights").

2. Assumption of Liabilities. USPF hereby assigns to Seller Representative, and Seller Representative accepts and assumes from USPF all Liabilities of the Companies with respect to the BP Claims and the other Assigned Rights, including without limitation any and all Taxes of any of the Companies and their respective Affiliates incurred in connection with or resulting from the assignment effected by this Agreement or the receipt and remittance to Seller Representative of any amounts described in Section 3(b) of this Agreement (the "Assumed Liabilities"), including any fees of counsel in connection with the BP Claims, and agrees to pay, perform and discharge, as and when due, all of the Assumed Liabilities.

3. <u>Forwarding of Notices and Payments</u>.

(a) USPF agrees to use reasonable best efforts to forward to Seller Representative all notices and other written information received from the Claims Administrator or any third party with respect to the Assigned Rights and to take such other and further actions with respect to the Assigned Rights as Seller Representative may from time to time reasonably request (provided that any such action shall be at the sole cost and expense of Seller Representative). Further, in the event that an objection to the BP Claims is received by USPF, upon USPF's receipt of notice of such objection, USPF shall reasonably promptly notify Seller Representative in writing.

(b) USPF further agrees that, if USPF receives any payments or other distributions on account of the Assigned Rights, whether in the form of cash, securities, instruments or any other property, and whether from the Claims Administrator or any other person or entity, such payment or distribution (as the case may be) shall constitute property of the Seller Representative included in the Assigned Rights to which the Seller Representative has an absolute right. USPF shall accept the same for the sole benefit of Seller Representative and hold the same in trust, and shall promptly deliver the same forthwith to Seller Representative in the same form received (free of any withholding, set-off, claim or deduction of any kind other than with respect to Taxes, if applicable, as described in Section 2 of this Agreement, which USPF may withhold from any such delivery and retain for the payment of such Taxes), within five (5) business days, which, in the case of securities, are in good deliverable form, with the endorsement of USPF when necessary or appropriate. In the event that USPF elects to withhold any amounts owing to Seller Representative for the payment of Taxes as described in the foregoing sentence, then USPF shall (i) provide notice of such withholding to Seller Representative within five (5) business days of receipt of any payments described in this Section 3(b), which notice shall describe the amount so withheld in reasonable detail and (ii) make available to Seller Representative appropriate personnel to discuss any funds withheld for Taxes pursuant to this Section 3(b) and the rationale therefor. USPF acknowledges and agrees that upon execution of this Agreement, Seller Representative, and not USPF, shall be the owner of the BP Claims. Neither USPF nor any Affiliate of USPF will take any position in any Tax Return prepared and filed on behalf of USPF or such Affiliate to the contrary unless, under the Tax law in effect at the time, there is no reasonable basis for the position that USPF is the owner of the BP Claims.

4. <u>Filings with Claim Administrator; Assignability of BP Claims</u>. USPF and Seller Representative shall make such filings with the Claims Administrator as reasonable and necessary to evidence the transfer of the Assigned Rights from USPF to Seller Representative. Notwithstanding anything to the contrary in this Agreement, the BP Claims shall not be deemed sold, transferred or assigned to Seller Representative pursuant to this Agreement if the attempted transfer or assignment thereof to Seller Representative without the consent or approval of any other person or entity would be ineffective or would constitute a breach of contract or a violation of any law or order, and such consent or approval is not obtained at or prior to the date hereof. In such case (a) the beneficial interest in or to the Assigned Rights (collectively, the "<u>Beneficial Rights</u>") shall in any event pass on the date hereof to Seller Representative under this Agreement; and (b) pending such consent or approval, Seller Representative shall discharge the Liabilities of USPF under such Beneficial Rights as agent for Seller Representative, and Seller Representative shall act as USPF's agent in the receipt of any benefits, rights or interest received from the Beneficial Rights. The parties shall use their respective reasonable best efforts to obtain and secure all consents and approvals that may be necessary to effect the legal and valid sale, transfer, assignment or assumption of the Assigned Rights underlying the Beneficial Rights and the Assumed Liabilities to the Seller Representative without any change in any of the material terms or conditions of such Assigned Rights and Assumed Liabilities.

-2-

5. <u>Notices</u>. All notices, requests, instructions and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), as of the date received, (ii) when sent by facsimile (with written confirmation of transmission) or email, as of the date received (provided, that, in the event of any email or facsimile transmission of such notice, request, instruction or other communications is received after 5:00 pm on a Business Day as of the place of receipt, then such notice, request, instruction, consent and other communication will be deemed to have been received on the immediately succeeding Business Day at the place of receipt), or (iii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision):

If to USPF, to:

United States Pipe and Foundry Company, LLC
c/o Forterra Pipe & Precast, LLC
300 E. John Carpenter Freeway, Suite 800
Irving, TX 75062
Attention:        Lori M. Browne
Facsimile:       (469) 586-1414
E-mail:           lori.browne@forterrabp.com

with a copy (which shall not constitute notice but shall be required for proper notice to be given) to:

Gibson, Dunn & Crutcher LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75210
Attention:        Jeffrey Chapman
                       Jonathan Corsico
Facsimile:       (214) 571-2920
                       (202) 530-4218
E-mail:           jchapman@gibsondunn.com
                       jcorsico@gibsondunn.com

If to Seller Representative, to:

Alabama Seller Rep Inc.
c/o Wynnchurch Capital, Ltd.
6250 N. River Road, Suite 10-100
Rosemont, IL 60018
Facsimile:       (847) 604-6105
Attention:       Terry M. Theodore and Christopher P. O'Brien
Email:           ttheodore@wynnchurch.com
                      cobrien@wynnchurch.com

-3-

with a copy (which shall not constitute notice but shall be required for proper notice to be given) to:

Foley & Lardner LLP
500 Woodward Avenue, Suite 2700
Detroit, MI 48226
Facsimile: (313) 234-2800
Attention: Tom Spillane and Omar Lucia
Email: tspillane@foley.com
        olucia@foley.com

6. <u>Successors and Assigns</u>. The provisions of this Agreement shall bind and inure to the benefit of USPF and Seller Representative and their respective successors and permitted assigns.

7. <u>Terms of the Purchase Agreement</u>. USPF and Seller Representative acknowledge and agree that all representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby, and in the event of any conflict or inconsistency between the terms of the Purchase Agreement and this Agreement hereof, the terms of the Purchase Agreement shall govern.

8. <u>Execution in Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

9. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).

[Signatures on next page]

-4-

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

<div style="margin-left:50%">

UNITED STATES PIPE AND FOUNDRY
COMPANY, LLC

By:
Name:
Title:

ALABAMA SELLER REP INC.

By:
Name:
Title:

</div>

*[Signature Page to BP Claims Assignment and Assumption Agreement]*

EX-2.6 Case: 18-31177     Document: 00515297113     Page: 579     Date Filed: 02/04/2020 2016136

Case 2:10-md-02179-CJB-DPC   Document 26293-2 Filed 02/05/20 Page 580 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26293-2 Filed 02/25/2019 Page 580 of 1003

**EXHIBIT VII**

**SCRAP METAL CALCULATION**

**Scrap Metal Inventory, Scrap Metal Payables, Scrap Metal (Exhibit)**

| | Dec-15 | Notes |
|---|---|---|
| Scrap raw material value ($000s) | $ 2,169 | Per Company SAP systems |
| Finished pipe Tons | 35,264 | Per Company SAP systems |
| Weighted average manufactured cost of scrap per Ton in previous month | $    191 | Internal Company statistic |
| Implied value of finished pipe tons ($000s) | $ 6,744 | |
| **Scrap Metal Inventory (as defined in Agreement) ($000s)** | **$ 8,913** | |
| **Scrap Metal Payables (as defined in Agreement) ($000s)** | **$ 1,853** | Per Company systems sum of scrap suppliers |
| Scrap raw material inventory Tons | 13,514 | Per Company SAP systems |
| Scrap finished pipe inventory Tons | 35,264 | See above |
| Accounts payable long tons (2,240 lbs) per vendor invoices | 9,353 | Per Company systems sum of scrap suppliers |
| Long tons (2,240 lbs) to short tons ("Tons") conversion factor | 1.12 | Long ton (2240 lbs) / short ton (2000 lbs) |
| Scrap accounts payable tons | 10,476 | |
| **Scrap Metal (as defined in Agreement)** | **38,302** | |

*Note: Tons means 2,000 lbs unless otherwise stated*

**EXHIBIT VIII**

**NET WORKING CAPITAL CALCULATION**

**Net Working Capital (Exhibit)**
*($ in 000s)*

| | Dec-15 |
|---|---|
| Cash and cash equivalents | $    2,048 |
| Accounts receivable less allowance | 78,166 |
| Inventories, net | 91,104 |
| Prepaid expenses and other current assets | 3,864 |
| Deferred income taxes | 2,405 |
| **Total current assets as reported** | **$ 177,587** |
| *Adjustments:* | |
| Less: Cash and cash equivalents | ($    2,048) |
| Plus: Outstanding checks | 6,729 |
| **Less: Company Cash (as defined in Agreement)** | **$    4,681** |
| Less: Deferred income taxes—current portion | (2,405) |
| Less: Scrap component of finished goods inventory | (6,744) |
| Less: Scrap component of raw materials Inventory | (2,169) |
| **Less: Scrap Metal Inventory (as defined in Agreement)** | **($   8,913)** |
| **Current Assets (as defined in Agreement)** | **$ 170,950** |
| Excess of checks over bank balance (excluded above through Company Cash) | $    6,729 |
| Trade accounts payable | 28,435 |
| Income taxes payable | 3,045 |
| Accrued liabilities | 13,032 |
| **Total current liabilities as reported** | **$   51,241** |
| *Adjustments:* | |
| Less: Income taxes payable | (3,045) |
| Less: Accrued interest and bank fees | (402) |
| Less: Scrap Metal Payables (as defined in Agreement) | (1,853) |
| Less: Accrued OPEB—short term | (326) |
| Less: Specific customer warranty accrual (Buckeystown) | (330) |
| Less: Management fee accrual | (110) |
| Less: Environmental accrual | (274) |
| **Current Liabilities (as defined in Agreement)** | **$   44,901** |
| **Net Working Capital (as defined in Agreement)** | **$ 126,049** |
| Scrap inventory finished goods Tons | 35,264 |
| Scrap inventory raw materials Tons | 13,514 |
| Scrap inventory Tons | 48,778 |
| Scrap accounts payable long tons (2,240 lbs) | 9,353 |
| Long tons (2,240 lbs) to short tons ("Tons") conversion factor | 1.12 |
| Scrap accounts payable Tons (Step-Two) | 10,476 |
| **Scrap Metal (as defined in Agreement)** | **38,302** |

*Note: Tons means 2,000 lbs unless otherwise stated*

# EXHIBIT 2

EX-2.3 2 exhibit23.htm EXHIBIT 2.3

**Execution Version**

## PURCHASE AGREEMENT

### BY AND AMONG

**MUELLER WATER PRODUCTS, INC.**
**As Parent,**

**MUELLER GROUP, LLC**
**As Seller,**

**and**

**USP HOLDINGS INC.**
**As the Purchaser,**

**DATED AS OF MARCH 7, 2012**

1

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **ARTICLE I** | **DEFINITIONS** | 1 |
| | | |
| 1.1 | Definitions | 1 |
| | | |
| **ARTICLE II** | **SALE AND PURCHASE OF EQUITY** | 1 |
| | | |
| 2.1 | Sale and Purchase of Company Units | 1 |
| 2.2 | Closing | 1 |
| 2.3 | Purchase Price; Payment Instructions | 1 |
| 2.4 | Purchase Price; Adjustments | 2 |
| 2.5 | Purchase Price Allocation | 3 |
| 2.6 | Reimbursement of Payments | 4 |
| | | |
| **ARTICLE III** | **REPRESENTATIONS AND WARRANTIES OF SELLER AND PARENT** | 4 |
| | | |
| 3.1 | Organization, Standing and Power | 4 |
| 3.2 | Capitalization and Equity Ownership | 5 |
| 3.3 | Authority | 5 |
| 3.4 | No Conflicts | 5 |
| 3.5 | No Consents | 5 |
| 3.6 | Title to Assets and Properties, Company Units and Rights in Licensed Assets and Properties; Absence of Encumbrances | 6 |
| 3.7 | Financial Statements and Schedules | 7 |
| 3.8 | Ordinary Course | 7 |
| 3.9 | Litigation | 8 |
| 3.10 | Intellectual Property | 8 |
| 3.11 | Environmental Matters | 9 |
| 3.12 | Taxes | 10 |
| 3.13 | Employee Benefit Plans | 11 |
| 3.14 | Employee Matters | 12 |
| 3.15 | Insurance | 13 |
| 3.16 | Brokers' and Finders' Fees; Third Party Expenses | 13 |
| 3.17 | Contracts | 13 |
| 3.18 | No Breach of Material Contracts | 15 |
| 3.19 | Affiliate Transactions | 15 |
| 3.20 | Compliance with Laws; Licenses | 15 |
| 3.21 | Accounts Receivable | 15 |
| 3.22 | Inventory | 15 |
| 3.23 | Product Warranty/Liability | 15 |
| 3.24 | Customers and Suppliers | 16 |
| | | |
| **ARTICLE IV** | **REPRESENTATIONS AND WARRANTIES OF PURCHASER** | 16 |

Exhibit 23Case: 18-31177     Document: 00515297113     Page: 586     Date Filed: 02/04/20203100

Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 587 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26293-5   Filed 02/20/19   Page 4 of 1003

| | | |
|---|---|---|
| 4.1 | Organization, Standing and Power | 16 |
| 4.2 | Authority | 16 |
| 4.3 | No Conflict | 16 |
| 4.4 | No Consents | 16 |
| 4.5 | Financial Resources | 16 |
| 4.6 | Litigation | 17 |
| 4.7 | No Brokers | 17 |
| 4.8 | Investigation by Purchaser | 17 |
| 4.9 | Purchase for Investment | 17 |
| **ARTICLE V** | **COVENANTS** | 17 |
| 5.1 | Conduct of Business by each Company, Seller and Parent | 17 |
| 5.2 | Regulatory and Other Authorizations; Notices and Consents | 19 |
| 5.3 | Other Actions | 20 |

i

| | | |
|---|---|---|
| 5.4 | Confidentiality; Access to Information | 20 |
| 5.5 | Disclosure of Certain Matters | 21 |
| 5.6 | Employees and Company Plans | 21 |
| 5.7 | Fees and Expenses | 23 |
| 5.8 | Tax Matters | 23 |
| 5.9 | Records and Documents | 24 |
| 5.10 | Litigation Support | 25 |
| 5.11 | Support Arrangements | 25 |
| 5.12 | Administration of Workers' Compensation Claims | 25 |
| 5.13 | Cooperation with Financing | 26 |
| 5.14 | Interim Financial Statements | 26 |
| 5.15 | No Negotiation | 26 |
| 5.16 | Non-Competition | 27 |
| 5.17 | Bank Accounts | 27 |
| 5.18 | Directors and Officers | 28 |
| 5.19 | Right of First Refusal | 28 |
| 5.20 | Restricted Payments | 28 |
| 5.21 | Environmental | 28 |
| 5.22 | Executive Payments | 29 |
| 5.23 | Release of Intercompany Claims | 29 |

**ARTICLE VI    CONDITIONS TO THE TRANSACTION**    29

| | | |
|---|---|---|
| 6.1 | Conditions to Obligations of Each Party | 29 |
| 6.2 | Additional Conditions to Obligations of Seller and Parent | 30 |
| 6.3 | Additional Conditions to the Obligations of Purchaser | 30 |

**ARTICLE VII    TERMINATION**    32

| | | |
|---|---|---|
| 7.1 | Termination | 32 |
| 7.2 | Notice of Termination; Effect | 32 |

**ARTICLE VIII    INDEMNIFICATION**    32

| | | |
|---|---|---|
| 8.1 | Survival of Representations and Warranties | 32 |
| 8.2 | Indemnification by Parent and Seller | 33 |
| 8.3 | Indemnification by Purchaser | 34 |
| 8.4 | Terms and Conditions of Indemnification | 34 |
| 8.5 | Indemnification Payments Constitute Adjustments to Purchase Price | 35 |
| 8.6 | No Double Recovery | 35 |
| 8.7 | Exclusivity | 36 |

**ARTICLE IX    GENERAL PROVISIONS**    36

| | | |
|---|---|---|
| 9.1 | Notices | 36 |
| 9.2 | Interpretation | 37 |
| 9.3 | Counterparts; Facsimile Signatures | 37 |

| 9.4 | Entire Agreement; Third Party Beneficiaries | 37 |
| 9.5 | Severability | 37 |
| 9.6 | Other Remedies; Specific Performance | 37 |
| 9.7 | Governing Law | 37 |
| 9.8 | Rules of Construction | 37 |
| 9.9 | Assignment | 37 |
| 9.10 | Amendment | 37 |
| 9.11 | Extension; Waiver | 38 |
| 9.12 | Dispute Resolution | 38 |
| 9.13 | Currency and Payment Obligations | 38 |

ii

Exhibit Case: 18-31177    Document: 00515297113    Page: 589    Date Filed: 02/04/2020 00100
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 590 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26293-5   Filed 02/20/19   Page 7 of 1003

**Annexes, Exhibits, and Schedules**

**Annexes**
Annex A          -    Permitted Fees
Annex B          -    UCC Financing Statements
Annex C          -    Related Party Agreements
Annex D      -    Retained Liabilities


**Exhibits**
Exhibit A      -    Definitions
Exhibit B      -    Form of Transition and Shared Services Agreement
Exhibit C      -    Form of Patent License Agreement
Exhibit D      -    Form of Assignment and Assumption Agreement
Exhibit E-1      -    Form of Trademark Assignment Agreement
Exhibit E-2      -    Form of Trademark Cooperation Agreement
Exhibit F      -    Form of Guaranty
Exhibit G      -    Form of Employee Leasing Agreement


**Schedules** -- Seller Disclosure Schedule
Section 3.4      -    Conflicts
Section 3.5      -    Consents
Section 3.6      -    Title to Assets and Properties; Absence of Encumbrances
Section 3.7      -    Financial Statements and Schedules
Section 3.8      -    Ordinary Course
Section 3.9      -    Litigation
Section 3.10      -    Intellectual Property
Section 3.11      -    Environmental Matters
Section 3.12      -    Taxes
Section 3.13      -    Employee Benefit Plans
Section 3.14      -    Employee Matters
Section 3.15      -    Insurance
Section 3.16      -    Brokers' and Finders' Fees; Third Party Expenses
Section 3.17      -    Contracts
Section 3.18      -    No Breach of Material Contract
Section 3.19      -    Affiliate Transactions
Section 3.20      -    Compliance with Laws; Licenses
Section 3.21      -    Accounts Receivable
Section 3.22      -    Inventory
Section 3.23      -    Product Warranty/Liabilities
Section 3.24      -    Customers and Suppliers
Section 5.1      -    Restructuring
Section 5.6      -    Employees and Company Plans
Section 5.11      -    Support Arrangements
Section 5.16      -    Non-Competition
Section 5.17      -    Bank Accounts

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT, dated as of March 7, 2012 (the "Agreement"), is made and entered into by and among (i) USP Holdings Inc., a Delaware corporation ("Purchaser"), (ii) Mueller Group, LLC, a Delaware limited liability company ("Seller"), and (iii) Mueller Water Products, Inc., a Delaware corporation ("Parent"). Purchaser, Seller and Parent are sometimes individually referred to herein as a "Party" or collectively as the "Parties."

### W I T N E S S E T H:

WHEREAS, Seller is the beneficial and record owner of (i) one thousand (1,000) membership interests in United States Pipe and Foundry Company, LLC, an Alabama limited liability company ("U.S. Pipe"), representing all of the outstanding membership interests in U.S. Pipe (the "U.S. Pipe Units"), and (ii) one (1) membership interest in Fast Fabricators, LLC, a Delaware limited liability company ("Fast Fabricators" and, together with U.S. Pipe, each a "Company" and together, the "Companies"), representing all of the outstanding membership interests in Fast Fabricators (the "Fabricator Units" and, together with the U.S. Pipe Units, the "Company Units");

WHEREAS, Seller desires to sell, transfer and deliver to Purchaser, and Purchaser desires to purchase, acquire and assume, from Seller, all of Seller's right, title and interest in the Company Units, free and clear of all Encumbrances;

WHEREAS, Seller desires to effect the Restructuring, as more fully described herein, to the extent practicable, prior to the Closing, which Restructuring shall be on terms and conditions reasonably acceptable to Purchaser; and

WHEREAS, the Parties desire to make certain representations, warranties, covenants and agreements in connection with, and establish various conditions precedent to, the consummation of the transactions contemplated by this Agreement, all as more fully set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions hereinafter set forth, and intending to be legally bound hereby, the Parties agree as follows:

### ARTICLE I
### DEFINITIONS

1.1    Definitions. Capitalized terms used in this Agreement shall have the meanings specified in Exhibit A or elsewhere in this Agreement.

### ARTICLE II
### SALE AND PURCHASE OF EQUITY

2.1    Sale and Purchase of Company Units. Subject to the terms and conditions herein set forth, at the Closing, Seller will sell, assign, convey, transfer and deliver to Purchaser, free and clear of any Encumbrances, and Purchaser will purchase and accept from Seller, all of the issued and outstanding Company Units (the "Sale").

2.2    Closing. The closing of the Sale (the "Closing") shall be held at the offices of Bryan Cave LLP, 1201 West Peachtree Street, Atlanta, Georgia, 30309 at a time and date to be specified by the Parties, which shall be no later than the Third Business Day after the satisfaction or waiver of the conditions set forth in Article VI (other than conditions which by their nature may only be satisfied at the Closing), or at such other time and location as the Parties shall otherwise agree (the date on which the Closing takes place is herein referred to as the "Closing Date"). The Closing shall be deemed to occur at 12:01 a.m. Atlanta, Georgia time on the Closing Date.

2.3    Purchase Price; Payment Instructions.

(a)    For purposes of this Agreement, the term "Purchase Price" means the amount equal to Eighty Nine Million Eight Hundred Thousand Dollars ($89,800,000), as adjusted as provided herein.

Exhibit 23 Case: 18-31177    Document: 00515297113    Page: 591    Date Filed: 02/04/2020 100

Case 2:10-md-02179-CJB-DPC   Document 26293-5   Filed 02/05/20   Page 592 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26293-5   Filed 02/05/20   Page 2 of 1003

(b)        On the Closing Date, Purchaser shall deliver to Seller an amount equal to (i) Eighty Nine Million Eight Hundred Thousand Dollars ($89,800,000), plus (ii) the amount, if any, by which the Estimated Net Working Capital is greater than the Net Working Capital Target, minus (iii) the amount, if any, by which the Estimated Net Working Capital is less than the Net Working Capital Target, minus (iv) the amount, if any, by which the Estimated Net Indebtedness is greater than the Net Indebtedness Target, plus (v) the amount, if any, by which the amount of the Estimated Net Indebtedness is less than the Net

1

Exhibit Case: 18-31177   Document: 00515297113   Page: 592   Date Filed: 02/04/2020 04/2020100

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 593 of 1003
Case 2:10-md-02179-CJB-DPC   Document 26193-3   Filed 02/05/20   Page 593 of 1003

Indebtedness Target.

(c)     All payments from Purchaser to Seller made pursuant to this Agreement or any other Ancillary Agreement shall be made in U.S. dollars by wire transfer of immediately available funds to the bank account(s) identified in writing by Parent; provided, however, that Seller may, by written notice delivered to Purchaser at least three (3) Business Days prior to the applicable payment date, direct Purchaser to wire transfer any payment to a different account as set forth in such written notice.

2.4   Purchase Price; Adjustments. The Purchase Price shall be subject to adjustment as set forth below, and all references in this Agreement to the Purchase Price shall be deemed to be the Purchase Price as adjusted pursuant to this Section 2.4.

(a)     Net Working Capital Adjustment.

(i)     Parent will prepare or cause to be prepared in good faith and delivered to Purchaser not later than three (3) Business Days prior to the Closing Date, an estimated combined balance sheet of the Companies prepared in accordance with the Accounting Principles, as of the Closing (the "Estimated Closing Balance Sheet"), together with a written statement setting forth in reasonable detail its good faith estimate of Net Working Capital (the "Estimated Net Working Capital") and Net Indebtedness (the "Estimated Net Indebtedness") as of the Closing using the appropriate data from the Estimated Closing Balance Sheet (the "Estimated Closing Statement").

(ii)     If the Estimated Net Working Capital is less than the Net Working Capital Target, then the Purchase Price shall be reduced dollar-for-dollar by the amount of such difference, and if the Estimated Net Working Capital is greater than the Net Working Capital Target, then the Purchase Price shall be increased dollar-for-dollar by the amount of such difference.

(iii)     If Net Working Capital, as finally determined pursuant to this Section 2.4, is less than the Estimated Net Working Capital, then the Purchase Price shall be reduced dollar-for-dollar by the amount of such difference. If Net Working Capital, as finally determined pursuant to this Section 2.4, is greater than the Estimated Net Working Capital, then the Purchase Price shall be increased dollar-for-dollar by the amount of such difference.

(b)     Net Indebtedness Adjustment.

(i)     If the Estimated Net Indebtedness is less than the Net Indebtedness Target, then the Purchase Price shall be increased dollar-for-dollar by the amount of such difference, and if the Estimated Net Indebtedness is greater than the Net Indebtedness Target, then the Purchase Price shall be reduced dollar-for-dollar by the amount of such difference.

(ii)     If Net Indebtedness, as finally determined pursuant to this Section 2.4, is greater than Estimated Net Indebtedness, then the Purchase Price shall be reduced dollar-for-dollar by the amount of such difference. If Net Indebtedness, as finally determined pursuant to this Section 2.4, is less than Estimated Net Indebtedness, then the Purchase Price shall be increased dollar-for-dollar by the amount of such difference.

(c)     Closing Balance Sheet; Schedule of Adjustments. The determination of the adjustments, if any, required to be made to the Purchase Price pursuant to clauses (a) and (b) of this Section 2.4 shall be made pursuant to the following provisions:

(i)     As promptly as practical, but in no event more than sixty (60) days after the Closing Date, Purchaser shall prepare or cause to be prepared a combined balance sheet of the Companies as of immediately prior to the Closing (the "Closing Balance Sheet"), as well as a calculation of Net Working Capital and Net Indebtedness, and deliver to Parent the Closing Balance Sheet, as well as calculations of Net Working Capital, Net Indebtedness and the adjustments, if any, required to be made to the Purchase Price pursuant to clauses (a) and (b) of this Section 2.4 (the "Schedule of Adjustments"). The Schedule of Adjustments shall be accompanied by reasonable supporting documentation containing reasonable detail as to the components or calculations of Net Working Capital, Net Indebtedness and Transaction Expenses. The Closing Balance Sheet shall be prepared in accordance with the Accounting Principles. The Parties agree that any proposed adjustments to the Estimated Net Working Capital or the Estimated Net Indebtedness will not involve changes in or challenges to the accounting methodologies, policies or procedures that were made in accordance with the Accounting Principles.

(ii)      During the thirty- (30) day period following the delivery by Purchaser of the Closing Balance Sheet, as well as the calculations of Net Working Capital, Net Indebtedness and the Schedule of Adjustments, Parent and its advisors may review the Closing Balance Sheet and such supporting documentation and shall have reasonable access during normal business hours to Purchaser's and the Companies' personnel as may be reasonably necessary to permit Parent and its advisors to review in detail the manner in which the Closing Balance Sheet and the calculations of Net Working Capital and Net

2

Indebtedness were prepared. If Purchaser fails to provide Parent the Closing Balance Sheet or Schedule of Adjustments, if any, within sixty (60) days after the Closing Date, the Estimated Closing Balance Sheet and the Estimated Closing Statement shall be final and binding on the Parties. Purchaser and Parent shall, and shall cause the Companies, as well as their respective advisors, to reasonably cooperate with one another in facilitating the preparation of the Closing Balance Sheet and its review. Upon completion of such review, Parent shall give any comments or objections it has with respect to the Closing Balance Sheet and the calculations of Net Working Capital and Net Indebtedness to Purchaser in writing within such thirty (30) day period (the "Objection Letter"). Purchaser and Parent shall use their reasonable best efforts to resolve any differences and issues set forth in the Objection Letter. If no Objection Letter is delivered or the matters set forth in the Objection Letter are so resolved, then the Closing Balance Sheet, as adjusted for any changes as are agreed by Parent and Purchaser, shall be final and binding on the Parties. If the matters raised in the Objection Letter cannot be resolved between Purchaser and Parent within fifteen (15) days of delivery of the Objection Letter, the question or questions in dispute shall then be submitted within an additional ten (10) days to an accounting firm of recognized standing mutually agreeable to Parent and Purchaser (other than Parent's auditors and Purchaser's auditors) (the "Independent Auditor"), the decision of which as to such question or questions in dispute shall be final and binding on the Parties. The Independent Auditor shall be instructed to resolve solely the question or questions in dispute within thirty (30) days of submission. Each Party shall cooperate with and assist the Independent Auditor in its determination, including by making available and granting reasonable access to records and employees. The fees of Purchaser and the Companies' advisors incurred in connection with the preparation of the Closing Balance Sheet, as well as the calculation of Net Working Capital, Net Indebtedness and the Schedule of Adjustments, shall be borne by Purchaser, and the fees of Parent's advisors incurred in connection with its review of the Closing Balance Sheet, as well as the calculation of Net Working Capital, Net Indebtedness and the Schedule of Adjustments, shall be borne by Parent. The cost of the Independent Auditor shall be paid by the Party whose aggregate estimate of the disputed amount or amounts, as the case may be, differs most greatly from the determination of the Independent Auditor. If the Parties' aggregate estimates of the disputed amount or amounts differ equally from the determination of the Independent Auditor, the cost of the Independent Auditor shall be borne equally by the Parties.

(iii)    If it is determined pursuant to this clause (c) that the Purchase Price paid at the Closing is less than the Purchase Price as adjusted pursuant to clauses (a) and (b) of this Section 2.4, Purchaser shall remit such difference to Seller.

(iv)    If it is determined pursuant to this clause (c) that the Purchase Price paid at the Closing is greater than the Purchase Price as adjusted pursuant to clauses (a) and (b) of this Section 2.4, Seller shall remit such difference to Purchaser.

(v)    Any cash payment to be made as a result of adjustments made in accordance with clauses (a) and (b) shall be paid within five (5) Business Days of the final determination of such adjustments by wire transfer of immediately available funds. Any such payment shall be made to such account or accounts as may be designated in writing by the Party entitled to such payment at least two (2) Business Days prior to the date that such payment is to be made.

2.5    Purchase Price Allocation.

(a)    Seller and Purchaser agree that (i) the sale and purchase of the Company Units shall be treated for U.S. federal and state income Tax purposes as the sale and purchase of all the assets of U.S. Pipe and Fast Fabricators and (ii) the Purchase Price, adjusted in accordance with this Agreement and modified to the extent required for U.S. federal income Tax purposes, shall be allocated among the assets of U.S. Pipe and Fast Fabricators for all Tax purposes in a manner consistent with Section 1060 of the Code and the Treasury Regulations promulgated thereunder. No later than ninety (90) days after the Closing Date, Purchaser shall deliver to Seller a prepared Form 8594 and any required exhibits thereto (the "Asset Acquisition Statement") allocating the Purchase Price (as adjusted and modified) among the assets of U.S. Pipe and Fast Fabricators in a manner consistent with this Section 2.5 and any Purchase Price allocation that is agreed upon at Closing, which shall be subject to the reasonable approval of Seller.

(b)    Seller shall have a period of fifteen (15) Business Days after the delivery of the Asset Acquisition Statement (the "Response Period") to notify Purchaser of any objections Seller may have to the allocations set forth therein (an "Objection Notice"). Unless Seller timely objects, such Asset Acquisition Statement shall be binding on the Parties without further adjustment, absent manifest error.

Exhibit 23 Case: 18-31177    Document: 00515297113    Page: 595    Date Filed: 02/04/2020 12/12/2019 10:00

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 596 of 1003
Case 2:10-md-02179-CJB-DCW   Document 26193-3   Filed 02/05/2019   Page 636 of 103

(c)       If Seller shall raise any objections within the Response Period, Purchaser and Seller shall use their reasonable best efforts to resolve such dispute. If the parties fail to agree within fifteen (15) days after the delivery of the Objection Notice, then the disputed items shall be resolved by an Independent Auditor selected pursuant to the procedures set forth in <u>Section 2.4(b)</u>, whose determination shall be final and binding on the Parties, absent manifest error. The Independent Auditor shall resolve the dispute within thirty (30) days after the dispute has been referred to it. The fees and expenses of such Independent Auditor shall be borne by Purchaser.

(d)       The Asset Acquisition Statement, as finally determined, shall be amended by Purchaser and Seller

3

consistent with Section 1060 and other applicable Tax law to reflect any adjustments to the Purchase Price hereunder. For all Tax purposes, Purchaser and Seller shall report the transactions contemplated by this Agreement in a manner consistent with the Allocation Schedule as it may be amended from time to time and the terms of this Agreement, and unless otherwise required by Law, neither Purchaser nor Seller will take any position inconsistent therewith in any Tax Return. Seller and Purchaser shall provide a copy of the filed Form 8594 to the other party, upon request.

2.6   Reimbursement of Payments. In the event that Seller (and/or any Seller's Affiliates) receive any payment either (i) belonging to Purchaser or the Companies or (ii) inadvertently paid by Purchaser to Seller, Seller (and/or any Seller's Affiliates) shall hold such payment in trust for Purchaser or the Companies, as applicable and remit such payment to Purchaser or the Companies, as applicable, in the form received within five (5) Business Days of receipt of such payment. In the event that after the Closing Date the Companies or Purchaser receive any payment (i) belonging to the Seller or Parent or (ii) inadvertently paid by Seller to Purchaser, the Purchaser or the Companies, as applicable, shall hold such payment in trust for the Seller or Parent, as applicable and remit such payment to Seller or Parent, as applicable, in the form received within five (5) Business Days of receipt of such payment.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER AND PARENT

Except for the representations and warranties of Seller and Parent contained in this Article III (in each case, as modified by the (i) specific disclosures made (to the extent expressly identified as disclosures relating to the Companies) in Parent's most recent annual report on Form 10-K filed with the SEC and any other forms, reports, schedules, registration statements and proxy statements filed with the SEC from November 29, 2011 through the date hereof under the Securities Act or the Exchange Act, other than disclosures referred to in the "Risk Factors" section of such reports; and (ii) disclosure schedules with respect thereto, which are attached hereto and made a part hereof (the "Seller Disclosure Schedule")), none of Seller, Parent or any other Person makes any other express or implied representation or warranty (whether oral or written) with respect to Seller, Parent, either Company or any other Person or the transactions contemplated by this Agreement, and each of Seller, the Companies and Parent disclaims any other representations or warranties, whether made by any of their respective Representatives or otherwise expressed or implied. The Seller Disclosure Schedule contains specific reference to the Section of this Article III as to which the information stated in such disclosure relates; provided, however, that the inclusion of any fact or item disclosed in any Section or subsection of the Seller Disclosure Schedule shall be deemed disclosed and incorporated in each other Section of the Seller Disclosure Schedule where it is expressly cross-referenced therein. Purchaser acknowledges and agrees that it has not relied on any representations and warranties other than the express representations and warranties set forth in this Article III. In addition, all representations and warranties of Seller and Parent as of the date hereof assume that the Restructuring has occurred and has been completed in accordance with Section 5.1(b) of the Seller Disclosure Schedule. Each of Seller and Parent represents and warrants to Purchaser as follows:

3.1   Organization, Standing and Power.

(a)      Parent is a corporation, and Seller is a limited liability company, each of which is duly organized, validly existing and in good standing under the Laws of Delaware. Each of Seller and Parent has the power and authority to own, use, license, lease and operate its Assets and Properties and to carry on its business as it is now being conducted and is duly qualified, licensed or admitted to do business and is in good standing in each jurisdiction in which the ownership, use, licensing, leasing or operation of its business makes such qualification, licensing or admission necessary, except where the failure to be so qualified would not have a Material Adverse Effect.

(b)      Each Company is a limited liability company duly formed, validly existing and in good standing under the laws of the state of its formation. Each Company has full limited liability company power and authority to own, lease or operate its Assets and Properties and to carry on its business as now being conducted. Each Company is duly qualified to transact business and is in good standing as a foreign limited liability company in each jurisdiction wherein its ownership or leasehold possession of property or the conduct of its business requires such qualification, except where the failure to be so qualified would not have a Material Adverse Effect on such Company. Complete and correct copies of the Articles of Organization and the Operating Agreement of U.S. Pipe, each dated as of September 23, 2005 (as may be amended after the date hereof with the prior written consent of Purchaser, the "U.S. Pipe LLC Agreement"), and the Limited Liability Agreement of Fast Fabricators, dated as of November 23, 2006 (as may be amended after the date

Exhibit Case: 18-31177    Document: 00515297113    Page: 597    Date Filed: 02/04/2020 0100

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 598 of 1003
Case 2:10-md-02179-CJB-DCW   Document 26193-3   Filed 02/05/2019   Page 850 of 1003

hereof with the prior written consent of Purchaser, the "Fabricators LLC Agreement" and with the U.S. Pipe LLC Agreement, the "LLC Agreements"), have been made available to Purchaser. Neither Company is in violation of any of the provisions of its respective LLC Agreement that are in effect as of the date hereof.

(c)    Neither Company has any Subsidiaries, and neither Company owns (of record or beneficially) any capital stock or other equity securities of any other corporation, limited liability company, general or limited partnership, firm,

4

association or business organization, entity or enterprise.

3.2    Capitalization and Equity Ownership.

(a)    Parent is the lawful owner of one hundred percent (100%) of the issued and outstanding equity interests of Seller. Seller is the lawful owner of the Company Units, and Seller has good and valid title to the Company Units, free and clear of any and all Encumbrances. Seller's Company Units constitute one hundred percent (100%) of the issued and outstanding equity interests of each Company, all of which have been duly authorized and validly issued, are fully paid and non-assessable, were issued in accordance with the registration or qualification provisions of relevant Laws, or pursuant to valid exemptions therefrom. Except for the Company Units, no other equity or ownership interests of either Company is issued or outstanding and there are no outstanding subscriptions, options, warrants, convertible securities, commitments or demands of any character, preemptive or otherwise or any other rights whatsoever for the purchase or sale of securities with respect to either Company, other than the U.S. Pipe LLC Agreement or the Fabricators LLC Agreement. Except for the LLC Agreements, there are no voting trust agreements or other contracts, agreements or arrangements restricting voting or dividend rights or transferability with respect to the Company Units or that provide for the sale, issuance, purchase, redemption or voting of, or dividend rights or transferability with respect to, the Company Units. There are no outstanding or authorized stock appreciation, phantom stock or similar rights with respect to either Company.

(b)    Other than this Agreement and the Ancillary Agreements, there are no Contracts relating to the issuance, sale, voting, redemption, purchase or transfer of any Company Units or any other debt or equity securities or ownership interests of either Company or any other right to participate in the income, equity or the election of managers or officers of either Company.

3.3    Authority. Each of Parent and Seller has all requisite corporate or limited liability power, as applicable, and authority to enter into this Agreement and each other Ancillary Agreement to which it is a party and to carry out the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and each other Ancillary Agreement to which Parent or Seller is a party, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary corporate or limited liability action, as applicable, required on the part of Parent or Seller. This Agreement has been, and the Ancillary Agreements to which Parent or Seller is a party will be, duly executed and delivered by Parent or Seller, as applicable. No other corporate or limited liability act or proceeding on the part of Parent or Seller is necessary to authorize this Agreement and each other Ancillary Agreement to which Parent or Seller is a party or the transactions contemplated hereby and thereby, and this Agreement and each other Ancillary Agreement to which Parent or Seller is a party constitutes the valid and legally binding obligations of Parent or Seller, as applicable, and is enforceable against Parent or Seller, as applicable, in accordance with its terms, except as may be limited by bankruptcy, reorganization, insolvency or other similar Laws affecting the enforcement of creditors' rights in general and subject to general principles of equity.

3.4    No Conflicts. Except as listed in Section 3.4 of the Seller Disclosure, the execution and delivery by each of Seller and Parent of this Agreement and the Ancillary Agreements to which it is a party, and the consummation by each of Seller and Parent of the transactions contemplated hereby and thereby do not and will not:

(a)    conflict with, or result in any violation of, the Certificate of Incorporation or bylaws of Parent or the articles of organization and operating agreement of Seller or either Company (collectively, the "Charter Documents");

(b)    assuming compliance with the matters described in Section 5, conflict with, or result in a violation of, in any material respect, any Law or Order applicable to Seller, Parent, or either Company;

(c)    assuming compliance with the matters described in Section 3.5 and receipt of consents listed in Section 3.5 of the Seller Disclosure Schedule, (i) conflict with or result in a material violation or breach of, (ii) constitute a material default (or an event that, with or without notice or lapse of time or both, would constitute a default) under, (iii) require Seller or Parent to obtain any consent, approval or action of, make any filing with or give any notice to any Person as a result or under the terms of, (iv) materially impair any Company right of or result in or give to any Person

any right of termination, cancellation, acceleration or modification in or with respect to, (v) result in or give to any Person any additional rights or entitlement to increased, additional, accelerated or guaranteed payments or performance under, or (vi) result in the loss of any material benefit under any of the terms, conditions or provisions of, any Material Contract; or

(d)    result in the creation or imposition of (or the obligation to create or impose) any Encumbrance upon the Company Units or the business or any of the material Assets and Properties of either Company.

3.5    <u>No Consents</u>. Except as set forth in Section 3.5 of the Seller Disclosure Schedule, no consent, approval, license,

5

order or authorization of, or registration, declaration or filing with, notice to or waiver from any Governmental Entity or any other Person is required by or with respect to the business or any of the Assets and Properties of either Company or Seller or Parent in connection with the execution and delivery of this Agreement or the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby, except for such filings required by the HSR Act.

      3.6   Title to Assets and Properties, Company Units and Rights in Licensed Assets and Properties; Absence of Encumbrances.

      (a)   Except as set forth in Section 3.6(a) of the Seller Disclosure Schedule, each Company has good and valid title to all of its Assets and Properties (including fee simple title to all Owned Real Property) free and clear of any Encumbrances, except for Permitted Encumbrances, and none of the Assets and Properties of either Company is subject to any preemptive right, or right of first refusal. Except as set forth in Section 3.6(a) of the Seller Disclosure Schedule, each Company has a lease, license or other form of authorization to Licensed Assets and Properties that is valid, binding and enforceable in accordance with their terms on the Company which is a party thereto and to the Knowledge of Seller, is valid, binding and enforceable on each counterparty thereto. Except as listed in Section 3.6(a) of the Seller Disclosure Schedule, all Assets and Properties and Licensed Assets and Properties of each Company are in good operating condition and repair, reasonable wear and tear and ordinary maintenance requirements excepted, and are suitable and adequate for use in the ordinary course of the business. Except as set forth in Section 3.6(a) of the Seller Disclosure Schedule, the Assets and Properties currently owned by each Company or the Licensed Assets and Properties currently leased or licensed by each Company are sufficient in order to conduct the Business consistent in all material respects with the manner in which such Company has conducted its business in the twelve (12) month period preceding the Closing Date.

      (b)   Section 3.6(b) of the Seller Disclosure Schedule contains a true, complete and correct list of all (i) real property owned by a Company ("Owned Real Property"), (ii) real property leased by a Company ("Leased Real Property" and together with the Owned Real Property, the "Real Property") and (iii) personal property leased by a Company with annual aggregate rental payments in excess of $50,000, and each Company has previously made available to Purchaser true, complete and correct copies of all documents relating to such leases. Except as set forth in Section 3.6 (b) of the Seller Disclosure Schedule, neither Company has subleased or otherwise granted to any Person the right to use or occupy or purchase any Real Property. All of the Real Property Leases and Personal Property Leases are valid, binding and enforceable in accordance with their terms on the Company which is a party thereto, except as may be limited by bankruptcy, reorganization, insolvency or other similar Laws affecting the enforcement of creditors' rights in general and subject to general principles of equity, and to the Knowledge of Seller, is valid, binding and enforceable on each counterparty thereto. Neither Company is in default under any material provision of such lease applicable to it, and there has not occurred any event that, either alone or with the giving of notice or lapse of time or both, would constitute a default by a Company under any material provision of a Real Property Lease or a Personal Property Lease.

      (c)   There are now in full force and effect duly issued certificates of occupancy permitting the Real Property and improvements located thereon to be legally used and occupied as the same are now constituted. All of the Real Property has permanent rights of access to dedicated public highways. No fact or condition exists which would prohibit or adversely affect the ordinary rights of access to and from the Real Property from and to the existing highways and roads and there is no pending or, to the Knowledge of Seller, threatened restriction or denial, governmental or otherwise, upon such ingress and egress. There is not (i) to the Knowledge of Seller any claim of adverse possession or prescriptive rights involving any of the Real Property, (ii) any structure located on any Real Property which encroaches on or over the boundaries of neighboring or adjacent properties, (iii) any structure of any other party which encroaches on or over the boundaries of any of such Real Property, or (iv) except as set forth on Section 3.6(c) of the Seller Disclosure Schedule, any structure located on any Real Property that encroaches on or over the boundaries of any setback areas or other areas established by applicable local zoning ordinances. Except as set forth in Section 3.6(c) of the Seller Disclosure Schedule, none of the Real Property is located in a flood plain, flood hazard area, wetland or lakeshore erosion area within the meaning of any Law, regulation or ordinance. No public improvements have been commenced and, to the Knowledge of Seller, none are planned which in either case may result in special assessments against or otherwise materially adversely affect any Real Property. The Owned Real Property is not subject to any easements, covenants, conditions, restrictions, ordinances or such other limitations on title so as to make such Owned Real Property unusable for its current use or the title uninsurable or unmarketable.

(d)        Since January 1, 2011, neither any Company nor Seller or Parent has received written notice of any, and to the Knowledge of Seller, there is not any (i) planned or proposed increase in assessed valuations of any Real Property, (ii) Order requiring repair, alteration, or correction of any existing condition affecting any Real Property or the systems or improvements thereat, (iii) condition or defect which could give rise to an order of the sort referred to in "(ii)" above, or (iv) underground storage tanks, or any structural, mechanical, or other defects of material significance affecting any Real Property or the systems or improvements thereat (including, but not limited to, inadequacy for normal use of mechanical systems or disposal or water systems at or serving the Real Property). No work that has been done or labor or materials that has or have been furnished to any Real

6

Property during the period of six (6) months immediately preceding the date of this Agreement could result in liens being filed against any of the Real Property in any such case where payment for such work or materials has not been accrued in the Financial Statements.

(e)       Neither the whole nor any portion of the Real Property or any other assets of Company is subject to any Order to be sold or is being condemned, expropriated or otherwise taken by any Government Entity with or without payment of compensation therefor, nor to the Knowledge of Seller, has any such condemnation, expropriation or taking been proposed.

3.7    <u>Financial Statements and Schedules</u>.

(a)       Parent has made available to Purchaser true, correct and complete copies of the unaudited financial statements of each Company, copies of which are attached to Section 3.7(a) of the Seller Disclosure Schedule, which include (i) the balance sheet and statement of operations as of and for the twelve (12) month periods ended September 30, 2010 and September 30, 2011 and (ii) the balance sheet (the "<u>Recent Balance Sheet</u>") and statement of operations as of and for the four (4) month period ended January 31, 2012 (together, the "<u>Financial Statements</u>"). Except as disclosed in Section 3.7(a) of the Seller Disclosure Schedule, the Financial Statements (x) present fairly, in all material respects, in conformity with the Accounting Principles, the financial condition of the Companies as at the dates thereof and the results of operations for the respective periods covered thereby, subject to (i) the absence of footnote disclosures, and (ii) changes resulting from normal immaterial year-end adjustments. Except as set forth in the Financial Statements, none of the companies maintain any "off-balance-sheet arrangement" within the meaning of Item 303 of Regulation S-K under the Securities Act of 1933 and (y) were compiled from books and records regularly maintained by management of the Companies used to prepare the financial statements of the Companies.

(b)       Neither Company has any Liability, loss or obligation of any nature (whether absolute, contingent, or otherwise) that would if known to the Company on the Closing Date, in accordance with GAAP be disclosed on a balance sheet except for (a) Liabilities included or reflected on the balance sheet dated as of September 30, 2011 (which is included in the Financial Statements) or (b) Liabilities or performance obligations arising subsequent to September 30, 2011 in the ordinary course of business consistent with past practice.

(c)       To the Knowledge of Seller, there has been no fraud, whether or not material, that involves management or employees of the Companies who have a significant role in the internal control over financial reporting of the Companies. Neither the Companies nor, to the Knowledge of Seller, any banking, financial or other outside advisors or independent accountants of the Companies has received any material complaint, allegation, assertion or claim, whether written or oral, regarding the accounting or auditing practices, procedures, methodologies or methods of the Companies or their respective internal accounting controls, including any material complaint, allegation, assertion or claim that either Company has engaged in questionable or fraudulent accounting or auditing practices.

3.8    <u>Ordinary Course</u>. Since October 1, 2010 until the date of this Agreement, each Company has conducted its business in the ordinary course consistent with past practice and there has not occurred any change, event or condition (whether or not covered by insurance) that has had or would reasonably be expected to have a Material Adverse Effect on either Company. In addition, without limiting the generality of the foregoing, since October 1, 2010 until the date of this Agreement, and except as set forth in Section 3.8 of the Seller Disclosure Schedule, neither Company has:

(a)       except in the ordinary course of business consistent with past practice, entered into or terminated any strategic alliance, joint development or joint marketing Contract;

(b)       authorized, declared, set aside or paid any distributions to any Person on the capital stock of such Company other than distributions to Seller;

(c)       issued, or agreed to issue, any equity interests in any Company, or options, warrants or other rights of any kind to acquire any such equity interests, whether by purchase or conversion or exchange of other equity interests or other securities;

Exhibit 23 Case: 18-31177    Document: 00515297113    Page: 603    Date Filed: 02/04/2020 12/12/2019, 13100

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 604 of 1003
Case 2:10-md-02179-CJB-DCW   Document 26193-3   Filed 12/5/2019   Page 2106 of 1003

(d)        except in the ordinary course of business consistent with past practice, (i) entered into any employment or consulting contract or commitment (whether oral or written), (ii) paid or agreed or made any commitment to pay any discretionary or stay bonus, to any Employee or independent contractor of or consultant to a Company, or (iii) adopted, amended, terminated or increased benefits under any Company Plan, in any case that resulted or would reasonably be expected to result in a material expense or Liability to a Company;

(e)        made, granted or approved any (i) grant of any equity or equity-related award pertaining to the securities

7

of a Company or any change in the vesting schedule applicable thereto, or (ii) increase in salary, rate of commissions, rate of consulting fees or other compensation of any current director, officer, or key Employee of a Company (other than annual increases consistent with past practices), or made any pension, retirement, profit-sharing, bonus or other employee welfare or benefit payment or contribution, other than payments or contributions required by a Company Plan as in effect on October 1, 2011;

(f)         except in the ordinary course of business consistent with past practice, (i) entered into, amended or terminated any Contract between any Company and any shareholder, director or officer of any Company (or with any relative, beneficiary, spouse or Affiliate of any such Person); (ii) entered into, amended or terminated any Contract to which any Company is (or was) a party; or (iii) released or waived any material claims or rights under any Material Contract to which the Company is (or was) a party;

(g)         made or changed any election in respect of any Tax, adopted or changed any accounting method in respect of any Tax, entered into any Tax allocation agreement, Tax sharing agreement, Tax indemnity agreement or closing agreement, settlement or compromise of any claim or assessment in respect of any Tax, or consented to any extension or waiver of the limitation period applicable to any claim or assessment in respect of any Tax;

(h)         except as reflected in the Financial Statements, made any material change in accounting policies, principles, methods, practices or procedures;

(i)         except in the ordinary course of business consistent with past practice, borrowed any amount except borrowing from Parent, Seller or any bank or other similar financial institutions or otherwise incurred any Indebtedness (including any Indebtedness of any other Person, the payment of which any Company is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, either severally or jointly with any other Person, whether contingent or otherwise);

(j)         sold, transferred, or otherwise disposed of any of its Assets and Properties with a fair market value in excess of $100,000 individually or $500,000 in the aggregate with regard to a series of similar items, other than the sale of inventory in the ordinary course of business consistent with past practice;

(k)         except in the ordinary course of business consistent with past practice, made any capital expenditures or commitments in excess of $500,000 individually or $1,000,000 in the aggregate with regard to a series of similar items;

(l)         experienced any damage, destruction or loss (whether or not covered by insurance) to any of its Assets and Properties or Licensed Assets and Properties in excess of $1,000,000;

(m)         licensed, sold or otherwise transferred any rights in Company-Owned Intellectual Property to any Person;

(n)         except in the ordinary course of business consistent with past practice, made any material change in connection with its accounts payable or accounts receivable terms, policies or procedures;

(o)         merged or consolidated with, acquired any interest in or acquired a substantial portion of the assets or business of any Person; or

(p)         agreed, whether in writing or otherwise, to take any action described in this Section 3.8.

3.9    Litigation.

(a)         Except as set forth in Section 3.9(a) of the Seller Disclosure Schedule, there are no, and there have not been any since October 1, 2011, material Actions or Proceedings pending or, to the Knowledge of Seller, threatened against either Company, Seller or Parent or any of their respective, Assets and Properties or the Licensed Assets and Properties.

      (b)      Except as set forth in Section 3.9(b) of the Seller Disclosure Schedule, (i) neither Company nor any of their respective Assets and Properties is subject to any material Order relating to the conduct of the business of either Company and (ii) there is no judgment, decree or Order applicable to Seller, Parent or either Company which could reasonably be expected to prevent, enjoin, alter or delay any of the transactions contemplated by this Agreement or the Ancillary Agreements.

      3.10   <u>Intellectual Property</u>.

      (a)      Each Company owns all rights, title and interest in and to the Company-Owned Intellectual Property.

8

Except as set forth in Section 3.10(a) of the Seller Disclosure Schedule, no Action or Proceeding, claim or challenge by any other Person to any rights, title or interests, of such Company with respect to such Company-Owned Intellectual Property or any Company-Licensed Intellectual Property is pending against a Company or has been threatened in writing against a Company that is yet unresolved.

(b)      Each Company possesses rights to the Company-Owned Intellectual Property and the Company-Licensed Intellectual Property sufficient for the conduct of the respective business of such Company as conducted in the twelve (12) month period preceding the Closing Date. Section 3.10(b) of the Seller Disclosure Schedule lists all IP Licenses other than commercially available shrink-wrap or click-wrap Software license agreements.

(c)      Except as set forth in Section 3.10(c) of the Seller Disclosure Schedule, to the Knowledge of Seller, (i) no other Person has infringed, violated or misappropriated any Company-Owned Intellectual Property; and (ii) neither the Company-Owned Intellectual Property nor the conduct of the business of each Company as conducted during the twelve (12) month period preceding the Closing Date infringe, violate or misappropriate any proprietary Intellectual Property right or any contractual right in Intellectual Property of any other Person.

(d)      Except as set forth in Section 3.10(d) of the Seller Disclosure Schedule, neither Company pays any royalties or other consideration for the right to use any Intellectual Property. Neither Company has taken or failed to take any action, and to the Seller's Knowledge no other event has occurred that could subject any IP License to termination or otherwise cause any such IP License not to be in effect as of the Closing Date. Neither Company is presently in material breach, and neither is alleged per a written notice of presently being in breach, under any IP License as of the Closing Date.

(e)      Section 3.10(e) of the Seller Disclosure Schedule lists, with respect to the Company-Owned Intellectual Property, all (i) issued Patents and pending Patent applications, (ii) registered Trademarks, trade names and service marks; (iii) registered Copyrights; (iv) registered Domain Names; and (v) any other Company-Owned Intellectual Property that is the subject of an application, certificate or registration issued by any Governmental Authority in each case listing the jurisdictions in which each has been issued or registered or in which any application for such issuance and registration has been filed.

(f)      Section 3.10(f) of the Seller Disclosure Schedule lists (i) all material licenses and sublicenses in effect as of the Closing Date as to which either Company is a party and pursuant to which any Person is authorized by a Company to use or has obtained some other rights to any Company-Owned Intellectual Property or Company-Licensed Intellectual Property and (ii) all agreements either Company has entered into which prohibits or restricts its use of Company-Owned Intellectual Property.

(g)      Except as set forth in Section 3.10(g) of the Seller Disclosure Schedule, to the Knowledge of Seller, all Company-Owned Intellectual Property and all applications, certificates and registrations for all Company-Owned Intellectual Property involving registered Patents, Trademarks, Copyrights and Domain Names are valid and subsisting. Subject to Section 3.10(g) of the Seller Disclosure Schedule, all necessary registration, maintenance, renewal fees, annuity fees and taxes due as of the Closing Date that are in connection with any such Company-Owned Intellectual Property registered before any Governmental Entity have been paid.

(h)      To the Knowledge of Seller, the Companies have complied in all material respects with all agreements governing the disclosure and use of Proprietary Information. The Companies have used commercially reasonable efforts to maintain the confidentiality and proprietary of all Proprietary Information of the Companies.

3.11    Environmental Matters. Except as set forth in the Environmental Disclosure Schedule or with respect to Non-Transferred Properties:

(a)      All of the operations of both Companies comply, in all material respects, with all applicable Environmental Laws, and neither Company, nor any other Person for whose conduct either Company is or may be held responsible, is subject to any material Environmental Liabilities. Neither Company has received any yet unresolved written citation, directive, inquiry, notice, Order, summons, warning, request for information, or other written

Exhibit 23   Case: 18-31177      Document: 00515297113      Page: 607      Date Filed: 02/04/2020   Page 23 of 100

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 608 of 1003
Case 2:10-md-02179-CJB-DCW   Document 26193-3   Filed 02/05/2019   Page 256 of 1003

communication from a Governmental Entity that relates to (i) Hazardous Materials, or (ii) any alleged, actual, or potential violation of or failure to comply with any Environmental Laws.

(b)      Neither Company has: (y) used, generated, stored, treated, disposed, handled or placed any Hazardous Material on, in, at, under, around or affecting any property currently or formerly owned, operated, occupied or leased by the Company or Parent (including, without limitation, property owned or leased pursuant to the Real Property Leases), except in material compliance with all Environmental Laws; or (z) disposed of, transported, sold, distributed, or manufactured any product, substance or material of such Company which is or contains any Hazardous Material, except in material compliance with all

9

Environmental Laws. There has been no material Release or threatened Release of Hazardous Material by either Company on, in, at, under, around or affecting any property currently or formerly owned, operated, occupied or leased by either Company (including, without limitation, property owned or leased pursuant to the Real Property Leases), or at any off-site property where either Company has disposed of or arranged for the disposal of Hazardous Materials, that constitutes an Environmental Liability of either Company.

(c)       To the Seller's Knowledge, (i) the Companies hold, and each Company is in compliance with, in all material respects, all permits required under the Environmental Laws for the lawful operation of the business as conducted during the preceding one (1) year period ("Environmental Permits"), and (ii) each Environmental Permit is valid and in full force and effect, and will remain in effect immediately after the Closing so as to allow the Companies to operate in compliance with Environmental Laws after Closing without interruption.

(d)       There are no planned capital expenditures which, in the aggregate exceed $100,000, required to reduce, offset, limit or otherwise control pollution and/or emissions, manage waste or otherwise ensure compliance with Environmental Laws (including, without limitation, costs of remediation, or required implementation of noise or pollution control equipment).

(e)       Neither Parent nor the Companies have retained or assumed by contract any Environmental Liability of any third party in connection with the Business or the Owned Real Property or the Leased Real Property or any property formerly owned, operated or leased by either Company that would reasonably be expected to lead to any future Environmental Liability of a Company.

(f)       True and correct copies of (i) all material non-routine, written reports of environmental inspections, investigations, studies, audits, tests, reviews or other analyses; and (ii) all as yet unresolved written citations, directives, inquiries, notices, Orders, summonses, warnings, requests for information, or other written communications indicating or alleging material non-compliance with Environmental Laws, in each case with respect to the Business, the Owned Real Property or the Leased Real Property or any property formerly owned, operated or leased by either Company which document conditions that could reasonably be expected to lead to any Environmental Liability of a Company in the possession or reasonable control of the Seller, the Parent, or the Companies have been provided to the Purchaser.

(g)       Neither this Agreement nor the consummation of the transactions contemplated hereby (including the Restructuring) will result in any obligations for site investigation, cleanup or remediation, or notification or disclosure to or consent pursuant to the Connecticut Transfer Act, also known as the Connecticut Property Transfer Program, Connecticut General Statutes Section 22a-134 *et seq.*, or the New Jersey Industrial Site Recovery Act, New Jersey Statutes §§ 13:1D-1, *et seq.*, 13:1K-6, 58:10-23.11a, *et seq*. and New Jersey Administrative Code, Title 7, Chapter 26B (collectively, the "Transfer Acts").

3.12   Taxes.

(a)       Each Company is and has been since September 23, 2005, in the case of U.S. Pipe, and November 20, 2006, in the case of Fast Fabricators, a "disregarded entity" under Treasury Regulations § 301.7701-3(b)(ii) and applicable provisions of State income tax laws, and Parent has included all items of income, expense, deductions and credit of each Company on its federal and applicable state income Tax Returns for all periods since September 23, 2005, in the case of U.S. Pipe, and January 4, 2007, in the case of Fast Fabricators. Except as set forth in Section 3.12(a) of the Seller Disclosure Schedule, Parent, Seller and each Company (or Parent on its behalf) has duly and timely filed all material Tax Returns required to be filed by it and has paid all Taxes which are due, all material Tax Returns required to be filed by or on behalf of a Company are true, complete and accurate in all material respects. Neither Company has requested any extension of time within which to file any Tax Return which Tax Return has not yet been filed. Except as set forth in Section 3.12(a) of the Seller Disclosure Schedule, there are no outstanding waivers by either Company of any statute of limitations in respect of Taxes and no outstanding extensions by either Company of the time in which to assess a Tax or collect a deficiency. There are no pending requests by either Company to enter into an agreement or waiver extending any statute of limitations in respect of Taxes.

(b)       Except as set forth in Section 3.12(b) of the Seller Disclosure Schedule, (i) there is no claim for any Tax that is an Encumbrance against any of the Assets and Properties of either Company or that is being asserted

against either Company with respect to any of their respective Assets and Properties, except for Permitted Encumbrances, (ii) there is no audit of any Tax Return relating to a Company or any of the Assets and Properties of a Company is being conducted by any Taxing Authority and none has been threatened in writing by any Taxing Authority, and (iii) neither Company has received any written notice from any Taxing Authority relating to any issue which could adversely affect the Tax Liability of the Company in any material respect. Except for any payroll processor or similar entity, neither Company has granted any power of attorney that is currently in force with respect to any Taxes or Tax Returns.

<div align="center">10</div>

(c)         Each Company has, or caused to be, withheld all material amounts required to be withheld by Law from payment made to any Person, whether that Person is regarded as an Employee, independent contractor, or otherwise, in the conduct of each Company's business. Each Company has, or caused to be, timely paid to the appropriate Taxing Authority all material amounts so withheld or otherwise due in connection with all such payments, and has, or caused to be, timely filed all requisite returns with the Taxing Authorities with respect to such Taxes. Neither Company is a party to any Tax proceeding with respect to the withholding of material Taxes from any payments made in the conduct of its business. Neither Company is or has been required to make any adjustment pursuant to Section 481(a) of the Code or any similar provision of state, local or foreign Tax law by reason of any change in any accounting method, there is no application pending with any Taxing Authority requesting permission for any change in any accounting method for Tax purposes and no Taxing Authority has proposed any such adjustment or change in accounting method.

(d)         Neither Company has received a written claim by any Taxing Authority in a jurisdiction where it does not file Tax Returns that such Company is or may be subject to taxation by that jurisdiction.

(e)         Except as set forth in Section 3.12(e) of the Seller Disclosure Schedule, neither Company (i) has been a member of an affiliated group filing a combined, consolidated, or unitary Tax Return (other than a group the common parent of which was Parent), (ii) has any Liability for, or any indemnification or reimbursement obligation with respect to, Taxes of any Person under Treasury Regulation §1.1502-6 (or any similar provision of state, local, or foreign law) or as transferee or successor, or (iii) is a party to any tax sharing agreement, tax indemnity obligation or similar agreement, arrangement or practice with respect to Taxes which is currently in effect or will become effective following the date hereof, other than this Agreement or leases of real or personal property entered into in the ordinary course of business.

(f)         Neither Company has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(g)         Neither Company is subject to Tax in any non-U.S. jurisdiction by virtue of (i) having a permanent establishment or other place of business or (ii) having a source of income in that jurisdiction.

3.13     Employee Benefit Plans.

(a)         Section 3.13(a) of the Seller Disclosure Schedule contains a true and complete list of each (i) "employee benefit plan" (within the meaning of Section 3(3) of ERISA), (ii) all medical, dental, life insurance, equity bonus or other incentive compensation, disability, salary continuation, severance, retention, retirement, pension and deferred compensation, and (iii) any other plans, agreements, trust funds or arrangements (whether written or unwritten, insured or self-insured) that provide compensation or benefits (A) established, maintained, sponsored or contributed to (or with respect to which any obligation to contribute has been undertaken) by a Company on behalf of any Employee, officer, director, stockholder or other service provider of a Company (or their beneficiaries or dependents), or (B) with respect to which a Company or any of its ERISA Affiliates has or has had any obligation on behalf of any such Employee, officer, director, stockholder or other service provider or beneficiary (collectively, the "Company Plans"). Section 3.13(a) of the Seller Disclosure Schedule identifies those Company Plans for which any Company is the sole or main plan sponsor (the "Company-Sponsored Plans"). Each Company Plan complies in all material respects in form and has been maintained and operated in all material respects in accordance with its terms and applicable Law, and each ERISA plan administrator of any such Company Plan has complied in all materials respects with its duties under applicable Law, including, without limitation, ERISA and the Code, and, other than routine claims for benefits in the ordinary course of business, since October 1, 2010, no claims have been asserted against any such Company Plan, any trustee or fiduciary thereof, or the assets of any trust of any Company Plan. Each Company Plan which is intended to meet requirements for tax-favored treatment under any provision of the Code satisfies the applicable requirements under the Code in all material respects and nothing has occurred that could cause the loss of such tax-favored treatment or the imposition of any tax or penalty. Each Company Plan intended to qualify under Section 401(a) of the Code has received a determination letter from the IRS upon which it may rely regarding its qualified status under the Code or is maintained on a prototype or volume submitter plan that has received a favorable opinion or advisory letter from the IRS upon which it may rely regarding its qualified status under the Code.

Exhibit 23  Case: 18-31177    Document: 00515297113    Page: 611    Date Filed: 02/04/2020 12/12/2019, 17:00

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 612 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26193-3   Filed 02/05/2019   Page 296 of 1003

(b)       Parent has made available to Purchaser complete and current copies of all of the Company Plans, including all amendments thereto, or a written description of any unwritten plan; any trust agreement, insurance contract or administrative services contract related to a Company Plan; the most recent employee handbooks and policies; and, for each Company Plan subject to ERISA, the most recent summary plan description; the most recent IRS determination letter for each Company Plan intended to be tax-qualified; and the three most recent Form 5500s and attached schedules, and related audited financial statements.

(c)       Neither Company has communicated to its Employees, nor formally adopted or authorized, any plan

11

not disclosed pursuant to this <u>Section 3.13</u> or any change in any existing Company Plan.

(d)      To the Knowledge of Seller, (i) except as set forth in Section 3.13(d) of the Seller Disclosure Schedule, neither Parent nor any ERISA Affiliate (including each of the Companies) nor any of their respective predecessors has ever contributed to, contributes to, has ever been required to contribute to, or otherwise participated in or participates in or in any way, Directly or Indirectly, has any Liability with respect to any Seller Group Plan subject to Section 412 of the Code, Section 302 of ERISA or Title IV of ERISA, including, without limitation, any "multiemployer plan" (within the meaning of Sections 3(37) or 4001(a)(3) of ERISA or Section 414(f) of the Code) or any "single-employer plan" (within the meaning of Section 4001(a)(15) of ERISA) which is subject to Sections 4063, 4064 or 4069 of ERISA, and (ii) other than Liabilities to be indemnified by Parent and Seller pursuant to Article VIII, neither Company has any Liability, Directly or Indirectly, contingent or otherwise, with respect to any plan disclosed pursuant to this subsection (d).

(e)      Other than such continuation of benefit coverage under any Company Plan that is required by Section 1001 of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and Sections 601 through 608 of ERISA or comparable state law, and except as otherwise set forth in Section 3.13(e) of the Seller Disclosure Schedule, to Seller's Knowledge no Company Plan provides for retiree health coverage or retiree life insurance coverage.

(f)      Except as set forth in Section 3.13(f) of the Seller Disclosure Schedule, neither the execution of this Agreement nor the consummation of the transactions contemplated by this Agreement will (either by themselves or in conjunction with any other event): (i) entitle any Employee or other service provider of a Company currently or formerly engaged in the conduct of a Company's business to severance benefits or any other payment (except as specifically contemplated therein) or (ii) accelerate the time of payment or vesting, or increase the amount, of compensation due any such Employee or service provider.

(g)      Neither Company has any indemnity obligation on or after the Closing Date, for any Taxes imposed under Section 409A or 4999 of the Code and neither Company will be subject to a loss of deduction under Code Section 280G of the Code in connection with the transactions contemplated by this Agreement.

(h)      All payments required by the Company Plans, (including, without limitation, all contributions or insurance premiums) with respect to all prior periods have been made or provided for by a Company and Parent in accordance with the provisions of each of the Company Plans or applicable Law.

(i)      Except as set forth in Section 3.13(i) of the Seller Disclosure Schedule, to the Knowledge of Seller, no non-exempt "prohibited transaction," within the meaning of Section 4975 of the Code and Section 406 of ERISA, has occurred with respect to the Company Plans.

(j)      Except as set forth in Section 3.13(j) of the Seller Disclosure Schedule, none of the Company Plans is under, and neither Company nor Parent has received any notice of, an audit by the IRS, DOL or any other Governmental Entity, and no such completed audit, if any, has resulted in the imposition of any Tax or penalty.

(k)      No deferred compensation plan subject to Code Section 409A and in which any Company employee participated has been terminated within the past three (3) years.

3.14   Employee Matters.

(a)      Except as set forth in Section 3.14(a) of the Seller Disclosure Schedule, in the last two (2) years, (i) there has been no federal or state claim filed, processed or otherwise litigated (including court claims, complaints or charges before a federal or state administration agency) alleging discrimination or harassment on the basis of sex, age, disability (as defined by the Americans with Disabilities Act or corresponding state law), race, national origin, religion or federal or state statutory discrimination claim, complaint or charge relating to employment, or any common law claim (including claims of wrongful termination and/or tort claims) by any Employee against a Company, nor is any such claim threatened in writing; and (ii) neither Company nor Parent has received any written notice of any claim that it has failed to comply in any respect with any Law relating to the employment or termination of employment of any of the Employees (including any provisions thereof relating to wages, hours, collective bargaining, the payment of social security and

Exhibit 23 Case: 18-31177    Document: 00515297113    Page: 613    Date Filed: 02/04/2020 100

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 614 of 1003
Case 2:10-md-02179-CJB-DCW   Document 26193-3   Filed 02/05/2019   Page 310 of 103

payroll taxes, equal employment opportunity, employment discrimination, failure to reasonably accommodate a disability, family or medical leave, immigration, including IRCA, the WARN Act, and employee safety) or that it is liable for any arrearage of wages or any Tax or penalty for failure to comply with any of the foregoing, nor during the last two (2) years has any such claim been threatened in writing.

(b)        Except as set forth in Section 3.14(b) of the Seller Disclosure Schedule, there is no pending claim against a Company by any Employee under any workers' compensation plan or policy or for long-term disability under any long-

12

term disability plan in excess of $100,000.

(c)    Section 3.14(c) of the Seller Disclosure Schedule lists each collective bargaining agreement or other labor union contract to which a Company is a party. Except as disclosed in the Seller Disclosure Schedule, in the last two (2) years there has been no work stoppage, strike, arbitration proceeding or other concerted action by any Employees, and there is no strike, labor dispute or union organization activity pending or, to the Knowledge of Seller, threatened in connection with a Company.

(d)    Except as set forth in Section 3.14(d) of the Seller Disclosure Schedule, the employment of each Employee of a Company is terminable at the will of such Company, and neither Company is a party to any employment, non-competition, severance or similar contract or agreement with any Employee of such Company (any such agreement, an "Employment Agreement"). To the Knowledge of Seller, no Employee of a Company is a party to, or is otherwise bound by, any agreement, including any confidentiality, non-competition or proprietary rights agreement, between such Employee and any Person other than a Company or Parent, as the case may be, that adversely affects the performance of that Employee's duties as an employee of a Company.

(e)    Seller has made available to Purchaser concurrently with Seller's execution and delivery of this Agreement a correct and complete list of all employees of the Companies as of a date not more than five (5) Business Days prior to the date hereof, and sets forth for each such employee the following: (i) name, (ii) title or position and employment status, (iii) hire date or date of commencement of employment, (iv) current annual base compensation rate; and (v) commission, bonus or other incentive-based compensation provided to each such individual as of the date hereof. Except to the extent caused by the date of this Agreement and the Closing Date occurring between normal paydays and except for any other employment terms providing for deferred or contingent accrual or payment of compensation, all commissions, bonuses and other compensation due and payable to employees of the Companies for services performed on or prior to Closing Date hereof have been paid in full. At Closing, Section 3.14 of the Seller's Disclosure Schedule will contain a correct and complete list of all former employees of the Companies whose employment was terminated in the ninety (90) days prior to the Closing.

3.15    Insurance.

(a)    Section 3.15 of the Seller Disclosure Schedule contains a current list of all insurance policies maintained by a Company or by Parent or Seller with respect to the Assets and Properties, Licensed Assets and Properties, or business of a Company for events occurring or claims made during the period beginning October 1, 2010 until the date hereof (the "Insurance Policies") including a notation as to which such Insurance Policies are currently in effect. The insurance provided under the Insurance Policies is (i) in such amounts, with such deductibles and against such risks and losses as are reasonable in respect of the operations of the business of the Companies and (ii) for such amounts as are sufficient for all requirements of Law and all Contracts to which the Companies are a party or by which it such Company is bound. The Insurance Policies are in full force and effect, and all premiums due and payable thereon have been paid in full.

(b)    Except as set forth in Section 3.15 of the Seller Disclosure Schedule, there is no claim pending under the Insurance Policies for an amount in excess of $100,000 and there is no such claim pending as to which coverage has been questioned, denied or disputed. None of Parent, Seller or the Companies has received any written notice of cancellation or termination of the Insurance Policies. Neither of the Companies has failed to give any notice or present any material claim thereunder in due and timely fashion. The Company has not been refused any insurance with respect to the Business, nor has its coverage been limited, by any insurance carrier to which it has applied for any such insurance with which it has carried insurance since January 1, 2008. Except as disclosed on Section 3.15 of the Seller Disclosure Schedule, there are no risks with respect to the Companies' assets or businesses which the Companies have designated as being self-insured. None of the Company or any of the Subsidiaries has received any written notice of cancellation or non-renewal of any such policies and all such policies will remain in full force and effect immediately following the consummation of the transactions contemplated by this Agreement.

3.16    Brokers' and Finders' Fees; Third Party Expenses. Except as set forth in Section 3.16 of the Seller Disclosure Schedule, none of either Company, Seller, Parent or any of their respective Affiliates, stockholders, Employees or agents has incurred, nor will incur, Directly or Indirectly, any Liability for brokerage, finders', or financial advisor's

fees or agents' commissions or investment bankers' fees or any similar charges, fees or commissions in connection with this Agreement or any of the transactions contemplated hereby.

        3.17   <u>Contracts</u>.

            (a)      Except for the Contracts described in Section 3.17 of the Seller Disclosure Schedule, neither Company is a party to or bound by:

13

---

(i)      any distributor, agency, advertising agency, marketing, manufacturer's or representative sales Contract involving annual payments by a Company of $100,000 or more or aggregate payments to a Company of $500,000 or more;

(ii)      any collective bargaining agreement or other labor union Contract to which any Company is a party;

(iii)      any Contract that (A) involves (or is reasonably expected to involve) aggregate payments by or to a Company of $500,000 or more in the twelve (12) months subsequent to September 30, 2011, other than a Contract with a customer or supplier of a Company, or (B) contains any covenant or other provision which limits either Company's (or any employee of the Company's) ability to compete with any Person in any market, area, jurisdiction or territory; or to solicit any employee, customer or other Person;

(iv)      any trust indenture, mortgage, promissory note, loan agreement or other Contract, except for those which are in Parent's name and for which neither Company has any Liability, for the borrowing of money, or other Indebtedness (including any Indebtedness of any other Person, the payment of which any Company is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, either severally or jointly with any other Person, whether contingent or otherwise), any currency exchange, commodities or other hedging arrangement, or any guarantees or any letter of credit issued for the account of a Company, including capital leases, in excess of $50,000;

(v)      any Contract for capital expenditures related to the conduct of the Business in excess of $500,000;

(vi)      any Contract of guarantee, support, indemnification, or any similar commitment with respect to, the obligations, or Liabilities of a Company or any other Person whether secured or unsecured where the obligation or Liability reasonably could be expected to be $250,000 or more individually or in the aggregate with regard to a series of similar items;

(vii)      any Employment Agreement;

(viii)      any joint venture, partnership or other similar agreement involving co-investment with a third party to which a Company is a party or which involve the investment by any Company in any Person;

(ix)      any Contract for the lease or use of personal property (whether as lessor or lessee) having a value in excess of $100,000;

(x)      any Real Property Lease;

(xi)      any Contract to which a Company is a party that grants or conveys rights of first refusal, or contain "most favored nation", "most favored customer" or similar pricing provisions;

(xii)      any Contract involving the sale of any Assets and Properties of a Company outside of the ordinary course of business, or the acquisition of any Assets and Properties of any Person by a Company outside of the ordinary course of business, in any business combination transaction (whether by merger, sale of stock, sale of assets or otherwise), in each case which have been entered into during the last three (3) years or under which obligations of any party thereto remain outstanding;

(xiii)      any IP Licenses other than commercially available shrink-wrap or click-wrap Software license agreements;

(xiv)      any consulting, joint development, development or similar Contracts relating to, or any Contract requiring the assignment of any interest in, any Company-Owned Intellectual Property; and

(xv)      any Contract with a customer or supplier of a Company that is listed in Section 3.24 of the Seller Disclosure Schedule.

Exhibit 23 Case: 18-31177    Document: 00515297113    Page: 617    Date Filed: 02/04/2020 2/4/2020 100

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 618 of 1003
Case 2:10-md-02179-CJB-DPC   Document 26193-3   Filed 12/5/2019   Page 356 of 103

(b) The agreements, documents and instruments required to be set forth in the Seller Disclosure Schedule in clauses (i)-(xv) of Section 3.17(a) and the Personal Property Leases are referred to herein as "Material Contracts."

(c) True and complete copies or, if none, reasonably complete written descriptions of which, together with all amendments and supplements thereto and all waivers of any terms thereof, of each Material Contract required to be listed in

14

the Seller Disclosure Schedule pursuant to Section 3.17(a) have been made available to Purchaser.

3.18    No Breach of Material Contracts. Except as set forth in Section 3.18 of the Seller Disclosure Schedule, each of the Material Contracts is in full force and effect and will not cease to be in full force and effect after the Closing Date as a result of the Sale, and there exists no material default or event of default or event, occurrence, condition or act, with respect to a Company or, to the Knowledge of Seller, with respect to the other contracting party, which, with the giving of notice, the lapse of time or the happening of any other event or conditions, would become a material default or event of default under any Material Contract.

3.19    Affiliate Transactions. Except as set forth in Section 3.19 of the Seller Disclosure Schedule, there are no Contracts between either Company, on the one hand, and Seller or Parent or any of their Affiliates (other than the Companies) or with Walter Energy, Inc. or Walter Industries, Inc., on the other hand, other than the services contemplated in the Transition and Shared Services Agreement, attached hereto as Exhibit B, or as otherwise contemplated by this Agreement.

3.20    Compliance with Laws; Licenses.

(a)    Except as set forth in Section 3.20(a) of the Seller Disclosure Schedule, each Company is in compliance and has complied in all material respects at all times since October 1, 2010 with each applicable Law to which such Company, its respective Assets and Properties or business, is or has been subject. Neither Company has received any written notice regarding any material violation of, conflict with, or failure to comply with, any Law since October 1, 2010. Each Company has duly obtained all material Governmental consents necessary for the lawful conduct of its business.

(b)    Section 3.20(b) of the Seller Disclosure Schedule contains a true and complete list of each License that is held by a Company and each License that is held by Seller or Parent which is necessary for either Company to conduct its business as currently conducted. Each such License is valid and in full force and effect. Each Company, Seller and Parent, as applicable, is, and at all times since October 1, 2010, has been, in compliance in all material respects with each such License. The Licenses required to be listed pursuant to Section 3.20 on the Seller Disclosure Schedule collectively constitute all of the material Licenses necessary to permit each Company to lawfully conduct and operate its respective business in the manner currently conducted.

(c)    No Company nor any Affiliate of any Company, nor to the Knowledge of Seller, any director, officer, employee or other Person associated with or acting on behalf of any of them, has directly or indirectly in violation of any Law or Order (a) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property, or services (i) to obtain favorable treatment in securing business for any Company, (ii) to pay for favorable treatment for business secured by any Company or (iii) to obtain special concessions or for special concessions already obtained, for or in respect of any Company or (b) established or maintained any fund or asset with respect to any Company that has not be recorded in the books and records of such Company.

3.21    Accounts Receivable. All of the outstanding accounts receivable shown on the Financial Statements and all outstanding accounts receivable that have arisen since the date of the Recent Balance Sheet (a) have been valued in accordance with the Accounting Principles, (b) represent, as of the respective dates thereof, valid Liabilities arising from sales actually made or services actually performed, in each case, in the ordinary course of business consistent with past practice and (c) fully reflect all returns, allowances, promotions and rebates. Except as set forth in Section 3.21 of the Seller Disclosure Schedule, neither Company has received any written notice of dispute, counterclaim or setoff regarding any accounts receivable outstanding as of the date hereof in an amount in excess of $50,000 individually. All of the outstanding accounts receivable deemed uncollectible have been reserved against on the Financial Statements in accordance with the Accounting Principles. The accounts receivable created since the date of the Recent Balance Sheet have been created in the ordinary course of business consistent with past practice. Since the date of the Recent Balance Sheet, none of the Companies have canceled, or agreed to cancel, in whole or in part, any accounts receivable; except in the ordinary course of business consistent with past practice.

3.22    Inventory. Except as set forth in Section 3.22 of the Seller Disclosure Schedule, all inventory reflected on the Financial Statements consists of a quality and quantity usable in the business of the Companies consistent with past

Exhibit 23 Case: 18-31177    Document: 00515297113    Page: 619    Date Filed: 02/04/2020 12/12/2019, 16)100

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 620 of 1003
Case 2:10-md-02179-CJB-DPC   Document 26193-3   Filed 02/05/2019   Page 97 of 100

practices and has been valued in accordance with the Accounting Principles. All of the inventory deemed obsolete, excessive, damaged, defective or below-standard quality has been reserved against, written off or written down to net realizable value on the Financial Statements and valued in accordance with the Accounting Principles.

3.23    Product Warranty/Liability. Section 3.23 of the Seller Disclosure Schedule contains a description of all (i) pending product recalls involving any Company products and (ii) recall campaigns to which any Company has been subject to since January 1, 2008. All products and services sold by either Company have been designed, manufactured, labeled and performed so as to meet and comply in all material respects with all applicable Governmental Entity standards and specifications, product

15

Exhibit Case: 18-31177    Document: 00515297113    Page: 620    Date Filed: 02/04/2020 02/04/2020 00100

Case 2:10-md-02179-CJB-DPC    Document 26293-3    Filed 02/05/2019    Page 621 of 1003
Case 2:10-md-02179-CJB-DPC    Document 26293-3    Filed 02/05/2019    Page 196 of 1003

specifications, contractual commitments, express warranties and Laws and Orders.

     3.24   Customers and Suppliers.

        (a)      Section 3.24(a) of the Seller Disclosure Schedule sets forth a true, correct and complete list, for the twelve (12) months ended September 30, 2011, of the ten (10) largest customers of goods and services by dollar revenue of each Company and the ten (10) largest suppliers of goods and services by dollar revenue to each Company.

        (b)      Except as set forth on Section 3.24(b) of the Seller Disclosure Schedule, no Person set forth on Section 3.24(a) of the Seller Disclosure Schedule (a) has threatened to cancel or otherwise terminate, or, to the Knowledge of Seller, intends to cancel or otherwise terminate, the relationship of such Person with either Company, or (b) has materially modified or decreased materially or threatened to materially modify or decrease materially or limit materially or, to the Knowledge of Seller, intends to materially modify its relationship with either Company or intends to decrease materially its purchases from, or services or supplies to, either Company.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

     Except for the representations and warranties of Purchaser contained in this Article IV, neither Purchaser nor any other Person makes any other express or implied representation or warranty (whether oral or written) with respect to Purchaser, any other Person or the transactions contemplated by this Agreement, and Purchaser disclaims any other representations or warranties, whether made by Purchaser or any of its Representatives. Purchaser represents and warrants to Seller and Parent as follows:

     4.1   Organization, Standing and Power. Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of Delaware and at least 50% of Purchaser's equity securities is owned by Wynnchurch as of the date of this Agreement. Purchaser has the corporate power and authority to own, use, lease and operate its Assets and Properties, and to carry on its business as it is now being conducted. Complete and correct copies of the Charter Documents of Purchaser, as amended and currently in effect, have been made available to Parent. Purchaser is not in violation of any of the provisions of Purchaser's Charter Documents.

     4.2   Authority. Purchaser has the requisite corporate power to enter into, execute and deliver this Agreement and the Ancillary Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Ancillary Agreements to which Purchaser or any of its Affiliates are each a party, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all necessary corporate, shareholder and other action on the part of Purchaser. This Agreement has been, and the Ancillary Agreements to which Purchaser is a party will be, duly executed and delivered by Purchaser. This Agreement constitutes, and the Ancillary Agreements to which Purchaser is a party, when executed and delivered as contemplated by this Agreement, will constitute, assuming due authorization, execution and delivery by each of the other Parties hereto and thereto, legal, valid and binding obligations of Purchaser, enforceable against it in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, reorganization and insolvency laws, the rights of creditors generally, and general principles of equity.

     4.3   No Conflict. The execution and delivery by Purchaser of this Agreement and the Ancillary Agreements to which it is a party do not, and the consummation by Purchaser of the transactions contemplated hereby and thereby will not (a) conflict with or result in any violation of (i) Purchaser's Certificate of Incorporation or bylaws, or (ii) any applicable Law or Order, or (b) conflict with or result in any material breach of or constitute a material default (or an event that with notice or lapse of time or both would constitute a default) under, or materially impair Purchaser's rights or give to others any rights of termination, amendment, acceleration or cancellation of, or result in the creation of a lien or Encumbrance on any of the properties or assets of Purchaser pursuant to, any Purchaser Contracts, except, with respect to any such conflicts, violations, breaches, defaults or other occurrences that would not, individually and in the aggregate, have a Material Adverse Effect on Purchaser.

     4.4   No Consents. No consent, approval, license, order or authorization of, or registration, declaration or filing with, notice to or waiver from any Governmental Entity or any other Person is required by or with respect to Purchaser in

Exhibit 23  Case: 18-31177    Document: 00515297113    Page: 621    Date Filed: 02/04/2020  12/12/2019, 22)100

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 622 of 1003
Case 2:10-md-02179-CJB-DCW   Document 26193-3   Filed 12/26/19   Page 396 of 1003

connection with the execution and delivery of this Agreement or the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby, except for (i) such consents, authorizations, filings, approvals and registrations which would not prevent or alter or delay any of the transactions contemplated by this Agreement or any of the Ancillary Agreements, and (ii) such filings required by the HSR Act.

        4.5    Financial Resources.

<center>16</center>

(a)        Purchaser has sufficient funds to pay pursuant to the equity commitment (the "Equity Commitment") from Wynnchurch Capital Partners III, L.P. ("Wynnchurch"), together with borrowing capacity pursuant to a financing commitment from Wells Fargo Capital Finance, LLC (the "Debt Commitment" and together with the Equity Commitment, the "Commitments") to finance, the Purchase Price, and the Closing is not subject to any financing conditions. A true, correct and complete copy of the Commitments has been provided to Parent. Each Commitment is in full force and effect and constitutes a legal, valid and binding obligation of Purchaser and the other parties thereto, except that such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar Laws now or hereafter in effect relating to creditors' rights generally and (ii) general principles of equity. As of the date of this Agreement, neither Commitment has been amended or modified in any material respect nor has been withdrawn or rescinded in any respect. As of the date of this Agreement, no event has occurred which, with or without notice, lapse of time or both, would constitute a material default or material breach on the part of Purchaser under either Commitment. Purchaser has paid any and all fees which are due and payable under each Commitment. As of the date of the Agreement, Purchaser has no reason to believe that it will be unable to satisfy on a timely basis any term or condition of each Commitment.

(b)        On or prior to the date hereof, Purchaser has delivered to Parent a copy of a guaranty, substantially in the form of Exhibit F (the "Guaranty"), duly executed by Wynnchurch with respect to the terms specified in the Guaranty.

(c)        At the time of the consummation of the transactions contemplated herein, and after giving effect thereto, Purchaser will be solvent. For purposes of this Agreement, "solvent" shall mean that, on the date specified (i) the fair value of the assets of Purchaser shall be greater than the total amount of its liabilities, including those arising under any Law, Order, Contract, arrangement, commitment or undertaking, (ii) the present fair salable value of Purchaser's assets is not less than the amount that will be required to pay the probable debts and liabilities of Purchaser on its debts as they become absolute and matured in accordance with their stated terms, (iii) Purchaser does not intend to, and does not believe that Purchaser will, incur debts or liabilities beyond its ability to pay as such debts and liabilities mature prior to and including the Closing, and (iv) Purchaser is not engaged in, and is not about to be engaged in a business or a transaction for which its property would constitute unreasonably small capital.

4.6    Litigation. There is (a) no private or governmental Action or Proceeding pending by or against Purchaser or, to the Knowledge of Purchaser, threatened in writing by or against Purchaser, that challenges, or that could reasonably be expected to have the effect of preventing, delaying, making illegal or otherwise interfering with, the transactions contemplated hereby, and (b) no judgment, decree or Order applicable to Purchaser, which could reasonably be expected to prevent, enjoin, alter or delay any of the transactions contemplated by this Agreement or the Ancillary Agreements.

4.7    No Brokers. Purchaser is not obligated for the payment of fees or expenses of any broker or finder in connection with the origin, negotiation or execution of this Agreement or the Ancillary Agreements or in connection with any transaction contemplated hereby or thereby.

4.8    Investigation by Purchaser. Purchaser has conducted its own independent review and analysis of each Company and their respective businesses, Assets and Properties, and Licensed Assets and Properties and has been provided access to the personnel, properties, Contracts, premises and records of each Company relating to such business, Assets and Properties, and Licensed Assets and Properties. Purchaser acknowledges that, except as set forth in Article III, none of Seller or Parent nor any other Person on behalf of Seller or Parent is making any representation or warranty, oral or written, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Purchaser or any of its respective Affiliates or any of its respective attorneys, accountants, consultants or other agents or representatives or any other Person for its benefit.

4.9    Purchase for Investment. Purchaser is purchasing the Company Units for its own account as principal, not as a nominee or agent, for investment purposes only, and not with a view to or for resale or distribution thereof in whole or in part. Purchaser is an accredited investor as that term is defined in Rule 501(a) under the Securities Act of 1933.

<div align="center">

**ARTICLE V
COVENANTS**

</div>

Exhibit 23 Case: 18-31177     Document: 00515297113     Page: 623     Date Filed: 02/04/2020 12/12/2019, 14)00

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 624 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26193-3   Filed 02/05/2019   Page 410 of 1003

5.1   <u>Conduct of Business by each Company, Seller and Parent</u>.

(a)        During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement pursuant to its terms or the Closing Date, except to the extent that Purchaser shall otherwise consent in writing (such consent not to be unreasonably withheld or delayed), each Company shall carry on its respective business in the usual, regular and ordinary course consistent with past practices, pay its debts, Liabilities and Taxes when due subject to good faith disputes over such debts or Taxes, pay or perform other material obligations when due, and use its commercially reasonable efforts

17

to (i) preserve substantially intact its present business organization and operations, (ii) keep available the services of its satisfactorily performing present officers and key Employees, (iii) preserve its relationships and goodwill with customers, suppliers, distributors, licensors, licensees, and others with which they have significant business dealings, and (iv) maintain and preserve their Assets and Properties and Licensed Assets and Properties in good repair, order and condition.

(b)        Seller and Parent shall use their respective commercially reasonable best efforts to cause the Companies to complete the Restructuring on or before the Closing Date, provided that with respect to any portion of the Restructuring that is not completed by the Closing Date, Parent and Seller shall continue to use their respective commercially reasonable best efforts to complete the Restructuring as soon as practicable and to the extent any portion of the Restructuring remains uncompleted as of the date which is one hundred eighty (180) days from the Closing Date, shall use their respective best efforts to complete the Restructuring as soon as possible, and in any event no later than the date which is eighteen (18) months from the Closing Date. For purposes of clarity, Seller and Parent acknowledge and agree that "best efforts" as used in the foregoing sentence requires Seller and Parent to do and cause to be done timely such actions as are necessary or required by applicable Laws (including Environmental Laws) or any Governmental Authority, and to comply with any terms and conditions necessary, and to expend such funds as necessary, in order to complete the Restructuring, including without limitation delivering such guarantees, bonds, letters of credit, deposits or other financial assurances/support arrangements (including capitalization requirements) as are required to complete the Restructuring no later than the date which is eighteen (18) months from the Closing Date. Seller and Parent shall keep Purchaser informed of any and all developments in connection with the Restructuring, including by promptly providing copies of any written correspondence with or from any Governmental Entity and notice and summaries of any meetings or discussions with any Governmental Entity regarding the Restructuring. To the extent reasonable in the circumstances, Purchaser may attend meetings regarding the Restructuring and request information from any Governmental Entity regarding the Restructuring. Purchaser shall cause the Companies to reasonably cooperate with such Restructuring after the Closing and Seller and Parent shall reimburse Purchaser and the Companies for any Liabilities, costs and expenses incurred in connection therewith. For any properties contemplated to be transferred to Parent as a part of the Restructuring the transfer of which is not effected by the Closing, Parent shall operate, maintain and control such properties in the ordinary course of business consistent with past practice (except as expressly contemplated by the Restructuring) and in compliance with applicable Law, and shall indemnify Purchaser in connection with same, and any such properties shall be treated by the Parties for all purposes as though such transfer had been effected. Except as required or permitted by the terms of this Agreement, as required by applicable Law, or as expressly contemplated by the Restructuring, without the prior written consent of Purchaser (not to be unreasonably withheld, conditioned or delayed), during the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement pursuant to its terms or the Closing Date, neither Company, nor Seller or Parent on behalf of a Company, shall do any of the following:

(i)        Waive any repurchase rights to the securities of a Company, accelerate, amend or (except as specifically provided for herein) change the period of exercisability of options, warrants or restricted securities, or reprice options granted under any Employee, consultant, director or other plans pertaining to securities of a Company or authorize cash payments in exchange for any options granted under any of such plans or any warrants;

(ii)        Grant or announce any option, equity or incentive awards or the increase in the salaries, bonuses or other compensation and benefits payable by a Company, Seller or Parent to any of the Employees, officers, directors, stockholders or other service providers of a Company, (B) hire any new employees, except in the ordinary course of business consistent with past practice and so long as such hiring is with respect to Employees with an annual base salary and incentive compensation opportunity not to exceed $150,000 and not more than $250,000 in the aggregate, (C) pay or agree to pay any pension, retirement allowance, termination or severance pay, bonus or other employee benefit not required by any existing Company Plan or other agreement or arrangement in effect on the date of this Agreement to any Employee, officer, director, stockholder or other service provider of a Company, whether past or present, in excess of $100,000 or more than $250,000 in the aggregate, (D) enter into or amend any Contracts of employment or any consulting, bonus, severance, retention, retirement or similar agreement, except where such Contracts or amendments do not and would not reasonably be expected to result in a material expense or Liability to a Company, or (E) except as required to ensure that any Company Plan is not then out of compliance with applicable Law, enter into or adopt any new, or increase benefits under or renew, amend or terminate any existing, Company Plan;

(iii)        Transfer or license to any person or otherwise extend, amend or modify or terminate any material rights to any Company-Owned Intellectual Property or IP Licenses;

Exhibit 23 Case: 18-31177    Document: 00515297113    Page: 625    Date Filed: 02/04/2020 100

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 626 of 1003
Case 2:10-md-02179-CJB-DCW   Document 26193-3   Filed 05/26/19   Page 436 of 1003

(iv)      Issue, deliver, sell, authorize, pledge or otherwise encumber, or agree to any of the foregoing with respect to, any Company Units or any securities convertible into or exchangeable for Company Units, or subscriptions, rights, warrants or options to acquire any Company Units or any securities convertible into or exchangeable for Company Units, or enter into other agreements or commitments of any character obligating it to issue any such Company Units or convertible or exchangeable securities;

18

(v)        Enter into, amend, terminate, or release or waive any material claims or rights under, any Contract which is (or would be) a Material Contract, other than in the ordinary course of business consistent with past practice;

(vi)        Amend an LLC Operating Agreement, unless required to do so hereunder;

(vii)        Acquire or agree to acquire by merging or consolidating with, or by purchasing any equity interest in or a portion of the assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets which are material, individually or in the aggregate, to the business of a Company, or enter into any joint ventures, strategic partnerships or alliances or other arrangements that provide for exclusivity of territory or otherwise restrict a Company's ability to compete or to offer or sell any products or services;

(viii)        Sell, transfer, lease, license, encumber or otherwise dispose of any of the Assets and Properties of the Companies, except sales, transfers, licenses, leases or other dispositions of any of the Assets and Properties of the Companies in the ordinary course of business or that are not material, individually or in the aggregate, to a Company;

(ix)        Amend any of the documents evidencing a Company's current Indebtedness or enter into any new agreements, arrangements, commitments or understandings, whether oral or written, to incur additional Indebtedness (including any Indebtedness of any other Person, the payment of which any Company is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, either severally or jointly with any other Person, whether contingent or otherwise), or make any loans, advances or capital contributions to, or investments in, any Person;

(x)        Except as required by GAAP, make any change in accounting methods, principles or practices;

(xi)        Except in the ordinary course of business consistent with past practices, incur or enter into any agreement, Contract or commitment requiring U.S. Pipe and/or Fast Fabricators to pay in excess of $500,000 in any 12 month period;

(xii)        Make or rescind any Tax elections that, individually or in the aggregate, could be reasonably likely to adversely affect in any material respect the Tax Liability or Tax attributes of such party or any Purchaser Claimant, settle or compromise any material income tax Liability or, except as required by applicable law, change any method of accounting for Tax purposes or prepare or file any Tax Return in a manner inconsistent with past practice;

(xiii)        Form, establish or acquire any Subsidiary;

(xiv)        Cancel, compromise, waive or release any right or claim (or series of related rights and claims) either involving more than $500,000 or outside the ordinary course of business;

(xv)        Commence, compromise or settle any suit, litigation, proceeding, investigation, mediation, arbitration or audit involving more than $50,000 or involving damages other than money damages;

(xvi)        Make any change in connection with its accounts payable or accounts receivable terms, policies or procedures;

(xvii)        Make capital expenditures except in the ordinary course of business consistent with past practices in an amount not to exceed $500,000 individually or $1,000,000 in the aggregate with regard to a series of similar items, except as contemplated by the Companies' Fiscal 2012 Annual Operating Plan, a copy of which was previously provided to Purchaser; or

Exhibit 23 Case: 18-31177    Document: 00515297113    Page: 627    Date Filed: 02/04/20200100

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 628 of 1003
Case 2:10-md-02179-CJB-DPC   Document 26193-3   Filed 12/27/2019   Page 456 of 1003

(xviii)        Agree in writing or otherwise agree, commit or resolve to take any of the actions described in Section 5.1(b)(i) through 5.1(b)(xvii) above.

5.2    Regulatory and Other Authorizations; Notices and Consents.

(a)        Each of the Parties shall use all commercially reasonable efforts to obtain all permits, authorizations, consents, orders and approvals of all Government Entities that may be or become necessary for its execution and delivery of, and the performance of its obligations pursuant to, this Agreement and will cooperate fully with the other Party in promptly seeking to obtain all such permits, authorizations, consents, Orders and approvals. Each Party agrees to make an appropriate filing (the

19

"HSR Filings") pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act") with respect to the transactions contemplated by this Agreement as soon as practicable after the date hereof but in no event later than fifteen (15) days following the execution and delivery of this Agreement and to supply as promptly as practicable to the appropriate Governmental Entity any additional information and documentary material that may be reasonably requested pursuant thereto. Any fees required for any filing that is necessary under the HSR Act shall be borne equally by Purchaser and Seller.

(b)    All filings, applications, notices, analyses, appearances, presentations, memoranda, submissions, briefs, arguments, opinions and proposals made or submitted by or on behalf of any Party before any Governmental Entity in connection with the approval of the contemplated transactions (except with respect to Taxes) shall require the joint approval of Parent and Purchaser and be under the joint control of Parent and Purchaser, acting with the advice of their respective counsel, it being the intent that the Parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such filing, application, notice, analysis, appearance, presentation, memorandum, submission, brief, argument, opinion and proposal; provided, however, that nothing herein will prevent a Party from responding to or complying with a subpoena or other legal process to the extent required by Law. In addition, except as prohibited by Law or by consistent and lawful practice of any Governmental Entity, each Party shall (i) promptly notify the other Party of any communication to that Party from any Governmental Entity relating to the approval or disapproval of the transactions contemplated hereby and (ii) not participate in any meetings or substantive discussions with any Governmental Entity with respect thereto without consulting with and offering the other Party a meaningful opportunity to participate in such meetings or discussions.

5.3    Other Actions. Upon the terms and subject to the conditions set forth in this Agreement, each of the Parties agrees to use its commercially reasonable efforts to take, or cause to be taken, all actions, and use its commercially reasonable efforts to do, to cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, including using commercially reasonable efforts to accomplish the following: (a) the taking of all acts necessary to cause the conditions precedent set forth in Article VI to be satisfied; (b) the obtaining of all necessary actions, waivers, consents, approvals, orders and authorizations from Governmental Entities and the making of all necessary registrations, declarations and filings (including registrations, declarations, notifications and filings with Governmental Entities, if any) and the taking of all reasonable steps as may be necessary to avoid any suit, claim, action, investigation or proceeding by any Governmental Entity; (c) the obtaining of all consents, approvals or waivers from third parties required as a result of the transactions contemplated in this Agreement, including without limitation the consents referred to in the Seller Disclosure Schedule; (d) the defending of any suits, claims, actions, investigations or proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the transactions contemplated hereby, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Entity vacated or reversed; and (e) the execution or delivery of any additional instruments reasonably necessary to consummate the transactions contemplated by, and to fully carry out the purposes of, this Agreement, including without limitation the execution or delivery by Seller, Parent and/or the Companies of such affidavits, instruments and other documents in form and substance reasonably requested by Purchaser's title company in order to issue, with respect to each Owned Real Property, an owner's title insurance policy with extended coverage over standard exceptions, and with a standard non-imputation endorsement and such other endorsements as Purchaser may reasonably request (including, without limitation, gap, access, survey, tax parcel, zoning 3.1 (modified to include parking), comprehensive, and contiguity). Subject to applicable Laws relating to the exchange of information and the preservation of any applicable attorney-client privilege, work-product doctrine, self-audit privilege or other similar privilege, and except to the extent necessary to protect confidential competitively sensitive information, each of the Companies, Seller and Parent, on the one hand, and Purchaser, on the other hand, shall have the right to review and comment on in advance, and to the extent practicable each will consult the other on, all the information relating to such Party that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the transactions contemplated by this Agreement; provided, however, that neither party shall be required to share information of the type required to be disclosed by Section 4(c) and/or 4(d) of the HSR Act. In exercising the foregoing right, each Company, Seller, Parent, and Purchaser shall act reasonably and as promptly as practicable.

5.4    Confidentiality; Access to Information.

(a)        Confidentiality. The terms of the Confidentiality Agreement shall remain in full force and effect. If this Agreement is terminated as provided in Article VII hereof, each Party (A) will promptly return or cause to be returned to the other all documents and other material obtained from the other in connection with the transactions contemplated hereby, and (B) will safeguard and handle all Proprietary Information of the other Party per the requirements of, and for such time period as specified by, the Confidentiality Agreement, and (C) will use its reasonable best efforts to delete from its computer systems all documents and other material obtained from the other in connection with the transactions contemplated hereby, except that, to the extent that any such provision of the Confidentiality Agreement causes such Agreement to be considered to be a confidential transaction as that term is defined in Treasury Regulation 1.6011-(b)(3), such provision shall be of force and effect.

20

(b)  <u>Publicity</u>. The Parties agree that (a) the initial press release with respect to this Agreement and the transactions contemplated hereby (which press release the Parties contemplate will be issued promptly following the execution and delivery of this Agreement) shall be a press release of Parent, subject to the review and approval of Purchaser, and (b) the press release with respect to the Closing hereby shall be a joint press release of Parent and Purchaser. Subject to the foregoing, no Party shall release, publish, or otherwise make available to the public in any manner whatsoever any information or announcement regarding the transactions contemplated herein without the prior written consent of the other Parties; <u>provided</u>, <u>however</u>, that nothing contained herein or in the Confidentiality Agreement will (x) limit any Party from making any announcements, statements or acknowledgments that such Party is required by applicable Law to make, issue or release, or (y) limit Parent from making any disclosures that it deems necessary or advisable to be made in filings with the SEC. Subject to the foregoing, Parent and Purchaser will consult with each other concerning the means by which each Company's Employees, customers, suppliers and others having business relations with each Company will be informed of the transactions contemplated hereby, and Purchaser will have the right to be present for any such communications.

5.5  <u>Disclosure of Certain Matters</u>. Parent may, by providing written notice to Purchaser, supplement or amend the Seller Disclosure Schedule, as applicable (each, a "<u>Disclosure Schedule</u>") being delivered pursuant to this Agreement with respect to any matter arising or discovered after delivery thereof which, if existing or known at the date of this Agreement, would have been required to be set forth or described in the Seller Disclosure Schedule. No supplement or amendment to the Seller Disclosure Schedule shall (a) eliminate the Purchaser's right, if any, to terminate this Agreement based on the inaccuracy of the representation or warranty of the supplementing or amending Party for purposes of determining satisfaction of the conditions set forth in <u>Section 6.3(a)</u> or (b) limit or otherwise affect the remedies available to any Party (including the right to seek indemnification hereunder). The rights and obligations of Parent to amend or supplement the Seller Disclosure Schedule being delivered herewith shall terminate on the Closing Date.

5.6  Employees and Company Plans.

(a)  Purchaser shall cause each Company to continue the employment of each current Employee (including, without limitation, any Employee who is absent from work on the Closing Date on paid vacation or pursuant to any leave of absence) (as to each Company, the "<u>Company Employees</u>" and, collectively, the "<u>Business Employees</u>") from and after the Closing Date on substantially similar terms and conditions as such Company Employee is currently receiving for a period of at least ninety (90) days following the Closing Date, other than any termination instituted for cause or otherwise consistent with past practice and pursuant to existing rules and policies. The foregoing provision shall not apply to any Business Employee whose terms and conditions of employment are governed by a collective bargaining agreement to which a Company is a party, and the terms of any such collective bargaining agreement shall govern.

(b)  Purchaser agrees to cause each Company to continue to maintain those Company Sponsored Plans, except for the Retiree Welfare Plans, and by no other Affiliates of that Company, on the same terms and conditions as such Company Plans are maintained immediately prior to the Closing Date through at least the six (6) month anniversary of the Closing; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 5.6(b)</u> or elsewhere in this Agreement shall limit the right of a Company to amend or terminate any such Company Plan at any time after the six (6) month anniversary of the Closing, subject to the terms and conditions of any applicable collective bargaining agreement or, if required by applicable Law, prior to the six (6) month anniversary of the Closing.

(c)  To the extent a Company participates in one or more Company Plans that are sponsored by one or more Affiliates of the Company (other than the Mueller Group, LLC Retirement Savings Plan No. 1, the Mueller Group, LLC Retirement Savings Plan No. 2, the Mueller Group, LLC Pension Plan for Selected Employees, the Mueller Water Products Non-Medicare Eligible Salaried Retirees component of the Mueller Water Products, Inc. Flexible Benefits Plan and any other Company Plan that provides retiree welfare for Company Employees, other than continuation of benefit coverage under any Company Plan that is required by Section 1001 of the Consolidated Omnibus Budget Reconciliation act of 1985, as amended, and Sections 601 through 608 of ERISA or comparable state law (together, the "<u>Retiree Welfare Plans</u>") which are addressed in subsections (e), (f) and (k) below), the Seller shall cause the Company (and any such Affiliate, if necessary) to take such action as is reasonably necessary to cause the Company immediately prior to the Closing Date to cease participation in each such Company Plan, to adopt a successor plan for those plans identified in Section 5.6(c) of the Seller Disclosure Schedule for Company Employees and, to the extent of continuing eligibility, former Employees of the Company, on the same terms and conditions as the predecessor Company Plan. The

Exhibit 23 Case: 18-31177    Document: 00515297113    Page: 631    Date Filed: 02/04/2020 100

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 632 of 1003
Case 2:10-md-02179-CJB-DCW   Document 26153-3   Filed 02/05/2019   Page 496 of 803

Purchaser shall cause each Company to continue to maintain the successor Company Plan through at least the six (6) month anniversary of the Closing; provided, however, that nothing in this Section 5.6(c) or elsewhere in this Agreement shall limit the right of a Company to amend or terminate any such successor Company Plan at any time after the six (6) month anniversary of the Closing, subject to the terms and conditions of any applicable collective bargaining agreement, or, if required by applicable Law, prior to the six (6) month anniversary of the Closing. Parent shall (or shall cause its Affiliates to) pay in the ordinary course all claims incurred prior to the Closing Date under each Company Plan that is sponsored by one or more Affiliates of the Company with respect to each current or former Business Employee and any dependent or beneficiary thereof (except to the extent the assets

21

of such plan are transferred pursuant to subsections (e) and (i) hereof).

(d)        With respect to the Mueller Group, LLC Pension Plan for Selected Employees, no later than immediately prior to the Closing Date, the Seller shall (i) take such action as may be necessary to freeze benefit accruals of Business Employees under such Company Plan (to the extent not already frozen); fully vest the benefits then accrued by such Business Employees; (iii) cause each Company that is a contributing sponsor to such Company Plan to cease to be a participating employer in such Company Plan; (iv) amend such Company Plan to recognize the Sale as a distributable event with respect to such Business Employees; (v) provide such notice to affected Business Employees as required by applicable Law; and (vi) file such reports to any Governmental Entity as required by applicable Law. In addition, with respect to such plan, to the extent any collective bargaining agreement covering Business Employees requires Business Employees to continue accruing vesting service under such plan for other reasons (for purposes of, for example, earning into early retirement eligibility), then the Seller shall cause Mueller Group, LLC to amend such plan to provide that service of any such Business Employee with the Companies after the Closing Date shall be counted as vesting service under such plan for such other reasons.

(e)        With respect to the Mueller Group, LLC Retirement Savings Plan No. 1 and the Mueller Group, LLC Retirement Savings Plan No. 2, the Purchaser shall establish one or more plans under Section 401(a) of the Code, or amend existing plan(s), to the extent required to satisfy Code Section 411(d)(6) and all applicable collective bargaining obligations, and cause such plan(s) to accept a transfer of the assets and liabilities associated with the account balances maintained under each such Company Plan on behalf of Business Employees and, to the extent applicable, account balances of deferred vested participants who are former Employees of a Company.

(f)        With respect to the Retiree Welfare Plans, the Seller shall or shall cause each Company to take such action as is reasonably necessary to cause each Company immediately prior to the Closing Date to cease participation in each such Retiree Welfare Plan. Seller shall also be responsible for providing any and all notices required by law or by the terms of any Retiree Welfare Plan to retirees and their dependants and beneficiaries of such cessation of participation.

(g)        For purposes of participating in Company Sponsored Plans and any new or successor plans from and after the Closing Date, Purchaser agrees that the Business Employees shall receive credit for all service time as an employee of a Company, Seller or Parent prior to the Closing Date for purposes of eligibility to participate, vesting, and eligibility to receive benefits under any such plans and for all purposes with respect to leave benefits but only to the same extent past service is credited under such plans or arrangements for similarly situated employees generally. Notwithstanding the foregoing, nothing in this Section 5.6(g) shall be construed to require crediting of service that would result in (A) duplication of benefits, (B) service credit for benefit accruals under a defined benefit pension plan, or (C) service credit under a newly established plan for which prior service is not taken into account for employees generally.

(h)        The Parties acknowledge and agree that all provisions contained in this Section 5.6 are included for the sole benefit of the Parties, and that nothing in this Agreement, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including, without limitation, any Business Employees, any participant in any Company Plan, or any dependent or beneficiary thereof, or (ii) to continued employment with Company, Purchaser or any of their Affiliates.

(i)        To the extent necessary to discharge the obligations (i) (A) of Parent under Section 6(a) of the Employment Agreement with Paul Ciolino, dated August 9, 2010, and (B) of U.S. Pipe under Section 9.1 of the Executive Change-in-Control Severance Agreement with Paul Ciolino, dated August 9, 2010 (as subsequently amended on June 10, 2011), and (ii) under Section 8.1 of each of the Executive Change-in-Control Severance Agreements with, respectively, Robert Waggoner, Brad Overstreet, Stacey Barry, John Williams and Paul Pereira, each dated June, 2011, Purchaser shall cause U.S. Pipe from and after the Closing Date to assume expressly and agree to perform the obligations under such Employment Agreement and each such Executive Change-in-Control Severance Agreement, including any amendments thereto.

(j)        Seller shall pay or cause to be paid, on or before Closing, all bonus/incentive payments relating to the performance period ended September 30, 2011.

Exhibit 23Case: 18-31177    Document: 00515297113    Page: 633    Date Filed: 02/04/2020100

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 634 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26153-3   Filed 12/27/2019   Page 310 of 1003

(k)        With respect to the Retiree Welfare Plans, other than continuation of benefit coverage under any Company Plan that is required by Section 1001 of the Consolidated Omnibus Budget Reconciliation act of 1985, as amended, and Sections 601 through 608 of ERISA ("<u>COBRA</u>") or comparable state law: (i) prior to the Closing Date, Seller shall take all actions necessary to assume all of the Company's obligations and liabilities under such plans, including but not limited to liabilities related to incurred but unpaid or unreported claims; (ii) Seller may amend such plans to provide that, as of the Closing Date, no Business Employee shall be entitled to be covered under such plans on and after the Closing Date other than any Business Employees who transfer employment to an Affiliate of the Company prior to the Closing Date, and (iii) Seller may amend such plans to provide that, with respect to any retired employee of the Companies who are currently enrolled in such plans, coverage may terminate;

22

provided that any such retired employee who has been covered by such plans for less than eighteen months as of the date of coverage termination will be permitted to elect continuation coverage under COBRA for the remainder of the eighteen-month period. If Seller takes any action described in clauses (ii) or (iii) hereof, Seller shall be solely responsible for any liability resulting from such actions.

(l)     Seller shall transfer any assets attributable to employee payroll deductions attributable to, and liabilities respecting, the flexible spending accounts maintained on behalf of Business Employees under the Mueller Water Products, Inc. Flexible Benefits Plan for the plan year containing the Closing Date, and Seller shall cause each Company to accept such assets and assume such liabilities under a substantially similar flexible spending account program.

(m)     For those plans identified in Section 5.6(c) of the Seller Disclosure Schedule for Company Employees, Seller and Parent shall provide as soon as practicable following the execution of this Agreement drafts of those plans, summary plan descriptions, and contracts, including but not limited to administrator services agreements and insurance contracts ("Successor Materials"), which correspond to such identified plans. Purchaser shall have the ability to make or negotiate changes to such Successor Materials as it requests or may negotiate with third parties. Seller and Parent and Purchaser shall provide reasonable cooperation to each other during such process. Purchaser shall be responsible for the engagement of any legal counsel considered necessary or desirable to facilitate the process and all fees and expenses associated with any such engagement.

(n)     Through the third anniversary of the Closing Date, Purchaser shall provide Seller with at least thirty (30) days' advance written notice of any cessation of operations, as contemplated by ERISA Section 4062(e) that affects the Business Employees, but without regard to the percentage threshold specified therein, at any location where the business of the Companies was being conducted immediately prior to the Closing Date, and Purchaser and Parent will consult with each other regarding actions that could be taken in connection with such cessation; provided that this Section 5.6(n) shall not require Purchaser to adopt any proposals presented by Parent.

5.7     Fees and Expenses. Whether or not the transactions contemplated by this Agreement are consummated, all fees and expenses incurred in connection herewith including, without limitation, all legal, accounting, financial advisory, finders, consulting and all other fees and expenses of third parties incurred by a Party in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such fee or expense.

5.8     Tax Matters. The following provisions shall govern the obligations and allocation of responsibility as between the Parties for certain Tax matters:

(a)     Tax Returns. Each of the Parties agrees to cooperate with each other Party in the preparation of any Tax Returns to the extent of any reasonable request. Parent shall include all items of income, expense, deduction, and credit of each Company in its federal and state income Tax Returns (and, as applicable, any franchise Tax Return to the extent based on income) for all periods ending on and with the Closing Date, based on the actual events of each Company that occur in such periods and ending on and with the Closing Date, in a manner that is reflective of and consistent with past practices of each such Company and Parent except as otherwise required by applicable Law. Seller shall prepare and file, or cause to be prepared and filed, the Tax Returns of each Company that are required to be filed on or before the Closing Date, and each such Tax Return shall be reflective of and consistent with past practices of each Company except as otherwise required by applicable Law. Purchaser shall prepare and file, or cause to be prepared and filed, all Tax Returns of each Company required to be filed after the Closing Date, and each such Tax Return shall be reflective of and consistent with past practices of each Company except as otherwise required by applicable Law. For any Tax Return of the Company, other than an income Tax Return, that is required to be filed after the Closing Date that includes a taxable period that begins before the Closing Date, (i) Purchaser shall deliver to Parent for review and comment a copy of the proposed Tax Return no later than thirty (30) days prior to the filing date of such Tax Return (including extensions thereof), (ii) Purchaser shall prepare the proposed Tax Return in a manner not materially inconsistent with the past practice of such Company in preparing any similar Tax Return except as otherwise required by applicable Law, (iii) Purchaser shall not take any position or adopt any method in respect of any such Tax Return that is materially inconsistent with the positions taken, elections made or methods used in preparing or filing such similar Tax Return in prior periods except as otherwise required by Law and in each case, such Tax Return shall be in conformity with the Code, Treasury Regulations and any other applicable Law, and (iv) Purchaser shall accept the reasonable written comments of Parent in

respect of any such Tax Return, provided that if Parent does not provide written comments to any such Tax Return within fifteen (15) days of the delivery of such Tax Return to Parent it shall be deemed to have no comments on such Tax Return.

(b)    Taxes Payable. Notwithstanding and in lieu of the procedures set forth in Section 8.4, upon Purchaser's request, Parent shall pay to Purchaser in immediately available funds within thirty (30) days following the filing of the applicable Tax Return, an amount equal to the Pre-Closing Taxes shown as owing on all Tax Returns of either Company filed or caused to be filed by Purchaser. Within thirty (30) days after receipt, Purchaser shall pay or cause to be paid to Parent any refund of Taxes

23

received by Purchaser, any Company, or any Affiliate thereof after the Closing, or any Tax credit actually applied (to the extent so applied) to reduce the Taxes of Purchaser, any Company, or any Affiliate, for any period beginning after the Closing Date, to the extent that the Tax refunded or credited was paid on or before the Closing Date by any Company, Parent, or any Affiliate thereof for a period ending on or before the Closing Date (such portion with respect to a Straddle Period to be allocated consistently with the principles set forth in Section 5.8(c)).

(c)    Straddle Periods. For purposes of this Agreement, whenever it is necessary to determine the Liability for Taxes (other than income Taxes) of either Company for any taxable period of a Company that includes (but does not end on or before) the Closing Date (a "Straddle Period"), the determination of the Taxes of a Company for the portion of the Straddle Period ending on and including, and the portion of the Straddle Period beginning after, the Closing Date shall be determined by assuming that the Straddle Period consisted of two (2) taxable years or periods, one which ended at the close of business on the Closing Date and the other which began at the beginning of the day following the Closing Date, and items of income, gain, deduction, loss or credit, and state and local apportionment factors of a Company and Parent for the Straddle Period, shall be allocated between such two (2) taxable years or periods on a "closing of the books basis" by assuming that the books of each Company and Parent were closed at the close of business on the Closing Date. However, (i) exemptions, allowances or deductions that are calculated on an annual basis, such as the deduction for depreciation, and (ii) periodic Taxes such as real and personal property Taxes shall be apportioned ratably between such periods on a daily basis.

(d)    Tax Treatment. All payments under this Section 5.8 shall be treated by the Parties for income Tax purposes as an adjustment to the purchase price paid for the Company Units.

(e)    Resolution of Tax Related Issues. Purchaser and Parent agree to consult and attempt to resolve in good faith any disagreement or issue arising (i) as a result of the review of proposed Tax Returns under Section 5.8(a) and (ii) with respect to the calculation and allocation of Taxes under Section 5.8(c). If Purchaser and Parent cannot agree upon the resolution of any such issues that are material within fifteen (15) days, Parent and Purchaser shall refer the matter to the Independent Auditor for resolution; provided, however, that, the Independent Auditor shall not concur with a position proposed by a Party unless such position meets the more likely than not standard (as contemplated in FIN 48 under GAAP). Parent and Purchaser shall each bear 50% of the fees and expenses of the independent auditor and its determination shall be final and binding on both Parent and Purchaser, unless otherwise reversed by a Taxing Authority.

(f)    Other Tax Matters. Notwithstanding and in lieu of the procedures set forth in Section 8.4, Purchaser shall promptly notify Parent in writing upon receipt by Purchaser or a Company of written notice of any pending or threatened Tax audit or Tax assessment which may affect the Tax Liabilities of a Company and for which Parent would be liable under this Agreement. Parent (and its designated representatives) shall have the right to participate, at its sole cost and expense, in any Tax matter, including any audit or administrative or judicial proceeding, which involves or results in a material Tax Liability or potential material Tax Liability for which Parent would be liable under this Agreement ("Parent Interested Tax Matter"). Purchaser shall cooperate fully with Parent (and its designated representatives) in the defense or compromise of any such Parent Interested Tax Matter. In no case shall Purchaser or a Company settle or otherwise compromise any such Parent Interested Tax Matter (including the filing of an amended Tax Return) without the prior approval of Parent, which approval will not be unreasonably withheld, conditioned or delayed.

(g)    Transfer Taxes. Any sales, use, transfer, real property transfer, recording, documentary, stamp, registration, stock transfer, and other similar transfer Taxes and fees (including any penalties and interest) resulting from the purchase and sale of the Company Units shall be paid equally by Purchaser and Seller. Purchaser shall file all necessary documentation and Tax Returns with respect to such Taxes.

(h)    Tax Return Amendments. Unless otherwise required by applicable Law, without Parent's prior written consent (which consent shall not be unreasonably conditioned, withheld or delayed), neither Purchaser nor either Company shall (i) amend or cause or permit the amendment of any Company Tax Return that relates to any Tax period involving Pre-Closing Taxes, (ii) extend or permit the extension or waiver of any statute of limitations applicable to any Company with respect to any Tax period involving Pre-Closing Taxes, or (iii) make or permit the making of a new filing of a Company Tax Return in any state or local jurisdiction with respect to any Tax Period involving Pre-Closing Taxes.

5.9  <u>Records and Documents</u>. The Parties will preserve and keep all books and records that they own immediately after the Closing relating to the business, Assets and Properties, or Licensed Assets and Properties of the Companies for a period of three (3) years following the Closing Date or for such longer period as may be required by applicable Law. After such retention period, a Party will provide at least sixty (60) days prior written notice to the other Party of its intent to dispose of any such books and records, and such other Party will be given the opportunity, at its cost and expense, to remove and retain all or any part of such books and records as it may select. During such retention period, duly authorized representatives of a Party will, upon

24

reasonable notice, have reasonable access during normal business hours to examine, inspect and copy such books and records held by the other Party; provided, however, that to the extent that disclosing any such information would reasonably be expected to constitute a waiver of attorney-client, work product or other privilege with respect thereto, the Parties will take all commercially reasonable action to prevent a waiver of any such privilege, including entering into an appropriate joint defense agreement in connection with affording access to such information. The access provided pursuant to this Section 5.9 will be subject to such additional confidentiality provisions as the disclosing Party may reasonably deem necessary.

5.10    Litigation Support. In the event and for so long as either Party is actively contesting or defending against any Action brought by a third party in connection with any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act or transaction involving the business or Assets or Properties of a Company, the other Party will reasonably cooperate with the contesting or defending Party and its counsel in the contest or defense, make reasonably available its personnel and provide such access to its non-privileged books and records as may be reasonably requested in connection with the contest or defense, at the sole cost and expense of the contesting or defending Party (unless such contesting or defending Party is entitled to indemnification therefor under Article VIII, in which case the costs and expense will be borne by the Parties in accordance with Article VIII).

5.11    Support Arrangements.

(a)    On or prior to the Closing Date (and to the extent necessary after the Closing Date), Purchaser shall use commercially reasonable efforts to (i) obtain releases of Parent and its Affiliates from all obligations under all surety and performance bonds, guarantees and other financial support arrangements (but excluding letters of credit) relating to the Companies that either (A) are set forth in Sections 5.11(a) or 5.11(b) of the Seller Disclosure Schedule or (B) are provided or otherwise become effective after the date of this Agreement and not in contravention of the terms of this Agreement (the "Support Arrangements"). Purchaser shall, with respect to the surety and performance bonds listed in Section 5.11(a) of the Seller Disclosure Schedule, to the extent not replaced on or prior to the Closing Date, (y) deliver to Parent facing or "back-up" surety bonds from a bank or surety company reasonably acceptable to Parent and containing terms and conditions reasonably acceptable to Parent and its bank and/or surety in amounts, form and substance reasonably acceptable to Parent for each such Support Arrangement outstanding on the Closing Date or (z) post cash collateral with the applicable issuer of the security bond in an amount equal to 105% (or such lesser amount in such issuer's sole discretion) of the aggregate amount of the outstanding Support Arrangement.

(b)    With respect to the Bahrain Letter of Credit, Parent and its Affiliates shall (i) maintain through the third anniversary of the Closing Date and (ii) be released, and Purchaser and the Companies shall procure such releases, from the Bahrain Letter of Credit no later than the third anniversary of the Closing Date; provided, further, that if a majority of the outstanding equity of U.S. Pipe or all or substantially all of U.S. Pipe's assets are sold, Parent and its Affiliates shall be released, and Purchaser and the Companies shall procure such releases, from the Bahrain Letter of Credit upon the effectiveness of such sale. With respect to the guarantees listed in Section 5.11(b) of the Seller Disclosure Schedule, Parent shall maintain such guarantees through the date which is the earlier of (A) sixty (60) days after the Closing or (B) the date Parent or its Affiliate is released from such guarantee.

(c)    Until such time as Parent and its Affiliates are released from all obligations thereunder, Purchaser shall promptly upon notice from Parent reimburse Parent (y) its reasonable out-of-pocket costs associated with the Bahrain Letter of Credit or any Support Arrangements that remain outstanding after the Closing Date and (z) within three (3) Business Days, the amount of any payments made under the Bahrain Letter of Credit or a Support Arrangement. Notwithstanding any other provision of this Agreement, none of Parent, Seller or any of their Affiliates shall be obligated to increase the amount of the Bahrain Letter of Credit or any Support Arrangement.

5.12    Administration of Workers' Compensation Claims.

(a)    For all workers' compensation claims of all Employees for losses that (x) occurred after August 15, 2006 but before the Closing Date (whether existing now or made after the Closing Date) (the "Post-2006 WC Claims") and (y) occurred on or before August 15, 2006 (whether existing now or made after the Closing Date) (the "Pre-2006 WC Claims" and collectively with the Post-2006 WC Claims, the "Pre-Closing WC Claims"), Parent shall administer or cause to be administered each such Pre-Closing WC Claim (including through the use of third-party service

providers) in the ordinary course of business consistent with its past practices, and including by maintaining any necessary letters of credit, surety bonds and guarantees. Subject to the limitations contained in Section 5.12(b) below, Purchaser agrees to promptly upon notice from Parent reimburse Parent for (i) the reasonable costs of its outstanding letters of credit, surety and performance bonds, guarantees and other financial support arrangements relating to the Companies with respect to the Pre-Closing WC Claims and (ii) the cost (which shall include reasonable third-party processing costs consistent with Parent's past practices) of such Pre-Closing WC Claims upon payment by Parent. Parent will invoice Purchaser for the amount of the Pre-Closing WC Claims paid by Parent, and payment shall be made by Purchaser within thirty (30) days of each invoice.

25

(b)         Purchaser's reimbursement obligations set forth in <u>Section 5.12(a)</u> above shall cease at such time as (i) in the case of the Post-2006 WC Claims, the amount of Post-2006 WC Claims paid by Purchaser to Seller pursuant to <u>Section 5.12(a)(ii)</u> exceeds Six Million Seven Hundred Thousand Dollars ($6,700,000) and (ii) in the case of the Pre-2006 WC Claims, the amount of Pre-2006 WC Claims paid by Purchaser to Seller pursuant to <u>Section 5.12(a)(ii)</u> exceeds Five Million One Hundred Thousand Dollars ($5,100,000), and Parent shall be solely responsible for such costs thereafter.

5.13    <u>Cooperation with Financing</u>. In order to assist Purchaser with obtaining the financing contemplated by the Debt Commitment or any other financing contemplated by Purchaser for the Closing or immediately following the Closing, Parent and Seller shall cause the Companies to provide such necessary and customary assistance and cooperation as Purchaser may reasonably request, including, without limitation, cooperation in Purchaser's preparation of all documentation for any such financing of Purchaser, Purchaser's preparation of any information memorandum or similar document or presentation, making senior management of the Companies available for a reasonable number of customary presentations and meetings and cooperation with prospective lenders in performing their due diligence, entering into customary agreements and entering into pledge and security documents, other definitive financing documents or other requested certificates or documents; <u>provided</u>, that such cooperation does not unreasonably interfere with the ongoing operations of the Companies. Notwithstanding anything in this Section 5.13 to the contrary, (a) the Companies shall not be required to pay any commitment fee or similar fee or incur any liability with respect to obtaining any financing contemplated by Purchaser prior to the Closing, (b) no officer, director or employee of the Companies shall be required to execute any documents that will be effective prior to the Closing and (c) the Companies shall not be required to issue any information memoranda or similar document or presentation or to indemnify any Person in connection with any such financing of Purchaser. Purchaser shall reimburse the Companies for all reasonable and documented out of pocket costs, fees and expenses incurred in connection with such assistance and cooperation. Without limiting the foregoing, none of Parent, Seller or the Companies shall be liable for any obligation incurred in connection with any such financing of Purchaser, and Purchaser shall indemnify and hold harmless Parent, Seller and the Companies with respect to such financing of Purchaser. Prior to the Closing, the proposed lenders in connection with the marketing of the financing contemplated by the Debt Commitment or any other financing contemplated by Purchaser for the Closing or immediately following the Closing shall be permitted to use the Companies' names and logos in the any information memorandum or similar document or presentation used in connection with Purchaser's obtaining such financing; provided, however, that Purchaser shall be identified as the borrower in any such information memorandum or similar document or presentation.

5.14    <u>Interim Financial Statements</u>. Following the end of each calendar month from the date hereof until the Closing, within thirty (30) days after the end of each month, Seller and Parent shall cause the Companies to provide Purchaser with unaudited monthly financial statements (prepared consistently with past practices and in accordance with the Accounting Principles) and Monthly Report of Operations (such reports to be in the form prepared by the Companies in the ordinary course of business) of the Companies for such preceding month.

5.15    <u>No Negotiation</u>.

(a)         From the date of this Agreement until the earlier of the Closing or the termination of this Agreement, Seller and Parent will, and will cause their respective Affiliates and representatives (including the Companies) to, discontinue any negotiations with any Person (other than Purchaser) relating to any transaction involving the Companies, including the sale of the Company Units, any merger or consolidation or the sale of any material portion of the assets of the Companies (other than the sale of assets in the ordinary course of business) (an "<u>Acquisition Transaction</u>"). Until such time, if any, as this Agreement is terminated or the Closing occurs, the Seller and Parent will not, and will cause their respective Affiliates and representatives (including the Companies) not to, (i) solicit, facilitate, initiate or encourage any inquiries or proposals from, or discuss or negotiate with, any Person (other than Purchaser) relating to an Acquisition Transaction, (ii) furnish or cause to be furnished, to any Person, any information concerning the business, operations, properties or assets of the Companies in connection with an Acquisition Transaction or (iii) otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any other Person to do or seek any of the foregoing. Seller and Parent agree not to (and to cause the Companies not to) release any third party from the confidentiality and standstill provisions of any agreement to which Seller, Parent or the Companies are a party with respect to any Acquisition Transaction.

Exhibit 23
Case: 18-31177     Document: 00515297113     Page: 641     Date Filed: 02/04/2020

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 642 of 1003
Case 2:10-md-02179-CJB-DPC   Document 26153-3   Filed 12/12/2019   Page 396 of 403

(b)          Seller and Parent shall notify Purchaser orally and in writing promptly (but in no event later than twenty-four (24) hours) after receipt by any of Seller, Parent, the Companies or any of the representatives thereof of any proposal or offer from any Person other than Purchaser to effect an Acquisition Transaction or any request for non-public information relating to the Companies or for access to the properties, books or records of the Companies by any Person other than Purchaser. Such notice shall indicate the identity of the Person making the proposal or offer, or intending to make a proposal or offer or requesting non-public information or access to the books and records of the Companies, the material terms of any such proposal or offer, or modification or amendment to such proposal or offer, and include copies of any written proposals or offers or amendments or

26

supplements thereto. Seller and Parent shall keep Purchaser informed, on a current basis, of any material changes in the status and any material changes or modifications in the material terms of any such proposal, offer, indication or request.

     5.16   <u>Non-Competition</u>.

     (a)   For a period of five (5) years commencing on the Closing Date with respect to subsections (i), (ii) and (iii) below, and for a period of three (3) years commencing on the Closing Date with respect to subsections (iv) and (v) below (the "<u>Restricted Term</u>"), Seller and Parent shall not, and shall not permit any of their Affiliates to, directly or indirectly:

     (i)   engage in or assist others in engaging in the Restricted Business;

     (ii)   have an interest in any Person that engages directly or indirectly in the Restricted Business in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant;

     (iii)   intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between a Company and customers or suppliers of the Companies;

     (iv)   hire any of the individuals listed in Section 5.16 of the Seller Disclosure Schedule; or

     (v)   solicit, induce or otherwise offer employment or engagement as an independent contractor to, or engage in discussions regarding employment with, any person who is or was an employee of or performed similar services for any Company, or assist any third party with respect to any of the foregoing unless such person has been separated from his or her employment or other relationship with the Purchaser and each of its Affiliates (including any Company) for a period of two (2) consecutive years; <u>provided</u>, <u>however</u>, nothing in this <u>Section 5.16(v)</u> shall prevent Seller, Parent or any of their Affiliates from hiring any person (i) pursuant to a general solicitation which is not directed specifically to such person; (ii) whose employment has been terminated by the Companies or Purchaser; or (iii) whose employment has been terminated by that person after one hundred eighty (180) days from the date of such termination of employment.

     (b)   Notwithstanding the foregoing, Seller, Parent or their Affiliates may (i) own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller is not a controlling Person of, or a member of a group with controls, such Person, and does not, directly or indirectly, own five percent (5%) or more of any class of securities of such Person and (ii) in connection with the sale of their products or services, alone or with any other Person (including a Competitor), even if such activity has the effect of otherwise violating the terms of this <u>Section 5.16</u>, bid, partner, sell, market, coordinate sales, coordinate marketing efforts or otherwise take any actions whose purpose is the sale of the products or services of Seller, Parent or their Affiliate (including, without limitation, the sale in North America of ductile iron pipe products, including pipe, joints, joint restraint products and fittings manufactured by third parties, or by Purchaser and the Companies).

     (c)   If Seller or Parent breaches, or threatens to commit a breach of, any of the provisions of this <u>Section 5.16</u>, Purchaser shall have the following rights and remedies, each of which shall be independent of the others and severally enforceable, and each of which is in addition to, and not in lieu of, any other rights and remedies available to Purchaser under law or in equity:

     (i)   the right and remedy to have such provision specifically enforced by any court having jurisdiction, it being acknowledged and agreed that any such breach or threatened breach may cause irreparable injury to Purchaser and that money damages may not provide an adequate remedy to Purchaser; and

     (ii)   the right and remedy to recover from the Seller all monetary damages suffered by Purchaser as the result of any acts or omissions constituting a breach of this <u>Section 5.16</u>.

Exhibit 23 Case: 18-31177 Document: 00515297113 Page: 643 Date Filed: 02/04/2020 100

Case 2:10-md-02179-CJB-DPC Document 26293-3 Filed 02/05/20 Page 644 of 1003
Case 2:10-md-02179-CJB-DCW Document 26193-3 Filed 02/05/2019 Page 6106 of 103

(d)        Nothing in this Agreement shall preclude or otherwise limit the ability of Parent to effect a sale of the shares of Parent, any merger or consolidation of Parent or the sale of any other portion of the assets of Parent to any Person and, in such event, such purchaser of the shares or assets of Parent, or successor of Parent by means of merger or consolidation, shall not be bound by the restrictions set forth in this Section 5.16.

(e)        Purchaser may sell, assign or otherwise transfer this covenant not to compete, in whole or in part, to any Person that purchases all or any portion of the Business.

5.17   Bank Accounts. On or prior to the Closing Date, Purchaser and Parent will use commercially reasonable efforts to ensure that Parent and its Affiliates are released from all obligations under all banking and credit card relationships that either

27

(a) are set forth in Section 5.17 of the Seller Disclosure Schedule or (b) are provided or otherwise become effective after the date of this Agreement and not in contravention of the terms of this Agreement. If Purchaser is unable to obtain any such release from any such arrangement by the Closing Date, at and after the Closing Date, Purchaser and Parent will continue to use commercially reasonable efforts to ensure that Parent and its Affiliates are released from such arrangements. Purchaser shall indemnify Parent and its Affiliates against all of their respective obligations under any such arrangement from which such beneficiary is not so released on the Closing Date.

5.18   <u>Directors and Officers</u>. For five (5) years after the Closing Date, the Seller shall maintain directors' and officers' liability insurance for those persons who are covered by such Company's directors' and officers' liability insurance policy at the date hereof for events occurring prior to the Closing Date by (a) maintaining each Company's current directors' and officers' liability insurance and/or (b) by purchasing a "tail" policy with respect thereto.

5.19   <u>Right of First Refusal</u>.

(a)   If Purchaser determines to pursue a sale, whether for cash, securities or other consideration and whether in a single transaction or a series of related transactions, of all or a majority of the equity interests in the Companies, or such assets of the Companies as comprise all or substantially all of the assets of the Companies, taken as a whole (any such transaction or series of related transactions, a "<u>U.S. Pipe Sale</u>"), prior to effecting any U.S. Pipe Sale, entering into a definitive agreement in respect of same or seeking bids from third parties for a U.S. Pipe Sale, Purchaser shall comply with its obligations set forth in this <u>Section 5.19</u>.

(b)   In the event Purchaser determines to pursue a U.S. Pipe Sale, Purchaser shall give written notice (a "<u>Sale Notice</u>") to Parent stating Purchaser's intention to pursue a U.S. Pipe Sale, and the estimated price upon which Purchaser would be willing to sell to Parent, as applicable, the equity interests in the Companies, or assets of the Companies, in each case, as described in the Sale Notice.

(c)   For a period of thirty (30) calendar days following receipt of the Sale Notice (the "<u>Exercise Period</u>"), Parent shall have the option, but not the obligation, to purchase the equity interests or assets that are the subject of the Sale Notice, subject to due diligence and execution of definitive documents with respect to the proposed U.S. Pipe Sale. To exercise such option, Parent shall provide a written notice (the "<u>Exercise Notice</u>") to Purchaser. If an Exercise Notice is not received by Purchaser by the end of such thirty (30) calendar-day period, Parent shall be deemed to have waived its rights hereunder with respect to such U.S. Pipe Sale.

(d)   In the event Parent delivers an Exercise Notice, then Purchaser and Parent shall negotiate in good faith the terms of the proposed U.S. Pipe Sale, including price and other customary and commercially reasonable representations, warranties and associated indemnities in favor of Parent pursuant to the definitive agreements to be entered into in connection with the U.S. Pipe Sale, for a period of not less than sixty (60) calendar days following Purchaser's receipt of the Exercise Notice from Parent (the "<u>Negotiation Period</u>").

(e)   If Parent either does not deliver an Exercise Notice with respect to a Sale Notice prior to expiration of the related Exercise Period or the parties do not execute definitive agreements in respect of a proposed U.S. Pipe Sale prior to expiration of the Negotiation Period with respect to a Sale Notice, then Purchaser shall be free to enter into definitive agreements with a third party with respect to the proposed U.S. Pipe Sale on such terms and conditions as may be determined by Purchaser in its sole discretion. If Purchaser has discontinued all negotiations with all potential purchasers in connection with a U.S. Pipe Sale for a period of not less than six (6) months, then the provisions of this <u>Section 5.19</u> shall again apply, and Purchaser shall not consummate or propose a U.S. Pipe Sale without again complying with this <u>Section 5.19</u>.

5.20   <u>Restricted Payments</u>. So long as Purchaser or either Company shall have any commitment under <u>Sections 5.11</u> or <u>5.12</u> to Parent or any of its Affiliates, neither Purchaser nor any Company shall, nor shall they permit any Subsidiary to, directly or indirectly, (a) declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so or (b) pay any management, transaction or similar fee to any Affiliate of Purchaser other than management fees and closing fees as set forth in <u>Annex A</u> and such other fees in connection with any future transactions involving Purchaser and/or the Company as are comparable with those set forth in <u>Annex A</u>; <u>provided</u>,

*however*, that if Purchaser or any Company is in default of any payment obligation under <u>Sections 5.11</u> or <u>5.12</u>, no such fees shall be paid.

      5.21   <u>Environmental</u>.

        (a)      <u>Mini-Mill Letter of Concurrence</u>. Prior to Closing, Seller and Parent shall cause U.S. Pipe to use their respective commercially reasonable efforts to complete all work necessary and sufficient to receive a Letter of Concurrence from

<div align="center">28</div>

---

the Alabama Department of Environmental Management for the Marvel City Mini Mill facility, located at 2101 18th Street, Bessemer, Alabama ("Mini Mill Property"), for Mini Mill's participation in the Alabama Voluntary Cleanup Program. In the event a Letter of Concurrence does not issue prior to Closing, Seller and Parent shall reimburse U.S. Pipe for all reasonably necessary costs and expenses required to complete all work necessary and sufficient to receive a Letter of Concurrence.

      (b)     Transfer Acts.

      (i)     Seller and Parent shall comply with any and all obligations (if any) of the Transfer Acts arising or resulting from the signing of this Agreement and/or the Closing, including but not limited to any required site investigation, cleanup or remediation, or notification, disclosure or consent.

      (ii)     Seller and Parent shall control the course of conduct of all matters within the scope of their compliance with the Transfer Acts; provided, however that Seller and Parent shall provide Purchaser with at least five (5) Business Days notice to review and comment in advance on any work plans, investigations, and other environmental remediation activities, and shall incorporate all reasonable comments of Purchaser in such final submissions. Seller and Parent will promptly deliver to Purchaser copies of all environmental reports, studies, surveys, test data and reports, assessments, cost estimates, correspondence (either received by or generated on behalf of Seller and Parent) relating to compliance with the Transfer Acts.

      (iii)     Seller, Parent, and Purchaser will cooperate to minimize costs, and nothing in this Agreement shall require actions beyond those that minimize the costs of any investigation or remediation while achieving the standard of compliance as required by Environmental Laws. Without limiting any other provision of this Section 5.21 (b), the Parties agree that reasonable deed or use restrictions and institutional controls may be implemented when such measures are allowed by Environmental Laws and approved for use by the relevant Governmental Entity, and do not unreasonably interfere with the use of any Owned Real Property or Leased Real Property. Purchaser agrees to cooperate to execute and file any documents necessary to implement such deed and use limitations.

      (iv)     Post-Closing, Purchaser shall allow Seller and Parent and Seller's and Parent's employees, consultants, and agents reasonable access to the Leased Real Property or the Owned Real Property as necessary for Seller and Parent to fulfill their obligations under the Transfer Acts. Seller and Parent shall provide at least two (2) Business Days notice prior to exercising the access granted herein and shall not unreasonably interfere with Purchaser's activities on the Leased Real Property or the Owned Real Property. Seller and Parent shall indemnify and hold harmless Purchaser from and against any costs and expenses (not including indirect, incidental, consequential or special damages) arising out of or resulting from the negligence or willful misconduct of Seller and Parent or Seller's and Parent's employees, consultants, and agents in accessing the Leased Real Property or the Owned Real Property to perform work under the Transfer Acts.

      (v)     Seller's obligations under this Section 5.21(b) shall terminate upon the fulfillment of Seller's and Parent's obligations, if any, under the Transfer Acts, as documented in writing by the Connecticut Department of Energy and Environmental Protection and the New Jersey Department of Environmental Protection.

      (c)     Burlington, NJ Permit Transfer. Seller and Parent shall cause the transfer of the Sanitary Landfill Closure/Post-Closure Approval obtained for the Burlington, New Jersey site from U.S. Pipe into Parent and shall comply with any and all obligations imposed by such permit.

    5.22   Executive Payments. Parent shall pay or cause the Companies to pay all Executive Payments at or prior to the Closing.

    5.23   Release of Intercompany Claims. Effective as of the Closing, Parent, on behalf of itself and its Affiliates, hereby releases each Company from any and all Liabilities arising prior to or existing as of the Closing, provided that such release shall not apply to any obligations under this Agreement or any Ancillary Agreement.

**ARTICLE VI**
**CONDITIONS TO THE TRANSACTION**

Exhibit 23 Case: 18-31177    Document: 00515297113    Page: 647    Date Filed: 02/04/2020 12/12/2100

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 648 of 1003
Case 2:10-md-02179-CJB-DCW   Document 26193-3   Filed 12/12/2019   Page 656 of 1003

6.1   <u>Conditions to Obligations of Each Party</u>. The respective obligations of each Party to effect the transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing Date of the following conditions:

(a)      all applicable waiting periods, including all extensions thereof, under the HSR Act relating to the Sale shall have expired or been terminated; and

29

---

(b)          no Governmental Entity shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, executive order, decree, injunction or other order (whether temporary, preliminary or permanent) which is in effect and which has the effect of making the Sale illegal or otherwise prohibiting consummation of the Sale, substantially on the terms contemplated by this Agreement.

6.2    Additional Conditions to Obligations of Seller and Parent. The obligations of Seller and Parent to consummate and effect the transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any of which may be waived, in writing, exclusively by Seller and Parent:

(a)          Representations and Warranties. Each representation and warranty of Purchaser contained in this Agreement that is qualified as to materiality shall have been true and correct (i) as of the date of this Agreement and (ii) on and as of the Closing Date with the same force and effect as if made on the Closing Date, without giving effect to any supplement to the Purchaser Disclosure Schedule. Each representation and warranty of Purchaser contained in this Agreement that is not qualified as to materiality shall have been true and correct in all material respects (A) as of the date of this Agreement and (B) on and as of the Closing Date with the same force and effect as if made on the Closing Date, without giving effect to any supplement to the Purchaser Disclosure Schedule.

(b)          Agreements and Covenants. Purchaser shall have performed or complied in all material respects with all agreements and covenants required by this Agreement or the Ancillary Agreements to be performed or complied with by it on or prior to the Closing Date. Parent shall have received a certificate with respect to the foregoing conditions in (a) and (b) signed on behalf of Purchaser by an authorized officer of Purchaser ("Purchaser Closing Certificate").

(c)          No Litigation. No action, suit or proceeding shall be pending or threatened before any Governmental Entity which is reasonably likely to (i) prevent consummation of the Sale, or (ii) cause the Sale to be rescinded following consummation.

(d)          Other Deliveries. Purchaser shall have delivered to Parent (i) copies of resolutions and actions taken by Purchaser's board of directors and/or stockholders, as applicable, in connection with the approval of this Agreement and the transactions contemplated hereunder, and (ii) such other documents or certificates as shall reasonably be required by Parent and its counsel in order to consummate the transactions contemplated hereunder.

(e)          Purchaser's Performance. Purchaser shall have delivered to Seller the Purchase Price.

(f)          Support Arrangements. Purchaser shall have satisfied its obligations contained in Section 5.11(a).

(g)          Patent License Agreement. Purchaser shall have delivered to U.S. Pipe and Parent a duly executed Patent License Agreement, substantially in the form of Exhibit C.

(h)          Trademark Assignment Agreement and Trademark Cooperation Agreement. Purchaser shall have delivered to U.S. Pipe and Parent a duly executed Trademark Assignment Agreement and Trademark Cooperation Agreement, substantially in the form of Exhibit E-1 and E-2, respectively.

(i)          Employee Leasing Agreement. Purchaser shall have delivered to Parent a duly executed Employee Leasing Agreement, substantially in the form of Exhibit G.

(j)          Transition and Shared Services Agreement. Purchaser shall have delivered to Parent a duly executed Transition and Shared Services Agreement, substantially in the form of Exhibit B.

6.3    Additional Conditions to the Obligations of Purchaser. The obligations of Purchaser to consummate and effect the transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any of which may be waived, in writing, exclusively by Purchaser:

    (a)   <u>Representations and Warranties</u>. Each representation and warranty of Seller and Parent contained in this Agreement shall be accurate in all respects (i) as of the date of this Agreement and (ii) on and as of the Closing Date with the same force and effect as if made on the Closing Date, without giving effect to any supplement to the Seller Disclosure Schedule, except for inaccuracies of representations or warranties the circumstances giving rise to which, individually or in the aggregate, do not constitute a Material Adverse Effect (it being understood that, for purposes of determining the accuracy of such representations and warranties, all "Material Adverse Effect" qualifications and other materiality qualifications therein shall be disregarded).

<div align="center">30</div>

---

(b)        Agreements and Covenants. Seller and Parent shall have performed or complied in all material respects with all agreements and covenants required by this Agreement or the Ancillary Agreements to be performed or complied with by Seller and Parent at or prior to the Closing Date. Purchaser shall have received a certificate with respect to the foregoing conditions in (a) and (b) signed on behalf of Seller and Parent ("Company Closing Certificate").

(c)        No Litigation. No action, suit or proceeding shall be pending or threatened before any Governmental Entity which is reasonably likely to (i) prevent the consummation of the Sale or (ii) cause the Sale to be rescinded following consummation.

(d)        Material Adverse Effect. No Material Adverse Effect with respect to the Companies, taken as a whole, shall have occurred since the date of this Agreement and be continuing.

(e)        Other Deliveries. Seller and Parent shall have delivered to Purchaser: (i) copies of resolutions and actions taken by Seller's managers and members and of Parent's board of directors in connection with the approval of this Agreement and the transactions contemplated hereunder, and (ii) such other documents and certificates as shall reasonably be required by Purchaser and its counsel in order to consummate the transactions contemplated hereunder.

(f)        Certificates. Parent shall have cause to be delivered the certificate of formation of each Company, certified by the Secretary of State of Alabama and Delaware, as applicable, and a certificate of good standing from the State of Alabama and Delaware, as applicable, each dated within ten (10) Business Days prior to the Closing Date and of each other jurisdiction in which a Company and is qualified to do business, each dated within fourteen (14) Business Days prior to the Closing Date.

(g)        Resignations. Each Company shall have caused to be delivered resignations effective as of the Closing of each of the managers and officers of each Company in their capacity as such (except to the extent that any such individuals will serve as managers or officers of a Company immediately after the Closing at the sole discretion of Purchaser), executed by such individuals.

(h)        FIRTPA Certificate. Seller shall have caused to be delivered a certificate, in form acceptable to Purchaser, duly completed pursuant to Sections 1.897-2(h) and 1.1445-2(c) of the Treasury Regulations, certifying that the Company Units are not United States real property interests, along with written authorization of Purchaser to deliver such form to the Internal Revenue Service on behalf of each Company.

(i)        Encumbrances. All Encumbrances (other than Permitted Encumbrances) on the Company Units and Assets and Properties of each Company must have been released at or prior to Closing, including the release and termination of each of the UCC financing statements and guarantees listed in Annex B.

(j)        Assignment of Workers' Compensation Claims. The Companies and Parent shall have delivered to Purchaser a duly executed Assignment and Assumption Agreement, substantially in the form of Exhibit D, whereby Parent will assume all obligations and other Liabilities associated with the Pre-Closing WC Claims.

(k)        Termination of Related Party Agreements. The Companies and Parent shall have caused to be terminated all related party agreements among Company and Parent or its Affiliates ("Related Party Agreements") listed in Annex C.

(l)        Patent License Agreement. U.S. Pipe and Parent shall have delivered to Purchaser a duly executed Patent License Agreement, substantially in the form of Exhibit C.

(m)        Trademark Assignment Agreement and Trademark Cooperation Agreement U.S. Pipe and Parent shall have delivered to Purchaser a duly executed Trademark Assignment Agreement and Trademark Cooperation Agreement, substantially in the form of Exhibit E-1 and E-2, respectively.

Exhibit Case: 18-31177    Document: 00515297113    Page: 651    Date Filed: 02/04/2020 0100

Case 2:10-md-02179-CJB-DPC    Document 26293-3    Filed 02/05/20    Page 652 of 1003
Case 2:10-md-02179-CJB-DCW    Document 26153-3    Filed 12/26/19    Page 39 of 103

       (n)      <u>Transition and Shared Services Agreement</u>. Parent shall have delivered to Purchaser a duly executed Transition and Shared Services Agreement, substantially in the form of <u>Exhibit B</u>.

       (o)      <u>Employee Leasing Agreement</u>. Parent shall have delivered to Purchaser a duly executed Employee Leasing Agreement, substantially in the form of <u>Exhibit G</u>.

<div align="center">31</div>

---

## ARTICLE VII
## TERMINATION

7.1    Termination. This Agreement may be terminated at any time prior to the Closing:

(a)        by mutual written agreement of Parent and Purchaser;

(b)        by either Parent or Purchaser, by written notice to the other Party, if a Governmental Entity shall have issued an Order or taken any other action, in any case having the effect of permanently restraining, enjoining or otherwise prohibiting the Sale, which Order or other action is final and nonappealable;

(c)        by Parent, upon written notice to Purchaser, (x) upon a material breach of any representation, warranty, covenant or agreement on the part of Purchaser set forth in this Agreement, or if any representation or warranty of Purchaser shall have become untrue, in either case such that any condition to Parent's and Seller's closing obligations set forth in Article VI would not be satisfied as of the time of such breach or as of the time such representation or warranty shall have become untrue, provided, however, that if such breach by Purchaser is curable by Purchaser prior to the Closing Date, then Parent may not terminate this Agreement under this Section 7.1(c) for ten (10) Business Days after delivery of written notice from Parent to Purchaser of such breach provided Purchaser continues to exercise commercially reasonable efforts to cure such breach, or (y) if the satisfaction of any of the conditions to Parent's closing obligations set forth in Article VI become impossible, and Parent has not waived such condition in writing on or before such date, (it being understood that Parent may not terminate this Agreement pursuant to this Section 7.1(c) if it shall have materially breached this Agreement or if such breach by Purchaser (if curable) is cured during such ten (10) Business Day period);

(d)        by Purchaser, upon written notice to Parent, (x) upon a material breach of any representation, warranty, covenant or agreement on the part of Seller or Parent set forth in this Agreement, or if any representation or warranty of Seller or Parent shall have become untrue, in either case such that the any condition to Purchaser's closing obligations set forth in Article VI would not be satisfied as of the time of such breach or as of the time such representation or warranty shall have become untrue; provided, however, that if such breach is curable by Seller or Parent prior to the Closing Date, then Purchaser may not terminate this Agreement under this Section 7.1(d) for ten (10) Business Days after delivery of written notice from Purchaser to Parent of such breach, provided Parent continues to exercise commercially reasonable efforts to cure such breach, or (y) if the satisfaction of any of the conditions to Purchaser's closing obligations set forth in Article VI become impossible, and Purchaser has not waived such condition in writing on or before such date (it being understood that Purchaser may not terminate this Agreement pursuant to this Section 7.1(d) if it shall have materially breached this Agreement or if such breach by Seller or Parent (if curable) is cured during such ten (10) Business Day period);

(e)        by either Parent or Purchaser if the Closing shall not have occurred on or prior to the date which is sixty (60) days from the date the HSR Filings are made pursuant to Section 5.2(a) (the "Termination Date") and the terminating Party is not in material breach of this Agreement; provided, however, that the right to terminate this Agreement under this Section 7.1(e) shall not be available to a Party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before the Termination Date.

7.2    Notice of Termination; Effect. Any termination of this Agreement under Section 7.1 will be effective immediately upon (or, if the termination is pursuant to Section 7.1(c) or Section 7.1(d) and the proviso therein is applicable, ten (10) Business Days after) the delivery of written notice of the terminating Party to the other Parties hereto. In the event of the termination of this Agreement as provided in Section 7.1, this Agreement shall be of no further force or effect and the Sale shall be abandoned, except for and subject to the following: (a) Sections 5.4, 5.7 and 7.2, and Article IX (General Provisions) shall survive the termination of this Agreement and (b) if the Agreement is terminated by either Party pursuant to Section 7.1(c) or Section 7.1(d), then the breaching Party shall indemnify the terminating Party for all Damages incurred by the terminating Party arising out of any breach by the breaching Party of the terms hereof.

## ARTICLE VIII
## INDEMNIFICATION

8.1    <u>Survival of Representations and Warranties</u>. All representations and warranties contained in <u>Articles III</u> and <u>IV</u> shall survive the Closing, and, except as further provided in this paragraph, neither the Purchaser Claimants nor the Seller Claimants, as applicable, shall have any right to bring any claim in respect of any breach thereof unless the Purchaser Claimants (in the case of any breach of <u>Article III</u>) or the Seller Claimants (in the case of any breach of <u>Article IV</u>) have provided written notice of any such claim on or prior to the date that is eighteen (18) months following the Closing Date (the "<u>General Survival Date</u>"); <u>provided</u>, <u>however</u>, that (x) the representations and warranties contained in <u>Sections 3.1</u>, <u>3.2</u>, <u>3.3</u>, <u>3.16</u>, <u>4.1</u>, and <u>4.2</u> shall remain in full force

32

Exhibit 23-31177    Case: 18-31177    Document: 00515297113    Page: 654    Date Filed: 02/04/2020 02/04/2020 00100

Case 2:10-md-02179-CJB-DPC    Document 26293    Document 26193-3    Filed 02/05/20  Filed 02/05/2019  Page 655 of 1003  Page 552 of 1003

and effect indefinitely, (y) the representations and warranties contained in Sections 3.11 and 3.13 shall survive until that date which is three (3) years from the Closing Date and (z) the representations and warranties contained in Section 3.12 shall survive until sixty (60) days past the expiration of the applicable statute of limitations (including all periods of extension, whether automatic or permissive). All covenants and agreements that by their terms contemplate performance after the Closing Date shall survive the Closing in accordance with their terms until fully performed.

8.2    Indemnification by Parent and Seller. From and after the Closing, Parent and Seller (the "Seller Indemnifying Parties") shall jointly and severally indemnify and hold Purchaser and its respective Affiliates (including the Companies after the Closing) and their respective directors, officers, employees, shareholders, members, partners, agents, successors and assigns (collectively "Purchaser Claimants" and individually a "Purchaser Claimant") harmless against any Damages, whether or not involving a third party claim, that Purchaser Claimants incurred directly or indirectly by reason of or attributable to:

(a)    the inaccuracy or breach of any representation or warranty of Seller or Parent contained in Article III of this Agreement to the extent not caused by Purchaser;

(b)    any failure by Seller or Parent to perform or comply with any covenant or obligation of Seller or Parent, as applicable, contained in this Agreement to the extent not caused by Purchaser, including but not limited to, any failure to satisfy the terms of the Assignment and Assumption Agreement;

(c)    any Pre-Closing Tax;

(d)    any brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by any Person with a Company, Seller or Parent or any Related Person (or any Person acting on their behalf) in connection with the transactions contemplated hereby;

(e)    the retained liabilities set forth on Annex D;

(f)    the Restructuring;

(g)    any Indebtedness of any other Person, the payment of which any Company is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, either severally or jointly with any other Person, whether contingent or otherwise; and/or

(h)    Environmental Liabilities to the extent (i) related to or arising from operations at (including without limitation off-site disposal from), or conditions at, on, under or proximate to any properties, landfills, or facilities retained by the Seller Indemnifying Parties after Closing (including but not limited to the properties, landfills or facilities to be transferred out of the Companies pursuant to the Restructuring, whether or not transferred prior to Closing), or which are not otherwise conveyed to Purchaser pursuant to this Agreement, including but not limited to facilities formerly owned by U.S. Pipe (the "Non-Transferred Properties"); or (ii) any remedial, response, abatement, cleanup, investigative, and monitoring work required by a Governmental Entity (collectively, "Remedial Work") resulting from a Release of Hazardous Materials from any Non-Transferred Properties, including without limitation a Release of Hazardous Materials which is discovered after Closing but which began before Closing. Notwithstanding the preceding, the Seller Indemnifying Parties shall not be liable under this Agreement to the extent (but only to the extent) of that portion of the costs and liabilities of any Environmental Liability or Remedial Work attributable to (y) an affirmative act of any Purchaser Claimant which causes the material aggravation of a then-existing Release of Hazardous Materials or (z) the introduction and initial Release of Hazardous Material by a Person other than either Company or any Seller Indemnifying Party or any Affiliate of any such party, from any Non-Transferred Property(ies) never owned, operated or leased by either Company or any Seller Indemnifying Party or any Affiliate of any such party.

(i)    The Seller Indemnifying Parties shall not be required to indemnify a Purchaser Claimant under clause (a) of this Section 8.2 unless (i) the Damages for an individual claim (or series of related claims so substantially related as to effectively constitute one claim) exceeds $50,000 and (ii) the aggregate cumulative sum of all Damages for which indemnity would otherwise be due under clause (a) of this Section 8.2 exceeds $1,000,000 ("Seller Basket") in which case the Seller Indemnifying Parties shall be responsible for the full amount of such Damages,

including the Seller Basket. In addition and subject to <u>Section 8.2(j)</u> below, the maximum aggregate liability of the Seller Indemnifying Parties for which indemnification under clause (a) of this <u>Section 8.2</u> shall equal $10,000,000 (the "<u>Seller Cap</u>"). The limitations set forth in the immediately two preceding sentences shall not apply to claims arising from an inaccuracy or breach of any representations or warranties contained in Sections 3.1, 3.2, 3.3, 3.12 and 3.16 or claims based on fraud. The aggregate liability of the Seller Indemnifying Parties under Section 8.2(a) shall not exceed the Purchase Price.

<p style="text-align:center">33</p>

(j)    In addition to and without limiting the obligations of the Seller Indemnifying Parties contained in this <u>Section 8.2</u> and without any application against the Seller Cap, the Purchaser Claimants shall be permitted to claim pursuant to <u>Section 8.2(a)</u>, and the Seller Indemnifying Parties shall indemnify and hold harmless Purchaser Claimants against, any Damages, whether or not involving a third party claim, that Purchaser Claimants incurred directly or indirectly by reason of or attributable to the inaccuracy or breach of any representations or warranties contained in <u>Section 3.11</u> hereof, up to a maximum additional aggregate liability of $5,000,000 (the "<u>Additional Environmental Cap</u>"). At the time Purchaser makes a claim, Purchaser shall notify (which election shall not be reversible) the Seller Indemnifying Parties in writing as to whether its claim for Damages pursuant to <u>Section 8.2(a)</u> will be applied against the Seller Cap or against the Additional Environmental Cap, or both (in which case identifying the amount applied against each). In the event claims for Damages are made against the Additional Environmental Cap, Purchaser and the Seller Indemnifying Parties shall each be responsible for 50% of the first $1,000,000 of any Damages claimed against the Additional Environmental Cap. For clarity, (i) the Seller Indemnifying Parties maximum liability under the Additional Environmental Cap, after considering the foregoing sharing of Damages up to $1,000,000, shall be $4,500,000, (ii) Purchase Claimants may choose, at their discretion, to make a claim for Damages either against the Seller Cap, the Additional Environmental Cap, or both, (iii) any claims made against the Additional Environmental Cap shall in no way apply against, reduce or limit in any way the Seller Cap and any claims made against the Seller Cap shall in no way apply against, reduce or limit in any way the Additional Environmental Cap and (iv) the limitation contained in <u>Section 8.2(i)(a)</u> <u>(i)</u> shall not apply to claims made against the Additional Environmental Cap.

8.3    Indemnification by Purchaser. From and after the Closing, Purchaser shall indemnify and hold Parent and Seller, their Affiliates and their respective directors, officers, employees, shareholders, members, partners, agents, successors and assigns (collectively "<u>Seller Claimants</u>" and individually a "<u>Seller Claimant</u>") harmless against any Damages, whether or not involving a third party claim, that the Seller Claimants incurred directly or indirectly by reason of or attributable to:

(a)    the inaccuracy or breach of any representation or warranty of Purchaser contained in <u>Article IV</u> of this Agreement;

(b)    any failure by Purchaser to perform or comply with any covenant or obligation of Purchaser contained in this Agreement; and

(c)    any brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by any Person with Purchaser (or any Person acting on its behalf) in connection with the transactions contemplated hereby.

(d)    Purchaser shall not be required to indemnify a Seller Claimant under clause (a) of this <u>Section 8.3</u> unless (i) the Damages for an individual claim (or series of related claims so substantially related as to effectively constitute one claim) exceeds $50,000 and (ii) the aggregate cumulative sum of all Damages for which indemnity would otherwise be due under clause (a) of this <u>Section 8.3</u> exceeds $1,000,000 (the "<u>Purchaser Basket</u>"), in which case Purchaser shall be responsible for the full amount of such Damages, including the Purchaser Basket. In addition, Purchaser's aggregate maximum liability for indemnification under clause (a) of this <u>Section 8.3</u> shall be $10,000,000. The limitations set forth in the immediately two preceding sentences shall not apply to claims arising from any inaccuracy or breach of the representations or warranties contained in <u>Section 4.2</u> or claims based on fraud.

8.4    <u>Terms and Conditions of Indemnification</u>. The respective obligations and liabilities of the Seller and Parent, on the one hand, and Purchaser, on the other, to indemnify pursuant to this <u>Article VIII</u> (a "<u>Claim</u>") shall be subject to the following additional terms and conditions:

(a)    A Party seeking indemnification (the "<u>Claimant</u>"), shall promptly notify the Party or Parties (the "<u>Indemnitor</u>") required to provide indemnification hereunder of any Claim but in no event later than twenty (20) days after becoming aware of the basis for such Claim; <u>provided</u>, <u>however</u>, that the failure of the Claimant to give the Indemnitor notice within the specified number of days shall not relieve the Indemnitor of any of its obligations hereunder except to the extent such failure actually prejudices such Indemnitor's ability successfully to defend the claim, action, suit or proceeding giving rise to the Claim.

Exhibit 23 Case: 18-31177    Document: 00515297113    Page: 657    Date Filed: 02/04/2020 Page 100

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 658 of 1003
Case 2:10-md-02179-CJB-DPC   Document 26193-3   Filed 02/05/2019   Page 756 of 1003

(b)        The Indemnitor shall have the right to undertake, by counsel or other representatives of its own choosing reasonably satisfactory to the Claimant, the defense, compromise and settlement of any third party claim ("Third Party Claim"). If the defense of a Third Party Claim is so tendered to the Indemnitor and within twenty (20) days thereafter the Indemnitor accepts such tender by written notice to the Claimant, then upon acceptance of such tender, the Indemnitor shall, unless otherwise expressly agreed in writing by the Claimant, be deemed to have agreed to indemnify the Claimant with respect to such Third Party Claim.

(c)        If the Indemnitor elects not to undertake such defense, or within twenty (20) days after notice of any

34

such Claim from the Claimant shall fail to defend or to reasonably and diligently contest, defend or litigate the Third Party Claim, the Claimant shall have the right to undertake the defense, compromise or settlement of such Claim, by counsel or other representatives of its own choosing, on behalf of and for the account and risk of the Indemnitor.

(d)        Notwithstanding anything in this Section 8.4 to the contrary, (i) the Indemnitor shall not, without the Claimant's written consent, settle or compromise any claim or consent to entry of any judgment unless such compromise or settlement includes as an unconditional term thereof the giving by the claiming Party or the plaintiff to the Claimant and its Affiliates of a full and unconditional release from all Liability in respect of such Claim and such compromise or settlement does not otherwise require Claimant or its Affiliates to pay any monetary damages or otherwise restrict Claimant in any material way, and (ii) if the Indemnitor undertakes defense of any Claim, the Claimant by counsel or other representative of its own choosing and at its sole cost and expense, shall have the right to consult with the Indemnitor and its counsel or other representatives concerning such Claim and the Indemnitor and the Claimant and their respective counsel or other representatives shall cooperate and keep Claimant informed with respect to such Claim, subject to the execution and delivery of a mutually satisfactory joint defense agreement provided, that if in the reasonable opinion of counsel for the Claimant, there is a conflict of interest between the Indemnitor and the Claimant (other than the conflict arising from the Indemnitor's obligations to the Claimant under this Article VIII) in connection with a Third Party Claim, such Claimant may engage its own counsel to represent it and all other affected Claimants in the defense of such Third Party Claim, and the Indemnitor shall be responsible for the reasonable fees and expenses of such one (1) counsel for all such affected Claimants in connection with such defense.

(e)        Notwithstanding anything contained in this Article VIII to the contrary, an Indemnitor shall not be entitled to assume any defense of a Third Party Claim hereunder if (i) the claim for indemnification is with respect to a criminal proceeding, action, indictment, allegation or investigation, (ii) the Claimant has been advised by counsel that a reasonable likelihood exists of a conflict of interest between the Indemnitor and the Claimant with respect to such Third Party Claim or (iii) if there is a reasonable probability that any Third Party Claim may materially and adversely affect the Claimant other than as a result of money damages or other money payments, including where equitable relief is sought or where the Third Party Claim involves a material customer or material supplier of the Claimant.

(f)        For purposes of this Article VIII, the terms "material," "Material Adverse Effect," or similar words, to the extent they appear in any representation, warranty, covenant or other provision of this Agreement, shall be disregarded for purposes of determining (i) whether there has been a breach and (ii) the amount of any Damages. For purposes of indemnification claims pursuant to this Article VIII, in determining (i) whether there has been a breach and (ii) the amount of any Damages, the representations and warranties contained in Section 3.13(d) of this Agreement shall be deemed to have been made without any qualifications as to "knowledge."

(g)        With respect to an indemnity notice that is delivered by a Claimant, upon final resolution or acceptance of the amount of Damages subject to such indemnity notice, Parent, Seller and/or Purchaser, as appropriate, shall promptly pay the amount of such Damages to the Claimant.

(h)        Any Remedial Work performed in connection with this Agreement which a Purchaser Claimant makes a Claim shall be performed by one or more professionally licensed environmental contractors or consulting engineers mutually acceptable to the Parties, such acceptance not to be unreasonably withheld, and Purchaser and Parent will consult with each other regarding the scope and implementation of any Remedial Work; provided, that this Section 8.4(h) shall not require Purchaser to adopt any proposals presented by Parent.

8.5   Indemnification Payments Constitute Adjustments to Purchase Price. Any indemnification payment hereunder shall constitute an adjustment of the Purchase Price for Tax purposes, and no Party shall take a position inconsistent therewith.

8.6   No Double Recovery. Notwithstanding anything in this Agreement to the contrary, no Person shall be entitled to indemnification under any provision of this Agreement for any amount to the extent such Person or its Affiliates have received a Purchase Price Adjustment pursuant to Section 2.4 or have been indemnified or reimbursed by, or received an offset benefit actually exercised in respect of, any insurance company or other third party (net of any applicable deductibles or similar costs or payments and costs of recovery or collection thereof) or any Tax benefit related thereto. In addition, if at any time following the payment of an indemnification obligation, the Claimant receives insurance

proceeds or other third party recoveries (including offset rights exercised or Tax benefits) in respect of the related Damages, the value of any such amount will promptly be repaid by Claimant to the Indemnitor (net of any applicable deductibles or similar costs or payments and costs of recovery or collection thereof and any Taxes imposed thereon). Each Claimant shall (and Parent shall cause each Company after the Closing Date to) use commercially reasonable efforts to pursue all legal rights and remedies available to it, including obtaining insurance proceeds or Tax benefits, in order to mitigate the losses for which indemnification is provided to such Claimant under this Article VIII.

35

8.7   _Exclusivity_. Except as otherwise provided in this Agreement, after the Closing, the indemnities set forth in this Article VIII will be the exclusive remedies of the Purchaser Claimants and Seller Claimants for any misrepresentation, breach of warranty or nonfulfillment or failure to be performed of any covenant or agreement contained in this Agreement or an Ancillary Agreement and/or otherwise related to the transactions contemplated by this Agreement for the matters specifically listed in Article VIII as being subject to indemnification, and the Parties will not be entitled to a rescission of this Agreement or to any further indemnification rights, damages or claims of any nature whatsoever in respect thereof, all of which the Parties hereto hereby waive; _provided_, _however_, that the limitations herein will not limit or restrict any right to recovery for claims based on fraud. Notwithstanding anything in this Agreement to the contrary, the Seller Indemnifying Parties' maximum aggregate liability to the Purchaser Claimants with respect to Damages incurred as a result of Environmental Liabilities other than with respect to the Non-Transferred Properties shall be $14,500,000; _provided_, _however_, that the limitations herein will not limit or restrict any right to recovery for claims based on fraud.

## ARTICLE IX
## GENERAL PROVISIONS

9.1   _Notices_. All notices and other communications hereunder shall be in writing and shall be deemed given or made (a) when delivered personally (by courier service or otherwise), (b) when sent via facsimile (receipt confirmed) or (c) when actually received if sent by other commercial delivery service, to the Parties at the following addresses or facsimile numbers (or at such other address or facsimile numbers for a Party as shall be specified by like notice):

if to Parent or Seller, to:

> Mueller Water Products, Inc.
> 1200 Abernathy Road N.E., Suite 1200
> Atlanta GA 30328
> Attention: General Counsel
> Telephone: (770) 206-4200
> Facsimile: (770) 206-4260

with a copy to:

> Bryan Cave LLP
> 1201 West Peachtree Street
> Fourteenth Floor
> Atlanta, GA 30309
> Attention: Todd Wade, Esq.
> Telephone: (404) 572-6694
> Facsimile: (404) 572-6999

if to the Purchaser to:

> USP Holdings Inc.
> c/o Wynnchurch Capital, Ltd.
> 6250 N. River Road
> Suite 10-100
> Rosemont, IL 60018
> Attention: Terry Theodore and Chris O'Brien
> Telephone: (847) 604-6100
> Facsimile: (847) 604-6118

with a copy to:

> Foley & Lardner LLP
> 500 Woodward Ave, Suite 2700
> Detroit, MI 48226

Exhibit Case: 18-31177    Document: 00515297113    Page: 661    Date Filed: 02/04/2020 0100

Case 2:10-md-02179-CJB-DPC    Document 26293-3    Filed 02/05/20    Page 662 of 1003
Case 2:10-md-02179-CJB-DCW    Document 26193-3    Filed 12/20/2019    Page 796 of 1003

Attention: Thomas B. Spillane and Daljit S. Doogal
Telephone: (313) 234-7100
Facsimile: (313) 234-2800

36

9.2    Interpretation. When a reference is made in this Agreement to an Exhibit or Schedule, such reference shall be to an Exhibit or Schedule to this Agreement unless otherwise indicated. When a reference is made in this Agreement to Sections or subsections, such reference shall be to a Section or subsection of this Agreement. Unless otherwise indicated the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation" unless preceded by a negative predicate. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. When reference is made herein to "the business of" an entity, such reference shall be deemed to include the business of all direct and indirect subsidiaries of such entity. The words "herein" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision, and to any certificates delivered pursuant hereto. The headings contained in this Agreement are for reference purposes only and shall not modify define, limit, expand or otherwise affect in any way the meaning or interpretation of this Agreement. The use of any gender herein shall be deemed to be or include the other genders and the use of the singular herein shall be deemed to be or include the plural (and vice versa), wherever appropriate. Reference to the subsidiaries of an entity shall be deemed to include all direct and indirect subsidiaries of such entity.

9.3    Counterparts; Facsimile Signatures. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Party, it being understood that all Parties need not sign the same counterpart. Delivery by facsimile to counsel for the other Party of a counterpart executed by a Party shall be deemed to meet the requirements of the previous sentence.

9.4    Entire Agreement; Third Party Beneficiaries. This Agreement, the Ancillary Agreements, and the other documents and instruments and other agreements among the Parties as contemplated by or referred to herein, including the Exhibits and Schedules hereto (a) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof; and (b) are not intended to and shall not confer upon any other person other than the Parties to this Agreement, the Ancillary Agreements or such other documents, instruments and agreements any legal or equitable rights or remedies hereunder.

9.5    Severability. In the event that any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the Parties. The Parties further agree to replace such void or unenforceable provisions of this Agreement with a valid and enforceable provision that will achieve, to the greatest extent possible, the economic, business and other purposes of such void or unenforceable provision.

9.6    Other Remedies; Specific Performance. Any and all remedies herein expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy. The Parties agree that irreparable damage would occur in the event that the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity.

9.7    Governing Law. This Agreement shall be governed by and construed in accordance with the law of the State of Delaware regardless of the law that might otherwise govern under applicable principles of conflicts of law thereof.

9.8    Rules of Construction. The Parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the Party drafting such agreement or document.

9.9    Assignment. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Parties. Subject to the first sentence of this Section 9.9, this

Agreement shall be binding upon, inure to the benefit of and be enforceable by the Parties and their respective legal representatives, successors and permitted assigns. Notwithstanding the foregoing, Purchaser shall be permitted to transfer and/or assign its rights pursuant to Section 8.2(h) to any transferee of all or substantially all of the assets of either or both Companies or any transferee of all of the ownership interest in either or both Companies, and such future assignees shall also have the right to transfer and/or assign such rights (including the right to transfer and/or assign) to any transferee of all or substantially all of the assets of either or both Companies or any transferee of all of the ownership interest in either or both Companies.

9.10   Amendment. This Agreement may be amended, modified or supplemented by the Parties at any time only by

37

execution of an instrument in writing signed by the Parties.

9.11    Extension; Waiver. At any time prior to the Closing, any Party may, to the extent legally allowed, (a) extend the time for the performance of any of the obligations or other acts of the other Parties, (b) waive any inaccuracies in the representations and warranties made to such Party contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions for the benefit of such Party contained herein. Any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party delivered to the other Party. Delay in exercising any right under this Agreement shall not constitute a waiver of such right. Waiver by any Party of any breach of or failure to comply with any provision of this Agreement by the other Party shall not be construed as, or constitute, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement.

9.12    Dispute Resolution.

(a)    Except as otherwise provided herein, in the event of a dispute hereunder or relating to the transactions contemplated hereby, including under or with respect to any of the agreements and instruments to be executed and delivered pursuant hereto, arbitration will be the sole and exclusive method of resolving the dispute, except that a Party may seek a preliminary injunction, temporary restraining order, or other preliminary judicial relief if, in its judgment, the action is necessary to avoid irreparable damage or harm.

(b)    The arbitrator will consist of any Person who is mutually acceptable to the Parties to the dispute. However, if the Parties are unable to agree on a single arbitrator, an arbitration panel of three arbitrators will be selected as provided below. Each Party (Parent and Seller, on the one hand, and Purchaser on the other hand), shall select one arbitrator, within ten (10) days from the date one Party advises the other Party that it cannot agree on a single arbitrator, and the third arbitrator shall be selected by the two chosen by the Parties within ten (10) days of such two arbitrators being chosen. Every arbitrator must be independent (not a party to this Agreement or a lawyer or relative to a Party or an agent, officer, director, employee, shareholder or affiliate of a Party to or a relative of any of those persons) without any economic or financial interest of any kind in the outcome of the arbitration. Each arbitrator's conduct will be governed by the rules of the American Arbitration Association. The arbitration will be conducted in New York, New York, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The arbitrator or arbitration panel will use reasonable efforts to cause the arbitration to be concluded as soon as practicable. The arbitrators shall not be empowered to award punitive damages.

(c)    The arbitrator or a majority of the arbitration panel shall render its decision in writing within thirty (30) days after the conclusion of the hearing. The decision of the arbitrator or arbitration panel will be final, binding and conclusive as to all the Parties, absent fraud or manifest error, and the decision of the arbitrator or arbitration panel will not be subject to appeal, review or re-examination, except for willful misconduct by an arbitrator that prejudices the rights of any Party to the arbitration.

(d)    The prevailing Party in any dispute shall be entitled to recover from the other Party all of its costs and expenses incurred in connection with the enforcement of its rights hereunder or thereunder, including reasonable attorneys' fees (including those of in house counsel) and costs incurred before and at arbitration, at any other proceeding, at all tribunal levels and whether or not suit or any other proceeding is brought.

9.13    Currency and Payment Obligations. Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein means U.S. dollars and all payments hereunder shall be made in U.S. dollars. If any payment is required to be made or other action (including the giving of notice) is required to be taken pursuant to this Agreement on a day which is not a Business Day, then such payment or action shall be considered to have been made or taken in compliance with this Agreement if made or taken on the next succeeding Business Day.

**[Remainder of Page Intentionally Left Blank]**

Exhibit Case: 18-31177    Document: 00515297113    Page: 665    Date Filed: 02/04/2020 0100

Case 2:10-md-02179-CJB-DPC    Document 26293-3    Filed 02/05/20    Page 666 of 1003
Case 2:10-md-02179-CJB-DCW    Document 26193-3    Filed 12/12/2019    Page 636 of 1003

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the date first written above.

<div style="margin-left:40%">

Parent:


MUELLER WATER PRODUCTS, INC.

By:    /s/ Gregory E. Hyland
      Name:    Gregory E. Hyland
      Title:    Chairman, President and CEO


Seller:


MUELLER GROUP, LLC

By:    /s/ Gregory E. Hyland
      Name:    Gregory E. Hyland
      Title:    Chairman, President and CEO


Purchaser:


USP HOLDINGS INC.

By:    /s/ Christopher P. O'Brien
      Name:    Christopher P. O'Brien
      Title:    Vice President

</div>

39

**EXHIBIT A**
**CERTAIN DEFINITIONS**

"Accounting Principles" means GAAP as applied in accordance with the accounting methodologies, policies and procedures used by Parent in preparing Parent's financial statements, consistently applied (provided that such methodologies, policies and procedures comply with GAAP).

"Acquisition Transaction" has the meaning set forth in Section 5.15.

"Action or Proceeding" means any claim, action, suit, complaint, litigation, proceeding, investigation, mediation, arbitration or other procedure by or before any Person.

"Additional Environmental Cap" has the meaning set forth in Section 8.2(i).

"Affiliate" means, as applied to any Person, any other Person Directly or Indirectly controlling, controlled by or under direct or indirect common control with, such Person. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, Directly or Indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Americans with Disabilities Act" means Americans With Disabilities Act of 1990, 42 U.S.C. § 12101 et seq.

"Ancillary Agreements" means, collectively, the Confidentiality Agreement and all other agreements to be entered into in connection with the transactions contemplated by this Agreement.

"Assets and Properties" of any Person means all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether absolute, accrued, contingent, fixed or otherwise and wherever situated), including the goodwill related thereto, owned and controlled by such Person, which may include (without limitation) accounts and notes receivable, chattel paper, documents owned and controlled by such Person (including those involving Proprietary Information), instruments, Licenses, Contracts, Software, general intangibles, assets, real estate, equipment, inventory, goods and Intellectual Property.

"Bahrain Letter of Credit" means the Irrevocable Standby Letter of Credit No. 3103247, dated February 15, 2011, issued by BNP Paribas Manama in favor of the Bahrain Electricity & Water Authority, further amended by that certain Amendment to a Documentary Credit, dated March 31, 2011.

"Business" means the research and development, design, manufacture, fabrication, production, marketing, distribution, supply and/or sale of ductile iron pipe products (including fabricated pipe, coated pipe and lined pipe products) and fittings, joint restraint products and other ductile iron products for use primarily in drinking water and wastewater infrastructure construction and ancillary activities related to the foregoing.

"Business Days" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York, or Atlanta, Georgia are required or authorized by law to be closed.

"Business Employees" has the meaning set forth in Section 5.6.

"Business Licenses" means all Licenses, (including applications therefore), which are used or held for use either by the Company or Parent in connection with or are necessary for the conduct of the business of either the Company or Parent.

"Cash and Cash Equivalents" means, with respect to the Company and Parent taken as a whole, (i) all cash, demand deposits, short-term, highly liquid investments and other cash equivalents, that are repayable on demand and

freely remittable as of the Closing Date into a known amount of cash, <u>less</u> (ii) the aggregate amount of any outstanding checks, drafts or wires as of the Closing Date.

"<u>CERCLA</u>" has the meaning set forth below, under "<u>Environmental Laws</u>."

"<u>Charter Documents</u>" has the meaning set forth in <u>Section 3.4(a)</u>.

A-1

"Claim" has the meaning set forth in Section 8.4.

"Claimant" has the meaning set forth in Section 8.4(a).

"Closing" has the meaning set forth in Section 2.2.

"Closing Balance Sheet" has the meaning set forth in Section 2.4(c)(i).

"Closing Date" has the meaning set forth in Section 2.2.

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Company" and "Companies" each has the meaning set forth in the Recitals.

"Company Closing Certificate" has the meaning set forth in Section 6.3(a).

"Company Employees" has the meaning set forth in Section 5.6.

"Company-Licensed Intellectual Property" means all Intellectual Property that is owned or controlled by someone other than either Company and then licensed to a Company and used or held for use in, or material to the conduct of, the business of such Company.

"Company-Owned Intellectual Property" means any Intellectual Property that is owned and controlled by either Company (or both Companies).

"Company Plans" has the meaning set forth in Section 3.13(a).

"Company-Sponsored Plans" has the meaning set forth in Section 3.13(a).

"Company Transaction Expenses" means all fees and expenses of the Companies (or for which any Company is liable) for legal, accounting, investment banking and other professional counsel in connection with the transactions contemplated hereby.

"Company Units" has the meaning set forth in the Recitals.

"Competitor" means any Person that now or hereafter engages in any aspect of the Business.

"Confidential Information" means information and materials not commonly known by or available to the public that the Companies and Seller treat as confidential but that does not qualify as a Trade Secret and includes information and materials that the Companies and Seller are under a duty to a third party to maintain as confidential or use for limited purposes.

"Confidentiality Agreement" means that Confidentiality Agreement, dated August 17, 2011, by and between Parent and Wynnchurch Capital, Ltd.

"Contract" means any agreement, lease, license, purchase order, evidence of Indebtedness, mortgage, indenture, security agreement or other contract or arrangement (whether written or oral) setting forth a legal obligation or right of a party thereto with respect to the subject matter thereof (including all amendments, supplements thereto, restatements thereof and consents, waivers and notices thereunder which affect the rights and/or obligations of any of the parties thereto).

"Copyrights" has the meaning set forth below, under "Intellectual Property".

Exhibit 23 Case: 18-31177 Document: 00515297113 Page: 669 Date Filed: 02/04/2020 12/12/2019 Page 1 of 100

Case 2:10-md-02179-CJB-DPC Document 26293-3 Filed 02/05/20 Page 670 of 1003
Case 2:10-md-02179-CJB-DCW Document 26193-3 Filed 12/15/2019 Page 97 of 103

"Damages" means and shall include (i) all debts, liabilities and obligations; (ii) all losses, damages, judgments, awards, settlements, costs and expenses (including, without limitation, interest (including prejudgment interest in any litigated matter), and costs of investigation, assessment, removal and remediation of Releases, Hazardous Materials or any other environmental conditions, penalties, court costs and reasonable legal and expert witness fees and expenses); and (iii) all demands, claims, suits, actions, costs of investigation, causes of action, proceedings and assessments, whether or not ultimately determined to be valid; provided, however, that the foregoing shall not be construed to preclude recovery by the Claimant in respect of Damages directly incurred from Claims by third parties.

"Directly or Indirectly" means as an individual, partner, shareholder, member, creditor, director, officer, principal, agent,

A-2

Employee, trustee, consultant, advisor or in any other relationship or capacity.

"DOL" means the United States Department of Labor.

"Domain Name" has the meaning set forth below, under "Intellectual Property".

"Employee" means any current or former employee, officer or director of a Company.

"Employment Agreement" has the meaning set forth in Section 3.14(d).

"Encumbrance" means any mortgage, pledge, security interest, lien, charge, hypothecation, security agreement, right of first refusal or other encumbrance, of any kind under any agreement, arrangement, commitment or understanding, whether written or oral, or any conditional sale Contract, title retention Contract or other Contract to give any of the foregoing.

"Environment" means any surface or subsurface physical medium or natural resource, including, air, land, soil, surface waters, ground waters, stream and river sediments.

"Environmental Disclosure Schedule" means, (a) for purposes of Section 6.3(a) and Section 7.1(d) hereof, both Section 3.11(A) and Section 3.11(B) of the Seller Disclosure Schedule and (b) for purposes of Article VIII hereof, only Section 3.11(B) of the Seller Disclosure Schedule. For clarity, when determining for purposes of Article VIII hereof both (i) whether there has been a breach and (ii) the amount of any Damages, "Environmental Disclosure Schedule" shall mean only Section 3.11(B) of the Seller Disclosure Schedule.

"Environmental Laws" means any Law or rule of common law (including, without limitation, nuisance and trespass claims) of any Governmental Entity, relating to human health, occupational safety, any Hazardous Material, natural resources or the environment (including, without limitation, ground, air, water or noise pollution or contamination, and underground or above-ground storage tanks), and shall include, without limitation, the Solid Waste Disposal Act, 42 U.S.C. § 6901 et seq.; the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq. ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"); the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300f et seq., and their state equivalents or analogs, and any other state or federal environmental statutes, and all rules, regulations, orders and decrees under any of the foregoing, as any of the foregoing now exist.

"Environmental Liabilities" means any Liabilities, including costs of Remedial Work of any matter (including those related to Third Party Claims) relating to the Environment of whatever kind or nature by any Person, which are incurred as a result of (A) the presence of or Release into the ambient air, surface water, groundwater, land surface or subsurface strata of any Hazardous Materials, (B) the transportation, treatment, storage or disposal of Hazardous Materials, or (C) the violation of any Environmental Laws. Notwithstanding the preceding, however, "Hazardous Material" will not mean or include any such Hazardous Material (y) used, generated, manufactured, stored, disposed of or otherwise handled in normal quantities in the ordinary course of business in compliance with, and so as not to create an Liability for either Company under, all applicable Environmental Laws as in existence on the date of this Agreement or (z) that in their relevant concentrations are demonstrated to be solely attributable to naturally occurring background concentrations in any ambient air, surface water, groundwater, land surface or subsurface strata.

"Environmental Permits" has the meaning set forth in Section 3.11(c).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any entity that is a member of a controlled group with, under common control with, or otherwise required to be aggregated with Parent pursuant to Sections 414(b), (c), (m) or (o) of the Code.

"Estimated Closing Balance Sheet" has the meaning set forth in Section 2.4(a).

"Estimated Closing Statement" has the meaning set forth in Section 24(a).

"Estimated Net Indebtedness" means a good faith estimate of Net Indebtedness as mutually agreed to by Purchaser and Parent prior to the Closing.

A-3

"Estimated Net Working Capital" means a good faith estimate of Net Working Capital as mutually agreed to by Purchaser and Parent prior to the Closing.

"Exchange Act" means Securities Exchange Act of 1934, as amended.

"Executive Payment" means any bonus, change of control payment or other amount (including all withholding and other payroll Taxes payable by the employee or a Company) fully earned by, and due and payable to, any employee by any Company (or Affiliate thereof) or Purchaser (i) at or prior to the Closing or (ii) solely by reason of the consummation of the transactions contemplated by this Agreement (but specifically excluding any double trigger change in control payments where the second trigger is the termination of employment after the Closing Date), including any retention or other amount (including all withholding and other payroll Taxes payable by the employee or a Company) fully earned by, and due and payable to, any employee by any Company or Purchaser under the Special Incentive Award Program for Selected Employees of U.S. Pipe.

"Exercise Notice" has the meaning set forth in Section 5.19(c).

"Exercise Period" has the meaning set forth in Section 5.19(c).

"Fast Fabricators" has the meaning set forth in the Recitals.

"Fabricators LLC Agreement" has the meaning set forth in Section 3.1(b).

"Fabricators Units" has the meaning set forth in Section 3.2(a).

"Financial Statements" has the meaning set forth in Section 3.7(a).

"GAAP" means accounting principles generally accepted in the United States of America as of the date of this Agreement is applied by the Companies.

"General Survival Date" has the meaning set forth in Section 8.1.

"Governmental Entity" means any United States federal, state or local and any foreign governmental, regulatory or administrative authority, agency, commission, legislature, department, bureau, court, tribunal or arbitral body.

"Hazardous Material" means any material or substance, whether solid, liquid or gaseous: (i) which is listed, regulated or defined as a "hazardous substance," "hazardous waste," "hazardous material," "regulated substance," "toxic substance," "contaminant," "pollutant" or "solid waste," or otherwise classified or regulated as hazardous or toxic, in or pursuant to any Environmental Laws, or for which a Person may be subject to Liability under any Environmental Laws; (ii) which is or contains asbestos, lead-based paint, radon, any polychlorinated biphenyl, polybrominated biphenyl ether, urea formaldehyde foam insulation, explosive or radioactive material, motor fuel, or petroleum (including, without limitation, petroleum products, by-products, constituents or other petroleum hydrocarbons), fungi, bacterial or viral matter which reproduces through the release of spores or the splitting of cells or other means, (including without limitation, mold, toxic or mycotoxin spores); or (iii) which causes a contamination or nuisance on, in, at, under, around or affecting any property or a hazard, or threat of the same, to public health, human health or the environment.

"HSR Act" has the meaning set forth in Section 5.2(a).

"Indebtedness" means with respect to the Companies (i) all obligations for borrowed money or with respect to deposits or advances of any kind, (ii) all obligations evidenced by bonds, debentures, debt securities, notes or similar instruments, (iii) all obligations upon which interest is customarily paid, (iv) all obligations for purchase money financing, including obligations under conditional sale or other title retention agreements or issued or assumed in respect of deferred purchase price, relating to assets purchased by a Company, (v) all guarantees of any obligation of the type described in the clauses hereof of any other Person, (vi) all interest rate protection, foreign currency exchange or other interest or exchange rate hedging agreements, (vii) Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise to be secured by) any Encumbrances on property owned or acquired by such

Person, (viii) all obligations under leases required to be (or which have been) capitalized in accordance with GAAP, (ix) any distributions, loans or advances payable to any Company's Affiliates or shareholders as of the Closing, (x) accrued interest and premiums on any of the foregoing, (xi) all obligations as an account party in respect of letters of credit and bankers' acceptances, (xii) all Company Transaction Expenses, and (xiii) all unpaid Executive Payments; provided that "Indebtedness" shall exclude (w) accounts payable incurred in the ordinary course of business, (x) any Liability related to potential product warranty or replacement claims that would not be required by GAAP to be disclosed on a

A-4

balance sheet and (y) amounts owed to an Affiliate that will be cancelled as of the Closing and (z) any other amount to the extent taken into account in calculating Net Working Capital.

"Indemnitor" has the meaning set forth in Section 8.4(a).

"Independent Auditor" has the meaning set forth in Section 2.4(c).

"Insurance Policies" has the meaning set forth in Section 3.15.

"Intellectual Property" means any or all of the following and all rights, arising out of or associated therewith, (a) all patents and patent applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof (collectively, "Patents"); (b) all underlying works of authorship copyrights, copyright registrations and applications therefore ("Copyrights"), (c) all internet uniform resource locators, domain names and social media account names or similar items ("Domain Names"); (d) trade names, logos, slogans, designs, trade dress, common law trademarks, service marks, and any registrations and applications therefor throughout the world (collectively, "Trademarks"); (e) all rights and benefits under any IP Licenses; (f) mask works and mask work registrations, know-how, discoveries, improvements, designs, shop and royalty rights, and rights and benefits under any employee covenants and agreements respecting intellectual property and non-competition; and (g) any similar or equivalent rights to any of the foregoing as recognized by law as an intangible, intellectual property right and interest.

"Inventory" means all inventory of any Company held at all locations (including in transit), including raw materials, packing materials, work-in-progress, finished goods, supplies, parts (including spare parts, service parts or repair parts) and similar items related thereto, used or held for use by any Company (including all such items that are in transit while owned by any Company, whether to or from any Company or a Third Party at any Company's direction) and including any such held by any other Person pursuant to a bailment arrangement or otherwise.

"IRS" means the United Stated Internal Revenue Service.

"IP Licenses" mean all licenses, sublicenses, authorizations and Contracts with respect to any Company-Licensed Intellectual Property that: (i) is incorporated in, is, or forms a part of any product or service of a Company, or (ii) is used by a Company.

"Knowledge" (including any derivation thereof such as "known" or "knowing") means the actual knowledge assuming due inquiry of (i) Christopher P. O'Brien and Terry M. Theodore, in the case of the Knowledge of Purchaser and (ii) Gregory E. Hyland, Paul Ciolino, Brad Overstreet, Bob Waggoner, Paul Pereira and Stacey Barry, in the case of the Knowledge of Seller.

"Law" means any U.S. federal, state, or local, and any foreign, statute, law, ordinance, regulation, rule, code, order, judgment, decree, or other requirement or rule of law, as in effect from time to time, including the Foreign Corrupt Practices Act of 1977.

"Leased Real Property" has the meaning set forth in Section 3.6(b).

"LLC Agreements" has the meaning set forth in Section 3.1(b).

"Liability" and "Liabilities" means with respect to any Person, any Indebtedness, liability, debt or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, matured or unmatured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is, or is required to be, accrued on the financial statements (if any) of such Person.

"License" means any license, permit, certificate of authority, authorization, approval, registration, franchise and similar consent granted or issued by any Governmental Entity.

"Licensed Assets and Properties" of any Person means all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether absolute, accrued, contingent, fixed or otherwise and wherever situated), including the goodwill related thereto, leased or licensed by such Person under Contract and used in the operation of the business of such Person, which may include (without limitation) real estate, Software, equipment, documents of another party (including those involving Proprietary Information owned and controlled by a third party), inventory, goods and Intellectual Property.

A-5

"Material Adverse Effect" means any fact, circumstance, event, change, effect or occurrence that, individually or in the aggregate with all other facts, circumstances, events, changes, effects or occurrences, has had or would be reasonably expected to have a material adverse effect on (a) the financial condition, business or results of operations of the Companies, taken as a whole, or (b) the ability of Parent or Seller to consummate the transactions contemplated by this Agreement; provided, however, that none of the following, and no effect arising out of or resulting from the following, shall be deemed to be a Material Adverse Effect and shall not be considered in determining whether there has occurred, or may, would or could occur, a Material Adverse Effect: (i) changes, events, occurrences or conditions generally affecting the economy, political climate or the credit, financial or capital markets in the United States or elsewhere in the world, including changes in interest rates, (ii) changes, events, occurrences or effects arising out of, resulting from or attributable to acts of terrorism, war (whether or not declared), or any escalation or worsening of such acts of terrorism or war (whether or not declared), pandemics, earthquakes, hurricanes, tornados, tsunamis or other natural disaster occurring in the United States or elsewhere in the world, (iii) changes, events, occurrences or effects arising out of, resulting from or attributable to changes or prospective changes in Law, GAAP or other accounting standards, regulations or principles or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, (iv) any general economic factors or conditions affecting the industries or markets in which a Company is involved generally, (v) changes as a result of any action or failure to take action, in each case, consented to or requested by Purchaser, (vi) events attributable to the announcement or performance of this Agreement or the consummation of the transactions contemplated hereby or the pendency of the Sale (including the loss or departure of officers or other employees of a Company, or the termination, reduction (or potential reduction) or any other negative effect (or potential negative effect) on a Company's relationships or agreements with any of its customers, suppliers or other business partners; provided, however, that, any fact, circumstance, event, change or occurrence referred to in clauses (i) through (iv) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or is reasonably expected to occur to the extent (but only to the extent) that such fact, circumstance, event, change or occurrence has had, or would reasonably be expected to have, a materially disproportionate impact on the financial condition, business or results of operations of the Companies, taken as a whole, relative to other participants in the industries in which a Company is involved (in which event the extent of such material adverse change may be taken into account in determining whether a Material Adverse Effect has occurred).

"Material Contract" has the meaning set forth in Section 3.17(b).

"Negotiation Period" has the meaning set forth in Section 5.19(d).

"Net Indebtedness" means the difference between the Companies' (i) Indebtedness and (ii) all Cash and Cash Equivalents.

"Net Indebtedness Target" means Zero Dollars ($0).

"Net Working Capital" means, as of 12:01 a.m. Atlanta, Georgia, time on the Closing Date, the amount equal to the aggregate current assets of the Companies minus the aggregate current liabilities of the Companies, each calculated in accordance with the Accounting Principles; provided, however, that for purposes of this definition (i) current assets shall exclude Cash and Cash Equivalents, accounts, notes or other amounts receivable from Affiliates of the Companies, and current and non-current Tax assets and (ii) current liabilities shall exclude Indebtedness, accounts payable to Affiliates of the Companies, current and non-current Tax Liabilities and current and non-current Liabilities related to workers' compensation.

"Net Working Capital Target" means One Hundred Million Dollars ($100,000,000).

"Non-Transferred Properties" has the meaning set forth in Section 8.2(h).

"Objection Letter" has the meaning set forth in Section 2.4(c)(ii).

"Objection Notice" has the meaning set forth in Section 2.5(b).

"Order" means any writ, judgment, decree, notice, ruling, opinion, stipulation, determination, injunction or similar order or award of any arbitrator, mediator or Governmental Entity (in each such case whether preliminary or final).

Exhibit 23 Case: 18-31177    Document: 00515297113    Page: 677    Date Filed: 02/04/2020 12/12/2019, 10)00

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 678 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26193-3   Filed 12/26/19   Page 895 of 1003

"Overpayment" has the meaning set forth in Section 5.8(b).

"Owned Real Property" has the meaning set forth in Section 3.6(b).

"Parent" has the meaning set forth in the Preamble.

"Parent Interested Tax Matter" has the meaning set forth in Section 5.8(f).

A-6

"Party" or "Parties" each has the meaning set forth in the Preamble.

"Patents" has the meaning set forth above, under "Intellectual Property."

"Permitted Encumbrance" means, in each case, so long as adequate reserves or accruals have been made in accordance with the Accounting Principles, (i) any Encumbrance for Taxes not yet due or delinquent or for Taxes being contested in good faith by appropriate proceedings and disclosed in the Seller Disclosure Schedule and (ii) any statutory Encumbrance arising in the ordinary course of business by operation of Law with respect to a Liability that is not yet due and payable and does not materially impair the value of the property subject to such Encumbrance or the use of such property in the conduct of the Business.

"Person" means any individual, corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization, entity or Governmental Entity.

"Personal Property Leases" means (i) the leases or subleases of tangible personal property described in Section 3.6(b) of the Seller Disclosure Schedule as to which the Company or Parent is the lessor or sublessor, and (ii) the leases of tangible personal property described in Section 3.6(b) of the Seller Disclosure Schedule as to which the Company or Parent is the lessee or sublessee, together with any options to purchase the underlying property.

"Post-2006 WC Claims" has the meaning set forth in Section 5.12(a).

"Pre-Closing Tax" means (i) any Tax of any Company, Parent, or any Affiliate thereof attributable to the period on or before the Closing Date (including any Tax for the portion of any Straddle Period ending on or before the Closing Date as determined in Section 5.8(c)), (ii) any Tax of any other Person arising by reason of a Company being a member of any "affiliated group" (within the meaning of Code § 1504(a)) on or prior to the Closing Date, including pursuant to Treasury Regulations § 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision of state, local or foreign law), and (iii) any Tax of any Person imposed on any Company as a transferee or successor, by contract or pursuant to any law, rule, or regulation, which Taxes relate to an event or transaction occurring before the Closing Date.

"Pre-Closing WC Claims" has the meaning set forth in Section 5.12(a).

"Pre-2006 WC Claims" has the meaning set forth in Section 5.12(a).

"Proprietary Information" means all "Confidential Information" and "Trade Secrets."

"Purchase Price" has the meaning set forth in Section 2.3.

"Purchaser" has the meaning set forth in the Preamble.

"Purchaser Claimant" and "Purchaser Claimants" have the meanings ascribed to them in Section 8.2.

"Purchaser Closing Certificate" has the meaning set forth in Section 6.2(b).

"Real Property" has the meaning set forth in Section 3.6(b).

"Real Property Leases" means (i) the leases and subleases of real property with respect to the Company's or Parent's facilities which are described in Section 3.6(a) of the Seller Disclosure Schedule as to which the Company or Parent is the lessor or sublessor, and (ii) the leases and subleases of real property described in Section 3.6(a) of the Seller Disclosure Schedule as to which the Company or Parent is the lessee or sublessee, together with any options to purchase the underlying property and leasehold improvements thereon, and in each case all other rights, subleases, licenses, permits and profits appurtenant to or related to such leases and subleases.

"Recent Balance Sheet" has the meaning set forth in Section 3.7(a).

Exhibit 23 Case: 18-31177    Document: 00515297113    Page: 679    Date Filed: 02/04/2020 of 100

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 680 of 1003
Case 2:10-md-02179-CJB-DCW   Document 26193-3   Filed 02/05/2019   Page 97 of 103

"Related Party Agreements" has the meaning set forth in Section 6.3(m).

"Release" means any past or present release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, depositing, escaping, injecting, leaching, dispersing, seeping, migrating, filtering, dumping, disposing, injecting or other releasing into the indoor or outdoor environment (including, without limitation, ambient air, surface water, groundwater, and surface or

A-7

subsurface strata) or into or out of any property, whether intentional or unintentional, including, without limitation, the movement of Hazardous Material on, in, under, above, about, through or into the air, soil, surface water, or groundwater.

"Remedial Work" has the meaning set forth in Section 8.2(h).

"Response Period" has the meaning set forth in Section 2.5(b).

"Restricted Business" means (i) the manufacture in North America (ii) or the manufacture other than in North America if the sale of such manufactured product by or on behalf of Parent or its Affiliates occurs in North America, of ductile iron pipe and joints and fittings that connect ductile iron pipe for the transmission and distribution of potable, reuse, waste and industrial water. Notwithstanding the foregoing, "Restricted Business" shall not include the manufacture or sale of any product categories that Anvil International, LLC or Mueller Co. LLC sell as of the Closing Date, or the manufacture or sale of any grooved piping joints and fittings.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any equity interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such equity interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment. Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person to the extent not otherwise expressly permitted hereunder.

"Restricted Term" has the meaning set forth in Section 5.16(a).

"Restructuring" means the transactions set forth in Section 5.1(b) of the Seller Disclosure Schedule, which shall be undertaken in form and substance reasonably acceptable to Purchaser.

"Sale" has the meaning set forth in Section 2.1.

"Sale Notice" has the meaning set forth in Section 5.19(b).

"SARA" has the meaning set forth above, under "Environmental Laws."

"Schedule of Adjustments" has the meaning set forth in Section 2.4(c)(i).

"SEC" means the Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1934, as amended.

"Seller" has the meaning set forth in the Preamble.

"Seller Cap" has the meaning set forth in Section 8.2(i).

"Seller Claimant" and "Seller Claimants" have the meanings ascribed to them in Section 8.3.

"Seller Disclosure Schedule" has the meaning set forth in the Preamble to Article III.

"Seller Indemnifying Parties" has the meaning set forth in Section 8.2.

"Seller Group Plans" means, collectively, (i) all "employee benefit plans" (within the meaning of Section 3(3) of ERISA), (ii) all medical, dental, life insurance, equity bonus or other incentive compensation, disability, salary continuation, severance, retention, retirement, pension, deferred compensation, vacation, sick pay or paid time off plans, and (iii) any other plans, agreements, trust funds or arrangements (whether written or unwritten, insured or self-insured) (A) established, maintained, sponsored or contributed to (or with respect to which any obligation to contribute has been

Exhibit 23 Case: 18-31177     Document: 00515297113     Page: 681     Date Filed: 02/04/2020 12/12/2019 100

Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 682 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26133-3   Filed 12/12/2019   Page 396 of 993

undertaken) by Parent or any of its ERISA Affiliates on behalf of any Employee, officer, director, stockholder or other service provider of either Parent or any ERISA Affiliate (whether current, former or retired) or their beneficiaries, or (B) with respect to which either Parent or any of its ERISA Affiliates has or has had any obligation on behalf of any such Employee, officer, director, stockholder or other service provider or beneficiary.

A-8

Exhibit Case: 18-31177     Document: 00515297113     Page: 682     Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293-3   Filed 02/05/20   Page 683 of 1003
Case 2:10-md-02179-CJB-JCW   Document 26293-3   Filed 02/25/19   Page 330 of 1001

"Software" means all software code, including without limitation, computer programs, operating systems, applications, firmware, and software tools along with documentation related thereto.

"Straddle Period" has the meaning set forth in Section 5.8(c).

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited partnership, limited liability company, limited liability partnership, joint venture or other legal entity, a majority of the stock or other equity interests or voting power of which is owned, Directly or Indirectly, by such Person (either alone or through or together with any other subsidiary of such Person).

"Support Arrangements" has the meaning set forth in Section 5.11(a).

"Tax" means (i) any and all taxes, fees, levies, duties, tariffs, imposts and other charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any Taxing Authority, including, without limitation, taxes or other charges on or with respect to income, built-in gains, excessive net passive income, franchises, windfall or other profits, gross receipts, property, sales, use, unclaimed property, escheatment registration, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation or net worth, taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value-added or gains taxes, license, registration and documentation fees, and customs' duties, tariffs and similar charges; (ii) any Liability for the payment of any amounts of the type described in clause (i) as a result of being a member of an affiliated, combined, consolidated or unitary group for any taxable period; (iii) any Liability for the payment of amounts of the type described in clause (i) or clause (ii) as a result of being a transferee of, or a successor in interest to, any Person or as a result of an express or implied obligation to indemnify any Person; and (iv) in each instance such term shall include any interest, penalties or additions to tax attributable to any such amounts.

"Tax Return" means any return, statement, declaration, report or form (including any estimated tax reports and returns, withholding tax reports and returns and information reports and returns) or other information required to be filed with respect to any Tax.

"Taxing Authority" means any Governmental Entity or taxing authority responsible for the assessment, collection or administration of any Tax.

"Termination Date" has the meaning set forth in Section 7.1(e).

"Third Party Claims" has the meaning set forth in Section 8.2.

"Trademarks" has the meaning set forth above, under "Intellectual Property."

"Trade Secrets" means information and materials related to the business of either Company or Seller that is not commonly known by or available to the public and that: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by property means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts by the Companies and Seller to maintain its secrecy that are reasonable under the circumstances.

"U.S. Pipe" has the meaning set forth in the Recitals.

"U.S. Pipe LLC Agreement" has the meaning set forth in Section 3.1(b).

"U.S. Pipe Sale" has the meaning set forth in Section 5.19(a).

"U.S. Pipe Units" has the meaning set forth in the Preamble.

A-9

EXHIBIT 9

**Proposed Rules**
**For Challenging Determination that a Review for Potential "Moratoria Losses" is Required**

Under Section 5.10.3 and Exhibit 16 to the Settlement Agreement, the Settlement Program shall conduct a review and exclude any (expressly reserved) claims for "Moratoria Losses" in the event that: **(a)** The Claims Administrator determines that the BEL Claiming Entity or IEL Claiming Job Employer falls with the NAICS codes and descriptions marked with an "x" in Section I of "Industry Types Subject to Review by Claims Administrator for Potential Moratoria Losses" in Exhibit 19; or **(b)** (i) The Claims Administrator determines that the BEL Claiming Entity or IEL Claiming Job Employer falls with the NAICS codes and descriptions marked with an "x" in Section II of "Industry Types Subject to Review by Claims Administrator for Potential Moratoria Losses" in Exhibit 19, and (ii) the BEL Claimant or IEL Employer responds affirmatively that, in 2009, the business provided significant services, goods and/or supplies to businesses in the offshore oil & gas industry in the Gulf of Mexico.

At this point, however, such a review for potential "Moratoria Losses" is not being performed by the Settlement Program, which has requested the Parties to provide additional agreed-upon guidance for such review under Exhibit 16.[1]

Therefore, the Claims Administrator hereby establishes the following Rules to allow businesses or individuals to challenge the Exhibit 19 determination:

**Rule 1.** In all cases in which the Claims Administrator has preliminarily determined or hereinafter determines that a review for potential "Moratoria Losses" under Exhibit 16 is required because **(a)** the Claims Administrator determines that the BEL Claiming Entity or IEL Claiming Job Employer falls with the NAICS codes and descriptions marked with an "x" in Section I of "Industry Types Subject to Review by Claims Administrator for Potential Moratoria Losses" in Exhibit 19, or **(b)** (i) the Claims Administrator determines that the BEL Claiming Entity or IEL Claiming Job Employer falls with the NAICS codes and descriptions marked with an "x" in Section II of "Industry Types Subject to Review by Claims Administrator for Potential Moratoria Losses" in Exhibit 19, and (ii) the BEL Claimant or IEL Employer responds affirmatively that in 2009, the business provided significant services, goods and/or supplies to businesses in the offshore oil & gas industry in the Gulf of Mexico; the Settlement Program will issue a Preliminary Notice of Moratoria Loss Review, explaining the basis upon which the preliminary determination was made.

**Rule 2.** Any Claimant who desires to challenge such preliminary determination shall have thirty (30) days to request a Re-Review, including the ability to submit additional documents and/or information.

---

[1] *See generally* Class Counsel's EX PARTE MOTION TO AUTHORIZE THE CLAIMS ADMINISTRATOR TO IMPLEMENT THE SETTLEMENT AGREEMENT WITH RESPECT TO OIL & GAS SUPPORT SERVICES INDUSTRY CLAIMS [Doc 11156] (Aug. 27, 2013).

EXHIBIT 9

**Rule 3.** In the event that, upon Re-Review, the Settlement Program determines that no Moratoria Loss review is required under the Settlement Agreement, the Program Vendors shall continue to process the Claim under the generally applicable BEL or IEL frameworks.[2]

**Rule 4.** In the event that, upon Re-Review, the Settlement Program continues to believe that a Moratoria Loss review is required, the Program shall issue a Notice of Moratoria Loss Review.

**Rule 5.** The Claimant, after receiving a Notice of Moratoria Loss Review, shall have thirty (30) days to seek Reconsideration, in accordance with the procedures that have been established pursuant to Section 6.1.2.1 of the Settlement Agreement.

**Rule 6.** In the event that, upon Reconsideration, the Settlement Program determines that no Moratoria Loss review is required under the Settlement Agreement, the Program Vendors shall continue to process the Claim under the generally applicable BEL or IEL frameworks.[3]

**Rule 7.** In the event that, upon Reconsideration, the Settlement Program continues to believe that a Moratoria Loss review is required, the Program shall issue a Final Notice of Moratoria Loss Review, which shall be provided to both the Claimant and to BP.

**Rule 8.** The Claimant, after receiving a Final Notice of Moratoria Loss Review, shall have the ability to file a Non-Baseball Appeal, under Rule 18(a)-(e) and the other applicable provisions of the Rules Governing the Appeal Process (*see generally* Rules 1-6, 8, 10, 12-16, and 20-24).

> Determination Upheld: If the Appeal Panel's decision is to uphold the determination, then the Claims Administrator shall return the Claim back to the Program for further evaluation and processing, subject to a Moratoria Loss review under Exhibit 16.

> Determination Overturned: If the Appeal panel's decision is to overturn the determination, then the Claims Administrator shall return the Claim to the ordinary BEL or IEL review process. The Claims Administrator shall also add 5% to the pre-RTP Compensation Amount (if any), and refund the filing fee to the Claimant.

*[Class Counsel Draft]*
*[Dec. 27, 2014]*

---

[2] Any right to contest any subsequent Eligibility Determination under Section 6 of the Settlement Agreement on these or any other available grounds shall be reserved to BP. Likewise, the Claimant shall retain the right to appeal any subsequent Eligibility Determination or Denial.

[3] Any right to contest any subsequent Eligibility Determination under Section 6 of the Settlement Agreement on these or any other available grounds shall be reserved to BP. Likewise, the Claimant shall retain the right to appeal any subsequent Eligibility Determination or Denial.

EXHIBIT 10

***FILED UNDER SEAL***

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig        MDL No. 2179
      "Deepwater Horizon" in the Gulf
      of Mexico, on April 20, 2010        SECTION: J

This Document Relates to:

      No. 12-970        JUDGE BARBIER

       MAGISTRATE WILKINSON

## ORDER

### [Regarding Claims in CSSP Subject to Moratoria Hold]

**CONSIDERING** Class Counsel's Motion regarding claims subject to the Moratoria Hold (Rec. Doc. 11156);

**IT IS ORDERED** that Mike Moore and Drake Martin are appointed as Neutrals to attempt to resolve the economic claims pending in the Court Supervised Settlement Program that are the subject of a "Moratoria Hold" to the extent that the Neutrals deem the resolution of such claims appropriate. The deadline for acceptance of any offers from the Neutrals is thirty (30) days from the date of this Order.

**It is Further Ordered** that the Claims Administer is authorized and directed to make any payments of settlements reached by the Neutrals pursuant to the forgoing Paragraph out of the insurance proceeds fund provided for in Section 5.14 of the Settlement Agreement, not to exceed an aggregate amount authorized by the Court. The Court finds that the impasse

EXHIBIT 10

among the parties in developing the guidelines required by Exhibit 16 of the Settlement Agreement constitutes an "extraordinary need or circumstance" pursuant to Section 5.14 of the Settlement Agreement.

**It Is Further Ordered** that, pursuant to the Court's inherent jurisdiction and Federal Rule of Evidence 408, every recipient of this Order shall treat as strictly confidential all drafts of all term sheets, release agreements, and communications regarding resolution of claims or lawsuits related to this multidistrict litigation (including both the fact and substance of any discussions and any document prepared in connection therewith). Any person who has been shown any such documents and/or included in communications shall be bound to keep such information as private and disclosed to no one unless specifically permitted **in advance** by the undersigned. Documents related to settlement shall be deemed exempt under the Freedom of Information Act, 5 U.S.C. sec. 552, and any corresponding state open records acts absent good cause shown in this proceeding. **Any person found to be in violation of this order will be subject to imposition of sanctions.**

Notwithstanding the preceding paragraph, a plaintiff/claimant, a trustee in bankruptcy, or other recipient of this Order may disclose documentation, communications, and other information that would otherwise be subject to the preceding paragraph solely for the purposes of: (1) seeking approval by a United States Bankruptcy Court of settlement of the claims related to this Multidistrict Litigation No. 2179; and (2) complying with any obligations in or requirements of a United States Bankruptcy Court.

SIGNED in New Orleans, Louisiana, this 23rd day of February, 2017.

United States District Judge

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

In Re:  Oil Spill by the Oil Rig "Deepwater     *    MDL NO. 2179
Horizon" in the Gulf of Mexico, on April        *
20, 2010                                        *
                                                *    SECTION J
                                                *
This document relates to 12-970                 *
                                                *
                                                *
                                                *    Honorable CARL J. BARBIER
                                                *
                                                *    Magistrate Judge SHUSHAN
                                                *

---

ORDER REGARDING
INSURANCE PROCEEDS FOR TRANSOCEAN PERSONNEL

The Court has considered the Joint Motion of BP and the Economic Class for Entry of
Order Regarding Insurance Proceeds for Transocean Personnel, as submitted jointly by BP
Exploration & Production Inc. and BP America Production Company (collectively, "BP") and
the *Deepwater Horizon* Economic and Property Damages Settlement Class (the "Economic
Class").  The Joint Motion is hereby GRANTED.

IT IS ORDERED that BP shall transfer $82,170,000.00 to a trust account established as
described and authorized by court order (Rec. Doc. 12997) to retain such funds in accordance
with the *Deepwater Horizon* Economic and Property Damages Settlement Agreement as
amended on May 2, 2012 (Rec. Doc. 6430-1) ("Settlement Agreement").

IT IS FURTHER ORDERED that the transfer of such sum, without more, fully and
finally satisfies and discharges BP's obligations under the Settlement Agreement relating in any
way to "Insurance Proceeds for Transocean Personnel," as such term is referred to in Section
5.14 of the Settlement Agreement and Section 1.1.4.2 of Exhibit 21 thereto.

EXHIBIT 11

Case: 18-31177    Document: 00515297113    Page: 692    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC   Document 26293   Filed 02/05/20   Page 693 of 1003
Case 2:10-md-02179-CJB-JCW   Document 13425   Filed 09/22/14   Page 2 of 3

IT IS FURTHER ORDERED that, upon BP's transfer of the aforementioned funds to the aforementioned trust account, neither the Economic Class, nor any member of the Economic Class, nor any of its Class Counsel shall make any claim that the Economic Class, any member of the Economic Class, or any of its Class Counsel is entitled to any payment of any greater or further amount for "Insurance Proceeds for Transocean Personnel" or that BP has not fully satisfied or discharged its obligations under Section 5.14 of the Settlement Agreement and Section 1.1.4.2 of Exhibit 21 thereto.

New Orleans, Louisiana this 22nd day of September, 2014.


_____
United States District Judge

EXHIBIT 12

# DEEPWATER HORIZON ECONOMIC AND PROPERTY SETTLEMENT
# BUSINESS ECONOMIC LOSS CLAIM FORM
# (PURPLE FORM)

Form ID: PURPLE



MMR GROUP INC DBA MMR CONSTRUCTORS INC
15961 AIRLINE HIGHWAY
BATON ROUGE, LA 70817

After you complete and sign your Claim Form, submit it to the Claims Administrator as directed in the Instructions Booklet that accompanies this Claim Form.  If you submit your Claim Form by mail or delivery, do not separate this cover page from the Claim Form.  If you have to take this Claim Form apart to photocopy or fax it, make sure you include this cover page as the first page when you submit it.

**Business Economic Loss Claim Form**

EXHIBIT 12

# DEEPWATER HORIZON ECONOMIC AND PROPERTY SETTLEMENT
# BUSINESS ECONOMIC LOSS CLAIM FORM
# (PURPLE FORM)

To make a **Business Economic Loss Claim** under the Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Settlement") for damages arising from the Deepwater Horizon Incident on April 20, 2010 (the "Spill"), you must complete and submit this Claim Form and all documentation required by the Settlement ("Supporting Documentation") to the Claims Administrator on or before April 22, 2014, or six months after the Effective Date of the Settlement, whichever is later.

The **Business Economic Loss Claim** is for businesses (including those reporting on Form 1040 Schedules C, E, or F) that assert economic loss due to the Spill.  Commercial Fishermen, Seafood Vessel Owners, Seafood Boat Captains, Seafood Crew, and Oyster Leaseholders who want to make a claim for economic losses relating to Seafood must use the Seafood Compensation Program Claim Form (Yellow Form) and not this Business Economic Loss Claim Form.

When completing this Claim Form, refer to the accompanying booklet called "Instructions for Completing the Business Economic Loss Claim Form (Purple Form)," which contains detailed instructions for completing and submitting this Claim Form, helpful definitions, and the list of Supporting Documentation required to prove your claim.

If you have access to a computer with an internet connection, it will be far easier for you to fill out and submit your Claim Form online, rather than on this paper Claim Form.  The online claim process will guide you through only the specific questions you need to answer, and will instruct you about the specific Supporting Documentation you must submit, based on the answers you enter as you go along.  Go to www.deepwaterhorizonsettlements.com to submit a claim online.

If you do not have access to the internet, you may visit a Claimant Assistance Center for assistance with submitting a claim in person.  Section 5 of the Business Economic Loss Instructions Booklet lists the Claimant Assistance Centers.

## A. Claimant Information

Provide the following information about the business on behalf of which you are filing this claim for Business Economic Loss.

| 1. | **Business Name:** | MMR Group Inc DBA MMR Constructors Inc |
|---|---|---|
| 2. | **Social Security Number:**<br>*or*<br>**Individual Taxpayer Identification Number:**<br>*or*<br>**Employer Identification Number:** | SSN or ITIN<br>\|\_\|\_\|\_\|-\|\_\|\_\|-\|\_\|\_\|\_\|\_\|<br>EIN<br>\|7\|2\|-\|1\|2\|7\|1\|0\|3\|0\| |

CF-4
v.1

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

3. **Claimant Number:** If you previously filed a claim with the Gulf Coast Claims Facility ("GCCF"), you will keep that same seven-digit Claimant Number in the Deepwater Horizon Settlement Program. Check the box at the right called "GCCF Claimant Number" and provide that seven-digit Claimant Number.

☐ GCCF Claimant Number

| | | | | | | |

OR

If you did not file a claim with the GCCF, you will receive a new Claimant Number when you file your initial Registration Form with the Deepwater Horizon Settlement Program. If you have already received your new Settlement Program Claimant Number, check the box called "Deepwater Horizon Settlement Program Claimant Number" and provide that nine-digit Claimant Number.

☒ Deepwater Horizon Settlement Program Claimant Number:

|1|0|0|1|1|8|5|5|2|

If you do not yet have a Claimant Number, leave this question blank.

## B. Information Required for a Business Economic Loss Claim

If you are making a Business Economic Loss Claim for more than one Claiming Facility, photocopy this section of the Claim Form before completing it and attach the copy to the Claim Form for submission. Make one copy for each additional Claiming Facility.

1. **You cannot make an economic loss claim for a business that falls into any of the categories listed below. Check any and all boxes that describe your business.**

   Refer to Section 2 of the Business Economic Loss Instructions Booklet for more detailed descriptions of these categories.

   ☐   (a) Financial Institution.
   ☐   (b) A fund, financial trust, or other financial vehicle.
   ☐   (c) Gaming.
   ☐   (d) Insurance.
   ☐   (e) Oil and gas industry.
   ☐   (f) Defense contractor or subcontractor.
   ☐   (g) Real estate development.
   ☐   (h) Selling or marketing BP-branded fuel at anytime from April 20, 2010, through April 16, 2012.

**If you check the box next to any of the above categories, your business is not eligible to make an Economic Loss Claim, and you should not complete or submit this Claim Form.**

| | |
|---|---|
| 2. **During the period from April 1, 2010 through December 31, 2010, did your business maintain more than one separate and distinct physical location?** If you check "Yes," continue to Question 3. If you check "No," go to Question 7. | ☒ **Yes**   ☐ **No** |
| 3. **Is your business' headquarters located within the Gulf Coast Areas?** | ☒ **Yes**   ☐ **No** |
| 4. **Are all of your business' Facilities located within the Gulf Coast Areas?** | ☒ **Yes**   ☐ **No** |
| 5. **Does your business maintain separate profit and loss statements for each Claiming Facility?** | ☐ **Yes**   ☒ **No** |

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

| 6. | **Is your business submitting a claim for all Facilities located within the Gulf Coast Areas?** If you checked "Yes" for Question 3, you may file a consolidated claim for all Facilities or you may elect to file individual claims for each Claiming Facility separately. If you checked "No" for Question 3, information must be provided on a Facility-by-Facility basis, but you may send in each of those claims together to facilitate efficient processing. | ☒ **Yes**    ☐ **No** |
|----|----|----|

By checking "Yes" to this question, you are indicating that you are submitting a consolidated Claim for *all* Facilities located within the Gulf Coast Areas. If you wish to file a claim for each Facility separately, check "No." You may not file a consolidated Claim for only a subset of your business' Facilities located within the Gulf Coast Areas.

If you are filing a Business Economic Loss Claim for a Multi-Facility Business and are providing information on a Facility-by-Facility basis, you must complete Section B, C, D, and E for each Claiming Facility. Questions 2 through 6 in this section are not required for each individual Facility. Only Question 1 is required for each individual Facility. Photocopy each section before completing it and attach the copy to this Claim Form for submission. Make as many copies as you need.

| 7. | **What is the address of your business?** For consolidated claims of a Multi-Facility Business with headquarters in the Gulf Coast Areas, this is the address of the corporate headquarters; otherwise this is the address of each separate Claiming Facility. |
|----|----|

| **Business Name** | **MMR Group Inc DBA MMR Constructors** | | |
|----|----|----|----|
| **Business Address**<br><br>☒    **Headquarters** | Street<br><br>15981 Airline Hwy | | |
| | City<br><br>Baton Rouge | State<br><br>LA | Zip Code<br><br>70817 |
| | County<br>East Baton Rouge | | |
| **Business Phone Number** | (225) 756-5090 | | |

| 8. | **In which Economic Loss Zone is your business located?** Go to **www.deepwaterhorizonsettlements.com**, call toll free at 1-866-992-6174, or visit a Claimant Assistance Center to determine in which Economic Loss Zone your business is located. | ☐ **Zone A**<br>☐ **Zone B**<br>☐ **Zone C**<br>☒ **Zone D** |
|----|----|----|

| 9. | **Provide the NAICS (North American Industry Classification System) Code for your business that forms the basis of your Economic Loss Claim.** You can search for your code using **www.census.gov/naics**. | 238200 |
|----|----|----|

**Provide a description of your business:**
**MMR Group Inc DBA MMR Constructors is an electrical contracting company located in Baton Rouge, La and services businesses across Louisiana.**

| 10. | **In 2009, did your business provide significant services, goods, and/or supplies to businesses in the offshore oil & gas industry in the Gulf of Mexico?** | ☐ **Yes**    ☒ **No** |
|----|----|----|

What were your business' total 2009 revenues?

What were your business' total 2009 revenues from the provision of services, goods, and/or supplies to businesses in the offshore Oil & Gas Industry in the Gulf of Mexico?

| Business Economic Loss Claim Form | Page 3 |
|----|----|

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

| | |
|---|---|
| **11. Has your business ceased operations, declared bankruptcy or liquidated substantially all of its assets since May 1, 2010?** If your business failed between May 1, 2010 and December 31, 2011, stop filling out this Claim Form and submit the **Failed Business Economic Loss Claim Form (Red Form)** instead. | ☐ **Yes** ☒ **No**<br><br>If Yes, provide the date your business ceased operations:<br><br><br>(Month/Day/Year) |

| | |
|---|---|
| **12. Is your business a Start-Up Business?** If your business' operations began on or after January 1, 2009, stop filling out this Claim Form and submit the **Start-up Business Economic Loss Claim Form (Gray Form)** instead. If your business' operations began after November 1, 2008 but before January 1, 2009, you have the option of using this Business Economic Loss Claim Form (Purple Form) and selecting 2009 as your Benchmark Period or proceeding under the Start-Up Business Economic Loss Claim Form (Gray Form). | ☐ **Yes** ☒ **No** |

| | |
|---|---|
| **13. Did your business participate in the Vessels of Opportunity (VoO) Program?** | ☐ **Yes** ☒ **No** |

**Identify any months after the Spill in which your business received revenue from the VoO program, and the amount of that revenue. Leave this section blank if your business did not receive any revenue because of participation in the VoO program.**

| | | | | |
|---|---|---|---|---|
| ☐ | **May 2010** | | ☐ | **September 2010** |
| ☐ | **June 2010** | | ☐ | **October 2010** |
| ☐ | **July 2010** | | ☐ | **November 2010** |
| ☐ | **August 2010** | | ☐ | **December 2010** |
| | | | ☐ | **All Months 2011** |

**Identify any months after the Spill in which your business incurred expenses because of participation in the VoO program, and the amount of those expenses. Leave this section blank if your business did not incur expenses because of participation in the VoO program.**

| | | | | |
|---|---|---|---|---|
| ☐ | **May 2010** | | ☐ | **September 2010** |
| ☐ | **June 2010** | | ☐ | **October 2010** |
| ☐ | **July 2010** | | ☐ | **November 2010** |
| ☐ | **August 2010** | | ☐ | **December 2010** |
| | | | ☐ | **All Months 2011** |

**14. Identify other sources of income to your business that can be used to reconcile tax returns with business financial statements, if any.**

| | |
|---|---|
| **Business Economic Loss Claim Form** | **Page 4** |

**For Questions B.15 – B.19, consult the definition section in the Business Economic Loss Instructions Booklet to determine if your business meets the definition or criteria. Go online to www.deepwaterhorizonsettlements.com, call toll free at 1-866-992-6174, or visit a Claimant Assistance Center to determine in which Economic Loss Zone your business is located and whether it meets the Tourism Definition.**

| | |
|---|---|
| 15. **Does your business sell to customers in multiple Economic Loss Zones?** | ☒ Yes   ☐ No |
| 16. **Is your business a Landing Site, Commercial Wholesale or Retail Dealer A, or a Primary Seafood Processor?** | ☐ Yes   ☒ No |
| 17. **Is your business a Commercial Wholesale or Retail Dealer B, a Secondary Seafood Processor, a Seafood Wholesaler or Distributor, or a Seafood Retailer?** | ☐ Yes   ☒ No |
| 18. **Does your business fall within the Tourism Definition?** | ☐ Yes   ☒ No |
| 19. **Is your business a Charter Fishing Operation?** | ☐ Yes   ☒ No |
| 20. **Did specific market changes outside your control, unrelated to the Spill, and occurring after April 20, 2010, prevent your business from earning revenues in 2011 that were comparable to pre-Spill periods?** | ☐ Yes   ☒ No |

**If Yes, describe these market changes.**  Examples may include, but are not limited to, the following:  (1) the entry of a competitor in 2011; (2) the bankruptcy of a significant customer in 2011; (3) nearby road closures affecting your business; (4) unanticipated interruption resulting in closure of your business; (5) the replacement of a product or service by a customer; or (6) the loss of financing and/or reasonable terms of renewal.

| | |
|---|---|
| 21. **Did the Spill directly result in the cancellation of a contract that your business was unable to replace?**  A Canceled Contract is a contract that was in place on April 20, 2010, and which was to be performed between April 21, 2010, and December 31, 2010, but was canceled between April 21, 2010, and December 31, 2010, and that you were unable to replace on the same or similar terms. | ☐ Yes   ☒ No |

**If Yes, attach the contract and describe your efforts and inability to replace the contract:**

| | |
|---|---|
| 22. **Did the Spill result in reservation cancellations that your business was unable to rebook?**  A Canceled Reservation is a reservation that was in place on April 20, 2010, and which was to occur between April 21, 2010, and December 31, 2010, but was canceled between April 21, 2010, and December 31, 2010, and that you were unable to replace on the same or similar terms. | ☐ Yes   ☒ No |

**If Yes, describe the cancellations and your efforts and inability to rebook the cancellations:**

## C. Selection of Benchmark and Compensation Periods

**Claimants must make several elections to qualify for benefits. Claimants select one historical set of years for all comparisons throughout the claims process (the Benchmark Period year(s)). In addition, Claimants select two Compensation Periods. Consult the "Instructions for Completing the Business Economic Claim Form (Purple Form)" for more information.**

23. **Select Benchmark Period years.** Choose one of the following periods, which will serve as the baseline for measuring your business' historical financial performance. The Claims Administrator will review all the documents and information you submit to determine the best Benchmark Period that maximizes your recovery, even if that differs from the period you select. If you do not wish to pick a Benchmark Period at all and instead would like the Claims Administrator to select your best Benchmark Period, select "Claims Administrator Selected Benchmark Period."

    ☒ **2009; or**

    ☐ **Average of 2008 and 2009; or**

    ☐ **Average of 2007, 2008, and 2009.**

    ☐ **Claims Administrator Selected Benchmark.**

24. **Select Step 1 Compensation Period.** Choose three or more consecutive months from May 2010 through December 2010. You can check all of the boxes or as few as three. However, all boxes checked must be consecutive. The Claims Administrator will review all the documents and information you submit to determine the best Step 1 Compensation Period that maximizes your recovery, even if that differs from the period you select. If you do not wish to pick a Step 1 Compensation Period at all and instead would like the Claims Administrator to select your best Step 1 Compensation Period, select "Claims Administrator Selected Step 1 Compensation Period." If you are eligible for compensation, a different Compensation Period may be selected to determine your Total Compensation. Refer to the Settlement for further information on how your business' Step 1 Compensation Period will be used in calculating Total Compensation.

    ☒ **May 2010**        ☒ **September 2010**

    ☒ **June 2010**        ☒ **October 2010**

    ☒ **July 2010**        ☒ **November 2010**

    ☒ **August 2010**       ☒ **December 2010**

    ☐ **Claims Administrator Selected Step 1 Compensation Period**

CF-4
v.1

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

**25.  Select Step 2 Compensation Period.** Choose one of the following periods, which will serve as your business' Step 2 Compensation Period.  If your business is eligible for compensation, the Step 2 Compensation Period you select will be used to determine your business' Total Compensation.  The Claims Administrator will review all the documents and information you submit to determine the best Step 2 Compensation Period that maximizes your recovery, even if that differs from the period you select.  If you do not wish to pick a Step 2 Compensation Period at all and instead would like the Claims Administrator to select your best Step 2 Compensation Period, select "Claims Administrator Selected Step 2 Compensation Period."  Refer to the Settlement for further information on how your business' Step 2 Compensation Period will be used in calculating Total Compensation.  NOTE:  If you select a seven-consecutive-month or eight-consecutive-month period for your Step 1 Compensation Period in Question 2, that same period of consecutive months in 2010 shall be used as your Step 2 Compensation Period.

☐    **May – October 2010; or**

☐    **June – November 2010; or**

☐     **July – December 2010; or**

☒    **Use same 7 or 8 month period as Question 24; or**

☐    **Claims Administrator Selected Step 2 Compensation Period**

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

## D. Documentation Required for a Business Economic Loss Claim

In addition to this Claim Form, you must submit certain Supporting Documentation to prove your Business Economic Loss Claim. The list of required documents, and instructions for how to submit them, are in Section 4 of the Business Economic Loss Instructions Booklet. If you do not submit the required Supporting Documentation, the Claims Administrator will not be able to review your claim and you will not receive payment for your claim.

## E. Payment

1. **If You Have Your Own Attorney.** Unless you check the box below, the Claims Administrator will make any payments jointly to you and to your attorney, which means that both you and your attorney will need to endorse the check before a bank will honor it.

☐ Check here if you want the Claims Administrator to make payments in connection with this and any other claim you may file in the Deepwater Horizon Economic and Property Settlement *only to your attorney*. This means that the Claims Administrator will send your payment to your attorney, who will then pay you pursuant to the retainer agreement you have with him/her.

2. **If You Do Not Have Your Own Attorney.** If you have not retained an attorney to represent you in connection with your Spill-related claim, the Claims Administrator will make any payments to which you are entitled directly to you by check. Payment checks will be sent by First Class Mail to the address you provided in the Registration Form or to the address that the Claims Administrator confirms for you during the processing of your Claim. **You have an obligation to notify the Claims Administrator if your address changes.**

The Claims Administrator will report annually to federal and state taxing authorities, using a Form 1099 or state form equivalent, for certain payments made. The Claims Administrator will send you a copy of that form, but cannot give you any tax advice regarding any payment issued to you. You should consult with your own tax advisor to determine the tax impact of any payment you receive from the Claims Administrator.

3. **Garnishments, Liens, and other Attachments.** Legally authorized garnishments, liens, or similar forms of attachments relating to your claim will be honored and deducted from your payment.

4. **W-9 Form Requirement.** All claimants must provide a W-9 Form. To obtain a copy of that form, go to www.deepwaterhorizonsettlements.com, or request one at a Claimant Assistance Center or by calling 1-866-992-6174.

5. **Do you intend to seek reimbursement for Claimant Accounting Support Services in connection with your claim?**

☒ Yes    ☐ No

If you check "Yes" for Question E.5, you must submit the documents listed in Section 4.E of the Business Economic Loss Instructions Booklet.

## F.  Signature

I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that the information provided in this Claim Form is true and accurate to the best of my knowledge, and that supporting documents attached to or submitted in connection with this form and the information contained therein are true, accurate, and complete to the best of my knowledge, and I understand that false statements or claims made in connection with this Claim Form may result in fines, imprisonment, and/or any other remedy available by law to the Federal Government, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution.

I certify that I am authorized to act on behalf of the business submitting this Claim Form.

By submitting this Claim Form, I consent to the use and disclosure by the Claims Administrator and those assisting the Claims Administrator of any information about me that they believe necessary and/or helpful to process my claim for compensation and any payment resulting from that claim.

| **Signature:** | /S/ Donald Fairbanks | **Date:** | 9 / 12 / 2012<br>(Month/Day/Year) |
|---|---|---|---|
| **Title:** | | | |

An authorized business representative must sign this Claim Form personally.

CF-4
v.1

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

EXHIBIT 13

# DEEPWATER HORIZON ECONOMIC AND PROPERTY SETTLEMENT
# BUSINESS ECONOMIC LOSS CLAIM FORM
# (PURPLE FORM)

Form ID: PURPLE



MMR GROUP INC DBA MMR CONSTRUCTORS INC
15961 AIRLINE HIGHWAY
BATON ROUGE, LA 70817

After you complete and sign your Claim Form, submit it to the Claims Administrator as directed in the Instructions Booklet that accompanies this Claim Form.  If you submit your Claim Form by mail or delivery, do not separate this cover page from the Claim Form.  If you have to take this Claim Form apart to photocopy or fax it, make sure you include this cover page as the first page when you submit it.

**Business Economic Loss Claim Form**

EXHIBIT 13

# DEEPWATER HORIZON ECONOMIC AND PROPERTY SETTLEMENT
# BUSINESS ECONOMIC LOSS CLAIM FORM
# (PURPLE FORM)

To make a **Business Economic Loss Claim** under the Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Settlement") for damages arising from the Deepwater Horizon Incident on April 20, 2010 (the "Spill"), you must complete and submit this Claim Form and all documentation required by the Settlement ("Supporting Documentation") to the Claims Administrator on or before April 22, 2014, or six months after the Effective Date of the Settlement, whichever is later.

The **Business Economic Loss Claim** is for businesses (including those reporting on Form 1040 Schedules C, E, or F) that assert economic loss due to the Spill.  Commercial Fishermen, Seafood Vessel Owners, Seafood Boat Captains, Seafood Crew, and Oyster Leaseholders who want to make a claim for economic losses relating to Seafood must use the Seafood Compensation Program Claim Form (Yellow Form) and not this Business Economic Loss Claim Form.

When completing this Claim Form, refer to the accompanying booklet called "Instructions for Completing the Business Economic Loss Claim Form (Purple Form)," which contains detailed instructions for completing and submitting this Claim Form, helpful definitions, and the list of Supporting Documentation required to prove your claim.

If you have access to a computer with an internet connection, it will be far easier for you to fill out and submit your Claim Form online, rather than on this paper Claim Form.  The online claim process will guide you through only the specific questions you need to answer, and will instruct you about the specific Supporting Documentation you must submit, based on the answers you enter as you go along.  Go to www.deepwaterhorizonsettlements.com to submit a claim online.

If you do not have access to the internet, you may visit a Claimant Assistance Center for assistance with submitting a claim in person.  Section 5 of the Business Economic Loss Instructions Booklet lists the Claimant Assistance Centers.

## A.Claimant Information

Provide the following information about the business on behalf of which you are filing this claim for Business Economic Loss.

| | | |
|---|---|---|
| **1.** | **Business Name:** | MMR Group Inc DBA MMR Constructors Inc |
| **2.** | **Social Security Number:** _or_ **Individual Taxpayer Identification Number:** | SSN or ITIN<br>\|\_\|\_\|\_\|-\|\_\|\_\|\_\|-\|\_\|\_\|\_\|\_\| |
| | _or_ **Employer Identification Number:** | EIN<br>\|7\|2\|-\|1\|2\|7\|1\|0\|3\|0\| |

| 3. | **Claimant Number:** If you previously filed a claim with the Gulf Coast Claims Facility ("GCCF"), you will keep that same seven-digit Claimant Number in the Deepwater Horizon Settlement Program. Check the box at the right called "GCCF Claimant Number" and provide that seven-digit Claimant Number.<br><br>If you did not file a claim with the GCCF, you will receive a new Claimant Number when you file your initial Registration Form with the Deepwater Horizon Settlement Program. If you have already received your new Settlement Program Claimant Number, check the box called "Deepwater Horizon Settlement Program Claimant Number" and provide that nine-digit Claimant Number.<br><br>If you do not yet have a Claimant Number, leave this question blank. | ☐ GCCF Claimant Number<br><br>\|_\|_\|_\|_\|_\|_\|_\|<br><br>OR<br><br>☒ Deepwater Horizon Settlement  Program Claimant Number:<br><br>\|_1_\|_0_\|_0_\|_1_\|_1_\|_8_\|_5_\|_5_\|_2_\| |

## B. Information Required for a Business Economic Loss Claim

If you are making a Business Economic Loss Claim for more than one Claiming Facility, photocopy this section of the Claim Form before completing it and attach the copy to the Claim Form for submission. Make one copy for each additional Claiming Facility.

| 1. | **You cannot make an economic loss claim for a business that falls into any of the categories listed below. Check any and all boxes that describe your business.**<br><br>Refer to Section 2 of the Business Economic Loss Instructions Booklet for more detailed descriptions of these categories.<br><br>☐    (a) Financial Institution.<br>☐    (b) A fund, financial trust, or other financial vehicle.<br>☐    (c) Gaming.<br>☐    (d) Insurance.<br>☐    (e) Oil and gas industry.<br>☐    (f) Defense contractor or subcontractor.<br>☐    (g) Real estate development.<br>☐    (h) Selling or marketing BP-branded fuel at anytime from April 20, 2010, through April 16, 2012. |

**If you check the box next to any of the above categories, your business is not eligible to make an Economic Loss Claim, and you should not complete or submit this Claim Form.**

| 2. | **During the period from April 1, 2010 through December 31, 2010, did your business maintain more than one separate and distinct physical location?** If you check "Yes," continue to Question 3. If you check "No," go to Question 7. | ☒ Yes | ☐ No |
|---|---|---|---|
| 3. | **Is your business' headquarters located within the Gulf Coast Areas?** | ☒ Yes | ☐ No |
| 4. | **Are all of your business' Facilities located within the Gulf Coast Areas?** | ☐ Yes | ☒ No |
| 5. | **Does your business maintain separate profit and loss statements for each Claiming Facility?** | ☐ Yes | ☒ No |

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

| | | |
|---|---|---|
| **6.** **Is your business submitting a claim for all Facilities located within the Gulf Coast Areas?** If you checked "Yes" for Question 3, you may file a consolidated claim for all Facilities or you may elect to file individual claims for each Claiming Facility separately. If you checked "No" for Question 3, information must be provided on a Facility-by-Facility basis, but you may send in each of those claims together to facilitate efficient processing. | ☐ **Yes** | ☒ **No** |

By checking "Yes" to this question, you are indicating that you are submitting a consolidated Claim for *all* Facilities located within the Gulf Coast Areas. If you wish to file a claim for each Facility separately, check "No." You may not file a consolidated Claim for only a subset of your business' Facilities located within the Gulf Coast Areas.

If you are filing a Business Economic Loss Claim for a Multi-Facility Business and are providing information on a Facility-by-Facility basis, you must complete Section B, C, D, and E for each Claiming Facility. Questions 2 through 6 in this section are not required for each individual Facility. Only Question 1 is required for each individual Facility. Photocopy each section before completing it and attach the copy to this Claim Form for submission. Make as many copies as you need.

| | |
|---|---|
| **7.** **What is the address of your business?** For consolidated claims of a Multi-Facility Business with headquarters in the Gulf Coast Areas, this is the address of the corporate headquarters; otherwise this is the address of each separate Claiming Facility. | |

| **Business Name** | **MMR Constructors Inc (Home office)** | | |
|---|---|---|---|
| **Business Address** <br><br> ☐ **Headquarters** | Street <br><br> 15961 Airline Hwy | | |
| | City <br><br> Baton Rouge | State <br><br> LA | Zip Code <br><br> 70817 |
| | County <br> East Baton Rouge | | |
| **Business Phone Number** | () - | | |

| | |
|---|---|
| **8.** **In which Economic Loss Zone is your business located?** Go to **www.deepwaterhorizonsettlements.com**, call toll free at 1-866-992-6174, or visit a Claimant Assistance Center to determine in which Economic Loss Zone your business is located. | ☐ **Zone A** <br> ☐ **Zone B** <br> ☐ **Zone C** <br> ☐ **Zone D** |

| |
|---|
| **9.** **Provide the NAICS (North American Industry Classification System) Code for your business that forms the basis of your Economic Loss Claim.** You can search for your code using **www.census.gov/naics**. |

**Provide a description of your business:**

| Business Economic Loss Claim Form | Page 3 |
|---|---|

**10.** Businesses/employers that fall within the NAICS codes and descriptions marked with an "x" in Exhibit 19, Section II must answer the following question:

**In 2009, did your business provide significant services, goods, and/or supplies to businesses in the offshore Oil & Gas Industry in the Gulf of Mexico?**  The Claims Administrator considers that an entity provided "significant" services, goods, and/or supplies to businesses in the offshore oil and gas industry in the Gulf of Mexico in 2009 if 33.00% or more of its 2009 net revenue was derived from such activities.

☐ **Yes**    ☐ **No**

**11.** **Has your business ceased operations, declared bankruptcy or liquidated substantially all of its assets since May 1, 2010?**  If your business failed between May 1, 2010 and December 31, 2011, stop filling out this Claim Form and submit the **Failed Business Economic Loss Claim Form (Red Form)** instead.

☐ **Yes**    ☐ **No**
If Yes, provide the date your business ceased operations:

_____
(Month/Day/Year)

**12.** **Is your business a Start-Up Business?**  If your business' operations began on or after January 1, 2009, stop filling out this Claim Form and submit the **Start-up Business Economic Loss Claim Form (Gray Form)** instead.  If your business' operations began after October 20, 2008 but before January 1, 2009, you have the option of using this Business Economic Loss Claim Form (Purple Form) and selecting 2009 as your Benchmark Period or proceeding under the Start-Up Business Economic Loss Claim Form (Gray Form).

☐ **Yes**    ☐ **No**

**13.** **Did your business participate in the Vessels of Opportunity (VoO) Program?**

☐ **Yes**    ☐ **No**

**Identify any months after the Spill in which your business received revenue from the VoO program, and the amount of that revenue.  Leave this section blank if your business did not receive any revenue because of participation in the VoO program.**

| | | | |
|---|---|---|---|
| ☐ | **May 2010** | ☐ | **September 2010** |
| ☐ | **June 2010** | ☐ | **October 2010** |
| ☐ | **July 2010** | ☐ | **November 2010** |
| ☐ | **August 2010** | ☐ | **December 2010** |
| | | ☐ | **All Months 2011**     <u>$0.00</u> |

**Identify any months after the Spill in which your business incurred expenses because of participation in the VoO program, and the amount of those expenses.  Leave this section blank if your business did not incur expenses because of participation in the VoO program.**

| | | | |
|---|---|---|---|
| ☐ | **May 2010** | ☐ | **September 2010** |
| ☐ | **June 2010** | ☐ | **October 2010** |
| ☐ | **July 2010** | ☐ | **November 2010** |
| ☐ | **August 2010** | ☐ | **December 2010** |
| | | ☐ | **All Months 2011**     <u>$0.00</u> |

| Business Economic Loss Claim Form | Page 4 |
|---|---|

14. **Identify other sources of income to your business that can be used to reconcile tax returns with business financial statements, if any.**

**For Questions B.15 – B.19, consult the definition section in the Business Economic Loss Instructions Booklet to determine if your business meets the definition or criteria. Go online to www.deepwaterhorizonsettlements.com, call toll free at 1-866-992-6174, or visit a Claimant Assistance Center to determine in which Economic Loss Zone your business is located and whether it meets the Tourism Definition.**

| | | | |
|---|---|---|---|
| 15. | **Does your business sell to customers in multiple Economic Loss Zones?** | ☐ **Yes** | ☐ **No** |
| 16. | **Is your business a Landing Site, Commercial Wholesale or Retail Dealer A, or a Primary Seafood Processor?** | ☐ **Yes** | ☐ **No** |
| 17. | **Is your business a Commercial Wholesale or Retail Dealer B, a Secondary Seafood Processor, a Seafood Wholesaler or Distributor, or a Seafood Retailer?** | ☐ **Yes** | ☐ **No** |
| 18. | **Does your business fall within the Tourism Definition?** | ☐ **Yes** | ☐ **No** |
| 19. | **Is your business a Charter Fishing Operation?** | ☐ **Yes** | ☐ **No** |
| 20. | **Did specific market changes outside your control, unrelated to the Spill, and occurring after April 20, 2010, prevent your business from earning revenues in 2011 that were comparable to pre-Spill periods?** | ☐ **Yes** | ☐ **No** |

**If Yes, describe these market changes.** Examples may include, but are not limited to, the following: (1) the entry of a competitor in 2011; (2) the bankruptcy of a significant customer in 2011; (3) nearby road closures affecting your business; (4) unanticipated interruption resulting in closure of your business; (5) the replacement of a product or service by a customer; or (6) the loss of financing and/or reasonable terms of renewal.

| | | | |
|---|---|---|---|
| 21. | **Did the Spill directly result in the cancellation of a contract that your business was unable to replace?** A Canceled Contract is a contract that was in place on April 20, 2010, and which was to be performed between April 21, 2010, and December 31, 2010, but was canceled between April 21, 2010, and December 31, 2010, and that you were unable to replace on the same or similar terms. | ☐ **Yes** | ☐ **No** |

**If Yes, attach the contract and describe your efforts and inability to replace the contract:**

| Business Economic Loss Claim Form | Page 5 |
|---|---|

| **22.** | **Did the Spill result in reservation cancellations that your business was unable to rebook?** A Canceled Reservation is a reservation that was in place on April 20, 2010, and which was to occur between April 21, 2010, and December 31, 2010, but was canceled between April 21, 2010, and December 31, 2010, and that you were unable to replace on the same or similar terms. | ☐ **Yes**   ☐ **No** |
|---|---|---|

**If Yes, describe the cancellations and your efforts and inability to rebook the cancellations:**




## C. Selection of Benchmark and Compensation Periods

Claimants must make several elections to qualify for benefits.  Claimants select one historical set of years for all comparisons throughout the claims process (the Benchmark Period year(s)).  In addition, Claimants select two Compensation Periods.  Consult the "Instructions for Completing the Business Economic Claim Form (Purple Form)" for more information.

**23.  Select Benchmark Period years.**  Choose one of the following periods, which will serve as the baseline for measuring your business' historical financial performance.  The Claims Administrator will review all the documents and information you submit to determine the best Benchmark Period that maximizes your recovery, even if that differs from the period you select.  If you do not wish to pick a Benchmark Period at all and instead would like the Claims Administrator to select your best Benchmark Period, select "Claims Administrator Selected Benchmark Period."

☐  **2009; or**

☐  **Average of 2008 and 2009; or**

☐   **Average of 2007, 2008, and 2009.**

☐  **Claims Administrator Selected Benchmark.**

24. **Select Step 1 Compensation Period.** Choose three or more consecutive months from May 2010 through December 2010. You can check all of the boxes or as few as three. However, all boxes checked must be consecutive. The Claims Administrator will review all the documents and information you submit to determine the best Step 1 Compensation Period that maximizes your recovery, even if that differs from the period you select. If you do not wish to pick a Step 1 Compensation Period at all and instead would like the Claims Administrator to select your best Step 1 Compensation Period, select "Claims Administrator Selected Step 1 Compensation Period." If you are eligible for compensation, a different Compensation Period may be selected to determine your Total Compensation. Refer to the Settlement for further information on how your business' Step 1 Compensation Period will be used in calculating Total Compensation.

☐ **May 2010**  ☐ **September 2010**

☐ **June 2010**  ☐ **October 2010**

☐ **July 2010**  ☐ **November 2010**

☐ **August 2010**  ☐ **December 2010**

☐ **Claims Administrator Selected Step 1 Compensation Period**

25. **Select Step 2 Compensation Period.** Choose one of the following periods, which will serve as your business' Step 2 Compensation Period. If your business is eligible for compensation, the Step 2 Compensation Period you select will be used to determine your business' Total Compensation. The Claims Administrator will review all the documents and information you submit to determine the best Step 2 Compensation Period that maximizes your recovery, even if that differs from the period you select. If you do not wish to pick a Step 2 Compensation Period at all and instead would like the Claims Administrator to select your best Step 2 Compensation Period, select "Claims Administrator Selected Step 2 Compensation Period." Refer to the Settlement for further information on how your business' Step 2 Compensation Period will be used in calculating Total Compensation. NOTE: If you select a seven-consecutive-month or eight-consecutive-month period for your Step 1 Compensation Period in Question 2, that same period of consecutive months in 2010 shall be used as your Step 2 Compensation Period.

☐ **May – October 2010; or**

☐ **June – November 2010; or**

☐  **July – December 2010; or**

☐ **Use same 7 or 8 month period as Question 24; or**

☐ **Claims Administrator Selected Step 2 Compensation Period**

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

## D. Documentation Required for a Business Economic Loss Claim

In addition to this Claim Form, you must submit certain Supporting Documentation to prove your Business Economic Loss Claim.  The list of required documents, and instructions for how to submit them, are in Section 4 of the Business Economic Loss Instructions Booklet.   If you do not submit the required Supporting Documentation, the Claims Administrator will not be able to review your claim and you will not receive payment for your claim.

## E. Payment

1.  **If You Have Your Own Attorney.**  Unless you check the box below, the Claims Administrator will make any payments jointly to you and to your attorney, which means that both you and your attorney will need to endorse the check before a bank will honor it.

    ☒  Check here if you want the Claims Administrator to make payments in connection with this and any other claim you may file in the Deepwater Horizon Economic and Property Settlement *only to your attorney*. This means that the Claims Administrator will send your payment to your attorney, who will then pay you pursuant to the retainer agreement you have with him/her.

2.  **If You Do Not Have Your Own Attorney.**  If you have not retained an attorney to represent you in connection with your Spill-related claim, the Claims Administrator will make any payments to which you are entitled directly to you by check.  Payment checks will be sent by First Class Mail to the address you provided in the Registration Form or to the address that the Claims Administrator confirms for you during the processing of your Claim.  **You have an obligation to notify the Claims Administrator if your address changes.**

    The Claims Administrator will report annually to federal and state taxing authorities, using a Form 1099 or state form equivalent, for certain payments made.  The Claims Administrator will send you a copy of that form, but cannot give you any tax advice regarding any payment issued to you.  You should consult with your own tax advisor to determine the tax impact of any payment you receive from the Claims Administrator.

3.  **Garnishments, Liens, and other Attachments.**  Legally authorized garnishments, liens, or similar forms of attachments relating to your claim will be honored and deducted from your payment.

4.  **W-9 Form Requirement.**  All claimants must provide a W-9 Form.  To obtain a copy of that form, go to www.deepwaterhorizonsettlements.com, or request one at a Claimant Assistance Center or by calling 1-866-992-6174.

5.   **Do you intend to seek reimbursement for Claimant Accounting Support Services in connection with your claim?**

    ☒ **Yes**      ☐ **No**

    If you check "Yes" for Question E.5, you must submit the documents listed in Section 4.E of the Business Economic Loss Instructions Booklet.

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

## F.  Signature

I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that the information provided in this Claim Form is true and accurate to the best of my knowledge, and that supporting documents attached to or submitted in connection with this form and the information contained therein are true, accurate, and complete to the best of my knowledge, and I understand that false statements or claims made in connection with this Claim Form may result in fines, imprisonment, and/or any other remedy available by law to the Federal Government, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution.

I certify that I am authorized to act on behalf of the business submitting this Claim Form.

By submitting this Claim Form, I consent to the use and disclosure by the Claims Administrator and those assisting the Claims Administrator of any information about me that they believe necessary and/or helpful to process my claim for compensation and any payment resulting from that claim.

| Signature: | /S/ Donald Fairbanks | Date: | 8 / 15 / 2013<br>(Month/Day/Year) |
|---|---|---|---|
| Title: | | | |

An authorized business representative must sign this Claim Form personally.

EXHIBIT 14

# DEEPWATER HORIZON ECONOMIC AND PROPERTY SETTLEMENT
# BUSINESS ECONOMIC LOSS CLAIM FORM
# (PURPLE FORM)

Form ID: PURPLE



MMR GROUP INC DBA MMR CONSTRUCTORS INC
15961 AIRLINE HIGHWAY
BATON ROUGE, LA 70817

---

After you complete and sign your Claim Form, submit it to the Claims Administrator as directed in the Instructions Booklet that accompanies this Claim Form.  If you submit your Claim Form by mail or delivery, do not separate this cover page from the Claim Form.  If you have to take this Claim Form apart to photocopy or fax it, make sure you include this cover page as the first page when you submit it.

---

**Business Economic Loss Claim Form**

EXHIBIT 14

# DEEPWATER HORIZON ECONOMIC AND PROPERTY SETTLEMENT
# BUSINESS ECONOMIC LOSS CLAIM FORM
# (PURPLE FORM)

To make a **Business Economic Loss Claim** under the Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Settlement") for damages arising from the Deepwater Horizon Incident on April 20, 2010 (the "Spill"), you must complete and submit this Claim Form and all documentation required by the Settlement ("Supporting Documentation") to the Claims Administrator on or before April 22, 2014, or six months after the Effective Date of the Settlement, whichever is later.

The **Business Economic Loss Claim** is for businesses (including those reporting on Form 1040 Schedules C, E, or F) that assert economic loss due to the Spill. Commercial Fishermen, Seafood Vessel Owners, Seafood Boat Captains, Seafood Crew, and Oyster Leaseholders who want to make a claim for economic losses relating to Seafood must use the Seafood Compensation Program Claim Form (Yellow Form) and not this Business Economic Loss Claim Form.

When completing this Claim Form, refer to the accompanying booklet called "Instructions for Completing the Business Economic Loss Claim Form (Purple Form)," which contains detailed instructions for completing and submitting this Claim Form, helpful definitions, and the list of Supporting Documentation required to prove your claim.

If you have access to a computer with an internet connection, it will be far easier for you to fill out and submit your Claim Form online, rather than on this paper Claim Form. The online claim process will guide you through only the specific questions you need to answer, and will instruct you about the specific Supporting Documentation you must submit, based on the answers you enter as you go along. Go to www.deepwaterhorizonsettlements.com to submit a claim online.

If you do not have access to the internet, you may visit a Claimant Assistance Center for assistance with submitting a claim in person. Section 5 of the Business Economic Loss Instructions Booklet lists the Claimant Assistance Centers.

## A.Claimant Information

Provide the following information about the business on behalf of which you are filing this claim for Business Economic Loss.

| 1. | **Business Name:** | MMR Group Inc DBA MMR Constructors Inc |
|---|---|---|

| 2. | **Social Security Number:** | |
|---|---|---|
| | *or* | |
| | **Individual Taxpayer Identification Number:** | SSN or ITIN<br>\|＿\|＿\|＿\|-\|＿\|＿\|＿\|-\|＿\|＿\|＿\|＿\| |
| | *or* | EIN |
| | **Employer Identification Number:** | \|7\|2\|-\|1\|2\|7\|1\|0\|3\|0\| |

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

**3. Claimant Number:** If you previously filed a claim with the Gulf Coast Claims Facility ("GCCF"), you will keep that same seven-digit Claimant Number in the Deepwater Horizon Settlement Program.  Check the box at the right called "GCCF Claimant Number" and provide that seven-digit Claimant Number.

If you did not file a claim with the GCCF, you will receive a new Claimant Number when you file your initial Registration Form with the Deepwater Horizon Settlement Program.  If you have already received your new Settlement Program Claimant Number, check the box called "Deepwater Horizon Settlement Program Claimant Number" and provide that nine-digit Claimant Number.

If you do not yet have a Claimant Number, leave this question blank.

☐ GCCF Claimant Number

| | | | | | | |

OR

☒ Deepwater Horizon Settlement  Program Claimant Number:

| 1 | 0 | 0 | 1 | 1 | 8 | 5 | 5 | 2 |

## B. Information Required for a Business Economic Loss Claim

If you are making a Business Economic Loss Claim for more than one Claiming Facility, photocopy this section of the Claim Form before completing it and attach the copy to the Claim Form for submission.  Make one copy for each additional Claiming Facility.

**1. You cannot make an economic loss claim for a business that falls into any of the categories listed below.  Check any and all boxes that describe your business.**

Refer to Section 2 of the Business Economic Loss Instructions Booklet for more detailed descriptions of these categories.

☐ (a) Financial Institution.
☐ (b) A fund, financial trust, or other financial vehicle.
☐ (c) Gaming.
☐ (d) Insurance.
☐ (e) Oil and gas industry.
☐ (f) Defense contractor or subcontractor.
☐ (g) Real estate development.
☐ (h) Selling or marketing BP-branded fuel at anytime from April 20, 2010, through April 16, 2012.

**If you check the box next to any of the above categories, your business is not eligible to make an Economic Loss Claim, and you should not complete or submit this Claim Form.**

| | | | | |
|---|---|---|---|---|
| **2. During the period from April 1, 2010 through December 31, 2010, did your business maintain more than one separate and distinct physical location?** If you check "Yes," continue to Question 3.  If you check "No," go to Question 7. | ☒ **Yes** | | ☐ **No** | |
| **3. Is your business' headquarters located within the Gulf Coast Areas?** | ☒ **Yes** | | ☐ **No** | |
| **4. Are all of your business' Facilities located within the Gulf Coast Areas?** | ☐ **Yes** | | ☒ **No** | |
| **5. Does your business maintain separate profit and loss statements for each Claiming Facility?** | ☐ **Yes** | | ☒ **No** | |

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

| | | |
|---|---|---|
| **6.** | **Is your business submitting a claim for all Facilities located within the Gulf Coast Areas?**  If you checked "Yes" for Question 3, you may file a consolidated claim for all Facilities or you may elect to file individual claims for each Claiming Facility separately.  If you checked "No" for Question 3, information must be provided on a Facility-by-Facility basis, but you may send in each of those claims together to facilitate efficient processing. | ☐ **Yes**   ☒ **No** |

By checking "Yes" to this question, you are indicating that you are submitting a consolidated Claim for *all* Facilities located within the Gulf Coast Areas.  If you wish to file a claim for each Facility separately, check "No."  You may not file a consolidated Claim for only a subset of your business' Facilities located within the Gulf Coast Areas.

If you are filing a Business Economic Loss Claim for a Multi-Facility Business and are providing information on a Facility-by-Facility basis, you must complete Section B, C, D, and E for each Claiming Facility.  Questions 2 through 6 in this section are not required for each individual Facility.  Only Question 1 is required for each individual Facility.  Photocopy each section before completing it and attach the copy to this Claim Form for submission.  Make as many copies as you need.

| | |
|---|---|
| **7.** | **What is the address of your business?**  For consolidated claims of a Multi-Facility Business with headquarters in the Gulf Coast Areas, this is the address of the corporate headquarters; otherwise this is the address of each separate Claiming Facility. |

| Business Name | MMR Constructors Inc. dba Offshore Services Inc (Lafayette) | | |
|---|---|---|---|
| **Business Address** | Street | | |
| | 1043 QCP Park Drive | | |
| ☐  **Headquarters** | City | State | Zip Code |
| | Broussard | LA | 70518 |
| | County | | |
| **Business Phone Number** | () - | | |

| | | |
|---|---|---|
| **8.** | **In which Economic Loss Zone is your business located?**  Go to **www.deepwaterhorizonsettlements.com**, call toll free at 1-866-992-6174, or visit a Claimant Assistance Center to determine in which Economic Loss Zone your business is located. | ☐ **Zone A**  ☐ **Zone B**  ☐ **Zone C**  ☐ **Zone D** |

| | |
|---|---|
| **9.** | **Provide the NAICS (North American Industry Classification System) Code for your business that forms the basis of your Economic Loss Claim.**  You can search for your code using **www.census.gov/naics**. |

**Provide a description of your business:**

| Business Economic Loss Claim Form | **Page 3** |
|---|---|

| | |
|---|---|
| **10.** Businesses/employers that fall within the NAICS codes and descriptions marked with an "x" in Exhibit 19, Section II must answer the following question:<br><br>**In 2009, did your business provide significant services, goods, and/or supplies to businesses in the offshore Oil & Gas Industry in the Gulf of Mexico?**  The Claims Administrator considers that an entity provided "significant" services, goods, and/or supplies to businesses in the offshore oil and gas industry in the Gulf of Mexico in 2009 if 33.00% or more of its 2009 net revenue was derived from such activities. | ☐ **Yes**   ☐ **No** |
| **11. Has your business ceased operations, declared bankruptcy or liquidated substantially all of its assets since May 1, 2010?**  If your business failed between May 1, 2010 and December 31, 2011, stop filling out this Claim Form and submit the **Failed Business Economic Loss Claim Form (Red Form)** instead. | ☐ **Yes**   ☐ **No**<br>If Yes, provide the date your business ceased operations:<br><br><br>(Month/Day/Year) |
| **12. Is your business a Start-Up Business?**  If your business' operations began on or after January 1, 2009, stop filling out this Claim Form and submit the **Start-up Business Economic Loss Claim Form (Gray Form)** instead.  If your business' operations began after October 20, 2008 but before January 1, 2009, you have the option of using this Business Economic Loss Claim Form (Purple Form) and selecting 2009 as your Benchmark Period or proceeding under the Start-Up Business Economic Loss Claim Form (Gray Form). | ☐ **Yes**   ☐ **No** |
| **13.  Did your business participate in the Vessels of Opportunity (VoO) Program?** | ☐ **Yes**   ☐ **No** |

**Identify any months after the Spill in which your business received revenue from the VoO program, and the amount of that revenue.  Leave this section blank if your business did not receive any revenue because of participation in the VoO program.**

| | | | | |
|---|---|---|---|---|
| ☐ | **May 2010** | ☐ | **September 2010** | |
| ☐ | **June 2010** | ☐ | **October 2010** | |
| ☐ | **July 2010** | ☐ | **November 2010** | |
| ☐ | **August 2010** | ☐ | **December 2010** | |
| | | ☐ | **All Months 2011** | **$0.00** |

**Identify any months after the Spill in which your business incurred expenses because of participation in the VoO program, and the amount of those expenses.  Leave this section blank if your business did not incur expenses because of participation in the VoO program.**

| | | | | |
|---|---|---|---|---|
| ☐ | **May 2010** | ☐ | **September 2010** | |
| ☐ | **June 2010** | ☐ | **October 2010** | |
| ☐ | **July 2010** | ☐ | **November 2010** | |
| ☐ | **August 2010** | ☐ | **December 2010** | |
| | | ☐ | **All Months 2011** | **$0.00** |

| | |
|---|---|
| Business Economic Loss Claim Form | **Page 4** |

**14.  Identify other sources of income to your business that can be used to reconcile tax returns with business financial statements, if any.**

For Questions B.15 – B.19, consult the definition section in the Business Economic Loss Instructions Booklet to determine if your business meets the definition or criteria. Go online to www.deepwaterhorizonsettlements.com, call toll free at 1-866-992-6174, or visit a Claimant Assistance Center to determine in which Economic Loss Zone your business is located and whether it meets the Tourism Definition.

| | |
|---|---|
| **15.  Does your business sell to customers in multiple Economic Loss Zones?** | ☐ Yes    ☐ No |
| **16.  Is your business a Landing Site, Commercial Wholesale or Retail Dealer A, or a Primary Seafood Processor?** | ☐ Yes    ☐ No |
| **17.  Is your business a Commercial Wholesale or Retail Dealer B, a Secondary Seafood Processor, a Seafood Wholesaler or Distributor, or a Seafood Retailer?** | ☐ Yes    ☐ No |
| **18.  Does your business fall within the Tourism Definition?** | ☐ Yes    ☐ No |
| **19.  Is your business a Charter Fishing Operation?** | ☐ Yes    ☐ No |
| **20.  Did specific market changes outside your control, unrelated to the Spill, and occurring after April 20, 2010, prevent your business from earning revenues in 2011 that were comparable to pre-Spill periods?** | ☐ Yes    ☐ No |

**If Yes, describe these market changes.**  Examples may include, but are not limited to, the following:  (1) the entry of a competitor in 2011; (2) the bankruptcy of a significant customer in 2011; (3) nearby road closures affecting your business; (4) unanticipated interruption resulting in closure of your business; (5) the replacement of a product or service by a customer; or (6) the loss of financing and/or reasonable terms of renewal.

| | |
|---|---|
| **21.  Did the Spill directly result in the cancellation of a contract that your business was unable to replace?**  A Canceled Contract is a contract that was in place on April 20, 2010, and which was to be performed between April 21, 2010, and December 31, 2010, but was canceled between April 21, 2010, and December 31, 2010, and that you were unable to replace on the same or similar terms. | ☐ Yes    ☐ No |

**If Yes, attach the contract and describe your efforts and inability to replace the contract:**

| Business Economic Loss Claim Form | Page 5 |
|---|---|

| 22. | **Did the Spill result in reservation cancellations that your business was unable to rebook?** A Canceled Reservation is a reservation that was in place on April 20, 2010, and which was to occur between April 21, 2010, and December 31, 2010, but was canceled between April 21, 2010, and December 31, 2010, and that you were unable to replace on the same or similar terms. | ☐ **Yes** ☐ **No** |

**If Yes, describe the cancellations and your efforts and inability to rebook the cancellations:**

## C. Selection of Benchmark and Compensation Periods

Claimants must make several elections to qualify for benefits.  Claimants select one historical set of years for all comparisons throughout the claims process (the Benchmark Period year(s)).  In addition, Claimants select two Compensation Periods.  Consult the "Instructions for Completing the Business Economic Claim Form (Purple Form)" for more information.

23. **Select Benchmark Period years.**  Choose one of the following periods, which will serve as the baseline for measuring your business' historical financial performance.  The Claims Administrator will review all the documents and information you submit to determine the best Benchmark Period that maximizes your recovery, even if that differs from the period you select.  If you do not wish to pick a Benchmark Period at all and instead would like the Claims Administrator to select your best Benchmark Period, select "Claims Administrator Selected Benchmark Period."

    ☐ **2009; or**

    ☐ **Average of 2008 and 2009; or**

    ☐ **Average of 2007, 2008, and 2009.**

    ☐ **Claims Administrator Selected Benchmark.**

CF-4
v.1

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

**24.  Select Step 1 Compensation Period.** Choose three or more consecutive months from May 2010 through December 2010.  You can check all of the boxes or as few as three.  However, all boxes checked must be consecutive.  The Claims Administrator will review all the documents and information you submit to determine the best Step 1 Compensation Period that maximizes your recovery, even if that differs from the period you select.  If you do not wish to pick a Step 1 Compensation Period at all and instead would like the Claims Administrator to select your best Step 1 Compensation Period, select "Claims Administrator Selected Step 1 Compensation Period."  If you are eligible for compensation, a different Compensation Period may be selected to determine your Total Compensation.  Refer to the Settlement for further information on how your business' Step 1 Compensation Period will be used in calculating Total Compensation.

☐ **May 2010**               ☐ **September 2010**

☐ **June 2010**              ☐ **October 2010**

☐ **July 2010**              ☐ **November 2010**

☐ **August 2010**            ☐ **December 2010**

☐ **Claims Administrator Selected Step 1 Compensation Period**

**25.  Select Step 2 Compensation Period.** Choose one of the following periods, which will serve as your business' Step 2 Compensation Period.  If your business is eligible for compensation, the Step 2 Compensation Period you select will be used to determine your business' Total Compensation.  The Claims Administrator will review all the documents and information you submit to determine the best Step 2 Compensation Period that maximizes your recovery, even if that differs from the period you select.  If you do not wish to pick a Step 2 Compensation Period at all and instead would like the Claims Administrator to select your best Step 2 Compensation Period, select "Claims Administrator Selected Step 2 Compensation Period."  Refer to the Settlement for further information on how your business' Step 2 Compensation Period will be used in calculating Total Compensation.  NOTE:  If you select a seven-consecutive-month or eight-consecutive-month period for your Step 1 Compensation Period in Question 2, that same period of consecutive months in 2010 shall be used as your Step 2 Compensation Period.

☐ **May – October 2010; or**

☐ **June – November 2010; or**

☐ **July – December 2010; or**

☐ **Use same 7 or 8 month period as Question 24; or**

☐ **Claims Administrator Selected Step 2 Compensation Period**

CF-4
v.1

## D. Documentation Required for a Business Economic Loss Claim

In addition to this Claim Form, you must submit certain Supporting Documentation to prove your Business Economic Loss Claim. The list of required documents, and instructions for how to submit them, are in Section 4 of the Business Economic Loss Instructions Booklet. If you do not submit the required Supporting Documentation, the Claims Administrator will not be able to review your claim and you will not receive payment for your claim.

## E. Payment

1. **If You Have Your Own Attorney.** Unless you check the box below, the Claims Administrator will make any payments jointly to you and to your attorney, which means that both you and your attorney will need to endorse the check before a bank will honor it.

   ☒ Check here if you want the Claims Administrator to make payments in connection with this and any other claim you may file in the Deepwater Horizon Economic and Property Settlement *only to your attorney*. This means that the Claims Administrator will send your payment to your attorney, who will then pay you pursuant to the retainer agreement you have with him/her.

2. **If You Do Not Have Your Own Attorney.** If you have not retained an attorney to represent you in connection with your Spill-related claim, the Claims Administrator will make any payments to which you are entitled directly to you by check. Payment checks will be sent by First Class Mail to the address you provided in the Registration Form or to the address that the Claims Administrator confirms for you during the processing of your Claim. **You have an obligation to notify the Claims Administrator if your address changes.**

   The Claims Administrator will report annually to federal and state taxing authorities, using a Form 1099 or state form equivalent, for certain payments made. The Claims Administrator will send you a copy of that form, but cannot give you any tax advice regarding any payment issued to you. You should consult with your own tax advisor to determine the tax impact of any payment you receive from the Claims Administrator.

3. **Garnishments, Liens, and other Attachments.** Legally authorized garnishments, liens, or similar forms of attachments relating to your claim will be honored and deducted from your payment.

4. **W-9 Form Requirement.** All claimants must provide a W-9 Form. To obtain a copy of that form, go to www.deepwaterhorizonsettlements.com, or request one at a Claimant Assistance Center or by calling 1-866-992-6174.

5. **Do you intend to seek reimbursement for Claimant Accounting Support Services in connection with your claim?**

   ☒ Yes    ☐ No

   If you check "Yes" for Question E.5, you must submit the documents listed in Section 4.E of the Business Economic Loss Instructions Booklet.

CF-4
v.1

## F.  Signature

I certify and declare under penalty of perjury pursuant to <u>28 U.S.C. Section 1746</u> that the information provided in this Claim Form is true and accurate to the best of my knowledge, and that supporting documents attached to or submitted in connection with this form and the information contained therein are true, accurate, and complete to the best of my knowledge, and I understand that false statements or claims made in connection with this Claim Form may result in fines, imprisonment, and/or any other remedy available by law to the Federal Government, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution.

I certify that I am authorized to act on behalf of the business submitting this Claim Form.

By submitting this Claim Form, I consent to the use and disclosure by the Claims Administrator and those assisting the Claims Administrator of any information about me that they believe necessary and/or helpful to process my claim for compensation and any payment resulting from that claim.

| Signature: | /S/ Donald Fairbanks | Date: | <u>8 / 15 / 2013</u><br>(Month/Day/Year) |
|---|---|---|---|
| Title: | | | |

An authorized business representative must sign this Claim Form personally.

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

# EXHIBIT 15

# DEEPWATER HORIZON ECONOMIC AND PROPERTY SETTLEMENT
# BUSINESS ECONOMIC LOSS CLAIM FORM
# (PURPLE FORM)

Form ID: PURPLE



MMR GROUP INC DBA MMR CONSTRUCTORS INC
15961 AIRLINE HIGHWAY
BATON ROUGE, LA 70817

After you complete and sign your Claim Form, submit it to the Claims Administrator as directed in the Instructions Booklet that accompanies this Claim Form.  If you submit your Claim Form by mail or delivery, do not separate this cover page from the Claim Form.  If you have to take this Claim Form apart to photocopy or fax it, make sure you include this cover page as the first page when you submit it.

**Business Economic Loss Claim Form**

EXHIBIT 15

# DEEPWATER HORIZON ECONOMIC AND PROPERTY SETTLEMENT
# BUSINESS ECONOMIC LOSS CLAIM FORM
# (PURPLE FORM)

To make a **Business Economic Loss Claim** under the Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Settlement") for damages arising from the Deepwater Horizon Incident on April 20, 2010 (the "Spill"), you must complete and submit this Claim Form and all documentation required by the Settlement ("Supporting Documentation") to the Claims Administrator on or before April 22, 2014, or six months after the Effective Date of the Settlement, whichever is later.

The **Business Economic Loss Claim** is for businesses (including those reporting on Form 1040 Schedules C, E, or F) that assert economic loss due to the Spill.  Commercial Fishermen, Seafood Vessel Owners, Seafood Boat Captains, Seafood Crew, and Oyster Leaseholders who want to make a claim for economic losses relating to Seafood must use the Seafood Compensation Program Claim Form (Yellow Form) and not this Business Economic Loss Claim Form.

When completing this Claim Form, refer to the accompanying booklet called "Instructions for Completing the Business Economic Loss Claim Form (Purple Form)," which contains detailed instructions for completing and submitting this Claim Form, helpful definitions, and the list of Supporting Documentation required to prove your claim.

If you have access to a computer with an internet connection, it will be far easier for you to fill out and submit your Claim Form online, rather than on this paper Claim Form.  The online claim process will guide you through only the specific questions you need to answer, and will instruct you about the specific Supporting Documentation you must submit, based on the answers you enter as you go along.  Go to www.deepwaterhorizonsettlements.com to submit a claim online.

If you do not have access to the internet, you may visit a Claimant Assistance Center for assistance with submitting a claim in person.  Section 5 of the Business Economic Loss Instructions Booklet lists the Claimant Assistance Centers.

## A. Claimant Information

Provide the following information about the business on behalf of which you are filing this claim for Business Economic Loss.

| 1. | **Business Name:** | MMR Group Inc DBA MMR Constructors Inc |
|---|---|---|
| 2. | **Social Security Number:** <br> *or* <br> **Individual Taxpayer Identification Number:** <br> *or* <br> **Employer Identification Number:** | SSN or ITIN <br> \|\_\|\_\|\_\|-\|\_\|\_\|-\|\_\|\_\|\_\|\_\| <br> EIN <br> \|7\|2\|-\|1\|2\|7\|1\|0\|3\|0\| |

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

**3.  Claimant Number:**  If you previously filed a claim with the Gulf Coast Claims Facility ("GCCF"), you will keep that same seven-digit Claimant Number in the Deepwater Horizon Settlement Program.  Check the box at the right called "GCCF Claimant Number" and provide that seven-digit Claimant Number.

If you did not file a claim with the GCCF, you will receive a new Claimant Number when you file your initial Registration Form with the Deepwater Horizon Settlement Program.  If you have already received your new Settlement Program Claimant Number, check the box called "Deepwater Horizon Settlement Program Claimant Number" and provide that nine-digit Claimant Number.

If you do not yet have a Claimant Number, leave this question blank.

☐ GCCF Claimant Number

| | | | | | | |

OR

☒  Deepwater Horizon Settlement  Program Claimant Number:

| 1 | 0 | 0 | 1 | 1 | 8 | 5 | 5 | 2 |

## B. Information Required for a Business Economic Loss Claim

If you are making a Business Economic Loss Claim for more than one Claiming Facility, photocopy this section of the Claim Form before completing it and attach the copy to the Claim Form for submission.  Make one copy for each additional Claiming Facility.

**1.  You cannot make an economic loss claim for a business that falls into any of the categories listed below.  Check any and all boxes that describe your business.**

Refer to Section 2 of the Business Economic Loss Instructions Booklet for more detailed descriptions of these categories.

☐  (a) Financial Institution.
☐  (b) A fund, financial trust, or other financial vehicle.
☐  (c) Gaming.
☐  (d) Insurance.
☐  (e) Oil and gas industry.
☐  (f) Defense contractor or subcontractor.
☐  (g) Real estate development.
☐  (h) Selling or marketing BP-branded fuel at anytime from April 20, 2010, through April 16, 2012.

**If you check the box next to any of the above categories, your business is not eligible to make an Economic Loss Claim, and you should not complete or submit this Claim Form.**

| | | | |
|---|---|---|---|
| **2.  During the period from April 1, 2010 through December 31, 2010, did your business maintain more than one separate and distinct physical location?**  If you check "Yes," continue to Question 3.  If you check "No," go to Question 7. | ☒ **Yes** | ☐ **No** |
| **3.  Is your business' headquarters located within the Gulf Coast Areas?** | ☒ **Yes** | ☐ **No** |
| **4.  Are all of your business' Facilities located within the Gulf Coast Areas?** | ☐ **Yes** | ☒ **No** |
| **5.  Does your business maintain separate profit and loss statements for each Claiming Facility?** | ☐ **Yes** | ☒ **No** |

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

| | |
|---|---|
| **6.** **Is your business submitting a claim for all Facilities located within the Gulf Coast Areas?** If you checked "Yes" for Question 3, you may file a consolidated claim for all Facilities or you may elect to file individual claims for each Claiming Facility separately. If you checked "No" for Question 3, information must be provided on a Facility-by-Facility basis, but you may send in each of those claims together to facilitate efficient processing. | ☐ **Yes**   ☒ **No** |

By checking "Yes" to this question, you are indicating that you are submitting a consolidated Claim for *all* Facilities located within the Gulf Coast Areas. If you wish to file a claim for each Facility separately, check "No." You may not file a consolidated Claim for only a subset of your business' Facilities located within the Gulf Coast Areas.

If you are filing a Business Economic Loss Claim for a Multi-Facility Business and are providing information on a Facility-by-Facility basis, you must complete Section B, C, D, and E for each Claiming Facility. Questions 2 through 6 in this section are not required for each individual Facility. Only Question 1 is required for each individual Facility. Photocopy each section before completing it and attach the copy to this Claim Form for submission. Make as many copies as you need.

| | |
|---|---|
| **7.** **What is the address of your business?** For consolidated claims of a Multi-Facility Business with headquarters in the Gulf Coast Areas, this is the address of the corporate headquarters; otherwise this is the address of each separate Claiming Facility. | |

| Business Name | MMR Constructors, Inc. dba MMR Offshore Services Inc (Belle Chasse) | | |
|---|---|---|---|
| **Business Address**<br><br>☐ **Headquarters** | Street<br><br>2104 Engineer Rd | | |
| | City<br><br>Belle Chase | State<br><br>LA | Zip Code<br><br>70037 |
| | County | | |
| **Business Phone Number** | () - | | |

| | |
|---|---|
| **8.** **In which Economic Loss Zone is your business located?** Go to **www.deepwaterhorizonsettlements.com**, call toll free at 1-866-992-6174, or visit a Claimant Assistance Center to determine in which Economic Loss Zone your business is located. | ☐ **Zone A**<br>☐ **Zone B**<br>☐ **Zone C**<br>☐ **Zone D** |

| | |
|---|---|
| **9.** **Provide the NAICS (North American Industry Classification System) Code for your business that forms the basis of your Economic Loss Claim.** You can search for your code using **www.census.gov/naics**. | |

**Provide a description of your business:**

| Business Economic Loss Claim Form | Page 3 |
|---|---|

| | |
|---|---|
| **10.** Businesses/employers that fall within the NAICS codes and descriptions marked with an "x" in Exhibit 19, Section II must answer the following question:<br><br>**In 2009, did your business provide significant services, goods, and/or supplies to businesses in the offshore Oil & Gas Industry in the Gulf of Mexico?**  The Claims Administrator considers that an entity provided "significant" services, goods, and/or supplies to businesses in the offshore oil and gas industry in the Gulf of Mexico in 2009 if 33.00% or more of its 2009 net revenue was derived from such activities. | ☐ **Yes**    ☐ **No** |
| **11. Has your business ceased operations, declared bankruptcy or liquidated substantially all of its assets since May 1, 2010?**  If your business failed between May 1, 2010 and December 31, 2011, stop filling out this Claim Form and submit the **Failed Business Economic Loss Claim Form (Red Form)** instead. | ☐ **Yes**    ☐ **No**<br>If Yes, provide the date your business ceased operations:<br><br><br>(Month/Day/Year) |
| **12. Is your business a Start-Up Business?**  If your business' operations began on or after January 1, 2009, stop filling out this Claim Form and submit the **Start-up Business Economic Loss Claim Form (Gray Form)** instead.  If your business' operations began after October 20, 2008 but before January 1, 2009, you have the option of using this Business Economic Loss Claim Form (Purple Form) and selecting 2009 as your Benchmark Period or proceeding under the Start-Up Business Economic Loss Claim Form (Gray Form). | ☐ **Yes**    ☐ **No** |
| **13. Did your business participate in the Vessels of Opportunity (VoO) Program?** | ☐ **Yes**    ☐ **No** |

**Identify any months after the Spill in which your business received revenue from the VoO program, and the amount of that revenue.  Leave this section blank if your business did not receive any revenue because of participation in the VoO program.**

| | | | |
|---|---|---|---|
| ☐ | **May 2010** | ☐ | **September 2010** |
| ☐ | **June 2010** | ☐ | **October 2010** |
| ☐ | **July 2010** | ☐ | **November 2010** |
| ☐ | **August 2010** | ☐ | **December 2010** |
| | | ☐ | **All Months 2011**    <u>$0.00</u> |

**Identify any months after the Spill in which your business incurred expenses because of participation in the VoO program, and the amount of those expenses.  Leave this section blank if your business did not incur expenses because of participation in the VoO program.**

| | | | |
|---|---|---|---|
| ☐ | **May 2010** | ☐ | **September 2010** |
| ☐ | **June 2010** | ☐ | **October 2010** |
| ☐ | **July 2010** | ☐ | **November 2010** |
| ☐ | **August 2010** | ☐ | **December 2010** |
| | | ☐ | **All Months 2011**    <u>$0.00</u> |

| Business Economic Loss Claim Form | Page 4 |
|---|---|

**14.** Identify other sources of income to your business that can be used to reconcile tax returns with business financial statements, if any.

For Questions B.15 – B.19, consult the definition section in the Business Economic Loss Instructions Booklet to determine if your business meets the definition or criteria. Go online to www.deepwaterhorizonsettlements.com, call toll free at 1-866-992-6174, or visit a Claimant Assistance Center to determine in which Economic Loss Zone your business is located and whether it meets the Tourism Definition.

| | |
|---|---|
| **15.** Does your business sell to customers in multiple Economic Loss Zones? | ☐ **Yes** ☐ **No** |
| **16.** Is your business a Landing Site, Commercial Wholesale or Retail Dealer A, or a Primary Seafood Processor? | ☐ **Yes** ☐ **No** |
| **17.** Is your business a Commercial Wholesale or Retail Dealer B, a Secondary Seafood Processor, a Seafood Wholesaler or Distributor, or a Seafood Retailer? | ☐ **Yes** ☐ **No** |
| **18.** Does your business fall within the Tourism Definition? | ☐ **Yes** ☐ **No** |
| **19.** Is your business a Charter Fishing Operation? | ☐ **Yes** ☐ **No** |
| **20.** Did specific market changes outside your control, unrelated to the Spill, and occurring after April 20, 2010, prevent your business from earning revenues in 2011 that were comparable to pre-Spill periods? | ☐ **Yes** ☐ **No** |

**If Yes, describe these market changes.** Examples may include, but are not limited to, the following: (1) the entry of a competitor in 2011; (2) the bankruptcy of a significant customer in 2011; (3) nearby road closures affecting your business; (4) unanticipated interruption resulting in closure of your business; (5) the replacement of a product or service by a customer; or (6) the loss of financing and/or reasonable terms of renewal.

| | |
|---|---|
| **21.** Did the Spill directly result in the cancellation of a contract that your business was unable to replace? A Canceled Contract is a contract that was in place on April 20, 2010, and which was to be performed between April 21, 2010, and December 31, 2010, but was canceled between April 21, 2010, and December 31, 2010, and that you were unable to replace on the same or similar terms. | ☐ **Yes** ☐ **No** |

**If Yes, attach the contract and describe your efforts and inability to replace the contract:**

| 22. | **Did the Spill result in reservation cancellations that your business was unable to rebook?** A Canceled Reservation is a reservation that was in place on April 20, 2010, and which was to occur between April 21, 2010, and December 31, 2010, but was canceled between April 21, 2010, and December 31, 2010, and that you were unable to replace on the same or similar terms. | ☐ **Yes**    ☐ **No** |
|---|---|---|

**If Yes, describe the cancellations and your efforts and inability to rebook the cancellations:**

## C. Selection of Benchmark and Compensation Periods

Claimants must make several elections to qualify for benefits.  Claimants select one historical set of years for all comparisons throughout the claims process (the Benchmark Period year(s)).  In addition, Claimants select two Compensation Periods.  Consult the "Instructions for Completing the Business Economic Claim Form (Purple Form)" for more information.

23. **Select Benchmark Period years.**  Choose one of the following periods, which will serve as the baseline for measuring your business' historical financial performance.  The Claims Administrator will review all the documents and information you submit to determine the best Benchmark Period that maximizes your recovery, even if that differs from the period you select.  If you do not wish to pick a Benchmark Period at all and instead would like the Claims Administrator to select your best Benchmark Period, select "Claims Administrator Selected Benchmark Period."

☐  **2009; or**

☐  **Average of 2008 and 2009; or**

☐   **Average of 2007, 2008, and 2009.**

☐  **Claims Administrator Selected Benchmark.**

**24.** **Select Step 1 Compensation Period.** Choose three or more consecutive months from May 2010 through December 2010.  You can check all of the boxes or as few as three.  However, all boxes checked must be consecutive.  The Claims Administrator will review all the documents and information you submit to determine the best Step 1 Compensation Period that maximizes your recovery, even if that differs from the period you select.  If you do not wish to pick a Step 1 Compensation Period at all and instead would like the Claims Administrator to select your best Step 1 Compensation Period, select "Claims Administrator Selected Step 1 Compensation Period."  If you are eligible for compensation, a different Compensation Period may be selected to determine your Total Compensation.  Refer to the Settlement for further information on how your business' Step 1 Compensation Period will be used in calculating Total Compensation.

☐ **May 2010**            ☐ **September 2010**

☐ **June 2010**           ☐ **October 2010**

☐ **July 2010**           ☐ **November 2010**

☐ **August 2010**         ☐ **December 2010**

☐ **Claims Administrator Selected Step 1 Compensation Period**

**25.** **Select Step 2 Compensation Period.** Choose one of the following periods, which will serve as your business' Step 2 Compensation Period.  If your business is eligible for compensation, the Step 2 Compensation Period you select will be used to determine your business' Total Compensation.  The Claims Administrator will review all the documents and information you submit to determine the best Step 2 Compensation Period that maximizes your recovery, even if that differs from the period you select.  If you do not wish to pick a Step 2 Compensation Period at all and instead would like the Claims Administrator to select your best Step 2 Compensation Period, select "Claims Administrator Selected Step 2 Compensation Period."  Refer to the Settlement for further information on how your business' Step 2 Compensation Period will be used in calculating Total Compensation.  NOTE:  If you select a seven-consecutive-month or eight-consecutive-month period for your Step 1 Compensation Period in Question 2, that same period of consecutive months in 2010 shall be used as your Step 2 Compensation Period.

☐ **May – October 2010; or**

☐ **June – November 2010; or**

☐ **July – December 2010; or**

☐ **Use same 7 or 8 month period as Question 24; or**

☐ **Claims Administrator Selected Step 2 Compensation Period**

## D. Documentation Required for a Business Economic Loss Claim

In addition to this Claim Form, you must submit certain Supporting Documentation to prove your Business Economic Loss Claim.  The list of required documents, and instructions for how to submit them, are in Section 4 of the Business Economic Loss Instructions Booklet.   If you do not submit the required Supporting Documentation, the Claims Administrator will not be able to review your claim and you will not receive payment for your claim.

## E. Payment

1.   **If You Have Your Own Attorney.**  Unless you check the box below, the Claims Administrator will make any payments jointly to you and to your attorney, which means that both you and your attorney will need to endorse the check before a bank will honor it.

☒  Check here if you want the Claims Administrator to make payments in connection with this and any other claim you may file in the Deepwater Horizon Economic and Property Settlement *only to your attorney*. This means that the Claims Administrator will send your payment to your attorney, who will then pay you pursuant to the retainer agreement you have with him/her.

2.   **If You Do Not Have Your Own Attorney.**  If you have not retained an attorney to represent you in connection with your Spill-related claim, the Claims Administrator will make any payments to which you are entitled directly to you by check.  Payment checks will be sent by First Class Mail to the address you provided in the Registration Form or to the address that the Claims Administrator confirms for you during the processing of your Claim.  **You have an obligation to notify the Claims Administrator if your address changes.**

The Claims Administrator will report annually to federal and state taxing authorities, using a Form 1099 or state form equivalent, for certain payments made.  The Claims Administrator will send you a copy of that form, but cannot give you any tax advice regarding any payment issued to you.  You should consult with your own tax advisor to determine the tax impact of any payment you receive from the Claims Administrator.

3.   **Garnishments, Liens, and other Attachments.**  Legally authorized garnishments, liens, or similar forms of attachments relating to your claim will be honored and deducted from your payment.

4.   **W-9 Form Requirement.**  All claimants must provide a W-9 Form.  To obtain a copy of that form, go to www.deepwaterhorizonsettlements.com, or request one at a Claimant Assistance Center or by calling 1-866-992-6174.

5.   **Do you intend to seek reimbursement for Claimant Accounting Support Services in connection with your claim?**

☒ **Yes**     ☐  **No**

If you check "Yes" for Question E.5, you must submit the documents listed in Section 4.E of the Business Economic Loss Instructions Booklet.

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

## F. Signature

I certify and declare under penalty of perjury pursuant to <u>28 U.S.C. Section 1746</u> that the information provided in this Claim Form is true and accurate to the best of my knowledge, and that supporting documents attached to or submitted in connection with this form and the information contained therein are true, accurate, and complete to the best of my knowledge, and I understand that false statements or claims made in connection with this Claim Form may result in fines, imprisonment, and/or any other remedy available by law to the Federal Government, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution.

I certify that I am authorized to act on behalf of the business submitting this Claim Form.

By submitting this Claim Form, I consent to the use and disclosure by the Claims Administrator and those assisting the Claims Administrator of any information about me that they believe necessary and/or helpful to process my claim for compensation and any payment resulting from that claim.

| **Signature:** | /S/ Donald Fairbanks | **Date:** | <u>8 / 15 / 2013</u><br>(Month/Day/Year) |
|---|---|---|---|
| **Title:** | | | |

An authorized business representative must sign this Claim Form personally.

EXHIBIT 16

# DEEPWATER HORIZON ECONOMIC AND PROPERTY SETTLEMENT
# BUSINESS ECONOMIC LOSS CLAIM FORM
# (PURPLE FORM)

Form ID: PURPLE



MMR GROUP INC DBA MMR CONSTRUCTORS INC
15961 AIRLINE HIGHWAY
BATON ROUGE, LA 70817

After you complete and sign your Claim Form, submit it to the Claims Administrator as directed in the Instructions Booklet that accompanies this Claim Form.  If you submit your Claim Form by mail or delivery, do not separate this cover page from the Claim Form.  If you have to take this Claim Form apart to photocopy or fax it, make sure you include this cover page as the first page when you submit it.

**Business Economic Loss Claim Form**

EXHIBIT 16

# DEEPWATER HORIZON ECONOMIC AND PROPERTY SETTLEMENT
# BUSINESS ECONOMIC LOSS CLAIM FORM
# (PURPLE FORM)

To make a **Business Economic Loss Claim** under the Deepwater Horizon Economic and Property Damages Settlement Agreement (the "Settlement") for damages arising from the Deepwater Horizon Incident on April 20, 2010 (the "Spill"), you must complete and submit this Claim Form and all documentation required by the Settlement ("Supporting Documentation") to the Claims Administrator on or before April 22, 2014, or six months after the Effective Date of the Settlement, whichever is later.

The **Business Economic Loss Claim** is for businesses (including those reporting on Form 1040 Schedules C, E, or F) that assert economic loss due to the Spill.  Commercial Fishermen, Seafood Vessel Owners, Seafood Boat Captains, Seafood Crew, and Oyster Leaseholders who want to make a claim for economic losses relating to Seafood must use the Seafood Compensation Program Claim Form (Yellow Form) and not this Business Economic Loss Claim Form.

When completing this Claim Form, refer to the accompanying booklet called "Instructions for Completing the Business Economic Loss Claim Form (Purple Form)," which contains detailed instructions for completing and submitting this Claim Form, helpful definitions, and the list of Supporting Documentation required to prove your claim.

If you have access to a computer with an internet connection, it will be far easier for you to fill out and submit your Claim Form online, rather than on this paper Claim Form.  The online claim process will guide you through only the specific questions you need to answer, and will instruct you about the specific Supporting Documentation you must submit, based on the answers you enter as you go along.  Go to www.deepwaterhorizonsettlements.com to submit a claim online.

If you do not have access to the internet, you may visit a Claimant Assistance Center for assistance with submitting a claim in person.  Section 5 of the Business Economic Loss Instructions Booklet lists the Claimant Assistance Centers.

## A. Claimant Information

Provide the following information about the business on behalf of which you are filing this claim for Business Economic Loss.

| | | |
|---|---|---|
| **1.** | **Business Name:** | MMR Group Inc DBA MMR Constructors Inc |
| **2.** | **Social Security Number:** *or* **Individual Taxpayer Identification Number:** | SSN or ITIN |_|_|_|_|- |_|_|_|- |_|_|_|_|_| |
| | *or* **Employer Identification Number:** | EIN |_7_|_2_|- |_1_|_2_|_7_|_1_|_0_|_3_|_0_| |

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

**3. Claimant Number:** If you previously filed a claim with the Gulf Coast Claims Facility ("GCCF"), you will keep that same seven-digit Claimant Number in the Deepwater Horizon Settlement Program. Check the box at the right called "GCCF Claimant Number" and provide that seven-digit Claimant Number.

If you did not file a claim with the GCCF, you will receive a new Claimant Number when you file your initial Registration Form with the Deepwater Horizon Settlement Program. If you have already received your new Settlement Program Claimant Number, check the box called "Deepwater Horizon Settlement Program Claimant Number" and provide that nine-digit Claimant Number.

If you do not yet have a Claimant Number, leave this question blank.

☐ GCCF Claimant Number

| | | | | | | |

OR

☒ Deepwater Horizon Settlement  Program Claimant Number:

| 1 | 0 | 0 | 1 | 1 | 8 | 5 | 5 | 2 |

## B. Information Required for a Business Economic Loss Claim

If you are making a Business Economic Loss Claim for more than one Claiming Facility, photocopy this section of the Claim Form before completing it and attach the copy to the Claim Form for submission. Make one copy for each additional Claiming Facility.

**1. You cannot make an economic loss claim for a business that falls into any of the categories listed below. Check any and all boxes that describe your business.**

Refer to Section 2 of the Business Economic Loss Instructions Booklet for more detailed descriptions of these categories.

☐  (a) Financial Institution.

☐  (b) A fund, financial trust, or other financial vehicle.

☐  (c) Gaming.

☐  (d) Insurance.

☐  (e) Oil and gas industry.

☐  (f) Defense contractor or subcontractor.

☐  (g) Real estate development.

☐  (h) Selling or marketing BP-branded fuel at anytime from April 20, 2010, through April 16, 2012.

**If you check the box next to any of the above categories, your business is not eligible to make an Economic Loss Claim, and you should not complete or submit this Claim Form.**

| **2. During the period from April 1, 2010 through December 31, 2010, did your business maintain more than one separate and distinct physical location?** If you check "Yes," continue to Question 3. If you check "No," go to Question 7. | ☒ **Yes** | ☐ **No** |
|---|---|---|
| **3. Is your business' headquarters located within the Gulf Coast Areas?** | ☒ **Yes** | ☐ **No** |
| **4. Are all of your business' Facilities located within the Gulf Coast Areas?** | ☐ **Yes** | ☒ **No** |
| **5. Does your business maintain separate profit and loss statements for each Claiming Facility?** | ☐ **Yes** | ☒ **No** |

CF-4
v.1

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

| 6. | **Is your business submitting a claim for all Facilities located within the Gulf Coast Areas?**  If you checked "Yes" for Question 3, you may file a consolidated claim for all Facilities or you may elect to file individual claims for each Claiming Facility separately.  If you checked "No" for Question 3, information must be provided on a Facility-by-Facility basis, but you may send in each of those claims together to facilitate efficient processing. | ☐ **Yes**  ☒ **No** |
|---|---|---|

By checking "Yes" to this question, you are indicating that you are submitting a consolidated Claim for *all* Facilities located within the Gulf Coast Areas.  If you wish to file a claim for each Facility separately, check "No."  You may not file a consolidated Claim for only a subset of your business' Facilities located within the Gulf Coast Areas.

If you are filing a Business Economic Loss Claim for a Multi-Facility Business and are providing information on a Facility-by-Facility basis, you must complete Section B, C, D, and E for each Claiming Facility.  Questions 2 through 6 in this section are not required for each individual Facility.  Only Question 1 is required for each individual Facility.  Photocopy each section before completing it and attach the copy to this Claim Form for submission.  Make as many copies as you need.

| 7. | **What is the address of your business?**  For consolidated claims of a Multi-Facility Business with headquarters in the Gulf Coast Areas, this is the address of the corporate headquarters; otherwise this is the address of each separate Claiming Facility. |
|---|---|

| **Business Name** | **MMR Constructors Inc (Kenner)** | | |
|---|---|---|---|
| **Business Address**<br><br>☐ **Headquarters** | Street<br><br>41 Veterans Blvd. Ste A | | |
| | City<br><br>Kenner | State<br><br>LA | Zip Code<br><br>70062 |
| | County | | |
| **Business Phone Number** | () - | | |

| 8. | **In which Economic Loss Zone is your business located?**  Go to **www.deepwaterhorizonsettlements.com**, call toll free at 1-866-992-6174, or visit a Claimant Assistance Center to determine in which Economic Loss Zone your business is located. | ☐ **Zone A**<br>☐ **Zone B**<br>☐ **Zone C**<br>☐ **Zone D** |
|---|---|---|

| 9. | **Provide the NAICS (North American Industry Classification System) Code for your business that forms the basis of your Economic Loss Claim.**  You can search for your code using **www.census.gov/naics**. | |
|---|---|---|

**Provide a description of your business:**

---

| Business Economic Loss Claim Form | Page 3 |
|---|---|

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

**10.** Businesses/employers that fall within the NAICS codes and descriptions marked with an "x" in Exhibit 19, Section II must answer the following question:

**In 2009, did your business provide significant services, goods, and/or supplies to businesses in the offshore Oil & Gas Industry in the Gulf of Mexico?**  The Claims Administrator considers that an entity provided "significant" services, goods, and/or supplies to businesses in the offshore oil and gas industry in the Gulf of Mexico in 2009 if 33.00% or more of its 2009 net revenue was derived from such activities.

☐ **Yes**    ☐ **No**

**11.** **Has your business ceased operations, declared bankruptcy or liquidated substantially all of its assets since May 1, 2010?**  If your business failed between May 1, 2010 and December 31, 2011, stop filling out this Claim Form and submit the **Failed Business Economic Loss Claim Form (Red Form)** instead.

☐ **Yes**    ☐ **No**
If Yes, provide the date your business ceased operations:


(Month/Day/Year)

**12.** **Is your business a Start-Up Business?**  If your business' operations began on or after January 1, 2009, stop filling out this Claim Form and submit the **Start-up Business Economic Loss Claim Form (Gray Form)** instead.  If your business' operations began after October 20, 2008 but before January 1, 2009, you have the option of using this Business Economic Loss Claim Form (Purple Form) and selecting 2009 as your Benchmark Period or proceeding under the Start-Up Business Economic Loss Claim Form (Gray Form).

☐ **Yes**    ☐ **No**

**13.** **Did your business participate in the Vessels of Opportunity (VoO) Program?**

☐ **Yes**    ☐ **No**

**Identify any months after the Spill in which your business received revenue from the VoO program, and the amount of that revenue.  Leave this section blank if your business did not receive any revenue because of participation in the VoO program.**

| | | | |
|---|---|---|---|
| ☐ | **May 2010** | ☐ | **September 2010** |
| ☐ | **June 2010** | ☐ | **October 2010** |
| ☐ | **July 2010** | ☐ | **November 2010** |
| ☐ | **August 2010** | ☐ | **December 2010** |
| | | ☐ | **All Months 2011**    <u>$0.00</u> |

**Identify any months after the Spill in which your business incurred expenses because of participation in the VoO program, and the amount of those expenses.  Leave this section blank if your business did not incur expenses because of participation in the VoO program.**

| | | | |
|---|---|---|---|
| ☐ | **May 2010** | ☐ | **September 2010** |
| ☐ | **June 2010** | ☐ | **October 2010** |
| ☐ | **July 2010** | ☐ | **November 2010** |
| ☐ | **August 2010** | ☐ | **December 2010** |
| | | ☐ | **All Months 2011**    <u>$0.00</u> |

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

**14. Identify other sources of income to your business that can be used to reconcile tax returns with business financial statements, if any.**

**For Questions B.15 – B.19, consult the definition section in the Business Economic Loss Instructions Booklet to determine if your business meets the definition or criteria. Go online to www.deepwaterhorizonsettlements.com, call toll free at 1-866-992-6174, or visit a Claimant Assistance Center to determine in which Economic Loss Zone your business is located and whether it meets the Tourism Definition.**

| | | | |
|---|---|---|---|
| **15. Does your business sell to customers in multiple Economic Loss Zones?** | ☐ **Yes** | ☐ **No** |
| **16. Is your business a Landing Site, Commercial Wholesale or Retail Dealer A, or a Primary Seafood Processor?** | ☐ **Yes** | ☐ **No** |
| **17. Is your business a Commercial Wholesale or Retail Dealer B, a Secondary Seafood Processor, a Seafood Wholesaler or Distributor, or a Seafood Retailer?** | ☐ **Yes** | ☐ **No** |
| **18. Does your business fall within the Tourism Definition?** | ☐ **Yes** | ☐ **No** |
| **19. Is your business a Charter Fishing Operation?** | ☐ **Yes** | ☐ **No** |
| **20. Did specific market changes outside your control, unrelated to the Spill, and occurring after April 20, 2010, prevent your business from earning revenues in 2011 that were comparable to pre-Spill periods?** | ☐ **Yes** | ☐ **No** |

**If Yes, describe these market changes.** Examples may include, but are not limited to, the following: (1) the entry of a competitor in 2011; (2) the bankruptcy of a significant customer in 2011; (3) nearby road closures affecting your business; (4) unanticipated interruption resulting in closure of your business; (5) the replacement of a product or service by a customer; or (6) the loss of financing and/or reasonable terms of renewal.

| | | |
|---|---|---|
| **21. Did the Spill directly result in the cancellation of a contract that your business was unable to replace?** A Canceled Contract is a contract that was in place on April 20, 2010, and which was to be performed between April 21, 2010, and December 31, 2010, but was canceled between April 21, 2010, and December 31, 2010, and that you were unable to replace on the same or similar terms. | ☐ **Yes** | ☐ **No** |

**If Yes, attach the contract and describe your efforts and inability to replace the contract:**

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

CF-4
v.1

| 22. | **Did the Spill result in reservation cancellations that your business was unable to rebook?** A Canceled Reservation is a reservation that was in place on April 20, 2010, and which was to occur between April 21, 2010, and December 31, 2010, but was canceled between April 21, 2010, and December 31, 2010, and that you were unable to replace on the same or similar terms. | ☐ **Yes** ☐ **No** |

**If Yes, describe the cancellations and your efforts and inability to rebook the cancellations:**

## C. Selection of Benchmark and Compensation Periods

Claimants must make several elections to qualify for benefits.  Claimants select one historical set of years for all comparisons throughout the claims process (the Benchmark Period year(s)).  In addition, Claimants select two Compensation Periods.  Consult the "Instructions for Completing the Business Economic Claim Form (Purple Form)" for more information.

23. **Select Benchmark Period years.**  Choose one of the following periods, which will serve as the baseline for measuring your business' historical financial performance.  The Claims Administrator will review all the documents and information you submit to determine the best Benchmark Period that maximizes your recovery, even if that differs from the period you select.  If you do not wish to pick a Benchmark Period at all and instead would like the Claims Administrator to select your best Benchmark Period, select "Claims Administrator Selected Benchmark Period."

    ☐ **2009; or**

    ☐ **Average of 2008 and 2009; or**

    ☐ **Average of 2007, 2008, and 2009.**

    ☐ **Claims Administrator Selected Benchmark.**

**24.** **Select Step 1 Compensation Period.** Choose three or more consecutive months from May 2010 through December 2010.  You can check all of the boxes or as few as three.  However, all boxes checked must be consecutive.  The Claims Administrator will review all the documents and information you submit to determine the best Step 1 Compensation Period that maximizes your recovery, even if that differs from the period you select.  If you do not wish to pick a Step 1 Compensation Period at all and instead would like the Claims Administrator to select your best Step 1 Compensation Period, select "Claims Administrator Selected Step 1 Compensation Period."  If you are eligible for compensation, a different Compensation Period may be selected to determine your Total Compensation.  Refer to the Settlement for further information on how your business' Step 1 Compensation Period will be used in calculating Total Compensation.

☐ **May 2010**          ☐ **September 2010**

☐ **June 2010**          ☐ **October 2010**

☐ **July 2010**          ☐ **November 2010**

☐ **August 2010**          ☐ **December 2010**

☐ **Claims Administrator Selected Step 1 Compensation Period**

**25.** **Select Step 2 Compensation Period.** Choose one of the following periods, which will serve as your business' Step 2 Compensation Period.  If your business is eligible for compensation, the Step 2 Compensation Period you select will be used to determine your business' Total Compensation.  The Claims Administrator will review all the documents and information you submit to determine the best Step 2 Compensation Period that maximizes your recovery, even if that differs from the period you select.  If you do not wish to pick a Step 2 Compensation Period at all and instead would like the Claims Administrator to select your best Step 2 Compensation Period, select "Claims Administrator Selected Step 2 Compensation Period."  Refer to the Settlement for further information on how your business' Step 2 Compensation Period will be used in calculating Total Compensation.  NOTE:  If you select a seven-consecutive-month or eight-consecutive-month period for your Step 1 Compensation Period in Question 2, that same period of consecutive months in 2010 shall be used as your Step 2 Compensation Period.

☐ **May – October 2010; or**

☐ **June – November 2010; or**

☐  **July – December 2010; or**

☐ **Use same 7 or 8 month period as Question 24; or**

☐ **Claims Administrator Selected Step 2 Compensation Period**

CF-4
v.1

TO FILE YOUR CLAIM ONLINE VISIT WWW.DEEPWATERHORIZONSETTLEMENTS.COM

## D. Documentation Required for a Business Economic Loss Claim

In addition to this Claim Form, you must submit certain Supporting Documentation to prove your Business Economic Loss Claim. The list of required documents, and instructions for how to submit them, are in Section 4 of the Business Economic Loss Instructions Booklet. If you do not submit the required Supporting Documentation, the Claims Administrator will not be able to review your claim and you will not receive payment for your claim.

## E. Payment

1. **If You Have Your Own Attorney.** Unless you check the box below, the Claims Administrator will make any payments jointly to you and to your attorney, which means that both you and your attorney will need to endorse the check before a bank will honor it.

   ☒ Check here if you want the Claims Administrator to make payments in connection with this and any other claim you may file in the Deepwater Horizon Economic and Property Settlement *only to your attorney*. This means that the Claims Administrator will send your payment to your attorney, who will then pay you pursuant to the retainer agreement you have with him/her.

2. **If You Do Not Have Your Own Attorney.** If you have not retained an attorney to represent you in connection with your Spill-related claim, the Claims Administrator will make any payments to which you are entitled directly to you by check. Payment checks will be sent by First Class Mail to the address you provided in the Registration Form or to the address that the Claims Administrator confirms for you during the processing of your Claim. **You have an obligation to notify the Claims Administrator if your address changes.**

   The Claims Administrator will report annually to federal and state taxing authorities, using a Form 1099 or state form equivalent, for certain payments made. The Claims Administrator will send you a copy of that form, but cannot give you any tax advice regarding any payment issued to you. You should consult with your own tax advisor to determine the tax impact of any payment you receive from the Claims Administrator.

3. **Garnishments, Liens, and other Attachments.** Legally authorized garnishments, liens, or similar forms of attachments relating to your claim will be honored and deducted from your payment.

4. **W-9 Form Requirement.** All claimants must provide a W-9 Form. To obtain a copy of that form, go to www.deepwaterhorizonsettlements.com, or request one at a Claimant Assistance Center or by calling 1-866-992-6174.

5. **Do you intend to seek reimbursement for Claimant Accounting Support Services in connection with your claim?**

   ☒ Yes     ☐ No

   If you check "Yes" for Question E.5, you must submit the documents listed in Section 4.E of the Business Economic Loss Instructions Booklet.

## F.  Signature

I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that the information provided in this Claim Form is true and accurate to the best of my knowledge, and that supporting documents attached to or submitted in connection with this form and the information contained therein are true, accurate, and complete to the best of my knowledge, and I understand that false statements or claims made in connection with this Claim Form may result in fines, imprisonment, and/or any other remedy available by law to the Federal Government, and that suspicious claims will be forwarded to federal, state, and local law enforcement agencies for possible investigation and prosecution.

I certify that I am authorized to act on behalf of the business submitting this Claim Form.

By submitting this Claim Form, I consent to the use and disclosure by the Claims Administrator and those assisting the Claims Administrator of any information about me that they believe necessary and/or helpful to process my claim for compensation and any payment resulting from that claim.

| **Signature:** | /S/ Donald Fairbanks | **Date:** | 8 / 15 / 2013 (Month/Day/Year) |
|---|---|---|---|
| **Title:** | | | |

An authorized business representative must sign this Claim Form personally.

EXHIBIT 17

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

## NOTICE REGARDING POTENTIAL MORATORIA LOSSES
### DATE OF NOTICE: October 7, 2014

### I. CLAIMANT AND CLAIM INFORMATION

| Claimant Name | Last/Name of Business | First | Middle |
|---|---|---|---|
| | MMR Group Inc DBA MMR Constructors Inc | | |

| Claimant ID | 100118552 | Claim ID | 229610 |
|---|---|---|---|

| Claim Type | Business Economic Loss |
|---|---|
| Law Firm | Law Office of Kyle Whitaker |

### II.  PURPOSE OF THIS NOTICE

This Notice is an official communication from the Claims Administrator for the Deepwater Horizon Economic and Property Damages Settlement Program ("Settlement Program") and relates to the claim identified in Section I. This is not a denial of your claim, but instead is a preliminary Notice to update you on the status of your claim.

Section 38.93 of the Economic and Property Damages Settlement Agreement ("Settlement Agreement") excludes all Moratoria Losses from the Settlement Program. During our review of your claim, we identified indicia of potential Moratoria Losses. Your claim may require additional scrutiny to distinguish excluded Moratoria Losses, if any, from compensable non-Moratoria Losses. We do not currently require any additional information or response from you. After we have completed reviewing your claim, we will send you a Notice explaining the outcome of that review. You will have the opportunity then to accept the outcome set forth in that Notice or, if applicable, request Re-Review or Reconsideration of all decisions made on your claim.

### III. MORATORIA LOSSES DEFINITION

Section 38.93 of the Settlement Agreement defines Moratoria Losses as any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity, including shallow water and deepwater activity, that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections, or permitting practices. Claims for Moratoria Losses are expressly reserved claims and are excluded from the Economic and Property Damages Settlement Class.

To implement this exclusion, the Claims Administrator established a dedicated special review team to examine all economic loss claims that include potential Moratoria Losses. This special review distinguishes excluded Moratoria Losses from compensable non-Moratoria Losses and may require supplemental information. At present, BP and Class Counsel have not developed the requisite guidance for the Claims Administrator to use in making compensation determinations that adhere to the Moratoria Losses exclusion in the Settlement Agreement. Once the Claims Administrator receives this guidance, the dedicated special review team will resume working on your claim. At that time, we will contact you if we need any additional information or documents.

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or the status of your claim(s) or need help, contact the Claimant Communications Center at 1-800-353-1262 or send an email to **Questions@dhecc.com**. If you are a law firm or claims preparation company, call or email your designated DWH Contact for help or assistance. You also may visit a Claimant Assistance Center and talk with one of our representatives.  For a complete list of Claimant Assistance Centers, go to **www.deepwaterhorizoneconomicsettlement.com.**

EXHIBIT 17
Claimant ID:  100118552
Claim ID:  229610

# EXHIBIT 18

**DEEPWATER HORIZON**
**CLAIMS CENTER**
ECONOMIC & PROPERTY DAMAGE CLAIMS

## NOTICE REGARDING POTENTIAL MORATORIA LOSSES
### DATE OF NOTICE: October 7, 2014

### I. CLAIMANT AND CLAIM INFORMATION

| Claimant Name | Last/Name of Business | First | Middle |
|---|---|---|---|
| | MMR Group Inc DBA MMR Constructors Inc | | |

| Claimant ID | 100118552 | Claim ID | 229615 |
|---|---|---|---|

| Claim Type | Business Economic Loss |
|---|---|

| Law Firm | Law Office of Kyle Whitaker |
|---|---|

### II. PURPOSE OF THIS NOTICE

This Notice is an official communication from the Claims Administrator for the Deepwater Horizon Economic and Property Damages Settlement Program ("Settlement Program") and relates to the claim identified in Section I. This is not a denial of your claim, but instead is a preliminary Notice to update you on the status of your claim.

Section 38.93 of the Economic and Property Damages Settlement Agreement ("Settlement Agreement") excludes all Moratoria Losses from the Settlement Program. During our review of your claim, we identified indicia of potential Moratoria Losses. Your claim may require additional scrutiny to distinguish excluded Moratoria Losses, if any, from compensable non-Moratoria Losses. We do not currently require any additional information or response from you. After we have completed reviewing your claim, we will send you a Notice explaining the outcome of that review. You will have the opportunity then to accept the outcome set forth in that Notice or, if applicable, request Re-Review or Reconsideration of all decisions made on your claim.

### III. MORATORIA LOSSES DEFINITION

Section 38.93 of the Settlement Agreement defines Moratoria Losses as any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity, including shallow water and deepwater activity, that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections, or permitting practices. Claims for Moratoria Losses are expressly reserved claims and are excluded from the Economic and Property Damages Settlement Class.

To implement this exclusion, the Claims Administrator established a dedicated special review team to examine all economic loss claims that include potential Moratoria Losses. This special review distinguishes excluded Moratoria Losses from compensable non-Moratoria Losses and may require supplemental information. At present, BP and Class Counsel have not developed the requisite guidance for the Claims Administrator to use in making compensation determinations that adhere to the Moratoria Losses exclusion in the Settlement Agreement. Once the Claims Administrator receives this guidance, the dedicated special review team will resume working on your claim. At that time, we will contact you if we need any additional information or documents.

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or the status of your claim(s) or need help, contact the Claimant Communications Center at 1-800-353-1262 or send an email to **Questions@dhecc.com**. If you are a law firm or claims preparation company, call or email your designated DWH Contact for help or assistance. You also may visit a Claimant Assistance Center and talk with one of our representatives. For a complete list of Claimant Assistance Centers, go to **www.deepwaterhorizoneconomicsettlement.com.**

EXHIBIT 18

GEN-19  **WWW.DEEPWATERHORIZONECONOMICSETTLEMENT.COM**  Claimant ID: 100118552
Claim ID: 229615

EXHIBIT 19

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

## NOTICE REGARDING POTENTIAL MORATORIA LOSSES

### DATE OF NOTICE: October 7, 2014

### I. CLAIMANT AND CLAIM INFORMATION

| Claimant Name | Last/Name of Business | First | Middle |
|---|---|---|---|
| | MMR Group Inc DBA MMR Constructors Inc | | |

| Claimant ID | 100118552 | Claim ID | 229616 |
|---|---|---|---|

| Claim Type | Business Economic Loss |
|---|---|

| Law Firm | Law Office of Kyle Whitaker |
|---|---|

### II.  PURPOSE OF THIS NOTICE

This Notice is an official communication from the Claims Administrator for the Deepwater Horizon Economic and Property Damages Settlement Program ("Settlement Program") and relates to the claim identified in Section I. This is not a denial of your claim, but instead is a preliminary Notice to update you on the status of your claim.

Section 38.93 of the Economic and Property Damages Settlement Agreement ("Settlement Agreement") excludes all Moratoria Losses from the Settlement Program. During our review of your claim, we identified indicia of potential Moratoria Losses. Your claim may require additional scrutiny to distinguish excluded Moratoria Losses, if any, from compensable non-Moratoria Losses. We do not currently require any additional information or response from you. After we have completed reviewing your claim, we will send you a Notice explaining the outcome of that review. You will have the opportunity then to accept the outcome set forth in that Notice or, if applicable, request Re-Review or Reconsideration of all decisions made on your claim.

### III. MORATORIA LOSSES DEFINITION

Section 38.93 of the Settlement Agreement defines Moratoria Losses as any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity, including shallow water and deepwater activity, that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections, or permitting practices. Claims for Moratoria Losses are expressly reserved claims and are excluded from the Economic and Property Damages Settlement Class.

To implement this exclusion, the Claims Administrator established a dedicated special review team to examine all economic loss claims that include potential Moratoria Losses. This special review distinguishes excluded Moratoria Losses from compensable non-Moratoria Losses and may require supplemental information. At present, BP and Class Counsel have not developed the requisite guidance for the Claims Administrator to use in making compensation determinations that adhere to the Moratoria Losses exclusion in the Settlement Agreement. Once the Claims Administrator receives this guidance, the dedicated special review team will resume working on your claim. At that time, we will contact you if we need any additional information or documents.

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or the status of your claim(s) or need help, contact the Claimant Communications Center at 1-800-353-1262 or send an email to **Questions@dhecc.com**. If you are a law firm or claims preparation company, call or email your designated DWH Contact for help or assistance. You also may visit a Claimant Assistance Center and talk with one of our representatives.  For a complete list of Claimant Assistance Centers, go to **www.deepwaterhorizoneconomicsettlement.com.**

EXHIBIT 19
Claimant ID:  100118552
Claim ID:  229616

EXHIBIT 20

**DEEPWATER HORIZON**
CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

## NOTICE REGARDING POTENTIAL MORATORIA LOSSES
### DATE OF NOTICE: October 7, 2014

### I. CLAIMANT AND CLAIM INFORMATION

| Claimant Name | Last/Name of Business<br>MMR Group Inc DBA MMR Constructors Inc | First | Middle |
|---|---|---|---|
| **Claimant ID** | 100118552 | **Claim ID** | 229618 |
| **Claim Type** | Business Economic Loss | | |
| **Law Firm** | Law Office of Kyle Whitaker | | |

### II. PURPOSE OF THIS NOTICE

This Notice is an official communication from the Claims Administrator for the Deepwater Horizon Economic and Property Damages Settlement Program ("Settlement Program") and relates to the claim identified in Section I. This is not a denial of your claim, but instead is a preliminary Notice to update you on the status of your claim.

Section 38.93 of the Economic and Property Damages Settlement Agreement ("Settlement Agreement") excludes all Moratoria Losses from the Settlement Program. During our review of your claim, we identified indicia of potential Moratoria Losses. Your claim may require additional scrutiny to distinguish excluded Moratoria Losses, if any, from compensable non-Moratoria Losses. We do not currently require any additional information or response from you. After we have completed reviewing your claim, we will send you a Notice explaining the outcome of that review. You will have the opportunity then to accept the outcome set forth in that Notice or, if applicable, request Re-Review or Reconsideration of all decisions made on your claim.

### III. MORATORIA LOSSES DEFINITION

Section 38.93 of the Settlement Agreement defines Moratoria Losses as any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity, including shallow water and deepwater activity, that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections, or permitting practices. Claims for Moratoria Losses are expressly reserved claims and are excluded from the Economic and Property Damages Settlement Class.

To implement this exclusion, the Claims Administrator established a dedicated special review team to examine all economic loss claims that include potential Moratoria Losses. This special review distinguishes excluded Moratoria Losses from compensable non-Moratoria Losses and may require supplemental information. At present, BP and Class Counsel have not developed the requisite guidance for the Claims Administrator to use in making compensation determinations that adhere to the Moratoria Losses exclusion in the Settlement Agreement. Once the Claims Administrator receives this guidance, the dedicated special review team will resume working on your claim. At that time, we will contact you if we need any additional information or documents.

### IV. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you have any questions about this Notice or the status of your claim(s) or need help, contact the Claimant Communications Center at 1-800-353-1262 or send an email to **Questions@dhecc.com**. If you are a law firm or claims preparation company, call or email your designated DWH Contact for help or assistance. You also may visit a Claimant Assistance Center and talk with one of our representatives. For a complete list of Claimant Assistance Centers, go to **www.deepwaterhorizoneconomicsettlement.com.**

EXHIBIT 20
Claimant ID:  100118552
Claim ID:  229618

EXHIBIT 21



## State Licensing Board for Contractors

This is to Certify that:

MMR CONSTRUCTORS, INC.
P. O. Box 84210
Baton Rouge, LA  70884-4210

is duly licensed and entitled to practice the following classifications

BUILDING CONSTRUCTION; ELECTRICAL WORK (STATEWIDE); HEAVY CONSTRUCTION;
MECHANICAL WORK (STATEWIDE); MUNICIPAL AND PUBLIC WORKS CONSTRUCTION; SPECIALTY:
INSTRUMENTATION AND CALIBRATION; SPECIALTY: POWER PLANTS

Witness our hand and seal of the Board dated,
Baton Rouge, LA    11th    day of    December    2010

_____ Chairman

_____ Director

_____ Secretary-Treasurer

This License Is Not Transferrable

Expiration Date:    December 10, 2013

License No:    20379



**EXHIBIT 21**

# EXHIBIT 22

CLIENT C2300

**MADDOX & ASSOCIATES, APC**
**9654 BROOKLINE AVENUE,STE. 100**
**BATON ROUGE, LA 70809-1459**
**(225) 926-3360**

September 9, 2010

MMR GROUP, INC.
15961 AIRLINE HIGHWAY
BATON ROUGE, LA 70817-7412

FEDERAL ID: 72-1271030

Dear Client:

Your Federal Corporation Income Tax Return was acknowledged as accepted by the Internal
Revenue Service on September 9, 2010.  No tax is payable with the filing of this return.  There is
an overpayment of $1,481,664, of which $1,481,664 has been applied to your 2010 estimated tax.
If you have questions about this return, please call the Odgen e-Help Desk at 1-866-255-0654.

Please be sure to call if you have any questions.

Sincerely,


WILLIAM B. BEALE

EXHIBIT 22

| Form **8879-C** | IRS *e-file* Signature Authorization for Form 1120 | OMB No. 1545-1864 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | For calendar year 2009 or tax year beginning _ _ _ _ _ , 2009 ending _ _ _ _ _ , _ _ _ _ ▶ See instructions. Do not send to the IRS. Keep for your records. | **2009** |

| Name of corporation | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

**Part I   Tax Return Information** (Whole dollars only)

| | | | |
|---|---|---|---|
| 1 | Total income (Form 1120, line 11) | **1** | 93,176,215. |
| 2 | Taxable income (Form 1120, line 30) | **2** | 43,670,365. |
| 3 | Total tax (Form 1120, line 31) | **3** | 13,779,864. |
| 4 | Amount owed (Form 1120, line 34) | **4** | |
| 5 | Overpayment (Form 1120, line 35) | **5** | 1,481,664. |

**Part II   Declaration and Signature Authorization of Officer (Be sure to get a copy of the corporation's return)**

Under penalties of perjury, I declare that I am an officer of the above corporation and that I have examined a copy of the corporation's 2009 electronic income tax return and accompanying schedules and statements and to the best of my knowledge and belief, it is true, correct, and complete. I further declare that the amounts in Part I above are the amounts shown on the copy of the corporation's electronic income tax return. I consent to allow my electronic return originator (ERO), transmitter, or intermediate service provider to send the corporation's return to the IRS and to receive from the IRS **(a)** an acknowledgement of receipt or reason for rejection of the transmission, **(b)** an indication of any refund offset, **(c)** the reason for any delay in processing the return or refund, and **(d)** the date of any refund. If applicable, I authorize the U.S. Treasury and its designated Financial Agent to initiate an electronic funds withdrawal (direct debit) entry to the financial institution account indicated in the tax preparation software for payment of the corporation's federal taxes owed on this return, and the financial institution to debit the entry to this account. To revoke a payment, I must contact the U.S. Treasury Financial Agent at **1-888-353-4537** no later than 2 business days prior to the payment (settlement) date. I also authorize the financial institutions involved in the processing of the electronic payment of taxes to receive confidential information necessary to answer inquiries and resolve issues related to the payment. I have selected a personal identification number (PIN) as my signature for the corporation's electronic income tax return and, if applicable, the corporation's consent to electronic funds withdrawal.

**Officer's PIN: check one box only**

[X] I authorize   MADDOX & ASSOCIATES, APC   to enter my PIN   32300   as my signature
                  ERO firm name                                  do not enter all zeros
on the corporation's 2009 electronically filed income tax return.

[ ] As an officer of the corporation, I will enter my PIN as my signature on the corporation's 2009 electronically filed income tax return

Officer's signature ▶ _____   Date ▶ 9-08-10   Title ▶ PRESIDENT

**Part III   Certification and Authentication**

**ERO's EFIN/PIN.** Enter your six-digit EFIN followed by your five-digit self-selected PIN

                                                                 72251770809
                                                                 do not enter all zeros

I certify that the above numeric entry is my PIN, which is my signature on the 2009 electronically filed income tax return for the corporation indicated above. I confirm that I am submitting this return in accordance with the requirements of **Pub 3112**, IRS *e-file* Application and Participation, and **Pub 4163**, Modernized e-File (MeF) Information for Authorized IRS *e-file* Providers for Business Returns

ERO's signature ▶ William B. Beale   Date ▶ 9-9-10

**ERO Must Retain This Form — See Instructions**
**Do Not Submit This Form to the IRS Unless Requested To Do So**

BAA  For Paperwork Reduction Act Notice, see instructions                    Form **8879-C** (2009)

CPCA1201L  10/16/09.

# Form 1120

Department of the Treasury
Internal Revenue Service

## U.S. Corporation Income Tax Return

For calendar year 2009 or tax year beginning _____ , 2009, ending _____ , _____

► See separate instructions.

OMB No. 1545-0123

# 2009

**A Check if:**

1 a Consolidated return (attach Form 851). [X]
  b Life/nonlife consolidated return......
2 Personal holding co (attach Sch PH)....
3 Personal service corp (see instr)....
4 Schedule M-3 attached [X]

**Use IRS label. Otherwise, print or type.**

MMR GROUP, INC.
15961 AIRLINE HIGHWAY
BATON ROUGE, LA 70817-7412

**B Employer identification number**
72-1271030

**C Date incorporated**
3/13/1990

**D Total assets (see instructions)**
$ 173,649,119.

**E Check if:** (1) [ ] Initial return (2) [ ] Final return (3) [ ] Name change (4) [ ] Address change

| | | | |
|---|---|---|---|
| **INCOME** | 1a Gross receipts or sales | 316,078,930. | b Less returns & allowances . | c Balance ► | 1c | 316,078,930. |
| | 2 Cost of goods sold (Schedule A, line 8)............ | | 2 | 245,530,298. |
| | 3 Gross profit. Subtract line 2 from line 1c............ | | 3 | 70,548,632. |
| | 4 Dividends (Schedule C, line 19)............ | | 4 | 1,055,467. |
| | 5 Interest............ | | 5 | |
| | 6 Gross rents............ | | 6 | |
| | 7 Gross royalties............ | | 7 | |
| | 8 Capital gain net income (attach Schedule D (Form 1120))............ | | 8 | |
| | 9 Net gain or (loss) from Form 4797, Part II, line 17 (attach Form 4797)............ | | 9 | |
| | 10 Other income (see instructions — attach schedule)............ SEE STATEMENT 1 | | 10 | 21,572,116. |
| | 11 **Total income.** Add lines 3 through 10............ ► | | 11 | 93,176,215. |

| | | | |
|---|---|---|---|
| **DEDUCTIONS** (SEE INSTRUCTIONS FOR LIMITATIONS ON DEDUCTIONS) | 12 Compensation of officers (Schedule E, line 4)............ | 12 | 16,652,206. |
| | 13 Salaries and wages (less employment credits)............ | 13 | 13,137,711. |
| | 14 Repairs and maintenance............ | 14 | 1,939,861. |
| | 15 Bad debts............ | 15 | |
| | 16 Rents............ | 16 | 989,943. |
| | 17 Taxes and licenses............ | 17 | 1,093,315. |
| | 18 Interest............ | 18 | 567,724. |
| | 19 Charitable contributions............ | 19 | |
| | 20 Depreciation from Form 4562 not claimed on Schedule A or elsewhere on return (attach Form 4562) .. | 20 | 3,292,004. |
| | 21 Depletion............ | 21 | |
| | 22 Advertising............ | 22 | 60,218. |
| | 23 Pension, profit-sharing, etc, plans............ | 23 | 300,000. |
| | 24 Employee benefit programs............ | 24 | |
| | 25 Domestic production activities deduction (attach Form 8903)............ | 25 | 2,786,893. |
| | 26 Other deductions (attach schedule)............ SEE STATEMENT 2 | 26 | 8,685,975. |
| | 27 **Total deductions.** Add lines 12 through 26............ ► | 27 | 49,505,850. |
| | 28 Taxable income before net operating loss deduction and special deductions. Subtract line 27 from line 11 . | 28 | 43,670,365. |
| | 29 **Less: a** Net operating loss deduction (see instructions) ..... | 29a | | |
| | **b** Special deductions (Schedule C, line 20) ............ | 29b | | 29c | |

| | | | |
|---|---|---|---|
| **TAX, REFUNDABLE CREDITS AND PAYMENTS** | 30 **Taxable income.** Subtract line 29c from line 28 (see instructions) ............ | 30 | 43,670,365. |
| | 31 **Total tax** (Schedule J, line 10)............ | 31 | 13,779,864. |
| | 32a 2008 overpayment credited to 2009 . 32a | 279,718. | | |
| | b 2009 estimated tax payments....... 32b | 11,100,000. | | |
| | c 2009 refund applied for on Form 4466... 32c | | d Bal ► | 32d | 11,379,718. |
| | e Tax deposited with Form 7004............ | 32e | 4,029,884. |
| | f Credits: (1) Form 2439 | (2) Form 4136 | 32f | |
| | g Refundable credits from Form 3800, line 19c, and Form 8827, line 8c..... 32g | | 32h | 15,409,602. |
| | 33 Estimated tax penalty (see instructions). Check if Form 2220 is attached............ ► [X] | 33 | 148,074. |
| | 34 Amount owed. If line 32h smaller than the total of lines 31 and 33, enter amount owed............ | 34 | |
| | 35 Overpayment. If line 32h is larger than the total of lines 31 and 33, enter amount overpaid............ | 35 | 1,481,664. |
| | 36 Enter amount from line 35 you want: Credited to 2010 estimated tax ► 1,481,664. Refunded ► | 36 | 0. |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer _____ Date _____ ► PRESIDENT (Title)

May the IRS discuss this return with the preparer shown below (see instructions)? [X] Yes [ ] No

**Paid Preparer's Use Only**

| | |
|---|---|
| Preparer's signature ► | Date | Check if self-employed [ ] | Preparer's SSN or PTIN P00437323 |
| Firm's name (or yours if self-employed), address, and ZIP code | MADDOX & ASSOCIATES, APC | EIN 72-1314069 |
| | 9654 BROOKLINE AVENUE, STE. 100 BATON ROUGE, LA 70809-1459 | Phone no. (225) 926-3360 |

BAA  For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.    CPCA0205L  10/21/09    Form **1120** (2009)

Form **1120** (2009)   MMR GROUP, INC.   72-1271030             Page **2**

## Schedule A | Cost of Goods Sold (see instructions)

| | | | |
|---|---|---|---:|
| 1 | Inventory at beginning of year | 1 | 371,927. |
| 2 | Purchases | 2 | 67,639,847. |
| 3 | Cost of labor | 3 | 129,859,015. |
| 4 | Additional section 263A costs (attach schedule) | 4 | |
| 5 | Other costs (attach schedule) . . . . . . . . . . . . . . . . SEE STATEMENT 3 | 5 | 48,164,647. |
| 6 | **Total.** Add lines 1 through 5 | 6 | 246,035,436. |
| 7 | Inventory at end of year | 7 | 505,138. |
| 8 | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on page 1, line 2 | 8 | 245,530,298. |

**9a** Check all methods used for valuing closing inventory:

  (i)  [X] Cost

  (ii)  [ ] Lower of cost or market

  (iii)  [ ] Other (Specify method used and attach explanation.) . . . . . . . ▶ _____

  **b** Check if there was a writedown of subnormal goods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ [ ]

  **c** Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) . . . . . . . . . . . . . . . . ▶ [ ]

  **d** If the LIFO inventory method was used for this tax year, enter percentage (or amounts) of closing inventory computed under LIFO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9d** | |

  **e** If property is produced or acquired for resale, do the rules of section 263A apply to the corporation? . . . . . . . . . . . . . . . . . [ ] Yes  [X] No

  **f** Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If 'Yes,' attach explanation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ] Yes  [X] No

## Schedule C | Dividends and Special Deductions (see instructions)

| | | (a) Dividends received | (b) Percentage | (c) Special deductions (a) x (b) |
|---|---|---:|:---:|---|
| 1 | Dividends from less-than-20%-owned domestic corporations (other than debt-financed stock) | | 70 | |
| 2 | Dividends from 20%-or-more-owned domestic corporations (other than debt-financed stock) | | 80 | |
| 3 | Dividends on debt-financed stock of domestic and foreign corporations | | see instructions | |
| 4 | Dividends on certain preferred stock of less-than-20%-owned public utilities | | 42 | |
| 5 | Dividends on certain preferred stock of 20%-or-more-owned public utilities | | 48 | |
| 6 | Dividends from less-than-20%-owned foreign corporations and certain FSCs | | 70 | |
| 7 | Dividends from 20%-or-more-owned foreign corporations and certain FSCs | | 80 | |
| 8 | Dividends from wholly owned foreign subsidiaries | | 100 | |
| 9 | **Total.** Add lines 1 through 8. See instructions for limitation | | | |
| 10 | Dividends from domestic corporations received by a small business investment company operating under the Small Business Investment Act of 1958 | | 100 | |
| 11 | Dividends from affiliated group members | | 100 | |
| 12 | Dividends from certain FSCs | | 100 | |
| 13 | Dividends from foreign corporations not included on lines 3, 6, 7, 8, 11, or 12 | 1,055,467. | | |
| 14 | Income from controlled foreign corporations under subpart F (attach Form(s) 5471) | | | |
| 15 | Foreign dividend gross-up | | | |
| 16 | IC-DISC and former DISC dividends not included on lines 1, 2, or 3 | | | |
| 17 | Other dividends | | | |
| 18 | Deduction for dividends paid on certain preferred stock of public utilities | | | |
| 19 | **Total dividends.** Add lines 1 through 17. Enter here and on page 1, line 4 . . . . . . ▶ | 1,055,467. | | |
| 20 | **Total special deductions.** Add lines 9, 10, 11, 12, and 18. Enter here and on page 1, line 29b . . . . . . . . . . . . . . . . ▶ | | | |

## Schedule E | Compensation of Officers (see instructions for page 1, line 12)

**Note:** Complete Schedule E only if total receipts (line 1a plus lines 4 through 10 on page 1) are $500,000 or more.

| 1 (a) Name of officer | (b) Social security number | (c) Percent of time devoted to business | Percent of corporation stock owned | | (f) Amount of compensation |
|---|---|---|---|---|---|
| | | | (d) Common | (e) Preferred | |
| SEE STATEMENT 4 | | % | % | % | 16,652,206. |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| **2** Total compensation of officers | | | | | 16,652,206. |
| **3** Compensation of officers claimed on Schedule A and elsewhere on return | | | | | |
| **4** Subtract line 3 from line 2. Enter the result here and on page 1, line 12 | | | | | 16,652,206. |

Form **1120** (2009)

Form **1120** (2009)    MMR GROUP, INC.    72-1271030                                   Page **3**

| **Schedule J** | **Tax Computation** (see instructions) | | |
|---|---|---|---|
| 1 | Check if the corporation is a member of a controlled group (attach Schedule O (Form 1120)) ........ ▶ ☐ | | |
| 2 | Income tax. Check if a qualified personal service corporation | | |
| | (see instructions) .................................................. ▶ ☐ | **2** | 15,284,628. |
| 3 | Alternative minimum tax (attach Form 4626) ................................... | **3** | |
| 4 | Add lines 2 and 3 ....................................................... | **4** | 15,284,628. |
| 5a | Foreign tax credit (attach Form 1118) ................. **5a** | 369,413. | |
| b | Credit from Form 8834, line 29 .................... **5b** | | |
| c | General business credit (attach Form 3800) ........... **5c** | 1,135,351. | |
| d | Credit for prior year minimum tax (attach Form 8827) .... **5d** | | |
| e | Bond credits from Form 8912 ..................... **5e** | | |
| 6 | **Total credits.** Add lines 5a through 5e ..................................... | **6** | 1,504,764. |
| 7 | Subtract line 6 from line 4 ................................................. | **7** | 13,779,864. |
| 8 | Personal holding company tax (attach Schedule PH (Form 1120)) ...................... | **8** | |
| 9 | Other taxes.  Check if from: ☐ Form 4255  ☐ Form 8611  ☐ Form 8697 | | |
| | ☐ Form 8866  ☐ Form 8902  ☐ Other (att schedule) ............ | **9** | |
| 10 | **Total tax.** Add lines 7 through 9. Enter here and on page 1, line 31 ................... | **10** | 13,779,864. |

| **Schedule K** | **Other Information** (see instructions) | | Yes | No |
|---|---|---|---|---|
| 1 | Check accounting method    **a** ☐ Cash  **b** ☒ Accrual  **c** ☐ Other (specify) ▶ _ _ _ _ _ _ _ _ _ _ _ | | | |
| 2 | See the instructions and enter the: | | | |
| a | Business activity code no. ▶ _238210_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | |
| b | Business activity ▶  CONSTRUCTION _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | |
| c | Product or service ▶  ELECTRICAL _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | |
| 3 | Is the corporation a subsidiary in an affiliated group or a parent-subsidiary controlled group? ................ | | | X |
| | If 'Yes,' enter name and EIN of the parent corporation ▶ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | |
| 4 | At the end of the tax year: | | | |
| a | Did any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote? If 'Yes,' complete Part I of Schedule G (Form 1120) (attach Schedule G) ............. | | | X |
| b | Did any individual or estate own, directly 20% or more, or own directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote? If 'Yes,' complete Part II of Schedule G (Form 1120) (attach Schedule G) ........ | | X | |
| 5 | At the end of the tax year, did the corporation: | | Yes | No |
| a | Own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of stock entitled to vote of any foreign or domestic corporation not included on **Form 851,** Affiliations Schedule? For rules of constructive ownership see instructions ........................................................... | | | X |
| | If 'Yes,' complete (i) through (iv) | | | |

| **(i)** Name of Corporation | **(ii)** Employer Identification Number (if any) | **(iii)** Country of Incorporation | **(iv)** Percentage Owned in Voting Stock |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Form **1120** (2009)    MMR GROUP, INC.    72-1271030    Page **4**

| **Schedule K** | *Continued* |
|---|---|

**b** Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership see instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **X**

If 'Yes,' complete (i) through (iv)

| **(i)** Name of Entity | **(ii)** Employer Identification Number (if any) | **(iii)** Country of Incorporation | **(iv)** Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**6**  During this tax year, did the corporation pay dividends (other than stock dividends and distributions in exchange for stock) in excess of the corporation's current and accumulated earnings and profits? (See sections 301 and 316.) . . . . . . . . . . . . . . . . . . . . .    **X**

If 'Yes,' file **Form 5452**, Corporate Report of Nondividend Distributions.

If this is a consolidated return, answer here for the parent corporation and on Form 851 for each subsidiary

**7**  At any time during the tax year, did one foreign person own, directly or indirectly, at least 25% of **(a)** the total voting power of all classes of the corporation's stock entitled to vote or **(b)** the total value of all classes of the corporation's stock? . . . . . . . . . . .    **X**

For rules of attribution see section 318. If 'Yes,' enter:

**(i)** Percentage owned ► _ _ _ _ _ _ _    and **(ii)** Owner's country ► _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**(c)** The corporation may have to file **Form 5472,** Information Return of a 25% Foreign-Owned U.S. Corporation or a Foreign Corporation Engaged in a U.S. Trade or Business. Enter the number of Forms 5472 attached ► _ _ _ _ _ _ _ _ _ _ _

**8**  Check this box if the corporation issued publicly offered debt instruments with original issue discount . . . . . . . . . . . . . . . . ► ☐

If checked, the corporation may have to file **Form 8281**, Information Return for Publicly Offered Original Issue Discount Instruments.

**9**  Enter the amount of tax-exempt interest received or accrued during the tax year ►    $ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ **NONE**

**10**  Enter the number of shareholders at the end of the tax year (if 100 or fewer) ►    21

**11**  If the corporation has an NOL for the tax year and is electing to forego the carryback period, check here . . . . . . . . . . . . . ► ☐

If the corporation is filing a consolidated return, the statement required by Regulations section 1.1502-21(b)(3) must be attached or the election with not be valid.

**12**  Enter the available NOL carryover from prior tax years (do not reduce it by any deduction on line 29a) ►   $ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ **NONE**

**13**  Are the corporation's total receipts (line 1a plus lines 4 through 10 on page 1) for the tax year **and** its total assets at the end of the tax year less than $250,000? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **X**

If 'Yes,' the corporation is not required to complete Schedules L, M-1, and M-2 on page 5. Instead, enter the total amount of cash distributions and the book value property distributions (other than cash) made during the tax year.   ►$ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Form **1120** (2009)

Form **1120** (2009)    MMR GROUP, INC.    72-1271030    Page **5**

| Schedule L | Balance Sheets per Books | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|---|
| | Assets | **(a)** | **(b)** | **(c)** | **(d)** |
| 1 | Cash | | 14,088,441. | | 25,699,643. |
| 2a | Trade notes and accounts receivable | 62,949,480. | | 56,126,132. | |
| b | Less allowance for bad debts | | 62,949,480. | | 56,126,132. |
| 3 | Inventories | | 371,927. | | 505,138. |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities (see instructions) | | | | |
| 6 | Other current assets (attach schedule)...STMT..5 | | 33,677,526. | | 57,310,074. |
| 7 | Loans to shareholders | | | | |
| 8 | Mortgage and real estate loans | | | | |
| 9 | Other investments (attach schedule) | | | | |
| 10a | Buildings and other depreciable assets | 25,048,696. | | 32,211,525. | |
| b | Less accumulated depreciation | 8,591,579. | 16,457,117. | 11,204,309. | 21,007,216. |
| 11a | Depletable assets | | | | |
| b | Less accumulated depletion | | | | |
| 12 | Land (net of any amortization) | | | | |
| 13a | Intangible assets (amortizable only) | | | | |
| b | Less accumulated amortization | | | | |
| 14 | Other assets (attach schedule)......STMT..6 | | 11,776,945. | | 13,000,916. |
| 15 | Total assets | | 139,321,436. | | 173,649,119. |
| | **Liabilities and Shareholders' Equity** | | | | |
| 16 | Accounts payable | | 17,463,068. | | 11,226,243. |
| 17 | Mortgages, notes, bonds payable in less than 1 year | | 2,355,355. | | 4,535,436. |
| 18 | Other current liabilities (attach sch)...STMT..7 | | 76,330,025. | | 76,895,269. |
| 19 | Loans from shareholders | | | | |
| 20 | Mortgages, notes, bonds payable in 1 year or more | | 5,708,910. | | 14,187,711. |
| 21 | Other liabilities (attach schedule) | | | | |
| 22 | Capital stock: a Preferred stock | | | | |
| | b Common stock | 875. | 875. | 875. | 875. |
| 23 | Additional paid-in capital | | | | |
| 24 | Retained earnings — Approp (att sch) | | | | |
| 25 | Retained earnings — Unappropriated | | 37,463,203. | | 66,803,585. |
| 26 | Adjmnt to shareholders' equity (att sch) | | | | |
| 27 | Less cost of treasury stock | | | | |
| 28 | Total liabilities and shareholders' equity | | 139,321,436. | | 173,649,119. |

| Schedule M-1 | Reconciliation of Income (Loss) per Books With Income per Return |
|---|---|

**Note:** Schedule M-3 required instead of Schedule M-1 if total assets are $10 million or more — see instructions

| | | | | | |
|---|---|---|---|---|---|
| 1 | Net income (loss) per books | | 7 | Income recorded on books this year not included on this return (itemize): | |
| 2 | Federal income tax per books | | | Tax-exempt interest $ _ _ _ _ _ _ _ | |
| 3 | Excess of capital losses over capital gains | | | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | |
| 4 | Income subject to tax not recorded on books this year (itemize): | | | | |
| | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | 8 | Deductions on this return not charged against book income this year (itemize): | |
| 5 | Expenses recorded on books this year not deducted on this return (itemize): | | | a Depreciation.. $ _ _ _ _ _ _ | |
| | a Depreciation........ $ _ _ _ _ _ _ | | | b Charitable contribns $ _ _ _ _ _ _ | |
| | b Charitable contributions.. $ _ _ _ _ _ _ | | | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | |
| | c Travel & entertainment.. $ _ _ _ _ _ _ | | | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | |
| | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | 9 | Add lines 7 and 8 | |
| 6 | Add lines 1 through 5 | | 10 | Income (page 1, line 28) — line 6 less line 9 | |

| Schedule M-2 | Analysis of Unappropriated Retained Earnings per Books (Line 25, Schedule L) |
|---|---|

| | | | | | |
|---|---|---|---|---|---|
| 1 | Balance at beginning of year | 37,463,203. | 5 | Distributions......... a Cash | |
| 2 | Net income (loss) per books | 29,340,382. | | b Stock    c Property | |
| 3 | Other increases (itemize): _ _ _ _ _ _ _ _ | | 6 | Other decreases (itemize): | |
| | | | | STATEMENT 9 _ _ _ _ _ _ _ | 19,355,546. |
| | STATEMENT 8 _ _ _ _ _ _ _ | 19,355,546. | 7 | Add lines 5 and 6 | 19,355,546. |
| 4 | Add lines 1, 2, and 3 | 86,159,131. | 8 | Balance at end of year (line 4 less line 7) | 66,803,585. |

CPCA0234L   08/25/09    Form **1120** (2009)

**SCHEDULE N**
**(Form 1120)**

Department of the Treasury
Internal Revenue Service

# Foreign Operations of U.S. Corporations

► Attach to Form 1120, 1120-C, 1120-IC-DISC, 1120-L,
1120-PC, 1120-REIT, 1120-RIC, or 1120S.

OMB No. 1545-0123

**2009**

| Name | Employer identification number (EIN) |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

## Foreign Operations Information

| | Yes | No |
|---|---|---|
| **1 a** During the tax year, did the corporation own (directly or indirectly) any foreign entity that was disregarded as an entity separate from its owner under Regulations sections 301.7701-2 and 301.7701-3 (see instructions)? | | X |
| If 'Yes,' you are generally required to attach **Form 8858,** Information Return of U.S. Persons With Respect to Foreign Disregarded Entities, for each foreign disregarded entity (see instructions). | | |
| **b** Enter the number of Forms 8858 attached to the tax return............................ ► _ _ _ _ _ _ _ _ _ _ | | |
| **2** Enter the number of **Forms 8865,** Return of U.S. Persons with Respect to Certain Foreign Partnerships, attached to the corporation's income tax return................................ ► _ _ _ _ _ _ _ _ _ _ | | |
| **3** Excluding any partnership for which a Form 8865 is attached to the tax return, did the corporation own at least a 10% interest, directly or indirectly, in any other foreign partnership (including an entity treated as a foreign partnership under Regulations section 301.7701-2 or 301.7701-3)?....................................... | | X |
| If 'Yes,' see instructions for required attachment. | | |
| **4 a** Was the corporation a U.S. shareholder of any controlled foreign corporation (CFC)? (See sections 951 and 957.)............ | | X |
| If 'Yes,' attach **Form 5471,** Information Return of U.S. Persons With Respect to Certain Foreign Corporations, for each CFC. | | |
| **b** Enter the number of Forms 5471 attached to the tax return.................................. ► 1 _ _ _ _ _ _ _ _ | | |
| **5** During the tax year, did the corporation receive a distribution from, or was it the grantor of, or transferor to, a foreign trust?... | | X |
| If 'Yes,' the corporation may have to file **Form 3520,** Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts. | | |
| **6 a** At any time during the 2009 calendar year, did the corporation have an interest in or a signature or other authority over a financial account (such as a bank account, securities account, or other financial account) in a foreign country?.............. | | X |
| See the instructions for exceptions and filing requirements for **Form TD F 90-22.1,** Report of Foreign Bank and Financial Accounts. | | |
| **b** If 'Yes,' enter the name of the foreign country ................... ► _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| **7 a** Is the corporation claiming the extraterritorial income exclusion?......................................... | | X |
| If 'Yes,' attach a separate **Form 8873,** Extraterritorial Income Exclusion, for **each** transaction or group of transactions. | | |
| **b** Enter the number of Forms 8873 attached to the tax return.............................. ► _ _ _ _ _ _ _ _ _ _ | | |
| **c** Enter the total of the amounts from line 52 (extraterritorial income exclusion (net of disallowed deductions)) of **all** Forms 8873 attached to the tax return....................................... ► $ | | |

**BAA   For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 1120.**        Schedule **N** (Form 1120) 2009

CPCA0801L  01/12/10

Form **4626**

Department of the Treasury
Internal Revenue Service

# Alternative Minimum Tax — Corporations

► **See separate instructions.**
► **Attach to the corporation's tax return.**

OMB No. 1545-0175

**2009**

| Name | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

| Part I | Alternative Minimum Tax Computation |
|---|---|

**Note:** *See the instructions to find out if the corporation is a small corporation exempt from the alternative minimum tax (AMT) under section 55(e).*

| | | | |
|---|---|---|---|
| 1 | Taxable income or (loss) before net operating loss deduction | 1 | 43,670,365. |
| 2 | **Adjustments and preferences:** | | |
| a | Depreciation of post-1986 property | 2a | |
| b | Amortization of certified pollution control facilities | 2b | |
| c | Amortization of mining exploration and development costs | 2c | |
| d | Amortization of circulation expenditures (personal holding companies only) | 2d | |
| e | Adjusted gain or loss | 2e | |
| f | Long-term contracts | 2f | |
| g | Merchant marine capital construction funds | 2g | |
| h | Section 833(b) deduction (Blue Cross, Blue Shield, and similar type organizations only) | 2h | |
| i | Tax shelter farm activities (personal service corporations only) | 2i | |
| j | Passive activities (closely held corporations and personal service corporations only) | 2j | |
| k | Loss limitations | 2k | |
| l | Depletion | 2l | |
| m | Tax-exempt interest income from specified private activity bonds | 2m | |
| n | Intangible drilling costs | 2n | |
| o | Other adjustments and preferences | 2o | 361,383. |
| 3 | Pre-adjustment alternative minimum taxable income (AMTI). Combine lines 1 through 2o | 3 | 44,031,748. |
| 4 | **Adjusted current earnings (ACE) adjustment:** | | |

| | | | | |
|---|---|---|---|---|
| a | ACE from line 10 of the ACE worksheet in the instructions | 4a | 44,031,748. | |
| b | Subtract line 3 from line 4a. If line 3 exceeds line 4a, enter the difference as a negative amount (see instructions) | 4b | | |
| c | Multiply line 4b by 75% (.75). Enter the result as a positive amount | 4c | | |
| d | Enter the excess, if any, of the corporation's total increases in AMTI from prior year ACE adjustments over its total reductions in AMTI from prior year ACE adjustments (see instructions). **Note:** *You must enter an amount on line 4d (even if line 4b is positive)* | 4d | 2,989,236. | |
| e | ACE adjustment. | | | |
| | • If line 4b is zero or more, enter the amount from line 4c | | 4e | 0. |
| | • If line 4b is less than zero, enter the **smaller** of line 4c or line 4d as a negative amount | | | |
| 5 | Combine lines 3 and 4e. If zero or less, stop here; the corporation does not owe any AMT | 5 | 44,031,748. |
| 6 | Alternative tax net operating loss deduction (see instructions) ........... SEE STATEMENT 10 ..... | 6 | 6,032,097. |
| 7 | **Alternative minimum taxable income.** Subtract line 6 from line 5. If the corporation held a residual interest in a REMIC, see instructions | 7 | 37,999,651. |
| 8 | **Exemption phase-out** (if line 7 is $310,000 or more, skip lines 8a and 8b and enter -0- on line 8c): | | |
| a | Subtract $150,000 from line 7 (if completing this line for a member of a controlled group, see instructions). If zero or less, enter -0- | 8a | |
| b | Multiply line 8a by 25% (.25) | 8b | |
| c | Exemption. Subtract line 8b from $40,000 (if completing this line for a member of a controlled group, see instructions). If zero or less, enter -0- | 8c | 0. |
| 9 | Subtract line 8c from line 7. If zero or less, enter -0- | 9 | 37,999,651. |
| 10 | If the corporation had qualified timber gain, complete Part II and enter the amount from line 24 here. Otherwise, multiply line 9 by 20% (.20) | 10 | 7,599,930. |
| 11 | Alternative minimum tax foreign tax credit (AMTFTC) (see instructions) | 11 | 211,093. |
| 12 | Tentative minimum tax. Subtract line 11 from line 10 | 12 | 7,388,837. |
| 13 | Regular tax liability before applying all credits except the foreign tax credit | 13 | 14,915,215. |
| 14 | **Alternative minimum tax.** Subtract line 13 from line 12. If zero or less, enter -0-. Enter here and on Form 1120, Schedule J, line 3, or the appropriate line of the corporation's income tax return | 14 | 0. |

**BAA For Paperwork Reduction Act Notice, see the instructions.**

Form **4626** (2009)

Form **851**

(Rev December 2005)

Department of the Treasury
Internal Revenue Service

## Affiliations Schedule

► File with each consolidated income tax return.

For tax year ending  12/31 , 2009

OMB No. 1545-0025

| Name of common parent corporation | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Number, street, and room or suite number. If a P.O. box, see instructions.

15961 AIRLINE HIGHWAY

City or town                                                    State       ZIP Code

BATON ROUGE, LA 70817-7412

### Part I   Overpayment Credits, Estimated Tax Payments, and Tax Deposits (see instructions)

| Corp No. | Name and address of corporation | Employer identification number | Portion of overpayment credits and estimated tax payments | Portion of tax deposited with Form 7004 |
|---|---|---|---|---|
| 1 | Common parent corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 11,379,718. | 4,029,884. |
| 2 | Subsidiary corporations:<br>MMR CONSTRUCTORS, INC.<br>15961 AIRLINE HIGHWAY, BATON ROUGE, LA 70817-7412 | 72-1046000 | | |
| 3 | MMR OFFSHORE SERVICES, INC.<br>15961 AIRLINE HIGHWAY, BATON ROUGE, LA 70817-7412 | 72-1217366 | | |
| 4 | MMR TECHNICAL SERVICES, INC.<br>15961 AIRLINE HIGHWAY, BATON ROUGE, LA 70817-7412 | 72-1209195 | | |
| 5 | MMR POWER SOLUTIONS LLC<br>15961 AIRLINE HIGHWAY, BATON ROUGE, LA 70817-7412 | 05-0584790 | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| | **Totals** (Must equal amounts shown on the consolidated tax return) . . . . . . . . . . . . . . . . . . . ► | | 11,379,718. | 4,029,884. |

### Part II   Principal Business Activity, Voting Stock Information, Etc (see instructions)

| Corp No. | Principal business activity (PBA) | PBA Code Number | Did the subsidiary make any nondividend distributions? Yes | No | Number of shares | Percent of voting power | Percent of value | Owned by corporation number |
|---|---|---|---|---|---|---|---|---|
| 1 | Common parent corporation:<br>CONSTRUCTION | 238210 | | | | | | |
| 2 | Subsidiary corporations:<br>CONSTRUCTION | 238210 | | X | | % | % | 1 |
| 3 | CONSTRUCTION | 238210 | | X | | % | % | 1 |
| 4 | CONSTRUCTION | 238210 | | X | | % | % | 1 |
| 5 | CONSTRUCTION | 221100 | | X | | % | % | 1 |
| 6 | | | | | | % | % | |
| 7 | | | | | | % | % | |
| 8 | | | | | | % | % | |
| 9 | | | | | | % | % | |
| 10 | | | | | | % | % | |

**BAA  For Paperwork Reduction Act Notice, see instructions.**                    Form **851** (Rev 12-2005)

CPCA2312L  06/30/05

Form **851** (Rev 12-2005) MMR GROUP, INC.    72-1271030                                                                                   Page **2**

| Part III | Changes in Stock Holdings During the Tax Year |
|---|---|

| Corp No. | Name of corporation | Share-holder of Corpora-tion No. | Date of transaction | (a) Changes | | (b) Shares held after changes described in column (a) | |
|---|---|---|---|---|---|---|---|
| | | | | Number of shares acquired | Number of shares disposed of | Percent of voting power | Percent of value |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |

**(c)** If any transaction listed above caused either a deconsolidation of a subsidiary or a deconsolidation of any share of subsidiary stock and afterward, any member continued to hold stock of the subsidiary, did the basis of any retained share exceed its value immediately before the deconsolidation? If 'Yes,' see the instructions . . . . . . . . . . . . . . . . . . . . .   ☐ **Yes**   ☒ **No**

**(d)** Is the group deducting a loss recognized on the disposition of the stock of a subsidiary? If 'Yes', see the instructions for details, including the statements that must be attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ☐ **Yes**   ☒ **No**

**(e)** If the equitable owners of any capital stock shown above were other than the holders of record, provide details of the changes.

_____

_____

_____

_____

_____

_____

**(f)** If additional stock was issued, or if any stock was retired during the year, list the dates and amounts of these transactions.

_____

_____

_____

_____

_____

Form **851** (Rev 12-2005)

Form **851** (Rev 12-2005)     MMR GROUP, INC.     72-1271030                                    Page **3**

| Part IV | Additional Stock Information (see instructions) |
|---------|-----|

**1**  During the tax year, did the corporation have more than one class of stock outstanding? ............................. ☐ **Yes** ☒ **No**

If 'Yes', enter the name of the corporation and list and describe each class of stock.

| Corp No. | Name of corporation | Class of stock |
|----------|--------------------|-----------------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**2**  During the tax year, was there any member of the consolidated group that reaffiliated within 60 months of disaffiliation? ☐ **Yes** ☒ **No**

If 'Yes', enter the name of the corporation(s) and explain the circumstances.

| Corp No. | Name of corporation | Explanation |
|----------|--------------------|-------------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**3**  During the tax year, was there any arrangement in existence by which one or more persons that were not members of the affiliated group could acquire any stock, or acquire any voting power without acquiring stock, in the corporation, other than a de minimis amount, from the corporation or another member of the affiliated group? ..................... ☐ **Yes** ☒ **No**

If 'Yes', enter the name of the corporation and see the instructions for what to enter in Items 3a, 3b, 3c, and 3d.

| Corp No. | Name of corporation | Item 3a | Item 3b | Item 3c |
|----------|--------------------|---------|---------|---------|
|  |  | % | % | % |
|  |  | % | % | % |
|  |  | % | % | % |
|  |  | % | % | % |

| Corp No. | Item 3d — Provide a description of any arrangement. |
|----------|-----------------------------------------------------|
|  |  |
|  |  |
|  |  |

**BAA**                                                                 Form **851** (Rev 12-2005)

| SCHEDULE B | **Additional Information for Schedule M-3 Filers** | | OMB No. 1545-0123 |
|---|---|---|---|
| **(Form 1120)** | ► Attach to Form 1120. | | |
| (December 2009) Department of the Treasury Internal Revenue Service | ► See instructions. | | |

| Name | Employer identification number (EIN) |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

|  |  | Yes | No |
|---|---|---|---|
| **1** | Do the amounts reported on Schedule M-3 (Form 1120), Part II, lines 9 or 10, column (d), reflect allocations to this corporation from a partnership of income, gain, loss, deduction, or credit that are disproportionate to this corporation's capital contribution to the partnership or its ratio for sharing other items of the partnership?........................ |  | X |
| **2** | At any time during the tax year, did the corporation sell, exchange, or transfer any interest in an intangible asset to a related person as defined in section 267(b)? ........................................................... |  | X |
| **3** | At any time during the tax year, did the corporation acquire any interest in an intangible asset from a related person as defined in section 267(b) ............................................................................. |  | X |
| **4a** | During the tax year, did the corporation enter into a cost-sharing arrangement with any related foreign party on whose behalf the corporation did not file Form 5471, Information Return of U.S. Persons With Respect To Certain Foreign Corporations?........................................................................................ |  | X |
| **b** | At any time during the tax year, was the corporation a participant in a cost-sharing arrangement with any related foreign party on whose behalf the corporation did not file Form 5471?............................................ |  | X |
| **5** | At any time during the tax year, did the corporation make any change in accounting principle for financial accounting purposes? See instructions for the definition of change in accounting principle.......................... |  | X |
| **6** | At any time during the tax year, did the corporation make any change in a method of accounting for U.S. income tax purposes?.................................................................................................. |  | X |
| **7** | At any time during the tax year, did the corporation own any voluntary employees' beneficiary association (VEBA) trusts that were used to hold funds designated for employee benefits?...................................... |  | X |
| **8** | At any time during the tax year, did the corporation use an allocation method for indirect costs capitalized to self-constructed assets that varied from its financial method of accounting?........................................ |  | X |
| **9** | At any time during the tax year, did the corporation treat for tax purposes indirect costs, as defined in Regulations sections 1.263A-1(e)(3)(ii)(F), (G), and (H), as mixed-service costs, as defined in Regulations section 1,263(A)-1(e)(4)(ii)(C)? .............................................................................................. |  | X |
| **10** | Did the corporation, under section 118 or 362(c) and the related regulations, take a return filing position characterizing any amount as a contribution to the capital of the corporation during the tax year by any non-shareholders? Amounts so characterized may include, without limitation, incentives, inducements, money, and property ........................ |  | X |

**BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 1120.**                    Schedule **B** (Form 1120) (12-2009)

| SCHEDULE G | Information on Certain Persons Owning the | OMB No. 1545-0123 |
| --- | --- | --- |

**SCHEDULE G**
**(Form 1120)**

Department of the Treasury
Internal Revenue Service

# Information on Certain Persons Owning the Corporation's Voting Stock

► **Attach to Form 1120.**

► **See Instructions.**

OMB No. 1545-0123

**2009**

| Name | Employer identification number (EIN) |
| --- | --- |
| MMR GROUP, INC. | 72-1271030 |

**Part I**    **Certain Entities Owning the Corporation's Voting Stock.** (Form 1120, Schedule K, Question 4a).
Complete columns (i) through (v) below for any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization that owns directly 20% or more, or owns, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote (see instructions).

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Percentage Owned in Voting Stock |
| --- | --- | --- | --- | --- |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**Part II**    **Certain Individuals and Estates Owning the Corporation's Voting Stock.** (Form 1120, Schedule K, Question 4b).
Complete columns (i) through (v) below for any individual or estate that owns directly 20% or more, or owns, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote (see instructions).

| (i) Name of Individual or Estate | (ii) Identifying Number (if any) | (iii) Country of Citizenship (see instructions) | (iv) Percentage Owned in Voting Stock |
| --- | --- | --- | --- |
|  |  | UNITED STATES | 29.13% |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**BAA**    **For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 1120.**          CPCA1901L   12/30/09          Form Schedule **G** (Form 1120) (2009)

**SCHEDULE M-3**
**(Form 1120)**

Department of the Treasury
Internal Revenue Service

# Net Income (Loss) Reconciliation for Corporations With Total Assets of $10 Million or More

► **Attach to Form 1120 or 1120-C.**
► **See separate instructions.**

OMB No. 1545-0123

# 2009

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): (1) ☐ Non-consolidated return  (2) ☒ Consolidated return (Form 1120 only)
(3) ☐ Mixed 1120/L/PC group  (4) ☐ Dormant subsidiaries schedule attached

| **Part I** | **Financial Information and Net Income (Loss) Reconciliation** (see instructions) |
|---|---|

**1a** Did the corporation file SEC Form 10-K for its income statement period ending with or within this tax year?
  ☐ **Yes.** Skip lines 1b and 1c and complete lines 2a through 11 with respect to that SEC Form 10-K.
  ☒ **No.** Go to line 1b. See instructions if multiple non-tax-basis income statements are prepared.
 **b** Did the corporation prepare a certified audited non-tax-basis income statement for that period?
  ☒ **Yes.** Skip line 1c and complete lines 2a through 11 with respect to that income statement.
  ☐ **No.** Go to line 1c.
 **c** Did the corporation prepare a non-tax-basis income statement for that period?
  ☐ **Yes.** Complete lines 2a through 11 with respect to that income statement.
  ☐ **No.** Skip lines 2a through 3c and enter the corporation's net income (loss) per its books and records on line 4a.
**2a** Enter the income statement period: Beginning  1/01/09  Ending  12/31/09
 **b** Has the corporation's income statement been restated for the income statement period on line 2a?
  ☐ **Yes.** (If 'Yes', attach an explanation and the amount of each item restated.)
  ☒ **No.**
 **c** Has the corporation's income statement been restated for any of the five income statement periods preceding the period on line 2a?
  ☐ **Yes.** (If 'Yes', attach an explanation and the amount of each item restated.)
  ☒ **No.**
**3a** Is any of the corporation's voting common stock publicly traded?
  ☐ **Yes.**
  ☒ **No.** If 'No', go to line 4a.
 **b** Enter the symbol of the corporation's primary U.S. publicly traded voting common stock . . . . . . . . . . . .
 **c** Enter the nine-digit CUSIP number of the corporation's primary publicly traded voting
    common stock. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| **4a** Worldwide consolidated net income (loss) from income statement source identified in Part I, line 1. . . . . . . . . | **4a** | 29,340,382. |
| **b** Indicate accounting standard used for line 4a (see instructions): | | |
| (1) ☐ GAAP  (2) ☐ IFRS  (3) ☐ Statutory  (4) ☐ Tax-basis  (5) ☐ Other (specify) _____ | | |
| **5a** Net income from nonincludible foreign entities (attach schedule). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **5a** | |
| **b** Net loss from nonincludible foreign entities (attach schedule and enter as a positive amount). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **5b** | |
| **6a** Net income from nonincludible U.S. entities (attach schedule). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **6a** | |
| **b** Net loss from nonincludible U.S. entities (attach schedule and enter as a positive amount). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **6b** | |
| **7a** Net income (loss) of other includible foreign disregarded entities (attach schedule). . . . . . . . . . . | **7a** | |
| **b** Net income (loss) of other includible U.S. disregarded entities (attach schedule). . . . . . . . . . . . . . | **7b** | |
| **c** Net income (loss) of other includible entities (attach schedule). . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **7c** | |
| **8** Adjustment to eliminations of transactions between includible entities and nonincludible entities (attach schedule). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **8** | |
| **9** Adjustment to reconcile income statement period to tax year (attach schedule). . . . . . . . . . . . . . . . | **9** | |
| **10a** Intercompany dividend adjustments to reconcile to line 11 (attach schedule). . . . . . . . . . . . . . . . . . . | **10a** | |
| **b** Other statutory accounting adjustments to reconcile to line 11 (attach schedule). . . . . . . . . . . . . . . | **10b** | |
| **c** Other adjustments to reconcile to amount on line 11 (attach schedule). . . . . . . . . . . . . . . . . . . . . . . | **10c** | |
| **11** **Net income (loss) per income statement of includible corporations.** Combine lines 4 through 10. . . . . . . . . . . | **11** | 29,340,382. |
| **Note.** Part I, line 11, must equal the amount on Part II, line 30, column (a), and Schedule M-2, line 2. | | |

**12** Enter the total amount (not just the corporation's share) of the assets and liabilities of all entities included or removed on the following lines:

| | Total Assets | Total Liabilities |
|---|---|---|
| **a** Included on Part I, line 4. . . . . . . . . . . . . . . . ► | | |
| **b** Removed on Part I, line 5. . . . . . . . . . . . . . . ► | | |
| **c** Removed on Part I, line 6. . . . . . . . . . . . . . . ► | | |
| **d** Included on Part I, line 7. . . . . . . . . . . . . . . ► | | |

**BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 1120.**    Schedule **M-3** (Form 1120) 2009

CPCA1001L  12/07/09

Schedule **M-3** (Form 1120) 2009                                                                                          Page **2**

| | |
|---|---|
| Name of corporation (common parent, if consolidated return) | **Employer identification number** |
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): (1) [X] Consolidated group  (2) ☐ Parent corp  (3) ☐ Consolidated eliminations  (4) ☐ Subsidiary corp  (5) ☐ Mixed 1120/L/PC group

Check if a sub-consolidated: (6) ☐ 1120 group  (7) ☐ 1120 eliminations

| | |
|---|---|
| Name of subsidiary (if consolidated return) | **Employer identification number** |

**Part II** Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return (see instructions)

| Income (Loss) Items (Attach schedules for lines 1 through 8) | (a) Income (Loss) per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Income (Loss) per Tax Return |
|---|---|---|---|---|
| 1 Income (loss) from equity method foreign corporations | | | | |
| 2 Gross foreign dividends not previously taxed | | | | |
| 3 Subpart F, QEF, and similar income inclusions | | | | |
| 4 Section 78 gross-up | | | | |
| 5 Gross foreign distributions previously taxed | | | | |
| 6 Income (loss) from equity method U.S. corporations | | | | |
| 7 U.S. dividends not eliminated in tax consolidation | | | | |
| 8 Minority interest for includible corporations | | | | |
| 9 Income (loss) from U.S. partnerships | | | | |
| 10 Income (loss) from foreign partnerships | | | | |
| 11 Income (loss) from other pass-through entities | | | | |
| 12 Items relating to reportable transactions (attach details) | | | | |
| 13 Interest income (attach Form 8916-A) | | | | |
| 14 Total accrual to cash adjustment | | | | |
| 15 Hedging transactions | | | | |
| 16 Mark-to-market income (loss) | | | | |
| 17 Cost of goods sold (attach Form 8916-A) | -245,530,298. | | | -245,530,298. |
| 18 Sale versus lease (for sellers and/or lessors) | | | | |
| 19 Section 481(a) adjustments | | | | |
| 20 Unearned/deferred revenue | | | | |
| 21 Income recognition from long-term contracts | | | | |
| 22 Original issue discount and other imputed interest | | | | |
| 23a Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities | | | | |
| b Gross capital gains from Schedule D, excluding amounts from pass-through entities | | | | |
| c Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| d Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| e Abandonment losses | | | | |
| f Worthless stock losses (attach details) | | | | |
| g Other gain/loss on disposition of assets other than inventory | | | | |
| 24 Capital loss limitation and carryforward used | | | | |
| 25 Other income (loss) items with differences (attach schedule) | | | | |
| 26 Total income (loss) items. Combine lines 1 through 25 | -245,530,298. | | | -245,530,298. |
| 27 Total expense/deduction items (from Part III, line 36) | -20,352,263. | 14,077,196. | 252,787. | -6,022,280. |
| 28 Other items with no differences | 295,222,943. | | | 295,222,943. |
| 29a Mixed groups, see instructions. All others, combine lines 26 through 28 | 29,340,382. | 14,077,196. | 252,787. | 43,670,365. |
| b PC insurance subgroup reconciliation totals | | | | |
| c Life insurance subgroup reconciliation totals | | | | |
| 30 Reconciliation totals. Combine lines 29a through 29c | 29,340,382. | 14,077,196. | 252,787. | 43,670,365. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

Schedule **M-3** (Form 1120) 2009      Page **3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): (1) ☒ Consolidated group  (2) ☐ Parent corp  (3) ☐ Consolidated eliminations  (4) ☐ Subsidiary corp  (5) ☐ Mixed 1120/L/PC group

Check if a sub-consolidated: (6) ☐ 1120 group  (7) ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| | |

**Part III**   **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return — Expense/Deduction Items** (see instructions)

| | Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|---|
| 1 | U.S. current income tax expense . . . . . . . . . . | 14,077,196. | −14,077,196. | | |
| 2 | U.S. deferred income tax expense . . . . . . . . . | | | | |
| 3 | State and local current income tax expense . | | | | |
| 4 | State and local deferred income tax expense | | | | |
| 5 | Foreign current income tax expense (other than foreign withholding taxes) . . . . . . . . . . . . | | | | |
| 6 | Foreign deferred income tax expense . . . . . . . | | | | |
| 7 | Foreign withholding taxes . . . . . . . . . . . . . . . . . | | | | |
| 8 | Interest expense (attach Form 8916-A) . . . . . . | | | | |
| 9 | Stock option expense . . . . . . . . . . . . . . . . . . . . | | | | |
| 10 | Other equity-based compensation . . . . . . . . . . | | | | |
| 11 | Meals and entertainment . . . . . . . . . . . . . . . . . | 960,500. | | −480,250. | 480,250. |
| 12 | Fines and penalties . . . . . . . . . . . . . . . . . . . . . . | 338,624. | | −338,624. | |
| 13 | Judgments, damages, awards, and similar costs . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 14 | Parachute payments . . . . . . . . . . . . . . . . . . . . | | | | |
| 15 | Compensation with section 162(m) limitation | | | | |
| 16 | Pension and profit-sharing . . . . . . . . . . . . . . . | | | | |
| 17 | Other post-retirement benefits . . . . . . . . . . . . | | | | |
| 18 | Deferred compensation . . . . . . . . . . . . . . . . . . | | | | |
| 19 | Charitable contribution of cash and tangible property . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 20 | Charitable contribution of intangible property | | | | |
| 21 | Charitable contribution limitation/carryforward . . . . . . . | | | | |
| 22 | Domestic production activities deduction . . . . | | | 2,786,893. | 2,786,893. |
| 23 | Current year acquisition or reorganization investment banking fees . . . . . . . . . . . . . . . . . | | | | |
| 24 | Current year acquisition or reorganization legal and accounting fees . . . . . . . . . . . . . . . | | | | |
| 25 | Current year acquisition/reorganization other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 26 | Amortization/impairment of goodwill . . . . . . . . | | | | |
| 27 | Amortization of acquisition, reorganization, and start-up costs . . . . . . . . . . . . . . . . . . . . . | | | | |
| 28 | Other amortization or impairment write-offs . . | | | | |
| 29 | Section 198 environmental remediation costs | | | | |
| 30 | Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 31 | Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,292,004. | | | 3,292,004. |
| 32 | Bad debt expense . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 33 | Corporate owned life insurance premiums . . . | 1,683,939. | | −1,683,939. | |
| 34 | Purchase versus lease (for purchasers and/or lessees) . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 35 | Other expense/deduction items with differences (attach schedule) . . . . . . . . . . . . . | | | −536,867. | −536,867. |
| 36 | **Total expense/deduction items.** Combine lines 1 through 35. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive . . | 20,352,263. | −14,077,196. | −252,787. | 6,022,280. |

Form **8916-A**

Department of the Treasury
Internal Revenue Service

**Supplemental Attachment to Schedule M-3**

► Attach to Schedule M-3 for Form 1065, 1120, 1120-L, 1120-PC, or 1120S.

OMB No. 1545-2061

**2009**

| Name of common parent | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |
| Name of subsidiary | Employer identification number |

**Part I** | **Cost of Goods Sold**

| Cost of Goods Sold Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| **1** Amounts attributable to cost flow assumptions.... | | | | |
| **2** Amounts attributable to: | | | | |
| **a** Stock option expense.......................... | | | | |
| **b** Other equity based compensation................ | | | | |
| **c** Meals and entertainment......................... | | | | |
| **d** Parachute payments............................ | | | | |
| **e** Compensation with section 162(m) limitation ..... | | | | |
| **f** Pension and profit sharing...................... | | | | |
| **g** Other post-retirement benefits.................. | | | | |
| **h** Deferred compensation ......................... | | | | |
| **i** Section 198 environmental remediation costs..... | | | | |
| **j** Amortization................................. | | | | |
| **k** Depletion.................................... | | | | |
| **l** Depreciation................................. | | | | |
| **m** Corporate owned life insurance premiums........ | | | | |
| **n** Other section 263A costs...................... | | | | |
| **3** Inventory shrinkage accruals .................... | | | | |
| **4** Excess inventory and obsolescence reserves..... | | | | |
| **5** Lower of cost or market write-downs............. | | | | |
| **6** Other items with differences (attach schedule).................... | | | | |
| **7** Other items with no differences................. | 245,530,298. | | | 245,530,298. |
| **8** **Total cost of goods sold.** Add lines 1 through 7, in columns a, b, c, and d. | 245,530,298. | 0. | 0. | 245,530,298. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**

Form **8916-A** (2009)

Form **8916-A** (2009)  MMR GROUP, INC.                                    72-1271030              Page **2**

| Part II | Interest Income | | | | |
|---|---|---|---|---|---|
| | Interest Income Item | **(a)** Income (Loss) per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Income (Loss) per Tax Return |
| 1 | Tax-exempt interest income...................... | | | | |
| 2 | Interest income from hybrid securities............ | | | | |
| 3 | Sale/lease interest income ....................... | | | | |
| 4a | Intercompany interest income — From outside tax affiliated group ................................ | | | | |
| 4b | Intercompany interest income — From tax affiliated group ................................ | | | | |
| 5 | Other interest income........................... | | | | |
| 6 | Total interest income. Add lines 1 through 5. Enter total on Schedule M-3 (Forms 1120, 1120-PC, and 1120-L), Part II, line 13 or Schedule M-3 (Forms 1065 and 1120-S) Part II, line 11..... | 0. | 0. | 0. | 0. |

| Part III | Interest Expense | | | | |
|---|---|---|---|---|---|
| | Interest Expense Item | **(a)** Expense per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Deduction per Tax Return |
| 1 | Interest expense from hybrid securities........... | | | | |
| 2 | Lease/purchase interest expense ................ | | | | |
| 3a | Intercompany interest expense — Paid to outside tax affiliated group........................... | | | | |
| 3b | Intercompany interest expense — Paid to tax affiliated group............................... | | | | |
| 4 | Other interest expense........................... | | | | |
| 5 | Total interest expense. Add lines 1 through 4. Enter total on Schedule M-3 (Form 1120) Part III, line 8; Schedule M-3 (Forms 1120-PC and 1120-L), Part III, line 36; Schedule M-3 (Form 1065) Part III, line 27; or Schedule M-3 (Form 1120-S) Part III, line 26..................... | 0. | 0. | 0. | 0. |

Form **8916-A** (2009)

Schedule **M-3** (Form 1120) 2009 | Page **2**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): (1) ☐ Consolidated group  (2) ☒ Parent corp  (3) ☐ Consolidated eliminations  (4) ☐ Subsidiary corp  (5) ☐ Mixed 1120/L/PC group
Check if a sub-consolidated:  (6) ☐ 1120 group  (7) ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| | |

**Part II**  **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** (see instructions)

| **Income (Loss) Items**<br>(Attach schedules for lines 1 through 8) | (a)<br>Income (Loss) per<br>Income Statement | (b)<br>Temporary<br>Difference | (c)<br>Permanent<br>Difference | (d)<br>Income (Loss) per<br>Tax Return |
|---|---|---|---|---|
| 1  Income (loss) from equity method foreign corporations | | | | |
| 2  Gross foreign dividends not previously taxed | | | | |
| 3  Subpart F, QEF, and similar income inclusions | | | | |
| 4  Section 78 gross-up | | | | |
| 5  Gross foreign distributions previously taxed | | | | |
| 6  Income (loss) from equity method U.S. corporations | | | | |
| 7  U.S. dividends not eliminated in tax consolidation | | | | |
| 8  Minority interest for includible corporations | | | | |
| 9  Income (loss) from U.S. partnerships | | | | |
| 10  Income (loss) from foreign partnerships | | | | |
| 11  Income (loss) from other pass-through entities | | | | |
| 12  Items relating to reportable transactions (attach details) | | | | |
| 13  Interest income (attach Form 8916-A) | | | | |
| 14  Total accrual to cash adjustment | | | | |
| 15  Hedging transactions | | | | |
| 16  Mark-to-market income (loss) | | | | |
| 17  Cost of goods sold (attach Form 8916-A) | | | | |
| 18  Sale versus lease (for sellers and/or lessors) | | | | |
| 19  Section 481(a) adjustments | | | | |
| 20  Unearned/deferred revenue | | | | |
| 21  Income recognition from long-term contracts | | | | |
| 22  Original issue discount and other imputed interest | | | | |
| 23a Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities | | | | |
| b Gross capital gains from Schedule D, excluding amounts from pass-through entities | | | | |
| c Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| d Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| e Abandonment losses | | | | |
| f Worthless stock losses (attach details) | | | | |
| g Other gain/loss on disposition of assets other than inventory | | | | |
| 24  Capital loss limitation and carryforward used | | | | |
| 25  Other income (loss) items with differences (attach schedule) | | | | |
| 26  **Total income (loss) items.** Combine lines 1 through 25 | | | | |
| 27  Total expense/deduction items (from Part III, line 36) | -472,707. | | | -472,707. |
| 28  Other items with no differences | 1,486,670. | | | 1,486,670. |
| 29a Mixed groups, see instructions. All others, combine lines 26 through 28 | 1,013,963. | 0. | 0. | 1,013,963. |
| b PC insurance subgroup reconciliation totals | | | | |
| c Life insurance subgroup reconciliation totals | | | | |
| 30  **Reconciliation totals.** Combine lines 29a through 29c | 1,013,963. | 0. | 0. | 1,013,963. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

Schedule **M-3** (Form 1120) 2009 | Page **3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group  **(2)** ☒ Parent corp  **(3)** ☐ Consolidated eliminations  **(4)** ☐ Subsidiary corp  **(5)** ☐ Mixed 1120/L/PC group
Check if a sub-consolidated:  **(6)** ☐ 1120 group  **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| | |

**Part III** | **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** — **Expense/Deduction Items** (see instructions)

| | Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|---|
| 1 | U.S. current income tax expense . . . . . . . . . . | | | | |
| 2 | U.S. deferred income tax expense . . . . . . . . . | | | | |
| 3 | State and local current income tax expense . | | | | |
| 4 | State and local deferred income tax expense | | | | |
| 5 | Foreign current income tax expense (other than foreign withholding taxes) . . . . . . . . . . . . . | | | | |
| 6 | Foreign deferred income tax expense . . . . . . . | | | | |
| 7 | Foreign withholding taxes . . . . . . . . . . . . . . . . . | | | | |
| 8 | Interest expense (attach Form 8916-A) . . . . . . | | | | |
| 9 | Stock option expense . . . . . . . . . . . . . . . . . . . . | | | | |
| 10 | Other equity-based compensation. . . . . . . . . . . | | | | |
| 11 | Meals and entertainment. . . . . . . . . . . . . . . . . . | | | | |
| 12 | Fines and penalties. . . . . . . . . . . . . . . . . . . . . . | | | | |
| 13 | Judgments, damages, awards, and similar costs. . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 14 | Parachute payments. . . . . . . . . . . . . . . . . . . . . . | | | | |
| 15 | Compensation with section 162(m) limitation | | | | |
| 16 | Pension and profit-sharing . . . . . . . . . . . . . . . . | | | | |
| 17 | Other post-retirement benefits. . . . . . . . . . . . . | | | | |
| 18 | Deferred compensation . . . . . . . . . . . . . . . . . . . | | | | |
| 19 | Charitable contribution of cash and tangible property. . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 20 | Charitable contribution of intangible property | | | | |
| 21 | Charitable contribution limitation/carryforward . . . . . . . | | | | |
| 22 | Domestic production activities deduction . . . . | | | | |
| 23 | Current year acquisition or reorganization investment banking fees . . . . . . . . . . . . . . . . . . | | | | |
| 24 | Current year acquisition or reorganization legal and accounting fees . . . . . . . . . . . . . . . . | | | | |
| 25 | Current year acquisition/reorganization other costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 26 | Amortization/impairment of goodwill . . . . . . . . | | | | |
| 27 | Amortization of acquisition, reorganization, and start-up costs . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 28 | Other amortization or impairment write-offs. . | | | | |
| 29 | Section 198 environmental remediation costs | | | | |
| 30 | Depletion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 31 | Depreciation. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 472,707. | | | 472,707. |
| 32 | Bad debt expense . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 33 | Corporate owned life insurance premiums. . . | | | | |
| 34 | Purchase versus lease (for purchasers and/or lessees). . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 35 | Other expense/deduction items with differences (attach schedule) . . . . . . . . . . . . . . . | | | | |
| 36 | **Total expense/deduction items. Combine** lines 1 through 35. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive. . | 472,707. | | | 472,707. |

CPCA1023L  12/07/09

| Schedule **M-3** (Form 1120) 2009 | | | | Page **2** |
|---|---|---|---|---|

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): (1) ☐ Consolidated group   (2) ☐ Parent corp   (3) ☐ Consolidated eliminations   (4) ☒ Subsidiary corp   (5) ☐ Mixed 1120/L/PC group

Check if a sub-consolidated: (6) ☐ 1120 group   (7) ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR CONSTRUCTORS, INC. | 72-1046000 |

**Part II**   **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** (see instructions)

| **Income (Loss) Items**<br>(Attach schedules for lines 1 through 8) | **(a)**<br>Income (Loss) per<br>Income Statement | **(b)**<br>Temporary<br>Difference | **(c)**<br>Permanent<br>Difference | **(d)**<br>Income (Loss) per<br>Tax Return |
|---|---|---|---|---|
| 1 Income (loss) from equity method foreign corporations. . . . . . . . . . . . . . . . . | | | | |
| 2 Gross foreign dividends not previously taxed. . . . . . . . . . . . . . . . | | | | |
| 3 Subpart F, QEF, and similar income inclusions. . . . . . . . . . . . . . . . . | | | | |
| 4 Section 78 gross-up. . . . . . . . . . . . . . . . | | | | |
| 5 Gross foreign distributions previously taxed. . . . . . . . . . | | | | |
| 6 Income (loss) from equity method U.S. corporations. . . . . . . . . . . . . . . | | | | |
| 7 U.S. dividends not eliminated in tax consolidation. . . . . . . . . . . . . . . . . | | | | |
| 8 Minority interest for includible corporations. . . . . . . . . . | | | | |
| 9 Income (loss) from U.S. partnerships. . . . . . . . . . . . . . . . | | | | |
| 10 Income (loss) from foreign partnerships. . . . . . . . . . . . . . . . | | | | |
| 11 Income (loss) from other pass-through entities. . . . . . . . . . . . . . . . | | | | |
| 12 Items relating to reportable transactions (attach details). . . . . . . . . . . . . . . | | | | |
| 13 Interest income (attach Form 8916-A). . . . . . . | | | | |
| 14 Total accrual to cash adjustment. . . . . . . . . . . | | | | |
| 15 Hedging transactions. . . . . . . . . . . . . . . . . . | | | | |
| 16 Mark-to-market income (loss). . . . . . . . . . . . . | | | | |
| 17 Cost of goods sold (attach Form 8916-A). . . . | -238,781,552. | | | -238,781,552. |
| 18 Sale versus lease (for sellers and/or lessors). . . . . . . . | | | | |
| 19 Section 481(a) adjustments. . . . . . . . . . . . . . | | | | |
| 20 Unearned/deferred revenue. . . . . . . . . . . . . | | | | |
| 21 Income recognition from long-term contracts | | | | |
| 22 Original issue discount and other imputed interest . . . . . | | | | |
| 23 a Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities . . . | | | | |
| b Gross capital gains from Schedule D, excluding amounts from pass-through entities . . . . . . | | | | |
| c Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses. . . . . . . . . . . . . . . . . . . . . | | | | |
| d Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses. . . . . . . . . . . . . . . . . . . . | | | | |
| e Abandonment losses. . . . . . . . . . . . . . . . . . | | | | |
| f Worthless stock losses (attach details). . . . . . . . . . . . . . | | | | |
| g Other gain/loss on disposition of assets other than inventory. . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 24 Capital loss limitation and carryforward used . . . . . . . . | | | | |
| 25 Other income (loss) items with differences (attach schedule). . . . . . . . . . . . . . | | | | |
| 26 **Total income (loss) items. Combine lines 1 through 25.** | -238,781,552. | | | -238,781,552. |
| 27 **Total expense/deduction items** (from Part III, line 36). | -19,856,953. | 14,077,196. | 259,660. | -5,520,097. |
| 28 Other items with no differences. . . . . . . . . . . . | 287,766,068. | | | 287,766,068. |
| 29 a Mixed groups, see instructions. All others, combine lines 26 through 28. . . . . . . . . . . . | 29,127,563. | 14,077,196. | 259,660. | 43,464,419. |
| b PC insurance subgroup reconciliation totals. | | | | |
| c Life insurance subgroup reconciliation totals. | | | | |
| 30 **Reconciliation totals. Combine lines 29a through 29c.** . | 29,127,563. | 14,077,196. | 259,660. | 43,464,419. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

Schedule **M-3** (Form 1120) 2009 | | Page **3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group   **(2)** ☐ Parent corp   **(3)** ☐ Consolidated eliminations   **(4)** ☒ Subsidiary corp   **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated:   **(6)** ☐ 1120 group   **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR CONSTRUCTORS, INC. | 72-1046000 |

**Part III**  Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return — Expense/Deduction Items (see instructions)

| | Expense/Deduction Items | **(a)** Expense per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Deduction per Tax Return |
|---|---|---|---|---|---|
| 1 | U.S. current income tax expense | 14,077,196. | -14,077,196. | | |
| 2 | U.S. deferred income tax expense | | | | |
| 3 | State and local current income tax expense | | | | |
| 4 | State and local deferred income tax expense | | | | |
| 5 | Foreign current income tax expense (other than foreign withholding taxes) | | | | |
| 6 | Foreign deferred income tax expense | | | | |
| 7 | Foreign withholding taxes | | | | |
| 8 | Interest expense (attach Form 8916-A) | | | | |
| 9 | Stock option expense | | | | |
| 10 | Other equity-based compensation | | | | |
| 11 | Meals and entertainment | 949,110. | | -474,555. | 474,555. |
| 12 | Fines and penalties | 338,624. | | -338,624. | |
| 13 | Judgments, damages, awards, and similar costs | | | | |
| 14 | Parachute payments | | | | |
| 15 | Compensation with section 162(m) limitation | | | | |
| 16 | Pension and profit-sharing | | | | |
| 17 | Other post-retirement benefits | | | | |
| 18 | Deferred compensation | | | | |
| 19 | Charitable contribution of cash and tangible property | | | | |
| 20 | Charitable contribution of intangible property | | | | |
| 21 | Charitable contribution limitation/carryforward | | | | |
| 22 | Domestic production activities deduction | | | 2,774,325. | 2,774,325. |
| 23 | Current year acquisition or reorganization investment banking fees | | | | |
| 24 | Current year acquisition or reorganization legal and accounting fees | | | | |
| 25 | Current year acquisition/reorganization other costs | | | | |
| 26 | Amortization/impairment of goodwill | | | | |
| 27 | Amortization of acquisition, reorganization, and start-up costs | | | | |
| 28 | Other amortization or impairment write-offs | | | | |
| 29 | Section 198 environmental remediation costs | | | | |
| 30 | Depletion | | | | |
| 31 | Depreciation | 2,808,084. | | | 2,808,084. |
| 32 | Bad debt expense | | | | |
| 33 | Corporate owned life insurance premiums | 1,683,939. | | -1,683,939. | |
| 34 | Purchase versus lease (for purchasers and/or lessees) | | | | |
| 35 | Other expense/deduction items with differences (attach schedule)     STMT 11 | | | -536,867. | -536,867. |
| 36 | **Total expense/deduction items.** Combine lines 1 through 35. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive | 19,856,953. | -14,077,196. | -259,660. | 5,520,097. |

Schedule **M-3** (Form 1120) 2009

CPCA1023L  12/07/09

Form **8916-A**

Department of the Treasury
Internal Revenue Service

**Supplemental Attachment to Schedule M-3**

► Attach to Schedule M-3 for Form 1065, 1120, 1120-L, 1120-PC, or 1120S.

OMB No. 1545-2061

**2009**

| Name of common parent | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |
| Name of subsidiary | Employer identification number |
| MMR CONSTRUCTORS, INC. | 72-1046000 |

**Part I** | **Cost of Goods Sold**

| Cost of Goods Sold Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| **1** Amounts attributable to cost flow assumptions.... | | | | |
| **2** Amounts attributable to: | | | | |
| **a** Stock option expense . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **b** Other equity based compensation. . . . . . . . . . . . . . . | | | | |
| **c** Meals and entertainment. . . . . . . . . . . . . . . . . . . . . . | | | | |
| **d** Parachute payments . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **e** Compensation with section 162(m) limitation . . . . . | | | | |
| **f** Pension and profit sharing . . . . . . . . . . . . . . . . . . . . | | | | |
| **g** Other post-retirement benefits. . . . . . . . . . . . . . . . . | | | | |
| **h** Deferred compensation . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **i** Section 198 environmental remediation costs. . . . . | | | | |
| **j** Amortization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **k** Depletion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **l** Depreciation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **m** Corporate owned life insurance premiums. . . . . . . . | | | | |
| **n** Other section 263A costs. . . . . . . . . . . . . . . . . . . . . | | | | |
| **3** Inventory shrinkage accruals . . . . . . . . . . . . . . . . . . | | | | |
| **4** Excess inventory and obsolescence reserves . . . . . | | | | |
| **5** Lower of cost or market write-downs. . . . . . . . . . . . | | | | |
| **6** Other items with differences (attach schedule) . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **7** Other items with no differences. . . . . . . . . . . . . . . . | 238,781,552. | | | 238,781,552. |
| **8** **Total cost of goods sold.** Add lines 1 through 7, in columns a, b, c, and d. | 238,781,552. | 0. | 0. | 238,781,552. |

**BAA For Paperwork Reduction Act Notice, see separate instructions.**

Form **8916-A** (2009)

Form **8916-A** (2009)  MMR GROUP, INC.                                       72-1271030            Page **2**

| Part II | Interest Income | | | | |
|---|---|---|---|---|---|
| | Interest Income Item | **(a)** Income (Loss) per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Income (Loss) per Tax Return |
| **1** | Tax-exempt interest income . . . . . . . . . . . . . . . . . . . . . | | | | |
| **2** | Interest income from hybrid securities . . . . . . . . . . . | | | | |
| **3** | Sale/lease interest income . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4a** | Intercompany interest income — From outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4b** | Intercompany interest income — From tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **5** | Other interest income . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **6** | Total interest income. Add lines 1 through 5. Enter total on Schedule M-3 (Forms 1120, 1120-PC, and 1120-L), Part II, line 13 or Schedule M-3 (Forms 1065 and 1120-S) Part II, line 11 . . . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

| Part III | Interest Expense | | | | |
|---|---|---|---|---|---|
| | Interest Expense Item | **(a)** Expense per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Deduction per Tax Return |
| **1** | Interest expense from hybrid securities . . . . . . . . . . | | | | |
| **2** | Lease/purchase interest expense . . . . . . . . . . . . . . | | | | |
| **3a** | Intercompany interest expense — Paid to outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **3b** | Intercompany interest expense — Paid to tax affiliated group . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4** | Other interest expense . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **5** | Total interest expense. Add lines 1 through 4. Enter total on Schedule M-3 (Form 1120) Part III, line 8; Schedule M-3 (Forms1120-PC and 1120-L), Part III, line 36; Schedule M-3 (Form 1065) Part III, line 27; or Schedule M-3 (Form 1120-S) Part III, line 26 . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

Form **8916-A** (2009)

CPCZ1612L  06/29/09

| Schedule **M-3** (Form 1120) 2009 | | | | Page **2** |
|---|---|---|---|---|

Name of corporation (common parent, if consolidated return)

MMR GROUP, INC.

**Employer identification number**
72-1271030

Check applicable box(es): (1) ☐ Consolidated group   (2) ☐ Parent corp   (3) ☐ Consolidated eliminations   (4) ☒ Subsidiary corp   (5) ☐ Mixed 1120/L/PC group

Check if a sub-consolidated:   (6) ☐ 1120 group   (7) ☐ 1120 eliminations

Name of subsidiary (if consolidated return)

MMR OFFSHORE SERVICES, INC.

**Employer identification number**
72-1217366

**Part II**    **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** (see instructions)

| **Income (Loss) Items**<br>(Attach schedules for lines 1 through 8) | **(a)**<br>Income (Loss) per<br>Income Statement | **(b)**<br>Temporary<br>Difference | **(c)**<br>Permanent<br>Difference | **(d)**<br>Income (Loss) per<br>Tax Return |
|---|---|---|---|---|
| 1 Income (loss) from equity method foreign corporations. | | | | |
| 2 Gross foreign dividends not previously taxed | | | | |
| 3 Subpart F, QEF, and similar income inclusions. | | | | |
| 4 Section 78 gross-up. | | | | |
| 5 Gross foreign distributions previously taxed. | | | | |
| 6 Income (loss) from equity method U.S. corporations. | | | | |
| 7 U.S. dividends not eliminated in tax consolidation. | | | | |
| 8 Minority interest for includible corporations. | | | | |
| 9 Income (loss) from U.S. partnerships. | | | | |
| 10 Income (loss) from foreign partnerships. | | | | |
| 11 Income (loss) from other pass-through entities. | | | | |
| 12 Items relating to reportable transactions (attach details) | | | | |
| 13 Interest income (attach Form 8916-A). | | | | |
| 14 Total accrual to cash adjustment. | | | | |
| 15 Hedging transactions. | | | | |
| 16 Mark-to-market income (loss). | | | | |
| 17 Cost of goods sold (attach Form 8916-A). | | | | |
| 18 Sale versus lease (for sellers and/or lessors). | | | | |
| 19 Section 481(a) adjustments. | | | | |
| 20 Unearned/deferred revenue. | | | | |
| 21 Income recognition from long-term contracts | | | | |
| 22 Original issue discount and other imputed interest | | | | |
| 23a Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities | | | | |
| b Gross capital gains from Schedule D, excluding amounts from pass-through entities | | | | |
| c Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses. | | | | |
| d Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses. | | | | |
| e Abandonment losses. | | | | |
| f Worthless stock losses (attach details). | | | | |
| g Other gain/loss on disposition of assets other than inventory. | | | | |
| 24 Capital loss limitation and carryforward used | | | | |
| 25 Other income (loss) items with differences (attach schedule) | | | | |
| 26 **Total income (loss) items.** Combine lines 1 through 25 | | | | |
| 27 **Total expense/deduction items** (from Part III, line 36). | | | | |
| 28 Other items with no differences. | | | | |
| 29a Mixed groups, see instructions. All others, combine lines 26 through 28. | 0. | 0. | 0. | 0. |
| b PC insurance subgroup reconciliation totals. | | | | |
| c Life insurance subgroup reconciliation totals. | | | | |
| 30 **Reconciliation totals.** Combine lines 29a through 29c. | 0. | 0. | 0. | 0. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

Schedule **M-3** (Form 1120) 2009 | Page **3**
--- | ---

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group  **(2)** ☐ Parent corp  **(3)** ☐ Consolidated eliminations  **(4)** ☒ Subsidiary corp  **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated:  **(6)** ☐ 1120 group  **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR OFFSHORE SERVICES, INC. | 72-1217366 |

**Part III**  Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return — Expense/Deduction Items (see instructions)

| | Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|---|
| 1 | U.S. current income tax expense . . . . . . . . . . . | | | | |
| 2 | U.S. deferred income tax expense . . . . . . . . . . | | | | |
| 3 | State and local current income tax expense . | | | | |
| 4 | State and local deferred income tax expense | | | | |
| 5 | Foreign current income tax expense (other than foreign withholding taxes) . . . . . . . . . . . . . | | | | |
| 6 | Foreign deferred income tax expense . . . . . . . | | | | |
| 7 | Foreign withholding taxes . . . . . . . . . . . . . . . . . | | | | |
| 8 | Interest expense (attach Form 8916-A) . . . . . . | | | | |
| 9 | Stock option expense . . . . . . . . . . . . . . . . . . . . | | | | |
| 10 | Other equity-based compensation . . . . . . . . . . . | | | | |
| 11 | Meals and entertainment . . . . . . . . . . . . . . . . . . | | | | |
| 12 | Fines and penalties . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 13 | Judgments, damages, awards, and similar costs . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 14 | Parachute payments . . . . . . . . . . . . . . . . . . . . . | | | | |
| 15 | Compensation with section 162(m) limitation | | | | |
| 16 | Pension and profit-sharing . . . . . . . . . . . . . . . . | | | | |
| 17 | Other post-retirement benefits . . . . . . . . . . . . . | | | | |
| 18 | Deferred compensation . . . . . . . . . . . . . . . . . . . | | | | |
| 19 | Charitable contribution of cash and tangible property . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 20 | Charitable contribution of intangible property | | | | |
| 21 | Charitable contribution limitation/carryforward . . . . . . . . | | | | |
| 22 | Domestic production activities deduction . . . . | | | | |
| 23 | Current year acquisition or reorganization investment banking fees . . . . . . . . . . . . . . . . . . | | | | |
| 24 | Current year acquisition or reorganization legal and accounting fees . . . . . . . . . . . . . . . . | | | | |
| 25 | Current year acquisition/reorganization other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 26 | Amortization/impairment of goodwill . . . . . . . . | | | | |
| 27 | Amortization of acquisition, reorganization, and start-up costs . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 28 | Other amortization or impairment write-offs . . | | | | |
| 29 | Section 198 environmental remediation costs | | | | |
| 30 | Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 31 | Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 32 | Bad debt expense . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 33 | Corporate owned life insurance premiums . . . | | | | |
| 34 | Purchase versus lease (for purchasers and/or lessees) . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 35 | Other expense/deduction items with differences (attach schedule) . . . . . . . . . . . . . | | | | |
| 36 | **Total expense/deduction items.** Combine lines 1 through 35. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive . . | | | | |

Schedule **M-3** (Form 1120) 2009

Schedule **M-3** (Form 1120) 2009                                                                      Page **2**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): (1) ☐ Consolidated group   (2) ☐ Parent corp   (3) ☐ Consolidated eliminations   (4) ☒ Subsidiary corp   (5) ☐ Mixed 1120/L/PC group

Check if a sub-consolidated:   (6) ☐ 1120 group   (7) ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR TECHNICAL SERVICES, INC. | 72-1209195 |

| **Part II** | **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** (see instructions) |
|---|---|

| **Income (Loss) Items**<br>(Attach schedules for lines 1 through 8) | **(a)**<br>Income (Loss) per<br>Income Statement | **(b)**<br>Temporary<br>Difference | **(c)**<br>Permanent<br>Difference | **(d)**<br>Income (Loss) per<br>Tax Return |
|---|---|---|---|---|
| **1** Income (loss) from equity method foreign corporations. . . . . . . . . . . . . . . . . | | | | |
| **2** Gross foreign dividends not previously taxed. . . . . . . . . . . . . . . . . | | | | |
| **3** Subpart F, QEF, and similar income inclusions. . . . . . . . . . . . . . . . . | | | | |
| **4** Section 78 gross-up. . . . . . . . . . . . . . . . . | | | | |
| **5** Gross foreign distributions previously taxed. . . . . . . . . . | | | | |
| **6** Income (loss) from equity method U.S. corporations. . . . . . . . . . . . . . . . . | | | | |
| **7** U.S. dividends not eliminated in tax consolidation. . . . . . . . . . . . . . . . . | | | | |
| **8** Minority interest for includible corporations. . . . . . . . . . | | | | |
| **9** Income (loss) from U.S. partnerships. . . . . . . . . . . . . . . . . | | | | |
| **10** Income (loss) from foreign partnerships. . . . . . . . . . . . . . . . . | | | | |
| **11** Income (loss) from other pass-through entities. . . . . . . . . . . . . . . . . | | | | |
| **12** Items relating to reportable transactions (attach details). . . . . . . . . . . . . . . . . | | | | |
| **13** Interest income (attach Form 8916-A). . . . . . . | | | | |
| **14** Total accrual to cash adjustment. . . . . . . . . . . | | | | |
| **15** Hedging transactions . . . . . . . . . . . . . . . . . | | | | |
| **16** Mark-to-market income (loss). . . . . . . . . . . . . | | | | |
| **17** Cost of goods sold (attach Form 8916-A). . . . | −302,840. | | | −302,840. |
| **18** Sale versus lease (for sellers and/or lessors). . . . . . . . . | | | | |
| **19** Section 481(a) adjustments. . . . . . . . . . . . . . | | | | |
| **20** Unearned/deferred revenue. . . . . . . . . . . . . . | | | | |
| **21** Income recognition from long-term contracts | | | | |
| **22** Original issue discount and other imputed interest . . . . . | | | | |
| **23a** Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities . . . | | | | |
| **b** Gross capital gains from Schedule D, excluding amounts from pass-through entities . . . . . . | | | | |
| **c** Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses. . . . . . . . . . . . . . . . . | | | | |
| **d** Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses. . . . . . . . . . . . . . . . . | | | | |
| **e** Abandonment losses. . . . . . . . . . . . . . . . . | | | | |
| **f** Worthless stock losses (attach details). . . . . . . . . . . . . . | | | | |
| **g** Other gain/loss on disposition of assets other than inventory. . . . . . . . . . . . . . . . . | | | | |
| **24** Capital loss limitation and carryforward used . . . . . . . . | | | | |
| **25** Other income (loss) items with differences (attach schedule). . . . . . . . . . . . . . | | | | |
| **26** **Total income (loss) items.** Combine lines 1 through 25. | −302,840. | | | −302,840. |
| **27** **Total expense/deduction items** (from Part III, line 36). | −1,070. | | 535. | −535. |
| **28** Other items with no differences. . . . . . . . . . . . | −33,954. | | | −33,954. |
| **29a** Mixed groups, see instructions. All others, combine lines 26 through 28. | −337,864. | 0. | 535. | −337,329. |
| **b** PC insurance subgroup reconciliation totals. | | | | |
| **c** Life insurance subgroup reconciliation totals. | | | | |
| **30** **Reconciliation totals.** Combine lines 29a through 29c. | −337,864. | 0. | 535. | −337,329. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

BAA                                           CPCA1023L   12/07/09                                      Schedule **M-3** (Form 1120) 2009

Schedule **M-3** (Form 1120) 2009     Page **3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group   **(2)** ☐ Parent corp   **(3)** ☐ Consolidated eliminations   **(4)** ☒ Subsidiary corp   **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated: **(6)** ☐ 1120 group   **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR TECHNICAL SERVICES, INC. | 72-1209195 |

**Part III**   **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return — Expense/Deduction Items** (see instructions)

| | Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|---|
| 1 | U.S. current income tax expense | | | | |
| 2 | U.S. deferred income tax expense | | | | |
| 3 | State and local current income tax expense | | | | |
| 4 | State and local deferred income tax expense | | | | |
| 5 | Foreign current income tax expense (other than foreign withholding taxes) | | | | |
| 6 | Foreign deferred income tax expense | | | | |
| 7 | Foreign withholding taxes | | | | |
| 8 | Interest expense (attach Form 8916-A) | | | | |
| 9 | Stock option expense | | | | |
| 10 | Other equity-based compensation | | | | |
| 11 | Meals and entertainment | | | −535. | |
| 12 | Fines and penalties | | | | |
| 13 | Judgments, damages, awards, and similar costs | | | | |
| 14 | Parachute payments | | | | |
| 15 | Compensation with section 162(m) limitation | | | | |
| 16 | Pension and profit-sharing | | | | |
| 17 | Other post-retirement benefits | | | | |
| 18 | Deferred compensation | | | | |
| 19 | Charitable contribution of cash and tangible property | | | | |
| 20 | Charitable contribution of intangible property | | | | |
| 21 | Charitable contribution limitation/carryforward | | | | |
| 22 | Domestic production activities deduction | | | | |
| 23 | Current year acquisition or reorganization investment banking fees | | | | |
| 24 | Current year acquisition or reorganization legal and accounting fees | | | | |
| 25 | Current year acquisition/reorganization other costs | | | | |
| 26 | Amortization/impairment of goodwill | | | | |
| 27 | Amortization of acquisition, reorganization, and start-up costs | | | | |
| 28 | Other amortization or impairment write-offs | | | | |
| 29 | Section 198 environmental remediation costs | | | | |
| 30 | Depletion | | | | |
| 31 | Depreciation | | | | |
| 32 | Bad debt expense | | | | |
| 33 | Corporate owned life insurance premiums | | | | |
| 34 | Purchase versus lease (for purchasers and/or lessees) | | | | |
| 35 | Other expense/deduction items with differences (attach schedule) | | | | |
| 36 | **Total expense/deduction items. Combine** lines 1 through 35. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive | | | −535. | |

Form **8916-A**

Department of the Treasury
Internal Revenue Service

**Supplemental Attachment to Schedule M-3**

► Attach to Schedule M-3 for Form 1065, 1120, 1120-L, 1120-PC, or 1120S.

OMB No. 1545-2061

**2009**

| Name of common parent | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |
| Name of subsidiary | Employer identification number |
| MMR TECHNICAL SERVICES, INC. | 72-1209195 |

**Part I** | **Cost of Goods Sold**

| Cost of Goods Sold Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| **1** Amounts attributable to cost flow assumptions.... | | | | |
| **2** Amounts attributable to: | | | | |
| **a** Stock option expense. . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **b** Other equity based compensation. . . . . . . . . . . . . . . | | | | |
| **c** Meals and entertainment. . . . . . . . . . . . . . . . . . . . . . | | | | |
| **d** Parachute payments. . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **e** Compensation with section 162(m) limitation . . . . . | | | | |
| **f** Pension and profit sharing . . . . . . . . . . . . . . . . . . . . | | | | |
| **g** Other post-retirement benefits. . . . . . . . . . . . . . . . . | | | | |
| **h** Deferred compensation . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **i** Section 198 environmental remediation costs. . . . . | | | | |
| **j** Amortization. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **k** Depletion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **l** Depreciation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **m** Corporate owned life insurance premiums. . . . . . . . | | | | |
| **n** Other section 263A costs. . . . . . . . . . . . . . . . . . . . . | | | | |
| **3** Inventory shrinkage accruals . . . . . . . . . . . . . . . . . . | | | | |
| **4** Excess inventory and obsolescence reserves. . . . . | | | | |
| **5** Lower of cost or market write-downs. . . . . . . . . . . . | | | | |
| **6** Other items with differences (attach schedule) . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **7** Other items with no differences. . . . . . . . . . . . . . . . | 302,840. | | | 302,840. |
| **8** **Total cost of goods sold.** Add lines 1 through 7, in columns a, b, c, and d. | 302,840. | 0. | 0. | 302,840. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**

Form **8916-A** (2009)

Form **8916-A** (2009) MMR GROUP, INC. 72-1271030 Page **2**

| Part II | Interest Income | | | | |
|---|---|---|---|---|---|

| | Interest Income Item | **(a)** Income (Loss) per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Income (Loss) per Tax Return |
|---|---|---|---|---|---|
| **1** | Tax-exempt interest income...................... | | | | |
| **2** | Interest income from hybrid securities............ | | | | |
| **3** | Sale/lease interest income....................... | | | | |
| **4a** | Intercompany interest income — From outside tax affiliated group................................. | | | | |
| **4b** | Intercompany interest income — From tax affiliated group................................. | | | | |
| **5** | Other interest income........................... | | | | |
| **6** | Total interest income. Add lines 1 through 5. Enter total on Schedule M-3 (Forms 1120, 1120-PC, and 1120-L), Part II, line 13 or Schedule M-3 (Forms 1065 and 1120-S) Part II, line 11.............................. | 0. | 0. | 0. | 0. |

| Part III | Interest Expense | | | | |
|---|---|---|---|---|---|

| | Interest Expense Item | **(a)** Expense per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Deduction per Tax Return |
|---|---|---|---|---|---|
| **1** | Interest expense from hybrid securities........... | | | | |
| **2** | Lease/purchase interest expense................ | | | | |
| **3a** | Intercompany interest expense — Paid to outside tax affiliated group............................ | | | | |
| **3b** | Intercompany interest expense — Paid to tax affiliated group................................. | | | | |
| **4** | Other interest expense........................... | | | | |
| **5** | Total interest expense. Add lines 1 through 4. Enter total on Schedule M-3 (Form 1120) Part III, line 8; Schedule M-3 (Forms1120-PC and 1120-L), Part III, line 36; Schedule M-3 (Form 1065) Part III, line 27; or Schedule M-3 (Form 1120-S) Part III, line 26..................... | 0. | 0. | 0. | 0. |

Form **8916-A** (2009)

Schedule **M-3** (Form 1120) 2009                                                                   Page 2

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): (1) ☐ Consolidated group  (2) ☐ Parent corp

Check applicable box(es): (1) ☐ Consolidated group  (2) ☐ Parent corp  (3) ☐ Consolidated eliminations  (4) ☒ Subsidiary corp  (5) ☐ Mixed 1120/L/PC group

Check if a sub-consolidated:  (6) ☐ 1120 group  (7) ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR POWER SOLUTIONS LLC | 05-0584790 |

**Part II**    **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** (see instructions)

| Income (Loss) Items<br>(Attach schedules for lines 1 through 8) | (a)<br>Income (Loss) per<br>Income Statement | (b)<br>Temporary<br>Difference | (c)<br>Permanent<br>Difference | (d)<br>Income (Loss) per<br>Tax Return |
|---|---|---|---|---|
| 1   Income (loss) from equity method foreign corporations | | | | |
| 2   Gross foreign dividends not previously taxed | | | | |
| 3   Subpart F, QEF, and similar income inclusions | | | | |
| 4   Section 78 gross-up | | | | |
| 5   Gross foreign distributions previously taxed | | | | |
| 6   Income (loss) from equity method U.S. corporations | | | | |
| 7   U.S. dividends not eliminated in tax consolidation | | | | |
| 8   Minority interest for includible corporations | | | | |
| 9   Income (loss) from U.S. partnerships | | | | |
| 10   Income (loss) from foreign partnerships | | | | |
| 11   Income (loss) from other pass-through entities | | | | |
| 12   Items relating to reportable transactions (attach details) | | | | |
| 13   Interest income (attach Form 8916-A) | | | | |
| 14   Total accrual to cash adjustment | | | | |
| 15   Hedging transactions | | | | |
| 16   Mark-to-market income (loss) | | | | |
| 17   Cost of goods sold (attach Form 8916-A) | -6,445,906. | | | -6,445,906. |
| 18   Sale versus lease (for sellers and/or lessors) | | | | |
| 19   Section 481(a) adjustments | | | | |
| 20   Unearned/deferred revenue | | | | |
| 21   Income recognition from long-term contracts | | | | |
| 22   Original issue discount and other imputed interest | | | | |
| 23a   Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities | | | | |
| b   Gross capital gains from Schedule D, excluding amounts from pass-through entities | | | | |
| c   Gross capital losses from Schedule D, excluding from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| d   Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| e   Abandonment losses | | | | |
| f   Worthless stock losses (attach details) | | | | |
| g   Other gain/loss on disposition of assets other than inventory | | | | |
| 24   Capital loss limitation and carryforward used | | | | |
| 25   Other income (loss) items with differences (attach schedule) | | | | |
| 26   **Total income (loss) items.** Combine lines 1 through 25 | -6,445,906. | | | -6,445,906. |
| 27   **Total expense/deduction items** (from Part III, line 36) | -21,533. | | 5,160. | -16,373. |
| 28   Other items with no differences | 6,004,159. | | | 6,004,159. |
| 29a   Mixed groups, see instructions. All others, combine lines 26 through 28 | -463,280. | 0. | 5,160. | -458,120. |
| b   PC insurance subgroup reconciliation totals | | | | |
| c   Life insurance subgroup reconciliation totals | | | | |
| 30   **Reconciliation totals.** Combine lines 29a through 29c | -463,280. | 0. | 5,160. | -458,120. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

BAA                        CPCA1023L   12/07/09                                Schedule **M-3** (Form 1120) 2009

Schedule **M-3** (Form 1120) 2009                                                                 Page **3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group    **(2)** ☐ Parent corp    **(3)** ☐ Consolidated eliminations    **(4)** ☒ Subsidiary corp    **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated:    **(6)** ☐ 1120 group    **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR POWER SOLUTIONS LLC | 05-0584790 |

**Part III**  Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return — Expense/Deduction Items (see instructions)

| | Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|---|
| 1 | U.S. current income tax expense . . . . . . . . . . | | | | |
| 2 | U.S. deferred income tax expense . . . . . . . . . | | | | |
| 3 | State and local current income tax expense . | | | | |
| 4 | State and local deferred income tax expense | | | | |
| 5 | Foreign current income tax expense (other than foreign withholding taxes) . . . . . . . . . . . . . | | | | |
| 6 | Foreign deferred income tax expense . . . . . . . | | | | |
| 7 | Foreign withholding taxes . . . . . . . . . . . . . . . . . | | | | |
| 8 | Interest expense (attach Form 8916-A) . . . . . . | | | | |
| 9 | Stock option expense . . . . . . . . . . . . . . . . . . . . | | | | |
| 10 | Other equity-based compensation . . . . . . . . . . | | | | |
| 11 | Meals and entertainment . . . . . . . . . . . . . . . . . | | | −5,160. | |
| 12 | Fines and penalties . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 13 | Judgments, damages, awards, and similar costs . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 14 | Parachute payments . . . . . . . . . . . . . . . . . . . . . | | | | |
| 15 | Compensation with section 162(m) limitation | | | | |
| 16 | Pension and profit-sharing . . . . . . . . . . . . . . . | | | | |
| 17 | Other post-retirement benefits . . . . . . . . . . . . | | | | |
| 18 | Deferred compensation . . . . . . . . . . . . . . . . . . | | | | |
| 19 | Charitable contribution of cash and tangible property . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 20 | Charitable contribution of intangible property | | | | |
| 21 | Charitable contribution limitation/carryforward . . . . . . . . | | | | |
| 22 | Domestic production activities deduction . . . . | | | | |
| 23 | Current year acquisition or reorganization investment banking fees . . . . . . . . . . . . . . . . . | | | | |
| 24 | Current year acquisition or reorganization legal and accounting fees . . . . . . . . . . . . . . . . | | | | |
| 25 | Current year acquisition/reorganization other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 26 | Amortization/impairment of goodwill . . . . . . . . | | | | |
| 27 | Amortization of acquisition, reorganization, and start-up costs . . . . . . . . . . . . . . . . . . . . . | | | | |
| 28 | Other amortization or impairment write-offs . . | | | | |
| 29 | Section 198 environmental remediation costs | | | | |
| 30 | Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 31 | Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 32 | Bad debt expense . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 33 | Corporate owned life insurance premiums . . . | | | | |
| 34 | Purchase versus lease (for purchasers and/or lessees) . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 35 | Other expense/deduction items with differences (attach schedule) . . . . . . . . . . . . . | | | | |
| 36 | **Total expense/deduction items. Combine** lines 1 through 35. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive . . | | | −5,160. | |

CPCA1023L   12/07/09

Form **8916-A**

**Supplemental Attachment to Schedule M-3**

OMB No. 1545-2061

Department of the Treasury
Internal Revenue Service

► Attach to Schedule M-3 for Form 1065, 1120, 1120-L, 1120-PC, or 1120S.

**2009**

| Name of common parent | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |
| Name of subsidiary | Employer identification number |
| MMR POWER SOLUTIONS LLC | 05-0584790 |

**Part I**    **Cost of Goods Sold**

| Cost of Goods Sold Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| **1** Amounts attributable to cost flow assumptions.... | | | | |
| **2** Amounts attributable to: | | | | |
| **a** Stock option expense........................... | | | | |
| **b** Other equity based compensation................ | | | | |
| **c** Meals and entertainment........................ | | | | |
| **d** Parachute payments............................. | | | | |
| **e** Compensation with section 162(m) limitation ..... | | | | |
| **f** Pension and profit sharing...................... | | | | |
| **g** Other post-retirement benefits.................. | | | | |
| **h** Deferred compensation ......................... | | | | |
| **i** Section 198 environmental remediation costs..... | | | | |
| **j** Amortization................................... | | | | |
| **k** Depletion...................................... | | | | |
| **l** Depreciation................................... | | | | |
| **m** Corporate owned life insurance premiums........ | | | | |
| **n** Other section 263A costs....................... | | | | |
| **3** Inventory shrinkage accruals .................... | | | | |
| **4** Excess inventory and obsolescence reserves..... | | | | |
| **5** Lower of cost or market write-downs............. | | | | |
| **6** Other items with differences (attach schedule)......................... | | | | |
| **7** Other items with no differences.................. | 6,445,906. | | | 6,445,906. |
| **8** Total cost of goods sold. Add lines 1 through 7, in columns a, b, c, and d. | 6,445,906. | 0. | 0. | 6,445,906. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**    Form **8916-A** (2009)

CPCZ1612L  06/29/09

Form **8916-A** (2009)  MMR GROUP, INC.                                        72-1271030              Page **2**

| Part II | Interest Income | | | | |
|---------|------------------|--|--|--|--|
| | Interest Income Item | **(a)** Income (Loss) per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Income (Loss) per Tax Return |
| **1** | Tax-exempt interest income . . . . . . . . . . . . . . . . . . . . . | | | | |
| **2** | Interest income from hybrid securities . . . . . . . . . . . | | | | |
| **3** | Sale/lease interest income . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4a** | Intercompany interest income — From outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4b** | Intercompany interest income — From tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **5** | Other interest income . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **6** | Total interest income. Add lines 1 through 5. Enter total on Schedule M-3 (Forms 1120, 1120-PC, and 1120-L), Part II, line 13 or Schedule M-3 (Forms 1065 and 1120-S) Part II, line 11 . . . . . . . . . . . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

| Part III | Interest Expense | | | | |
|----------|-------------------|--|--|--|--|
| | Interest Expense Item | **(a)** Expense per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Deduction per Tax Return |
| **1** | Interest expense from hybrid securities . . . . . . . . . . . | | | | |
| **2** | Lease/purchase interest expense . . . . . . . . . . . . . . . | | | | |
| **3a** | Intercompany interest expense — Paid to outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **3b** | Intercompany interest expense — Paid to tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4** | Other interest expense . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **5** | Total interest expense. Add lines 1 through 4. Enter total on Schedule M-3 (Form 1120) Part III, line 8; Schedule M-3 (Forms 1120-PC and 1120-L), Part III, line 36; Schedule M-3 (Form 1065) Part III, line 27; or Schedule M-3 (Form 1120-S) Part III, line 26 . . . . . . . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

Form **8916-A** (2009)

Schedule **M-3** (Form 1120) 2009 — Page **2**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): (1) ☐ Consolidated group (2) ☐ Parent corp (3) ☒ Consolidated eliminations (4) ☐ Subsidiary corp (5) ☐ Mixed 1120/L/PC group

Check if a sub-consolidated: (6) ☐ 1120 group (7) ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| | |

**Part II** — **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** (see instructions)

| **Income (Loss) Items**<br>(Attach schedules for lines 1 through 8) | **(a)**<br>Income (Loss) per<br>Income Statement | **(b)**<br>Temporary<br>Difference | **(c)**<br>Permanent<br>Difference | **(d)**<br>Income (Loss) per<br>Tax Return |
|---|---|---|---|---|
| 1 Income (loss) from equity method foreign corporations | | | | |
| 2 Gross foreign dividends not previously taxed | | | | |
| 3 Subpart F, QEF, and similar income inclusions | | | | |
| 4 Section 78 gross-up | | | | |
| 5 Gross foreign distributions previously taxed | | | | |
| 6 Income (loss) from equity method U.S. corporations | | | | |
| 7 U.S. dividends not eliminated in tax consolidation | | | | |
| 8 Minority interest for includible corporations | | | | |
| 9 Income (loss) from U.S. partnerships | | | | |
| 10 Income (loss) from foreign partnerships | | | | |
| 11 Income (loss) from other pass-through entities | | | | |
| 12 Items relating to reportable transactions (attach details) | | | | |
| 13 Interest income (attach Form 8916-A) | | | | |
| 14 Total accrual to cash adjustment | | | | |
| 15 Hedging transactions | | | | |
| 16 Mark-to-market income (loss) | | | | |
| 17 Cost of goods sold (attach Form 8916-A) | | | | |
| 18 Sale versus lease (for sellers and/or lessors) | | | | |
| 19 Section 481(a) adjustments | | | | |
| 20 Unearned/deferred revenue | | | | |
| 21 Income recognition from long-term contracts | | | | |
| 22 Original issue discount and other imputed interest | | | | |
| 23a Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities | | | | |
| b Gross capital gains from Schedule D, excluding amounts from pass-through entities | | | | |
| c Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| d Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| e Abandonment losses | | | | |
| f Worthless stock losses (attach details) | | | | |
| g Other gain/loss on disposition of assets other than inventory | | | | |
| 24 Capital loss limitation and carryforward used | | | | |
| 25 Other income (loss) items with differences (attach schedule) | | | | |
| 26 **Total income (loss) items.** Combine lines 1 through 25 | | | | |
| 27 **Total expense/deduction items** (from Part III, line 36) | | | -12,568. | -12,568. |
| 28 Other items with no differences | | | | |
| 29a Mixed groups, see instructions. All others, combine lines 26 through 28 | 0. | 0. | -12,568. | -12,568. |
| b PC insurance subgroup reconciliation totals | | | | |
| c Life insurance subgroup reconciliation totals | | | | |
| 30 **Reconciliation totals.** Combine lines 29a through 29c | 0. | 0. | -12,568. | -12,568. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

Schedule **M-3** (Form 1120) 2009                                                                                                    Page **3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group  **(2)** ☐ Parent corp  **(3)** ☒ Consolidated eliminations  **(4)** ☐ Subsidiary corp  **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated:  **(6)** ☐ 1120 group  **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| | |

**Part III**    Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return — Expense/Deduction Items (see instructions)

| Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| 1 U.S. current income tax expense . . . . . . . . . . | | | | |
| 2 U.S. deferred income tax expense . . . . . . . . . | | | | |
| 3 State and local current income tax expense . | | | | |
| 4 State and local deferred income tax expense | | | | |
| 5 Foreign current income tax expense (other than foreign withholding taxes) . . . . . . . . . . . . . | | | | |
| 6 Foreign deferred income tax expense . . . . . . | | | | |
| 7 Foreign withholding taxes . . . . . . . . . . . . . . . . | | | | |
| 8 Interest expense (attach Form 8916-A) . . . . . | | | | |
| 9 Stock option expense . . . . . . . . . . . . . . . . . . . | | | | |
| 10 Other equity-based compensation . . . . . . . . . | | | | |
| 11 Meals and entertainment . . . . . . . . . . . . . . . . . | | | | |
| 12 Fines and penalties . . . . . . . . . . . . . . . . . . . . . | | | | |
| 13 Judgments, damages, awards, and similar costs . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 14 Parachute payments . . . . . . . . . . . . . . . . . . . . | | | | |
| 15 Compensation with section 162(m) limitation | | | | |
| 16 Pension and profit-sharing . . . . . . . . . . . . . . . | | | | |
| 17 Other post-retirement benefits . . . . . . . . . . . . | | | | |
| 18 Deferred compensation . . . . . . . . . . . . . . . . . . | | | | |
| 19 Charitable contribution of cash and tangible property . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 20 Charitable contribution of intangible property | | | | |
| 21 Charitable contribution limitation/carryforward . . . . . . . | | | | |
| 22 Domestic production activities deduction . . . . | | | 12,568. | 12,568. |
| 23 Current year acquisition or reorganization investment banking fees . . . . . . . . . . . . . . . . . . | | | | |
| 24 Current year acquisition or reorganization legal and accounting fees . . . . . . . . . . . . . . . . | | | | |
| 25 Current year acquisition/reorganization other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 26 Amortization/impairment of goodwill . . . . . . . . | | | | |
| 27 Amortization of acquisition, reorganization, and start-up costs . . . . . . . . . . . . . . . . . . . . . | | | | |
| 28 Other amortization or impairment write-offs . . | | | | |
| 29 Section 198 environmental remediation costs | | | | |
| 30 Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 31 Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 32 Bad debt expense . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 33 Corporate owned life insurance premiums . . . | | | | |
| 34 Purchase versus lease (for purchasers and/or lessees) . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 35 Other expense/deduction items with differences (attach schedule) . . . . . . . . . . . . . | | | | |
| 36 **Total expense/deduction items. Combine** lines 1 through 35. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive . . | | | 12,568. | 12,568. |

CPCA1023L   12/07/09

Schedule **M-3** (Form 1120) 2009

Form **1118**
(Rev December 2009)

Internal Revenue Service
Department of the Treasury

# Foreign Tax Credit — Corporations

▶ Attach to the corporation's tax return.
▶ See separate instructions.

OMB No. 1545-0122

For calendar year  2009 , or other tax year beginning  , and ending  .

Name of corporation
MMR GROUP, INC.

Employer identification number
72-1271030

Use a **separate** Form 1118 for each applicable category of income listed below. See **Categories of Income** in the instructions. Also, see **Specific Instructions.**
Check only one box on each form.

[X] Passive Category Income

[ ] General Category Income

[ ] Section 901(j) Income: Name of Sanctioned Country ▶ _____

[ ] Income Re-sourced by Treaty: Name of Country ▶ _____

## Schedule A   Income or (Loss) Before Adjustments (Report all amounts in U.S. dollars. See *Specific Instructions.*)

### Gross Income or (Loss) From Sources Outside the United States (*INCLUDE* Foreign Branch Gross Income here *and* on Schedule F)

| 1 Foreign Country or U.S. Possession (Enter two-letter code from list in the instructions. Use a separate line for each.)* | 2 Deemed Dividends (see instructions) | | 3 Other Dividends | | 4 Interest | 5 Gross Rents, Royalties, and License Fees | 6 Gross Income From Performance of Services | 7 Other (attach schedule) | 8 Total (add columns 2(a) through 7) |
|---|---|---|---|---|---|---|---|---|---|
| | (a) Exclude gross-up | (b) Gross-up (sec 78) | (a) Exclude gross-up | (b) Gross-up (sec 78) | | | | | |
| **A** NI | 183,898. | 39,571. | | | | | | | 223,469. |
| **B** VE | 341,524. | 490,474. | | | | | | | 831,998. |
| **C** | | | | | | | | | |
| **D** | | | | | | | | | |
| **E** | | | | | | | | | |
| **F** | | | | | | | | | |
| **Totals** (add lines A thru F) | 525,422. | 530,045. | | | | | | | 1,055,467. |

\* For section 863(b) income, NOLs, income from RICs, and high-taxed income, use a single line (see instructions).

### Deductions (*INCLUDE* Foreign Branch Deductions here *and* on Schedule F)

| | 9 Definitely Allocable Deductions | | | | | 10 Apportioned Share of Deductions Not Definitely Allocable (enter amount from applicable line of Schedule H, Part II, column (d)) | 11 Net Operating Loss Deduction | 12 Total Deductions (add columns 9(e) through 11) | 13 Total Income or (Loss) Before Adjustments (subtract column 12 from column 8) |
|---|---|---|---|---|---|---|---|---|---|
| | Rental, Royalty, and Licensing Expenses | | (c) Expenses Related to Gross Income From Performance of Services | (d) Other Definitely Allocable Deductions | (e) Total Definitely Allocable Deductions (add columns 9(a) through 9(d)) | | | | |
| | (a) Depreciation, Depletion, and Amortization | (b) Other Expenses | | | | | | | |
| **A** | | | | | | | | | 223,469. |
| **B** | | | | | | | | | 831,998. |
| **C** | | | | | | | | | |
| **D** | | | | | | | | | |
| **E** | | | | | | | | | |
| **F** | | | | | | | | | |
| **Totals** | | | | | | | | | 1,055,467. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions**

Form **1118** (Rev 12-2009)

CPCA9512L  02/23/10

Form 1118 (Rev 12-2009)    MMR GROUP, INC.    72-1271030      Page **2**

| Schedule B | Foreign Tax Credit *(Report all foreign tax amounts in U.S. dollars.)* |
|---|---|

## Part I — Foreign Taxes Paid, Accrued, and Deemed Paid (see instructions)

| | 1 Credit is Claimed for Taxes: Paid ☐ / Accrued ☐ — Date Paid / Date Accrued | 2 Foreign Taxes Paid or Accrued (attach schedule showing amounts in foreign currency and conversion rate(s) used) | | | | | | | | 3 Tax Deemed Paid (from Schedule C — Part I, column 10, Part II, column 8(b), and Part III, column 8) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Tax Withheld at Source on: | | | Other Foreign Taxes Paid or Accrued on: | | | | (h) Total Foreign Taxes Paid or Accrued (add columns 2(a) through 2(g)) | |
| | | (a) Dividends | (b) Interest | (c) Rents, Royalties, and License Fees | (d) Section 863(b) Income | (e) Foreign Branch Income | (f) Services Income | (g) Other | | |
| A | | | | | | | | | | 39,571. |
| B | | | | | | | | | 490,474. | 530,045. |
| C | | | | | | | | | | |
| D | | | | | | | | | | |
| E | | | | | | | | | | |
| F | | | | | | | | | | |
| Totals (add lines A through F) | | | | | | | | | 530,045. | 530,045. |

## Part II — Separate Foreign Tax Credit *(Complete a separate Part II for each applicable category of income.)*

1 Total foreign taxes paid or accrued (total from Part I, column 2(h)) .................... **530,045.**
2 Total taxes deemed paid (total from Part I, column 3)
3 Reductions of taxes paid, accrued, or deemed paid (enter total from Schedule G)
4 Taxes reclassified under high-tax kickout.
5 Enter the sum of any carryover of foreign taxes (from Schedule K, line 3, column (xiv)) plus any carrybacks to the current tax year
6 Total foreign taxes (combine lines 1 through 5) .................... **530,045.**
7 Enter the amount from the applicable column of Schedule J, Part I, line 11 (see instructions). If Schedule J is **not** required to be completed, enter the result from the 'Totals' line of column 13 of the applicable Schedule A .................... **1,055,467.**
8a Total taxable income from all sources (enter taxable income from the corporation's tax return) .................... **43,670,365.**
b Adjustments to line 8a (see instructions)
c Subtract line 8b from line 8a .................... **43,670,365.**
9 Divide line 7 by line 8c. Enter the resulting fraction as a decimal (see instructions). If line 7 is greater than line 8c, enter 1. .................... **0.02416895**
10 Total U.S. income tax against which credit is allowed (regular tax liability (see section 26(b) minus American Samoa economic development credit) .................... **15,284,628.**
11 Credit limitation (multiply line 9 by line 10) (see instructions) .................... **369,413.**
12 **Separate foreign tax credit** (enter the smaller of line 6 or line 11 here and on the appropriate line of Part III) .................... **369,413.**

## Part III — Summary of Separate Credits (Enter amounts from Part II, line 12 for **each** applicable category of income. **Do not** include taxes paid to sanctioned countries.)

1 Credit for taxes on passive category income. .................... **369,413.**
2 Credit for taxes on general category income.
3 Credit for taxes on income re-sourced by treaty (combine all such credits on this line).
4 Total (add lines 1 through 3) .................... **369,413.**
5 Reduction in credit for international boycott operations (see instructions)
6 **Total foreign tax credit** (subtract line 5 from line 4). Enter here and on the appropriate line of the corporation's tax return. .................... **369,413.**

Form **1118** (Rev 12-2009)

CPCA9512L   02/23/10

Form **1118**
(Rev December 2009)

Internal Revenue Service
Department of the Treasury

**ALTERNATIVE MINIMUM TAX**
**Foreign Tax Credit — Corporations**

▶ Attach to the corporation's tax return.
▶ See separate instructions.

OMB No. 1545-0122

Name of corporation
MMR GROUP, INC.

Employer identification number
72-1271030

For calendar year 2009, or other tax year beginning , and ending

Use a **separate** Form 1118 for each applicable category of income listed below. See **Categories of Income** in the instructions. Also, see **Specific Instructions.**
Check only one box on each form.

[X] Passive Category Income     ☐ Section 901(j) Income: Name of Sanctioned Country ▶
☐ General Category Income     ☐ Income Re-sourced by Treaty: Name of Country ▶

**Schedule A** | **Income or (Loss) Before Adjustments** *(Report all amounts in U.S. dollars. See Specific Instructions.)*

**Gross Income or (Loss) From Sources Outside the United States (INCLUDE Foreign Branch Gross Income here and on Schedule F)**

| 1 Foreign Country or U.S. Possession (Enter two-letter code from list in the instructions. Use a separate line for each.)* | 2 Deemed Dividends (see instructions) | | 3 Other Dividends | | 4 Interest | 5 Gross Rents, Royalties, and License Fees | 6 Gross Income From Performance of Services | 7 Other (attach schedule) | 8 Total (add columns 2(a) through 7) |
|---|---|---|---|---|---|---|---|---|---|
| | (a) Exclude gross-up | (b) Gross-up (sec 78) | (a) Exclude gross-up (sec 78) | (b) Gross-up (sec 78) | | | | | |
| A NI | 183,898. | 39,571. | | | | | | | 223,469. |
| B VE | 341,524. | 490,474. | | | | | | | 831,998. |
| C | | | | | | | | | |
| D | | | | | | | | | |
| E | | | | | | | | | |
| F | | | | | | | | | |
| **Totals** (add lines A thru F) | 525,422. | 530,045. | | | | | | | 1,055,467. |

**Deductions (INCLUDE Foreign Branch Deductions here and on Schedule F)**

| | 9 Definitely Allocable Deductions | | | | | 10 Apportioned Share of Deductions Not Definitely Allocable (enter amount from applicable line of Schedule H, Part II, column (d)) | 11 Net Operating Loss Deduction | 12 Total Deductions (add columns 9(e) through 11) | 13 Total Income or (Loss) Before Adjustments (subtract column 12 from column 8) |
|---|---|---|---|---|---|---|---|---|---|
| | Rental, Royalty, and Licensing Expenses | | (c) Expenses Related to Gross Income From Performance of Services | (d) Other Definitely Allocable Deductions | (e) Total Definitely Allocable Deductions (add columns 9(a) through 9(d)) | | | | |
| | (a) Depreciation, Depletion, and Amortization | (b) Other Expenses | | | | | | | |
| A | | | | | | | | | 223,469. |
| B | | | | | | | | | 831,998. |
| C | | | | | | | | | |
| D | | | | | | | | | |
| E | | | | | | | | | |
| F | | | | | | | | | |
| **Totals** | | | | | | | | | 1,055,467. |

**BAA For Paperwork Reduction Act Notice, see separate instructions**

* For section 863(b) income, NOLs, income from RICs, and high-taxed income, use a single line (see instructions).

Form **1118** (Rev 12-2009)

ALTERNATIVE MINIMUM TAX

Page **2**

Form 1118 (Rev 12-2009) MMR GROUP, INC.    72-1271030

**Schedule B** | **Foreign Tax Credit** (*Report all foreign tax amounts in U.S. dollars.*)

**Part I — Foreign Taxes Paid, Accrued, and Deemed Paid** (*see instructions*)

| | 1 Credit is Claimed for Taxes: | | 2 Foreign Taxes Paid or Accrued (attach schedule showing amounts in foreign currency and conversion rate(s) used) | | | | | | | (h) Total Foreign Taxes Paid or Accrued (add columns 2(a) through 2(g)) | 3 Tax Deemed Paid (from Schedule C — Part I, column 10, Part II, column 8(b), and Part III, column 8) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Paid / Date Paid | Accrued / Date Accrued | Tax Withheld at Source on: | | | Other Foreign Taxes Paid or Accrued on: | | | | | |
| | | | (a) Dividends | (b) Interest | (c) Rents, Royalties, and License Fees | (d) Section 863(b) Income | (e) Foreign Branch Income | (f) Services Income | (g) Other | | |
| A | | | | | | | | | | | 39,571. |
| B | | | | | | | | | | | 490,474. |
| C | | | | | | | | | | | |
| D | | | | | | | | | | | |
| E | | | | | | | | | | | |
| F | | | | | | | | | | | |
| Totals (add lines A through F) | | | | | | | | | | | 530,045. |

**Part II — Separate Foreign Tax Credit** (*Complete a separate Part II for each applicable category of income.*)

1 Total foreign taxes paid or accrued (total from Part I, column 2(h)) ... | 530,045.
2 Total taxes deemed paid (total from Part I, column 3) ...
3 Reductions of taxes paid, accrued, or deemed paid (enter total from Schedule G) ...
4 Taxes reclassified under high-tax kickout ...
5 Enter the sum of any carryover of foreign taxes (from Schedule K, line 3, column (xiv)) plus any carrybacks to the current tax year ... | 355,646.
6 Total foreign taxes (combine lines 1 through 5) ... | 885,691.
7 Enter the amount from the applicable column of Schedule J, Part I, line 11 (see instructions). If Schedule J is **not** required to be completed, enter the result from the 'Totals' line of column 13 of the applicable Schedule A ... | 1,055,467.
8a Total taxable income from all sources (enter taxable income from the corporation's tax return) ... | 37,999,651.
b Adjustments to line 8a (see instructions) ...
c Subtract line 8b from line 8a ... | 37,999,651.
9 Divide line 7 by line 8c. Enter the resulting fraction as a decimal (see instructions). If line 7 is greater than line 1, enter 1. ... | 0.027777570
10 Total U.S. income tax against which credit is allowed (regular tax liability (see section 26(b) minus American Samoa economic development credit) ... | 7,599,930.
11 Credit limitation (multiply line 9 by line 10) (see instructions) ... | 211,093.
12 **Separate foreign tax credit** (enter the smaller of line 6 or line 11 here and on the appropriate line of Part III) ... | 211,093.

**Part III — Summary of Separate Credits** (Enter amounts from Part II, line 12 for **each** applicable category of income. **Do not** include taxes paid to sanctioned countries.)

1 Credit for taxes on passive category income ... | 211,093.
2 Credit for taxes on general category income ...
3 Credit for taxes on income re-sourced by treaty (combine all such credits on this line) ...
4 Total (add lines 1 through 3) ... | 211,093.
5 Reduction in credit for international boycott operations (see instructions) ...
6 **Total foreign tax credit** (subtract line 5 from line 4). Enter here and on the appropriate line of the corporation's tax return ... | 211,093.

CPCA9512L    02/23/10

Form **1118** (Rev 12-2009)

Form **2220**

Department of the Treasury
Internal Revenue Service

**Underpayment of Estimated Tax by Corporations**

► See separate instructions.
► Attach to the corporation's tax return.

OMB No. 1545-0142

**2009**

| Name | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

**Note:** *Generally, the corporation is not required to file Form 2220 (see Part II below for exceptions) because the IRS will figure any penalty owed and bill the corporation. However, the corporation may still use Form 2220 to figure the penalty. If so, enter the amount from page 2, line 38 on the estimated tax penalty line of the corporation's income tax return, but* **do not** *attach Form 2220.*

| Part I | Required Annual Payment |
|---|---|

| | | | | | |
|---|---|---|---|---|---|
| 1 | Total tax (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **1** | 13,779,864. |
| 2a | Personal holding company tax (Schedule PH (Form 1120), line 26) included on line 1 . . . . . . . . . . . . . . . . . . . . . . . . . . | **2a** | | | |
| b | Look-back interest included on line 1 under section 460(b)(2) for completed long-term contracts or section 167(g) for depreciation under the income forecast method . . . . . . . . . . . . . . . . . . . . . . . . . . | **2b** | | | |
| c | Credit for federal tax paid on fuels (see instructions) . . . . . . . . . . . . . . . . . . . . . . | **2c** | | | |
| d | **Total.** Add lines 2a through 2c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **2d** | |
| 3 | Subtract line 2d from line 1. If the result is less than $500, **do not** complete or file this form. The corporation does not owe the penalty . . . . . . . . . . . . . . . . . . . . . . . | | | **3** | 13,779,864. |
| 4 | Enter the tax shown on the corporation's 2008 income tax return (see instructions). **Caution:** *If the tax is zero or the tax year was for less than 12 months, skip this line and enter the amount from line 3 on line 5* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **4** | 1,731,669. |
| 5 | **Required annual payment.** Enter the **smaller** of line 3 or line 4. If the corporation is required to skip line 4, enter the amount from line 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **5** | 1,731,669. |

| Part II | Reasons for Filing — Check the boxes below that apply. If any boxes are checked, the corporation **must** file Form 2220, even if it does not owe a penalty (see instructions). |
|---|---|

| | | |
|---|---|---|
| 6 | ☐ | The corporation is using the adjusted seasonal installment method. |
| 7 | ☐ | The corporation is using the annualized income installment method. |
| 8 | ☒ | The corporation is a 'large corporation' figuring its first required installment based on the prior year's tax. |

| Part III | Figuring the Underpayment |
|---|---|

| | | | (a) | (b) | (c) | (d) |
|---|---|---|---|---|---|---|
| 9 | **Installment due dates.** Enter in columns (a) through (d) the 15th day of the 4th (**Form 990– PF filers:** Use 5th month), 6th, 9th, and 12th months of the corporation's tax year . . . . . . . . . . . . . . . . . . . | **9** | 4/15/09 | 6/15/09 | 9/15/09 | 12/15/09 |
| 10 | **Required installments.** If the box on line 6 and/or line 7 above is checked, enter the amounts from Schedule A, line 38. If the box on line 8 (but not 6 or 7) is checked, see instructions for the amounts to enter. If none of these boxes are checked, enter 25% of line 5 above in each column . . . . . . . . . . . . . . . . . . . | **10** | 432,917. | 6,457,015. | 3,444,966. | 3,444,966. |
| 11 | Estimated tax paid or credited for each period (see instructions). For column (a) only, enter the amount from line 11 on line 15 . . . . . . . . . . . . . . . . | **11** | 1,779,718. | | 2,500,000. | 4,100,000. |
| | *Complete lines 12 through 18 of one column before going to the next column.* | | | | | |
| 12 | Enter amount, if any, from line 18 of the preceding column . . . . . . . . | **12** | | 1,346,801. | | |
| 13 | Add lines 11 and 12 . . . . . . . . . . . . . . . . . . . . . . | **13** | | 1,346,801. | 2,500,000. | 4,100,000. |
| 14 | Add amounts on lines 16 and 17 of the preceding column . . . . . . . . | **14** | | | 5,110,214. | 6,055,180. |
| 15 | Subtract line 14 from line 13. If zero or less, enter -0- . . . . . . . . . . | **15** | 1,779,718. | 1,346,801. | 0. | 0. |
| 16 | If the amount on line 15 is zero, subtract line 13 from line 14. Otherwise, enter -0- . . . . . . . . | **16** | | 0. | 2,610,214. | |
| 17 | **Underpayment.** If line 15 is less than or equal to line 10, subtract line 15 from line 10. Then go to line 12 of the next column. Otherwise, go to line 18 . . . . . . . . | **17** | | 5,110,214. | 3,444,966. | 3,444,966. |
| 18 | **Overpayment.** If line 10 is less than line 15, subtract line 10 from line 15. Then go to line 12 of the next column . . . . . . . . | **18** | 1,346,801. | | | |

***Go to Part IV on page 2 to figure the penalty. Do not go to Part IV if there are no entries on line 17– no penalty is owed.***

**BAA For Paperwork Reduction Act Notice, see separate instructions.**

CPCZ0312L  01/02/10

Form **2220** (2009)

Form **2220** (2009)     MMR GROUP, INC.                                    72-1271030          Page **2**

| **Part IV** | **Figuring the Penalty** |
|---|---|

SEE ATTACHED SCHEDULE

| | | (a) | (b) | (c) | (d) |
|---|---|---|---|---|---|
| **19** | Enter the date of payment or the 15th day of the 3rd month after the close of the tax year, whichever is earlier (see instructions). **(Form 990-PF and Form 990-T filers:** Use 5th month instead of 3rd month.).... | **19** | | 12/15/09 | 1/22/10 | 3/15/10 |
| **20** | Number of days from due date of installment on line 9 to the date shown on line 19 ............... | **20** | | 183 | 129 | 90 |
| **21** | Number of days on line 20 after 4/15/2009 and before 7/1/2009. ................................. | **21** | | 15 | | |
| **22** | Underpayment on line 17   x   Number of days on line 21 / 365   x 4%... | **22** | | 8,400.35 | | |
| **23** | Number of days on line 20 after 6/30/2009 and before 10/1/2009. ................................ | **23** | | 92 | 15 | |
| **24** | Underpayment on line 17   x   Number of days on line 23 / 365   x 4%... | **24** | | 47,412.57 | 5,662.95 | |
| **25** | Number of days on line 20 after 9/30/2009 and before 1/1/2010. ................................. | **25** | | 76 | 92 | 16 |
| **26** | Underpayment on line 17   x   Number of days on line 25 / 365   x 4%... | **26** | | 21,739.86 | 32,120.58 | 6,040.49 |
| **27** | Number of days on line 20 after 12/31/2009 and before 4/1/2010. ................................ | **27** | | | 22 | 74 |
| **28** | Underpayment on line 17   x   Number of days on line 27 / 365   x 4%... | **28** | | | 4,713.86 | 21,983.22 |
| **29** | Number of days on line 20 after 3/31/2010 and before 7/1/2010. ................................. | **29** | | | | |
| **30** | Underpayment on line 17   x   Number of days on line 29 / 365   x ___*%... | **30** | | | | |
| **31** | Number of days on line 20 after 6/30/2010 and before 10/1/2010. ................................ | **31** | | | | |
| **32** | Underpayment on line 17   x   Number of days on line 31 / 365   x ___*%... | **32** | | | | |
| **33** | Number of days on line 20 after 9/30/2010 and before 1/1/2011. ................................. | **33** | | | | |
| **34** | Underpayment on line 17   x   Number of days on line 33 / 365   x ___*%... | **34** | | | | |
| **35** | Number of days on line 20 after 12/31/2010 and before 2/16/2011. ............................... | **35** | | | | |
| **36** | Underpayment on line 17   x   Number of days on line 35 / 365   x ___*%... | **36** | | | | |
| **37** | Add lines 22, 24, 26, 28, 30, 32, 34, and 36 ......... | **37** | | 77,552.78 | 42,497.39 | 28,023.71 |
| **38** | **Penalty.** Add columns (a) through (d) of line 37. Enter the total here and on Form 1120, line 33; or the comparable line for other income tax returns ...................................................... | **38** | | | | 148,074. |

*Use the penalty interest rate for each calendar quarter, which the IRS will determine during the first month in the preceding quarter. These rates are published quarterly in an IRS News Release and in a revenue ruling in the Internal Revenue Bulletin. To obtain this information on the Internet, access the IRS website at **www.irs.gov.** You can also call 1-800-829-4933 to get interest rate information.

Form **2220** (2009)

| 2009 | FORM 2220 WORKSHEET | PAGE 1 |
|---|---|---|
| | **MMR GROUP, INC.** | 72-1271030 |

| Installment Period | Underpayment | | | Penalty | | | |
|---|---|---|---|---|---|---|---|
| | **Amount** | **From** | **To** | **Days Late** | **Interest Rate Periods** | **Rate** | **Penalty \*** |
| 2 | | | | | | | |
| | 2,500,000. | 6/15/09 | 9/15/09 | 15 | 4/15/09 – 6/30/09 | 4.00% | 4,109.59 |
| | | | | 77 | 7/01/09 – 9/30/09 | 4.00% | 21,095.89 |
| | 2,610,214. | 6/15/09 | 12/15/09 | 15 | 4/15/09 – 6/30/09 | 4.00% | 4,290.76 |
| | | | | 92 | 7/01/09 – 9/30/09 | 4.00% | 26,316.68 |
| TOTALS | 5,110,214. | | | 76 | 10/01/09 – 12/31/09 | 4.00% | 21,739.86 |
| | | | | | | | 77,552.78 |
| 3 | | | | | | | |
| | 1,489,786. | 9/15/09 | 12/15/09 | 15 | 7/01/09 – 9/30/09 | 4.00% | 2,448.96 |
| | | | | 76 | 10/01/09 – 12/31/09 | 4.00% | 12,408.08 |
| | 1,955,180. | 9/15/09 | 1/22/10 | 15 | 7/01/09 – 9/30/09 | 4.00% | 3,213.99 |
| | | | | 92 | 10/01/09 – 12/31/09 | 4.00% | 19,712.50 |
| TOTALS | 3,444,966. | | | 22 | 1/01/10 – 3/31/10 | 4.00% | 4,713.86 |
| | | | | | | | 42,497.39 |
| 4 | | | | | | | |
| | 1,044,820. | 12/15/09 | 1/22/10 | 16 | 10/01/09 – 12/31/09 | 4.00% | 1,832.01 |
| | | | | 22 | 1/01/10 – 3/31/10 | 4.00% | 2,519.02 |
| | 2,400,146. | 12/15/09 | 3/15/10 | 16 | 10/01/09 – 12/31/09 | 4.00% | 4,208.48 |
| | | | | 74 | 1/01/10 – 3/31/10 | 4.00% | 19,464.20 |
| TOTALS | 3,444,966. | | | | | | 28,023.71 |

**Total Underpayment Penalty** ................................................................. | 148,074.

\* Underpayment  x  $\dfrac{\text{Days Late}}{365 \text{ or } 366}$  x  Rate

CPCL1301L  08/18/03

| Form **3800** | **General Business Credit** | OMB No. 1545-0895 |
|---|---|---|
| | ► See separate instructions. | **2009** |
| Department of the Treasury Internal Revenue Service (99) | ► Attach to your tax return. | Attachment Sequence No. **22** |

| Name(s) shown on return | Identifying number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

**Part I**  **Current Year Credit**

**Important:** You may not be required to complete and file a separate credit form (shown in parentheses below) to claim the credit. For details, see the instructions.

| | | | |
|---|---|---|---|
| **1 a** | Investment credit (Form 3468, Part II only) (attach Form 3468) | **1 a** | |
| **b** | Welfare-to-work credit (only from partnerships, S corporations, estates, and trusts) | **1 b** | |
| **c** | Credit for increasing research activities (Form 6765). (Individuals: see instructions.) | **1 c** | |
| **d** | Low-income housing credit (Form 8586, Part I only) (enter EIN if claiming this credit from a pass-through entity: _ _ _ _ _ _ _ _ _ _ _) | **1 d** | |
| **e** | Disabled access credit (Form 8826) (do not enter more than $5,000) | **1 e** | |
| **f** | Renewable electricity production credit (Form 8835;) | **1 f** | |
| **g** | Indian employment credit (Form 8845) | **1 g** | |
| **h** | Orphan drug credit (Form 8820) | **1 h** | |
| **i** | New markets credit (Form 8874)  (enter EIN if claiming this credit from a pass-through entity: _ _ _ _ _ _ _ _ _ _ _). | **1 i** | |
| **j** | Credit for small employer pension plan startup costs (Form 8881) (do not enter more than $500) | **1 j** | |
| **k** | Credit for employer-provided child care facilities and services (Form 8882) (enter EIN if claiming this credit from a pass-through entity: _ _ _ _ _ _ _ _ _ _ _) | **1 k** | |
| **l** | Biodiesel and renewable diesel fuels credit (attach Form 8864) | **1 l** | |
| **m** | Low sulfur diesel fuel production credit (Form 8896) | **1 m** | |
| **n** | Distilled spirits credit (Form 8906) | **1 n** | |
| **o** | Nonconventional source fuel credit (Form 8907) | **1 o** | |
| **p** | Energy efficient home credit (Form 8908) | **1 p** | |
| **q** | Energy efficient appliance credit (Form 8909) | **1 q** | |
| **r** | Alternative motor vehicle credit (Form 8910) (enter EIN if claiming this credit from a pass-through entity: _ _ _ _ _ _ _ _ _ _ _). | **1 r** | |
| **s** | Alternative fuel vehicle refueling property credit (Form 8911). | **1 s** | |
| **t** | Credits for affected Midwestern disaster area employers (Form 5884-A) | **1 t** | |
| **u** | Mine rescue team training credit (Form 8923) | **1 u** | |
| **v** | Agricultural chemicals security credit (Form 8931) | **1 v** | |
| **w** | Credit for employer differential wage payments (Form 8932) | **1 w** | |
| **x** | Carbon dioxide sequestration credit (Form 8933) | **1 x** | |
| **y** | Qualified plug-in electric drive motor vehicle credit (Form 8936) | **1 y** | |
| **z** | Qualified plug-in electric vehicle credit (Form 8834, Part I only) | **1 z** | |
| **aa** | Credit for contributions to selected community development corporations (only from partnerships and S corporations) | **1 aa** | |
| **bb** | General credits from an electing large partnership (Schedule K-1 (Form 1065-B)) | **1 bb** | |
| **2** | Add lines 1a through 1bb | **2** | |
| **3** | Passive activity credits included on line 2 (see instructions) | **3** | |
| **4** | Subtract line 3 from line 2 | **4** | |
| **5** | Passive activity credits allowed for 2009 (see instructions) | **5** | |
| **6** | Carryforward of general business credit to 2009. See instructions for the schedule to attach . . . . . . . . . . . . . . . . STMT. .12. . | **6** | 598,484. |
| **7** | Carryback of general business credit from 2010 (see instructions) | **7** | |
| **8** | **Current year credit.** Add lines 4 through 7 | **8** | 598,484. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**                      Form **3800** (2009)

Form **3800** (2009)    MMR GROUP, INC.    72-1271030    Page **2**

| Part II | Allowable Credit |
| --- | --- |

| | | | |
| --- | --- | --- | --- |
| 9 | Regular tax before credits: | | |
| | ● Individuals. Enter the amount from Form 1040, line 44 or Form 1040NR, line 41. | | |
| | ● Corporations. Enter the amount from Form 1120, Schedule J, line 2; or the applicable line of your return . . . . | **9** | 15,284,628. |
| | ● Estates and trusts. Enter the sum of the amounts from Form 1041, Schedule G, lines 1a and 1b, or the amount from the applicable line of your return . | | |
| 10 | Alternative minimum tax: | | |
| | ● Individuals. Enter the amount from Form 6251, line 36 . | | |
| | ● Corporations. Enter the amount from Form 4626, line 14 . | **10** | |
| | ● Estates and trusts. Enter the amount from Schedule I (Form 1041), line 56 . | | |
| 11 | Add lines 9 and 10. | **11** | 15,284,628. |

| | | | | |
| --- | --- | --- | --- | --- |
| 12a | Foreign tax credit. | **12a** | 369,413. | |
| b | Credits from Form 1040, lines 48 through 52 (or Form 1040NR, lines 45 through 48); Form 8859, line 11; Form 8834, lines 22 and 29; Form 8910, line 21; Form 8911, line 23; Form 8936, line 14; and Schedule R, line 24 . | **12b** | | |
| c | Add lines 12a and 12b. | | **12c** | 369,413. |
| 13 | **Net income tax.** Subtract line 12c from line 11. If zero, skip lines 14 through 17 and enter -0- on line 18a . | | **13** | 14,915,215. |
| 14 | **Net regular tax.** Subtract line 12c from line 9. If zero or less, enter -0-. | **14** | 14,915,215. | |
| 15 | Enter 25% (.25) of the excess, if any, of line 14 over $25,000 (see instructions) . | **15** | 3,722,554. | |
| 16 | Tentative minimum tax: | | | |
| | ● Individuals. Enter the amount from Form 6251, line 34 . | | | |
| | ● Corporations. Enter the amount from Form 4626, line 12 . | **16** | 7,388,837. | |
| | ● Estates and trusts. Enter the amount from Schedule I (Form 1041), line 54. | | | |
| 17 | Enter the greater of line 15 or line 16 . | | **17** | 7,388,837. |
| 18a | Subtract line 17 from line 13. If zero or less, enter -0- . | | **18a** | 7,526,378. |
| b | For a corporation electing to accelerate the research credit, enter the bonus depreciation amount attributable to the research credit. (see instructions). | | **18b** | |
| c | Add lines 18a and 18b. | | **18c** | 7,526,378. |
| 19a | Enter the **smaller** of line 8 or line 18c. | | **19a** | 598,484. |
| | **C corporations:** See the line 19a instructions if there has been an ownership change, acquisition, or reorganization. | | | |
| b | Enter the smaller of line 8 or line 18a. If you made an entry on line 18b, go to line 19c; otherwise, skip line 19c . | | **19b** | 598,484. |
| c | Subtract line 19b from line 19a. This is the refundable amount for a corporation electing to accelerate the research credit. Include this amount on line 32g of Form 1120 (or the applicable line of your return). | | **19c** | |

Form **3800** (2009)

Form **3800** (2009)    MMR GROUP, INC.    72-1271030    Page **3**

| Part II | Allowable Credit (Continued) |
|---|---|

**Note.** If you are not filing Form 8844, skip lines 20 through 24 and enter -0- on line 25.

| | | | |
|---|---|---|---:|
| 20 | Multiply line 16 by 75%. | 20 | |
| 21 | Enter the greater of line 15 or line 20 | 21 | |
| 22 | Subtract line 21 from line 13. If zero or less, enter -0- | 22 | |
| 23 | Subtract line 19b from line 22. If zero or less, enter -0- | 23 | |
| 24 | Enter the amount from Form 8844, line 10 or line 12 | 24 | |
| 25 | Empowerment zone and renewal community employment credit allowed. Enter the smaller of line 23 or line 24 | 25 | 0. |
| 26 | Subtract line 15 from line 13. If zero or less, enter -0- | 26 | 11,192,661. |
| 27 | Add lines 19b and 25 | 27 | 598,484. |
| 28 | Subtract line 27 from line 26. If zero or less, enter -0- | 28 | 10,594,177. |

| | | | | |
|---|---|---|---:|---:|
| 29 a | Enter the investment credit from Form 3468, Part III, line 19 (attach Form 3468). | 29 a | | |
| b | Enter the work opportunity credit from Form 5884, line 10 or line 12. | 29 b | 536,867. | |
| c | Enter the alcohol and cellulosic biofuel fuels credit from Form 6478, line 14 or line 16 | 29 c | | |
| d | Enter the low-income housing credit from Form 8586, Part II, line 18 or line 20 | 29 d | | |
| e | Enter the applicable part of the amount of the renewable electricity, refined coal, and Indian coal production credit from Form 8835, Part II, line 36 or line 38 | 29 e | | |
| f | Enter the credit for employer social security and Medicare taxes paid on certain employee tips from Form 8846, line 12 | 29 f | | |
| g | Enter the qualified railroad track maintenance credit from Form 8900, line 12 | 29 g | | |

| | | | |
|---|---|---|---:|
| 30 | Add lines 29a through 29g | 30 | 536,867. |
| 31 | Enter the smaller of line 28 or line 30 | 31 | 536,867. |
| 32 | **Credit allowed for the current year.** Add lines 27 and 31. | | |
| | Report the amount from line 32 (if smaller than the sum of lines 8, 24 and 30, see instructions) as indicated below or on the applicable line of your return: | | |
| | • Individuals. Form 1040, line 53 or Form 1040NR, line 49. | | |
| | • Corporations. Form 1120, Schedule J, line 5c. | 32 | 1,135,351. |
| | • Estates and trusts. Form 1041, Schedule G, line 2c. | | |

Form **3800** (2009)

Form **4562**

Department of the Treasury
Internal Revenue Service    (99)

**Depreciation and Amortization**
**(Including Information on Listed Property)**

► See separate instructions.    ► Attach to your tax return.

OMB No. 1545-0172

**2009**

Attachment
Sequence No. **67**

Name(s) shown on return
MMR GROUP, INC.

Identifying number
72-1271030

Business or activity to which this form relates
FORM 1120

| **Part I** | **Election To Expense Certain Property Under Section 179** |
|---|---|

Note: *If you have any listed property, complete Part V before you complete Part I.*

| | | | |
|---|---|---|---|
| 1 | Maximum amount. See the instructions for a higher limit for certain businesses.................... | **1** | $250,000. |
| 2 | Total cost of section 179 property placed in service (see instructions)....................... | **2** | |
| 3 | Threshold cost of section 179 property before reduction in limitation (see instructions).................. | **3** | $800,000. |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0-..................... | **4** | |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions.......................... | **5** | |

| 6 | **(a)** Description of property | **(b)** Cost (business use only) | **(c)** Elected cost |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| 7 | Listed property. Enter the amount from line 29.................. **7** | | |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7............. | **8** | |
| 9 | Tentative deduction. Enter the **smaller** of line 5 or line 8.......................... | **9** | |
| 10 | Carryover of disallowed deduction from line 13 of your 2008 Form 4562.................... | **10** | |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5 (see instrs). | **11** | |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but do not enter more than line 11............ | **12** | |
| 13 | Carryover of disallowed deduction to 2010. Add lines 9 and 10, less line 12.... ► **13** | | |

Note: *Do not use Part II or Part III below for listed property. Instead, use Part V.*

| **Part II** | **Special Depreciation Allowance and Other Depreciation (Do not** include listed property.**)** (See instructions.) |
|---|---|

| | | | |
|---|---|---|---|
| 14 | Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year (see instructions).......................... | **14** | |
| 15 | Property subject to section 168(f)(1) election............................. | **15** | |
| 16 | Other depreciation (including ACRS)............................... | **16** | |

| **Part III** | **MACRS Depreciation (Do not** include listed property.**)** (See instructions) |
|---|---|

**Section A**

| | | | |
|---|---|---|---|
| 17 | MACRS deductions for assets placed in service in tax years beginning before 2009.............. | **17** | 2,791,394. |
| 18 | If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here......................... ► ☐ | | |

**Section B — Assets Placed in Service During 2009 Tax Year Using the General Depreciation System**

| **(a)** Classification of property | **(b)** Month and year placed in service | **(c)** Basis for depreciation (business/investment use only — see instructions) | **(d)** Recovery period | **(e)** Convention | **(f)** Method | **(g)** Depreciation deduction |
|---|---|---|---|---|---|---|
| **19a** 3-year property........... | | | | | | |
| **b** 5-year property........... | | 1,579,564. | 5 | HY | S/L | 195,612. |
| **c** 7-year property........... | | 992,129. | 7 | HY | S/L | 109,570. |
| **d** 10-year property........... | | | | | | |
| **e** 15-year property........ | | 4,547,443. | 15 | HY | S/L | 50,497. |
| **f** 20-year property........ | | 850,122. | 20 | HY | S/L | 144,931. |
| **g** 25-year property........ | | | 25 yrs | | S/L | |
| **h** Residential rental property.................. | | | 27.5 yrs | MM | S/L | |
| | | | 27.5 yrs | MM | S/L | |
| **i** Nonresidential real property.................. | | | 39 yrs | MM | S/L | |
| | | | | MM | S/L | |

**Section C — Assets Placed in Service During 2009 Tax Year Using the Alternative Depreciation System**

| | | | | | | |
|---|---|---|---|---|---|---|
| **20a** Class life................. | | | | | S/L | |
| **b** 12-year................. | | | 12 yrs | | S/L | |
| **c** 40-year................. | | | 40 yrs | MM | S/L | |

| **Part IV** | **Summary** (See instructions.) |
|---|---|

| | | | |
|---|---|---|---|
| 21 | Listed property. Enter amount from line 28................................ | **21** | |
| 22 | **Total.** Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations — see instructions.......... | **22** | 3,292,004. |
| 23 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs.............. **23** | | |

**BAA For Paperwork Reduction Act Notice, see separate instructions.**    FDIZ0812L 07/07/09    Form **4562** (2009)

Form **5471**

(Rev December 2007)

Department of the Treasury
Internal Revenue Service

## Information Return of U.S. Persons With Respect To Certain Foreign Corporations

► See separate instructions.

Information furnished for the foreign corporation's annual accounting period (tax year required by section 898) (see instructions) beginning    1/01 , 2009 , and ending    12/31 , 2009

OMB No. 1545-0704

Attachment
Sequence No. **121**

Name of person filing this return

MMR GROUP, INC.

Number, street, and room or suite no. (or P.O. box number if mail is not delivered to street address)

15961 AIRLINE HIGHWAY

City or town, state, and ZIP code

BATON ROUGE, LA 70817-7412

**A** **Identifying number**

72-1271030

**B** Category of filer (See instructions. Check applicable box(es)):

1 (repealed)  2 [X]  3 [ ]  4 [ ]  5 [ ]

**C** Enter the total percentage of the foreign corporation's voting stock you owned at the end of its annual accounting period   100.0000 %

Filer's tax year beginning    1/01 , 2009 , and ending    12/31 , 2009

**D** Person(s) on whose behalf this information return is filed:

| (1) Name | (2) Address | (3) Identifying number | (4) Check applicable box(es) | | |
|---|---|---|---|---|---|
| | | | Shareholder | Officer | Director |
| MMR CONSTRUCTORS, INC. | 15961 AIRLINE HIGHWAY | 72-1046000 | X | | |
| | BATON ROUGE, LA 70817-7412 | | | | |
| | | | | | |
| | | | | | |

**Important:** *Fill in all applicable lines and schedules. All information* **must** *be in English. All amounts* **must** *be stated in U.S. dollars unless otherwise indicated.*

**1a** Name and address of foreign corporation

MMR INTERNATIONAL, LTD
AKARA BUILDING 24, DE CASTRO STREET
WICHAMS CAY I, ROAD TOWN, TORTOLA,

**b** Employer identification number, if any

**c** Country under whose laws incorporated

BRITISH VIRGIN ISLANDS

| **d** Date of incorporation | **e** Principal place of business | **f** Principal business activity code number | **g** Principal business activity | **h** Functional currency |
|---|---|---|---|---|
| 6/27/1997 | VENEZUELA | 235310 | ELECTRICAL | BOLIVAR |

**2** Provide the following information for the foreign corporation's accounting period stated above.

**a** Name, address, and identifying number of branch office or agent (if any) in the United States

**b** If a U.S. income tax return was filed, enter:

| *(i)* Taxable income or (loss) | *(ii)* U.S. income tax paid (after all credits) |
|---|---|
| | |

**c** Name and address of foreign corporation's statutory or resident agent in country of incorporation

MOSSACK FONSECA & CO (B.V.I.) LTD
P.O. BOX 3136
ROAD TOWN, TORTOLA,

**d** Name and address (including corporate department, if applicable) of person (or persons) with custody of the books and records of the foreign corporation, and the location of such books and records, if different

JENNIFER COURVILLE
15961 AIRLINE HIGHWAY
BATON ROUGE, LA 70817-7412

| Schedule A | Stock of the Foreign Corporation |
|---|---|

| (a) Description of each class of stock | (b) Number of shares issued and outstanding | |
|---|---|---|
| | *(i)* Beginning of annual accounting period | *(ii)* End of annual accounting period |
| | | |
| | | |
| | | |
| | | |

**BAA  For Paperwork Reduction Act Notice, see the instructions.**

Form **5471** (Rev 12-2007)

Form **5471** (Rev 12-2007)    MMR GROUP, INC.                    72-1271030                    Page **2**

## Schedule B | U.S. Shareholders of Foreign Corporation (see instructions)

| **(a)** Name, address, and identifying number of shareholder | **(b)** Description of each class of stock held by shareholder. **Note:** This description should match the corresponding description entered in Schedule A, column (a). | **(c)** Number of shares held at beginning of annual accounting period | **(d)** Number of shares held at end of annual accounting period | **(e)** Pro rata share of subpart F income (enter as a percentage) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## Schedule C | Income Statement (see instructions)

**Important:** *Report all information in functional currency in accordance with U.S. GAAP. Also, report each amount in U.S. dollars translated from functional currency (using GAAP translation rules). However, if the functional currency is the U.S. dollar, complete only the U.S. Dollars column. See instructions for special rules for DASTM corporations.*

| | | | | Functional Currency | U.S. Dollars |
|---|---|---|---|---|---|
| **I N C O M E** | **1a** | Gross receipts or sales | **1a** | | |
| | **b** | Returns and allowances | **b** | | |
| | **c** | Subtract line 1b from line 1a | **c** | | |
| | **2** | Cost of goods sold | **2** | | |
| | **3** | Gross profit (subtract line 2 from line 1c) | **3** | | |
| | **4** | Dividends | **4** | | |
| | **5** | Interest | **5** | | |
| | **6a** | Gross rents | **6a** | | |
| | **b** | Gross royalties, and license fees | **6b** | | |
| | **7** | Net gain or (loss) on sale of capital assets | **7** | | |
| | **8** | Other income (attach schedule) | **8** | | |
| | **9** | Total income (add lines 3 through 8) | **9** | | |
| **D E D U C T I O N S** | **10** | Compensation not deducted elsewhere | **10** | | |
| | **11a** | Rents | **11a** | | |
| | **b** | Royalties, and license fees | **11b** | | |
| | **12** | Interest | **12** | | |
| | **13** | Depreciation not deducted elsewhere | **13** | | |
| | **14** | Depletion | **14** | | |
| | **15** | Taxes (exclude provision for income, war profits, and excess profits taxes) | **15** | | |
| | **16** | Other deductions (attach schedule — exclude provision for income, war profits, and excess profits taxes) | **16** | | |
| | **17** | Total deductions (add lines 10 through 16) | **17** | | |
| **N E T   I N C O M E** | **18** | Net income or (loss) before extraordinary items, prior period adjustments, and the provision for income, war profits, and excess profits taxes (subtract line 17 from line 9) | **18** | | |
| | **19** | Extraordinary items and prior period adjustments (see instrs) | **19** | | |
| | **20** | Provision for income, war profits, and excess profits taxes (see instructions) | **20** | | |
| | **21** | Current year net income or (loss) per books (combine lines 18 through 20) | **21** | | |

Form **5471** (Rev 12-2007)  MMR GROUP, INC.                                72-1271030          Page **3**

## Schedule E | Income, War Profits, and Excess Profits Taxes Paid or Accrued (see instructions)

| (a) Name of country or U.S. possession | Amount of tax | | |
|---|---|---|---|
| | (b) In foreign currency | (c) Conversion rate | (d) In U.S. dollars |
| 1  U.S. | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8  Total............................................................► | | | |

## Schedule F | Balance Sheet

**Important:** *Report all amounts in U.S. dollars prepared and translated in accordance with U.S. GAAP. See instructions for an exception for DASTM corporations.*

| Assets | | (a) Beginning of annual accounting period | (b) End of annual accounting period |
|---|---|---|---|
| 1  Cash......................................................... | 1 | | |
| 2a Trade notes and accounts receivable........................... | 2a | | |
| b Less allowance for bad debts................................. | 2b | | |
| 3  Inventories.................................................. | 3 | | |
| 4  Other current assets (attach schedule)........................ | 4 | | |
| 5  Loans to shareholders and other related persons ............... | 5 | | |
| 6  Investment in subsidiaries (attach schedule).................... | 6 | | |
| 7  Other investments (attach schedule).......................... | 7 | | |
| 8a Buildings and other depreciable assets......................... | 8a | | |
| b Less accumulated depreciation ............................... | 8b | | |
| 9a Depletable assets............................................ | 9a | | |
| b Less accumulated depletion .................................. | 9b | | |
| 10  Land (net of any amortization)................................ | 10 | | |
| 11  Intangible assets: | | | |
| a Goodwill.................................................... | 11a | | |
| b Organization costs........................................... | 11b | | |
| c Patents, trademarks, and other intangible assets.............. | 11c | | |
| d Less accumulated amortization for lines 11a, b, and c........... | 11d | | |
| 12  Other assets (attach schedule)................................ | 12 | | |
| 13  Total assets................................................. | 13 | | |

| Liabilities and Shareholders' Equity | | | |
|---|---|---|---|
| 14  Accounts payable............................................ | 14 | | |
| 15  Other current liabilities (attach schedule)..................... | 15 | | |
| 16  Loans from shareholders and other related persons.............. | 16 | | |
| 17  Other liabilities (attach schedule) ............................ | 17 | | |
| 18  Capital stock: | | | |
| a Preferred stock.............................................. | 18a | | |
| b Common stock.............................................. | 18b | | |
| 19  Paid-in or capital surplus (attach reconciliation).................. | 19 | | |
| 20  Retained earnings........................................... | 20 | | |
| 21  Less cost of treasury stock .................................. | 21 | | |
| 22  Total liabilities and shareholders' equity........................ | 22 | | |

**BAA**                                                                 Form **5471** (Rev 12-2007)

Form **5471** (Rev 12-2007)  MMR GROUP, INC.                          72-1271030              Page **4**

## Schedule G | Other Information

| | | Yes | No |
|---|---|---|---|
| 1 | During the tax year, did the foreign corporation own at least a 10% interest, directly or indirectly, in any foreign partnership?.. | ☐ | ☒ |
| | If 'Yes,' see the instructions for required attachment. | | |
| 2 | During the tax year, did the foreign corporation own an interest in any trust? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ☐ | ☒ |
| 3 | During the tax year, did the foreign corporation own any foreign entities that were disregarded as entities separate from their owners under Regulations sections 301.7701-2 and 301.7701-3 (see instructions)?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ☐ | ☒ |
| | If 'Yes,' you are generally required to attach Form 8858 for each entity (see instructions). | | |
| 4 | During the tax year, was the foreign corporation a participant in any cost sharing arrangement? . . . . . . . . . . . . . . . . . . . . . . . . . . . | ☐ | ☒ |
| 5 | During the course of the tax year, did the foreign corporation become a participant in any cost sharing arrangement?. . . . . . . . . | ☐ | ☒ |

## Schedule H | Current Earnings and Profits (see instructions)

**Important:** *Enter the amounts on lines 1 through 5c in* **functional** *currency.*

| | | | | | |
|---|---|---|---|---|---|
| 1 | Current year net income or (loss) per foreign books of account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 1 | |
| 2 | Net adjustments made to line 1 to determine current earnings and profits according to U.S. financial and tax accounting standards (see instructions): | **Net Additions** | **Net Subtractions** | | |
| a | Capital gains or losses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| b | Depreciation and amortization. . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| c | Depletion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| d | Investment or incentive allowance . . . . . . . . . . . . . . . . . . . . . | | | | |
| e | Charges to statutory reserves . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| f | Inventory adjustments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| g | Taxes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| h | Other (attach schedule) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 3 | Total net additions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 4 | Total net subtractions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 5a | Current earnings and profits (line 1 plus line 3 minus line 4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 5a | |
| b | DASTM gain or (loss) for foreign corporations that use DASTM (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . | | | 5b | |
| c | Combine lines 5a and 5b. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 5c | |
| d | Current earnings and profits in U.S. dollars (line 5c translated at the appropriate exchange rate as defined in section 989(b) and the related regulations (see instructions)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 5d | |
| | Enter exchange rate used for line 5d ► | | | | |

## Schedule I | Summary of Shareholder's Income From Foreign Corporation (see instructions)

| | | | |
|---|---|---|---|
| 1 | Subpart F income (line 38b, Worksheet A in the instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | |
| 2 | Earnings invested in U.S. property (line 17, Worksheet B in the instructions). . . . . . . . . . . . . . . . . . . . . . . | 2 | |
| 3 | Previously excluded subpart F income withdrawn from qualified investments (line 6b, Worksheet C in the instructions). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | |
| 4 | Previously excluded export trade income withdrawn from investment in export trade assets (line 7b, Worksheet D in the instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | |
| 5 | Factoring income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | |
| 6 | Total of lines 1 through 5. Enter here and on your income tax return. See instructions. . . . . . . . . . . . . . . . . . | 6 | |
| 7 | Dividends received (translated at spot rate on payment date under section 989(b)(1)) . . . . . . . . . . . . . . . . . . | 7 | |
| 8 | Exchange gain or (loss) on a distribution of previously taxed income. . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | |

| | | Yes | No |
|---|---|---|---|
| • | Was any income of the foreign corporation blocked? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ☐ | ☐ |
| • | Did any such income become unblocked during the tax year (see section 964(b))? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ☐ | ☐ |
| | If the answer to either question is 'Yes,' attach an explanation. | | |

Form **5471** (Rev 12-2007)

**SCHEDULE O**
**(Form 5471)**

(Rev December 2005)

Department of the Treasury
Internal Revenue Service

# Organization or Reorganization of Foreign Corporation, and Acquisitions and Dispositions of its Stock

► **Attach to Form 5471. See Instructions for Form 5471.**

OMB No. 1545-0704

| Name of person filing Form 5471 | Identifying number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Name of foreign corporation
MMR INTERNATIONAL, LTD

**Important:** *Complete a **separate** Schedule O for each foreign corporation for which information must be reported.*

**Part I**  To Be Completed by U.S. Officers and Directors

| (a) Name of shareholder for whom acquisition information is reported | (b) Address of shareholder | (c) Identifying number of shareholder | (d) Date of original 10% acquisition | (e) Date of additional 10% acquisition |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**Part II**  To Be Completed by U.S. Shareholders
**Note:** *If this return is required because one or more shareholders became U.S. persons, attach a list showing the names of such persons and the date each became a U.S. person.*

## Section A—General Shareholder Information

| (a) Name, address, and identifying number of shareholder(s) filing this schedule | (b) For shareholder's latest U.S. income tax return filed, indicate: | | | (c) Date (if any) shareholder last filed information return under section 6046 for the foreign corporation |
|---|---|---|---|---|
| | (1) Type of return (enter form number) | (2) Date return filed | (3) Internal Revenue Service Center where filed | |
| | | | | |

## Section B—U.S. Persons Who Are Officers or Directors of the Foreign Corporation

| (a) Name of U.S. officer or director | (b) Address | (c) Social security number | (d) Check appropriate box(es) | |
|---|---|---|---|---|
| | | | Officer | Director |
| | | | | |
| | | | | |
| | | | | |

## Section C—Acquisition of Stock

| (a) Name of shareholder(s) filing this schedule | (b) Class of stock acquired | (c) Date of acquisition | (d) Method of acquisition | (e) Number of shares acquired | | |
|---|---|---|---|---|---|---|
| | | | | (1) Directly | (2) Indirectly | (3) Constructively |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 5471.**   CPCA8789L   06/24/05   Schedule O (Form 5471) (Rev 12-2005)

OMB No. 1545-0219

Form **5884**

Department of the Treasury
Internal Revenue Service

**Work Opportunity Credit**

► **Attach to your tax return.**

**2009**

Attachment
Sequence No. **77**

Name(s) shown on return

MMR GROUP, INC.

Identifying number

72-1271030

| | | | | |
|---|---|---|---|---|
| **1** | Enter on the applicable line below the total qualified first- or second-year wages paid or incurred during the tax year, and multiply by the percentage shown, for services of employees who are certified (if required) as members of a targeted group. | | | |
| **a** | Qualified first-year wages of employees who worked for you at least 120 hours but fewer than 400 hours. . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _ _ _ _ _ 591,900. x 25% (.25) | **1a** | | 147,975. |
| **b** | Qualified first-year wages of employees who worked for you at least 400 hours . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _ _ _ _ _ 972,230. x 40% (.40) | **1b** | | 388,892. |
| **c** | Qualified second-year wages of employees certified as long-term family assistance recipients . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _ _ _ _ _ _ _ _ _ _ x 50% (.50) | **1c** | | |
| **2** | Add lines 1a, 1b, and 1c. See instructions for the adjustment you must make to salaries and wages . . . . . . . . | **2** | | 536,867. |
| **3** | Work opportunity credit from partnerships, S corporations, cooperatives, estates, and trusts. . . . . . . . . . . . . . . | **3** | | |
| **4** | Add lines 2 and 3. Partnerships and S corporations, report this amount on Schedule K; all others, go to line 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **4** | | 536,867. |
| **5** | Work opportunity credit included on line 4 from passive activities (see instructions) . . . . . . . . . . . . . . . . . . . . . | **5** | | |
| **6** | Subtract line 5 from line 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **6** | | 536,867. |
| **7** | Work opportunity credit allowed for 2009 from a passive activity (see instructions) . . . . . . . . . . . . . . . . . . . . . . | **7** | | |
| **8** | Carryforward of any work opportunity credit that originated in a tax year that began after 2006 and carryforward from 2008 of the New York Liberty Zone business employee credit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **8** | | |
| **9** | Carryback of the work opportunity credit from 2010 (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **9** | | |
| **10** | Add lines 6 through 9. Cooperatives, estates, and trusts, continue on to line 11. All others, report this amount on Form 3800, line 29b. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **10** | | 536,867. |
| **11** | Amount allocated to the patrons of the cooperative or beneficiaries of the estate or trust (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **11** | | |
| **12** | Cooperatives, estates, and trusts, subtract line 11 from line 10. Report this amount on Form 3800, line 29b . . | **12** | | |

OMB No. 1545-1984

Form **8903**

Department of the Treasury
Internal Revenue Service

**Domestic Production Activities Deduction**

► **Attach to your tax return.**   ► **See separate instructions.**

**2009**

Attachment
Sequence No. **143**

| Name(s) as shown on return | Identifying number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

| | | | | | |
|---|---|---|---|---|---|
| **1** | Domestic production gross receipts (DPGR) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **1** | 338,697,475. |
| **2** | Allocable cost of goods sold. If you are using the small business simplified overall method, skip lines 2 and 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **2** | 245,530,298. | | |
| **3** | Enter deductions and losses allocable to DPGR (see instructions) . . . . . . . . . . . | **3** | 46,718,957. | | |
| **4** | If you are using the small business simplified overall method, enter the amount of cost of goods sold and other deductions or losses you ratably apportion to DPGR. All others, skip line 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **4** | | | |
| **5** | Add lines 2 through 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **5** | 292,249,255. |
| **6** | Subtract line 5 from line 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **6** | 46,448,220. |
| **7** | Qualified production activities income from estates, trusts, and certain partnerships and S corporations (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **7** | |
| **8** | Add line 6 and 7. Estates and trusts, go to line 9, all others, skip line 9 and go to line 10 . . . . . . . . . | | | **8** | 46,448,220. |
| **9** | Amount allocated to beneficiaries of the estate or trust (see instructions) . . . . . . . . . . . . . . . . . . . | | | **9** | |
| **10** | **Qualified production activities income.** Estates and trusts, subtract line 9 from line 8, all others, enter amount from line 8. If zero or less, enter -0- here, skip lines 11 through 19, and enter -0- on line 20 . . . . . . . | | | **10** | 46,448,220. |
| **11** | Income limitation (see instructions): | | | | |
| | • Individuals, estates, and trusts. Enter your adjusted gross income figured without the domestic production activities deduction . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| | • All others. Enter your taxable income figured without the domestic production activities deduction (tax-exempt organizations, see instructions) . . . . . . . . . . . . . . . . . . . . . . . | | | **11** | 46,457,258. |
| **12** | Enter the smaller of line 10 or line 11. If zero or less, enter -0- here, skip lines 13 through 19, and enter -0- on line 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **12** | 46,448,220. |
| **13** | Enter 6% of line 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **13** | 2,786,893. |
| **14** | Form W-2 wages (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **14** | 160,185,799. |
| **15** | Form W-2 wages from estates, trusts, and certain partnerships and S corporations (see instructions) . . . . . . | | | **15** | |
| **16** | Add lines 14 and 15. Estates and trusts, go to line 17, all others, skip line 17 and go to line 18 . . . . . . . . . . . | | | **16** | 160,185,799. |
| **17** | Amount allocated to beneficiaries of the estate or trust (see instructions) . . . . . . . . . . . . . . . . . . . . . | | | **17** | |
| **18** | Estates and trusts, subtract line 17 from line 16, all others, enter amount from line 16 . . . . . . . . . . . . . . . . . | | | **18** | 160,185,799. |
| **19** | Form W-2 wage limitation. Enter 50% of line 18 . . . . . . . . . . . . . . . . . . . . . . . . . | | | **19** | 80,092,900. |
| **20** | Enter the smaller of line 13 or line 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **20** | 2,786,893. |
| **21** | Domestic production activities deduction from cooperatives. Enter deduction from Form 1099-PATR, box 6 . . | | | **21** | |
| **22** | Expanded affiliated group allocation (see instructions) . . . . . . . . . . . . . . . . . . . . . | | | **22** | |
| **23** | **Domestic production activities deduction.** Combine lines 20 through 22 and enter the result here and on Form 1040, line 35; Form 1120, line 25; or the applicable line of your return . . . . . . . . . . . . . . . . . . . | | | **23** | 2,786,893. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**          FDIZ4001L  11/24/09          Form **8903** (2009)

Form **8925**

(December 2009)

Department of the Treasury
Internal Revenue Service    (99)

## Report of Employer-Owned Life Insurance Contracts

► **Attach to the policyholder's tax return — See instructions.**

OMB No. 1545-2089

Attachment
Sequence No. **160**

| Name(s) shown on return | Identifying number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |
| Name of policyholder, if different from above | Identifying number, if different from above |
| MMR CONSTRUCTORS, INC. | 72-1046000 |

Type of business

CONSTRUCTION : 238210

| | | | |
|---|---|---|---|
| **1** | Enter the number of employees the policyholder had at the end of the tax year............................. | **1** | 21. |
| **2** | Enter the number of employees included on line 1 who were insured at the end of the tax year under the policyholder's employer-owned life insurance contract(s) issued after August 17, 2006. See *Section 1035 exchanges* in the instructions for an exception........................................................... | **2** | 21. |
| **3** | Enter the total amount of employer-owned life insurance in force at the end of the tax year for employees who were insured under the contract(s) specified on line 2.......................................... | **3** | 84,340,948. |
| **4a** | Does the policyholder have a valid consent (see instructions) for each employee included on line 2?............................................................... ☒ **Yes**  ☐ **No** | | |
| **b** | If 'No,' enter the number of employees included on line 2 for whom the policyholder does not have a valid consent.................................................................... | **4b** | |

**BAA  For Paperwork Reduction Act Notice, see instructions.**    CPCA4501L  06/25/09    Form **8925** (12-2009)

# 12/31/09 — Consolidated Statement of Income and Deductions — Page 1

**72-1271030**

## MMR GROUP, INC.

| | | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR OFFSHORE SERVICES, INC. 72-1217366 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 |
|---|---|---|---|---|---|---|
| **INCOME** | | | | | | |
| 1a | Gross receipts or sales | | 309,378,086. | | 245,770. | 6,455,074. |
| 1b | Less returns and allowances | | | | | |
| 1c | Net sales | | 309,378,086. | | 245,770. | 6,455,074. |
| 2 | Cost of goods sold | | 238,781,552. | | 302,840. | 6,445,906. |
| 3 | Gross profit | | 70,596,534. | | -57,070. | 9,168. |
| 4 | Dividends | 1,055,467. | | | | |
| 5 | Interest | | | | | |
| 6 | Gross rents | | | | | |
| 7 | Gross royalties | | | | | |
| 8 | Capital gain net income | | | | | |
| 9 | Net gain (loss) from 4797 | | | | | |
| 10 | Other income | Statement 1  1,450,650. | 19,813,790. | | 6. | 307,670. |
| 11 | **Total income** | 2,506,117. | 90,410,324. | 0. | -57,064. | 316,838. |
| **DEDUCTIONS** | | | | | | |
| 12 | Compensation of officers | | 16,652,206. | | | |
| 13 | Salaries and wages | 227,014. | 12,510,131. | | 207,656. | 192,910. |
| 14 | Repairs and maintenance | 254,498. | 1,680,599. | | | 4,764. |
| 15 | Bad debts | | | | | |
| 16 | Rents | 3,600. | 960,273. | | 13,020. | 13,050. |
| 17 | Taxes and licenses | | 1,086,574. | | 6,662. | 79. |
| 18 | Interest expense | 170,291. | 386,761. | | 10,672. | |
| 19 | Charitable contributions | | | | | |
| 20c | Depreciation | 472,707. | 2,808,084. | | | 11,213. |
| 21 | Depletion | | | | | |
| 22 | Advertising | | 55,573. | | | 4,645. |
| 23 | Pension, profit-sharing plans | | 300,000. | | | |
| 24 | Employee benefit programs | | | | | |
| 25 | Domestic production activities deduction | | 2,774,325. | | | |
| 26 | Other deductions | Statement 2  364,044. | 7,731,379. | | 42,255. | 548,297. |
| 27 | **Total deductions** | 1,492,154. | 46,945,905. | 0. | 280,265. | 774,958. |
| **TAXABLE INCOME** | | | | | | |
| 28 | TI before NOL/special deductions | 1,013,963. | 43,464,419. | 0. | -337,329. | -458,120. |
| 29a | Net operating loss deduction | | | | | |
| 29b | Special deductions | | | | | |
| 30 | **Taxable income** | 1,013,963. | 43,464,419. | 0. | -337,329. | -458,120. |

# Consolidated Statement of Income and Deductions

Page 2

72-1271030

12/31/09

MMR GROUP, INC.

| | | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|
| **INCOME** | | | | | |
| 1a | Gross receipts or sales | 316,078,930. | | | 316,078,930. |
| 1b | Less returns and allowances | | | | |
| 1c | Net sales | 316,078,930. | | | 316,078,930. |
| 2 | Cost of goods sold | 245,530,298. | | | 245,530,298. |
| 3 | Gross profit | 70,548,632. | | | 70,548,632. |
| 4 | Dividends | 1,055,467. | | | 1,055,467. |
| 5 | Interest | | | | |
| 6 | Gross rents | | | | |
| 7 | Gross royalties | | | | |
| 8 | Capital gain net income | | | | |
| 9 | Net gain (loss) from 4797 | | | | |
| 10 | Other income    Statement 1 | 21,572,116. | | | 21,572,116. |
| 11 | **Total income** | 93,176,215. | | | 93,176,215. |
| **DEDUCTIONS** | | | | | |
| 12 | Compensation of officers | 16,652,206. | | | 16,652,206. |
| 13 | Salaries and wages | 13,137,711. | | | 13,137,711. |
| 14 | Repairs and maintenance | 1,939,861. | | | 1,939,861. |
| 15 | Bad debts | | | | |
| 16 | Rents | 989,943. | | | 989,943. |
| 17 | Taxes and licenses | 1,093,315. | | | 1,093,315. |
| 18 | Interest expense | 567,724. | | | 567,724. |
| 19 | Charitable contributions | | | | |
| 20c | Depreciation | 3,292,004. | | | 3,292,004. |
| 21 | Depletion | | | | |
| 22 | Advertising | 60,218. | | | 60,218. |
| 23 | Pension, profit-sharing plans | 300,000. | | | 300,000. |
| 24 | Employee benefit programs | | | | |
| 25 | Domestic production activities deduction | 2,774,325. | | 12,568. | 2,786,893. |
| 26 | Other deductions    Statement 2 | 8,685,975. | | | 8,685,975. |
| 27 | **Total deductions** | 49,493,282. | | 12,568. | 49,505,850. |
| **TAXABLE INCOME** | | | | | |
| 28 | TI before NOL/special deductions | 43,682,933. | | -12,568. | 43,670,365. |
| 29a | Net operating loss deduction | | | | |
| 29b | Special deductions | | | | |
| 30 | **Taxable income** | 43,682,933. | | -12,568. | 43,670,365. |

# Consolidated Statement of Cost of Goods Sold

**Page 1**
**72-1271030**

**12/31/09**

**MMR GROUP, INC.**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR OFFSHORE SERVICES, INC. 72-1217366 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 |
|---|---|---|---|---|---|
| 1 Inventory at beginning of year | | | | | |
| 2 Purchases | | 86,867. | 285,060. | | 6,445,906. |
| 3 Cost of labor | | 61,193,941. | | 119,218. | |
| 4 Additional section 263A costs | | 129,739,797. | | | |
| 5 Other costs          Statement 3 | | 48,266,085. | -285,060. | 183,622. | |
| 6 Total | | 239,286,690. | | 302,840. | 6,445,906. |
| 7 Inventory at end of year | | 505,138. | | | |
| 8 Cost of goods sold | 0. | 238,781,552. | 0. | 302,840. | 6,445,906. |

# Consolidated Statement of Cost of Goods Sold

Page 2

72-1271030

12/31/09

**MMR GROUP, INC.**

| | | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|
| 1 | Inventory at beginning of year | 371,927. | | | 371,927. |
| 2 | Purchases | 67,639,847. | | | 67,639,847. |
| 3 | Cost of labor | 129,859,015. | | | 129,859,015. |
| 4 | Additional section 263A costs | | | | |
| 5 | Other costs                Statement 3 | 48,164,647. | | | 48,164,647. |
| 6 | Total | 246,035,436. | | | 246,035,436. |
| 7 | Inventory at end of year | 505,138. | | | 505,138. |
| 8 | Cost of goods sold | 245,530,298. | | | 245,530,298. |

Case: 18-31177    Document: 00515297113    Page: 819    Date Filed: 02/04/2020
Case 2:10-md-02179-CJB-DPC    Document 26293    Filed 02/05/20    Page 820 of 1003

Page 1
72-1271030

# Consolidated Statement of Dividend Income

**MMR GROUP, INC.**

12/31/09

| | MMR GROUP, INC.<br>72-1271030 | MMR CONSTRUCTORS, INC.<br>72-1046000 | MMR OFFSHORE SERVICES, INC.<br>72-1217366 | MMR TECHNICAL SERVICES, INC.<br>72-1209195 | MMR POWER SOLUTIONS LLC<br>05-0584790 |
|---|---|---|---|---|---|
| 1 Dividends from less-than-20%-owned domestic corporations | | | | | |
| 2 Dividends from 20%-or-more-owned domestic corporations | | | | | |
| 3 Dividends on debt-financed stock of domestic and foreign corporations | | | | | |
| 4 Dividends on certain preferred stock of less-than-20%-owned public utilities | | | | | |
| 5 Dividends on certain preferred stock of 20%-or-more-owned public utilities | | | | | |
| 6 Dividends from less-than-20%-owned foreign corporations and certain FSCs | | | | | |
| 7 Dividends from 20%-or-more-owned foreign corporations and certain FSCs | | | | | |
| 8 Dividends from wholly-owned foreign subsidiaries | | | | | |
| 10 Dividends from domestic corporations received by a small business investment company operating under the Small Business Investment Act of 1958 | | | | | |
| 11 Dividends from affiliated group members | | | | | |
| 12 Dividends from certain FSCs | | | | | |
| 13 Other dividends from foreign corporations | 1,055,467. | | | | |
| 14 Income from controlled foreign corporations under subpart F | | | | | |
| 15 Foreign dividend gross-up | | | | | |
| 16 IC-DISC and former DISC dividends not included above | | | | | |
| 17 Other dividends | | | | | |
| 19 **Total dividends** | 1,055,467. | | | | |

# Consolidated Statement of Dividend Income

**12/31/09**

**MMR GROUP, INC.**

**Page 2**

72-1271030

| | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|
| 1  Dividends from less-than-20%-owned domestic corporations | | | | |
| 2  Dividends from 20%-or-more-owned domestic corporations | | | | |
| 3  Dividends on debt-financed stock of domestic and foreign corporations | | | | |
| 4  Dividends on certain preferred stock of less-than-20%-owned public utilities | | | | |
| 5  Dividends on certain preferred stock of 20%-or-more-owned public utilities | | | | |
| 6  Dividends from less-than-20%-owned foreign corporations and certain FSCs | | | | |
| 7  Dividends from 20%-or-more-owned foreign corporations and certain FSCs | | | | |
| 8  Dividends from wholly-owned foreign subsidiaries | | | | |
| 10  Dividends from domestic corporations received by a small business investment company operating under the Small Business Investment Act of 1958 | | | | |
| 11  Dividends from affiliated group members | | | | |
| 12  Dividends from certain FSCs | | | | |
| 13  Other dividends from foreign corporations | 1,055,467. | | | 1,055,467. |
| 14  Income from controlled foreign corporations under subpart F | | | | |
| 15  Foreign dividend gross-up | | | | |
| 16  IC-DISC and former DISC dividends not included above | | | | |
| 17  Other dividends | | | | |
| 19  **Total dividends** | 1,055,467. | | | 1,055,467. |

# Consolidated Beginning Balance Sheet

**12/31/09**  ·  **Page 1**  ·  72-1271030

## MMR GROUP, INC.

| | | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR OFFSHORE SERVICES, INC. 72-1217366 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| 1 | Cash | | 14,015,590. | 2,049. | 66,227. | 4,575. |
| 2a | Trade notes & accounts receivable | | 43,049,302. | 19,845,285. | 54,893. | |
| 2b | Less allowance for bad debts | | | | | |
| 3 | Inventories | | 86,867. | 285,060. | | |
| 4 | U.S. government obligations | | | | | |
| 5 | Tax-exempt securities | | | | | |
| 6 | Other current assets | Statement 5 | 12,346. | 14,188,099. | 13,602,745. | 7,761. | 5,866,575. |
| 7 | Loans to shareholders | | | | | |
| 8 | Mortgage and real estate loans | | | | | |
| 9 | Other investments | | | | | |
| 10a | Buildings & other depreciable assets | | 3,141,873. | 21,629,223. | 231,050. | | 46,550. |
| 10b | Less accumulated depreciation | | ( 749,901.) | (7,731,802.) | ( 79,619.) | | ( 30,257.) |
| 11a | Depletable assets | | | | | |
| 11b | Less accumulated depletion | | | | | |
| 12 | Land (net of amortization) | | | | | |
| 13a | Intangible assets (amortizable) | | | | | |
| 13b | Less accumulated amortization | | | | | |
| 14 | Other assets | Statement 6 | 11,056,243. | 636,117. | 3,155. | | 81,430. |
| 15 | **Total assets** | | 13,460,561. | 85,873,396. | 33,889,725. | 128,881. | 5,968,873. |
| **LIABILITIES AND EQUITY** | | | | | | |
| 16 | Accounts payable | | | 12,534,590. | 4,926,072. | 587. | 1,819. |
| 17 | Mortgages, notes, bonds payable in less than one year | | 238,597. | 2,116,758. | | | |
| 18 | Other current liabilities | | 21,685. | 57,198,014. | 9,608,107. | 1,678,990. | 7,823,229. |
| 19 | Loans from shareholders | Statement 7 | | | | | |
| 20 | Mortgages, notes, bonds payable in more than one year | | 2,281,329. | 3,427,581. | | | |
| 21 | Other liabilities | | | | | | |
| 22a | Capital stock - preferred | | | | | | |
| 22b | Capital stock - common | | | 875. | | | |
| 23 | Additional paid-in capital | | | | | | |
| 24 | Retained earnings - appropriated | | | | | | |
| 25 | Retained earnings - unappropriated | | 10,918,950. | 10,595,578. | 19,355,546. | -1,550,696. | |
| 26 | Adjustments to shareholder equity | | | | | | -1,856,175. |
| 27 | Less cost of treasury stock | | | | | | |
| 28 | **Total liabilities and equity** | | 13,460,561. | 85,873,396. | 33,889,725. | 128,881. | 5,968,873. |

# Consolidated Beginning Balance Sheet

**12/31/09**

**Page 2**

72-1271030

**MMR GROUP, INC.**

| | | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|
| | **ASSETS** | | | | |
| 1 | Cash | 14,088,441. | | | 14,088,441. |
| 2a | Trade notes & accounts receivable | 62,949,480. | | | 62,949,480. |
| 2b | Less allowance for bad debts | | | | |
| 3 | Inventories | 371,927. | | | 371,927. |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities | | | | |
| 6 | Other current assets  Statement 5 | 33,677,526. | | | 33,677,526. |
| 7 | Loans to shareholders | | | | |
| 8 | Mortgage and real estate loans | | | | |
| 9 | Other investments | | | | |
| 10a | Buildings & other depreciable assets | 25,048,696. | | | 25,048,696. |
| 10b | Less accumulated depreciation | (8,591,579.) | | | (8,591,579.) |
| 11a | Depletable assets | | | | |
| 11b | Less accumulated depletion | | | | |
| 12 | Land (net of amortization) | | | | |
| 13a | Intangible assets (amortizable) | | | | |
| 13b | Less accumulated amortization | | | | |
| 14 | Other assets  Statement 6 | 11,776,945. | | | 11,776,945. |
| 15 | **Total assets** | 139,321,436. | | | 139,321,436. |
| | **LIABILITIES AND EQUITY** | | | | |
| 16 | Accounts payable | 17,463,068. | | | 17,463,068. |
| 17 | Mortgages, notes, bonds payable in less than one year | 2,355,355. | | | 2,355,355. |
| 18 | Other current liabilities  Statement 7 | 76,330,025. | | | 76,330,025. |
| 19 | Loans from shareholders | | | | |
| 20 | Mortgages, notes, bonds payable in more than one year | 5,708,910. | | | 5,708,910. |
| 21 | Other liabilities | | | | |
| 22a | Capital stock - preferred | | | | |
| 22b | Capital stock - common | 875. | | | 875. |
| 23 | Additional paid-in capital | | | | |
| 24 | Retained earnings - appropriated | | | | |
| 25 | Retained earnings - unappropriated | 37,463,203. | | | 37,463,203. |
| 26 | Adjustments to shareholder equity | | | | |
| 27 | Less cost of treasury stock | | | | |
| 28 | **Total liabilities and equity** | 139,321,436. | | | 139,321,436. |

# Consolidated Ending Balance Sheet

**12/31/09**   **Page 1**

72-1271030

## MMR GROUP, INC.

| | | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR OFFSHORE SERVICES, INC. 72-1217366 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| 1 | Cash | | 25,581,977. | | 112,158. | 5,508. |
| 2a | Trade notes & accounts receivable | | 56,066,404. | | 59,728. | |
| 2b | Less allowance for bad debts | | | | | |
| 3 | Inventories | | 505,138. | | | |
| 4 | U.S. government obligations | | | | | |
| 5 | Tax-exempt securities | | | | | |
| 6 | Other current assets | Statement 5 | 117,869. | 44,997,646. | 1,310. | 12,193,249. |
| 7 | Loans to shareholders | | | | | |
| 8 | Mortgage and real estate loans | | | | | |
| 9 | Other investments | | | | | |
| 10a | Buildings & other depreciable assets | | 3,410,818. | 28,742,327. | | 58,380. |
| 10b | Less accumulated depreciation | | (1,222,608.) | (9,940,231.) | | ( 41,470.) |
| 11a | Depletable assets | | | | | |
| 11b | Less accumulated depletion | | | | | |
| 12 | Land (net of amortization) | | | | | |
| 13a | Intangible assets (amortizable) | | | | | |
| 13b | Less accumulated amortization | | | | | |
| 14 | Other assets | Statement 6 | 12,111,709. | 807,777. | | 81,430. |
| 15 | **Total assets** | | **14,417,788.** | **146,761,038.** | **0.** | **173,196.** | **12,297,097.** |
| **LIABILITIES AND EQUITY** | | | | | | |
| 16 | Accounts payable | | | 11,204,935. | | 1,850. | 19,458. |
| 17 | Mortgages, notes, bonds payable in less than one year | | 255,616. | 3,363,530. | | | 916,290. |
| 18 | Other current liabilities | Statement 7 | 201,608. | 65,152,612. | | 2,059,906. | 9,481,143. |
| 19 | Loans from shareholders | | | | | |
| 20 | Mortgages, notes, bonds payable in more than one year | | 2,027,651. | 7,960,399. | | | 4,199,661. |
| 21 | Other liabilities | | | | | |
| 22a | Capital stock - preferred | | | | | |
| 22b | Capital stock - common | | | 875. | | |
| 23 | Additional paid-in capital | | | | | |
| 24 | Retained earnings - appropriated | | | | | |
| 25 | Retained earnings - unappropriated | | 11,932,913. | 59,078,687. | | -1,888,560. | -2,319,455. |
| 26 | Adjustments to shareholder equity | | | | | |
| 27 | Less cost of treasury stock | | | | | |
| 28 | **Total liabilities and equity** | | **14,417,788.** | **146,761,038.** | **0.** | **173,196.** | **12,297,097.** |

# Consolidated Ending Balance Sheet

**Page 2**

**12/31/09**

**MMR GROUP, INC.**

72-1271030

| | | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|
| | **ASSETS** | | | | |
| 1 | Cash | 25,699,643. | | | 25,699,643. |
| 2a | Trade notes & accounts receivable | 56,126,132. | | | 56,126,132. |
| 2b | Less allowance for bad debts | | | | |
| 3 | Inventories | 505,138. | | | 505,138. |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities | | | | |
| 6 | Other current assets                Statement 5 | 57,310,074. | | | 57,310,074. |
| 7 | Loans to shareholders | | | | |
| 8 | Mortgage and real estate loans | | | | |
| 9 | Other investments | | | | |
| 10a | Buildings & other depreciable assets | 32,211,525. | | | 32,211,525. |
| 10b | Less accumulated depreciation | (11,204,309.) | | | (11,204,309.) |
| 11a | Depletable assets | | | | |
| 11b | Less accumulated depletion | | | | |
| 12 | Land (net of amortization) | | | | |
| 13a | Intangible assets (amortizable) | | | | |
| 13b | Less accumulated amortization | | | | |
| 14 | Other assets                        Statement 6 | 13,000,916. | | | 13,000,916. |
| 15 | **Total assets** | 173,649,119. | | | 173,649,119. |
| | **LIABILITIES AND EQUITY** | | | | |
| 16 | Accounts payable | 11,226,243. | | | 11,226,243. |
| 17 | Mortgages, notes, bonds payable in less than one year | 4,535,436. | | | 4,535,436. |
| 18 | Other current liabilities           Statement 7 | 76,895,269. | | | 76,895,269. |
| 19 | Loans from shareholders | | | | |
| 20 | Mortgages, notes, bonds payable in more than one year | 14,187,711. | | | 14,187,711. |
| 21 | Other liabilities | | | | |
| 22a | Capital stock - preferred | | | | |
| 22b | Capital stock - common | 875. | | | 875. |
| 23 | Additional paid-in capital | | | | |
| 24 | Retained earnings - appropriated | | | | |
| 25 | Retained earnings - unappropriated | 66,803,585. | | | 66,803,585. |
| 26 | Adjustments to shareholder equity | | | | |
| 27 | Less cost of treasury stock | | | | |
| 28 | **Total liabilities and equity** | 173,649,119. | | | 173,649,119. |

# Consolidated Schedule M-2

**Page 1**

72-1271030

## MMR GROUP, INC.

**12/31/09**

| | | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR OFFSHORE SERVICES, INC. 72-1217366 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 |
|---|---|---|---|---|---|---|
| | **SCHEDULE M-2** | | | | | |
| 1 | Beginning retained earnings | 10,918,950. | 10,595,578. | 19,355,546. | -1,550,696. | -1,856,175. |
| 2 | Net income or loss per books | 1,013,963. | 29,127,563. | 0. | -337,864. | -463,280. |
| 3 | Other increases          Statement 8 | | 19,355,546. | | | |
| 4 | Total lines 1 - 3 | 11,932,913. | 59,078,687. | 19,355,546. | -1,888,560. | -2,319,455. |
| 5 | Distributions: | | | | | |
| 5a | Cash | | | | | |
| 5b | Stock | | | | | |
| 5c | Property | | | | | |
| 6 | Other decreases          Statement 9 | | | 19,355,546. | | |
| 7 | Total lines 5 and 6 | 0. | 0. | 19,355,546. | 0. | 0. |
| 8 | Ending retained earnings | 11,932,913. | 59,078,687. | 0. | -1,888,560. | -2,319,455. |

# Consolidated Schedule M-2

**Page 2**

12/31/09

72-1271030

## MMR GROUP, INC.

| | | | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|
| **SCHEDULE M-2** | | | | | | |
| 1 | Beginning retained earnings | | 37,463,203. | | | 37,463,203. |
| 2 | Net income or loss per books | | 29,340,382. | | | 29,340,382. |
| 3 | Other increases | Statement 8 | 19,355,546. | | | 19,355,546. |
| 4 | Total lines 1 - 3 | | 86,159,131. | | | 86,159,131. |
| 5 | Distributions: | | | | | |
| 5a | Cash | | | | | |
| 5b | Stock | | | | | |
| 5c | Property | | | | | |
| 6 | Other decreases | Statement 9 | 19,355,546. | | | 19,355,546. |
| 7 | Total lines 5 and 6 | | 19,355,546. | | | 19,355,546. |
| 8 | Ending retained earnings | | 66,803,585. | | | 66,803,585. |

# Consolidated Statement of Alternative Minimum Taxable Income

**Page 1**

72-1271030

12/31/09

## MMR GROUP, INC.

| | | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTOR S. INC. 72-1046000 | MMR OFFSHORE SERVICES, INC. 72-1217366 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 |
|---|---|---|---|---|---|---|
| 1 | Taxable income before NOL | 1,013,963. | 43,464,419. | 0. | -337,329. | -458,120. |
| | **Adjustments and Preferences:** | | | | | |
| 2a | Depreciation of post-86 property | | | | | |
| 2b | Amortization of certified pollution control facilities | | | | | |
| 2c | Amortization of mining exploration & development costs | | | | | |
| 2d | Amortization of circulation expenditures | | | | | |
| 2e | Adjusted gain or loss | | | | | |
| 2f | Long-term contracts | | | | | |
| 2g | Merchant marine capital construction funds | | | | | |
| 2h | Section 833(b) deduction | | | | | |
| 2i | Tax shelter farm activities | | | | | |
| 2j | Passive activities | | | | | |
| 2k | Loss limitations | | | | | |
| 2l | Depletion | | | | | |
| 2m | Tax-exempt interest from specified private activity bonds | | | | | |
| 2n | Intangible drilling costs | | | | | |
| 2o | Other adjustments | | 361,926. | | | |
| 3 | Pre-adjustment AMTI | 1,013,963. | 43,826,345. | 0. | -337,329. | -458,120. |
| 4a | Adjusted current earnings | 1,013,963. | 43,826,345. | | -337,329. | -458,120. |
| 4b | Subtract line 3 from line 4a | | | | | |
| 4c | Multiply line 4b by 75% | | | | | |
| 4d | Prior ACE increases over prior ACE reductions | 0. | 2,949,652. | 39,584. | 0. | 0. |
| 4e | ACE adjustment | 0. | 0. | 0. | 0. | 0. |
| 5 | AMTI before ATNOL | 1,013,963. | 43,826,345. | | -337,329. | -458,120. |
| 6 | ATNOL deduction | | 6,032,097. | | | |
| 7 | Alternative minimum taxable income | 1,013,963. | 37,794,248. | | -337,329. | -458,120. |

# Consolidated Statement of Alternative Minimum Taxable Income

**Page 2**

**12/31/09**

**MMR GROUP, INC.**

72-1271030

| | | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|
| 1 | Taxable income before NOL | 43,682,933. | | -12,568. | 43,670,365. |
| | **Adjustments and Preferences:** | | | | |
| 2a | Depreciation of post-86 property | | | | |
| 2b | Amortization of certified pollution control facilities | | | | |
| 2c | Amortization of mining exploration & development costs | | | | |
| 2d | Amortization of circulation expenditures | | | | |
| 2e | Adjusted gain or loss | | | | |
| 2f | Long-term contracts | | | | |
| 2g | Merchant marine capital construction funds | | | | |
| 2h | Section 833(b) deduction | | | | |
| 2i | Tax shelter farm activities | | | | |
| 2j | Passive activities | | | | |
| 2k | Loss limitations | | | | |
| 2l | Depletion | | | | |
| 2m | Tax-exempt interest from specified private activity bonds | | | | |
| 2n | Intangible drilling costs | | | | |
| 2o | Other adjustments | 361,926. | | -543. | 361,383. |
| 3 | Pre-adjustment AMTI | 44,044,859. | | -13,111. | 44,031,748. |
| 4a | Adjusted current earnings | 44,044,859. | | -13,111. | 44,031,748. |
| 4b | Subtract line 3 from line 4a | | | | |
| 4c | Multiply line 4b by 75% | | | | |
| 4d | Prior ACE increases over prior ACE reductions | 2,989,236. | | | 2,989,236. |
| 4e | ACE adjustment | 0. | | | 0. |
| 5 | AMTI before ATNOL | 44,044,859. | | -13,111. | 44,031,748. |
| 6 | ATNOL deduction | 6,032,097. | | | 6,032,097. |
| 7 | Alternative minimum taxable income | 38,012,762. | | -13,111. | 37,999,651. |

# Consolidated Statement of Adjusted Current Earnings

**Page 1**

72-1271030

12/31/09

## MMR GROUP, INC.

| | | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR OFFSHORE SERVICES, INC. 72-1217366 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 |
|---|---|---|---|---|---|---|
| 1 | **Pre-adjustment AMTI** | 1,013,963. | 43,826,345. | 0. | -337,329. | -458,120. |
| | **Depreciation adjustment for ACE** | | | | | |
| 2a | AMT depreciation | 472,707. | 2,808,084. | | | 11,213. |
| 2b | Post-1993 property | 22,607. | 476,100. | | | 1,903. |
| | Post-1989, pre-1994 property | | | | | |
| | Pre-1990 MACRS property | 450,100. | 2,331,984. | | | 9,310. |
| | Pre-1990 original ACRS property | | | | | |
| | Property described in 168(f)(1-4) | | | | | |
| | Other property | | | | | |
| | Section 179 expense | | | | | |
| | Total ACE depreciation | 472,707. | 2,808,084. | | | 11,213. |
| 2c | ACE depreciation adjustment | 0. | 0. | 0. | 0. | |
| | **Inclusion in ACE of items included in Earnings & Profits** | | | | | |
| 3a | Tax-exempt interest income | | | | | |
| 3b | Death benefits from life insurance contracts | | | | | |
| 3c | All other distributions from life insurance contracts | | | | | |
| 3d | Inside buildup of life insurance contracts | | | | | |
| 3e | Other items included in E & P | | | | | |
| 3f | Increases to ACE of items in E & P | 0. | 0. | 0. | 0. | 0. |
| | **Disallowance of items not deductible from Earnings & Profits** | | | | | |
| 4a | Certain dividends received | | | | | |
| 4b | Dividends paid on preferred stock of utilities | | | | | |
| 4c | Dividends paid to an ESOP | | | | | |
| 4d | Nonpatronage dividends | | | | | |
| 4e | Other items not deductible from E & P | | | | | |
| 4f | Total increases to ACE | 0. | 0. | 0. | 0. | 0. |
| | **Other adjustments:** | | | | | |
| 5a | Intangible drilling costs | | | | | |
| 5b | Circulation expenditures | | | | | |
| 5c | Organizational expenditures | | | | | |
| 5d | LIFO inventory adjustments | | | | | |
| 5e | Installment sales | | | | | |
| 5f | Total other E & P adjustments | 0. | 0. | 0. | 0. | 0. |
| 6 | Loss on bad debt pool exchange | | | | | |
| 7 | Acq. expense of life ins. companies | | | | | |
| 8 | Depletion | | | | | |
| 9 | Basis adjustments | | | | | |
| 10 | **Adjusted current earnings** | 1,013,963. | 43,826,345. | 0. | -337,329. | -458,120. |

# Consolidated Statement of Adjusted Current Earnings

**12/31/09**

**MMR GROUP, INC.**

Page 2

72-1271030

| | | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|
| 1 | **Pre-adjustment AMTI** | 44,044,859. | | -13,111. | 44,031,748. |
| | **Depreciation adjustment for ACE** | | | | |
| 2a | AMT depreciation | 3,292,004. | | | 3,292,004. |
| 2b | Post-1993 property | 500,610. | | | 500,610. |
| | Post-1989, pre-1994 property | | | | |
| | Pre-1990 MACRS property | 2,791,394. | | | 2,791,394. |
| | Pre-1990 original ACRS property | | | | |
| | Property described in 168(f)(1-4) | | | | |
| | Other property | | | | |
| | Section 179 expense | | | | |
| | Total ACE depreciation | 3,292,004. | | | 3,292,004. |
| | ACE depr. adjustment from K-1 | | | | |
| 2c | ACE depreciation adjustment | 0. | | | 0. |
| | **Inclusion in ACE of items included in Earnings & Profits** | | | | |
| 3a | Tax-exempt interest income | | | | |
| 3b | Death benefits from life insurance contracts | | | | |
| 3c | All other distributions from life insurance contracts | | | | |
| 3d | Inside buildup of life insurance contracts | | | | |
| 3e | Other items included in E & P | | | | |
| 3f | Increases to ACE of items in E & P | 0. | | | 0. |
| | **Disallowance of items not deductible from Earnings & Profits** | | | | |
| 4a | Certain dividends received | | | | |
| 4b | Dividends paid on preferred stock of utilities | | | | |
| 4c | Dividends paid to an ESOP | | | | |
| 4d | Nonpatronage dividends | | | | |
| 4e | Other items not deductible from E & P | | | | |
| 4f | Total increases to ACE | 0. | | | 0. |
| | **Other adjustments:** | | | | |
| 5a | Intangible drilling costs | | | | |
| 5b | Circulation expenditures | | | | |
| 5c | Organizational expenditures | | | | |
| 5d | LIFO inventory adjustments | | | | |
| 5e | Installment sales | | | | |
| 5f | Total other E & P adjustments | 0. | | | 0. |
| 6 | Loss on bad debt pool exchange | | | | |
| 7 | Acq. expense of life ins. companies | | | | |
| 8 | Depletion | | | | |
| 9 | Basis adjustments | | | | |
| 10 | **Adjusted current earnings** | 44,044,859. | | -13,111. | 44,031,748. |

# Federal Statements

**Page 1**

**2009**

72-1271030

## MMR GROUP, INC.

**Statement 1**
**Form 1120, Line 10**
**Other Income**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR OFFSHORE SERVICES, INC. 72-1217366 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 |
|---|---|---|---|---|---|
| MISCELLANEOUS | | | | | 298,632. |
| MISCELLANEOUS INCOME | 1,450,650. | 19,813,790. | | 6. | |
| Net Income from K-1 | | | 0. | | 9,038. |
| Total | 1,450,650. | 19,813,790. | 0. | 6. | 307,670. |

# 2009

# Federal Statements

**Page 2**

72-1271030

## MMR GROUP, INC.

**Statement 1 (continued)**
**Form 1120, Line 10**
**Other Income**

| | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|
| MISCELLANEOUS | 20,112,428. | | | 20,112,428. |
| MISCELLANEOUS INCOME | 1,450,650. | | | 1,450,650. |
| Net Income from K-1 | 9,038. | | | 9,038. |
| Total | 21,572,116. | 0. | 0. | 21,572,116. |

**2009**

# Federal Statements

**MMR GROUP, INC.**

**Page 3**

72-1271030

## Statement 2
### Form 1120, Line 26
### Other Deductions

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR OFFSHORE SERVICES, INC. 72-1217366 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 |
|---|---|---|---|---|---|
| COMPUTER EXPENSE | | 475,680. | | | 3,337. |
| CONSULTING | | 16,043. | | | |
| Dues and Subscriptions | | 62,826. | | | 4,124. |
| EXPENSES | 332,449. | 3,727,297. | | 20,234. | 62,713. |
| Insurance | 26,410. | 962,327. | | 7,700. | 19,250. |
| Legal and Professional | | 560,899. | | | 30,600. |
| Meals and Entertainment | | 474,555. | | 535. | 5,160. |
| Miscellaneous | | 520,901. | | 2,831. | 419. |
| Net Loss from K-1 | | | | | 385,725. |
| Office Expense | 3,467. | | | | |
| Postage | 124. | 124,877. | | 4,154. | 2,038. |
| Printing | | 96,002. | | 177. | 317. |
| REPOSSESSION EXPENSE | | | | 82. | 44. |
| REPRODUCTION | | 123,264. | | | 3,288. |
| Supplies | | 240,986. | | | |
| Utilities | 1,594. | 345,722. | | 6,542. | 31,282. |
| Total | 364,044. | 7,731,379. | 0. | 42,255. | 548,297. |

2009                                          **Federal Statements**                                    **Page 4**

                                                  MMR GROUP, INC.                                       72-1271030

**Statement 2 (continued)**
**Form 1120, Line 26**
**Other Deductions**

|                              | Total      | Eliminations | Adjustments | Consolidated |
|------------------------------|-----------:|-------------:|------------:|-------------:|
| COMPUTER EXPENSE             | 479,017.   |              |             | 479,017.     |
| CONSULTING                   | 16,043.    |              |             | 16,043.      |
| Dues and Subscriptions       | 66,950.    |              |             | 66,950.      |
| EXPENSES                     | 4,142,693. |              |             | 4,142,693.   |
| Insurance                    | 1,015,687. |              |             | 1,015,687.   |
| Legal and Professional       | 591,499.   |              |             | 591,499.     |
| Meals and Entertainment      | 480,250.   |              |             | 480,250.     |
| Miscellaneous                | 524,151.   |              |             | 524,151.     |
| Net Loss from K-1            | 385,725.   |              |             | 385,725.     |
| Office Expense               | 3,467.     |              |             | 3,467.       |
| Postage                      | 131,193.   |              |             | 131,193.     |
| Printing                     | 96,496.    |              |             | 96,496.      |
| REPOSSESSION EXPENSE         | 126.       |              |             | 126.         |
| REPRODUCTION                 | 123,264.   |              |             | 123,264.     |
| Supplies                     | 244,274.   |              |             | 244,274.     |
| Utilities                    | 385,140.   |              |             | 385,140.     |
| Total                        | 8,685,975. | 0.           | 0.          | 8,685,975.   |

**2009**

# Federal Statements

**Page 5**

72-1271030

## MMR GROUP, INC.

**Statement 3**
**Form 1120, Schedule A, Line 5**
**Other Cost of Goods Sold**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTOR S, INC. 72-1046000 | MMR OFFSHORE SERVICES, INC. 72-1217366 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 |
|---|---|---|---|---|---|
| CONSOLIDATION WITH MMR CONSTRUCTORS, INC | | | -285,060. | | |
| OTHER | | 25,570,674. | | 162,901. | |
| PAYROLL, TAX & INSURANCE | | 22,695,411. | | 20,721. | |
| Total | 0. | 48,266,085. | -285,060. | 183,622. | 0. |

# 2009

# Federal Statements

## MMR GROUP, INC.

Page 6

72-1271030

**Statement 3 (continued)**
**Form 1120, Schedule A, Line 5**
**Other Cost of Goods Sold**

| | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|
| CONSOLIDATION WITH MMR CONSTRUCTORS, INC | -285,060. | | | -285,060. |
| OTHER | 25,733,575. | | | 25,733,575. |
| PAYROLL, TAX & INSURANCE | 22,716,132. | | | 22,716,132. |
| Total | 48,164,647. | 0. | 0. | 48,164,647. |

| 2009 | FEDERAL STATEMENTS | PAGE 7 |
|---|---|---|

**MMR GROUP, INC.**                                                    **72-1271030**

**STATEMENT 4**
**FORM 1120, SCHEDULE E, LINE 1**
**OFFICER SCHEDULE**

| NAME OF OFFICER | SSN | % TIME DEVOTED TO BUSINESS | COMMON STOCK % | PREF'D STOCK % | COMPENSATION |
|---|---|---|---|---|---|
| MMR GROUP, INC. - 72-1271030 | | | | | |
| | | | | | . |
| MMR CONSTRUCTORS, INC. - 72-1046000 | | | | | |
| | | | | | . |
| MMR OFFSHORE SERVICES, INC. - 72-1217366 | | | | | |
| MMR TECHNICAL SERVICES, INC. - 72-1209195 | | | | | |
| | | | | | . |

| 2009 | FEDERAL STATEMENTS | PAGE 8 |
|---|---|---|
| | MMR GROUP, INC. | 72-1271030 |

**STATEMENT 4 (CONTINUED)**
**FORM 1120, SCHEDULE E, LINE 1**
**OFFICER SCHEDULE**

| NAME OF OFFICER | SSN | % TIME DEVOTED TO BUSINESS | COMMON STOCK % | PREF'D STOCK % | COMPENSATION |
|---|---|---|---|---|---|
| | | | | | 0. |
| MMR POWER SOLUTIONS LLC - 05-0584790 | | | | | |
| | | | | | 0. |
| | | | | TOTAL | $16,652,206. |

**2009**

# Federal Statements

**Page 9**
72-1271030

## MMR GROUP, INC.

**Statement 5**
**Form 1120, Schedule L, Line 6**
**Other Current Assets**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR OFFSHORE SERVICES, INC. 72-1217366 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 |
|---|---|---|---|---|---|
| **Beginning:** | | | | | |
| COSTS IN EXCESS OF BILLINGS | | | 57,545. | | |
| DUE FROM AFFILIATES | | 12,219,501. | 13,126,128. | | |
| ESTIMATES EARNED-UNBILLED | | 186,315. | | | |
| MISCELLANEOUS | | 608,017. | | | |
| MISCELLANEOUS RECEIVABLE | | | 17,729. | 7,761. | 2,514. |
| MISCELLANEOUS RECEIVABLES | | 1,174,266. | 401,343. | | |
| PREPAID EXPENSES | 12,346. | | | | 2,706. |
| UNBILLED ESTIMATES EARNED | | | | | 5,861,355. |
| Total | 12,346. | 14,188,099. | 13,602,745. | 7,761. | 5,866,575. |

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR OFFSHORE SERVICES, INC. 72-1217366 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 |
|---|---|---|---|---|---|
| **Ending:** | | | | | |
| DUE FROM AFFILIATES | | 42,033,021. | | | |
| ESTIMATES EARNED-UNBILLED | | 553,405. | | | |
| MISCELLANEOUS | | 662,819. | | | |
| MISCELLANEOUS RECEIVABLE | | | | 225. | 2,613. |
| MISCELLANEOUS RECEIVABLES | | 1,748,401. | | 1,085. | 132. |
| PREPAID EXPENSES | 117,869. | | | | 12,190,504. |
| UNBILLED ESTIMATES EARNED | | | | | |
| Total | 117,869. | 44,997,646. | 0. | 1,310. | 12,193,249. |

# Federal Statements

## MMR GROUP, INC.

**2009**

**Statement 5 (continued)**
**Form 1120, Schedule L, Line 6**
**Other Current Assets**

| | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|
| **Beginning:** | | | | |
| COSTS IN EXCESS OF BILLINGS | 57,545. | | | 57,545. |
| DUE FROM AFFILIATES | 25,345,629. | | | 25,345,629. |
| ESTIMATES EARNED-UNBILLED | 186,315. | | | 186,315. |
| MISCELLANEOUS | 608,017. | | | 608,017. |
| MISCELLANEOUS RECEIVABLE | 20,243. | | | 20,243. |
| MISCELLANEOUS RECEIVABLES | 7,761. | | | 7,761. |
| PREPAID EXPENSES | 1,590,661. | | | 1,590,661. |
| UNBILLED ESTIMATES EARNED | 5,861,355. | | | 5,861,355. |
| Total | 33,677,526. | 0. | 0. | 33,677,526. |
| **Ending:** | | | | |
| DUE FROM AFFILIATES | 42,033,021. | | | 42,033,021. |
| ESTIMATES EARNED-UNBILLED | 553,405. | | | 553,405. |
| MISCELLANEOUS | 662,819. | | | 662,819. |
| MISCELLANEOUS RECEIVABLE | 2,613. | | | 2,613. |
| MISCELLANEOUS RECEIVABLES | 225. | | | 225. |
| PREPAID EXPENSES | 1,867,487. | | | 1,867,487. |
| UNBILLED ESTIMATES EARNED | 12,190,504. | | | 12,190,504. |
| Total | 57,310,074. | 0. | 0. | 57,310,074. |

| 2009 | Federal Statements | Page 11 |

MMR GROUP, INC.

72-1271030

**Statement 6**
**Form 1120, Schedule L, Line 14**
**Other Assets**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR OFFSHORE SERVICES, INC. 72-1217366 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 |
|---|---|---|---|---|---|
| **Beginning:** | | | | | |
| DEPOSITS | | 144,655. | 3,155. | | |
| DUE FROM AFFILIATES | 11,056,243. | | | | |
| INVESTMENT IN JOINT VENTURE | | 491,462. | | | 81,430. |
| Total | 11,056,243. | 636,117. | 3,155. | 0. | 81,430. |
| **Ending:** | | | | | |
| DEPOSITS | | 66,315. | | | |
| DUE FROM AFFILIATES | 12,111,709. | | | | |
| INVESTMENT IN JOINT VENTURE | | 741,462. | | | 81,430. |
| Total | 12,111,709. | 807,777. | 0. | 0. | 81,430. |

| 2009 | Federal Statements | Page 12 |
| --- | --- | --- |
| | MMR GROUP, INC. | 72-1271030 |

**Statement 6 (continued)**
**Form 1120, Schedule L, Line 14**
**Other Assets**

| | Total | Eliminations | Adjustments | Consolidated |
| --- | --- | --- | --- | --- |
| **Beginning:** | | | | |
| DEPOSITS | 147,810. | | | 147,810. |
| DUE FROM AFFILIATES | 11,056,243. | | | 11,056,243. |
| INVESTMENT IN JOINT VENTURE | 572,892. | | | 572,892. |
| Total | 11,776,945. | 0. | 0. | 11,776,945. |

| | Total | Eliminations | Adjustments | Consolidated |
| --- | --- | --- | --- | --- |
| **Ending:** | | | | |
| DEPOSITS | 66,315. | | | 66,315. |
| DUE FROM AFFILIATES | 12,111,709. | | | 12,111,709. |
| INVESTMENT IN JOINT VENTURE | 822,892. | | | 822,892. |
| Total | 13,000,916. | 0. | 0. | 13,000,916. |

**2009**

**Federal Statements**

**Page 13**

72-1271030

MMR GROUP, INC.

**Statement 7**
**Form 1120, Schedule L, Line 18**
**Other Current Liabilities**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR OFFSHORE SERVICES, INC. 72-1217366 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 |
|---|---|---|---|---|---|
| **Beginning:** | | | | | |
| ACCRUED EXPENSES | | 39,271,638. | 5,588,067. | 195,396. | |
| BILLINGS IN EXCESS OF COST | | 4,464,345. | 35,903. | | |
| DUE TO AFFILIATES | 21,685. | | | | |
| DUE TO RELATED PARTY | | 14,611,496. | | 220,835. | 7,823,229. |
| ESTIMATES BILLED-UNEARNED | | 98,846. | 2,203,941. | 307,847. | |
| Federal Tax Payable | | -1,402,355. | | 867,540. | |
| INCOME TAX ADJ. FROM CONSOLIDATION | | | 1,726,416. | | |
| INCOME TAX CREDIT FROM CONSOLIDATION | | | | | |
| State Tax Payable | | 154,044. | 53,780. | 87,372. | |
| Total | 21,685. | 57,198,014. | 9,608,107. | 1,678,990. | 7,823,229. |

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR OFFSHORE SERVICES, INC. 72-1217366 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 |
|---|---|---|---|---|---|
| **Ending:** | | | | | |
| ACCRUED EXPENSES | | 37,395,593. | | 333,035. | 44,825. |
| BILLINGS IN EXCESS OF EARNINGS | | | | | 9,436,318. |
| DUE TO AFFILIATES | 201,608. | | | | |
| DUE TO RELATED PARTY | | 18,020,553. | | 617,533. | |
| ESTIMATES BILLED-UNEARNED | | 14,415,820. | | | |
| Federal Tax Payable | | -5,430,043. | | 1,107,948. | |
| INCOME TAX ADJ. FROM CONSOLIDATION | | 750,689. | | 1,390. | |
| State Tax Payable | | | | | |
| Total | 201,608. | 65,152,612. | 0. | 2,059,906. | 9,481,143. |

**2009**                                    **Federal Statements**                        **Page 14**

72-1271030

**MMR GROUP, INC.**

**Statement 7 (continued)**
**Form 1120, Schedule L, Line 18**
**Other Current Liabilities**

| | Total | Eliminations | Adjustments | Consolidated |
|---|---:|---:|---:|---:|
| **Beginning:** | | | | |
| ACCRUED EXPENSES | 45,055,101. | | | 45,055,101. |
| BILLINGS IN EXCESS OF COST | 35,903. | | | 35,903. |
| DUE TO AFFILIATES | 12,309,259. | | | 12,309,259. |
| DUE TO RELATED PARTY | 220,835. | | | 220,835. |
| ESTIMATES BILLED-UNEARNED | 14,611,496. | | | 14,611,496. |
| Federal Tax Payable | 2,610,634. | | | 2,610,634. |
| INCOME TAX ADJ. FROM CONSOLIDATION | -534,815. | | | -534,815. |
| INCOME TAX CREDIT FROM CONSOLIDATION | 1,726,416. | | | 1,726,416. |
| State Tax Payable | 295,196. | | | 295,196. |
| Total | 76,330,025. | 0. | 0. | 76,330,025. |
| **Ending:** | | | | |
| ACCRUED EXPENSES | 37,728,628. | | | 37,728,628. |
| BILLINGS IN EXCESS OF EARNINGS | 44,825. | | | 44,825. |
| DUE TO AFFILIATES | 9,637,926. | | | 9,637,926. |
| DUE TO RELATED PARTY | 617,533. | | | 617,533. |
| ESTIMATES BILLED-UNEARNED | 18,020,553. | | | 18,020,553. |
| Federal Tax Payable | 14,415,820. | | | 14,415,820. |
| INCOME TAX ADJ. FROM CONSOLIDATION | -4,322,095. | | | -4,322,095. |
| State Tax Payable | 752,079. | | | 752,079. |
| Total | 76,895,269. | 0. | 0. | 76,895,269. |

**2009**

# Federal Statements

**Page 15**

72-1271030

**MMR GROUP, INC.**

**Statement 8**
**Form 1120, Schedule M-2, Line 3**
**Other Increases**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTOR S, INC. 72-1046000 | MMR OFFSHORE SERVICES, INC. 72-1217366 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 |
|---|---|---|---|---|---|
| CONSOLIDATION OF MMR OFFSHORES SERVICES | | 19,355,546. | | | |
| Total | 0. | 19,355,546. | 0. | 0. | 0. |

**2009**

# Federal Statements

**Page 16**

72-1271030

MMR GROUP, INC.

**Statement 8 (continued)**
**Form 1120, Schedule M-2, Line 3**
**Other Increases**

| | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|
| CONSOLIDATION OF MMR OFFSHORES SERVICES | 19,355,546. | 0. | 0. | 19,355,546. |
| Total | 19,355,546. | 0. | 0. | 19,355,546. |

**2009** | **Federal Statements** | **Page 17**

**MMR GROUP, INC.**

72-1271030

**Statement 9**
**Form 1120, Schedule M-2, Line 6**
**Other Decreases**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTOR S, INC. 72-1046000 | MMR OFFSHORE SERVICES, INC. 72-1217366 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 |
|---|---|---|---|---|---|
| CONSOLIDATION WITH MMR CONSTRUCTORS, INC | | | 19,355,546. | | |
| Total | 0. | 0. | 19,355,546. | 0. | 0. |

| 2009 | Federal Statements | Page 18 |
| --- | --- | --- |
| | MMR GROUP, INC. | 72-1271030 |

**Statement 9 (continued)**
**Form 1120, Schedule M-2, Line 6**
**Other Decreases**

| | Total | Eliminations | Adjustments | Consolidated |
| --- | --- | --- | --- | --- |
| CONSOLIDATION WITH MMR CONSTRUCTORS, INC | 19,355,546. | 0. | 0. | 19,355,546. |
| Total | 19,355,546. | 0. | 0. | 19,355,546. |

| 2009 | FEDERAL STATEMENTS | PAGE 19 |
|------|--------------------|---------|

**MMR GROUP, INC.**    72-1271030

**STATEMENT 10**
**FORM 4626, LINE 6**
**ALTERNATIVE TAX NET OPERATING LOSS DEDUCTION**

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| | NET SRLY LOSS | NET SRLY LOSS | | NON-SRLY LOSS | NET | TOTAL LOSS AVAILABLE |
| LOSS YEAR | BEFORE LIMITATION | AFTER LIMITATION | NON-SRLY ORIGINAL LOSS | PREVIOUSLY USED | NON-SRLY LOSS AVAILABLE | IN 2009 C + F |
| MMR CONSTRUCTORS, INC. - 72-1046000 | | | | | | |
| 12/08 | 0. | 0. | 6,032,097. | 0. | 6,032,097. | 6,032,097. |

TOTAL ALTERNATIVE TAX NET OPERATING LOSS DEDUCTION.................................. $ 6,032,097.

---

**STATEMENT 11**
**SCHEDULE M-3, PART III, LINE 35**
**72-1271030**
**OTHER EXPENSE/DEDUCTION ITEMS WITH DIFFERENCES**

| DESCRIPTION | PER INCOME STATEMENT | TEMPORARY DIFFERENCE | PERMANENT DIFFERENCE | PER TAX RETURN |
|-------------|---------------------|---------------------|---------------------|----------------|
| WORK OPPORTUNITY CREDIT WAGES | | | $   -536,867. | $   -536,867. |
| TOTALS | $         0. | $         0. | $   -536,867. | $   -536,867. |

---

**STATEMENT 12**
**FORM 3800, LINE 6**
**GENERAL BUSINESS CREDIT CARRYOVER**

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| | SRLY CARRYOVER | SRLY CARRYOVER | | NON-SRLY CARRYOVER | NET | TOTAL CARRYOVER AVAILABLE |
| CARRY-OVER YEAR | BEFORE LIMITATION | AFTER LIMITATION | NON-SRLY CARRYOVER | PREVIOUSLY USED | NON-SRLY CARRYOVER AVAILABLE | IN 2009 C + F |
| MMR CONSTRUCTORS, INC. - 72-1046000 | | | | | | |
| 2008 | 0. | 0. | 598,484. | 0. | 598,484. | 598,484. |

TOTAL GENERAL BUSINESS CREDIT CARRYOVER.................................................. $    598,484.

CLIENT C2300

**MADDOX & ASSOCIATES APC**
**5627 BANKERS AVE BLDG 2**
**BATON ROUGE, LA 70808-2610**
**(225) 926-3360**

August 18, 2011

MMR GROUP, INC.
15961 AIRLINE HIGHWAY
BATON ROUGE, LA 70817-7412

FEDERAL ID: 72-1271030

Dear Client:

Your Federal Corporation Income Tax Return was acknowledged as accepted by the Internal
Revenue Service on August 18, 2011.  No tax is payable with the filing of this return.  There is
an overpayment of $873,801, of which $873,801 has been applied to your 2011 estimated tax.  If
you have questions about this return, please call the Odgen e-Help Desk at 1-866-255-0654.

Please be sure to call if you have any questions.

Sincerely,


WILLIAM B. BEALE

Form **8879-C**

Department of the Treasury
Internal Revenue Service

**IRS e-file Signature Authorization
for Form 1120**

For calendar year 2010, or tax year beginning _ _ _ _ _ _ , 2010, ending _ _ _ _ _ _ , _ _ _ _
► **See instructions. Do not send to the IRS. Keep for your records.**

OMB No. 1545-1864

**2010**

| Name of corporation | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

**Part I    Tax Return Information** (Whole dollars only)

| | | | |
|---|---|---|---|
| 1 | Total income (Form 1120, line 11) | 1 | 63,202,750. |
| 2 | Taxable income (Form 1120, line 30) | 2 | 10,214,567. |
| 3 | Total tax (Form 1120, line 31) | 3 | 2,370,754. |
| 4 | Amount owed (Form 1120, line 34) | 4 | |
| 5 | Overpayment (Form 1120, line 35) | 5 | 873,801. |

**Part II    Declaration and Signature Authorization of Officer (Be sure to get a copy of the corporation's return)**

Under penalties of perjury, I declare that I am an officer of the above corporation and that I have examined a copy of the corporation's 2010 electronic income tax return and accompanying schedules and statements and to the best of my knowledge and belief, it is true, correct, and complete. I further declare that the amounts in Part I above are the amounts shown on the copy of the corporation's electronic income tax return. I consent to allow my electronic return originator (ERO), transmitter, or intermediate service provider to send the corporation's return to the IRS and to receive from the IRS **(a)** an acknowledgement of receipt or reason for rejection of the transmission, **(b)** the reason for any delay in processing the return or refund, and **(c)** the date of any refund. If applicable, I authorize the U.S. Treasury and its designated Financial Agent to initiate an electronic funds withdrawal (direct debit) entry to the financial institution account indicated in the tax preparation software for payment of the corporation's federal taxes owed on this return, and the financial institution to debit the entry to this account. To revoke a payment, I must contact the U.S. Treasury Financial Agent at **1-888-353-4537** no later than 2 business days prior to the payment (settlement) date. I also authorize the financial institutions involved in the processing of the electronic payment of taxes to receive confidential information necessary to answer inquiries and resolve issues related to the payment. I have selected a personal identification number (PIN) as my signature for the corporation's electronic income tax return and, if applicable, the corporation's consent to electronic funds withdrawal.

**Officer's PIN: check one box only**

[X] I authorize    MADDOX & ASSOCIATES APC    to enter my PIN    32300    as my signature
    ERO firm name    do not enter all zeros

on the corporation's 2010 electronically filed income tax return.

[ ] As an officer of the corporation, I will enter my PIN as my signature on the corporation's 2010 electronically filed income tax return.

Officer's signature ►  _(signature)_    Date ► 8-18-11    Title ► PRESIDENT

**Part III    Certification and Authentication**

**ERO's EFIN/PIN.** Enter your six-digit EFIN followed by your five-digit self-selected PIN ......................................    72251770809
    do not enter all zeros

I certify that the above numeric entry is my PIN, which is my signature on the 2010 electronically filed income tax return for the corporation indicated above. I confirm that I am submitting this return in accordance with the requirements of **Pub 3112**, IRS e-file Application and Participation, and **Pub 4163**, Modernized e-File (MeF) Information for Authorized IRS e-file Providers for Business Returns.

ERO's signature ►  _William B. Beale_    Date ► 8-18-11

**ERO Must Retain This Form — See Instructions
Do Not Submit This Form to the IRS Unless Requested To Do So**

**BAA    For Paperwork Reduction Act Notice, see instructions**    Form **8879-C** (2010)

CPCA1201L  08/05/10

**MADDOX & ASSOCIATES APC**
**5627 BANKERS AVE BLDG 2**
**BATON ROUGE, LA 70808-2610**
**(225) 926-3360**

August 18, 2011

MMR GROUP, INC.
15961 AIRLINE HIGHWAY
BATON ROUGE, LA 70817-7412

Dear Client:

Your 2010 Federal Corporation Income Tax Return will be electronically filed with the Internal Revenue Service upon receipt of a signed Form 8879C - IRS e-file Signature Authorization.  No tax is payable with the filing of this return.  There is an overpayment of $873,801, of which $873,801 has been applied to your 2011 estimated tax.

All payments due must be electronically deposited through the Electronic Federal Tax Payment System (EFTPS).  For EFTPS deposits to be made on time, the transaction must be initiated at least one business day before the date the deposit is due.

Attached to your e-filed federal return is the Information Return of U.S. Persons With Respect To Certain Foreign Corporations, Form 5471.

Your estimated tax schedule for 2011 is listed below:

| Due Date | Federal |
|----------|---------|
| 4/15/11 | $ 0 |
| 6/15/11 | 311,577 |
| 9/15/11 | 592,689 |
| 12/15/11 | 592,689 |
| | ---------- |
| | $ 1,496,955 |

Please be sure to call if you have any questions.

Sincerely,


WILLIAM B. BEALE

| Form **1120** | | **U.S. Corporation Income Tax Return** | | | | OMB No. 1545-0123 |
|---|---|---|---|---|---|---|
| Department of the Treasury Internal Revenue Service | | For calendar year 2010 or tax year beginning _____ , 2010, ending _____ , _____  ► See separate instructions. | | | | **2010** |

**A** Check if:

| | | | |
|---|---|---|---|
| 1 a Consolidated return (attach Form 851). | [X] | **Print or type** | MMR GROUP, INC. 15961 AIRLINE HIGHWAY BATON ROUGE, LA 70817-7412 |
| b Life/nonlife consoli-dated return. . . . . | | | |
| 2 Personal holding co (attach Sch PH) . . | | | |
| 3 Personal service corp (see instr). . . . | | | |
| 4 Schedule M-3 attached . . . . | [X] | | |

**B** Employer identification number: 72-1271030

**C** Date incorporated: 3/13/1990

**D** Total assets (see instructions): $ 163,455,039.

**E** Check if: **(1)** [ ] Initial return  **(2)** [ ] Final return  **(3)** [ ] Name change  **(4)** [ ] Address change

| | | | |
|---|---|---|---|
| **I N C O M E** | 1a Gross receipts or sales | 250,285,326. **b** Less returns & allowances . | **c** Balance ► **1c** 250,285,326. |
| | 2 Cost of goods sold (Schedule A, line 8). . . . . . . . . . | | **2** 202,809,966. |
| | 3 Gross profit. Subtract line 2 from line 1c. . . . . . . . . | | **3** 47,475,360. |
| | 4 Dividends (Schedule C, line 19) . . . . . . . . . . . . . | | **4** 9,983,195. |
| | 5 Interest. . . . . . . . . . . . . . . . . . . . . . . . . | | **5** 176,579. |
| | 6 Gross rents . . . . . . . . . . . . . . . . . . . . . . . | | **6** |
| | 7 Gross royalties. . . . . . . . . . . . . . . . . . . . . . | | **7** |
| | 8 Capital gain net income (attach Schedule D (Form 1120)) . . . . . . . . . . | | **8** |
| | 9 Net gain or (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . . . . . . | | **9** |
| | 10 Other income (see instructions — attach schedule) . . . . . . . . SEE STATEMENT 1 | | **10** 5,567,616. |
| | 11 **Total income.** Add lines 3 through 10. . . . . . . . . . . . . . . . . . . ► | | **11** 63,202,750. |
| **D E D U C T I O N S** (**FOR LIMITATIONS SEE INSTRUCTIONS ON DEDUCTIONS**) | 12 Compensation of officers (Schedule E, line 4). . . . . . . . . . . . . . . | | **12** 16,245,095. |
| | 13 Salaries and wages (less employment credits) . . . . . . . . . . . . . . | | **13** 15,767,152. |
| | 14 Repairs and maintenance. . . . . . . . . . . . . . . . . . . . . . . . | | **14** 1,249,932. |
| | 15 Bad debts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **15** |
| | 16 Rents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **16** 1,143,916. |
| | 17 Taxes and licenses. . . . . . . . . . . . . . . . . . . . . . . . . . . | | **17** 833,431. |
| | 18 Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **18** 653,046. |
| | 19 Charitable contributions. . . . . . . . . . . . . . . . . . . . . . . . | | **19** |
| | 20 Depreciation from Form 4562 not claimed on Schedule A or elsewhere on return (attach Form 4562) . . | | **20** 3,666,058. |
| | 21 Depletion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **21** |
| | 22 Advertising . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **22** 67,511. |
| | 23 Pension, profit-sharing, etc., plans. . . . . . . . . . . . . . . . . . . | | **23** 300,000. |
| | 24 Employee benefit programs . . . . . . . . . . . . . . . . . . . . . . . | | **24** |
| | 25 Domestic production activities deduction (attach Form 8903) . . . . . . . . | | **25** 204,220. |
| | 26 Other deductions (attach schedule) . . . . . . . . . . SEE STATEMENT 2 | | **26** 12,857,822. |
| | 27 **Total deductions.** Add lines 12 through 26. . . . . . . . . . . . . . ► | | **27** 52,988,183. |
| | 28 Taxable income before net operating loss deduction and special deductions. Subtract line 27 from line 11. . | | **28** 10,214,567. |
| | 29 **Less: a** Net operating loss deduction (see instructions) . . . . . . . . . | **29a** | |
| | **b** Special deductions (Schedule C, line 20) . . . . . . . . . . . . | **29b** | **29c** |
| **T A X** | 30 **Taxable income.** Subtract line 29c from line 28 (see instructions) . . . . . . . . | | **30** 10,214,567. |
| | 31 **Total tax** (Schedule J, line 10) . . . . . . . . . . . . . . . . . . . | | **31** 2,370,754. |
| **REFUNDABLE CREDITS AND PAYMENTS** | 32a 2009 overpayment credited to 2010 . . **32a** 1,481,664. | | |
| | **b** 2010 estimated tax payments . . . . . . **32b** | | |
| | **c** 2010 refund applied for on Form 4466 . . . . . **32c** **d** Bal ► **32d** 1,481,664. | | |
| | **e** Tax deposited with Form 7004 . . . . . . . . . **32e** 1,762,891. | | |
| | **f** Credits: **(1)** Form 2439 | **(2)** Form 4136 | **32f** |
| | **g** Refundable credits from Form 3800, line 19c, and Form 8827, line 8c . . . . . **32g** | | **32h** 3,244,555. |
| | 33 Estimated tax penalty (see instructions). Check if Form 2220 is attached . . . . . . . . ► [X] | | **33** |
| | 34 **Amount owed.** If line 32h smaller than the total of lines 31 and 33, enter amount owed. . . . . . . . . | | **34** |
| | 35 **Overpayment.** If line 32h is larger than the total of lines 31 and 33, enter amount overpaid . . . . . . . | | **35** 873,801. |
| | 36 Enter amount from line 35 you want: Credited to 2011 estimated tax . . . ► 873,801.  **Refunded** ► | | **36** 0. |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer | Date | ► PRESIDENT

May the IRS discuss this return with the preparer shown below (see instructions)?  [X] Yes  [ ] No

**Paid Preparer Use Only**

| | | | |
|---|---|---|---|
| Print/Type preparer's name WILLIAM B. BEALE | Preparer's signature | Date | Check [ ] if self-employed  PTIN P00437323 |
| Firm's name ► MADDOX & ASSOCIATES APC | | | Firm's EIN ► 72-1314069 |
| Firm's address ► 5627 BANKERS AVE BLDG 2 BATON ROUGE, LA 70808-2610 | | | Phone no. (225) 926-3360 |

**BAA For Paperwork Reduction Act Notice, see separate instructions.**    CPCA0205L  03/02/11    Form **1120** (2010)

Form **1120** (2010)    MMR GROUP, INC.    72-1271030    Page **2**

## Schedule A   Cost of Goods Sold (see instructions)

| | | |
|---|---|---:|
| 1 | Inventory at beginning of year | 505,138. |
| 2 | Purchases | 45,733,191. |
| 3 | Cost of labor | 115,089,367. |
| 4 | Additional section 263A costs (attach schedule) | |
| 5 | Other costs (attach schedule) . . . . . . . . . . . . . . . . . . . SEE STATEMENT 3 | 42,029,162. |
| 6 | **Total.** Add lines 1 through 5 | 203,356,858. |
| 7 | Inventory at end of year | 546,892. |
| 8 | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on page 1, line 2 | 202,809,966. |

**9a** Check all methods used for valuing closing inventory:

    (i)  [X] Cost

    (ii) [ ] Lower of cost or market

    (iii) [ ] Other (Specify method used and attach explanation.) . . . . . . . ▶ _____

   **b** Check if there was a writedown of subnormal goods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ [ ]

   **c** Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) . . . . . . . . . . . . . . ▶ [ ]

   **d** If the LIFO inventory method was used for this tax year, enter percentage (or amounts) of closing inventory computed under LIFO . . . . . . . . . . . . . . . . . . . . . . . . . . . **9d** | |

   **e** If property is produced or acquired for resale, do the rules of section 263A apply to the corporation? . . . . . . . . . . . . . . . . [ ] Yes [X] No

   **f** Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If 'Yes,' attach explanation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ] Yes [X] No

## Schedule C   Dividends and Special Deductions (see instructions)

| | | (a) Dividends received | (b) Percentage | (c) Special deductions (a) x (b) |
|---|---|---:|:---:|---|
| 1 | Dividends from less-than-20%-owned domestic corporations (other than debt-financed stock) | | 70 | |
| 2 | Dividends from 20%-or-more-owned domestic corporations (other than debt-financed stock) | | 80 | |
| 3 | Dividends on debt-financed stock of domestic and foreign corporations | | see instructions | |
| 4 | Dividends on certain preferred stock of less-than-20%-owned public utilities | | 42 | |
| 5 | Dividends on certain preferred stock of 20%-or-more-owned public utilities | | 48 | |
| 6 | Dividends from less-than-20%-owned foreign corporations and certain FSCs | | 70 | |
| 7 | Dividends from 20%-or-more-owned foreign corporations and certain FSCs | | 80 | |
| 8 | Dividends from wholly owned foreign subsidiaries | | 100 | |
| 9 | **Total.** Add lines 1 through 8. See instructions for limitation | | | |
| 10 | Dividends from domestic corporations received by a small business investment company operating under the Small Business Investment Act of 1958 | | 100 | |
| 11 | Dividends from affiliated group members | | 100 | |
| 12 | Dividends from certain FSCs | | 100 | |
| 13 | Dividends from foreign corporations not included on lines 3, 6, 7, 8, 11, or 12 | 9,983,195. | | |
| 14 | Income from controlled foreign corporations under subpart F (attach Form(s) 5471) | | | |
| 15 | Foreign dividend gross-up | | | |
| 16 | IC-DISC and former DISC dividends not included on lines 1, 2, or 3 | | | |
| 17 | Other dividends | | | |
| 18 | Deduction for dividends paid on certain preferred stock of public utilities | | | |
| 19 | **Total dividends.** Add lines 1 through 17. Enter here and on page 1, line 4 . . . . . . ▶ | 9,983,195. | | |
| 20 | **Total special deductions.** Add lines 9, 10, 11, 12, and 18. Enter here and on page 1, line 29b . . . . . . . . . . . . . . ▶ | | | |

## Schedule E   Compensation of Officers (see instructions for page 1, line 12)

**Note:** Complete Schedule E only if total receipts (line 1a plus lines 4 through 10 on page 1) are $500,000 or more.

| 1 (a) Name of officer | (b) Social security number | (c) Percent of time devoted to business | Percent of corporation stock owned (d) Common | (e) Preferred | (f) Amount of compensation |
|---|---|---|---|---|---:|
| SEE STATEMENT 4 | | % | % | % | 16,245,095. |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |
| | | % | % | % | |

| | | |
|---|---|---:|
| 2 | Total compensation of officers | 16,245,095. |
| 3 | Compensation of officers claimed on Schedule A and elsewhere on return | |
| 4 | Subtract line 3 from line 2. Enter the result here and on page 1, line 12 | 16,245,095. |

Form **1120** (2010)

Form **1120** (2010)     MMR GROUP, INC.     72-1271030                                            Page **3**

| **Schedule J** | **Tax Computation** (see instructions) | | | | |
|---|---|---|---|---|---|
| 1 | Check if the corporation is a member of a controlled group (attach Schedule O (Form 1120)). . . . . . . ▶ ☐ | | | | |
| 2 | Income tax. Check if a qualified personal service corporation | | | | |
| | (see instructions). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐ | | | **2** | 3,475,098. |
| 3 | Alternative minimum tax (attach Form 4626). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **3** | |
| 4 | Add lines 2 and 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **4** | 3,475,098. |
| 5a | Foreign tax credit (attach Form 1118). . . . . . . . . . . . . . . . . . . . . . . . . . . | **5a** | 1,104,344. | | |
| b | Credit from Form 8834, line 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **5b** | | | |
| c | General business credit (attach Form 3800). . . . . . . . . . . . . . . . . . . . . . | **5c** | | | |
| d | Credit for prior year minimum tax (attach Form 8827). . . . . . . . . . . . . . | **5d** | | | |
| e | Bond credits from Form 8912. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **5e** | | | |
| 6 | **Total credits.** Add lines 5a through 5e. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **6** | 1,104,344. |
| 7 | Subtract line 6 from line 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **7** | 2,370,754. |
| 8 | Personal holding company tax (attach Schedule PH (Form 1120)). . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **8** | |
| 9 | Other taxes.          ☐ Form 4255    ☐ Form 8611    ☐ Form 8697 | | | | |
| | Check if from:    ☐ Form 8866    ☐ Form 8902    ☐ Other (att schedule). . . . . . . . | | | **9** | |
| 10 | **Total tax.** Add lines 7 through 9. Enter here and on page 1, line 31. . . . . . . . . . . . . . . . . . . . . . . . . | | | **10** | 2,370,754. |

| **Schedule K** | **Other Information** (see instructions) | | | Yes | No |
|---|---|---|---|---|---|
| 1 | Check accounting method    **a** ☐ Cash    **b** ☒ Accrual    **c** ☐ Other (specify) ▶ _ _ _ _ _ _ _ _ _ _ | | | | |
| 2 | See the instructions and enter the: | | | | |
| a | Business activity code no. ▶ 238210 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | |
| b | Business activity ▶ CONSTRUCTION _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | |
| c | Product or service ▶ ELECTRICAL _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | |
| 3 | Is the corporation a subsidiary in an affiliated group or a parent-subsidiary controlled group?. . . . . . . . . . . . . . . . . . . . | | | | X |
| | If 'Yes,' enter name and EIN of the parent corporation ▶ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | |
| | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | |
| 4 | At the end of the tax year: | | | | |
| a | Did any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote? If 'Yes,' complete Part I of Schedule G (Form 1120) (attach Schedule G). . . . . . . . | | | | X |
| b | Did any individual or estate own, directly 20% or more, or own directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote? If 'Yes,' complete Part II of Schedule G (Form 1120) (attach Schedule G). . . . . . . | | | X | |
| 5 | At the end of the tax year, did the corporation: | | | | |
| a | Own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of stock entitled to vote of any foreign or domestic corporation not included on **Form 851,** Affiliations Schedule? For rules of constructive ownership, see instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | X |
| | If 'Yes,' complete (i) through (iv) | | | | |

| **(i)** Name of Corporation | **(ii)** Employer Identification Number (if any) | **(iii)** Country of Incorporation | **(iv)** Percentage Owned in Voting Stock |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

CPCA0234L  01/19/11

Form **1120** (2010)    MMR GROUP, INC.    72-1271030    Page **4**

| Schedule K | *Continued* |
|---|---|

**b** Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership see instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . X

If 'Yes,' complete (i) through (iv)

| **(i)** Name of Entity | **(ii)** Employer Identification Number (if any) | **(iii)** Country of Incorporation | **(iv)** Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**6** During this tax year, did the corporation pay dividends (other than stock dividends and distributions in exchange for stock) in excess of the corporation's current and accumulated earnings and profits? (See sections 301 and 316.) . . . . . . . . . . . . . . . . . . . . . X

If 'Yes,' file **Form 5452**, Corporate Report of Nondividend Distributions.

If this is a consolidated return, answer here for the parent corporation and on Form 851 for each subsidiary

**7** At any time during the tax year, did one foreign person own, directly or indirectly, at least 25% of **(a)** the total voting power of all classes of the corporation's stock entitled to vote or **(b)** the total value of all classes of the corporation's stock? . . . . . . . . . . . X

For rules of attribution see section 318. If 'Yes,' enter:

**(i)** Percentage owned ► _ _ _ _ _ _    and **(ii)** Owner's country ► _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**(c)** The corporation may have to file **Form 5472,** Information Return of a 25% Foreign-Owned U.S. Corporation or a Foreign Corporation Engaged in a U.S. Trade or Business. Enter the number of Forms 5472 attached ► _ _ _ _ _ _ _ _ _ _ _ _ _

**8** Check this box if the corporation issued publicly offered debt instruments with original issue discount . . . . . . . . . . . . . . . ► ☐

If checked, the corporation may have to file **Form 8281**, Information Return for Publicly Offered Original Issue Discount Instruments.

**9** Enter the amount of tax-exempt interest received or accrued during the tax year ►    $ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ NONE

**10** Enter the number of shareholders at the end of the tax year (if 100 or fewer) ►    21 _ _ _ _ _ _ _ _ _ _ _ _ _ _

**11** If the corporation has an NOL for the tax year and is electing to forego the carryback period, check here . . . . . . . . . . . . ► ☐

If the corporation is filing a consolidated return, the statement required by Regulations section 1.1502-21(b)(3) must be attached or the election will not be valid.

**12** Enter the available NOL carryover from prior tax years (do not reduce it by any deduction on line 29a.) ►  $ _ _ _ _ _ _ _ _ _ _ _ _ _ _ NONE

**13** Are the corporation's total receipts (line 1a plus lines 4 through 10 on page 1) for the tax year **and** its total assets at the end of the tax year less than $250,000? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . X

If 'Yes,' the corporation is not required to complete Schedules L, M-1, and M-2 on page 5. Instead, enter the total amount of cash distributions and the book value property distributions (other than cash) made during the tax year.  ►$ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**14** Is the corporation required to file Schedule UTP (Form 1120), Uncertain Tax Position Statement (see instructions)? . . . . . . . . . . X
If 'Yes,' complete and attach Schedule UTP.

Form **1120** (2010)

Form **1120** (2010)    MMR GROUP, INC.    72-1271030    Page **5**

| Schedule L | Balance Sheets per Books | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|---|
| | **Assets** | **(a)** | **(b)** | **(c)** | **(d)** |
| 1 | Cash.................................... | | 25,699,643. | | 14,855,313. |
| 2a | Trade notes and accounts receivable........ | 56,126,132. | | 42,749,015. | |
| b | Less allowance for bad debts............... | | 56,126,132. | | 42,749,015. |
| 3 | Inventories................................ | | 505,138. | | 546,892. |
| 4 | U.S. government obligations................ | | | | |
| 5 | Tax-exempt securities (see instructions)..... | | | | |
| 6 | Other current assets (attach schedule)...STMT..5.... | | 57,310,074. | | 62,356,586. |
| 7 | Loans to shareholders..................... | | | | |
| 8 | Mortgage and real estate loans............ | | | | |
| 9 | Other investments (attach schedule)........ | | | | |
| 10a | Buildings and other depreciable assets...... | 32,211,525. | | 32,505,877. | |
| b | Less accumulated depreciation............. | 11,204,309. | 21,007,216. | 12,061,327. | 20,444,550. |
| 11a | Depletable assets......................... | | | | |
| b | Less accumulated depletion............... | | | | |
| 12 | Land (net of any amortization)............. | | | | |
| 13a | Intangible assets (amortizable only)........ | | | | |
| b | Less accumulated amortization............ | | | | |
| 14 | Other assets (attach schedule)......STMT..6.... | | 13,000,916. | | 22,502,683. |
| 15 | Total assets.............................. | | 173,649,119. | | 163,455,039. |
| | **Liabilities and Shareholders' Equity** | | | | |
| 16 | Accounts payable......................... | | 11,226,243. | | 11,603,058. |
| 17 | Mortgages, notes, bonds payable in less than 1 year.... | | 4,535,436. | | 6,311,240. |
| 18 | Other current liabilities (attach sch)....STMT..7.... | | 76,895,269. | | 62,275,146. |
| 19 | Loans from shareholders................... | | | | |
| 20 | Mortgages, notes, bonds payable in 1 year or more..... | | 14,187,711. | | 9,955,826. |
| 21 | Other liabilities (attach schedule)........... | | | | |
| 22 | Capital stock: a Preferred stock............ | | | | |
| | b Common stock.......... | 875. | 875. | 875. | 875. |
| 23 | Additional paid-in capital.................. | | | | |
| 24 | Retained earnings — Approp (att sch)........ | | | | |
| 25 | Retained earnings — Unappropriated........ | | 66,803,585. | | 73,308,894. |
| 26 | Adjmnt to shareholders' equity (att sch)............ | | | | |
| 27 | Less cost of treasury stock................ | | | | |
| 28 | Total liabilities and shareholders' equity..... | | 173,649,119. | | 163,455,039. |

| Schedule M-1 | Reconciliation of Income (Loss) per Books With Income per Return |
|---|---|

**Note:** Schedule M-3 required instead of Schedule M-1 if total assets are $10 million or more — see instructions

| | | | | | |
|---|---|---|---|---|---|
| 1 | Net income (loss) per books............... | | 7 | Income recorded on books this year not included on this return (itemize): | |
| 2 | Federal income tax per books.............. | | | Tax-exempt interest $ _ _ _ _ _ _ _ _ _ _ | |
| 3 | Excess of capital losses over capital gains .. | | | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | |
| 4 | Income subject to tax not recorded on books this year (itemize): | | | | |
| | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | 8 | Deductions on this return not charged against book income this year (itemize): | |
| 5 | Expenses recorded on books this year not deducted on this return (itemize): | | | a Depreciation.. $ _ _ _ _ _ _ _ _ _ _ | |
| | a Depreciation........ $ _ _ _ _ _ _ _ _ _ | | | b Charitable contribns $ _ _ _ _ _ _ _ _ _ | |
| | b Charitable contributions.. $ _ _ _ _ _ _ _ _ _ | | | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | |
| | c Travel & entertainment . $ _ _ _ _ _ _ _ _ _ | | | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | |
| | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | 9 | Add lines 7 and 8...................... | |
| 6 | Add lines 1 through 5.................... | | 10 | Income (page 1, line 28) — line 6 less line 9 .... | |

| Schedule M-2 | Analysis of Unappropriated Retained Earnings per Books (Line 25, Schedule L) |
|---|---|

| | | | | | |
|---|---|---|---|---|---|
| 1 | Balance at beginning of year............... | 66,803,585. | 5 | Distributions.............. a Cash.... | |
| 2 | Net income (loss) per books............... | 6,505,309. | | b Stock        c Property .. | |
| 3 | Other increases (itemize): _ _ _ _ _ _ _ _ _ _ | | 6 | Other decreases (itemize): | |
| | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | 7 | Add lines 5 and 6...................... | |
| 4 | Add lines 1, 2, and 3.................... | 73,308,894. | 8 | Balance at end of year (line 4 less line 7)...... | 73,308,894. |

**SCHEDULE N**
**(Form 1120)**

Department of the Treasury
Internal Revenue Service

# Foreign Operations of U.S. Corporations

► Attach to Form 1120, 1120-C, 1120-IC-DISC, 1120-L,
1120-PC, 1120-REIT, 1120-RIC, or 1120S.

OMB No. 1545-0123

**2010**

| Name | Employer identification number (EIN) |
|------|--------------------------------------|
| MMR GROUP, INC. | 72-1271030 |

## Foreign Operations Information

| | | Yes | No |
|---|---|---|---|
| **1a** | During the tax year, did the corporation own (directly or indirectly) any foreign entity that was disregarded as an entity separate from its owner under Regulations sections 301.7701-2 and 301.7701-3 (see instructions)? | | X |
| | If 'Yes,' you are generally required to attach **Form 8858,** Information Return of U.S. Persons With Respect to Foreign Disregarded Entities, for each foreign disregarded entity (see instructions). | | |
| **b** | Enter the number of Forms 8858 attached to the tax return. ► _ _ _ _ _ _ _ _ _ _ | | |
| **2** | Enter the number of **Forms 8865,** Return of U.S. Persons With Respect to Certain Foreign Partnerships, attached to the corporation's income tax return. ► _ _ _ _ _ _ _ _ _ _ | | |
| **3** | Excluding any partnership for which a Form 8865 is attached to the tax return, did the corporation own at least a 10% interest, directly or indirectly, in any other foreign partnership (including an entity treated as a foreign partnership under Regulations section 301.7701-2 or 301.7701-3)? | | X |
| | If 'Yes,' see instructions for required attachment. | | |
| **4a** | Was the corporation a U.S. shareholder of any controlled foreign corporation (CFC)? (See sections 951 and 957.) | | X |
| | If 'Yes,' attach **Form 5471,** Information Return of U.S. Persons With Respect to Certain Foreign Corporations, for each CFC. | | |
| **b** | Enter the number of Forms 5471 attached to the tax return. ► 1 _ _ _ _ _ _ _ _ _ | | |
| **5** | During the tax year, did the corporation receive a distribution from, or was it the grantor of, or transferor to, a foreign trust? | | X |
| | If 'Yes,' the corporation may have to file **Form 3520,** Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts. | | |
| **6a** | At any time during the 2010 calendar year, did the corporation have an interest in or a signature or other authority over a financial account (such as a bank account, securities account, or other financial account) in a foreign country? | | X |
| | See the instructions for exceptions and filing requirements for **Form TD F 90-22.1,** Report of Foreign Bank and Financial Accounts. | | |
| **b** | If 'Yes,' enter the name of the foreign country ► _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| **7a** | Is the corporation claiming the extraterritorial income exclusion? | | X |
| | If 'Yes,' attach a separate **Form 8873,** Extraterritorial Income Exclusion, for **each** transaction or group of transactions. | | |
| **b** | Enter the number of Forms 8873 attached to the tax return. ► _ _ _ _ _ _ _ _ _ _ | | |
| **c** | Enter the total of the amounts from line 52 (extraterritorial income exclusion (net of disallowed deductions)) of **all** Forms 8873 attached to the tax return. ► $ | | |

**BAA   For Paperwork Reduction Act Notice, see the Instructions for Form 1120.**          Schedule **N** (Form 1120) 2010

Form **4626**

Department of the Treasury
Internal Revenue Service

## Alternative Minimum Tax — Corporations

▶ See separate instructions.
▶ Attach to the corporation's tax return.

OMB No. 1545-0175

**2010**

| Name | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

**Note:** *See the instructions to find out if the corporation is a small corporation exempt from the alternative minimum tax (AMT) under section 55(e).*

| | | | |
|---|---|---|---:|
| 1 | Taxable income or (loss) before net operating loss deduction | 1 | 10,214,567. |
| 2 | **Adjustments and preferences:** | | |
| a | Depreciation of post-1986 property | 2a | |
| b | Amortization of certified pollution control facilities | 2b | |
| c | Amortization of mining exploration and development costs | 2c | |
| d | Amortization of circulation expenditures (personal holding companies only) | 2d | |
| e | Adjusted gain or loss | 2e | |
| f | Long-term contracts | 2f | |
| g | Merchant marine capital construction funds | 2g | |
| h | Section 833(b) deduction (Blue Cross, Blue Shield, and similar type organizations only) | 2h | |
| i | Tax shelter farm activities (personal service corporations only) | 2i | |
| j | Passive activities (closely held corporations and personal service corporations only) | 2j | |
| k | Loss limitations | 2k | |
| l | Depletion | 2l | |
| m | Tax-exempt interest income from specified private activity bonds | 2m | |
| n | Intangible drilling costs | 2n | |
| o | Other adjustments and preferences | 2o | |
| 3 | Pre-adjustment alternative minimum taxable income (AMTI). Combine lines 1 through 2o | 3 | 10,214,567. |
| 4 | **Adjusted current earnings (ACE) adjustment:** | | |

| | | | | | |
|---|---|---|---:|---|---:|
| a | ACE from line 10 of the ACE worksheet in the instructions | 4a | 10,214,567. | | |
| b | Subtract line 3 from line 4a. If line 3 exceeds line 4a, enter the difference as a negative amount (see instructions) | 4b | | | |
| c | Multiply line 4b by 75% (.75). Enter the result as a positive amount | 4c | | | |
| d | Enter the excess, if any, of the corporation's total increases in AMTI from prior year ACE adjustments over its total reductions in AMTI from prior year ACE adjustments (see instructions). **Note:** *You* **must** *enter an amount on line 4d (even if line 4b is positive)* | 4d | 2,949,652. | | |
| e | ACE adjustment. | | | | |
| | • If line 4b is zero or more, enter the amount from line 4c | | | 4e | 0. |
| | • If line 4b is less than zero, enter the **smaller** of line 4c or line 4d as a negative amount | | | | |
| 5 | Combine lines 3 and 4e. If zero or less, stop here; the corporation does not owe any AMT | | | 5 | 10,214,567. |
| 6 | Alternative tax net operating loss deduction (see instructions) ....... SEE STATEMENT 8 | | | 6 | 1,830,194. |
| 7 | **Alternative minimum taxable income.** Subtract line 6 from line 5. If the corporation held a residual interest in a REMIC, see instructions | | | 7 | 8,384,373. |
| 8 | **Exemption phase-out** (if line 7 is $310,000 or more, skip lines 8a and 8b and enter -0- on line 8c): | | | | |

| | | | | | |
|---|---|---|---:|---|---:|
| a | Subtract $150,000 from line 7 (if completing this line for a member of a controlled group, see instructions). If zero or less, enter -0- | 8a | | | |
| b | Multiply line 8a by 25% (.25) | 8b | | | |

| | | | |
|---|---|---|---:|
| c | Exemption. Subtract line 8b from $40,000 (if completing this line for a member of a controlled group, see instructions). If zero or less, enter -0- | 8c | 0. |
| 9 | Subtract line 8c from line 7. If zero or less, enter -0- | 9 | 8,384,373. |
| 10 | Multiply line 9 by 20% (.20) | 10 | 1,676,875. |
| 11 | Alternative minimum tax foreign tax credit (AMTFTC) (see instructions) | 11 | 764,937. |
| 12 | Tentative minimum tax. Subtract line 11 from line 10 | 12 | 911,938. |
| 13 | Regular tax liability before applying all credits except the foreign tax credit | 13 | 2,370,754. |
| 14 | **Alternative minimum tax.** Subtract line 13 from line 12. If zero or less, enter -0-. Enter here and on Form 1120, Schedule J, line 3, or the appropriate line of the corporation's income tax return | 14 | 0. |

**BAA For Paperwork Reduction Act Notice, see the instructions.**

Form **4626** (2010)

CPCA1401L 02/14/11

Form **851**

(Rev December 2010)

Department of the Treasury
Internal Revenue Service

# Affiliations Schedule

► **File with each consolidated income tax return.**

**For tax year ending** 12/31 , 2010

OMB No. 1545-0025

| Name of common parent corporation | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Number, street, and room or suite number. If a P.O. box, see instructions.

15961 AIRLINE HIGHWAY

City or town      State      ZIP Code

BATON ROUGE, LA 70817-7412

## Part I  Overpayment Credits, Estimated Tax Payments, and Tax Deposits (see instructions)

| Corp No. | Name and address of corporation | Employer identification number | Portion of overpayment credits and estimated tax payments | Portion of tax deposited with Form 7004 |
|---|---|---|---|---|
| 1 | Common parent corporation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 1,481,664. | 1,762,891. |
| 2 | Subsidiary corporations:<br>MMR CONSTRUCTORS, INC.<br>15961 AIRLINE HIGHWAY, BATON ROUGE, LA 70817-7412 | 72-1046000 | | |
| 3 | MMR TECHNICAL SERVICES, INC.<br>15961 AIRLINE HIGHWAY, BATON ROUGE, LA 70817-7412 | 72-1209195 | | |
| 4 | MMR POWER SOLUTIONS LLC<br>15961 AIRLINE HIGHWAY, BATON ROUGE, LA 70817-7412 | 05-0584790 | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| | **Totals** (Must equal amounts shown on the consolidated tax return). . . . . . . . . . . . . . . . . . . ► | | 1,481,664. | 1,762,891. |

## Part II  Principal Business Activity, Voting Stock Information, Etc (see instructions)

| Corp No. | Principal business activity (PBA) | PBA Code Number | Did the subsidiary make any nondividend distributions? | | Stock holdings at beginning of year | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Yes | No | Number of shares | Percent of voting power | Percent of value | Owned by corporation number |
| 1 | Common parent corporation:<br>CONSTRUCTION | 238210 | | | | | | |
| 2 | Subsidiary corporations:<br>CONSTRUCTION | 238210 | | X | | % | % | 1 |
| 3 | CONSTRUCTION | 238210 | | X | | % | % | 1 |
| 4 | CONSTRUCTION | 221100 | | X | | % | % | 1 |
| 5 | | | | | | % | % | |
| 6 | | | | | | % | % | |
| 7 | | | | | | % | % | |
| 8 | | | | | | % | % | |
| 9 | | | | | | % | % | |
| 10 | | | | | | % | % | |

**BAA  For Paperwork Reduction Act Notice, see instructions.**

Form **851** (Rev 12-2010)

CPCA2312L  02/07/11

Form **851** (Rev 12-2010) MMR GROUP, INC.    72-1271030                                    Page **2**

| Part III | Changes in Stock Holdings During the Tax Year |
|---|---|

| Corp No. | Name of corporation | Share-holder of Corpora-tion No. | Date of transaction | (a) Changes | | (b) Shares held after changes described in column (a) | |
|---|---|---|---|---|---|---|---|
| | | | | Number of shares acquired | Number of shares disposed of | Percent of voting power | Percent of value |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |

**(c)**  If any transaction listed above caused a transfer of a share of subsidiary stock (defined to include dispositions and deconsolidations), did the share's basis exceed its value at the time of the transfer? See instructions............. ☐ **Yes** ☒ **No**

**(d)**  Did any share of subsidiary stock become worthless within the meaning of section 165 (taking into account the provisions of Regulations section 1.1502-80(c)) during the taxable year? See instrs.................................. ☐ **Yes** ☒ **No**

**(e)**  If the equitable owners of any capital stock shown above were other than the holders of record, provide details of the changes.

_____

_____

_____

_____

_____

_____

**(f)**  If additional stock was issued, or if any stock was retired during the year, list the dates and amounts of these transactions.

_____

_____

_____

_____

_____

_____

Form **851** (Rev 12-2010)

Form **851** (Rev 12-2010)     MMR GROUP, INC.     72-1271030                                            Page **3**

| Part IV | Additional Stock Information (see instructions) |
|---|---|

**1**  During the tax year, did the corporation have more than one class of stock outstanding? ............................... ☐ Yes ☒ No

If 'Yes', enter the name of the corporation and list and describe each class of stock.

| Corp No. | Name of corporation | Class of stock |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**2**  During the tax year, was there any member of the consolidated group that reaffiliated within 60 months of disaffiliation? ☐ Yes ☒ No

If 'Yes', enter the name of the corporation(s) and explain the circumstances.

| Corp No. | Name of corporation | Explanation |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**3**  During the tax year, was there any arrangement in existence by which one or more persons that were not members of the affiliated group could acquire any stock, or acquire any voting power without acquiring stock, in the corporation, other than a de minimis amount, from the corporation or another member of the affiliated group?..................... ☐ Yes ☒ No

If 'Yes', enter the name of the corporation and see the instructions for the percentages to enter in columns (a), (b), and (c).

| Corp No. | Name of corporation | (a) Percent of value | (b) Percent of outstanding voting stock | (c) Percent of voting power |
|---|---|---|---|---|
| | | % | % | % |
| | | % | % | % |
| | | % | % | % |
| | | % | % | % |

| Corp No. | (d) Provide a description of any arrangement. |
|---|---|
| | |
| | |
| | |
| | |

**BAA**                                                                 Form **851** (Rev 12-2010)

**SCHEDULE B**
**(Form 1120)**

(December 2009)
Department of the Treasury
Internal Revenue Service

# Additional Information for Schedule M-3 Filers

► **Attach to Form 1120.**
► **See instructions.**

OMB No. 1545-0123

| Name | Employer identification number (EIN) |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

|  |  | Yes | No |
|---|---|---|---|
| 1 | Do the amounts reported on Schedule M-3 (Form 1120), Part II, lines 9 or 10, column (d), reflect allocations to this corporation from a partnership of income, gain, loss, deduction, or credit that are disproportionate to this corporation's capital contribution to the partnership or its ratio for sharing other items of the partnership? |  | X |
| 2 | At any time during the tax year, did the corporation sell, exchange, or transfer any interest in an intangible asset to a related person as defined in section 267(b)? |  | X |
| 3 | At any time during the tax year, did the corporation acquire any interest in an intangible asset from a related person as defined in section 267(b)? |  | X |
| 4a | During the tax year, did the corporation enter into a cost-sharing arrangement with any related foreign party on whose behalf the corporation did not file Form 5471, Information Return of U.S. Persons With Respect To Certain Foreign Corporations? |  | X |
| b | At any time during the tax year, was the corporation a participant in a cost-sharing arrangement with any related foreign party on whose behalf the corporation did not file Form 5471? |  | X |
| 5 | At any time during the tax year, did the corporation make any change in accounting principle for financial accounting purposes? See instructions for the definition of change in accounting principle. |  | X |
| 6 | At any time during the tax year, did the corporation make any change in a method of accounting for U.S. income tax purposes? |  | X |
| 7 | At any time during the tax year, did the corporation own any voluntary employees' beneficiary association (VEBA) trusts that were used to hold funds designated for employee benefits? |  | X |
| 8 | At any time during the tax year, did the corporation use an allocation method for indirect costs capitalized to self-constructed assets that varied from its financial method of accounting? |  | X |
| 9 | At any time during the tax year, did the corporation treat for tax purposes indirect costs, as defined in Regulations sections 1.263A-1(e)(3)(ii)(F), (G), and (H), as mixed-service costs, as defined in Regulations section 1,263(A)-1(e)(4)(ii)(C)? |  | X |
| 10 | Did the corporation, under section 118 or 362(c) and the related regulations, take a return filing position characterizing any amount as a contribution to the capital of the corporation during the tax year by any non-shareholders? Amounts so characterized may include, without limitation, incentives, inducements, money, and property |  | X |

**BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 1120.**

Schedule **B** (Form 1120) (12-2009)

**SCHEDULE G**
**(Form 1120)**

Department of the Treasury
Internal Revenue Service

# Information on Certain Persons Owning the Corporation's Voting Stock

► **Attach to Form 1120.**

► **See instructions.**

OMB No. 1545-0123

## 2010

| Name | Employer identification number (EIN) |
|------|--------------------------------------|
| MMR GROUP, INC. | 72-1271030 |

**Part I**  **Certain Entities Owning the Corporation's Voting Stock.** (Form 1120, Schedule K, Question 4a).
Complete columns (i) through (v) below for any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization that owns directly 20% or more, or owns, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote (see instructions).

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Percentage Owned in Voting Stock |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Part II**  **Certain Individuals and Estates Owning the Corporation's Voting Stock.** (Form 1120, Schedule K, Question 4b).
Complete columns (i) through (iv) below for any individual or estate that owns directly 20% or more, or owns, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote (see instructions).

| (i) Name of Individual or Estate | (ii) Identifying Number (if any) | (iii) Country of Citizenship (see instructions) | (iv) Percentage Owned in Voting Stock |
|---|---|---|---|
| | | UNITED STATES | 29.13% |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 1120.**

CPCA1901L  01/25/11

Schedule **G** (Form 1120) 2010

**SCHEDULE M-3**
**(Form 1120)**

Department of the Treasury
Internal Revenue Service

# Net Income (Loss) Reconciliation for Corporations With Total Assets of $10 Million or More

► Attach to Form 1120 or 1120-C.
► See separate instructions.

OMB No. 1545-0123

# 2010

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): (1) ☐ Non-consolidated return    (2) ☒ Consolidated return (Form 1120 only)
(3) ☐ Mixed 1120/L/PC group    (4) ☐ Dormant subsidiaries schedule attached

## Part I  Financial Information and Net Income (Loss) Reconciliation (see instructions)

**1a** Did the corporation file SEC Form 10-K for its income statement period ending with or within this tax year?

☐ **Yes.** Skip lines 1b and 1c and complete lines 2a through 11 with respect to that SEC Form 10-K.

☒ **No.** Go to line 1b. See instructions if multiple non-tax-basis income statements are prepared.

**b** Did the corporation prepare a certified audited non-tax-basis income statement for that period?

☒ **Yes.** Skip line 1c and complete lines 2a through 11 with respect to that income statement.

☐ **No.** Go to line 1c.

**c** Did the corporation prepare a non-tax-basis income statement for that period?

☐ **Yes.** Complete lines 2a through 11 with respect to that income statement.

☐ **No.** Skip lines 2a through 3c and enter the corporation's net income (loss) per its books and records on line 4a.

**2a** Enter the income statement period: Beginning  1/01/10   Ending  12/31/10

**b** Has the corporation's income statement been restated for the income statement period on line 2a?

☐ **Yes.** (If 'Yes', attach an explanation and the amount of each item restated.)

☒ **No.**

**c** Has the corporation's income statement been restated for any of the five income statement periods preceding the period on line 2a?

☐ **Yes.** (If 'Yes', attach an explanation and the amount of each item restated.)

☒ **No.**

**3a** Is any of the corporation's voting common stock publicly traded?

☐ **Yes.**

☒ **No.** If 'No', go to line 4a.

**b** Enter the symbol of the corporation's primary U.S. publicly traded voting common stock . . . . . . . . . . .

**c** Enter the nine-digit CUSIP number of the corporation's primary publicly traded voting common stock. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| **4a** Worldwide consolidated net income (loss) from income statement source identified in Part I, line 1. . . . . . . . . . | **4a** | 6,505,309. |
| **b** Indicate accounting standard used for line 4a (see instructions): | | |
| (1) ☒ GAAP  (2) ☐ IFRS  (3) ☐ Statutory  (4) ☐ Tax-basis  (5) ☐ Other (specify) | | |
| **5a** Net income from nonincludible foreign entities (attach schedule). . . . . . . . . . . . . . . . . . . | **5a** | |
| **b** Net loss from nonincludible foreign entities (attach schedule and enter as a positive amount). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **5b** | |
| **6a** Net income from nonincludible U.S. entities (attach schedule). . . . . . . . . . . . . . . . . . . . | **6a** | |
| **b** Net loss from nonincludible U.S. entities (attach schedule and enter as a positive amount). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **6b** | |
| **7a** Net income (loss) of other includible foreign disregarded entities (attach schedule). . . . . . . . . | **7a** | |
| **b** Net income (loss) of other includible U.S. disregarded entities (attach schedule). . . . . . . . . . | **7b** | |
| **c** Net income (loss) of other includible entities (attach schedule). . . . . . . . . . . . . . . . . . . . | **7c** | |
| **8** Adjustment to eliminations of transactions between includible entities and nonincludible entities (attach schedule). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **8** | |
| **9** Adjustment to reconcile income statement period to tax year (attach schedule). . . . . . . . . . . . | **9** | |
| **10a** Intercompany dividend adjustments to reconcile to line 11 (attach schedule). . . . . . . . . . . . . | **10a** | |
| **b** Other statutory accounting adjustments to reconcile to line 11 (attach schedule). . . . . . . . . . . | **10b** | |
| **c** Other adjustments to reconcile to amount on line 11 (attach schedule). . . . . . . . . . . . . . . . . | **10c** | |
| **11** **Net income (loss) per income statement of includible corporations.** Combine lines 4 through 10. . . . . . . . . . . | **11** | 6,505,309. |

**Note.** Part I, line 11, must equal the amount on Part II, line 30, column (a), and Schedule M-2, line 2.

**12** Enter the total amount (not just the corporation's share) of the assets and liabilities of all entities included or removed on the following lines:

| | Total Assets | Total Liabilities |
|---|---|---|
| **a** Included on Part I, line 4. . . . . . . . . . . . . . ► | | |
| **b** Removed on Part I, line 5. . . . . . . . . . . . . . ► | | |
| **c** Removed on Part I, line 6. . . . . . . . . . . . . . ► | | |
| **d** Included on Part I, line 7. . . . . . . . . . . . . . ► | | |

**BAA For Paperwork Reduction Act Notice, see the Instructions for Form 1120.**    Schedule **M-3** (Form 1120) 2010

CPCA1001L  06/24/10

Schedule **M-3** (Form 1120) 2010      Page **2**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): (1) ☐   (2) ☒ Consolidated group   (2) ☐ Parent corp   (3) ☐   Consolidated eliminations   (4) ☐   Subsidiary corp   (5) ☐   Mixed 1120/L/PC group

Check if a sub-consolidated:   (6) ☐   1120 group   (7) ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| | |

**Part II**   **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** (see instructions)

| Income (Loss) Items (Attach schedules for lines 1 through 8) | (a) Income (Loss) per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Income (Loss) per Tax Return |
|---|---|---|---|---|
| 1 Income (loss) from equity method foreign corporations | | | | |
| 2 Gross foreign dividends not previously taxed | | | | |
| 3 Subpart F, QEF, and similar income inclusions | | | | |
| 4 Section 78 gross-up | | | | |
| 5 Gross foreign distributions previously taxed | | | | |
| 6 Income (loss) from equity method U.S. corporations | | | | |
| 7 U.S. dividends not eliminated in tax consolidation | | | | |
| 8 Minority interest for includible corporations | | | | |
| 9 Income (loss) from U.S. partnerships | | | | |
| 10 Income (loss) from foreign partnerships | | | | |
| 11 Income (loss) from other pass-through entities | | | | |
| 12 Items relating to reportable transactions (attach details) | | | | |
| 13 Interest income (attach Form 8916-A) | | | | |
| 14 Total accrual to cash adjustment | | | | |
| 15 Hedging transactions | | | | |
| 16 Mark-to-market income (loss) | | | | |
| 17 Cost of goods sold (attach Form 8916-A) | -202,809,966. | | | -202,809,966. |
| 18 Sale versus lease (for sellers and/or lessors) | | | | |
| 19 Section 481(a) adjustments | | | | |
| 20 Unearned/deferred revenue | | | | |
| 21 Income recognition from long-term contracts | | | | |
| 22 Original issue discount and other imputed interest | | | | |
| 23a Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities | | | | |
| b Gross capital gains from Schedule D, excluding amounts from pass-through entities | | | | |
| c Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| d Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| e Abandonment losses | | | | |
| f Worthless stock losses (attach details) | | | | |
| g Other gain/loss on disposition of assets other than inventory | | | | |
| 24 Capital loss limitation and carryforward used | | | | |
| 25 Other income (loss) items with differences (attach schedule) | | | | |
| 26 Total income (loss) items. Combine lines 1 through 25. | -202,809,966. | | | -202,809,966. |
| 27 Total expense/deduction items (from Part III, line 38). | -7,945,335. | 694,455. | 3,014,803. | -4,236,077. |
| 28 Other items with no differences | 217,260,610. | | | 217,260,610. |
| 29a Mixed groups, see instructions. All others, combine lines 26 through 28. | 6,505,309. | 694,455. | 3,014,803. | 10,214,567. |
| b PC insurance subgroup reconciliation totals. | | | | |
| c Life insurance subgroup reconciliation totals. | | | | |
| 30 Reconciliation totals. Combine lines 29a through 29c. | 6,505,309. | 694,455. | 3,014,803. | 10,214,567. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

Schedule **M-3** (Form 1120) 2010                                                           Page **3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): (1) [X] Consolidated group   (2) [ ] Parent corp   (3) [ ] Consolidated eliminations   (4) [ ] Subsidiary corp   (5) [ ] Mixed 1120/L/PC group

Check if a sub-consolidated: (6) [ ] 1120 group   (7) [ ] 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| | |

| **Part III** | **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** — Expense/Deduction Items (see instructions) |
|---|---|

| Expense/Deduction Items | (a)<br>Expense per<br>Income Statement | (b)<br>Temporary<br>Difference | (c)<br>Permanent<br>Difference | (d)<br>Deduction per<br>Tax Return |
|---|---|---|---|---|
| 1 U.S. current income tax expense . . . . . . . . . . . | 694,455. | -694,455. | | |
| 2 U.S. deferred income tax expense . . . . . . . . . . | | | | |
| 3 State and local current income tax expense . | | | | |
| 4 State and local deferred income tax expense | | | | |
| 5 Foreign current income tax expense (other than foreign withholding taxes) . . . . . . . . . . . . . | | | | |
| 6 Foreign deferred income tax expense . . . . . . . | | | | |
| 7 Foreign withholding taxes . . . . . . . . . . . . . . . . | | | | |
| 8 Interest expense (attach Form 8916-A) . . . . . . | | | | |
| 9 Stock option expense . . . . . . . . . . . . . . . . . . . | | | | |
| 10 Other equity-based compensation . . . . . . . . . . | | | | |
| 11 Meals and entertainment . . . . . . . . . . . . . . . . . | 731,598. | | -365,799. | 365,799. |
| 12 Fines and penalties . . . . . . . . . . . . . . . . . . . . . | 15,297. | | -15,297. | |
| 13 Judgments, damages, awards, and similar costs . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 14 Parachute payments . . . . . . . . . . . . . . . . . . . . | | | | |
| 15 Compensation with section 162(m) limitation | | | | |
| 16 Pension and profit-sharing . . . . . . . . . . . . . . . | | | | |
| 17 Other post-retirement benefits . . . . . . . . . . . . | | | | |
| 18 Deferred compensation . . . . . . . . . . . . . . . . . . | | | | |
| 19 Charitable contribution of cash and tangible property . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 20 Charitable contribution of intangible property . | | | | |
| 21 Charitable contribution limitation/carryforward . . . . . . . . . | | | | |
| 22 Domestic production activities deduction . . . . | | | 204,220. | 204,220. |
| 23 Current year acquisition or reorganization investment banking fees . . . . . . . . . . . . . . . . | | | | |
| 24 Current year acquisition or reorganization legal and accounting fees . . . . . . . . . . . . . . | | | | |
| 25 Current year acquisition/reorganization other costs . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 26 Amortization/impairment of goodwill . . . . . . . . | | | | |
| 27 Amortization of acquisition, reorganization, and start-up costs . . . . . . . . . . . . . . . . . . . . | | | | |
| 28 Other amortization or impairment write-offs . . | | | | |
| 29 Section 198 environmental remediation costs | | | | |
| 30 Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 31 Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,666,058. | | | 3,666,058. |
| 32 Bad debt expense . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 33 Corporate owned life insurance premiums . . . | 2,837,927. | | -2,837,927. | |
| 34 Purchase versus lease (for purchasers and/or lessees) . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 35 Research and development costs (attach schedule) . . . . . . . . . . . . . . . . . . . . . | | | | |
| 36 Section 118 exclusion (att sch) . . . . . . . . . . . | | | | |
| 37 Other expense/deduction items with differences (attach schedule) . . . . . . . . . . . . | | | | |
| 38 **Total expense/deduction items.** Combine lines 1 through 37. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive . . | 7,945,335. | -694,455. | -3,014,803. | 4,236,077. |

Form **8916-A**

Department of the Treasury
Internal Revenue Service

**Supplemental Attachment to Schedule M-3**

► Attach to Schedule M-3 for Form 1065, 1120, 1120-L, 1120-PC, or 1120S.

OMB No. 1545-2061

**2010**

| Name of common parent | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |
| Name of subsidiary | Employer identification number |

| **Part I** | **Cost of Goods Sold** | | | | |
|---|---|---|---|---|---|
| **Cost of Goods Sold Items** | | **(a)** Expense per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Deduction per Tax Return |
| **1** Amounts attributable to cost flow assumptions.... | | | | | |
| **2** Amounts attributable to: | | | | | |
| **a** Stock option expense........................ | | | | | |
| **b** Other equity based compensation............... | | | | | |
| **c** Meals and entertainment...................... | | | | | |
| **d** Parachute payments.......................... | | | | | |
| **e** Compensation with section 162(m) limitation..... | | | | | |
| **f** Pension and profit sharing.................... | | | | | |
| **g** Other post-retirement benefits................. | | | | | |
| **h** Deferred compensation....................... | | | | | |
| **i** Section 198 environmental remediation costs..... | | | | | |
| **j** Amortization................................ | | | | | |
| **k** Depletion................................... | | | | | |
| **l** Depreciation................................ | | | | | |
| **m** Corporate owned life insurance premiums........ | | | | | |
| **n** Other section 263A costs...................... | | | | | |
| **3** Inventory shrinkage accruals................... | | | | | |
| **4** Excess inventory and obsolescence reserves..... | | | | | |
| **5** Lower of cost or market write-downs............. | | | | | |
| **6** Other items with differences (attach schedule)................. | | | | | |
| **7** Other items with no differences................. | | 202,809,966. | | | 202,809,966. |
| **8** **Total cost of goods sold.** Add lines 1 through 7, in columns a, b, c, and d............. | | 202,809,966. | 0. | 0. | 202,809,966. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**                    Form **8916-A** (2010)

CPCZ1612L  02/28/11

Form **8916-A** (2010)  MMR GROUP, INC.                                72-1271030              Page **2**

## Part II — Interest Income

| | Interest Income Item | (a) Income (Loss) per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Income (Loss) per Tax Return |
|---|---|---|---|---|---|
| 1 | Tax-exempt interest income . . . . . . . . . . . . . . . . . . . . . | | | | |
| 2 | Interest income from hybrid securities . . . . . . . . . . . | | | | |
| 3 | Sale/lease interest income . . . . . . . . . . . . . . . . . . . . . | | | | |
| 4a | Intercompany interest income — From outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 4b | Intercompany interest income — From tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 5 | Other interest income . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 6 | Total interest income. Add lines 1 through 5. Enter total on Schedule M-3 (Forms 1120, 1120-PC, and 1120-L), Part II, line 13 or Schedule M-3 (Forms 1065 and 1120-S) Part II, line 11 . . . . . . . . . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

## Part III — Interest Expense

| | Interest Expense Item | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|---|
| 1 | Interest expense from hybrid securities . . . . . . . . . . | | | | |
| 2 | Lease/purchase interest expense . . . . . . . . . . . . . . . | | | | |
| 3a | Intercompany interest expense — Paid to outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 3b | Intercompany interest expense — Paid to tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 4 | Other interest expense . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 5 | Total interest expense. Add lines 1 through 4. Enter total on Schedule M-3 (Form 1120) Part III, line 8; Schedule M-3 (Forms 1120-PC and 1120-L), Part III, line 36; Schedule M-3 (Form 1065) Part III, line 27; or Schedule M-3 (Form 1120-S) Part III, line 26 . . . . . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

Form **8916-A** (2010)

Schedule **M-3** (Form 1120) 2010 | Page **2**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): (1) ☐ Consolidated group   (2) ☒ Parent corp   (3) ☐ Consolidated eliminations   (4) ☐ Subsidiary corp   (5) ☐ Mixed 1120/L/PC group

Check if a sub-consolidated:   (6) ☐ 1120 group   (7) ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| | |

**Part II** | **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** (see instructions)

| **Income (Loss) Items**<br>(Attach schedules for lines 1 through 8) | **(a)**<br>Income (Loss) per<br>Income Statement | **(b)**<br>Temporary<br>Difference | **(c)**<br>Permanent<br>Difference | **(d)**<br>Income (Loss) per<br>Tax Return |
|---|---|---|---|---|
| **1** Income (loss) from equity method foreign corporations. | | | | |
| **2** Gross foreign dividends not previously taxed | | | | |
| **3** Subpart F, QEF, and similar income inclusions. | | | | |
| **4** Section 78 gross-up. | | | | |
| **5** Gross foreign distributions previously taxed. | | | | |
| **6** Income (loss) from equity method U.S. corporations. | | | | |
| **7** U.S. dividends not eliminated in tax consolidation. | | | | |
| **8** Minority interest for includible corporations. | | | | |
| **9** Income (loss) from U.S. partnerships. | | | | |
| **10** Income (loss) from foreign partnerships. | | | | |
| **11** Income (loss) from other pass-through entities. | | | | |
| **12** Items relating to reportable transactions (attach details) | | | | |
| **13** Interest income (attach Form 8916-A). | | | | |
| **14** Total accrual to cash adjustment. | | | | |
| **15** Hedging transactions | | | | |
| **16** Mark-to-market income (loss). | | | | |
| **17** Cost of goods sold (attach Form 8916-A). | | | | |
| **18** Sale versus lease (for sellers and/or lessors). | | | | |
| **19** Section 481(a) adjustments. | | | | |
| **20** Unearned/deferred revenue. | | | | |
| **21** Income recognition from long-term contracts | | | | |
| **22** Original issue discount and other imputed interest | | | | |
| **23a** Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities | | | | |
| **b** Gross capital gains from Schedule D, excluding amounts from pass-through entities | | | | |
| **c** Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses. | | | | |
| **d** Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses. | | | | |
| **e** Abandonment losses. | | | | |
| **f** Worthless stock losses (attach details). | | | | |
| **g** Other gain/loss on disposition of assets other than inventory. | | | | |
| **24** Capital loss limitation and carryforward used | | | | |
| **25** Other income (loss) items with differences (attach schedule) | | | | |
| **26** **Total income (loss) items.** Combine lines 1 through 25. | | | | |
| **27** **Total expense/deduction items** (from Part III, line 38). | -537,672. | | | -537,672. |
| **28** Other items with no differences. | 9,511,817. | | | 9,511,817. |
| **29a** Mixed groups, see instructions. All others, combine lines 26 through 28. | 8,974,145. | 0. | 0. | 8,974,145. |
| **b** PC insurance subgroup reconciliation totals. | | | | |
| **c** Life insurance subgroup reconciliation totals. | | | | |
| **30** **Reconciliation totals.** Combine lines 29a through 29c. | 8,974,145. | 0. | 0. | 8,974,145. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

Schedule **M-3** (Form 1120) 2010                                                                                              Page **3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group  **(2)** ☒ Parent corp  **(3)** ☐ Consolidated eliminations  **(4)** ☐ Subsidiary corp  **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated:  **(6)** ☐ 1120 group  **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| | |

**Part III**   **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return — Expense/Deduction Items** (see instructions)

| Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| 1 U.S. current income tax expense . . . . . . . . . . . | | | | |
| 2 U.S. deferred income tax expense . . . . . . . . . . | | | | |
| 3 State and local current income tax expense . | | | | |
| 4 State and local deferred income tax expense | | | | |
| 5 Foreign current income tax expense (other than foreign withholding taxes) . . . . . . . . . . . . . | | | | |
| 6 Foreign deferred income tax expense . . . . . . . | | | | |
| 7 Foreign withholding taxes . . . . . . . . . . . . . . . . . | | | | |
| 8 Interest expense (attach Form 8916-A) . . . . . . | | | | |
| 9 Stock option expense . . . . . . . . . . . . . . . . . . . . | | | | |
| 10 Other equity-based compensation . . . . . . . . . . . | | | | |
| 11 Meals and entertainment . . . . . . . . . . . . . . . . . . | | | | |
| 12 Fines and penalties . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 13 Judgments, damages, awards, and similar costs . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 14 Parachute payments . . . . . . . . . . . . . . . . . . . . . | | | | |
| 15 Compensation with section 162(m) limitation | | | | |
| 16 Pension and profit-sharing . . . . . . . . . . . . . . . . | | | | |
| 17 Other post-retirement benefits . . . . . . . . . . . . . | | | | |
| 18 Deferred compensation . . . . . . . . . . . . . . . . . . . | | | | |
| 19 Charitable contribution of cash and tangible property . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 20 Charitable contribution of intangible property . | | | | |
| 21 Charitable contribution limitation/carryforward . . . . . . . . | | | | |
| 22 Domestic production activities deduction . . . . | | | | |
| 23 Current year acquisition or reorganization investment banking fees . . . . . . . . . . . . . . . . . | | | | |
| 24 Current year acquisition or reorganization legal and accounting fees . . . . . . . . . . . . . . . | | | | |
| 25 Current year acquisition/reorganization other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 26 Amortization/impairment of goodwill . . . . . . . . | | | | |
| 27 Amortization of acquisition, reorganization, and start-up costs . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 28 Other amortization or impairment write-offs . . | | | | |
| 29 Section 198 environmental remediation costs | | | | |
| 30 Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 31 Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . | 537,672. | | | 537,672. |
| 32 Bad debt expense . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 33 Corporate owned life insurance premiums . . . | | | | |
| 34 Purchase versus lease (for purchasers and/or lessees) . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 35 Research and development costs (attach schedule) . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 36 Section 118 exclusion (att sch) . . . . . . . . . . . . | | | | |
| 37 Other expense/deduction items with differences (attach schedule) . . . . . . . . . . . . . . | | | | |
| 38 **Total expense/deduction items. Combine** lines 1 through 37. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive . . | 537,672. | | | 537,672. |

CPCA1023L  08/05/10                                                                      Schedule **M-3** (Form 1120) 2010

Schedule **M-3** (Form 1120) 2010 — Page **2**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group  **(2)** ☐ Parent corp  **(3)** ☐ Consolidated eliminations  **(4)** ☒ Subsidiary corp  **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated:  **(6)** ☐ 1120 group  **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR CONSTRUCTORS, INC. | 72-1046000 |

**Part II**  **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** (see instructions)

| Income (Loss) Items (Attach schedules for lines 1 through 8) | (a) Income (Loss) per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Income (Loss) per Tax Return |
|---|---|---|---|---|
| 1 Income (loss) from equity method foreign corporations | | | | |
| 2 Gross foreign dividends not previously taxed | | | | |
| 3 Subpart F, QEF, and similar income inclusions | | | | |
| 4 Section 78 gross-up | | | | |
| 5 Gross foreign distributions previously taxed | | | | |
| 6 Income (loss) from equity method U.S. corporations | | | | |
| 7 U.S. dividends not eliminated in tax consolidation | | | | |
| 8 Minority interest for includible corporations | | | | |
| 9 Income (loss) from U.S. partnerships | | | | |
| 10 Income (loss) from foreign partnerships | | | | |
| 11 Income (loss) from other pass-through entities | | | | |
| 12 Items relating to reportable transactions (attach details) | | | | |
| 13 Interest income (attach Form 8916-A) | | | | |
| 14 Total accrual to cash adjustment | | | | |
| 15 Hedging transactions | | | | |
| 16 Mark-to-market income (loss) | | | | |
| 17 Cost of goods sold (attach Form 8916-A) | −201,763,072. | | | −201,763,072. |
| 18 Sale versus lease (for sellers and/or lessors) | | | | |
| 19 Section 481(a) adjustments | | | | |
| 20 Unearned/deferred revenue | | | | |
| 21 Income recognition from long-term contracts | | | | |
| 22 Original issue discount and other imputed interest | | | | |
| 23a Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities | | | | |
| b Gross capital gains from Schedule D, excluding amounts from pass-through entities | | | | |
| c Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| d Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| e Abandonment losses | | | | |
| f Worthless stock losses (attach details) | | | | |
| g Other gain/loss on disposition of assets other than inventory | | | | |
| 24 Capital loss limitation and carryforward used | | | | |
| 25 Other income (loss) items with differences (attach schedule) | | | | |
| 26 Total income (loss) items. Combine lines 1 through 25. | −201,763,072. | | | −201,763,072. |
| 27 Total expense/deduction items (from Part III, line 38). | −7,393,900. | 694,455. | 3,015,372. | −3,684,073. |
| 28 Other items with no differences | 207,489,658. | | | 207,489,658. |
| 29a Mixed groups, see instructions. All others, combine lines 26 through 28. | −1,667,314. | 694,455. | 3,015,372. | 2,042,513. |
| b PC insurance subgroup reconciliation totals. | | | | |
| c Life insurance subgroup reconciliation totals. | | | | |
| 30 Reconciliation totals. Combine lines 29a through 29c. | −1,667,314. | 694,455. | 3,015,372. | 2,042,513. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

BAA  CPCA1023L  08/05/10  Schedule **M-3** (Form 1120) 2010

Schedule **M-3** (Form 1120) 2010    Page **3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group  **(2)** ☐ Parent corp  **(3)** ☐ Consolidated eliminations  **(4)** ☒ Subsidiary corp  **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated: **(6)** ☐ 1120 group  **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR CONSTRUCTORS, INC. | 72-1046000 |

| **Part III** | **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return — Expense/Deduction Items** (see instructions) |
|---|---|

| Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| 1 U.S. current income tax expense . . . . . . . . . . | 694,455. | -694,455. | | |
| 2 U.S. deferred income tax expense . . . . . . . . . . | | | | |
| 3 State and local current income tax expense . | | | | |
| 4 State and local deferred income tax expense | | | | |
| 5 Foreign current income tax expense (other than foreign withholding taxes) . . . . . . . . . . . . . | | | | |
| 6 Foreign deferred income tax expense . . . . . . . | | | | |
| 7 Foreign withholding taxes . . . . . . . . . . . . . . . . . | | | | |
| 8 Interest expense (attach Form 8916-A) . . . . . . | | | | |
| 9 Stock option expense . . . . . . . . . . . . . . . . . . . . | | | | |
| 10 Other equity-based compensation . . . . . . . . . . | | | | |
| 11 Meals and entertainment . . . . . . . . . . . . . . . . . . | 728,310. | | -364,155. | 364,155. |
| 12 Fines and penalties . . . . . . . . . . . . . . . . . . . . . | 15,297. | | -15,297. | |
| 13 Judgments, damages, awards, and similar costs . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 14 Parachute payments . . . . . . . . . . . . . . . . . . . . . | | | | |
| 15 Compensation with section 162(m) limitation | | | | |
| 16 Pension and profit-sharing . . . . . . . . . . . . . . . | | | | |
| 17 Other post-retirement benefits . . . . . . . . . . . . | | | | |
| 18 Deferred compensation . . . . . . . . . . . . . . . . . . | | | | |
| 19 Charitable contribution of cash and tangible property . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 20 Charitable contribution of intangible property. | | | | |
| 21 Charitable contribution limitation/carryforward . . . . . . . . | | | | |
| 22 Domestic production activities deduction . . . . | | | 202,007. | 202,007. |
| 23 Current year acquisition or reorganization investment banking fees . . . . . . . . . . . . . . . . . | | | | |
| 24 Current year acquisition or reorganization legal and accounting fees . . . . . . . . . . . . . . . | | | | |
| 25 Current year acquisition/reorganization other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 26 Amortization/impairment of goodwill . . . . . . . . | | | | |
| 27 Amortization of acquisition, reorganization, and start-up costs . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 28 Other amortization or impairment write-offs . . | | | | |
| 29 Section 198 environmental remediation costs | | | | |
| 30 Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 31 Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,117,911. | | | 3,117,911. |
| 32 Bad debt expense . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 33 Corporate owned life insurance premiums . . . | 2,837,927. | | -2,837,927. | |
| 34 Purchase versus lease (for purchasers and/or lessees) . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 35 Research and development costs (attach schedule) . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 36 Section 118 exclusion (att sch) . . . . . . . . . . . . | | | | |
| 37 Other expense/deduction items with differences (attach schedule) . . . . . . . . . . . . . | | | | |
| 38 **Total expense/deduction items.** Combine lines 1 through 37. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive . . | 7,393,900. | -694,455. | -3,015,372. | 3,684,073. |

CPCA1023L  08/05/10                    Schedule **M-3** (Form 1120) 2010

Form **8916-A**

Department of the Treasury
Internal Revenue Service

**Supplemental Attachment to Schedule M-3**

► Attach to Schedule M-3 for Form 1065, 1120, 1120-L, 1120-PC, or 1120S.

OMB No. 1545-2061

**2010**

| Name of common parent | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |
| Name of subsidiary | Employer identification number |
| MMR CONSTRUCTORS, INC. | 72-1046000 |

**Part I** | **Cost of Goods Sold**

| Cost of Goods Sold Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| **1** Amounts attributable to cost flow assumptions.... | | | | |
| **2** Amounts attributable to: | | | | |
| **a** Stock option expense. . . . . . . . . . . . . . . . . . . . | | | | |
| **b** Other equity based compensation. . . . . . . . . . . . . . . | | | | |
| **c** Meals and entertainment. . . . . . . . . . . . . . . . . . . | | | | |
| **d** Parachute payments. . . . . . . . . . . . . . . . . . . . . | | | | |
| **e** Compensation with section 162(m) limitation . . . . . | | | | |
| **f** Pension and profit sharing . . . . . . . . . . . . . . . . . | | | | |
| **g** Other post-retirement benefits. . . . . . . . . . . . . . . | | | | |
| **h** Deferred compensation . . . . . . . . . . . . . . . . . . . | | | | |
| **i** Section 198 environmental remediation costs. . . . . | | | | |
| **j** Amortization. . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **k** Depletion. . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **l** Depreciation. . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **m** Corporate owned life insurance premiums. . . . . . . . | | | | |
| **n** Other section 263A costs. . . . . . . . . . . . . . . . . . | | | | |
| **3** Inventory shrinkage accruals . . . . . . . . . . . . . . . . | | | | |
| **4** Excess inventory and obsolescence reserves. . . . . | | | | |
| **5** Lower of cost or market write-downs. . . . . . . . . . . . | | | | |
| **6** Other items with differences (attach schedule) . . . . . . . . . . . . . . . . . . . | | | | |
| **7** Other items with no differences. . . . . . . . . . . . . . | 201,763,072. | | | 201,763,072. |
| **8** **Total cost of goods sold.** Add lines 1 through 7, in columns a, b, c, and d. | 201,763,072. | 0. | 0. | 201,763,072. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**

Form **8916-A** (2010)

Form **8916-A** (2010)   MMR GROUP, INC.                                           72-1271030                    Page **2**

| Part II | Interest Income | | | | |
|---------|-----------------|---|---|---|---|
| | Interest Income Item | **(a)** Income (Loss) per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Income (Loss) per Tax Return |
| 1 | Tax-exempt interest income . . . . . . . . . . . . . . . . . . . . . | | | | |
| 2 | Interest income from hybrid securities . . . . . . . . . . . | | | | |
| 3 | Sale/lease interest income . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 4a | Intercompany interest income — From outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 4b | Intercompany interest income — From tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 5 | Other interest income . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 6 | Total interest income. Add lines 1 through 5. Enter total on Schedule M-3 (Forms 1120, 1120-PC, and 1120-L), Part II, line 13 or Schedule M-3 (Forms 1065 and 1120-S) Part II, line 11 . . . . . . . . . . . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

| Part III | Interest Expense | | | | |
|----------|------------------|---|---|---|---|
| | Interest Expense Item | **(a)** Expense per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Deduction per Tax Return |
| 1 | Interest expense from hybrid securities . . . . . . . . . . | | | | |
| 2 | Lease/purchase interest expense . . . . . . . . . . . . . . . | | | | |
| 3a | Intercompany interest expense — Paid to outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 3b | Intercompany interest expense — Paid to tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 4 | Other interest expense . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 5 | Total interest expense. Add lines 1 through 4. Enter total on Schedule M-3 (Form 1120) Part III, line 8; Schedule M-3 (Forms 1120-PC and 1120-L), Part III, line 36; Schedule M-3 (Form 1065) Part III, line 27; or Schedule M-3 (Form 1120-S) Part III, line 26 . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

Form **8916-A** (2010)

Schedule **M-3** (Form 1120) 2010                                                                                          Page **2**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): (1) ☐ Consolidated group  (2) ☐ Parent corp  (3) ☐ Consolidated eliminations  (4) ☒ Subsidiary corp  (5) ☐ Mixed 1120/L/PC group
Check if a sub-consolidated: (6) ☐ 1120 group  (7) ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR TECHNICAL SERVICES, INC. | 72-1209195 |

**Part II** | **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** (see instructions)

| **Income (Loss) Items**<br>(Attach schedules for lines 1 through 8) | **(a)**<br>Income (Loss) per<br>Income Statement | **(b)**<br>Temporary<br>Difference | **(c)**<br>Permanent<br>Difference | **(d)**<br>Income (Loss) per<br>Tax Return |
|---|---|---|---|---|
| 1 Income (loss) from equity method foreign corporations | | | | |
| 2 Gross foreign dividends not previously taxed | | | | |
| 3 Subpart F, QEF, and similar income inclusions | | | | |
| 4 Section 78 gross-up | | | | |
| 5 Gross foreign distributions previously taxed | | | | |
| 6 Income (loss) from equity method U.S. corporations | | | | |
| 7 U.S. dividends not eliminated in tax consolidation | | | | |
| 8 Minority interest for includible corporations | | | | |
| 9 Income (loss) from U.S. partnerships | | | | |
| 10 Income (loss) from foreign partnerships | | | | |
| 11 Income (loss) from other pass-through entities | | | | |
| 12 Items relating to reportable transactions (attach details) | | | | |
| 13 Interest income (attach Form 8916-A) | | | | |
| 14 Total accrual to cash adjustment | | | | |
| 15 Hedging transactions | | | | |
| 16 Mark-to-market income (loss) | | | | |
| 17 Cost of goods sold (attach Form 8916-A) | −205,893. | | | −205,893. |
| 18 Sale versus lease (for sellers and/or lessors) | | | | |
| 19 Section 481(a) adjustments | | | | |
| 20 Unearned/deferred revenue | | | | |
| 21 Income recognition from long-term contracts | | | | |
| 22 Original issue discount and other imputed interest | | | | |
| 23a Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities | | | | |
| b Gross capital gains from Schedule D, excluding amounts from pass-through entities | | | | |
| c Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| d Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| e Abandonment losses | | | | |
| f Worthless stock losses (attach details) | | | | |
| g Other gain/loss on disposition of assets other than inventory | | | | |
| 24 Capital loss limitation and carryforward used | | | | |
| 25 Other income (loss) items with differences (attach schedule) | | | | |
| 26 **Total income (loss) items.** Combine lines 1 through 25 | −205,893. | | | −205,893. |
| 27 **Total expense/deduction items** (from Part III, line 38) | −1,100. | | 550. | −550. |
| 28 Other items with no differences | −9,437. | | | −9,437. |
| 29a Mixed groups, see instructions. All others, combine lines 26 through 28 | −216,430. | 0. | 550. | −215,880. |
| b PC insurance subgroup reconciliation totals | | | | |
| c Life insurance subgroup reconciliation totals | | | | |
| 30 **Reconciliation totals.** Combine lines 29a through 29c | −216,430. | 0. | 550. | −215,880. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

BAA                                            CPCA1023L   08/05/10                                            Schedule **M-3** (Form 1120) 2010

Schedule **M-3** (Form 1120) 2010     Page **3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es):  **(1)** ☐ Consolidated group  **(2)** ☐ Parent corp  **(3)** ☐ Consolidated eliminations  **(4)** ☒ Subsidiary corp  **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated:  **(6)** ☐ 1120 group  **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR TECHNICAL SERVICES, INC. | 72-1209195 |

| **Part III** | **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return — Expense/Deduction Items** (see instructions) |
|---|---|

| Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| 1 U.S. current income tax expense . . . . . . . . . . | | | | |
| 2 U.S. deferred income tax expense . . . . . . . . . | | | | |
| 3 State and local current income tax expense . | | | | |
| 4 State and local deferred income tax expense | | | | |
| 5 Foreign current income tax expense (other than foreign withholding taxes) . . . . . . . . . . . . . | | | | |
| 6 Foreign deferred income tax expense . . . . . . . | | | | |
| 7 Foreign withholding taxes . . . . . . . . . . . . . . . . . | | | | |
| 8 Interest expense (attach Form 8916-A) . . . . . . | | | | |
| 9 Stock option expense . . . . . . . . . . . . . . . . . . . . . | | | | |
| 10 Other equity-based compensation . . . . . . . . . . . | | | | |
| 11 Meals and entertainment . . . . . . . . . . . . . . . . . . | | | −550. | |
| 12 Fines and penalties . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 13 Judgments, damages, awards, and similar costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 14 Parachute payments . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 15 Compensation with section 162(m) limitation | | | | |
| 16 Pension and profit-sharing . . . . . . . . . . . . . . . . | | | | |
| 17 Other post-retirement benefits . . . . . . . . . . . . . | | | | |
| 18 Deferred compensation . . . . . . . . . . . . . . . . . . . | | | | |
| 19 Charitable contribution of cash and tangible property . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 20 Charitable contribution of intangible property . | | | | |
| 21 Charitable contribution limitation/carryforward . . . . . . . . | | | | |
| 22 Domestic production activities deduction . . . . | | | | |
| 23 Current year acquisition or reorganization investment banking fees . . . . . . . . . . . . . . . . . . | | | | |
| 24 Current year acquisition or reorganization legal and accounting fees . . . . . . . . . . . . . . . . | | | | |
| 25 Current year acquisition/reorganization other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 26 Amortization/impairment of goodwill . . . . . . . . | | | | |
| 27 Amortization of acquisition, reorganization, and start-up costs . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 28 Other amortization or impairment write-offs . . | | | | |
| 29 Section 198 environmental remediation costs | | | | |
| 30 Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 31 Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 32 Bad debt expense . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 33 Corporate owned life insurance premiums . . . | | | | |
| 34 Purchase versus lease (for purchasers and/or lessees) . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 35 Research and development costs (attach schedule) . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 36 Section 118 exclusion (att sch) . . . . . . . . . . . . | | | | |
| 37 Other expense/deduction items with differences (attach schedule) . . . . . . . . . . . . . . | | | | |
| 38 **Total expense/deduction items. Combine** lines 1 through 37. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive . . | | | −550. | |

CPCA1023L  08/05/10     Schedule **M-3** (Form 1120) 2010

Form **8916-A**

Department of the Treasury
Internal Revenue Service

**Supplemental Attachment to Schedule M-3**

► Attach to Schedule M-3 for Form 1065, 1120, 1120-L, 1120-PC, or 1120S.

OMB No. 1545-2061

**2010**

| Name of common parent | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |
| Name of subsidiary | Employer identification number |
| MMR TECHNICAL SERVICES, INC. | 72-1209195 |

**Part I** **Cost of Goods Sold**

| Cost of Goods Sold Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| **1** Amounts attributable to cost flow assumptions.... | | | | |
| **2** Amounts attributable to: | | | | |
| **a** Stock option expense........................ | | | | |
| **b** Other equity based compensation............... | | | | |
| **c** Meals and entertainment...................... | | | | |
| **d** Parachute payments......................... | | | | |
| **e** Compensation with section 162(m) limitation..... | | | | |
| **f** Pension and profit sharing................... | | | | |
| **g** Other post-retirement benefits................ | | | | |
| **h** Deferred compensation...................... | | | | |
| **i** Section 198 environmental remediation costs..... | | | | |
| **j** Amortization.............................. | | | | |
| **k** Depletion................................ | | | | |
| **l** Depreciation.............................. | | | | |
| **m** Corporate owned life insurance premiums........ | | | | |
| **n** Other section 263A costs..................... | | | | |
| **3** Inventory shrinkage accruals.................... | | | | |
| **4** Excess inventory and obsolescence reserves..... | | | | |
| **5** Lower of cost or market write-downs............. | | | | |
| **6** Other items with differences (attach schedule)....... | | | | |
| **7** Other items with no differences................. | 205,893. | | | 205,893. |
| **8** **Total cost of goods sold.** Add lines 1 through 7, in columns a, b, c, and d. | 205,893. | 0. | 0. | 205,893. |

**BAA   For Paperwork Reduction Act Notice, see separate instructions.**   Form **8916-A** (2010)

Form **8916-A** (2010)  MMR GROUP, INC.                                         72-1271030                    Page **2**

| Part II | Interest Income |

| | Interest Income Item | (a) Income (Loss) per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Income (Loss) per Tax Return |
|---|---|---|---|---|---|
| 1 | Tax-exempt interest income . . . . . . . . . . . . . . . . . . . . | | | | |
| 2 | Interest income from hybrid securities . . . . . . . . . . | | | | |
| 3 | Sale/lease interest income. . . . . . . . . . . . . . . . . . . . . | | | | |
| 4a | Intercompany interest income — From outside tax affiliated group. . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 4b | Intercompany interest income — From tax affiliated group. . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 5 | Other interest income . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 6 | Total interest income. Add lines 1 through 5. Enter total on Schedule M-3 (Forms 1120, 1120-PC, and 1120-L), Part II, line 13 or Schedule M-3 (Forms 1065 and 1120-S) Part II, line 11. . . . . . . . . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

| Part III | Interest Expense |

| | Interest Expense Item | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|---|
| 1 | Interest expense from hybrid securities . . . . . . . . . . | | | | |
| 2 | Lease/purchase interest expense. . . . . . . . . . . . . . . | | | | |
| 3a | Intercompany interest expense — Paid to outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 3b | Intercompany interest expense — Paid to tax affiliated group. . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 4 | Other interest expense . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 5 | Total interest expense. Add lines 1 through 4. Enter total on Schedule M-3 (Form 1120) Part III, line 8; Schedule M-3 (Forms 1120-PC and 1120-L), Part III, line 36; Schedule M-3 (Form 1065) Part III, line 27; or Schedule M-3 (Form 1120-S) Part III, line 26. . . . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

Form **8916-A** (2010)

Schedule **M-3** (Form 1120) 2010 | | Page **2**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group  **(2)** ☐ Parent corp  **(3)** ☐ Consolidated eliminations  **(4)** ☒ Subsidiary corp  **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated: **(6)** ☐ 1120 group  **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR POWER SOLUTIONS LLC | 05-0584790 |

**Part II**  **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** (see instructions)

| **Income (Loss) Items**<br>(Attach schedules for lines 1 through 8) | **(a)**<br>Income (Loss) per<br>Income Statement | **(b)**<br>Temporary<br>Difference | **(c)**<br>Permanent<br>Difference | **(d)**<br>Income (Loss) per<br>Tax Return |
|---|---|---|---|---|
| 1 Income (loss) from equity method foreign corporations | | | | |
| 2 Gross foreign dividends not previously taxed | | | | |
| 3 Subpart F, QEF, and similar income inclusions | | | | |
| 4 Section 78 gross-up | | | | |
| 5 Gross foreign distributions previously taxed | | | | |
| 6 Income (loss) from equity method U.S. corporations | | | | |
| 7 U.S. dividends not eliminated in tax consolidation | | | | |
| 8 Minority interest for includible corporations | | | | |
| 9 Income (loss) from U.S. partnerships | | | | |
| 10 Income (loss) from foreign partnerships | | | | |
| 11 Income (loss) from other pass-through entities | | | | |
| 12 Items relating to reportable transactions (attach details) | | | | |
| 13 Interest income (attach Form 8916-A) | | | | |
| 14 Total accrual to cash adjustment | | | | |
| 15 Hedging transactions | | | | |
| 16 Mark-to-market income (loss) | | | | |
| 17 Cost of goods sold (attach Form 8916-A) | −841,001. | | | −841,001. |
| 18 Sale versus lease (for sellers and/or lessors) | | | | |
| 19 Section 481(a) adjustments | | | | |
| 20 Unearned/deferred revenue | | | | |
| 21 Income recognition from long-term contracts | | | | |
| 22 Original issue discount and other imputed interest | | | | |
| 23a Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities | | | | |
| b Gross capital gains from Schedule D, excluding amounts from pass-through entities | | | | |
| c Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| d Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| e Abandonment losses | | | | |
| f Worthless stock losses (attach details) | | | | |
| g Other gain/loss on disposition of assets other than inventory | | | | |
| 24 Capital loss limitation and carryforward used | | | | |
| 25 Other income (loss) items with differences (attach schedule) | | | | |
| 26 Total income (loss) items. Combine lines 1 through 25. | −841,001. | | | −841,001. |
| 27 Total expense/deduction items (from Part III, line 38). | −12,663. | | 1,094. | −11,569. |
| 28 Other items with no differences | 268,572. | | | 268,572. |
| 29a Mixed groups, see instructions. All others, combine lines 26 through 28. | −585,092. | 0. | 1,094. | −583,998. |
| b PC insurance subgroup reconciliation totals. | | | | |
| c Life insurance subgroup reconciliation totals. | | | | |
| 30 Reconciliation totals. Combine lines 29a through 29c. | −585,092. | 0. | 1,094. | −583,998. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

Schedule **M-3** (Form 1120) 2010 — Page **3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group  **(2)** ☐ Parent corp  **(3)** ☐ Consolidated eliminations  **(4)** ☒ Subsidiary corp  **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated:  **(6)** ☐ 1120 group  **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR POWER SOLUTIONS LLC | 05-0584790 |

**Part III**  **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return — Expense/Deduction Items** (see instructions)

| Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| 1  U.S. current income tax expense . . . . . . . . . . . | | | | |
| 2  U.S. deferred income tax expense . . . . . . . . . | | | | |
| 3  State and local current income tax expense . | | | | |
| 4  State and local deferred income tax expense | | | | |
| 5  Foreign current income tax expense (other than foreign withholding taxes) . . . . . . . . . . . . . | | | | |
| 6  Foreign deferred income tax expense . . . . . . . | | | | |
| 7  Foreign withholding taxes . . . . . . . . . . . . . . . . . | | | | |
| 8  Interest expense (attach Form 8916-A) . . . . . . | | | | |
| 9  Stock option expense . . . . . . . . . . . . . . . . . . . . | | | | |
| 10  Other equity-based compensation . . . . . . . . . . . | | | | |
| 11  Meals and entertainment . . . . . . . . . . . . . . . . . . | 2,188. | | -1,094. | 1,094. |
| 12  Fines and penalties . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 13  Judgments, damages, awards, and similar costs . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 14  Parachute payments . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 15  Compensation with section 162(m) limitation | | | | |
| 16  Pension and profit-sharing . . . . . . . . . . . . . . . . | | | | |
| 17  Other post-retirement benefits . . . . . . . . . . . . . | | | | |
| 18  Deferred compensation . . . . . . . . . . . . . . . . . . . | | | | |
| 19  Charitable contribution of cash and tangible property . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 20  Charitable contribution of intangible property . | | | | |
| 21  Charitable contribution limitation/carryforward . . . . . . . . | | | | |
| 22  Domestic production activities deduction . . . . | | | | |
| 23  Current year acquisition or reorganization investment banking fees . . . . . . . . . . . . . . . . . . | | | | |
| 24  Current year acquisition or reorganization legal and accounting fees . . . . . . . . . . . . . . . . | | | | |
| 25  Current year acquisition/reorganization other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 26  Amortization/impairment of goodwill . . . . . . . . | | | | |
| 27  Amortization of acquisition, reorganization, and start-up costs . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 28  Other amortization or impairment write-offs . . | | | | |
| 29  Section 198 environmental remediation costs | | | | |
| 30  Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 31  Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,475. | | | 10,475. |
| 32  Bad debt expense . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 33  Corporate owned life insurance premiums . . . | | | | |
| 34  Purchase versus lease (for purchasers and/or lessees) . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 35  Research and development costs (attach schedule) . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 36  Section 118 exclusion (att sch) . . . . . . . . . . . . | | | | |
| 37  Other expense/deduction items with differences (attach schedule) . . . . . . . . . . . . . . | | | | |
| 38  **Total expense/deduction items. Combine** lines 1 through 37. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive . . | 12,663. | | -1,094. | 11,569. |

CPCA1023L  08/05/10                                          Schedule **M-3** (Form 1120) 2010

Form **8916-A**

**Supplemental Attachment to Schedule M-3**

OMB No. 1545-2061

Department of the Treasury
Internal Revenue Service

► Attach to Schedule M-3 for Form 1065, 1120, 1120-L, 1120-PC, or 1120S.

**2010**

| Name of common parent | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |
| Name of subsidiary | Employer identification number |
| MMR POWER SOLUTIONS LLC | 05-0584790 |

**Part I** | **Cost of Goods Sold**

| Cost of Goods Sold Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| **1** Amounts attributable to cost flow assumptions.... | | | | |
| **2** Amounts attributable to: | | | | |
| **a** Stock option expense............................ | | | | |
| **b** Other equity based compensation................ | | | | |
| **c** Meals and entertainment........................ | | | | |
| **d** Parachute payments.............................. | | | | |
| **e** Compensation with section 162(m) limitation..... | | | | |
| **f** Pension and profit sharing...................... | | | | |
| **g** Other post-retirement benefits................. | | | | |
| **h** Deferred compensation.......................... | | | | |
| **i** Section 198 environmental remediation costs..... | | | | |
| **j** Amortization................................... | | | | |
| **k** Depletion...................................... | | | | |
| **l** Depreciation................................... | | | | |
| **m** Corporate owned life insurance premiums........ | | | | |
| **n** Other section 263A costs....................... | | | | |
| **3** Inventory shrinkage accruals.................... | | | | |
| **4** Excess inventory and obsolescence reserves..... | | | | |
| **5** Lower of cost or market write-downs............. | | | | |
| **6** Other items with differences (attach schedule)................................. | | | | |
| **7** Other items with no differences................. | 841,001. | | | 841,001. |
| **8** **Total cost of goods sold.** Add lines 1 through 7, in columns a, b, c, and d.. | 841,001. | 0. | 0. | 841,001. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**

Form **8916-A** (2010)

CPCZ1612L  02/28/11

Form **8916-A** (2010)  MMR GROUP, INC.                                72-1271030                        Page **2**

| Part II | Interest Income | | | | |
|---|---|---|---|---|---|
| | Interest Income Item | **(a)** Income (Loss) per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Income (Loss) per Tax Return |
| **1** | Tax-exempt interest income . . . . . . . . . . . . . . . . . . . . | | | | |
| **2** | Interest income from hybrid securities . . . . . . . . . . | | | | |
| **3** | Sale/lease interest income . . . . . . . . . . . . . . . . . . . . | | | | |
| **4a** | Intercompany interest income — From outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4b** | Intercompany interest income — From tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **5** | Other interest income . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **6** | Total interest income. Add lines 1 through 5. Enter total on Schedule M-3 (Forms 1120, 1120-PC, and 1120-L), Part II, line 13 or Schedule M-3 (Forms 1065 and 1120-S) Part II, line 11 . . . . . . . . | 0. | 0. | 0. | 0. |

| Part III | Interest Expense | | | | |
|---|---|---|---|---|---|
| | Interest Expense Item | **(a)** Expense per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Deduction per Tax Return |
| **1** | Interest expense from hybrid securities . . . . . . . . . . | | | | |
| **2** | Lease/purchase interest expense . . . . . . . . . . . . . . . | | | | |
| **3a** | Intercompany interest expense — Paid to outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **3b** | Intercompany interest expense — Paid to tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4** | Other interest expense . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **5** | Total interest expense. Add lines 1 through 4. Enter total on Schedule M-3 (Form 1120) Part III, line 8; Schedule M-3 (Forms 1120-PC and 1120-L), Part III, line 36; Schedule M-3 (Form 1065) Part III, line 27; or Schedule M-3 (Form 1120-S) Part III, line 26 . . . . . . . . | 0. | 0. | 0. | 0. |

Form **8916-A** (2010)

Schedule **M-3** (Form 1120) 2010 | Page **2**

| | |
|---|---|
| Name of corporation (common parent, if consolidated return) | Employer identification number |
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): (1) ☐ Consolidated group    (2) ☐ Parent corp    (3) ☒ Consolidated eliminations    (4) ☐ Subsidiary corp    (5) ☐ Mixed 1120/L/PC group
Check if a sub-consolidated: (6) ☐ 1120 group    (7) ☐ 1120 eliminations

| | |
|---|---|
| Name of subsidiary (if consolidated return) | Employer identification number |

| **Part II** | **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** (see instructions) |
|---|---|

| **Income (Loss) Items**<br>(Attach schedules for lines 1 through 8) | **(a)**<br>Income (Loss) per<br>Income Statement | **(b)**<br>Temporary<br>Difference | **(c)**<br>Permanent<br>Difference | **(d)**<br>Income (Loss) per<br>Tax Return |
|---|---|---|---|---|
| 1 Income (loss) from equity method foreign corporations | | | | |
| 2 Gross foreign dividends not previously taxed | | | | |
| 3 Subpart F, QEF, and similar income inclusions | | | | |
| 4 Section 78 gross-up | | | | |
| 5 Gross foreign distributions previously taxed | | | | |
| 6 Income (loss) from equity method U.S. corporations | | | | |
| 7 U.S. dividends not eliminated in tax consolidation | | | | |
| 8 Minority interest for includible corporations | | | | |
| 9 Income (loss) from U.S. partnerships | | | | |
| 10 Income (loss) from foreign partnerships | | | | |
| 11 Income (loss) from other pass-through entities | | | | |
| 12 Items relating to reportable transactions (attach details) | | | | |
| 13 Interest income (attach Form 8916-A) | | | | |
| 14 Total accrual to cash adjustment | | | | |
| 15 Hedging transactions | | | | |
| 16 Mark-to-market income (loss) | | | | |
| 17 Cost of goods sold (attach Form 8916-A) | | | | |
| 18 Sale versus lease (for sellers and/or lessors) | | | | |
| 19 Section 481(a) adjustments | | | | |
| 20 Unearned/deferred revenue | | | | |
| 21 Income recognition from long-term contracts | | | | |
| 22 Original issue discount and other imputed interest | | | | |
| 23a Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities | | | | |
| b Gross capital gains from Schedule D, excluding amounts from pass-through entities | | | | |
| c Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| d Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| e Abandonment losses | | | | |
| f Worthless stock losses (attach details) | | | | |
| g Other gain/loss on disposition of assets other than inventory | | | | |
| 24 Capital loss limitation and carryforward used | | | | |
| 25 Other income (loss) items with differences (attach schedule) | | | | |
| 26 Total income (loss) items. Combine lines 1 through 25 | | | | |
| 27 Total expense/deduction items (from Part III, line 38) | | | -2,213. | -2,213. |
| 28 Other items with no differences | | | | |
| 29a Mixed groups, see instructions. All others, combine lines 26 through 28 | 0. | 0. | -2,213. | -2,213. |
| b PC insurance subgroup reconciliation totals | | | | |
| c Life insurance subgroup reconciliation totals | | | | |
| 30 Reconciliation totals. Combine lines 29a through 29c | 0. | 0. | -2,213. | -2,213. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

Schedule **M-3** (Form 1120) 2010                                                                                          Page **3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group   **(2)** ☐ Parent corp   **(3)** ☒ Consolidated eliminations   **(4)** ☐ Subsidiary corp   **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated:   **(6)** ☐ 1120 group   **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|

| **Part III** | **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return — Expense/Deduction Items** (see instructions) |
|---|---|

| Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| 1  U.S. current income tax expense . . . . . . . . . . | | | | |
| 2  U.S. deferred income tax expense . . . . . . . . . | | | | |
| 3  State and local current income tax expense . | | | | |
| 4  State and local deferred income tax expense | | | | |
| 5  Foreign current income tax expense (other than foreign withholding taxes) . . . . . . . . . . . . . | | | | |
| 6  Foreign deferred income tax expense . . . . . . | | | | |
| 7  Foreign withholding taxes . . . . . . . . . . . . . . . . | | | | |
| 8  Interest expense (attach Form 8916-A) . . . . . . | | | | |
| 9  Stock option expense . . . . . . . . . . . . . . . . . . . | | | | |
| 10  Other equity-based compensation . . . . . . . . . . | | | | |
| 11  Meals and entertainment . . . . . . . . . . . . . . . . . | | | | |
| 12  Fines and penalties . . . . . . . . . . . . . . . . . . . . . | | | | |
| 13  Judgments, damages, awards, and similar costs . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 14  Parachute payments . . . . . . . . . . . . . . . . . . . . | | | | |
| 15  Compensation with section 162(m) limitation | | | | |
| 16  Pension and profit-sharing . . . . . . . . . . . . . . . | | | | |
| 17  Other post-retirement benefits . . . . . . . . . . . . | | | | |
| 18  Deferred compensation . . . . . . . . . . . . . . . . . | | | | |
| 19  Charitable contribution of cash and tangible property . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 20  Charitable contribution of intangible property . | | | | |
| 21  Charitable contribution limitation/carryforward . . . . . . . . | | | | |
| 22  Domestic production activities deduction . . . . | | | 2,213. | 2,213. |
| 23  Current year acquisition or reorganization investment banking fees . . . . . . . . . . . . . . . . . | | | | |
| 24  Current year acquisition or reorganization legal and accounting fees . . . . . . . . . . . . . . . | | | | |
| 25  Current year acquisition/reorganization other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 26  Amortization/impairment of goodwill . . . . . . . . | | | | |
| 27  Amortization of acquisition, reorganization, and start-up costs . . . . . . . . . . . . . . . . . . . . . | | | | |
| 28  Other amortization or impairment write-offs . . | | | | |
| 29  Section 198 environmental remediation costs | | | | |
| 30  Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 31  Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 32  Bad debt expense . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 33  Corporate owned life insurance premiums . . . | | | | |
| 34  Purchase versus lease (for purchasers and/or lessees) . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 35  Research and development costs (attach schedule) . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 36  Section 118 exclusion (att sch) . . . . . . . . . . . . | | | | |
| 37  Other expense/deduction items with differences (attach schedule) . . . . . . . . . . . . . . | | | | |
| 38  **Total expense/deduction items. Combine** lines 1 through 37. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive . . | | | 2,213. | 2,213. |

CPCA1023L   08/05/10                                                                              Schedule **M-3** (Form 1120) 2010

# Form 1118
(Rev December 2009)

Internal Revenue Service
Department of the Treasury

## Foreign Tax Credit — Corporations

► Attach to the corporation's tax return.
► See separate instructions.

OMB No. 1545-0122

For calendar year 2010, or other tax year beginning                    , and ending

Name of corporation: MMR GROUP, INC.

Employer identification number: 72-1271030

Use a **separate** Form 1118 for each applicable category of income listed below. See **Categories of Income** in the instructions. Also, see **Specific Instructions.**
Check only one box on each form.

[X] Passive Category Income

[ ] General Category Income

[ ] Section 901(j) Income: Name of Sanctioned Country ►

[ ] Income Re-sourced by Treaty: Name of Country ►

## Schedule A   Income or (Loss) Before Adjustments  (Report all amounts in U.S. dollars. See **Specific Instructions**)

### Gross Income or (Loss) From Sources Outside the United States (*INCLUDE* Foreign Branch Gross Income here *and* on Schedule F)

| 1 Foreign Country or U.S. Possession (Enter two-letter code from list in the instructions. Use a separate line for each.)* | 2 Deemed Dividends (see instructions) (a) Exclude gross-up | 2 (b) Gross-up (sec 78) | 3 Other Dividends (a) Exclude gross-up (sec-78) | 3 (b) Gross-up (sec 78) | 4 Interest | 5 Gross Rents, Royalties, and License Fees | 6 Gross Income From Performance of Services | 7 Other (attach schedule) | 8 Total (add columns 2(a) through 7) |
|---|---|---|---|---|---|---|---|---|---|
| A NI | 576,194. | 42,999. | | | | | | | 619,193. |
| B VE | 2,304,779. | 900,713. | | | | | | | 3,205,492. |
| C | | | | | | | | | |
| D | | | | | | | | | |
| E | | | | | | | | | |
| F | | | | | | | | | |
| Totals (add lines A thru F) | 2,880,973. | 943,712. | | | | | | | 3,824,685. |

* For section 863(b) income, NOLs, income from RICs, and high-taxed income, use a single line (see instructions).

### Deductions (*INCLUDE* Foreign Branch Deductions here *and* on Schedule F)

| | 9 Definitely Allocable Deductions | | | | | 10 Apportioned Share of Deductions Not Definitely Allocable (enter amount from applicable line of Schedule H, Part II, column (d)) | 11 Net Operating Loss Deduction | 12 Total Deductions (add columns 9(e) through 11) | 13 Total Income or (Loss) Before Adjustments (subtract column 12 from column 8) |
|---|---|---|---|---|---|---|---|---|---|
| | Rental, Royalty, and Licensing Expenses (a) Depreciation, Depletion, and Amortization | (b) Other Expenses | (c) Expenses Related to Gross Income From Performance of Services | (d) Other Definitely Allocable Deductions | (e) Total Definitely Allocable Deductions (add columns 9(a) through 9(d)) | | | | |
| A | | | | | | | | | 619,193. |
| B | | | | | | | | | 3,205,492. |
| C | | | | | | | | | |
| D | | | | | | | | | |
| E | | | | | | | | | |
| F | | | | | | | | | |
| Totals | | | | | | | | | 3,824,685. |

BAA  **For Paperwork Reduction Act Notice, see separate instructions**

Form **1118** (Rev 12-2009)

CPCA9512L  02/23/10

Form 1118 (Rev 12-2009) MMR GROUP, INC.    72-1271030    Page **2**

## Schedule B  Foreign Tax Credit (*Report all foreign tax amounts in U.S. dollars.*)

### Part I — Foreign Taxes Paid, Accrued, and Deemed Paid (*see instructions*)

| | 1 Credit is Claimed for Taxes: | | 2 Foreign Taxes Paid or Accrued (attach schedule showing amounts in foreign currency and conversion rate(s) used) | | | | | | | | (h) Total Foreign Taxes Paid or Accrued (add columns 2(a) through 2(g)) | 3 Tax Deemed Paid (from Schedule C — Part I, column 10, Part II, column 8(b), and Part III, column 8) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Paid / Accrued | | Tax Withheld at Source on: | | | Other Foreign Taxes Paid or Accrued on: | | | | | | |
| | Date Paid | Date Accrued | (a) Dividends | (b) Interest | (c) Rents, Royalties, and License Fees | (d) Section 863(b) Income | (e) Foreign Branch Income | (f) Services Income | (g) Other | | | |
| **A** | | | | | | | | | | | | 42,999. |
| **B** | | | | | | | | | | | | 900,713. |
| **C** | | | | | | | | | | | | |
| **D** | | | | | | | | | | | | |
| **E** | | | | | | | | | | | | |
| **F** | | | | | | | | | | | | |
| Totals (add lines A through F) | | | | | | | | | | | | 943,712. |

### Part II — Separate Foreign Tax Credit (*Complete a separate Part II for each applicable category of income.*)

1  Total foreign taxes paid or accrued (total from Part I, column 2(h)) ..... **943,712.**

2  Total taxes deemed paid (total from Part I, column 3) .....

3  Reductions of taxes paid, accrued, or deemed paid (enter total from Schedule G) .....

4  Taxes reclassified under high-tax kickout .....

5  Enter the sum of any carryover of foreign taxes (from Schedule K, line 3, column (xiv)) plus any carrybacks to the current tax year ..... **160,632.**

6  Total foreign taxes (combine lines 1 through 5) ..... **1,104,344.**

7  Enter the amount from the applicable column of Schedule J, Part I, line 11 (see instructions). If Schedule J is **not** required to be completed, enter the result from the 'Totals' line of column 13 of the applicable Schedule A ..... **3,824,685.**

8a Total taxable income from all sources (enter taxable income from the corporation's tax return) ..... **10,214,567.**

 b Adjustments to line 8a (see instructions) .....

 c Subtract line 8b from line 8a .....

9  Divide line 7 by line 8c. Enter the resulting fraction as a decimal (see instructions). If line 7 is greater than line 8c, enter 1 ..... **0.37443437**

10  Total U.S. income tax against which credit is allowed (regular tax liability (see section 26(b) minus American Samoa economic development credit)) ..... **3,475,098.**

11  Credit limitation (multiply line 9 by line 10) (see instructions) ..... **1,301,196.**

12  **Separate foreign tax credit** (enter the smaller of line 6 or line 11 here and on the appropriate line of Part III) ..... **1,104,344.**

### Part III — Summary of Separate Credits (Enter amounts from Part II, line 12 for **each** applicable category of income. **Do not** include taxes paid to sanctioned countries.)

1  Credit for taxes on passive category income ..... **1,104,344.**

2  Credit for taxes on general category income .....

3  Credit for taxes on income re-sourced by treaty (combine all such credits on this line) .....

4  Total (add lines 1 through 3) ..... **1,104,344.**

5  Reduction in credit for international boycott operations (see instructions) .....

6  **Total foreign tax credit** (subtract line 5 from line 4). Enter here and on the appropriate line of the corporation's tax return ..... **1,104,344.**

CPCA9512L  02/23/10

Form **1118** (Rev 12-2009)

Form **1118**
(Rev December 2009)

Internal Revenue Service
Department of the Treasury

### ALTERNATIVE MINIMUM TAX
# Foreign Tax Credit — Corporations
► Attach to the corporation's tax return.
► See separate instructions.

OMB No. 1545-0122

Name of corporation: MMR GROUP, INC.

Employer identification number: 72-1271030

For calendar year 2010, or other tax year beginning _____, and ending _____

Use a **separate** Form 1118 for each applicable category of income listed below. See **Categories of Income** in the instructions. Also, see **Specific Instructions.**
Check only one box on each form.

[X] Passive Category Income

[ ] General Category Income

[ ] Section 901(j) Income: Name of Sanctioned Country ►

[ ] Income Re-sourced by Treaty: Name of Country ►

**Schedule A** | **Income or (Loss) Before Adjustments** (*Report all amounts in U.S. dollars. See Specific Instructions*)

Gross Income or (Loss) From Sources Outside the United States (*INCLUDE Foreign Branch Gross Income here and on Schedule F*)

| 1 Foreign Country or U.S. Possession (Enter two-letter code from list in the instructions. Use a separate line for each.)* | 2 Deemed Dividends (see instructions) | | 3 Other Dividends | | 4 Interest | 5 Gross Rents, Royalties, and License Fees | 6 Gross Income From Performance of Services | 7 Other (attach schedule) | 8 Total (add columns 2(a) through 7) |
|---|---|---|---|---|---|---|---|---|---|
| | (a) Exclude gross-up (sec 78) | (b) Gross-up (sec 78) | (a) Exclude gross-up | (b) Gross-up (sec 78) | | | | | |
| A NI | 576,194. | | 42,999. | | | | | | 619,193. |
| B VE | 2,304,779. | | 900,713. | | | | | | 3,205,492. |
| C | | | | | | | | | |
| D | | | | | | | | | |
| E | | | | | | | | | |
| F | | | | | | | | | |
| Totals (add lines A thru F) | 2,880,973. | | 943,712. | | | | | | 3,824,685. |

* For section 863(b) income, NOLs, income from RICs, and high-taxed income, use a single line (see instructions).

Deductions (*INCLUDE Foreign Branch Deductions here and on Schedule F*)

| | 9 Definitely Allocable Deductions | | | | | 10 Apportioned Share of Deductions Not Definitely Allocable (enter amount from applicable line of Schedule H, Part II, column (d)) | 11 Net Operating Loss Deduction | 12 Total Deductions (add columns 9(e) through 11) | 13 Total Income or (Loss) Before Adjustments (subtract column 12 from column 8) |
|---|---|---|---|---|---|---|---|---|---|
| | Rental, Royalty, and Licensing Expenses | | (c) Expenses Related to Gross Income From Performance of Services | (d) Other Definitely Allocable Deductions | (e) Total Definitely Allocable Deductions (add columns 9(a) through 9(d)) | | | | |
| | (a) Depreciation, Depletion, and Amortization | (b) Other Expenses | | | | | | | |
| A | | | | | | | | | 619,193. |
| B | | | | | | | | | 3,205,492. |
| C | | | | | | | | | |
| D | | | | | | | | | |
| E | | | | | | | | | |
| F | | | | | | | | | |
| Totals | | | | | | | | | 3,824,685. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions**

Form **1118** (Rev 12-2009)

CPCA9512L  02/23/10

ALTERNATIVE MINIMUM TAX

Form 1118 (Rev 12-2009) MMR GROUP, INC.    72-1271030

Page **2**

## Schedule B  Foreign Tax Credit (*Report all foreign tax amounts in U.S. dollars.*)

### Part I — Foreign Taxes Paid, Accrued, and Deemed Paid (*see instructions*)

| | 1 Credit is Claimed for Taxes: | | 2 Foreign Taxes Paid or Accrued (attach schedule showing amounts in foreign currency and conversion rate(s) used) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Paid / Accrued | | Tax Withheld at Source on: | | | Other Foreign Taxes Paid or Accrued on: | | | (h) Total Foreign Taxes Paid or Accrued (add columns 2(a) through 2(g)) | 3 Tax Deemed Paid (from Schedule C — Part I, column 10, Part II, column 8(b), and Part III, column 8) |
| | Date Paid | Date Accrued | (a) Dividends | (b) Interest | (c) Rents, Royalties, and License Fees | (d) Section 863(b) Income | (e) Foreign Branch Income | (f) Services Income | (g) Other | | |
| A | | | | | | | | | | | 42,999. |
| B | | | | | | | | | | | 900,713. |
| C | | | | | | | | | | | |
| D | | | | | | | | | | | |
| E | | | | | | | | | | | |
| F | | | | | | | | | | | |
| Totals (add lines A through F) | | | | | | | | | | | 943,712. |

### Part II — Separate Foreign Tax Credit (*Complete a separate Part II for each applicable category of income.*)

1  Total foreign taxes paid or accrued (total from Part I, column 2(h)) .................... 943,712.
2  Total taxes deemed paid (total from Part I, column 3) ....................
3  Reductions of taxes paid, accrued, or deemed paid (enter total from Schedule G) ....................
4  Taxes reclassified under high-tax kickout ....................
5  Enter the sum of any carryover of foreign taxes (from Schedule K, line 3, column (xiv)) plus any carrybacks to the current tax year ......... 674,598.
6  Total foreign taxes (combine lines 1 through 5) .................... 1,618,310.
7  Enter the amount from the applicable column of Schedule J, Part I, line 11 (see instructions). If Schedule J is **not** required to be completed, enter the result from the 'Totals' line of column 13 of the applicable Schedule A .................... 3,824,685.
8a Total taxable income from all sources (enter taxable income from the corporation's tax return) .................... 8,384,373.
  b Adjustments to line 8a (see instructions) ....................
  c Subtract line 8b from line 8a .................... 8,384,373.
9  Divide line 7 by line 8c. Enter the resulting fraction as a decimal (see instructions). If line 7 is greater than line 8c, enter 1 .................... 0.45616830
10 Total U.S. income tax against which credit is allowed (regular tax liability (see section 26(b) minus American Samoa economic development credit) .................... 1,676,875.
11 Credit limitation (multiply line 9 by line 10) (see instructions) .................... 764,937.
12 **Separate foreign tax credit** (enter the smaller of line 6 or line 11 here and on the appropriate line of Part III) .................... 764,937.

### Part III — Summary of Separate Credits (Enter amounts from Part II, line 12 for **each** applicable category of income. **Do not** include taxes paid to sanctioned countries.)

1  Credit for taxes on passive category income. .................... 764,937.
2  Credit for taxes on general category income. ....................
3  Credit for taxes on income re-sourced by treaty (combine all such credits on this line). ....................
4  Total (add lines 1 through 3). .................... 764,937.
5  Reduction in credit for international boycott operations (see instructions) ....................
6  **Total foreign tax credit** (subtract line 5 from line 4). Enter here and on the appropriate line of the corporation's tax return. .................... 764,937.

Form **1118** (Rev 12-2009)

CPCA9512L  02/23/10

Form **2220**

Department of the Treasury
Internal Revenue Service

### Underpayment of Estimated Tax by Corporations

► See separate instructions.
► Attach to the corporation's tax return.

OMB No. 1545-0142

**2010**

| Name | Employer identification number |
|------|-------------------------------|
| MMR GROUP, INC. | 72-1271030 |

**Note:** *Generally, the corporation is not required to file Form 2220 (see Part II below for exceptions) because the IRS will figure any penalty owed and bill the corporation. However, the corporation may still use Form 2220 to figure the penalty. If so, enter the amount from page 2, line 38 on the estimated tax penalty line of the corporation's income tax return, but* **do not** *attach Form 2220.*

| Part I | Required Annual Payment | | | |
|--------|------------------------|---|---|---|
| **1** | Total tax (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **1** | 2,370,754. |
| **2a** | Personal holding company tax (Schedule PH (Form 1120), line 26) included on line 1 . . . . . . . . . . . . | **2a** | | |
| **b** | Look-back interest included on line 1 under section 460(b)(2) for completed long-term contracts or section 167(g) for depreciation under the income forecast method . . . . . . . . . . . . . . . | **2b** | | |
| **c** | Credit for federal tax paid on fuels (see instructions) . . . . . . . . . . . . . . . . . . . . | **2c** | | |
| **d** | **Total.** Add lines 2a through 2c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **2d** | |
| **3** | Subtract line 2d from line 1. If the result is less than $500, **do not** complete or file this form. The corporation does not owe the penalty . . . . . . . . . . . . . . . . . . . . . . . . . . | | **3** | 2,370,754. |
| **4** | Enter the tax shown on the corporation's 2009 income tax return (see instructions). **Caution:** *If the tax is zero or the tax year was for less than 12 months, skip this line and enter the amount from line 3 on line 5* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **4** | 13,779,864. |
| **5** | **Required annual payment.** Enter the **smaller** of line 3 or line 4. If the corporation is required to skip line 4, enter the amount from line 3 . . . . . . . . . . . . . . . . . . . . . . . . . . | | **5** | 2,370,754. |

| Part II | Reasons for Filing — Check the boxes below that apply. If any boxes are checked, the corporation **must** file Form 2220, even if it does not owe a penalty (see instructions). |
|---------|---|
| **6** | ☐ The corporation is using the adjusted seasonal installment method. |
| **7** | ☐ The corporation is using the annualized income installment method. |
| **8** | ☒ The corporation is a 'large corporation' figuring its first required installment based on the prior year's tax. |

| Part III | Figuring the Underpayment | | | (a) | (b) | (c) | (d) |
|----------|--------------------------|---|---|-----|-----|-----|-----|
| **9** | **Installment due dates.** Enter in columns (a) through (d) the 15th day of the 4th (**Form 990– PF filers:** Use 5th month), 6th, 9th, and 12th months of the corporation's tax year . . . . . . . . . . . . | | **9** | 4/15/10 | 6/15/10 | 9/15/10 | 12/15/10 |
| **10** | **Required installments.** If the box on line 6 and/or line 7 above is checked, enter the amounts from Schedule A, line 38. If the box on line 8 (but not 6 or 7) is checked, see instructions for the amounts to enter. If none of these boxes are checked, enter 25% of line 5 above in each column . . . . . . . . . . . | | **10** | 592,688. | 592,688. | 592,689. | 592,689. |
| **11** | Estimated tax paid or credited for each period (see instructions). For column (a) only, enter the amount from line 11 on line 15 . . . . . . . . . . | | **11** | 3,244,555. | | | |
| | **Complete lines 12 through 18 of one column before going to the next column.** | | | | | | |
| **12** | Enter amount, if any, from line 18 of the preceding column . . . . . . . | | **12** | | 2,651,867. | 2,059,179. | 1,466,490. |
| **13** | Add lines 11 and 12 . . . . . . . . . . . . . . . . . . . . . . . . | | **13** | | 2,651,867. | 2,059,179. | 1,466,490. |
| **14** | Add amounts on lines 16 and 17 of the preceding column . . . . . . . | | **14** | | | | |
| **15** | Subtract line 14 from line 13. If zero or less, enter -0- . . . . . . . . . | | **15** | 3,244,555. | 2,651,867. | 2,059,179. | 1,466,490. |
| **16** | If the amount on line 15 is zero, subtract line 13 from line 14. Otherwise, enter -0- . . . . . . . . | | **16** | | 0. | 0. | |
| **17** | **Underpayment.** If line 15 is less than or equal to line 10, subtract line 15 from line 10. Then go to line 12 of the next column. Otherwise, go to line 18 . . . . . . . . . . | | **17** | | | | |
| **18** | **Overpayment.** If line 10 is less than line 15, subtract line 10 from line 15. Then go to line 12 of the next column . . . . . . . . . . | | **18** | 2,651,867. | 2,059,179. | 1,466,490. | |

*Go to Part IV on page 2 to figure the penalty. Do not go to Part IV if there are no entries on line 17— no penalty is owed.*

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**

CPCZ0312L  02/25/11

Form **2220** (2010)

Form **2220** (2010)   MMR GROUP, INC.                     72-1271030           Page **2**

| Part IV | Figuring the Penalty |
|---|---|

| | | | (a) | (b) | (c) | (d) |
|---|---|---|---|---|---|---|
| 19 | Enter the date of payment or the 15th day of the 3rd month after the close of the tax year, whichever is earlier (see instructions). **(Form 990-PF and Form 990-T filers:**Use 5th month instead of 3rd month.) . . . . | 19 | | | | |
| 20 | Number of days from due date of installment on line 9 to the date shown on line 19 . . . . . . . . . . . . . . | 20 | | | | |
| 21 | Number of days on line 20 after 4/15/2010 and before 7/1/2010 . . . . . . . . . . . . . . . . . . . . . . . . . | 21 | | | | |
| 22 | Underpayment on line 17   x   Number of days on line 21 ÷ 365   x 4% . . | 22 | | | | |
| 23 | Number of days on line 20 after 6/30/2010 and before 10/1/2010 . . . . . . . . . . . . . . . . . . . . . . . . . | 23 | | | | |
| 24 | Underpayment on line 17   x   Number of days on line 23 ÷ 365   x 4% . . . | 24 | | | | |
| 25 | Number of days on line 20 after 9/30/2010 and before 1/1/2011 . . . . . . . . . . . . . . . . . . . . . . . . . | 25 | | | | |
| 26 | Underpayment on line 17   x   Number of days on line 25 ÷ 365   x 4% . . . | 26 | | | | |
| 27 | Number of days on line 20 after 12/31/2010 and before 4/1/2011 . . . . . . . . . . . . . . . . . . . . . . . . | 27 | | | | |
| 28 | Underpayment on line 17   x   Number of days on line 27 ÷ 365   x 3% . . . | 28 | | | | |
| 29 | Number of days on line 20 after 3/31/2011 and before 7/1/2011 . . . . . . . . . . . . . . . . . . . . . . . . . | 29 | | | | |
| 30 | Underpayment on line 17   x   Number of days on line 29 ÷ 365   x ___ *% . . . | 30 | | | | |
| 31 | Number of days on line 20 after 6/30/2011 and before 10/1/2011 . . . . . . . . . . . . . . . . . . . . . . . . . | 31 | | | | |
| 32 | Underpayment on line 17   x   Number of days on line 31 ÷ 365   x ___ *% . . . | 32 | | | | |
| 33 | Number of days on line 20 after 9/30/2011 and before 1/1/2012 . . . . . . . . . . . . . . . . . . . . . . . . . | 33 | | | | |
| 34 | Underpayment on line 17   x   Number of days on line 33 ÷ 365   x ___ *% . . . | 34 | | | | |
| 35 | Number of days on line 20 after 12/31/2011 and before 2/16/2012 . . . . . . . . . . . . . . . . . . . . . . . | 35 | | | | |
| 36 | Underpayment on line 17   x   Number of days on line 35 ÷ 366   x ___ *% . . . | 36 | | | | |
| 37 | Add lines 22, 24, 26, 28, 30, 32, 34, and 36 . . . . . . . . . | 37 | | | | |
| 38 | **Penalty.** Add columns (a) through (d) of line 37. Enter the total here and on Form 1120, line 33; or the comparable line for other income tax returns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 38 | | | | 0. |

*Use the penalty interest rate for each calendar quarter, which the IRS will determine during the first month in the preceding quarter. These rates are published quarterly in an IRS News Release and in a revenue ruling in the Internal Revenue Bulletin. To obtain this information on the Internet, access the IRS website at **www.irs.gov.** You can also call 1-800-829-4933 to get interest rate information.

| Form **4562** | **Depreciation and Amortization** | OMB No. 1545-0172 |
|---|---|---|
| | **(Including Information on Listed Property)** | **2010** |
| Department of the Treasury<br>Internal Revenue Service   (99) | ► See separate instructions.   ► Attach to your tax return. | Attachment<br>Sequence No. **67** |

| Name(s) shown on return | Identifying number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Business or activity to which this form relates
FORM 1120

## Part I — Election To Expense Certain Property Under Section 179
**Note:** *If you have any listed property, complete Part V before you complete Part I.*

| | | | |
|---|---|---|---|
| 1 | Maximum amount (see instructions)................................................ | **1** | 500,000. |
| 2 | Total cost of section 179 property placed in service (see instructions)........................ | **2** | |
| 3 | Threshold cost of section 179 property before reduction in limitation (see instructions).............. | **3** | 2,000,000. |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0-................... | **4** | |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions........................ | **5** | |

| 6 | **(a)** Description of property | **(b)** Cost (business use only) | **(c)** Elected cost |
|---|---|---|---|
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| 7 | Listed property. Enter the amount from line 29.................................... **7** | | |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7............. | **8** | |
| 9 | Tentative deduction. Enter the **smaller** of line 5 or line 8............................. | **9** | |
| 10 | Carryover of disallowed deduction from line 13 of your 2009 Form 4562..................... | **10** | |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5 (see instrs). | **11** | |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but do not enter more than line 11.......... | **12** | |
| 13 | Carryover of disallowed deduction to 2011. Add lines 9 and 10, less line 12.........► **13** | | |

**Note:** *Do not use Part II or Part III below for listed property. Instead, use Part V.*

## Part II — Special Depreciation Allowance and Other Depreciation (Do not include listed property.) (See instructions.)

| | | | |
|---|---|---|---|
| 14 | Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year (see instructions)........................ | **14** | |
| 15 | Property subject to section 168(f)(1) election.................................... | **15** | |
| 16 | Other depreciation (including ACRS)......................................... | **16** | |

## Part III — MACRS Depreciation (Do not include listed property.) (See instructions)

### Section A

| | | | |
|---|---|---|---|
| 17 | MACRS deductions for assets placed in service in tax years beginning before 2010.............. | **17** | 3,368,534. |
| 18 | If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here.........................► ☐ | | |

### Section B — Assets Placed in Service During 2010 Tax Year Using the General Depreciation System

| **(a)** Classification of property | **(b)** Month and year placed in service | **(c)** Basis for depreciation (business/investment use only — see instructions) | **(d)** Recovery period | **(e)** Convention | **(f)** Method | **(g)** Depreciation deduction |
|---|---|---|---|---|---|---|
| **19a** 3-year property........... | | | | | | |
| **b** 5-year property........... | | 1,082,531. | 5 | HY | S/L | 129,235. |
| **c** 7-year property........... | | 1,238,784. | 7 | HY | S/L | 82,388. |
| **d** 10-year property......... | | 114,697. | 10 | HY | S/L | 1,925. |
| **e** 15-year property......... | | 623,159. | 15 | HY | S/L | 6,962. |
| **f** 20-year property......... | | 2,292,298. | 20 | HY | S/L | 77,014. |
| **g** 25-year property......... | | | 25 yrs | | S/L | |
| **h** Residential rental property.............. | | | 27.5 yrs | MM | S/L | |
| | | | 27.5 yrs | MM | S/L | |
| **i** Nonresidential real property.............. | | | 39 yrs | MM | S/L | |
| | | | | MM | S/L | |

### Section C — Assets Placed in Service During 2010 Tax Year Using the Alternative Depreciation System

| | | | | | | |
|---|---|---|---|---|---|---|
| **20a** Class life................ | | | | | S/L | |
| **b** 12-year.............. | | | 12 yrs | | S/L | |
| **c** 40-year.............. | | | 40 yrs | MM | S/L | |

## Part IV — Summary (See instructions.)

| | | | |
|---|---|---|---|
| 21 | Listed property. Enter amount from line 28..................................... | **21** | |
| 22 | **Total.** Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations — see instructions....... | **22** | 3,666,058. |
| 23 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs..................... **23** | | |

**BAA For Paperwork Reduction Act Notice, see separate instructions.**       FDIZ0812L 10/29/10       Form **4562** (2010)

Form **5471**

(Rev December 2007)

Department of the Treasury
Internal Revenue Service

# Information Return of U.S. Persons With Respect To Certain Foreign Corporations

► See separate instructions.

Information furnished for the foreign corporation's annual accounting period (tax year required by section 898) (see instructions) beginning   1/01 , 2010 , and ending   12/31 , 2010

OMB No. 1545-0704

Attachment Sequence No. **121**

| Name of person filing this return | A | Identifying number |
|---|---|---|
| MMR GROUP, INC. | | 72-1271030 |

| Number, street, and room or suite no. (or P.O. box number if mail is not delivered to street address) | B | Category of filer (See instructions. Check applicable box(es)): |
|---|---|---|
| 15961 AIRLINE HIGHWAY | | **1** (repealed)  **2** X  **3**  **4**  **5** |

| City or town, state, and ZIP code | C | Enter the total percentage of the foreign corporation's voting stock you |
|---|---|---|
| BATON ROUGE, LA 70817-7412 | | owned at the end of its annual accounting period  100.0000 % |

Filer's tax year beginning   1/01 , 2010 , and ending   12/31 , 2010

**D**   Person(s) on whose behalf this information return is filed:

| (1) Name | (2) Address | (3) Identifying number | (4) Check applicable box(es) | | |
|---|---|---|---|---|---|
| | | | Shareholder | Officer | Director |
| MMR CONSTRUCTORS, INC. | 15961 AIRLINE HIGHWAY | 72-1046000 | X | | |
| | BATON ROUGE, LA 70817-7412 | | | | |
| | | | | | |
| | | | | | |

**Important:**  *Fill in all applicable lines and schedules. All information **must** be in English. All amounts **must** be stated in U.S. dollars unless otherwise indicated.*

| **1a** Name and address of foreign corporation | **b** Employer identification number, if any |
|---|---|
| MMR INTERNATIONAL, LTD  AKARA BUILDING 24, DE CASTRO STREET  WICHAMS CAY I, ROAD TOWN, TORTOLA, | |
| | **c** Country under whose laws incorporated  BRITISH VIRGIN ISLANDS |

| **d** Date of incorporation | **e** Principal place of business | **f** Principal business activity code number | **g** Principal business activity | **h** Functional currency |
|---|---|---|---|---|
| 6/27/1997 | VENEZUELA | 235310 | ELECTRICAL | BOLIVAR |

**2**   Provide the following information for the foreign corporation's accounting period stated above.

| **a** Name, address, and identifying number of branch office or agent (if any) in the United States | **b** If a U.S. income tax return was filed, enter: | |
|---|---|---|
| | *(i)* Taxable income or (loss) | *(ii)* U.S. income tax paid (after all credits) |
| | | |

| **c** Name and address of foreign corporation's statutory or resident agent in country of incorporation | **d** Name and address (including corporate department, if applicable) of person (or persons) with custody of the books and records of the foreign corporation, and the location of such books and records, if different |
|---|---|
| MOSSACK FONSECA & CO (B.V.I.) LTD  P.O. BOX 3136  ROAD TOWN, TORTOLA, | DONALD W. FAIRBANKS  15961 AIRLINE HIGHWAY  BATON ROUGE, LA 70817-7412 |

## Schedule A    Stock of the Foreign Corporation

| (a) Description of each class of stock | (b) Number of shares issued and outstanding | |
|---|---|---|
| | *(i)* Beginning of annual accounting period | *(ii)* End of annual accounting period |
| | | |
| | | |
| | | |
| | | |

**BAA  For Paperwork Reduction Act Notice, see the instructions.**

Form **5471** (Rev 12-2007)

Form **5471** (Rev 12-2007)  MMR GROUP, INC.                                    72-1271030                    Page **2**

## Schedule B | U.S. Shareholders of Foreign Corporation (see instructions)

| (a) Name, address, and identifying number of shareholder | (b) Description of each class of stock held by shareholder. **Note:** This description should match the corresponding description entered in Schedule A, column (a). | (c) Number of shares held at beginning of annual accounting period | (d) Number of shares held at end of annual accounting period | (e) Pro rata share of subpart F income (enter as a percentage) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## Schedule C | Income Statement (see instructions)

**Important:** *Report all information in functional currency in accordance with U.S. GAAP. Also, report each amount in U.S. dollars translated from functional currency (using GAAP translation rules). However, if the functional currency is the U.S. dollar, complete only the U.S. Dollars column. See instructions for special rules for DASTM corporations.*

| | | | | Functional Currency | U.S. Dollars |
|---|---|---|---|---|---|
| **I N C O M E** | **1a** | Gross receipts or sales................................................ | **1a** | | |
| | **b** | Returns and allowances.............................................. | **b** | | |
| | **c** | Subtract line 1b from line 1a...................................... | **c** | | |
| | **2** | Cost of goods sold.................................................. | **2** | | |
| | **3** | Gross profit (subtract line 2 from line 1c)......................... | **3** | | |
| | **4** | Dividends........................................................... | **4** | | |
| | **5** | Interest............................................................ | **5** | | |
| | **6a** | Gross rents......................................................... | **6a** | | |
| | **b** | Gross royalties, and license fees................................... | **6b** | | |
| | **7** | Net gain or (loss) on sale of capital assets....................... | **7** | | |
| | **8** | Other income (attach schedule)..................................... | **8** | | |
| | **9** | Total income (add lines 3 through 8)............................... | **9** | | |
| **D E D U C T I O N S** | **10** | Compensation not deducted elsewhere............................... | **10** | | |
| | **11a** | Rents.............................................................. | **11a** | | |
| | **b** | Royalties, and license fees........................................ | **11b** | | |
| | **12** | Interest........................................................... | **12** | | |
| | **13** | Depreciation not deducted elsewhere................................ | **13** | | |
| | **14** | Depletion.......................................................... | **14** | | |
| | **15** | Taxes (exclude provision for income, war profits, and excess profits taxes)...... | **15** | | |
| | **16** | Other deductions (attach schedule — exclude provision for income, war profits, and excess profits taxes)................ | **16** | | |
| | **17** | Total deductions (add lines 10 through 16)......................... | **17** | | |
| **N E T  I N C O M E** | **18** | Net income or (loss) before extraordinary items, prior period adjustments, and the provision for income, war profits, and excess profits taxes (subtract line 17 from line 9)............ | **18** | | |
| | **19** | Extraordinary items and prior period adjustments (see instrs)...... | **19** | | |
| | **20** | Provision for income, war profits, and excess profits taxes (see instructions)......... | **20** | | |
| | **21** | Current year net income or (loss) per books (combine lines 18 through 20)........ | **21** | | |

CPCA8712L  06/21/07                                                                            Form **5471** (Rev 12-2007)

Form **5471** (Rev 12-2007)  MMR GROUP, INC.                                72-1271030        Page **3**

| Schedule E | Income, War Profits, and Excess Profits Taxes Paid or Accrued (see instructions) |

| (a) Name of country or U.S. possession | Amount of tax | | |
|---|---|---|---|
| | (b) In foreign currency | (c) Conversion rate | (d) In U.S. dollars |
| 1  U.S. | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8  Total............................................................▶ | | | |

| Schedule F | Balance Sheet |

**Important:** *Report all amounts in U.S. dollars prepared and translated in accordance with U.S. GAAP. See instructions for an exception for DASTM corporations.*

| Assets | | (a) Beginning of annual accounting period | (b) End of annual accounting period |
|---|---|---|---|
| 1  Cash.................................................. | 1 | | |
| 2a Trade notes and accounts receivable................... | 2a | | |
| b Less allowance for bad debts........................ | 2b | | |
| 3  Inventories........................................... | 3 | | |
| 4  Other current assets (attach schedule)................ | 4 | | |
| 5  Loans to shareholders and other related persons........ | 5 | | |
| 6  Investment in subsidiaries (attach schedule)........... | 6 | | |
| 7  Other investments (attach schedule).................. | 7 | | |
| 8a Buildings and other depreciable assets................. | 8a | | |
| b Less accumulated depreciation...................... | 8b | | |
| 9a Depletable assets..................................... | 9a | | |
| b Less accumulated depletion......................... | 9b | | |
| 10 Land (net of any amortization)........................ | 10 | | |
| 11 Intangible assets: | | | |
| a Goodwill........................................... | 11a | | |
| b Organization costs.................................. | 11b | | |
| c Patents, trademarks, and other intangible assets..... | 11c | | |
| d Less accumulated amortization for lines 11a, b, and c.. | 11d | | |
| 12 Other assets (attach schedule)........................ | 12 | | |
| 13 Total assets........................................... | 13 | | |

| Liabilities and Shareholders' Equity | | | |
|---|---|---|---|
| 14 Accounts payable.................................... | 14 | | |
| 15 Other current liabilities (attach schedule)............. | 15 | | |
| 16 Loans from shareholders and other related persons...... | 16 | | |
| 17 Other liabilities (attach schedule).................... | 17 | | |
| 18 Capital stock: | | | |
| a Preferred stock..................................... | 18a | | |
| b Common stock..................................... | 18b | | |
| 19 Paid-in or capital surplus (attach reconciliation)....... | 19 | | |
| 20 Retained earnings................................... | 20 | | |
| 21 Less cost of treasury stock.......................... | 21 | | |
| 22 Total liabilities and shareholders' equity.............. | 22 | | |

**BAA**                                                                Form **5471** (Rev 12-2007)

Form **5471** (Rev 12-2007)  MMR GROUP, INC.                                72-1271030          Page **4**

## Schedule G | Other Information

|   |                                                                                                                                                                                                                 | Yes | No |
|---|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-----|----|
| 1 | During the tax year, did the foreign corporation own at least a 10% interest, directly or indirectly, in any foreign partnership?.. |  | X |
|   | If 'Yes,' see the instructions for required attachment. | | |
| 2 | During the tax year, did the foreign corporation own an interest in any trust? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | X |
| 3 | During the tax year, did the foreign corporation own any foreign entities that were disregarded as entities separate from their owners under Regulations sections 301.7701-2 and 301.7701-3 (see instructions)? . . . . . . . . . . . . . . . . . . . . . . . . . . |  | X |
|   | If 'Yes,' you are generally required to attach Form 8858 for each entity (see instructions). | | |
| 4 | During the tax year, was the foreign corporation a participant in any cost sharing arrangement? . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | X |
| 5 | During the course of the tax year, did the foreign corporation become a participant in any cost sharing arrangement? . . . . . . . . . |  | X |

## Schedule H | Current Earnings and Profits (see instructions)

**Important:** *Enter the amounts on lines 1 through 5c in **functional** currency.*

| |  | Net Additions | Net Subtractions | | |
|---|---|---|---|---|---|
| 1 | Current year net income or (loss) per foreign books of account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **1** | |
| 2 | Net adjustments made to line 1 to determine current earnings and profits according to U.S. financial and tax accounting standards (see instructions): | | | | |
| a | Capital gains or losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| b | Depreciation and amortization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| c | Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| d | Investment or incentive allowance . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| e | Charges to statutory reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| f | Inventory adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| g | Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| h | Other (attach schedule) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 3 | Total net additions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 4 | Total net subtractions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 5a | Current earnings and profits (line 1 plus line 3 minus line 4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **5a** | |
| b | DASTM gain or (loss) for foreign corporations that use DASTM (see instructions) . . . . . . . . . . . . . . . . . . . . . | | | **5b** | |
| c | Combine lines 5a and 5b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **5c** | |
| d | Current earnings and profits in U.S. dollars (line 5c translated at the appropriate exchange rate as defined in section 989(b) and the related regulations (see instructions)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **5d** | |
| | Enter exchange rate used for line 5d ► | | | | |

## Schedule I | Summary of Shareholder's Income From Foreign Corporation (see instructions)

| |  | | |
|---|---|---|---|
| 1 | Subpart F income (line 38b, Worksheet A in the instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1** | |
| 2 | Earnings invested in U.S. property (line 17, Worksheet B in the instructions) . . . . . . . . . . . . . . . . . . . . . . . . . | **2** | |
| 3 | Previously excluded subpart F income withdrawn from qualified investments (line 6b, Worksheet C in the instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **3** | |
| 4 | Previously excluded export trade income withdrawn from investment in export trade assets (line 7b, Worksheet D in the instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **4** | |
| 5 | Factoring income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **5** | |
| 6 | Total of lines 1 through 5. Enter here and on your income tax return. See instructions . . . . . . . . . . . . . . . . . . | **6** | |
| 7 | Dividends received (translated at spot rate on payment date under section 989(b)(1)) . . . . . . . . . . . . . . . . . . . . . | **7** | |
| 8 | Exchange gain or (loss) on a distribution of previously taxed income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **8** | |

|   |   | Yes | No |
|---|---|-----|----|
| • | Was any income of the foreign corporation blocked? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| • | Did any such income become unblocked during the tax year (see section 964(b))? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| | If the answer to either question is 'Yes,' attach an explanation. | | |

Form **5471** (Rev 12-2007)

**SCHEDULE O**
**(Form 5471)**

(Rev December 2005)

Department of the Treasury
Internal Revenue Service

# Organization or Reorganization of Foreign Corporation, and Acquisitions and Dispositions of its Stock

► **Attach to Form 5471. See Instructions for Form 5471.**

OMB No. 1545-0704

| Name of person filing Form 5471 | Identifying number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Name of foreign corporation
MMR INTERNATIONAL, LTD

**Important:** *Complete a **separate** Schedule O for each foreign corporation for which information must be reported.*

| Part I | To Be Completed by U.S. Officers and Directors |
|---|---|

| (a) Name of shareholder for whom acquisition information is reported | (b) Address of shareholder | (c) Identifying number of shareholder | (d) Date of original 10% acquisition | (e) Date of additional 10% acquisition |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| Part II | To Be Completed by U.S. Shareholders |
|---|---|

**Note:** *If this return is required because one or more shareholders became U.S. persons, attach a list showing the names of such persons and the date each became a U.S. person.*

## Section A—General Shareholder Information

| (a) Name, address, and identifying number of shareholder(s) filing this schedule | (b) For shareholder's latest U.S. income tax return filed, indicate: | | | (c) Date (if any) shareholder last filed information return under section 6046 for the foreign corporation |
|---|---|---|---|---|
| | (1) Type of return (enter form number) | (2) Date return filed | (3) Internal Revenue Service Center where filed | |
| | | | | |
| | | | | |

## Section B—U.S. Persons Who Are Officers or Directors of the Foreign Corporation

| (a) Name of U.S. officer or director | (b) Address | (c) Social security number | (d) Check appropriate box(es) | |
|---|---|---|---|---|
| | | | Officer | Director |
| | | | | |
| | | | | |
| | | | | |

## Section C—Acquisition of Stock

| (a) Name of shareholder(s) filing this schedule | (b) Class of stock acquired | (c) Date of acquisition | (d) Method of acquisition | (e) Number of shares acquired | | |
|---|---|---|---|---|---|---|
| | | | | (1) Directly | (2) Indirectly | (3) Constructively |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 5471.**     CPCA8789L  06/24/05     Schedule O (Form 5471) (Rev 12-2005)

OMB No. 1545-1984

**Form 8903**
(Rev December 2010)
Department of the Treasury
Internal Revenue Service

# Domestic Production Activities Deduction

► Attach to your tax return.    ► See separate instructions.

Attachment
Sequence No. **143**

Name(s) as shown on return

MMR GROUP, INC.

Identifying number

72-1271030

**Note. Do not** complete column (a), unless you have oil-related production activities. Enter amounts for all activities in column (b), including oil-related production activities.

| | | | **(a)** Oil-related production activities | **(b)** All activities |
|---|---|---|---|---|
| 1 | Domestic production gross receipts (DPGR) | 1 | | 255,881,001. |
| 2 | Allocable cost of goods sold. If you are using the small business simplified overall method, skip lines 2 and 3 | 2 | | 202,809,966. |
| 3 | Enter deductions and losses allocable to DPGR (see instructions) | 3 | | 50,801,926. |
| 4 | If you are using the small business simplified overall method, enter the amount of cost of goods sold and other deductions or losses you ratably apportion to DPGR. All others, skip line 4 | 4 | | |
| 5 | Add lines 2 through 4 | 5 | | 253,611,892. |
| 6 | Subtract line 5 from line 1 | 6 | | 2,269,109. |
| 7 | Qualified production activities income from estates, trusts, and certain partnerships and S corporations (see instructions) | 7 | | |
| 8 | Add line 6 and 7. Estates and trusts, go to line 9, all others, skip line 9 and go to line 10 | 8 | | 2,269,109. |
| 9 | Amount allocated to beneficiaries of the estate or trust (see instructions) | 9 | | |
| 10a | **Oil-related qualified production activities income.** Estates and trusts, subtract line 9, column (a), from line 8, column (a), all others, enter amount from line 8, column (a). If zero or less, enter -0- here | 10a | | |
| b | **Qualified production activities income.** Estates and trusts, subtract line 9, column (b), from line 8, column (b), all others, enter amount from line 8, column (b). If zero or less, enter -0- here, skip lines 11 through 21, and enter -0- on line 22 | 10b | | 2,269,109. |
| 11 | Income limitation (see instructions):<br>• Individuals, estates, and trusts. Enter your adjusted gross income figured without the domestic production activities deduction<br>• All others. Enter your taxable income figured without the domestic production activities deduction (tax-exempt organizations, see instructions) | 11 | | 10,418,787. |
| 12 | Enter the smaller of line 10b or line 11. If zero or less, enter -0- here, skip lines 13 through 21, and enter -0- on line 22 | 12 | | 2,269,109. |
| 13 | Enter 9% of line 12 | 13 | | 204,220. |
| 14a | Enter the smaller of line 10a or line 12 | 14a | | |
| b | Reduction for oil-related qualified production activities income. Multiply line 14a by 3% | 14b | | |
| 15 | Subtract line 14b from line 13 | 15 | | 204,220. |
| 16 | Form W-2 wages (see instructions) | 16 | | 147,101,614. |
| 17 | Form W-2 wages from estates, trusts, and certain partnerships and S corporations (see instructions) | 17 | | |
| 18 | Add lines 16 and 17. Estates and trusts, go to line 19, all others, skip line 19 and go to line 20 | 18 | | 147,101,614. |
| 19 | Amount allocated to beneficiaries of the estate or trust (see instructions) | 19 | | |
| 20 | Estates and trusts, subtract line 19 from line 18, all others, enter amount from line 18 | 20 | | 147,101,614. |
| 21 | Form W-2 wage limitation. Enter 50% of line 20 | 21 | | 73,550,807. |
| 22 | Enter the smaller of line 15 or line 21 | 22 | | 204,220. |
| 23 | Domestic production activities deduction from cooperatives. Enter deduction from Form 1099-PATR, box 6 | 23 | | |
| 24 | Expanded affiliated group allocation (see instructions) | 24 | | |
| 25 | **Domestic production activities deduction.** Combine lines 22 through 24 and enter the result here and on Form 1040, line 35; Form 1120, line 25; or the applicable line of your return | 25 | | 204,220. |

**BAA For Paperwork Reduction Act Notice, see separate instructions.**

Form **8903** (Rev.12-2010)

FDIZ4001L  12/29/10

Form **8925**

(January 2010)

Department of the Treasury
Internal Revenue Service    **(99)**

# Report of Employer-Owned Life Insurance Contracts

► **Attach to the policyholder's tax return — See instructions.**

OMB No. 1545-2089

Attachment
Sequence No. **160**

| Name(s) shown on return | Identifying number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |
| Name of policyholder, if different from above | Identifying number, if different from above |
| MMR CONSTRUCTORS, INC. | 72-1046000 |

Type of business

CONSTRUCTION : 238210

| | | |
|---|---|---:|
| **1** Enter the number of employees the policyholder had at the end of the tax year.......................... | **1** | 21. |
| **2** Enter the number of employees included on line 1 who were insured at the end of the tax year under the policyholder's employer-owned life insurance contract(s) issued after August 17, 2006. See *Section 1035 exchanges* in the instructions for an exception................................................... | **2** | 21. |
| **3** Enter the total amount of employer-owned life insurance in force at the end of the tax year for employees who were insured under the contract(s) specified on line 2................................. | **3** | 97,386,328. |
| **4a** Does the policyholder have a valid consent (see instructions) for each employee included on line 2?........................................................ [X] Yes  [ ] No | | |
| **b** If 'No,' enter the number of employees included on line 2 for whom the policyholder does not have a valid consent................................................. | **4b** | |

**BAA  For Paperwork Reduction Act Notice, see instructions.**    CPCA4501L  04/06/10    Form **8925** (12-2009)

# Consolidated Statement of Income and Deductions

**12/31/10**  **Page 1**

**MMR GROUP, INC.**  72-1271030

| | | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|---|
| | **INCOME** | | | | | | | | |
| 1a | Gross receipts or sales | | 249,183,817. | 230,237. | 871,272. | 250,285,326. | | | 250,285,326. |
| 1b | Less returns and allowances | | | | | | | | |
| 1c | Net sales | | 249,183,817. | 230,237. | 871,272. | 250,285,326. | | | 250,285,326. |
| 2 | Cost of goods sold | | 201,763,072. | 205,893. | 841,001. | 202,809,966. | | | 202,809,966. |
| 3 | Gross profit | | 47,420,745. | 24,344. | 30,271. | 47,475,360. | | | 47,475,360. |
| 4 | Dividends | 9,983,195. | | | | 9,983,195. | | | 9,983,195. |
| 5 | Interest | | 176,579. | | | 176,579. | | | 176,579. |
| 6 | Gross rents | | | | | | | | |
| 7 | Gross royalties | | | | | | | | |
| 8 | Capital gain net income | | | | | | | | |
| 9 | Net gain (loss) from 4797 | | | | | | | | |
| 10 | Other income | Statement 1 | 5,415,162. | 250. | 152,204. | 5,567,616. | | | 5,567,616. |
| 11 | **Total income** | 9,983,195. | 53,012,486. | 24,594. | 182,475. | 63,202,750. | | | 63,202,750. |
| | **DEDUCTIONS** | | | | | | | | |
| 12 | Compensation of officers | | 16,245,095. | | | 16,245,095. | | | 16,245,095. |
| 13 | Salaries and wages | | 15,298,428. | 182,351. | 286,373. | 15,767,152. | | | 15,767,152. |
| 14 | Repairs and maintenance | | 1,248,162. | 1,770. | | 1,249,932. | | | 1,249,932. |
| 15 | Bad debts | | | | | | | | |
| 16 | Rents | | 1,119,497. | 10,850. | 13,569. | 1,143,916. | | | 1,143,916. |
| 17 | Taxes and licenses | 321,419. | 504,584. | 7,310. | 118. | 833,431. | | | 833,431. |
| 18 | Interest expense | 149,959. | 503,046. | 41. | | 653,046. | | | 653,046. |
| 19 | Charitable contributions | | | | | | | | |
| 20c | Depreciation | 537,672. | 3,117,911. | | 10,475. | 3,666,058. | | | 3,666,058. |
| 21 | Depletion | | | | | | | | |
| 22 | Advertising | | 66,111. | | 1,400. | 67,511. | | | 67,511. |
| 23 | Pension, profit-sharing plans | | 300,000. | | | 300,000. | | | 300,000. |
| 24 | Employee benefit programs | | | | | | | | |
| 25 | Domestic production activities deduction | | | | | | | | |
| 26 | Other deductions | Statement 2 | 202,007. | 38,152. | 454,538. | 202,007. | | -2,213. | 204,220. |
| | | | 12,365,132. | | | 12,857,822. | | | 12,857,822. |
| 27 | **Total deductions** | 1,009,050. | 50,969,973. | 240,474. | 766,473. | 52,985,970. | | 2,213. | 52,988,183. |
| | **TAXABLE INCOME** | | | | | | | | |
| 28 | TI before NOL/special deductions | 8,974,145. | 2,042,513. | -215,880. | -583,998. | 10,216,780. | | -2,213. | 10,214,567. |
| 29a | Net operating loss deduction | | | | | | | | |
| 29b | Special deductions | | | | | | | | |
| 30 | **Taxable income** | 8,974,145. | 2,042,513. | -215,880. | -583,998. | 10,216,780. | | -2,213. | 10,214,567. |

# Consolidated Statement of Cost of Goods Sold

**12/31/10**

**Page 1**

72-1271030

## MMR GROUP, INC.

| | | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Inventory at beginning of year | | 505,138. | | | 505,138. | | | 505,138. |
| 2 | Purchases | | 44,892,190. | | 841,001. | 45,733,191. | | | 45,733,191. |
| 3 | Cost of labor | | 114,981,442. | 107,925. | | 115,089,367. | | | 115,089,367. |
| 4 | Additional section 263A costs | Statement 3 | | | | | | | |
| 5 | Other costs | | 41,931,194. | 97,968. | | 42,029,162. | | | 42,029,162. |
| 6 | Total | | 202,309,964. | 205,893. | 841,001. | 203,356,858. | | | 203,356,858. |
| 7 | Inventory at end of year | | 546,892. | | | 546,892. | | | 546,892. |
| 8 | Cost of goods sold | 0. | 201,763,072. | 205,893. | 841,001. | 202,809,966. | | | 202,809,966. |

# Consolidated Statement of Dividend Income

**12/31/10**

**Page 1**

**72-1271030**

## MMR GROUP, INC.

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| 1 | Dividends from less-than-20%-owned domestic corporations | | | | | | | |
| 2 | Dividends from 20%-or-more-owned domestic corporations | | | | | | | |
| 3 | Dividends on debt-financed stock of domestic and foreign corporations | | | | | | | |
| 4 | Dividends on certain preferred stock of less-than-20%-owned public utilities | | | | | | | |
| 5 | Dividends on certain preferred stock of 20%-or-more-owned public utilities | | | | | | | |
| 6 | Dividends from less-than-20%-owned foreign corporations and certain FSCs | | | | | | | |
| 7 | Dividends from 20%-or-more-owned foreign corporations and certain FSCs | | | | | | | |
| 8 | Dividends from wholly-owned foreign subsidiaries | | | | | | | |
| 10 | Dividends from domestic corporations received by a small business investment company operating under the Small Business Investment Act of 1958 | | | | | | | |
| 11 | Dividends from affiliated group members | | | | | | | |
| 12 | Dividends from certain FSCs | | | | | | | |
| 13 | Other dividends from foreign corporations | 9,983,195. | | | | 9,983,195. | | | 9,983,195. |
| 14 | Income from controlled foreign corporations under subpart F | | | | | | | |
| 15 | Foreign dividend gross-up | | | | | | | |
| 16 | IC-DISC and former DISC dividends not included above | | | | | | | |
| 17 | Other dividends | | | | | | | |
| 19 | **Total dividends** | 9,983,195. | | | | 9,983,195. | | | 9,983,195. |

**12/31/10**

# Consolidated Beginning Balance Sheet

**Page 1**

72-1271030

## MMR GROUP, INC.

| | | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|---|
| | **ASSETS** | | | | | | | | |
| 1 | Cash | | 25,581,977. | 112,158. | 5,508. | 25,699,643. | | | 25,699,643. |
| 2a | Trade notes & accounts receivable | | 56,066,404. | 59,728. | | 56,126,132. | | | 56,126,132. |
| 2b | Less allowance for bad debts | | | | | | | | |
| 3 | Inventories | | 505,138. | | | 505,138. | | | 505,138. |
| 4 | U.S. government obligations | | | | | | | | |
| 5 | Tax-exempt securities | | | | | | | | |
| 6 | Other current assets   Statement 5 | 117,869. | 44,997,646. | 1,310. | 12,193,249. | 57,310,074. | | | 57,310,074. |
| 7 | Loans to shareholders | | | | | | | | |
| 8 | Mortgage and real estate loans | | | | | | | | |
| 9 | Other investments | | | | | | | | |
| 10a | Buildings & other depreciable assets | 3,410,818. | 28,742,327. | | 58,380. | 32,211,525. | | | 32,211,525. |
| 10b | Less accumulated depreciation | (1,222,608.) | (9,940,231.) | | ( 41,470.) | (11,204,309.) | | | (11,204,309.) |
| 11a | Depletable assets | | | | | | | | |
| 11b | Less accumulated depletion | | | | | | | | |
| 12 | Land (net of amortization) | | | | | | | | |
| 13a | Intangible assets (amortizable) | | | | | | | | |
| 13b | Less accumulated amortization | | | | | | | | |
| 14 | Other assets   Statement 6 | 12,111,709. | 807,777. | | 81,430. | 13,000,916. | | | 13,000,916. |
| 15 | **Total assets** | 14,417,788. | 146,761,038. | 173,196. | 12,297,097. | 173,649,119. | | | 173,649,119. |
| | **LIABILITIES AND EQUITY** | | | | | | | | |
| 16 | Accounts payable | | 11,204,935. | 1,850. | 19,458. | 11,226,243. | | | 11,226,243. |
| 17 | Mortgages, notes, bonds payable in less than one year | 255,616. | 3,363,530. | | 916,290. | 4,535,436. | | | 4,535,436. |
| 18 | Other current liabilities   Statement 7 | 201,608. | 65,152,612. | 2,059,906. | 9,481,143. | 76,895,269. | | | 76,895,269. |
| 19 | Loans from shareholders | | | | | | | | |
| 20 | Mortgages, notes, bonds payable in more than one year | 2,027,651. | 7,960,399. | | 4,199,661. | 14,187,711. | | | 14,187,711. |
| 21 | Other liabilities | | | | | | | | |
| 22a | Capital stock - preferred | | | | | | | | |
| 22b | Capital stock - common | | 875. | | | 875. | | | 875. |
| 23 | Additional paid-in capital | | | | | | | | |
| 24 | Retained earnings - appropriated | | | | | | | | |
| 25 | Retained earnings - unappropriated | 11,932,913. | 59,078,687. | -1,888,560. | -2,319,455. | 66,803,585. | | | 66,803,585. |
| 26 | Adjustments to shareholder equity | | | | | | | | |
| 27 | Less cost of treasury stock | | | | | | | | |
| 28 | **Total liabilities and equity** | 14,417,788. | 146,761,038. | 173,196. | 12,297,097. | 173,649,119. | | | 173,649,119. |

**12/31/10**

# Consolidated Ending Balance Sheet

## MMR GROUP, INC.

**Page 1**

72-1271030

| | | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|---|
| | **ASSETS** | | | | | | | | |
| 1 | Cash | | 14,813,967. | 36,558. | 4,788. | 14,855,313. | | | 14,855,313. |
| 2a | Trade notes & accounts receivable | | 42,691,653. | 53,362. | 4,000. | 42,749,015. | | | 42,749,015. |
| 2b | Less allowance for bad debts | | | | | | | | |
| 3 | Inventories | | 546,892. | | | 546,892. | | | 546,892. |
| 4 | U.S. government obligations | | | | | | | | |
| 5 | Tax-exempt securities | | | | | | | | |
| 6 | Other current assets    Statement 5 | | 49,487,364. | 225. | 12,868,997. | 62,356,586. | | | 62,356,586. |
| 7 | Loans to shareholders | | | | | | | | |
| 8 | Mortgage and real estate loans | | | | | | | | |
| 9 | Other investments | | | | | | | | |
| 10a | Buildings & other depreciable assets | 3,817,712. | 28,629,785. | | 58,380. | 32,505,877. | | | 32,505,877. |
| 10b | Less accumulated depreciation | (1,760,280.) | (10,249,102.) | | ( 51,945.) | (12,061,327.) | | | (12,061,327.) |
| 11a | Depletable assets | | | | | | | | |
| 11b | Less accumulated depletion | | | | | | | | |
| 12 | Land (net of amortization) | | | | | | | | |
| 13a | Intangible assets (amortizable) | | | | | | | | |
| 13b | Less accumulated amortization | | | | | | | | |
| 14 | Other assets    Statement 6 | 21,797,162. | 566,302. | | 139,219. | 22,502,683. | | | 22,502,683. |
| 15 | **Total assets** | 23,854,594. | 126,486,861. | 90,145. | 13,023,439. | 163,455,039. | | | 163,455,039. |
| | **LIABILITIES AND EQUITY** | | | | | | | | |
| 16 | Accounts payable | | 11,523,586. | 964. | 78,508. | 11,603,058. | | | 11,603,058. |
| 17 | Mortgages, notes, bonds payable in less than one year | 283,786. | 5,111,164. | | 916,290. | 6,311,240. | | | 6,311,240. |
| 18 | Other current liabilities | 863,696. | 47,567,462. | 2,194,171. | 11,649,817. | 62,275,146. | | | 62,275,146. |
| 19 | Loans from shareholders    Statement 7 | | | | | | | | |
| 20 | Mortgages, notes, bonds payable in more than one year | 1,800,054. | 4,872,401. | | 3,283,371. | 9,955,826. | | | 9,955,826. |
| 21 | Other liabilities | | | | | | | | |
| 22a | Capital stock - preferred | | | | | | | | |
| 22b | Capital stock - common | | 875. | | | 875. | | | 875. |
| 23 | Additional paid-in capital | | | | | | | | |
| 24 | Retained earnings - appropriated | | | | | | | | |
| 25 | Retained earnings - unappropriated | 20,907,058. | 57,411,373. | -2,104,990. | -2,904,547. | 73,308,894. | | | 73,308,894. |
| 26 | Adjustments to shareholder equity | | | | | | | | |
| 27 | Less cost of treasury stock | | | | | | | | |
| 28 | **Total liabilities and equity** | 23,854,594. | 126,486,861. | 90,145. | 13,023,439. | 163,455,039. | | | 163,455,039. |

**12/31/10**

# Consolidated Schedule M-2

## MMR GROUP, INC.

**Page 1**

**72-1271030**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| **SCHEDULE M-2** | | | | | | | | |
| 1 Beginning retained earnings | 11,932,913. | 59,078,687. | -1,888,560. | -2,319,455. | 66,803,585. | | | 66,803,585. |
| 2 Net income or loss per books | 8,974,145. | -1,667,314. | -216,430. | -585,092. | 6,505,309. | | | 6,505,309. |
| 3 Other increases | | | | | | | | |
| 4 Total lines 1 - 3 | 20,907,058. | 57,411,373. | -2,104,990. | -2,904,547. | 73,308,894. | | | 73,308,894. |
| 5 Distributions: | | | | | | | | |
| 5a   Cash | | | | | | | | |
| 5b   Stock | | | | | | | | |
| 5c   Property | | | | | | | | |
| 6 Other decreases | | | | | | | | |
| 7 Total lines 5 and 6 | 0. | 0. | 0. | 0. | 0. | | | 0. |
| 8 Ending retained earnings | 20,907,058. | 57,411,373. | -2,104,990. | -2,904,547. | 73,308,894. | | | 73,308,894. |

# Consolidated Statement of Alternative Minimum Taxable Income

**Page 1**

**12/31/10**

**MMR GROUP, INC.**

72-1271030

| | | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Taxable income before NOL | 8,974,145. | 2,042,513. | -215,880. | -583,998. | 10,216,780. | | -2,213. | 10,214,567. |
| | **Adjustments and Preferences:** | | | | | | | | |
| 2a | Depreciation of post-86 property | | | | | | | | |
| 2b | Amortization of certified pollution control facilities | | | | | | | | |
| 2c | Amortization of mining exploration & development costs | | | | | | | | |
| 2d | Amortization of circulation expenditures | | | | | | | | |
| 2e | Adjusted gain or loss | | | | | | | | |
| 2f | Long-term contracts | | | | | | | | |
| 2g | Merchant marine capital construction funds | | | | | | | | |
| 2h | Section 833(b) deduction | | | | | | | | |
| 2i | Tax shelter farm activities | | | | | | | | |
| 2j | Passive activities | | | | | | | | |
| 2k | Loss limitations | | | | | | | | |
| 2l | Depletion | | | | | | | | |
| 2m | Tax-exempt interest from specified private activity bonds | | | | | | | | |
| 2n | Intangible drilling costs | | | | | | | | |
| 2o | Other adjustments | | | | | | | | |
| 3 | Pre-adjustment AMTI | 8,974,145. | 2,042,513. | -215,880. | -583,998. | 10,216,780. | | -2,213. | 10,214,567. |
| 4a | Adjusted current earnings | 8,974,145. | 2,042,513. | -215,880. | -583,998. | 10,216,780. | | -2,213. | 10,214,567. |
| 4b | Subtract line 3 from line 4a | | | | | | | | |
| 4c | Multiply line 4b by 75% | | | | | | | | |
| 4d | Prior ACE increases over prior ACE reductions | 0. | 2,949,652. | 0. | 0. | 2,949,652. | | | 2,949,652. |
| 4e | ACE adjustment | 0. | 0. | 0. | 0. | 0. | | | 0. |
| 5 | AMTI before ATNOL | 8,974,145. | 2,042,513. | -215,880. | -583,998. | 10,216,780. | | -2,213. | 10,214,567. |
| 6 | ATNOL deduction | | | | | | | 1,830,194. | 1,830,194. |
| 7 | Alternative minimum taxable income | 8,974,145. | 2,042,513. | -215,880. | -583,998. | 10,216,780. | | -1,832,407. | 8,384,373. |

# Consolidated Statement of Adjusted Current Earnings

**12/31/10**    Page 1

**MMR GROUP, INC.**    72-1271030

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| 1   Pre-adjustment AMTI | 8,974,145. | 2,042,513. | -215,880. | -583,998. | 10,216,780. | | -2,213. | 10,214,567. |
| **Depreciation adjustment for ACE** | | | | | | | | |
| 2a   AMT depreciation | 537,672. | 3,117,911. | | 10,475. | 3,666,058. | | | 3,666,058. |
| 2b   Post-1993 property | 41,909. | 255,615. | | | 297,524. | | | 297,524. |
| Post-1989, pre-1994 property | | | | | | | | |
| Pre-1990 MACRS property | 495,763. | 2,862,296. | | 10,475. | 3,368,534. | | | 3,368,534. |
| Pre-1990 original ACRS property | | | | | | | | |
| Property described in 168(f)(1-4) | | | | | | | | |
| Other property | | | | | | | | |
| Section 179 expense | | | | | | | | |
| Total ACE depreciation | 537,672. | 3,117,911. | | 10,475. | 3,666,058. | | | 3,666,058. |
| ACE depr. adjustment from K-1 | | | | | | | | |
| 2c   ACE depreciation adjustment | 0. | 0. | 0. | 0. | 0. | | | 0. |
| **Inclusion in ACE of items included in Earnings & Profits** | | | | | | | | |
| 3a   Tax-exempt interest income | | | | | | | | |
| 3b   Death benefits from life insurance contracts | | | | | | | | |
| 3c   All other distributions from life insurance contracts | | | | | | | | |
| 3d   Inside buildup of life insurance contracts | | | | | | | | |
| 3e   Other items included in E & P | | | | | | | | |
| 3f   Increases to ACE of items in E & P | 0. | 0. | 0. | 0. | 0. | | | 0. |
| **Disallowance of items not deductible from Earnings & Profits** | | | | | | | | |
| 4a   Certain dividends received | | | | | | | | |
| 4b   Dividends paid on preferred stock of utilities | | | | | | | | |
| 4c   Dividends paid to an ESOP | | | | | | | | |
| 4d   Nonpatronage dividends | | | | | | | | |
| 4e   Other items not deductible from E & P | | | | | | | | |
| 4f   Total increases to ACE | 0. | 0. | 0. | 0. | 0. | | | 0. |
| **Other adjustments:** | | | | | | | | |
| 5a   Intangible drilling costs | | | | | | | | |
| 5b   Circulation expenditures | | | | | | | | |
| 5c   Organizational expenditures | | | | | | | | |
| 5d   LIFO inventory adjustments | | | | | | | | |
| 5e   Installment sales | | | | | | | | |
| 5f   Total other E & P adjustments | 0. | 0. | 0. | 0. | 0. | | | 0. |
| 6   Loss on bad debt pool exchange | | | | | | | | |
| 7   Acq. expense of life ins. companies | | | | | | | | |
| 8   Depletion | | | | | | | | |
| 9   Basis adjustments | | | | | | | | |
| 10   Adjusted current earnings | 8,974,145. | 2,042,513. | -215,880. | -583,998. | 10,216,780. | | -2,213. | 10,214,567. |

**2010**

# Federal Statements

**MMR GROUP, INC.**

**Page 1**

72-1271030

**Statement 1**
**Form 1120, Line 10**
**Other Income**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTOR S, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| MISCELLANEOUS | | 5,415,162. | 250. | 3,684. | 5,419,096. | | | 5,419,096. |
| Net Income from K-1 | | | | 148,520. | 148,520. | | | 148,520. |
| Total | 0. | 5,415,162. | 250. | 152,204. | 5,567,616. | 0. | 0. | 5,567,616. |

# 2010

# Federal Statements

## Page 2

MMR GROUP, INC.

72-1271030

**Statement 2**
**Form 1120, Line 26**
**Other Deductions**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| COMPUTER EXPENSE | | 303,494. | 325. | | 303,819. | | | 303,819. |
| CONSULTING | | 51,068. | | | 51,068. | | | 51,068. |
| Dues and Subscriptions | | 84,565. | | 637. | 85,202. | | | 85,202. |
| EXPENSES | | 5,666,103. | 17,737. | 59,663. | 5,743,503. | | | 5,743,503. |
| Insurance | | 3,208,465. | 8,400. | 19,250. | 3,236,115. | | | 3,236,115. |
| Legal and Professional | | 706,781. | | 5,079. | 711,860. | | | 711,860. |
| Meals and Entertainment | | 364,155. | 550. | 1,094. | 365,799. | | | 365,799. |
| Miscellaneous | | 891,222. | 2,049. | 11,351. | 904,622. | | | 904,622. |
| Net Loss from K-1 | | | | 330,236. | 330,236. | | | 330,236. |
| Postage | | 135,477. | 2,560. | 2,524. | 140,561. | | | 140,561. |
| Printing | | 94,232. | | 66. | 94,298. | | | 94,298. |
| REPRODUCTION | | 151,773. | | | 151,773. | | | 151,773. |
| Supplies | | 299,803. | 197. | 591. | 300,591. | | | 300,591. |
| Utilities | | 407,994. | 6,334. | 24,047. | 438,375. | | | 438,375. |
| Total | 0. | 12,365,132. | 38,152. | 454,538. | 12,857,822. | 0. | 0. | 12,857,822. |

**2010**

# Federal Statements

**MMR GROUP, INC.**

**Page 3**

72-1271030

## Statement 3
### Form 1120, Schedule A, Line 5
### Other Cost of Goods Sold

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| OTHER | | 20,423,545. | 78,135. | | 20,501,680. | | | 20,501,680. |
| PAYROLL TAX & INSURANCE | | 21,507,649. | 19,833. | | 21,527,482. | | | 21,527,482. |
| Total | 0. | 41,931,194. | 97,968. | 0. | 42,029,162. | 0. | 0. | 42,029,162. |

| 2010 | FEDERAL STATEMENTS | PAGE 4 |
|------|--------------------|--------|
| | MMR GROUP, INC. | 72-1271030 |

**STATEMENT 4**
**FORM 1120, SCHEDULE E, LINE 1**
**OFFICER SCHEDULE**

| NAME OF OFFICER | SSN | % TIME DEVOTED TO BUSINESS | COMMON STOCK % | PREF'D STOCK % | COMPENSATION |
|-----------------|-----|---------------------------|----------------|----------------|--------------|
| MMR GROUP, INC. - 72-1271030 | | | | | |
| | | | | | 0. |
| MMR CONSTRUCTORS, INC. - 72-1046000 | | | | | |
| | | | | | . |
| MMR TECHNICAL SERVICES, INC. - 72-1209195 | | | | | |
| | | | | | 0. |
| MMR POWER SOLUTIONS LLC - 05-0584790 | | | | | |
| | | | | | 0. |

| 2010 | FEDERAL STATEMENTS | PAGE 5 |
|------|-------------------|--------|
| | MMR GROUP, INC. | 72-1271030 |

**STATEMENT 4 (CONTINUED)**
**FORM 1120, SCHEDULE E, LINE 1**
**OFFICER SCHEDULE**

| NAME OF OFFICER | SSN | % TIME DEVOTED TO BUSINESS | COMMON STOCK % | PREF'D STOCK % | COMPENSATION |
|-----------------|-----|---------------------------|----------------|----------------|--------------|
| | | | | TOTAL | $16,245,095. |

**2010**

# Federal Statements

**Page 6**

**MMR GROUP, INC.**

72-1271030

**Statement 5**
**Form 1120, Schedule L, Line 6**
**Other Current Assets**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| **Beginning:** | | | | | | | | |
| DUE FROM AFFILIATES | | 42,033,021. | | | 42,033,021. | | | 42,033,021. |
| ESTIMATES EARNED-UNBILLED | | 553,405. | | | 553,405. | | | 553,405. |
| MISCELLANEOUS | | 662,819. | | | 662,819. | | | 662,819. |
| MISCELLANEOUS RECEIVABLE | | | | 2,613. | 2,613. | | | 2,613. |
| MISCELLANEOUS RECEIVABLES | | | 225. | | 225. | | | 225. |
| PREPAID EXPENSES | 117,869. | 1,748,401. | 1,085. | 132. | 1,867,487. | | | 1,867,487. |
| UNBILLED ESTIMATES EARNED | | | | 12,190,504. | 12,190,504. | | | 12,190,504. |
| Total | 117,869. | 44,997,646. | 1,310. | 12,193,249. | 57,310,074. | 0. | 0. | 57,310,074. |
| **Ending:** | | | | | | | | |
| DUE FROM AFFILIATES | | 41,385,710. | | | 41,385,710. | | | 41,385,710. |
| ESTIMATES EARNED-UNBILLED | | 2,329,340. | | | 2,329,340. | | | 2,329,340. |
| MISCELLANEOUS | | 5,772,314. | | | 5,772,314. | | | 5,772,314. |
| MISCELLANEOUS RECEIVABLE | | | | 2,613. | 2,613. | | | 2,613. |
| MISCELLANEOUS RECEIVABLES | | | 225. | | 225. | | | 225. |
| PREPAID EXPENSES | | | | 10,833. | 10,833. | | | 10,833. |
| UNBILLED ESTIMATES EARNED | | | | 12,855,551. | 12,855,551. | | | 12,855,551. |
| Total | 0. | 49,487,364. | 225. | 12,868,997. | 62,356,586. | 0. | 0. | 62,356,586. |

**2010**

# Federal Statements

**MMR GROUP, INC.**

Page 7

72-1271030

**Statement 6**
**Form 1120, Schedule L, Line 14**
**Other Assets**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| **Beginning:** | | | | | | | | |
| DEPOSITS | | 66,315. | | | 66,315. | | | 66,315. |
| DUE FROM AFFILIATES | 12,111,709. | | | | 12,111,709. | | | 12,111,709. |
| INVESTMENT IN JOINT VENTURE | | 741,462. | | 81,430. | 822,892. | | | 822,892. |
| Total | 12,111,709. | 807,777. | 0. | 81,430. | 13,000,916. | 0. | 0. | 13,000,916. |
| **Ending:** | | | | | | | | |
| DEPOSITS | 1,455. | 74,840. | | | 76,295. | | | 76,295. |
| DUE FROM AFFILIATES | 21,795,707. | | | | 21,795,707. | | | 21,795,707. |
| INVESTMENT IN JOINT VENTURE | | 491,462. | | 139,219. | 630,681. | | | 630,681. |
| Total | 21,797,162. | 566,302. | 0. | 139,219. | 22,502,683. | 0. | 0. | 22,502,683. |

**2010**                    **Federal Statements**                    **Page 8**

72-1271030

**MMR GROUP, INC.**

**Statement 7**
**Form 1120, Schedule L, Line 18**
**Other Current Liabilities**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| **Beginning:** | | | | | | | | |
| ACCRUED EXPENSES | | 37,395,593. | 333,035. | | 37,728,628. | | | 37,728,628. |
| BILLINGS IN EXCESS OF EARNINGS | | | | 44,825. | 44,825. | | | 44,825. |
| DUE TO AFFILIATES | 201,608. | | | 9,436,318. | 9,637,926. | | | 9,637,926. |
| DUE TO RELATED PARTY | | | 617,533. | | 617,533. | | | 617,533. |
| ESTIMATES BILLED-UNEARNED | | 18,020,553. | | | 18,020,553. | | | 18,020,553. |
| Federal Tax Payable | | 14,415,820. | | | 14,415,820. | | | 14,415,820. |
| INCOME TAX ADJ. FROM CONSOLIDATION | | -5,430,043. | 1,107,948. | | -4,322,095. | | | -4,322,095. |
| State Tax Payable | | 750,689. | 1,390. | | 752,079. | | | 752,079. |
| Total | 201,608. | 65,152,612. | 2,059,906. | 9,481,143. | 76,895,269. | 0. | 0. | 76,895,269. |
| **Ending:** | | | | | | | | |
| ACCRUED EXPENSES | | 38,843,509. | 153,337. | | 38,996,846. | | | 38,996,846. |
| DUE TO AFFILIATES | 863,696. | | | 11,649,817. | 12,513,513. | | | 12,513,513. |
| DUE TO RELATED PARTY | | | 632,474. | | 632,474. | | | 632,474. |
| ESTIMATES BILLED-UNEARNED | | 7,910,722. | | | 7,910,722. | | | 7,910,722. |
| Federal Tax Payable | | 709,751. | | | 709,751. | | | 709,751. |
| INCOME TAX ADJ. FROM CONSOLIDATION | | | 1,406,990. | | 1,406,990. | | | 1,406,990. |
| State Tax Payable | | 103,480. | 1,370. | | 104,850. | | | 104,850. |
| Total | 863,696. | 47,567,462. | 2,194,171. | 11,649,817. | 62,275,146. | 0. | 0. | 62,275,146. |

**2010**                    **FEDERAL STATEMENTS**                    **PAGE 9**

**MMR GROUP, INC.**                                    **72-1271030**

**STATEMENT 8**
**FORM 4626, LINE 6**
**ALTERNATIVE TAX NET OPERATING LOSS DEDUCTION**

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| | NET SRLY LOSS | NET SRLY LOSS | | NON-SRLY LOSS | NET | TOTAL LOSS AVAILABLE |
| LOSS YEAR | BEFORE LIMITATION | AFTER LIMITATION | NON-SRLY ORIGINAL LOSS | PREVIOUSLY USED | NON-SRLY LOSS AVAILABLE | IN 2010 C + F |
| MMR TECHNICAL SERVICES, INC. - 72-1209195 | | | | | | |
| 12/06 | 0. | 0. | 2,645,083. | 814,889. | 1,830,194. | 1,830,194. |

TOTAL ALTERNATIVE TAX NET OPERATING LOSS DEDUCTION.................................$ 1,830,194.

**2011 TAX RETURN**

GOVERNMENT COPY

**Client:**            C2300

**Prepared for:**      MMR GROUP, INC.
                       15961 AIRLINE HIGHWAY
                       BATON ROUGE, LA  70817-7412
                       225-756-5090

**Prepared by:**       WILLIAM B. BEALE
                       MADDOX & ASSOCIATES APC
                       5627 BANKERS AVE BLDG 2
                       BATON ROUGE, LA  70808-2610
                       (225) 926-3360

**Date:**              JULY 23, 2012

**Comments:**



**Route to:** _____  _____  _____  _____

**MADDOX & ASSOCIATES APC**
**5627 BANKERS AVE BLDG 2**
**BATON ROUGE, LA 70808-2610**
**(225) 926-3360**

July 23, 2012

MMR GROUP, INC.
15961 AIRLINE HIGHWAY
BATON ROUGE, LA 70817-7412

Dear Client:

Your 2011 Federal Corporation Income Tax Return will be electronically filed with the Internal Revenue Service upon receipt of a signed Form 8879C - IRS e-file Signature Authorization.  No tax is payable with the filing of this return.  There is an overpayment of $99,950, of which $99,950 has been applied to your 2012 estimated tax.

All payments due must be electronically deposited through the Electronic Federal Tax Payment System (EFTPS).  For EFTPS deposits to be made on time, the transaction must be initiated at least one business day before the date the deposit is due.

Attached to your e-filed federal return is the Information Return of U.S. Persons With Respect To Certain Foreign Corporations, Form 5471.

Your estimated tax schedule for 2012 is listed below:

| Due Date | Federal |
|----------|---------|
| 4/16/12 | $ 1,587,962 |
| 6/15/12 | 1,687,912 |
| 9/17/12 | 1,687,912 |
| 12/17/12 | 1,687,912 |
| | ---------- |
| | $ 6,651,698 |

Please be sure to call if you have any questions.

Sincerely,


WILLIAM B. BEALE

Form **1120**

Department of the Treasury
Internal Revenue Service

# U.S. Corporation Income Tax Return

For calendar year 2011 or tax year beginning _____ , 2011, ending _____ , _____

► See separate instructions.

OMB No. 1545-0123

**2011**

**A** Check if:

1 **a** Consolidated return (attach Form 851). [X]

**b** Life/nonlife consolidated return . . . . . . [ ]

2 Personal holding co (attach Sch PH) . . [ ]

3 Personal service corp (see instrs). . . [ ]

4 Schedule M-3 attached . . . . [X]

**TYPE OR PRINT**

MMR GROUP, INC.
15961 AIRLINE HIGHWAY
BATON ROUGE, LA 70817-7412

**B** Employer identification number

72-1271030

**C** Date incorporated

3/13/1990

**D** Total assets (see instructions)

$ 235,992,504.

**E** Check if: **(1)** [ ] Initial return **(2)** [ ] Final return **(3)** [ ] Name change **(4)** [ ] Address change

| | | | | |
|---|---|---|---|---|
| **I N C O M E** | 1a Merchant card and third-party payments. For 2011, enter -0- . . . . . . . . . . . . | 1a | 0. | |
| | **b** Gross receipts or sales not reported on line 1a (see instructions) . . . . . . . . | 1b | 239,281,030. | |
| | **c** Total. Add lines 1a and 1b . . . . . . . . . . . . . . . . . . . . . . . . . | 1c | 239,281,030. | |
| | **d** Returns and allowances plus any other adjustments (see instructions) . . . . | 1d | | |
| | **e** Subtract line 1d from line 1c . . . . . . . . . . . . . . . . . . . . . . . . . | 1e | 239,281,030. | |
| | 2 Cost of goods sold from Form 1125-A, line 8 (attach Form 1125-A) . . . . . . . . | 2 | 192,397,215. | |
| | 3 Gross profit. Subtract line 2 from line 1e . . . . . . . . . . . . . . . . . . . | 3 | 46,883,815. | |
| | 4 Dividends (Schedule C, line 19) . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 1,151,189. | |
| | 5 Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 264,621. | |
| | 6 Gross rents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 | | |
| | 7 Gross royalties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 | | |
| | 8 Capital gain net income (attach Schedule D (Form 1120)) . . . . . . . . . . . . | 8 | | |
| | 9 Net gain or (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . . . . | 9 | | |
| | 10 Other income (see instructions — attach schedule) . . . . . . . . SEE STATEMENT 1 | 10 | 23,837,619. | |
| | 11 **Total income.** Add lines 3 through 10 . . . . . . . . . . . . . . . . . ► | 11 | 72,137,244. | |
| **D E D U C T I O N S   S E E   I N S T R U C T I O N S   ( F O R   L I M I T A T I O N S   O N   D E D U C T I O N S )** | 12 Compensation of officers from Form 1125-E, line 4 (attach Form 1125-E) . . . . | 12 | 10,385,587. | |
| | 13 Salaries and wages (less employment credits) . . . . . . . . . . . . . . . . . | 13 | 14,950,736. | |
| | 14 Repairs and maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 | 1,350,700. | |
| | 15 Bad debts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 | | |
| | 16 Rents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16 | 1,311,149. | |
| | 17 Taxes and licenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17 | 1,327,824. | |
| | 18 Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18 | 1,242,776. | |
| | 19 Charitable contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 | | |
| | 20 Depreciation from Form 4562 not claimed on Form 1125-A or elsewhere on return (attach Form 4562) . | 20 | 4,526,738. | |
| | 21 Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21 | | |
| | 22 Advertising . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 | 208,543. | |
| | 23 Pension, profit-sharing, etc, plans . . . . . . . . . . . . . . . . . . . . . . | 23 | 300,000. | |
| | 24 Employee benefit programs . . . . . . . . . . . . . . . . . . . . . . . . . . | 24 | 33,600. | |
| | 25 Domestic production activities deduction (attach Form 8903) . . . . . . . . . . | 25 | 1,956,877. | |
| | 26 Other deductions (attach schedule) . . . . . . . . . . . . . . SEE STATEMENT 2 | 26 | 14,668,535. | |
| | 27 **Total deductions.** Add lines 12 through 26 . . . . . . . . . . . . . . . ► | 27 | 52,263,065. | |
| | 28 Taxable income before net operating loss deduction and special deductions. Subtract line 27 from line 11 . . | 28 | 19,874,179. | |
| | 29a Net operating loss deduction (see instructions) . . . . . . . . . . . | 29a | | |
| | **b** Special deductions (Schedule C, line 20) . . . . . . . . . . . | 29b | | |
| | **c** Add lines 29a and 29b . . . . . . . . . . . . . . . . . . . . . . . . . . . | 29c | | |
| **T A X,   R E F U N D A B L E   C R E D I T S,   A N D   P A Y M E N T S** | 30 **Taxable income.** Subtract line 29c from line 28 (see instructions) . . . . . . . | 30 | 19,874,179. | |
| | 31 Total tax (Schedule J, Part I, line 11) . . . . . . . . . . . . . . . . . . . . | 31 | 6,751,646. | |
| | 32 Total payments and refundable credits (Schedule J, Part II, line 21) . . . . . . | 32 | 6,899,301. | |
| | 33 Estimated tax penalty (see instructions). Check if Form 2220 is attached . . . . . . ► [X] | 33 | 47,705. | |
| | 34 **Amount owed.** If line 32 is smaller than the total of lines 31 and 33, enter amount owed . . . | 34 | | |
| | 35 **Overpayment.** If line 32 is larger than the total of lines 31 and 33, enter amount overpaid . . | 35 | 99,950. | |
| | 36 Enter amount from line 35 you want: Credited to 2012 estimated tax . . . ► 99,950. Refunded ► | 36 | 0. | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer _____ Date _____

Title ► PRESIDENT

May the IRS discuss this return with the preparer shown below (see instructions)? [X] Yes [ ] No

**Paid Preparer Use Only**

| | | | |
|---|---|---|---|
| Print/Type preparer's name | Preparer's signature | Date | Check [ ] if self-employed | PTIN |
| WILLIAM B. BEALE | | | | P00437323 |
| Firm's name ► MADDOX & ASSOCIATES APC | | | Firm's EIN ► 72-1314069 |
| Firm's address ► 5627 BANKERS AVE BLDG 2 | | | |
| BATON ROUGE, LA 70808-2610 | | Phone no. (225) 926-3360 |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**          CPCA0205L   12/12/11          Form **1120** (2011)

Form **1120** (2011)   MMR GROUP, INC.   72-1271030                                    Page **2**

| Schedule C | Dividends and Special Deductions (see instructions) | (a) Dividends received | (b) Percentage | (c) Special deductions (a) x (b) |
|---|---|---|---|---|
| 1 | Dividends from less-than-20%-owned domestic corporations (other than debt-financed stock) | | 70 | |
| 2 | Dividends from 20%-or-more-owned domestic corporations (other than debt-financed stock) | | 80 | |
| 3 | Dividends on debt-financed stock of domestic and foreign corporations | | see instructions | |
| 4 | Dividends on certain preferred stock of less-than-20%-owned public utilities | | 42 | |
| 5 | Dividends on certain preferred stock of 20%-or-more-owned public utilities | | 48 | |
| 6 | Dividends from less-than-20%-owned foreign corporations and certain FSCs | | 70 | |
| 7 | Dividends from 20%-or-more-owned foreign corporations and certain FSCs | | 80 | |
| 8 | Dividends from wholly owned foreign subsidiaries | | 100 | |
| 9 | **Total.** Add lines 1 through 8. See instructions for limitation | | | |
| 10 | Dividends from domestic corporations received by a small business investment company operating under the Small Business Investment Act of 1958 | | 100 | |
| 11 | Dividends from affiliated group members | | 100 | |
| 12 | Dividends from certain FSCs | | 100 | |
| 13 | Dividends from foreign corporations not included on lines 3, 6, 7, 8, 11, or 12 | 1,151,189. | | |
| 14 | Income from controlled foreign corporations under subpart F (attach Form(s) 5471) | | | |
| 15 | Foreign dividend gross-up | | | |
| 16 | IC-DISC and former DISC dividends not included on lines 1, 2, or 3 | | | |
| 17 | Other dividends | | | |
| 18 | Deduction for dividends paid on certain preferred stock of public utilities | | | |
| 19 | **Total dividends.** Add lines 1 through 17. Enter here and on page 1, line 4 ▶ | 1,151,189. | | |
| 20 | **Total special deductions.** Add lines 9, 10, 11, 12, and 18. Enter here and on page 1, line 29b ▶ | | | |

Form **1120** (2011)

Form **1120** (2011)    MMR GROUP, INC.    72-1271030    Page **3**

| **Schedule J** | **Tax Computation and Payment** (see instructions) | | | | |
|---|---|---|---|---|---|
| **Part I — Tax Computation** | | | | | |
| 1 | Check if the corporation is a member of a controlled group (attach Schedule O (Form 1120)) . . . . . . . . ▶ ☐ | | | | |
| 2 | Income tax. Check if a qualified personal service corporation | | | | |
| | (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐ | | **2** | 6,955,963. | |
| 3 | Alternative minimum tax (attach Form 4626) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **3** | | |
| 4 | Add lines 2 and 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **4** | 6,955,963. | |
| 5a | Foreign tax credit (attach Form 1118) . . . . . . . . . . . . . . . . . | **5a** | 204,317. | | |
| b | Credit from Form 8834, line 30 (attach Form 8834) . . . . . . . . . . | **5b** | | | |
| c | General business credit (attach Form 3800) . . . . . . . . . . . . . . | **5c** | | | |
| d | Credit for prior year minimum tax (attach Form 8827) . . . . . . . . . | **5d** | | | |
| e | Bond credits from Form 8912 . . . . . . . . . . . . . . . . . . . . . . | **5e** | | | |
| 6 | **Total credits.** Add lines 5a through 5e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **6** | 204,317. | |
| 7 | Subtract line 6 from line 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **7** | 6,751,646. | |
| 8 | Personal holding company tax (attach Schedule PH (Form 1120)) . . . . . . . . . . . . . . . . . . . . . . . | | **8** | | |
| 9a | Recapture of investment credit (attach Form 4255) . . . . . . . . . . | **9a** | | | |
| b | Recapture of low-income housing credit (attach Form 8611) . . . . . | **9b** | | | |
| c | Interest due under the look-back method — completed long-term contracts (attach Form 8697) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **9c** | | | |
| d | Interest due under the look-back method — income forecast method (attach Form 8866) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **9d** | | | |
| e | Alternative tax on qualifying shipping activities (attach Form 8902) . . . . . . . . . . | **9e** | | | |
| f | Other (see instructions — attach schedule) . . . . . . . . . . . . . . | **9f** | | | |
| 10 | **Total.** Add lines 9a through 9f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **10** | | |
| 11 | **Total tax.** Add lines 7, 8, and 10. Enter here and on page 1, line 31 . . . . . . . . . . . . . . . . . . . . | | **11** | 6,751,646. | |
| **Part II — Payments and Refundable Credits** | | | | | |
| 12 | 2010 overpayment credited to 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **12** | 873,801. | |
| 13 | 2011 estimated tax payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **13** | 4,425,500. | |
| 14 | 2011 refund applied for on Form 4466 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **14** | | |
| 15 | Combine lines 12, 13, and 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **15** | 5,299,301. | |
| 16 | Tax deposited with Form 7004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **16** | 1,600,000. | |
| 17 | Withholding (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **17** | | |
| 18 | **Total payments.** Add lines 15, 16 and 17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **18** | 6,899,301. | |
| 19 | Refundable credits from: | | | | |
| a | Form 2439 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **19a** | | | |
| b | Form 4136 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **19b** | | | |
| c | Form 3800, line 17c and Form 8827, line 8c . . . . . . . . . . . . . . | **19c** | | | |
| d | Other (attach schedule — see instructions) . . . . . . . . . . . . . . | **19d** | | | |
| 20 | **Total credits.** Add lines 19a through 19d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **20** | | |
| 21 | **Total payments and credits.** Add lines 18 and 20. Enter here and on page 1, line 32 . . . . . . . . . . . . | | **21** | 6,899,301. | |

| **Schedule K** | **Other Information** (see instructions) | | Yes | No |
|---|---|---|---|---|
| 1 | Check accounting method    **a** ☐ Cash    **b** ☒ Accrual    **c** ☐ Other (specify) ▶ _ _ _ _ _ _ _ _ _ _ _ | | | |
| 2 | See the instructions and enter the: | | | |
| a | Business activity code no. ▶  238210 | | | |
| b | Business activity ▶  CONSTRUCTION | | | |
| c | Product or service ▶  ELECTRICAL | | | |
| 3 | Is the corporation a subsidiary in an affiliated group or a parent-subsidiary controlled group? . . . . . . . . . . . . . . . . . | | | X |
| | If 'Yes,' enter name and EIN of the parent corporation ▶ | | | |
| 4 | At the end of the tax year: | | | |
| a | Did any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote? If 'Yes,' complete Part I of Schedule G (Form 1120) (attach Schedule G) . . . . . . . . . . | | | X |
| b | Did any individual or estate own, directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote? If 'Yes,' complete Part II of Schedule G (Form 1120) (att Schedule G) . . . | | X | |

**BAA**    CPCA0234L   10/31/11    Form **1120** (2011)

Form **1120** (2011)    MMR GROUP, INC.    72-1271030    Page **4**

| **Schedule K** | **Other Information** *continued* (see instructions) | | | |

**5** At the end of the tax year, did the corporation:

| | | | | Yes | No |
|---|---|---|---|---|---|
| **a** Own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of stock entitled to vote of any foreign or domestic corporation not included on **Form 851,** Affiliations Schedule? For rules of constructive ownership, see instructions. | | | | | X |

If 'Yes,' complete (i) through (iv) below.

| **(i)** Name of Corporation | **(ii)** Employer Identification Number (if any) | **(iii)** Country of Incorporation | **(iv)** Percentage Owned in Voting Stock |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | | | Yes | No |
|---|---|---|---|---|---|
| **b** Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership, see instructions. | | | | | X |

If 'Yes,' complete (i) through (iv) below.

| **(i)** Name of Entity | **(ii)** Employer Identification Number (if any) | **(iii)** Country of Organization | **(iv)** Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | | Yes | No |
|---|---|---|---|
| **6** During this tax year, did the corporation pay dividends (other than stock dividends and distributions in exchange for stock) in excess of the corporation's current and accumulated earnings and profits? (See sections 301 and 316.) | | | X |

If 'Yes,' file **Form 5452,** Corporate Report of Nondividend Distributions.

If this is a consolidated return, answer here for the parent corporation and on Form 851 for each subsidiary

| | | Yes | No |
|---|---|---|---|
| **7** At any time during the tax year, did one foreign person own, directly or indirectly, at least 25% of **(a)** the total voting power of all classes of the corporation's stock entitled to vote or **(b)** the total value of all classes of the corporation's stock? | | | X |

For rules of attribution, see section 318. If 'Yes,' enter:

**(i)** Percentage owned ► _ _ _ _ _ _ _ _    and **(ii)** Owner's country ► _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**(c)** The corporation may have to file **Form 5472,** Information Return of a 25% Foreign-Owned U.S. Corporation or a Foreign Corporation Engaged in a U.S. Trade or Business. Enter the number of Forms 5472 attached ► _ _ _ _ _ _ _ _ _ _ _

**8** Check this box if the corporation issued publicly offered debt instruments with original issue discount ► ☐

If checked, the corporation may have to file **Form 8281,** Information Return for Publicly Offered Original Issue Discount Instruments.

**9** Enter the amount of tax-exempt interest received or accrued during the tax year ► $ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ NONE

**10** Enter the number of shareholders at the end of the tax year (if 100 or fewer) ► _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**11** If the corporation has an NOL for the tax year and is electing to forego the carryback period, check here ► ☐

If the corporation is filing a consolidated return, the statement required by Regulations section 1.1502-21(b)(3) must be attached or the election will not be valid.

**12** Enter the available NOL carryover from prior tax years (do not reduce it by any deduction on line 29a.) ► $ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ NONE

| | | Yes | No |
|---|---|---|---|
| **13** Are the corporation's total receipts (line 1c plus lines 4 through 10 on page 1) for the tax year **and** its total assets at the end of the tax year less than $250,000? | | | X |

If 'Yes,' the corporation is not required to complete Schedules L, M-1, and M-2 on page 5. Instead, enter the total amount of cash distributions and the book value property distributions (other than cash) made during the tax year.   ► $ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

| | | Yes | No |
|---|---|---|---|
| **14** Is the corporation required to file Schedule UTP (Form 1120), Uncertain Tax Position Statement (see instructions)? | | | X |
| If 'Yes,' complete and attach Schedule UTP. | | | |
| **15a** Did the corporation make any payments in 2011 that would require it to file Form(s) 1099 (see instructions)? | | X | |
| **b** If 'Yes,' did or will the corporation file all required Forms 1099? | | X | |

Form **1120** (2011)

Form **1120** (2011)    MMR GROUP, INC.    72-1271030    Page **5**

## Schedule L — Balance Sheets per Books

| | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|
| **Assets** | (a) | (b) | (c) | (d) |
| 1 Cash. | | 14,855,313. | | 6,011,800. |
| 2a Trade notes and accounts receivable. | 42,749,015. | | 57,729,267. | |
| b Less allowance for bad debts. | | 42,749,015. | | 57,729,267. |
| 3 Inventories. | | 546,892. | | 604,813. |
| 4 U.S. government obligations. | | | | |
| 5 Tax-exempt securities (see instructions). | | | | |
| 6 Other current assets (attach schedule). STMT 3 | | 62,356,586. | | 79,636,512. |
| 7 Loans to shareholders. | | | | |
| 8 Mortgage and real estate loans. | | | | |
| 9 Other investments (attach schedule). | | | | |
| 10a Buildings and other depreciable assets. | 32,505,877. | | 49,556,071. | |
| b Less accumulated depreciation. | 12,061,327. | 20,444,550. | 15,252,863. | 34,303,208. |
| 11a Depletable assets. | | | | |
| b Less accumulated depletion. | | | | |
| 12 Land (net of any amortization). | | | | |
| 13a Intangible assets (amortizable only). | | | | |
| b Less accumulated amortization. | | | | |
| 14 Other assets (attach schedule). STMT 4 | | 22,502,683. | | 57,706,904. |
| 15 Total assets. | | 163,455,039. | | 235,992,504. |
| **Liabilities and Shareholders' Equity** | | | | |
| 16 Accounts payable. | | 11,603,058. | | 30,766,938. |
| 17 Mortgages, notes, bonds payable in less than 1 year. | | 6,311,240. | | 10,727,563. |
| 18 Other current liabilities (attach sch). STMT 5 | | 62,275,146. | | 61,106,057. |
| 19 Loans from shareholders. | | | | |
| 20 Mortgages, notes, bonds payable in 1 year or more. | | 9,955,826. | | 28,862,753. |
| 21 Other liabilities (attach schedule). | | | | |
| 22 Capital stock: a Preferred stock. | | | | |
| b Common stock. | 875. | 875. | 875. | 875. |
| 23 Additional paid-in capital. | | | | |
| 24 Retained earnings — Approp (att sch). | | | | |
| 25 Retained earnings — Unappropriated. | | 73,308,894. | | 93,516,042. |
| 26 Adjmnt to shareholders' equity (att sch). STMT 6 | | | | 11,012,276. |
| 27 Less cost of treasury stock. | | | | |
| 28 Total liabilities and shareholders' equity. | | 163,455,039. | | 235,992,504. |

## Schedule M-1 — Reconciliation of Income (Loss) per Books With Income per Return

**Note:** Schedule M-3 required instead of Schedule M-1 if total assets are $10 million or more — see instructions

| | | | | |
|---|---|---|---|---|
| 1 Net income (loss) per books. | | 7 Income recorded on books this year not included on this return (itemize): | | |
| 2 Federal income tax per books. | | Tax-exempt interest $ _ _ _ _ _ _ _ _ _ | | |
| 3 Excess of capital losses over capital gains. | | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| 4 Income subject to tax not recorded on books this year (itemize): | | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| | | 8 Deductions on this return not charged against book income this year (itemize): | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | a Depreciation.. $ _ _ _ _ _ _ _ _ _ | | |
| 5 Expenses recorded on books this year not deducted on this return (itemize): | | b Charitable contribns $ _ _ _ _ _ _ _ | | |
| a Depreciation. $ _ _ _ _ _ _ _ _ _ | | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| b Charitable contributions $ _ _ _ _ _ _ | | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| c Travel & entertainment $ _ _ _ _ _ _ | | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | 9 Add lines 7 and 8. | | |
| 6 Add lines 1 through 5. | | 10 Income (page 1, line 28) — line 6 less line 9. | | |

## Schedule M-2 — Analysis of Unappropriated Retained Earnings per Books (Line 25, Schedule L)

| | | | | |
|---|---|---|---|---|
| 1 Balance at beginning of year. | 73,308,894. | 5 Distributions. a Cash. | | |
| 2 Net income (loss) per books. | 20,207,148. | b Stock    c Property. | | |
| 3 Other increases (itemize): _ _ _ _ _ _ _ _ _ | | 6 Other decreases (itemize): | | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| | | 7 Add lines 5 and 6. | | |
| 4 Add lines 1, 2, and 3. | 93,516,042. | 8 Balance at end of year (line 4 less line 7). | | 93,516,042. |

**SCHEDULE N**
**(Form 1120)**

Department of the Treasury
Internal Revenue Service

# Foreign Operations of U.S. Corporations

► **Attach to Form 1120, 1120-C, 1120-IC-DISC, 1120-L,
1120-PC, 1120-REIT, 1120-RIC, or 1120S.**

OMB No. 1545-0123

**2011**

Name
MMR GROUP, INC.

Employer identification number (EIN)
72-1271030

## Foreign Operations Information

| | Yes | No |
|---|---|---|
| **1a** During the tax year, did the corporation own (directly or indirectly) any foreign entity that was disregarded as an entity separate from its owner under Regulations sections 301.7701-2 and 301.7701-3 (see instructions)? | | X |
| If 'Yes,' you are generally required to attach **Form 8858,** Information Return of U.S. Persons With Respect to Foreign Disregarded Entities, for each foreign disregarded entity (see instructions). | | |
| **b** Enter the number of Forms 8858 attached to the tax return. . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► _ _ _ _ _ _ _ _ _ _ | | |
| **2** Enter the number of **Forms 8865,** Return of U.S. Persons With Respect to Certain Foreign Partnerships, attached to the corporation's income tax return. . . . . . . . . . . . . . . . . . . . . ► _ _ _ _ _ _ _ _ _ _ | | |
| **3** Excluding any partnership for which a Form 8865 is attached to the tax return, did the corporation own at least a 10% interest, directly or indirectly, in any other foreign partnership (including an entity treated as a foreign partnership under Regulations section 301.7701-2 or 301.7701-3)? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| If 'Yes,' see instructions for required attachment. | | |
| **4a** Was the corporation a U.S. shareholder of any controlled foreign corporation (CFC)? (See sections 951 and 957.) . . . . . . . . . . | | X |
| If 'Yes,' attach **Form 5471,** Information Return of U.S. Persons With Respect to Certain Foreign Corporations, for each CFC. | | |
| **b** Enter the number of Forms 5471 attached to the tax return. . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► 1 _ _ _ _ _ _ _ _ | | |
| **5** During the tax year, did the corporation receive a distribution from, or was it the grantor of, or transferor to, a foreign trust?. . . | | X |
| If 'Yes,' the corporation may have to file **Form 3520,** Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts. | | |
| **6a** At any time during the 2011 calendar year, did the corporation have an interest in or a signature or other authority over a financial account (such as a bank account, securities account, or other financial account) in a foreign country?. . . . . . . . . . . . . . | | X |
| See the instructions for exceptions and filing requirements for **Form TD F 90-22.1,** Report of Foreign Bank and Financial Accounts. | | |
| **b** If 'Yes,' enter the name of the foreign country . . . . . . . . . . _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| **7a** Is the corporation claiming the extraterritorial income exclusion? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| If 'Yes,' attach a separate **Form 8873,** Extraterritorial Income Exclusion, for **each** transaction or group of transactions. | | |
| **b** Enter the number of Forms 8873 attached to the tax return. . . . . . . . . . . . . . . . . . . . . . . . . ► _ _ _ _ _ _ _ _ _ _ | | |
| **c** Enter the total of the amounts from line 52 (extraterritorial income exclusion (net of disallowed deductions)) of **all** Forms 8873 attached to the tax return. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► $ | | |

**BAA   For Paperwork Reduction Act Notice, see the Instructions for Form 1120.**

Schedule **N** (Form 1120) 2011

Form **4626**

Department of the Treasury
Internal Revenue Service

## Alternative Minimum Tax — Corporations

OMB No. 1545-0175

► **See separate instructions.**
► **Attach to the corporation's tax return.**

**2011**

| Name | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

**Note:** *See the instructions to find out if the corporation is a small corporation exempt from the alternative minimum tax (AMT) under section 55(e).*

| | | | |
|---|---|---|---|
| 1 | Taxable income or (loss) before net operating loss deduction. | **1** | 19,874,179. |
| 2 | **Adjustments and preferences:** | | |
| a | Depreciation of post-1986 property. | **2a** | |
| b | Amortization of certified pollution control facilities. | **2b** | |
| c | Amortization of mining exploration and development costs. | **2c** | |
| d | Amortization of circulation expenditures (personal holding companies only). | **2d** | |
| e | Adjusted gain or loss. | **2e** | |
| f | Long-term contracts. | **2f** | |
| g | Merchant marine capital construction funds. | **2g** | |
| h | Section 833(b) deduction (Blue Cross, Blue Shield, and similar type organizations only). | **2h** | |
| i | Tax shelter farm activities (personal service corporations only). | **2i** | |
| j | Passive activities (closely held corporations and personal service corporations only). | **2j** | |
| k | Loss limitations. | **2k** | |
| l | Depletion. | **2l** | |
| m | Tax-exempt interest income from specified private activity bonds. | **2m** | |
| n | Intangible drilling costs. | **2n** | |
| o | Other adjustments and preferences. | **2o** | |
| 3 | Pre-adjustment alternative minimum taxable income (AMTI). Combine lines 1 through 2o. | **3** | 19,874,179. |
| 4 | **Adjusted current earnings (ACE) adjustment:** | | |
| a | ACE from line 10 of the ACE worksheet in the instructions. `4a` 19,874,179. | | |
| b | Subtract line 3 from line 4a. If line 3 exceeds line 4a, enter the difference as a negative amount (see instructions). `4b` | | |
| c | Multiply line 4b by 75% (.75). Enter the result as a positive amount. `4c` | | |
| d | Enter the excess, if any, of the corporation's total increases in AMTI from prior year ACE adjustments over its total reductions in AMTI from prior year ACE adjustments (see instructions). **Note:** *You must enter an amount on line 4d (even if line 4b is positive)*. `4d` 2,949,652. | | |
| e | ACE adjustment. | | |
| | • If line 4b is zero or more, enter the amount from line 4c. | **4e** | 0. |
| | • If line 4b is less than zero, enter the **smaller** of line 4c or line 4d as a negative amount. | | |
| 5 | Combine lines 3 and 4e. If zero or less, stop here; the corporation does not owe any AMT. | **5** | 19,874,179. |
| 6 | Alternative tax net operating loss deduction (see instructions). | **6** | |
| 7 | **Alternative minimum taxable income.** Subtract line 6 from line 5. If the corporation held a residual interest in a REMIC, see instructions. | **7** | 19,874,179. |
| 8 | **Exemption phase-out** (if line 7 is $310,000 or more, skip lines 8a and 8b and enter -0- on line 8c): | | |
| a | Subtract $150,000 from line 7 (if completing this line for a member of a controlled group, see instructions). If zero or less, enter -0-. `8a` | | |
| b | Multiply line 8a by 25% (.25). `8b` | | |
| c | Exemption. Subtract line 8b from $40,000 (if completing this line for a member of a controlled group, see instructions). If zero or less, enter -0-. | **8c** | 0. |
| 9 | Subtract line 8c from line 7. If zero or less, enter -0-. | **9** | 19,874,179. |
| 10 | Multiply line 9 by 20% (.20). | **10** | 3,974,836. |
| 11 | Alternative minimum tax foreign tax credit (AMTFTC) (see instructions). | **11** | 230,238. |
| 12 | Tentative minimum tax. Subtract line 11 from line 10. | **12** | 3,744,598. |
| 13 | Regular tax liability before applying all credits except the foreign tax credit. | **13** | 6,751,646. |
| 14 | **Alternative minimum tax.** Subtract line 13 from line 12. If zero or less, enter -0-. Enter here and on Form 1120, Schedule J, line 3, or the appropriate line of the corporation's income tax return. | **14** | 0. |

**BAA For Paperwork Reduction Act Notice, see the instructions.**

Form **4626** (2011)

Form **1125-A**
(December 2011)

Department of the Treasury
Internal Revenue Service

**Cost of Goods Sold**

► Attach to Form 1120, 1120-C, 1120-F, 1120-S, 1065, and 1065-B.

OMB No. 1545-2225

| Name | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

| | | | |
|---|---|---|---:|
| **1** | Inventory at beginning of year | **1** | 546,892. |
| **2** | Purchases | **2** | 49,760,582. |
| **3** | Cost of labor | **3** | 91,922,575. |
| **4** | Additional section 263A costs (attach schedule) | **4** | |
| **5** | Other costs (attach schedule) . . . . . . . . . . . . SEE STATEMENT 7 | **5** | 50,771,979. |
| **6** | **Total.** Add lines 1 through 5 | **6** | 193,002,028. |
| **7** | Inventory at end of year | **7** | 604,813. |
| **8** | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on Form 1120, page 1, line 2 or the appropriate line of your tax return (see instructions) | **8** | 192,397,215. |

**9a** Check all methods used for valuing closing inventory:

   *(i)* [X] Cost

   *(ii)* [ ] Lower of cost or market

   *(iii)* [ ] Other (Specify method used and att. expl.) . . ► _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

  **b** Check if there was a writedown of subnormal goods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► [ ]

  **c** Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) . . . . . . . . . . . ► [ ]

  **d** If the LIFO inventory method was used for this tax year, enter amount of closing inventory computed under LIFO . . . . . . . . . . . . . . . . . . . . . . **9d** | |

  **e** If property is produced or acquired for resale, do the rules of section 263A apply to the corporation? . . . . . . . . . . . . . . . [ ] Yes [X] No

  **f** Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If 'Yes,' attach explanation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ] Yes [X] No

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**

Form **1125-A** (12-2011)



**SCHEDULE B**
**(Form 1120)**

(December 2009)
Department of the Treasury
Internal Revenue Service

# Additional Information for Schedule M-3 Filers

► **Attach to Form 1120.**
► **See instructions.**

OMB No. 1545-0123

| Name | Employer identification number (EIN) |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

|  |  | Yes | No |
|---|---|---|---|
| **1** | Do the amounts reported on Schedule M-3 (Form 1120), Part II, lines 9 or 10, column (d), reflect allocations to this corporation from a partnership of income, gain, loss, deduction, or credit that are disproportionate to this corporation's capital contribution to the partnership or its ratio for sharing other items of the partnership? | | X |
| **2** | At any time during the tax year, did the corporation sell, exchange, or transfer any interest in an intangible asset to a related person as defined in section 267(b)? | | X |
| **3** | At any time during the tax year, did the corporation acquire any interest in an intangible asset from a related person as defined in section 267(b) | | X |
| **4a** | During the tax year, did the corporation enter into a cost-sharing arrangement with any related foreign party on whose behalf the corporation did not file Form 5471, Information Return of U.S. Persons With Respect To Certain Foreign Corporations? | | X |
| **b** | At any time during the tax year, was the corporation a participant in a cost-sharing arrangement with any related foreign party on whose behalf the corporation did not file Form 5471? | | X |
| **5** | At any time during the tax year, did the corporation make any change in accounting principle for financial accounting purposes? See instructions for the definition of change in accounting principle | | X |
| **6** | At any time during the tax year, did the corporation make any change in a method of accounting for U.S. income tax purposes? | | X |
| **7** | At any time during the tax year, did the corporation own any voluntary employees' beneficiary association (VEBA) trusts that were used to hold funds designated for employee benefits? | | X |
| **8** | At any time during the tax year, did the corporation use an allocation method for indirect costs capitalized to self-constructed assets that varied from its financial method of accounting? | | X |
| **9** | At any time during the tax year, did the corporation treat for tax purposes indirect costs, as defined in Regulations sections 1.263A-1(e)(3)(ii)(F), (G), and (H), as mixed service costs, as defined in Regulations section 1,263(A)-1(e)(4)(ii)(C)? | | X |
| **10** | Did the corporation, under section 118 or 362(c) and the related regulations, take a return filing position characterizing any amount as a contribution to the capital of the corporation during the tax year by any non-shareholders? Amounts so characterized may include, without limitation, incentives, inducements, money, and property | | X |

**BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 1120.**

Schedule **B** (Form 1120) (12-2009)

CPCA1801L   02/07/11

**SCHEDULE G**
**(Form 1120)**
(Rev December 2011)

Department of the Treasury
Internal Revenue Service

# Information on Certain Persons Owning the Corporation's Voting Stock

► **Attach to Form 1120.**

► **See instructions.**

OMB No. 1545-0123

Name

MMR GROUP, INC.

**Employer identification number (EIN)**

72-1271030

| Part I | **Certain Entities Owning the Corporation's Voting Stock.** (Form 1120, Schedule K, Question 4a). |
|---|---|

Complete columns (i) through (v) below for any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization that owns directly 20% or more, or owns, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote (see instructions).

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Percentage Owned in Voting Stock |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| Part II | **Certain Individuals and Estates Owning the Corporation's Voting Stock.** (Form 1120, Schedule K, Question 4b). |
|---|---|

Complete columns (i) through (iv) below for any individual or estate that owns directly 20% or more, or owns, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote (see instructions).

| (i) Name of Individual or Estate | (ii) Identifying Number (if any) | (iii) Country of Citizenship (see instructions) | (iv) Percentage Owned in Voting Stock |
|---|---|---|---|
| | | UNITED STATES | 34.21% |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**BAA    For Paperwork Reduction Act Notice, see the Instructions for Form 1120.**

CPCA1901L   06/02/11

Schedule **G** (Form 1120) (Rev 12-2011)

**SCHEDULE M-3**
**(Form 1120)**

Department of the Treasury
Internal Revenue Service

# Net Income (Loss) Reconciliation for Corporations With Total Assets of $10 Million or More

► Attach to Form 1120 or 1120-C.
► See separate instructions.

OMB No. 1545-0123

**2011**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es):  (1) ☐ Non-consolidated return    (2) ☒ Consolidated return (Form 1120 only)
(3) ☐ Mixed 1120/L/PC group    (4) ☐ Dormant subsidiaries schedule attached

## Part I    Financial Information and Net Income (Loss) Reconciliation (see instructions)

**1a** Did the corporation file SEC Form 10-K for its income statement period ending with or within this tax year?

☐ **Yes.** Skip lines 1b and 1c and complete lines 2a through 11 with respect to that SEC Form 10-K.

☒ **No.** Go to line 1b. See instructions if multiple non-tax-basis income statements are prepared.

**b** Did the corporation prepare a certified audited non-tax-basis income statement for that period?

☒ **Yes.** Skip line 1c and complete lines 2a through 11 with respect to that income statement.

☐ **No.** Go to line 1c.

**c** Did the corporation prepare a non-tax-basis income statement for that period?

☐ **Yes.** Complete lines 2a through 11 with respect to that income statement.

☐ **No.** Skip lines 2a through 3c and enter the corporation's net income (loss) per its books and records on line 4a.

**2a** Enter the income statement period:  Beginning  1/01/11    Ending  12/31/11

**b** Has the corporation's income statement been restated for the income statement period on line 2a?

☐ **Yes.** (If 'Yes', attach an explanation and the amount of each item restated.)

☒ **No.**

**c** Has the corporation's income statement been restated for any of the five income statement periods preceding the period on line 2a?

☐ **Yes.** (If 'Yes', attach an explanation and the amount of each item restated.)

☒ **No.**

**3a** Is any of the corporation's voting common stock publicly traded?

☐ **Yes.**

☒ **No.** If 'No', go to line 4a.

**b** Enter the symbol of the corporation's primary U.S. publicly traded voting common stock . . . . . . . . . . .

**c** Enter the nine-digit CUSIP number of the corporation's primary publicly traded voting common stock.

| | | |
|---|---|---|
| **4a** Worldwide consolidated net income (loss) from income statement source identified in Part I, line 1. . . . . . . . | **4a** | 20,207,148. |
| **b** Indicate accounting standard used for line 4a (see instructions): (1) ☒ GAAP  (2) ☐ IFRS  (3) ☐ Statutory  (4) ☐ Tax-basis  (5) ☐ Other (specify) | | |
| **5a** Net income from nonincludible foreign entities (attach schedule). . . . . . . . . . . . . . . . . . . . . . . | **5a** | |
| **b** Net loss from nonincludible foreign entities (attach schedule and enter as a positive amount). . . . . . . . . . . . . . . . . | **5b** | |
| **6a** Net income from nonincludible U.S. entities (attach schedule). . . . . . . . . . . . . . . . . | **6a** | |
| **b** Net loss from nonincludible U.S. entities (attach schedule and enter as a positive amount). . . . . . . . . . . . . . . . . | **6b** | |
| **7a** Net income (loss) of other includible foreign disregarded entities (attach schedule). . . . . . . . . . . | **7a** | |
| **b** Net income (loss) of other includible U.S. disregarded entities (attach schedule). . . . . . . . . . . . | **7b** | |
| **c** Net income (loss) of other includible entities (attach schedule). . . . . . . . . . . . . . . . | **7c** | |
| **8** Adjustment to eliminations of transactions between includible entities and nonincludible entities (attach schedule). . . . . . . . . . . . . . . . | **8** | |
| **9** Adjustment to reconcile income statement period to tax year (attach schedule). . . . . . . . . . . . . . . . | **9** | |
| **10a** Intercompany dividend adjustments to reconcile to line 11 (attach schedule). . . . . . . . . . | **10a** | |
| **b** Other statutory accounting adjustments to reconcile to line 11 (attach schedule). . . . . . . . . | **10b** | |
| **c** Other adjustments to reconcile to amount on line 11 (attach schedule). . . . . . . . . . | **10c** | |
| **11** **Net income (loss) per income statement of includible corporations.** Combine lines 4 through 10. . . . . . . . . . | **11** | 20,207,148. |

**Note.** Part I, line 11, must equal the amount on Part II, line 30, column (a), and Schedule M-2, line 2.

**12** Enter the total amount (not just the corporation's share) of the assets and liabilities of all entities included or removed on the following lines:

| | Total Assets | Total Liabilities |
|---|---|---|
| **a** Included on Part I, line 4 . . . . . . . . . . . . . . . ► | | |
| **b** Removed on Part I, line 5 . . . . . . . . . . . . . . . ► | | |
| **c** Removed on Part I, line 6 . . . . . . . . . . . . . . . ► | | |
| **d** Included on Part I, line 7 . . . . . . . . . . . . . . . ► | | |

**BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 1120.**

CPCA1001L  06/02/11

Schedule **M-3** (Form 1120) 2011

Schedule **M-3** (Form 1120) 2011                                                                                           Page **2**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** [X] Consolidated group  **(2)** [ ] Parent corp  **(3)** [ ] Consolidated eliminations  **(4)** [ ] Subsidiary corp  **(5)** [ ] Mixed 1120/L/PC group

Check if a sub-consolidated: **(6)** [ ] 1120 group  **(7)** [ ] 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
|  |  |

**Part II**  **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** (see instructions)

| Income (Loss) Items<br>(Attach schedules for lines 1 through 11) | (a)<br>Income (Loss) per<br>Income Statement | (b)<br>Temporary<br>Difference | (c)<br>Permanent<br>Difference | (d)<br>Income (Loss) per<br>Tax Return |
|---|---|---|---|---|
| **1** Income (loss) from equity method foreign corporations. | | | | |
| **2** Gross foreign dividends not previously taxed | | | | |
| **3** Subpart F, QEF, and similar income inclusions. | | | | |
| **4** Section 78 gross-up. | | | | |
| **5** Gross foreign distributions previously taxed | | | | |
| **6** Income (loss) from equity method U.S. corporations. | | | | |
| **7** U.S. dividends not eliminated in tax consolidation | | | | |
| **8** Minority interest for includible corporations. | | | | |
| **9** Income (loss) from U.S. partnerships. | | −369,660. | | −369,660. |
| **10** Income (loss) from foreign partnerships. | | | | |
| **11** Income (loss) from other pass-through entities. | | | | |
| **12** Items relating to reportable transactions (attach details) | | | | |
| **13** Interest income (attach Form 8916-A) | | | | |
| **14** Total accrual to cash adjustment. | | | | |
| **15** Hedging transactions. | | | | |
| **16** Mark-to-market income (loss). | | | | |
| **17** Cost of goods sold (attach Form 8916-A) | −192,397,215. | | | −192,397,215. |
| **18** Sale versus lease (for sellers and/or lessors). | | | | |
| **19** Section 481(a) adjustments. | | | | |
| **20** Unearned/deferred revenue. | | | | |
| **21** Income recognition from long-term contracts | | | | |
| **22** Original issue discount and other imputed interest | | | | |
| **23a** Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities | | | | |
| **b** Gross capital gains from Schedule D, excluding amounts from pass-through entities | | | | |
| **c** Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses. | | | | |
| **d** Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses. | | | | |
| **e** Abandonment losses. | | | | |
| **f** Worthless stock losses (attach details) | | | | |
| **g** Other gain/loss on disposition of assets other than inventory. | | | | |
| **24** Capital loss limitation and carryforward used | | | | |
| **25** Other income (loss) items with differences (attach schedule) | | | | |
| **26** **Total income (loss) items.** Combine lines 1 through 25. | −192,397,215. | −369,660. | | −192,766,875. |
| **27** **Total expense/deduction items** (from Part III, line 38). | −7,672,965. | −846,542. | 883,233. | −7,636,274. |
| **28** Other items with no differences. | 220,277,328. | | | 220,277,328. |
| **29a** Mixed groups, see instructions. All others, combine lines 26 through 28. | 20,207,148. | −1,216,202. | 883,233. | 19,874,179. |
| **b** PC insurance subgroup reconciliation totals. | | | | |
| **c** Life insurance subgroup reconciliation totals. | | | | |
| **30** **Reconciliation totals.** Combine lines 29a through 29c. | 20,207,148. | −1,216,202. | 883,233. | 19,874,179. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

Schedule **M-3** (Form 1120) 2011                                                              **Page 3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** [X] Consolidated group    **(2)** [ ] Parent corp   **(3)** [ ] Consolidated eliminations   **(4)** [ ] Subsidiary corp   **(5)** [ ] Mixed 1120/L/PC group

Check if a sub-consolidated: **(6)** [ ] 1120 group   **(7)** [ ] 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
|  |  |

| **Part III** | **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return − Expense/Deduction Items** (see instructions) |
|---|---|

| Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| 1 U.S. current income tax expense . . . . . . . . . . | | | | |
| 2 U.S. deferred income tax expense . . . . . . . . . | | | | |
| 3 State and local current income tax expense . | | 846,542. | | 846,542. |
| 4 State and local deferred income tax expense | | | | |
| 5 Foreign current income tax expense (other than foreign withholding taxes) . . . . . . . . . . . . . | | | | |
| 6 Foreign deferred income tax expense . . . . . . . | | | | |
| 7 Foreign withholding taxes . . . . . . . . . . . . . . . . | | | | |
| 8 Interest expense (attach Form 8916-A) . . . . . . | | | | |
| 9 Stock option expense . . . . . . . . . . . . . . . . . . . | | | | |
| 10 Other equity-based compensation . . . . . . . . . . | | | | |
| 11 Meals and entertainment . . . . . . . . . . . . . . . . . | 615,773. | | -307,886. | 307,887. |
| 12 Fines and penalties . . . . . . . . . . . . . . . . . . . . . | 60,290. | | -62,060. | -1,770. |
| 13 Judgments, damages, awards, and similar costs . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 14 Parachute payments . . . . . . . . . . . . . . . . . . . . . | | | | |
| 15 Compensation with section 162(m) limitation | | | | |
| 16 Pension and profit-sharing . . . . . . . . . . . . . . . . | | | | |
| 17 Other post-retirement benefits . . . . . . . . . . . . | | | | |
| 18 Deferred compensation . . . . . . . . . . . . . . . . . . | | | | |
| 19 Charitable contribution of cash and tangible property . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 20 Charitable contribution of intangible property . | | | | |
| 21 Charitable contribution limitation/carryforward . . . . . . . . | | | | |
| 22 Domestic production activities deduction . . . . | | | 1,956,877. | 1,956,877. |
| 23 Current year acquisition or reorganization investment banking fees . . . . . . . . . . . . . . . . . | | | | |
| 24 Current year acquisition or reorganization legal and accounting fees . . . . . . . . . . . . . . . . | | | | |
| 25 Current year acquisition/reorganization other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 26 Amortization/impairment of goodwill . . . . . . . . | | | | |
| 27 Amortization of acquisition, reorganization, and start-up costs . . . . . . . . . . . . . . . . . . . . . | | | | |
| 28 Other amortization or impairment write-offs . . | | | | |
| 29 Section 198 environmental remediation costs | | | | |
| 30 Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 31 Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,526,738. | | | 4,526,738. |
| 32 Bad debt expense . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 33 Corporate owned life insurance premiums . . . | 2,470,164. | | -2,470,164. | |
| 34 Purchase versus lease (for purchasers and/or lessees) . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 35 Research and development costs . . . . . . . . . . . . . . . . . | | | | |
| 36 Section 118 exclusion (att sch) . . . . . . . . . . . . | | | | |
| 37 Other expense/deduction items with differences (attach schedule) . . . . . . . . . . . . . . | | | | |
| 38 **Total expense/deduction items.** Combine lines 1 through 37. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive . . | 7,672,965. | 846,542. | -883,233. | 7,636,274. |

CPCA1023L  08/12/11                                                      Schedule **M-3** (Form 1120) 2011

Form **8916-A**

Department of the Treasury
Internal Revenue Service

**Supplemental Attachment to Schedule M-3**

► Attach to Schedule M-3 for Form 1065, 1120, 1120-L, 1120-PC, or 1120S.

OMB No. 1545-2061

**2011**

| Name of common parent | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |
| Name of subsidiary | Employer identification number |

| Part I | **Cost of Goods Sold** |
|---|---|

| Cost of Goods Sold Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| **1** Amounts attributable to cost flow assumptions.... | | | | |
| **2** Amounts attributable to: | | | | |
| **a** Stock option expense.................... | | | | |
| **b** Other equity based compensation............... | | | | |
| **c** Meals and entertainment..................... | | | | |
| **d** Parachute payments........................ | | | | |
| **e** Compensation with section 162(m) limitation..... | | | | |
| **f** Pension and profit sharing................... | | | | |
| **g** Other post-retirement benefits................ | | | | |
| **h** Deferred compensation..................... | | | | |
| **i** Section 198 environmental remediation costs..... | | | | |
| **j** Amortization............................. | | | | |
| **k** Depletion............................... | | | | |
| **l** Depreciation............................. | | | | |
| **m** Corporate owned life insurance premiums........ | | | | |
| **n** Other section 263A costs.................... | | | | |
| **3** Inventory shrinkage accruals.................... | | | | |
| **4** Excess inventory and obsolescence reserves..... | | | | |
| **5** Lower of cost or market write-downs............. | | | | |
| **6** Other items with differences (attach schedule)........................ | | | | |
| **7** Other items with no differences.................. | 192,397,215. | | | 192,397,215. |
| **8** **Total cost of goods sold.** Add lines 1 through 7, in columns a, b, c, and d. | 192,397,215. | 0. | 0. | 192,397,215. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**

Form **8916-A** (2011)

CPCZ1612L  12/22/11

Form **8916-A** (2011)  MMR GROUP, INC.                           72-1271030        Page **2**

| **Part II** | **Interest Income** | | | | |
|---|---|---|---|---|---|
| | Interest Income Item | **(a)** Income (Loss) per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Income (Loss) per Tax Return |
| **1** | Tax-exempt interest income . . . . . . . . . . . . . . . . . . . . | | | | |
| **2** | Interest income from hybrid securities . . . . . . . . . . | | | | |
| **3** | Sale/lease interest income. . . . . . . . . . . . . . . . . . . . . | | | | |
| **4a** | Intercompany interest income — From outside tax affiliated group. . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4b** | Intercompany interest income — From tax affiliated group. . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **5** | Other interest income . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **6** | Total interest income. Add lines 1 through 5. Enter total on Schedule M-3 (Forms 1120, 1120-PC, and 1120-L), Part II, line 13 or Schedule M-3 (Forms 1065 and 1120S) Part II, line 11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

| **Part III** | **Interest Expense** | | | | |
|---|---|---|---|---|---|
| | Interest Expense Item | **(a)** Expense per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Deduction per Tax Return |
| **1** | Interest expense from hybrid securities . . . . . . . . . . | | | | |
| **2** | Lease/purchase interest expense. . . . . . . . . . . . . . . | | | | |
| **3a** | Intercompany interest expense — Paid to outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **3b** | Intercompany interest expense — Paid to tax affiliated group. . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4** | Other interest expense . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **5** | Total interest expense. Add lines 1 through 4. Enter total on Schedule M-3 (Form 1120) Part III, line 8; Schedule M-3 (Forms 1120-PC and 1120-L), Part III, line 36; Schedule M-3 (Form 1065) Part III, line 27; or Schedule M-3 (Form 1120S) Part III, line 26 . . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

Form **8916-A** (2011)

| Schedule **M-3** (Form 1120) 2011 | | | | Page **2** |
|---|---|---|---|---|

| Name of corporation (common parent, if consolidated return) | | Employer identification number | | |
|---|---|---|---|---|
| MMR GROUP, INC. | | 72-1271030 | | |

Check applicable box(es): **(1)** ☐ Consolidated group  **(2)** ☒ Parent corp  **(3)** ☐ Consolidated eliminations  **(4)** ☐ Subsidiary corp  **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated:  **(6)** ☐ 1120 group  **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| | |

**Part II**  **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** (see instructions)

| **Income (Loss) Items**<br>(Attach schedules for lines 1 through 11) | **(a)**<br>Income (Loss) per<br>Income Statement | **(b)**<br>Temporary<br>Difference | **(c)**<br>Permanent<br>Difference | **(d)**<br>Income (Loss) per<br>Tax Return |
|---|---|---|---|---|
| **1** Income (loss) from equity method foreign corporations. . . . . . . . . . . . . . . . . | | | | |
| **2** Gross foreign dividends not previously taxed. . . . . . . . . . . . . . . . . | | | | |
| **3** Subpart F, QEF, and similar income inclusions. . . . . . . . . . . . . . . . . | | | | |
| **4** Section 78 gross-up. . . . . . . . . . . . . . . . | | | | |
| **5** Gross foreign distributions previously taxed. . . . . . . . . . | | | | |
| **6** Income (loss) from equity method U.S. corporations. . . . . . . . . . . . . . . | | | | |
| **7** U.S. dividends not eliminated in tax consolidation . . . . . . . . . . . . . . . . | | | | |
| **8** Minority interest for includible corporations. . . . . . . . . . | | | | |
| **9** Income (loss) from U.S. partnerships. . . . . . . . . . . . . . . . . . . | | | | |
| **10** Income (loss) from foreign partnerships. . . . . . . . . . . . . . . . . . | | | | |
| **11** Income (loss) from other pass-through entities. . . . . . . . . . . . . . . . . | | | | |
| **12** Items relating to reportable transactions (attach details) . . . . . . . . . . . . | | | | |
| **13** Interest income (attach Form 8916-A). . . . . . . | | | | |
| **14** Total accrual to cash adjustment. . . . . . . . . . . | | | | |
| **15** Hedging transactions . . . . . . . . . . . . . . . . . . | | | | |
| **16** Mark-to-market income (loss). . . . . . . . . . . . . | | | | |
| **17** Cost of goods sold (attach Form 8916-A). . . . | -2,510,939. | | | -2,510,939. |
| **18** Sale versus lease (for sellers and/or lessors). . . . . . . . . | | | | |
| **19** Section 481(a) adjustments. . . . . . . . . . . . . | | | | |
| **20** Unearned/deferred revenue. . . . . . . . . . . . . | | | | |
| **21** Income recognition from long-term contracts . . . | | | | |
| **22** Original issue discount and other imputed interest . . . . . | | | | |
| **23a** Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities . . . | | | | |
| **b** Gross capital gains from Schedule D, excluding amounts from pass-through entities . . . . . . | | | | |
| **c** Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **d** Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses. . . . . . . . . . . . . . . . . . | | | | |
| **e** Abandonment losses. . . . . . . . . . . . . . . . | | | | |
| **f** Worthless stock losses (attach details) . . . . . . . . . . . . | | | | |
| **g** Other gain/loss on disposition of assets other than inventory. . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **24** Capital loss limitation and carryforward used . . . . . . . . | | | | |
| **25** Other income (loss) items with differences (attach schedule) . . . . . . . . . . . . | | | | |
| **26** Total income (loss) items. Combine lines 1 through 25. | -2,510,939. | | | -2,510,939. |
| **27** Total expense/deduction items (from Part III, line 38). | -861,594. | | 3,770. | -857,824. |
| **28** Other items with no differences. . . . . . . . . . . . | 3,013,694. | | | 3,013,694. |
| **29a** Mixed groups, see instructions. All others, combine lines 26 through 28. . . . . . . . . . . | -358,839. | 0. | 3,770. | -355,069. |
| **b** PC insurance subgroup reconciliation totals . | | | | |
| **c** Life insurance subgroup reconciliation totals. | | | | |
| **30** Reconciliation totals. Combine lines 29a through 29c. . . | -358,839. | 0. | 3,770. | -355,069. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

| **BAA** | CPCA1023L  08/12/11 | Schedule **M-3** (Form 1120) 2011 |
|---|---|---|

Schedule **M-3** (Form 1120) 2011           Page **3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72−1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group  **(2)** ☒ Parent corp  **(3)** ☐ Consolidated eliminations  **(4)** ☐ Subsidiary corp  **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated: **(6)** ☐ 1120 group  **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|

**Part III**    **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return − Expense/Deduction Items** (see instructions)

| Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| 1  U.S. current income tax expense . . . . . . . . . . | | | | |
| 2  U.S. deferred income tax expense . . . . . . . . . | | | | |
| 3  State and local current income tax expense . | | | | |
| 4  State and local deferred income tax expense | | | | |
| 5  Foreign current income tax expense (other than foreign withholding taxes) . . . . . . . . . . . . . | | | | |
| 6  Foreign deferred income tax expense . . . . . . . | | | | |
| 7  Foreign withholding taxes . . . . . . . . . . . . . . . . . | | | | |
| 8  Interest expense (attach Form 8916-A) . . . . . . | | | | |
| 9  Stock option expense . . . . . . . . . . . . . . . . . . . . | | | | |
| 10  Other equity-based compensation . . . . . . . . . . | | | | |
| 11  Meals and entertainment . . . . . . . . . . . . . . . . . . | 7,540. | | −3,770. | 3,770. |
| 12  Fines and penalties . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 13  Judgments, damages, awards, and similar costs . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 14  Parachute payments . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 15  Compensation with section 162(m) limitation | | | | |
| 16  Pension and profit-sharing . . . . . . . . . . . . . . . . | | | | |
| 17  Other post-retirement benefits . . . . . . . . . . . . . | | | | |
| 18  Deferred compensation . . . . . . . . . . . . . . . . . . . | | | | |
| 19  Charitable contribution of cash and tangible property . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 20  Charitable contribution of intangible property | | | | |
| 21  Charitable contribution limitation/carryforward | | | | |
| 22  Domestic production activities deduction . . . . | | | | |
| 23  Current year acquisition or reorganization investment banking fees . . . . . . . . . . . . . . . . . | | | | |
| 24  Current year acquisition or reorganization legal and accounting fees . . . . . . . . . . . . . . . | | | | |
| 25  Current year acquisition/reorganization other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 26  Amortization/impairment of goodwill . . . . . . . . | | | | |
| 27  Amortization of acquisition, reorganization, and start-up costs . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 28  Other amortization or impairment write-offs . | | | | |
| 29  Section 198 environmental remediation costs | | | | |
| 30  Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 31  Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 854,054. | | | 854,054. |
| 32  Bad debt expense . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 33  Corporate owned life insurance premiums . . . | | | | |
| 34  Purchase versus lease (for purchasers and/or lessees) . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 35  Research and development costs . . . . . . . . . . . . . . . | | | | |
| 36  Section 118 exclusion (att sch) . . . . . . . . . . . . | | | | |
| 37  Other expense/deduction items with differences (attach schedule) . . . . . . . . . . . . . . . . . . . . | | | | |
| 38  **Total expense/deduction items.** Combine lines 1 through 37. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive . . | 861,594. | | −3,770. | 857,824. |

Form **8916-A**

Department of the Treasury
Internal Revenue Service

**Supplemental Attachment to Schedule M-3**

► Attach to Schedule M-3 for Form 1065, 1120, 1120-L, 1120-PC, or 1120S.

OMB No. 1545-2061

**2011**

| Name of common parent | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |
| Name of subsidiary | Employer identification number |

**Part I** | **Cost of Goods Sold**

| Cost of Goods Sold Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| 1 Amounts attributable to cost flow assumptions.... | | | | |
| 2 Amounts attributable to: | | | | |
| a Stock option expense.......................... | | | | |
| b Other equity based compensation............... | | | | |
| c Meals and entertainment....................... | | | | |
| d Parachute payments............................ | | | | |
| e Compensation with section 162(m) limitation..... | | | | |
| f Pension and profit sharing..................... | | | | |
| g Other post-retirement benefits................. | | | | |
| h Deferred compensation......................... | | | | |
| i Section 198 environmental remediation costs..... | | | | |
| j Amortization................................. | | | | |
| k Depletion.................................... | | | | |
| l Depreciation................................. | | | | |
| m Corporate owned life insurance premiums........ | | | | |
| n Other section 263A costs...................... | | | | |
| 3 Inventory shrinkage accruals.................... | | | | |
| 4 Excess inventory and obsolescence reserves..... | | | | |
| 5 Lower of cost or market write-downs............ | | | | |
| 6 Other items with differences (attach schedule)........................ | | | | |
| 7 Other items with no differences................. | 2,510,939. | | | 2,510,939. |
| 8 **Total cost of goods sold.** Add lines 1 through 7, in columns a, b, c, and d. | 2,510,939. | 0. | 0. | 2,510,939. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**

Form **8916-A** (2011)

CPCZ1612L   12/22/11

Form **8916-A** (2011)   MMR GROUP, INC.                              72-1271030         Page **2**

| Part II | Interest Income | | | | |
|---------|----------------|---|---|---|---|
| | Interest Income Item | **(a)** Income (Loss) per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Income (Loss) per Tax Return |
| **1** | Tax-exempt interest income . . . . . . . . . . . . . . . . . . . . . | | | | |
| **2** | Interest income from hybrid securities . . . . . . . . . . . | | | | |
| **3** | Sale/lease interest income . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4a** | Intercompany interest income — From outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4b** | Intercompany interest income — From tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **5** | Other interest income . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **6** | Total interest income. Add lines 1 through 5. Enter total on Schedule M-3 (Forms 1120, 1120-PC, and 1120-L), Part II, line 13 or Schedule M-3 (Forms 1065 and 1120S) Part II, line 11 . . . . . . . . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

| Part III | Interest Expense | | | | |
|----------|------------------|---|---|---|---|
| | Interest Expense Item | **(a)** Expense per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Deduction per Tax Return |
| **1** | Interest expense from hybrid securities . . . . . . . . . | | | | |
| **2** | Lease/purchase interest expense . . . . . . . . . . . . . . . | | | | |
| **3a** | Intercompany interest expense — Paid to outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **3b** | Intercompany interest expense — Paid to tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4** | Other interest expense . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **5** | Total interest expense. Add lines 1 through 4. Enter total on Schedule M-3 (Form 1120) Part III, line 8; Schedule M-3 (Forms 1120-PC and 1120-L), Part III, line 36; Schedule M-3 (Form 1065) Part III, line 27; or Schedule M-3 (Form 1120S) Part III, line 26 . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

Form **8916-A** (2011)

Schedule **M-3** (Form 1120) 2011 — Page **2**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): (1) ☐ Consolidated group  (2) ☐ Parent corp  (3) ☐ Consolidated eliminations  (4) ☒ Subsidiary corp  (5) ☐ Mixed 1120/L/PC group

Check if a sub-consolidated:  (6) ☐ 1120 group  (7) ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR CONSTRUCTORS, INC. | 72-1046000 |

**Part II** — **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** (see instructions)

| Income (Loss) Items<br>(Attach schedules for lines 1 through 11) | (a)<br>Income (Loss) per<br>Income Statement | (b)<br>Temporary<br>Difference | (c)<br>Permanent<br>Difference | (d)<br>Income (Loss) per<br>Tax Return |
|---|---|---|---|---|
| 1  Income (loss) from equity method foreign corporations | | | | |
| 2  Gross foreign dividends not previously taxed | | | | |
| 3  Subpart F, QEF, and similar income inclusions | | | | |
| 4  Section 78 gross-up | | | | |
| 5  Gross foreign distributions previously taxed | | | | |
| 6  Income (loss) from equity method U.S. corporations | | | | |
| 7  U.S. dividends not eliminated in tax consolidation | | | | |
| 8  Minority interest for includible corporations | | | | |
| 9  Income (loss) from U.S. partnerships | | | | |
| 10  Income (loss) from foreign partnerships | | | | |
| 11  Income (loss) from other pass-through entities | | | | |
| 12  Items relating to reportable transactions (attach details) | | | | |
| 13  Interest income (attach Form 8916-A) | | | | |
| 14  Total accrual to cash adjustment | | | | |
| 15  Hedging transactions | | | | |
| 16  Mark-to-market income (loss) | | | | |
| 17  Cost of goods sold (attach Form 8916-A) | -188,213,756. | | | -188,213,756. |
| 18  Sale versus lease (for sellers and/or lessors) | | | | |
| 19  Section 481(a) adjustments | | | | |
| 20  Unearned/deferred revenue | | | | |
| 21  Income recognition from long-term contracts | | | | |
| 22  Original issue discount and other imputed interest | | | | |
| 23a  Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities | | | | |
| b  Gross capital gains from Schedule D, excluding amounts from pass-through entities | | | | |
| c  Gross capital losses from Schedule D, excluding from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| d  Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| e  Abandonment losses | | | | |
| f  Worthless stock losses (attach details) | | | | |
| g  Other gain/loss on disposition of assets other than inventory | | | | |
| 24  Capital loss limitation and carryforward used | | | | |
| 25  Other income (loss) items with differences (attach schedule) | | | | |
| 26  Total income (loss) items. Combine lines 1 through 25. | -188,213,756. | | | -188,213,756. |
| 27  Total expense/deduction items (from Part III, line 38). | -6,806,026. | -845,172. | 753,594. | -6,897,604. |
| 28  Other items with no differences | 216,144,964. | | | 216,144,964. |
| 29a  Mixed groups, see instructions. All others, combine lines 26 through 28. | 21,125,182. | -845,172. | 753,594. | 21,033,604. |
| b  PC insurance subgroup reconciliation totals. | | | | |
| c  Life insurance subgroup reconciliation totals. | | | | |
| 30  Reconciliation totals. Combine lines 29a through 29c. | 21,125,182. | -845,172. | 753,594. | 21,033,604. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

Schedule **M-3** (Form 1120) 2011        Page **3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group   **(2)** ☐ Parent corp   **(3)** ☐ Consolidated eliminations   **(4)** ☒ Subsidiary corp   **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated: **(6)** ☐ 1120 group   **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR CONSTRUCTORS, INC. | 72-1046000 |

**Part III**   **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** − **Expense/Deduction Items** (see instructions)

| | Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|---|
| 1 | U.S. current income tax expense . . . . . . . . . . | | | | |
| 2 | U.S. deferred income tax expense . . . . . . . . . | | | | |
| 3 | State and local current income tax expense . | | 845,172. | | 845,172. |
| 4 | State and local deferred income tax expense | | | | |
| 5 | Foreign current income tax expense (other than foreign withholding taxes) . . . . . . . . . . . . . | | | | |
| 6 | Foreign deferred income tax expense . . . . . . . | | | | |
| 7 | Foreign withholding taxes . . . . . . . . . . . . . . . . . | | | | |
| 8 | Interest expense (attach Form 8916-A) . . . . . . | | | | |
| 9 | Stock option expense . . . . . . . . . . . . . . . . . . . . | | | | |
| 10 | Other equity-based compensation . . . . . . . . . . . | | | | |
| 11 | Meals and entertainment . . . . . . . . . . . . . . . . . . | 606,775. | | -303,387. | 303,388. |
| 12 | Fines and penalties . . . . . . . . . . . . . . . . . . . . . | 60,290. | | -60,290. | |
| 13 | Judgments, damages, awards, and similar costs . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 14 | Parachute payments . . . . . . . . . . . . . . . . . . . . . | | | | |
| 15 | Compensation with section 162(m) limitation | | | | |
| 16 | Pension and profit-sharing . . . . . . . . . . . . . . . . | | | | |
| 17 | Other post-retirement benefits . . . . . . . . . . . . . | | | | |
| 18 | Deferred compensation . . . . . . . . . . . . . . . . . . | | | | |
| 19 | Charitable contribution of cash and tangible property . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 20 | Charitable contribution of intangible property . | | | | |
| 21 | Charitable contribution limitation/carryforward . . . . . . . . | | | | |
| 22 | Domestic production activities deduction . . . . | | | 2,080,247. | 2,080,247. |
| 23 | Current year acquisition or reorganization investment banking fees . . . . . . . . . . . . . . . . . | | | | |
| 24 | Current year acquisition or reorganization legal and accounting fees . . . . . . . . . . . . . . . . | | | | |
| 25 | Current year acquisition/reorganization other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 26 | Amortization/impairment of goodwill . . . . . . . . | | | | |
| 27 | Amortization of acquisition, reorganization, and start-up costs . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 28 | Other amortization or impairment write-offs . . | | | | |
| 29 | Section 198 environmental remediation costs | | | | |
| 30 | Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 31 | Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,668,797. | | | 3,668,797. |
| 32 | Bad debt expense . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 33 | Corporate owned life insurance premiums . . . | 2,470,164. | | -2,470,164. | |
| 34 | Purchase versus lease (for purchasers and/or lessees) . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 35 | Research and development costs . . . . . . . . . . . . . . . | | | | |
| 36 | Section 118 exclusion (att sch) . . . . . . . . . . . . | | | | |
| 37 | Other expense/deduction items with differences (attach schedule) . . . . . . . . . . . . . . . . | | | | |
| 38 | **Total expense/deduction items.** Combine lines 1 through 37. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive . . | 6,806,026. | 845,172. | -753,594. | 6,897,604. |

CPCA1023L   08/12/11        Schedule **M-3** (Form 1120) 2011

Form **8916-A**

Department of the Treasury
Internal Revenue Service

**Supplemental Attachment to Schedule M-3**

► Attach to Schedule M-3 for Form 1065, 1120, 1120-L, 1120-PC, or 1120S.

OMB No. 1545-2061

**2011**

| Name of common parent | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |
| Name of subsidiary | Employer identification number |
| MMR CONSTRUCTORS, INC. | 72-1046000 |

**Part I    Cost of Goods Sold**

| Cost of Goods Sold Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| **1** Amounts attributable to cost flow assumptions.... | | | | |
| **2** Amounts attributable to: | | | | |
| **a** Stock option expense......................... | | | | |
| **b** Other equity based compensation................ | | | | |
| **c** Meals and entertainment....................... | | | | |
| **d** Parachute payments........................... | | | | |
| **e** Compensation with section 162(m) limitation ..... | | | | |
| **f** Pension and profit sharing..................... | | | | |
| **g** Other post-retirement benefits................. | | | | |
| **h** Deferred compensation ....................... | | | | |
| **i** Section 198 environmental remediation costs..... | | | | |
| **j** Amortization................................. | | | | |
| **k** Depletion.................................... | | | | |
| **l** Depreciation................................. | | | | |
| **m** Corporate owned life insurance premiums........ | | | | |
| **n** Other section 263A costs...................... | | | | |
| **3** Inventory shrinkage accruals .................... | | | | |
| **4** Excess inventory and obsolescence reserves..... | | | | |
| **5** Lower of cost or market write-downs............. | | | | |
| **6** Other items with differences (attach schedule)........................ | | | | |
| **7** Other items with no differences.................. | 188,213,756. | | | 188,213,756. |
| **8** **Total cost of goods sold.** Add lines 1 through 7, in columns a, b, c, and d. | 188,213,756. | 0. | 0. | 188,213,756. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**                    Form **8916-A** (2011)

CPCZ1612L  12/22/11

Form **8916-A** (2011)  MMR GROUP, INC.                                72-1271030              Page **2**

| Part II | Interest Income | | | | |
|---|---|---|---|---|---|

| | Interest Income Item | **(a)** Income (Loss) per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Income (Loss) per Tax Return |
|---|---|---|---|---|---|
| **1** | Tax-exempt interest income . . . . . . . . . . . . . . . . . . . . | | | | |
| **2** | Interest income from hybrid securities . . . . . . . . . . | | | | |
| **3** | Sale/lease interest income . . . . . . . . . . . . . . . . . . . . | | | | |
| **4a** | Intercompany interest income — From outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4b** | Intercompany interest income — From tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **5** | Other interest income . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **6** | Total interest income. Add lines 1 through 5. Enter total on Schedule M-3 (Forms 1120, 1120-PC, and 1120-L), Part II, line 13 or Schedule M-3 (Forms 1065 and 1120S) Part II, line 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

| Part III | Interest Expense | | | | |
|---|---|---|---|---|---|

| | Interest Expense Item | **(a)** Expense per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Deduction per Tax Return |
|---|---|---|---|---|---|
| **1** | Interest expense from hybrid securities . . . . . . . . . . | | | | |
| **2** | Lease/purchase interest expense . . . . . . . . . . . . . . . | | | | |
| **3a** | Intercompany interest expense — Paid to outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **3b** | Intercompany interest expense — Paid to tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4** | Other interest expense . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **5** | Total interest expense. Add lines 1 through 4. Enter total on Schedule M-3 (Form 1120) Part III, line 8; Schedule M-3 (Forms 1120-PC and 1120-L), Part III, line 36; Schedule M-3 (Form 1065) Part III, line 27; or Schedule M-3 (Form 1120S) Part III, line 26 . . . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

Form **8916-A** (2011)

Schedule **M-3** (Form 1120) 2011 | | Page **2**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group    **(2)** ☐ Parent corp    **(3)** ☐ Consolidated eliminations    **(4)** ☒ Subsidiary corp    **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated:    **(6)** ☐ 1120 group    **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR TECHNICAL SERVICES, INC. | 72-1209195 |

**Part II** **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** (see instructions)

| **Income (Loss) Items**<br>(Attach schedules for lines 1 through 11) | **(a)**<br>Income (Loss) per<br>Income Statement | **(b)**<br>Temporary<br>Difference | **(c)**<br>Permanent<br>Difference | **(d)**<br>Income (Loss) per<br>Tax Return |
|---|---|---|---|---|
| **1** Income (loss) from equity method foreign corporations. . . . . . . . . . . . . . . . . . | | | | |
| **2** Gross foreign dividends not previously taxed. . . . . . . . . . . . . . . . . . . . . | | | | |
| **3** Subpart F, QEF, and similar income inclusions. . . . . . . . . . . . . . . . . . . . . | | | | |
| **4** Section 78 gross-up. . . . . . . . . . . . . . . . . | | | | |
| **5** Gross foreign distributions previously taxed. . . . . . . . . | | | | |
| **6** Income (loss) from equity method U.S. corporations. . . . . . . . . . . . . . . . . . | | | | |
| **7** U.S. dividends not eliminated in tax consolidation . . . . . . . . . . . . . . . . . . | | | | |
| **8** Minority interest for includible corporations. . . . . . . . . | | | | |
| **9** Income (loss) from U.S. partnerships. . . . . . . . . . . . . . . . . . . . | | | | |
| **10** Income (loss) from foreign partnerships. . . . . . . . . . . . . . . . . . . . | | | | |
| **11** Income (loss) from other pass-through entities. . . . . . . . . . . . . . . . . . . . | | | | |
| **12** Items relating to reportable transactions (attach details). . . . . . . . . . . . | | | | |
| **13** Interest income (attach Form 8916-A). . . . . . . | | | | |
| **14** Total accrual to cash adjustment. . . . . . . . . . . | | | | |
| **15** Hedging transactions . . . . . . . . . . . . . . . . . . . . | | | | |
| **16** Mark-to-market income (loss). . . . . . . . . . . . . | | | | |
| **17** Cost of goods sold (attach Form 8916-A). . . . | -220,245. | | | -220,245. |
| **18** Sale versus lease (for sellers and/or lessors). . . . . . . . . | | | | |
| **19** Section 481(a) adjustments. . . . . . . . . . . . . . . | | | | |
| **20** Unearned/deferred revenue. . . . . . . . . . . . . . . | | | | |
| **21** Income recognition from long-term contracts . . . . . | | | | |
| **22** Original issue discount and other imputed interest . . . . . | | | | |
| **23a** Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities . . . | | | | |
| **b** Gross capital gains from Schedule D, excluding amounts from pass-through entities . . . . . . | | | | |
| **c** Gross capital losses from Schedule D, excluding from pass-through entities, abandonment losses, and worthless stock losses. . . . . . . . . . . . . . . . . . . . | | | | |
| **d** Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses. . . . . . . . . . . . . . . . . . . | | | | |
| **e** Abandonment losses. . . . . . . . . . . . . . . . . . . . . | | | | |
| **f** Worthless stock losses (attach details). . . . . . . . . . . . . | | | | |
| **g** Other gain/loss on disposition of assets other than inventory. . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **24** Capital loss limitation and carryforward used . . . . . . . . | | | | |
| **25** Other income (loss) items with differences (attach schedule). . . . . . . . . . . . . . | | | | |
| **26** Total income (loss) items. Combine lines 1 through 25. | -220,245. | | | -220,245. |
| **27** Total expense/deduction items (from Part III, line 38). | | -1,370. | 1,770. | 400. |
| **28** Other items with no differences. . . . . . . . . . . . . | -1,751. | | | -1,751. |
| **29a** Mixed groups, see instructions. All others, combine lines 26 through 28 . . . . . . . . . . . . . . | -221,996. | -1,370. | 1,770. | -221,596. |
| **b** PC insurance subgroup reconciliation totals. | | | | |
| **c** Life insurance subgroup reconciliation totals. | | | | |
| **30** Reconciliation totals. Combine lines 29a through 29c. . . . | -221,996. | -1,370. | 1,770. | -221,596. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

**BAA** | CPCA1023L  08/12/11 | Schedule **M-3** (Form 1120) 2011

Schedule **M-3** (Form 1120) 2011 | Page **3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group **(2)** ☐ Parent corp **(3)** ☐ Consolidated eliminations **(4)** ☒ Subsidiary corp **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated: **(6)** ☐ 1120 group **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR TECHNICAL SERVICES, INC. | 72-1209195 |

**Part III** | **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return — Expense/Deduction Items** (see instructions)

| | Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|---|
| 1 | U.S. current income tax expense . . . . . . . . . . | | | | |
| 2 | U.S. deferred income tax expense . . . . . . . . . | | | | |
| 3 | State and local current income tax expense . | | 1,370. | | |
| 4 | State and local deferred income tax expense | | | | |
| 5 | Foreign current income tax expense (other than foreign withholding taxes) . . . . . . . . . . . . | | | | |
| 6 | Foreign deferred income tax expense . . . . . . | | | | |
| 7 | Foreign withholding taxes . . . . . . . . . . . . . . . . | | | | |
| 8 | Interest expense (attach Form 8916-A) . . . . . . | | | | |
| 9 | Stock option expense . . . . . . . . . . . . . . . . . . . | | | | |
| 10 | Other equity-based compensation . . . . . . . . . . | | | | |
| 11 | Meals and entertainment . . . . . . . . . . . . . . . . . | | | | |
| 12 | Fines and penalties . . . . . . . . . . . . . . . . . . . . . | | | -1,770. | |
| 13 | Judgments, damages, awards, and similar costs . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 14 | Parachute payments . . . . . . . . . . . . . . . . . . . . | | | | |
| 15 | Compensation with section 162(m) limitation | | | | |
| 16 | Pension and profit-sharing . . . . . . . . . . . . . . . . | | | | |
| 17 | Other post-retirement benefits . . . . . . . . . . . . . | | | | |
| 18 | Deferred compensation . . . . . . . . . . . . . . . . . . | | | | |
| 19 | Charitable contribution of cash and tangible property . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 20 | Charitable contribution of intangible property . | | | | |
| 21 | Charitable contribution limitation / carryforward . | | | | |
| 22 | Domestic production activities deduction . . . . | | | | |
| 23 | Current year acquisition or reorganization investment banking fees . . . . . . . . . . . . . . . . . | | | | |
| 24 | Current year acquisition or reorganization legal and accounting fees . . . . . . . . . . . . . . . . | | | | |
| 25 | Current year acquisition/reorganization other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 26 | Amortization/impairment of goodwill . . . . . . . . | | | | |
| 27 | Amortization of acquisition, reorganization, and start-up costs . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 28 | Other amortization or impairment write-offs . . | | | | |
| 29 | Section 198 environmental remediation costs | | | | |
| 30 | Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 31 | Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 32 | Bad debt expense . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 33 | Corporate owned life insurance premiums . . . | | | | |
| 34 | Purchase versus lease (for purchasers and/or lessees) . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 35 | Research and development costs . . . . . . . . . . . . . . | | | | |
| 36 | Section 118 exclusion (att sch) . . . . . . . . . . . . | | | | |
| 37 | Other expense/deduction items with differences (attach schedule) . . . . . . . . . . . . . . | | | | |
| 38 | **Total expense/deduction items.** Combine lines 1 through 37. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive . . | | 1,370. | -1,770. | |

Form **8916-A**

Department of the Treasury
Internal Revenue Service

**Supplemental Attachment to Schedule M-3**

▶ Attach to Schedule M-3 for Form 1065, 1120, 1120-L, 1120-PC, or 1120S.

OMB No. 1545-2061

**2011**

| Name of common parent | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |
| Name of subsidiary | Employer identification number |
| MMR TECHNICAL SERVICES, INC. | 72-1209195 |

**Part I**    **Cost of Goods Sold**

| Cost of Goods Sold Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| **1** Amounts attributable to cost flow assumptions.... | | | | |
| **2** Amounts attributable to: | | | | |
| **a** Stock option expense. . . . . . . . . . . . . . . . . . . . | | | | |
| **b** Other equity based compensation. . . . . . . . . . . . . . | | | | |
| **c** Meals and entertainment. . . . . . . . . . . . . . . . . . . | | | | |
| **d** Parachute payments. . . . . . . . . . . . . . . . . . . . . | | | | |
| **e** Compensation with section 162(m) limitation . . . . . | | | | |
| **f** Pension and profit sharing . . . . . . . . . . . . . . . . | | | | |
| **g** Other post-retirement benefits. . . . . . . . . . . . . . . | | | | |
| **h** Deferred compensation . . . . . . . . . . . . . . . . . . . | | | | |
| **i** Section 198 environmental remediation costs. . . . . | | | | |
| **j** Amortization. . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **k** Depletion. . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **l** Depreciation. . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **m** Corporate owned life insurance premiums. . . . . . . | | | | |
| **n** Other section 263A costs. . . . . . . . . . . . . . . . . . | | | | |
| **3** Inventory shrinkage accruals . . . . . . . . . . . . . . . . | | | | |
| **4** Excess inventory and obsolescence reserves. . . . . | | | | |
| **5** Lower of cost or market write-downs. . . . . . . . . . . | | | | |
| **6** Other items with differences (attach schedule) . . . . . . . . . . . . . . . . . . . . | | | | |
| **7** Other items with no differences. . . . . . . . . . . . . . | 220,245. | | | 220,245. |
| **8** **Total cost of goods sold.** Add lines 1 through 7, in columns a, b, c, and d. | 220,245. | 0. | 0. | 220,245. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**

Form **8916-A** (2011)

CPCZ1612L   12/22/11

Form **8916-A** (2011)  MMR GROUP, INC.                                        72-1271030            Page **2**

| Part II | Interest Income | | | | |
|---|---|---|---|---|---|
| | Interest Income Item | **(a)** Income (Loss) per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Income (Loss) per Tax Return |
| 1 | Tax-exempt interest income . . . . . . . . . . . . . . . . . . . . | | | | |
| 2 | Interest income from hybrid securities . . . . . . . . . . | | | | |
| 3 | Sale/lease interest income. . . . . . . . . . . . . . . . . . . . . | | | | |
| 4a | Intercompany interest income — From outside tax affiliated group. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 4b | Intercompany interest income — From tax affiliated group. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 5 | Other interest income . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 6 | Total interest income. Add lines 1 through 5. Enter total on Schedule M-3 (Forms 1120, 1120-PC, and 1120-L), Part II, line 13 or Schedule M-3 (Forms 1065 and 1120S) Part II, line 11. . . . . . . . . . . . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

| Part III | Interest Expense | | | | |
|---|---|---|---|---|---|
| | Interest Expense Item | **(a)** Expense per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Deduction per Tax Return |
| 1 | Interest expense from hybrid securities . . . . . . . . . . | | | | |
| 2 | Lease/purchase interest expense. . . . . . . . . . . . . . . | | | | |
| 3a | Intercompany interest expense — Paid to outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 3b | Intercompany interest expense — Paid to tax affiliated group. . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 4 | Other interest expense . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 5 | Total interest expense. Add lines 1 through 4. Enter total on Schedule M-3 (Form 1120) Part III, line 8; Schedule M-3 (Forms 1120-PC and 1120-L), Part III, line 36; Schedule M-3 (Form 1065) Part III, line 27; or Schedule M-3 (Form 1120S) Part III, line 26 . . . . . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

Form **8916-A** (2011)

Schedule **M-3** (Form 1120) 2011                                                               Page **2**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group   **(2)** ☐ Parent corp   **(3)** ☐ Consolidated eliminations   **(4)** ☒ Subsidiary corp   **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated: **(6)** ☐ 1120 group   **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR POWER SOLUTIONS LLC | 05-0584790 |

| Part II | Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return (see instructions) |
|---|---|

| **Income (Loss) Items**<br>(Attach schedules for lines 1 through 11) | **(a)**<br>Income (Loss) per<br>Income Statement | **(b)**<br>Temporary<br>Difference | **(c)**<br>Permanent<br>Difference | **(d)**<br>Income (Loss) per<br>Tax Return |
|---|---|---|---|---|
| 1 Income (loss) from equity method foreign corporations. . . . . . . . . . . . . . . . . . | | | | |
| 2 Gross foreign dividends not previously taxed. . . . . . . . . . . . . . . . . | | | | |
| 3 Subpart F, QEF, and similar income inclusions. . . . . . . . . . . . . . . . . | | | | |
| 4 Section 78 gross-up. . . . . . . . . . . . . . . | | | | |
| 5 Gross foreign distributions previously taxed . . . . . . . . | | | | |
| 6 Income (loss) from equity method U.S. corporations. . . . . . . . . . . . . . . . | | | | |
| 7 U.S. dividends not eliminated in tax consolidation . . . . . . . . . . . . . . . . . | | | | |
| 8 Minority interest for includible corporations . . . . . . . . . | | | | |
| 9 Income (loss) from U.S. partnerships. . . . . . . . . . . . . . . ST 8 | | −369,660. | | −369,660. |
| 10 Income (loss) from foreign partnerships. . . . . . . . . . . . . . . . . . | | | | |
| 11 Income (loss) from other pass-through entities. . . . . . . . . . . . . . | | | | |
| 12 Items relating to reportable transactions (attach details) . . . . . . . . . . | | | | |
| 13 Interest income (attach Form 8916-A) . . . . . . | | | | |
| 14 Total accrual to cash adjustment . . . . . . . . . . . | | | | |
| 15 Hedging transactions . . . . . . . . . . . . . . . . . . . . | | | | |
| 16 Mark-to-market income (loss) . . . . . . . . . . . . . . | | | | |
| 17 Cost of goods sold (attach Form 8916-A) . . . . | −1,452,275. | | | −1,452,275. |
| 18 Sale versus lease (for sellers and/or lessors) . . . . . . . . . | | | | |
| 19 Section 481(a) adjustments . . . . . . . . . . . . . . . | | | | |
| 20 Unearned/deferred revenue . . . . . . . . . . . . . . . | | | | |
| 21 Income recognition from long-term contracts . . . . . . . . . | | | | |
| 22 Original issue discount and other imputed interest . . . . . | | | | |
| 23a Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities . . . | | | | |
| b Gross capital gains from Schedule D, excluding amounts from pass-through entities . . . . . . | | | | |
| c Gross capital losses from Schedule D, excluding from pass-through entities, abandonment losses, and worthless stock losses . . . . . . . . . . . . . . . . . . . . | | | | |
| d Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses. . . . . . . . . . . . . . . . . . . | | | | |
| e Abandonment losses. . . . . . . . . . . . . . . . . . . . | | | | |
| f Worthless stock losses (attach details) . . . . . . . . . . . . | | | | |
| g Other gain/loss on disposition of assets other than inventory . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 24 Capital loss limitation and carryforward used . . . . . . . . | | | | |
| 25 Other income (loss) items with differences (attach schedule) . . . . . . . . . . . . . . | | | | |
| 26 **Total income (loss) items.** Combine lines 1 through 25 . | −1,452,275. | −369,660. | | −1,821,935. |
| 27 **Total expense/deduction items** (from Part III, line 38). | −5,345. | | 729. | −4,616. |
| 28 Other items with no differences. . . . . . . . . . . . . | 1,120,421. | | | 1,120,421. |
| 29a Mixed groups, see instructions. All others, combine lines 26 through 28 . . . . . . . . . . . | −337,199. | −369,660. | 729. | −706,130. |
| b PC insurance subgroup reconciliation totals . | | | | |
| c Life insurance subgroup reconciliation totals . | | | | |
| 30 **Reconciliation totals.** Combine lines 29a through 29c . . | −337,199. | −369,660. | 729. | −706,130. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

Schedule **M-3** (Form 1120) 2011

Page **3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group  **(2)** ☐ Parent corp  **(3)** ☐ Consolidated eliminations  **(4)** ☒ Subsidiary corp  **(5)** ☐ Mixed 1120/L/PC group
Check if a sub-consolidated:  **(6)** ☐ 1120 group  **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| MMR POWER SOLUTIONS LLC | 05-0584790 |

**Part III**  **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return — Expense/Deduction Items** (see instructions)

| | Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|---|
| 1 | U.S. current income tax expense . . . . . . . . . . | | | | |
| 2 | U.S. deferred income tax expense . . . . . . . . . | | | | |
| 3 | State and local current income tax expense . | | | | |
| 4 | State and local deferred income tax expense | | | | |
| 5 | Foreign current income tax expense (other than foreign withholding taxes) . . . . . . . . . . . . | | | | |
| 6 | Foreign deferred income tax expense . . . . . . | | | | |
| 7 | Foreign withholding taxes . . . . . . . . . . . . . . . . | | | | |
| 8 | Interest expense (attach Form 8916-A) . . . . . . | | | | |
| 9 | Stock option expense . . . . . . . . . . . . . . . . . . . . | | | | |
| 10 | Other equity-based compensation . . . . . . . . . . | | | | |
| 11 | Meals and entertainment . . . . . . . . . . . . . . . . . . | 1,458. | | -729. | 729. |
| 12 | Fines and penalties . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 13 | Judgments, damages, awards, and similar costs . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 14 | Parachute payments . . . . . . . . . . . . . . . . . . . . . | | | | |
| 15 | Compensation with section 162(m) limitation | | | | |
| 16 | Pension and profit-sharing . . . . . . . . . . . . . . . . | | | | |
| 17 | Other post-retirement benefits . . . . . . . . . . . . . | | | | |
| 18 | Deferred compensation . . . . . . . . . . . . . . . . . . | | | | |
| 19 | Charitable contribution of cash and tangible property . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 20 | Charitable contribution of intangible property . | | | | |
| 21 | Charitable contribution limitation/carryforward . | | | | |
| 22 | Domestic production activities deduction . . . . | | | | |
| 23 | Current year acquisition or reorganization investment banking fees . . . . . . . . . . . . . . . . . . | | | | |
| 24 | Current year acquisition or reorganization legal and accounting fees . . . . . . . . . . . . . . . . | | | | |
| 25 | Current year acquisition/reorganization other costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 26 | Amortization/impairment of goodwill . . . . . . . . | | | | |
| 27 | Amortization of acquisition, reorganization, and start-up costs . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 28 | Other amortization or impairment write-offs . . | | | | |
| 29 | Section 198 environmental remediation costs | | | | |
| 30 | Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 31 | Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,887. | | | 3,887. |
| 32 | Bad debt expense . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 33 | Corporate owned life insurance premiums . . . | | | | |
| 34 | Purchase versus lease (for purchasers and/or lessees) . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 35 | Research and development costs . . . . . . . . . . . . . . | | | | |
| 36 | Section 118 exclusion (att sch) . . . . . . . . . . . . | | | | |
| 37 | Other expense/deduction items with differences (attach schedule) . . . . . . . . . . . . . . | | | | |
| 38 | **Total expense/deduction items.** Combine lines 1 through 37. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive . . | 5,345. | | -729. | 4,616. |

CPCA1023L  08/12/11

Schedule **M-3** (Form 1120) 2011

Form **8916-A**

Department of the Treasury
Internal Revenue Service

**Supplemental Attachment to Schedule M-3**

► Attach to Schedule M-3 for Form 1065, 1120, 1120-L, 1120-PC, or 1120S.

OMB No. 1545-2061

**2011**

Name of common parent
MMR GROUP, INC.

**Employer identification number**
72-1271030

Name of subsidiary
MMR POWER SOLUTIONS LLC

**Employer identification number**
05-0584790

**Part I**  **Cost of Goods Sold**

| Cost of Goods Sold Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| **1** Amounts attributable to cost flow assumptions.... | | | | |
| **2** Amounts attributable to: | | | | |
| **a** Stock option expense. . . . . . . . . . . . . . . . . . . | | | | |
| **b** Other equity based compensation. . . . . . . . . . . . . . | | | | |
| **c** Meals and entertainment. . . . . . . . . . . . . . . . . . . . | | | | |
| **d** Parachute payments. . . . . . . . . . . . . . . . . . . . . . | | | | |
| **e** Compensation with section 162(m) limitation . . . . . | | | | |
| **f** Pension and profit sharing . . . . . . . . . . . . . . . . . | | | | |
| **g** Other post-retirement benefits. . . . . . . . . . . . . . . | | | | |
| **h** Deferred compensation . . . . . . . . . . . . . . . . . . . . | | | | |
| **i** Section 198 environmental remediation costs. . . . . | | | | |
| **j** Amortization. . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **k** Depletion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **l** Depreciation. . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **m** Corporate owned life insurance premiums. . . . . . . . | | | | |
| **n** Other section 263A costs. . . . . . . . . . . . . . . . . . . | | | | |
| **3** Inventory shrinkage accruals . . . . . . . . . . . . . . . . . | | | | |
| **4** Excess inventory and obsolescence reserves. . . . . | | | | |
| **5** Lower of cost or market write-downs. . . . . . . . . . . . | | | | |
| **6** Other items with differences (attach schedule) . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **7** Other items with no differences. . . . . . . . . . . . . . . | 1,452,275. | | | 1,452,275. |
| **8** **Total cost of goods sold.** Add lines 1 through 7, in columns a, b, c, and d. | 1,452,275. | 0. | 0. | 1,452,275. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**

Form **8916-A** (2011)

CPCZ1612L  12/22/11

Form **8916-A** (2011) MMR GROUP, INC.                                72-1271030              Page **2**

| Part II | Interest Income | | | | |
|---|---|---|---|---|---|
| | Interest Income Item | **(a)** Income (Loss) per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Income (Loss) per Tax Return |
| **1** | Tax-exempt interest income . . . . . . . . . . . . . . . . . . . . | | | | |
| **2** | Interest income from hybrid securities . . . . . . . . . . . | | | | |
| **3** | Sale/lease interest income . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4a** | Intercompany interest income — From outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4b** | Intercompany interest income — From tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **5** | Other interest income . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **6** | Total interest income. Add lines 1 through 5. Enter total on Schedule M-3 (Forms 1120, 1120-PC, and 1120-L), Part II, line 13 or Schedule M-3 (Forms 1065 and 1120S) Part II, line 11 . . . . . . . . . . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

| Part III | Interest Expense | | | | |
|---|---|---|---|---|---|
| | Interest Expense Item | **(a)** Expense per Income Statement | **(b)** Temporary Difference | **(c)** Permanent Difference | **(d)** Deduction per Tax Return |
| **1** | Interest expense from hybrid securities . . . . . . . . . . | | | | |
| **2** | Lease/purchase interest expense . . . . . . . . . . . . . . . | | | | |
| **3a** | Intercompany interest expense — Paid to outside tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **3b** | Intercompany interest expense — Paid to tax affiliated group . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **4** | Other interest expense . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **5** | Total interest expense. Add lines 1 through 4. Enter total on Schedule M-3 (Form 1120) Part III, line 8; Schedule M-3 (Forms 1120-PC and 1120-L), Part III, line 36; Schedule M-3 (Form 1065) Part III, line 27; or Schedule M-3 (Form 1120S) Part III, line 26 . . . . . . . . . . . . . . . . | 0. | 0. | 0. | 0. |

Form **8916-A** (2011)

Schedule **M-3** (Form 1120) 2011                                                Page **2**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group   **(2)** ☐ Parent corp   **(3)** ☒ Consolidated eliminations   **(4)** ☐ Subsidiary corp   **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated: **(6)** ☐ 1120 group   **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| | |

| **Part II** | **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return** (see instructions) |
|---|---|

| **Income (Loss) Items**<br>(Attach schedules for lines 1 through 11) | **(a)**<br>Income (Loss) per<br>Income Statement | **(b)**<br>Temporary<br>Difference | **(c)**<br>Permanent<br>Difference | **(d)**<br>Income (Loss) per<br>Tax Return |
|---|---|---|---|---|
| 1 Income (loss) from equity method foreign corporations | | | | |
| 2 Gross foreign dividends not previously taxed | | | | |
| 3 Subpart F, QEF, and similar income inclusions | | | | |
| 4 Section 78 gross-up | | | | |
| 5 Gross foreign distributions previously taxed | | | | |
| 6 Income (loss) from equity method U.S. corporations | | | | |
| 7 U.S. dividends not eliminated in tax consolidation | | | | |
| 8 Minority interest for includible corporations | | | | |
| 9 Income (loss) from U.S. partnerships | | | | |
| 10 Income (loss) from foreign partnerships | | | | |
| 11 Income (loss) from other pass-through entities | | | | |
| 12 Items relating to reportable transactions (attach details) | | | | |
| 13 Interest income (attach Form 8916-A) | | | | |
| 14 Total accrual to cash adjustment | | | | |
| 15 Hedging transactions | | | | |
| 16 Mark-to-market income (loss) | | | | |
| 17 Cost of goods sold (attach Form 8916-A) | | | | |
| 18 Sale versus lease (for sellers and/or lessors) | | | | |
| 19 Section 481(a) adjustments | | | | |
| 20 Unearned/deferred revenue | | | | |
| 21 Income recognition from long-term contracts | | | | |
| 22 Original issue discount and other imputed interest | | | | |
| 23 a Income statement gain/loss on sale, exchange, abandonment, worthlessness, or other disposition of assets other than inventory and pass-through entities | | | | |
| b Gross capital gains from Schedule D, excluding amounts from pass-through entities | | | | |
| c Gross capital losses from Schedule D, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| d Net gain/loss reported on Form 4797, line 17, excluding amounts from pass-through entities, abandonment losses, and worthless stock losses | | | | |
| e Abandonment losses | | | | |
| f Worthless stock losses (attach details) | | | | |
| g Other gain/loss on disposition of assets other than inventory | | | | |
| 24 Capital loss limitation and carryforward used | | | | |
| 25 Other income (loss) items with differences (attach schedule) | | | | |
| 26 **Total income (loss) items.** Combine lines 1 through 25 | | | | |
| 27 **Total expense/deduction items** (from Part III, line 38) | | | 123,370. | 123,370. |
| 28 Other items with no differences | | | | |
| 29 a Mixed groups, see instructions. All others, combine lines 26 through 28 | 0. | 0. | 123,370. | 123,370. |
| b PC insurance subgroup reconciliation totals | | | | |
| c Life insurance subgroup reconciliation totals | | | | |
| 30 **Reconciliation totals.** Combine lines 29a through 29c | 0. | 0. | 123,370. | 123,370. |

**Note.** Line 30, column (a) must equal the amount on Part I, line 11, and column (d) must equal Form 1120, page 1, line 28.

**BAA**                            CPCA1023L   08/12/11                           Schedule **M-3** (Form 1120) 2011

Schedule **M-3** (Form 1120) 2011            Page **3**

| Name of corporation (common parent, if consolidated return) | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Check applicable box(es): **(1)** ☐ Consolidated group   **(2)** ☐ Parent corp   **(3)** ☒ Consolidated eliminations   **(4)** ☐ Subsidiary corp   **(5)** ☐ Mixed 1120/L/PC group

Check if a sub-consolidated: **(6)** ☐ 1120 group   **(7)** ☐ 1120 eliminations

| Name of subsidiary (if consolidated return) | Employer identification number |
|---|---|
| | |

**Part III**   **Reconciliation of Net Income (Loss) per Income Statement of Includible Corporations With Taxable Income per Return — Expense/Deduction Items** (see instructions)

| Expense/Deduction Items | (a) Expense per Income Statement | (b) Temporary Difference | (c) Permanent Difference | (d) Deduction per Tax Return |
|---|---|---|---|---|
| 1 U.S. current income tax expense . . . . . . . . . . | | | | |
| 2 U.S. deferred income tax expense . . . . . . . . . | | | | |
| 3 State and local current income tax expense . | | | | |
| 4 State and local deferred income tax expense | | | | |
| 5 Foreign current income tax expense (other than foreign withholding taxes) . . . . . . . . . . . . . | | | | |
| 6 Foreign deferred income tax expense . . . . . . | | | | |
| 7 Foreign withholding taxes . . . . . . . . . . . . . . . . . | | | | |
| 8 Interest expense (attach Form 8916-A) . . . . . . | | | | |
| 9 Stock option expense . . . . . . . . . . . . . . . . . . . | | | | |
| 10 Other equity-based compensation . . . . . . . . . . | | | | |
| 11 Meals and entertainment . . . . . . . . . . . . . . . . . | | | | |
| 12 Fines and penalties . . . . . . . . . . . . . . . . . . . . . | | | | |
| 13 Judgments, damages, awards, and similar costs . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 14 Parachute payments . . . . . . . . . . . . . . . . . . . . | | | | |
| 15 Compensation with section 162(m) limitation | | | | |
| 16 Pension and profit-sharing . . . . . . . . . . . . . . . . | | | | |
| 17 Other post-retirement benefits . . . . . . . . . . . . . | | | | |
| 18 Deferred compensation . . . . . . . . . . . . . . . . . . | | | | |
| 19 Charitable contribution of cash and tangible property . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 20 Charitable contribution of intangible property | | | | |
| 21 Charitable contribution limitation/carryforward | | | | |
| 22 Domestic production activities deduction . . . . | | | -123,370. | -123,370. |
| 23 Current year acquisition or reorganization investment banking fees . . . . . . . . . . . . . . . . . | | | | |
| 24 Current year acquisition or reorganization legal and accounting fees . . . . . . . . . . . . . . . | | | | |
| 25 Current year acquisition/reorganization other costs . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 26 Amortization/impairment of goodwill . . . . . . . . | | | | |
| 27 Amortization of acquisition, reorganization, and start-up costs . . . . . . . . . . . . . . . . . . . . . | | | | |
| 28 Other amortization or impairment write-offs . | | | | |
| 29 Section 198 environmental remediation costs | | | | |
| 30 Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 31 Depreciation . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 32 Bad debt expense . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 33 Corporate owned life insurance premiums . . . | | | | |
| 34 Purchase versus lease (for purchasers and/or lessees) . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 35 Research and development costs . . . . . . . . . . . . . . . . . | | | | |
| 36 Section 118 exclusion (att sch) . . . . . . . . . . . . | | | | |
| 37 Other expense/deduction items with differences (attach schedule) . . . . . . . . . . . . . . | | | | |
| 38 **Total expense/deduction items.** Combine lines 1 through 37. Enter here and on Part II, line 27, reporting positive amounts as negative and negative amounts as positive . . | | | -123,370. | -123,370. |

CPCA1023L   08/12/11          Schedule **M-3** (Form 1120) 2011

Form **851**

(Rev December 2010)

Department of the Treasury
Internal Revenue Service

## Affiliations Schedule

► File with each consolidated income tax return.

**For tax year ending** 12/31 , 2011

OMB No. 1545-0025

| Name of common parent corporation | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Number, street, and room or suite number. If a P.O. box, see instructions.

15961 AIRLINE HIGHWAY

| City or town | State | ZIP Code |
|---|---|---|
| BATON ROUGE, LA 70817-7412 | | |

### Part I — Overpayment Credits, Estimated Tax Payments, and Tax Deposits (see instructions)

| Corp No. | Name and address of corporation | Employer identification number | Portion of overpayment credits and estimated tax payments | Portion of tax deposited with Form 7004 |
|---|---|---|---|---|
| 1 | Common parent corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 5,299,301. | 1,600,000. |
| | Subsidiary corporations: | | | |
| 2 | MMR CONSTRUCTORS, INC. 15961 AIRLINE HIGHWAY, BATON ROUGE, LA 70817-7412 | 72-1046000 | | |
| 3 | MMR TECHNICAL SERVICES, INC. 15961 AIRLINE HIGHWAY, BATON ROUGE, LA 70817-7412 | 72-1209195 | | |
| 4 | MMR POWER SOLUTIONS LLC 15961 AIRLINE HIGHWAY, BATON ROUGE, LA 70817-7412 | 05-0584790 | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| | **Totals** (Must equal amounts shown on the consolidated tax return) . . . . . . . . . . . . . . . . . . . ► | | 5,299,301. | 1,600,000. |

### Part II — Principal Business Activity, Voting Stock Information, Etc (see instructions)

| Corp No. | Principal business activity (PBA) | PBA Code Number | Did the subsidiary make any nondividend distributions? Yes | No | Number of shares | Percent of voting power | Percent of value | Owned by corporation number |
|---|---|---|---|---|---|---|---|---|
| 1 | Common parent corporation: CONSTRUCTION | 238210 | | | | | | |
| 2 | Subsidiary corporations: CONSTRUCTION | 238210 | | X | | % | % | 1 |
| 3 | CONSTRUCTION | 238210 | | X | | % | % | 1 |
| 4 | CONSTRUCTION | 221100 | | X | | % | % | 1 |
| 5 | | | | | | % | % | |
| 6 | | | | | | % | % | |
| 7 | | | | | | % | % | |
| 8 | | | | | | % | % | |
| 9 | | | | | | % | % | |
| 10 | | | | | | % | % | |

**BAA  For Paperwork Reduction Act Notice, see instructions.**

Form **851** (Rev 12-2010)

Form **851** (Rev 12-2010) MMR GROUP, INC.    72-1271030                                                                 Page **2**

| Part III | Changes in Stock Holdings During the Tax Year |

| Corp No. | Name of corporation | Share-holder of Corpora-tion No. | Date of transaction | (a) Changes | | (b) Shares held after changes described in column (a) | |
|---|---|---|---|---|---|---|---|
| | | | | Number of shares acquired | Number of shares disposed of | Percent of voting power | Percent of value |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |
| | | | | | | % | % |

**(c)** If any transaction listed above caused a transfer of a share of subsidiary stock (defined to include dispositions and deconsolidations), did the share's basis exceed its value at the time of the transfer? See instructions . . . . . . . . . . . . . . ☐ **Yes** ☒ **No**

**(d)** Did any share of subsidiary stock become worthless within the meaning of section 165 (taking into account the provisions of Regulations section 1.1502-80(c)) during the taxable year? See instrs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☒ **No**

**(e)** If the equitable owners of any capital stock shown above were other than the holders of record, provide details of the changes.

_____

_____

_____

_____

_____

_____

**(f)** If additional stock was issued, or if any stock was retired during the year, list the dates and amounts of these transactions.

_____

_____

_____

_____

_____

Form **851** (Rev 12-2010)

Form **851** (Rev 12-2010)    MMR GROUP, INC.    72-1271030    Page **3**

| Part IV | Additional Stock Information (see instructions) |

**1** During the tax year, did the corporation have more than one class of stock outstanding? ............................... ☐ Yes ☒ No
If 'Yes', enter the name of the corporation and list and describe each class of stock.

| Corp No. | Name of corporation | Class of stock |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**2** During the tax year, was there any member of the consolidated group that reaffiliated within 60 months of disaffiliation? ☐ Yes ☒ No
If 'Yes', enter the name of the corporation(s) and explain the circumstances.

| Corp No. | Name of corporation | Explanation |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**3** During the tax year, was there any arrangement in existence by which one or more persons that were not members of the affiliated group could acquire any stock, or acquire any voting power without acquiring stock, in the corporation, other than a de minimis amount, from the corporation or another member of the affiliated group?..................... ☐ Yes ☒ No
If 'Yes', enter the name of the corporation and see the instructions for the percentages to enter in columns (a), (b), and (c).

| Corp No. | Name of corporation | (a) Percent of value | (b) Percent of outstanding voting stock | (c) Percent of voting power |
|---|---|---|---|---|
| | | % | % | % |
| | | % | % | % |
| | | % | % | % |
| | | % | % | % |

| Corp No. | (d) Provide a description of any arrangement. |
|---|---|
| | |
| | |
| | |
| | |

**BAA**                                                                 Form **851** (Rev 12-2010)

Form **1118**
(Rev December 2011)

Internal Revenue Service
Department of the Treasury

# Foreign Tax Credit — Corporations

► See separate instructions.
► Attach to the corporation's tax return.

OMB No. 1545-0122

Name of corporation: MMR GROUP, INC.

Employer identification number: 72-1271030

For calendar year 2011, or other tax year beginning _____, and ending _____.

Use a **separate** Form 1118 for each applicable category of income listed below. See **Categories of Income** in the instructions. Also, see **Specific Instructions.**
Check only one box on each form.

[X] Passive Category Income

[ ] General Category Income

[ ] Section 901(j) Income: Name of Sanctioned Country ► _____

[ ] Income Re-sourced by Treaty: Name of Country ► _____

## Schedule A | Income or (Loss) Before Adjustments *(Report all amounts in U.S. dollars. See Specific Instructions.)*

### Gross Income or (Loss) From Sources Outside the United States (*INCLUDE* Foreign Branch Gross Income here *and* on Schedule F)

| 1 Foreign Country or U.S. Possession (Enter two-letter code; see instructions. Use a separate line for each.)* | 2 Deemed Dividends (see instructions) (a) Exclude gross-up | (b) Gross-up (sec-78) | 3 Other Dividends (a) Exclude gross-up | (b) Gross-up (sec-78) | 4 Interest | 5 Gross Rents, Royalties, and License Fees | 6 Gross Income From Performance of Services | 7 Other (attach schedule) | 8 Total (add columns 2(a) through 7) |
|---|---|---|---|---|---|---|---|---|---|
| A NI | 482,905. | 131,926. | | | | | | | 614,831. |
| B VE | 463,967. | 72,391. | | | | | | | 536,358. |
| C | | | | | | | | | |
| D | | | | | | | | | |
| E | | | | | | | | | |
| F | | | | | | | | | |
| **Totals** (add lines A thru F) | 946,872. | 204,317. | | | | | | | 1,151,189. |

* For section 863(b) income, NOLs, income from RICs, and high-taxed income, use a single line (see instructions).

### Deductions (*INCLUDE* Foreign Branch Deductions here *and* on Schedule F)

| | 9 Definitely Allocable Deductions | | | | | 10 Apportioned Share of Deductions Not Definitely Allocable (enter amount from applicable line of Schedule H, Part II, column (d)) | 11 Net Operating Loss Deduction | 12 Total Deductions (add columns 9(e) through 11) | 13 Total Income or (Loss) Before Adjustments (subtract column 12 from column 8) |
|---|---|---|---|---|---|---|---|---|---|
| | Rental, Royalty, and Licensing Expenses (a) Depreciation, Depletion, and Amortization | (b) Other Expenses | (c) Expenses Related to Gross Income From Performance of Services | (d) Other Definitely Allocable Deductions | (e) Total Definitely Allocable Deductions (add columns 9(a) through 9(d)) | | | | |
| A | | | | | | | | | 614,831. |
| B | | | | | | | | | 536,358. |
| C | | | | | | | | | |
| D | | | | | | | | | |
| E | | | | | | | | | |
| F | | | | | | | | | |
| **Totals** | | | | | | | | | 1,151,189. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions**

Form **1118** (Rev 12-2011)

CPCA9512L  12/29/11

Form 1118 (Rev 12-2011) MMR GROUP, INC.    72-1271030    Page **2**

## Schedule B | Foreign Tax Credit (Report all foreign tax amounts in U.S. dollars.)

### Part I — Foreign Taxes Paid, Accrued, and Deemed Paid (see instructions)

| 1 Credit is Claimed for Taxes: Paid / Accrued (Date Paid / Date Accrued) | 2 Foreign Taxes Paid or Accrued (attach schedule showing amounts in foreign currency and conversion rate(s) used) | | | | | | | | 3 Tax Deemed Paid (from Schedule C—Part I, column 10, Part II, column 8(b), and Part III, column 8) |
|---|---|---|---|---|---|---|---|---|---|
| | Tax Withheld at Source on: | | | Other Foreign Taxes Paid or Accrued on: | | | | (h) Total Foreign Taxes Paid or Accrued (add columns 2(a) through 2(g)) | |
| | (a) Dividends | (b) Interest | (c) Rents, Royalties, and License Fees | (d) Section 863(b) Income | (e) Foreign Branch Income | (f) Services Income | (g) Other | | |
| A | | | | | | | | | 131,926. |
| B | | | | | | | | | 72,391. |
| C | | | | | | | | | |
| D | | | | | | | | | |
| E | | | | | | | | | |
| F | | | | | | | | | |
| Totals (add lines A through F) | | | | | | | | | 204,317. |

### Part II — Separate Foreign Tax Credit (Complete a *separate Part II* for *each applicable category of income.*)

1 Total foreign taxes paid or accrued (total from Part I, column 2(h)) .......... **204,317.**
2 Total taxes deemed paid (total from Part I, column 3) ..........
3 Reductions of taxes paid, accrued, or deemed paid (enter total from Schedule G) ..........
4 Taxes reclassified under high-tax kickout ..........
5 Enter the sum of any carryover of foreign taxes (from Schedule K, line 3, column (xiv)) plus any carrybacks to the current tax year ..........
6 Total foreign taxes (combine lines 1 through 5) .......... **204,317.**
7 Enter the amount from the applicable column of Schedule J, Part I, line 11 (see instructions). If Schedule J is **not** required to be completed, enter the result from the "Totals" line of column 13 of the applicable Schedule A .......... **1,151,189.**
8a Total taxable income from all sources (enter taxable income from the corporation's tax return) .......... **19,874,179.**
b Adjustments to line 8a (see instructions) ..........
c Subtract line 8b from line 8a ..........
9 Divide line 7 by line 8c. Enter the resulting fraction as a decimal (see instructions). If line 7 is greater than line 8c, enter 1. .......... **0.05792385**
10 Total U.S. income tax against which credit is allowed (regular tax liability (see section 26(b) minus American Samoa economic development credit) .......... **6,955,963.**
11 Credit limitation (multiply line 9 by line 10) (see instructions) .......... **402,916.**
12 **Separate foreign tax credit** (enter the smaller of line 6 or line 11 here and on the appropriate line of Part III) .......... **204,317.**

### Part III — Summary of Separate Credits (Enter amounts from Part II, line 12 for **each** applicable category of income. **Do not** include taxes paid to sanctioned countries.)

1 Credit for taxes on passive category income .......... **204,317.**
2 Credit for taxes on general category income ..........
3 Credit for taxes on income re-sourced by treaty (combine all such credits on this line) ..........
4 Total (add lines 1 through 3) .......... **204,317.**
5 Reduction in credit for international boycott operations (see instructions) ..........
6 **Total foreign tax credit** (subtract line 5 from line 4). Enter here and on the appropriate line of the corporation's tax return. .......... **204,317.**

Form **1118** (Rev 12-2011)

CPCA9512L   12/29/11

Form **1118**
(Rev December 2011)

Internal Revenue Service
Department of the Treasury

**ALTERNATIVE MINIMUM TAX**
**Foreign Tax Credit — Corporations**

► See separate instructions.
► Attach to the corporation's tax return.

OMB No. 1545-0122

Name of corporation
MMR GROUP, INC.

For calendar year   2011 , or other tax year beginning                          , and ending

Employer identification number
72-1271030

Use a **separate** Form 1118 for each applicable category of income listed below. See **Categories of Income** in the instructions. Also, see **Specific Instructions.**
Check only one box on each form.

☒ Passive Category Income

☐ General Category Income

☐ Section 901(j) Income: Name of Sanctioned Country ►

☐ Income Re-sourced by Treaty: Name of Country ►

**Schedule A   Income or (Loss) Before Adjustments** *(Report all amounts in U.S. dollars. See   Specific Instructions.)*

**Gross Income or (Loss) From Sources Outside the United States (INCLUDE Foreign Branch Gross Income here and on Schedule F)**

| 1 Foreign Country or U.S. Possession (Enter two-letter code; see instructions. Use a separate line for each.)* | 2 Deemed Dividends (see instructions) | | 3 Other Dividends | | 4 Interest | 5 Gross Rents, Royalties, and License Fees | 6 Gross Income From Performance of Services | 7 Other (attach schedule) | 8 Total (add columns 2(a) through 7) |
|---|---|---|---|---|---|---|---|---|---|
| | (a) Exclude gross-up | (b) Gross-up (sec 78) | (a) Exclude gross-up (sec 78) | (b) Gross-up (sec 78) | | | | |
| A NI | 482,905. | 131,926. | | | | | | | 614,831. |
| B VE | 463,967. | 72,391. | | | | | | | 536,358. |
| C | | | | | | | | | |
| D | | | | | | | | | |
| E | | | | | | | | | |
| F | | | | | | | | | |
| Totals (add lines A thru F) | 946,872. | 204,317. | | | | | | | 1,151,189. |

* For section 863(b) income, NOLs, income from RICs, and high-taxed income, use a single line (see instructions).

**Deductions (INCLUDE Foreign Branch Deductions here and on Schedule F)**

| | 9 Definitely Allocable Deductions | | | | 10 Apportioned Share of Deductions Not Definitely Allocable (enter amount from applicable line of Schedule H, Part II, column (d)) | 11 Net Operating Loss Deduction | 12 Total Deductions (add columns 9(e) through 11) | 13 Total Income or (Loss) Before Adjustments (subtract column 12 from column 8) |
|---|---|---|---|---|---|---|---|---|
| Rental, Royalty, and Licensing Expenses | | (c) Expenses Related to Gross Income From Performance of Services | (d) Other Definitely Allocable Deductions | (e) Total Definitely Allocable Deductions (add columns 9(a) through 9(d)) | | | | |
| (a) Depreciation, Depletion, and Amortization | (b) Other Expenses | | | | | | | |
| A | | | | | | | | 614,831. |
| B | | | | | | | | 536,358. |
| C | | | | | | | | |
| D | | | | | | | | |
| E | | | | | | | | |
| F | | | | | | | | |
| Totals | | | | | | | | 1,151,189. |

**BAA   For Paperwork Reduction Act Notice, see separate instructions**

Form **1118** (Rev 12-2011)

CPCA9512L   12/29/11

Form 1118 (Rev 12-2011) MMR GROUP, INC.    72-1271030

ALTERNATIVE MINIMUM TAX

Page 2

## Schedule B | Foreign Tax Credit (Report all foreign tax amounts in U.S. dollars.)

### Part I — Foreign Taxes Paid, Accrued, and Deemed Paid (see instructions)

| | 1 Credit is Claimed for Taxes: | | 2 Foreign Taxes Paid or Accrued (attach schedule showing amounts in foreign currency and conversion rate(s) used) | | | | | | | | 3 Tax Deemed Paid (from Schedule C — Part I, column 10, Part II, column 8(b), and Part III, column 8) |
| | ☐ Paid | ☐ Accrued | Tax Withheld at Source on: | | | Other Foreign Taxes Paid or Accrued on: | | | | (h) Total Foreign Taxes Paid or Accrued (add columns 2(a) through 2(g)) | |
| | Date Paid | Date Accrued | (a) Dividends | (b) Interest | (c) Rents, Royalties, and License Fees | (d) Section 863(b) Income | (e) Foreign Branch Income | (f) Services Income | (g) Other | | |
| A | | | | | | | | | | | 131,926. |
| B | | | | | | | | | | | 72,391. |
| C | | | | | | | | | | | |
| D | | | | | | | | | | | |
| E | | | | | | | | | | | |
| F | | | | | | | | | | | |
| Totals (add lines A through F.) | | | | | | | | | | | 204,317. |

### Part II — Separate Foreign Tax Credit (Complete a separate Part II for each applicable category of income.)

| | | |
|---|---|---|
| 1 | Total foreign taxes paid or accrued (total from Part I, column 2(h)) | 204,317. |
| 2 | Total taxes deemed paid (total from Part I, column 3) | |
| 3 | Reductions of taxes paid, accrued, or deemed paid (enter total from Schedule G) | |
| 4 | Taxes reclassified under high-tax kickout | |
| 5 | Enter the sum of any carryover of foreign taxes (from Schedule K, line 3, column (xiv)) plus any carrybacks to the current tax year | 853,373. |
| 6 | Total foreign taxes (combine lines 1 through 5) | 1,057,690. |
| 7 | Enter the amount from the applicable column of Schedule J, Part I, line 11 (see instructions). If Schedule J is not required to be completed, enter the result from the 'Totals' line of column 13 of the applicable Schedule A | 1,151,189. |
| 8a | Total taxable income from all sources (enter taxable income from the corporation's tax return) | 19,874,179. |
| b | Adjustments to line 8a (see instructions) | |
| c | Subtract line 8b from line 8a | 19,874,179. |
| 9 | Divide line 7 by line 8c. Enter the resulting fraction as a decimal (see instructions). If line 7 is greater than line 8c, enter 1 | 0.05792385 |
| 10 | Total U.S. income tax against which credit is allowed (regular tax liability (see section 26(b)) minus American Samoa economic development credit) | 3,974,836. |
| 11 | Credit limitation (multiply line 9 by line 10) (see instructions) | 230,238. |
| 12 | Separate foreign tax credit (enter the smaller of line 6 or line 11 here and on the appropriate line of Part III) | 230,238. |

### Part III — Summary of Separate Credits (Enter amounts from Part II, line 12 for each applicable category of income. Do not include taxes paid to sanctioned countries.)

| | | |
|---|---|---|
| 1 | Credit for taxes on passive category income | 230,238. |
| 2 | Credit for taxes on general category income | |
| 3 | Credit for taxes on income re-sourced by treaty (combine all such credits on this line) | |
| 4 | Total (add lines 1 through 3) | 230,238. |
| 5 | Reduction in credit for international boycott operations (see instructions) | |
| 6 | Total foreign tax credit (subtract line 5 from line 4). Enter here and on the appropriate line of the corporation's tax return | 230,238. |

Form 1118 (Rev 12-2011)

CPCA9512L    12/29/11

Form **1125-E**
(December 2011)

Department of the Treasury
Internal Revenue Service

**Compensation of Officers**

► Attach to Form 1120, 1120-C, 1120-F, 1120-RIC.
► See separate instructions.

OMB No. 1545-2225

| Name | Employer identification number |
|------|-------------------------------|
| MMR GROUP, INC. | 72-1271030 |

**Note.** Complete Form 1125-E only if total receipts are $500,000 or more. See instructions for definition of total receipts.

| 1 | (a) Name of officer | (b) Social security number | (c) Percent of time devoted to business | Percent of stock owned | | (f) Amount of compensation |
|---|---|---|---|---|---|---|
| | | | | (d) Common | (e) Preferred | |
| | MMR GROUP, INC. - 72-1271 | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |

| 2 | Total compensation of officers............................................................ | 10,385,587. |
|---|---|---|
| 3 | Compensation of officers claimed on Form 1125-A or elsewhere on return............................... | |
| 4 | Subtract line 3 from line 2. Enter the result here and on Form 1120, page 1, line 12 or the appropriate line of your tax return............................................................ | 10,385,587. |

**BAA For Paperwork Reduction Act Notice, see separate instructions.**

Form **1125-E** (12-2011)

Form **1125-E**
(December 2011)

Department of the Treasury
Internal Revenue Service

## Compensation of Officers

► Attach to Form 1120, 1120-C, 1120-F, 1120-RIC.
► See separate instructions.

OMB No. 1545-2225

| Name | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

**Note.** Complete Form 1125-E only if total receipts are $500,000 or more. See instructions for definition of total receipts.

| 1 | (a) Name of officer | (b) Social security number | (c) Percent of time devoted to business | Percent of stock owned | | (f) Amount of compensation |
|---|---|---|---|---|---|---|
| | | | | (d) Common | (e) Preferred | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |

DRAFT

| | | |
|---|---|---|
| **2** | Total compensation of officers............................................................... | |
| **3** | Compensation of officers claimed on Form 1125-A or elsewhere on return................................. | |
| **4** | Subtract line 3 from line 2. Enter the result here and on Form 1120, page 1, line 12 or the appropriate line of your tax return.................................................................. | |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**                    Form **1125-E** (12-2011)

Form **1125-E**
(December 2011)

Department of the Treasury
Internal Revenue Service

## Compensation of Officers

► **Attach to Form 1120, 1120-C, 1120-F, 1120-RIC.**
► **See separate instructions.**

OMB No. 1545-2225

| Name | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

**Note.** Complete Form 1125-E only if total receipts are $500,000 or more. See instructions for definition of total receipts.

| 1 | **(a)** Name of officer | **(b)** Social security number | **(c)** Percent of time devoted to business | Percent of stock owned | | **(f)** Amount of compensation |
|---|---|---|---|---|---|---|
| | | | | **(d)** Common | **(e)** Preferred | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |
| | | | % | % | % | |

| | | |
|---|---|---|
| **2** | Total compensation of officers.................................................... | |
| **3** | Compensation of officers claimed on Form 1125-A or elsewhere on return.................. | |
| **4** | Subtract line 3 from line 2. Enter the result here and on Form 1120, page 1, line 12 or the appropriate line of your tax return..................................................... | |

**BAA** **For Paperwork Reduction Act Notice, see separate instructions.** Form **1125-E** (12-2011)

CPCA2101L 01/19/12

Form **2220**

Department of the Treasury
Internal Revenue Service

### Underpayment of Estimated Tax by Corporations

► See separate instructions.
► Attach to the corporation's tax return.

OMB No. 1545-0142

**2011**

| Name | Employer identification number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

**Note:** *Generally, the corporation is not required to file Form 2220 (see Part II below for exceptions) because the IRS will figure any penalty owed and bill the corporation. However, the corporation may still use Form 2220 to figure the penalty. If so, enter the amount from page 2, line 38 on the estimated tax penalty line of the corporation's income tax return, but **do not** attach Form 2220.*

| Part I | Required Annual Payment |
|---|---|

| | | | |
|---|---|---|---|
| 1 | Total tax (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1** | 6,751,646. |
| **2a** | Personal holding company tax (Schedule PH (Form 1120), line 26) included on line 1 . . . . . . . . . . . . . **2a** | | |
| **b** | Look-back interest included on line 1 under section 460(b)(2) for completed long-term contracts or section 167(g) for depreciation under the income forecast method . . . . . . . . . . . . . . . . **2b** | | |
| **c** | Credit for federal tax paid on fuels (see instructions) . . . . . . . . . . . . . . . . . . . . . . **2c** | | |
| **d** | **Total.** Add lines 2a through 2c . . . . . . . . . . . . . . . . . . . . . . . | **2d** | |
| 3 | Subtract line 2d from line 1. If the result is less than $500, **do not** complete or file this form. The corporation does not owe the penalty . . . . . . . . . . . . . . . . . . . . . . . . . . . | **3** | 6,751,646. |
| 4 | Enter the tax shown on the corporation's 2010 income tax return (see instructions). **Caution:** *If the tax is zero or the tax year was for less than 12 months, skip this line and enter the amount from line 3 on line 5* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **4** | 2,370,754. |
| 5 | **Required annual payment.** Enter the **smaller** of line 3 or line 4. If the corporation is required to skip line 4, enter the amount from line 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **5** | 2,370,754. |

| Part II | Reasons for Filing — Check the boxes below that apply. If any boxes are checked, the corporation **must** file Form 2220 even if it does not owe a penalty (see instructions). |
|---|---|

| | | |
|---|---|---|
| 6 | ☐ | The corporation is using the adjusted seasonal installment method. |
| 7 | ☐ | The corporation is using the annualized income installment method. |
| 8 | ☒ | The corporation is a 'large corporation' figuring its first required installment based on the prior year's tax. |

| Part III | Figuring the Underpayment |
|---|---|

| | | | (a) | (b) | (c) | (d) |
|---|---|---|---|---|---|---|
| 9 | **Installment due dates.** Enter the 15th day of the 4th (**Form 990-PF filers:** Use 5th month), 6th, 9th, and 12th months of the corporation's tax year . . . . . . . . . . | **9** | 4/15/11 | 6/15/11 | 9/15/11 | 12/15/11 |
| 10 | **Required installments.** If the box on line 6 and/or line 7 above is checked, enter the amounts from Schedule A, line 38. If the box on line 8 (but not 6 or 7) is checked, see instructions for the amounts to enter. If none of these boxes are checked, enter 25% of line 5 above in each column . . . . . . . . . . . | **10** | 592,689. | 2,783,135. | 1,687,912. | 1,687,912. |
| 11 | Estimated tax paid or credited for each period (see instructions). For column (a) only, enter the amount from line 11 on line 15 . . . . . . . . | **11** | 873,801. | | 1,775,500. | 650,000. |
| | *Complete lines 12 through 18 of one column before going to the next column.* | | | | | |
| 12 | Enter amount, if any, from line 18 of the preceding column . . . . . . . . | **12** | | 281,112. | | |
| 13 | Add lines 11 and 12 . . . . . . . . . . . . . . . . | **13** | | 281,112. | 1,775,500. | 650,000. |
| 14 | Add amounts on lines 16 and 17 of the preceding column . . . . . . . . . | **14** | | | 2,502,023. | 2,414,435. |
| 15 | Subtract line 14 from line 13. If zero or less, enter -0- . . . . . . . . . . . | **15** | 873,801. | 281,112. | 0. | 0. |
| 16 | If the amount on line 15 is zero, subtract line 13 from line 14. Otherwise, enter -0- . . . . | **16** | | 0. | 726,523. | |
| 17 | **Underpayment.** If line 15 is less than or equal to line 10, subtract line 15 from line 10. Then go to line 12 of the next column. Otherwise, go to line 18 . . . . . | **17** | | 2,502,023. | 1,687,912. | 1,687,912. |
| 18 | **Overpayment.** If line 10 is less than line 15, subtract line 10 from line 15. Then go to line 12 of the next column . . . . . | **18** | 281,112. | | | |

***Go to Part IV on page 2 to figure the penalty. Do not go to Part IV if there are no entries on line 17 — no penalty is owed.***

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**

CPCZ0312L  12/02/11

Form **2220** (2011)

Form **2220** (2011)   MMR GROUP, INC.                                      72-1271030          Page **2**

| Part IV | Figuring the Penalty | | | SEE ATTACHED SCHEDULE | |
|---|---|---|---|---|---|
| | | **(a)** | **(b)** | **(c)** | **(d)** |
| **19** Enter the date of payment or the 15th day of the 3rd month after the close of the tax year, whichever is earlier (see instructions). **(Form 990-PF and Form 990-T filers:** Use 5th month instead of 3rd month.) | **19** | | 2/03/12 | 2/03/12 | 3/13/12 |
| **20** Number of days from due date of installment on line 9 to the date shown on line 19 | **20** | | 233 | 141 | 89 |
| **21** Number of days on line 20 after 4/15/2011 and before 7/1/2011 | **21** | | 15 | | |
| **22** Underpayment on line 17  x  Number of days on line 21 / 365  x 4% | **22** | | 4,112.91 | | |
| **23** Number of days on line 20 after 6/30/2011 and before 10/1/2011 | **23** | | 92 | 15 | |
| **24** Underpayment on line 17  x  Number of days on line 23 / 365  x 4% | **24** | | 10,243.57 | 2,774.65 | |
| **25** Number of days on line 20 after 9/30/2011 and before 1/1/2012 | **25** | | 92 | 92 | 16 |
| **26** Underpayment on line 17  x  Number of days on line 25 / 365  x 3% | **26** | | 1,326.59 | 12,763.39 | 2,219.72 |
| **27** Number of days on line 20 after 12/31/2011 and before 4/1/2012 | **27** | | 34 | 34 | 73 |
| **28** Underpayment on line 17  x  Number of days on line 27 / 366  x 3% | **28** | | 213.26 | 4,704.02 | 9,346.76 |
| **29** Number of days on line 20 after 3/31/2012 and before 7/1/2011 | **29** | | | | |
| **30** Underpayment on line 17  x  Number of days on line 29 / 366  x  *% | **30** | | | | |
| **31** Number of days on line 20 after 6/30/2012 and before 10/1/2012 | **31** | | | | |
| **32** Underpayment on line 17  x  Number of days on line 31 / 366  x  *% | **32** | | | | |
| **33** Number of days on line 20 after 9/30/2012 and before 1/1/2013 | **33** | | | | |
| **34** Underpayment on line 17  x  Number of days on line 33 / 366  x  *% | **34** | | | | |
| **35** Number of days on line 20 after 12/31/2012 and before 2/16/2013 | **35** | | | | |
| **36** Underpayment on line 17  x  Number of days on line 35 / 365  x  *% | **36** | | | | |
| **37** Add lines 22, 24, 26, 28, 30, 32, 34, and 36 | **37** | | 15,896.33 | 20,242.06 | 11,566.48 |
| **38** **Penalty.** Add columns (a) through (d) of line 37. Enter the total here and on Form 1120, line 33; or the comparable line for other income tax returns | | | | **38** | 47,705. |

*Use the penalty interest rate for each calendar quarter, which the IRS will determine during the first month in the preceding quarter. These rates are published quarterly in an IRS News Release and in a revenue ruling in the Internal Revenue Bulletin. To obtain this information on the Internet, access the IRS website at **www.irs.gov.** You can also call 1-800-829-4933 to get interest rate information.

CPCZ0312L  12/02/11                                                      Form **2220** (2011)

**2011**                    **FORM 2220 WORKSHEET**                    **PAGE 1**

**MMR GROUP, INC.**                                        **72-1271030**

| Installment Period | Underpayment | | | Penalty | | | |
|---|---|---|---|---|---|---|---|
| | Amount | From | To | Days Late | Interest Rate Periods | Rate | Penalty * |
| 2 | | | | | | | |
| | 1,775,500. | 6/15/11 | 7/15/11 | 15 | 4/15/11 – 6/30/11 | 4.00% | 2,918.63 |
| | | | | 15 | 7/01/11 – 9/30/11 | 4.00% | 2,918.63 |
| | 650,000. | 6/15/11 | 10/14/11 | 15 | 4/15/11 – 6/30/11 | 4.00% | 1,068.49 |
| | | | | 92 | 7/01/11 – 9/30/11 | 4.00% | 6,553.42 |
| | | | | 14 | 10/01/11 – 12/31/11 | 3.00% | 747.95 |
| | 76,523. | 6/15/11 | 2/03/12 | 15 | 4/15/11 – 6/30/11 | 4.00% | 125.79 |
| | | | | 92 | 7/01/11 – 9/30/11 | 4.00% | 771.52 |
| | | | | 92 | 10/01/11 – 12/31/11 | 3.00% | 578.64 |
| | | | | 34 | 1/01/12 – 3/31/12 | 3.00% | 213.26 |
| TOTALS | 2,502,023. | | | | | | 15,896.33 |
| 3 | | | | | | | |
| | 1,687,912. | 9/15/11 | 2/03/12 | 15 | 7/01/11 – 9/30/11 | 4.00% | 2,774.65 |
| | | | | 92 | 10/01/11 – 12/31/11 | 3.00% | 12,763.39 |
| | | | | 34 | 1/01/12 – 3/31/12 | 3.00% | 4,704.02 |
| TOTALS | 1,687,912. | | | | | | 20,242.06 |
| 4 | | | | | | | |
| | 235,565. | 12/15/11 | 2/03/12 | 16 | 10/01/11 – 12/31/11 | 3.00% | 309.78 |
| | | | | 34 | 1/01/12 – 3/31/12 | 3.00% | 656.49 |
| | 1,452,347. | 12/15/11 | 3/13/12 | 16 | 10/01/11 – 12/31/11 | 3.00% | 1,909.94 |
| | | | | 73 | 1/01/12 – 3/31/12 | 3.00% | 8,690.27 |
| TOTALS | 1,687,912. | | | | | | 11,566.48 |

DRAFT

**Total Underpayment Penalty** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    47,705.

* Underpayment   x   $\dfrac{\text{Days Late}}{365 \text{ or } 366}$   x   Rate

CPCL1301L   05/03/11

OMB No. 1545-0172

Form **4562**

Department of the Treasury
Internal Revenue Service    (99)

**Depreciation and Amortization**
**(Including Information on Listed Property)**

► See separate instructions.    ► Attach to your tax return.

**2011**

Attachment
Sequence No. **179**

Name(s) shown on return

MMR GROUP, INC.

Identifying number

72-1271030

Business or activity to which this form relates

FORM 1120

| **Part I** | **Election To Expense Certain Property Under Section 179** |
|---|---|

**Note:** *If you have any listed property, complete Part V before you complete Part I.*

| | | | |
|---|---|---|---|
| 1 | Maximum amount (see instructions) | **1** | 500,000. |
| 2 | Total cost of section 179 property placed in service (see instructions) | **2** | |
| 3 | Threshold cost of section 179 property before reduction in limitation (see instructions) | **3** | 2,000,000. |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | **4** | |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | **5** | |

| 6 | **(a)** Description of property | **(b)** Cost (business use only) | **(c)** Elected cost |
|---|---|---|---|
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| 7 | Listed property. Enter the amount from line 29 | **7** | |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | **8** | |
| 9 | Tentative deduction. Enter the **smaller** of line 5 or line 8 | **9** | |
| 10 | Carryover of disallowed deduction from line 13 of your 2010 Form 4562 | **10** | |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5 (see instrs) | **11** | |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but do not enter more than line 11 | **12** | |
| 13 | Carryover of disallowed deduction to 2012. Add lines 9 and 10, less line 12 ► | **13** | |

**Note:** *Do not use Part II or Part III below for listed property. Instead, use Part V.*

| **Part II** | **Special Depreciation Allowance and Other Depreciation (Do not** include listed property.**)** (See instructions.) |
|---|---|

| | | | |
|---|---|---|---|
| 14 | Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year (see instructions) | **14** | |
| 15 | Property subject to section 168(f)(1) election | **15** | |
| 16 | Other depreciation (including ACRS) | **16** | |

| **Part III** | **MACRS Depreciation (Do not** include listed property.**)** (See instructions.) |
|---|---|

| Section A | | |
|---|---|---|
| 17 | MACRS deductions for assets placed in service in tax years beginning before 2011 | **17** | 2,863,186. |
| 18 | If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here ► ☐ | | |

| Section B — Assets Placed in Service During 2011 Tax Year Using the General Depreciation System | | | | | | |
|---|---|---|---|---|---|---|
| **(a)** Classification of property | **(b)** Month and year placed in service | **(c)** Basis for depreciation (business/investment use only — see instructions) | **(d)** Recovery period | **(e)** Convention | **(f)** Method | **(g)** Depreciation deduction |
| **19 a** 3-year property | | | | | | |
| **b** 5-year property | | 6,412,133. | 5 | HY | S/L | 670,491. |
| **c** 7-year property | | 2,875,626. | 7 | HY | S/L | 368,411. |
| **d** 10-year property | | 7,232,100. | 10 | HY | S/L | 602,149. |
| **e** 15-year property | | 405,537. | 15 | HY | S/L | 21,716. |
| **f** 20-year property | | 38,108. | 20 | HY | S/L | 785. |
| **g** 25-year property | | | 25 yrs | | S/L | |
| **h** Residential rental property | | | 27.5 yrs | MM | S/L | |
| | | | 27.5 yrs | MM | S/L | |
| **i** Nonresidential real property | | | 39 yrs | MM | S/L | |
| | | | | MM | S/L | |

| Section C — Assets Placed in Service During 2011 Tax Year Using the Alternative Depreciation System | | | | | | |
|---|---|---|---|---|---|---|
| **20 a** Class life | | | | | S/L | |
| **b** 12-year | | | 12 yrs | | S/L | |
| **c** 40-year | | | 40 yrs | MM | S/L | |

| **Part IV** | **Summary** (See instructions.) |
|---|---|

| | | | |
|---|---|---|---|
| 21 | Listed property. Enter amount from line 28 | **21** | |
| 22 | **Total.** Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations — see instructions | **22** | 4,526,738. |
| 23 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | **23** | |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**    FDIZ0812L 05/20/11    Form **4562** (2011)

Form **5471**

(Rev December 2011)

Department of the Treasury
Internal Revenue Service

# Information Return of U.S. Persons With Respect To Certain Foreign Corporations

► See separate instructions.

Information furnished for the foreign corporation's annual accounting period (tax year required by section 898) (see instructions) beginning   1/01 , 2011 , and ending   12/31 , 2011

OMB No. 1545-0704

Attachment
Sequence No. **121**

| Name of person filing this return | | A | Identifying number |
|---|---|---|---|
| MMR GROUP, INC. | | | 72-1271030 |

Number, street, and room or suite no. (or P.O. box number if mail is not delivered to street address)

15961 AIRLINE HIGHWAY

City or town, state, and ZIP code

BATON ROUGE, LA 70817-7412

**B** Category of filer (See instructions. Check applicable box(es)):

1 (repealed) ☐   2 ☒   3 ☐   4 ☐   5 ☐

**C** Enter the total percentage of the foreign corporation's voting stock you owned at the end of its annual accounting period . . . . . . . . .   100.0000 %

Filer's tax year beginning   1/01 , 2011 , and ending   12/31 , 2011

**D** Person(s) on whose behalf this information return is filed:

| (1) Name | (2) Address | (3) Identifying number | (4) Check applicable box(es) | | |
|---|---|---|---|---|---|
| | | | Shareholder | Officer | Director |
| MMR CONSTRUCTORS, INC. | 15961 AIRLINE HIGHWAY | 72-1046000 | X | | |
| | BATON ROUGE, LA 70817-7412 | | | | |
| | | | | | |
| | | | | | |

**Important:** *Fill in all applicable lines and schedules. All information* **must** *be in English. All amounts* **must** *be stated in U.S. dollars unless otherwise indicated.*

| **1a** Name and address of foreign corporation | **b(1)** Employer identification number, if any |
|---|---|
| MMR INTERNATIONAL, LTD AKARA BUILDING 24, DE CASTRO STREET WICHAMS CAY I, ROAD TOWN, TORTOLA, | APPLIED FOR |
| | **b(2)** Reference ID number (see instructions) |
| | **c** Country under whose laws incorporated BRITISH VIRGIN ISLANDS |

| **d** Date of incorporation | **e** Principal place of business | **f** Principal business activity code number | **g** Principal business activity | **h** Functional currency |
|---|---|---|---|---|
| 6/27/1997 | VENEZUELA | 235310 | ELECTRICAL | BOLIVAR |

**2** Provide the following information for the foreign corporation's accounting period stated above.

| **a** Name, address, and identifying number of branch office or agent (if any) in the United States | **b** If a U.S. income tax return was filed, enter: | |
|---|---|---|
| | *(i)* Taxable income or (loss) | *(ii)* U.S. income tax paid (after all credits) |
| | | |

| **c** Name and address of foreign corporation's statutory or resident agent in country of incorporation | **d** Name and address (including corporate department, if applicable) of person (or persons) with custody of the books and records of the foreign corporation, and the location of such books and records, if different |
|---|---|
| MOSSACK FONSECA & CO (B.V.I.) LTD P.O. BOX 3136 ROAD TOWN, TORTOLA, | DONALD W. FAIRBANKS 15961 AIRLINE HIGHWAY BATON ROUGE, LA 70817-7412 |

## Schedule A    Stock of the Foreign Corporation

| (a) Description of each class of stock | (b) Number of shares issued and outstanding | |
|---|---|---|
| | *(i)* Beginning of annual accounting period | *(ii)* End of annual accounting period |
| | | |
| | | |
| | | |
| | | |

**BAA  For Paperwork Reduction Act Notice, see the instructions.**                    Form **5471** (Rev 12-2011)

CPCA8712L  01/06/12

Form **5471** (Rev 12-2011) MMR GROUP, INC.                                                72-1271030                Page **2**

## Schedule B | U.S. Shareholders of Foreign Corporation (see instructions)

| **(a)** Name, address, and identifying number of shareholder | **(b)** Description of each class of stock held by shareholder. **Note:** This description should match the corresponding description entered in Schedule A, column (a). | **(c)** Number of shares held at beginning of annual accounting period | **(d)** Number of shares held at end of annual accounting period | **(e)** Pro rata share of subpart F income (enter as a percentage) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## Schedule C | Income Statement (see instructions)

**Important:** *Report all information in functional currency in accordance with U.S. GAAP. Also, report each amount in U.S. dollars translated from functional currency (using GAAP translation rules). However, if the functional currency is the U.S. dollar, complete only the U.S. Dollars column. See instructions for special rules for DASTM corporations.*

| | | | | **Functional Currency** | **U.S. Dollars** |
|---|---|---|---|---|---|
| **I N C O M E** | **1a** | Gross receipts or sales | **1a** | | |
| | **b** | Returns and allowances | **b** | | |
| | **c** | Subtract line 1b from line 1a | **c** | | |
| | **2** | Cost of goods sold | **2** | | |
| | **3** | Gross profit (subtract line 2 from line 1c) | **3** | | |
| | **4** | Dividends | **4** | | |
| | **5** | Interest | **5** | | |
| | **6a** | Gross rents | **6a** | | |
| | **b** | Gross royalties, and license fees | **6b** | | |
| | **7** | Net gain or (loss) on sale of capital assets | **7** | | |
| | **8** | Other income (attach schedule) | **8** | | |
| | **9** | Total income (add lines 3 through 8) | **9** | | |
| **D E D U C T I O N S** | **10** | Compensation not deducted elsewhere | **10** | | |
| | **11a** | Rents | **11a** | | |
| | **b** | Royalties, and license fees | **11b** | | |
| | **12** | Interest | **12** | | |
| | **13** | Depreciation not deducted elsewhere | **13** | | |
| | **14** | Depletion | **14** | | |
| | **15** | Taxes (exclude provision for income, war profits, and excess profits taxes) | **15** | | |
| | **16** | Other deductions (attach schedule — exclude provision for income, war profits, and excess profits taxes) | **16** | | |
| | **17** | Total deductions (add lines 10 through 16) | **17** | | |
| **N E T  I N C O M E** | **18** | Net income or (loss) before extraordinary items, prior period adjustments, and the provision for income, war profits, and excess profits taxes (subtract line 17 from line 9) | **18** | | |
| | **19** | Extraordinary items and prior period adjustments (see instrs) | **19** | | |
| | **20** | Provision for income, war profits, and excess profits taxes (see instructions) | **20** | | |
| | **21** | Current year net income or (loss) per books (combine lines 18 through 20) | **21** | | |

CPCA8712L  01/06/12                                                                        Form **5471** (Rev 12-2011)

Form **5471** (Rev 12-2011) MMR GROUP, INC.                              72-1271030                    Page **3**

| Schedule E | Income, War Profits, and Excess Profits Taxes Paid or Accrued (see instructions) | | | |
|---|---|---|---|---|
| **(a)** Name of country or U.S. possession | **Amount of tax** | | | |
| | **(b)** In foreign currency | **(c)** Conversion rate | **(d)** In U.S. dollars | |
| 1   U.S. | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8   Total.................................................................► | | | | |

| Schedule F | Balance Sheet |
|---|---|

**Important:** *Report all amounts in U.S. dollars prepared and translated in accordance with U.S. GAAP. See instructions for an exception for DASTM corporations.*

| **Assets** | | **(a)** Beginning of annual accounting period | **(b)** End of annual accounting period |
|---|---|---|---|
| 1   Cash........................................................ | 1 | | |
| 2a Trade notes and accounts receivable.......................... | 2a | | |
| b Less allowance for bad debts............................... | 2b | | |
| 3   Inventories................................................ | 3 | | |
| 4   Other current assets (attach schedule)....................... | 4 | | |
| 5   Loans to shareholders and other related persons .............. | 5 | | |
| 6   Investment in subsidiaries (attach schedule)................... | 6 | | |
| 7   Other investments (attach schedule)......................... | 7 | | |
| 8a Buildings and other depreciable assets....................... | 8a | | |
| b Less accumulated depreciation ............................. | 8b | | |
| 9a Depletable assets......................................... | 9a | | |
| b Less accumulated depletion ............................... | 9b | | |
| 10  Land (net of any amortization)............................. | 10 | | |
| 11  Intangible assets: | | | |
| a Goodwill................................................ | 11a | | |
| b Organization costs........................................ | 11b | | |
| c Patents, trademarks, and other intangible assets ............. | 11c | | |
| d Less accumulated amortization for lines 11a, b, and c.......... | 11d | | |
| 12  Other assets (attach schedule) ............................ | 12 | | |
| 13  Total assets.............................................. | 13 | | |
| **Liabilities and Shareholders' Equity** | | | |
| 14  Accounts payable......................................... | 14 | | |
| 15  Other current liabilities (attach schedule).................... | 15 | | |
| 16  Loans from shareholders and other related persons............ | 16 | | |
| 17  Other liabilities (attach schedule) ......................... | 17 | | |
| 18  Capital stock: | | | |
| a Preferred stock.......................................... | 18a | | |
| b Common stock........................................... | 18b | | |
| 19  Paid-in or capital surplus (attach reconciliation).............. | 19 | | |
| 20  Retained earnings........................................ | 20 | | |
| 21  Less cost of treasury stock ............................... | 21 | | |
| 22  Total liabilities and shareholders' equity..................... | 22 | | |

**BAA**                                                                                              Form **5471** (Rev 12-2011)

Form **5471** (Rev 12-2011)  MMR GROUP, INC.                                72-1271030                Page **4**

## Schedule G | Other Information

|  |  | Yes | No |
|---|---|:---:|:---:|
| 1 | During the tax year, did the foreign corporation own at least a 10% interest, directly or indirectly, in any foreign partnership?. . |  | X |
|  | If 'Yes,' see the instructions for required attachment. |  |  |
| 2 | During the tax year, did the foreign corporation own an interest in any trust? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  | X |
| 3 | During the tax year, did the foreign corporation own any foreign entities that were disregarded as entities separate from their owners under Regulations sections 301.7701-2 and 301.7701-3 (see instructions)?. . . . . . . . . . . . . . . . . . . . . . . . . . . |  | X |
|  | If 'Yes,' you are generally required to attach Form 8858 for each entity (see instructions). |  |  |
| 4 | During the tax year, was the foreign corporation a participant in any cost sharing arrangement? . . . . . . . . . . . . . . . . . . . . . . . . |  | X |
| 5 | During the course of the tax year, did the foreign corporation become a participant in any cost sharing arrangement?. . . . . . . . . |  | X |

## Schedule H | Current Earnings and Profits (see instructions)

**Important:** *Enter the amounts on lines 1 through 5c in* **functional** *currency.*

| | | Net Additions | Net Subtractions | | |
|---|---|---|---|---|---|
| 1 | Current year net income or (loss) per foreign books of account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 1 | |
| 2 | Net adjustments made to line 1 to determine current earnings and profits according to U.S. financial and tax accounting standards (see instructions): | | | | |
| a | Capital gains or losses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| b | Depreciation and amortization. . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| c | Depletion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| d | Investment or incentive allowance . . . . . . . . . . . . . . . . . . . . . | | | | |
| e | Charges to statutory reserves . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| f | Inventory adjustments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| g | Taxes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| h | Other (attach schedule) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 3 | Total net additions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 4 | Total net subtractions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| 5a | Current earnings and profits (line 1 plus line 3 minus line 4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 5a | |
| b | DASTM gain or (loss) for foreign corporations that use DASTM (see instructions). . . . . . . . . . . . . . . . . . | | | 5b | |
| c | Combine lines 5a and 5b. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 5c | |
| d | Current earnings and profits in U.S. dollars (line 5c translated at the appropriate exchange rate as defined in section 989(b) and the related regulations (see instructions). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 5d | |
| | Enter exchange rate used for line 5d ▶ | | | | |

## Schedule I | Summary of Shareholder's Income From Foreign Corporation (see instructions)

| | | | |
|---|---|---|---|
| 1 | Subpart F income (line 38b, Worksheet A in the instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 | |
| 2 | Earnings invested in U.S. property (line 17, Worksheet B in the instructions). . . . . . . . . . . . . . . . . . . . . . . | 2 | |
| 3 | Previously excluded subpart F income withdrawn from qualified investments (line 6b, Worksheet C in the instructions). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | |
| 4 | Previously excluded export trade income withdrawn from investment in export trade assets (line 7b, Worksheet D in the instructions). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | |
| 5 | Factoring income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | |
| 6 | Total of lines 1 through 5. Enter here and on your income tax return. See instructions. . . . . . . . . . . . . . . . . . | 6 | |
| 7 | Dividends received (translated at spot rate on payment date under section 989(b)(1)) . . . . . . . . . . . . . . . . . | 7 | |
| 8 | Exchange gain or (loss) on a distribution of previously taxed income. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | |

|  | Yes | No |
|---|:---:|:---:|
| ● Was any income of the foreign corporation blocked?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  |  |
| ● Did any such income become unblocked during the tax year (see section 964(b))?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  |  |
| If the answer to either question is 'Yes,' attach an explanation. |  |  |

Form **5471** (Rev 12-2011)

**SCHEDULE O**
**(Form 5471)**

(Rev December 2005)

Department of the Treasury
Internal Revenue Service

**Organization or Reorganization of Foreign Corporation, and Acquisitions and Dispositions of its Stock**

► **Attach to Form 5471. See Instructions for Form 5471.**

OMB No. 1545-0704

| Name of person filing Form 5471 | Identifying number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |

Name of foreign corporation
MMR INTERNATIONAL, LTD

**Important:** *Complete a **separate** Schedule O for each foreign corporation for which information must be reported.*

**Part I** To Be Completed by U.S. Officers and Directors

| (a) Name of shareholder for whom acquisition information is reported | (b) Address of shareholder | (c) Identifying number of shareholder | (d) Date of original 10% acquisition | (e) Date of additional 10% acquisition |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**Part II** To Be Completed by U.S. Shareholders

**Note:** *If this return is required because one or more shareholders became U.S. persons, attach a list showing the names of such persons and the date each became a U.S. person.*

### Section A—General Shareholder Information

| (a) Name, address, and identifying number of shareholder(s) filing this schedule | (b) For shareholder's latest U.S. income tax return filed, indicate: | | | (c) Date (if any) shareholder last filed information return under section 6046 for the foreign corporation |
|---|---|---|---|---|
| | (1) Type of return (enter form number) | (2) Date return filed | (3) Internal Revenue Service Center where filed | |
| | | | | |
| | | | | |

### Section B—U.S. Persons Who Are Officers or Directors of the Foreign Corporation

| (a) Name of U.S. officer or director | (b) Address | (c) Social security number | (d) Check appropriate box(es) | |
|---|---|---|---|---|
| | | | Officer | Director |
| | | | | |
| | | | | |
| | | | | |

### Section C—Acquisition of Stock

| (a) Name of shareholder(s) filing this schedule | (b) Class of stock acquired | (c) Date of acquisition | (d) Method of acquisition | (e) Number of shares acquired | | |
|---|---|---|---|---|---|---|
| | | | | (1) Directly | (2) Indirectly | (3) Constructively |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 5471.**    CPCA8789L  02/23/11    Schedule **O** (Form 5471) (Rev 12-2005)

Form **8903**
(Rev December 2010)
Department of the Treasury
Internal Revenue Service

# Domestic Production Activities Deduction

► Attach to your tax return.    ► See separate instructions.

OMB No. 1545-1984

Attachment
Sequence No. **143**

Name(s) as shown on return: MMR GROUP, INC.

Identifying number: 72-1271030

**Note. Do not** complete column (a), unless you have oil-related production activities. Enter amounts for all activities in column (b), including oil-related production activities.

| | | | (a) Oil-related production activities | (b) All activities |
|---|---|---|---|---|
| 1 | Domestic production gross receipts (DPGR) | 1 | | 264,446,481. |
| 2 | Allocable cost of goods sold. If you are using the small business simplified overall method, skip lines 2 and 3 | 2 | | 192,397,215. |
| 3 | Enter deductions and losses allocable to DPGR (see instructions) | 3 | | 50,306,188. |
| 4 | If you are using the small business simplified overall method, enter the amount of cost of goods sold and other deductions or losses you ratably apportion to DPGR. All others, skip line 4 | 4 | | |
| 5 | Add lines 2 through 4 | 5 | | 242,703,403. |
| 6 | Subtract line 5 from line 1 | 6 | | 21,743,078. |
| 7 | Qualified production activities income from estates, trusts, and certain partnerships and S corporations (see instructions) | 7 | | |
| 8 | Add line 6 and 7. Estates and trusts, go to line 9, all others, skip line 9 and go to line 10 | 8 | | 21,743,078. |
| 9 | Amount allocated to beneficiaries of the estate or trust (see instructions) | 9 | | |
| 10a | **Oil-related qualified production activities income.** Estates and trusts, subtract line 9, column (a), from line 8, column (a), all others, enter amount from line 8, column (a). If zero or less, enter -0- here | 10a | | |
| b | **Qualified production activities income.** Estates and trusts, subtract line 9, column (b), from line 8, column (b), all others, enter amount from line 8, column (b). If zero or less, enter -0- here; skip lines 11 through 21, and enter -0- on line 22 | 10b | | 21,743,078. |
| 11 | Income limitation (see instructions): <br>• Individuals, estates, and trusts. Enter your adjusted gross income figured without the domestic production activities deduction <br>• All others. Enter your taxable income figured without the domestic production activities deduction (tax-exempt organizations, see instructions) | 11 | | 21,831,056. |
| 12 | Enter the smaller of line 10b or line 11. If zero or less, enter -0- here, skip lines 13 through 21, and enter -0- on line 22 | 12 | | 21,743,078. |
| 13 | Enter 9% of line 12 | 13 | | 1,956,877. |
| 14a | Enter the smaller of line 10a or line 12 | 14a | | |
| b | Reduction for oil-related qualified production activities income. Multiply line 14a by 3% | 14b | | |
| 15 | Subtract line 14b from line 13 | 15 | | 1,956,877. |
| 16 | Form W-2 wages (see instructions) | 16 | | 117,258,898. |
| 17 | Form W-2 wages from estates, trusts, and certain partnerships and S corporations (see instructions) | 17 | | |
| 18 | Add lines 16 and 17. Estates and trusts, go to line 19, all others, skip line 19 and go to line 20 | 18 | | 117,258,898. |
| 19 | Amount allocated to beneficiaries of the estate or trust (see instructions) | 19 | | |
| 20 | Estates and trusts, subtract line 19 from line 18, all others, enter amount from line 18 | 20 | | 117,258,898. |
| 21 | Form W-2 wage limitation. Enter 50% of line 20 | 21 | | 58,629,449. |
| 22 | Enter the smaller of line 15 or line 21 | 22 | | 1,956,877. |
| 23 | Domestic production activities deduction from cooperatives. Enter deduction from Form 1099-PATR, box 6 | 23 | | |
| 24 | Expanded affiliated group allocation (see instructions) | 24 | | |
| 25 | **Domestic production activities deduction.** Combine lines 22 through 24 and enter the result here and on Form 1040, line 35; Form 1120, line 25; or the applicable line of your return | 25 | | 1,956,877. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**

Form **8903** (Rev.12-2010)

FDIZ4001L  12/29/10

Form **8925**
(Rev January 2010)

Department of the Treasury
Internal Revenue Service    (99)

## Report of Employer-Owned Life Insurance Contracts

▶ **Attach to the policyholder's tax return — See instructions.**

OMB No. 1545-2089

Attachment
Sequence No. **160**

| Name(s) shown on return | Identifying number |
|---|---|
| MMR GROUP, INC. | 72-1271030 |
| Name of policyholder, if different from above | Identifying number, if different from above |
| MMR GROUP, INC. | |

Type of business

CONSTRUCTION : 238210

| | | | |
|---|---|---|---|
| **1** | Enter the number of employees the policyholder had at the end of the tax year. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1** | 19. |
| **2** | Enter the number of employees included on line 1 who were insured at the end of the tax year under the policyholder's employer-owned life insurance contract(s) issued after August 17, 2006. See *Section 1035 exchanges* in the instructions for an exception. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **2** | 19. |
| **3** | Enter the total amount of employer-owned life insurance in force at the end of the tax year for employees who were insured under the contract(s) specified on line 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **3** | 86,679,062. |
| **4a** | Does the policyholder have a valid consent (see instructions) for each employee included on line 2?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes  ☒ No | | |
| **b** | If 'No,' enter the number of employees included on line 2 for whom the policyholder does not have a valid consent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **4b** | |



**BAA  For Paperwork Reduction Act Notice, see instructions.**                    CPCA4501L   02/23/11                    Form **8925** (12-2009)

# 12/31/11 — Consolidated Statement of Income and Deductions — Page 1

## MMR GROUP, INC.

72-1271030

| | | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|---|
| | **INCOME** | | | | | | | | |
| 1a | Merchant card and third-party pymts | | | | | | | | |
| 1b | Gross receipts or sales not on line 1a | 4,282,934. | 233,230,892. | 250,733. | 1,516,471. | 239,281,030. | | | 239,281,030. |
| 1c | Total | 4,282,934. | 233,230,892. | 250,733. | 1,516,471. | 239,281,030. | | | 239,281,030. |
| 1d | Less returns and allowances | | | | | | | | |
| 1e | Net sales | 4,282,934. | 233,230,892. | 250,733. | 1,516,471. | 239,281,030. | | | 239,281,030. |
| 2 | Cost of goods sold | 2,510,939. | 188,213,756. | 220,245. | 1,452,275. | 192,397,215. | | | 192,397,215. |
| 3 | Gross profit | 1,771,995. | 45,017,136. | 30,488. | 64,196. | 46,883,815. | | | 46,883,815. |
| 4 | Dividends | | | | | | | | |
| 5 | Interest | 1,151,189. | | | | 1,151,189. | | | 1,151,189. |
| 6 | Gross rents | | 264,621. | | | 264,621. | | | 264,621. |
| 7 | Gross royalties | | | | | | | | |
| 8 | Capital gain net income | | | | | | | | |
| 9 | Net gain (loss) from 4797 | | | | | | | | |
| 10 | Other income | Statement 1    17,365. | 23,717,000. | 224. | 103,030. | 23,837,619. | | | 23,837,619. |
| 11 | **Total income** | 2,940,549. | 68,998,757. | 30,712. | 167,226. | 72,137,244. | | | 72,137,244. |
| | **DEDUCTIONS** | | | | | | | | |
| 12 | Compensation of officers | | 10,385,587. | | | 10,385,587. | | | 10,385,587. |
| 13 | Salaries and wages | 447,536. | 14,117,174. | 180,692. | 205,334. | 14,950,736. | | | 14,950,736. |
| 14 | Repairs and maintenance | 7,471. | 1,339,412. | 175. | 3,642. | 1,350,700. | | | 1,350,700. |
| 15 | Bad debts | | | | | | | | |
| 16 | Rents | 83,171. | 1,180,066. | 15,190. | 32,722. | 1,311,149. | | | 1,311,149. |
| 17 | Taxes and licenses | 8,832. | 1,308,724. | 9,336. | 932. | 1,327,824. | | | 1,327,824. |
| 18 | Interest expense | 221,296. | 1,021,480. | | | 1,242,776. | | | 1,242,776. |
| 19 | Charitable contributions | | | | | | | | |
| 20 | Depreciation | 854,054. | 3,668,797. | | 3,887. | 4,526,738. | | | 4,526,738. |
| 21 | Depletion | | | | | | | | |
| 22 | Advertising | 850. | 206,775. | 490. | 428. | 208,543. | | | 208,543. |
| 23 | Pension, profit-sharing plans | | 300,000. | | | 300,000. | | | 300,000. |
| 24 | Employee benefit programs | 33,600. | | | | 33,600. | | | 33,600. |
| 25 | Domestic production activities deduction | | 2,080,247. | | | 2,080,247. | | | 1,956,877. |
| 26 | Other deductions | Statement 2    1,638,808. | 12,356,891. | 46,425. | 626,411. | 14,668,535. | | -123,370. | 14,668,535. |
| 27 | **Total deductions** | 3,295,618. | 47,965,153. | 252,308. | 873,356. | 52,386,435. | | -123,370. | 52,263,065. |
| 28 | TI before NOL/special deductions | -355,069. | 21,033,604. | -221,596. | -706,130. | 19,750,809. | | 123,370. | 19,874,179. |
| 29a | Net operating loss deduction | | | | | | | | |
| 29b | Special deductions | | | | | | | | |
| 30 | **Taxable income** | -355,069. | 21,033,604. | -221,596. | -706,130. | 19,750,809. | | 123,370. | 19,874,179. |

**12/31/11**

# Consolidated Statement of Cost of Goods Sold

**Page 1**

72-1271030

## MMR GROUP, INC.

| | | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Inventory at beginning of year | | 546,892. | | | 546,892. | | | 546,892. |
| 2 | Purchases | 1,972,765. | 46,335,542. | | 1,452,275. | 49,760,582. | | | 49,760,582. |
| 3 | Cost of labor | 538,174. | 91,263,085. | 121,316. | | 91,922,575. | | | 91,922,575. |
| 4 | Additional section 263A costs | | | | | | | | |
| 5 | Other costs | Statement 7 | 50,673,050. | 98,929. | | 50,771,979. | | | 50,771,979. |
| 6 | Total | 2,510,939. | 188,818,569. | 220,245. | 1,452,275. | 193,002,028. | | | 193,002,028. |
| 7 | Inventory at end of year | | 604,813. | | | 604,813. | | | 604,813. |
| 8 | Cost of goods sold | 2,510,939. | 188,213,756. | 220,245. | 1,452,275. | 192,397,215. | | | 192,397,215. |

DRAFT

**12/31/11**

# Consolidated Statement of Dividend Income

**Page 1**

72-1271030

## MMR GROUP, INC.

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| 1 Dividends from less-than-20%-owned domestic corporations | | | | | | | | |
| 2 Dividends from 20%-or-more-owned domestic corporations | | | | | | | | |
| 3 Dividends on debt-financed stock of domestic and foreign corporations | | | | | | | | |
| 4 Dividends on certain preferred stock of less-than-20%-owned public utilities | | | | | | | | |
| 5 Dividends on certain preferred stock of 20%-or-more-owned public utilities | | | | | | | | |
| 6 Dividends from less-than-20%-owned foreign corporations and certain FSCs | | | | | | | | |
| 7 Dividends from 20%-or-more-owned foreign corporations and certain FSCs | | | | | | | | |
| 8 Dividends from wholly-owned foreign subsidiaries | | | | | | | | |
| 10 Dividends from domestic corporations received by a small business investment company operating under the Small Business Investment Act of 1958 | | | | | | | | |
| 11 Dividends from affiliated group members | | | | | | | | |
| 12 Dividends from certain FSCs | | | | | | | | |
| 13 Other dividends from foreign corporations | 1,151,189. | | | | 1,151,189. | | | 1,151,189. |
| 14 Income from controlled foreign corporations under subpart F | | | | | | | | |
| 15 Foreign dividend gross-up | | | | | | | | |
| 16 IC-DISC and former DISC dividends not included above | | | | | | | | |
| 17 Other dividends | | | | | | | | |
| 19 **Total dividends** | 1,151,189. | | | | 1,151,189. | | | 1,151,189. |

DRAFT

# Consolidated Beginning Balance Sheet

**12/31/11**

**Page 1**

**72-1271030**

## MMR GROUP, INC.

DRAFT

| | | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|---|
| | **ASSETS** | | | | | | | | |
| 1 | Cash | | 14,813,967. | 36,558. | 4,788. | 14,855,313. | | | 14,855,313. |
| 2a | Trade notes & accounts receivable | | 42,691,653. | 53,362. | 4,000. | 42,749,015. | | | 42,749,015. |
| 2b | Less allowance for bad debts | | | | | | | | |
| 3 | Inventories | | 546,892. | | | 546,892. | | | 546,892. |
| 4 | U.S. government obligations | | | | | | | | |
| 5 | Tax-exempt securities | | | | | | | | |
| 6 | Other current assets | Statement 3 | 49,487,364. | 225. | 12,868,997. | 62,356,586. | | | 62,356,586. |
| 7 | Loans to shareholders | | | | | | | | |
| 8 | Mortgage and real estate loans | | | | | | | | |
| 9 | Other investments | | | | | | | | |
| 10a | Buildings & other depreciable assets | | 28,629,785. | | 58,380. | 32,505,877. | | | 32,505,877. |
| 10b | Less accumulated depreciation | | (10,249,102.) | | ( 51,945.) | (12,061,327.) | | | (12,061,327.) |
| 11a | Depletable assets | | | | | | | | |
| 11b | Less accumulated depletion | | | | | | | | |
| 12 | Land (net of amortization) | | | | | | | | |
| 13a | Intangible assets (amortizable) | | | | | | | | |
| 13b | Less accumulated amortization | | | | | | | | |
| 14 | Other assets | Statement 4 | 21,797,162. | 566,302. | 139,219. | 22,502,683. | | | 22,502,683. |
| 15 | **Total assets** | | 23,854,594. | 126,486,861. | 90,145. | 13,023,439. | 163,455,039. | | | 163,455,039. |
| | **LIABILITIES AND EQUITY** | | | | | | | | |
| 16 | Accounts payable | | | 11,523,586. | 964. | 78,508. | 11,603,058. | | | 11,603,058. |
| 17 | Mortgages, notes, bonds payable in less than one year | | | 5,111,164. | 2,194,171. | 916,290. | 6,311,240. | | | 6,311,240. |
| 18 | Other current liabilities | Statement 5 | 863,696. | 47,567,462. | | 11,649,817. | 62,275,146. | | | 62,275,146. |
| 19 | Loans from shareholders | | | | | | | | |
| 20 | Mortgages, notes, bonds payable in more than one year | | 1,800,054. | 4,872,401. | | 3,283,371. | 9,955,826. | | | 9,955,826. |
| 21 | Other liabilities | | | | | | | | |
| 22a | Capital stock - preferred | | | | | | | | |
| 22b | Capital stock - common | | | 875. | | | 875. | | | 875. |
| 23 | Additional paid-in capital | | | | | | | | |
| 24 | Retained earnings - appropriated | | | | | | | | |
| 25 | Retained earnings - unappropriated | | 20,907,058. | 57,411,373. | -2,104,990. | -2,904,547. | 73,308,894. | | | 73,308,894. |
| 26 | Adjustments to shareholder equity | Statement 6 | | | | | | | |
| 27 | Less cost of treasury stock | | | | | | | | |
| 28 | **Total liabilities and equity** | | 23,854,594. | 126,486,861. | 90,145. | 13,023,439. | 163,455,039. | | | 163,455,039. |

**12/31/11**

# Consolidated Ending Balance Sheet

**Page 1**

## MMR GROUP, INC.

72-1271030

DRAFT

| | | | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|---|---|
| | **ASSETS** | | | | | | | | | |
| 1 | Cash | | 21,413. | 5,933,982. | 37,429. | 18,976. | 6,011,800. | | | 6,011,800. |
| 2a | Trade notes & accounts receivable | | 348,357. | 57,307,980. | 72,930. | | 57,729,267. | | | 57,729,267. |
| 2b | Less allowance for bad debts | | | | | | | | | |
| 3 | Inventories | | | 604,813. | | | 604,813. | | | 604,813. |
| 4 | U.S. government obligations | | | | | | | | | |
| 5 | Tax-exempt securities | | | | | | | | | |
| 6 | Other current assets | Statement 3 | | 73,632,707. | 225. | 6,003,580. | 79,636,512. | | | 79,636,512. |
| 7 | Loans to shareholders | | | | | | | | | |
| 8 | Mortgage and real estate loans | | | | | | | | | |
| 9 | Other investments | | | | | | | | | |
| 10a | Buildings & other depreciable assets | | 6,908,316. | 42,626,541. | | 21,214. | 49,556,071. | | | 49,556,071. |
| 10b | Less accumulated depreciation | | (2,738,757.) | (12,504,824.) | | ( 9,282.) | (15,252,863.) | | | (15,252,863.) |
| 11a | Depletable assets | | | | | | | | | |
| 11b | Less accumulated depletion | | | | | | | | | |
| 12 | Land (net of amortization) | | | | | | | | | |
| 13a | Intangible assets (amortizable) | | | | | | | | | |
| 13b | Less accumulated amortization | | | | | | | | | |
| 14 | Other assets | Statement 4 | 52,616,428. | 4,917,472. | | 173,004. | 57,706,904. | | | 57,706,904. |
| 15 | **Total assets** | | 57,155,757. | 172,518,671. | 110,584. | 6,207,492. | 235,992,504. | | | 235,992,504. |
| | **LIABILITIES AND EQUITY** | | | | | | | | | |
| 16 | Accounts payable | | 44,718. | 30,675,441. | 881. | 45,898. | 30,766,938. | | | 30,766,938. |
| 17 | Mortgages, notes, bonds payable in less than one year | | 621,559. | 9,189,714. | | 916,290. | 10,727,563. | | | 10,727,563. |
| 18 | Other current liabilities | Statement 5 | 17,231,657. | 35,317,743. | 2,436,689. | 6,119,968. | 61,106,057. | | | 61,106,057. |
| 19 | Loans from shareholders | | | | | | | | | |
| 20 | Mortgages, notes, bonds payable in more than one year | | 7,697,328. | 18,798,343. | | 2,367,082. | 28,862,753. | | | 28,862,753. |
| 21 | Other liabilities | | | | | | | | | |
| 22a | Capital stock - preferred | | | | | | | | | |
| 22b | Capital stock - common | | | 875. | | | 875. | | | 875. |
| 23 | Additional paid-in capital | | | | | | | | | |
| 24 | Retained earnings - appropriated | | | | | | | | | |
| 25 | Retained earnings - unappropriated | | 20,548,219. | 78,536,555. | -2,326,986. | -3,241,746. | 93,516,042. | | | 93,516,042. |
| 26 | Adjustments to shareholder equity | Statement 6 | 11,012,276. | | | | 11,012,276. | | | 11,012,276. |
| 27 | Less cost of treasury stock | | | | | | | | | |
| 28 | **Total liabilities and equity** | | 57,155,757. | 172,518,671. | 110,584. | 6,207,492. | 235,992,504. | | | 235,992,504. |

# Consolidated Schedule M-2

## MMR GROUP, INC.

12/31/11

Page 1

72-1271030

| SCHEDULE M-2 | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| 1 Beginning retained earnings | 20,907,058. | 57,411,373. | -2,104,990. | -2,904,547. | 73,308,894. | | | 73,308,894. |
| 2 Net income or loss per books | -358,839. | 21,125,182. | -221,996. | -337,199. | 20,207,148. | | | 20,207,148. |
| 3 Other increases | | | | | | | | |
| 4 Total lines 1 - 3 | 20,548,219. | 78,536,555. | -2,326,986. | -3,241,746. | 93,516,042. | | | 93,516,042. |
| 5 Distributions: | | | | | | | | |
| 5a Cash | | | | | | | | |
| 5b Stock | | | | | | | | |
| 5c Property | | | | | | | | |
| 6 Other decreases | | | | | | | | |
| 7 Total lines 5 and 6 | 0. | 0. | 0. | 0. | 0. | | | 0. |
| 8 Ending retained earnings | 20,548,219. | 78,536,555. | -2,326,986. | -3,241,746. | 93,516,042. | | | 93,516,042. |

DRAFT

**12/31/11**

# Consolidated Statement of Alternative Minimum Taxable Income

**Page 1**

72-1271030

## MMR GROUP, INC.

| | | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Taxable income before NOL | -355,069. | 21,033,604. | -221,596. | -706,130. | 19,750,809. | | 123,370. | 19,874,179. |
| | **Adjustments and Preferences:** | | | | | | | | |
| 2a | Depreciation of post-86 property | | | | | | | | |
| 2b | Amortization of certified pollution control facilities | | | | | | | | |
| 2c | Amortization of mining exploration & development costs | | | | | | | | |
| 2d | Amortization of circulation expenditures | | | | | | | | |
| 2e | Adjusted gain or loss | | | | | | | | |
| 2f | Long-term contracts | | | | | | | | |
| 2g | Merchant marine capital construction funds | | | | | | | | |
| 2h | Section 833(b) deduction | | | | | | | | |
| 2i | Tax shelter farm activities | | | | | | | | |
| 2j | Passive activities | | | | | | | | |
| 2k | Loss limitations | | | | | | | | |
| 2l | Depletion | | | | | | | | |
| 2m | Tax-exempt interest from specified private activity bonds | | | | | | | | |
| 2n | Intangible drilling costs | | | | | | | | |
| 2o | Other adjustments | | | | | | | | |
| 3 | Pre-adjustment AMTI | -355,069. | 21,033,604. | -221,596. | -706,130. | 19,750,809. | | 123,370. | 19,874,179. |
| 4a | Adjusted current earnings | -355,069. | 21,033,604. | -221,596. | -706,130. | 19,750,809. | | 123,370. | 19,874,179. |
| 4b | Subtract line 3 from line 4a | | | | | | | | |
| 4c | Multiply line 4b by 75% | | | | | | | | |
| 4d | Prior ACE increases over prior ACE reductions | 0. | 2,949,652. | 0. | 0. | 2,949,652. | | | 2,949,652. |
| 4e | ACE adjustment | 0. | 0. | 0. | 0. | 0. | | | 0. |
| 5 | AMTI before ATNOL | -355,069. | 21,033,604. | -221,596. | -706,130. | 19,750,809. | | 123,370. | 19,874,179. |
| 6 | ATNOL deduction | | | | | | | | |
| 7 | Alternative minimum taxable income | -355,069. | 21,033,604. | -221,596. | -706,130. | 19,750,809. | | 123,370. | 19,874,179. |

DRAFT

**12/31/11**

# Consolidated Statement of Adjusted Current Earnings

**Page 1**

**MMR GROUP, INC.**

72-1271030

| | | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Pre-adjustment AMTI | -355,069. | 21,033,604. | -221,596. | -706,130. | 19,750,809. | | 123,370. | 19,874,179. |
| | **Depreciation adjustment for ACE** | | | | | | | | |
| 2a | AMT depreciation | 854,054. | 3,668,797. | | 3,887. | 4,526,738. | | | 4,526,738. |
| 2b | Post-1993 property | 331,698. | 1,331,459. | | 395. | 1,663,552. | | | 1,663,552. |
| | Post-1989, pre-1994 property | | | | | | | | |
| | Pre-1990 MACRS property | 522,356. | 2,337,338. | | 3,492. | 2,863,186. | | | 2,863,186. |
| | Pre-1990 original ACRS property | | | | | | | | |
| | Property described in 168(f)(1-4) | | | | | | | | |
| | Other property | | | | | | | | |
| | Section 179 expense | | | | | | | | |
| | Total ACE depreciation | 854,054. | 3,668,797. | | 3,887. | 4,526,738. | | | 4,526,738. |
| | ACE depr. adjustment from K-1 | | | | | | | | |
| 2c | ACE depreciation adjustment | 0. | 0. | 0. | 0. | 0. | | | 0. |
| | **Inclusion in ACE of items included in Earnings & Profits** | | | | | | | | |
| 3a | Tax-exempt interest income | | | | | | | | |
| 3b | Death benefits from life insurance contracts | | | | | | | | |
| 3c | All other distributions from life insurance contracts | | | | | | | | |
| 3d | Inside buildup of life insurance contracts | | | | | | | | |
| 3e | Other items included in E & P | | | | | | | | |
| 3f | Increases to ACE of items in E & P | 0. | 0. | 0. | 0. | 0. | | | 0. |
| | **Disallowance of items not deductible from Earnings & Profits** | | | | | | | | |
| 4a | Certain dividends received | | | | | | | | |
| 4b | Dividends paid on preferred stock of utilities | | | | | | | | |
| 4c | Dividends paid to an ESOP | | | | | | | | |
| 4d | Nonpatronage dividends | | | | | | | | |
| 4e | Other items not deductible from E & P | | | | | | | | |
| 4f | Total increases to ACE | 0. | 0. | 0. | 0. | 0. | | | 0. |
| | **Other adjustments:** | | | | | | | | |
| 5a | Intangible drilling costs | | | | | | | | |
| 5b | Circulation expenditures | | | | | | | | |
| 5c | Organizational expenditures | | | | | | | | |
| 5d | LIFO inventory adjustments | | | | | | | | |
| 5e | Installment sales | | | | | | | | |
| 5f | Total other E & P adjustments | 0. | 0. | 0. | 0. | 0. | | | 0. |
| 6 | Loss on bad debt pool exchange | | | | | | | | |
| 7 | Acq. expense of life ins. companies | | | | | | | | |
| 8 | Depletion | | | | | | | | |
| 9 | Basis adjustments | | | | | | | | |
| 10 | Adjusted current earnings | -355,069. | 21,033,604. | -221,596. | -706,130. | 19,750,809. | | 123,370. | 19,874,179. |

**2011**

**Federal Statements**

**Page 1**

**MMR GROUP, INC.**

72-1271030

**Statement 1**
**Form 1120, Line 10**
**Other Income**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| MISCELLANEOUS | | 23,717,000. | 224. | 15,052. | 23,732,276. | | | 23,732,276. |
| MISCELLANEOUS INCOME | 17,365. | | | | 17,365. | | | 17,365. |
| Net Income from K-1 | | | | 87,978. | 87,978. | | | 87,978. |
| Total | 17,365. | 23,717,000. | 224. | 103,030. | 23,837,619. | 0. | 0. | 23,837,619. |

DRAFT

# Federal Statements

**2011**                                         **Page 2**

**MMR GROUP, INC.**

72-1271030

**Statement 2**
**Form 1120, Line 26**
**Other Deductions**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| COMPUTER EXPENSE | 14,837. | 260,564. | | | 275,401. | | | 275,401. |
| CONSULTING | | 111,621. | | | 111,621. | | | 111,621. |
| Dues and Subscriptions | 36,155. | 40,316. | 82. | 1,068. | 77,621. | | | 77,621. |
| EXPENSES | 1,473,309. | 5,585,479. | 27,561. | 109,942. | 7,196,291. | | | 7,196,291. |
| Insurance | | 2,877,808. | 8,400. | 21,000. | 2,907,208. | | | 2,907,208. |
| Legal and Professional | 69,435. | 605,933. | | 435. | 675,803. | | | 675,803. |
| Meals and Entertainment | 3,770. | 303,388. | | 729. | 307,887. | | | 307,887. |
| Miscellaneous | 5,169. | 1,333,880. | 1,206. | 11,489. | 1,351,744. | | | 1,351,744. |
| Net Loss from K-1 | 52. | | | 457,638. | 457,690. | | | 457,690. |
| Office Expense | 16,181. | | | | 16,181. | | | 16,181. |
| Postage | 3,037. | 161,395. | 1,439. | 3,780. | 169,651. | | | 169,651. |
| Printing | | 81,350. | 399. | 178. | 81,927. | | | 81,927. |
| REPRODUCTION | | 211,389. | | | 211,389. | | | 211,389. |
| Supplies | | 355,346. | 128. | 3,125. | 358,601. | | | 358,601. |
| Utilities | 16,863. | 428,422. | 7,208. | 17,027. | 469,520. | | | 469,520. |
| Total | 1,638,808. | 12,356,891. | 46,425. | 626,411. | 14,668,535. | 0. | 0. | 14,668,535. |

DRAFT

# 2011 — Federal Statements — Page 3

## MMR GROUP, INC.
72-1271030

**Statement 3**
**Form 1120, Schedule L, Line 6**
**Other Current Assets**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| **Beginning:** | | | | | | | | |
| DUE FROM AFFILIATES | | 41,385,710. | | | 41,385,710. | | | 41,385,710. |
| ESTIMATES EARNED-UNBILLED | | 2,329,340. | | | 2,329,340. | | | 2,329,340. |
| MISCELLANEOUS | | 5,772,314. | | | 5,772,314. | | | 5,772,314. |
| MISCELLANEOUS RECEIVABLE | | | | 2,613. | 2,613. | | | 2,613. |
| MISCELLANEOUS RECEIVABLES | | | 225. | | 225. | | | 225. |
| PREPAID EXPENSES | | | | 10,833. | 10,833. | | | 10,833. |
| UNBILLED ESTIMATES EARNED | | | | 12,855,551. | 12,855,551. | | | 12,855,551. |
| Total | 0. | 49,487,364. | 225. | 12,868,997. | 62,356,586. | 0. | 0. | 62,356,586. |
| **Ending:** | | | | | | | | |
| DUE FROM AFFILIATES | | 67,488,854. | | | 67,488,854. | | | 67,488,854. |
| ESTIMATES EARNED-UNBILLED | | 2,878,072. | | | 2,878,072. | | | 2,878,072. |
| MISCELLANEOUS | | 3,265,781. | | | 3,265,781. | | | 3,265,781. |
| MISCELLANEOUS RECEIVABLE | | | | 3,578. | 3,578. | | | 3,578. |
| MISCELLANEOUS RECEIVABLES | | | 225. | | 225. | | | 225. |
| UNBILLED ESTIMATES EARNED | | | | 6,000,002. | 6,000,002. | | | 6,000,002. |
| Total | 0. | 73,632,707. | 225. | 6,003,580. | 79,636,512. | 0. | 0. | 79,636,512. |

DRAFT

**2011**  |  **Federal Statements**  |  **Page 4**

72-1271030

**MMR GROUP, INC.**

**Statement 4**
**Form 1120, Schedule L, Line 14**
**Other Assets**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| **Beginning:** | | | | | | | | |
| DEPOSITS | 1,455. | 74,840. | | | 76,295. | | | 76,295. |
| DUE FROM AFFILIATES | 21,795,707. | | | | 21,795,707. | | | 21,795,707. |
| INVESTMENT IN JOINT VENTURE | | 491,462. | | 139,219. | 630,681. | | | 630,681. |
| Total | 21,797,162. | 566,302. | 0. | 139,219. | 22,502,683. | 0. | 0. | 22,502,683. |
| | | | | | | | | |
| **Ending:** | | | | | | | | |
| DEPOSITS | 1,455. | 84,846. | | 4,105. | 90,406. | | | 90,406. |
| DUE FROM AFFILIATES | 26,170,816. | | | | 26,170,816. | | | 26,170,816. |
| INVESTMENT IN JOINT VENTURE | | 491,462. | | 168,899. | 660,361. | | | 660,361. |
| INVESTMENTS | 26,444,157. | | | | 26,444,157. | | | 26,444,157. |
| NOTES RECEIVABLE | | 4,341,164. | | | 4,341,164. | | | 4,341,164. |
| Total | 52,616,428. | 4,917,472. | 0. | 173,004. | 57,706,904. | 0. | 0. | 57,706,904. |

**2011**

# Federal Statements

## MMR GROUP, INC.

Page 5

72-1271030

DRAFT

**Statement 5**
**Form 1120, Schedule L, Line 18**
**Other Current Liabilities**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| **Beginning:** | | | | | | | | |
| ACCRUED EXPENSES | | 38,843,509. | 153,337. | | 38,996,846. | | | 38,996,846. |
| DUE TO AFFILIATES | 863,696. | | | 11,649,817. | 12,513,513. | | | 12,513,513. |
| DUE TO RELATED PARTY | | | 632,474. | | 632,474. | | | 632,474. |
| ESTIMATES BILLED-UNEARNED | | 7,910,722. | | | 7,910,722. | | | 7,910,722. |
| Federal Tax Payable | | 709,751. | | | 709,751. | | | 709,751. |
| INCOME TAX ADJ. FROM CONSOLIDATION | | | 1,406,990. | | 1,406,990. | | | 1,406,990. |
| State Tax Payable | | 103,480. | 1,370. | | 104,850. | | | 104,850. |
| Total | 863,696. | 47,567,462. | 2,194,171. | 11,649,817. | 62,275,146. | 0. | 0. | 62,275,146. |
| **Ending:** | | | | | | | | |
| ACCRUED EXPENSES | | 21,086,393. | 155,033. | | 21,241,426. | | | 21,241,426. |
| DUE TO AFFILIATES | 17,231,657. | | | 6,119,968. | 23,351,625. | | | 23,351,625. |
| DUE TO RELATED PARTY | | | 959,932. | | 959,932. | | | 959,932. |
| ESTIMATES BILLED-UNEARNED | | 5,888,396. | | | 5,888,396. | | | 5,888,396. |
| Federal Tax Payable | | 7,498,536. | | | 7,498,536. | | | 7,498,536. |
| INCOME TAX ADJ. FROM CONSOLIDATION | | | 1,320,354. | | 1,320,354. | | | 1,320,354. |
| State Tax Payable | | 844,418. | 1,370. | | 845,788. | | | 845,788. |
| Total | 17,231,657. | 35,317,743. | 2,436,689. | 6,119,968. | 61,106,057. | 0. | 0. | 61,106,057. |

**2011**

# Federal Statements

**Page 6**

## MMR GROUP, INC.

72-1271030

**Statement 6**
**Form 1120, Schedule L, Line 26**
**Adjustments to Shareholders' Equity**

DRAFT

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1209195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| **Beginning:** | | | | | | | | |
| Total | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Ending:** | | | | | | | | |
| CONSOLIDATION OF AFFILIATE | 11,012,276. | 0 | 0 | 0 | 11,012,276. | 0 | 0 | 11,012,276. |
| Total | 11,012,276. | | | | 11,012,276. | | | 11,012,276. |

**2011**

# Federal Statements

**Page 7**

**MMR GROUP, INC.**

72-1271030

**Statement 7**
**Form 1125-A, Line 5**
**Other Cost of Goods Sold**

| | MMR GROUP, INC. 72-1271030 | MMR CONSTRUCTORS, INC. 72-1046000 | MMR TECHNICAL SERVICES, INC. 72-1269195 | MMR POWER SOLUTIONS LLC 05-0584790 | Total | Eliminations | Adjustments | Consolidated |
|---|---|---|---|---|---|---|---|---|
| OTHER | | 33,005,496. | 77,854. | | 33,083,350. | | | 33,083,350. |
| PAYROLL TAX & INSURANCE | | 17,667,554. | 21,075. | | 17,688,629. | | | 17,688,629. |
| Total | 0. | 50,673,050. | 98,929. | 0. | 50,771,979. | 0. | 0. | 50,771,979. |

DRAFT

**2011**

# FEDERAL STATEMENTS

**PAGE 8**

MMR GROUP, INC.

72-1271030

STATEMENT 8
SCHEDULE M-3, PART II, LINE 9
72-1271030
INCOME OR LOSS FROM U.S. PARTNERSHIPS

| NAME | EIN | YEAR END PROFIT SHARING % | YEAR END LOSS SHARING % | PER INCOME STATEMENT | TEMPORARY DIFFERENCE | PERMANENT DIFFERENCE | PER TAX RETURN |
|------|-----|---------------------------|-------------------------|----------------------|----------------------|----------------------|----------------|
| CALAMCO CO-GEN, LLC | N/A | 0% | 0% | | $ -102,807. | | $ -102,807. |
| CALCO GEN, LLC | N/A | 0% | 0% | | 87,978. | | 87,978. |
| WESTERN CO-GEN, LLC | N/A | 0% | 0% | | -354,831. | | -354,831. |
| TOTALS | | | | $ 0. | $ -369,660. | $ 0. | $ -369,660. |

DRAFT

EXHIBIT 23

## Claimant Correspondence

**Email to Attorney on 9/13/13**

Rodi,

I wanted to follow up with you regarding the previous questions I sent for MMR Group.  It has been two weeks since I sent the first set of questions and I have not received a response.  If I do not receive answers by 9/16/13, I will have to send an incompleteness notice to give you time to gather the support required to answer my questions.  As always, let me know if you have any questions.

Thanks,
Chris

**Email to Attorney on 9/5/13**

Hey Rodi,

I've been trying to reconcile the tax return and still am coming up with net income variances I was hoping you could help me resolve.  I added all of the separate P&Ls to compare to the tax return and was able to reconcile revenue, however there are still large net income variances.  See the screenshot below.  The first column with amounts listed is 2009 and the second column is 2010.

| | | | | | | |
|---|---|---|---|---|---|---|
| Net Income/ Loss (per Monthly P&L's) - Lafayette | $ | - | $ | - | $ 25,052,443.57 | $ 4,315,450.00 |
| Net Income/ Loss (per Monthly P&L's) - Belle Chase | | - | | - | 6,235,125.07 | 3,097,159.00 |
| Net Income/ Loss (per Monthly P&L's) - Home Office | | - | | - | 7,531,204.47 | (19,090,382.00) |
| Net Income/ Loss (per Monthly P&L's) - Kenner | | - | | - | 3,337,533.41 | (2,554,724.00) |
| Net Income/ Loss (per Monthly P&L's) - Corpus Christi | | - | | - | 613,927.04 | 1,331,078.00 |
| Net Income/ Loss (per Monthly P&L's) - Denver | | - | | - | 1,409,563.35 | 5,510,448.00 |
| Net Income/ Loss (per Monthly P&L's) - Warren | | - | | - | - | - |
| Net Income/ Loss (per Monthly P&L's) - Beaumont | | - | | - | 1,870,805.04 | 4,102,216.00 |
| Net Income/ Loss (per Monthly P&L's) - MMR Communications | | - | | - | (2,118,012.16) | 472,961.00 |
| Net Income/ Loss (per Monthly P&L's) - MMR Technical | | - | | - | (337,329.59) | (215,880.00) |
| Net Income/ Loss (per Monthly P&L's) - Mobile | | - | | - | 3,620,118.43 | 14,342,598.00 |
| Net Income/ Loss (per Monthly P&L's) - Odessa | | - | | - | - | - |
| Net Income/ Loss (per Monthly P&L's) - Power Solutions | | - | | - | (458,120.65) | (583,998.00) |
| Total Net Income/ Loss (per Monthly P&L's) | $ | - | $ | - | $ 46,757,257.98 | $ 10,726,926.00 |
| Net Income/ Loss (per Tax Return) | | - | | - | 29,340,382.00 | 6,505,309.00 |
| Variance - Monthly P&L's vs. Tax Return | $ | - | $ | - | $ 17,416,875.98 | $ 4,221,617.00 |
| Variance % - Gross Receipts (per Monthly P&L's) vs. Tax Variance | 0.00% | | 0.00% | | 5.50% | 1.68% |

I looked at the old consolidated financial statements and was able to find some areas that may be causing the variance.  There is a reserve expense item for $15,711,637 in 2009 and $14,202,454 in 2010 on the consolidated financial statements.  There was also a Bonus expense line item for $6,082,577 in 2009 and $4,152,439 in 2010 that was on the consolidated P&Ls.  Can you please explain why these items are not on the separate P&Ls and provide a detailed description of what both expense items relate to?  It appears there may be other smaller amounts that were not included on the separate P&Ls as well.  It looks like $83,135 of expenses I could not identify are not included on the separate P&Ls in 2009 and $54,702 are not included in 2010.

If you could provide me with a net income reconciliation it would be greatly appreciated.  Let me know if you have any questions.

Thanks,
Chris

EXHIBIT 23

**Email to Attorney on 9/4/13**

Rodi,

I hope you had a good time at the game in Dallas last weekend.  I've got another list of questions for you for the other MMR claims.  Please let me know when I can expect to receive a response on any of the claims.  Please send the information as you receive it so I can continue to review the claims.

**Belle Chase**
1. Please explain why there are little to no expenses in the Insurance Expense category (Group Health, Liability, and Self Insurance) in 2009.
2. Please explain why the Miscellaneous - Other Owner Expense line item is much larger in 2010 when compared to 2009.
3. Please explain why the Rent and Utilities expenses increase in 2010.
4. Please explain why there are no payroll taxes recorded from March 2009 - December 2010 in the Operating Section.
5. Please provide supporting documentation such as sales journals to verify the revenue recorded in July - October 2009
6. Please explain why Contract Income is lower than normal in January 2009 and higher than normal in March 2009.
7. Please explain why there were no equipment rentals from April - December 2009.
8. Please explain why there is no direct contract labor recorded in February 2009 and why it is lower than normal in January and April 2010.
9. Please explain why there is no FICA expense recorded in February 2009 and why the expense is higher than normal in April 2009 (COGS Section).
10. Please explain why there is no Salaries and Wages expense recorded in April 2009 (COGS Section).
11. Please explain why Purchased Materials are higher than normal in February 2009 and June 2009, and lower than normal in November 2010.
12. Please explain why Self Insurance expenses are negative in April 2010, May 2010, and September 2010.

**Kenner**
1. Please provide sales journals to verify revenue for the months of May - October 2009.
2. Please explain why there are no equipment rentals from April 2009 - December 2010.
3. Please explain why Field Vehicle Maintenance is higher than normal in January and February 2009.  Is this a non routine repair rather than maintenance?
4. Please explain why Employee Wages is lower than normal in January 2009 and February 2009, increases in December 2009 and December 2010, and is way higher in 2010 when compared to 2009.
5. Please explain why there are no payroll taxes recorded from March 2009 - December 2010 in the Operating Section.
6. Please explain why Direct Contract Labor fluctuates in 2009.  It is lower than normal in June 2009 and is higher than normal for the following three months (July - September 2009), is lower than normal in October 2009 and is higher than normal in the following two months (November - December 2010).
7. Please explain why FICA expenses are higher than normal in April 2009 in the COGS Section.
8. Please explain why there is no Salaries and Wages expense recorded in April 2009 and the expense is higher than normal in July 2009 (COGS Section).
9. Please explain why Purchased Materials are higher than normal in July 2009.
10. Please explain why Group Health expenses are higher than normal in January 2009, and higher in 2010 when compared to 2009.  Please also explain why the expense fluctuates significantly ranging from $1 - $2500.

**Lafayette**

1. Please explain why there are no equipment rentals from April 2009 - December 2010.
2. Please explain why there are no payroll taxes or supervisor wages in the Operating Section for April 2009 - December 2010.
3. Please provide sales journals to verify revenue for the months of May - December 2009.
4. Please explain why Health Insurance is higher than normal in January - March 2009, $0 in May 2009, and very low in other months in 2009.
5. Please explain why FICA is much higher than normal in April 2009 (COGS Section).
6. Please explain why Medicare is higher than normal in July 2009 and April 2009.
7. Please explain why Salaries and Wages are higher than normal in January 2009, $0 in April 2009, and higher than normal in July 2009.
8. Please explain why Purchased Materials are higher than normal in July 2009, October 2009, and December 2009.  Please also explain why it is lower than normal in November 2010.
9. Please explain why Group Health Insurance is higher than normal in January 2009 and December 2010.
10. Please explain why there is no Self Insurance recorded in 2009 and why the expense is negative in April, May, and September 2010.
11. Please explain why Equipment expenses increased in 2010.
12. Please explain why Employee Wages increase in December 2009 and December 2010.


I understand that this is a long list of questions.  Please let me know if you have any questions and send your answers to me as you receive them.  Please make every effort to respond as soon as possible.

Thanks,
Chris


**Email to Attorney 8/30/13**

Rodi,

I have started my review of the MMR claims submitted and have many inquiries regarding the P&Ls.  I have looked over the general accounts and the home office location in detail.  I will send my questions for the other facilities when I get the chance to look at them more closely.  This email will hopefully give you some time to respond to my initial questions before I send more detailed questions on the other three claims.

**General**
1. Please provide PDF copies of the P&Ls for the four locations filed for with the creation date listed on the P&Ls.
2. Verify the basis of accounting for book and tax purposes.
3. Please provide a detailed description of the following accounts:
    1. Discounts Earned - Please describe this account in detail including a description of what specific discounts the revenue item relates to.
    2. Rebates - Cash from Vendors -  Please describe this account in detail including a description of what specific rebates the revenue item relates to.
    3. Self Insurance - Over-Accrual
    4. Equipment Rentals - Is this a main part of the business and what type of equipment is rented?
    5. Sale of Scrap - **Seco** - Please provide the entire title for this revenue item.  It was cut off in the provided statements.  Also, please describe what the sale of scrap relates to and if it is a main part of MMR's operations.
    6. Rental Income - Please provide a detailed description of what the rental income relates to and if it is a main part of MMR's business or a minor investment.

7.     Direct Contract Labor - Please provide a detailed description of the type of contract labor expenses listed in this account.  Does this account include only contract labor or is there salaried employee expenses included?
8.     Inventory Balance Adjustments
9.     Inventory Consolidation - MMR
10.    Health Insurance (COGS Section) - Please provide a detailed description of who the health insurance covers.  Are owners/officers or anyone else covered besides salaried employees?  How does this expense item listed in COGS differ from health insurance expenses listed in the Operating Section?
11.    Payroll Taxes (COGS Section) -  Please provide a detailed description of who the payroll taxes cover.  Are owners/officers or anyone else paid for besides salaried employees?  How does this expense item listed in COGS differ from payroll taxes listed in the Operating Section?
12.    Equipment and Machinery Purchases - Please provide a detailed description of what type of equipment and machinery is purchased and how it is used by MMR Group.  Please explain why this is listed as an expense rather than a Balance Sheet item.
13.    Fees - Please provide a detailed description of what the Fees expenses relate to.
14.    Loss from K-1 - Please provide a detailed description of this account.
15.    Group Health Insurance - Are owners/officers or anyone else covered besides salaried employees?
16.    Self Insurance - Please provide a detailed description of what type of insurance Self Insurance is and who it covers.
17.    Equipment Reconciliation
18.    Postage - Does this expense item include any freight charges or only relate to normal postage expenses?
19.    Reproduction
20.    Payroll Taxes (Operating Section) - Please provide a detailed description of who the payroll taxes cover.  Are owners/officers or anyone else paid for besides salaried employees?
21.    Workers Compensation -  Please provide a detailed description of who Workers Compensation covers.  Are owners/officers or anyone else paid for besides salaried employees?

**Home Office Location - 15961 Airline Highway**
1.     Please provide supporting documentation such as sales journals to verify the revenue recorded in June - December 2009.
2.     Please explain the increase in Equipment Rentals in June and July 2009.
3.     Please explain why there are hardly any Rebates - Cash from Vendors entries after 2009.
4.     Please explain why there is no Manufacturing Revenue prior to 2010.  Were there no manufacturing operations prior to 2010?
5.     Please explain why Sales of Scrap Materials is much higher in 2010 than 2009.  Please explain why May 2010 is higher than normal as well.
6.     Why was there not a Self Insurance Revenue Adjustment in January 2010 like there is in 2009 and 2011?
7.     Please explain the high amount of Direct Contract Labor in June, July, August, October, and December 2009.
8.     Please explain why there is a very large increase the Salaries and Wages (COGS Section) in April 2009 and a smaller increase in July 2009.
9.     Please provide an explanation for the increase in Purchased Materials in July 2009 and October 2009, and the low amount of purchases in November 2010.
10.    Please provide an explanation for the increase in Employee Wages (Operating Section) in December 2009 and December 2010.
11.    Please explain why Equipment & Machinery Purchases are higher in 2010 when compared to 2009.
12.    Please explain why Inventory Consolidation entries are made in 2009 and not in 2010.

Please let me know if you have any questions and have a great weekend.

Thanks,
Chris

# EXHIBIT 24



Natalia Donskaya (US - Advisory) <natalia.donskaya@pwc.com>

---

# DWHCC Information request - MMR Group Inc DBA MMR Constructors Inc - Claimant ID: 100118552

Kyle Whitaker <kyle@kylewhitaker.com>
To: "Natalia Donskaya (US - Advisory)" <natalia.donskaya@pwc.com>

Mon, Jul 31, 2017 at 5:34 PM

Natalia:

Please see the response from my client below.

Kyle-

Please see the following responses below.  Let Natalia and others know that they can call at any time for questions/clarifications.  Thanks- Rodi



**Rodi F. Rispone | General Counsel - Vice President | MMR Group, Inc.**
15961 Airline Highway | Baton Rouge, LA 70817

(o) 225-756-5090 | (d) 225-612-8102 (m) 225-937-5986

www.mmrgrp.com

---

**From:** Kyle Whitaker [mailto:kyle@kylewhitaker.com]
**Sent:** Wednesday, July 26, 2017 4:35 PM
**To:** Rodi Rispone <rrispone@mmrgrp.com>
**Subject:** FW: DWHCC Information request - MMR Group Inc DBA MMR Constructors Inc - Claimant ID: 100118552

From: Natalia Donskaya (US - Advisory) [mailto:natalia.donskaya@pwc.com]
Sent: Wednesday, July 26, 2017 4:13 PM
To: Kyle Whitaker
Cc: Ana-Maria Rotariu (US - Advisory); Lauren Steel (US - Advisory)
Subject: DWHCC Information request - MMR Group Inc DBA MMR Constructors Inc - Claimant ID: 100118552

Mr. Whitaker,

EXHIBIT 24

I hope this email finds you well. My name is Natalia Donskaya and I am an analyst with the Deepwater Horizon Claims Center. My team and I have continued our review of the claims for MMR Group Inc DBA MMR Constructors Inc (Claim IDs: 229610; 229615; 229616; 229618) and we are requesting further explanations / information regarding the claims:

1. Please clarify which entity (e.g. MMR Group, Inc. or MMR Constructors Inc.) owned or leased the following filing facilities during the claiming period from 2007 - 2011.

- Claim ID: 229610 - 115961 Airline Hwy, Baton Rouge, LA 70817 (Home Office/HQ)

- Claim ID: 229615 - 1043 QCP Park Drive, Broussard, LA 70518 (Lafayette)

- Claim ID: 229616 - 2104 Engineer Rd, Belle Chase, LA 70037 (Belle Chasse) and

- Claim ID: 229618 - 41 Veterans Blvd. Ste A, Kenner, LA 70062 (Kenner)

MMR Constructors, Inc.

2. Additionally, please clarify which entity/subsidiary reported financial information from operations on the tax returns or consolidating schedules of that entity/subsidiary for the following facilities during the claiming period from 2007 - 2011:

- Claim ID: 229610 - 115961 Airline Hwy, Baton Rouge, LA 70817 (Home Office/HQ)

- Claim ID: 229615 - 1043 QCP Park Drive, Broussard, LA 70518 (Lafayette)

- Claim ID: 229616 - 2104 Engineer Rd, Belle Chase, LA 70037 (Belle Chasse) and

- Claim ID: 229618 - 41 Veterans Blvd. Ste A, Kenner, LA 70062 (Kenner)

The operations of these facilities were consolidated and filed under MMR Group's Federal Tax Return.

3. Please explain how the P&Ls were created and/or maintained for each facility location as there is no indication of what location or entity the operations within the P&Ls relate to per the provided P&Ls (e.g. Doc ID: 11233694 for Claim ID: 229610).

MMR recorded income and expenses on a percent complete basis.  Expenses are charged to the job and location on a daily basis.  These documents were provided to First Financial of Baton Rouge.  First Financial used these source documents to create P&L's in QuickBooks at the direction of the claims center.

4. Please clarify the additional non-filing facility locations that are reported under each entity (e.g. MMR Group, Inc. or MMR Constructors Inc.) for tax filing purposes.

 In 2007 MMR Group, Inc. filed Federal consolidated tax return with following entities:  MMR Constructors, Inc.; MMR Offshore Services, Inc.; MMR Technical Services, Inc.; MMR AEI, Inc.; MMR Power Solutions, LLC.

    MMR Constructors, Inc. included the following divisions, National (Baton Rouge), Corpus Christi, New Orleans (Kenner), Lake Charles, & Mobile.

    MMR Offshore Services, Inc. included the following divisions, Broussard  (Lafayette) & Belle Chase

    MMR Technical Services, Inc. – only union work

    MMR AEI, Inc. – only AEI division

    MMR Power Solutions, LLC – power distribution assets in California

In 2008 MMR Group, Inc. filed Federal consolidated tax return with following entities:  MMR Constructors, Inc.; MMR Offshore Services, Inc.; MMR Technical Services, Inc.; MMR AEI, Inc.; MMR Power Solutions, LLC.

MMR Constructors, Inc. included the following divisions, National (Baton Rouge), Corpus Christi, New Orleans (Kenner), Lake Charles, Mobile, Colorado, Baton Rouge & SECO division.

MMR Offshore Services, Inc. included the following divisions, Broussard (Lafayette) & Belle Chase

MMR Technical Services, Inc. – only union work

MMR AEI, Inc. – Merged into MMR Constructors, Inc.

MMR Power Solutions, LLC – power distribution assets in California

In 2009 MMR Group, Inc. filed Federal consolidated tax return with following entities:  MMR Constructors, Inc.; MMR Offshore Services, Inc.; MMR Technical Services, Inc.; MMR Power Solutions, LLC.

MMR Constructors, Inc. included the following divisions, National (Baton Rouge), Corpus Christi, New Orleans (Kenner), Lake Charles, Mobile, Colorado, Baton Rouge, SECO, Broussard (Lafayette), Fire & Gas, Belle Chasse & Communications divisions.

MMR Offshore Services, Inc. – Merged into MMR Constructors, Inc.

MMR Technical Services, Inc. – only union work

MMR Power Solutions, LLC – power distribution assets in California

In 2010 MMR Group, Inc. filed Federal consolidated tax return with following entities:  MMR Constructors, Inc.; MMR Technical Services, Inc.; MMR Power Solutions, LLC.

MMR Constructors, Inc. included the following divisions, National (Baton Rouge), Corpus Christi, New Orleans (Kenner), Lake Charles, Mobile, Colorado, Baton Rouge, SECO, Broussard (Lafayette), Fire & Gas, Belle Chasse, Panel Shop & Communications divisions.

MMR Technical Services, Inc. – only union work

MMR Power Solutions, LLC – power distribution assets in California

MMR West, LLC. – Aircraft holding company

In 2011 MMR Group, Inc. filed Federal consolidated tax return with following entities:  MMR Constructors, Inc.; MMR Technical Services, Inc.; MMR Power Solutions, LLC

MMR Constructors, Inc. included the following divisions, National (Baton Rouge),  Beaumont, Belle Chasse, Broussard (Lafayette), Baton Rouge, Colorado, Communications, Corpus Christi, Fire & Gas, Long Beach, Mobile, New Orleans, Odessa, Panel Shop &  Pennsylvania divisions.

MMR Technical Services, Inc. – only union work

MMR Power Solutions, LLC – power distribution assets in California

MMR West, LLC. – Aircraft holding company

Please provide the requested responses by July 31, 2017.


If you have any questions the above information requests, do not hesitate to ask me. I am happy to discuss these items further at your convenience.


--

Sincerely,


Natalia Donskaya


PwC | Experienced Associate

Office: (571) 340-7491

Email: natalia.donskaya@us.pwc.com

PricewaterhouseCoopers LLP

1800 Tysons Blvd., McLean, VA 22102

http://www.pwc.com/us

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer. PricewaterhouseCoopers LLP is a Delaware limited liability partnership. This communication may come from PricewaterhouseCoopers LLP or one of its subsidiaries.

The information transmitted in this electronic message may contain CONFIDENTIAL and/or PRIVILEGED information. If you are not the intended recipient, any disclosure, distribution, or use of the contents of this message is STRICTLY PROHIBITED. If you have received this communication in error, please contact the sender by reply e-mail and delete the message from your computer system immediately.

---


image001.png
7K

# EXHIBIT 25



Natalia Donskaya (US - Advisory) <natalia.donskaya@pwc.com>

---

## MMR Group - follow up

Lauren Canto (US - Advisory) <lauren.s.canto@pwc.com>                    Thu, Aug 3, 2017 at 4:09 PM
To: Kyle@kylewhitaker.com
Cc: "Ana-Maria Rotariu (US - Advisory)" <ana-maria.rotariu@pwc.com>, "Natalia Donskaya (US - Advisory)"
<natalia.donskaya@pwc.com>

Good afternoon Kyle,


I hope you are doing well. My team has continued our review on the claims filed under **MMR Group Inc DBA MMR Constructors Inc (Claimant ID: 100118552)** and have a few questions from our review that we would like further clarification and/or information for in order to proceed, as outlined below.


Additionally, we would like to see if we are able to set up a conference call with you and the Claimant to obtain a detailed description and understanding of the Claimant's business operations (i.e. projects, types of projects, time period of projects, how they are managed, etc.) throughout the 2009 - 2011 claiming period.


1. Per Doc ID: 20791195, pg. 3, MMR Constructors, Inc. reported the financial activities of several divisions in the Consolidated Schedules per MMR Group, Inc.'s federal tax returns. We noted a few divisions noted, which did not indicate the location of those divisional operations. Please confirm where the operations of the following divisions are performed.

- **SECO**
- **Fire & Gas** - appears to operate from the Broussard/Lafayette, LA facility. Are operations of this division already included in the P&Ls provided in Doc File ID: 18984180?
- **Panel Shop** - appears to operate from the Belle Chasse facility. Are operations of this division already included in the P&Ls provided in Doc File ID: 18984190?
- **MMR Communications** - (P&Ls in Doc File ID: 18984208) appears to operate from the Home Office/Baton Rouge, LA facility. Is this a subsidiary of MMR Constructors, Inc.? If so, did it have a separate and unique TIN/EIN or was it a disregarded entity?

2. Upon consolidated of the filing P&Ls (Doc File IDs: 18984180; 18984202; 18984197; 18984190) and non-filing P&Ls (Doc File IDs: 18984215 (Odessa); 18984212 (Mobile); 18984208 (MMR Comm); 18984187 (Beaumont/Lake Charles); 18984184 (PA); & 18984173 (Corpus Christi)) and in consideration of the description of what divisions are reported under the consolidating schedules of MMR Constructors, Inc. (Doc ID: 20791195, pg. 3), we attempted to perform a Gross Receipts tax reconciliation using Contract Income figures. We noted a $1,601,071 Gross Receipts variance in 2011 (P&Ls - $234,831,963 vs. Tax Returns - $233,230,892).

- We noted a **$4,282,934 Gross Receipts variance in 2011** (P&Ls - $237,513,826 vs. Tax Returns - $233,230,892). Please explain these Gross Receipts variances noted in 2011. Please note that no P&Ls for Long Beach were provided, however the P&Ls are currently showing a greater amount than the tax returns show.

EXHIBIT 25

| Gross Receipts Reconciliation | 2011 |
|---|---|
| **Gross Receipts or Sales (Total)** | $ 237,513,826 |
| Gross Receipts or Sales - Lafayette/Broussard, LA | $ 51,637,880 |
| Gross Receipts or Sales - Home Office/Baton Rouge, LA | $ 66,170,445 |
| Gross Receipts or Sales - Belle Chase, LA | $ 29,094,686 |
| Gross Receipts or Sales - Kenner, LA/New Orleans | $ 9,954,058 |
| Gross Receipts or Sales - Corpus Christi, TX | $ 8,097,577 |
| Gross Receipts or Sales - Denver, CO | $ 21,254,590 |
| Gross Receipts or Sales - Warren, PA | $ 2,681,863 |
| Gross Receipts or Sales - Beaumont/Lake Charles, LA | $ 21,459,347 |
| Gross Receipts or Sales - MMR Communications | $ 6,594,623 |
| Gross Receipts or Sales - Mobile, AL | $ 15,584,105 |
| Gross Receipts or Sales - Odessa, TX | $ 4,984,652 |
| **Gross Receipts or Sales (per Tax Return)** | $ 233,230,892 |
| **Variance** | $ 4,282,934 |

3. Additionally, per the Net Income reconciliation performed for 2009 and 2010, we noted large variances as shown in the chart below. Please provide an explanation for these variances noted. Per the consolidated P&Ls in Doc ID: 4327523, could the variances noted potentially be due to "Reserve" and "Bonus" accounts not included within any of the divisional P&Ls provided?

| Net Income Reconciliation | 2009 | 2010 |
|---|---|---|
| **Net Income/ Loss (Consolidated)** | $47,552,708 | $ 11,526,804 |
| Net Income / Loss - Lafayette, LA | $ 25,052,444 | $ 4,315,450 |
| Net Income / Loss - Home Office | $ 7,531,205 | $ (19,090,382) |
| Net Income / Loss - Belle Chase, LA | $ 6,235,125 | $ 3,097,159 |
| Net Income / Loss - Kenner, LA | $ 3,337,533 | $ (2,554,724) |
| Net Income / Loss - Corpus Christi, TX | $ 613,927 | $ 1,331,078 |
| Net Income / Loss - Denver, CA | $ 1,409,563 | $ 5,510,448 |
| Net Income / Loss - Beaumont/Lake Charles, LA | $ 1,870,805 | $ 4,102,216 |
| Net Income / Loss - MMR Communications | $ (2,118,012) | $ 472,961 |
| Net Income / Loss - Mobile, AL | $ 3,620,118 | $ 14,342,598 |
| **Net Income/ Loss (per Tax Return)** | $ 29,127,563 | $ (1,667,314) |
| **Variance** | $ 18,425,145 | $ 13,194,118 |

4. Please confirm the basis of accounting used by the Claimant to maintain and create P&Ls and financial source recorded in the normal course of business.

We look forward to hearing back from you by Tuesday, August 8th, 2017. If you have any questions or would like to discuss anything in further detail, I would be happy to do so. We appreciate your help.

Kind regards,
Lauren Canto
[Quoted text hidden]