UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * | MDL 2179 |
| | | SECTION: J(2) |
| Applies to: | * | JUDGE BARBIER |
| No. 10-03261, *Shivers, et al. v. BP p.l.c., et al.* | * | MAG. JUDGE WILKINSON |
| No. 12-1713, *Andry, et al. v. BP products North America, Inc., et al.* | * | |

## ORDER & REASONS
[As to the Motions to Dismiss the *Andry* and *Shivers* Actions]

Before the Court are Defendants' Motions to Dismiss the referenced member cases (Rec. Docs. 24736, 24873), Plaintiffs' oppositions (Rec. Docs. 24809, 24884), and Defendants' reply (Rec. Doc. 24821). The core issue raised by these motions is whether the factual allegations in the complaints place the Plaintiffs them within the "zone of danger," as required to state a claim for negligent infliction of emotional distress. For reasons explained below, the Court concludes that one set of plaintiffs, the *Shivers* Plaintiffs, were not within the zone of danger, while the other set of plaintiffs, the *Andry* Plaintiffs, have sufficiently alleged that they were within the zone of danger.

### I. BACKGROUND

On the evening of April 20, 2010, a blowout, explosions, and fire occurred aboard the DEEPWATER HORIZON, a semi-submersible drilling rig, as it was in the process of temporarily abandoning a well, known as Macondo, it had drilled approximately fifty miles off the coast of Louisiana, in approximately 5,000 feet of water. *See In re Oil Spill by the Oil Rig "Deepwater* Horizon," 21 F. Supp. 3d 657, 666-

67 (E.D. La. 2014). Eleven workers died in the incident, and many others were injured. *Id.* at 667. The 115 survivors evacuated to the M/V DAMON BANKSTON, a supply vessel that was next to the rig when the blowout began. *Id.* The rig burned until mid-morning on April 22, when it capsized and sank, resulting in a massive oil spill in the Gulf of Mexico. *Id.*

The DEEPWATER HORIZON/Macondo Well incident spawned thousands of lawsuits by hundreds of thousands of plaintiffs/claimants, most of which were consolidated before this Court as Multidistrict Litigation No. 2179. The instant motions concern two of these cases, each containing three plaintiffs. These plaintiffs claim they were fishing offshore when the explosions on the DEEPWATER HORIZON occurred. They seek damages for emotional injuries they allegedly suffered as a result of the events of April 20, 2010, as further described below.

### A. The *Shivers* Plaintiffs (No. 10-03261)

The *Shivers* Plaintiffs—Bradley Shivers, Mark Mead, and Scott Russell—were located miles from the DEEPWATER HORIZON when the explosions occurred. According to their complaint, the *Shivers* Plaintiffs were fishing from a 31' boat when "a distant light caught [Bradley Shivers's] attention" around 9:45 p.m. (Compl. ¶ 7, No. 10-03261, Rec. Doc. 1-1). After viewing the light through binoculars, Shivers realized he was witnessing a rig on fire. (*Id.*). The *Shivers* Plaintiffs then heard distress calls from the DEEPWATER HORIZON over VHF radio. (*Id.* ¶ 8). "The [*Shivers* Plaintiffs] then heard and felt a concussive sonic boom explosion." (*Id.* ¶ 9).

The *Shivers* Plaintiffs motored to the DEEPWATER HORIZON where "they found a chaotic scene of enormous proportion." (*Id.* ¶ 14). The *Shivers* Plaintiffs claim 5-8 people were still in the water when they arrived. (*Id.* ¶ 15). They allegedly saw several survivors "who obviously needed medical attention," including one person who was "horribly burned." (*Id.*). Plaintiffs recount hearing people screaming for help. (*Id.*). The *Shivers* Plaintiffs state that someone asked them to search around the rig for missing persons. (*Id.* ¶ 16). They searched for several hours but found no one. The *Shivers* Plaintiffs claim that while they were searching "there were many times when [they] felt and heard deep rumbling sounds coming from deep below the surface of the water," which they believed "were caused by other explosions." (*Id.* ¶ 24). Plaintiffs state that they were "frightened," but they continued searching until around 3:00 a.m. on April 21. (*Id.* ¶¶ 24, 26). At that point, there were approximately 40 boats on the scene and Coast Guard helicopters overhead. (*Id.*).

The *Shivers* Plaintiffs sued certain BP entities, Transocean entities, Halliburton, Cameron, and Anadarko.[1] They assert that Defendants' conduct put them at risk of physical injury and caused them to develop "emotional distress, anguish, stress, and physical manifestations of same." (*Id.* ¶¶ 102-103). For example, Mark Mead states that he collapsed when he returned home on April 21. (*Id.* ¶ 29). In the following days he allegedly suffered anxiety attacks, depression, stress, and

---

[1] BP owned a majority interest in both the Macondo Well and the lease for the relevant block of the Outer Continental Shelf. Transocean owned the DEEPWATER HORIZON and was hired by BP to drill the Macondo Well. Halliburton was BP's cement contractor. Cameron built the DEEPWATER HORIZON's blowout preventer. Anadarko owned a non-operating minority interest in the Macondo Well and in the lease.

3

recurring memories, and he "began taking medication to deal with his symptoms." (*Id.*).

## B. The *Andry* Plaintiffs (No. 12-01713)

The *Andry* Plaintiffs—Albert Andry, III, Ryan Chaisson, and Dustin King—allege in their amended complaint that on the evening of April 20 they were fishing from a 26' boat positioned "under the lip" of the DEEPWATER HORIZON. (Am. Compl. ¶ 45, Rec. Doc. 24812). They claim that "an unknown liquid substance began raining down from the rig's network of pipes," which caused their eyes to burn upon contact. (*Id.* ¶ 46). They also heard a loud "hissing noise." (*Id.*) One of the boat's occupants shouted that they needed to move away from the rig. (*Id.* ¶ 47). Albert Andry allegedly "accelerated his boat away from the rig as quickly as possible." (*Id.* ¶ 48). "When [the *Andry*] Plaintiffs got about 50 yards away they heard a boom, looked back and the lights went off on the rig. Then the whole rig exploded." (*Id.*). "Plaintiffs watched as the rig continued exploding and flames were shooting out of the rig. The water was on fire." (*Id.* ¶ 51). They watched as some people jumped off the rig and fell approximately 80 feet to the water below. (*Id.* ¶ 52). The *Andry* Plaintiffs state that they communicated by radio their desire to assist those who jumped in the water, but were told not to approach. (*Id.* ¶ 54). "They watched helpless[ly] as some individuals who jumped off the rig drifted away and never made it to the supply boat." (*Id.*).

The *Andry* Plaintiffs sued the same defendants as the *Shivers* Plaintiffs, save Anadarko. Their complaint asserts that they "were in the zone of danger and were

4

placed in immediate risk of physical harm." (*Id.* ¶ 50). The *Andry* Plaintiffs allegedly suffered "mental and emotional injuries consisting of post-traumatic stress disorder, fear, mental anguish, [and] pain and suffering . . . due to their being in the 'zone of danger' at the time of the explosion and their physical exposure to the hazardous chemical fumes and debris in the air [surrounding] them at the time of the explosion." (*Id.* ¶ 57). The *Andry* Plaintiffs claim that they have incurred and will continue to incur medical treatment as a result of their mental and emotional injuries. (*Id.* ¶ 60).

## II.  LEGAL STANDARD

Defendants move to dismiss both the *Shivers* and *Andry* complaints for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). To survive such a motion,

> a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(citations and some quotation marks omitted). Although courts must accept factual allegations in the complaint as true, they "'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The plaintiff must allege enough factual content "to 'nudge' his claim . . . 'across the line from conceivable to plausible.'" *Id.* at

5

683 (quoting *Twombly*, 550 U.S. at 570). Determining whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### III. DISCUSSION

**A. Negligent Infliction of Emotional Distress**

The *Shivers* and *Andry* complaints attempt to plead claims for negligent infliction of emotional distress ("NIED"). In other words, Plaintiffs seek to recover for "mental or emotional harm (such as fright or anxiety) that is caused by the negligence of another and that is not directly brought about by a physical injury, but that may manifest itself in physical symptoms." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 544 (1994). Their claims are governed by general maritime law. *See In re Deepwater Horizon*, 741 F. App'x 185, 188 (5th Cir. 2018) (per curiam); *In re Deepwater Horizon*, 745 F.3d 157, 166 (5th Cir. 2014). While it is clear that general maritime law recognizes a cause of action for NIED, *see Gough v. Nat. Gas Pipeline Co. of Am.*, 996 F.2d 763, 765 (5th Cir. 1993), there is an initial disagreement between the parties over one of the elements applicable to that claim. Specifically, Plaintiffs contend that those who are within the "zone of danger" may recover for NIED, while Defendants argue that the Fifth Circuit has never recognized a "zone of danger" theory under general maritime law.

"No jurisdiction . . . allows recovery for all emotional harms, no matter how intangible or trivial, that might be causally linked to the negligence of another." *Gottshall*, 512 U.S. at 545. Courts have impose various limitations, taking the form

6

of "tests" or "rules," on the right to recover for NIED. *Id.* The most restrictive of these is the "physical injury or impact rule," which requires that the plaintiff sustain a physical impact or injury due to the defendant's conduct. *Id.* at 547. The "zone of danger" test is a less restrictive standard—it limits recovery to plaintiffs who either sustained a physical impact *or* are within the zone of danger of physical contact. *Id.* at 547-48.[2] There is no question that a plaintiff who meets the physical injury or impact rule may recover under general maritime law for NIED (assuming all other elements of the claim are met). *See Gough*, 996 F.2d at 765. However, the Fifth Circuit has repeatedly declined to either adopt or reject the zone of danger test for general maritime claims. *See, e.g.*, *Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 224 (5th Cir. 2013).

This Court holds that the zone of danger test applies to NIED claims under general maritime law. First, it is settled law that the zone of danger test applies under the Jones Act. *See Naquin v. Elevating Boats, L.L.C.*, 744 F.3d 927, 938 (5th Cir. 2014). Second, at least three other circuits have adopted the zone of danger test for non-Jones Act maritime claims. *See Sawyer Bros. Inc. v. Island Transporter, LLC*, 887 F.3d 23, 36-38 (1st Cir. 2018) ("Given its application to seamen, we see no principled basis for imposing the more restrictive physical impact test upon passengers alleging NIED under the general maritime law."); *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1338 (11th Cir. 2012); *Stacy v. Rederiet Otto Danielsen, A.S.*,

---

[2] Other tests exist which are even less restrictive than the zone of danger test. *See Gottshall*, 512 U.S. at 548; *Plaisance v. Texaco, Inc.*, 966 F.2d 166, 169 (5th Cir. 1992) (en banc). No party has argued that any of these tests apply here, however.

7

609 F.3d 1033 (9th Cir. 2010). Third, prior decisions from this district have concluded that the zone of danger test applies to general maritime claims. *See, e.g., In re Clearsky Shipping Corp.*, No. 96-4099, 2002 WL 31496659, at *3 (E.D. La. Nov. 7, 2002); *Authement v. Seacor Marine,* No. 92-1721, 1993 WL 330037, at *2 (E.D. La. Aug. 26, 1993).

Having concluded that the zone of danger test applies under general maritime law, the next question is whether the complaints allege sufficient factual matter, accepted as true, to allow the Court to draw the reasonable inference that Plaintiffs were within the "zone of danger." *See Iqbal*, 556 U.S. at 678. To be in the zone of danger, the plaintiff must be in "immediate risk of physical harm." *Barker*, 713 F.3d at 224-25 (citing *Gottshall*, 512 U.S. at 548). This is an objective standard. *See Anselmi v. Penrod Drilling Corp.*, 813 F. Supp. 436, 442 (E.D. La. 1993) ("[T]he plaintiff must, objectively, be within a fact-particular zone of danger."). The plaintiff must also subjectively believe that he is in immediate risk of physical harm. *See, e.g.*, *Gaston v. Flowers Transp.*, 866 F.2d 816, 820 (5th Cir. 1989) ("Neither [Gaston's] deposition nor his answers to interrogatories indicate that he was concerned that *he* might be harmed when James was caught between the barges." (emphasis in original)). The Supreme Court has explained that the zone of danger test recognizes that "a near miss may be as frightening as a direct hit," *Gottshall*, 512 U.S. at 547, but it also advances policy concerns surrounding purely emotional injuries: "the potential for a flood of trivial suits, the possibility of fraudulent claims that are difficult for judges and juries to detect, and the specter of unlimited and unpredictable

8

liability." *Id.* at 557. Related to the last concern, the Supreme Court explicitly acknowledged that the zone of danger test will inevitably preclude some genuine emotional injuries. *Id.*[3]

Several Fifth Circuit decisions help sketch out the perimeters of the zone of danger. In *Ainsworth v. Penrod Drilling Corp.*, a worker on a jack-up rig sued for emotional injuries that allegedly resulted when a helicopter crashed and exploded on the deck of the rig. 972 F.2d 546, 547 (5th Cir. 1992). The court concluded the worker was not in the zone of danger, noting that the crash occurred approximately 100 feet from the plaintiff, the plaintiff was inside the rig's control room at the time of the crash, "which . . . was separated from the helicopter by the bow leg," and the plaintiff testified that he knew the helicopter would not crash into the control room. *Id.* at 548.

In *Plaisance v. Texaco*, a tugboat was towing a barge that struck an underwater gas pipeline, which caused an explosion and fire at the rear of the barge. 966 F.2d 166, 167 (5th Cir. 1992) (en banc). The captain backed the tugboat to the bow of the barge so the barge crew could escape. *Id.* The captain later reconnected to the barge and towed it away from the rupture site. *Id.* The captain subsequently received extended treatment at a psychiatric hospital and was diagnosed with post-traumatic stress disorder, allegedly because of his belief that he or someone else could have been killed in the explosion and fire. *Id.* at 168. The Fifth Circuit held that the

---

[3] This Court further notes that being within the zone of danger does not permit the plaintiff to recover for emotional damages that result purely from witnessing an injury to another person. *See Naquin*, 774 F.3d at 939-40. Instead, the zone of danger test allows the plaintiff "'to recover for emotional injury caused by fear of physical injury to himself.'" *Id.* at 939 (quoting *Gottshall*, 512 U.S. at 556) (emphasis omitted).

9

captain could not establish a claim for NIED "under any known theory of recovery—even the most liberal." *Id.* The opinion notes that the explosion and fire did not damage the tug and the captain was never in danger, indicating that the captain was outside the zone of danger. *Id.* at 167

In contrast to *Ainsworth* and *Plaisance*, the plaintiff in *Gough v. Natural Gas Pipeline Co. of America* was able to recover for his purely emotional injuries, albeit under the physical injury or impact rule. 996 F.2d at 766-67. In that case, a fishing boat allided with a submerged pipeline. "Within seconds, a fireball swept the ship from stern to bow," killing eleven of the fourteen crew. *Id.* at 764. The plaintiff was inside the vessel's pilot house at the time, but he could feel the heat from the fire. *Id.* at 766. He exited the pilot house and jumped overboard moments before flames engulfed the pilot house. *Id.* The plaintiff suffered multiple contusions, ingested sea water, inhaled fumes from the fire, and possibly suffered minor burns. *Id.* The court held that the plaintiff was able to recover emotional distress damages because he satisfied the physical injury or impact rule. *Id.* Consequently, it did not decide whether the plaintiff could recover under a zone of danger theory. *Id.* However, it seems safe to assume that the plaintiff faced immediate risk of physical harm, and therefore was inside the zone of danger, if the court would have reached the question.

A final case to consider is *Anselmi v. Penrod Drilling Corp.*, a decision from another section of this Court. 813 F. Supp. 436 (E.D. La. 1993). That case concerned a worker on a jack-up rig that was "rocked by two explosions." *Id.* at 438. The plaintiff allegedly felt the impact of the explosion and believed the rig was ready to collapse

10

into the water. *Id.* at 442. He also came within fifty to seventy-five feet of flames that were fueled by a gas leak, and he could not easily flee the scene given that the jack-up rig was an isolated, self-supporting unit. *Id*. Given those circumstances, Judge Feldman denied the defendant's motion for summary judgment and held that there was at least a triable issue of fact as to whether the plaintiff was objectively within the zone of danger. *Id.* [4]

With this background in mind, the Court examines the instant pleadings. As to the *Shivers* Plaintiffs, the Court finds that their complaint does not contain sufficient factual matter to show that they were in immediate risk of physical harm. The *Shivers* Plaintiffs point out that their complaint alleges that they "heard and felt a concussive sonic boom explosion" (Compl. ¶ 9) and argue that they are therefore similar to the plaintiff in *Anselmi*. However, their complaint reflects that they were miles away when they "heard and felt" the initial explosion. Consequently, the *Shivers* Plaintiffs are easily distinguished from the plaintiff in *Anselmi*, who, *inter alia*, was on board the jack-up rig where the explosion occurred. The *Shivers* Plaintiffs also point out that after driving to the scene they "felt and heard deep rumbling sounds coming from deep below the surface of the water," which they believed "were caused by other explosions," and they were "frightened." (Compl. ¶ 24). Their subjective fright notwithstanding, these facts do not permit the reasonable inference that the *Shivers* Plaintiffs objectively faced immediate risk of physical harm from the

---

[4] Defendants also cite to *Barker v. Hercules Offshore, Inc.*, where the Fifth Circuit held that a worker who was standing two feet away from a hole that suddenly opened up in the rig floor was not within the zone of danger. 713 F.3d 208, 224-25 (5th Cir. 2013). Those facts are so distinct from a blowout and explosion that they provide little help with deciding the instant motions.

11

"rumbling sounds coming from deep below the surface of the water." There is nothing in the *Shivers* Plaintiffs' complaint to suggest they were any closer to the zone of danger than the plaintiffs in *Ainsworth* or *Plaisance*.

The *Shivers* Plaintiffs alternatively argue that they meet the "physical injury or impact" rule because they heard and felt the initial explosions. However, the Fifth Circuit has held that "trivial" injuries or impacts will not satisfy this test. *See Ainsworth*, 972 F.2d at 547; *see also Metro-North Commuter R. Co. v. Buckley*, 521 U.S. 424, 432 (1997) ("[L]anguage and cited precedent indicate that the words 'physical impact' [as used in *Gottshall*] do not encompass every form of 'physical contact.'"). The *Shivers* Plaintiffs cite no cases where this sort of "impact"—sensing the air-pressure changes from a distant explosion—satisfied the physical injury or impact test. Plaintiffs attempt to compare themselves to the plaintiff in *Anselmi*, who allegedly "felt the impact of the explosion," but the Court does not read that opinion as contemplating that Mr. Anselmi might satisfy the physical injury or impact rule. Rather, *Anselmi* held that there was a triable issue as to whether the plaintiff was "within an articulable area of actual ***threat*** to his well-being." 813 F. Supp. at 442 (emphasis added).[5] Additionally, while *Gough* perhaps did not establish the outer limits of the physical injury or impact rule, it is certainly relevant to note that the *Shivers* Plaintiffs' experiences are a far cry from that plaintiff, who suffered multiple bruises and possibly minor burns, ingested sea water, and inhaled fumes from the

---

[5] In any event, the "impact" described in *Anselmi* was very different from the "impact" allegedly felt by the *Shivers* Plaintiffs. Mr. Anselmi was on the rig where the explosions occurred; he stated that the explosions shook the rig and sounded like a bomb had exploded; and he believed the rig would collapse into the water as a result. *Id.*

12

burning vessel. 996 F.2d at 766. The Court concludes that the facts alleged in the *Shivers* complaint do not show that the physical injury or impact rule is met.

Turning to the *Andry* Plaintiffs, it is a closer question whether the allegations in their complaint place them within the zone of danger. The *Andry* Plaintiffs were fishing underneath the DEEPWATER HORIZON when an unknown liquid from the rig started raining down upon them, which was followed by loud hissing noise. The *Andry* Plaintiffs quickly drove their vessel away; the first explosion occurred when they were approximately fifty yards (150 feet) from the rig. Is 150 feet sufficiently far enough away that the *Andry* Plaintiffs were outside the zone of danger when the DEEPWATER HORIZON exploded? Possibly; possibly not. Assuming without deciding that they were outside the zone of danger at the time of the explosion, non-binding caselaw suggests that a plaintiff who must flee from the zone of danger in order to avoid injury may still recover for NIED. *See Alabama Power Co. v. Murray*, 751 So. 2d 494, 499 (Ala. 1999) (plaintiffs who awoke to find their home on fire and exited through smoke and soot to the street held to be within the zone of danger).[6] Consequently, the issue may turn on whether or not the *Andry* Plaintiffs faced immediate risk of physical harm while they were underneath the rig, or perhaps whether they would have faced such risk had they remained underneath the DEEPWATER HORIZON until it exploded. It is certainly possible that the *Andry* Plaintiffs, had they remained under the rig, would have faced no more threat of

---

[6] Some of the Supreme Court's language in *Gottshall* also suggests that one who successfully flees from the zone of danger may still be able to recover for NIED. *See* 512 U.S. at 556 ("We see no reason, however, to allow an employer to escape liability for emotional injury caused by the apprehension of physical impact **simply because of the fortuity that the impact did not occur**." (emphasis added)).

13

physical harm than the plaintiffs in *Ainsworth* and *Plaisance*. It is also possible that the *Andry* Plaintiffs' circumstances were sufficiently more dangerous than those encountered in *Ainsworth* and *Plaisance*. Answering these questions will require parsing facts that are not presently before the Court. Given the current procedural posture, however, the Court finds that the *Andry* Plaintiffs allegations have nudged their claim "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 683. The Court leaves open the possibility that this issue may warrant revisiting once the factual record is developed.[7]

### B. Intentional Infliction of Emotional Distress

The *Shivers* Plaintiffs, but not the *Andry* Plaintiffs, also attempt to state a claim for intentional infliction of emotional distress ("IIED"). The parties agree that the elements of an IIED claim are (1) that the defendant's conduct was so extreme in degree and so outrageous in character that it went beyond all bounds of decency and was utterly intolerable in civilized community; (2) that such conduct caused severe emotional distress; and (3) that defendant intended, by performing the acts complained of, to inflict severe emotional distress on plaintiff, or that defendant knew that such severe emotional distress would be certain or substantially certain to result from the conduct.

Although the Court must accept as true the factual allegations in the *Shivers* Plaintiffs complaint, it is not bound to accept as true legal conclusions that are

---

[7] The *Andry* Plaintiffs do not explicitly argue that their alleged contact with the unknown liquid satisfies the physical injury or impact test. Because of this, and given that the Court concludes that the *Andry* Plaintiffs have sufficiently pleaded themselves within the zone of danger, the Court does not address whether the *Andry* Plaintiffs satisfy the physical injury or impact test.

14

couched as factual allegations. Also, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Here, the Court finds that the *Shivers* Plaintiffs' factual allegations fail to satisfy the third element of an IIED claim. The complaint contains conclusory, threadbare element recitals such as, "The defendants knew, or should have known, that the plaintiffs would suffer severe emotional distress as a result of their willful, wanton, and reckless conduct." (Compl. ¶ 130). This is insufficient. *See also Dumas v. Angus Chemical Co.*, 728 So. 2d 441, 446-47 (La. 2d Cir. 1999) (explaining, in a case involving a chemical plant explosion, "Even if we assume that . . . [the defendants] intended to destroy the plant, it is absurd to suggest that not only would their intent be to kill or wound workers and cause millions of dollars in damages, but also that their conduct would be calculated to cause severe emotional distress directed at plant workers, Sterlington residents, and their relatives spread around the world."). Accordingly, the *Shivers* Plaintiffs have failed to state a claim for IIED that is plausible on its face.

### III. CONCLUSION

For the reasons explained above, the Court finds that the *Andry* Plaintiffs have stated a claim for NIED that is plausible on its face. However, the *Shivers* Plaintiffs have failed to state a plausible claim for either NIED or IIED. The Court will give the *Shivers* Plaintiffs seven days to amend their complaint to attempt to cure the defects in their complaint. If the *Shivers* Plaintiffs fail to do so, the Court will enter a judgment dismissing their complaint with prejudice.

15

Accordingly,

IT IS ORDERED that Defendants' Motion to Dismiss (Rec. Doc. 24873) is DENIED with respect to the *Andry* Plaintiffs (No. 12-01713).

IT IS FURTHER ORDERED that Defendants' Motion to Dismiss (Rec. Doc. 24736) is GRANTED with respect to *Shivers* Plaintiffs (No. 10-03261).

IT IS FURTHER ORDERED that the *Shivers* Plaintiffs are hereby granted leave to file an amended complaint to attempt to state a claim to relief that is plausible on its face. The amended complaint shall be filed no later than seven days from the date this Order & Reasons is entered in the master docket. If the *Shivers* Plaintiffs do not file an amended complaint by this deadline, the Court will issue a judgment dismissing their complaint with prejudice.

New Orleans, Louisiana, this 11 day of February, 2020.

United States District Judge