## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | ) | |
| OIL SPILL BY THE OIL RIG | ) | |
| "DEEPWATER HORIZON" IN THE | ) | MDL Docket No. 2179 |
| GULF OF MEXICO ON APRIL 20, 2010 | ) | |
| | ) | |
| THIS DOCUMENT RELATES: | ) | |
| | ) | |
| Bradley Shivers, et al v. BP, PLC, et al | ) | |
| Case No. 2:10-cv-03261 | ) | |

### FIRST AMENDED COMPLAINT

COME NOW Plaintiffs, BRADLEY SHIVERS, MARK MEAD, and SCOTT RUSSELL and file their First Amended Complaint pursuant to the Court's February 11, 2020 Order and Reasons as follows:

### THE EVENTS LEADING TO THIS LAWSUIT

1.      The Plaintiffs Bradley Shivers and Scott Russell began planning their first tuna fishing trip of the year in March.  As the third week of April approached, the two friends decided that Tuesday, April 20, would be the day to set out for 36 hours of nothing but fishing.

2.      Bradley and Scott began the process of assembling the crew.  When they learned that Mark Mead, also a plaintiff, was available, they invited him to join the team.  A capable fisherman, Mark had fished with them in the past, and they enjoyed one another's company.

3.      This trip began like countless others.  On Monday afternoon, April 19, Bradley splashed the Ramblin Wreck, which was his Jupiter 31' center console boat.

4.      On Tuesday morning, April 20, Bradley secured the bait, ice, and other supplies required for an overnight tuna fishing trip.  After loading the boat and checking the safety equipment, the Plaintiffs left Orange Beach at approximately noon on Tuesday, April 20.

5.     The Ramblin Wreck's first stop was near the 255 rig.

6.      The Plaintiffs then headed for the Horn Mountain rig for the afternoon bite.

7.      Around 9:45, a distant light caught Bradley's attention. He reached for binoculars and to his surprise he realized he was looking at what appeared to be a rig on fire.

8.     Bradley immediately grabbed the Ramblin Wreck's VHF.  The Plaintiffs heard a woman's voice coming over channel 16 of the vessel's VHF:  "Mayday, Mayday, Mayday, this is the Deepwater Horizon. . . .We are on fire. There has been an explosion, and we are abandoning the rig."

9.     The Plaintiffs then heard and felt a concussive sonic boom explosion.

10.    The shockwave from the explosion hit each Plaintiff and shook the boat.

11.    The Plaintiffs knew the explosion was bad.

12.    Bradley threw the throttle down on the boat and the Plaintiffs began to respond to the Mayday call. Plaintiffs were an estimated 15 miles away when they received the mayday call.

13.    It was nighttime, the Plaintiffs were forced to run the Jupiter 31' center console boat on radar.  The Plaintiffs were anxious.

14.    As the Plaintiffs approached the flames and wreckage, they pulled out life jackets, floating pillows, rope, and other supplies that might be used to assist in the rescue of the workers from the water.

15.    The Plaintiffs also put on life jackets because they knew they had to be ready to jump in to help.

16.    It took approximately 20 minutes for the Plaintiffs to arrive at the scene. There were people, life boats, and fiery debris in the water.

17.     The Plaintiffs arrived at a chaotic scene of enormous proportion.  There was no apparent organization, and it was difficult to determine who was in charge.  There was confusion and the Plaintiffs immediately understood the severity of the scene.

18.     The Deepwater Horizon, which was 396 feet in length and 256 feet in breath, was engulfed in a massive firestorm.

19.     Flames blazed on the water's surface and the flames from the rig jumped as high as 500 feet in the air. The heat was intense, and the fire was loud.

20.     Only the supply boat, the Damon B. Bankston, was on scene when the Plaintiffs arrived.  At this time, and for a long time thereafter, this supply boat and the Plaintiffs' Jupiter 31' center console boat were the only two vessels at the incident.

21.     The Plaintiffs saw several injured survivors lying onboard the Damon B. Bankston.  Survivors who needed medical attention.  There were also 5-8 people still in the water at the time they arrived on the scene.  They also recall seeing four or so lifeboats, rescue boats, and people screaming and crying out for help.   Plaintiff Scott particularly remembers one horribly burned survivor pleading for help.

22.     The area surrounding the burning rig had low visibility due to the intense brightness of the fire, yet the Plaintiffs knew people were in the water and that they had to help with the search.

23.     There were subsequent explosions every few minutes on the burning rig.

24.     Plaintiffs believed they were under constant threat of another massive explosion that would send debris towards them and their boat throughout their hours long search and rescue efforts around the Deepwater Horizon.

25.     The Plaintiffs had to navigate their small fishing vessel around floating wreckage from the Deepwater Horizon. The Plaintiffs were forced to use gaffs at times to push fiery debris out of the way of the Ramblin Wreck to search for survivors.

26.     The Plaintiffs were asked to search debris filled water around the rig for missing persons.  Bradley asked how many, and a man responded that around 10 to 15 people were missing.  It was unclear who was accounted for and who was not.

27.     On at least three occasions, one or more of the Plaintiffs saw something floating in the water that could have been a body.  Each time they suspected seeing a body, they would maneuver closer to the rig to get a better look.  Each time it turned out to be debris.

28.     The Plaintiffs were frequently forced to reverse their boat due to the overwhelming heat of the burning rig. Plaintiffs estimate that they were within 100 to 200 feet from the rig at times. There was parts falling from the Deepwater Horizon into the water.  The Plaintiffs' faces were burned, and their hair was singed. The powder coating of the Ramblin Wreck was melted in places.

29.     At some point, the Ramblin Wreck was requested to retrieve an industrial medical kit from a nearby supply boat that could not travel as quickly as Bradley's vessel.

30.     Once they had picked up the medical supplies, the Ramblin Wreck raced back toward the Damon B Bankston.  This time, Bradley pulled up along the starboard side of the supply boat and passed the medical supplies to those onboard.

31.     Scott smashed his hand while holding on to a lifeboat.

32.     Plaintiffs also suffered scratches and bruises when leaning over the rails while mooring to other vessels and passing gear from vessel to vessel.

33.    The Plaintiffs did not have any bumpers to protect their boat from the larger Damon Bankston or the smaller lifeboats, which in turn caused damage to the Ramblin Wreck miles away from land.

34.    The Plaintiffs also provided the medical kits and supplies that were onboard the Ramblin Wreck as well as some water, cokes, and whatever else they could offer.

35.    The scene was chaotic and everyone was in shock.

36.    The Plaintiffs' Ramblin Wreck received a call on the VHF from a vessel called the Cora Lee asking that they investigate what appeared to be a strobe light going off in the distance.  Once the Ramblin Wreck obtained a visual on the light, the Plaintiffs headed in the direction it was coming from.  Bradley tried to find the object on the radar, but he was unable to locate any type of structure in the water.  They drove a few minutes toward the light, but it suddenly quit flashing.  It did not flash again.  Because he thought the light might have been a signal from a survivor, Bradley continued to check the radar.  However, his efforts to locate the source of the light were unsuccessful.

37.    The Plaintiffs continued to make laps around the Deepwater Horizon, but they were unable to locate anyone still in the water.

38.    During the hours-long rescue efforts, the Plaintiffs communicated continually with the Coast Guard on channel 16 in order to relay the messages on channel 68 to the Damon B Bankston (the Coast Guard and the Damon B Bankston were unable to communicate directly).

39.    Throughout the Plaintiffs' search and rescue efforts that night, there were many times when the Plaintiffs felt and heard deep rumbling sounds coming from deep below the surface of the water. These rumblings shook the Ramblin Wreck. The Plaintiffs believed that these rumblings were caused by other explosions and that they were in an immediate risk of

harm.  Although the Plaintiffs were frightened, they continued to circle the rig in hopes they could save others.

40.     As the hours passed, Plaintiffs came to the conclusion that the missing men would likely never be found.

41.     The Plaintiffs continued their rescue efforts for several hours.  By around 3:00 on the morning of April 21, there were approximately 40 boats on the scene and Coast Guard choppers flying overhead.

42.     At this point, the Plaintiffs decided they could be of no further help and their fuel was low.

43.     As the Plaintiffs prepared to leave the scene, personnel on the Damon B Bankston thanked Plaintiffs Bradley, Scott, and Mark for their efforts.  They also instructed the three men to contact BP to let the company know what they had done.  The personnel said BP would want to compensate the Plaintiffs for the medical kit, the fuel, and their efforts following the tragic explosion.

44.      When Plaintiff Mark returned home on April 21, he literally collapsed.  Mark describes the turn of events as his personal 9/11.  After a few days of painful anxiety attacks and recurring images of what he had seen and heard, Mark began taking medication to deal with his symptoms.  To make matters worse, the oil spill resulting from the explosion has destroyed Mark's business for the foreseeable future.  It is hard to describe the stress and depression Plaintiff Mark experiences on a daily and nightly basis.

45.     Upon seeing his wife, Plaintiff Scott broke down in tears and said he would not wish on anyone what he had seen and heard.  It remains difficult for Scott to discuss the details

of what transpired at the Deepwater Horizon.  Plaintiff Scott suffers severe emotional distress, discomfort, and anguish.

46.     When Plaintiff Bradley saw his wife for the first time, he broke down in tears and hugged her for a long time. His three children were home from school, and he also hugged them and told them that he loved them.  Bradley remembers being very emotional, tired, hot, and dirty. He still feared for the missing rig workers.  He knew they were dead but he hoped their bodies would be recovered.  Plaintiff Bradley suffers from severe emotional distress, discomfort and anguish.

47.     Plaintiffs also relayed to BP that the Plaintiffs had extensive videos and dozens of photographs of the accident scene that might help a professional determine what had gone so terribly wrong at the Deepwater Horizon.  Because Plaintiffs thought the videos and photographs might provide some answers about how and why the tragic explosion occurred, he offered to share the materials with BP.

48.      No one from BP ever contacted Plaintiffs, and BP has not offered to pay for the cost of the medical kit, the fuel costs, or in any way compensate the Plaintiffs for their voluntary rescue efforts on the evening of April 20 and the early morning hours of April 21.

49.     Bradley also emailed a representative of Transocean regarding the matter.

50.     No one from Transocean ever responded to the email, and Transocean has not offered to pay for the cost of the medical kit, the fuel costs, or in any way compensate the Plaintiffs for their voluntary rescue efforts on the evening of April 20 and the early morning hours of April 21.

## ALL DEFENDANTS ARE RESPONSIBLE FOR THE EXPLOSION

51.     On April 20, 2010, at approximately 9:45 in the evening, an enormous mass of oil erupted from the wellhead at the Macondo prospect site in the Gulf of Mexico, engulfing the Deepwater Horizon oil rig managed by BP in fire and sinking the rig a day and a half later.  The explosion and fire killed 11 workers, injured 17 others, and led to an uncontrolled and unprecedented oil leak in the Gulf, covering thousands of square miles.

52.     Prior to its destruction, the rig was an ultra-deepwater, dynamic-positioned, semi-submersible oil rig or "ultra-deepwater floater."  It was owned and operated by Transocean and leased to BP through September 2013.

53.     The Deepwater Horizon has a water depth capacity of approximately 10,000 feet and a drilling depth of approximately 30,000 feet.

54.     BP leased the rig to drill an exploratory well at the Macondo prospect site in Mississippi Canyon block 252 ("MC252"), located on the outer continental shelf approximately 130 miles southeast of New Orleans. BP has a 65% interest in MC252.

55.     The defendants BP and Anadarko own the remaining interest in MC252.  At the time of the explosion, drilling was taking place at more than 22,000 feet—2,000 feet deeper than allowed by federal permitting.

56.     The defendant Cameron is a leading provider of flow equipment products, systems, and services to worldwide oil, gas, and process industries.  Cameron manufactured the blowout preventer ("the BOP") on the Deepwater Horizon rig that failed to function correctly.

57.     The BOP is a steel-framed stack of valves, rams, housing, tanks, and hydraulic tubing that is painted industrial yellow and sits atop the oil well.  Approximately 16 feet wide, the BOP sits on the seabed between the well and the pipe that carries oil to the surface, known as

the riser.  The drilling pipe, which comes down from the rig through the riser, is usually about half a foot in diameter and is surrounded inside the well by a larger pipe that forms a permanent casing for the finished well.  Each BOP is configured for a given well.  The BOP for the Deepwater Horizon has a series of five hydraulic rams.  Some are designed to seal the well by clamping around the drill pipe.  According to a report in the New York Times from Saturday, May 1, 2010, when the explosion and fire ripped through the rig on April 20, 2010, workers threw a switch to activate the BOP, which was supposed to seal the well quickly in the event of such a burst of pressure.  According to the report, "[i]t did not work, and the failsafe switch on the device also failed to function."  The report continued with a quote from a person familiar with the effort to activate the BOP, who requested anonymity because he was not authorized to speak on the subject:  "It's a mystery, a huge Apollo 13-type mystery," as to why the blowout preventer did not work.

58.     Halliburton is a leading provider of oilfield technology, including fluid management and technologies to assist in the drilling and construction of oil and gas well. Halliburton was a subcontractor to the Deepwater Horizon rig.

59.     Halliburton was performing cementing operations of the well and well cap which, in the performance of these duties, increased the pressure at the well.  Halliburton's activities contributed to the fire, explosion, and resulting oil spill.

60.     The risks of offshore drilling were well known to the defendants, and are especially high in the Gulf of Mexico, where floating rigs are used, unlike the permanent rigs used in other areas such as the North Sea.  Permanent rigs are anchored to the ocean floor and cannot swing, while floating rigs are far more precarious and subject to serious accidents.

61.    The defendants also knew that the threat of blowouts increases as the drilling depth increases.

62.    A 2004 study by federal regulators showed that blowout preventers may not function in deepwater drilling environments because of the increased force needed to pinch and cut the stronger pipes necessary to drill at such great depths.  The study singled out Cameron, the manufacturer of the Deepwater Horizon's blowout preventer, for relying on faulty calculations to determine the necessary strength for its blowout preventer equipment at greater depths.  This information was known by BP.

63.    The operation of the rig, and particularly the installation of the final cement casing at the wellhead prior to the conclusion of the exploratory phase of the well, was also recklessly carried out by Halliburton and BP.

64.    As the New York Times reported on May 3, 2010:  "More than a half-dozen workers who were on the rig at the time of the explosion told the lawyers that the rig operator had seemed to be rushing to finish and detach from the well—a possible factor that could have contributed to the explosion."  The article went on to say:

> The explosion that sank the drilling rig came less than a day after workers finished pumping concrete into the well, a step toward closing it off temporarily. BP planned to return to the well later to set up a permanent rig and start producing oil. Encasing a well in concrete is one of the most critical aspects of oil drilling, and presents many risks. The concrete involved is highly specialized.  It needs to be blended and stirred properly.  It also must be pumped down into the well so that it comes out the bottom and oozes back up around the well casing, forming a tight seal. The concrete work apparently did not achieve a complete seal, and natural gas started seeping into the well in the late stages, the lawyers said.  But idling a rig to address such a problem can cost huge sums. . . . [L]awyers said that supervisors either missed or ignored the signals and proceeded with the job.

65.     When workers released the last valves that were holding back the natural gas that had built up inside the well, the gas shot up the pipe and sprayed into the drilling rig, igniting the fireball that caused the deaths of 11 workers, injured others and sank the rig."

66.     The New York Times has similarly reported, citing lawyers representing environmental groups, oil rig workers, and commercial fishermen, that:  "At least one worker who was on the oil rig at the time of the explosion on April 20, and who handled company records for BP, said the rig had been drilling deeper than 22,000 feet, even though the company's federal permit allowed it to go only 18,000 to 20,000 feet deep."

67.     The blowout, fire, and explosion on the Deepwater Horizon, as well as its sinking and the resulting calamitous oil leak from the Macondo well, were caused by the combined and concurring negligence of the defendants, which renders them liable, jointly and severally, to the Plaintiffs.

## BP IS A LONG-TIME RECKLESS REFINER

68.     According to the company's website, "BP's commitment to safety begins at the most senior levels of our organization—with robust systems to implement, audit, report on and improve our performance."

69.     When current CEO Tony Hayward took office in 2007, he promised to change BP's corporate culture, with a renewed commitment to safety.  This proved to be a hollow promise.

70.     Despite its self-serving and gratuitous statements about its focus on safety, BP has regularly and routinely placed cost-cutting (and ever more obscene profits) over safety.  These practices culminated in the BP Texas City Refinery explosion that killed 15 people and injured 170 others in 2005.

71.     Only a year later, a leaky BP pipeline in Alaska forced the shutdown of one of the nation's biggest oil fields.  BP was fined $20 million in criminal penalties after prosecutors said the company had neglected corroding pipelines.

72.     The New York Times uncovered documents last fall that BP, four years after the Texas City catastrophe, had still failed to address hundreds of safety hazards at that refinery. That failure prompted the largest fine in the history of OSHA.  However, the fine—which was $87 million—paled in comparison to BP's profits in 2009—which were $17 billion.

73.     During the last three years BP accounted for 97 percent of all flagrant violations found in the refining industry by United States government inspectors.   These included 69 citations for "willful" violations, 760 citations for "egregious, willful" violations (compared with only eight at the two oil companies that tied for second place), and 30 citations for "serious" violations.

74.     OSHA defines a "willful" violation as one "committed with plain indifference to or intentional disregard for employee safety and health."

75.     An "egregious, willful" violation is considered so severe that it can result in a penalty each time a violation occurs, rather than a single penalty for all violations of a regulation.

76.     A "serious" violation is described as one creating a "substantial probability" of death or serious injury.

77.     As set forth herein, BP has a long history of ignoring crucial safety issues related to the operation of offshore submersible rigs such as the Deepwater Horizon rig, including problems with the crucial blowout preventer devices that so spectacularly failed during this tragic disaster.

78.     Despite repeated incidents serving as "red flags" of the possibility of a major explosion and oil spill in the Gulf of Mexico, BP still elected to cut costs, including safety and maintenance expenditures, as they focused on achieving unprecedented profits.

79.     BP also lobbied federal and state authorities to remove or decrease the extent of safety and maintenance regulation of the company's Gulf of Mexico operations.  In doing so,

80.     BP, ignoring clear evidence to the contrary, remarkably claimed that "voluntary compliance" would adequately address safety and environmental concerns.

81.     Shortly after the Deepwater Horizon catastrophe, the Deputy Assistant Secretary of Labor for Occupational Safety and Health stated that "the only thing you can conclude is that BP has a serious, systemic safety problem in their company."

82.     Simply put, the Deepwater Horizon disaster is not an isolated incident.  Rather, it is the result of a corporate culture at BP that values schedule, budget, and profitability more so than employee safety.

## PRIOR PROBLEMS—AND SHORTCUTS—AT THE DEEPWATER HORIZON RIG

83.     There had been numerous prior spills and fires on the Deepwater Horizon rig, which had been issued citations for "acknowledged pollution source" by the United States Coast Guard some 18 times during the last 11 years.  Moreover, the Deepwater Horizon rig experienced many serious incidents in the recent past, including a 2008 incident where 77 persons were evacuated from the rig after it listed over and began to sink after a section of pipe was accidentally removed from the rig's ballast system.

84.     BP's renegade rush to profits also affected the decisions it made regarding the Deepwater Horizon.  For example, one company engineer called it a "nightmare well" a mere six days before it blew on April 20.

85.     Internal company documents warned in advance of the disaster that BP's plan to install a certain type of liner would increase the risk of a blowout and likely violate federal safety regulations.

86.     Additionally, BP consciously and improperly failed to install at least two pieces of back-up safety equipment that would have stopped the leak even without the blowout preventer.

87.     BP deliberately elected not to install an acoustically activated remote-control shut-off valve to the well.  The cost to do so would have been only $500,000.  These acoustic switches are mandated in other countries, such as Brazil and Norway, and are routinely employed by other oil companies, but have not been legally required in the United States because of the lobbying efforts of BP and others.

88.     BP also deliberately chose not to install a deep-water valve that would have been placed approximately 200 feet under the sea floor.  Much like blowout preventers, this deep-water valve could have served as a cutoff of last resort during an explosion.

89.     BP recklessly ignored these precautions despite being acutely aware of the increased risk of deepwater drilling, particularly in a situation involving the failure of the primary blowout safety mechanism.

90.     BP's reckless behavior concerning the Deepwater Horizon rig produced dire results.  Results that easily could have been avoided.

## PARTIES

91.     Plaintiff BRADLEY SHIVERS ("Bradley") is an individual over the age of 19 years and is a resident of the State of Alabama.

92.     Plaintiff MARK MEAD ("Mark") is an individual over the age of 19 years and is a resident of the State of Alabama.

93.     Plaintiff SCOTT RUSSELL ("Scott") is an individual over the age of 19 years and is a resident of the State of Alabama.

94.     Upon information and belief, defendant BP P.L.C. ("BP") is a foreign company with its primary place of business in the United Kingdom. BP will be served in accordance with the Hague Convention or any other lawful means if waiver of service is refused.

95.     Upon information and belief, defendant BP EXPLORATION & PRODUCTION, INC. ("BP Exploration") is a Delaware corporation and may be served at C T Corporation System, 2 North Jackson Street, Suite 605, Montgomery, AL 36104.

96.     Upon information and belief, defendant BP AMERICA, INC. ("BP America") is a Delaware corporation and may be served at C T Corporation System, 2 North Jackson Street, Suite 605, Montgomery, AL 36104.

97.     Upon information and belief, defendant BP PRODUCTS NORTH AMERICA, INC. ("BP Products") is a Maryland corporation and may be served at CSC-Lawyers Incorporating Service, 150 S. Perry Street, Montgomery, AL 36104.

98.     BP P.L.C.; BP EXPLORATION & PRODUCTION, INC.; and BP AMERICA, INC. are collectively referred to as the "BP Defendants."

99.     Upon information and belief, defendant TRITON ASSET LEASING GMBH ("Triton") is a limited liability company organized and existing under the laws of the Swiss Confederation with its principle office in Zug, Switzerland.  Triton will be served in accordance with the Hague Convention or any other lawful means if waiver of service is refused.

100.    Upon information and belief, defendant TRANSOCEAN HOLDINGS LLC ("Transocean Holdings") is a Delaware corporation and may be served at The Corporation Trust Company, Corporation Trust Center 1209 Orange Street Wilmington, DE, 19801.

101.    Upon information and belief, defendant TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC. ("Transocean Offshore") is a Delaware corporation and may be served at The Corporation Trust Company, Corporation Trust Center 1209 Orange Street Wilmington, DE, 19801.

102.    Upon information and belief, defendant TRANSOCEAN DEEPWATER INC. ("Transocean Deepwater") is a Delaware corporation and may be served at The Corporation Trust Company, Corporation Trust Center 1209 Orange Street Wilmington, DE, 19801.

103.    Upon information and belief, defendant TRANSOCEAN LTD. ("Transocean") is a company organized and existing under the laws of the Swiss Confederation with its principle office in Zug, Switzerland. Transocean will be served in accordance with the Hague Convention or any other lawful means if waiver of service is refused.

104.    TRANSOCEAN HOLDINGS LLC; TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC.; TRANSOCEAN DEEPWATER INC.; TRITON; and TRANSOCEAN LTD. are collectively referred to as the "Transocean Defendants."

105.    Upon information and belief, defendant HALLIBURTON ENERGY SERVICES, INC. ("Halliburton") is a Delaware corporation and may be served at The Corporation Trust Company, Corporation Trust Center 1209 Orange Street Wilmington, DE, 19801. HALLIBURTON ENERGY SERVICES, INC. is referred to as the "Halliburton Defendant."

106.    Upon information and belief, defendant CAMERON INTERNATIONAL CORPORATION, F/K/A COOPER CAMERON CORPORATION ("Cameron") is a Delaware

corporation and may be served at The Corporation Trust Company, Corporation Trust Center 1209 Orange Street Wilmington, DE, 19801. CAMERON INTERNATIONAL CORPORATION, F/K/A COOPER CAMERON CORPORATION is referred to as the "Cameron Defendant."

107.    Upon information and belief, defendant ANADARKO PETROLEUM CORPORATION ("Anadarko") is a Delaware corporation and may be served at The Corporation Trust Company, Corporation Trust Center 1209 Orange Street Wilmington, DE, 19801. ANADARKO PETROLEUM CORPORATION is referred to as the "Anadarko Defendant."

## JURISDICTION & VENUE

108.    This Court has subject matter jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 in that complete diversity exists between the Plaintiffs and each of the defendants and the amount in controversy exceeds $75,000.

109.    The Court has personal jurisdiction over each of the defendants because each either does business in Alabama or has sufficient minimum contacts with Alabama to justify this State's exercise of personal jurisdiction over the defendant consistent with the laws of Alabama and the United States Constitution.

110.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred here, and the defendants have received substantial compensation and other transfers of money in this District by doing business here and engaging in activities having an effect here.

## FIRST CAUSE OF ACTION
## NEGLIGENCE

111.    The Plaintiffs incorporate each and every allegation set forth above and incorporate the same herein by reference.

112.    The defendants owed a duty to the Plaintiffs to exercise reasonable care in the design, construction, operation, inspection, training, repair, and maintenance of the Deepwater Horizon oil well.

113.    The defendants had a heightened duty of care to the Plaintiffs because of the known risks and dangers associated with deepwater drilling in the Gulf of Mexico. For instance, defendants recognized the magnitude of the potential harms associated with offshore drilling such a blowout, explosion, and oil spill prior to April 20, 2010.[1]  Moreover, the Macondo well was drilled in deepwater, which made the drilling operation much more dangerous and complicated.  These facts combined with the characteristics of the geological formation into which the Macondo well was drilled added complexity that is not present in all deepwater wells, which was known by the defendants prior to April 20, 2010.  Each of these features increased the chance that a blowout, explosion, and oil spill would occur, which, in turn, further raised the standard of care of the defendants. Furthermore, defendants knew that oil rigs are an attractive location for fisherman due to the marine life around them and that fisherman would be the first responders in the event of an emergency.

114.    According to a trial exhibit in the Phase One Trial, the drilling at the Macondo had many problems prior to April 20, 2010. Some referred to it as the "well from hell."[2]

115.    In the United States District Court For The Eastern District of Louisiana's Finding of Fact and Conclusions of Law for the Phase One Trial, the Court found BP was subject to

---

[1] This is partially reflected in the Minerals Management Service regulations, which required defendants "protect health, safety, property, and the environment by . . . [p]erforming all operations in a safe and workmanlike manner," 30 C.F.R. § 250.107(a), "use the best available and safest technology . . . whenever practical on all exploration, development, and production operations," id. § 250.107(c), "take measures to prevent unauthorized discharge of pollutants into the offshore waters [and] . . . not create conditions that will pose unreasonable risk to public health, life, property, aquatic life, wildlife, [etc.]," id. § 250.3000, and "take necessary precautions to keep wells under control at all times [including] . . . use[ing] the best available and safest drilling technology to monitor and evaluate well conditions and minimize the potential for the well to flow or kick," id. § 250.401.
[2] TREX 3188 at 1 (Bob Kaluza interview notes); Transcript at 3717:12-3718:4 (Keith).

enhanced civil penalties under the Clean Water Act, as the discharge of oil was the result of BP's gross negligence and willful misconduct.[3]

116.    The United States District Court For The Eastern District of Louisiana's Finding of Fact and Conclusions of Law for the Phase One Trial also found BP, Transocean, and Halliburton liable under gender maritime law for the blowout, explosion, and oil spill noting that BP's conduct was reckless, Transocean's conduct was negligent, and Halliburton's conduct was negligent. The Court further noted that BP's conduct warranted the imposition of punitive damages under general maritime law but that BP could not have been held liable for such damages under Fifth Circuit precedent.[4]

117.    The defendants breached their legal duty to the Plaintiffs by failing to exercise reasonable care and acting negligently toward the Plaintiffs in the design, construction, operation, inspection, training, repair and maintenance of the Deepwater Horizon oil well.  The blowout, fire, explosion, and resulting oil leak was caused by the negligence, concurrent and otherwise, of the defendants.

118.    The defendants knew or should have known that their negligent conduct would foreseeably result in the catastrophic event that occurred on April 20, 2010.

119.    It was, or should have been, reasonably foreseeable to the defendants that their negligent conduct would place the Plaintiffs at risk of physical injury.

120.    As a result of the defendants' negligent conduct, the Plaintiffs were in fact placed at risk of physical injury and have suffered same.

121.    As a result of the defendants' negligent conduct, the Plaintiffs in fact suffered emotional distress, anguish, stress, and physical manifestations of same.

---

[3] Rec. Doc. 13381 at ¶ 611, 21 F. Supp. 3d 657 (E.D. La. 2014).
[4] Rec. Doc. 13381 at ¶ 612-13, 21 F. Supp. 3d 657 (E.D. La. 2014).

122.    The defendants knew, or should have known, that the Plaintiffs would suffer emotional distress as a result of their negligent conduct.

123.    The defendants' conduct was extreme and outrageous.

124.    The defendants' conduct caused emotional distress so severe that no reasonable person could be expected to endure it.

125.    The defendants consciously and deliberately engaged in negligent conduct, that is, conduct carried on with a reckless or conscious disregard of the rights and safety of others, including the rights and safety of the Plaintiffs.

126.    The Plaintiffs are entitled to a judgment finding the defendants liable to the Plaintiffs for damages suffered as a result of the defendants' negligence and awarding the Plaintiffs adequate compensation in amounts determined by the trier of fact.

**SECOND CAUSE OF ACTION**
**WANTONNESS, RECKLESSNESS, WILLFUL DISREGARD,**
**AND GROSS NEGLIGENCE**

127.    The Plaintiffs incorporate each and every allegation set forth above and incorporate the same herein by reference.

128.    The defendants owed a duty to the Plaintiffs to exercise reasonable care in the design, construction, operation, inspection, training, repair, and maintenance of the Deepwater Horizon oil well.

129.    The defendants had a heightened duty of care to the Plaintiffs because of the known risks and dangers associated with deepwater drilling in the Gulf of Mexico. For instance, defendants recognized the magnitude of the potential harms associated with offshore drilling such a blowout, explosion, and oil spill prior to April 20, 2010.[5]  Moreover, the Macondo well

---

[5] This is partially reflected in the Minerals Management Service regulations, which required defendants "protect health, safety, property, and the environment by . . . [p]erforming all operations in a safe and workmanlike manner,"

was drilled in deepwater, which made the drilling operation much more dangerous and complicated.  These facts combined with the characteristics of the geological formation into which the Macondo well was drilled added complexity that is not present in all deepwater wells, which was known by the defendants prior to April 20, 2010.  Each of these features increased the chance that a blowout, explosion, and oil spill would occur, which, in turn, further raised the standard of care of the defendants. Furthermore, defendants knew that oil rigs are an attractive location for fisherman due to the marine life around them and that fisherman would be the first responders in the event of an emergency.

130.    According to a trial exhibit in the Phase One Trial, the drilling at the Macondo had many problems prior to April 20, 2010. Some referred to it as the "well from hell."[6]

131.    In the United States District Court For The Eastern District of Louisiana's Finding of Fact and Conclusions of Law for the Phase One Trial, the Court found BP was subject to enhanced civil penalties under the Clean Water Act, as the discharge of oil was the result of BP's gross negligence and willful misconduct.[7]

132.    The United States District Court For The Eastern District of Louisiana's Finding of Fact and Conclusions of Law for the Phase One Trial also found BP, Transocean, and Halliburton liable under gender maritime law for the blowout, explosion, and oil spill noting that BP's conduct was reckless, Transocean's conduct was negligent, and Halliburton's conduct was negligent. The Court further noted that BP's conduct warranted the imposition of punitive

---

30 C.F.R. § 250.107(a), "use the best available and safest technology . . . whenever practical on all exploration, development, and production operations," id. § 250.107(c), "take measures to prevent unauthorized discharge of pollutants into the offshore waters [and] . . . not create conditions that will pose unreasonable risk to public health, life, property, aquatic life, wildlife, [etc.]," id. § 250.3000, and "take necessary precautions to keep wells under control at all times [including] . . . use[ing] the best available and safest drilling technology to monitor and evaluate well conditions and minimize the potential for the well to flow or kick," id. § 250.401.
[6] TREX 3188 at 1 (Bob Kaluza interview notes); Transcript at 3717:12-3718:4 (Keith).
[7] Rec. Doc. 13381 at ¶ 611, 21 F. Supp. 3d 657 (E.D. La. 2014).

damages under general maritime law but that BP could not have been held liable for such damages under Fifth Circuit precedent.[8]

133.    The defendants breached their legal duty to the Plaintiffs by failing to exercise reasonable care and acting with reckless, willful, grossly negligent, and wanton disregard for the Plaintiffs in the design, construction, operation, inspection, training, repair and maintenance of the Deepwater Horizon oil well.  The blowout, fire, explosion, and resulting oil leak was caused by the concurrent negligence of the defendants.

134.    The defendants knew or should have known that their negligent, willful, wanton, grossly negligent, and reckless conduct would foreseeably result in the catastrophic event that occurred on April 20, 2010.

135.    It was, or should have been, reasonably foreseeable to the defendants that their willful, wanton, and reckless conduct would place the Plaintiffs at risk of physical injury.

136.    As a result of the defendants' willful, wanton, grossly negligent and reckless conduct, the Plaintiffs were in fact placed at risk of physical injury.

137.    As a result of the defendants' willful, wanton, grossly negligent and reckless conduct, the Plaintiffs in fact suffered emotional distress and other types of injury.

138.    The defendants knew, or should have known, that the Plaintiffs would suffer emotional distress as a result of their willful, wanton, and reckless conduct.

139.    The defendants' conduct was extreme and outrageous.

140.    The defendants' conduct caused emotional distress so severe that no reasonable person could be expected to endure it.

---

[8] Rec. Doc. 13381 at ¶ 612-13, 21 F. Supp. 3d 657 (E.D. La. 2014).

141.    The defendants consciously and deliberately engaged in wanton conduct, that is, conduct carried on with a reckless or conscious disregard of the rights and safety of others, including the rights and safety of the Plaintiffs.

142.    The Plaintiffs are entitled to a judgment finding the defendants liable to the Plaintiffs for damages suffered as a result of the defendants' wanton, reckless, willful disregard and grossly negligent conduct and awarding the Plaintiffs adequate compensation and punitive damages in amounts determined by the trier of fact.

**THIRD CAUSE OF ACTION**
**INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS**

143.    The Plaintiffs incorporate each and every allegation set forth above and incorporate the same herein by reference.

144.    The defendants owed a duty to the Plaintiffs to exercise reasonable care in the design, construction, operation, inspection, training, repair, and maintenance of the Deepwater Horizon oil well.

145.    The defendants had a heightened duty of care to the Plaintiffs because of the known risks and dangers associated with deepwater drilling in the Gulf of Mexico.  For instance, defendants recognized the magnitude of the potential harms associated with offshore drilling such a blowout, explosion, and oil spill prior to April 20, 2010.[9]  Moreover, the Macondo well was drilled in deepwater, which made the drilling operation much more dangerous and complicated.  These facts combined with the characteristics of the geological formation into

---

[9] This is partially reflected in the Minerals Management Service regulations, which required defendants "protect health, safety, property, and the environment by . . . [p]erforming all operations in a safe and workmanlike manner," 30 C.F.R. § 250.107(a), "use the best available and safest technology . . . whenever practical on all exploration, development, and production operations," id. § 250.107(c), "take measures to prevent unauthorized discharge of pollutants into the offshore waters [and] . . . not create conditions that will pose unreasonable risk to public health, life, property, aquatic life, wildlife, [etc.]," id. § 250.3000, and "take necessary precautions to keep wells under control at all times [including] . . . use[ing] the best available and safest drilling technology to monitor and evaluate well conditions and minimize the potential for the well to flow or kick," id. § 250.401.

which the Macondo well was drilled added complexity that is not present in all deepwater wells, which was known by the defendants prior to April 20, 2010.  Each of these features increased the chance that a blowout, explosion, and oil spill would occur, which, in turn, further raised the standard of care of the defendants. Furthermore, defendants knew that oil rigs are an attractive location for fisherman due to the marine life around them and that fisherman would be the first responders in the event of an emergency.

146.    According to a trial exhibit in the Phase One Trial, the drilling at the Macondo had many problems prior to April 20, 2010. Some referred to it as the "well from hell."[10]

147.    In the United States District Court For The Eastern District of Louisiana's Finding of Fact and Conclusions of Law for the Phase One Trial, the Court found BP was subject to enhanced civil penalties under the Clean Water Act, as the discharge of oil was the result of BP's gross negligence and willful misconduct.[11]

148.    The United States District Court For The Eastern District of Louisiana's Finding of Fact and Conclusions of Law for the Phase One Trial also found BP, Transocean, and Halliburton liable under gender maritime law for the blowout, explosion, and oil spill noting that BP's conduct was reckless, Transocean's conduct was negligent, and Halliburton's conduct was negligent. The Court further noted that BP's conduct warranted the imposition of punitive damages under general maritime law but that BP could not have been held liable for such damages under Fifth Circuit precedent.[12]

149.    The defendants breached their legal duty to the Plaintiffs by failing to exercise reasonable care and acting with intentional, reckless, willful, and wanton disregard for the Plaintiffs in the design, construction, operation, inspection, training, repair and maintenance of

[10] TREX 3188 at 1 (Bob Kaluza interview notes); Transcript at 3717:12-3718:4 (Keith).
[11] Rec. Doc. 13381 at ¶ 611, 21 F. Supp. 3d 657 (E.D. La. 2014).
[12] Rec. Doc. 13381 at ¶ 612-13, 21 F. Supp. 3d 657 (E.D. La. 2014).

the Deepwater Horizon oil well. The blowout, fire, explosion, and resulting oil leak was caused by the concurrent negligence of the defendants.

150.    The defendants knew or should have known that their intentional, willful, wanton, and reckless conduct would foreseeably result in the catastrophic event that occurred on April 20, 2010.

151.    It was, or should have been, reasonably foreseeable to the defendants that their intentional, willful, wanton, and reckless conduct would place the Plaintiffs at risk of physical injury.

152.    As a result of the defendants' intentional, willful, wanton, and reckless conduct, the Plaintiffs were in fact placed at risk of physical injury and defendants knew that severe emotional distress would occur and was substantially likely to occur because of their conduct.

153.    As a result of the defendants' intentional, willful, wanton, and reckless conduct, the Plaintiffs in fact suffered severe emotional distress and other types of injury.

154.    The defendants knew, or should have known, that the Plaintiffs would suffer severe emotional distress as a result of their willful, wanton, and reckless conduct.

155.    The defendants' conduct was extreme and outrageous.

156.    The defendants' conduct caused severe emotional distress so severe that no reasonable person could be expected to endure it.

157.    The defendants consciously and deliberately engaged in wanton conduct, that is, conduct carried on with a reckless or conscious disregard of the rights and safety of others, including the rights and safety of the Plaintiffs. The defendants have a pattern and practice of such conduct.

158.    The Plaintiffs are entitled to a judgment finding the defendants liable to the Plaintiffs for damages suffered as a result of the defendants' intentional and reckless infliction of emotional distress, and awarding the Plaintiffs adequate compensation and punitive damages in amounts determined by the trier of fact.

## PRAYER FOR RELIEF

159.    WHEREFORE, the Plaintiffs demand judgment against the defendants, jointly and severally, as follows:

Compensatory damages, including but not limited to special damages for emotional distress and anguish, in an amount to be determined at trial;

Punitive damages;

Pre-judgment and post-judgment interest at the maximum rate allowable by law;

Attorney's fees and costs;

Such other and further relief available and any relief the Court deems just and appropriate.

Dated: February 18, 2020

/s/ Rhon E. Jones_____
Rhon E. Jones, Esq. (ASB-7747-E52R)
William R. Sutton, Esq. (ASB-3903-L74S)
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, Alabama 36104
(800) 898-2034
William.sutton@beasleyallen.com

/s/ Adam M. Milam_____
ADAM M. MILAM, Esq. (MILAA2597)
MILAM & MILAM, LLC
2206 Main Street
Daphne, AL 36526
(251) 928-0191
amilam@milam-law.com
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing *Plaintiffs First Amended Complaint* has been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 18th day of February, 2020.

/s/Rhon E. Jones
Rhon E. Jones