**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: )<br>OIL SPILL BY THE OIL RIG )<br>"DEEPWATER HORIZON" IN THE )<br>GULF OF MEXICO ON APRIL 20, 2010 )<br>)<br>THIS DOCUMENT RELATES: )<br>)<br>Bradley Shivers, et al v. BP, PLC, et al )<br>Case No. 2:10-cv-03261 ) | MDL Docket No. 2179 |

**PLAINTIFFS' RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Plaintiffs Bradley Shiver, Scott Russell, and Mark Mead (collectively "Plaintiffs") file this Response and Memorandum of Law in Opposition to Defendants' Motion to Dismiss, and memorandum in support thereof (Rec. Docs. 26365, 26365-1) ("Mot." and "Mem."), Plaintiffs' First Amended Complaint (Rec. Doc. 26329) ("FAC").

**I.   BACKGROUND**

On Tuesday, April 20, Bradley Shivers, Scott Russell, and Mark Mead set out for a 36-hour fishing trip. FAC ¶ 1. At around 9:45 p.m. that evening, Mr. Shivers observed a distant light. *Id.* ¶ 7. Mr. Shivers viewed the light through his binoculars and saw that it appeared to be an oil rig that was on fire. *Id*. Mr. Shivers turned on the vessel's VHF whereupon he and Plaintiffs Mead and Russell heard a woman's voice over channel 16 of the vessel's VHF calling for help and stating that they were abandoning the rig. *Id*. ¶ 8. Plaintiffs then heard and felt a concussion from an explosion. *Id*. ¶ 9. The shockwave from the explosion hit each Plaintiff and shook the boat. *Id*. ¶ 10. The Plaintiffs immediately responded to the mayday call. *Id*. ¶ 12.

When Plaintiffs arrived at the scene, there were people, life boats, and fiery debris in the water. *Id.* ¶ 16. Plaintiffs found a chaotic scene. *Id.* ¶ 17. The Deepwater Horizon, which was 396 feet in length and 256 feet in breath, was engulfed in a massive firestorm. *Id.* ¶ 18. Flames blazed on the water's surface and the flames from the rig jumped as high as 500 feet in the air. The heat was intense, and the fire was loud. *Id.* ¶ 19. Only the supply boat, the Damon B. Bankston, was on scene when the Plaintiffs arrived. At this time, and for a long time thereafter, this supply boat and the Plaintiffs' Jupiter 31' center console boat were the only two vessels at the incident. *Id.* ¶ 20.

The area surrounding the burning rig had low visibility due to the intense brightness of the fire, yet the Plaintiffs knew people were in the water and that they had to help with the search. *Id.* ¶ 22. There were subsequent explosions every few minutes on the burning rig. *Id.* ¶ 23. Plaintiffs believed they were under constant threat of another massive explosion that would send debris towards them and their boat throughout their hours long search and rescue efforts around the Deepwater Horizon. *Id.* ¶ 24. The Plaintiffs had to navigate their small fishing vessel around floating wreckage from the Deepwater Horizon. The Plaintiffs were forced to use gaffs at times to push fiery debris out of the way of the Ramblin Wreck to search for survivors. *Id.* ¶ 25.

Plaintiffs searched around the burning rig in the debris filled water for 10-15 missing persons. *Id.* ¶ 26. The Plaintiffs were frequently forced to reverse their boat due to the overwhelming heat of the burning rig. Plaintiffs estimate that they were within 100 to 200 feet from the rig at times. There were parts falling from the Deepwater Horizon into the water. The Plaintiffs' faces were burned, and their hair was singed. The powder coating of the Ramblin Wreck was melted in places. *Id.* ¶ 28. Scott smashed his hand while holding on to a lifeboat. *Id.* ¶ 31. Plaintiffs also suffered scratches and bruises when leaning over the rails while mooring to other vessels and passing gear from vessel to vessel. *Id.* ¶ 32. The Plaintiffs did not have any bumpers to

protect their boat from the larger Damon Bankston or the smaller lifeboats, which in turn caused damage to the Ramblin Wreck miles away from land. *Id*. ¶ 33.

Plaintiffs continued searching for hours by making laps around the burning Deepwater Horizon. *Id*. ¶¶ 37-38. Throughout the night, Plaintiffs repeatedly felt and heard deep rumbling sounds coming from below the surface of the water that shook the Ramblin Wreck. *Id*. ¶ 39. The Plaintiffs believed that these rumblings were caused by other explosions and that they were in an immediate risk of harm. Although the Plaintiffs were frightened, they continued to circle the rig in hopes they could save others. *Id*. ¶ 39. Eventually, after hours passed, the Plaintiffs concluded that the missing men would likely never be found. *Id*. ¶ 40. By around 3:00 on the morning of April 21, there were approximately 40 boats on the scene and the Coast Guard choppers flying overhead. *Id*. ¶ 41. Plaintiffs concluded that they could be of no further help and returned home. *Id*. ¶ 42-43.

Upon returning home on April 21, Plaintiff Mark Mead collapsed. *Id*. ¶ 44. Plaintiff Mark Mead experienced days of painful anxiety attacks and recurring images of what he had seen and heard. *Id*. Mr. Mead continued to experience stress and depression following the incident. *Id*. Plaintiff Scott Russell broke down in tears when he saw his wife. *Id*. ¶ 45. Mr. Russell suffers from severe emotional distress, discomfort, and anguish. *Id*. Plaintiff Bradley Shivers also broke down in tears when he saw his wife. *Id*. ¶ 46. Mr. Shivers suffers from severe emotional distress, discomfort, and anguish. *Id*. ¶

On July 20, 2010, Plaintiffs Bradley Shivers, Mark Mead, and Scott Russell filed their original Complaint for their personal injuries suffered as first responders to the Deepwater Horizon explosion and fire. Plaintiffs alleged three causes of action against Defendants: 1) negligence; 2) wantonness, recklessness, willful disregard, and gross negligence; 3) intentional

3

or reckless infliction of emotional distress. *See* Complaint (Case No. 10-03261, Rec. Doc. 1) ("Original Complaint") ¶¶ 108, 121, 134.

On August 10, 2018, the Defendants moved to dismiss Plaintiffs' complaint, arguing that it failed to state a claim on which relief could be granted. *See* Defendants' Motion to Dismiss for Failure to State a Claim (Rec. Doc. 24736). This Court dismissed the Original Complaint, but gave Plaintiffs seven days to amend. *See* Order & Reasons at 15 (Rec. Doc. 26318). Plaintiffs filed their First Amended Complaint on February 18, 2020, asserting additional factual allegations to cure the deficiencies noted in this Court's Order & Reasons. On March 3, 2020, Defendants filed their second motion to dismiss for failure to state a claim upon which relief could be granted.

## II.  LEGAL STANDARD

Defendants have moved to dismiss Plaintiffs' FAC for failure to state a claim. Rule 12(b)(6) motions to dismiss should be denied as long as a complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). Determining whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)). The Court's task is to determine whether the Plaintiffs have stated legally cognizable claims that are plausible, not to evaluate the Plaintiffs' likelihood of success. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Iqbal, 556* at 678).

## III.  ARGUMENT

There are two core issues raised by the Defendants. The first issue is whether Plaintiffs' FAC contains factual allegations that plausibly satisfy one of the "tests" or "rules" for negligent infliction of emotional distress (NIED). The second issue is whether Plaintiffs' FAC contains factual allegations that plausibly establish a claim for intentional infliction of emotional distress (IIED), particularly the third element of IIED, which requires the Plaintiffs to show that the defendant intended, by performing the acts complained of, to inflict severe emotional distress on plaintiff, or that defendant knew that such severe emotional distress would be certain or substantially certain to result from the conduct. *See Deus v. Allstate Insurance Co.*, 15 F.3d 506, 514 (5th Cir. 1994); see also Restatement (Second) of Torts § 46 (1965) ("one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress ..."). As discussed in more detail herein, Plaintiffs' FAC cures each deficiency noted in this Court's order dismissing Plaintiffs' original complaint. The FAC contains factual allegations that plausibly satisfy both the "zone of danger" test as well as the "physical injury or impact" test regarding the issues raised by the Defendants with respect to the NIED claims. Plaintiffs' FAC also contains factual allegations sufficiently stating a claim for IIED. Defendants' primary argument is that Plaintiffs were approximately 15 miles away at the time of the initial explosion at the Deepwater Horizon. That is not the basis of Plaintiffs claims, and is not the substantive issue.

**A. Plaintiffs' FAC Satisfies both the Zone of Danger Test and the Physical Injury or Impact Test.**

To state a claim for NIED, Plaintiffs must allege "mental or emotional harm (such as fright or anxiety) that is caused by another's negligence and that is not directly brought about by a physical injury, but that may manifest itself in physical symptoms."

*Gottshall*, 512 U.S. 532, 533 (1994)). Plaintiffs may recover for emotional injuries when they "sustain a physical impact as a result of a defendant's negligent conduct, or … are placed in an immediate risk of physical harm by that conduct. *Id.* at 547-48. The first test is the "physical injury or impact rule." *Id.* at 547. The second test is referred to as the "zone of danger" test. *Id.* As a threshold matter, this Court previously held that the zone of danger test applies to negligent infliction of emotional distress claims. Order & Reasons at 7.

### 1. Plaintiffs FAC demonstrates that they were objectively in the zone of danger.

To satisfy the zone of danger test, the plaintiff must be in "immediate risk of physical harm." *Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 224-25 (5th Cir. 2013). "[T]he plaintiff must, objectively, be within a <u>fact-particular</u> zone of danger." See *Anselmi v. Penrod Drilling Corp.*, 813 F. Supp. 436, 442 (E.D. La. 1993) (emphasis added). Moreover, the plaintiff must also subjectively believe that he is in immediate risk of physical harm. *See, e.g.*, *Gaston v. Flowers Transp.*, 866 F.2d 816, 820 (5th Cir. 1989) ("Neither [Gaston's] deposition nor his answers to interrogatories indicate that he was concerned that *he* might be harmed when James was caught between the barges." (emphasis in original)). Finally, the plaintiff must show that he or she was "threatened with physical harm as a consequence of the defendant's negligence." *Plaisance v. Texaco, Inc.*, 937 F.2d 1004, 1009 (5th Cir. 1991). With these requirements in mind, this Court has consistently acknowledged the importance of rescuers such as the Plaintiffs. "When the rescuer acts from motives of altruism, and risks himself to save another, the risk of his harm falls on the tortfeasor who created the peril." *Carter v. Taylor Diving & Salvage Co.*, 341 F.Supp. 628, 630 (E.D.La.1972) (citing *Restatement (Second) of Torts* § 449(c) (1965)). "A rescuer, such as [the plaintiff] here, is favored in the eyes of the law and one acting in an emergency to rescue the life of another from imminent peril is not chargeable with negligence

6

merely because he failed to make the wisest choice to accomplish the purpose" *Grigsby v. Coastal Marine Serv. Of Tex., Inc.*, 235 F.Supp. 97, 109 (D.C.La.1964).

Defendants argue that Plaintiffs have not pled facts to permit an inference that they were objectively within the zone of danger at any point.[1] Despite Defendants arguments regarding the objective prong, the factual allegations in the FAC demonstrate that Plaintiffs faced "immediate risk of physical harm" as contemplated under Fifth Circuit precedent. *Barker*, 713 F.3d at 224-25 (citing *Gottshall*, 512 U.S. at 548). For instance, the Eastern District of Louisiana applied the zone of danger test to a crane operator's claim for emotional distress damages after the rig upon which he was working caught fire. *Anselmi*, 813 F. Supp. at 442 (analyzing *Hagerty v. L & L Marine Serves, Inc.*, 788 F.2d 315 (5th Cir. 1986); *Gaston v. Flowers Transp.*, 866 F.2d 816 (5th Cir. 1989); *Ainsworth v. Penrod Drilling Corp.*, 972 F.2d 546 (5th Cir. 1992); *Plaisance v. Texaco, Inc.*, 966 F.2d 166 (5th Cir. 1992)). The court denied the defendant's <u>motion for summary judgment</u>, holding that whether the crane operator was within the zone of danger and whether his emotional injuries were reasonably foreseeable were questions of fact for the jury to decide. *Anselmi*, 813 F. Supp. at 442 (emphasis added).

Here, at the motion to dismiss stage, Plaintiffs' FAC contains sufficient factual allegations providing context that supports reasonable inferences that those fears were objectively warranted. The crux of these factual allegations is that Plaintiffs' "believed they were under constant threat of another massive explosion that would send debris towards them and their boat through their hours long search and rescue efforts around the Deepwater Horizon." FAC ¶ 24. A reasonable inference is that such another large explosion could have sunk Plaintiffs boat or caused severe injuries and/or death. This is supported by the fact that Plaintiffs alleged

---

[1] Defendants do not appear to argue in their motion or memorandum that Plaintiffs failed to allege facts that plausibly satisfy the subjective prong of the zone of danger test.

7

that they "heard and felt a concussive sonic boom explosion" and "[t]he shockwave from the explosion hit each Plaintiff and shook the boat" when they were miles from the initial explosion at the Deepwater Horizon. FAC ¶¶ 9-10. Plaintiffs' FAC also contained the following factual allegations:

- The incident occurred at night. FAC ¶ 13.

- Plaintiffs were on a small 31' center console boat. FAC ¶ 3.

- Plaintiffs "put on lifejackets because they knew they had to be ready to jump in [the water] to help." FAC ¶ 14.

- There was fiery debris in the water. FAC ¶ 16.

- The Deepwater Horizon was engulfed in a massive firestorm. FAC ¶ 18.

- "Flames blazed on the water's surface and the flames from the rig jumped as high as 500 feet in the air." FAC ¶ 19.

- "The area surrounding the burning rig had low visibility due to the intense brightness of the fire." FAC ¶ 22.

- "There were subsequent explosions every few minutes on the burning rig." FAC ¶ 23.

- Plaintiffs had to "navigate their small fishing vessel around floating wreckage from the Deepwater Horizon" and had to use gaffs to push burning debris out of the way. FAC ¶ 25.

- Plaintiffs were "asked to search debris filled water around the rig for missing persons." FAC ¶ 26.

- Plaintiffs were "frequently forced to reverse their boat due to the overwhelming heat of the burning rig," "the Plaintiffs' faces were burned, and their hair was

- singed," and "[t]he powder coating of the Rambling Wreck was melted in places." FAC ¶ 27.

- Plaintiffs "did not have any bumpers to protect their boat from the larger Damon Bankston or the smaller lifeboats, which in turn caused damage to the Ramblin Wreck." FAC ¶ 33.

- Parts of the rig were falling and continued into the water around them. FAC ¶ 33.

- "The scene was chaotic and everyone was in shock" FAC ¶ 35.

- "Throughout the Plaintiffs' search and rescue efforts that night, there were many times when the Plaintiffs felt and hear deep rumbling sounds coming from deep below the surface of the water. These rumblings shook the Ramblin Wreck. The plaintiffs believed that these rumbling were caused by other explosions and that they were in an immediate risk of harm." FAC ¶ 39.

- The Plaintiffs continued their rescue efforts for several hours. FAC ¶ 41.

Together, these factual allegations provide the Court with the context to draw a reasonable inference that Plaintiffs faced an "immediate risk of physical harm" during their search and rescue efforts as the first responders and that the zone of danger did not begin and end with the initial explosion at the Deepwater Horizon. It is not the initial explosion that matters, the Defendants cannot ignore and must address the entire situation.

Defendants largely frame their arguments on a single factor: the distance between the initial explosion of the Deepwater Horizon and the Plaintiffs. These arguments ignore the "fact-particular zone of danger" analysis established in the Fifth Circuit precedent and applied in each case cited by the Defendants in their argument. *Anselmi* at 442. Put simply, distance is only one of several factors to be considered in analyzing the fact-particular zone of danger in each case.

9

For example, Defendants cite to the *Ainsworth* case where the plaintiff witnessed a helicopter crash from the control room, which occurred approximately 100 feet away from the control room and was separated from the helicopter by bow leg of the rig. 972 F.2d at 548. Defendants' emphasized the Court's holding was in part due to the fact the plaintiff was "separated from the crash by 100 feet and the bow leg of the rig." Mem. at 5. However, the *Ainsworth* holding was also based in part on the plaintiff's deposition testimony that he knew the helicopter would not crash into the control room and his admission that he did fear for his life as a result of the crash itself. *Ainsworth* at 548. Thus, he failed the objective and subjective prongs of the zone of danger test. Unlike *Ainsworth*, the present case is at the motion to dismiss stage and the FAC does not contain factual allegations that the Plaintiffs were protected by a control room or bow leg or some other equivalent during their search and rescue efforts surrounding the Deepwater Horizon. Nor are there any factual allegations in the FAC that the Plaintiffs knew or had objective reasons to know they would not be harmed during their search and rescue efforts. Instead, the FAC contains factual allegations that are just the opposite, *supra*. FAC ¶¶ 3-41.

Defendants also point to *Anselmi* to suggest that Plaintiffs in the present case needed to have been within 50-75 feet of the Deepwater Horizon's <u>initial</u> explosion to be within the zone of danger. In *Anselmi*, the Eastern District of Louisiana applied the zone of danger test to a crane operator's claim for emotional distress damages after the rig upon which he was working caught fire. *Anselmi*, 813 F. Supp. at 442. The court denied the defendant's motion for summary judgment, holding that whether the crane operator was within the zone of danger and whether his emotional injuries were reasonably foreseeable were questions of fact for the jury to decide. *Id.* at 442–43. The court reasoned in part that the crane operator "felt the impact of the explosion and was within fifty to seventy-five feet of flames." *Id.* at 442. The Court also focused on various

case specific facts for the jury to weigh in determining whether a plaintiff is within the zone of danger such as: "a jackup rig is an isolated, self-supporting unit;" "[t]he plaintiff could not easily flee the scene;" and "it was several hours before he was able to leave the rig." *Id*.

Defendants similarly cite *SCF Waxler Marine LLC v. M/V ARIS T* Civil Action No. 16-902 c/w, 2019 WL 6174981 (E.D.La., 2019). In this case the Eastern District of Louisiana held that a plaintiff who did not see or hear the vessel collisions could not recover for his alleged emotional injury under a zone of danger theory and in reaching this holding the Court analyzed several factors. *Id*. at *38-39. Defendants' memorandum summarized this holding as being based on distance and time. However, the Court noted the following in its conclusions of law: that neither the plaintiff nor the dock on which he was standing was impacted by any of the vessels; the plaintiff did not feel or hear the impact of the collision; the vessel did not strike, and was never in danger of striking, the dock where the plaintiff was located; the vessel was traveling at a slow rate of speed by the time it passed the plaintiff; the vessel was in the middle of the river under the assistance of tugs by the time it passed the plaintiff; and the vessel was moving away from the dock where plaintiff was located when it passed. *Id*. at *38-39. Moreover, the Court found that the plaintiff's testimony about the incident was not credible and therefore discounted it in material respects. *Id*. at *39. Here, the totality of the scene at and surrounding the Deepwater Horizon should be considered by the Court.

Other courts outside the Fifth Circuit have had to the opportunity to examine the zone of danger test and those cases provide instructional guidance here. In *Twyman v. Carnival Corporation*, 410 F.Supp.3d 1311 (S.D. Fla. 2019), the father of deceased cruise ship passenger adequately alleged that he was in zone of danger with regards to his NIED claim. The case involved a personal watercraft accident where the father alleged that he was in the immediate

11

area and <u>entered water following the collision</u>, that he feared being struck by other personal watercraft and/or other watercraft traveling in vicinity of passenger's unresponsive body when father tried to rescue the passenger, that he feared drowning as he struggled to lift passenger's unresponsive body out of water and onto personal watercraft in order to seek medical assistance, and that he experienced various physical manifestations of his emotional distress. *Id*. at 1325.

In *Destefano v. Children's Nat. Medical Center*, the District of Columbia Court of Appeals examined whether the plaintiff was initially in the zone of danger and then whether she was later in the zone of danger when she attempted to rescue her child. 121 A.3d 59, 68 (D.C.2015). The court recognized that a plaintiff can bring themselves into the zone of danger after another has been injured under the "rescue doctrine." *Id*. at 71. This is analogous to what happened in the present case when the Plaintiffs responded to the mayday call from the Deepwater Horizion. The *Destefano* Court further noted that a vast majority of jurisdictions acknowledge "that 'it is commendable to save life,' and that therefore 'a person who endeavors to avert the consequences of the negligence of another person, by an act which is dangerous but not reckless, is not precluded from recovering damages for injury suffered as a consequence of having interposed'" and ultimately adopted the rescue doctrine *Id*. at 71 (D.C.,2015) (citing *Scott v. John H. Hampshire, Inc.*, 227 A.2d 751, 753 (1967), superseded on other grounds by rule); see also *H.D.W., Annotation, Liability for death of, or injury to, one seeking to rescue another*, 158 A.L.R. 189 (2015) (citing cases from forty-three states discussing aspects of the rescue doctrine). The *Destefano* Court held that "plaintiffs who enter the zone of danger in a rescue attempt may recover damages for mental distress, as long as they feared for their own safety, because of the defendant's negligence, while in the zone of danger." *Destefano* at 72.

Fifth Circuit case law makes an important distinction between a mere bystander and someone in the zone of danger, *e.g.*, "a bystander cannot recover merely for witnessing harm to another where the bystander suffered no harm or threat of harm." *Barker*, 713 F.3d at 224 (citing *Gaston,* 866 F.2d at 818–20) (emphasis added). The factual allegations in the FAC show that the Plaintiffs are not mere bystanders and are more akin to the type of rescuers discussed in *Twyman* and *Destefano* above when they entered the zone of danger surrounding the Deepwater Horizon.

### 2. Plaintiffs experienced injuries that satisfy the physical impact or injury rule.

Alternatively, Plaintiffs' FAC contains factual allegations that plausibly satisfy the "physical injury or impact rule." To satisfy the physical injury or impact rule set forth in *Gottshall* the plaintiffs "must have contemporaneously sustained a physical impact (no matter how slight) or injury due to the defendant's conduct." *Gottshall*, 512 U.S. at 547. However, under Fifth Circuit case law, "trivial physical injuries" alone, such as a single bruised elbow, do not support recovery for emotional distress. *See*, *e.g.*, *Gaston,* F.2d at 817. Similalry, in *Ainsworth*, the record showed that "Mr. Ainsworth suffered no physical contact or impact...any physical injuries that Mr. Ainsworth may have experienced, for example, an upset stomach, headaches, or a pulled muscle, are trivial and do not support recovery." 972 F.2d at 547 (emphasis added).

On the other hand, in *Gough*, the Fifth Circuit applied the physical injury or physical impact rule in favor of a captain of a fishing vessel for his emotional injuries after the vessel collided with an exposed natural gas pipeline, causing a fire on the vessel. *Gough v. Natural Gas Pipeline Co. of America*, 996 F.2d 763, 766 (5th Cir.1993). The Court reasoned that the captain jumped overboard in the Gulf of Mexico to avoid the flames and that the heat from the fire was unbearable even under the water. *Id*. The court further considered evidence that the captain suffered from minor burns, inhaled fumes from the fire, and suffered multiple bruises. *Id*. Similar

13

to *Gough*, the Plaintiffs in the present case were close enough to the Deepwater Horizon that their faces were burned and their hair singed. FAC ¶ 28. In fact, Plaintiffs were frequently forced to reverse their boat due to the overwhelming heat of the burning Deepwater Horizon. FAC ¶ 28. Plaintiffs similarly suffered multiple bruises while leaning over the rails while mooring to other vessels and passing gear to and from other vessels. FAC ¶ 32. Plaintiffs also alleged other injuries, *e.g.*, Scott Russell smashing his hand while holding on to a lifeboat and each of the Plaintiffs suffering scratches. FAC ¶¶ 31-32. In sum, Plaintiffs injuries were equal to or greater in severity than those described in *Gough* and objectively more extensive than the upset stomach, headaches, and pulled shoulder muscle described in *Ainsworth* and the single elbow bruise described in *Gaston.* The FAC does not contain any factual allegations that suggest Plaintiffs' injuries were trivial as the Defendants suggest in their arguments.

      **3.     Fifth Circuit maritime jurisprudence permits, and public policy favors, rescuers' ability to recover for their emotional injuries.**

Defendants assert without citing any authority that maritime law does not permit emotional distress claims for rescuers. In doing so they attempt to blur the lines between mere bystanders and rescuers in the zone of danger. Initially, Defendants acknowledge the Fifth Circuit has held "[f]or of all branches of jurisprudence, the admiralty must be the one most hospitable to the impulses of man and law to save life and limb and property." *Grigsby v. Coastal Marine Serv. Of Tex., Inc.*, 412 F.2d 1011, 1021 (5th Cir. 1969). Defendants compare *Grisby* to the holding in *Gaston* to suggest rescuers are mere bystanders. However, the *Gaston* Court specifically held "[w]e do not hold today that no recovery can be had under the FELA/Jones Act for a purely emotional injury…But whatever merit allowing recovery for purely emotional injury may have or may lack, we see none in allowing <u>mere crewmen-bystanders to recover for witnessing the misfortune of another.</u>" 866 F.2d at 821 (emphasis added). Defendants

cite *Theodories v. Hercules Navigation Co.*, 448 F.2d 701, 704 (5th Cir. 1971) for the proposition that the Fifth Circuit has refused to recognize "blanket protection" for injuries during maritime rescue. Plaintiffs do not disagree due to the "nearly infinite and unpredictable liability" concerns considered in *Gottshall* and that is why the courts have adopted criteria such as "physical impact or injury" test or the "zone of danger" test.

While acknowledging admiralty law promotes rescuer situations and that the Plaintiffs' rescue efforts in this case were rightly commended, Defendants repeatedly argue that maritime law cannot recognize liability for mental harms incurred by individuals who travel to the scene of the disaster. They provide no authority for this argument. However, they cite to case law examining mere bystander situations and they also cite to a case that noted a reference to state law is appropriate where federal maritime law is silent. *Coastal Iron Works, Inc. v. Petty Ray Geophysical, Div. of Geosource, Inc.*, 783 F.2d 577, 582 (5th Cir. 1986). Federal maritime law is not silent, *i.e.*, the cases set forth the elements and tests to recover for NIED.

Since *Gaston*, as discussed above, federal courts have held general maritime cases that a rescuer could recover for emotional damages. *Twyman*, 410 F.Supp.3d 1311. Similarly, the *Destefano* Court held that "plaintiffs who enter the zone of danger in a rescue attempt may recover damages for mental distress, as long as they feared for their own safety, because of the defendant's negligence, while in the zone of danger." *Destefano* at 72. In comparison to the present case, the plaintiff in the *Gaston* case was purely a bystander whereas the Plaintiffs here were rescuers that did fear for their own safety and had good reason for that fear like the plaintiff in *Twyman*. In contrast, the *Gaston* Court specifically noted that "no evidence was presented tending to show that Gaston was ever concerned for his own safety; all of his alleged emotional injuries stem from viewing the death of his near relative." F.2d at 819 (emphasis added). Again, Fifth Circuit jurisprudence distinguishes between a mere bystander and someone in the zone of

15

danger, *e.g.*, "a bystander cannot recover merely for witnessing harm to another where the bystander suffered no harm or threat of harm." *Barker*, 713 F.3d at 224 (citing *Gaston,* 866 F.2d at 818–20) (emphasis added). "When the rescuer acts from motives of altruism, and risks himself to save another, the risk of his harm falls on the tortfeasor who created the peril." *Carter v. Taylor Diving & Salvage Co.*, 341 F.Supp. 628, 630 (E.D. La. 1972) (citing *Restatement (Second) of Torts* § 449(c) (1965)).

### B. Defendants' Intentional Infliction of Emotional Distress

Louisiana law also recognizes the tort of intentional infliction of emotional distress without physical injury. *Morris v. Maryland Cas. Co.*, 657 So. 2d 198 (La. Ct. App. 3d Cir. 1995). The elements in a claim for intentional infliction of emotional distress are: (1) that defendant's conduct was so extreme in degree and so outrageous in character that it went beyond all bounds of decency and was utterly intolerable in civilized community; (2) that such conduct caused severe emotional distress; and (3) that defendant intended, by performing the acts complained of, to inflict severe emotional distress on plaintiff, or that defendant knew that such severe emotional distress would be certain or substantially certain to result from the conduct. *See Deus v. Allstate Insurance Co*., 15 F.3d 506, 514 (5th Cir. 1994); *see also Restatement (Second) of Torts* § 46 (1965) ("one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress ...").

Plaintiffs' FAC contains specific factual allegations outlining Defendants knowledge of the known risks and dangers associated with deepwater drilling in the Gulf of Mexico and that their actions increased the chance that a blowout, explosion, and oil spill would occur. FAC ¶¶ 113, 129, and 145. Plaintiffs also alleged that Defendants knew that oil rigs such as the Deepwater Horizon were frequented by fishermen due to the marine life around the oil rigs and

that fisherman would be the first responders in the event of an emergency. FAC ¶¶ 113, 129, and 145. A plausible inference based on these allegations is that the Defendants knew their reckless actions leading to a blowout, explosion, and oil spill would cause severe emotional distress in addition to loss of life and personal injury.

## IV. CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully requests that this Court enter an Order denying Defendants' Motion to Dismiss First Amended Complaint. Plaintiffs have sufficiently stated each of their claims for relief and the Defendants' motion should be denied.

Dated: March 20, 2020              /s/ Rhon E. Jones_____

                                              Rhon E. Jones, Esq. (ASB-7747-E52R)
                                              William R. Sutton, Esq. (ASB-3903-L74S)
                                              BEASLEY, ALLEN, CROW,
                                              METHVIN, PORTIS & MILES, P.C.
                                              218 Commerce Street
                                              Montgomery, Alabama 36104
                                              (800) 898-2034
                                              William.sutton@beasleyallen.com

                                              */s/ Adam M. Milam*_____
                                              ADAM M. MILAM, Esq. (MILAA2597)
                                              MILAM & MILAM, LLC
                                              2206 Main Street
                                              Daphne, AL 36526
                                              (251) 928-0191
                                              amilam@milam-law.com
                                              ***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing *PLAINTIFFS' RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT* has been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 20th day of March, 2020.

/s/Rhon E. Jones
Rhon E. Jones