IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT
IN AND FOR LEE COUNTY, FLORIDA
CIVIL ACTION

ANDREW J. DITCH

    Plaintiff,

v.

KENNETH R. FEINBERG,
FEINBERG ROZEN, LLP, D.B.A.
GULF COAST CLAIMS FACILITY, and
WILLIAM G. GREEN, JR.

    Defendants.

_____/

CASE NO.

13 – CA – 001612
Judge: McHugh, Michael T

COPY

2:13-cv-531-FtM-29 UAM

FILED LEE CO. FLORIDA
CLERK OF COURTS
2013 JUN 12 AM 10: 09
D.C.

## COMPLAINT

COMES NOW Plaintiff, ANDREW J. DITCH (hereinafter "Ditch"), by and

through his undersigned attorney, files this action against Defendants KENNETH R.

FEINBERG, an individual (hereinafter "Feinberg"); FEINBERG ROZEN, LLP, a District of

Columbia limited liability partnership (hereinafter "Feinberg Rozen") doing business as

GULF COAST CLAIMS FACILITY (hereinafter "GCCF"); and WILLIAM G. GREEN, JR., an

individual (hereinafter "Green") and alleges as follows:

## NATURE OF ACTION

1. On April 20, 2010, an explosion and fire occurred aboard the mobile offshore drilling

unit Deepwater Horizon. On the morning of April 22, 2010, the Deepwater Horizon sank

resulting in a massive oil spill incident. Oil flowed into the Gulf of Mexico unchecked for nearly

three months. Millions of barrels of oil were discharged into the Gulf of Mexico and upon

adjoining shorelines, causing immense environmental and economic harm to the entire region.

2. On August 23, 2010, Defendant Feinberg Rozen, doing business as GCCF, replaced the claims process which BP had established to fulfill its obligations as a responsible party pursuant to the Oil Pollution Act of 1990 (hereinafter "OPA"). The protocol established by the defendants sets forth the procedure for the submission and resolution by GCCF of claims by individuals and businesses for costs and damages incurred as a result of the Deepwater Horizon oil spill incident.

3. All Defendants herein have misled Plaintiff by fraudulently, recklessly, negligently and/or knowingly stating the protocol under which GCCF operates is structured to be compliant with OPA and apply the standards of OPA.

4. In violation of OPA, GCCF's approach to determining claimant eligibility was driven by two factors: (1) loss location; and (2) claimant business type.

5. All Defendants herein have misled GCCF claimants by fraudulently, recklessly, negligently and/or knowingly employing a "Delay, Deny, Defend" strategy against GCCF claimants. This strategy, commonly used by unscrupulous insurance companies, is as follows: "Delay payment, starve claimant, and then offer the economically and emotionally-stressed claimant a miniscule percent of all damages to which the claimant is entitled. If the financially ruined claimant rejects the settlement offer, he or she may sue."

6. During GCCF Phase I, which operated from August 23, 2010 through November 23, 2010, GCCF accepted Emergency Advance Payment ("EAP") claims. A claimant who received an EAP during Phase I was not required to execute a release and covenant not to sue BP or any other party.

-2-

7. All Defendants herein have misled GCCF claimants by fraudulently, recklessly, negligently and/or knowingly employing an "Expedited EAP Denial" strategy against GCCF claimants. This strategy is as follows: "Fail to verify, investigate, and appraise the amount of loss claimed by the claimant in the EAP claim and deny the EAP claim without ever requesting supporting documentation from the claimant."

8. More than 74,000 unique claimants that filed EAP claims received denial letters from GCCF during Phase I.

9. All Defendants herein have misled Plaintiff Ditch by fraudulently, recklessly, negligently and/or knowingly employing an "Expedited EAP Denial" strategy against him.

10. The ultimate objective of Defendants' "Delay, Deny, Defend" strategy and "Expedited EAP Denial" strategy was to limit BP's liability by obtaining a signed "Release and Covenant Not to Sue" from as many BP oil spill victims as possible.

11. GCCF's "Release and Covenant Not to Sue" requirement forces economically and emotionally-stressed victims of the BP oil spill to sign a release and covenant not to sue in order to receive a miniscule payment amount for all damages, including future damages, they incur as a result of the BP oil spill.

12. GCCF's "Release and Covenant Not to Sue" requirement violates OPA, State contract law, and is contrary to public policy.

13. Forcing BP oil spill victims to sign a "Release and Covenant Not to Sue" in order to be compensated for their damages was the idea of Defendant Feinberg.

14. After GCCF denied his EAP claim, Plaintiff Ditch refused to be forced into signing a "Release and Covenant Not to Sue" in exchange for a miniscule percent of all damages to which

-3-

he is entitled under OPA.

15. The "Delay, Deny, Defend" strategy and "Expedited EAP Denial" strategy, although unconscionable, have proven to be very effective for Defendants and BP.

16. GCCF forced 84.68% of the claimants to sign a "Release and Covenant Not to Sue" in which the claimant agreed not to sue BP and all other potentially liable parties.

17. Only 15.32% of the claimants were not required to sign a "Release and Covenant Not to Sue" in order to be paid.

18. GCCF denied payment to approximately 61.46% of the claimants who filed claims.

19. The average total amount paid per claimant by GCCF was a paltry $27,466.47.

20. Defendant Feinberg has misled Plaintiff by fraudulently, recklessly, negligently and/or knowingly using the fear of costly and protracted litigation to coerce Plaintiff Ditch to file a claim with GCCF rather than file a lawsuit.

21. During widely-reported town hall meetings organized to promote GCCF, Defendant Feinberg repeatedly tells victims of the BP oil spill: "The litigation route in court will mean uncertainty, years of delay and a big cut for the lawyers." and "I take the position, if I don't find you eligible, no court will find you eligible."

22. Defendants, on their website, indicate the following in the section titled "Frequently Asked Questions:" "To be paid on a Full Review Final Payment Claim, you will have to release and waive any claims that you have or may have in the future against BP and all other potentially responsible parties with regard to the Spill or to submit any claim for payment to the National Pollution Funds Center, the Coast Guard office responsible for evaluating and approving Oil Pollution Act claims, or in court."

-4-

23. Defendants have misled Plaintiff by fraudulently, recklessly, negligently and/or knowingly failing to inform him that: (a) no claimant should receive any less compensation in the GCCF claims process than they are entitled to under OPA; and (b) under OPA, the term "claim" means "a request, made in writing for a *sum certain*, for compensation for damages or removal costs resulting from an oil spill incident" and any acceptance for a lesser amount *shall not* preclude the claimant from pursuing future recovery for unrecovered amounts with the OSLTF or through litigation.

24. Defendant Feinberg, for the purpose of benefiting himself and Defendant Feinberg Rozen and limiting BP's liability, has misled Plaintiff by fraudulently, recklessly, negligently and/or knowingly publicly advising during well-reported town hall meetings, on a number of occasions, potential claimants that the fund which he administers is fully funded in the amount of $20 billion. At the end of 2010, the most the fund would have had in its escrow account would have been $5 billion.

25. In sum, Plaintiff Ditch alleges that BP is responsible for the oil spill incident; Defendants Feinberg, Feinberg Rozen, and Green (independent contractors), via employment of their "Expedited EAP Denial" strategy, are responsible for not compensating, and thereby damaging the economic interests of Plaintiff Ditch and more than 74,000 other unique claimants that filed EAP claims with GCCF during Phase I.

26. This case is brought by Plaintiff under the following causes of action: (a) Gross Negligence; (b) Negligence; (c) Negligence Per Se; (d) Fraud; (e) Fraudulent Inducement; (f) Promissory Estoppel; and (g) Unjust Enrichment.

## JURISDICTION AND VENUE

27. This is an action for damages which exceeds fifteen thousand dollars ($15,000.00).

28. Venue in this judicial district is proper under Florida Statute § 48.193 because the tortious acts and injuries alleged in this action were committed in more than one judicial circuit in Florida, including the Twentieth Judicial Circuit in and for Lee County, Florida and Defendants operate, conduct, engage in, or carry on a business or business venture in Florida.

## PARTIES

29. Plaintiff Ditch, a resident of Lee County, Florida, is an individual and sole proprietor of a business engaged in aquaculture, specifically the growing of farm-raised hard-shell clams. Plaintiff Ditch grows hard-shell clams on sovereignty submerged land leased from the State of Florida. Plaintiff Ditch holds the Sovereignty Submerged Land Aquaculture Lease ("SSLAL"), Florida Department of Agriculture and Consumer Services Lease No. 36-AQ-705 in Lee County, Florida. Plaintiff Ditch's principal place of business is located in Lee County at 2317 York Road, St. James City, FL 33956.

30. Defendant Feinberg is a resident of the District of Colombia and Founder and Managing Partner of Defendant Feinberg Rozen which does business as GCCF.

31. Defendant Feinberg Rozen, which does business as GCCF, is a District of Colombia limited liability partnership with its principal place of business in Washington, D.C.

32. GCCF is the name established by Defendant Feinberg and Defendant Feinberg Rozen under which Feinberg Rozen does business. At all times material herein, GCCF had 13 offices located in the State of Florida including an office located at 4121 E. Tamiami Trail, Naples, Florida 34112.

-6-

33. Defendant Green is a resident of the State of Florida and an "Independent Adjuster - All Lines" licensed by the State of Florida. Defendant Green is "Liaison" to GCCF and the "Overseer" of all seafood claims for GCCF in the State of Florida who trained accountants to specifically handle claims of clam farmers.

## BACKGROUND FACTS

34. At approximately 10 p.m. on April 20, 2010, the U.S. Coast Guard District Eight command center in New Orleans, Louisiana received a report of an explosion and fire aboard the mobile offshore drilling unit Deepwater Horizon. On the morning of April 22, 2010, the Deepwater Horizon sank, resulting in a massive oil spill incident. Oil flowed into the Gulf of Mexico unchecked for months. Ultimately, the "Macondo Well" was finally sealed on September 19, 2010, nearly five months after the blowout began. By that time, millions of barrels of oil had been discharged into the Gulf of Mexico and upon adjoining shorelines, causing immense environmental and economic harm to the entire region.

35. OPA requires BP Exploration & Production Inc. (hereinafter "BP"), as the designated "responsible party" for the Deepwater Horizon oil spill, to establish a procedure for the payment or settlement of claims for damages resulting from this oil spill incident.

36. In the initial months after this oil spill incident, BP directly received and paid interim claims arising from the oil spill. During the initial four months, BP contracted with one or more claims adjusting firms to assist in handling claims.

37. On June 16, 2010, President Obama announced that BP agreed to set aside $20 billion to pay economic damage claims to individuals and businesses affected by the Deepwater

Horizon oil spill. President Obama stated, "Another important element is that this $20 billion fund will not be controlled by either BP or by the government. It will be put in a escrow account, administered by an impartial, independent third party."

38. At the request of the White House and BP, Defendant Feinberg, acting through and as Managing Partner of Defendant Feinberg Rozen, established GCCF to independently administer and where appropriate settle and authorize the payment of certain claims asserted against BP as a result of the explosion at the Deepwater Horizon rig and consequent spillage of oil into the Gulf of Mexico.

39. On August 6, 2010, BP created the Deepwater Horizon Oil Spill Trust. The Trust Agreement provides, "To secure the payment and performance of its obligations to make the contributions to the Trust hereunder, BP hereby agrees to grant, convey, and/or assign to the Trust first priority perfected security interests in production payments pertaining to BP's U.S. oil and natural gas production."

40. The Trust Agreement further provides that BP shall contribute: (a) "THREE BILLION DOLLARS ($3,000,000,000) to the Trust on or about August 9, 2010; (b) an additional TWO BILLION DOLLARS ($2,000,000,000) to the Trust, in one or more installments, during the fourth calendar quarter of 2010 and by no later than December 31, 2010; and (c) an additional ONE BILLION TWO HUNDRED FIFTY MILLION DOLLARS ($1,250,000,000) to the Trust, in one or more installments, during and prior to the end of each calendar quarter commencing with the first calendar quarter of 2011 and continuing through the last calendar quarter of 2013."

41. On August 23, 2010, GCCF, spearheaded by Defendant Feinberg and Defendant

-8-

Feinberg Rozen, replaced the original BP claims process and commenced performing BP's

obligations under OPA with respect to private economic loss claims.

42. The nature of the relationship between BP and Defendant Feinberg and Defendant

Feinberg Rozen has been memorialized in a written agreement between Defendant Feinberg

Rozen and BP, which was negotiated over a period of several months and was finalized and

executed on January 6, 2011. Section 11 of the agreement, titled "Independent Contractor; No

Agency," states:

> "It is the express intention of the parties that Feinberg Rozen shall be an
> independent contractor throughout the Term of this Agreement. Except as
> otherwise agreed to by the parties, nothing in this Agreement shall in any way be
> construed to constitute Feinberg Rozen as an agent or representative of BP, and
> Feinberg Rozen shall otherwise perform the Services hereunder as an independent
> contractor. The execution of this Agreement shall not be construed to create an
> attorney-client relationship between BP and Feinberg Rozen, and the provision of
> Services hereunder shall not constitute, or be otherwise construed to constitute,
> provision of legal advice from Feinberg Rozen, or any of its partners or
> employees, to BP."

### I. GCCF Payment Methodology

43. During GCCF Phase I, GCCF implemented a claims process by which eligible

claimants allegedly would receive compensation for the loss of earnings or profits, removal and

clean-up costs, real or personal property damage, loss of subsistence use of natural resources and

physical injury or death caused by the BP oil spill by submitting a lesser level of documentation

than would be required in later stages of GCCF. This was known as the Emergency Advance

Payment ("EAP") claims process.

44. GCCF accepted EAP claims from August 23, 2010 through November 23, 2010.

45. Over 475,000 EAP claims were filed with GCCF by BP oil spill victims from August 23, 2010 through November 23, 2010.

46. GCCF paid in excess of $2.5 billion to more than 169,000 Phase I claimants.

47. In sum, the average total amount paid per EAP claimant by GCCF was a paltry $14,793.00.

48. A claimant who received an EAP was not required to execute a "Release and Covenant Not to Sue."

49. During GCCF Phase II, known as the "Interim Payment/Final Payment" claims process, GCCF received the following three types of claims: Quick Payment Final Claim, Interim Payment Claim, and Full Review Final Payment Claim.

50. Under the "Quick Payment Final Claim," a claimant who had received a prior EAP or Interim Payment from GCCF could receive, without further documentation of losses caused by the BP oil spill, a one-time final payment of $5,000 for individuals and $25,000 for businesses. Claimants seeking a Quick Payment were required to submit with their claim form a "Release and Covenant Not to Sue."

51. Defendants cannot justify limiting payments under the "Quick Payment Final Claim" program to just $5,000 for individuals and $25,000 for businesses. There is no evidence that these amounts even remotely represent adequate consideration to compensate claimants for the damages that claimants did or will suffer as a result of the BP oil spill.

52. Under the "Interim Payment Claim," a claimant allegedly could elect to receive compensation for documented past losses or damages caused by the BP oil spill for which the claimant previously had not been compensated. A claimant seeking an Interim Payment was not

required to sign a "Release and Covenant Not to Sue." A claimant was permitted to file only one Interim Payment Claim per quarter.

53. Under the "Full Review Final Payment Claim," a claimant could receive payment for all documented past damages and estimated future damages resulting from the BP oil spill. Claimants wishing to accept a Final Payment were required to sign and submit a "Release and Covenant Not to Sue." Any Full Review Final Payment awarded to a claimant was decreased by the amount of any previous payments received.

54. Claim forms for Phase II became available to the public on December 18, 2010.

55. The assessment of claimant eligibility and calculation of losses for those claims did not begin until February 18, 2011.

56. GCCF forced 84.68% of the claimants to sign a "Release and Covenant Not to Sue" in which the claimant agreed not to sue BP and all other potentially liable parties.

57. Only 15.32% of the claimants were not required to sign a "Release and Covenant Not to Sue" in order to be paid.

58. GCCF denied payment to approximately 61.46% of the claimants who filed claims.

59. The average total amount paid per claimant by GCCF was a paltry $27,466.47.

## II. Plaintiff's Experience with GCCF Claim Process

60. At all times material herein, Defendants claim the protocols under which GCCF operates are structured to be compliant with OPA and apply the standards of OPA.

61. At all times material herein, Defendant Feinberg publicly advises potential claimants that they do not need to hire a lawyer and will be much better off accepting what he offers rather than going to court.

-11-

62. On November 23, 2010, Plaintiff Ditch submitted an EAP claim, in the amount of $51,863.00, to GCCF. This EAP claim was for lost earnings or profits for six months.

63. On December 6, 2010, merely thirteen (13) days after Plaintiff Ditch submitted his EAP claim, GCCF sent Plaintiff Ditch its boilerplate denial letter wherein GCCF states, "You submitted a claim to the Gulf Coast Claims Facility ("GCCF") for an Emergency Advance Payment for damages relating to the Deepwater Horizon incident on April 20, 2010. Your submission did not provide sufficient documentation to support your claim and consequently, your request for an Emergency Advance Payment has been denied."

64. GCCF Phase I protocols did not include a process by which a claimant could appeal an adverse resolution or have its claim re-reviewed by GCCF.

65. Prior to issuing its denial letter, GCCF never requested supplemental supporting documentation from Plaintiff Ditch which would support his EAP claim.

66. Plaintiff Ditch refused to be forced by Defendants into filing a claim during GCCF Phase II which would ultimately require him to sign a "Release and Covenant Not to Sue" in exchange for a miniscule percent of all damages to which he is entitled under OPA.

67. As a direct result of Defendants' "Expedited EAP Denial" strategy, after approximately 10 years of successful operation, Plaintiff Ditch lost his market share for hard-shell clams in upstate New York.

68. Plaintiff Ditch, in order to meet his financial obligations, is now forced to spend six to eight months per year away from his family while working as a commercial fisherman on Lake Ontario in upstate New York. Moreover, Plaintiff Ditch incurs the added cost of having to plant 200,000 clam seed per year to fulfill the terms of the SSLAL which he had acquired in 1999.

69. As of the date of the filing of this Complaint, Plaintiff Ditch now estimates the extent of damages directly resulting from Defendants' "Expedited EAP Denial" strategy to be approximately $1,570,357.00.

### III. Defendants, Without Any Legal Authority For Doing So, Circumvent Many of the Rights Provided to Plaintiff Under OPA

70. Plaintiff Ditch refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

71. At all times material herein, Defendants claim the protocols under which GCCF operates are structured to be compliant with OPA and apply the standards of OPA.

72. At all times material herein, Defendant Green is the "Liaison" to GCCF who is aware of, who participates in, and who is in charge of implementing Defendants' "Delay, Deny, Defend" strategy and "Expedited EAP Denial" strategy and who trained accountants to specifically handle claims of clam farmers.

73. Defendant Feinberg, for the purpose of benefiting himself and Defendant Feinberg Rozen and limiting BP's liability, has misled Plaintiff by fraudulently, recklessly, negligently and/or knowingly publicly advising during well-reported town hall meetings, on a number of occasions, potential claimants that they do not need to hire a lawyer and will be much better off accepting what he offers rather than going to court.

74. All Defendants herein, for the purpose of benefiting themselves and limiting BP's liability, have misled Plaintiff by fraudulently, recklessly, negligently and/or knowingly stating the protocol under which GCCF operates is structured to be compliant with OPA and apply the standards of OPA.

-13-

## A. Proximate Causation

75. GCCF's Protocol states, "The GCCF will only pay for harm or damage that is proximately caused by the Spill. The GCCF will take into account, among other things, geographic proximity, nature of industry, and dependence upon injured natural resources."

76. OPA is a strict liability statute. In order to recover damages, a claimant merely needs to show that his or her damages "resulted from" the oil spill. OPA states, "The responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages *that result from* such incident." See 33 U.S.C. § 2702(a)

77. All Defendants herein have misled Plaintiff by fraudulently, recklessly, negligently and/or knowingly requiring that Plaintiff has the increased burden of proving "proximate causation" between his damages and the Deepwater Horizon oil spill incident.

78. GCCF stated in its Final Rules that "[n]either physical proximity to the Spill nor a particular type of work or business engaged in by the claimant is a prerequisite for payment of a claim."

79. In reality, location of loss and business type defined the steps the claimant would need to undertake to demonstrate to GCCF that claimed losses were the result of the Deepwater Horizon oil spill incident.

80. All Defendants herein have misled Plaintiff by fraudulently, recklessly, negligently and/or knowingly paying for damages based on location of loss ("geographic proximity") and business type ("nature of industry").

-14-

## B. Single Emergency Advance Payment

81. GCCF's Protocol provides, "Emergency Advance Payment applications may be submitted during the period August 23 - November 23, 2010. After that date, applications for Emergency Advance Payments will no longer be accepted."

82. A single six-month emergency advance payment for lost income is in violation of OPA. Moreover, the lack of a procedure for the payment or settlement of claims for interim, short-term damages beyond 90 days, as required by 33 U.S.C. § 2705, is also in violation of OPA.

83. OPA specifically provides for interim partial payments. "The responsible party shall establish a procedure for the payment or settlement of claims for interim, short-term damages. Payment or settlement of a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled *shall not* preclude recovery by the claimant for damages not reflected in the paid or settled partial claim." See 33 U.S.C. § 2705(a).

84. The fact that a single payment does not preclude recovery by the claimant for future damages demonstrates that the legislative intent of Congress was for the responsible party to pay a series of partial claims in order to ensure that victims of the oil spill are fully compensated. Each of these partial claims would be paid after the date on which the claimant discovers damages resulting from the oil spill.

85. All Defendants herein have misled Plaintiff by fraudulently, recklessly, negligently and/or knowingly offering Plaintiff the opportunity to submit a claim for a single six-month emergency advance payment for lost income or profits.

-15-

86. All Defendants herein have misled Plaintiff by fraudulently, recklessly, negligently and/or knowingly failing to pay or settle claims for interim, short-term damages beyond 90 days.

### C. Single Final Settlement

87. GCCF's Protocol, in violation of OPA, provides for a single final settlement payment.

88. OPA provides: (a) "Payment or settlement of a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled *shall not* preclude recovery by the claimant for damages not reflected in the paid or settled partial claim." See 33 U.S.C. § 2705(a); and (b) Any person, including the [Oil Spill Liability Trust] Fund, who pays compensation pursuant to OPA to any claimant for damages shall be subrogated to all rights, claims, and causes of action that the claimant has under any other law. Moreover, payment of such a claim *shall not* foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under OPA or under any other law. See 33 U.S.C. § 2715(b)(2)

89. All Defendants herein have misled Plaintiff by fraudulently, recklessly, negligently and/or knowingly offering Plaintiff the opportunity to submit a claim for a single final settlement payment.

### D. Period of Limitations

90. Defendants fraudulently, recklessly, negligently and/or knowingly have misled Plaintiff by stating that no claim may be submitted to the GCCF "more than three years after the date the Protocol becomes operative."

-16-

91. Under OPA, an action for damages shall be barred unless the action is brought within three years after the date on which the loss and the connection of the loss with the discharge in question are reasonably discoverable with the exercise of due care. 33 U.S.C. § 2717(f)(1)(A)

92. The damages suffered by Plaintiff Ditch and other victims of this oil spill will be enormous and on-going. The livelihoods of all persons whose businesses rely on the natural resources of the Gulf Coast are at risk. Recreational deep sea fishing boat operators, commercial fishermen, clam farmers, oyster harvesters, shrimpers, and businesses involved, directly or indirectly, in processing and packaging for the seafood industry will experience the end of a way of life that, in many cases, has been passed down from one generation to the next.

93. It is too early for Plaintiff Ditch to calculate his exact economic damages. Defendants' "take it or leave it" Period of Limitations and the final settlement offer are unconscionable, requiring financially-stressed BP oil spill victims to file a claim before the claimants know, and are able to corroborate, the full extent of the damages incurred as a result of the oil spill.

94. Defendants' "Delay, Deny, Defend" strategy and "Expedited EAP Denial" strategy, which are intended to result in BP oil spill victims being forced to sign a "Release and Covenant Not to Sue," are also unconscionable.

### E. Release and Covenant Not to Sue

95. OPA defines a "claim" as "a request, made in writing, *for a sum certain*, for compensation for damages or removal costs resulting from an incident." 33 U.S.C. § 2701(3)

96. OPA further provides: (a) "Payment or settlement of a claim for interim, short-term

damages representing less than the full amount of damages to which the claimant ultimately may be entitled *shall not* preclude recovery by the claimant for damages not reflected in the paid or settled partial claim." 33 U.S.C. § 2705(a); and (b) Any person, including the [Oil Spill Liability Trust] Fund, who pays compensation pursuant to OPA to any claimant for damages shall be subrogated to all rights, claims, and causes of action that the claimant has under any other law. Moreover, payment of such a claim *shall not* foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under OPA or under any other law. 33 U.S.C. § 2715(b)(2).

97. Defendants, on their website, indicate the following in the section titled "Frequently Asked Questions": "To be paid on a Full Review Final Payment Claim, you will have to release and waive any claims that you have or may have in the future against BP and all other potentially responsible parties with regard to the Spill or to submit any claim for payment to the National Pollution Funds Center, the Coast Guard office responsible for evaluating and approving Oil Pollution Act claims, or in court."

98. Defendants have misled Plaintiff Ditch by fraudulently, recklessly, negligently and/or knowingly failing to inform him that: (a) no claimant should receive any less compensation in the GCCF claims process than they are entitled to under the OPA; and (b) under OPA, the term "claim" means "a request, made in writing for a *sum certain*, for compensation for damages or removal costs resulting from an oil spill incident" and any acceptance for a lesser amount *shall not* preclude the claimant from pursuing future recovery for unrecovered amounts with the OSLTF or through litigation.

99. The ultimate objective of Defendants' "Delay, Deny, Defend" strategy and "Expedited EAP Denial" strategy was to limit BP's liability by obtaining a signed "Release and Covenant Not to Sue" from as many BP oil spill victims as possible.

100. The specific objective of Defendants' "Expedited EAP Denial" strategy, in the instant case, was to limit BP's liability by obtaining a signed "Release and Covenant Not to Sue" from Plaintiff Ditch.

**IV. Use of the Fear of Costly and Protracted Litigation to Coerce Plaintiff**

101. At all times material herein, Defendants claim the protocols under which GCCF operates are structured to be compliant with OPA and apply the standards of OPA.

102. Between June 18, 2010 and January 19, 2011, Defendant Feinberg appeared at 37 Town Hall meetings throughout the Gulf Coast region and appeared on regional television programs. GCCF staff members accompanied Defendant Feinberg to the Town Hall meetings and answered questions from the audience.

103. At all times material herein, Defendant Feinberg publicly advises potential claimants that they do not need to hire a lawyer and will be much better off accepting what he offers rather than going to court.

104. Defendant Feinberg has misled Plaintiff by fraudulently, recklessly, negligently and/or knowingly using the fear of costly and protracted litigation to try to coerce Plaintiff to to file a claim with GCCF rather than file a lawsuit. During widely-reported town hall meetings organized to promote GCCF, Defendant Feinberg repeatedly tells victims of the BP oil spill:

(a) "The litigation route in court will mean uncertainty, years of delay and a big cut for the lawyers;"

-19-

(b) "I am determined to come up with a system that will be more generous, more beneficial, than if you go and file a lawsuit;"

(c) "It is not in your interest to tie up you and the courts in years of uncertain protracted litigation when there is an alternative that has been created;" and

(d) "I take the position, if I don't find you eligible, no court will find you eligible."

105. Defendants Feinberg and Green have misled Plaintiff by fraudulently, recklessly, negligently and/or knowingly failing to affirmatively state that punitive damages (and/or additional damages), which may be available in litigation, are not being recognized or paid by GCCF.

### V. The Deepwater Horizon Oil Spill Trust Fund

106. At all times material herein, Defendant Feinberg has referred to the Deepwater Horizon Oil Spill Trust Fund as the "$20 Billion Fund."

107. The Trust Agreement for the Deepwater Horizon Oil Spill Trust Fund provides that BP shall contribute $5 billion in 2010, $5 billion in 2011, $5 billion in 2012 and $5 billion in 2013. The Trust Agreement further provides, "To secure the payment and performance of its obligations to make the contributions to the Trust hereunder, BP hereby agrees to grant, convey, and/or assign to the Trust first priority perfected security interests in production payments pertaining to BP's U.S. oil and natural gas production."

108. The fact that future production payments pertaining to BP's U.S. oil and natural gas production, rather than hard U.S. assets, are being used as collateral by BP means that the "$20 Billion Fund" does not currently exist and that there is no guarantee that BP will contribute $20 billion to the Fund by the end of 2013.

-20-

109.  Defendant Feinberg, for the purpose of benefiting himself and Defendant Feinberg Rozen and limiting BP's liability, has misled Plaintiff by fraudulently, recklessly, negligently and/or knowingly publicly advising during well-reported town hall meetings, on a number of occasions, potential claimants that the fund which he administers is fully funded in the amount of $20 billion. At the end of 2010, the most the fund would have had in its escrow account would have been $5 billion.

## COUNT I
## GROSS NEGLIGENCE

110.  Plaintiff Ditch refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

111.  Defendants owed a duty to Plaintiff to exercise reasonable care in regard to the operation of GCCF's claim intake, claim review, claim evaluation and claim settlement and payment services.

112.  Defendants had a heightened duty of care to Plaintiff because of the unprecedented environmental and economic harm resulting from the millions of barrels of oil that had been discharged into the Gulf of Mexico and upon adjoining shorelines by the Deepwater Horizon oil spill incident. The damages suffered by Plaintiff Ditch and other victims of this oil spill incident will be enormous and on-going. The livelihoods of all persons, including Plaintiff, whose businesses rely on the natural resources of the Gulf Coast are at risk. Commercial fishermen, clam farmers, oyster harvesters, shrimpers, and businesses involved in processing and packaging for the seafood industry will experience the end of a way of life that, in many cases, has been passed down from one generation to the next.

113. Defendants breached their legal duty to Plaintiff, failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for the business and livelihood of Plaintiff in their negligent operation of GCCF's claim intake, claim review, claim evaluation and claim settlement and payment services in the following manner:

(1) Inadequate Claim Processing - On November 23, 2010, GCCF failed to properly receive and verify the EAP claim which Plaintiff Ditch had submitted to GCCF.

(2) Inadequate Claim Investigation - GCCF failed to even investigate the claim which Plaintiff Ditch submitted to GCCF on November 23, 2010. GCCF failed to appraise the amount of loss claimed by Plaintiff Ditch.

(3) Expedited EAP Denial - GCCF employed an "Expedited EAP Denial" strategy against Plaintiff Ditch in the following manner: On December 6, 2010, merely thirteen (13) days after Plaintiff submitted his EAP claim, GCCF sent Plaintiff Ditch its boilerplate denial letter wherein GCCF states, "You submitted a claim to the Gulf Coast Claims Facility ("GCCF") for an Emergency Advance Payment for damages relating to the Deepwater Horizon incident on April 20, 2010. Your submission did not provide sufficient documentation to support your claim and consequently, your request for an Emergency Advance Payment has been denied."

114. The specific objective of Defendants' "Expedited EAP Denial" strategy, in the instant case, was to limit BP's liability by obtaining a signed "Release and Covenant Not to Sue" from Plaintiff Ditch.

(4) Unreasonable Denial of Claim - Prior to issuing its denial letter, GCCF never requested supplemental documentation from Plaintiff Ditch which would support his EAP claim.

-22-

115. Defendants knew or should have known that their wanton or reckless conduct would foreseeably result in damage to the economic interests of Plaintiff Ditch and his family.

116. As a direct and proximate result of Defendants' wanton or reckless conduct, Plaintiff Ditch has suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss.

117. Defendants' wanton or reckless conduct, as described herein, constitutes such a conscious disregard or indifference to the rights and life of Plaintiff Ditch that it entitles Plaintiff Ditch to punitive damages.

<u>COUNT II</u>
<u>NEGLIGENCE</u>

118. Plaintiff Ditch refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

119. Defendants owed a duty to Plaintiff Ditch to exercise reasonable care in regard to the operation of GCCF's claim intake, claim review, claim evaluation and claim settlement and payment services.

120. Defendants knew or should have known that their conduct would foreseeably result in damage to the economic interests of Plaintiff Ditch and his family.

121. Defendants breached their legal duty to Plaintiff Ditch and failed to exercise reasonable care in the following manner:

(1) Inadequate Claim Processing - On November 23, 2010, GCCF failed to properly receive and verify the EAP claim which Plaintiff Ditch had submitted to GCCF.

-23-

(2) Inadequate Claim Investigation - GCCF failed to even investigate the claim which Plaintiff Ditch submitted to GCCF on November 23, 2010. GCCF failed to appraise the amount of loss claimed by Plaintiff Ditch.

(3) Expedited EAP Denial - GCCF employed an "Expedited EAP Denial" strategy against Plaintiff Ditch in the following manner: On December 6, 2010, merely thirteen (13) days after Plaintiff submitted his EAP claim, GCCF sent Plaintiff Ditch its boilerplate denial letter wherein GCCF states, "You submitted a claim to the Gulf Coast Claims Facility ("GCCF") for an Emergency Advance Payment for damages relating to the Deepwater Horizon incident on April 20, 2010. Your submission did not provide sufficient documentation to support your claim and consequently, your request for an Emergency Advance Payment has been denied."

122.  The ultimate objective of Defendants' "Delay, Deny, Defend" strategy and "Expedited EAP Denial" strategy was to limit BP's liability by obtaining a signed "Release and Covenant Not to Sue" from as many BP oil spill victims as possible.

123.  The specific objective of Defendants' "Expedited EAP Denial" strategy, in the instant case, was to limit BP's liability by obtaining a signed "Release and Covenant Not to Sue" from Plaintiff Ditch.

(4) Unreasonable Denial of Claim - Prior to issuing its denial letter, GCCF never requested supporting documentation from Plaintiff Ditch which would support his EAP claim.

124. As a direct and proximate result of Defendants' negligent conduct, Plaintiff Ditch has suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss.

-24-

125. Defendants are further liable under the doctrine of *res ipsa loquitor* because the loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss by Plaintiff Ditch could not have occurred in the absence of the negligence of Defendants.

## COUNT III
## NEGLIGENCE PER SE

126. Plaintiff Ditch refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

127. Defendants' conduct with regard to the operation of GCCF's claim intake, claim review, claim evaluation and claim settlement and payment services is governed by the Oil Pollution Act of 1990.

128. The Oil Pollution Act of 1990 creates statutory standards that are intended to protect and benefit Plaintiff.

129. Defendants' violations of these statutory standards constitute negligence *per se* under Florida law.

130. Defendants' violations of these statutory standards proximately caused Plaintiff's injuries, warranting compensatory and punitive damages.

## COUNT IV
## FRAUD

131. Plaintiff Ditch refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

132. Defendants, knowing the representations were false at the time the representations were made, made the following false representations of fact to Plaintiff:

(1) The protocol under which GCCF operates is structured to be compliant with OPA and apply the standards of OPA;

(2) "Each Emergency Advance Payment application will be evaluated preliminarily within 24 hours of receipt of the completed form and supporting documentation to determine whether an Emergency Advance Payment is appropriate based on the information submitted by the Claimant;"

(3) "Complex business claims submitted for an Emergency Advance Payment will be evaluated preliminarily within 7 days of receipt of the completed form and supporting documentation to determine whether an Emergency Advance Payment is appropriate based on the information submitted by the Claimant;"

(4) "Upon a determination that the Claimant is eligible for an Emergency Advance Payment, a payment will be authorized within 24 hours;"

(5) Potential claimants do not need to hire a lawyer and will be much better off accepting what Defendant Feinberg offers rather than going to court;

(6) "The litigation route in court will mean uncertainty, years of delay and a big cut for the lawyers;"

(7) "I am determined to come up with a system that will be more generous, more beneficial, than if you go and file a lawsuit;"

(8) "It is not in your interest to tie up you and the courts in years of uncertain protracted litigation when there is an alternative that has been created;"

(9) "I take the position, if I don't find you eligible, no court will find you eligible;" and

-26-

(10) Defendants referred to the Deepwater Horizon Oil Spill Trust Fund as the "$20 Billion Fund." At the end of 2010, the most the fund would have had in its escrow account would have been $5 billion.

133. Defendants made these false representations for the purpose of inducing Plaintiff to act in reliance on the false representations.

134. Plaintiff Ditch relied on Defendants' representations rather than elect to commence an action in court against the responsible party or to present the claim to the OSLTF.

135. Plaintiff Ditch's reliance, which was reasonable and foreseeable, resulted in the following damage to Plaintiff: Plaintiff Ditch has suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss.

## COUNT V
## FRAUDULENT INDUCEMENT

136. Plaintiff Ditch refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

137. Defendants made the following false statements of material fact to Plaintiff:

(1) The protocol under which GCCF operates is structured to be compliant with OPA and apply the standards of OPA;

(2) "Each Emergency Advance Payment application will be evaluated preliminarily within 24 hours of receipt of the completed form and supporting documentation to determine whether an Emergency Advance Payment is appropriate based on the information submitted by the Claimant;"

-27-

(3) "Complex business claims submitted for an Emergency Advance Payment will be evaluated preliminarily within 7 days of receipt of the completed form and supporting documentation to determine whether an Emergency Advance Payment is appropriate based on the information submitted by the Claimant;"

(4) "Upon a determination that the Claimant is eligible for an Emergency Advance Payment, a payment will be authorized within 24 hours;"

(5) Potential claimants do not need to hire a lawyer and will be much better off accepting what Defendant Feinberg offers rather than going to court;

(6) "The litigation route in court will mean uncertainty, years of delay and a big cut for the lawyers;"

(7) "I am determined to come up with a system that will be more generous, more beneficial, than if you go and file a lawsuit;"

(8) "It is not in your interest to tie up you and the courts in years of uncertain protracted litigation when there is an alternative that has been created;"

(9) "I take the position, if I don't find you eligible, no court will find you eligible;"

(10) Defendants referred to the Deepwater Horizon Oil Spill Trust Fund as the "$20 Billion Fund." At the end of 2010, the most the fund would have had in its escrow account would have been $5 billion.

138. Defendants knew or should have known these statements were false.

139. Defendants made these false statements of material fact for the purpose of inducing Plaintiff Ditch to file a claim with GCCF which would ultimately require him to sign a "Release and Covenant Not to Sue" in exchange for a miniscule percent of all damages to which he is

-28-

entitled under OPA.

140. Plaintiff Ditch justifiably relied upon these false statements of material fact.

141. Reliance on these false statements of material fact did, in fact, induce Plaintiff Ditch to file a claim with GCCF and refrain from commencing an action in court against the responsible party or presenting the claim to the OSLTF which proximately caused the following injury to Plaintiff: Plaintiff Ditch has suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss.

## COUNT VI
## PROMISSORY ESTOPPEL

142. Plaintiff Ditch refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

143. Defendants made the following representations as to material facts that are contrary to Defendants' current representations:

(1) On or about August 23, 2010, GCCF, on its website, stated, "Each Emergency Advance Payment application will be evaluated preliminarily within 24 hours of receipt of the completed form and supporting documentation to determine whether an Emergency Advance Payment is appropriate based on the information submitted by the Claimant;"

(2) On or about August 23, 2010, GCCF, on its website, stated, "Complex business claims submitted for an Emergency Advance Payment will be evaluated preliminarily within 7 days of receipt of the completed form and supporting documentation to determine whether an Emergency Advance Payment is appropriate based on the information submitted by the

-29-

Claimant;"

(3) On or about August 23, 2010, GCCF, on its website, stated, "Upon a determination that the Claimant is eligible for an Emergency Advance Payment, a payment will be authorized within 24 hours;"

144. Plaintiff Ditch reasonably relied on Defendants' representation that his claim would be promptly evaluated and paid.

145. This reasonable reliance of Plaintiff Ditch on Defendants' representation proximately caused the following injury to Plaintiffs: Plaintiff Ditch has suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, loss of profit, loss of business reputation, loss of livelihood, loss of income, and other economic loss.

## COUNT VII
## UNJUST ENRICHMENT

146. Plaintiff Ditch refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

147. At all times material herein, Defendants claim the protocols under which GCCF operates are structured to be compliant with OPA and apply the standards of OPA.

148. As a result of limiting BP's liability by delaying and denying payment to BP oil spill victims, Defendants were unjustly enriched by BP by receiving a grossly excessive monthly payment for services which did not rise to the standards expected of their profession.

149. Plaintiff Ditch has suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, loss of profit, loss of business reputation, loss of livelihood,

-30-

loss of income, and other economic loss due to Defendants' intentional "Expedited EAP Denial" strategy.

150.  Defendants lack any legal justification for violating the rights provided to Plaintiff Ditch under OPA.

151.  Under the circumstances described herein it would be inequitable for Defendants to retain the benefits of their actions without paying the value thereof to Plaintiff Ditch.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ditch demands judgment against Defendants, jointly and severally, as follows:

(a) Economic and compensatory damages in amounts to be determined at trial;

(b) Punitive damages;

(c) Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(d) Attorney's fees and costs of litigation;

(e) Such other and further relief as the Court may deem just and appropriate; and

(f) A trial by jury as to all Defendants on all issues so triable.

DATED: June 12, 2013

Respectfully submitted,

Brian J. Donovan
Attorney for Plaintiff
Florida Bar No. 143900
3102 Seaway Court, Suite 304
Tampa, FL 33629
Tel: (352)328-7469

-31-