## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: | Oil Spill by the Oil Rig **"Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010** | MDL 2179 |
| | | SECTION "J" |

**This Document Relates To:**
*No. 15-4143, 15-4146 & 15-4654*

**District Judge Carl J. Barbier**

**Chief Magistrate Judge Joseph C. Wilkinson, Jr.**

## MEMORANDUM IN SUPPORT OF MOTION FOR APPROVAL OF FINAL DISTRIBUTION OF THE PUNITIVE DAMAGES PORTION OF THE HALLIBURTON ENERGY SERVICES, INC. AND TRANSOCEAN LTD. SETTLEMENT AGREEMENTS

Patrick A. Juneau (the "New Class Claims Administrator")[1], Claims Administrator of the Punitive Damages portion of the Halliburton Energy Services, Inc. ("HESI") Punitive Damages and Assigned Claims Settlement Agreement, Amended as of September 2, 2015 [Rec. Doc. 15322], and of the Punitive Damages portion of the Transocean Punitive Damages and Assigned Claims Settlement Agreement [Rec. Doc. 14644] (collectively, the "Settlement Agreements"), hereby submits this memorandum in support of his motion for approval of distribution of the Punitive Damages portions of the HESI and Transocean Settlement Agreements (the "Motion").

## I.      BACKGROUND

On February 15, 2017, the District Court granted final approval to the Settlement Agreements [Rec. Doc. 22253].  Further, by Order dated February 15, 2017 [Rec. Doc. 22252],

---

[1] The District Court had previously appointed Michael J. Juneau as Claims Administrator of the Punitive Damages portions of the Settlement Agreements [Rec. Doc. 15481].  Following the appointment of Michael J. Juneau as United States District Judge, the Court appointed Patrick A. Juneau as the New Class Claims Administrator [Rec. Doc. 25134].

the District Court approved the New Class Claims Administrator's Distribution Model for allocating the Punitive Damages portions of the Settlement Funds (the "New Class Distribution Model") [Rec. Doc. 18797 and clarified in Rec. Doc. 21778].

The New Class Distribution Model generally sought to compensate Claimants with standing to assert claims for punitive damages under the *Robins Dry Dock* line of cases, which provides that those individuals and entities with standing to assert punitive damages are generally those with a proprietary interest in real or personal property that was physically damaged by oil or substances used in the Spill.[2]  Some other courts (but not the United States Court of Appeals for the Fifth Circuit [the "U.S. Fifth Circuit"], to date) have extended this physical damage requirement to include commercial fishermen and those who experienced a loss of subsistence as a result of an oil spill.[3]  Consistent with this, the New Class Distribution Model afforded priority to those claim categories that have the most recognizable right to assert viable claims for punitive damages under *Robins Dry Dock*, in the following priority: (a) those who held a proprietary interest in real and personal property that was physically damaged, (b) commercial fishermen, (c) parties that experienced a loss of subsistence, and (d) charterboat operators[4].

On December 10, 2015, the Allocation Neutral allocated the Settlement Funds between the Punitive Damages Class (the "New Class") and the Assigned Claims Class (the "Old Class") pursuant to Section 6 of the Settlement Agreements, allocating 72.8%, or $902,083,250, for Punitive Damages to the New Class (the "New Class Portion"), and 27.2%, or $337,666,750, for Assigned Claims to the Old Class (the "Old Class Portion") [Rec. Doc. 15653].

---

[2] The underlying basis of the New Class Distribution Model is explained in more detail in the Model itself.
[3] Subsistence is defined as fishing or hunting to harvest, catch, barter, consume, or trade in natural resources (including seafood and game) in a traditional or customary manner, to sustain basic personal or family dietary, economic, security, shelter, tool or clothing needs, which specifically excludes those participating in hunting or fishing for recreational or sport purposes.
[4] Charterboat operators and subsistence fishermen do not have clear *Robins Dry Dock* standing under current law, so the New Class Distribution Model afforded a somewhat discounted value to those types of claims.

The Court previously approved Distribution A as defined in the motion and memorandum filed by the New Class Claims Administrator regarding the same [Rec. Docs. 25899 and 25990]. For the reasons set forth below, the New Class Claims Administrator now recommends distributing the currently estimated $755,038,305.16 remaining of the New Class Settlements Funds ("Distribution B") to Coastal Real Property, Wetlands Real Property, Oyster Leaseholder, and Real Property Sales Damage (the "Real Property Claims" or the "Distribution B Claims") (Declaration of Michelle M. La Count Regarding HESI and Transocean Punitive Damages Settlements' Allocations and Distribution B [the "La Count Decl."], §27).

Based thereon, for the purpose of making distributions on the Distribution B Claims, the New Class Claims Administrator recommends funding the HESI-Transocean Punitive Damages Commingled Distribution Fund B account established by the Settlement Administrator (as defined below) on behalf of the New Class Claims Administrator with the remaining proceeds from the HESI and Transocean Settlement Funds, plus additional interest earned between May 1, 2020 through June 15, 2020, reduced for taxes due, currently held in escrow (La Count Decl., §28).

## II.    NEW CLASS CLAIMS ADMINISTRATION PROCESS

The New Class Claims Administrator engaged Garden City Group ("GCG" or "Epiq" or the "Settlement Administrator")[5] to assist in the administration of the Settlement Agreements and in the implementation of the New Class Distribution Model.  GCG was also authorized to act as the Class Notice Administrator in connection with the Settlement Agreements. GCG's efforts are summarized in the La Count Decl. at Sections 2 - 6.

Considerable time, effort, and expense were incurred by the Deepwater Horizon Economic and Property Damages Settlement ("DHEPDS") Court Supervised Settlement Program ("CSSP")

---

[5] GCG was acquired by Epiq as of June 15, 2018 and is now continuing operations as part of Epiq.

in reviewing and evaluating claims that also fit within the definition of the New Class claims. The terms of the DHEPDS Agreement have previously been reviewed by both the District Court and the U.S. Fifth Circuit and were found to be fair and equitable. Processing of claims within the CSSP has also been accompanied by extensive due process rights, including several iterations of review by the claims processors as well as appeal rights to an independent appeals panel, the District Court, and even the U.S. Fifth Circuit.

Given that a majority of the New Class Members were also DHEPDS Class Members[6], the New Class Distribution Model therefore sought to leverage claim determinations made under the DHEPDS Agreement to take advantage of the extensive efforts and due process already expended under that program to avoid significant duplication of time and expense, savings of which all benefit the New Class.  In this way, New Class Members who had previously submitted claims to and received final determinations from the CSSP were not required to file additional claim or registration forms or submit any additional supporting documentation[7], and no additional claim form review was necessary to determine eligibility or payment amount.  Rather, under the New Class Distribution Model, the claim determinations and base compensation amounts determined by the CSSP formed the basis for determining eligibility and compensation for such claimants.

While no claim intake or claim review was necessary for such Claimants, substantial data compilation, transfer, and analysis was required to ensure that the underlying information forming

---

[6] Pursuant to *Baker*, punitive damages should have no more than a 1:1 ratio when compared with compensatory damages, so the New Class Distribution Model assigned a punitive damage value of $0 to Claimants that had not previously received compensatory damages.  DHEPDS Class Members who (a) did not opt out of the DHEPDS to pursue separate claims for compensatory damages to support eligibility for punitive damages under the New Class Distribution Model, or (b) did not timely file claims in the DHEPDS Program pursuant to the DHEPDS Agreement, were therefore assigned a punitive damage value of $0 under the New Class Distribution Model.

[7] As per the New Class Distribution Model, DHEPDS Claimants and plaintiffs who eventually settled their claims or lawsuits through the Court-appointed Neutrals process were required to file New Class Claim Forms.  While the New Class Distribution Model provided that such parties were required to provide evidence of the existence of the Neutrals settlement to establish the existence of compensatory damages, the mere existence of a Neutrals settlement did not entitle such a party to eligibility in the Settlement Agreements (La Count Decl., §11)

the basis of the distribution for these New Class Members was accurate and complete.  First, for the New Class-applicable claim types in the DHEPDS, claim status and base compensation amount information[8] had to be transferred from the CSSP to the HESI/Transocean Distribution Database (the "Database") (La Count Decl., §7).  Such claim statuses transferred to the Database included eligibility, denial, and FWA denial information.

Moreover, certain individuals and entities were not included in the DHEPDS Class, because, for example, they were either excluded or chose to opt out.  To the extent such individuals and entities were included in the New Class, the New Class Distribution Model required them to file New Class Claim Forms on or before the deadline of December 15, 2016.  Such potential Claimants were also required to demonstrate that they had received compensation for compensatory damages or had preserved their rights to compensatory damages by complying with Pretrial Order 60.[9]  In reviewing such claims, the New Class Distribution Model sought to generally apply the same principles and methods of determining eligibility and base compensation amounts as those contained in the DHEPDS Agreement to reach generally consistent determinations, and the New Class Distribution Model provided for significant notice, due process, and appellate rights whereby claimants could contest these determinations[10] (La Count Decl., §8).

---

[8] For claims with a DHEPDS determination, the DHEPDS Eligibility Notice line 1 base compensation amounts were used as the New Class compensation amount baselines for purposes of allocation and distribution [Rec. Doc. 18797 at 3 – 4].

[9] As explained further in the New Class Claims Administrator's Clarification of New Class Distribution Model Issues [Rec. Doc 21778], for individuals and entities which had received no compensatory damages and did not have a reasonable likelihood to recover compensatory damages because their claims were dismissed for failure to comply with Pretrial Order 60, the New Class Distribution Model assigned $0 (zero dollars) as the most reasonable value of their corresponding punitive damages claims under *Baker*.

[10] The Settlement Agreements and the New Class Distribution Model provided Claimants with the right to appeal to the New Class Claims Administrator and to the District Court as to the amount of any payment to any individual Claimant.  However, the Settlement Agreements and New Class Distribution Model also provided generally that there shall be no right of appeal to the U.S. Fifth Circuit.

Lastly, a very small number of potential Class Members opted out of the Settlement Agreements and therefore were not permitted to file New Class Claim Forms or have prior DHEPDS claim determination data assessed for New Class eligibility (La Count Decl., §13).

## III.   NEW CLASS DISTRIBUTION MODEL AND PAYMENTS

### a.   Distribution Model Fund Initial Allocations and Reallocation of Funds

As noted above, the New Class Distribution Model approved by the District Court afforded greatest priority to those eligible New Class Members with the most direct and longest recognized standing under *Robins Dry Dock*.  The New Class Distribution Model was also designed to account for the fact that DHEPDS claims were evaluated in varying ways depending on the underlying claim category, type, and associated framework under the DHEPDS Agreement. With this in mind, the New Class Distribution Model considered DHEPDS base compensation amounts with enhancements or reductions as appropriate under the circumstances based on each claim category. The New Class Distribution Model then allocated the punitive damages settlement funds into sub-pool percentages, which also had the benefits of expediting distribution to the greatest degree and in the most cost-efficient manner possible.[11] Those sub-pool percentages were as follows:

| New Class Claim Category | Prorated Gross Settlement Fund Allocation (Percentage)[12] |
|---|---|
| Real Property | 80.00% |
| Personal Property | 0.60% |
| Commercial Fishermen | 17.80% |
| Charterboat Operators | 0.20% |
| Loss of Subsistence | 1.40% |
| Total | 100.00% |

---

[11] This process is described in more detail in the New Class Distribution Model itself [Rec. Doc. 18797 at 21 *et seq.*].

[12] The New Class Claims Administrator reserved the right to reallocate as much as 3% of the total settlement fund among these claim categories to accommodate unforeseen mixes or values in claim submissions [Rec. Doc. 18797 at 26].  Additional details on updates to the percentages pursuant to this established right are provided below.

Generally, the New Class Distribution Model further provided that each claim type's sub-pool would be divided *pro rata* among the eligible claims within that claim category based on their base compensation amounts, with some exceptions that related to select New Class Distribution A claim types.

The New Class Claims Administrator reserved the right to reallocate as much as 3% of the total settlement fund among the claim categories to accommodate unforeseen mixes or values in claim submissions.[13]  After further reviewing the pending Distribution B Claims as well as the aggregate losses associated with them, the New Class Claims Administrator seeks to inform the Court of his intent to reallocate remaining New Class Distribution A reserve funds[14] totaling $27,062,497.50, inclusive of the $1,000,000.00 reallocated to New Class Distribution B as part of the New Class Distribution A preparations, to the New Class Distribution B pool, which total does not exceed the 3% reallocation cap provided under the previously approved New Class Distribution Model.

The New Class Claims Administrator's bases for reallocation are as follows.  First, the vast majority of the funds to be reallocated were set aside within the Seafood Compensation distribution pool, which has already received a *pro rata* distribution of nearly 100% of its initial compensation value in New Class Distribution A after reallocating $1,000,000.00 from that distribution pool at that time; in order to maintain compliance with *Baker*, no additional funds should be distributed to this subset of the Class.  Second, the New Class Distribution B claim types are the strongest and most consistent with eligibility per the standards set by *Robins Dry Dock* and its progeny, but also

---

[13] In the Court's Order approving Distribution A, funds totaling $1,000,000 were reallocated to the Real Property Claims category during the New Class Distribution A payment preparations pursuant to the New Class Claims Administrator's reserved authority in the New Class Distribution Model as described in the Memorandum in Support of Motion for Approval of Partial Distribution of the Punitive Damages Portion of the Halliburton Energy Services, Inc. and Transocean Ltd. Settlements Agreements  [Rec. Doc. 25899-1 at paragraph VIII(3)].

[14] Such funds include the unused New Class Distribution A Reserve Claim funds, the $5,800,000.00 contingency reserve fund, and any allocated administrative funds that will not be needed, as discussed in Section VI below.

were so numerous and substantial in value that this reallocation acts to equitably bring the *pro rata* of these Distribution B claim types more in line with the underpinnings of *Robins Dry Dock* relative to those claim types in Distribution A.  Third, the administrative expenses of disbursing these reserve funds to the underlying New Class Distribution A Class Members would be of significant cost to the settlement funds themselves and therefore to the Class itself, and many checks would be only *de minimis* in value.  Thus, the New Class Claims Administrator seeks to inform the Court of his intent to reallocate these funds as per the New Class Distribution Model.

### b.  Reconciliation Notices and Subsequent Results

To provide notice and due process to potentially eligible New Class Claimants, the New Class Claims Administrator issued New Class claims reconciliation notices, which provided Claimants and any prior DHEPDS legal representative with a list of all their potential claims along with their statuses, so that Claimants would have the opportunity to raise any issues or concerns.[15] Following evaluation of the responses received by the New Class Claims Administrator, the identified reconciliation issues were resolved.[16]

### c.  Equitable Adjustments Considering Exceptional or Extraordinary Facts or Circumstances

The New Class Distribution Model provided the New Class Claims Administrator with "the right to adjust the award amount in any specific case for equitable purposes in light of exceptional or extraordinary facts or circumstances relative to that claim." (New Class Distribution Model at p. 27).  In assessing the New Class claim population, the New Class Claims Administrator has determined the following adjustments are necessary and plans to implement them pursuant to

---

[15] Because these notices were sent to legal counsel as well as the Claimants themselves, it provided the opportunity to notify Claimants of the Court's Order capping attorneys' fees and to clear up any potential representation issues.

[16] The reconciliation issues identified by the New Class Claims Administrator did not relate to Distribution B Claims and therefore are not germane to this motion and memorandum.

his equitable authority reserved in the New Class Distribution Model.  Additional detail is available in Section 14 of the La Count Decl.:

1. Regarding Real Property claims associated with parcels that fell outside of their respective Real Property Compensation Zones, but where evidence of oiling provided by the Claimant warranted inclusion, the New Class Claims Administrator made allowances on appeal to include claims for real property that had been oiled.  On Wetlands Real Property claims where the necessary oiled-feet-of-property observation data was not available in Shoreline Cleanup Assessment Technique ("SCAT") or Natural Resource Damages Assessment ("NRD") records, but evidence of oiling was submitted and deemed adequate by the New Class Claims Administrator so as to establish an alternate basis for inclusion in those situations, the Coastal Real Property valuation formula was utilized.[17]

2. Regarding Coastal Real Property claims, the New Class Distribution Model as approved by the Court states on Page 9 in the Eligibility Requirements and Calculation Methodology for Newly Filed Claims section: "The minimum compensation amounts noted in DHEPDS based on land use designations will not be considered in this Program."  However, for the practical and cost-efficiency reasons explained in further detail in Section 14 of the La Count Decl., the same minimum compensation methodology used by the CSSP in calculating DHEPDS framework values has been utilized for applicable New Class claims.

---

[17] The New Class Claims Administrator deemed this to be the only time and cost-effective approach given that no contemporaneous oiling measurements from 2010 were available to otherwise use in applying the Wetlands Real Property valuation formula.  Moreover, this approach was affirmed by the Court on appeal by Chief Magistrate Judge Wilkinson [Rec. Doc. 25212].

## IV.     ESTABLISHMENT OF DISTRIBUTION B RESERVE CLAIMS

This Motion seeks approval for distribution of only the Distribution B Claims, consisting of the Coastal Real Property, Wetlands Real Property, Oyster Leaseholder, and Real Property Sales Damage claim types (La Count Decl., §15).  None of the Distribution B Claims for New Class-relevant claim categories remain pending with the DHEPDS (La Count Decl., §15).  There are 276 Distribution B Claims associated with 29 Claimants' New Class Claim Forms that are pending in the various appellate processes set forth in the Settlement Agreements and the New Class Distribution Model (the "Distribution B Reserve Claims").  Values have been assigned to these claims so that funds may be set aside for later distribution if/when these claims are deemed eligible (La Count Decl., §22 and §29).

## V.     CLAIM DISPOSITIONS

A total of 2,751 Distribution B Claims were determined to be eligible by the New Class Claims Administrator as a result of the claims review process after applying the New Class Distribution Model methodologies.  Another 46,665 eligible claims associated with New Class Distribution B claim types were transferred from the DHEPDS as explained in Section 20 of the La Count Decl.  Collectively, these are referred to as the Eligible Claims (La Count Decl., §20).  The Eligible Claim counts as well as their aggregate values by claim category and claim type are provided in Section 20 of the La Count Decl.

Further, a total of 3,428 New Class Distribution B Claims were reviewed by the New Class Claims Administrator and denied or determined to have a $0 value pursuant to the New Class Distribution Model.  Another 29,498 denied claims associated with New Class claim categories were transferred from the DHEPDS as explained in Section 21 of the La Count Decl.  Collectively, these are referred to as the Denied Claims (La Count Decl., §21).   The Denied Claim counts for

New Class Claim Forms by claim type, along with denial reasons, are provided in Section 21 of the La Count Decl.

## VI.     ADJUSTMENTS TO PRIOR COURT-APPROVED HOLDBACKS

The New Class Claims Administrator previously requested, and the Court previously approved, setting aside of $5,800,000.00 prior to *pro rata* allocation of the funds for any items identified after either Distributions A or B that may require adjustment [Rec. Doc. 25990 at paragraph f]. To date a very limited number of such claims have been identified from New Class Distribution A. Further, although New Class Distribution B is much larger in terms of fund allocation, there are fewer claim types under consideration, which serves to simplify the data set and reduce the need for contingent funds. As a result, the New Class Claims Administrator requests the contingency holdback be reduced to $3,500,000.00 for the New Class Distribution B, with the excess held back prior to New Class Distribution A being included in the 3% reallocation of $27,062,497.50 to the extent possible.

The Court also approved an administrative fees and expenses holdback of $8,125,000.00 prior to New Class Distribution A, earmarked for administrative costs associated with the remaining activities for the New Class Distributions A and B, of which $1,952,495.55 is no longer deemed necessary. The New Class Claims Administrator recommends including these funds with the New Class Distribution B Net Settlement Fund as well.

## VII.    DISTRIBUTION B NET SETTLEMENT FUND AND RESERVED FUNDS

As detailed in the La Count Decl. at Section 24, the New Class Claims Administrator seeks to cease bifurcating invoices between the Old Class and New Class, applying the prior Court-approved allocation remaining for the Old Class ($72,539.28) to the next Court-approved invoice and thereafter submitting only one invoice to be satisfied from the New Class Punitive Damages

11

Combined Settlements Fund B account, given that much of the prior work benefitted both the Old and New Classes and the vast majority of any future work performed in relation to the Old Class will also benefit the New Class.  Additionally, the New Class Claims Administrator seeks to allocate the $1,952,495.55 in excess administrative fee and expense holdback from the previously approved $8,125,000.00 approved by the Court, leaving $2,749,500.00 allocated to complete the following[18]:

a.   This estimate assumes only a Distribution A and a Distribution B will be required.  Any administrative costs and expenses associated with a further distribution, to the extent administratively feasible, necessary, and approved by the Court, have not been included in this estimate.

b.   Payments for eligible Distribution B Reserve Claims will be made periodically with payment reissues in the normal course.

c.   The estimated administrative fees and expenses include estimated federal tax liability on interest earned as well as tax preparation expenses anticipated to be incurred through 2021.

d.   Any necessary escheatment will be conducted in two rounds, within one calendar year of the end of the Settlements Program.

Based on the foregoing the New Class Claims Administrator will allocate funds for each New Class Reserve B Claim within the distribution pool and hold those funds back until such time as the claims in question are deemed eligible, if ever, per Section IV above and further described in the La Count Decl. at Sections 22 and 29.  This will require reallocation of the funds to be held back after the additional interest earned from May 1, 2020 - June 15, 2020 has been added to the

---

[18] During the administration and disbursement of Distributions A and B, the New Class Claims Administrator will continue to submit invoices for reasonable and necessary expenses incurred to the Court for approval on a quarterly basis, with such amounts to be paid from the funds reserved for payment of future administrative costs (La Count Decl., §24).

New Class Distribution B Net Settlement Fund, as will be necessary for all claims (La Count Decl. §27).

As noted above in Section I, the Allocation Neutral allocated $902,083,250.00 of the commingled HESI and Transocean Settlement Agreements proceeds to the New Class [Rec. Doc. 15653]. After the inclusion of interest earned and anticipated to be earned on the New Class Settlements' Portion, as well as the reallocated New Class Distribution A Reserve funds described above in Section III, and after deduction of a) the previously approved New Class administrative expense invoices, b) the New Class taxes due to be paid from the New Class Settlement funds on interest earned between May 1, 2020 – June 15, 2020, and c) the allocation for any potential Distribution B Reserve Claims that may eventually be deemed eligible, the New Class Settlement Fund remaining available for distribution is $755,038,305.16, which amount will be subject to adjustment once final interest earned, after taxes, is included.

The New Class Claims Administrator seeks approval for the transfer of these funds from the HESI and Transocean escrow accounts to the HESI-Transocean Punitive Damages Commingled Distribution account, upon entry of Court Order authorizing the same. Second quarter taxes shall be paid prior to the final funds transfer from the escrow accounts to the distribution account, and subsequently the escrow accounts shall be closed.

## VIII.   DISTRIBUTION B ESTIMATED *PRO RATA*

Considering the foregoing, and based on an estimated Commingled Net Settlement Fund of $755,038,305.16 for Distribution B Claimants[19], below is the estimated *pro rata* from the La Count Decl. at Section 29:

---

[19] The distribution pool includes an allocation of funds for all Distribution B Reserve Claims based on their potential, maximum recognized losses. The distribution value for the allocation to these Distribution B Reserve Claims will change given it is established based on a *pro rata* allocation of the Distribution B Net Settlement Fund value, which must be finalized to account for additional interest earned between May 1, 2020 through July 15, 2020.

| Claim Category | Eligible Claims Count | Reserve Claims Count | All Claims - Recognized Losses (Pre-Multiplier) | 2.5X Multiplier Value for Coastal Real Property & Wetlands Real Property Claims | All Claims – Recognized Losses Including 2.5X Multiplier (as applicable) | Distribution Pool Value | Estimated *Pro Rata* |
|---|---|---|---|---|---|---|---|
| **Real Property, including Coastal Real Property, Wetlands Real Property, Real Property Sales & Oyster Leaseholder** | 49,416 | 276 | $895,915,581.29 | $411,766,308.54 | $1,307,681,889.82 | $755,038,305.16 | 0.5773868331 |

## IX.    THIRD PARTY CLAIMS AND BANKRUPTCY ISSUES

Third Party Claimants, to the extent they complied with the requirements of Court Approved Procedure 3 [Rec. Doc. 25472], will be paid.  Similarly, to the extent an eligible New Class Claimant has filed for bankruptcy and the Trustee has complied with Court Approved Procedure 4 [Rec. Doc. 25472], such payments will be made to the appropriate party (La Count Decl., §16 and §17).

## X.    QUALITY ASSURANCE, FRAUD PREVENTION, AND REGULATORY COMPLIANCE

Prior to distribution, all eligible Claimants will be checked against the Settlement Administrator's known "watch list" of fraudulent filers as well as the federal government's list of restricted persons and persons who reside in countries to which payment is prohibited, in accordance with the regulations of the Office of Foreign Asset Control (La Count Decl., §18 and §19).

## XI.    TAX REPORTING

New Class Members or their attorneys who receive reportable New Class distribution payments of $600 or more will receive IRS Forms 1099-MISC as applicable under IRS regulations

(La Count Decl., §32).  To facilitate this process and accurate tax reporting, eligible New Class Members will be required to submit IRS Forms W-9 if a complete and accurate IRS Form W-9 was not already on file with the Settlements Program (La Count Decl., §30).  Absent a complete and accurate Form W-9, New Class distribution payments may be subject to a backup withholding of 24% which will be paid to the IRS on the Claimant's behalf[20] (La Count Decl., §30 and §31).

Respectfully submitted,

/s/ Patrick A. Juneau
PATRICK A. JUNEAU
Old Class Claims Administrator

---

[20] Alternatively, the New Class Claims Administrator, in his discretion, may opt to hold the payment to the eligible Claimant to allow him/her/it time to respond prior to distributing the payment less the 24% withholding amount.