# Exhibit 1

# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | MDL NO. 2179 <br><br> SECTION: J <br><br><br> HONORABLE CARL J. BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class, <br><br>        Plaintiffs, <br><br> v. <br><br> BP Exploration & Production Inc., *et al.*, <br><br>        Defendants. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | NO. 12-CV-968 <br><br> SECTION: J <br><br><br> HONORABLE CARL J. BARBIER <br><br> MAGISTRATE JUDGE SHUSHAN |

## <u>DECLARATION OF DR. JESSICA HERZSTEIN</u>

I, Dr. Jessica Herzstein, am over twenty-one years of age and of sound mind and body. My declaration is based on my personal knowledge, experience, and review of the materials described herein.  If called to testify, I could testify to the matters set forth in this declaration.

1.      I am a physician licensed to practice medicine in Pennsylvania.  I have worked for more than 20 years as an occupational and environmental physician with a specific focus on the care of workers who have been exposed to potential environmental or occupational hazards.  I am board certified in internal medicine and occupational medicine.  I am a Fellow of the American College of Physicians, a Fellow of the American College of Occupational and

Environmental Medicine, and a member of the International College of Occupational Health. In February 2012, I was appointed to the United States Preventive Services Task Force. I also have served on the Agency for Toxic Substances and Disease Registry (ATSDR) expert panel that developed the Final Criteria for Determining the Appropriateness of a Medical Monitoring Program under CERCLA (Federal Register, 1995).

2.     I serve as the Global Medical Director for Air Products and Chemicals, Inc., a company that manufactures chemicals in more than 30 countries. At Air Products, I manage the programs in worker health, including industrial hygiene, health hazard assessment, medical surveillance, wellness, and mental health. I review potential worker exposure hazards and the potential risk of acute and chronic disease, and decide what preventive measures to use to detect and reduce underlying causes of work-related illness and disease. I make decisions about the potential contribution of potentially hazardous occupational exposures to illness or injury in individual workers and oversee decisions about fitness for duty in specific cases. I have also communicated with health professionals and community members concerning potential health effects of acute toxic exposure following chemical releases.

3.     I am also the President of Environmental Health Resources, P.C., a consulting company that focuses on developing programs that address occupational and environmental health, including programs for medical screening and surveillance, international medical services, and risk assessment and communication. I have developed various medical screening programs for workers in the chemical, defense, and pharmaceutical industries, as well as emergency response workers, who have been exposed to potentially toxic agents and where medical screening was appropriate. I also have reviewed ATSDR proposals for health risk assessment and managed communications relating to community environmental exposures.

4.      Since 2006, I have been a lecturer at the University of Pennsylvania School of Medicine, Department of Occupational and Environmental Health.  I was a lecturer at the Harvard University School of Public Health, Department of Environmental Health from 1996 - 2004 and at Northwestern University School of Medicine from 1997 - 2004.  I served on the clinical faculty at Temple University School of Medicine from 1992 - 1997, and was a visiting professor at the West Virginia School of Medicine, Institute of Occupational and Environmental Health, in 1996.  From 1995 - 1997, I was a Medical Director for the Department of Defense, where I oversaw national medical programs for the Department, and from 1992 - 1996 I served as a consultant to the Department of Justice, Environmental Health and Biomonitoring.  I continue to lecture and teach health professionals, including public health students and physicians, about occupational and environmental health.

5.      I am co-editor of three books on environmental health, entitled "Environmental Medicine", "Resources in International Occupational and Environmental Medicine", and "Issues in International Occupational and Environmental Medicine", and have contributed chapters to multiple books on occupational health and toxicology.

6.      I received my M.D. and Masters Degree in Public Health, Environmental Health, from the Yale University School of Medicine, and my Bachelor of Arts Degree in Chemistry from Harvard College.  A copy of my curriculum vitae is attached to this declaration as Exhibit A.

7.      I did not personally participate in any settlement negotiations between BP and the plaintiffs, nor did I have an advisory role during the settlement process.

8.      In preparing this declaration, I have reviewed the following materials:

a.   The Medical Benefits Class Action Settlement Agreement (as amended May 1, 2012) ("Medical Settlement Agreement"), including the Specified Physical Conditions Matrix ("Matrix") (Exhibit 8 thereto) and the Periodic Medical Consultation Program (Exhibit 12 thereto);

b.   The "Medical Encounters" database maintained by BP in connection with its response to the *Deepwater Horizon* oil spill, which reflects visits by Clean-Up Workers to medic stations established by BP, as well as underlying data and documentation from which the "Medical Encounters" database was created;

c.   Declarations of Dr. Robert Cox, Dr. David Dutton, and Dr. Peter Lees;

d.   Reports from government agencies and non-profit entities regarding the *Deepwater Horizon* Incident, as set forth in Exhibit B to this declaration; and

e.   Medical literature, as set forth in Exhibit C to this declaration.

**Terms of the Medical Settlement Agreement**

9.      The Medical Settlement Agreement provides for a class consisting of Clean-Up Workers, residents of defined beachfront areas (Zone A) who have had or have a Specified Physical Condition, and residents of defined wetlands areas (Zone B).  Residents of Zone A and B must have resided in those areas for some time on at least 60 days between April 20, 2010 to September 30, 2010 (for Zone A residents) or December 31, 2010 (for Zone B residents). "Clean-Up Workers" are defined as individuals who performed clean-up activities, remediation efforts, and/or other responsive actions, including the use and handling of dispersants, relating to the *Deepwater Horizon* Incident at any time between April 20, 2010, and April 16, 2012.

10.     The Medical Settlement Agreement provides the following benefits to qualifying class members: (1) compensation for a Specified Physical Condition, as set forth on the Matrix;

(2) participation in the Periodic Medical Consultation Program; and (3) participation in the Back-End Litigation Option for Later-Manifested Physical Conditions.

**Potential Routes of Contact with Oil and/or Dispersants
Resulting from the *Deepwater Horizon* Incident**

11.    As described in the final National Institute for Occupational Safety and Health (NIOSH) Health Hazard Evaluation Report and the Federal On-Scene Coordinator's Report for the *Deepwater Horizon* Oil Spill, Clean-Up Workers performed a variety of tasks in connection with the response to the *Deepwater Horizon* oil spill, including:  beach clean-up, consisting of the sifting of sand, the removal of tar balls, and digging out tar mats; wildlife clean-up and rehabilitation; vessel decontamination and clean-up; oil booming, skimming, and/or vacuuming; *in situ* oil burning; dispersant application; and source control.  To the extent that Clean-Up Workers came into contact with components of oil and/or dispersants,[1] such contact would have occurred primarily through two routes:  (1) inhalation (*i.e.*, breathing) and/or (2) direct contact (*i.e.*, dermal, or direct contact with skin; direct contact with eyes).  To the extent that Zone A or B Residents came into contact with such substances, they would have done so primarily through the same routes.

12.    I have reviewed reports issued and statements made by NIOSH, the Occupational Safety and Health Administration (OSHA), and the U.S. Environmental Protection Agency (EPA) regarding oil and dispersants, exposure monitoring, and observational assessments, as well as the declarations of Dr. Lees, Dr. Cox, and Dr. Dutton.  As these sources indicate, given the location of the oil spill, the components of oil and dispersants, observed levels of airborne

---

[1]  References in this declaration to "oil and/or dispersants" refer to the crude oil, other hydrocarbons, dispersants, decontaminants, and/or other substances resulting from the *Deepwater Horizon* Incident, including the resulting mixture of the substances as well as the byproducts of the *in situ* burns.

concentrations of oil and dispersants, the concentration of oil by the time it reached the shoreline, the preventive measures taken to protect against exposure, the reported measurements of airborne exposures, and the observations regarding limited dermal contact, severe adverse effects to Clean-Up Workers and residents of Zones A and B from contact with oil and/or dispersants would not be expected.

### The Medical Settlement Agreement Includes Appropriate Physical Conditions

13.     The Medical Settlement Agreement provides for monetary compensation to qualifying class members who demonstrate that they have or have had an Acute or Chronic Specified Physical Condition, as set forth on the Matrix.  Acute Specified Physical Conditions, described on Table 1 of the Matrix, include the following broad spectrum of conditions: (1) ocular;  (2) upper airway and respiratory;  (3) otolaryngological;  (4) dermal;  and (5) neurophysiological, neurologic, and odor-related.  Acute Specified Physical Conditions also include effects from exposure to heat experienced by Clean-Up Workers.  Chronic Specified Physical Conditions, described on Table 3 of the Matrix, include the following conditions: (1) ocular, specifically sequela from direct chemical splash to eye(s); (2) respiratory, specifically chronic rhinosinusitis and Reactive Airways Dysfunction Syndrome (RADS); and (3) dermal, specifically chronic contact dermatitis and chronic eczematous reaction.

14.     The Acute and Chronic Specified Physical Conditions on the Matrix consist of those conditions for which there is a medical basis to conclude that contact with oil and/or dispersants caused them if there were exposure to sufficient amounts of such substances for a sufficient duration of time.  In addition to the reports of certain government agencies and the declarations of Dr. Cox, Dr. Lees, and Dr. Dutton,  I have considered the following materials in reaching this conclusion:  (1) medical literature pertaining to health effects from exposure to the components of oil and/or dispersants; (2) data and documentation regarding the conditions and

symptoms reported by Clean-Up Workers at medic stations established by BP during the response to the spill; (3) published public health surveillance data from the *Deepwater Horizon* Incident; and (4) conditions and symptoms reported by response workers and residents in connection with other oil spills.

15.     As indicated above, medical literature supports the inclusion of the conditions listed on the Matrix.   For example, direct dermal contact with components of oil and/or dispersants can cause skin irritation and rashes in the area(s) of contact.  Macys, Capt. DA, *et al.*, *Results of a Workshop on Health Effects of Crude Oil Exposures Related to Operation Desert Storm*, Nav. Med. Res. Instit.: Bethesda, MD; 92:04, ¶¶ III.3.1.3. and III.3.3.3, 1992.  Ocular contact with Volatile Organic Compounds (VOCs), by a direct chemical splash to the eye and by contact with oil mist or vapors, is known to cause eye irritation.   Macys, at ¶ III.3.3.5.  Neurologic symptoms can be caused by inhalation of certain VOCs at sufficient levels and duration.  For example, inhalation of VOCs at levels of approximately 250 to 500 parts per million (ppm) has been associated with headache and nausea.  Macys, at ¶ III.3.3.4.  Headache and nausea are also recognized to occur as a result of unpleasant odors, which can be produced by much lower levels of VOC exposure.  Hudnell, HK, *et al.  Exposure of Humans to a Volatile Organic Mixture. II.  Sensory*, Arch. Environ. Health 47(1):31-38, Jan-Feb 1992.

16.     As set forth in Dr. Dutton's declaration, medic stations were made available to Clean-Up Workers if they felt ill or were injured during response activities.  The stations were established by BP and generally staffed by Emergency Medical Technicians or paramedics.  The conditions and symptoms reported by Clean-Up Workers at the medic stations were subsequently recorded in an Excel spreadsheet, known as the "Medical Encounters" database, and are identified by the most analogous OSHA code and/or through a written description summarizing

the Clean-Up Worker's report of his or her condition or symptoms. Decl. of Dr. David Dutton, ¶¶ 66-69. The database includes entries for approximately 20,000 visits made to these medic stations by approximately 13,000 individuals. The database reflects that approximately 70% of these individuals reported conditions that are reflected on Table 1, Table 3, or Level A4 of the Matrix. The conditions and symptoms reported by the remaining 30% of the approximately 13,000 individuals consist of trauma (*e.g.*, cuts, lacerations, broken bones), musculoskeletal problems (*e.g.*, back pain), routine care (*e.g.*, routine checks of blood pressure and blood sugar), and other events generally unrelated to exposure to oil and/or dispersants or heat (*e.g.*, cardiac events, stroke, and pre-existing conditions). Based upon my review of the "Medical Encounters" database, the Matrix appropriately includes those conditions that were actually reported by Clean-Up Workers shortly after performing response activities and that could be caused by contact with oil and/or dispersants or by exposure to heat.

17. The Matrix is also consistent with published public health surveillance data regarding the conditions and symptoms reported by Clean-Up Workers and individuals in the Gulf states from April through September 2010. *See* Centers for Disease Control and Prevention (CDC) Health Surveillance Reports for Louisiana, Mississippi, Alabama, and Florida, and BioSense, *available at* http://emergency.cdc.gov/gulfoilspill2010/2010gulfoilspill/health_surveillance.asp. Specifically, "headache, dizziness, nausea, vomiting, weakness/fatigue and upper respiratory irritation" were the most frequently reported symptoms amongst 415 health complaints in Louisiana reported by the Louisiana Department of Health and Hospitals Office of Public Health. Louisiana Department of Health and Hospitals Office of Public Health (OPH) Section of Environmental Epidemiology & Toxicology (SEET) Oil Spill Health Effect Summary, *MS Canyon 252 Oil Spill*

*Surveillance Report*, Sept 19-25, 2010.  Similarly, of the 1,191 exposure calls relating to the *Deepwater Horizon* Incident, the symptoms most commonly reported to the American Association of Poison Control Centers included "headaches, nausea, vomiting, diarrhea, throat irritation, eye pain, coughing/choking and dizziness."  American Association of Poison Control Centers (AAPCC) Website, *The Oil Spill and Calls to Poison Centers*, *available at* http://www.aapcc.org/dnn/NewsandEvents/PoisonCentersandtheGulfOilSpill.aspx.  As reported in 826 surveys completed by workers in the Plaquemines Branch Incident Command System, the most frequently reported symptoms by workers performing response activities were headache, upper respiratory symptoms, and symptoms consistent with heat stress.  King, BS, Gibbins, JD, *Health Hazard Evaluation of Deepwater Horizon Response Workers*, Health Hazard Evaluation Report 2010-0115 and 2010-0129-3138, at 9, Aug. 2011.

18.     While health conditions that result from exposure to crude oil, dispersants, or other substances released or used in connection with an oil spill depend on a number of factors, some of which may differ from the *Deepwater Horizon* Incident, the conditions on the Matrix are generally consistent with conditions frequently self-reported by individuals who performed clean-up activities on, and residents who lived in areas within the vicinity of, previous oil spills.  Respiratory symptoms (including throat irritation and coughing), eye irritation, dermatitis, headache, nausea, and dizziness were reported by response workers and residents affected by other oil spills, and are included on the Matrix in the Medical Settlement Agreement.  *See, e.g.,* Lyons, RA, *et al.  Acute Health Effects of the Sea Empress Oil Spill*, J Epidemiol Community Health 1999; 53:306-310.

19.     The Matrix requires that the Acute and Chronic Specified Physical Conditions, or the symptoms thereof, manifested within specified timeframes after exposure to oil and/or

dispersants, or to heat. Specifically, Acute and Chronic ocular conditions, Acute neurophysiological, neurological and odor-related conditions, and the Chronic respiratory condition Reactive Airways Dysfunction Syndrome (RADS), must have manifested within 24 hours after exposure to oil and/or dispersants. Certain acute upper airway / respiratory conditions (*i.e.*, exacerbation of pre-existing asthma, exacerbation of chronic Obstructive Pulmonary Disorder (COPD), and epistaxis (nose bleeding)) and acute pharyngitis (throat irritation) must have manifested within 48 hours after exposure to oil and/or dispersants. Acute and chronic dermal conditions, other acute upper airway / respiratory conditions (*i.e.*, acute rhinosinusitis, acute tracheobronchitis, and acute bronchitis), and chronic rhinosinusitis must have initially manifested within 72 hours of exposure to oil and/or dispersants. Finally, Clean-Up Workers must have manifested a heat-related condition during or immediately following the shift in which they allege they became ill.

20. These timeframes are appropriate and have a scientific basis. Adverse health effects caused by contact with oil and/or dispersants or exposure to heat would manifest within the timeframes set forth on the Matrix, if not sooner. For instance, the onset of asthma symptoms occurring within minutes to hours, or less than 24 hours, after exposure is a diagnostic criteria for RADS. Tarlo, SM, *et al.*, *Diagnosis and Management of Work-Related Asthma: American College Of Chest Physicians (ACCP) Consensus Statement*, CHEST 134(Supp. 3):1S, 11S, Table 1, Sept. 2008. Certain conditions on the Matrix, such as irritant contact dermatitis, would result from an irritant-induced reaction to the substance's contact with the affected surface area of the body. Symptoms of the irritation would be expected to develop within a few minutes to a few hours after contact with the irritating substance. Other Matrix conditions, such as urticaria (hives), would typically result from an allergic-induced reaction to the relevant

10

substance's contact with the affected surface area of the body.  The first symptoms of these allergic-induced reactions would be expected to occur well within the 72-hour timeframe set forth on the Matrix.

### The Periodic Medical Consultation Program
### Provides a Significant Health Benefit to Class Members

21.    The Medical Settlement Agreement provides all class members with the opportunity to receive up to 8 physician visits over a 21-year period through the Periodic Medical Consultation Program.  At each visit, class members are eligible to receive, without charge to them, a physical examination that includes vision screening, a comprehensive medical, occupational, and environmental history, and counseling regarding risk factor reductions and interventions.  In addition, the physician performing the consultation visit, using his or her discretion and taking into account the individual class member's age, reported symptoms, personal and family history, and clinical presentation, and with the class member's informed consent, can order the blood, urine, cardiac, and respiratory tests listed on Exhibit 12 to the Medical Settlement Agreement, which tests would also be performed without charge to the class member.

22.    The Periodic Medical Consultation Program is not designed to, and in practice does not, provide a medical monitoring or screening program for conditions claimed to be caused by contact with oil and/or dispersants.  Rather, it provides class members with access to primary medical services at no cost.  This is a significant and tangible benefit, especially to those class members who might not otherwise have access to or be able to afford such medical services. Class members will have the opportunity to establish a physician-patient relationship with physicians participating in the Program, which provides an important health benefit to individuals who may otherwise not have a primary care physician.   Medical Settlement

Agreement, § VII.B2; Stewart, MA, *Effective Physician-Patient Communication and Health Outcomes: A Review*, Can. Med. Assoc. J. 152(9):1423-33, May 1995. The consultation visits also provide an opportunity for participating class members to engage in dialogue with qualified medical providers regarding individual health concerns, and to address behavioral and preventive measures that can improve individual health outcomes and reduce chronic disease, such as such as stopping tobacco use. United States Preventive Services Task Force, *Counseling and Interventions to Prevent Tobacco Use and Tobacco-Caused Disease in Adults and Pregnant Women: U.S. Preventive Services Task Force Reaffirmation Recommendation Statement*, Ann. Intern. Med. 150:551-555, 2009.

23. The Periodic Medical Consultation Program incorporates a number of features to promote class member utilization of the medical consultation visits. The Medical Settlement Agreement provides that the Claims Administrator will coordinate the scheduling of consultation visits through a web portal and call center, provide telephone and written reminders in the week before scheduled visits, pay mileage reimbursement for visits over 25 miles from home, and send qualifying class members annual statements and reminders of when they are next eligible for a consultation visit. These features are designed to maintain class member participation rates over time. Further, the integration of the Periodic Medical Consultation Program providers with Federal Qualified Health Centers (FQHC's) and FQHC "look-alikes", certain of which will benefit from the Gulf Region Health Outreach Program, will increase class member access to behavioral and mental health services, and other more specialized care, in one location. The Periodic Medical Consultation Program provides class members with the opportunity to establish an ongoing physician/patient relationship and improve health outcomes by addressing acute and

chronic health conditions, and improved knowledge of and compliance with preventive health measures.

24.     The fact that the participating physicians must use their discretion in deciding which of the possible tests to order for the participating class member — taking into account the individual class member's personal and family history and clinical presentation, appropriate medical guidelines regarding uses of the available tests, and the class member's active participation with the doctor and preferences and values in the decision-making process — is an important feature of the Periodic Medical Consultation Program.  By engaging with the patient in a meaningful discussion of the risks and benefits of one or more of the available tests, the participating physician will help the class member weigh the potential benefits and risks of each test so that he or she can make an informed decision about whether to have the test performed and understand the implications of the test results.

25.     The blood, urine, cardiac, and/or respiratory tests set forth on Exhibit 12 to the Medical Settlement Agreement, when performed as part of the Periodic Medical Consultation Program, can provide a benefit to participating class members in the following three ways:

a. First, various tests available in the Periodic Medical Consultation Program can be appropriately used to obtain information regarding certain pre-existing medical conditions.  For example, a hemoglobin $A_{1c}$ blood test in a diabetic person could provide a doctor with information regarding how well the patient is managing the diabetes over the previous few months.  Qaseem, A, *et al.  Glycemic Control and Type 2 Diabetes Mellitus:  The Optimal Hemoglobin $A_{1c}$ Targets.  A Guidance Statement from the American College of Physicians*, Ann Intern Med.  147:417-422, 2007.  This information, along with the examination during the consultation visit,

13

could be used to provide education and guidance regarding behavioral and medication changes the patient could make to improve the management of his or her disease, to reduce risk of disease, or to encourage the continuation of good health practices.

b.  Second, some of the tests available in the Periodic Medical Consultation Program can help provide diagnostic information regarding manifest and latent physical disease, including cancer, in symptomatic individuals.  For example, a chest x-ray may provide useful diagnostic information to a physician when performed on patients with symptoms of chronic cough and fever, and abnormal sounds on physical exam.  For someone with symptoms of lung cancer (*e.g.*, weight loss, fatigue, coughing up blood), the chest x-ray could help provide information to diagnose lung cancer. Chiles, C, Guilla, SM.  *Radiology of the Chest, in* Basic Radiology 2nd ed., Chen, MYM, *et al*. eds., Ch. 4:96-100, McGraw-Hill, 2011.  Similarly, a complete blood count could be recommended for those persons with a suspected active infectious process, in which a white blood count and differential would be useful diagnostic information.  Seebach, J, *et al. The Diagnostic Value of the Neutrophil Left Shift in Predicting Inflammatory and Infectious Disease*, Am J Clin Pathol. 107(5):582, 590, 1997.  A urinalysis could be recommended for persons with symptoms of pain or discomfort during urination, in order to provide information that may help diagnose bladder infections, kidney stones, pyelonephritis (upper urinary tract disease), or other kidney disease.  McPherson, RA and Ben-Ezra, J., *Basic Examination of Urine*, *in* McPherson RA, Pincus MR, Henry's Clinical Diagnosis and Management by Laboratory Methods, Ch. 28, 22nd ed. Phila., Pa: W.B. Saunders Company, 2011.

c. Third, qualified public health groups have determined that sufficient evidence exists that some of the tests available in the Periodic Medical Consultation Program can be effective in helping to reduce mortality in certain sub-groups of the general population by detecting certain medical conditions in asymptomatic class members within those sub-groups. For example, a lipid panel could be appropriately ordered for detecting lipid disorders in men aged 35 and older, men aged 20 to 35 if they are at increased risk for coronary heart disease, and women aged 20 and older if they are at increased risk for coronary heart disease. U.S. Preventive Services Task Force, *Screening for Lipid Disorders in Adults, Recommendation Statement*, June 2008, *available at* http://www.uspreventiveservicestaskforce.org/uspstf08/lipid/lipidrs.htm. A Fecal Occult Blood Test could be appropriately ordered to screen for colorectal cancer in adults beginning at age 50 years and continuing until age 75 years. U.S. Preventive Services Task Force, *Screening for Colorectal Cancer: U.S. Preventive Services Task Force Recommendation Statement*, Ann. Intern. Med. 149:627-637, 2008. The results of such tests can serve as the basis for behavioral health counseling and modification to reduce health risks of chronic disease, as well as treatment of detected conditions.

### Later-Manifested Physical Conditions

26. Under the Medical Settlement Agreement, a Later-Manifested Physical Condition is defined as a physical condition first diagnosed after April 16, 2012 and which is claimed to have resulted from a class member's exposure to oil and/or dispersants, where such exposure occurred on or before September 30, 2010 (Zone A Residents), December 31, 2010 (Zone B Residents) or April 16, 2012 (Clean-Up Workers). Medical Settlement Agreement, ¶ II.VV.

This definition is medically appropriate, as there is no medical basis to assert that a latent disease allegedly caused by contact with oil and/or dispersants could develop before April 16, 2012.

27.     As set forth in the declarations of Dr. Lees and Dr. Cox, and in published reports, the detected levels of the substances referenced above in Paragraph 12 were far below EPA standards for acceptable lifetime cancer risks.  Given these levels of exposure, it is highly unlikely that class members will develop latent diseases, such as cancers, because of any contact with oil and/or dispersants in the *Deepwater Horizon* Incident.  Based on epidemiologic data regarding background rates of certain diseases in the general population, it is expected that various class members will develop latent diseases, such as cancers, over the course of their lifetime for reasons that have nothing do with any contact they may have had with oil and/or dispersants.  In the U.S., for example, there is slightly less than a 1 in 2 lifetime risk of a man and a little more than a 1 in 3 lifetime risk of a woman developing cancer.  American Cancer Society. *Cancer Facts & Figures 2012*, at 1.

28.     To the extent latent diseases, such as cancers, could be caused by contact with oil and/or dispersants in sufficient amounts and for sufficient duration, such diseases would not be expected to manifest in class members for years after their exposure to these substances.  U.S. Department of Health and Human Services, Public Health Service, National Toxicology Program, *Report on Carcinogens, Twelfth Edition*, at 4, 2011.

I declare under penalty of perjury that the foregoing analysis and opinions are true and correct.

Executed on August 12, 2012.

Dr. Jessica A. Herzstein

Case 2:10-md-02179-CJB-JCW   Document 7512-7   Filed 09/15/12   Page 19 of 31

EXHIBIT "A"

# Curriculum Vitae

## JESSICA HERZSTEIN, M.D., M.P.H.

**OFFICES**

Environmental Health Resources, P.C.
1755 P Street, NW
Washington, D.C. 20036
O – 202-588-9202
herzstj@gmail.com


Air Products
7201 Hamilton Boulevard
Allentown, PA  18195-1501
O – 610-706-7625
F -  610-706-5316
herzstj@airproducts.com


**EDUCATION**

Yale University School of Medicine
New Haven, Connecticut
M.P.H. in Environmental Health, 1989

Yale University School of Medicine
New Haven, Connecticut
M.D., 1983

Harvard College, Cambridge, Massachusetts
A.B. Cum Laude in Chemistry, 1978

University of California at Berkeley, 1974-1976

**MEDICAL
TRAINING**

Fellowship:   Yale University School of Medicine, Department of Medicine
Dana Fellow in Occupational and Environmental Health, 1987-89

Research on cellular mechanisms of toxin-induced lung disease

Residency:   Beth Israel Hospital and Harvard University School of Medicine
Internal Medicine and Primary Care, 1985-1987

Internship:   University of California at San Francisco
Internal Medicine, 1983-1984

07/12

Jessica Herzstein, M.D., M.P.H.
**Page 2**

**PROFESSIONAL
EXPERIENCE**

| | |
|---|---|
| 2012 - | Member, United States Preventive Services Task Force |
| 1997- | Global Medical Director<br>Air Products |
| 2006- | Lecturer, University of Pennsylvania School of Medicine<br>Department of Occupational and Environmental Health |
| 1995- | Consultant and President, Environmental Health Resources, P.C. |
| 1996-2004 | Visiting Lecturer in Occupational Medicine<br>Department of Environmental Health<br>Harvard School of Public Health |
| 1995- 97 | Medical Director<br>Defense Contract Management District East<br>Department of Defense |
| 1996-98 | Consultant to Harvard Institute of International Development<br>and U.S. Agency for International Development (Eastern Europe) |
| 1996-97 | Associate Clinical Professor of Medicine<br>Temple University School of Medicine |
| 1992-95 | Assistant Clinical Professor of Medicine<br>Temple University School of Medicine |
| 1992-2000 | Clinical Faculty, Department of Medicine,<br>Abington Memorial Hospital, Abington, Pennsylvania |
| 1992-95 | Director, Center for Occupational & Environmental Health<br>Abington Memorial Hospital |
| 1992-96 | Consultant, Department of Justice: Environmental Health & Biomonitoring |
| 1990-92 | Assistant Professor of Medicine, Department of Medicine and<br>Department of Community and Preventive Medicine<br>Division of Occupational and Environmental Health<br>Medical College of Pennsylvania |
| 1987-89 | Occupational Medicine Physician, Employee Health Services<br>Yale-New Haven Hospital, New Haven, CT |

Jessica Herzstein, M.D., M.P.H.
Page 3

## ACADEMIC APPOINTMENTS AND GRANTS

2007-           Visiting Lecturer in Occupational and Environmental Health,
                University of Pennsylvania School of Medicine

1996-04         Visiting Lecturer in Occupational Medicine
                Department of Environmental Health
                Harvard School of Public Health

1997-04         Visiting Lecturer, Northwestern University School of Medicine,
                Preventive Medicine Department

1996            Visiting Professor, Institute of Occupational and Environmental Health,
                West Virginia School of Medicine

1996-97         Associate Clinical Professor of Medicine, Department of Medicine
                Temple University School of Medicine

1992-1995       Assistant Clinical Professor of Medicine, Department of Medicine
                Temple University School of Medicine

1990-1992       Assistant Professor of Medicine,
                Department of Medicine and Department of Community and Preventive Medicine
                Medical College of Pennsylvania

1992-1993       American Lung Association / Pennsylvania Thoracic Society Research Grant:
                Toxic Inhalation Lung Injury

## BOARD CERTIFICATION

1987            American Board of Internal Medicine
1990            American Board of Preventive Medicine, Specialty of Occupational Medicine

## OTHER CERTIFICATION

Certified Medical Review Officer (MROCC)

## MEDICAL LICENSURE

Pennsylvania (active)

## PROFESSIONAL SOCIETIES

Fellow, American College of Physicians
Member, Council on Foreign Relations
Fellow, American College of Occupational and Environmental Medicine
American Public Health Association
International Commission on Occupational Health
Member, National Business Group on Health

Jessica Herzstein, M.D., M.P.H.
Page 4

**ADVISORY BOARDS / COMMITTEES**

Advisory Board, Global Business Group on Health at the National Business Group on Health

Advisory Board, Global Health and Development
The Aspen Institute (2010 to present)

National Institute for Occupational Safety and Health (NIOSH)
National Occupational Research Agenda (NORA) Liaison Committee
 (2010 to present)

Occupational Medicine Residency Advisory Committee
Environmental and Occupational Health Sciences Institute
University of Medicine and Dentistry of New Jersey and Rutgers University
Robert Wood Johnson School of Medicine (1995 to present)

National Board of Medical Examiners
American Board of Preventive Medicine
Committee on Examination Questions for Occupational Medicine (1995-2003)

American College of Occupational and Environmental Medicine
    Past Chair, Medical Surveillance Committee
    Publications Committee (Past co-chair)
    Member, Council on International Occupational/Environmental Medicine
        (past co-chair)
    Member, Committee on Environmental Medicine

**PEER REVIEW
ACTIVITIES**

| | |
|---|---|
| 2008- | Editorial Board, Journal of Health and Productivity |
| 1998- | Occupational Medicine |
| 1996- | Journal of Occupational and Environmental Medicine |
| 1995- | Agency for Toxic Substances Disease Registry |

## SELECTED  PUBLICATIONS

Lee PR and Herzstein J.  *International Drug Regulation*.  Annual Review of Public Health  7:217-235, 1986.

Herzstein J and Cullen MR.  *Methyl Bromide Intoxication in Four Fieldworkers During Removal of  Soil Fumigation Sheets*. American Journal of Industrial Medicine 17:321-326, 1990.

Herzstein J, Gracely EJ, Rankin JA.  *Airway Inflammation and Interleukin-1 Like Activity Induced by Toluene Diisocyanate in a Guinea Pig Model*.  American Review of Respiratory Disease 147 (4):A733, 1993.

Herzstein J.  *Considerations of Susceptible Populations*.  Chapter in Textbook of Clinical Occupational and Environmental Medicine, Rosenstock and Cullen (Eds.).  W.B. Saunders Company, Philadelphia, 1994.

Herzstein J.  *Medical Surveillance*.  Clinical Care Update. National Assoc. of Occupational Health Professionals, Nov., 1994.

Herzstein J.  *The Susceptible Patient*.  Chapter in Environmental Medicine: Principles and Practice, Brooks S, Gochfeld M, Herzstein J, Schenker M, Jackson R (Eds.).  Mosby and Co., St. Louis, 1995.

Herzstein J, Fleming LE, Shalat SS.  *Health Surveillance*.  Chapter in Environmental Medicine: Principles and Practice, Brooks S, Gochfeld M, Herzstein J, Schenker M (Eds.).  Mosby and Co, St. Louis, 1995.

Brooks S, Gochfeld M, Jackson R, Herzstein J, Schenker M. (Eds.) Environmental Medicine: Principles and Practice, Mosby & Co., St. Louis, 1995.  Section entitled "Preventive Approaches in Environmental Medicine" edited by J. Herzstein.

Tolsma DD, Herzstein J.  *Helping Patients Adopt Healthful Lifestyle Choices*.  Chapter in Environmental Medicine: Principles and Practice, Brooks S, Gochfeld M, Herzstein J, Schenker M, Jackson R (Eds.). Mosby and Co., 1995.

Herzstein J, Fleming LE, Herzstein RE.  *International Trade: A Forum for Environmental and Occupational Issues*. American Journal of Public Health (abstract), Presented at American Public Health Assoc. National Meeting, November, 1995.

Herzstein J. *Screening Workers for Cancers Linked with Occupational Exposures*. Clinical Care Update, National Association of Occupational Health Professionals, February 13, 1995.

Bunn WB, Herzstein J, Fleming LE. *International Update on Japanese Encephalitis, Cholera, High Altitude Syndromes*. Beverly, MA.  OEM Report, April 1995.

Fleming LE,  Herzstein J, Bunn WB, (Eds). Issues in International Occupational and Environmental Medicine. Beverly, MA: OEM Press, 1997.

**PUBLICATIONS** (cont'd)

Borak J, Pastides H, Van Ert M, Russi M, Herzstein J. *Exposure to MTBE and Acute Human Health Effects: A Critical Literature Review*. Human and Ecological Risk Assessment. 4 (1): 177-200, 1998.

Herzstein J. *Occupational Medical Surveillance*. Chapter in Accident Prevention Manual for Business and Industry: Engineering and Technology, Krieger, GR, Montgomery, JF, eds. Itasca, Il.: National Safety Council, 1997.

Fleming, LE, Herzstein JA. *Emerging Issues in Pesticide Health Studies*. Occupational Medicine: State of the Art Reviews. Keifer M, ed. Philadelphia: Hanley and Belfus, 1997.

Herzstein J, Fleming LE, Bunn, WB, eds. International Occupational and Environmental Medicine. St. Louis: Mosby & Co., Inc., 1998.

Stave, GM, Herzstein, J et al. *Recommended Library and Electronic Resources for Occupational and Environmental Physicians* 43: 202-215, 2001.

Herzstein J**,** Fritsch E, Ryan JL**.** *Recombinant Organisms.* Chapter 31 in Physical and Biological Hazards of the Workplace, 2nd Edition. Peter Wald and Gregg Stave, eds.  New York: John Wiley and Sons,  2002.

Herzstein J**.** *Susceptible Populations*.  Chapter in Textbook of Occupational and Environmental Medicine, 2/e. Rosenstock, Cullen, Brodkin, Redlich (Eds.).  Harcourt, Philadelphia, 2005.

Herzstein J**,** Bunn WB. *Environmental Issues in Travel Medicine*. Travel Medicine. 2/e. Keystone  Kozarsky Freedman Nothdurft Connor.  Philadelphia: Elsevier, 2007.

Bunn, William; Cook, Stephanie; Herzstein, Jessica; Monto, Arnold; Poland, Greg; Pawlecki, Brent; Pikelny, Dan. An Expert Review of the Cost-Savings and Benefits with Employee Influenza Vaccination.  *Journal of Health and Productivity Management:* Vol 2, No 2, October 2007.

# EXHIBIT "B"

1. AAPCC.  American Association of Poison Control Centers (AAPCC) Website, *The Oil Spill and Calls to Poison Centers*, *available at* http://www.aapcc.org/dnn/NewsandEvents/PoisonCentersandtheGulfOilSpill.aspx.

2. CDC.  Health Surveillance Reports for Louisiana, Mississippi, Alabama, and Florida, and BioSense, *available at* http://emergency.cdc.gov/gulfoilspill2010/2010gulfoilspill/health_surveillance.asp.

3. EPA.  Questions and Answers Related to the Findings in the Reports: Gulf Oil Spill: Assessment of Dioxin Emissions from *in situ* Oil Burns.  *Available at* http://www.fda.gov/Food/FoodSafety/FoodContaminantsAdulteration/ChemicalContaminants/DioxinsPCBs/ucm077524.htm.

4. Federal On-Scene Coordinator Report for the *Deepwater Horizon* Oil Spill, submitted to the National Response Team, September 2011, *available for download at* www.uscg.mil/foia/docs/DWH/FOSC_DWH_Report.pdf.

5. Louisiana Department of Health and Hospitals.  Oil Spill Health Effect Summary, MS Canyon 252 Oil Spill Surveillance Report, Week 38.  *Available at* http://new.dhh.louisiana.gov/index.cfm/page/79/n/104.

6. NIOSH.  Bradley S. King & John D. Gibbins.  Health Hazard Evaluation of Deepwater Horizon Response Workers, August 2011.  HETA 2010-0115 & 2010-0129-3138.  *Available at* http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html.

7. NIOSH.  Deepwater Horizon Roster Summary Report.  DHHS (NIOSH) Publication No. 2011-175.  *Available at* http://www.cdc.gov/niosh/topics/oilspillresponse/workerroster.html.

8. NIOSH.  Health Hazard Evaluation of Deepwater Horizon Response Workers: Interim Report 1, dated June 23, 2010.  HETA 2010-0115.  *Available at* http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html.

9. NIOSH.  Health Hazard Evaluation of Deepwater Horizon Response Workers: Interim Report 2, dated July 12, 2010.  HETA 2010-0115.  *Available at* http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html.

10. NIOSH.  Health Hazard Evaluation of Deepwater Horizon Response Workers: Interim Report 3, dated July 22, 2010.  HETA 2010-0115.  *Available at* http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html.

11. NIOSH.  Health Hazard Evaluation of Deepwater Horizon Response Workers: Interim Report 4, dated August 11, 2010.  HETA 2010-0115.  *Available at* http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html.

12. NIOSH.  Health Hazard Evaluation of Deepwater Horizon Response Workers: Interim Report 5, dated August 27, 2010.  HETA 2010-0115.  *Available at* http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html.

13. NIOSH.  Health Hazard Evaluation of Deepwater Horizon Response Workers: Interim Report 6, dated September 13, 2010.  HETA 2010-0115.  *Available at* http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html.

14. NIOSH.  Health Hazard Evaluation of Deepwater Horizon Response Workers: Interim Report 7, dated October 14, 2010.  HETA 2010-0115.  *Available at* http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html.

15. NIOSH.  Health Hazard Evaluation of Deepwater Horizon Response Workers: Interim Report 8, dated October 26, 2010.  HETA 2010-0115.  *Available at* http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html.

16. NIOSH.  Health Hazard Evaluation of Deepwater Horizon Response Workers: Interim Report 9, dated December 7, 2010.  HETA 2010-0115.  *Available at* http://www.cdc.gov/niosh/topics/oilspillresponse/gulfspillhhe.html.

17. NIOSH.  Report of Deepwater Horizon Response / Unified Area Command Illness and Injury Data (Apr. 23, 2010 - July 27, 2010), dated Aug. 13, 2010.  *Available at* http://www.cdc.gov/niosh/topics/oilspillresponse/data.html.

18. OSAT.  Summary Report for Sub-Sea and Sub-Surface Oil and Dispersant Detection: Sampling and Monitoring, dated December 17, 2010, and Ecotoxicity Addendum, dated July 8, 2011.  *Available at* http://www.restorethegulf.gov/release/2011/07/29/osat-summary-report-sub-sea-and-sub-surface-oil-and-dispersant-detection-ecotoxic.

19. OSAT.  Summary Report for Fate and Effects of Remnant Oil in the Beach Environment, dated February 10, 2011.  *Available at* http://www.restorethegulf.gov/release/2011/07/29/osat-summary-report-sub-sea-and-sub-surface-oil-and-dispersant-detection-ecotoxic.

20. OSHA.  Deepwater Horizon Oil Spill:  OSHA's Role in the Response, dated May 2011.  A *Available for download at* www.osha.gov/oilspills/dwh_osha_response_0511a.pdf.

EXHIBIT "C"

1. American Cancer Society.  *Cancer Facts & Figures 2012*.  Atlanta: American Cancer Society; 2012, *available at* http://www.cancer.org/acs/groups/content/@epidemiologysurveilance/documents/document/acspc-031941.pdf.

2. Benninger, Michael S., *et al.*  "Adult Chronic Rhinosinusitis:  Definitions, Diagnosis, Epidemiology, and Pathophysiology," *Otolaryngol Head Neck Surg*. 129S:S1-S32, Sept. 2003.

3. Chiles, Caroline and Shannon  M. Gulla.  "Radiology of the Chest*," in Basic Radiology*, Michael Y.M. Chen, Thomas L. Pope, and David J. Ott, eds. (New York:  McGraw-Hill, 2nd. ed., 2011), Ch. 4:67-128.

4. EPA.  Kuwait Oil Fires:  Interagency Interim Report.  EPA 160/1991.3.  April 3, 1991.

5. Gifford, Thomas O., Capt. and Richard R. Orlandi.  "Epistaxis," *Otolaryngol Clin N Am*, 41 (2008) 525–536.

6. Herrick, Christina A. and Kalman L. Watsky.  "Other Dermatoses," *in Textbook of Clinical, Occupational and Environmental Medicine*, Linda Rosenstock, Mark Cullen, Carl Andrew Brodkin, and Carrie A. Redlich, eds. (Philadelphia, PA:  W.B. Saunders Co., 2nd  ed., 2004) 29.2:713-726.

7. Hudnell, H. Kenneth, David A. Otto, Dennis E. House and Lars Mølhave.  "Exposure of Humans to a Volatile Organic Mixture. II.  Sensory", *Arch Environ Health* 1992 Jan.-Feb.;47(1):31-38.

8. Knutson, Doug and Chad Braun.  "Diagnosis and Management of Acute Bronchitis," *Am. Family Physician*, May 15, 2002; 65(10): 2039-2044.

9. Lyons, Ronan A., J. Mark F. Temple, Daphne Evans, David L. Fone, Stephen R. Palmer.  "Acute Health Effects of the Sea Empress Oil Spill," *J Epidemiol Community Health* 1999; 53:306-310.

10. Macys, D.A., Capt., R.L. Carpenter, Capt. J.F. Risher, A. Vinegar, D. E. Dodd and H. G. Wall.  *Results of a Workshop on Health Effects of Crude Oil Exposures Related to Operation Desert Storm*, Nav. Med. Res. Instit.: Bethesda, MD; 92:04.

11. McPherson, Richard A. and Jonathan Ben-Ezra.  "Basic Examination of Urine," *in Henry's Clinical Diagnosis and Management by Laboratory Methods*, Richard A. McPherson and Matthew R. Pincus, eds. (Philadelphia, PA:  W.B. Saunders Co., 22nd ed., 2011), 28:445-479.

12. Qaseem, Amir, Sandeep Vijan, Vincenza Snow, J. Thomas Cross, Kevin B. Weiss and Douglas Owens, for the Clinical Efficacy Assessment Subcommittee of the American College of Physicians.  "Glycemic Control and Type 2 Diabetes Mellitus:  The Optimal

Hemoglobin A$_{1c}$ Targets.  A Guidance Statement from the American College of Physicians," *Ann Intern Med.* 2007;147:417-422.

13. Seebach, Jörg, Rudolf Morant, Regula Rüegg, Burkhardt Seifert and Jörg Fehr.  "The Diagnostic Value of the Neutrophil Left Shift in Predicting Inflammatory and Infectious Disease," *Am J Clin Pathol.* 1997;107(5):582-591.

14. Sim, Min Seob, Ik Joon Jo and Hyoung Gon Song.  "Acute Health Problems Related to the Operation Mounted to Clean the Hebei Spirit Oil Spill in Taean, Korea", *Mar Pollut Bull.* 2010;60(1)51-57.

15. Stewart, Moira A.  "Effective Physician-Patient Communication and Health Outcomes," *Can Med Assoc J.*  May 1, 1995; 152(9):1423-1433.

16. Tarlo, Susan M., John Balmes, Ronald Balkissoon, Jeremy Beach, William Beckett, David Bernstein, Paul D. Blanc, Stuart M. Brooks, Clayton T. Cowl, Feroza Daroowalla, Philip Harber, Catherine Lemiere, Gary M. Liss, Karin A. Pacheco, Carrie A. Redlich, Brian Rowe and Julia Heitzer.  "Diagnosis and Management of Work-Related Asthma: American College Of Chest Physicians (ACCP) Consensus Statement", *CHEST* 134(Supp. 3):1S-41S (Sept. 2008).

17. U.S. Department of Health and Human Services, Public Health Service, National Toxicology Program, *Report on Carcinogens, Twelfth Edition*, 2011.

18. U.S. Preventive Services Task Force.  *Screening for Colorectal Cancer: U.S. Preventive Services Task Force Recommendation Statement*.  *Ann Intern Med.* 2008;149:627-37.

19. U.S. Preventive Services Task Force.  *Screening for Lipid Disorders in Adults:  U.S. Preventive Services Task Force Recommendation Statement*.  June 2008.  *Available at* http://www.uspreventiveservicestaskforce.org/uspstf08/lipid/lipidrs.htm (last visited Aug. 9, 2012)

20. U.S. Preventive Services Task Force.  *Counseling and Interventions to Prevent Tobacco Use and Tobacco-Caused Disease in Adults and Pregnant Women:  U.S. Preventive Services Task Force Reaffirmation Recommendation Statement.  Ann Intern Med.* 2009;150:551-555.