# Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * * * * * * * | MDL NO. 2179<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |
| Plaisance, *et al.*, individually and on behalf of the Medical Benefits Settlement Class,<br><br>Plaintiffs,<br><br>v.<br><br>BP Exploration & Production Inc., *et al.*,<br><br>Defendants. | * * * * * * * * * * * * | NO. 12-CV-968<br><br>SECTION: J<br><br><br>HONORABLE CARL J. BARBIER<br><br>MAGISTRATE JUDGE SHUSHAN |

### SUPPLEMENTAL DECLARATION OF DR. JESSICA HERZSTEIN

I, Dr. Jessica Herzstein, am over twenty-one years of age and of sound mind and body. My declaration is based on my personal knowledge, experience, and review of the materials described herein.  If called to testify, I could testify to the matters set forth in this declaration.

1.      In preparing this supplemental declaration, I have reviewed the following materials:

    a.   The objections to the Medical Settlement Agreement and other materials described on Exhibit A to this supplemental declaration;

    b.   Literature described in Exhibit B to this supplemental declaration; and

1

  c. Supplemental declarations of Dr. Robert Cox, Dr. David Dutton and Dr. Peter Lees.

  2. None of the objections or other materials changes the opinions, conclusions and analyses set forth in my declaration dated August 12, 2012.

  3. Certain objectors have asserted that the Specified Physical Conditions Matrix ("Matrix") is unfair because it does not include some conditions allegedly caused by contact with oil and/or dispersants[1] (including some conditions that no objector claims that he or she has or had); because some of the Acute Specified Physical Conditions are also chronic conditions and should be included on the list of Chronic Specified Physical Conditions; or because the Matrix includes a requirement that the class member first manifest the Acute or Chronic Specified Physical Condition within 24 to 72 hours after contact with oil and/or dispersants. Some of the objectors rely on blood testing for volatile organic compounds (VOCs) to attempt to demonstrate their exposure to oil and/or dispersants or to support their claims that they have experienced adverse health effects. Some objectors attempt to support their claimed exposures and/or conditions through a description of the alleged benefits of a detoxification therapy. Some of the objectors claim that the Matrix is unfair based solely on their personal circumstances. I address each of these points in turn.

  4. As I stated in paragraph 14 of my August 12, 2012 declaration, the Matrix appropriately includes conditions for which there is a medical basis to conclude that contact with oil and/or dispersants caused those conditions if there were exposure to sufficient amounts of such substances for a sufficient duration of time. The objections and other materials referenced in Exhibit A provide no credible evidence that the Matrix excludes conditions for which there is

---

[1] As with my previous declaration, references in this supplemental declaration to "oil and/or dispersants" refer to the crude oil, other hydrocarbons, dispersants, decontaminants, and/or other substances resulting from the *Deepwater Horizon* Incident, including the resulting mixture of the substances as well as the byproducts of the *in situ* burns.

a reasonable medical basis to conclude that contact with oil and/or dispersants at the reported levels could have been the cause. For example:

     a.     Some objectors assert that they have vague symptoms not included on the Matrix, such as "severe back and nose issues," (Declaration of Jaime Restrepo at ¶ 4), "throat problems," (Declaration of Jose Antonio Pupo at ¶ 4), and "ocular problems - vision" (Declaration of Alejandro Quintana at ¶ 4). (10-cv-07777, Rec. Doc. 92, Exhibit A to Sterbcow Objection). It is not possible on the basis of such generalized statements to assess what medical conditions these objectors are asserting, and it would have been inappropriate to include such vague descriptions on the Matrix.

     b.     Some objectors cite the results of various laboratory tests and imaging studies rather than actual medical conditions. For example, objector Ronald Franklin Shearon, Jr. claims that contact with oil and/or dispersants caused, among other things, "peribronchial thickening." (*Steve Kolian, et al. v. BP Exploration & Production, Inc., et al.*, Complaint for Damages, at 36-37). Peribronchial thickening is a non-specific radiologic sign indicative of an excess fluid or mucus buildup in the lung's small airways. This finding is seen in connection with a variety of medical conditions, some of which are included on the Matrix (acute bronchitis, asthma exacerbation) and many others which are not (*e.g.*, congestive heart failure, cystic fibrosis). It would be inappropriate to include on the Matrix the results of tests that provide information to clinicians as part of the diagnostic process but are not themselves medical conditions.

     c.     Two objectors, Kevin Scott Lewallen (10-cv-07777, Rec. Doc. 182) and Richard Danos (*Steve Kolian, et al.*, Complaint for Damages, at 35) claim that they developed pulmonary emboli as a result of contact with oil and/or dispersants. A pulmonary embolus, or blood clot in the lungs, occurs when a portion of a blood clot that formed in one of the body's large veins (a

"deep vein thrombosis") breaks off and travels through the heart to the lungs, leading to blockages of the pulmonary vasculature (together, deep vein thromboses and pulmonary emboli are referred to as "venous thromboembolism, or "VTE"). Based on current population estimates, pulmonary emboli are estimated to occur in over 215,000 persons and will be the cause of death of between 29,000 and 86,000 persons in the U.S. this year. *See* Surgeon General's Call to Action to Prevent Deep Vein Thrombosis and Pulmonary Embolism, U.S. Department of Health and Human Services, 2008, at 9-10. Risk factors for VTE include genetic conditions, pregnancy, trauma, immobility, surgery, oral contraceptive usage, hormone therapy, myocardial infarction, stroke, cancer, previous VTE, obesity, and age. *Id.* at 12-17. There is no medical or scientific evidence that contact with oil and/or dispersants could cause pulmonary emboli or VTE.

     d.     While some objectors, such as Patricia Boyles (in her Short-Form Joinder), assert that they developed peripheral neuropathy after contact with oil and/or dispersants, or have described symptoms that would typically be seen in cases of peripheral neuropathy, the Matrix appropriately does not include peripheral neuropathy as a condition. Peripheral neuropathy is a "general term for disorders affecting peripheral nerves. . . . Symptoms of peripheral neuropathy include weakness, sensory loss, abnormal balance and autonomic dysfunction." Shy M, Peripheral Neuropathies, 2012, at 2396. Diabetes is the most common cause of neuropathy in the Western world, and other types of neuropathies include genetic, inflammatory and immunologic, paraneoplastic, autoimmune, vasculitic, infectious (*e.g.*, HIV, herpes, Lyme disease and leprosy) and compressive (*e.g.*, carpal tunnel syndrome). *Id.* at 2396-2408. Dr. William Sawyer, whose declaration was submitted in support of objectors represented by attorneys Stuart Smith and Robert McKee, states that peripheral neuropathy has been reported in occupational exposure settings with reported n-hexane air measurements of 500 to 2,500 ppm.

Sawyer Declaration at ¶ 10 (10-cv-07777, Rec. Doc. 185-5; 10-cv-07777, Rec. Doc 202-5). In fact, those levels were reported to cause peripheral neuropathy in a small percentage of persons who worked more than 8 hours per day manufacturing sandals for months to years in "narrow badly ventilated dwellings where vapor of the volatile solvent filled the rooms." Yamamura Y, *n-Hexane Polyneuropathy*, 1969, at 45; *see also* Yamada S, *Intoxication Polyneuritis in the Workers Exposed to n-Hexane*, 1967; Abbritti G *et al.*, *Shoe-Makers' Polyneuropathy in Italy: the Aetiological Problem*, 1976. As noted by Dr. Cox and Dr. Lees in their supplemental declarations at paragraphs 43 to 46 and 15 to 16, respectively, the measured airborne levels of n-hexane associated with the *Deepwater Horizon* Incident were significantly lower than even the lowest measurement reported by Dr. Sawyer to cause peripheral neuropathy. There is no reasonable basis in the literature cited by Dr. Sawyer, which describes high levels of exposure over a long duration, to support the assertion that contact with oil and/or dispersants would have caused peripheral neuropathy.

     e.     Two objectors, Fabian Cortes (Declaration at ¶ 5) and Bryant Herrera (Declaration at ¶ 4), assert that they have lost hearing subsequent to contact with oil and/or dispersants. (10-cv-07777, Rec. Doc. 92, Exhibit A to Sterbcow Objection). They do not provide medical records, nor do they specify whether they are suffering from conductive and/or sensorineural hearing loss, both of which may be caused by numerous factors unrelated to contact with oil and/or dispersants. These objectors do not provide any medical or scientific evidence to support their allegation that their loss of hearing was related to their contact with oil and/or dispersants. The medical and scientific literature does not support the assertion that the reported levels and duration of contact with oil and/or dispersants could cause loss of hearing, and thus it was appropriately not included on the Matrix.

f.      One objector, Rebecca Harrell Tickell, claims that she experiences ongoing skin reactions allegedly caused by phototoxicity from contact with oil and/or dispersants. (10-cv-07777, Rec. Doc. 185-11 and 10-cv-07777, Rec. Doc. 202-11). After a visit from Ms. Tickell in 2010, dermatologist Dr. Vincent De Leo asserted that Ms. Tickell had a phototoxic response to oil and/or dispersants, which he described as a classic case of "tar smarts or tar smarting," and which resulted in poikiloderma, or a mottled discoloration of the neck and chest. "Tar smarting," or skin burning, has been reported to occur in persons exposed to sun shortly after contact with coal tar. It is thought to be caused by light activating the polycyclic aromatic hydrocarbons (PAHs) found in coal tar. Petroleum-based tars, which have different compositions of PAHs than coal-tars, are not thought to cause phototoxicity. *See* Emmet E, Phototoxicity and Photosensitivity Reactions, 173-174. Significantly, Dr. De Leo (Ms. Tickell's physician) does not identify petroleum-based tars or dispersants as a cause of phototoxicity in his two publications on the topic. De Leo V, Photocontact Dermatitis; De Leo V, Photoallergens. Given the lack of a scientific basis for asserting contact with oil and/or dispersant could have caused a phototoxic reaction, it is appropriate that the Matrix does not include phototoxicity. I note that class members with chronic contact dermatitis are eligible for compensation on the Matrix.

g.      No objector alleges that she actually had a spontaneous abortion or miscarriage because of contact with oil and/or dispersants. However, objector Rebecca Harrell Tickell claims that a toxicologist informed her that she is at a high risk for one were she to become pregnant. Tickell Declaration at ¶ 28 (10-cv-07777, Rec. Doc. 185-11 and 10-cv-07777, Rec. Doc. 202-11). It is well documented in the literature, including the literature cited by Dr. Sawyer, that spontaneous abortion is a common occurrence in the general population, with

reported rates varying from 15 to more than 50% of all pregnancies.[2]  While Dr. Sawyer also identifies spontaneous abortion as a potential adverse health effect of exposure to oil and/or dispersants, the Matrix appropriately does not include spontaneous abortion because there is no medical basis to assert that the reported levels of contact with oil and/or dispersants could cause a spontaneous abortion.  The three studies[3] cited by Dr. Sawyer in paragraphs 34 (McMartin), 36 (Lindbohm), and 37 (Taskinen) of his declaration, which report rates of spontaneous abortion among exposed populations consistent with the background rates, fail to support any claim of a statistically significant increased risk of spontaneous abortion due to the *Deepwater Horizon* Incident.[4]  The McMartin paper specifically states that the five pooled studies it examined "do not demonstrate a statistically significant relationship between organic solvent exposure in pregnancy and spontaneous abortion."  McMartin at 291.  No statistically significant increased rates of spontaneous abortion were reported by Lindbohm in the women exposed to toluene or aliphatic hydrocarbons.  Lindbohm at 456, Table V.  Further, toluene exposure was not associated with statistically significant increased rates of spontaneous abortions even for women with "high exposure" to toluene.  *Id.* at 456, Table VI.  Given the low levels of exposure in

---

[2] *See* Carlson B, Cleavage and Implantation, 2009, at 60; Ventura S *et al.*, Estimated Pregnancy Rates and Rates of Pregnancy Outcomes for the United States, 1990-2008, 2012, at 9, Table 1; Wilcox A *et al.*, Incidence of Early Loss of Pregnancy, 1988.

[3] McMartin K *et al.*, Pregnancy Outcome Following Maternal Organic Solvent Exposure: A Meta-Analysis of Epidemiologic Studies, 1998; Lindbohm M-L *et al.*, Spontaneous Abortions Among Women Exposed to Organic Solvents, 1990; Taskinen H *et al.*, Laboratory Work and Pregnancy Outcome, 1994.

[4] Dr. Sawyer also misstates or omits data from all three studies he cites. The McMartin meta-analysis includes only 557 women who self-reported having a spontaneous abortion, not the 2,899 as claimed by Dr. Sawyer. McMartin at 291, Table IV. The 5.2 odds ratios reported in Lindbohm as the increased risk of spontaneous abortion in certain groups of workers related to graphic workers occupationally exposed to high levels of aliphatic hydrocarbons, not toluene, as Dr. Sawyer states. Lindbohm at 457, Table VII. The 4.7 odds ratio reported in Taskinen was only for laboratory assistants who were frequently exposed to toluene not all women, as Dr. Sawyer implies. Taskinen at 314, Table 3. Further, the authors state "the results concerning these individual chemicals should, however, be interpreted cautiously because the laboratory assistants were often exposed to several solvents and chemicals simultaneously." *Id.* at 314.

7

connection with the *Deepwater Horizon* Incident and the study's limitations, Taskinen does not support Dr. Sawyer's claim that spontaneous abortion is likely to be an adverse effect of the *Deepwater Horizon* Incident. Dr. Sawyer does not point to any literature indicating why there would be an increased rate of spontaneous abortion -- a common occurrence in the general population regardless of exposure -- at the reported exposure levels in the *Deepwater Horizon* Incident.

      h.      Objectors represented by attorneys Robert McKee, Stuart Smith, Nexsen Pruet and Daniel Becnel assert that the Matrix unfairly excludes certain medical conditions, relying on Dr. William Sawyer's declaration, in which he describes findings from other oil spills and suggests that similar health effects could result from exposures in connection with the *Deepwater Horizon* Incident. The Matrix in fact includes many conditions and symptoms that are referenced in the literature regarding the previous oil spills that Dr. Sawyer cites in his declaration. However, other conditions referenced by Dr. Sawyer do not belong on the Matrix. As set forth by Dr. Cox, different oil spills release different types of chemicals, as well as different concentrations of the same chemicals, and the geographic and temporal proximity to the source of a spill can vary significantly. Cox Supplemental Declaration at ¶¶ 34-36.

      i.      Dr. Sawyer refers in his declaration to three articles[5] in paragraphs 18 (Zock 2007), 19 (Zock 2009) and 28 (Rodriguez-Trigo) that relate to the *Prestige* oil spill in 2002 in Galacia, Spain, as support for the theory that persistent respiratory effects (including wheezing with breathlessness, wheezing (apart from colds), nocturnal attacks of shortness of

---

[5] Zock J-P *et al.*, Prolonged Respiratory Symptoms in Clean-Up Workers of the Prestige Oil Spill, 2007; Zock J-P *et al.*, Long-Term Health Effects of the Prestige Oil Spill (Galicia, Spain), 2009; and Rodriguez-Trigo G *et al.*, Health Changes in Fishermen 2 Years After Clean-Up of the Prestige Oil Spill, 2010.

breath, chronic cough and/or chronic phlegm) would be expected to occur following the

*Deepwater Horizon* Incident. However, as the authors of the Rodriguez-Trigo article state:

> [T]he findings [from the *Prestige* spill] cannot be extrapolated to spills of other types of oil. For example, the *Prestige* tanker contained bunker C oil, whereas oil spilled in the 2010 U.S. Deepwater Horizon disaster is crude oil. The main components of the oil spills are presumably similar, but proportions of those components (for example, volatile organic compounds, polycyclic aromatic hydrocarbons, hydrogen sulfide gas, and heavy metals) are probably different, as might be dispersants to break up the oil slick and the proportion of oil that evaporates and could be inhaled by humans. Findings from this study therefore cannot predict what effects individuals exposed to other oil spills, such as that in the Gulf of Mexico might experience.

Rodriguez-Trigo at 497. Further, Rodriguez-Trigo, which reports on the same data as Zock

2009, found that the reported respiratory symptoms were not associated with objective lung

function decrements measured by spirometry two years after exposure. Rodriguez-Trigo at 495.

      ii.    Dr. Sawyer also cites Rodriguez-Trigo in paragraph 28 and three studies[6]

in paragraph 29 of his declaration, in claiming that biomarkers of respiratory changes and

genotoxicity may be found in people following an oil spill. A study relating to the *Braer* spill

reported no evidence of genotoxicity markers in that spill. Cole J *et al.*, *Biomonitoring of*

*Possible Human Exposure to Environmental Genotoxic Chemicals: Lessons from a Study*

*Following the Wreck of the Oil Tanker* Braer, 1997. Further, "[t]he clinical significance of

exhaled biomarkers and chromosomal findings are uncertain. The association between oil

exposure and the observed changes may not be causal. The findings may not apply to spills

involving other types of oil or to different populations of oil spill workers." Rodriguez-Trigo at

489. Neither Dr. Sawyer nor the authors of the Rodriguez-Trigo article demonstrate a causal

---

[6] Aguilera F *et al.*, Review on the Effects of Exposure to Spilled Oils on Human Health, 2010; Perez-Cadahia B *et al.*, Genetic Damage Induced by Accidental Environmental Pollutants, 2006; and Perez-Cadahia B *et al.*, Initial Study on the Effects of the Prestige Oil on Human Health, 2007.

association between exposure and the changes in biomarkers and chromosomal findings, nor is there any evidence that class members have such changes.

i.      Dr. Michael Robichaux, who has submitted a declaration in support of the objection filed by attorneys Robert McKee and Stuart Smith, and which is adopted by objectors represented by Nexsen Pruet, Douglas M. Schmidt and the Becnel Law Firm, claims that some of his patients have developed "multiple chemical sensitivit[y]" (MCS) allegedly as a result of contact with oil and/or dispersants.  Dr. Robichaux Declaration at ¶ 33 (10-cv-07777, Rec. Doc. 185-3; 10-cv-07777, Rec. Doc 202-3).  The term MCS was first introduced to describe persons who reported adverse reactions to common, very low-level chemical exposures.  *See* Cullen M, The Worker with Multiple Chemical Sensitivities: An Overview, 1987.  MCS was used to describe a condition characterized by the occurrence of multiple symptoms attributed to environmental sensitivities in persons who had no objective evidence of any disease or generally accepted medical condition to account for his or her symptoms.  Despite international study, there is no accepted case definition, etiology, or accepted treatment for MCS.  *See, e.g.*, American College of Occupational and Environmental Medicine (ACOEM) Position Statement. Multiple Chemical Sensitivities: Idiopathic Environmental Intolerance, 1999; International Union of Pure and Applied Chemistry (IUPAC) Glossary of Terms Used in Toxicology, 2011. Double blind provocation tests in environmental chambers revealed that MCS subjects did not demonstrate reliable reactions when challenged to agents to which they believed they were sensitive, and thus the link between low level exposures and symptoms was not validated. Staudenmayer H *et al.*, Double-Blind Provocation Chamber Challenges in 20 Patients Presenting with "Multiple Chemical Sensitivity," 1993.  Moreover, many persons who claim to have MCS also have psychiatric disorder(s) that predate the onset of symptoms, and psychological factors

underlie the symptom complex in many persons claiming to have MCS. There is no accepted medical basis to include this subjective set of symptoms as a compensable condition on the Matrix.

   j.  Dr. Robichaux suggests the Matrix is faulty because it does not include compensation for persons with alleged long-term neurological problems purportedly from brain injury due to oil and/or dispersant exposure. He claims that he has approximately 100 patients with chronic conditions resulting from the *Deepwater Horizon* Incident, many of whom have neurologic symptoms. Dr. Robichaux Declaration at ¶¶ 31 and 34. He has publicly stated that such neurological problems are getting worse. *See* BP Spill Workers Seek Care as Health Study Progresses, Nov. 29, 2011, *at* http://www.huffingtonpost.com/susan-buchanan/bp-spill-workers-seek-car_b_1115413.html. Dr. Robichaux's anecdotal reports in the lay press concerning neurotoxicity, which he has not subjected to the scrutiny of peer-review and lack scientific validity. For example, Dr. Robichaux claims that he has "seen several patients who have no positive laboratory or x-ray abnormalities, but who are actually paralyzed." *Id.* Dr. Robichaux has provided no information regarding the methodology he uses to determine that these patients have neurological injury or that, if they do, it is related to contact with oil and/or dispersants. Dr. Sawyer also states that chronic exposures to high levels of solvents can cause permanent neurologic damage. Dr. Sawyer Declaration at ¶ 10. As noted by Dr. Cox and Dr. Lees in paragraphs 43 to 46 and 15 to 16 of their supplemental declarations, respectively, the reported levels of airborne contact with oil and/or dispersants were significantly below levels that could result in permanent neurologic effects. Neither Dr. Robichaux nor Dr. Sawyer has provided any scientific rationale for including the claimed neurological conditions on the Matrix.

5.      Some objectors assert that they developed some of the conditions listed on the Matrix as Acute Specified Physical Conditions, but that those conditions persist to the present. While a few of the Acute Specified Physical Conditions are similar to corresponding Chronic Specified Physical Conditions (*i.e.*, dermatitis, eczematous reaction, rhinosinusitis, and ocular), there is no scientific evidence that the other Acute Specified Physical Conditions would persist if in fact they were caused by contact with oil and/or dispersants. For example:

a.      Some objectors claim that they still have intermittent headaches allegedly caused by contact with oil and/or dispersants. While contact with oil and/or dispersants at the reported levels could have precipitated the occurrence of a headache due to odor or sensory irritation, when the smell or irritating substance is removed, the headache would go away. If a headache persists or recurs frequently, it is likely caused by something else. *See, e.g.*, Schaumburg H, Human Neurotoxic Disease, 2000; Boes J *et al.*, Headache and Other Craniofacial Pain, 2008. Headaches can be a manifestation of central nervous system toxicity associated with very high level exposure to some of the hydrocarbon constituents found in crude oil and/or dispersants. However, the air monitoring done in connection with the *Deepwater Horizon* Incident showed levels well below those that could cause any central nervous system effects. Moreover, even if someone were exposed to very high levels of VOCs, such as the levels associated with the recreational abuse of solvents to become intoxicated (*i.e.*, sniffing glue), they would not be expected to have ongoing headaches lasting months to years as a result.

b.      Some objectors, including James Morgan and Ronald Franklin Shearon, Jr., assert, among other conditions, that they have chronic coughing after exposure to oil and/or dispersants. (*Steve Kolian, et al.*, Complaint for Damages, at 35-37). Acute bronchitis and rhinosinusitis are conditions on the Matrix that could be associated with a cough. Following

Case 2:10-md-02179-CJB-JCW   Document 7732-1   Filed 10/22/12   Page 14 of 27

cessation of exposure to the airborne irritant, the underlying respiratory irritation would be expected to resolve, leading to resolution of the cough. Chronic cough can be caused by a range of disease processes, most of which are unrelated to contact with oil and/or dispersants (*e.g.*, gastroesophageal reflux disease, viral infection, chronic tonsillar enlargement, tracheal diverticuli, laryngopharyngeal reflux, premature ventricular contractions, swallowing dysfunction, adverse reactions to medications (angiotensin-converting-enzyme inhibitors), and smoking). It is possible that the chronic respiratory conditions on the Matrix, chronic rhinosinusitis and Reactive Airways Dysfunction Syndrome (RADS), could cause a persistent cough as a result of post-nasal drip or bronchial hyperreactivity. If this were to be the case, the class member's medical condition would be included on the Matrix. Thus, "chronic coughing" is appropriately not itself listed as a Chronic Specified Physical Condition.

6.      The objections regarding the timeframes in the Matrix lack merit. First, some objectors claim that the 24 to 72 hour timeframes set forth in the Matrix are too restrictive. As I previously stated, these timeframes between contact with oil and/or dispersants and first manifestation of a Specified Physical Condition are appropriate and have a sound medical basis. Adverse health effects caused by contact with oil and/or dispersants or exposure to heat would manifest within the timeframes set forth on the Matrix, if not sooner. Symptoms of irritation would be expected to develop within a few minutes to a few hours after contact with an irritating substance, while symptoms of allergic-induced reactions would be expected to occur well within the timeframe set forth on the Matrix. Second, a few objectors are apparently confused about the timeframes set forth on the Matrix, as they assert that it is unfair that class members are required to have gone to a medical doctor to seek treatment for a Specified Physical Condition within the 24 to 72 hour period. However, the Matrix requires that the Specified Physical Condition or its

associated symptom(s) manifest within 24 to 72 hours after contact with oil and/or dispersants (depending on the condition), not that the individual goes to a doctor within 24 to 72 hours after their contact with oil and/or dispersants. Likewise, Clean-Up Workers must manifest a heat-related condition during or immediately following the shift in which they allege they became ill; the Matrix does not require that they go to a medical doctor during or immediately following their shift.

7.    There is no scientific basis to support the assertions made by some individuals, including Wilma Subra, whose declaration was submitted by objectors represented by attorneys Robert McKee and Stuart Smith (10-cv-07777, 185-9 and 10-cv-07777, 202-9), that blood tests for Volatile Organic Compounds (VOCs) can establish prior exposure to oil and/or dispersants or a link to adverse health effects from such exposure. The Gulf Oil Spill's Toxic Legacy, In a guidance document prepared in response to the *Deepwater Horizon* Incident, CDC and Agency for Toxic Substances and Disease Registry (ATSDR) guidelines "did not recommend the use of laboratory testing for specific chemicals to either determine exposure or guide delivery of care." CDC/ATSDR Guidance on the Interpretation and Use of Blood Laboratory Analyses for Volatile Organic Compounds (CDC/ATSDR Guidance). There are reasons why blood tests to detect VOCs are not reliable to prove either prior exposure or adverse effects. VOC blood testing is useful only for measuring immediate past exposures to the tested compounds. As noted in the CDC/ATSDR Guidance, VOCs "have a short half life in the blood and test results only reflect very recent exposures (within hours or days) prior to testing." If levels were detected above the reference range, this would reflect recent exposures, including activities immediately before the blood was drawn, including smoking, working with paints, glues or solvents, and/or the environmental conditions along the roadway upon which a person travelled to get his or her

14

blood drawn. Thus, VOC measurements from tests performed today, or even days or weeks after alleged exposure, would provide no medically useful information about exposures in connection with the *Deepwater Horizon* Incident. In addition, "[t]he presence of a volatile chemical in [patients'] blood does not generally indicate any adverse health effect, even at levels multiple times higher than reference ranges." *Id.* VOC blood tests are not reliable indicators of prior exposure or adverse health effects, and there is no medical basis for performing such testing on class members in relation to the *Deepwater Horizon* Incident.

8.     Dr. Robichaux and others claim that they can treat people with vague neurological conditions through a detoxification program, and they suggest that self-reported improvement in their patients' vague symptoms and/or lowered blood VOC levels are proof of the treatment's success. These claims have no medical or scientific basis, and it would have been inappropriate for such programs to be included in the Medical Settlement.

a.     Dr. Robichaux supervises the operation of the "Gulf Coast Detoxification Project" in Raceland, LA. The detoxification method was initially developed by L. Ron Hubbard, the founder of the Church of Scientology, and the Gulf Coast Detoxification Project was founded by parishioners of the Church of Scientology Celebrity Centre. Church of Scientology Celebrity Centre International Celebrates 43rd Anniversary, August 12, 2012. Dr. Robichaux has notably failed to publish the treatment protocol, and his findings have not been subjected to peer-review. Reports in the lay press note that individuals undergoing detoxification spend around 30 days at the clinic, with daily exercise, vitamin supplements, including unspecified amounts of niacin, meals and sauna sessions. Doctor Says Symptoms of Gulf War Illness and Oil Spill Illness Are 'Identical,' Courthouse News Service, Mar. 20, 2012.

15

b.    In his declaration, Dr. Robichaux claims that patients' symptoms improve with treatment.  Dr. Robichaux Declaration at ¶¶ 31-32.  However, Dr. Robichaux provides no objective evidence to support his claims that his detoxification treatment has improved his patients' health.    Even if his claims regarding improvement of symptoms following detoxification were true, Dr. Robichaux has presented no objective evidence that such improvement is not the result of the placebo effect or other causes.  As indicated above in paragraph 7, the VOCs being tested for by Metametrix in its VOC panel would have been eliminated by the body's natural processes shortly after contact and would not be permanently stored in the body, and thus there would be nothing to be "detoxified," especially months or years after any contact with oil and/or dispersants.  Any changes in health status thus would not be attributable to the detoxification therapy.

c.    Objector Joseph Yerkes has described participating in another detoxification program being promoted to individuals in the Gulf Coast, which is run by Dr. Rodney Soto.  Mr. Yerkes described Dr. Soto's program as consisting of 2 to 4 intravenous drips per week, a "special, very expensive" diet, and more than 40 pills per day.  'The Gulf was My Church' – A Fisherman Reflects on Loving, and Leaving, the Gulf Coast, April 25, 2012, Bridge the Gulf Project Blog.  Dr. Soto has not provided a written protocol or described the program in peer-reviewed literature, but has indicated in the lay press that it involves the administration of an intravenous detoxification agent.  Local Doctor Links Spill to Symptoms, Nov. 2, 2010, Walton Sun.  As with Dr. Robichaux's detoxification program, there is no scientific evidence of any health benefits, just subjective and unproven anecdotal reports.

d.    Further, the VOC blood measurements and detoxification treatments have the potential to cause significant harm to class members and other individuals who believe such

practices to be legitimate medicine. As a member of the United States Preventive Services Task Force, I am involved in reviewing research evidence about both benefits and harms of medical services when creating or updating evidence-based recommendations for preventive services provided in primary care settings. As indicated above, there is no scientific or medical basis to assert that the VOC blood tests or detoxification treatments are useful; however, there is evidence that these tests and treatments can cause harm. Mistaken belief in the validity of VOC blood testing or the therapeutic benefits of detoxification programs can increase anxiety and fear, cause mistrust of evidence-based medicine, and result in harmful behavioral changes. The mistaken belief in such testing and detoxification increases the likelihood that individuals will jeopardize their employment, withdraw from their social circles, and withdraw from the established medical community, and thus may not seek appropriate and needed treatment for current or future real medical conditions. There are other harms associated with such treatment, including infection from inserting and withdrawing intravenous lines and from drawing blood, adverse effects from large quantities of substances such as vitamins, adverse effects from compounded prescriptions (*e.g.*, the recent fungal meningitis outbreak seen with compounded prescriptions from the New England Compounding Center, http://www.fda.gov/Drugs/DrugSafety/ucm322734.htm), increased frequency and severity of harm from disease when people forego evidence-based medicine, and potential increased morbidity and mortality when accepted medical practices are not followed. Given the risk of harms from such testing and treatment, and the absence of any proven benefit, there is absolutely no valid medical or scientific basis for these programs to be part of the Medical Benefits Class Action Settlement.

9.      A few objections raise unique issues which I address below:

a.      George R. Hall asserts that he has incurred certain expenses due to his contact with oil and/or dispersants, which he claims caused chronic rhinosinusitis and unspecified blood and low platelet disorders.  (10-cv-07777, Rec. Doc. 160).  The materials provided by Mr. Hall do not establish that he has the claimed conditions.  Moreover, even if he were to have the conditions that he claims, the medical records that he provides demonstrate that most of the claimed $53,000 in medical expenses are likely unrelated to such conditions.  There is no documentation establishing which drugs cost $20,321.67, let alone any indication of the medical diagnosis for which those drugs were prescribed.  The documentation that he provides includes a charge of $18,122.60 for a hospital admission at Lafayette Surgical Hospital on April 2, 2012 for a common prostate condition; the primary diagnosis code was listed as 60001, which is benign prostatic hypertrophy with urinary obstruction.  Mr. Hall has also submitted bills for diabetes testing, urine culture tests associated with a urological condition, and lipid and Prostate Specific Antigen testing consistent with a general preventive medical examination.  Mr. Hall is an example of a person who could benefit from the Periodic Medical Consultation Program, but he provides no evidence that his alleged maladies are exposure-related.  Thus, there is no medical or scientific support for providing compensation for them.

b.      Roommates Matthew Judson Canipe (10-cv-07777, Rec. Doc. 203) and Timothy Patrick McLane (10-cv-07777, Rec. Doc. 205) mistakenly assert that a positive methacholine challenge test is required to be eligible for compensation on the Matrix.  If they are class members and if they in fact have the conditions and symptoms they claim within the timeframes specified in the Matrix, it appears that they could be eligible for compensation for an Acute Specified Physical Condition.

18

I declare under penalty of perjury that the foregoing analysis and opinions are true and correct.

Executed on October 22, 2012.

Dr. Jessica A. Herzstein

# EXHIBIT "A"

1. Objection to Medical Settlement; Barbara Adams (10-cv-07777, Rec. Doc. 243).

2. Objection to Settlement; Ilease Bartlette (10-cv-07777; Rec. Doc. 51).

3. Objection to Fairness of Proposed Personal Injury Settlement; Charles A. Boggs (10-cv-07777; Rec. Doc. 41).

   A. Short Form Joinder of Charles A. Boggs.

4. Statement of Objections; Carolyn Booker and Zena Coleman (10-cv-07777; Rec. Doc. 208).

   A. Short Form Joinders of Carolyn Booker and Zena Coleman.

5. Objection to Medical Settlement; Lance Clay Brown (10-cv-07777; Rec. Doc. 130).

   A. Short Form Joinder of Lance Clay Brown.

6. Objection to Terms of the Medical Benefits Class Action Settlement; Matthew Judson Canipe (10-cv-07777; Rec. Doc. 203).

   A. Short Form Joinder of Matthew Judson Canipe.

7. Objection; Stella Chagares (10-cv-07777, Rec. Doc. 250).

8. Objection to Proposed Medical Settlement Agreement; Malcolm Coco and Jared Shane Elrod (10-cv-07777; Rec. Doc. 180).

   A. *Jared Shane Elrod, Malcolm Coco, Troy Sens and Derrick McMillen v. BP Exploration and Production, Inc., et al.*, Medical Class Action Complaint, United States District Court, Eastern District of Louisiana, Civil Action No. 2:12-cv-00981-CJB-SS.

   B. Short Form Joinder of Malcolm Coco.

   C. Plaintiff Profile Form of Jared Shane Elrod.

9. Statement of Objections Relating to Medical Benefits Class Members; Linda Breedlove, *et al.* (10-cv-07777; Rec. Doc. 158).

   A. Short Form Joinders of Linda Breedlove, Sassy Cooler, Sandra Elder, David Hall, Jr., Demetrius Heard, and Gerald Williams.

10. State of Louisiana's *Amicus Curiae* Memorandum in Opposition to Motion for Certification of Economic and Property Damages Settlement Class and in Opposition to Motion for Certification of Medical Benefits Settlement Class (10-cv-07777; Rec. Doc. 228).

11. Objection to the Settlement; George R. Hall (10-cv-07777; Rec. Doc. 160).

    A. Short Form Joinder of George R. Hall.

12. Halliburton Energy Services, Inc.'s Objections to Plaintiffs' Memorandum in Support of Final Approval of Medical Benefits Class Action Settlement and BP's Motion for Final Approval of the Medical Benefits Class Action Settlement (10-cv-07777; Rec. Doc. 93).

13. Medical Objection Letter to BP; Kevin Scott Llewallen (10-cv-07777; Rec. Doc. 182).

    A. Short Form Joinder of Kevin Scott Llewallen.

14. Letter re: Poisoning by BP Oil Spill Fairness Hearing Statement; Deborah Lucas (10-cv-07777; Rec. Doc. 236).

15. Objection to Settlement; Albio Luis Machuca (10-cv-07777; Rec. Doc. 57).

16. Objection to Terms of the Medical Benefits Class Action Settlement; Timothy Patrick McLane (10-cv-07777; Rec. Doc. 205).

17. Objection to Medical Benefits Portion of Proposed Class Action Settlement; Mike Sturdivant, *et al.* (10-cv-07777; Rec. Doc. 124; copy at 10-cv-07777, Rec. Doc. 213).

18. Objection to Medical Settlement; Gerald Porter.

19. Letter of Objections to the Medical Benefits Class Action Settlement; Jason B. Sims (10-cv-07777; Rec. Doc. 61).

20. Statement of Objections; Joseph Yerkes, *et al.*(10-cv-07777; Rec. Doc. 185)

   A. *Joseph Yerkes, Joshua Allen Bengson, Austin Norwood and Margaret Norwood, as husband and wife, v. BP Exploration & Production, Inc., et al.*, Complaint for Damages, United States District Court, Eastern District of Louisiana, Civil Action No. 2:12-cv-01485-CJB-SS.

   B. Plaintiff Profile Forms of Joshua Allen Bengson, Austin Norwood, Margaret Norwood, Bobby Taylor and Joseph Yerkes.

21. Statement of Objections; Bryan Baird, *et al.* (10-cv-07777; Rec. Doc. 202)

   A. *Paul Matthew Doom, Christopher Albert Martin, Jeffrey R. Vaughan, Steven Aguinaga, Stephane Aguinaga, Monette Wynne, Greg Wynne, Marlee Wynne, Ranger Wynne, Giselle Wynne, Doug Maurras, Rachel Maneen v. BP Exploration & Production Inc., et al.*, Complaint for Damages, United States District Court, Eastern District of Louisiana, Civil Action No. 2:12-cv-02048-CJB-SS.

   B. *Steven Kolian, David Landrieu, Kim Flair Landrieu, Michael Boatright, Charles Taylor, Christopher Green, Gregory Turner, Daniel Hatcher, Richard and Janice Danos, James Morgan, Ronald Shearon, Patricia Rye, and David Hackney v. BP Exploration & Production, Inc., et al.*, Complaint for Damages, United States District Court, Eastern District of Louisiana, Civil Action No. 2:12-cv-02338-CJB-SS.

   C. *Extreme Fishing Charters, Inc., Allen Walker, Roxanne Walker v. BP, P.L.C., et al.*, United States District Court, Eastern District of Louisiana, Civil Action No. 2:12-cv-02155-CJB-SS.

   D. Short Form Joinders of Bryan Joshua Baird (original and amended), Patricia Boyles, Jorey Tristan Danos, Christopher Alan Green, Robyn Hill, Frank Morris Howell, Rachel Renee Maneen, Denise Malcombe Richoux, Gary Lane Schexnayder and Gregory Scott Turner.

22. Notice of Consolidated Objection to the Fairness and Adequacy of the Proposed Medical Benefits Class Action Settlement Agreement; Reynaldo Abreu, *et al.* (10-cv-07777; Rec. Doc. 92).

# EXHIBIT "B"

1. Abbritti, G, A. Siracusa, C. Cianchetti, C.A. Coli, F. Curradi, G. F. Perticoni and F. De Rosa. "Shoe-makers' Polyneuropathy in Italy: the Aetiological Problem," *Br. J. Ind. Med.*, 33:92-99, 1976.

2. Aguilera, Francisco, Josefina Mendez, Eduardo Pasaro and Blanca Laffon. "Review on the Effects of Exposure to Spilled Oils on Human Health," *J. Appl. Toxicol.* 30:291-301, 2010.

3. American College of Occupational and Environmental Medicine (ACOEM). Position Statement. Multiple Chemical Sensitivities: Idiopathic Environmental Intolerance, *J. Occup. Environ. Med.* 41(11):940-92, Nov. 1999.

4. Boes, Christopher J., David J. Capobianco, F. Michael Cutrer, David W. Dodick, Ivan Garza and Jerry W. Swanson. Headache and Other Craniofacial Pain. In: Neurology in Clinical Practice, W.G. Bradley, *et al.*, editors. Philadelphia: Butterworth-Heinemann/Elsevier, 5th ed., Vol. 2, Ch. 73, pp. 2011-2062, 2008.

5. Carlson, Bruce M. Cleavage and Implantation. In *Human Embryology and Developmental Biology*, Bruce M. Carlson, editor. Philadelphia, PA: Mosby Elsevier, 4th ed., Ch. 3., pp. 43-64, 2009.

6. CDC/ATSDR. Guidance on the Interpretation and Use of Blood Laboratory Analyses for Volatile Organic Compounds, *available at available at* http://emergency.cdc.gov/gulfoilspill2010/voc_clinicians.asp.

7. Cole, Jane, David M. Beare, Alastair P.W. Waugh, Emily Capulas, Kay E. Aldridge, Colin F. Arlett, Michael H.L. Green, Jacqueline E. Crum, Derek Cox, R. Colin Garner, Karen H. Dingley, Elizabeth A. Martin, Karen Podmore, Robert Heydon and Peter B. Farmer. "Biomonitoring of Possible Human Exposure to Environmental Genotoxic Chemicals: Lessons from a Study Following the Wreck of the Oil Tanker *Braer*," *Env. and Mol. Mutagenesis* 30:97-111, 1997.

8. Cullen, Mark. The Worker with Multiple Chemical Sensitivities: An Overview. In: Occupational Medicine: State of the Art Reviews. Philadelphia; Hanley and Belfus Inc., Vol. 2, No. 4, pp. 655–662, October-December 1987.

9. De Leo, Vincent A. Photoallergens. In: Contact and Occupational Dermatology, James G. Marks, Peter Elsner and Vincent A. De Leo, editors. St. Louis: Mosby, 3rd ed., Ch. 9, pp. 217-260, 2002.

10. De Leo, Vincent A. "Photocontact Dermatitis," *Dermatologic Therapy*, 17:279-288, 204.

11. Emmet, Edward A. Phototoxicity and Photosensitivity Reactions. In: Occupational Skin Disease, Robert M. Adams, editor. Philadelphia: W.B. Saunders Co., 3rd ed., Ch. 10, pp. 172-180, 1999.

12. IUPAC Glossary of Terms Used in Toxicology, 2nd Edition, 2011, *available at* http://sis.nlm.nih.gov/enviro/iupacglossary/glossarym.html#mcs.

13. Lindbohm, Marja-Liisa, Helena Taskinen, Markku Sallmen and Kari Hemminki. "Spontaneous Abortions Among Women Exposed to Organic Solvents," *Am. J. Ind. Med.*, 17:449-463, 1990.

14. McMartin, Kristen I., Merry Chu, Ernest Kopecky, Thomas R. Einarson and Gideon Koren. "Pregnancy Outcome Following Maternal Organic Solvent Exposure: A Meta-Analysis of Epidemiologic Studies," *Am. J. Ind. Med.*, 34:288-292, 1998.

15. Perez-Cadahia, Beatriz, Blanca Laffon Eduardo Pasaro and Josefina Mendez. "Genetic Damage Induced by Accidental Environmental Pollutants," *The Scientific World JOURNAL* 6:1221-1237, 2006.

16. Perez-Cadahia, Beatriz, Anunciacion Lafuente, Teresa Cabaleiro, Eduardo Pasaro, Josefina Mendez and Blanca Laffon. "Initial Study on the Effects of *Prestige* Oil on Human Health," *Environ. Int.* 33:176-185, 2007.

17. Rodriguez-Trigo, Gema, Jan-Paul Zock, Francisco Pozo-Rodriguez, Federico P. Gomez, Gemma Monyarch, Laura Bouso, M. Dolors Coll, Hector Verea, Josep M. Anto, Carme Fuster and Joan Albert Barbera, for the SEPAR-Prestige Study Group. "Health Changes in Fishermen 2 Years After the *Prestige* Oil Spill," *Ann. Intern. Med.*, 153(8):489-498, 2010.

18. Schaumburg, Herbert H. Human Neurotoxic Disease. In: Experimental and Clinical Neurotoxicology, Peter S. Spencer, *et al.*, editors. New York: Oxford University Press, 2nd ed., Ch. 2, pp. 55 to 82, 2000.

19. Shy, Michael. Peripheral Neuropathies. In: Goldman's Cecil Medicine, Lee Goldman, M.D. and Andrew I. Schafer, M.D., editors. Philadelphia: Elsevier Saunders, 24th ed., Ch. 428, pp. 2396-2408, 2012.

20. Staudenmayer, Herman, John C. Selner and Martin P. Buhr. "Double-Blind Provocation Chamber Challenges in 20 Patients Presenting with 'Multiple Chemical Sensitivity,'" *Reg. Tox. Pharm.*, 18:44-53, 1993.

21. Surgeon General's Call to Action to Prevent Deep Vein Thrombosis and Pulmonary Embolism, U.S. Department of Health and Human Services, dated 2008. *Available for download at* http://www.surgeongeneral.gov/topics/deepvein/calltoaction/call-to-action-on-dvt-2008.pdf.

22. Taskinen, Helena, Pentti Kyyrönen, Kari Hemminki, Matti Hoikkala, Kari Lajunen and Marja-Liisa Lindbohm. "Laboratory Work and Pregnancy Outcome," *J. Occ. Med.*, 36(3): 311-319, 1994.

23. Ventura, Stephanie J., Sally C. Curtin and Joyce C. Abma. "Estimated Pregnancy Rates and Rates of Pregnancy Outcomes for the United States, 1990-2008," *National Vital Statistics Reports*, 60(7):1-21, June 20, 2012.

24. Wilcox, Allen J., Clarice R. Weinberg, John F. O'Connor, Donna D. Baird, John P. Schlatterer, Robert E. Canfield, E. Glenn Armstrong and Bruce C. Nisula. "Incidence of Early Loss of Pregnancy," *N. Engl. J. Med.* 319:189-194, 1988.

25. Yamada, Schin'ya. "Intoxication Polyneuritis in the Workers Exposed to n-Hexane," *Jap. J. Ind. Health*, 9:651-659, 1967.

26. Yamamura, Yasuhiro. "n-Hexane Polyneuropathy," *Folia Psychiatr. Neurol. Jap.*, 23:45-57, 1969.

27. Zock, Jan-Paul, Gema Rodriguez-Trigo, Emma Rodriguez-Rodriguez, Francisco Pozo-Rodriguez, Federico P. Gomez, Carme Fuster, Gema Castano-Vinyals, Josep M. Anto and Joan Albert Barbera. "Long-Term Health Effects of the *Prestige* Oil Spill (Galicia, Spain)," *Epidemiology*, 20(6):S242-S243, Nov. 2009.

28. Zock, Jan-Paul, Gema Rodriguez-Trigo, Francisco Pozo-Rodriguez, Joan A. Barbera, Laura Bouso, Yolanda Torralba, Josep M. Anto, Federico P. Gomez, Carme Fuster and Hector Verea, for the SEPAR-Prestige Study Group. "Prolonged Respiratory Symptoms in Clean-Up Workers of the *Prestige* Oil Spill," *Am. J. Respir. Crit. Care Med.*, 176:610-616, 2007.