# Exhibit 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

In Re:

DEEPWATER HORIZON BELO CASES      )   Case No. 3:19cv963/MCR
                                  )
                                  )
                                  )
                                  )
                                  )   Pensacola, Florida
                                  )   **March 31, 2020**
                                  )   1:30 p.m.
                                  )
_____)

**MOTION FOR SUMMARY JUDGMENT**

TRANSCRIPT OF TELECONFERENCE PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
(Pages 1-71)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*100 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

## A P P E A R A N C E S

FOR THE PLAINTIFFS:      **TIMOTHY J. FALCON, ESQUIRE**
                         **JEREMIAH A. SPRAGUE, ESQUIRE**
                         Falcon Law Firm
                         5044 Lapalco Boulevard
                         Marrero, Louisiana  70072

                         **ALLEN W. LINDSAY, ESQUIRE**
                         Lindsay & Lindsay, P.A.
                         5218 Willing Street
                         Milton, Florida  32570

                         **ALISON DIVINE, ESQUIRE**
                         The Nations Law Firm
                         9703 Richmond, Suite 200
                         Houston, Texas  77042

                         **C. DAVID DURKEE, ESQUIRE**
                         **CRAIG DOWNS, ESQUIRE**
                         **GABRIEL HAWA, ESQUIRE**
                         The Downs Law Group, P.A.
                         3250 Mary Street, Suite 307
                         Coconut Grove, Florida  33133


FOR THE DEFENDANT:       **R. KEITH JARRETT, ESQUIRE**
                         **CHARLES WILMORE, ESQUIRE**
                         Liskow & Lewis
                         701 Poydras Street, Suite 5000
                         New Orleans, Louisiana  70139

                         **FRANCIS M. MCDONALD, JR., ESQUIRE**
                         **SARAH A. LONG, ESQUIRE**
                         McDonald Toole Wiggins, P.A.
                         111 North Magnolia Avenue, Suite 1200
                         Orlando, Florida  32801

                         **KEVIN M. HODGES, ESQUIRE**
                         Williams & Connolly, LLP
                         725 Twelfth Street, N.W.
                         Washington, D.C.  20005

**P R O C E E D I N G S**

01:20:39   1

01:30:05   2       **THE COURT:**  This is Judge Rodgers.

01:30:10   3       **MR. MCDONALD:**  Good afternoon, Your Honor.

01:30:12   4       **THE COURT:**  Good afternoon.  Let me just announce from

01:30:16   5   the Court's end who is on the call.  We have a couple of guests

01:30:23   6   calling in from the Eastern District of Louisiana, and then

01:30:29   7   I'll ask the parties to identify themselves.

01:30:30   8       So, obviously, I'm on the call.  We're all in remote

01:30:34   9   locations.  My law clerk, Annette Williams, is on the call.  I

01:30:42   10  believe -- Judge Morgan, are you on the call?

01:30:48   11      **JUDGE MORGAN:**  Yes, I am, and my law clerk, Abigail

01:30:53   12  Bush.  And thank you for letting us listen in.

01:30:56   13      **THE COURT:**  Yes, you're very welcome.  Happy to have

01:30:59   14  you.

01:31:00   15      And I believe also, from the Eastern District of

01:31:02   16  Louisiana, Ben Allums, who is Judge Barbier's law clerk, is on

01:31:10   17  the line.

01:31:12   18      Ben, are you there?

01:31:13   19      **MR. ALLUMS:**  Yes, Your Honor, I am.

01:31:15   20      **THE COURT:**  Ms. Simms, I'm quite sure you're on, but

01:31:21   21  just to make sure, are you on?

01:31:32   22      **MADAM CLERK SIMMS:**  Yes, I'm here.

01:31:32   23      **THE COURT:**  Judge Jones, are you present?

01:31:34   24      **JUDGE JONES:**  I am, I'm online, hear you fine and

01:31:37   25  clear.

| | |
|---|---|
| 01:31:38 | 1 |
| 01:31:39 | 2 |
| 01:31:45 | 3 |
| 01:31:50 | 4 |
| 01:31:54 | 5 |
| 01:31:58 | 6 |
| 01:32:02 | 7 |
| 01:32:05 | 8 |
| 01:32:17 | 9 |
| 01:32:17 | 10 |
| 01:32:21 | 11 |
| 01:32:23 | 12 |
| 01:32:28 | 13 |
| 01:32:30 | 14 |
| 01:32:34 | 15 |
| 01:32:36 | 16 |
| 01:32:43 | 17 |
| 01:32:46 | 18 |
| 01:32:49 | 19 |
| 01:32:53 | 20 |
| 01:32:58 | 21 |
| 01:33:05 | 22 |
| 01:33:09 | 23 |
| 01:33:15 | 24 |
| 01:33:18 | 25 |

**THE COURT:**  Very good, very good.

All right.  I believe that's everyone from the Court's end.  How about let me ask, for the Plaintiffs, who do I have on the call?

**MR. FALCON:**  Good morning, Your Honor.  Tim Falcon and Jeremiah Sprague on the phone for the Lindsey-Falcon plaintiffs.

**MR. DURKEE:**  And David Durkee from the Downs Law Group.

**MR. HAWA:**  Gabriel Hawa from the Downs Law Group.

**THE COURT:**  Anyone else?

**MR. LINDSAY:**  This is Allen Lindsay.  I'm on, but I don't have a speaking part.

**MR. DOWNS:**  Craig Downs from the Downs Law Group.  I also will not be speaking.

**THE COURT:**  Okay.  For BP, who is on the call?

**MR. MCDONALD:**  Good afternoon, Your Honor.  Frank McDonald and Sarah Long here in Orlando calling in.  I know there's some others on the line as well, including for BP themselves, the representatives are Marsha Montgomery, Tracy Rodgers, and Kathy McEldowney, I believe they're on the line.

And Kevin Hodges, who is BP counsel of record, is on the line as well as Mr. Keith Jarrett from Liskow & Lewis from New Orleans.  He's been admitted pro hac on the cases by Your Honor's order, and he's on the line, and he'll be addressing

| | | |
|---|---|---|
| 01:33:21 | 1 | the Court today. |
| 01:33:22 | 2 | **THE COURT:**  Is that Russell Jarrett? |
| 01:33:26 | 3 | **MR. JARRETT:**  Yes, Your Honor, Russell Keith.  I go by |
| 01:33:30 | 4 | my middle name.  And I'm here with my partner Charles Wilmore, |
| 01:33:34 | 5 | who has also been admitted pro hac. |
| 01:33:37 | 6 | **THE COURT:**  Thank you.  Anyone else? |
| 01:33:41 | 7 | **UNIDENTIFIED PERSON:**  I believe that's it, Your Honor. |
| 01:33:43 | 8 | **THE COURT:**  Very good.  I'll ask, since we're not in |
| 01:33:47 | 9 | person and Ms. Boland, I don't believe, is familiar with your |
| 01:33:50 | 10 | voices, and nor am I with everyone, so please identify |
| 01:33:54 | 11 | yourselves, if you would, when you speak. |
| 01:33:58 | 12 | Let me make a couple of comments and observations |
| 01:34:03 | 13 | before we get started with the argument.  I'd like to state |
| 01:34:10 | 14 | first that my previous order, which is at Document 52 in ECF, |
| 01:34:17 | 15 | which was the order denying the Downs Law Group motion to |
| 01:34:21 | 16 | enforce the terms of the Medical Settlement Agreement which the |
| 01:34:28 | 17 | Downs Group asked for judgment as a matter of law on the issue |
| 01:34:32 | 18 | of causation, that that order stands.  It's not going to be |
| 01:34:35 | 19 | reconsidered. |
| 01:34:36 | 20 | To the extent there is an argument from the Plaintiffs |
| 01:34:39 | 21 | now that the Court should accept the science as establishing |
| 01:34:48 | 22 | general causation as a matter of law, I just want to state, as |
| 01:34:52 | 23 | I did in my earlier order, BP has not stipulated to general |
| 01:34:57 | 24 | causation for any purpose outside of the Medical Settlement |
| 01:35:06 | 25 | Agreement.  And my decision is based on the scientific evidence |

01:35:09    1    that is in this record in these cases before me, not on the

01:35:13    2    record before Judge Barbier in the MDL.

01:35:21    3         So the question before me today, as I see it -- and

01:35:24    4    let me stop for a moment and thank you all for the submissions

01:35:31    5    in support of your motion for BP and then in defense of the

01:35:35    6    motion by the Plaintiffs.  I think I've been through -- my law

01:35:40    7    clerk and I have been through everything, and again I

01:35:44    8    appreciate the time you took to put it all together.

01:35:46    9         So as it sort of boils down for me, the question today

01:35:54   10    on the BP motion is, for the Group 1 cases, is whether the

01:36:00   11    chemicals at issue, namely the particulate matter, are capable

01:36:11   12    of causing the later-manifested physical conditions of chronic

01:36:15   13    conjunctivitis and dry eye syndrome through a dermal pathway of

01:36:20   14    exposure; and then in the Group 3 of cases, whether the

01:36:23   15    chemicals -- as well as I can tell, it's PM and arsenic -- are

01:36:29   16    capable of causing chronic conjunctivitis, chronic sinusitis,

01:36:32   17    chronic rhinitis, chronic dermatitis, and chronic

01:36:35   18    rhinosinusitis, either through a dermal pathway or inhalation

01:36:38   19    and/or ingestion pathway of exposure.

01:36:42   20         In the interest of time and to help you all focus your

01:36:46   21    arguments, I'll add at the outset here that, in my view, the

01:36:54   22    pathway of exposure as well as amount and duration of exposure

01:36:59   23    -- or as well as that amount of duration and exposure necessary

01:37:05   24    to cause these specific LMPCs in the general population is

01:37:10   25    relevant to the general causation analysis and is not something

| | | |
|---|---|---|
| 01:37:13 | 1 | that's limited strictly to specific causation. |
| 01:37:18 | 2 | And finally, I have to disagree with the argument that |
| 01:37:23 | 3 | was made by the Plaintiffs that these chemicals are generally |
| 01:37:28 | 4 | accepted by the scientific community as harmful in the same way |
| 01:37:36 | 5 | as cigarette smoke and asbestos are, and there's nothing to |
| 01:37:40 | 6 | that effect in the law that's been presented to me or in the |
| 01:37:43 | 7 | factual record before me. |
| 01:37:45 | 8 | So, with those observations and comments made, I'm |
| 01:37:51 | 9 | ready to hear your arguments.  I just received a PowerPoint |
| 01:37:57 | 10 | from the BP Defendants.  I have that and I printed it out.  I |
| 01:38:03 | 11 | also forwarded it on to others on the phone with the Court. |
| 01:38:09 | 12 | Who will be making the arguments for BP today? |
| 01:38:15 | 13 | **MR. JARRETT:**  Good afternoon, Your Honor.  This is |
| 01:38:17 | 14 | Keith Jarrett in New Orleans, and I'll be making the arguments |
| 01:38:24 | 15 | for BP. |
| 01:38:24 | 16 | **THE COURT:**  I'm sorry.  You told me that.  All right, |
| 01:38:26 | 17 | Mr. Jarrett, I'll call on you to start the argument.  It's your |
| 01:38:30 | 18 | motion. |
| 01:38:31 | 19 | **MR. JARRETT:**  Thank you, Judge Rodgers.  We appreciate |
| 01:38:34 | 20 | the time today.  We have asked for oral argument, and the Court |
| 01:38:38 | 21 | graciously granted that.  But we did not ask because our |
| 01:38:42 | 22 | argument is complicated.  To the contrary, our argument is very |
| 01:38:46 | 23 | simple.  We requested oral argument so we could be sure to |
| 01:38:50 | 24 | address anything the Court had. |
| 01:38:51 | 25 | And I've taken note of the comments you've already |

01:38:54    1    made, which I had hoped to address in my comments today.  But

01:38:57    2    when I come to those in my outline, I'll skip over them.

01:39:02    3           As background, all 12 of these BELO plaintiffs in

01:39:07    4    Groups 1 and 3 have asserted these BELO claims which are

01:39:12    5    derivative of the Medical Settlement Agreement.  The Medical

01:39:19    6    Settlement Agreement requires these plaintiffs to prove legal

01:39:21    7    causation.  And we've moved for summary judgment because we

01:39:24    8    don't believe their experts have done that.

01:39:28    9           We filed a Motion for Summary Judgment rather than a

01:39:32   10    *Daubert*, but I think they achieve the same purpose today.

01:39:36   11    Because under the Eleventh Circuit jurisprudence, when the

01:39:41   12    plaintiffs seek to oppose a summary judgment by virtue of

01:39:44   13    expert testimony or expert reports that they suggest create a

01:39:48   14    genuine issue of material fact, the Court is to assess that

01:39:53   15    testimony under *Daubert* as it would in a separate *Daubert*

01:39:57   16    hearing.  So we get to the same place.

01:39:59   17           Our motion is based on a challenge to the single, sole

01:40:06   18    expert nominated by these two plaintiff groups to testify as to

01:40:11   19    general causation, and that's Dr. Patricia Williams, a

01:40:18   20    toxicologist.  We've not challenged Dr. Williams's credentials.

01:40:24   21    Our motion is focused solely on her methodology.  And quite

01:40:28   22    honestly, because of the way that her opinions are expressed,

01:40:33   23    we don't think they satisfy the helpfulness requirement of Rule

01:40:37   24    702 either, but principally we're going to talk about

01:40:44   25    methodology today.

| | |
|---|---|
| 01:40:45 | 1 |

The Plaintiffs have opposed our motion on three bases. They defend Dr. Williams's reports, and we'll talk about their defense in some detail.  They point to the SPC matrix.  But Your Honor, I think, has dispensed with that discussion.  And when I get to that, I'll move past it.  And they also suggest that one of BP's experts has conceded the point, and I'll address that in turn.

To create an issue of material fact, an expert report has to be reliable.  And in the Eleventh Circuit, reliability for general causation purposes is very well developed.

And Your Honor, if you've read our briefs, as you have, you see we rely in great detail on your *Abilify* decision from a year-and-a-half ago, two years ago.  I actually read the closing argument in your *Daubert* general causation hearing for *In Re: Abilify* and, trust me, our presentation today is not nearly as detailed as that.

Our main argument today is that Dr. Williams, Patricia Williams, does not use adequately any of the three methodologies that the Eleventh Circuit has approved.  She doesn't appropriately use epidemiology, she doesn't even touch upon dose-response, and she doesn't even touch upon background risk of disease -- the only three primary methodologies that the Eleventh Circuit recognizes.

Dr. Williams instead relies primarily on what she calls a mechanistic approach, which I think some other folks

| | | |
|---|---|---|
| 01:42:39 | 1 | talk about as biological plausibility. |
| 01:42:41 | 2 | We don't challenge her conclusion on that subject in |
| 01:42:44 | 3 | this motion, although we disagree with them.  Why?  Because the |
| 01:42:47 | 4 | Eleventh Circuit has said that secondary methodologies like |
| 01:42:51 | 5 | biological plausibility or mechanistic data are not enough by |
| 01:42:57 | 6 | themselves, or even in the aggregate, to establish general |
| 01:42:57 | 7 | causation. |
| 01:43:01 | 8 | To be reliable, an expert's opinion must be based on |
| 01:43:05 | 9 | one of the primary methodologies or it is considered unreliable |
| 01:43:12 | 10 | as a matter of law. |
| 01:43:13 | 11 | So, if we focus on Dr. Williams's -- she issued two |
| 01:43:20 | 12 | reports and she has three opinions, which, Your Honor, you've |
| 01:43:26 | 13 | already outlined. |
| 01:43:28 | 14 | She claims arsenic exposure can cause chronic |
| 01:43:33 | 15 | dermatitis and similarly that particulate matter exposure can |
| 01:43:45 | 16 | cause chronic conjunctivitis, chronic sinusitis, chronic |
| 01:43:46 | 17 | rhinitis, and chronic rhinosinusitis, all of which are upper |
| 01:43:48 | 18 | respiratory conditions. |
| 01:43:51 | 19 | I want to focus first on the epidemiology because, not |
| 01:43:57 | 20 | only does the Eleventh Circuit consider that's a primary tool |
| 01:44:02 | 21 | for causation in a toxic tort case, it is what takes up the |
| 01:44:08 | 22 | majority of Dr. Williams's two reports. |
| 01:44:10 | 23 | She has cited to three sources of epidemiology: Some |
| 01:44:17 | 24 | that deal with oil spills generically, some that deal with |
| 01:44:23 | 25 | studies of particulate matter, and some that deal with studies |

| | |
|---|---|
| 01:44:27 | 1 |

of arsenic.  But she treats all three groups exactly the same.

What do I mean by that?  I mean she cites them, she includes a blurb about them, and that blurb that she includes, she says in deposition, comes from the studies themselves.  She doesn't like to paraphrase the studies because she finds those open her up to criticism.

And so, she cites a study, she includes a blurb about the study that she pulls from the study, but she doesn't analyze the studies, and she doesn't -- as we call it in our brief, she doesn't show her work.  And we say, just like a student in the third grade, you can't just put an answer down on the piece of paper; you have to show your math formula that got you there.

And, Your Honor, for the slides that I have circulated today -- that BP has circulated, I would ask you to draw your attention to slide 2 at this time.

All of the contents of these slides came from our briefs or exhibits to our briefs.  There's no new material here.  But we simply picked the first -- as an exemplar, the first epidemiology study that Dr. Williams cited in her analysis of arsenic.  And it's called -- the author is Wei, W-e-i, and it appears at Section 11 of her report that she issues for the Downs bellwether plaintiffs, and I've reprinted it here on this slide, and it's just a screenshot of her brief.

But what I wanted to draw the Court's attention to is

01:46:17    1   this is similar for how she treats every one of the

01:46:20    2   epidemiology studies that she cites.  What I've highlighted in

01:46:28    3   green on the slide is taken directly from the study.

01:46:31    4        It talks about -- it's a study evidently investigating

01:46:35    5   subjects in China who were chronically exposed to arsenic in

01:46:42    6   drinking water, and it suggests that they developed skin

01:46:46    7   lesions.  But we don't know what chronically exposed means in

01:46:52    8   that population.  We certainly have no allegations in these

01:46:55    9   cases about ingestion of arsenic.  It's all dermal and

01:46:59   10   respiratory pathways.

01:47:01   11        So we're left to wonder why is this study relevant,

01:47:06   12   and she never tells us.  Not only does she not tell us on a

01:47:11   13   study-by-study basis, one would think that at the end of all of

01:47:16   14   her studies -- and she cites seven more arsenic studies in her

01:47:20   15   narrative and even more arsenic studies in her reference list,

01:47:24   16   but she never packages the group together.

01:47:27   17        If the Court were to look at Section 11 from her

01:47:30   18   report, you would see she concludes Section 11 by citing to

01:47:34   19   another study and then moving to Section 12.  There is nothing

01:47:37   20   here that supports her analysis.  There's nothing -- she

01:47:43   21   doesn't put the relative risk of the studies, she doesn't put

01:47:46   22   the confidence intervals, she doesn't list the studies'

01:47:51   23   limitations, nothing.  And that is a persistent problem

01:47:55   24   throughout both of her reports.

01:47:56   25        And if I could ask the Court to look at the next

01:48:01   1   slide, slide 3, we just cite general principles about

01:48:05   2   epidemiology here that are relevant.

01:48:08   3          The reference manual on scientific litigation which

01:48:12   4   she purports to rely on -- it's mentioned in many places

01:48:15   5   throughout her report and it's mentioned in the Plaintiffs'

01:48:18   6   opposition -- to use epidemiology in litigation, "the

01:48:25   7   methodological soundness of the studies and its implications

01:48:29   8   for resolution of the question of causation must be assessed."

01:48:33   9   "Must."

01:48:33   10          And then the next quote also from the scientific

01:48:37   11   reference manual says, quote, "evaluating epidemiological

01:48:45   12   evidence, the key questions then are the extent to which a

01:48:46   13   study's limitations compromise its findings and permit

01:48:50   14   inferences about causation."

01:48:51   15          Dr. Williams gives us none of that.  She doesn't

01:48:57   16   assess the epidemiology, she doesn't ask the key questions, and

01:49:00   17   she doesn't put them on the paper.

01:49:03   18          And, Your Honor, quoting directly from your decision

01:49:07   19   in *Abilify*, you repeat the same observation from the reference

01:49:13   20   manual about confounding being key to ensuring the reliability.

01:49:19   21          The opposition memoranda suggests that it's okay

01:49:24   22   because peer review, the fact that the epidemiological studies

01:49:29   23   were peer reviewed accounts for these possible problems.  But

01:49:33   24   that's not the law.

01:49:36   25          According to the Eleventh Circuit in the *Allison vs.*

01:49:40  1   *McGhan* case, peer review does nothing to ensure the soundness

01:49:46  2   or appropriateness of a study for a causation analysis.  It's

01:49:52  3   hornbook law.

01:49:53  4        And then, if I -- continuing on, Your Honor, if I move

01:49:58  5   to slide 4, we asked her specifically in her deposition whether

01:50:03  6   she had critiqued these studies, and the answer is right there:

01:50:10  7   "I'm not going to critique each study and put that in a

01:50:14  8   report."

01:50:14  9        Well, you know, with apologies to Dr. Williams, that's

01:50:17  10  what the report is for.  The report -- the requirement in the

01:50:23  11  law is that her methodology must be capable of being tested.

01:50:28  12  That's the first *Daubert* criteria.  There's others: Is it

01:50:34  13  subject to peer review, does it have a known error rate, and is

01:50:39  14  it generally accepted in the relevant scientific community.

01:50:42  15  But let's just focus on the first, capable of being tested.

01:50:46  16        How can BP and its experts test her theory when it is

01:50:52  17  not expressed?  Only a conclusion is expressed.  And I think

01:50:58  18  the Supreme Court and this Court have called that *ipse dixit*,

01:51:05  19  the idea that it must be so because the expert says it's so.

01:51:09  20        We are supposed to -- and according to these reports

01:51:12  21  and her testimony, we are supposed to accept that.  She called

01:51:15  22  that -- when I asked her again about the analysis in her

01:51:21  23  deposition which I took -- it shows you on page 5 of the

01:51:26  24  slide -- she called that gobbledygook.  Gobbledygook.

01:51:34  25        Again, with apologies to Dr. Williams, that's

| | |
|---|---|
| 01:51:37 | 1 |

precisely the kind of information we need.  And quite honestly,
she had four opportunities to do it.  She had two reports and
two depositions, and in none of them did she correct these
flaws.

And frankly, if you look at the opposition memorandum,
they don't push back on all this.  They repeat Dr. Williams's
statements that she had reviewed the material but they don't
cite to anything.  They don't show us.  They ask us to take her
word for it, and that's just not the way it works.

And, Your Honor, I would specifically draw your
attention to your decision in *Abilify* here.  Because, even
though many of the experts at issue in that case survived
*Daubert*, one did not, and the expert who did not survive
*Daubert* was Dr. Russell Luepker.

And this is from pages 359 and 360 of the Court's
opinions.  You found that Dr. Luepker was sufficiently
qualified but you -- quote, "The Court's concern with respect
to Dr. Luepker, based on his expert reports and deposition
testimony, is that he does not appear to have brought his
considerable expertise to bear in his analysis of the
evidence."  And then you wrote, "This presents a reliability
problem under *Daubert*," you go on to write.  And this is again
a quote, "The Court is of the view that his background,"
discussing Dr. Luepker's credentials, "well equips him to offer
unique insights into the methodological soundness of the only

01:53:33    1    epidemiological evidence in this case, the Etminan Study.  Yet,

01:53:42    2    Dr. Luepker devotes just a single paragraph of his initial

01:53:48    3    expert report to the Etminan Study," a single paragraph.

01:53:50    4         Well, I would submit that that's exactly what Dr.

01:53:53    5    Williams has done.  Look through the reports.  She cites many

01:53:58    6    epidemiological studies, but in each of them only for a

01:54:02    7    paragraph and with no unique original analysis whatsoever.

01:54:07    8         We would submit that her flaws match those of

01:54:11    9    Dr. Luepker and that she should -- the reliability of her

01:54:15   10    conclusions should be rejected for that reason alone.

01:54:19   11         However, however, we have more.  We would also point

01:54:25   12    out that there are other reasons why the epidemiology she used

01:54:29   13    is not reliable.  The studies that she relied on are not a good

01:54:35   14    fit for the case.

01:54:37   15         And if Your Honor would turn to slide 6, this is a

01:54:41   16    table on the hierarchy of epidemiologic evidence.  And it talks

01:54:47   17    about the quality of an epidemiological study design for

01:54:52   18    purposes of general causation.  It's in the form of a pyramid.

01:54:55   19    The top is the best, the bottom on the worst.  But analytical

01:54:59   20    epidemiology, cohort studies, and case controlled studies,

01:55:03   21    those are the gold standard for making causation associations

01:55:09   22    in epidemiology.  Cross-sectional studies and those below like

01:55:17   23    case reports are not.

01:55:19   24         Well, this Court knows that because in your *Abilify*

01:55:22   25    case again you made the observation that, quote, "it is not

| | | |
|---|---|---|
| 01:55:30 | 1 | possible to establish the temporal relation between exposure |
| 01:55:34 | 2 | and disease -- that is, that the exposure preceded the disease, |
| 01:55:38 | 3 | which would be necessary for drawing any causal inference -- by |
| 01:55:44 | 4 | reference to a cross-sectional study." |
| 01:55:48 | 5 | Cross-sectional studies don't work at the general |
| 01:55:51 | 6 | causation stage.  That's why the Nations plaintiffs are no |
| 01:55:56 | 7 | longer a part of this, Your Honor.  We took their expert's |
| 01:56:00 | 8 | deposition, Dr. Levy, who had initially relied on all these |
| 01:56:04 | 9 | cross-sectional studies, and during his deposition he recanted. |
| 01:56:07 | 10 | The next thing you know, the cases were all dismissed. |
| 01:56:10 | 11 | So if you look -- |
| 01:56:11 | 12 | **THE COURT:**  Mr. Jarrett, were any of those studies |
| 01:56:16 | 13 | that Dr. Williams cited, were any of them cohort or case |
| 01:56:20 | 14 | controlled studies, randomized controlled studies? |
| 01:56:25 | 15 | **MR. JARRETT:**  Yes, Your Honor, there were.  And I |
| 01:56:28 | 16 | think if you look at the next slide, 7, we can talk about that. |
| 01:56:32 | 17 | **THE COURT:**  Okay. |
| 01:56:33 | 18 | **MR. JARRETT:**  Slide 7 is a list of the oil spill |
| 01:56:38 | 19 | epidemiological studies that she cited.  And I haven't added |
| 01:56:41 | 20 | them up here, but it looks to be a dozen or more. |
| 01:56:44 | 21 | They are all cross-sectional except for two.  And the |
| 01:56:48 | 22 | two of them, if you look on the left-hand column, you'll see |
| 01:56:51 | 23 | one is a study by M-e-o -- I don't know how to pronounce that |
| 01:56:58 | 24 | and I don't want to say meow because people will laugh at me -- |
| 01:57:03 | 25 | M-e-o, and that is a study of an oil spill in Greece that took |

01:57:07  1  place -- I don't know when it took place, but the study was

01:57:10  2  issued in 2009.

01:57:11  3       But what I would tell you is that none of the

01:57:17  4  conditions that were discussed in that report match an LMPC in

01:57:23  5  this case.  And how do I know that --

01:57:25  6       **THE COURT:**  Are they primarily -- are they symptoms?

01:57:32  7       **MR. JARRETT:**  I think they are, Your Honor, symptoms,

01:57:35  8  not diagnoses, correct.  And I think that all that is discussed

01:57:40  9  on page -- I'm flipping my notes here -- page 40 of Dr.

01:57:45  10  Williams's report, and it carries over from page 39.  I'm

01:57:55  11  looking at her report from Mr. Falcon, and she talks about a

01:58:14  12  runny nose and eye irritation.  That's as close as we get.

01:58:19  13       **THE COURT:**  Okay.

01:58:23  14       **MR. JARRETT:**  Plus, I would point out that there's no

01:58:26  15  statement of causation made in that discussion.  In other

01:58:33  16  words --

01:58:34  17       **THE COURT:**  In the report or in the study itself?

01:58:39  18       **MR. JARRETT:**  Well, it's been -- I confess, Your

01:58:41  19  Honor, it's been a long time since I've read that study.  I

01:58:45  20  read it -- I don't remember.  But Dr. Williams certainly

01:58:49  21  doesn't suggest it.

01:58:52  22       **THE COURT:**  Okay.  And I was going to confirm that I'm

01:58:55  23  correct when I say none of these studies are in the record?  We

01:59:02  24  couldn't find them.

01:59:03  25       **MR. JARRETT:**  That's correct, Your Honor, that's

correct, Your Honor.  And if you're looking at the same slide

7, in the right-hand column, "retrospective cohort study"

there, I think it's the third one down.

**THE COURT:**  Yes.

**MR. JARRETT:**  But, again, I think the title tells you

anything you need to know about the spill because it involves

acute effects.  Remember our case is about chronic effects, not

acute.  And also it deals with an oil spill in a rural

community.  In other words, this is a land-based spill.  This

isn't an oil spill in the water.  And she doesn't explain how

it is -- how it's useful in her work.

So, of all of the oil spill studies, Your Honor,

they're all cross-sectional except for those two that we've

just discussed.  But beyond that, Your Honor, I would point out

that, if you remember just for the oil spill studies, Dr.

Williams's opinions focused not on oil but on dispersant.

According to her, the arsenic that her clients were

exposed to originates in the Corexit dispersant that was used.

By the way, if we get to that, we will show that's false

premise.  She says the arsenic comes from the dispersant which

she says also created the particulate matter problem when it

was aerially -- what's the word I'm looking for -- deployed,

sprayed.

**THE COURT:**  That's the Corexit?

**MR. JARRETT:**  That's correct, Your Honor, that's a

| | | |
|---|---|---|
| 02:01:25 | 1 | tradename for the dispersant that was used.  And actually, BP |
| 02:01:29 | 2 | used two formulations of Corexit in the response, and used it |
| 02:01:34 | 3 | from April through July, through the middle of July, if I |
| 02:01:40 | 4 | recall right.  Yeah. |
| 02:01:45 | 5 | **THE COURT:**  She also cited benzine as a problem? |
| 02:01:56 | 6 | **MR. JARRETT:**  Not in her conclusions, Your Honor. |
| 02:02:01 | 7 | **THE COURT:**  Okay. |
| 02:02:03 | 8 | **MR. JARRETT:**  I would point out, the reason I brought |
| 02:02:08 | 9 | out the Corexit dispersant issue is none of these oil spill |
| 02:02:14 | 10 | studies that are cited -- she doesn't discuss whether |
| 02:02:18 | 11 | formulation -- she says that she points out that, well, the |
| 02:02:24 | 12 | problem -- we could digress here and I could point out a lot of |
| 02:02:29 | 13 | problems with using oil spill studies from other oil spills. |
| 02:02:31 | 14 | Every oil is individually constituted and has different |
| 02:02:35 | 15 | components and different percentages, and so it's very hard to |
| 02:02:40 | 16 | use conclusions from one oil spill on another. |
| 02:02:42 | 17 | But putting that aside for the moment, her opinions |
| 02:02:45 | 18 | don't even relate to oil.  Her opinions relate exclusively to |
| 02:02:52 | 19 | dispersant.  And there's no discussion in her report about |
| 02:02:55 | 20 | whether these oil spill studies that she relies on did or |
| 02:02:58 | 21 | didn't involve dispersants and did or didn't involve Corexit, |
| 02:03:02 | 22 | for that matter. |
| 02:03:04 | 23 | **THE COURT:**  I'm sorry, I don't mean to speak over you. |
| 02:03:11 | 24 | Do you know in her deposition, since you took her deposition, |
| 02:03:15 | 25 | is there a particular discussion in the deposition that you |

| 02:03:21 | 1 | could point me to where you're asking her about what chemicals |

could point me to where you're asking her about what chemicals

02:03:30  2  she sees at issue here and she tells you that her opinion is

02:03:36  3  limited to the dispersant?

02:03:41  4        **MR. JARRETT:**  Let me --

02:03:42  5        **THE COURT:**  Or is it just in her report?

02:03:46  6        **MR. JARRETT:**  I'm looking at my colleague Charles

02:03:50  7  Wilmore.  Before I hand over the call, I will get you that

02:03:53  8  information.  I just don't have it at my fingertips.

02:04:00  9        **THE COURT:**  All right.  Thank you.

02:04:03  10        **MR. JARRETT:**  But I wanted to go on and talk about --

02:04:06  11  moving from the subject of oil spill epidemiology to the

02:04:12  12  particulate matter epidemiology that she cited, and that's with

02:04:17  13  a series of slides beginning at slide 8, which is a table that

02:04:20  14  we created as an exhibit to our motion in which we tried to

02:04:24  15  identify in all of the epidemiology studies that were cited

02:04:31  16  whether the actual LMPCs were mentioned.

02:04:38  17        And, Your Honor, you can flip through and you can see

02:04:41  18  the number of -- there's a lot of nos, but I'm not -- there's

02:04:45  19  only a couple of yeses.  And the problem with most of this --

02:04:50  20  the problem with most of these studies is that they do either

02:04:54  21  two things.  They talk about symptoms, not diagnoses, and they

02:05:04  22  talk about acute versus chronic.

02:05:08  23        And one of the -- and this is the first chronic case

02:05:11  24  that has ever, despite Judge Morgan's efforts -- she has

02:05:17  25  scheduled and cancelled at least six *Daubert* hearings on this

| | | |
|---|---|---|
| 02:05:20 | 1 | but she can't ever get the case this far.  But our defenses |
| 02:05:25 | 2 | have persistently been, wait a minute, you can't conflate |
| 02:05:31 | 3 | symptoms with diagnoses, and you can't conflate acute illness |
| 02:05:37 | 4 | with chronic illness.  A diagnosis of conjunctivitis, for |
| 02:05:47 | 5 | example, chronic illness requires chronic exposure.  That's the |
| 02:05:51 | 6 | flaw in all of these cases, there's never chronic exposure. |
| 02:05:55 | 7 | There was two or three months of exposure, and here we are ten |
| 02:05:58 | 8 | years later. |
| 02:05:59 | 9 | But all of that by way of saying -- I'm not asking you |
| 02:06:03 | 10 | to decide the merits of that today.  I'm pointing out why it |
| 02:06:07 | 11 | matters the epidemiology you use has to match.  And that's not |
| 02:06:13 | 12 | me saying it, Your Honor.  You said that.  When you wrote |
| 02:06:17 | 13 | *Abilify*, you said, quote, "The first step in establishing |
| 02:06:23 | 14 | causation through epidemiology is to demonstrate that exposure |
| 02:06:26 | 15 | to a drug is associated with a particular disease or adverse |
| 02:06:32 | 16 | effect." |
| 02:06:35 | 17 | We agree.  Particularity is important.  You can't use |
| 02:06:38 | 18 | a study that studies acute conditions as a surrogate for a |
| 02:06:42 | 19 | chronic condition because the mechanism of disease is |
| 02:06:47 | 20 | different.  You can't use symptoms -- as we point out in our |
| 02:06:50 | 21 | briefing, Your Honor, all of these problems, conjunctivitis, |
| 02:06:55 | 22 | rhinosinusitis, they all have that suffix i-t-i-s which means |
| 02:07:04 | 23 | inflammation. |
| 02:07:05 | 24 | **THE COURT:**  Didn't Dr. Williams in her deposition -- |
| 02:07:08 | 25 | you got her to agree with you about that and then she said -- I |

02:07:14  1   believe she said that the inflammation is explained in her

02:07:19  2   mechanistic or her, basically, biological plausibility opinion?

02:07:29  3         **MR. JARRETT:**  I think that's right, Your Honor, you're

02:07:33  4   exactly correct.  But that's two ships passing in the night.

02:07:37  5   She's trying to explain why chronic can be a result of the

02:07:40  6   mechanism of disease, but I was asking why the epidemiology is

02:07:47  7   appropriate.

02:07:49  8         How can you use epidemiology that doesn't document

02:07:52  9   inflammation to talk about these conditions?  If the

02:07:59  10  epidemiology is to fit -- and, as Your Honor points out, it's

02:08:03  11  supposed to fit -- then it has to deal with inflammation, too.

02:08:10  12  And these studies do not.

02:08:11  13        But all of that is by way of saying -- I come back to

02:08:16  14  the original premise, which was, she didn't tell us any of

02:08:20  15  that.  There's nowhere in those reports that the questions I'm

02:08:23  16  asking either -- the questions I'm posing today in this

02:08:27  17  argument are answered.  She doesn't say anywhere --

02:08:31  18  *Mr. Jarrett, you're wrong because --* *Mr. Jarrett, I could use*

02:08:36  19  *acute in lieu of chronic because --* *Mr. Jarrett, I can use oil*

02:08:41  20  *spills and don't talk about dispersants as a surrogate here*

02:08:45  21  *because --*

02:08:45  22        I don't have any answer to the "because."  And because

02:08:48  23  I don't, I don't think she's met her obligations under *Daubert*

02:08:53  24  and the Eleventh Circuit jurisprudence.

02:09:01  25        **THE COURT:**  Okay.

02:09:01   1          **MR. JARRETT:**  Your Honor, I would just point out on my
02:09:04   2     whole discussion of epidemiology that the Plaintiffs'
02:09:08   3     opposition is not helpful in addressing the questions I've
02:09:13   4     posed.  They don't cite to anything either, and I think that's
02:09:19   5     very telling.
02:09:21   6          But I would also -- before I move on from discussing
02:09:25   7     Dr. Williams's reports, I would also point out that the two
02:09:29   8     other methodologies that the Eleventh Circuit endorses, that is
02:09:33   9     dose-response relationship and background risk of disease, are
02:09:37   10    completely absent from her reports.  They do not appear there.
02:09:45   11    And of course, you've written about this, Your Honor --
02:09:48   12          **THE COURT:**  But there's -- I believe Dr. Williams's
02:09:51   13    response to that was, well, it's all in the studies.
02:09:57   14          **MR. JARRETT:**  That's what she says, and I say,
02:10:00   15    "Where?"
02:10:01   16          **THE COURT:**  Right, I read that.
02:10:05   17          **MR. JARRETT:**  If her goal was to get me to use up my
02:10:10   18    eight hours of deposition time by trying to ferret this out, I
02:10:15   19    mean, that's -- you know, she just doesn't believe
02:10:19   20    dose-response, despite the fact that if you look at page 8 of
02:10:23   21    her report she writes down that dose-response relationship is a
02:10:28   22    key component of a general causation analysis -- it's on page 8
02:10:33   23    of both reports -- she doesn't give it to us anywhere,
02:10:38   24    anywhere.
02:10:38   25          And then when I asked her about it, the last slide in

02:10:42  1   my presentation is she said, *I'm not doing it for this stage.*

02:10:47  2   *That's a specific causation inquiry.   I don't do it as general*

02:10:52  3   *causation.*

02:10:52  4        But that's -- her testimony is belied by her actual

02:10:56  5   report.  And Your Honor has written on this in the *Abilify*

02:11:03  6   case.  You even commented on it back in April of last year when

02:11:07  7   you were talking about setting up this general causation phase,

02:11:12  8   you said dose-response and exposure-response would be

02:11:15  9   important.  We agree it's important, and it's important but

02:11:20  10  it's missing.

02:11:21  11       Background risk of disease, Dr. Williams doesn't know

02:11:24  12  anything about that.  She doesn't -- she doesn't even say it's

02:11:29  13  in the report she cited.  She thinks it's a secondary

02:11:33  14  methodology, according to her testimony, and she has no idea.

02:11:39  15       Because -- and that -- if there's any case, Your

02:11:42  16  Honor, where the background risk of disease is important -- we

02:11:46  17  all live in the Gulf South.  Things like rhinosinusitis is

02:11:53  18  pretty common down here.  We all have the allergies, we all

02:11:57  19  have the rhinitis.  The background risk is super important.

02:12:03  20  But it is nothing -- you can't find it discussed in her

02:12:07  21  reports.

02:12:08  22       And again, in their opposition brief they try to

02:12:11  23  defend against that complaint or that argument on our part by

02:12:15  24  saying "but the studies were peer reviewed."  So I've already

02:12:19  25  pointed out that peer review is not dispositive in the Eleventh

02:12:26   1   Circuit and it's not sufficient in the Eleventh Circuit.  And

02:12:29   2   she never suggested that the background risk of disease was

02:12:32   3   ever discussed in any of the epidemiology she cited.

02:12:36   4       So, Your Honor, that is -- that's my discussion of her

02:12:41   5   reports themselves and their deficiencies.  I had been prepared

02:12:46   6   to discuss the other two arguments raised by the Plaintiffs,

02:12:50   7   which is their MSA argument, which I think you've already

02:12:55   8   addressed in opening.

02:12:56   9       One of my main arguments was going to be actually that

02:13:00   10  that's nothing more than a motion for reconsideration and they

02:13:06   11  have to go to the requirements of Rules 59 or 60 for that.

02:13:11   12      Unless the Court has any questions about the MSA

02:13:14   13  discussion, I'm going to skip over that.

02:13:15   14      **THE COURT:**  No, I don't.  And actually, I've seen in

02:13:26   15  the deposition -- or at least my notes of the deposition where

02:13:29   16  Dr. Williams did admit that the benzine, that was not relevant

02:13:35   17  to the Group 3 cases.

02:13:40   18      And as best I can tell -- maybe the Plaintiff will

02:13:44   19  correct me on this -- it appears to me that, as far as the

02:13:49   20  arsenic, that she only relates it to the dermatitis, not the

02:13:55   21  other conditions.  But I'll let them address that.

02:13:59   22      **MR. JARRETT:**  Well, I can answer that question, Your

02:14:01   23  Honor.  It's entirely correct, that's exactly right.  The

02:14:07   24  particulate matter accounts for six of the seven problems that

02:14:11   25  are at issue.  Chronic dermatitis is the only LMPC that she

| | | |
|---|---|---|
| 02:14:16 | 1 | relates to arsenic exposure. |
| 02:14:18 | 2 | **THE COURT:**  Okay. |
| 02:14:22 | 3 | **MR. JARRETT:**  So, I had a thought there that -- oh, on |
| 02:14:26 | 4 | the benzine, Your Honor, part of the -- you know, perhaps part |
| 02:14:30 | 5 | of the reason that the benzine is not discussed in her report |
| 02:14:33 | 6 | is that it was never in any -- it was never measured in any of |
| 02:14:38 | 7 | the areas where these plaintiffs were. |
| 02:14:43 | 8 | And there are -- we haven't even got into that, but |
| 02:14:49 | 9 | there is -- the amount of sampling data and the studies of the |
| 02:14:55 | 10 | constituents that were in the air, all of the experts on both |
| 02:15:00 | 11 | sides I think will ultimately admit there's never been this |
| 02:15:03 | 12 | much data in a toxic tort scenario.  We have more data than we |
| 02:15:10 | 13 | can shake a stick at, and it's uniformly good, I mean, it's |
| 02:15:14 | 14 | uniformly good for the defense, meaning that there was a lot of |
| 02:15:18 | 15 | care given to protect these workers and that, by all |
| 02:15:22 | 16 | appearances, those protections were successful, notwithstanding |
| 02:15:25 | 17 | the Plaintiffs' arguments to the contrary.  But, as I said, |
| 02:15:29 | 18 | that's for another stage. |
| 02:15:30 | 19 | **THE COURT:**  Right.  I did read about -- obviously I |
| 02:15:34 | 20 | did, in reading the depositions, particularly of Damian Shea, |
| 02:15:41 | 21 | certainly noted the number of samples, and Dr. Cox as well. |
| 02:15:46 | 22 | Let me ask you a question, though, if I could, |
| 02:15:50 | 23 | Mr. Jarrett, about Damian Shea.  So his deposition is part of |
| 02:15:55 | 24 | the record in this case; am I right? |
| 02:15:58 | 25 | **MR. JARRETT:**  It is, Your Honor, yes. |

| | | |
|---|---|---|
| 02:16:00 | 1 | **THE COURT:**  So on page 125 of his deposition, he seems |
| 02:16:10 | 2 | to agree that the adverse health effects identified can be |
| 02:16:20 | 3 | caused by exposures above the EPA and other benchmarks. |
| 02:16:26 | 4 | Why isn't that sufficient?  What's BP's response to |
| 02:16:29 | 5 | that?  Why isn't that sufficient? |
| 02:16:31 | 6 | **MR. JARRETT:**  Yes, Your Honor, I'm glad you focused on |
| 02:16:33 | 7 | that because that's my next subject.  And I have at least three |
| 02:16:36 | 8 | reasons, at least three, why that's not helpful to the |
| 02:16:40 | 9 | Plaintiffs. |
| 02:16:41 | 10 | The first reason is that this is out of his lane. |
| 02:16:46 | 11 | He's not a medical doctor.  He's got a Ph.D. in environmental |
| 02:16:50 | 12 | chemistry.  His report doesn't include any opinions on medical |
| 02:16:54 | 13 | causation.  And so, you know, you're asking -- they're asking |
| 02:17:01 | 14 | the wrong expert. |
| 02:17:03 | 15 | By the time they took Dr. Shea's deposition, they had |
| 02:17:07 | 16 | already asked the right experts, which were Drs. Cox and |
| 02:17:11 | 17 | Alexander, and they both answered that question in the negative |
| 02:17:15 | 18 | based on their study in the literature. |
| 02:17:19 | 19 | Dr. Shea did not offer any opinions in his report on |
| 02:17:21 | 20 | this.  It was fishing, and they got something that they've |
| 02:17:24 | 21 | latched on to.  So that's the first point.  This is not his |
| 02:17:30 | 22 | subject matter.  His subject matter is fate and transport. |
| 02:17:35 | 23 | And second, although he did mention that quote that |
| 02:17:41 | 24 | you mentioned to me, Judge Rodgers, that was a single isolated |
| 02:17:49 | 25 | sentence in a long deposition.  He repeatedly emphasized |

02:17:53　1　elsewhere, including in the passage immediately before that

02:17:58　2　that you quoted, that he said, "I'm not providing a medical

02:18:02　3　opinion specific to these symptoms, it's not a medical opinion

02:18:04　4　but a chemical exposure opinion that I'm offering."

02:18:09　5　　　　　And third, I would say this isn't really the stage of

02:18:14　6　the case where admissions -- the most they could argue, looking

02:18:18　7　at the case most favorable to them, they would say, *Aha, we*

02:18:21　8　*have an admission from Dr. Shea.*  But you can't -- this is not

02:18:25　9　the stage of the case where admissions play a role.  This is

02:18:28　10　the stage where the reliability of the evidence is at issue.

02:18:31　11　　　　　And if they wanted to rely on that statement from

02:18:35　12　Dr. Shea, they would have to back it up just like they have to

02:18:39　13　back up Dr. Williams.  They would have to say why Shea, who is

02:18:45　14　testifying outside his field of expertise, rendered an opinion

02:18:50　15　that was based on proper methodologies.

02:18:53　16　　　　　And they haven't purported to do that because they

02:18:57　17　can't do it because that's not what Dr. Shea -- that's not his

02:19:03　18　bailiwick, it's not his field.  They're trying to extrapolate

02:19:08　19　something to help them.  I don't blame them.  But it's

02:19:14　20　unhelpful, and I don't think it's sufficient to create a

02:19:16　21　genuine issue of material fact just because -- why not ask me

02:19:21　22　what I think?

02:19:23　23　　　　　You cannot -- it's not appropriate to ask an expert

02:19:26　24　outside of their field on which they've been offered and which

02:19:31　25　they've studied to offer an opinion on a subject and use that

| | | |
|---|---|---|
| 02:19:34 | 1 | to try to create a genuine issue of material fact. |
| 02:19:39 | 2 | So those are the three points why I think their |
| 02:19:43 | 3 | argument is misplaced. |
| 02:19:45 | 4 | **THE COURT:**  All right.  Thank you. |
| 02:19:46 | 5 | **MR. JARRETT:**  Your Honor, you know, I would at the |
| 02:19:50 | 6 | moment, unless the Court has any questions, I would tender. |
| 02:19:53 | 7 | **THE COURT:**  No.  You've answered my questions, those |
| 02:19:57 | 8 | that I have at this time.  Thank you. |
| 02:20:00 | 9 | And I will ask now who is going to address the Court |
| 02:20:06 | 10 | for the Plaintiffs, I guess the Group 1 cases? |
| 02:20:11 | 11 | **MR. FALCON:**  Group 1 cases, Your Honor, this is Tim |
| 02:20:14 | 12 | Falcon for the Group 1 plaintiffs. |
| 02:20:16 | 13 | **THE COURT:**  Okay, Mr. Falcon. |
| 02:20:18 | 14 | **MR. FALCON:**  Thank you, Your Honor.  So, Your Honor, |
| 02:20:20 | 15 | my argument was going to start with explaining why Dr. Williams |
| 02:20:24 | 16 | has used the proper methodology and qualifications, and I'm |
| 02:20:28 | 17 | going to go through that and talk about epidemiology. |
| 02:20:31 | 18 | But since the Court has now raised the Dr. Shea issue, |
| 02:20:34 | 19 | I want to answer at this point the three points that |
| 02:20:37 | 20 | Mr. Jarrett says do not comport and why you should not consider |
| 02:20:43 | 21 | his opinion. |
| 02:20:44 | 22 | **THE COURT:**  Okay. |
| 02:20:45 | 23 | **MR. FALCON:**  The first one is "out of his lane."  So |
| 02:20:49 | 24 | this Dr. Shea has been paid hundreds of thousands of dollars |
| 02:20:55 | 25 | since 2010 or '11 I believe to study this particular oil spill, |

| | |
|---|---|
| 02:20:59 | 1 |
| 02:21:05 | 2 |
| 02:21:08 | 3 |
| 02:21:11 | 4 |
| 02:21:12 | 5 |
| 02:21:16 | 6 |
| 02:21:20 | 7 |
| 02:21:24 | 8 |
| 02:21:27 | 9 |
| 02:21:30 | 10 |
| 02:21:35 | 11 |
| 02:21:39 | 12 |
| 02:21:44 | 13 |
| 02:21:50 | 14 |
| 02:21:50 | 15 |
| 02:21:55 | 16 |
| 02:21:58 | 17 |
| 02:22:04 | 18 |
| 02:22:07 | 19 |
| 02:22:11 | 20 |
| 02:22:12 | 21 |
| 02:22:15 | 22 |
| 02:22:18 | 23 |
| 02:22:22 | 24 |
| 02:22:23 | 25 |

all the chemical constituents, how much is it.  He's looked at

hundreds of thousands -- I don't know how much data he's looked

at.  And we appreciate that, we understand, and we'll address

that.

But all we got from his report and all we got in his

deposition was, based on my study of the data, it was a

sufficient amount of toxicant to cause this problem.

And so, after that, all I asked Dr. Shea -- to the

question of whether or not this is in his lane or not, we sent

you -- Exhibit 12 of the list we sent yesterday is from

Dr. Shea's website of his qualifications.

His research interests include detections, sources,

behavior, and adverse effects of chemicals in the environment,

with the goal of improving our ability to assess human and

ecological risks associated with exposure to chemicals.

First he goes down and he says that he's actually been

the peer reviewer of studies that are submitted to the World

Health Organization, the EPA, and other such bodies to

determine the assessment of chemicals and human risk -- and the

risk to humans.

So, to try to say at this point in time that Dr. Shea

is out of his lane and he's not qualified to give these

opinions is not correct.  And those qualifications are in his

-- in this record.

THE COURT:  Well, Mr. Falcon, we haven't seen what

| | | |
|---|---|---|
| 02:22:31 | 1 | you're referring to.  I don't know where you've submitted that |
| 02:22:38 | 2 | on this website. |
| 02:22:39 | 3 | MR. FALCON:  I believe it was sent with the |
| 02:22:42 | 4 | submissions from Mr. Durkee's office.  It's No. 12, I believe, |
| 02:22:47 | 5 | of that submission. |
| 02:22:49 | 6 | THE COURT:  Well, I haven't seen it and my law clerk |
| 02:22:53 | 7 | hasn't seen it and my judicial assistant hasn't seen anything. |
| 02:22:57 | 8 | Did you say it came yesterday? |
| 02:23:00 | 9 | MR. FALCON:  That's what I'm being told, Your Honor. |
| 02:23:03 | 10 | I didn't do it personally but that's what I'm told. |
| 02:23:05 | 11 | MR. DURKEE:  Yes, Your Honor.  This is David Durkee. |
| 02:23:09 | 12 | My office submitted a package of exhibits that were labeled 1 |
| 02:23:13 | 13 | through 12.  I think we were -- *(inaudible)* -- it was under the |
| 02:23:19 | 14 | Downs Law Group and it was submitted by Glenda Hernandez, my |
| 02:23:24 | 15 | assistant. |
| 02:23:26 | 16 | THE COURT:  Ms. Simms, you're on the call.  Have you |
| 02:23:29 | 17 | seen anything? |
| 02:23:32 | 18 | MADAM CLERK SIMMS:  I have not seen an email, and I |
| 02:23:35 | 19 | didn't see anything posted in the case either.  But I'm |
| 02:23:40 | 20 | checking your chambers email to see if it's there. |
| 02:23:45 | 21 | THE COURT:  Well, I know Ms. Williams checks that and |
| 02:23:48 | 22 | so does Ms. Rock. |
| 02:23:54 | 23 | MR. FALCON:  Your Honor, we apologize for it not |
| 02:23:56 | 24 | getting to you.  I would ask that we be able to supplement the |
| 02:24:00 | 25 | record for this.  It's clearly his statement of his |

| | |
|---|---|
| 02:24:03 | 1 |

qualifications from his own website from the North Carolina
State University.

**THE COURT:**  All right.  I don't have the other
exhibits either, though, so I don't know what those are.

But for purposes of your argument regarding Dr. Shea,
I will allow you to supplement the record with those pages from
his website documenting his qualifications.

**MR. FALCON:**  So my point is they did not ask him to
offer this opinion, and maybe they should have.  If we look
back at the Court's first -- kind of the first couple of status
conferences, one in April with you, Judge Rodgers and Judge
Jones, and then the follow-up June 10th with Judge Jones, the
old kind of -- basically what their statements were from the
Court were, we are surprised that BP is questioning general
liabilities for these specific conditions, for the conditions
that have been alleged by the plaintiffs.  That was the Court's
position, that was Judge Jones's position.

But because BP would not agree to that and they wanted
to challenge it, we had to go through this exercise.  And I
will go through the exercise.  But after all this work, I was
able to sit down with one of their experts and ask them the
very specific question as you've pointed out, Your Honor, an
expert who has studied this stuff extensively, been paid
hundreds of thousands of dollars to look at this, knows the
specific conditions we've alleged in the chronic

| | | |
|---|---|---|
| 02:25:37 | 1 | conjunctivitis, chronic sinusitis, all the chronic conditions. |
| 02:25:43 | 2 | **THE COURT:** But, Mr. Falcon, the qualifications is |
| 02:25:46 | 3 | only one hurdle to get over. As was just argued to the Court, |
| 02:25:54 | 4 | and correctly so, that opinion is subject to the same tests and |
| 02:26:01 | 5 | standards as any expert opinion before the Court. |
| 02:26:06 | 6 | **MR. FALCON:** We understand, Your Honor. |
| 02:26:07 | 7 | **THE COURT:** And it's not even in his report. |
| 02:26:10 | 8 | **MR. FALCON:** We understand. So the stage of the case |
| 02:26:12 | 9 | that we're at right now and the actual procedural vehicle that |
| 02:26:17 | 10 | we're discussing is a Motion for Summary Judgment. And does |
| 02:26:22 | 11 | the fact that an expert has now testified after he's done all |
| 02:26:27 | 12 | this work and studied it that these conditions can be caused by |
| 02:26:31 | 13 | exposure to these chemicals and, more than that, he actually |
| 02:26:34 | 14 | gives a dose-response level and that dose-response is the safe |
| 02:26:38 | 15 | level set by the EPA does not create an issue of material fact |
| 02:26:45 | 16 | that in and of itself allow the Court to deny the summary |
| 02:26:50 | 17 | judgment? |
| 02:26:50 | 18 | **THE COURT:** Not if the opinion is not reliable. |
| 02:26:57 | 19 | **MR. FALCON:** Nobody has challenged this opinion. |
| 02:27:00 | 20 | Nobody has said his opinion is not reliable. I mean, where is |
| 02:27:04 | 21 | the argument that it's not reliable? |
| 02:27:07 | 22 | **THE COURT:** I think they did just make that argument. |
| 02:27:10 | 23 | But before I can consider it as evidence in the case such that |
| 02:27:15 | 24 | it would be admissible evidence in the case, I have to satisfy |
| 02:27:20 | 25 | myself that it's reliable, and so I have to have the support |

| | | |
|---|---|---|
| 02:27:25 | 1 | for that, which I don't think I have. |
| 02:27:34 | 2 | **MR. FALCON:** I believe in his deposition and his |
| 02:27:36 | 3 | report it shows the extensive work that he's done on this oil |
| 02:27:39 | 4 | spill, it shows his understanding of the actual conditions that |
| 02:27:43 | 5 | are alleged by the plaintiffs, and then it also shows what |
| 02:27:50 | 6 | we'll put in is his expertise in this area, he has done a lot |
| 02:27:54 | 7 | of work in assessing human health conditions. |
| 02:27:57 | 8 | **THE COURT:** Okay. I'm not ruling today, but I'm |
| 02:28:03 | 9 | suggesting to you that qualifications and experience is not |
| 02:28:08 | 10 | enough. |
| 02:28:14 | 11 | **MR. FALCON:** Your Honor, we'll move forward, that's |
| 02:28:18 | 12 | fine. We think that he is at least, if nothing else, he has |
| 02:28:25 | 13 | created an issue of material fact. But I'll go on to why Dr. |
| 02:28:29 | 14 | Williams is acceptable to the Court and the motion should be |
| 02:28:31 | 15 | denied. |
| 02:28:38 | 16 | You know, it's interesting in this case, Your Honor, |
| 02:28:40 | 17 | that the Defendants have completely focused on epidemiology as |
| 02:28:44 | 18 | their basis for asking Dr. Williams to not be allowed to |
| 02:28:48 | 19 | testify. And although they've -- in their slide, if we can go |
| 02:28:53 | 20 | back to their slides. |
| 02:28:56 | 21 | And the last slide is, do you consider dose-response |
| 02:29:06 | 22 | in this exposure scenario, and the actual answer was with the |
| 02:29:11 | 23 | plaintiff, she said, "Yes, ma'am," which she took that question |
| 02:29:15 | 24 | to be are we talking about dose-response or what these actual |
| 02:29:19 | 25 | plaintiffs were exposed to, he says, "Yes, ma'am," she said, |

02:29:23  1    "I'm not doing specific causation report."

02:29:25  2           So this question and answer that they put in front of

02:29:28  3    the Court is of no moment because it doesn't deal with the

02:29:31  4    issue.  It is in her report, which she says repeatedly in her

02:29:35  5    deposition, "That information is in my report."

02:29:37  6           And in her report she does deal with dose-response.

02:29:40  7    First it's at page -- we can go to page 46 under the

02:29:52  8    particulate matter section.  And in these studies is embedded

02:30:05  9    dose-response, and on page 46 in particular -- this whole

02:30:08  10   section talks about it, but 46 deals with -- it's the paragraph

02:30:14  11   beginning with "Between June 6th and December 14th," and the

02:30:19  12   last thing is the concentration to PM 10 and the number of

02:30:25  13   patients showed a dose-response relationship, 2018.

02:30:31  14          So this is in her report, page 56, she talks about as

02:30:34  15   to Dr. Shea about the EPA levels of safe exposure.  And page 56

02:30:46  16   even quantifies at a point that wasn't done by Dr. Shea --

02:30:57  17   *(inaudible)* --

02:30:57  18          **THE COURT:**  Can you point me to where in the report

02:31:09  19   there is a discussion about that risk or exposure level in

02:31:18  20   relation to the chronic conditions that you have on --

02:31:29  21          **MR. FALCON:**  Yes, that report -- and to kind of go

02:31:32  22   back a little bit, Your Honor, to lay the groundwork for my

02:31:36  23   argument, what Dr. Williams has done is she has followed what

02:31:39  24   is required under the Federal Judicial Manual, under *Abilify*,

02:31:43  25   and all cases that talk about how do you use -- what analysis

02:31:46  1    do you use in order to get to a causation opinion, in this case

02:31:53  2    general causation, and that is the Bradford Hill analysis

02:31:56  3    that's been actually put in the Federal Judicial Manual.  It's

02:32:03  4    in *Abilify* itself.

02:32:04  5         Under the epidemiology section of *Abilify*, even though

02:32:08  6    that section talks about just the epidemiology, it says, in

02:32:11  7    order to apply epidemiology, you have to go through all of

02:32:14  8    those nine factors.  And in this case, that is what Dr.

02:32:24  9    Williams has done, and she taken the epidemiology and she has

02:32:29  10   searched for all epidemiology that's out there.

02:32:32  11        One of our exhibits, Your Honor, is her references,

02:32:37  12   which is Plaintiff's Exhibit 3 to our brief lists the

02:32:41  13   references.  This shows the extensive search that she's done

02:32:45  14   for anything -- any scientific study, any reference that may

02:32:49  15   have something to do with these cases.  And this is an 11-page

02:32:54  16   document that has individual citations to all the different

02:32:57  17   resources she looked at.

02:32:59  18        Now, once you start looking into the nine different

02:33:04  19   factors, dose-response is one of them, and she talks about that

02:33:08  20   dose-response in her particulate matter section on the

02:33:12  21   mechanism of how the injury is caused.  So she alludes to

02:33:18  22   dose-response in that bit.

02:33:19  23        Basically what that means is that, if there's a higher

02:33:22  24   dose, that means there's a greater chance of having exposure.

02:33:25  25   And that's in her report and she discussed it in her

02:33:29    1    deposition.  But -- so there is some dose-response discussion,

02:33:34    2    Your Honor.

02:33:35    3         And the next, does she have epidemiology.  She

02:33:40    4    certainly does.  Even the Defendant's slides point out that the

02:33:44    5    ones that they're talking about, there's over 12 studies of oil

02:33:50    6    spill exposed workers, and two of those are case controlled

02:33:54    7    studies, the ones that they don't criticize as being

02:33:58    8    inappropriate.

02:33:59    9         The other ones are cross-sectional studies which, even

02:34:03    10   though they may not by themselves be able to establish

02:34:06    11   causation in a toxic tort case, certainly cross-sectional

02:34:11    12   studies add to the science and add to the whole totality of the

02:34:16    13   evidence that Dr. Williams has relied upon.

02:34:21    14        If there weren't, let's say, ten of those studies that

02:34:25    15   shows these symptoms and these problems were consistent with

02:34:28    16   workers being exposed to oil spill, she would not be going down

02:34:34    17   the path explaining is there an association.

02:34:36    18        Because remember, Your Honor, from *Abilify* and the

02:34:39    19   Federal Judicial Manual, epidemiology is the starting point, it

02:34:45    20   is the coherence in the factors, basically is there an

02:34:52    21   association between the toxicant and the disease.  And she has

02:34:59    22   used the cross-sectional studies.  And I'm going to get into

02:35:04    23   chronic versus acute.

02:35:08    24        And the Court has alluded to this, we have to start

02:35:11    25   with association.  Has she used epidemiology?  Yes, she has.

39

| | |
|---|---|
| 02:35:14 | 1 |
| 02:35:19 | 2 |
| 02:35:22 | 3 |
| 02:35:25 | 4 |
| 02:35:29 | 5 |
| 02:35:34 | 6 |
| 02:35:43 | 7 |
| 02:35:48 | 8 |
| 02:35:55 | 9 |
| 02:36:04 | 10 |
| 02:36:11 | 11 |
| 02:36:21 | 12 |
| 02:36:25 | 13 |
| 02:36:26 | 14 |
| 02:36:38 | 15 |
| 02:36:44 | 16 |
| 02:36:50 | 17 |
| 02:36:56 | 18 |
| 02:37:01 | 19 |
| 02:37:04 | 20 |
| 02:37:06 | 21 |
| 02:37:14 | 22 |
| 02:37:22 | 23 |
| 02:37:28 | 24 |
| 02:37:32 | 25 |

1   How has she used it?  She has used it to show there is an

2   association between the symptoms and the problems and having

3   symptoms or even having acute problems are there.  And the

4   studied oil spill cases that show it --

5        **THE COURT:**  So, Mr. Falcon, let me ask you to stop for

6   a moment and focus back on the epidemiological studies that Dr.

7   Williams cited that are outlined in BP's PowerPoint.

8        The two studies that I'm most focused on would be the

9   one case controlled study involving oil cleanup operations

10  following an oil spill from a Greek tanker, that's the M-e-o

11  study, and then the retrospective cohort study regarding acute

12  health effects of a crude oil spill in a rural community in

13  Nigeria.

14       So, if I wanted to know why Dr. Williams feels these

15  studies are relevant to her opinion in this case, I'm not going

16  to find that in her report.  At least, I haven't found it in

17  her report.  And I don't have these studies.  And I don't think

18  it's incumbent upon me to go and research and find and look at

19  all these studies to decide whether she has appropriately

20  relied on them.

21       For instance, we just heard from Mr. Jarrett that one

22  of these studies doesn't even involve a spill in the water,

23  that it's a land-based spill.  I mean, that would seem to me to

24  be a notable distinction and something that she should observe

25  and comment on in her report.

| 02:37:36 | 1 | **MR. FALCON:**  What she talks about, Your Honor, and she |

**MR. FALCON:**  What she talks about, Your Honor, and she starts her report talking about how are these workers exposed and she gives a description because she's viewed all the plaintiffs and read the depositions and she understands how they were exposed and what's the --

**THE COURT:**  When you say how they were exposed, are you talking about the plaintiffs in the cases here or are you talking about the individuals in the study?

**MR. FALCON:**  I'm starting to point out that she did that for the individuals in this case before the Court now.

**THE COURT:**  But you're not answering my question.  My question is, if I want to test her opinion that it's based on this study, how do I do that?

**MR. FALCON:**  Well, we do it because the studies talk about the -- how were these people exposed and their dermal exposure.  Whether it's on land or on water, there's dermal exposure.

**THE COURT:**  But she doesn't recognize that limitation at all.

**MR. FALCON:**  But, Your Honor, this part of the report is only to show is there an association.  We're not trying to completely rely upon the epidemiology to be able to --

**THE COURT:**  But you have to have -- I mean, you have relied -- I'm sorry, Mr. Falcon, but she has put forth all of these studies in support of her opinions that you're asking me

02:39:04  1     to accept.  And you know the standard that I have to employ

02:39:12  2     here, and I can't just accept what an expert says about a

02:39:19  3     particular study without any explanation of how that study

02:39:25  4     relates to their opinion.  There's got to be some explanation

02:39:30  5     of that, some discussion of it.

02:39:33  6                 **MR. FALCON:**  And so the explanation is --

02:39:41  7                 **THE COURT:**  The other study -- the M-e-o study, again,

02:39:48  8     I haven't read it, but Mr. Jarrett says it doesn't even involve

02:39:55  9     dispersants.

02:39:57  10                **MR. FALCON:**  Your Honor, I wanted to point one thing

02:39:59  11    out, though.  In the *Abilify* case, the reason why the Court

02:40:02  12    went through the extensive analysis of the Etminan Study is

02:40:13  13    because of the challenge by the defendants as to the actual

02:40:18  14    efficacy and the proper methodology of the study itself, and

02:40:22  15    throughout the whole opinion it's the defendants' challenge,

02:40:26  16    the defendants' challenge, the defendants' challenge.

02:40:29  17                In these cases, the Defendants have not challenged the

02:40:32  18    underlying of the epidemiology, and this is the epidemiology

02:40:37  19    Dr. Williams relied upon.  And so how do the Defendants test

02:40:40  20    her using this epidemiology?  It would be for them and their

02:40:44  21    experts to try to point out the differences, which again go

02:40:47  22    back to the interpretation --

02:40:50  23                **THE COURT:**  Well, in *Abilify*, the Etminan Study was

02:40:57  24    submitted independent of anything else and then there were

02:41:01  25    experts that incorporated and relied upon that Etminan Study.

| | | |
|---|---|---|
| 02:41:09 | 1 | But it was the only piece of epidemiology that existed in the |
| 02:41:12 | 2 | case, so it was obviously -- and the order reflects that, it |
| 02:41:15 | 3 | was a critical piece of evidence and a critical study, and it |
| 02:41:22 | 4 | was thoroughly scrubbed from all angles. |
| 02:41:27 | 5 | MR. FALCON:  I understand the pain you went through in |
| 02:41:29 | 6 | that case, Your Honor. |
| 02:41:31 | 7 | THE COURT:  But it was a study that I had, I mean, I |
| 02:41:34 | 8 | had the study, and I had an extensive body of evidence and |
| 02:41:41 | 9 | testimony about that study.  So really it's apples and oranges |
| 02:41:51 | 10 | to what we have here.  I don't have any of these studies, and I |
| 02:41:55 | 11 | don't have an expert who has thoroughly explained their |
| 02:41:58 | 12 | reliance on these studies.  She's just quoted the studies. |
| 02:42:05 | 13 | MR. FALCON:  The point that she's making, Your Honor, |
| 02:42:07 | 14 | is that, in order to use epidemiology under this criterion, |
| 02:42:13 | 15 | which she has used appropriately, can she show an association |
| 02:42:17 | 16 | between the exposure of the toxicant for the oil spill studies, |
| 02:42:21 | 17 | is there an association between exposure to the intoxicants to |
| 02:42:24 | 18 | the disease, and that's what those studies show. |
| 02:42:27 | 19 | But she doesn't stop there and she doesn't rest there. |
| 02:42:30 | 20 | That's when she goes on and shows the mechanism of the injury, |
| 02:42:34 | 21 | which, according to Eleventh Circuit precedent, you start with |
| 02:42:36 | 22 | and you have to have dose-response and/or epidemiology, which |
| 02:42:40 | 23 | we argue that she has both, and then you go on and explain how |
| 02:42:46 | 24 | does this association lead to the general causation of the |
| 02:42:48 | 25 | symptoms that these plaintiffs have. |

02:42:50   1          And what she has done extensively in her report and in

02:42:54   2    her deposition and I think even this Court questioned

02:42:57   3    Mr. Jarrett about is she's shown through the mechanism of the

02:43:01   4    injury and it's not being challenged at this time.  They have

02:43:06   5    conceded that she's done the mechanism of injury correctly.

02:43:09   6          **THE COURT:**  I don't know that they conceded that.  I

02:43:12   7    believe what Mr. Jarrett said is that he's not challenging it

02:43:15   8    right now.  But if I have questions about the reliability of

02:43:24   9    her opinion as far as mechanism of injury, then that's

02:43:29  10    something I have to decide.  There's no concession here or

02:43:33  11    stipulation by BP about that.

02:43:36  12          **MR. FALCON:**  But there's no challenge -- I'm sorry,

02:43:41  13    Your Honor.

02:43:42  14          **THE COURT:**  Mr. Falcon, this is something I've got to

02:43:45  15    decide at every level that her opinion is reliable.  And so I'm

02:43:49  16    not -- I don't want to mislead anyone here that I'm going to

02:43:53  17    ignore her opinion on mechanism of injury.  I'm not suggesting

02:44:01  18    what that decision is going to be, but I'm not going to ignore

02:44:04  19    it in terms of deciding whether it's reliable or not.

02:44:09  20          But let me ask you to go back to this study, the M-e-o

02:44:16  21    study.

02:44:18  22          So tell me how that study supports Dr. Williams's

02:44:26  23    opinion when it doesn't -- the study apparently doesn't even

02:44:31  24    involve dispersants.

02:44:37  25          **MR. FALCON:**  Well, the main thing she's relying upon

| | |
|---|---|
| 02:44:40 | 1 |

is particulate matter.  And particulate matter -- she has

epidemiology on particulate matter.  The oil spill studies is

not what she's primarily relying on.  She's using those to show

the association between these symptoms and these problems with

people who work in oil spill and that start the pathway down is

there an association.

Do these people -- do similar workers who have these

kinds of exposures have increased incidents of these symptoms

and these type of problems, and that's what she's using it for.

**THE COURT:**  So I've got to go through, it sounds like,

through all of these studies to see if they support an opinion

that a particular -- whether it's particulate matter or

arsenic, if there's support in those studies for the opinion

that that agent can cause each one of these chronic health

conditions?

**MR. FALCON:**  No, no, you don't, Your Honor.  In her

report she sets out the condition, the odds ratio, the relevant

risk, the P-value, and it shows in itself in this report which

will show exactly where in the studies the information -- the

scientific basis for showing that there is an increased risk of

these conditions being caused by that exposure.

**THE COURT:**  But I either have to take -- I have to

take her word for the association with the specific LMPC, I

have to take her word for it that that study is about that

condition or else I have to go look to those studies to make

02:46:31  1    sure that they actually support her conclusion that there's an

02:46:40  2    association between arsenic and chronic dermatitis, for

02:46:45  3    instance, at a certain level of exposure.  Because she hasn't

02:46:49  4    said that in her report.

02:46:52  5         **MR. FALCON:**  What she has said in her report and she

02:46:55  6    has shown is that these studies allow for the association

02:46:58  7    between these conditions and these exposures, and that's all

02:47:01  8    that we can get from epidemiology.  Epidemiology cannot prove

02:47:05  9    causation.  It's in the manuals.  And that -- even Dr. Cox

02:47:12  10   agreed to this.

02:47:17  11        **THE COURT:**  Is it the Plaintiffs' position that,

02:47:21  12   because a study finds an association -- I'm just speaking

02:47:27  13   hypothetically here -- but because a study finds an association

02:47:32  14   between one of these agents and one of the chronic conditions,

02:47:49  15   that I have to accept her word for that, her conclusion, if

02:47:59  16   that's a conclusion she reaches, I have to just accept that?  I

02:48:03  17   mean, don't I have to know that the study actually deals with

02:48:07  18   that condition?

02:48:08  19        Again, what I guess I'm trying to ask is, is it the

02:48:12  20   Plaintiffs' position that, if the study deals with skin

02:48:19  21   irritations for someone who has been exposed to the agent, you

02:48:24  22   know, for 24 hours or 48 hours and then has this irritation of

02:48:29  23   the skin or of the eyes, that her conclusion is that that

02:48:34  24   causes or is associated with chronic conjunctivitis or chronic

02:48:44  25   dry eye or chronic dermatitis, that that's something I can

02:48:48   1   accept?

02:48:49   2          **MR. FALCON:**  No, Your Honor, and that's not what we're

02:48:51   3   asking you to do.  We're asking --

02:48:54   4          **THE COURT:**  But these studies don't refer to those

02:49:00   5   chronic conditions.

02:49:01   6          **MR. FALCON:**  Your Honor, the conclusions are judged at

02:49:05   7   the end of the report.  It's a 64-page report.  You have to

02:49:08   8   look at all of the nine factors and the nine areas of

02:49:15   9   scientific evidence that the courts and the law requires before

02:49:20   10  you can get to a conclusion, and then you can go to the

02:49:24   11  conclusions and say is there not enough science in this entire

02:49:28   12  body of work that she's put in front of you in her report and

02:49:31   13  her depositions to not support her conclusions.

02:49:34   14         And the Court has to be careful there because at some

02:49:37   15  point we are looking at is she qualified; conceded.  And did

02:49:41   16  she use the proper methodology.  And the proper methodology,

02:49:46   17  she put in some science that's credible and reliable science on

02:49:51   18  all of those nine different factors.  And you can't take one

02:49:54   19  out and say -- just because she didn't complete the analysis

02:49:57   20  with epidemiology you stop and say she's not qualified to

02:50:01   21  testify.

02:50:01   22         **THE COURT:**  No, no, I'm not going that far.  But I'm

02:50:04   23  asking you about the epidemiology and whether what she did with

02:50:09   24  the epidemiology is a reliable methodology.

02:50:15   25         If that epidemiology -- if those studies are limited

02:50:19  1    to conditions that are not at issue in this case, how do we

02:50:24  2    make that leap to her conclusion using that epidemiology?

02:50:29  3         That epidemiology stands for nothing as far as these

02:50:33  4    conditions, unless that study found an association between the

02:50:39  5    agent and the conditions.  I think I'm being asked to find

02:50:46  6    that, because an agent causes, you know, eye irritation or skin

02:50:51  7    irritation, that I have to conclude from that study that it

02:50:59  8    therefore can cause, without anything else in that study, that

02:51:03  9    it therefore can cause a chronic condition.

02:51:07  10        **MR. FALCON:**  So we're not asking you to do that just

02:51:10  11   based on the study.  And in her deposition she's asked -- it's

02:51:15  12   come back to acute versus chronic, and her explanation is the

02:51:19  13   epidemiology will show that it can cause the condition.  And

02:51:22  14   now we have to look at, after the condition is caused, is it

02:51:25  15   going to be an acute condition or will it be a chronic

02:51:28  16   condition.

02:51:28  17        And how do we determine if it becomes a chronic

02:51:31  18   condition that's caused by -- initially caused by the toxicant,

02:51:35  19   the exposure, how do we know that that chronic condition is

02:51:38  20   still caused by the exposure.

02:51:40  21        And she talks about it in her deposition, page 66 to

02:51:49  22   70, the mechanism, 72 to 80, that whole section is talking

02:51:53  23   about how do we go -- and she talked about this in her

02:51:56  24   deposition and it's in her report, how do we go from saying

02:52:00  25   that an agent that can cause a condition, how do we distinguish

02:52:06   1   between acute and chronic.  And she does that, and she gives
02:52:08   2   science to back that up, and that science is in the mechanism.
02:52:11   3   The mechanism --
02:52:12   4         THE COURT:  But I guess what I'm looking for is
02:52:14   5   epidemiology that shows the association between the agent and
02:52:20   6   the chronic condition, not the agent and an acute condition
02:52:28   7   that then I have to look at something else for support for the
02:52:36   8   opinion about the chronic condition.  The epidemiology seems
02:52:42   9   irrelevant in that context.
02:52:45  10         MR. FALCON:  It doesn't, Your Honor, because you have
02:52:46  11   to start with an association.  And even if --
02:52:49  12         THE COURT:  But it has to be an association with the
02:52:52  13   condition that you've sued about.
02:52:54  14         MR. FALCON:  And the condition --
02:52:56  15         THE COURT:  You haven't sued about acute sinusitis.
02:53:00  16         MR. FALCON:  And Dr. Williams is going to explain the
02:53:03  17   difference between acute and chronic, and it comes down to --
02:53:05  18   it doesn't come down to it's a cause.  It's about what happens
02:53:09  19   in the mechanism of injury, what happens when the intoxicants
02:53:13  20   get on the eye, what damage does it cause to the eye that makes
02:53:16  21   it turn into a chronic condition.
02:53:19  22         THE COURT:  I understand she talks about that, and it
02:53:23  23   may be that that's not questionable.  You're right, Mr. Jarrett
02:53:26  24   didn't spend any time on that and said he's not challenging
02:53:29  25   that.

02:53:29    1              But I guess -- and I'll ask you to move off this in

02:53:34    2    just a moment.  But the association -- you're saying that you

02:53:42    3    look to the epidemiology for an association.  I agree with you,

02:53:45    4    but it's an association with the condition that her opinion is

02:53:48    5    based on.

02:53:51    6              And these studies, as far as I can tell, none of these

02:53:55    7    studies deal with the conditions that are the subject of your

02:54:01    8    complaint just in terms of the epidemiology.  That's all we're

02:54:07    9    talking about, unless you know something that I don't know.

02:54:13   10              And just to reference -- back to the case controlled

02:54:19   11    study, just to reference an oil spill, what does that -- does

02:54:24   12    her report tell me what the agents were, the chemical agents

02:54:31   13    were in that oil spill?  Do we know that?

02:54:37   14              If it's in her report, please point me to it.  But if

02:54:42   15    it's not, I have to go look at that study to see what the

02:54:46   16    agents were to see if they're even relevant here.

02:54:49   17              MR. FALCON:  No, because the main purpose of those

02:54:51   18    studies is to show the association and then she goes into and

02:54:55   19    says what is the actual constituent, what is it that these

02:55:02   20    particular workers are exposed to that when she goes and finds

02:55:09   21    the epidemiology on particulate matter to show that it can

02:55:12   22    cause these conditions.

02:55:13   23              THE COURT:  But is it all the same?  And I'm asking a

02:55:16   24    genuine question.  I don't know.  Mr. Jarrett says no, it's not

02:55:20   25    the same.  But is it all the same, any oil spill, crude oil

| | | |
|---|---|---|
| 02:55:27 | 1 | spill, all the particulate matter and constituents are the same |
| 02:55:32 | 2 | in every case? |
| 02:55:33 | 3 | **MR. FALCON:**  Well, the particulate matter is the same. |
| 02:55:36 | 4 | And then in her deposition she points out it's not -- the |
| 02:55:41 | 5 | constituent of the particulate matter, it is the particulate |
| 02:55:45 | 6 | matter itself, it's the particles that are getting in the eyes |
| 02:55:49 | 7 | and on the skin that are causing the damage. |
| 02:55:51 | 8 | And so when it -- our next step in this case is were |
| 02:55:55 | 9 | these plaintiffs exposed to this particulate matter, not |
| 02:55:58 | 10 | whether the particulate matter can cause these conditions. |
| 02:56:02 | 11 | **THE COURT:**  Right, I understand that. |
| 02:56:03 | 12 | **MR. FALCON:**  So we're not at that point yet.  So it |
| 02:56:07 | 13 | doesn't matter if it's benzine, ozone, arsenic, whatever. |
| 02:56:11 | 14 | There is particulate matter.  And our duty and our |
| 02:56:14 | 15 | responsibility is going to be to show that these workers were |
| 02:56:18 | 16 | exposed to unsafe levels.  And we have the EPA level in the |
| 02:56:23 | 17 | report which Dr. Shea agrees, if you're exposed to this level, |
| 02:56:27 | 18 | these conditions will be caused by this exposure. |
| 02:56:32 | 19 | So, Your Honor, in *Abilify* it talked about the |
| 02:56:35 | 20 | totality of the evidence.  This is when the experts are looking |
| 02:56:39 | 21 | at all the science, not just one part or the other.  And |
| 02:56:42 | 22 | respectfully, I think what the Defense has done and what I |
| 02:56:45 | 23 | think is wrong to take this Court down that path is to say |
| 02:56:49 | 24 | let's just look at the epidemiology.  That's the only thing |
| 02:56:52 | 25 | that's important.  You can win a case without any epidemiology. |

| | | |
|---|---|---|
| 02:56:56 | 1 | That's in *Abilify*. |
| 02:56:56 | 2 | THE COURT:  Well, Mr. Falcon, you can, but you can't |
| 02:57:02 | 3 | win a case as a plaintiff without one of the three primary |
| 02:57:08 | 4 | methods of establishing general causation, at least not in this |
| 02:57:11 | 5 | circuit.  So you've got to either have epidemiology, you've got |
| 02:57:16 | 6 | to have background risk of disease or dose-response. |
| 02:57:19 | 7 | And in *Abilify*, the plaintiffs were very, very weak -- |
| 02:57:24 | 8 | and that may be generous -- on the background risk of disease |
| 02:57:29 | 9 | and dose-response.  So epidemiology -- that's what they had to |
| 02:57:35 | 10 | hang their hat on, that's it, that's all they had.  And they |
| 02:57:40 | 11 | had a fairly strong case with the secondary methods of proving |
| 02:57:49 | 12 | general causation in this circuit.  But the Eleventh Circuit is |
| 02:57:52 | 13 | clear that you've got to have at least one of the primary |
| 02:57:56 | 14 | methodologies. |
| 02:57:57 | 15 | MR. FALCON:  And we're not saying we don't, Your |
| 02:57:59 | 16 | Honor.  I think the argument is how strong is our epidemiology |
| 02:58:03 | 17 | and is it sufficient.  So my point is that we have not relied |
| 02:58:07 | 18 | upon no epidemiology.  We've relied upon epidemiology for the |
| 02:58:11 | 19 | very purpose it's needed, is there an association.  And then |
| 02:58:14 | 20 | you go back -- |
| 02:58:14 | 21 | THE COURT:  Is there an association -- I would like |
| 02:58:17 | 22 | you to say to me, Mr. Falcon, what -- is there an association, |
| 02:58:23 | 23 | fill in the blank, is there an association between what? |
| 02:58:27 | 24 | MR. FALCON:  Between particulate matter and the |
| 02:58:29 | 25 | conjunctivitis, the sinusitis, all the items that these |

02:58:34  1   plaintiffs -- and she has epidemiological studies that support

02:58:41  2   an association between those conditions and the exposure to the

02:58:44  3   particulate matter.

02:58:48  4          THE COURT:  Are those studies based on acute exposure?

02:58:53  5   Are they based on chronic exposure?  Which is it?

02:59:01  6          MR. FALCON:  The studies show that the longer the

02:59:04  7   exposure, the more likely the condition will be exacerbated,

02:59:08  8   which goes to dose-response.  And that's inside of her study,

02:59:12  9   it's inside of her report and her deposition, including the

02:59:15  10  page that I referenced earlier on dose-response.  So it is the

02:59:20  11  longer you're exposed to it and at what point does it become

02:59:25  12  problematic.

02:59:25  13         We have evidence in this record that above the EPA

02:59:31  14  safe level -- between Dr. Williams's report and Dr. Shea's,

02:59:36  15  above certain levels these conditions are caused by exposures

02:59:39  16  to the particulate matter and same on the arsenic.

02:59:42  17         So the totality, again, Your Honor, the totality of

02:59:45  18  the evidence that Dr. Williams relies upon allows her to make

02:59:49  19  those conclusions.  And then it becomes the fact-finder's

02:59:56  20  obligation to determine whether or not she has sufficient --

03:00:00  21  the weight of the evidence now comes in, and the Defendants get

03:00:03  22  to cross-examine her and they get to bring in all these points.

03:00:06  23         But at this stage of the proceedings, it's not time to

03:00:09  24  say that she has not used all of the science available, all of

03:00:13  25  the factors, and that just because the one factor may be a

| | |
|---|---|
| 03:00:18 | 1 |

little weaker than others that she should not be allowed to

testify.

And that's where we are in this case at this time,

Your Honor.  We've already gone down the path in order to

submit specific causation reports.  We've done that work, and

we're ready to present that.  I think at that stage then the

Defendants start drilling down.

They certainly have -- how do they challenge her?

They've got her report, they've got her report, everything she

has.  There's a way to test her opinions and that science, and

that's all that's required at the *Daubert* stage, and they

certainly have that in front of them, is she qualified and is

there a method to test.

THE COURT:  All right.  Is that everything?

MR. DURKEE:  Your Honor, this is David Durkee on

behalf of the Downs plaintiffs.

THE COURT:  I'm sorry, Mr. Durkee.  Go ahead.

MR. DURKEE:  Yes, Your Honor.  One of your questions

was where in Dr. Williams's report can you find how she applies

the various epidemiological studies to the various conditions

that we've alleged.  And on page 41 of the Downs Law Group --

and I think she has a section to this in the Falcon report

also, but on page 41 of the Downs report there is a narrative

of particulate matter and conjunctivitis.  In paragraph form,

she lays out why she believes there is a connection between

03:01:56  1   particulate matter and conjunctivitis and cites to those

03:01:59  2   epidemiological reports and tries to outline how she makes

03:02:05  3   those connections.

03:02:06  4          On page 46 she does the same thing with particulate

03:02:10  5   matter in upper airway disease.  And then on page 61 under

03:02:17  6   Section 11 she does the same thing with arsenic and chronic

03:02:22  7   dermatitis.

03:02:24  8          I believe she has the same type of paragraph form

03:02:27  9   explanation in the Falcon report.  So I think there is a

03:02:30  10  section in the report where she does try and rope in why she

03:02:35  11  feels these various studies are applicable, relevant, and why

03:02:42  12  she relied upon them.

03:02:44  13         Second of all, we really do need to understand -- I

03:02:49  14  know the Court does -- where we are in this case.  We are in a

03:02:53  15  general causation state.  We are asking for the opportunity to

03:02:58  16  do the specific analysis as to what toxin these folks were

03:03:07  17  exposed to, how much they were exposed to, and how it

03:03:11  18  specifically relates with medical doctors and such to their

03:03:13  19  medical conditions.

03:03:14  20         Well, at this stage, we've only been asked a very

03:03:19  21  simple question.  And I know you've rejected this argument, and

03:03:22  22  I won't be long on this.  This was the area I was supposed to

03:03:25  23  address, and I know you've somewhat rejected this already.

03:03:27  24         I'm not arguing that there is a undisputed fact or a

03:03:37  25  finding by the Court under the BELO cases prior to the

| | | |
|---|---|---|
| 03:03:42 | 1 | settlement.  But I do think there was record evidence and I do |
| 03:03:47 | 2 | think there were affidavits or declarations that were put into |
| 03:03:53 | 3 | the record on behalf of all the claimants, on behalf of all the |
| 03:03:57 | 4 | class members -- and we are a class member -- and then evidence |
| 03:04:00 | 5 | in the record at the time preceding the testimony would have |
| 03:04:05 | 6 | benefited BP to agree to certain low-hanging fruit so they |
| 03:04:11 | 7 | could resolve a lot of acute claims and chronic claims. |
| 03:04:17 | 8 | Their experts came before the Court and said for the |
| 03:04:20 | 9 | easy proposition of does -- do these -- do oil and oil based |
| 03:04:27 | 10 | dispersants cause these general chronic afflictions.  And that |
| 03:04:33 | 11 | was a pretty easy analysis when they were getting up to the |
| 03:04:37 | 12 | settlement and trying to resolve certain chronic conditions. |
| 03:04:41 | 13 | Understanding that, number one, in order for those |
| 03:04:46 | 14 | experts to agree to that, they put a lot of condition |
| 03:04:51 | 15 | precedents before it.  They said, listen, you've got to have |
| 03:04:55 | 16 | the manifestation within 24 or 72 hours.  You've got to, with |
| 03:05:01 | 17 | conjunctivitis, have direct contact.  There were a lot of |
| 03:05:08 | 18 | precedents before they would agree to that general population. |
| 03:05:15 | 19 | But, under the circumstances, BP has acknowledged by |
| 03:05:17 | 20 | their experts prior to the settlement that, for these specific |
| 03:05:22 | 21 | general conditions, chronic -- very limited chronic conditions, |
| 03:05:29 | 22 | their experts agreed that generally they could be caused by |
| 03:05:32 | 23 | exposure to petroleum or petroleum based dispersants. |
| 03:05:39 | 24 | **THE COURT:**  Mr. Durkee, I think that may be true.  But |
| 03:05:44 | 25 | both of their -- well, Jessica Herzstein, and then actually the |

03:05:52   1   other expert that you referred to, Mr. Harbut, that was a

03:05:59   2   plaintiffs steering committee expert.  But both of their

03:06:02   3   opinions were conditioned on an understanding of sufficient

03:06:08   4   exposures so that the person had been exposed for a sufficient

03:06:12   5   amount of time, for a sufficient duration of time.  That was

03:06:18   6   what their opinion was based on.

03:06:22   7        So my question here is not what these plaintiffs in

03:06:29   8   your cases were exposed to.  That's a question for another day.

03:06:32   9   But my question here is, what is the threshold exposure limit,

03:06:47   10  if you will, in the general population, what is that for these

03:06:51   11  dispersants to cause these problems?

03:06:59   12       MR. DURKEE:  On page 50, 51, 52 of deposition for

03:07:06   13  Patricia Downs [sic], she does talk about exposure limits that

03:07:10   14  are done by the EPA and the World Health Organization and

03:07:13   15  things like that, but also talks about, when she gets into

03:07:16   16  specific causation as a toxicologist, about absorption and

03:07:22   17  cumulation and how these things can accumulate in your system

03:07:25   18  over time.  And all those things will be addressed in specific

03:07:34   19  causation.

03:07:35   20       But whenever you get into this analysis of time, how

03:07:38   21  long the person was exposed, location, where they were exposed,

03:07:42   22  what toxins were in that area at the time they were exposed,

03:07:46   23  that all requires -- and I asked one of their experts during

03:07:48   24  the time I took his deposition, all those things require

03:07:52   25  individuality, correct, those all require you to make an

| | | |
|---|---|---|
| 03:07:56 | 1 | analysis based on time, location, and toxicity, and they all |
| 03:08:05 | 2 | agreed to that. |
| 03:08:05 | 3 | And all of that goes into, like you said and like we |
| 03:08:09 | 4 | expect to do, case specific analysis when we can build through |
| 03:08:15 | 5 | samplings or through their studies or through their samples |
| 03:08:19 | 6 | that they took, what were they exactly exposed, how much it was |
| 03:08:23 | 7 | they were exposed to, and the time frame.  The only issue -- |
| 03:08:26 | 8 | THE COURT:  I don't disagree with you.  We're on the |
| 03:08:28 | 9 | same page about that.  I don't agree to the extent that there's |
| 03:08:33 | 10 | an argument that exposure is irrelevant to the general |
| 03:08:37 | 11 | causation analysis.  And I don't mean exposure to these |
| 03:08:40 | 12 | plaintiffs or of these plaintiffs.  I'm talking about exposure |
| 03:08:44 | 13 | in the general population. |
| 03:08:48 | 14 | But back to the issue of the Medical Settlement |
| 03:08:58 | 15 | Agreement, I have ruled and these matters are not -- they're |
| 03:09:02 | 16 | not in the record before me.  And to the extent they bear on |
| 03:09:10 | 17 | general causation for the settlement class, you all were |
| 03:09:15 | 18 | required as part of that settlement class to prove legal |
| 03:09:18 | 19 | causation.  That was not something that you left the MDL with |
| 03:09:23 | 20 | the benefit of. |
| 03:09:26 | 21 | MR. DURKEE:  Well, Your Honor, that's absolutely |
| 03:09:28 | 22 | correct.  But we did leave with the Medical Settlement |
| 03:09:32 | 23 | Agreement.  One thing it did and with very particularity on |
| 03:09:40 | 24 | page 68 of the Medical Settlement Agreement it specifically |
| 03:09:42 | 25 | says that one of the stipulated issues is that a BELO |

03:09:49  1    plaintiff -- a plaintiff would not have to prove exposure for
03:09:55  2    the medical benefits settlement class member, which is what the
03:09:59  3    BELO people are, to oil, other hydrocarbons, and other
03:10:05  4    substances released from the MC252 well and/or dispersants
03:10:13  5    and/or decontaminants that are used in connection with the
03:10:18  6    response activity.  But --
03:10:21  7            THE COURT:  I agree, Mr. Durkee.  There's no
03:10:23  8    disagreement about that.  I agree with you.  That is a finding
03:10:27  9    that your clients have the benefit of.  They were exposed.  Go
03:10:38  10   ahead.
03:10:39  11           MR. DURKEE:  I'm sorry, Your Honor.  So the issue
03:10:40  12   is -- in oil there is an element of arsenic in it.  In
03:10:46  13   dispersants there is an element of arsenic in it.  And the
03:10:50  14   issue that you posed for us is, okay, if we know, based on the
03:10:56  15   settlement agreement, they have been, quote/unquote, "exposed"
03:11:00  16   to oil and other hydrocarbons and we know they've been exposed
03:11:06  17   to dispersants, then can those elements that make up those
03:11:09  18   products -- oil and other hydrocarbons and dispersants --
03:11:14  19   generally cause these chronic conditions.
03:11:19  20           And you're exactly right, Your Honor, the affidavits
03:11:21  21   that were filed before -- and I do believe we attached those
03:11:25  22   affidavits to the Defendant's response, but I don't know if you
03:11:29  23   consider that evidence in the record, but I do believe we
03:11:32  24   attached those.  But the issue -- I was just trying to frame
03:11:37  25   the issue.

| 03:11:38 | 1 | Originally we started out with there was a consensus |

03:11:38  1        Originally we started out with there was a consensus

03:11:41  2   about very specific chronic conditions with condition

03:11:45  3   precedents based on the fact that they were, quote/unquote,

03:11:47  4   "exposed."

03:11:49  5        And you're right, in our BELO case we've got to run

03:11:52  6   through that door and make sure that at some point we prove, A)

03:11:57  7   that the elemental compounds that make up these things, oil and

03:12:03  8   other dispersants and hydrocarbons, and the elemental makeup of

03:12:16  9   those generally cause these conditions.  Now we need to know if

03:12:20  10  the elemental makeup they've admitted they've been exposed to

03:12:24  11  can generally cause these chronic conditions.  And that's

03:12:26  12  exactly what was part of the consensus making it into this

03:12:29  13  settlement.

03:12:31  14       And now, even though they still admit these plaintiffs

03:12:35  15  as a part of the Medical Settlement Agreement were exposed,

03:12:40  16  they won't agree to that simple proposition that they

03:12:43  17  originally agreed to that are in that matrix that are outlined

03:12:47  18  specifically with conditions precedents with the requirements

03:12:50  19  that they be manifested within 24 to 72 hours, et cetera, and

03:12:54  20  they're saying, no, arsenic, an elemental makeup of oil, cannot

03:13:01  21  cause chronic conjunctivitis even if you stick it in your eye.

03:13:04  22       **THE COURT:**  I don't think that's what they're saying,

03:13:07  23  Mr. Durkee.  And the question in my mind on general causation

03:13:13  24  is what is that -- is there a safe level of exposure.

03:13:21  25       **MR. DURKEE:**  Right.  And she definitely -- Dr.

| | |
|---|---|
| 03:13:24 | 1 |
| 03:13:31 | 2 |
| 03:13:35 | 3 |
| 03:13:38 | 4 |
| 03:13:42 | 5 |

Williams definitely addresses that as to the A) the EPA standards and the World Health Organization standards and things like that that are known references to arsenic and particulate matter.  But she also goes on to say that those are for the economic purposes of doing standards.

When you really dive into specific causation, there are things like absorption and cumulation that you have to factor in, and eventually you come up with whether or not they've been exposed enough to this arsenic to create this physical condition or not.  But that analysis requires a bunch of specific particulars.

In this case, all we're looking for is generally did this cause this.  And as I said, I think she did, in various paragraph forms based on epidemiological cross-sectional case studies, et cetera, support that opinion.

But I think we all can put this into context is was she really jumping out on a limb here by concluding that oil and other hydrocarbons which they admit these people were exposed to or dispersants that they admit they were exposed to, can they generally cause these relatively minor but chronic conditions like dermatitis, respiratory items and the list of the different respiratory problems and the dermatitis.

**THE COURT:**  The question for me is not whether she's jumped out on a limb.  And actually the question is not exactly, you know, is there evidence somewhere out there to

03:15:09   1   support the general causation claim.  The question before me is

03:15:14   2   whether she did.  She's your expert.

03:15:19   3            MR. DURKEE:  Well, I understand that, Your Honor, and

03:15:21   4   I did try and address your --

03:15:23   5            THE COURT:  Yeah, did she do that sufficiently.

03:15:26   6            MR. DURKEE:  I understand, Your Honor.  And all I'm

03:15:28   7   saying is that I do think I tried to cite to her report where

03:15:32   8   she did in paragraph form try and explain her reliance on these

03:15:35   9   various reports that you have correctly outlined and analyzed.

03:15:42   10           THE COURT:  Okay.  Well, I will certainly be going

03:15:48   11  back through everything in light of the arguments that have

03:15:53   12  been made.

03:15:53   13           I am going to give BP the last word since it's their

03:15:57   14  motion and they have the burden on the motion.  But thank you,

03:16:01   15  Mr. Durkee.

03:16:03   16           MR. DURKEE:  Thank you, Your Honor, for your time.

03:16:09   17           MR. JARRETT:  Hi, Your Honor.  Keith Jarrett again.

03:16:11   18  Thank you for the opportunity to conclude, and I will be brief.

03:16:15   19           The first point I would make is that, in response to

03:16:20   20  one of Your Honor's questions, the Plaintiffs essentially said

03:16:24   21  that look at her conclusions, look at Dr. Williams's

03:16:27   22  conclusions.

03:16:28   23           But I would want to remind the Court that *Daubert* is

03:16:33   24  exactly the opposite of that.  We don't look at her conclusions

03:16:37   25  at all.  We only look at her methodology.  Her conclusions are

03:16:42  1   irrelevant.  That's a jury issue.  The question is, is her

03:16:45  2   methodology reliable.

03:16:47  3          And just to pick up -- to clarify a point that

03:16:51  4   Mr. Durkee just mentioned, arsenic is not in oil, and Williams

03:16:59  5   never said it was.  She said it was in dispersant and

03:17:03  6   particulate matter are her opinions, not that oil causes it or

03:17:10  7   dispersants.  That's the first point.

03:17:15  8          The second point I would make is, Your Honor, you

03:17:18  9   mentioned when we started this hearing today that the issues of

03:17:25  10  pathway of exposure and duration of exposure in your estimation

03:17:28  11  are relevant under the case law to general causation.  We

03:17:33  12  agree.

03:17:33  13         In fact, even Dr. Williams testified that her clients

03:17:38  14  need to be, and that her first step to conclude that they are

03:17:42  15  in the, quote, "presence" of a toxicant -- that's at page 73 of

03:17:47  16  her Downs deposition.

03:17:48  17         But nobody has talked about this because she didn't

03:17:50  18  look at any of the sampling data -- all of the data, she didn't

03:17:56  19  look at any of it to confirm that her folks were in the

03:17:59  20  presence of a toxicant.  The admitted first step of any

03:18:03  21  analysis she didn't even perform.

03:18:07  22         **THE COURT:**  But, Mr. Jarrett, when I said duration of

03:18:09  23  exposures, I didn't mean by these plaintiffs.

03:18:15  24         **MR. JARRETT:**  I understood your point, Your Honor.

03:18:17  25  Your point was in the dose-response analysis there's a level of

| | | |
|---|---|---|
| 03:18:20 | 1 | exposure that presumably is safe and a level of exposure that |
| 03:18:24 | 2 | presumably is unsafe, and you were looking for that in the |
| 03:18:27 | 3 | report and you didn't see it.  And I would point out to you |
| 03:18:29 | 4 | that's because it's not there, it's not there. |
| 03:18:34 | 5 | On that M-e-o study that we've talked about and kicked |
| 03:18:40 | 6 | around, the one cohort study that's in her list of oil spills, |
| 03:18:45 | 7 | I've pulled it in the interim, and I will just confirm for the |
| 03:18:48 | 8 | Court that there's no mention of dispersant whatsoever in that |
| 03:18:51 | 9 | study, and all that study focused on was symptoms, not |
| 03:18:55 | 10 | diagnoses.  And it's with an oil spill in Pakistan.  So there's |
| 03:19:04 | 11 | that. |
| 03:19:05 | 12 | What else did I want to mention?  Oh, when Mr. Falcon |
| 03:19:16 | 13 | was talking, he pointed out that Dr. Williams contends that she |
| 03:19:19 | 14 | adhered to the Bradford Hill principles which are well known to |
| 03:19:23 | 15 | the Court and to people who deal with this toxic tort world. |
| 03:19:27 | 16 | What I would say to you again, where is that?  She |
| 03:19:31 | 17 | mentions the Bradford Hill -- step back a minute.  Bradford |
| 03:19:37 | 18 | Hill are criterion that are used by experts once an association |
| 03:19:43 | 19 | -- when the epidemiology links to a conclusion there's an |
| 03:19:49 | 20 | association between exposure and a certain condition.  If the |
| 03:19:54 | 21 | epidemiology supports a finding of an association, experts then |
| 03:19:57 | 22 | go through the Bradford Hill criterion to determine whether |
| 03:20:00 | 23 | that association amounts to causation.  That's in the reference |
| 03:20:06 | 24 | manual.  I think that's the established protocol. |
| 03:20:08 | 25 | Here I would say that Dr. Williams failed on both |

03:20:11  1    points.  Where does she really say in these reports that

03:20:15  2    there's an association?  I would think something so fundamental

03:20:22  3    and important we would all be able to point to the report and

03:20:25  4    say, here is her section where she points out there's an

03:20:28  5    association between arsenic and chronic dermatitis.  She never

03:20:32  6    says that.  Ditto for particulate matter and conjunctivitis,

03:20:37  7    ditto for particulate matter and chronic rhinosinusitis or any

03:20:41  8    of the respiratory.

03:20:42  9         She never actually says, *I find that these studies*

03:20:45  10   *create an association.*  That would be the first step.  That

03:20:47  11   would be nice to see.  It's not there.

03:20:49  12        Then and only then when she goes to the Bradford Hill

03:20:54  13   analysis, which she would be required and obligated to do, but

03:20:57  14   I ask you to scour her reports for that.  On pages 8 and 9 of

03:21:03  15   her report she lists the Bradford Hill criterion, she lists

03:21:08  16   them, but she doesn't answer them.  She just points out what

03:21:12  17   they are.  She doesn't say, *I find this criterion is*

03:21:16  18   *established because...* nowhere in her report.  So that's a key

03:21:22  19   element also missing.

03:21:23  20        **THE COURT:**  What about the EPA limits that the

03:21:29  21   Plaintiffs have referenced both for particulate matter and I

03:21:34  22   think also arsenic?  I think they said there's a reference to

03:21:39  23   that as well.

03:21:42  24        **MR. JARRETT:**  Well, I think it is true to say that the

03:21:45  25   EPA has established safe levels of particulate matter exposure

03:21:53   1   and safe levels of arsenic exposure.  But I would say in

03:21:57   2   response to that, so what?

03:21:59   3        There's a level -- there's an EPA level that suggested

03:22:03   4   that below which you would not be expected to find symptoms.

03:22:07   5   But symptoms of what?  And of course, it has nothing to do with

03:22:11   6   causation.

03:22:13   7        And they don't -- it's just a level of -- the

03:22:17   8   government has done some studies and, as for the purposes of

03:22:21   9   industry, has created what they believe to be levels below

03:22:26   10   which you would not expect to find symptomology.  Symptomology

03:22:31   11   of what?  Causation of what?  They haven't put any of that

03:22:34   12   evidence into the record.

03:22:36   13        And these levels, by the way, are set at many levels

03:22:40   14   of magnitude below any proven response or any proven reaction.

03:22:47   15   And they are -- I think the Court knows that they are set

03:22:51   16   several orders of magnitude below exposures.  But it doesn't

03:22:55   17   answer the causation question anyway.

03:22:59   18        Your Honor, you had asked me when I was first up where

03:23:03   19   I could point you in the deposition where Dr. Williams

03:23:06   20   identified that she was only concerned with arsenic and

03:23:11   21   particulate matter and not about benzine, and I have those

03:23:15   22   citations for you in the Falcon deposition that could be found

03:23:21   23   on page 21 and in the --

03:23:24   24        **THE COURT:**  I think you said benzine is not the

03:23:27   25   boogeyman.  I went back and found the citation.

03:23:32   1   **MR. JARRETT:**  That's correct, Your Honor.  And just so

03:23:35   2   -- I think Your Honor has foreclosed this argument that

03:23:39   3   Mr. Durkee is making about the Medical Settlement Agreement,

03:23:42   4   but I want to point out that the argument he's making is

03:23:45   5   completely circular.

03:23:46   6        And by that I mean the Medical Settlement Agreement

03:23:49   7   itself -- the BELO section itself says that you can't make

03:23:56   8   reference to the Medical Settlement Agreement or other

03:24:00   9   documents -- you can't make reference to the Medical Settlement

03:24:02   10  Agreement for proof of anything in the case and you have to

03:24:07   11  prove legal causation.

03:24:08   12       So, if you can't use the Medical Settlement Agreement

03:24:10   13  to prove legal causation, then -- anyway, the parties -- the

03:24:14   14  point is, as you said in your earlier ruling, Your Honor, the

03:24:18   15  Medical Settlement Agreement is a contract.  The parties

03:24:19   16  negotiated the terms.  And what they're trying to do now is

03:24:23   17  prohibited expressly by the agreement that the parties agreed

03:24:27   18  to.

03:24:27   19       And finally, I think the last topic I would close with

03:24:31   20  is the one that the Plaintiffs opened with and it was the whole

03:24:36   21  discussion about Dr. Shea.  I think Your Honor correctly -- I

03:24:41   22  would point out that they want to supplement the record to

03:24:45   23  include his credentials.  His credentials are impressive, but

03:24:50   24  his credentials are -- he's not a medical doctor, and his

03:24:53   25  report doesn't address medical literature.  By the way, this

03:24:57  1   is, I think, maybe most telling.  If you look at his expert

03:25:00  2   report, there's no reference in that at all to medical

03:25:03  3   literature whatsoever, no epidemiological studies, none of that

03:25:09  4   stuff.

03:25:09  5        So my point is, if they want to rely on that, they

03:25:14  6   have to vouch for it.  The fact that Dr. Shea made one

03:25:19  7   testimonial statement in a multi-page deposition that they like

03:25:26  8   doesn't create a genuine issue of fact unless they can show

03:25:30  9   that his opinion was well based.

03:25:35  10       Oh, and last on that, Your Honor, on the EPA standard

03:25:40  11  piece, I think the Eleventh Circuit has specifically addressed

03:25:43  12  that in the *McClain* case that regular standards do not equal

03:25:47  13  causation, and that's at page 1248 through 1250 of that

03:25:53  14  decision.

03:25:55  15       **THE COURT:**  But when I'm looking for a level of

03:26:02  16  exposure for the general population that would produce -- or

03:26:11  17  that can produce the condition, where would I find that?

03:26:19  18       **MR. JARRETT:**  Well, through -- yeah, I think you would

03:26:23  19  -- I think that's the problem in this case, Your Honor, you

03:26:26  20  won't find it either in the regulatory standards, which are not

03:26:30  21  condition specific, nor in Williams's reports, nor even in the

03:26:34  22  Defense reports because the Defense reports doesn't mean --

03:26:40  23  *(inaudible)* -- these LMPC conditions.

03:26:42  24       **THE COURT:**  All right.  Well, let me ask, in fairness

03:26:47  25  Mr. Durkee or Mr. Falcon, where would I find that?  You rely on

| | | |
|---|---|---|
| 03:26:55 | 1 | the EPA -- |
| 03:27:03 | 2 | **MR. DURKEE:**  Your Honor, I know she discusses it on |
| 03:27:06 | 3 | the Downs deposition, page 50 and 51, and might be a page |
| 03:27:11 | 4 | before or page after.  But she does talk about the World Health |
| 03:27:17 | 5 | Organization 10 micrograms per liter, that's 10 parts per |
| 03:27:22 | 6 | billion, as a standard for arsenic, and then talks about 12 |
| 03:27:26 | 7 | micrograms per cubic meter inhalation as far as -- so I do |
| 03:27:33 | 8 | believe in her deposition she cites it.  And I'll let Tim speak |
| 03:27:38 | 9 | while I peruse her report real quick, Your Honor. |
| 03:27:42 | 10 | **MR. FALCON:**  Your Honor, as we pointed out, she does |
| 03:27:45 | 11 | discuss different levels of exposure of particulate matter. |
| 03:27:48 | 12 | One of them is found at page 46 of her report where she shows |
| 03:27:54 | 13 | that the -- *(inaudible)* -- significantly higher conjunctivitis |
| 03:28:01 | 14 | and -- *(inaudible)* -- of PM -- *(inaudible)* -- and the number of |
| 03:28:06 | 15 | patients dose-response relationship, and it starts out with |
| 03:28:09 | 16 | concentration of -- *(inaudible)*.  So her report does contain |
| 03:28:19 | 17 | that type of information. |
| 03:28:21 | 18 | **THE COURT:**  So let me ask the Plaintiffs something |
| 03:28:24 | 19 | else related to this.  Back to the arsenic, though, I believe |
| 03:28:34 | 20 | it's, Mr. Durkee, you were just referencing the 10 micrograms |
| 03:28:40 | 21 | per liter as being, I guess, a World Health Organization |
| 03:28:46 | 22 | standard.  Is that what I heard you refer to? |
| 03:28:49 | 23 | **MR. DURKEE:**  I believe it's referred to as a -- that |
| 03:28:52 | 24 | was the 10 micrograms per liter for arsenic, Your Honor, that |
| 03:29:02 | 25 | was using the NAAQS. |

| | | |
|---|---|---|
| 03:29:07 | 1 | **THE COURT:** I was referring to the arsenic -- I am |
| 03:29:10 | 2 | referring to the arsenic.  And my understanding is that |
| 03:29:16 | 3 | standard is for drinking water.  Is that at issue here?  Were |
| 03:29:24 | 4 | they drinking toxic water? |
| 03:29:30 | 5 | **MR. DURKEE:** Well, I think one of her opinions is that |
| 03:29:35 | 6 | particulate matter could have arsenic in it, and when you're |
| 03:29:38 | 7 | inhaling it, you -- it can get basically into your mouth and |
| 03:29:44 | 8 | you can swallow it. |
| 03:29:45 | 9 | In one page of her deposition she talks about all |
| 03:29:48 | 10 | three -- I'm trying to find it -- around 50, 51 she talks about |
| 03:29:54 | 11 | dermal, ingestion, and inhalation. |
| 03:29:57 | 12 | **THE COURT:** But is that the same as the study that was |
| 03:30:01 | 13 | dealing with drinking water? |
| 03:30:05 | 14 | **MR. DURKEE:** Well, I mean, I think -- |
| 03:30:14 | 15 | **THE COURT:** I'll have to look more closely because I |
| 03:30:23 | 16 | thought we were dealing with dermal absorption here.  But |
| 03:30:29 | 17 | you're saying -- where is it in her depo or her report that |
| 03:30:33 | 18 | you're saying she's discussing it? |
| 03:30:37 | 19 | **MR. DURKEE:** It's in the -- I have on my notes page 50 |
| 03:30:43 | 20 | and 51 she talks about arsenic dermal, ingestion, and |
| 03:30:47 | 21 | inhalation. |
| 03:30:48 | 22 | **THE COURT:** Okay.  All right. |
| 03:30:55 | 23 | **MR. FALCON:** Your Honor, may I just answer? |
| 03:30:58 | 24 | **THE COURT:** Yes, Mr. Falcon. |
| 03:31:00 | 25 | **MR. FALCON:** Dose-response -- on page 39 of the Group |

| | | |
|---|---|---|
| 03:31:04 | 1 | 1 Falcon deposition she talks about dose-response.  On page 130 |
| 03:31:09 | 2 | she talks about dose-response and how it's found in her |
| 03:31:12 | 3 | literature in the report.  And then 179 talks about it as well. |
| 03:31:21 | 4 | So she absolutely does address the dose-response. |
| 03:31:26 | 5 | She's giving the studies that have levels of exposures and |
| 03:31:32 | 6 | there's a bunch of other stuff. |
| 03:31:34 | 7 | Your Honor, I would ask the Court to indulge us.  The |
| 03:31:38 | 8 | Court has raised some issues today that obviously the Court is |
| 03:31:42 | 9 | very -- has put focus on for us whether we are going to win |
| 03:31:47 | 10 | this motion or not.  Is there a chance that we could brief a |
| 03:31:51 | 11 | couple of these issues for the Court to -- before you rule on |
| 03:31:54 | 12 | this thing? |
| 03:31:55 | 13 | **THE COURT:**  I don't need more briefing, Mr. Falcon.  I |
| 03:32:00 | 14 | have plenty here to keep me busy.  I appreciate your arguments |
| 03:32:06 | 15 | today, and I'll take into account everything before me, but I |
| 03:32:12 | 16 | don't need any more.  And I haven't -- there's no more evidence |
| 03:32:17 | 17 | that I've heard today, so no, I don't need any further |
| 03:32:21 | 18 | argument.  But thank you. |
| 03:32:22 | 19 | **MR. FALCON:**  Okay. |
| 03:32:23 | 20 | **THE COURT:**  All right.  Well, I thank both sides again |
| 03:32:28 | 21 | for your submissions.  I thank you for your presentations |
| 03:32:32 | 22 | today.  And I will endeavor and do my best to get a written |
| 03:32:38 | 23 | order out just as quickly as I can. |
| 03:32:41 | 24 | As I'm sure you all are aware, we're all working |
| 03:32:45 | 25 | remotely.  We're still working, but it's just a little |

| | | |
|---|---|---|
| 03:32:49 | 1 | different.  But we'll do our best to get this out as quickly as |
| 03:32:55 | 2 | possible. |
| 03:32:55 | 3 | And I want to say that I hope all of you and your |
| 03:32:58 | 4 | family members and your staff stay healthy and free of this |
| 03:33:04 | 5 | virus. |
| 03:33:06 | 6 | **MR. DURKEE:**  Thank you, Your Honor.  We wish you the |
| 03:33:09 | 7 | same. |
| 03:33:09 | 8 | **THE COURT:**  Thank you so much. |
| 03:33:29 | 9 | **MR. MCDONALD:**  Thank you, Your Honor, on behalf of the |
| 03:33:31 | 10 | BP parties. |
| | 11 | *(Proceedings concluded at 3:33 p.m.)* |
| | 12 | -------------------- |
| | 13 | *I certify that the foregoing is a correct transcript from the* |
| | 14 | *record of proceedings in the above-entitled matter.  Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy are noted within the transcript.* |
| | 15 | |
| | 16 | |
| | 17 | *s/Donna L. Boland                            5-15-2020* <br> *Donna L. Boland, RPR, FCRR              Date* <br> *Official Court Reporter* |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |