# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill | * | MDL No. 2179 |
| by the Oil Rig "Deepwater Horizon" | * | |
| in the Gulf of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | |
| | * | JUDGE BARBIER |
| | * | |
| | * | MAG. JUDGE CURRAULT |
| This Document Relates to: | * | |
| *All Claims In Pleading Bundle B3* | * | |

## BP'S PROPOSAL FOR FUTURE CASE MANAGEMENT OF THE B3 BUNDLE

Pursuant to the Court's June 17 and August 25 Orders (Rec. Docs. 26551 and 26632), BP America Production Company and BP Exploration & Production Inc. (together, "BP") respectfully submit that the remaining cases in the B3 bundle should be reallocated from MDL 2179 for individual proceedings in the appropriate courts at this time. BP makes this request for three separate and straightforward reasons. *First*, over the last several years, this Court has efficiently streamlined and managed cases in the B3 bundle to the point that common issues have largely been resolved, and the remaining cases are unlikely to be efficiently advanced through additional coordinated or consolidated proceedings. *Second*, information provided pursuant to three separate pretrial orders—Pretrial Order 63 (Rec. Doc. 22295), Pretrial Order 66 (Rec. Doc. 24282), and Pretrial Order 68 (Rec. Doc. 26070)—establishes that the remaining B3 cases turn on highly individualized facts and issues that are not suitable for adjudication on an aggregate basis. *Third*, experience in the related Back-End Litigation Option ("BELO") cases—in which 3,100 individual cases have been dismissed in the last year alone—demonstrates that these B3 cases are most efficiently progressed through individual proceedings outside of the MDL. After several years of common proceedings in this MDL, BP respectfully requests that the remaining B3 cases are now ready for reallocation.

**I.      THIS COURT HAS ALREADY TAKEN SEVERAL STEPS TO RESOLVE COMMON ISSUES IN THE B3 BUNDLE.**

As the Fifth Circuit has remarked, MDL 2179 is a consolidated litigation of "gargantuan size and extraordinary complexity." *In re Deepwater Horizon*, 819 F.3d 190, 197 (5th Cir. 2016). As part of MDL 2179, thousands of personal injury claims were included in the B3 pleading bundle. (Rec. Doc. 569.) Over the last several years, this Court has implemented several case management protocols and pre-trial orders to advance cases in the B3 bundle. In particular, Pretrial Order ("PTO") 63 dismissed the B3 Master Complaint and required B3 plaintiffs to file individual complaints and provide other information about their claims. (Rec. Doc. 22295.) PTO 66 required remaining B3 plaintiffs to provide detailed Particular Statement of Claims ("PSOC") forms disclosing additional information about the nature of their claims, alleged injuries, and potential status as members of the Medical Benefits Class Action Settlement Agreement ("MSA"). (Rec. Doc. 24282; *see also* May 6, 2019 Status Report from the *Deepwater Horizon* Medical Benefits Settlement Claims Administrator, Rec. Doc. 25611.) Most recently, PTO 68 required BP and the B3 plaintiffs to produce certain documents and initial disclosures, including supplemental information about plaintiffs' medical conditions and medical records in the plaintiffs' possession. (Rec. Doc. 26070.) Taken together, PTOs 63, 66, and 68 have substantially streamlined the number and scope of remaining B3 claims and provided the Court and the parties with information that both informs the appropriate next steps for management of the remaining cases and will expedite future proceedings in individual cases.

Approximately 879 B3 plaintiffs currently remain before the Court. As detailed below, discovery to date demonstrates that these remaining cases turn on resolution of a myriad of facts and issues that are so highly particularized to individual plaintiffs that further consolidated proceedings would not efficiently or effectively advance the B3 docket as a whole.

## II.     THE REMAINING B3 CLAIMS SHOULD BE REALLOCATED FROM MDL 2179.

BP respectfully suggests that the Court reallocate the remaining B3 cases from the MDL for individual proceedings in the appropriate courts.[1]  These cases present highly individualized facts and issues that are best addressed in individual case proceedings rather than through centralization in the MDL.  Recent experience in the related BELO litigation proves that these cases can be advanced efficiently through individualized case settings.

### A.     Reallocation Is Appropriate Where, as Here, Individualized Facts and Issues Predominate in the Remaining Cases.

The Judicial Panel on Multidistrict Litigation has explained that consolidated cases are ready for individual treatment "[o]nce *common* pretrial proceedings and any other pretrial proceedings that the transferee court considers appropriate have been completed in the transferee district."  *In re Air Crash Disaster Near Chicago, Ill., on May 25, 1979*, 476 F. Supp. 445, 449 (J.P.M.L. 1979) (emphasis added); *In re Evergreen Valley Project Litig.*, 435 F. Supp. 923, 924 (J.P.M.L. 1977) ("It is not contemplated that a Section 1407 transferee judge will necessarily complete all pretrial proceedings in all actions transferred and assigned to him by the Panel, but rather that the transferee judge in his discretion will conduct the common pretrial proceedings with respect to the actions and any additional pretrial proceedings as he deems otherwise appropriate."). Under 28 U.S.C. § 1407, an action transferred by the Judicial Panel on Multidistrict Litigation can be remanded by the panel "at or before the conclusion" of pretrial proceedings in the transferee court.  "Whether Section 1407 remand is appropriate for an action in any particular multidistrict docket is based upon the totality of circumstances involved in that docket."  *In re Managed Care*

---

[1]  Counsel for BP has met and conferred with counsel for the remaining B3 plaintiffs and with those B3 plaintiffs proceeding pro se.  B3 plaintiffs represented by Herman Herman & Katz and the Becnel Law Firm agree with BP's proposal to reallocate the remaining B3 cases at this juncture.  A group of other B3 plaintiffs, including those represented by Nexsen Pruet, do not agree with BP's proposal but instead propose additional proceedings in this Court, as described below.

*Litig.*, 416 F. Supp. 2d 1347, 1348 (J.P.M.L. 2006), and "the Panel has consistently given great weight to the transferee judge's determination that remand of an action is appropriate." *In re King Res. Co. Sec. Litig.*, 458 F. Supp. 220, 222 (J.P.M.L. 1978).

Transferee courts have determined that remand is appropriate where, as here, individualized issues would predominate in any further proceedings. For example, in *In re A. H. Robins Co., Inc. "Dalkon Shield" IUD Prod. Liability Litigation*, the judge presiding over an MDL involving claims related to a medical device recommended remand because "all pretrial proceedings of a general nature have been concluded," "the centralized pretrial procedures under Section 1407 have been achieved," and the "completion of the remaining discovery and resolution of the remaining issues can most expeditiously be effectuated by the transferor courts." 453 F. Supp. 108, 109 (J.P.M.L. 1978); *see also In re Chinese-Man'd Drywall Prod. Liab. Litig.*, No. MDL 2047, 2018 WL 3972041, at *5 (E.D. La. Aug. 20, 2018) (suggesting remand of cases where the court, "after managing this MDL for nine years," had addressed numerous "pretrial issues involving facts and legal questions common to the various cases in this MDL proceeding," and found that remaining "discovery is case-specific; thus, it can, and perhaps should, be supervised by the transferor court"); *In re Activated Carbon-Based Hunting Clothing Mktg. & Sales Practices Litig.*, 840 F. Supp. 2d 1193, 1198-201 (D. Minn. 2012) (remand appropriate where individual issues predominated further proceedings).

The same reasoning applies here: this Court's processes have resolved many issues common to the B3 bundle, reducing the number of cases and clarifying the scope of the remaining cases. The B3 cases that are left do not lend themselves to common proceedings. For example, each of the remaining B3 cases will turn on consideration of a multitude of individual facts and issues, including each plaintiff's:

      (i)       claimed exposure to contaminants (whether oil, dispersants, or decontaminants);

      (ii)      route of exposure (whether inhalation, dermal contact, and/or ingestion);

      (iii)     exposure levels, durations, and locations;

      (iv)     dose;

      (v)      work history;

      (vi)     claimed medical conditions (including timing of onset and validity of diagnoses); and

      (vii)    specific causation (including prior medical history and alternative causation).[2]

The remaining B3 plaintiffs' submissions in response to this Court's pretrial orders show that there is no singular type of B3 plaintiff; nor do the remaining B3 plaintiffs' claims fall into defined categories that can be efficiently advanced through additional common proceedings. Rather, the remaining B3 plaintiffs present a diverse array of allegations regarding each individual plaintiff's alleged exposure, injury and damages. While the B3 plaintiffs provided some greater specificity regarding their alleged injuries in response to PTO 68, each B3 plaintiff still identifies, on average, more than ***19 separate medical conditions, symptoms, or complaints*** that they claim were caused by the spill. In total, the remaining B3 plaintiffs identified ***more than 1,900 unique medical conditions, symptoms or complaints*** that they claim were caused in various ways, from various exposures to various contaminants, in various durations, in various locations, to various extents, at various times, and during various activities as a result of the spill. The injuries identified in response to PTO 68 include a panoply of conditions ranging from a hysterectomy, to broken teeth, boils, sleep apnea, abdominal cramps, chest pain, kidney stones, chronic hepatitis, sore

---

[2] This does not purport to be an exhaustive list of case-specific issues. For example, some B3 plaintiffs complain about their personal protective equipment, about BP's alleged failure to warn of risks inherent in oil spill cleanups, about a lack of proper training, or other forms of alleged negligence. And, of course, the damages being sought by each plaintiff are entirely unique to the individual.

throat, runny nose, acne, rashes, chapped lips, blurred vision, vertigo, difficulty hearing, insomnia, gait problems, numbness in limbs, weight loss, night sweats, headaches, gastroenteritis, various respiratory issues, postnasal drip, stroke, dizziness, mood swings, dry eyes, diabetes, excessive thirst, "brain fog," hallucinations, anxiety, PTSD, hypertension, memory loss, "difficulty concentrating," and various forms of cancer, to name just a few.  Examples of the remaining B3 plaintiffs' PTO 68 submissions are summarized in **Appendix A**.  The diversity of these allegations across the B3 cases demonstrates that further common proceedings in this MDL would be inefficient and unwieldy.

> **B.** **Reallocation for Individual Case Proceedings Would Most Efficiently Advance the Remaining B3 Cases.**

Given the predominance of plaintiff-specific facts and issues, the remaining B3 cases can best be advanced individually.  Information provided in response to this Court's pretrial orders confirms that these B3 cases involve many allegations similar to the BELO cases, which have progressed efficiently through the courts as individual cases.  Indeed, since the last B3 status hearing in this MDL in August 2019, more than 3,100 individual BELO cases have been dismissed voluntarily or through motion practice—reducing the number of BELO lawsuits pending in all courts from over 3,600 to just 690.  As a result, the total number of pending BELO lawsuits is now well under the number of remaining B3 cases pending in this Court.

Moreover, experience in the BELO docket demonstrates that courts in the Eastern District of Louisiana, where BP expects that the vast majority of the remaining B3 cases to land, are capable of moving the B3 cases forward expeditiously on an individual basis.  To date, 1,161 BELO lawsuits have been venued in the Eastern District of Louisiana.  *All* of those BELO lawsuits have proceeded as individual actions; *none* has been consolidated for any purpose.  Only 62

pending suits remain here. BP is confident that the courts in this district can advance individual B3 cases on a similar expeditious timeline.

Based on meet-and-confer discussions, BP understands that many of the B3 plaintiffs, including those represented by Nexsen Pruet and Stag Liuzza, propose that this Court undertake a consolidated expert process focused on general causation issues along the lines of the process that they proposed last year. That proposal suggested that BP, and not plaintiffs, would be required to provide expert reports addressing, in a vacuum, whether oil and dispersants could be capable of causing unspecified conditions through unspecified routes of exposure, at unspecified levels, for unspecified durations, and under unspecified circumstances. (Pls.' Proposed Case Management Order, Rec. Doc. 25947-1 at 5) Such a process would be unproductive here given that plaintiffs have put over 1,900 separate medical conditions and complaints at issue in these cases. Moreover, without considering the extent, level, or duration of any exposure that plaintiffs here may have experienced to any particular oil or dispersant constituents or the timing of onset of any such conditions, such a process would ignore key aspects of general causation.[3] (*See* 8/28/19 Hr'g Tr. at 65:13-67:6.) Finally, even if such a process focused on certain specified conditions, the approach would necessarily advance only a small portion of the overall B3 bundle, partially addressing only those cases where such conditions were among the 19 separate conditions that each B3 plaintiff, on average, alleges.[4]

---

[3] *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (noting that general causation requires assessment of the "type of exposures [plaintiffs] experienced"); *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) (Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case."); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1241 (11th Cir. 2005) (To prove general causation, "a plaintiff must demonstrate 'the level[] of exposure that [is] hazardous to human beings generally . . . .'").

[4] The Nexsen-led B3 plaintiff group suggested to BP on September 8 that they may propose to seek additional unspecified discovery of BP regarding purportedly "common issues," such as certain "policies and procedures." Those plaintiffs have not yet provided any details of this proposal. BP is not aware of discovery

7

The predominance of these type of individual exposure and causation issues is precisely why courts in this and other districts have declined to consolidate BELO cases even for discovery or other pretrial purposes.[5]  For example, in approving the BELO CMO, Judge Wilkinson held that the exposure and causation issues to be litigated in each BELO case "are ***so highly particularized as to individual plaintiffs*** that they substantially ***predominate over any common issues that might merit extensive consolidated discovery procedures*** . . . ."  (Rec. Doc. 14099 at 1-2 (emphasis added).)  This Court rejected also a request to consolidate four BELO actions for pretrial discovery and motion practice for similar reasons.  (12/21/17 Order, Rec. Doc. 23785.)

Other courts have reached the same result.  For example, following this Court's lead, Judge Terry Moorer of the Southern District of Alabama refused to consolidate 10 BELO cases for discovery or trial, holding that "BELO lawsuits are focused on litigation of individual rather than common issues."  *De La Cruz v. BP Am. Prod. Co., et al.*, Case No. 1:18-cv-00472, Dkt. 39 Mem. Op. and Order, at *6 (S.D. Ala. Mar. 25, 2019).  The Court reasoned that individual "factors preponderate against consolidation—plaintiffs were at different worksites, had different levels of exposure, have different medical claims, and have different damages claims."  *Id*.[6]

---

that would further advance the B3 bundle on a global basis given the wide disparity of facts relevant to each case, and such discovery could be conducted post-reallocation.

[5]  In meet-and-confer discussions, counsel for the Nexsen-led B3 plaintiff group stated that they did not intend to present any proposal for trial "flights" or individual bellwether trials of the B3 cases.  BP opposes any such request for the reasons set forth in its Proposed Case Management Order for the B3 Bundle (Rec. Doc. 25947-2 at 1-4.); *see e.g.*, *In re Fibreboard Corp.*, 893 F.2d 706, 711-12 (5th Cir. 1990) (rejecting consolidated trial of specific causation and damages issues); *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 316-17 (5th Cir. 1998) (similar).

[6]  In the Northern District of Florida, Judge Rodgers has issued a series of orders to manage that court's BELO docket.  Her Honor has directed that all BELO cases in that district be transferred to her, but her Order states unequivocally that it "is not a consolidation of the individual BELO case for any purposes."  Order, Doc. 1, Case No. 3:19cv963 (N.D. Fla. April 25, 2019).  And while Judge Rodgers has implemented a quasi-bellwether process to deal with issues of general causation for certain cases on her docket, that process originally addressed seven conditions across 26 cases—many fewer than the more than 1,900 "conditions" and 800+ cases at issue here.  Order, Doc. 3, Case No. 3:19-cv-963 (N.D. Fla. April 30, 2019).

8

In sum, the same type of individual facts and issues that predominate in the BELO cases likewise predominate in the B3 cases.  Further common proceedings in the MDL would therefore not meaningfully or efficiently advance the remaining B3 cases as a whole, only a select few cases featuring a select few conditions.  Any marginal benefit of further consolidated proceedings are outweighed by the delay and cost, as well as the benefits that can be gained through individual actions.  Accordingly, BP respectfully requests that this Court (1) issue a suggestion of remand for B3 cases that were transferred to this Court for consolidation with MDL 2179, and (2) request that the Clerk of the United States District Court for the Eastern District of Louisiana reallocate those B3 cases filed directly in this Court for individual disposition.

Respectfully submitted,

*/s/ R. Keith Jarrett*
R. Keith Jarrett (Bar #16984)
**LISKOW & LEWIS**
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana  70139-5099
Telephone: (504) 581-7979
Fax: (504) 556-4108

Matthew T. Regan, P.C.
(matthew.regan@kirkland.com)
A. Katrine Jakola, P.C.
(katie.jakola@kirkland.com)
Martin L. Roth, P.C.
(martin.roth@kirkland.com)
Kristopher Ritter
(ritterk@kirkland.com)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, IL  60654
Telephone: (312) 862-2000
Fax: (312) 862-2200

*Counsel for BP America Production Company and BP Exploration & Production Inc.*

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing **BP'S PROPOSAL FOR FUTURE CASE MANAGEMENT OF THE B3 BUNDLE** has been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 9th day of September, 2020.

                                              */s/ R. Keith Jarrett*
                                              R. Keith Jarrett