1                   UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF LOUISIANA

3
    ****************************************************************
4
    IN RE: OIL SPILL BY THE
5   OIL RIG *DEEPWATER HORIZON*
    IN THE GULF OF MEXICO ON
6   APRIL 20, 2010

7
                             CIVIL ACTION NO. 10-MD-2179 "J"
8                            NEW ORLEANS, LOUISIANA
                             WEDNESDAY, SEPTEMBER 9, 2020, 9:00 A.M.
9

10
    THIS DOCUMENT RELATES TO
11  13-1658, 13-1286, 16-5923,
    16-5941, 16-5952, 18-11120,
12  16-3966, 16-6126, 16-6131,
    16-6118, 16-6585, 16-4149,
13  16-7488, 16-5277, 18-11122,
    13-948 (CERTAIN CASES IN THE
14  B1 BUNDLE)

15  ****************************************************************

16
    TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS VIA VIDEOCONFERENCE
17         HEARD BEFORE THE HONORABLE CARL J. BARBIER
                 UNITED STATES DISTRICT JUDGE
18

19
    APPEARANCES:
20

21
    FOR THE PLAINTIFFS:        THE BUZBEE LAW FIRM
22                             BY:  CAROLINE E. ADAMS, ESQUIRE
                               600 TRAVIS STREET, SUITE 7300
23                             JP MORGAN CHASE TOWER
                               HOUSTON TX  77002
24

25

                        ***OFFICIAL TRANSCRIPT***

```
 1    APPEARANCES CONTINUED:

 2

 3                              LAW OFFICES OF RONNIE G. PENTON
                               BY:  RONNIE G. PENTON, ESQUIRE
 4                              209 HOPPEN PLACE
                               BOGALUSA LA  70427
 5

 6
                               BRENT COON & ASSOCIATES
 7                              BY:  BRENT W. COON, ESQUIRE
                               215 ORLEANS STREET
 8                              BEAUMONT TX  77701

 9

10                              EUGENE J. HOFFMAN, IV
                               ATTORNEY AT LAW
11                              245 PONTCHARTRAIN DRIVE
                               SLIDELL LA  70458
12

13
                               THE KRELLER LAW FIRM
14                              BY:  STEPHEN S. KRELLER, ESQUIRE
                               757 ST. CHARLES AVENUE, SUITE 301
15                              NEW ORLEANS LA  70130

16

17                              JASON J. JOY & ASSOCIATES
                               BY:  JASON J. JOY, ESQUIRE
18                              909 TEXAS ST. SUITE 1801
                               HOUSTON TX  77002
19

20

21    ATTORNEYS FOR BP AMERICA
      PRODUCTION COMPANY
22    AND BP EXPLORATION &
      PRODUCTION INC.:          KIRKLAND & ELLIS
23                              BY:  MATTHEW T. REGAN, ESQUIRE
                                    KRISTOPHER S. RITTER, ESQUIRE
24                              300 NORTH LASALLE STREET
                               CHICAGO IL  60654
25
```

*OFFICIAL TRANSCRIPT*

1    APPEARANCE CONTINUED:

2

3                                 KIRKLAND & ELLIS
                                  BY:  CHRISTOPHER W. KEEGAN, ESQUIRE
4                                 555 CALIFORNIA STREET
                                  27TH FLOOR
5                                 SAN FRANCISCO CA  94104

6

7    OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
                                  CERTIFIED REALTIME REPORTER
8                                 REGISTERED MERIT REPORTER
                                  500 POYDRAS STREET, ROOM B-275
9                                 NEW ORLEANS LA  70130
                                  (504) 589-7779
10                                Cathy_Pepper@laed.uscourts.gov

11   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

***OFFICIAL  TRANSCRIPT***

1          **P-R-O-C-E-E-D-I-N-G-S**

2          WEDNESDAY, SEPTEMBER 9, 2020

3          M O R N I N G   S E S S I O N

4          (VIA VIDEOCONFERENCE)

5

6

7          THE COURT:  Good morning, everyone.

8          VOICES:  Good morning, Your Honor.

9          THE COURT:  All right.  Hopefully, everyone is present

10   who needs to be present.

11          This matter is a status conference that the Court

12   has scheduled to discuss and figure out how to proceed with the

13   remaining B1 claimants or lawsuits.  It appears, from my list,

14   that we have 16 remaining B1 cases.  I don't know if anyone

15   wants to respond to whether they feel that number is accurate

16   or not.

17          MR. REGAN:  Your Honor, Matthew Regan on behalf of BP.

18          I think in terms of the actual case number, I

19   think we have 15, and I can walk through the five that we

20   believe are no longer active since our filing in January of

21   2020, and then the actual number of cases is probably smaller

22   than that because there are some related plaintiffs, but I

23   think in the 15 range is what we have, Your Honor.

24          THE COURT:  Okay.  Well, we're close.  I'm showing 16;

25   although, I'll tell you what I'll do, and you can check these

*OFFICIAL TRANSCRIPT*

1    off your list as we go through, I'm just going to read the case

2    numbers and the names of the plaintiffs really quickly.  We

3    have them, more or less, alphabetically, so not necessarily in

4    numerical case number order.

5            So, the first one I have on the list is 13-1658,

6    Allstar Pipe Services, Inc.  The attorney is listed as

7    Jason Joy from Houston.  Is Mr. Joy present on here?  It looks

8    like he is.

9            MR. JOY:  Present, Your Honor.

10           THE COURT:  Okay.  Thank you.

11           Then I have 13-01286, BioMarine Technologies and

12   Gulf Marine Institute of Technology, represented by

13   Garcia de la Garza, LLP, and the Kreller Law Firm.  Is someone

14   present from that group?

15           MR. KRELLER:  Yes, Your Honor.  Stephen Kreller.

16           THE COURT:  Okay.  Then 16-5923, Classy Cycles, Inc.,

17   from the Buzbee Law Firm in Houston.

18           MS. ADAMS:  Yes, Your Honor Caroline from the Buzbee

19   Law Firm.

20           THE COURT:  Okay.  You all have the next two also on my

21   list, 16-5941, Coastal Land Development Group and 16-5952,

22   Loggerhead Holdings, Inc., right?

23           MS. ADAMS:  Yes, Your Honor.  But Coastal Land

24   Development, we have reached a tentative settlement.  My client

25   is in bankruptcy, so we are getting approval from the Court.

*OFFICIAL TRANSCRIPT*

1          THE COURT:  Okay.  So, that is 16-5941, correct?

2          MS. ADAMS:  That is correct, Your Honor.

3          THE COURT:  Okay.  Then the next case I have is

4     18-11120, Enviro Tech Systems represented by Eugene Hoffman.

5          MR. HOFFMAN:  Yes, Your Honor.  I'm here.

6          THE COURT:  Hi.  Then 16-3966, Robert Evans.  I think

7     he's a *pro se* litigant.

8               16-6126, Fin & Feather Adventures, L.L.C.,

9     Kreller Law Firm and Al Robert.

10         MR. KRELLER:  Stephen Kreller.

11         THE COURT:  Okay.  Hi.  Then the next two appear to be

12    somewhat related claims, 16-6131, Fin & Feather Cabins, and

13    16-6118, Fin & Feather L.L.C., same law firms, correct?

14         MR. KRELLER:  Yes, Your Honor.

15         THE COURT:  So, all three of those cases are still

16    pending to your knowledge?

17         MR. KRELLER:  That is correct.

18         THE COURT:  All right.  Then we have 16-6585,

19    Global Disaster Recovery and Rebuilding Services, Brent Coon

20    Law Firm.

21         MR. COON:  Good morning, Your Honor, Brent Coon (audio

22    distortion gap).

23         THE COURT:  Good morning.

24              Then 16-4149, another *pro se* case, John Hanks,

25    Lady Luck Fishing -- It's either Lady Luck Fishing or

*OFFICIAL TRANSCRIPT*

1    Lucky Lady Fishing.  I'm not sure which.  Apparently, it's been

2    used interchangeably but that's a *pro se* case.

3              Then 16-07488, Nabaa, N-A-B-A-A, Gas Montgomery,

4    L.L.C., represented by Doug Lyons of Tampa and Samuel Adams of

5    Lynn Haven, Florida.  Is someone here from that firm or for

6    that case?  (No response.)

7              All right.  Then 16-5277, John DeSilva, The Bird

8    of Paradise, L.L.C, Ronnie Penton.

9         MR. PENTON:  Yes, Your Honor.  I am present for

10   The Bird of Paradise.

11        THE COURT:  All right.  Thank you.

12             Then 18-11122, Donald Thibodeaux is the claimant,

13   represented by ROE-DEE or Rodi Rispone of Baton Rouge.

14        MR. REGAN:  Your Honor, this is Matthew Regan.  I

15   believe that case is also one that's been resolved.  The

16   paperwork may not have gotten to the Court yet.

17        THE COURT:  So, that may account for the difference

18   between your number and mine, I don't know.  Were you including

19   that in your 15, Mr. Regan?

20        MR. REGAN:  We were not.  The only case that you have

21   not mentioned, Your Honor, that is the same number of 15 would

22   be Kirk Williams.

23        THE COURT:  Yeah, I have that.  That was my next and

24   last one, yes.

25             13-948, Kirk Williams, another *pro se* case.

**OFFICIAL TRANSCRIPT**

 1          So, the only difference in my 15 and your 16 is

 2     that Thibodeaux case, Donald Thibodeaux?

 3          MR. REGAN:  That and the Coastal Land, Coastal Land

 4     Development as well.

 5          THE COURT:  Well, if both of those go away, I'm down to

 6     14 then.

 7          Okay.  All right.  So, I think we're all on the

 8     same page.

 9          I don't know much, actually, I don't know

10     basically anything about any of these cases other than I'm

11     assuming they all either have to be opt-outs or they could be

12     excluded claims, I'm not sure.  Does anybody want to identify

13     any of these excluded claims as opposed to opt-outs, B1

14     opt-outs?  Do you know, Mr. Regan?

15          MR. REGAN:  I don't have that right offhand, but I

16     think they are, for the most part, opt-outs.  If it's helpful

17     for the Court, we can divide it into a couple of different

18     categories.

19          THE COURT:  All right.  Why don't you go ahead and give

20     us what you've grouped together, and then we can let anybody

21     else respond, okay?

22          MR. REGAN:  Yes, very well.

23          So, again, as our filing in January of 2020

24     confirmed, we had gone from about 70 of these B1 nonMexican

25     fishermen claims to approximately 20.  As we had just gone

*OFFICIAL TRANSCRIPT*

 1     through, about 5 more of those had been resolved since that

 2     filing.

 3                  The first group I would like to talk about,

 4     Your Honor, are ones where we proposed that, really, a simple

 5     show cause process would probably take care of a question about

 6     what should we do next with these cases?

 7                  The very first one that I referred to would be

 8     the Nabaa Gas case.  That's 16-7488.  I know counsel for

 9     Nabaa Gas is not on the call.  We did confer with him before

10     the hearing.

11                  That's a BP dealer.  As Your Honor is aware,

12     there is an order in 2012 barring those claims, so for Nabaa

13     Gas, we would just propose a show cause as to why that claims

14     should not be just dismissed based on the Court's prior order.

15     That's prior order Record Number 7526.  We let counsel for

16     Nabaa Gas know that that's what we would propose to the Court.

17                  The next one also is we're preserving a show

18     cause box would be Allstar Pipe Services, 13-1658.  Our

19     position is that Allstar is a class member.  It did not opt out

20     of the settlement, and so we think the next step for that case

21     would be a show cause as to why their case can proceed given

22     that they were a class member.

23                  I believe counsel for Allstar is on the hearing,

24     so I'll pause there.

25                  THE COURT:  It's Mr. Joy.

                        *OFFICIAL TRANSCRIPT*

1          MR. JOY:  Your Honor, Jason Joy for Allstar Pipe.

2                I disagree with BP's characterization that

3     Allstar Pipe was a class member.  It's fairly clear that had

4     they tried to proceed with the settlement program, they would

5     have either been summarily dismissed by Mr. Juneau or summarily

6     placed in an indefinite moratoria hold and then ultimately

7     subject to this court -- breached an order -- placing all of

8     the cases into the MDL -- (audio distortion gap) for the

9     steering committee.

10          THE COURT:  Mr. Joy, I'm not clear.  So, you say your

11    position is your client is not and never was a member of a

12    class; is that it?

13          MR. JOY:  That's correct, Your Honor.

14          THE COURT:  Is that because they are a moratoria

15    claimant, they are excluded, or what?

16          MR. JOY:  Yes, Your Honor.  We believe that they were

17    excluded from the class just by the settlement agreement,

18    Your Honor.  They were clearly engaged in offshore oil and gas

19    services, activities.  They were -- I believe that they were

20    engaged in -- their products and services were being used on

21    offshore vessels, Your Honor, and their vessels were -- their

22    entire business basically came to a halt after the explosion,

23    Your Honor.  I think there is some -- I think we're disagreeing

24    about some of the facts here, but if BP wants to file a motion,

25    we'll be more than happy to respond to it.

                         ***OFFICIAL TRANSCRIPT***

1          THE COURT:  All right.  Okay.  I understand.  It's kind

2     of interesting, I'll say, because, except for your client,

3     everybody else who appeared to have some moratoria aspect to

4     their claim fought to stay in the settlement instead of being

5     kicked out of the settlement, but that's your prerogative, your

6     client's prerogative.

7               Okay.  Mr. Regan, do you want to go back to your

8     report?

9          MR. REGAN:  I'll go through these in a summary fashion

10    like I've been doing.

11              The next one is Lady Luck, which is 16-cv-4149,

12    and that case, again, we think could be subject to a show cause

13    because of a prior settlement with the neutrals process; so, we

14    think a simple show cause as to why that case could proceed

15    given that settlement would answer the question whether any

16    further proceedings are necessary for Lady Luck.

17         THE COURT:  Okay.  What else?

18         MR. REGAN:  The last one in that group would be the

19    Enviro Tech case, 18-cv-11120.  Enviro Tech is one where,

20    again, we think the show cause process because of a failure --

21    because of the pretrial orders that Your Honor put in place for

22    the mediation, specifically PTO 67.

23              I don't think there is a dispute that Enviro Tech

24    did not meet those deadlines for quite a specific period of

25    time and did not produce the materials required under that

**OFFICIAL TRANSCRIPT**

1    order; so, from our perspective, a show-cause process to

2    determine whether any further proceedings would be necessary

3    for Enviro Tech given the noncompliance with the pretrial

4    order.

5             THE COURT:  Which pretrial order are you alleging they

6    did not comply with?

7             MR. REGAN:  67, Your Honor, the one that basically was

8    the starting point for the mediation process that took place in

9    2019.

10            THE COURT:  Okay.  All right.  Any others?

11            MR. REGAN:  Enviro Tech's counsel is on the call, if I

12    heard correctly.

13            THE COURT:  Oh, yes, Mr. Hoffman.

14            MR. HOFFMAN:  Yes, Your Honor.  Gene Hoffman for

15    Enviro Tech Systems.

16               Your Honor, Pretrial Order 67 came about while I

17    was personally in the hospital.  I would respectfully ask that

18    Your Honor allow me to file a motion for leave with an

19    affidavit explaining my situation and my client's situation

20    and, if Your Honor so grants, allow us to stay with our claim.

21               We would be happy to go through a mediation

22    process or arbitration or something of that nature to try to

23    get this claim settled out without having to take much more

24    time on Your Honor's docket.

25            THE COURT:  Well, I would suggest two things:  Why

**OFFICIAL TRANSCRIPT**

1    don't you have a conversation afterwards with Mr. Regan and see

2    what his position is on that, first of all, and if there is no

3    agreement, then Mr. Regan will file some sort of motion, as I'm

4    appreciating things, and you can respond and explain whatever

5    you wish to include in that response, okay?

6          MR. HOFFMAN:  Yes, sir, Your Honor.  We were part of

7    the settlement claims, but in 2018, when the process was ended

8    with the moratoriums, we were kind of in limbo from the

9    moratorium delay, which I think came about in 2015.

10         THE COURT:  Is this claim one that was in the

11   settlement program and was on moratoria hold; is that what

12   you're saying?

13         MR. HOFFMAN:  Yes, sir, Your Honor.  Yes.

14         THE COURT:  Then we kicked you out after a while,

15   right?

16         MR. HOFFMAN:  Yes, sir, Your Honor.

17         THE COURT:  All right.  I understand where you are.

18              Okay.  Mr. Regan.

19         MR. REGAN:  Judge, the last two that are sort of in

20   this category, Your Honor, are both *pro se*, so understanding

21   they are *pro se*, I'll give you our view on those.

22              The first would one be Kirk Williams, 13-948.  I

23   can say that Mr. Williams was formerly represented by the

24   Herman Herman Katz firm, and there was a mediation, but after

25   the mediation, Mr. Williams stopped communicating with

**OFFICIAL TRANSCRIPT**

1   everybody, including Herman Herman Katz.  I think they've

2   withdrawn as his counsel, and from our last report from

3   Judge Shushan, she has not heard anything further from

4   Mr. Williams.

5          So, from our perspective, perhaps a show-cause

6   order directed to Mr. Williams as to whether he intends to

7   proceed with his claim or not is what our current view of how

8   to handle the situation is, but neither we nor the mediator has

9   been able to hear anything further from Mr. Williams about to

10  whether he's pursuing his claim.

11         THE COURT:  Okay.

12         MR. REGAN:  Sorry, yes.  We did Mr. Williams, yes.

13         The other one is Mr. Evans, also *pro se*.  In that

14  case, we've heard from Magistrate Shushan that she has been

15  trying to work with him to see if that case can get resolved

16  from the mediation.

17         So, our proposal on this one, sorry -- which is

18  16-3966, Robert Evans -- is that we may file an offer of

19  judgment or something just to see if we can spur that along to

20  get the case resolved, but that one, I would say, it's still in

21  the mediation process, and we hope that it can be resolved in

22  that process.  We just haven't been able to complete it due to

23  some of the challenges in working with Mr. Evans.

24         THE COURT:  Okay.

25         MR. REGAN:  So, Your Honor, that is the first six from

**OFFICIAL TRANSCRIPT**

1    the list.  If I then would transition to sort of a different

2    approach or some different proposal, I should say, with respect

3    to what's left, so broadly speaking, this would apply to

4    The Bird of Paradise claims, BioMarine, Gulf Marine,

5    Classy Cycles, Loggerhead, Global Disaster, and the three

6    Fin & Feather entities.  Collectively, that's six disputes.

7    It's more parties than that, but it's essentially, I think, six

8    disputes.

9            We have gone through mediations.  We were not

10   successful, and from our perspective, really, the final

11   question for most of them is some core questions about

12   causation and damages.

13           We would like to be as efficient as possible to

14   finish this part of the B1 docket, so we've proposed to send

15   Your Honor a case management proposal that would have a very

16   small number of depositions for these matters, no more than two

17   per side, and then a very small amount of process to then get

18   to some summary judgment filings or some summary judgment type

19   filings.

20           From our perspective, me and my partner,

21   Mr. Keegan, have spoken with a number of the counsel on this

22   call.  We think that an expedited process like that would give

23   clarity to both sides about risks that were identified during

24   the mediations, just to speak generally, and might allow us to

25   see where those claims lie.

**OFFICIAL TRANSCRIPT**

1            I will say that there are a couple of them where

2      we would be filing motions; so, the two in specific for that

3      would be the BioMarine and Gulf Marine.  That's 13-1286.  We

4      would be filing a motion with Your Honor with respect to where

5      federal law bars essentially the business that that case

6      intends that they intended to be in, which was a fish farm

7      processed in the Gulf of Mexico, which is barred under federal

8      law.

9            Then the other one --

10           THE COURT:  That's interesting, Mr. Regan, because I

11     just read in the newspaper this morning, are you referring to a

12     Fifth Circuit case that came out recently which said that the

13     Magnuson Act did not authorize the federal government to permit

14     these fish farms in the Gulf of Mexico; is that what you're

15     talking about?

16           MR. REGAN:  That's the last part of it.  There is a

17     long history of the question of whether this is authorized by

18     NOAA or --

19           THE COURT:  What's interesting -- and I only know about

20     what's on the surface, so to speak -- but I read in the paper

21     this morning, and I was kind of surprised to read that despite

22     the recent ruling by the Fifth Circuit, some entity of the

23     federal government, the current administration, plans to go

24     forward with these fish farms in the Gulf of Mexico

25     nonetheless, or in the ocean somewhere, and I'm not quite sure

*OFFICIAL TRANSCRIPT*

1   what the arguments are there, but you may or may not be right

2   is all I'm pointing out.

3          MR. REGAN:  I think that's what we would like to put in

4   front of the Court is not only that case but all of the history

5   with respect to that particular claim because it's a

6   fundamental go, no-go question on the BioMarine, Gulf Marine

7   cases that, I think, some guidance would be helpful on.

8              The other one that has sort of that threshold

9   legal question would be The Bird of Paradise matter, which is

10  16-5277.  From our perspective, there is a question about who

11  owns that claim, and through motion practice we think that

12  could be resolved, which would then, obviously, provide

13  direction of what should happen next.

14             With respect to the others, I mean, again, I

15  think without getting into detail on them, I'm happy to talk

16  about any of the specific cases, but what we would be proposing

17  is an expedited procedure that could be completed probably in

18  about nine months, we think, given that it's only six essential

19  matters, and it's not that many depositions that would bring us

20  to a substantial closure, if not complete closure, for what's

21  here.

22             I'm happy to answer further questions, but that's

23  what we proposed with respect to those last remaining matters.

24          THE COURT:  So, am I understanding that all of these

25  remaining, not all of these, this last group that you talked

**OFFICIAL TRANSCRIPT**

1    about, subgroup, however you want to describe it, all of them

2    were claimants that went through the neutrals mediation process

3    or Judge Shushan's mediation process but were unsuccessful; is

4    that accurate?

5            MR. REGAN:  Yes, Your Honor.

6            THE COURT:  Okay.  All right.  So, that was a lot said

7    there by Mr. Regan.  Anybody who wants to respond?  Anyone want

8    to respond who hasn't already?

9            MR. KRELLER:  Your Honor, it's Stephen Kreller.  I

10   represent BioMarine and Gulf Marine Institute of Technology.

11            That case I've had some exchanges with

12   Chris Keegan by email on what his proposal is as far as limited

13   discovery, and our issue is just what is the boundaries of the

14   limited discovery and does that get into expert -- exchanges of

15   expert reports and expert depositions?

16            These cases, as far as the damages aspect for

17   BioMarine and Gulf Marine Institute of Technology, do involve

18   expert testimony; so, as far as their limited discovery plan, I

19   just want a better understanding of that.  I've had some good

20   discussions with Chris.  I think we can probably come to an

21   agreement of what that is.

22            The other claims that I represent are the

23   Fin & Feather claims, and that would be the same discussion.  I

24   think they have proposed limited discovery, and from what I'm

25   understanding, it's to explore the cases a little bit more so

*OFFICIAL TRANSCRIPT*

1   BP can file their motions, whatever they may be, motions to

2   dismiss, motion for summary judgment, but again, I just want to

3   understand what that limited discovery is and, you know, who

4   they plan on deposing.

5         THE COURT:  Well, I imagine it's going to have to be

6   something that's going have to be worked out in each of these

7   cases.  I have no idea.

8             What kind of businesses are these three

9   Fin & Feather entities that you represent?  I suppose they are

10   all related somehow, right?

11         MR. KRELLER:  Yes, sir, Judge.  They are all related.

12   They are in Boothville, Louisiana.  Fin & Feather is a boat

13   storage rental business.  Fin & Feather Cabins is fishery

14   cabins.  Fin & Feather Adventures is a development that the

15   Prests, Kirk and Denise Prest, had formed and began to develop

16   a property into a more commercial scale sort of retreat, sort

17   of compound where corporate clients can come and stay at this

18   facility, go out and fish.  So, it involved guided fishery

19   services primarily targeting speckled trout and redfish, and

20   that's really what these businesses are.

21         THE COURT:  Are your clients opt-outs or excluded

22   claimants?

23         MR. KRELLER:  I believe they are opt-outs, Judge.  I

24   got involved in these cases after Judge Shushan's mediation

25   process, and I have had limited discussions with Judge Shushan

**_OFFICIAL TRANSCRIPT_**

1    about the case -- these cases but not much.

2              THE COURT:  Okay.  Does anybody else want to say

3    anything?

4              MS. ADAMS:  Thank you, Your Honor.

5              THE COURT:  Go ahead, Ms. Adams.  Are you trying to

6    speak?

7              MS. ADAMS:  Yes, I am, Your Honor.  I represent --

8    thank you.

9                   I represent two plaintiffs in this case.  One is

10   basically a diver hotel, kind of a floating hotel, and then

11   another is Loggerhead Holdings, who has two diving vessels that

12   are kind of live-aboard vessels.  Then, I also represent

13   Classy Cycles, which is in the panhandle, and they rent a great

14   deal of the motorized scooters or golf carts, a vehicle called

15   a *QuickStart* and are tourist related.  They were opt-outs and

16   would have likely not received compensation in the program just

17   due to either documentation or kind of unique circumstances of

18   both claimants.

19                   I do agree that nine months is sufficient and

20   limited discovery.  I do think we could come to an agreement.

21   We do want to file formal expert reports and designations.  I

22   think that that is something that's necessary for this to go

23   forward, but other than that, I think that we could work with

24   BP to come up with a broad list and schedule in these cases.

25             THE COURT:  Okay.  So, both of those clients of your

                         *OFFICIAL TRANSCRIPT*

1    firm are opt-outs; is that what I heard?

2         MS. ADAMS:  Yes, Your Honor.  One would have been under

3    the failed business formula, which was not favorable at all,

4    and then the other one has some issues with their

5    documentation, which would not have qualified them even though

6    Classy Cycles is its own business.

7         THE COURT:  Well, if you had trouble with your

8    documentation under the settlement program, I don't know if

9    that issue goes away now that you're in litigation, does it?

10   You still have to product documentation -- I'm sorry, what?

11        MS. ADAMS:  (Speaking simultaneously) Yes, Your Honor.

12   Your Honor, yes, yes.  There were just some errors and they

13   have been corrected, but kind of outside of the (audio

14   distortion gap).  We didn't think we would be able to do it by

15   2013.  It was not -- we did not think we would be able to meet

16   the formal document requirements but we think we have now.

17        THE COURT:  Okay.  Thank you.

18             Does anyone else want to speak?

19        MR. COON:  Good morning, Your Honor.  Brent Coon on

20   behalf of Global.  We concur with the nine months -- track and

21   we are prepared to (audio distortion gap.)

22        THE COURT:  What kind of a case is yours, Mr. Coon?

23        MR. COON:  The one remaining, Mr. Birkett had two

24   businesses.  One was successfully resolved with the mediation

25   program.  The other is a remediation recovery type of business

*OFFICIAL TRANSCRIPT*

1    with contracts, municipal contracts.

2             THE COURT:  Okay.  Were they an excluded claimant or an

3    opt-out?

4             MR. COON:  It was an opt-out, Your Honor.

5             THE COURT:  Okay.  Would anyone else like to speak?

6                  Mr. Penton, you must be muted.  I can't hear you.

7    I don't see the little muted microphone on your screen but I

8    can't hear you.  Can anyone else hear Mr. Penton?

9             MR. REGAN:  No, Your Honor.

10                  Mr. Penton, it may just be you're not connected

11   to the computer audio.  If you see in the bottom left corner

12   where there is a mute button and a little arrow, you might be

13   able to connect to the computer audio there.  That might solve

14   it.

15            THE COURT:  Try again, Mr. Penton.  I still can't hear

16   you.  It says you're connecting now.  You're connecting now but

17   you're still not quite there yet, Mr. Penton.

18                  I've got to say, I've known Mr. Penton a long

19   time, this is the quietest he's ever been.

20                  Okay.  I think you're there.  Try now.  No.  I

21   still can't hear him.  Mr. Penton, you might have to use sign

22   language, if you're good at that.  I'm sorry, but we can't hear

23   you.

24                  Steve, could it be a Wi-Fi connectivity issue?

25            THE IT TECHNICIAN:  He had troubles connecting this

1    morning and he had to reboot.  Then he dialed in on the phone

2    so he could hear, but I don't see the phone connection, so he

3    must have dropped off.

4         THE COURT:  We can't hear you.  It says you're trying

5    to connect, but you're not connected to audio for some reason,

6    Mr. Penton.

7              Does anybody else want to speak meanwhile while

8    we're trying to get Mr. Penton connected?  Does anybody else

9    have anything else to say?

10             Mr. Regan, let me get back to you for a second.

11   When you said nine months, two depositions, what kind of

12   discovery?  Respond to Mr. Kreller's concerns or questions.

13        MR. REGAN:  So, I think we've already exchanged

14   documents for the mediation process, and I think we could just

15   use that for their -- I think several of these cases, the

16   question of whether experts are necessary or not is something

17   we could talk with the other side about, but most of these

18   businesses are sort of one-person or one-lead-person type

19   businesses, so there is not a large number of people involved,

20   and so I think the question of whether we would need two

21   depositions plus an expert deposition, I think, for the most

22   part probably we would not.

23             That's not to say that we would -- you know, if

24   someone wants to submit an expert deposition or a declaration,

25   we could work with somebody on that for accommodating that

**OFFICIAL TRANSCRIPT**

1   particular claim, but, frankly, Your Honor, to just speak

2   generically with respect to what we saw and a lot of the

3   damages filings that were made, we got just simple things like

4   damages claims that are going for 25 years past 2010.  Some of

5   the Fin & Feather stuff is like that and other very, very

6   simple questions that, you know, we could have experts on and

7   get into things, but some of it is very fundamental about just

8   the basic boundaries of speculation and what's appropriate.

9           So, I think multiple counsel said that we could

10  work with them.  We tried to talk to people before this hearing

11  so that everybody could have a sense of what we were going to

12  propose, but I think for the most part, Your Honor, to be very

13  simple, we just need to have some things done under oath with

14  respect to somebody's businesses as to what they were doing and

15  when, and then questions about sort of, really, more detail

16  about the -- what the -- so, that's really the causation

17  question -- and more detail about how those two questions

18  relate to the damages theory because, again, not everybody -- I

19  just want to speak hypothetically, but hypothetically a number

20  of the damages models that we were shown were settlement

21  program damages models, and we're not in the settlement

22  program.  We're in litigation.

23          So, we just want to get -- I think as Mr. Kreller

24  may have said and others, and I agree with them -- we want to

25  get a little further down the road with these cases because a

*OFFICIAL TRANSCRIPT*

 1   lot of work has already been done by everybody, but get them in

 2   a place where we can understand them better, but also maybe

 3   clear up some of what I think were some of the barriers that

 4   occurred or at least were shown to occur in the mediations with

 5   Judge Shushan.

 6        THE COURT:  Let me tell Mr. Penton, you're still not

 7   audible there.  I don't know if you want to try to call in, but

 8   he could only listen if he called in, though, but can you hear

 9   us, Mr. Penton?

10        MR. PENTON:  Judge, I can hear you well.

11        THE COURT:  Now I hear you.

12        MR. PENTON:  When we tried to unmute or mute to reverse

13   the problem with the audio, it kicked us out and it wouldn't

14   let us back in.  We're in now.

15        THE COURT:  Well, you're loud and clear now, so go

16   ahead and speak.  Go ahead.

17        MR. PENTON:  Your Honor, I represent The Bird of

18   Paradise, which is an Anheuser-Busch celebrity charity in --

19   St. Pete Beach, Florida.  I've also had discussions with

20   Chris Keegan and was told the same thing -- they want to do

21   some discovery.

22             I would point out to the Court that this is a

23   purely legal issue on, as Mr. Regan says, who owns the claim.

24   This is a single entity L.L.C, and who owns the claim of that

25   type of L.L.C. is purely a -- are purely a legal issue.

*OFFICIAL TRANSCRIPT*

1              If the Court wants or grants discovery in a CMO,

2      we'll be happy to participate in that, and we'll be happy to

3      meet with Mr. Keegan and Mr. Regan and try to work that out.

4              THE COURT:  When you say *it's purely,* it may be purely

5      a legal issue, but I'm not sure that's necessarily the case.  I

6      don't know.  The claim is listed as *John DeSilva*.  Is that the

7      person you represent here, is John DeSilva?

8              MR. PENTON:  Yes, Your Honor, as John DeSilva is on the

9      presentment paperwork, as well as all the claims, is the single

10     member of -- owner of The Bird of Paradise, L.L.C.

11             THE COURT:  Okay.  So, what's the issue, as you

12     understand it, as to what BP is suggesting that there is an

13     issue of who owns this claim?

14             MR. PENTON:  Judge, the first we found out about this

15     was actually in the mediation, and apparently -- I'll let

16     Mr. Regan speak for them -- in 2017, Mr. DeSilva sold this

17     business, and I have to say that could be the only -- the only

18     issue that I'm aware of, but I'll let Mr. Regan speak to that.

19             THE COURT:  What year?  I'm sorry?  What year?

20             MR. PENTON:  2017.

21             THE COURT:  Oh, okay.  So, long after the oil spill.

22     So, the question is:  Did he retain ownership of this claim or

23     not?

24             MR. PENTON:  Yes.  That's why it goes back to what a

25     single entity L.L.C is.

*OFFICIAL TRANSCRIPT*

1          THE COURT:  Well, who did he sell it to?  Did that
2    entity or person make a claim?
3          MR. PENTON:  No, they didn't.  He still has the claim.
4    That's our opinion.
5               Judge, just so that the Court understands our
6    position is under a single entity L.L.C., you can elect whether
7    to be taxed as a corporation or as a disregarded entity.  As a
8    disregarded entity, you take -- you take the deductions and the
9    revenue on your personal return when you're a single-member
10   L.L.C.
11         THE COURT:  Well, thanks for that tax lesson, but I'm
12   not sure I understand how that helps resolve this here.
13              So, really quickly, Mr. Regan, what's BP's
14   argument here as to why there is a question about who owns this
15   claim?
16         MR. REGAN:  Yeah, it's exactly what the question you
17   just asked.  We don't see evidence or evidence that he actually
18   retained the claim.  He doesn't own this business any more.  He
19   sold it in 2017.
20              As I said in the beginning, both BioMarine and
21   Gulf Marine for different issues and also Bird of Paradise,
22   these are the two where, even before we get into some
23   depositions, there might be some legal questions that we could
24   bring forth immediately because, frankly, this is the challenge
25   we have in that we need to know that the person that's in front

1     of us actually has the claim.

2                 That's our question.  It was the question we had

3     before the case was mediated, and it's the reason why the

4     mediation really didn't go anywhere because it really hasn't

5     been answered from our standpoint, and we know there have been

6     other --

7          THE COURT:  So, what are you looking for?  Are you

8     looking for documents?  Do you have documents pertaining to the

9     sale itself and what those documents say or don't say?

10         MR. REGAN:  I don't think we have it in detail to

11    confirm that we know that Mr. Penton's clients retained the

12    claim, no.

13         MR. PENTON:  Well, Mr. Keegan, Your Honor, had told me

14    yesterday that there was no documents that he really needed to

15    resolve this issue.  He just needed to take the depositions.

16                 If there are additional documents they need, I

17    would be happy to review our exhibits that we tendered to BP

18    and see if there are other documentation they are interested

19    in.  Mr. Keegan said there was not.

20         THE COURT:  I'll let Mr. Keegan answer, if he wants to,

21    for himself, but it just strikes me fundamentally that a

22    document that might be relevant would be whatever documents

23    relate to the sale of the business, because those documents

24    perhaps state whether this claim was sold or retained or what.

25    It certainly seems like that would be relevant.

*OFFICIAL TRANSCRIPT*

 1          Let me let Mr.  Keegan respond, if he cares to.

 2          MR. KEEGAN:  Yes, Your Honor.  Chris Keegan on behalf

 3     of the BP departments.

 4              For all of these cases, as Mr. Regan has said we

 5     think very limited discovery is appropriate.  To the extent

 6     that we don't (audio distortion gap) -- wasn't sure if that was

 7     provided in the earlier process or not.  I think Your Honor is

 8     right that one or two relevant documents might be spot on; so,

 9     Mr. Penton, if we don't have that already (audio distortion

10     gap) -- whether we need a deposition on top of that or not, I

11     think is a very open question, and we would be happy to discuss

12     with Mr. Penton, but it is a very straightforward question

13     whether purely legal or (audio distortion gap) the ownership.

14          THE COURT:  Okay.  Mr. Penton, did you want to say

15     anything else?

16          MR. PENTON:  Yes, Your Honor.

17              Like I said, we first sounded this issue at the

18     mediation.  We were not prepared to produce anything that was

19     needed, but we'll be happy to review our tender.  We'll be

20     happy to meet with Chris and discuss documentation.  If there

21     are additional transactional documents, we'll certainly be

22     happy to produce them so we could work that issue out.

23          THE COURT:  Okay.  All right.  Anybody else have

24     anything to say right now?

25              I guess I'll ask a general question first:  If I

*OFFICIAL  TRANSCRIPT*

1    get to the point where these cases may be severed from the MDL

2    itself, do we know which of these lawsuits, which of these

3    claims were originally filed elsewhere and came here only

4    because of the MDL or which ones were filed here originally?

5           Mr. Regan, do you have that information?

6           MR. REGAN:  I can pull it up but I think, generally

7    speaking, Your Honor, almost all of these are EDLA cases, but I

8    can pull that up.

9           THE COURT:  Okay.

10          MR. REGAN:  Particularly of the six that we're talking

11   about here at the end, but I can pull that up.

12          MS. ADAMS:  Your Honor, this is Caroline, and the two

13   of mine were filed in Houston.

14          THE COURT:  And came here as tagalongs?

15          MS. ADAMS:  Yes, Your Honor.

16          THE COURT:  Okay.

17          MR. PENTON:  Your Honor, Ronnie Penton.  Bird of

18   Paradise likewise was filed in the Middle District of Florida

19   in Tampa and transferred.

20          THE COURT:  Okay.  So, at some point if we can't

21   otherwise resolve these, those cases will either have to be

22   sent back to the originating district or the parties could

23   stipulate to leave them stay here.  That would be the

24   plaintiff's choice in those cases.  I'm not asking anybody to

25   make that decision right now, but you can keep that in mind.

*OFFICIAL TRANSCRIPT*

1              Okay.  Anybody else?

2              Mr. Regan, I think what you should do is submit

3    something along the lines of what we discussed here this

4    morning, what everybody discussed, and put it in the form of a

5    draft case management order and circulate it amongst all

6    counsel.  How long would it take you to get that together?

7              MR. REGAN:  We could do it within a week, Your Honor.

8              THE COURT:  Okay.  Circulate that amongst all counsel

9    and all parties within a week.  We'll give everyone a week to

10   respond to you, and then after you get their responses, let's

11   say within, I'll build in a little extra time, let's say within

12   21 days, BP will submit a proposed case management order and

13   either state that it's agreed upon by all of the parties, and

14   if there is anyone who is not in agreement, of course you

15   should point that out, and they can submit their objection or

16   whatever at the time, okay, within 21 days.

17             Okay.  Does anyone have any questions about that?

18   Okay.  I'm going to try my best.  I know these cases have been

19   stayed for a long time, and it's just part of the MDL process

20   when you have so many cases as we had, and most of the emphasis

21   has been on resolving the several large class settlements that

22   we had, and we're about at the end of the road with that.

23             I talked to Mr. Juneau yesterday.  I think he

24   and, I think, BP are working on some sort of order to propose

25   to the Court to totally wind down his claim office.  I think he

**OFFICIAL TRANSCRIPT**

1  has essentially nothing left.  There may be one or two cases up

2  in the circuit, still.

3              Mr. Regan, are you aware of that?

4          You need to unmute yourself, Mr. Regan.

5          MR. REGAN:  That's correct, Your Honor.  It's a very

6  small number and we'll get that feedback and then provide that

7  to the Court.

8          THE COURT:  Okay.  Unless someone has anything else,

9  thanks to everyone and we'll be in touch, okay?

10             Thank you.  Have a good day.

11         MR. REGAN:  Thank you, Your Honor.

12         MS. ADAMS:  Thank you, Your Honor.

13         (WHEREUPON, at 9:51 a.m. the proceedings were

14  concluded.)

15                      *    *    *

16

17                  REPORTER'S CERTIFICATE

18       I, Cathy Pepper, Certified Realtime Reporter, Registered
   Merit Reporter, Certified Court Reporter in and for the State
19 of Louisiana, Official Court Reporter for the United States
   District Court, Eastern District of Louisiana, do hereby
20 certify that the foregoing is a true and correct transcript to
   the best of my ability and understanding from the record of the
21 proceedings in the above-entitled and numbered matter.

22                        *s/Cathy Pepper*
                          Cathy Pepper, CRR, RMR, CCR
23                        Certified Realtime Reporter
                          Registered Merit Reporter
24                        Official Court Reporter
                          United States District Court
25                        Cathy_Pepper@laed.uscourts.gov


                    ***OFFICIAL TRANSCRIPT***