1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3     ****************************************************************

4     IN RE: OIL SPILL BY THE
      OIL RIG *DEEPWATER HORIZON*
5     IN THE GULF OF MEXICO ON
      APRIL 20, 2010
6

7                              CIVIL ACTION NO. 10-MD-2179 "J"
8                              NEW ORLEANS, LOUISIANA
                               WEDNESDAY, SEPTEMBER 9, 2020, 10:00 A.M.
9

10
      THIS DOCUMENT RELATES TO
11    CERTAIN CASES IN THE B1 BUNDLE
      BY MEXICAN PLAINTIFFS
12
      ****************************************************************
13

14      TRANSCRIPT OF MOTION HEARING PROCEEDINGS VIA VIDEOCONFERENCE
              HEARD BEFORE THE HONORABLE CARL J. BARBIER
15                    UNITED STATES DISTRICT JUDGE

16

17    APPEARANCES:

18

19    FOR THE PLAINTIFFS:        WELLER GREEN TOUPS & TERRELL
                                 BY:  MITCHELL A. TOUPS, ESQUIRE
20                               2615 CALDER STREET, SUITE 400
                                 BEAUMONT TX  77702
21

22                               THE BUZBEE LAW FIRM
23                               BY:  CAROLINE E. ADAMS, ESQUIRE
                                 600 TRAVIS STREET, SUITE 7300
24                               JP MORGAN CHASE TOWER
                                 HOUSTON TX  77002
25

                            *OFFICIAL TRANSCRIPT*

```
 1    APPEARANCES CONTINUED:

 2

 3                                LAW OFFICES OF GRANT D. AMEY
                                 BY:  GRANT D. AMEY, ESQUIRE
 4                               P.O. BOX 67
                                 FAIRHOPE AL  36533
 5

 6

 7    ATTORNEYS FOR BP AMERICA
      PRODUCTION COMPANY
 8    AND BP EXPLORATION &
      PRODUCTION INC.:          KIRKLAND & ELLIS
 9                               BY:  MATTHEW T. REGAN, ESQUIRE
                                      KRISTOPHER S. RITTER, ESQUIRE
10                               300 NORTH LASALLE STREET
                                 CHICAGO IL  60654
11

12

13                               KIRKLAND & ELLIS
                                 BY:  CHRISTOPHER W. KEEGAN, ESQUIRE
14                               555 CALIFORNIA STREET
                                 27TH FLOOR
15                               SAN FRANCISCO CA  94104

16

17    OFFICIAL COURT REPORTER:   CATHY PEPPER, CRR, RMR, CCR
                                 CERTIFIED REALTIME REPORTER
18                               REGISTERED MERIT REPORTER
                                 500 POYDRAS STREET, ROOM B-275
19                               NEW ORLEANS LA  70130
                                 (504) 589-7779
20                               Cathy_Pepper@laed.uscourts.gov

21    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
      PRODUCED BY COMPUTER.

22

23

24

25
```

*OFFICIAL TRANSCRIPT*

1              **P-R-O-C-E-E-D-I-N-G-S**

2              WEDNESDAY, SEPTEMBER 9, 2020

3              M O R N I N G    S E S S I O N

4              (VIA VIDEOCONFERENCE)

5

6

7         THE COURT:  All right.  Good morning, everyone.

8         VOICES:  Good morning, Your Honor.

9         THE COURT:  All right.  Hopefully, everyone is present

10   who intends to speak.  We have a status conference to discuss,

11   actually, for argument on BP's dispositive motion as to the B1

12   claims of the Mexico fishermen plaintiffs or claimants.  BP's

13   motion is at Record Document, this is in the MDL 2179, of

14   course, Record Document 25477.

15              So, these are the lawyers I have who are listed

16   who intend to speak, Caroline Adams -- is it CAROL-LIN or

17   CAROL-LINE?

18         MS. ADAMS:  CAROL-line, Your Honor.

19         THE COURT:  Caroline Adams, okay.  Good.  Mr. Keegan,

20   Chris Keegan, Grant Amey, and Mitchell Toups.

21         MR. TOUPS:  Yes, Your Honor, I'm here.

22         THE COURT:  Matt Regan.

23         MR. REGAN:  Yes, Your Honor.

24         THE COURT:  And Kris Ritter.

25         MR. RITTER:  Yes, Your Honor.

1        THE COURT:  Okay.  So, BP's motion seeks to dismiss, it

2   looks like, 115 Mexican plaintiffs who have asserted B1 claims.

3   The cases in question are listed in Exhibit A to BP's motion.

4   It looks like all of these plaintiffs are represented by three

5   separate law firms, the Buzbee Law Firm represents, according

6   to my notes, 56 Mexican plaintiffs, which includes 49 fishing

7   cooperatives and 17 individual fishermen.

8             Mr. -- is it Kuykendall?

9        MR. AMEY:  Yes, Your Honor.  It's Kuykendall and I'm

10  here on behalf of the Kuykendall Group.

11       THE COURT:  Okay.  Pronounce the name again.  Is it

12  Kuykendall?  Is that how he pronounces it?

13       MR. AMEY:  Yes, sir it is.  It's KIRK-KEN-DOLL.

14       THE COURT:  KIRK-KEN-DOLL.  Thank you.  So, your firm

15  represents 18 Mexican cooperatives.

16            Mr. Toups, Mitchell Toups, your firm represents,

17  apparently, 41 Mexican cooperatives.

18       MR. TOUPS:  That's correct, Your Honor.

19       THE COURT:  All right.  So, there are two issues raised

20  by BP's motion.  One is whether the plaintiffs, these Mexican

21  fishermen, are allowed to assert any or bring any claims under

22  the Oil Pollution Act of 1990.  As foreign claimants, they

23  would be required to, essentially, show that there was some

24  sort of treaty between the United States and Mexico that

25  authorizes the Mexican fishermen to recover under OPA, and,

*OFFICIAL TRANSCRIPT*

1   alternatively, if they have no right to recover under OPA, they

2   have asserted claims under the general maritime law, and the

3   question there raised by BP's motion is whether their claims

4   under the general maritime law are displaced by OPA.

5           So, with that said, who is going to argue on

6   behalf of BP?

7           MR. REGAN:  I will, Your Honor.  I'm Matthew Regan.

8           THE COURT:  Okay.  Go ahead.  I have, obviously, read

9   everything that you all have filed, okay?

10          MR. REGAN:  Yes.  Since Your Honor has summarized, it's

11  with respect to these 115 claimants, we believe they should all

12  be dismissed with prejudice.

13          With respect to the OPA claims, the specific

14  provision, as Your Honor said, is 33 U.S.C. § 2707(a)(1), which

15  requires either a treaty or a certification from the Secretary

16  of State, neither of which exists here.

17          The three groups of plaintiffs that we have here

18  have identified a collection of various treaties to try to meet

19  that special.  None of them do.  At most, they talk about

20  general cooperation concepts or they talk about reinforcement

21  of rights for people who already have a legally recognized

22  interest.  That, obviously, is not the test under OPA's very

23  specific language.

24          None of those, and we can speak to any of them if

25  we need to, but none of the ones that have been put forth to

**OFFICIAL TRANSCRIPT**

1    Your Honor to satisfy that fundamental threshold can meet.

2    It's as simple as that with respect to the OPA claims, with

3    respect to these Mexican citizen claimants.

4            With respect to maritime claims, we do agree that

5    that very specific language, it's our contention that very

6    specific language in OPA directly speaks to the question of how

7    and when a foreign claimant could recover for a spill such as

8    the *Deepwater Horizon* spill, and because that language is so

9    express, we think -- and directly speaks to it, we do believe

10   that it does displace any maritime claims.

11           We would also cite the 2014 Fifth Circuit

12   opinion, the *American Commercial Lines*, 759 F.3d 420, which in

13   a different context but talks about this where OPS is so

14   specific with respect to how to handle an aspect of one of

15   these incidents, it does displace the maritime law.

16           Two additional points to highlight from our

17   briefing, Your Honor:  Even if it doesn't displace, and we

18   firmly believe that it does, the actual constellation of

19   plaintiffs that are before you, only 17 of them are individual

20   commercial fishermen and only 17 then could even get past the

21   *Robins Dry Dock* test.

22           The rest of them are either entities involved in

23   some form of fishing, perhaps, or they are not involved in it

24   at all, but they don't meet that fundamental test; so, at most

25   this maritime question, really, is only relevant to 17, but we

**OFFICIAL TRANSCRIPT**

1    think, even after those 17, the very specific language in OPA

2    would displace their right to bring those claims.

3              Then, finally, everything we've done in our

4    briefing, what I've just said, Your Honor, takes care of -- is

5    the basis for a dismissal of prejudice for all 115 of these

6    claimants.

7              There is an additional reason for dismissal with

8    respect to the 41 cooperatives that are represented by

9    Mr. Toups.  All of these claims are subject to Your Honor's

10   pretrial orders, particularly Pretrial Order 60, which required

11   individual actions and certification by the plaintiffs.

12             There has actually been several appeals with

13   respect to Mexican fishermen and Mexican citizen claims with

14   respect to Your Honor's orders, and those appeals the

15   Fifth Circuit has affirmed PTO 60's requirements with respect

16   to Mexican fishermen.

17             At the time in 2016, you went through a process,

18   Your Honor, where you had show cause processes and then

19   additional show cause processes, which really ended in an order

20   in December of 2016.

21             With respect to Mr. Toups' clients specifically,

22   this is Rec Doc. 22003, those 41 cooperatives were allowed to

23   proceed in this litigation provided that they deleted any

24   reference to any specific individuals who were trying to

25   proceed with other people other than the named plaintiff.

*OFFICIAL TRANSCRIPT*

1          As it turns out then, when we got a later

2    pretrial order that required damages to be set forth, it was

3    then revealed that actually those 41 were trying to bring

4    claims of 11,876 Mexican fishermen, and there is no question

5    that is an end run to the express language of PTO 60, and there

6    could be no question that it is an end run of December 2016

7    order.

8          So, with respect to those 41 cooperatives, we

9    believe, as Your Honor has done in prior orders, that they have

10   an additional basis for dismissal for noncompliance with the

11   Court's specific pretrial orders as affirmed by the

12   Fifth Circuit.

13          Your Honor, those are our bases.  OPA doesn't

14   apply.  The maritime clause, we believe, are displaced but, at

15   best, would only apply to 17, but we think it's specifically

16   displaced and, independent of that, the Toups plaintiffs in

17   particular would be in violation of Your Honor's prior orders.

18          THE COURT:  Let me ask you one specific question about

19   the OPA treaty requirement.  Well, one of the things that the

20   plaintiffs rely on is the North American Agreement on

21   Environmental Cooperation, NAAEC, I guess, for short, or an

22   acronym, which is apparently a so-called *side agreement* entered

23   into at the same time as NAFTA in 1993, and the Mexican

24   plaintiffs primarily rely on Article 6, which states in

25   relevant part, Article 6, which deals with private access to

**OFFICIAL TRANSCRIPT**

1    remedies -- and this was obviously in effect at the time of

2    this oil spill in 2010 -- that Article 6, in relevant part,

3    says, "Each Party shall ensure that persons with a legally

4    recognized interest under its law in a particular matter have

5    appropriate access to administrative, quasi-judicial or

6    judicial proceedings for the enforcement of the Party's

7    environmental laws and regulations."

8              Then, it goes on further to say that, Private

9    access to remedies shall include rights, in accordance with the

10   Party's law, such as:  Right to sue another person under that

11   Party's jurisdiction for damages, and so forth.

12             So, what's your response to why that does not

13   satisfy the requirement for a foreign claimant to have a remedy

14   under OPA?

15   MR. REGAN:  Because of the express language,

16   Your Honor, that you read in Section 6.  It says, "Any party,"

17   quote, "that already had a legally recognized interest."  So,

18   it's just reinforcing the interest that already existed under

19   the law.

20             By definition, what OPA is saying in the

21   *Foreign Claimant* section is there needs to be a treaty that now

22   is going to say you have a -- the right now to sue under OPA.

23   It has to be that express and explicit.

24             This is simply just reinforcing the status quo,

25   which the status quo is that there is not a treaty that exists

**OFFICIAL TRANSCRIPT**

1    that says the foreign claimants have a right to pursue claims

2    under OPA, nor has there been a certification by the Secretary

3    of State.

4              As the section states, I think it's entirely

5    complicit, Your Honor, that that treaty is simply reinforcing

6    what exists, not adding or being incremental or reaching that

7    threshold for OPA saying and we are actually now saying under

8    OPA, you can bring these claims as a foreign claimant.

9              The second section that you read, Your Honor, is

10   just the procedure by which someone who already has a legally

11   recognized interest can proceed; so, I think the second one

12   doesn't change it.

13             It's really reinforcing what exists, and what

14   these plaintiffs need is a treaty that says, no, actually,

15   post OPA, we are confirming that OPA does now apply to foreign

16   claimants or a certification through the Secretary of State

17   that says that, and we don't have that in this case.

18        THE COURT:  Okay.  Thank you.  Is there anything else

19   you wanted to add?  I don't know which plaintiffs' counsel

20   would like to go first.

21        MR. TOUPS:  I'll start, Your Honor.

22        THE COURT:  Mr. Toups.

23        MR. TOUPS:  Yes, sir.  I'll just follow up on

24   Your Honor's question.

25             We disagree with BP's rendition of the

*OFFICIAL TRANSCRIPT*

1   North American Agreement on Environmental Cooperation.  It is a

2   side agreement to NAFTA.  The whole purpose of NAFTA in the

3   NAAEC was to provide certain rights between the citizens of the

4   United States, Mexico, and Canada.  They didn't have to go into

5   this particular agreement with the North American Agreement on

6   Environmental Cooperation and list every particular law that

7   would apply.  It specifically from 1993 forward says that our

8   citizens have the same rights if they exist.  What that means

9   legally recognized interests if they exist in their own

10  country.

11          So, the citizens of Mexico have rights that they

12  can assert had this happened in Mexico, and if they have those

13  rights there, then each of the countries are recognizing to

14  protect the other citizens in the United States and/or Canada

15  if Canada was involved.

16          So, we believe that without a doubt that both

17  NAFTA, in combination with the North American Agreement on

18  Environmental Cooperation, is a treaty that allows foreign

19  claimants to bring a suit under OPA.

20          OPA specifically says foreign claimants can bring

21  it as long as two things:  One, they haven't received

22  compensation, which no one disagrees.  They have not.  They

23  have not received any compensation; in fact, there have been

24  some lawsuits filed in Mexico in which BP -- and I've attached

25  these to our pleadings -- in which BP has stated that there is

*OFFICIAL TRANSCRIPT*

1   no jurisdiction for our clients' claims there, that the proper

2   place to bring those is the United States.  I think that's a

3   judicial admission against BP that the proper jurisdiction

4   resides in the United States.

5           Superimposed on that now, effective on June 3rd

6   of 2020, the Senate confirmed the USMCA, which is the amended

7   NAFTA that came about as a result of President Trump, and now

8   the USMCA agreement that took effect has now taken on much of

9   the language that's in the North American Agreement on

10  Environmental Cooperation and put that in that treaty, which

11  also gives citizens of Mexico and Canada and the United States

12  to sue each other under their various states --

13          THE COURT:  Let me stop you for one second, Mr. Toups.

14  I'm not clear on how that would matter, the fact that the

15  USMCA, I think is the acronym, that it now has now been

16  implemented or ratified as of July of this year, I mean, I

17  don't know how that could apply to something that occurred in

18  2010, but as I appreciate it, it doesn't really change anything

19  anyway.  The essential provision that you're relying on from

20  the other so-called *side agreement* to NAFTA includes

21  essentially the same language; is that correct?

22          MR. TOUPS:  That's right, Your Honor.  That's exactly

23  right.  I just wanted to show that even in the new agreement

24  they didn't change anything.  In fact, they basically copied

25  the North American Agreement on Environmental Cooperation; so,

                          ***OFFICIAL TRANSCRIPT***

1   it just further illustrates how the three countries that are

2   signators to all of these agreements are still saying that the

3   same rights apply.

4           So, we believe there is a treaty.  These clients

5   have not been compensated.  Further, as we put in our brief --

6   we attached the pleadings that BP filed -- they said that the

7   proper jurisdiction for claims out of the *Deepwater Horizon* for

8   Mexican citizens is the United States.  They put that in a

9   judicial pleading in Mexico.  We've attached that with a

10  translation to our brief.

11          The other issue that Mr. Regan raised with regard

12  to the Toups cooperatives, those cooperatives are no different

13  than any of the other cooperatives in this litigation.

14          Cooperative is a legally recognized entity with

15  the president under their charter, which we've attached to our

16  pleading.  They have the right to bring a lawsuit or be sued on

17  behalf of the members of that cooperative.  No different than a

18  cooperation could bring a suit.

19      THE COURT:  Well, you do know that is essentially an

20  end run around PTO 60, it seems to me, and I've previously

21  dismissed similar or identical arguments that somehow these

22  claims can be joined together in one lawsuit; so, how do you

23  get around that?

24      MR. TOUPS:  Well, it's not an end run, Your Honor.

25      THE COURT:  I've dismissed them and the Fifth Circuit

**OFFICIAL TRANSCRIPT**

1    has affirmed that dismissal.

2          MR. TOUPS:  Right.  This is different.  One of the

3    things that you dismissed for class actions that I filed and

4    you dismissed some mass joinder cases that other lawyers filed,

5    and I know that those were affirmed by the Fifth Circuit, here

6    we brought actions on behalf of 41 individual cooperatives that

7    are legal entities.

8                In one of the other pretrial orders by

9    Your Honor, we had to list what our damages are, and in those

10   damages we listed what the damages were for each one of those

11   cooperatives, and here we illustrated how much that would be if

12   it got divided equally among the members, which it doesn't

13   necessarily go that way; so, this is really what are the

14   damages of a cooperative?  It's not an end run.

15         THE COURT:  Whose damages are you claiming?  It sounds

16   like you're claiming damages for 11,000 individual Mexican

17   fishermen.

18         MR. TOUPS:  I'm claiming damages for 41 individual

19   cooperatives.

20         THE COURT:  How are their claims calculated?  What

21   would it be based on?

22         MR. TOUPS:  Well, the damages can be calculated a

23   number of ways.  The number of boats that the cooperatives

24   have.  They submit all of their fish that they catch to the

25   government of Mexico.  The taxes go through the cooperative as

                      *OFFICIAL TRANSCRIPT*

1   one entity, so they have records for that entity.  All my

2   economist was showing in the damage bottle was if you divided

3   that damage number up, this is what it would result in their

4   membership.

5        THE COURT:  Well, if they were successful in

6   recovering, if your 41 cooperatives were successful in

7   recovering, where would the money go?  Who would get the money?

8        MR. TOUPS:  It would go to the cooperative.  To the

9   president, the treasurer.

10       THE COURT:  One person would get all of the money?  The

11  fishermen wouldn't get anything?

12       MR. TOUPS:  It would go to -- well, it would go to the

13  cooperative itself.  One, to pay any debts or liens or taxes

14  that they may have.  Then, depending on what the charter says,

15  if there is any money left over, there may be a distribution to

16  the members within the cooperative.

17       THE COURT:  All right.  Anything else you want to add

18  on that?

19       MR. TOUPS:  Your Honor, I would also add, and we have

20  this in our briefing, that the only defendants that filed

21  dispositive motions were the BP entities.  There were others --

22  Transocean, Triton, Halliburton -- did not file dispositive

23  motions.

24            Halliburton filed what we believe to be an

25  untimely joinder, and we would argue that those other

1   defendants have waived any dispositive motion against these

2   Mexican entities that all of the lawyers here in this hearing

3   represent and that certainly maritime claims would not be

4   displaced against those nonresponsible parties under OPA.

5         THE COURT:  I need to ask you -- and other plaintiffs'

6   counsel can respond to this question when they get to speak --

7   tell me something about where were these Mexican fishermen,

8   11,000 or however many there were in your case, where did they

9   fish?  In U.S. waters or Mexican waters?

10        MR. TOUPS:  They fished in Mexican waters, Your Honor.

11   That's mine.  I'm not speaking for anyone else.

12        THE COURT:  I know there were claims by three Mexican

13   states, which ultimately the Court found they couldn't bring a

14   claim under OPA and couldn't satisfy *Robins Dry Dock* by not

15   having sufficient proprietary interest in any property damaged

16   by the oil spill.  I know that BP, at least, contends that no

17   oil ever got anywhere close to Mexican waters or shorelines.

18          What I'm trying to figure out is do your clients

19   contend they were prohibited from fishing for some period of

20   time and why, if so?

21        MR. TOUPS:  Yes, Your Honor.  Two things:  We submitted

22   an expert report timely under one of your pretrial orders with

23   regard to an expert report that shows that there is damage and

24   that there was oil in the Mexican easy waters.

25          Two things happened to these fishermen:  The

*OFFICIAL TRANSCRIPT*

1    amount of certain species of fish -- this is one ecosystem, the

2    entire Gulf of Mexico.  If you do something in the northern

3    Gulf, it doesn't mean that it doesn't affect the southern Gulf

4    of Mexico.  It did affect the southern Gulf of Mexico.

5              What happened is a number of species, different

6    fish went down in numbers.  The amount of catch per cooperative

7    was down as much as 40 or 50 percent over a period of three or

8    four years.

9              Then, some of these cooperatives had to

10    completely close down because there was not enough fish for all

11    of the number of cooperatives within Mexico for the competition

12    that was out there in the Mexican waters.

13         THE COURT:  Were any of the Mexican fisheries, the

14    waters, I mean, where they fished, I'm assuming they need some

15    sort of permits or something from the Mexican government to

16    fish in certain areas; is that correct?

17         MR. TOUPS:  Yes, sir.  The cooperatives obtained those

18    licenses from the federal government.

19         THE COURT:  So, did the federal government, I'm talking

20    about the Mexican federal government, obviously, shut down some

21    of the areas and say you can't -- I know that happened in the

22    U.S. waters in the Gulf.  There was some period of time where

23    the fishing was shut down in certain areas of the Gulf of

24    Mexico in the United States.  Did that occur in Mexico or not?

25         MR. TOUPS:  I don't know for a fact, Your Honor, but

*OFFICIAL TRANSCRIPT*

1   what I do know is because of the way that the fishing industry,

2   commercial fishing industry is set up in Mexico, the federal

3   government likes these cooperatives because they contract

4   everything that's occurring, and the government has kept

5   records on the amount of catches that have taken place since

6   the *Deepwater Horizon* incident, and those records show that the

7   amount of species, certain fish have gone down over a period of

8   years.

9           THE COURT:  So, let me ask you this:  If your clients

10  can't meet the foreign claimant requirements of OPA to have an

11  OPA claim, let's assume for the sake of argument right now that

12  I agree that OPA does not totally displace general maritime

13  law, they would still have to deal with *Robins Dry Dock*,

14  correct?

15          MR. TOUPS:  That's correct, Your Honor.

16          THE COURT:  So, if your clients are the cooperatives

17  and not the fishermen, which is what I hear you saying, how do

18  you comply with *Robins Dry Dock*?

19          MR. TOUPS:  Because the cooperatives own the boats that

20  go out into the water that do the fishing.

21          THE COURT:  Yeah, but they have to have physical damage

22  to a proprietary interest.  What's the physical damage?

23          MR. TOUPS:  Well, the physical damage is that they were

24  not to catch the fish because the fish were affected and

25  destroyed for a certain extent for a number of years.

                                    ***OFFICIAL TRANSCRIPT***

1          THE COURT:  Well, that may be true for the fishermen,

2     but I'm not sure that's true for the cooperatives.  The

3     cooperatives are not the fishermen, that's what you keep

4     telling me, and they have their own separate claims, you said.

5          MR. TOUPS:  Yes.

6          THE COURT:  But it would be like commercial

7     fishermen -- and by the way, we're talking about commercial

8     fishermen as that's been a recognized exception to the

9     *Robins Dry Dock* physical damage requirement; although, I have

10    to say, the Fifth Circuit has never actually said that, a

11    couple of other circuits have, and several district courts,

12    including the old *TESTBANK* case from this court, Judge Beer in

13    this court many years ago, he held that commercial fishing was

14    in a unique situation.  He recognized that they would be an

15    exception to the physical.  Even though the fishermen don't own

16    the fish until they are caught, obviously, don't own water, so

17    they have no damage to any proprietary interest of theirs,

18    physical damage, that is; nonetheless, he recognized this

19    so-called *commercial fishermen exception*.  That case went to

20    the circuit, the *TESTBANK* case, but that issue didn't to go the

21    circuit.

22          So, the point is there is still some open

23    question as to the extent of this commercial fishermen

24    exception, but it's pretty clear, I think, that it doesn't

25    apply to, like, people that buy the fish at the dock, seafood

**OFFICIAL TRANSCRIPT**

1    dealers, seafood processors, a lot of other entities or

2    businesses that are connected to fishing, but they are not the

3    commercial fishermen themselves; so, it seems to me these

4    cooperatives, these 41 cooperatives that you represent are more

5    akin to those entities rather than being a commercial

6    fishermen.

7         MR. TOUPS:  I disagree, Your Honor.  My 41 are

8    different than maybe some of the other cooperatives that have

9    filed suit.

10         THE COURT:  Well, you started off your argument,

11    Mr. Toups, by telling me they were exactly like all the other

12    cooperatives.  Now you're saying they're different.

13         MR. TOUPS:  No, the commercial fishing cooperatives are

14    all identical.  All 41 that I represent are nothing but

15    commercial fishermen.  They are not dock workers or other

16    workers on the dock doing other things.  That's what I mean.

17         THE COURT:  I understand that, but it's not the

18    fishermen themselves.  That's how you're trying to get around

19    PTO 60 by saying you're bringing a claim for the cooperatives

20    and not for the fishermen, right?

21         MR. TOUPS:  No, Your Honor.

22         THE COURT:  It's got to be one or the other.

23         MR. TOUPS:  The cooperative owns the license, owns the

24    boats, and are the ones that go out.  The members are more like

25    employees of the cooperative; and so, the cooperative owns the

*OFFICIAL TRANSCRIPT*

1   fishing licenses from the federal government, the one that owns

2   the boats and does the fishing.  My belief is it does satisfy

3   *Robins Dry Dock*, those particular 41.

4   THE COURT:  Okay.  I understand your argument.  Okay.

5   Anything else, Mr. Toups?

6   MR. TOUPS:  No, Your Honor.

7   THE COURT:  Okay.  Who wants to go next?  Ms. Adams?

8   MS. ADAMS:  Your Honor, this is -- yes, Your Honor.

9   THE COURT:  Let me just say that a lot of the arguments

10   that the three firms made were identical.  In fact, Mr. Toups,

11   I think you copied and of pasted Mr. Kuykendall's memo; so, I

12   should have started with him, I guess, instead of you, but go

13   ahead, Ms. Adams.  You did do your own memo, at least.

14   MS ADAMS:  Thank you, Your Honor.

15   MR. AMEY:  Your Honor, Your Honor, this is Greg Amey on

16   behalf of the Kuykendall group of clients.  You're right, they

17   are substantially similar arguments, so to avoid duplicating

18   efforts here, I don't think that we have very much to add at

19   this point; so, I just wanted to say that at this point.

20   THE COURT:  Okay.  Thank you for that.

21   Okay.  Ms. Adams.

22   MS. ADAMS:  Your Honor, the same is here I don't want

23   to just duplicate what Mr. Toups eloquently said.  I will say I

24   am the one who found the NAAEC and circulated that; so, I think

25   it's the best argument.

**OFFICIAL TRANSCRIPT**

1          I think it's important to remember that the OPA

2    expands coverage.  I think it does specifically provide for

3    foreign claimants, and I think it's important for defender OPA

4    to look at the savings provision, which expressly says -- and I

5    can pull up any of this to look at -- but that the act does not

6    affect admiralty or maritime law; so, I thought the 17

7    individual fishermen, as well as its offices, and I do think

8    that all of my 67 do have claims under general maritime and

9    OPA, and I'm happy to address anything specifically, but I

10   think Article 6 of the NAAEC is explanatory --

11   self-explanatory, really, and provides coverage here for my

12   clients.

13        THE COURT:  Let me ask you this:  I don't know if

14   you've looked at this.  None of the parties, neither BP nor

15   plaintiffs, cited to or spoke to another statute.  This is part

16   of the original NAFTA.

17          Somebody has a barking dog.  Can you silence your

18   dog or silence yourself.

19          There is a statute at 19 USC § 3312(c),

20   19 USC § 3312 (c).  As I said, it's part of the recently

21   repealed NAFTA Act.  That section says, quote, "No person other

22   than the United States shall have any cause of action or

23   defense under the NAAEC on a challenge on any action brought

24   under any provision of law or any action or inaction by any

25   department or agency or an instrumentality," etcetera,

*OFFICIAL TRANSCRIPT*

1    etcetera.

2              I just wonder if anybody had noted that statute

3    and whether it may be relevant to what we're talking about here

4    with respect to the rights or not under this NAAEC?

5              I guess I'm posing that to you first, Ms. Adams.

6         MS. ADAMS:  I'm sorry, Your Honor, that was my dog; so,

7    I had to take care of that.

8              I have not and, so, it was 19, is it CFR subpart

9    33?  Is that what you said, Your Honor?

10        THE COURT:  Let me see.  Let me get the exact -- I

11   think it's -- I have it right here.  It's Title 19 of

12   United States Code, Section 3312(c).  Subpart (c) is entitled

13   *Effect of Agreement* -- now, remember, they are talking about

14   that NAFTA and that NAAEC -- *Effect of Agreement with Respect*

15   *to Private Remedies*.  That's the section I'm talking about.

16        MS. ADAMS:  And, Your Honor, I would need to look at

17   that because I have not -- that was not pointed out or

18   addressed.

19        THE COURT:  Okay.  All right.  I didn't mean to

20   interrupt you, Ms. Adams.  Is there anything else you would

21   like to add other than agreeing with Mr. Toups?

22        MS. ADAMS:  No, Your Honor.  Our fishermen, some of

23   them did tell us that they found oil on their fish.  So, that

24   is an issue that I think needs to be addressed as well.

25        THE COURT:  Were they also fishing in Mexican waters, I

*OFFICIAL TRANSCRIPT*

1    assume?

2         MS. ADAMS:  Yes, Your Honor, they were.

3         THE COURT:  Okay.  All right.

4         MS. ADAMS:  As Your Honor, knows --

5         THE COURT:  Go ahead.  Go ahead.

6         MS. ADAMS:  Well, there was oil found in Galveston as

7    well; so, some of it did drift west.

8         THE COURT:  Galveston is how far from the Mexican

9    waters?  You would know more than me, but Galveston is on the

10   east side of Texas, isn't it?

11        MS. ADAMS:  Yes, it is, Your Honor.

12        THE COURT:  So, I don't know.

13             Anyway, another question I wanted to ask counsel

14   for plaintiffs is none of you seem to confront the two most

15   recent Fifth Circuit cases.  I know you all cite to my earlier

16   ruling on the so-called *B1 order* from 2011, I think it was,

17   where I held that, in circumstances that I was dealing with at

18   the time, that OPA did not totally displace general maritime

19   law, but after this court rendered that decision, the

20   Fifth Circuit issued two decisions concerning OPA's

21   displacement of general maritime law.  One is the *United States*

22   *versus American Commercial Lines*, usually referred to as the

23   *ACL* case from 2014, and the *In re: Settoon Towing*, a

24   Fifth Circuit case from 2017.

25             Although neither case addressed the specific

**OFFICIAL TRANSCRIPT**

1    issue involved in this case, the language used by the

2    Fifth Circuit and the reasoning seemed to be pretty broad and

3    may well cast doubt on the correctness of this Court's prior

4    decision; so, I wanted to see if anybody had a comment on that.

5              Plaintiffs' counsel?

6              MR. TOUPS:  No, Your Honor.  I'm not familiar with the

7    general language that you're referring to.

8              MS. ADAMS:  *ACL*, as you noted, I mean, it applies to

9    the removal costs, which is very different than having a

10   maritime cause of action or recovery of damages under the OPA.

11             THE COURT:  Well, I said that the specific issue was

12   different; however, with respect to OPA's displacement of

13   general maritime law, that court, the Fifth Circuit said, it

14   talked about when once Congress enacts a comprehensive scheme

15   with respect to certain types of cases or structures certain

16   remedies, it suggests that Congress intends the statutory

17   remedies to be exclusive and displace any preexisting,

18   previously recognized common law or general maritime law,

19   judge-made common general maritime law.  There is no question

20   that OPA did displace parts of general maritime law.

21             For example, it displaced *Robins Dry Dock*.  If

22   you have a claim under OPA, you're not subject to the

23   *Robins Dry Dock* obstacle.  It also displaced

24   The Limitation Act, the vessel, the admiralty Limitation Act;

25   so, these claims under OPA are not subject to limitation.

**OFFICIAL TRANSCRIPT**

1          So, the question is:  What is meant by and import

2    the Court should give to that so-called *admiralty savings*

3    *clause*?  Does anybody want to comment on that?

4          MR. TOUPS:  Your Honor, what I argued in the brief was

5    that the general maritime claims may be dismissed against BP,

6    but we have the OPA claims against the BP entities, but they

7    are not displaced against the other defendants that are not

8    designated as *responsible parties;* and, of course, we have the

9    *Robins Dry Dock* with regards to those.

10         THE COURT:  The only party involved here that was not

11   designated as a possible party was Halliburton.  Transocean,

12   actually, was designated a responsible party along with BP.

13         Let me get back for a second to Mr. Regan.  If

14   you are right, Mr. Regan, if BP is right on its argument that

15   OPA totally displaces general maritime law and that the savings

16   clause does not save these claims, what purpose would it serve?

17   It would seem to be rather superfluous, wouldn't it?

18         MR. REGAN:  Well, I think, Your Honor, as is written by

19   the Fifth Circuit in the *ACL* case, the savings clause is there

20   for things that are not otherwise explicitly addressed, and

21   that was the language that the Fifth Circuit used to say, "If

22   we find express language in OPA on a topic, then the savings

23   clause cannot undo that express language."  So, it was there as

24   a gap filler for true gaps.

25         As in *ACL*, as is this case, where OPA could not

*OFFICIAL TRANSCRIPT*

1    be more explicit about how it wants to handle foreign claims

2    recovery, and it has a section directly on it and it's exactly

3    analogous to the way the Fifth Circuit analyzed that question

4    in *ACL*, both questions that Your Honor has put, the first is

5    how to read OPA generally but the second is where you just

6    worded does the savings clause essentially become the catch-all

7    that undoes the specific requirements?

8              I just -- I've got it here, but, I think, as

9    Your Honor has prefaced, has it as well, the Court addressed

10   its all fours, and that said, "If there's specific language."

11   That's really the point here.  There is very specific language

12   in OPA; so, the displacement here of maritime law is also

13   narrow.  It's not a displacement of all maritime law for all

14   types of claims in all circumstances.

15             THE COURT:  Give me an example, if you can, of a type

16   of maritime claim that would be saved by the savings clause.

17             MR. REGAN:  Well, I think a U.S. commercial fisherman

18   claim would probably be one that, you know, if a U.S.

19   commercial fisherman were to bring a claim, they would be able

20   to navigate both having a maritime law claim and not being

21   barred by *Robins Dry Dock*.  That's the one comes immediately to

22   mind.

23             THE COURT:  Yeah, but that's saved by the express

24   language in OPA, as I recall.  There is language --

25             MR. REGAN:  It may very well be, yes.

**OFFICIAL TRANSCRIPT**

1       THE COURT:  -- or maybe it was in the conference report

2   or something.  Maybe it was the report when Congress passed OPA

3   where they used that as an example of something that's not --

4   yeah, it's a part of -- thanks -- it's a part of OPA which

5   basically says you don't have to own, have a proprietary

6   interest in the property that was injured or destroyed in order

7   to bring a claim under OPA; i.e., it basically recognized the

8   commercial fishermen exception that we have been talking about,

9   but it recognized more than that has been held, and that's why

10  people, unlike in the *Exxon Valdez* case, once OPA was passed,

11  hotels, restaurants, bars, and all sorts of entities, as we

12  know, were able to make claims without complying with

13  *Robins Dry Dock*.  So, I'm trying to envision some type of

14  maritime claim.

15       My point is:  You didn't need the savings clause

16  to do that because that's in the statute itself.  So, what

17  would be saved?  I'm having trouble coming up with something

18  that would be saved by this savings clause.  If not -- go

19  ahead.

20       MR. REGAN:  I think that's exactly the point, which is

21  that the savings clause is there for things that were

22  unanticipated compared to the express terms that were very

23  anticipated.  I think that's what the Fifth Circuit is saying.

24       The problem is less of can we think of that

25  example that no one could really imagine at the time.  The

**OFFICIAL TRANSCRIPT**

1   issue is the opposite, and that's what the Fifth Circuit is

2   saying in *ACL*.  It cannot be the case that if you have a,

3   quote, "savings clause," which is there for exceptional

4   purposes, that clause undoes the very explicit language of the

5   statute because, otherwise, then there is no point in having

6   it.

7           So, I don't have a better narrow example for you

8   right at the top of my mind, but I actually think that may be

9   the issue, Your Honor, that OPA was very specific in a lot of

10  places, but for today's purposes it was very specific about

11  foreign claimants.

12          To interpret the savings clause to say, well,

13  notwithstanding all of these words about recovery by foreign

14  claimants titled sections, we actually think, no, you can have

15  it -- you can have it through the savings clause.

16          That's what *ACL* was arguing to the Fifth Circuit

17  was their issue, and the Fifth Circuit, using fundamental

18  statutory interpretation and just, you know -- you know,

19  fundamental ways of looking at this thing, it can't be the

20  case.

21          As they said, to interpret it as -- as *ACL*

22  proposed would be to supersede OPA, and courts cannot without

23  textual warranty expand the operation of the savings clause to

24  modify the scope of displacement under OPA.  I think the

25  Fifth Circuit did address this.

                        ***OFFICIAL TRANSCRIPT***

```
 1              If I could just turn to a couple of the other
 2    points, Your Honor, unless there are further questions on that.
 3              THE COURT:  No, go ahead.
 4              Let me ask, did plaintiffs' counsel have anything
 5    else to add?
 6              MR. TOUPS:  Not here, Your Honor.
 7              MS. ADAMS:  No, Your Honor.
 8              THE COURT:  Okay.  Mr. Regan, I have got to wrap up in
 9    just about two minutes because I've got an en banc meeting at
10    eleven o'clock, so, okay.
11              MR. REGAN:  Very well.  Your Honor, you pointed to
12    19 U.S.C. § 3312(c), which reinforces that this private right
13    of action paragraph 6 does not actually provide a private right
14    of action under that treaty.  This reinforces our argument that
15    that treaty does not expand any rights or rule of law, which is
16    what is required under OPA.  There needs to be something that's
17    bringing OPA to foreign claimants.  That treaty does not do it.
18    All it's doing is reinforcing existing rights, and what you
19    cited is a further reinforcement to that.  No one can sue and
20    say, "Well, wait a second, this treaty did bring these new
21    rights."  It did nothing like that.
22              Then, lastly, so, I think it's a circular
23    argument to say, "Well, this says you have rights under the
24    law," because they say, "Well, that's expanding the right."
25    Those cannot be consistent.
```

**OFFICIAL TRANSCRIPT**

1          Then, finally, with respect to the pecuniary

2     interest issues with the cooperative person, the individuals,

3     first of all, the interest that's being alleged is a generic

4     one -- Gulf of Mexico, southern Gulf of Mexico.  It's not

5     specific.  It doesn't reach to the level of specificity of

6     damage that's required under *Robins Dry Dock*.

7          Lastly, I would finish with this, Your Honor:  If

8     it were true, as argued by plaintiffs' counsel, that actually

9     they don't need to sue by the individual fishermen, they just

10    can sue as a cooperative, we would have never seen the

11    individual fishermen in the first instance.

12         The progress of what we have here is all these

13    claims by individual fishermen which the Court was not allowing

14    under pretrial orders were then converted into 41 claims for

15    cooperatives to comply with Your Honor's order, and now it's

16    trying to be flipped back.  If it were the case that that was

17    unnecessary, nobody would have taken those steps.

18         So, with that, Your Honor, and I'm mindful of

19    your time, those would be my comments on what you heard from

20    plaintiffs' counsel.

21         THE COURT:  All right.

22         MR. TOUPS:  Can I ask ten seconds?

23         THE COURT:  Go ahead.

24         MR. TOUPS:  That last statement by Mr. Regan is not

25    exactly accurate.  Most, I think, all of these cooperatives

*OFFICIAL TRANSCRIPT*

1   have been claimants all along.  There are other plaintiffs that

2   have disappeared over time, including the class actions.  My

3   cooperatives have always been plaintiffs along with other

4   fishermen.

5           THE COURT:  Okay.  All right.  Thank you, Counsel.

6   We'll take this under advisement and issue a ruling as soon as

7   we are able to.

8               Okay.  Thank you.  Have a good day.

9           MR. REGAN:  Thank you, Your Honor.

10          MS. ADAMS:  Thank you, Your Honor.

11          MR. TOUPS:  Thank you, Your Honor.

12          (WHEREUPON, at 10:55 a.m., the proceedings were

13  concluded.)

14                          *   *   *

15

16                     REPORTER'S CERTIFICATE

17

18          I, Cathy Pepper, Certified Realtime Reporter, Registered
    Merit Reporter, Certified Court Reporter in and for the State
19  of Louisiana, Official Court Reporter for the United States
    District Court, Eastern District of Louisiana, do hereby
20  certify that the foregoing is a true and correct transcript to
    the best of my ability and understanding from the record of the
21  proceedings in the above-entitled and numbered matter.

22                              *s/Cathy Pepper*
                                Cathy Pepper, CRR, RMR, CCR
23                              Certified Realtime Reporter
                                Registered Merit Reporter
24                              Official Court Reporter
                                United States District Court
25                              Cathy_Pepper@laed.uscourts.gov

                        ***OFFICIAL  TRANSCRIPT***