1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4    IN RE:  OIL SPILL BY THE OIL RIG   *   10-MD-2179
             *DEEPWATER HORIZON* IN THE  *
5            GULF OF MEXICO ON           *
             APRIL 20, 2010              *   Section J(2)
6                                        *
                                         *
7    Related to:                         *   September 23, 2020
     All Cases in the B3 Bundle          *
8                                        *
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

9

10
                      STATUS CONFERENCE BEFORE
11               THE HONORABLE CARL J. BARBIER
                   UNITED STATES DISTRICT JUDGE
12

13
     Appearances:
14

15   For the Plaintiffs:            Nexsen Pruet, LLC
                                    BY:   PAUL A. DOMINICK, ESQ.
16                                  205 King Street, Suite 400
                                    Post Office Box 486
17                                  Charleston, South Carolina 29402

18
     For the Plaintiffs:            Johnson Rahman & Thomas
19                                  BY:  DAVID K. JOHNSON, ESQ.
                                    2237 S. Acadian Thruway
20                                  Post Office Box 98001
                                    Baton Rouge, Louisiana 70898
21

22   For the Plaintiffs:            FRANK J. D'AMICO JR., ESQ.
                                    4608 Rye Street
23                                  Metairie, Louisiana 70006

24

25

1   <u>Appearances</u>:

2

3   For the Plaintiffs:          Falcon Law Firm
                                 BY:  TIMOTHY J. FALCON, ESQ.
                                 5044 Lapalco Boulevard
4                                Marrero, Louisiana 70072

5
    For the Plaintiffs:          Herman Herman & Katz, LLC
6                                BY:  SOREN E. GISLESON, ESQ.
                                 820 O'Keefe Avenue
7                                New Orleans, Louisiana 70113

8
    For the Plaintiffs:          Downs Law Group, PA
9                                BY:  C. DAVID DURKEE, ESQ.
                                 3250 Mary Street, Suite 307
10                               Coconut Grove, Florida  33133

11
    For the Defendants:          Liskow & Lewis, APLC
12                               BY:  R. KEITH JARRETT, ESQ.
                                 701 Poydras Street, Suite 5000
13                               New Orleans, Louisiana 70139

14
    For the Defendants:          Kirkland & Ellis, LLP
15                               BY:  MATTHEW T. REGAN, ESQ.
                                     A. KATRINE JAKOLA, ESQ.
16                               300 North LaSalle
                                 Chicago, Illinois 60654
17

18  Official Court Reporter:     Toni Doyle Tusa, CCR, FCRR
                                 500 Poydras Street, Room B-275
19                               New Orleans, Louisiana 70130
                                 (504) 589-7778
20

21

22
    Proceedings recorded by mechanical stenography using
23  computer-aided transcription software.

24

25

1                                **<ins>INDEX</ins>**

2                                                              <ins>Page</ins>

3    **Rule to Show Cause Re: PTO 68**                          4

4          A. Katrine Jakola, Esq.                              6

5          Paul A. Dominick, Esq.                              11

6          A. Katrine Jakola, Esq.                             14

7          David K. Johnson, Esq.                              18

8          A. Katrine Jakola, Esq.                             19

9          David K. Johnson, Esq.                              20

10         A. Katrine Jakola, Esq.                             20

11         Frank J. D'Amico Jr., Esq.                          24

12         A. Katrine Jakola, Esq.                             28

13         Frank J. D'Amico Jr., Esq.                          29

14         A. Katrine Jakola, Esq.                             32

15

16   **Future Case Management for B3 Bundle**                 33

17         Timothy J. Falcon, Esq.                             35

18         R. Keith Jarrett, Esq.                              37

19         Timothy J. Falcon, Esq.                             40

20         Soren E. Gisleson, Esq.                             42

21         C. David Durkee, Esq.                               45

22         A. Katrine Jakola, Esq.                             50

23

24

25

**PROCEEDINGS**

**(September 23, 2020)**

1   
2   
3         **THE COURT:**  Good morning everyone.  Hopefully
4   everyone is on who needs to be on.  We will proceed.
5              Gail, you can call the case.
6         **THE DEPUTY CLERK:**  Civil Action 10-MD-2179,
7   *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of*
8   *Mexico on April 20, 2010.*
9         **THE COURT:**  We have a few things to discuss.  First
10  we are going to talk about the rule to show cause regarding
11  compliance or lack of compliance with Pretrial Order 68.  I'm
12  not sure who is going to speak first on that.
13        **MR. JOHNSON:**  Your Honor, I can for LWCC.
14        **THE COURT:**  Okay.  I was going to start with someone
15  from BP, actually, since it's their motion, in effect.
16             Before we do that, let me just say, as I
17  appreciate it, PTO 68 basically imposed three requirements on
18  B3 plaintiffs: first, produce medical records; secondly,
19  complete a two-page, two-question supplemental medical
20  disclosure form, which could be signed by the attorney on
21  behalf of the client; and the third requirement was to sign the
22  authorization for release of medical records and medical
23  information.
24             The plaintiffs initially had 90 days or until
25  January 21, 2020, to comply with PTO 68.  Many plaintiffs

09:43

1 requested an extension, and these extensions were granted up to

2 February 20 to comply.  Once these deadlines had passed, BP

3 initially believed that 391 plaintiffs had failed to comply

4 with PTO 68.  The Court encouraged the parties to meet and

5 confer to see if they could resolve a lot of these alleged

6 noncompliance issues.  The parties ultimately resolved 292 of

7 the 391 and, therefore, in April 2020 BP filed a status report

8 indicating that in its view there remained 99 B3 plaintiffs who

9 were still noncompliant.

10    After receiving this status report, the Court

11 issued an order to show cause regarding compliance with PTO 68,

12 and in that order the Court deemed 8 of the 99 plaintiffs

13 listed in BP's status report to be compliant.  However, the

14 Court ordered the remaining 91 plaintiffs to show cause in

15 writing by May 18 why their claims should not be dismissed for

16 failing to comply with PTO 68.  Of course, the Court received

17 several responses to the show cause order and a reply from BP.

18    On September 8, 2020, the Court issued its

19 PTO 68 compliance order which ruled on 48 of the 91 plaintiffs

20 listed in the show cause order.  The Court deferred ruling on

21 the other 43 plaintiffs and stated it would address those 43

22 plaintiffs today, so that's why we are here.

23    So with that said, does anyone want to speak

24 first for BP before I hear from the plaintiffs or their

25 attorneys?

09:46

1          MS. JAKOLA:  Yes, Your Honor.  This is Katie Jakola
2     for BP.
3          THE COURT:  Good morning.
4          MS. JAKOLA:  Can you hear me okay, Your Honor?
5          THE COURT:  I can hear you perfectly.  Go ahead.
6          MS. JAKOLA:  Good morning, Your Honor.
7          THE COURT:  Good morning.
8          MS. JAKOLA:  Your Honor is correct.  With respect to
9     the 43 plaintiffs for whom Your Honor has reserved judgment,
10    those 43 plaintiffs can really be divided into three main
11    buckets, as I think about it, and I will offer that up to
12    Your Honor just as a construct to walk through them today.
13         THE COURT:  Okay.
14         MS. JAKOLA:  The first bucket, Your Honor, are the
15    35 plaintiffs who are listed in BP's Appendix 6.  Those are
16    plaintiffs who did file show cause responses in response to
17    Your Honor's order but whom BP submits remain noncompliant with
18    PTO 68.  That's the first category, the largest group.
19              The second category are the seven plaintiffs
20    represented by the D'Amico law firm who are listed on
21    Appendix 7, Your Honor, and those submissions raise some
22    serious concerns that we believe warrant some further
23    consideration of the Court as it relates to their compliance
24    with both PTO 66 and PTO 68.  Your Honor, I would also note
25    that these are the same folks who were previously found to be

09:47

1   noncompliant with PTO 63, who then were given another chance,

2   if you will, by the Fifth Circuit.  So that's the second

3   category and now they are back before Your Honor.

4            The final category is really one plaintiff by

5   itself, which is represented -- I believe we heard earlier from

6   Mr. Johnson.  This is the Louisiana Workers' Compensation

7   Corporation.  That plaintiff is a little different than some of

8   the others in some ways and so warrants a separate discussion,

9   Your Honor.

10           So if it pleases Your Honor, I can start briefly

11  by giving an overview of each of the three categories.

12           **THE COURT:**  Okay.  Go ahead.

13           **MS. JAKOLA:**  Okay.  Thank you, Your Honor.  With

14  respect to the plaintiffs in Appendix 6 to BP's show cause

15  reply brief, Your Honor, these plaintiffs, despite having

16  seven months and multiple opportunities to do so, have still

17  failed to comply with the basic disclosure requirements in

18  PTO 68.  Your Honor already summarized those requirements, but

19  just to reiterate, PTO 68 requires the submission of a two-page

20  medical disclosure form that really had two questions, both of

21  which were designed, as Your Honor will recall, to provide

22  greater specificity and really in some cases just some basic

23  information about fundamental issues about the claims being

24  brought against BP.  This includes disclosure of the specific

25  conditions that these plaintiffs claim were caused by the

09:49

1    *Deepwater Horizon* spill and the dates that they were diagnosed

2    for those conditions as well as their medical provider.

3                The plaintiffs listed in Appendix 6 despite, as

4    I mentioned, having multiple opportunities both provided by

5    this Court and despite multiple attempts to meet-and-confer

6    discussion by BP, have still not provided this information.

7    The plaintiffs in that appendix have demonstrated a clear

8    record of delay and contumacious conduct, and as a result BP

9    respectfully submits that at this juncture their claims should

10   be dismissed with prejudice for noncompliance with PTO 68.

11               **THE COURT:**  So give me an example of the alleged

12   noncompliance in that category.

13               **MS. JAKOLA:**  Yes, Your Honor.  We can do that.  If it

14   pleases the Court, we do have -- because I think it might be

15   helpful if we look at some of the submissions to call up onto

16   the Zoom an example, your Honor, I can talk through it.

17               The first example I would like to point to is

18   Mr. Pickett.  Your Honor, this is, for the record, case number

19   17-CV-4482.  He is a B3 plaintiff represented by Nexsen Pruet.

20               Matt, if we can go ahead and put up Slide 2 with

21   Mr. Pickett's submission.

22               For everyone, this is Mr. Pickett's PTO 66

23   submission.  We have excerpted sections of it onto the slide so

24   that everyone can see it.

25               Your Honor, are you able to see the screen?

09:51

1        **THE COURT:**  Yes.

2        **MS. JAKOLA:**  Thank you, Your Honor.

3            What's being shown on the screen, Your Honor, is

4   Mr. Pickett's PTO 66 submission.  As you can see, Mr. Pickett

5   identifies in his submission various symptoms, as he describes

6   it, up at the top of his submission.

7            Just as background and as Your Honor knows,

8   PTO 66 also required the plaintiffs to identify the conditions

9   and the medical providers who treated them for the conditions

10  that they alleged were caused from the spill response.  This

11  was Mr. Pickett's response to PTO 66, which he submitted back

12  in May of 2018.

13           Mr. Pickett, in response to PTO 66, submitted

14  under oath that the conditions listed at the top were the

15  conditions that were caused by the spill, and he identified two

16  medical providers in particular, Dr. Wigginton and

17  Dr. Williamson, who treated him for those conditions.  You can

18  see that he is also indicating that the records are being

19  ordered there on the left.

20           If we can go to the next slide and look at what

21  we received in response to Mr. Pickett's PTO 68 submission in

22  February of 2020, Mr. Pickett identifies new and different

23  conditions -- you can see those listed on the left -- from what

24  was described in his PTO 66 form.  He identifies no medical

25  providers who treated him for any of the conditions he

09:52

1    identified in response to Question 1 of the form, which is
2    shown here.  He indicates that he did not seek treatment for
3    any of these conditions.  He then submitted it to us, and he
4    does not provide any information about dates of treatment or
5    dates of first diagnosis.  I should say, Your Honor, this was
6    submitted under a signed attorney verification by the Nexsen
7    Pruet firm.

8              BP met and conferred with Nexsen Pruet about
9    Mr. Pickett's submission and many of the other submissions.
10   Then if we can go to what we received next, we received a
11   second PTO 68 submission form from Mr. Pickett, this one in
12   April of 2020, and again Mr. Pickett reiterates that he did not
13   seek treatment for any of the disclosed conditions.  The date
14   of treatment and date of diagnosis, we now see that he is
15   saying he did not seek treatment.  In response to Question 2 on
16   this form, we see a disclosure of Singing River Health System
17   and that counsel is awaiting records.

18             So we see a disclosure of a new medical provider
19   that was not identified in response to PTO 66 and a statement
20   that the counsel is awaiting medical records.  This was
21   puzzling to us because he has indicated in the very same form
22   that he has not actually received any treatment for any of the
23   conditions he is claiming were a result of the spill.  So it
24   looks internally inconsistent as well as inconsistent with the
25   prior submission.

1           We met and conferred again with the Nexsen Pruet

2    firm about Mr. Pickett and other plaintiffs, and if we can see

3    what we received next by going to the next slide.  We then

4    received a second amended, so this is now the third PTO 68

5    submission we received from the Nexsen Pruet firm in May of

6    2020.  We now see that Mr. Pickett is stating that he does not

7    recall whether he was treated for any of the conditions

8    identified in PTO 68.  He again says that he is awaiting

9    medical records.  He still does not identify either of the

10   doctors that were originally identified in response to PTO 66

11   in this form either.

12           **THE COURT:**  Let me stop you there.  We looked at all

13   of these.  I had to apologize to my law clerk, Ben, to make him

14   go through all this tedious stuff.  Mr. Pickett is not the only

15   one that's in the same general category of issues, correct?

16           **MS. JAKOLA:**  That is correct, Your Honor.

17           **THE COURT:**  There are a number of other people.  I'm

18   looking at a Mr. Moore, a Ms. Richardson, a White, a Yen Do,

19   Stallworth, Roberts, Pickett, and Porter, who all have similar

20   issues where it's hard to make sense of what they are saying,

21   frankly.  All of these are Nexsen Pruet clients, apparently.

22   The ones I just named I think are all Nexsen Pruet clients.

23           Who is here for Nexsen Pruet?

24           **MR. DOMINICK:**  Paul Dominick, Your Honor.  Can you

25   hear me?

09:56

1          **THE COURT:**  Mr. Dominick, I can hear you.  Thank you.

2     This is a mess, and I don't know how anyone can make sense of

3     this.

4          **MR. DOMINICK:**  Well, Your Honor, some of the

5     inconsistency in this is essentially that clients from, you

6     know, eight, nine, ten years ago, they can't remember the exact

7     time they would have sought medical treatment.  We had

8     discussed some of this was inconsistent when starting out.  On

9     some of them we put not applicable and tried to explain in the

10    meet-and-confer that when that was done, it was because the

11    client couldn't recall the exact dates.

12          From the original PTO 68 submission, Singing

13    River Health System is listed as a treating facility from where

14    the client was still receiving treatment, but we did not have

15    the medical records.  It's my understanding under PTO 68 we are

16    supposed to produce whatever medical records were in our

17    possession or the client's possession.  At that time we did not

18    have those records.  I think that was part of the purpose of us

19    signing a medical release form so that BP -- you know, they are

20    certainly free to get the records from Singing River now that

21    they had the medical release form.

22          The fact is, Your Honor, this client and our

23    other clients, we produced the medical records we had.  We

24    produced the second category, which were any tests or treatment

25    or that kind of thing.  We produced over 200,000 documents to

09:58

1  BP for our clients.  We answered the questions in PTO 68 and we

2  signed a medical release form.  So all of these clients that we

3  are talking about checked every box.  It's just that BP didn't

4  like, you know, some of the responses.

5          Now, to the extent there's an inconsistency, you

6  know, I would say that's fair game for cross-examination or

7  deposition or whatever, but it certainly doesn't rise to the

8  level of contumacious conduct that would dismiss a client's

9  case who has met every requirement of this Court for years,

10 Your Honor.

11         THE COURT:  Well, the problem is, though -- and we

12 are using Mr. Pickett as an example.  He is not the only one,

13 though.  He first says he had certain symptoms within a week

14 after exposure, but he never sought treatment and was never

15 diagnosed.  Then he says he was still being treated at Singing

16 River Hospital.  I don't even know what to make of that.  Then

17 to later come in with these amended ones, which still say he

18 did not seek treatment and, as I recall, there's one where --

19 he didn't seek treatment, but you're awaiting medical records.

20 What medical records are you awaiting if your client is saying

21 he didn't seek treatment?  That's the kind of stuff that's kind

22 of puzzling.

23         MR. DOMINICK:  Okay.  Well, Your Honor, the way we

24 read the form is that the initial questions were the date of

25 the first symptoms, date first sought treatment, date of first

1    diagnosis, and then the diagnosing doctor and health care

2    provider.  Did you seek treatment initially for that date of

3    first symptoms, we said, you know, did not; but as time went by

4    and time progressed, he did seek medical treatment for

5    problems.

6                    As far as the first diagnosis and the first date

7    of treatment, that kind of thing, he could not remember that

8    information, so we didn't provide, you know, some mythical

9    date.  You know, he told us he couldn't remember.  Then he said

10   he was currently seeking treatment from Singing River Health

11   System, and we have been consistent in that disclosure.

12            **MS. JAKOLA:**  Your Honor, may I respond?

13            **THE COURT:**  Yes.  Go ahead.  We are not going to talk

14   about all of these individually.  I was trying to use this one

15   as an example of the issues we have.  Okay.  Go ahead.

16            **MS. JAKOLA:**  Yes, Your Honor.  We did raise the same

17   questions, Your Honor, with Mr. Dominick.  Specifically, when

18   we see that someone is saying they did not seek treatment in

19   response to Question 1, which is where we are supposed to

20   understand what is the basis of your lawsuit, where do we go to

21   get any records, what is the nature of the claim,

22   Mr. Pickett -- I'll give you an example -- responds that he did

23   not seek treatment.  But at the same time, as Your Honor says,

24   he says in response to Question 2 that he is seeking treatment.

25   The question is:  For what?  For what?  What is he still

10:02

1   seeking treatment for?  If he is still seeking treatment, he
2   should be able to tell us what that is.
3           **THE COURT:**  Well, I will say this, Ms. Jakola.  When
4   I started looking at these questions again, the questions
5   weren't as artfully worded as they could have been.  I will
6   just say that.
7               The first question on the supplemental medical
8   disclosure form asks -- you know, it's like a chart: name the
9   medical condition, the date of first symptoms, first treatment
10  sought, date of diagnosis, and doctor.
11              Then Question 2 says:  Does the medical
12  condition and/or injury persist today?  Yes or no.  If yes,
13  does the B3 plaintiff still receive treatment?  Yes or no.  If
14  yes, from whom?
15              What struck me is if they list multiple
16  conditions in Question 1.  Question 2 doesn't ask which ones
17  are you still being treated for, all of them or one or two or
18  none or what.  The questions could have been more artfully
19  worded.  You know the old saying if you ask a poor question,
20  you are probably going to get a poor answer.  Lawyers are
21  pretty good about giving evasive answers to poor questions, and
22  that may be part of the problem here.
23              Go ahead.  You wanted to say something?
24          **MS. JAKOLA:**  It's a fair point, Your Honor.  We
25  worked with the plaintiffs to come up with those proposed

10:04

1    forms.  Your Honor may remember at the last hearing we did try

2    to make it simple.  It's a fair point, Your Honor.

3             I think the issue you are identifying, though,

4    doesn't explain the responses we are seeing.  We are still

5    seeing "did not seek treatment" in response to every identified

6    condition in response to Question 1.  If that's the case, then

7    what medical records are we waiting for if you did not seek

8    treatment?  It's just kind of all over the place, and we have

9    tried repeatedly to try to get answers on that and have not

10   been able to.

11        THE COURT:  Well, I will tell you how I interpret

12   this, for whatever it's worth.  I'm interpreting this type of

13   response as saying someone claims they had symptoms soon after

14   the alleged exposure.  They never went to a doctor, never

15   sought treatment, but more recently they have gone to a doctor

16   or a hospital for some medical condition that they allege

17   persists, but we don't know which condition that is because the

18   form doesn't ask them to identify it.  That's where we are with

19   this.

20             Okay.  You want to talk about some other issues,

21   Ms. Jakola?

22        MS. JAKOLA:  Yes, Your Honor, I can talk about some

23   other issues in Appendix 6.  Your Honor, just one more point on

24   this is that we do see hundreds of plaintiffs, including

25   hundreds of claims represented by Nexsen Pruet, completing this

10:05

1    form correctly, including dates much more recent than right
2    after the spill.  So most folks did understand how to complete
3    it, including represented by Mr. Dominick.

4               On another topic in Appendix 6, Your Honor, one
5    of the responses we saw a lot of is that folks have been
6    waiting for medical records.  They just can't simply recall and
7    they need medical records to respond.  Your Honor, as we
8    pointed out and we described in Appendix 6, many of the
9    plaintiffs said that they were awaiting medical records from
10   the same providers back in 2018.  We think that whatever effort
11   was needed to identify this information in response to the
12   form, it's not a production requirement; it was a requirement
13   to answer the question.  The intent was, as specified in
14   PTO 68, that this questionnaire would be treated like an
15   interrogatory, and that inquiry should have been made to try to
16   answer those questions.

17               In response to our PTO 68 submissions,
18   Your Honor, we don't see from any of the plaintiffs any
19   explanation for the delay, any reason why they weren't able to
20   get whatever information they think we need from records or
21   from talking to anybody at all.  Your Honor, where that's the
22   case, the Fifth Circuit has made clear in the *Ferrera* decision,
23   in *Park National* as well, that where we have repeated
24   violations of a court order without any evidence being
25   submitted of a good faith mistake or a good faith reason for a

10:07

1    delay, then dismissal is appropriate.  Here there has been no

2    justification offered for why the information was not able to

3    be obtained.  Again, as the court in *Ferrera* noted, we have

4    hundreds of plaintiffs, including many claims represented by

5    the same firm, able to respond appropriately.

6                      So unless Your Honor has any other questions on

7    Appendix 6, I can pause here or --

8              THE COURT:  Let's see.  You know what, since I see

9    Mr. Johnson patiently waiting there, his client is very

10   different, it seems to me.  This is the Louisiana Workers'

11   Compensation Corporation.  I don't know how they could be

12   expected to provide the documentation or information that these

13   other plaintiffs have been required to produce.

14                      As I appreciate it, Mr. Johnson, your client

15   paid, it says, about $4 million in workers' compensation

16   benefits to 89 different workers.  None of these involved

17   exposure injuries, as I appreciate it, right?

18             MR. JOHNSON:  That is correct, Your Honor, yes.

19             THE COURT:  So these are all some sort of falls,

20   impacts, some other kind of injury or accident, but not alleged

21   exposure to chemicals, right?

22             MR. JOHNSON:  That is correct, Your Honor, yes.

23             THE COURT:  As I appreciate it, you represent that

24   your client has produced all the medical records or information

25   that you have on these workers' comp claimants, right?

10:09

1      **MR. JOHNSON:**  We have produced on the large claims.
2   There are some minor claims that have a low value that we
3   haven't produced all the records of those.  For the bulk of our
4   claim -- that's about 94 percent -- we have produced, I want to
5   say, somewhere around 10,000 pages of records.
6          **THE COURT:**  So I don't understand how BP could expect
7   them to produce any more, Ms. Jakola.  It seems to me this case
8   is kind of *sui generis* and needs to be severed out.  Now, I
9   will say I also don't know how they are going to prove their
10  case when it's severed out.
11          Mr. Johnson, you are going to have to show how
12  these people were injured, whose fault it was, causation, and
13  all of those issues.
14          **MR. JOHNSON:**  Yes, sir.
15          **MS. JAKOLA:**  Your Honor, may I be heard on this --
16          **THE COURT:**  Yes.  Go ahead.
17          **MS. JAKOLA:**  -- a point of clarification?  I saw in
18  LWCC's submission on that they are claiming that none of their
19  plaintiffs have exposure claims, but their complaint that they
20  have submitted in that case, 17-CV-3199, makes several
21  allegations about plaintiffs being exposed to toxic substances
22  in connection with the spill response and BP's alleged failure
23  to train and protect workers from exposure to toxic substances.
24          There's also an exhibit attached to their
25  complaint which appears to list individuals on whose behalf

10:11

1   they are proceeding against BP, and several of those

2   individuals appear to show alleged conditions -- it says

3   poisoning through absorption.  So, Your Honor, that may be a

4   point of needing clarification.

5            **MR. JOHNSON:**  Your Honor, if I may?

6            **THE COURT:**  Yes.

7            **MR. JOHNSON:**  For the Court's benefit, when that was

8   filed, we weren't certain.  I have since personally gone

9   through all the records and I have checked all the records, and

10  I will represent on the record there are no exposure claims.

11           **THE COURT:**  So to the extent that was alleged in the

12  initial complaint, you're waiving those claims, right?

13           **MR. JOHNSON:**  Yes, sir.  Yes, sir.

14           **THE COURT:**  Okay.  With that said, I'm obviously not

15  going to dismiss this case.  We are going to sever it out and

16  let it proceed on its own.

17           **MR. JOHNSON:**  I appreciate it, Your Honor.

18           **THE COURT:**  Okay, Mr. Johnson.

19              Ms. Jakola, what do you want to talk about next?

20           **MS. JAKOLA:**  Appendix 7, Your Honor, the seven

21  plaintiffs on Appendix 7.

22           **THE COURT:**  Okay.

23           **MS. JAKOLA:**  These are the individuals that I

24  mentioned who were all represented by the D'Amico firm.  For

25  these folks, we received their initial PTO 68 submissions and

10:12

1  then in response to the Court's show cause order a submission

2  referring us to their PTO 66 submission as providing

3  information that was missing from their PTO 68 submission.

4         When we went back to look at what had been

5  provided in response to PTO 66 to see if we could piece

6  together the missing information, Your Honor, we discovered

7  some troubling inconsistencies between the submissions.  When

8  we compared each of those seven plaintiffs that are listed here

9  against their PTO 66 submission -- I do have an example of

10  this, Your Honor, to show what we found for one plaintiff.

11         If we can pull up Slide 12, Matt, for the first

12  plaintiff.

13         **THE COURT:**  What's the name of the plaintiff?

14         **MS. JAKOLA:**  I was going to tell you the name of the

15  plaintiff, Your Honor, but I'm just sensitive to some privacy

16  concerns.  We have a lot of folks on the line.  If you can see

17  it, Your Honor, on your screen, this plaintiff is discussed on

18  page 17 of our brief --

19         **THE COURT:**  Okay.

20         **MS. JAKOLA:**  -- Exhibit D to our reply brief that we

21  filed under seal.  I just will refer to him as "Mr. C" unless

22  there's no objection to me using his name.

23         **THE COURT:**  I couldn't understand what you just said,

24  Ms. Jakola.

25         **MS. JAKOLA:**  I just said unless there's no objection

10:14

1   to me using his name by Mr. D'Amico, I will just refer to him

2   as "Mr. C."

3           **MR. FALCON:**  The slide that you put up shows his

4   name.

5           **THE COURT:**  We are in court.  This is an issue.  I

6   think you can use his name.  Go ahead.

7           **MS. JAKOLA:**  Thank you, Your Honor.  Mr. Clopton --

8   and this is case number 19-CV-1161 -- submitted in response to

9   PTO 66 a sworn statement identifying COPD as his only condition

10  that he claims caused from the spill.

11          In his PTO 68 submission, which is the paragraph

12  below that, Your Honor, you can see that he for the first time

13  identifies claims for injury for toxic exposure, optic

14  problems, chest pain, hypertension, in addition to the COPD.

15  While newly disclosed, these conditions are not new to

16  Mr. Clopton.  He was diagnosed with these conditions back in

17  2012 and 2013, five years before PTO 66, and then also by two

18  never previously disclosed physicians, Dr. Mary and Dr. Harbor.

19          We have other examples like this, Your Honor.

20  You can go to the next example, Mr. Bryant, also discussed in

21  our brief.  His submissions are in Exhibit C to the brief.

22  It's case number 19-CV-11664.  Mr. Bryant identified several

23  conditions listed in response to PTO 66 at the top of the

24  screen.  In response to PTO 68, he identified several newly

25  disclosed conditions -- toxic poisoning, skin rashes, memory

10:16

1   loss, headaches, fatigue -- again that were apparently

2   diagnosed back in 2011 and 2012 again by Dr. Charles Mary,

3   Dr. Harbor.  None of this information was included in

4   Mr. Bryant's PTO 66 disclosures.  We see these same doctors --

5   Dr. Mary, Dr. Harbor -- now identified as having treated the

6   majority of the plaintiffs that Mr. D'Amico's firm represents.

7            Your Honor, we think that these call into

8   question the accuracy and the veracity of the submissions that

9   we received in response to PTO 66 and also in response to

10  PTO 68.  They raise questions about the submissions and at the

11  very best demonstrate lack of diligence in responding to these

12  forms and a disregard of the seriousness of the Court's orders.

13  We tried to meet and confer with Mr. D'Amico's firm and

14  received no response.

15           Your Honor, as I noted, these are the same

16  individuals who also previously were found to have been

17  noncompliant with PTO 63, so we have issues with all three of

18  the relevant PTOs that relate to this pleading bundle.  They

19  were given another chance by the Fifth Circuit to come back

20  down.  These, Your Honor, frankly, are repeat offenders.  While

21  they technically filled in the blanks with the information in

22  each of the boxes, as you can see on PTO 68, we do not believe

23  that they have complied with either PTO 66 and/or PTO 68.

24           THE COURT:  So the issue you have with these

25  claimants is what you believe is obvious inconsistencies

between their responses to PTO 66 and the responses to PTO 68;
is that right?

**MS. JAKOLA:** Yes, Your Honor.

**THE COURT:** Okay. These are all D'Amico clients?

**MS. JAKOLA:** Yes, Your Honor.

**THE COURT:** Is Mr. D'Amico present on the call?

**MR. D'AMICO:** Yes.

**THE COURT:** Let's hear from Mr. D'Amico.

**MR. D'AMICO:** Yes. If you can leave the forms up, if
you don't mind, so that I can refer to them.

**MS. JAKOLA:** I'm sorry. You want to leave them up,
sir?

**MR. D'AMICO:** Yes, if we are going to talk about
those, I would like to talk about them [audio distortion] --

**MS. JAKOLA:** We are pulling them back up. There you
go.

**MR. D'AMICO:** All right. Johnny Clopton [audio
distortion] --

**THE COURT:** Mr. D'Amico, your sound is pretty poor.
Maybe you can get closer to your microphone. I don't know.

**MR. D'AMICO:** Can we turn the volume up? I don't
know.

**THE COURT:** Turn the volume up or do --

**MR. D'AMICO:** I'll try to speak up.

**THE COURT:** Okay.

10:19

1          **MR. D'AMICO:**  Can you hear me, Your Honor?

2          **THE COURT:**  I can hardly see you and hardly hear you.

3  I don't know where your computer is, but where you are, you

4  look like you're a mile away.

5          **MR. D'AMICO:**  Can you hear me and see me now?

6          **THE COURT:**  That's a lot better, yes.  Thank you.

7          **MR. D'AMICO:**  All right.  Judge, let's talk about

8  Johnny Clopton, if we could, Your Honor.  PTO 66, Mr. Clopton

9  is claiming COPD.  We provided all the medical documentation we

10  had.  This has been provided for years now.  There is nothing

11  new on this claim.

12            PTO 68 we read to mean that the defendants are

13  now seeking additional medical documentation that was not

14  already provided.  So we provided all medical documentation we

15  had for this client even if it wasn't relevant to the claim he

16  is making of COPD.  Maybe that's caused some confusion and

17  maybe it was a misunderstanding on our part.

18          **THE COURT:**  Wait a minute.

19          **MR. D'AMICO:**  We --

20          **THE COURT:**  Wait a minute, wait a minute, wait a

21  minute, Mr. D'Amico.  So you're saying all of these new

22  conditions that you put in your response to PTO 68 are

23  completely irrelevant to his claim in the lawsuit?

24          **MR. D'AMICO:**  We are not making any additional

25  claims, Your Honor, that's correct.

10:20

 1          **THE COURT:**  So his only claim is for COPD?

 2          **MR. D'AMICO:**  That's correct.

 3          **THE COURT:**  All right.  We can stop talking.  We will

 4  just have that on the record.

 5              There are no other claims, Ms. Jakola, other

 6  than COPD.  Okay?

 7          **MS. JAKOLA:**  (Nods head.)

 8          **THE COURT:**  Okay.  Do you want to talk about any

 9  other clients, Mr. D'Amico?

10          **MR. D'AMICO:**  It would be the same for every client,

11  Your Honor.  We couldn't understand the difference between 66

12  and 68 unless they wanted some additional information because

13  otherwise --

14          **THE COURT:**  Well, my sense of the whole purpose of

15  68 -- and Ms. Jakola can maybe correct me if my understanding

16  or recollection is wrong -- is that in response to PTO 66, some

17  claimants and some attorneys just gave kind of a laundry list

18  of alleged conditions.  A lot of them weren't even conditions.

19  They were just symptoms maybe.  The idea of 68 was to kind of

20  narrow this down as to what really is at issue, what medical

21  condition or diagnosis is alleged to have resulted from the oil

22  spill that is at issue.

23              I don't think the intent was, "Oh, now we are

24  going to add all these new conditions that we didn't disclose

25  before," but that's what we are seeing in these and some

10:22

1 others.  I have no idea why you would put all these other

2 conditions down.  It's interesting because you just told me

3 that all these are irrelevant to your client's claim -- and I'm

4 looking at Mr. Clopton now -- but the form that you filled out

5 says, for example, toxic exposure.

6                 Well, toxic exposure is not a medical condition.

7 Then optic problems, rhinitis, COPD, shortness of breath, I

8 guess, chest pains -- I guess some of that could be related to

9 COPD.  I don't know where, for example, the optic problems came

10 from or the rhinitis.  I just don't know why you put that on

11 there if it's not relevant to his COPD that he is alleging.

12       **MR. D'AMICO:**  We were understanding that we were to

13 provide any medical documentation that we had in our possession

14 for this client.  He is not making a claim for toxic exposure

15 per se.  He is making a claim for COPD.

16       **THE COURT:**  Well, where does he claim the COPD

17 resulted from?

18       **MR. D'AMICO:**  From the toxic exposure, but not --

19       **THE COURT:**  Okay.

20       **MR. D'AMICO:**  -- just a general toxic exposure claim.

21 He is making a COPD claim.  These are all documents that

22 support the COPD claim.

23       **THE COURT:**  Okay.

24       **MR. D'AMICO:**  In other words, it's not our intent to

25 expand on what was originally done.  We have provided the date

10:24

1    of first symptoms, the date he sought treatment --

2            **THE COURT:**  So for none of these clients -- your

3    intent was not to expand in any way their original allegation

4    of what conditions were caused by the oil spill?

5            **MR. D'AMICO:**  That's correct, Your Honor.  We are

6    sticking to the original claims.  We thought we were to provide

7    any medical documentation in our possession, which we have

8    done.  The authorizations have been signed and we have signed

9    the two-page form.

10           **THE COURT:**  Okay.  Ms. Jakola, do you want to

11   respond?

12           **MS. JAKOLA:**  Yes.  Yes, Your Honor.  I hear what

13   Mr. D'Amico is saying, but it doesn't quite make sense to me

14   because if you look in the case of Mr. Bryant, the PTO 68 form

15   is both overinclusive and underinclusive.

16               If you think about this like a Venn diagram, a

17   Venn diagram where you have concentric circles, there's

18   overlap, but not entirely.  You see PTO 66 identifies some

19   conditions that I hear Mr. D'Amico saying he is claiming were

20   caused from the spill.  You can see respiratory complications

21   identified, for example, and then in PTO 68 I don't see any

22   reference to respiratory conditions.

23               Again, we are left at a loss.  The point of

24   PTO 68, as Your Honor will remember -- and this is just an

25   example of what we are seeing across hundreds of plaintiffs and

10:25

1    this is why it's really important -- we are trying to get

2    clarity around what it is the basis of these lawsuits is.  We

3    asked folks to drill down on that in a real simple chart.

4                So we would expect to see, as Your Honor

5    indicated, almost a funneling effect or at least more

6    information about what was provided in PTO 66.  Instead we see

7    these things as some things falling off and that raises

8    questions.  If there were conditions that were being alleged as

9    a basis of a lawsuit, they should have been identified in

10   PTO 66, assuming the condition was known at that time, and we

11   see these diagnoses were predating PTO 66.

12               If Mr. D'Amico says he misunderstood the form,

13   which does clearly say that you're only to identify conditions

14   you are claiming are caused by the spill, then we would expect

15   to have seen the respiratory issues disclosed.  As it stands

16   now, I'm not sure what Mr. Bryant is suing us for.

17          MR. D'AMICO:  Well, he says it on PTO 66, Your Honor.

18   He says he is suing for blindness, optic atrophy, coughing -- I

19   can't see the rest of the form -- esophagus deterioration,

20   vomiting, and all these medical conditions support that claim.

21   I don't see where there's an inconsistency.

22          THE COURT:  All right.  Let me just say this.  I will

23   make a general observation about all of these.  We are not

24   going to be able to sit here and parse these one by one, item

25   by item, line by line.  I'm just not going to do that.  I will

10:27    1   just make a general statement.

2               If the plaintiffs were required to produce

3   something, you know, disclose something and didn't disclose it

4   and now they are trying to add to it, I think those are issues

5   that BP will be able to bring up in the appropriate forum at

6   the appropriate time.  These cases, if they are not resolved by

7   some kind of settlement -- you have got medical disclosure

8   authorizations apparently from all these people.  To the extent

9   they have identified doctors or health care providers, you will

10   have to get their records, which either will confirm what they

11   are alleging or not confirm what they are alleging.

12               I think these plaintiffs who have alleged one

13   thing and then added something later are going to have problems

14   down the line -- I will just put it that way -- if it's shown

15   that they are not being truthful or forthcoming, I guess would

16   be a better way to put it.  I don't know that these are bases

17   to dismiss these claimants.

18               Mr. D'Amico, your clients have been problematic

19   from the beginning in complying with Court orders.  This is the

20   third round of orders that we have had problems with you and

21   your clients.  One that I wanted to ask specifically about,

22   there's a claim by a Ms. or Mrs. DeAgano, Kimberly --

23               **MR. D'AMICO:**  Kimberly DeAgano, yes, Your Honor.

24               **THE COURT:**  -- DeAgano, yes.  Then she has a minor

25   son apparently, Dereck Joseph DeAgano.

10:29

1    **MR. D'AMICO:**  Yes.  They were all --

2         **THE COURT:**  Let me just ask you.  Let me pose a

3    question to you because it's not clear.  BP is complaining that

4    Dereck's response to Question 1 on the supplemental disclosure

5    form has incomplete date of first treatment, date of diagnosis,

6    and it gives only the year.

7              The bigger issue appears to be that, as noted by

8    BP, your response, Mr. D'Amico, in your brief indicates that

9    this client has disavowed any claim for the conditions listed

10   in the disclosure form and now only pursues a loss of

11   consortium claim, which I presume is based somehow on his

12   mother's injuries.  Is that clear?

13        **MR. D'AMICO:**  No, no, no.  There's three claims,

14   Your Honor.  One is for Teddy DeAgano, which is the husband,

15   Kimberly DeAgano is the wife, and the son is Dereck DeAgano.

16   We are not making any personal injury claims for the husband.

17   He has purely got a loss of consortium claim.  The son --

18        **THE COURT:**  So it's the husband that has the loss of

19   consortium claim?

20        **MR. D'AMICO:**  That's correct, Your Honor.

21        **THE COURT:**  What's his name?

22        **MR. D'AMICO:**  His name is Theodore "Teddy" DeAgano.

23        **THE COURT:**  So the son has what kind of claim?

24        **MR. D'AMICO:**  The son was swimming in water with his

25   mother on their summer vacation in June of 2010 when the

1    exposure occurred.  He had skin rashes and it irritated his

2    skin, and he had dermatological treatment for that with Bopp

3    Dermatology.  That's what that claim is for.  Ms. Kimberly

4    DeAgano has the most severe claim.  His claim is merely skin

5    rashes that were irritating his skin.

6          THE COURT:  Ms. Jakola, do you want to say anything

7    in response to that?

8          MS. JAKOLA:  Your Honor, I wanted to talk more

9    generally about these plaintiffs on Appendix 7.  Your Honor, we

10   understand your guidance on this in terms of dismissal.  We

11   would ask Your Honor to consider imposing a lesser sanction

12   and, in particular, given what Mr. D'Amico has said today that

13   we just made clear -- I'm not even sure it's a sanction, more

14   just a statement of clarity -- that the plaintiff listed in

15   Appendix 7 should be limited to those conditions that are

16   identified in the PTO 66 forms and should be precluded from

17   pursuing those claims to the extent that they are newly

18   identified in response to PTO 68.

19         THE COURT:  Yes.  I think that's what I was trying to

20   say a little while ago, but you said it better.  As far as I'm

21   concerned, the plaintiffs are going to be limited to what they

22   disclosed in response to PTO 66.  Now, if in 68 they clarified

23   something -- or if there's something new that arose that they

24   could not have disclosed earlier, that's a different situation,

25   of course.  If they had conditions which they knew or should

10:32

1   have known back in 2012 or whenever and were required to

2   disclose it in response to PTO 66 and failed to, I think they

3   are going to be limited to what they did disclose.  Okay.

4          MR. D'AMICO:  That's our intent, Your Honor.

5          THE COURT:  Good.  We are going to look at these

6   again before we issue an order, but the remaining 43 is what we

7   are talking about here today.  Right, Ms. Jakola?

8          MS. JAKOLA:  Yes, Your Honor, that's right, the 35

9   plaintiffs on Appendix 6, the seven on Appendix 7, and then the

10  LWCC plaintiff which Your Honor has already addressed.

11         THE COURT:  Right.  Right.

12         MS. JAKOLA:  That's 43.

13         THE COURT:  So with respect to the plaintiffs, the

14  issues of inconsistency between PTO 66 and 68, I think I have

15  just explained what my ruling is on that.

16         MS. JAKOLA:  Those are the Appendix 7 people,

17  Your Honor, just to clarify.

18         THE COURT:  Okay.

19         MS. JAKOLA:  They are different than the Appendix 6

20  people who have some of the same issues because the Appendix 6

21  people are also noncompliant with PTO 68 on its face after

22  multiple submissions.

23         THE COURT:  I think part of what else I would say

24  about this is going to bleed over into the next part of the

25  hearing today, the case management issue on how to go forward

10:35

1     on the remaining B3 cases, so let's move on to that.

2            Mr. Johnson, I see you are still there.  If you

3     want to leave, you're welcome to it.  If you are just

4     interested, you are welcome to hang on, but you don't have to.

5     We definitely are severing your case out.

6            **MR. JOHNSON:**  Thank you, Your Honor.  I will take my

7     leave, then.

8            **THE COURT:**  All right.  The parties have submitted

9     proposed case management orders.  B3 submitted a proposal,

10    Rec. Doc. 26672, which they represent is joined by the

11    Herman Herman & Katz law firm and the Becnel Law Firm, who

12    agree with BP's proposal.

13           The proposal, as I read it, is essentially to do

14    something similar to what we did with the BELO cases, that is,

15    we would just go ahead and unaggregate, if that's the right

16    word -- disaggregate/unaggregate these cases and reallocate

17    them, deciding first which of these -- it's represented that

18    BP, at least, believes most of these cases would remain here in

19    the Eastern District.  I haven't really looked at them in any

20    detail for that purpose.  There may be some that may have to be

21    sent to other districts or could be sent to other districts.

22           Then a group of plaintiffs, including those

23    represented by Nexsen Pruet, by the Downs Law Firm, by

24    Mr. D'Amico's law firm, and several other law firms apparently

25    disagree and believe that it would be better to have these

10:38

1  cases remain on this Court's docket and to resolve what they

2  believe are the remaining common issues.

3        I guess what I would like to hear is -- I don't

4  know who wants to speak first for the Nexsen Pruet, et al.,

5  group of law firms as to what common issues they believe remain

6  that could or should be resolved in this Court before the cases

7  are reallocated for trial.

8        **MR. FALCON:**  Good morning, Your Honor.  It's

9  Tim Falcon for the B3 group.

10        **THE COURT:**  Hello, Mr. Falcon.

11        **MR. FALCON:**  Can you hear me okay?

12        **THE COURT:**  Yes.  Loud and clear.  Thank you.

13        **MR. FALCON:**  Good.  Good morning.

14        **THE COURT:**  Good morning.

15        **MR. FALCON:**  So, Your Honor, unlike the BELO cases

16  where the liability and all of that was resolved and basically

17  the plaintiffs only had to show causal connection to their

18  exposure and their disease, correct me if I'm wrong, but I

19  think with the opt-out cases we still have an issue of:  Do the

20  B3 plaintiffs have to prove liability?  What are the

21  affirmative defenses BP is going to raise?  Are they going to

22  have contractor claims for an affirmative defense?

23        We brought this up at one of our early status

24  conferences talking about the opt-out cases, and I don't think

25  we got a clear answer from BP, especially on the liability.

10:39

1  Are they accepting liability for these claims?  Are we going

2  forward similar to where the BELO cases are going?  Because in

3  their submission to the Court, they are primarily saying these

4  are just like the BELO cases [audio distortion].  I think there

5  could be some common issues of liability, what type of

6  affirmative defenses, and that's why we propose the scheduling

7  order that will let us sit down in 30 days, find out if there

8  are any common issues that we can agree on or a subject that

9  the Court hasn't resolved, and then come to the Court --

10         THE COURT:  Well, let me just ask right now.  I have

11  my own thoughts about that, obviously, but I will ask BP's

12  counsel their position on that.

13             We had a two- or three-month trial, Mr. Regan,

14  on liability and extensive findings and conclusions by this

15  Court.  We had other rulings on contractual issues and

16  immunities by, for example, the people who -- remind me.

17  What's the name of the company that had provided Corexit?

18         THE LAW CLERK:  Nalco.

19         THE COURT:  Nalco.  Thank you.

20         MR. FALCON:  Nalco.

21         THE COURT:  Nalco.  Anyway, I will let BP talk about

22  it if they would like to weigh in on whether there are any

23  liability issues.  I'm not talking about causation, obviously.

24  We know you have to prove causation.  How would these cases, if

25  they are tried, be the same or, more importantly, how would

10:41   1   they differ from the BELO cases?

2           **MR. REGAN:**  Your Honor, I will confirm your

3   three-month trial.  Yes, that was true.

4           **THE COURT:**  We were both there.  We were both there

5   the whole time.

6           **MR. REGAN:**  We were both there, yes.  On this

7   specific topic, particularly in comparing B3 to not only what

8   happened there but also to BELO, if I could, I will turn it to

9   Mr. Jarrett and he can provide some feedback on that question,

10  Your Honor.

11          **THE COURT:**  Okay.  Good.

12          **MR. JARRETT:**  Good morning, Your Honor.  Keith

13  Jarrett for BP.  I hope you can hear me.

14          **THE COURT:**  I can.  Thank you.

15          **MR. JARRETT:**  Your Honor, on the question of fault,

16  it is absolutely clear that you have made findings as to who

17  was at fault for the spill, and BP has no intention of

18  relitigating any of those issues.  That finding, unfortunately,

19  is not relevant for most of the plaintiffs and the reason is

20  this:  Most of the plaintiffs in B3 are individuals who heard

21  about the spill and came to the spill seeking employment.  In

22  other words, they were not exposed because of the spill; they

23  were exposed because they chose to work in the response effort.

24          Your Honor, you might be familiar maritime law

25  has an established concept sometimes called the repairman's

10:42

doctrine, but it provides that if a repairman, in the typical
case of a vessel, is brought aboard the vessel to fix the
condition and is injured by that condition, he has no claim.

There's a famous case by Judge John Brown -- I
know that Your Honor knows Judge Brown or knew him.  He has
passed, of course -- called *Stass v. American Commercial Lines*
which says it best, that a ship may not be found negligent
merely because a condition of the ship that requires repair or
inspection injures the person hired to inspect or repair the
condition.

If you extend that maritime law principle to
this context, those plaintiffs who were response workers can't
sue because there's a spill.  They have to sue because of some
negligence or fault in the response effort.  If they can prove
that BP improvidently went about the response in some way that
exposed them to harm, they have a claim, and those would be
highly individualized, as you could imagine, Your Honor: where
was the plaintiff exposed, how was he trained, what protective
gear was he wearing, etc.

There's a second class of plaintiffs for whom
Your Honor's finding is very helpful, and those are plaintiffs
who were exposed to the oil through no fault of their own or no
action of their own.  Think residents.  Those folks, I think
the judge's finding about the spill is useful to them.  In that
case the judge's finding might be enough to handle the whole

1  liability question, but that's a small category of plaintiffs

2  in B3.

3         Even those individuals, Your Honor, even

4  individuals who were exposed through no fault of their own, if

5  their allegation involves Corexit, the dispersant, not the

6  spill, well, it's a different inquiry.  Corexit wasn't released

7  because of the spill.  Corexit was a decision made by BP and

8  the Unified Command to try to deal with the response.  So if

9  their allegation is based on that, that's a different set of

10  inquiry.  Again, they will have to prove that BP somehow was

11  negligent in its employment of dispersant or in how they

12  protected workers or suggested workers be protected from that

13  Corexit.

14         So the answer, bottom line, is it's more

15  complicated than yes or no.  The judge's prior findings would

16  be relevant to some subclass of plaintiffs but not to others,

17  in BP's opinion.  Did that address the fault issue, Judge, to

18  your satisfaction?

19         THE COURT:  Yes, but I'm not sure it cleared up

20  anything.  It might have made it, as you said, more

21  complicated.  So how is that relevant one way or the other to

22  support or not support BP's argument that these cases should be

23  severed now and sent separately on their way?

24         MR. JARRETT:  Well, Your Honor, we think that because

25  the vast majority of B3 plaintiffs are response workers for

10:46

1   whom the judge's prior findings of fault in causing the spill

2   are truly not relevant because these workers -- I'm going to

3   use the word *voluntarily*.  They were hired on to clean up oil.

4   They knew the oil was present.  Were they treated appropriately

5   and protected appropriately in that response effort?  They will

6   have to prove that, and that's a highly individualized inquiry,

7   Your Honor: which plaintiff was trained, which wasn't; did he

8   have PPE, who didn't; what he was exposed to; what actually he

9   claims his mechanism of exposure was.

10          Those issues we have been dealing with and

11  grappling with, and some of the lawyers on this call will be

12  very familiar with that.  We have been grappling with that in

13  the BELO because it's an element of causation as well.  On the

14  specific causation inquiry in a toxic case, the details of

15  exposure matter, how a plaintiff was exposed matters, but it

16  also matters on the fault side if they want to claim that they

17  were negligently exposed.

18          **MR. FALCON:**  Your Honor --

19          **THE COURT:**  Who is trying to speak?  Mr. Falcon.

20          **MR. FALCON:**  Yes.  Tim Falcon.  Your Honor, that is

21  exactly my point I raised.  This is a very broad legal issue.

22  Unless we accept Mr. Jarrett's interpretation of the law on the

23  facts of this matter sitting here today, it's not clear that

24  your ruling is or is not applicable to these plaintiffs.

25          We feel that your experience in this case and

10:47

1    putting that big legal issue before one court, let the Court

2    resolve it, and then we may get to a point we have some

3    individualized issues.  But the liability and their defenses is

4    clearly something that can be handled, we think, in one

5    proceeding with a general liability question that can be

6    answered, including their defenses.

7            At some point it may even be punitive damages

8    not for the spill itself -- I know the Court has already ruled

9    on that.  But if BP was involved with failure and intentionally

10   not providing PPE for these workers, which our workers are

11   telling us -- if they are involved in that at a high enough

12   level, there could be actual punitive damage issues for the

13   Court on the exposure case.

14           That's something we think one court can rule on.

15   Those issues could be handled by this Court as opposed to going

16   to 10 or 20 or I don't know how many number different judges

17   would have to rule on those issues, and then you will have a

18   bunch of different opinions bubbling up to the Fifth Circuit.

19           I think Mr. Jarrett is actually pointing out the

20   very problem that I'm pointing out to why a dispersal of the

21   cases will cause more problems for the Court, will not be

22   judicially efficient, as opposed to some legal issues that we

23   think in 30 days we can identify for the Court and come back to

24   the Court and say these are the ones we feel this Court can

25   handle.

10:49

1      **MS. JAKOLA:**  Your Honor, may I add something?

2      **THE COURT:**  When you say "legal issues," you're

3   talking about handling these in some sort of pretrial motion

4   practice?  It sounded like what Mr. Jarrett was talking about

5   would require one or more trials.

6      **MR. FALCON:**  I think there could be motion practice

7   or there could be trials.  I think what applies and what

8   doesn't apply from the Court's prior rulings could be handled

9   in motion practice.

10      **MR. GISLESON:**  Your Honor, this is Soren Gisleson.

11   Could I please be heard?

12      **THE COURT:**  Sure.

13      **MR. GISLESON:**  So, Your Honor, Soren Gisleson on

14   behalf of the Herman Herman & Katz clients.  We have five

15   clients.  Given what Mr. Jarrett just said, we need to withdraw

16   our joinder for what their position actually should be in terms

17   of these cases being sent back.

18          If, in fact, they are saying that the trial that

19   was conducted by Your Honor doesn't have any preclusive effect,

20   then we are starting at square one.  One of our five clients

21   signed a maritime contract with one of the B3 companies.  If

22   that's BP's position, we are back to talking about punitive

23   damages.

24          If they were going to say that the causation

25   begins anew when somebody comes to participate in the cleanup,

10:50

1    then that absolutely deals with a host of legal issues:  What

2    do the terms of the VoO contract provide for?  What were BP's

3    obligations under that VoO contract?

4              These are purely legal issues that can be teed

5    up on the front end to decide things like punitive damages, but

6    we cannot agree with BP right now to send these cases to the

7    other judges in your Court if we have to start with these legal

8    issues all over again.  I just don't see a way around it.

9          **THE COURT:**  Are you telling me you changed your

10    position?  You did indicate you agreed with them.

11          **MR. GISLESON:**  That's correct, Your Honor.  When I

12    had a conversation with BP counsel ahead of time, this issue

13    never came up.  The issue was simply let's go ahead, send all

14    these cases, reallot them to Your Honor's Court, and just treat

15    them like old-fashioned cases.  I was not aware that BP was

16    going to come in and say, you know, the trial is off the table,

17    we have to relitigate all the legal issues anew as they deal

18    with the cleanup because the cleanup is now going to be

19    considered a completely separate factual set of circumstances

20    from which only then can you infer or have some sort of

21    liability determination.  We think that's a game-changer and,

22    yes, I'm saying this on the fly.  I just can't go along with

23    it.

24          **THE COURT:**  Well, there may be one overarching legal

25    issue that could be addressed on cross-motions of some sort

10:52   1    that Mr. Jarrett raised, this repairman's --

2                    What's it called, repairman's defense,

3    Mr. Jarrett?  You're still muted.

4            **MR. JARRETT:**  Yes, Your Honor.  They're certainly

5    called that in Louisiana law.  The principle is in maritime

6    law, and I think those of us who practice it use that as a

7    shorthand for the concept.

8            **THE COURT:**  I obviously can't decide that today, but

9    that may or may not be applicable in this context.  I don't

10    know.  It's different.  You know, there's another principle of

11    law -- I can't put a label on it, but it deals with causation,

12    I guess.  If you negligently injure someone and they go to a

13    hospital emergency room and the doctor commits malpractice on

14    them, the general principle is the original tortfeasor is still

15    liable.  It's not an unexpected or intervening event that, I

16    guess you could say, severs or disrupts causation.  That may or

17    may not be applicable in this type of case.  I don't know.

18                    If BP is serious about having to litigate in

19    every one of these cases those kinds of issues individually on

20    a factual basis, we have a nightmare on our hands here, folks,

21    and we may be here for another 10 years.  I can't believe BP

22    really wants that.

23                    I know I've had conversations with people

24    that -- not you, Mr. Jarrett.  I'm not pointing fingers at any

25    particular person, but there's a big desire and interest to

10:54

1    shut this whole thing down one way or another.  What you said

2    really troubles me, I have to tell you, if that's the position

3    BP is going to take, where every claimant is going to have to

4    litigate and try to prove BP was somehow independently or

5    separately or additionally negligent beyond what the Court has

6    already found.  I have to tell you that surprises me.  I had no

7    idea that was the position you-all were going to take.

8         MR. DURKEE:  Your Honor, this is David Durkee on

9    behalf of the Downs Firm.  I have a 12:00 eastern time -- 11:00

10   your time -- summary judgment hearing with another judge in the

11   Eastern District of Louisiana, so I wondered if I could just be

12   heard shortly and then sign off?

13        THE COURT:  Who is that judge?  That might guide my

14   answer.  Who is the other judge?

15        MR. DURKEE:  I'm sorry.  Currault, Your Honor.

16        THE COURT:  She is just a magistrate.  You don't have

17   to worry about her.  Tell her you're running late, you are in

18   with me.

19        MR. DURKEE:  I will make sure to tell her that,

20   Your Honor.

21        THE COURT:  She is actually a great judge and a good

22   friend of mine.  I was just joking.  Seriously, you can tell

23   her she can wait on you for a little bit --

24        MR. DURKEE:  I appreciate that, Your Honor.

25        THE COURT:  -- but I will let you speak anyway,

1    Mr. Durkee.  Go ahead.

2         **MR. DURKEE:**  Yes.  As you know, I have been very

3    involved in the BELO cases.  I've been managing quite a few of

4    those cases.  It seems to me that what the plaintiffs in this

5    case, in the B3 lot, I believe want is just kind of the same

6    guardrails that were imposed on the BELO cases, and that is to

7    clear the water.  It's muddy water right now, and I think

8    Mr. Jarrett's comments muddy it a little further.  I think that

9    we need to clear that muddy water up on liability as much as we

10   can.  We may not be able to clear it up at all if Mr. Jarrett

11   is right.  It may go back to very individual issues.  But as a

12   legal issue, we can clarify that in some regard.

13        Also, if Mr. Jarrett is right and the cleanup

14   operations become the focus of the liability, not the original

15   spill, then there are opportunities for the plaintiffs, then,

16   to try and show that there are punitive damages related to

17   those actions that they took in the spill -- I mean in the

18   cleanup as opposed to the spill, and the Court has already

19   ruled that the spill has not any punitive damages attached.  So

20   the Court was able to clear the water up a little bit for the

21   BELO cases.  So we know that the negligence issues are

22   resolved, we know that there are no punitive damages, and the

23   issues that are left are exposure, causation, diagnosis, and

24   damages.

25        This Court could walk down a very short path and

10:57

1    deal with a handful of very broad legal issues that would bring

2    some clarity to the water.  It may end up dealing with quite a

3    few broad issues.  I don't anticipate that, but I think it will

4    be more on the short end of a big, broad number of issues

5    decided by this Court to give us some guardrails.

6              **THE COURT:**  Well, the problem is some of the

7    guardrails you are speaking of were the result of the

8    settlement.  The provisions relating to BELO cases were

9    settlement provisions, which don't apply here, and that's the

10   problem.  Your clients -- and I'm not faulting them, but they

11   elected to opt out of the settlement.  These are all opt-outs,

12   right?

13             **MR. DURKEE:**  Yes, Your Honor, but the point that I'm

14   making is that the Court's ruling --

15             **THE COURT:**  So they elected to opt out.  I will say

16   this.  Really, I'm serious about I hope that Mr. Jarrett and

17   Mr. Regan and other attorneys representing BP will go back to

18   their client and seriously consider whether they really want to

19   raise those types of issues that Mr. Jarrett described.

20             I think it would behoove everyone -- I know it

21   would behoove the Court, and I'm pretty sure it would behoove

22   the parties and the clients and the litigation in general, the

23   cost of the litigation and so forth -- if we essentially

24   treated these as BELO cases, which is the way I have always

25   been looking at them in basically everything but name only in

10:59

1   terms of what's at issue here.  I'm just going to ask you-all
2   to do that, please.
3                MS. JAKOLA:  Yes, Your Honor.  May I be heard?
4                THE COURT:  Yes.  Let me just let Mr. Durkee finish
5   so he can get to Judge Currault.  I don't want to hold her up
6   too much.
7                MS. JAKOLA:  Yes, Your Honor.
8                MR. DURKEE:  Thank you, Your Honor.  I agree with
9   Your Honor that some of those efficiencies were created by the
10  master settlement agreement, but some of those efficiencies
11  were created by the Court's broad rulings on liability and on
12  punitive damages.  Those rulings clarified the water enough --
13               THE COURT:  No, no, no.  I have to correct you.  The
14  punitive damages ruling came well after the settlement, the
15  settlement that created the BELO program.
16               Am I right, Mr. Regan?  I'm pretty sure I'm
17  right about that.
18               MR. REGAN:  Yes.  September of 2014 was your order on
19  punitive damages.  The settlement was in January of 2013.
20               THE COURT:  Yes.
21               MR. DURKEE:  I apologize, Your Honor.
22               THE COURT:  So, in other words, the parties had
23  already agreed to a class settlement which included this
24  provision about BELO cases and what would have to be proved,
25  what didn't have to be proved, and the fact that no punitive

 1   damages were available, and in the BELO I think only BP --

 2   you-all know what the provisions were.

 3           **MR. DURKEE:**  Yes.

 4           **THE COURT:**  Anyway, it wasn't the case that that

 5   resulted from this Court's order.

 6           **MR. DURKEE:**  Well, I misspoke, Your Honor.  I guess

 7   the point I was making is the negligence ruling certainly put

 8   things down a path that allowed us to do the master settlement

 9   agreement, and then subsequently the punitive damages order

10   gave us some clarity on that issue for even these plaintiffs.

11           **THE COURT:**  You're mistaken again, unfortunately,

12   Mr. Durkee, because the Court's negligence ruling again came

13   after the settlement.  In other words, there was a class

14   settlement.  There were two class settlements.  There was an

15   economic settlement and the medical settlement, which is what

16   we are talking about.

17           **MR. DURKEE:**  BELO, right.

18           **THE COURT:**  Then the Court's ultimate ruling on

19   liability came.  Go ahead, Mr. Durkee.

20           **MR. DURKEE:**  I apologize for being misspoken and

21   being factually wrong on that, Your Honor, but the point is

22   that those types of broad rulings will give us clarity where

23   there is not much clarity at this point.  For every individual

24   judge to be wading in the same waters and every individual

25   judge coming out possibly on different positions on those

11:02

1   issues would bring even more confusion to this group of

2   plaintiffs.  As Your Honor said, it would drag things out even

3   further because every individual case would have these

4   individual legal issues and --

5           THE COURT:  Mr. Durkee, I understand, but you're just

6   repeating what I just said, I think.  Thank you for that.

7           MR. DURKEE:  All right, Your Honor.  Thank you very

8   much.

9           THE COURT:  You are released if you need to go meet

10  with Judge Currault.

11          MR. DURKEE:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          Where were we?  I think Ms. Jakola wanted to say

14  something.

15          MS. JAKOLA:  Yes, Your Honor.  I wanted to provide

16  some context around this issue because this isn't a new issue.

17  Your Honor may recall this issue came up at a hearing we had

18  last year.  The same questions came up about how does fault

19  relate to this bundle, how do punitive damages relate to this

20  bundle.  You may also recall that we had included in our

21  original version of PTO 66 a provision that the parties would

22  brief the issue and then we all agreed to pull down that

23  briefing, and there was a reason for that.

24          As we met and conferred, I met and conferred

25  with Mr. Dominick, who I understand speaks for a group of

11:03

1  folks.  We discussed the fact-intensive nature of this inquiry

2  as it relates to these plaintiffs because plaintiffs here are

3  alleging punitive damages in many of these cases.  So as we

4  talked through these issues, I --

5          THE COURT:  Well, let me just say this.  I've been

6  operating under the assumption, for whatever it's worth, as I

7  said, that we wouldn't be trying any liability issues in these

8  cases and that the plaintiffs would not be entitled to claim

9  punitive damages based on my previous rulings.

10          MS. JAKOLA:  I understand, Your Honor.

11          THE COURT:  Go ahead.

12          MS. JAKOLA:  I understood that last year, that that

13  was what Your Honor had shared with us.

14          THE COURT:  Right.

15          MS. JAKOLA:  When we talked about that, we talked

16  about what our parties' respective positions were on these

17  issues.  My understanding -- and Mr. Dominick can definitely

18  correct me if I misunderstood -- was that the plaintiffs were

19  not willing to remove the punitive damages demand.  They wanted

20  to preserve their ability to claim punitive damages in

21  individual cases if they could make a showing of some contact

22  by BP in connection with the response that would give rise to

23  fault and, therefore, that all of these questions around who --

24  and we see many of the B3 complaints allege specific conduct

25  related to the response, either a failure to train, a failure

11:04

1   to provide PPE, specific instructions that were provided to

2   them when they were on the site.  You can imagine all the

3   different nuances there.

4              Frankly, I understood that position.  I don't

5   quite agree with the fact that they could ever make that

6   showing, but we understood the position.  We agreed that it was

7   a fact-intensive discussion.  I understand people can change

8   their minds, but just to give Your Honor some context of how we

9   got here, the two things go hand in hand.  You heard Mr. Falcon

10   raise this question about punitives.  It's a two-way street, I

11   think is what I would say on this, Your Honor.

12   **THE COURT:**  Well, I think these, in my view, again

13   would go hand in hand.  It's all or nothing.  In other words,

14   if the plaintiffs believe that the Court's previous rulings

15   should control and that there would be no need to prove any

16   other liability-type issues, at the same time the Court's

17   previous rulings on punitive damages should control.  That's my

18   view at this point.  Okay.

19   **MS. JAKOLA:**  That's what I had understood,

20   Your Honor.  When we talked about this issue with the

21   plaintiffs last year, my understanding was and the reason we

22   pulled that out of the order, we agreed to pull it out -- we

23   agreed to do it last year, and then we agreed to pull it out

24   because we understood they did not want to address the issue of

25   punitive damages because they want to keep that and use

11:06

1    individual --

2            THE COURT:  Well, this might be a good time at this

3    juncture, in light of everything that's been said about this

4    this morning, for me to give the parties some time to meet and

5    confer, discuss it, and brief it to the Court.  21 days?

6    30 days?  What do you-all suggest?

7            MR. FALCON:  30 days, Your Honor, if Your Honor is

8    willing to give us 30 days, should give us enough time.

9            THE COURT:  BP, is that enough time for you guys?

10           MS. JAKOLA:  I think that's sufficient, Your Honor.

11   I would like to understand their position on this.

12           THE COURT:  Well, that's why I suggested meet and

13   confer before you file anything with the Court.

14           MS. JAKOLA:  Got it.  Yes, Your Honor.

15           THE COURT:  I think it would be helpful on the BP

16   side if you meet and confer with your client, too, before you

17   have further discussions either with plaintiffs' counsel or

18   with the Court.

19           MS. JAKOLA:  Of course, Your Honor.

20           THE COURT:  I will give you-all 30 days to file

21   something with the Court on that.

22           MR. FALCON:  Okay.

23           THE COURT:  Depending on where we are on that I think

24   may largely drive my ultimate decision on how to go forward

25   with a case management order in these cases.  I was hoping to

1   resolve that this morning.  In light of what's been said, I

2   think I'm going to hold off for the final ruling on that.

3            Let me just ask.  Does anyone else want to add

4   anything in particular on future case management orders?

5            I have to tell you.  Walking in here this

6   morning, I will just say I was inclined to go along with BP's

7   suggestion about it's time to separate these cases and

8   reallocate them or whatever, but I'm kind of troubled by some

9   of the things that have been said this morning.  I'm hesitant

10  to do that right now.

11           Anybody else want to say anything on the case

12  management proposal going forward?  No?

13       **MR. DOMINICK:**  Yes.  This is Paul Dominick,

14  Your Honor, from the Nexsen Pruet firm.

15       **THE COURT:**  Okay.

16       **MR. DOMINICK:**  The only thing I wanted to say --

17  well, first I would be remiss if I didn't thank you for

18  arranging this Zoom conference.  I certainly appreciate that.

19           My understanding, Your Honor -- I just want to

20  make sure I understand what our mission is -- is to meet and

21  confer with BP and then brief the liability issue, and after

22  that we will reconvene.  Would the other things be up for

23  discussion at that time?  Case management, are we going to

24  revisit that issue at the same time?  Where are we on that?

25       **THE COURT:**  Yes.  I will have to decide how to handle

11:09

1    it, if we need another conference like this or whether I'll

2    just do it on paper.  I haven't even thought through that yet,

3    Mr. Dominick.

4              **MR. DOMINICK:**  Yes, Your Honor.  Thank you.

5              **THE COURT:**  All right.

6              **MR. GISLESON:**  Your Honor, Soren Gisleson with

7    Herman Herman.

8              **THE COURT:**  Yes.

9              **MR. GISLESON:**  I just want to clarify.  You are not

10   asking us to actually file dispositive motions.  You are asking

11   us to file briefings as to how the legal issues affect --

12             **THE COURT:**  Yes.  If you-all can come to hopefully

13   some agreement or common understanding as to what issues will

14   have to be tried in any of those cases that go to trial --

15   obviously, I think these would largely be individual trials.

16   What issues will have to be tried, I guess, is what I'm looking

17   for.

18             Again, my thought -- and I guess I would say

19   right now my hope -- would be that the trials would be similar,

20   if not identical, to what a BELO trial would look like.

21             Okay.  Anybody have anything else?  Everyone

22   have a good day.

23             (Proceedings adjourned.)

24                        *  *  *

25

1    **<u>CERTIFICATE</u>**

2         I, Toni Doyle Tusa, CCR, FCRR, Official Court

3    Reporter for the United States District Court, Eastern District

4    of Louisiana, certify that the foregoing is a true and correct

5    transcript, to the best of my ability and understanding, from

6    the record of proceedings in the above-entitled matter.

7

8

9                              */s/ Toni Doyle Tusa*
                              Toni Doyle Tusa, CCR, FCRR
10                             Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25