# Exhibit B

# UNITD STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | * | MDL 2179 |
|     "Deepwater Horizon" in the Gulf | | |
|     Of Mexico, on April 20, 2010 | * | SECTION: J |
| | * | JUDGE BARBIER |
| This Document Relates To: | | |
| *All Cases in Pleading Bundle B3* | * | MAG. JUDGE WILKINSON |

| | | |
|---|---|---|
| **MICHAEL BOATRIGHT** | | |
| | * | **CIVIL ACTION NO 2:17-cv-3111** |
|     **PLAINTIFFS** | * | **SECTION J** |
| **VERSUS** | * | **JUDGE BARBIER** |
| **BP EXPLORATION & PRODUCTION,** | * | **MAG. JUDGE WILKINSON** |
| **INC., BP AMERICA PRODUCTION** | | |
| **COMPANY, BP P.L.C.,** | * | |
| **TRANSOCEAN LTD., TRANSOCEAN** | | |
| **OFFSHORE DEEPWATER DRILLING** | * | |
| **INC., TRANSOCEAN DEEPWATER** | | |
| **INC., TRANSOCEAN HOLDINGS LLC,** | * | |
| **TRITON ASSSET LEASING GMBH,** | | |
| **HALLIBURTON ENERGY SERVICES,** | * | |
| **INC.** | | |
| | * | |
|     **DEFENDANTS** | | |

## COMPLAINT

NOW INTO COURT, through undersigned counsel, comes Plaintiff, MICHAEL BOATRIGHT, and respectfully avers as follows:

## PARTIES

1.    Plaintiff, Michael Boatright, a person of full age and majority, is a resident and citizen of Harvey, Louisiana.

2.      Defendant, BP EXPLORATION & PRODUCTION INC., a Delaware corporation at all pertinent times registered to do and doing business in the State of Louisiana, whose principal business establishment and registered business office in Louisiana is 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808 and whose agent for service of process is C.T. Corporation, 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808. BP EXPLORATION & PRODUCTION INC. was a leaseholder and designated operator of the Macondo well from which the oil spill originated upon which this complaint is based and was designated as a responsible party by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714.

3.      Defendant, BP AMERICA PRODUCTION COMPANY, a Delaware corporation at all pertinent times registered to do and doing business in the State of Louisiana, whose principal business establishment and registered business office in Louisiana is 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808 and whose agent for service of process is C.T. Corporation, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA 70808. BP AMERICA PRODUCTION COMPANY was party to the contract for the drilling of the Macondo well by the Deepwater Horizon vessel with Transocean, Ltd.

4.      Defendant, BP, P.L.C., a foreign corporation at all pertinent times doing business in the State of Louisiana and within this district through control of its wholly-owned subsidiaries BP Exploration & Production, Inc. and BP America Production Company (collectively "BP").

5.      Defendant, TRANSOCEAN LTD., a foreign corporation at all pertinent times doing business in the State of Louisiana and within this district.

6.      Defendant, TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., a

Delaware corporation at all pertinent times doing business in the State of Louisiana.

7.    Defendant, TRANSOCEAN DEEPWATER, INC., a Delaware corporation at all pertinent times doing business in the State of Louisiana.

8.    Defendant, TRANSOCEAN HOLDINGS, LLC, a Delaware Corporation at all pertinent times doing business in the State of Louisiana.

9.    Defendant, TRITON ASSET LEASING GMBH, a foreign corporation at all pertinent times doing business in the State of Louisiana (collectively "Transocean" with Transocean Ltd, Transocean Offshore Deepwater Drilling, Inc., Transocean Deepwater, Inc., and Transocean Holdings, LLC).

10.    Defendant, HALLIBURTON ENERGY SERVICES, INC., a Delaware corporation at all pertinent times registered to do and doing business in the State of Louisiana whose principal business establishment in Louisiana is 1450 Poydras St., Suite 2070, New Orleans, LA 70112 and whose registered office in the state of Louisiana is 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808 and whose registered agent in Louisiana is C.T. Corporation, 5615 Corporate Blvd., Suite 400B, Baton Rouge, LA 70808 (hereinafter "Halliburton").

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332(a)(4), because this matter in controversy exceeds the minimum jurisdictional amount of $75,000.00, exclusive of interest and costs, and this case is between Plaintiff and citizens of a State or of different States.

12.    Jurisdiction is also proper under 28 U.S.C. Section 1331, because the claims asserted by Plaintiffs arise under the laws of the United States of America, including the laws of

various states which have been declared, pursuant to 43 U.S.C., Section 1331(f)(1) and 1333(a)(2), to be the law of the United States for that portion of the outer continental shelf from which the oil spill originated.

13.    Pleading in the alternative, jurisdiction also exists over this action pursuant to The Admiralty Extension Act, 46 U.S.C., §30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

14.    Venue is proper is appropriate in this District under 28 U.S.C. § 1391, because the events or omissions giving rise to the claims asserted herein occurred in this District. Venue is also proper because response operations were coordinated, determined and directed in this district. Defendants have substantial, systematic and continuous contacts in the Eastern District of Louisiana and are subject to personal jurisdiction in the District. Venue is also appropriate in this District consistent with 28 U.S.C. § 1407 and the Transfer Order, subject to the provisions of the Direct Filing Order (PTO No. 20).

## FACTUAL ALLEGATIONS

15.    These cases arise from the April 20, 2010, loss of control of the Macondo well that was being drilled by the Deepwater Horizon drilling vessel and the related explosions on that vessel which caused it to sink and resulted in the discharge of significant amounts of oil that spread throughout the Gulf of Mexico over a period of more than three months. They also arise due to subsequent additional negligent acts and failure of reasonable care which occurred in Florida territorial waters.

a.    At all times relevant to this action, the Deepwater Horizon, an ultra-

deep water semi-submersible drilling rig, was leased to BP. At the time of its explosion on April 20, 2010, the Deepwater Horizon was being operated by BP for the purposes of drilling an exploratory well at the Macondo prospect on Mississippi Canyon Block 252 on the Outer Continental Shelf, south, west and north of Florida shores and waters.

b. The Macondo prospect was being explored pursuant to a ten-year lease, OCS- G32306, granted by the Minerals Management Services on June 1, 2008, and owned at the time of the explosion by BP. The lease allowed BP to drill for hydrocarbons and perform oil production-related operations in the Mississippi Canyon Block 252 area which includes the Macondo prospect. BP was designated the lease operator.

### The Blowout

16. At approximately 10 p.m. on April 20, 2010, following cementing operations aboard the vessel Deepwater Horizon, workers were finishing drilling operations for the Macondo well and displacing the drilling mud in the marine riser at the direction of BP in preparation for completion pursuant to BP's design, when they encountered an uncontrolled influx of highly pressurized hydrocarbons into the wellbore leading to a "blowout" or loss of control of the well.

17. The combustible gas flowing uncontrolled into the wellbore traveled quickly up to the rig floor where it was ignited leading to a fiery explosion on the Deepwater Horizon.

18. Defendant, BP was unable to regain control of the well and the fiery explosions onboard the Deepwater Horizon caused the vessel to be destroyed and sink to the bottom of the Gulf of Mexico.

19.     BP did not follow safe procedures, in order to save money, by electing to utilize a risky well design that provided for fewer barriers against hydrocarbon influx into the wellbore relative to well designs typically used in an unknown and troublesome formation like the Macondo prospect.

20.     Due to the depth of the Macondo well, BP was also negligent in the selection of a casing material that was vulnerable to collapse under high pressure. BP's negligence in well design and casing selection allowed for an increase risk of a blowout.  BP knew or should have known of those risks but chose risk over increased costs.

21.     In addition to the casing-related problems, the float collar installed on the final section of casing likely failed to seal properly, which may have allowed hydrocarbons to leak into the casing, contributing to the April 20, 2010 blowout.

22.     A float collar is a component installed near the bottom of the casing string on which cement plugs land during the cementing job.

23.     Upon information and belief BP was negligent in operations to install the float collar and/or in neglecting warning signs of a potentially improper installation of the float collar.

24.     BP was negligent in preparing the wellbore for cementing operations which led to an increased likelihood that the cement job would fail and a blowout would occur.

25.     BP was negligent in electing to utilize an unsafe cement job design that was unlikely to create a secure barrier against hydrocarbon influxes into the Macondo wellbore.

26.     BP was negligent in the selection of an improper cement mixture that was susceptible to failure under the high pressures and temperatures typical in the Macondo well.

27.     Negligent cementing operations failed to isolate the well bore from

hydrocarbon zones and seal the bottom of the well against an influx of gas. BP was negligent in failing to identify this bad cement job ignoring numerous warning signs in the process.

28.     Upon information and belief, the defective cement job allowed a pathway for highly pressured gas to enter the Macondo wellbore and travel rapidly from there to the rig floor.

29.     BP was negligent in the monitoring and design of the drilling mud program which failed to prevent hydrocarbons from flowing into the wellbore and up to the Deepwater Horizon.

30.     BP was negligent in the decision and design to displace the drilling mud from the marine riser before allowing time for the cement to fully set.

31.     BP was also negligent in conducting and monitoring the displacement operations, failing to recognize the many signs of trouble.

32.     BP was negligent in failing to utilize a casing hanger lockdown sleeve that would have stopped the hydrocarbons from escaping past the wellhead and reaching the rig floor.

33.     BP was negligent in failing to timely identify that hydrocarbons were entering the wellbore during displacement operations and in failing to initiate well control measures.

34.     After hydrocarbons reached the rig floor, the Blowout Preventers (BOP's) for the Deepwater Horizon, failed to activate as designed to prevent the continued uncontrolled flow of gas from the formation.

35.     The BOP utilized by BP was defective and unreasonably dangerous in their manufacture, design, and/or composition, and/or failed to contain adequate warnings and

instructions.

36.     BP failed to ensure that the BOP design used on Deepwater Horizon was sufficient for the drilling conditions and program expected at the Macondo site.

37.     BP was negligent in failing to properly maintain the BOP's for the Deepwater Horizon in accordance with safe practices and federal regulations.

38.     BP failed to ensure that the BOP's possessed the necessary technology to properly function including adequate safeguards and redundant systems to prevent blowouts.

39.     BP failed to ensure that the BOP's and all related systems were properly tested to operational conditions and confirmed to be in good working order.

40.     BP was negligent in failing to properly utilize and maintain emergency systems and equipment on board the Deepwater Horizon or to supervise and/or inspect to assure same.

41.     Defendants' negligent actions and/or omissions caused the blowout of the Macondo well leading to the destruction and sinking of the Deepwater Horizon and subsequent uncontrolled discharge of oil into the Gulf of Mexico.

**Uncontrolled Discharge of Oil into the Gulf and Environmental Implications**

42.     After the sinking of the Deepwater Horizon, the well began to release, leak, and/or discharge oil directly into the Gulf of Mexico due to the failure of the well's cement and/or casing and the concurrent failure of the blow-out preventors.

43.     Defendant, BP, recklessly, willfully and/or wantonly failed to ensure that oil would be quickly and fully contained within the immediate vicinity of the Macondo well in the event of a blowout.

44.     The well discharged an estimated 50,000 to 100,000 barrels of oil into the

Gulf of Mexico on a daily basis for at least 87 days.

45.     The United States government has estimated that approximately 5,000,000 barrels (210,000,000 gallons) of oil gushed into the Gulf of Mexico during the months that the well was uncontained with others estimating that the well discharged upwards of 7,000,000 barrels.

46.     Defendant, BP, willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled discharge from the Macondo well into the Gulf of Mexico and to prevent injuring Plaintiffs.

47.     This massive release of oil contaminated thousands of square miles of waters in the Gulf as the well flowed uncontained for three months resulting in the ban of recreational and commercial fishing by the government in many areas during that time period.

48.     The oil discharged into the Gulf of Mexico from the Macondo well contained hydrocarbon molecules, carcinogens and other toxic pollutants including heavy metals which are extremely hazardous to the marine ecosystem in the Gulf of Mexico including into the environment where Plaintiffs work, live and enjoy the recreational activities of swimming, fishing and boating.

49.     After the explosions, BP attempted to downplay and conceal the severity of the Oil Spill. Government investigators have found BP's initial leak estimate of 1,000 barrels a per day to be a fraction of its measured leakage amount, which in fact exceeded 50,000 barrels per day.  Additionally, an internal BP document from around the time of the spill shows that the company's own analysis had actually estimated that the rate of oil spillage could reach 100,000 barrels, or 4,200,000 gallons, per day.

50.     Each day during the course of the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out in a widening slick of oil, as well as spreading out in vast subsurface plumes.  On the surface, the shifting mass was large enough to be visible from outer spaces, at times covering tens of thousands of square miles, spreading with the wind and currents towards the Gulf States' coastlines.

51.     Beginning on or about April 30, 2010, oil made landfall along the Gulf Coast on white sand beaches, leased and privately owned subsurface areas, and in ecologically sensitive marshes and estuaries.   Underwater, immense plumes of oil and dispersant chemicals swirled through the entire water column, damaging ecosystems throughout the Gulf of Mexico.

52.     The oil spewed from the well of twelve weeks until BP finally capped the well on July 15, 2010.  Ultimately, almost five million barrels (210 million gallons) of crude oil spilled in the Gulf of Mexico.

53.     Crude oil carried with it significant public health risks.  Crude oil has many highly toxic chemical ingredients that can damage every system in the body.

54.     Crude oil contains benzene and other volatile organic compounds ("VOCs") such as ethylbenzene, toluene, xylene and napththalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes and heavy metals such as aluminum, cadmium, nickel, lead and zonc, all of which can harm human health.

55.     Chemicals such as benzene, PAHs and many other chemicals in crude oil are toxic and volatile, moving from the oil to the air.  Once airborne, they can blow over the ocean for miles, reaching communities far from the spill.  They may be noticed as petroleum odors.

56.     Dermal exposure to certain VOCs in crude oil can cause, *inter alia*, redness,

swelling, irritation, rashes and blisters on the skin and mucous membranes. Inhalation exposure to certain VOCs in crude oil can cause, *inter alia*, coughing, throat irritation, congestion, shortness of breath and wheezing. Inhalation exposure to other OVCs in crude oil can also affect, *inter alia*, the nervous system causing, among other things, nausea, vomiting, dizziness, irritability, confusion, and weakness of extremities. Ingestion of food or water containing VOCs from crude oil can cause, *inter alia*, nausea, vomiting and diarrhea.

57.     According to the Agency for Toxic Substances and Disease Registry ("ASTDR"), which is part of the U.S. Department of Health and Human Services, benzene is a known mutagen and carcinogen. Benzene in crude oil can cause a variety of health complications, including ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain and lethal central nervous system depression.

58.     A 2007 Centers for Disease Control review of benzene toxicity concluded that there is substantial evidence that benzene causes leukemia, aplastic anemia (precursor of leukemia), chromosomal abnormalities in lymphocyctes and bone marrow cells, damage to the immune system, and abnormal development of blood cells. Long-term low-level oral and inhalation exposures to benzene have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping and memory loss.

59.     As noted by Dr. Lisa Kaplowitz of the U.S. Department of Health and Human Services in her June 15, 2010 testimony before Congress: "Oil can remain toxic in the environment for years."

60.     The OPA imposes liability upon a "responsible party for a …facility from which oil is discharged …into or upon navigable waters or adjoining shorelines" for the

damages that result from such incident as well as removal costs.  33 U.S.C. §2702.

61.     The U.S. Coast Guard is responsible for implementing many aspects of the OPA, including designating responsible parties, as well as responding to oil spills and supervising and/or coordinating response actions.

62.     After the Oil Spill, the Coast Guard formally and/or informally designated, *inter alia*, Defendants BP Exploration and Transocean Holdings as "responsible parties" under the OPA.

63.     In the wake of the disaster, and pursuant to its duties as a responsible party under the OPA, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States.   This disaster response plan had three primary components: offshore containment; shoreline protection; and subsea response.

64.     As part of its offshore containment response program, BP directed the use of vessels to, *inter alia*, recover coming to the surface of the Gulf of Mexico; skim oil from the surface of the water; and conduct *in-situ* burning of oil that reached the surface of the water.  BP also employed vessels to tow and deploy booms – floating barriers intended to contain, deflect, or hold back oil floating in the water's surface.

65.     In addition, BP's response plan included the use of chemical dispersants that were intended to break down the oil into finely dispersed droplets.

66.     Dispersants generally contain a solvent, a surfactant and other additives that break up the surface tension of an oil slick or sheen to make the oil more soluble in water.

67.     Among other dispersants, BP applied a highly toxic form of chemical dispersant called Corexit.  BP used both Corexit®9500 and Corexit®EC9527A.

68.     The Material Safety Data Sheet ("Data Sheet") – a form that sets forth the

properties of a particular substance, including its toxicity and health effects – for Corexit®9500 indicates that it contains hazardous substances, that it is harmful to human health, and that dermal exposure, inhalation and ingestion should be avoided. The Data Sheet further states that Corexit® 9500 is an eye and skin irritant and may irritate the respiratory tract if inhaled. If ingested, it may cause chemical pneumonia.

69.     The Data Sheet for Corexit® EC9527A also indicates that it contains hazardous substances, it is harmful to human health, and that dermal exposure, inhalation and ingestion should be avoided. The Data Sheet further states that Corexit® EC9527A is an eye and skin irritant and, if inhaled, may irritate the respiratory tract. If ingested, it may cause liver and kidney effects and/or damage, or irritate the gastrointestinal tract. Acute exposure may cause adverse central nervous system effects, nausea, vomiting, anesthetic or narcotic effects.

70.     In addition, Corexit® EC9527A contains 2-butoxyethanol, also known as EGBE. Repeated or excessive exposure to EGBE may cause injury to red blood cells, the kidneys, and the liver. EGBE may be carcinogenic to humans. It is an eye, nose, and throat irritant. It can cause nausea, vomiting, diarrhea, and abdominal pain. Exposure to EGBE can also cause headaches, dizziness, lightheadedness and unconsciousness. Exposure to EGBE can damage a developing fetus, and chronic exposure may result in damage to male and female reproductive systems in animals.

71.     Both of these Corexit® products also contain non-specified organic sulfonic acid salt, which is "moderately toxic," as well as propylene glycol, a chemical with solvent properties. Propylene glycol is an irritant and exposure to high levels of propylene glycol and mists containing this chemical can cause eye, nose, throat and lung irritation. Some individuals are allergic to propylene glycol and those with eczema may be at higher risk.

Exposure may cause erythema, edema, induration, and other skin problems.

72.     Upon information and belief, BP also authorized the application of other chemical dispersants, including PES51™ and OMI-500®, to near-shore and on-shore areas, as well as to contaminated vessels and containment equipment, to disperse the oil and clean vessels and equipment.

73.     The Data Sheet for PES51™ indicates that it should be handled with gloves, that it is an irritant, and that dermal exposure and ingestion should be avoided.

74.     The Data Sheet for OMI-500® indicates that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided.  Among other effects, OMI-500® can be irritating to skin and eyes and may cause irritation of the respiratory tract, typically experienced as nasal discomfort and discharge, possibly with chest pain and coughing.  Headache, nausea, vomiting, dizziness, and drowsiness may occur. Exposure may also cause mild to severe irritation experienced as discomfort or pain, excess blinking and tear production, possibly with marked redness and swelling of the conjunctiva.

75.     In summary, the dispersants used by BP are known to cause, *inter alia*, headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation of the skin, eyes, nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and developmental damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of chronic obstructive pulmonary disease.

76.     Upon information and belief, immediately after the Deepwater Horizon

disaster, on or about April 23, 2010, BP began subsea and aerial application of chemical dispersants to the resulting oil slick and sheens on the surface of the Gulf. Chemical dispersants have been sprayed onto the ocean surface from aircraft that fly over spills and dispense the chemicals from cargo holds, sprayed onto the ocean surface from fountain-type jets on the docks of boats, sprayed from smaller vessels onto the surface of the water, injected immediately below the surface of the water from vessels, injected deep below the surface of the ocean, and sprayed by hand.

77.     BP coordinated and directed aircraft owned and/or operated by others to fly out over the Gulf to spot oil slicks and to spray chemical dispersants on the surface of the Gulf.

78.     According to the Aerial Dispersants Operations -- Houma Status Report, as of June 26, 2010, BP made use of at least 10 spray aircraft and 8 spotter aircraft. At least four spray planes left from Houma, Louisiana. At least six spray planes left from Stennis International Airport in Mississippi.   Upon information and belief, aerial dispersant sorties also would leave from airfields in Florida and were conducted and orchestrated by BP.

79.     On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator directed BP to identify and begin using chemical dispersants less toxic than Corexit®.

80.     In addition to the oil that was released by BP's Macondo well, BP directed over two million gallons of chemical dispersants to be sprayed, injected or otherwise released into Gulf waters. BP had injected at least 770,000 gallons of chemical dispersants directly into the damaged wellhead and otherwise directed its contractors to apply considerable amounts of chemical dispersants directly into the Gulf of Mexico.

81.     On or about May 19, 2010, the U.S. Environmental Protection Agency (EPA)

Administrator directed BP within 24 hours of issuance to identify and to change to chemical dispersants that are less toxic than those dispersants that BP had been using, including Corexit®. BP refused to comply and continued using dispersants of its choice.

82.     On May 20, 2010, BP objected to this order and notified the EPA that it would continue using Corexit®.

83.     BP's use of chemical dispersants then skyrocketed: on May 22, 2010, BP used 45,000 gallons of dispersant and on May 23, 2010, it used 70,000 gallons of dispersant.

84.     Upon information and belief, BP stopped using Nalco's Corexit® 9527 on May 23, 2010, when supplies allegedly ran out.  It relied on Corexit® 9500 thereafter.

85.     On May 26, 2010, the EPA directed BP to reduce the overall use of Corexit® by 75% and to stop using chemical dispersants on the water's surface except in rare cases where an exemption was sought in writing from and approved by the On Site Coordinator.

86.     BP thereafter sought more than 40 exemption requests to use chemical dispersants on the surface of the Gulf of Mexico.  According to the Aerial Dispersants Operations -- Houma Status Report, by June 26, 2010, BP had applied 933,023 gallons of dispersant by aerial application.  As of the same date, BP had ordered application of dispersant by 386 flights, or sorties, and had covered approximately 291 square miles of the Gulf with dispersant.

87.     BP and its contractors used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico.

88.     Defendant BP recklessly, willfully and/or wantonly failed to use ordinary care by electing to use chemical dispersants that are more toxic than others in the response efforts and thereby amplified the toxic effects on the marine environment and the damages to Plaintiffs.

### Plaintiff's Factual Allegations

89.     Plaintiff is a scientific diver and environmental scientist who is a member of EcoRigs Non-Profit Corporation. On or about June, 2010, EcoRigs was approached by Jon Fajans of the National Oceanic and Atmospheric Administration (NOAA) regarding work related to the Deepwater Horizon Oil Spill Disaster. Based upon information and belief, Jon Fajans was employed as the Lab Coordinator and Scientific Logistical Support for the BP Operations Learning Center in Houma, Louisiana. EcoRigs was requested by Mr. Fajans to submit research proposals regarding subsurface oil and dispersant plumes in the northwest Gulf of Mexico and to conduct offshore research trips whereby water samples from the Gulf of Mexico would be submitted to BP. In email communications and telephone conversations, Mr. Fajans promised that EcoRigs would receive funding for their research and that their water samples would help Mr. Fajans obtain funding from BP for EcoRigs' research.

90.     At the request of Mr. Fajans, Plaintiff participated in approximately 25 to 30 dives offshore during August and September of 2010 in the Gulf of Mexico Main Pass, Mississippi Canyon and Grand Isle areas. Based upon information and belief, BP was aware that Plaintiff was participating in these dives. Mr. Fajans took steps to coordinate with Plaintiff so that BP could receive water samples from these dive excursions. Based upon information and belief, Mr. Fajans and other employees of BP were aware of the locations in which Plaintiff was diving in order to obtain water samples for BP. Plaintiff was told by Mr. Fajans and others acting on behalf of BP that the areas where they were diving were safe for diving.

91.     After completing the dives for BP, Plaintiff began to suffer from health symptoms, including but not limited to, blood in their stools, bleeding from the nose and eyes, nausea, vomiting, diarrhea, stomach cramps, dizziness and confusion, headaches, shortness of

breath, blurred vision, skin rashes, pain in their arms and legs, stress, anxiety and depression. In the Fall of 2011, Plaintiff received treatment at the Gulf Coast Detoxification Program and were told that their symptoms were more likely than not caused by their exposure to the Deepwater Horizon oil spill during their research dives.

92.     In May 2012, the Government Accountability Project ("GAP") issued a Freedom of Information Act ("FOIA") request to NOAA regarding diver safety during the Deepwater Horizon oil spill. In a document dated June 3, 2010 and produced pursuant to GAP's FOIA request, a NOAA Diving Program Manager states "In response to several requests from NOAA divers for clarification on acceptable areas for diving in the Gulf of Mexico, the NOAA diving Control and Safety Board ...decided to establish a 'dive exclusion zone' extending 30 NM beyond the furthest boundary line shown in 72-Hour nearshore Surface Oil Forecast Deepwater Horizon MC252..." Based upon information and belief, Mr. Fajans and others working for BP were aware of this dive exclusion zone and failed to inform Plaintiff of the dive exclusion zone and further failed to warn Plaintiff of the dangers of diving in the zone exclusion zone. Based upon information and belief, Plaintiff completed research and water sampling dives within the dive exclusion zone and Mr. Fajans and others working for BP were aware that Plaintiff was diving in the dive exclusion zone.

93.     In a document dated May 3, 2010, a NOAA Dive Manager states "Diving in water contaminated with crude oil requires specialized training, equipment and diving protocols and is currently outside the scope of the NOAA Diving Program. Until such time that these elements are established, NOAA divers are prohibited from diving in these waters." Mr. Fajan and others working for BP failed to warn Plaintiff that divers were prohibited from diving in the Gulf of Mexico. Additionally, Mr. Fajans and others working for BP directed Plaintiff to collect water

samples via scuba diving and made arrangements to collect Plaintiff's water samples from the Gulf of Mexico.

94.     A document dated July 7, 2010 and produced by NOAA pursuant to GAP's FOIA request, states "Our basic recommendation for our own EPA operations is that divers that haven't been doing this for a period of time should not attempt to do it 'on the fly' in the Gulf within the areas the NOAA Office of Restoration and Response have shown oil to be present or potentially present - the most likely outcome is that divers will be acutely exposed, or unnecessarily increase their chances of showing long term effects down the road." Based on information and belief, BP was aware of the potential for acute toxic exposure and long term adverse health effects for divers exposed to the oil spill and failed to warn Plaintiff of these risks.

95.     Plaintiff also entered into a Master Vessel Charter Agreement with BP America Production Company.

## CLAIMS FOR RELIEF

### COUNT I
### Negligence Under General Maritime Law

96.     Plaintiff re-alleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

97.     The existence and breach of Defendants' legal duties are established under general maritime law.

98.     At all times material hereto, Defendants owed duties of ordinary and reasonable care to Plaintiff in connection with the drilling operations and maintenance of the Deepwater Horizon, including its appurtenances and equipment. BP additionally owed duties to guard against and/or prevent the risk of an oil spill and to mitigate the harm if an oil spill did

occur.

99. Further, BP owed a duty to Plaintiff to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

100. BP had a heightened duty of care to Plaintiff because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

101. At all times relevant to this litigation, BP and the other defendants knew or should have known that: (a) crude oil contains chemicals hazardous to human health; (b) chemical dispersants contain chemicals hazardous to human health; (c) Plaintiff was entitled to adequate and timely warning of the harmful effects of exposure to crude oil and chemical dispersants and the hazardous substances that crude oil and dispersants contain; and (d) Plaintiff should have been provided proper protective clothing and respirators when engaged in Oil Spill clean-up and response activities; and (d) failure to exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures would result in harm to Plaintiff.

102. BP breached its duty of care to the Plaintiff in the following non-exclusive respects:

> a. failing to prevent the explosion on board the Deepwater Horizon;
>
> b. failing to cap the Macondo well in a timely manner;
>
> c. failing to warn Plaintiff, public officials, and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous chemicals they contain;
>
> d. failing to properly train and equip cleanup and response workers to avoid

exposure to hazardous substances encountered in connection with relief efforts;

e.    failing to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

f.    failing to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of vessels and crewmembers being exposed to aerial chemical dispersants; and

g.    failing to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures;

h.    failing to operate the Deepwater Horizon in a safe manner;

i.    operating the Deepwater Horizon in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill;

j.    failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purpose;

k.    failing to promulgate, implement, and enforce rules and regulations pertaining to the safe operations of the Deepwater Horizon, which, if they had been promulgated, implemented, and enforced, would have averted the fire, explosion, sinking, and oil pill;

l.    failing to adhere to applicable safety, construction, and/or operating regulations, including, but not limited to, regulations designed to prevent the fire, explosion, and discharge of oil;

m.   failing to properly design and/or engineer the well, drilling program, cementing program, mud program and completion program;

n.   failing to take appropriate action to avoid or mitigate the accident;

o.   negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

p.   failing to properly train their employees;

q.   failing to ascertain that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

r.   failing to timely warn; Failing to provide respiratory and dermal protective gear to Plaintiff;

s.   failing to provide all reasonable cooperation and assistance requested by the responsible officials in connection with the clean-up and removal activities;

t.   failing to ensure that adequate plans, equipment, safeguards, resources and technology were readily available to prevent and/or mitigate the effects of the loss of control of a well and unfettered discharge of oil into the Gulf of Mexico;

u.   failing to timely bring the oil release under control, to prevent the spill from migrating throughout the Gulf of Mexico;

v.   failing to provide appropriate accident prevention equipment; Failing to ensure that the casing and float collar were properly designed and installed;

w.   providing BOP's that failed to properly function;

      x.      failing to ensure that BOP's would work as intended;

      y.      failing to test the BOP's to ensure that they would operate properly;

      z.      recklessly altering the BOP's and failing to use them in a safe manner;

      aa.    failing to conduct well cementing operations properly;

      bb.    failing to employ alternative cementing operations in light of known problems with the actual cementing operations employed;

      cc.    failing to have a reasonably adequate well control plan and necessary equipment in case of a loss of the well;

      dd.    failing to exercise reasonable care in the design and implementation of both well control efforts and response and recovery efforts;

      ee.    failing to insure that adequate plans, equipment, safeguards resources, and technology were available to prevent or mitigate the quantity of hazardous chemicals that would enter into and effect the Gulf of Mexico.

      ff.    recklessly using dispersants so as to cause the greatest migration and widest potential for environmental toxic exposures and effects throughout the Gulf.

103.    The blowout and explosions on the Deepwater Horizon, its sinking and the resulting spill were caused by the joint and concurrent negligence of the BP Defendants and the Transocean and/or Halliburton Defendants named herein.

104.    Defendants' breach of their duties posed an unreasonable risk of harm to Plaintiffs.

105.    Plaintiff suffered injury, loss and damages as a direct and proximate result of Defendants' breach of their aforementioned duties.

## COUNT II
## Gross Negligence Under General Maritime Law

106.　　Plaintiff re-alleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

107.　　Defendants had a heightened duty of care to Plaintiff because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

108.　　Defendants breached their legal duty to Plaintiff and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent failure to prevent and contain the oil spill.

109.　　Defendants knew or should have known that their willful, wanton, and reckless conduct would cause injury to Plaintiff.

110.　　Defendants' willful, wanton, reckless, and/or grossly negligent conduct is the factual and legal cause of Plaintiff's injuries and damages.

111.　　Defendants were aware at all times relevant hereto that their operations and the acts and/or omissions described above created an unreasonable risk of harm that Plaintiff and knew that catastrophic environmental destruction and economic loss would occur if the well being serviced by the DEEPWATER HORIZON were to blow out.

112.　　Defendants were indifferent to this risk of harm. Defendants intentionally failed to perform the duties owed to Plaintiff in reckless disregard of the consequences their actions and/or omissions would have on Plaintiff.

113.　　Moreover, Defendants acted intentionally with knowledge that their acts would probably result in injury or in such a way as to allow an inference of a reckless disregard of the probable consequences of their acts. Therefore, Defendants are also liable to Plaintiff for gross negligence and/or willful misconduct.

114.    The oil spill and subsequent response and recovery efforts that have caused damage and continue to cause damage to Plaintiff was proximately caused by Defendants' negligence, gross negligence and/or willful misconduct.

115.    Further, upon information and belief, the oil spill was proximately caused by the Defendants' violation of applicable federal safety, construction, or operating regulations and/or by violations of such regulations by an agent or employee of the Defendants and/or a person acting pursuant to a contractual relationship with Defendants.

116.    Defendants had a duty to conform their conduct in such a manner as to assure that a blowout would not occur, that the Deepwater Horizon would not be destroyed and sink, that an uncontrolled oil spill would not result and that adequate well control and response measures would exist in case of emergency pursuant to federal and Louisiana, Mississippi, Alabama and Florida law.

117.    Defendants failed to conform their conduct to the appropriate legal standard, thereby breaching their duty to assure that a blowout would not occur, that the Deepwater Horizon would not be destroyed and sink, that an uncontrolled oil spill would not result and that adequate well control and response measures would exist and be properly implemented in case of emergency pursuant to federal and Louisiana, Mississippi, Alabama and Florida law.

118.    Defendants' substandard conduct in failing to prevent the blowout, the ensuing destruction and sinking of the Deepwater Horizon, and the uncontrolled discharge of oil from the Macondo well into the Gulf of Mexico pursuant to federal and state laws was the cause-in-fact of the injuries, harm, and damages suffered by the Plaintiff.

119.    Defendants' substandard conduct in failing to prevent and/or contain the blowout that resulted in the sinking of the Deepwater Horizon and the subsequent oil spill from the

Macondo well was the legal cause of the Plaintiff's injuries, harm, and damage.

120.    In addition, and/or in the alternative, the blowout, fire, explosion, destruction of the Deepwater Horizon and ensuing oil spill were caused by defective equipment and would have been prevented by non-defective equipment, including the BOP and float collar, which were in the care, custody, and control of the Defendants and over which the Defendants had *garde*. Defendants knew or should have known of these defects and Defendants are therefore liable for the defects.

121.    BP has taken responsibility for the oil spill and cleaning up the oil spill, as former BP Chief Executive, Tony Hayward, had issued a statement on the BP website that BP is "… taking full responsibility for the spill and we will clean it up." BP has therefore admitted its liability for the oil spill.

122.    BP's duties are non-delegable.

123.    It was foreseeable that the Defendants' actions and/or omissions, resulting in the blowout of the Macondo well, the sinking and destruction of the Deepwater horizon, and the ensuing uncontrolled oil spill from the Macondo well, would proximately cause the damage, injury, and harm that Plaintiffs did suffer and will continue to suffer, as alleged herein.

124.    The injuries to the Plaintiff was also caused by or aggravated by the fact that Defendants failed to take reasonably necessary actions to mitigate the dangers associated with their operations.

125.    As a direct and proximate result of the Defendants' negligence and gross negligence, Plaintiff has suffered and will continue to suffer significant physical, economic and other damages in excess of $75,000.00

126.    As a direct and proximate result of the negligence of the Defendants, the Plaintiff

suffered bodily injury and resulting pain and suffering, disability and disfigurement, mental anguish, loss of the capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a pre-existing condition. These losses are either permanent or continuing in nature and Plaintiff will continue to suffer these losses in the future. Plaintiff's physical injuries required medical care in the past and will likely require on going care in the future. The Defendants are liable jointly and severally for Plaintiffs' damages resulting from Defendants negligence and gross negligence. As a result of Defendants' gross negligence, Plaintiff is also entitled to punitive damages.

### COUNT III
### Negligence Per Se Under General Maritime Law, State and Federal Law

127.    Plaintiff re-alleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

128.    Defendants' conduct with regard to the manufacture, maintenance and/or operation of oil- drilling vessels such as the Deepwater Horizon, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by federal laws and permits issued under the authority of these laws. These laws and permits create statutory and regulatory standards that are intended to protect and benefit Plaintiff, including, but not limited to, those that govern the National Oil and Hazardous Substances Contingency Plan, *see, e.g.* 40 C.F.R. §300.150. BP failed to adhere to the requirements for response actions established by the National Contingency Plan, 29 C.F.R. §1910.120. Additionally, BP failed to adhere to regulations set forth in Section 311 of the Clean Water Act, 40 C.F.R. §300 App. E, 30 C.F.R. Part 254 and the Oil Pollution Act, 33 U.S.C. §2717(b) (the "OPA"). One or more of Defendants violated these statutory and/or

regulatory standards and therefore breached their responsibilities under these regulatory provisions.

129.    In addition, the federal Bureau of Safety and Environmental Enforcement ("BSEE") found that BP violated the following federal regulations:

a.    BP failed to protect health, safety, property, and the environment by failing to perform all operations in a safe and workmanlike manner, in violation of 30 C.F.R. §250.107(a)(1);

b.    BP did not take measures to prevent unauthorized discharge of pollutants into offshore waters, in violation of 30 C.F.R. §250.300.;

c.    BP failed to take necessary precautions to keep the well under control at all times, in violation of 30 C.F.R. §250.401(a);

d.    BP did not cement the well in a manner that would properly control formation pressures and fluids and prevent the direct or indirect release of fluids from any stratum through the wellbore into offshore waters, in violation of 30 C.F.R. §250.420(a)(1) and (2);

e.    BP failed to conduct an accurate pressure integrity test, in violation of 30 C.F.R. §250.427;

f.    BP failed to maintain the Deepwater Horizon's BOP system in accordance with the American Petroleum Institute's Recommended Procedure 53 §18.10.3, in violation of 30 C.F.R. §250.446(a);

g.    BP failed to obtain approval of the Temporary Abandonment procedures it actually used at the Macondo well, in violation of 30 C.F.R. §250.1721(a);

h.    BP failed to conduct an accurate pressure integrity test at the 13-5/8"
liner shoe, inviolation of 30 C.F.R. §250.427; and

i.    BP failed to suspend drilling operations at the Macondo well when
the safe drilling margin identified in the approval application for the
permit to drill was not maintained, in four separate violations of 30
C.F.R. §250.427 (b).

130.    Defendants' violations of these statutory and/or regulatory standards constitute
negligence per se under federal law, as well as general maritime law.

131.    Defendants' violations of these statutory and/or regulatory standards constitute
negligence *per se* under Louisiana, Texas, Mississippi, Alabama and Florida Law.

132.    Defendants had actual and/or constructive knowledge of the facts and
circumstances leading to and causing the incidents described herein, which in turn caused
Plaintiffs' injuries, and their actions and inactions were grossly negligent, reckless, willful
and/or wanton.

133.    As a direct and proximate cause of Defendants' violation of statutory and/or
regulatory standards, the Plaintiff has suffered injuries and is entitled to damages.

### COUNT IV
### Claims under Louisiana Nuisance Law

134.    Plaintiff realleges each and every allegation set forth in all preceding
paragraphs as if fully restated here.

135.    BP's oil disaster has significantly interfered with Plaintiff's right to use and
enjoy the Gulf of Mexico without oil slicks, chemical dispersants, tar balls, and other associated
pollution.

136.    Prior to the *Deepwater Horizon* disaster, Plaintiff enjoyed the use of the Gulf of

Mexico for fishing, boating, and other economic and recreational pursuits, including residing on the Gulf of Mexico.

137.     Since the disaster, Plaintiff has been unable to fish or boat, and many Plaintiffs have lost their livelihoods.

138.     As a result of the oil disaster, Plaintiff, as a resident living in close proximity of the Gulf of Mexico, are constantly exposed to harmful chemicals in the air from oil, dispersants, and/or other harmful chemicals resulting from the Oil Spill at levels, amounts, and under conditions different from the general public.

139.     Moreover, Plaintiff has been subjected to foul and harmful odors emanating from the crude oil soaked booms and/or the chemical dispersants. Tarballs, oil and dispersants mixed with crude oil continue to contaminate the Gulf of Mexico and the Plaintiff's environment.

140.     Plaintiff has a substantial likelihood of success based on the allegations, and Plaintiff's allegations are likely to be proven and are not merely speculative.

## COUNT V
## Jones Act Claims

141.     Plaintiff realleges and reavers each and every allegation set  forth  in  all preceding paragraphs as fully set forth herein and further state:

142.     Plaintiff asserts this claim against the BP defendants.

143.     Plaintiff, was injured while employed on vessels engaged in commerce and navigation on navigable waters, performing service work entailing inspection and maintenance of vessel appurtenances, and their injuries bear a significant relationship to maritime activity, thus invoking general maritime law and the Jones Act under 46 U.S.C. § 688.

144.     During this time, Plaintiff was a Jones Act seaman because (1) his duties

contributed to the function of the vessel and to the accomplishment of its mission, and (2) his connection to the navigational vessels was substantial in duration and nature. *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995). Alternatively, Plaintiffs was a maritime worker entitled to compensation under the Longshore and Harbor Workers' Compensation Act (LHWCA) codified at 33 U.S.C. §§ 901-950 (2003). *Id.* at 356.

145.     A third person who borrows a worker may become the Jones Act employer if the borrowing employer assumed sufficient control over the worker. Factors indicating control include payment, direction and supervision of the employees, and the power to hire and fire. See Volykis v. M-V Isabelle, 668 F.2d 863 (5th Cir. 1982). See also Ruiz v. Shell Oil Co., 413 F.2d 310 (5th Cir. 1986). BP Defendants were the employers of Plaintiff as these defendants directed the dives and water sampling activities, controlled payment and exercised the power to hire and fire Plaintiff. An employer may be liable under the Jones Act although he is not the owner or operator of the vessel as to which his employee is a seaman. *Id*. Therefore, Plaintiff may prosecute their Jones Act claims against BP, although BP did not own or operate the vessel upon which Plaintiff was employed.

### COUNT VI
### Negligence, Gross Negligence and/or Failure to Warn Under
### State Law

146.     Plaintiff realleges and reaver each and every allegation set forth in all preceding paragraphs as fully set forth herein and further state:

147.     Plaintiff asserts that defendants are jointly and severally liable for damages under Louisiana law for grossly negligent and/or intentional failure to conduct reasonable inspection and to do what they should have done and for grossly negligent and/or intentional failure to warn.

148.     Defendants owed a duty and failed in their duty to know what products they were spraying or applying onto the waters of the Gulf of Mexico and into the environment where Plaintiff was located and to know the likely impact that their activities would have upon the environment and the health and welfare of Gulf Coast Region residents and tourists and disaster response workers such as Plaintiff. Defendants applied the chemicals and dispersants without regard to the likely short and long term impacts upon human health likely to be caused by the quantity and geographic broad scope of their chemical applications onto hydrocarbons.

149.     Defendants owed a duty and breached the duty to spray chemicals onto the waters of the Gulf of Mexico and into Plaintiff's environment in a way which was consistent with their product labels.

150.     Defendants owed a duty, and breached the duty, to warn of the effects of their spraying activities to Plaintiff and all those who would be potentially injured or damaged by their activities in a time frame which would have allowed Plaintiff to attempt to stop or reduce the quantity or location of the spraying activities, or alternatively to devise plans to mitigate or prevent damage to the Plaintiff's health and environment.

151.     Defendants owed a duty to reject spraying huge quantities of dispersants onto the Gulf and into Plaintiff's environment in order to protect the environment where Plaintiff was located and the safety, health and welfare of Gulf Coast residents and tourists and disaster response workers.   Defendants knew or should have known that they would be spraying quantities of chemicals over volumes of water in ways which had never been tested for affect.   Defendants breached that duty of reasonable care. Defendants owed a duty and failed in its duty of exercising reasonable care in the use of dispersants repetitiously in the same and contiguous areas, and in the type of the dispersants used. Defendants owed a duty and failed

in that duty to mitigate the damages caused by the negligent activities in order to prevent its harm or to reduce the quantity of hazardous chemicals that would enter into and effect the Gulf of Mexico and the health, safety and welfare of Plaintiff. Defendants owed a duty and failed in that duty to warn Plaintiffs of the deleterious health effects of crude oil and dispersants.

152.     Defendants owed a duty and failed in that duty to provide Plaintiff who was providing disaster response services with proper protective equipment, including, but not limited to respirators.

153.     Defendant knew or should have known that burning crude oil would negatively impact the health, safety and welfare of Plaintiff and did not bother to warn Plaintiff of the dangers associated with exposure to fumes from burning crude oil.

154.     Defendants knew or should have known that the crude oil from the DeepWater Oil Spill would cause significant environmental problems, including the widespread growth of toxic bacteria, including Vibrio Vulnificus, and owed a duty and failed in that duty to warn Plaintiff of this environmental impact and the potentially harmful consequences of bodily contact with this bacteria.

155.     As a direct and proximate result of the negligence of the Defendants, the Plaintiff was physically exposed to the subject chemicals on their bodies and via inhalation. Each was injured as a result of said exposure, suffered bodily injury and resulting pain and suffering, disability and disfigurement, mental anguish, loss of the capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a pre-existing condition.   These losses are either permanent or continuing in nature and Plaintiff will continue to suffer these losses in the future. As a result of Defendants' gross negligence, Plaintiff is also entitled to punitive damages.

Defendants are liable jointly and severally for Plaintiff's damages resulting from Defendants' negligence.

**COUNT VII**
**Breach of Contract under General Maritime**
**and Louisiana Law and alternative Claims of Justifiable Reliance Against the BP**
**Defendants**

156.    Plaintiff asserts a cause of action for breach of contract under maritime law. There is maritime jurisdiction over maritime contract disputes. The guiding principle is that a contract is maritime if its "subject matter" is maritime. *North Pac. S.S. Co. V. Hall Bros. Marine Ry. & Shipbldg. Co.*, 249 U.S. 119 (1919).  Based upon information and belief, the BP defendants hired Plaintiff to charter a vessel to offshore locations and to collect water samples.

157.    The BP defendants offered to provide funding to Plaintiff in exchange for the water samples that were retrieved during the offshore charters.  Plaintiff accepted this offer and performed several offshore charters and numerous dives in effort to retrieve water samples for the BP defendants.  The BP defendants received numerous water samples from Plaintiff. Thus, based upon information and belief, Plaintiff performed all obligations under the contract.  The BP defendants failed to provide funding to Plaintiff.  The BP defendants breached their maritime contract with Plaintiff by failing to provide the agreed upon funding. Further, based upon information and belief, the BP defendants promised funding to Plaintiff, in exchange for written proposals of Natural Resource Damage Assessment (NRDA) that was to be completed by Plaintiff. Plaintiff submitted a written proposal on or about July 15, 2010 entitled "Investigation, Delineation and Analysis of Subsurface Oil and Dispersants in the Northwest Gulf of Mexico" Jon Fajans, who was upon information and belief, acting on behalf of the BP defendants responded that the proposals needed to be "tweaked" and they would be accepted by the BP

defendants. Plaintiff accepted the BP's offer to allow Plaintiff to complete the NRDA by changing the proposal to conform with Mr. Fajan's directives who was based upon information and belief representing the BP defendants in the contract between Plaintiff and the BP defendants. BP breached this contract by failing to provide the promised funding.

158.     Plaintiff also entered into a Master Vessel Charter Agreement with BP America Production Company.

159.     From May 18, 2010 until Plaintiff received his off-hire dispatch notification letter dated November 26, 2010, Plaintiff and his vessel were contractually obligated under Article 2. A to remain available at BP's disposal for operation twenty-four hours (24) hours per day and Plaintiff was prohibited from using his vessel for any purpose other than performance of services during the charter term. Because Plaintiff was contractually obligated to BP, he was unable to pursue any other sources of revenue until he received his off-hire dispatch notification.

160.     Alternatively, if these contracts are determined not to be maritime in subject matter, Plaintiff asserts a cause of action under Louisiana law for breach of oral contract. Oral contracts are enforceable under Louisiana law. Plaintiff asserts that the same operative factual allegations stated in the preceding paragraphs relevant to the breach of maritime contract apply and are reasserted and restated herein.

161.     Alternatively, if a contract is not found to have existed under maritime or Louisiana Law, Plaintiff asserts a cause of action for justifiable reliance, negligent representation and fraudulent inducement.

162.     Plaintiffs seek any and all compensation that might be owed by BP and/or any Defendant under a VoO or other similar Charter Agreement or other contract, relating to Plaintiff's vessel charter, other clean-up efforts and/ or other response efforts.

## COUNT VIII
## Fraudulent Misrepresentation Against BP Defendants

163.     Petitioners incorporate by reference the preceding allegations of this Petition for Damages as if fully set forth below.

164.     Defendants made false representations of material facts to Plaintiff. Representatives of BP represented to Plaintiff that scuba diving in the Gulf of Mexico was safe. Based upon information and belief, defendants were aware that scuba diving in the Gulf of Mexico following the Deepwater Horizon Oil Spill would present hazards to human health and safety and that Plaintiff was likely to receive an injury.

165.     Plaintiff relied on the Defendants' false representations of material facts to Petitioners regarding the safety of diving in the Gulf of Mexico as set forth above.

166.     Plaintiff's reliance on the Defendants' false representations of material facts regarding the safety of scuba diving in the Gulf of Mexico was reasonable under the circumstances.

167.     Plaintiff has been damaged as the proximate result of their reliance on the Defendants' false representations of material facts regarding the safety of scuba diving.

## COUNT IX
## Battery

168.     Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

169.     Defendants place Plaintiff on VoOs without adequate training, warning of risks, or safety equipment.

170.     Defendants intentionally sprayed, and/or directed spraying, chemical

dispersants in the immediate vicinity of Plaintiff.

171.    Defendants' spraying of chemical dispersants in the immediate vicinity of Plaintiff without warning or safety equipment has caused Plaintiff to be exposed to harmful chemicals and resulted in headaches, rashes, chemical burns, nausea, and vomiting.

172.    Defendants spraying of chemical dispersants in the immediate vicinity of Plaintiffs without warning has caused Plaintiff to be exposed to harmful chemicals and resulted in headaches, rashes, chemical burns, nausea, and vomiting.

173.    Plaintiff is entitled to judgment finding Defendants liable to Plaintiff for damages suffered as a result of subjecting Plaintiff to unwanted, offensive conduct and enjoining Defendants' tortious conduct toward Plaintiff.

## COUNT X
## Punitive Damages

174.    Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon*.

175.    Defendants BP, Transocean, and Halliburton engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire, and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence. Plaintiffs, society and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by Defendants' misconduct herein..

176.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the

Deepwater Horizon by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

177.    BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of live; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

178.    Transocean callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the Deepwater Horizon and prevented said system from operating properly and preventing or containing the explosions, fire and loss of life.

179.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by using a well design with too few barriers to gas flow.

180.    BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

181.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job.

182.    BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly

dangerous activities on the Deepwater Horizon by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well.

183.     BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by failing to run a cement bond log to evaluate the integrity of the cement job.

184.     BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

185.     BP and Transocean focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

186.     BP, Transocean, and Halliburton focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by ignoring and/or misinterpreting abnormal, "red flag" pressure test results.

187.     BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and improper operation and use of the BOPs appurtenant to the Deepwater Horizon.

188.     BP and Transocean recklessly, willfully and/or wantonly failed to ensure that

oil would expeditiously and adequately be contained within the immediate vicinity of the Deepwater Horizon in the event of a blowout.

189.    BP and Transocean recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

190.    BP and Transocean willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

191.    BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

192.    In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality. As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

193.    Defendants' conduct was oppressive, wanton, malicious, reckless, or grossly negligent each time they:

        a.      failed to properly maintain and/or operate the Deepwater Horizon;

      b.      operated the Deepwater Horizon in such a manner the safety and integrity of the vessel and the well were disregarded to save time and money;

      c.      ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

      d.      failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the Deepwater Horizon;

      e.      violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

      f.      failed to take appropriate action to avoid or mitigate the accident;

      g.      failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

      h.      failed to ensure that the Deepwater Horizon and its equipment were free from defects, properly maintained and/or in proper working order;

      i      failed to provide appropriate disaster prevention equipment;

      j.      failed to have an appropriate emergency spill response plan or readily available spill response equipment.

194.    Defendants recklessly, willfully and/or wantonly caused or contributed to Plaintiffs' injuries by their tortious design, and reckless and wanton operation and use of chemical dispersants.

195.    Defendants recklessly, willfully and/or wantonly failed to ensure that Plaintiffs would be adequately protected from exposure to harmful chemicals in oil, chemical dispersants, and other harmful chemicals resulting from the Oil Spill.

196.    Defendants willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico and the corresponding clean up response measures involving the use of chemical dispersants.

197.    BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Oil Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

198.    Defendants' conduct, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because Defendants' conduct was motivated by financial gain; because it injured and endangered human and environmental health and safety; because it caused devastating damage and loss to the livelihoods, businesses, and properties of Plaintiffs; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to Defendants; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish Defendants and deter further repetition by Defendants or others.

199.    Accordingly, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## DAMAGES

200.    Defendants are jointly, severally and solidarily liable for the past, present and future damages suffered by plaintiffs in the following non-exclusive particulars:

1.    Loss of enjoyment of life;

2.    Physical disability, pain and suffering;

3.     Past and future mental pain and suffering;

4.     Past and future loss of income and benefits;

5.     Disruption of bodily cells, tissues, organs and systems;

6.     Past and future medical expenses;

7.     Loss of family relationships, love and affection;

8.     Loss of consortium;

9.     Damages for medical screening and monitoring;

10.    The implementation of medical screening and monitoring program to be funded by the Defendants

11.    Injunction to abate the public nuisance created by Defendants;

12.    Injunction to require monitoring of air and water;

13.    Pre-judgment and post-judgment interest at the maximum rate allowable by law;

14.    Attorneys' fees and costs of litigation;

15.    Economic and compensatory damages in amounts to be determined at trial;

16.    Punitive damages; and

17.    Any other further relief the Court deems just and proper.

## <u>JURY DEMAND</u>

201.    Plaintiff demands a trial by jury of all issues triable as of right by jury.

April 10, 2017                  Respectfully submitted,

                                By: /s/   Merritt E. Cunningham

                                Michael G. Stag, Esquire
                                Louisiana Bar Number:  23314
                                mstag@smithstag.com
                                Merritt E. Cunningham, Esquire

Louisiana Bar Number:  32843
mcunningham@smithstag.com
Ashley M. Liuzza, Esquire
Louisiana Bar Number: 34645
aliuzza@smithstag.com
Stephen H. Wussow, Esquire
Louisiana Bar Number: 35391
swussow@smithstag.com
Matthew D. Rogenes, Esquire
Louisiana Bar Number: 36652
mrogenes@smithstag.com
SMITH STAG, L.L.C.
One Canal Place, Suite 2850
365 Canal Street
New Orleans, Louisiana  70130
(504) 593-9600 telephone
(504) 593-9601 facsimile

And

Kelley B. Stewart, Esquire
Florida Bar Number:  492132
kstewart@krupnicklaw.com
Michael J. Ryan, Esquire
Florida Bar Number:  975990
mryan@krupnicklaw.com
Joseph J. Slama, Esquire
Florida Bar Number:  476171
jslama@krupnicklaw.com
Jesse S. Fulton, Esquire
Florida Bar Number:  112495
jfulton@krupnicklaw.com
Kevin A. Malone, Esquire
Florida Bar Number:  224499
kmalone@krupnicklaw.com
Carlos A. Acevedo, Esquire
Florida Bar Number:   0097771
cacevedo@krupnicklaw.com
KRUPNICK, CAMPBELL, MALONE,
BUSER, SLAMA, HANCOCK,
LIBERMAN, P.A.
12 Southeast Seventh Street, Suite 801
Fort Lauderdale, Florida  33301-3434
954-763-8181 telephone
954-763-8292 facsimile
Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the above and foregoing Complaint for Damages will be served on All Counsel by electronically uploading the same to LexisNexis File & Serve in accordance with Pretrial Orders No. 12 and 63, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 10th day of April 2017.

s/ Merritt E. Cunningham
Merritt E. Cunningham

JS 44 (Rev. 07/16) **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Michael Boatright | BP Exploration & Production, Inc., et al. |

| (b) County of Residence of First Listed Plaintiff | Jefferson, LA | County of Residence of First Listed Defendant | |
|---|---|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | | *(IN U.S. PLAINTIFF CASES ONLY)* | |
| | | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. | |

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Smith Stag, LLC
One Canal Place, 365 Canal Street, Suite 2850 New Orleans, LA 70130
Telephone: 504-593-9600

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☒ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☒ 8 Multidistrict Litigation - Direct File

| VI. CAUSE OF ACTION | Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*: 28 U.S.C. 1332 |
|---|---|
| | Brief description of cause: Personal Injuries related to BP Oil Spill |

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. | DEMAND $ 2,000,000.00 | CHECK YES only if demanded in complaint: JURY DEMAND: ☒ Yes ☐ No |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | *(See instructions):* | JUDGE Carl Barbier | DOCKET NUMBER MDL 2179 |
|---|---|---|---|

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 04/10/2017 | /s/ Merritt E. Cunningham |

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

**EXHIBIT A**

*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*
Civil Action No. 10-MD-2179-CJB-SS

FORM FOR DISCLOSURES REGARDING REMAINING CLEAN-UP, MEDICAL MONITORING, AND POST-APRIL 20 PERSONAL INJURY CLAIMS, VESSELS OF OPPORTUNITY CHARTER CLAIMS, AND ALL OTHER B3 CLAIMS

| Last Name | First Name | Middle Name/Maiden | Suffix |
|---|---|---|---|
| Boatright | Michael | E | |

| Phone Number | E-Mail Address |
|---|---|
| 504-430-8900 | meboatright@yahoo.com |

| Current Mailing Address | City / State / Zip |
|---|---|
| 2649 Centar Street | Harvey, LA 70058 |

| Employer at Time of Incident | Date of Birth |
|---|---|
| Self-Employed | 1957 |

| Attorney Name and Firm | Attorney E-Mail Address |
|---|---|
| Michael G. Stag, Smith Stag, LLC | mstag@smithstag.com |

| All previous addresses where Plaintiff resided from April 2010 to present, including the date ranges Plaintiff resided at each address? |
|---|
| N/A |

| Any prior name used by Plaintiff from April 2010 to present? |
|---|
| N/A |

| The last 4 digits of the Plaintiff's social security number (if individual) or full Tax ID number in the case of a business plaintiff | Business Name (for non-medical, non-personal injury claims) |
|---|---|
| 2068 | N/A |

Please indicate your status:

☑ Properly opted out of the Medical Benefits Settlement*

☐ Not a member of the Medical Benefits Settlement Class

☐ Member of the Medical Benefits Settlement Class

☐ Other:_____

*If you opted out, a copy of your valid opt-out form must be included with your service of this Exhibit A.

---

Did you participate in any of the following Response Activities* in response to the *Deepwater Horizon* incident? No

☐ Captain, crew, or other worker employed under the Vessels of Opportunity ("VoO") program who performed Response Activities.

☐ Workers employed to perform the decontamination of vessels involved in Response Activities.

☐ Captains, crew, and other workers on vessels other than VoO who performed Response Activities.

☐ Onshore personnel employed to perform Response Activities.

☐ Persons involved in the recovery, transport, and decontamination of wildlife affected by the *Deepwater Horizon* incident.

* Response Activities is defined as the clean-up, remediation efforts, and all other responsive actions (including the use and handling of dispersants) relating to the release of oil, other hydrocarbons, and other substances from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances that were done under the auspices of the Unified Command, BP, or a federal, state, or local authority.

---

**You are pursuing a claim against at least one B3 Defendant by way of (*select all that apply*):**

☐ A Previously-Filed Individual Action, Eastern District of Louisiana Case No. _____.

☐ A New Individual Action (filed because plaintiff previously had only a short-form joinder* on file), Eastern District of Louisiana Case No. _____.

☑ A New Individual Action (filed because plaintiff previously was part of Complaint with more than one plaintiff or a putative class action). List both prior Eastern District of Louisiana Case No. 2:12-cv-2338 _____ and new Individual Action Case No._____

☐ Other:_____ ____

 * A copy of your timely SFJ(s) (and any PPFs) must be included with your service of this Exhibit A.

**You are pursuing a claim against at least one B3 Defendant for (*select all that apply*):**

☐ Personal injury or wrongful death arising from circumstances <u>other than</u> alleged exposure to crude oil or dispersants.

     If so, describe the alleged injury and identify the location and approximate date of the alleged

     injury: _____

     _____

☑ Medical monitoring, personal injury, or wrongful death arising from alleged exposure to crude oil or dispersants.

     If so, identify the location and approximate date of the alleged exposure: July-September 2010; Gulf of Mexico (Main Pass, Mississippi Canyon; Grand Isle)

     If so, describe the alleged injury and identify the location and approximate date of the alleged injury: July 2010-Present; Gulf of Mexico; Injuries include, but not limited to, blood in stool, bleeding from the nose and eyes, nausea, vomiting, and etc.. The full extent of injury is unknown at this time.

☑ Vessels of Opportunity Contract Claim.

☐ Non-Vessels-of-Opportunity Contract Claim Related to the Response.

☑ Other. Please specify: Scientific Diver .

**GCCF Claim:**

Did you, the plaintiff seeking relief, present this claim to the Gulf Coast Claims Facility ("GCCF")?

     Yes __X_____.    No _____.

If Yes, please identify:

1. The claim number(s) (if available). _3460742_____.

2. Did you execute a release of your claims upon receiving payment through the GCCF:

     Yes _____.    No __X_____.

I state under penalty of perjury that the foregoing is true and correct. Executed on the following date at the following location:

Date: _March 17th_, 2017

Location (City and State): _New Orleans La_

_[signature]_

Signature of Plaintiff (*Plaintiff's Attorney Cannot Sign on Plaintiff's Behalf*)

_Michael Boatright_

Print Name

**This Sworn Statement and any supporting information must be filed with the Court and served on both Counsel for BP and the PSC on or before April 12, 2017. Service on Counsel for BP and the PSC can be made via United States mail at the following addresses:**

| Counsel for BP | MDL 2179 Plaintiffs' Steering Committee |
|---|---|
| Attn: J. Andrew Langan | Attn: Steven J. Herman |
| Kirkland & Ellis LLP | Herman, Herman, Katz & Cotlar, LLP |
| 300 North LaSalle St, | 820 O'Keefe Avenue |
| Suite 2400 | New Orleans, LA 70113 |
| Chicago IL 60654 | |

**Claimants represented by counsel may additionally or alternatively serve the sworn statements and any supporting information upon the PSC and Counsel for BP via File & ServeXpress ("F&S").**

4

# IN RE: OIL SPILL by "Deepwater Horizon"

| MDL 2179 and Civil Action No. 10-2771 | SECTION: J | JUDGE CARL BARBIER |
|---|---|---|

## PLAINTIFF PROFILE FORM ["PPF"]

| Last Name Boatright | First Name Michael | Middle/Maiden | Suffix |
|---|---|---|---|

| Phone Number (504) 430-8900 | E-Mail Address |
|---|---|

| Address 2649 Centar Street | City / State / Zip Harvey, LA 70058 |
|---|---|

| **INDIVIDUAL CLAIM** ✓ | **BUSINESS CLAIM** |
|---|---|
| Employer Name | Business Name |
| Job Title / Description | Type of Business |
| Address 2649 Centar Street | Address |
| City / State / Zip Harvey , LA 70058 | City / State / Zip |
| Social Security Number 2068 | Tax ID Number |

| Attorney Name Michael G. Stag, Esq. | Firm Name Smith Stag LLC |
|---|---|
| Address 365 Canal Street | City / State / Zip New Orleans, LA 70130 |
| Phone Number (504) 593 - 9600 | E-Mail Address mstag@smithstag.com |

| Claim filed with BP? YES ☐ NO ■ | Claim Filed with GCCF?: YES ■ NO ☐ |
|---|---|
| If yes, BP Claim No.: | If yes, Claimant Identification No.: 3460353 |

Claim Type (Please check all that apply): ☐ Damage or destruction to real or personal property; ☐ Earnings/Profit Loss; ■ Personal Injury/Death; ☐ Fear of Future Injury and/or Medical Monitoring; ☐ Loss of Subsistence use of Natural Resources; ☐ Removal and/or clean-up costs; ☐ Other _____

| Original Case Caption Kolian et al v. BP Exploration & Production Inc. et al | Original Civil Action Number |
|---|---|
| Originating Court USDC, Eastern District Of Louisiana | EDLA Civil Action Number 2:12-cv-02338 |

Please check the box(es) below that you think apply to you and your claims:
**Non-governmental Economic Loss and Property Damage Claims (Bundle B1)**

☐ Commercial fisherman, shrimper, crabber, or oysterman, or the owner and operator of a business involving fishing, shrimping, crabbing or oystering.

☐ Seafood processor, distributor, retail and seafood market, or restaurant owner and operator, or an employee thereof.

☐ Recreational business owner, operator or worker, including a recreational fishing business, commercial guide service, or charter fishing business who earn their living through the use of the Gulf of Mexico.

☐ Commercial business, business owner or worker, including commercial divers, offshore oilfield service, repair and supply, real estate agents, and supply companies, or an employee thereof.

☐ Recreational sport fishermen, recreational diver, beachgoer, or recreational boater.

☐ Plant and dock worker, including commercial seafood plant worker, longshoreman, or ferry operator.

☐ Owner, lessor, or lessee of real property alleged to be damaged, harmed or impacted, physically or economically, including lessees of oyster beds.

☐ Hotel owner and operator, vacation rental owner and agent, or all those who earn their living from the tourism industry.

☐ Bank, financial institution, or retail business that suffered losses as a result of the spill.

☐ Person who utilizes natural resources for subsistence.

☐ Other:_____

**Post-Explosion Personal Injury, Medical Monitoring, and Property Damage Related to Cleanup (Bundle B3)**

☐ Boat captain or crew involved in the Vessels of Opportunity program.

☐ Worker involved in decontaminating vessels that came into contact with oil and/or chemical dispersants.

☐ Vessel captain or crew who was not involved in the Vessels of Opportunity program but who were exposed to harmful chemicals, odors and emissions during post-explosion clean-up activities.

☐ Clean-up worker or beach personnel involved in clean-up activities along shorelines and intercoastal and intertidal zones.

☐ Resident who lives or works in close proximity to coastal waters.

■ Other: Scientific Diver

**Brief Description:**

For earnings/profit loss, property damage and loss of subsistence use claims, describe the nature of the injury. For claims involving real estate/property, include the property location, type of property (residential/commercial), and whether physical damage occurred. For claims relating to fishing of any type, include the type and location of fishing grounds at issue.

_____

For personal injury claims, describe the injury, how and when it was sustained, and identify all health care providers and employers 2008 to present and complete authorization forms for each.

Upon information and belief: Michael Boatright is a scientific diver and environmental scientist. Between August and September 2010, Mr. Boatright participated in over 25 dives in the areas of the Gulf of Mexico Main Pass, Mississippi Canyon, and Grand Isle. After completing these dives, Mr. Boatright began suffering from health symptoms such as blood in stools, bleeding from the eyes and nose, nausea, vomiting, diarrhea, stomach cramps, dizziness and confusion, headaches, shortness of breath, blurred vision, skin rashes, pain in his extremities, stress, anxiety and depression.

Health Care Providers: Dr. Michael Robichaux, Dr. Bertha Coignet

Employers: Self-employed, Marine Gardens LLC, Agnagreen LLC. IFBC Inc.

For post-explosion claims related to clean-up or removal, include your role in the clean-up activities, the name of your employer, and where you were working.

_____

Both BP and the Gulf Coast Claims Facility ("GCCF") are hereby authorized to release to the Defendants in MDL 2179 all information and documents submitted by above-named Plaintiff and information regarding the status of any payment on the claim, subject to such information being treated as "Confidential Access Restricted" under the Order Protecting Confidentiality (Pre-Trial Order No. 11), and subject to full copies of same being made available to both the Plaintiff (or his attorney if applicable) filing this form and PSC through Plaintiff Liaison Counsel.

_____       5/23/2013
Claimant or Attorney Signature       Date

Return Original Signed Form To:

For Krupnick Campbell Clients:
Odalys Borges
Krupnick Campbell Malone, et. al.
12 SE 7 Street, Suite 801
Ft. Lauderdale, FL 33301

For Smith Stag Clients:
Dawn Saucier
Smith Stag, LLC
One Canal Place
365 Canal Street
Suite 2850
New Orleans, LA 70130

## Medical Benefits Opt-Out Notice

I wish to exclude myself from the Medical Class.

Date 10-25-2012

Sign Here _Michael Boatright_

Print Name _Michael Boatright_
Date of Birth _____ - 1957_

Address _2649 Centaur St._
City/State _HARVEY LA._
Zip Code _70058_

Phone _504 430-8900_

**\*Please provide copy of your driver's license or other government-issued identification.**