# Exhibit G

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

IN RE:  OIL SPILL BY THE OIL RIG          *
"DEEPWATER HORIZON" IN THE                      MDL NO. 2179
GULF OF MEXICO ON APRIL 20, 2010
                                          *
                                                SECTION J
**This Document Relates To:**             *
*All Cases in Pleading Bundle B3*
                                                JUDGE BARBIER
                                          *

                                          *     MAG. JUDGE SHUSHAN

_____

MICHAEL HELMHOLTZ,               *  CIVIL ACTION NO. 2:17-cv-2932

vs.                              *  SECTION J

BP EXPLORATION & PRODUCTION, INC.,*  JUDGE BARBIER
BP AMERICA PRODUCTION COMPANY,
BP, P.L.C.,                      *  MAG.JUDGE WILKINSON

                                 *
_____


**COMPLAINT**


  **NOW COMES PLAINTIFF, MICHAEL HELMHOLTZ,** by and through undersigned

counsel and alleges as follows:

**Nature of the Action**


1. On or about April 20, 2010, the *Deepwater Horizon* drilling platform exploded and  sank,

 causing a spill of over 200 million gallons of crude oil from the Macondo Well, MC-252, and

 resulting in the worst maritime environmental disaster in United States history.

2. Plaintiff has suffered injuries as a result of exposure to oil and/or oil-dispersing chemicals and/or decontaminants.

## JURISDICTION AND VENUE

3. Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime Jurisdiction."

4. In addition, this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1333, and the Admiralty Extension Act, 46 U.S.C. § 30101.

5. The claim presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiff hereby designates this case as an admiralty or maritime case, and request a non-jury trial, pursuant to Rule 9(h).

6. This Court has personal jurisdiction over BP Exploration and BP America because each is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

7. This Court may exercise personal jurisdiction over BP p.l.c. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, the federal long-arm jurisdiction provision, because claims in this action arise under federal law, the exercise of jurisdiction over BP p.l.c. is consistent with the United States Constitution and laws.

8. This Court also has jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm statute (La. Rev. Stat. Ann. § 13:3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure. Plaintiff's cause of action arise out of wrongful conduct committed by BP p.l.c., directly or indirectly by its agents, which caused injury or damage in Louisiana by an offense or quasi-offense committed through an act or

omission outside of Louisiana. These acts or omissions took place both before the blowout resulting in the oil spill, which is described more fully below, and in the negligent conduct of BP p.l.c. after the blowout in attempting to contain the oil spill. BP p.l.c. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana. BP p.l.c. has had continuous and systematic contacts with Louisiana (and with the United States more generally).

9. In addition, this Court also has personal jurisdiction over BP p.l.c. under agency principles because BP p.l.c.'s agents, BP America and BP Exploration, do business in Louisiana. In BP p.l.c.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America and BP Exploration, BP p.l.c. states that it "controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities . . . ."

10. BP p.l.c.'s direct, joint and/or assumed responsibility and/or liability for safety and well control, both before and/or after the explosions and blowout on April 20, 2010, is further evidenced by the announcement of the Macondo Project on the BP website hosted and copyrighted by BP p.l.c., the publication of information concerning the casualty and spill on the BP website hosted and copyrighted by BP, the express and/or implied acceptance of responsibility for safety of BP operations in North America and the Gulf of Mexico in statements by officers of BP p.l.c., the presence (upon information and belief) of a BP p.l.c. officer or employee on the *Deepwater Horizon* for the celebration that occurred shortly before the explosions and fire, the direct

participation of BP p.l.c. employees in the post-casualty investigation, the direct participation of BP p.l.c. officers and employees in the governmental post-casualty investigations, the direct participation of BP p.l.c. officers and employees in the post-casualty well-control efforts, and the direct participation of BP p.l.c. in the establishment and/or funding of the Escrow Fund and/or Gulf Coast Claims Facility.

11. Venue is appropriate in this District under 28 U.S.C. § 1391, because the events or omissions giving rise to the claims asserted herein occurred in this District. Venue is also appropriate in this District consistent with 28 U.S.C. § 1407 and the Transfer Order of the Judicial Panel on Multidistrict Litigation, *see In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* 731 F. Supp. 2d 1352 (J.P.M.L. 2010), as well as this Court's Pretrial Order No. 20 (Rec. Doc. 904), which allows Plaintiff to directly file complaints arising out of the *Deepwater Horizon* incident in this District.

## PARTIES

12. Plaintiff, MICHAEL HELMHOLTZ, is an individual who is a resident of Old Town, Florida in Dixie County and is the age of majority of 58.

13. Defendant BP Exploration & Production Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois. BP Exploration was a leaseholder and the designated operator in the lease granted by the former

Minerals Management Service ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo," where the oil spill originated. BP Exploration was designated as a "responsible party" by the U.S. Coast Guard under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2714.

14. Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas. BP America was the party to the drilling contract with Transocean Ltd. for the drilling of the Macondo well by the *Deepwater Horizon* vessel.

15. Defendant BP p.l.c. is a British public limited company with its corporate headquarters in London, England. BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo. BP p.l.c. is one of the world's largest energy companies, with over 80,000 employees and $239 billion in revenues in 2009. BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division in which BP Exploration and BP America fall, through vertical business arrangements aligned by product or service groups. BP p.l.c.'s operations are worldwide, including in the United States. Defendants BP Exploration and BP America are wholly- owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally.

---

[2]

The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010; however, it is referred to as the MMS throughout this document.

16. BP p.l.c. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development. A sampling of BP p.l.c.'s contacts with the U.S. are as follows: (a) BP p.l.c.'s American Depository Shares are listed on the New York Stock Exchange ("NYSE") and BP p.l.c. is the largest non- U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP p.l.c. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP p.l.c.'s fixed assets are located in the U.S. or the European Union; and (e) BP p.l.c. reports having 2,000 U.S.-based employees in non-Exploration and Production, non-Refining and Marketing BP entities.

17. BP Exploration, BP America and BP p.l.c. are generally referred to herein collectively as "BP." As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

## FACTUAL ALLEGATIONS

### The *Deep-water Horizon* Catastrophe

18. The *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi- submersible oil vessel built in 2001. It was one of the largest vessels of its kind.

19. BP leased the *Deepwater Horizon* through September 2013 to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf off the coast of Louisiana.

20. On April 20, 2010, and as described in greater detail in the First Amended B1 Master

Complaint (Rec. Doc. 1128) (whose factual allegations are incorporated fully by reference herein), workers on the *Deepwater Horizon* oil rig lost control of the Macondo well just after the final cementing work was completed. During the course of the cementing work, an explosion occurred on the *Deepwater Horizon* and it caught fire.

21. The explosion and fire caused the deaths of 11 people and injuries of many other workers on the vessel. After burning for two days, the vessel sank to the ocean floor.

22. The *Deepwater Horizon* had been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser. As the *Deepwater Horizon* tipped into the sea, it pulled the riser down with it, bending and breaking the pipe. Oil flowed out from the now-open end of the riser, as well as through two breaks along its length. An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, causing the blown-out well to spew oil into the Gulf waters (the "Oil Spill").

23. Crude oil was discharged before the *Deepwater Horizon* finally sank on April 22, 2010, and the rate of discharge increased once the *Deepwater Horizon* sank to the ocean floor.

24. After the explosions, BP attempted to downplay and conceal the severity of the Oil Spill. Government investigators have found BP's initial leak estimate of 1,000 barrels per day to be a fraction of its measured leakage amount, which in fact exceeded 50,000 barrels per day. Additionally, an internal BP document from around the time of the spill shows that the company's own analysis had actually estimated that the rate of oil spillage could reach 100,000 barrels, or 4,200,000 gallons, per day.

25. Each day during the course of the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out

into a widening slick of oil, as well as spreading out in vast subsurface plumes. On the surface, the shifting mass was large enough to be visible from outer space, at times covering tens of thousands of square miles, and spreading with the wind and currents towards the Gulf States' coastlines.

26. Beginning on or about April 30, 2010, oil made landfall along the Gulf Coast on white sand beaches, leased and privately owned subsurface areas, and in ecologically sensitive marshes and estuaries. Under water, immense plumes of oil and dispersant chemicals swirled through the entire water column, damaging ecosystems throughout the Gulf of Mexico.

27. The oil spewed from the well for over twelve weeks until BP finally capped the well on July 15, 2010. Ultimately, almost five million barrels (210 million gallons) of crude oil spilled in the Gulf of Mexico.

*The Crude Oil*

28. The crude oil carried with it significant public health risks. Crude oil has many highly toxic chemical ingredients that can damage every system in the body.

29. Crude oil contains benzene and other volatile organic compounds ("VOCs") such as ethylbenzene, toluene, xylene and naphthalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes and heavy metals such as aluminum, cadmium, nickel, lead and zinc, all of which can harm human health.

30. Chemicals such as benzene, PAHs and many other chemicals in crude oil are toxic and volatile, moving from the oil into the air. Once airborne, they can blow over the ocean for miles, reaching communities far from the spill. They may be noticed as petroleum odors.

31. Dermal exposure to certain VOCs in crude oil can cause, *inter alia,* redness, swelling, irritation, rashes and blisters on the skin and mucous membranes. Inhalation exposure to certain VOCs in crude oil can cause, *inter alia,* ocular redness, soreness, watering and itching. Inhalation exposure to certain other VOCs in crude oil can cause, *inter alia,* coughing, throat irritation, congestion, shortness of breath and wheezing. Inhalation exposure to other VOCs in crude oil can also affect, *inter alia,* the nervous system causing, among other things, nausea, vomiting, dizziness, irritability, confusion, and weakness of extremities. Ingestion of food or water containing VOCs from crude oil can cause, *inter alia*, nausea, vomiting, and diarrhea.

32. According to the Agency for Toxic Substances and Disease Registry ("ASTDR"), which is part of the U.S. Department of Health and Human Services, benzene is a known mutagen and carcinogen. Benzene in crude oil can cause a variety of health complications, including ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain and lethal central nervous system depression.

33. A 2007 Centers for Disease Control review of benzene toxicity concluded that there is substantial evidence that benzene causes leukemia, aplastic anemia (a precursor of leukemia), chromosomal abnormalities in lymphocytes and bone marrow cells, damage to the immune system, and abnormal development of blood cells. Longterm low-level oral and inhalation exposures to benzene have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping and memory loss.

34. As noted by Dr. Lisa Kaplowitz of the U.S. Department of Health and Human services, in her June 15, 2010 testimony before Congress: "Oil can remain toxic in the

environment for years."

**The Response Effort and the Use of Chemical Dispersants**

35. The OP A imposes liability upon a "responsible party for a . . . facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

36. The U.S. Coast Guard is responsible for implementing many aspects of the OPA, including designating responsible parties, as well as responding to oil spills and supervising and/or coordinating response actions.

37. After the Oil Spill, the Coast Guard formally and/or informally designated, *inter alia,* Defendants BP Exploration and Transocean Holdings as "responsible parties" under the OPA.

38. In the wake of the disaster, and pursuant to its duties as a responsible party under the OPA, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States. This disaster response plan had three primary components: offshore containment; shoreline protection; and subsea response.

39. As part of its offshore containment response program, BP directed the use of vessels to, *inter alia,* recover oil coming to the surface of the Gulf of Mexico; skim oil from the surface of the water; and conduct *in-situ* burning of oil that reached the surface of the water. BP also employed vessels to tow and deploy booms—floating barriers intended to contain, deflect, or hold back oil floating in the water's surface.

40. In addition, BP's response plan included the use of chemical dispersants that were intended to break down the oil into finely dispersed droplets.

41. Dispersants generally contain a solvent, a surfactant and other additives that break up

the surface tension of an oil slick or sheen to make the oil more soluble in water.

42. Among other dispersants, BP applied a highly toxic form of chemical dispersant called Corexit. BP used both Corexit® 9500 and Corexit® EC9527A.

43. The Material Safety Data Sheet ("Data Sheet")—a form that sets forth the properties of a particular substance, including its toxicity and health effects—for Corexit® 9500 indicates that it contains hazardous substances, that it is harmful to human health, and that dermal exposure, inhalation, and ingestion should be avoided. The Data Sheet further states that Corexit® 9500 is an eye and skin irritant and may irritate the respiratory tract if inhaled. If ingested, it may cause chemical pneumonia.

44. The Data Sheet for Corexit® EC9527A also indicates that it contains hazardous substances, it is harmful to human health, and that dermal exposure, inhalation, and ingestion should be avoided. The Data Sheet further states that Corexit® EC9527A is an eye and skin irritant and, if inhaled, may irritate the respiratory tract. If ingested, it may cause liver and kidney effects and/or damage, or irritate the gastrointestinal tract. Acute exposure may cause adverse central nervous system effects, nausea, vomiting, anesthetic or narcotic effects.

45. In addition, Corexit® EC9527A contains 2-butoxyethanol, also known as EGBE. Repeated or excessive exposure to EGBE may cause injury to red blood cells, the kidneys, and the liver. EGBE may be carcinogenic to humans. It is an eye, nose, and throat irritant. It can cause nausea, vomiting, diarrhea, and abdominal pain. Exposure to EGBE can also cause headaches, dizziness, lightheadedness, and unconsciousness. Exposure to EGBE can damage a developing fetus, and chronic exposure may result in damage to the male and female reproductive systems in animals.

46. Both of these Corexit® products also contain non-specified organic sulfonic acid salt, which is "moderately toxic," as well as propylene glycol, a chemical with solvent properties. Propylene glycol is a mild irritant, and exposure to high levels of propylene glycol and mists containing this chemical can cause eye, nose, throat, and lung irritation. Some individuals are allergic to propylene glycol and those with eczema may be at higher risk. Exposure may cause erythema, edema, induration, and other skin problems.

47. Upon information and belief, BP also authorized the application of other chemical dispersants, including PES51™ and OMI-500®, to near-shore and onshore areas, as well as to contaminated vessels and containment equipment, to disperse the oil and clean vessels and equipment.

48. The Data Sheet for PES51™ indicates that it should be handled with gloves, that it is an irritant, and that dermal exposure and ingestion should be avoided.

49. The Data Sheet for OMI-500® indicates that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided. Among other effects, OMI-500® can be irritating to skin and eyes and may cause irritation of the respiratory tract, typically experienced as nasal discomfort and discharge, possibly with chest pain and coughing. Headache, nausea, vomiting, dizziness, and drowsiness may occur. Exposure may also cause mild to severe irritation experienced as discomfort or pain, excess blinking and tear production, possibly with marked redness and swelling of the conjunctiva.

50. In summary, the dispersants used by BP are known to cause, *inter alia,* headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness;

irritation of the skin, eyes, nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and developmental damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of chronic obstructive pulmonary disease.

51. Upon information and belief, immediately after the *Deepwater Horizon* disaster, on or about April 23, 2010, BP began subsea and aerial application of chemical dispersants to the resulting oil slick and sheens on the surface of the Gulf. Chemical dispersants have been sprayed onto the ocean surface from aircraft that fly over spills and dispense the chemicals from cargo holds, sprayed onto the ocean surface from fountain- type jets on the decks of boats, sprayed from smaller vessels onto the surface of the water, injected immediately below the surface of the water from vessels, injected deep below the surface of the ocean, and sprayed by hand.

52. BP coordinated and directed aircraft owned and/or operated by others to fly out over the Gulf to spot oil slicks and to spray chemical dispersants on the surface of the Gulf.

53. According to the Aerial Dispersants Operations -- Houma Status Report, as of June 26, 2010, BP made use of at least 10 spray aircraft and 8 spotter aircraft. At least four spray planes left from Houma, Louisiana. At least six spray planes left from Stennis International Airport in Mississippi. Upon information and belief, aerial dispersant sorties also would leave from airfields in Florida and were conducted and orchestrated by BP.

54. Generally, the United States Oil Spill National Contingency Plan permits spraying of

chemical dispersants at least 3 miles offshore or where the water is at least 10 meters deep. The Coast Guard's Federal On Site Coordinator (the "On Site Coordinator") had to approve BP's requests to use chemical dispersants.

55. On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator directed BP to identify and begin using chemical dispersants less toxic than Corexit® within the next 24 hours.

56. On May 20, 2010, BP objected to this order and notified the EPA that it would continue using Corexit®.

57. BP's use of chemical dispersants then skyrocketed: on May 22, 2010, BP used 45,000 gallons of dispersant and on May 23, 2010, it used 70,000 gallons of dispersant.

58. Upon information and belief, BP stopped using Nalco's Corexit® 9527 on May 23, 2010, when supplies allegedly ran out. It relied on Corexit® 9500 thereafter.

59. On May 26, 2010, the EPA directed BP to reduce overall use of Corexit® by 75% and to stop using chemical dispersants on the water's surface except in rare cases where an exemption was sought in writing from and approved by the On Site Coordinator.

60. BP thereafter sought more than 40 exemption requests to use chemical dispersants on the surface of the Gulf of Mexico. According to the Aerial Dispersants Operations - Houma Status Report, by June 26, 2010, BP had applied 933,023 gallons of dispersant by aerial application. As of the same date, BP had ordered the application of dispersant by 386 flights, or sorties, and had covered approximately 291 square miles of the Gulf with dispersant.

61. To date, BP and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

**Plaintiff's Exposure to Oil and Harmful Chemicals and their Resulting Injuries and Damages**

62. Plaintiff has suffered and/or will suffer injuries and damages, including, *inter alia,* exposure to dangerous chemicals, physical injuries and diseases, accompanying physical, mental and emotional pain, suffering and anguish, the need for medical monitoring, costs and inconvenience of obtaining past and future medical treatment for exposure to chemicals, and increased risk and fear of future disease as a result of exposure to oil, dispersants, and/or oil and dispersant mixtures.

63. Plaintiff has been placed at risk of developing additional diseases over the decades and becoming saddled with the financial burden, inconvenience, and emotional strain of monitoring their compromised health. Plaintiff has already manifested injuries and illnesses associated with exposure to chemicals in the environment resulting from the Oil Spill.

**BP's Knowledge of the Risks**

64. As early as May 2010, federal regulators at the Occupational Safety and Health Administration ("OSHA") repeatedly raised concerns with BP over significant deficiencies in BP's Oil Spill response operations relating to worker safety. OSHA regulators remained frustrated, however, that BP did not address the most serious problems.

65. BP, aware of the risks that response vessels would face, failed to provide adequate training and vessel inspections and ignored worker safety concerns, even in the face of OSHA warnings and notification by the U.S. Department of Health and Human Services that vessel workers in its Vessels of Opportunity ("VoO") program, as well as other offshore and onshore Clean-Up Workers, were complaining of illnesses after

being exposed to oil and dispersants.

66. At all times relevant to this litigation, BP knew or should have known that:

    a. crude oil contains chemicals hazardous to human health;

    b. chemical dispersants contain chemicals hazardous to human health;

    c. Plaintiff were entitled to adequate and timely warning of the harmful effects of exposure to crude oil and chemical dispersants and the hazardous substances that crude oil and dispersants contain; and

    d. Plaintiff should have been provided proper protective clothing and respirators when engaged in Oil Spill clean-up activities.

**BP's Willful and Wanton Conduct**

67. BP focused primarily on profit and disregarded public and environmental health and safety while undertaking ultra-hazardous activities on the *Deepwater Horizon* by, among other things:

    a. performing a critical well pressure test with untrained and unqualified personnel and callously ignoring and/or misinterpreting abnormal "red flag" pressure test results;

    b. using a well design with too few barriers to gas flow;

    c. failing to use a sufficient number of "centralizers" to prevent channeling during the cement process;

    d. failing to run a bottoms-up circulation of the drilling mud prior to beginning the cement job;

    e. failing to run a cement bond log to evaluate the integrity of the cement job;

    f. failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well;

    g. using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes;

    h. grossly inadequate maintenance, and reckless and improper operation

and use of the blowout preventers appurtenant to the *Deepwater Horizon*;

i.   failing to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout;

j.   failing to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill; and

k.   failing to use reasonably safe dispersant chemicals in the attempt to respond to the Oil Spill.

68. BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of life; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

69. In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality. As such, BP increased the magnitude of, and the damage caused by, the spill by willfully, wantonly, and/or recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

70. BP, by its conscious and/or deliberate unreasonable acts and/or omissions complained of herein, displayed gross negligence, reckless indifference, willfulness, and/or wantonness.

## CASE-SPECIFIC FACTS

71. Plaintiff is presently a resident of Old Town, Florida but resided in Hernando Beach, Florida at the time of the Oil Spill.   Plaintiff is a certified marine life diver with 3 certifications and is also a researcher/advisor of seahorses with the FWC (Fish and Wildlife Commission).

72.  Plaintiff was the owner and sole operator of Above The Reef, a business that harvests live marine life such as tropical fish, sponges and invertebrates and sells wholesale to pet retail stores throughout the Gulf Coast of Mexico and The Florida Keys.

73. Plaintiff was consistently exposed to oil and dispersants while harvesting live marine life in the Gulf of Mexico.

74. As a direct and proximate result of Deepwater Horizon incident and oil spill the Plaintiff suffered from chemical burns to his skin, lungs and eyes from direct contact from the dispersants; nose bleeds, rash and irritated skin, headaches, blurry vision, burning eyes, breathing and respiratory difficulties.   He has been diagnosed with C.O.P.D. (Chronic Obstructive Pulmonary Disease) and some of these medical issues still linger as of the date of the filing of this Complaint.

75. Consequently, the Plaintiff seeks compensatory damages in this action.   As discussed generally above, Plaintiff's compensatory damages as a result of Defendants' acts and omissions include, but are not limited to, the following:

     a.   Past, present, and future lost income, revenue and profits due to the inability to work;

     b.   implementation of a medical screening and monitoring program to be funded by BP ;

     c.   All other damages or relief to which the Plaintiff is entitled when additional information regarding the full extent of the Plaintiff's damages becomes available; and

    d.   Other damages, losses or costs as will be shown at trial.

76. This list is by no means exhaustive. There are many other forms of harm or damage from the Spill that may be unknown, and the Plaintiff reserves the right to amend this Complaint as additional information becomes available.

77. As a direct and proximate result of the *Deepwater Horizon* Incident and the Defendants' acts and omissions, the Plaintiff was forced to hire undersigned counsel and the undersigned law firm and has incurred attorneys' fees and costs.

## CAUSES OF ACTION

### Negligence Under General Maritime Law

78. Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

79. The existence and breach of Defendants' legal duties are established under general maritime law.

80. At all times material hereto, Defendants owed duties of ordinary and reasonable care to Plaintiff in connection with the drilling operations and maintenance of the *Deepwater Horizon,* including its appurtenances and equipment. BP additionally owed duties to guard against and/or prevent the risk of an oil spill and to mitigate the harm if an oil spill did occur.

81. Further, BP owed a duty to Plaintiff to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

82. BP had a heightened duty of care to Plaintiff because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

83. The risk of injury and loss to Plaintiff was reasonably foreseeable, and BP knew of the

dangers associated with deep water drilling. Specifically, at all times relevant to this litigation, BP knew or should have known that:

    a.    crude oil contains chemicals hazardous to human health;

    b.    chemical dispersants contain chemicals hazardous to human health;

    c.    Plaintiff should have been adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances that they contain; and

    d.    failure to exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures would result in harm to Plaintiff.

84. BP breached its duty of care to the Plaintiff in the following non-exclusive respects:

    a.    failing to prevent the explosion on board the *Deepwater Horizon*;

    b.    failing to cap the Macondo well in a timely manner;

    c.    failing to warn Plaintiff, public officials, and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous chemicals they contain;

    d.    failing to properly train and equip Clean-Up Workers to avoid exposure to hazardous substances encountered in connection with relief efforts;

    e.    failing to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

    f.    failing to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of vessels and crewmembers being exposed to aerial chemical dispersants; and

    g.    failing to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

85. The blowout and explosions on the *Deepwater Horizon,* its sinking and the resulting spill were caused by the joint and concurrent negligence of the BP Defendants and the Transocean and/or Halliburton Defendants named in the operative B3 Master Complaint.

86. Defendants' breach of their duties posed an unreasonable risk of harm to Plaintiff.

87. Plaintiff suffered injury, loss, and damages as a direct and proximate result of Defendants' breach of their aforementioned duties.

88. Furthermore, as an element of damages, Plaintiff is entitled to medical monitoring relief. Plaintiff's exposure to oil and harmful chemicals may lead to serious health problems, diseases, and medical conditions that may be prevented or minimized by timely medical diagnosis and treatment.

89. Monitoring procedures exist that make possible the early detection of any latent disease. Such procedures are reasonably necessary will be of great benefit to Plaintiff by preventing or minimizing health problems that Plaintiff may encounter as a result of the Oil Spill and related Response Activities.

90. In order to reach maximum medical improvement, Plaintiff is entitled to a monitoring protocol. Defendants' failure to provide such a protocol is callous, willful, wanton, or otherwise tortious.

**Gross Negligence Under General Maritime Law**

91. Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

92. Defendants had a heightened duty of care to Plaintiff because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

100. Defendants breached their legal duty to Plaintiff and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent failure to prevent and contain the Oil Spill.

101. Defendants knew or should have known that their willful, wanton, and reckless conduct would cause injury to Plaintiff.

102. Defendants' willful, wanton, reckless, and/or grossly negligent conduct is the factual and legal cause of Plaintiff's injuries and damages. Similarly, for the reasons set forth above, Plaintiff is entitled to medical monitoring relief as an element of damages for Defendants' gross negligence.

### Negligence *Per Se* Under General Maritime Law and Federal Law

103. Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

104. Defendants' conduct with regard to the manufacture, maintenance and/or operation of oil-drilling vessels such as the *Deepwater Horizon,* the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by federal laws and permits issued under the authority of these laws. These laws and permits create statutory and regulatory standards that are intended to protect and to benefit Plaintiff, including, but not limited to, those that govern the National Oil and Hazardous Substances Contingency Plan, *see, e.g.,* 40 C.F.R. § 300.150. BP failed to adhere to the requirements for response actions established by the National Contingency Plan, 29 C.F.R. § 1910.120. BP therefore breached its responsibilities under this regulatory provision.

105. In addition, the federal Bureau of Safety and Environmental Enforcement ("BSEE") found that BP violated the following federal regulations:

    a. BP failed to protect health, safety, property, and the environment by failing to perform all operations in a safe and workmanlike manner, in violation of 30 C.F.R. § 250.107(a)(1);

    b. BP did not take measures to prevent unauthorized discharge of pollutants into offshore waters, in violation of 30 C.F.R. § 250.300;

    c. BP failed to take necessary precautions to keep the well under control at all

times, in violation of 30 C.F.R. § 250.401(a);

     d. BP did not cement the well in a manner that would properly control formation pressures and fluids and prevent the direct or indirect release of fluids from any stratum through the wellbore into offshore waters, in violation of 30 C.F.R. §§ 250.420(a)(1) and (2);

     e. BP failed to conduct an accurate pressure integrity test, in violation of 30 C.F.R. § 250.427;

     f. BP failed to maintain the *Deepwater Horizon's* BOP system in accordance with the American Petroleum Institute's Recommended Procedure 53 section 18.10.3, in violation of 30 C.F.R. § 250.446(a);

     g. BP failed to obtain approval of the Temporary Abandonment procedures it actually used at the Macondo well, in violation of 30 C.F.R. § 250.1721(a);

     h. BP failed to conduct an accurate pressure integrity test at the 13-5/8" liner shoe, in violation of 30 C.F.R. § 250.427; and

     i. BP failed to suspend drilling operations at the Macondo well when the safe drilling margin identified in the approval application for the permit to drill was not maintained, in four separate violations of 30 C.F.R. § 250.427(b).

106. BP's violations of these statutory and/or regulatory standards constitute negligence *per se* under federal law, as well as general maritime law.

107. BP had actual and/or constructive knowledge of the facts and circumstances leading to and causing the incidents described herein, which in turn caused Plaintiff' and the Class's injuries, and their actions and inactions were grossly negligent, reckless, willful and/or wanton.

108. As a direct and proximate cause of BP's violation of statutory and/or regulatory standards, the Plaintiff have suffered injuries and are entitled to damages, including, *inter alia,* costs of medical monitoring.

**Medical Monitoring Claim Under General Maritime Law**

109. Plaintiff realleges each and every allegation set forth in all preceding paragraphs as if fully restated herein.

110.  The law governing medical monitoring in a number of jurisdictions is consistent with both the general common law and the remedial purposes underlying the general maritime law. Accordingly, the general maritime law should recognize a cause of action for medical monitoring relief other than lump sum damages, irrespective of whether a particular Plaintiff has manifested a bodily injury to date.

111. Plaintiff has been exposed to greater than normal background levels of oil, dispersants, and/or other hazardous chemicals as a result of the Oil Spill.

112.  Plaintiff's exposure was caused by Defendants' negligence or otherwise tortious conduct.

113.  As a direct and proximate result of his exposure, the Plaintiff has manifested physical injuries or illnesses. Plaintiff, however, has developed a significantly increased risk of future injury.

114.  The method and means for diagnosing Plaintiff's potential medical problems exist and are well-accepted in the medical and scientific community and will be of great benefit to Plaintiff by preventing or minimizing health problems. Such procedures enable the early detection of any future injury that are different from those normally recommended in the absence of the exposure.

115.  The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

116.  Defendants' failure to provide benefits such as those described above has been callous, willful, wanton, or otherwise tortious.

## **JURY TRIAL DEMAND**

117.  The Plaintiff demands trial by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff demands judgment against Defendants, jointly and severally as follows:

a)      compensatory damages in amounts to be determined at trial;

b)      medical monitoring;

c)      pre-judgment and post-judgment interest at the maximum rate allowable by law;

d)      attorneys' fees and costs of litigation;

e)      such other and further relief available under all applicable state and federal laws; and

f)      any further relief the Court deems just and appropriate.

Dated:   April 6, 2017.

Respectfully submitted,

_____/s/ Frank M. Petosa_____
**Frank M. Petosa, Esq.**
Florida Bar #972754
**Morgan & Morgan Complex Litigation Group**
600 North Pine Island Road, Suite 400
Plantation, FL 33324
Phone:  (954) 318-0268
Facsimile:  (954) 333-3515
Email:  fpetosa@forthepeople.com
Website:  www.forthepeople.com

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

❏ 1  U.S. Government
       Plaintiff

❏ 3  Federal Question
       *(U.S. Government Not a Party)*

❏ 2  U.S. Government
       Defendant

❏ 4  Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - | ❏ 690 Other | ❏ 423 Withdrawal | ❏ 400 State Reapportionment |
| ❏ 130 Miller Act | ❏ 315 Airplane Product | Product Liability | | 28 USC 157 | ❏ 410 Antitrust |
| ❏ 140 Negotiable Instrument | Liability | ❏ 367 Health Care/ | | | ❏ 430 Banks and Banking |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ❏ 450 Commerce |
| & Enforcement of Judgment | Slander | Personal Injury | | ❏ 820 Copyrights | ❏ 460 Deportation |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' | Product Liability | | ❏ 830 Patent | ❏ 470 Racketeer Influenced and |
| ❏ 152 Recovery of Defaulted | Liability | ❏ 368 Asbestos Personal | | ❏ 840 Trademark | Corrupt Organizations |
| Student Loans | ❏ 340 Marine | Injury Product | | | ❏ 480 Consumer Credit |
| (Excludes Veterans) | ❏ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | ❏ 490 Cable/Sat TV |
| ❏ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | ❏ 850 Securities/Commodities/ |
| of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | Act | ❏ 862 Black Lung (923) | Exchange |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | ❏ 371 Truth in Lending | ❏ 720 Labor/Management | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| ❏ 190 Other Contract | Product Liability | ❏ 380 Other Personal | Relations | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal | Property Damage | ❏ 740 Railway Labor Act | ❏ 865 RSI (405(g)) | ❏ 893 Environmental Matters |
| ❏ 196 Franchise | Injury | ❏ 385 Property Damage | ❏ 751 Family and Medical | | ❏ 895 Freedom of Information |
| | ❏ 362 Personal Injury - | Product Liability | Leave Act | | Act |
| | Medical Malpractice | | ❏ 790 Other Labor Litigation | | ❏ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 791 Employee Retirement | **FEDERAL TAX SUITS** | ❏ 899 Administrative Procedure |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ❏ 870 Taxes (U.S. Plaintiff | Act/Review or Appeal of |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | or Defendant) | Agency Decision |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate | | ❏ 871 IRS—Third Party | ❏ 950 Constitutionality of |
| ❏ 240 Torts to Land | ❏ 443 Housing/ | Sentence | | 26 USC 7609 | State Statutes |
| ❏ 245 Tort Product Liability | Accommodations | ❏ 530 General | | | |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 446 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration | | |
| | Other | ❏ 550 Civil Rights | Actions | | |
| | ❏ 448 Education | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

❏ 1  Original
       Proceeding

❏ 2  Removed from
       State Court

❏ 3  Remanded from
       Appellate Court

❏ 4  Reinstated or
       Reopened

❏ 5  Transferred from
       Another District
       *(specify)*

❏ 6  Multidistrict
       Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
_____

Brief description of cause:
_____

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A **CLASS ACTION**
    UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ❏ Yes  ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

JS 44 Reverse (Rev. 12/12)

Case 2:10-cv-02179-CJB-DPC Document 26741-7 Filed 10/23/20 Page 28 of 34
Case 2:17-cv-02933-CJB Document 1-1 Filed 04/06/17 Page 2 of 2

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**   **Origin.** Place an "X" in one of the six boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

440 (Rev. 06/12) Summons in a Civil Action

# United States District Court

### for the
### Eastern District of Louisiana

| | | |
|---|---|---|
| MICHAEL HELMHOLTZ, | § | CIVIL ACTION NO. |
| | § | |
| Plaintiff, | § | |
| | § | SECTION J |
| | § | |
| vs. | § | |
| | § | JUDGE BARBIER |
| BP EXPLORATION & PRODUCTION, | § | |
| INC., BP AMERICA PRODUCTION | § | |
| COMPANY and BP, P.L.C., | § | MAG. JUDGE WILKINSON |
| | § | |
| Defendants. | § | |

## SUMMONS IN A CIVIL ACTION

To:     BP America Production Company
        c/o CT Corporation System
        5615 Corporate Boulevard, Suite 400B
        Baton Rouge, LA 70808

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

        Michael Helmholtz
        250 NE 660th street
        Old Town, FL 32680

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____        _____
                                      *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

☐ I personally served the summons on the individual at *(place)*_____

_____ on *(date)* ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*_____

_____, a person of suitable age and discretion who resides there, on *(date)* _____

and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____, who is

designated by law to accept service of process on behalf of *(name of organization)* on *(date)* ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*

My fees are $_____ for travel and $_____ for services, for a total of

$_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc:

440 (Rev. 06/12) Summons in a Civil Action

---

# UNITED STATES DISTRICT COURT

for the
Eastern District of Louisiana

| | | |
|---|---|---|
| MICHAEL HELMHOLTZ, | § | CIVIL ACTION NO. |
| Plaintiff, | § | |
| | § | |
| vs. | § | SECTION J |
| | § | |
| BP EXPLORATION & PRODUCTION, | § | JUDGE BARBIER |
| INC., BP AMERICA PRODUCTION | § | |
| COMPANY and BP, P.L.C., | § | |
| | § | MAG. JUDGE WILKINSON |
| Defendants. | § | |

## SUMMONS IN A CIVIL ACTION

To: BP Exploration & Production, Inc.
c/o CT Corporation System
5615 Corporate Boulevard, Suite 400B
Baton Rouge, LA 70808

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Michael Helmholtz
250 NE 660th street
Old Town, FL 32680

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____        _____
                                      *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____
was received by me on *(date)* _____.

    ☐ I personally served the summons on the individual at *(place)*_____

_____ on *(date)* _____ ; or

    ☐ I left the summons at the individual's residence or usual place of abode with *(name)*_____

_____, a person of suitable age and discretion who resides there, on *(date)* _____

and mailed a copy to the individual's last known address; or

    ☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* on *(date)* ; or

    ☐ I returned the summons unexecuted because _____; or

    ☐ Other *(specify):*



    My fees are $_____ for travel and $_____ for services, for a total of
$_____ .

    I declare under penalty of perjury that this information is true.


Date: _____          _____
                                                  *Server's signature*

                                                _____
                                                *Printed name and title*


                                                _____
                                                *Server's address*

Additional information regarding attempted service, etc:

440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the
Eastern District of Louisiana

| | | |
|---|---|---|
| MICHAEL HELMHOLTZ, | § | CIVIL ACTION NO. |
| Plaintiff, | § | |
| | § | |
| vs. | § | SECTION J |
| | § | |
| BP EXPLORATION & PRODUCTION, | § | JUDGE BARBIER |
| INC., BP AMERICA PRODUCTION | § | |
| COMPANY and BP, P.L.C., | § | |
| | § | MAG. JUDGE WILKINSON |
| Defendants. | § | |

## SUMMONS IN A CIVIL ACTION

To:     BP, P.L.C.
        1 St James's Square
        London SW1Y 4PD, England

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

        Michael Helmholtz
        250 NE 660th street
        Old Town, FL 32680

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                     *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. _____

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

    ☐ I personally served the summons on the individual at *(place)*_____

_____ on *(date)* ; or

    ☐ I left the summons at the individual's residence or usual place of abode with *(name)*_____

_____, a person of suitable age and discretion who resides there, on *(date)* _____

and mailed a copy to the individual's last known address; or

    ☐ I served the summons on *(name of individual)* _____, who is

designated by law to accept service of process on behalf of *(name of organization)* on *(date)* ; or

    ☐ I returned the summons unexecuted because _____; or

    ☐ Other *(specify):*

    My fees are $_____ for travel and $_____ for services, for a total of

$_____ .

    I declare under penalty of perjury that this information is true.

Date: _____

                                      _____
                                      *Server's signature*

                                      _____
                                      *Printed name and title*

                                        _____
                                      *Server's address*

Additional information regarding attempted service, etc: