## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * <br> <br> * | MDL 2179 <br> <br> SECTION: J(2) |
| Applies to: <br> *Certain Cases in the B1 Bundle (See Exhibit A)* | * <br> <br> * | JUDGE BARBIER <br> <br> MAG. JUDGE CURRAULT |

## ORDER & REASONS
### [As to the Claims of the Mexican Plaintiffs]

Before the Court are BP's Dispositive Motion as to the Claims of Mexican Plaintiffs (Rec. Doc. 25477), plaintiffs' oppositions (Rec. Docs. 25515, 25523, 25533), and BP's reply (Rec. Doc. 25591).[1] The motion targets 115 cases brought by Mexican residents (collectively, the "Mexican Plaintiffs") who seek damages under the Oil Pollution Act of 1990 ("OPA") 33 U.S.C. §§ 2701, et seq., and general maritime law for economic losses they allegedly incurred due to the DEEPWATER HORIZON/Macondo Well oil spill in the Gulf of Mexico. BP's primary arguments are (1) the Mexican Plaintiffs' cannot satisfy certain requirements OPA imposes on "foreign claimants," *see* 33 U.S.C. § 2707(a), and (2) OPA displaced the Mexican Plaintiffs' claims under general maritime law. The Court heard oral argument on September 9, 2020. (Minute Entry, Rec. Doc. 26667; Transcript, Rec. Doc. 26701). Having considered the parties' arguments, the applicable law, and the relevant record, the Court grants BP's motion and dismisses with prejudice the Mexican Plaintiffs' claims for the reasons set out below.

---

[1] Halliburton Energy Services, Inc. joins in BP's motion. (Rec. Docs 25507, 25506).

BACKGROUND

On April 20, 2010, a blowout, explosions, and fire occurred aboard the semi-submersible drilling rig DEEPWATER HORIZON as it was preparing to temporarily abandon a well, known as Macondo, it had recently drilled some 50 miles off the Louisiana coast. These events resulted in 11 deaths, multiple injuries, the loss of the DEEPWATER HORIZON, and a massive oil spill in the Gulf of Mexico. BP, which owned a majority interest in both the Macondo Well and the lease of the relevant block of the outer continental shelf, is a "responsible party" for the oil spill under OPA. (*See* Order of Feb. 22, 2012 at 5-15, Rec. Doc. 5809). These events gave rise to thousands of lawsuits, with well over one hundred thousand plaintiffs, against BP and other parties. On August 10, 2010, the Judicial Panel on Multidistrict Litigation created this multidistrict litigation, MDL 2179, and assigned it to this Court, all pursuant to 28 U.S.C. § 1407. (Rec. Doc. 1). Nearly all federal cases arising from the DEEPWATER HORIZON/Macondo Well casualty have been consolidated with MDL 2179.

To facilitate the administration of this sprawling litigation, the Court organized the various types of claims into "pleading bundles." (PTO 11, Rec. Doc. 569). Relevant here is the "B1" bundle, which contained non-governmental claims for economic loss and/or property damage. During the first several years of the MDL the B1 bundle contained more claims than any other pleading bundle. However, after a massive class settlement in 2012, thousands of individual settlements of opt-out and excluded claims between 2016 and 2020, several targeted pretrial orders, and numerous rulings on dispositive motions over the past decade, only around 130 cases

2

remain in the B1 bundle today.[2] The Mexican Plaintiffs account for 115 of the remaining B1 cases.[3]

Seventeen of the Mexican Plaintiffs purport to be commercial fishermen who fished in Mexican waters around the time of the oil spill. Most of the other Mexican Plaintiffs are fishing "cooperatives." As it has been explained to the Court, a cooperative is a juridical entity under Mexican law that can sue and be sued like any other business entity. The members of a fishing cooperative are individual fishermen. Plaintiffs' counsel explained at oral argument that the cooperative typically owns the fishing license issued by the Mexican government and the boats used by the cooperative's members. A few of the Mexican Plaintiffs are some other type of cooperative, such as a tourism cooperative. (*See, e.g.*, No. 16-6294).

The Mexican Plaintiffs allege the oil spill caused a decline in the amount of fish they caught in Mexican waters. They sued to recover their economic losses from BP and other defendants under OPA and general maritime law. In Pretrial Order No. 67 (Rec. Doc. 25370), the Court instructed defendants to file any dispositive motions with respect to the Mexican Plaintiffs' cases, which prompted the instant motion. As mentioned, BP's main arguments are (1) the Mexican Plaintiffs cannot satisfy OPA's "foreign claimants" provision, meaning they cannot recover under OPA, and (2) the Mexican Plaintiffs cannot recover under general maritime law because OPA displaced those claims. BP also argues that 41 of the Mexican Plaintiffs should be

---

[2] At the time of this writing, there are 958 cases in the MDL, and roughly the same number of plaintiffs. The vast majority of these concern personal injuries and deaths allegedly due to chemical exposure, what are known as "B3" claims.

[3] 56 of the Mexican Plaintiffs are represented by the Buzbee Law Firm, 41 are represented by Weller, Green, Toups & Terrell, and 18 are represented by Kuykendall & Associates.

dismissed for the additional reason that their lawsuits violate this Court's Pretrial Order No. 60 (Rec. Doc. 16050), which barred mass joinder complaints. Each of these issues is discussed below.

DISCUSSION

### A.   Mexican Plaintiffs' Claims Under OPA

OPA was passed in response to an oil spill by the EXXON VALDEZ in Prince William Sound, Alaska, in 1989, as well as three other spills that occurred a few months later in Rhode Island, the Delaware River, and the Houston Ship Channel. *See* S. Rep. No. 101-94, at 2-3 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 722, 723-24. The Act is broad, and it made many changes to existing laws. *See generally* P.L. 101-380, 104 Stat. 484 (1990). One of OPA's innovations is that it makes statutorily-defined "responsible parties" strictly liable for removal costs and a wide range of damages that result from an oil spill. *See* 33 U.S.C. § 2702(a); *In re Settoon Towing, L.L.C.*, 859 F.3d 340, 344 (5th Cir. 2017). OPA enumerates six categories of damages that may be recovered. *See* 33 U.S.C. § 2702(b)(2). The Mexican Plaintiffs' claims fall within subsection (E), which allows recovery of "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant." 33 U.S.C. § 2702(b)(2)(E).

However, foreign claimants like the Mexican Plaintiffs must satisfy certain additional requirements before they may recover under OPA. Section 2707 states in relevant part:

> In addition to satisfying the other requirements of this Act, to recover removal costs or damages resulting from an incident a foreign claimant shall demonstrate that—
>
> (A) the claimant has not been otherwise compensated for the removal costs or damages; and
>
> (B) recovery is authorized by a treaty or executive agreement between the United States and the claimant's country, or the Secretary of State, in consultation with the Attorney General and other appropriate officials, has certified that the claimant's country provides a comparable remedy for United States claimants.

33 U.S.C. § 2707(a)(1).

There is no dispute that the Mexican Plaintiffs have not been compensated for their alleged damages. The Mexican Plaintiffs do not claim that their recovery is authorized by an executive agreement between the United States and Mexico, nor do they assert that the United States Attorney General has certified that Mexico provides a comparable remedy for U.S. claimants. The Mexican Plaintiffs do contend, however, that two treaties authorize their recovery under OPA: (1) the United States-Mexico-Canada Agreement ("USMCA") and (2) the North American Agreement on Environmental Cooperation ("NAAEC"). BP disputes this.[4]

As to the USMCA, that treaty did not enter into force until this year, a decade after the DEEPWATER HORIZON/Macondo Well oil spill and several years after the Mexican Plaintiffs filed their lawsuits. The Mexican Plaintiffs fail to explain why that treaty has any effect on their claims. The Court concludes the USMCA is

---

[4] The Court pauses to note that this is not the first time it has addressed OPA's "foreign claimants" requirements in this MDL. In 2011, three Mexican States argued their recovery was authorized by four treaties, different from the two considered here. In 2018, a fourth Mexican State argued that Mexico's General Law of Ecological Balance and Environmental Protection provides a remedy to United States claimants that is comparable to OPA, although there was no certification from the U.S. Attorney General saying so. The Court rejected all of these arguments. (Rec. Doc. 4845 at 9-12; Rec. Doc. 24119 at 3-4). Those decisions were not appealed.

irrelevant.[5]

The NAAEC, however, was in effect during the relevant time. The NAAEC is a "side agreement" to the North American Free Trade Agreement ("NAFTA"). The Mexican Plaintiffs rely primarily on Article 6 of the NAAEC, which states in relevant part:

> Article 6:     Private Access to Remedies
> . . .
> 2.  Each Party shall ensure that persons with a legally recognized interest under its law in a particular matter have appropriate access to administrative, quasi-judicial or judicial proceedings for the enforcement of the Party's environmental laws and regulations.
>
> 3.  Private access to remedies shall include rights, in accordance with the Party's law, such as:
>     (a) to sue another person under that Party's jurisdiction for damages;
>     (b) to seek sanctions or remedies such as monetary penalties, emergency closures or orders to mitigate the consequences of violations of its environmental laws and regulations;

NAAEC, Can.-Mex.-U.S., Sept. 14, 1993, 32 I.L.M. 1480, 1484.

Article 6(2) merely states that the United States will ensure that "persons **with a legally recognized interest** under [United States] law" will have "appropriate access to administrative, quasi-judicial or judicial proceedings for the enforcement of the [United States'] environmental laws." (emphasis added). The NAAEC does not itself give the Mexican Plaintiffs a "legally recognized interest" under OPA. Similarly, while Article 6(3) says, "Private access to remedies shall include rights . . . to sue another person under that Party's jurisdiction for damages," those rights must be

---

[5] Additionally, the language in the USMCA relied upon by the Mexican Plaintiffs is very similar to the language in the NAAEC. As explained below, the NAAEC does not authorize the Mexican Plaintiffs' recovery under OPA. Therefore, even if the USMCA somehow did apply retroactively, it would not satisfy § 2707.

asserted "in accordance with [United States] law." NAAEC, at Art. 6(3). Nothing in United States law allows Mexican residents to sue under OPA. Thus, the NAAEC stops short of authorizing the Mexican Plaintiffs' recovery under OPA.

This conclusion is supported by 19 U.S.C. § 3312(c), which is part of the Act that implemented NAFTA in the United States.[6] That statute states, "No person other than the United States . . . shall have any cause of action or defense under . . . the [NAAEC] . . . ." The Court also notes that the Mexican Plaintiffs cite no case holding that the NAAEC authorizes suit under OPA.

Because the Mexican Plaintiffs fail to satisfy OPA's requirements for foreign claimants, 33 U.S.C. § 2707, their OPA claims must be dismissed.

## B.    Mexican Plaintiffs' Claims Under General Maritime Law

The Mexican Plaintiffs also seek to recover under general maritime law (i.e., judge-made maritime law). Their arguments rely almost entirely on prior decisions in this MDL where the Court held that OPA did not displace entirely claims for oil spill-related losses under general maritime law. BP, citing more recent decisions from the Fifth Circuit, contends that OPA provides the exclusive source of law for matters governed thereunder; therefore, OPA displaces the Mexican Plaintiffs' claims under general maritime law.

### 1.    Prior Rulings in MDL 2179 Re: OPA Displacement of Maritime Law

This is not the first time the Court has addressed the interplay between OPA and general maritime law. The question first arose in 2011 when the Court

---

[6] Although 19 U.S.C. § 3312(c) was recently repealed, it, like the NAAEC, was in effect at the relevant time.

considered motions to dismiss the Master Complaint for the B1 Bundle. (*See* Rec. Doc. 3830 at 18-27) ("B1 Order"). As recounted in the B1 Order, before OPA's enactment in 1990 private persons who suffered oil spill-related losses could bring a tort claim under general maritime law. Those claims were subject to a number of restrictions, however. Notably, most plaintiffs would need to show that oil had physically damaged property in which the plaintiff held a proprietary interest, as general maritime law bars tort claims for purely economic losses—what is known as the *Robins Dry Dock* rule. Some courts, including this one in the B1 Order, recognized a narrow exception to *Robins Dry Dock* with respect to commercial fishermen.[7] Another hurdle for maritime claims is the Limitation of Liability Act, under which a vessel owner may limit her liability to the post-casualty value of the vessel plus any pending freight. *See* 46 U.S.C. § 30505.[8] Additionally, plaintiffs typically must prove that the defendant was negligent. *See United States v. M/V Big* Sam, 681 F.2d 432, 440 (5th Cir. 1982). However, where there is egregious fault, general maritime law provides the remedy of punitive damages. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 488-

---

[7] The Mexican Plaintiffs did not suffer a physical injury to a proprietary interest. Their maritime claims rely entirely on the commercial fishermen exception to the *Robins Dry Dock* rule.

[8] A Senate Report from 1989 described the state of pre-OPA oil pollution law. It explained:

> Finally, the 1851 Limitation of Liability Act represents a potentially devastating bar to effective recovery of either cleanup costs or damages. Perhaps that Act had merit 135 year ago, since its purpose was to further the interests of this country's budding merchant marine by encouraging shipbuilding and employment of ships. To that end, vessel owner liability was limited to "the amount or value of the interest of such owner in such vessel, and her freight pending." Current application of that law, however, has resulted in situations where the owner pays next to nothing because the vessel and cargo are a total loss following a catastrophic incident. In two Federal cases where the owner of a vessel has invoked the provisions of this Act, courts have held that this law, where applicable, has the effect of limiting recoveries under State law, including provisions allowing unlimited liability.

S. Rep. No. 101-94, at 4 (1989), *as reprinted in* 1989 U.S.C.C.A.N. 722, 725.

89 (2008).

OPA removed many of these obstacles to recovery. Neither the *Robins Dry Dock* rule nor the Limitation of Liability Act applies to OPA claims. *See Settoon Towing*, 859 F.3d at 344-45, 352; *Metlife Capital Corp. v. M/V Emily S*, 132 F.3d 818, 822 (1st Cir. 1997). Also, an OPA plaintiff will not need to prove negligence in many instances, because OPA makes a "responsible party" strictly liable unless one of the limited defenses apply. *Settoon Towing*, 859 F.3d at 344 & n.3.[9] OPA is silent, however, as to whether a plaintiff may sue a non-responsible party or recover punitive damages from either a responsible party or non-responsible party.

In their motions to dismiss the B1 Master Complaint, the defendants argued that OPA displaced the plaintiffs' general maritime law claims such that they could only sue a responsible party and punitive damages were not available. The Court largely disagreed. As to non-responsible parties, the B1 Order held that plaintiffs who could have sued these entities under general maritime law before OPA's enactment (i.e., plaintiffs who could satisfy the *Robins Dry Dock* rule or were commercial fishermen) could still sue these parties after OPA, and they may be entitled to punitive damages. (B1 Order at 25-27). The Court's ruling was more nuanced with respect to responsible parties. The B1 Order held that OPA did not displace the maritime law remedy of punitive damages, however, all claims against a responsible party must comply with OPA's "presentment procedure," *see* 33 U.S.C. § 2713 (discussed in Part B.2., below), even if the plaintiff alleged only claims under general

---

[9] The responsible party's conduct is not entirely irrelevant under OPA, however. For example, OPA limits the responsible party's liability to certain amounts unless the plaintiff shows, for example, that the responsible party was grossly negligent. 33 U.S.C. § 2704(c).

maritime law. (B1 Order at 25-27). The B1 Order's conclusions were based on two then-recent Supreme Court decisions,[10] the fact that OPA contains a savings clause for maritime law, *see* 33 U.S.C. § 2751(e) (quoted in Part B.2., below), the fact that these general maritime law claims and remedies pre-existed OPA, and the Court's observation that permitting these claims did not appear to frustrate Congress' remedial scheme (e.g., the same conduct that would justify an award of punitive damages would also lift OPA's liability caps, *see* 33 U.S.C. § 2704(c)).

Subsequent decisions in the MDL built on the B1 Order. (*See, e.g.*, Rec. Doc. 4578 at 7 (general maritime law claims by states of Louisiana and Alabama not displaced by OPA)). Notably, the Court held in December 2011 that three Mexican States could not recover under OPA because, like the Mexican Plaintiffs here, they could not satisfy OPA's "foreign claimants" requirements. (Rec. Doc. 4845). Nevertheless, the Court went on to hold that the Mexican States may have viable claims under general maritime law if they met the *Robins Dry Dock* rule.[11]

2.   <u>Intervening Decisions by the Fifth Circuit Re: OPA Displacement of Maritime Law</u>

In the years following the B1 Order, the Fifth Circuit issued two decisions that addressed whether OPA displaced general maritime law: *United States v. American*

---

[10] *See Baker*, 554 U.S. at 488-89 (holding that the Clean Water Act did not displace the maritime remedy of punitive damages in a pre-OPA oil pollution case); *Atlantic Sounding Co. v. Townsend,* 557 U.S. 404 (2009) (holding that that the Jones Act did not displace the maritime remedy of punitive damages in a maintenance and cure claim).

[11] The Court subsequently determined on summary judgment that the Mexican States did not, in fact, hold the requisite proprietary interest in physically damaged property, and dismissed their maritime tort claims. (Rec. Doc. 11281). The Fifth Circuit affirmed on the grounds that the Mexican States did not satisfy the *Robins Dry Dock* rule. *In re Deepwater Horizon*, 784 F.3d 1019, 1030-32 (5th Cir. 2015). The Circuit explicitly declined to reach the issue of whether OPA displaced general maritime law. *Id.* at 1023 n.3.

*Commercial Lines, LLC*, 759 F.3d 420 (5th Cir. 2014) [hereinafter *ACL*] and *In Re: Settoon Towing, L.L.C.*, 859 F.3d 340 (5th Cir. 2017).

In *ACL*, companies that had performed oil spill cleanup work presented claims for payment to the designated responsible party in accordance with § 2713 of OPA. That section requires claimants to first present their claims to the responsible party for payment, but if the responsible party does not pay within 90 days, the claimant may elect to sue the responsible party in court or present the claim to the Oil Spill Liability Trust Fund ("the Fund"), a federal fund established by OPA and administered by the Coast Guard. *ACL*, 759 F.3d at 422-23 (citing 33 U.S.C. § 2713). When the Fund pays a claim, it subrogates to the claimant's rights and can recoup the payment from other entities, including the responsible party. *Id.* at 423 (citing 33 U.S.C. § 2712(f)). The responsible party in *ACL* did not pay the cleanup companies' entire bill, and they elected to submit the balance of their claim to the Fund. *Id.* The Coast Guard paid additional sums to the cleanup companies from the Fund and then sued to recover those amounts from the responsible party. *Id.* The responsible party responded by asserting third-party claims against the cleanup companies, joining them in the Coast Guard's suit against the responsible party. *Id.* at 423-24. The district court dismissed the responsible party's claims against the cleanup parties, concluding that OPA displaced the responsible party's claims under general maritime law. *Id.* The Fifth Circuit affirmed.

With respect to OPA's displacement of general maritime law, *ACL* stated:

. . . [I]n enacting OPA, Congress intended to build upon the Clean Water Act to create a single Federal law providing cleanup authority, penalties, and liability for oil pollution. . . . OPA prescribes a

11

supplemental, comprehensive federal plan for handling oil spill responses, allocating responsibility among participants, and prescribing reimbursement for cleanup costs and injuries to third parties.

More generally, when Congress enacts a carefully calibrated liability scheme with respect to specific remedies, "the structure of the remedies suggests that Congress intended for th[e] statutory remedies to be exclusive." *United States v. M/V BIG SAM*, 681 F.2d 432, 441 (5th Cir.1982) . . . . ***Indeed, "we are to conclude that federal common law has been preempted as to every question to which the legislative scheme spoke directly, and every problem that Congress has addressed."*** *Id.* at 442 . . . . As found by the district court, "***OPA directly speaks to the claims asserted by ACL.***" Hence we hold that this "balanced and comprehensive remedial scheme" ***provides the exclusive remedy for a claimant to recover statutory removal costs from a responsible party*** and forecloses a responsible party from bringing a third-party complaint against a spill responder that has chosen to submit claims to the Fund after 90 days without payment.

. . . Nothing in OPA authorizes a responsible party to bring a third-party complaint against a claimant that has chosen, under § 2713(c)(2), to submit claims to the Fund after 90 days without payment. . . .

*Id.* at 424-25 (some citations omitted; emphasis added).

*ACL* further explained that OPA's savings clause did not preserve the responsible party's claims against the cleanup companies. That clause states, "Except as otherwise provided in this Act, this Act does not affect—(1) admiralty and maritime law . . . ." 33 U.S.C. § 2751(e). *ACL* reasoned:

The savings clause here begins "except as otherwise provided." OPA provides a procedure for submission, consideration, and payment of cleanup expenses by the Fund when the responsible party fails to settle such claims within 90 days—the situation presented here. ***As OPA did "otherwise provide[ ]," ACL's claims against [the cleanup companies] for return of payments made by the Fund under OPA cannot be saved by this clause.*** To interpret § 2751(e) as ACL proposes would be to supersede OPA, and courts cannot, without any textual warrant, expand the operation of savings clauses to modify the scope of displacement under OPA.

759 F.3d at 424-26 (citation omitted; emphasis added).

*Settoon Towing*, which concerned a responsible party's claim for contribution under § 2709[12] against a partially at-fault non-responsible party, echoed some of the themes from *ACL*. *See In re: Settoon Towing*, 859 F.3d at 351. Notably, the court explained that the phrase "except as otherwise provided in this Act" in OPA's saving clause "shows that the admiralty claims that are preserved are those that are ***not addressed*** in the OPA." *Id.* (emphasis added).

    3.    <u>Under *ACL* and *Settoon Towing*, the Mexican Plaintiffs' Claims Under General Maritime Law Are Displaced by OPA</u>

In their briefing and at oral argument, the Mexican Plaintiffs had virtually no response to *ACL* and *Settoon Towing*. In light of the reasoning in those cases, the Court is bound to conclude that OPA has displaced the Mexican Plaintiffs' claims under general maritime law.[13] OPA clearly "addressed" in § 2707(a) foreign claimants' claims for economic losses due to an oil spill; therefore, those claims are not preserved by OPA's savings clause. *See Settoon Towing*, 859 F.3d at 351. Or, to use *ACL*'s language, "[a]s OPA did 'otherwise provide[ ]'" how foreign claimants like the Mexican Plaintiffs may recover, their claims under general maritime law "cannot be saved by" § 2751(e). *ACL*, 759 F.3d at 426. Accordingly, the Mexican Plaintiffs' claims under general maritime law must be dismissed. Furthermore, because they have no remaining claims, all 115 cases by the Mexican Plaintiffs will be dismissed.

Nevertheless, the Court questions certain aspects of the *ACL* and *Settoon*

---

[12] "A person may bring a civil action for contribution against any other person who is liable or potentially liable under this Act or another law." 33 U.S.C. § 2709.

[13] Likewise, *ACL* and *Settoon Towing* cast substantial doubt on the B1 Order's conclusion regarding displacement of general maritime law.

*Towing* decisions. Those views are provided in Part D at the end of this Order & Reasons. Part D is not part of the Court's holding.

### C.   41 of the Mexican Plaintiffs Also Failed to Comply with PTO 60

Pretrial Order No. 60 ("PTO 60") issued in March of 2016 and required that all plaintiffs in the B1 bundle file an individual lawsuit. (Rec. Doc. 16050). In other words, PTO 60 prohibited the use of multi-plaintiff lawsuits, except in very limited circumstances. PTO 60 warned that the claims of B1 plaintiffs who failed to comply would be dismissed with prejudice. In response to PTO 60, the law firm of Weller Green Toups & Terrell, L.L.P. ("Toups") filed 41 cases, each consisting of one Mexican fishing cooperative and its individual members. In June 2016, the Court issued a show cause order that noted these cases were non-compliant because the plaintiffs had filed mass-joinder complaints. (Rec. Doc. 18724-4). In response, Toups informed the Court that it "amended all complaints . . . and limited them to only the one cooperativa of fishermen in each lawsuit and they have deleted any reference to a list of other individuals." (Rec. Doc. 22004 at 9). Toups' amendments and representations in its brief prompted BP to withdraw its objection to the Toups' cases, and the Court deemed these 41 plaintiffs to be compliant with PTO 60. (*Id.*)

In 2018, the Court issued PTO 65, which required B1 plaintiffs to file a verified statement that described in detail the plaintiff's damages. (Rec. Doc. 23825). Toups' clients filed statements reflecting that each cooperative was actually claiming the full losses allegedly suffered by its individual members, as opposed to the cooperative's loss as its own entity. For example, the cooperative in case no. 16-4706 stated that each of its members suffered an economic loss of $10,867. The cooperative calculated

14

"its" damages by multiplying this amount by the number of its members (2,137) to arrive at $23.2 million, and then doubled that amount to account for alleged future losses. (No. 16-4706, Rec. Doc. 8-2 at 1, Rec. Doc. 8-1 at 2).

The Court agrees with BP that the 41 cases filed by the Toups "cooperatives" are, in realty, mass joinders in contravention of PTO 60. This provides an additional reason to dismiss the 41 Mexican Plaintiffs represented by Toups. *See In re Deepwater Horizon*, 713 F. App'x 360 (5th Cir. 2018) (unpublished).

## D.   Additional Comments Regarding OPA's Displacement of General Maritime Law

As stated above in Part B.3., the Fifth Circuit's decisions in *ACL* and *Settoon Towing* compel the conclusion that the Mexican Plaintiffs' claims under general maritime law are displaced by OPA. However, the Court questions parts of the analysis in those decisions, and expresses those views here. To be clear, nothing in this Part D changes the holding in Part B.3. The Mexican Plaintiffs' cases remain dismissed.

Whether OPA displaces an aspect of general maritime law boils down to a question of how to interpret the phrase, "Except as otherwise provided in this Act," in OPA's saving clause, "Except as otherwise provide in this Act, this Act does not affect . . . admiralty and maritime law . . . ." 33 U.S.C. § 2751(e). *ACL* and *Settoon Towing* interpreted this phrase broadly, and thus read the savings clause narrowly. As noted, *Settoon Towing* construed § 2751(e) to mean the maritime claims that are not displaced "are those that are ***not addressed*** in the OPA." 859 F.3d at 351

(emphasis added). For the reasons below, the Court respectfully believes that this interpretation is incorrect.

1. <u>Congress Made a Deliberate Choice to Include a Maritime Law Savings Clause in OPA</u>

The EXXON VALDEZ oil spill in 1989 propelled both houses of Congress to draft oil spill legislation. That fall, the Senate produced S. 686, while the House created H.R. 1465. Although similar in many respects, these bills also contained significant differences. A conference comprised of select members of both houses convened over the summer in 1990 to attempt to resolve these differences. The conferees created a compromise bill that adopted some aspects from the House bill and some aspects from the Senate bill. This compromise bill (also known as the conference substitute) was later enacted as Public Law No. 101-380, the Oil Pollution Act of 1990.

The conferees' work is documented in a report dated August 1, 1990. *See* H.R. Rep. No. 101-653 (1990) (Conf. Rep.) [hereinafter "Conf. Rep."], *as reprinted in* 1990 U.S.C.C.A.N. 779.[14] It explains "[t]he differences between the House bill, the Senate amendment [i.e., S. 686], and the substitute agreed to in conference." *Id.* at 101, 1990 U.S.C.C.A.N. at 779. Notably, the Senate's bill did not include a saving clause for maritime law, while the House's bill did. *Id.* at 159, 1990 U.S.C.C.A.N. at 838. The conferees—and ultimately Congress—decided to include the savings clause. *Id.* Thus,

---

[14] Note that the Fifth Circuit has looked to legislative history, and conference reports in particular, when interpreting oil spill legislation. *See, e.g.*, *Settoon Towing*, 859 F.3d at 352; *M/V Big Sam*, 681 F.2d at 439 & n.13, 442-43 & n.14 (interpreting 33 U.S.C. § 1321).

when faced with a choice between including or omitting a savings clause for maritime law, Congress chose to include a savings clause in OPA.

   2.   <u>The Conference Report Explains How the Savings Clause Should Be Interpreted</u>

The savings clause in the House bill stated simply, "This Act does not affect – (1) admiralty and maritime law . . . ." *See*  H.R. 1465, 101st Cong. § 6002 (engrossed in House Nov. 9, 1989). The conferees added "except as otherwise provided" to the beginning of the saving clause. *See* Conf. Rep. at 159, 1990 U.S.C.C.A.N. at 838. The Conference Report explains how the conferees intended this phrase to be interpreted:

> Section 6001 of the House bill clarifies that the House bill does not affect admiralty and maritime law . . . .
>
> The Conference substitute adopts the House provision with respect to admiralty and maritime laws with an amendment clarifying that the provision was subject to the provisions of the substitute. Section 1002 of the Conference substitute [now codified at 33 U.S.C. § 2702] establishes liability notwithstanding any other provision or rule of law, including the Act of March 3, 1851 [the Limitation of Liability Act, 46 U.S.C. §§ 30501-12]. ***Therefore, there is no change in current law unless there is a specific provision to the <u>contrary</u>.***

*Id*. (emphasis added). In contrast to the interpretations applied in *ACL* and *Settoon Towing*, the conferees intended "except as otherwise provided" to be interpreted narrowly—existing maritime law is only displaced or superseded when OPA contains a "specific provision ***to the contrary***."

The passage above also provides an example of an area of maritime law that would not be preserved by the savings clause: the Limitation of Liability Act. In providing this example, the Conference Report references OPA's "Elements of Liability," § 2702, creating an interpretative bridge between that section and §

17

2751(e). Section 2702 states, in pertinent part, "Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party . . . is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident." 33 U.S.C. § 2702(a). When the Conference Report discusses § 2702, it provides a second example of an aspect of maritime law that would not be preserved by the savings clause, the *Robins Dry Dock* rule:

> Liability under this Act is established notwithstanding any other provision or rule of the law. This means that the liability provisions of this Act would govern compensation for removal costs and damages notwithstanding any limitations under existing statutes such as the [Limitation of Liability Act], or under existing requirements that physical damage to the proprietary interest of the claimant be shown.

Conf. Rep. at 103, 1990 U.S.C.C.A.N. at 781.

The Limitation of Liability Act and the *Robins Dry Dock* rule are clearly contrary to specific provisions of OPA. OPA contains its own limits of liability and its own rules for lifting those limits, both of which are different from their analogues in the Limitation of Liability Act. *Compare* 33 U.S.C. § 2704, *with* 46 U.S.C. § 30505.[15] Likewise, § 2702(b)(2)(E) in OPA permits recovery of economic losses without physical damage to a proprietary interest, which is contrary to the rule typically applied under general maritime law. *See Settoon Towing*, 859 F.3d at 344-45, 352 (citing *Louisiana*

---

[15] As explained in the Senate's Report on S. 686,

> The [Limitation of Liability Act] limits liability of owners or operators [of vessels] to the value of the vessel and the cargo after an incident has occurred. In today's liability scheme, this approach appears dated and inconsistent with Congress' repeated statements on the appropriate liability of parties. If applied to these circumstances, the 1851 statute virtually eliminates any meaningful liability on the part of the owner or operator and would unravel the balance of liability set forth herein. Therefore this bill completely supersedes the 1851 statute with respect to oil pollution.

S. Rep. No. 101-94, at 15 (1989), *as reprinted in* 1989 U.S.C.C.A.N. 722, 736.

*ex rel. Guste v. M/V Testbank*, 752 F.2d 1019, 1022 (5th Cir. 1985) (en banc)). Note also that the Conference Report states that the "notwithstanding" clause in § 2702 is intended to supersede "limitations" or "requirements" that would be imposed on oil spill claims under pre-OPA law; it does not state that OPA supersedes all other laws or is meant to provide the exclusive avenue of recovery.

To summarize, the Conference Report tells us that § 2751(e) preserves existing maritime law except where OPA contains a specific provision ***to the contrary***. The Report's two examples of laws not preserved by the savings clause, as well as its description of § 2702's "notwithstanding" clause, illustrate what sort of laws Congress viewed as "contrary" to OPA—laws that would impose additional limits or restrictions on an OPA claim beyond what the Act already contains. This indicates that general maritime law is not displaced when it merely overlaps with OPA. Accordingly, and contrary to what may be implied in *ACL* and *Settoon Towing*, it does not appear that Congress intended OPA to provide the exclusive remedy for damages covered by that Act. Indeed, Congress knows how to make a statutory remedy exclusive when it desires that result. *See, e.g.*, Longshore and Harbor Workers' Comp. Act, 33 U.S.C. § 905(a) (making an employer's liability under the LHWCA "exclusive and in place of all other liability of such employer to the employee . . . on account of such injury or death.").

3.   <u>Permitting a Foreign Claimant to Recover Under General Maritime Law Does Not Appear to Be Contrary to OPA</u>

Without a doubt, OPA specifically addressed foreign claimants. *See* 33 U.S.C. § 2707 (quoted in Part A., above). However, this should not be enough to conclude

that OPA displaces the Mexican Plaintiffs' claim under general maritime law, at least not according to the Conference Report. The issue should turn on whether it would be "contrary" to OPA to permit a foreign plaintiff who cannot satisfy the requirements of § 2707 to pursue a claim and potentially recover under general maritime law. The Court believes it would not be contrary.

The intent of OPA was to expand, not contract, rights. Prior to OPA there existed "a fragmented collection of Federal and State laws providing inadequate cleanup and damage remedies . . . and substantial barriers to victim recoveries—such as legal defenses, statutes of limitation, the corporate form, and the burdens of proof that favor those responsible for the spill." S. Rep. No. 101-94, at 2 (1989), *as reprinted in* 1989 U.S.C.C.A.N. 722, 723. One of OPA's goals was to cure these deficits in the law. Thus, "'Congress intended OPA to allow a broader class of claimants to recover economic losses than allowed under general maritime law.'" *Settoon Towing*, 859 F.3d at 351 (quoting the B1 Order). As mentioned, OPA removed the *Robins Dry Dock* prohibition against purely economic losses, superseded the Limitation of Liability Act, and imposes strict liability on a responsible party. Furthermore, to help ensure there would be sufficient funds to pay for oil spill cleanup and damages, OPA required evidence of financial responsibility from responsible parties, and it created a direct action against a responsible party's "guarantor." 33 U.S.C. §§ 2715, 2713(c). OPA also established the $1 billion Oil Spill Liability Trust Fund ("the Fund"), which is available to pay claims when funding from the responsible party was unavailable or not forthcoming. *Id.* § 2713(d); *see also ACL*, 759 F.3d at 422-23. In light of this, it seems odd to conclude that when Congress imposed special requirements on a foreign

claimant's ability to recover under OPA, it also meant to silently remove that claimant's ability to recover under any other law in the event those requirements could not be satisfied. *Cf. Townsend*, 557 U.S. at 417 (supporting its conclusion that the Jones Act does not displace the general maritime law remedy of punitive damages for the willful failure to pay maintenance and cure by noting that the purpose of the Jones Act "was to enlarge that protection [provided to seaman], not to narrow it."); *Baker*, 554 U.S. at 488-89 ("[W]e find it too hard to conclude that a statute expressly geared to protecting 'water,' 'shorelines,' and 'natural resources' was intended to eliminate *sub silentio* oil companies' common law duties to refrain from injuring the bodies and livelihoods of private individuals.") (interpreting 33 U.S.C. § 1321).

There are obvious advantages to suing under OPA as opposed to general maritime law. A hypothetical private plaintiff who may sue under only general maritime law:

    (1) does not enjoy OPA's strict liability against the responsible party,
    (2) may not partake in the Fund as a possible alternative source of compensation,
    (3) does not have a direct action against the responsible party's guarantor,
    (4) must satisfy the *Robins Dry Dock rule*, and
    (5) may have her recovery limited or barred entirely by the Limitation of Liability Act.[16]

It would clearly contravene OPA to allow a plaintiff who cannot satisfy OPA's requirements to reap its benefits, such as strict liability, partaking in the Fund, etc. But it does not seem to contradict OPA or frustrate its remedial scheme to permit

---

[16] Also, this Court has repeatedly noted that it is unclear what causation standard applies to economic loss claims under OPA § 2702(b)(2)(E). (*See* B1 Order at 32-33, Rec. Doc. 3830; Rec. Doc. 12055 at 23; Rec. Doc. 15987 at 16). It is possible something less than proximate cause is required, whereas a plaintiff relegated to suing under general maritime law would have to prove proximate cause. *See* 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5:5 (6th ed. 2018).

that same plaintiff to recover under general maritime law, provided of course, that she can overcome all of the obstacles that exist under maritime law.[17]

      4.    *ACL's* and *Settoon Towing's* Interpretations of § 2751(e) Appear to Render that Provision Meaningless

If OPA's savings clause is interpreted as meaning that it preserves only those claims not addressed in OPA, then one may wonder what purpose the savings clause serves. Some courts have proposed that maritime claims for personal injury due to an oil spill and collision damage (i.e., damage to a vessel's hull caused by a collision that also results in an oil spill) are not displaced by OPA. *See Metlife Capital Corp.*, 132 F.3d at 822; *Gabarick v. Laurin Maritime (America) Inc.*, 623 F. Supp. 2d 741, 745 (E.D. La. 2009); *Nat'l Shipping Co. of Saudia Arabia v. Moran Mid-Atlantic Corp.*, 924 F. Supp. 1436, 1447 (E.D. Va. 1996). This Court emphatically agrees that such claims are not affected by OPA. However, this Court also believes that these claims would persist even if OPA did not contain a maritime law savings clause, as OPA simply did not address personal injuries or collision damages. If this is correct, then it shows that interpreting OPA's savings clause as meaning it only preserves claims that are not addressed by OPA gives no meaning to the savings clause—the same claims will be displaced or preserved regardless of whether Congress included a maritime law savings clause or not.

---

[17] This conclusion may be different if a plaintiff sought to recover from a responsible party whose liability was capped under OPA. Under that circumstance, it could be argued that allowing a general maritime law claim would frustrate Congress' decision to limit a responsible party's liability for oil spill damages. But this is not clear, nor is this issue even remotely before the Court. Early in this MDL, BP waived any right to limited liability it may have under OPA. (Rec. Doc. 559). The Court later determined that BP's conduct was such that OPA's limits of liability do not apply. (*See* Rec. Doc. 13381-1 ¶¶ 491, 499, 601).

A statute should not be interpreted in a way that renders it "inoperative or superfluous, void or insignificant." *Settoon Towing*, 859 F.3d at 349 (quotations and citation omitted). As explained above, Congress made a deliberate choice to include maritime law savings clause in OPA. The Conference Report explains how that clause should be interpreted. Not only does the interpretation applied in *Settoon Towing* and *ACL* appear to be at odds with the Conference Report, it also appears to render the savings clause superfluous. Section 2751(e) must preserve some general maritime law claims even though they are addressed by OPA, otherwise the savings clause does nothing.

5. <u>General Maritime Law Is Not "Displaced" as Easily as Other, Non-Maritime Federal Common Law</u>

The last point is likely the least important, but deserves mention.

*ACL* states, "Indeed, 'we are to conclude that federal common law has been preempted as to every question to which the legislative scheme spoke directly, and every problem that Congress has addressed.'" 759 F.3d at 423. *ACL* was quoting a Fifth Circuit decision from 1982, *United States v. M/V Big Sam*, 681 F.2d 432, 442 (5th Cir. 1982), which itself was quoting (and adopting) a Second Circuit decision, *In re Oswego Barge Corp.*, 664 F.2d 327, 335 (2d Cir. 1981). *Big Sam* and *Oswego Barge* were actually providing the standard to determine whether a federal statute displaces ***non-***maritime federal common law. *See Big Sam*, 681 F.2d at 442. However, those cases observed that "[i]n recognizing a substantial law-creating function for federal courts in maritime law, the Supreme Court appears to have applied the presumption of statutory preemption somewhat ***less forcefully*** to judge-made

maritime law than to non-maritime federal common law." *Id.* (quotations and citations omitted; emphasis added). *Big Sam/Oswego Barge* concluded that "determining whether non-statutory maritime law, as to both liabilities and remedies, survives enactment of a statute requires a careful analysis of several factors . . . ." *Id.* (quotations and citations omitted).

Although it is not entirely clear what the Supreme Court's current view of this question is, it does appear that the issue of statutory displacement of general maritime law is not as straightforward as *ACL* might suggest. Last year, the Supreme Court considered whether the Jones Act—a statute that does not contain a savings clause for maritime law, unlike OPA—displaces the maritime remedy of punitive damages in a seaman's cause of action for unseaworthiness. *See Dutra Grp. v. Batterton*, 139 S. Ct. 2275 (2019). *Batterton* opens with the following remarks:

> By granting federal courts jurisdiction over maritime and admiralty cases, the Constitution implicitly directs federal courts sitting in admiralty to proceed in the manner of a common law court. Thus, where Congress has not prescribed specific rules, federal courts must develop the amalgam of traditional common-law rules, modifications of those rules, and newly created rules that forms the general maritime law. But maritime law is no longer solely the province of the Federal Judiciary. Congress and the States have legislated extensively in these areas. When exercising its inherent common-law authority, an admiralty court should look primarily to these legislative enactments for policy guidance. We may depart from the policies found in the statutory scheme in discrete instances based on long established history, but we do so cautiously in light of Congress's persistent pursuit of uniformity in the exercise of admiralty jurisdiction.

*Id.* at 2278 (citations and quotations omitted). While this language plainly evinces judicial deference to federal legislative enactments, it also admits that admiralty courts "may depart from the policies found in the statutory scheme" under the

appropriate circumstances. *Batterton*'s analysis similarly suggests that displacement is a complex question in the maritime context. The Court noted there is "significant overlap" between unseaworthiness and the Jones Act, and that the former "serves as a duplicate and substitute for" the latter. *Id.* at 2282, 2286. If general maritime law is displaced "as to every question to which the legislative scheme spoke directly, and every problem that Congress has addressed," then one would expect that *Batterton* would have simply looked to whether punitive damages were available under the Jones Act and, upon finding they were not, concluded that such damages were not available under unseaworthiness. But this is not how the Supreme Court proceeded. Rather, *Batterton* examined (1) whether punitive damages were historically available for an unseaworthiness claim (and determined they were not), *id.* at 2283-84; (2) it then considered whether punitive damages were necessary to "maintain uniformity with Congress's clearly expressed policies" in the Jones Act and FELA (and concluded they were not), *id* at 2284-85; (3) finally, *Batterton* contemplated whether punitive damages could be justified on policy grounds or as a regulatory measure (and concluded they were not), *id.* at 2285-87.

Did *Batterton* established a framework applicable to all future displacement-of-maritime-law questions? This Court does not hazard a guess. But *Batterton* does seem to support *Big Sam/Oswego Barge*'s proposition that "determining whether non-statutory maritime law . . . survives enactment of a statute requires a careful analysis of several factors . . . ." Similarly, *Batterton*'s rather complex approach to the problem seems to cast doubt on *ACL*'s apparent view on the displaceability of general maritime law.

25

6.      <u>Closing Remarks</u>

The views in this Part D are dicta. As explained in Part B.3., the *ACL* and *Settoon Towing* decisions compel this Court to conclude that the Mexican Plaintiffs' general maritime law claims are displaced by OPA. The Court further notes that it does not disagree with the outcomes in *ACL* and *Settoon Towing*.[18] The Court only questions one or two aspects of those decisions.

Also, it should be noted that even if it were determined that OPA did not displace the Mexican Plaintiffs' claims under general maritime law, they would have to overcome several other hurdles before they could recover. As noted in Part C, 41 of the 115 Mexican Plaintiffs' claims are barred for the additional reason that they did not comply with PTO 60. Also, none of the Mexican Plaintiffs claim to have suffered physical injury to a proprietary interest. Instead, all their hopes are pinned on the "commercial fishermen exception" to the *Robins Dry Dock rule*. (*See* B1 Order at 19-20, Rec. Doc. 3830). Although some courts, including this one, have recognized this exception, the Fifth Circuit has yet to do so. *See Testbank*, 752 F.2d at 1021 n.2 ("The rights of commercial fishermen who survived summary judgment are not before us."). Thus, even if some of the Mexican Plaintiffs were to prevail in this Court, it is likely they would have to convince the Fifth Circuit to recognize the commercial fishermen exception to *Robins Dry Dock*.

---

[18] Using *Settoon Towing* as an example, it would be extremely odd for Congress to create a statutory regime that permits plaintiffs to recover previously-unrecognized damages (purely economic losses), makes a discharger strictly liable for those damages, and explicitly recognizes the discharger's ability to seek contribution from a third party who is actually at fault for causing those damages, yet does not allow the discharger to recover those damages from the third party.

Even assuming the Fifth Circuit would recognize the commercial fishermen exception, some or perhaps all of the Mexican Plaintiffs may be excluded from this exception. It may be the case, as pointed out by BP, that the commercial fishermen exception only applies to those who routinely fished in waters closed by a government entity. *See State of Louisiana ex rel. Guste v. M/V Testbank*, 524 F. Supp. 1170, 1174 (E.D. La. 1981), *aff'd* 752 F.2d 1019 (5th Cir. 1985) (en banc). If this is so, then it may exclude all of the Mexican Plaintiffs from the commercial fishermen exception.[19] Additionally, only 17 of the Mexican Plaintiffs purport to be individual commercial fishermen; the rest are cooperatives. BP argues that the cooperatives cannot claim the commercial fisherman exception because the cooperatives were not the ones that actually fished. BP also contends that some of the cooperatives were tourism or restaurant cooperatives, which are not remotely commercial fishermen. The Court need not and does not decide any of these issues here, but notes that they have been raised and are preserved.

Finally, even those Mexican Plaintiffs that could overcome the above hurdles would still have to show that their damages were proximately caused by the oil spill. It is safe to say that this issue would be hotly contested by the defendants.

## CONCLUSION

For the reasons set forth in Parts A, B, and C of the Discussion,

IT IS ORDERED that BP's Dispositive Motion as to the B1 Claims of the Mexican Plaintiffs (Rec. Doc. 25477) is GRANTED.

---

[19] At oral argument, the Court asked the Mexican Plaintiffs' attorneys if the Mexican government ever closed Mexican fishing grounds following the oil spill. They were unsure if this occurred. (*See* Transcript at 17, Rec. Doc. 26701).

IT IS FURTHER ORDERED that all claims by the Mexican Plaintiffs, listed in Exhibit A to this Order & Reasons, are DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, this 26th day of October, 2020.

_____
United States District Judge