# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig | * | MDL 2179 |
| "Deepwater Horizon" in the Gulf | | |
| of Mexico, on April 20, 2010" | * | Section: J |
| | | |
| | * | JUDGE BARBIER |
| This Document Relates to: | | |
| Pleadings Bundle B3 | * | MAG. JUDGE CURRAULT |

| | | |
|---|---|---|
| HENRY PERDOMO | * | |
| PLAINTIFF, | | |
| VERSUS | * | CIVIL ACTION NO. 17-cv-03346 |
| | | |
| BP EXPLORATION & PRODUCTION, | * | Section: J |
| INC., A DELAWARE CORPORATION, | | |
| BP AMERICA PRODUCTION CO., | * | JUDGE BARBIER |
| A DELAWARE CORPORATION, | | |
| TRANSOCEAN HOLDINGS, LLC., | * | MAG. JUDGE CURRAULT |
| A DELAWARE CORPORATION, | | |
| TRANSOCEAN DEEPWATER, INC., | * | |
| A DELAWARE CORPORATION, | | |
| TRANSOCEAN OFFSHORE | * | |
| DEEPWATER DRILLING, INC., | | |
| A DELAWARE CORPORATION, | * | |
| HALLIBURTON ENERGY SERVICES, | | |
| INC., A DELAWARE CORPORATION, | * | |
| | | |
| DEFENDANTS. | | |

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW,** Plaintiff, HENRY PERDOMO ("Plaintiff"), by and through the

undersigned counsel, and hereby brings this cause of action against BP Exploration & Production,

Inc. ("BP Exploration"), BP America Production Co. ("BP America"), Transocean Holdings, LLC ("Transocean Holdings"), Transocean Deepwater, Inc. ("Transocean Deepwater"), Transocean Offshore Deepwater Drilling Inc. ("Transocean Offshore"), Halliburton Energy Services, Inc. ("Halliburton"), hereinafter collectively referred to as ("Defendants"). Plaintiff alleges the following upon information and belief:

## INTRODUCTION

1. This is an action for the Defendants' negligence, gross negligence, and negligence *per se* resulting in serious injuries to the Plaintiff.

2. Plaintiff's injuries were caused by exposure to toxic substances due to the BP *Deepwater Horizon* Oil Spill on April 20, 2010 ("BP Oil Spill").

## PARTIES
### Plaintiff

3. Plaintiff at all times relevant hereto, was a resident of the State of Louisiana. he suffered injuries and damages as a direct, proximate result, or both, of his exposure to Defendants' toxic substances, resulting from the BP Oil Spill. Plaintiff is a Clean Up Worker [1] as defined under the Medical Settlement Agreement (the "MSA").[2] He timely opted out of the Medical Benefit Class Settlement[3].

4. Plaintiff was exposed to said harmful substances as a result of performing Response Activities[4] including decontamination activities and deploying booms from approximately October 2010

---

[1] MSA § II.Q.

[2] Deepwater Horizon *Medical Benefits Class Action Settlement Agreement*, *as Amended on May 1, 2012*, MDL 2179, Rec. Doc. 6427-1 (May 3, 2012).

[3] MSA § II.WWW

[4] MSA § II.OOOO

to March 2011.

5.  At the time of his injury, Plaintiff resided in 157 Betty Avenue, La Place, LA 70068 and currently resides at 65 Shearwater Dr La Place LA 70068.

**Defendants**
*BP Exploration*

6.  BP Exploration is a Delaware corporation with its principal place of business located in Houston, Texas.

7.  BP Exploration was a leaseholder and performed oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, (hereinafter the "Macondo Well") where the oil spill originated.

8.  BP Exploration was designated as a "responsible party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714.

9.  BP Exploration purposely availed itself of the Court's personal jurisdiction by having performed various acts that were related to the BP Oil Spill including:

    i.   Managing clean-up and/or response activities in or around the shores of Alabama, Louisiana, Mississippi, Florida and Texas (hereinafter "Gulf States" at all relevant times;

    ii.  Pumped crude oil that ended up throughout the coasts of the Gulf States;

    iii. Directed and participated with Unified Command, contracting with various clean-up crew companies throughout the Gulf States; and

    iv.  Engaged in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that include petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities.

### *BP America*

10. BP America is a Delaware corporation with its principal place of business in Houston, Texas.

11. BP America was a party to the drilling contract with Transocean Holdings for the drilling of the Macondo Well.

12. BP America purposely availed itself of the Court's personal jurisdiction by having performed various acts that were related to the BP Oil Spill including:

    i. Managed clean-up and/or response activities in or around the Gulf States at all relevant times;

    ii. Pumped crude oil that ended up all throughout the coasts of the Gulf States;

    iii. Directed and participated with Unified Command, contracting with various clean-up crew companies throughout the Gulf States; and

    iv. Engaged in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that include petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities.

13. BP America and BP Exploration will hereinafter collectively be referred to as "BP Defendants."

### *Transocean*

14. Transocean Holdings, Transocean Deepwater, and Transocean Offshore are Delaware corporations (hereinafter referred to collectively as "Transocean Defendants") with their principal place of business located in Houston, Texas.

15. Transocean Defendants purposely availed themselves of the Court's personal jurisdiction by having performed various acts that were related to the BP Oil Spill, including:

    i. Engaging in clean-up and/or response activities in or around the Gulf States at all

relevant times;

ii.  Manned and guided the Deepwater Horizon Rig ("DHR"), which exploded while pumping crude oil, resulting in the mass discharge and prolonged seepage of crude oil throughout the coasts of the Gulf States;

iii. Directed and participated with Unified Command, contracting with various disaster response companies which supplied the clean-up workers tasked with removing and/or collecting oil from the beaches and shores of the Gulf States.

iv.  Engaged in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that included petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities.

### *Halliburton*

16. Halliburton is a Delaware Corporation with its principal place of business in Houston, Texas.

17. Halliburton purposely availed itself of the Court's personal jurisdiction by having manufactured, as a subcontractor for BP America and/or BP Exploration, a nitrogen foam cement slurry mixture (hereinafter "Cement Mixture"), to provide cementing and mudlogging services for the DHR.

## JURISDICTION AND VENUE

18. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332(a) because complete diversity exists among the parties, as all Defendants are all incorporated and have their principal places of business in states other than the state in which Plaintiff resides. Additionally, the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs.

19. This venue is proper for filing in this District pursuant to both 28 U.S.C. § 1407 and the

Transfer Order of the Judicial Panel on Multidistrict Litigation, which allows Plaintiff to directly file complaints arising out of the BP Oil Spill in this District. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352 (J.P.M.L. 2010); *See Also Pretrial Order No. 20* (Rec. Doc. 904).

20. Additionally, this Court has Jurisdiction based on Federal Question under 28 U.S.C. §1331, in that Article III, Section 2 of the United States Constitution empowers the federal judiciary to hear "all cases of admiralty and maritime jurisdiction."

21. This Court also has jurisdiction pursuant to 28 U.S.C. §1333; as well as the Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to "cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land."

22. Notwithstanding the above, the most appropriate venue in accordance with U.S.C. §1391(b)(2) is the Eastern District of Louisiana, as Plaintiff was exposed in the Eastern District of Louisiana, the Plaintiff currently lives in the Eastern District of Louisiana , and Plaintiff's most relevant witnesses and evidence is located in the Eastern District of Louisiana. Considering the relative ease of access to sources of proof, the ability to secure attendance of witnesses and ability to minimize costs of witnesses, the appropriate venue for this cause of action is the Eastern District of Louisiana.

23. All other prerequisites to file this action have been satisfied by Plaintiff.

### SUMMARY OF FACTS
**General Summary of Facts**

24. Plaintiff incorporates all findings of facts and conclusions of law detailed in *Findings of Fact and Conclusions of Law - Phase One Trial* ("Phase One Findings"), MDL No. 2179, Rec. Doc. 13355, (E.D. La. Sept. 4, 2014).

25. Pursuant to Federal Law, Phase One Findings are binding as to all Defendants listed within this Complaint.

26. All injuries detailed within this Complaint arise from the same transaction and/or occurrence relating to the BP Oil Spill, *Deepwater Horizon* explosion and subsequent oil spill related events.

27. While crude oil was believed to be discharged before the *Deepwater Horizon* platform finally sank on April 22, 2010, the rate of discharge is believed to have increased once the Deepwater Horizon sank to the ocean floor.

28. After the explosion and sinking of the *Deepwater Horizon*, BP Defendants attempted to downplay conceal the severity the BP Oil Spill. Its initial leak estimate of 1,000 barrels of oil per day was found by government investigators to be a fraction of its measured leakage amount of 50,000 barrels per day. Moreover, BP Defendants did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the BP Oil Spill.

29. On or about June 20, 2010, Congressman Edward Markey released an internal BP document showing that the company's own analysis had revealed the actual rate of oil leakage to be 4,200,000 gallons per day and that the total oil leakage could reach 100,000 barrels.

30. The flow of oil continued unabated, and the BP Oil Spill made landfall on April 30, 2010, and will continue to have negative repercussions on the Gulf Coast.

31. The BP Oil Spill created an oil slick with a range of thousands of miles and thick voluminous plumes of oil in the deep waters within the Gulf of Mexico.

32. As the oil from the BP Oil Spill made landfall along the Gulf Coast, it infiltrated and will continue to infiltrate the delicate wetlands and intertidal zones that protect the coasts of Louisiana, Mississippi, Alabama, Texas and Florida, requiring clean up.

33. Oil flowed into the Gulf of Mexico for eighty-six (86) days following the *Deepwater Horizon* explosion, dumping an estimated 200 million gallons of crude oil into sensitive coastland and intertidal ecosystems.

34. BP Defendants finally capped the well on July 15, 2010, almost four months after the explosion and fire on the *Deepwater Horizon.*

35. After the Oil Spill, the United States Coast Guard formally and/or informally designated, inter alia, Defendants BP Exploration, Transocean Offshore, Transocean Deepwater, and Transocean Holdings as "responsible parties" under the OPA.

36. The OPA imposes liability upon a "responsible party for a … facility from which oil is discharged … into or upon navigable waters or adjoining shorelines" for the damages that result from such incident or removal costs. 33 U.S.C. § 2702.

37. The crude oil that leaked from the *Deepwater Horizon* and associated well carried with it significant public health risks. Crude oil contains many highly toxic and hazardous chemicals that can damage every system in the human body.

38. In the wake of the disaster, and pursuant to its duties and responsibilities under the OPA, BP Defendants began implementing a response and containment plan.

**BP Oil Spill**
<u>Deepwater Horizon</u>

39. BP Oil Spill includes the events, actions, inactions, and omissions leading up to and including:

    i.   The blowout of the Macondo Well which was drilled by the Transocean Marianas and DHR on the outer continental shelf in the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana;

    ii.  The explosions and fire on board the DHR on or about April 20, 2010;

    iii. The sinking of the DHR on or about April 22, 2010;

    iv.  The release of oil, other hydrocarbons, and other toxic substances from the Macondo Well and/or the DHR and its appurtenances;

    v.  The efforts to contain the Macondo Well; and

    vi.  Response activities performed by clean-up workers under the direction of Unified Command.

40. On or about December 9, 1998, predecessors to all BP Defendants[5] and all Transocean Defendants[6] entered into a contract for the construction, use, and operation of the DHR.

41. BP Defendants were the operators of the Macondo Well under federal regulations of the Minerals Management Service ("MMS") therefore it was the entity the lessee(s) designated as having control or management of operations.

42. As operators and primary leaseholders, BP Defendants were responsible for but not limited to assessing the geology of the site, engineering the well design, obtaining regulatory approvals for well operations, retaining, and overseeing the projects contractors, and working on various aspects of the well and drilling operations.

<u>DW Toxic Chemicals</u>

43. For purposes of this complaint, crude oil, hydrocarbons, benzene, or products containing benzene, associated with the clean-up efforts hailing from the Macondo Well and the DHR explosion, will collectively be known as "DW Toxic Chemicals."

44. BP Defendants response plan included the use of chemical dispersants that were intended to break down the oil into finely dispersed droplets.

---

[5] The phrase "BP Defendants" is used hereinafter to refer to BP Exploration & Production, Inc. and BP America Production Co. collectively.
[6] Like the phrase "BP Defendants" before it, the phrase "Transocean Defendants" is used hereinafter to collectively refer to the various Transocean entities cited above.

45. Upon information and belief, immediately after the *Deepwater Horizon* disaster, on or about April 23, 2010, BP began subsea and aerial application of chemical dispersants manufactured by Nalco to the resulting oil slicks and sheens on the surface of the Gulf of Mexico.

46. On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator directed BP Defendants within 24 hours of issuance to identify and to change to chemical dispersants that are less toxic than the Corexit dispersants BP Defendants had been using.

47. On May 20, 2010, BP Defendants objected to changing dispersants and notified the EPA that it would continue using Corexit.

48. BP Defendants use of chemical dispersants skyrocketed: on May 22, 2010, BP used 45,000 gallons and on May 23, 2010, it used 70,000 gallons.

49. On May 26, 2010, the EPA directed BP Defendants to reduce overall use of Corexit by 75%. The May 26, 2010 EPA directive also required BP Defendants to eliminate use of chemical dispersants on the surface except in rare cases where an exemption is sought in writing from and approved by the On-Site Coordinator.

50. Since the May 26, 2010 EPA directive, BP Defendants have sought more than 40 exemption requests to use chemical dispersants on the surface and subsea in the Gulf of Mexico.

51. The dispersant-treated and raw crude oil carried with it significant public health risks; as it contained many highly toxic chemicals that can damage various systems in the body.

52. Crude oil contains benzene and other volatile organic compounds such as ethylbenzene, toluene, xylene and naphthalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes and heavy metals such as aluminum, cadmium, nickel, lead and zinc, all of which cause severe harm to human health.

53. Chemicals such as benzene, PAHs, and many other chemicals in crude oil are toxic, and move

from the oil into the air. Once airborne, these chemicals and fugitive emissions, with pungent petroleum like odors, can blow over the ocean for miles, reaching communities far from the location of the spill.

54. According to the Agency for Toxic Substances and Disease Registry, which is part of the U.S. Department of Health and Human Services, benzene is a known mutagen and carcinogen. Benzene in crude oil can cause a variety of health complications, including ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain, and lethal central nervous system depression.

55. A 2007 Centers for Disease Control review of benzene toxicity concluded that there is substantial evidence that benzene causes leukemia, chromosomal abnormalities in lymphocytes and bone marrow cells, damage to the immune system, and abnormal development of blood cells. Long term, low-level oral and inhalation exposures to benzene have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping, memory loss, and cancer.

56. As a result of the explosion of the DHR, DW Toxic Chemicals and many highly toxic dispersants were released from the Macondo Well and reached the shores of the Gulf States.

Toxic Dispersants

57. Aside from DW Toxic Chemicals, BP Defendants purchased highly noxious chemical dispersants from Nalco and/or its subsidiaries and sprayed them as part of the response activities performed in the clean-up efforts. These dispersants include Corexit EC9500A and Corexit EC9527A.

58. The Material Safety Data Sheet ("Data Sheet")[7] for Corexit EC9500 indicates that it contains hazardous substances; it is harmful to human health; and that dermal exposure, inhalation, and ingestion should be avoided. The Data Sheet further states that Corexit EC9500 is an eye and skin irritant and may irritate the respiratory tract if inhaled. If ingested, it may cause chemical pneumonia.

59. Corexit EC9527A contains 2-butoxyethanol, also known as EGBE. Repeated or excessive exposure to EGBE may cause injury to red blood cells, the kidneys, and the liver. EGBE may be carcinogenic to humans. It is an eye, nose, and throat irritant. It can cause nausea, vomiting, diarrhea, and abdominal pain. Exposure to EGBE can also cause headaches, dizziness, lightheadedness, and unconsciousness.

60. All of the aforementioned harmful dispersants, Corexit EC9500A and Corexit EC9527A, are hereinafter collectively referred to as "Toxic Dispersants."

61. According to the BP *Deepwater Horizon Gulf Study*, funded by BP Defendants themselves, it has been shown that upstream petrochemical workers, who are likely to have many exposures similar to that of oil spill clean-up workers, have reported experiencing leukemia, multiple myeloma, melanoma, and esophageal adenocarcinoma.

62. BP Defendants, despite being aware of the risks that response vessels would face, failed to provide adequate training, inspect vessels, and respond to worker safety concerns. BP Defendants ignored these concerns despite OSHA warnings, notifications by the U.S. Department of Health and Human Services, and complaints of illnesses from the clean-up workers after they were exposed to oil and dispersants.

---

[7] A form that sets forth the properties of a particular substance, including its toxicity and health effects.

63. On or about April 23, 2010, BP Defendants and/or their agents began applying Toxic Dispersants to the oil on the surface of the Gulf of Mexico. Toxic Dispersants were sprayed onto the ocean surface from aircrafts that flew over areas with oil and dispensed chemicals from cargo holds, fountain type jets on the decks of boats, and smaller vessels onto the surface of the water. Toxic Dispersants were also injected immediately below the surface of the water from vessels, deep below the surface of the ocean, and even sprayed by hand. These Toxic Dispersants were sprayed day and night, exposing anyone near the coastal areas, despite warnings not to.

64. According to BP's Gulf Study, based on the health effects of zone residents and clean up workers around the BP Oil Spill, the toxic effects on the human body are 52 times more toxic when Corexit and crude oil are combined.

65. The dispersants used by BP Defendants are known to cause, inter alia, headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation of the skin, eyes, nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and developmental damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of chronic obstructive pulmonary disease.

66. BP Defendants and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

<u>Plaintiff</u>

67. At all times relevant, Plaintiff resided at 157 Betty Avenue, LaPlace, LA 70068.

68. Following the April 20, 2010 BP Oil Spill, Plaintiff was continuously exposed as a result of

performing Response Activities as a Clean-Up Worker including decontamination activities and deploying booms from around October 2010 until approximately March 2011 at Port Fourchon, Grand Isle, LA for Able Body Labor and Employ US.

69. During Plaintiff's Response Activities as a Clean-up Worker his eyes, nose, mouth, skin and airways were exposed to *DW Toxic Chemicals* and Toxic Dispersants. This exposure was sufficient to be the legal and proximate cause of Plaintiff's injuries and the resulting care and treatment essential to treat his medical conditions of Chronic Nasopharyngitis, Dermatitis, Chronic Pain Upper and Lower Limbs, Headaches, Fatigue/Malaise, Nausea/Vomiting/Diarrhea and Visual Disturbances all diagnosed on March 12, 2013.

70. As a result of Plaintiff's exposure, he has developed a reasonable fear that in the future he may develop a severe disease, injury, or illness, including, but not limited to cancer(s) arising out of, resulting from, and/or relating to his aforementioned medical conditions. The *Industrial Union Dep't AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607 (1980) case decided that a link exists between benzene, one of the *DW Toxic Chemicals*, and cancer.

71. BP Defendants' aerial spray planes negligently and/or intentionally sprayed Nalco's Toxic Dispersants on the water, despite the presence of boats and families being in the vicinity of the spraying.

72. BP Defendants, aware of the risks, failed to respond to civilian safety concerns. These acts continued despite OSHA warnings, notifications by the U.S. Department of Health and Human Services, and complaints of illnesses by exposed civilians.

73. Plaintiff along with many other Clean-Up Workers was not provided adequate personal protective equipment and was not warned of the danger and risk of toxic exposure while performing Response Activities for the BP Oil Spill disaster.

14

74. The exposure to *DW Toxic Chemicals* and Toxic Dispersants was sufficient to be the legal and proximate cause of Plaintiff' injuries and the resulting care and treatment essential to treat his medical condition of Chronic Nasopharyngitis, Dermatitis, Chronic Pain Upper and Lower Limbs, Headaches, Fatigue/Malaise, Nausea/Vomiting/Diarrhea and Visual Disturbances.

## CAUSES OF ACTION

**FIRST CLAIM FOR RELIEF- NEGLIGENCE UNDER GENERAL MARITIME LAW**

75. Plaintiff incorporates and re-alleges each and every allegation set forth in all preceding paragraphs as if fully restated here, and further alleges: Plaintiff claims that Defendants were negligent in their involvement in the BP Oil Spill, the aftermath which ultimately resulted in the injuries to Plaintiff.

76. At all times material hereto, Defendants owed and breached duties of ordinary and reasonable care to Plaintiff in connection with the drilling operations of the DHR and maintenance of the vessel, its appurtenances and equipment and additionally owed and breached duties to Plaintiff to guard against and/or prevent the risk of an oil spill.

77. Additionally, Defendants owed and breached a duty to Plaintiff as well as to all persons who might foreseeably be harmed, to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

78. Defendants owed and breached a heightened duty of care to Plaintiff because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants in his capacity as a Clean- Up Worker. Defendants failed to properly train, equip, warn and supervise Clean-Up Workers including the Plaintiff to avoid exposure to hazardous substances encountered in connection with remedial efforts.

79. The existence and breach of these legal duties are established under the General Maritime Law.

The blowout and explosions on the DHR, its sinking and the resulting Spill were caused by the joint and concurrent negligence of Defendants.

80. On September 4th, 2014, Judge Barbier issued findings of facts and conclusions of law and found that BP's conduct was reckless, Transocean's conduct was negligent, and Haliburton's conduct was negligent; and that each were liable under general maritime law for the blowout, explosion, and subsequent oil spill from the *Deepwater Horizon* Incident.

81. The aforementioned Defendants' breach directly and proximately caused Plaintiff' injuries and the resulting care and treatment essential to treat his medical conditions of Chronic Nasopharyngitis, Dermatitis, Chronic Pain Upper and Lower Limbs, Headaches, Fatigue/Malaise, Nausea/Vomiting/Diarrhea and Visual Disturbances.

82. As a direct and proximate result of Defendants' breach of their above-mentioned duties, Plaintiff suffered injury, loss, and damages. Due to Defendants' negligence, Plaintiff was exposed to DW Toxic Chemicals and Toxic Dispersants, which resulted in his injuries and therefore Plaintiff is entitled to recover actual and punitive damages.

   **WHEREFORE** Plaintiff respectfully demands judgment against Defendants by awarding Plaintiff damages for the following pursuant to General Maritime Law in an amount to be determined at trial and additionally and any other relief this Court deems just and proper.

    i.    Past and future medical expenses;

    ii.    Past and future loss wages;

    iii.    Past and future loss of personal services;

    iv.    Past and future intangible losses including those for physical pain and suffering, loss of life's enjoyment;

    v.    Scarring and disfigurement; and

vi.      Mental anguish, anxiety, and fear of cancer and future medical issues.

## SECOND CLAIM FOR RELIEF- NEGLIGENCE

83.  Plaintiff incorporates and re-alleges each and every allegation set forth in all preceding paragraphs as if fully restated here, and further alleges:

84. Plaintiff claims that Defendants were negligent in its involvement in the BP Oil Spill, the aftermath which ultimately resulted in the injuries to Plaintiff.

85. At all times material hereto, Defendants owed duties of ordinary and reasonable care to Plaintiff.

86. Defendants failed to use the standard of care that an ordinary, reasonable, and prudent person would use under similar circumstances.

87.  Defendants owed the following duties to Plaintiff:

i.      A duty to warn Plaintiff, public officials, and government agencies of the harmful effects of DW Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, a naturally occurring component in crude oil;

ii.      A duty to properly warn Plaintiff to avoid exposure to hazardous substances encountered in connection with the BP Oil Spill, including relief efforts because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

iii.      A duty to implement a mechanism to ensure the continued safety of Plaintiff when safety issues arose, such as but not limited to, foreseeable injuries;

iv.      A duty to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

v.      A duty to ensure that Toxic Dispersants were sprayed safely to avoid contact with people, including Plaintiff, and in a manner that would assure Plaintiff' health and

safety;

vi.     A duty to coordinate and conduct aerial spraying in a manner so as to eliminate the risk to Plaintiff from being exposed to DW Toxic Chemicals;

vii.    A duty to maintain, monitor, and operate, the DHR in a reasonably safe manner so as not to avoid harm to foreseeable Plaintiffs like Plaintiff.

viii.   A duty to inspect the Blowout Preventer (BOP) to ensure that it was not faulty and would not fail during reasonable use so as not to avoid harm to foreseeable Plaintiffs like Plaintiff.

ix.     A duty to properly produce, manufacture and inspect cement slurry mixture before use so as not to avoid harm to foreseeable Plaintiffs like Plaintiff.

x.      A duty to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures to avoid harm to Plaintiff.

v.      A duty to properly warn Plaintiff of the harmful to avoid exposure to hazardous substances encountered in connection with the BP Oil Spill including relief efforts.

vi.     A duty to properly train Plaintiff as a Clean-Up Worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants.

vii.    A duty of care to properly equip Plaintiff with adequate personal protective equipment as a Clean-Up Worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants.

viii.   A duty to properly supervise Plaintiff while he performed Response Activities associated with the BP Oil Spill

88. Defendants breached their duty of care when they:

i.      Failed to warn Plaintiff of the harmful effects of DW Toxic Chemicals, Toxic Dispersants, and any other hazardous chemicals they contain, including benzene, the naturally occurring component in crude oil, which have come into contact with Plaintiff's person and the local environment;

ii.     Failed to properly warn Plaintiff to avoid exposure to hazardous substances encountered in connection with the BP Oil Spill and relief efforts, despite the great dangers associated with exposure to DW Toxic Chemicals and Toxic Dispersants;

iii.    Failed to implement a basic mechanism to ensure the continued safety of Plaintiff, by allowing the spraying of Toxic Dispersants in the vicinity of Plaintiff and other residents;

iv.     Failed to abide by the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and in shallow waters;

v.      Failed to ensure that Toxic Dispersants were sprayed in a manner that would avoid contact with Plaintiff and in a manner that would ensure Plaintiff health and safety; and

vi.     Failed to coordinate and conduct aerial spraying in a manner so as to eliminate the risk to Plaintiff from being exposed to *DW Toxic Chemicals*;

vii.    Failed to maintain, monitor, and operate, the DHR in a reasonably safe manner so as not to avoid harm to foreseeable Plaintiffs like Plaintiff.

viii.   Failed to inspect the BOP to ensure that it was not faulty and would not fail during reasonable use so as not to avoid harm to foreseeable Plaintiffs like Plaintiff.

ix.     Failed to properly produce, manufacture and inspect cement slurry mixture before use so as not to avoid harm to foreseeable plaintiffs like Plaintiff.

x.      Failed to otherwise exercise reasonable care in the operation, maintenance,

handling, design, implementation and execution of the relief and recovery measures to avoid harm to Plaintiff.

xi.     Failed to properly warn Plaintiff of the harmful to avoid exposure to hazardous substances encountered in connection with the BP Oil Spill including relief efforts.

xii.    Failed to properly train Plaintiff as a Clean-Up Worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants.

xiii.    Failed to properly equip Plaintiff with adequate personal protective equipment as a Clean-Up Worker, because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants.

xiv.    Failed to properly supervise Plaintiff while he performed Response Activities associated with the BP Oil Spill.

89. The aforementioned Defendants' breach directly and proximately caused Plaintiff' injuries and the resulting care and treatment essential to treat his medical conditions of Chronic Nasopharyngitis, Dermatitis, Chronic Pain Upper and Lower Limbs, Headaches, Fatigue/Malaise, Nausea/Vomiting/Diarrhea and Visual Disturbances.

90. The danger and risk of harm to Plaintiff was reasonably foreseeable.

91. As a direct and proximate result of Defendants' breach of their above-mentioned duties, Plaintiff suffered injury, loss, and damages. Due to Defendants' negligence, Plaintiff was exposed to DW Toxic Chemicals and Toxic Dispersants, which resulted in his injuries. Defendants are therefore, in addition to the damages in paragraph 82, liable in ordinary damages to the Plaintiff.

## THIRD CLAIM FOR RELIEF- GROSS NEGLIGENCE UNDER GENERAL MARITIME LAW

92.    Plaintiff incorporates and re-alleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

93.    Plaintiff claims that Defendants were grossly negligent in their involvement in the DHR explosion, the aftermath of which ultimately resulted in his injuries.

94.    At all times material hereto, Defendants' owed duties of ordinary and reasonable care to Plaintiff in connection with the manufacture, maintenance, and operation of the DHR, and additionally owed and breached duties to Plaintiff to guard against the and/or prevent the risk of the BP Oil Spill which occurred herein. The existence and breach of these duties are established under General Maritime Law.

95.    Defendants have taken control and responsibility for all aspects of the recovery and relief effort to attempt to contain the BP Oil Spill, prevent oil from damaging the Gulf of Mexico and the shoreline and to clean up the damage caused to date, including the use of Nalco's chemical dispersants. Defendants owed and breached a duty to Plaintiff as well as to all persons who might foreseeably be harmed to exercise due care in the operation, maintenance, handling, design, implementation, and execution of the relief and recovery measures. Defendants also owed and breached a heightened duty of care to Plaintiff because of the great danger associated with exposure to DW Toxic Chemicals and Toxic Dispersants in his capacity as a Clean- Up Worker. Defendants failed to properly train, equip, warn and supervise Clean-Up Workers including the Plaintiff to avoid exposure to hazardous substances encountered in connection with remedial efforts. The existence and breach of these legal duties are established under General Maritime Law.

96.    Defendants breached their legal duty to Plaintiff and failed to exercise reasonable care and acted with reckless, willful and wanton disregard in the negligent failure to contain the BP Oil Spill.

97. On September 4th, 2014, Judge Barbier found that BP's conduct was reckless and that BP was liable under general maritime law for the blowout, explosion, and subsequent oil spill from the *Deepwater Horizon* Incident.

98. On September 4, 2014, Judge Barbier made the finding that the discharge of oil from the *Deepwater Horizon* Incident was the result of BP Defendants' gross negligence and willful misconduct.

99. Defendants knew or should have known that their wanton or reckless conduct would foreseeably cause Plaintiff's injury and/or property damage.

100.    At all relevant times to this litigation, Defendants knew or should have known that:

i.    Crude oil contains hazardous chemicals that are deleterious to human health and the environment;

ii.    Chemical dispersants contain hazardous chemicals that are deleterious to human health and the environment;

iii.    Plaintiffs should have been adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances which they contain, which were being released into the environment; and

iv.    Plaintiffs should wear proper protective clothing and respirators when in close proximity to the above mentioned hazardous and toxic substances.

101.    As a direct and proximate cause of Defendants' wanton or reckless acts, Plaintiff has

suffered physical injuries. Defendants' wanton or reckless conduct and reckless indifference described herein entitles Plaintiff to punitive damages. The amount of punitive damages recoverable by Plaintiffs is not lawfully limited to the amount of their compensatory damages, but rather should be a multiplier of same; sufficient to both punish Defendants and deter similar wrongdoing in the future.

**WHEREFORE** Plaintiff respectfully demands judgment against Defendants by awarding Plaintiff punitive damages pursuant to General Maritime Law in an amount to be determined at trial and additionally any other relief this Court deems just and proper.

### FOURTH CLAIM FOR RELIEF -NEGLIGENCE PER SE

102.    Plaintiff incorporates and re-alleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

103.    Plaintiff claims that involvement in the DHR explosion, the aftermath of which ultimately resulted in his injuries constitutes negligent per se.

104.    Defendant's conduct with regard to the manufacturing, maintenance and/or operations of drilling operations of DHR and release of DW Toxic Chemicals is governed by numerous state and federal laws and permits under the authority of these laws. These laws and permits create statutory and regulatory standards that are intended to protect and benefit Plaintiff, including but not limited to those that govern the National Oil and Hazardous Substances Contingency Plan *see,* e.g., 40 C.F.R. § 300.150. BP failed to adhere to the requirements for response actions established by the National Contingency Plan, 29 C.F.R. § 1910.20. BP therefore breached its responsibilities under this regulatory provision.

105.    The Oil Pollution Act, 33 U.S.C. § 2701, et seq. (the "OPA"), imposes liability upon a "responsible party for a... vessel or a facility from which oil is discharged...into or upon

navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. § 2702.

106. The Coast Guard has named BP as the responsible party for the downhole release of oil and Transocean as the responsible party for the release of diesel on the surface. Therefore, BP and Transocean are strictly liable pursuant to Section 2702 of the OPA for all the damages resulting from the Spill.

107. In addition, the Federal Bureau of Safety and Environmental Enforcement ("BSEE") has found that Defendants have violated federal regulations including:

    i.    30 CFR 250.107(a)(1) – BP failed to protect health, safety, property, and the environment by failing to perform all operations in a safe and workmanlike manner.

    ii.    30 CFR 250.300 – BP did not take measures to prevent unauthorized discharge of pollutants into offshore waters.

    iii.    30 CFR 250.401(a) – BP failed to take necessary precautions to keep the well under control at all times.

    iv.    30 CFR 250.420(a)(1) and (2) – BP did not cement the well in a manner that would properly control formation pressures and fluids and prevent the direct or indirect release of fluids from any stratum through the wellbore into offshore waters.

    v.    30 CFR 250.427 – BP failed to conduct an accurate pressure integrity test.

    vi.    30 CFR 250.446(a) – BP failed to maintain the Deepwater Horizon BOP system in accordance to American Petroleum Institute's Recommended Procedure 53 section 18.10.3.

    vii.    30 CFR 250.1721(a) – BP failed to obtain approval of the Temporary Abandonment procedures actually used at the Macondo well.

    viii.    30 CFR 250.427 – BP failed to conduct a pressure integrity test at the 13-5/8" liner shore.

    ix.    30 CFR 250.427(b) – BP failed to suspend drilling operations at the Macondo well when the safe drilling margin identified in the approved application for permit to drill was not maintained.

    x.    30 CFR 250.107(a)(1) – Transocean failed to protect health, safety, property, and the environment by failing to perform all operations in a safe and workmanlike manner.

    xi.    30 CFR 250.300 – Transocean did not take measures to prevent unauthorized discharge of pollutants into offshore waters.

    xii.    30 CFR 250.401(a) – Transocean failed to take necessary precautions to keep the well under control at all times.

    xiii.    30 CFR 250.446(a) – Transocean failed to maintain the Deepwater Horizon BOP system in accordance to American Petroleum Institute's Recommended Procedure 53 section 18.10.3.

    xiv.    30 CFR 250.107(a)(1) – Halliburton failed to protect health, safety, property, and the environment by failing to perform all operations in a safe and workmanlike manner.

    xv.    30 CFR 250.300 – Halliburton did not take measures to prevent unauthorized discharge of pollutants into offshore waters.

    xvi.    30 CFR 250.401(a) – Halliburton failed to take necessary precautions to keep the well under control at all times.

    xvii.    30 CFR 250.420(a)(1) and (2) – Halliburton did not cement the well in a manner that would properly control formation pressures and fluids and prevent the direct or indirect release of fluids from any stratum through the wellbore into offshore waters.

108. Defendants violation of these statutory and/or regulatory standards constitutes negligence per se under federal law, as well as general maritime law.

**WHEREFORE** Plaintiff respectfully demands judgment against Defendants by awarding Plaintiff actual and punitive damages pursuant to federal law, as well as general maritime law and any other relief this Court deems just and proper.

**FIFTH CLAIM FOR RELIEF MEDICAL MONITORING AS AN ELEMENT OF DAMAGES**

109. Plaintiff incorporates and re-alleges each and every allegation set forth in all preceding paragraphs as if fully restated here.

110. As a direct and/or proximate result of Defendant's negligence conduct, Plaintiff has been exposed to greater than normal levels of oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill which has created a significantly increased risk of contracting a serious latent disease.

111. Plaintiff has required medical treatment as a result of injuries caused by exposure to oil and/or chemical dispersants and other hazardous chemicals used to combat or resulting from the Oil Spill and has not reached maximum medical improvement.

112. Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

113. Plaintiff will suffer irreparable harm if Court does not the medical monitoring relief prayed

for herein and if Defendants are not ordered to create, fund or support a medical monitoring program.

114.   Plaintiff demands injunctive and equitable relief, in the form of Defendants being ordered to provide continued medical monitoring for Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against the above referenced Defendants as follows:

  i.   Economic and compensatory damages in amounts to be determined at trial including;

    **a.**  Past and future medical expenses

    **b.**  Past and future loss wages;

    **c.**  Past and future loss of personal services;

    **d.**  Past and future intangible losses including those for physical pain and suffering, loss of life's enjoyment,

    **e.**  Scarring and disfigurement; and

    **f.**   Mental anguish, anxiety, and fear of cancer and future medical issues.

  ii.   Punitive damages;

  iii.   Damages for medical screening and monitoring;

  iv.   Implementation of a medical screening and monitoring program to be funded by the Defendants;

  v.   Injunction to acquire medical screening and monitoring

  vi.   Pre-judgment and post-judgment interest at the maximum rate allowable by law;

vii.   Attorneys' fees and cost of litigation; and

viii.  Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

ix.   Plaintiff demands a trial by jury.

This Complaint was filed by undersigned counsel this 2nd  day of November 2020.

Respectfully Submitted,

**THE DOWNS LAW GROUP, P.A.**
*/s/ Charles David Durkee*
**CHARLES DAVID DURKEE,**
**Florida Bar No. 998435**
3250 Mary Street. Suite 307
Coconut Grove, FL 33133
Telephone: (305) 444-8226
Facsimile: (305)-444-6773
Email: ddurkee@downslawgroup.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179.

<u>*/s/ Charles D. Durkee*</u>
Charles D. Durkee, Esq.