# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | **MDL NO. 2179** **SECTION J** |
| This Document relates to: | * * | **JUDGE BARBIER** |
| *Robert Evans v. BP Expl. & Prod. Inc., et al.,* Case No. 16-cv-3966 | * * | **MAGISTRATE JUDGE CURRAULT** |

---

<u>**DECLARATION OF ASHLEY E. LITTLEFIELD IN SUPPORT OF BP'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**</u>

I, Ashley E. Littlefield, declare as follows:

1.      I am a Partner at Kirkland & Ellis LLP, counsel of record for Defendants BP Exploration & Production Inc. and BP America Production Company (collectively, "BP") in the above-captioned action.  I am a member of good standing of the Bar of the State of California.

2.      I respectfully submit this Declaration in Support of BP's Motion to Dismiss for Failure to State a Claim.  The statements in this declaration are based on my personal knowledge. If called upon to testify as a witness, I could provide testimony competently under oath.

3.      Attached hereto as Exhibit A is a true and correct rendering of the web page hosted at the domain http://www.firstbiggestcrime.blogspot.com, exactly as it appeared as of February 4, 2021.

4.      Attached hereto as Exhibit B is a true and correct copy of Mr. Evans's written statement produced to BP pursuant to the Court's Pretrial Order No. 67 (MDL 2179, Rec. Doc. 25370).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed in San Francisco, California on this 9th day of February, 2021.

_Ashley E. Littlefield_
Ashley E. Littlefield

# Exhibit A to Declaration of A. Littlefield

# The BiggestCrime.Com Blog

NetworkedBlogs

Widget discontinued. Please remove it from your blog.

Follow this blog

**THURSDAY, MARCH 16, 2017**

EVIDENCE PERTAINING TO MDL-2179 WHICH WAS PREVIOUSLY PUBLISHED HERE IS AVAILABLE TO APPROPRIATE REQUESTORS UPON REQUEST!

Posted by Owner_biggestcrime.com at 9:50 AM

Reactions: ☐ funny (0)   ☐ interesting (0)   ☐ cool (0)

No comments:

**MONDAY, JANUARY 24, 2011**

http://cgi.ebay.com/Exclusive-License-Sell-Clorox-Company-/110643729431?pt=LH_DefaultDomain_0&hash=item19c2e15417

Exclusive license to sell commercial advertising time to the Clorox Company. Bid to receive a written and signed license agreement that provides exclusive rights to serve as the middleman, to arrange advertising agreement(s) between BiggestCrime2000THREE (TM) and the Clorox Company. And be entitled to earn a profit, which will be the difference between what you convince the Clorox Company to pay for the advertisement(s), and what BiggestCrime2000THREE (TM) agrees to accept.

The programming where the advertising is to appear will be a reality television competition series (RTCS) that is in pre-launch. Carefully read the content on http://www.firstbiggestcrime.blogspot.com to learn more about the RTCS.

The Exclusive License shall be in effect for 12 years from the time that it is sold to the winning bidder. The Exclusive License shall apply to the television, cable, radio, and/or the on-line broadcast of BiggestCrime2000THREE (TM) the RTCS, or any modified versions thereof. Implementation of all advertising shall be based on a "whenever possible" model. No refunds of the Exclusive License fees paid to BiggestCrime2000THREE (TM) by the winning bidder shall be granted nor allowed.

Major Clorox Company products are Clorox Bleach, Brita, Fresh Step, Glad, Pine-Sol, Burt's Bees, Green Works, Hidden Valley, Scoop Away, KC Masterpiece, S.S.O., Ever Clean, Kingford, Tilex, Formula 409, Liquid-Plmr.

Members of the Clorox Company membership team are Donald R. Knauss, Thomas P. Britanik, Daniel J. Heinrich, Lawrence S. Peiros, Beth Springer, Frank A. Tataseo, Wayne L. Delker, Benno Dorer, Ellen Liu, James Foster, Jacqueline P. Kane, Grant J. Montagne, George C. Roeth, Laura Stein.

Members of the Clorox Company Board of Directors are Donald R. Knauss, Pamela Thomas-Graham, Carolyn M. Ticknor, Jan L. Murley, Daniel Boggan Jr., Richard H. Carmona, Tully M. Friedman, George Harad, Robert W. Matschullat, Gary G. Michael, Edward A. Mueller.

DDB Worldwide, a part of Omnicon Group Inc., is the primary advertising agency that the Clorox Company uses. In addition to traditional advertising, the Clorox Company is making a push into social marketing on the Internet.

The information and facts about the Clorox Company, provided here, are meant to serve as a starting point for those who wish to engage in their own independent research. Changes regarding the facts provided here are expected to occur in the normal course of business. BiggestCrime2000THREE (TM) shall not be held accountable for any misrepresentation of facts regarding the Clorox Company.

http://cgi.ebay.com/Exclusive-License-Sell-Clorox-Company-/110643729431?pt=LH_DefaultDomain_0&hash=item19c2e15417

I have much more evidence to prove my version of the "Biggest Crime In American History"

Posted by Owner_biggestcrime.com at 4:29 PM

Reactions: ☐ funny (0) ☐ interesting (0) ☐ cool (0)

No comments:

---

TUESDAY, SEPTEMBER 14, 2010

TURNING JOBS CREATION PROGRAMS SUPPORTERS INTO JOB CREATORS

Posted by Owner_biggestcrime.com at 12:15 PM

Reactions: ☐ funny (0) ☐ interesting (0) ☐ cool (0)

No comments:

WEDNESDAY, SEPTEMBER 1, 2010

BiggestCrime - The Movie - Based on a True Story




SponsoredTweets hire me badge

FILL IN THE BLANKS STRATEGY GAME:............ BROWSE THIS WEBSITE
TO OBTAIN CLUES AND HINTS.......... The _____ will also show why _____
_____ _____ _____ filmmakers, actors, extras, crew persons, businesses, etc.,
who are were _____ _____ upon _____ _____ activity in the _____ _____
_____ _____, should organize to _____ a _____-_____ _____ against the
_____ _____, and some of _____ _____, _____, _____, _____, and others,
including _____ _____ _____ to United States Senators and their relatives,
staffmembers, lobbyists, etc.

Posted by Owner_biggestcrime.com at 1:11 PM

Reactions:   funny (0)   interesting (0)   cool (0)

No comments:

**Home**

Subscribe to: Posts (Atom)

## PAGES

- Home
- SOLVING THE BIGGEST CRIME IN AMERICAN HISTORY
- MORE EVIDENCE
- LAW to CREATE SMALL BUSINESS JOBS and LOANS
- MY FINAL MVP
- PRIVACY POLICY
- Sales Page
- PRODUCT: Exclusive License To Arrange To Sell Advertising To The Exxon Mobile Corporation
- PRODUCT: Exclusive License To Arrange To Sell Advertising To The Bank Of America Corporation

## FOLLOWERS

Followers (0)

Follow

## BLOG ARCHIVE

▼ 2017 (1)
  ▼ March (1)
     EVIDENCE PERTAINING TO MDL-2179 WHICH WAS PREVIOUS...

► 2011 (1)
► 2010 (2)

# Exhibit B to Declaration
# of A. Littlefield

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ROBERT EVANS

a/k/a Engineers&Film-

makersComputerUsersGroup

PLAINTIFF

VERSUS

BP EXPLORATION & PRODUCTION

INCORPORATED;

BP AMERICAN PRODUCTION COMPANY;

BP PIPELINE COMPANY;

JOHN or JANE DOE 1-500+  Whose True Names

Are Unknown

DEFENDANTS

\* CIVIL ACTION No. 16-3966

\* SECTION: J

\* JUDGE BARBIER

\* MAG. JUDGE WILKINSON

PURSUANT TO PTO 67, "WRITTEN STATEMENT AND
SUPPORTING CLAIMED LOSS CALCULATION; EVIDENCE
IN SUPPORT OF CLAIMS; DECLATIONS

<u>Written Statement and Supporting Claimed Loss Calculation</u>
**<u>Pursuant to Pretrial Order Number 67</u>**

I am proceeding as a mentally-disabled, pro se claimant, *in forma paupers.* I am a citizen of the state of California 28 USC 1332(a)1.

Damages are based upon misappropriation of trade secrets, fraudulent concealment, constructive trust, breach of contracts (Vessels of Opportunity program), etc. claims, relative to my Deepwater Horizon MDL-2179 claims.

I have a proprietary interest in many businesses located on the Gulf Coast, as well as other locations, deriving from confidential, business-development agreements and other activity involving the PresidioTrust and others.

There are three phases to my misappropriation of trade secrets Cause of Action:

(1) misappropriation in regards to *past* use of my trade secrets that resulted in positive resolution of "high-stakes" disputes, and business-development agreements and activity. The past use of my trade secrets resulted in the creation/growth of businesses that have received, or are entitled to receive, MDL-2179 settlement payments from which I am entitled to a fair share. Defendants involved in *past* misappropriation of my trade secrets may be referred to hereinafter as "Defendant(s)-past phase". "Defendants-past" phase benefited from the misappropriation of my trade secrets in the past by using them to facilitate and incentive resolution of "high-stakes" disputes.

(2) misappropriation in regards to use of my trade secrets to incentive and facilitate the agreement to one of more of the settlement agreements in this *current* MDL-2179

litigation. Defendants involved in this *current MDL-2179 litigation* misappropriation of my trade secrets may be referred to hereinafter as "Defendant(s)_MDL-2179 phase".


     (3) "Vessels of Opportunity breach of contracts phrase," can be placed in either or both of the other two phrases and is placed here separately for damages-accounting purposes:

     Claimant assumes that the Vessels of Opportunity contracts that the companies in which it have proprietary interest entered into, and suffered, breach of contracts similar in manner as described in these sources:

http://files.courthousenews.com/2010/12/07/JescoBP.pdf

https://cases.justia.com/federal/district-courts/alabama/alsdce/

1:2010cv00692/48784/4/0.pdf?ts=1294198450

    The legal theories and factual allegations pleaded in claimant's PTO 65 documents are fully incorporated into and made a part herein.

There are **ALSO** two phrases to focus on in regards to "fraudulent concealment and nondisclosure:

     (1) There is "fraudulent concealment and nondisclosure conduct that serves as evidence to help prove misappropriation of trade secrets claim"


     (2) There is "fraudulent concealment and nondisclosure in support of tolling statues of limitations"

Defendants benefited from one or both of two different ways that they could have benefited from the misappropriation of Plaintiff's trade secrets:

Some defendants benefited by using Plaintiff's trade secrets to enter into business-development agreements/activity, and some defendants benefited by using Plaintiff's trade secrets in ways other than to enter into business-development agreements/activity.

Damages calculations against "defendants-past" phrase and/or Vessels of Opportunity breach of contracts phrase:

Claimant incorporate by reference "PTO 65 VERIFIED STATEMENT REGARDING CAUSATION AND DAMAGES (B1 CLAIMS)

At lease 1% of the vessels in the Vessels of Opportunity program are 10% owned by claimant pursuant to law and evidence described in plaintiff's PTO 65 verified statement.

WORKING VoO PARTICIPANTS

Claimant calculates that he is entitled to claim $4,160 (10% of $41,600) in compensatory damages, for **each qualified** "Less than 30 feet" vessel.

Claimant calculates that he is entitled to claim $4,940 (10% of $49,400) in compensatory damages, for **each qualified** "30 feet-45 feet" vessel.

Claimant calculates that he is entitled to claim $6,240 (10% of $62,400) in compensatory damages, for **each qualified** "46 feet-65 feet" vessel.

Claimant calculates that he is entitled to claim $8,840 (10% of $88,400) in compensatory damages, for **each qualified** "Greater than 65 feet" vessel.

## NON-WORKING VoO PARTICIPANTS

Claimant calculates that he is entitled to claim $480 (10% of $4,800) in compensatory damages, for **each qualified** "Less than 30 feet" vessel.

Claimant calculates that he is entitled to claim $570 (10% of $5,700) in compensatory damages, for **each qualified** "30 feet-45 feet" vessel.

Claimant calculates that he is entitled to claim $720 (10% of $7,200) in compensatory damages, for **each qualified** "46 feet-65 feet" vessel.

Claimant calculates that he is entitled to claim $1,020 (10% of $10,200) in compensatory damages, for **each qualified** "Greater than 65 feet" vessel.

**The additional information requested in Pretrial Order No. 67 "Attachment A-Documents and Information To Be Produced By Plaintiffs"** is unavailable to me at this time due to the *de jure* and/or Constructive Trust nature of my claims, except:

"Any documents the EXHIBIT 1 B1 Plaintiff intends to offer as evidence in litigation in support of its claim that its losses were caused by the Gulf oil spill and the quantum of those losses;" and

"A disclosure of any related individuals and/or entities (1) that have an ownership interest in the EXHIBIT 1 B1 Plaintiff, (2) that have a financial interest in the outcome of any resolution of the disclosing EXHIBIT 1 B1 Plaintiff's claim, or (3) in which the EXHIBIT 1 B1 Plaintiff has an ownership interest (collectively "Related Parties")". I AM NOT AWARE OF ANY SUCH INDIVIDUALS OR ENTITIES

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date: MARCH 29, 2019

Print Name: ROBERT EVANS

Signature: _____

EVIDENCE IN SUPPORT OF CLAIMS
## Pursuant to Pretrial Order Number 67

Granting Final Approval of the Economic and Property Damages Settlement Agreement]
stopped page 17, last paragraph

http://www.laed.uscourts.gov/sites/default/files/OilSpill/Orders/
12212012OrderAndReasons(Settlement).pdf

Pages 14-15
With respect to Vessels of Opportunity ("VoO") Charter Payment, all Working VoO
Participants receive **at least $41,600 in compensation**, with the amount increasing
depending on the size of the boat. **Working VoO Participants who also will receive
economic loss compensation that directly involves the use of their VoO vessel
(except in the case of payments under the Seafood Compensation Program) will
have their economic loss compensation partially reduced by the VoO Earned
Income Offset
and the VoO Settlement Payment Offset.**11 VoO participants who weren't ever placed
on hire to perform actual services on the water will be entitled to receive up to $10,200,
with no offset, even if such "Non-Working VoO Participants" will also receive an award
under the Seafood Compensation Program. VoO claims, because they involved one-
time service agreements and thus do not involve future risk that the same course of
dealings will be repeated, are not eligible for an RTP.
**The Vessel Physical Damage Framework (Exhibit 14)** allows vessel owners whose
vessels
were physically damaged as a result of the oil spill or cleanup operations to recover the
lesser of the costs necessary to conduct a reasonable repair or replace the vessel. (my
estimate: $10,000 per vessel.) Vessels are eligible even if they did not participate in the
VoO program; the only vessels that may not recover are those that were both (i) working
for an Oil Spill Response Organization or an Oil Spill Removal Organization at the time
of the physical injury and (ii) were not participating in the VoO Program. No RTP is
applied to this category of claims.

5.5.2. WORKING VoO PARTICIPANTS are entitled to the following payments, based on boat
size, representing pay for 26 days' work under the VoO MASTER VESSEL CHARTER
AGREEMENT: CHART A Boat Size Amount of Compensation Less than 30 feet $41,600 30
feet-45 feet $49,400 46 feet-65 feet $62,400 Greater than 65 feet $88,400 5.5.2.1. Economic
Damage payments to any Working VoO Participants who are Case 2:10-md-02179-CJB-SS
Document 6430-1 Filed 05/03/12 Page 35 of 123 33 not participants in the Seafood
Compensation Program will be reduced by any VoO Settlement Payment Offset and VoO Earned
Income Offset. No other claims are subject to this reduction. 5.5.3. NON-WORKING VoO

PARTICIPANTS are entitled to the following payments without any offset: CHART B Boat Size Amount of Compensation Less than 30 feet $4,800 30 feet-45 feet $5,700 46 feet-65 feet $7,200 Greater than 65 feet $10,200

5.6. VESSEL PHYSICAL DAMAGE COMPENSATION. 5.6.1. The VESSEL PHYSICAL DAMAGE CLAIM PROCESS, VESSEL PHYSICAL DAMAGE CLAIM FRAMEWORK, and other details for determining the VESSEL PHYSICAL DAMAGE COMPENSATION AMOUNT are set forth in Exhibit 14 to the Agreement.    http:// www.deepwaterhorizonsettlements.com/Documents/Economic%20SA/ Settlement_Agreement.pdf

On April 30, BP started searching for local vessels for hire that were capable of deploying boom in the Gulf. By May 2, more than 1,000 people had received training from BP on clean-up procedures, and more than 500 "vessels of opportunity" were in operation for BP. By July 7, that number had grown to 3,000 vessels. On September 16, BP halted their VOO program in Alabama, Florida and Mississippi. Over 6,000 boats had been contracted to work, although only 3,500 boats were actually put to work.
**Over 6,000 boats had been contracted to work, although only 3,500 boats were actually put to work.**

23.  The Deepwater Horizon disaster required roughly 6,500 boats for a cleanup effort that was still unable to prevent oil washing up on thousands of kilometers of coastline." http://www.climatechangenews.com/2018/04/05/documents-shed-light-bps-failures-great-australian-bight/

24.  Claimant's trade secrets time-range calculation, to determine damages is from the time the trade secrets were available for misappropriation unto the time the Vessel of Opportunity program ended; beginning from on or about April 24, 1998 until "in most cases, on August 27, 2010 (http://www.prweb.com/releases/ voolawsuitagainstbp/taylormartino/prweb4762304.htm)".

.

25.  Claimant incorporate by reference "PTO 65 VERIFIED STATEMENT REGARDING CAUSATION AND DAMAGES (B1 CLAIMS) REDACTED VERSION PURSUANT TO  PTO 13"

At lease 1% of the vessels in the Vessels of Opportunity program are 10% owned by claimant pursuant to law and evidence described in plaintiff's PTO 65 verified statement.

## WORKING VoO PARTICIPANTS

26. Claimant calculates that he is entitled to claim $4,160 (10% of $41,600) in compensatory damages, for **each qualified** "Less than 30 feet" vessel based on the following:

Claimant calculates that he is entitled to claim $4,940 (10% of $49,400) in compensatory damages, for **each qualified** "30 feet-45 feet" vessel based on the following:

Claimant calculates that he is entitled to claim $6,240 (10% of $62,400) in compensatory damages, for **each qualified** "46 feet-65 feet" vessel based on the following:

Claimant calculates that he is entitled to claim $8,840 (10% of $88,400) in compensatory damages, for **each qualified** "Greater than 65 feet" vessel based on the following:

## NON-WORKING VoO PARTICIPANTS

Claimant calculates that he is entitled to claim $480 (10% of $4,800) in compensatory damages, for **each qualified** "Less than 30 feet" vessel based on the following:

Claimant calculates that he is entitled to claim $570 (10% of $5,700) in compensatory damages, for **each qualified** "30 feet-45 feet" vessel based on the following:

Claimant calculates that he is entitled to claim $720 (10% of $7,200) in compensatory damages, for **each qualified** "46 feet-65 feet" vessel based on the following:

Claimant calculates that he is entitled to claim $1,020 (10% of $10,200) in compensatory damages, for **each qualified** "Greater than 65 feet" vessel based on the following:

Damages calculations against "Defendant(s)_MDL-2179" phrase:

**JUSTIFICATION AND CALCULATION FOR DETERMINING AMOUNT OF DAMAGES TO BE .5% OF ALL CASH PAID OUT IN ALL SETTLEMENTS; based on value claimant's trade secrets brought to MDL-2179 and the resulting settlements:**

As the Fifth Circuit has recognized, "this case is no ordinary class action." In Re Deepwater Horizon, 819 F.3d 190, 197 (5th Cir. 2016). It is "particularly complex, even epic," "gargantuan," and "nearly unprecedented" in scope and size. Id.; In Re Deepwater Horizon, 793 F.3d 479, 490 (5th Cir. 2015). Consequently, this Court "has especially strong and flexible managerial power in this highly complex [multidistrict litigation]." In Re Deepwater Horizon, 819 F.3d at 198. http://www.laed.uscourts.gov/sites/default/files/OilSpill/03292018Order%28SupersedeasBond%29.pdf

**[ABSOLUTELY LOWEST ACCEPTABLE AMOUNT = $37.5 MILLION]**
**The value, viability, and integrity of claimant's trade secrets shall not be compromised in any way.**

Pursuant to the constructive trust situation of my claims, I am unable to provide the additional information requested in Attachment A-Documents and Information To Be Produced By Plaintiffs, except for **"A disclosure of any related individuals and/or entities (1) that have an ownership interest in the EXHIBIT 1 B1 Plaintiff, (2) that have a financial interest in the outcome of any resolution of the disclosing EXHIBIT 1 B1 Plaintiff's claim, or (3) in which the EXHIBIT 1 B1 Plaintiff has an ownership interest (collectively "Related Parties")":**

[Up to this point (2016), Plaintiff have only made educated guesses, absent of compelling evidence, to arrive at the opinion that these Causes of Actions occurred.
- -Fraudulent Concealment and Failure To Disclose.
Jane Blackstone, then Deputy Director, Presidio Trust, was the contract person that I dealt with the most. She stated that (those who eventually won the first contract that I sought) were "loaded with cash." She stated this in a half-shouting, emotional manner, as if she was attempting to convince me to not press my contracting rights. This conduct had a hypnotic-like effect upon me. This contributed to discourage me from pursuing my contracting rights, especially my first contract proposal. She failed to disclose that my Proposal was approved, was in the process of being approved, or had a good chance of being approved, before enticing me to agree to cancel it.
Defendants benefited from one or both of two different ways that they could have benefited from the misappropriation of Plaintiff's trade secrets:
Some defendants benefited by using Plaintiff's trade secrets to enter into business-development agreements/activity, and some defendants benefited by
using Plaintiff's trade secrets in ways other than to enter into business-development agreements/activity.]

[Newly-identified defendants: defendants similar to "Defendant(s)_MDL-2179 phase" defendants but not involved in MDL-2179.]

25.  Claimant incorporate by reference "PTO 65 VERIFIED STATEMENT REGARDING CAUSATION AND DAMAGES (B1 CLAIMS) REDACTED VERSION PURSUANT TO  PTO 13"

At lease 1% of the vessels in the Vessels of Opportunity program are 10% owned by claimant pursuant to law and evidence described in plaintiff's PTO 65 verified statement.

**JUSTIFICATION AND CALCULATION FOR DETERMINING AMOUNT OF DAMAGES TO BE .5% = $310 MILLION. ABSOLUTELY LOWEST ACCEPTABLE AMOUNT = $37.5 MILLION:**

20.  As the Fifth Circuit has recognized, "this case is no ordinary class action." In Re Deepwater Horizon, 819 F.3d 190, 197 (5th Cir. 2016). It is "particularly complex, even epic," "gargantuan," and "nearly unprecedented" in scope and size. Id.; In Re Deepwater Horizon, 793 F.3d 479, 490 (5th Cir. 2015). Consequently, this Court "has especially strong and flexible managerial power in this highly complex [multidistrict litigation]." In Re Deepwater Horizon, 819 F.3d at 198. http://www.laed.uscourts.gov/sites/default/files/OilSpill/03292018Order%28SupersedeasBond%29.pdf

Claimant assumes that the Vessels of Opportunity contracts that the companies in which it have proprietary interest entered into, and suffered breach of, contracts similar in manner as described in these sources: http://files.courthousenews.com/2010/12/07/JescoBP.pdf

https://cases.justia.com/federal/district-courts/alabama/alsdce/1:2010cv00692/48784/4/0.pdf?ts=1294198450

the legal theories and factual allegations pleaded in claimant's PTO 65 documents are fully incorporated into and made a part of this PTO 66 response

Expert-witness testimony may be needed to avoid Summary Judgment:

Summary Judgment

Under Rule 56(c), a party is entitled to summary judgment in his favor "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 56(e) further provides:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party. Fed.R.Civ.P. 56(e).

**https://www.casemine.com/judgement/us/5914bfedadd7b049347b0c57

## COMMENT TO MYSELF:

Though BP has worked through almost all of the 390,000 legal claims stemming from the 2010 explosion, the bill for its remaining claims unexpectedly jumped late last year (2017). The company was forced to take a surprise $1.7 billion charge to net income in the fourth quarter because the cases that did remain were among the largest and most complex.    https://www.bloomberg.com/news/articles/2018-05-01/bp-caps-shaky-big-oil-earnings-season-as-cash-flow-falls-short

**Any and all settlement agreements that Robert Evans enter into, must be strictly tailored to not unnecessarily devalue his trade secrets in any way.** Based upon the nature of claimant's trade secrets, claimant shall not enter into any settlement agreement that require him to sign any blanket liability wavier. Claimant will only agree to liability waivers that clearly protect the value, integrity, and viability of his trade secrets.

**All denied claims could request a reconsideration based on the possibility that the financial conflict between Claimant and all the settlements decision-makers could have caused the decision-makers to have wrongfully denied**

**their own claims. The reconsideration of this claims will result in the uncovering/discovery of facts and evidence that will boost my claims.**

FED. R. EVID. 408

23.  Magistrate Wilkerson: "As the Fifth Circuit stated in Florida Bahamas Lines, Ltd.v. Steel Barge Star 800, 433 F.2d 1243, 1249 (5th Cir. 1970) (quotation and citations omitted), "admiralty jurisdiction embraces the resources of equity whenever the need arises. The Chancellor is no longer fixed to the woolsack. He may stride the quarter-deck of maritime jurisprudence and, in the role of admiralty judge, dispense, as would his landlocked brother, that which equity and good conscience impels." "The integrity of the court is no less worthy of protection in action[s] at law, than in actions in equity." T. Leigh Anenson, Limiting Legal Remedies: An Analysis of Unclean Hands, 99 Ky.L.J. 63, 89 (2011) (quotation omitted)."  http://www.gulfspillpunitivedamagessettlement.com/docs/23805_Redacted.pdf

24.  The New Class Administrator reserves the right to require additional documentation or to consider appropriate alternative documentation he deems to be reliable and appropriate for verification and evaluation of a given claim.

The New Class Claims Administrator reserves the right to adjust the award amount in any specific case for equitable purposes in light of exceptional or extraordinary facts or circumstances relative to that claim.

The New Class Administrator reserves the right to require additional documentation or to consider appropriate alternative documentation he deems to be reliable and appropriate for verification and evaluation of a given claim.
 http://www.gulfspillpunitivedamagessettlement.com/docs/
Transocean%20New%20Class%20Distribution%20Model.pdf

**JUSTIFICATION AND CALCULATION FOR DETERMINING AMOUNT OF DAMAGES TO BE .5% = $310 MILLION. ABSOLUTELY LOWEST ACCEPTABLE AMOUNT = $37.5 MILLION:**
20.  As the Fifth Circuit has recognized, "this case is no ordinary class action." In Re Deepwater Horizon, 819 F.3d 190, 197 (5th Cir. 2016). It is "particularly complex, even epic," "gargantuan," and "nearly unprecedented" in scope and size. Id.; In Re Deepwater Horizon, 793 F.3d 479, 490 (5th Cir. 2015). Consequently, this Court "has especially strong and flexible

managerial power in this highly complex [multidistrict litigation]." In Re Deepwater Horizon, 819 F.3d at 198.  http://www.laed.uscourts.gov/sites/default/files/OilSpill/ 03292018Order%28SupersedeasBond%29.pdf

**237. The Aggregate Fee Petition includes a declaration by Brian T.Fitzpatrick, a law professor at Vanderbilt University and an MDL 2179 "Thought Leader." Professor Fitzpatrick states, "I have never seen a case this complex nor one that required more of class counsel. The number of moving parts here was -and this is an understatement -dizzying. The law, the facts, the science -all of it was far more challenging than perhaps any class action case I have ever seen."**
http://www.chinamericalegaladvisors.com/wp-content/uploads/2019/02/ Donovan-v.-Herman-Complaint-02122019-eFile.pdf

**22.**  "The Parties contemplate that the New Class definition may be adjusted upon agreement of and consistent with the intent of the Parties, with approval of the Court, based upon information made available to the Parties after execution of this SA."   http:// www.gulfspillpunitivedamagessettlement.com/docs/ Amended%20HESI%20Settlement%20Agreement.pdf

**See file named:  serve and file PTO 66.pages:**

**See file named:   vessels of opportunity.pages:**

11.  Describe how the Vessels of Opportunities contracts was breached

Claimant assumes that the Vessels of Opportunity contracts that the companies in which it have proprietary interest entered into, and suffered breach of, contracts similar in manner as described in these sources: http://files.courthousenews.com/2010/12/07/JescoBP.pdf

https://cases.justia.com/federal/district-courts/alabama/alsdce/
1:2010cv00692/48784/4/0.pdf?ts=1294198450

the legal theories and factual allegations pleaded in claimant's PTO 65 documents
are fully incorporated into and made a part of this PTO 66 response

14.  ORDER AND REASONS
[Granting Final Approval of the Economic and Property Damages Settlement
Agreement]  stopped page 17, last paragraph

http://www.laed.uscourts.gov/sites/default/files/OilSpill/Orders/
12212012OrderAndReasons(Settlement).pdf

Pages 14-15
With respect to Vessels of Opportunity ("VoO") Charter Payment, all Working VoO
Participants receive **at least $41,600 in compensation**, with the amount increasing
depending on the size of the boat. **Working VoO Participants who also will receive
economic loss compensation that directly involve the use of their VoO vessel
(except in the case of payments under the Seafood Compensation Program) will
have their economic loss compensation partially reduced by the VoO Earned
Income Offset
and the VoO Settlement Payment Offset.**11 VoO participants who weren't ever placed
on hire to perform actual services on the water will be entitled to receive up to $10,200,
with no offset, even if such "Non-Working VoO Participants" will also receive an award
under the Seafood Compensation Program. VoO claims, because they involved one-
time service agreements and thus do not involve future risk that the same course of
dealings will be repeated, are not eligible for an RTP.
**The Vessel Physical Damage Framework (Exhibit 14)** allows vessel owners whose
vessels
were physically damaged as a result of the oil spill or cleanup operations to recover the
lesser of the costs necessary to conduct a reasonable repair or replace the vessel. (my
estimate: $10,000 per vessel.) Vessels are eligible even if they did not participate in the
VoO program; the only vessels that may not recover are those that were both (i) working
for an Oil Spill Response Organization or an Oil Spill Removal Organization at the time
of the physical injury and (ii) were not participating in the VoO Program. No RTP is
applied to this category of claims.

5.5.2. WORKING VoO PARTICIPANTS are entitled to the following payments, based on boat
size, representing pay for 26 days' work under the VoO MASTER VESSEL CHARTER
AGREEMENT: CHART A Boat Size Amount of Compensation Less than 30 feet $41,600 30
feet-45 feet $49,400 46 feet-65 feet $62,400 Greater than 65 feet $88,400 5.5.2.1. Economic

Damage payments to any Working VoO Participants who are Case 2:10-md-02179-CJB-SS Document 6430-1 Filed 05/03/12 Page 35 of 123 33 not participants in the Seafood Compensation Program will be reduced by any VoO Settlement Payment Offset and VoO Earned Income Offset. No other claims are subject to this reduction. 5.5.3. NON-WORKING VoO PARTICIPANTS are entitled to the following payments without any offset: CHART B Boat Size Amount of Compensation Less than 30 feet $4,800 30 feet-45 feet $5,700 46 feet-65 feet $7,200 Greater than 65 feet $10,200

5.6. VESSEL PHYSICAL DAMAGE COMPENSATION. 5.6.1. The VESSEL PHYSICAL DAMAGE CLAIM PROCESS, VESSEL PHYSICAL DAMAGE CLAIM FRAMEWORK, and other details for determining the VESSEL PHYSICAL DAMAGE COMPENSATION AMOUNT are set forth in Exhibit 14 to the Agreement.   http://www.deepwaterhorizonsettlements.com/Documents/Economic%20SA/Settlement_Agreement.pdf

On April 30, BP started searching for local vessels for hire that were capable of deploying boom in the Gulf. By May 2, more than 1,000 people had received training from BP on clean-up procedures, and more than 500 "vessels of opportunity" were in operation for BP. By July 7, that number had grown to 3,000 vessels. On September 16, BP halted their VOO program in Alabama, Florida and Mississippi. Over 6,000 boats had been contracted to work, although only 3,500 boats were actually put to work.
**Over 6,000 boats had been contracted to work, although only 3,500 boats were actually put to work.**

23.  The Deepwater Horizon disaster required roughly 6,500 boats for a cleanup effort that was still unable to prevent oil washing up on thousands of kilometers of coastline." http://www.climatechangenews.com/2018/04/05/documents-shed-light-bps-failures-great-australian-bight/

24.  Claimant's trade secrets time-range calculation, to determine damages is from the time the trade secrets were available for misappropriation unto the time the Vessel of Opportunity program ended; beginning from on or about April 24, 1998 until "in most cases, on August 27, 2010 (http://www.prweb.com/releases/voolawsuitagainstbp/taylormartino/prweb4762304.htm)".

.

25.  Claimant incorporate by reference "PTO 65 VERIFIED STATEMENT REGARDING CAUSATION AND DAMAGES (B1 CLAIMS) REDACTED VERSION PURSUANT TO  PTO 13"

At lease 1% of the vessels in the Vessels of Opportunity program are 10% owned by claimant pursuant to law and evidence described in plaintiff's PTO 65 verified statement.

## WORKING VoO PARTICIPANTS

26.  Claimant calculates that he is entitled to claim $4,160 (10% of $41,600) in compensatory damages, for **each qualified** "Less than 30 feet" vessel based on the following:
Claimant calculates that he is entitled to claim $4,940 (10% of $49,400) in compensatory damages, for **each qualified** "30 feet-45 feet" vessel based on the following:

Claimant calculates that he is entitled to claim $6,240 (10% of $62,400) in compensatory damages, for **each qualified** "46 feet-65 feet" vessel based on the following:

Claimant calculates that he is entitled to claim $8,840 (10% of $88,400) in compensatory damages, for **each qualified** "Greater than 65 feet" vessel based on the following:

## NON-WORKING VoO PARTICIPANTS

Claimant calculates that he is entitled to claim $480 (10% of $4,800) in compensatory damages, for **each qualified** "Less than 30 feet" vessel based on the following:

Claimant calculates that he is entitled to claim $570 (10% of $5,700) in compensatory damages, for **each qualified** "30 feet-45 feet" vessel based on the following:

Claimant calculates that he is entitled to claim $720 (10% of $7,200) in compensatory damages, for **each qualified** "46 feet-65 feet" vessel based on the following:

Claimant calculates that he is entitled to claim $1,020 (10% of $10,200) in compensatory damages, for **each qualified** "Greater than 65 feet" vessel based on the following:

12.  JESCO petition

JESCO spent over $1 million to retrofit some of the vessels and rent some of the vessels, and to hire and train the crews, of 11 vessels in all. Invoices submitted to BP totaled $5, 759,000 (July), $4,659,000 (August), $4, 659,000 (September), $4, 659,000 (October).

"BP never paid the invoices."

http://files.courthousenews.com/2010/12/07/JescoBP.pdf

This First Amended Master Complaint does not constitute a waiver or dismissal of any actions or claims asserted in the individual and class actions arising out of the

Oil Spill, nor by it do the Plaintiffs relinquish the right to add or assert, or seek leave to add or assert, additional claims and parties defendant depending on further information learned through discovery or investigation.

**See file named:  transocean new class settlement and Deficiency appeals.pages:**

163. As the Fifth Circuit has recognized, "this case is no ordinary class action."
In Re Deepwater Horizon, 819 F.3d 190, 197 (5th Cir. 2016). It is "particularly complex, even epic," "gargantuan," and "nearly unprecedented" in scope and size. Id.; In Re Deepwater Horizon, 793 F.3d 479, 490 (5th Cir. 2015). Consequently, this Court "has especially strong and flexible managerial power in this highly complex [multidistrict litigation]." In Re Deepwater Horizon, 819 F.3d at 198.

22.  The Plaintiffs Steering Committee attorneys in this MDL-2179 litigation have earned more than $600 million by obtaining settlements through the use of claimant's trade secrets:  "…while those (attorneys) on the settlement team view negotiations as more important to the overall success of the case."  Document 22826, filed 04/11/17.

"Those on the science team (attorneys) tend to think that environmental

and/or economic development should be more heavily credited…"

Document 22826, filed 04/11/17.

Also see PSC duties described in Order No. 8.


All of this help to show the uniqueness, value, confidentiality, and/or

largeness of claimant's trade secrets. And help to show that it is

reasonable to calculate the total number of "certain MDL-2179 claims/

claimants" and "second-class participants" claims to be at a minimum of

600, with an average of $200,000 per claim, and with my share of total

Damages ($120 million) being 10%, which is $12 million.


https://www.atra.org/wp-content/uploads/2016/11/BP-Deepwater-Conflict-of-interest-AS-FILED-Motion-for-Leave-and-Amicus-Brief.pdf :

6.However, in other cases (including this one) administrators are endowed with a far more substantial role, making qualitative judgments about the validity of a claim and quantitative judgments about the amount of damages properly awarded under the settlement's terms. A claims administrator exercising that level of discretion is

serving an essentially adjudicative function, akin to an arbitrator or master. 7. Longstanding precedent holds that, even when parties agree to resolve their dispute through a third-party tribunal or master, courts are obligated to enforce the basic principle that tribunals authorized by law to decide cases and controversies must avoid even the appearance of partiality. The district court unquestionably had authority to enforce that rule of impartiality here through its supervisory power over the claims administrator. 8. But the district court's decision could be read to create substantial uncertainty over whether the claims administrator is subject to the same standards of impartiality—enforced through either disqualification or disclosure rules—that apply to other adjudicators authorized by law to exercise discretion in resolving cases and controversies. . 9. The district court's rule, if upheld, could have serious consequences for settlement agreements —and in turn, for the dockets of the courts of this Circuit and amici's members. If parties believe

that they would have no recourse if a Case: 14-31299 Document: 00512883028 Page: 4 Date Filed: 12/26/2014

5claims administrator turns out to have undisclosed biases or the appearance thereof, they will be unwilling to structure settlements in a way that cedes any discretion to the administrator—forcing the court system to take on adjudicative functions for all claims.That exception to the broadly-applicable prohibition against partiality is unwarranted and it threatens the integrity, and thus usefulness, of claims administrators—ultimately imposing greater costs on the court system, the public at large, andamici's members.10.Appellants have consented to the filing of theamicus brief. The Claims Administrator has stated that he takes no position on this motion. ThePlaintiffs Steering Committee has stated that it objects to the motion.WHEREFORE, amici respectfully request that the Court grant their motion for leave to file the attached brief as amici curiae. Case:

14-31299 Document: 00512883028 Page: 5 Date Filed: 12/26/2014

## 2016The Deepwater Horizon Oil Spill Litigation: Proofof Concept for the Manual for Complex Litigation and the 2015 Amendments to the Federal Rules ofCivil Procedure
https://repository.law.umich.edu/cgi/viewcontent.cgi?article=1056&context=mjeal

"All the plaintiffs want is for BP to stand by their contract. Instead, what we see here is a recurring theme in BP's oil spill payments – an initial payment to 'calm the waters,' and then a quiet withdrawal of their obligations."
The contract in question, the "Master Vessel Charter Agreement," stipulates that vessels be used exclusively in the VOO program, and that BP must issue a formal termination, called an "Off Hire Dispatch Notification" before vessels are released from that contract. On July 22, 2010, BP placed a large number of vessel owners on standby due to the proximity of Tropical Storm Bonnie. Many of those vessels were never reactivated, and remained on standby until BP terminated their contracts several weeks later: in most cases, on August 27, 2010. The VOO lawsuit alleges that BP is contractually obligated to pay vessel owners, who were prohibited from using their boats for any other purpose, for their time spent on standby. "At least forty vessel owners have contacted us since the beginning of November. We are preparing their complaints and plan to file en masse." said **Steven A. Martino**, senior partner at Taylor Martino.

24.  Claimant's trade secrets time-range calculation, to determine damages is from the time the trade secrets were available for misappropriation unto the time the Vessel of Opportunity program ended; beginning from on or about April 24, 1998

until "in most cases, on August 27, 2010 (http://www.prweb.com/releases/
voolawsuitagainstbp/taylormartino/prweb4762304.htm

**http://www.gulfspillpunitivedamagessettlement.com/docs/
Transocean%20New%20Class%20Distribution%20Model.pdf**

Having reviewed these materials, together with records in this court, IT
IS ORDERED that this matter is hereby REMANDED
to the Claims Administrator for further consideration.

As provided in the final paragraph of the court-approved Distribution
Model, Record Doc. No. 18797 at p. 27, the Claims Administrator
is directed to reconsider this "specific case for equitable purposes in light
of exceptional or extraordinary facts or circumstances relative to" claim.
Based on all of the preceding facts and arguments; and based on
information and belief:

The information about the ships and other businesses that claimant is
required to provide can not be provided without discovery because all of
these entries are under confidential agreements to not disclose their
involvement with business with the Presidio Trust. Or, in the alternative,
a percentage of total eligible claims and/or a percentage of total HESI/
Transocean Settlements payments should be allocated to claimant (such
as the 0.05% that have ben calculated by claimant). These two
alternative are most appropriate given the fact opposing parties are better
situated to obtain the required information from the partner the Presidio
Trust.

See, e.g., Carol L. Izumi & Homer C. La Rue, Prohibiting "Good Faith" Reports Under the Uniform Mediation Act: Keeping the Adjudication Camel Out of the Mediation Tent, 2003 J. Disp. RESOL. 67, 68-69 (2003) (discussing the differing values in the litigation and mediation processes and concluding that mandatory court-connected mediation "may create 'process dissonance'); Wayne D. Brazil, Continuing the Conversation About the Current Status and the Future of ADR: A View From the Court, 2000 J. DiSP. RESOL. 11, 29 (2000) (The traditional litigation behaviors that should be kept out of the mediation process include "self-conscious posturing, feigning emotions(even anger) or states of mind, pressing arguments known or suspected to be specious, concealing significant information, obscuring weaknesses, attempting to divert the attention of other parties away from the main analytical or evidentiary chance, misleading others about the existence or persuasive power of evidence not yet formally presented... resisting well-made suggestions, intentionally injecting hostility or friction into the process, remaining rigidly attached to positions not sincerely held, delaying other parties' access to information, or needlessly protracting the proceeding-simply to gain time, or to wear down the other parties or to increase their cost burdens.

**https://kb.osu.edu/bitstream/handle/1811/76957/**

**OSJDR_V26N2-3_363.pdf?sequence=1**


**Declarations by claimant, expert-witness statements/reports, and/or damage calculations can be derived from the 25 paragraphs below:**


If defendant(s) admit that they have agreed to sponsor, or otherwise engage in the creation and/or development of business ventures (relative to successful settlement negotiations), then the proof of my claims would be greatly enhanced.


If defendant(s) admit that they have encountered or utilized any trade secrets strikingly similar to claimant's trade secret (relative to successful settlement negotiations), then the proof of my claims would be greatly enhanced.

If defendant(s) admit that they are not aware of any documentary records that show that anyone else conceived of trade secrets or concepts strikingly similar to claim's trade secrets, then the proof of my claims would be greatly enhanced.

If it can be determined that trade secrets/concepts similar to my trade secrets were utilized to significantly help to resolve other MDL cases such as "IN RE CHRYSLER-DODGE-JEEP ECODIESEL MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION", and/or other "high-stakes" disputes, then the proof of my claim would be greatly enchanted.

If it can be determined what the the Presidio Trust board members and top managers did and how they reacted after they learned that I withdrew my proposal(s) (which I did via the "hypnotic-like" telephone exchange with Jane Blackstone); and/or If it can be determined what the the Presidio Trust board members and top managers did and how they reacted after I failed to show up at the two locations/meetings referred to in the record about the "hypnotic-like" effect caused by Jane Blackstone; then proof of my claims would be greatly enhanced.

If it can be determined that it is more *convenient* for claimant, a mentally-disabled/incompetent, informa paupers, pro se claimant, to prosecute his claims in a class-action/multi-district litigation/settlement environment than in an individual

litigation situation; and that Due Process requires that such should be the case, then proof of my claims will be greatly enhanced.

If it can be determined that other evidence described help to show that claimant's two proposals submitted to the Presidio Trust had a good chance of being approved, were in the process of being approved, or had been approved, prior to the time that Jane Blackstone caused claimant to abandon his efforts pursuant to the "hypnotic-like effect" endured by claimant, then proof of my claims would be greatly enhanced.

If it can be determined that telephone conversation with the subject enhances the ability to hypnotize the subject.  https://aircall.io/blog/five-hypnosis-tricks-to-persuade-customers-over-the-phone/

If it can be determined by law-enforcement officials that my trade secrets allegations should be investigated by them, then proof of my claims would be greatly enhanced.

If it can be determined that the other eight competing proposals, and even later proposals, show that individuals and very small business ventures would not have been shy, if it occurred to them to offer up  trade-secret based proposals containing trade secrets similar to claimant's, then proof of my claims would be greatly enhanced.

[https://www.thebaycitybeacon.com/politics/how-to-do-press-interviews-when-running-for-mayor/article_1ad206c2-3d0a-11e8-a21a-23ec5cd4104e.html

https://heydaybooks.com/book/ransoming-pagan-babies/]

If it can be determined that the true source(s) of the conception of trade secrets/concepts similar to claimants were not be identified, nor existed, during congressional procedures and processes, relative to enactment of new legislation regarding the Presidio Trust, then proof of my claims would be greatly enhanced.

If it can be determined that claimant is qualified to be an expert witness as an "innovator," and pertaining to "innovation" topics and matters, then proof of my claims would be greatly enhanced.

If it can be determined that it is common practice to use and rely upon hypnotism by certain governmental agencies, then proof of my claims would be greatly enhanced.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date: _MARCH 29, 2019_

Print Name: _RoBerT EvANS_

Signature: _____

# **DECLARATIONS**

# **Pursuant to Pretrial Order Number 67**

1.  Jane Blackstone, the first Deputy Director for Real Estate, at the
Presidio Trust, was the contracting official that I communicated with the
most regarding my two Responses to Requests for Qualifcations/
Proposals, hereinafter RsRsQs (plural) and RRQ (singular). During one
telephone call she made to me, she asked if I wanted to end efforts in
regards to having my first RRQ approved and instead, submit a future
RRQ for different buildings in the Presidio Park. She asked that in tone and
mannerism that indicated to me that this is what I should do, because
immediately before or after she asked this, she stated that others who
were competing against my first  RRQ were "loaded with cash." She
stated this in a half-shouting, emotional manner, as if she was attempting
to convince me to not press my contracting rights. This conduct in total,
by Jane Blackstone, had a hypnotic-like effect upon me, and caused me
to officially agree to end my first RRQ contract efforts during and through
this same telephone call. Jane Blackstone at no time indicated that my
first RRQ was or will be rejected, nevertheless, if she would have told me

that my first RRQ had a good chance of being approved, had been approved, or will be approve, I never would have agreed to withdraw it. The results of this telephone call discouraged me, or greatly contributed to discourage me, from pursuing my contracting rights, especially in regards to my first RRQ submitted to the Presidio Trust. I have subsequently studied the definition and techniques of hypnotism at least to the point of informing me about "hypnotic-like" processes. Claimant's definition of "hypnotic-like" state is a state-of-being whereby a person is much more susceptible to suggestion than he or she normally would. Claimant's best description of emotional" are the synonyms listed here: http://www.thesaurus.com/browse/emotional.

As a child, claimant had to live with an abusive stepfather who regularly beat him, and nearly everyday shouted at him and berated him. This shouting, berating, and these beatings caused claimant to unduly become under the influence of not only his stepfather, but even others outside the house who shouted at and showed hatred and/or contempt towards him. These situations caused claimant to run away from home approximately four times before the age of fifteen, as well as enter the court system on two separate occasions as a juvenile delinquent. He permanently moved out of the house he was living with his stepfather, mother, and half-siblings in New Jersey, and begun to live with his grandmother in Alabama after

suffering psychiatric episodes which included hospitalizations and which

entitled him to begin to receive Social Security Disability payments at the

age of seventeen. He continued to have psychiatric episodes throughout

the years. ALL ~~[struck out]~~ REFERENCES HEREIN TO "Him"
"CLAiMANt" And "He" MEANS "I" OR "ME".

2.  Edward Blakely became the City of New Orleans Hurricane Katrina

Redevelopment Czar after he obtained access of claimant's RsRsQs/trade

secrets through his former position as a member of the Presidio Trust

board of directors. Many New Orleans-area thought-leaders consider him

to have been a failure and not qualified for the Czar position.


3.  Before I submitted my trade secrets to the Presidio Trust, Sean Cooper
lived and was established in the New Orleans area. After I submitted my
trade secrets to the Presidio Trust, Sean Cooper became managing
partner of WestEnd Capital Management, an investment advisory firm
with office space in Presidio National Park, San Francisco, California;
which is operated by the Presidio Trust.

4.  Kenneth Feinberg falsely stated to the class claimants that he was
independent  of the BP Exploration & Production Incorporated defendant.

5.  Kenneth Feinberg and Feinberg Rosen, doing business as Gulf Coast
Claims Facility, replaced the claims process which BP had established to
fulfill its obligations as a responsible party pursuant to the Oil Pollution
Act of 1990. The new protocol established by Kenneth Feinberg and
Feinberg Rosen, set forth the procedure for the submission  and
resolution by Gulf Coast Claims Facility of claims by individuals and
businesses for costs and damages incurred as a result of the Deepwater
Horizon oil spill incident.

6.  Claimant was further incentivized to keep and maintain the secrecy of his trade secrets because he expected to obtain proprietary interest from each new, and pre-existing business that made use of his trade secrets.

7.  Prior to any suspicion that his trade secrets would be misappropriated, claimant was incentivized to take a "hands-off" involvement in the management and application of his trade secrets:  (1) in order to not interfere with the more knowledgeable and experienced personnel at the Presidio Trust, and (2) claimant believed the first Executive Director at the Presidio Trust was referring mainly to the management, application, and coordination of the use of claimant's trade secrets, when the Executive Director announced, in a public meeting that "the Presidio Trust will *facilitate*." [And then he repeated] The Presidio Trust will *facilitate*."

8.  I received two different letters from the second Executive Director of the Presidio Trust, Craig Middleton. The letters gave notice of the time and locations of closed meetings where selected persons would discuss and possibly take action in regards to matters pertaining to the Financial Management Plan of the newly formed Presidio Trust and the Presidio National Park. I recall the first letter stating the location of this first meeting was in a remote location in the Park.  After a significant amount of days, I received the second letter, which stated that a similar meeting was being held at the offices of Swords To Plowshares located in the Park. I failed to attend both of these meetings, mostly due to prior interaction with Jane Blackstone as described in Declaration #3 contained in this Document.

9.  According to "Exposing The Underbelly of Mass Tort Litigation," Blogs.Reuters.com, May 24, 2016: Outside funding of lawsuits did not begin in earnest until after the disclosure of my trade secrets.

10.  The contents of my trade secrets and the two Proposals/Responses To Requests For Qualifications in which they were included, addressed and provided solutions to the Presidio Trust's most crucial concern: how to meet its financial self-sufficiency as mandated by Congress.

11.  From the time that I decided to submit my First Proposal to The Presidio Trust, to the present, I have had a laser-focus on developments and media coverage of Presidio Trust –related activity, and to my knowledge, no one else have been identified as the originator of anything similar to my trade secrets.

12.  A class action settlement agreement, In Re: Katrina Canal Breaches Consolidation Litigation, Master Consolidated Class Action, was established after my trade secrets were submitted to the Presidio Trust. "Document 20136, 12/09/10, Page4."

13. The Settlement Agreement supports my "alternative documentation" process which is spearheaded by showing that I have a *de jure*, constructive trust, proprietary interest in many businesses located on the Gulf Coast, as well as other locations, deriving from confidential, business-development agreements involving the Presidio Trust and others. "FIRST REPORT OF THE AUDIT COMMITTEE", (section entitled: "Documentation Deficiencies"), http://bit.ly/2uWmbj9, pages 4-8.

14.  In the two Proposals/Responses To Requests For Qualifications that I submitted to the Presidio Trust I required, in addition to other compensation, that I receive 5%-10% proprietary ownership of every new and significantly expanded business that made use of my trade secrets in the business-development and/or the conflict-resolution contexts.

15. I utilized my extensive, very long, and enormously time consuming interdisciplinary background in many topics, subjects, fields, and disciplines; to prepare myself to be able to obtain the ingenuity I needed to contrive, develop, and perceive the value of my trade secret concepts exactly during the time that the Presidio's unique redevelopment thinking was becoming a national and international focus; in the governmental/ political, environmental, and urban arenas, and with the public.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date: _MARCH 29, 2019_

Print Name: _RoBerT EvAns_

Signature: _[signature]_