## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" in the GULF | § | |
| OF MEXICO, on APRIL 20, 2010 | § | SECTION J |
| | § | |
| | § | |
| This Documents Relates to: | § | |
| *All Claims In Pleading Bundle B3* | § | JUDGE BARBIER |
| | § | MAG. JUDGE WILKINSON |

| | | |
|---|---|---|
| **Brian Gortney** | § | CIVIL ACTION NO. 2:15-cv-01047 |
| *Plaintiff* | § | |
| vs. | § | SECTION: J |
| | § | |
| BP Exploration & Production, Inc., BP | § | JUDGE BARBIER |
| America Production Company, and BP, P.L.C. | § | |
| *Defendants* | § | MAG. JUDGE WILKINSON |

## UNOPPOSED MOTION FOR EXTENSION OF TIME IN ORDER TO ENGAGE COUNSEL AND TO FILE MOTION TO SEVER, AND FOR SUGGESTION OF REMAND AND/OR TO TRANSFER VENUE

Plaintiff Brian Gortney requests an extension of time to obtain new counsel and determine whether he wants to file a motion to sever and for suggestion of remand or alternatively to transfer venue to the Northern District of Florida, where the case was pending after BP removed it from state court and for a stay of the deadlines involving his case for 60 days (other than his PTO 68 response which the parties are addressing by a separate motion and which will be provided by March 30, 2021).

The Fifth Circuit on March 3, 2021 issued its mandate returning Gortney's claims to this court. While his appeal was pending, the court issued a number of orders in anticipation of returning the B3 cases to individual courts. The Court's November 20, 2020 order ordered BP and the B3 plaintiffs to provide the court with a list of the B3 cases that

1

are still pending in this court. The jointly submitted list does not include Gortney. (Doc. 26807).  He should be part of a future severance order.

That same order also directs the parties to list the "B3 cases that will be severed." Gortney's case should be severed.

On February 25, 2021, the court issued an order regarding motions to transfer venue. (Doc. 26934). The order directs the parties in the list of cases (Doc. 26807-1), which does *not* include Gortney, to file motions to transfer by March 12, 2021. While the order technically does not apply to Gortney, out of an abundance of caution, Gortney hereby requests a 60-day extension so he can locate new counsel who can determine whether a motion to remand or transfer should be filed so the case can be returned to Florida. Gortney's original lawsuit was filed in the Walton County Circuit Court, Florida.

A copy of a draft motion to sever, remand or transfer is attached as Exhibit 1. Attached to that motion is Gortney's original state court lawsuit, BP's notice of removal, and the MDL Panel's transfer order as Exhibits, A, B, and C respectively. Gortney wishes to preserve his right to request a remand and/or transfer but that decision should be reached after consulting with his new attorney. To be clear, by not opposing this request for an extension, BP does not consent or agree to the contents of the draft motion and states that it needs to review Gortney's PTO 68 response before determining its position. The parties will be filing a separate motion setting forth a proposed schedule for his PTO 68 response.

Gortney's claims were previously handled by Charles Herd, who at the time was at the Lanier Law Firm. When Mr. Herd left the firm, he continued to handle Gortney's case with the consent of the Lanier Law Firm. Mr. Herd has extensive background in admiralty

law. After Gortney's case was dismissed in January 2019, Gortney terminated Herd. The appellate lawyers at The Lanier Law Firm offered to handle his appeal, but Gortney is now looking for new counsel.

Gortney has begun the process of communicating with prospective counsel but needs additional time because he has not located an attorney as of this date. By agreement of the parties, Gortney will provide his PTO 68 responses by March 30, 2021. Gortney requests that all other deadlines and proceedings involving his claims be stayed for 60 days.

ACCORDINGLY, Gortney requests that his case be included in the list of cases that should be severed and that he be granted until May 12 to locate new counsel and file a motion to transfer venue, should his new counsel deem it appropriate. Other than his PTO 68 response, Gortney further requests that all other deadlines and proceedings involving his claims be stayed for 60 days.

Respectfully Submitted,

**THE LANIER LAW FIRM**

By:   /s/  Mark Lanier
       W. Mark Lanier
       State Bar No: 11934600
       Harvey G Brown, Jr.
       State Bar No: 03130500
       10940 W. Sam Houston Pwky N.
       Suite 100
       Houston, Texas 77069
       Telephone:  713.659.5200
       Facsimile:  713.659.2204
       Email: wml@lanierlawfirm.com
       Email: Harvey.brown@lanierlawfirm.com

**ATTORNEYS FOR PLAINTIFF**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing **Unopposed Motion For Extension of Time in order to to Engage Counsel and to File Motion to Sever, and For Suggestion of Remand and/or to Transfer Venue**, has been served on All Counsel by electronically uploading the same to File & ServeXpress in accordance with Pretrial Order No. 12, as amended, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 12th day of March, 2021.

*/s/  Mark Lanier*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" in the GULF | § | |
| OF MEXICO, on APRIL 20, 2010 | § | SECTION J |
| | § | |
| | § | |
| **This Documents Relates to:** | § | |
| *All Claims In Pleading Bundle B3* | § | JUDGE BARBIER |
| | § | MAG. JUDGE WILKINSON |

| | | |
|---|---|---|
| **Brian Gortney** | § | CIVIL ACTION NO. 2:15-cv-01047 |
| *Plaintiff* | § | |
| **vs.** | § | SECTION: J |
| | § | |
| **BP Exploration & Production, Inc., BP** | § | JUDGE BARBIER |
| **America Production Company, and BP, P.L.C.** | § | |
| *Defendants* | § | MAG. JUDGE WILKINSON |

## <u>PLAINTIFF'S MOTION TO SEVER AND FOR SUGGESTION OF REMAND AND/OR MOTION TO TRANSFER VENUE</u>

Plaintiff Brian Gortney hereby moves the Court for a severance and suggestion of remand and/or moves to transfer his case back to the United States District Court for the Northern District of Florida.  The grounds supporting this motion are set forth in the accompanying Memorandum of Law in Support of Plaintiff's Motion to Sever and for Suggestion of Remand and/or Motion to Transfer Venue.

Plaintiff's counsel conferred with opposing counsel before filing this motion, but [was unsuccessful in reaching an agreement on this issue].

Respectfully Submitted,

**THE LANIER LAW FIRM**

By: _____

W. Mark Lanier
State Bar No: 11934600
Harvey G Brown, Jr.



**EXHIBIT**

**1**

State Bar No: 03130500
10940 W. Sam Houston Pwky N.
Suite 100
Houston, Texas 77069
Telephone:  713.659.5200
Facsimile:  713.659.2204
Email: wml@lanierlawfirm.com
Email: Harvey.brown@lanierlawfirm.com

**ATTORNEYS FOR PLAINTIFF**

2

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing Motion to Sever and for Suggestion of Remand and/or Motion to Transfer Venue was electronically served on all counsel of record in accordance with Pretrial Order No. 12, and was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179 on this ___ day of March, 2021.

Dated this _____ day of March, 2021.

_____
Harvey Brown

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG | § | MDL No. 2179 |
| "DEEPWATER HORIZON" in the GULF | § | |
| OF MEXICO, on APRIL 20, 2010 | § | SECTION J |
| | § | |
| | § | |
| This Documents Relates to: | § | |
| *All Claims In Pleading Bundle B3* | § | JUDGE BARBIER |
| | § | MAG. JUDGE WILKINSON |

| | | |
|---|---|---|
| **Brian Gortney** | § | **CIVIL ACTION NO. 2:15-cv-01047** |
| *Plaintiff* | § | |
| **vs.** | § | **SECTION: J** |
| | § | |
| **BP Exploration & Production, Inc., BP** | § | **JUDGE BARBIER** |
| **America Production Company, and BP, P.L.C.** | § | |
| *Defendants* | § | **MAG. JUDGE WILKINSON** |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF BRIAN GORTNEY'S MOTION TO SEVER AND FOR SUGGESTION OF REMAND AND/OR MOTION TO TRANSFER VENUE

B3 Plaintiff Brian Gortney submits this Memorandum of Law in Support of his Motion to Sever and for Suggestion of Remand and/or Motion to Transfer Venue to the United States District Court for the Northern District of Florida, Pensacola Division, in accordance with 28 U.S.C. § 1407, and would show the Court as follows:

### I.      FACTUAL AND PROCEDURAL BACKGROUND

B3 Plaintiff Brian Gortney originally brought this suit in Florida state court alleging exposure-related injuries he suffered as a result of the April 20, 2010 Deepwater Horizon oil spill. *See* State Court Complaint, attached as Exhibit A.  BP removed the case to the United States District Court for the Northern District of Florida, Pensacola Division.  *See* BP's Notice of Removal, attached as Exhibit B.  On April 1, 2015, the United States Judicial Panel on Multidistrict

4

Litigation ("JPML") issued Conditional Transfer Order 125, transferring this case to the Eastern District of Louisiana for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *See* CTO-125 (Doc. 1857), attached as Exhibit C.  The case was then assigned to MDL 2179; "In re: Oil Spill by the Oil Rig 'Deepwater Horizon' in the Gulf of Mexico, on April 20, 2010."  Those pretrial proceedings are now substantially complete.

In its November 17, 2020 status conference, the Court announced its intent to sever the remaining B3 bundle of cases from the MDL.  *See* November 17, 2020 Minute Entry (Doc. 26784). To aid in that process, it ordered the parties to file an agreed list of all remaining B3 cases currently in the MDL, indicating which cases (a) would remain in the Eastern District of Louisiana post-severance, (b) would be remanded by the Judicial Panel on Multidistrict Litigation to a transferor district post-severance, and (c) should be transferred by consent to another district.  *Id*. It also required the parties to file a proposed omnibus suggestion of remand for cases like Gortney's, which were transferred to this Court pursuant to §1407.  *Id*. On February 25, 2021, this Court issued its Order Regarding Motions to Transfer Venue in Certain B3 Cases, requiring that:

> for cases listed in the December 8, 2020 List of B3 Cases with the "Remain in E.D. La" venue designation (see Rec. Doc. 26807-1), any party that wishes to file a motion to transfer venue shall do so by no later than Friday, March 12, 2021, otherwise the parties to these cases will be deemed to have waived any objection they may have to venue in this district.

(Doc. 26934).

The February 25, 2021 Order does not apply to Gortney's case because Plaintiff Gortney's case was on appeal at the time of the November 17, 2020 status conference and therefore was not included on the Joint Submission of List of Cases Remaining in the B3 Pleading Bundle.  *See* (Doc. 26807-1).

Gortney's case should not be given the "Remain in E.D. La" designation that the February 25 Order references.  According to the minutes from the November 17 status conference, cases

that would "remain in E.D. La post-severance" would include "cases that were originally filed in E.D. La, cases that were removed to E.D. La from a Louisiana state court, and cases in which the parties consent to proceeding in E.D. La for all purposes even though the case was transferred to E.D. La pursuant to 28 U.S.C. § 1407."  November 17, 2020 Minute Entry at p. 2 (Doc. 26784); *see also* Joint Submission of List of Cases Remaining in the B3 Pleading Bundle at p. 2 (Doc. 26807) (using the same criteria to distinguish between cases that would remain in E.D. La post-severance and those that must be remanded to a transferor district pursuant to § 1407(a)). Gortney's case meets none of those criteria.

Gortney files this Motion for Suggestion of Remand and/or Motion to Transfer Venue to make clear his contention that once severed, this case should be remanded by the JPML to the federal court from whence it came (the Northern District of Florida, Pensacola Division),[1] pursuant to 28 U.S.C. 1407(a).

## II.    ARGUMENT

This case was transferred to the MDL by the JPML pursuant to 28 U.S.C. §1407.  Section 1407(a) provides that "[e]ach action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated."  28 U.S.C. § 1407(a).  The JMPL's duty to remand is compulsory.  *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 40 (1998).

Because the duty to remand rests solely with the JPML, "at some point after the JPML's referral, the transferee court is expected to suggest to the JPML that the matter should be returned to the transferor court for final resolution." *In re Activated Carbon-Based Hunting Clothing Mktg.*

---

[1] Gortney contends his case should ultimately be remanded from federal court back to the Florida state court where his Complaint was originally filed, and will seek a court order in the transferee court to that effect.

& *Sales Practices Litig.*, 840 F. Supp. 2d 1193, 1198 (D. Minn. 2012) (citing *In re Light Cigarettes Mktg. Sales Practices Litig.,* No. MDL 2068, 2011 WL 6151510, at *2 (D. Me. Dec. 12, 2011)); *see also* MULTIDIST LIT Rule 10.1 ("Typically, the transferee judge recommends remand of an action, or a part of it, to the transferor court at any time by filing a suggestion of remand with the Panel.").  The JPML gives great weight to the suggestion of the transferee judge, as "the transferee judge has a special vantage point with respect to the conduct of coordinated or consolidated pretrial proceedings under Section 1407, and his suggestion of remand to the Panel demonstrates that he perceives his role under Section 1407 to have ended."  *In re King Res. Co. Sec. Litig.*, 458 F. Supp. 220, 222 (J.P.M.L. 1978).

Given that the Court has announced its intent to sever the remaining B3 cases from the MDL, the time has come for a suggestion of remand as to Gortney's case.  Gortney therefore requests that his case be severed from the MDL and that the Court suggest to the JPML that his case be remanded or transferred back to the Northern District of Florida, Pensacola Division.

Should the Court conclude its February 25, 2020 Order Regarding Motions to Transfer Venue in Certain B3 Cases applies to Gortney's case, Gortney alternatively requests that this motion be construed as a motion to transfer venue back to the Northern District of Florida, Pensacola Division.  *See* Order (Doc. 26934) (indicating parties must file a motion to transfer venue to avoid waiving venue objections).

### III.    CONCLUSION

Plaintiff Brian Gortney respectfully requests that the Court sever his case from the MDL and suggest to the Judicial Panel on Multidistrict Litigation that the case be remanded to the Northern District of Florida, Pensacola Division.  To the extent that the Court construes its February 25, 2021 Order Regarding Motions to Transfer Venue in Certain B3 Cases applicable to

Gortney's case, he objects to the Court's continued venue in this case once it is severed from the MDL and seeks a remand to its federal court of origin.

Respectfully Submitted,

**THE LANIER LAW FIRM**

By:    */s/  Harvey Brown*         
              W. Mark Lanier
              State Bar No: 11934600
              Harvey G Brown, Jr.
              State Bar No: 03130500
              10940 W. Sam Houston Pwky N.
              Suite 100
              Houston, Texas 77069
              Telephone:  713.659.5200
              Facsimile:  713.659.2204
              Email: wml@lanierlawfirm.com
              Email: Harvey.brown@lanierlawfirm.com

**ATTORNEYS FOR PLAINTIFF**

8

**IN THE CIRCUIT COURT IN AND FOR WALTON COUNTY, FLORIDA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| BRIAN GORTNEY | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.:  _____ |
| | § | |
| BP, PL, BP PRODUCTS NORTH AMERICA, | § | |
| INC., BP AMERICA, INC., TRANSOCEAN, | § | |
| LTD., TRANSOCEAN OFSHORE DEEPWATER | § | |
| DRILLING, INC., TRANSOCEAN DEEPWATER, | § | |
| INC., and HALLIBURTON ENERGY SERVICES, | § | |
| INC. | § | **JURY TRIAL DEMANDED** |
| Defendants. | § | |
| | § | |
| | § | |

## COMPLAINT

Plaintiff, BRIAN GORTNEY (hereafter "Plaintiff"), files this action against the Defendants BP, PLC, BP PRODUCTS NORTH AMERICA, INC.,  BP AMERICA, INC. A/K/A BP AMERICA OF DELAWARE, INC., TRANSOCEAN, LTD., TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., TRANSOCEAN DEEPWATER, INC., and HALLIBURTON ENERGY SERVICES, INC (hereafter "Defendants"), and would show the Court as follows:

## INTRODUCTION

1.     For years, the mobile offshore drilling unit DEEPWATER HORIZON (hereafter "Deepwater Horizon" or the "Vessel") was engaged in dangerous, deep-water drilling of a well (the "Well") in a fragile ecosystem off the coast of Louisiana, at the Macondo Prospect of the Mississippi Canyon, Block 252, in the United States' Gulf of Mexico (the "Macondo Prospect"). Although its owners and operators were well aware of state and federal laws regulating oil drilling, the design, location and operation of the Vessel was not in compliance with these laws.  Although



EXHIBIT
A

its owners and operators were also aware of the dangers of oil spills — grave dangers that affected not only their employees, but potentially the lives, livelihoods, and health of millions of residents of the coastal region of the Gulf of Mexico (the "Gulf Coast"), the fragile Gulf of Mexico ecosystems, and tens of thousands of Gulf Coast businesses — they did not take adequate precautions to avoid them.  On April 20, 2010, their negligence in operating the Deepwater Horizon resulted in an oil spill that ultimately became the greatest environmental catastrophe in a generation.

2.      At about 10:00 p.m. Central Daylight Time on April 20, 2010, an explosion occurred on the Vessel.  Had the Vessel been properly equipped and maintained, the resulting fire could have been contained, but it had not been, and the fire raged unchecked.  Had the Vessel been equipped with a remote-controlled shut-off switch, like similar offshore drilling rigs operated by nations ranging from Brazil to Norway, the Well could have been shut-in, limiting the damage to the Vessel itself, but it was not. Consequently, the Vessel was destroyed and crude oil flowed from the Well unabated.  The Vessel sank on April 22, 2010, and thousands of barrels of crude oil per day gushed from the Well, resulting in a spill of an estimated 4.9 million barrels of oil and ultimately creating a thick and viscous slick larger than the state of Rhode Island (the "Oil Spill"). The Oil Spill caused catastrophic damages to businesses all along the Gulf Coast, wreaked havoc on the fragile marine and land ecosystems of the Gulf of Mexico, and caused harm to thousands or hundreds of thousands of Gulf Coast residents.  In some instances, that harm was and is both immeasurable and irreparable.

3.      Plaintiff, at the time a resident of Miramar Beach, Walton County, Florida, lived very near the Gulf Coast and was directly exposed to weathered crude oil in the form of tar balls, evaporated crude oil's many hydrocarbon constituents, and a toxic cocktail of dangerous dispersants and other chemicals that were both intentionally and unintentionally released by Defendants during and as a result of the Oil Spill.

2

**PARTIES**

4.     Named Plaintiff is Brian Gortney, who at the time was a resident of Walton County, Florida, and who resided approximately two tenths (0.2) of a mile from the Gulf Coast.

5.     Defendants herein are:

   a.     BP, PLC ("BP") is a British corporation doing business in the States of Louisiana, Texas, and Florida, and within this district.  Defendant BP may be served with process through its registered Agent at:  North American Headquarters, 28300 Torch Parkway, Warrenville, IL 60555-3938.

   b.     BP PRODUCTS NORTH AMERICA, INC. ("BP Products") is a Maryland corporation, with its principal place of business in Houston, Texas, and does business in the State of Florida and within this district.  Defendant BP Products may be served with process through its registered Agent at: The Prentice-Hall Corporation System, Inc., 1201 Hays Street, Tallahassee, Florida 32301.

   c.     BP AMERICA, INC. a/k/a BP America of Delaware Inc. ("BP America") is a Delaware corporation with its principal place of business in Warnerville, Illinois, but is doing business in the State of Florida and within this district. BP America, Inc. is a subsidiary of BP, PLC.  Defendant BP America may be served with process through its registered Agent at: CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

   d.     Defendants BP Products and BP America are wholly owned subsidiaries of the global parent corporation, BP, PLC, and they shall be referred to herein collectively as "BP."

   e.     TRANSOCEAN, LTD., ("Transocean, Ltd.") is a Swiss corporation doing business in the State of Florida and within this district. Defendant may be

served with process through its registered Agent at: Tumstrasse 30, CH-6300 Zug, Switzerland.

f.   TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC. ("Transocean Offshore") is a Delaware corporation with its principal place of business in Houston, Texas, and does business in the State of Florida and within this district.  Defendant Transocean Offshore may be served with process through its registered Agent at: Capitol Services, Inc., 1675 S. State St., Suite B, Dover, Delaware 19901.

g.   TRANSOCEAN DEEPWATER, INC. ("Transocean Deepwater") is a Delaware corporation with its principal place of business in Houston, Texas, and does business in the State of Florida and within this district.  Transocean Deepwater, Inc. is a subsidiary of Transocean Ltd.  Defendant Transocean Deepwater may be served with process through its registered Agent at: Capitol Services, Inc., 1675 S. State St., Suite B, Dover, Delaware, 19901.

h.   At all times material hereto, the Deepwater Horizon was owned, manned, possessed, managed, controlled, chartered and/or operated by Transocean and/or BP.

i.   HALLIBURTON ENERGY SERVICES, INC. ("Halliburton") is a Delaware corporation with two headquarters, one in Houston, Texas, and one in Dubai, United Arab Emirates, and which does business in the State of Florida.  On the Deepwater Horizon, Halliburton was engaged in the cementing of the well and well cap.  Defendant Halliburton may be served with process through its registered Agent at: Capitol Corporate Services, Inc., 155 Office Plaza Drive, Suite A, Tallahassee, Florida 32301.

**JURISDICTION AND VENUE**

6.     This Court has jurisdiction over this action because the claims brought by Plaintiff herein include negligence, intentional conduct and/or tortious conduct, which are recoverable under Florida law.

7.     Prosecution of this action in this court is proper because all the events or omissions giving rise to the claims asserted herein, as well as the toxic exposures described herein, and Plaintiff's illnesses, symptoms and health problems described herein, occurred in Walton County, Florida.

**FACTUAL ALLEGATIONS**

8.     Transocean, Ltd., Transocean Offshore and Transocean Deepwater (collectively "Transocean") are the owners and/or operators of the Deepwater Horizon, a semi-submersible mobile drilling rig, which was performing completion operations for BP, BP Products, and BP America on the Outer Continental Shelf, Macondo Prospect, at the site from which the Oil Spill arose, on April 20, 2010.

9.     BP, BP Products, and BP America (collectively "BP") are the holders of a lease of the Macondo Prospect granted by the United States Minerals Management Service that allows BP to drill for oil and perform oil-production-related operations at the site of the well and Oil Spill.  On April 20, 2010, BP operated the Well that was the source of the Oil Spill.

10.     Halliburton was engaged in cementing operations of the Well and Well cap and, upon information and belief, improperly and negligently performed these duties, increasing the pressure at the Well and contributing to the fire, explosion, and resulting oil spill.

11.     Below the Vessel, on the sea floor, ran the Well's drill string, riser and related piping.  The piping ran through a mechanical "cage" called a Blow-Out Preventer ("BOP"), whose purpose was to close-in the Well in the event of a major disruption.  The BOP was designed to

shut-in automatically when conditions constituting a blow-out developed, as well as to be shut-in manually by Defendants' personnel, officers, and representatives located above, on the Vessel.

12.     Although the purpose of a BOP is to shut-in and contain a well blow-out before it becomes dangerous, the BOP used by Defendants was not properly designed or maintained, and its systems were faulty.  Its shears did not mash and close the pipe as intended, and its solenoids and batteries failed, such that the BOP's shut-in system did not function.  The Defendants failed to install, monitor and maintain the BOP, which failed, contributing to the massive spill and resulting damages.

13.     Defendants knew or should have known that the BOP was defective, would not stop the flow of oil up the well-bore, and thus would not stop a massive oil spill.

14.     Upon information and belief, it is well-known in the oil extraction industry that oil rigs can be equipped with remote-controlled shut-off switches.  This inexpensive precaution allows the owner of the oil rig to close a well via remote signal in the event of a rig malfunction, thereby preventing an oil spill.  Because of their low cost and obvious safety benefits, remote-controlled shutoff switches are used in oil rigs throughout the world, in nations ranging from Brazil to Norway.

15.     Upon information and belief, Defendants, and each of them, were aware of the danger posed by not installing a remote-controlled shut-off switch on the Deepwater Horizon. Specifically, Defendants were aware that failing to install such a device on the Vessel would greatly increase the danger of an oil spill that would choke and poison thousands of square miles of marine and coastal ecosystems in the Gulf of Mexico, as well as injure, sicken and threaten the lives of thousands (if not hundreds of thousands) of residents along the Gulf Coast.  Defendants, who have made record profits in the past decade, were also aware that such a device could be installed on the Deepwater Horizon at negligible cost.

16.     Defendants, and each them, failed to install a remote-controlled shut-off switch on the Deepwater Horizon.

17.     At all times material hereto, the Deepwater Horizon was owned, manned, possessed, managed, controlled, chartered and/or operated by Transocean and/or BP.

18.     Upon information and belief, Defendants, and each of them, were fully aware that deep-water oil drilling is significantly more dangerous than drilling in other areas.  Defendants were fully aware that deep-water drilling cannot be carried out safely using equipment that is inadequately designed or poorly maintained.

19.     Although Defendants knew or should have known that the Deepwater Horizon had defective BOPs and was not equipped with a remote shut-off switch, Defendants used the Deepwater Horizon to drill the deepest oil well in history in September of 2009.

20.     On April 20, 2010, an explosion occurred in the Deepwater Horizon.  Because the defective BOPs failed to operate, the explosion was not contained, and fire spread throughout the Vessel.  Since Defendants were negligent and failed to equip the Vessel with a functioning remote shut-off switch, the Well was not – and could not be – shut-in.  The explosion and fire caused multiple leaks in the still-pressurized pipe through which the Vessel was extracting oil.  Within approximately a week after the catastrophe began, at least three leaks were reported.

21.     On April 22, 2010, the Deepwater Horizon sank, and it now sits under approximately 5,000 feet of water.  The ruptured well continued to spew oil into the Gulf of Mexico for approximately 80 days thereafter.  Approximately 4.9 million barrels of oil – or 210 million gallons – were spilled from the uncontrolled well before Defendants finally capped it and stemmed the flow.

22.     When Defendants learned of the Oil Spill, they reported that the Well was leaking approximately 1,000 barrels per day.  The Well, in fact, was leaking between 50,000 and 60,000 barrels, or up to 2.5 million gallons of oil, per day.  Defendants continuously and systematically

misrepresented the severity of the disaster by knowingly understating the amount of oil that was leaking from the Well.  Defendants, given their long history of drilling experience and their knowledge of the Macondo Prospect and the quantities of oil and pressures involved, knew or should have known that the inordinately low estimates they provided were grossly underreported and inaccurate, and that they would – and ultimately did – mislead governmental authorities and others to believe that the Oil Spill was not nearly as extensive, serious, or as dangerous to life, as it in fact was.

23.     On information and belief, Defendants knowingly impaired the response to the emergency, greatly increasing the danger to the environment, human health of residents up and down the Gulf Coast, and the entire regional economy.

24.     The spilled oil directly contaminated bodies of water that eventually moved inland, forming a vast expanse of thick, poisonous sludge that fouled an area larger than the state of Rhode Island.  The oil evaporated off of the surface of the waters of the Gulf of Mexico, and along with dispersants (including Corexit) and other chemicals that were sprayed onto and into the water, and even directly into the air, contaminated atmospheric air masses that then moved repeatedly and often continuously onto and through coastal areas, including Walton County, Florida.  This toxic vapor cloud poisoned residents and significantly affected life in the Gulf Coast region both during the Oil Spill, and after the Well was finally sealed in September 2010.  It's likely the effects continue as oil rises to the top of the water column.

25.     The Oil Spill caused enormous damage to human health, including that of Plaintiff. Several studies have linked oil contamination with significantly increased risk of cancer and other illnesses.  In addition, recent medical research suggests that potentially permanent genetic damage and epigenetic changes leading to meaningful adverse physiological effects, dysfunction, and disease are probable in cases of significant toxic exposure.

26.     Millions of Gulf Coast residents, including Plaintiff, were exposed to dangerous hydrocarbons, dispersants, and other toxins released during and by the Oil Spill.  Dispersants, including nearly 2 million gallons of COREXIT 9500 and/or COREXIT 9527 (together, "Corexit"), were released intentionally and excessively by BP (combined, the "Dispersants").  Some experts have stated that the use of the Dispersants can cause devastating long-term health effects, and others have concurred, indicating that they believe that the combination of the Dispersants and crude oil can be up to fifty two (52) times more toxic and harmful to life than either component alone.  By visiting the coastline, or simply breathing or being exposed to the air (both outdoors and in their homes), numerous Gulf Coast residents, including Plaintiff, have suffered the consequences of Defendants' negligence and/or gross negligence, and many will continue to suffer for decades to come.

27.     In addition, the Oil Spill crippled, and perhaps destroyed, hundreds of species of fish, birds, and other wildlife in one of the planet's richest marine ecosystems, including one of only two breeding grounds in the world for Atlantic bluefin tuna, greatly increasing the likelihood that this species will go extinct in the near future.

28.     The fire and explosion on the Deepwater Horizon, its sinking, and the resulting Oil Spill were caused by the inexcusable negligence and recklessness of Defendants, which renders them liable jointly, severally, and *in solido* to Plaintiff for all of his damages.

29.     The injuries and damages suffered by Plaintiff were caused by Defendants' knowing violations of numerous statutes and regulations, including, but not limited to statutes and regulations issued by OSHA and the United States Coast Guard, including the requirement to test the sub-sea BOPs at regular intervals.

30.     Defendants knew of the dangers associated with deep-water drilling, but failed to take appropriate measures to prevent damage to Plaintiff, a Gulf Coast resident, and perhaps hundreds of thousands of others similarly situated.

31.     The hydrocarbons, Dispersants, and related chemicals released during and by the Oil Spill caused extensive damage, illness, and adverse health effects to people along the Florida Gulf Coast, including Plaintiff.  Plaintiff was made ill by the Oil Spill, has been required to undergo extensive medical testing and care, has been diagnosed with a number of complex and multi-systemic illnesses, infections, and related medical conditions and complications, and is now required to follow a strict course of medical treatment, which includes a closely-maintained nutritional and dietary regimen, non-caloric dietary supplementation, and regular detoxification-related therapies.  Plaintiff must also minimize or avoid exposure to a multitude of chemicals and environmental toxins, or risk meaningful worsening of symptoms and the deterioration of his health.  These limitations on Plaintiff's routine everyday activities make normal functioning in society challenging, and in some cases impossible.  It is expected that Plaintiff's medical conditions, their related effects, and the need for treatment, will be ongoing.

32.     Due to his illnesses and injuries, Plaintiff has lost the ability to work.  Prior to Plaintiff's exposure to the Oil Spill, he was successful in creating, managing and running his own businesses.  However, due to the Spill, Plaintiff has not been able to continue with his work.  As a result, Plaintiff has lost substantial income, personal and business opportunities of great economic value, and other economic benefits, and these losses are expected to continue.

33.     Plaintiff was required to move far away from the Florida Gulf Coast in order to escape exposure to the toxic chemicals released by, during, and after the Oil Spill.  Having to move has caused Plaintiff additional damages.

34.     Plaintiff has experienced pain, suffering, and emotional distress as a result of his injuries, the illnesses caused by his exposure to toxic chemicals released by and during the Oil Spill, and by events caused by or proximal to both the Oil Spill and the negligent and/or grossly negligent actions and conduct of the Defendants.  Plaintiff is expected to continue to experience such injuries in the future.

35.     The Dispersants used and overused by the BP Defendants, including Corexit, are known to cause health issues.  The BP Defendants knew that Corexit had not been approved for use in the United Kingdom, but represented to all concerned that it was safe to use in the Gulf of Mexico and along the Gulf Coast, as an appropriate response to the Oil Spill.  In particular, as early as May 2010, the United States Environmental Protection Agency (the "EPA") recognized the toxicity of Corexit, noted that it was being used by the BP Defendants in their response to the Oil Spill in unapproved ways and in extreme quantities, and ordered the BP Defendants to either suspend its use and to find and use less toxic alternatives, or to provide an analysis of available dispersants and justification for the continued use of Corexit.  Following both a review of the BP Defendants' analysis (which was found deficient by the EPA and the United States Coast Guard) and additional study, the EPA ultimately required the BP Defendants to use 75% less Corexit, surface use was generally prohibited, and subsurface use was capped, reflecting the toxic nature of the substance and the potential for adverse environmental and health effects.  Despite these developments and the additional knowledge acquired by the BP Defendants, they continued to use these Dispersants in excessive amounts, undiluted or over-concentrated mixtures, improper or unauthorized areas, and by unsafe and prohibited means.

36.     The Dispersants used and overused, including Corexit, were not safe, and Defendants knew or should have known that the their use and overuse could or would result in both serious adverse health consequences for those living and working in the Gulf Coast region, and in damage to and destruction of delicate Gulf Coast ecosystems.

37.     There are many other potential effects from the Oil Spill that have not yet become known or understood, and Plaintiff reserves the right to amend this Complaint once additional information becomes available.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE)

38.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if copied herein.

39.     The fire, explosion and resulting oil spill was caused by the concurrent negligence of the Defendants.

40.     Upon information and belief, Plaintiff avers that the fire, explosion, and the resulting Oil Spill was caused by the joint negligence and fault of the Defendants in the following non-exclusive particulars:

    a.     Failing to properly maintain and operate the Deepwater Horizon;

    b.     Operating the Vessel in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill;

    c.     Failing to properly inspect the Vessel to assure that its equipment and personnel were fit for their intended purpose;

    d.     Acting in a careless and negligent manner, without due regard for the safety of others;

    e.     Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the Vessel which, if they had been so promulgated, implemented and enforced, would have averted the fire, explosion, sinking and oil spill;

    f.     Operating the Vessel with untrained and unlicensed personnel;

    g.     Inadequate and negligent training and hiring of personnel;

    h.     Failing to take appropriate action to avoid or mitigate the accident;

    i.     Negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

j.     Employing untrained or poorly trained employees and failing to properly train their employees;

k.     Failing to ascertain that the Vessel and its equipment were free from defects and/or in proper working order;

l.     Failure to timely warn;

m.     Failure to timely bring the oil release under control;

n.     Failure to provide appropriate accident-prevention equipment;

o.     Failure to observe and read gauges that would have indicated excessive pressures in the well;

p.     Failure to react to danger signs;

q.     Failure to equip the Vessel with working BOPs, and failure to test the BOPs to determine whether those installed were in fact working properly and as intended;

r.     Conducting well and well cap cementing operations improperly;

s.     Choosing to use and overuse toxic dispersants, including Corexit, when Defendants knew or should have known that such chemicals likely would be harmful to Gulf Coast residents (including Plaintiff) and the entire ecosystem of the Gulf of Mexico;

t.     Acting in a manner that justifies imposition of punitive damages;

u.     Failing to equip the Vessel with a properly-functioning remote shut-off switch;

v.     Impairing the emergency response by understating the extent of the oil leak in the days following April 20, 2010; and,

w.     Such other acts of negligence and omissions as will be shown at the trial of this matter; all of which acts are in violation of the laws of the State of Florida, and Federal law applicable on the Outer Continental Shelf.

41.     In addition, and in the alternative, the fire, explosion, sinking and resulting Oil Spill were caused by defective equipment, including the BOPs, which were in the care, custody, and control of Defendants.  Defendants knew or should have known of these defects and Defendants are, therefore, liable for them.

42.     The injuries to Plaintiff were also caused or aggravated by the fact that Defendants failed to take necessary actions to mitigate the dangers associated with their operations.

43.     In addition to the negligent actions described above, and in the alternative thereto, the injuries and damages suffered by Plaintiff were caused by the acts and/or omissions of the Defendants that are beyond proof by the Plaintiff, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the fire, explosion, sinking, and Oil Spill resulted from the negligence of Defendants.  Furthermore, the fire, explosion, sinking and the resulting Oil Spill would not have occurred had the Defendants exercised the high degree of care imposed on them, and Plaintiff, therefore, pleads the doctrine of *res ipsa loquitur*.

44.     Plaintiff is entitled to a judgment finding Defendants liable to Plaintiff for all damages suffered as a result of Defendants' negligence and awarding Plaintiff adequate compensation therefore in amounts determined by the trier of fact.

## SECOND CAUSE OF ACTION
## (TORTIOUS or INTENTIONAL CONDUCT)

45.     Defendants' conduct constitutes a tort under Florida law.

46.     The BP Defendants' conduct related to the use and release of dispersants was intentional.

## PRAYER FOR RELIEF

WHEREFORE, demand judgment against Defendants, jointly, severally and *in solido*, as follows:

a.    Economic and compensatory damages in amounts to be determined at trial;

b.    Past medical expenses;

c.    The reasonable current value of future medical expenses;

d.    The reasonable current value of the relative risks of developing cancer, of potentially permanent genetic damage, of potentially permanent epigenetic changes, and all related health problems, and of the fear and anticipation of developing same;

e.    Pain-and-suffering sustained in the past;

f.    Pain-and-suffering reasonably established to occur in the future;

g.    Pre-judgment and post-judgment interest at the maximum rate allowable by law;

h.    Attorneys' fees and costs of litigation;

i.    Such other and further relief available under all applicable Florida state law; and,

j.    A trial by jury as to all claims, against all Defendants.


Dated:  February 6, 2015.


Respectfully submitted,


/s/Stephen H. Echsner
STEPHEN H. ECHSNER
Florida Bar Number: 304719
FLORIDA BAR NO:
Aylstock, Witkin, Kreis
 & Overholtz, PLLC
17 East Main Street, Second floor
Pensacola, Florida  32502
Office:  (850) 202-1010
Fax:  (850) 916-7449
Email: sechsner@awkolaw.com
Service Email:  jlindsey@awkolaw.com;
sbaswell@awkolaw.com
Attorney for Plaintiff



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

| | |
|---|---|
| BRIAN GORTNEY,<br><br>        Plaintiff,<br><br>v.<br><br>BP PLC, BP PRODUCTS NORTH AMERICA INC., BP AMERICA INC., TRANSOCEAN, LTD., TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., TRANSOCEAN DEEPWATER, INC., and HALLIBURTON ENERGY SERVICES, INC.,<br><br>        Defendants. | CASE NO. 3:15-cv-118<br><br>On removal from the Circuit Court of the First Judicial Circuit in and for Walton County, Florida: Case No. 15-000055-CA |

**BP'S NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA, PENSACOLA DIVISION**

Pursuant to 28 U.S.C. §§ 1331, 1441, 1446; and 43 U.S.C. § 1349, Defendants BP Products North America Inc. and BP America Inc. (collectively, "BP") hereby give notice and remove this case to the United States District Court for the Northern District of Florida, Pensacola Division.

BP represents the following in accordance with the requirement of 28 U.S.C. § 1446(a) for a "short and plain statement of the grounds for removal":

<u>**Background and Procedural Requirements**</u>

1.      BP is a defendant in the matter styled "*Brian Gortney v. BP p.l.c., BP Products North America Inc., BP America Inc., Transocean Ltd., Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., and Halliburton Energy Services Inc.,*" pending in the Circuit Court of the First Judicial Circuit in and for Walton County, Florida, and bearing Case No. 15-000055-CA ("State Court Action").


EXHIBIT

B

2. Plaintiff filed his Complaint for Damages ("Complaint") in the State Court Action on February 24, 2015.

3. Defendant BP America Inc. was served with process in the State Court Action on March 2, 2015.

4. Defendant BP Products North America Inc. was served with process in the State Court Action on March 3, 2015.

5. This Notice of Removal is timely filed, as it is being filed within thirty days after receipt of the initial pleading setting forth the claims for relief and within thirty days of service of process as required by 28 U.S.C. § 1446(b), as computed pursuant to Fed. R. Civ. P. 6(a).

6. Pursuant to 28 U.S.C. § 1446(a), BP attaches as Exhibit A hereto a copy of all process, pleadings and orders served on BP in the State Court Action.

**Original Federal Jurisdiction Exists Over the Complaint Pursuant to OCSLA and the Federal Question Statute.**

7. The two grounds for removing the State Court Action to this Court relate to the fact that this lawsuit arises in connection with cleanup activities, organized under a complex body of federal statutes, that result from an oil spill occurring on the Outer Continental Shelf ("OCS" or "the Shelf") and thus are directly connected to drilling activities on the Shelf. Two jurisdictional consequences follow as a result: *First*, the State Court Action falls within the jurisdictional grant of the federal Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, *et seq. Second*, the OCS is a federal enclave, meaning that all cases arising from events on the Shelf arise under federal law, even if that law borrows its substance from a neighboring State.

8.     The Complaint states that the events giving rise to the action emanate from "the mobile offshore drilling unit DEEPWATER HORIZON . . . off the coast of Louisiana, at the Macondo Prospect of the Mississippi Canyon, Block 252, in the United States' Gulf of Mexico."  Compl. ¶ 1.  On "April 20, 2010, an explosion occurred on the Vessel," and according to Plaintiff, "[h]ad the Vessel been properly equipped and maintained, the resulting fire could have been contained" and "the Well could have been shut-in, limiting the damage to the vessel itself, but it was not."  *Id.* ¶ 2.   At the time of the blowout, BP held "a lease of the Macondo Prospect granted by the United States Minerals Management Service that allow[ed] BP to drill for oil and perform oil-production-related operations at the site of the well and Oil Spill.  On April 20, 2010, BP operated the Well that was the source of the Oil Spill."  *Id.* ¶ 9.

9.     Plaintiff alleges a host of negligent conduct with respect to the *Deepwater Horizon*'s operations on the OCS.  For example, Plaintiff asserts that BP "knew or should have known that the [Blow-Out Preventer] was defective," *id.* ¶ 13, and was "negligent and failed to equip the Vessel with a functioning remote shut-off switch," *id.* ¶ 20.  Plaintiff also itemizes over twenty "non-exclusive particulars" allegedly demonstrating BP's negligent conduct on the OCS, including: "[f]ailing to properly maintain and operate the Deepwater Horizon," *id.* ¶ 40(a), "failing to properly inspect the Vessel to assure that its equipment and personnel were fit for their intended purpose," *id.* ¶ 40(c), "[a]cting in a careless and negligent manner, without due regard for the safety of others," *id.* ¶ 40(d), "[n]egligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico," *id.* ¶ 40(i), "[f]ailing to ascertain that the Vessel and its equipment were free from defects and/or in proper working order," *id.* ¶ 40(k), and

"[c]onducting well and well cap cementing operations improperly," *id.* ¶ 40(r).  Plaintiff asserts that as a result of these and other alleged breaches of duties owed to Plaintiff, he suffered "injuries and damages."  *Id.* ¶ 43.

10.  Following the Macondo blowout, BP deployed "[d]ispersants, including nearly 2 million gallons of COREXIT 9500 and/or COREXIT 9527" to break up oil in the Gulf of Mexico.  *Id.* ¶ 26.  Plaintiff relies on statements of unnamed "experts" alleging that "the use of the Dispersants can cause devastating long-term health effects, and . . . the combination of the Dispersants and crude oil can be up to fifty two (52) times more toxic and harmful to life than either component alone."  *Id.*  Plaintiff alleges that he was "exposed to dangerous hydrocarbons, dispersants and other toxins released during and by the Oil Spill."  *Id.*

11.  <u>OCSLA Jurisdiction</u>:  This case is removable to this Court under the jurisdictional grant of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, *et seq*.  OCSLA provides, in relevant part, that "district courts of the United States shall have jurisdiction of cases and controversies ***arising out of, or in connection with*** (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals."  43 U.S.C. § 1349(b)(1) (emphasis added).

12.  OCSLA defines "minerals" to include "oil, gas, sulphur, geopressured-geothermal and associated resources."  43 U.S.C. § 1331(q).  "Exploration" is the "process of searching for minerals, including . . . any drilling."  43 U.S.C. § 1331(k).

13.  As Plaintiff notes, on April 20, 2010, the date the oil spill began, the *Deepwater Horizon* was on the Shelf in the Gulf of Mexico working at the Macondo well.  Compl. ¶ 8.  The

Fifth Circuit recently noted that the *Deepwater Horizon*'s purpose was to "drill the Macondo well, which is located on the sea floor at Mississippi Canyon Block 252." *Center for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 418 (5th Cir. 2013). These operations were part of BP's "exploration and drilling operations in the Gulf of Mexico." *Id.* The court in *Phillips v. BP p.l.c.*, 2010 WL 3257737 (N.D. Fla. Aug. 17, 2010) reached a similar conclusion: "[w]hen it exploded, the *Deepwater Horizon* was operating on the outer continental shelf. Its operations were part of the exploration for, and intended development and production of, continental-shelf oil." *Id.* at \*1.

14. Furthermore, the location at which the actual injury occurred is irrelevant to determining whether a federal district court has OCSLA jurisdiction. Indeed, the Fifth Circuit recently affirmed OCSLA jurisdiction over the removal of claims based on contamination of coastal waters and alleged harm to wildlife caused by the *Deepwater Horizon* incident. *In re: Deepwater Horizon*, 745 F.3d 157, 164 (5th Cir. 2014) (rejecting the argument that OCSLA requires that a plaintiff's injury occur on an OCSLA "situs" in order to trigger federal jurisdiction).

15. The State Court Action thus "aris[es] out of" and "in connection with" a drilling operation on the OCS. Plaintiff concedes this point by alleging that he "was made ill by the Oil Spill," Compl. ¶ 31, that he has been unable to work "due to the spill," *id.* ¶ 32, and that the "Oil spill arose, on April 20, 2010" at "the Outer Continental Shelf, Macondo Prospect" leased by BP, *id.* ¶ 8. Likewise, the litany of alleged negligent acts described by Plaintiff in the State Court Action relate to core, on-Shelf drilling operations. *See supra* ¶ 9.

16.     Moreover, Plaintiff claims to have suffered injuries resulting from exposure to crude oil from the blowout and chemical dispersants used in the response. *See supra* ¶ 9-10. As discussed above, the *Deepwater Horizon* was engaged in oil exploration at the time of the blowout. Thus the response effort, including "surface" and "subsurface" use of dispersants, Compl. ¶ 35, arose out of and in connection with operations covered by OCSLA. After all, the sole reason for undertaking the clean-up effort was to eliminate oil and gas flowing from the blown-out well and to comply with related obligations of federal law. *See Phillips* 2010 WL 3257737, at *1 (finding subject matter jurisdiction under § 1349(b)(1) "because, but for the explosion on Defendants' oil rig, Plaintiff would have no claim at all"). The *Deepwater Horizon*'s operations at the Macondo well were unquestionably related to oil exploration, and that sunken vessel is now resting on the seabed of the Shelf. As a result, this Court has original subject matter jurisdiction under 43 U.S.C. § 1349(b)(1)(A).

17.     <u>Federal Question Jurisdiction</u>: This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because the claims asserted arise in connection with a federal statute, namely, OCSLA, 43 U.S.C. § 1331 *et seq.*, and because claims involving federal enclaves like the OCS by their nature arise under federal law. Federal question claims ordinarily are subject to the well-pleaded complaint rule, but cases involving federal enclaves *unavoidably* involve federal and not state law, regardless of whether a plaintiff invokes federal law on the face of the complaint. Moreover, even if this were not true, OCSLA claims are not subject to the well-pleaded complaint rule. *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1205 (5th Cir. 1988) ("In determining federal court jurisdiction, we need not traverse the Serbonian Bog of the well pleaded complaint

rule . . . because § 23 of OCSLA expressly invests jurisdiction in the United States District Courts.").

18. OCSLA not only provides that federal courts have original jurisdiction over all cases arising out of Shelf operations, it also directly specifies that federal law governs as a substantive matter. *See* 43 U.S.C. § 1333(a)(1). Hence, federal question jurisdiction under 28 U.S.C. § 1331 inherently and unavoidably exists over claims that arise out of Shelf conduct without regard to claims made by plaintiffs that a source of law other than federal law, such as state tort law, controls.

19. Plaintiff's claims "arise under" federal law for purposes of removal under 28 U.S.C. § 1441(c) because OCSLA establishes a federal enclave on the Shelf. *In re: Deepwater Horizon*, 745 F.3d at 171; *see also Defenders of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242, 1246 (11th Cir. 2012) ("OCSLA governs federal offshore oil and gas leasing, exploration, and development . . . ."). Claims arising out of conduct within federal enclaves necessarily arise under federal law.

### Venue and Removal Under 28 U.S.C. §§ 1446(a), 1441

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1446(a), as the United States District Court for the Northern District of Florida, Pensacola Division is the District and Division in which the State Court Action was pending.

21. This matter is removable under 28 U.S.C. § 1441 as a civil action over which the United States District Court for the Northern District of Florida has original subject matter jurisdiction under 43 U.S.C. § 1349 and 28 U.S.C. § 1331.

22. Removal is timely, as this Notice is filed within 30 days of BP's receipt of the Complaint. *See* 28 U.S.C. § 1446(b)(2)(B) ("Each defendant shall have 30 days after receipt by or

service on that defendant of the initial pleading or summons described in paragraph (1) to file the notice of removal.").

## Effectuation of Removal

23.     BP hereby removes this action to the United States District Court for the Northern District of Florida, Pensacola Division.

24.     By filing this Notice of Removal, BP expressly consents to the removal.

25.     The consents of all Defendants that have been served are attached as Exhibit B.

26.     Pursuant to 28 U.S.C. § 1446(a), copies of all pleadings, as well as copies of all process and other papers, including the Complaint, on file in the record of the State Court Action which are within the possession, custody, and control of BP are attached as Exhibit A.

27.     The allegations of this Notice were true at the time the State Court Action was commenced and remain true as of the date of filing of this Notice of Removal.

28.     Undersigned counsel certifies that a notice of filing removal, along with a copy of this Notice of Removal, will be promptly filed with the Circuit Court of the First Judicial Circuit, in and for Walton County, Florida.

WHEREFORE, BP hereby removes this action to the United States District Court for the

Northern District of Florida, Pensacola Division.

Respectfully submitted on March 20, 2015.

OF COUNSEL:
KIRKLAND & ELLIS LLP
J. Andrew Langan, P.C.
Wendy L. Bloom
300 North LaSalle Street
Chicago, IL  60654
312-862-2000 (Tel)
312-862-2200 (Fax)
*Attorneys for BP America Inc. and*
*BP Products North America Inc.*

AKERMAN LLP
106 East College Avenue, Suite 1200
Tallahassee, FL  32301
Phone:  (850) 224-9634
Fax:  (850) 222-0103


By:  s/ Thomas A. Range
J. Riley Davis
Florida Bar Number:  118121
Thomas A. Range
Florida Bar Number:  568651
*Attorneys for BP America Inc. and*
*BP Products North America Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing has been filed on March 20, 2015 via CM/ECF, which will send a copy of this filing via electronic mail to all attorneys of record, and a copy has been furnished on March 20, 2015 via U.S. Mail and email to the following:

| | |
|---|---|
| Stephen H. Echsner<br>Aylstock, Witkin, Kreis & Overholtz, PLLC<br>17 E. Main St., Second Floor<br>Pensacola, FL 32502;<br>sechsner@awkolaw.com<br>jlindsey@awkolaw.com<br>sbaswell@awkolaw.com<br>Counsel for Plaintiff | James M. Talley<br>Kyle A. Diamantis<br>Baker, Donelson, Bearman, Caldwell &<br>Berkowitz, PC<br>SunTrust Center<br>200 South Orange Ave.<br>Orlando, FL 32802<br>jtalley@bakerdonelson.com<br>kdiamantis@bakerdonelson.com<br>vmcfarland@bakerdonelson.com<br>sdenny@bakerdonelson.com<br>fedcts@bakerdonelson.com<br>Counsel for the Transocean Defendants |
| Mark Barber<br>Broad & Cassel<br>100 North Tampa Street, Suite 3500<br>Tampa, FL 33602<br>mbarber@broadandcassel.com<br>Counsel for Halliburton Energy Services, Inc. | |

s/ Thomas A. Range

EXHIBIT A

 CT Corporation

**Service of Process Transmittal**
03/02/2015
CT Log Number 526667067

| | |
|---|---|
| **TO:** | LaTrisha Charles<br>BP America Inc.<br>501 Westlake Park Blvd, Matter: 21714 Vendor: 0080178147<br>Houston, TX 77079-2604 |

**RE:** **Process Served in Florida**

**FOR:** BP America of Delaware Inc. (Assumed Name) (Domestic State: DE)
BP America Inc. (True Name)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Brian Gortney, Pltf. vs. BP, PL, et al. including BP America, Inc. a/k/a BP America of Delaware, Inc., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Walton County Circuit Court, FL<br>Case # 2015CA55 |
| **NATURE OF ACTION:** | Personal Injury – Failure to Maintain Premises in a Safe Condition – On April 20, 2010 Mississippi Canyon, Block 252, United States 'Gulf of Mexico' |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Plantation, FL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 03/02/2015 at 12:35 |
| **JURISDICTION SERVED :** | Florida |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service of this summons upon that defendant, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | Stephen H. Echsner<br>Aylstock, Witkin, Kreis & Overholtz, PLLC<br>17 East Main Street, Second Floor<br>Pensacola, FL 32502<br>850-202-1010 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 03/02/2015, Expected Purge Date: 03/07/2015<br>Image SOP<br>Email Notification, Malika Herring malika.herring@bp.com<br>Email Notification, Melanie Johnson melanie.johnson@bp.com<br>Email Notification, LaTrisha Charles LaTrisha.Charles@bp.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 1200 South Pine Island Road<br>Plantation, FL 33324 |
| **TELEPHONE:** | 954-473-5503 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

Filing # 24149134 E-Filed 02/24/2015 04:02:16 PM

| SERVED | | | |
|---|---|---|---|
| / / | @ | : | AM/PM |

Server Initials_____ ID#_____

IN THE CIRCUIT COURT IN
AND FOR WALTON COUNTY, FLORIDA
CIRCUIT CIVIL DIVISION

BRIAN GORTNEY,
    Plaintiff,

    vs.

BP, PLC, BP PRODUCTS NORTH
AMERICA, INC., BP AMERICA, INC.
a/k/a BP AMERICA OF DELAWARE, INC.,
TRANSOCEAN, LTD., TRANSOCEAN
OFFSHORE DEEPWATER DRILLING,
INC., TRANSOCEAN DEEPWATER, INC.
and HALLIBURTON ENERGY SERVICES,
INC.,
    Defendants.

CASE NO: 2015-CA-55
DIVISION: SANTURRI

#1349
03/02/15
12:39pm

## SUMMONS

THE STATE OF FLORIDA:

TO ALL AND SINGULAR THE SHERIFFS OF THE STATE OF FLORIDA:

GREETINGS:

    YOU ARE HEREBY COMMANDED to serve this summons and a copy of the Complaint or petition in the above-styled cause upon the defendant(s):

    **CT Corporation Systems**
    **as Registered Agent for**
    **BP America, Inc. a/k/a**
    **BP America of Delaware, Inc.**
    **1200 South Pine Island Road**
    **Plantation, Florida 33324**

Each defendant is required to serve written defenses to said complaint or petition on plaintiff's attorney, whose name and address is:

    **STEPHEN H. ECHSNER, ESQ.**
    **AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC**
    **17 E. MAIN STREET, SUITE 200**
    **PENSACOLA, FL 32502**

within 20 days after service of this summons upon that defendant, exclusive of the day of service, and to

Electronically Filed Walton Case # 15000055CAAXMX 02/11/2015 10:49:44 AM

file the original said written defense with the clerk of said court either before service on plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

    WITNESS my hand and the seal of said Court on this \_\_\_\_\_ day of \_\_\_\_\_, 2015.

                            **ALEX ALFORD**
                            **CLERK OF COURT**

                            Deputy Clerk

Filing # 23470720 E-Filed 02/06/2015 02:08:51 PM

## IN THE CIRCUIT COURT IN AND FOR WALTON COUNTY, FLORIDA
## CIVIL DIVISION

| | | |
|---|---|---|
| BRIAN GORTNEY | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.: _____ |
| | § | |
| BP, PL, BP PRODUCTS NORTH AMERICA, | § | |
| INC., BP AMERICA, INC., TRANSOCEAN, | § | |
| LTD., TRANSOCEAN OFSHORE DEEPWATER | § | |
| DRILLING, INC., TRANSOCEAN DEEPWATER, | § | |
| INC., and HALLIBURTON ENERGY SERVICES, | § | |
| INC. | § | **JURY TRIAL DEMANDED** |
| Defendants. | § | |
| | § | |
| | § | |

## COMPLAINT

Plaintiff, BRIAN GORTNEY (hereafter "Plaintiff"), files this action against the Defendants

BP, PLC, BP PRODUCTS NORTH AMERICA, INC., BP AMERICA, INC. A/K/A BP

AMERICA OF DELAWARE, INC., TRANSOCEAN, LTD., TRANSOCEAN OFFSHORE

DEEPWATER DRILLING, INC., TRANSOCEAN DEEPWATER. INC., and HALLIBURTON

ENERGY SERVICES, INC (hereafter "Defendants"), and would show the Court as follows:

## INTRODUCTION

1.      For years, the mobile offshore drilling unit DEEPWATER HORIZON (hereafter

"Deepwater Horizon" or the "Vessel") was engaged in dangerous, deep-water drilling of a well (the

"Well") in a fragile ecosystem off the coast of Louisiana, at the Macondo Prospect of the

Mississippi Canyon, Block 252, in the United States' Gulf of Mexico (the "Macondo Prospect").

Although its owners and operators were well aware of state and federal laws regulating oil drilling,

the design, location and operation of the Vessel was not in compliance with these laws. Although

its owners and operators were also aware of the dangers of oil spills — grave dangers that affected not only their employees, but potentially the lives, livelihoods, and health of millions of residents of the coastal region of the Gulf of Mexico (the "Gulf Coast"), the fragile Gulf of Mexico ecosystems, and tens of thousands of Gulf Coast businesses — they did not take adequate precautions to avoid them. On April 20, 2010, their negligence in operating the Deepwater Horizon resulted in an oil spill that ultimately became the greatest environmental catastrophe in a generation.

2.     At about 10:00 p.m. Central Daylight Time on April 20, 2010, an explosion occurred on the Vessel. Had the Vessel been properly equipped and maintained, the resulting fire could have been contained, but it had not been, and the fire raged unchecked. Had the Vessel been equipped with a remote-controlled shut-off switch, like similar offshore drilling rigs operated by nations ranging from Brazil to Norway, the Well could have been shut-in, limiting the damage to the Vessel itself, but it was not. Consequently, the Vessel was destroyed and crude oil flowed from the Well unabated. The Vessel sank on April 22, 2010, and thousands of barrels of crude oil per day gushed from the Well, resulting in a spill of an estimated 4.9 million barrels of oil and ultimately creating a thick and viscous slick larger than the state of Rhode Island (the "Oil Spill"). The Oil Spill caused catastrophic damages to businesses all along the Gulf Coast, wreaked havoc on the fragile marine and land ecosystems of the Gulf of Mexico, and caused harm to thousands or hundreds of thousands of Gulf Coast residents. In some instances, that harm was and is both immeasurable and irreparable.

3.     Plaintiff, at the time a resident of Miramar Beach, Walton County, Florida, lived very near the Gulf Coast and was directly exposed to weathered crude oil in the form of tar balls, evaporated crude oil's many hydrocarbon constituents, and a toxic cocktail of dangerous dispersants and other chemicals that were both intentionally and unintentionally released by Defendants during and as a result of the Oil Spill.

2

## PARTIES

4.    Named Plaintiff is Brian Gortney, who at the time was a resident of Walton County,

Florida, and who resided approximately two tenths (0.2) of a mile from the Gulf Coast.

5.    Defendants herein are:

a.    BP, PLC ("BP") is a British corporation doing business in the States of
Louisiana, Texas, and Florida, and within this district. Defendant BP may be
served with process through its registered Agent at: North American
Headquarters, 28300 Torch Parkway, Warrenville, IL 60555-3938.

b.    BP PRODUCTS NORTH AMERICA, INC. ("BP Products") is a Maryland
corporation, with its principal place of business in Houston, Texas, and does
business in the State of Florida and within this district. Defendant BP Products
may be served with process through its registered Agent at: The Prentice-Hall
Corporation System, Inc., 1201 Hays Street, Tallahassee, Florida 32301.

c.    BP AMERICA, INC. a/k/a BP America of Delaware Inc. ("BP America") is a
Delaware corporation with its principal place of business in Warnerville,
Illinois, but is doing business in the State of Florida and within this district.
BP America, Inc. is a subsidiary of BP, PLC. Defendant BP America may be
served with process through its registered Agent at: CT Corporation System,
1200 South Pine Island Road, Plantation, Florida 33324.

d.    Defendants BP Products and BP America are wholly owned subsidiaries of the
global parent corporation, BP, PLC, and they shall be referred to herein
collectively as "BP."

e.    TRANSOCEAN, LTD., ("Transocean, Ltd.") is a Swiss corporation doing
business in the State of Florida and within this district. Defendant may be

3

served with process through its registered Agent at: Tumstrasse 30, CH-6300
Zug, Switzerland.

f.   TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC. ("Transocean
     Offshore") is a Delaware corporation with its principal place of business in
     Houston, Texas, and does business in the State of Florida and within this
     district. Defendant Transocean Offshore may be served with process through
     its registered Agent at: Capitol Services, Inc., 1675 S. State St., Suite B,
     Dover, Delaware 19901.

g.   TRANSOCEAN DEEPWATER, INC. ("Transocean Deepwater") is a
     Delaware corporation with its principal place of business in Houston, Texas,
     and does business in the State of Florida and within this district. Transocean
     Deepwater, Inc. is a subsidiary of Transocean Ltd. Defendant Transocean
     Deepwater may be served with process through its registered Agent at: Capitol
     Services, Inc., 1675 S. State St., Suite B, Dover, Delaware, 19901.

h.   At all times material hereto, the Deepwater Horizon was owned, manned,
     possessed, managed, controlled, chartered and/or operated by Transocean
     and/or BP.

i.   HALLIBURTON ENERGY SERVICES, INC. ("Halliburton") is a Delaware
     corporation with two headquarters, one in Houston, Texas, and one in Dubai,
     United Arab Emirates, and which does business in the State of Florida. On the
     Deepwater Horizon, Halliburton was engaged in the cementing of the well and
     well cap. Defendant Halliburton may be served with process through its
     registered Agent at: Capitol Corporate Services, Inc., 155 Office Plaza Drive,
     Suite A, Tallahassee, Florida 32301.

4

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action because the claims brought by Plaintiff herein include negligence, intentional conduct and/or tortious conduct, which are recoverable under Florida law.

7.      Prosecution of this action in this court is proper because all the events or omissions giving rise to the claims asserted herein, as well as the toxic exposures described herein, and Plaintiff's illnesses, symptoms and health problems described herein, occurred in Walton County, Florida.

## FACTUAL ALLEGATIONS

8.      Transocean, Ltd., Transocean Offshore and Transocean Deepwater (collectively "Transocean") are the owners and/or operators of the Deepwater Horizon. a semi-submersible mobile drilling rig, which was performing completion operations for BP, BP Products, and BP America on the Outer Continental Shelf, Macondo Prospect, at the site from which the Oil Spill arose, on April 20, 2010.

9.      BP, BP Products, and BP America (collectively "BP") are the holders of a lease of the Macondo Prospect granted by the United States Minerals Management Service that allows BP to drill for oil and perform oil-production-related operations at the site of the well and Oil Spill. On April 20, 2010, BP operated the Well that was the source of the Oil Spill.

10.     Halliburton was engaged in cementing operations of the Well and Well cap and, upon information and belief, improperly and negligently performed these duties, increasing the pressure at the Well and contributing to the fire, explosion, and resulting oil spill.

11.     Below the Vessel, on the sea floor, ran the Well's drill string, riser and related piping. The piping ran through a mechanical "cage" called a Blow-Out Preventer ("BOP"). whose purpose was to close-in the Well in the event of a major disruption. The BOP was designed to

5

shut-in automatically when conditions constituting a blow-out developed, as well as to be shut-in manually by Defendants' personnel, officers, and representatives located above, on the Vessel.

12. Although the purpose of a BOP is to shut-in and contain a well blow-out before it becomes dangerous, the BOP used by Defendants was not properly designed or maintained, and its systems were faulty. Its shears did not mash and close the pipe as intended, and its solenoids and batteries failed, such that the BOP's shut-in system did not function. The Defendants failed to install, monitor and maintain the BOP, which failed, contributing to the massive spill and resulting damages.

13. Defendants knew or should have known that the BOP was defective, would not stop the flow of oil up the well-bore, and thus would not stop a massive oil spill.

14. Upon information and belief, it is well-known in the oil extraction industry that oil rigs can be equipped with remote-controlled shut-off switches. This inexpensive precaution allows the owner of the oil rig to close a well via remote signal in the event of a rig malfunction, thereby preventing an oil spill. Because of their low cost and obvious safety benefits, remote-controlled shutoff switches are used in oil rigs throughout the world, in nations ranging from Brazil to Norway.

15. Upon information and belief, Defendants, and each of them, were aware of the danger posed by not installing a remote-controlled shut-off switch on the Deepwater Horizon. Specifically, Defendants were aware that failing to install such a device on the Vessel would greatly increase the danger of an oil spill that would choke and poison thousands of square miles of marine and coastal ecosystems in the Gulf of Mexico, as well as injure, sicken and threaten the lives of thousands (if not hundreds of thousands) of residents along the Gulf Coast. Defendants, who have made record profits in the past decade, were also aware that such a device could be installed on the Deepwater Horizon at negligible cost.

6

16.     Defendants, and each them, failed to install a remote-controlled shut-off switch on the Deepwater Horizon.

17.     At all times material hereto, the Deepwater Horizon was owned, manned, possessed, managed, controlled, chartered and/or operated by Transocean and/or BP.

18.     Upon information and belief, Defendants, and each of them, were fully aware that deep-water oil drilling is significantly more dangerous than drilling in other areas. Defendants were fully aware that deep-water drilling cannot be carried out safely using equipment that is inadequately designed or poorly maintained.

19.     Although Defendants knew or should have known that the Deepwater Horizon had defective BOPs and was not equipped with a remote shut-off switch, Defendants used the Deepwater Horizon to drill the deepest oil well in history in September of 2009.

20.     On April 20, 2010, an explosion occurred in the Deepwater Horizon. Because the defective BOPs failed to operate, the explosion was not contained, and fire spread throughout the Vessel. Since Defendants were negligent and failed to equip the Vessel with a functioning remote shut-off switch, the Well was not – and could not be – shut-in. The explosion and fire caused multiple leaks in the still-pressurized pipe through which the Vessel was extracting oil. Within approximately a week after the catastrophe began, at least three leaks were reported.

21.     On April 22, 2010, the Deepwater Horizon sank, and it now sits under approximately 5,000 feet of water. The ruptured well continued to spew oil into the Gulf of Mexico for approximately 80 days thereafter. Approximately 4.9 million barrels of oil – or 210 million gallons – were spilled from the uncontrolled well before Defendants finally capped it and stemmed the flow.

22.     When Defendants learned of the Oil Spill, they reported that the Well was leaking approximately 1,000 barrels per day. The Well, in fact, was leaking between 50,000 and 60,000 barrels, or up to 2.5 million gallons of oil, per day. Defendants continuously and systematically

7

misrepresented the severity of the disaster by knowingly understating the amount of oil that was leaking from the Well. Defendants, given their long history of drilling experience and their knowledge of the Macondo Prospect and the quantities of oil and pressures involved, knew or should have known that the inordinately low estimates they provided were grossly underreported and inaccurate, and that they would – and ultimately did – mislead governmental authorities and others to believe that the Oil Spill was not nearly as extensive, serious, or as dangerous to life, as it in fact was.

     23.     On information and belief, Defendants knowingly impaired the response to the emergency, greatly increasing the danger to the environment, human health of residents up and down the Gulf Coast, and the entire regional economy.

     24.     The spilled oil directly contaminated bodies of water that eventually moved inland, forming a vast expanse of thick, poisonous sludge that fouled an area larger than the state of Rhode Island. The oil evaporated off of the surface of the waters of the Gulf of Mexico, and along with dispersants (including Corexit) and other chemicals that were sprayed onto and into the water, and even directly into the air, contaminated atmospheric air masses that then moved repeatedly and often continuously onto and through coastal areas, including Walton County, Florida. This toxic vapor cloud poisoned residents and significantly affected life in the Gulf Coast region both during the Oil Spill, and after the Well was finally sealed in September 2010. It's likely the effects continue as oil rises to the top of the water column.

     25.     The Oil Spill caused enormous damage to human health, including that of Plaintiff. Several studies have linked oil contamination with significantly increased risk of cancer and other illnesses. In addition, recent medical research suggests that potentially permanent genetic damage and epigenetic changes leading to meaningful adverse physiological effects, dysfunction, and disease are probable in cases of significant toxic exposure.

26.     Millions of Gulf Coast residents, including Plaintiff, were exposed to dangerous hydrocarbons, dispersants, and other toxins released during and by the Oil Spill. Dispersants, including nearly 2 million gallons of COREXIT 9500 and/or COREXIT 9527 (together, "Corexit"), were released intentionally and excessively by BP (combined, the "Dispersants"). Some experts have stated that the use of the Dispersants can cause devastating long-term health effects, and others have concurred, indicating that they believe that the combination of the Dispersants and crude oil can be up to fifty two (52) times more toxic and harmful to life than either component alone. By visiting the coastline, or simply breathing or being exposed to the air (both outdoors and in their homes), numerous Gulf Coast residents, including Plaintiff, have suffered the consequences of Defendants' negligence and/or gross negligence, and many will continue to suffer for decades to come.

27.     In addition, the Oil Spill crippled, and perhaps destroyed, hundreds of species of fish, birds, and other wildlife in one of the planet's richest marine ecosystems, including one of only two breeding grounds in the world for Atlantic bluefin tuna, greatly increasing the likelihood that this species will go extinct in the near future.

28.     The fire and explosion on the Deepwater Horizon, its sinking, and the resulting Oil Spill were caused by the inexcusable negligence and recklessness of Defendants, which renders them liable jointly, severally, and *in solido* to Plaintiff for all of his damages.

29.     The injuries and damages suffered by Plaintiff were caused by Defendants' knowing violations of numerous statutes and regulations, including, but not limited to statutes and regulations issued by OSHA and the United States Coast Guard, including the requirement to test the sub-sea BOPs at regular intervals.

30.     Defendants knew of the dangers associated with deep-water drilling, but failed to take appropriate measures to prevent damage to Plaintiff, a Gulf Coast resident, and perhaps hundreds of thousands of others similarly situated.

31.     The hydrocarbons, Dispersants, and related chemicals released during and by the Oil Spill caused extensive damage, illness, and adverse health effects to people along the Florida Gulf Coast, including Plaintiff. Plaintiff was made ill by the Oil Spill, has been required to undergo extensive medical testing and care, has been diagnosed with a number of complex and multi-systemic illnesses, infections, and related medical conditions and complications, and is now required to follow a strict course of medical treatment, which includes a closely-maintained nutritional and dietary regimen, non-caloric dietary supplementation, and regular detoxification-related therapies. Plaintiff must also minimize or avoid exposure to a multitude of chemicals and environmental toxins, or risk meaningful worsening of symptoms and the deterioration of his health. These limitations on Plaintiff's routine everyday activities make normal functioning in society challenging, and in some cases impossible. It is expected that Plaintiff's medical conditions, their related effects, and the need for treatment, will be ongoing.

32.     Due to his illnesses and injuries, Plaintiff has lost the ability to work. Prior to Plaintiff's exposure to the Oil Spill, he was successful in creating, managing and running his own businesses. However, due to the Spill, Plaintiff has not been able to continue with his work. As a result, Plaintiff has lost substantial income, personal and business opportunities of great economic value, and other economic benefits, and these losses are expected to continue.

33.     Plaintiff was required to move far away from the Florida Gulf Coast in order to escape exposure to the toxic chemicals released by, during, and after the Oil Spill. Having to move has caused Plaintiff additional damages.

34.     Plaintiff has experienced pain, suffering, and emotional distress as a result of his injuries, the illnesses caused by his exposure to toxic chemicals released by and during the Oil Spill, and by events caused by or proximal to both the Oil Spill and the negligent and/or grossly negligent actions and conduct of the Defendants. Plaintiff is expected to continue to experience such injuries in the future.

35.     The Dispersants used and overused by the BP Defendants, including Corexit, are known to cause health issues. The BP Defendants knew that Corexit had not been approved for use in the United Kingdom, but represented to all concerned that it was safe to use in the Gulf of Mexico and along the Gulf Coast, as an appropriate response to the Oil Spill. In particular, as early as May 2010, the United States Environmental Protection Agency (the "EPA") recognized the toxicity of Corexit, noted that it was being used by the BP Defendants in their response to the Oil Spill in unapproved ways and in extreme quantities, and ordered the BP Defendants to either suspend its use and to find and use less toxic alternatives, or to provide an analysis of available dispersants and justification for the continued use of Corexit. Following both a review of the BP Defendants' analysis (which was found deficient by the EPA and the United States Coast Guard) and additional study, the EPA ultimately required the BP Defendants to use 75% less Corexit, surface use was generally prohibited, and subsurface use was capped, reflecting the toxic nature of the substance and the potential for adverse environmental and health effects. Despite these developments and the additional knowledge acquired by the BP Defendants, they continued to use these Dispersants in excessive amounts, undiluted or over-concentrated mixtures, improper or unauthorized areas, and by unsafe and prohibited means.

36.     The Dispersants used and overused, including Corexit, were not safe, and Defendants knew or should have known that the their use and overuse could or would result in both serious adverse health consequences for those living and working in the Gulf Coast region, and in damage to and destruction of delicate Gulf Coast ecosystems.

37.     There are many other potential effects from the Oil Spill that have not yet become known or understood, and Plaintiff reserves the right to amend this Complaint once additional information becomes available.

11

## FIRST CAUSE OF ACTION
## (NEGLIGENCE)

38.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if copied herein.

39.     The fire, explosion and resulting oil spill was caused by the concurrent negligence of the Defendants.

40.     Upon information and belief, Plaintiff avers that the fire, explosion, and the resulting Oil Spill was caused by the joint negligence and fault of the Defendants in the following non-exclusive particulars:

        a.     Failing to properly maintain and operate the Deepwater Horizon;

        b.     Operating the Vessel in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill;

        c.     Failing to properly inspect the Vessel to assure that its equipment and personnel were fit for their intended purpose;

        d.     Acting in a careless and negligent manner, without due regard for the safety of others;

        e.     Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the Vessel which, if they had been so promulgated, implemented and enforced, would have averted the fire, explosion, sinking and oil spill;

        f.     Operating the Vessel with untrained and unlicensed personnel;

        g.     Inadequate and negligent training and hiring of personnel;

        h.     Failing to take appropriate action to avoid or mitigate the accident;

        i.     Negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

12

j. Employing untrained or poorly trained employees and failing to properly train their employees;

k. Failing to ascertain that the Vessel and its equipment were free from defects and/or in proper working order;

l. Failure to timely warn;

m. Failure to timely bring the oil release under control;

n. Failure to provide appropriate accident-prevention equipment;

o. Failure to observe and read gauges that would have indicated excessive pressures in the well;

p. Failure to react to danger signs;

q. Failure to equip the Vessel with working BOPs, and failure to test the BOPs to determine whether those installed were in fact working properly and as intended;

r. Conducting well and well cap cementing operations improperly;

s. Choosing to use and overuse toxic dispersants, including Corexit, when Defendants knew or should have known that such chemicals likely would be harmful to Gulf Coast residents (including Plaintiff) and the entire ecosystem of the Gulf of Mexico;

t. Acting in a manner that justifies imposition of punitive damages;

u. Failing to equip the Vessel with a properly-functioning remote shut-off switch;

v. Impairing the emergency response by understating the extent of the oil leak in the days following April 20, 2010; and,

w. Such other acts of negligence and omissions as will be shown at the trial of this matter; all of which acts are in violation of the laws of the State of Florida, and Federal law applicable on the Outer Continental Shelf.

13

41.     In addition, and in the alternative, the fire, explosion, sinking and resulting Oil Spill were caused by defective equipment, including the BOPs, which were in the care, custody, and control of Defendants. Defendants knew or should have known of these defects and Defendants are, therefore, liable for them.

42.     The injuries to Plaintiff were also caused or aggravated by the fact that Defendants failed to take necessary actions to mitigate the dangers associated with their operations.

43.     In addition to the negligent actions described above, and in the alternative thereto, the injuries and damages suffered by Plaintiff were caused by the acts and/or omissions of the Defendants that are beyond proof by the Plaintiff, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the fire, explosion, sinking, and Oil Spill resulted from the negligence of Defendants. Furthermore, the fire, explosion. sinking and the resulting Oil Spill would not have occurred had the Defendants exercised the high degree of care imposed on them, and Plaintiff, therefore, pleads the doctrine of *res ipsa loquitur*.

44.     Plaintiff is entitled to a judgment finding Defendants liable to Plaintiff for all damages suffered as a result of Defendants' negligence and awarding Plaintiff adequate compensation therefore in amounts determined by the trier of fact.

## SECOND CAUSE OF ACTION
## (TORTIOUS or INTENTIONAL CONDUCT)

45.     Defendants' conduct constitutes a tort under Florida law.

46.     The BP Defendants' conduct related to the use and release of dispersants was intentional.

## PRAYER FOR RELIEF

WHEREFORE, demand judgment against Defendants, jointly, severally and *in solido*, as follows:

14

a.    Economic and compensatory damages in amounts to be determined at trial;

b.    Past medical expenses;

c.    The reasonable current value of future medical expenses;

d.    The reasonable current value of the relative risks of developing cancer, of

       potentially permanent genetic damage, of potentially permanent epigenetic changes,

       and all related health problems, and of the fear and anticipation of developing same;

e.    Pain-and-suffering sustained in the past;

f.    Pain-and-suffering reasonably established to occur in the future;

g.    Pre-judgment and post-judgment interest at the maximum rate allowable by law;

h.    Attorneys' fees and costs of litigation;

i.    Such other and further relief available under all applicable Florida state law; and,

j.    A trial by jury as to all claims, against all Defendants.

Dated:  February 6, 2015.

                              Respectfully submitted,

                              /s/Stephen H. Echsner
                              STEPHEN H. ECHSNER
                              Florida Bar Number: 304719
                              FLORIDA BAR NO:
                              Aylstock, Witkin, Kreis
                               & Overholtz, PLLC
                              17 East Main Street, Second floor
                              Pensacola, Florida 32502
                              Office: (850) 202-1010
                              Fax: (850) 916-7449
                              Email: sechsner@awkolaw.com
                              Service Email: jlindsey@awkolaw.com;
                              sbaswell@awkolaw.com
                              Attorney for Plaintiff

                                      15

.

.

.

.

.

16

EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

BRIAN GORTNEY,

               Plaintiff,

v.

BP PLC, BP PRODUCTS NORTH
AMERICA INC., BP AMERICA INC.,
TRANSOCEAN, LTD., TRANSOCEAN
OFFSHORE DEEPWATER DRILLING, INC.,
TRANSOCEAN DEEPWATER, INC., and
HALLIBURTON ENERGY SERVICES, INC.,

               Defendants.

CASE NO. 3:15-cv-118

On Removal from the Circuit Court of the
First Judicial Circuit, In and For Walton
County, Florida: Case No. 15-000055-CA

**CONSENT TO NOTICE OF REMOVAL BY DEFENDANTS TRANSOCEAN, LTD.,
TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC.,
AND TRANSOCEAN DEEPWATER, INC.**

Defendants Transocean, Ltd., Transocean Offshore Deepwater Drilling, Inc., and

Transocean Deepwater, Inc., pursuant to 28 U.S.C. § 1446, without waiving, and specifically

reserving, all rights, defenses, objections, and exceptions, hereby give notice they consent to the

Notice of Removal filed by Defendants BP Products North America Inc. and BP America Inc.

Dated: March 20, 2015

**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ, PC**

SunTrust Center
200 South Orange Avenue (32801)
Post Office Box 1549
Orlando, Florida 32802
Tel: (407) 422-6600
Fax: (407) 841-0325

By:   */s/ James M. Talley*
       JAMES M. TALLEY
       Florida Bar No.: 331961
       jtalley@bakerdonelson.com
       vmcfarland@bakerdonelson.com
       fedcts@bakerdonelson.com
       KYLE A. DIAMANTAS
       Florida Bar No.: 106916
       kdiamantas@bakerdonelson.com
       sdenny@bakerdonelson.com
       fedcts@bakerdonelson.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

BRIAN GORTNEY,

        Plaintiff,

v.

BP PLC, BP PRODUCTS NORTH
AMERICA INC., BP AMERICA INC.,
TRANSOCEAN, LTD., TRANSOCEAN
OFFSHORE DEEPWATER DRILLING, INC.,
TRANSOCEAN DEEPWATER, INC., and
HALLIBURTON ENERGY SERVICES, INC.,

        Defendants.

CASE NO. 3:15-cv-118

On Removal from the Circuit Court of the
First Judicial Circuit, In and For Walton
County, Florida: Case No. 15-000055-CA

## CONSENT TO NOTICE OF REMOVAL BY
## DEFENDANT HALLIBURTON ENERGY SERVICES, INC.

Defendant Halliburton Energy Services, Inc., pursuant to 28 U.S.C. § 1446, without waiving, and specifically reserving, all rights, defenses, objections, and exceptions, hereby gives notice it consents to the Notice of Removal filed by Defendants BP Products North America Inc. and BP America Inc. At this time Halliburton Energy Services, Inc. provides consent to removal of this action with the understanding that it is not making an appearance in this matter. Halliburton Energy Services, Inc. specifically reserves all defenses pursuant to Federal Rule of Civil Procedure 12(b), including lack of subject matter jurisdiction, lack of personal jurisdiction, improper venue, insufficient service of process, and failure to state a claim upon which relief can be granted.

Dated: March 20, 2015

Respectfully submitted,

**GODWIN LEWIS PC**

By:    /s/Donald E. Godwin
Donald E. Godwin, Attorney in Charge
Texas Bar Number 08056500
Don.Godwin@GodwinLewis.com
Bruce W. Bowman, Jr.
Texas Bar Number 02752000
Bruce.Bowman@GodwinLewis.com
Jenny L. Martinez
Texas Bar Number 24013109
Jenny.Martinez@GodwinLewis.com
Gavin E. Hill
Texas Bar Number 00796756
Gavin.Hill@GodwinLewis.com
Floyd R. Hartley, Jr.
Texas Bar Number 00798242
Floyd.Hartley@GodwinLewis.com

1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
Telephone: 214.939.4400
Facsimile: 214.760.7332

And

R. Alan York
Texas Bar Number 22167500
Alan.York@GodwinLewis.com

1331 Lamar, Suite 1665
Houston, Texas 77010
Telephone: 713.595.8300
Facsimile: 713.425.7594

**BROAD AND CASSEL**

By:    /s/ Mark M. Barber
Mark M. Barber
Florida Bar Number 0573701
mbarber@broadandcassel.com
Regions Bank Building
100 North Tampa Street, Suite 3500
Tampa, Florida 33602
Telephone: 813.225.3020
Facsimile: 813.225.3039

and

Ginger Barry Boyd
Florida Bar Number 0294550
gbarry@broadandcassel.com
4100 Legendary Drive
Suite 280
Destin, FL 32541
Telephone: 850.269.0148
Facsimile: 850.521.1472

**Counsel for Halliburton Energy Services, Inc.**

Case 2:10-md-02179-CJB-DPC Document 26970 Filed 03/15/21 Page 64 of 66
Case 2:10-md-02179-CJB-SS Document 16423 Filed 04/24/15 Page 1 of 2
Case MDL No. 2179   Document 1857   Filed 04/01/15   Page 1 of 2

# UNITED STATES JUDICIAL PANEL
## on
## MULTIDISTRICT LITIGATION

**IN RE: OIL SPILL BY THE OIL RIG
&QUOT;DEEPWATER HORIZON&QUOT; IN
THE GULF OF MEXICO, ON APRIL 20, 2010**                    MDL No. 2179

(SEE ATTACHED SCHEDULE)

### CONDITIONAL TRANSFER ORDER (CTO −125)

On August 10, 2010, the Panel transferred 44 civil action(s) to the United States District Court for the Eastern District of Louisiana for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *See* 731 F.Supp.2d 1352 (J.P.M.L. 2010). Since that time, 890 additional action(s) have been transferred to the Eastern District of Louisiana. With the consent of that court, all such actions have been assigned to the Honorable Carl J Barbier.

It appears that the action(s) on this conditional transfer order involve questions of fact that are common to the actions previously transferred to the Eastern District of Louisiana and assigned to Judge Barbier.

Pursuant to Rule 7.1 of the <u>Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation</u>, the action(s) on the attached schedule are transferred under 28 U.S.C. § 1407 to the Eastern District of Louisiana for the reasons stated in the order of August 10, 2010, and, with the consent of that court, assigned to the Honorable Carl J Barbier.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Eastern District of Louisiana. The transmittal of this order to said Clerk shall be stayed 7 days from the entry thereof. If any party files a notice of opposition with the Clerk of the Panel within this 7−day period, the stay will be continued until further order of the Panel.

FOR THE PANEL:

Jeffery N. Lüthi
Clerk of the Panel

Inasmuch as no objection is
pending at this time, the
stay is lifted.

Apr 01, 2015

CLERK'S OFFICE
UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**EXHIBIT**

tabbies®

C

Case 2:10-md-02179-CJB-DPC Document 26970 Filed 03/15/21 Page 65 of 66
Case 2:10-md-02179-CJB-SS Document 14423 Filed 04/01/15 Page 25 of 26
Case MDL No. 2179   Document 1857   Filed 04/01/15   Page 2 of 2

**IN RE: OIL SPILL BY THE OIL RIG**
**&QUOT;DEEPWATER HORIZON&QUOT; IN**
**THE GULF OF MEXICO, ON APRIL 20, 2010**                      MDL No. 2179

### SCHEDULE CTO−125 − TAG−ALONG ACTIONS

| DIST | DIV. | C.A.NO. | CASE CAPTION |
|------|------|---------|--------------|
| | | | |

FLORIDA NORTHERN

| | | | |
|------|------|---------|--------------|
| 15-1047 J(1)    FLN | 3 | 15−00118 | GORTNEY v. BP PLC et al |



**Fw: CORRECTION: CTO-125: MDL 2179, Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010**

FLNDdb_efile MDL   to: Sylvia Williams                               04/17/2015 07:20 AM
Sent by: Kimberly Westphal
Cc:        Travis Green

Thank you.
Kim

----- Forwarded by Kimberly Westphal/FLND/11/USCOURTS on 04/17/2015 08:20 AM -----

| | |
|---|---|
| From: | LAEDdb_Oilspill_mdl_Clerk/LAED/05/USCOURTS |
| To: | MDLClerks@flnd.uscourts.gov |
| Date: | 04/16/2015 02:34 PM |
| Subject: | CORRECTION: CTO-125: MDL 2179, Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 |
| Sent by: | Gail Chauvin |

**IN RE: MDL 2179, Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010**

Attached is a copy of the transfer order received from the Multidistrict Litigation Panel in Washington, D.C. It instructs that the above listed case(s) be transferred to our district for disposition pursuant to Title 28 USC 1407, as soon as possible. The order includes the case number(s) assigned to each action by the Eastern District of Louisiana.

When the case has been closed in your District, please follow these procedures:

1. Initiate the civil case transfer functionality in CM/ECF: **Extract Civil Case**;
2. When prompted to select the Court, choose **Eastern District of Louisiana**; and
3. In the **Remarks** section, please indicate **MDL 2179**

Should you have any questions regarding this request, please contact Gail Chauvin at (504)



589-7704.  10md2179 CTO-125.pdf