# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BRIAN J. DONOVAN

    Plaintiff,

v.

CARL J. BARBIER; STEPHEN J. HERMAN; JAMES P. ROY;
BRIAN H. BARR; SCOTT SUMMY; JEFFREY A. BREIT;
ELIZABETH J. CABRASER; PHILIP F. COSSICH, JR.;
ROBERT T. CUNNINGHAM; ALPHONSO MICHAEL EPSY;
CALVIN C. FAYARD, JR.; ROBIN L. GREENWALD;
COLSON HICKS EIDSON; RHON E. JONES; MATTHEW E.
LUNDY; MICHAEL C. PALMINTIER; PAUL M. STERBCOW;
MIKAL C. WATTS; JOSEPH F. RICE; CONRAD S.P. "DUKE"
WILLIAMS, III; KENNETH R. FEINBERG; THE GARRETSON
FIRM RESOLUTION GROUP, INC.; and PATRICK A. JUNEAU.

    Defendants.

_____/

8:2020cv 418 T 60 cpt

FILED IN CAMERA AND
UNDER SEAL PUSUANT
TO 31 U.S.C. § 3730(b)(2)

## **COMPLAINT**

Plaintiff/*qui tam* Relator Brian J. Donovan ("Plaintiff"), on behalf of the United States of

America (the "Government") and himself, files this action against Defendants Carl J. Barbier,

Stephen J. Herman, James P. Roy, Brian H. Barr, Scott Summy, Jeffrey A. Breit, Elizabeth J.

Cabraser, Philip F. Cossich, Jr., Robert T. Cunningham, Alphonso Michael Epsy, Calvin C.

Fayard, Jr., Robin L. Greenwald, Colson Hicks Eidson, Rhon E. Jones, Matthew E. Lundy,

Michael C. Palmintier, Paul M. Sterbcow, Mikal C. Watts, Joseph F. Rice, Conrad S.P. "Duke"

Williams, III, Kenneth R. Feinberg, The Garretson Firm Resolution Group, Inc., and Patrick A.

Juneau ("Defendants"). Based upon direct and independent personal knowledge, relevant

documents, information, and belief, Plaintiff specifically alleges as follows.

**Exhibit 1**

## NATURE OF ACTION

1. At approximately 10 p.m. on April 20, 2010, the U.S. Coast Guard District Eight command center in New Orleans, Louisiana received a report of an explosion and fire aboard the mobile offshore drilling unit *Deepwater Horizon* as it was engaged in drilling activities on the "Macondo Well" on the Outer Continental Shelf off the coast of Louisiana. On the morning of April 22, 2010, the *Deepwater Horizon* sank, resulting in a massive oil spill incident. Oil flowed into the Gulf of Mexico unchecked for months. Ultimately, the "Macondo Well" was finally sealed on September 19, 2010, nearly five months after the blowout began. By that time, millions of barrels of oil had been discharged into the Gulf of Mexico and upon adjoining shorelines, causing immense environmental and economic harm to the entire region.

2. This British Petroleum ("BP") oil well blowout in April 2010 is arguably the largest and most egregious mass tort in U.S. history. It has affected hundreds of thousands of individuals and businesses along the U.S. Gulf Coast and beyond. The full extent of damages may never be known.

3. The Judicial Panel on Multidistrict Litigation ("JPML") centralized all federal actions (excluding securities suits) in the MDL 2179 ("*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010") pursuant to 28 U.S.C. § 1407. All cases relating to the BP oil well blowout were transferred to the Eastern District of Louisiana on August 10, 2010. Defendants Herman and Roy were formally appointed by Defendant Barbier as Plaintiffs' Co-Liaison Counsel on August 27, 2010. Defendant Barbier formally appointed the seventeen defendants to the MDL 2179 Plaintiffs' Steering Committee ("PSC") on October 8, 2010.

4. Defendants, individually and/or in collusion with each other, fraudulently, recklessly, negligently and knowingly conceived, developed, and/or facilitated an "Eight-Step" fraudulent scheme to maximize judicial efficiency and/or maximize their compensation in exchange for limiting the liability of BP.

5. Rather than properly allege claims under the Oil Pollution Act of 1990 ("OPA"), a *strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA"), which governs the MDL 2179 personal injury and wrongful death actions and borrows the law of the adjacent state as surrogate federal law, the defendants, for the sole purpose of limiting BP's liability, state in their "B1" First Amended Master Complaint, "The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiffs hereby designate this case as an admiralty or maritime case, and request a non-jury trial, pursuant to Rule 9(h)."

6. Defendant Herman explains in a Loyola Law Review article (64 Loy. L. Rev. 1) which he authored in 2018: (1) the primary purpose of his appointment as Lead Counsel in MDL 2179 is to further the interests of judicial efficiency and economy [while maximizing his compensation]; and (2) his primary fiduciary duty is to Defendant Barbier. Herman states "the notion that some 'fiduciary duty' extends to individually retained counsel, in my view, *goes too far*." (Emphasis added).

7. In order to limit BP's liability, Defendants illegally transferred, and continue to illegally transfer, the majority of the BP oil well blowout economic and medical costs from BP (the "responsible party") to the Government.

8. The following facts are illustrative of how the defendants limited BP's liability for the

purpose of maximizing judicial efficiency and/or maximizing their compensation.

(a) Unbeknownst to the victims of the BP oil well blowout, Defendants and BP made the business decision to have BP pay a total amount of **$20 billion** to compensate all the BP oil well blowout victims in the settlement class action.

(b) The Feinberg-administered victims' compensation fund denied payment to approximately **61.46%** of the claimants who filed claims.

(c) Approximately **220,000** Feinberg-administered victims' compensation fund claimants who executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment (**$5,000** for individuals and **$25,000** for businesses) were subsequently excluded by Defendants Barbier, Herman, and Roy from the settlement class action.

(d) The compensation paid to Kenneth R. Feinberg by BP from June 15, 2010 to April 15, 2012 was approximately **$24,700,000**.

(e) Defendants fraudulently induced the MDL 2179 plaintiffs not to opt-out of the settlement.

(f) Defendant Juneau denied payment to approximately **60.03%** of the claims submitted to the Deepwater Horizon Claims Center (**"DHCC"**).

(g) The compensation paid to Defendant Juneau is unknown but ongoing.

(h) The defendants and BP negotiated a Medical Benefits Class Action Settlement Agreement which Defendant Barbier approved on January 11, 2013. In order to limit BP's liability, Defendants knowingly ignored the fact that public policy dictates that a toxic tort is a *strict liability* tort. Seventy-eight percent (**78%**) of Specified Physical Condition ("SPC") claims submitted to Defendant Garretson received either a "Request for Additional Information" or a "Notice of Defect." In the end, only 20% of claimants received any compensation. These claimants were forced to accept the lowest payment of **$1,300** because they could no longer wait for the money to cover their medical expenses.

(i) As part of Defendants' overall strategy to limit BP's liability, Defendant Barbier knowingly failed to hold BP fully accountable in regard to the Clean Water Act ("CWA") civil penalty. Defendant Barbier saved BP approximately **$4.30 billion** by finding that only 4.0 million barrels of oil, rather than 5.0 million barrels of oil proposed by the United States, exited the reservoir.

(j) Defendants Barbier and Herman also provided an extremely favorable payment schedule for BP in regard to the government entity settlements.

-4-

(k) The total compensation (comprised of common benefit fees, contingent fees, co-counsel fees, and hold-backs) paid to Defendants Herman, Roy, and the seventeen MDL 2179 PSC defendants was **$3.035 billion**.

9. The False Claims Act ("FCA") establishes liability for any person who:

"knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" 31 U.S.C. § 3729(a)(1)(A)
"knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" 31 U.S.C. § 3729(a)(1)(B) or
"knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or *knowingly and improperly avoids or decreases an obligation to pay* or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

10. Under the FCA, "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Defendants' false records or statements clearly influenced, or were capable of influencing, the receipt of money from the Government and the payment of money to the Government.

11. Given that the Feinberg-administered victims' compensation fund denied payment to approximately **61.46%** of the claimants who filed claims; Defendant Juneau denied payment to approximately **60.03%** of the claims submitted to the DHCC; and Defendant Garretson denied payment to approximately **80%** of the claims submitted under the Medical Benefits Class Action Settlement Agreement, the defendants are not able to argue that they did not violate the FCA because they did not know that the Government provided, or would be required to provide, funding.

12. In MDL 2179, as required in 31 U.S.C. § 3729(a)(1)(G), the Government was owed a specific, legal obligation pursuant to the Clean Water Act which is a *strict liability* statute. The Clean Water Act civil penalty was not merely a potential liability.

13. Plaintiff, on behalf of the Government and himself, brings this action to recover damages and civil penalties for violations of 31 U.S.C. § 3729(a)(1)(A), 31 U.S.C. § 3729(a)(1)(B), and 31 U.S.C. § 3729(a)(1)(G) by the defendants with respect to damages resulting from Defendants' "Eight-Step" fraudulent scheme to maximize judicial efficiency and/or maximize Defendants' compensation in exchange for limiting the liability of BP in MDL 2179.

14. Plaintiff, on behalf of the Government, his business, and himself, also brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., alleging that the defendants engaged in an "Eight-Step" scheme to fraudulently limit BP's liability for the purpose of maximizing judicial efficiency and/or maximizing their compensation.

15. In sum, Plaintiff Donovan brings this action on behalf of the Government and himself, specifically on behalf of the following Government payers and agencies:

A. Government Payer
Government Payer shall mean any federal governmental body, agency, department, plan, program, or entity that administers, funds, pays, contracts for, or provides medical items, services, and/or prescription drugs, including but not limited to the Medicare Program, the Medicaid Program, Tricare, the Department of Veterans Affairs, and the Department of Indian Health Services; provided, however, that the term Government Payer shall not include Medicare Part C or Part D Programs.

B. CMS
"CMS" shall mean the Centers for Medicare & Medicaid Services, the agency within the United States Department of Health and Human Services responsible for administration of the Medicare Program and the Medicaid Program.

C. Medicare
Congress established Medicare in 1965 to provide health insurance coverage for people aged sixty-five or older and for people with certain disabilities or afflictions. See 42 U.S.C. §§ 1395 *et seq.* Medicare is funded by the federal government and administered

by CMS, which is part of the United States Department of Health and Human Services ("HHS").

"Medicare Program" shall mean the Medicare Parts A and B federal program administered by CMS under which certain medical items, services, and/or prescription drugs are furnished to Medicare beneficiaries under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq.

"Medicare Part C or Part D Program" shall mean the program (or programs) under which Medicare Advantage, Medicare cost, and Medicare health care prepayment plan benefits and Medicare Part D prescription drug plan benefits are administered by private entities that contract with CMS.

D. Medicaid
The Medicaid program was established in 1965 and is codified as Title XIX of the Social Security Act. *See* 42 U.S.C. § 1396, *et seq.* Medicaid is a needs-based entitlement program providing joint federal and state funding of medical care for specified classes of individuals found to be unable to pay their own medical costs. It is administered by the states but financed with both state and federal funds. The federal government provides 50% to 83% of the costs of care and services. The exact percentage for a particular state, known as the federal medical assistance percentage, is calculated pursuant to a formula tied to the state's per capita income. *See* 42 U.S.C. § 1396d(b); 42 C.F.R. § 433.

Similar to state Medicaid agencies, the Department of Veterans Affairs ("VA") and Indian Health Services ("IHS") also pay for prescription drug benefits for individuals and are authorized by statute to recover the reasonable cost of medical care and services from liable third parties. With regard to the VA, the statute provides that the Government is subrogated to any right or claim that a beneficiary might have against a third party. 38 U.S.C. § 1729(b). With IHS, the statute provides that the Government, as well as IHS, have a right to recover against a liable third party. 25 U.S.C. § 1621e(a).

E. The U.S. Department of Labor's Office of Workers' Compensation Programs (OWCP).

F. The U.S. Department of Labor's Division of Longshore and Harbor Workers' Compensation (DLHWC).

G. The U.S. Small Business Administration (SBA).

H. The U.S. Department of Housing and Urban Development (HUD).

I. The U.S. Department of Agriculture's (USDA) Programs, including but not limited to, Food and Nutrition Service (FNS).

J. The U.S. Social Security Administration (SSA)

K. The U.S. Environmental Protection Agency (EPA) Programs, including but not limited to, the Clean Water Act (CWA).

16. Plaintiff Donovan has filed this suit because he believes that our federal justice system is not a sanctuary for Defendants to use for the purpose of carrying out their own massive, nefarious scheme in the name of "judicially-efficient" multidistrict litigation and to hold Defendants responsible for their "Eight-Step" fraudulent scheme which (1) transfers the BP oil well blowout economic and medical costs from BP (the "responsible party") to the Government and (2) turns "MDL 2179" into "the MDL 2179 Enterprise."

## JURISDICTION AND VENUE

17. Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over the subject matter of this action since it arises under the laws of the United States, in particular the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*

18. Venue is proper in this Court under 31 U.S.C. § 3732(a) because the defendants transact, or have transacted, substantial business in this judicial district.

19. There have been no public disclosures of the allegations or transactions contained herein that bar jurisdiction under 31 U.S.C. §3730(e).

## PARTIES

20. Since 2010 and at all times material herein, Plaintiff Donovan, a citizen of the United States of America, a taxpayer of the United States of America, and an attorney admitted to practice law in the State of Florida, the U.S. District Court, Middle District of Florida, and the U.S. Court of Appeals for the Eleventh Circuit, represented victims of the BP oil well blowout of

April 20, 2010 and victims of MDL 2179. Plaintiff Donovan's principal place of business is located in Hillsborough County at 3102 Seaway Ct., #304, Tampa, Florida 33629.

21. At all times material herein, Defendant Barbier, a resident of the State of Louisiana and a United States District Judge of the United States District Court for the Eastern District of Louisiana, served as the transferee judge for MDL 2179. The allegations in this complaint are brought against The Honorable Carl J. Barbier under each of the two exceptions to absolute judicial immunity. Defendant Barbier's principal place of business is located at 500 Poydras Street, Room C256, New Orleans, Louisiana 70130.

22. At all times material herein, Defendant Herman, a resident of the State of Louisiana and a partner at the law firm Herman, Herman & Katz, LLC, served as *pre-MDL 2179* Co-Liaison Counsel for all cases, including cases initially filed in the State of Florida and subsequently consolidated in the EDLA, Co-Liaison Counsel MDL 2179, Co-Lead Class Counsel for the BP Settlement Classes, Co-Lead Settlement Class Counsel for the Halliburton/ Transocean Settlement Class, member of the Plaintiffs' Executive Committee, Co-Chair of the Fee Committee, and *ex officio* member of the PSC. At all times material herein, Defendant Herman oversaw and steered the entire MDL 2179 "litigation" effort. This includes settlement negotiations with BP, Halliburton, and Transocean, as well as settlement approval, and settlement implementation, post-settlement administrative disputes, litigation, and appeals, approval, payment, and reimbursement of Shared Expenses and other general planning and administration, coordination with Defendants, Special Masters, the Court, the States, and the United States, case-management orders and procedures, public relations efforts, the monitoring of and coordination with the U.S. Judicial Panel on Multidistrict Litigation ("JPML"),

Government, and other satellite investigations, lawsuits, and proceedings, general communications, coordination, organization, and strategy. Herman's principal place of business is located at 820 O'Keefe Ave., New Orleans, Louisiana 70113.

23. At all times material herein, Defendant Roy, a resident of the State of Louisiana and a partner at the law firm Domengeaux Wright Roy & Edwards LLC, served as *pre-MDL* 2179 Co-Liaison Counsel for all cases, including cases initially filed in the State of Florida and subsequently consolidated in the EDLA, Co-Liaison Counsel in MDL 2179, Co-Lead Class Counsel for the BP Settlement Classes, a member of the Plaintiffs' Executive Committee, the Co-Chair of the Fee Committee, and *ex officio* member of the PSC. Defendant Roy, together with Defendant Herman, oversaw and steered the entire litigation effort. Roy's principal place of business is located at 556 Jefferson Street, Suite 500, Lafayette, Louisiana 70501.

24. At all times material herein, Defendant Barr, a resident of the State of Florida and a partner at the law firm Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A., served as a member of the MDL 2179 PSC. Defendant Barr was one of the primary attorneys that Co-Liaison Counsel relied upon for leadership and overall strategy. He was one of the primary attorneys responsible for PSC / Common Benefit Attorneys communications and PR. Barr participated in the BP Economic Settlement negotiations, and also participated in settlement implementation and the post-settlement disputes. Barr's principal place of business is located at 316 S Baylen Street, Ste. 600, Pensacola, FL 32502

25. At all times material herein, Defendant Summy, a resident of the State of Texas and a partner at the law firm Baron & Budd, P.C., served as a member of the MDL 2179 PSC. Defendant Summy was appointed to the Executive Committee and contributed to the

development of the scientific and environmental issues, assisted with the *pre-MDL* 2179

organization, and participated in various Executive Committee and PSC strategy discussions and

projects throughout the litigation. Summy's principal place of business is located at 3102 Oak

Lawn Ave Suite 1100, Dallas, TX 75219.

26. At all times material herein, Defendant Breit, a resident of the State of Virginia

and a partner at the law firm Breit, Drescher, Imprevento & Walker, P.C., served as a member of

the MDL 2179 PSC and committed substantially to the MDL 2179 "litigation." Breit's principal

place of business is located at 600 22nd Street, Suite 402, Virginia Beach, VA 23451.

27. At all times material herein, Defendant Cabraser, a resident of the State of California

and a partner at the law firm Lieff, Cabraser, Heimann & Bernstein, LLP, served as a member of

the MDL 2179 PSC. Defendant Cabraser played a lead role in the research, preparation, drafting

and other coordination of pleadings, briefs, and appeals. She participated in BP Settlement

Negotiations, the settlement approval process, the settlement implementation process, and the

post-settlement disputes. Defendant Cabraser was also involved in the development of economic

and property damages models. Cabraser's principal place of business is located at 275 Battery

Street, 29th Floor, San Francisco, CA 94111.

28. At all times material herein, Defendant Cossich, a resident of the State of Louisiana

and a partner at the law firm Cossich, Sumich, Parsiola & Taylor, L.L.C., served as a member of

the MDL 2179 PSC and contributed substantial efforts to the development of scientific and

environmental issues through the BP Settlements. Cossich's principal place of business is located

at 8397 Highway 23, Suite 100, Belle Chasse, Louisiana 70037.

29. At all times material herein, Defendant Cunningham, a resident of the State of

-11-

Alabama and a partner at the law firm Cunningham Bounds, LLC, served as a member of the MDL 2179 PSC and participated in the post-settlement "litigation" with BP, general settlement implementation in the program, and Class Counsel assistance to other plaintiffs' attorneys, CPAs and unrepresented claimants with their Settlement Program claims and appeals. Cunningham was also a member of the PSC whom Co-Liaison Counsel generally relied upon for leadership and overall strategy. Cunningham's principal place of business is located at 1601 Dauphin Street, Mobile, Alabama 36604.

30. At all times material herein, Defendant Epsy, a resident of the State of Mississippi and an attorney at the law firm Morgan & Morgan, P.A., served as a member of the MDL 2179 PSC; participated in the development of scientific, economic, and environmental issues; and assisted with the PSC / Common Benefit Attorney communication and PR efforts. Epsy's principal place of business is located at 4450 Old Canton Road, Suite 200, Jackson, Mississippi 39211.

31. At all times material herein, Defendant Fayard, a resident of the State of Louisiana and a partner at the law firm Fayard & Honeycutt APC, served as a member of the MDL 2179 PSC. He was the designated PSC member responsible for exploring settlement opportunities, working closely with Defendants Rice, Herman, and Roy on the BP Settlement negotiations. Fayard's principal place of business is located at 519 Florida Ave SW, Denham Springs, Louisiana 70726.

32. At all times material herein, Defendant Greenwald, a resident of the State of New York and a partner at the law firm Weitz & Luxenberg, P.C., served as a member of the MDL 2179 PSC. Greenwald served as a negotiator of the Medical Benefits Settlement and also played

a major role in Medical Settlement approval, implementation, administration, the post-settlement Chronic SPC dispute, and the BELO CMO. Greenwald's principal place of business is located at 700 Broadway, New York, NY 10003.

33. At all times material herein, Ervin A. Gonzalez, a former resident of the State of Florida and a partner at the law firm Colson Hicks Eidson, served as a member of the MDL 2179 PSC. Mr. Gonzalez passed away on June 8, 2017. Colson Hicks Eidson's principal place of business is located at 255 Alhambra Circle, Penthouse, Coral Gables, Florida 33134.

34. At all times material herein, Defendant Jones, a resident of the State of Alabama and a partner at the law firm Beasley Allen, served as a member of the MDL 2179 PSC. He made substantial contributions to the BP Economic Class Settlement negotiations and settlement implementation, both with respect to the BEL "matching" issues and with respect to the general Class Counsel assistance of plaintiffs' attorneys, CPAs, and unrepresented claimants with questions regarding Settlement Program claims and appeals. Defendant Jones also assisted with the general coordination of private and Government claims. Jones's principal place of business is located at 218 Commerce Street, Montgomery, Alabama 36104.

35. At all times material herein, Defendant Lundy, a resident of the State of Louisiana and a partner at the law firm Lundy, Lundy, Soileau & South, LLP, served as a member of the MDL 2179 PSC. He made substantial contributions to the negotiation and implementation of the Medical Settlement. Lundy's principal place of business is located at 501 Broad Street, Lake Charles, Louisiana 70601.

36. At all times material herein, Defendant Palmintier, a resident of the State of Louisiana and a partner at the law firm degravelles, Palmintier, Holthaus & Fruge, served as a

member of the MDL 2179 PSC. He assisted with the negotiation and drafting of the Assignment of BP Claims that was incorporated into the BP Economic & Property Damages Settlement. Palmintier's principal place of business is located at 618 Main Street, Baton Rouge, Louisiana 70801.

37. At all times material herein, Defendant Sterbcow, a resident of the State of Louisiana and a partner at the law firm Lewis, Kullman, Sterbcow & Abramson, LLC, served as a member of the MDL 2179 PSC and assisted with research and briefing, as well as general PSC duties and overall litigation strategy. Sterbcow's principal place of business is located at 601 Poydras Street, # 2615, New Orleans, Louisiana 70130.

38. At all times material herein, Defendant Watts, a resident of the State of Texas and a partner at the law firm Watts Guerra LLP, served as a member of the MDL 2179 PSC and was acquitted in the criminal trial that was held in the Southern District of Mississippi. Watts's principal place of business is located at 4 Dominion Dr. Building 3, Suite 100, San Antonio, Texas 78257.

39. At all times material herein, Defendant Rice, a resident of the State of South Carolina and a partner at the law firm Motley Rice LLC, served as a member of the MDL 2179 PSC. He worked closely with Co-Liaison Counsel with respect to the exploration of settlement opportunities and took the lead with respect to much of the settlement discussions with BP. He provided support with respect to GCCF outreach and supervision and was intimately involved in assisting Co-Liaison Counsel with settlement approval, settlement implementation, and the post-settlement "litigation" with BP. Rice's principal place of business is located at 28 Bridgeside Blvd., Mount Pleasant, South Carolina 29464.

40. At all times material herein, Defendant Williams, a resident of the State of Louisiana and a partner at the law firm Williams Law Group, LLC, served as a member of the MDL 2179 PSC. He provided continuous support within the depository, as well as general PSC duties and overall "litigation" strategy, and participated in the BP settlement negotiations. Williams's principal place of business is located at 909 Poydras Street, #1625, New Orleans, Louisiana 70112.

41. At all times material herein, Defendant Feinberg, a resident of the District of Colombia and Founder and Managing Partner of Feinberg Rozen, served as the fund administrator of the BP compensation fund in MDL 2179. Feinberg's principal place of business is located at 1455 Pennsylvania Avenue, NW, Suite 390 Washington, DC 20004.

42. At all times material herein, The Garretson Firm Resolution Group, Inc. d/b/a Garretson Resolution Group ("GRG"), served as the claims administrator of the Medical Settlement Agreement in MDL 2179. GRG's principal place of business is located at 7775 Cooper Road, Cincinnati, OH 45242.

43. On March 8, 2012, the MDL 2179 Court entered an Order creating a process to facilitate the transition from the Feinberg-administered BP compensation fund to the Court Supervised Claims Program ("CSCP") envisioned by the settlement. The CSCP was later renamed The Deepwater Horizon Claims Center ("DHCC"). At all times material herein, Defendant Juneau, a resident of the State of Louisiana served as the fund administrator of the CSCP/DHCC. Juneau's principal place of business is located at 1018 Harding Street, # 202, Lafayette LA, 70503.

## LEGAL BACKGROUND

### I. The Multidistrict Litigation Statute (28 U.S.C. § 1407)

44. In 1968, Congress enacted the Multidistrict Litigation Statute (28 U.S.C. § 1407), the statute to which the United States Judicial Panel on Multidistrict Litigation ("JPML") owes its existence. The multidistrict litigation ("MDL") statute provides, in pertinent part, "When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district *for coordinated or consolidated pretrial proceedings*. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be *for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions*. Each action so transferred ***shall be remanded*** by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated." (Emphasis added).

### II. The Oil Pollution Act of 1990 (33 U.S.C. § 2702)

#### A. The Text of the OPA Statute

45. OPA is a *strict liability* statute. In order to recover damages, a claimant merely needs to show that his or her damages "resulted from" the oil spill.

> OPA provides,
> "Each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages that result from such incident." 33 U.S.C. § 2702(a).

> The damages referred to in 33 U.S.C. § 2702(a) include, but are not limited to:
> "Damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which ***shall*** be recoverable by any claimant." 33 U.S.C. § 2702(b)(2)(E) (Emphasis added).

-16-

OPA further provides,
(a) "Payment or settlement of a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled **shall not** preclude recovery by the claimant for damages not reflected in the paid or settled partial claim." 33 U.S.C. § 2705(a) (Emphasis added); and
(b) "Payment of such a claim [i.e. payment to a claimant for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled] **shall not** foreclose a claimant's right to recovery of all damages to which the claimant otherwise is entitled under this Act or under any other law."
33 U.S.C. §§ 2715(b)(1) and (2) (Emphasis added).

46.  "Shall" means shall. The Supreme Court has made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the command. See *United States v. Monsanto*, 491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (by using "shall" in civil forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied").

47.  Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is mandatory and "may" is permissive. "The mandatory 'shall'….normally creates an obligation impervious to judicial discretion." *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).

**B. The Legislative History of the OPA Statute**
48.  OPA's legislative history is shot through with general statements indicative of congressional intent to ensure that all oil spill victims are fully compensated. 135 CONG. REC. H7959 (daily ed. Nov. 2, 1989) (statement of Rep. Tauzin) ("ensure that all victims are fully compensated"); 135 CONG. REC. H7964 (daily ed. Nov. 2, 1989) (statement of Rep. Hammerschmidt) ("ensure that all justified claims for compensation are satisfied"); 135 CONG. REC. H7969 (daily ed. Nov. 2, 1989) (statement of Rep. Dyson) ("assurances that damages arising from spills will be completely compensated"); 136 CONG. REC. H336 (daily ed. Feb. 7,

1990) (statement of Rep. Carper) ("ensure that those people or those businesses that are damaged by these spills are fairly and adequately compensated"); 136 CONG. REC. S7752 (daily ed. June 12, 1990) (statement of Sen. Mitchell) ("ensure the fullest possible compensation of oil spill victims"); S. REP. NO. 101–94, at 12 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 734. ("These provisions are intended to provide compensation for a wide range of injuries and are not so narrowly focused as to prevent victims of an oil spill from receiving reasonable compensation."); 135 CONG. REC. H7893 (daily ed. Nov. 1, 1989) (statement of Rep. Quillen) ("full, fair, and swift compensation for everyone injured by oil spills.").

> As the Supreme Court explained,
> "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

49. The text and the legislative history of the OPA statute are clear. OPA *expressly prohibits* Responsible Parties from engaging in a "Delay, Deny, Defend" strategy wherein the victims of an oil spill are starved and ultimately forced to sign a "Release and Covenant Not to Sue" in order to receive a miniscule payment amount for all damages, including future damages, they incur as a result of the oil spill.

**C. The Oil Spill Liability Trust Fund**

50. OPA provides the Oil Spill Liability Trust Fund ("OSLTF"), a trust fund administered by the U.S. Coast Guard through its National Pollution Funds Center ("NPFC"), to pay costs related to oil-spill-removal activities, property damages, and economic damages when the responsible party cannot or does not pay. In essence, OSLTF is an insurance policy, or backstop, for victims of an oil spill incident that are not fully compensated by the responsible party.

51.  An oil spill victim who wishes to raise a claim, without having to endure litigation, can do so under OPA by first presenting their claim to the responsible party and waiting 90 days. If the responsible party does not pay the claim, the claimant can resubmit to the NPFC, which manages OSLTF. From there, the NPFC compensates the victim, and the U.S. Attorney General must commence actions against the responsible party to collect the amount.

52.  OSLTF is intended to supplement payments made by the responsible party in the event that the responsible party exceeds a $75 million liability limit. It is funded by "a per barrel tax of 8 cents on petroleum products either produced in the United States or imported from other countries, reimbursements from responsible parties for costs of removal and damages, fines and penalties paid pursuant to various statutes, and interest earned on U.S. Treasury investments."

53.  Any person, including OSLTF, that pays compensation pursuant to OPA to any claimant for damages [resulting from an oil spill] shall be subrogated to all rights, claims, and causes of action that the claimant has under any other law. 33 U.S.C. § 2715(a).

54.  Moreover, at the request of the Secretary, the Attorney General shall commence an action on behalf of OSLTF to recover any compensation paid by OSLTF to any claimant pursuant to OPA, and all costs incurred by OSLTF by reason of the claim, including interest (including prejudgment interest), administrative and adjudicative costs, and attorney's fees. Such an action may be commenced against any responsible party or guarantor, or against any other person who is liable, pursuant to any law, to the compensated claimant or to OSLTF, for the cost or damages for which the compensation was paid. 33 U.S.C. § 2715(c).

55.  OSLTF is capped at $1 billion per incident.

56.  On June 15, 2012 at 12:11 PM, Plaintiff Donovan sent an email to Mr. Craig A.

Bennett, Director - NPFC, requesting an updated OSLTF status report in regard to the Deepwater Horizon oil spill incident. On June 15, 2012 at 12:53 PM, Director Bennett responded to Plaintiff Donovan via email stating "Spending against the OSLTF for the Deepwater Horizon oil spill incident is currently at $641 million."

### III. The Toxic Tort

57. "The long term effects [of the BP oil well blowout] on the environment and fisheries may not be known for many years."
> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 3830 at 31, August 26, 2011).

58. Gulf War Syndrome, or "Gulf War illness," is a serious illness that affects approximately 25 to 30 percent of the 700,000 U.S. veterans who served in the 1990 - 1991 Gulf War. These veterans' illnesses went untreated and mostly unacknowledged until 2008, when a congressional report titled "Gulf War Illness and the Health of Gulf War Veterans" was published. This complex of multiple concurrent symptoms typically includes persistent memory and concentration problems, and other chronic abnormalities not explained by well-established diagnoses. The symptoms of Gulf War Syndrome, which are still being suffered by between 175,000 and 210,000 U.S. veterans, are identical to the symptoms being experienced by the estimated 200,000 BP oil well blowout victims who were exposed to crude oil and/or dispersants.

59. The approximately 200,000 U.S. veterans who continue to suffer from Gulf War Syndrome receive disability benefits from the United States Department of Veterans Affairs. The estimated 200,000 BP oil well blowout victims who are experiencing symptoms identical to Gulf War Syndrome should receive equivalent disability benefits from BP.

60. The chronic illnesses being experienced by the victims of the BP oil well blowout who were exposed to crude oil and/or dispersants will probably be with them for the rest of their lives. According to Dr. Michael Robichaux, a large percentage of BP oil well blowout patients have experienced what he refers to as "Multiple Endocrinopathies." These disorders result in disruption of menses in women, impotence in many of the men, wide fluctuations of blood sugar, and disruption in the function of the adrenal glands.

61. Crude oil contains highly toxic chemicals such as benzene and n-hexane that can cause cancer, birth defects, and permanent nerve damage. Inhaling crude oil mist can cause chemical pneumonitis, a serious lung disease. Serious harm from crude oil that may not be recognized quickly includes liver, kidney, respiratory, reproductive, blood, immune, and nervous system damage.

62. The BP oil well blowout is an environmental toxic tort. Accordingly, damages can only be calculated based on projections of the timing of the ecosystem's recovery and associated economic losses. These complexities beg the question: Is it fair to place the burden on the victims of the BP oil well blowout to preserve the right to collect damages from BP that are not known to exist at the time of settlement?

63. A toxic tort is a tort claim that results from a plaintiff's exposure to toxic substances as a result of a defendant's actions. In traditional tort cases, personal injuries occur contemporaneously with the causing event, which allows the victim to recover reasonable expenses for past and future damages in a lump sum. In toxic tort cases, injuries are often not contemporaneous with exposure to the toxic substance and do not manifest until years after the exposure.

64. Typically, toxic tort laws impose *strict liability* on the responsible party whereby the claimant is entitled to recover not only the immediate costs, but also future damages that *result from* the incident. This liability is "analogous to negligence per se, but is not called negligence because a court makes determination judgment that the hazardous activity's value to the community is sufficiently great that the mere participation in the activity is not to be stigmatized as wrongdoing….The activity is simply required to pay its own way…., but it does pay with full tort damages." (VICTOR E. SCHWARTZ, ET AL., PROSSER, WADE AND SCHWARTZ'S TORTS 703-04 (Found. Press, 10th ed. 2000)).

65. Defendant Barbier, in his Order and Reasons [As to Motions to Dismiss the B1 Master Complaint], states "Offshore drilling operations are not considered ultra-hazardous." (Rec. Doc. 3830 at 28, Aug, 26, 2011). Although Defendant Barbier believes "*offshore* drilling operations are not considered ultra-hazardous," an unbiased, reasonable trier of fact would most certainly conclude that BP's Macondo *deep-water* exploratory well drilling operations are considered ultra-hazardous and hold BP strictly liable.

66. Another unique characteristic of toxic tort is that often the exposures involved injure thousands of people. This is important in an administrative sense; it impacts the way toxic tort claims are handled. In order to avoid the potential legal complexities of litigating each claim separately, settlements are usually reached before litigation ensues. With so much money at stake in environmental disasters, the responsible party is often eager to settle claims to avoid adverse rulings that can render the responsible party insolvent, or in a worst-case scenario, destroy an entire industry.

67. While alternative dispute resolution may be essential to expeditiously and efficiently

handling claims in mass toxic tort actions, the lack of judicial oversight raises concerns. In the absence of statutory guidelines, claimants lack many of the protections afforded under the conventional court system, rendering them vulnerable to unscrupulous settlement tactics that are likely to be used by the responsible party.

68.  Those who have attacked the legitimacy of the BP oil well blowout victims' compensation "fund" which was administered by Kenneth R. Feinberg have claimed that courts should refuse to enforce waiver provisions because of public policy, emphasizing the difference between justice in a tort context and in a contract context. Even when the contract is a full and genuine exercise of both parties' freedom to contract, contract provisions may offend public policy, in which case courts can and should refuse to enforce them. The issue is not whether the parties dealt wrongfully with each other, but whether the contract is or should be forbidden because it damages the public good.

69.  In evaluating the BP oil well blowout, one must consider that the unique characteristics of toxic tort render traditional-tort remedies inadequate to fully and justly compensate victims.

70.  Historically, in environmental catastrophes, courts have refused to allow parties to enter into covenants not to sue without a reopening provision, because **public policy dictates that a toxic tort is a *strict liability* tort** where the claimant is entitled to recover not only the immediate removal costs, but also future damages that result from such an incident.

-23-

### IV. MDL 2179 is Unconstitutional

71. In a settlement class action, an agreement to resolve the dispute is reached by the parties involved prior to the district court's ruling on a motion to certify the class.

72. In MDL 2179, Defendants and BP are not adversaries. They are cohorts expeditiously seeking judicial efficiency and the common objectives of closure, limited liability, and profit.

73. Defendants Herman, Roy, and the MDL 2179 PSC attorneys/dealmakers are privy to the settlement matrix and the confidential guidance document given to the claims administrator, which explains qualifying criteria for recovery. This knowledge allows Defendants Herman, Roy, and the PSC attorneys to tailor their own clients' claim submissions to maximize their payout (and Defendants Herman, Roy, and the PSC attorneys' contingent fees). This insider information also prompts Defendants Herman, Roy, and the PSC attorneys to seek and collect co-counsel fees for serving as co-counsel to non-PSC attorneys.

74. The settlement class action is always unconstitutional because it involves no litigation. A typical class action is legitimate because the interests of the plaintiffs and defendant are adverse. In that scenario, the monetary interests of class counsel, which are contingent on class recovery, are aligned with the absent class members' interest in maximum redress, incentivizing a presentation of the issues that benefits both equally. These incentives break down in the context of the non-adversarial settlement class action. Because class counsel seeks the same outcome as the defendant, she has no reason to formulate her clients' arguments or destroy her opponent's case. Particularly, she lacks incentive to present to the Court evidence that may shed unfavorable light upon the non-adversarial agreement, even though that evidence may

reveal critical details about the effect of the settlement on absent class members.

75. The Court needs to consider class settlements in terms of separation of powers because maintaining the limits of Article III's "case or controversy" requirements is fundamental for protecting the individual liberties of all. By authorizing a federal court to redistribute resources as a means of enforcing legislative directives absent an adversary adjudication, the settlement class action effectively transforms the Court into an administrative body, which is more appropriately located in the executive branch….and improperly transfers powers reserved to the executive branch to the federal judiciary, in clear contravention of separation-of-powers dictates.

### A. Where's the Case or Controversy in MDL 2179?

76. "Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund."
> The Honorable John G. Heyburn II, Chairman, Panel on Multidistrict Litigation, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Transfer Order, August 10, 2010).

77. "In February 2011, [only 4 months after I appointed my pre-selected cooperative attorneys to the PSC] negotiations began in earnest for the proposed Economic and Property Damages Settlement. Talks intensified in July 2011, occurring on an almost-daily basis."
> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 7138 at 3, December 21, 2012).

78. Article III extends federal judicial power solely to the adjudication of a "case" or a "controversy." "Case," in Article III, means a justiciable "action or suit," or an "argument." "Controversy" means a disagreement or a dispute between parties as to the suit's preferred outcome. Both a "case" and a "controversy" require an adversarial suit. For a suit to be

justiciable, according to the U.S. Supreme Court, the parties must maintain "adverse legal interests" throughout, and their dispute must be "definite and concrete." The Fifth Circuit has held that Article III plainly "requires that the parties be truly adverse."

79.  On the most basic analytical level, the unconstitutionality of the settlement class action should be obvious, purely as a matter of textual construction. There is simply no rational means of defining the terms "case" or "controversy" to include a proceeding in which, from the outset, nothing is disputed and the parties are in complete agreement. Moreover, from both historical and doctrinal perspectives, U.S. Supreme Court decisions could not be more certain that Article III is satisfied only when the parties are truly "adverse" to one another, which, at the time the relevant proceeding is undertaken, they are not in the case of the settlement class action."

80.  The most serious problem with the settlement class action is that by its nature it does not involve any live dispute between the parties that a federal court is being asked to resolve through litigation, and because from the outset of the proceeding the parties are in full accord as to how the claims should be disposed of, there is missing the adverseness between the parties that is a central element of Article III case-or-controversy requirement. The settlement class action, in short, is inherently unconstitutional.

81.  The term "collusion," in the class action context, is used to refer to a secret, unethical agreement between the named plaintiffs and defendant. For purposes of Article III's adverseness requirement, however, the term has a far broader meaning. It includes any suit in which, from the outset, the parties are in agreement as to the outcome.

82.  Article III proceeds on the assumption that a showing of a lack of adverseness at the

-26-

outset of a suit automatically establishes the improperly collusive nature of the suit. Article III adopts lack of adverseness as an ex ante, categorical basis on which to find inadequate representation of the interests of future litigants who are similarly situated.

83.  When the plaintiffs and defendant agree on settlement terms and the desirability of certification prior to coming to Court, neither party has the incentive to challenge such important questions as whether class representation is "adequate" or the claims are "typical" of the class as a whole. This inherently deprives the Court of the benefit of adversarial litigation concerning the satisfaction of Rule 23's requirements, thereby seriously limiting its ability to protect absent class members.

84.  In contrast to the case-by-case focus employed by class action scholars, Article III employs a far more categorical and prophylactic conception of "collusion." Article III makes an ex ante categorical judgment that a non-adversarial suit is inherently collusive and therefore in violation of constitutional norms. As the U.S. Supreme Court in *Poe v. Ullman*, construing Article III, explained: "The case may not be 'collusive'….in the sense of merely colorable disputes got up to secure an advantageous ruling from the Court. But the Court has found unfit for adjudication any cause that 'is not in any real sense adversary,' that 'does not assume the honest and actual antagonistic assertion of rights' to be adjudicated - a safeguard essential to the integrity of the judicial process, and one which we have held to be indispensable to adjudication of constitutional questions by this Court."

85.  The settlement class's fundamental constitutional defect is that *all* settlement classes - not merely those involving unethical attorney behavior - are, by definition, non-adversarial. An adversarial dispute cannot be said to exist at the time the class action proceeding

-27-

begins. At that point, the litigants differ over absolutely nothing. They have agreed on the terms of both certification and settlement prior to the filing of the class proceeding. In fact, the only conceivable reason that class counsel in this position files a complaint and request for certification with the Court, rather than simply embodying the terms of their private agreement in an enforceable contract, is to bind absent class members to a settlement negotiated in their absence."

### B. Where's the Due Process in MDL 2179?

86. "All motions, requests for discovery or other pre-trial proceedings with respect to plaintiffs shall be initiated by and/or coordinated through the Plaintiff Steering Committee ("PSC"), *to be filed by and through Plaintiffs' Liaison Counsel.* If the PSC does not support the motion, discovery or other requested proceeding, then the moving or requesting plaintiff shall be permitted to file such motion or request, but shall include a certificate of non-support."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 569 at 13, October 19, 2010).

87. "….all pending and future motions, including the Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 676 at 1, November 5, 2010).

88. "Any individual plaintiff who is a named plaintiff in a case that falls within Pleading Bundle B1, B3, D1, or D2, or any combination thereof, is deemed to be a plaintiff in the applicable Master Complaint(s)….All individual petitions or complaints that fall within Pleading Bundles B1, B3, D1, or D2, whether pre-existing or filed hereafter, are stayed until further order of the Court."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 983 at 2, 4, January 12, 2011).

89. Each claimant in an MDL has an individually held, constitutionally protected property right at stake. Those rights are guaranteed by the Fifth Amendment, which protects life, liberty, and property against deprivation absent due process of law. The "property" at stake in an MDL is the "chose in action." This historically established concept refers to the right to sue to enforce a legally protected claim, even the unlitigated right to sue. Under the Fifth Amendment, then, MDL claimants cannot be deprived of their rights to a chose in action without due process of law.

90. In MDL 2179, individual litigants, for all practical purposes, lose a substantial degree of control over the procedural fate of their claims. In sum, MDL 2179 fails to provide a constitutionally adequate opportunity to litigate.

91. The so-called "day-in-court ideal" is at the heart of constitutionally guaranteed procedural due process, according to the U.S. Supreme Court, and is central to the American conception of the adversarial model of litigation.

92. MDL 2179 severely undermines the day-in-court ideal by depriving individual litigants of their opportunity to protect their interests through the litigation process.

93. The right to one's own day-in-court means a right to meaningful control over litigation strategy and goals, including choice of legal representative. It requires a full and fair opportunity to litigate, which means a full opportunity to prepare one's own arguments and evidence. At base, meaningful participation in the adjudicatory process - the day-in-court ideal - includes, in the words of a respected scholar, "the right to observe, to make arguments, to present evidence, and to be informed of the reasons for a decision."

94. The U.S. Supreme Court has identified the "two central concerns of procedural due

-29-

process" to be "the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decision making process." The day-in-court ideal takes account of both of these concerns. First, an individual day-in-court helps achieve accurate outcomes (thus avoiding "unjustified or mistaken deprivations") because the stakeholders, those who will be most affected by the outcome and are the most motivated to protect their own rights, participate in the decision-making process. In addition, individual participation is inherently valuable in a democratic system because it legitimizes the adjudicating entities in the minds of the litigants.

95. On the surface, MDL practice seems largely innocuous; the JPML merely temporarily transfers cases to a different district court for pretrial matters. But for a variety of reasons transfer effectively amounts to the end of the road for the overwhelming majority of cases. This is troublesome from a constitutional perspective, because not even the most minimal protection of the day-in-court ideal from the perspective of either the paternalism or autonomy models is satisfied.

96. MDL 2179 plaintiffs in no sense meaningfully participate in, much less control, their day-in-court. Nor are there any assurances that those in charge of the litigation are adequately representing the interest of the individual claimants.

97. One key way that litigants control their day-in-court is by selecting their attorneys. This is often the first expression of their autonomy: they seek the advice of counsel when they consider whether to even file a claim.

98. Permitting litigants to choose their representatives is central to providing a full and fair opportunity to litigate. The foundations of due process dictate that that choice belongs to the

parties alone. But claimants forced into an MDL are deprived of that essential choice. By virtue of his case's transfer into the MDL - a move that the plaintiff cannot prevent - his chosen lawyer will invariably not be the one actually representing his interests in the course of all the important MDL. Rather, the lawyers on the court-appointed steering committee will take over, and they will do so without the protective assurances of either there adequacy, their good faith, or the extent to which the interests of the absent litigants truly overlap or any other controls.

99. When a transferee judge appoints a steering committee, he does so at his discretion, outside the strictures of any Federal Rule, or statute, or adversary proceeding. Appointment to the steering committee comes after nothing more than a judge-designated period of nominations and written objections. The process fails to guarantee that the appointed representatives will zealously advocate on behalf of absent litigants in the same way that their hired representative presumably would have. This is certainly the case in MDL 2179.

100. In addition to the fact that appointed counsel are selected by the Court, rather than by the individuals they represent, MDL claimants do not enjoy a traditional attorney-client relationship with the members of the court-appointed steering committee. The small group of attorneys chosen for leadership roles is charged with representing all of the possibly thousands of plaintiffs, whose cases have facts that are often only loosely linked.

101. MDL 2179 falls far short of providing the "deep-rooted historic tradition" of an individual's day-in-court.

102. In consolidated proceedings, the attorney's loyalty divides not only between clients, but also between clients and self-interest. Compensation for attorneys who work on behalf of the group depends upon the value of every plaintiff's settlement or judgment. As a result, PSC

attorneys may push hard for settlement as opposed to remand, prefer a quick settlement in favor of a protracted discovery period, or advocate for settlement terms that may not be particularly favorable to some or many plaintiffs. The First Circuit has acknowledged existence of this "inherent conflict of interest" between the PSC and individual plaintiffs in mass-tort MDLs.

103.  At the most basic level, MDL 2179 Plaintiffs are not given a meaningful opportunity to present their case(s), as demanded by the Due Process Clause.

## V. Defendant Barbier Does Not Have Absolute Judicial Immunity

104.  The U.S. Supreme Court noted that there are only two incidents where absolute judicial immunity does not apply: (1) where the actions of the judge are not considered to be judicial acts; and (2) where the judge acts in a complete absence of all jurisdiction. *Mireles v. Waco*, 502 U.S. 9 (1991).

105.  In *Forrester v. White*, 484 U.S. 219, 229 (1988), the U.S. Supreme Court held that a judge's exercise of administrative functions, such as "….overseeing the efficient operation of a court - may have been quite important in providing the necessary conditions of a sound adjudicative system," but such administrative decisions "were not themselves judicial or adjudicative." The Court determined that administrative actions, when completed by judges, do not allow the judge to be protected by immunity.

106.  When a judge knows that he lacks jurisdiction, or acts in the face of clearly valid statutes expressly depriving him of jurisdiction, judicial immunity is lost. *Rankin v. Howard*, (1980) 633 F.2d 844, cert den. *Zeller v. Rankin*, 101 S.Ct. 2020, 451 U.S. 939, 68 L.Ed 2d 326.

107.  The U.S. Supreme Court has insisted that a judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority;

rather, he will be subject to liability only when he has acted in the "clear absence of all jurisdiction." *Stump v. Sparkman*, 435 U.S. 349 (1978).

108. In MDL 2179, Defendant Barbier acts in the clear absence of all jurisdiction.

**A. The MDL Statute**

109. The MDL Statute (28 U.S.C. § 1407), provides, in pertinent part, "When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district *for coordinated or consolidated pretrial proceedings*. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be *for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions*. Each action so transferred ***shall be remanded*** by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated." (Emphasis added).

110. "Shall" means shall. The Supreme Court has made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the command. See *United States v. Monsanto*, 491 U.S. 600, 607, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989).

111. Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is mandatory and "may" is permissive. "The mandatory 'shall'....normally creates an obligation impervious to judicial discretion." *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).

112. Judge Alex Kozinski characterizes self-transfer in MDL as "a remarkable power grab by federal judges," because the practice exceeds the authority Congress granted to transferee judges.

113. Judge Patrick E. Higginbotham further explains, "The disconnect between the power of the transferee judge and the power that the judge exercises rests on a statute that authorizes only the transfer of cases to that judge for purposes of pretrial proceeding with return to their filing homes, as the U.S. Supreme Court made clear in *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*. The rest of the operation finds its footing in some form of consent and assertions of implied and inherent authority sometimes on little more than empty air."

114. In sum, "each action so transferred [to MDL 2179] ***shall be remanded*** by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred."

115. Since Defendant Barbier knows he lacks jurisdiction and acts in the face of 28 U.S.C. § 1407, a clearly valid statute expressly depriving him of jurisdiction (other than for purposes of pretrial proceeding with return of transferred cases to their filing homes), judicial immunity is lost.

**B. A "Case" or "Controversy" Does Not Exist in MDL 2179**

116. Article III extends federal judicial power solely to the adjudication of a "case" or a "controversy." "Case," in Article III, means a justiciable "action or suit," or an "argument." "Controversy" means a disagreement or a dispute between parties as to the suit's preferred outcome. Both a "case" and a "controversy" require an adversarial suit. For a suit to be justiciable, according to the U.S. Supreme Court, the parties must maintain "adverse legal interests" throughout, and their dispute must be "definite and concrete." The Fifth Circuit has also held that Article III plainly "requires that the parties be truly adverse."

117. In the transfer order establishing MDL 2179, the JPML states,

"Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund."
    The Honorable John G. Heyburn II, Chairman, Panel on Multidistrict Litigation, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Transfer Order, August 10, 2010).

118. "In February 2011, [only 4 months after I appointed my pre-selected cooperative attorneys to the PSC settlement,] negotiations began in earnest for the proposed Economic and Property Damages Settlement. Talks intensified in July 2011, occurring on an almost-daily basis."
    The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 7138 at 3, December 21, 2012).

119. From the very beginning, there was never a "case" or "controversy" in MDL 2179. Defendant Barbier knows the MDL 2179 parties (Defendants who are PSC members or Liaison Counsel and BP) never maintained "adverse legal interests" throughout, and their dispute was never "definite and concrete." There is simply no rational means of defining the terms "case" or "controversy" to include a proceeding in which, from the outset, nothing is disputed and the parties are in complete agreement.

120. As a result of Defendant Barbier's use of a Feinberg-administered victims' compensation fund and a settlement class action, MDL 2179 is not a justiciable "action or suit," or an "argument." Defendant Barbier has effectively transformed MDL 2179 into an administrative body. Accordingly, judicial immunity is lost.

## VI. The False Claims Act

121. The False Claims Act ("FCA") establishes liability for any person who:

"knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" 31 U.S.C. § 3729(a)(1)(A)
"knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" 31 U.S.C. § 3729(a)(1)(B) or
"knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

122. Under the FCA, "knowing" and "knowingly" mean that a person, with respect to information:

"(i) has actual knowledge of the information;
(ii) acts in deliberate ignorance of the truth or falsity of the information; or
(iii) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b)(1)(A)-(B).

123. Under the FCA, "obligation" means "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

124. Under the FCA, "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

### A. Presentment and False Statement Actions
125. A lawsuit alleging that a defendant made a false claim for payment in violation of 31 U.S.C. § 3729(a)(1)(A) is commonly known as a "presentment" action. In such actions, the relator maintains that the defendant made a material "presentment claim" - *i.e.,* an explicitly false or fraudulent demand, for payment.

-36-

126. In sum, a count brought under 31 U.S.C. § 3729(a)(1)(A) has three elements:

"(i) the defendant submitted a claim [for payment] to the government,
(ii) the claim was false, and
(iii) the defendant knew the claim was false."
     *United States ex rel. Folliard v. CDW Tech. Servs., Inc.,* 722 F.Supp.2d 20, 26
     (D.D.C. 2010) (quoting *United States ex rel. Westrick v. Second Chance Body*
     *Armor, Inc.,* 685 F.Supp.2d 129, 134 (D.D.C. 2010)).

127. A lawsuit brought under 31 U.S.C. § 3729(a)(1)(B) - referred to as a "false

statement action" - is complementary to a count brought under 31 U.S.C. § 3729(a)(1)(A)

because subsection (a)(1)(B) is "designed to prevent those who make false records or statements

in order to get claims paid or approved from escaping liability solely on the ground that they did

not *themselves* present a claim for payment or approval." *United States ex rel. Totten v.*

*Bombardier Corp.,* 380 F.3d 488, 501 (D.C. Cir. 2004) (emphasis in original). Reflecting this,

the elements for a count brought under section 3729(a)(1)(B) are practically identical to the

requirements for a count brought under section 3729(a)(1)(A). *See Folliard,* 722 F.Supp.2d at 36.

The only notable difference is that, as the language suggests, section 3729(a)(1)(B) requires

evidence that the defendant made a false *statement* to the government, as opposed to the

submission of a false *claim* for payment. *Compare* 31 U.S.C. § 3729(a)(1)(B) *with*

§ 3729(a)(1)(A).

**B. Reverse False Claim**

128. 31 U.S.C. § 3729(a)(1)(G) provides a cause of action where the defendant has made

what is commonly known as a "reverse" false claim. *United States ex rel. Landis v. Tailwind*

*Sports Corp.,* No. 10–cv–00976, 51 F.Supp.3d 9, 55, 2014 WL 2772907, at *30 (D.D.C. 2014).

A reverse false claim is any fraudulent conduct that "results in no payment to the government

when a payment is obligated." *Hoyte v. Am. Nat'l Red Cross,* 518 F.3d 61, 63 n. 1 (D.C. Cir.

-37-

2008) (quoting *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004)). Section 3729(a)(1)(G) specifically imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. 31 U.S.C. § 3729(a)(1)(G). Whereas a traditional false claim action involves a false or fraudulent statement made to the government to support a claim for money from the government, a typical reverse false claim action involves a defendant knowingly making a false statement in order to *avoid* having to pay the government when payment is otherwise due. *United States v. Caremark, Inc.,* 634 F.3d 808, 814–15 (5th Cir. 2011).

129.  To recover for a reverse false claim, "the United States must demonstrate that it was owed a specific, legal obligation....The obligation cannot be merely a potential liability: instead, in order to be subject to the penalties of the [FCA], a defendant must have had a present duty to pay money...." *United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 773 (8th Cir. 1997). As further explained by the Sixth Circuit: A defendant does not execute a reverse false claim by engaging in behavior that might or might not result in the creation of an obligation to pay...the government. Contingent obligations - those that will arise only after the exercise of discretion by government Actors - are not contemplated by the statute. *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 738 (6th Cir. 1999).

### C. The Fraud Enforcement and Recovery Act of 2009 ("FERA")
130.  The U.S. Supreme Court's unanimous decision in *Allison Engine v. United States ex rel. Sanders*, 128 S. Ct. 2123 (2008) limited the reach of FCA liability by holding that a defendant must have the specific intent to get a false claim paid or approved by the

government. FERA, however, eliminates the provision interpreted by the Supreme Court to require specific intent and replaces it with the less demanding requirement that a false statement be "material" to a false claim. The term "material" is broadly defined to mean "having a material tendency to influence, or be capable of influencing, the payment or receipt of money or property." A defendant may no longer be able to argue that it did not violate the FCA because it did not know that the Government provided funding to the defrauded entity.

131. FERA also broadens the scope of the FCA to capture fraud committed indirectly, as well as directly, on the Government. Numerous courts had held that presenting a false claim to a recipient of federal funds did not satisfy the FCA's "presentment" requirement because the claim was not presented directly to the United States. *See, e.g., United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488 (D.C. Cir. 2004) (holding that the FCA's presentment requirement was not met because the allegedly false claim was presented to Amtrak, a federal grantee, not to the United States). The FERA amendments, however, now reach such indirect false claims by redefining the term "claim" to include "any request or demand….for money or property" that is made to a "contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest." These changes expand the reach of the FCA to entities that would not otherwise have been liable before. A person who submits a false claim to any entity receiving federal funds is now potentially subject to treble damages under the FCA. The Senate Judiciary Committee report accompanying the legislation makes it clear, however, that the amendments were necessary "in order to protect the Federal assistance and relief funds expended in response to our current economic crisis." S. Rep. No. 111-10, at 10 (2009).

-39-

132.   The FERA amendments also expand the scope of liability under the "reverse false claim" provision of the FCA.  Specifically, liability is now imposed on anyone who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." The term "obligation" is defined to include "the retention of an overpayment." Although FERA does not expressly make this amendment retroactive, it arguably imposes instant liability on anyone who is "knowing and improperly" retaining an "overpayment" from the Government, even if that overpayment occurred years before FERA's enactment. Notably, this new liability provision does not require any false statement or claim; liability is simply imposed on anyone who "knowing and improperly" retains an "overpayment."

**D. Indirect Reverse False Claim**

133.  In 2011, the Fifth Circuit held that a pharmacy benefits manager may be found liable under Section 3729(a)(7) of the federal FCA under a theory of "indirect reverse false claims." *USA v. Caremark, Inc., et al.*, No. 09-50727 (5th Cir. Decided: Feb. 24, 2011). (Note: In the Fraud Enforcement and Recovery Act of 2009 ("FERA"), 31 U.S.C. § 3729(a)(7) was recodified at 31 U.S.C. § 3729(a)(1)(G)).

134.  The *Caremark* case is instructive. Caremark is a pharmacy benefits management company ("PBM") that administers pharmacy benefits for its clients, which include insurance companies, managed care organizations, and public and private health plans and organizations. Caremark's role is to manage its clients' plans in accordance with each plan's provisions. Each plan has benefits and restrictions, such as only covering prescriptions filled at certain pharmacies or requiring preauthorization for a prescription to be covered by the plan.

-40-

135.  Some people who are eligible under a plan administered by a PBM are also eligible for Medicaid. These individuals, referred to as dual-eligible individuals, sometimes identify themselves at a pharmacy as Medicaid recipients instead of privately-insured individuals, thus resulting in a state Medicaid agency paying the bill. However, if the state Medicaid agency discovers that a Medicaid recipient is a dual-eligible individual, the agency must seek reimbursement from the private insurer (known as a "third party") under federal law. 42 U.S.C. § 1396(a)(25). In addition to requiring state Medicaid agencies to seek reimbursement from third parties, federal law directs the States to enact laws that require Medicaid recipients to assign their rights to receive payments from any third party to the state Medicaid agency.

136.  Claims under 31 U.S.C. § 3729(a)(7) require proof that the defendant "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." This is known as a reverse false claim because the effect of the defendant's knowingly false statement is a failure to pay the Government when payment is required. A direct claim, on the other hand, occurs when a false claim for payment is submitted to the Government. *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 652 (5th Cir. 2004). In this case, the Government contends that Caremark made false statements to the state Medicaid agencies-who receive over half of their funding from the Government-that allowed Caremark to fraudulently avoid making payments to the state Medicaid agencies. This is known as an indirect reverse false claim because the defendant allegedly knowingly made a false statement to a third party, knowing that its statement would "conceal, avoid, or decrease" an obligation to the Government. 31 U.S.C. § 3729(a)(7).

-41-

137. In *Caremark*, the Government argues that even if Caremark does not owe an "obligation" directly to "the Government," it may be held liable for causing the States to impair their obligations to the Government. Section 3729(a)(7) provides that a person who causes a false statement to be made "to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government" is liable under the FCA. 31 U.S.C. § 3729(a)(7); *see also United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) ("The FCA applies to anyone who knowingly assists in causing the government to pay claims grounded in fraud, without regard to whether that person has direct contractual relations with the government.").

138. Two cases have interpreted § 3729(a)(7) to allow liability for indirect reverse false claims. *See United States ex rel. Hunt v. Merck-Medco Managed Care, L.L.C.*, 336 F.Supp.2d 430, 444-45 (E.D. Pa. 2004); *United States ex rel. Koch v. Koch Indus., Inc.*, 57 F.Supp.2d 1122, 1128-29 (N.D. Okla. 1999).

139. In *Hunt*, the relator claimed that Merck-Medco, a PBM, violated the FCA by making false statements to Blue Cross/Blue Shield, a health insurance company that provided health insurance to federal employees. *Hunt*, 336 F.Supp.2d at 444. Merck-Medco argued that it did not owe an obligation to the Government because its obligation was to Blue Cross/Blue Shield and the statute required the obligation to be owed directly to the Government. Id. The Court rejected this "direct privity" argument, ruling that the statute allowed liability if the party caused a false statement "to be made or used." Id. The court concluded that "[t]he fact that Medco may not have been in direct contractual privity with the Government is not an automatic bar to § 3729(a)(7) liability." Id. The court accepted the Government's argument that because

"any contractual penalties owing from Medco to Blue Cross [were] required by law to be turned over to the Government, the distinction between Medco and Blue Cross [was] legally worthless." Id. Because of this "unique relationship," the "predictable, even certain, consequence of its actions (or inactions) would and could be to reduce the amount of money owed to a party (Blue Cross) that it knew was in direct contractual privity with the Government." Id.

140.  Similarly, in *Koch*, the relator argued that the defendants violated § 3729(a)(7) by making false statements to a party who had mineral leases with the Government. *Koch*, 57 F. Supp. 2d at 1124. The defendants argued that they could not be held liable under § 3729(a)(7) because they made statements to the lessee, not to the Government. Id. at 1127. The court disagreed, noting that the defendants' false measurements may have "caused the lessee or operator to understate its royalty obligation to the Government." Id. at 1129. The court rejected the defendants' argument that "because subsection (a)(7) and (c) [which defined the term "claim" for purposes of the FCA] were added at the same time, the absence of any reverse false claim language in subsection (c) conclusively demonstrates that Congress did not intend the FCA to impose liability for indirect reverse false claims." Id. at 1128. The court noted that "[w]hile it is true that Congress did not explicitly include indirect reverse false claims within the gambit of the FCA, it is not clear to this Court that Congress intended to exclude them." Id. at 1129. Instead, the court concluded that Congress's intent was to expand the FCA "to reach further to protect the Government from fraud due to false filings." Id. at 1128.

141. The court also interpreted a prior version of the FCA to encompass indirect reverse false claims. *Smith v. United States*, 287 F.2d 299 (5th Cir. 1961). In *Smith*, the defendant made false claims for payment to the Beaumont Housing Authority ("BHA") and also made false

-43-

statements to the BHA to avoid financial obligations. Id. at 300, 303-04. The court accepted the indirect reverse false claim theory because "the False Claims Act applies even where there is no direct liability running from the Government to the claimant." Id. at 304. The court reasoned that had the BHA "not made these payments and had they not been reflected in the quarterly reports, the Government, in one quarter, would have received more rent and in the other would have made a lesser payment. The expenses were therefore ultimately borne by the United States Treasury." Id.

142. The States have a legal duty to return federal funds if they are able to recover from third parties. 42 C.F.R. § 433.140 ("If the State receives FFP in Medicaid payments for which it receives third party reimbursement, the State must pay the Federal government a portion of the reimbursement."). The States also have a legal duty to seek reimbursement from a third party for dual-eligible individuals. 42 U.S.C. § 1396a(a)(25)(A) (requiring the States to "take all reasonable measures to ascertain the legal liability of third parties" and to seek reimbursement for medical assistance to the extent of any third party's legal liability); 42 C.F.R. § 433.139(b)(1) (requiring the state agency to reject a claim and return it to a third party for a determination of the amount of liability). These requirements impose an obligation on the States to the Government. If Caremark made false statements that an individual is not covered by a plan, these false statements would cause the state Medicaid agencies to pay for the prescription and seek reimbursement from the Government rather than from Caremark. This, in turn, would cause the States to receive and to keep federal funds to which they would not otherwise be entitled. Caremark's actions therefore could have impaired the States' obligation to the Government under 42 U.S.C. § 1396a(a)(25).

143. In *Caremark*, the Fifth Circuit held "The *Smith*, *Hunt*, and *Koch* cases are instructive because they all allow FCA liability for knowingly making a false statement that will cause a third party to impair its obligation to the federal government. *Smith*, 287 F.2d at 304; *Hunt*, 336 F.Supp.2d at 444-45; *Koch*, 57 F.Supp.2d at 1128-29. The statute does not require that the statement impair the defendant's obligation; instead, it requires that the statement impair 'an obligation to pay or transmit money or property to the Government.' 31 U.S.C. § 3729(a)(7). We hold that if the Government is able to prove that Caremark knowingly made false statements to the States knowing that these statements could cause the States to impair their obligation to the Government, Caremark will be liable under § 3729(a)(7)."

**E. Conspiracy**

144. Also relevant here is 31 U.S.C. § 3729(a)(1)(C), which imposes liability for "conspir[ing] to commit a violation of" the FCA. To state a cause of action for conspiracy under this statutory provision, the relator must allege:

> (i) that "an agreement existed to have false or fraudulent claims allowed or paid" to the government,
> (ii) that each alleged member of the conspiracy "joined that agreement," and
> (iii) that "one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy."
> *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.,* 608 F.3d 871, 899 (D.C. Cir. 2010).

145. General civil conspiracy principles apply to FCA-based conspiracy actions. For example, following these general civil conspiracy principles, courts have applied the intra-corporate (or intra-enterprise) conspiracy doctrine in conspiracy actions brought under the FCA. Under this doctrine, one entity "cannot conspire with its employees, and its employees, when acting within the scope of their employment, cannot conspire among themselves." Another

important civil conspiracy principle is that no conspiracy can exist without "some underlying tortious act." *Halberstam v. Welch,* 705 F.2d 472, 477 (D.C. Cir. 1983). In the context of the FCA, this means that there can be no liability for conspiracy where there is no underlying violation of the FCA. *See United States ex rel. Amin v. George Washington Univ.,* 26 F.Supp.2d 162, 165 (D.D.C. 1998) (dismissing a conspiracy action because, among other things, the alleged fraudulent actions of defendants were "entirely lawful" and did not violate the FCA).

### F. Federal Rule of Civil Procedure 9(b)

146.   When a complaint contains allegations of fraud, the complaint must also "state with particularity the circumstances constituting fraud...." Fed. R. Civ. P. 9(b). This generally requires that the plaintiff "support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story - that is, the who, what, when, where and how of the events at issue.'" *Majestic Blue Fisheries,* 812 F.3d at 207. There is no dispute that complaints alleging violations of the FCA are subject to the particularity requirement of Rule 9(b). *See Schindler Elevator Corp. v. United States ex rel. Kirk,* 563 U.S. 401, 404 (2011).

147.   The circuits have varied in their statements of exactly what Rule 9(b) requires in a qui tam action. A consensus has yet to develop on whether, when, and to what extent a relator must state the particulars of specific examples of the type of false claims alleged. *See Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155–56 (3d Cir. 2014) (surveying circuits).

148.   The First Circuit has distinguished pleading standards for direct claims, or sales to the government, which are governed by 31 U.S.C. § 3729(a)(1)(A), from indirect claims to the government where a defendant causes third-parties to submit false claims, which are governed by 31 U.S.C. § 3729(a)(1)(B). *See United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*,

579 F.3d 13, 29 (1st Cir. 2009) ("*Duxbury I*"). "In a *qui tam* action in which the defendant is alleged to have induced third parties to file false claims with the government, a relator can satisfy this requirement by 'providing factual or statistical evidence to strengthen the inference of fraud beyond possibility without necessarily providing details as to each false claim.'" *Ge*, 737 F.3d at 123-124 (quoting *Duxbury I*, 579 F.3d at 29). Thus, a *qui tam* complaint alleging that a defendant induced a third party to submit false claims to the government for reimbursement must allege two things to satisfy Rule 9(b): (1) particular details of a scheme to cause the submission of false claims to the government; and (2) factual or statistical evidence that strengthens the inference of fraud on the government beyond a mere possibility. *Duxbury I*, 579 F.3d at 29.

149.    *Nargol v. DePuy Orthopaedics, Inc*., No. 16-1442 (1st Cir, 2017) is instructive. In *Nargol*, the First Circuit explains "…..we have nevertheless recognized at least one exception to the expectation that a relator should be able to allege the essential particulars of at least some actual false claims that were in fact submitted to the government for payment. '[W]e have….recognized a difference between qui tam actions alleging that the defendant made false claims to the government and those alleging that the defendant induced third-parties to file false claims with the government.' *Lawton ex rel. United States v. Takeda Pharm. Co*., 842 F.3d 125, 130 (1st Cir. 2016) (citing *Duxbury*, 579 F.3d at 29). We apply a "more flexible" standard in actions of the latter, indirect type: where the defendant allegedly "induced third parties to file false claims with the government….a relator could satisfy Rule 9(b) by providing 'factual or statistical evidence to strengthen the inference of fraud beyond possibility' without necessarily providing details as to each false claim." *Duxbury*, 579 F.3d at 29 (quoting *United States ex rel. Rost v. Pfizer, Inc*., 507 F.3d 720, 733 (1st Cir. 2007)); see *Ge*, 737 F.3d at 123–24. Such

-47-

evidence must pair the details of the scheme with 'reliable indicia that lead to a strong inference that claims were actually submitted.'" Id. (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

150. The court further explains "In one instance, on de novo review we did reverse a Rule 9(b) dismissal of a qui tam action. *See Duxbury*, 579 F.3d at 32. The fraudulent scheme alleged in *Duxbury* involved the payment of kickbacks to health care providers in a manner designed to artificially inflate the reported price of a pharmaceutical product. Id. at 17. The kickbacks took the form, in large part, of free product given to providers "so that" they could submit the free product for reimbursement at the reported price, pocketing the payment. Id. at 31. The relator did "not identify specific claims." Id. at 30. He did, however, identify "as to each of....eight medical providers (the who), the illegal kickbacks (the what), the rough time periods and locations (the where and when), and the filing of the false claims themselves." Id. These allegations were sufficient to show 'that false claims were in fact filed by the medical providers [the relator] identified, which further support[ed] a strong inference that such claims were also filed nationwide.'" Id. at 31.

151. In *Duxbury*, the entire purpose of giving doctors free product was so that they would seek reimbursement to realize the kickback. *Duxbury*, 579 F.3d at 31. The alleged scheme would have made little sense had reimbursement not been sought. And the added detail about transactions involving eight providers, while not claim-specific within the sense described in *Karvelas*, made the filing of some claims "beyond possib[le]." Id. (quoting *Rost*, 507 F.3d at 733).

152. The First Circuit states "To summarize, the relators in *Nargol* allege that, over a

-48-

five-year period, several thousand Medicare and Medicaid recipients received what their doctors understood to be Pinnacle MoM device implants; that more than half of those implants fell outside the specifications approved by the FDA; and that the latency of the defect was such that doctors would have had no reason not to submit claims for reimbursement for noncompliant devices. In this context, where the complaint essentially alleges facts showing that it is statistically certain that DePuy caused third parties to submit many false claims to the government, we see little reason for Rule 9(b) to require Relators to plead false claims with more particularity than they have done here in order to fit within *Duxbury's* "more flexible" approach to evaluating the sufficiency of fraud pleadings in connection with indirect false claims for government payment. In short, we have in this case a complaint that alleges the details of a fraudulent scheme with 'reliable indicia that lead to a strong inference that claims were actually submitted,' *Duxbury*, 579 F.3d at 29 (quoting *Grubbs*, 565 F.3d at 190), for government reimbursement from the United States and from the state of New York. The foregoing suffices to sustain Relators' claims under the FCA for indirect false claims for government payment."

153. Footnote 9 in *Nargol* is noteworthy. The court instructs "As Relators observe, the district court stated: 'The First Circuit has distinguished pleading standards for direct claims, or sales to the government, which are governed by 31 U.S.C. § 3729(a)(1)(A), from indirect claims to the government where a defendant causes third-parties to submit false claims, which are governed by 31 U.S.C. § 3729(a)(1)(B).' *Nargol*, 159 F. Supp. 3d at 252. This is incorrect: neither § 3729(a)(1)(A) nor § 3729(a)(1)(B) applies only to direct or indirect claims for government payment. Section 3729(a)(1)(A) imposes liability on defendants who directly 'present a false or fraudulent claim for payment or approval,' and defendants who indirectly

-49-

'cause to be presented a false or fraudulent claim for payment or approval.' 31 U.S.C. §

3729(a)(1)(A). Likewise, section 3729(a)(1)(B) similarly prohibits both directly 'making or

using….a false record or statement material to a false or fraudulent claim' and 'causing to be

made or used a false record or statement material to a false or fraudulent claim.' Id. §

3729(a)(1)(B). Relators allege that doctors certified to Medicare that the device they implanted

was reasonable and necessary for patient care because it was the Pinnacle MoM device that the

FDA had approved, and that such certifications were frequently false because manufacturing

defects made the implanted device materially different from the one the FDA approved. This is

sufficient to particularly plead a cause of action under both § 3729(a)(1)(A) and

§ 3729(a)(1)(B)."

## VII. Racketeer Influenced and Corrupt Organizations (RICO)

154.  Congress designed RICO as a flexible tool to fight organized crime. As such, it

makes the following activities unlawful:

> (a) investing income derived, directly or indirectly, from a pattern of racketeering activity through collection of an unlawful debt in any enterprise which affects interstate commerce; (b) acquiring or maintaining an interest in any enterprise which affects interstate commerce through a pattern of racketeering activity or through collection of an unlawful debt; (c) conducting or participating in the affairs of any enterprise which affects interstate commerce through a pattern of racketeering activity or collection of an unlawful debt; or (d) conspiring to violate any of the provisions of Section 1962(a)-(c). 18 U.S.C. § 1962.

> "Racketeering activities" covers a wide range of federal and state crimes, including acts

that are 'chargeable' under several generically described state criminal laws, any act 'indictable'

under numerous specific federal criminal provisions, *including mail and wire fraud*, and any

'offense' involving bankruptcy or securities fraud or drug-related activities that are 'punishable' under federal law." *Sedima, S.P.R.L. v. Imrex Co. Inc.,* 473 U.S. 479, 482, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985) (quoting 18 U.S.C. § 1961(1)).

### A. 18 U.S.C. § 1341 (Mail Fraud) and 18 U.S.C. § 1343 (Wire Fraud)

155.  "There are two elements in mail fraud: (1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)." *Schmuck v. United States,* 489 U.S. 705, 721 n. 10 (1989); *see also Pereira v. United States,* 347 U.S. 1, 8 (1954) ("The elements of the offense of mail fraud under....§ 1341 are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme."); Laura A. Eilers & Harvey B. Silikovitz, *Mail and Wire Fraud,* 31 Am. Crim. L. Rev. 703, 704 (1994).

156.  The elements of wire fraud under Section 1343 directly parallel those of the mail fraud statute, but require the use of an interstate telephone call or electronic communication made in furtherance of the scheme. *United States v. Briscoe,* 65 F.3d 576, 583 (7th Cir. 1995) (*citing United States v. Ames Sintering Co.,* 927 F.2d 232, 234 (6th Cir. 1990) (per curiam)); *United States v. Frey,* 42 F.3d 795, 797 (3d Cir. 1994) (wire fraud is identical to mail fraud statute except that it speaks of communications transmitted by wire); *see also, e.g., United States v. Profit,* 49 F.3d 404, 406 n. 1 (8th Cir.) (the four essential elements of the crime of wire fraud are: (1) that the defendant voluntarily and intentionally devised or participated in a scheme to defraud another out of money; (2) that the defendant did so with the intent to defraud; (3) that it was reasonably foreseeable that interstate wire communications would be used; and (4) that interstate wire communications were in fact used) (*citing* Manual of Model Criminal Jury

Instructions for the District Courts of the Eighth Circuit 6.18.1341 (West 1994)), *cert. denied*, 115 S. Ct. 2289 (1995); *United States v. Hanson*, 41 F.3d 580, 583 (10th Cir. 1994) (two elements comprise the crime of wire fraud: (1) a scheme or artifice to defraud; and (2) use of interstate wire communication to facilitate that scheme); *United States v. Faulkner*, 17 F.3d 745, 771 (5th Cir. 1994) (essential elements of wire fraud are: (1) a scheme to defraud and (2) the use of, or causing the use of, interstate wire communications to execute the scheme), *cert. denied*, 115 S. Ct. 193 (1995); *United States v. Cassiere*, 4 F.3d 1006 (1st Cir. 1993) (to prove wire fraud government must show (1) scheme to defraud by means of false pretenses, (2) defendant's knowing and willful participation in scheme with intent to defraud, and (3) use of interstate wire communications in furtherance of scheme); *United States v. Maxwell*, 920 F.2d 1028, 1035 (D.C. Cir. 1990) ("Wire fraud requires proof of (1) a scheme to defraud; and (2) the use of an interstate wire communication to further the scheme.").

157.  To engage in a "pattern of racketeering activity," the defendant must have participated in "at least two acts of racketeering activity, one of which occurred after the effective date of RICO and the last of which occurred within ten years (excluding any term of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Finally, "enterprise" is defined under the statute as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

158.  The civil remedies provision of RICO states "any person injured in his business or property by reason of a violation of Section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and

-52-

the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

159. The elements of a civil RICO claim are: "(1) a violation of section 1962; (2) injury to business or property; and (3) that the violation caused the injury." *Avirgan v. Hull,* 932 F.2d 1572, 1577 (11th Cir. 1991).

160. To establish a violation of Section 1962, the plaintiff must allege facts demonstrating that the defendant engaged in a pattern of racketeering activity and that an enterprise existed. *Bill Buck Chevrolet v. GTE Fla.,* 54 F. Supp. 2d 1127, 1137 (M.D.Fla.1999).

161. In showing a pattern of racketeering activity, the plaintiff must allege at least two racketeering predicate acts that are related and that amount to, or threaten the likelihood of, continued criminal activity. *H.J. Inc. v. Northwestern Bell Tele. Co.,* 492 U.S. 229, 237-238, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989). Therefore, in order to survive a motion to dismiss, the plaintiff must allege facts sufficient to support at least two of the predicate acts. *Republic of Panama v. BCCI Holdings,* 119 F.3d 935, 949 (11th Cir.1997).

1. Racketeering Activity

162. In the instant Complaint, Plaintiff Donovan alleges that Defendants knowingly engaged in the following racketeering predicate acts: mail fraud in violation of Title 18, United States Code, Section 1341; wire fraud in violation of Title 18, United States Code, Section 1343; and obstruction of justice in violation of Title 18, United States Code, Section 1503. Each of these statutes requires proof of scienter. *BCCI Holdings,* 119 F.3d at 949 (citing *Pelletier,* 921 F.2d at 1498).

163. A plaintiff must show the following elements to establish liability under the federal wire and mail fraud statutes: "(1) that defendants knowingly devised or participated in a scheme

-53-

to defraud plaintiffs, (2) that they did so willingly with an intent to defraud, and (3) that the defendants used the U.S. mails or the interstate wires for the purpose of executing the scheme." *Langford v. Rite Aid of Alabama, Inc.,* 231 F.3d 1308, 1312 (11th Cir.2000) (citing *Neder v. U.S.,* 527 U.S. 1, 24-25, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)).

164.  Plaintiff Donovan alleges that Defendants have made, and continue to make, material misrepresentations of material facts to Plaintiffs, government agencies, and the general public, while maintaining that they are complying with the Oil Pollution Act of 1990 (a *strict liability* statute), toxic tort law (a *strict liability tort*), and the Clean Water Act (a *strict liability* statute), and this behavior constitutes Defendants' scheme to defraud Plaintiffs. Although proof of mail or wire fraud requires a showing that the defendant had the knowing intent to defraud, a RICO plaintiff does not need direct proof of scienter. *Bill Buck Chevrolet,* 54 F. Supp. 2d at 1132. However, "a RICO plaintiff's allegations of scienter cannot be 'merely conclusory and unsupported by any factual allegations.'" *Id.* (quoting *Republic of Panama v. BCCI Holdings,* 119 F.3d 935, 949 (11th Cir.1997) (quoting *O'Malley v. O'Neill,* 887 F.2d 1557, 1561 (11th Cir.1989))).

165.  The allegations in Plaintiff Donovan's Complaint give rise to a "strong inference" that Defendants possessed the specific intent necessary for the alleged predicate acts. *See Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987) (stating that RICO plaintiffs must "provide some factual basis for conclusory allegations of intent"). Plaintiff Donovan's Complaint, in pertinent part, alleges that Defendants' plan was to knowingly mislead Plaintiffs into thinking or believing that Defendants were complying with the Oil Pollution Act of 1990 (a *strict liability* statute), toxic tort law (a *strict liability tort*), and the Clean Water Act (a *strict*

*liability* statute), and alleges that their purpose in misrepresenting their compliance with federal law was with the sole intent of defrauding Plaintiffs.

### 2. Pattern

166. If the plaintiff has pled the requisite predicate acts, the Court must look to see if he or she has pled the pattern of such acts. Pleading that a pattern exists requires the plaintiff to plead both that the predicate acts are related to each other, and that they either constitute or threaten long-term criminal activity. *Northwestern Bell,* 492 U.S. at 239, 109 S. Ct. 2893. Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* The continuity aspect refers to either a closed period of repeated conduct or to past conduct that, by its nature, projects into the future with a threat of competition. *Bill Buck Chevrolet,* 54 F. Supp. 2d at 1134 (quoting *Northwestern Bell,* 492 U.S. at 241, 109 S. Ct. 2893). "The threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* (quoting *Northwestern Bell,* 492 U.S. at 243, 109 S. Ct. 2893).

167. In the instant Complaint, Plaintiff Donovan alleges that Defendants have continuously engaged in the predicate acts of mail fraud, wire fraud, and obstruction of justice as part of Defendants' normal process of carrying on its business. Furthermore, given that these acts are related to each other and "have the same or similar purposes, results, participants, victims, or methods of commission," Plaintiff Donovan alleges sufficient facts to show that a pattern of racketeering activity in fact exists.

3. Enterprise

168.  "The definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes." *U.S. v. Goldin Industries, Inc.,* 219 F.3d 1271 (11th Cir. 2000). The "person" and the "enterprise" cannot be the same person. *U.S. v. Goldin Industries, Inc.,* 219 F.3d 1268, 1269 (11th Cir. 2000) (en banc).

169.  Here, Plaintiff Donovan alleges that Defendants are part of the enterprise, not the enterprise; thus, Plaintiff Donovan does not allege that the person and the enterprise are the same. The presence of an enterprise is an essential element of a RICO complaint. Merely identifying the type of business in which the members of the alleged enterprise engage in is not enough either to allow the Court to evaluate whether the alleged enterprise constitutes an enterprise within the meaning of RICO or to provide Defendant fair notice of the claim against which Defendant must defend. *Bill Buck Chevrolet,* 54 F. Supp. 2d at 1135. Here, Plaintiff Donovan has alleged sufficient facts to show that a RICO enterprise (the "MDL 2179 Enterprise") in fact exists.

4. Causation of Injury

170.  A plaintiff suing under civil RICO must show that his injury was proximately caused by the commission of the predicate acts. In *Pelletier v. Zweifel,* the Eleventh Circuit explained: There is some question whether this proximate cause requirement limits damages recoverable to those caused directly by the predicate act or to those caused indirectly by the predicate act. We have taken the more restrictive view, holding that a plaintiff has standing to sue under section 1964(c) *only if his injury flowed directly from the commission of the predicate acts.* This means that when the alleged predicate act is mail or wire fraud, the Plaintiff must have

-56-

been a target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme. 921 F.2d 1465, 1499-1500 (11th Cir.1991) (emphasis added). A "scheme to defraud" involves making misrepresentations "reasonably calculated to deceive persons of ordinary prudence and comprehension." *Wilson v. De Angelis,* 156 F. Supp. 2d 1335, 1338 (S.D. Fla. 2001) (quoting *Pelletier,* 921 F.2d at 1498-1499).

171. As noted *supra*, Plaintiff Donovan's Complaint, in pertinent part, alleges that Defendants' plan was to knowingly mislead Plaintiffs into thinking or believing that Defendants were complying with the Oil Pollution Act of 1990 (a *strict liability* statute), toxic tort law (a *strict liability tort*), and the Clean Water Act (a *strict liability* statute), and alleges that their purpose in misrepresenting their compliance with federal law was with the sole intent of defrauding Plaintiffs. Additionally, Plaintiff Donovan sets forth how Defendants' alleged misrepresentations and alleged predicate acts injured Plaintiff Donovan's business. The allegations clearly lead to the conclusion that Defendants targeted Plaintiffs in the alleged "scheme to defraud" Plaintiffs by the alleged acts of mail fraud, wire fraud, and obstruction of justice. Moreover, Plaintiffs' injuries flow directly from Defendants' alleged commission of the predicate acts, as required to establish a cause of action for a civil RICO claim. In sum, Plaintiff Donovan alleges sufficient facts to show that the causation requirement for a civil RICO cause of action in fact exists.

5. Civil Conspiracy

172. To state a cause of action for a civil conspiracy, a plaintiff must allege: (1) an agreement between two or more parties to achieve an illegal objective; (2) an overt act in furtherance of that illegal objective; and (3) resulting injury. *Bivens Gardens Office Bldg., Inc. v.*

-57-

*Barnett Banks of Florida, Inc.,* 140 F.3d 898 (11th Cir.1998). However, the RICO conspiracy provision in Section 1962(d) does not require an overt act. Instead, a Plaintiff asserting a violation of Section 1962(d) must allege that "the conspirators agreed to participate directly or indirectly in the affairs of an enterprise through a pattern of racketeering activity." *Florida Software Sys. v. Columbia/HCA Healthcare Corp.,* 46 F. Supp. 2d 1276, 1281 (M.D. Fla. 1999) (quoting *U.S. v. Castro,* 89 F.3d 1443, 1451 (11th Cir.1996)). In the Eleventh Circuit, proof of an agreement to participate in a RICO conspiracy can be established by either "(1) showing an agreement of an overall objective or (2) in the absence of an agreement on an overall objective, by showing that a defendant agreed personally to commit two predicate acts." *Id.* (quoting *U.S. v. Church,* 955 F.2d 688, 694 (11th Cir. 1992)).

173.  Plaintiff Donovan alleges sufficient facts to infer an agreement between Defendants necessary to support the RICO claim under Section 1962(d). Here, Donovan alleges that Defendants have agreed to the overall objective of the conspiracy and/or have agreed to commit predicate acts in furtherance of the conspiracy. The "overall objective" of the conspiracy is to fraudulently limit BP's liability for the purpose of maximizing judicial efficiency and/or maximizing their compensation. In order to limit BP's liability, Defendants illegally transferred, and continue to illegally transfer, the majority of the BP oil well blowout economic and medical costs from BP (the "responsible party") to the Government. The "predicate acts" are mail fraud, wire fraud, and obstruction of justice. The Defendants conspired with each other and the "MDL 2179 Enterprise" and/or have agreed to commit predicate acts in furtherance of the conspiracy.

**B. 18 U.S.C. § 1503 (Obstruction of Justice)**

174. The omnibus clause, or "catch-all provision" of 18 U.S.C. § 1503, provides:

Whoever....corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be (guilty of an offense).

175. The scope of the omnibus clause has been a subject of dispute among the United States Courts of Appeals. Some courts have taken the position that the clause should be read broadly to include any conduct interfering with the fair administration of justice if that conduct was undertaken with a corrupt motive. *United States v. Saget*, 991 F.2d 702 (11th Cir.), *cert. denied*, 510 U.S. 950 (1993); *United States v. Rasheed*, 663 F.2d 843 (9th Cir. 1981), *cert. denied*, *sub. nom. Phillips v. United States*, 454 U.S. 1157 (1982); *United States v. Ogle*, 613 F.2d 233 (10th Cir. 1979), *cert. denied*, 449 U.S. 825 (1980); *United States v. Baker*, 611 F.2d 964 (4th Cir. 1979); *United States v. Howard*, 569 F.2d 1331, 1333-36 (5th Cir.), *cert. denied*, 439 U.S. 834 (1978); *United States v. Walasek*, 527 F.2d 676 (3d Cir. 1975); *United States v. Cioffi*, 493 F.2d 1111 (2d Cir.), *cert. denied*, 419 U.S. 417 (1974).

176. The United States Supreme Court favors a broad reading of the omnibus clause. *See, e.g., United States v. Aguilar*, U.S. 115 S. Ct. 2357 (1995). The omnibus clause of section 1503 "makes an offense of any proscribed endeavor, without regard to the technicalities of the law or to the law of impossibility." *United States v. Neal*, 951 F.2d 630, 632 (5th Cir. 1992); *United States v. Williams*, 874 F.2d 968 (5th Cir. 1989), citing *Osborn v. United States*, 385 U.S. 323 (1966). The clause was "intended to cover all endeavors to obstruct justice" and as such "was drafted with an eye to the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined." *United States v. Neal*, 951 F.2d at 632.

## VIII.  Litigation Activity as RICO Predicate Acts

177.  *Kim v. Kimm*, Case Nos. 16-2944; -3115 (2d Cir., Feb. 27, 2018) is instructive.

178.  In *Kim*, the court declined to reach the issue of whether all RICO actions based on litigation activity are categorically meritless. The court concluded only that "where a plaintiff alleges that a defendant engaged in a single frivolous, fraudulent, or baseless lawsuit, such litigation activity *alone* cannot constitute a viable RICO predicate act. At the time Kim filed this suit, there was no binding precedent in this Circuit as to whether litigation activities could serve as predicate acts for purposes of RICO. Indeed, some courts had endorsed the viability of some such claims. *See Sykes*, 757 F. Supp. 2d at 425–26." In *Kim*, the Second Circuit cites a district court opinion, *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 418 (S.D.N.Y. 2010), to explain that litigation activity could be predicate acts under RICO.

179.  In *Sykes*, the district court denied the defendants' motion to dismiss the plaintiffs' section 1962(c) claims, observing that the plaintiffs pleaded a pattern of racketeering activity that included "at least twenty allegedly fraudulent statements and eighteen acts involving use of the mail and wires over three years, in furtherance of the alleged fraud." Id. at 425. In *Sykes*, eight plaintiffs allege that a debt-buying company, a law firm, a process service company, and others engaged in a "massive scheme" to fraudulently obtain default judgments against them and more than 100,000 other consumers in state court. Plaintiffs allege that defendants did so by engaging in "sewer service," the practice of failing to serve a summons and complaint and then filing a fraudulent affidavit attesting to service. When the debtors failed to appear in court because they did not have notice of the lawsuits, defendants obtained default judgments against them. Id. at 418–20. Accordingly, even though those defendants used litigation to carry out their scheme,

they also engaged in a variety of other out-of-court actions to further this activity.

180. In sum, Courts have held that where a defendant is "engaged in a single frivolous, fraudulent, or baseless lawsuit, such litigation activity *alone* cannot constitute a viable RICO predicate act." *Kim v. Kimm*, Case Nos. 16-2944; -3115 (2d Cir., Feb. 27, 2018). However, many courts have concluded that litigation activity could be predicate acts under RICO where defendants used litigation to carry out a "massive scheme" and/or engaged in a variety of other out-of-court actions to further their fraudulent "massive scheme." *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 418 (S.D.N.Y. 2010).

181. As noted *supra*, the omnibus clause of section 1503 "makes an offense of any proscribed endeavor, without regard to the technicalities of the law or to the law of impossibility." *United States v. Neal*, 951 F.2d 630, 632 (5th Cir. 1992); *United States v. Williams*, 874 F.2d 968 (5th Cir. 1989), citing *Osborn v. United States*, 385 U.S. 323 (1966). The clause was "intended to cover all endeavors to obstruct justice" and as such "was drafted with an eye to the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined." *United States v. Neal*, 951 F.2d at 632.

182. On October 25, 2010, the MDL 2179 Court issued "Pretrial Order No. 12" which states "IT IS HEREBY ORDERED that whenever service is required by the Federal Rules of Civil Procedure, in lieu of the methods set forth in Rule 5(b),….the parties will utilize the services of LexisNexis File & Serve ("File & Serve") and its litigation system for providing electronic service, storage and delivery of court-filed and discovery related documents through a secure website. All attorneys of record in this litigation on whom service of documents must be

effectuated shall....(2) forward to Liaison Counsel (James P. Roy and Stephen J. Herman) for

Plaintiffs....a fully completed "MDL 2179 Counsel Contact Information Form,"....and

(3) sign up for electronic service in this litigation....[with] File & Serve....Once a document is

uploaded and submitted electronically, File & Serve shall send an e-mail to all registered users

notifying them that the document has been posted to its Website. The e-mail shall also contain a

hypertext link(s) to the document location(s) on the System (or, if so designated by the recipient,

the e-mail shall have the document attached thereto)....any document electronically served via

File & Serve pursuant to this Order shall be deemed to have been served under the Federal

Rules of Civil Procedure....*Any documents served pursuant to this Order shall be deemed to be*

*served by mail under Federal Rule of Civil Procedure 6(e)*....Service of Pleadings and Motions:

Once File & Serve advises Liaison Counsel that the File & Serve system is in place, Liaison

Counsel will notify all of their respective counsel of record with whom they are affiliated. Upon

such notice by Liaison Counsel, Liaison Counsel is no longer required to serve and distribute

pleadings and motions on attorneys of record with whom they are affiliated, as required by this

Pre-Trial Order....Service of Court Orders: Liaison Counsel are required to serve and distribute

all Orders of the Court on all counsel of record. Such service of Court Orders by Liaison Counsel

shall be accomplished electronically through File & Serve."

183. Since 2011, Plaintiff Donovan has received an email from File & Serve at 3:06 AM

which contains all Pleadings, Motions, and Court Orders filed in MDL 2179 on the previous

date.

184. Our federal justice system is not a sanctuary for those who would use it to carry out

their own massive, nefarious schemes in the name of "judicially-efficient" multidistrict litigation.

## FACTUAL BACKGROUND

### I. Introduction

185.  At approximately 10 p.m. on April 20, 2010, the U.S. Coast Guard District Eight command center in New Orleans, Louisiana received a report of an explosion and fire aboard the mobile offshore drilling unit *Deepwater Horizon*. On the morning of April 22, 2010, the *Deepwater Horizon* sank, resulting in a massive oil spill incident. Oil flowed into the Gulf of Mexico unchecked for months. Ultimately, the "Macondo Well" was finally sealed on September 19, 2010, nearly five months after the blowout began. By that time, millions of barrels of oil had been discharged into the Gulf of Mexico and upon adjoining shorelines, causing immense environmental and economic harm to the entire region.

186.  This BP oil well blowout in April 2010 is arguably the largest and most egregious mass tort in U.S. history. It has affected hundreds of thousands of individuals and businesses along the U.S. Gulf Coast and beyond. The full extent of damages may never be known.

187.  Immediately after April 20, 2010 Defendants (MDL 2179 Co-Liaison Counsel and MDL 2179 PSC members), with the sole intention of securing a lucrative position as an MDL 2179 Liaison Counsel or MDL 2179 PSC member, captured market share via signing up tens of thousands of clients *en masse* to contingent fee contracts, often contacting victims of the BP oil well blowout through a lay intermediary. Defendants immediately started to coordinate with one another and developed a formal limited joint-prosecution agreement to facilitate the coordination and sharing of information, research, and litigation strategy.

188.  The JPML created MDL 2179 and transferred cases relating to the BP oil well blowout to the Eastern District of Louisiana on August 10, 2010. Defendants Herman and Roy were formally appointed by Defendant Barbier as Plaintiffs' Co-Liaison Counsel on August 27,

2010. Defendant Barbier formally appointed the PSC on October 8, 2010. In reality, Defendants

Herman, Roy, and the members of the MDL 2179 PSC appointed themselves months before the

JPML established MDL 2179. In MDL 2179 court documents, Defendants Herman and Roy

have the arrogance to refer to themselves as "*pre-MDL* Co-Liaison Counsel for the cases

consolidated in the EDLA."

189.   The U.S. District Court for the Eastern District of Louisiana has defined

"collusion" as the "lawful means for the accomplishment of an unlawful purpose" and as a

"*secret understanding between two or more persons prejudicial to another, or a secret*

*understanding to appear as adversaries, though in agreement.*" Collusion does not require

fraudulent conduct. Collusion permeates MDL 2179 as demonstrated, in part, by the fact that the

defendants' "Eight-Step" fraudulent scheme circumvents the Oil Pollution Act of 1990,

incorporates a Feinberg-administered victims' compensation fund on the frontend and a

settlement class action on the backend.

190.   At all times material herein, Defendants, individually and/or in collusion with

each other and the "MDL 2179 Enterprise," fraudulently, recklessly, negligently and knowingly

conceived, developed, and/or facilitated an "Eight-Step" fraudulent scheme to maximize judicial

efficiency and/or maximize their compensation in exchange for limiting the liability of BP.

191.   At all times material herein, Defendants, individually and/or in collusion with

each other and the "MDL 2179 Enterprise," in order to limit BP's liability and thereby maximize

judicial efficiency and/or their compensation, have misled Plaintiff and the Government by

fraudulently, recklessly, negligently and knowingly designating the "B1" Master Complaint as

an admiralty or maritime case, and requesting a non-jury trial pursuant to Rule 9(h), rather than

properly alleging claims under the Oil Pollution Act of 1990 ("OPA"), a *strict liability* statute, and the Outer Continental Shelf Lands Act ("OCSLA").

192.  At all times material herein, Defendants, individually and/or in collusion with each other and the "MDL 2179 Enterprise," in order to limit BP's liability and thereby maximize judicial efficiency and/or their compensation, have misled Plaintiff and the Government by fraudulently, recklessly, negligently and knowingly aiding and abetting the Kenneth R. Feinberg-administered victims' compensation fund to circumvent the OPA. As a result of Defendants' fraudulent and negligent conduct, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action.

193.  At all times material herein, Defendants, individually and/or in collusion with each other and the "MDL 2179 Enterprise," in order to limit BP's liability and thereby maximize judicial efficiency and/or their compensation, have misled Plaintiff and the Government by fraudulently, recklessly, negligently and knowingly aiding and abetting Kenneth R. Feinberg to use the fear of costly and protracted litigation in an attempt to coerce MDL 2179 Plaintiffs to accept grossly inadequate settlements. During widely-reported town hall meetings and on the Internet, Kenneth R. Feinberg repeatedly told victims of the BP oil well blowout incident: "The litigation route in court will mean uncertainty, years of delay and a big cut for the lawyers....I take the position, if I don't find you eligible, no court will find you eligible."

194.  At all times material herein, Defendants, individually and/or in collusion with each other and the "MDL 2179 Enterprise," in order to limit BP's liability and thereby maximize

judicial efficiency and/or their compensation, have misled Plaintiff and the Government by fraudulently, recklessly, negligently and knowingly circumventing the OPA by negotiating and drafting a settlement class action which limits a claimant's recovery of damages to geographic bounds and certain business activities while requiring a heightened and vague proof of causation between his, her, or its damages and the BP oil well blowout incident.

195. At all times material herein, Defendants, individually and/or in collusion with each other and the "MDL 2179 Enterprise," fraudulently, recklessly, negligently and knowingly breached their fiduciary and ethical duties to Plaintiff and the Government by failing to zealously and competently advocate on behalf of all MDL 2179 Plaintiffs.

196. At all times material herein, Defendants, individually and/or in collusion with each other and the "MDL 2179 Enterprise," fraudulently, recklessly, negligently and knowingly breached their fiduciary and ethical duties to Plaintiff and the Government by exercising oversight of a multidistrict litigation which is unconstitutional. MDL 2179, which employs a victims' compensation fund on the frontend and a settlement class action on the backend, involves no litigation and infringes individual claimants' procedural due process rights. The most serious problem with the MDL 2179 settlement class action is that by its nature it does not involve any live dispute between the parties that a federal court is being asked to resolve through litigation, and because from the outset of the proceeding Defendants and BP are in full accord as to how the claims should be disposed of. There is missing the adverseness between the parties that is a central element of Article III case-or-controversy requirement.

197. On November 10, 2014, Defendant Barbier states,
"….as the parties were approaching the final fairness hearing in November 2012, there was a concerted effort by the parties and claims facility to process a substantial number of high value claims in order to demonstrate that the

settlement program was working as intended…BP and Class Counsel were aware of the push to resolve claims, **as was the Court**. Although some of these claims were for clients of PSC members, according to Mr. Juneau over 60% of the claims were for clients of non-PSC attorneys….While the Settlement Agreement in general terms provides that claims will be processed in the order in which they are received….there is no evidence that the Claims Administrator acted improperly in this regard."

The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 13635 at 3, November 10, 2014).

198. At all times material herein, Defendants secretly colluded to inflate the amount of compensation received by some plaintiffs (just prior to the "fairness" hearing) in order to induce the remaining plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate." Fraudulent inducement is not a procedure which is well within a Court's discretion when it conducts a fairness hearing.

199. At all times material herein, Defendants, individually and/or in collusion with each other and the "MDL 2179 Enterprise," in order to limit BP's liability and thereby maximize judicial efficiency and/or their compensation, have misled Plaintiff and the Government by fraudulently, recklessly, negligently and knowingly failing to disclose to all MDL 2179 Plaintiffs that a class member seeking to determine his or her compensation would not be able to simply read the settlement agreements and determine how his or her circumstances fit into the frameworks. The frameworks of the settlement agreements are certainly not detailed and transparent. A claimant could not possibly make a reasonable determination of how his or her claim will be resolved based on his or his business's circumstances. Defendants drafted these settlement agreements under the premise that "if we can't dazzle them with brilliance, we will baffle them with obfuscation."

200. At all times material herein, Defendants, individually and/or in collusion with

each other and the "MDL 2179 Enterprise," in order to limit BP's liability and thereby maximize judicial efficiency and/or their compensation, have misled Plaintiff and the Government by fraudulently, recklessly, negligently and knowingly failing to disclose to all MDL 2179 Plaintiffs the material fact that contingent fees are designed to increase proportionally alongside a plaintiff's recovery - to tie the fates of lawyer and client. When Defendants take things one-step further and bargain for the defendant to pay their common benefit fees directly, they sever that tie. As a result, the attorneys' financial self-interest may no longer be linked to their clients' outcome, but to the defendant's wishes. This concern has long been recognized as one of structural collusion in the class context. John C. Coffee, Jr., *Rethinking the Class Action: A Policy Primer on Reform*, 62 IND. L.J. 625, 647-48 (1987). Courts have agreed. *E.g.,* Zucker v. Occidental Petroleum Corp., 192 F.3d 1323 (9th Cir. 1999).

201.  At all times material herein, Defendants, individually and/or in collusion with each other and the "MDL 2179 Enterprise," in order to limit BP's liability and thereby maximize judicial efficiency and/or their compensation, have misled Plaintiff and the Government by fraudulently, recklessly, negligently and knowingly failing to disclose to all MDL 2179 Plaintiffs: (a) the total amount of the settlement is only $20 billion; (b) The Feinberg-administered victims' compensation fund denied payment to approximately 61.46% of the claimants who filed claims; (c) Approximately 220,000 Feinberg-administered victims' compensation fund claimants who executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment ($5,000 for individuals and $25,000 for businesses) were subsequently excluded from the settlement class action; (d) the MDL 2179 plaintiffs were fraudulently induced not to opt-out of the settlement; (e) Patrick Juneau denied payment to

approximately 60.03% of the claims submitted to the Deepwater Horizon Claims Center;
(f) the Medical Benefits Class Action Settlement Agreement forced Claimants to accept the
lowest payment of $1,300 because they could no longer wait for the money to cover their
medical expenses; (g) Defendant Barbier saved BP approximately $4.30 billion by finding that
only 4.0 million barrels of oil, rather than 5.0 million barrels of oil proposed by the United
States, exited the reservoir; (h) Defendants Barbier and Herman provided an extremely favorable
payment schedule for BP in regard to the government entity settlements; and (i) The total
compensation (comprised of common benefit fees, contingent fees, co-counsel fees, and hold-
backs) paid to Defendants Herman, Roy, and the seventeen MDL 2179 PSC defendants was
$3.035 billion.

202. Defendant Herman sets forth, in part, one reason for this complaint in a Loyola Law
Review article (64 Loy. L. Rev. 1) which he authored in 2018. The article, titled "Duties Owed
by Appointed Counsel to MDL Litigants Whom They Do Not Formally Represent," explores the
duties, *if any*, owed by appointed counsel in leadership positions to their own clients, to other
plaintiffs, and to the privately retained counsel who represent other plaintiffs in the litigation.

203. In his article, Defendant Herman correctly states, "...the U.S. Supreme Court has
made it clear that an MDL transferee judge's authority over actions originating in other judicial
districts extends only to *pre*-trial proceedings, with such actions subject to remand "to the district
from which it was transferred unless it shall have been previously terminated. 28 U.S.C. §
1407(a) (2012); see *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998)
(stating that a federal district court conducting pretrial proceedings pursuant to the multidistrict
litigation statute has no authority to invoke the change-of-venue statute to assign a transferred

case to itself for trial)....In *Deepwater Horizon*, thousands of plaintiffs were individually represented by attorneys who, for all practical purposes, had no power or authority to take depositions, argue motions, question witnesses, or perform other functions an attorney would typically be expected to undertake in a conventional suit for damages....Instead, the MDL transferee judge appointed a steering committee of nineteen lawyers from around the country to: (1) initiate, coordinate, and conduct all pretrial discovery on behalf of plaintiffs; (2) examine witnesses and introduce evidence at hearings; (3) coordinate the trial team's selection, management, and presentation of any common issue, 'bellwether' or 'test case' trial; (4) submit, argue, and oppose motions; and (5) explore, develop, and pursue settlement opportunities."

204.  Defendant Herman further states in his article, "It is important to recognize that Lead Counsel's authority in an MDL proceeding emanates from the court. This is distinguished from the typical attorney-client relationship in which the lawyer's authority arises from a formal retainer agreement between the attorney and the plaintiff. When counsel is appointed [by the transferee judge] Lead Counsel's authority and concomitant responsibility is generally defined by the procedural steps that must be undertaken from the court's perspective, rather than the ultimate goals sought by plaintiffs; those responsibilities are generally set forth in an order of appointment which describes the services that Lead Counsel is asked and directed to perform. *Such appointment's primary purpose is to further the interests of judicial efficiency and economy*....While Lead Counsel clearly has a duty to perform the functions to which they have been appointed in a fair, honest, competent, reasonable, and responsible way **it would be inappropriate to describe their obligations to other plaintiffs as 'fiduciary'** in the traditional sense of the word....**The appointment of Lead Counsel....is intended to enhance judicial**

-70-

**economy.** It therefore seems unlikely that the courts would knowingly establish a "fiduciary" role for attorneys who could not efficiently or effectively accomplish the appointed tasks while working within the strictures typically imposed upon a fiduciary." (Emphasis added).

205. In addressing Lead Counsel's duty to provide information to MDL plaintiffs, Herman states, "Both traditional fiduciary responsibility and the Professional Rules of Conduct impose affirmative obligations to inform clients about significant developments or decisions affecting their interests, as well as a general duty of full disclosure regarding any and all facts and circumstances regarding the representation when asked. In the MDL situation, on the other hand, Lead Counsel acquires information, not as agents of a particular plaintiff, but because they have been authorized or directed to undertake a certain function by the court."

206. Defendant Herman concludes by stating, "While such Lead Counsel should, of course, be mindful of the interests of other attorneys who are representing plaintiffs in the MDL under individual retainer agreements, the notion that some 'fiduciary duty' extends to such individually retained counsel, in my view, *goes too far*." (Emphasis added).

207. In sum, Defendant Herman instructs: (1) his primary purpose is to further the interests of judicial efficiency and economy [while maximizing his compensation]; and (2) his primary fiduciary duty is to Defendant Barbier. This duty would logically include the furtherance of the interests of judicial efficiency and economy via the "Eight-Step" fraudulent scheme which would most certainly require the knowledge and approval of Defendant Barbier.

208. Defendant Herman illustrates a central problem with MDL 2179, namely, the Court's sole focus is on judicial economy without any consideration for justice, accountability or transparency.

## II. Defendants' 8-Step Fraudulent Scheme to Limit BP's Liability and Maximize Their Compensation

209.  Defendants, individually and/or in collusion with each other, fraudulently, recklessly, negligently and knowingly conceived, developed, and/or facilitated the following "Eight-Step" fraudulent scheme to maximize judicial efficiency and/or their compensation in exchange for limiting the liability of BP.

### A. Step No. 1: Capture Market Share

210.  In MDL 2179, a victim of the BP oil well blowout is not a person. MDL 2179 plaintiffs are merely bargaining chips or commodities acquired by the defendants (MDL 2179 Co-Liaison Counsel and MDL 2179 PSC members) and later "sold" in bulk to BP.

211.  The MDL 2179 plaintiffs serve as a bargaining chips in four ways: (a) an attorney with a sufficient number of bargaining chips has a better chance to be awarded with a lucrative appointment to the MDL 2179 PSC by Defendant Barbier; (b) after the attorney has been appointed to the PSC, he pools his bargaining chips with the bargaining chips of the other members of the PSC to exert leverage on BP while graciously offering BP and BP's shareholders closure; (c) the settlement class action achieved by this leverage will hopefully result in significant judicial efficiency; and (d) this judicial efficiency, in turn, will result in Defendant Barbier ensuring that Defendants Herman, Roy, and the cooperative PSC attorneys are excessively compensated for closing the deal with BP in a timely manner. Justice for the BP oil well blowout victims is never considered by the defendants.

212.  Defendant Barbier praises the attorneys he appointed to the MDL 2179 PSC for their initiative, "Shortly after the events of April 20, 2010, various law firms who would eventually become Liaison Counsel, PSC members, Class Counsel, and other common benefit

-72-

attorneys….started to coordinate with one another….Working together, the lawyers developed a formal limited joint-prosecution agreement to facilitate the coordination and sharing of information, research, and litigation strategy." Defendants Herman, Roy, and each attorney appointed by Defendant Barbier to the MDL 2179 PSC directly represent tens of thousands of clients.

### B. Step No. 2: The JPML Transfer Order

213.  In the transfer order for MDL 2179, the JPML states, "Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund."

214.  Defendants did not have to rely solely on a settlement class action to limit BP's liability. From the very beginning, Defendants also had a victims' compensation fund, sanctioned by the JPML, to eliminate hundreds of thousands of MDL 2179 Plaintiff-Claimants.

### C. Step No. 3: Establishment of Feinberg's Victims' Compensation Fund

215.  Kenneth R. Feinberg, masquerading as a "Fund Administrator," was employed by BP to limit BP's liability.

216.  In violation of the OPA, but with the approval of Defendants, Feinberg's approach to determining claimant eligibility was driven by two factors: (1) loss location; and (2) claimant business type.

217.  Feinberg's use of coercion and fraudulent inducement was also in clear violation of the OPA. Feinberg used the fear of costly and protracted litigation, during town hall meetings, on the Internet, and via email to coerce victims of the BP oil well blowout to accept grossly inadequate settlements.

218.  In MDL 2179, Feinberg used a "Delay, Deny, Defend" tactic against legitimate BP

oil well blowout victims. This tactic, commonly used by unscrupulous insurance companies, is as follows: "Delay payment, starve claimant, and then offer the economically and emotionally-stressed claimant a miniscule percent of all damages, including future damages, to which the claimant is entitled. If the financially ruined claimant rejects the settlement offer, he or she may sue."

219. This "Delay, Deny, Defend" tactic, although unconscionable, proved to be very effective for the defendants and BP.

220. Defendants fully sanctioned and facilitated Feinberg's "Release and Covenant Not to Sue."

221. The ultimate objective of Feinberg's "Delay, Deny, Defend" tactic was to limit BP's liability by obtaining a signed "Release and Covenant Not to Sue" from as many BP oil well blowout victims as possible. Feinberg's "Release and Covenant Not to Sue" requirement violates OPA, State contract law, and is contrary to public policy.

222. Releases, compromises and settlement agreements are contracts and the rules of construction applicable to all contracts are used in the interpretation of such agreements.

223. Whether a compromise, settlement, or release is a valid contract between the parties is determined by reference to State substantive law governing contracts generally. Whether a contract or a contractual provision is unconscionable or unenforceable on grounds of illegality or public policy is a question of law.

224. In examining whether a contract is unconscionable, the court must determine whether one party lacked a meaningful choice and the contract terms were unreasonably favorable to the other party.

225. Kenneth R. Feinberg's "Release and Covenant Not to Sue" violates State contract law and is contrary to public policy because it: (a) was obtained through the use of economic duress; (b) was obtained without free consent (Claimants did not consent to the release by choice, because the only option for receiving payment required Claimants to sign a release, the terms of which they had no opportunity to negotiate.); (c) was obtained through fraud; (d) requires Claimants to discharge, waive and release future claims (including those resulting from gross negligence) for costs and damages (including punitive damages) that are unknown and have not yet arisen. As Defendant Barbier clearly states in his Order of August 26, 2011, "The long term effects [of the BP oil well blowout] on the environment and fisheries may not be known for many years;" (e) was obtained in exchange for inadequate consideration; and (f) has as its objective the circumvention of the OPA.

226. Accordingly, Defendants' sanctioned "Release and Covenant Not to Sue" is void *ab initio*.

227. Incredibly, Defendant Barbier still held: (a) "While OPA does not specifically address the use of waivers and releases by Responsible Parties, the statute also does not clearly prohibit it;" and (b) "In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill."

228. The OPA requires more than merely "speedy and efficient." The OPA requires that all BP oil well blowout victims are *fully* compensated. Furthermore, the purpose of the Federal Rules of Civil Procedure is "to secure the *just*, speedy, and inexpensive determination of every action and proceeding (Emphasis added)." Victims of the BP oil well blowout turned to the court in search of justice, not merely a "speedy" determination of their cases.

229. Efficiency is not the only touchstone of justice. A substantial body of opinion and a respect for jurisdictional principles suggest that a plaintiff ordinarily has a right to a trial in the forum of his or her choosing. Aggregation of cases for the purpose of facilitating settlement is a byproduct of §1407, but is not its central statutory purpose.

230. Judicial economy is undoubtedly well-served by MDL consolidation when scores of similar cases are pending in the courts. Nevertheless, the excessive delay and marginalization of juror fact finding (i.e., dearth of jury trials) associated with traditional MDL practice, such as MDL 2179, are developments that cannot be defended.

231. The appropriate focus for Defendants' sanctioned Feinberg-administered victims' compensation fund resolution of mass claims should be justice for the claimants, not merely judicial economy and closure for BP.

232. Defendant Feinberg denied payment to approximately 61.46% of the claimants who filed claims.

233. The BP/Feinberg victims who executed a "Release and Covenant Not to Sue" (approximately 220,000 in number) were subsequently excluded by Defendants Barbier, Herman, and Roy from the settlement class action.

**D. Step. No. 4: Appointment of "Cooperative" Attorneys to the PSC**

234. It is important to understand that Defendant Herman, in a 2018 Loyola Law Review article which he authored, openly admits that judicial efficiency replaces justice and his primary fiduciary duty is to Defendant Barbier in MDL 2179.

235. MDL 2179 is not a litigation. Attorneys appointed to the MDL 2179 PSC are not appointed by Defendant Barbier to be litigators. These attorneys are not selected for the purpose of zealously advocating on behalf of their clients. Defendants Herman, Roy, and the attorneys

-76-

appointed to the MDL 2179 PSC are cooperative dealmakers.

236.  In sum, the main criteria for membership in the MDL 2179 PSC is very simple:
(a) The attorney must be "cooperative;" (b) The attorney should be a "repeat player;" and (c) The attorney must have signed-up a large stable of clients which he or she is already directly representing.

237.  It is helpful to remember the three Cs of any successful PSC: cooperation, control, and compensation. Greater cooperation (between the dealmakers) and control (in terms of a significant market share of plaintiffs) results in closing the deal faster with the defendant and clearing the docket faster which results in greater compensation. A happy transferee judge is a generous transferee judge. A happy Plaintiffs' Co-Liaison Counsel is a generous Plaintiffs' Co-Liaison Counsel. In MDL 2179, the comatose, hapless plaintiffs received little or no compensation while the compensation paid to Defendants (Herman, Roy, and the members of MDL 2179 PSC) is estimated to be *$3.035 billion.*

### E. Step No. 5: Circumvention of OPA, a Strict Liability Statute

238.  "OPA applies of its own force, because that act governs, *inter alia*, private claims for property damage and economic loss resulting from a discharge of oil in navigable waters. *See* 33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 3830 at 11, August 26, 2011).

239.  The OPA is a ***strict liability*** statute. In order to recover damages under the OPA, a claimant merely needs to show that his or her damages "resulted from" the oil spill or oil well blowout.

240.  "Shall" means shall. The U.S. Supreme Court has made clear that when a statute uses the word "shall," Congress has imposed a mandatory duty upon the subject of the

command.

241. Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is mandatory and "may" is permissive. "The mandatory 'shall'….normally creates an obligation impervious to judicial discretion."

242. BP, the majority owner and operator of the Macondo Well, is a "responsible party" for the BP oil well blowout of April 20, 2010 under the OPA, 33 U.S.C. §2702(a).

243. Although liability under the OPA is subject to a monetary cap of $75,000,000 for each incident by each responsible party, there is no limit to liability if the damage was proximately caused by "gross negligence or willful misconduct." It is important to note that BP, the responsible party, waived the monetary cap of $75,000,000 for the BP oil well blowout incident in the Gulf of Mexico on April 20, 2010 and the MDL 2179 Court concluded that the discharge of oil was the result of BP's "gross negligence" and "willful misconduct" under the Clean Water Act ("CWA"). Accordingly, in theory, there is no limit to BP's liability. Defendants' greed-induced reality is so very different.

244. Allegedly, in order to efficiently manage MDL 2179, the Court consolidated and organized the various types of claims into several "pleading bundles" for the purpose of the filing of complaints, answers, and any Rule 12 motions.

245. The "B1" pleading bundle includes all claims for private or "non-governmental" economic loss and property damages.

246. On January 12, 2011, the MDL 2179 Court issued PTO No. 25, in order to clarify "the scope and effect" of the "B1" Master Complaint. The Court held that any individual plaintiff who is a named plaintiff in a case that falls within pleading bundle "B1" is deemed to be a

plaintiff in the "B1" Master Complaint. Also, "the allegations, claims, theories of recovery and/or prayers for relief contained within the pre-existing petition or complaint are deemed to be amended, restated, and superseded by the allegations, claims, theories of recovery, and/or prayers for relief in the respective "B1" Master Complaint(s) in which the defendant is named."

247. Rather than allege claims under OPA and the Outer Continental Shelf Lands Act ("OCSLA") (which governs the MDL 2179 personal injury and wrongful death actions and borrows the law of the adjacent state as surrogate federal law), the "cooperative" Defendants Herman and Roy made the unfathomable decision to allege claims under a hodgepodge of statutes. In the "B1" Master Complaint, Defendant Herman states, "The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiffs hereby designate this case as an admiralty or maritime case, and request a non-jury trial, pursuant to Rule 9(h)."

248. Defendants Herman and Roy were concerned that a jury may not be "cooperative."

249. The U.S. Supreme Court has quoted testimony by an admiralty expert who stated "maritime law in the strict sense has never had to deal with the resources in the ground beneath the sea, and its whole tenor is ill adapted for that purpose." The Court then added that "since the Act [OCSLA] treats seabed, subsoil, and artificial islands the same, dropping any reference to special treatment for presumptive vessels, the most sensible interpretation of Congress' reaction to this testimony is that admiralty treatment was eschewed altogether…." The U.S. Supreme Court additionally stuns with its unqualified statement that it "*has specifically held that drilling platforms are not within admiralty jurisdiction.*" (Emphasis added)

250. The U.S. Supreme Court has reaffirmed as a basis for an admiralty tort that the

wrong must bear a substantial relation to a traditional maritime activity in *Foremost Insurance Co. v. Richardson, Sisson v. Ruby, Grubart,* and, most recently, *Herb's Welding.* If the MDL 2179 Court were to apply this requirement in the BP oil well blowout litigation, Defendants' claim of admiralty jurisdiction for the BP oil well blowout - the epitome of an oil and gas drilling operation - would have proven difficult, if not impossible, to sustain.

251. OCSLA's role as an essential component of the BP oil well blowout cannot be ignored. OCSLA, the U.S. Supreme Court has declared, "defines a body of law applicable to the seabed, the subsoil and the...structures...on the Outer Continental Shelf." OPA is no less essential to the tort, of course, because, as the MDL 2179 Court itself acknowledges, the statute "governs....private claims for property damage and economic loss resulting from a discharge of oil in navigable waters." The BP oil well blowout, in sum, inextricably engages *both* statutes in this unique configuration. OCSLA, the U.S. Supreme Court declared in 1969 in *Rodrigue v. Aetna Casualty & Surety Company*, was intended to "define a body of law applicable to the seabed, the subsoil and the....structures....on the Outer Continental Shelf." OCSLA's legislative history, as carefully evaluated by *Rodrigue*, disdains admiralty law as OCS governing law. Congress refashioned OCSLA in 1978 as a "new statutory regime" designed to "prevent or minimize the likelihood of *blowouts, loss of well control,* fires....or other occurrences which may cause damage to the environment or to property, or endanger life or health." Congress could not have spoken more directly to BP oil well blowout's core issue and corresponding remedial program, particularly as OCSLA was subsequently refined and expanded by OPA.

252. Following the *Exxon Valdez* disaster in 1989, Congress unanimously adopted OPA, which the Senate Public Works and Environmental Committee portrayed as a "single Federal

law providing cleanup authority, penalties, and liability from oil pollution." Consolidated and harmonized within this single act were major elements of four existing oil pollution statutes, including OCSLA's title III.

253. The comprehensiveness of the displacement of general maritime law by the two non-admiralty statutes, OCSLA and OPA, is evident on two fronts.

254. The first is Congress's reformulation of general maritime law's episodic, conflicting, and, at best, embryonic treatment of the tort. The second is Congress's own undertaking in OPA to comprehensively incorporate and reformulate in a single federal statute its own work in the four prior statutes. This extraordinarily extensive undertaking leaves negligible space for the credibility of any claim that these efforts fall short of Congress's effective occupation of a field coextensive with the boundaries delineated in the BP oil well blowout.

255. In *Herb's Welding*, the U.S. Supreme Court excoriated as "*untenable*" the Fifth Circuit's view that "*offshore drilling is maritime commerce*." *Herb's Welding*'s explicit confirmation of and reference to the U.S. Supreme Court's assessment in *Rodrigue* that OCSLA's legislative history "*at the very least forecloses the Court of Appeals' holding that offshore drilling is a maritime activity.…*" would seem to leave precious little space for Defendants' position.

256. In *Rodrigue*, the U.S. Supreme Court clashed with the Fifth Circuit's *Snipes v. Pure Oil Company* decision, which, in another manifestation of the Fifth Circuit's reflexive admiralty-centrism, defined as "maritime" a tortious injury suffered by an OCS stationary platform worker at this OCSLA site. In *Rodrigue*, the U.S. Supreme Court held that admiralty law does not apply

-81-

to torts originating on OCSLA situses unless Congress affirmatively expresses its "intent" favoring this override. The U.S. Supreme Court's language favoring this conclusion could not be more forthright: "Even if the admiralty law would have applied to the deaths occurring in these cases under traditional principles, OCSLA's legislative history shows that Congress did not intend that result. First, Congress assumed that the admiralty law would not apply to an OCSLA situs unless Congress made it apply, and then Congress decided not to make it apply." Earlier discussion disclosed Congress's 1978 institution of its "new OCSLA statutory regime." The Conference Committee explained that the former clarified that federal law is to be *applicable to all activities on all devices in contact with the seabed for exploration, development, and production.* The committee intends that federal law is, therefore, to be applicable to activities on drilling ships, *semi-submersible drilling rigs*, and other watercraft, when they are *connected to the seabed by drill string,* pipes, or *other appurtenances,* on the OCS for exploration, development, or production purposes. *Ships and vessels are specifically not covered only when they are being used for the purpose of transporting OCS mineral resources.*

257. The House described title III's function as providing the "procedures to be followed in the event of an oil spill and compensation for cleanup costs and damages resulting from such a spill." The title limits the definition of "vessels" to watercraft operating in OCS or territorial waters and which transport "oil directly from an offshore facility." An "offshore facility," it stated, is "any oil refinery, or *drilling structure*,....which is used to *drill for*, produce,....or transport oil produced from the Outer Continental Shelf....." These definitions exclude semisubmersibles as "vessels" by including them under "any drilling structure." The term "vessel" is restricted to any watercraft used exclusively to "transport oil directly from an offshore

-82-

facility." Hence the statement of the conferees: "*Once a drilling ship or other watercraft is attached to the seabed for exploration*, development or production, *it is to be considered an 'offshore facility' rather than a vessel*, for purposes of applying the differing requirements for a facility as compared to a vessel."

258. In fact, OCSLA's section 1333(a), its title III OCS economic-and property-loss cause of action, and the latter's refinement and expansion in OPA are not creatures of admiralty at all. They are instead independently grounded in the Constitution's Property and Interstate and Foreign Commerce clauses, respectively.

259. Historically, the U.S. Supreme Court has objected to "fortuitous," "perverse" or "absurd" results that may result from pinning the admiralty tail on disputes for which admiralty can claim no expertise. The U.S. Supreme Court undertook to discourage this practice in *Executive Jet Aviation Company v. City of Cleveland* by requiring a "substantial relationship" connecting the matter in question "to traditional maritime activity." "In determining whether there is admiralty jurisdiction over a particular tort or class of torts," the Court stated, "reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than a purely mechanical application of the locality test."

260. General maritime law's judge-made principles do not enjoy a presumption against displacement by a federal statute. Despite idealized assertions of admiralty's capacity to resolve complex social or economic issues, the reality, as Justice Holmes counseled, is that general maritime law is not a "corpus juris," but "a very limited body of customs and ordinances of the sea."

-83-

261. Defendant Herman's reasoning and Defendant Barbier's orders and reasoning are contrary to U.S. Congressional intent, the OCSLA, the OPA and U.S. Supreme Court decisions. The only logical conclusion is that they are the product of Defendants acting individually and/or in collusion with each other and the "MDL 2179 Enterprise" in order to knowingly limit BP's liability and thereby maximize judicial efficiency and/or their compensation

262. Filing of the "B1" Master Complaint as an admiralty or maritime case artfully circumvented the OPA. By doing so, Defendant Herman assisted Defendant Barbier in expeditiously being able to erroneously and incomprehensibly find, "….that nothing prohibits Defendants from settling claims for economic loss. While OPA does not specifically address the use of waivers and releases by Responsible Parties, the statute also does not clearly prohibit it. In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill."

263. As a result of this finding by Defendant Barbier, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action. There is no evidence that these amounts even remotely represent adequate consideration to compensate claimants for the damages that claimants did or will suffer as a result of the BP oil well blowout.

264. By alleging claims under general maritime law rather than under the OPA (*a strict liability statute*) and OCSLA, in the "B1" First Amended Master Complaint, Defendant Herman assisted Defendant Barbier in expeditiously being able to:

> (a) Erroneously find, "The *Deepwater Horizon* was at all material times *a vessel in navigation.*"

-84-

(b) Erroneously find, "Admiralty jurisdiction is present because the alleged tort occurred upon navigable waters of the Gulf of Mexico, disrupted maritime commerce, and the operations of the vessel *bore a substantial relationship to traditional maritime activity*. With admiralty jurisdiction comes the application of substantive maritime law."

(c) Erroneously find, "State law, both statutory and common, is preempted by maritime law, *notwithstanding OPA's savings provisions*. All claims brought under state law are dismissed."

(d) Erroneously find, "General maritime law *claims that do not allege physical damage to a proprietary interest are dismissed* under the *Robins Dry Dock* rule, unless the claim falls into the commercial fishermen exception."

265.  Moreover, the maritime rule in the Fifth Circuit is that operational recklessness or willful disregard is generally insufficient to visit punitive damages upon the employer. Rather, the conduct must emanate from corporate policy or that a corporate official with policy-making authority participated in, approved of, or subsequently ratified the egregious conduct.

266.  Accordingly, Defendant Barbier concluded that BP cannot be held liable for punitive damages under general maritime law. Defendant Barbier further noted that, even if BP were liable for punitive damages, only commercial fishermen or those who could satisfy the "physical injury" threshold of the *Robins Dry Dock* rule would be entitled to such an award.

267.  Since Defendant Herman requested a non-jury trial pursuant to Rule 9(h) and alleged claims under general maritime law, rather than OPA and OCSLA, Defendants Barbier, Herman, and Roy formulated a trial plan that dispensed with trial by jury and instead conducted a bench trial applying general maritime law.

268.  Circumventing the OPA also allowed the settlement to limit a claimant's recovery of damages by geographic bounds, pertain solely to certain business activities, and require a heightened and vague proof of causation between his or her damages and the BP oil well blowout incident.

-85-

### F. Step No. 6: Approval of the Settlement Class Action

269. In February 2011, only 4 months after Defendant Barbier appointed Defendants Herman, Roy, and the other cooperative attorneys, settlement negotiations began "in earnest." Defendants Herman, Roy, and BP negotiated a total amount which BP was willing to pay in order to settle the BP oil well blowout case.

270. Carefully implementing the above-described Steps No. 1 through No. 5, Defendants Herman, Roy, and BP worked backwards from that agreed upon total amount to draft the terms and conditions of the settlement.

271. Just prior to the final fairness hearing in November 2012, Defendants Herman, Roy, the members of the MDL 2179 PSC, Defendant Juneau, and BP, with the approval of Defendant Barbier, intentionally processed a substantial number of high value claims in an attempt to demonstrate that the settlement program was working as promised. Here, the objective was to keep as many of the remaining claimants/plaintiffs in the settlement class action as possible. Opt-outs were seriously frowned upon. The settlement class action was the only game in town. Take it or leave it!

272. At the fairness hearing, Defendant Barbier limited oral presentations by individual objectors (or their counsel, as applicable) to not more than 3 minutes each.

273. In sum, the purpose of the fairness hearing was to allow the cooperative dealmakers to argue in favor of approval of the Economic and Property Damages Settlement. Claims Administrator Patrick Juneau and Michael Juneau also presented on the glorious status of the settlement and the virtually non-existent settlement opt-outs.

274. The BP oil well blowout of April 2010 resulted in the largest environmental disaster

-86-

in the history of the United States. An estimated 5.0 million barrels of crude oil gushed into the Gulf of Mexico.

275. Defendant Barbier clearly states, "The long term effects [of the BP oil well blowout] on the environment and fisheries may not be known for many years." Nevertheless, in order to limit BP's liability, one tactic employed by the defendants was to limit the compensation period to 2010.

276. Incredibly, Defendant Barbier found, and Defendants Herman and Roy agreed, that limiting the compensation period to 2010 is reasonable. Defendant Barbier explains, "Certain objectors complain that the Economic Damage Claim Frameworks are unfair because they do not compensate persons who did not begin suffering losses until 2011. Yet this provision is reasonable for three reasons: (i) the Macondo well ceased flowing in July 2010; (ii) there is evidence that by late 2010, Gulf Coast tourism had returned to or surpassed 2009 levels; and (iii) as to claims by individuals and businesses in charter fishing, seafood processing, or other businesses relying on access to Gulf waters, nearly all federal and state waters were reopened for commercial fishing by November 2010. *Thus, extending compensation to 2011 would cover losses not likely caused by the spill.*" (Emphasis added)

277. Defendants' settlement causation requirements take obfuscation to a new level.

278. The BP oil well blowout settlement contains various causation requirements for Business Economic Loss ("BEL") claims. Two of the causation tests, the Modified V-test and the Decline-Only test, require a revenue calculation based on benchmark periods and, in addition, a decline in the share of total revenue generated by non-local customers or customers in Zones A to C as reflected in specified documentation.

-87-

279. In discussing the causation requirements for BEL claims, Defendant Barbier explains, "Certain objectors contend that to invoke the Modified V-Test or the Decline-Only Test, they are required to satisfy the Customer Mix Test, which requires these businesses to establish where their customers are located. The objective evidence shows that the causation tests available under the Settlement Agreement are both economically reasonable and highly favorable to claimants, which is why they were negotiated by experienced counsel in consultation with their clients and experts….Other objectors complain that before they can invoke the V-Shaped Revenue Pattern test, they must demonstrate a 5% revenue recovery during the correlating months of 2011 as compared to the 2010 baseline period. This provision is reasonable, as *losses that continued after the spill are likely to be due to factors other than the spill*." (Emphasis added)

280. Defendants fraudulently, recklessly, negligently and knowingly breached their fiduciary and ethical duties to Plaintiffs by reassuring BP oil well blowout Plaintiffs that the settlement claims program's Risk Transfer Premium ("RTP") enhances the compensation amount for, among other things, certain claimants whose damages could be recurring, to account for that risk of future damages.

281. Defendants further fraudulently, recklessly, negligently and knowingly breached their fiduciary and ethical duties to Plaintiffs by supporting the Court's finding that, "RTP payments are meant to compensate class members for pre-judgment interest, the risk of oil returning, consequential damages, inconvenience, aggravation, the risk of future loss, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors."

-88-

282. According to Defendants Barbier and Herman, RTP payments are simply magical.

283. Defendants Herman, Roy, and the members of the MDL 2179 PSC, tendered either jointly or on their own behalf four "experts" in the law of class actions: Professors Coffee, Issacharoff, Klonoff, and Miller. Indeed, Defendant Barbier cites to, or in some instances quotes from, the opinions of these "Thought Leaders" at various points in its analysis of class certification issues.

284. The following are a few examples of the quotes of these "Thought Leaders" and Claims Administrator.

(a) The class definition is geographically circumscribed to Louisiana, Alabama, Mississippi, and certain specified counties in Florida and Texas along the Gulf Coast, as well as Specified Gulf Waters [*in violation of the OPA*].

(b) According to Professor Coffee, such careful negotiation of the release was "an example of reasoned statesmanship [*in violation of the OPA*]."

(c) "Because a class action is the vastly superior method by which to resolve the impact of this mass disaster on the Gulf Coast Region, it would be a social tragedy if class certification were denied."

(d) "I've never been involved in a project that has gotten up this quick, had the involvement with the volume we had to deal with, and to either have started it earlier or gotten it paid this quickly. It's been a remarkable experience for me."

(e) "The pace of payment determinations and payments is very high in comparison to other claims matters and is especially reasonable considering the other substantial responsibilities of the Settlement Program during this same period of time."

285. Defendants fraudulently, recklessly, negligently and knowingly breached their fiduciary and ethical duties to Plaintiffs by retaining, and highly compensating, four law professors/thought leaders to give their "unbiased" opinions in order to induce the plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate."

286. Notwithstanding the opinions of the four law professors, Plaintiff believes it is obvious to any reasonable person that the settlement class action violates the OPA statute by defining class members by geographic bounds and certain business activities while requiring proof of a heightened, vague standard of causation.

287. The MDL 2179 class settlement agreement is a business deal entered into between Defendants Barbier, Herman, Roy, the members of the MDL 2179 PSC, and BP for their own personal benefit. This deal was consummated behind closed doors. Although there is no stated limit on the amount that BP is willing to pay, there is an absolute limit that BP is willing to pay ($20 billion). Otherwise, BP would not have agreed to the settlement terms and conditions. More importantly, Defendants conveniently fail to mention that although there is no stated ceiling, there is also no stated floor. BP is not obligated to pay any amount. Moreover, BP and Defendants are able to argue that certain claims are not legitimate and Defendants may clawback "fraudulent" payments previously paid to BP oil well blowout victims.

288. After eliminating the class members who opted-out and the illegally excluded BP oil well blowout victims, the vast majority of remaining Plaintiffs are either comatose or are directly represented by Defendants Herman, Roy, and members of the PSC. Plaintiffs directly represented by Defendants Herman, Roy, and members of the PSC know they shall be well-compensated because each client must pay a contingent fee to his or her "cooperative" dealmaker attorney.

### G. Step No. 7: The Post-Settlement Mop-Up Procedures

289. Transferee judges tend to issue *Lone Pine* orders after most plaintiffs' cases are resolved through a comprehensive settlement. *Lone Pine* orders are usually issued with little

advanced notice. Although plaintiffs may be relying on common evidence produced by the PSC, when they refuse to settle, *Lone Pine* orders might require a plaintiff to retain an individual expert and produce her opinion within a couple of weeks. In sum, *Lone Pine* orders require non-settling plaintiffs to provide some evidentiary support for their claims to avoid dismissal.

290.  Defendants Herman, Roy, and MDL 2179 PSC members routinely argue that a *Lone Pine* order is appropriate as "a post-settlement mop-up procedure utilized to address those cases which either were not eligible for compensation through the MDL 2179 settlement program or which had opted-out of participation in the MDL 2179 settlement program." In reality, the purpose of a *Lone Pine* order is to eliminate those few remaining non-cooperating plaintiffs who have the audacity to demand justice.

291.  In lieu of having the Court issue a *Lone Pine* order, Defendant Barbier created Pretrial Order No. 60 ("PTO 60") and Pretrial Order No. 64 ("PTO 64") to eliminate those few remaining non-cooperating, pesky plaintiffs who have the audacity to demand justice.

292.  On March 29, 2016, the MDL 2179 Court issued PTO 60 wherein the Court dismissed the amended "B1" Master Complaint as having "no further administrative or procedural benefit."

293.  In PTO 60, the Court required plaintiffs in pleading bundle "B1" who had filed a timely claim, and not previously released their claim, to file and serve on BP a sworn statement disclosing information regarding their claims. PTO 60, in pertinent part, states:

> "A. As to Plaintiffs who filed Individual Lawsuits.
> (i) Any plaintiff who previously filed an individual lawsuit must complete the sworn statement in the form reflected in Exhibit A. The completed sworn statement shall be attached to a cover sheet reflecting the caption of the individual lawsuit in the form of Exhibit B. Both the cover sheet and the attached sworn statement must be filed into the

record of the plaintiff's individual lawsuit (as opposed to the master docket for MDL 2179) no later than May 2, 2016. Plaintiff also shall serve the sworn statement on the Plaintiffs' Steering Committee ("PSC") and counsel for BP no later than May 2, 2016."

294. In addition, the Court required those "B1" plaintiffs who had not previously filed an individual complaint (defined as a complaint not joined in by any other plaintiffs) against BP to file a new individual complaint. PTO 60, in pertinent part, states:

"B. Plaintiffs who DID NOT file Individual Lawsuits, (i.e., only filed a SFJ and/or were part of a "Mass Joinder" Lawsuit).
(i) Where Plaintiffs did not file an individual lawsuit, but instead filed a SFJ and/or were part of a complaint with more than one plaintiff, each such plaintiff must, by May 2, 2016, file an individual lawsuit (Complaint) (one per plaintiff), using the caption reflected in Exhibit C. The Complaint should include as an attachment the completed sworn statement in Exhibit A. Each plaintiff also must, by May 2, 2016, serve the PSC and Counsel for BP with a copy of the completed sworn statement.
(ii) Plaintiffs that did not file individual lawsuits, but instead filed a SFJ and/or were part of a complaint with more than one plaintiff, who fail to comply with the above requirements by May 2, 2016, will have their claims deemed dismissed with prejudice without further notice."

295. In sum, plaintiffs who failed to comply with the sworn statement requirement or the new individual complaint requirement by the compliance deadline (May 2, 2016) were to have their claims deemed *dismissed with prejudice without further notice*.

296. PTO 60, allegedly in order to further assist the Court in streamlining the dismissal of the remaining claims, addresses the issue of "Presentment" under the OPA. PTO 60 asks any plaintiff who previously filed an individual lawsuit, "Did you, the plaintiff seeking relief, present this claim at least 90 days prior to filing a lawsuit or joining the "B1" Complaint?"

297. Plaintiff Donovan believes a logical question is: Why didn't Defendant Herman immediately ask each Plaintiff if he or she presented his or her claim to BP (the "Responsible Party") at least 90 days prior to filing a lawsuit or joining the "B1" Complaint, as required under

-92-

the OPA, when the plaintiff's case was transferred to MDL 2179 or when the plaintiff filed a SFJ?

298.  Following a show cause process, the MDL 2179 Court recognized approximately 1,000 remaining "B1" plaintiffs to be compliant with PTO 60 and subject to further proceedings in MDL 2179. The claims of any other remaining "B1" plaintiffs were dismissed.

299.  On July 14, 2016, the MDL 2179 Court issued an Order (Re: Compliance with PTO 60 Regarding All Remaining Claims in Pleading Bundle "B1") wherein the Court held "As to all Plaintiffs in the "B1" bundle, only those Plaintiffs who have not previously released their claims, have made timely presentment as required by OPA, have previously filed an individual lawsuit, and have otherwise complied with the requirements of PTO 60 have preserved their individual claims. All other B1 bundle claims are time-barred."

300.  BP believes that a very large number of these approximately 1,000 remaining claims are subject to dismissal "based upon the MDL 2179 Court's prior orders, *lack of OPA presentment*, or release (including membership in the settlement classes and their attendant releases)." Certain of these claims may require further proceedings, including but not limited to dispositive motion practice.

301.  Interestingly, and ironically, BP states that "it also reserves all of its rights concerning its arguments that *OPA displaces all forms of maritime claims*."

302.  On February 22, 2017, the Court issued Pretrial Order No. 64/Case Management Order No. 6 ("PTO 64," Rec. Doc. 22297), one of the goals of which was to identify those "Remaining B1 Plaintiffs" who could plausibly allege a claim under general maritime law. As used in PTO 64, "Remaining B1 Plaintiffs" meant those plaintiffs who had been deemed

-93-

compliant with PTO 60 and who had not voluntarily dismissed their claims.

303. PTO 64 required that each Remaining B1 Plaintiff who wished to pursue a general maritime law claim must complete and serve upon BP's counsel and the Plaintiffs' Steering Committee ("PSC") by April 5, 2017 a "Sworn Statement Regarding General Maritime Law Claims."

304. If a Remaining B1 Plaintiff failed to comply with PTO 64, then that plaintiff's general maritime law claim(s) would be deemed waived and "any such general maritime law claims shall be dismissed without further notice and with prejudice."

305. On January 11, 2018, the Court issued Pretrial Order No. 65 ("PTO 65," Rec. Doc. 23825), requiring remaining B1 Plaintiffs to file verified statements regarding causation and damages by April 11, 2018.

306. PTO 65 requires the "Remaining B1 Plaintiffs" to provide sworn answers to the following four questions concerning damages and causation: (1) Describe specifically the compensatory damages that you claim in your lawsuit, including the nature of the damage, the date(s) of the damage, the amount of the damage, and the calculations used to arrive at that amount; (2) Describe specifically the evidence you rely on to prove the damages you allege in response to Question No. 1; (3) Describe specifically how the Deepwater Horizon/Macondo Well incident and oil spill caused the damages you allege in response to Question No. 1; and (4) Do you have at this time an expert who will opine as to any of your responses to the above questions?

307. On *May 25, 2018*, the Court issued an "Order to Show Cause Re: Compliance with PTO 65" (Rec. Doc. 24558). The Order states "Any Plaintiff appearing on the attached lists of

-94-

321 Remaining B1 Plaintiffs must show cause in writing on or before *June 15, 2018* why this Court should not dismiss his/her/its B1 claim(s) with prejudice for failing to comply with the requirements of PTO 65."

**H. Step No. 8: Clawback**

308. Carefully implementing the above-described Steps No. 1 through No. 7, Defendants eliminated, excluded or dismissed virtually all remaining claims against BP.

309. In the status report submitted to the BP oil well blowout Court on February 14, 2017, attorneys for BP Exploration & Production Inc. and BP America Production Company state, "Following a show cause process, the MDL 2179 Court recognized approximately 1,000 remaining "B1" plaintiffs to be compliant with PTO 60 and subject to further proceedings in MDL 2179. The claims of any other remaining "B1" plaintiffs were dismissed. Certain plaintiffs who were found noncompliant with PTO 60 and had their claims dismissed by the Court's December 16, 2016 Reconciliation Order have filed motions for reconsideration and/or notices of appeal…BP believes that a very large number of these pending claims are subject to dismissal based upon the Court's prior orders, lack of OPA presentment, or release (including membership in the settlement classes and their attendant releases). Certain of these claims may require further proceedings, including but not limited to dispositive motion practice….*BP also reserves all of its rights concerning its arguments that OPA displaces all forms of maritime claims*."

310. One purpose of the "clawback" order was allegedly to refund to BP the amount paid to claimants who had submitted fraudulent claims. However, Defendants' primary purpose was to burnish BP's tarnished image. Although only an infinitesimal percentage of submitted claims were found to be fraudulent, these claims were highly publicized and reported on the Internet and

in the media. Any casual observer could easily conclude that BP was the only true victim of the oil well blowout disaster. Indeed, were there ever any real victims with legitimate claims?

### III. Defendants Breached Their Fiduciary and Ethical Duties

#### A. "Come Into the Fold," Pay Us, and Keep Quiet

311. Upon transfer to MDL 2179, the attorneys which the BP oil well blowout plaintiffs initially retained are magically replaced by Defendants Roy, Herman, and the cooperative attorneys appointed to the MDL 2179 PSC.

312. The first lawsuit Plaintiff Donovan's clients filed against Feinberg, et al. was eventually transferred from the Florida State Court to MDL 2179 in August 2011. On August 29, 2011 at 7:12 AM, Plaintiff Donovan emailed James Parkerson Roy, Plaintiffs' Co-Liaison Counsel for MDL 2179. Plaintiff Donovan introduced himself, attached a copy of the JPML transfer order, and stated, "I would like to commence discovery as soon as possible. Since this action does not involve common questions of fact with actions previously transferred to MDL 2179, please advise as to how we may most expeditiously initiate and coordinate discovery. I look forward to working with you on this case."

313. On September 5, 2011 at 11:15 PM, Plaintiff received an emailed response from Roy and Stephen J. Herman wherein they state, "We have received and appreciate your correspondence of August 29, 2011….Please be advised that the Court has declined to permit formal discovery on Feinberg or the GCCF….Should you desire to participate in the common benefit effort, we would welcome your inclusion in the GCCF Jurisdiction Work Group, which has, for the past year, coordinated Plaintiffs' collective efforts regarding Feinberg and the GCCF in terms of information collection, jurisdictional issues,

communications with claimants, OPA compliance, and the appropriate scope and effect of the GCCF release."

314. Defendant Herman and the MDL 2179 PSC did not coordinate Plaintiffs' collective efforts regarding Feinberg and the GCCF in terms of OPA compliance and the appropriate scope and effect of the GCCF release.

315. On November 7, 2011 at 3:46 PM, Plaintiff Donovan sent a follow up letter via email to Herman wherein Plaintiff Donovan states the following.

316. "I refer to my letter, dated August 29, 2011, to Mr. James Roy and to our subsequent telephone conversation of September 8, 2011.

317. During our phone conversation you advised me that, as a result of the transfer of this case to MDL 2179, the extent of my representation of the plaintiffs in this case is now limited to three options. I may: (a) 'do nothing;' (b) 'come into the fold;' or (c) 'go off on my own and directly file pleadings with the Court.'

318. Given the ongoing economic stress being experienced by my clients resulting from the 'Delay, Deny, Defend' strategy being employed by Kenneth R. Feinberg, et al., 'do nothing' is not a viable option.

319. I believe Option (b), 'come into the fold,' refers to your invitation to join the GCCF Jurisdiction Work Group (JWG), which has, for the past year, allegedly coordinated Plaintiffs' collective efforts regarding Feinberg and the GCCF in terms of information collection, jurisdictional issues, communications with claimants, OPA compliance, and the appropriate scope and effect of the GCCF release.

320. Unfortunately, since the Court has declined to permit formal discovery on Feinberg or the GCCF, my clients would not benefit from JWG's limited scope of discovery.

321. As you had mentioned, Option (c), 'go off on my own and directly file pleadings with the Court,' would be ill-advised because such action would not be well-received by the Court. However, PTO No. 11 (Case Management Order No. l) requires that all motions or other pretrial proceedings with respect to plaintiffs shall be initiated by and/or coordinated through the PSC. If the PSC does not support the motion or other requested action, the moving or requesting party is permitted to file a motion or request, but must include a certificate of non-support. I believe this option is in the best interests of our clients. Rest assured, we will always confer with or act through the PSC or seek PSC consent prior to filing a motion or request and certificate of non-support."

322. In his November 7, 2011 letter to Defendant Herman, Plaintiff Donovan also questions the decision of the Court not to permit formal discovery on Feinberg or the GCCF as follows. "When will the Court permit formal discovery on Feinberg and the GCCF?

323. In your email, dated September 5, 2011, you state, '….the Court has declined to permit formal discovery on Feinberg or the GCCF.'

324. The passage of time is the defendant's best friend. Memories fade, witnesses are more difficult to locate, and the plaintiffs lose the desire to continue to fight and either 'move on' or settle for less. By declining to permit formal discovery on Feinberg and the GCCF, the MDL 2179 Court is ensuring that the defendants will not be held accountable and, more importantly, the claimants-turned-plaintiffs will not be fully compensated for damages.

325. Discovery on Feinberg/GCCF and the associated pressure of a trial are required in

-98-

order exert pressure on the parties to negotiate a settlement which reflects the true value of the claims and not one which focuses on minimizing the liability of Feinberg Rozen, LLP, Feinberg/GCCF, and the responsible parties."

326. On November 14, 2011 at 4:27 PM, after Plaintiff had already rejected Herman's offer to "come into the fold" on November 7, 2011, Plaintiff Donovan received an unsolicited GCCF Outreach Workgroup Invitation, GCCF Jurisdiction and Court Oversight Workgroup Invitation, Invoice and Limited Joint Prosecution and Confidentiality Agreement from Herman and Roy wherein they state the following.

327. "You have been invited by the PSC to serve as a member of the GCCF Outreach Workgroup and GCCF Jurisdiction and Court Oversight Workgroup of the PSC. As a work group member, your work will be under the supervision and direction of the work group Coordinators who are reporting directly to the PSC/EC and Liaison. Your common benefit time and expenses will be submitted with those of PSC members, workgroup coordinators, and work group members, for consideration by the Court in the event of recovery by settlement or judgment in connection with the MDL proceedings, in accordance with Pretrial Order No. 9. You will have access to the common work product that is developed, and will be invited to participate in various meetings from time to time.

328. By acceptance of your appointment as a member of the above-named workgroup, your personal time and financial obligations will be potentially significant. Work Group Member Assessments have been set by the PSC at 10% of PSC member assessments (which currently total $330,000); a work group member firm's assessments to date total $33,000.

329.  Your appointment is at the discretion of the Executive Committee/PSC, subject to the requirements of Pretrial Order No. 9 and other Orders of the Court, and requires your payment of an initial assessment of at least $10,000 by December 1, 2011; staying current on future assessments; and continued contribution of PSC authorized common benefit work in furtherance of the workgroup for MDL 2179. Common benefit work and expenses will be done only upon written authorization and oversight of the PSC/EC/Liaison and/or upon direction of Workgroup Coordinators.

330.  There are no guarantees that you will receive any remuneration; such is dependent upon success of the litigation and determination by the Court of entitlement to common benefit cost reimbursement and/or fees.

331.  Accordingly, if you accept this appointment, please sign where indicated below and FedEx this form and your $10,000 (to $33,000) assessment (payable to MDL 2179 PSC account) to: Plaintiffs Steering Committee, c/o James P. Roy & Steve Herman.

332.  The Limited Joint Prosecution and Confidentiality Agreement (BP Oil Spill Litigation), in pertinent part, states the following.

> "Any and all documents, communications, information, strategy, experts, legal theory and/or other work product that is shared or exchanged by and through this Agreement shall be kept and remain confidential....This agreement is not a co-counsel agreement nor an agreement, whether express or implied, to share, claim, shift, or consent to an award of any type of client contingency, statutory and/or common benefit attorney's fee. The signatories may hereafter be referred to herein as the 'BP Gulf Spill Litigation Joint Prosecution Group.'....Signatories shall obtain signatures of associates and clerical staff working on these matters to assure their compliance with this agreement. Materials subject to this agreement will not be shown to non-group experts or non-group members without compliance with procedures to be established by Group....Any party hereto can withdraw at any time. If a member withdraws, he is still subject to this agreement's confidentiality."

-100-

333. MDL 2179 is so perverse that Defendants Herman and Roy do not want the victims of the BP oil well blowout to even know that this confidentiality agreement exists. Paragraph 6 of the confidentiality agreement states, "This Agreement itself shall be confidential, and no counsel or party shall reference, cite or otherwise use the drafting, circulating, existence or use of this Agreement in any motion, petition or other application to be appointed, designated or otherwise recognized by any Court for any leadership position. The members agree that except as may be ordered by Court this agreement and its terms and conditions and the work product of the Group and/or its members will be kept strictly confidential and shall not be disclosed to any third party for any reason."

334. Plaintiff Donovan finds the last paragraph of the confidentiality agreement, which appears to be an afterthought, to be "curious." Paragraph 7, titled "Ethics and Conflicts Compliance" states, "Each member firm is responsible for doing its own conflict and individual ethics checks on an ongoing basis and otherwise in complying with all applicable Rules of Professional Responsibility."

335. Plaintiff Donovan does not understand how any attorney could find Defendants to be ethical and in compliance with all applicable Rules of Professional Responsibility. MDL 2179's contravention of the MDL statute, U.S. Supreme Court decisions, and the Oil Pollution Act of 1990, use of a Feinberg-administered fund and a settlement class action treats the plaintiffs as nothing more than a commodity. Moreover, completely replacing justice with judicial efficiency is not remotely ethical.

**B. Defendants Refused to Answer Plaintiff's Questions**

336. On December 21, 2012, Plaintiff sent a letter via email to Defendant Herman and cc'd the letter to James Parkerson Roy, Brian H. Barr, and Scott Summy. In the letter, Plaintiff

-101-

asks Defendant Herman the following questions.

337. "I am writing this open letter on behalf of my clients and all similarly-situated BP oil spill and Gulf Coast Claims Facility (GCCF) victims.

338. In sum, my clients were forced to be represented by the PSC. Accordingly, since you have stepped into my shoes, I, and all similarly-situated attorneys representing BP oil spill and GCCF victims, hold the PSC strictly accountable to zealously advocate on behalf of all MDL 2179 Plaintiffs.

339. QUESTION No. 1: Why did the PSC designate the 'B1' Master Complaint as an admiralty or maritime case, and request a non-jury trial pursuant to Rule 9(h), rather than properly allege claims under the Oil Pollution Act of 1990 (OPA), a *strict liability* statute, and the Outer Continental Shelf Lands Act (OCSLA)?

340. QUESTION No. 2: Why has the PSC failed to inform Judge Barbier that the Honorable MDL 2179 Court has overreached its authority?

341. QUESTION No. 3: Why has the PSC failed to inform Judge Barbier that the E&PD class settlement violates the Oil Pollution Act of 1990 ("OPA")?

342. QUESTION No. 4: Why has the PSC failed to inform Judge Barbier that the honorable MDL 2179 Court has illegally excluded approximately 200,000 BP oil spill victims from the E&PD class settlement thereby greatly decreasing the bargaining power of the remaining class members?

343. QUESTION No. 5: Why has the PSC failed to inform Judge Barbier that the E&PD class settlement is not 'fair, reasonable, and adequate' and has not been entered into without collusion between the parties?

344. QUESTION No. 7: Why has the PSC allowed the MDL 2179 Court to decline to permit formal discovery on Feinberg, et al?

345. QUESTION No. 8: Why does the PSC allow its BP oil spill victim clients to receive grossly inadequate compensation?

346. QUESTION No. 9: Why does the PSC allow for the E&PD class settlement to provide for a refund of approximately $6 billion to BP while granting *excessive* compensation to the PSC and other counsel allegedly performing "common benefit" work?

347. QUESTION No. 10: Given the above-referenced was not merely the result of poor legal strategy, do you believe the MDL 2179 PSC's actions constitute legal malpractice?

348. Since April 8, 2012, our firm has filed: (a) a Motion to Vacate Order and Reasons [As to Motions to Dismiss the B1 Master Complaint]; (b) three Motions to Vacate Preliminary Approval Order [As to the Proposed Economic and Property Damages Class Action Settlement]; and (c) a Motion to Nullify Each and Every Gulf Coast Claims Facility ("GCCF") "Release and Covenant Not to Sue."

349. In contrast, as noted *supra*, the PSC appears to be more interested in maximizing its compensation and ensuring significant economy and efficiency in the judicial administration of the MDL 2179 Court rather than in obtaining justice for the MDL 2179 plaintiffs.

350. If you have any questions, please do not hesitate to contact me....I would be happy to provide the PSC with any and all supporting documentation."

351. On December 21, 2012, shortly after he receives Plaintiff's open letter, Defendant Herman responds, "I respectfully decline to respond to your questions, which seem argumentative and disingenuous."

-103-

352.  On December 22, 2012 at 4:03 AM, Plaintiff Donovan sends an email to Defendant Herman in which he states, "Thank you for your prompt response....Your decision not to address the issues raised in the open letter, although completely understandable, is disturbing....Last night, subsequent to your receipt of the open letter, Judge Barbier granted final approval to the E&PD class settlement agreement. Notwithstanding this fact, all victims of the BP oil spill and the 'Delay, Deny, Defend' strategy employed by Kenneth R. Feinberg, et al. have a right to clearly understand how and why they were represented by the PSC in MDL 2179. The PSC's clients are not being 'argumentative and disingenuous' when they demand to know why they have not been fully compensated for their damages."

353.  On December 25, 2012 at 6:45 PM, Plaintiff receives an email from Defendant Herman wherein Defendant Herman states, "I suppose that you are free to attack the PSC and/or the Court in whatever way you deem appropriate. At the same time, I would suggest that your clients not participating in the Economic Settlement will best be served if you: (i) ensure that you and/or they make Presentment of what you and/or they believe to be their full damages before January 18, 2013; and then, having made such presentment, (ii) file (or re-file) (and/or amend) suit on their behalf by April 20, 2013; and then (iii) with respect to any client whom you believe to have executed an invalid GCCF Release, assemble and prepare the best case you can to support the argument that such Release was procured under fraud, error, or duress."

354.  On December 31, 2012, Plaintiff sent a second letter via email to Steve Herman and cc'd the letter to James Parkerson Roy, Brian H. Barr, and Scott Summy. In the letter, Plaintiff states, in pertinent part, the following and asks Defendant Herman four additional questions.

355. QUESTION No. 11: Why did the PSC wait until one month before the claim filing deadline to notify all BP oil spill and GCCF victims (its clients) of the OPA 'Presentment' requirement?

356. Defendant Herman and the members of the PSC should have notified all BP oil spill and GCCF victims (their clients) of the Presentment requirement in October 2010, not in December 2012.

357. QUESTION No. 12: Why has the PSC failed to notify all BP oil spill and GCCF victims (its clients) that a lawsuit may be filed against Kenneth R. Feinberg, et al. without having to fulfill the OPA Presentment requirement?

358. Since Feinberg, et al. is not a 'Responsible Party' and therefore may not be sued under OPA, a lawsuit against Feinberg, et al. may be filed immediately because it does not require Presentment. Defendant Herman would, however, need to advise all GCCF victims in regard to the statute of limitations and the associated tolling of the statute of limitations for class actions and fraudulent concealment or a misrepresentation by the defendant.

359. QUESTION No. 13: Why does the PSC, which failed to adequately challenge the legality of the GCCF Release and Covenant Not to Sue for the past two years, suddenly advise non-PSC attorneys to 'assemble and prepare the best case you can to support the argument that such Release was procured under fraud, error, or duress?'

360. Steve, if the PSC had properly filed the 'B1' Master Complaint under OPA rather than alleging claims under admiralty law, Feinberg, et al. would never have been allowed to use the Release and Covenant Not to Sue to illegally exclude approximately 200,000 BP oil spill victims from the E&PD class settlement.

-105-

361. It has been, and remains, the responsibility of the PSC to 'assemble and prepare the best case to support the argument that such Release was procured under fraud, error or duress.' On September 25, 2012, my clients filed their Motion to Nullify Each and Every Gulf Coast Claims Facility Release and Covenant Not to Sue. Please feel free to use the legal argument in this motion to assist with the preparation of the PSC case.

362. QUESTION No. 14: Are you declining to answer these questions because you believe that an attorney-client relationship does not exist between the PSC and all BP oil spill and GCCF victims?

363. Steve, please understand that these fourteen questions are directed to the PSC by me on behalf of my clients (now PSC's clients) and all similarly-situated BP oil spill and GCCF victims. These questions are not directed to the MDL 2179 Court. In sum, the PSC's clients merely seek a better understanding of their representation by the PSC.

364. Defendant Herman, the members of the MDL 2179 PSC, and other counsel allegedly performing common benefit work in MDL 2179 initiated settlement negotiations 'in earnest' merely four (4) months after Judge Barbier appointed members to the PSC. Clearly, the MDL 2179 settlement class action was not achieved in the full context of adversarial litigation.

365. On December 31, 2012 at 3:27 PM, Defendant Herman responded via email, "Not sure what you are trying to accomplish, but I think we have past the point of diminishing returns. Good luck."

366. Apparently, "Good Luck" is the only response Defendant Herman is willing to give to attorneys who decide not to "come into the fold," pay the PSC at least $10,000, and keep quiet.

367. Over the years, Plaintiff Donovan has touched base with Defendant Herman to inquire as to when Defendant Herman and Judge Barbier will permit formal discovery on Feinberg or the GCCF. The following exchange of emails is instructive.

368. On December 9, 2013, Plaintiff emails Defendant Herman, "I attach a copy of your email dated September 5, 2011. Please advise as to when the Court will permit formal discovery on Feinberg or the GCCF....Thank you." Email response from Defendant Herman: "No idea."

369. Plaintiff's email reply to Defendant Herman: "Would you be kind enough to attempt to find out when the Court will permit formal discovery on Feinberg or the GCCF?" Defendant Herman's response: "Yes. At an appropriate time."

### C. Defendants Refuse to Be Fully Transparent and Defendants Refuse to Be Held Accountable

370. The aggregate settlement rule ("ASR") governs global MDL settlements.

371. Defendants breached their fiduciary duties to Plaintiffs by violating the ASR.

372. Courts have long recognized that lawyers may be subject to total or partial fee forfeiture as a sanction for serious violations of the ASR. Plaintiff does not have to prove either causation or injury to be entitled to fee forfeiture as a remedy for Defendants' breach of fiduciary duty.

373. The ASR is Rule 1.8(g) of the ABA *Model Rules of Professional Conduct* ("*Model Rules*"), and it states: "A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients....unless each client gives informed consent, in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims....involved and of the participation of each person in the settlement."

-107-

374.  All "group" settlements are now "aggregate settlements" and must comply with the disclosure requirements of Rule 1.8(g).

375.  Rule 1.8(g) requires a lawyer to disclose *at a minimum*, the following information to the clients for whom or to whom the settlement or agreement proposal is made.

(a) The total amount of the aggregate settlement;

(b) The existence and nature of all of the claims....involved in the aggregate settlement;

(c) The details of every other client's participation in the aggregate settlement....whether it be their....settlement receipts.....or any other....receipt of something of value as a result of the aggregate resolution;

(d) The total fees and costs to be paid to the lawyer as a result of the aggregate settlement, if the lawyer's fees and/or costs will be paid, in whole or in part, from the proceeds of the settlement or by an opposing party or parties; and

(e) The method by which costs (including costs already paid by the lawyer as well as costs to be paid out of the settlement proceeds) are to be apportioned among them.

376.  Informed consent to an aggregate settlement requires that each claimant be able to review the settlements of all other persons subject to the aggregate settlement or the formula by which the settlement will be divided among all claimants. Further, *informed consent requires that the total financial interest of claimants' counsel be disclosed to each claimant.*

377.  In sum, Defendants Herman, Roy, and the MDL 2179 PSC members owe fiduciary duties to MDL 2179 Plaintiffs. A lawsuit based on a violation of the ASR can be brought as a breach of fiduciary duty claim; the plaintiff(s) need not show any economic loss from the attorney's breach in order to prevail; full or partial forfeiture of the fees that the attorney received from the former client is the remedy.

378.  On November 13, 2017, Plaintiff Donovan filed a motion on behalf of his clients wherein Plaintiff Donovan requested the MDL 2179 Court to place on the public record the total amount and source of compensation, *from all sources*, paid to all members of the PSC and the total amount and source of compensation paid to the legal experts, Special Masters, and Claims Administrator Patrick Juneau. This was neither a Motion to Compel nor an Objection. This was merely a motion by the plaintiff, on behalf of himself and his clients, to request the MDL 2179 Court to conduct itself in a fully transparent manner.

379.  In the motion, Plaintiff Donovan pointed out to the Court that the total compensation paid to the 19 PSC attorneys and their law firms is guesstimated to be $3.035 billion. It is beyond cavil that a reasonable, objective observer would not conclude that this amount is out of all proportion to the value of the professional services rendered. Plaintiff Donovan further pointed out to the Court that a narrow focus on judicial efficiency cannot allow the circumvention of the core democratic premises of representation, transparency, and accountability.

380.  On March 6, 2018, the MDL 2179 Court issued an Order wherein the Honorable Carl J. Barbier succinctly states, "Before the Court is a 'Motion to Request this Court to Place on the Public Record the Total Amount and Source of Compensation, From All Sources, Paid to All Members of the PSC, et al.' IT IS ORDERED that the Motion (Rec. Doc. 23677) is DENIED. New Orleans, Louisiana, this 6th day of March, 2018." Obviously, neither Defendant Barbier nor Defendant Herman believes that the plaintiffs in MDL 2179 have a right to know how much compensation the attorneys allegedly representing their interests are receiving.

### D. Defendants Did Not Hold BP Accountable

381. Defendants fraudulently, recklessly, negligently and knowingly breached their fiduciary and ethical duties to MDL 2179 Plaintiffs by making false statements of material fact in order to induce Plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate" for the purpose of maximizing his compensation and the compensation of the members of the MDL 2179 PSC in exchange for limiting the liability of BP.

#### 1. The Victims' Compensation Fund

382. The compensation paid to BP oil well blowout victims by the Kenneth R. Feinberg-administered victims' compensation fund was $6,079,922,450.47.

383. The compensation paid to BP oil well blowout victims during the transition period was approximately $405,000,000.00.

384. In sum, the total compensation paid to BP oil well blowout victims from August 23, 2010 to June 4, 2012 was $6,484,922,450.47.

#### 2. The Economic and Property Damages Settlement Class Action

385. In mid-2010, Defendants and BP made the business decision to have BP pay a total amount of $20 billion to compensate all the BP oil well blowout victims in the settlement class action.

386. On October 25, 2016, Defendant Barbier states, "In December 2015, Magistrate Judge Wilkinson estimated the total claims payout from the Economic Settlement when he allocated amounts under the Transocean and Halliburton Settlements. Judge Wilkinson's estimate was $10.825 billion. (Rec. Doc. 15652 at 16). Judge Wilkinson's estimate appears to be based solely on projected payments under the Economic Settlement, and does not appear to include Seafood and Tourism Promotional Grants, Transocean Insurance Proceeds, Medical

Settlement benefits, administrative costs, notice costs, or common benefit attorney fees. Considering the foregoing, the Court finds that a conservative estimate of the total value of the Settlements is $13 billion." (Rec. Doc. 21849 at 32 - 33).

387. In October 2016, approximately $6.2 billion had been paid out under the GCCF. Defendant Barbier could not predict, on October 25, 2016, that the total amount that will eventually be paid by just the Deepwater Horizon Claims Center is $13 billion unless Defendant Barbier knew *Defendants and BP made the business decision to have BP pay a total amount of $20 billion to compensate all the BP oil well blowout victims in the settlement class action* ($20 billion - $6.2 billion - $0.6 billion in attorneys' fees yields an estimate of $13 billion).

### 3. The Medical Benefits Settlement Class Action

388. Cleanup workers and coastal residents who suffered exposure to crude oil and chemical dispersants resulting from the BP oil well blowout brought personal injury lawsuits against BP and other entities involved in this disaster.

389. The defendants and BP negotiated a Medical Benefits Class Action Settlement Agreement which the MDL 2179 court approved on January 11, 2013.

390. During the Fairness Hearing in November 2012, Defendant Greenwald stated that she believed approximately 200,000 people, cleanup workers and residents, could belong to the Medical Benefits Settlement Class.

391. The Medical Benefits Class Action Settlement Agreement divided the claims into two phases. Under the first phase, each class member with adequate affidavits or medical records was to be compensated for a Specified Physical Condition ("SPC") according to the list of tables

known as the "Matrix," which specified medical conditions, times of physical manifestation of the condition, and proof required for compensation. Under the second phase, known as the Back-End Litigation Option ("BELO"), a class member with a "later-manifested physical condition" ("LMPC") diagnosed after the cut-off date of April 16, 2012, was to be allowed to litigate the claim in court.

392. Claim processing and administration was the responsibility of the Garretson Resolution Group ("Garretson" or "Claims Administrator").

393. Unfathomably, Defendant Barbier agreed with BP and Defendant Garretson in finding that a class member who was diagnosed with a chronic condition after April 16, 2012 was excluded from asserting an SPC claim, and could only assert a LMPC claim under the BELO.

**a. SPC**

394. To be compensated for a SPC, claimants had to submit a Proof of Claim form to Defendant Garretson no later than one year after the "effective date" of February 12, 2014 or they would lose their right to be compensated.

395. Allegedly, depending on the type of medical condition suffered because of exposure and the level of proof presented, claimants could qualify for one of five levels of compensation (A1, A2, A3, A4, or B1). Acute conditions are compensable under levels A1, A2, A3, and A4. Chronic conditions are compensable under level B1.

396. The lowest level of compensation was the A1 level ($1,300 for cleanup workers and $900 for zone residents). Here, a claimant had to declare the manifestation of a medical condition within a prescribed timeframe (within seventy two hours of exposure). To qualify for

-112-

the A2, A3, and A4 levels of compensation (a lump sum between $2,700 and $12,350), a claimant had to present supporting medical records that Defendant Garretson evaluated "based on the totality of the evidence....whether that evidence more likely than not supports the assertions made in the declaration." To qualify for the B1 level of compensation ($60,700 for cleanup workers and $36,950 for zone residents), a claimant had to present relevant medical records establishing ongoing care for a chronic condition as well as "indicate that exposure was considered by either the claimant or the medical professional to be related to the condition(s) or symptom(s)."

397. The only way to claim compensation above the basic A1 level ($1,300 for cleanup workers and $900 for residents) was for a claimant to have a medical diagnosis of his or her condition. This was disastrous for many class members who did not have health insurance and could not pay for the costly medical tests required to get diagnosis.

398. As Defendant Greenwald admitted during the Fairness Hearing, there was "no fund set up for people....to go to a doctor and get their diagnoses" and there was "no place that they [could] go before they file[d] their claim form to find out what they ha[d]."

399. If a claimant could not afford medical diagnosis - a process which included not only a visit to a primary care physician, but also multiple visits to and costly medical tests from a specialist - such a claimant was arguably precluded from receiving compensation higher than the A1 level. These claimants, some with multiple conditions, will now have to participate in the litigation phase that was originally intended for class members with medical conditions manifesting years after the exposure, including leukemia and other cancers.

400. Many SPC claims were uncompensated or undercompensated. Defendant Garretson

-113-

has absolute and unreviewable power to determine whether claims are valid or not and what level of compensation is due to each claimant. **Seventy-eight percent (78%)** of SPC claims submitted to Defendant Garretson received either a "Request for Additional Information" or a "Notice of Defect." As of November 2018, merely 22,836 out of 37,225 claimants had been awarded $67.2 million in compensation. This yields an average compensation per person of $2,944. **Thirty-six percent (36%)** of the total 37,225 claimants (or 13,403 claimants) were denied any compensation under SPC.

401.  Many claimants decided to accept the lowest payment of $1,300 (under A1) because they could no longer wait for the money to cover their medical expenses. Defendant Garretson employed a very successful "Delay, Deny, Defend" strategy to limit BP's liability.

**b. BELO**

402.  To be compensated under the BELO, a plaintiff must first submit to Defendant Garretson a written Notice of Intent to Sue ("NOIS)" and identify particular diagnosed medical conditions that the plaintiff will allege in the BELO claim. Defendant Garretson is required to review the NOIS and transmit it to BP within ten days. Then, BP has thirty days to choose whether to mediate the claim. If BP chooses not to mediate, the plaintiff acquires the right to file a BELO action, provided it is filed within six months of the date Defendant Garretson informs the plaintiff of BP's decision not to mediate.

403.  BELO claims are only for compensatory damages. Plaintiffs may not assert any claims in a BELO lawsuit for punitive damages, exemplary damages, multiple damages, and other non-compensatory damages or penalties of any kind.

404.  As of November 2018, class members had filed a total of 6,699 NOIS claims, 4,080

of them were approved by Garretson, and, of those, 2,673 claims are eligible to be filed in the Eastern District of Louisiana.

405. If a plaintiff who claims a LMPC is determined by the MDL 2179 court to have failed to comply with the procedures set forth in Section VIII of the Medical Benefits Class Action Settlement Agreement, and such determination is final and not subject to further appeal, he or she shall be barred from bringing a BELO lawsuit and all of his or her claims related to that LMPC shall be deemed released and discharged with prejudice.

### 4. The Clean Water Act

406. Defendant Barbier also failed to hold BP accountable in regard to the Clean Water Act ("CWA") civil penalty as follows.

(a) The total amount of oil released from the reservoir was 5,000,000 barrels;

(b) The total amount of "collected oil" was 810,000 barrels;

(c) The net discharge of oil was 4,190,000 barrels;

(d) The CWA civil penalty due to BP's gross negligence is $4,300/barrel;

(e) The CWA penalty BP should pay is $18.02 billion; and

(f) The total CWA penalty BP actually paid is $13.72 billion.

407. Defendant Barbier saved BP approximately $4.30 billion by agreeing that only 4.0 million barrels of oil, rather than 5.0 million barrels of oil, was released from the reservoir. Defendant Barbier argued that for purposes of calculating the maximum possible civil penalty under the CWA that 3.19 million barrels of oil discharged into the Gulf of Mexico. In short, the maximum CWA civil penalty that could be assessed against BP is approximately $13.72 billion (3,190,000 x $4,300).

408. Defendants Barbier and Herman also negotiated the following very favorable

payment schedule for BP in regard to the government entity settlements. BP is required to pay,

> (a) $5.5 billion to the United States as a civil penalty under the Clean Water Act, *payable over 15 years*;

> (b) $7.1 billion to the United States and the five Gulf states for natural resource damages, *payable over 15 years*; and

> (c) $4.9 billion to settle economic and other claims made by the five Gulf Coast states, *payable over 18 years*.

### IV. Defendants Intentionally and Systematically Misled Plaintiffs

**A. The Agreement-in-Principle**

409. On March 9, 2012, Defendant Herman released a summary of the agreement-in-principle which was allegedly entered into between the MDL 2179 plaintiffs and BP.

410. In this summary, Defendant Herman made the following false statements of material fact to Plaintiffs.

> (a) This Settlement is an *enormous victory* for Gulf Coast workers, businesses and families.

> (b) The Settlement *does the most good for the greatest number of people* - encompassing the wide geographic region and many types of businesses affected by the BP Gulf Oil Spill.

> (c) Contrary to what some news outlets have implied, the Settlement has *no cap or limit*. The only exception is the Seafood Program for commercial fishing vessel owners, captains and deckhands. BP has agreed to fund this Seafood Program at $2.3 billion.

> (d) The Settlement *holds BP accountable*.

> (e) The parties *have not had any fee discussions to date* and will not have any such discussions until authorized to do so by the Court.

> (f) Many qualifying claimants may receive greater benefits from the Settlement Claims Programs than from the GCCF.

-116-

(g) *Hundreds of thousands of victims of the BP Gulf Oil Spill will be made whole* as a result of this settlement - regardless of whether or not they previously joined the MDL lawsuit or filed a claim with the GCCF.

(h) Once the Settlement Claims Programs are set up, the Court will continue to supervise their operation in all respects throughout their duration to *ensure fairness, transparency, and efficiency.*

(i) A $57 million marketing fund will be established *to promote tourism and Gulf seafood.*

411. Defendant Herman makes the following false statements of material fact to

Plaintiffs when he further tries to explain why he believes the settlement claims program is fair.

(a) The Settlement process and formulas used to calculate compensation will be *completely transparent* and applied with consistency.

(b) The Court will supervise the Settlement Claims process from start to finish to *ensure fair, impartial, and consistent processing and payment of claims.*

(c) Claimants, their accountants, and their lawyers will know the compensation formulas and *will be able to calculate compensation for specific claims before deciding whether to opt-out* or participate in the Settlement.

(d) The compensation *calculations have been carefully determined* to account for relevant economic factors and are flexible to each claimant's specific circumstances.

(e) The Settlement Claims Program will generally apply a larger enhancement to *account for potential future losses* and other risks than did the GCCF.

(f) Offsets for amounts already received from BP or the GCCF are deducted after the enhancement for future losses is applied.

(g) A Class Member *can choose to opt-out of the Settlement and instead prosecute their case in Court.*

(h) Businesses and individuals that are not Class Members, or whose claims are not included in the Settlement, *can generally continue to prosecute their cases in Court.*

412. On November 5, 2010, the MDL 2179 Court issued PTO No. 15 which states, "All

pending and future motions, including the Motions to Remand, are continued without date unless

a motion is specifically excepted from the continuance by the Court."

413.  On January 12, 2011, the MDL 2179 Court issued PTO No. 25 which states, "Any individual plaintiff who is a named plaintiff in a case that falls within Pleading Bundle B1, B3, D1, or D2, or any combination thereof, is deemed to be a plaintiff in the applicable Master Complaint(s)....All individual petitions or complaints that fall within Pleading Bundles B1, B3, D1, or D2, whether pre-existing or filed hereafter, are stayed until further order of the Court."

414.  Defendants Barbier and Herman make it very clear that the settlement class action is the only game in town. Take it or leave it. It has been nearly 10 years since the BP oil well blowout. PTO No. 15 and PTO No. 25 are still in force. Class Members who opted-out, including Plaintiff Donovan's clients, are still not able to pursue their claims.

415.  It is important to understand that *the MDL 2179 plaintiffs* did not reach an Agreement-in-Principle on the proposed settlements. Defendants Herman, Roy, the MDL 2179 PSC members and BP entered into a mutually beneficial settlement. The plaintiffs in MDL 2179 were merely a commodity bargained for and sold by Defendants Herman, Roy, the MDL 2179 PSC members to BP.

416.  The negotiated settlement class action is not superior to the OPA (a *strict liability* statute). The only reason this settlement class action exists is because Defendant Herman designated the "B1" Master Complaint as an admiralty or maritime case in order to limit BP's liability.

417.  The settlement is not "an enormous victory for Gulf Coast workers, businesses and families."

-118-

418. The negotiated settlement class action which illegally excludes approximately 220,000 claimants, requires that a claimant's recovery of damages under the OPA be limited by geographic bounds, pertain solely to certain business activities, and demands a heightened and vague proof of causation between his or her damages and the oil well blowout incident is not "fair, reasonable, adequate, and consistent with governing law."

419. Defendant Herman fraudulently, recklessly, negligently and knowingly breached his fiduciary and ethical duties to MDL 2179 Plaintiffs by making false statements of material fact in order to induce MDL 2179 Plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate."

### B. The Highly Compensated "Thought Leaders"

420. Theoretically, a "Thought Leader" means one whose views on a subject are taken to be authoritative and influential. Thought leaders are the informed opinion leaders and the go-to people in their field of expertise. In reality, thought leaders are primarily academics who are highly compensated by an industry to either maintain the status quo of the industry or increase market share for their benefactors. It is important to remember that this requires more greed than thought on the part of these leaders.

421. The financial services industry, pharmaceutical companies, and, most recently, Defendants retain highly compensated thought leaders.

422. In the BP oil well blowout MDL, Defendants retained four "experts" in the law of class actions: Professors Coffee, Issacharoff, Klonoff, and Miller.

423. The "unbiased" opinions of these four individuals are included to deceive the class members. If the MDL 2179 economic and property damages settlement agreement is fair,

reasonable, adequate, and free of collusion, it would be clearly obvious to anyone who reads the agreement. There would be no need to retain "four experts in the law of class actions" to try to lend a thin veneer of respectability to an otherwise abhorrent, one-sided, collusive agreement.

424.  Defendants fraudulently, recklessly, negligently and knowingly breached their fiduciary and ethical duties to MDL 2179 Plaintiffs by retaining these four legal thought leaders to make false statements of material fact in order to induce MDL 2179 Plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate."

425.  The following are examples of the "unbiased" opinions of Defendants' highly-compensated expert legal "Thought Leaders" in MDL 2179.

426.  Defendant Barbier included each of these false statements of material fact in his Order granting final approval of the economic and property damages settlement agreement.

> Opinion No. 1: "This Settlement is nearly the epitome of how a class in a mass tort action ought to be defined, as it is objective, precise, and detailed, and does not turn on the merits."

> Opinion No. 2: "Since their appointment, members of the PSC have diligently prosecuted this litigation, consulted widely among class members in negotiating the Settlement, and aggressively represented the interests of their clients."

> Opinion No. 3: "The proposed class in this case consists exclusively of individuals and businesses that have already suffered economic loss and property damage, and the Settlement compensates class members for their past losses through detailed, objective compensation criteria and for their anticipated potential future damages through RTP payments or through other methods that take into account risk of future loss."

> Opinion No. 4: According to Professor Miller, this case is "perhaps the single most impressive class action settlement I have observed in nearly thirty years as a scholar, practitioner, and teacher in the field" in its structural features designed to avoid intraclass conflicts."

Opinion No. 5: "....the settlement terms for each identifiable subgroup were subjected to the approval of a seventeen-member Plaintiffs' Steering Committee. The PSC was consulted and participated throughout the settlement process. Whenever a particular category of claims was discussed during negotiations, lawyers who had clients with such claims took an active role in advising the negotiators."

Opinion No. 6: "....there was no discussion of attorneys' fees until all other terms of the agreement were negotiated, agreed upon, reduced to writing, and submitted to the Court, so Class Counsel could not have engaged in trading off the interests of class representatives or absent class members so as to maximize their fee recovery."

Opinion No. 7: "Because a class action is the vastly superior method by which to resolve the impact of this mass disaster on the Gulf Coast Region, it would be a social tragedy if class certification were denied." "Individual lawsuits are neither a feasible nor a sensible alternative to a class action in this case."

Opinion No. 8: "....the Settlement preserved the Rule 23(b)(3) opt-out opportunity, and provided a generous opt-out period that the Court later extended to November 1, 2012. Any plaintiff who does not wish to take part in the Settlement remained free to opt-out of the settlement class and pursue his own action."

Opinion No. 9: "The uncontroverted evidence establishes that the Settlement was reached only after many months of hard-fought negotiations that were conducted simultaneously with adversarial trial preparations."

Opinion No. 10: "Certain objectors complain that the Economic Damage Claim Frameworks are unfair because they do not compensate persons who did not begin suffering losses until 2011. Yet this provision is reasonable for three reasons: (i) the Macondo well ceased flowing in July 2010; (ii) there is evidence that by late 2010, Gulf Coast tourism had returned to or surpassed 2009 levels; and (iii) as to claims by individuals and businesses in charter fishing, seafood processing, or other businesses relying on access to Gulf waters, nearly all federal and state waters were reopened for commercial fishing by November 2010. *Thus, extending compensation to 2011 would cover losses not likely caused by the spill.*" (Emphasis added)

Opinion No. 11: "Other objectors complain that before they can invoke the V-Shaped Revenue Pattern test, they must demonstrate a 5% revenue recovery during the correlating months of 2011 as compared to the 2010 baseline period. *This provision is reasonable, as losses that continued after the spill are likely to be due to factors other than the spill.*" (Emphasis added)

427. The Aggregate Fee Petition includes a declaration by Brian T. Fitzpatrick, a law

professor at Vanderbilt University and an MDL 2179 "Thought Leader." Professor Fitzpatrick states, "I have never seen a case this complex nor one that required more of class counsel. The number of moving parts here was - and this is an understatement - dizzying. The law, the facts, the science - all of it was far more challenging than perhaps any class action case I have ever seen."

428.  Given the opinions of Defendant Barbier and Professor Fitzpatrick, the victims of the BP oil well blowout are led to believe that Defendants Herman, Roy, and the MDL 2179 PSC members are zealously advocating on their behalf. Justice is most assuredly just around the corner.

## V. Defendants Excessively Compensated Themselves by "Quadruple Dipping"

429.  Defendants Herman, Roy, and the MDL 2179 PSC members "quadruple dip."

430.  Defendants Herman, Roy, and the MDL 2179 PSC members are compensated from at least the following four sources of revenue.

(a) Six percent (6%) of the gross monetary settlements, judgments or other payments made on or after December 30, 2011 through June 3, 2012 to any other plaintiff or claimant-in-limitation;

(b) BP has agreed to pay any award for common benefit and/or Rule 23(h) attorneys' fees, as determined by the Court, up to $600 million;

(c) Contingent fees from clients directly "represented" by Defendants Herman, Roy, and the MDL 2179 PSC members; and

(d) Co-counsel fees received by Defendants Herman, Roy, and the MDL 2179 PSC attorneys for serving as co-counsel to non-member firms of the PSC.

431.  Mikal C. Watts of Watts Guerra could easily be the posterchild for how attorneys applying for a lucrative position on the MDL 2179 PSC should not try to capture market share

via signing up a large stable of "clients."

432. Watts and six codefendants were accused in a federal fraud and identity theft indictment of orchestrating a scheme to defraud BP and the Courts by asserting claims on behalf of more than 40,000 phantom plaintiffs who purported suffered damages in the 2010 BP oil well blowout. The indictment against Watts was brought on behalf of the United States because this PSC attorney stands accused of corrupting the federal justice system to make money for himself and his investors.

433. Though the Watts firm initially presented more than 44,000 claim forms to BP, including a nearly $46,000 claim by the dog Lucy Lu, it ended up asserting claims for just 786 clients. According to the indictment, only 4 were deemed eligible for payments.

**A. Compensation Paid to Kenneth R. Feinberg by BP**

434. The following is an overview of the compensation which BP paid to Kenneth R. Feinberg.

| | |
|---|---|
| June 15, 2010 to January 15, 2011 | $ 5,950,000 |
| January 16, 2011 to April 15, 2012 | $18,750,000 |
| **Total Compensation Paid to Feinberg by BP** | **$24,700,000** |

**B. Compensation Paid to BP Oil Well Blowout Victims by Kenneth R. Feinberg (GCCF Program Statistics)**

435. The GCCF status report of March 7, 2012 indicates that a total of 574,379 unique claimants filed claims with the GCCF during the period from approximately August 23, 2010 to March 7, 2012. The GCCF paid only 221,358 of these claimants. The total amount paid was $6,079,922,450.47. In sum, Kenneth R. Feinberg denied payment to approximately 61.46% of the claimants who filed claims.

436. The status report further indicates that the GCCF paid a total of 230,370 claimants

-123-

who filed claims with the GCCF during the "Phase II" period. Of these, 195,109 were either Quick Pay or Full Review Final payments; only 35,261 were Interim payments. In sum, Kenneth R. Feinberg forced 84.68% of the claimants to sign a "Release and Covenant Not to Sue" in which the claimant agreed not to sue BP and all other potentially liable parties.

### C. The Deepwater Horizon Claims Center (DHCC Program Statistics)

437. The DHCC status report of March 29, 2017 indicates that a total of 389,457 claims were submitted to the DHCC during the period from approximately June 4, 2012 to March 29, 2017. The DHCC paid only 155,652 of these claims. The total amount paid was $10,070,688,009.00. In sum, the DHCC denied payment to approximately 60.03% of the submitted claims.

438. On October 25, 2016, Judge Barbier stated that he believes that a conservative estimate of the total amount that will eventually be paid by just the Deepwater Horizon Claims Center is $13 billion.

### D. Compensation Paid to Defendants

439. Defendants Herman, Roy, and the MDL 2179 PSC members and their law firms in MDL 2179 are not double-dipping. They are quadruple-dipping.

440. The known sources of compensation received by Defendants Herman, Roy, and the MDL 2179 PSC members and their law firms in MDL 2179 are: common benefit fees, contingent fees, co-counsel fees, and "Hold-Backs."

### 1. Common Benefit Fees

441. BP has agreed to pay any award for common benefit and/or Rule 23(h) attorneys' fees, as determined by the MDL 2179 Court, up to $600 million.

442. On October 25, 2016, Judge Barbier approved and awarded a common benefit fee and cost award of $600 million consisting of:

-124-

"$37,597,151.98 in Shared Expenses, which have already been paid to third-party service providers and/or reimbursed to Common Benefit Attorneys, pursuant to previous Court orders;

Up to $7,187,698.30 in claimed Held Expenses, which have been submitted to Court-appointed CPA Phil Garrett and the Fee Committee pursuant to PTO 9, (as amended), and PTO 59; and

The remainder of the Settlements' Common Benefit Cost and Fee Award amount, of approximately $555.2 million, to Class Counsel and other common benefit attorneys collectively, for work performed to advance the common and collective interests of the Economic Class and the Medical Class."

443. During the summer of 2015, BP announced a global settlement with the United States, the five Gulf Coast States, and local governments, to resolve Clean Water Act, natural resource damage, and economic loss claims, damages, and penalties. In order to help facilitate that settlement, the existing hold-back on all state and local government recoveries was lifted, and a payment by BP of $40 million to common benefit attorneys collectively was approved.

444. Halliburton and Transocean have agreed to pay up to $124,950,000 in common benefit attorneys' fees and expenses in connection with the Halliburton and Transocean class settlements.

### 2. Contingent Fees
445. Defendants Herman, Roy, and the MDL 2179 PSC members and their law firms have their own clients and have also received or will also receive a fee directly from them. (N.B. - On June 15, 2012, the MDL 2179 Court ordered that "contingent fee arrangements for all attorneys representing claimants/plaintiffs that settle claims through either or both of the Settlements will be capped at 25% plus reasonable costs.").

### 3. Co-counsel Fees
446. Co-counsel fees are received by Defendants Herman, Roy, and the MDL 2179 PSC members and their law firms for serving as co-counsel to non-member firms of the PSC. For

-125-

example, on March 13, 2012 at 12:29 PM, Plaintiff Donovan received an unsolicited mass email from Russell Budd of the law firm Baron Budd, P.C. The email stated, in pertinent part, "Co-Counsel Opportunity for BP Oil Spill Cases: News of the recent BP Settlement has caused many individuals and businesses along the Gulf Coast to contemplate either filing a new claim or amending a claim that has already been submitted. *If you receive inquiries of this nature we would like you to consider a co-counsel relationship with our firm.* Even if someone has already filed a claim it is advisable to retain legal counsel to analyze the impact of this settlement on claimants and maximize recovery. If you receive inquiries and are interested in co-counseling with us on the BP claims, please email Erin McIntosh."

### 4. Hold-Backs

447. The MDL 2179 Court issued a hold-back order which ultimately directed the defendants to hold back and place into escrow, from any judgment or settlement after December 30, 2011:

(a) Six Percent (6%) of the recoveries of any private claimants or plaintiffs who, at any time, had an action that was filed in, removed to, or transferred to, the MDL;

(b) Four Percent (4%) of the economic loss damages payable to the States of Alabama and/or Louisiana;

(c) Four Percent (4%) of the recoveries of any local government entities located within the State of Alabama and/or the State of Louisiana, that, at any time, had an action that was filed in, removed to, or transferred to the MDL;

(d) Six Percent (6%) of the recoveries of any local government entities in the States of Mississippi, Florida, and/or Texas, that, at any time, had an action that was filed in, removed to, or transferred to the MDL; and,

(e) Six Percent (6%) of the economic loss damages payable to the States of Florida, Mississippi, and/or Texas, should they ever file actions in, be removed to, or be transferred to, the MDL.

-126-

### E. Calculation of Compensation Paid to Defendants Herman, Roy, and the MDL 2179 PSC Members

448. The following is an overview of the compensation paid to Defendants Herman, Roy, and the 17 MDL 2179 PSC members.

| | |
|---|---|
| Common Benefit Fees | $597.354 million |
| Contingent Fee (25%) | $ 2.438 billion |
| Co-counsel Fee | Unknown |
| Hold-Backs | Unknown |
| Total Compensation Paid to Defendants Herman, Roy and PSC | $ 3.035 billion |

### F. Calculation of Compensation Paid to 103 Non-PSC Attorneys

449. The following is an overview of the compensation paid to 103 Non-PSC attorneys.

| | |
|---|---|
| Total Recommended Fee Allocations | $704.500 million |
| Total Compensation Paid to 19 PSC Attorneys | $597.354 million |
| Total Compensation Paid to 103 Non-PSC Attorneys | $107.146 million |

450. Common benefit attorneys' fees are generated from the following three sources.

| | |
|---|---|
| BP Class Settlements | $555.20 million |
| Louisiana & Alabama Settlements | $ 40.00 million |
| Transocean/Haliburton Settlements | $124.95 million |
| Total | $720.15 million |

451. Contingent Fee (25%) is calculated from the following total amounts paid for submitted claims.

| | |
|---|---|
| Gulf Coast Claims Facility (GCCF) | $ 6.1 billion |
| Transition Period | $ 405 million |
| Deepwater Horizon Claims Facility (DHCC) | $ 13 billion |
| Total Amount Paid | $19.505 billion |

452. According to the FCC, the proposed recommended fee allocations total approximately $704.5 million. This leaves a proposed reserve of approximately $15.65 million.

### G. How the Court Allocated the $720.15 million to Common Benefit Attorneys

453. The manner in which Defendant Barbier allocated the $720.15 million to

Defendants Herman, Roy, the MDL 2179 PSC members, and other Common Benefit Attorneys
is humorously instructive.

454. On July 15, 2015, Defendant Barbier issued Pretrial Order No. 59 which, in
pertinent part, states, "Pursuant to the Court's inherent authority over this multidistrict litigation,
the Court hereby appoints a fee committee and sets forth guidelines for common benefit fee and
cost reimbursements....The Court appoints a Common Benefit Fee and Cost Committee ("FCC")
to be responsible for submitting to the Court, at an appropriate time, an Aggregate Fee and Cost
Petition and an Allocation Recommendation."

455. The FCC shall be comprised of: (a) Stephen J. Herman of Herman, Herman & Katz,
LLC, Co-Liaison Counsel in MDL 2179, who shall serve as Co-Chair and Secretary of the
FCC....

456. The FCC shall recommend an allocation of the amounts awarded by the Court to
compensate counsel for common benefit fees and reimbursement of reasonable expenses....The
FCC shall evaluate the Fee Applicants' common benefit contributions, using objective measures
and the FCC's subjective understanding of the relevant contributions of each Fee Applicant
toward generating the benefits provided pursuant to.... the Economic Settlement, and/or
otherwise substantially advancing the litigation on behalf of all claimants in MDL 2179, in
accordance with established protocols, and make a recommendation to the Court for
consideration as to each Fee Applicant.

457. On April 11, 2017, the FCC filed its proposed fee allocation with the MDL 2179
Court.

458. Defendant Herman and the FCC explains that it "did not employ a 'lodestar' or

'hourly rate' approach....the Fee Committee did not solicit from Common Benefit Attorneys what they might claim to be their own individual or average blended hourly 'rates'....Nor did the FCC interpret its task to simply apply a single blended hourly rate to all hours that had been submitted in the case....Rather, the Court asked the Fee Committee to rely, in part, upon '*the FCC's subjective understanding of the relevant contributions of each Fee Applicant.*'

459. Defendant Herman and the FCC made the following final recommended allocation to each potential FCC and PSC Common Benefit Fee Applicant Firm.

| | |
|---|---|
| Total Amount the FCC Members Paid to Themselves | $321,602,542.45 |
| Total Amount Paid to Other PSC Members | $277,043,154.06 |
| Total Amount Paid a Non-PSC Member (Barrios, Kingsdorf & Casteix) | $ 1,291,576.47 |

460. Defendant Herman paid himself $87,827,200.35.

461. On October 8, 2010, Defendant Barbier appointed Mikal C. Watts as one of the initial fifteen members to the MDL 2179 PSC. Watts was appointed based largely on the fact that he allegedly had more than 40,000 clients. On March 13, 2013, Watts resigned from the MDL 2179 PSC. On September 15, 2015, Watts and six codefendants were indicted by a federal grand jury on 95 counts of conspiracy, mail and wire fraud, identity theft, and aggravated identity theft. As set forth in the indictment, the defendants, without contacting the individuals, would obtain names, addresses, dates of birth, and social security numbers from any source available to create "clients" for anticipated litigation as a result of the *Deepwater Horizon* Oil Spill. The indictment further alleges that the defendants fraudulently submitted names of over 40,000 individuals as plaintiffs represented by Mikal C. Watts in litigation related to the *Deepwater Horizon*/BP oil spill, knowing that the individuals had not consented to be represented by the firm, and/or that stolen and false social security numbers, dates of birth, addresses, and occupations were claimed.

-129-

According to the indictment, the defendants attempted to obtain payments from the Gulf Coast Claims Facility for persons Mikal C. Watts claimed to represent and ultimately submitted 'Presentment Forms' to BP for each of the 40,000 plus individuals Mikal C. Watts claimed to represent. The indictment alleges that the total amount of claims submitted by the defendants to BP was in excess of $2 billion.

462. On April 11, 2017, the FCC filed its proposed fee allocation with the MDL 2179 Court. (Rec. Doc. 22628).

463. The FCC recommended Watts Guerra Craft, LLP be allocated $16,790,494.18 in common benefit fees.

464. The FCC explains, "The Fee Committee has not taken into consideration any of the issues raised in BP's Complaint and Motion to Enjoin the Seafood Program [Civil Action No. 2:13-cv-6674]. Whether and/or how such allegations might or might not affect the allocation or award of common benefit fees to Watts Guerra is left to the sound judgment and discretion of the Court. The Fee Committee does note that Mr. Watts was acquitted by the jury in the criminal trial that was held in the Southern District of Mississippi."

465. On October 12, 2017, Special Master John W. Perry, Jr. filed "Special Master's Recommendations Concerning the Allocation of Common Benefit Fees and the Reimbursement of Shared Expenses and Held Costs" with the MDL 2179 Court. (Rec. Doc. 23491)

466. Special Master Perry recommended Watts Guerra Craft, LLP be allocated *$18,290,494.18* in common benefit fees.

467. How much would Watts Guerra Craft, LLP have been allocated if its more than 40,000 "clients" were not phantoms? The MDL 2179 plaintiffs may never know.

468. Defendants Herman, Roy, and the MDL 2179 PSC members, with the approval of Defendant Barbier, were able to grossly overcompensate themselves in exchange for limiting the liability of BP.

## COUNT I
## FEDERAL FALSE CLAIMS ACT
## INDIRECT FALSE CLAIM
## 31 U.S.C. § 3729(a)(1)(A)

469. Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

470. By virtue of the acts described above, Defendants knowingly presented or caused to be presented materially false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A); that is, Defendants knowingly made or presented, or caused to be made or presented, to the Government claims for payment that BP was obligated to pay under: (a) the Oil Pollution Act of 1990 (a *strict liability* statute); and (b) toxic tort law (a *strict liability tort*).

471. Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of the defendants' conduct.

472. By virtue of the false or fraudulent claims that Defendants presented or caused to be presented, the Government has suffered actual damages in an amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

## COUNT II
**FEDERAL FALSE CLAIMS ACT
INDIRECT FALSE CLAIM
31 U.S.C. § 3729(a)(1)(B)**

473. Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

474. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements, namely, false claims and false statements about compliance with the Oil Pollution Act of 1990 and toxic tort law for damages resulting from the BP oil well blowout of April 2010, all of which were material to get false or fraudulent claims paid or approved by the Government, in violation of 31 U.S.C. § 3729(a)(1)(B).

475. Payment of the false or fraudulent claims was a reasonable and foreseeable consequence of the defendants' statements and actions.

476. By virtue of the false or fraudulent records or statements that Defendants made, used, or caused to be made and presented, the Government has suffered actual damages in an amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

## COUNT III
**FEDERAL FALSE CLAIMS ACT
INDIRECT REVERSE FALSE CLAIM
31 U.S.C. § 3729(a)(1)(G)**

477. Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint.

478. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation by BP to pay or transmit

-132-

money to the Government, or knowingly concealed or knowingly and improperly causing BP to avoid or decrease an obligation by BP to pay or transmit money to the Government, namely, the payment of the civil penalty of $4,300 per barrel of total amount of oil discharged during the BP oil well blowout of April 2010 which is required under the Clean Water Act (a *strict liability* statute) resulting from the gross negligence or willful misconduct by BP under the Clean Water Act, 33 U.S.C. § 1321(b)(7)(D), in violation of 31 U.S.C. § 3729(a)(1)(G).

479. By virtue of Defendants knowingly making, using, or causing to be made or used, false records or statements material to an obligation by BP to pay or transmit money to the Government, or knowingly concealing or knowingly and improperly causing BP to avoid or decrease an obligation by BP to pay or transmit money to the Government, the Government has suffered actual damages in an amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

## COUNT IV
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) 18 U.S.C. § 1961, et seq. THE MDL 2179 ENTERPRISE (AGAINST ALL DEFENDANTS (THE "RICO MDL 2179 DEFENDANTS"))

480. Plaintiff Donovan refers to and incorporates by reference as though fully set forth herein each and every foregoing paragraph of this Complaint, and further alleges as follows:

481. The RICO MDL 2179 Defendants through the use of the MDL 2179 Court that appeared to be independent of the RICO MDL 2179 Defendants; through the dissemination of information and publications that supported the RICO MDL 2179 Defendants' scheme; through the use of the opinions of four experts ("Thought Leaders") in the law of class actions who were

controlled and/or funded by the RICO MDL 2179 Defendants to promote their message; and through implementation of their "Eight-Step" fraudulent scheme, conducted an association-in-fact enterprise, and/or participated in the conduct of an enterprise through a pattern of illegal activities (the predicate racketeering acts of mail, wire fraud, and obstruction of justice) to carry-out the common purpose of the MDL 2179 Enterprise, i.e., to unlawfully limit BP's liability for the purpose of maximizing judicial efficiency and/or maximizing their compensation. Through the racketeering activities of the MDL 2179 Enterprise, the RICO MDL 2179 Defendants sought to further the common purpose of the enterprise through a fraudulent scheme to limit BP's liability by illegally transferring the majority of the BP oil well blowout economic and medical costs from BP (the "responsible party") to the Government. In so doing, each of the RICO MDL 2179 Defendants knowingly conducted and participated in the conduct of the activities of the MDL 2179 Enterprise by engaging in mail fraud, wire fraud, and obstruction of justice in violation of 18 U.S.C. §§ 1962(c), and (d).

482. The MDL 2179 Enterprise alleged above is an association-in-fact enterprise that consists of the RICO MDL 2179 Defendants (Carl J. Barbier, Stephen J. Herman, James P. Roy, Brian H. Barr, Scott Summy, Jeffrey A. Breit, Elizabeth J. Cabraser, Philip F. Cossich, Jr., Robert T. Cunningham, Alphonso Michael Epsy, Calvin C. Fayard, Jr., Robin L. Greenwald, Colson Hicks Eidson, Rhon E. Jones, Matthew E. Lundy, Michael C. Palmintier, Paul M. Sterbcow, Mikal C. Watts, Joseph F. Rice, Conrad S.P. "Duke" Williams, III, Kenneth R. Feinberg, The Garretson Firm Resolution Group, Inc., and Patrick A. Juneau).

483. Each of the RICO MDL 2179 Defendants conducted and participated in the conduct of the RICO MDL 2179 Enterprise by playing a distinct role in furthering the enterprise's

-134-

common purpose of the MDL 2179 Enterprise, i.e., to unlawfully limit BP's liability for the

purpose of maximizing judicial efficiency and/or maximizing their compensation. Through the

racketeering activities of the MDL 2179 Enterprise, the RICO MDL 2179 Defendants sought to

further the common purpose of the enterprise through a fraudulent scheme to limit BP's liability

by illegally transferring the majority of the BP oil well blowout economic and medical costs

from BP (the "responsible party") to the Government.

484. Specifically, the RICO MDL 2179 Defendants each worked together to coordinate

the enterprise's goals and conceal their role, and the enterprise's existence, from the public by,

among other things,

> (i) knowingly conceiving, developing, promoting, and/or facilitating their "Eight-Step" fraudulent scheme to maximize judicial efficiency and/or maximize their compensation in exchange for limiting the liability of BP;
> (ii) failing to inform Claimants that BP would only pay a total amount of $20 billion to compensate all the BP oil well blowout victims in the settlement class action;
> (iii) using the fear of costly and protracted litigation in an attempt to coerce MDL 2179 Plaintiffs to accept grossly inadequate settlements;
> (iv) circumventing the OPA by negotiating and drafting a settlement class action agreement which limits a claimant's recovery of damages to geographic bounds and certain business activities while requiring a heightened and vague proof of causation between his, her, or its damages and the BP oil well blowout incident;
> (v) failing to inform Claimants the victims' compensation fund "Release and Covenant Not to Sue" requirement violates OPA, State contract law, and is contrary to public policy;
> (vi) secretly colluding to inflate the amount of compensation received by some MDL 2179 plaintiffs (just prior to the "fairness" hearing) in order to induce the remaining MDL 2179 plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate;"
> (vii) failing to inform Plaintiffs that judicial efficiency replaces justice in MDL 2179;
> (viii) informing Claimants that limiting the compensation period to 2010 is reasonable ("....*extending compensation to 2011 would cover losses not likely caused by the spill.*");

(ix) further promoting their false messages by retaining, and highly compensating, four law professors/thought leaders to give their "unbiased" opinions in order to induce the plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate;" and
(x) knowingly making false statements of material fact to MDL 2179 Plaintiffs (See *supra*, ¶ ¶ 410, 411, and 426).

485. Each of the RICO MDL 2179 Defendants helped disguise the role of each other by purporting to be zealously and competently advocating on behalf of all MDL 2179 Plaintiffs in order to disseminate information that promoted the RICO MDL 2179 Defendants' false messages, thereby further obscuring the RICO MDL 2179 Defendants' role in the enterprise and the enterprise's existence.

486. Further, each of the RICO MDL 2179 Defendants that made-up the MDL 2179 Enterprise had systematic links to and personal relationships with each other through joint participation in the MDL 2179 Plaintiffs' Steering Committee and the MDL 2179 Court. The systematic links and personal relationships that were formed and developed allowed members of the MDL 2179 Enterprise the opportunity to form the common purpose and agree to conduct and participate in the conduct of the MDL 2179 Enterprise. Each of the individuals and entities who formed the MDL 2179 Enterprise acted to enable the common purpose and fraudulent scheme of the MDL 2179 Enterprise.

487. At all relevant times, the MDL 2179 Enterprise: (a) had an existence separate and distinct from each RICO MDL 2179 Defendant and its members; (b) was separate and distinct from the pattern of racketeering in which the RICO MDL 2179 Defendants engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the RICO MDL 2179 Defendants; (d) was characterized by interpersonal

relationships between and among each member of the MDL 2179 Enterprise; and (e) had

sufficient longevity for the enterprise to pursue its purpose and functioned as a continuing unit.

488. The persons and entities engaged in the MDL 2179 Enterprise are systematically

linked through contractual relationships, financial ties, personal relationships, and continuing

coordination of activities, as spearheaded by the RICO MDL 2179 Defendants.

489. The RICO MDL 2179 Defendants conducted and participated in the conduct of the

MDL 2179 Enterprise through a pattern of racketeering activity that included mail fraud in

violation of Title 18, United States Code, Section 1341; wire fraud in violation of Title 18,

United States Code, Section 1343; and obstruction of justice in violation of Title 18, United

States Code, Section 1503, to limit BP's liability by illegally transferring the majority of the BP

oil well blowout economic and medical costs from BP (the "responsible party") to the

Government for the purpose of maximizing judicial efficiency and/or maximizing their

compensation.

490. The RICO MDL 2179 Defendants each committed, conspired to commit, and/or

aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e.

violations of 18 U.S.C. §§ 1341, 1343, and 1503) within the past ten years. The multiple acts of

racketeering activity that the RICO MDL 2179 Defendants committed, or aided and abetted in

the commission of, were related to each other, posed a threat of continued racketeering activity,

and therefore constitute a "pattern of racketeering activity." The racketeering activity was made

possible by the RICO MDL 2179 Defendants' regular use of the employees of the MDL 2179

Enterprise, the U.S. Mail, and interstate wire facilities. The RICO MDL 2179 Defendants

participated in the scheme to defraud by using mail, telephones and the Internet to transmit

mailings and wires in interstate or foreign commerce.

491. The RICO MDL 2179 Defendants' predicate acts of racketeering (18 U.S.C. §

1961(1)) include, but are not limited to:

a. Mail Fraud: The RICO MDL 2179 Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to limit BP's liability by illegally transferring the majority of the BP oil well blowout economic and medical costs from BP (the "responsible party") to the Government for the purpose of maximizing judicial efficiency and/or maximizing their compensation by means of false pretenses, misrepresentations, promises, and omissions;

b. Wire Fraud: The RICO MDL 2179 Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to limit BP's liability by illegally transferring the majority of the BP oil well blowout economic and medical costs from BP (the "responsible party") to the Government for the purpose of maximizing judicial efficiency and/or maximizing their compensation by means of false pretenses, misrepresentations, promises, and omissions; and

c. Obstruction of Justice: The RICO MDL 2179 Defendants violated 18 U.S.C. § 1503 by engaging in a variety of corrupt methods by which the proper administration of justice was impeded or thwarted, a variety limited only by the imagination of the criminally inclined RICO MDL 2179 Defendants.

492. Indeed, as summarized herein, the RICO MDL 2179 Defendants obstructed justice and used the mail and wires to send or receive thousands of communications, publications, representations, statements, electronic transmissions and payments to carry-out the MDL 2179 Enterprise's fraudulent scheme.

493. Because the RICO MDL 2179 Defendants disguised their participation in the enterprise, and worked to keep even the enterprise's existence secret so as to give the false appearance that they were zealously and competently advocating on behalf of all MDL 2179 Plaintiffs, many of the precise dates of the MDL 2179 Enterprise's uses of the U.S. Mail and

interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the books and records maintained by the RICO MDL 2179 Defendants. Indeed, an essential part of the successful operation of the MDL 2179 Enterprise alleged herein depended upon secrecy. However, Plaintiff Donovan has described the occasions on which the RICO MDL 2179 Defendants disseminated misrepresentations and false statements to MDL 2179 Plaintiffs, and how those acts were in furtherance of the scheme.

494. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims and Plaintiffs. The RICO MDL 2179 Defendants calculated and intentionally crafted the scheme and common purpose of the MDL 2179 Enterprise to ensure maximum judicial efficiency and their own compensation remained high. In designing and implementing the scheme, the RICO MDL 2179 Defendants understood and intended that the MDL 2179 plaintiffs would rely on the integrity and oversight of the MDL 2179 Court in regard to the RICO MDL 2179 Defendants' activities.

495. The RICO MDL 2179 Defendants' pattern of racketeering activity alleged herein and the MDL 2179 Enterprise are separate and distinct from each other. Likewise, the RICO MDL 2179 Defendants are distinct from the MDL 2179 Enterprise.

496. The racketeering activities conducted by the RICO MDL 2179 Defendants amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive the Plaintiffs. Each separate use of the U.S. Mail and/or interstate wire facilities employed by Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims and

the Plaintiffs. The RICO MDL 2179 Defendants have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the MDL 2179 Enterprise.

497. Each of the RICO MDL 2179 Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§§ 1341, 1343, and 1503 offenses.

498. As described herein, the RICO MDL 2179 Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of maximizing judicial efficiency and obtaining significant compensation from limiting the liability of BP. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

499. The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court. The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

500. The RICO MDL 2179 Defendants' violations of law and their pattern of racketeering activity directly and proximately caused the Government's injury and Plaintiff's injury in his business. The RICO MDL 2179 Defendants' pattern of racketeering activity logically, substantially and foreseeably caused the Government's damages. The Government's damages and Plaintiff Donovan's injuries were not unexpected, unforeseen or independent.

501. It was foreseeable and expected that the RICO MDL 2179 Defendants creating and then participating in the MDL 2179 Enterprise through a pattern of racketeering activities to

carry-out their fraudulent scheme would lead to the transfer of the majority of the BP oil well blowout economic and medical costs from BP (the "responsible party") to the Government.

502. Specifically, the RICO MDL 2179 Defendants' creation of, and then participation in, the MDL 2179 Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme has injured Plaintiffs in the form of substantial losses of money that logically, directly and foreseeably arise from the limiting BP's liability by illegally transferring the majority of the BP oil well blowout economic and medical costs from BP (the "responsible party") to the Government for the purpose of maximizing judicial efficiency and/or maximizing their compensation. Plaintiffs' injuries, as alleged throughout this complaint, and expressly incorporated herein by reference, may include:

> a. Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from the effects of the BP oil well blowout toxic tort;
> b. Costs associated with the injuries to the health and welfare of the members of the United Houma Nation caused by Defendants' intentional failure to hold BP accountable;
> c. Costs associated with the OWCP, DLHWC, SBA, HUD, USDA, FNS, SSA, EPA, and CWA resulting from illegally transferring the majority of the BP oil well blowout economic costs from BP (the "responsible party") to the Government; and
> d. The costs associated with the injury to Plaintiff Donovan's business.

503. Plaintiffs' injuries were directly and thus proximately caused by these Defendants' racketeering activities because they were the logical, substantial and foreseeable cause of Plaintiffs' injuries. But for the fraudulent scheme the RICO MDL 2179 Defendants created through their MDL 2179 Enterprise, Plaintiffs would not have lost money, and the health and welfare of the MDL 2179 Plaintiffs would not have been injured.

504. Plaintiff seeks all legal and equitable relief as allowed by law, including, inter alia, actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised corrective communication; forfeiture as deemed proper by the Court; attorney's fees; all costs and expenses of suit; and pre- and post-judgment interest, including, inter alia:

a. Actual damages and treble damages, including pre-suit and post-judgment interest;

b. An order enjoining any further violations of RICO;

c. An order enjoining any further violations of any statutes alleged to have been violated in this Complaint; and

d. An order enjoining the commission of any tortious conduct, as alleged in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff/*qui tam* Relator Brian J. Donovan requests the Court enter the following relief:

A. That Defendants be ordered to cease and desist from violating 31 U.S.C. §3729 *et seq.*

B. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729;

C. That Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act.

-142-

D. That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

E. That Relator recover such other relief as the Court deems just and proper.

DATED: February 24, 2020

Respectfully submitted,

Brian J. Donovan, Esq.
Florida Bar No. 143900
3102 Seaway Court, Suite 304
Tampa, FL 33629
Tel: (352)328-7469
BrianJDonovan@verizon.net
Plaintiff/*qui tam* Relator and Attorney

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of this Complaint and written disclosure of substantially all material evidence and information Relator possesses has been served on the Government as provided in FRCP 4 as follows:

By United States Mail, Certified Delivery, Return Receipt Requested to:

Ms. Maria Chapa Lopez
U.S. Attorney for the Middle District of Florida
U.S. Attorney's Office
400 North Tampa Street
Suite 3200
Tampa, FL 33602

By United States Mail, Certified Delivery, Return Receipt Requested to:

Mr. William P. Barr
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

DATED: February ___24___, 2020

Respectfully submitted,

Brian J. Donovan, Esq.
Florida Bar No. 143900
3102 Seaway Court, Suite 304
Tampa, FL 33629
Tel: (352)328-7469
BrianJDonovan@verizon.net

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Donovan, Brian J. | Barbier, Carl J. (See Attachment) |

**(b)** County of Residence of First Listed Plaintiff    **Hillsborough County, FL**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   **Orleans Parish, Louisiana**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Brian J. Donovan, Esq.
3102 Seaway Ct., #304
Tampa, FL 33629     Tel: (352)328-7469

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☒ 2   U.S. Government
Defendant

☒ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for:

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☒ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product    Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument |    Liability   ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &    Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
|    & Enforcement of Judgment |    Slander    Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'    Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted |    Liability   ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
|    Student Loans | ☐ 340 Marine    Injury Product | |    New Drug Application | ☐ 470 Racketeer Influenced and |
|    (Excludes Veterans) | ☐ 345 Marine Product    Liability | | ☐ 840 Trademark |    Corrupt Organizations |
| ☐ 153 Recovery of Overpayment |    Liability   **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) |    (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending |    Act | ☐ 862 Black Lung (923) | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract |    Product Liability   ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) |    Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal    Property Damage |    Relations | ☐ 864 SSID Title XVI | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise |    Injury   ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury -    Product Liability | ☐ 751 Family and Medical | |    Exchange |
| |    Medical Malpractice |    Leave Act | | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee |    Income Security Act |    or Defendant) | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party |    Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/    Sentence | |    26 USC 7609 | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability |    Accommodations   ☐ 530 General | | | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** | |    Act/Review or Appeal of |
| |    Employment   **Other:** | ☐ 462 Naturalization Application | |    Agency Decision |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| |    Other   ☐ 550 Civil Rights |    Actions | |    State Statutes |
| | ☐ 448 Education   ☐ 555 Prison Condition | | | |
| |     ☐ 560 Civil Detainee - | | | |
| |      Conditions of | | | |
| |      Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
Another District
*(specify)*

☐ 6   Multidistrict
Litigation -
Transfer

☐ 8   Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. § 3729

Brief description of cause:
Action brought under the False Claims Act

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE

DOCKET NUMBER

DATE   2/24/2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

## Civil Cover Sheet Attachment

### DEFENDANTS

CARL J. BARBIER
STEPHEN J. HERMAN
JAMES P. ROY
BRIAN H. BARR
SCOTT SUMMY
JEFFREY A. BREIT
ELIZABETH J. CABRASER
PHILIP F. COSSICH, JR.
ROBERT T. CUNNINGHAM
ALPHONSO MICHAEL EPSY
CALVIN C. FAYARD, JR.
ROBIN L. GREENWALD
COLSON HICKS EIDSON
RHON E. JONES
MATTHEW E. LUNDY
MICHAEL C. PALMINTIER
PAUL M. STERBCOW
MIKAL C. WATTS
JOSEPH F. RICE
CONRAD S.P. "DUKE" WILLIAMS, III
KENNETH R. FEINBERG
THE GARRETSON FIRM RESOLUTION GROUP, INC.
PATRICK A. JUNEAU.