**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **In re: Oil Spill by the Oil Rig** | * | **MDL NO. 2179** |
| **"Deepwater Horizon" in the Gulf of** | * | |
| **Mexico, on April 20, 2010** | * | **SECTION J** |
| | * | |
| **This Document Relates To:** | * | **JUDGE BARBIER** |
| | * | |
| *26 Cases in the B3 Bundle Identified in* | * | **MAGISTRATE JUDGE CURRAULT** |
| *Exhibit A to this Order* | * | |

<u>**ORDER**</u>
**[Severing and Transferring 26 Cases in the B3 Pleading Bundle to Other Districts Pursuant to 28 U.S.C. § 1404(a)]**

During a status conference on November 17, 2020, the Court announced its intent to sever from this Multidistrict Litigation ("MDL") nearly all cases in the "B3" pleading bundle. (Rec. Doc. 26784).[1] These cases will take one of three routes following severance. Most will remain in this district and be re-allotted among the several judges of this Court. A pair of cases will be remanded to another district pursuant to the multidistrict litigation statute, 28 U.S.C. § 1407(a). Finally, some cases will be transferred to another district pursuant to the change of venue statute, 28 U.S.C. § 1404(a).

This Order concerns the last group of cases. Separate and forthcoming orders will address the other two. As detailed below and in the attached EXHIBIT A, this Order severs 26 cases from MDL 2179 and transfers them to other districts pursuant to 28 U.S.C. § 1404(a).

---

[1] All "Rec. Doc." citations are to the MDL 2179 master docket, No. 10-md-2179, unless the citation indicates otherwise.

**BACKGROUND**

**I.   The DEEPWATER HORIZON/Macondo Well Casualty and Oil Spill, the Response, and the B3 Claims**

On the evening of April 20, 2010, a blowout, explosions, and fire occurred on the DEEPWATER HORIZON, a semi-submersible drilling rig, as it was in the process of temporarily abandoning a well, known as Macondo, it had drilled on the Outer Continental Shelf approximately 50 miles off the coast of Louisiana. Eleven workers died tragically in the casualty. The 115 survivors evacuated to a nearby supply vessel. Fueled by hydrocarbons from the well, the fire on the DEEPWATER HORIZON burned continuously until mid-morning on April 22, when it capsized and sank. As the rig descended, the pipe that connected it to the well (known as a marine riser) collapsed and fractured in multiple places. Oil from the well then spewed into the Gulf of Mexico via the riser breaks, approximately 5,000 feet beneath the water's surface. The Macondo Well was successfully capped on July 15, 2010, halting a nearly three-month discharge that released an estimated 3.19 million barrels of oil into the Gulf. (Rec. Doc. 14021 ¶¶ 184, 273). In September, a relief well pumped cement into Macondo's annulus, killing the well.

The oil spill instigated a massive response that included government entities and officials, BP (the majority owner and designated operator of the Macondo Well and a "responsible party" for the oil spill under the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701, et seq.), BP's contractors and subcontractors, other industry participants, and thousands of private individuals. The response involved, over time, a cumulative total of over 90,000 response workers, 6,500 vessels, 127 aircraft, and 13.5 million feet of boom. (Rec. Doc. 8217 at 2). Response activities included skimming oil from the surface of the water, *in situ* burning of oil, deploying containment and sorbent boom, onshore and beach clean-up, decontaminating vessels that engaged in various response efforts, and the application of chemical dispersants. One notable aspect of the response

was the "Vessels of Opportunity" ("VoO") Program, in which local vessels were hired to perform various response activities, such as placing or retrieving boom.

The plaintiffs whose cases are identified in Exhibit A to this Order have brought claims against BP and other parties claiming that they or persons represented by them were injured by exposure to oil from the Macondo Well and/or chemical dispersants or other substances used in the response efforts.

## II.   Relevant MDL 2179 Proceedings

The Judicial Panel on Multidistrict Litigation created this MDL on August 10, 2010. (Rec. Doc. 1). There have been many developments over the past eleven years.[2] Here the Court recounts the MDL procedural history relevant to the plaintiffs whose claims are severed and transferred by this Order.

Numerous claims asserting a variety of damages were consolidated in this MDL. Early on, the Court organized claims by type into one of several "pleading bundles." (*See* Pretrial Order No. 11, Rec. Doc. 569; Pretrial Order No. 25, Rec. Doc. 983). The claims at issue fall within the "B3" pleading bundle, which includes personal injury claims due to chemical exposure, non-exposure personal injury claims, and contract claims, among others. On March 30, 2011, the Plaintiffs' Steering Committee filed an Amended Master Complaint for the B3 bundle. (Rec. Doc. 1812). Plaintiffs could join in and adopt the claims of the Amended B3 Master Complaint by submitting a 3-page Short Form Joinder. (Rec. Docs. 983, 983-3, 982).

On October 4, 2011, the Court issued an order granting in part and denying in part defendants' motion to dismiss the Amended B3 Master Complaint. (Rec. Doc. 4209). In that

---

[2] The MDL master docket, No. 10-md-2179, contains over 27,000 document entries to date. Many of the significant rulings, case management orders, etc., in MDL 2179 are posted to the Court's public website, http://www.laed.uscourts.gov/OilSpill/OilSpill.htm.

order, the Court held (among other things) that plaintiffs' state-law claims were preempted by maritime law and dismissed, but that plaintiffs had stated claims for negligence and gross negligence under general maritime law.

On November 28, 2012, the Court granted a motion for summary judgment filed by Nalco Company and its related companies, the manufacturer of certain chemical dispersants (Corexit EC9500A and Corexit EC9527A) used in the response, and dismissed the claims against the Nalco defendants. (Rec. Doc. 8037).

In 2012, BP agreed to the Deepwater Horizon Medical Benefits Class Action Settlement Agreement ("Medical Settlement," Rec. Doc. 6427), which was intended to resolve personal injury claims from alleged exposure to oil and/or dispersants arising from the DEEPWATER HORIZON/Macondo Well incident and response. The Medical Settlement also created a process, known as the Back-End Litigation Option ("BELO"), for class members to pursue later-manifested physical conditions. (*Id.*) The Court granted preliminary approval of the Medical Settlement on May 2, 2012 (Rec. Doc. 6419), oversaw an objection and opt-out period, held a fairness hearing on November 8, 2012 (Rec. Doc. 7900), and granted final approval of the Medical Settlement on January 11, 2013 (Rec. Docs. 8217, 8218).

Many B3 plaintiffs either properly opted out of the settlement or were not members of the settlement class.

The Court held two major bench trials in 2013 and a third in 2015. The Phase One Trial commenced on February 25, 2013 and concluded on April 17, 2013. Known as the Incident Phase, it addressed fault determinations relating to the loss of well control, the ensuing explosion and fire, the sinking of the DEEPWATER HORIZON, and the initiation of the release of oil from the well. (*See* Findings & Conclusions, Phase One Trial, Rec. Doc. 13381). The Phase Two

Trial commenced on September 30, 2013 and concluded on October 18, 2013. This phase was divided into two segments: "Source Control" and "Quantification." Source Control concerned issues pertaining to stopping the discharge of hydrocarbons; the Quantification segment addressed the amount of oil that released into the Gulf of Mexico. (*See* Findings & Conclusions, Phase Two Trial, Rec. Doc. 14021). The third phase, known as the Penalty Phase, occurred between January 20 and February 2, 2015. The purpose of that trial was to determine the amount of the civil penalty to be imposed under the Clean Water Act, 33 U.S.C. § 1321(b)(7), on BP and Anadarko Petroleum Corporation, which owned a minority interest in the Macondo Well. (*See* Findings & Conclusions, Penalty Phase Trial, Rec. Doc. 15606).

Once the major trial phases were concluded, the Court turned its attention to other matters in the MDL. On February 16 and August 2, 2016, the Court dismissed with prejudice the B3 claims against the "Clean-Up Responder Defendants,"[3] a group of defendants who had assisted in the spill response efforts, with the exception of the B3 claims by Nathan Fitzgerald (13-00650) and Joseph Brown (12-2333) against DRC Emergency Services, LLC. (Rec. Docs. 15853, 21406).

On February 22, 2017, the Court issued Pretrial Order No. 63 ("PTO 63"), which applied to all remaining claims in the B3 bundle. (Rec. Doc. 22295). PTO 63 required all plaintiffs who had timely filed a claim in the B3 pleading bundle and had not released their claims (through the Medical Settlement or otherwise) to submit certain documents. Specifically, B3 plaintiffs who previously filed an individual lawsuit (*i.e.*, a single-plaintiff complaint without class allegations) were required to complete, file, and serve a sworn statement regarding the status of their claim.

---

[3] O'Brien's Response Management, L.L.C. (formerly known as O'Brien's Response Management, Inc.), National Response Corporation, Marine Spill Response Corporation, Dynamic Aviation Group, Inc., Airborne Support, Inc., Airborne Support International, Inc., DRC Emergency Services, LLC, International Air Response, Inc., Lynden, Inc., Lane Aviation, Inc., Tiger Rentals, Ltd., The Modern Group, Ltd., and The Modern Group GP-SUB, Inc.

B3 plaintiffs who had not filed an individual lawsuit, but instead had filed a Short Form Joinder and/or were part of a complaint with more than one plaintiff, were required to complete, file, and serve an individual lawsuit in this Court and a sworn statement.[4] B3 plaintiffs initially had until April 12, 2017 to comply with PTO 63. Many sought and received an extension up to May 3, 2017 to comply. PTO 63 warned that plaintiffs who failed to comply would "face dismissal of their claims with prejudice without further notice." (PTO 63 at 7, Rec. Doc. 22295).

On July 18, 2017, the Court issued the "PTO 63 Compliance Order." (Rec. Doc. 23047). Exhibit 1 to the PTO 63 Compliance Order identified 960 B3 plaintiffs deemed to be compliant with PTO 63 and whose B3 claims were subject to further proceedings in this Court. B3 claims that were not listed on Exhibit 1 were dismissed with prejudice. Some B3 plaintiffs moved for reconsideration of the PTO 63 Compliance Order. On December 6, 2017, the Court issued an order granting some of those motions and denying others. (Rec. Doc. 23735). On April 6, 2018, the Court issued an Updated PTO 63 Compliance List, identifying 981 B3 plaintiffs that had complied with PTO 63. (Rec. Doc. 24268).

On April 9, 2018, the Court issued Pretrial Order No. 66 ("PTO 66," Rec. Doc. 24282), which required remaining B3 plaintiffs to complete, sign, and serve a Particularized Statement of Claim ("PSOC," Exhibit A to PTO 66) on counsel for BP.[5] The PSOC is a 12-page questionnaire that was designed to help the parties and the Court better understand the nature and scope of the injuries, damages, and causation alleged by the remaining B3 plaintiffs. The PSOC solicited general background information about each B3 plaintiff as well as information specific to the

---

[4] Filing a new lawsuit in this Court as required by PTO 63 does not constitute consent to having that case tried in this Court, nor does it mean the plaintiff waives his or right to request remand to the transferor court. (*See* PTO 63 ¶ 8, Rec. Doc. 22295 ("[M]ere compliance with this Order will not result in a Plaintiff submitting to this Court's jurisdiction for anything beyond pretrial purposes.")).

[5] The B3 plaintiffs were not required to file the PSOC in the Court's record.

plaintiff's claim. For example, Part "D" of the PSOC, entitled "Exposure Claims," and Part "F," entitled "Information About Your Injury or Illness," required the plaintiff to provide the following information:

18.　　Were you exposed to oil, dispersants, or both?

19.　　How were you exposed? (Check all that apply)
　　　　A.　Inhalation　　　　　　Yes_____ No_____
　　　　B.　Dermal (skin) contact Yes_____ No_____
　　　　C.　Ingestion　　　　　　Yes_____ No_____
　　　　D.　Other (please describe):

20.　　What was the date(s) of your exposure?

21.　　How many time(s) were you exposed to oil or dispersants (for each time, please note whether the exposure was to oil, dispersants, or both)?

22.　　What was the geographic location(s) of your exposure (for each location, please note on what date this exposure occurred and whether the exposure was to oil, dispersants, or both)?

23.　　For each time that you were exposed to oil or dispersants or both, for how long were you exposed to this substance or chemical?

24.　　Describe in as much detail as possible the circumstance(s) in which your exposure to the oil spill and/or chemical dispersant occurred:

25.　　For cleanup workers only: Did you report your exposure to oil and/or dispersants to your direct supervisor?

26.　　If you answered "Yes" to Question No. 25, provide the name of the supervisor to whom you reported your exposure and the date you first reported the exposure:

. . .

29.　　Describe in as much detail as possible the bodily injury (or medical condition) that you claim resulted from the spill or your cleanup work in response to the oil spill:

30.　　Please explain how your injury (or medical condition) resulted from the spill or your cleanup work in response to the oil spill:

31.　　On what date did you first report or seek treatment for your injury or illness:

32.　　On what date was your injury first diagnosed:

33.   Identify the doctor(s) (or other healthcare providers) who first diagnosed your injury (or condition):

34.   Identify doctor(s) (or other healthcare providers) who have treated your injury (or condition):

35.   Have you ever suffered this type of injury or condition before (i.e., before the date given in your answer to Question No. 32)? [yes or no] If "Yes,"
    A.    When?
    B    Who diagnosed the injury (or condition) at that time?

36.   Do you claim that your exposure to the oil spill and/or chemical dispersant worsened an injury (or condition) that you already had or had in part? [yes or no] If "Yes,"
    A.    What date did you first experience such injury or condition?
    B.    What injury (or condition) was made worse?

37.   Please list your family and/or primary care physician(s) for the past ten (10) years:

38.   Do you have in your possession, custody, or control, any medical records, bills, and any other documents, from physicians, healthcare providers, hospitals, pharmacies, insurance companies, or others who have provided treatment to you relating to the diagnosis or treatment of any injuries or illnesses arising from the *Deepwater Horizon* oil spill or response efforts, or that you otherwise identified in this Form?

39.   Describe specifically the compensatory damages that you claim in your lawsuit, including the nature of the damage, the date(s) of the damage, the amount of the damage, and the calculations used to arrive at that amount:

40.   Have you received workers compensation or other compensation or reimbursement for the injury alleged or associated expenses? [yes or no] If "Yes":
    A.    From whom did you receive this compensation or reimbursement?
    B.    When did you receive this compensation or reimbursement?
    C.    What was the amount of the compensation or reimbursement?

(Rec. Doc. 24282-1).

Many B3 plaintiffs sought and received an extension up to and including August 8, 2018 to comply with PTO 66. (Rec. Doc. 24671). On September 20, 2018, the Court issued the "PTO 66 Show Cause Order." (Rec. Doc. 24875). The PTO 66 Show Cause Order identified 825 B3 plaintiffs who appeared to be compliant with PTO 66. Those who were not compliant were

required to show cause in writing why their claims should not be dismissed with prejudice. On January 31, 2019, the Court issued its "PTO 66 Compliance Order." (Rec. Doc. 25356). The PTO 66 Compliance Order identified 911 B3 plaintiffs who had complied with PTO 66. (Rec. Doc. 25356-8). After addressing motions for reconsideration, the Court issued an Updated PTO 66 Compliance List on June 26, 2019, which identified 913 B3 plaintiffs who had complied with PTO 66. (Rec. Doc. 25748). The Court subsequently deemed another 22 plaintiffs to be compliant with PTO 66, bringing the total number of B3 plaintiffs who had complied with PTOs 63 and 66 to 935. (Rec. Docs. 25907, 25929).

On October 21, 2019, the Court issued Pretrial Order No. 68 ("PTO 68"), which required, among other things, that B3 plaintiffs complete a Supplemental Medical Disclosure Form, which provided additional information about the conditions that they claimed were caused by their exposure to oil, dispersants or other substances during the spill or response, provide an executed authorization for release of medical records, and produce medical records in their possession to BP within 90 days. (Rec. Doc. 26070). In turn, BP was required to produce 16 categories of documents to the B3 plaintiffs within that same 90-day period, including (but not limited to):

- All information, data and/or tangible materials, if any, about plaintiff in the BP medical encounters database and/or oil spill cleanup worker database;

- All non-privileged information, data, and/or tangible materials concerning job duty, job assignment, safety training, badge data and/or time records, if any, in BP's possession, custody or control relating to plaintiff; and

- All contracts and/or agreements between BP and plaintiff or plaintiff's direct employer(s), if any, concerning oil spill response work, including but not limited to requirements, policies, invoices and procedures concerning health, safety and welfare of oil spill response workers.

(Rec. Doc. 26070).

BP complied with its disclosure obligations under PTO 68 by the original January 17, 2020 deadline. (Rec. Doc. 26449). Many B3 plaintiffs requested and received an extension up to February 20, 2020 to comply. (Rec. Docs. 26199, 26206, & 26211). On April 20, 2020, the Court issued the "PTO 68 Show Cause Order." (Rec. Doc. 26453). The PTO 68 Show Cause Order noted that BP had fulfilled its obligations under PTO 68 and identified 91 B3 plaintiffs whose compliance with PTO 68 was disputed and who were therefore required to show cause in writing why their claims should not be dismissed with prejudice. On September 8 and 29, 2020, the Court issued its "PTO 68 Compliance Order" in two parts. (Rec. Docs. 26663, 26695). The PTO 68 Compliance Order dismissed with prejudice the claims of 49 B3 plaintiffs for noncompliance with PTO 68. None of the plaintiffs whose cases are subject to this Order were dismissed by the PTO 68 Compliance Order. Instead, the plaintiffs whose cases are subject to this Order have been deemed to be materially compliant with this Court's Pretrial Orders 63, 66, and 68.

The Court held a status conference on September 23, 2020 to address future management of the remaining cases in the B3 pleading bundle. Prior to the conference, the parties submitted case management proposals for the future management of the B3 cases. Following that status conference, the Court ordered the parties to meet and confer regarding what issues needed to be tried in the individual B3 cases and then to file reports with the Court addressing those issues within 30 days. (Rec. Doc. 26684). The Court then held a status conference on November 17, 2020. After hearing arguments from counsel, the Court announced its intent to sever nearly all of the remaining B3 cases from MDL 2179. (Rec. Doc. 26784).

Furthermore, the Court stated its intent to issue, prior to severing the B3 cases, a case management order that bifurcates each B3 case such that issues relating solely to punitive

damages will be stayed until after the plaintiff establishes entitlement to compensatory damages. In other words, plaintiffs must first prove that chemicals from the oil spill or response legally caused their injuries and the amount of damages that fairly compensates them for those injuries before any litigation regarding punitive damages (discovery, motion practice, trial, etc.) may occur. (*See* Rec. Doc. 26784). On February 23, 2021, the Court issued the contemplated case management order. (Case Management Order for the B3 Bundle, Rec. Doc. 26924). A copy of this case management order is attached to this Order as EXHIBIT B.

The Court observed during the November 17, 2020 status conference that "[m]ost cases will remain in this district post-severance and will be re-allotted among the judges of this court." (Rec. Doc. 26784). The Court ordered the parties to file a list identifying those B3 cases that would be subject to re-allotment within the U.S. District Court for the Eastern District of Louisiana. (*Id.*) Because certain B3 cases were transferred to MDL 2179 pursuant to 28 U.S.C. § 1407, the Court further ordered the parties to indicate on that list of B3 cases, among other things, whether the parties to any of the B3 cases that were transferred pursuant to 28 U.S.C. § 1407 nonetheless consented to trial in this Court. (Rec. Doc. 26784). If they did not, the case would need to be remanded to the transferor district. *See* FED. JUDICIAL CTR., MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.93 (2004) (*citing Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998)). On December 8, 2020, the parties filed the B3 case list, which stated that 805 of the then-existing B3 cases would remain in the Eastern District of Louisiana post-severance and 2 would need to be remanded per § 1407. (Rec. Doc. 26807). However, this list is no longer accurate.

The Court previously indicated to the parties that contested issues regarding venue would not be ruled upon prior to severing the B3 cases from the MDL. (*See* 11/17/20 Minute

11

Entry at 2 n.5, Rec. Doc. 26784). Consequently, the B3 case list filed on December 8, 2020 reflects that certain cases will remain in this district post-severance when the parties actually dispute whether venue is appropriate here. On February 25, 2021, the Court changed this process and ordered that any party in a B3 case that intended to file a motion to transfer venue must do so by March 12, 2021, otherwise that party would "be deemed to have waived any objection they may have to venue in this district." (Rec. Doc. 26934; *see also* Rec. Doc. 26992). Several timely motions to transfer venue were filed. (Rec. Docs. 26929-26932, 26961, 26987). BP and Michael Vickers (the plaintiff in case nos. 13-00304 and 13-00456) filed responses stating that they did not oppose the requested transfers. (Rec. Docs. 27009, 27010).

The Court has considered the motions to transfer venue (Rec. Docs. 26929-26932, 26961, 26987) and finds they should be granted.[6] In short, the Court concludes that the convenience of the parties and witnesses and the interest of justice weigh in favor of transferring these 26 cases to other districts once they are severed from the MDL. *See* 28 U.S.C. § 1404(a).

## CONCLUSION

The Judicial Panel on Multidistrict Litigation has explained that consolidated cases are ready for individual treatment "[o]nce common pretrial proceedings and any other pretrial proceedings that the transferee court considers appropriate have been completed in the transferee district." *In re Air Crash Disaster Near Chicago, Ill*., on May 25, 1979, 476 F. Supp. 445, 449 (J.P.M.L. 1979); *In re Evergreen Valley Project Litig*., 435 F. Supp. 923, 924 (J.P.M.L. 1977) ("It is not contemplated that a Section 1407 transferee judge will necessarily complete all pretrial proceedings in all actions transferred and assigned to him by the Panel, but rather that the

---

[6] Also, the Court previously granted a motion to transfer venue filed by plaintiff Michael Helmholtz, although it did not actually transfer Helmholtz's case at that time (Rec. Doc. 26921). Helmholtz's case is one of the 26 transferred by this Order.

transferee judge in his discretion will conduct the common pretrial proceedings with respect to the actions and any additional pretrial proceedings as he deems otherwise appropriate.").

When the Judicial Panel on Multidistrict Litigation created MDL 2179, it noted that centralization "will eliminate duplicative discovery, prevent inconsistent pretrial rulings, including ruling on class certification and other issues, and conserve the resources of the parties, their counsel, and the judiciary." (Rec. Doc. 1 at 3). Following consolidation in MDL 2179, the vast majority of claims have been resolved. For the past few years, the largest category of claims remaining in MDL 2179 has been the exposure-related personal injury claims within the B3 pleading bundle. The Court believes those claims are now ripe to proceed outside of MDL 2179.

Although there is still work to do in the MDL with respect to certain other cases, the B3 cases listed on Exhibit A to this Order have been the subject of extensive proceedings focused on common issues. As set forth above, those proceedings have included the exchange of information and documents administered through the PTO 63, 66, and 68 processes. Those processes have been completed, and the remaining B3 cases involve highly individualized facts and issues. The Court now concludes that the B3 cases subject to this Order would not benefit from further coordinated proceedings in MDL 2179 and are most efficiently advanced through individual case settings. (*See also* Case Management Order for the B3 Bundle, Rec. Doc. 26924 (attached as Exhibit B)). Finally, and as discussed above, the Court finds that the cases subject to this Order should be transferred to other districts pursuant to 28 U.S.C. § 1404(a).

Accordingly,

1.   **IT IS ORDERED** that the 26 cases listed on the attached Exhibit A are hereby **SEVERED** and **DECONSOLIDATED** from MDL 2179. All future filings for these severed cases shall be filed in the respective individual dockets, not in the

MDL 2179 master docket (No. 10-md-2179), and will use the caption for the individual case, not the MDL 2179 caption.

2.    **IT IS FURTHER ORDERED** that the pending Motions to Transfer Venue (Rec. Docs. 26929, 26930, 26931, 26932, 26961, 26987) are **GRANTED**, and the 26 cases listed on the attached Exhibit A are **TRANSFERRED** to the district courts identified therein.

3.    **IT IS FURTHER ORDERED** that the stay imposed by this Court's pretrial orders in MDL 2179 in a case listed on the attached Exhibit A shall be deemed lifted when the Clerk of Court actually transfers that case to another district in accordance with this Order.

4.    **IT IS FURTHER ORDERED** that, notwithstanding the stay of proceedings, if any plaintiff whose case is listed on the attached Exhibit A has not already served the defendants with a summons and a copy of the complaint as contemplated in Federal Rule of Civil Procedure 4, the plaintiff shall promptly do so.

5.    **IT IS FURTHER ORDERED** that following transfer of a case on the attached Exhibit A, and in accordance with the Court's Case Management Order for the B3 Bundle of February 23, 2021 (Rec. Doc. 26924 ¶ 3)—a copy of which is attached as Exhibit B—issues that pertain solely to punitive damages (hereinafter, "Punitive Damages Issues") are **BIFURCATED** from all other issues in the case and **STAYED**, and there will be no discovery, motion practice, or other litigation respecting a Punitive Damages Issue until the plaintiff in the case is adjudged entitled to compensatory damages on the plaintiff's claim. The provisions of this

14

paragraph shall apply unless expressly altered or superseded by the judge to whom the case is transferred.

6.     **IT IS FURTHER ORDERED** that following transfer of a case on the attached Exhibit A, and in accordance with the Court's Case Management Order for the B3 Bundle issued on February 23, 2021 (Rec. Doc. 26924 ¶ 4), the transferee judge will issue a scheduling order setting forth deadlines for further discovery, motion practice, pretrial conference, trial, etc., which will govern that case (subject to the provisions of above paragraph no. 5, unless expressly altered or superseded by the transferee judge).

7.     **IT IS FURTHER ORDERED** that the Clerk of Court shall file a copy of this order in the MDL 2179 master docket, no. 10-md-2179, and in the individual dockets of the cases listed on the attached Exhibit A.

8.     The parties previously filed in the MDL master docket a Joint Omnibus Designation of Record for the B3 Cases identifying those parts of the the MDL 2179 master docket that are relevant to many or all of the cases in the B3 bundle. ("Joint Designation of Record," Rec. Doc. 26821).[7] **IT IS FURTHER ORDERED** that the Clerk of Court shall create an appendix ("Appendix") to the Joint Designation of Record that contains hyperlinks to the documents listed in the Joint Designation of Record. The Clerk of Court shall file both the Joint Designation of Record and the Appendix in the individual dockets of the cases listed on the attached Exhibit A.

---

[7] The Fitzgerald Plaintiffs' objection (Rec. Doc. 26822) to the Joint Designation of Record is hereby overruled.

9.      **IT IS FURTHER ORDERED** that once the Clerk of Court files the Joint Designation of Record and Appendix into the individual docket of a case as contemplated in paragraph 8, the documents identified in the Joint Designation of Record shall be deemed a part of the record of that case. No party need file the Joint Designation of Record or the documents identified therein into the docket of an individual case. The Court's previous instruction to the contrary (*see* Rec. Doc. 26784) is vacated.

10.     **IT IS FURTHER ORDERED** that the parties to each of the cases listed on the attached Exhibit A may jointly designate any additional parts of the MDL master docket or any other docket associated with MDL 2179 (*e.g.*, No. 10-8888) that are specifically relevant to the severed case and which were not included in the Joint Designation of Record ("Supplemental Joint Designation of Record"). Unless ordered otherwise by the undersigned or the transferee judge, the Supplemental Joint Designation shall be filed within 60 days of the date the last defendant in a severed case is served or, if all defendants have already been served, within 60 days of the case's re-allotment pursuant to this Order.

New Orleans, Louisiana, this 1st day of April, 2021.

UNITED STATES DISTRICT JUDGE

**Notes to Clerk:**
**1. File in the MDL master docket (10-md-2179) and in each case listed on the attached Exhibit A.**
**2. Mail a copy of this order to Michael Helmholtz (No. 17-2932), who is *pro se*.**

16

EXHIBIT A

**26 "B3" Cases Severed from MDL 2179 and Transferred to the Districts Identified Below**

Southern District of Texas (*See* Rec. Doc. 26932)

| Title | Case No. | Venue |
|---|---|---|
| Rivers v. BP Exploration & Production, Inc. et al | 20-cv-01092 | S.D. Tex. |

Southern District of Mississippi (*See* Rec. Docs. 26929, 26987, 26938, 26992)

| Title | Case No. | Venue |
|---|---|---|
| Costello v. BP Exploration & Production, Inc. et al | 20-cv-01980 | S.D. Miss. |
| Bradford v. BP Exploration & Production, Inc. et al | 20-cv-03316 | S.D. Miss. |
| Crosby v. BP Exploration & Production, Inc. et al | 20-cv-03330 | S.D. Miss. |
| Vickers v. Knight's Marine & Industrial Services, Inc. | 13-cv-00456 | S.D. Miss. [Note: the Court recommends that the S.D. Miss. consolidate 13-cv-00456 with 13-cv-00304] |
| Vickers v.  BP Exploration & Production Inc., et al. | 13-cv-00304 | S.D. Miss. [Note: the Court recommends that the S.D. Miss. consolidate 13-cv-00304 with 13-cv-00456] |

Southern District of Alabama (*See* Rec. Docs. 26931, 26961)

| Title | Case No. | Venue |
|---|---|---|
| Pritchett v. BP American Production Co., et al | 17-cv-03231 | S.D. Ala. |
| Collier v. BP Exploration & Production, Inc. et al | 18-cv-13928 | S.D. Ala. |
| Eaton v. BP Exploration & Production, Inc. et al | 19-cv-12694 | S.D. Ala. |
| Smith v. BP Exploration & Production, Inc. et al | 20-cv-01995 | S.D. Ala. |
| Langley v. BP Exploration & Production, Inc. et al | 20-cv-02439 | S.D. Ala. |

| Title | Case No. | Venue |
|---|---|---|
| Wilson v. BP Exploration & Production, Inc. et al | 20-cv-02489 | S.D. Ala. |
| Hoffman v. BP Exploration & Production, Inc. et al | 20-cv-02935 | S.D. Ala. |
| McDaniel v. BP Exploration & Production, Inc. et al | 20-cv-03166 | S.D. Ala. |
| McFadden v. BP Exploration & Production, Inc. et al | 20-cv-03284 | S.D. Ala. |
| Benton Jr. v. BP Exploration & Production, Inc. et al | 20-cv-03309 | S.D. Ala. |
| Weaver v. BP Exploration & Production, Inc. et al | 20-cv-03319 | S.D. Ala. |
| Cummins v. BP Exploration & Production, Inc. et al | 20-cv-03467 | S.D. Ala. |
| Edwards v. BP Exploration & Production, Inc. et al | 20-cv-03475 | S.D. Ala. |

Northern District of Florida (*See* Rec. Docs. 26930, 26921)

| Title | Case No. | Venue |
|---|---|---|
| Adams v. BP Exploration & Production, Inc. et al | 18-cv-08694 | N.D. Fla. |
| Enfinger v. BP Exploration & Production, Inc. et al | 18-cv-13926 | N.D. Fla. |
| Mock v. BP Exploration & Production, Inc. et al | 18-cv-13924 | N.D. Fla. |
| Frassetti v. BP Exploration & Production, Inc. et al | 20-cv-03303 | N.D. Fla. |
| Turner v. BP Exploration & Production, Inc. et al | 20-cv-03311 | N.D. Fla. |
| Young v. BP Exploration & Production, Inc. et al | 18-cv-09900 | N.D. Fla. |
| Helmholtz v. BP Exploration & Production, Inc. et al. | 17-cv-02932 | N.D. Fla. |

EXHIBIT B

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * | MDL 2179 SECTION: J(2) |
| Applies to: *All Cases in the B3 Pleading Bundle* | * * | JUDGE BARBIER MAG. JUDGE CURRAULT |

## CASE MANAGEMENT ORDER FOR THE B3 BUNDLE

This multidistrict litigation ("MDL") arose from the blowout, explosions, and fire on the mobile offshore drilling unit DEEPWATER HORIZON on April 20, 2010, and the massive oil spill that resulted in the Gulf of Mexico. Early on, the Court organized the various types of claims into "pleading bundles." (*See* PTO 11, Rec. Doc. 569; PTO 25, Rec. Doc. 983). Relevant here is the "B3 bundle," which consists of claims for personal injury and wrongful death due to exposure to oil and/or other chemicals used during the oil spill response (e.g., dispersant).[1] "B3 plaintiff/claim/case" refers to a plaintiff, claim, or case in this bundle. Approximately 810 of the 839 cases remaining in the MDL are in the B3 bundle.[2]

On November 17, 2020, the Court held a status conference to discuss future case management for the B3 bundle. (*See* 11/17/20 Minute Entry, Rec. Doc. 26784; Transcript, Rec. Doc. 26788). After hearing counsels' arguments—and having

---

[1] While all of the remaining B3 cases assert chemical exposure claims, approximately 60 also allege a non-exposure injury (e.g., slip and fall while performing cleanup work). (*See* 8/28/19 Minute Entry at 1, Rec. Doc. 25994).

[2] Most of the B3 cases contain one plaintiff. A relative few contain multiple plaintiffs, such as when spouses and their children are joined in a single case. Consequently, the number of remaining B3 plaintiffs, as opposed to B3 cases, is around 870.

studied the parties' written proposals submitted in advance of the conference—the Court announced its plan for the B3 cases: The B3 cases will be severed from the MDL and either redistributed among the judges of this court or transferred to another district for further proceedings. Prior to severance, each B3 case will be bifurcated such that issues relating solely to punitive damages will be stayed and not litigated until after the plaintiff establishes entitlement to compensatory damages.

This Case Management Order bifurcates the B3 cases as contemplated. The operative language appears near the end of this document. Immediately below the Court explains its reasons for severing the B3 cases from the MDL and bifurcating the issue of punitive damages. A forthcoming order will actually sever the B3 cases from the MDL.

This Case Management Order draws from the Court's extensive experience with the Back-End Litigation Option ("BELO") cases filed pursuant to the *Deepwater Horizon* Medical Benefits Class Action Settlement Agreement ("Medical Settlement" or "Settlement," Rec. Doc. 6427-1). The Medical Settlement is a class action settlement that resolved (or attempted to resolve) many chemical exposure claims that arose from the oil spill and response.[3] Under the Settlement, class members gave up their right to pursue through litigation claims for conditions or illnesses that were diagnosed on or before April 16, 2012.[4] (*See* Medical Settlement § XVI). Claims based

---

[3] The B3 plaintiffs either opted out of the Medical Settlement or were excluded from the class definition.

[4] Class members could submit these claims to the Settlement's Claims Administrator, who paid them in accordance with the Settlement's "Specified Physical Conditions" matrix. The matrix sets forth the conditions that are eligible for compensation, the required proof that the class member must submit, and the available compensation amounts. (*See* Medical Settlement § VI & Ex. 8).

on conditions that were diagnosed after April 16, 2012—known as "Later-Manifested Physical Conditions" ("LMPC")—generally were not released by the Settlement. Class members could pursue a claim for LMPC by filing a BELO lawsuit in accordance with the Medical Settlement's BELO provisions. (*See* Medical Settlement § VIII).

Over 4,700 BELO cases have been filed to date.[5] The Settlement requires that these cases be filed in this Court, although they may be transferred to another venue later. (Medical Settlement § VIII(G)(1)(c)). The Court adopted special case management procedures (collectively, "the BELO Initial Proceedings CMO") to handle the BELO cases. (*See* Rec. Docs. 140909, 25738). The BELO Initial Proceedings CMO required that all BELO cases initially be assigned to section J (the undersigned) and division 1 (originally Magistrate Judge Wilkinson (now retired), later Magistrate Judge Currault). BELO plaintiffs had to fill out a Plaintiff Profile Form and produce certain documents (e.g., medical records) within 90 days of filing the BELO lawsuit. BELO plaintiffs who repeatedly failed to comply with this requirement were dismissed.[6] Those who complied were either transferred to another district or re-allotted among one of the judges of this Court for further proceedings and, if necessary, trial.[7] At this point, the BELO Initial Proceedings CMO ended. The newly-assigned judge was free adopt whatever case management plan he or she

---

[5] Most BELO cases were filed in 2018 and 2019. New BELO cases continue to trickle in, but nowhere near the amount that were filed in 2018-19.
[6] Around 1,100 BELO cases were dismissed for this reason.
[7] Around 2,400 BELO cases were transferred to another venue/district for further proceedings, while approximately 1,200 remained in this district.

deemed appropriate. Many judges treated the BELO cases like any other case—they simply set pretrial deadlines and trial dates for each BELO case; BELO cases were not consolidated. This approach kept the BELO cases moving. Today, only around 600 BELO cases remain pending across all districts.

BELO cases and the B3 cases are similar in several important respects. Both allege personal injuries or wrongful death due to exposure to oil or other chemicals used during the oil spill response. Furthermore, both BELO plaintiffs and B3 plaintiffs must prove that the legal cause of the claimed injury or illness is exposure to oil or other chemicals used during the response. (*See* Medical Settlement § VIII(G)(3)(a)). Also, pretrial orders in this MDL required B3 plaintiffs to provide information and documents similar to what was required of the BELO plaintiffs under the BELO Initial Proceedings CMO.[8] In other words, the existing B3 cases are in roughly the same state, procedurally speaking, as a typical BELO case just before it is re-allotted within this court or transferred to another for further proceedings.

B3 and BELO cases are not entirely alike, of course, but the few differences that exist are not so great as to persuade the Court to deviate from the well-worn path made by the BELO cases. Notably, experience has shown that causation is a critical element—if not *the* critical element—in BELO cases,[9] and therefore will likely

---

[8] Pretrial Order No. 66 required B3 plaintiffs to complete a Particularized Statement of Claim, which is similar to the Plaintiff Profile Form required in BELO cases. (Rec. Doc. 24282). Pretrial Order No. 68 required B3 plaintiffs to produce medical records and other documents. (Rec. Docs. 26070, 26077).

[9] *See, e.g.*, *McGill v. BP Expl. & Prod., Inc.*, 830 F. App'x 430, 434 (5th Cir. 2020) (affirming dismissal on summary judgment because the BELO plaintiff "failed to offer the evidence necessary to prove legal causation per the [Medical Settlement] under any plausible causation standard. He does not put forward any non-speculative evidence that Corexit and oil exposure cause the types of illnesses he suffers from."); *In re Deepwater Horizon Belo Cases*, No. 19-963, 2020 WL 6689212, at *16 (N.D. Fla. Nov. 4, 2020) (dismissing multiple BELO lawsuits because "absent a qualified expert to testify

be the make-or-break issue for many B3 cases as well. Additionally, the issue of causation in these toxic tort cases will require an individualized inquiry. This counsels in favor of severing the B3 cases from the MDL so the parties can litigate this crucial issue.

The possibility of punitive damages is a notable difference between the B3 and BELO cases. The Medical Settlement expressly prohibits BELO plaintiffs from recovering punitive damages—only compensatory damages are available. (Medical Settlement § VIII(G)(2)(b)-(c)). The B3 plaintiffs are not so restrained. Some have argued that this difference means that the B3 cases should be handled differently than the BELO cases, as the availability of punitive damages raises certain issues that should be dealt with on a global basis while the B3 cases are still consolidated in the MDL. The Court's view, however, is that punitive damages are the proverbial tail on the dog; they should not dictate the case management process.

There is a general rule that punitive damages are unavailable unless the party seeking them has sustained actual damage. *See, e.g.*, Richard C. Tenney, Annotation, *Sufficiency of Showing of Actual Damages to Support Award of Punitive Damages—Modern Cases*, 40 A.L.R. 4th 11 § 2(a) (1985). As explained, proving causation will be a key hurdle for the B3 plaintiffs. If a B3 plaintiff cannot prove this element, she will

---

regarding general causation, Plaintiffs cannot survive summary judgment"); *Garcia-Maradiaga v. BP Expl. & Prod. Inc.*, No. 18-11850, <u>2020 WL 491183</u>, at *3 (E.D. La. Jan. 30, 2020) (Ashe, J.) (dismissing BELO case on summary judgment where plaintiff failed to produce an expert report on causation, explaining, "Expert testimony is required to establish causation in toxic-tort cases where scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden of proof." (internal quotations and brackets omitted)); *Torres v. BP Expl. & Prod. Inc.*, No. 18-12652, <u>2020 WL 2197919</u> (E.D. La. May 6, 2020) (Barbier, J.) (same).

not be entitled to any damages, compensatory or punitive. Considering that there are around 810 B3 cases, the sensible approach is to require the parties to focus on litigating issues that bear on whether a B3 plaintiff is entitled to compensatory damages, and put aside issues that solely relate to punitive damages. Once a B3 plaintiff proves her entitlement to compensatory damages, then and only then should that plaintiff then be allowed to litigate issues concerning punitive damages. Bifurcating the B3 cases in this manner will help to keep each case streamlined and focused on what appears to be the major issues: causation and compensatory damages. In other words, after bifurcation the B3 cases should more or less resemble the BELO cases following the BELO Initial Proceedings CMO.[10]

◆ ◆ ◆

---

[10] Additionally, some of the Court's past rulings in the MDL should narrow the issues in the B3 cases. *See, e.g., In re Oil Spill by the Oil Rig Deepwater Horizon*, 21 F. Supp. 3d 657, 746-47 (E.D. La. 2014) (finding BP liable under general maritime law tort for the oil spill); *id.* at 752 (finding that Transocean's and Halliburton's contractual indemnities and releases are valid and enforceable against BP); *Winkler v. BP Expl. & Prod., Inc.*, 205 F. supp. 3d 820, (E.D. La. 2016) (rejecting BP's argument that it is not liable to oystermen whose vessel struck "orphaned anchors" left over from the oil spill response even though the Federal On-Scene Coordinator ("FOSC") determined that the anchors should not be removed; explaining that the Clean Water Act reflects Congress' intent that "responsible parties" (as defined under OPA) would be liable for damages that result from actions directed by the FOSC in response to an oil spill); *In re Oil Spill by the Oil Rig Deepwater Horizon*, 2016 WL 614690 (E.D. La. Feb. 16, 2016) *and* 2016 WL 4091416, at *11 (E.D. La. Aug. 2, 2016) (dismissing all B3 claims against certain "Clean-Up Responder Defendants," except for Nathan Fitzgerald's and Joseph Brown's claims against DRC Emergency Services, LLC); *In re Oil Spill by the Oil Rig Deepwater Horizon*, 2012 WL 5960192, at *21 (E.D. La. Nov. 28, 2012) (dismissing B3 claims asserted against Nalco in the B3 Master Complaint).

Accordingly, **IT IS ORDERED**:

1.  This Case Management Order ("CMO") applies to all cases in the B3 bundle (described above) presently consolidated with MDL 2179.[11]

2.  This CMO shall take effect in an individual B3 case once that case is severed from MDL 2179,[12] and it shall remain in effect unless <u>expressly</u> altered or superseded by the judge assigned to the case following severance.

3.  Issues in a B3 case that pertain solely to punitive damages (hereinafter, "Punitive Damages Issues") are BIFURCATED from all other issues in the B3 case and STAYED, and there will be no discovery, motion practice, or other litigation respecting a Punitive Damages Issue until the plaintiff in that case is adjudged entitled to compensatory damages on the plaintiff's B3 claim.

4.  Following severance from the MDL and either re-allotment within this district or transfer to another district, as applicable, the newly-assigned judge will issue a scheduling order setting forth deadlines for further discovery, motion practice, pretrial conference, trial, etc., which will govern the B3 case <u>subject</u> to the

---

[11] Except that this CMO does not apply to the 3 declaratory actions by United Sates Environmental Services, LLC and its related entities, Nos. 17- 3370, 17-3382, 17-3388. (*See* 11/17/20 Minute Entry at 3, Rec. <u>Doc. 26784</u>).

[12] The B3 cases will be severed from the MDL in a separate and forthcoming order.

provisions of this CMO (unless <u>expressly</u> altered or superseded by the newly-assigned judge).

5. **<u>Future B3 Cases</u>**: Any B3 case filed in this Court <u>after</u> the issuance of this CMO ("Future B3 Case") shall be consolidated with MDL 2179, and the plaintiff shall comply with the requirements of PTO 63 (Rec. <u>Doc. 22295</u>), PTO 66 (Rec. <u>Doc. 24282</u>), and PTO 68 (26070, 26077) within 90 days of the date the Future B3 Case is filed.[13] The parties will then follow the procedure set forth in the First Amended BELO Cases Initial Proceeding Case Management Order No. 2 (Rec. <u>Doc. 25738</u>).[14] Once the Future B3 Case is severed from the MDL and either re-allotted within this district or transferred to another district, paragraphs 3 and 4 above (bifurcating and staying Punitive Damages Issues) shall take effect unless <u>expressly</u> altered or superseded by the newly-assigned judge.

---

[13] BP shall similarly comply with its production obligations under PTO 68 within 90 days of the date the Future B3 Case is filed.

[14] For example, if the plaintiff in a Future B3 Case timely complies with PTOs 63, 66, and 68, then the parties to that case will file a venue stipulation within 30 days of compliance, and the Magistrate Judge will sever that Future B3 Case from the MDL and either transfer or re-allot it per the parties' stipulation. If the plaintiff in a Future B3 Case does not timely comply PTOs 63, 66, and 68, then the parties and the Court shall follow the procedure outlined in paragraphs 2-5 in First Amended BELO Cases Initial Proceedings Case Management Order No. 2 (Rec. <u>Doc. 25738</u>).

New Orleans, Louisiana, this 23rd day of February, 2021.

_____
United States District Judge

The "Note to Clerk" has been redacted to avoid possible confusion.