## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | MDL 2179 |
| | SECTION: J |
| This Document Relates to: No. 12-970 | JUDGE BARBIER |
| | MAG. JUDGE CURRAULT |

_____/

### OBJECTION TO PROPOSED ORDER
**[Regarding the Court Supervised Settlement Program and the Economic
and Property Damages Settlement Agreement]**

Plaintiff, Brian J. Donovan, on behalf of his business, himself, and those parties who are not able to assert their rights because they have been denied access to the courts, respectfully submits this objection, in accordance with the Court's Order of December 10, 2020 [Rec. Doc. 26811], to this Honorable Court's entry of the proposed order [Rec. Doc. 26811-1] that would initiate the closure and winddown of the Court Supervised Settlement Program ("CSSP") for the reasons set out herein.

## LEGAL BACKGROUND

### I. The Multidistrict Litigation Statute (28 U.S.C. § 1407)

In 1968, Congress enacted the Multidistrict Litigation Statute (28 U.S.C. § 1407), the statute to which the United States Judicial Panel on Multidistrict Litigation ("JPML") owes its existence. The multidistrict litigation ("MDL") statute provides, in pertinent part, "When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district *for coordinated or consolidated pretrial proceedings*. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be *for the convenience of*

*parties and witnesses and will promote the just and efficient conduct of such actions*. Each action

so transferred ***shall be remanded*** by the panel at or before the conclusion of such pretrial

proceedings to the district from which it was transferred unless it shall have been previously

terminated." (Emphasis added).

## II.  The Oil Pollution Act of 1990 (33 U.S.C. § 2702)

### A. The Text of the OPA Statute

OPA is a *strict liability* statute. In order to recover damages, a claimant merely needs

to show that his or her damages "resulted from" the oil spill.

> OPA provides,
> "Each responsible party for a vessel or a facility from which oil is discharged, or which
> poses the substantial threat of a discharge of oil, into or upon the navigable waters or
> adjoining shorelines or the exclusive economic zone is liable for the removal costs and
> damages that result from such incident." 33 U.S.C. § 2702(a).
>
> The damages referred to in 33 U.S.C. § 2702(a) include, but are not limited to:
> "Damages equal to the loss of profits or impairment of earning capacity due to the injury,
> destruction, or loss of real property, personal property, or natural resources, which ***shall***
> be recoverable by any claimant." 33 U.S.C. § 2702(b)(2)(E) (Emphasis added).
>
> "Payment or settlement of a claim for interim, short-term damages representing less
> than the full amount of damages to which the claimant ultimately may be entitled ***shall***
> ***not*** preclude recovery by the claimant for damages not reflected in the paid or settled
> partial claim." 33 U.S.C. § 2705(a) (Emphasis added); and
>
> "Payment of such a claim [i.e. payment to a claimant for interim, short-term damages
> representing less than the full amount of damages to which the claimant ultimately may
> be entitled] ***shall not*** foreclose a claimant's right to recovery of all damages to which the
> claimant otherwise is entitled under this Act or under any other law."
> 33 U.S.C. §§ 2715(b)(1) and (2) (Emphasis added).

Use of "shall" and "may" in statutes also mirrors common usage; ordinarily "shall" is

mandatory and "may" is permissive. "The mandatory 'shall'….normally creates an obligation

impervious to judicial discretion." *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523

U.S. 26, 35 (1998).

-2-

**B. The Legislative History of the OPA Statute**

OPA's legislative history is shot through with general statements indicative of congressional intent to ensure that all oil spill victims are fully compensated. 135 CONG. REC. H7959 (daily ed. Nov. 2, 1989) (statement of Rep. Tauzin) ("**ensure that all victims are fully compensated**"); 135 CONG. REC. H7964 (daily ed. Nov. 2, 1989) (statement of Rep. Hammerschmidt) ("**ensure that all justified claims for compensation are satisfied**"); 135 CONG. REC. H7969 (daily ed. Nov. 2, 1989) (statement of Rep. Dyson) ("**assurances that damages arising from spills will be completely compensated**"); 136 CONG. REC. H336 (daily ed. Feb. 7, 1990) (statement of Rep. Carper) ("**ensure that those people or those businesses that are damaged by these spills are fairly and adequately compensated**"); 136 CONG. REC. S7752 (daily ed. June 12, 1990) (statement of Sen. Mitchell) ("**ensure the fullest possible compensation of oil spill victims**"); S. REP. NO. 101–94, at 12 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722, 734. ("**These provisions are intended to provide compensation for a wide range of injuries and are not so narrowly focused as to prevent victims of an oil spill from receiving reasonable compensation**."); 135 CONG. REC. H7893 (daily ed. Nov. 1, 1989) (statement of Rep. Quillen) ("**full, fair, and swift compensation for everyone injured by oil spills.**").

### III.  Multidistrict Litigation is Unconstitutional

The settlement class action is always unconstitutional because it involves no litigation. A typical class action is legitimate because the interests of the plaintiffs and defendant are adverse. In that scenario, the monetary interests of class counsel, which are contingent on class recovery, are aligned with the absent class members' interest in maximum redress, incentivizing a

presentation of the issues that benefits both equally. These incentives break down in the context

of the non-adversarial settlement class action. Because class counsel seeks the same outcome as

the defendant, she has no reason to formulate her clients' arguments or destroy her opponent's

case. Particularly, she lacks incentive to present to the Court evidence that may shed unfavorable

light upon the non-adversarial agreement, even though that evidence may reveal critical details

about the effect of the settlement on absent class members.

### A. Where's the Case or Controversy in MDL?

Article III extends federal judicial power solely to the adjudication of a "case" or a

"controversy." "Case," in Article III, means a justiciable "action or suit," or an "argument."

"Controversy" means a disagreement or a dispute between parties as to the suit's preferred

outcome. Both a "case" and a "controversy" require an adversarial suit. For a suit to be

justiciable, according to the U.S. Supreme Court, the parties must maintain "adverse legal

interests" throughout, and their dispute must be "definite and concrete." The Fifth Circuit has

held that Article III plainly "requires that the parties be truly adverse."

On the most basic analytical level, the unconstitutionality of the settlement class

action should be obvious, purely as a matter of textual construction. There is simply no rational

means of defining the terms "case" or "controversy" to include a proceeding in which, from the

outset, nothing is disputed and the parties are in complete agreement. Moreover, from both

historical and doctrinal perspectives, U.S. Supreme Court decisions could not be more certain

that Article III is satisfied only when the parties are truly "adverse" to one another, which, at the

time the relevant proceeding is undertaken, they are not in the case of the settlement class

action.

-4-

**B. Collusion**

The term "collusion," in the class action context, is used to refer to a secret, unethical agreement between the named plaintiffs and defendant. For purposes of Article III's adverseness requirement, however, the term has a far broader meaning. It includes any suit in which, from the outset, the parties are in agreement as to the outcome. Article III proceeds on the assumption that a showing of a lack of adverseness at the outset of a suit automatically establishes the improperly collusive nature of the suit. Article III adopts lack of adverseness as an ex ante, categorical basis on which to find inadequate representation of the interests of future litigants who are similarly situated.

The settlement class's fundamental constitutional defect is that *all* settlement classes - not merely those involving unethical attorney behavior - are, by definition, non-adversarial. An adversarial dispute cannot be said to exist at the time the class action proceeding begins. At that point, the litigants differ over absolutely nothing. They have agreed on the terms of both certification and settlement prior to the filing of the class proceeding. In fact, the only conceivable reason that class counsel in this position files a complaint and request for certification with the Court, rather than simply embodying the terms of their private agreement in an enforceable contract, is to bind absent class members to a settlement negotiated in their absence."

**C. Where's the Due Process in MDL?**

Each claimant in an MDL has an individually held, constitutionally protected property right at stake. Those rights are guaranteed by the Fifth Amendment, which protects life, liberty, and property against deprivation absent due process of law. The "property" at stake in an MDL is the "chose in action." This historically established concept refers to the right to sue to enforce a

-5-

legally protected claim, even the unlitigated right to sue. Under the Fifth Amendment, then, MDL claimants cannot be deprived of their rights to a chose in action without due process of law.

The so-called "day-in-court ideal" is at the heart of constitutionally guaranteed procedural due process, according to the U.S. Supreme Court, and is central to the American conception of the adversarial model of litigation. The right to one's own day-in-court means a right to meaningful control over litigation strategy and goals, including choice of legal representative. It requires a full and fair opportunity to litigate, which means a full opportunity to prepare one's own arguments and evidence. At base, meaningful participation in the adjudicatory process - the day-in-court ideal - includes, in the words of a respected scholar, "the right to observe, to make arguments, to present evidence, and to be informed of the reasons for a decision."

One key way that litigants control their day-in-court is by selecting their attorneys. This is often the first expression of their autonomy: they seek the advice of counsel when they consider whether to even file a claim. Permitting litigants to choose their representatives is central to providing a full and fair opportunity to litigate. The foundations of due process dictate that that choice belongs to the parties alone. But claimants forced into an MDL are deprived of that essential choice. By virtue of his case's transfer into the MDL - a move that the plaintiff cannot prevent - his chosen lawyer will invariably not be the one actually representing his interests in the course of all the important MDL. Rather, the lawyers on the court-appointed steering committee will take over, and they will do so without the protective assurances of either there adequacy, their good faith, or the extent to which the interests of the absent litigants truly

-6-

overlap or any other controls.

In addition to the fact that appointed counsel are selected by the Court, rather than by the individuals they represent, MDL claimants do not enjoy a traditional attorney-client relationship with the members of the court-appointed steering committee. The small group of attorneys chosen for leadership roles is charged with representing all of the possibly thousands of plaintiffs, whose cases have facts that are often only loosely linked.

In consolidated proceedings, the attorney's loyalty divides not only between clients, but also between clients and self-interest. Compensation for attorneys who work on behalf of the group depends upon the value of every plaintiff's settlement or judgment. As a result, PSC attorneys may push hard for settlement as opposed to remand, prefer a quick settlement in favor of a protracted discovery period, or advocate for settlement terms that may not be particularly favorable to some or many plaintiffs. The First Circuit has acknowledged existence of this "inherent conflict of interest" between the PSC and individual plaintiffs in mass-tort MDLs.

### IV.  The Aggregate Settlement Rule

The aggregate settlement rule ("ASR") governs global MDL settlements.

Courts have long recognized that lawyers may be subject to total or partial fee forfeiture as a sanction for serious violations of the ASR. *Plaintiff does not have to prove either causation or injury to be entitled to fee forfeiture* as a remedy for Defendants' breach of fiduciary duty.

The ASR is Rule 1.8(g) of the ABA *Model Rules of Professional Conduct* ("*Model Rules*"), and it states: "A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients….unless each client gives informed consent, in a writing signed by the client.

-7-

Informed consent to an aggregate settlement requires that each claimant be able to review the settlements of all other persons subject to the aggregate settlement or the formula by which the settlement will be divided among all claimants. Further, *informed consent requires that the total financial interest of claimants' counsel be disclosed to each claimant.*

In sum, Lead Counsel owe fiduciary duties to MDL 2179 Plaintiffs. A lawsuit based on a violation of the ASR can be brought as a breach of fiduciary duty claim; the plaintiff(s) need not show any economic loss from the attorney's breach in order to prevail; full or partial forfeiture of the fees that the attorney received from the former client is the remedy.

### V.    The Law of the Transferor Court Must be Applied to a Case That Has Been Transferred to MDL

When transfer results in a change of venue for purposes of MDL pretrial proceedings, the transferee judge generally must apply the substantive law of the transferor forum, including that forum's choice-of-law rules and appropriate state law. The Supreme Court held in *Van Dusen* and *Ferens* that the policies underlying the holdings of *Erie* and *Klaxon* mandated that the law, including the choice-of-law rules, of the transferor court, rather than those of the transferee court, must be applied to a case that has been transferred pursuant to 28 U.S.C. § 1404(a). *Ferens v. John Deere Co*., 494 U.S. 516, 532 (1990); *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964)."

### FACTUAL BACKGROUND

The MDL 2179 Court and Lead Counsel developed and facilitated an "Eight-Step" robust, unprecedented, and tremendously sophisticated fraudulent scheme to maximize judicial efficiency and maximize the compensation of Lead Counsel in exchange for limiting the liability of BP. The sole focus of the MDL 2179 Court and Lead Counsel is on judicial efficiency and economy without any consideration for justice, accountability or transparency.

-8-

## I. The Primary Purpose of the Appointment of Lead Counsel in MDL 2179 Is Judicial Efficiency

Stephen J. Herman explains in a Loyola Law Review article (64 Loy. L. Rev. 1) which he authored in 2018: (1) the primary purpose of the appointment of Liaison Counsel and PSC members in MDL 2179 is to further the interests of judicial efficiency and economy [while maximizing their compensation]; and (2) their primary fiduciary duty is to Judge Barbier. Herman states "the notion that some 'fiduciary duty' extends to individually retained counsel, in my view, *goes too far*." (Emphasis added).

## II. The "Black Hole"

It is the worst-kept secret in civil procedure that the MDL is really a dispositive, not pretrial, action. MDL transferee judges, unlike judges even in class actions, do not generally manage to trial or even to the possibility of trial. The MDL judge in many ways acts more like a modern administrator than the judge the FRCP envisions, not least because, like agencies, the particular MDL judges are chosen for these cases specifically for their expertise in practical administration.

Since 2010, cases transferred by the JPML to MDL 2179 have been sentenced to the proverbial "Black Hole" where they are automatically and indefinitely stayed. MDL has frequently been described as a "Black Hole" because transfer is typically a one-way ticket. Indeed, the JPML has abdicated its proper role by providing no recourse to remedy or to exit an MDL "Black Hole." *See, e.g.*, Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323, 2330 (2008) ("Indeed, the strongest criticism of the traditional MDL process is that the centralized forum can resemble a 'black hole,' into which cases are transferred never to be heard from again.").

Judge Patrick E. Higginbotham further explains, "The disconnect between the power

of the transferee judge and the power that the judge exercises rests on a statute that authorizes

only the transfer of cases to that judge for purposes of pretrial proceeding with return to their

filing homes, as the U.S. Supreme Court made clear in *Lexecon, Inc. v. Milberg Weiss Bershad*

*Hynes & Lerach*. The rest of the operation finds its footing in some form of consent and

assertions of implied and inherent authority sometimes on little more than empty air."

Writing in dissent for the Ninth Circuit, Judge Alex Kozinski presaged the U.S. Supreme

Court's ruling in *Lexecon* by characterizing self-transfer as "a remarkable power grab by federal

judges," because the practice exceeded the authority Congress granted to transferee judges.

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach* (*In re American Continental*

*Corp./Lincoln Sav. & Loan Sec. Litig.*), 102 F.3d 1524, 1540 (9th Cir. 1996) (Kozinski, J.,

dissenting) (arguing that "the language itself [of 1407] is clear as sunlight"), rev'd, 118 S. Ct.

956 (1998).

### III.  Based on Little More Than Empty Air, the MDL 2179 Court Held That OPA Does Not Impose a Duty on the Responsible Party to Settle Plaintiffs' Claims

As explained *supra*, OPA is a strict liability statute. In order to recover damages, a

claimant merely needs to show that his or her damages "resulted from" the oil spill.

"OPA applies of its own force, because that act governs, *inter alia*, private claims

for property damage and economic loss resulting from a discharge of oil in navigable waters. *See*

33 U.S.C. § 2702(a), (b)(2)(B), (b)(2)(C), (b)(2)(E)."
    The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in
    the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 3830 at 11, August 26, 2011).

Nevertheless, Judge Barbier, in his Order and Reasons (Rec. Doc. 26571 at 8), held:

"**Plaintiffs urge that OPA imposed on the GCCF a duty to settle the Donovan
Plaintiffs' claims. OPA contains no such duty**. OPA is intended "to promote settlement
and avoid litigation." How does it do this? As mentioned, OPA's presentment procedure

-10-

requires a claimant to give the responsible party the opportunity (90 days) to settle her claim before she may sue in court. OPA also provides that interest typically begins to accrue following the 30th day after the claim is presented, which incentivizes early settlement. **But there is a wide chasm between a process that "promotes" settlement (what Congress enacted) and one that "requires" settlements (what the Donovan Plaintiffs apparently wish Congress enacted)**….OPA provides no private cause of action to a claimant for the mere fact that the responsible party (or a third party engaged to fulfill the responsible party's obligations, as occurred here) failed to settle a claim."

The precedent established by MDL 2179 ensures that the offshore oil and gas industry will never be held strictly liable for damages resulting from an oil well blowout in the Gulf of Mexico.

Although the durability of Judge Barbier's uniquely creative reasoning in regard OPA is questionable, the precedent established by MDL 2179 is clear: A "Responsible Party" under OPA may now enter into a contract with a politically well-connected third party "Fund Administrator," e.g., Kenneth R. Feinberg and Feinberg Rozen, LLP, d/b/a GCCF. This third party "Administrator / Straw Person," *directly and excessively compensated by the party responsible for the oil well blowout incident*, may totally disregard OPA, operate the claims process of the responsible party as fraudulently and negligently as it desires for the sole purpose of limiting the liability of, and providing closure to, the responsible party, and the third party "Administrator / Straw Person" shall never be held accountable for its tortious acts.

Rather than allege claims under OPA and the Outer Continental Shelf Lands Act ("OCSLA") (which governs the MDL 2179 personal injury and wrongful death actions and borrows the law of the adjacent state as surrogate federal law), the "cooperative" Herman and Roy made the unfathomable decision to allege claims under a hodgepodge of statutes. In the "B1" Master Complaint, Herman states, "The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiffs hereby

-11-

designate this case as an admiralty or maritime case, and request a non-jury trial, pursuant to Rule 9(h)."

Filing of the "B1" Master Complaint as an admiralty or maritime case artfully circumvented the OPA. By doing so, Herman assisted Judge Barbier in expeditiously being able to erroneously and incomprehensibly find, "While OPA does not specifically address the use of waivers and releases by Responsible Parties, the statute also does not clearly prohibit it. In fact, as the Court has recognized in this Order, one of the goals of OPA was to allow for speedy and efficient recovery by victims of an oil spill."

As a result of this finding by Judge Barbier, approximately 220,000 Kenneth R. Feinberg victims who or that executed a "Release and Covenant Not to Sue" in exchange for a one-time final payment ($5,000 for individuals and $25,000 for businesses) were excluded from the settlement class action. There is no evidence that these amounts even remotely represent adequate consideration to compensate claimants for the damages that claimants did or will suffer as a result of the BP oil well blowout.

Since Herman requested a non-jury trial pursuant to Rule 9(h) and alleged claims under general maritime law, rather than OPA and OCSLA, the MDL 2179 Court formulated a trial plan that dispensed with trial by jury and instead conducted a bench trial applying general maritime law.

Circumventing the OPA also allowed the settlement to limit a claimant's recovery of damages by geographic bounds, pertain solely to certain business activities, and require a heightened and vague proof of causation between his or her damages and the BP oil well blowout incident.

-12-

## IV.  MDL 2179 is Unconstitutional

MDL 2179, which employs a victims' compensation fund on the frontend and a

settlement class action on the backend, involves no case or controversy and infringes individual

claimants' procedural due process rights.

### A.  Where's the Case or Controversy in MDL 2179?
"Centralization may also facilitate closer coordination with Kenneth Feinberg's

administration of the BP compensation fund."
The Honorable John G. Heyburn II, Chairman, Panel on Multidistrict Litigation, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Transfer Order, August 10, 2010).

"In February 2011, [only 4 months after I appointed my pre-selected cooperative

attorneys to the PSC] negotiations began in earnest for the proposed Economic and

Property Damages Settlement. Talks intensified in July 2011, occurring on an almost-daily

basis."
The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 7138 at 3, December 21, 2012).

In a settlement class action, an agreement to resolve the dispute is reached by the parties

involved prior to the district court's ruling on a motion to certify the class. In MDL 2179, Lead

Counsel and BP are not adversaries. They are cohorts expeditiously seeking judicial efficiency

and the common objectives of closure, limited liability, and profit.

### B.  Collusion in MDL 2179
As explained above, Article III proceeds on the assumption that a showing of a lack of

adverseness at the outset of a suit automatically establishes the improperly collusive nature of the

suit. In MDL 2179, from the outset, the parties are in agreement as to the outcome.

### C.  Where's the Due Process in MDL 2179?
"All motions, requests for discovery or other pre-trial proceedings with respect to

-13-

plaintiffs shall be initiated by and/or coordinated through the Plaintiff Steering Committee ("PSC"), *to be filed by and through Plaintiffs' Liaison Counsel*. If the PSC does not support the motion, discovery or other requested proceeding, then the moving or requesting plaintiff shall be permitted to file such motion or request, but shall include a certificate of non-support."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 569 at 13, October 19, 2010).

"….all pending and future motions, including the Motions to Remand, are continued without date unless a motion is specifically excepted from the continuance by the Court."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 676 at 1, November 5, 2010).

"Any individual plaintiff who is a named plaintiff in a case that falls within Pleading Bundle B1, B3, D1, or D2, or any combination thereof, is deemed to be a plaintiff in the applicable Master Complaint(s)….All individual petitions or complaints that fall within Pleading Bundles B1, B3, D1, or D2, whether pre-existing or filed hereafter, are stayed until further order of the Court."

> The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 983 at 2, 4, January 12, 2011).

When a transferee judge appoints a steering committee, he does so at his discretion, outside the strictures of any Federal Rule, or statute, or adversary proceeding. Appointment to the steering committee comes after nothing more than a judge-designated period of nominations and written objections. The process fails to guarantee that the appointed representatives will zealously advocate on behalf of absent litigants in the same way that their hired representative presumably would have. This is certainly the case in MDL 2179.

In MDL 2179, individual litigants, for all practical purposes, lose a substantial degree of control over the procedural fate of their claims. MDL 2179 severely undermines the day-in-

court ideal by depriving individual litigants of their opportunity to protect their interests through the litigation process. MDL 2179 plaintiffs in no sense meaningfully participate in, much less control, their day-in-court. Nor are there any assurances that those in charge of the litigation are adequately representing the interest of the individual claimants. At the most basic level, MDL 2179 Plaintiffs are not given a meaningful opportunity to present their case(s), as demanded by the Due Process Clause.

### V. The Fairness Hearing

On November 10, 2014, Judge Barbier states,

> "....as the parties were approaching the final fairness hearing in November 2012, there was *a concerted effort by the parties and claims facility* to process a substantial number of high value claims in order to demonstrate that the settlement program was working as intended…BP and Class Counsel were aware of the push to resolve claims, *as was the Court*. Although some of these claims were for clients of PSC members, according to Mr. Juneau over 60% of the claims were for clients of non-PSC attorneys….While the Settlement Agreement in general terms provides that claims will be processed in the order in which they are received….there is no evidence that the Claims Administrator acted improperly in this regard."
>
> > The Honorable Carl J. Barbier, *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, on April 20, 2010 (Rec. Doc. 13635 at 3, November 10, 2014).

In short, the parties secretly conspired to inflate the amount of compensation received by some plaintiffs (just prior to the "fairness" hearing) in order to induce the remaining plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate." Here, the objective was to keep as many of the remaining claimants/plaintiffs in the settlement class action as possible. Opt-outs were seriously frowned upon. The settlement class action was the only game in town. Take it or leave it! Fraudulent inducement is not a procedure which is well within a Court's discretion when it conducts a fairness hearing.

At the fairness hearing, Judge Barbier limited oral presentations by individual objectors

-15-

(or their counsel, as applicable) to not more than 3 minutes each. In sum, the purpose of the fairness hearing was to allow the cooperative dealmakers to argue in favor of approval of the Economic and Property Damages Settlement. Claims Administrator Patrick Juneau and Michael Juneau also presented on the glorious status of the settlement and the virtually non-existent settlement opt-outs.

## VI. Lead Counsel Breached Their Fiduciary and Ethical Duties

### A. The MDL 2179 Court and Lead Counsel Refused to Be Fully Transparent and Refused to Be Held Accountable

As explained *supra*, the aggregate settlement rule ("ASR") governs global MDL settlements. Lead Counsel breached their fiduciary duties to Plaintiffs by violating the ASR.

On November 13, 2017, Plaintiff Donovan filed a motion on behalf of his clients wherein Plaintiff Donovan requested the MDL 2179 Court to place on the public record the total amount and source of compensation, *from all sources*, paid to all members of the PSC and the total amount and source of compensation paid to the legal experts, Special Masters, and Claims Administrator Patrick Juneau. This was neither a Motion to Compel nor an Objection. This was merely a motion by the plaintiff, on behalf of himself and his clients, to request the MDL 2179 Court to conduct itself in a fully transparent manner.

In the motion, Donovan pointed out to the Court that the total compensation paid to Herman, Roy, and the 17 PSC attorneys and their law firms, is guesstimated to be $3.035 billion. It is beyond cavil that a reasonable, objective observer would not conclude that this amount is out of all proportion to the value of the professional services rendered. Donovan further pointed out to the Court that a narrow focus on judicial efficiency cannot allow the circumvention of the core democratic premises of representation, transparency, and accountability.

-16-

On March 6, 2018, the MDL 2179 Court issued an Order wherein the Honorable

Carl J. Barbier succinctly states, "Before the Court is a 'Motion to Request this Court to Place on

the Public Record the Total Amount and Source of Compensation, From All Sources, Paid to All

Members of the PSC, et al.' IT IS ORDERED that the Motion (Rec. Doc. 23677) is DENIED.

New Orleans, Louisiana, this 6th day of March, 2018." Obviously, Judge Barbier does not

believe that the plaintiffs in MDL 2179 have a right to know how much compensation the

attorneys allegedly representing their interests are receiving.


### VII. The MDL 2179 Court Improperly Applies Louisiana Law Rather Than the Choice-of-Law Rules of the State in Which the Transferor Court Sits

On February 26, 2020, Plaintiffs filed a Motion for Clarification (Rec. Doc. 26344)

moving the Court to enter an order clarifying whether the Honorable MDL 2179 Court applies

the choice-of-law rules of the state in which the transferor court sits. On March 2, 2020, the

Honorable MDL 2179 Court issued an Order (Rec. Doc. 26357) denying the Motion for

Clarification. In sum, Plaintiffs were left in the dark in regard to the choice-of-law rules applied

by the Honorable MDL 2179 Court.

> Judge Barbier, in his Order and Reasons (Rec. Doc. 28, Filed 03/27/20), held:
> "….the Court's own research reveals that **Florida's choice of law regime applies the law of the state that has most this significant relationship to the parties and the occurrence**. *See Merkle v. Robinson*, 737 So.2d 540, 542 (Fla. 1999). Donovan is an attorney in Florida. Herman is an attorney in Louisiana. No contract exists between them. Donovan's claims concern actions Herman allegedly took in his role as a member of the PSC and as Plaintiffs' Co-Liaison Counsel, leadership positions in an MDL that is centralized in Louisiana. Herman's appointments came from this Court, which sits in Louisiana. (Rec. Docs. 110, 506). **All attorneys who appear in this MDL, including both Donovan and Herman, are subject to this Court's disciplinary authority** (Rec. Doc. 7812) and Louisiana's Rules of Professional Conduct. *See In Re: Deepwater Horizon*, 824 F.3d 571 (5th Cir. 2015) (affirming this Court's decision to sanction attorneys in MDL 2179 for violations of the Louisiana Rules of Professional Conduct); *see also* Rec. Doc. 26089 at 8. **Considering these factors, the Court holds that Louisiana has the most significant relationship to the parties and the events giving**

-17-

rise to this dispute. **As a result, Donovan's [twelve] claims are untimely under La. R.S. 9:5605(a)**....Herman cites Louisiana case law indicating that no fiduciary duty exists between these parties. (Rec. Doc. 26269-1 at 2 (citing *Scheffler v. Adams & Reese*, 950 So. 2d 641, 652-53 (La. 2007)). As explained above, **Louisiana law governs this dispute**." (Rec. Doc. 28, Filed 03/27/20).

As explained above, in its March 27, 2020 Order, the MDL 2179 Court's uniquely creative reasoning allows the Court to circumvent the U.S. Supreme Court's holdings in *Van Dusen* and *Ferens* and hold that **Louisiana law, rather than Florida law, governs this dispute.** This allows Judge Barbier to conveniently and unfathomably find, "As a result, Donovan's [**twelve**] claims are untimely under La. R.S. 9:5605(a)."

### VIII.  The MDL 2179 Court and Lead Counsel Did Not Hold BP Accountable

#### A.  The BP Victims' Compensation Fund
In the transfer order for MDL 2179, the JPML states, "Centralization may also facilitate closer coordination with Kenneth Feinberg's administration of the BP compensation fund." The MDL 2179 Court and Lead Counsel did not have to rely solely on a settlement class action to limit BP's liability. From the very beginning, they also had a victims' compensation fund, sanctioned by the JPML, to eliminate hundreds of thousands of MDL 2179 Claimants.

Kenneth R. Feinberg, masquerading as a "Fund Administrator," was employed by BP to limit BP's liability. In violation of the OPA, but with the approval of the MDL 2179 Court and Lead Counsel, Feinberg's approach to determining claimant eligibility was driven by two factors: (1) loss location; and (2) claimant business type.

In MDL 2179, Feinberg used a "Delay, Deny, Defend" tactic against legitimate BP oil well blowout victims. This tactic, commonly used by unscrupulous insurance companies, is as follows: "Delay payment, starve claimant, and then offer the economically and emotionally-

-18-

stressed claimant a miniscule percent of all damages, including future damages, to which the

claimant is entitled. If the financially ruined claimant rejects the settlement offer, he or she may

sue." The ultimate objective of Feinberg's "Delay, Deny, Defend" tactic was to limit BP's

liability by obtaining a signed "Release and Covenant Not to Sue" from as many BP oil

well blowout victims as possible. *Feinberg's "Release and Covenant Not to Sue" requirement*

*violates OPA, State contract law, and is contrary to public policy*.

### B. The Economic and Property Damages Settlement Class Action

The BP oil well blowout of April 2010 resulted in the largest environmental disaster

in the history of the United States. An estimated 5.0 million barrels of crude oil gushed into the

Gulf of Mexico. Judge Barbier correctly states, "The long term effects [of the BP oil well

blowout] on the environment and fisheries may not be known for many years." Nevertheless, in

order to limit BP's liability, one tactic employed by MDL 2179 was to limit the compensation

period to 2010. Incredibly, Judge Barbier found, and Herman and Roy agreed, that limiting the

compensation period to 2010 is reasonable. Judge Barbier explains, "Certain objectors complain

that the Economic Damage Claim Frameworks are unfair because they do not compensate

persons who did not begin suffering losses until 2011. Yet this provision is reasonable for three

reasons: (i) the Macondo well ceased flowing in July 2010; (ii) there is evidence that by late

2010, Gulf Coast tourism had returned to or surpassed 2009 levels; and (iii) as to claims by

individuals and businesses in charter fishing, seafood processing, or other businesses relying on

access to Gulf waters, nearly all federal and state waters were reopened for commercial fishing

by November 2010. *Thus, extending compensation to 2011 would cover losses not likely caused*

*by the spill*."

In discussing the causation requirements for BEL claims, Judge Barbier explains,

-19-

"*losses that continued after the spill are likely to be due to factors other than the spill*."

The MDL 2179 Court and Lead Counsel breached their fiduciary and ethical duties to Plaintiffs by reassuring BP oil well blowout Plaintiffs that the settlement claims program's Risk Transfer Premium ("RTP") enhances the compensation amount for, among other things, certain claimants whose damages could be recurring, to account for that risk of future damages.

Lead Counsel further breached their fiduciary and ethical duties to Plaintiffs by supporting the Court's finding that, "RTP payments are meant to compensate class members for pre-judgment interest, the risk of oil returning, consequential damages, inconvenience, aggravation, the risk of future loss, the lost value of money, compensation for emotional distress, liquidation of legal disputes about punitive damages, and other factors." RTP payments are simply magical.

### IX.  Lead Counsel Retained Highly Compensated "Thought Leaders" to Deceptively Promote the Proposed Settlement

Herman, Roy, and the members of the MDL 2179 PSC tendered either jointly or on their own behalf four "experts" in the law of class actions: Professors Coffee, Issacharoff, Klonoff, and Miller. The "unbiased" opinions of these four individuals are included in the Court's Order granting final approval of the economic and property damages settlement agreement in order to induce MDL 2179 Plaintiffs into believing that the proposed settlement is "fair, reasonable, and adequate." If the MDL 2179 economic and property damages settlement agreement is fair, reasonable, adequate, and free of collusion, it would be clearly obvious to anyone who reads the agreement. There would be no need to retain "four experts in the law of class actions" to try to lend a thin veneer of respectability to an otherwise abhorrent, one-sided, collusive agreement.

Given these opinions, the victims of the BP oil well blowout are led to believe that

Herman, Roy, and the seventeen MDL 2179 PSC members are zealously advocating on their

behalf. Justice is most assuredly just around the corner.

## X.  Lead Counsel Excessively Compensated Themselves by "Quadruple Dipping"

Herman, Roy, and the seventeen MDL 2179 PSC members, "quadruple dip." Herman,

Roy, and the seventeen MDL 2179 PSC members, are compensated from at least the following

four sources of revenue.

(a) Six percent (6%) of the gross monetary settlements, judgments or other payments made on or after December 30, 2011 through June 3, 2012 to any other plaintiff or claimant-in-limitation;

(b) BP has agreed to pay any award for common benefit and/or Rule 23(h) attorneys' fees, as determined by the Court, up to $600 million;

(c) Contingent fees from clients directly "represented" by Herman, Roy, and the seventeen MDL 2179 PSC members; and

(d) Co-counsel fees received by Herman, Roy, and the seventeen MDL 2179 PSC members for serving as co-counsel to non-member firms of the PSC.

### A.  Compensation Paid to Kenneth R. Feinberg by BP
The following is an overview of the compensation BP paid to Kenneth R. Feinberg.

| | |
|---|---|
| June 15, 2010 to January 15, 2011 | $  5,950,000 |
| January 16, 2011 to April 15, 2012 | $18,750,000 |
| **Total Compensation Paid to Feinberg by BP** | **$24,700,000** |

### B.  Compensation Paid to BP Oil Well Blowout Victims by Kenneth R. Feinberg (GCCF Program Statistics)
The GCCF status report of March 7, 2012 indicates that a total of 574,379 unique

claimants filed claims with the GCCF during the period from approximately August 23, 2010 to

March 7, 2012. The GCCF paid only 221,358 of these claimants. The total amount paid was

-21-

$6,079,922,450.47. In sum, Kenneth R. Feinberg denied payment to approximately **61.46%** of the claimants who filed claims. The compensation paid to BP oil well blowout victims during the transition period was approximately $405,000,000.00.

The status report further indicates that the GCCF paid a total of 230,370 claimants who filed claims with the GCCF during the "Phase II" period. Of these, 195,109 were either Quick Pay or Full Review Final payments; only 35,261 were Interim payments. In sum, Feinberg forced 84.68% of the claimants to sign a "Release and Covenant Not to Sue" in which the claimant agreed not to sue BP and all other potentially liable parties.

### C. The Deepwater Horizon Claims Center (DHCC Program Statistics)

The DHCC status report of March 29, 2017 indicates that a total of 389,457 claims were submitted to the DHCC during the period from approximately June 4, 2012 to March 29, 2017. The DHCC paid only 155,652 of these claims. The total amount paid was $10,070,688,009.00. In sum, the DHCC denied payment to approximately **60.03%** of the submitted claims.

### D. Calculation of Compensation Paid to Herman, Roy and the 17 MDL 2179 PSC Members

The following is an overview of the compensation paid to Herman, Roy, and the seventeen MDL 2179 PSC members and their law firms.

| | |
|---|---|
| Common Benefit Fees | $597.354 million |
| Contingent Fee (25%) | $   2.438 billion |
| Co-counsel Fee | Unknown |
| Hold-Backs | Unknown |
| **Total Compensation Paid to Herman, Roy, et al.** | **$   3.035 billion** |

Herman, Roy, and the seventeen MDL 2179 PSC members were able to grossly overcompensate themselves in exchange for limiting the liability of BP.

## SUMMARY

The following facts are illustrative of how the MDL 2179 Court and Lead Counsel limited BP's liability in exchange for maximizing judicial efficiency and maximizing the compensation of Lead Counsel.

(a) Unbeknownst to the victims of the BP oil well blowout, Herman, Roy, and BP made the business decision to have BP pay a total amount of **$20 billion** to compensate all the BP oil well blowout victims in the settlement class action.

(b) The Feinberg-administered victims' compensation fund denied payment to approximately **61.46%** of the claimants who filed claims.

(c) Approximately **220,000** Feinberg-administered victims' compensation fund claimants who executed a "Release and Covenant Not to Sue" in exchange for a one-time miniscule final payment (**$5,000** for individuals and **$25,000** for businesses) were subsequently excluded by Judge Barbier, Herman, and Roy from the settlement class action.

(d) The compensation paid to Kenneth R. Feinberg by BP from June 15, 2010 to April 15, 2012 was approximately **$24,700,000**.

(e) Lead Counsel and BP fraudulently induced the MDL 2179 plaintiffs not to opt-out of the settlement.

(f) Patrick Juneau denied payment to approximately **60.03%** of the claims submitted to the Deepwater Horizon Claims Center (**"DHCC"**). The compensation paid to Patrick Juneau is unknown but ongoing.

(g) Lead Counsel and BP negotiated a Medical Benefits Class Action Settlement Agreement which Judge Barbier approved on January 11, 2013. In order to limit BP's liability, the MDL 2179 Court and Lead Counsel knowingly ignored the fact that public policy dictates that a toxic tort is a *strict liability* tort. Seventy-eight percent (**78%**) of Specified Physical Condition ("SPC") claims submitted to Garretson received either a "Request for Additional Information" or a "Notice of Defect." In the end, only 20% of claimants received any compensation. These claimants were forced to accept the lowest payment of **$1,300** because they could no longer wait for the money to cover their medical expenses.

(h) As part of the overall strategy to limit BP's liability, Judge Barbier knowingly failed to hold BP fully accountable in regard to the Clean Water Act ("CWA") civil penalty. Judge Barbier saved BP approximately **$4.30 billion** by finding that only 4.0 million barrels of oil, rather than 5.0 million barrels of oil proposed by the United States, exited the reservoir.

-23-

(i) On October 5, 2015, the DOJ released the following statement: "….This global settlement resolves the governments' civil claims under the Clean Water Act and natural resources damage claims under the Oil Pollution Act, as well as economic damage claims of the five Gulf states and local governments. Taken together this global resolution of civil claims is worth $20.8 billion." The DOJ failed to point out that **BP is able to deduct $15.3 billion of this $20.8 billion on its U.S. tax return**. In short, this "global settlement" requires U.S. taxpayers to pay $15.3 billion and BP is only required to pay $5.5 billion. BP also wrote off the cost of its $32 billion cleanup effort after the spill, costing U.S. taxpayers roughly $10 billion.

(j) The total compensation paid to Herman, Roy, and the seventeen members of the MDL 2179 PSC was **$3.035 billion**.

(k) The MDL 2179 Court **improperly applies Louisiana law rather than the choice-of-law rules of the state in which the transferor court sits**.

(l) In its July 2, 2020 Order, the MDL 2179 Court held "**OPA does not impose on the Responsible Party a duty to settle Plaintiffs' claims**…."

For the reasons given above, Plaintiff respectfully requests the Court <u>not</u> to enter the proposed order [Rec. Doc. 26811-1] that would initiate the closure and winddown of the CSSP. Reason for the Honorable MDL 2179 Court not to enter the proposed order applies with particular force here, (a) where victims of the BP oil well blowout have not been "fully compensated;" (b) where the parties' use of our federal justice system as a sanctuary for the purpose of carrying out their own massive, nefarious scheme in the name of "judicially-efficient" multidistrict litigation is ongoing; and (c) where the potential harm to the public's perception of the judicial process is especially acute because of the large number of plaintiffs in MDL 2179.

Plaintiff further respectfully requests the Court to consider the following law review article and two complaints.

Stephen J. Herman, *Duties Owed by Appointed Counsel to MDL Litigants Whom They Do Not Formally Represent*, 64 Loy. L. Rev. 1, 8 - 12 (2018).

*Donovan v. Herman*, 2:19-cv-12014-CJB-JCW

*Donovan v. Barbier, et al*., FLM/8:20-cv-02598

DATED: January 7, 2021                                          Respectfully submitted,

                                                                **/s/ Brian J. Donovan**
                                                                Brian J. Donovan
                                                                Florida Bar No. 143900
                                                                The Donovan Law Group, PLLC
                                                                3102 Seaway Court, Suite 304
                                                                Tampa, FL 33629
                                                                Tel: (352)328-7469
                                                                BrianJDonovan@verizon.net


## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been served on all counsel by electronically

uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and

that the foregoing was electronically filed with the Clerk of Court of the United States District

Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a

notice of electronic filing in accordance with the procedures established in MDL 2179, on this

7th day of January, 2021.

                                                                **/s/ Brian J. Donovan_____**
                                                                Brian J. Donovan
                                                                Florida Bar No. 143900
                                                                3102 Seaway Court, Suite 304
                                                                Tampa, FL 33629
                                                                Tel: (352)328-7469
                                                                BrianJDonovan@verizon.net